UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,

                 Plaintiff,

        v.

MARTIN SHKRELI and EVAN GREEBEL,

                Defendants.

--------------------------------------------------------x

ECF Case

No. 15-cr-00637 (KAM)

**ORAL ARGUMENT REQUESTED**


**MR. GREEBEL'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR
PROMPT DISCLOSURE OF *BRADY* MATERIALS**

# TABLE OF CONTENTS

Page

I.    Preliminary Statement..........................................................................................1

II.   Statement of Facts................................................................................................1

      A.    Our Prior Requests for *Brady* Information .............................................2

III.  Argument ...........................................................................................................4

      A.    Motion for Prompt Disclosure of *Brady* Materials .................................4

            1.    The Applicable Legal Standard .....................................................4

            2.    Production of Specific *Brady* Materials.......................................8

            3.    The Government Must Identify the Exculpatory Information
                  Within the Discovery ...................................................................19

      B.    Motion for Confirmation That the Government Has Searched the FBI's
            Files and Emails, and Sought *Brady* Materials from the SEC .............19

IV.   Conclusion ........................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Brady v. Maryland,*
  373 U.S. 83 (1963).................................................................................................1, 5

*Cone v. Bell,*
  556 U.S. 449 (2009)..................................................................................................12

*DiSimone v. Phillips,*
  461 F.3d 181 (2d Cir. 2006).................................................................................7, 17

*Giglio v. United States,*
  405 U.S. 150 (1972).............................................................................................2, 5, 19

*Kyles v. Whitley,*
  514 U.S. 419 (1995)............................................................................................5, 7, 19

*Leka v. Portuondo,*
  257 F.3d 89 (2d Cir. 2001)..............................................................................6, 8, 10, 17

*Mendez v. Artuz,*
  303 F.3d 411 (2d Cir. 2002)......................................................................................12

*Ostrer v. United States,*
  577 F.2d 782 (2d Cir. 1978).......................................................................................13

*Singh v. Greene,*
  No. 10-CV-4444 (JFB), 2011 WL 2009309 (E.D.N.Y. May 20, 2011)....................9

*Smith v. Cain,*
  132 S. Ct. 627 (2012)............................................................................................5, 19

*Strickler v. Green,*
  527 U.S. 263 (1999).....................................................................................................4

*United States v. Bagley,*
  473 U.S. 667 (1985).............................................................................................2, 4, 5

*United States v. Barret,*
  824 F. Supp. 2d 419 (E.D.N.Y. 2011) ........................................................................6

*United States v. Cody,*
  722 F.2d 1052 (2d Cir. 1983)....................................................................................19

*United States v. Coppa*,
   267 F.3d 132 (2d Cir. 2002)...............................................................................6

*United States v. Espinal*,
   96 F. Supp. 3d 53 (S.D.N.Y. 2015)..........................................................5, 9, 10

*United States v. Gil*,
   297 F.3d 93 (2d Cir. 2002)...................................................................6, 7, 8, 19

*United States v. Gupta*,
   848 F. Supp. 2d 491 (S.D.N.Y. 2012)..............................................................20

*United States v. Hsia*,
   24 F. Supp. 2d 14 (D.D.C. 1998).......................................................................8

*United States v. Jackson*,
   345 F.3d 59 (2d Cir. 2003).................................................................................6

*United States v. JB Tax Professional Services, Inc.*,
   No. 13-127, 2014 WL 2533773 (E.D. La. June 5, 2014)....................................20

*United States v. Kahale*,
   No. 09-cr-159 (KAM), 2010 WL 456860 (E.D.N.Y. Feb. 3, 2010), *aff'd sub
   nom*, United States v. Graham, 477 F. App'x 818 (2d Cir. 2012).........................11

*United States v. Leung*,
   40 F.3d 577 (2d Cir. 1994)...............................................................................11

*United States v. Lino*,
   No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001).........................18

*United States v. Mahaffy*,
   693 F.3d 113 (2d Cir. 2012)..................................................................4, 12, 20

*United States v. Rittweger*,
   524 F.3d 171 (2d Cir. 2008)..........................................................................7, 8

*United States v. Rivas*,
   377 F.3d 195 (2d Cir. 2004)..........................................................................4, 12

*United States v. Rodriguez*,
   496 F.3d 221 (2d Cir. 2007)..........................................................................5, 10

*United States v. Thomas*,
   981 F. Supp. 2d 229 (S.D.N.Y 2013).................................................................8

*United States v. Tillem*,
   906 F.2d 814 (2d Cir. 1990)...............................................................................5

*United States v. Triumph Capital Group, Inc.*,
  544 F.3d 149 (2d Cir. 2008)...................................................................................13, 19

*United States v. Upton*,
  856 F. Supp. 727 (E.D.N.Y. 1994) ......................................................................5, 20

*Youngblood v. West Virginia*,
  547 U.S. 867 (2006)...................................................................................................12

**Statutes**

18 U.S.C. § 3500...........................................................................................................8

**Other Authorities**

United States Attorney's Criminal Resource Manual §165..........................................7

Defendant Evan Greebel respectfully submits this memorandum of law in support of his Motion for Prompt Disclosure of *Brady* Materials.  Mr. Greebel respectfully requests oral argument on this motion.

## I.        Preliminary Statement

Mr. Greebel moves for the prompt production of *Brady* materials.  *Brady v. Maryland*, 373 U.S. 83 (1963).  Based on Mr. Greebel's July 12, 2016 letter asking the government for such materials, the government's July 13, 2016 letter response, and the position taken by the government during the July 14, 2016 court conference, it is readily apparent that the government has taken too narrow a view of what constitutes *Brady* and when it is required to disclose such information.  The government cannot and should not take the position that witness statements and other evidence contradicting the government's theories of its case—for example, the allegation that Retrophin's consulting agreements were "sham" transactions—do not fall within *Brady* and will be disclosed at a later date with other Jencks Act materials.  *Brady* trumps the Jencks Act and requires prompt disclosure of exculpatory material so that the defense has sufficient time to investigate the information revealed therein.[1]

## II.        Statement of Facts

Mr. Greebel incorporates the Statement of Facts contained in Mr. Greebel's Memorandum of Law in Support of his Motion for a Bill of Particulars, and sets forth below those additional facts pertinent to the instant motion.

---

[1] We do not allege at this time that the government has violated *Brady*.  However, in light of the government's narrow interpretation, we make this motion for the prompt production of materials that we respectfully believe fall within *Brady* and are necessary and important for Mr. Greebel's defense.

## A.      Our Prior Requests for *Brady* Information

On or about July 12, 2016, counsel for Mr. Greebel sent a letter to the government

requesting any and all materials in the possession, custody, and control of the government, the

FBI, and the SEC pursuant to *Brady*, and its progeny, including *Giglio v. United States*, 405 U.S.

150 (1972) and *United States v. Bagley*, 473 U.S. 667 (1985), and the Fifth and Sixth

Amendments to the United States Constitution.  *See* Declaration of Lisa H. Rubin ("Rubin

Decl."), Ex. A.  In the letter, we also identified a non-exhaustive list of thirty-one examples of

information that we consider to fall within *Brady*.

Just one day later, the government produced certain information that unquestionably

contradicts one of the government's core theories of its case and yet the government maintained

that its disclosures were made "in an abundance of caution," not pursuant to *Brady*.  Specifically,

in its letter dated July 13, 2016, the government disclosed for the first time that three individuals,

whom the government accuses of signing "sham" consulting agreements with Retrophin, "may

have information that is helpful to the defense in the above-referenced case."  Rubin Decl., Ex. B

at 1:[2]

> 1)  With respect to the first consultant, the government identified
>     documents produced in discovery reflecting "statements made by
>     and/or on behalf of [the first consultant] that he performed services as
>     a consultant for Retrophin in connection with his consulting agreement
>     with the company."  *Id.*  The government omitted that this consultant
>     had spoken with the government, and that this consultant apparently
>     made exculpatory statements to the government.  Rubin Decl., Ex. C
>     (July 14, 2016 Hearing Tr.) at 6:1-2.
>
> 2)  With respect to the second consultant, the government stated that
>     "[d]uring an initial interview with law enforcement, [the second
>     consultant] stated, in sum and substance, that he served [as] a 'life
>     coach' to defendant Shkreli and performed some consulting services

---

[2]   We have redacted the names of these consultants in this memorandum and the government's letter from this
public filing.

2

for Retrophin in connection with a consulting agreement" but that "[i]n subsequent interviews, [the second consultant] stated, in sum and substance, that he only signed the consulting agreement as a means to recover his investment in MSMB Healthcare, and that he did not provide any consulting services to Retrophin in connection with the agreement." Rubin Decl., Ex. B at 1. The government did not produce the exculpatory statements that the second consultant has made to the government.

3) With respect to the third consultant, the government stated that he "stated, in sum and substance, that he performed some consulting services for Retrophin in connection with a consulting agreement" but that "[i]n subsequent interviews, [the third consultant] admitted, in sum and substance, that he only signed a consulting agreement with Retrophin to recover his investment in Elea Capital, and that he did not provide any consulting services to Retrophin in connection with the agreement." *Id.* at 1–2. The government did not produce the exculpatory statements that the third consultant has made to the government.

Subsequently, at the July 14, 2016 conference, the government took the position that these materials did not fall within *Brady* and refused to produce the FBI reports and corresponding notes reflecting the statements that all three consultants made to the government on multiple occasions. *See* Rubin Decl., Ex. C at 6:1-2 ("I don't think the [g]overnment believes it's *Brady*"). During this conference, the Court stated: "I would just urge the government to please put them at ease, review the documents, and provide additional materials. If you have a sense that it may be *Brady* or exculpatory, err in favor of providing it." *Id.* at 16:8-11. The government then promised to "take a close look at all the 302s and reassess," and "[i]f there's something that even comes close to the line, we'll be happy to provide it." *Id.* at 16:12-14. Since the July 14 conference, however, the government has not produced any statements in whole, in part, or in substance relating to the three consultants who were the subject of the government's July 13, 2016 letter, or any other consultant or witness.

On or about July 13, 2016, the government also produced "for defendant Greebel a copy of defendant Shkreli's prior statements (Bates number SHKRELI000001-273, and previously produced to defendant Shkreli on December 22, 2015)."  Rubin Decl., Ex. B at 2.  Although the government apparently does not view this material as *Brady*, Mr. Greebel does.  The material contains statements by Mr. Shkreli expressing shock that Mr. Greebel would be charged, describing the government's decision to charge Mr. Greebel as "just bizarre," and stating that "the Evan dimension" proves Retrophin engendered the investigation and charges against Mr. Shkreli and Mr. Greebel.  Rubin Decl., Ex. D (video of FBI interview, dated December 17, 2015 with Mr. Shkreli) at 16:35 & Ex. E (certified transcript of same) at 14:20.  Mr. Shkreli's statements upon arrest contradict allegations in the indictment against Mr. Greebel.

### III.    Argument

**A.    Motion for Prompt Disclosure of *Brady* Materials**

**1.    The Applicable Legal Standard**

Under *Brady*, the government has a "broad duty" to disclose material information favorable to the defense in a timely manner prior to trial.  *Strickler v. Green*, 527 U.S. 263, 281 (1999).  *Brady* imposes an obligation on the prosecutors to provide any potentially exculpatory information that may directly, or indirectly, rebut the prosecution's case "to assist the defense in making its case," *Bagley*, 473 U.S. at 675 & n.6, even if that information also contains portions that are consistent with the government's theory.  *United States v. Mahaffy*, 693 F.3d 113, 130–33 (2d Cir. 2012).  In *Mahaffy*, for example, the Second Circuit vacated convictions where the government failed to produce SEC transcripts that contained both information consistent with the government's theory of the case and exculpatory information consistent with the defendant's theory of the case.  Similarly, in *United States v. Rivas*, 377 F.3d 195, 199–200 (2d Cir. 2004), the Second Circuit vacated the conviction where the government failed to disclose a statement by

a testifying witness that, though in some sense incriminating, also exculpated the defendant because it supported the defendant's theory of the case.

*Brady* does not demand "an open file policy," and *Brady* is not implicated "every time the government fails or chooses not to disclose evidence that might prove helpful to the defense," but "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles v. Whitley*, 514 U.S. 419, 436–38 (1995).  In *United States v. Espinal*, 96 F. Supp. 3d 53, 68 (S.D.N.Y. 2015), for example, Circuit Judge Denny Chin, sitting by designation in the district court, stated that "[m]erely providing the name of a witness who has said something exculpatory in the grand jury is not the equivalent of disclosing the exculpatory information."  At the same time, "mere speculation by a defendant that the government has not fulfilled its obligations under *Brady* [], is not enough to establish that the government has, in fact, failed to honor its discovery obligations." *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994).  And to the extent the government does not have the information requested, naturally the government is not obligated to disclose it. *Id.*; *United States v. Tillem*, 906 F.2d 814, 824 (2d Cir. 1990).

*Brady* and its progeny require the government to promptly provide any information tending to mitigate punishment, *Brady*, 373 U.S. at 89; any information which could be used to impeach significant prosecution witnesses, *Giglio*, 405 U.S. at 153–54 (1972); any information that reflects bias or incentives to lie, *see, e.g.*, *Bagley*, 473 U.S. at 683–84; and any prior inconsistent statements of potential government witnesses that could be material to the question of the defendant's guilt, *see, e.g.*, *Smith v. Cain*, 132 S. Ct. 627, 630 (2012).

The form and admissibility of the information are irrelevant.  The *Brady* obligation attaches to information known by prosecutors, regardless of whether notes were taken, *see, e.g.*,

*United States v. Rodriguez*, 496 F.3d 221, 225–26 (2d Cir. 2007) (non-memorialized oral statements are discoverable under *Brady*); regardless of whether the defendant is testifying or whether the statement is hearsay, *see, e.g.*, *United States v. Jackson*, 345 F.3d 59, 70–71 (2d Cir. 2003); and regardless of whether the information is admissible, as it could lead to additional discovery or could be used for impeachment, *see, e.g.*, *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).

   *Brady* also requires the timely disclosure of potentially exculpatory information, information that might impeach witnesses, information reflecting bias or incentives to lie, and any prior inconsistent statements of potential witnesses.  The government is not obligated under *Brady* to make disclosures upon defendant's demand, but the defendant must possess "*Brady* evidence in time for its effective use."  *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2002).  "[T]he opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought."  *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001).  Thus, while the government does not always have an obligation to "immediately disclose *Brady* or *Giglio* material simply upon request by defendant," early disclosure is appropriate "if the material warrants additional investigation by the defense." *United States v. Barret*, 824 F. Supp. 2d 419, 455 (E.D.N.Y. 2011) (ordering early disclosure of *Giglio* materials within 45 days of this Court's order because later disclosure "has great potential to disrupt the flow of trial"); *see also Leka*, 257 F.3d at 101 ("The limited *Brady* material disclosed to [defendant] could have led to specific exculpatory information only if the defense undertook further investigation").

   Unless there are compelling reasons for failing to disclose right away, *Brady* disclosures should not be made on the eve of trial.  In *Gil*, for example, the Second Circuit held that a

document that was "exculpatory and impeaching *Brady* material" and given to the defendant on the Friday before a Monday trial, was in effect suppressed within the meaning of *Brady* as it was buried in the midst of "five reams of paper labeled '3500 material.'"  297 F.3d at 101-06.  Here, there are no compelling reasons to delay disclosure of significant evidence consistent with Mr. Greebel's defense.  Even if certain information is Jencks Act material, in a contest between the timing mandated by the Jencks Act and by the due process clause, the government's due process obligations are controlling.  *See United States v. Rittweger*, 524 F.3d 171, 181 n.4 (2d Cir. 2008).  Indeed, according to the United States Department of Justice's January 4, 2010 memorandum, "Guidance for Prosecutors Regarding Criminal Discovery," "[e]xculpatory information, *regardless of whether the information is memorialized*, must be disclosed to the defendant reasonably promptly after discovery."  United States Attorney's Criminal Resource Manual §165 (emphasis added).

Moreover, even if the prosecutor is skeptical about the materiality of the *Brady* information, the government should disclose the information.  *See, e.g.*, *Rittweger*, 524 F.3d at 181 ("The fact that the government may have some evidence that a particular defendant is guilty does not negate the exculpatory nature of the testimony of a witness with knowledge that the defendant did not commit the crime as charged."); *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) ("[I]f there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it ….  To allow otherwise would be to appoint the fox as henhouse guard.").  Prosecutors should resolve doubtful questions in favor of disclosure "to preserve the criminal trial, as distinct from the prosecutor's private

deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles*, 514 U.S. at 440.

Finally, the government "cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013). At some point, such evidence is effectively unavailable to the defense, even if it has technically been produced. *See Gil*, 297 F.3d at 106 (finding *Brady* evidence unavailable when made as part of a large production on the eve of trial); *see also United States v. Hsia*, 24 F. Supp. 2d 14, 29–30 (D.D.C. 1998) ("The [g]overnment cannot meet its *Brady* obligations by providing . . . 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack").

### 2. Production of Specific *Brady* Materials

We respectfully submit that the government's interpretation of *Brady* and its progeny is far too narrow, and we ask the Court to require the government to make prompt production of the following categories of information:

#### a. FBI Reports and Notes of Consultant Statements to the Government

*Brady* and its progeny require the government to immediately produce the FBI reports and corresponding notes of the government's interviews of the three consultants (and any others) who said, in sum and substance, that their consulting agreements were not "sham" agreements.

While district courts cannot order early production of witness statements under the Jencks Act, 18 U.S.C. § 3500, production of witness statements that constitute *Brady* material should not be delayed to the time of the production of 3500 materials. As Justice Sonia Sotomayor stated when she served on the Second Circuit Court of Appeals: "Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power

of 18 U.S.C. § 3500." *Rittweger*, 524 F.3d at 181 n.4.  When the material is *Brady*, the "delayed disclosure of evidence tends to impair the opportunity of the defense to use it." *Leka*, 257 F.3d at 100–01 (finding *Brady* violation when potentially favorable witness testimony was disclosed late).

Indeed, in *Espinal*, 96 F. Supp. 3d at 68, Judge Chin rejected the government's contention that disclosure of the name of a witness and a summary of the exculpatory statements "in an abundance of caution" satisfied its obligations under *Brady*.  Specifically, Judge Chin stated:

> I have difficulty with the government's position.  The government has the ability to subpoena a witness and place him in the grand jury, where he must testify under oath.  A defendant does not have that power, and knowing the identity of a witness is a far cry from knowing what he said, under oath, in the grand jury.  Moreover, the witness may not be willing to speak to the defendant or defense counsel, and even if he is willing to talk, he may say something different from what he said in the grand jury.  Merely providing the name of a witness who has said something exculpatory in the grand jury is not the equivalent of disclosing the exculpatory information.

*Id.*  Judge Chin further held that the summaries of the witness statements provided by the government were not comprehensive and "belied the true extent of the exculpatory content" of the witnesses' statements.  *Id.* at 69.

In its July 13, 2016 disclosure that three consultants had informed the government that their agreements were not "sham" contracts and that they had provided, or intended to provide, services to Retrophin pursuant to the agreements, the government declined to produce the FBI reports and corresponding notes purporting to reflect those statements.  *See* Rubin Decl., Ex. B (government's July 13, 2016 discovery letter).  What these individuals said, and how they said it, to the government in defending their consulting agreements is absolutely essential to Mr. Greebel's defense.  *Brady* does not "require[] defense counsel priority access to witnesses."

9

*Singh v. Greene*, No. 10-CV-4444 (JFB), 2011 WL 2009309, at *23 (E.D.N.Y. May 20, 2011).
However, paraphrasing *Brady* statements in one or two sentences does not necessarily meet the
government's obligations; *Brady* information must be "sufficiently specific and complete to be
useful." *Rodriguez*, 496 F.3d at 226; *see also Leka*, 257 F.3d at 100–03 (finding *Brady* violation
where the government did not disclose sufficient details of a potential witness's knowledge nine
days before opening argument to permit the defense to make an intelligent determination about
how to "deploy scarce trial resources"); *Espinal*, 96 F. Supp. 3d at 68-69.

  In defending the validity of their consulting agreements with Retrophin, these three
consultants, for example, may have directed the government to specific services they provided,
to other potential witnesses who corroborate their defense of the agreements, and/or to attorneys
representing them who may have approved of the use of the consulting agreements. Disclosure
of these types of statements on the eve of trial will not give Mr. Greebel sufficient time to
investigate and unearth such evidence for presentation at trial. Further, what these individuals
said they told others, including, but not limited to Mr. Greebel, about their consulting agreements
with the company is critical to Mr. Greebel's defense. For example, if any of the consultants
defended their agreements to others, including but not limited to Mr. Greebel, such statements
would constitute *Brady* and should be immediately produced to Mr. Greebel.

  The government has not offered, and cannot offer, any compelling or reasonable rationale
for withholding the FBI reports and corresponding notes of the statements of these three
consultants. Delaying disclosure right up to the eleventh hour to maintain a tactical advantage is
not an appropriate position, particularly for the government whose duty is to justice and fairness
above all. Moreover, no rationale could justify delay of the production of *Brady* material in a
case as complicated as this one; a case that has required and still requires extraordinary amounts

of time to sift through millions of pages of documents in discovery; a case whose charges span multiple years and involve many different parties and entities; and a case that is far from typical in that the government has charged a law firm partner in connection with the work and advice that this attorney, among many others, provided to Retrophin and its executives.

In the alternative, we respectfully submit that the Court should review the FBI reports and the contemporaneous handwritten interview notes *in camera* to ensure that no *Brady* material has been excluded. While *in camera* review arises only in "rare circumstances," here review is appropriate because the defense "has made a specific request for identified documents" relating to critical exculpatory evidence. *United States v. Leung*, 40 F.3d 577, 582–83 & n.1 (2d Cir. 1994). Such review is necessary to "supplement the [g]overnment's assessment of materiality with the impartial view provided by the trial judge." *Leung*, 40 F.3d at 583; *see, e.g.*, *United States v. Kahale*, No. 09-cr-159 (KAM), 2010 WL 456860, at *4–5 (E.D.N.Y. Feb. 3, 2010), *aff'd sub nom*, *United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012). The risk of late disclosure of *Brady* material is too great to take when a person's liberty is at stake. Disclosure on June 19, 2017 at the final pretrial conference—just one week prior to trial—is insufficient time for the defense to take stock of the statements, and investigate them further (including, but not limited to, by following up on any evidence that the consultants proffered in support of the validity of the consulting agreements).

### b.    Evidence That Any Agreements at Issue Were Not "Shams"

Given that the government does not view statements made by consultants defending the validity of their agreements as *Brady* material, the government is construing *Brady* too narrowly and should be ordered to produce any and all evidence, including statements of any witnesses, contradicting the government's theory that any settlement agreements, consulting agreements, and/or share transfer agreements were fraudulent.

11

The government's position on *Brady* makes no sense.  As the Supreme Court has determined, information that "squarely contradict[s] the [government's] account of the incidents" is *Brady*.  *Youngblood v. West Virginia*, 547 U.S. 867, 868–70 (2006); *Mendez v. Artuz*, 303 F.3d 411, 413–14 (2d Cir. 2002) ("[I]nformation is exculpatory and thus favorable to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses." (internal citation omitted)); *see also Cone v. Bell*, 556 U.S. 449, 470 n.16 (2009) ("evidence . . .  consistent with" defendant's defense is *Brady*); *Mahaffy*, 693 F.3d at 130 (same); *Rivas*, 377 F.3d at 199 (same).  At the heart of the government's case against Mr. Greebel in Count Seven is the allegation that Mr. Greebel knew that the consulting agreements were "sham[s]," that no consulting services were performed or intended to be performed for Retrophin, and that Mr. Greebel knew that no consulting services had been or would be performed.  (Ind. ¶ 7c.)  Accordingly, any statements by consultants that, in fact, the agreements were real and services were either performed or intended to be performed would squarely contradict a central theory of the government's case and thus constitute *Brady*.  *See* Ex. B (government's July 13, 2016 discovery letter).

Thus, evidence in any form that *any* of the settlement agreements, consulting agreements, and/or share transfer agreements were legitimate, arose out of genuine threats to Retrophin, were entered into with the approval of Retrophin's Board of Directors, and/or were reasonably entered into based on the circumstances would undercut the government's allegation that they were fraudulent (and/or that Mr. Greebel believed them to be fraudulent) and must be produced promptly.  Likewise, any evidence that any of the contracting parties told anyone, including but not limited to the government, that, in sum and substance, the agreements were not "sham" contracts, that they had real claims against Retrophin leading to the settlement agreements, that

they had performed services for Retrophin pursuant to the consulting agreements, that they intended to perform services for Retrophin pursuant to the consulting agreements, and/or that they told Mr. Greebel, anyone at the Katten law firm, or any other third party that the agreements were not "sham" contracts, that they had real claims against Retrophin, that they had performed services, and/or that they intended to perform services would fall squarely within *Brady* and its progeny.  For example, if any consultant told Mr. Greebel and/or others, including the government, that he had provided or intended to provide services to Retrophin, then these statements would be powerful evidence that Mr. Greebel had every reason to believe that such consultant had provided or intended to provide services and that, moreover, such consulting agreement was not a "sham" contract at all.  *Cf. United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 163 (2d Cir. 2008) (finding undisclosed notes supporting defendant's version of events and impeaching government witness material constituted *Brady* material when government evidence was "far from overwhelming").

### c.   Evidence That Mr. Shkreli Lied to and/or Deceived Others

The government should produce any evidence that Mr. Shkreli lied to and/or deceived others including, but not limited to, Mr. Greebel.  That evidence would constitute *Brady* for Mr. Greebel and immediate production would be required to enable Mr. Greebel to investigate such evidence and potentially use it in his defense.

To be sure, "*Brady* requires only the disclosure of material information, not all evidence that might conceivably be of use to the defense."  *Ostrer v. United States*, 577 F.2d 782, 788 n.4 (2d Cir. 1978).  But evidence that Mr. Shkreli lied to and/or deceived others, including but not limited to counsel at Retrophin, counsel at one of the multiple law firms that provided legal services to Retrophin, Retrophin's Board of Directors, Retrophin's other executives, Retrophin's outside auditors, MSMB's investors, Elea Capital's investors, and/or Retrophin's investors,

would be exculpatory and material evidence for Mr. Greebel in at least three respects.  First, any evidence that Mr. Shkreli lied to and/or deceived Mr. Greebel may, depending on the circumstances, undermine the government's theory that there was an illegal agreement—or so-called "meeting of the minds"—between them as alleged in Counts Seven and Eight.  Second, any evidence that Mr. Shkreli lied to and/or deceived Mr. Greebel may undermine any claim that Mr. Shkreli relied on Mr. Greebel's advice.  Finally, any evidence that Mr. Shkreli lied to and/or deceived others—such as Retrophin's Board members, executives, outside auditors, and/or investors—may assist Mr. Greebel's defense.  For example, if the government has evidence that Mr. Shkreli made verbal statements to any members of Retrophin's Board of Directors that the alleged "sham" consulting agreements were for valid services, those statements should be produced to Mr. Greebel.  Those statements would constitute potentially exculpatory evidence that Mr. Greebel had every reason to believe that the consulting agreements were for valid services.

### d.    Evidence That Mr. Shkreli Did Not Follow Mr. Greebel's Counsel

Any evidence, including statements of witnesses or others, that Mr. Shkreli did not follow Mr. Greebel's counsel to the company, that Mr. Shkreli contradicted Mr. Greebel's advice to the company, that Mr. Shkreli criticized Mr. Greebel's counsel to the company, and/or that Mr. Greebel advised Mr. Shkreli not to take a certain course of action but Mr. Shkreli went ahead anyway would constitute *Brady*.  Such evidence would undermine the government's theory of prosecution that there was an understanding between Mr. Greebel, Mr. Shkreli, and others to misappropriate assets from Retrophin and/or make false and misleading statements to Retrophin's shareholders.

####    e.    Evidence That Mr. Shkreli Did Not Follow Advice of Other Counsel

Any evidence, including statements of witnesses or others, that Mr. Shkreli did not follow

the advice of other counsel working as in-house attorneys at Retrophin, or as outside counsel at

Katten and/or at any other law firm representing Retrophin, MSMB, and/or Elea Capital; that

Mr. Shkreli contradicted the advice of counsel that he received from others; that Mr. Shkreli

criticized the advice provided by any of these attorneys; and/or that Mr. Shkreli defied the advice

he received and proceeded against what he was told would constitute *Brady*.  Such evidence

would undermine, and potentially lead to the discovery of evidence that would further

undermine, the government's theory of prosecution that there was an understanding between Mr.

Greebel, Mr. Shkreli, and others to misappropriate assets from Retrophin and/or to make false

and misleading statements to Retrophin's shareholders.

####    f.    Any and All Statements by Mr. Shkreli to the Government That Have Not Yet Been Produced

There is reason to believe that the government has not produced all statements made by

Mr. Shkreli to the government during and after his arrest.  What has been produced appears to

reflect missing statements.  Specifically, on or about July 13, 2016, the government produced a

videotape of approximately 20 minutes in duration that shows Mr. Shkreli, who was handcuffed

to a railing in a room following his arrest, speaking with an FBI agent.  Early on, the videotape

reflects an FBI agent stating to Mr. Shkreli: "The reason why we're—because of the comments

you just made, you said you want to talk about the case while we're waiting.  So, I wanted to go

through this with you again."  Ex. D (Shkreli interview video) at 4:45 & Ex. E (Shkreli interview

transcript) at 3:15–19.  The FBI's reference to "the comments you just made" appear to reflect

that Mr. Shkreli made certain comments to the FBI before the videotape began, but such

statements do not appear to have been produced to Mr. Greebel.  Similarly, the FBI agent's

statement that "[s]o, I wanted to go through this with you again" suggests that the FBI had a discussion with Mr. Shkreli prior to that time, but such statements also do not appear to have been produced to Mr. Greebel.  Moreover, during Mr. Shkreli's discussion with the FBI agent, the FBI agent suddenly leaves the room, and the videotape abruptly ends.  At the time that the videotape stops, Mr. Shkreli remains handcuffed to a bar on the wall in the room and appears to be speaking.  Given the context, the absence of any statement by the FBI agent in the room or Mr. Shkreli that Mr. Shkreli would no longer be speaking, and that Mr. Shkreli appears to be speaking when the videotape ended, it seems likely that Mr. Shkreli did not stop speaking and that he made further statements to the government.

Each and every statement that Mr. Shkreli made to the government is potentially important for Mr. Greebel's defense.  The videotape of Mr. Shkreli's conversation with the FBI following his arrest is a prime example of that.  It contains statements by Mr. Shkreli expressing shock that Mr. Greebel was arrested, describing the government's decision to charge Mr. Greebel as "just bizarre," and stating that the fact that Mr. Greebel was charged—which Mr. Shkreli characterizes as "the Evan dimension" of the case—proves Retrophin engineered the investigation and charges against Mr. Shkreli and Mr. Greebel.  Ex. D at 16:35 & Ex. E at 14:20. Regardless of whether the government believes these statements, Mr. Greebel has the fundamental right to any and all materials in the government's possession that contradict the government's case, including but not limited to, Mr. Shkreli's expressions of surprise that Mr. Greebel was charged alongside Mr. Shkreli.

### g.   Evidence That Mr. Greebel Was Not Mr. Shkreli's Personal Attorney

Any evidence, including statements of witnesses or others, that Mr. Greebel was not Mr. Shkreli's personal attorney would constitute *Brady* and should be produced.  The Superseding Indictment states that, "[a]t various times, from approximately February 2011 to September

2014, Greebel also served as counsel to the defendant Martin Shkreli ....."  (Ind. ¶ 2).  In addition, counsel for Mr. Shkreli stated at the July 14, 2016 conference that "Martin Shkreli has perhaps the most relevant reliance on counsel defense I've ever encountered" and that Mr. Greebel was Mr. Shkreli's personal counsel.  Ex. C at 21:20-23; *see id.* at 27:18–22 ("[J]ust so the record is clear as far as Mr. Shkreli is concerned, we take the strong position that Mr. Greebel during the relevant time period wore two hats:  He was Retrophin's counsel and he was Mr. Shkreli's personal counsel.").  Accordingly, any evidence, including statements of witnesses or others, reflecting that Mr. Greebel did not serve as personal counsel to Mr. Shkreli, but rather that he served as one of many outside counsel to Retrophin or MSMB, would constitute *Brady* material.  *See, e.g.*, *DiSimone*, 461 F.3d at 195 (pointing out *Brady* evidence that "supported a potential defense theory"); *Leka*, 257 F.3d at 89 (finding *Brady* material because non-testifying eyewitness described events that conflicted with testifying eyewitnesses' version).

### h.   Evidence Going to Mr. Shkreli's Credibility Including Threats to Others

Mr. Shkreli's counsel has stated that he may assert a "reliance on the advice of counsel" defense.  Accordingly, any information concerning Mr. Shkreli's credibility would also be important for Mr. Greebel's defense, and should be produced promptly by the government.  Falling within that category, for example, is any alleged evidence that Mr. Shkreli threatened potential witnesses, which has never been produced to Mr. Greebel.  Specifically, the government has informed the Court that it learned from "interviews" that "several witnesses have advised that [they] have been threatened by defendant Shkreli" with regard to "personal or professional" issues, and "at least one witness has advised the government that defendant Shkreli reached out to him or her in the spring of 2015 … and suggested that the witness agree to a false version of certain events."  Government's Reply Memorandum of Law in Support of Application

17

to Intervene and to Stay Civil Proceedings at 13–14, *SEC v. Shkreli*, No. 15-cv-7175, Dkt. 26 (Feb. 18, 2016).  Such evidence of alleged threats to witnesses, and any other evidence that undermines Mr. Shkreli's credibility, should be produced to Mr. Greebel.

### i.   Government Threats of Prosecution, and Prosecution and/or Non-Prosecution Agreements with These Consultants

*Brady* and its progeny require the government to produce any statements reflecting (implicitly or explicitly) any threats of prosecution against the three consultants (and any others) who said that their agreements were not "sham" contracts.  *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *17 (S.D.N.Y. Jan. 2, 2001) (ordering "immediate production of materials showing a potential bias or prejudice of any witness the Government anticipates calling in its case-in-chief, including (i) a statement whether any promise, reward, or inducement has been given to any such witness, identifying by name each such witness and each promise, reward, or inducement, and (ii) a copy of any promise, reward, or inducement reduced to writing").  Such threats—whether implicit or explicit, including, but not limited to, statements to the witness and/or counsel for the witness that the government does not believe the person's account—would constitute *Brady* material.  It would substantiate a potential defense that individuals who originally defended their consulting agreements with the government bowed under threat of prosecution to the government's version of events.  Moreover, if any of the consultants who initially told the government that their agreements with Retrophin were valid and/or that they had provided or intended to provide services, later changed their account and received a non-prosecution agreement in return, such evidence of a non-prosecution agreement would constitute *Brady* material.

####              j.         Impeachment Evidence Against Government Witnesses

Mr. Greebel is entitled to the immediate production of any statements casting doubt on

the veracity of any of the government's witnesses, their potential bias, and any incentives to

change their account of the facts.  Impeachment material is the heartland of the government's

*Giglio* obligations.  *See, e.g.*, *Giglio*, 405 U.S. at 152 (involving a failure to disclose that a

prosecutor had promised a key government witness that he would not be prosecuted if he

testified before a grand jury); *Cain*, 132 S. Ct. at 630 (prior inconsistent statements are *Brady*);

*Triumph Capital Group, Inc.*, 544 F.3d at 161–65 (agent's notes from proffer meeting with

witness's attorney should be disclosed); *United States v. Cody*, 722 F.2d 1052, 1061–63 (2d Cir.

1983) (FBI agent's threats to witness should have been disclosed as *Giglio* material).

### 3.    The Government Must Identify the Exculpatory Information Within the Discovery

*Brady* also requires the government to identify the exculpatory information within the

over three million pages of documents that it has produced.  *Brady* material cannot be buried in a

haystack of discovery.  *See Gil*, 297 F.3d at 106–07.  If *Brady* material has somehow already

been provided, in light of the extensive assortment of documents, the difficulties parsing through

them as described above, and the fundamental fairness principles embodied in *Brady*, the

government should identify those documents (as it has done for one consultant who signed a

consulting agreement with Retrophin).

### B.    Motion for Confirmation That the Government Has Searched the FBI's Files and Emails, and Sought *Brady* Materials from the SEC

We respectfully move for confirmation that the government has searched the FBI's files,

including emails, reports, and handwritten notes, for *Brady* materials.  Under Supreme Court

precedent, the prosecutor is chargeable under *Brady* with knowledge of information known to

law enforcement officers involved in the investigation or prosecution of the case.  *Kyles*, 514

U.S. at 438–39; *see also Mahaffy*, 693 F.3d at 122, 130 (failure of United States Attorney's Office to disclose SEC transcripts was *Brady* violation).

Moreover, we respectfully move for the production of any *Brady* materials in the possession, custody, and/or control of the SEC. *See United States v. JB Tax Professional Services, Inc.*, No. 13-127, 2014 WL 2533773, at *2–3 (E.D. La. June 5, 2014) (requiring "assurance that the government has disclosed all such materials in its possession, custody or control," including from other government agencies). Where the government conducts a "joint investigation" with the SEC, "courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (citing *United States v. Upton*, 856 F. Supp. 727, 749–50 (E.D.N.Y. 1994)). As Judge Rakoff wrote in *Gupta*, "[t]hat separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense; but that they can then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all." *Id.* at 492. Accordingly, if the United States Attorney's Office and the FBI conducted any joint interviews of witnesses with the SEC Staff, it is incumbent on the government to seek out and obtain any *Brady* materials in the possession of the SEC.

## IV.    Conclusion

For the aforementioned reasons, Mr. Greebel respectfully moves for the prompt production of *Brady* materials.

20

Dated:   New York, New York
        September 16, 2016

                                      */s/* Reed Brodsky
                                        Reed Brodsky
                                        Winston Y. Chan
                                        Lisa H. Rubin

                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        (212) 351-4000
                                        rbrodsky@gibsondunn.com

                                        *Counsel for Defendant Evan Greebel*