WMP:JMK/AES
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      15 CR 637 (KAM)

MARTIN SHKRELI and
EVAN GREEBEL,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN RESPONSE TO THE DEFENDANTS' DISCOVERY MOTIONS

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

WINSTON M. PAES
JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ......................................................................................2

    I.    Factual Background ....................................................................................2

        A.    The Defendants and Key Entities ...............................................2

        B.    The Fradulent Schemes ...............................................................3

            1.    The MSMB Capital Hedge Fund Scheme ......................3

            2.    The MSMB Healthcare Hedge Fund Scheme ................5

            3.    The Retrophin Misappropriation Scheme ......................6

            4.    The Unrestricted Shares Scheme ....................................9

        C.    Defendants' Ouster from Retrophin............................................10

    II.    Procedural History ....................................................................................10

        A.    SEC and EDNY Investigations ..................................................10

        B.    Judge Weinstein's Crime-Fraud Exception Ruling ...................11

        C.    The Indictment, the Arrests and the SEC Complaint ................13

        D.    Discovery and Disclosures .........................................................14

        E.    Meetings with Counsel ...............................................................16

        F.    The Superseding Indictment .......................................................17

ARGUMENT - POINT ONE:  DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS
    SHOULD BE DENIED .................................................................................19

    I.    Legal Standard .........................................................................................20

    II.    Argument ..................................................................................................22

        A.    Information Already Provided to the Defendants Provides Them with
            Sufficient Notice of the Pending Charges ..................................22

        B.    The Defendants' Specific Requests Lack Merit .........................25

1.      The Defendants' Requests for Specified Entities and Individuals in
        the Superseding Indictment Lack Merit..........................................28

2.      Shkreli's Specific Requests Lack Merit .........................................29

3.      Greebel's Specific Requests Lack Merit ........................................37

ARGUMENT - POINT TWO: GREEBEL'S MOTION FOR EARLY DISCLOSURE OF
     CERTAIN MATERIALS SHOULD BE DENIED ..........................................46

I.      Legal Standard .............................................................................46

II.     Argument ......................................................................................48

CONCLUSION............................................................................................52

## PRELIMINARY STATEMENT

The government submits this memorandum of law in response to (1) the defendant Martin Shkreli's memorandum of law, dated September 16, 2016, in support of his motion for a bill of particulars ("Shkreli Br."), (2) the defendant Evan Greebel's memorandum of law, dated September 16, 2016, in support of his motion for a bill of particulars ("Greebel BOP Br."), and (3) the defendant Greebel's memorandum of law, dated September 16, 2016, in support of his motion for <u>Brady</u> materials ("Greebel Br.").

For the reasons set forth below, the defendants' motions are without merit and should be denied.

## STATEMENT OF FACTS

### I.      Factual Background

#### A.      The Defendants and Key Entities

The defendant Martin Shkreli was a hedge fund manager and Chief Executive Officer ("CEO") of Retrophin, Inc., a publicly-traded company.  Beginning in 2006, Shkreli was the managing member and portfolio manager of Elea Capital Management ("Elea"), a hedge fund located in New York, New York.  Within approximately a year, Shkreli had lost all of the investor money in Elea and had to liquidate the fund.

Beginning in approximately 2009 and continuing until approximately 2012, Shkreli founded, and then served as the managing member and portfolio member for, two separate hedge funds based in New York that focused their investments in the healthcare sector:  MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare").  During this time period, starting in approximately 2011, Shkreli also founded a biopharmaceutical company called Retrophin LLC.   Retrophin LLC later became Retrophin, Inc. ("Retrophin" or "RTRX"), and became a publicly-traded company via a reverse merger with a shell company called Desert Gateway, Inc. ("Desert Gateway") in December 2012.   From approximately December 2012 to September 2014, Shkreli served as the CEO of Retrophin, which was ultimately a publicly-traded company on the NASDAQ exchange.

The defendant Evan Greebel was an attorney licensed to practice law in New York and a law partner in the New York office of Katten Muchin Rosenman LLP ("Katten").  From approximately February 2011 to September 2014, Greebel served as lead outside counsel to

Retrophin.  Greebel also served as counsel to the MSMB entities, and was the Principal Attorney at Katten for all matters related to the MSMB entities and Retrophin.[1]

###### B.    The Fraudulent Schemes[2]

######    1.    The MSMB Capital Hedge Fund Scheme

Following the collapse of Elea Capital, in approximately 2009, Shkreli and Co-Conspirator 1 founded MSMB Capital.  In order to induce investments in MSMB Capital, Shkreli and Co-Conspirator 1 made a series of misrepresentations to potential investors, including that: (i) MSMB Capital was a transparent investment vehicle for sophisticated investors with monthly liquidity; (ii) MSMB Capital had retained independent certified public accountants as auditors who would issue an annual audit report; and (iii) Shkreli had a successful track record as a hedge fund manager.  Once MSMB Capital was up and running, Shkreli, together with others, made these and additional misrepresentations to induce additional investment in the fund, including about the fund's assets under management ("AUM").

Based on such misrepresentations, between approximately September 2009 and January 2011, eight investors (the "Capital Limited Partners") invested a total of $3 million in MSMB Capital.  During this period, Shkreli and Co-Conspirator 1 misappropriated funds from MSMB Capital by withdrawing $200,000 from the hedge fund that were far in excess of the fees that were represented to the Capital Limited Partners.

---

[1]  The Indictment and Superseding Indictment allege that "[a]t various times, from approximately February 2011 to September 2014, Greebel also served as counsel to Shkreli, MSMB Capital, MSMB Healthcare and other MSMB entities."  Based on statements made by defense counsel at the last status conference, the defendants appear to dispute whether Greebel ever served as counsel to Shkreli in his personal capacity; the government expects that this issue will be the subject of future motion practice.

[2]  The four fraudulent schemes are described in greater detail in the Superseding Indictment at paragraphs 8 to 40.  Individuals are identified here by the same as terms as in the Superseding Indictment.

Then, on or about February 1, 2011, Shkreli entered into a large short sale position in Orexigen Therapeutics, Inc. ("OREX") in MSMB Capital's brokerage account at Merrill, Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch").   Contrary to Shkreli's representations to Merrill Lynch, MSMB Capital was unable to locate OREX shares to cover the position; as a result, Merrill Lynch suffered a loss of more than $7 million.  In addition, MSMB Capital suffered more than $1 million in other trading losses in approximately February 2011.  By the end of February 2011, MSMB Capital had approximately $58,500 remaining in its bank and brokerage accounts.

Shkreli subsequently took steps to conceal from the Capital Limited Partners the fact that he had lost all of the money they had invested in MSMB Capital.  For months following the complete loss of the investments in MSMB Capital and the end of trading activity, Shkreli continued to send fabricated performance updates to the Capital Limited Partners that touted profits of as high as forty percent since inception.

In September 2012, Shkreli, Co-Conspirator 1 and MSMB Capital entered into a settlement agreement with Merrill Lynch in connection with the OREX trading losses, in which Shkreli, Co-Conspirator 1 and MSMB Capital agreed to pay Merrill Lynch a total of $1,350,000 on or before December 15, 2012.  In the settlement agreement, Shkreli and Co-Conspirator 1 stated that MSMB Capital had $0 in assets.  Around the same time in September 2012, in stark contrast to his representations to Merrill Lynch, Shkreli told the Capital Limited Partners in an email (the "Liquidation Email") that he had "decided to wind down" both MSMB Capital and MSMB Healthcare and that the original MSMB investors had "just about doubled their money net of fees." Additionally, even though the MSMB entities had essentially no liquid assets, Shkreli falsely advised the Capital Limited Partners that they could "have their limited partnership interests

4

redeemed by the fund for cash.  Alternatively, investors may ask for a redemption of Retrophin

shares, or a combination of Retrophin shares and cash."

2.     <u>The MSMB Healthcare Hedge Fund Scheme</u>

Following the collapse of MSMB Capital after the failed OREX trade, Shkreli

founded MSMB Healthcare.  From approximately February 2011 to November 2012, Shkreli and

others solicited investments in MSMB Healthcare from potential investors based on material

misrepresentations and omissions.  Once MSMB Healthcare was operational, Shkreli continued to

make misrepresentations and omissions to MSMB Healthcare's investors (the "Healthcare Limited

Partners") in order to prevent them from redeeming their investments.  These misrepresentations

and omissions included, <u>inter alia</u>, that: (i) Shkreli had a successful track record as a hedge fund

manager; (ii) MSMB Capital was a successful hedge fund; and (iii) MSMB Healthcare had an

AUM far in excess of the actual value of the fund.  As with MSMB Capital, Shkreli and others

misappropriated funds from MSMB Healthcare by withdrawing funds from the hedge fund far in

excess of the fees permitted under the partnership agreement for the fund.

Additionally, without the Healthcare Limited Partners' knowledge or consent,

Shkreli improperly used MSMB Healthcare assets to pay for obligations that were not the

responsibility of MSMB Healthcare.  For example, Shkreli caused assets from MSMB Healthcare

to be used to pay a portion of the Merrill Lynch settlement (owed by MSMB Capital, Shkreli and

Co-Conspirator 1).  Specifically, Shkreli improperly reclassified a $900,000 equity investment by

MSMB Healthcare into Retrophin LLC as an interest-bearing loan via a back-dated promissory

note; he subsequently caused Retrophin to "repay" the loan to MSMB Healthcare, and then

funneled a total of $898,000 from that "repayment" to Merrill Lynch.

5

3.    The Retrophin Misappropriation Scheme

Shkreli founded Retrophin in 2011 and initially had some difficulty soliciting outside investors for the company.  To raise capital, he caused MSMB Healthcare to invest significant sums into Retrophin between 2011 and mid-2012.  Those investments were reflected in Retrophin's capitalization table, which was maintained by Greebel.  As of September 2012, the capitalization table showed that MSMB Healthcare had invested approximately $2.1 million into Retrophin; it also indicated that MSMB Capital had not invested any money in Retrophin.

By the fall of 2012, Shkreli and Greebel were preparing to take Retrophin public, and Shkreli announced to the MSMB investors that he was winding down the funds in the Liquidation Email.  However, as detailed above, MSMB Capital had no funds that could be used to repay the Capital Limited Partners, let alone at the falsely inflated rates of return that Shkreli had been reporting for years.  Similarly, although MSMB Healthcare had invested in Retrophin – and, as a result, Healthcare Limited Partners would be entitled to receive some Retrophin stock at the time that the company went public, if it was able to do so –Shkreli did not have the cash to provide redemptions to those Healthcare Limited Partners who did not wish to receive Retrophin stock, as he had overvalued MSMB Healthcare's investment in Retrophin and had reported returns for the Healthcare Limited Partners far in excess of available funds.  At the same time, as detailed above, Shkreli owed $1.35 million to Merrill Lynch by December 2012; he also had significant other personal and professional debts.  Additionally, the Securities and Exchange Commission ("SEC") had reached out to Shkreli in September 2012 in connection with an investigation of the MSMB entities (see Section II, below); in response to a query, Shkreli sent an email in November 2012 in which he falsely stated that, inter alia, MSMB Capital was still an active entity with $2.6 million in AUM.

By the time the reverse merger for Retrophin was finalized in December 2012, several MSMB Capital and MSMB Healthcare investors had become deeply suspicious of the process by which Shkreli had liquidated the hedge funds.  For example, Shkreli failed to provide cash redemptions for MSMB investors who requested such redemptions, and the method by which he purported to convert their investments into Retrophin stock was opaque and unsupported by documentation.  As a result, several MSMB investors began threatening to sue Shkreli if they did not get answers about what happened to their investments.

Faced with disgruntled investors, the defendants engaged in a scheme to defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations.  This scheme had three major components.  First, in the fall of 2012, Shkreli and Greebel engaged in a series of transactions designed to create the false appearance that MSMB Capital had invested in Retrophin and received shares in return.  Specifically, in November and December 2012, Shkreli and Greebel orchestrated transfers of Retrophin shares from three individuals (Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2) to Shkreli, and backdated these transfers to the summer of 2012.  Immediately thereafter, Shkreli transferred the Retrophin shares he had received from these three individuals to MSMB Capital, and also backdated that agreement to the summer of 2012.  As a result of these backdated agreements, it appeared that MSMB Capital had made an investment in Retrophin in the summer of 2012 in exchange for a stake in the company when, in fact, MSMB Capital had never invested in Retrophin and had no interest in the company.

Second, in the spring of 2013, the defendants caused Retrophin to enter into a series of settlement agreements with several of the defrauded MSMB Capital and MSMB Healthcare

7

investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Shkreli had reported on those investments. The defendants did not seek authorization from Retrophin's Board of Directors (the "Board") prior to entering into these fraudulent settlements. In total, the defendants caused Retrophin to pay more than $3.4 million in cash and RTRX stock to settle claims with seven Capital Limited Partners and Healthcare Limited Partners even though Retrophin was not responsible for those claims.

Third, in the fall of 2013 – after Retrophin's external auditor questioned the propriety of the settlement agreements and concluded that Retrophin was not responsible for repayment of the defrauded MSMB Capital and MSMB Healthcare investors – the defendants caused Retrophin to enter into a series of sham consulting agreements with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse those investors for their lost investments in Shkreli's hedge funds. By styling the agreements as "consulting" agreements instead of "settlement" agreements, the defendants sought to avoid scrutiny from Retrophin's Board and auditors. The defendants presented the sham consulting agreements to the defrauded investors as the vehicle by which they could receive the returns reported to them by Shkreli. Notably, the defrauded investors who entered into these sham consulting agreements did not perform any legitimate consulting services for Retrophin. In total, the defendants caused Retrophin to pay more than $7.6 million in cash and RTRX stock through these sham consulting agreements to settle claims with Capital and Healthcare Limited Partners, as well as an Elea Capital investor, even though Retrophin was not responsible for those claims.

4.      The Unrestricted Shares Scheme

In connection with the reverse merger between Retrophin and Desert Gateway, Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin by concealing Shkreli's beneficial ownership and control of the majority of Retrophin's unrestricted or free trading shares.  These unrestricted shares, also known as the "Fearnow shares," were initially the shares of Desert Gateway; at the time of the reverse merger, the shares (2.5 million in total) became free-trading shares of Retrophin held by the sole stockholder ("John Doe 1") of Desert Gateway.  In late November 2012, Shkreli informed seven of his employees and contractors – including Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2 – that they would each be permitted to purchase a portion of those shares from John Doe 1 for a nominal amount.

In or about December 2012, the defendants divided 2 million of the unrestricted shares across the seven individuals to ensure that each individual's ownership was below the SEC's five percent reporting requirement threshold; they also arranged for an additional 400,000 shares to be held for those individuals in the name of John Doe 1, for future distribution to those individuals.  Prior to this distribution, the defendants took steps to make it appear that these seven individuals were no longer associated with the MSMB entities or Retrophin so that the shares would remain free-trading after the merger (as any free-trading shares held by individuals associated with Retrophin would become restricted).  These steps included an email sent by Shkreli that falsely decreed that the individuals were no longer employees or contractors of Retrophin or the MSMB entities; in reality, a number of the seven individuals continued to do work for MSMB entities and/or Retrophin.

9

Subsequently, between December 2012 and September 2014, the defendants attempted to control – and in some cases, succeeded in controlling – these 2.4 million unrestricted shares (listed under the names of these seven individuals) for the benefit of Shkreli.  For example, the defendants orchestrated the transfer of shares from some of the seven individuals to defrauded MSMB Capital and MSMB Healthcare investors in order to settle liabilities owed by the MSMB entities and Shkreli.

### C.      The Defendants' Ouster from Retrophin

On September 30, 2014, Retrophin's Board of Directors removed Shkreli as CEO. Shortly thereafter, Retrophin determined that Greebel would no longer serve as outside counsel for the company.  In June 2015, Greebel left Katten.  In September 2015, Retrophin filed suit in the Southern District of New York, charging Shkreli with defrauding Retrophin in connection with some of the above-described conduct.

## II.    Procedural History

### A.      SEC and EDNY Investigations

The Securities and Exchange Commission ("SEC") began an investigation into some of the above-described fraudulent schemes in approximately 2011.  Shkreli gave testimony in connection with that investigation on August 23, 2013 and February 24, 2014; on both occasions, he was represented by a partner at Katten.

The United States Attorney's Office for the Eastern District of New York ("EDNY" or "the government") began a separate, parallel investigation into the above-described fraudulent schemes in approximately 2014.   On January 29, 2015, Shkreli met voluntarily with the government and answered questions about the investigation.

**B.      Judge Weinstein's Crime-Fraud Exception Ruling**

In November 2015, the government filed an application, ex parte and under seal, with the United States District Court for the Eastern District of New York for an order compelling the production of 133 emails between Shkreli and Greebel and others (the "Crime Fraud Emails") pursuant to grand jury subpoenas issued to Retrophin.  See In Re Grand Jury Investigation, 15-MC-2227 (JBW), Dkt. Nos. 9, 10.  The application acknowledged that the Crime Fraud Emails might qualify as attorney-client communications (due to Greebel's provision of advice and information to Shkreli and others), but contended that the crime-fraud exception applied to the documents.  Id.  In furtherance of that application, the government submitted (1) redacted versions of the Crime Fraud Emails, (2) a motion detailing the reasons why the crime-fraud exception applied to those documents, and (3) a 47-page factual affidavit, signed by Special Agent Christopher Delzotto of the FBI, which provided evidentiary support for the motion (the "Crime Fraud Affidavit," attached hereto as Exhibit A).  Id.  The Crime Fraud Affidavit contained, inter alia, the following information about four categories of Shkreli and Greebel's criminal conduct:

- Shkreli and Greebel backdated several transfers of Retrophin stock and altered the Retrophin capitalization table in order to make it appear to the SEC and MSMB investors that MSMB Capital had an interest in Retrophin.  In reality, MSMB Capital had never invested in Retrophin; MSMB Capital was defunct following the failed OREX trade in February 2011, which occurred prior to Retrophin's founding. The Crime Fraud Affidavit provided significant detail about this conduct, including the names of the individuals involved in backdating the share transfers; the dates on which the share transfers were signed and backdated; the content of relevant emails; the process by which the capitalization table was updated to reflect MSMB Capital's fraudulent interest in Retrophin; and communications about the SEC filings completed by the defendants that reflected the fraudulent interest.  Exhibit A ¶¶ 13-33.

- Shkreli and Greebel worked to allocate the free-trading Fearnow Shares among a small group of Shkreli's associates in a manner that concealed Shkreli's true ownership of, and control over, those shares.  The Crime Fraud Affidavit provided significant detail about this conduct, including the names of the individuals who received the Fearnow Shares; the dates on which purchase agreements were signed

by Fearnow Share recipients; steps taken by Shkreli and Greebel to control the use of the Fearnow Shares by their recipients, including by allocating those shares at Shkreli's direction.  Exhibit A ¶¶ 34-57.

- Shkreli and Greebel improperly caused Retrophin to repay MSMB Capital and MSMB Healthcare investors who had been defrauded by Shkreli by causing Retrophin to enter into settlement agreements whereby the defrauded investors received cash and/or stock from Retrophin.  The Crime Fraud Affidavit included the names of five defrauded MSMB Capital and MSMB Healthcare investors who entered into settlement agreements with Retrophin; details about the terms of those settlement agreements; and communications Shkreli and Greebel had with those defrauded investors.  Exhibit A ¶¶ 58-71.

- Shkreli and Greebel improperly caused Retrophin to repay MSMB Capital and MSMB Healthcare investors who had been defrauded by Shkreli by causing Retrophin to enter into sham consulting agreements whereby the defrauded investors received cash and/or stock from Retrophin.  The Crime Fraud Affidavit included the names of the three defrauded MSMB Capital and MSMB Healthcare investors who entered into sham consulting agreements with Retrophin; details about the terms of those settlement agreements; and communications Shkreli and Greebel had with the defrauded investors.  Exhibit A ¶¶ 72-76.

The application was assigned to the Honorable Jack Weinstein, who subsequently requested unredacted versions of the Crime Fraud Emails for an in camera review; the unredacted versions were provided directly to Judge Weinstein by Retrophin.  On December 3, 2015, after reviewing the Crime Fraud Emails and the Crime Fraud Affidavit, Judge Weinstein ruled that the Crime Fraud Emails "were part of a scheme, conspiracy or fraudulent attempt to commit a securities fraud" and thereby any attorney-client privilege that might have attached to the emails was "voided by the criminal conduct" of Shkreli and Greebel; alternatively, Judge Weinstein ruled that the Crime Fraud Emails were also not privileged because they concerned company business.  Retrophin was also ordered to produce the Crime Fraud Emails to the government in unredacted form.  In Re Grand Jury Investigation, 15-MC-2227 (JBW), Dkt. No. 6.

The government's application and Judge Weinstein's ruling remained under seal until January 21, 2016, when an unsealing order was granted.  Id., Dkt. No. 8.  The unredacted

12

versions of the Crime Fraud Emails were produced to both defendants on January 15, 2016; the redacted versions of the Crime Fraud Emails were subsequently produced on March 16, 2016.

### C.      The Indictment, the Arrests and the SEC Complaint

On December 14, 2015, a federal grand jury sitting in the Eastern District of New York returned a 29-page, 53-paragraph "speaking" indictment charging Shkreli and Greebel for their participation in the MSMB Capital, MSMB Healthcare and Retrophin Schemes (the "Indictment").  Specifically, the indictment alleges that in or about and between September 2009 and September 2014, Shkreli, together with Greebel and others, orchestrated "three interrelated fraudulent schemes" whereby they agreed to, inter alia, (1) "defraud investors and potential investors in MSMB [] by inducing them to invest in MSMB [] through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and the retaining of an independent auditor and administrator; and then by preventing redemptions by investors in MSMB [] through material misrepresentations and omissions about, inter alia, the performance of the fund and the misappropriation by Shkreli and others of fund assets"; (2) "defraud investors and potential investors in MSMB Healthcare by inducing them to invest in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and existing liabilities; and then by preventing redemptions by investors in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the performance of the fund and the misappropriation by Shkreli and others of fund assets"; and (3) "defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations," including by causing Retrophin to enter into

settlement and/or sham consulting agreements with, <u>inter alia</u>, defrauded MSMB and MSMB Healthcare investors to settle liabilities owed by the MSMB funds and Shkreli.

Three days later, on December 17, 2015, both defendants were arrested at their residences.  Both defendants made videotaped post-arrest statements; in addition, Shkreli made a number of remarks to FBI agents during transport and processing.  Both defendants were arraigned that same day before the Honorable Robert M. Levy, United States Magistrate Judge; Shkreli was released on a $5 million bond that was subsequently secured by an E*TRADE account containing securities, while Greebel was released on a $1 million bond that was subsequently secured by his home.  <u>See</u> Dkt. Nos. 10, 11, 14, 19.

Also, on December 17, 2015, the SEC filed a 22-page complaint in the United States District Court for the Eastern District of New York against Shkreli and Greebel, along with several other entities ("SEC Complaint").  <u>See</u> <u>SEC v. Shkreli et al.</u>, 15-CV-7175 (KAM), Dkt. No. 1.  The government moved to intervene and requested a complete stay of the SEC action.  <u>Id.</u>, Dkt. No. 12.  Over the defendants' objections, this Court granted the government's motion to intervene and ordered a complete stay of the SEC action on March 22, 2016.  <u>Id.</u>, Dkt. No. 33.

**D.      Discovery and Disclosures**

The government produced initial discovery pursuant to Fed. R. Crim. P. 16 ("Rule 16") on December 22, 2015, a mere five days after the defendants were arraigned.  <u>See</u> Dkt. No. 16.  Over the past nine months, the government has made eight subsequent productions of discovery pursuant to Rule 16.  <u>See</u> Dkt. Nos. 21, 45, 48, 49, 57, 63, 68, 76, 88.  In a cover letter accompanying each production, the government described for the defendants the exact source of each set of records, the corresponding Bates range and whether the documents had been originally received by the SEC.  <u>See</u> Exhibit B (summarizing information about discovery productions

14

previously provided to defendants).   The government has generally produced records to the defendants in the format that those records were received by the government; however, if the records were received in hard copy, the government converted the records to electronic format prior to production.  The government's investigation in this case did not involve the execution of any search warrants. Consequently, the documents produced in discovery were obtained either by a subpoena issued on behalf of the grand jury for the investigation and/or as a result of a direct request for information related to the investigation.

As set forth in Exhibit B, the vast majority of the records produced to the defendants (2,819,321 Bates-stamped pages, out of 2,920,082 Bates-stamped pages, or approximately 96.5 percent)[3] were produced as load files with tiffs and native files, which means that the records are not only text-searchable, but contain metadata (including date of creation in some instances), and can be easily be loaded into a document review platform (*e.g.*, Relativity or Concordance).  It is our understanding that both defendants are utilizing such a platform for document review in this case.  The remaining records – including those received from financial institutions, technology companies, phone companies, individuals, etc. – were produced in an electronic format that was

---

[3]  This page count does not include certain types of files, such as Microsoft Excel files that were produced only in native format.  However, these files are themselves text-searchable.  In addition, Marcum LLP (Retrophin's outside auditor) also produced a stand-alone laptop ("Marcum Laptop") that contains the underlying workpapers for its audits of Retrophin.  Greebel complains that the Marcum Laptop contains "an unknown number of documents that have not been imaged and are stored on software that the defendant does not have and cannot easily obtain."  Greebel BOP Br. at 9.  However, as Marcum has explained to the government and to defense counsel, the files on the laptop can be copied to a thumb drive without the use of special software (by simply clicking on the files in each audit folder and dragging them over to the thumb drive); from there, the files can be uploaded to a review platform, where they be text-searchable. Counsel for Greebel acknowledged this fact at the June 16, 2016 status conference.  See 6/16/2016 Status Conference Transcript at 13-14, attached hereto as Exhibit C ("We were very relieved to understand this week for the first time, according to Marcum's counsel, that all the documents will be able to be transferred over to electronic discovery platforms or other computers, so we would be able to see them in a format that's intelligible to us").

either already text-searchable, or that could be converted to a text-searchable format by simply loading the documents to the review platform.  The government is only aware of a small number of documents – less than 100 pages in total – that contain handwritten notes.

In addition, on July 13, 2016, the government sent the defendants a letter that identified three individuals who entered into consulting agreements with Retrophin and who might have information that would be helpful to the defense ("Identified Witnesses").  See Greebel Br., Ex. B.  Specifically, the letter provided defendants with the Identified Witnesses' names; contact information for the Identified Witnesses' counsel; and a summary of certain statements made by the Identified Witnesses.  Id.  It also pointed the defendants to a specific Bates range that contained statements of one of the Identified Witnesses.  Id.

Finally, the defendants have received copies of all prior statements made by either defendant to law enforcement or to the SEC in connection with this case.  These disclosures were initially made to the individual defendant who made the statement in question, and were subsequently provided to the co-defendant in anticipation of pre-trial motions.  See Exhibit B; Greebel Br., Ex. B.  Shkreli's prior statements consist of the following: (1) testimony before the SEC on August 23, 2013 and February 24, 2014; (2) notes of statements to the FBI during a voluntary interview on January 29, 2015; (3) a video recording of statements made following his arrest on December 17, 2015; (4) notes of additional statements to the FBI on December 17, 2015.  Greebel's prior statements consist solely of a video recording following his arrest on December 17, 2015.

### E. Meetings with Counsel

Following the defendants' arrests, at defense counsels' request, the government met on several occasions with defense counsel between approximately January 2016 and May 2016.

16

See, e.g., Greebel BOP Br. at 10.  The government had no obligation to meet with defense counsel. At each of those meetings, which generally lasted approximately an hour, the government discussed the case with defense counsel and responded to various requests, including identifying certain individuals referenced in the Indictment.  Id.  The government advised defense counsel that the Crime Fraud Affidavit, the Crime Fraud Emails (in unredacted form) and certain specific records that had been previously produced in discovery (e.g., records from Retrophin, bank statements for the MSMB entities and Retrophin, etc.) were key sources of information about the case.  The government further advised defense counsel that defense counsel should be able to readily identify in those sources, inter alia, the names of certain individuals enumerated in the Indictment (e.g., Capital Limited Partners and Healthcare Limited Partners), the names of defrauded MSMB investors who entered into settlement and consulting agreements with Retrophin, the circumstances surrounding the finalization of those agreements, and the terms of those agreements.  The government also stated that if, after reviewing the enumerated sources, defense counsel still had difficulty finding this information, the government would provide defense counsel with additional guidance.  As the government never received any follow-up requests, the government believed that defense counsel had located this information (which was easily discernable from the sources of information identified by the government).  Defense counsel did request some information during these meetings that the government advised that it would not provide, including a list of the government's "hot documents" for the case, the names of the government's witnesses and all statements made by the government's witnesses.

## F.   The Superseding Indictment

On June 3, 2016, a federal grand jury sitting in the Eastern District of New York returned a 35-page, 61-paragraph "speaking" superseding indictment in the case (the "Superseding

Indictment").   The Superseding Indictment differed from the Indictment in that it detailed information about the Unrestricted Shares Scheme (at paragraphs 36 to 40) and added Count Eight, which charged Shkreli and Greebel with conspiracy to commit securities fraud in connection with that scheme.   Specifically, the new portions of the Superseding Indictment allege that Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin through material misrepresentations and omissions about the beneficial ownership and control of Retrophin's unrestricted or "free trading" shares (also known as the "Fearnow Shares").

The defendants were arraigned on the Superseding Indictment before this Court on June 7, 2016.

18

**ARGUMENT**

**POINT ONE**

**DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED**

Shkreli and Greebel argue that a bill of particulars, as detailed below, is necessary to prepare their defense and prevent unfair surprise and prejudice at trial.

Shkreli seeks a bill of particulars identifying the following:  (i) the identities of the MSMB Capital investors; (ii) each transaction related to MSMB Capital induced by Shkreli's misrepresentations and omissions; (iii) the "dates, times and documents" that contain fabricated performance statements sent to MSMB Capital investors; (iv) details of the $200,000 in MSMB Capital investor funds that Shkreli misappropriated, and whether his theft of those funds constituted securities fraud, conspiracy to commit securities fraud or wire fraud; (v) evidence that MSMB Capital investors lost their money and how much money they allegedly lost; (vi) whether Shkreli misrepresented his past performance as a hedge fund manager to all MSMB Healthcare investors or just Investor 3; (vii) the identity of "Corrupt Employee 1" and the details of how Shkreli told that individual to misrepresent assets under management to an investor; (viii) details of the MSMB Healthcare funds that Shkreli misappropriated above and beyond the one percent fee permitted by the MSMB Healthcare partnership agreement, and whether his theft of those funds constituted securities fraud, conspiracy to commit securities fraud or wire fraud; (ix) the parties who entered into the settlement agreements referenced in Count Seven; (x) evidence proving that Shkreli used MSMB Healthcare funds to invest in Retrophin, and the "fraudulent aspect" of such investment; (xi) the parties who entered into the sham consulting agreements identified in Count Seven; and (xii) the individuals whose free-trading shares Shkreli controlled and any transactions they might have entered into at his behest.  See Shkreli Br. at 5-10.

19

Greebel seeks a bill of particulars identifying the following: (i) the names of all unindicted co-conspirators in Counts One, Two, Four, Five, Seven and Eight; (ii) the names of all other "unidentified individuals and entities" in the Indictment; (iii) the "specific settlement, consulting, share transfer and any other agreements or transactions that the government alleges were in furtherance of any of the charged conspiracies"; (iv) all allegedly false and fraudulent statements, representations and/or omissions made in furtherance of Counts Seven and Eight; (v) the "exact dates of the beginning and the end" of the conspiracies charged in Counts Seven and Eight and "when and how Greebel learned of and joined" these conspiracies; and (vi) disclosure of all of the overt acts that the government intends to prove in furtherance of the securities fraud conspiracy alleged in Count Eight.  See Greebel BOP Br. at 13-27.

For the reasons set forth below, the defendants' requests are without merit, and their motions for a bill of particulars should be rejected in their entirety.

## I.      Legal Standard

The Federal Rules of Criminal Procedure require only that an indictment set forth a "plain, concise and definite written statement of the essential facts constituting the offense."  Fed. R. Crim. P. 7(c).  Additional details, in the form of a bill of particulars, see Fed. R. Crim. P. 7(f), are appropriate only when the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, avoid unfair surprise, and preclude double jeopardy. See United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004); United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (bill of particulars required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused") (internal quotation marks omitted).  A defendant must establish why he needs each of the particulars demanded and explain how the denial

of each will prevent him from identifying the specific crimes with which he is charged.  Therefore, the question is not whether the information would be helpful to the defendant, but rather whether the information is necessary.  United States v. Gotti, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1992) (bill of particulars is necessary only if "directed to curing defects in an indictment; that is [only if it] clarifies the charges against the defendant") (emphasis in original).

Neither the Federal Rules of Criminal Procedure nor the Second Circuit requires that the government "particularize" its evidence; rather, a bill of particulars is required only when the charges in the indictment are so general that they fail to apprise the defendant of the specific acts of which he or she is accused.  See Torres, 901 F.2d at 234.  If the information sought by the defendant is provided in the indictment or through some other means, a bill of particulars is not warranted.  See Chen, 378 F.3d at 163; Walsh, 194 F.3d at 47; Torres, 901 F.2d at 234; United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Urso, 369 F. Supp. 2d 254, 271 (E.D.N.Y. 2005).

It is inappropriate to use Rule 7(f) to limit the government's evidence or flush out its prosecutorial theories in advance of trial.  See Urso, 369 F. Supp. 2d at 272 ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."); see also United States v. Barret, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) ("[T]he court is mindful that it cannot compel the government to disclose, through a bill of particulars, the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories") (quotations and citations omitted); United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."); United States v.

21

Albunio, No. 91-CR-0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.").  The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it is helpful to the defendant.  See United States v. Aliperti, 867 F. Supp. 142, 148 (E.D.N.Y. 1994); United States v. Weinberg, 656 F. Supp. 1020, 1029 (E.D.N.Y. 1987).  Consequently, a motion for a bill of particulars must be denied where it would "unduly restrict the Government's ability to present its case."  United States v. Baez, 62 F. Supp. 2d 557, 559 (D. Conn. 1999).

There are three basic reasons for these restrictions on the use of bills of particulars.  First, their use "is not comparable to discovery in civil [cases] because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury."  United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) (internal quotations and citations omitted).  Second, the government must not be compelled "to give a preview of its evidence and legal theories lest the defendant tailor his testimony to explain away the Government's case."  United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (citations omitted).  Finally, the government should not be stopped from "using proof it may develop as the trial approaches."  Id. (citation omitted).

## II.   Argument

### A.   Information Already Provided to the Defendants Provides Them with Sufficient Notice of the Pending Charges

The charges in the Superseding Indictment provide the defendants with the necessary information to apprise them of the charges to allow them to prepare a defense, avoid unfair surprise and preclude double jeopardy.  See United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991).  In fact, "indictments which track the language of a statute and, in addition, do little more

22

than state time and place in approximate terms" are sufficient.  See United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973).  But the government has done far more here.  In a 35-page, 61-paragraph "speaking" superseding indictment in the case, the government has provided the defendants with extensive information about the defendants and other key individuals; the structure, genesis and operation of relevant entities; and the fraudulent schemes, including many specific examples of how the schemes were executed and the roles played by the defendants in the schemes.

In addition to the Superseding Indictment, the government has provided the defendants with extensive Rule 16 discovery, which it has been producing to the defendants, as it receives it, on a rolling basis.  Significantly, this discovery has been clearly identified to the defendants by source so that the defendants can more efficiently locate documents of interest to them, and determine how they relate to the relevant charges in the indictment.

For example, the Superseding Indictment details how Shkreli lost the Capital Limited Partners' investments in a disastrous short sale trade of the stock OREX in MSMB Capital's Merrill Lynch trading account, and how he and Co-Conspirator 1 subsequently settled with Merrill Lynch pursuant to a FINRA arbitration in September 2012.  See Superseding Indictment ¶¶ 11, 14, 16, 19, 20, 24.  The government produced records from Merrill Lynch on January 15, 2016; at that time, it advised the defendants of the specific Bates ranges for those records, and further explained that some of those records had originally been received by the SEC and were related to the FINRA arbitration. If the defendants review those documents, they can see that they include, inter alia, (1) briefs from Merrill Lynch and Shkreli detailing the events surrounding the OREX trade, (2) documents produced by Merrill Lynch and Shkreli during the arbitration, including the tax documents issued by MSMB Capital to the Capital Limited Partners (who are identified by name in those documents) and (3) the

23

September 2012 settlement agreement, which (along with the other records in the productions) clearly identifies Co-Conspirator 1 by name (although it is difficult to imagine that the defense counsel needed any assistance outside of the indictment to identify Co-Conspirator 1). See Exhibit B.

The government also provided the defendants with the 47-page Crime Fraud Affidavit and the 133 Crime Fraud Emails. As set forth above at pages 11-12, the Crime Fraud Affidavit provides extensive detail about the charges in Counts Seven and Eight in the Superseding Indictment, including the backdating of documents to create a fraudulent interest in Retrophin for MSMB Capital in the fall of 2012 (Crime Fraud Affidavit ¶¶ 13-33; Superseding Indictment ¶¶ 25, 25a-j); the allocation and control of the unrestricted or Fearnow Shares (Crime Fraud Affidavit ¶¶ 34-57; Superseding Indictment ¶¶ 36-40); the use of settlement agreements to cause Retrophin to pay Shkreli's obligations (Crime Fraud Affidavit ¶¶ 58-77; Superseding Indictment ¶¶ 26-30); and the use of consulting agreements that caused Retrophin to pay Shkreli's obligations (Crime Fraud Affidavit ¶¶ 72-76; ; Superseding Indictment ¶¶ 31-35). Moreover, the Crime Fraud Affidavit contains specific cites to the Crime Fraud Emails, which themselves provide even more information about the charges (e.g., the full names and email addresses of various participants; the dates on which certain events occurred; and documents that were attached to emails, such as drafts of agreements).

Finally, the government made a disclosure on July 13, 2016, which detailed the names and contact information for three individuals who had entered into sham consulting agreements with Retrophin. The letter identified a Bates range of documents related to Individual SR, which detailed various statements by and on behalf of the individual relating to his consulting agreement; identified Individual AG as a MSMB Healthcare investor who entered into a sham consulting agreement to recoup his lost investment; and identified Individual LY as an Elea Capital investor who entered into a sham consulting agreement with Retrophin to recoup his lost investment.

24

Collectively, the Superseding Indictment, the government's discovery, the Crime Fraud Affidavit and the Crime Fraud Emails provide the defendants with more than adequate detail regarding the crimes with which they are charged, and distinguish this case from those situations where "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." Torres, 901 F.2d at 234.  Indeed, the level of disclosure here is far beyond what is required under the law.  Under these circumstances, no further disclosure is necessary or justified.  See Walsh, 194 F.3d at 47 (explaining that if information sought by the defendant is provided in the indictment or through some other means, a bill of particulars is not warranted); Bortnovsky, 820 F.2d at 574; Urso, 369 F. Supp. 2d at 271.

### B.    The Defendants' Specific Requests Lack Merit

Many of the defendants' specific requests appear to be an attempt to have the government do the work of defense counsel.  Indeed, the answers to so many of the defendants' requests are patently clear from the face of the Superseding Indictment, the Crime Fraud Affidavit or the Crime Fraud Emails, and/or are easily located in the government's disclosures or discovery productions.  Others of the defendants' specific requests are for information that is not necessary to understand the charges against them, but which improperly seek to compel the government to reveal its legal theories of the case and/or its trial strategy.  In addition, the government is concerned that the defendants are using this bill of particulars request to restrict the government's proof at trial.  As the Court is aware, a bill of particulars is not designed to support or further any of these motives.  See, e.g., Barret, 824 F. Supp. 2d 419; United States v. Batista, No. 06-CR-265 (DLI), 2009 WL 910357, at *10 (E.D.N.Y. Mar. 31, 2009); Ianniello, 621 F. Supp. at 1478; see also United States v. Larracuente, 740 F. Supp. 160, 163 (E.D.N.Y. 1990) ("A bill of particulars is not to be viewed as a discovery device to seek and compel disclosure of the Government's evidence prior to trial . . ..").

25

As a general matter, the defendants assert that they are entitled to bills of particulars because the "massive volume of discovery" (Shkreli Br. at 2) in the case has "obfuscate[d] the allegedly unlawful conduct" and made it difficult for the defendants to prepare for trial. Greebel BOP Br. at 28-30. In particular, Greebel contends that because "[m]ost of the government productions require significant processing and are not text-searchable or date-searchable," he and his defense counsel have had to "resort[] to a page-by-page review of the approximately three million pages." Greebel BOP Br. at 9.

These assertions are wrong. As an initial matter, the government strongly disagrees with Greebel's characterization of the government's discovery productions in this case. As detailed in the Statement of Facts, 96% of the government's productions have been made in load file format, which means that those documents are text-searchable and can be loaded directly to a document review platform, which the government understands defense counsel to be using. The remaining productions need only to be loaded to a review platform to be made text-searchable.[4] Consequently, Greebel should have no difficulty using "[k]eyword searches … to narrow the scope of document review effectively." Id. Moreover, because the discovery was organized for the defendants by source, such keyword searches can easily be run through specific sets of documents most likely to yield responsive results; for example, if the defendants wanted to locate documents related to the sham consulting agreement that the defendants caused Retrophin to enter into with Individual AG, the defendants could run searches through the productions of documents from Retrophin and from Individual AG.[5]

---

[4] As detailed in footnote 3, this includes the files on the Marcum Laptop.

[5] As detailed below, both defendants claim that they cannot identify the parties to the sham consulting agreements referenced in the Superseding Indictment. See Shkreli Request #11, Greebel Request #3. However, Individual AG is identified in the Crime Fraud Affidavit by name as an individual who entered into a sham consulting agreement and whose agreement was placed on the agenda for

More importantly, the amount of discovery is not in and of itself an obstacle to the defendants' understanding of the charges in this case because, as detailed in Section II.A. above, the government has provided significant guidance for review of that discovery in the Superseding Indictment, the Crime Fraud Affidavit, the Crime Fraud Emails and the government's disclosures. For example, both defendants assert that they need a bill of particulars to identify specific individuals and entities to whom the government referred to by defined terms pseudonyms in the Superseding Indictment. Shkreli Br. at 8, Greebel BOP Br. at 18-20. However, a simple side-by-side comparison of the Superseding Indictment and the Crime Fraud Affidavit make the majority of those identities of those individuals and entities patently clear. For example, the Superseding Indictment references an email exchange on November 29, 2012 between "Accountant 1" and "RTRX Employee 1" in which the former exclaimed "WT....F." Superseding Indictment, ¶ 25(g). The Crime Fraud Affidavit also specifically references this same email, identifying it by date and a quote to the exclamation "WT....F." Exhibit A at ¶ 25(a). The corresponding Crime Fraud Email, which is referenced by Bates number, clearly states the full names of "Accountant 1" and "RTRX Employee 1."

Finally, the defendants have requested and received from the Court a significant amount of time to prepare for trial in this case, primarily because they have stated that they wanted time to thoroughly review the discovery. The government's first discovery disclosures were made on December 22, 2015, and the trial date is now set for June 26, 2017. Courts have held that even when the volume of discovery is significant, which is rather small in this case when compared to

---

discussion at a Board meeting, a description that matches exactly the description of a sham consulting agreements in the Superseding Indictment (see Superseding Indictment ¶¶ 32-35; Crime Fraud Affidavit ¶ 73 (citing to multiple communications in the Crime Fraud Emails between the defendants and Individual AG)). Individual AG was also identified by name in the government's July 13, 2016 disclosure.

other securities fraud cases, the fact that the defendants have had a substantial amount of time to digest that discovery weighs against the grant of a bill of particulars.  See, e.g., United States v. Columbo, No. 04-CR-273 (NRB), 2006 WL 2012511, at *6 (S.D.N.Y. July 18, 2006) (rejecting a request for a bill of particulars based on defendants' assertions that the discovery was "voluminous and overwhelming" because, inter alia, the defendants "had more than a year to review discovery prior to trial").

While "the government cannot rely on the sheer quantity of the documents produced during discovery as an automatic substitute for identifying the charges with the necessary specificity," this "general principle … does not allow Defendants to use the vastness or complexity of the alleged conspiracy and the attendant documentary evidence as a sword against the government when the Indictment, discovery and other information provided by the government adequately notify Defendants of the charges against them."  United States v. Rigas, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) (denying motions for bills of particulars).  Put simply, the defendants should not be permitted to unfairly use the government's well-organized, early discovery disclosures as such a sword in this case.

The government further addresses each of the defendants' specific requests for a bill of particulars as follows:

### 1.    The Defendants' Requests for Specified Entities and Individuals in the Superseding Indictment Lack Merit

Both defendants have stated that they need a bill of particulars in order to identify all individuals and entities who are referred to in the Superseding Indictment by defined terms or pseudonyms, as well as the identities of the defrauded MSMB Healthcare, MSMB Capital and Elea Capital investors who entered into the settlement and sham consulting agreements referenced in Count Seven.  See, e.g., Shkreli Br. at 8-10; Greebel BOP Br. at 18-24.  This is untrue.  As

28

detailed above (with the examples regarding the identities of "RTRX Employee 1" and "Accountant 1"; "Co-Conspirator 1"; and individuals who entered into sham consulting agreements), the identities of individuals and entities specified in the Superseding Indictment, as well as the individuals who entered into the settlement and consulting agreements, are self-evident from a review of the Superseding Indictment, the Crime Fraud Affidavit, the Crime Fraud Emails and the government's other disclosures.  In fact, at meetings with defense counsel earlier this year – in addition to identifying certain of these individuals to defense counsel directly (see, e.g., Greebel BOP Br. at 10) – the government pointed defense counsel to these materials, and advised that defense counsel could return to the government with follow-up questions if it had any difficulty making further identifications.  Defense counsel never informed the government that they were unable to make these identifications, and – until the instant motions were filed – the government understood that defense counsel had the information they needed.

Notwithstanding any legal requirement to do so, the government will provide to the defendants under separate cover a list of all of the individuals and entities referred to by defined terms in the Superseding Indictment, as well as which defrauded investors entered into the settlement and sham consulting agreements.

### 2. Shkreli's Specific Requests Lack Merit

a. Request #1: Identify the MSMB Capital investors (Shkreli Br. at 5-6).

See Section II.B.1 above; the MSMB Capital investors are defined as the "Capital Limited Partners" in the Superseding Indictment.

b. Request #2:  Identify each transaction related to MSMB Capital induced by Shkreli's misrepresentations and omissions (Shkreli Br. at 6).

Shkreli is not entitled to a list of each and every transaction induced by Shkreli's misrepresentations and omissions.  The Superseding Indictment describes the various subjects

29

about which Shkreli's made misrepresentations and omissions to the Capital Limited Partners in order to either induce investment or prevent redemptions, including about the fund's AUM; the fund's liquidity; Shkreli's history as a hedge fund manager; the fund's performance; the fees that Shkreli was taking from MSMB Capital; etc.  Superseding Indictment ¶¶ 8-15.  The government has also provided specific examples of these transactions, including that Investor 1 invested $1,000,000 in MSMB Capital on or about December 8, 2010, and another $250,000 on January 5, 2011, based on Shkreli's misrepresentations about MSMB Capital's AUM and whether it had independent auditors or administrators.  See Superseding Indictment ¶ 10.  In addition, Shkreli has been provided with all documents in the government's possession relevant to these transactions, including email communications, MSMB Capital offering memoranda and bank records, from sources including MSMB Capital, various Capital Limited Partners, Merrill Lynch, Retrophin and Interactive Brokers.  No further particulars are necessary.  Barret, 824 F. Supp. 2d at 439-40 (finding that the information provided by the government in the indictment, agent affidavits and discovery was sufficient to give the defendant notice of the charges against him); United States v. Badoolah, No. 12-CR-774 (KAM), 2014 WL 4793787, at *14 (E.D.N.Y. Sept. 25, 2014)

To the extent that Shkreli seeks to have the government detail its trial exhibits regarding these transactions, such a request is wholly inappropriate.  See Torres, 901 F.2d at 234 (bill of particulars is not properly used to provide "evidentiary detail" about the government's case; nor is the government under a duty to disclose the precise manner in which the crimes alleged in the indictment were committed or to preview its evidence or legal theory); United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991) (bill of particulars not required to identify the specific acts by which the defendant furthered conspiracy).  Nor is Shkreli entitled to witness statements regarding these

transactions at this time.  See United States v. RW Prof'l Leasing Servs. Corp., 317 F. Supp. 2d 167, 179 (E.D.N.Y. 2004) (a defendant has "no pre-trial right to Giglio materials").[6]

> c. Request #3: Provide the "dates, times and documents" that contain fabricated performance statements sent to MSMB Capital investors (Shkreli Br. at 6-7).

Shkreli is not entitled to a list of the hedge fund performance statements sent to MSMB Capital investors that contain false statements.  The government has detailed in the Superseding Indictment that, after Shkreli lost all money that was invested in MSMB Capital in the failed OREX trade, Shkreli "continued to send fabricated performance updates to the Capital Limited Partners that touted profits of as high as forty percent since inception." Superseding Indictment ¶ 12.  The Superseding Indictment also provides specific examples of these fabricated performance updates, including updates sent to Investor 2 on April 10, 2011 and to Investor 1 on January 25, 2012, and explained why those updates were fabricated (i.e., because they reflected that MSMB Capital had returned a profit when in fact there was no money left in the fund).  Id. The government has provided in discovery copies of all of the performance statements sent to MSMB Capital investors in its possession (including those referenced in the indictment); these documents were produced from several sources, including records received from Retrophin, MSMB Capital, and individual Capital Limited Partners.  No further particulars are necessary. Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14 (same).

---

[6] The Court has already set a schedule for the disclosure of Jencks or 3500 materials.

       d.   Request #4: Give details of the $200,000 in MSMB Capital investor funds that Shkreli misappropriated, and whether his theft of those funds constituted securities fraud, conspiracy to commit securities fraud or wire fraud (Shkreli Br. at 7).

Shkreli is not entitled to additional details regarding the $200,000 in MSMB Capital investor funds that he misappropriated.   The Superseding Indictment details that Shkreli represented to investors that the investment advisor was entitled to a one percent management fee per year, and the general partner was entitled to a fee of twenty percent of the limited partners' net profits for the year; that MSMB Capital had no assets and thus earned no profits after the failed OREX trade; and that Shkreli withdrew money from the MSMB Capital fund far in excess of the management and general partner fees.   Superseding Indictment ¶¶ 8, 13.   The government has provided in discovery copies of the MSMB Capital partnership agreements with the Capital Limited Partners, and other related documents, in which representations about fees were made; communications between Capital Limited Partners and Shkreli; and records from MSMB Capital's bank and brokerage accounts, which detail investments by Capital Limited Partners, trading gains and losses between November 2009 and January 2011, the failed OREX trade in February 2011, and withdrawals from the MSMB Capital fund by Shkreli.   No further particulars are necessary. See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.   Moreover, Shkreli is not entitled to preview the government's theories regarding his misappropriation of MSMB Capital funds at this time.   See Torres, 901 F.2d at 234.

       e.   Request #5: Identify evidence that MSMB Capital investors lost their money and how much money they allegedly lost (Shkreli Br. at 7).

Shkreli is not entitled to have the government identify additional evidence regarding losses suffered by MSMB Capital investors.   The Superseding Indictment details that, in total, eight Capital Limited Partners invested $3 million into MSMB Capital.   Superseding

Indictment ¶ 10.  The Superseding Indictment further details that as of November 30, 2010, the value of assets in MSMB Capital's bank and brokerage accounts totaled approximately $700; after the failed OREX trade on February 1, 2011, MSMB Capital had less than $58,500 in its bank and brokerage accounts; and that MSMB Capital caused Merrill Lynch $7 million dollars in trading losses in connection with the OREX trade.  Id.  In addition, the government has provided in discovery records from MSMB Capital's bank and brokerage accounts, which detail investments and redemptions from Capital Limited Partners; records from Merrill Lynch detailing the OREX trade; and records from Retrophin, MSMB Capital and individual Capital Limited Partners, including partnership agreements and communications, which provide additional information about the Capital Limited Partners' investments.  No further particulars are necessary.  See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.

> f.  Request #6:  Explain whether Shkreli misrepresented his past performance as a hedge fund manager to all MSMB Healthcare investors or just Investor 3 (Shkreli Br. at 8).

Shkreli is not entitled to a bill of particulars to "clarify details of which [MSMB Healthcare] investors claim misrepresentations were made." (Shkreli Br. at 8).  At its core, this request is aimed at obtaining early disclosure of witness statements from MSMB Healthcare investors, which is not a proper use of a bill of particulars.  Moreover, Shkreli has been provided with information about his misrepresentations concerning his past performance as a hedge fund manager to MSMB Healthcare investors.  The Superseding Indictment sets forth a specific example of a MSMB Healthcare investor who was misled by Shkreli and Corrupt Employee 1 about Shkreli's track record as a hedge fund manager, in that the investor was told only positive information, and was not told that the Elea Capital fund lost all of its money; that the MSMB Capital fund lost of its money; and that Shkreli and MSMB Capital owed significant liabilities to

33

Merrill Lynch.  Superseding Indictment ¶ 16.  In addition, the government has produced to the government in discovery records from MSMB Capital, Retrophin and individual MSMB investors that detail additional misrepresentations that were made about Shkreli's past performance as a hedge fund manager, including PowerPoint presentations about MSMB Healthcare that were sent to potential investors, and communications with potential investors.  No further particulars are necessary.  See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.

> g.  Request #7:  Identify "Corrupt Employee 1" and the details of how Shkreli told that individual to misrepresent assets under management to an investor (Shkreli Br. at 8).

With respect to the identification of "Corrupt Employee 1," see Section II.B.1 above.  As to Shkreli's other request, the Superseding Indictment at paragraph 17 describes an email communication between Shkreli and Corrupt Employee 1, and states that the date of the communication is April 18, 2012.  This email has been produced in the government's discovery productions.  No further particulars are warranted.

> h.  Request #8:  Explain how Shkreli misappropriated more than the one percent fee permitted by the MSMB Healthcare partnership agreement, and whether his theft of those funds constituted securities fraud, conspiracy to commit securities fraud or wire fraud.

This request seeks the same information for the MSMB Healthcare Scheme as was requested in Shkreli's Request # 4 for the MSMB Capital Scheme; Shkreli is not entitled to a bill of particulars for this information for the same reasons as set forth in Section II.B.2.d. above.  The Superseding Indictment details that the MSMB Healthcare partnership agreement permitted a one percent management fee per year; that the general partner was also entitled to a fee of twenty percent of the limited partners' net profits for the year; and that Shkreli withdrew money from the MSMB Healthcare fund far in excess of these management and general partner fees.  Superseding Indictment ¶ 19.  The government has provided in discovery copies of the MSMB Healthcare

34

partnership agreements with the Healthcare Limited Partners, and other related documents, in which representations about fees were made; communications between Healthcare Limited Partners and Shkreli; and records from MSMB Healthcare's bank and brokerage accounts, which detail investments by Healthcare Limited Partners, trading gains and losses, and withdrawals from the MSMB Healthcare fund by Shkreli.  No further particulars are warranted.  See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.  Moreover, Shkreli is not entitled to a preview of the government's legal theories about the way in which his misappropriation of MSMB Capital funds is evidence of the charged schemes.  See Torres, 901 F.2d at 234.

> i.  Request #9:  Identify the parties who entered into the settlement agreements referenced in Count Seven (Shkreli Br. at 9).

See Section II.B.1 above.

> j.  Request #10:  Identify evidence proving that Shkreli used MSMB Healthcare funds to invest in Retrophin, and the "fraudulent aspect" of such investment (Shkreli Br. at 9).

Shkreli is not entitled to a bill of particulars detailing evidence "proving" that MSMB that Shkreli used MSMB Healthcare funds to invest in Retrophin.  This is simply not the purpose for a bill of particulars.  The Superseding Indictment details that Shkreli caused MSMB Healthcare to invest in Retrophin in 2011 and 2012, and that as of July 31, 2012, the capitalization table for Retrophin LLC detailed that MSMB Healthcare had invested approximately $2,135,000 in Retrophin LLC.  Superseding Indictment ¶¶ 22-23.  The government has also provided in discovery bank records for MSMB Healthcare and Retrophin LLC; versions of the Retrophin LLC and Retrophin capitalization tables (in the Retrophin and Marcum productions); and email communications between the defendants and others about the capitalization table.  No further particulars about MSMB Healthcare's investment in Retrophin are required.  See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.

35

Shkreli also seeks information about the "fraudulent aspect" of MSMB Healthcare's investment in Retrophin.  The government does not understand what information Shkreli seeks with this request.[7]  To the extent that Shkreli is seeking to determine the government's trial strategy or legal theories regarding MSMB Healthcare into Retrophin, this is an inappropriate use of a bill of particulars.  See Torres, 901 F.2d at 234.

> k.  Request #11:  Identify the parties who entered into the sham consulting agreements identified in Count Seven (Shkreli Br. at 9-10).

See Section II.B.1 above.

> l.  Request #12:  Identify the individuals whose free-trading shares Shkreli controlled and any transactions they might have entered into at his behest (Shkreli Br. at 10).

With respect to the identification of individuals who received free-trading shares as part of the Unrestricted Shares Scheme, see Section II.B.1.

Shkreli is not entitled to a bill of particulars detailing all transactions involving the recipients of the free-trading shares that were entered into at Shkreli's behest.  The Superseding Indictment details a number of examples of such transactions in the overt acts for Count Eight, including when Shkreli and Greebel directed John Doe 1 to divide up the remaining 400,000 shares that had allegedly been given to the original Fearnow Share recipients, and when Shkreli directed Greebel to take Fearnow Shares from "anyone" to settle a dispute with a defrauded MSMB Healthcare investor.  Superseding Indictment ¶¶ 59(j), 59(k).  In addition, the Crime Fraud Affidavit includes two sections titled "Allocation and Ownership of Fearnow Shares" and "Shkreli

---

[7]  The Superseding Indictment does discuss at length the process by which the defendants created a fraudulent interest in Retrophin for MSMB Capital (not MSMB Healthcare), by backdating a series of share transfer agreements to make it appear that MSMB Capital had invested in Retrophin when it had not. See Superseding Indictment ¶ 25.  Additional information about the process of creating this fraudulent interest was provided in the Crime Fraud Affidavit; the Crime Fraud Emails; and in other records received from Retrophin that were produced in discovery.

Controls the Allocation of Remaining Fearnow Shares" that provide extensive detail about transactions involving the Fearnow Shares, with reference to specific Crime Fraud Emails.  See Exhibit A ¶¶ 34-57.  Finally, the government has produced in discovery the relevant share purchase agreements; additional emails detailing the transfer of Fearnow Shares at the defendants' direction; and emails in which Shkreli seeks to control the Fearnow Shares issued to Individual TP.  No further particulars are warranted.  See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.

### 3.    Greebel's Specific Requests Lack Merit

a.    Request #1: Identify the names of all unindicted co-conspirators in Counts One, Two, Four, Five, Seven and Eight.

With respect to the identification of Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2, see Section II.B.1.

Greebel is not entitled to a bill of particulars detailing all unindicted co-conspirators in the charged fraudulent schemes.  "The case law in this circuit is clear that the government is not required to provide the identities of alleged co-conspirators."  Batista, 2009 WL 910357, at *10. See also United States v. Gotti, 784 F. Supp. 1017, 1018 (E.D.N.Y.1992) (citing Torres, 901 F.2d at 233-34) (stating that the Second Circuit will not find reversible error in a district court's refusal to direct the filing of a bill of particulars as to the names of unindicted coconspirators).  Based on the quantity and quality of information about the charged schemes provided in the Superseding Indictment, Crime Fraud Affidavit, Crime Fraud Emails and discovery alone (as detailed above and in the Statement of Facts), Greebel has more than sufficient information about unindicted co-conspirators to ensure that he can adequately prepare for trial.  See Badoolah, 2014 WL 4793787, at *14; Batista, 2009 WL 910357, at *10.

Courts sometimes[8] look to a six-factor test to determine whether the names of unindicted co-conspirators are necessary for a defendant to prepare for trial and avoid surprise, weighing:  "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation."  United States v. Kahale, 789 F. Supp. 2d 359 (E.D.N.Y. 2009).

Here, as to the first factor, the number of co-conspirators is limited, and the same group of individuals are involved across the four charged schemes; for example, Co-Conspirator 1 assisted Shkreli with the MSMB Capital Scheme; participated in the backdating of share purchase agreements to create a fraudulent interest in Retrophin for MSMB Capital; and also received Fearnow Shares and agreed to have them distributed at Shkreli's direction.  Superseding Indictment ¶¶ 8-15, 20, 25, 36-40.  The defendants also already know the identities of Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2.

As to the second factor, the four interrelated schemes are each less than five years in length, and are all based in New York.  The third and fourth factors balance out, as discussed above in Section II.B.; the government has provided a relatively high volume of discovery, but it has been well-organized and is easily searchable, especially with the guidance provided by the Superseding Indictment, Crime Fraud Affidavit, Crime Fraud Emails and other disclosures.

---

[8]  Courts in this Circuit routinely reject bill of particulars requests for the names of unindicted co-conspirators without applying this test.  See Badoolah, 2014 WL 4793787, at *14 (rejecting request for identities of unindicted co-conspirators without applying the test); Batista, 2009 WL 910357, at *10 (same).

As to the fifth and sixth factors, the government has previously provided evidence that Shkreli has taken steps to intimidate and influence witnesses in the past.  See SEC v. Shkreli, 15 CV 7175 (KAM), Dkt. No. 26 at 10-14 (detailing Shkreli's threatening phone calls, letters and emails to a potential witness).

Taken together, these factors weigh against granting Greebel's request.  Greebel leans heavily on this Court's ruling in Kahale in support of his request.  However, in Kahale, there were four indicted defendants (rather than two); a conspiracy with a vast geographic scope, which the Court gave significant weight (mentioning it in connection with factors two and four); and no concerns about witness tampering.  789 F. Supp. 2d at 373.

Thus, Greebel is not entitled to a bill of particulars detailing all unindicted co-conspirators in the charged fraudulent schemes.

> b.  Request #2: Identify the names of all other "unidentified individuals and entities" in the Indictment.

See Section II.B.1.

> c.  Request #3: Identify the "specific settlement, consulting, share transfer and any other agreements or transactions that the government alleges were in furtherance of any of the charged conspiracies."

With respect to the identities of the defrauded investors who entered into the settlement and sham consulting agreements referenced in Count Seven, and the identities of the individuals who received the unrestricted shares in Count Eight, see Section II.B.1.

Greebel is not entitled to a bill of particulars identifying all agreements and transactions that were in furtherance of the conspiracies charged in Counts Seven and Eight. (Greebel BOP Br. at 20-24).  The Superseding Indictment details at length the settlement and sham consulting agreements that are at issue in the Retrophin Misappropriation Scheme (see id. ¶¶ 26-35), as does the Crime Fraud Affidavit, which includes sections titled "The Settlement

39

Agreements" and "The Consulting Agreements" that explain the process by which agreements were negotiated and drafted by the defendants; the terms of certain agreements; the way that the defendants directed Fearnow Shares to defrauded MSMB investors in connection with certain settlement agreements; and specific communications with the defendants about these agreements that are contained in the Crime Fraud Emails.  (See Exhibit A ¶ 58-71).  The defendants also have a significant amount of information about the settlement and consulting agreements in the discovery productions – including productions from Retrophin, Katten, and the individual defrauded investors who entered into these agreements – including bank records, copies of final and draft agreements and communications regarding the agreements.  Similar information has been provided in the Superseding Indictment, Crime Fraud Affidavit, Crime Fraud Emails and discovery productions for the agreements and transactions related to the Fearnow Shares, as alleged in the Unrestricted Shares Scheme.  See Section II.B.2.l.  No further particulars about these agreements and transactions are required.  See Barret, 824 F. Supp. 2d at 439-40; Badoolah, 2014 WL 4793787, at *14.

    Greebel also seeks information about "the manner in which the agreements and transactions were allegedly fraudulent."  As discussed in the Statement of Facts, and detailed at length in the Superseding Indictment and the Crime Fraud Affidavit, the purpose of the Retrophin Misappropriation Scheme (Count Seven) was misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations, including by causing Retrophin to enter into settlement and sham consulting agreements to repay such debts and obligations; and the purpose of the Unrestricted Shares Scheme (Count Eight) was to defraud investors and potential investors in Retrophin by concealing Shkreli's beneficial ownership and control of Retrophin's unrestricted or

40

free trading shares.  In other words, the agreements and transactions were fraudulent because they functioned to steal money and stock from Retrophin to repay Shkreli's debts, and to hide Shkreli's control over unrestricted shares that he failed to report.  This information is sufficient for Greebel to understand the charges against him; any further explanations would require the government to reveal its legal theories or trial strategy, which is an impermissible use of a bill of particulars.  See Torres, 901 F.2d at 234.

    d.   Request #4: Identify all allegedly false and fraudulent statements, representations and/or omissions made in furtherance of Counts Seven and Eight.

Greebel is not entitled to a bill of particulars detailing all allegedly false and fraudulent statements, representations and/or omissions made in furtherance of Counts Seven and Eight.  (Greebel BOP Br. at 24-25).  As detailed in Section II.B.3.c., the government has provided significant information about the charges in Counts Seven and Eight: it has detailed its theories of the schemes and provided the relevant agreements, information about relevant transactions and extensive email communications between the defendants about the schemes (in the Crime Fraud Emails and elsewhere).  The Superseding Indictment, Crime Fraud Affidavit and Crime Fraud Emails also provide extensive information about misrepresentations and omissions made by the defendants in the course of their dealings with Retrophin's Board of Directors and the SEC in connection with these two schemes.  For example, the Superseding Indictment details material omissions by Shkreli and Greebel with respect to the Board: first, that they were present at all relevant Board meetings during the time that the settlement agreements were negotiated and finalized, and that they did not seek authorization from the Board prior to entering the agreements (Id. ¶ 26); and second, that Shkreli and Greebel "concealed from the Board that the purpose of [Investor 3's] consulting agreement was to resolve Investor 3's complaints about his MSMB

Healthcare investment."  (<u>Id.</u> ¶ 33).  The Crime Fraud Affidavit further details the defendants'

omissions, stating that "Retrophin Board members have stated that the consulting agreement for

[Investor 3] … was not discussed at the meeting," even though the Board minutes drafted by

Greebel for that meeting indicate that Investor 3 was approved by the Board as a consultant.  With

respect to material omissions and misrepresentations to the SEC, the Superseding Indictment and

Crime Fraud Affidavit details how Greebel drafted a Schedule 13D that failed to disclose Shkreli's

beneficial ownership and control over any of the unrestricted or free-trading shares; how Shkreli

filed that schedule with the SEC; and how Shkreli later filed an amended version that contained

the same omissions.  Superseding Indictment ¶ 38-40, 59(d), 59(e), 59(h).  Given the information

provided to the defendants to date, no further particulars are required to give Greebel fair notice

of the charges against him.  <u>See</u> <u>Barret</u>, 824 F. Supp. 2d at 439-40; <u>Badoolah</u>, 2014 WL 4793787,

at *14.  Moreover, the request to detail all false and fraudulent statements "seeks evidentiary detail

beyond what is required to give [Greebel] fair notice of the charges against him."  <u>Columbo</u>, 2006

WL 2012511 at *5.

> e.  <u>Request #5: Identify the "exact dates of the beginning and the end" of</u>
> <u>the conspiracies charged in Counts Seven and Eight and "when and how</u>
> <u>Greebel learned of and joined" these conspiracies.</u>

Greebel is not entitled to the exact dates of the beginning and end of the

conspiracies in Counts Seven and Eight, or the dates that he joined these conspiracies (accepting

for the sake of argument only Greebel's premise that he did not participate in the full scope of both

conspiracies).  Greebel BOP Br. at 25-26.  "Courts 'consistently reject[] demands for particulars

as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant'

because 'the government is not required to prove exactly when or how a conspiracy was formed

or when or how a particular defendant joined the scheme.'"  <u>United States v. Oruche</u>, No. 07-CR-

124, 2008 WL 612694, at *3 (S.D.N.Y. Mar. 5, 2008) (citing United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988); United States v. Nachamie, 91 F. Supp. 2d 565, 574-76 (S.D.N.Y. 2000)).

Greebel cites only one case in support of this request in which a court has actually ordered the government the information sought in this request.  (The other two cases Greebel cites in support of his argument either don't address the issue, United States v. Shteyman, No. 10 Cr. 347 (SJ), 2011 WL 2006291 (E.D.N.Y. May 23, 2011)), or support the proposition that the demand for such information is "routinely denied," Nachamie, 91 F. Supp. 2d at 574).  In United States v. Feola, 651 F. Supp. 1068 (S.D.N.Y. 1987), 19 defendants were charged in a 17-count indictment (6 substantive counts and 11 forfeiture counts); six defendants moved for a bill of particulars on various issues, and the Court did require the government to provide information about the exact dates the defendants joined the various conspiracies and when certain defendants became members of the conspiracies.  Id. at 1133.  However, the Feola court provided absolutely no explanation or analysis as to why it granted the defendant's requests for this information; it also predates the many subsequent cases in this Circuit that where courts have held that such information is not an appropriate subject of a bill of particulars.  See, e.g., Badoolah, 2014 WL 4793787, at *14; Batista, 2009 WL 910357, at *9; Oruche, 2008 WL 612694, at *3; United States v. Savin, No. 00-CR-045 (RWS), 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001); United States v. Mittal, No. 98-CR-1302, 1999 WL 461293, at *9 (S.D.N.Y. July 7, 1999) (citing cases).  Thus, this request should be denied.

f.   Request #6:  Identify all of the overt acts that the government intends to prove in furtherance of the securities fraud conspiracy alleged in Count Eight.

Greebel is not entitled to a bill of particulars containing all of the overt acts it intends to prove in furtherance of the securities fraud conspiracy in Count Eight.  (Greebel BOP Br. at 26-28).   As Greebel acknowledges (Greebel BOP Br. at 27), "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge."  United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975).  Nor does this case present the sort of extreme circumstances in which courts have held that the government should provide this information.  Of all the cases cited by Greebel in support of this request, in only two instances did a court order that the government provide a bill of particulars regarding overt acts, and both cases are inapposite.

First, in Oruche, the defendant was charged alongside seven other defendants in an indictment alleging five separate conspiracies; the defendant himself was only charged in two counts in the indictment, and was only named in one overt act listed in the indictment (out of numerous other overt acts for each count).  2008 WL 612694 at *1-*2.  Given the paucity of information about the defendant's role in the conspiracies, the court ruled that the government needed to provide the defendant with a list of all overt acts it would seek to prove thirty days before trial.  Id. at *4.  By contrast, the Superseding Indictment sets forth twelve overt acts in Count Eight; Greebel is named in ten of those acts.  And as detailed exhaustively above, Greebel has also been provided with significant additional information about the Unrestricted Shares Scheme in the Crime Fraud Affidavit, Crime Fraud Emails and other discovery and disclosures.  All of this information is more than sufficient to provide the information "necessary" that Greebel needs to understand the charges against him, unlike the defendant in Oruche.

44

The second case Greebel cites in which a court granted a bill of particulars for overt acts is United States v. Bin Laden, 92 F. Supp. 2d 225 (S.D.N.Y. 2000).  Bin Laden was a terrorism case involving a worldwide criminal conspiracy, and is materially different from this case in its complexity and scope: its indictment charged "15 named defendants with 267 discrete criminal offenses, charged certain defendants with 229 counts of murder, covered a period of nearly ten years, and alleged 144 overt acts in various countries that covered an unusually vast geographical scope."  United States v. Wedd, No. 15-CR-616 (KBF), 2016 WL 1055737, at *4 (S.D.N.Y. Mar. 10, 2016) (rejecting defendant's attempt to analogize an indictment charging conspiracy to commit wire fraud and money laundering to the indictment in Bin Laden, and declining to order a bill of particulars).  Consequently, Bin Laden does not support Greebel's request for a list of all overt acts that the government intends to prove in connection with Count Eight.

*     *     *

For the foregoing reasons, the defendants' various requests for a bill of particulars should be denied.

45

**POINT TWO**

**GREEBEL'S MOTION FOR EARLY DISCLOSURE OF
CERTAIN MATERIALS SHOULD BE DENIED**

In his motion, Greebel requests the prompt production of information he categorizes as <u>Brady</u> material, including impeachment material pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  As set forth in its July 13, 2016 letter to both defendants and discussed extensively during the July 14, 2016 status conference, the government is aware of, and will continue to comply with, all of its disclosure obligations.  <u>See</u> Greebel Br., Ex. B; 7/14/2016 Status Conference Transcript at 5-10, 13-18, attached hereto as Exhibit D.  With respect to <u>Brady</u> materials, the government has provided all responsive information after review of the materials in its possession, custody and control, and if it acquires any additional <u>Brady</u> material, it will promptly produce it.[9]  With respect to Greebel's request for <u>Giglio</u> information, the defendant is not entitled to its production at this stage.

## I.   Legal Standard

The government has a "constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." <u>United States v. Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001).  Favorable evidence includes not only evidence that tends to exculpate a defendant, but evidence that is useful for impeaching a witness. <u>Id.</u> (citing <u>Giglio</u>, 405 U.S. at 154; <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)).  "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that an outcome of a trial in which the evidence

---

[9]   The government confirms that it has requested all documents and reports from the FBI and has conducted a <u>Brady</u> review of those materials.  It also confirms that it has produced all statements made by Shkreli to the government.  Additionally, the government requested and reviewed all materials related the SEC's parallel investigation and civil action, and has reviewed those materials for <u>Brady</u> as well.

had been disclosed would have been different." Coppa, 267 F.3d at 142.  "The rationale underlying Brady is not to supply a defendant with all the evidence in the [g]overnment's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the [g]overnment."  United States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982).  Notably, the scope of the government's Brady obligation does not extend to "investigative files merely because they contain information which could assist the defendant."  United States v. Reddy, 190 F. Supp. 2d 558, 575 (S.D.N.Y. 2002); see also United States v. Mavashev, No. 08-CR-902 (DLI), 2010 WL 670083 (E.D.N.Y. Feb. 23, 2010).  The government is not required to disclose exculpatory, material evidence if the defendant knows or should have known of "the essential facts permitting him to take advantage of any exculpatory evidence."  Reddy, 190 F. Supp. 2d at 575 (citing United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993)).

The Second Circuit has often "reiterate[d] the longstanding constitutional principle that as long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."  Coppa, 267 F.3d at 144; see also United States v. Nixon, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); United States v. Yu, No. 97-CR-102 (SJ), 1998 WL 57079, at *5 (E.D.N.Y. Feb. 5, 1998) ("Brady material of an impeachment nature, commonly referred to as Giglio material, is not required to be produced before trial."); United States v. Velasquez, No. 96-CR-126 (JFK), 1997 WL 414132, at *6 (S.D.N.Y. July 23, 1997) (same).  A court has the discretion to order Brady disclosure at any time as a matter of "sound case management." Mavashev, 2010 WL 670083 at *2.

Disclosure of the names of potential exculpatory witnesses satisfies the government's Brady obligations. See United States v. Zagari, 111 F.3d 307, 320 (2d Cir. 1997); Reddy, 190 F. Supp. 2d at 575 ("In fulfilling its obligations under Brady, the [g]overnment may direct the [d]efendants' attention to any witnesses who may have material exculpatory evidence"); Mavashev, 2010 WL 670083 at *3. When the government "has also described the nature of the exculpatory information possessed by each witness," the government has "further assist[ed] [the] defendant's ability to make 'effective use' of it at trial." Mavashev, 2010 WL 670083 at *3 (finding that the government had satisfied its Brady obligations when it disclosed the identities of witnesses with potentially exculpatory information and one- to two-sentence summaries of that information) (citing Coppa, 267 F.3d at 144). Once the government discloses the identities of potentially exculpatory witnesses, the defendant may "attempt to interview them to 'ascertain the substance of their prospective testimony,' or subpoena them if the [g]overnment does not intend to call them as witnesses at trial." Reddy, 190 F. Supp. 2d at 575 (citations omitted). Additionally, "the [g]overnment is not required to produce [18 U.S.C. § 3500] materials other than as required by the statute, unless statements are material within the meaning of Brady." Reddy, 190 F. Supp. 2d at 576.

## II.   **Argument**

Here, the government has complied with its Brady obligations thus far, and Greebel has failed to show otherwise. First, prior to a trial date even being set in this case, the government provided a Brady disclosure to the defendants in a letter dated July 13, 2016, after having provided discovery to the defendants on April 28, 2016 that contained exculpatory information. See Greebel Br., Ex. B. As set forth above, in the July 13, 2016 letter, the government identified three individuals who entered into consulting agreements with Retrophin who may have information

that would be helpful to the defense.  Id.  For each individual, the government provided the individual's name, a summary of the potentially exculpatory information that each witness may possess, and the contact information for each witness' counsel.  Id.  As set forth in the letter, only one of the individuals disclosed by the government in that letter maintains that he actually provided consulting services to Retrophin pursuant to his consulting agreement.  Id.  For that individual, the government directed the defendants to a Bates range of previously-produced documents that contains further information about that witness's potentially exculpatory information (i.e., the nature of the consulting services that the witness claimed he provided to Retrophin pursuant to his consulting agreement, and the actions he supposedly took as a consultant).  Id.

For the other two witnesses, the government disclosed out of an abundance of caution the fact that those witnesses had initially stated that they had performed some consulting services for Retrophin in connection with their consulting agreements; in subsequent interviews, those witnesses admitted, in sum and substance, that they had not provided any consulting services in connection with their agreements.  Id.  Instead, they stated, in sum and substance, that they entered into the consulting agreements as a means of recovering their investments in MSMB Capital and Elea Capital, respectively.  Id.  These witnesses' initial statements, in light of their later statements, are more appropriately categorized as Giglio material, which the government was under no obligation to provide at this time.  United States v. RW Prof'l Leasing Servs. Corp., 317 F. Supp. 2d 167, 179 (E.D.N.Y. 2004) (a defendant has "no pretrial discovery right to Giglio materials").  Indeed, the Court stated to defense counsel at the July 14, 2016 status conference in reference to the information provided by these two witnesses in their initial interviews: "I think it could be debatable whether this is exculpatory to the extent that you're asserting that some of these

49

consulting agreements with certain individuals were shams or not shams.  It appears that at least with two of the three there were no consulting services provided." Ex. D at 10.

Additionally, during the July 14, 2016 status conference, the Court and the parties discussed the government's <u>Brady</u> obligations in great detail.  Ex. D at 1-10.  The government made clear that it takes its <u>Brady</u> obligations seriously, and that it will continue to provide any additional <u>Brady</u> information it obtains in a timely manner.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 5-8.  During that appearance, Greebel's counsel raised the fact that the government did not provide any actual statements of the witness who maintains that his consulting agreement is legitimate, and argued that "while paraphrasing in certain instances may be sufficient under the law," the government should disclose the actual statements of the witness to fulfill its <u>Brady</u> obligations here.  <u>Id.</u> at 15-17.  In response, the government noted that it had gone "above and beyond" what is actually required of the government in terms of its <u>Brady</u> obligations, and that the witness at issue is involved in both civil litigation and arbitrations in which he has provided statements of his knowledge regarding his consulting agreement with Retrophin.  <u>Id.</u> at 17.  During the status conference, the Court affirmed that it cannot order the government to produce Jencks or Section 3500 material at this time.  <u>Id.</u> at 16, 18.

In his motion, Greebel revisits the same ground covered during the July 14, 2016 status conference.  He yet again asks for witness statements and FBI reports to which he is not entitled by law.  Greebel Br. at 9-11.  Notably, nine months before trial, Greebel does not appear to have made any attempt to make "effective use" of the government's <u>Brady</u> disclosure, despite the fact that he has the names of the individuals at issue, the contact information for their attorneys, and a summary of their potentially exculpatory information.

Greebel also requests that the Court compel the government to produce: (1) evidence that any consulting agreements were not "shams" (Greebel Br. at 11-13); (2) evidence that Shkreli lied to and/or deceived others (Id. at 13-14); (3) evidence that Shkreli did not follow Greebel's counsel (Id. at 14); (4) evidence that Greebel was not Shkreli's personal attorney; (5) evidence of Shkreli's credibility, including threats to others; (5) any statements reflecting alleged threats of prosecution to the three individuals identified in the government's July 13, 2016 letter (Id. at 18); and (6) immediate production of any statements "casting doubt on the veracity of any of the government's witnesses" (Id. at 19).  In other words, Greebel asks this Court to compel the government to supply him with all the evidence in the government's possession which might conceivably assist in the preparation of his defense; the case law makes clear that such disclosures are far beyond what Brady requires.  See, e.g., LeRoy, 687 F.2d at 619; Coppa, 267 F.3d 132 (Brady "imposes a disclosure obligation narrower in scope than the obligation to disclose all evidence favorable to the defendant") (emphasis in original).  Additionally, most of these requests are way beyond the scope of Brady or any other type of disclosures required of the government and would only be remotely appropriate if the law required the government to prepare the defense's case for trial.

In making these requests, Greebel also urges this Court to compel the government to provide early disclosure of both Giglio and Section 3500 material.  As noted above, the Court informed the defendants at the last status conference that it was not authorized to do so under the law.  See RW Prof'l Leasing Servs. Corp., 317 F. Supp. 2d at 179 (a defendant has "no pre-trial right to Giglio materials").  Moreover, such disclosure is neither appropriate nor warranted here.

For the reasons set forth above, Greebel's motion to compel disclosure of Brady and other materials should be denied.

51

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that the defendants'

discovery motions should be denied in their entirety.


Dated:  Brooklyn, New York
         September 30, 2016

                                        Respectfully submitted,

                                        ROBERT L. CAPERS
                                        United States Attorney
                                        Eastern District of New York


                                        _____/s/_____
                                        Winston M. Paes
                                        Jacquelyn M. Kasulis
                                        Alixandra E. Smith
                                        Assistant U.S. Attorneys
                                        (718) 254-6023 (Paes)


Enclosures

cc:   Clerk of the Court (KAM)
      Defense Counsel (By ECF and Email)