# EXHIBIT A

WP/AS:DKK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

IN RE GRAND JURY SUBPOENAS DATED
MAY 14, 2014 AND JANUARY 13, 2015

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN
SUPPORT OF *EX PARTE*
REQUEST FOR
*IN CAMERA* REVIEW

- - - - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

Christopher Delzotto, being duly sworn, deposes and says:

### INTRODUCTION

1.  I am a Special Agent with the FBI. I have been employed by the FBI for

approximately six years. Since March 2011, I have been assigned to Squad C-1, one of the FBI's

securities and corporate fraud units, which focuses its investigations on securities fraud, mail

fraud, and wire fraud offenses. I attended and graduated from the FBI Academy, where I

received comprehensive training in white collar and financial crimes investigations. In my

capacity as an FBI Special Agent, I have participated in numerous investigations into securities

fraud, mail fraud, wire fraud, and money laundering, during the course of which I have conducted

or participated in surveillance, execution of search warrants and arrest warrants, and debriefings

of victims and informants. I am aware that individuals committing fraud commonly use

electronic means of communication in furtherance of their criminal activities, including but not

limited to electronic mail. As a result of my training and experience, I am familiar with the

techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.      I make this affidavit in support of the government's ex parte motion for in camera review of certain emails obtained pursuant to two Grand Jury Subpoenas to Retrophin, Inc. ("Retrophin" or "RTRX"), a public company whose former Chief Executive Officer, Martin Shkreli ("SHKRELI"), and former outside counsel, Evan Greebel ("GREEBEL"), among others, are under investigation by the government for various crimes, including conspiracy to commit wire fraud, mail fraud and securities fraud, in violation of 15 U.S.C. § 78j(b), 18 U.S.C. § 1349 and/or 18 U.S.C. § 371.  Retrophin has produced these emails, and their attachments, in redacted form because SHKRELI has asserted an attorney-client privilege over some of the contents of those emails.

3.      I have personally participated in the investigation of the offenses discussed herein.  I am familiar with the facts and circumstances of this investigation from my review of documents, discussions I have had with other law enforcement personnel, interviews with current and former employees of the companies discussed herein, and my training and experience.

4.      Because this affidavit is being submitted for the limited purpose of establishing a factual basis that supports in camera review by this Court, this affidavit does not include all the facts that I have learned during the course of my investigation.  This application does not set forth all of my knowledge about this matter and does not discuss all of the documents I have reviewed.  Furthermore, where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  If an email discussed herein was sent or copied to

multiple individuals, I have not always identified all of those individuals. All quotations from documents are provided verbatim, except where otherwise noted.

## SUMMARY

5.      Between 2009 and 2011, SHKRELI established a series of hedge funds ("MSMB entities"), including MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare"). The letters "MSMB" refer to the initials in SHKRELI's name, followed by the initials in the name of Marek Biestek ("BIESTEK"), who was SHKRELI's business partner and the co-founder of the MSMB entities. From October 2009 to January 2011, nine investors purchased a total of over $3 million in MSMB Capital limited partnership interests. In 2011, SHKRELI founded Retrophin LLC, a privately held pharmaceutical company that went public in December 2012, becoming Retrophin Inc. As of November 2012, MSMB Healthcare LP, but not MSMB Capital, had invested in Retrophin LLC.

6.      Based on my analysis, and as detailed below, SHKRELI, aided by GREEBEL and others, engaged in fraudulent conduct related to MSMB Capital, MSMB Healthcare, and Retrophin between 2012 and 2014. During the relevant time period, GREEBEL was employed as a partner at Katten Muchin Rosenman LLP ("KATTEN"), and served (with the assistance of several other KATTEN attorneys) as Retrophin's outside counsel. As is relevant to the government's ex parte application, that fraudulent conduct included the following:

        a.      In November 2012, SHKRELI stated to the Securities and Exchange Commission ("SEC") that MSMB Capital had millions of dollars in assets under management when in fact MSMB Capital had little or no such assets. Then SHKRELI, assisted by GREEBEL, attempted to disguise the assets under management. They created a series of fraudulent documents that were back-dated to suggest that shares of Retrophin LLC had been transferred to MSMB Capital before SHKRELI's November statement to the SEC although in fact those shares were transferred only after SHKRELI had made that statement.

3

      b.     Between 2012 and 2014, SHKRELI, assisted by GREEBEL, orchestrated a series of transactions involving certain shares of RTRX stock that was designed to conceal SHKRELI's true ownership and control over those shares.

      c.     Finally, between 2012 and 2014, SHKRELI, assisted by GREEBEL, arranged to have Retrophin pay cash or RTRX stock to investors in MSMB entities in order to induce those investors to release claims the investors had against SHKRELI or those MSMB entities. SHKRELI and GREEBEL arranged for these payments to be made in two deceptive ways. First, they asked certain investors to sign "settlement agreements" that included Retrophin as a party in order to make it appear that the payments were being made in exchange for a release of claims against Retrophin, rather than against SHKRELI or MSMB entities. Second, they arranged for other investors to sign "consulting agreements" with Retrophin pursuant to which they would receive cash or stock in exchange for providing "consulting services." SHKRELI and GREEBEL understood that the agreements were in fact designed to compensate the investors for debts owed by SHKRELI or MSMB entities, not to Retrophin. Although the investors who signed consulting agreements received compensation from Retrophin, they did not provide the consulting services outlined in their agreements.

      7.     On September 30, 2014, Retrophin's Board of Directors removed

SHKRELI as CEO; SHKRELI subsequently resigned his positions with Retrophin on October

13, 2014. In June 2015, GREEBEL left KATTEN.[1] In August 2015, Retrophin sued SHKRELI

by filing a complaint in the Southern District of New York ("the Retrophin Complaint").

Retrophin alleged, among other things, that SHKRELI, assisted by Retrophin's outside counsel,

had engaged in the fraudulent conduct described in the previous paragraph.

      8.     On May 14, 2014, and January 13, 2015, a Grand Jury in the Eastern

District of New York issued subpoenas to Retrophin. The two subpoenas sought various

categories of documents, including documents related to the issuance of RTRX stock,

communications by SHKRELI, and the relationship between Retrophin and various MSMB

---

[1]     The government is not aware of the circumstances surrounding GREEBEL's departure from KATTEN.

entities.  Retrophin provided documents in response to those subpoenas, but provided emails involving SHKRELI and GREEBEL or KATTEN, only in redacted form.

       9.     On August 3, 2015, SHKRELI's attorney sent a letter to Retrophin's attorney asserting "any attorney-client privilege and other privilege that Mr. Shkreli may have" in emails in Retrophin's possession.  SHKRELI's attorney acknowledged that "some communications between Mr. Shkreli and Katten were made by Mr. Shkreli in his official capacity as Chief Executive Officer ("CEO") of Retrophin, and that therefore Retrophin is the holder of the privilege for those communications," but argued that GREEBEL and KATTEN had also represented SHKRELI in his personal capacity and that Retrophin could not waive the attorney-client privilege as to emails sent pursuant to that personal representation.

       10.    On September 30, 2015, Retrophin informed the government that it would waive the attorney-client privilege with respect to certain categories of documents, including: the circumstances surrounding SHKRELI's transfer of Retrophin shares to MSMB capital; the allocation and transfer of post-merger RTRX shares by SHKRELI; and settlement and consulting agreements with certain MSMB investors.  Based upon the following discussion, I believe that the categories of documents over which Retrophin has agreed to waive any attorney-client privilege address the fraudulent conduct discussed herein.  I understand that Retrophin has not provided unredacted copies of the documents it had previously provided in redacted form, however, in part because of SHKRELI's general assertion of privilege.

       11.    In conjunction with the filing of this affidavit, the government has filed an ex parte motion seeking an in camera review by this Court of certain emails between SHKRELI and GREEBEL or other KATTEN attorneys that Retrophin has indicated may be subject to an assertion of the attorney-client privilege by SHKRELI.  The purpose of the in camera review is to

5

determine whether, assuming those redacted emails relate to GREEBEL's and KATTEN's

purported representation of SHKRELI in his personal capacity, the attorney-client privilege

should nonetheless not apply because of the so-called "crime-fraud" exception to that privilege.

      12.    Based on the government's investigation, including the emails and other

evidence discussed below, I believe that an in camera review is warranted. Specifically, I believe

that prudent person would have a reasonable basis to suspect that SHKRELI, assisted by

GREEBEL, perpetrated a series of frauds and that the redacted communications between

SHKRELI and GREEBEL or KATTEN, discussed herein, were made in furtherance of those

frauds.

## SHKRELI BACKDATED THE TRANSFER OF SECURITIES TO DECEIVE THE SEC AND MSMB INVESTORS

      13.    By the end of February 2011, MSMB Capital had little or no assets. In that

month, SHKRELI took a short position in a company called OREX in MSMB Capital's account

at Merrill Lynch. That transaction resulted in losses of over $7 million. MSMB Capital also

suffered over $1 million in other trading losses in February 2011. The value of the assets in

MSMB Capital's bank and brokerage accounts (not including the OREX losses at Merrill Lynch)

declined from over $1.12 million on January 31, 2011 to $58,500 at the end of February 2011.

MSMB Capital did not engage in any trading after February 2011.

      14.    In September 2012, SHKRELI signed a Settlement Agreement in an arbitration

between MSMB Capital and Merrill Lynch arising out of SHKRELI's failed short trade related to

OREX. SHKRELI signed on behalf of MSMB Capital, and his signature was notarized. Among

other things, the Settlement Agreement purported to set forth "the approximate value of each of

[the settling parties'] material assets and liabilities as they currently exist." That Settlement Agreement lists MSMB Capital's "Assets/Liabilities" as "$0."

15.     In fall 2012, SHKRELI decided that Retrophin should become a public company. SHKRELI decided to take Retrophin public through a "reverse merger," pursuant to which Retrophin would pay $200,000 to an individual named Michael Fearnow to purchase a publicly-traded shell corporation called Desert Gateway ("GATEWAY"). After such a merger, shares of Retrophin, the private company, would be exchanged for shares of RTRX, the public company. In addition, as part of the reverse merger, Retrophin would obtain 2.4 million shares in the post-merger entity ("Fearnow Shares"). Unlike the shares in the post-merger entity that would result from the conversion of shares in the privately held Retrophin, the Fearnow Shares could be traded immediately.

16.     Also in the fall of 2012, the Securities and Exchange Commission ("SEC") opened an investigation entitled "In the Matter of MSMB Capital Management LLC Valuation."

17.     On September 5, 2012, an attorney at KATTEN emailed SHKRELI and GREEBEL, attaching an "updated Retrophin capitalization table" that showed the individuals and entities that owned Retrophin shares. [RP00058271][2] The table shows, in relevant part, that: MSMB Healthcare LP held 30,000 "Class A Common Investment Units"; Thomas Fernandez ("FERNANDEZ") held 50,000 Class A units; Kevin Mulleady ("MULLEADY") held 30,000 Class A units and 10,000 Class B units; and BIESTEK held 10,000 Class B units, of which 4,167 were vested. Based upon my analysis of documents and interviews with current and former Retrophin and MSMB employees, I understand that FERNANDEZ was an employee at

---

[2]     This affidavit refers to each redacted document for which the government seeks in camera review using the format "[Bates number]", where the Bates number listed is the corresponding Bates number on the document provided by Retrophin. A copy of each redacted document cited herein is attached to this affidavit.

MSMB Capital and later became Director of Business Development for Retrophin, and that

MULLEADY held several titles at MSMB Capital including CEO. The table did not list MSMB

Capital as holding any units of Retrophin.

18.     On or about September 10, 2012, SHKRELI sent an email to the investors in

MSMB Capital and MSMB Healthcare telling them he planned to devote all his time to

Retrophin and would be dissolving MSMB Capital and MSMB Healthcare. SHKRELI told those

investors that the original MSMB Capital investors "have just about doubled their money net of

fees." In the same email, SHKRELI wrote that, going forward, "Retrophin will embody all of my

investment activities and attention. I think it will prove to be a successful public company and

investment. . . ." SHKRELI also represented that all MSMB investors could redeem their

investments for their choice of cash or Retrophin stock by the end of October 2012.

19.     On or about October 1, 2012, the SEC issued a subpoena to the MSMB entities

seeking documents showing their assets under management.

20.     On November 4, 2012, SHKRELI sent an email to the SEC, attaching a series of

"documents responsive" to the SEC's requests. The documents included a "Schedule of Funds

Managed by MSMB." That schedule listed "MSMB Capital Management LP"—MSMB

Capital—as having "$2,600,000 AUM [Assets Under Management] – fund being liquidated."

SHKRELI did not supply any supporting documentation to identify those assets, instead writing

that documents for that fund "are available upon request."

21.     I believe SHKRELI's statement to the SEC about MSMB Capital's assets under

management was false. My belief is based upon, among other things, the following facts. First,

on September 5, 2012—only two months before his statement to the SEC—SHKRELI had

8

asserted that MSMB Capital had "$0" in assets.  Second, bank records and brokerage statements reveal that MSMB Capital had approximately $58,000 in assets following the OREX trade.

22.     On November 8, 2012, an MSMB employee emailed GREEBEL and others a "Retrophin Post-Conversion Capitalization Table."  [RP01906304]  As with the September 2012 capitalization table, the table sent on November 8 states, in relevant part, that: MSMB Healthcare LP held 30,000 "Class A Common Investment Units"; FERNANDEZ held 50,000 Class A units; MULLEADY held 30,000 Class A units and 10,000 Class B units, and BIESTEK held 10,000 Class B units, of which 4,167 were vested.  The Capitalization Table does not list MSMB Capital as holding any units of Retrophin.

23.     The information in that capitalization table is consistent with emails that SHKRELI had sent in May 2012.  On May 14, 2012, SHKRELI emailed GREEBEL and others that he had transferred 50,000 Retrophin shares to FERNANDEZ and had transferred 30,000 Retrophin shares to MULLEADY.

24.     Over the next few weeks, however, SHKRELI and GREEBEL took steps to make it appear as if MSMB Capital held 75,000 of Retrophin shares as of July 2012, thereby: (1) supporting SHKRELI's assertion to the SEC that MSMB Capital had $2.6 million of assets under management, and (2) supporting statements made by SHKRELI to MSMB Capital investors that MSMB Capital had invested in Retrophin (and that, because of SHKRELI's valuation of Retrophin units, MSMB Capital had achieved sizeable returns for those investors).

25.     On November 29, SHKRELI and GREEBEL arranged for BIESTEK to sign what appears to be an agreement to transfer Retrophin shares from BIESTEK to SHKRELI that is dated June 1, 2012.

9

a. On November 29, 2012, at 3:20 PM, MSMB Capital's Chief Financial Officer ("CFO") emailed GREEBEL a signed "Transfer and Donee Representation Letter." [RP00410177] That document transfers 4,167 Class B shares of Retrophin from BIESTEK to SHKRELI. A handwritten date indicates that the document was signed by SHKRELI on "11/29/12," the same day that the email from the CFO was sent.

b. Over the next five hours SHKRELI, GREEBEL, and the CFO exchanged emails in response to the email from the CFO. These emails have been redacted. [RP00183236]

c. Six hours after the CFO had sent GREEBEL the BIESTEK-to-SHKRELI transfer document, one of Retrophin's accountants emailed the CFO: "WT…..F." [RP00410218]

d. At 8:56 PM on November 29, 2012, after what appears to be the same exchange of redacted emails mentioned above, the CFO sent SHKRELI, GREEBEL, and BIESTEK, a document entitled "Transfer and Donee Representation Letter." [RP00183242] That document appears to be identical to the one that the CFO sent at 3:20 PM with one difference: Rather than indicate the document was signed on "11/29/12," this document lists the date, written by hand, as "7/1/12."

e. I have examined the 8:56 PM copy of the BIESTEK-to-SHKRELI transfer document. Based on that examination, and my training and experience, I believe that pieces of correction tape, whose edges are visible in the copy of the document obtained by the government, were placed over the original "11/29/12" dates, and that someone then wrote "7/1/12" on top of the correction tape. In other words, I believe the original document was altered to reflect that it was signed on a date earlier than the date on which it was actually signed.

f. At 8:56 PM on November 29, 2012, GREEBEL responded to the CFO's email of 3:55 PM, but the contents of that email have been redacted. [RP00410212]

g. At 9:32 PM, approximately half an hour after the CFO sent the altered copy of the BIESTEK-to-SHKRELI transfer document to SHKRELI and GREEBEL, the CFO sent another email to those individuals and BIESTEK. [RP00183259] The contents of that email are redacted, but the email attaches another copy of the BIESTEK-to-SHKRELI transfer document. That document appears to be identical to the one that the CFO sent at 8:56 PM, except that the handwritten dates and addresses on the signature page present on the 8:56 PM copy are no longer visible at all. Instead, the date listed is "June 1st, 2012," and the date is typed using a computer rather than written by hand.

        h.      There are several variants of the November 29, 2012, email chains discussed above that contain some of the same emails and subject headings but also additional emails that are redacted. [RP00183241; RP00183258; RP00410565] Based upon my training and experience, and my analysis of all of the emails discussed herein, I believe that those additional email chains on November 29 relate to the same issues discussed in the preceding sub-paragraphs.

26.     On November 30, 2012, SHKRELI arranged to have MULLEADY sign what

appears to be an agreement to transfer Retrophin shares from MULLEADY to SHKRELI dated

May 25, 2012, in exchange for MULLEADY's receipt of Fearnow Shares at a later date.

        a.      On November 30, 2012, SHKRELI emailed MULLEADY a "Transfer and Donee Representation Letter" that, when signed, would transfer 10,000 Class A shares of Retrophin from MULLEADY to SHKRELI. In that email, SHKRELI wrote: "This will reverse the 10,000 shares I gave you. The 30,000 shares I gave you were transferred invalidly (the auditors and lawyers just determined this)."

        b.      Based on my training and experience, as well as my analysis of the capitalization tables emailed before November 30, I believe that the "10,000 shares" in SHKRELI's email refers to the 10,000 Class B units MULLEADY held, whereas the "30,000 shares" refers to the 30,000 Class A units of Retrophin that MULLEADY held.

        c.      SHKRELI also wrote that "Michael Fearnow will sell you stock for a nominal amount (<$1000) that equal [sic] to 5% of the common stock (but not preferred stock) of Retrophin Inc., the public company post-merger. . . . I need your signature ASAP." Based on my training and experience, as well as my analysis of the emails discussed herein, I believe that SHKRELI had arranged for MULLEADY to transfer shares in the privately held Retrophin company to SHKRELI in exchange for Fearnow Shares.

        d.      Although SHKRELI sent his email on November 30, the unsigned "Transfer and Donee Representation Letter" attached to the email was dated "May 25, 2012." Based on my training and experience, as well as my analysis of the emails discussed herein, I believe that, when SHKRELI wrote "I need your signature ASAP," he was asking MULLEADY to sign the document dated May 25, 2012.

        e.      Moreover, as discussed below, MULLEADY also appears to have signed an untitled document dated "July 1st, 2012" that states: "I, Kevin Mulleady, acknowledge that my receipt of 30,000 Class A Common Units

11

from Martin Shkreli was invalid due to failure to sign the Adjoiner to Founder's Agreement." Based upon my analysis of the foregoing, and in particular SHKRELI's statement on November 30, 2012, that he "just found out" that a prior transfer of 30,000 shares was "invalid[]," I believe that this document was in fact signed after July 1, 2012.

27.     Also on November 30, 2012, SHKRELI arranged to have FERNANDEZ sign

what appears to be an agreement to transfer Retrophin shares from FERNANDEZ to SHKRELI

and that is dated July 1, 2012, in exchange for FERNANDEZ's receipt of Fearnow Shares at a

later date.

        a.    On November 30, 2012, FERNANDEZ emailed SHKRELI "Can you memorialize our understanding as discussed?" SHKRELI responded: "sure – you will surrender all of your [Retrophin] stock to me and have zero" and then receive Fearnow Shares in exchange "for a nominal amount."

        b.    Earlier that week, on November 26, 2012, SHKRELI and GREEBEL emailed each other with the subject "Surrender Agreement." [RP00182022] The contents of all of those emails are redacted. Based upon my analysis of the emails sent after that November 26 email chain, I believe the "Surrender Agreement" refers to the documents that SHKRELI and GREEBEL prepared to have FERNANDEZ "surrender all of" his Retrophin stock, as SHKRELI wrote on November 30.

        c.    The government has obtained a copy of a "Transfer and Donee Representation Letter," signed by FERNANDEZ and SHKRELI and dated, by hand, "7/1/12," that purports to transfer 50,000 Retrophin shares from FERNANDEZ to SHKRELI.

28.     On December 3, 2012, SHKRELI sent GREEBEL and Retrophin's CFO a "Final

Capitalization Table." [RP00184239] That table shows that Retrophin's "Pre-Money, Pre-

Merger" common stock included 75,000 shares owned by "MSMB Capital LP," in addition to

shares owned by MSMB Healthcare. Also, that table does not list any "Pre-Money, Pre-Merger"

shares held by FERNANDEZ, MULLEADY, or BIESTEK. Based upon my training and

experience, as well as my analysis of the documents discussed herein, I believe that this new

table reflects the results of the transfers of Retrophin shares from FERNANDEZ, MULLEADY,

and BIESTEK to SHKRELI, and from SHKRELI to MSMB Capital, all of which were arranged in the days preceding the email.

29. Also on December 3, 2012, the CFO emailed Steven Aselage ("ASELAGE"), who served as Retrophin's CEO from September 2012 until the reverse merger in December 2012, and remained with Retrophin as a member of its Board of Directors.[3] The CFO wrote that SHKRELI's "transfer of shares from people whom he gave them to – and now having them transfer it back to him is delaying the financials to be sent to the auditors for review. Every time this occurs, the accountants have to go back and redo the work, most recently as this morning with the share transfer." [RP00411194]

30. Finally, also on December 3, 2012, the CFO emailed GREEBEL a series of documents identified as "transfer docs." [RP00411491.] Those documents consisted of:

      a.      A signed "Transfer and Donee Representation Letter" purporting to transfer 10,000 shares of Retrophin from MULLEADY to SHKRELI, dated "July 1st, 2012."

      b.      A signed "Transfer and Donee Representation Letter" purporting to transfer 4,167 shares of Retrophin from BIESTEK to SHKRELI, dated "June 1st, 2012." This document appears identical to the one the CFO sent to SHKRELI and GREEBEL on November 29, 2012.

      c.      A signed "Transfer and Donee Representation Letter" purporting to transfer 50,000 shares of Retrophin from FERNANDEZ to SHKRELI, dated by hand "7/1/12"

      d.      A "Transfer and Donee Representation Letter" purporting to transfer 75,000 shares of Retrophin from SHKRELI to MSMB Capital, dated "7/1/12" The handwriting used to write "7/1/12" in that document appears to be the same used to write "7/1/12" on the FERNANDEZ-to-SHKRELI document described above.

      e.      An untitled document dated "July 1st, 2012" and signed by MULLEADY, stating: "I, Kevin Mulleady, acknowledge that my receipt of 30,000 Class

---

[3]     Following the Board of Directors' decision to remove SHKRELI in September 2014, ASELAGE became the CEO of Retrophin, and currently holds that position.

A Common Units from Martin Shkreli was invalid due to failure to sign the Adjoiner to Founder's Agreement."

31.     Based upon my training and experience, and my analysis of the aforementioned documents and emails, I believe these "transfer docs" were created, and in some cases altered, in November 2012 to suggest that they had been executed between May and July 2012 rather than in November or December 2012. Using these false documents, SHKRELI and GREEBEL could attempt to justify SHKRELI's false assertion to the SEC that MSMB Capital had more than "$0" in assets under management as of November 2012 by making it appear as if MSMB Capital had received Retrophin shares as of July 2012. These false documents also permitted SHKRELI to argue to MSMB Capital investors that MSMB Capital had achieved sizeable returns due to its alleged investment in Retrophin.

32.     Later in December 2012, SHKRELI and GREEBEL prepared an SEC Schedule 13D that misrepresented the source of the 75,000 Retrophin shares that SHKRELI had transferred to MSMB Capital.

      a.     On December 15 and 16, 2012, GREEBEL and SHKRELI exchanged emails with the subject "13D." The contents of these emails have been redacted. [RP00187512]

      b.     On December 20, 2012, GREEBEL emailed SHKRELI a "draft of the 13D" and said "we should discuss." The email attached a "SCHEDULE 13D" related to the reverse merger of Retrophin and GATEWAY. Based on my training and experience, I know that a Schedule 13D is a document required by the SEC to report whether an individual or entity is a "beneficial owner" of a security.

      c.     The draft Schedule 13D states, among other things, that the "shares of Retrophin Common Stock held by MSMB Capital LP prior to the Merger [of Retrophin and GATEWAY] were purchased with working capital." Based on my analysis of the documents discussed above and my training and experience, I believe that statement is false. The 75,000 shares of Retrophin purportedly held by MSMB Capital were transferred by SHKRELI to MSMB Capital days before the merger with GATEWAY. The transfer agreement does not refer to any payment from MSMB Capital

14

to SHKRELI in exchange for those shares. There is no evidence that those shares were "purchased with working capital."

d.   The Schedule 13D ultimately filed by MSMB Capital contains the same statement about how the 75,000 Retrophin shares were purchased as in the draft that GREEBEL emailed to SHKRELI.

33.   Based on the foregoing, I believe that SHKRELI, assisted by GREEBEL, used back-dated documents to misrepresent the nature and source of MSMB Capital's assets in advance of the merger between Retrophin and GATEWAY.[4]

## THE ALLOCATION AND OWNERSHIP OF FEARNOW SHARES

34.   As discussed above, Retrophin had agreed to pay $200,000 to Fearnow in exchange for the GATEWAY shell corporation and 2.4 million Fearnow Shares, which could be freely traded as soon as the merger was completed. At the time of the merger in December 2012, however, Retrophin paid only $100,000 of the purchase price. As a result, SHKRELI and Fearnow agreed that 400,000 Fearnow Shares would remain in escrow until Fearnow received a second $100,000 payment. SHKRELI directed the allocation of the available two million shares.

35.   Pursuant to 17 C.F.R. § 230.144 ("Rule 144"), Fearnow Shares allocated directly to SHKRELI would have lost their freely trading characteristics. As a result, and as described below, SHKRELI and GREEBEL proceeded to allocate the two million available Fearnow Shares in a manner intended to conceal that SHKRELI was the true owner of some of those shares, which had purportedly been issued to others. Specifically, SHKRELI and GREEBEL arranged for certain Fearnow Shares to be issued to seven of SHKRELI's associates: BIESTEK; FERNANDEZ; MULLEADY; Timothy Pierotti ("PIEROTTI"); Edward Sullivan

---

[4]      In addition to the other emails discussed in this section, on December 5, 2012, GREEBEL sent SHKRELI an email whose contents are redacted. [RP00184826] Based upon my training and experience, and the discussion in this section about actions taken by SHKRELI and GREEBEL in December 2012, I believe that the December 5 email relates to the same actions discussed in this section of the affidavit.

("SULLIVAN"); Ronald Tilles ("TILLES"); and Andrew Vaino ("VAINO"), Retrophin's Vice President of Research and Development.[5] SHKRELI then arranged to control the trading of those shares himself.

36.     In December 2012, SHKRELI held a meeting with individuals to whom he intended to allocate Fearnow Shares. At that meeting, he explained the allocation and also asked each individual to deposit those shares in a brokerage account. The existence and substance of that meeting were confirmed to the government by multiple individuals. In addition, the Retrophin Complaint alleges that SHKRELI decided to allocate Fearnow Shares to the seven individuals listed above.

37.     On December 11, 2012, SHKRELI and GREEBEL exchanged a series of emails with the subject "fearnow stock" or "fearnow purchase." The contents of all of these emails are redacted. [RP00186256; RP00186374] In addition, they exchanged emails on December 8, with no subject, and December 10, with the subject "Retrophin." The contents of these email chains are also redacted. [RP00185515; RP00185997] Based upon my training and experience, and the timing of these emails and subsequent emails discussed herein and below, I believe that all of those email chains relate to SHKRELI's plan to allocate Fearnow Shares to his associates while concealing his control over those shares.

38.     The Merger Agreement between Retrophin and GATEWAY was dated December 12, 2012.

39.     On December 12, 2012, GREEBEL emailed BIESTEK: "attached are purchase agreements for the acquisition of the Fearnow stock. Please provide them to Andrew, Ron,

---

[5]     Based upon my analysis of documents and on interviews conducted with former and current MSMB and RTRX employees, I understand that PIEROTTI, SULLIVAN, and TILLES were all associates of SHKRELI and affiliated with MSMB or RTRX.

16

Kevin, Tim, and Tom. Please ask each person to sign the last page and return it to me."
BIESTEK responded less than nine hours later by attaching to an email purchase agreements
signed by MULLEADY, TILLES, FERNANDEZ, PIEROTTI, BIESTEK, and VAINO.[6]

40.     Also on December 12, 2012, Retrophin's CFO emailed GREEBEL a document
called "Retrophin Capitalization Table 12-12-2012.xls." That email responded to a long email
chain, the contents of which are redacted. [RP01897321] The capitalization table reflects that
"Fearnow Stock" would be issued to PIEROTTI, MULLEADY, FERNANDEZ, BIESTEK,
TILLES (in the name of "Claridge Capital LLC"), VAINO, and SULLIVAN.

41.     On December 13 and 14, 2012, GREEBEL sent a series of emails, some of which
are redacted, in an effort to ensure that the Fearnow Shares would be issued in the manner
SHKRELI had determined.

            a.      On December 13, 2012, at 11:03 AM, Retrophin's CFO emailed
                    GREEBEL and SHKRELI to ask "What is the name of the entity(s) that
                    we're paying 200k for the shell. [COREY] needs to know." The three
                    individuals then exchanged a series of emails whose contents are redacted.
                    [RP00186948; RP00186953]

            b.      On December 13, 2012, at 1:31 PM, SHKRELI and GREEBEL exchanged
                    emails whose contents are redacted. [KMR_RTRX_123795] At 2:50 PM
                    that day, GREEBEL emailed Fearnow and copied SHKRELI, urging
                    Fearnow to help get the Fearnow Shares issued quickly and stating "The
                    purchasers need this stock asap."

            c.      On December 13, 2012, at 10:43 PM, GREEBEL received an email
                    containing a draft "Opinion Letter" from the law firm ANSLOW &
                    JACLIN LP. I have reviewed the letter, which is addressed to the transfer
                    agent that would issue the Fearnow Shares. The letter offers the opinion
                    that the transfer agent should issue Fearnow Shares to MULLEADY,
                    FERNANDEZ, BIESTEK, PIEROTTI, "Claridge Capital LLC" (a/k/a
                    TILLES), VAINO, and SULLIVAN. In addition, the letter asserted that
                    none of the individuals receiving shares is an officer, director, or "holder
                    of 10% or more of the outstanding equity securities" of GATEWAY. On

---

[6]      TILLES signed on behalf of an entity called "Claridge Capital."

December 14, GREEBEL responded to that email with comments. He and SHKRELI also exchanged emails related to the email chain in which GREEBEL commented on the "Opinion Letter," but the contents of those emails are redacted. [RP00187282]

d.  On December 13, 2012, at 5:57 PM, GREEBEL emailed BIESTEK and SULLIVAN, asking each of them to confirm that he was "not an officer, a director, or holder of 10% or more of the outstanding equity securities of [GATEWAY]. . . ." BIESTEK and GREEBEL emailed back and forth after that, but some of the emails are redacted. [RP00415521] On December 14, BIESTEK forwarded the email chain to PIEROTTI. Also, on December 13 at 10:58 PM, GREEBEL sent an email to BIESTEK and SULLIVAN, which email he forwarded to SHKRELI. The contents of those emails are redacted. [RP00187120] Based on my training and experience, as well as my analysis of the other emails sent on December 13 and 14, I believe these redacted email chains relate to efforts by GREEBEL to confirm the statement in the "Opinion Letter" that none of the individuals receiving Fearnow Shares was an officer, director, or 10% holder of GATEWAY.

42.  On December 17, 2012, SHKRELI sent an email to "Firmwide," with the subject "Retrophin." SHKRELI wrote: "Effective immediately, I am the CEO of Retrophin Inc. . . . Retrophin has 4 employees: myself, Leonora Izerne, Jackson Su, and Michael Smith. If you are not on this list, you are not an employee or consultant to Retrophin and no longer an employee or consultant of Retrophin if you were previously. . . . Finally, to my knowledge, no one other than the 4 direct employees mentioned and our Board of Directors, has material non-public information regarding Retrophin." SHKRELI then forwarded that email to GREEBEL, who responded with a message whose contents are redacted. [RP00187697] Based on my training and experience, including my experience investigating securities fraud cases, I believe that this email was intended to sever any official connection between Retrophin and the individuals to whom SHKRELI had allocated Fearnow Shares on his behalf, so that those individuals could not be deemed to be an officer or director of Retrophin given their prior high-level positions at

18

entities associated with SHKRELI, and to hold and trade those shares without being accused of violating any laws related to insider trading.

43.     On December 19, 2012, GREEBEL and BIESTEK exchanged a series of emails whose contents are redacted. [RP00416842; RP00416847]  The subject of the emails is "stock question."  Later that day, GREEBEL forwarded to BIESTEK an email he had received concerning "Rule 144," the rule that, as discussed above, might have limited the ability of SHKRELI, as an officer of Retrophin, to trade Fearnow Shares.  The text of GREEBEL's email to BIESTEK is redacted. [RP00416894]  Based on my training and experience, as well as my analysis of these and other emails, I believe that these email chains relate to questions BIESTEK had about whether and how Fearnow Shares could be traded.  The trading of Fearnow Shares was particularly important to anyone who sought to control and/or manipulate the stock price of Retrophin because the Fearnow Shares were the only freely trading or unrestricted shares of RTRX at that time.

44.     On December 28, 2012, the transfer agent in charge of distributing Fearnow Shares sent GREEBEL an email with the subject "Totals."  GREEBEL forwarded the email to SHKRELI and the two exchanged emails whose contents are redacted. [RP00190475]

45.     Although Fearnow Shares were issued to the various individuals whom SHKRELI had identified in December 2012, I believe that both SHKRELI and at least some of the individuals to whom the shares were issued understood that SHKRELI viewed those shares as belonging to himself.  In other words, I believe that SHKRELI expected each associate to hold the shares in the associate's own name but on SHKRELI's behalf.  My belief about SHKRELI's plan to conceal his beneficial ownership of the Fearnow Shares, and thereby to control their trading, is based on my training and experience, as well as interviews conducted with multiple

19

individuals involved in the events at the time they occurred, as well as other evidence.  For example:

   a.   Former Retrophin employees stated that SHKRELI asked to see account statements for the accounts established by the individuals who received and held the Fearnow Shares and SHKRELI's behalf.  Based on my training and experience, I believe that SHKRELI wanted to be able to see the account statements so that SHKRELI could reassure himself that the shares had not been sold.

   b.   On December 14, 2012, BIESTEK sent an email to GREEBEL with the subject "Scottrade Supporting Documentation Request."  The contents of the email are redacted.  [KMR_RTRX_016559] Based on my training and experience, , I believe this December 14 email relates to a request by SHKRELI that the Fearnow Shares be held in a Scottrade account that he could monitor.  In other words, I believe that GREEBEL was tasked with helping to ensure that Fearnow Shares held secretly on behalf of SHKRELI by other individuals were placed in Scottrade accounts.

   c.   A former Retrophin employee has stated that SHKRELI asked specific people to hold Fearnow Shares in their names on behalf of SHKRELI.  SHKRELI also said that he could not hold the shares himself and that individuals who agreed to hold shares on his behalf would also receive shares in return.

   d.   On December 29, 2012, SHKRELI exchanged emails with GREEBEL with the subject "OVER-THE-WALL and CONFIDENTIAL."  The contents of those emails are redacted.  [RP00190619]  On December 30, 2012, SHKRELI sent an email to the individuals who had received Fearnow Shares, announcing a plan to raise $1 million from private equity investors.  The email stated, among other things, that "now that you are 'over the wall,' you may not sell any stock until these transactions are completed."  Later that day, BIESTEK emailed SHKRELI: "Are you legally allowed to put someone over the wall without asking their permission first?"  SHKRELI responded: "As with everything I do I ask counsel before I did it."  Based upon my training and experience and my analysis of the facts surrounding these emails, I believe that SHKRELI's effort to put the holders of Fearnow Shares "over the wall" was an effort to control their ability to sell shares that SHKRELI believed to be his.

   46.   After the merger, SHKRELI and various MSMB entities issued a Schedule 13D in order to disclose direct and beneficial ownership of RTRX stock.  As discussed above, GREEBEL helped prepare that Schedule 13D, which does not list the Fearnow Shares issued to

20

the seven individuals SHKRELI selected in December 2012, and does not assert that SHKRELI had a beneficial ownership of any such shares, despite the foregoing facts indicating that SHKRELI did in fact control those shares.

47.     In this same time period, GREEBEL was also involved in a series of other events related to SHKRELI's plan to take Retrophin public but to conceal his ownership stake in that public company by allocating Fearnow Shares to associates rather than directly to himself.

a.      On December 28, 2012, SHKRELI emailed PIEROTTI that "I'm going to be in your neck of the woods tomorrow . . . and have some time to pop down if you have a minute." PIEROTTI responded: "If you need to communicate something to me, talk to Marek." SHKRELI forwarded that email chain to GREEBEL, who responded. GREEBEL's response has been redacted. [RP00190502] On January 2, 2013, SHKRELI emailed GREEBEL with the subject: "Litigation – [message to be sent to Tim Pierotti] – let me know what you think." The contents of that and subsequent emails in the chain are redacted. [KMR_RTRX026758] Based on my analysis of the Retrophin Complaint, my review of statements by Retrophin and MSMB employees, and my training and experience, I believe these emails relate to a lawsuit that Retrophin ultimately commenced, at SHKRELI's direction, against PIEROTTI in August 2013. The lawsuit accused PIEROTTI of breaking an alleged promise that he would continue to work to help grow Retrophin in exchange for acquiring 400,000 Fearnow Shares at a discounted price. The Retrophin Complaint states that SHKRELI caused Retrophin to sue PIEROTTI "in order to obtain [PIEROTTI'S] Fearnow Shares . . . for himself [SHKRELI]," not for Retrophin.

b.      On December 29, 2012, SHKRELI and GREEBEL exchanged emails concerning a "Retrophin Liquidation Press Release" that SHKRELI appears to have drafted. The contents of those emails are redacted. [RP00190511; RP00190523]

c.      On December 31, 2012, GREEBEL and BIESTEK exchanged emails, whose contents are redacted. [KMR_RTRX_016557] Also on December 31, GREEBEL and SHKRELI exchanged emails, whose contents are redacted. [RP00190939] Based upon the timing of these emails relative to the other events described in this section, as well as my training and experience, I believe these redacted emails also relate to SHKRELI's efforts to make Retrophin a public company and to control the ownership of Fearnow Shares.

48. In sum, based on the foregoing, I believe that SHKRELI, assisted by GREEBEL, orchestrated a series of deceptive transactions that involved Fearnow Shares and were designed to conceal SHKRELI'S beneficial ownership of and control over those shares.

## SHKRELI CONTROLS THE ALLOCATION OF REMAINING FEARNOW SHARES

49. As discussed above, not all of the Fearnow Shares were issued to the individuals designated by SHKRELI at the time of the merger because Fearnow held 400,000 in escrow pending a second payment of $100,000 by Retrophin. On or about February 26, 2013, Retrophin made that second payment. Thereafter, SHKRELI and GREEBEL arranged for some of the remaining 400,000 shares to be distributed not, as originally intended, to the individuals SHKRELI had designated but rather in a manner that would help SHKRELI fund the various settlement and consulting agreements discussed below as well as to enrich himself.

50. In March and April 2013, SHKRELI, assisted by GREEBEL, arranged for some of the remaining Fearnow Shares allocated to SHKRELI's associates to be issued instead to former investors in MSMB entities in order to pay debts incurred by SHKRELI or the MSMB entities. Based upon my training and experience, I understand that this process allowed SHKRELI to use those shares to pay his or the MSMB entities' debts without gaining direct ownership over the shares, which ownership would have placed restrictions on the ability to sell or distribute such shares. SHKRELI did not, however, disclose his indirect control over these shares.

    a. On March 6, 2013, SHKRELI emailed VAINO: "Just so we're clear. . . . You will forgo the 'escrowed' [F]earnow shares[.] You will receive a handsome stock option or RSU grant[.] Okay? Am I missing anything?" Vaino responded that Shkreli's proposal was "fine." On May 13, SHKRELI, GREEBEL, VAINO, and BIESTEK exchanged a number of emails with the subject "Vaino Purchase Agreement Amendment." The contents of some of those emails are redacted. [RP00319413;

22

RP00319443] VAINO ultimately transferred 47,128 of his shares to Richard Kocher ("KOCHER")—an MSMB investor who had a claim against SHKRELI and MSMB entities, see infra ¶ 62—and the remaining 2,872 shares to SHKRELI.

b. On March 14, 2013, GREEBEL sent an email to an individual who works at a law firm. The subject of the email was "Kevin Mulleady." GREEBEL wrote, in part: "When I spoke with Kevin last week, I explained that Retrophin was asking him to assign the remaining shares that he is entitled to from the Fearnow purchases to certain investors of Retrophin. I apologize if I was not clear in my conversation with Kevin. To clarify, Retrophin would like Kevin to surrender any claims that he has to receive additional shares from [Fearnow] and Retrophin will facilitate such shares being transferred to certain investors in Retrophin. Also, I understand that the Company is still not able to access the computer that Kevin used and as per my email from Monday we would like the relevant passwords . . . ." Based upon my training and experience, as well as my analysis of this and other emails in this section, I believe that, at some point before GREEBEL's email, MULLEADY severed his relationship with Retrophin. I also believe that, unlike VAINO, MULLEADY had refused to participate in a similar transfer of Fearnow Shares to MSMB investors in order to satisfy claims against SHKRELI or the MSMB entities.

c. In addition, between March 8 and March 12, 2013, SHKRELI and GREEBEL exchanged a number of emails, whose contents are redacted but whose subject line refers to "Fearnow breakdown" or "Fearnow." [RP00212244; RP00212363; KMR_RTRX_016546] Based upon my training and experience, as well as my analysis of those and other emails discussed in this section, I believe the redacted emails involve conversations about the allocation or distribution of additional Fearnow Shares. Also during that five-day period, SHKRELI and GREEBEL exchanged other emails with the subject "hi" and "#s". [RP00212744; RP00212791] The contents of those emails are redacted. Based upon my training and experience, and the foregoing discussion, I believe that these redacted emails could also relate to discussions about the additional Fearnow Shares.

d. In March and April 2013, SHKRELI and GREEBEL also arranged to have additional Fearnow Shares owed to BIESTEK and SULLIVAN instead to be issued to Lindsay Rosenwald ("ROSENWALD") and Thomas Koestler ("KOESTLER"), investors in MSMB entities who had claims against SHKRELI and those entities. (See infra ¶¶ 60, 76.) On March 26, 2013, GREEBEL sent an email attaching "executed version of the Amendment to the Purchase Agreement between [Fearnow] and Marek Biestek and [Fearnow] and Ed Sullivan." On April 10, GREEBEL emailed Fearnow,

23

directing him to issue Fearnow Shares as follows: "The 50k shares that were owed to [BIESTEK] should be broken down as follows . . . 30,000 shares shall be issued in the name of [ROSENWALD] . . . 20,000 shares shall be issued in the name of [KOESTLER]. . . . The 50k shares that were owed to [SULLIVAN] shall be issued in the name of [ROSENWALD] . . . The transfer agent can combine the two certificates for Rosenwald into one certificate for 80k shares." Thus GREEBEL and SHKRELI arranged to pay KOESTLER the 20,000 shares and ROSENWALD the 80,000 shares that SHKRELI had promised them, using shares allocated to SHKRELI's associates. SHKRELI used these shares to pay his debts although he never declared direct or beneficial ownership over them.

e.    On December 9, 2013, SHKRELI emailed GREEBEL and copied Fearnow, with the subject "Release of remaining escrow shares." SHKRELI wrote: "Can you work to get me the remaining escrow shares? These will go directly to me." Based upon my training and experience, as well as my analysis of the evidence discussed herein related to SHKRELI's control over Fearnow Shares, I believe SHKRELI's statement that the remaining shares "will go directly to me" was an implicit acknowledgement that other Fearnow Shares that had been issued to other individuals "indirectly" belonged to SHKRELI. Later that day, SHKRELI and GREEBEL exchanged emails, whose contents have been redacted, with the subject "escrow shares." [RP00297863]

51.    In December 2013, SHKRELI and GREEBEL arranged for SHKRELI to acquire a total of 150,000 additional Fearnow Shares from TILLES, FERNANDEZ, and BIESTEK. As discussed in the rest of this section, I believe the purpose of these transactions to deceive the market and inflate RTRX's stock price.

52.    Based upon my review of the transaction documents, I believe that SHKRELI and GREEBEL structured the acquisition of the 150,000 shares by having each of the three individuals sign a "Purchase Agreement" prepared by GREEBEL. The agreements did not require SHKRELI to pay for the Fearnow Shares. Instead, each agreement provided the SHKRELI would pay for the shares at some point in the future. Moreover, each agreement stated that, if SHKRELI did not pay the price required in the agreement, the seller's "sole remedy" would be to require SHKRELI to choose either to pay the money owed or to return one-half of

24

the shares sold. In other words, the agreement allowed SHKRELI to pay for none of the shares but nevertheless to keep half of them.

53.     Based upon my training and experience, I understand that structuring SHKRELI's acquisition of Fearnow Shares in the manner described above served several improper purposes. The acquisitions allowed SHKRELI to represent to the market that he believed the shares were worth $7 and that he had purchased a significant number of them without actually having to pay for the shares. Indeed, the "Purchase Agreements" allowed SHKRELI to default on his payment obligation yet retain half of the 150,000 shares.

54.     GREEBEL and KATTEN were directly involved the preparation and execution of these deceptive "Purchase Agreements." Between December 20 and 30, 2013, GREEBEL and another KATTEN attorney sent a series of emails to SHKRELI, FERNANDEZ, TILLES, BIESTEK and others that attached drafts of the "Purchase Agreements" or discussed such drafts. The contents of some of those emails are redacted in whole or in part, but the subject lines of those emails, and the names of the attachments, refer to "purchase agreements" or include the word "Fernandez." [RP00303558; RP00303745; RP00303834; RP00304539; RP00305641] Moreover, earlier in the month, on December 10, SHKRELI and GREEBEL exchanged emails, whose contents have been redacted, with the subject "Fearnow Stock." [RP00301562] Based upon my training and experience, and my analysis of these emails, other emails discussed in this section, and the other facts discussed herein, I believe that these redacted emails relate to SHKRELI's deceptive acquisition of 150,000 of the remaining Fearnow Shares.

55.     On or about January 2, 2014, SHKRELI signed, and then subsequently filed, an SEC Form 4 related to his acquisition of the 150,000 additional Fearnow Shares. Based upon my training and experience, I know that an SEC Form 4 is a document by which an officer, director,

or significant holder of stock in a public company announces an acquisition or sale of stock in that public company. The Form 4 that SHKRELI signed states that, on December 31, 2013, SHKRELI acquired 150,000 shares of RTRX stock at a price of $7. A footnote to the form stated that "In accordance with the terms of privately-negotiated transactions, [SHKRELI] is required to pay the Sellers of such shares $7.00 per share . . . subject to adjustments under certain circumstances." Based upon my analysis of the transaction documents and the foregoing discussion, I believe that statement is deceptive. In effect, the "privately-negotiated transactions" allowed SHKRELI to acquire 75,000 shares at no cost. Moreover, the statement in the Form 4 does not reflect that SHKRELI did not have to pay the purchase price at the time of the transaction and could do so months later.

56.     In the days before SHKRELI signed that deceptive SEC Form 4, GREEBEL and SHKRELI exchanged a number of emails whose contents are redacted in whole or in part. Based upon the subject lines of those emails, however, I believe that they relate to the preparation of the Form 4. Those subject lines are: "Draft Form 4 (Marek [BIESTEK] Transaction)", "form 4," and "Revised Form 4." [RP00305448; RP00305505; RP00305775; RP00305780]

57.     In sum, based on the foregoing, I believe that between late 2012 and early 2014, SHKRELI, assisted by GREEBEL, orchestrated a series of deceptive transactions that involved Fearnow Shares issued after Retrophin paid an additional $100,000, which were designed to conceal SHKRELI's beneficial ownership of and control over those shares.

## THE SETTLEMENT AGREEMENTS

58.     SHKRELI announced in September 2012 that he would be dissolving MSMB Capital and MSMB Healthcare in order to devote his time to Retrophin. He also represented that all MSMB investors could redeem their investments for their choice of cash or RTRX stock by

the end of October 2012. In reality, the investors did not have a choice of getting cash because

neither MSMB nor Retrophin had significant cash on hand to redeem investments. Instead,

SHKRELI simply caused the investors to be issued shares in the newly formed public company

Retrophin. Some investors were unhappy with SHKRELI's failure to give them cash instead of

shares or with the number of shares they had received.

59.     In 2013, as discussed below, SHKRELI attempted to address the unhappy MSMB

investors by causing Retrophin to issue those investors additional shares of RTRX and, in some

cases, to make additional cash payments to investors. SHKRELI and GREEBEL disguised these

efforts to compensate MSMB investors using Retrophin's assets by having each investor sign a

"Settlement Agreement" with Retrophin in exchange for compensation. Each "Settlement

Agreement" released all claims the investor had against SHKRELI and various MSMB entities,

as well as Retrophin. After these agreements were discovered, SHKRELI disingenuously

promised to indemnify Retrophin for the costs of the agreements.

60.     In March 2013, SHKRELI and GREEBEL arranged for ROSENWALD, who had

invested approximately $100,000 in MSMB Capital and whose investment was lost, to receive

80,000 additional shares of RTRX stock as part of a "settlement agreement."

> a.     In February 2013, ROSENWALD's attorney sent a letter to SHKRELI,
> objecting to SHKRELI's conversion of her investment in MSMB Capital
> into 24,000 restricted shares of RTRX and demanding an additional
> 76,000 shares.
>
> b.     SHKRELI forwarded that letter to GREEBEL and then exchanged emails
> with GREEBEL about the forwarded letter. The contents of those emails
> are redacted. [RP00206019; RP00206639]
>
> c.     On February 22, 2013, SHKRELI and GREEBEL exchanged emails
> whose contents are redacted. [RP00207076] The subject of the emails is
> "response to rosenwald."

d.  On March 1, 2013, GREEBEL sent a "revised draft of the Settlement Agreement between Dr. Rosenwald and Martin Shkreli, et al." to ROSENWALD's attorneys. In the agreement, which is between SHKRELI, MSMB Capital, Retrophin, and ROSENWALD, ROSENWALD agreed to release all claims against the other parties in exchange for SHKRELI delivering 80,000 shares of RTRX stock. The agreement also provides that ROSENWALD would return any RTRX shares he currently possessed not to Retrophin but "to Shkreli."

e.  On March 13, 2013, GREEBEL forwarded a version of the agreement, signed by ROSENWALD, to SHKRELI. The contents of the email are redacted. [KMR_RTRX_099713]

61.  In April 2013, SHKRELI and GREEBEL arranged for Sarah Hassan

("HASSAN"), who had invested approximately $300,000 in MSMB Capital and whose

investment was lost, to receive $400,000 in cash from Retrophin as part of a "settlement

agreement."

a.  In February 2013, SHKRELI and GREEBEL exchanged emails with the subject "sarah hassan." The contents of those emails are redacted. [RP00207093]

b.  On April 5, 2013, HASSAN emailed SHKRELI: "Sorry for the delay. I was hoping to get this back to you yesterday." The subject of the email was "Settlement and Release Agreement." SHKRELI forwarded that email to GREEBEL and then exchanged emails with GREEBEL about it, but the contents of those emails are redacted. [RP00224000]

c.  On or about April 25, 2013, HASSAN signed a "Settlement and Release Agreement" with SHKRELI, Retrophin, MSMB Capital, and other MSMB entities. The agreement provides that Retrophin will pay HASSAN $400,000 in cash in exchange for HASSAN's releasing all of the parties from any claims she has against them.

62.  In April 2013, SHKRELI and GREEBEL arranged for KOCHER, who had

invested approximately $100,000 in MSMB Healthcare, to receive $400,000 in cash from

Retrophin as part of a "settlement agreement."

a.  Between April 24 and 25, 2013, SHKRELI and GREEBEL emailed each other with the subject "kocher." The contents of these emails are redacted. [RP00226821] On April 26, SHKRELI and GREEBEL again exchanged

redacted emails. [RP00227343]  Based on my training and experience, as well as my analysis of the timing of these and other emails, I believe that the April 26, 2012, emails also related to the proposed "settlement agreement" with respect to KOCHER.

b.    On May 9, 2013, SHKRELI and GREEBEL again exchanged emails, whose contents are redacted, with the subject "kocher." [RP00231809]

c.    KOCHER and SHKRELI ultimately signed a "Settlement and Release Agreement." That agreement purports to be between KOCHER, SHKRELI, MSMB Capital, other MSMB entities, and Retrophin. SHKRELI signed on behalf of all of the parties except for KOCHER.

d.    The agreement states that MSMB Capital or Retrophin would deliver $123,711 to KOCHER and that SHKRELI would deliver 47,128 Retrophin shares to KOCHER. The agreement states that, in exchange, KOCHER would release SHKRELI, MSMB Capital, and Retrophin "of any and all claims" that KOCHER has against them. The agreement does not identify any such claims. The agreement provides that KOCHER would return any other shares of Retrophin he owned not to Retrophin but rather to "the MSMB Entities."

63.    In May 2013, SHKRELI and GREEBEL arranged for David Geller ("DAVID

GELLER"), who had invested approximately $200,000 in MSMB Healthcare, to receive

$300,000 in cash from Retrophin as part of a "settlement agreement."

a.    On March 16, 2013, DAVID GELLER emailed SHKRELI to acknowledge he had received 30,514 shares in Retrophin and to ask "how much of my original investment is in the fund and how much is in Retrophin?"

b.    On or about May 30, 2013, DAVID GELLER signed a "Settlement and Release Agreement" with SHKRELI, Retrophin, MSMB Capital, and other MSMB entities. The agreement provides that Retrophin would pay DAVID GELLER $300,000 in cash in exchange for DAVID GELLER's releasing all of those parties from any claims he has against them.

c.    On July 11, 2013, an email was sent to GREEBEL from the same email address that DAVID GELLER used to communicate with SHKRELI and GREEBEL. The subject of the email was "Settlement Agreement." The email stated: "As per Martin's instructions, I will be contacting you with all correspondence going forward. I have retained counsel to start legal action." GREEBEL forwarded that email to SHKRELI, and the two exchanged emails. The contents of all of those emails are redacted. [KMR_RTRX_022383]

29

64.     In June 2013, SHKRELI and GREEBEL arranged for MICHAEL LAVELLE,

who had invested more than $1 million in MSMB Healthcare, to receive $1,355,000 in cash and

5,000 shares of stock from Retrophin as part of a "settlement agreement."

        a.    In March 2013, LAVELLE sent SHKRELI a series of emails about his investment in MSMB. LAVELLE wrote "I want to understand a number of things," including "I had a mark to market on my $1mn investment in MSMB at circa $1.25mn. I put forward a capital call on that position, but have heard nothing."

        b.    On April 8, 2013, SHKRELI forwarded that email chain to GREEBEL. The two exchanged a number of emails thereafter, but the contents of those emails are redacted. [RP00221283]

        c.    On April 10, 2013, SHKRELI and GREEBEL exchanged emails, the contents of which are redacted. [RP00222037] Based on my training and experience and the timing of this email chain relative to the one on April 8 and the ones discussed below, I believe that this redacted email chain concerns the "settlement" with LAVELLE.

        d.    Between April 25 and May 3, 2013, SHKRELI and GREEBEL exchanged more emails with the subject "lavelle," but the contents of all of those emails are redacted. [RP00230110]

        e.    On May 3, 2013, GREEBEL emailed LAVELLE, writing "Hi Michael, as discussed is a draft of the Settlement Agreement." After exchanging more emails with LAVELLE, GREEBEL forwarded the entire email chain to SHKRELI, and the two then emailed back and forth. The contents of those emails are redacted. [RP00236356]

        f.    On or about June 10, 2013, LAVELLE signed a "Settlement and Release Agreement" with SHKRELI, Retrophin, MSMB Capital, and other MSMB entities. The agreement provides that Retrophin would pay LAVELLE $1,355,000 in cash and 5,000 Retrophin shares in exchange for LAVELLE's releasing all of those parties from any claims he has against them.

65.     In July or August 2013, Retrophin's auditors determined that the "settlement

agreements" primarily benefited MSMB entities, not Retrophin, and required revisions to

Retrophin's SEC filings. GREEBEL helped draft an SEC Form 10-Q that would disclose the

30

existence of the "settlement agreements" that SHKRELI and he had arranged through June 30,

2013.

a.  On July 30, 2013, Retrophin's CFO emailed GREEBEL, stating that
Retrophin's auditors had "asked that we expand on the disclosure of the
settlements, since it accounts for a material amount of our operating loss
and accrued liabilities. I've drafted the attached." Later that day,
GREEBEL responded with "suggested changes." In relevant part, the
paragraph, as revised by GREEBEL, states:

During the period ended June 30, 2013, the Company [Retrophin]
entered into settlement agreements with certain shareholders of the
Company ("Shareholders"). The Shareholders were also investors
in an affiliate of the Company and disputed the value of the
Company shares they received following the consummation of the
[reverse merger]. . . .

The paragraph does not identify the "affiliate" at issue, MSMB Capital or
MSMB Healthcare, or explain the nature of the affiliation. Moreover, the
paragraph does not state that the shareholders at issue disputed not just
"the value of the Company shares they received" but also the decision by
SHKRELI to renege on his initial promise to offer those investors cash
rather than RTRX shares during the dissolution of MSMB Capital and
MSMB Healthcare.

b.  On August 5, 2013, Retrophin's CFO emailed SHKRELI a document with
the subject "Draft 10Q," and SHKRELI responded "Lets discuss." The
document attached to that email includes the text, as revised by
GREEBEL, discussed above.

c.  On August 15, 2013, Retrophin's CFO exchanged emails with SHKRELI,
copying GREEBEL. The text of those emails has been redacted.
[RP00260643.0001] The subject of the emails is "10q."

66.   On or about August 19, 2013, GREEBEL prepared a memorandum for

Retrophin's auditors (the "Internal Controls Memo"). That memorandum provided that "certain

payments made by [Retrophin] to three individuals pursuant to certain Settlement and Release

Agreements . . . should be reclassified as obligations that should have been borne solely by

MSMB and its related funds." The Internal Controls Memo concluded that Retrophin "does not

have sufficient internal controls" and asserted that "any future agreement that includes the

31

Company and MSMB or any of its related funds will required the signature of the Chief Financial Officer."

67.     The Internal Controls Memo also stated that "MSMB and its related funds delivered promissory notes to [Retrophin] and entered into indemnification agreements with [Retrophin], pursuant to which MSMB and its related funds have agreed to indemnify and hold harmless [Retrophin] for any costs, charges or damages incurred by [Retrophin] in connection with the Settlement and Release Agreements."

68.     The same day as that text about promissory notes appeared in the draft Internal Controls Memo, Retrophin's CFO emailed SHKRELI "drafts of the indemnification agreement [sic] for all settlement agreements entered into, as well as a note for the amounts and shares already paid." [RP00262039.001]  SHKRELI and then GREEBEL responded, but each of their emails has been redacted.

69.     On August 28, SHKRELI and GREEBEL arranged for SCHUYLER MARSHALL, who had invested approximately $200,000 in MSMB Capital and whose investment was lost, to receive $300,000 in cash and 6,300 shares of stock from Retrophin, as part of a "settlement agreement."  As explained below, the structure of that "settlement agreement" was different than the previous ones in order, it appears, to circumvent the requirements imposed by the Internal Controls Memo.

        a.     On May 31, 2013, SHKRELI emailed GREEBEL, copying MARSHALL, with the subject "settlement": "$300k cash, $300k stock . . . so we would issue 6300 shares of stock and wire $300k in cash."  GREEBEL and SHKRELI continued to email about that email, but the contents of those subsequent emails are redacted.  [RP00238878]

        b.     On June 18, 2013, GREEBEL sent MARSHALL a "draft Settlement Agreement" that was materially the same as the ones sent to HASSAN and LAVELLE.  The agreement provided that MARSHALL would receive

$300,000 and 6,300 shares of Retrophin stock in exchange for releasing any claims against SHKRELI, Retrophin, and the MSMB entities.

c.     On July 10, 2013, after MARSHALL had emailed GREEBEL about the status of the settlement agreement, GREEBEL wrote that "I spoke to Martin and he confirmed everything should proceed." GREEBEL then forwarded his email chain to SHKRELI, and the two exchanged emails about it. The contents of those emails are redacted. [RP00249890]

d.     On August 21, 2013, MARSHALL again emailed GREEBEL and SHKRELI to ask whether they could "consummate our settlement agreement." GREEBEL forwarded the email to SHKRELI, but the contents of his email are redacted. [RP00262381]

e.     On August 23, 2013, MARSHALL again emailed SHKRELI about finalizing the settlement. SHKRELI forwarded the email to GREEBEL, and the two then engaged in a series of emails. The contents of all of those emails are redacted. [RP00263271.0001; RP00263340.0001; RP00263384.0001]

f.     On August 26, 2013, SHRELI received an email sent "On Behalf of Schuyler Marshall" with the subject "wiring instructions." The contents of the email were information about a bank account held in the name of Schuyler MARSHALL. SHREKLI forwarded that email chain to GREEBEL, but the contents of his email, and of GREEBEL's response, are redacted. [RP00264557.0001; RP00264701.0001]

g.     Also on August 26, 2013, Retrophin's CFO emailed SHKRELI, copying GREEBEL, with the subject line "wiring instructions." The CFO stated: "I think this is a little too much for my risk tolerance. [REDACTION] If you are going to force me to pay through retrophin, I'm going to have to ask the board of guidance or resign. This is not something I'm comfortable deciding on an island." SHKRELI and the CFO exchanged emails thereafter, copying GREEBEL, but the contents of those emails has been redacted. [RP00263834] SHKRELI and GREEBEL also exchanged emails in response to that "wiring instructions" email, but the contents of those emails has been redacted. [RP00365837] Based on my training and experience, as well as my review of the other emails discussed in this affidavit, I believe that the CFO's statement "If you are going to force me to pay through retrophin" refers to a request from SHKRELI or GREEBEL that money be wired from a Retrophin bank account to MARSHALL, using the instructions provided in the email sent "On Behalf of Schuyler Marshall."

h.     On August 27, 2013, SHKRELI and GREEBEL exchanged emails, the contents of which are redacted. [RP00366701] Based on my training and

experience and the timing of this email chain relative to the one on August 26 and the ones discussed below, I believe that this redacted email chain concerns the "settlement" with MARSHALL.

i.  On August 28, 2013, SHKRELI wrote to MARSHALL that "after exhaustive talks with our attorneys, there WILL be a revision to the agreement . . . The revision is simple – it merely removes MSMB as an obligor and references Retrophin alone. This is crucial for a number of reasons that are beyond my ability to explain." GREEBEL then replied, attaching two documents, a "Retrophin Settlement and Release Agreement" and a "MSMB Settlement and Release Agreement." GREEBEL explained that "The difference between these 2 agreements and the prior is that we divided the prior version to separate Retrophin's payment obligation and release from the delivery obligation and release of Martin and MSMB."

j.  Based on my training and experience, and my analysis of the timing and structure of the MARSHALL settlements, I believe that GREEBEL and SHKRELI decided to structure the settlement as two agreements because the Internal Controls Memorandum, which GREEBEL had prepared, required the approval of the Retrophin CFO for ""any future agreement that includes [Retrophin] and MSMB or any of [Shkreli's] related funds." In other words, I believe that, because the CFO had refused to wire money to MARSHALL a few days earlier, GREEBEL and SHKRELI restructured the arrangement with MARSHALL to avoid running afoul of the Internal Controls Memo, which by its terms applied only to transactions involving both Retrophin and an MSMB entity.

k.  On September 20, 2013, MARSHALL emailed SHKRELI and GREEBEL to ask about "the additional shares" he was owed. GREEBEL and SHKRELI exchanged additional emails related to that one, but the contents of those emails are redacted. [RP00275860] Moreover, in December 2013, the two exchanged emails with the subject "Schuyler Marshall," but the contents of the emails are redacted. [RP00275860; RP00305550]

70.  In September 2013, GREEBEL was involved in a series of emails related to further revisions to the disclosure of the "settlement agreements" that he had helped to begin to draft in August 2013.

a.  On September 1, 2013, the Retrophin CFO sent GREEBEL a "Footnote disclosure." The contents of that email exchange and the attachments are redacted. [RP00370223] On September 2, the CFO exchanged a series of

34

emails about the "footnote disclosure" with GREEBEL. The contents of that email exchange are redacted. [RP00370470.0001]

b.    On September 4, 2013, GREEBEL, the CFO, and Retrophin's external auditors exchanged a series of emails. The contents of some of those emails are redacted. In an unredacted email, an auditor wrote: "Critical item to evaluate is the evidence of MSMB's ability to repay the remaining settlements and/or indemnify [Retrophin] for the payment exposure." The CFO responded that "MSMB has advised us that it has received assurances from its managing member that it will have the resources to pay the obligations set forth in the notes and the indemnification agreements. MSMB advised us that the managing member provided documentation demonstrating that it owns securities with an estimated value in excess of $8 million." The auditor responded that "we need to confirm that ability with audit documentation." The CFO responded that "There are form 4s that have been filed that show the ability."

c.    The CFO and GREEBEL also exchanged different sets of emails in response to the email about "evidence of MSMB's ability to repay." The contents of those emails is redacted. [RP00371644; RP00371691; RP00371723] Based upon my training and experience, as well as my analysis of the email exchanges discussed in this section, I believe that the redacted portions of those email chains relate to the subject matter being discussed in the unredacted emails, namely whether the indemnification agreements that SHKRELI and GREEBEL had offered were supported by assets.

d.    The Form 10-K for Retrophin for the fiscal year ended December 31, 2013, states that the settlement agreements were the "primary obligation" of the MSMB entities, not Retrophin, and that: "Concurrent with its execution of [the settlement agreements], the Company and the related party entered into promissory notes whereby the related party agreed to pay the Company the principal amount [of the settlements]. . . . There is uncertainty as to whether the related party [i.e., the MSMB entities] will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary."

71.    Based on my training and experience, my review of these emails, and my review

of other emails discussed herein, I believe that statement in the Retrophin 10-K confirms

SHKRELI's misconduct. SHKRELI, assisted by GREEBEL, committed Retrophin to settle

potential claims brought by MSMB investors against SHKRELI and the MSMB entities, not

Retrophin. Then SHKRELI, with GREEBEL's knowledge, signed indemnification agreements

in which he committed the MSMB entities to repay those Retrophin obligations, despite elsewhere asserting that the MSMB entities would wind down and had few if any assets.

## THE CONSULTING AGREEMENTS

72.     In addition to their scheme involving "settlement agreements," SHKRELI and GREEBEL attempted to compensate other disgruntled investors in the MSMB entities by having those investors sign "consulting agreements" with Retrophin. Each agreement, prepared by GREEBEL, proposed that Retrophin would provide RTRX stock or cash in exchange for the investor providing "consulting services." Each agreement also included a provision by which the investor would release all claims against not just Retrophin but also against SHKRELI and the MSMB entities. As discussed below, the evidence demonstrates that these agreements were merely a way to disguise SHKRELI's use of Retrophin assets to pay disgruntled MSMB investors to resolve claims against SHKRELI and the MSMB entities.

73.     Between April and September 2013, SHKRELI and GREEBEL proposed and then negotiated a "consulting agreement" between Retrophin and Alan Geller ("ALAN GELLER"), who had invested approximately $1 million in MSMB Healthcare, in order to resolve ALAN GELLER's claims against SHKRELI and MSMB Healthcare.

        a.     In April 2013, ALAN GELLER and SHKRELI exchanged emails about ALAN GELLER's request for an additional 31,500 shares of Retrophin stock he was owed by SHKRELI or MSMB Healthcare as a result of the redemption of his investment in MSMB Healthcare.

        b.     On April 10, 2013, SHKRELI emailed GREEBEL, stating that SHKRELI and ALAN GELLER "did reach an oral agreement" that ALAN GELLER "would receive . . . an additional 31,500 shares [of RTRX]. Can you have the transfer agent issue them?"

        c.     Later that day, at 4:44 PM, GREEBEL wrote back to SHKRELI with the subject "email to Al." The contents of the email are redacted. [RP00222113]

36

d.  At 5:04 PM that day, twenty minutes after GREEBEL emailed SHKRELI, SHKRELI emailed ALAN GELLER: "Hi Al, would you be willing to sign a consultant agreement in connection with the issuance of the 31,500 shares to you? It would be the quickest way to get the stock issued to you and satisfies any request that the transfer agent may have. If so, I will have Evan prepare something for you. Thanks for your help."

e.  Based on the timing of the two aforementioned emails, my examination of the length and shape of the redacted email at 4:44 PM, and my training and experience, I believe that the email SHKRELI sent at 5:04 PM contains the same text that was redacted in the 4:44 PM email. In other words, I believe that SHKRELI sent ALAN GELLER the message that GREEBEL had drafted. In addition, I believe that GREEBEL came up with the idea of using a "consulting agreement" with Retrophin as the vehicle for paying the debt owed to ALAN GELLER.

f.  In addition, based on my training and experience, I believe that SHKRELI's statement that a consulting agreement would "satisf[y] any request that the transfer agent may have" was meant to convey that the transfer agent holding Retrophin's stock might ask for the reason shares were being transferred to ALAN GELLER, and that SHKRELI and GREEBEL did not want to reveal the true reason for the transfer—to repay a debt that MSMB Healthcare and SHKRELI, but not Retrophin, owed to ALAN GELLER.

g.  On April 18, 2013, GREEBEL sent SHKRELI a "Form Consulting Agreement." The contents of the email chain and attachment are redacted. [RP00224819] On April 19, the two exchanged emails with the subject "Geller," although the contents are again redacted. [RP00224953]

h.  On April 19, 2013, GREEBEL emailed ALAN GELLER, copying SHKRELI: "Hi Al, as per our conversation, attached is a draft of the Consulting Agreement." The attached agreement proposed that Retrophin would give ALAN GELLER 300,000 shares of Retrophin stock in exchange for "consulting services . . . on strategic and corporate governance matters."

i.  Between June 24 and August 23, 2013, SHKRELI and GREEBEL exchanged various emails that appear to attach copies of a "Geller Option Agreement" and "Geller Consulting Agreement." [RP00245158; RP00253771; RP00253787; RP00262803; KMR_RTRX_015364] The contents of these emails are redacted in whole or in part. One of the email chains has the subject line "31,500 shares," which I believe to be a reference to the 31,500 shares that ALAN GELLER was owed. [RP00253771]

j.  Between September 4 and September 9, 2013, GREEBEL sent emails to Retrophin's CFO regarding a draft agenda for a Retrophin Board Meeting. The contents of those emails are redacted. [RP00371465.0001; RP00374789.0001]

k.  On September 8, 2013, Retrophin's auditors asked the CFO whether Retrophin had any "new material contracts or agreement" and referred to the ALAN GELLER agreement. The CFO forwarded the questions to GREEBEL, who responded in an email whose contents have been redacted. [RP01709583]

l.  The final version of the agenda for the Board Meeting on September 9 includes an item: "Approve retaining Al Geller Ken Banta as Consultants."

m.  The Board Minutes, dated September 9, 2013, reflect that the Board approved retaining ALAN GELLER as a consultant. However, there is no evidence in the minutes that either SHKRELI or GREEBEL explained that they considered the consulting agreement to be "the quickest way to get" ALAN GELLER the 31,500 shares that he was owed by SHKRELI or MSMB Healthcare.

n.  Retrophin Board members have stated that the consulting agreement for ALAN GELLER (or any similar agreement for Ken Banta) was not in fact discussed at the meeting, and that the Board did not approve any such agreement.

74.  Between August 2013 and March 2014, SHKRELI and GREEBEL proposed and then negotiated a "consulting agreement" between Retrophin and Darren Blanton ("BLANTON"), who had invested approximately $1 million in MSMB Capital and whose investment was lost, in order to resolve BLANTON's claims against SHKRELI and the MSMB entities.

a.  On August 10, 2013, SHKRELI emailed BLANTON and GREEBEL that "Darren [BLANTON] and I have agreed that I will give him 100,000 shares of my stock. Please effect this transaction . . . ." Responding to a later email in the same email chain, SHKRELI wrote: "Guys – please use the same agreement we used with AG." After SHKRELI sent that email, he and GREEBEL exchanged additional emails in the same email chain, but the content of those emails are redacted. [RP00260586]

38

b.  On August 15, 2013, GREEBEL emailed BLANTON a "draft of the escrow agreement." The attached document is titled "OPTION AGREEMENT" and purports to be an agreement between SHKRELI in his personal capacity and BLANTON pursuant to which BLANTON would receive an option to purchase 100,000 shares of RTRX stock. The agreement also purports to release SHKRELI, Retrophin, MSMB Capital, and various other MSMB entities from any claims that BLANTON may have against them.

c.  On August 22, 2013, SHKRELI and GREEBEL exchanged multiple emails with the subject "Blanton." The content of those emails are redacted. [RP00262739]

d.  On September 4, 2013, SHKRELI emailed GREEBEL: "Can you send Darren a consulting agreement for Retrophin." The subsequent emails in that chain have been redacted. [RP00266302] Later that day GREEBEL emailed SHKRELI a document with the subject "Draft Blanton Consulting Agreement." The text of the email, as well as of the attachment, are redacted. [RP00266367]

e.  Between September 6 and October 16, 2013, SHKRELI and GREEBEL exchanged at least three chains of emails whose subject lines refer to BLANTON. The contents of these emails has been redacted. [RP00267493; RP00269333; RP00279790]

f.  On October 1, 2013, SHKRELI and GREEBEL exchanged a series of emails about what SHKRELI referred to as "a template consulting agreement." The contents of all of those emails are redacted. [RP00274936; RP00274952; RP00274975]

g.  On October 24, 2013, GREEBEL emailed SHKRELI with the subject "Blanton Settlement Agreement." The contents of that email chain have been redacted. [RP00282180]

h.  Later that day, GREEBEL sent BLANTON a "draft Settlement Agreement." The attached document purports to be an agreement between BLANTON and Retrophin pursuant to which Retrophin would transfer BLANTON 100,000 shares of stock and BLANTON agreed that "any interests that [he] may have in any of the MSMB Entities" would be "immediately canceled" and released SHKRELI, various MSMB entities, and Retrophin of any claims against them.

i.  On December 31, 2013, GREEBEL emailed SHKRELI, copying Michael Rosensaft, another partner at KATTEN. GREEBEL wrote that Rosensaft had spoken with someone who worked at Blanton's office and said that "based on Blanton's 'role' and prior investment [in MSMB entities] that

he would like to receive an additional 200k free traded shares of RTRX [Retrophin]." [RP00305638]  The rest of the email chain is redacted, as is an email chain from two days earlier between SHKRELI, GREEBEL, and Rosensaft.  [RP00305052]

j.  On January 15 and February 17, 2014, GREEBEL and SHKRELI exchanged emails about BLANTON, most of which are redacted. [RP00069259.0001; KMR_RTRX_149409]

k.  On February 18, 2014, GREEBEL emailed BLANTON a "draft Consulting Agreement."  The attachment purports to be a "Consulting Agreement and Release"  between BLANTON and Retrophin pursuant to which BLANTON will provide "consulting services" on "strategic and corporate governance" in exchange for 200,000 shares of Retrophin stock.  In the agreement, BLANTON releases all claims against SHKRELI, Retrophin, MSMB Capital, and other MSMB entities.  A signed version of the agreement is dated March 6, 2014.

l.  On March 17 and May 16, 2014, GREEBEL and SHKRELI exchanged emails whose subject lines include "blanton."  The contents of all of these emails are redacted.  [KMR_RTRX_138657; KMR_RTRX_146650]

m.  The Retrophin Complaint states that Retrophin's Board of Directors was not informed of and did not approve the Blanton Consulting Agreement. Additionally, Retrophin Board members have stated that they did not approve BLANTON's consulting agreement.

75.  Between December 2012 and February 2014, SHKRELI and GREEBEL proposed and then negotiated a "consulting agreement" between Retrophin and Steven Rosenfeld ("ROSENFELD"), who had invested approximately $200,000 in MSMB Healthcare, in order to resolve ROSENFELD's claims against SHKRELI and the MSMB entities.

a.  On December 21, 2012, shortly after SHKRELI announced that MSMB Capital and MSMB Healthcare would liquidate and return cash or Retrophin shares to investors, ROSENFELD "[c]alled [for SHKRELI] regarding the redemptions for MSMB.  Wanted to know when he would get his money back."

b.  On March 14, 2013, after exchanging a series of emails with and about ROSENFELD regarding ROSENFELD's efforts to secure a redemption of his investment, SHKRELI used an MSMB Capital email address to email ROSENFELD that he was "informed you're considering legal action

against our company.  As a result, I must inform you that you should speak only with Evan Greebel going forward . . . ."

c.      Earlier that day, SHKRELI had exchanged a series of emails with GREEBEL whose contents are redacted.  [RP00214008]  Based on the timing of these emails and my training and experience, I believe they related to ROSENFELD's threatened litigation.

d.      On May 7, 2013, GREEBEL sent an email to TILLES and SHKRELI, with the subject "Rosenfeld Consulting Agreement."  The contents of the resulting email chain and the attachment have been redacted. [RP00230725.0001]

e.      On May 28, 2013, TILLES emailed a consulting agreement to ROSENFELD.  The agreement provides that Rosenfeld would be paid 60,000 shares of Retrophin stock in exchange for "consulting services . . . on strategic and corporate governance."

f.      Based on my review of the relevant documents, I believe that the consulting agreement provided to ROSENFELD is materially the same as the one provided to ALAN GELLER.  In particular, the agreement includes a clause by which ROSENFELD agrees to release not just Retrophin but also SHKRELI, MSMB Capital, MSMB Healthcare, and other MSMB entities from any claims he has against them.

g.      On May 31, 2013, SHKRELI, GREEBEL, and TILLES exchanged a series of emails.  The contents of those emails have been redacted. [RP00327806]  Based upon my training and experience, the individuals involved in the email exchange, and the timing of those emails, I believe those emails relate to the ROSENFELD consulting agreement.

h.      On June 12, 2013, TILLES emailed Retrophin's CFO, forwarding the ROSENFELD consulting agreement, and writing: "He is asking for another 15k shares to go away."  The email forwards an attachment originally sent by GREEBEL on May 24, 2013.  That attachment is redacted.  [RP01702337]

i.      On January 27, 2014, ROSENFELD emailed Retrophin's CFO: "This is to confirm our conversation on Saturday 1/25/14 reference your offer of 1 million dollars any way you want it in stock or cash and that you would get back to me today as of now you have not."

j.      On February 4, 2014, GREEBEL and SHKRELI exchanged emails with the subject "rosenfeld."  The contents of those emails are redacted. [KMR_RTRX_136430]

41

        k.      The consulting agreement between ROSENFELD and Retrophin is dated February 14, 2014. The agreement provides that ROSENFELD will receive 66,000 shares of Retrophin stock, as well as $200,000, for "consulting services" provided from the date of the agreement through December 31, 2014.

        l.      The Retrophin Complaint states that Retrophin's Board of Directors was not informed of and did not approve the Rosenfeld Consulting Agreement. Additionally, Retrophin Board members have stated that they did not approve ROSENFELD's consulting agreement.

76.    Finally, between April 2012 and October 2014, SHKRELI and GREEBEL

proposed and negotiated a "consulting agreement" between Retrophin and Thomas Koestler

("KOESTLER") in order to resolve a debt that SHKRELI owed to KOESTLER. The "consulting

agreement" was proposed only after SHKRELI had acknowledged his debt but delayed paying it

for months. The "agreement" was never signed.

        a.     On April 16, 2012, SHKRELI emailed KOESTLER, stating that SHKRELI would transfer 35,000 Class A units of Retrophin LLC to KOESTLER. SHKRELI said that 30,000 of those shares were in compensation for "the excellent advice and mentorship you provided" and 5,000 were for "a further extension of the above, coinciding but not dependent on the Retrophin financing currently scheduled to close this week." SHKRELI copied GREEBEL on that email.

        b.     On May 14, 2012—the same day that SHKRELI had transferred Retrophin LLC shares to FERNANDEZ and MULLEADY—SHKRELI emailed GREEBEL and another attorney at KATTEN with the subject "Retrophin Shkreli Transfer Summaries." The contents of that email are redacted. [RP01887450] Based upon my training and experience, as well as the subject of that email and its timing relative to the transfer to KOESTLER, FERNANDEZ, and MULLEADY, I believe the contents of this email will reflect that SHKRELI in fact promised to transfer shares to KOESTLER.

        c.     On November 19, 2012, one of Retrophin's accountants emailed the CFO, stating that she was "missing the following." One of the documents listed was: "'Adoption Agreement' page on Thomas Koestler transfer agreement." The CFO forwarded the email to SHKRELI, who replied and copied GREEBEL. SHKRELI's email, and GREEBEL's response, are redacted. [RP00181323.0001]

d.  On November 20, 2012, GREEBEL forwarded the April 16, 2012, email discussed above to SHKRELI and attached an undated "Transfer and Donee Representation Letter" for 35,000 shares, signed by SHKRELI but not by KOESTLER. Earlier that day, GREEBEL had forwarded to Retrophin's CFO several documents with the subject "Form Transfer Documents for A Units." The contents of that email are redacted in part. [RP00407896] Based upon my training and experience, the timing of these emails, and the relationship between SHKRELI's promise to transfer Class A units and the redacted attachment's title, which relates to "A Units," I believe GREEBEL's email to the CFO relates to SHKRELI's promise to transfer shares to KOESTLER.

e.  On November 26, 2012, SHKRELI emailed KOESTLER to "ask[] you to 'give up' your common stock [in Retrophin], which was previously inducement [sic] to invest in the Series A preferred stock."

f.  On December 3, 2012, SHKRELI emailed Steve Calvelli, a personal financial advisor for KOESTLER, with the subject "Retrophin Capitalization." SHKRELI wrote, in part: "Tom Koestler is an interesting story. Koestler put $425,000 (15,625 shares) into the preferred stock and received 35,000 shares of common as a gift from me. It turns out that we signed the wrong paperwork for Tom (I just found out about this) and the transfer was invalid."

g.  On January 13, 2013, Calvelli wrote to SHKRELI: "attached as requested is the transfer agreement. It was signed by you and Tom and you accepted it on behalf of the company. Perhaps the accountants did not have this copy."

h.  On January 25, 2013, Calvelli responded to that email, writing: "Could you please let us know where we are on Tom's 35,000 Common shares? They are not reflected on the transfer agents [sic] books, nor have we heard anything from you or the accounting firm." Later that day, SHKRELI responded, copying GREEBEL: "The general consensus is I will have to transfer the shares personally. The difficulty in that is it will look as if I have sold the stock to Tom. I could 'surrender the stock as a party to an agreement' and Wall Street might absorb the news more easily…but it will definitely decrease my stake which I just want to be careful of regarding messaging. I have CCed my attorney – it would be good if I could transfer the shares. It adds up to 175,000 [shares in RTRX], the value of which today is about $700,000."

i.  On January 26, 2013, SHKRELI and GREEBEL exchanged emails, the contents of all of which are redacted. [RP00198034; RP00198047] Based upon the timing of these emails, and my training and experience, I believe they refer to the discussing about KOESTLER the day before.

43

j.   On February 18, 2013, after Calvelli had sent a series of emails to SHKRELI asking for updates on KOESTLER's 35,000 shares, SHKRELI wrote: "I am making progress with resolving the issue. . . . I admit Tom has complete and full rights to those shares – the best way to transfer them is on my accountants and lawyers to figure out." SHKRELI then forwarded the email chain to GREEBEL, and the two exchanged emails whose contents are redacted. [RP00208637]

k.   In April 2013, KOESTLER was issued 20,000 shares of RTRX stock.

l.   On June 13, 2013, Calvelli emailed SHKRELI and copied GREEBEL: "Tom has received your 20,000 share certificate for Retrophin Inc. as well as Evan's note regarding the additional 155,000 shares. . . . Our understanding was that you transferred 35,000 Retrophin LLC Common in 2012 . . . These shares were transferrable to Desert Gateway/Retrophin Inc. at 5 to 1 ratio, so that Tom should be receiving a total of 175,000 Retrophin Inc. from you." SHKRELI replied: "Yes, you are 100% correct. We will be continuing with the additional transfers."

m.   On August 20, 2013, Calveli replied to SHKRELI's email of June 13, writing "Can you advise on the status of the transfers below?" GREEBEL forwarded that email to SHKRELI, and the two exchanged a series of emails whose contents have been redacted. [RP00262971; RP0026972]

n.   On August 23, 2013, GREEBEL sent SHKRELI and Retrophin's CFO a "Draft Koestler Consulting Agreement." The attachment has been redacted. [RP00263096]  Based upon my training and experience, my review of these emails, the timing of these emails, and the other consulting agreements that GREEBEL proposed, I believe that GREEBEL's August 23 email was meant as a suggestion to SHKRELI that SHKRELI's remaining debt to KOESTLER be paid through a "consulting agreement" with Retrophin.

o.   On April 9, 2014, attorneys representing KOESTLER sent a letter to GREEBEL stating that KOESTLER had "received only 20,000 of the Retrophin shares" and "intends to pursue his rights against Shkreli and Retrophin, and is prepared to commence litigation for that purpose." SHKRELI and GREEBEL then exchanged emails, whose contents are redacted, about that letter. [RP00101923.0001; RP00101930]

p.   On April 23, 2014, GREEBEL emailed KOESTLER's attorney that "per our conversation, attached is a revised draft of Dr. Koestler's consulting agreement." The draft agreement stated that KOESTLER would provide "consulting services . . . on strategic and other matters to the management of the Company" in exchange for 155,000 shares of Retrophin.  155,000 is

44

the same number of shares that KOESTLER's attorneys previously asserted SHKRELI owed KOESTLER.

q.  On May 28, 2014, Retrophin's CFO emailed SHKRELI: "Should we have . . . koestler's consulting agreement[] reviewed by board this afternoon?" SHKRELI wrote: "no"

r.  On June 25, 2014, SHKRELI and GREEBEL exchanged emails with the subject "consultants." The rest of those emails are redacted. [RP00139803]  Based upon the timing of that email in relation to the earlier emails about KOESTLER's consulting agreement, I believe that this email chain also refers in part to KOESTLER.

s.  In July 2014, GREEBEL and KOESTLER's attorney exchanged a series of emails, including an email on which KOESTLER's attorney copied the managing partner of KATTEN's New York office. In response to that email, GREEBEL wrote: "please stop ccing [that partner] as he has no role in this matter."

t.  On September 25, 2014, KOESTLER emailed SHKRELI: "It has been more than four months since my counsel and company for the counsel exchanged drafts of what we believed was an agreed final form of consulting agreement (and settlement of claims).  We have been told repeatedly that the agreement is subject to review by the company's board, but our counsel refuses to indicate when, if ever, the matter will be taken up, and the agreement signed." SHKRELI forwarded that email to Meg Valeur-Jensen, the individual who became Retrophin's general counsel in or around September 2014.  The two exchanged emails, the contents of which are redacted.  [RP00158462]  Valeur-Jensen then forwarded the email chain to GREEBEL and exchanged additional emails with him and SHKRELI.  The contents of all of those emails are redacted too.

u.  Also on September 25, 2012, ASELAGE emailed SHKRELI, with the subject "Dr. Koestler," writing: "I still don't quite understand what we promised." SHKRELI replied: "Stock in exchange for his consulting." SHKRELI did not mention KOESTLER's investment in MSMB or that the amount of RTRX shares in the draft consulting agreement were the same number of shares that SHKRELI had previously agreed he owed to KOESTLER independent of any services provided to Retrophin.

v.  On September 30, 2014, Retrophin decided to replace SHKRELI, who resigned on or about October 13, 2014.

w.  On October 1, 2014, KOESTLER's attorney wrote to GREEBEL: "Dr. Koestler is making arrangements to create an LLC to receive the shares.

45

How do you plan to revise the settlement agreement to deal with that?" GREEBEL responded: "Can we please discuss by phone?"

x.    On October 7, 2014, Michael Verde, KATTEN's Deputy General Counsel, wrote to Mag Valeur-Jensen, then the Retrophin General Counsel, and others with the subject "Katten files – Mulleady, Koestler and Johnson Matters." The contents of that email, except for a paragraph discussing KOESTLER, are redacted. [RP01494264] Verde attached, among other documents, a KOESTLER consulting agreement, and wrote that the agreement "was awaiting board approval."

y.    On October 16, 2014, KOESTLER sent an email to ASELAGE, recounting the long series of emails and negotiations that had begun with SHKRELI's initial grant of 35,000 shares in Retrophin LLC. At the end of the email, KOESTLER wrote that, on September 25, "Greebel contacted [my attorney] . . . [GREEBEL] initially indicated that the problem was that providing shares to me might be best arranged in the form of transfers to an LLC controlled by myself. We took steps to create such an LLC. Mr. Greebel, however, later indicated that the matter was still before the Retrophin board, and that he had no timetable for a resolution."

## CONCLUSION

77.    It is respectfully submitted that the facts contained herein establish that a prudent person would have a reasonable basis to suspect that SHKRELI, assisted by GREEBEL, perpetrated a series of frauds and that the redacted communications between SHKRELI and GREEBEL and other attorneys at KATTEN, discussed herein, were made in furtherance of those frauds. In particular, it is reasonable to believe based on the foregoing that SHKRELI used his communications with GREEBEL to help in: back-dating transfers of Retrophin shares to MSMB Capital after SHKRELI represented to the SEC that MSMB Capital had millions of dollars under management; controlling the allocation of Fearnow Shares to disguise SHREKLI's ownership and control of those shares; and causing Retrophin to pay debts owed by SHKRELI or MSMB entities through the use of "settlement agreements" and "consulting agreements."

78.    The grand jury investigation of SHKRELI and GREEBEL, as well as others, is ongoing. Based upon my training and experience, I believe that any disclosure of this ex parte

46

affidavit could jeopardize that investigation. This affidavit reviews not only numerous documents obtained pursuant to grand jury subpoenas, but also recounts information the government has been told as part of its ongoing investigation and identifies or suggests the identity of the individuals who have cooperated with the investigation.

79. My opinion about the need for an ex parte procedure is not affected by the facts that the existence of a government investigation of SHKRELI has been discussed in news articles and SHKRELI has spoken once with the government in January 2015. The full nature and scope of the government's investigation, and particularly its focus on GREEBEL, has not been made public, and doing so could jeopardize that investigation.

CHRISTOPHER DELZOTTO
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIATION

Sworn to before me
on the 18th of Nov. 2015

LINDA THORNTON
Notary Public, State of New York
No. 01TH6074799
Qualified in Kings County
Commission Expires May 20, 2018

47