UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

MARTIN SHKRELI and EVAN GREEBEL,

                    Defendants.
-----------------------------------------------------------x

ECF Case

No. 15-cr-00637 (KAM)

**<u>ORAL ARGUMENT REQUESTED</u>**

**MR. GREEBEL'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION FOR A BILL OF PARTICULARS AND
MOTION FOR PROMPT DISCLOSURE OF *BRADY* MATERIALS**

# TABLE OF CONTENTS

Page

A.    The Requested Particulars Are Necessary for Mr. Greebel to Prepare
      for Trial and to Prevent Unfair Surprise ....................................................1

    1.    The Names of Unindicted Co-Conspirators......................................5

    2.    *All* of the Fraudulent Agreements in Furtherance of Counts
      Seven and Eight ...............................................................................9

    3.    Any Allegedly False and Fraudulent Statements,
      Representations, and/or Omissions Made in Furtherance of
      Counts Seven and Eight...................................................................10

    4.    When and How Mr. Greebel Allegedly Learned of and Joined
      the Charged Conspiracies After Mr. Shkreli and Others Were
      Purportedly Already Engaged in Other Alleged Conspiracies
      Underway at the Time.....................................................................10

    5.    Any Overt Acts Not Listed in the Indictment that the
      Government Plans to Introduce at Trial for Count Eight.........................11

B.    The Government's Refusal to Disclose the Requested Exculpatory
      Information Is Unsupportable .................................................................12

    1.    FBI Reports and Notes of Statements Made to the Government...............17

    2.    Any Statements Made to the Government that the Consulting
      Agreements Were Not "Shams" ......................................................17

    3.    Evidence that Mr. Shkreli Lied to and/or Deceived Mr.
      Greebel and Others ........................................................................18

    4.    Evidence that Mr. Shkreli Did Not Follow Mr. Greebel's
      Counsel ........................................................................................18

    5.    Evidence that Mr. Shkreli Did Not Follow Counsel from
      Others...........................................................................................18

    6.    Evidence of Mr. Shkreli's Other Statements ............................................19

    7.    Evidence that Mr. Greebel Was Not Mr. Shkreli's Personal
      Attorney .......................................................................................19

    8.    Evidence of Mr. Shkreli's Lack of Credibility, Including
      Threats..........................................................................................19

    9.    Government Threats of Prosecution and Non-Prosecution
      Agreements ...................................................................................19

    10.   *Brady* in Possession of the SEC and Now Admittedly in
      Constructive, if not Actual, Possession of the United States
      Department of Justice .....................................................................20

Conclusion ........................................................................................................20

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Badoolah*,
    No. 12-CR-774 (KAM), 2014 WL 4793787 (E.D.N.Y. Sept. 25, 2014)..............................8, 9

*United States v. Barret*,
    824 F. Supp. 2d 419 (E.D.N.Y. 2011) ..............................................................................4, 10

*United States v. Batista*,
    No. 06-CR-265 (DLI), 2009 WL 910357 (E.D.N.Y. Mar. 31, 2009)......................................4

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000)....................................................................................12

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987)..................................................................................................12

*United States v. Carroll*,
    510 F.2d 507 (2d Cir. 1975)..................................................................................................12

*United States v. Chen*,
    378 F.3d 151 (2d Cir. 2004)....................................................................................................5

*United States v. Columbo*,
    No. 04 CR. 273 (NRB), 2006 WL 2012511 (S.D.N.Y. July 18, 2006)..............................4, 10

*United States v. Coppa*,
    267 F.3d 132 (2d Cir. 2001)..................................................................................................13

*United States v. Eldridge*,
    No. 09CR329A, 2010 WL 3749060 (W.D.N.Y. Sept. 20, 2010).............................................7

*United States v. Espinal*,
    96 F. Supp. 3d 53 (S.D.N.Y. 2015)................................................................................. 16, 17

*United States v. Fasciana*,
    No. S301-CR-00058 (LTS), 2002 WL 31495995 (S.D.N.Y. Nov. 6, 2002).........................15

*United States v. Feola*
    651 F. Supp. 1068 (S.D.N.Y. 1987).....................................................................................11

*United States v. Gotti*,
    784 F. Supp. 1017 (E.D.N.Y. 1992) .......................................................................................8

*United States v. Kahale*,
    789 F. Supp. 2d 359 (E.D.N.Y. 2009) ................................................................................5, 6

*United States v. LeRoy*,
    687 F.2d 610 (2d Cir. 1982)............................................................................13, 15, 16

*United States v. Lino*,
    No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001)...........................20

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012)...................................................................................20

*United States v. Mavashev*,
    No. 08-CR-902 (DLI) (MDG), 2010 WL 670083 (E.D.N.Y. Feb. 23, 2010) .........15

*United States v. Mittal*,
    No. 98 CR. 1302 (JGK), 1999 WL 461293 (S.D.N.Y. July 7, 1999).....................11

*United States v. Nachamie*,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000)....................................................................7, 12

*United States v. Nixon*,
    418 U.S. 683 (1974)................................................................................................15

*United States v. Oruche*,
    No. 07 Cr. 0124 (WHP), 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008)................5, 11

*United States v. Reddy*,
    190 F. Supp. 2d 558 (S.D.N.Y. 2002)................................................................15, 16

*United States v. Rigas*,
    258 F. Supp. 2d 299 (S.D.N.Y. 2003)......................................................................5

*United States v. Rittweger*,
    524 F.3d 171 (2d Cir. 2008)..................................................................13, 16, 17, 18

*United States v. RW Prof'l Leasing Servs. Corp.*,
    327 F. Supp. 2d 192 (E.D.N.Y. 2004) ....................................................................17

*United States v. RW Prof'l Leasing Servs. Corp.*,
    317 F. Supp. 2d 167 (E.D.N.Y. 2004) ....................................................................17

*United States v. Savin*,
    No. 00 CR. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ......................11

*United States v. Shteyman*,
    No. 10 Cr. 347 (SJ), 2011 WL 2006291 (E.D.N.Y. May 23, 2011).........................7

*United States v. Torres*,
    901 F.2d 205 (2d Cir. 1990).................................................................................4, 10

*United States v. Urso*,
　369 F. Supp. 2d 254 (E.D.N.Y. 2005) ................................................................ 8

*United States v. Velasquez*,
　No. S9 96 CR. 126 (JFK), 1997 WL 414132 (July 23, 1997) ........................... 13, 14

*United States v. Walsh*,
　194 F.3d 37 (2d Cir. 1999) .................................................................................. 5

*United States v. Warme*,
　No. 09CR19A, 2009 WL 427111 (W.D.N.Y. Feb. 20, 2009) .............................. 8

*United States v. Yu*,
　No. 97 CR 102 (SJ), 1998 WL 57079 (E.D.N.Y. Feb. 5, 1998) ......................... 17

*United States v. Zagari*,
　111 F.3d 307 (2d Cir. 1997) ............................................................................. 14, 15

**Statutes**

18 U.S.C. § 3500 ................................................................................................. 12

**Rules**

Fed. R. Crim. P. 7(f) ............................................................................................ 1

Defendant Evan Greebel respectfully submits this reply in support of his Motion for a Bill of Particulars and his Motion for Prompt Disclosure of *Brady* Materials, and respectfully requests oral argument.

**A.    The Requested Particulars Are Necessary for Mr. Greebel to Prepare for Trial and to Prevent Unfair Surprise**

In response to Mr. Greebel's Motion for a Bill of Particulars, the government argues against disclosure of any information, but then produced by letter on the same date the following particulars sought by Mr. Greebel:  the names of certain unidentified parties in the Superseding Indictment ("the Indictment"); the names of parties to the settlement agreements referenced in the Indictment; the names of parties to the consulting agreements referenced in the Indictment; and the names of alleged victims in counts charged against Mr. Shkreli only.  *See* Government's Letter of Sept. 30, 2016.  While Mr. Greebel appreciates these necessary and important disclosures, they are not sufficient to satisfy the government's obligations.  The government offers no reasonable rationale for denying disclosure of the remaining requested particulars other than for tactical advantage at the expense of fair notice to Mr. Greebel.  Indeed, the government states that all relevant information, including the identity of the unnamed "other" co-conspirators, is easy to find in the approximately three million plus pages of discovery through text searches—but then refuses to supply the information.  If the information is so easy to identify, the government loses nothing by disclosing it, and Mr. Greebel should not have to assume the terrible risk of guessing incorrectly.

The government's disclosures are incomplete in crucial ways.  The government seems to acknowledge that not all Retrophin transactions during the charged conspiracies were fraudulent, but refuses to identify the ones that were, forcing Mr. Greebel to defend against all of them.  The

government identifies parties to settlement and consulting agreements, but refuses to identify the specific agreements at issue and then confirm whether they are the only ones at issue.

Yet the government, in its opposition, does **not** dispute certain material facts: *First*, the government does not dispute that this case is complex, Tr. of Feb. 3, 2016 Hearing at 6, and that bills of particulars are appropriate when cases are complex. *Second*, the government does not dispute that approximately three million plus pages have been produced in discovery. (Opp'n at 26). *Third*, the government does not dispute that the allegations relating to Mr. Greebel are merely a subset of a larger indictment against Mr. Shkreli. The government does not dispute that Mr. Greebel had nothing to do with the alleged "MSMB Capital Hedge Fund Scheme," or the alleged "MSMB Healthcare Hedge Fund Scheme." *Fourth*, the government does not dispute that Retrophin had over one hundred settlement, consulting, and share transfer agreements during the charged period—many of which are in the discovery—but the government refuses to identify all of the ones it claims are fraudulent, leaving Mr. Greebel to defend them all.

The government also does not appear to dispute that the Indictment makes three fundamental assumptions. It assumes (incorrectly) that Mr. Greebel knew in 2012 that "MSMB Capital never invested in Retrophin" and that Mr. Shkreli "defrauded MSMB Capital and MSMB Healthcare investors." (*See* Ind. ¶ 21). It assumes (incorrectly) that Mr. Greebel joined the alleged Retrophin scheme to further the "MSMB Capital Hedge Fund Scheme" and the "MSMB Healthcare Hedge Fund Scheme." (*See id.*). Finally, it assumes (incorrectly) that Mr. Greebel knew in 2012 that (a) Mr. Shkreli allegedly made false statements to the SEC and (b) Mr. Shkreli needed to "fabricate an investment by MSMB Capital in Retrophin LLC" for purposes of the SEC inquiry. (*See* Ind. ¶ 25). Given that the Indictment makes these assumptions, without expressly stating them, that each one is fundamental to the charges, and that the discovery will

not answer whether these incorrect assumptions are part of the charges, Mr. Greebel is entitled to fair notice of whether they are, in fact, part of the government's theory of prosecution.

The government's argument (at 15-16, 26) that production of "text-searchable" documents with a general index excuses its duty to provide particulars makes no sense.  To begin with, much of the discovery is actually not searchable by its metadata (date sent; sender name; e-mail subject; or filename); much of the content of the discovery is not reliably text-searchable; and much of the discovery is wildly disorganized.[1]  Moreover, even assuming the discovery was all text-searchable, this argument is a red herring.  Millions of pages of irrelevant information are obscuring the ability to find the relevant information.  A simple search of "agreements," for example, will identify hundreds of agreements in the discovery.  But it will not help Mr. Greebel identify which of them are, in the government's view, fraudulent, leaving Mr. Greebel to spend his limited resources and time to defend all of them.[2]  The issue is the same with a general index—given that there are **over seventy** different sources, the index does little to identify necessary particulars to understand the charges.

---

[1]  As reflected in the attached affidavit of an eDiscovery Specialist at Gibson Dunn who examined the government's productions (Exhibit A), the content of many documents in the production is not reliably text-searchable; only portions of other documents are text-searchable; and the metadata of many productions lack the date of the creation of the document or other useful metadata, rendering the metadata almost entirely useless.

[2]  Indeed, text-searching does not fill in gaps of knowledge when it is either impossible to search for what the government claims is easily found in the discovery or the documents do not address the issues.  For example, through the limited text-searching available, we have been unable to find any evidence relating to the incorrect assumptions in the Indictment that Mr. Greebel knew in 2012 that (1) MSMB Capital had never invested in Retrophin, (2) Mr. Shkreli had defrauded MSMB Healthcare investors, (3) Mr. Shkreli made false statements to the SEC, and (4) Mr. Shkreli needed to fabricate an investment by MSMB Capital in Retrophin to substantiate his statements to the SEC.  We cannot fathom how to search for documents to confirm that these assumptions are part of the charges against Mr. Greebel.  The government should so inform Mr. Greebel so that he has fair notice of the charges against him.

3

The Court should compel the government to produce the following information to Mr. Greebel: the names of other unindicted co-conspirators in addition to Co-Conspirator 1; *all* fraudulent agreements in furtherance of Counts Seven and Eight—not just parties to certain agreements; a list of the allegedly false statements and/or material omissions in Counts Seven and Eight; when and how Mr. Greebel allegedly learned of and joined the conspiracies charged in Counts Seven and Eight; and any unidentified overt acts in Count Eight.

The government argues that "the level of disclosure here is far beyond what is required under the law" (Opp'n at 25), but the cases it cites miss the mark.  Of the twenty new cases cited in the government's brief in opposition to Mr. Greebel's request for particulars, ten involved violent or drug trafficking offenses.  And, as the court stated in *Columbo*, a case upon which the government relies, a "review of the case law suggests that requests for bills of particulars have rarely been granted in cases involving defendants charged with violent offenses."  *United States v. Columbo*, No. 04 CR. 273 (NRB), 2006 WL 2012511, at *6 n.18 (S.D.N.Y. July 18, 2006). And in many of the narcotics trafficking cases upon which the government relies, the government produced extensive wiretap and search warrant evidence far beyond its reliance on emails in this case obscured by the production of millions of pages of documents.[3]

---

[3] *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (denying bill of particulars in a narcotics trafficking case where the government produced electronic intercepts, search evidence, and "exhaustive supporting affidavits" which laid out all of the details sought by the defendants); *United States v. Barret*, 824 F. Supp. 2d 419, 439-40 (E.D.N.Y. 2011) (denying bill of particulars in a narcotics trafficking case where the search warrant affidavits, videotapes, physical evidence, and particulars disclosed by the government were sufficient and far more than what the government has disclosed in this case); *United States v. Batista*, No. 06-CR-265 (DLI), 2009 WL 910357 (E.D.N.Y. Mar. 31, 2009) (denying bill of particulars in a narcotics trafficking case where the government did not produce millions of pages but rather produced detailed wiretap applications setting out times and places of alleged trafficking, line sheets and transcripts detailing the defendant's activities, and early production of 3500 material relating to one critical government witness).

The government also relies on cases where the facts and charges are far simpler than the instant one, the discovery in such cases consisted of tens of thousands of pages (not millions), and the government had already made significant disclosures far beyond this one.  In *United States v. Walsh*, for example, the corrections officer was charged with a single count, for one unforgettable and uncomplicated incident—the defendant stepped on an inmate's genitalia.  194 F.3d 37, 47 (2d Cir. 1999), *overruled on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[4]  In *United States v. Chen*, the charges of loansharking were simple, and the government had provided extensive particulars through recordings and transcripts, early disclosure of FBI interview reports, grand jury testimony, and disclosures in court during discussion of the defendant's motion for a bill of particulars.  378 F.3d 151, 162 (2d Cir. 2004). Similarly, in *United States v. Rigas*, unlike here, the government agreed "to provide a bill of particulars addressing Defendants' general areas of concern."  258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003).

### 1.      The Names of Unindicted Co-Conspirators

The government's application of the 6-factor test set forth in this Court's decision in *United States v. Kahale* does not withstand scrutiny.  As in *United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008), a case on which the government relies, disclosure is warranted here given the volume of discovery and breadth of the charged conspiracies.  All of the factors favor disclosure of the names of unindicted co-conspirators to Mr. Greebel.  789 F. Supp. 2d 359, 372 (E.D.N.Y. 2009).

---

[4]  Moreover, the affidavit submitted by the AUSA provided extensive information—particulars the government refuses to provide here—for it: "(1) identified the names of each witness to each count; (2) explained the rationale for each given date range for the alleged events; and (3) specified the location of each incident, and the fact that Counts I and II allegedly occurred in the same cell, but Count III occurred in a different cell."  *Walsh*, 194 F.3d at 41.

The first factor—the number of co-conspirators—favors disclosure.  While the government asserts "the number of co-conspirators is limited," citing Co-Conspirator 1, Corrupt Employee 1, and Corrupt Employee 2 (Opp'n at 38), the government conspicuously leaves out the number of *other* unindicted co-conspirators whom it refuses to disclose.  As this Court held in *Kahale*, there is an "unknown number of unindicted individuals."  789 F. Supp. 2d at 372. Moreover, it is unclear whether the government is alleging that Corrupt Employee 1 and Corrupt Employee 2 are unindicted co-conspirators.

The second factor—the duration and breadth of the alleged conspiracy—strongly favors disclosure.  The government makes a half-hearted attempt to claim otherwise, stating that "four interrelated schemes are each less than five years in length, and are all based in New York" (Opp'n at 38)—omitting that there are actually six separately charged conspiracies; that two of the six charged conspiracies are, in fact, five years in length (*see* Ind. ¶¶ 42, 45)—as this Court found was a "lengthy" period in *Kahale*; that members of Retrophin's Board of Directors and parties to agreements identified thus far were located throughout the United States, not just New York; and that the breadth of the charged conspiracies is extensive, involving at least twenty-four investors, at least eleven parties to certain agreements and possibly hundreds of other parties to yet-to-be-identified agreements, at least two accounting firms, at least five law firms serving as outside counsel to Retrophin, and numerous attorneys representing the counterparties to the agreements at issue.

The third factor—whether the government has already provided adequate notice of particulars—favors disclosure.  Other than identifying the specifically referenced parties in the

Indictment, potential victims, and parties to certain transactions, and arguing that the discovery is text-searchable (Opp'n at 38), the government refuses to provide any further particulars.[5]

The fourth factor—the volume of pretrial discovery—strongly favors disclosure. Here, there can be no serious dispute that the volume of pretrial discovery is extraordinary. In *Nachamie*, the government was compelled to disclose more information because the discovery was "over 200,000 pieces of paper"—here, the government has produced fifteen times as many pieces of paper. *United States v. Shteyman*, No. 10 Cr. 347 (SJ), 2011 WL 2006291, at *8 (E.D.N.Y. May 23, 2011) (describing *United States v. Nachamie,* 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000)).

The fifth and sixth factors—the potential danger to co-conspirators, the nature of the alleged criminal conduct, and the potential harm to the government's investigation—strongly favor disclosure to Mr. Greebel. The government concedes that Mr. Greebel poses no danger. Mr. Greebel's defense should not suffer because of allegations against a co-defendant. Further, the government cannot have it both ways. Having asserted that the identities of unindicted co-conspirators are easily obtained in "text-searchable" discovery, the government cannot reasonably argue against disclosure due to potential danger. Moreover, this Court has the power to impose a protective order to ensure that there is no danger posed by disclosure of the names *to Mr. Greebel. See United States v. Eldridge*, No. 09CR329A, 2010 WL 3749060, at *8 (W.D.N.Y. Sept. 20, 2010). Finally, having already identified certain individuals in its

---

[5]   The government should disclose, for example, whether it alleges any of the following individuals are unindicted co-conspirators: the parties to any agreements at issue including any consultants to Retrophin; any members of the Board of Directors of Retrophin; any other employees of Retrophin, including but not limited to senior executives and in-house counsel; any additional employees or consultants to MSMB and its affiliates; and/or any other outside attorneys for Retrophin and/or other parties. Keeping Mr. Greebel in the dark about who else was purportedly involved in the charged conspiracies makes no sense, and leaves Mr. Greebel profoundly prejudiced.

7

September 30, 2016 letter without seeking a protective order to address safety concerns, the government cannot reasonably claim that non-disclosure of the additional names poses a danger.[6]

The government's reliance on cases involving violent crimes, such as *United States v. Gotti*, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1992), *United States v. Urso*, 369 F. Supp. 2d 254 (E.D.N.Y. 2005), and *United States v. Badoolah*, No. 12-CR-774 (KAM), 2014 WL 4793787, at *15 (E.D.N.Y. Sept. 25, 2014), is misplaced.  In *Gotti*, the Honorable I. Leo Glasser held that there was no comparison between seeking names of unindicted co-conspirators to charged crimes with the defendant's request for the same information for *un*charged crimes.  784 F. Supp. at 1019.  Moreover, Judge Glasser found that the government "already provided adequate information to the defendants with respect to these eight uncharged crimes—such as the time, the place, and the nature of each offense."  *Id.*  In *Urso*, while compelling the government to identify the "locations" of poker machines, the "identity of the victim or victims (individual or business) of the alleged conspiracy," "the specific locations where credit was allegedly extended or sought to be collected," and "the identity of Basile's alleged loansharking co-conspirators," the Honorable Nicholas G. Garaufis denied the request to identify co-conspirators to one defendant because he was charged with extreme violence.  369 F. Supp. 2d at 272.  Finally, in *Badoolah*, this Court denied particulars, including names of co-conspirators, to a defendant charged in a simple mortgage fraud scheme where the government provided extensive particulars.  2014 WL 4793787, at *1.  The defendant allegedly recruited people who lacked income to serve as straw buyers of properties, and then oversaw preparation of mortgage loan applications with false statements.  *Id.*  This Court held that disclosures were extensive in the affidavit in support of a

---

[6]  *Cf. United States v. Warme*, No. 09CR19A, 2009 WL 427111, at *2 (W.D.N.Y. Feb. 20, 2009) (noting government's identification of other victims weighed against concerns about protecting the identity of one unidentified victim).

search warrant, the affidavit in support of the arrest warrant, the government's letter seeking a permanent order of detention, and specific government disclosures provided to the defendant with the addresses, dates, and locations of the alleged fraudulent closings, and the names of the straw companies and buyers.  *Id.* at *14.  There can be no serious dispute that the government has not provided comparable disclosures in this case.

   2.   ***All* of the Fraudulent Agreements in Furtherance of Counts Seven and Eight**

   It is unfair and deeply prejudicial that the government will not identify ***all*** allegedly fraudulent transactions at issue.  Without additional disclosures, Mr. Greebel will be forced to spend limited time and resources defending the legitimacy of over one-hundred agreements entered into by Retrophin during the charged conspiracies.[7]

   The government should also be compelled to identify what, if any, statements in the agreements were false.  If there are none, and the government is instead arguing that the agreements were fraudulent in purpose, the government should say so—Mr. Greebel then does not have to spend hundreds of hours obtaining evidence that statements were either true in fact, or true based upon the information provided him by Mr. Shkreli and others.[8]

---

[7]   In requesting this information, counsel is not ignoring the November 18, 2015 affidavit submitted by Special Agent Christopher Delzotto to the Honorable Jack B. Weinstein.  That affidavit, however, does not track the Indictment, incorporates allegations from an unrelated civil complaint filed by Retrophin against Mr. Shkreli (and not Mr. Greebel), and contains extensive and incorrect speculation about the content of redacted documents.  If the government is asserting that the affidavit nevertheless identifies all of the transactions and agreements for which Mr. Greebel must prepare a defense, all unindicted co-conspirators, and all other particulars sought by Mr. Greebel, the government should confirm as much.

[8]   The government should also answer whether there was any transfer of cash and/or shares pursuant to any agreements; having alleged the agreements were shams, it would be critical to know whether the cash and/or shares were actually transferred pursuant to those agreements.  Finally, the government should identify whether any parties were investors in related entities or affiliates, and if so, the amounts invested and purportedly lost by such investors.

The government's cited cases (Opp'n at 41-42) do not counsel otherwise. *United States v. Barret* is inapposite—that case involved a simple conspiracy to distribute marijuana, and possession of a firearm in relation to drug trafficking, and the government disclosed, among other things, a surveillance video capturing defendants' narcotics-related activities so the defendants had no doubt as to the scope of the charged conduct. 824 F. Supp. 2d at 419, 439-40 (E.D.N.Y. 2011). Similarly, *Torres* involved heroin trafficking, and was not a document-intensive case; further, the government provided "exhaustive supporting affidavits" laying out detail requested by defendants. 901 F.2d at 234.

### 3. Any Allegedly False and Fraudulent Statements, Representations, and/or Omissions Made in Furtherance of Counts Seven and Eight

The government seems to say that there are no affirmative false statements or representations, but rather that the government's theory of prosecution against Mr. Greebel is based on "material omissions" (Opp'n at 41-42). If so, this is a significant development and the government should be clear about it.[9] If not, the government should identify any false statements or representations.

### 4. When and How Mr. Greebel Allegedly Learned of and Joined the Charged Conspiracies After Mr. Shkreli and Others Were Purportedly Already Engaged in Other Alleged Conspiracies Underway at the Time

The government refuses to acknowledge that Mr. Greebel allegedly joined the conspiracy when it was already underway. When and how Mr. Greebel joined is fundamental to understanding the nature of the charges against him.

---

[9] The government's reliance on *United States v. Columbo,* No. 04 CR. 273 (NRB), 2006 WL 2012511 (S.D.N.Y. July 18, 2006), misses the mark. The court denied a defendant's request that the government identify the "fraudulent aspect" of each fraudulent invoice, because the "double-billing" crime for which he was charged "is ordinarily not a complex financial crime and should be relatively easy to detect from the discovery produced in this case." *Id.* at *8.

The government in its opposition cites a laundry list of cases (Opp'n at 43), many of which involve violent crimes and not document-intensive cases.  *United States v. Savin*, No. 00 CR. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001), supports Mr. Greebel's request for further information on which transactions were fraudulent, *id.* at *3-*4, and while the court denied a bill of particulars concerning Savin's entrance in the conspiracy, it applied no case-specific analysis, *id.* at *5.  While the court in *United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694, at *3-4 (S.D.N.Y. Mar. 5, 2008), denied the request for information about when a defendant joined the conspiracy, the court granted the defendant's request for "a bill of particulars stating any acts, beyond those included in the Indictment or the Oluigbo Complaint, which the Government will offer at trial."  In *United States v. Mittal*, the court noted both that the government "had already provided the defendant with a list of the patients whom the defendant allegedly referred" in violation of the charging statute.  No. 98 CR. 1302 (JGK), 1999 WL 461293, at *9 (S.D.N.Y. July 7, 1999).

The government incorrectly dismisses *United States v. Feola* (Opp'n at 43) as "provid[ing] absolutely no explanation or analysis as to why it granted the defendant's request for this information."  But in fact, that court stated:  "Where a defendant is named in only one count and particular information as to him has not been provided, his request for the time, location and persons present at the time of the alleged transaction may be granted so that he may properly prepare his defense."  651 F. Supp. 1068, 1133 (S.D.N.Y. 1987).  Further, the government has no answer for the holding in *United States v. Nachamie* that such information is reasonable in a request for a bill of particulars.  91 F. Supp. 2d at 574.

5.      **Any Overt Acts Not Listed in the Indictment that the Government Plans to Introduce at Trial for Count Eight**

11

The request for information on overt acts is also reasonable.  By contrast, the government's reliance (Opp'n at 44) on *United States v. Carroll* is misplaced.  The crime at issue was the attempted robbery of a U.S. mail truck where a guard was killed and the driver wounded. That straightforward set of facts—as opposed to millions of pages produced here in a case based on the interpretation of emails—would hardly lend itself to a request for a bill of particulars.  510 F.2d 507, 508 (2d Cir. 1975).  Moreover, in distinguishing *United States v. Bin Laden* (Opp'n at 45) based on its extreme factual circumstances, the government overlooks that the court relied on two significant decisions that support Mr. Greebel's motion:  *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987), and *Nachamie*.  92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000).[10]

## B.    The Government's Refusal to Disclose the Requested Exculpatory Information Is Unsupportable

In its opposition to Mr. Greebel's Motion for Prompt Disclosure of *Brady* Materials, the government did not dispute that *Brady* trumps the Jencks Act and 18 U.S.C. § 3500; that the government must not deny the accused "access to exculpatory evidence only known to the [g]overnment," (Opp'n at 47) (quoting *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982)); that the government's July 13, 2016 letter was, in fact, a *Brady* disclosure (Opp'n at 48) (despite making the argument to the contrary during the July 14, 2016 court conference (Tr. of July 14, 2016 Hearing at 5-8)); that *Brady* disclosures should not be made on the eve of trial (Opp'n at 46); and that the government has constructive, if not actual, possession, custody, and

---

[10]   We respectfully disagree with the government's account of our prior requests for basic information about, among other things, the names and agreements reflected in the indictment. (Opp'n at 29).  In a February 2016 meeting, the government expressly declined to identify the parties to the settlement agreements, the parties to the consulting agreements, Investor 1, Investor 2, and Investor 3.  In an April 2016 meeting, we followed up and sought the same (and additional information).  This time the government promised to identify the unnamed individuals except for investors, and the parties to the settlement and consulting agreements, and they would consider whether to disclose the names of the investors.  At no point did we believe the government was waiting to hear back from us before making these disclosures.

control over the SEC's documents including notes and transcripts of interviews and testimony (Opp'n at 46 n.9).

The government is able to state that they have no *Brady* material because they continue to take a narrow view of *Brady* and refuse to provide evidence that contradicts the government's theories of prosecution.  *See United States v. Rittweger*, 524 F.3d 171, 181 n.4 (2d Cir. 2008).  The government should not be using the standard announced in *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001), as its talisman for disclosure (Opp'n at 46-47)—that is the standard used following an alleged *Brady* violation, not how the government should fulfill its *Brady* obligations before trial.

The government attempts to reclassify Mr. Greebel's *Brady* requests as impeachment material to sidestep disclosures of information that is contrary to the government's theories of prosecution against Mr. Greebel (Opp'n at 47).  It overreaches in citing *United States v. Velasquez*, No. S9 96 CR. 126 (JFK), 1997 WL 414132 (S.D.N.Y. July 23, 1997), a case that supports Mr. Greebel, not the government.  There, the court denied production of impeachment material, clarifying "the distinction between direct exculpatory information and impeachment material":  "Direct exculpatory information often becomes part of the defense's direct case and provides theories of defense.  Additional time may be needed for the defense to make effective use of such information."  *Id.* at *6.  The court noted that the government had promised to "turn over all [such] direct exculpatory *Brady* material well before trial should information surface in their preparation.  In contrast, impeachment material has a narrow, specific use—to attack the credibility of a witness on cross-examination.  No extended pretrial investigation and preparation of such material is necessary for its effective use."  *Id.* Here, Mr. Greebel requests *Brady* material—exculpatory information that "provides theories of defense," such as evidence

(including witness statements) reflecting that consulting agreements were entered into for the purpose of providing services, that Mr. Greebel was deceived by Mr. Shkreli or others, and that Mr. Greebel was not Mr. Shkreli's attorney.  Such statements are not simply impeachment material—they are *Brady*, and thus necessitate prompt disclosure under this circuit's precedents.

Instead, the government insists that it need disclose only the name of a witness with exculpatory information, citing a laundry list of cases beginning with *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997).  (Opp'n at 48).  But even *Zagari* does not support that absolute rule.  There, the Second Circuit held that there was no *Brady* violation when the government concealed the insanity and neo-Nazi leanings of its key witness, Dotey, because the defendants "had actual knowledge of the witnesses with information about Dotey."  *Id.* at 320-31.  In addition, the defense had an enormous amount of impeaching evidence concerning Dotey, including his "falsification of professional credentials and engineering documents," and

> his prior inconsistent statements before the grand jury, his misstatements to the FBI about his personal background, the financial abandonment of his children, his enormous tax debt, his loss of relevant records, his own involvement in the charged crimes, the civil judgments against him, the foreclosure on his home, bad checks he had written, and his acceptance of expense money from the FBI.

*Id.* at 320-21.  "This alone," the Second Circuit held, "might be enough to make the evidence of his bizarre statements cumulative and non-material."  *Id.* at 321.  However, the *Zagari* court also held that "were Dotey's evidence the only support for Appellants' convictions, we would be concerned that perhaps the evidence of his mental condition *is* material."  *Id.* (emphasis added). In no way, in other words, was simply the fact that the defense knew of Dotey's existence enough under *Brady*.

Similarly, the government misses the mark in citing *United States v. Mavashev* (Opp'n at 48), where the court also "urged" the government to "bear in mind whether, to the extent any version of a particular exculpatory statement [in its possession] is in a form that would be

14

admissible in evidence, any other evidentiary form of that information is … available to the

defense for presentation at trial." No. 08-CR-902 (DLI) (MDG), 2010 WL 670083, at *3

(E.D.N.Y. Feb. 23, 2010) (quoting *United States v. Fasciana*, No. S301-CR-00058 (LTS), 2002

WL 31495995 (S.D.N.Y. Nov. 6, 2002)). Likewise, in *United States v. Reddy*, the court actually

held that "to the extent the Government has in its possession witness statements from the EDS

investigatory file from persons that it does not intend to call to testify at trial and such statements

constitute *Brady* material, they must be produced in a manner consistent with the timetable

applicable for *Brady* disclosure." 190 F. Supp. 2d 558, 573 (S.D.N.Y. 2002). Finally, the

government's reliance on *United States v. Nixon*, 418 U.S. 683, 701-02 (1974) (Opp'n at 47), is

mystifying, as the statement made there was about the special prosecutor's ability to subpoena

documents, not *Brady* at all. *See id.* at 702 (concluding that the district court did not err in

"authorizing the issuance of the subpoena duces tecum").

 *United States v. LeRoy* is similarly inapposite and cannot bear the weight the government

places on it (Opp'n at 47). In *LeRoy*, the court held that withholding grand jury testimony by

three witnesses was not a *Brady* violation because the defendant should have known of the

witness's testimony—there, "Hitchings [the defendant] was … on notice that [the witnesses]

might have testified before the grand jury and that their statements might have supported

[Hitchings's] defense" in part because "Hitchings was aware long before trial that [the witnesses]

had been in his employ," that one of his employees had testified that a third party, Scaccia, "had

instructed him *as well as* [the three witnesses] to lie to the grand jury," 687 F.2d at 618-19

(emphasis added), about the exact statements that Hitchings later claimed the government should

have disclosed, *id.* at 616. In other words, it was crystal clear to Hitchings that the three

witnesses, formerly in his employ, had testified before the grand jury in his favor and Hitchings knew *what* each of these witnesses said to the grand jury.

The government also relies (Opp'n at 47) on *United States v. Reddy* while ignoring the Honorable Denny Chin's recent decision in *United States v. Espinal*, 96 F. Supp. 3d 53 (S.D.N.Y. 2015)—overlooking a decision by a sitting Second Circuit Judge with a clear view that identifying the name of a potentially exculpatory witness with summarized statements is not sufficient to comply with *Brady* obligations. As Judge Chin explains, witnesses are often unavailable to the defense and thus the defense cannot blindly call them to the witness stand based on summarized statements from the government. *Id.* at 68.

*Rittweger*, a case conspicuously omitted by the government, is instructive here. There, a key government witness and co-conspirator had made statements to the FBI and testified before the grand jury that the defendant Brandon was unaware of the fraudulent nature of certain statements the government claimed were false and in furtherance of a larger conspiracy. The Second Circuit held that what this witness said to the FBI and the grand jury lent "credence to Brandon's defense" that he was unaware of the falsity of the statements. 524 F.3d at 181. By the time the government disclosed the statements to the defendant, however, the witness/co-conspirator was unavailable for health reasons. *See* Brief for Defendant-Appellant Douglas C. Brandon at 9, *United States v. Rittweger*, Nos. 05-3600-cr, 05-3766-cr, 05-3769-cr, 2006 WL 6637685 (2d Cir. Mar. 17, 2006). The Honorable Sonia Sotomayor, then sitting on the Second Circuit Court of Appeals, stated that the Court was "troubled by the government's failure to produce" grand jury testimony of a co-conspirator "sooner," *Rittweger*, 524 F.3d at 180, and that while there was no prejudice in this case, "the government should have acted in favor of disclosing the *Brady* material earlier," *id.* at 182, particularly as the early discovery "would not

have had the potential to harm the witness," *id*.  The government's reliance on district court cases

such as *United States v. Yu*, No. 97 CR 102 (SJ), 1998 WL 57079 (E.D.N.Y. Feb. 5, 1998), to

absolve it of any *Brady* responsibility is misguided in light of more recent—and binding—

precedent.

### 1.     FBI Reports and Notes of Statements Made to the Government

The government argues that the issue of the FBI reports was resolved by this Court.

(Opp'n at 50; *but see* Tr. of July 14, 2016 Hearing at 10.)  However, the government overlooks

that, during the brief portion of the hearing in which those documents were discussed, no party

provided the Court with relevant cases.  In particular, Judge Chin's decision in *Espinal* is directly

on point.  The government also does not address Mr. Greebel's request that the Court, in the

alternative, review the FBI reports and handwritten notes *in camera*—the government had no

objection to this approach when it was before the Court on July 14, 2016, and we presume the

government still has no objection today.  (*See* Tr. of July 7, 2016 Hearing at 4-5.)[11]

### 2.     Any Statements Made to the Government that the Consulting Agreements Were Not "Shams"

The government treats this category of information cavalierly, but such evidence would

exculpate Mr. Greebel—as it would directly contradict a central premise of the government's

theory of prosecution.  *See also Rittweger*, 524 F.3d at 181 (finding statements that supported

---

[11]   The government mistakenly relies (Opp'n at 49) on *United States v. RW Professional Leasing Services Corp.*, 317 F. Supp. 2d 167, 179 (E.D.N.Y. 2004), because it relates to the disclosure of purely *Giglio* material going to the credibility of government witnesses at trial, not to *Brady* evidence.  Moreover, the government's further reliance on this case for the proposition that disclosure of *Giglio* materials "three days prior to the trial" was satisfactory is belied by the record.  Judge Spatt granted defendants' motion to postpone the trial to enable the defense to have an additional month to review the materials, and found that, "[b]ecause of the voluminous documents for discovery and preparation for trial, the Court finds that fair play necessitates that the defendants be permitted more time to examine the Government's production of statements of all prospective witnesses."  *United States v. RW Prof'l Leasing Servs. Corp.*, 327 F. Supp. 2d 192, 197 (E.D.N.Y. 2004).

defendant's theory of the defense "favorable to the defendant" and therefore *Brady*).  This evidence is not, as the government seemingly asserts (Opp'n at 51), "way beyond the scope of *Brady*."

       **3.**      **Evidence that Mr. Shkreli Lied to and/or Deceived Mr. Greebel and Others**

The government does not address why evidence that Mr. Shkreli lied to and/or deceived Mr. Greebel, and/or others, would not fall within *Brady*.  Such evidence would exculpate Mr. Greebel.  At minimum, it would be favorable to Mr. Greebel's defense.  And disclosures of any lies by Mr. Shkreli to Mr. Greebel and/or others would require significant pretrial investigation. The significance of such evidence cannot be overstated.  Evidence of Mr. Shkreli's lies to Mr. Greebel, for example, would directly contradict the government's theory that Mr. Greebel and Mr. Shkreli entered into an illegal agreement.  Further, such evidence would support a defense that Mr. Greebel's legal advice was based on the information he was provided; and a defense that Mr. Greebel is a victim, not a co-conspirator.  Evidence of this kind is not, as the government asserts, "way beyond the scope of *Brady*"—indeed, it is critical and in the bullseye of *Brady* in this case.

       **4.**      **Evidence that Mr. Shkreli Did Not Follow Mr. Greebel's Counsel**

The government gives this request similar short shrift, but such evidence would exculpate Mr. Greebel—it would directly contradict the government's theory that Mr. Greebel and Mr. Shkreli entered into an illegal agreement to defraud Retrophin, and that Mr. Greebel's legal advice was somehow fraudulent.  This evidence is not "way beyond the scope of *Brady*," but at the heart of it.

       **5.**      **Evidence that Mr. Shkreli Did Not Follow Counsel from Others**

18

Such evidence would exculpate Mr. Greebel by showing that Mr. Shkreli did not follow the advice of others in the same way he did not follow Mr. Greebel's advice.  This evidence is also not, as the government contends, "beyond the scope" of *Brady*.

### 6.      Evidence of Mr. Shkreli's Other Statements

The government has acknowledged that it is obligated to produce any and all statements Mr. Shkreli made, and "confirms that it has produced all statements made by Shkreli to the government." (Opp'n at 46 n.9).  However, it does not address the evidence in the record—from the videotape of Mr. Shkreli's arrest—that Mr. Shkreli apparently made additional, non-memorialized statements to the FBI that day.

### 7.      Evidence that Mr. Greebel Was Not Mr. Shkreli's Personal Attorney

This evidence, should it exist, would directly contradict, almost verbatim, the government's language in the Indictment (*see* ¶ 2); as a result, it is within the "scope" of the government's *Brady* obligations.  Indeed, the government anticipates this will be the subject of motion practice before trial; accordingly, the government should certainly disclose any such evidence promptly.

### 8.      Evidence of Mr. Shkreli's Lack of Credibility, Including Threats

As with the other categories of exculpatory information, such evidence would support any opposition to Mr. Shkreli's "advice of counsel" defense proffered by his current eminent counsel and should be produced right away.

### 9.      Government Threats of Prosecution and Non-Prosecution Agreements

The government denies this is *Brady* material (Opp'n at 51), which is wrong.  *See United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *17 (S.D.N.Y. Jan. 2, 2001) (listing

"any promise, reward, or inducement" given to any witness as *Brady* material).  Any such information concerning the alleged consultants or others should be disclosed far more than two weeks in advance of trial.

> **10.**    ***Brady* in Possession of the SEC and Now Admittedly in Constructive, if not Actual, Possession of the United States Department of Justice**

Stating that "the government requested and reviewed all materials related to the SEC's parallel investigation and civil action, and has reviewed those materials for *Brady* as well," (Opp'n at 46 n.9), the government acknowledges that it has constructive, if not actual, possession of the SEC's documents.  Such materials would include SEC notes and emails regarding SEC interviews of witnesses and SEC transcripts of testimony from multiple witnesses during the course of the SEC's investigation for many months before and during the USAO's criminal investigation.  As held in *United States v. Mahaffy*, 693 F.3d 113, 130-33 (2d Cir. 2012), the government must disclose SEC materials—including interview notes and transcripts of statements by witnesses to the SEC Staff—that contain exculpatory information.  Other than Mr. Shkreli's testimony taken by the SEC Staff, the discovery does not appear to include any other statements of witnesses obtained by the SEC.

**Conclusion**

For the aforementioned reasons, Mr. Greebel respectfully requests that the Court order the government to provide a bill of particulars and find that the specific categories of information requested by Mr. Greebel fall within *Brady* and thus the government should promptly disclose any information in its possession, custody, or control falling within those categories.

20

Dated:   New York, New York
         October 7, 2016

                                    /s/ Reed Brodsky
                                    Reed Brodsky / Winston Y. Chan / Lisa H. Rubin

                                    GIBSON, DUNN & CRUTCHER LLP
                                    200 Park Avenue
                                    New York, NY 10166
                                    (212) 351-4000
                                    rbrodsky@gibsondunn.com

                                    *Counsel for Defendant Evan Greebel*