```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     UNITED STATES OF AMERICA
 3                                       15 CR 637(KAM)
            versus
 4                                       U.S. Courthouse
     MARTIN SHKRELI and EVAN GREEBEL,    225 Cadman Plaza East
 5                                       Brooklyn, NY 11201
                     Defendants.         November 22nd, 2016
 6   ------------------------------------x 1:00 p. m.

 7

 8        TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION TO COMPEL

 9             BEFORE THE HONORABLE KIYO MATSUMOTO

10               UNITED STATES DISTRICT JUDGE

11
                            APPEARANCES
12

13   For the Government:    ROBERT CAPERS
                            UNITED STATES ATTORNEY
14                          EASTERN DISTRICT OF NEW YORK
                            271 Cadman Plaza East
15                          Brooklyn, New York 11201
                            BY: WINSTON PAES, ESQ.
16                              ALIXANDRA SMITH, ESQ.
                                JACQUELYN KASULIS, ESQ.
17                          Assistant United States Attorneys

18
     For the Defendant:     BRAFMAN & ASSOCIATES, PC
19   Martin Shkreli         767 Third Avenue
                            New York, New York 10017
20                          BY:  BENJAMIN BRAFMAN,ESQ.
                                 ANDREA ZELLAN, ESQ.
21
     For the Defendant:     GIBSON, DUNN & CRUTCHER, LLP
22   Evan Greebel           200 Park Avenue
                            New York, NY 10166
23                          BY:  REED BRODSKY, ESQ.
                                 LISA RUBIN, ESQ.
24                               WINSTON CHAN, ESQ.

25
```

LISA SCHMID, CCR, RMR

```
 1                      APPEARANCES (CONTINUED)

 2

    For Katten Muchin      KATTEN MUCHIN ROSENMAN, LLP
 3  Rosenman, LLP:         575 Madison Avenue
                           New York, New York 10022
 4                         BY:  MICHAEL VERDE, ESQ.
                                ELIZABETH LANGDALE, ESQ.
 5

    For Retrophin and      COOLEY, LLP
 6  MSMB entities:         The Grace Building
                           1114 Avenue of the Americas
 7                         New York, New York 10036
                           BY:  IAN SHAPIRO, ESQ.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22  Court Reporter:        LISA SCHMID, CCR, RMR
                           225 Cadman Plaza East
23                         Brooklyn, New York 11201
                           Phone:  718-613-2644 Fax: 718-613-2379
24

    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.
```

```
 1              COURTROOM DEPUTY:  This is a Hearing on a Motion to

 2   Compel in 15 CR 637, USA versus Martin Shkreli and Evan

 3   Greebel.

 4              Will the government's attorneys state your

 5   appearances, please?

 6              MR. PAES:  Winston Paes, Jacquelyn Kasulis and

 7   Alixandra Smith for the government.  Good afternoon, Your

 8   Honor.

 9              THE COURT:  Good afternoon.

10              COURTROOM DEPUTY:  Those on behalf of Mr. Shkreli?

11              MR. BRAFMAN:  Benjamin Brafman and Andrea Zellan.

12   Good afternoon, Your Honor.

13              THE COURT:  Good afternoon.

14              COURTROOM DEPUTY:  Those on behalf of Mr. Greebel?

15              MR. BRODSKY:  Yes, Your Honor.  Reed Brodsky,

16   Winston Chan and Lisa Rubin on behalf of Evan Greebel, who is

17   also here with us.

18              THE COURT:  Good afternoon.

19              And I think we had counsel for Katten that was asked

20   to be here.  Do you want to come up to the table and sit

21   somewhere, wherever you're comfortable, and state your

22   appearances, please?

23              MR. VERDE:  Michael Verde and Elizabeth Langdale for

24   Katten, Muchin, Rosenman.

25              THE COURT:  Verde and Langdale?
```

```
 1                    MR. VERDE:  Yes.

 2                    THE COURT:  All right.  Thank you.

 3                    And who do we have from the Cooley Firm on behalf of

 4       Retrophin?  Come on up, sir.  Mr. Shapiro?

 5                    MR. SHAPIRO:  Hi.

 6                    THE COURT:  Welcome.  You can sit over there.

 7       There's plenty of room over there.  No one is taking sides.

 8                    All right.  And will Mr. Shapiro be speaking on

 9       behalf of Retrophin?

10                    MR. SHAPIRO:  Yes, Your Honor.

11                    THE COURT:  All right.  Thank you.

12                    Mr. Brafman you're standing. What do you want to

13       say?

14                    MR. BRAFMAN:  Yes, Your Honor.  I just wanted, for

15       the convenience of the Court, just to set the table, if I may,

16       Your Honor, to hopefully expedite matters.

17                    THE COURT:  I would appreciate it.

18                    MR. BRAFMAN:  Thank you.  And I also just want to

19       note that while Mr. Agnifilo spearheaded the project and got

20       all the parties together, and I was supposed to be on a plane

21       somewhere else.  Unfortunately, his daughter was in a very

22       serious car accident and he's upstate in Albany with her at

23       the hospital.

24                    THE COURT:  I'm sorry.

25                    MR. BRAFMAN:  I arranged to take a later flight
```

1    because I thought it would be too difficult to reschedule

2    this, given the number of lawyers involved and the convenience

3    of the Court and all parties.  We are prepared to proceed.

4              THE COURT:  All right.  I appreciate you being here,

5    and please give him my regards.

6              MR. BRAFMAN:  I will, Your Honor.

7              Your Honor, I think this is, as complicated as it

8    was to arrange for the conference, I think the issues are

9    rather simple.

10             We, on behalf of Mr. Shkreli, had subpoenaed the

11   Katten Law Firm and asked them to produce various documents

12   which we laid out in the subpoena -- which I'm obviously

13   prepared to explain to the Court if it becomes necessary --

14   and as I understand, Katten's position is they have the

15   documents.  They are prepared to turn them over.  Both Mr.

16   Shkreli, through counsel, has waived his privilege and they're

17   his documents for the most part.

18             I understand from conversations with Mr. McGorty,

19   Glen McGorty, who is representing Marek Biestek, who has also

20   waived his privilege, one of the founders of MSMB and --

21             THE COURT:  He waives it only with regard to

22   Mr. Shkreli?

23             MR. BRAFMAN:  I'm sorry?

24             THE COURT:  He has waived it only with regard to

25   Mr. Shkreli?

1              MR. BRAFMAN:  He has waived it with regard to any

2      documents that pertain to Mr. Shkreli.  That's correct, Your

3      Honor.

4              THE COURT:  So is he maintaining his privilege?

5              MR. BRAFMAN:  No.  He's waiving his privilege with

6      respect to any documents that we deem appropriate and that

7      we've outlined in the subpoena.

8              THE COURT:  So that takes care of MSMB Capital and

9      MSMB Healthcare?

10             MR. BRAFMAN:  Correct, Your Honor.  And as I

11     understand it, the only issue to resolve is counsel for

12     Retrophin has taken the position that they do not waive on

13     behalf of Retrophin, and we take the position that by

14     complying with a document production and making a document

15     production to the United States Attorney's office, they have

16     essentially waived that privilege on these documents.

17             And they have apparently selected those documents

18     which they felt the government should have and kept and

19     maintained a great many documents which, upon information and

20     belief as an officer of the court, I tell you that I have a

21     good faith basis to suggest that many of the documents that

22     they maintain are not only relevant to the defendant, Martin

23     Shkreli, and also to the advice of counsel defense that I

24     think he is going to be entitled to introduce at trial, but

25     they are relevant to many of the documents that they have

1  already produced, and what they have done is produce documents

2  that relate back and yet the documents in between have not

3  been produced.

4          So, Mr. Shkreli, I believe has the right to have

5  those documents and I think the only thing that is standing in

6  the way of Katten producing them is they do not want to be

7  making the decision as to whose privilege it is.  Otherwise,

8  they would have turned them over a long time ago.  I think

9  that sets the table as to where we are.

10         THE COURT:  All right.  I think that -- thanks to

11  Cooley's recent letter dated November 18th, they have

12  indicated a couple things and that I think give some hope that

13  there could be a resolution.

14         One is that they have offered or reached out to

15  Mr. Shkreli's counsel to discuss the expansion of the

16  Retrophin or Retrophin waiver.  Has any progress been made on

17  that front?

18         MR. SHAPIRO:  We haven't heard anything in response

19  on that point.

20         THE COURT:  All right.  Well, I don't know what the

21  expanded bounds of the waiver would be, but it might obviate

22  some of the litigation.  The problem I have is, A, I haven't

23  seen the documents; B, I haven't gotten as clear an idea from

24  Retrophin what particular documents it asserts a privilege

25  over.

1          There are a couple of things that I have in my mind.

2     One is that there has been a production to the U. S.

3     Attorney's office.  Those documents have been provided, as I

4     understand it, to defense counsel already; two, there's a

5     claim I think between Katten and the Cooley Firm that 90

6     percent of the documents may not even relate to the issues in

7     the indictment.  So we're talking about a fairly small

8     universe of documents.

9          And on that point, I would ask Mr. Brafman whether

10    he would consider narrowing the scope of his request because

11    as we know, the subpoena seeks all communications, all emails,

12    all documents regarding Mr. Shkreli, and I would think that he

13    might want to focus on documents that pertain to issues in the

14    indictment rather than this broad universe -- because

15    otherwise, we're talking about a lot more documents, and I

16    don't really see how it could be relevant to claims or the

17    assertions in the indictment or to the defense if they have

18    nothing whatsoever to do would those charges.

19          MR. BRAFMAN:  Your Honor, it's almost impossible for

20    us to do that unless there was an index provided by Retrophin

21    as to what documents they maintained and --

22          THE COURT:  Well, they'll have to do that because if

23    they maintain a privilege, I'm going to order that they give a

24    privilege log, so everyone will have an idea what documents

25    are at stake.

1          And one way of doing that is for Retrophin to go to

2   the Katten Firm and review documents and decide what documents

3   it continues to maintain an assertion of privilege over --

4   bearing in mind that, one, they have already produced

5   documents to the government; two, Judge Weinstein has already

6   found that certain documents are subject to the Crime-Fraud

7   Exception, so the waiver does not apply; three, Retrophin has

8   commenced a Southern District action against Mr. Shkreli,

9   alleging acts that are similar to, or overlapping in some

10  sense with the charges in this case.

11         And we know that courts may not allow the

12  attorney/client privilege to be used as a sword and a shield.

13  So to the extent they may be relying upon documents to prove

14  fraud claims against Mr. Shkreli, they are in fact waiving any

15  privilege over those documents.

16         I understand that that case is stayed simply because

17  this case is going forward.  I think that, you know, Retrophin

18  has to take a hard look and decide whether they are, in fact,

19  attempting to use the privilege as a sword and a shield, a

20  sword against Mr. Shkreli in the fraud case and a shield here,

21  to protect against his right to get access to those documents.

22         MR. SHAPIRO:  Your Honor, one suggestion that might

23  facilitate that, since we're addressing the subpoena that was

24  addressed to Katten, if Katten could in the first instance

25  enumerate the matters in which they provided legal advice to

Retrophin, and Mr. Brafman and I might be able to decide that

with respect to any number of those matters that they're too

far afield from the transactions at issue in this case.  And

so we wouldn't need to do a document-by-document review of the

Katten documents that fall within those matters.  But with

respect to any matters where Mr. Brafman believes that the

matter could be relevant to this case, then we will do

whatever we're asked and we'll deal with the Katten documents

in those categories and make a determination about whether

they're within the scope of the company's waiver or subject to

the principle that you just articulated with respect to our

civil action.

MR. BRAFMAN:  Your Honor, I'm happy to do whatever

Your Honor feels will be productive, but I just want to say

several things so that the Court recognizes that I'm not

certain we are on a level playing field when it comes to the

Retrophin agenda, if you will -- and this is not speaking

poorly of Mr. Shapiro.  But I think Your Honor needs to know

the following very simple facts.

With the employment contract between Mr. Shkreli and

Retrophin, the only way he gets the substantial benefits that

are still owed to him is if he is convicted.  Having been

charged, they stayed all of these benefits and owe him a lot

of money if he ends up getting convicted.

Among the documents that they provided to the

1    government -- and they provided them under what they describe

2    as a limited waiver in a letter that they wrote -- is our

3    documents that are, in my opinion, incomplete and unfair in

4    the way they characterize some of the transactions involving

5    Mr. Shkreli.

6            In the Katten Firm where Mr. Greebel was a partner

7    during almost all of the period covered by the indictment,

8    this was Mr. Greebel's biggest client.  Katten billed more

9    than five million dollars of legal services for the

10   representation of Mr. Shkreli and part MSMB and also Retrophin

11   during the relevant time period.

12           When you're doing the reliance on counsel defense

13   that we already have the good faith basis to articulate, it's

14   absolutely clear just from the handful of documents we got

15   from the government that on many occasions, Mr. Shkreli sought

16   guidance from Mr. Greebel and Mr. Greebel gave him guidance.

17           Now, it's impossible for us to say what is and what

18   is not relevant on the issue of reliance of counsel because

19   unless we do document-by-document -- which will take months

20   because we're talking about hundreds of thousands of pieces of

21   paper -- and we're not doing a severance motion by agreement

22   among counsel because it would make us do it twice until after

23   we see those documents -- but I think under Rule 502 of the

24   Federal Rules of Evidence, I think Retrophin has waived any

25   further claim on the privilege by the partial production.

1              And in pertinent part, I want to represent to the

2     Court what Your Honor said is very on point.  They have sued

3     Mr. Shkreli.  And once you sue someone, as Your Honor pointed

4     out, even if it's a stayed proceeding, you can't just say I'm

5     suing you, but I'm not giving you the documents because I'm

6     maintaining privilege.  That's A.

7              And under the Rules of Evidence as I read them --

8     and I just want to in pertinent part make this part of the

9     record, 502(a) provides, "Disclosure made in a federal

10    proceeding for the federal officer or agency, Scope of Waiver:

11    When the disclosure is made in a federal proceeding or to a

12    federal officer or agency and waives the attorney/client

13    privilege or work product protection, the waiver extends to an

14    undisclosed communication or information in a federal

15    proceeding only if the waiver is intentional" -- and here, it

16    was.  They intentionally waived it -- "two, the disclosed and

17    disclosed communications or information concerned the same

18    subject matter" -- and we maintain that it does and I'll

19    explain in a minute -- "and three, they ought to, in fairness,

20    be considered together."  I think it refers also to Rule 106

21    of the Doctrine of Completeness.

22              You can't give me an email in July that relates back

23    to advice given six months earlier and then not give me the

24    chain that leads up to the ultimate email.  And the reason it

25    relates to the same subject matter is the government and

1    Retrophin in its lawsuit have maintained from the beginning

2    that Mr. Shkreli's companies, whether it be MSMB or Retrophin,

3    was in effect a Ponzi scheme from the beginning to end.

4           And I think during the period of Katten's

5    representation, they provided guidance to Mr. Shkreli.  They

6    billed five hundred thousand and change for work done for MSMB

7    and they billed more than four and-a-half million dollars for

8    work done on behalf of Mr. Shkreli and Retrophin.  And you

9    can't separate the two and say we were doing it for Shkreli on

10   day one and for Retrophin on day two.

11          Retrophin is the -- if you will -- the protagonist

12   in this case.  They went to the U. S. Attorney's office.

13   That's the catalyst for the charges against Mr. Shkreli.  I

14   think they have a bias.  They have a vested interest in the

15   outcome of these proceedings, and I think he's a defendant in

16   a criminal case who has, A, waived the privilege.  They're his

17   documents.  Mr. Biestek has waived the privilege.  They're his

18   documents.  And for Retrophin to say, we're going to give the

19   government the documents we think help them and then stand on

20   ceremony when it comes to the balance of the documents --

21          I think they're all potentially relevant because the

22   universe of work done on behalf of Mr. Shkreli is -- goes to

23   the heart of the reliance on counsel defense.  You can't bill

24   someone five million dollars for doing legal work and then

25   say, by the way, I didn't give you advice on that single day

LISA SCHMID, CCR, RMR

1   so therefore, you're guilty.  So I don't know.  I don't know

2   how to do this without spending months trying to comb through

3   boxes of material.

4          THE COURT:  Well, Cooley, maintains that there

5   aren't that many documents.  There are 2000 email chains which

6   could probably be reviewed in a couple of days.  And there are

7   8,000 emails, but they're part of an email chain, many of

8   these, right?

9          MR. BRAFMAN:  I think that understates substantially

10  the amount.  I think if you check with Katten, the numbers are

11  substantially greater.

12         THE COURT:  Well, they dispute what Katten says and

13  I guess Katten has the documents, so they probably are the

14  most reliable.  But it seems that Retrophin is only concerned

15  about the universe of 2000 email chains, right?

16         MR. SHAPIRO:  Those are the emails we were

17  describing, that is, the emails between Mr. Shkreli and

18  Mr. Greebel between December 2012 --

19         THE COURT:  Certain dates?

20         MR. SHAPIRO:  -- and Mr. Shkreli's departure from

21  Retrophin in October of 2014.  There's a prior period, but we

22  were using that 21 month period as a reference point to say

23  that in a five or six month period in '11 and '12, where

24  Mr. Verde thought there could be overlap, that we didn't see

25  how it's possible that there were tens of thousands of emails.

1          MR. BRAFMAN:  Your Honor, they are closeting this as

2    communications between Mr. Shkreli and Mr. Greebel.  There are

3    communications with other Retrophin people who are critical

4    government witnesses in this case, who I think are the

5    catalysts for the criminal charges, who I think their email

6    chain will show an extraordinary bias and very, very difficult

7    relationship with Martin Shkreli that I think are going to

8    impact severely on their credibility when and if this case

9    proceeds to trial.

10          And it is very important for Mr. Shkreli that we not

11   adjourn the trial date for any reason because it's hard to

12   live under the cloud of an indictment, and we have been

13   working feverishly not to have to adjourn that case.

14          A critical issue Your Honor will have to decide

15   before the trial -- including this issue, obviously -- is

16   whether or not there is one trial or two trials.  And I think

17   if we convince Your Honor that there is a very serious

18   reliance of counsel defense, it becomes untenable for

19   Mr. Shkreli and Mr. Greebel to be tried together at the same

20   time -- at least that's going to be our position.  And I don't

21   see how the Cooley Firm on behalf of Retrophin can essentially

22   start a criminal proceeding and then throw a monkey wrench

23   into the ability of the principal defendant to defend himself.

24          THE COURT:  Well, I understand, and I understand

25   that point.  I guess there's a couple of --

1           Did you want to be heard, Mr. Shapiro?

2           MR. SHAPIRO:  We didn't start the criminal

3  proceeding.  We were responding to a subpoena that we had

4  received from the government.  That's number one.

5           And number two, we're not proposing to withhold

6  documents on the same subject matter where we waive the

7  privilege or where there would be additional topics where

8  Mr. Brafman asked us to consider waiving the privilege, as

9  well.  What we're suggesting is with respect to a wide range

10 of topics that have no relevance to this case, we're seeking

11 to maintain privilege.

12          THE COURT:  All right.  But you haven't identified

13 what those documents are.  I don't know who they were -- I

14 don't know what the subject matter was.  I don't know who was

15 on the email chain.  And Katten has the documents.  It appears

16 that there are documents where Katten cannot remember or can't

17 determine whether they were doing work for Retrophin or MSMB

18 or Mr. Shkreli or both, just from the face of the email.

19          And do I understand you correctly, Mister --

20          MR. VERDE:  Verde.

21          THE COURT:  All right.  You're Mr. Verde.  Yes?

22          MR. VERDE:  Yes, Your Honor.  That's correct.

23 There's a couple of different time periods here.  It may help

24 if I give you some idea of the magnitude.

25          THE COURT:  Well, what is wrong with the idea of

1    having Retrophin or Mr. Shkreli look at those documents and

2    tell you, if you can't tell from the face of it?

3              I mean, it would seem to me that Katten would have

4    retainer agreements that they would bill a particular day or

5    set of time within a day to a particular client, and you would

6    be able to tell by looking at your time records and the work

7    that you did bill and who you billed as to whose work you were

8    doing.

9              And then I think the next layer that has to be

10   examined is whether you were providing legal advice or

11   business advice.  I don't know what it was.  But as we know,

12   the privilege only applies to legal advice, not business

13   advice.

14             I also don't know whether Mr. Greebel was the only

15   attorney at Katten who gave advice to Retrophin and

16   Mr. Greebel -- I'm sorry, Mr. Shkreli -- or whether there were

17   other attorneys there who are still at Katten who could assist

18   in that or who could recollect.

19             Maybe, you know, the concern is if Retrophin goes in

20   there, into your firm and looks at documents that may pertain

21   only to MSMB, they may be breaching a privilege, which in

22   fact, has been waived by MSMB.

23             But I'm trying to think of a way forward.

24             MR. VERDE:  Well, what we had suggested in our meet

25   and confer that there was a period of time where we were

```
 1    representing only MSMB --

 2                 THE COURT:  Right.

 3                 MR. VERDE:  -- prior to representing Retrophin.  But

 4    Retrophin, LLC, a precursor to Retrophin, Inc., did exist at

 5    the time.  So we said, well, can we at least produce those

 6    documents to Mr. Shkreli's counsel?  Retrophin responded no

 7    because Retrophin, Inc. existed at that time.  Some of those

 8    documents might refer to Retrophin, Inc.

 9                 THE COURT:  But they have to identify them and

10    assert a privilege and do a privilege log and tell us what the

11    basis is for that privilege.  We can't just throw this broad

12    net, right?  And leave you holding the documents, so to speak.

13    So you need to do some work.  You need to go there and look

14    through the documents and figure out what's privileged and

15    what's not, and then maybe I'll look at them in camera and

16    decide whether they are.

17                 MR. SHAPIRO:  We'll do more than that.  There's a

18    period from early 2011 where Katten in its good faith review

19    of the documents is confident that they only relate to MSMB,

20    then we will take their representation on that point and they

21    can produce them as unrelated to their representation of

22    Retrophin, LLC.

23                 What we're objecting to is making that determination

24    in a mechanical way that didn't involve the use of a lawyer's

25    judgment and merely involves the use of search terms.
```

1          But Mr. Verde can review documents from a period of

2    time before they ever represented Retrophin, LLC, to confirm

3    that there's no possibility that they were representing

4    Retrophin, then we're comfortable with those documents being

5    produced to Mr. Shkreli.

6          MR. VERDE:  We had offered to produce -- to do a

7    search of any documents that had the word "Retrophin" in it

8    anywhere, and put that to one side and just produce those

9    documents, made no reference to Retrophin anywhere.  We were

10   told that was not correct because this has been continual.

11   That part of the plan for sometime was to convert MSMB, in

12   effect, to Retrophin and take those investors and move them to

13   shareholders for Retrophin.

14          So this idea that we're going to review thousands of

15   emails and make judgment calls as to whether they could

16   possibly -- as you heard, very broad -- if there is anyway

17   that they could impact upon Retrophin or be considered

18   Retrophin documents, it's impossible for us to make those

19   decisions.  We're choosing between two former clients, and

20   we're going to be calling balls and strikes in the hundreds of

21   thousands of emails, and somebody is not going to be happy

22   about that.

23          THE COURT:  Well, are there any other attorneys at

24   Katten who worked on these matters with Mr. Greebel and his

25   firm --

1          MR. BRAFMAN:  Yes, Your Honor.

2          THE COURT:  -- who could assist with this process?

3          MR. VERDE:  It's not a matter of the manpower, Your

4     Honor.  It's a matter of the fact that if you look at a lot of

5     these documents we're talking about, in the emails, they do

6     cover multiple matters.  There is a history there that you

7     need to understand.  These are not even calls.

8          And so what we were suggesting is to put the burden

9     on us of making judgment calls that we really should not be

10    making, that we would -- if there was any kind of mechanical

11    rules, search terms, logical, if not X then Y, then Z -- we'll

12    do anything.  What we want to avoid is making judgment calls.

13         THE COURT:  So I agree and I appreciate that and I

14    understand your position.  But it seems to me that if

15    Retrophin is taking the position that it's taking with regard

16    to its privilege, then it needs to, you know, roll up its

17    sleeves, go into your document files and figure out what

18    documents they're going to assert a privilege over and

19    determine, A, whether or not it's already been produced; B,

20    whether or not it would be subject to the Crime-Fraud

21    Exception; C, whether or not it is implicated by the civil

22    claims against Mr. Shkreli.  And then at the end of the day,

23    if I have to look at them, I will, but I don't even know how

24    many documents we're talking about, so --

25         MR. SHAPIRO:  That's fine, Your Honor.

LISA SCHMID, CCR, RMR

```
 1              THE COURT:  -- if Retrophin is also willing to
 2    expand the scope of its waiver and make more documents
 3    available, that would be the first step, so that nobody has
 4    to do unnecessary work.
 5              MR. SHAPIRO:  That's something we've offered and
 6    we're still willing to talk to Mr. Brafman about that.
 7              MR. BRAFMAN:  Your Honor, what you're proposing,
 8    most respectfully, and what they are offering is going to be a
 9    monumental undertaking and let me just explain, most
10    respectfully, Your Honor.
11              For example, I have the summary of billing records
12    for the year 2013, 2014.  During that year alone, Katten
13    billed 5,684 hours to Shkreli.  It says Retrophin, but that's
14    the umbrella under which they billed it.  During that period
15    --
16              THE COURT:  What was the umbrella?
17              MR. BRAFMAN:  Retrophin, Inc.
18              So that's how they have it for internal billing
19    purposes, but we know from just looking at the documents the
20    government produced that during that time period are a lot of
21    Shkreli-related materials -- and we're not just looking for
22    emails.  There are billing records that we haven't gotten
23    which detail the work done by Mr. Greebel and others on behalf
24    of Mr. Shkreli, legal filings that they did on behalf of
25    Mr. Shkreli and legal memoranda.
```

1          And Your Honor, it was from the materials we have

2    received, you know, Evan Greebel went to Katten at various

3    times citing his work on behalf of Shkreli and Retrophin as a

4    basis upon which he should receive bonuses because of all of

5    the work that they have done.

6          For Retrophin to suggest that they have any

7    prejudice whatsoever by turning over these documents --

8    they're not going to be -- we could take it under a protective

9    order.  Let us look at them.  We will give them back if we

10   think that has nothing to do with this case.

11         But it is humanly impossible to expect Katten to

12   make these judgment calls because they cannot understand how

13   they may be relevant to our defense, and I think Retrophin

14   should not be able to do that because Retrophin has a vested

15   interest in keeping from Mr. Shkreli that information which I

16   believe could lead to his acquittal, because they owe him

17   millions and millions of dollars if he is convicted.

18         So I'm not doubting Mr. Shapiro's personal good

19   faith, but for Retrophin to take the position that, A, I can

20   start a lawsuit; and B, I can sue Mr. Shkreli; and C, I can

21   cooperate with the U. S. Attorney's office and dump documents

22   to them, and then with the letter that they write to suggest

23   that it's a limited waiver flies in the face of Rule 502.

24         And I think what the Court needs to do if we're

25   going to keep this schedule is order Retrophin to permit

```
1   Katten to just give us the records.  We'll look at them under
2   a protective order.  No one outside of our firm will go
3   through them.  We will then report back and say, here, here's
4   back what we don't need.  Here's what we are keeping and
5   intend to use at the trial.  And here's the theory on which we
6   will keep it and use it for the trial and then report to Your
7   Honor.
8              And then if they have an issue of us not being able
9   to use that, it makes a lot more sense for them to do it that
10  way, and then they can give it to the government at the same
11  time and the government can look at them.  This is not us
12  trying to gain an undue advantage.  We are placed in an
13  untenable position because Retrophin has given the government
14  selective documents.
15             THE COURT:  No, I know that, sir.  You have told me
16  that three times now.  I get that, respectfully.
17             But yes, Mr. Paes?
18             MR. PAES:  I just want to make one point.
19  Obviously, with respect to any documents that would be turned
20  over, the government would also want to receive a copy.  I
21  think Mr. Brafman alluded to that.
22             MR. BRAFMAN:  Yes.
23             MR. PAES:  I just want to be clear that given the --
24  at least the Shkreli waiver and MSMB waiver from what we have
25  heard, we just want to make sure that, you know, if documents
```

```
 1    go over that it's not -- I'm not saying Mr. Brafman is

 2    alluding to this -- but that Shkreli's lawyers get to decide

 3    what to keep, what to still return back as being privileged,

 4    then the government should have an equal opportunity to review

 5    those documents as well, as to whatever -- we don't have

 6    obviously, you know, a dog in this fight in terms of whose

 7    privilege it is and who is asserting it, but I just want to

 8    make sure that we don't somehow get out left out of the

 9    process of ultimately receiving the documents that are

10    provided to defense counsel.

11            And we also have a subpoena as -- you know, as

12    Mr. Verde knows that he served on the Katten Law Firm, and we

13    haven't received documents in large part because of the same

14    issues of privilege and the --

15            MR. VERDE:  (Nods head affirmatively.)

16            MR. PAES:  -- inability of Katten to decide where

17    the privilege lies, and that may be because of how some of

18    these things were billed.  We understand, as was reported,

19    they were all billed under the Retrophin umbrella, regardless

20    of what the work was being done, and I believe Retrophin was

21    billed and they can speak to that.

22            But there are some issues here, obviously, which is

23    why we haven't received the documents pursuant to our subpoena

24    to Katten, as well.

25            THE COURT:  Let me ask Retrophin's counsel, who
```

1  currently is asserting the privilege on Retrophin?  What

2  person?  Because I think that's something I ordered.

3          MR. SHAPIRO:  The company, the board of directors.

4          THE COURT:  But who?  Who is the authorized

5  individual that's asserting the privilege?

6          MR. SHAPIRO:  At the time when the board -- when the

7  company decided to make the limited waiver in the summer of

8  2015, the board -- there was a board meeting and the board

9  decided to approve the limited waiver by implication to

10  continue to assert the privilege over everything else.

11          And we are -- we're not seeking to prejudice

12  Mr. Shkreli in addressing this waiver.  We're just objecting

13  to a wholesale waiver of all of the work that Katten did for

14  Retrophin over this three or four year period.

15          THE COURT:  All right.  Well, let me ask Katten, do

16  you have -- who did you deal with when you -- when your firm

17  did work for Retrophin, who was the individual with whom you

18  dealt?

19          MR. VERDE:  Primarily was Martin Shkreli.

20          THE COURT:  All right.  And is there anyone else

21  that you dealt with?

22          MR. VERDE:  Yes.  We tried to -- it's difficult

23  because of the volume of emails, but I could probably best

24  explain through the numbers.

25          THE COURT:  Okay.

1          MR. VERDE:  We have approximately 85,500 emails all

2     in related to Retrophin that we recovered.  During the period

3     that we looked between the indictment period of November 1st,

4     2012 and March 31th, 2014, we have three -- just

5     coincidentally, exactly 3,333 emails between Mr. Greebel and

6     Mr. Shkreli.

7          THE COURT:  What about other lawyers at Katten who

8     did work?

9          MR. VERDE:  There were 28 different custodians, 28

10    different attorneys who worked on various matters, and there

11    are 22,871 emails between those other attorneys and Martin

12    Shkreli.

13         THE COURT:  All right.  And were these emails for

14    work done on the behalf of Retrophin, MSMB or Mr. Shkreli?

15         MR. VERDE:  Well --

16         THE COURT:  I mean, do you have a way to quantify?

17    Because I think MSMB documents are not at issue anymore,

18    correct?

19         MR. VERDE:  Well --

20         THE COURT:  As far as I understand from Mr. Shkreli,

21    who was the principal and Mr. Biestek's attorney, and based on

22    Mr. Brafman's November 16th letter, MSMB is not asserting any

23    sort of privilege right now?

24         MR. VERDE:  Right.  So when we had the meet and

25    confer, we thought that would be okay to produce them.

```
 1            THE COURT:  Right.

 2            MR. VERDE:  That's when Retrophin said, Retrophin,

 3    Inc. -- Retrophin, LLC, existed and they said that they would

 4    object to those productions to the extent that they involve

 5    Retrophin in any way.  And so we went back to now trying to

 6    figure out what that means in the context of MSMB.

 7            MR. SHAPIRO:  Just to clarify one point which might

 8    help, it's not whether or not those documents involved

 9    Retrophin in any way.  It's whether or not Retrophin was the

10    client in the communication reflected in those documents.

11            And so, if there's some reference to Retrophin, but

12    it's clear to Mr. Verde and lawyers in his firm that they were

13    not providing legal advice to Retrophin in that particular

14    context, then we have no objection to turning over that

15    document.

16            THE COURT:  But, you know, I think you need to just

17    figure out document-by-document, if you're taking the position

18    that every document could be subject to Retrophin's privilege.

19    You need to get in there and figure out what really matters

20    and what --

21            MR. SHAPIRO:  That's fine.  If we get in there and

22    we actually make determinations of categories of documents

23    that we're not asserting privilege over them as a way of

24    expediting this process, we'll do that, as well.

25            THE COURT:  And what legal authority do you think
```

```
 1    bars Mr. Shkreli as the principal representative of Retrophin

 2    during this period in which Katten was retained by Mr. Shkreli

 3    to do legal work on behalf of Retrophin?  What precludes him

 4    from going in and reviewing those documents and deciding also

 5    what -- which of those documents might be Retrophin documents

 6    versus MSMB documents or documents that pertain only to

 7    himself and his own legal issues?

 8              MR. SHAPIRO:  Well, I think since he's no longer an

 9    officer or director of the corporation, he doesn't have a

10    right to those privileged documents.

11              THE COURT:  Wouldn't you agree that he's in the best

12    position to know whether or not the work that Katten was doing

13    at the time pertained to Retrophin or MSMB or to simply

14    himself or his relatives?  Maybe Katten did work on a closing

15    for an apartment or a will for somebody.  We don't know.

16              MR. SHAPIRO:  I think honestly, though, I think it

17    gets confused, Your Honor.  Mr. Shkreli at a prior point in

18    time, his counsel had asserted personal privilege in a number

19    of these documents which Judge Weinstein addressed.  You know,

20    at this point, I think we are in a fair position to evaluate

21    that, and if we can't evaluate it, we'll take it up with

22    Mr. Brafman.

23              MR. BRAFMAN:  Your Honor, I remind everyone, most

24    respectfully, that Judge Weinstein's decision was based on an

25    ex parte submission by the Government.  We were not a party to
```

those proceedings.  Subsequently, we decided not to appeal
Judge Weinstein's order without agreeing that the Crime-Fraud
Exception applied because we wanted the materials and intended
to use the material.  So I think it's unfair to say that, you
know, we litigated that issue.

And the reason Mr. Shapiro can't provide Your Honor
with any authority to support his position is because there
isn't any, and the reason there isn't any is because it's rare
to have a confluence of facts that you have in this case where
there's already been a limited waiver.

I read the Wells Fargo decision by Judge Furman,
thinking that that might offer some guidance, but A, that is a
civil case; and B, while there is dicta in there to suggest
that it could apply to a criminal case, there was no issue of
partial waiver in that decision.  So I don't think there is
any precedent directly on point that would guide Your Honor in
this case.

THE COURT:  There may be not precedent, but there is
a Second Circuit case decided in October 2015, *In Re: Grand
Jury Subpoenas*.  It arose from when the U. S. Attorney's
office served a subpoena on an investment company whose
president and owner was a subject of a grand jury proceeding.

And the district judge, Judge Caproni in that case,
held that the Crime-Fraud Exception overrode the
attorney/client privilege.  The Second Circuit agreed that

1    was the case.  Now, in that case, the Circuit held that

2    because the company owner and president was the source of the

3    investigation and because the owner, quote, appeared to have

4    been using lawyers to further his fraudulent scheme, that the

5    documents that were in the possession of the company who

6    objected to production on attorney/client privilege grounds

7    had been breached by the Crime-Fraud Exception.

8              MR. SHAPIRO:  And we're not -- we're not objecting

9    to the production of documents that are within the scope of

10   our waiver, which is largely coextensive to the superseding

11   indictment.  I think that there might be one other topic in

12   the superseding document that wasn't within the scope of our

13   waiver.  We're not proposing to withhold those documents, but

14   we also don't think that Mr. Shkreli should be the person to

15   decide on a case-by-case basis whether certain types of

16   documents are within the scope of the waiver or well beyond

17   the scope.

18             THE COURT:  Well, what are you saying?

19   Mr. Brafman's argument that because you don't have anyone

20   currently at Retrophin who could know or make the

21   determination about the legal services that Katten was

22   providing to Retrophin during the relevant time on the

23   relevant issues that Mr. Shkreli should be included in the

24   process of determining what documents may pertain to Katten's

25   legal work on behalf of Retrophin or Mr. Shkreli?

```
 1            MR. SHAPIRO:  So I think there are a number of -- I
 2   think we are comfortable that we understand to a significant
 3   degree what services were being provided to the company and
 4   why legal services were provided and how legal services were
 5   being provided, particularly as it relates to the transactions
 6   in this case.
 7            So I think we are going to be able to look at those
 8   Katten communications and determine whether or not Katten was
 9   providing legal advice to Retrophin or to MSMB.  And if it's
10   MSMB, there is no assertion of privilege anymore, then we're
11   not going to have an objection to turning those documents
12   over.
13            THE COURT:  Can I understand something though?  When
14   Judge Weinstein made his ruling on the Crime-Fraud Exception,
15   was that in response to a subpoena that the government had
16   served on Retrophin?
17            MR. SHAPIRO:  That is correct, Your Honor.
18            THE COURT:  And was there only one subpoena served
19   or were there two?  And did the waiver that Retrophin gave,
20   the limited waiver, was that in response to the subpoena, that
21   it was a subject of Judge Weinstein's order or was it a
22   different -- was it a different subpoena?
23            MR. SHAPIRO:  Your Honor, the company received a
24   subpoena in the summer of 2014, when Katten was still counsel
25   and then received another subpoena in early 2015.
```

1          THE COURT:  I'm sorry.  What were the dates again,

2     2014?

3          MR. SHAPIRO:  Yeah.  In the summer of 2014, maybe

4     May and then another subpoena in January and February of 2015.

5          And the company made a limited production in

6     response that that first subpoena.  And then the company made

7     a number presentations to the government, where we reviewed

8     documents that we collected on certain topics with the

9     government, and then those documents were produced to the

10    government, and then the company received certain additional

11    requests from the government to produce documents.

12          At a certain point, the company -- the government

13    asked us whether or not the company would consider waiving its

14    privilege on certain enumerated topics and also suggested that

15    the Crime-Fraud Exception might apply with respect to those

16    subjects and ultimately, after some consideration, the company

17    decided to waive with respect to those topics.

18          THE COURT:  That was in September of 2015?

19          MR. SHAPIRO:  No, that was by July of 2015 that the

20    company had made this decision.  It may have been a little bit

21    earlier.  And in --

22          THE COURT:  So where is that letter where you

23    defined your waiver?

24          MR. SHAPIRO:  The --

25          MR. VERDE:  It's attached to Exhibit A to our

LISA SCHMID, CCR, RMR

1      response, Your Honor.

2              THE COURT:  Okay.  Because what I have is a

3      September 30th, 2015 letter, Katten --

4              MR. SHAPIRO:  The company effected the waiver much

5      earlier than that, Your Honor, two or three months earlier

6      than that.  And in civil litigation that was then pending in

7      the Southern District, Your Honor, we produced additional

8      documents in that Southern District litigation, not the

9      litigation that we subsequently filed against Mr. Shkreli.  It

10     was a short swing case involving Mr. Shkreli in the Southern

11     District.

12             We produced additional documents in that litigation

13     because the company had decided to make the waiver.  And when

14     we produced additional documents in that Southern District

15     litigation, we received a letter from Mr. Shkreli's

16     then-counsel at Arnold and Porter, arguing that Mr. Shkreli

17     might have a personal privilege in some of the documents that

18     we had just produced.

19             And so we let the government know that Mr. Shkreli

20     was asserting a personal privilege in some of the documents

21     that we had just produced pursuant to the waiver, and the

22     government directed us to prepare binders on the enumerated

23     topics that included the non-privileged documents that we

24     previously reviewed with the government, as well as additional

25     privileged documents that had not been previously reviewed

1   with the government.  And those binders with the

2   non-privileged and privileged documents on the enumerated

3   topics were presented to Judge Weinstein for his consideration

4   as to whether or not Mr. Shkreli had a personal privilege in

5   those documents.

6        MR. PAES:  And just to add to -- I agree with what

7   Mr. Shapiro said.  Just one point at the end.  When we made

8   our application to Judge Weinstein, it was based on the

9   non-privileged set of findings, and the application was based

10  on that and --

11       THE COURT:  You made your application to Judge

12  Weinstein on what?

13       MR. PAES:  With the Crime-Fraud Exception and the

14  fact that, you know, personal privilege may apply.  That

15  application was based on the non-privileged binder set that we

16  received from Retrophin, and we made the application based on

17  that.

18       Judge Weinstein then directed Cooley to present him

19  with the documents that were -- the privileged set of the

20  binder and made his ruling following an in camera review.  He

21  thought the privilege in terms of what the government had not

22  seen at that point in time.  We only received that binder

23  after Judge Weinstein's ruling.

24       MR. BRAFMAN:  Your Honor --

25       THE COURT:  Well, Judge Weinstein says that the

company redacted documents on the theory that they may contain privileged information between a former employee and a former attorney, and are covered by the attorney/client privilege. The Court finds that are not subject to an attorney/client privilege of the employee, Mr. Shkreli, because these documents were the company's property.

And then the judge said the company has waived its own attorney/client privilege with the attorney.  I don't quite understand what that means, but you can put that in context.

MR. SHAPIRO:  Let me briefly -- having made the waiver, Your Honor, we were prepared to produce the documents subject to the waiver to the government, but Mr. Shkreli's counsel said that he might have a personal privilege in those documents.

And so, before we turned those documents over to the government, in light of Mr. Shkreli's assertion of a personal privilege in those documents, those documents were submitted to Judge Weinstein for in camera review to determine whether or not Mr. Shkreli's assertion of a personal privilege prevented the company from turning those documents over --

THE COURT:  All right.  So then the judge redacted certain portions of those documents and ordered that the remainder of the --

MR. SHAPIRO:  By and large with respect to what we

```
 1   had redacted to protect Mr. Shkreli's assertion of personal
 2   privilege, the judge said that those portions of those
 3   documents were not subject to his personal privilege.  There
 4   were a handful.
 5               THE COURT:  What about your privilege?
 6               MR. SHAPIRO:  Right.  With respect to the enumerated
 7   topics, we waived the privilege.  We didn't seek to redact any
 8   of that.  There were a handful of sentences or pieces of
 9   documents in those four binders that related to topics that
10   were well outside of the waiver and over which the company
11   asserted privilege.  And so Judge Weinstein allowed us to
12   maintain a handful of redactions where there was a privilege
13   implicated that was totally unrelated to the waiver.
14               MR. BRAFMAN:  Can I ask a question, Your Honor?
15   It's one thing for a defendant pre-indictment to try to assert
16   a privilege to keep his personal materials from review by the
17   government, the Court, which is quite understandable.  I'm not
18   criticizing Arnold and Porter, who was predecessor counsel.
19               But now we're way down the road and what we are
20   living with without necessarily agreeing is Judge Weinstein's
21   finding that there was a Crime-Fraud Exception that allowed
22   those documents that Mr. Shkreli would otherwise have
23   privilege to be produced.  It also impacts on Mr. Greebel's
24   ability to assert any privilege, which he doesn't have because
25   they're not his documents.
```

```
 1              But the issue in question is the Court -- and Judge

 2   Weinstein found with respect to Retrophin that they were

 3   required to produce them because the Court found a Crime-Fraud

 4   Exception applied to those records, and Retrophin produced

 5   them.  The Crime-Fraud Exception is now front and center

 6   because the government has named Mr. Greebel as a co-defendant

 7   in this case.  Mr. Greebel is a partner or was a partner in

 8   the Katten Firm during period in question.

 9              It just seems to me impossible for us to defend this

10   case including, quite frankly, Mr. Greebel's ability to defend

11   the case against him without having access to the full

12   universe of Katten documents that were developed, maintained

13   while he was a partner at that firm, and Katten is not the

14   obstacle here.  Katten is prepared to produce it, not stand on

15   ceremony.  They just don't want the responsibility,

16   understandably, of making the privilege decision.

17              And I don't think that Retrophin has either

18   presented Your Honor with any authority for its position, has

19   in any way responded to the fact that there is a partial

20   waiver that you cannot selectively invoke in a case like this.

21              And Your Honor, to hear that there were twenty-odd

22   lawyers working on this case, it's humanly impossible to go to

23   these people and say when you billed your time against the

24   Retrophin time sheet, what were you doing at the time, without

25   actually looking at the time records?  And I will venture a
```

```
1    wild guess that virtually the majority of the time billed

2    had -- in part, reflects on work performed on behalf of Martin

3    Shkreli -- because during the period in question, Martin

4    Shkreli was, as a practical matter, Retrophin, because he's

5    been charged with essentially running Retrophin and running it

6    in a criminal -- in a criminal manner.

7              And I think in order to have access to these

8    materials, I think Retrophin has very, very weak -- a very,

9    very weak position, and given the amount of materials outlined

10   by Mr. Verde that are involved, it's going to take months if

11   we do it section-by-section.

12             And if you give it to us and we agree to give it to

13   the government, we can figure out what's there.  We can ignore

14   or give back the materials that we don't think are relevant.

15   We can do it under a protective order, so that Retrophin

16   documents aren't circulating in the legal industry.  This is

17   no different than when the government gives us something

18   that's under a protective order, and you have to trust the

19   lawyers to act responsibly.

20             I think if you want to, Your Honor, keep the

21   schedule that I think we all want to keep, we need to move

22   this process forward and what Mr. Shapiro is suggesting is not

23   going to move it forward and we'll -- ultimately, we'll be

24   back before you.

25             THE COURT:  Well, if he is going to insist on
```

1    asserting a privilege on behalf of his clients or his clients

2    want to maintain that privilege, he's going to have to --

3    they're going to have to pay him to move quickly and to devote

4    the resources to getting this done.

5             MR. SHAPIRO:  I understand.

6             THE COURT:  All the documents are there.  There are

7    software programs that can help search, and if you don't think

8    that's good enough, look at the documents, but you need to act

9    quickly.

10            MR. SHAPIRO:  We understand that, Your Honor.

11            THE COURT:  I mean, I want these documents produced

12   by the end of January at the very latest.

13            MR. SHAPIRO:  We understand.  And Your Honor, again

14   --

15            THE COURT:  How soon could you get through these

16   documents, given what you've just described?

17            MR. SHAPIRO:  What I would propose is that we report

18   back to this group two weeks after we have had a sense to

19   learn more about what's there.

20            THE COURT:  Well, you said you have a good idea

21   about five minutes ago.  You said you had a good idea about

22   what was there and you would be able to make a fairly quick

23   assessment about what documents you would want to assert a

24   privilege over.

25            MR. SHAPIRO:  I have an idea about what transactions

1    there were of which Katten provided advice to the company,

2    particularly in 2012, 2013 and 2014.  There's obviously some

3    disagreement about volume.  There are internal Katten emails

4    that were within the scope of the subpoena that we would have

5    never seen at Retrophin.  So we are -- I am asking for some

6    time to size it up.

7            But, again, Your Honor, we are not seeking to use

8    the waiver unfairly.  If Mr. Brafman told me that he thought

9    certain additional topics were important in order to defend

10   against the indictment, then we would quickly talk to our

11   client about potentially waiving on those, but Mr. Verde has

12   said that most of these documents relate to commercial

13   transactions that have nothing to do with the transactions --

14           THE COURT:  Right.  Ninety percent was, I think, the

15   figure I heard, ninety percent of the documents have nothing

16   to do with the case.

17           Was it you, Mr. Verde, or was it Mr. Shapiro who

18   made that representation?  I was stunned by that, but that

19   also makes me think that this has to be put into hyper-speed,

20   so we can keep on track.

21           MR. VERDE:  Trying to work through the various

22   matters that were open, some of them dealt with litigations,

23   not anything involving the --

24           THE COURT:  Right.

25           MR. VERDE:  -- indictment.  Some of them involved

1   transactional work that -- deals either consummated or not

2   consummated.

3        Most of the things that we're talking about here

4   seem to have been billed to a general number, and that number

5   represents about somewhere about 20 or 30 percent of the

6   overall total, which we're just trying to work backwards and

7   then out of that, how much of that is directly related to the

8   matters in the indictment.  We're perfectly prepared to give

9   everything to anyone, but just to give you some concept of the

10  context.

11       MR. SHAPIRO:  Even if it's seventy percent, we just

12  don't understand how fairness requires us to turn over all of

13  that commercial information.

14       MR. BRAFMAN:  Can I explain it in a nutshell?  If

15  you are going to inject a reliance on counsel defense, which

16  we have advised the Court that we intend to do so, the

17  professional relationship between the defendant and the lawyer

18  during the period in question shows that Shkreli doesn't do

19  anything without checking with Katten and getting advice from

20  Greebel on a whole host of matters -- sometimes 15 different

21  matters in the same day -- is all relative to whether or not

22  he had a good faith basis upon which to believe that he was

23  getting good sound legal advice.  So for them to tell me that

24  on matters that aren't charged in the indictment, Martin's

25  conferring with Mr. Greebel and his partners before doing

1    anything is not relevant is just not correct under the law.

2              THE COURT:  Well, I'm just thinking I don't know

3    whether the government would be willing to stipulate for

4    purposes of trial that Mr. Shkreli had a relationship with

5    Katten and conferred with them on X number of occasions, over

6    X period of time on X number of matters, and that because the

7    matters themselves are not relevant to the charges, you know

8    --

9              MR. BRAFMAN:  Your Honor, we could work that through

10   if we got to that point.  But what you have is -- and we'll

11   have to see the billing records before we can explain that

12   because the summary only says in that year, five thousand

13   hours, which means a lot of people worked on a lot of things,

14   but if you look at the time records, many of the consulting

15   agreements, many of the settlement agreements, the

16   relationships between many of the witnesses, there is

17   correspondence.  There is --

18             THE COURT:  Do you have those billing records?  You

19   have the contemporaneous time sheets that showed what legal

20   work was being done?

21             MR. BRAFMAN:  We don't have the actual details.  We

22   have the summaries of the time records.  We have what was

23   turned over to the government.  We don't have line-by-line

24   items.

25             THE COURT:  How detailed are the Katten records, the

1    billing records, Mr. Verde?

2              MS. SMITH:  The records that we received are kind

3    of -- I believe what Mr. Brafman is referring to are year-end

4    totals.  We do not have any kind of billing, day-by-day

5    billing because that -- those billing entries as you know

6    would themselves contain privilege information.  So if there

7    was a waiver, we may be able to get those entries, but often,

8    it describes partner X worked on --

9              THE COURT:  But they would give more detail as to

10   whether or not the work being done was for MSMB, Mr. Shkreli

11   or Retrophin, right?  So that's why I was thinking there

12   should be some way to correlate those contemporaneous daily

13   billing records with the emails that are being generated

14   contemporaneously, if there is any doubt as to what client was

15   being served.

16             MR. PAES:  Your Honor, if I may, just from a factual

17   standpoint?

18             THE COURT:  Yes?

19             MR. PAES:  If I may, some of the problems that have

20   arisen over here is because in some ways how Katten billed for

21   the work and in some ways because of what the structure was.

22             So with respect to MSMB Capital, right, there was no

23   overlap with MSMB Capital as a hedge fund existed while it was

24   still functional, because that gets you to kind of January

25   2011, and then the OREX transactions happened around that

1   time.

2          While there is still some work to be done with

3   respect to, you know, the falling out and kind of dealing with

4   investors or things along those lines with MSMB Capital, what

5   becomes really confusing is MSMB Healthcare and Retrophin, LLC

6   are in existence for the same time frame.

7          And you know, from our perspective -- again, we

8   don't take any position as to whose privilege it is and who

9   should claim it, but just for the Court to understand, these

10  are two entities that are being both run by Mr. Shkreli at the

11  same time, and from what we understand, at some point, the

12  billing was just done to Retrophin regardless of where the

13  work is actually being performed.

14         And I think because of the fact that MSMB Healthcare

15  does end up investing in Retrophin at some point, and the fact

16  that there's overlap between the individuals who are

17  working -- it all runs from the same office at the same

18  time -- I think is what's leading to some of these issues with

19  respect to, you know, whose privilege it is, even though one

20  party may say we waive it and Retrophin wants to maintain it.

21         It's a little -- in that time frame in particular

22  and it continues actually even I think past 2012 and Retrophin

23  becomes a publicly-traded company, there's still some issues

24  involving MSMB that are still being sorted through.  I think

25  it's a little tricky, just so the Court understands in terms

 1    of whose privilege.  That's why we're having this back and

 2    forth.

 3            THE COURT:  All right.  How many documents are at

 4    stake here in that time frame, during that period when there's

 5    overlap and some joining of it, if you can tell me?  Because

 6    really, ultimately, we need to get to -- there's clearly MSMB

 7    documents that are not going to be at issue.  Then we've got

 8    this sort of hybrid situation, which hopefully we can sort

 9    through, and then we're going to deal with the Retrophin

10    documents, which I think may be implicated by waivers or by

11    Crime-Fraud.

12            MR. VERDE:  Mr. Paes is correct that at some

13    point -- actually, to be specific, in April 2012, we issued

14    our final bill to MSMB.  And at that point, all the bills

15    going forward were to Retrophin, but --

16            THE COURT:  That you were saying it may not be

17    strictly for Retrophin work?

18            MR. VERDE:  That's correct.  And we -- again, I

19    don't have the facts on this issue, but Mr. Paes said during

20    conversations at our meet and confer that he believed that

21    Retrophin had paid for some of the MSMB work.  So I really

22    don't know in terms --

23            THE COURT:  The fact that they paid doesn't mean

24    they're the client, right?  As we know --

25            MR. VERDE:  I agree.

```
 1              THE COURT:  -- people get their legal fees paid by
 2    all kinds of people and it doesn't implicate the privilege.
 3              MR. VERDE:  Right.  But I mean, again, because we
 4    don't -- we will produce everything when we're ordered to, but
 5    in fairness, there is a period of time in 2012 into 2013,
 6    where it looks like they're moving away from MSMB and they're
 7    moving towards Retrophin as the primary platform for
 8    Mr. Shkreli's investment -- investment strategies.
 9              And it's during that time -- I agree with
10    Mr. Paes -- it's difficult to pull out whether they're talking
11    about Retrophin, MSMB.  The advisory affects both companies.
12    And that's really what we kind of broke down and frankly, I
13    think even if you put this on Retrophin, for Retrophin's
14    counsel, they're going to have the same problem.  And unless
15    they take the position that there's issues involving both
16    companies and the assertion of privilege by Retrophin blocks
17    the entire email or portion of the email, this is going to be
18    extremely difficult.
19              THE COURT:  Well, we don't know what Retrophin is
20    going to do because they haven't been explicit or specific.
21              MR. BRAFMAN:  May I have a question?
22              THE COURT:  Yes?
23              MR. BRAFMAN:  I don't know why this question, quite
24    frankly, isn't dispositive of the issue.  Judge Weinstein made
25    a ruling that the Crime-Fraud Exception applied, and while he
```

1    had a small universe of materials that the government gave him

2    to consider, the Court made the finding and we're stuck with

3    it, if you will, that the relationship between the Katten

4    partner who was representing Shkreli and Retrophin and Shkreli

5    was not a privileged relationship and if it was privileged,

6    the Crime-Fraud Exception waives the privilege.

7              THE COURT:  And in that case, did Retrophin assert

8    specifically a privilege or was it --

9              MR. PAES:  Yeah.  Well, I mean --

10             THE COURT:  It seems that they did with regard to

11   certain documents, but not really in a blanket way, the way

12   they're doing it now.

13             MR. PAES:  And also just to be clear, I think Judge

14   Weinstein's ruling was confined to the four areas of the

15   government inquiry that was set forth in the letter from

16   Retrophin saying they agreed to waive it before Mr. Shkreli

17   had asserted his own personal privilege.

18             So, you know, I agree with Mr. Brafman in the fact

19   that obviously, Judge Weinstein ruled that the Crime-Fraud

20   Exception applied, but it was not to the entire representation

21   involving Mr. Greebel's work or for that matter, you know, the

22   Katten Firm, because they represented that there were other

23   partners.  I know we dealt with Michael Rosensaft on some

24   issues, for example, who is a partner at Katten, as well, who

25   I believe represented Mr. Shkreli in SEC matters.

```
 1              MR. VERDE:  (Nods head affirmatively.)

 2              MR. PAES:  And so I don't think, for example, just

 3    that as an example that Judge Weinstein's ruling touches even

 4    on that representation.  He's not suggesting that the

 5    representation by Katten on other matters, you know, impacts

 6    the Crime-Fraud Exception.

 7              THE COURT:  Okay.  This is the problem -- yes?

 8              MR. BRODSKY:  I apologize, Your Honor.  I just want

 9    to get a few words in.

10              THE COURT:  Okay.  It would have been nice to have

11    heard from you earlier.

12              So on October 16th in the letter that Mr. Brafman

13    handed in and certainly, by October 18th, when I said to the

14    Retrophin folks, based on a footnote in Mr. Brafman's letter

15    that Retrophin might have more to say about this, it would

16    have been nice to have heard from you earlier than Sunday

17    evening at seven o'clock.

18              MR. BRODSKY:  Your Honor, what we were trying to do

19    is correct what we thought, for clarity purposes, was some

20    information provided in those letters.  Our principal point

21    was with respect to our pending bill of particulars, which I

22    know is not an issue we should talk about today.

23              THE COURT:  Not an issue that we're going to talk

24    about here.

25              MR. BRODSKY:  So we will not make a point about
```

LISA SCHMID, CCR, RMR

1    that.  What I did want to address is the issues that were

2    addressed here today.

3              We -- first, Your Honor, respectfully, Judge --

4    nobody is talking about paragraph six of Judge Weinstein's

5    ruling, which is relevant.  I know Your Honor has read it.

6    Paragraph six of course, Judge Weinstein said he's not making

7    a determination whether it's Crime-Fraud with respect to every

8    specific document because he didn't have all the relevant

9    facts.  He didn't know all the interested parties involved.

10   That's first.  I know other people are saying it's Crime-Fraud

11   broadly and generally, but Judge Weinstein in paragraph six

12   couldn't tell, based on the records before him.

13             Second, Your Honor, we de-duped the documents

14   generally that Citrin Cooperman provided and that Retrophin

15   provided regarding the waived subjects.  Retrophin did not

16   produce all the emails that Citrin Cooperman did.  So in other

17   words, we have with respect to what Citrin Cooperman produced

18   Retrophin communications, over a thousand documents that

19   Citrin Cooperman produced with respect to Retrophin that

20   Retrophin did not produce to the government.  To us, that

21   raises a question as to whether or not Retrophin, you know,

22   how they're determining their waiver, what they're producing,

23   what they're not producing.  I just provide that for Your

24   Honor's information.

25             THE COURT:  Can you educate me and remind me, who is

```
 1   Citrin?
 2           MR. BRODSKY:  Citrin Cooperman was outside
 3   accountants for Retrophin.  They provided accounting advice on
 4   a regular basis to Retrophin with respect to their books and
 5   records.  They weren't the outside auditor.  That was Marcum.
 6   But on a regular basis, they were providing outside accounting
 7   services.
 8           The third point I did want to make, Your Honor, that
 9   I think is relevant is that -- and I know we disagree
10   respectfully with Mr. Brafman -- is that Katten was not
11   representing Martin in his personal capacity.  I know that
12   Mr. Brafman has made that as part of his position.
13           THE COURT:  Well, Katten hasn't really shed a lot of
14   light on that.
15           MR. BRODSKY:  And I suppose that may be a question
16   for Mr. Verde.
17           Our understanding is that their representation by
18   Katten started with MSMB Capital.  It then morphed into a
19   broader representation of MSMB, including MSMB Healthcare.
20   MSMB Healthcare and MSMB Capital and Retrophin all had
21   interrelationships, affiliations to each other.
22           And there are communications, Your Honor, as we
23   understand it -- and I know there's a parsing of each
24   individual communication -- but there are communications
25   regarding MSMB Capital, MSMB Healthcare and Retrophin in the
```

1    same communication.  And that is partly what's creating this

2    issue.

3           And finally, Your Honor, most respectfully, there

4    were other lawyers at Katten who were communicating with

5    people at Retrophin, including for example, Marc Panoff, who

6    was the chief financial officer of Retrophin.  So there are

7    communications beyond with Martin Shkreli and there may be

8    communications with board members and people at Katten.  And

9    we haven't seen a lot of those communications, so those raise

10   just other issues.

11          THE COURT:  Those are probably the subject of

12   Retrophin's assertion, the ones that don't have to do with

13   Mr. Shkreli necessarily.

14          MR. PAES:  Your Honor, and again, it would be easier

15   for to us say that Katten did not represent Mr. Shkreli at

16   all, but at least from what we have seen, even we have to

17   concede that at least for some matters, including the SEC

18   representation before the SEC, there were some transcripts

19   where Katten obviously showed up representing Mr. Shkreli in

20   his personal capacity.

21          So the only thing I would -- you know, I don't think

22   it's actually factually correct to say that they did not

23   represent him in his personal capacity at all, regardless, as

24   you said, who paid the bill.  At least there were some

25   instances that we have seen that they did represent him in a

1    personal capacity.

2            MR. BRAFMAN:  Your Honor, I appreciate that

3    statement from the government.  I also know that however much

4    Mr. Greebel and his counsel would like to have perhaps never

5    represented Mr. Shkreli, the fact is that the evidence is

6    overwhelming that on many occasions, it was Mr. Shkreli who

7    personally communicated with Mr. Greebel on a regular basis

8    and received advice.

9            Now, whether it was an advice as to how you form a

10   company, how you write a settlement agreement, how you write a

11   consulting agreement -- Your Honor, at various times,

12   Mr. Shkreli wore a lot of hats, but he was always Martin

13   Shkreli, and if he's Martin Shkreli working at MSMB and Katten

14   is providing legal services that he is authorizing MSMB to pay

15   for, it's sort of absurd, quite frankly, to suggest that

16   Mr. Shkreli was not personally represented by this firm during

17   the overwhelming period in question.

18           And that's the tension between the defendants that I

19   think will ultimately require a severance over the vigorous

20   objection by the government, I assume, but we have a right to

21   at least explore the issue to Your Honor's satisfaction.

22           THE COURT:  All right.

23           Mr. Shapiro, did you have anything more to say?

24           MR. SHAPIRO:  One small response to Mr. Brodsky,

25   with reference to when the company made its waiver.

1    When the company made its waiver, the government

2    asked us to include a subset of documents within that --

3    within the waiver in the binders that were presented to

4    Judge Weinstein.  We've never been asked to produce all of the

5    documents within the scope of the waiver.  We don't have an

6    objection to doing that if they're requested of us, but I

7    didn't want there to be a suggestion that they were somehow

8    deliberately withheld in any way.

9    MR. BRAFMAN:  Could I just add one thing that

10   Ms. Zellan reminded me of which I think matters a great deal?

11   We're talking about representation of Mr. Shkreli and MSMB

12   when these were start-up companies, not when they were

13   companies that were in existence for a long time.  So when

14   you're representing someone who is starting a company, it's

15   impossible to separate the person from the entity they're

16   trying to create.

17   THE COURT:  I agree, but I think what Retrophin is

18   saying is that we have now transformed into Retrophin, Inc.,

19   and we take the privilege with us from Retrophin, LLC into

20   Retrophin, Inc., and we're asserting our privilege to the

21   predecessor entity of Retrophin, Inc.

22   MR. BRAFMAN:  I think they should have said that

23   before they made a partial production and executed a partial

24   waiver.

25   THE COURT:  Right.  From what I remember stating

1   their position to be is they made a very limited explicit

2   waiver and it was only with regard to the government and it

3   was only with regard to certain transactions and subject

4   matters and not with regard to everything, so --

5             MR. BRAFMAN:  Well, this may be the first time in my

6   35 years of practicing in this building where a company was

7   allowed to essentially limit its production response to a

8   grand jury subpoena.  When I represent a company, it's

9   generally, give us every piece of paper you have and then it's

10  up to us to go and modify.

11            So to the extent that they managed to limit its

12  production only to matters that were consistent with the

13  theory advanced by the SEC, Retrophin in its civil lawsuit and

14  ultimately, the government, leads me to understand and, quite

15  frankly, know that there is a lot of good stuff in the Katten

16  files that will be very helpful to Martin Shkreli, and I'd

17  like to have them before the trial.

18            THE COURT:  All right.  Why don't you -- or why

19  haven't you or someone in your firm spoken with Mr. Shapiro on

20  behalf of Retrophin, to try to talk about a broadening of

21  their limited waiver?  There might be things that they will

22  give you.

23            I just want to define the perimeters of the dispute,

24  all right?  Because right now, as much as I credit the

25  attorneys for trying, I'm not sure it's gotten any narrower.

```
 1    The one thing we've accomplished is we've gotten MSMB out of
 2    the way.
 3              But there's this hybrid.  We don't really know who
 4    is being -- what client was being represented at the time this
 5    email might have been generated with this memo.  There's that
 6    hybrid stuff and there is also I think Retrophin is willing to
 7    waive even documents or communications that are pertinent to
 8    the charges in the indictment, and certainly pertinent to
 9    their lawsuit.  Those should not even be in dispute.  So what
10    remains?  What remains in dispute?
11              Retrophin can't sue Mr. Shkreli and allege similar
12    acts of wrongdoing and then hide behind the attorney/client
13    privilege.
14              MR. SHAPIRO:  Your Honor, the waiver we made we
15    think encompasses the indictment except for one transaction
16    related to a $900,000 that was in the superseding indictment,
17    and we would -- I need to address this with my client, though
18    I expect that we would be prepared to extend the waiver to
19    include that additional transaction.
20              THE COURT:  So authorize Katten to give that to
21    Mr. Shkreli.
22              MR. SHAPIRO:  I have to talk to my client about
23    that.
24              THE COURT:  All right.
25              MR. SHAPIRO:  But that's an example of something
```

1   that's in the indictment, but that's not yet in our waiver

2   because it wasn't on the table when we made our waiver.

3           Now, with respect to our civil complaint, there may

4   be -- there are subjects in that civil complaint that are

5   beyond the scope of our waiver.  I don't -- I don't recall at

6   this point because this is more than a year ago, but I think

7   where we have not relied on attorney/client communications in

8   making claims in that civil complaint, I don't believe that we

9   would have waived the privilege in those instances where we're

10  not relying on attorney/client communications and using the

11  privilege as a sword and a shield.

12          Having said that, if in the course of my

13  communications with Mr. Brafman, there are limited additional

14  topics where we can cut through all this by expanding the

15  scope of our waiver, I will absolutely take that up with my

16  client and try and eliminate most of this dispute.

17          THE COURT:  All right.  Can you do that within one

18  week from today, please?  Because --

19          MR. SHAPIRO:  Of course.  I need to hear from Mr.

20  Brafman about where he --

21          THE COURT:  Well, this is the thing.  Mr. Brafman, I

22  know you want everything and I understand that's your job, and

23  you may well get everything.  But why not, since there are

24  overtures being made to try to cut through some of this and to

25  define and narrow the matters in dispute, so that Katten can

```
 1    decide or once an order is made by myself to decide, you know,
 2    how quickly you can get those documents out to everybody?  Why
 3    don't you try to narrow the dispute for now without prejudice
 4    to any of your rights, your client's rights, and then we'll
 5    figure out what's left in the fight?
 6              Do I have to look at an in camera, you know, volume
 7    of documents?  What is the magnitude of that review, in camera
 8    review, if I have to go there?  I would like you to try to
 9    eliminate and narrow it as much as possible what's in dispute.
10    If he's offering to waive more, take it.  Get the documents.
11              MR. BRAFMAN:  I will, but, Judge, to be candid,
12    Judge, it took -- I was preparing for a suppression hearing,
13    but monitoring the emails on a daily basis.  It took almost
14    two weeks to get the lawyers to agree on a meet and greet
15    date, which then had to be done by telephone conference
16    because everyone was very busy.
17              I'll take you up on that offer, but normally, Judge,
18    when we're not flying blind, we're looking at a privilege log
19    and we say we need categories 20 through 60 -- I don't think
20    in all the months that they've done this that they have
21    created a privilege log.
22              THE COURT:  Oh, I'm ordering them to do that.  I
23    want it, you know, I want it sooner rather than later.
24              And your client is going to have to spend the money
25    to get them to do it.  And I understand that that is an
```

1    expense they have to bear, but, you know, you're required to

2    give a privilege log, so that we know what the scope of the

3    privilege is.

4              MR. SHAPIRO:  I don't -- I don't recall us

5    withholding documents on the ground of privilege or the

6    government asking us to produce.

7              THE COURT:  No, but you're prohibiting Katten from

8    providing --

9              MR. SHAPIRO:  I can't prepare a privilege log on the

10   documents in Katten's possession because I've never seen them.

11   And this comes back to what I had said at the beginning of the

12   afternoon.  If Katten were to prepare a list of the matters

13   for which they gave, provided advice to Retrophin and MSMB,

14   then Mr. Brafman can take a look at that list and say there

15   are these ten matters where we would like you to waive the

16   privilege or go to Katten and make a decision.  Are you going

17   to waive the privilege or are you going to log those

18   documents?

19              That, to me, seems like the best and quickest way

20   for us to get Mr. Brafman the source of documents he wants

21   without insisting on a wholesale waiver of the company's

22   privilege.

23              THE COURT:  No one is insisting on a wholesale

24   waiver.  What I'm insisting on is that you provide a privilege

25   log for those documents that you are asserting a privilege

1    over.

2         MR. SHAPIRO:  That's Katten documents.

3         THE COURT:  That's what you're asserting a privilege

4    over, am I correct?  Unless you want to let Mr. Brafman go in

5    there with Mr. Shkreli and look at the documents and they can

6    decide.

7         MR. SHAPIRO:  I understand. I understand.

8         THE COURT:  I mean, somehow we have to get to it.

9    Mr. Shkreli is one of the few people who can identify which of

10   those emails that he sent or received pertaining to what

11   matter.  He's one of the few people, but you don't want him to

12   do that.

13        MR. SHAPIRO:  We're prepared to work with Katten as

14   quickly as possible to identify whether there are documents

15   over which we're asserting privilege and which of those are --

16        THE COURT:  I mean, you may have to just go in and

17   take a look at the documents and make a log.  That's how it

18   works.

19        MR. BRAFMAN:  It wouldn't make any sense for us to

20   confer with them until we get an alert from either Katten or

21   Retrophin that they have a privilege log.  And within a week

22   after getting that, we'll report back to Your Honor.

23        But to give them a head start, we believe that any

24   correspondence that relates to Martin Shkreli is not

25   privileged, and it's his privilege to waive any emails that he

```
 1   is either copied on or pertain to any of the matters in the
 2   indictment, he's entitled to.
 3           And with respect to any invoicing, we think the
 4   billing records should not remain privileged.  They can redact
 5   out -- we're not looking to see who they billed, other clients
 6   or what they billed them for.  They can redact those billing
 7   records.
 8           But any time sheets that reflect work done on behalf
 9   of Mr. Shkreli, MSMB or Retrophin, the lawyers, as I
10   understand it, just don't bill.  They write down "consulting
11   agreement."  They write down "correspondence."  They write
12   down "emails."  Well, we're entitled to that and that's really
13   a road map in this case.
14           So to get a jump start, I can't imagine how if they
15   redact the billing records, getting our billing records that
16   he paid for should be something they could stand on ceremony
17   on.  That would produce a great deal of material on the
18   reliance of counsel defense and that's the process.
19           THE COURT:  It's also not a communication.  It's not
20   a communication.  Your billing records saying what you did for
21   a particular client is not a communication made to a client,
22   intended to bring privilege for the purpose of rendering legal
23   advice is not a privilege, I don't think for the most part,
24   unless there's something in there that amounts to a
25   communication that would be privileged, but I would doubt it.
```

```
 1              MR. SHAPIRO:  Of course, unless there's something in
 2    there.  I don't think --
 3              THE COURT:  All right.  So let's authorize Katten
 4    right now to provide those billing records to Mr. Brafman.
 5    All right?
 6              MR. PAES:  And to the government.
 7              THE COURT:  And to the government.
 8              MR. SHAPIRO:  Your Honor -- Your Honor, I --
 9    respectfully, I would like to have a conversation with my
10    client tonight of which --
11              THE COURT:  Well, why haven't you had that
12    conversation?  You know there's billing records.
13              MR. SHAPIRO:  Because we had not been asked to turn
14    over Katten's billing records.  We have in Katten --
15              MR. BRAFMAN:  It was in a subpoena.
16              MR. SHAPIRO:  We have a copy of Katten -- we happen
17    to have a copy of Katten's billing records.
18              THE COURT:  You've got the subpoena, do you not --
19              MR. SHAPIRO:  We have the subpoena.
20              THE COURT:  -- served?  You know they want it.
21              MR. SHAPIRO:  What we're prepared to do is take a
22    day to look at those billing records, make sure there's
23    nothing in there that we assert a privilege over and then
24    we'll tell Katten they can turn them over to Mr. Brafman.
25              THE COURT:  All right.  And then you'll log it if it
```

```
 1   is?
 2           MR. SHAPIRO:  Right.
 3           MR. PAES:  And the government?
 4           THE COURT:  And the government.
 5           MR. BRODSKY:  Respectfully, if the government gets a
 6   copy, if Mr. Shkreli's lawyers get a copy, I take it Your
 7   Honor won't object if Mr. Greebel also has a copy?
 8           THE COURT:  I'll hear from the parties.
 9           Do the government and Mr. Brafman object to sharing
10   with Mr. Greebel?
11           MR. BRAFMAN:  I don't object to sharing.
12           THE COURT:  Okay.
13           MR. PAES:  We don't object either, Your Honor.
14           THE COURT:  In this time of Thanksgiving.
15           MR. BRAFMAN:  Yes, Your Honor.  The spirit of the
16   season.
17           MR. BRODSKY:  May I share one other --
18           THE COURT:  Yes.
19           MR. BRODSKY:  -- in the spirit of Thanksgiving?
20           Respectfully, Your Honor, I know there's been a lot
21   of discussion of who at Katten was representing, if anyone,
22   Martin Shkreli personally.  It's a hundred percent correct
23   that in September of 2013 -- in or about September 2013, when
24   Mr. Shkreli testified at an SEC proceeding, a Katten
25   attorney -- not Mr. Greebel -- a Katten attorney, a partner at
```

 1   Katten did represent MSMB and Mr. Shkreli at that testimony.

 2   And it is also correct, Your Honor, that there are hundreds

 3   of -- literally hundreds of communications between Katten

 4   attorneys -- including Mr. Greebel -- and Mr. Shkreli.

 5         As Your Honor knows, when a corporation like

 6   Retrophin or any other corporation in America like Microsoft,

 7   Apple, Google, whoever it may be -- hires a law firm and that

 8   law firm, partners there communicate with the CEO, they're

 9   communicating and providing advice to the corporation.

10         And their understanding is, when they're

11   communicating to the CEO, that they're representing the

12   corporation and providing advice to the corporation, and not

13   necessarily the CEO in his or her personal capacity.  I just

14   wanted to make that clear and not just assume -- and I know

15   this is battle that the defendants will wage at a later time,

16   Your Honor, possibly in connection with severance.

17         THE COURT:  It's a fact-specific inquiry, and I

18   don't think we can make any gross generalizations about that.

19   I mean, think about MSMB and Retrophin, LLC, and they were

20   essentially started by and operated by Mr. Shkreli.  All

21   right?

22         MR. BRODSKY:  That's correct, Your Honor.

23         THE COURT:  At the time, it wasn't a public company.

24   There were not shareholders.  It was his company.

25         And I think there is a way to move this forward.  I

1    don't want to get bogged down in a lot of side litigation.

2    Katten is willing and able to give documents to whomever

3    ultimately I order them to provide to.  And I don't think the

4    government is objecting to Mr. Greebel's documents --

5    receiving documents, are you?

6                MR. PAES:  No, Your Honor.

7                THE COURT:  All right.  So let's do this.  The

8    burden is on Retrophin, since they are asserting the

9    privilege, to act expeditiously in concert with Katten to

10   review the documents, to make a privilege log and work with

11   Mr. Brafman to try to narrow the privilege.

12               If he's willing to expand his waiver -- its

13   waiver -- let me just strike that.  If Retrophin is willing to

14   expand its waiver, they should let Mr. Brafman know

15   immediately and let Katten know, so they can provide the

16   documents.

17               And I'm going to keep a very short time frame on

18   this because the effect of this is delaying the motion

19   practice that I had ordered, and I want to keep the case on

20   track for trial in June.  So it will require that Retrophin's

21   counsel work hard and fast to get this done.

22               MR. BRAFMAN:  With respect to the billing records,

23   you're ordering them to produce them as soon as they've had an

24   opportunity to speak to their client?

25               THE COURT:  Right.  And I would think that should

 1    not take more than a few days.  Tomorrow is not a holiday.

 2    Friday is not a holiday.  Monday is not a holiday.  So maybe

 3    in a week, you can let us know.

 4              MR. SHAPIRO:  The bills will be produced by Monday,

 5    subject to any redactions.

 6              MR. BRAFMAN:  That's fine.

 7              THE COURT:  All right.  All right.  What else can we

 8    cut through?

 9              MR. VERDE:  Just two things that may foreclose the

10    need to come back for clarification.  One is to the extent

11    that anyone wants to see documents that are arguably MSMB

12    documents, this would probably be a good time to make sure

13    with everyone here who has a say in this that there is no

14    objection to us giving what are arguably MSMB documents to

15    Retrophin?

16              THE COURT:  Is MSMB counsel here today?  Did I

17    overlook them?

18              MR. VERDE:  I believe that's Mr. Brafman.

19              THE COURT:  No, no.  There was a lawyer on behalf

20    of --

21              MR. BRAFMAN:  Mr. McGorty represented Mr. Biestek.

22              THE COURT:  Who?

23              MR. BRAFMAN:  Glen McGorty.

24              THE COURT:  McGorty?  Is he here?

25              MR. BRAFMAN:  He represents -- no, he's not, but he

```
 1    was on the call, Your Honor, and he affirmatively waived them

 2    on behalf of Mr. Biestek.

 3                THE COURT:  Does anybody dispute that?

 4                MR. VERDE:  He didn't waive as much as he said.  He

 5    conceded that it's Mr. Shkreli's privilege to assert.  So I

 6    just want to be clear that if we're asked by Retrophin to give

 7    all the documents that may also be MSMB, there is no

 8    objection.

 9                MR. BRAFMAN:  No objection.

10                MR. VERDE:  And the second thing that will make this

11    such speedier is to the extent that Mr. Shkreli's counsel and

12    Retrophin's counsel agree on expansion of the waiver, if they

13    could convey their instructions to us in terms of search terms

14    and dates rather than descriptions because --

15                THE COURT:  Right.

16                MR. VERDE:  -- otherwise, we're going to be back in

17    the same morass.

18                THE COURT:  Right.  And you know, Katten is

19    incurring a lot of expense for no client but just its own --

20    its own time and effort in trying to accommodate these

21    competing positions.

22                MR. VERDE:  Yeah.  We're big boys.  We're okay with

23    that.  We just -- the one thing we just keep trying to avoid

24    is having to make judgment calls about what -- how to

25    interpret an instruction.  So if we get something that's
```

```
 1    mechanical, that is, date range, you know, certain terms are
 2    included, certain terms are excluded, however the parties can
 3    work that out, if they should work to an agreement on those
 4    terms, then we can execute on it right away.
 5              THE COURT:  All right.  So Mr. Brafman and Mr.
 6    Shapiro, you understand what Katten needs?  I expect you to
 7    move quickly.  I could ask for a status update within a
 8    certain number of days.  I would hope that, you know, you all
 9    move more quickly towards a resolution, and that if there is
10    going to be a universe of documents I have to review in
11    camera, you will not burden me with banker's boxes full of
12    documents.
13              MR. BRAFMAN:  Your Honor, could we also ask
14    Retrophin's counsel, since MSMB is no longer an issue, I know
15    that they have certain MSMB records that Retrophin has, if
16    they could return them to Mr. Shkreli or his counsel?
17              MR. SHAPIRO:  Your Honor, Retrophin has an email
18    server.  There are many -- there are MSMB emails on that email
19    server.  There are also MSMB documents on Retrophin's systems.
20    Under the company's email policy and other systems policy, all
21    of those documents are now Retrophin's property.
22              At some point in the past, we turned over to
23    Mr. Shkreli's counsel all of the hard copy MSMB documents that
24    had been lying around or copies of those documents.  It would
25    be --
```

1            THE COURT:  Did you print everything?  You printed

2    everything that was from the email server and gave it to --

3            MR. SHAPIRO:  No, Your Honor.  Separate and apart

4    from the email server, if there were hard copies of MSMB files

5    that were at Retrophin, we provided copies to Mr. Shkreli's

6    counsel.

7            What we are reluctant to do is undertake the burden

8    of going through this enormous email server to find any email

9    that's arguably an MSMB email rather than a Retrophin email.

10   Mr. Shkreli sent and received those emails on Retrophin's

11   email server, and they're stored on Retrophin's email

12   archives.  Under the company's email policy that Mr. Shkreli

13   adopted, all of those communications are now Retrophin's

14   property.

15           MR. BRAFMAN:  But Your Honor -- but Your Honor,

16   they're his property.  He was MSMB.  They are not owned for

17   perpetuity by Retrophin and it's fairly easy if we do a search

18   electronically to identify that.  I'm not asking you to do it

19   for tomorrow, but those are not yours to retain.

20           MR. SHAPIRO:  Your Honor, legally, we contend that

21   they're the company's property.

22           THE COURT:  So your policy, which I have yet to see,

23   is that if I were one of your employees and I communicated

24   with my doctor about a medical issue, that would be

25   Retrophin's, not the personal --

1           MR. SHAPIRO:  That's what the email policy says, and

2   Judge Weinstein relied on it in finding that Mr. Shkreli

3   didn't have a personal privilege of the documents.  We tried

4   to --

5           THE COURT:  All right.  But you don't have a

6   privilege over the MSMB documents?

7           MR. SHAPIRO:  No, no, no.

8           THE COURT:  Even though they're yours, if they

9   served a subpoena on you for MSMB documents, you would have to

10  produce them because they're not privileged and they're

11  entitled to it, no?

12          MR. SHAPIRO:  Yes.  If they served a subpoena on us

13  for those documents, we would have to produce copies of those

14  documents to Mr. Shkreli.

15          THE COURT:  All right.  So serve the subpoena and

16  you'll get them.

17          MR. BRODSKY:  I have a relevant fact with respect to

18  the issue --

19          THE COURT:  Yes?

20          MR. BRODSKY:  -- of the email control.  I don't know

21  whether or not there's a separate MSMB server that was left

22  behind at Retrophin and then another Retrophin server.  My

23  understanding was that Retrophin is in possession of its MSMB

24  server, and then they're also in possession of a Retrophin

25  server.

1          My second understanding, Your Honor, from reviewing

2    the discovery, we did search for Retrophin email policy -- and

3    Mr. Shapiro, correct this if we're wrong -- we may not have

4    the relevant policy, but the one that was produced in

5    discovery was dated September 2013, and it seems to us that

6    Retrophin, if that is the policy that they're relying on, that

7    it's hard for them to argue that it's retroactive to MSMB

8    email communications prior to September 2013.

9          In other words, if Retrophin had an email policy in

10   September 2013 and informed its employees that from now on, if

11   you communicate over our server, we own it, it doesn't apply

12   to August of 2013 or August of 2012, and I don't know what

13   policy they showed to Judge Weinstein, but that's the policy

14   that was produced in discovery.

15         I also know, Your Honor, that there's case law out

16   there that if a company bears a heavy burden in proving to

17   federal courts that their email policy is so explicit that it

18   warrants a waiver of communications unrelated to the

19   company -- the email policy we read from September 2013 from

20   Retrophin is about as vague as one can get from our

21   perspective, when we compare it to other policies.  So I do

22   think that would be an issue Your Honor would want to look at.

23         THE COURT:  I don't want to look at it.  I want you

24   to work it out, but I will look at it if I have to.

25         MR. PAES:  I don't think it's an issue, given that

1    Retrophin has said they would produce it to Mr. Shkreli.

2              THE COURT:  Pursuant to subpoena.

3              MR. PAES:  So I don't think that we need to get into

4    the issue of the law on, you know, waivers based on policies,

5    Your Honor.

6              THE COURT:  All right.  It's like $15 to get a

7    process server to drop a subpoena on them.  Maybe they'll take

8    it by email, right?

9              MR. BRAFMAN:  Yes, Your Honor.

10             THE COURT:  Will you take it by email?

11             MR. SHAPIRO:  Of course.  Of course.

12             THE COURT:  What else?

13             MR. PAES:  Well, hopefully nothing else.

14             I just wanted to know if the Court wanted us to even

15   address what we believe was somewhat of a surprising letter.

16             THE COURT:  Yes.  Why don't you, because we have the

17   bill of particulars under advisement, and I did think it would

18   be fair to allow the government to respond to give -- this

19   letter dated November 20th.

20             Did you want to respond, Mr. Paes?

21             MR. PAES:  Sure.  I mean, just for one, obviously,

22   we're on this call where we're trying to sort through

23   representation issues, as I'm sure now the Court is aware of

24   are at the very least complicated and involve different

25   parties having different claims.

1          During the course of the -- and by the way, this is
2     all done by telephone conference, so it's not that the
3     government was sitting across the table from Mr. Brodsky, so
4     he could ascertain surprise, for example, in the event of the
5     government saying, well, we're surprised at this.  So we
6     thought it was kind of, you know, interesting that the
7     government's position or reaction was characterized on this
8     call as being surprised by it.
9          What happened was, there was a question that was
10    posed to understand a fact which is because we don't have the
11    bills, because we don't know what the representation issues
12    were, and we know that Mr. Shkreli -- and the government has
13    never alleged in any of its filings or submissions that
14    Mr. Greebel assisted Mr. Shkreli with that filing with the
15    SEC.
16          So -- but in light of some of the issues regarding
17    representations and billing, we did ask when we were on the
18    phone in this call as a factual matter, because, you know, one
19    could argue it could help the government knowing this or maybe
20    doesn't because you have to advise the government -- we asked
21    if Katten represented Mr. Shkreli when he was responding to a
22    request from the SEC in September 2012.  Mr. Verde said --
23          THE COURT:  It was 2013?
24          MR. PAES:  No, no, no.  2013, I think there's no
25    dispute that Katten did represent Mr. Shkreli.

1          THE COURT:  Okay.

2          MR. PAES:  2012 is when Mr. Shkreli -- and from what

3    we can gather through what was produced in discovery responded

4    directly to the SEC providing information about the MSMB files

5    at that time.

6          And so we asked the question, did Katten represent

7    Mr. Shkreli in that inquiry by the SEC?  Obviously, it's

8    relevant to us if there's a fact out there that I'm aware of

9    because if he did, we can expect, I'm sure, another advice of

10   counsel or reliance on counsel defense with respect to that

11   submission.  So we did, and Mr. Verde said, no, he did not,

12   and I said, are you sure?  I just want to make sure we confirm

13   that.  And he said no.

14         As far as we are concerned, that was the end of the

15   discussion.  But somehow, that got characterized as a surprise

16   by the government, that we were taken aback in some ways by

17   learning of this fact and that it's somehow connected to a

18   bill of particulars request.  And the fact that they had asked

19   for things in the bill of particulars, which I think we've

20   gone over this.  We've argued.  If you ask for 20 different

21   things, doesn't make it appropriate for a bill of particulars.

22         So one, I just want to let the Court know that I

23   think it was a mischaracterization of our reaction to it,

24   which I'm not sure how they ascertained we were surprised,

25   given it was over a telephone conference call, given the fact

1    I didn't say, "I'm surprised."  All I said was, "Wow.  That's

2    interesting, you know."

3           But anyway, that was put obviously before the Court

4    and tried to connect it with respect to a bill of particulars

5    request.  We don't think that the Court needs anything beyond

6    what it already has.  If the Court would obviously like us to

7    respond to this in writing, we are happy to.  We don't see how

8    it impacts the bill of particulars request.  It's not what the

9    indictment alleges.

10          The indictment just alleges that Mr. Greebel had

11   knowledge of the facts of the situation of MSMB Capital at the

12   time, you know, that he decided to backdate these documents

13   and create an interest of MSMB Capital in the Retrophin cap

14   table, and that's clear from the emails that have been laid

15   out in the indictment as to what his knowledge was because he

16   had the Retrophin cap table as early as June and July.  And he

17   saw that there was no MSMB interest in there and that was

18   created obviously after the fact.

19          The indictment did not allege that Mr. Greebel in

20   any way assisted Mr. Shkreli in a submission to the SEC, which

21   had he done so -- and we were somewhat now surprised.  You

22   could see how that's a relevant fact.  How it becomes relevant

23   with respect to a bill of particulars, still, I don't get

24   that.  But they have asked for a lot of things in the bill of

25   particulars which we don't believe they're entitled to.  So

1    that's all I wanted to say on that issue, Your Honor.

2            THE COURT:  Do you still -- are you satisfied now,

3    Mr. Brodsky?

4            MR. BRODSKY:  Respectfully, Your Honor, on the

5    call -- On the call, Your Honor -- and I'll just move up, so

6    you can hear me -- on the call, Your Honor, Mr. Paes said that

7    for the benefit of Mr. Biestek's counsel, Glen McGorty -- he

8    didn't ask a question.  He said he made a statement, he said

9    for the benefit of Mr. McGorty, he said -- and we put it in

10   our letter.  We were all on the call.  We checked with

11   Mr. McGorty as to the accuracy, and we checked with Katten's

12   counsel as to accuracy before we submitted this.

13           He said there was an SEC inquiry in September of

14   2012, and that Katten represented MSMB and Mr. Shkreli in

15   responding to that inquiry.  At that point, Mr. Verde stopped

16   the conversation and said, "That's not so."  He said that

17   Katten did not represent anyone or do any work relating to the

18   SEC investigation into MSMB and/or Mr. Shkreli in the year

19   2012.

20           And he went on to explain that it was in 2013 -- in

21   or about August of 2013 -- when Mr. Shkreli testified and he

22   said -- Mr. Verde said a few months prior to that in the

23   summer of 2013, that's when -- the first time Katten

24   represented MSMB or Mr. Shkreli in connection with the SEC

25   investigation.  And then Mr. Paes asked, "Is that right?  Is

```
 1    that correct?"  That's why we wrote he appeared to be
 2    surprised by the news.
 3            Now, respectfully, Your Honor, a bill of
 4    particulars -- and we wrote appeared to be surprised.  We
 5    certainly didn't say he is surprised.  We wrote appeared to be
 6    surprised because he checked again with Katten if that
 7    information was correct.
 8            THE COURT:  Well, why wouldn't a careful lawyer do
 9    that, just to make sure that, you know, the time frame that's
10    being represented and the representation of Mr. Verde's firm
11    with regard to the personal representation of Mr. Shkreli was
12    accurate?
13            MR. BRODSKY:  I agree.  He should check.
14            THE COURT:  Okay.
15            MR. BRODSKY:  But his first statement was
16    inconsistent with what Mr. Verde then informed him.  It
17    appeared to us that he made a statement.
18            What's relevant here, Your Honor, is not really the
19    back and forth.  What's relevant to us is we appreciate the
20    concession because we view it as a concession.  If you cut
21    through all the red tape here -- and we can disagree about
22    whether he was surprised or not surprised -- to us, that's a
23    red herring.
24            The key issue to us is the fact that Katten was
25    representing for the first time MSMB and Mr. Shkreli in 2013
```

1    is relevant to our bill of particulars.  Why?  A bill of
2    particulars is fair notice to the defendant about what charges
3    we're facing.  All we want, Your Honor, is fair notice.  Tell
4    us that you're alleging, so we can defend ourselves.

5           We're here for the indictment and we pointed out,
6    Your Honor, we put in our brief that it appears to us -- and
7    we weren't sure -- but it appeared to us the superseding
8    indictment -- this is page two of docket number 92 in this
9    case -- and what we wrote was, "The indictment assumes
10   incorrectly that Mr. Greebel knew in 2012 that, A, Mr. Shkreli
11   allegedly made false statements to the SEC; and B, Mr. Shkreli
12   needed to, quote, fabricate an investment by MSMB Capital in
13   Retrophin, LLC, end quote, for purposes of the SEC inquiry."

14          Now, what we were trying to get the government to
15   tell us is whether or not they were alleging Mr. Greebel knew
16   in 2012 that Mr. Shkreli, representing himself, was making
17   false statements to the SEC, and that Mr. Shkreli,
18   representing himself, was fabricating an investment in MSMB
19   Capital to deceive the SEC, but the government refused to tell
20   us that.

21          And so this revelation to us and this acknowledgment
22   that Katten did not represent Mr. Shkreli or MSMB in the SEC
23   case in 2012 is meaningful to us and it may not -- the
24   government may not care.  But it is meaningful to us if the
25   government is saying here today -- we hope they will say here

1    today -- that they are not alleging in any way, shape or form

2    that in 2012, Mr. Greebel knew Mr. Shkreli was making false

3    statements to the SEC or that in 2012, Mr. Greebel knew Mr.

4    Shkreli was deceiving the SEC about the MSMB Capital

5    investment.  That's what's important to us, not the back and

6    forth on the phone call.  But that allegation is significant,

7    and it matters to our defense.

8         And Your Honor, most respectfully, when the

9    government stands up and says, well, Mr. Greebel asked for 20

10   things and that means he really is only interested in three --

11   with all due respect to Mr. Paes, we are trying to defend a

12   person, and we are trying to understand the allegations, so we

13   can do that defense.  That's all.  And we believe this was

14   significant.  We repeated it multiple times, and it appears --

15   we would like clarity that they are not alleging and do not

16   allege that Mr. Greebel knew in 2012 about these false

17   statements to the SEC.  That's what we're asking for.

18        MR. PAES:  Your Honor, I think throughout this bill

19   of particulars, what they have tried to do is try to confine

20   us to what we're not alleging.

21        What we have alleged in the indictment and what we

22   have alleged is pretty clear.  What they've tried to do is

23   say, well, you know, kind of proving a negative.  So all of

24   these things, let's -- tell us if it's anything that you

25   possibly could find out or possibly could learn in the course

1    between now and trial, tell us now that that's not part of the

2    case.

3            How can we say that when we haven't received

4    documents from Katten, for example?  We don't know what the

5    documents from Katten are going to show us with respect to

6    what his knowledge was.

7            I can assure you if we knew and had evidence right

8    now because we alleged duress in the document that Mr.

9    Greebel, you know, explicitly knew in documentary evidence,

10   you know, which they would know if it's in discovery.  They

11   would have it.  We would have alleged it.

12           But that's not what a bill of particulars requires

13   one to do.  What they've tried to use the bill of particulars

14   is to try to kind of cabin in and say, well, you know what?

15   This is all you can try to look at.  This is all you can try

16   to prove.  That's not the purpose.

17           The idea that Mr. Greebel doesn't know the charges

18   against him, I find that to be one of the most, you know,

19   unbelievable things I've heard because, one, the indictment is

20   very clear.  It gives examples of it.  We provided more

21   information as part of, you know, this request which we

22   believed was not even required, but we did.

23           And so to stand up and say, you know, we're only

24   trying to understand the charges against him -- if they don't

25   understand the charges against him at this point, I don't know

what to expect in terms of going forward, in terms of what
other questions or issues they may have with respect to
severance.  How could they have made a motion if they didn't
understand the charges?

And here's what's also troubling.  You know, their
position changes with -- and we haven't had this issue,
candidly speaking, you know, to some extent with counsel for
Mr. Shkreli, where they had issues where we engaged in.  We
disagree on a lot of things, as Your Honor knows.

But we're at a point where we're concerned about
having conversations that lawyers typically have with one
another, trying to advance the ball because it may be
mischaracterized in this instance.  And we're at a point where
we feel we need to maybe resort to just putting things in
writing, because we don't want things to be taken out of
context in this matter.

But, you know, today, you heard, for example, where
it seemed very ironic that Gibson Dunn was now able to
de-dupe, you know, Citrin Cooperman productions forces Katten
productions to come up with something and realize that there
was a discrepancy in that.

I'll just say for someone who knows a little bit of
how technology works, that's pretty sophisticated technology
to be able to do that.  And listen to what they were saying
previously with respect to their inability to review documents

1    and emails.  I would just point out to the Court, as you are

2    considering some of their requests, that stands in stark

3    contrast to all of the complaints they were making about

4    inability to wade through documents when they can perform

5    de-duplications in two separate productions and figure out

6    that Retrophin has not produced some emails that they received

7    from Citrin Cooperman.

8           So I just want to, you know, point out to the Court

9    because I think there's been a lot of, you know, bluster

10   about something, a lot of accusations and lot of assumptions,

11   and I just don't think sometimes they are consistent with the

12   facts of this case.

13          MR. BRODSKY:  Your Honor, most respectfully, on the

14   last point, we put in an affidavit.  Don't take my word for it

15   or my representation, although it was made in good faith and

16   has been made in good faith from the beginning, as an officer

17   of the court.

18          And don't take Mr. Paes' word for what we can do at

19   Gibson Dunn.  Take the word under sworn penalty of perjury of

20   Marc Schneider from Gibson, Dunn and Crutcher, who works as an

21   eDiscovery specialist in the practice group, who wrote a sworn

22   affidavit about exactly what we could or could not do in terms

23   of the documents that we received.  Nowhere does it say we

24   can't de-dupe on a basic level.  That was a red herring that

25   Mr. Paes just threw up and I just want to answer it because

```
 1    he's attacking our credibility, most respectfully.  The
 2    affidavit -- sworn affidavit by Marc Schneider, which Mr. Paes
 3    is suggesting is not true.
 4              THE COURT:  No, he's not.  He's just arguing that
 5    the bill of particulars motion and the information that it
 6    seeks is, in his view, attempting to limit and to impose
 7    burdens beyond what is required of the government.  He's not
 8    impugning anyone's integrity.  I didn't read it as a personal
 9    attack.
10              MR. BRODSKY:  Thank you.
11              THE COURT:  I think he is trying to make the point
12    that there is software out there and that a firm like yours
13    has access to the best available in the market for reviewing
14    volumes of documents.  There are -- it's a large firm with
15    many lawyers who are capable of devoting time and effort to
16    parsing through all the documents and preparing the case for
17    trial.  And I think he was trying to make a comparison -- and
18    I don't think he meant any disrespect to you or to Mr. Gibson
19    or to Mr. Brafman's firm, which is leaner and meaner, perhaps,
20    in terms of --
21              MR. BRAFMAN:  I'll take the meaner.
22              THE COURT:  -- and has managed to get along fine
23    with the government and there aren't as many issues.  That's
24    all he was saying.  I'm not --
25              MR. BRODSKY:  Understood, Your Honor.
```

1          THE COURT:  -- going to hold any of that against

2     anybody.

3          MR. BRODSKY:  Understood.  I did want to come to

4     Mr. Schneider's defense when he said to Your Honor in his

5     sworn affidavit that there were text-based searches that

6     couldn't capture all the emails or that there were handwritten

7     documents of poor quality that wouldn't be captured by

8     text-based searches.  I didn't want that to be missed.

9          So I appreciate Your Honor's comment, and I won't

10    take Mr. Paes as attacking Marc Schneider's credibility.

11         I did want to return, though, to the notice

12    requirement.  Why is it significant to Evan Greebel as to

13    whether or not the government is alleging in 2012, he knew

14    Mr. Shkreli made false statements to the SEC?  Well, in the

15    indictment, they allege that there's certain conduct that

16    occurred in 2012, and the purpose of that conduct, they allege

17    by Mr. Shkreli, is for the purposes of backing up false

18    statements allegedly made to the SEC.

19         Now, it is incredibly significant to us, Your Honor,

20    that if they have no evidence and they are not alleging -- and

21    they are not today, based on what they know today -- alleging

22    that Mr. Greebel knew in 2012 that Mr. Shkreli was making

23    these false statements, well, our defense changes.

24         If they were making that allegation, we would bring

25    forth to a jury before Your Honor evidence to expressly

```
 1    show -- we have to pull together the evidence.  It would take

 2    time.  It would take a few witnesses -- but we would

 3    definitely be able to affirmatively prove Mr. Greebel did not

 4    know Mr. Shkreli was allegedly making these false statements.

 5          That is time and resources and energy and fair

 6    notice that we're entitled to have.  That is an important

 7    point.  It's not a side point that we're asking here.  But a

 8    bill of particulars by definition -- by definition, of course

 9    by providing fair notice to the defense, limits the

10    government.  The government's position always happens to be

11    they always oppose a bill of particulars except in some cases.

12    They always say, we don't want to tell you all the

13    transactions we're interested in.  But it naturally limits the

14    defense -- the government, but we want fair notice, Your

15    Honor.

16          THE COURT:  He's made it clear that the indictment,

17    the superseding indictment defines the scope of the charges.

18    He's given you additional information.  He's correlated

19    documents, numbers and subjects with various allegations in

20    the superseding indictment, and I think that if you look at

21    the sum total of what he's got, he's provided and tried to

22    share with you -- you know, he's made disclosure that he

23    argues is adequate for you to defend Mr. Greebel.

24          Now, he also said today if he receives documents

25    indicating that Mr. Greebel knew certain issues in 2012, then
```

```
 1    maybe the charges would reflect that.  Maybe they would
 2    supersede.  I don't know.  That's what I heard him say.
 3              MR. BRODSKY:  Right, Your Honor.
 4              THE COURT:  So --
 5              MR. BRODSKY:  I understand that.
 6              THE COURT:  You're smart and savvy and you've also
 7    been a prosecutor and you know how indictments are framed and
 8    how the government provides discovery.
 9              And I would say that in this case, it appears to me
10    that the government has gone further than some prosecutors
11    who I've seen in terms of providing information and trying to
12    be forthright and transparent.  Although the charges and what
13    documents may assist you in defending your client, I haven't
14    ruled on the motion, but it's certainly under advisement and
15    you should expect a decision soon.
16              MR. BRODSKY:  Thank you, Your Honor.
17              And Your Honor, we thank you for the last conference
18    and with your help, we believe the government did narrow the
19    transactions to some of the documents that they provided to
20    us, which we appreciated and we totally understand.
21              THE COURT:  All right.  If the government can do
22    more, do more.  All right?  I know that, you know, sometimes
23    you are willing with some prompting or just on your own to
24    provide more to the defense, and you should do that.
25              MR. PAES:  Your Honor, we have.  I'll just give you
```

```
 1   one example, you know, where there are situations -- and this
 2   happened recently in not too -- what I meant, there was
 3   some -- getting a call, you know, there was some
 4   misunderstanding by Mr. Shkreli's counsel -- we believe some
 5   misunderstanding on some facts.  And you know, we called them.
 6   We provided the information, you know, not totally advocate a
 7   position, but hey, according to what we believe, you may have
 8   this fact wrong.  And we provided that information and told
 9   them that, because in the end -- look, we get they're headed
10   for trial.  We get, you know, zealous advocacy.  I believe
11   they're going to be headed there.  Each side will represent
12   their client as best as it can.
13          But I think if we don't argue and don't fight about
14   the things that don't really matter, I think we'll all benefit
15   from that, and I think we've tried to show that.  We tried to,
16   you know, provide information where we believe it was helpful
17   and at the same time obviously not hurting our own interest as
18   well, and what's required under the law.
19          THE COURT:  From their perspective, they're a
20   defendant and everything matters.  So to the extent you can
21   give them more without feeling that you are limiting your
22   ability to prosecute this case, do it.
23          MR. PAES:  And Your Honor, we have no issues with
24   doing that and I think the fact that you pointed out the
25   chart that we gave up and produced.  We did a lot of work to
```

1    put that together.

2              THE COURT:  Yes.  That was helpful to me.

3              MR. PAES:  And we did that and so, you know, while

4    we thought it wasn't required, we nonetheless did that.  And I

5    think that's an example of how we, you know, acted in this

6    case.

7              MR. BRODSKY:  Yes, Your Honor.  Thank you very much.

8    Thank you for your time.

9              THE COURT:  May I just ask one question of

10   Mr. Shapiro?  I have this September 2015 waiver letter.  Are

11   there other letters I should be aware of?

12             MR. SHAPIRO:  That address the waiver?

13             THE COURT:  Uh-hum (affirmative response).

14             MR. SHAPIRO:  Not that I can recall, but I will go

15   back and check.

16             THE COURT:  I think you refer to one that was

17   attached to Katten's letter.  Was it in July, that waiver

18   letter?

19             MR. VERDE:  That's the same one.

20             THE COURT:  Okay.  Thank you.

21             MR. SHAPIRO:  The letter that defines the scope of

22   the waiver.

23             THE COURT:  But then you said you also included

24   other things in your waiver at the government's request and

25   are there letters that reflect that?

1            MR. SHAPIRO:  No.  In July of 2015, we made a

2     supplemental production in a separate civil case, because as a

3     result of the waiver, there were documents that were withheld

4     in that civil case as privileged, which we then realized that

5     we had to produce in that civil case in the Southern District.

6            THE COURT:  So by Monday, you will --

7            MR. SHAPIRO:  The bills.

8            THE COURT:  -- let Katten know whether they can

9     provide the billing records to all interested parties, the two

10    defendants and the government?  And you will -- I mean, I can

11    give you a deadline, but I want to be realistic, but you need

12    to go over to Katten and review those documents and use

13    whatever search terms you need to facilitate and expedite

14    that, but I'm going to expect that within two weeks, we have

15    something definite from you.

16           MR. SHAPIRO:  Sure.

17           THE COURT:  So by -- today is November 22nd, and in

18    two weeks, that brings us to December 6th.

19           MR. SHAPIRO:  That's fine, Your Honor.

20           THE COURT:  So you will provide something in writing

21    to Katten, the government, Mr. Greebel's attorney,

22    Mr. Shkreli's attorney and file it with the Court.  All right?

23           MR. SHAPIRO:  That's fine.

24           THE COURT:  All right.  Thank you.  I appreciate

25    that.  Everybody have a good Thanksgiving.

1          MR. BRAFMAN:  Thank you, Your Honor.

2          (Proceedings concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25