# Exhibit 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                                     12 Cr. 245 (ADS) (GRB)

      -against-

                                                     ECF CASE

ERIC ARONSON,
VINCENT BUONAURO and
FREDRIC AARON,

                    Defendants.
--------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT FREDRIC AARON'S MOTION FOR A SEVERANCE

Elkan Abramowitz
Robert M. Radick
Dana Delger
MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Fredric Aaron*

Dated: February 8, 2013
       New York, New York

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT ................................................................................................................... 10

    I.      Severance Should Be Granted Because Mr. Aaron and Aronson Can
          Be Expected to Present Mutually Antagonistic Defenses ......................... 10

    II.     Severance Should Be Granted Because, Even Accepting the
          Government's Allegations, Mr. Aaron Played Only a Peripheral Role
          in Aronson's Extended, Wide-Reaching Fraud ......................................... 14

CONCLUSION ................................................................................................................. 17

i

Case 2:15-cr-00687-ADS-GRB   Document 160-1   Filed 02/17/17   Page 4 of 22 PageID #: 1309

# TABLE OF AUTHORITIES

## CASES

*United States v. Barret*, 824 F. Supp. 2d 419 (E.D.N.Y. 2011) ....................................................14

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) ...............................14

*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991) ......................................................13, 15

*United States v. Carpentier*, 689 F.2d 21 (2d Cir. 1982) ...........................................................13

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) .......................................................13

*United States v. DiNome*, 954 F.2d 83 (2d Cir. 1992)................................................................15

*United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987)........................................................10

*United States v. Ramos*, 346 F. Supp. 2d 567 (S.D.N.Y. 2004) ..................................................10

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) .....................................................................10

*United States v. Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994)........................................................10

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..................................................................13

*Williamson v. United States*, 207 U.S. 425 (1908) .....................................................................14

*Zafiro v. United States*, 506 U.S. 534 (1993) ...........................................................10, 13, 14, 16

## RULES

Fed. R. Crim. P. 14(a)......................................................................................................................1

Defendant Fredric Aaron respectfully submits this memorandum of law in support of his motion for a severance pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

In April 2012, Fredric Aaron was charged along with Eric Aronson and Vincent Buonauro in an alleged fraudulent investment scheme that Aronson orchestrated, executed, and directed. In the ten months that have passed since the indictment was handed up, Mr. Aaron – who has his own law practice and an unblemished record that he earned through over 20 years of hard work – has quietly waited to clear his name. Indeed, as the government slowly produced voluminous discovery (including extensive tape recordings that Aronson secretly made and which were only recently obtained from the Securities and Exchange Commission in connection with a related case, despite a request made to the U.S. Attorney's Office months before), Mr. Aaron has been patiently reviewing the materials he was provided and anticipating his ultimate trial day and his hoped-for vindication. For these past ten months, Mr. Aaron has looked forward to the time when he could show that, far from being a criminal or a fraudster, he acted in good faith as Aronson cynically deceived him, manipulated him, and took advantage of his earnestness in order to pacify the very same investors whom Mr. Aaron genuinely sought to help. For these ten months, Mr. Aaron looked forward to what he has presumed to be the approaching day when he could finally clear his name, put this matter behind him, and devote himself again to his wife, his family, and the law practice that supports them.

Yet in just the last several months, through no fault of his own, Mr. Aaron's hopes of arriving at a prompt and just conclusion to this matter have darkened significantly. In

fact, just as Mr. Aaron has come to find himself before this Court in the first place because of the perfidy and deceit of Eric Aronson, Mr. Aaron's desire for a prompt and fair trial are now being jeopardized again by Aronson's relentless pattern of misconduct.

As the Court undoubtedly recalls, Aronson (who already has a prior fraud conviction from another case) recently violated the conditions of his release by perpetrating still another fraud scheme while on bail, was ordered remanded after a lengthy hearing, deceived and took advantage of the criminal defense attorney who long represented him in this matter, and then tried to evade justice by failing to surrender on the date set by the Court. Further, as a result of this pattern of misconduct, Aronson created a conflict with his prior attorney, which resulted in his being assigned a new lawyer and creating significant further delay in the trial of this matter while his new attorney (appropriately) seeks to review the extensive discovery and arrive at an understanding of the issues that underlie the case. In light of these recent events, Mr. Aaron is now compelled to take a different approach and seek a severance in order to vindicate his rights to a fair and prompt trial.

Indeed, even setting aside the issue of delay, the cumulative weight of a number of critical factors requires that this Court grant Mr. Aaron's motion to be tried separately from Aronson, as only a severance can prevent the fundamental unfairness that will result if Mr. Aaron is tried with Aronson.

*First*, based in part on the recordings that we have recently received, there can be little doubt about the nature of Aronson's plan for defending this matter: he intends to scapegoat Mr. Aaron by relying on a meritless advice-of-counsel defense. This tactic, however, is in fundamental conflict with the good-faith defense that Mr. Aaron intends to

2

offer. As mentioned above, Mr. Aaron intends to show at trial that, far from knowingly advising Aronson with respect to what now appears to have been a scheme to defraud, he was just one in a series of lawyers whom Aronson has manipulated, lied to, and taken advantage of for their good faith. In a joint trial in this matter, a jury could not reasonably be expected simultaneously to give fair consideration to Mr. Aaron's defense that he was used, misled, and deceived by Aronson, and at the same time assess Aronson's expected attempt to shift the blame to Mr. Aaron through an advice-of-counsel defense. In other words, given these fundamentally incompatible defenses, it would be difficult, if not impossible, for a single jury to credit one such defense without automatically rejecting the other. In such a circumstance, the governing case law in this Circuit requires a severance.

*Second*, from the face of the indictment, the disparity between Aronson's involvement and Mr. Aaron's alleged involvement is plain. The bulk of the allegations in the indictment relate to Aronson's role as the organizer of the investment scheme that involved his various companies. The indictment and the discovery show Mr. Aaron to be only a tangential figure in Aronson's multi-faceted fraud: much of the alleged conduct that is critical to the indictment occurred well before Mr. Aaron had ever met Aronson or become the attorney for him and his companies. Thus, if tried with Aronson, Mr. Aaron will be unfairly tainted by the scope and quantity of the evidence against Aronson, the vast majority of which may be entirely inadmissible if Mr. Aaron were tried alone.

Moreover, for reasons that appear to be the inevitable consequence of Aronson's efforts to misuse his prior criminal defense attorney, pay that counsel with the proceeds of a fraud, and have that counsel secure a delay in the surrender date imposed after

3

Aronson violated his bail conditions – thereby unwittingly giving Aronson time to

attempt to escape justice – the Court recently granted the motion of that prior attorney to

withdraw from his representation of Aronson.  Perhaps if this case were less complex, the

delay engendered by this substitution of counsel would be modest and would not

occasion or support a motion to sever, as new counsel could reasonably be expected to

master the facts and promptly be ready for trial.  Here, though, where there are tens of

thousands of documents, complicated allegations that span the course of many years, and

hundreds of hours of tape recordings made by Aronson - which his new counsel will now

need to review – Mr. Aaron's desire to proceed expeditiously to trial would be unduly

prejudiced were he to remain bound to Aronson's now-delayed schedule.

## STATEMENT OF FACTS

On October 4, 2011, in a Complaint that was filed in the Eastern District of New

York, the government charged Eric Aronson and two alleged co-conspirators with fraud

relating to a series of Aronson's companies that were in the business of marketing and

selling a new type of water-permeable paving stone.  (See Decl. of Elkan Abramowitz,

dated Feb. 8, 2013 ("Abramowitz Decl."), Ex. 1 (Compl. [Docket #1], No. 12 Cr. 245

(ADS), filed Oct. 4, 2011).)  Fredric Aaron was not charged in this Complaint, and it was

not until six months later, when an Indictment was filed on April 4, 2012, that Mr. Aaron

was brought into the ambit of the government's case against Aronson – and even then, in

a comparatively minor role.  (See Abramowitz Decl. Ex. 2 (Indictment [Docket #55], No.

12 Cr. 245 (ADS), filed Apr. 4, 2012).)

In the Indictment filed against Aronson, Mr. Aaron, and a third defendant,

Vincent Buonauro, the government alleged that between 2006 and 2010, Aronson used

the various businesses he controlled (collectively, the "Permapave Entities" or the "Entities") as a means to perpetrate a scheme to defraud his investors. For instance, the Indictment alleges that Aronson "caused cash withdrawals to be made from accounts holding investor funds and converted that cash for his personal use," "falsely told investors in 2009 that he had 'finalized an agreement with the city of Augusta, Georgia' to install Permapave products," and, along with co-defendant Buonauro, "sent a letter to investors claiming that 'through May 12, 2008, we ordered approximately $5,400,000 of Permapave product,' which, if true, would generate an expected $1 million gross profit." (See Indictment ¶¶ 9(b), 13, 20(a)). Further, each of the money laundering allegations relates to Aronson alone, not Aaron or Buonauro. In fact, Mr. Aaron is not alleged to have taken any actions independent of Aronson's direction, and was not even employed by Aronson during the period when half of the overt acts named in the indictment were allegedly committed.

Certain facts alleged in the Indictment regarding Aronson's conduct are not in dispute: promissory notes were issued to raise funds for an investment in water-permeable paving stones; Aronson did not pay back these investors in a timely manner, and appears to have used their funds for his own personal gain; investors in the Permapave Entities were offered the opportunity to exchange their promissory notes first for convertible debentures issued by another of Aronson's companies, Permeable Solutions, Inc. ("PSI"), then for PSI common stock, and then for stock in Interlink, a publicly-traded company that was acquired by PSI in a reverse merger. (See Indictment ¶¶ 1-17.) Yet it was not until October 2008, well after Aronson had committed many of the acts that underlie the government's case against him – for instance, issuing

promissory notes with exorbitant rates of interest, defaulting on those notes, and using investors' funds to pay back earlier investors and benefit himself – that Aronson retained Mr. Aaron to perform legal work on behalf of the Permapave Entities.

Based on documents he was shown and representations that were made to him, Mr. Aaron had every reason to believe that Aronson's operation was above-board. Aronson presented to Mr. Aaron the same misleading picture he had presented to investors and to his previous lawyers: that the Permapave Entities were a vibrant and growing enterprise with a valuable and sought-after new product, that extensive product orders had already been received, and that multiple investors wished to purchase the Entities for millions of dollars. Based on these understandings, Mr. Aaron – acting at Aronson's behest – tried to restructure the Permapave Entities' debts in a way that he believed would ultimately benefit both the Entities and their investors. Acting in good faith, Mr. Aaron counseled the investors as they were given the option of transitioning from promissory notes  issued by Aronson's various companies, to convertible debentures (issued by PSI), to equity in Aronson's companies (first PSI, then Interlink). However, despite his good intentions, Mr. Aaron ultimately found himself a defendant in this criminal case.

In the time since Mr. Aaron was indicted, the government has gradually and sporadically made the productions required by Rule 16, and in some instances has allowed the SEC to fulfill the discovery obligations that the government itself should have satisfied. (Two days after the criminal complaint was filed in this matter, a civil complaint containing similar factual allegations and naming Aronson, Mr. Aaron, and others as defendants was filed by the SEC in the United States District Court for the

Southern District of New York and assigned to the Hon. Jed Rakoff, U.S.D.J. <u>See</u>
Abramowitz Decl. Ex. 3 (Compl. [Docket #1], No. 11 Civ. 7033 (JSR) (S.D.N.Y.), filed
Oct. 6, 2011).) In particular, the government made significant, though apparently
incomplete, productions on July 27, 2012; September 6, 2012; and most recently, January
24, 2013. None of these productions contained the substantial audio recordings made by
Aronson during the time periods relevant to the indictment; these were disclosed to Mr.
Aaron by the SEC on November 9, 2012.

Based on this discovery (including, most notably, the recordings produced by the
SEC), we fully expect Aronson to invoke the defense that he appears to have long
planned to fall back upon if and when the end of his scheme finally came – namely, that
any fraudulent intent or other misconduct on his part can somehow be excused because of
his purported "reliance" on the advice of professionals such as Mr. Aaron. The tapes that
have recently been obtained from the SEC, which Aronson personally made using a
recording program that he apparently had installed on his work computer, reveal that
Aronson began setting up his defense from the moment he retained Mr. Aaron. The tapes
show Aronson soliciting Mr. Aaron's approval of his actions; claiming (falsely) that he
had provided Mr. Aaron with the information necessary to Mr. Aaron's provision of legal
advice; and speaking cynically about his own supposed desire to make up for his past
misdeeds and stay on the straight-and-narrow to avoid ever again facing the kinds of
criminal charges that he was convicted of once before.

Although it is now abundantly clear that Mr. Aaron was dragooned into
Aronson's fraud and exploited for his candid demeanor and his lack of guile, at no point
while he was affiliated with Aronson did Mr. Aaron know that Aronson's representations

were untrue. Indeed, Mr. Aaron could not have known of the scope or nature of the fraud that Aronson apparently was committing. As the history of this case and the pending SEC matter make clear, Aronson regularly provided his lawyers, including Mr. Aaron, with incomplete and inaccurate information, withheld other information and documents, and manipulated his attorneys to take advantage of the credibility that they provided. Aronson even went so far as to solicit two opinion letters from Mr. Aaron attesting to the bona fides of the Permapave Entities – without, of course, having given Mr. Aaron full and accurate information about the operations of those businesses. (See Abramowitz Decl. Ex. 4 (Mem. from Fredric H. Aaron, Esq. to Eric J. Aronson, dated Apr. 29, 2009 ("April 2009 Opinion Letter")) & Abramowitz Decl. Ex. 5 (Mem. from Fredric H. Aaron, Esq. to Eric J. Aronson, dated July 17, 2009 ("July 2009 Opinion Letter")).)

Another striking example of Aronson's attempts to misuse his counsel was revealed in the SEC's relatively recent deposition of Charles Hecht, who had previously provided legal counsel to Aronson and his companies. The transcript of Mr. Hecht's testimony, cited at greater length below (see Argument, Part I, infra), demonstrates that Aronson repeatedly failed to fulfill promises to provide Mr. Hecht and his colleagues with relevant documentation and other information necessary for Mr. Hecht's firm to perform due diligence in connection with a private placement memorandum that Aronson sought.

And, as this Court well knows, Aronson's pattern of dishonesty with his attorneys has not abated even during the pendency of this case. In November 2012, the government moved to revoke Aronson's bail based on evidence showing that Aronson had committed yet another fraud while awaiting trial. During the course of the bail

revocation hearing, it was also revealed that Aronson had used the offices of his then-attorney to host meetings in furtherance of that new fraud entirely without that attorney's knowledge or consent. (See Abramowitz Decl. Ex. 6 (Excerpt from Tr. of Bail Revocation Hr'g ("Bail Revocation Hr'g Tr.")), at 345:1-348:7.) The evidence during the hearing further demonstrated that Aronson intended to use the proceeds of his latest fraud in order to pay his then-counsel's attorneys' fees.

In a ruling from the bench on the final day of the hearing, the Court granted the Government's motion to revoke Aronson's bail. (See id. at 492:5-496:25.) After subsequently having his then-attorney argue for and secure a delay in the surrender date, Aronson betrayed that attorney – and this Court – by failing to surrender and attempting to evade the Court's jurisdiction.

Not long thereafter, on December 27, 2012, the Court granted the *ex parte*, sealed motion of Aronson's counsel to withdraw as attorney of record. (See Abramowitz Decl. Ex. 7 (Order [Docket #133], No. 12 Cr. 245 (ADS), dated Dec. 27, 2012), at 2.) Aronson was appointed a new attorney at a hearing on January 25, 2013, and that new counsel (Paul Rinaldo) is now reviewing the extensive discovery that has been provided in this matter.

**LEGAL STANDARD**

A court has the discretion to grant a severance where the joinder of multiple defendants "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). The Supreme Court has explained that "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," then a motion for severance should

be granted.  Zafiro v. United States, 506 U.S. 534, 539 (1993); see also United States v.

Rosa, 11 F.3d 315, 341 (2d Cir. 1993).

      Courts in the Second Circuit must consider several factors in deciding whether

severance is warranted under Rule 14.  The relevant factors include:

> (1) the number of defendants and the number of counts;
> (2) the complexity of the indictment; (3) the estimated
> length of the trial; (4) disparities in the degrees of
> involvement by defendants in the overall scheme;
> (5) possible conflict between various defense theories; and
> (6) prejudice resulting from evidence admissible as to some
> defendants, but not others.

United States v. Ramos, 346 F. Supp. 2d 567, 569-70 (S.D.N.Y. 2004) (citing United

States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987)).  A severance is warranted when

the weight of any one factor, or the weight of multiple factors taken together, suggests

that a defendant's constitutional right could be compromised by a joint trial.  United

States v. Upton, 856 F. Supp. 727, 736 (E.D.N.Y. 1994); United States v. Barret, 824 F.

Supp. 2d 419, 433-34 (E.D.N.Y. 2011) ("The determination of whether such prejudice

exists is highly fact-specific and must be evaluated on a case-by-case basis.").

### ARGUMENT

      In this case, two factors strongly counsel in favor of severance.  Moreover, when

assessed together, these factors lead to the ineluctable conclusion that only a severance

can ensure a fair trial and prevent the prejudice that a joint trial would bring.

### I.    Severance Should Be Granted Because Mr. Aaron and Aronson Can Be Expected to Present Mutually Antagonistic Defenses

      The defense that Mr. Aaron intends to advance at trial is a simple one:  he was

entirely unaware of the existence of Aronson's fraud because Aronson had lied to him

and actively prevented him from learning the truth about Aronson's business practices

from the outset of their relationship.  Everything that Mr. Aaron did on behalf of Aronson – speaking to investors, creating new entities, and so on – he did with the utmost good faith.

It is our full expectation that Aronson's defense, at least in part, will be that he relied on the advice of his attorneys, including Mr. Aaron, in supposedly forming the belief that his business practices were legitimate.  Indeed, there is much evidence that points to the likelihood that Aronson will attempt to pin the blame on Mr. Aaron through an advice-of-counsel defense.

First, Aronson repeatedly sought written documents from his attorneys stating that the business endeavors of the Permapave Entities were legitimate, but did not provide those attorneys with accurate information upon which to base their opinions.  This includes Mr. Aaron, who would not have offered the opinions Aronson sought had Aronson provided him with a complete and accurate record of his businesses.  (See April 2009 Opinion Letter, at 1-2 ("You have requested that I provide you with my observations and legal opinion as to the conduct of your business. . . . Please note that my opinions expressed herein are based solely on my personal observations, conversations with employees and consultants, and review of documents. . . . While there have been problems with your business . . . these appear to be the normal growing pains of a new company and not part of a nefarious scheme."); July 2009 Opinion Letter, at 2 ("During my engagement as your attorney, I have learned of various rumors, allegations and innuendos that your businesses are a sham and that this is a Ponzi scheme. . . . However, to date, I have not seen any evidence to substantiate these claims.").)  As noted above,

Aronson also secretly recorded his conversations with Mr. Aaron and others, for the transparent purpose of attempting to bolster a potential advice-of-counsel defense.

Likewise, evidence elicited in the course of the related SEC civil enforcement action, currently pending in the Southern District of New York, demonstrates that Aronson also sought to obtain approval of the actions of the Permapave Entities from another former attorney, Charles Hecht. Mr. Hecht testified that Aronson was neither forthcoming, honest, nor candid with him or his colleagues – including when Aronson asked Mr. Hecht to perform due diligence in connection with a private placement memorandum. (See Abramowitz Decl. Ex. 8 (Tr. of Dep. of Charles J. Hecht, dated Oct. 17, 2012 ("Hecht Tr.")), at 113:10-115:23; 145:7-148:21.) This evidence suggests that Aronson, a recidivist offender, was deceitfully setting up his lawyers as prophylaxes for the day when he would have to answer for his misdeeds.

Second, Aronson's history of improperly using his lawyers for his own benefit extends beyond the business of the Permapave Entities. In December 2000, Aronson pled guilty in the Southern District of New York to an Information charging him with wire, mail, and securities fraud. (See Abramowitz Decl. Ex. 9 (Judgment [Docket #64], No. S2 98 Cr. 564 (DAB) (S.D.N.Y.), filed Dec. 18, 2000).) Among other things, the Information alleged that Aronson "attempted to persuade [his] Attorney" to allow a victim of his fraud to make a loan, but

> failed to advise the Attorney that (1) he was under indictment on charges of, among other things, securities fraud; (2) SRNI [the business of which Aronson was Chairman and CEO] did not have sufficient accounts receivable or inventory to secure the loan; and (3) SRNI owed millions of dollars to its defrauded investors.

12

(Abramowitz Decl. Ex. 10 (Information [Docket #51], No. S2 98 Cr. 564 (DAB) (S.D.N.Y.), filed Sept. 27, 1999), at 11.)

More recently, as this Court is aware, Aronson also lied to and manipulated the very attorney who previously represented him in this matter. While free on bail in 2012 after having been arrested in connection with this criminal case, Aronson was limited by the conditions of his bail to traveling to a small number of places other than his home – among them, his attorney's office, for the purpose of preparing his legal defense. However, evidence elicited at the bail revocation hearing held by this Court demonstrated that Aronson traveled to his prior attorney's office on numerous occasions, apparently without that attorney's knowledge, for the purpose of meeting with individuals whom Aronson intended (as is his wont) to defraud. (See Bail Revocation Hr'g Tr., at 345:1-348:7.)

These facts, and particularly the advice-of-counsel defense that Aronson evidently intends to advance, demonstrate that severance is necessary. In this case, "in order to believe one defendant, [the jury] 'must necessarily disbelieve the testimony offered on behalf of his co-defendant.'" United States v. Casamento, 887 F.2d 1141, 1153 (2d Cir. 1989) (quoting United States v. Carpenter, 689 F.2d 21, 28 (2d Cir. 1982)). Put another way, Aaron and Aronson's defenses are mutually antagonistic, because accepting one defense requires that "the jury must of necessity convict a second defendant." Cardascia, 951 F.2d at 484; see also Zafiro, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant"); see also United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003).

In a trial in this matter, Aronson can advance a reliance-on-counsel defense only if he fully and truthfully apprised his counsel of all relevant facts necessary for counsel to arrive at and offer an informed opinion as to the legality of Aronson's conduct. See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1194 (2d Cir. 1989) ("[A] defendant who would rely on an advice-of-counsel defense is required to have disclosed all pertinent information in his possession to his attorney[.]") (citing Williamson v. United States, 207 U.S. 425, 453 (1908)). Mr. Aaron's defense is precisely the opposite: that Aronson lied to him about virtually every material fact of his business, and did so even while soliciting Mr. Aaron's opinion that Aronson's behavior was proper. In a joint trial, a reasonable jury could not believe that Aronson had fully and accurately informed Mr. Aaron of all pertinent facts, and simultaneously believe that Aronson had lied to and misled Mr. Aaron about those very same facts. That is, the jury could not accept the different defenses that the two co-defendants would be advancing were Mr. Aaron and Aronson to remain joined for trial. Severance, as a result, must be granted.

## II.   Severance Should Be Granted Because, Even Accepting the Government's Allegations, Mr. Aaron Played Only a Peripheral Role in Aronson's Extended, Wide-Reaching Fraud

In Zafiro, the Supreme Court noted that the risk of proceeding with a joint trial is "heightened" where, as here, co-defendants "have markedly different degrees of culpability." 506 U.S. at 539. Indeed, "[t]here are some instances in which severance is necessary because the volume of irrelevant evidence to be adduced at trial against one defendant is grossly disproportional to that of his or her co-defendants." Barret, 824 F. Supp. 2d at 433-34. The Second Circuit has similarly found the failure to grant severance to be reversible error when one defendant is "swamped" by a "mass of irrelevant

14

evidence" introduced against other co-defendants. United States v. DiNome, 954 F.2d
839, 844-45 (2d Cir. 1992). Precedent from the Second Circuit further instructs that there
exists the danger of a defendant "suffer[ing] some prejudice" if he is "forced to sit before
the jury" while evidence is introduced about the bad acts of his co-defendant – acts with
which he, himself, was not involved. United States v. Cardascia, 951 F.2d 474, 483 (2d
Cir. 1991).

A joint trial in this matter implicates each of these fundamental concerns. At its
core, the pending indictment arises from the actions of Eric Aronson, a fraudster and
recidivist so brazen that after having been imprisoned for one fraud, and arrested and
indicted in connection with a second, he attempted to perpetrate a third while out on bail.
In fact, the indictment alleges that the second of these frauds – the one charged in this
case – began as a Ponzi scheme in which Aronson solicited investor moneys, paid those
investors with funds raised from subsequent investors, and siphoned off the remaining
profits for his own gain. The proceedings and evidence in this matter, and in the parallel
SEC matter pending in the Southern District of New York, further suggest that Aronson
regularly seeks to use his lawyers as pawns in his various machinations. In this case in
particular, the evidence shows that Aronson used Mr. Aaron's apparent candor, rectitude,
and decency as a tool for deceiving and forestalling his various disappointed investors.

As we expect the evidence will show, and as we will advance in any trial in this
matter, Mr. Aaron was not in league with Eric Aronson in the frauds and crimes that
Aronson committed. In light of these circumstances and the defenses that Mr. Aaron will
advance, it would be unjust for his trial – and his fate – to be enmeshed with that of

Aronson, the inveterate schemer who manipulated Aaron into this situation in the first place, and as to whom an overwhelming body of incriminating evidence appears to exist.

Further, many of the overt acts charged against Aronson in the indictment occurred prior to October 2008, which is the first time that Mr. Aaron ever even met or dealt with Aronson. Evidence relating to this period would likely be inadmissible against Mr. Aaron if he were to be tried alone, and the spillover prejudice that would result from the admission of such evidence would be neither appropriate, nor necessary, nor curable.

In a trial against Eric Aronson (and thus against Mr. Aaron as well, unless a severance is granted), we also expect that the government would seek to introduce still more facts that would unduly prejudice Mr. Aaron. In particular, we expect that the government would seek to show that Aronson: (1) was previously convicted of securities fraud and sentenced to forty months imprisonment, (2) perpetrated yet another fraud in 2012 while free on bail, which fraud did not involve Mr. Aaron in any way; and (3) attempted to evade justice by fleeing after having been ordered to surrender for violating his conditions of release.

In a trial of Aronson alone, these facts may well be relevant and admissible to show factors such as Aronson's intent, lack of mistake, and consciousness of guilt. In a joint trial, however, the introduction of these facts against Aronson – while Mr. Aaron sits beside him in the judgment of the same jury – would cause unfair spillover prejudice towards Mr. Aaron and significantly encumber the jury's ability to "make a reliable judgment about [Aaron's] guilt or innocence." Zafiro, 506 U.S. at 539. This, in turn, would impermissibly "compromise [Aaron's] specific trial right" to be judged only on evidence admissible against, and relevant to, him alone. Id. Severance is the one failsafe

in situations as this one, as it is solely through severance that the prejudicial nature of otherwise inadmissible evidence can be kept from improperly spilling over onto Mr. Aaron and tainting the jury's ability to reach a fair and appropriate verdict.

## CONCLUSION

For the reasons stated above, Defendant Fredric Aaron respectfully requests that this Court grant his motion for a severance.

Dated: February 8, 2013
       New York, New York

By: *Elkan Abramowitz /law*
    Elkan Abramowitz
    Robert M. Radick
    Dana M. Delger
    *Attorneys for Fredric Aaron*
    MORVILLO ABRAMOWITZ
    GRAND IASON & ANELLO P.C.
    565 Fifth Avenue
    New York, New York 10017
    (212) 856-9600

# CERTIFICATE OF SERVICE

I hereby certify that, on February 8, 2013, I caused true copies of the foregoing document to be served via ECF upon the following persons:

William Patrick Campos, Esq.
Assistant United States Attorney
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6104

Paul Peter Rinaldo, Esq
*Attorney for Eric Aronson*
Grossman & Rinaldo
108-18 Queens Boulevard, Suite 5
Forest Hills, New York 11375
718-520-8722

Marc S. Gottlieb
*Attorney for Vincent Buonauro*
Sanders Ortoli et al.
501 Madison Ave., 14th Floor
New York, New York 10022
212-829-8943

Dated: February 8, 2013
New York, New York

Robert M. Radick