WMP:JMK/AES/GKS
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        15 CR 637 (KAM)

MARTIN SHKRELI and
EVAN GREEBEL,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN RESPONSE TO THE DEFENDANTS' SEVERANCE MOTIONS

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

WINSTON M. PAES
JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
    (Of Counsel)

<u>**PRELIMINARY STATEMENT**</u>

The government submits this memorandum of law in response to (1) the defendant Martin Shkreli's memorandum of law, dated February 17, 2017 (Dkt. No. 161), in support of his motion for severance ("Shkreli Br."), and (2) the defendant Evan Greebel's memorandum of law, dated February 17, 2017 (Dkt. No. 163), in support of his motion for severance ("Greebel Br."). For the reasons set forth below, the defendants' motions should be denied.

<u>**STATEMENT OF FACTS**</u>

**I.      <u>Defendants and Key Entities</u>**

The defendant Martin Shkreli was a hedge fund manager and Chief Executive Officer ("CEO") of Retrophin, Inc., a publicly-traded company.  Beginning in 2006, Shkreli was the managing member and portfolio manager of Elea Capital Management ("Elea"), a hedge fund located in New York, New York.  Within approximately a year, Shkreli had lost all of the investor money in Elea and had to liquidate the fund.

Beginning in approximately 2009 and continuing until approximately 2012, Shkreli founded, and then served as the managing member and portfolio member for, two separate hedge funds based in New York that focused their investments in the healthcare sector:  MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare").  During this time period, starting in approximately 2011, Shkreli also founded a biopharmaceutical company called Retrophin LLC.   Retrophin LLC later became Retrophin, Inc. ("Retrophin" or "RTRX"), and became a publicly-traded company via a reverse merger with a shell company called Desert Gateway, Inc. ("Desert Gateway") in December 2012.   From approximately December 2012 to September 2014, Shkreli served as the CEO of Retrophin, which was ultimately a publicly-traded company on the NASDAQ exchange.

The defendant Evan Greebel was an attorney licensed to practice law in New York and a law partner in the New York office of Katten Muchin Rosenman LLP ("Katten").  From approximately February 2011 to September 2014, Greebel served as lead outside counsel to Retrophin.  Greebel also served as counsel to the MSMB entities, and was the Principal Attorney at Katten for all matters related to the MSMB entities and Retrophin.

## II.    The Fraudulent Schemes[1]

### A.    The MSMB Capital Hedge Fund Scheme

Following the collapse of Elea Capital, in approximately 2009, Shkreli and Co-Conspirator 1 founded MSMB Capital.  To induce investments in MSMB Capital, Shkreli and Co-Conspirator 1 made a series of misrepresentations to potential investors, including that (i) MSMB Capital had monthly liquidity; (ii) MSMB Capital had retained independent certified public accountants as auditors; (iii) Shkreli had a successful track record as a hedge fund manager; and (iv) the fund had substantial assets under management ("AUM").  Based on such misrepresentations, between approximately September 2009 and January 2011, eight investors (the "Capital Limited Partners") invested a total of $3 million in MSMB Capital.

Subsequently, on or about February 1, 2011, Shkreli entered into a large short sale position in Orexigen Therapeutics, Inc. ("OREX") in MSMB Capital's brokerage account at Merrill, Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch").  MSMB Capital was unable to locate OREX shares to cover the position; as a result, Merrill Lynch suffered a loss of more than $7 million.  In addition, MSMB Capital suffered more than $1 million in other trading

---

[1] The four fraudulent schemes are described in greater detail in the Superseding Indictment at paragraphs 8 to 40, as well as the government's September 30, 2016 memorandum of law in opposition to the defendants' discovery motions. (Dkt. No. 90, at 3-10).  Individuals are identified here by the same terms as in the Superseding Indictment.

losses in approximately February 2011.  By the end of February 2011, MSMB Capital had approximately $58,500 remaining in its bank and brokerage accounts.

Shkreli concealed from the Capital Limited Partners the fact that he had lost all of the money they had invested in MSMB Capital.  For more than a year following the complete loss of the investments in MSMB Capital and the end of trading activity, Shkreli continued to send fabricated performance updates to the Capital Limited Partners that touted profits of as high as forty percent since inception.  Then, in September 2012, Shkreli told the Capital Limited Partners in an email (the "Liquidation Email") that he had "decided to wind down" both MSMB Capital and MSMB Healthcare and falsely stated that the original MSMB investors had "just about doubled their money net of fees."  Additionally, even though the MSMB entities had essentially no liquid assets, Shkreli falsely advised the Capital Limited Partners that they could redeem their limited partnership interests for cash, Retrophin shares, or a combination of both.

Approximately one week prior to sending the Liquidation Email, Shkreli, Co-Conspirator 1 and MSMB Capital entered into a settlement agreement with Merrill Lynch in connection with the OREX trading losses and agreed to pay Merrill Lynch a total of $1,350,000 on or before December 15, 2012.  In stark contrast to the false information provided to the Capital Limited Partners, Shkreli and Co-Conspirator 1 stated in the settlement agreement that MSMB Capital had $0 in assets.

**B.     The MSMB Healthcare Hedge Fund Scheme**

Following the collapse of MSMB Capital after the failed OREX trade, Shkreli founded MSMB Healthcare.  From approximately February 2011 to November 2012, Shkreli and others solicited investments in MSMB Healthcare from potential investors based on material misrepresentations and omissions.  Once MSMB Healthcare was operational, Shkreli continued to

3

make misrepresentations and omissions to MSMB Healthcare's investors (the "Healthcare Limited Partners") in order to prevent them from redeeming their investments.  These misrepresentations and omissions included, inter alia, that: (i) Shkreli had a successful track record as a hedge fund manager; (ii) MSMB Capital was a successful hedge fund; and (iii) MSMB Healthcare had substantial AUM (far in excess of the actual value of the fund).  As with MSMB Capital, Shkreli and others misappropriated funds from MSMB Healthcare by withdrawing funds from the hedge fund far in excess of the fees permitted under the partnership agreement for the fund.

Additionally, without the Healthcare Limited Partners' knowledge or consent, Shkreli improperly used MSMB Healthcare assets to pay for obligations that were not the responsibility of MSMB Healthcare.  For example, Shkreli caused assets from MSMB Healthcare to be used to pay a portion of the Merrill Lynch settlement (owed by MSMB Capital, Shkreli and Co-Conspirator 1).  Specifically, Shkreli improperly reclassified a $900,000 equity investment by MSMB Healthcare into Retrophin LLC as an interest-bearing loan via a back-dated promissory note; he subsequently caused Retrophin to "repay" the loan to MSMB Healthcare, and then funneled a total of $898,000 from that "repayment" to Merrill Lynch.

## C.    The Retrophin Misappropriation Scheme

Shkreli primarily raised capital for Retrophin by causing MSMB Healthcare to invest significant sums into Retrophin between 2011 and mid-2012.  Those investments were reflected in Retrophin's capitalization table, which was maintained by Greebel.  As of September 2012, the capitalization table showed that MSMB Healthcare had invested approximately $2.1 million into Retrophin; it also indicated that MSMB Capital had not invested any money in Retrophin.

By the fall of 2012, Shkreli and Greebel were preparing to take Retrophin public, and Shkreli announced to the MSMB investors that he was winding down the funds in the Liquidation Email.  However, as detailed above, MSMB Capital had no funds that could be used to repay the Capital Limited Partners, let alone at the falsely inflated rates of return that Shkreli had been reporting for years.  Similarly, although MSMB Healthcare had invested in Retrophin – and, as a result, Healthcare Limited Partners would be entitled to receive some Retrophin stock at the time that the company went public, if it was able to do so – Shkreli did not have the cash to provide redemptions to those Healthcare Limited Partners who did not wish to receive Retrophin stock, as he had overvalued MSMB Healthcare's investment in Retrophin and had reported returns for the Healthcare Limited Partners far in excess of available funds.

By the time the reverse merger for Retrophin was finalized in December 2012, several MSMB Capital and MSMB Healthcare investors had become deeply suspicious of the process by which Shkreli had liquidated the hedge funds.  For example, Shkreli failed to provide cash redemptions for MSMB investors who requested such redemptions, and the method by which he purported to convert their investments into Retrophin stock was opaque and unsupported by documentation.  As a result, several MSMB investors began threatening to sue Shkreli if they did not get answers about what happened to their investments.

Faced with disgruntled investors, the defendants engaged in a scheme to defraud Retrophin by misappropriating millions of dollars of Retrophin's assets through material misrepresentations and omissions in an effort to repay the previously defrauded MSMB investors. This scheme had three major components.  First, in the fall of 2012, Shkreli and Greebel engaged in a series of transactions designed to create the false appearance that MSMB Capital had invested in Retrophin and received shares in return.  Second, in the spring of 2013, the defendants caused

Retrophin to enter into a series of settlement agreements with several of the defrauded MSMB Capital and MSMB Healthcare investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Shkreli had reported on those investments.  The defendants did not seek or obtain approval from Retrophin's Board of Directors for these agreements.  Third, in the fall of 2013 – after Retrophin's external auditor questioned the propriety of the settlement agreements and concluded that Retrophin was not responsible for repayment of the defrauded MSMB Capital and MSMB Healthcare investors – the defendants caused Retrophin to enter into a series of sham consulting agreements with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse those investors for their lost investments in Shkreli's hedge funds.  Notably, the defrauded investors who entered into these sham consulting agreements did not perform any legitimate consulting services for Retrophin.

     **D.**     **The Retrophin Unrestricted Shares Scheme**

     In connection with the reverse merger between Retrophin and Desert Gateway, Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin by concealing Shkreli's beneficial ownership and control of the majority of Retrophin's unrestricted or free trading shares.  These unrestricted shares, also known as the "Fearnow shares," were initially the shares of Desert Gateway; at the time of the reverse merger, the shares (2.5 million in total) became free-trading shares of Retrophin held by the sole stockholder ("John Doe 1") of Desert Gateway.  In late November 2012, Shkreli informed seven of his employees and contractors that they would each be permitted to purchase a portion of those shares from John Doe 1 for a nominal amount.

In or about December 2012, the defendants divided 2 million of the unrestricted shares across the seven individuals to ensure that each individual's ownership was below the Securities and Exchange Commission's ("SEC") five percent reporting requirement threshold; they also arranged for an additional 400,000 shares to be held for those individuals in the name of John Doe 1, for future distribution to those individuals.  Prior to this distribution, the defendants took steps to make it appear that these seven individuals were no longer associated with either the MSMB entities or Retrophin so that the shares would remain free-trading after the merger (as any free-trading shares held by individuals associated with Retrophin would become restricted).  These steps included an email sent by Shkreli (and subsequently forwarded by Shkreli to Greebel) that falsely decreed that the individuals were no longer employees or contractors of Retrophin or the MSMB entities; in reality, a number of the seven individuals continued to do work for the MSMB entities and/or Retrophin.

Subsequently, between December 2012 and September 2014, the defendants attempted to control – and in some cases, succeeded in controlling – these 2.4 million unrestricted shares (listed under the names of these seven individuals) for the benefit of Shkreli.  For example, the defendants orchestrated the transfer of shares from some of the seven individuals to defrauded MSMB Capital and MSMB Healthcare investors in order to settle liabilities owed by the MSMB entities and Shkreli.

## III.    **The Indictment, The Arrests and The Superseding Indictment**[2]

On December 14, 2015, a federal grand jury sitting in the Eastern District of New York returned an indictment charging Shkreli and Greebel for their participation in the MSMB

---

[2] The procedural history of this case is described in greater detail in the government's September 30, 2016 memorandum of law in opposition to the defendants' discovery motions. (Dkt. No. 90, at 10-17).

Capital, MSMB Healthcare and Retrophin Schemes (the "Indictment").   Specifically, the indictment alleges that in or about and between September 2009 and September 2014, Shkreli, together with Greebel and others, orchestrated "three interrelated fraudulent schemes" whereby they agreed to, <u>inter alia</u>, (1) "defraud investors and potential investors in MSMB Capital by inducing them to invest in MSMB Capital through material misrepresentations and omissions about, <u>inter alia</u>, the prior performance of the fund, its assets under management and the retaining of an independent auditor and administrator; and then by preventing redemptions by investors in MSMB Capital through material misrepresentations and omissions about, <u>inter alia</u>, "the performance of the fund and the misappropriation by Shkreli and others of fund assets"; (2) "defraud investors and potential investors in MSMB Healthcare by inducing them to invest in MSMB Healthcare through material misrepresentations and omissions about, <u>inter alia</u>, the prior performance of the fund, its assets under management and existing liabilities; and then by preventing redemptions by investors in MSMB Healthcare through material misrepresentations and omissions about, <u>inter alia</u>, the performance of the fund and the misappropriation by Shkreli and others of fund assets"; and (3) "defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations," including by causing Retrophin to enter into settlement and/or sham consulting agreements with, <u>inter alia</u>, defrauded MSMB Capital and MSMB Healthcare investors to settle liabilities owed by the MSMB funds and Shkreli.  (<u>See</u> Dkt No. 1).

Three days later, on December 17, 2015, both defendants were arrested at their residences.  Both defendants were arraigned that same day before the Honorable Robert M. Levy, United States Magistrate Judge; Shkreli was released on a $5 million bond that was subsequently

secured by an E*TRADE account containing securities, while Greebel was released on a $1 million bond that was subsequently secured by his home.  (See Dkt. Nos. 10, 11, 14, 19).

On June 3, 2016, a federal grand jury sitting in the Eastern District of New York returned a superseding indictment in the case (the "Superseding Indictment").  The Superseding Indictment differed from the Indictment in that it detailed information about the Unrestricted Shares Scheme (at paragraphs 36 to 40) and added Count Eight, which charged Shkreli and Greebel with conspiracy to commit securities fraud in connection with that scheme.  Specifically, the new portions of the Superseding Indictment allege that Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin through material misrepresentations and omissions about the beneficial ownership and control of Retrophin's unrestricted shares.  (See Dkt. No. 60).

## IV.   Greebel's Representation of the MSMB Entities and Retrophin

As noted above, between approximately 2011 and September 2014, Greebel served as counsel to the MSMB entities; lead outside counsel to Retrophin; and was the Principal Attorney at Katten for all matters involving the MSMB entities, Retrophin and Shkreli.[3]  In those roles, Greebel either worked on, or oversaw work for, a wide variety of tasks and projects, including, inter alia, targets for shareholder activity for MSMB Capital; investment projects for MSMB Capital and Retrophin; employment matters for the MSMB entities and Retrophin; filings with the

---

[3] As detailed below, until February 28, 2017, either Shkreli and/or MSMB Capital employee Marek Biestek had made claims of privilege over documents related to Katten's representation of the MSMB entities, which included its representation of the MSMB entities and Shkreli in connection with the SEC investigation.  After both Shkreli and Biestek withdrew those claims, the government received more than 10,000 documents related to that representation on March 3, 2017, the date of this filing.  The government expects that its understanding of Katten's – and by extension, Greebel's – representation of the MSMB entities will be more fulsome once it has had the opportunity to review and digest those documents.

Securities and Exchange Commission ("SEC") for MSMB Capital and Retrophin; preparation of Retrophin Board meeting materials, attendance at Board meetings, and preparation of Board meeting minutes; license agreements; litigation between Retrophin and former MSMB and/or Retrophin employees; the reverse merger between Retrophin and Desert Gateway; financings for Retrophin, including public offerings.  In addition, Greebel also provided Shkreli with advice during the course of Katten's representation of the MSMB entities and Shkreli in connection with an investigation by the SEC into some of the fraudulent schemes described above, including prior to Shkreli's testimony before the SEC (detailed below).  In these roles, Greebel communicated frequently with Shkreli and other MSMB and Retrophin employees by email and telephone, and in person.

During the charged conspiracy period, Greebel personally billed more hours to matters associated with the MSMB entities and Retrophin than to any other client for whom he performed work.  For example, in the period between February 2011 and January 2012, Greebel billed approximately 926 hours to MSMB Capital and Retrophin matters; he billed only approximately 212 hours to matters associated with his next most-active client.  Similarly, between, February 2013 and January 2014, Greebel billed approximately 1116 hours to Retrophin matters, and only approximately 208 hours to matters associated with his next most-active client. In total, Katten billed MSMB Capital and Retrophin for more than $10 million in services provided by Greebel and others during the conspiracy period.

On September 30, 2014, Retrophin's Board of Directors removed Shkreli as CEO. Shortly thereafter, Retrophin determined that Greebel would no longer serve as outside counsel for the company.  In June 2015, Greebel left Katten.

**V.**   **Shkreli and Greebel's Statements**

The following are statements about the offense conduct made by Shkreli and/or Greebel to various government agencies and/or in public fora.

**A.**   **Shkreli's Statements to the SEC and Law Enforcement**

The SEC began an investigation into some of the above-described criminal conduct in approximately 2011.  Shkreli gave sworn testimony in connection with that investigation on two occasions:  August 23, 2013 and February 24, 2014.  On both occasions, Shkreli was represented in person by a Katten partner.  In addition, as noted above, Shkreli conferred with Greebel about the SEC investigation on a number of occasions prior to providing testimony.

In response to questioning, Shkreli provided information on, _inter alia_, representations made to investors in MSMB Capital and MSMB Healthcare to induce investment in the hedge funds; the performance of those funds; the process by which Retrophin was founded and developed; the failed OREX trade; the subsequent settlement of that trade with Merrill Lynch; and the process by which Retrophin was taken public via reverse merger.  During the course of his testimony over both days, Shkreli mentioned Greebel on only one occasion:  on February 24, 2014, he stated that Greebel had handled the documents for a private placement offering for MSMB Healthcare in 2012.

Subsequently, on January 29, 2015,[4] Shkreli voluntarily attended a meeting with the United States Attorney's Office for the Eastern District of New York ("EDNY") and the Federal Bureau of Investigation ("FBI").  During the course of that meeting, at which Shkreli was

---

[4] This is the same meeting referenced by Shkreli in his memorandum of law; however, Shkreli stated that it took place on February 11, 2015.  (See Shkreli Br. at 11).  The date of the agent's report of the meeting was February 11, 2015, but the meeting itself took place on January 29, 2015; this is likely the source of the confusion over the date.

not represented by counsel, Shkreli discussed, <u>inter alia</u>, his ouster from Retrophin in September 2014; Shkreli's sales of Retrophin shares during his tenure as CEO; the failed OREX trade; the performance of MSMB Capital and MSMB Healthcare; and the distribution of the Fearnow shares. Shkreli mentioned Greebel on only two occasions during that meeting, as follows: (1) Shkreli identified Greebel as the attorney that Retrophin used to effect the reverse merger with Desert Gateway, and (2) Shkreli identified Greebel as the attorney who handled the purchase of the Desert Gateway shell and its free-trading shares.

On December 17, 2015, the date of his arrest, Shkreli made both a videotaped statement to FBI agents, and additional one-off statements to FBI agents during transport and arrest processing. In the course of those statements, Shkreli discussed, <u>inter alia</u>, the lawsuit Retrophin filed against him and his initial impressions of the criminal case. On only two occasions during those interactions did Shkreli mention Greebel: (1) during his videotaped statement, Shkreli stated that "especially the Evan thing is just bizarre," explained that Retrophin, its Board members and their attorneys "really didn't like [Greebel]," and then referred to "the Evan dimension"; and (2) during arrest processing, Shkreli stated that he could not imagine Greebel doing anything wrong.

### B.   Shkreli's Public Statements

Shkreli has made numerous public statements – via social media, in interviews with the press, and on online message boards – about the criminal conduct underlying the Superseding Indictment, both prior and subsequent to his arrest on December 17, 2015. For example, on December 16, 2015, in an interview with online magazine HipHopDX, Shkreli discussed actions he had taken one of the seven individuals to whom he had allocated Fearnow shares, and who subsequently refused to allow Shkreli to control those shares. Shkreli stated to HipHopDX: "I threatened that f****** guy and his f****** kids because he f****** took $3 million from me

and he ended up paying me back." (Greebel Br. Appendix, Ex. 1 ("Martin Shkreli Plans to Bail-Out Bobby Schmurda")). Similarly, on January 16, 2016, in an interview with Vice, Shkreli explained misrepresentations he made to MSMB investors as follows: "I felt that I had to be the big guy on campus. I wanted to beat my chest, and if there's a way to describe my fund as a $5 million fund and there's a way to describe my fund as a $30 million fund, and both have some modicum of truth in them, I'll take 30. I wanted to look good." (Greebel Br. Appendix, Ex. 18 ("Wine, Wu-Tang and Pharmaceuticals – Inside Martin Shkreli's World")).

Of all of the public statements made by Shkreli that discuss the criminal conduct detailed in the Superseding Indictment, and that are known to the government at this time,[5] only one such statement includes what is arguably a reference to Greebel and/or Katten, though neither is mentioned by name. In a posting on an investor website in February 2015, Shkreli stated, in reference to Retrophin, "Every transaction was done with outside counsel's blessing (I have the bills to prove it), board approval and made good corporate sense." (Greebel Br. Appendix, Ex. 10 ("In Shkreli Case, a Company Lawyer May Have Crossed the Line")).

In addition, Shkreli has also made numerous public statements subsequent to his arrest about the fact that he has been criminally charged. For example, on January 15, 2016, Shkreli told the New York Times that "I feel like I'm being prosecuted for being a jerk"; on November 3, 2016, Shkreli told the Financial Times that the trial in this case was "all for political show." (See Greebel Br. Appendix, Exs. 13 and 43). Finally, Shkreli has made many public statements on topics – ranging from pop stars to rap music to politicians – that are wholly unrelated

---

[5] Shkreli has made many public statements since his 2015 arrest, including during the course of hundreds of hours of online video chats that were streamed live over the Internet; the government has not yet identified or reviewed all of this material.

either to the criminal conduct charged in this case or to the case itself.  (See, e.g., Greebel Br. Appendix Exs. 2-9, 14-15, 17-26, 29-42, 44-46, 48-72).

## C.    Greebel's Statements to Law Enforcement

On December 17, 2015, the date of his arrest, Greebel made a videotaped statement to FBI agents in which he detailed, inter alia, the scope of his representation of the MSMB entities; his role as outside counsel for Retrophin; his relationship with Shkreli; specific transactions undertaken by Retrophin; and the settlement and consulting agreements detailed in the Indictment. During the course of discussing these subjects, Greebel made many direct and indirect references to Shkreli.

However, there are a number of portions of Greebel's statement in which Greebel provides information and makes no reference to Shkreli.  The following are a few examples:[6]

(1) Discussion of Greebel's role as outside counsel for Retrophin

| | |
|---|---|
| FBI Agent: | Okay, so then why don't— I guess the next step, uh. What was the next step after that meeting? |
| Greebel: | We get engaged by Retrophin for general corporate matters. |
| FBI Agent: | Okay. And Retrophin is obviously still a private company. |
| Greebel: | Mhhm-hmm. |
| FBI Agent: | Is it an LLC or… |
| Greebel: | It's an LLC. |
| FBI Agent: | Did you help change it into an LLC? |
| Greebel: | No. |
| FBI Agent: | Did it start as a partnership or .. |

---

[6] The transcribed portions of Greebel's post-arrest statement contained herein are in draft form.

| | |
|---|---|
| Greebel: | I was not present as counsel. To my understanding based on the documents, it was always an LLC. I didn't form it. I didn't create it. I didn't do its initial rounds of financing. I didn't do its initial cap table. I didn't do any of that stuff. I literally got all that given to me. |
| FBI Agent: | Alright. So now you're general counsel. |
| Greebel: | No. |
| FBI Agent: | What's it called? Sorry. |
| Greebel: | I'm a lawyer for the company. I'm not … I don't work for the company. |
| FBI Agent: | I was thinking outside … general counsel, but— |
| Greebel: | —Nope. |
| FBI Agent: | Okay. So you're a lawyer that works for your own company but you're consulting for Retrophin? |
| Greebel: | No. No, no, no. |
| FBI Agent: | Okay. What's your— |
| Greebel: | —I'm a partner with Katten Muchin. Katten Muchin is engaged by Retrophin. |

(2) <u>Discussion of Greebel's Recollection of Retrophin Board Meetings</u>

| | |
|---|---|
| FBI Agent: | Typically how long are the board meetings? |
| Greebel: | Not. Not extensive. |
| FBI Agent: | Is there not a typical? Not extensive so— |
| Greebel: | I'd say somewhere between 45 minutes and 90 minutes. |
| FBI Agent: | Okay. And did most people call in or was there, everybody, I mean, I know you called in so you might not know but... |
| Greebel: | I have no idea. I only recall being at maybe two meetings in person in the full time. I have no idea where people were. |
| FBI Agent: | Alright. I was just wondering if everybody called in or if certain people were together. You don't know? |

15

Greebel:          I have no idea

(3) <u>Discussion of Greebel's Interactions with Marek Biestek</u>

FBI Agent:      Um, what about Marek Biestek?

Greebel:          I had nominal interactions with him. He was an employee of the company. He was the co-founder of the MSMB Capital. I never really had any direct interaction with him.

## VI.    **Shkreli's Advice of Counsel Defense and MSMB-Related Katten Documents**

Counsel for Shkreli stated on multiple occasions prior to filing his motion for severance that he might seek to raise an advice of counsel defense to address the charges in the Superseding Indictment.  (See, e.g., June 6, 2016 Hearing Tr. at 9:20-24, 13:19-23; July 14, 2016 Hearing Tr. at 21:17-23 ("Martin Shkreli has perhaps the most relevant reliance on counsel defense I've ever encountered")).  In connection with that potential defense, Shkreli sought to compel Katten to produce documents related to Katten's representation of the MSMB entities and Retrophin, because Shkreli believed that such documents would support his theory that he "acted in good faith and without criminal intent in regard to these transactions in that he sought the advice of one or more of Katten's highly experienced lawyers and followed that advice."  (Shkreli's Motion to Compel Katten dated October 27, 2016, Dkt. No 103).  However, certain of the documents in Katten's possession were possibly subject to one or more privileges asserted by multiple parties, as follows: (1) Shkreli maintained that he would assert attorney-client privilege on behalf of both MSMB entities over documents relating to Katten's representation of those entities; (2) Marek Biestek maintained that he would assert attorney-client privilege on behalf of MSMB Capital over documents relating to Katten's representation of MSMB Capital; and (3) Retrophin maintained that it would assert attorney-client privilege over documents relating to

Katten's representation of Retrophin.  (See, e.g., Government Letter dated December 12, 2016, Dkt. No. 132, at 1-3; December 14, 2016 Hearing Tr. at 1-26).

After extensive briefing and multiple status conferences, it was determined that the documents in Katten's possession relating to the MSMB entities would be provided to Shkreli and Biestek so that they could review them and determine whether each would continue to assert privilege over them; the documents were also provided to Greebel at his request.  (December 14, 2016 Hearing Tr. at 1-26; 42-45).  The government also advised the Court and Shkreli that if Shkreli decided to attempt to assert an advice of counsel defense at trial, he would need to waive attorney-client privilege in connection with that decision.  (Government Letter dated December 12, 2016, Dkt. No. 132, at 9-10).  Subsequently, on January 20, 2017, Shkreli and Biestek provided the government with a joint privilege log for approximately 10,000 MSMB-related Katten documents, and stated that they were both maintaining their claims of privilege to those documents.

On February 17, 2017, Shkreli filed his motion for severance, in which he clearly stated that he would pursue an advice of counsel defense at trial.  (See, e.g., Shkreli Br. at 16 ("Shkreli will defend himself by claiming that he relied on Greebel in good faith")).  Greebel also filed his motion for severance on that same date; he appended to the motion two MSMB-related Katten documents that were entirely redacted, and also discussed those documents in a redacted section of the motion.  (See Greebel Br. at 11-13, 16).  In addition, Greebel announced his intention to attempt to offer into evidence at a joint trial "documents from Katten Muchin that [Shkreli] has listed on his privilege logs."  (Greebel Br. at 24).

On February 22, 2017, following a conversation with the government, counsel for Shkreli confirmed that Shkreli would waive attorney-client privilege with respect to both MSMB

17

entities in connection with his decision to pursue that defense.  Subsequently, on February 28, 2017, counsel for Biestek advised the government that he would not assert privilege over any MSMB Capital documents in connection with this case, though he stated that he reserves all other rights with respect to those documents.  As a result, on March 3, 2017 – the same day as this filing – Shkreli provided the government with a copy of all MSMB-related Katten documents.  In addition, the government received an unredacted version of Greebel's brief and exhibits on February 24, 2017, pursuant to an agreement with all parties.

## ARGUMENT

## DEFENDANTS' MOTIONS FOR SEVERANCE SHOULD BE DENIED

There is a strong preference in the federal system for joint trials of defendants who are indicted together, as joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" Zafiro v. United States, 506 U.S. 534, 537 (1993).  Joint trials also "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury." United States v. Barret, 824 F. Supp. 2d 419 (E.D.N.Y. 2011) (quoting United States v. Rucker, 32 F.Supp.2d 545, 547 (E.D.N.Y. 1999)).

Where two defendants have been properly joined under Federal Rule of Criminal Procedure 8, a defendant seeking severance under Federal Rule of Criminal Procedure 14 has the "extremely difficult burden of proving not merely that he would be prejudiced by a joint trial, but that the prejudice would be so great as to deprive him of his right to a fair trial." United States v. Bellomo, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (quoting United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989)) (quotation marks omitted); see also United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998) (severance is appropriate only if a defendant can establish a risk of

prejudice that is "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials").  Among the factors to be weighed to determine whether a defendant has met his or her burden to show such severe prejudice are: (1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others.  United States v. Ramos, 346 F.Supp.2d 567, 570 (S.D.N.Y. 2004) (citing United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987)). Ultimately, "the decision whether to sever a trial is committed to the sound discretion of the district court."  Barret, 824 F.Supp.2d at 433.

Here, there is no dispute that the defendants, who have been charged as co-conspirators, are properly joined pursuant to Federal Rule of Criminal Procedure 8.  There is also no dispute that the criminal conduct charged in the Superseding Indictment is extremely complex, as evidenced by the Court's designation of the case as such.  Nor is there any dispute that the trial is expected to last approximately a month and will involve, at a minimum, dozens of witnesses and hundreds of exhibits.  (See, e.g., July 14, 2016 Hearing Tr. at 31).

In addition, while Greebel is not charged in the counts that relate to the MSMB Capital and MSMB Healthcare Hedge Fund schemes, those frauds are inextricably intertwined with the Retrophin Misappropriation and Unrestricted Shares schemes, in which both defendants are charged.  Neither the defendants' conspiracy to loot Retrophin via the settlement and consulting agreements to repay defrauded MSMB investors, nor the defendants' conspiracy to improperly control and distribute the Fearnow shares for Shkreli's benefit – in part to further compensate some of those defrauded MSMB investors – can be explained without first detailing the MSMB schemes:

namely, the identities of the MSMB investors; how those investors were defrauded by Shkreli's misrepresentations and mismanagement of the MSMB funds; how MSMB Capital never invested in Retrophin; how MSMB Healthcare's investment in Retrophin was significantly different than was portrayed to the MSMB Healthcare investors; and how Shkreli made misrepresentations to the defrauded investors about the funds' performance and the mechanics of their liquidation.  In other words, the Retrophin schemes were designed and employed by the defendants expressly to repay the debt owed by Shkreli to the defrauded MSMB investors, and to conceal Shkreli's initial fraudulent conduct.  Consequently, evidence of the two MSMB fund schemes is also evidence admissible against both defendants in connection with the Retrophin schemes.

Despite all of these factors that weigh in favor of a joint trial, Shkreli and Greebel nevertheless contend in their motions that severance is necessary.  First, both Shkreli and Greebel assert that they will advance "mutually antagonistic" defenses at trial that require severance. (Shkreli Br. at 14-17; Greebel Br. at 8-23).  Second, both Shkreli and Greebel contend that there are insurmountable evidentiary obstacles presented by a joint trial, including the potential for the introduction of post-conspiracy statements by each defendant that cannot be modified to satisfy Bruton.  (Shkreli Br. at 17-19; Greebel Br. at 23-29).  Greebel makes two additional arguments in support of severance:  that a joint trial will present a risk of "spillover prejudice" because Greebel is not charged with the MSMB schemes (Greebel Br. at 29-34), and that Greebel will be deprived of a fair trial because Shkreli has a "stated plan … to disrupt the criminal trial, instill confusion, taint the jury and apparently seek jury nullification."  (Greebel Br. at 34-38).

For the reasons set forth below, these arguments are unavailing.  Because the defendants cannot "meet their heavy burden of proving that severance is warranted," Barret, 824 F.Supp.2d at 433, their motions should be denied.

I.      **The Defendants' Stated Defenses Do Not Require Severance**

       The defendants assert that severance is required because they will each advance a defense at trial that is "antagonistic" to the other's defense.  For the reasons stated below, however, the defendants' stated defenses are not in fact "mutually antagonistic," and the defendants have not articulated prejudice sufficient to require a severance.

A.      **Legal Standard**

       The mere fact that two defendants advance defenses that are adversarial to one another "clearly does not, alone, require trials to be severed.  Were this true, a virtual ban on multi-defendant conspiracy trials would ensue since conspirators raise many different and conflicting defenses."  United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1992).  "Mere fingerpointing does not require severance."  United States v. Casamento, 887 F.2d 1141 (2d Cir. 1989) (quotations omitted); see also United States v. Serpoosh, 919 F.2d 835, 837 (2d Cir. 1990) ("The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance.").

       The term "mutually antagonistic" has been adopted to describe a category of adversarial defenses where "accepting one defense requires that the jury must of necessity convict a second defendant."  United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003); see also Zafiro, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one ... necessarily preclude[s] acceptance of the other and acquittal of the codefendant").  However, the Supreme Court has held that even "mutually antagonistic defenses are not prejudicial per se," and that severance is not required when defendants adopt antagonistic defenses "even if prejudice is shown."  Zafiro, 506 U.S. at 538-39.  Rather, when defendants adopt mutually antagonistic defenses, severance is appropriate only if defendants can demonstrate "a

serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. See also United States v. Scott, 637 F. App'x 10, 13 (2d Cir. 2015), cert. denied, 137 S. Ct. 208 (2016) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal … the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice and amounted to a denial of a constitutionally fair trial") (quotations and quotation marks omitted).

"In those rare instances where a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" United States v. Abakporo, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3 (S.D.N.Y. Nov. 25, 2013) (quoting Zafiro, 506 U.S. at 539). In such a case, "the tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion." Id.; see also Yousef, 327 F.3d at 150 ("the fashioning of remedial steps to minimize prejudice to a defendant is committed to the sound discretion of the district court").

To determine if severance is warranted, therefore, a Court must undertake a three-step analysis. First, the Court must determine whether the adversarial defenses that Shkreli and Greebel assert they will advance are in fact "mutually antagonistic," such that acceptance of one defense necessarily precludes the acceptance of the other, or if they are merely "fingerpointing." Second, the Court must determine whether, if the defenses are in fact "mutually antagonistic," such defenses are "prejudicial" to one or both defendants. And finally, even if the Court determines that one or both defendants might suffer prejudice as a result of a joint trial, the Court must find that there is a serious risk that a "joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment" about the defendants' guilt or innocence that

cannot be mitigated by a less drastic measure than severance, such as a series of limiting instructions.

## B.     Argument

In their motion papers, the defendants have described their intended trial defenses[7] in a manner that suggests each defense will stand in stark contrast with the another.  Specifically, Shkreli states that he will "maintain[] his complete innocence" and advance an advice of counsel defense, which will consist of arguing that Shkreli "ensured that his counsel was fully aware of all relevant information ... they needed to render appropriate and accurate advice, and that he followed that advice, believing it to be proper and correct."  (Shkreli Br. at 15).[8]  Greebel, on the other hand, states that he will advance a defense at trial that he was an "unknowing pawn" in a "fraud about which [he] was unaware."   (Greebel Br. at 1).  Greebel states that he will further argue that Shkreli

---

[7] It is the government's understanding that the defenses that the defendants describe in their motion papers are the defenses they intend to advance at any trial in this matter, whether or not this Court determines to grant a severance – that is, the defendants will advance these defenses at either a joint trial or in separate trials.  To that end, both defendants have taken steps to confirm that the defenses they describe herein are the defenses they will in fact assert:  Shkreli has waived attorney-client privilege over all MSMB documents in connection with his assertion of an advice of counsel defense (see supra Statement of Facts, Section VI), and Greebel's counsel, as an agent of Greebel, has filed a declaration that Greebel will advance a defense that he was, inter alia, a pawn in "fraudulent schemes unbeknownst to him."  (See Declaration of Reed Brodsky, Dkt. No. 159).

[8] In order to establish a colorable advice-of-counsel defense at trial, and thus be entitled to a jury instruction with respect to those offenses to which it may apply, Shkreli will have to first introduce evidence that: (1) before taking action, he "honestly and in good faith [sought] the advice of a lawyer as to what [s]he may lawfully do"; (2) he "fully and honestly [laid] all the facts before his counsel"; and (3) he acted strictly in accordance with the advice of his counsel.  United States v. Evangelista, 122 F.3d 112, 117 (2d Cir. 1997) (internal quotation marks omitted).  If Shkreli cannot meet one or more of these requirements, he will not be entitled to a jury instruction regarding advice of counsel.  Id.; see also United States v. Quinones, 417 F. App'x 65, 67 (2d Cir. 2011) (affirming denial of instruction and order precluding defense from arguing advice of counsel in summation; "defendants are not entitled to such an instruction unless there are sufficient facts in the record to support the defense," and "the defendants [in this case] have not shown the required factual predicate for an advice-of-counsel defense").

not only failed to disclose material information to Greebel, but that Shkreli affirmatively lied to Greebel and other attorneys at Katten, as well as misrepresented Greebel's advice to others. (Greebel Br. at 9-10). The defendants further argue that because Shkreli will say that he provided "full information" to Greebel, while Greebel will say that Shkreli withheld information from and/or provided false information to Greebel, such defenses fit the definition of "mutually antagonistic" because it would not be possible for a jury to accept the defense advanced by one defendant without finding the other defendant guilty.  (See Shkreli Br. at 13-17; Greebel Br. at 6-23).

The defendants' conclusion is incorrect.  First, the defenses are not as adversarial as they appear because certain aspects of the intended defenses cannot be advanced at a trial (joint or separate).  Second, even if the defendants' intended defenses could proceed exactly as detailed in the defendants' brief, such defenses do not require a jury to find one defendant guilty if it credits the defense of the other.  Finally, even if the intended defenses were truly "mutually antagonistic," the defendants have not demonstrated a severe risk of prejudice.

### 1.      Greebel's Proposed Defense Faces Evidentiary Hurdles

Greebel's intended defense will not in fact be as adversarial to Shkreli's proposed defense because the form of Greebel's intended defense (as detailed in his motion papers and his attorney's declaration) faces evidentiary hurdles.

Greebel states that if he decides to testify on his own behalf, he will offer the following testimony: (a) he has "come to learn that [] Shkreli lied to him," (b) he "discovered these lies from his review of documents produced in discovery in this case that he had never seen before," (c) Shkreli made "material misrepresentations to and/or omitted material information from" him during the charged conspiracy period, and (d) he "believes [] Shkreli used [him] and

24

other attorneys at Katten Muchin as unknowing pawns in his scheme." (See Declaration of Reed

Brodsky, Dkt. No. 159, at 2-3). This testimony is described by Greebel as testimony that will "in

effect, prosecute [] Shkreli at trial for committing [] acts of deception" and that is illustrative of

how the defendants' defenses are "mutually antagonistic and irreconcilable." (Greebel Br. at 10-

11). However, this proposed testimony should not be admitted in the form described.

 As a lay witness, Greebel can only testify to facts that he had personal knowledge

of at the time of the charged conspiracy; that is, facts that he personally had an opportunity to, and

actually did, observe. See Federal Rule of Evidence 602. His attorney may ask him, and Greebel

may testify to, information that he personally knew or did not know at the time of the conspiracy;

his attorney may also ask him whether his actions (such as his legal advice) would have been

different if he had known certain other independently established facts. See, e.g., United States v.

Cuti, 720 F.3d 453, 458 (2d Cir. 2013). However, Greebel cannot himself enter into evidence

information that he "learned" or "discovered" from other sources (such as the discovery in this

case) after the conspiracy period ended; this is evidence that he himself will ostensibly concede

that he did not actually perceive or observe when interacting with Shkreli. See, e.g., 1 McCormick

On Evid. § 10 (7th ed.).

 Similarly, Greebel cannot testify directly to the state of mind of other individuals,

including Shkreli and other Katten attorneys. See, e.g., Fenje v. Feld, 301 F.Supp.2d 781, 815–16

(N.D.Ill. 2003) (while a witness may testify as to his own state of mind, and may testify subject to

applicable limitations about another person's actions or statements, a witness is not competent to

testify as to another person's state of mind); Taylor v. Evans, No. 94 Civ. 8425, 1997 WL 154010,

at *2 (S.D.N.Y. Apr. 1, 1997) ("musings as to defendants' motivations would not be admissible if

given by any witness—lay or expert"); United States v. Rodriguez-Adorno, 695 F.3d 32, 38 (1st

Cir. 2012) ("[T]estimony regarding culpability is a form of lay opinion that will rarely, if ever, meet the requirements of Federal Rule of Evidence 701.").  Indeed, Greebel can no more testify that Shkreli "lied" to him or that his statements constituted "material misrepresentations" any more than he could testify that Shkreli told the truth, because such testimony is not based on Greebel's knowledge at the time he acted.  Moreover, such testimony assumes that Greebel personally knows Shkreli's state of mind, as opposed to inferring such state of mind from other evidence, which is the province of the jury, not a witness.  Greebel does not personally know if Shkreli was, as alleged, deliberately misleading him, or was deluded, wrong or also ignorant of a pertinent fact.  For the same reasons, Greebel also cannot testify that other attorneys at Katten Muchin were "unknowing pawns," because such a statement is an opinion from the evidence; it is not, itself, admissible evidence.  Rather, Greebel's attorney may be able elicit from Greebel (pursuant to applicable evidentiary restrictions, such as the hearsay rules) what information he was told by Shkreli; whether he believed such information to be true at the time (and not whether he believes it be true now); and what information he observed Shkreli provide to other Katten attorneys at the time (and again, not whether he believes it be true now).  Greebel is also barred from providing a lay opinion as to the state of state of mind of such individuals, even if based solely on what he learned before he was charged, because such opinion is both less helpful than his substantive testimony about what he directly observed of Shkreli's and or other Katten attorneys' statements and behavior during the conspiracy period, and far more prejudicial than probative (particularly in a joint trial).  See Federal Rule of Evidence 701; see also United States v. Rea, 958 F.2d 1206, 1219 (2d Cir. 2007) (holding testimony that a defendant knew that the purpose of a certain action was to evade taxes was inadmissible; "It did no more than instruct the jury as to what result it should reach on

the issue of knowledge. We conclude that the admission of this opinion was therefore an abuse of discretion.").

In addition to the above-described testimony, Greebel also asserts that his defense will include evidence that Shkreli has "a long-term, pattern and practice of blaming others, including Greebel, for his own misconduct." (Greebel Br. at 9). While Greebel does highlight statements by Shkreli where Shkreli argued that he was innocent because he relied on his attorneys' advice, Greebel does not detail any general "pattern and practice" evidence of Shkreli blaming others for his misconduct, nor does he explain how such propensity evidence would be admissible at trial.

As a result, Greebel's intended defense is unlikely to proceed as described in Greebel's motion papers, nor will it be as inflammatory as Greebel's motion papers suggest. While it is likely that Greebel's counsel will nonetheless make many of these sorts of arguments in opening and closing statements – reasoning from the facts provided by Greebel's testimony and other evidence in the case that, for example, Shkreli lied to Greebel and as a result Greebel did not have the requisite intent to commit the charged crimes – such arguments, as opposed to testimony, are not evidence and cannot be considered as such, and the jury will be instructed on that point. See, e.g., United States v. Abakporo, 12-CR-340 (SAS), 2013 WL 6188260, at *5 (S.D.N.Y. Nov. 25, 2013).

### 2.      Defendants' Proposed Defenses Are Not Antagonistic

Even setting aside the evidentiary hurdles to aspects of Greebel's proposed defense, and assuming that the defendants could advance their defenses in exactly the manner that they propose, such defenses are not "mutually antagonistic" because they do not require a jury to find one defendant guilty if that jury accepts the other defendant's defense. Yousef, 327 F.3d at 151.

That is, it is eminently possible for a jury to credit the defense Shkreli intends to advance – that he provided full information to his attorneys and acted in accordance with their instructions – without convicting Greebel of a crime, and vice versa. In fact, there are multiple scenarios in which this could occur. For example:

- The jury may conclude that Shkreli's defense is credible in that he provided all relevant information to his attorneys and relied on their advice in good faith, but also acquit Greebel for failing to have the requisite intent to be convicted of a crime because he did not fully process or review the information that he was provided (e.g., he was simply neglectful of his duties as an attorney, not part of a criminal scheme).

- The jury may conclude that Shkreli's defense is credible in that he provided all relevant information to his attorneys and relied on their advice in good faith, and acquit him on that basis, but also acquit Greebel because the government did not meet its burden to show that either the Retrophin Misappropriation scheme or the Unrestricted Share scheme was in fact a fraud.

- The jury may conclude that Greebel's defense is credible and that Shkreli lied to him repeatedly, but also acquit Shkreli because the government did not meet its burden to show that either the Retrophin Misappropriation scheme or the Unrestricted Share scheme was in fact a fraud.

- The jury may conclude that Greebel's defense is credible and that Shkreli provided misinformation to him with respect to certain facts, but also acquit Shkreli because Shkreli was simply passing along that misinformation from another source and did not have the intent to commit a crime.

- The jury may conclude that both defendants sincerely believe the defenses they are advancing, and there was simply miscommunication between Shkreli, Greebel and the other Katten attorneys on key factual issues.

The reason that there are so many potential avenues for a jury to credit one (or even both) of Shkreli's and Greebel's defenses and still acquit the other is because the crimes charged are incredibly complex. This is not a single instance of obvious criminal conduct, like a murder or drug transaction, where there were only two individuals present when the crime occurred and believing the testimony of one defendant that he or she did not commit the crime necessarily requires disbelieving the testimony of another. Rather, this is a complex set of schemes that took

place over several years and involved multiple individuals and transactions. As a result, it is implausible that Shkreli and Greebel will provide diametrically opposed testimony on each and every relevant fact.

The Second Circuit has recognized this distinction between cases with a narrow set of facts where defenses can in fact be "mutually antagonistic," and cases with more complex sets of facts where the jury may find multiple avenues to its verdict. For example, in Serpoosh, two co-defendants were charged in connection with a single drug sale, and each testified at trial that the sale had been arranged by the other. 919 F.2d at 838. The Second Circuit found that the co-defendants had provided "mutually exclusive explanations" of what happened in the hours leading up to the sale, and that as a result, the district court had erred in failing to sever the case. Id. The court also found that "the main purpose of the rule governing joinder, judicial economy, would not have been seriously frustrated by separate trials" because the "entire trial of both defendants, almost half of which was devoted to their testimony, lasted just over one day." Id. at 839.

By contrast, in Scott, the Second Circuit considered whether the district court properly determined not to sever the trial of two co-defendants, an attorney and his client, who were charged with securities fraud. 637 F. App'x at 13. There, as here, the client advised the district court that he would advance an advice of counsel defense at trial and claim he lacked the intent to commit the crime, while the attorney stated that his defense at trial would be to advance a defense that he "unwittingly" acted on his client's instructions. Id. The Second Circuit found that these proposed defenses were not in fact "antagonistic" because, as here, "the jury could have accepted both anticipated defenses, finding that neither [defendant] had the intent to defraud under the circumstances." Id. The Second Circuit also echoed the Supreme Court in Zafiro and observed that even mutually antagonistic defenses "are not prejudicial per se," such that even if such

29

defenses were mutually antagonistic, the defendants would have also had to demonstrate a serious risk of prejudice to warrant a severance.  Id.

Both defendants lean heavily in their motions on a district court decision granting severance in United States v. Aronson, No. 12-CR-245 (E.D.N.Y. May 23, 2013) (Dkt. No. 167) (Spatt, J.) (Shkreli Br. Ex. A).  (Shkreli Br. at 16-17, Greebel Br. at 18-19).  There, the co-defendants were also an attorney and his client who were charged with conspiring to perpetuate a Ponzi scheme.  (Shkreli Br. Ex. A at 14).  The case was extremely complex:  there were a total of 14 counts spanning a four-year period, and the attorney was charged with aiding the client to restructure a series of failing businesses to conceal the Ponzi scheme from investors.  Aronson, 12-CR-245, Dkt. No. 146.  The attorney advised the district court that he would advance a defense that his client lied to him and "used [him] to perpetuate his alleged Ponzi scheme"; it was also assumed the client would advance an advice of counsel defense (though the client did not actually confirm this as his defense).  (Shkreli Br. Ex. A. at 14).  The district court granted severance, concluding that the defenses were "mutually antagonistic" because "if a jury believes [the attorney's] defense that [the client] deceived him into becoming an unknowing person in the fraud, then the jury will have to find [the client] guilty of devising the Ponzi scheme," while "if a jury believes [the client's] defense that the fraud was due to [the attorney] and his bad legal advice, then the jury will have to believe that [the attorney] was responsible for the Ponzi scheme."  (Id.). The district court did not conduct any analysis to determine whether the stated defenses were also prejudicial, simply stating that the defenses "are mutually antagonistic so as to result in prejudice to one another."  (Id. at 15).

The decision in Aronson is not dispositive here, and is of limited persuasive value for two important reasons.[9]  First, the district court summarily concluded that a jury would be required to convict the attorney if the jury believed the client's defense, and vice versa.  In such a complex case, it seems highly unlikely that, as here, there were no scenarios in which the jury could have credited one defendant's defense and still acquitted the other defendant.  Second, and more importantly, the district court conducted no analysis, as required by Zafiro, to determine whether the defendants' allegedly "mutually antagonistic" defenses in fact resulted in a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," or whether less drastic measures other than severance would be appropriate.  Zafiro, 506 U.S. at 538-39.

This is significant, because even if Aronson was correctly decided and the defendants can demonstrate that their proposed defenses were "mutually antagonistic," the defendants still need to meet the Zafiro test with respect to prejudice – and they have not.  The defendants themselves have neither articulated a specific trial right that would be compromised by their intended defenses, nor have they shown how their defenses would prevent a jury from reaching a reliable verdict; moreover, neither has shown why less drastic measures, such as limiting instructions, would not be appropriate.  In fact, Shkreli does not directly address prejudice in his brief.  (Shkreli Br. at 13-17).

Greebel's primary argument with respect to prejudice appears to be that courts in the Second Circuit have suggested that in a case where one or both defendants actively argue that

---

[9] In addition, the district court initially denied the motion for severance; in that decision, which failed to directly address the attorney's intended defense, the court concluded there was no prejudice to the attorney that would result from a joint trial, and rejected arguments that the attorney would be prejudiced because he was only charged in certain counts or as a result of spillover evidence.  Aronson, 12-CR-245, Dkt. No. 151 (Memorandum dated March 7, 2013).

his or her co-defendant is guilty of the charged crime, as distinguished from a case where each defendant is merely claiming that he or she lacked the intent to commit the charged crime, the conflict between the two defenses creates a risk of prejudice severe enough to warrant severance. (Greebel Br. at 21-23).  For example, in Abakporo, where the court confirmed a prior decision not to grant severance, the court noted that the client "did not argue that the evidence proved that [the attorney] committed a crime" as part of the client's defense, and that suggested that because the client "merely argued that [the client] had acted on [the attorney's advice]," the case did not present the "type of truly antagonistic defense that would warrant severance."  2013 WL 6188260, at *4. Similarly, in Serpoosh, the court found that the defendants were prejudiced by a joint trial in part because of the "sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted his story to escape blame."  919 F.2d 838.[10]  But see United States v. Yousef, 1997 U.S. Dist. LEXIS 10449, at *5-6 (S.D.N.Y. July 16, 1997) (concluding that "the fact that one defendant seeks to place blame on the other is not a sufficient basis for severance").

Looking to those cases, Greebel suggests that because that he will take the position at trial that the Retrophin Misappropriation and Unrestricted Shares schemes were in fact "fraudulent schemes," and that Shkreli is not merely a liar who provided false information to Greebel, but is in fact guilty of the crimes as charged, the prejudice presented by a joint trial will

---

[10] Greebel also cites to United States v. Van Hise, 12-CR-847 (PGG), 2013 WL 6877319, at *12 (S.D.N.Y. Dec. 31, 2013), for the proposition that "severance should be granted when antagonism at the essence of the defenses prevails to such a degree – even without being mutually exclusive – that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty."  This language in Van Hise is dicta, and represents the court's summary of the holding of Serpoosh, described above, rather than a separate legal principle.

be severe enough to warrant severance.  See, e.g., Greebel Br. at 9 (describing Greebel as a pawn in Shkreli's "fraudulent schemes"); 21-23.  If Greebel is fully committed to proceed with that approach, the Court should take that into account as part of its prejudice analysis.  However, if Greebel will ultimately take a more measured approach, as adopted by most of the defendants in the cited caselaw – for example, that the government has the burden to prove that the Retrophin Misappropriation and Unrestricted Shares schemes were frauds, but that if the jury concludes that the schemes were in fact frauds, Greebel was not a member of any conspiracy, with Shkreli or otherwise, that perpetuated such frauds (because, for example, he did not know certain information) – then this factor should not weigh in the Court's prejudice analysis.

## II.    There Are No Evidentiary Issues That Warrant Severance

In his motion, Greebel also argues that Shkreli and Greebel's "irreconcilable defenses" will lead to "significant evidentiary obstacles."  (Greebel Br. at 23).  Specifically, Greebel argues that there will "likely" be instances in which one defendant will attempt to introduce evidence that the other defendant will attempt to keep out at trial, that Greebel will likely move to preclude the admission of certain evidence relating to the scope and breadth of Shkreli's actions relating to the MSMB schemes, and that the government's admission of certain statements made by Shkreli would run afoul of the United States Constitution and Bruton v. United States, 391 U.S. 123 (1968), or would somehow prejudice Greebel.  (Id.).  In his motion, Shkreli argues that the introduction at trial of Greebel's post-arrest statements will violation Shkreli's Confrontation Clause rights if Greebel does not testify at trial.  (Shkreli Br. at 17-19).  For the reasons set forth below, these arguments do not provide a basis for severance.

A.      **Legal Standard**

As explained in detail above, a defendant must do far more than show prejudice to warrant a severance.  He or she must show "prejudice so substantial as to amount to a miscarriage of justice," United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988) (internal quotation marks omitted), by demonstrating "a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.  The Supreme Court has recognized, however, a narrow set of circumstances where severance may be necessary because the government seeks to introduce at trial a confession made by one defendant that implicates one or more co-defendants.  The Supreme Court has held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a non testifying defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant."  Richardson v. Marsh, 481 U.S. 200, 207 (1987) (citing Bruton, 391 U.S. at 135-36).  This is because, "[w]here the powerfully incriminating extrajudicial statements of a codefendant . . . are admitted at joint trial, courts cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination."  United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009) (citing Bruton, 391 U.S. at 135-37) (internal quotation marks omitted).  Importantly, Bruton is not implicated with respect to statements made by co-defendants in furtherance of a conspiracy during the period of the charged conspiracy — even statements where a defendant may implicate another defendant — because such statements are admissible as co-conspirator declarations, which are "not hearsay."  Federal Rule of Evidence 801(d)(2)(E); United States v. DeVillo, 983 F.2d 1185, 1193 (2d Cir. 1993).

As a general rule, the Second Circuit has recognized that severance is not required when a confession will be introduced, so long as the statement in question is properly sanitized to

remove all references to the non-testifying co-defendant.  "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." United States v. Brown, 374 Fed. Appx. 208, 210 (2d Cir. 2010) (quoting Richardson, 481 U.S. at 211).  As a result, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights." Jass, 569 F.3d at 56 (quoting United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989)) (approving substitution of neutral words "others," "other people," and "another person" for names of co-defendants in confession of non-testifying defendant); see also United States v. Benitez, 920 F.2d 1080, 1087-88 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend").

"[T]he appropriate analysis to be used when applying the Bruton rule requires . . . view[ing] the redacted confession in isolation from the other evidence introduced at trial." United States v. Williams, 936 F.2d 698, 700 (2d Cir. 1991).  "[W]hat Bruton and its progeny demand is a redaction and substitution adequate to remove the 'overwhelming probability' that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant." Jass, 569 F.3d at 60.  The Jass court explained that Bruton and its progeny "do not construe the Confrontation Clause to demand further that a confession be redacted so as to permit no incriminating inference against the non-declarant defendant." Id.  The Court further explained that "[t]he critical inquiry is [] not whether a jury might infer from other facts . . . that a declarant's neutral allusion to a confederate might have referenced the defendant" but "whether the neutral allusion sufficiently conceals the fact of explicit identification to eliminate

the overwhelming probability that a jury hearing the confession at a joint trial will not be able to follow an appropriate limiting instruction."  Id. at 61.  See also Richardson, 481 U.S. at 208 (holding that Bruton does not categorically exclude a confession that is incriminating "only when linked with evidence introduced later at trial").  Zafiro, 506 U.S. at 539.

        Courts have also applied Bruton to protect defendants from undue prejudice caused by the introduction of public statements made by a co-defendant.  In United States v. Norwood, for example, the government intended to introduce at trial two rap videos and other Facebook postings by one of the co-defendants as a co-conspirator statement, statement of a party opponent or statement against penal interest.  No. 12-CR-20287, 2014 WL 2989806 (E.D. Mich. July 2, 2014).  The moving defendant argued that these Facebook postings violated his right to a fair trial, but the court rejected that challenge, holding that proper redactions pursuant to Bruton and a limiting instruction sufficed to cure any prejudice.  Id. at *2-*4 (citing Richardson v. Marsh, 481 U.S. 200 (1987)).

### B.    Argument

        Here, Greebel provides examples of potential "evidentiary obstacles" that do not exist; viewed as a whole, the potential level of prejudice to Greebel or Shkreli from such alleged obstacles does not rise to the level that that severance is warranted.  First, Greebel explains that a "core part" of his defense entails offering "proof" that Shkreli "deceived MSMB Capital investors and MSMB Healthcare investors unbeknownst to [] Greebel and other attorneys at Katten Muchin," and that Shkreli "lied to and deceived [] Greebel about the assets under management" relating to the MSMB entities.  (Greebel Br. at 24).  Greebel also states that "Shkreli will likely try to preclude [] Greebel from introducing evidence that the government would not ordinarily be able to admit into evidence at trial but for [] Greebel's defenses."  (Greebel Br. at 24).  Greebel

fails to explain, however, why any evidence that Greebel will seek to admit in support of his ultimate arguments that Shkreli lied to him and defrauded MSMB investors unbeknownst to him (that is separate and apart from the substantial evidence the government intends to admit in support of its case) creates prejudice that is so "substantial as to amount to a miscarriage of justice," Friedman, 854 F.2d at 563, or that such evidence would "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. He also fails to explain why his intent to admit such evidence would create "significant evidentiary obstacles" – as opposed to typical evidentiary issues presented to the court during trial – that necessitate the sacrifice of judicial economy that results from severance.

Greebel also claims that he intends to offer into evidence "certain post-arrest statements made by [] Shkreli to law enforcement that inculpate [] Shkreli but exculpate [] Greebel," and then provides examples from a videotape of Shkreli's statements to law enforcement agents following his arrest. (Greebel Br. at 25). Greebel also states that he will be "offering other similar evidence at the trial," and that he will seek to admit evidence of this kind "over the objections of the government" and possibly Shkreli. (Id.). Again, Greebel fails to explain how he will be able to actually admit this evidence at trial, considering that it is clearly hearsay, and therefore inadmissible. Federal Rules of Evidence 801, 802.

Greebel also argues that he intends to move to "preclude the admission of certain evidence relating to the scope and breadth of [] Shkreli's crimes relating to MSMB Capital and MSMB Healthcare," (Greebel Br. at 26), without explaining his legal basis for doing so in a joint trial. Greebel then cites to United States v. Locascio, 357 F.Supp.2d 536, 545 (E.D.N.Y. 2004), as support for his assertion that evidence relating to the MSMB schemes would "either be inadmissible entirely or admissible in a much more limited form." (Greebel Br. at 26). Greebel's

reliance on Locascio is misplaced.  As explained in more detail below, in Locascio, in support of its finding that severance was warranted, the court found that "most of the prejudicial evidence" against eight defendants in an organized crime case would not be admissible against the three other defendants who had not been charged with racketeering activities or alleged to have been associated with organized crime.   357 F.Supp.2d at 544-45.  Such an imbalance in evidence admissible against Greebel versus Shkreli and the prejudicial nature of the evidence at issue – evidence regarding the MSMB schemes – do not exist here.  Instead, if Greebel were to be tried separately, the government would seek to admit most, if not all, of the evidence in support of the MSMB schemes against Greebel because the schemes are inextricably intertwined with the Retrophin schemes.

Greebel also asserts that "the government will likely be moving to admit certain statements by [] Shkreli that would normally be inadmissible in a trial against [] Greebel alone" because such statements would violate the Confrontation Clause and the protections of Bruton. (Greebel Br. at 26-27).  Shkreli makes similar arguments.  (Shkreli Br. at 17-19).  These assertions are wholly speculative and without basis.  The government intends to seek the admission at trial of certain statements made by the defendants that were made in furtherance of the conspiracies in which they are charged during the relevant time periods.  Such evidence is not hearsay.  Federal Rule of Evidence 801(d)(2)(e); DeVillo, 983 F.2d at 1193.  Additionally, the government will also seek to admit statements made by the defendants to law enforcement after the time period of the charged conspiracies, after properly sanitizing them to remove all references to the non-testifying co-defendant and ensuring that they fully comport with Bruton.  Such statements are admissible with a proper limiting instruction.  See Brown, 374 Fed. Appx. at 210.

Greebel also expresses concern that the government will seek to admit certain post-arrest statements made by Shkreli to the press as consciousness of guilt.  (Greebel Br. at 28-29).  In support of his argument, Greebel asserts that such statements would be admissible against Shkreli, but not Greebel in a separate trial.  (Id.).   Again, if the government seeks to admit such statements, it will ensure that the statements comply with the requirements set forth in Bruton.  See Norwood, 2014 WL 2989806 at *2.

In sum, Greebel and Shkreli have not demonstrated that there are "evidentiary obstacles" presented by a joint trial that are so complex that a severance is warranted.

## III.   Greebel's Spillover Prejudice Argument is Meritless

In his motion, Greebel also argues that alleged "spillover prejudice" supports a severance in this matter.  (Greebel Br. at 29-34).  Greebel concedes, however, that evidence concerning the MSMB schemes would be introduced against him at a separate trial. (Id. at 30.)  Having so conceded the relevance of the MSMB schemes to his charges, Greebel faces a very heavy burden of showing undue prejudice from a joint trial.  Because he has not met that burden, this basis for severance does not support severance.

### A.   Legal Standard

As set forth above, "[a] defendant seeking severance under Rule 14 bears an 'extremely difficult burden of proving . . . that the prejudice would be so great as to deprive him of his right to a fair trial.'"  Bellomo, 954 F. Supp. at 649; Casamento, 887 F.2d at 1149.  "Evidence adduced against one alleged co-conspirator is 'neither spillover nor prejudicial' if it would be admissible at a separate trial against the movant as an act of a co-conspirator in furtherance of a conspiracy due to the nature of conspiratorial illegal activity.  United States v. Spicer, No. 10-CR-657 (SJ) (RML), 2013 WL 871952, at *3 (E.D.N.Y. Mar. 7, 2013) (citing United States v. Rosa,

11 F.3d 315, 341 (2d Cir.1993) ("A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately.  Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."")).  "This is true even when the co-conspirator's acts are of greater severity." Id.  "The defendant requesting severance must show substantial prejudice resulting from joinder, not just that he would have a better chance for acquittal at a separate trial." United States v. Alegria, 761 F. Supp. 308, 312 (S.D.N.Y. 1991) (citing United States v. Torres, 901 F.2d 205, 230 (2d Cir.1990)).  "[W]here there is some connection between the alleged conspiracy and the counts that charge [the defendant alleging spillover prejudice] alone such that some overlap of evidence can be anticipated at trial, [the defendant] has not carried his burden for showing a single trial to be prejudicial." Id.

Even where one defendant has been charged in fewer counts than another or played a lesser role than another, courts routinely deny severance motions.  "[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role." United States v. Ferrarini, 9 F. Supp. 2d 284, 290 (S.D.N.Y. 1998) (citing Cardascia, 951 F.2d at 483); Casamento, 887 F.2d at 1153.  A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." Cardascia, 951 F.2d at 483.

Crucially, Rule 8 "does not require a common goal or conspiracy." Ferrarini, 9 F. Supp. 2d at 292. Rather, it "requires only that the counts be connected by common facts or participants *or* that they arise out of a common plan or scheme. The similarity between the schemes

reduces the likelihood of any prejudicial spillover." Id. (emphasis in original).  Indeed, where one

set of schemes served to "cover up" another set of criminal acts, all of the acts should be tried

together.  Id.  Joinder has been found to be proper where "[p]roof of one scheme was helpful to a

full understanding of the other."  See United States v. Biaggi, 909 F.2d 662, 676 (2d Cir. 1990);

see also United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988) (holding that where "there is

a key link between the two offenses—one scheme stemmed from the other—. . . that link provides

a sound basis for joinder").

### B.    Argument

The law is clear that when one defendant is charged in fewer counts than another,

the commonality in the proof as to all defendants weighs strongly in favor of a joint trial.  That is

the case here.  It will be impossible for the jury to understand the nature, scope and execution of

the Retrophin schemes without understanding their purposes.  Among those purposes was to

"cover up" another set of criminal acts—the MSMB schemes—by stealing the funds from

Retrophin and paying off defrauded MSMB investors.  Ferrarini, 9 F. Supp. 2d at 292.  Thus,

"proof of one scheme" will be essential "to a full understanding of the other."  Biaggi, 909 F. 2d

at 676.  Moreover, Shkreli and Greebel are charged with the same types of crimes.  This is not a

situation in which, for example, one defendant is charged with a financial fraud and another is

charged with the same financial fraud plus racketeering, murder and a host of unrelated, but highly

prejudicial, crimes.  See DiNome, 954 F.2d at 844-45.  Indeed, limiting instructions have been

held to be adequate safeguards even where the most inflammatory charges are at issue.  See, e.g.,

O'Connor, 650 F.3d 839, 860 (2d Cir. 2011) (holding that limiting instruction to consider the

evidence separately as to each defendant was sufficient in a sex trafficking/incest case where

evidence was introduced of the non-moving defendant's past pedophilic conduct and proclivities).

Given the heavy burden placed on defendants to demonstrate spillover prejudice, it is unsurprising that the cases cited by Greebel in support of his argument are inapposite. For example, in United States v. Spy Factory, 960 F. Supp. 684 (S.D.N.Y. 1997), severance was, in fact, denied. In that case, the fact that the defendant had been named in some counts, but not others, was not sufficient to warrant severance because "'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" Id. at 688 (quoting United States v. Scarpa, 913 F.2d 993, 1015 (2d Cir. 1990)). This is true even where the evidence as to one defendant differs "in kind and degree" than as to another. Id. "Any other conclusion would lend the last-tried defendant a decided benefit in having heard the testimony of the government's witnesses and in having much of the government's case before trial." Id. (citing Richardson v. Marsh, 481 U.S. 280 (1997) (joint trials necessary to avoid "randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case")).

Severance was similarly denied in United States v. Kahale, 789 F. Supp. 2d 359, 393 (E.D.N.Y. 2009), and United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003), two additional cases cited by Greebel. In both cases, the court emphasized that proper instructions to the jury can cure potential spillover prejudice. Kahale, 789 F. Supp. 2d at 393; Spinelli, 352 F.3d at 55. Severance was also denied in Barret, 824 F. Supp. 2d at 433-34, where the court found that "severance is not necessarily required simply because evidence is admissible against one defendant, but not another." Indeed, the court in Barret found that severance may be warranted where only an "infinitesimal fraction" of the evidence pertained to the moving defendant. Id. at 434 (citing DiNome, 954 F.2d at 844-45) Such is not the case here, as discussed in more detail

below.  As the <u>Barret</u> court noted, joint trials are "particularly appropriate" where the "defendants allegedly participated in the same criminal conspiracy."  <u>Id.</u>

This case is also distinguishable from cases like <u>Locascio</u>, 357 F. Supp. 2d 536, another case relied upon by Greebel, because of the substantial overlap in the evidence against Shkreli alone and against Shkreli and Greebel together.  In <u>Locascio</u>, by contrast, the court granted severance because the evidence as to the non-moving defendants in a large racketeering conspiracy had little to do with the proof against the moving defendants.  <u>Id.</u>  Crucially, however, the <u>Locascio</u> court denied the severance motions of certain defendants where the broader racketeering evidence was directly relevant to their conduct.  <u>Id.</u> at 545-46.  This case is also distinguishable from <u>United States v. Gilbert</u>, 504 F. Supp. 565 (S.D.N.Y. 1980), because Greebel was not simply a minor participant in the fraudulent schemes.  Rather, the substantial role played by Greebel in the Retrophin schemes helped to conceal the MSMB schemes.  He was thus a crucial conspirator in the overall continuum of fraud charged in this case.

## IV.  <u>Shkreli's Notoriety is Not a Basis for Severance</u>

In his motion, Greebel also argues that Shkreli's notoriety and various public statements about this case and other issues will deprive him of a fair trial.  This argument is also without merit.

### A.    **Legal Standard**

Courts have routinely held that "differences in degree of guilt and possibly degree of notoriety" do not necessitate severance.  <u>United States v. Aloi</u>, 511 F.2d 585, 598 (2d Cir. 1975); <u>see also</u> <u>United States v. Gotti</u>, 399 F. Supp. 2d 214, 218 (S.D.N.Y. 2005) (holding that "the notoriety of the Gotti name" in a case involving John Gotti, Jr. and other co-defendants was not sufficient to warrant severance).  Coupled with the court's "inherent power to supervise and control

its own proceedings and to sanction counsel or a litigant for bad faith conduct or for disobeying the court's orders," searching voir dire and proper limiting instructions, there is little risk that a joint trial will prejudice Greebel due to Shkreli's notoriety.  See Mickle v. Morin, 297 F.3d 114, 125 (2d Cir. 2002); see also Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (discussing a court's inherent authority to control its proceedings and noting that "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum, in their presence, and submission to their lawful mandates").   This is in keeping with the strong federal policy favoring joint trials.

**B.   Argument**

Here, Shkreli's notoriety is not a valid basis for severance.  That Greebel can only cite to People v. Jenkins, 2015 NY Slip Op. 51740, 2015 WL 7740695, at *4 (N.Y. Cty Ct. Nov. 30, 2015), a single "unreported disposition" from the county court of Sullivan County, New York, in support of his position is telling.  In that case, the Mayor of Monticello, New York, and a city building inspector were charged with, among other things, taking a bribe in connection with the demolition of a city building.  The Jenkins court granted severance because the mayor "ha[d] garnered extreme notoriety of a negative nature" but his co-defendant "ha[d] NO notoriety" as a lower-level city employee.  Id. (emphasis in original).  In this case, by contrast, while Shkreli has a certain level of notoriety, Greebel is not an anonymous civilian or employee of Shkreli.  In fact, Greebel was a partner at a prominent law firm in New York and has been mentioned in news articles in connection with this case.  And Shkreli's comparatively greater level of notoriety is not a basis for severance. Indeed, courts have rejected severance even where one of the defendants was a member of the notorious Gotti family, holding that "a searching voir dire and emphatic jury

instructions will ensure that Gotti and his co-defendants receive a fair trial before an impartial jury." Gotti, 399 F. Supp. 2d at 218. Greebel thus cites no persuasive authority in his favor.

Regardless, almost none of the acts that have contributed to Shkreli's notoriety will be admitted during the government's case-in-chief and thus the risk of prejudice to Greebel is minimal. Shkreli's prescription drug pricing decisions, public attacks on women and public figures, "ongoing and deliberate efforts since his arrest to spread hate and hostility," tweets at popular music stars, ban from Twitter and the rest of the parade of horribles contained in Greebel's motions are, at best, possible fodder for cross-examination. (Greebel Br. at 34-38). The risk of prejudice is thus purely speculative and depends on Shkreli testifying at trial and providing a foundation for such cross-examination in his direct examination. While Greebel's motion is an attempt at a scathing indictment of Shkreli's character, the government will be trying only the charges in the Superseding Indictment.

Finally, even assuming, arguendo, that Shkreli's various public provocations are introduced at trial, it is entirely unclear whether Greebel will benefit or suffer prejudice from that evidence. Indeed, Greebel charges that Shkreli is building an illegitimate jury nullification strategy, which, ironically, could benefit Greebel. Or Greebel, who apparently "lives quietly with his wife and three children away from cameras, reporters and social media" may be looked upon favorably by jurors in contrast to Shkreli's public persona. (Greebel Br. at 38). Greebel may be seen as an island of calm compared to his co-defendant's "plan . . . [to] creat[e] a circus-like atmosphere and encouraging hostile publicity." (Greebel Br. at 35). These imponderables are no reason to sever clearly related defendants and criminal conduct into two burdensome trials. None of it undermines the well-settled ability of criminal juries to focus on the evidence in determining guilt, or the Court's control of her courtroom. Pure speculation is no reason to ignore the strong

federal policy in favor of joint trials.  Regardless, the Court has its full inherent authority to "impose silence, respect and decorum" in the presence of the jury and "submission to the [Court's] lawful mandates" should Shkreli even attempt to create a "circus-like atmosphere" as Greebel asserts.  Chambers, 501 U.S. at 43.  Indeed, the Court can even police Shkreli's conduct outside the courtroom if necessary to protect the sanctity of these proceedings.  As the Supreme Court has held, a court's "power to punish for contempt . . . reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not . . . merely disruption of court proceedings.  Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." Id. (citing Young v. United States ex rel Vuitton et Fils S.A., 481 U.S. 787, 798 (1987)).  Accordingly, Greebel's argument that Shkreli's notoriety is cause for severance is meritless.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendants'

severance motions should be denied.


Dated:  Brooklyn, New York
          March 3, 2017

                                    Respectfully submitted,

                                    ROBERT L. CAPERS
                                    United States Attorney
                                    Eastern District of New York


                                    _____/s/_____
                                    Winston M. Paes
                                    Jacquelyn M. Kasulis
                                    Alixandra E. Smith
                                    G. Karthik Srinivasan
                                    Assistant U.S. Attorneys
                                    (718) 254-6023 (Paes)

cc:    Clerk of the Court (KAM)
       Defense Counsel (By ECF and Email)