UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

UNITED STATES OF AMERICA,

           Plaintiff,

       v.

MARTIN SHKRELI and EVAN GREEBEL,

           Defendants.

---------------------------------------------------------x

ECF Case

No. 15-cr-00637 (KAM)

**<u>ORAL ARGUMENT REQUESTED
AND SCHEDULED FOR APRIL 7,
2017</u>**


# MR. GREEBEL'S REPLY MEMORANDUM OF LAW
# IN SUPPORT OF HIS MOTION FOR SEVERANCE

# TABLE OF CONTENTS

**Page**

I.      Preliminary Statement...................................................................................1

II.     Reply to Government's and Mr. Shkreli's Factual Allegations............................2

III.    Reply to Government's Arguments Opposing Severance ...................................4

     A.      The Mutually Antagonistic Defenses Compel Severance .......................................4

          1.      Mutually Antagonistic Defenses Rise to the Level of Prejudice Compelling Severance Where, to Believe One Defendant's Defense, the Jury Must Reject the Other Defendant's Defense.................5

          2.      There Are No Evidentiary Hurdles to Mr. Greebel's Defense that Mr. Shkreli Deceived Him as Demonstrated by Three Specific Examples of Proof that the Government Does Not Address ....................11

          3.      The Government's Arguments That These Defenses Are Not Mutually Antagonistic Make No Sense ....................................................13

     B.      The Government Overlooks the Substantial, Thorny, and Unique Evidentiary Issues and Spillover Prejudice Presented by the Rare Trial of Mutually Antagonistic Defenses in this Case .......................................................17

     C.      The Government Takes Too Lightly the Risk of Severe Prejudice Arising from Mr. Shkreli's Stated Intent to Achieve Jury Nullification ...........................19

IV.     Conclusion ...................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bruton v. United States*,
  391 U.S. 123 (1968)................................................................................19

*Crawford v. Washington*,
  541 U.S. 36 (2004)................................................................................10

*Grant v. Hoke*,
  921 F.2d 28 (2d Cir. 1990)......................................................................5

*United States v. Abakporo*,
  No. S3 12 CR 340 (SAS), 2013 WL 6188260 (S.D.N.Y. Nov. 25, 2013) ..............................6

*United States v. Andrews*,
  No. 1:12CR100, 2013 WL 6230450 (N.D. W. Va. Nov. 26, 2013) ....................................9, 10

*United States v. Aronson*,
   No. 2:12-cr-00245 (ADS) (E.D.N.Y. May 23, 2013), ECF No. 167............................ *passim*

*United States v. Carpentier*,
  689 F.2d 21 (2d Cir. 1982)....................................................................5, 14

*United States v. Copeland*,
  336 F. Supp. 2d 223 (E.D.N.Y. 2004) ...........................................................8

*United States v. Faltine*,
  No. 13-CR-315 KAM, 2014 WL 4370811 (E.D.N.Y. Sept. 2, 2014) ................................5, 14

*United States v. Green*,
  324 F. Supp. 2d 311 (D. Mass. 2004) ..........................................................9

*United States v. Lewis*,
  No. CRIM.A. 11-107, 2013 WL 6623898 (E.D. La. Dec. 16, 2013) ...................................10

*United States v. Odom*,
  888 F.2d 1014 (4th Cir. 1989) ................................................................9

*United States v. Romanello*,
  726 F. 2d 173 (5th Cir. 1984) ................................................................9

*United States v. Scott*,
  637 Fed. Appx. 10 (2d Cir. 2015) .............................................................17

*United States v. Serpoosh,*
    919 F.2d 835 (2d Cir. 1990)...........................................................................9, 14, 17

*United States v. Tootick,*
    952 F.2d 1078 (9th Cir. 1991) .........................................................................8

*United States v. Van Hise,*
    No. S4 12 Cr. 847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013)..............................9

*United States v. W.R. Grace,*
    439 F. Supp. 2d 1125 (D. Mont. 2006)...........................................................2, 14

*United States v. White,*
    887 F.2d 267 (D.C. Cir. 1989) .........................................................................10

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003)...............................................................................6

*Zafiro v. United States,*
    506 U.S. 534 (1993) (Stevens, J., concurring).................................................8, 17

Defendant Evan Greebel respectfully submits this reply memorandum of law in support of his Motion for Severance.  Oral argument is scheduled for April 7, 2017.

## I.      Preliminary Statement

Mr. Shkreli and Mr. Greebel have mutually antagonistic defenses that have set them on a course of war against one another.  Mr. Shkreli has unequivocally asserted a reliance on the advice of counsel defense, claiming that he relied on Mr. Greebel's advice "only to find himself indicted for crimes he did not commit" and erroneously asserting that Mr. Greebel misled the FBI after his arrest.  Shkreli Br. at 2 & 11-13.  And we have unequivocally asserted that Mr. Shkreli repeatedly lied to, omitted material information from, and deceived Mr. Greebel, and provided specific detailed examples of those lies and the deception.  Greebel Br. at 9-16.  These defenses are directly and irreconcilably antagonistic.  The law in the Second Circuit is clear: where defenses are genuinely mutually antagonistic such that acceptance of one defendant's defense requires rejection of the co-defendant's defense, as they are in this case, the prejudice is deemed compelling and automatically requires severance.

In opposing severance, the government (1) does not apply the correct legal standard, (2) overlooks Second Circuit decisions holding legally cognizable prejudice arises whenever a court confronts defenses that are genuinely mutually antagonistic, (3) fails to distinguish a well-reasoned decision squarely on all fours with this case by a highly respected judge in the Eastern District of New York, *United States v. Aronson*, Decl. of Lisa H. Rubin in Supp. of Mot. for Severance, Ex. 1 at 14 (Mem. of Decision & Order Granting Severance, No. 2:12-cr-00245 (E.D.N.Y. May 23, 2013), ECF No. 167) (hereinafter "Rubin Decl., Ex. 1"), and (4) minimizes the multiple ways in which Mr. Greebel will be able to prove his defense through admissible evidence at trial.  Indeed, the government does not recognize that that the attorney-client relationship between Katten Muchin Rosenman LLP ("Katten Muchin") and MSMB/Retrophin

differentiates this case from the garden variety multi-defendant case in which a severance is sought for reasons wholly different than the grounds sought here.

Should there be a joint trial and should the jury accept Mr. Greebel's defense, the jury will have to reject Mr. Shkreli's advice of counsel defense and find him guilty.  And there can be no serious dispute that, in a joint trial, the government will gain an unfair advantage to the detriment of Mr. Greebel's constitutional rights.  In the only two federal criminal cases we have been able to find presenting the same rare circumstance—a defendant asserting a reliance on the advice of counsel defense and a co-defendant-attorney asserting deception by the other defendant—the courts severed the trials.  *See Aronson*, Rubin Decl., Ex. 1; *United States v. W.R. Grace*, 439 F. Supp. 2d 1125 (D. Mont. 2006).

We respectfully request that Your Honor follow *Aronson*, sever the trials, and afford Mr. Greebel his right to defend himself in a separate trial from Mr. Shkreli.

## II.   Reply to Government's and Mr. Shkreli's Factual Allegations

Mr. Greebel is ***not*** charged in Counts One through Six relating to the alleged MSMB Capital and MSMB Healthcare schemes.  Yet, in their briefs, both the government and Mr. Shkreli unfairly and inaccurately attempt to draw Mr. Greebel into those alleged schemes.

For example, both the government and Mr. Shkreli quote paragraph 7 of the Superseding Indictment, charging in conclusory fashion that Mr. Shkreli "together" with Mr. Greebel "orchestrated" the MSMB Capital and the MSMB Healthcare schemes.  *See* Gov't Br. at 7-8; Shkreli Br. at 12-13.  And yet there is ***not a single reference*** to Mr. Greebel in the descriptions of those schemes in the indictment.  *See* Ind. ¶¶ 8-20.  Painting with a broad brush, both the government and Mr. Shkreli ask this Court to draw the unreasonable inference that Mr. Greebel must have been involved in these alleged schemes based on the number of hours billed by Mr. Greebel, the total amount charged by Katten Muchin, and general statements regarding Mr.

2

Greebel's alleged work.  *See* Gov't Br. at 9-10; Shkreli Br. at 1-2 & 8-11.  Suffice it to say that we respectfully disagree with much of what the government and Mr. Shkreli want this Court to infer from these generalizations.

Relying on statistics, both the government and Mr. Shkreli portray a skewed view of the facts.[1]  Both conspicuously omit any mention that there were ***approximately 88*** attorneys at Katten Muchin, including multiple litigation and corporate partners, working on MSMB and Retrophin matters.  One wonders how anyone could believe that Mr. Greebel was able to conspire with Mr. Shkreli in the midst of so many attorneys working on the very same matters.  Further, both the government and Mr. Shkreli create the misimpression that Mr. Greebel billed a majority of the work on those matters—he did not.  Both omit any mention that Mr. Greebel had other significant clients.  Both omit any mention that, whatever Katten Muchin billed, the majority of the money Katten Muchin collected from Retrophin related to work on a successful listing on Nasdaq, multiple litigations, and two transformative acquisitions.[2]

Indeed, in a rush to tie Mr. Greebel to the MSMB-related schemes, the government and Mr. Shkreli make mistakes in describing the facts.  For example, the government states that, during Mr. Shkreli's testimony before the SEC on February 24, 2014, Mr. Shkreli "stated that Greebel had handled the documents for a private placement offering for MSMB Healthcare in 2012."  Gov't Br. at 11.  But Mr. Shkreli said no such thing, and Mr. Greebel did not ever handle any private placement offering for MSMB Healthcare.  Asked with whom Mr. Shkreli discussed amending *Retrophin's* private placement offering in September 2012, Mr. Shkreli testified:

---

[1]  One is reminded of what Mark Twain and Andrew Lang both observed about the use of statistics.  Twain said: "There are lies, damned lies, and statistics."  Lang put it a little differently:  "He uses statistics as a drunk man uses lamp posts – for support rather than for illumination."

[2]  Mr. Shkreli's continued claims that he was Mr. Greebel's client is inaccurate.  Katten Muchin represented MSMB/Retrophin, and a Katten Muchin partner other than Mr. Greebel represented MSMB and Mr. Shkreli in connection with Mr. Shkreli's testimony before the SEC in August 2013 and February 2014.

"Well obviously our attorney at Katten Muchin, Evan Gr[eebel], who really took care of all the documents, they didn't edit them or touch them at all at this point, so I could imagine he would be one of the people involved in that."  Suppl. Decl. of Lisa H. Rubin in Supp. of Mot. for Severance, Ex. 33 at SHKRELI0000254:3-7.

Finally, Mr. Shkreli's salacious allegation that Mr. Greebel misled the FBI agents on the day of his arrest (Shkreli Br. at 17-19) is totally and utterly false.  Despite asking for a copy of the indictment (and requesting an opportunity to call counsel on more than one occasion), the FBI asked Mr. Greebel questions without context, and Mr. Greebel answered each and every one truthfully.

### III.    Reply to Government's Arguments Opposing Severance

### A.    The Mutually Antagonistic Defenses Compel Severance

The government makes two arguments against severance based on the mutually antagonistic defenses of the defendants.  The government does not dispute that a core defense of Mr. Greebel will be that Mr. Shkreli lied to and deceived Mr. Greebel.  And the government does not dispute that Mr. Shkreli has "clearly stated that he would pursue an advice of counsel defense at trial."  Gov't Br. at 17.  Instead, the government asserts (1) that these defendants "are not in fact 'mutually antagonistic,'" and (2) even if they were, "the defendants have not articulated prejudice sufficient to require a severance."  *Id.* at 21.  The government's arguments miss the mark in at least three ways.

As explained below, the government does not apply the correct legal standard, overlooking Second Circuit decisions holding legally cognizable prejudice arises whenever a court confronts defenses that are genuinely mutually antagonistic and require the jury to disbelieve the core defense of one co-defendant if they believe the core defense of another co-defendant.  Indeed, the government's criticism of a decision squarely on all fours with this

4

case—Judge Spatt's decision in *United States v. Aronson*—does not withstand scrutiny.  Second, the government's argument that the defenses "are not as adversarial as they appear," (Gov't Br. at 24), overlooks the inherent mutual antagonism, minimizes the multiple ways in which Mr. Greebel will be able to prove his defense through admissible evidence at trial, and ignores the specific examples of proof Mr. Greebel submitted.  Finally, the government offers speculative theories about how the jury might acquit both defendants.  But there is no support in law or in fact for the government's hypothetical scenarios that do not take into account the irreconcilable and mutually antagonistic defenses in this case.

1.    **Mutually Antagonistic Defenses Rise to the Level of Prejudice Compelling Severance Where, to Believe One Defendant's Defense, the Jury Must Reject the Other Defendant's Defense**

The government's opposition to severance attempts to create a new, and stringent, legal standard through which a moving defendant must *separately* prove mutually antagonistic defenses and prejudice.  That approach contradicts the Second Circuit standard, as set forth in *United States v. Carpenter*, 689 F.2d 21, 27-28 (2d Cir. 1982), and its progeny:  "The defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) ***that compels severance of that defendant***, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant."  (emphasis added) (internal citations omitted); *accord Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990) ("It has nonetheless been recognized that a joint trial is fundamentally unfair where co-defendants present mutually antagonistic defenses.").  Indeed, this Court in *United States v. Faltine*, No. 13-CR-315 KAM, 2014 WL 4370811, at *5 (E.D.N.Y. Sept. 2, 2014), recognized this principle:  "Antagonistic defenses rise to the level of prejudice requiring severance only 'upon a showing that the jury, in order to believe the core testimony offered on

behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.'"[3]

Courts require severance in such circumstances because compelling prejudice necessarily arises when the jury must reject the defense of one defendant to accept the defense of a second defendant.  Here, to accept Mr. Shkreli's reliance on the advice of counsel defense, the jury must find that, *inter alia*, he "fully and honestly [laid] all the facts before his counsel," (Gov't Br. at 23 n.8), and the jury must reject Mr. Greebel's defense that Mr. Shkreli lied to, omitted material information from, and deceived him.  Similarly, to accept Mr. Greebel's defense that Mr. Shkreli lied to, omitted material information from, and deceived him, the jury must reject Mr. Shkreli's reliance on the advice of counsel defense.

While the government relies on *United States v. Abakporo*, No. S3 12 CR 340 (SAS), 2013 WL 6188260, at *2-5 (S.D.N.Y. Nov. 25, 2013), for the proposition that "[i]n those rare instances where a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice,'" (Gov't Br. at 22), that case does not support its proposed approach.  The *Abakporo* court made clear—following a long line of prior decisions—that "[d]efenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant,'" and that such circumstances constitute "what is known as 'legally cognizable prejudice.'"  *Abakporo*,

---

[3]   The government relies on *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003), for the same proposition, albeit the facts in *Yousef* are very different than the circumstances in this case.  In *Yousef*, the defendants Ramzi Yousef and Eyad Ismoil appealed their convictions for their involvement in the February 1993 bombing of the World Trade Center in New York.  In a few paragraphs of a 173-page decision, the Second Circuit agreed with the district court that "Yousef has 'not articulate[d] any specific instances of prejudice. Instead, [he] contend[s] that the very nature of [his and Ismoil's] defenses, without more, prejudiced [him].'"  *Id*. at 151.  Among other reasons for the failure to articulate prejudice was that Ismoil had failed to argue at trial that he was "duped" into bombing the World Trade Center and thus the nature of his defense was not mutually antagonistic to Yousef's defense.  *Id*. at 152.

2013 WL 6188260, at *3.  The *Abakporo* court ultimately found that the defenses were not mutually antagonistic on wholly different facts.  *See* Greebel Br. at 21-22.

The government's criticism of Judge Spatt's decision in *Aronson* does not withstand scrutiny.  *See* Rubin Decl., Ex. 1.  The government does not dispute that the case is strikingly similar to this one.[4]  Rather, the government's first criticism is that Judge Spatt did not take into account any "scenarios in which the jury could have credited one defendant's defense and still acquitted the other defendant."  Gov't Br. at 31.  That is not necessarily the correct legal standard.  Moreover, the government overlooks Judge Spatt's thorough analysis of the case law in the Second Circuit and his careful consideration in a 16-page decision as to whether the defenses were mutually antagonistic.  Rubin Decl., Ex. 1 at 12-15.  The government's second criticism is that Judge Spatt "conducted no analysis" to determine whether the defendants would suffer prejudice arising from the mutually antagonistic defenses.  Gov't Br. at 31.  But again, the government overlooks Judge Spatt's clear determinations, specifically: that a certain amount of prejudice is acceptable in a joint trial; that there must be true incompatibility between the defenses to be considered mutually antagonistic; that mutually antagonistic defenses require a finding that, if the jury believes one defense, the jury must disbelieve the other; that the claimed defenses of both defendants were "uncomplicated and easy to understand"; that the attorney Aaron was going to allege that Aronson had lied to and deceived him and that, by contrast, the reliance on advice of counsel defense required Aronson to show that he did not lie to or deceive Aaron; and that Judge Spatt found the mutually antagonistic defenses would require the jury to

---

[4]  Both cases charge the attorney-defendant and the CEO defendant with conspiracy to commit securities fraud; both are "complex"; and the attorney-defendant in both alleged the CEO-defendant had lied to the attorney.  In *Aronson*, there was some question as to whether the CEO-defendant would actually assert a reliance on the advice of counsel defense, *see* Rubin Decl., Ex. 1 at 13, but there is no question that Mr. Shkreli has asserted that defense.

reject the reliance on advice of counsel if they accepted the attorney's defense of lies and deception.[5]  Rubin Decl., Ex. 1 at 12-15.  Accordingly, this Court should reject the government's overly narrow and hypercritical reading of Judge Spatt's decision.

Indeed, courts find that truly mutually antagonistic defenses—such as the ones presented in this case—compel severance because of the severe prejudice that arises from those defenses.  Evidence exonerating Mr. Greebel, *i.e.* showing that Mr. Shkreli lied to and deceived him, will inculpate Mr. Shkreli.  By the same token, evidence exonerating Mr. Shkreli through the advice of counsel defense will inculpate Mr. Greebel.  Examples of the severe prejudice arising out of genuinely mutually antagonistic defenses include, but certainly are not limited to, the following:

- **Co-defendants become "extra prosecutors":**  In a joint trial, mutually antagonistic defendants have perverse incentives to heap blame on and convict their co-defendants.  To zealously represent their clients, defense counsel will do everything ethically and legally permissible to convict the other defendant and demonstrate that the co-defendant is not credible.  Yet "[t]he existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor."  *Zafiro v. United States*, 506 U.S. 534, 544 n.3 (1993) (Stevens, J., concurring); *accord United States v. Copeland*, 336 F. Supp. 2d 223, 224 (E.D.N.Y. 2004) (holding irreconcilable defenses are so prejudicial to compel severance "where, as here, in effect, a defendant's counsel becomes a second prosecutor") (internal citations omitted).

- **Co-defendants offer "gruesome and outlandish" opening and closing statements about each other's guilt:**  Opening and closing arguments—while not evidence—will allow Mr. Greebel to argue that Mr. Shkreli is the sole perpetrator of crimes, and will allow Mr. Shkreli to argue that he was merely following Mr. Greebel's advice, and that if the conduct was a crime, then Mr. Greebel is culpable.  Indeed, "[o]pening statements can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the 'other' defendant."  *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991).

---

[5]  The history of *Aronson*—which the government itself recites—further reflects that Judge Spatt gave careful consideration to the automatic prejudice that follows from mutually antagonistic defenses.  *See* Gov't Br. at 31 n.9.  Judge Spatt initially denied the attorney-defendant's motion for severance.  That Judge Spatt reversed course—once it was sufficiently clear that Aronson would assert a reliance on the advice of counsel defense— reflects that Judge Spatt found the defenses were mutually antagonistic *and* prejudicial.  *See* Rubin Decl., Ex. 1 at 15 ("Aaron's theory with respect to Aronson's advice-of-counsel defense rises above being merely hypothetical, as Aaron has adequately shown that Aronson intends to raise such a defense….").

8

- **Juries "unjustifiably infer" that antagonism proves guilt:**  In a joint trial, it is almost certain that the government will argue to the jury that both defendants cannot be right—that Mr. Shkreli's reliance on the advice of counsel defense conflicts directly with Mr. Greebel's defense that Mr. Shkreli lied.  The jury will likely infer that these mutually antagonistic defenses are merely evidence of two guilty individuals seeking to blame each other.  Consequently, the jury is more likely to reject both defenses and find them both guilty.  *See United States v. Van Hise*, No. S4 12 Cr. 847 (PGG), 2013 WL 6877319, at *12 (S.D.N.Y. Dec. 31, 2013) (Severance "should be granted when antagonism at the essence of the defenses prevails to such a degree—even without being mutually exclusive—that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty.") (citing *United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990)). [6]

- **Co-defendants seek mutual destruction through pre-trial motions & cross-examination strategies**:  Counsel for each defendant will make and oppose motions, and cross-examine witnesses, with the goal of advancing each respective defense and destroying the co-defendant's defense—and without objection by the government.[7]  For example, in attacking Mr. Greebel's defense, Mr. Shkreli's counsel likely would prosecute Mr. Greebel for revealing privileged and/or confidential information in his own defense.

- **Joinder may chill a defendant's right to testify:**  Joinder may chill each defendant's constitutional right to testify.  On the one hand, Mr. Shkreli's decision to testify might be chilled knowing that we are duty-bound to cross-examine him using whatever confidential information is known to our client and likely unknown to the government.  On the other hand, Mr. Greebel's decision to

---

[6]  *See also United States v. Romanello,* 726 F. 2d 173 (5th Cir. 1984) ("In this case, we are concerned with the specific prejudice that results when defendants become weapons against each other, clawing into each other with antagonistic defenses.  Like the wretches in Dante's hell, they may become entangled and ultimately fuse together in the eyes of the jury, so that neither defense is believed and all defendants are convicted."); *see also United States v. Green*, 324 F. Supp. 2d 311, 325 (D. Mass. 2004) ("There is a considerable risk that each defendant, ably throwing pot-shots at the other, would make the government's case for it.  Specifically, in the din, a juror could well say: 'I cannot figure out who did the shooting, given the defendants' mutual accusations, but it doesn't matter.  They were involved somehow and that is enough.'  That conclusion would redound to the government's benefit.").

[7]  For example, during cross-examination of government witnesses relating to MSMB Capital and MSMB Healthcare, we will seek to elicit testimony reiterating the prosecution's charges and demonstrating that, just as Mr. Shkreli deceived and lied to these individuals, Mr. Shkreli deceived and lied to Mr. Greebel.  Similarly, we anticipate that, on cross-examination, Mr. Shkreli's counsel will seek to elicit evidence that Mr. Greebel and/or other Katten Muchin lawyers were somehow involved in certain issues or decisions and thus, by implication, responsible for Mr. Shkreli's conduct.  *See, e.g.*, *United States v. Odom*, 888 F.2d 1014, 1015 (4th Cir. 1989) (severance granted where after "it became obvious that [one co-defendant's] attorney had adopted a plan of defense which included doing all in his power to attack [the other] codefendant"); *United States v. Andrews*, No. 1:12CR140, 2013 WL 6230450, at *6 (N.D. W. Va. Nov. 26, 2013) (severance granted where the court "would have to choose between restricting [one co-defendant's] defense or permitting [his] attacks on [his co-defendant]; either option results in prejudice").

testify—which he has every present intention of doing—might be chilled by any attempt by Mr. Shkreli's counsel to suggest that it is unethical for Mr. Greebel to reveal client confidences to defend himself.

- **Joinder creates a potential conflict between Sixth Amendment and privilege:** While Mr. Shkreli has waived his privileges to certain areas, and Retrophin has waived its privilege to certain areas, Mr. Greebel has an absolute right to cross-examine Mr. Shkreli and/or any other witness, or introduce admissible evidence, outside the scope of the waivers.  Depending on the circumstances, that might conflict with Mr. Shkreli's privilege rights.  *See*, *e.g.*, *United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989) ("The prosecution may not gain, through the device of a joint trial, admission against one defendant of otherwise inadmissible evidence on the happenstance that the door to admitting the evidence has been opened by a codefendant.").

- **Joinder presents a unique Confrontation Clause problem:**  Mr. Shkreli has argued and will argue that he has been "indicted for crimes that he did not commit" by relying on Mr. Greebel's legal advice.  Shkreli Br. at 2.  Should Mr. Shkreli fail to testify, Mr. Greebel will not be able to exercise his constitutional right to confront his accuser through cross-examination.  *Cf. Crawford v. Washington*, 541 U.S. 36 (2004).

- **Joinder reinforces the prosecution's case against each defendant:**  Joinder will benefit the government to the detriment of the co-defendants via the profound effects of repetitive accusations against one another.  When Mr. Greebel accuses Mr. Shkreli of criminal acts, it will reinforce the government's case against Mr. Shkreli.  And when Mr. Shkreli accuses Mr. Greebel of providing advice that got him indicted, it will reinforce the government's case against Mr. Greebel.[8]

Finally, we respectfully submit the attached declaration of Michael S. Frisch, Adjunct Professor of Law and the Ethics Counsel at Georgetown University Law Center, that outlines special concerns that likely would "exacerbate" the prejudice arising out of a joint trial of  an attorney-defendant asserting that the client/client representative lied, on the one hand, and the

---

[8] *See United States v. Lewis*, No. CRIM.A. 11-107, 2013 WL 6623898, at *3 (E.D. La. Dec. 16, 2013) (granting severance where a co-defendant's testimony "will reduce the Government's burden to prove [the other co-defendant] guilty beyond a reasonable doubt")); *United States v. Andrews*, No. 1:12CR100, 2013 WL 6230450, at *6 (N.D.W. Va. Nov. 26, 2013) (granting severance because joinder would "reduc[e] the government's burden" especially where "the defense counsel are not always held to the limitations and standards imposed on the government prosecutor") (internal citation omitted).

client-co-defendant asserting a reliance on the advice of counsel defense, on the other hand.  *See* Decl. of Michael S. Frisch in Supp. of Mot. for Severance.

> **2.      There Are No Evidentiary Hurdles to Mr. Greebel's Defense That Mr. Shkreli Deceived Him as Demonstrated by Three Specific Examples of Proof that the Government Does Not Address**

The government's arguments that the defenses "are not as adversarial as they appear" because the proposed defense "faces evidentiary hurdles" (Gov't Br. at 24) is meritless.

First, the government does not dispute that the proffered defenses of Mr. Shkreli and Mr. Greebel are genuine and that we intend to offer evidence in support of Mr. Greebel's defenses. Rather, the government speculates that we might face challenges (*i.e.*, "hurdles") proving some points.  Such speculation does not trump or in any way undermine the *prima facie* showing that we have made as to the need for a severance here.

Second, the government does not cite a single case in support of its theory that, if there are evidentiary hurdles, then mutually antagonistic defenses are "not as adversarial as they appear." *Id.*  Moreover, a defendant has an ironclad right not to disclose his trial strategies and how he intends to present proof of his defenses at trial.  *See* Greebel Br. at 10-11 n.2.  If courts required a defendant to outline such defenses in detail to obtain severance, as the government suggests, it would interfere with a defendant's constitutional rights.

Third, there are no evidentiary hurdles to Mr. Greebel's core defense that Mr. Shkreli lied, stated half-truths, omitted material facts and deceived him.  The government reads the undersigned's declaration *summarizing* certain proffered testimony of Mr. Greebel too literally and narrowly.  *See* Gov't Br. at 24-27.  The government overlooks our stated intention to present admissible evidence that Mr. Shkreli lied to, deceived, and omitted information from Mr. Greebel and other attorneys at Katten Muchin.  *See* Brodsky Decl. ¶¶ 2a-2f.  We agree that Mr. Greebel will testify based on his personal knowledge at the time of the relevant events.  We also

agree that Mr. Greebel will be able to testify about whether he was aware of certain information that contradicts what Mr. Greebel was told at the time.  For example, we will be able to show Mr. Greebel certain email communications already admitted into evidence as business records, statements by Mr. Shkreli not offered for the truth of the matter, and/or evidence of Mr. Shkreli's then-present state of mind—which Mr. Greebel neither received nor sent—for purposes of asking Mr. Greebel whether certain information in those emails was conveyed to him at the time. While we agree, of course, that neither Mr. Greebel nor any other witness will be able to testify about another person's state of mind, such testimony from Mr. Greebel is not necessary to prove that Mr. Shkreli lied to and deceived him—just as the government presumably believes it can prove that Mr. Shkreli lied to others through admissible evidence.

Fourth, conspicuously absent from the government's opposition is any mention of the three specific examples of proof that Mr. Shkreli lied to and deceived Mr. Greebel about material facts relating to the indictment.  *See* Greebel Br. at 11-16.  Through documentary evidence alone, we will be able to prove that Mr. Shkreli lied to Mr. Greebel about the amount of assets that MSMB Capital and MSMB Healthcare had in the fall of 2011; that Mr. Shkreli lied to and deceived Mr. Greebel relating to a loan that a former member of Retrophin's Board of Directors made to Retrophin; and that Mr. Shkreli lied to and deceived both Mr. Greebel and another partner at Katten Muchin about repaying a loan from MSMB Healthcare that caused the other partner to unknowingly provide false information to the SEC.  *Id*.  The documents are admissible (a) under Rule 801 because Mr. Shkreli's lies are not offered for the truth, (b) under Rule 803(3) as documents reflecting the then-existing state of mind of the declarant, and (c) under Rule 803(6) as business records.  Moreover, Mr. Greebel could testify about, among other things,

what Mr. Shkreli told him at the time; what Mr. Shkreli did not tell him; and how, if at all, Mr. Shkreli's lies, omissions, and deceptions impacted legal advice.

Fifth, although the government claims that Mr. Greebel's evidence will not "be as inflammatory as Mr. Greebel's motion papers suggest," (Gov't Br. at 27), given that we will be proving, through documents and testimony of multiple witnesses, that Mr. Shkreli lied to, deceived, and omitted material information from Mr. Greebel and other Katten Muchin lawyers with respect to facts and events at issue in the government's indictment, such evidence will, by definition, be "inflammatory."  In fact, our presentation of the evidence at trial will, by necessity, make us a second prosecutor of Mr. Shkreli.

Finally, the government also questions how we will be able to admit evidence that Mr. Shkreli had a long-term pattern and practice of blaming others for his own misconduct.  Without outlining all evidence supporting that defense, we proffer to the Court that we will be able to introduce admissible evidence in support of this defense.  Indeed, we stated in a sworn declaration that "it is our present intention as counsel to Mr. Greebel to present evidence at trial that:  Mr. Shkreli has a long-term pattern and practice of blaming others for his own misconduct."  Brodsky Decl. ¶ 2f.  By way of example, we will be able to introduce admissible evidence relating to the subject matters of the indictment where Mr. Shkreli, in fact, blamed others for his misconduct.  Should Mr. Shkreli testify, we will cross-examine him regarding his pattern and practice of blaming others, and such evidence will be admissible because, among other reasons, it goes to Mr. Shkreli's credibility.

### 3.    The Government's Arguments That These Defenses Are Not Mutually Antagonistic Make No Sense

The government faces an impossible task in arguing that Mr. Shkreli's advice of counsel defense—requiring proof that Mr. Shkreli provided accurate and complete information to Mr.

Greebel—is not mutually antagonistic with a core of Mr. Greebel's defense that Mr. Shkreli did not provide accurate and complete information to him.  Indeed, all of the government's arguments that these defenses are not mutually antagonistic find no support in the case law; would impose a substantial obstacle to any defendant's right to severance; and make no sense.

The government's principal argument that these defenses "do not require a jury to find one defendant guilty if that jury accepts the other defendant's defense," (Gov't Br. at 27), is wrong.  The government cites no case where a court has found that a client or client representative's advice of counsel defense is not mutually antagonistic with an attorney's defense that the client or client representative lied and deceived him/her.  Moreover, based on our review of federal case law, we found that the only two courts addressing whether to sever the trials against one co-defendant asserting the advice of counsel defense and a co-defendant-attorney asserting deception by the other defendant granted severance.  *See Aronson*, Rubin Decl., Ex. 1; *W.R. Grace*, 439 F. Supp. 2d at 1125.

The government's contention that "it is implausible that Shkreli and Greebel will provide diametrically opposed testimony on each and every relevant fact," (Gov't Br. at 29), equally misses the mark.  Diametric opposition on "each and every relevant fact" is not the legal standard, nor could it be.  Such a rule would make severance entirely impossible.  Courts focus on whether the "core" of one defendant's defense will be mutually antagonistic with the "core" of another defendant—not whether there are diametrically opposing positions on each and every relevant fact.  *Serpoosh*, 919 F.2d at 838; *Carpentier*, 789 F.2d at 28; *Faltine*, 2014 WL 4370811, at *5.

The government hypothesizes five theories—divorced from any factual or legal support—as to how a jury might find the defenses are *not* mutually antagonistic.  *See* Gov't Br.

14

at 28.  None of these theories take into account the reality of the irreconcilable and mutually antagonistic defenses in this case.

The government's second and third theories highlight this point.  The government speculates it might not meet its burden of proving a case beyond a reasonable doubt and thus the defendants might be acquitted regardless of their respective defenses.[9]  The fundamental flaw in this argument is that there is always a possibility that the jury will acquit any defendant if the government fails to meet its burden of proof or for any other reason.  If the mere possibility that the government may not prove its case against either defendant were a valid basis for denying severance—a theory that finds no support in the case law—then severance never would be granted.

The government's other theories of potential outcomes in the face of mutually antagonistic defenses are untethered to any evidence.  The government's first theory—that the jury might accept Mr. Shkreli's reliance on advice of counsel defense but find that Mr. Greebel was "simply neglectful" (Gov't Br. at 28)—requires the jury to accept a proposition that neither the government nor Mr. Greebel intends to argue.   The government's fourth theory—that the jury might accept Mr. Greebel's defense that Mr. Shkreli lied to and deceived him "but also acquit Shkreli because Shkreli was simply passing along that misinformation from another source and did not have the intent to commit a crime" (*id.*)—contradicts the government's own case, lacks evidentiary support, and simply makes no sense.  For example, there is no reason to believe that Mr. Shkreli will argue that he determined the amount of assets under management at MSMB Capital and MSMB Healthcare from information provided by any source other than

---

[9]   *See* Gov't Br. at 28 ("The jury may ... also acquit Greebel because the government did not meet its burden to show that either the Retrophin Misappropriation scheme or the Unrestricted Share scheme was in fact a fraud;" "The jury may ... also acquit Shkreli because the government did not meet its burden to show either the Retrophin Misappropriation Scheme or the Unrestricted Share Scheme was in fact a fraud.").

himself or that he did not control those assets at all relevant times.  Indeed, Mr. Shkreli was the head of MSMB Capital and MSMB Healthcare, served as its sole trader, and fully understood the amount of assets under management at those funds and their affiliates.  And both the government and Mr. Greebel will offer evidence at trial to prove that Mr. Shkreli knew the amount of assets under management but lied about it to others.

Similarly, the government's fifth and final theory—that "the jury may conclude that both defendants sincerely believe the defenses they are advancing, and there was simply miscommunication between Shkreli, Greebel and the other Katten attorneys on key factual issues" (*id.*)—is both irrelevant and ignores evidence.  It is irrelevant because a jury accepting that a defendant believes his defense does not mean that they credit it.  The jury would not credit Mr. Greebel's defense that Mr. Shkreli lied to him if it concluded that "there was simply miscommunication."  *Id*.  Further, it ignores the evidence for the reasons given above:  Once again, for example, our proof that Mr. Shkreli lied to Mr. Greebel about the assets under management at MSMB Capital and MSMB Healthcare cannot be explained though a "miscommunication."

At the end of the day, if the government's hypotheticals—which are divorced from the government's own theories of the case, Mr. Greebel's theories of the case, Mr. Shkreli's theories of the case, and the actual facts of the case—were sufficient to overcome mutually antagonistic defenses, then the government would always be able to defeat a motion for severance.

Given this, the government attempts to create further limits on severance beyond mutually antagonistic defenses and suggests severance should be granted only in simple cases with short trials.  *See id*.  But no case stands for that proposition.  Indeed, "[w]hen many

defendants are tried together in a complex case and they have markedly different degrees of culpability, th[e] risk of prejudice is heightened." *Zafiro*, 506 U.S. at 539.

The government's reliance on *United States v. Serpoosh*, 919 F.2d 835, 836-38 (2d Cir. 1990), and *United States v. Scott*, 637 Fed. Appx. 10, 13 (2d Cir. 2015) (Gov't Br. at 29), is also misplaced.  In *Serpoosh*, the Second Circuit held that "the prejudice caused by the joint trial is evident" due to the mutually antagonistic defenses.  919 F.2d at 838.  Whether the facts of the case were simple or complex was not a factor.  In *Scott*, the defenses were not mutually antagonistic; no one argued—as they will at this trial—that the client representative relied on the advice of counsel, that the attorney was deceived, and/or that the other co-defendant was guilty of any charges.  Here, where the defendants have mutually antagonistic defenses, there is "legally cognizable prejudice," and the defendants must be severed.

**B.     The Government Overlooks the Substantial, Thorny, and Unique Evidentiary Issues and Spillover Prejudice Presented by the Rare Trial of Mutually Antagonistic Defenses in this Case**

The government's argument that the evidentiary obstacles either "do not exist" or "do[ ] not rise to the level that [ ] severance is warranted" (Gov't Br. at 36) overlooks the substantial and thorny evidentiary issues presented by a joint trial in this unique case.

It is rare to have a joint criminal trial against an attorney and the principal representative of the client.  And it is even rarer to have a joint criminal trial against an attorney asserting that the principal representative of the client lied to and deceived him, and the principal representative of the client asserting a reliance on the advice of counsel defense.  The nature of this conflict gives rise to atypical evidentiary issues.  *See* Frisch Decl., ¶¶ 7-10.

For example, given that Mr. Shkreli consulted with and sought legal advice from Mr. Greebel over several years, Mr. Greebel learned a lot of information about Mr. Shkreli and Retrophin.  Should Mr. Shkreli take the witness stand in his defense, we will be duty-bound to

cross-examine Mr. Shkreli with such knowledge.  Further, in attacking Mr. Shkreli's reliance on the advice of counsel defense, we will be seeking to introduce evidence that ordinarily would not be part of this criminal trial, but would go to Mr. Shkreli's ability to rely on that defense.  While it is difficult to foresee all of the complications arising from a joint trial, there can be no serious dispute that the evidentiary issues will be atypical and will present challenging, if not novel, questions for the Court.

The government questions how we will be able to offer into evidence certain post-arrest statements made by Mr. Shkreli to law enforcement that inculpate Mr. Shkreli but exculpate Mr. Greebel.  *See* Greebel Br. at 25-26.  But such statements will be admissible in several respects. First, should Mr. Shkreli testify at trial, we will be able to cross-examine him about his post-arrest statements.  Second, even if Mr. Shkreli does not testify at trial, we expect to offer the statements into evidence pursuant to Rule 804(b)(3), which applies in the event the declarant is unavailable and the statement was made against the declarant's interest.  Pursuant to Rule 804(b)(1), we expect to offer portions of Mr. Shkreli's SEC testimony into evidence.  Further, if the government moves to admit Mr. Shkreli's statements and Mr. Shkreli does not testify, we may seek to admit Mr. Shkreli's statements for purposes of attacking Mr. Shkreli's credibility pursuant to Rule 806.

Although the government argues that it will be able to admit "most, if not all, of the evidence in support of the MSMB schemes against Greebel," (Gov't Br. at 38), that is not necessarily so.  The government will have to demonstrate how such evidence can be admitted against Mr. Greebel under Rules 401 and 403, as well as the other rules of evidence.  For example, the following types of evidence would clearly not be admissible under any theory against Mr. Greebel: Mr. Shkreli's post-arrest statements, Mr. Shkreli's actions in any schemes

that pre-date when Mr. Greebel and Mr. Shkreli met, and Mr. Shkreli's statements prior to the charged conspiracies in Counts Seven and Eight.  For example, the government does not address how it would be able to admit evidence of Mr. Shkreli's alleged misuse of MSMB monies in a trial against Mr. Greebel.

Finally, while acknowledging that it will be seeking to admit Mr. Shkreli's post-arrest statements, (Gov't Br. at 38-39), the government does not identify them.  Without such notice, however, neither the Court nor the parties can assess the extent to which such statements are prejudicial and cannot be effectively redacted to comport with *Bruton v. United States*, 391 U.S. 123, 126 (1968).

## C. The Government Takes Too Lightly the Risk of Severe Prejudice Arising from Mr. Shkreli's Stated Intent to Achieve Jury Nullification

This case is like no other.  In a first-of-its-kind, we have a defendant who has a stated plan—corroborated by his repeated post-arrest actions—to disrupt the criminal trial, instill confusion, taint the jury, and apparently seek jury nullification.  Due to that plan—and not Mr. Shkreli's notoriety—the risk of severe prejudice to Mr. Greebel is real and substantial.  And it alone warrants a severance.

The government does not dispute that Mr. Shkreli has a stated plan to create a bizarre, one-of-a-kind spectacle in an apparent effort to cause the jury to reject the evidence and refuse to apply the law.  The government also does not dispute that Mr. Shkreli has engaged in a calculated effort to become more polarizing in pursuit of that plan.  And the government does not dispute the documentary, audio, and video proof of this plan.

Instead, the government makes three arguments that do not take into account the unique reality of this situation.  First, the government says "notoriety" is not a basis for severance.  But we are not seeking severance due to notoriety but rather due to Mr. Shkreli's stated plan and

19

actions.  Second, the government argues that "it is entirely unclear whether Greebel will benefit

or suffer prejudice from" Mr. Shkreli's public provocations and plans.  Gov't Br. at 45.  But any

attempts to distract the jury from the law and the facts, to spread hatred and inspire dissension

among jurors, and to provoke jurors into doing anything other than evaluating the evidence will

be severely prejudicial to Mr. Greebel.  An objective and dispassionate review of the facts will

result in the acquittal of Mr. Greebel and will demonstrate, among other things, that Mr. Greebel

has been victimized by someone who has lied to and deceived many others.  Finally, without

question the Court has the authority to control the courtroom; however, Mr. Shkreli has

demonstrated that his actions are unpredictable and unfortunately uncontrollable.

## IV.    Conclusion

For the foregoing reasons, and the reasons explained in our memorandum in support of

severance, this Court should sever Mr. Greebel's trial from Mr. Shkreli.


Dated:  New York, New York
        March 10, 2017

                                        */s/* Reed Brodsky
                                        Reed Brodsky
                                        Winston Y. Chan
                                        Lisa H. Rubin

                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        (212) 351-4000
                                        rbrodsky@gibsondunn.com
                                        *Counsel for Defendant Evan Greebel*

20