JMK:AES/GKS
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                              15 CR 637 (KAM)

MARTIN SHKRELI and
EVAN GREEBEL,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


THE GOVERNMENT'S MEMORANDUM OF LAW
IN RESPONSE TO THE DEFENDANTS' REMAINING SUBSTANTIVE MOTIONS

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government submits this memorandum of law in response to (1) the defendant Martin Shkreli's memorandum of law, dated March 27, 2017 (see Dkt. No. 174), in support of his motions to suppress certain documents produced by Retrophin in response to government subpoenas and for disclosure of materials related to a defrauded Retrophin employee ("Shkreli Br.")[1], and (2) the defendant Evan Greebel's memorandum of law, dated March 27, 2017 (see Dkt. No. 178), in support of his motions to strike certain language from the Superseding Indictment and to dismiss Count Eight of the Superseding Indictment ("Greebel Br.").

For the reasons set forth below, the defendants' motions are without merit and should be denied.

---

[1] Shkreli also moved to compel documents from Retrophin. (See Shkreli Br. at 14-16). As this motion is not directed at the government, but at a third party, the government will not respond to the motion.

## STATEMENT OF FACTS

I.  <u>**Factual Background of Charged Conduct**</u>[2]

A.  **The Defendants and Key Entities**

The defendant Martin Shkreli was a hedge fund manager and Chief Executive Officer ("CEO") of Retrophin, Inc., a publicly-traded company. Beginning in 2006, Shkreli was the managing member and portfolio manager of Elea Capital Management ("Elea"), a hedge fund located in New York, New York. Within approximately a year, Shkreli had lost all of the investor money in Elea and had to liquidate the fund.

Beginning in approximately 2009 and continuing until approximately 2012, Shkreli founded, and then served as the managing member and portfolio member for, two separate hedge funds based in New York that focused their investments in the healthcare sector: MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare"). During this time period, starting in approximately 2011, Shkreli also founded a biopharmaceutical company called Retrophin LLC. Retrophin LLC later became Retrophin, Inc. ("Retrophin" or "RTRX"), and became a publicly-traded company via a reverse merger with a shell company called Desert Gateway, Inc. ("Desert Gateway") in December 2012. From approximately December 2012 to September 2014, Shkreli served as the CEO of Retrophin, which was ultimately a publicly-traded company on the NASDAQ exchange.

The defendant Evan Greebel was an attorney licensed to practice law in New York and a law partner in the New York office of Katten Muchin Rosenman LLP ("Katten"). From approximately June 2011 to September 2014, Greebel served as lead outside counsel to Retrophin.

---

[2]  The defendants and the four fraudulent schemes are described in greater detail in the Superseding Indictment at Paragraphs 8 to 40.

Greebel also served as counsel to the MSMB entities, and was the Principal Attorney at Katten for all matters related to the MSMB entities and Retrophin.

**B.    The Fraudulent Schemes**

1.    <u>The MSMB Capital Hedge Fund Scheme</u>

Following the collapse of Elea Capital, in approximately 2009, Shkreli and Co-Conspirator 1 founded MSMB Capital.  In order to induce investments in MSMB Capital, Shkreli and Co-Conspirator 1 made a series of misrepresentations to potential investors, including that: (i) MSMB Capital was a transparent investment vehicle for sophisticated investors with monthly liquidity; (ii) MSMB Capital had retained independent certified public accountants as auditors who would issue an annual audit report; and (iii) Shkreli had a successful track record as a hedge fund manager.  Once MSMB Capital was up and running, Shkreli, together with others, made these and additional misrepresentations to induce additional investment in the fund, including about the fund's assets under management ("AUM").    Based on such misrepresentations, between approximately September 2009 and January 2011, eight investors (the "Capital Limited Partners") invested a total of $3 million in MSMB Capital.  During this period, Shkreli and Co-Conspirator 1 misappropriated funds from MSMB Capital by withdrawing $200,000 from the hedge fund that were far in excess of the fees that were represented to the Capital Limited Partners.

Then, on or about February 1, 2011, Shkreli entered into a large short sale position in Orexigen Therapeutics, Inc. ("OREX") in MSMB Capital's brokerage account at Merrill, Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch").    Contrary to Shkreli's representations to Merrill Lynch, MSMB Capital was unable to locate OREX shares to cover the position; as a result, Merrill Lynch suffered a loss of more than $7 million.  In addition, MSMB Capital suffered more than $1 million in other trading losses in approximately February 2011.  By

the end of February 2011, MSMB Capital had approximately $58,500 remaining in its bank and brokerage accounts.

Shkreli subsequently took steps to conceal from the Capital Limited Partners the fact that he had lost all of the money they had invested in MSMB Capital. For months following the complete loss of the investments in MSMB Capital and the end of trading activity, Shkreli continued to send fabricated performance updates to the Capital Limited Partners that touted profits of as high as forty percent since inception.

In September 2012, Shkreli, Co-Conspirator 1 and MSMB Capital entered into a settlement agreement with Merrill Lynch in connection with the OREX trading losses, in which Shkreli, Co-Conspirator 1 and MSMB Capital agreed to pay Merrill Lynch a total of $1,350,000 on or before December 15, 2012. In the settlement agreement, Shkreli and Co-Conspirator 1 stated that MSMB Capital had $0 in assets. Around the same time in September 2012, in stark contrast to his representations to Merrill Lynch, Shkreli told the Capital Limited Partners in an email (the "Liquidation Email") that he had "decided to wind down" both MSMB Capital and MSMB Healthcare and that the original MSMB investors had "just about doubled their money net of fees." Additionally, even though the MSMB entities had essentially no liquid assets, Shkreli falsely advised the Capital Limited Partners that they could "have their limited partnership interests redeemed by the fund for cash. Alternatively, investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares and cash."

2.    The MSMB Healthcare Hedge Fund Scheme

Following the collapse of MSMB Capital after the failed OREX trade, Shkreli founded MSMB Healthcare. From approximately February 2011 to November 2012, Shkreli and others solicited investments in MSMB Healthcare from potential investors based on material

misrepresentations and omissions. Once MSMB Healthcare was operational, Shkreli continued to make misrepresentations and omissions to MSMB Healthcare's investors (the "Healthcare Limited Partners") in order to prevent them from redeeming their investments. These misrepresentations and omissions included, <u>inter alia</u>, that: (i) Shkreli had a successful track record as a hedge fund manager; (ii) MSMB Capital was a successful hedge fund; and (iii) MSMB Healthcare had an AUM far in excess of the actual value of the fund. As with MSMB Capital, Shkreli and others misappropriated funds from MSMB Healthcare by withdrawing funds from the hedge fund far in excess of the fees permitted under the partnership agreement for the fund.

Additionally, without the Healthcare Limited Partners' knowledge or consent, Shkreli improperly used MSMB Healthcare assets to pay for obligations that were not the responsibility of MSMB Healthcare. For example, Shkreli caused assets from MSMB Healthcare to be used to pay a portion of the Merrill Lynch settlement (owed by MSMB Capital, Shkreli and Co-Conspirator 1). Specifically, Shkreli improperly reclassified a $900,000 equity investment by MSMB Healthcare into Retrophin LLC as an interest-bearing loan via a back-dated promissory note; he subsequently caused Retrophin to "repay" the loan to MSMB Healthcare, and then funneled a total of $898,000 from that "repayment" to Merrill Lynch.

### 3. The Retrophin Misappropriation Scheme

Shkreli founded Retrophin in 2011 and initially had some difficulty soliciting outside investors for the company. To raise capital, he caused MSMB Healthcare to invest significant sums into Retrophin between 2011 and mid-2012. Those investments were reflected in Retrophin's capitalization table, which was maintained by Greebel. As of September 2012, the capitalization table showed that MSMB Healthcare had invested approximately $2.1 million into Retrophin; it also indicated that MSMB Capital had not invested any money in Retrophin.

By the fall of 2012, Shkreli and Greebel were preparing to take Retrophin public, and Shkreli announced to the MSMB investors that he was winding down the funds in the Liquidation Email. However, as detailed above, MSMB Capital had no funds that could be used to repay the Capital Limited Partners, let alone at the falsely inflated rates of return that Shkreli had been reporting for years. Similarly, although MSMB Healthcare had invested in Retrophin – and, as a result, Healthcare Limited Partners would be entitled to receive some Retrophin stock at the time that the company went public, if it was able to do so –Shkreli did not have the cash to provide redemptions to those Healthcare Limited Partners who did not wish to receive Retrophin stock, as he had overvalued MSMB Healthcare's investment in Retrophin and had reported returns for the Healthcare Limited Partners far in excess of available funds. At the same time, as detailed above, Shkreli owed $1.35 million to Merrill Lynch by December 2012; he also had significant other personal and professional debts. Additionally, the Securities and Exchange Commission ("SEC") had reached out to Shkreli in September 2012 in connection with an investigation of the MSMB entities; in response to a query, Shkreli sent an email in November 2012 in which he falsely stated that, inter alia, MSMB Capital was still an active entity with $2.6 million in AUM.

By the time the reverse merger for Retrophin was finalized in December 2012, several MSMB Capital and MSMB Healthcare investors had become deeply suspicious of the process by which Shkreli had liquidated the hedge funds. For example, Shkreli failed to provide cash redemptions for MSMB investors who requested such redemptions, and the method by which he purported to convert their investments into Retrophin stock was opaque and unsupported by documentation. As a result, several MSMB investors began threatening to sue Shkreli if they did not get answers about what happened to their investments.

Faced with disgruntled MSMB investors, the defendants engaged in a scheme to defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations to the MSMB investors. This scheme had three major components. First, in the fall of 2012, Shkreli and Greebel engaged in a series of transactions designed to create the false appearance that MSMB Capital had invested in Retrophin and received shares in return. Specifically, in November and December 2012, Shkreli and Greebel orchestrated transfers of Retrophin shares from three individuals (Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2) to Shkreli, and backdated these transfers to the summer of 2012. Immediately thereafter, Shkreli transferred the Retrophin shares he had received from these three individuals to MSMB Capital, and also backdated that agreement to the summer of 2012. As a result of these backdated agreements, it appeared that MSMB Capital had made an investment in Retrophin in the summer of 2012 in exchange for a stake in the company when, in fact, MSMB Capital had never invested in Retrophin and had no interest in the company.

Second, in the spring of 2013, the defendants caused Retrophin to enter into a series of settlement agreements with several of the defrauded MSMB Capital and MSMB Healthcare investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Shkreli had reported on those investments. The defendants did not seek authorization from Retrophin's Board of Directors (the "Board") prior to entering into these fraudulent settlements. In total, the defendants caused Retrophin to pay more than $3.4 million in cash and RTRX stock to settle claims with seven Capital Limited Partners and Healthcare Limited Partners even though Retrophin was not responsible for those claims.

Third, in the fall of 2013 – after Retrophin's external auditor questioned the propriety of the settlement agreements and concluded that Retrophin was not responsible for repayment of the defrauded MSMB Capital and MSMB Healthcare investors – the defendants caused Retrophin to enter into a series of sham consulting agreements with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse those investors for their lost investments in Shkreli's hedge funds. By styling the agreements as "consulting" agreements instead of "settlement" agreements, the defendants sought to avoid scrutiny from Retrophin's Board and auditors. The defendants presented the sham consulting agreements to the defrauded investors as the vehicle by which they could receive the returns reported to them by Shkreli. Notably, the defrauded investors who entered into these sham consulting agreements did not perform any legitimate consulting services for Retrophin. In total, the defendants caused Retrophin to pay more than $7.6 million in cash and RTRX stock through these sham consulting agreements to settle claims with Capital and Healthcare Limited Partners, as well as an Elea Capital investor, even though Retrophin was not responsible for those claims.

### 4. The Unrestricted Shares Scheme

In connection with the reverse merger between Retrophin and Desert Gateway, Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin by attempting to fraudulently control the price and trading of Retrophin's stock. Shkreli and Greebel, together with others, executed this scheme by, among other things, concealing Shkreli's beneficial ownership and control of the majority of Retrophin's unrestricted or free trading shares. These unrestricted shares, also known as the "Fearnow shares," were initially the shares of Desert Gateway; at the time of the reverse merger, the shares (2.5 million in total) became free-trading

shares of Retrophin held by the sole stockholder ("John Doe 1") of Desert Gateway. In late November 2012, Shkreli informed seven of his employees and contractors – including Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2 – that they would each be permitted to purchase a portion of those shares from John Doe 1 for a nominal amount.

In or about December 2012, the defendants divided 2 million of the unrestricted shares across the seven individuals to ensure that each individual's ownership was below the SEC's five percent reporting requirement threshold; they also arranged for an additional 400,000 shares to be held for those individuals in the name of John Doe 1, for future distribution to those individuals. Prior to this distribution, the defendants took steps to make it appear that these seven individuals were no longer associated with the MSMB entities or Retrophin so that the shares would remain free-trading after the merger (as any free-trading shares held by individuals associated with Retrophin would become restricted). These steps included an email sent by Shkreli that falsely decreed that the individuals were no longer employees or contractors of Retrophin or the MSMB entities; in reality, a number of the seven individuals continued to do work for MSMB entities and/or Retrophin.

Subsequently, between December 2012 and September 2014, the defendants attempted to control – and in some cases, succeeded in controlling – these 2.4 million unrestricted shares (listed under the names of these seven individuals) for the benefit of Shkreli and to regulate the price and trading of Retrophin stock. For example, the defendants attempted to prevent one of the individuals who received Fearnow Shares from selling them on the open market directly following the reverse merger, as they were concerned that such sales would negatively affect Retrophin's share price. The defendants also orchestrated the transfer of shares from some of the

seven individuals to defrauded MSMB Capital and MSMB Healthcare investors in order to settle liabilities owed by the MSMB entities and Shkreli.

## C. Retrophin's Policies Regarding Ethics, Computer Usage, Electronic Records and Business Records

As of May 2013, Retrophin developed email and Internet usage policies that applied to all users of the Company's email system, including Shkreli. (See Email Attaching Retrophin Policies, dated May 23, 2013, attached hereto as Exhibit A).[3] This email policy governed "all electronic communications using the Company's computers and related communications equipment and connections," as well as "communications over third-party e-mail software or web sites (e.g., gmail, yahoo, etc.) if accessed on a Company computer." (Id. at R023538). It further stated that all computers "used by Company personnel and the information contained on them are the property of Retrophin, Inc., not the user" and that all "electronic data … that are transmitted through Company facilities and/or stored on a Company computer or storage media are the property of the Company." (Id.). In connection with the email policy, Retrophin personnel "waive[d] any right to privacy in electronic communications and consent[ed] to the possible interception and disclosure of these communications," as the company's "e-mail system is not the U.S. Postal Service: there is no guarantee of privacy." (Id.). Similarly, the Internet Usage Policy stated that employees "should have no expectation of privacy in anything they create, store, post, send or receive using the company's computer equipment." (Id. at R023541).

Subsequently, in September 2013, Retrophin's Board of Directors adopted and instituted a code of business conduct and ethics that applied to all "directors, officers, employees, temporary employees [and] consultants" of the company, including Shkreli. (See Email Attaching

---

[3] Personally identifiable information ("PII") has been redacted from Exhibits A and B; the defendants have received unredacted versions of these documents in discovery.

Retrophin, Inc. Code of Business Conduct and Ethics and Insider Trading Policy, dated September 9, 2013, attached hereto as Exhibit B).  This code included similar warnings about the use of Retrophin's electronic servers and email communications systems:  "All communications are subject to access, monitoring and review by appropriate, authorized Company personnel at any time … Even personal messages on the company's e-mail and voicemail systems are Company property." (<u>Id.</u> at R024160).  The code also warns that "it is unlawful to destroy, conceal, alter, forge or falsify any Company business or other record, document or object (including email and other electronic records) for the purpose of obstructing or influencing any governmental or legal proceeding, investigation or lawsuit.  Accordingly, you are prohibited from destroying any records that are potentially relevant to a violation of law or currently pending, threatened or reasonably foreseeable litigation or any pending, threatened or reasonably foreseeable government investigation or proceeding." (<u>Id.</u> at R024159).

Not only did Shkreli receive by email Retrophin's policies regarding ethics, electronic records, computer usage and business records, but Shkreli also agreed to follow such policies as part of his employment agreement with Retrophin.  (<u>See</u> Retrophin 8-K filing dated December 18, 2013, containing Shkreli Employment Agreement dated December 16, 2013, attached hereto as Exhibit C).  In Section 2(b) of that agreement, Shkreli agreed to "observe and comply with the rules, policies and procedures of the Company as adopted by the Company from time to time." (<u>Id.</u> at 55).  And in Section 14(h) of that agreement, Shkreli specifically agreed to "sign and agree to be bound by the Company's Code of Ethics and Insider Trading Policy." (<u>Id.</u> at 64).  Shkreli personally signed the employment agreement and filed it with the SEC in December 2013.  (<u>Id.</u> at 65).

### D. Shkreli Commingled Business Related to the MSMB Entities and to Retrophin

As set forth above, Shkreli founded MSMB Capital in the fall of 2009, and founded MSMB Healthcare and Retrophin in the spring of 2011 following the failed OREX trade. The three entities were run by Shkreli out of the same physical space (initially at an office located at 111 Broadway, New York, NY, and later at an office located at 777 Third Avenue, New York, NY) between the spring of 2011 and December 2012, when Retrophin went public via the reverse merger with Desert Gateway and Shkreli allegedly "wound down" the MSMB entities. The MSMB entities and Retrophin also shared many of the same employees, and Shkreli caused MSMB Healthcare to invest millions of dollars in Retrophin.

During this period, Greebel and other Katten attorneys did work for both the MSMB entities and Retrophin. The initial work Katten completed for the MSMB entities was billed to the MSMB entities only, but subsequent work for the MSMB entities was billed to and paid for by Retrophin at Shkreli's direction. Shkreli also caused Retrophin to pay other bills accrued by the MSMB entities; for example, Shkreli caused Retrophin to repay the majority of the legal bills he accrued in connection with a 2011 SEC subpoena related to shareholder activism work undertaken by Shkreli and Greebel in connection with the MSMB entities.

In addition, as detailed at length above, Shkreli and Greebel stole funds from Retrophin to repay defrauded MSMB investors. For example, Shkreli and Greebel created a fraudulent interest in Retrophin for MSMB Capital by improperly backdating Retrophin share transfers; improperly reclassified an investment by MSMB Healthcare in Retrophin as a loan; caused Retrophin to pay defrauded MSMB investors with cash and stock; and redirected Fearnow Shares at Shkreli's direction to defrauded MSMB investors.

Finally, Shkreli utilized an MSMB Capital email address to conduct work on behalf of both the MSMB entities and Retrophin. Specifically, Shkreli used an MSMB Capital email address when conducting business related to Retrophin about, _inter alia_, changes to Retrophin's capitalization table; the reverse merger between Retrophin and Desert Gateway; the distribution of the Fearnow Shares (which were unrestricted shares of Retrophin); and efforts to raise funds for Retrophin after the reverse merger was completed. In fact, Shkreli continued to use an MSMB Capital email address to conduct business on behalf of Retrophin until at least September 2014, long after the MSMB entities had ceased functioning, including in attempts to control the distribution and subsequent sale of Fearnow Shares, and in the negotiation of certain of the settlement and consulting agreements with defrauded MSMB investors.

### E. The Defendants' Ouster from Retrophin

On September 30, 2014, Retrophin's Board of Directors removed Shkreli as CEO. Shortly thereafter, Retrophin determined that Greebel would no longer serve as outside counsel for the company. In June 2015, Greebel left Katten.

## II. Procedural History

### A. The SEC and EDNY Investigations

The U.S. Securities and Exchange Commission ("SEC") began an investigation into some of the above-described fraudulent schemes in approximately 2011. In connection with that investigation, the SEC issued subpoenas to various third parties for documents, including Shkreli, the MSMB entities and Retrophin, all of whom produced documents in their possession, custody and/or control to the SEC in response to those subpoenas.

The United States Attorney's Office for the Eastern District of New York ("EDNY" or "the government") began a separate, parallel investigation into the above-described fraudulent

schemes in approximately 2014.  In connection with that investigation, the government obtained documents from the SEC via a sharing order, including documents that were provided to the SEC by Shkreli, the MSMB entities and Retrophin.  The government also issued subpoenas to various third parties for documents, including banks, accounting firms, brokerage firms, defrauded MSMB investors and Retrophin.  Finally, the government met with and discussed the facts of the Fraudulent Schemes with many of the victims of those schemes, including defrauded MSMB investors and Retrophin.[4]

Retrophin produced records responsive to the government subpoenas it received that were in the company's custody, possession and/or control.  Those responsive records were located by Retrophin either on the company's electronic servers (e.g., emails and electronic documents) or in hard copy in the company's physical offices.  Of the hundreds of thousands of records ultimately produced by Retrophin, only three were documents that were located by Retrophin in Shkreli's former physical office:  two MSMB Healthcare subscription agreements, and a letter sent by Shkreli to Investor 1 regarding his MSMB Capital investment.[5]

### B.     The Indictment and Superseding Indictment

On December 14, 2015, a federal grand jury sitting in the Eastern District of New York returned a 29-page, 53-paragraph "speaking" indictment charging Shkreli and Greebel for their participation in the MSMB Capital, MSMB Healthcare and Retrophin Schemes (the "Indictment").  Specifically, the indictment alleges that in or about and between September 2009

---

[4]     In his brief, Shkreli refers on several occasions to "presentations" and "written presentation" by Retrophin to the government.  (See Shkreli Br. at 5-6).  Counsel for Retrophin did meet with the government on several occasions to discuss documents that it provided to the government in response to subpoenas, but did not make any "presentations" that consisted of materials other than responsive documents, all of which have been produced to the defendants.

[5]     Those three documents bear Bates numbers R019574, R026472 and R026486.

and September 2014, Shkreli, together with Greebel and others, orchestrated "three interrelated fraudulent schemes" whereby they agreed to, inter alia, (1) "defraud investors and potential investors in MSMB [] by inducing them to invest in MSMB [] through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and the retaining of an independent auditor and administrator; and then by preventing redemptions by investors in MSMB [] through material misrepresentations and omissions about, inter alia, the performance of the fund and the misappropriation by Shkreli and others of fund assets"; (2) "defraud investors and potential investors in MSMB Healthcare by inducing them to invest in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and existing liabilities; and then by preventing redemptions by investors in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the performance of the fund and the misappropriation by Shkreli and others of fund assets"; and (3) "defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations," including by causing Retrophin to enter into settlement and/or sham consulting agreements with, inter alia, defrauded MSMB and MSMB Healthcare investors to settle liabilities owed by the MSMB funds and Shkreli.

On June 3, 2016, a federal grand jury sitting in the Eastern District of New York returned a 35-page, 61-paragraph "speaking" superseding indictment in the case (the "Superseding Indictment"). The Superseding Indictment differed from the Indictment in that it detailed information about the Unrestricted Shares Scheme (at Paragraphs 36 to 40) and added Count Eight, which charged Shkreli and Greebel with conspiracy to commit securities fraud in connection with that scheme. Specifically, the new portions of the Superseding Indictment allege that Shkreli and

Greebel engaged in a scheme to defraud investors and potential investors in Retrophin through material misrepresentations and omissions about the beneficial ownership and control of Retrophin's unrestricted or "free trading" shares (also known as the "Fearnow Shares"), in order to exercise control over the price and trading of Retrophin stock.

### C. The Government's Production of Discovery and Additional Disclosures

The government produced initial discovery pursuant to Fed. R. Crim. P. 16 ("Rule 16") on December 22, 2015, a mere five days after the defendants were arraigned. See Dkt. No. 16. Over the past 16 months, the government has made 11 subsequent productions of discovery pursuant to Rule 16. (See Dkt. Nos. 21, 45, 48, 49, 57, 63, 68, 76, 88, 135, 155). As detailed in the cover letters accompanying those productions, some of the records produced in discovery were received from Retrophin. (Id.). The government requested reciprocal discovery from the defendants in connection with each of those discovery productions; to date, neither defendant has produced any discovery to the government (with the exception of materials related to MSMB that were produced by Shkreli, which had been originally provided to Shkreli by Katten in connection with Shkreli's November 2016 motion to compel).

In addition, on July 13, 2016, the government sent the defendants a letter that identified three defrauded MSMB investors who entered into sham consulting agreements with Retrophin and who might have information that would be helpful to the defense ("Identified Witnesses"). (See Dkt. No. 84, Exhibit B). Specifically, the letter provided defendants with the Identified Witnesses' names; contact information for the Identified Witnesses' counsel; and a summary of certain statements made by the Identified Witnesses. (Id.). It also pointed the defendants to a specific Bates range of documents received from Retrophin that contained statements of one of the Identified Witnesses ("Identified Witness SR"). (Id.). Subsequently, on

February 8, 2017, the government produced additional documents it had received from Retrophin related to Identified Witness SR. (See Dkt. No. 155). Those documents were related to an arbitration that took place between Identified Witness SR and Retrophin earlier this year.

### D. Defendants' Original Discovery Motions

The Court ordered that the parties were to file all discovery motions by September 16, 2016. (See Dkt. No. 74). On that date, Shkreli filed a motion for a bill of particulars, and Greebel filed a motion for a bill of particulars as well as a motion seeking early disclosure of certain materials that Greebel categorized as Brady materials. (See Dkt. Nos. 80, 82-87). The government filed its response in opposition to all three motions on September 30, 2016. (See Dkt. No. 90).

In connection with that response, on September 30, 2016, the government also provided to the defendants a chart that identified by name all individuals referenced in the Superseding Indictment, including individuals with defined names like Co-Conspirator 1 and Corrupt Employee 1, as well as the defrauded MSMB investors ("Superseding Indictment Chart"). (See Dkt. No. 90 at 29 ("the government will provide to the defendants under separate cover a list of all the a list of all of the individuals and entities referred to by defined terms in the Superseding Indictment, as well as which defrauded investors entered into the settlement and sham consulting agreements")). The Superseding Indictment Chart detailed the four individuals who entered into the sham consulting agreements with Retrophin that are referenced in Count Seven of the Superseding Indictment: three defrauded MSMB investors and one defrauded Elea Capital investor.

Based on the information provided by the government, Shkreli withdrew his motion for a bill of particulars. On December 16, 2016, the Court issued a memorandum and order

denying Greebel's motions for a bill of particulars and for the early production of certain materials. (See Dkt. No. 138).

### E.    Defrauded Retrophin Employee Sues Shkreli and Retrophin

In addition to defrauding MSMB investors, as detailed at length above, Shkreli routinely failed to pay certain personal obligations to individuals who served as MSMB and Retrophin employees, as well as to vendors who did work for the MSMB entities.  Shkreli references one of those Retrophin employees ("Defrauded Employee TK") in his motion seeking additional discovery materials from the government.  (Shkreli Br. at 11-13).  In 2012, Defrauded Employee TK had done work related to Retrophin at Shkreli's direction, and Shkreli had promised to personally provide him with Retrophin shares as compensation for his work.

In 2014, Shkreli and Greebel attempted to cause Retrophin to repay the obligations Shkreli personally owed to Defrauded Employee TK via a consulting agreement with Retrophin. That consulting agreement was never finalized, as Shkreli was fired from Retrophin before the agreement could be signed; Retrophin subsequently refused to pay Defrauded Employee TK because the money owed to Defrauded Employee TK was owed by Shkreli in his personal capacity. Defrauded Employee TK then sued both Retrophin and Shkreli in order to recover the money owed to him by Shkreli.

Defrauded Employee TK's arbitration against both Retrophin and Shkreli was resolved in 2016.  The arbitrator ultimately determined that it was solely Shkreli's personal obligation to provide the Retrophin shares to Defrauded Employee TK, and that Retrophin was not responsible for providing any shares to Defrauded Employee TK.  Specifically, the arbitrator found that Shkreli personally owed Defrauded Employee TK 155,000 Retrophin shares (which had an estimated value of $2.3 million), and that such shares should be transferred to Defrauded Employee

TK by August 31, 2016.  After Shkreli failed to transfer the shares as ordered, the arbitrator further ordered Shkreli to pay interest on the shares and to pay to cover the cost of the arbitration (approximately $300,000 in total).  Defrauded Employee TK subsequently filed suit in the Southern District of New York to enforce the arbitration award, in a case docketed as <u>Koestler v. Shkreli</u>, 16-CV-7175.  On February 6, 2017, the district court issued an order confirming the arbitration award and requiring Shkreli to pay Defrauded Employee TK a total of approximately $2.6 million.  (<u>See</u> Order dated February 7, 2017, attached hereto as Exhibit D).

As set forth in the Superseding Indictment Chart, which was provided to the defendants on September 30, 2016, Defrauded Employee TK was <u>not</u> one of the four individuals referenced in the Superseding Indictment who entered into a sham consulting agreement with Retrophin at Shkreli and Greebel's direction.

# ARGUMENT

# POINT ONE

# SHKRELI'S MOTION TO SUPPRESS SHOULD BE DENIED

Shkreli moves to suppress unspecified[6] "MSMB material" – including but not limited to subscription agreements for the MSMB entities, email correspondence related to the MSMB entities, investor statements sent to defrauded MSMB investors and MSMB Capital's settlement agreement with Merrill Lynch – on the theory that Retrophin, which produced this "MSMB material" to the government in response to a series of subpoenas, conducted an unlawful search of its own electronic servers and physical offices to locate that material and, in doing so, acted as a "government agent." (Shkreli Br. at 6-11).

This motion fails at each and every step of the applicable analysis. As an initial matter, the Fourth Amendment is not implicated by Retrophin's actions because the "MSMB material" is not the "property" of the MSMB entities; because Shkreli had no reasonable expectation of privacy in the "MSMB material" (in part because such material was stored on Retrophin's electronic servers and in Retrophin's physical offices); because Shkreli voluntarily disclosed such material to Retrophin and to other third parties, including the government and the

---

[6]     While Shkreli provides some examples of documents he alleges constitute "MSMB material" or "the property of the MSMB entities," he suggests that these examples are not exclusive (by stating, for example, that such materials "includ[e] at least" the enumerated examples). (Shkreli Br. at 4-5). If the Court were to reach the merits of this motion – and for the reasons set forth herein, it need not – the Court would need a specific list of Bates numbers of these alleged "MSMB materials" so that it could evaluate whether those materials were the "property" of the MSMB entities in the first place. As detailed in the Statement of Facts and below, all documents with a connection to MSMB were not in fact the property of the MSMB entities, given, for example, Retrophin's various document policies and that Shkreli used an MSMB Capital email address to conduct business on behalf of Retrophin between 2011 and 2014.

SEC; and because the "MSMB material" constitutes corporate records not subject to the Fourth Amendment at all. Even if Retrophin's actions in gathering the "MSMB material" – which was in its possession, custody and control, and required no "search" to access – and providing it to the government in response to subpoenas did implicate the Fourth Amendment, Shkreli's motion is still unsuccessful because Shkreli (1) has not demonstrated that he personally has standing to challenge any such search, (2) Retrophin, a private party, was not acting as a "government agent" in conducting any such search, and (3) the "MSMB material" would inevitably have been discovered by the government.

For these reasons, Shkreli's motion to suppress the "MSMB material" – and his related request for a hearing – should be denied in its entirety.

## I.      <u>Legal Standard</u>

### A.      **The Fourth Amendment Is Not Implicated When No "Reasonable Expectation of Privacy" Exists, Including For Voluntarily Disclosed Information or For Corporate Records**

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against <u>unreasonable searches and seizures</u>, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added). Government conduct is not considered a "search" or "seizure" within the meaning of the Fourth Amendment unless the person targeted by the government has "a reasonable expectation of privacy" in the places searched or items seized. <u>See, e.g.</u>, <u>Katz v. United States</u>, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (explaining the "twofold requirement" to finding an expectation reasonable: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is

prepared to recognize as 'reasonable.'").  Without a reasonable expectation of privacy, the Fourth Amendment is not implicated, and accordingly, no warrant is required.

Information voluntarily disclosed to a third party is not protected under the Fourth Amendment.  See, e.g., Smith v. Maryland, 442 U.S. 735, 743-44 (1979) (no reasonable expectation of privacy in numbers dialed on a telephone due to the risk assumed that the phone company will disclose this information to the government); United States v. Miller, 425 U.S. 435, 444 (1976) (bank account records do not command a privacy interest).  This is true "even if the information is revealed [to the third party] on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."  Miller, 425 U.S. at 443.

Moreover, although "the Fourth Amendment protects corporations from subpoenas that are unreasonably broad, Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208 (1946), neither the officers of a corporation, Wilson v. United States, 221 U.S. 361, 376-77 (1911), the shareholders, see Grant v. United States, 227 U.S. 74, 80 (1913), the custodian of the records, Wheeler v. United States, 226 U.S. 478 (1913), nor the corporation itself, Wilson v. United States, supra, 221 U.S. at 374-75, has any other Fourth Amendment interest in corporate records."  United States v. Lartey, 716 F.2d 955, 961 (2d Cir. 1983).  See also United States v. Barr, 605 F. Supp. 114, 117 (S.D.N.Y. 1985).

When no Fourth Amendment interest is implicated, a "case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued."  Miller, 425 U.S. at 444.

### B.  A Corporate Employee Must Establish Standing Separate From A Corporation to Challenge A Search or Seizure

A defendant seeking suppression bears the burden of establishing by a preponderance of the evidence that his personal Fourth Amendment rights were violated by the challenged search and seizure.  Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978); accord United States v. Padilla, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." (emphasis in original)); United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991); United States v. Shelton, No. 14 Cr. 6009, 2015 WL 500886, at *2 (W.D.N.Y. Feb. 5, 2015).

A corporate entity – such as Retrophin or the MSMB entities – and the natural individuals who created it or were its employees are different "persons" for Fourth Amendment purposes.  See G.M. Leasing Corp. v. United States, 429 U.S. 338, 353 (1977) (corporations are among the people protected against unreasonable searches and seizures under the Fourth Amendment); see also Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001) ("incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.").  With respect to searches of corporate property, therefore, a corporate entity's employee or shareholder – even a sole shareholder or the corporation's CEO – does not automatically have standing to assert the corporation's Fourth Amendment rights absent harm to an individualized, legitimate and reasonable expectation of privacy.  See United States v. Hamdan, 891 F. Supp. 88, 94 (E.D.N.Y. 1995) ("the determination as to whether an individual has standing to challenge a warrantless search does not depend strictly upon the ownership of the premises searched, but upon whether the individual had a reasonable expectation to privacy in

the area searched" (citing <u>Mancusi v. DeForte</u>, 392 U.S. 364, 366 (1968))).  Consequently, "[w]hen a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment."  <u>United States v. Guterma</u>, 272 F.2d 344, 346 (2d Cir. 1959) (citation omitted); <u>accord</u> <u>United States v. Triumph Capital Grp., Inc.</u>, 211 F.R.D. 31, 54 (D. Conn. 2002).

Instead, to establish standing, a defendant must show "some personal expectation of privacy in the corporate records at issue."  <u>Triumph Capital</u>, 211 F.R.D. at 54.  "This threshold question involves two separate inquiries:  first, [the defendant] must demonstrate a subjective expectation of privacy in a searched place or item; and second, his expectation must be one that society accepts as reasonable."  <u>United States v. Chuang</u>, 897 F.2d 646, 649 (2d Cir. 1990). Whether a "corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched."  <u>Id.</u> (internal quotation marks and citation omitted; alteration in original).

C.    **Illegal Search Conducted by Private Party Only Violates Fourth Amendment If Private Party Acts as Government Agent**

The Fourth Amendment also does not provide protection against searches by private individuals acting in a private capacity.  <u>See</u> <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984) (the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official" (internal quotation marks and citation omitted)).  Thus, evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.  <u>See</u> <u>Walter v. United States</u>, 447 U.S. 649, 656 (1980) ("[A]

24

wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and ... such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." (citation omitted)).

Consequently, an improper search conducted by a private party can only violate the Fourth Amendment when that private party acts as an agent or instrument of the Government at the time of the search. That analysis "turns on the degree of the Government's participation in the private party's activities," Skinner v. Ry. Labor Execs.' Assoc., 489 U.S. 602, 614 (1989) (internal citations and quotations omitted), where "some evidence of Government participation or affirmative encouragement of the private search is required before that search is held to be unconstitutional." United States v. Heleniak, Crim. No. 14-42A, 2015 WL 521287 (W.D.N.Y. Feb. 9, 2015) (citing United States v. Richardson, 607 F.3d 357 (4th Cir 2010)). The defendant "bear[s] the burden to establish that a private party acted as a government instrument or agent." United States v. Dupree, 781 F. Supp. 2d 115, 158 (E.D.N.Y. 2011).

### D.    Inevitable Discovery Exception

Even when a search violates the Fourth Amendment, the exclusionary rule is inapplicable if the evidence recovered during the search inevitably would have been discovered through lawful means. See Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006).

## II.    Argument

### A.    The Fourth Amendment Was Not Implicated By Retrophin's Production of Documents Related to MSMB to the Government

As an initial matter, the government strongly disagrees with Shkreli's characterization of certain documents provided to the government by Retrophin in response to a subpoena as "MSMB material" and/or "documents that were clearly the property of MSMB."

(Shkreli Br. at 4-5). For example, Shkreli has included among these documents "email correspondence related to MSMB and its entities." (Id.). As detailed above, Shkreli used an MSMB Capital email address to conduct business related to Retrophin from its inception in 2011 until his termination in 2014. Shkreli's broad assertion that all email correspondence sent to and from that account constitutes "MSMB material" is incorrect. Moreover, Retrophin had several policies that plainly indicated that documents and communications stored on or accessed via Retrophin's electronic servers were in fact the property of Retrophin, and that any documents that might be the subject of a government investigation or a litigation should be preserved. (See Exhibit A at R023538 and R023541; Exhibit B at R024159-60). Shkreli was aware of and agreed to comply with all of these policies. (See Exhibit C at 55, 64-65).[7]

Even assuming that the documents identified by Shkreli could be construed as the property of the MSMB entities, however, the Fourth Amendment was not implicated by Retrophin's provision of those documents to the government because neither Shkreli nor MSMB had any expectation of privacy in the records related to MSMB that were stored on Retrophin's servers and/or in Retrophin's offices. The aforementioned policies make it clear that Shkreli, as a Retrophin officer and employee, had no expectation of privacy in any documents and emails that were viewed on, transmitted through or stored, even temporarily, on Retrophin's servers. See, e.g., Exhibit A at R023541 (Retrophin employees "should have no expectation of privacy in anything they create, store, post, send or receive using the company's computer equipment"). Similarly, Shkreli

---

[7]     Shkreli never acknowledges the various Retrophin policies that were in effect at the time that Shkreli was an employee of Retrophin, and that applied both to him and to all documents stored on Retrophin's servers. Instead, Shkreli states broadly – and without any factual or legal support – that Retrophin "is not in control of, and not authorized to provide, the corporate property of another corporate entity such as a[n] MSMB entity." (Shkreli Br. at 8). For the reasons set forth above, this argument is unavailing.

voluntarily left documents related to the MSMB entities in his office at Retrophin, even after his termination. Consequently, it is clear that Shkreli voluntarily disclosed to Retrophin any documents he left by placing them on Retrophin's servers and in Retrophin's offices. Shkreli "cannot claim a legitimate expectation of privacy" in emails and documents that he gave Retrophin "permission to access and view." Dupree, 781 F. Supp. 2d at 159; see also United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) (holding that, like letter-writers whose expectation of privacy ends upon delivery of the letter, individuals do not possess a legitimate expectation of privacy "in transmissions over the Internet or e-mail that have already arrived at the recipient").

It is also significant that Shkreli himself voluntarily disclosed the majority of the "MSMB material" that he is seeking to suppress either to the government directly, or to a third party other than Retrophin. For example, Shkreli made a large production of MSMB documents to the SEC that included, inter alia, investor statements sent to defrauded MSMB investors and email correspondence related to the MSMB entities. See, e.g., Dkt. No. 21 (detailing production of MSMB documents from the SEC). This production was compiled with the assistance of Katten attorneys, who in turn billed Retrophin for that work. Shkreli also provided copies of documents such as investor statements and subscription agreements for MSMB Healthcare to the defrauded MSMB Healthcare investors, and the MSMB settlement agreement with Merrill Lynch to Merrill Lynch. The government has obtained copies of these documents from those third parties either directly or via the sharing order with the SEC, and have provided them back to Shkreli and Greebel in the course of document discovery in this case. (See, e.g., Dkt. Nos. 21, 45 and 48 (detailing productions from individual investors and of records from the Merrill Lynch arbitration)). Most recently, the government received from Shkreli himself a vast trove of email communications

related to the MSMB entities that were stored at Katten, some of which are duplicative of email communications stored on Retrophin's servers.

Moreover, it is clear that all of the records that Shkreli seeks to suppress – including subscription agreements for the various MSMB entities, email correspondence related to the MSMB entities, records related to investments in the MSMB entities, and a settlement agreement entered into by MSMB Capital – are all, by Shkreli's own description, corporate records of the MSMB entities. As set forth in <u>Lartey</u> and the Supreme Court cases to which it cites, neither the MSMB entities nor Shkreli has any Fourth Amendment interest in such corporate records. 716 F.2d at 961; <u>see also</u> <u>Barr</u>, 605 F. Supp. at 117 ("an individual has no expectation of privacy in papers which are corporate records or records required to be kept by law").

For all of these reasons – because the "MSMB material" on Retrophin's servers and in Retrophin's offices were not in fact the property of MSMB, because such documents were voluntarily disclosed to Retrophin and to other third parties, and because such documents constitute corporate records of the MSMB entities – it is clear that Retrophin's provision of these documents to the government did not constitute a violation of the Fourth Amendment because no "search or seizure" actually occurred.

**B.  Even if Fourth Amendment Applied, Shkreli's Motion Is Without Merit**

Even if Fourth Amendment was implicated by Retrophin's production of documents responsive to the government subpoena – and, for the reasons set forth above, it is clear the Fourth Amendment was <u>not</u> implicated by such action – Shkreli's motion must fail. <u>First</u>, even if Retrophin's actions could be deemed a "search" within the meaning of the Fourth Amendment, Shkreli cannot meet his burden to demonstrate that he has standing to challenge such a search. Shkreli's personal Fourth Amendment rights are separate and distinct from any

Fourth Amendment rights that could be exercised by the MSMB entities.  See Guterma, 272 F.2d at 346; Triumph Capital, 211 F.R.D. at 54.  To establish standing as an individual, Shkreli would need to show "some personal expectation of privacy" in the documents at issue,  Triumph Capital, 211 F.R.D. at 54, specifically, by showing both "a subjective expectation of privacy in a searched place or item" and that "his expectation [is] one that society accepts as reasonable." Chuang, 897 F.2d at 649.  As detailed above, Shkreli had no reasonable personal expectation of privacy in the MSMB corporate records, whether they were stored on Retrophin's electronic servers or in his corporate office at Retrophin.  See, e.g., Barr, 605 F. Supp. at 117.  He also had no reasonable personal expectation of privacy in documents stored on Retrophin's servers generally – even in the content of those documents was a personal communication or contained personal information (which they did not) – given Retrophin's policies and his agreement to abide by such policies.  See generally Exhibits A, B and C.  Even if Retrophin did not have such policies in effect, Shkreli has articulated no basis for his claim that he had a reasonable expectation of privacy over documents and records that were left on Retrophin's servers and in Retrophin's offices for a period of years, where they could have been accessed at any time by other employees at Retrophin.

Second, even if Retrophin's actions could be deemed a "search," and even if Shkreli had standing to challenge such a search, Retrophin is a private party and did not function as an "agent of the government" to collect the documents provided to the government.  Shkreli himself admits that a "search carried out by a private person does not implicate the Fourth Amendment."  (Shkreli Br. at 8).  However, he goes on to argue that Retrophin should be considered an "agent of the government" because the government knew "[a]t some point in th[e] process" of receiving documents responsive to subpoenas that it was receiving documents related

to the MSMB entities, and thus must have known that Retrophin was engaging in "intrusive conduct" to obtain such documents. (Shkreli Br. at 9). Shkreli further suggests that because Retrophin's purpose was to "assist law enforcement," Retrophin was functioning as a "government agent." (Id.).

Shkreli's wildly speculative arguments fail.[8] The mere fact that Retrophin produced documents that related to the MSMB entities in response to the government's subpoenas did not constitute evidence that Retrophin was engaging in "intrusive conduct" to obtain such documents, particularly when Shkreli routinely, and over a period of many years, used his MSMB Capital email address to conduct Retrophin business; when documents related to the MSMB entities were sent to Retrophin employees and to Katten in connection with the negotiation of the consulting and settlement agreements at issue in Count Seven; and when Shkreli had previously produced such documents to the SEC with the assistance of Katten attorneys, who billed their work for those productions to Retrophin. Moreover, for the reasons stated above, Retrophin did not engage in "intrusive conduct" to obtain those documents.

The mere fact that Retrophin – a victim of a significant financial crime committed by Shkreli and Greebel – met with and provided documents to the government, and even may have desired that Shkreli and Greebel be prosecuted for that crime, does not magically transform Retrophin into a "government agent." See, e.g., Metellus v. JetBlue Airways Corp., No. 07-CV-4719, 2010 WL 1267777, at *5-*6 (E.D.N.Y. Mar. 30, 2010) (dismissing Fourth Amendment

---

[8]     Shkreli alleges that the only way that Shkreli could be "permanently removed as CEO" was if he had a criminal conviction, so Retrophin was willing to do "anything the Government wanted if it meant the prosecution and potential conviction of Shkreli." (Shkreli Br. at 10). There is absolutely no evidence that Retrophin took any steps other than to provide to the government responsive documents to subpoenas that were in its custody, possession and control, and to meet with the government – as victims have a right to do – to discuss those documents.

claims against security officers for private company who were present at detention and interrogation of plaintiff, and concluding that the "bare allegation that JetBlue cooperated with a police investigation does not render the company a state actor"); see also Middleton v. City of New York, No. 04-CV-1304, 2006 WL 1720400, at *8 (E.D.N.Y. Jun. 19, 2006).  In fact, crime victims have an absolute right, pursuant to the Crime Victims' Rights Act, to consult with the government about the status of a case.  See 18 U.S.C. § 3771 (granting a crime victim, inter alia, the "reasonable right to confer with the attorney for the Government in the case").

The government cannot find a single case in which an individual – who was expressly on notice that he had no reasonable expectation of privacy in documents that he left on his employer's electronic servers and in its physical offices – has successfully argued that the company was acting as a "government agent" when it responded to a lawful subpoena and provided documents that were in its possession, custody or control.  Indeed, any such holding would not only turn the state actor, third-party and reasonable expectation doctrines on their head, but also deprive employers of their ability to control and direct the use of their property.  Shkreli surrendered any possessory interest in the documents at issue – assuming, arguendo, he ever had one – the minute he placed the documents under Retrophin's control.  The Fourth Amendment simply does not convert an employer's property into an employees' property in these circumstances.

The line of cases upon which Shkreli relies, in which private parties have been found to be acting as "government agents," present radically different circumstances than the facts of this case and do not require a different outcome.  For example, in Skinner – perhaps the seminal case in this area – the Supreme Court was asked to consider whether federal regulations that required a railroad company to conduct breath and urine tests to employees who violated

safety rules, and then report those findings to the government, transformed the private railroad company into a "government agent" for Fourth Amendment purposes. 489 U.S. at 606-613. The Supreme Court found that the railroad company was in fact acting as "government agent" in this context, and thus the tests were "searches" within the meaning of the Fourth Amendment, because the government was seeking to obtain physical evidence from the employees' person and specifically dictated when and how the tests should take place (though the court ultimately concluded that the searches themselves did not violate the Fourth Amendment). Id. at 616-18, 634.

Here, the government did not direct or encourage Retrophin to conduct a specific type of search for documents related to the MSMB entities or to Shkreli, nor did Retrophin conduct an otherwise improper search. Rather, the government provided Retrophin with a series of subpoenas with general subject matter requests, and Retrophin produced responsive documents that it had in its possession, custody and control.

Third and finally, even if Shkreli could show that the Fourth Amendment was implicated, and that Retrophin unlawfully obtained the documents relating to the MSMB entities, and that Shkreli could personally assert standing to challenge that "search," and that Retrophin had acted as a "government actor" in conducting a "search," his motion would still fail because of the doctrine of inevitable discovery. As discussed at length above, the categories of documents at issue here (subscription agreements, investor statements, emails related to the MSMB entities, etc.) are categories of documents that Shkreli already provided to the SEC, Katten, defrauded MSMB investors and/or other third parties, and that the government obtained lawfully from those sources. Shkreli does not identify any specific documents that were provided by Retrophin that the government did not also lawfully obtain from another source.

Because the documents identified by Shkreli would inevitably have been discovered by the government through other lawful means, there is no legal basis to suppress such documents.  <u>See</u>, <u>e.g.</u>, <u>United States v. Rivera</u>, 89 F. Supp. 3d 376, 394 (E.D.N.Y. 2015) (finding that, in the alternative, items seized by the government would inevitably been discovered during a lawful inventory search and thus suppression was not appropriate).

*    *    *

For the reasons set forth above, Shkreli's motion to suppress, and his attendant request for a hearing on the question of whether Retrophin acted as a government agent, should be denied.  Retrophin's production of certain documents related to the MSMB entities to the government in response to a subpoena did not implicate the Fourth Amendment in any respect. Moreover, even if Retrophin's retrieval of documents related to the MSMB entities constituted a "search," Shkreli has failed to demonstrate he can assert standing to challenge such a search, that Retrophin acted as a "government agent" in carrying out that search, or that the documents at issue would not have been ultimately obtained by the government through lawful means.

**SHKRELI'S MOTION FOR EARLY DISCLOSURE OF
CERTAIN MATERIALS SHOULD BE DENIED**

In his motion, Shkreli requests that the government produce "[a]ll evidence contradicting the Government's theory that any settlement agreements, consulting agreements, and/or share transfer agreements were fraudulent" pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), prior to the April 21, 2017 exhibits deadline.[9]  (Shkreli Br. at 13).  As an example, Shkreli states that the government should produce transcripts and documents from Defrauded Employee TK's arbitration against Retrophin and Shkreli.  (<u>Id.</u> at 11, 13).  For the reasons set forth below, Shkreli's request is without merit and should be denied.

As Shkreli notes in his motion, on July 13, 2016, the government provided the defendants with information regarding three Identified Witnesses that the government believed would be helpful to the defense.   Following that disclosure, co-defendant Greebel filed a motion to compel the government to produce various alleged <u>Brady</u> materials, including materials that contradict "the allegation that Retrophin's consulting agreements were 'sham' transactions." (Dkt. No. 83 at 1).  On October 14, 2016, the Court heard oral argument regarding Greebel's motion, and denied the motion in a memorandum and order on December 16, 2016.  (Dkt. No. 138 at 1, 4-9).

In that order, the Court denied Greebel's motion to compel <u>Brady</u> materials because the Court was "satisfied with the Government's representation that it has met, and will continue to meet, its <u>Brady</u> obligations." (<u>Id.</u> at 4).  The Court further noted that "[t]he Government repeatedly

---

[9]      Contrary to the defendants' assertions, the government has never alleged that every settlement agreement, consulting agreement or share transfer agreement entered into by Shkreli and/or Retrophin is fraudulent.

has made good faith representations to the court and to defense counsel that it recognizes its disclosure obligations under <u>Brady</u>, and that it has complied with said obligation and will continue to do so in a timely manner." (<u>Id.</u> at 6) (citations omitted). The Court concluded that courts of this Circuit "repeatedly have denied pre-trial requests for discovery orders pursuant to <u>Brady</u> where the Government has made such good faith representations." (<u>Id.</u> at 7) (citations omitted).

Since the Court's December 16, 2016 order, the government has continued to recognize and comply with its <u>Brady</u> obligations in a timely manner, and Shkreli has provided no reason to believe that the government has not complied with its obligations. Notably, the specific materials Shkreli requests in his motion – transcripts and documents from the arbitration brought by Defrauded Employee TK against Retrophin and Shkreli – are not in the government's possession, and the government is under no obligation to seek those materials. <u>See</u> <u>United States v. Thomas</u>, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (citing <u>United States v. Tadros</u>, 310 F.3d 999, 1005 (7th Cir. 2002)) (noting that <u>Brady</u> does not require the government to "seek out information like a 'private investigator and valet . . . gathering evidence and delivering it to opposing counsel'"). Shkreli's motion is particularly specious considering that he is a party to the very arbitration from which he seeks materials. If the government obtains any materials from Defrauded Employee TK's arbitration proceedings, it will promptly review those materials for any potential <u>Brady</u> material and will produce any such material in a timely manner to the defendants.

Accordingly, Shkreli's motion to compel certain material is meritless and should be denied.

**GREEBEL'S MOTION TO STRIKE LANGUAGE IN THE**
**SUPERSEDING INDICTMENT SHOULD BE DENIED**

In his motion, Greebel requests that the Court strike either the first three lines of Paragraph 7 before Subparagraph 7(a) from the Superseding Indictment, or, in the alternative, the phrase "the defendant EVAN GREEBEL and" from Paragraph 7 because that language allegedly constitutes impermissible surplusage under Federal Rule of Criminal Procedure 7(d). (Greebel Br. at 1-2). Greebel argues that the language at issue should be stricken to "prevent jury confusion," and to "preclude the enlargement of the charges against Mr. Greebel." (Id. at 6). As detailed below, because the language in Paragraph 7 regarding Greebel is not impermissible surplusage, the Court should deny Greebel's motion.

## I.    Legal Standard

A defendant's motion to strike surplusage from an indictment should not be granted unless "the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001) (quoting United States v. Scarpa, 913 F.2d 933, 1013 (2d Cir. 1990)); see also United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996). Thus, even language deemed prejudicial may not be stricken "if evidence of the allegation is admissible and relevant to the charge." Scarpa, 913 F.2d at 1013 (citation omitted); see also United States v. Mahaffy, 446 F. Supp. 2d 115, 118 (E.D.N.Y. 2006). "Given this exacting standard, such motions [to strike] are rarely granted." United States v. Coffey, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005).

## II.    Argument

Here, the language that Greebel contests in Paragraph 7 of the Superseding Indictment is relevant to the charges and is neither inflammatory nor prejudicial such that it

constitutes impermissible surplusage that must be stricken. Paragraph 7 states that "In or about and between September 2009 and September 2014, the defendant MARTIN SHKRELI, together with the defendant EVAN GREEBEL and others, orchestrated four interrelated fraudulent schemes[]." Paragraphs 7(a)-(d) then briefly list the four schemes that are spelled out in much greater detail in Paragraphs 8 through 40 of the Superseding Indictment.

Read in context, it is clear that the government is not alleging based on the language in Paragraph 7 relating to Greebel that he orchestrated all four interrelated schemes. Instead, the language illustrates that Shkreli – who is charged with crimes related to all four interrelated schemes – did not orchestrate those schemes in a vacuum. He orchestrated those schemes variously with others, including Greebel, as set forth in detail in the remaining paragraphs of the Superseding Indictment.[10] The fact that Shkreli orchestrated some of the fraudulent schemes summarized in Paragraph 7 with Greebel is relevant to the charges crimes, and, accordingly, it is neither inflammatory nor prejudicial beyond the allegations in the indictment itself. There is therefore little risk of juror confusion.[11] Also, the notion that the government will cite to this isolated language in the Superseding Indictment to argue at trial that Greebel orchestrated all four interrelated schemes with Shkreli is farfetched considering the allegations contained in the Superseding Indictment itself and the position that the government has taken repeatedly in its submissions to the Court and during oral argument regarding Greebel's culpability in this case.

---

[10] If the government intended to allege that Shkreli and Greebel both orchestrated the four interrelated schemes, Paragraph 7 of the Superseding Indictment would instead state, "In or about between September 2009 and September 2014, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, orchestrated four interrelated fraudulent schemes[]," as set forth in the Counts in which both Shkreli and Greebel are charged. (See, e.g., SI ¶ 56 (Count Seven), ¶ 58 (Count Eight)).

[11] Notably, the government's understanding is that the Court's practice is to refrain from sending the indictment back to the jury for deliberation purposes.

Thus, the language at issue in Paragraph 7 regarding Greebel is both relevant and not so prejudicial or inflammatory as to require that it be stricken from the Superseding Indictment.[12]

---

[12] If the Court decides to send the indictment back to the jury during deliberations, the government will consent to striking the phrase "the defendant EVAN GREEBEL and" from Paragraph 7 of the Superseding Indictment to avoid any need for further litigation on this inconsequential issue.

**POINT FOUR**

**GREEBEL'S MOTION TO DISMISS COUNT EIGHT OF THE
SUPERSEDING INDICTMENT SHOULD BE DENIED**

Greebel also requests that the Court dismiss Count Eight of the Superseding Indictment – in which Shkreli and Greebel are charged with securities fraud conspiracy for their participation in the Retrophin Unrestricted Shares scheme – because the count allegedly fails to state an offense under 18 U.S.C. § 371. (Greebel Br. at 7-12). Specifically, Greebel states that Count Eight "fails to identify with any clarity the objective of the charged conspiracy," and thus "there is a lack of clarity as to what Mr. Greebel allegedly agreed to do." (Id. at 10). For the reasons set forth below, Greebel's motion is meritless and should be denied.

## I.    Legal Standard

For an indictment to be sufficient, it must give a defendant notice of the charge against him. Federal Rule of Criminal Procedure 7(c) ("Rule 7(c)") requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). It is well-established that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).

The Second Circuit has held that an indictment that tracks the language of the statute is sufficient to meet these notice requirements. See United States v. Flaharty, 295 F.3d 182, 198 (2d Cir. 2002) ("an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusations against him ... state time and place in approximate terms") (quoting United States v. Bagaric, 706 F.2d 42, 61 (2d Cir. 1962)); United States v. Citron, 783 F.2d 307,

314 (2d Cir. 1986) ("Where ... an indictment tracks the statutory language and specifies the nature of the criminal activity ... it is sufficiently specific to withstand a motion to dismiss") (citation omitted); United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) ("an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime") (citation omitted); United States v. Bernstein, 533 F.2d 775, 786 (2d Cir. 1976) (the Court has "consistently sustained indictments which tracked the language of the statute and, in addition, do little more than state time and place in approximate terms").

The Court must accept all factual allegations in the indictment as true on a pretrial motion to dismiss, and "the sufficiency of the evidence is not appropriately addressed on a pre-trial motion to dismiss an indictment." Alfonso, 143 F.3d at 776-77; see also United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir. 2005) ("[t]here is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"). When the definition of an offense includes generic terms, the indictment "'must state the species -- it must descend to particulars.'" Russell v. United States, 369 U.S. 749, 765 (1962) (quoting United States v. Cruikshank, 92 U.S. 542, 558 (1875)). However, an indictment "must be read to include facts which are necessarily implied by the specific allegations made." United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002) (quoting Stavroulakis, 952 F.2d at 693).

For conspiracy charges, the law requires that there is an agreement regarding the "object" of the conspiracy. United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977). "This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the 'essential nature of the plan' must be shown." Id. (citation omitted). Courts should focus "on the essence of the underlying illegal objective to determine

whether the conspirators agreed on 'what kind of criminal conduct was in fact contemplated.'" Stravroulakis, 952 F.2d at 690 (internal quotations omitted).

## II.    __Argument__

Here, the defendants have been given more than sufficient notice of the securities fraud conspiracy charge contained in Count Eight of the Superseding Indictment.  Count Eight tracks the language of the relevant statutes, 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff, and the indictment itself contains extensive factual allegations in support of the securities fraud conspiracy charge.  See Alfonso, 143 F.3d at 776; Flaharty, 295 F.3d at 198; Stravroulakis, 952 F.2d at 693.

Indeed, the Superseding Indictment provides even more detail about the Unrestricted Shares Scheme than is required by law.  It is clear from the allegations in the Superseding Indictment that Shkreli and Greebel are charged in Count Eight with conspiring to defraud investors and potential investors in Retrophin by fraudulently "exercis[ing] control over the price and trading of Retrophin's stock," (SI ¶ 37), by concealing Shkreli's beneficial ownership and control of Retrophin's unrestricted or free trading shares.  In order to achieve that objective, a number of overt acts are detailed in the Superseding Indictment.  For example, Shkreli, in concert with Greebel, sent an email on or about December 17, 2012 to six of the seven employees and contractors, among others, in which he falsely stated that they were no longer employees or contractors of Retrophin or the MSMB entities; the defendants coordinated to send this email in order to "fraudulently classify the employees and contractors as independent shareholders who were not affiliated with Retrophin or MSMB to enable them to receive and hold the unrestricted or free trading shares."  (SI ¶ 37).  Additional overt acts are alleged in Paragraphs 38 through 40, and in Paragraphs 59(a) through (l) of the Superseding Indictment.  (SI ¶¶ 38-40, 59(a)-(l)).

There can be no dispute that efforts made by a CEO of a publicly-traded company, with the assistance of outside counsel, to fraudulently control the price and trading of the company's stock, while concealing the CEO's ownership and control over the company's shares, constitute a violation of securities law. Thus, the Superseding Indictment sets forth a valid objective of the securities fraud conspiracy charge at issue. See, e.g., United States v. Royer, 549 F.3d 886, 899-900 (2d Cir. 2008) (upholding securities fraud conviction where defendants sought to manipulate market prices of securities); United States v. Regan, 937 F.2d 823, 829 (2d Cir. 1991) ("In enacting section 10(b), 'Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices'" including market manipulation schemes) (quoting Santa Fe Indus. v. Green, 430 U.S. 462, 477 (1977)); United States v. Heredia, Cr. No. 02-1246 (SWK), 2003 WL 21524008 (S.D.N.Y. July 3, 2003) (finding that the indictment was sufficient to charge securities fraud conspiracy, among other charges, when the object of the charge was to manipulate and control the share price of the target company's stock). The government does not allege in the Superseding Indictment that Shkreli and Greebel conspired merely to "park[] shares" of Retrophin, as Greebel speculates (Greebel Br. at 12); instead, it alleges that Shkreli and Greebel's actions to consolidate and conceal Shkreli's ownership and control over all unrestricted Retrophin shares were for a common, fraudulent purpose – to control the price and trading of Retrophin stock.

Accordingly, because the government has satisfied the notice requirements set forth in Rule 7(c), Greebel's motion to dismiss Count Eight of the Superseding Indictment should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendants' remaining substantive motions should be denied in their entirety.

Dated:  Brooklyn, New York
      April 10, 2017

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York


_____/s/_____
Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-6103 (Kasulis)

Enclosures

cc:    Clerk of the Court (KAM)
      Defense Counsel (By ECF and Email)