# EXHIBIT C

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 2 of 66 PageID #: 2598



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

_____

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported)   December 12, 2013

# RETROPHIN, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 000-53293 | 26-2383102 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 777 Third Avenue, 22 nd Floor, New York, NY | 10017 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code    (646) 837-5863

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐        Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐        Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐        Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2 (b))

☐        Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13a-4 (c))

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 3 of 66 PageID #: 2599

**Item 1.01 Entry into a Material Definitive Agreement.**

*Novartis License Agreement*

On December 12, 2013, Retrophin, Inc. (the " Company ") entered into an agreement (the " Novartis License Agreement ") with Novartis Pharma AG and Novartis AG (together, " Novartis "), pursuant to which Novartis agreed to grant the Company an exclusive, perpetual, and royalty-bearing license for the manufacture, development and commercialization of Syntocinon and related intranasal products in the United States. Under the license, Novartis is obligated to transfer to the Company certain information that is necessary for or related to the development or commercialization of Syntocinon. The Company is responsible for conducting research and preclinical, clinical and other development of Syntocinon at its own expense, and must use commercially reasonably efforts to develop Syntocinon in the United States.

As consideration for the license, the Company paid to Novartis a $5 million upfront fee and is required to make substantial payments upon the achievement of certain milestones. Should the Company commercialize Syntocinon, the Company will be obligated to pay Novartis a 20% royalty on net sales of such products. The Company is also required to pay annual maintenance fees to Novartis and Novartis AG.

The Novartis License Agreement contains other customary clauses and terms as are common in similar agreements in the industry.

The Novartis License Agreement will continue in perpetuity unless terminated by the Company or by Novartis. Novartis may terminate the agreement due to (i) the Company's uncured material breach of the agreement, (ii) the Company's insolvency, or (iii) failure to achieve certain milestones with respect to FDA approvals and commercial sales of a product. The Company may terminate the agreement due to (i) Novartis's uncured material breach of the agreement or (ii) failure to achieve certain milestones with respect to FDA approvals.

The foregoing description of the Novartis License Agreement does not purport to be complete and is qualified in its entirety by reference to the Novartis License Agreement, which is filed as Exhibit 10.1 hereto and is incorporated herein by reference.

*Weg Exclusive License Agreement*

On December 12, 2013, the Company entered into an agreement (the " Weg License Agreement ") with Stuart Weg, MD, pursuant to which Dr. Weg agreed to grant the Company an exclusive worldwide license for the manufacture, development and distribution of products to be developed for the treatment of central nervous system disorders. As consideration for the license, the Company is required to pay Dr. Weg an upfront fee, which amount included a $250,000 payment prior to the execution of the Weg License Agreement, as well as certain maintenance and sublicensing fees. The Company is also obligated to pay Dr. Weg certain royalties on sales of FDA-approved products.

The Weg License Agreement contains other customary clauses and terms as are common in similar agreements in the industry.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 4 of 66 PageID #: 2600

The Weg License Agreement will continue in perpetuity unless terminated by the Company or by Dr. Weg. The Company may terminate the agreement at any time by giving written notice to Dr. Weg. Dr. Weg may terminate the agreement due to the Company's uncured material breach of the agreement.

The foregoing description of the Weg License Agreement does not purport to be complete and is qualified in its entirety by reference to the Weg License Agreement, which is filed as Exhibit 10.2 hereto and is incorporated herein by reference.

*UCSD Sponsored Research Agreement*

On December 12, 2013, the Company entered into an agreement (the " SRA ") with The Regents of the University of California, on behalf of its San Diego Campus (" UCSD "), pursuant to which UCSD will undertake research projects related to a study on oxytocin. As consideration for the research program, the Company is obligated to pay an aggregate of approximately $1.6 million in fees to UCSD on a specified timeline. The SRA will continue until completion of the projects, unless earlier terminated by either party (i) due to a material uncured breach of the SRA by the other party or (ii) for any reason by giving written notice to the other party.

The foregoing description of the SRA does not purport to be complete and is qualified in its entirety by reference to the SRA, which is filed as Exhibit 10.3 hereto and is incorporated herein by reference.

*Shkreli Employment Agreement*

On December 16, 2013, the Company entered into an employment agreement (the " Shkreli Employment Agreement ") with Martin Shkreli, pursuant to which Mr. Shkreli will continue to serve as the Company's Chief Executive Officer.

In accordance with the terms of the Shkreli Employment Agreement, Mr. Shkreli will be paid (i) a base salary in the amount of $300,000 (subject to adjustments at the discretion of the Company's board of directors after each anniversary of the Effective Date), and (ii) at the sole discretion of the board, an annual bonus award based upon specific goals and performance metrics. Mr. Shkreli will also be awarded options to purchase One Million Eighty Thousand (1,080,000) shares of restricted common stock of the Company, a pro rata portion of which will vest quarterly during the 3 years following the Effective Date. In the event of a change of control of the Company, all of Mr. Shkreli's unvested options shall immediately vest.

The Shkreli Employment Agreement contemplates that Mr. Shkreli's employment will be for a three-year term and may be automatically extended for successive three-year periods unless (i) Mr. Shkreli gives notice of non-extension to the Company no later than one hundred eighty (180) days prior to the expiration of the Agreement or (ii) Mr. Shkreli is terminated.

In the event that Mr. Shkreli's employment is terminated by Mr. Shkreli for good reason (as such term is defined in the Shkreli Employment Agreement), then Mr. Shkreli will be entitled to continue to receive his annual base salary, any unpaid bonus and health insurance coverage on the same terms as made available to the Company's employees for a period of twelve (12) months following such termination. If Mr. Shkreli's employment is terminated other than for good reason, Mr. Shrekli will forfeit any unvested stock options that he received and will not be entitled to severance or any additional payments.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 5 of 66 PageID #: 2601

If Mr. Shkreli's employment is terminated for cause (as such term is defined in the Shkreli employment Agreement) then Mr. Shkreli will not be entitled to any further payments of any kind, except for payment of base salary plus reimbursement of certain expenses.

In the event that Mr. Shkreli is no longer employed by the Company, any options that have not vested prior to the date of termination will be immediately cancelled and not subject to further vesting.

The foregoing description of the Shkreli Employment Agreement does not purport to be complete and is qualified in its entirety by reference to the Shkreli Employment Agreement, which is filed as Exhibit 10.4 hereto and is incorporated herein by reference.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

The information contained in Item 1.01 under the heading "Shkreli Employment Agreement" is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

10.1    License Agreement, dated December 12, 2013, by and among Retrophin, Inc., Novartis Pharma AG and Novartis AG.   **(Portions of Sections 1, 4, 10, 11, 16, Schedule A and Schedule B of the Exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the Commission.)**

10.2    Exclusive License Agreement, dated December 12, 2013, by and between Retrophin, Inc. and Stuart Weg, MD. **(Portions of Sections 2, 3, 4, 6, 7, Appendix A and Appendix B of the Exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the Commission.)**

10.3    Sponsored Research Agreement, dated December 12, 2013, by and between Retrophin, Inc. and The Regents of the University of California, on behalf of its San Diego Campus.   **(Portions of the Recital, Sections 1, 2, 3, 4, 5, 6, 8, 9, 14, Exhibit A and Exhibit B of the Exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the Commission.)**

10.4    Employment Agreement, dated December 16, 2013, by and between Retrophin, Inc. and Martin Shkreli.

Case 1:15-cr-00637-KAM    Document 189-3    Filed 04/10/17    Page 6 of 66 PageID #: 2602

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

RETROPHIN, INC.

Date: December 18, 2013

By:/s/ Marc Panoff
      Name: Marc Panoff
      Title:   Chief Financial Officer

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 7 of 66 PageID #: 2603

**FINAL**

**LICENSE AGREEMENT**

between

**NOVARTIS PHARMA AG**

**NOVARTIS AG**

and

**RETROPHIN, INC.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 8 of 66 PageID #: 2604

**Table of Contents**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | LICENSE | 5 |
| 3. | TRANSFER OF INFORMATION | 6 |
| 4. | DEVELOPMENT AND REGULATORY REGARDING PRODUCT | 6 |
| 5. | MANUFACTURING AND COMMERCIALIZATION OF THE PRODUCT | 7 |
| 6. | APPLICATION AND USE OF THE TRADEMARK | 7 |
| 7. | QUALITY CONTROL AND APPROVAL PROCEDURES | 8 |
| 8. | OWNERSHIP OF INVENTIONS | 8 |
| 9. | GOVERNANCE | 8 |
| 10. | FINANCIAL PROVISIONS | 8 |
| 11. | ROYALTY REPORTS AND ROYALTY PAYMENT TERMS | 9 |
| 12. | FURTHER OBLIGATIONS | 11 |
| 13. | REPRESENTATIONS AND WARRANTIES | 12 |
| 14. | INDEMNIFICATION. | 13 |
| 15. | INFRINGEMENT OF LICENSED IP BY THIRD PARTIES | 14 |
| 16. | TERM AND TERMINATION | 15 |
| 17. | CONFIDENTIALITY | 16 |
| 18. | PRESS RELEASE | 18 |
| 19. | MISCELLANEOUS | 18 |

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 9 of 66 PageID #: 2605

## LICENSE AGREEMENT

This LICENSE AGREEMENT (" **License Agreement** ") is made as of this 12 th day of December, 2013 (" **Effective Date** "), by and between Novartis Pharma AG, a company organized under the laws of Switzerland and located at Lichtstrasse 35, 4056 Basel, Switzerland (" **NPAG** "), Novartis AG, a company organized under the laws of Switzerland and located at Forum 1, Novartis Campus, 4056 Basel, Switzerland (" **NAG** ") ( **NPAG** and **NAG** together called " **Novartis** ") and Retrophin, Inc., a company organized under the laws of the State of Delaware, United States with its principal executive offices located at 777 Third Avenue, 22nd Floor, New York, NY 10017 (" **Retrophin** "). Novartis and Retrophin are each referred to individually as a " **Party** " and together as the " **Parties.** "

### RECITALS

WHEREAS, Novartis and/or its Affiliates own or control the Licensed IP;

WHEREAS, Novartis and/or its Affiliates desire to grant to Retrophin, and Retrophin desires to obtain rights to, the Licensed IP exclusively related to Product in the Territory; and

WHEREAS, Retrophin desires to develop, market, sell, distribute, manufacture and commercialize Product in the Territory.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Parties hereby agree as follows:

**1.**      **DEFINITIONS AND INTERPRETATION**

**1.1.**      **Definitions** .  The capitalized terms used in this License Agreement shall have the meanings as defined below:

" **Accounting Standards** " means with respect to Retrophin, US GAAP (United States Generally Accepted Accounting Principles), as generally and consistently applied throughout Retrophin's organisation. Retrophin shall promptly notify Novartis in the event that it changes the Accounting Standards pursuant to which its records are maintained, it being understood that Retrophin may only use internationally recognized accounting principles (e.g. IFRS, US GAAP, etc.).

" **Affiliate** " means, with respect to a Party, any person that directly or indirectly controls, is controlled by, or is under common control with that Party.  For the purpose of this definition, "Control" shall mean: (i)(a) direct or indirect ownership of more than ######## * of the shares of stock entitled to vote for the election of directors, in the case of a corporation or (b) more than ########* of the equity interest in the case of any other type of legal entity, status as a general partner in any partnership; and (ii) any other arrangement whereby the entity or Person controls or has the right to control the board of directors or equivalent governing body of a corporation or other entity.  In the case of entities organized under the Laws of certain countries, the maximum percentage ownership permitted by Law for a foreign investor may be less than ########*, and in such case such lower percentage shall be substituted in the preceding sentence, provided that such foreign investor has the power to direct the management and policies of such entity.

---

* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 10 of 66 PageID #: 2606

" **Alliance Manager** " shall have the meaning set forth in Clause 9.1.

" **Auditor** " shall have the meaning set forth in Clause 11.4(b) of this License Agreement.

" **Business Day** " means a day (other than a Saturday, Sunday or a public holiday) on which the banks are open for business in Basel, Switzerland and New York, New York.

####### *

####### *

" **Combination Product(s)** " shall mean #######*.

" **Commercialize** " means to market, promote, distribute, import, offer to sell and/or sell Product, itself, by or through Affiliates or using Third Parties, and " **Commercialization** " means commercialization activities relating to the Product, including activities relating to marketing, promoting, distributing, importing, offering for sale and/or selling the Product, itself, by or through Affiliates or using Third Parties.

" **Develop** " or " **Development** " means drug development activities, including test method development and stability testing, assay development and audit development, toxicology, formulation, quality assurance/quality control development, statistical analysis, clinical studies, packaging development, regulatory affairs, and the preparation, filing and prosecution of NDAs.

" **Drug Substance** " means the active pharmaceutical ingredient oxytocin contained in the Product, having the structure set forth in Schedule B.

" **Effective Date** " means the date this License Agreement enters into effect as set out in the Parties clause above.

" **Encumbrances** " shall have the meaning set forth in Clause 13.2(a).

" **FDA** " means the United States Food and Drug Administration or any successor entity thereto.

" **Field** " shall mean treatment, prevention or diagnosis of all indications, or any pharmaceutical use, in humans.

" **First Commercial Sale** " means, with respect to the Product, the first arm's length sale to a Third Party in the Territory.

" **Force Majeure** " means any event which is beyond the reasonable control of the Party affected, including but not limited to the following events: earthquake, storm, flood, fire or other acts of nature, epidemic, war, riot, public disturbance, strike or lockouts, government actions, terrorist attack or the like.

" **Good Manufacturing Practice** " or " **GMP** " means the current good manufacturing practices (cGMP) and all applicable governmental rules and regulations as applied at the site(s) of manufacture and control, as amended from time to time and in effect during the term of this License Agreement.

---

\* **####### = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

2

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 11 of 66 PageID #: 2607

" **Governmental Entity** " means any court, agency, authority, department, legislative or regulatory body of any (i) government, (ii) country, (iii) national, federal, state, provincial, regional, county, city or other political subdivision of any such government or country or (iv) quasi-governmental authority or self-regulatory organization of competent authority.

" **IND** " means an Investigational New Drug application in the Territory filed with the FDA.

" **Information** " means ######## * .

" **Infringement** " has the meaning ascribed to such term in Clause 15.1.

" **Initial NDA** " means the NDA filed by Novartis on or about 19 January 1960 for the following indications: initial milk let-down, milk retention, incipient mastitis, impaired milk let-down.

" **Insolvency Event** " means, in relation to Retrophin, any one of the following: (a) Retrophin is the subject of voluntary or involuntary bankruptcy proceedings instituted on behalf of or against Retrophin (except for involuntary bankruptcy proceedings which are dismissed within ########*); (b) an administrative receiver, receiver and manager, interim receiver, custodian, sequestrator or similar officer is appointed in respect of Retrophin; (c) a notice shall have been issued by Retrophin to convene a meeting for the purpose of passing a resolution to wind up Retrophin, or such a resolution to wind up Retrophin shall have been passed other than a resolution for the solvent reconstruction or reorganization of Retrophin; or (d) a resolution shall have been passed by Retrophin or Retrophin's directors to make an application for an administration order or to appoint an administrator.

" **Know-How** " means ########*.

" **Law** " means any statute, law, ordinance, requirement, regulatory rule, code or order of a Governmental Entity.

" **Licensed IP** " means ########*.

" **Losses** " shall have the meaning set forth in Clause 14.1 hereof.

" **Marked Product(s)** " has the meaning ascribed to such term in Clause 6.1.

" **Milestone** " shall have the meaning set forth in Clause 10.1.

" **NDA** " means the filing of a New Drug Application [or equivalent] with the FDA in the Territory for authorization to market the Product, as defined in the applicable Laws and regulations.

" **Net Sales** " means ########*.

With respect to the calculation of Net Sales:

---

* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 12 of 66 PageID #: 2608

######## *

" **Novartis Indemnitees** " shall have the meaning set forth in Clause 14.1 hereof.

" **Person** " means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity.

" **Product** " means Syntocinon and/or any intranasal product (including Combination Product) Developed under this License Agreement incorporating or comprising the Drug Substance.

" **Regulatory Approva** l" means, with respect to the Product, any NDA approval (notwithstanding the indication), registration, license or authorization from the FDA to market and sell such Product in the Territory in the Field.

" **Regulatory Filings** " means, with respect to the Drug Substance or Product, any submission to the FDA of any appropriate regulatory application, and shall include any IND or NDA.

" **Retrophin Indemnitees** " shall have the meaning set forth in Clause 14.2 hereof.

" **Royalty(ies)** " shall have the meaning set forth in Clause 10.3.

" **Sales & Royalty Report** " means a written report or reports showing each of: ########*.

" **Syntocinon** " means the SYNTOCINON™ intranasal product that includes the Drug Substance as the sole active ingredient.

" **Territory** " means the United States of America, its territories and possessions.

" **Third Party** " shall mean any Person other than a Party or an Affiliate of a Party.

" **Trademark** " means the trademark pending application SYNTOCINON ########* in the Unites States as provided in Schedule A and any other marks now in existence incorporating such term and used in the Territory, including all goodwill associated therewith.

" **Upfront Payment** " means the payment to be made by Retrophin to Novartis upon the Effective Date as set forth in Clause 10.1.

" **USD** " or " **US$** " or " **US Dollars** " means the lawful currency of the United States of America.

**1.2.**      **Interpretation** .  In this License Agreement unless otherwise specified:

(a)      "includes" and "including" shall mean respectively includes without limitation and including without limitation;

(b)      words denoting the singular shall include the plural and vice versa and words denoting any gender shall include all genders;

_____

\* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 13 of 66 PageID #: 2609

(c)      the Schedules and other attachments form part of the operative provision of this License Agreement and references to this License Agreement shall, unless the context otherwise requires, include references to the Schedules and attachments;

(d)      references to Clauses are to Clauses of this License Agreement unless otherwise specified;

(e)      the headings in this License Agreement are for information only and shall not be considered in the interpretation of this License Agreement;

(f)      any reference to "writing" or "written" includes faxes and any legible reproduction of words delivered in permanent and tangible form (but does not include email); and

(g)      the words "hereof", "herein" and "hereunder" and words of like import used in this License Agreement shall refer to this License Agreement as a whole and not to any particular provision of this License Agreement;

(h)      references to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; and

(i)      the Parties agree that the terms and conditions of this License Agreement are the result of negotiations between the Parties and that this License Agreement shall not be construed in favour of or against any Party by reason of the extent to which any Party participated in its preparation.

2.      **LICENSE**

2.1.      **License Grant from Novartis to Retrophin.**

Subject to the terms and conditions of this License Agreement, including, without limitation, Clause 7 below, and except as otherwise specified herein, Novartis, on behalf of itself and its Affiliates, grants to Retrophin an exclusive, perpetual, royalty-bearing, non-sublicensable (except as expressly provided in Clause 2.2 below) license under the Licensed IP to make, manufacture or have made or manufactured, use, Develop and Commercialize, the Product in the Field in the Territory.

2.2.      **Sublicensing.**

(a)      **By Retrophin** .  Subject to Clause 2.2(b) below, Retrophin may sublicense the rights granted to it under Clause 2.1 of this License Agreement with the prior written consent of Novartis, which consent shall not be unreasonably denied, delayed or conditioned; provided, however, that no consent shall be required for any sublicenses to Retrophin Affiliates.  In the event that the written consent of Novartis is forthcoming such consent shall be subject to Clause 2.2(b) below and such other requirements or obligations that Novartis may require as a condition of giving its consent.

(b)      **Sublicense Requirements** .  Any sublicense by Retrophin will be subject to a written agreement that (i) requires the sublicensee to comply with all applicable obligations of this License Agreement, and (ii) is not in conflict with any term of this License Agreement.  Retrophin shall undertake to enforce the provisions of any such sublicense and shall remain responsible and jointly and severally liable with the sub-licensee to Novartis for the performance of its sublicensee's obligations and for all acts or omissions of its sublicensees as if they were the acts or omissions of Retrophin under this License Agreement.

---

* **####### = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 14 of 66 PageID #: 2610

**2.3.**     **Restriction of Rights** . Neither Retrophin nor any of its Affiliates shall, whether directly or indirectly: (a) sell Product to customers outside the Territory; (b) manufacture Product specifically for use outside the Territory; and/or (c) manufacture Product for sale to customers who Retrophin has actual knowledge intend to sell such Product outside the Territory.

**2.4.**     **Reservation of Rights by Novartis** . Without prejudice to any other rights that Novartis may have, Retrophin agrees that Novartis retains or shares full and unencumbered rights under the Licensed IP: (a) to make Drug Substance and Product in the Territory for sale outside the Territory; (b) to exploit or have exploited the Licensed IP in the Territory outside the Field; and (c) to exploit or have exploited the Licensed IP in the Territory in the Field to Develop, use, manufacture, have manufactured and Commercialize injectable products incorporating or comprising the Drug Substance. Retrophin acknowledges and agrees that as between the Parties, Novartis and/or its Affiliates are the sole owner(s) of all right, title and interest in and to the Licensed IP, and Retrophin has not acquired, and shall not acquire, any right, title or interest in or to the Licensed IP pursuant to this License Agreement other than the rights expressly set forth in this License Agreement.

**3.**     **TRANSFER OF INFORMATION**

**3.1.**     **Delivery of Information** .

(a)     Simultaneous with the execution of this Agreement, a letter, in the form attached hereto as <u>Exhibit A</u> , shall be duly executed by Novartis and Retrophin and delivered to the FDA.

(b)     Within one hundred twenty (120) days following the Effective Date, Novartis shall provide to Retrophin copies of all Information in electronic or in paper form.

(c)     Following execution of the Agreement for a period of ######## * , if Retrophin determines that the Information previously provided to Retrophin does not include certain information (however characterized) reasonably necessary for or related to the Development and/or Commercialization of the Product in the Field in the Territory, it may request such information (however characterized) from Novartis, and Novartis shall use commercially reasonable efforts to determine if such information (however characterized) is held by or available to Novartis. If Novartis determines that such information (however characterized) is held by or available to Novartis, Novartis shall deliver such information to Retrophin within thirty (30) days of determining that such information (however characterized) is held by or available to Novartis.

**4.**     **DEVELOPMENT AND REGULATORY REGARDING PRODUCT**

**4.1.**     **Development** . Subject to Clause 4.2, Retrophin will be responsible for conducting, at its sole expense, such research and preclinical, clinical and other Development of the Drug Substance and/or Product as it determines appropriate in its sole discretion and at its sole risk.

**4.2.**     **Development Diligence** . Notwithstanding anything to the contrary, Retrophin shall itself, or through its Affiliates or authorized sublicensees, use commercially reasonable efforts to Develop the Product in the Field in the Territory. Within ########*, Retrophin shall provide Novartis with its development plan for the Product and shall provide Novartis with updates to such plan no less than every ########* thereafter until First Commercial Sale of the Product in the Territory.

---

* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM    Document 189-3    Filed 04/10/17    Page 15 of 66 PageID #: 2611

**4.3.        Regulatory** .  Retrophin will (i) determine the regulatory plans and strategies for the Drug Substance and Product, (ii) (either itself or through its authorized sublicensees) make all Regulatory Filings with respect to its Commercialization of the Product and (iii) be responsible for obtaining and maintaining Regulatory Approval in the Territory in the name of Retrophin or its authorized sublicensees.

**4.4.        Compliance** .  Retrophin agrees that in performing its obligations under this License Agreement, in particular with regard to the Product: (a) it shall comply with all applicable current international regulatory standards, including cGMP, cGLP, cGCP and other rules, regulations and requirements; and (b) it will not employ or use any person that has been debarred under Section 306(a) or 306(b) of the U.S. Federal Food, Drug and Cosmetic Act.

## 5.        MANUFACTURING AND COMMERCIALIZATION OF THE PRODUCT

**5.1.        Manufacturing** .  Retrophin (or its designated authorized sublicensee(s)) hereby acknowledges and agrees that it will be solely responsible for the manufacture and supply of the Drug Substance and the Product and for the Commercialization of the Product under this License Agreement.

**5.2.        Commercialization** .  Retrophin will be solely responsible for all aspects of Commercialization of the Product in the Territory, including planning and implementation, distribution, booking of sales, pricing and reimbursement.  Notwithstanding anything to the contrary, Retrophin shall itself, or through its Affiliates or authorised sublicensees, use commercially reasonable efforts to Commercialize the Product in the Field in the Territory.

**5.3.        Pharmacovigilance** .  Within sixty (60) days following execution of this Agreement, the Parties shall enter into a mutually-agreed written pharmacovigilance agreement substantially in the form attached hereto as Exhibit B.

## 6.        APPLICATION AND USE OF THE TRADEMARK

**6.1.        Application of Trademarks** .  Nothing in this License Agreement shall require or oblige Retrophin to use the Trademark in relation to the Product.  Any manufacture, marketing, promotion, sale, and/or distribution by Retrophin of Product that carries, or sold by reference to, the Trademark (" **Marked Product(s)** ") shall be governed by the relevant provisions of this License Agreement.  In the event Retrophin either (1) elects not to use the Trademark in connection with its Commercialization of the Product or (ii) elects to cease using the Trademark in connection with the sale of the Product and changes the name under which the Product is sold in the Territory, Novartis shall be entitled to cease maintenance of the Trademark.

**6.2.        Marked Product(s)** .  Retrophin hereby acknowledges and agrees that no third party trademark other than the Trademark may be affixed to or used on and in connection with a Marked Product(s); provided however, that (i) Retrophin may use its trade name on packaging, leaflets, advertising and promotional materials for the Marked Product(s) and (ii) Retrophin may develop and use combination or extension marks, including by adding modifiers to the Trademark (e.g. "Syntocinon Extended Release").

**6.3.        Use of Trademarks** .  Retrophin shall not use in its business (or apply or obtain registration for) any trademark or corporate name or trading name identical with or confusingly similar to the Trademark.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 16 of 66 PageID #: 2612

## 7.      QUALITY CONTROL AND APPROVAL PROCEDURES

**7.1.      Standards of Quality** .  Retrophin undertakes to comply strictly with the applicable FDA standards and specifications in the manufacture and handling of Marked Product(s).  For the avoidance of doubt, Retrophin agrees to strictly comply, at least, with applicable Good Manufacturing Practice in the manufacture of Marked Product(s), as well as to strictly comply with applicable Laws and regulations in the marketing, sale, and distribution of Marked Product(s).

**7.2.      Quality Control** .  During the term of this License Agreement and upon Novartis' request, Retrophin shall, at Retrophin's expense, submit to Novartis for approval a reasonable number of production samples of any Marked Product (s).  In the event that Novartis reasonably determines that the quality of any sample does not meet the requirements of Clause 7.1, Novartis shall give written notice of such objection to Retrophin within sixty (60) days of receipt of the sample by Novartis, specifying the way in which the sample fails to meet the quality standards and specifications.  Retrophin shall be obliged to remedy the failure and to submit further samples to Novartis for approval in accordance with this Clause 7.2.  In the event Retrophin fails to remedy any failures to meet the quality standards set forth in this License Agreement within ninety (90) days of receipt of written notice thereof, Novartis shall be entitled to terminate the license set forth in Clause 2 above as to the Trademark; provided, however, that Novartis shall not be entitled to exercise such right of termination if Retrophin is using commercially reasonable efforts to remedy such failure.

## 8.      OWNERSHIP OF INVENTIONS

**8.1.      Ownership of Inventions** .  All inventions created and developed by Retrophin arising from Retrophin's activities under this License Agreement, including any patent applications and patents covering such inventions, shall be owned by Retrophin.

## 9.      GOVERNANCE

**9.1.      Alliance Managers** .  Within thirty (30) days following the Effective Date, each Party will appoint (and notify the other Party of the identity of) a senior representative having a general understanding of pharmaceutical development and commercialization issues to act as its alliance manager under this License Agreement ("Alliance Manager").  The Alliance Managers will serve as the contact point between the Parties for the purpose of providing Novartis with information on the progress of Retrophin's Development and Commercialization of the Product in the Territory and will be primarily responsible for facilitating the flow of information and otherwise promoting communication and coordination between the Parties; providing single point communication for seeking consensus both internally within the respective Party's organization and together regarding any issues, as appropriate, including facilitating review of external corporate communications; and raising cross-Party and/or cross-functional disputes in a timely manner.  Each Party may replace its Alliance Manager on written notice to the other Party.

## 10.      FINANCIAL PROVISIONS

**10.1.      Upfront & Milestone Payments** .  In consideration of the licenses and rights granted to Retrophin hereunder , Retrophin shall pay NAG:

(a)       a non-refundable, non-creditable upfront payment in the sum of USD3,000,000.00 (Three Million United States Dollars) upon the Effective Date (" **Upfront Payment** ");

(b)    ######## * ;

(c)    ######## * ;

(d)    ######## * ;

(e)    ######## * ;

(f)    ######## * ;

(g)    ######## * ;

(h)    ######## * ;

(i)    ######## * ;

(j)    ######## * ; and

(k)    ######## * .

Each event described in 10.1 (b) through (k) is hereinafter referred to as a (" **Milestone** ") and each associated payment is hereinafter referred to as a ("Milestone Payment").

######## *

**10.2.**    **Royalty Payments** .

(a)    In consideration of the licenses and rights granted to Retrophin hereunder, during the Royalty Term (as defined below), Retrophin will make royalty payments to NAG on ######## * at the rate of 20% (Twenty Percent) of Net Sales (" **Royalty** ").

(b)    Royalties will be payable ######## * and shall continue to be paid for the term of this License Agreement (" **Royalty Term** ").

## 11.    ROYALTY REPORTS AND ROYALTY PAYMENT TERMS

**11.1.**    **Payment Terms** .

(a)    ######## * .

(b)    All payments from Retrophin to NAG shall be made by wire transfer in US Dollars to the credit of such bank account as may be designated by NAG in this License Agreement or in writing to Retrophin from time to time.  Any payment which falls due on a date which is not a Business Day may be made on the next succeeding Business Day.

**11.2.**    **Currency** .  All payments under this License Agreement shall be payable in US dollars.

**11.3.**    **Taxes** .

---

* **######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

(a)      To the extent permitted by applicable Law, all payments to Novartis under this License Agreement shall be made by Retrophin ######## * .

(b)      Novartis shall deliver to Retrophin ######## * .

(c)      Novartis shall deliver to Retrophin, at such times prescribed by law and promptly upon request by Retrophin, such documentation prescribed by applicable law and such additional documentation reasonably requested by Retrophin as may be necessary for Retrophin to comply with its obligations under Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended, the treasury regulations thereunder and official interpretations thereof, in each case as in effect from time to time (or any amended or successor version thereof).

(d)      Novartis shall make commercially reasonable efforts and shall fully cooperate with Retrophin to the extent reasonably requested by Retrophin to eliminate, reduce or recover from the relevant taxing authority or other governmental authority, any taxes in respect of any amount paid or payable under this License Agreement.

(e)      Notwithstanding anything to the contrary herein, ######## * .

(f)      For purposes of this License Agreement the following terms shall have the following meanings:

######## *

" **FATCA** " shall mean Sections 1471 through 1474 of the Code, the Treasury Regulations thereunder and official interpretations thereof, in each case as in effect from time to time (or any amended or successor version thereof).

" **Code** " means the Internal Revenue Code of 1986, as amended.

" **Treasury Regulations** " means all proposed, temporary and final regulations promulgated and in effect under the Code.

**11.4.     Records and Audit Rights.**

(a)      Retrophin shall keep complete, true and accurate books and records in accordance with its Accounting Standards in relation to this License Agreement, including in relation to Net Sales and Royalties.  Retrophin will keep such books and records for at least ######## * following ######## * to which they pertain.

(b)      Novartis shall have the right for a period of ######## * to audit whether by itself or through its Affiliate(s) and/or to appoint an internationally-recognized independent accounting firm (whether Novartis, its Affiliate or an accounting firm, hereinafter referred to as the " **Auditor** ") with experience in the pharmaceutical industry to inspect the relevant records of Retrophin or its Affiliates or applicable authorized sublicensees to verify such reports, statements, records or books of accounts, as applicable.  No more than one audit of Retrophin or its authorized sublicenses may occur in any ######## * period and such audits may only take place during Retrophin's or its applicable authorized sublicensee's regular business hours and after reasonable advance written notice (not less than two (2) weeks).  Where the Auditor is not Novartis, the Auditor shall have the right to disclose to Novartis and/or other Affiliates of Novartis its conclusions regarding any payments owed under this License Agreement.

_____

* **######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 19 of 66 PageID #: 2615

(c)        Retrophin and its authorized sublicensees shall make their records available for inspection by the Auditor during regular business hours at such place or places where such records are customarily kept, upon receipt of reasonable advance notice from Auditor to verify the accuracy of the Sales & Royalty Reports and compliance with this License Agreement.  Any such party conducting an audit shall enter into a reasonable confidentiality agreement provided by Retrophin, which will allow disclosure of information only if it is necessary to disclose it to enforce Novartis' rights under this License Agreement or if disclosure is required by Law.

(d)        ######## * .

(e)        In the event that the final result of the inspection reveals an undisputed underpayment or overpayment by Retrophin, the underpaid or overpaid amount shall be settled promptly.

11.5.       Retrophin will provide Novartis with the following:

       ######## *

## 12.      FURTHER OBLIGATIONS

**12.1.**      **Actions.**  Neither Party shall do or omit to do anything that would substantially diminish or impair the rights of Novartis in the Licensed IP.  If either Party becomes aware of any claim or challenge to, the validity of the Licensed IP, it shall promptly inform the other Party.

**12.2.**      **Prosecution and Defense of Trademark** .  Novartis shall maintain, prosecute and defend, with counsel reasonable acceptable to Retrophin, the Trademark in the Territory, and Retrophin agrees that the law firm of Tepper & Eyster, PLLC, 3724 Benson Drive Raleigh, NC 27609 shall be acceptable counsel for purposes of this Clause 12.2.  Retrophin shall provide Novartis with any assistance, documentation, samples of Marked Products or other materials Novartis may require in connection with the registration, prosecution or defense of the Trademark, at no additional cost to Novartis.  Each Party shall promptly notify the other Party of any actual or suspected claim or challenge to, the validity of the Trademark within the Territory that comes to its attention, and the Parties shall agree in good faith on how to best defend such claim or challenge.  In the event that Novartis determines not to, or fails to, maintain, prosecute, and/or defend the Trademark in the Territory, Retrophin may, in its discretion, elect to maintain, prosecute and defend the Trademark in the Territory. Each Party shall promptly notify the other Party of any actual or suspected claim or challenge to, the validity of the Trademark within the Territory that comes to its attention, and the Parties shall agree in good faith on how to best defend such Trademark. Unless Retrophin determines not to maintain, or defend, as applicable, the Trademark, Retrophin shall bear all costs and expenses related to the maintenance (including but not limited to, renewal fees and the monitoring costs for the Trademark) and defense of the Trademark in the Territory as of the Effective Date, in all cases subject to Clause 15.

**12.3.**      **Registration of License** .  In case a Party wants to make application(s) to the appropriate authority in the Territory for either the registration of this License Agreement as a license or the registration of Retrophin as a registered user of the Trademark, the Parties shall co-operate to that effect and the Party that initiated such application(s) shall bear the respective costs.

---

* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 20 of 66 PageID #: 2616

**12.4.** **Regulatory Actions** .  In the event that any assets, businesses or licenses are required to be divested or assigned in order to avoid the filing of a complaint in a court of competent jurisdiction or the issuance of any administrative complaint seeking the entry of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing the consummation of, unwinding, or making illegal, any part or all of the transactions contemplated hereby, or otherwise as required by any Governmental Entity, Retrophin shall have the right to assign its rights under this Agreement to a Third Party, provided that in connection with any such Assignment, Retrophin shall simultaneously enter into an agreement with Novartis, in form and substance reasonably satisfactory to Novartis, providing for the payment by Retrophin of any amounts that would otherwise be payable pursuant to Clause 10 as and when such amounts would be payable pursuant to this Agreement.

## 13.     REPRESENTATIONS AND WARRANTIES

**13.1.** **Representations and Warranties by Each Party** .  Each Party represents and warrants to the other as of the Effective Date that:

(a)      it is a company duly organized, validly existing, and in good standing under the Laws of its jurisdiction of formation;

(b)      it has full corporate power and authority to execute, deliver, and perform this License Agreement, and has taken all corporate action required by Law and its organizational documents to authorize the execution and delivery of this License Agreement and the consummation of the transactions contemplated by this License Agreement; and

(c)      this License Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms.

**13.2.** **Novartis Representations and Warranties.**   Novartis represents and warrants that to the best of its knowledge as of the Effective Date:

(a)      None of the Licensed IP is subject to any outstanding option or similar right of any other Person to acquire the same, and Novartis has the right to grant to Retrophin the licenses granted hereunder.  The licenses granted hereunder to the Licensed IP will be free and clear of any security interests, mortgages, pledges, defects in title, restrictive covenants or other restrictions (" **Encumbrances** ").

(b)      the Information provided to Retrophin pursuant to Clause 3.1 constitutes all information (however characterized) necessary for or related to the Development and/or Commercialization of Product in the Field in the Territory held by or available to Novartis as of the Effective Date.

**13.3.** **Retrophin Representation and Warranty** .  Retrophin warrants to Novartis that:

(a)      neither Retrophin, nor, to the actual knowledge, following reasonable inquiry, of Retrophin, any employee, agent or subcontractor of Retrophin, involved or to be involved in the Development and/or Commercialization of the Drug Substance or the Product has been debarred under Subsection (a) or (b) of Section 306 of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 335a); (ii) no Person who is known by Retrophin to have been debarred under Subsection (a) or (b) of Section 306 of said Act will be employed by Retrophin in the performance of any activities hereunder; and (iii) to the actual knowledge, following reasonable inquiry, of Retrophin, no Person on any of the FDA clinical investigator enforcement lists (including, but not limited to, the (1) Disqualified/Totally Restricted List, (2) Restricted List and (3) Adequate Assurances List) will participate in the performance of any activities hereunder;

_____

\* ####### = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

(b)        Retrophin is not and has not been subject to any litigation by customers or investigation by local and/or regulatory authorities which would negatively impact Retrophin's obligations hereunder;

(c)        There is no suit, action, investigation or proceeding pending or threatened against Retrophin, that challenges or seeks to prevent or enjoin the transactions contemplated by this License Agreement; and

(d)        Retrophin has carried out an analysis whether any anti-trust approvals or notifications from the relevant merger control authorities are required in connection with the transaction contemplated by this License Agreement and has concluded that no such approvals or notifications are required.

**13.4.        Special, Indirect and Other Losses.**   NEITHER PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES.  Except as provided in Clauses 13.1 or 13.2 in this Agreement, NOVARTIS MAKES NO REPRESENTATIONS, EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, AND ASSUMES NO RESPONSIBILITY OR LIABILITY AFTER THE EFFECTIVE DATE WHATSOEVER IN RESPECT OF THE LICENSED IP OR THE APPLICATION, OPERATION, OWNERSHIP, NON-INFRINGEMENT OR USE THEREOF, WHICH RETROPHIN IS LICENSING "AS-IS" AND WITH ALL FAULTS.  Except as provided in Clauses 13.1 or 13.3 or as otherwise provided for in this Agreement, RETROPHIN MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED.

**13.5.        Claims.**   If a Party breaches a representation or warranty, it shall be liable to the other Party for the Loss caused by such breach, subject to the limitations and other provisions of this License Agreement.

**13.6.        Survival.**   The representations and warranties made by the Parties and contained in this License Agreement shall survive until ####### *  after of the Effective Date.

**14.        INDEMNIFICATION.**

**14.1.        Indemnification by Retrophin.**   Retrophin shall indemnify and hold Novartis, its Affiliates and their respective officers, directors, agents and employees (" **Novartis Indemnitees** ") harmless from and against (i) any and all costs, charges, claims (including Third Party claims) damages or expenses (including reasonable attorneys' fees and expenses) against or incurred by them (" **Losses** ") to the extent arising or resulting from Retrophin's or any of its Affiliates, sublicensees' or contractors' breach of any representation, warranty, covenant or agreement contained herein, (ii) any product liability claims relating to a Product and/or (iii) any claims brought by a Third Party for (a) infringement, misappropriation or other violation of its intellectual property rights in connection with any intellectual property developed by Retrophin after the Effective Date and incorporated into the Products or (b) resulting from Retrophin's or any of its Affiliates, sublicensees' or contractors' actions or inactions in connection with the Development, manufacturing and/or Commercialization of the Product; provided however, that Retrophin shall not be obliged to so indemnify, defend and hold harmless the Novartis Indemnitees to the extent that such claims arise from a Loss subject to Clause 14.2.

**14.2.        Indemnification by Novartis.**   Novartis shall indemnify and hold Retrophin, its Affiliates and their respective officers, directors, agents and employees (" **Retrophin Indemnitees** ") harmless from and against any and all Losses to the extent arising or resulting from Novartis's or any of its Affiliates', sublicensees' or contractors' breach of Clauses 3.1, 12.2, 13.1, 13.2 or 17 herein.

---

* **####### = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

13

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 22 of 66 PageID #: 2618

**14.3.**      **Indemnification Procedure.**   If any indemnified party under this Clause 14 (the "Indemnified Party") receives notice of any claim or the commencement of any action or proceeding with respect to which any party is obligated to provide indemnification pursuant to this Clause 14 (the " **Indemnifying Party** "), such Indemnified Party shall promptly notify the Indemnifying Party, in writing, of such claim.  The Indemnifying Party shall have twenty (20) business days after said notice is given to elect, by written notice given to such Indemnifying Party, to undertake, conduct and control, through counsel of their own choosing (subject to the consent of such Indemnified Party, such consent not to be unreasonably withheld) and at their sole risk and expense, the good faith settlement or defense of such claim, and such Indemnified Party shall cooperate with the Indemnifying Party in connection therewith; provided: (a) all settlements require prior reasonable consultation with the Indemnified Party and the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, and (b) the Indemnified Party shall be entitled to participate in such settlement or defense through counsel chosen by the Indemnified Party (provided that the fees and expenses of such counsel shall be borne by the Indemnified Party).  So long as the Indemnifying Party is contesting any such claim in good faith, the Indemnified Party shall not pay or settle any such claim.  If the Indemnifying Party does not make a timely election to undertake the good faith defense or settlement of the claim as aforesaid, or if the Indemnifying Party fails to proceed with the good faith defense or settlement of the matter after making such election, then, in either such event, the Indemnified Party shall have the right to contest, settle or compromise (provided, that, all settlements or compromises require the prior reasonable consultation with the Indemnifying Party and the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed) the claim at their exclusive discretion, at the risk and expense of the Indemnifying Party.  Regardless of which party is controlling the defense of any claim, each party shall act in good faith and shall provide reasonable documents and cooperation to the party handling the defense.

## 15.      INFRINGEMENT OF LICENSED IP BY THIRD PARTIES

**15.1.**      **Infringement.**   Each Party shall promptly notify the other Party of any actual, suspected or threatened infringement, violation or misappropriation within the Territory of the Licensed IP ("Infringement") that comes to its attention.

**15.2.**      **Right to Bring Action.**   Except as set forth in Clause 15.3 below, Retrophin shall have the sole right to send notices and bring and conduct actions in relation to any Infringement in the Territory.  Novartis will co-operate fully with Retrophin in taking all reasonable steps requested by Retrophin in connection with any Infringement action, including joining in legal proceedings.  Retrophin shall bear the costs of any such legal proceedings, and shall be entitled to any damages, account of profits and/or awards of costs recovered.

**15.3.**      **Exception.**   In the event that Retrophin does not take reasonable steps to prevent any individual Infringement within ninety (90) days of becoming aware of all necessary facts and circumstances related thereto or receiving notice thereof, Novartis shall hereafter have the right (but shall not be under any obligation in this regard and such right shall be subject to Retrophin's right in Clause 15.2) to send notices and bring and conduct actions in relation to such Infringement.  Retrophin will co-operate fully with Novartis in taking all reasonable steps requested by Novartis in connection with any such Infringement action, including joining in legal proceedings.  Novartis shall bear the costs of any such legal proceedings, and shall be entitled to any damages, account of profits and/or awards of costs recovered.

**15.4.    Settlements.**   The Parties shall reasonably consult with each other before accepting any settlement or any judicial finding which is reviewable by a higher authority.

## 16.    TERM AND TERMINATION

**16.1.    Term.**   This License Agreement shall come into force on the Effective Date and, subject only to earlier termination pursuant to this Clause 16, shall continue in full force and effect in perpetuity.

**16.2.    Novartis Termination** .  Novartis has the right to immediately terminate the license granted hereunder by serving written notice on Retrophin in the event:

(a)      Retrophin commits a material breach of this License Agreement and fails to remedy such material breach within thirty (30) days of receipt of a written notice from Novartis specifying the nature of the breach and representatives of both Parties have held a face-to-face meeting in good faith within thirty (30) days of receipt of the written notice and have not been able to identify measures which Retrophin agrees to put in place as a reasonable protection against the recurrence of such material breach;

(b)      An Insolvency Event occurs that is not resolved within ######## * .  In any event when Retrophin first becomes aware of the likely occurrence of any Insolvency Event in regard to Retrophin, it shall promptly so notify Novartis to give Novartis reasonable notice to protect its interests under this License Agreement;

(c)      Retrophin does not receive approval from FDA of its NDA for any indication for the Product on or before ########*; and/or

(d)      The First Commercial Sale does not occur within ########*.

**16.3.    Retrophin Termination** .  Retrophin has the right to immediately terminate the license granted hereunder by serving written notice to Novartis:

(a)      In the event Novartis commits a material breach of this License Agreement and fails to remedy such material breach within thirty (30) days of receipt of a written notice from Retrophin specifying the nature of the breach and representatives of both Parties have held a face-to-face meeting in good faith within thirty (30) days of receipt of the written notice and have not been able to identify measures which Novartis agrees to put in place as reasonable protection against the recurrence of such material breach; or

(b)      After ########*, if Retrophin has not received approval from FDA of its NDA for any indication for the Product on or before ########*.

**16.4.    Effect of Termination** .

(a)      If this License Agreement is terminated pursuant to Clauses 16.2(a) or 16.2(b):

(i)      ######## * ;

_____

* **######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

15

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 24 of 66 PageID #: 2620

(ii)        ########*; and

(iii)        ########*.

(b)        If this License Agreement is terminated pursuant to Clauses 16.2(c) or 16.2(d):

(i)        ########*; and

(ii)        ########*.

(c)        If this License Agreement is terminated pursuant to Clause 16.3(b):

(i)        ########*; and

(ii)        ########*.

(d)        ########*.

**16.5.**    **Survival** .  The termination of this License Agreement shall not relieve the Parties of any obligation accruing prior to such expiration or termination.  Without limiting the forgoing the provisions of Clauses 1, 8, 10, 11, 13.4, 16.4, 16.5, 17, 19 shall survive the expiration or termination of this License Agreement.

**16.6.**    **Termination Not Sole Remedy** .  Termination is not the sole remedy under this License Agreement, and, whether or not termination is effected and notwithstanding anything contained in this License Agreement to the contrary, all other remedies will remain available except as otherwise agreed to herein.

**17.**        **CONFIDENTIALITY**

**17.1.**    **Duty of Confidence** .

(a)        Subject to the other provisions of this Clause 17, all non-public information disclosed by a Party or its Affiliates under this License Agreement will be maintained in confidence and otherwise safeguarded by the recipient Party.  The recipient Party may only use the such information strictly for the purposes of this License Agreement and pursuant to the rights granted to the recipient Party under this License Agreement.  Subject to the other provisions of this Clause 17, each Party shall hold as confidential such information of the other Party or its Affiliates in the same manner and with the same protection as such recipient Party maintains its own confidential information.  Subject to the other provisions of this Clause 17, a recipient Party may only disclose such information of the other Party to employees, agents, contractors, consultants and advisers of the Party and to its Affiliates and their employees, agents and contractors, and in the case of Retrophin, Retrophin may also disclose to its authorized sublicensees to the extent reasonably necessary for the purposes of, and for those matters undertaken pursuant to, this License Agreement; provided that such Persons are bound to maintain the confidentiality of such information in a manner consistent with the confidentiality provisions of this Agreement.

**17.2.**    **Exceptions.**  The obligations under this Clause 17 shall not apply to any information to the extent the recipient Party can demonstrate by competent evidence that such information:

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 25 of 66 PageID #: 2621

(a)        is (at the time of disclosure) or becomes (after the time of disclosure) known to the public or part of the public domain through no breach of this License Agreement by the recipient Party or, including its Affiliates and in the case of Retrophin, through its authorized sublicensees;

(b)        was known to, or was otherwise in the possession of, the recipient Party (or its Affiliates), prior to the time of disclosure by the disclosing Party (or any of its Affiliates);

(c)        is disclosed to the recipient Party (or an Affiliate) on a non-confidential basis by a Third Party who is entitled to disclose it without breaching any confidentiality obligation to the disclosing Party (or any of its Affiliates); or

(d)        is independently developed by or on behalf of the recipient Party (or its Affiliates), as evidenced by its written records, without reference to the non-public information disclosed by the disclosing Party (or its Affiliates) under this License Agreement.

Specific aspects or details of such information shall not be deemed to be within the public domain or in the possession of the recipient Party merely because the information is embraced by more general information in the public domain or in the possession of the recipient Party.  Further, any combination of such information shall not be considered in the public domain or in the possession of the recipient Party merely because individual elements of such information are in the public domain or in the possession of the recipient Party unless the combination and its principles are in the public domain or in the possession of the recipient Party.

**17.3.        Authorized Disclosures.**

(a)        In addition to disclosures allowed under Clause 17.2, Retrophin may disclose such information belonging to Novartis or its Affiliates to the extent such disclosure is necessary in connection with the Regulatory Filings for a Product.

(b)        In addition to disclosures allowed under Clause 17.2, either Party may disclose such information belonging to the other Party (and/or its Affiliates in the case of Novartis) to the extent such disclosure is necessary to: (i) prosecute or defend litigation as permitted by this License Agreement; and/or (ii) comply with applicable court orders, governmental regulations, investigations, clinical trials or regulatory procedures.

(c)        In the event the recipient Party is required to disclose such information of the disclosing Party by Law or in connection with bona fide legal process, such disclosure shall not be a breach of this License Agreement; provided that the recipient Party (i) informs the disclosing Party as soon as reasonably practicable of the required disclosure; (ii) limits the disclosure to the required purpose; and (iii) at the disclosing Party's request and expense, assists in an attempt to object to or limit the required disclosure.

(d)        Retrophin may disclose such information to its Affiliates, sublicensees and manufacturers as reasonable or necessary for the manufacture, Commercialization or Development of the Product and in accordance with the licenses granted in this License Agreement.

**17.4.        Ongoing Obligation for Confidentiality** .  Upon early and/or partial termination of this License Agreement for any reason, each Party and its Affiliates (in the case of Novartis) shall immediately return to the other Party or destroy any non-public information disclosed by the other Party, except for one copy which may be retained in its confidential files for archive purposes.

17

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 26 of 66 PageID #: 2622

**18.      PRESS RELEASE**

**18.1.      Press Releases.**   Neither Party shall issue any press release, trade announcement or make any other public announcement or statement with regard to the transactions contemplated by this License Agreement without the other Party's prior written consent, which shall not be unreasonably delayed, denied or conditioned.  Where consent is forthcoming, the Parties agree to consult with each other regarding the content of any such press release or other announcement.  The aforementioned restriction shall not apply to announcements required by any Governmental Entity under applicable Law provided that in such event the Parties shall take reasonable efforts to coordinate the wording and Retrophin shall take into consideration and comply with any reasonable requests of Novartis.  However, in such event the Parties shall, to the extent reasonably practicable, coordinate the wordings of any such announcements.  Retrophin acknowledges that Novartis shall have the right to disclose a brief summary of the transaction, in its official financial reports.

**19.      MISCELLANEOUS**

**19.1.      Governing Law and Jurisdiction.**   This License Agreement shall be governed by and construed under the Laws of the State of New York USA, without giving effect to the conflicts of Laws provision thereof, and with the exclusion of the Vienna Convention on the International Sale of Goods.

**19.2.      Arbitration.**   Any dispute arising out of, or relating to, this Agreement or the breach thereof, or regarding the interpretation thereof, shall be finally settled by arbitration conducted in New York City in accordance with the rules of the American Arbitration Association then in effect before a single arbitrator appointed in accordance with such rules applying the laws of the State of New York.  Judgment upon any award rendered therein may be entered and enforcement obtained thereon in any court having jurisdiction.  The arbitrator shall have authority to grant any form of appropriate relief (other than punitive damages), whether legal or equitable in nature, including specific performance.  For the purpose of any judicial proceeding to enforce such award or incidental to such arbitration or to compel arbitration, the parties hereby submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County, or the United States District Court for the Southern District of New York, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon it if sent by registered mail addressed to it at the addresses set forth herein.

**19.3.      Assignment.**   Neither Party may assign its rights and obligations under this Agreement without the other Party's prior written consent, except that (i) Novartis may (a) assign its rights and obligations under this License Agreement or any part hereof to one or more of its Affiliates without the consent of Retrophin; and (b) assign this Agreement in its entirety to a successor to all or substantially all of its business or assets to which this Agreement relates and (ii) Retrophin may, without the consent of Novartis, assign its rights and obligations under this Agreement or any part hereof to one or more of its Affiliates or subsidiaries.  Any permitted assignee shall assume all obligations of its assignor under this License Agreement (or related to the assigned portion in case of a partial assignment to a Novartis Affiliate), and no permitted assignment shall relieve the assignor of liability hereunder.  Any attempted assignment in contravention of the foregoing shall be void.

**19.4.      Injunctive Relief.**   The Parties understand and agree that monetary damages may not be a sufficient remedy for breach of this License Agreement and that each Party will be entitled to equitable relief, including injunction and specific performance for any such breach.  Nothing contained in this License Agreement shall be construed as limiting Novartis' right to any other remedies it may have under this License Agreement or in Law, including the recovery of damages for breach of this License Agreement.

18

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 27 of 66 PageID #: 2623

**19.5.     Force Majeure.**   If and to the extent that either Party is prevented or delayed by Force Majeure from performing any of its obligations under this License Agreement and promptly so notifies in writing the other Party, specifying the matters constituting Force Majeure together with such evidence in verification thereof as it can reasonably give and specifying the period for which it is estimated that the prevention or delay will continue, then the Party so affected shall be relieved of liability to the other for failure to perform or for delay in performing such obligations (as the case may be), but shall nevertheless use its commercially reasonable efforts to resume full performance thereof.

**19.6.     Notices.**   All notices, consents, waivers, and other communications under this License Agreement must be in writing and will be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt); (b) sent by fax (with written confirmation of receipt), provided that a copy is immediately sent by an internationally recognized overnight delivery service (receipt requested); or (c) when received by the addressee, if sent by an internationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and fax numbers set forth below (or to such other addresses and fax numbers as a Party may designate by written notice):

> If to Retrophin:
>
> Retrophin, Inc.
> 777 Third Avenue
> 22nd Floor
> New York, NY 10017
> Attention: Martin Shkreli
> Fax: 646.861.6485
> E mail: Martin@retrophin.com
>
> With a copy to (which shall not constitute notice hereunder):
>
> Katten Muchin Rosenman LLP
> 575 Madison Avenue
> New York, NY 10022
> Phone:  212-940-6383
> Facsimile:  212.894.5883
> Attention:  Evan L. Greebel, Esq.
> E-mail: evan.greebel@kattenlaw.com
>
> If to Novartis:
>
> Novartis Pharma AG
> Lichtstrasse 35
> CH-4056 Basel, Switzerland
> Attn: Head of BD&L
> Fax:  +41 61 324 2100
>
> With a copy to (which shall not constitute notice hereunder):
>
> Novartis Pharma AG
> Lichtstrasse 35
> CH-4056 Basel, Switzerland
> Attn:  General Counsel
> Fax:  +41 61 324 7399

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 28 of 66 PageID #: 2624

**19.7.** **Waiver and Amendments** . The failure of any Party to assert a right hereunder or to insist upon compliance with any term or condition of this License Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other Party. No waiver shall be effective unless it has been given in writing and signed by the Party giving such waiver. No provision of this License Agreement may be amended or modified other than by a written document signed by authorized representatives of each Party.

**19.8.** **Severability.** Without prejudice to any other rights that the Parties have pursuant to this License Agreement, every provision of this License Agreement is intended to be severable. If any provision of this License Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this License Agreement, which shall remain in full force and effect. The Parties hereto agree to consult each other and to agree upon a new stipulation which is permissible under the Law and which comes as close as possible to the original purpose and intent of the invalid, void or unenforceable provision.

**19.9.** **Entire Agreement.** This License Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.

**19.10.** **Relationship of the Parties.** Nothing contained in this License Agreement shall be deemed to constitute a partnership, joint venture, or legal entity of any type between Novartis and Retrophin, or to constitute one as the agent of the other. Moreover, each Party agrees not to construe this License Agreement, or any of the transactions contemplated hereby, as a partnership for any tax purposes. Each Party shall act solely as an independent contractor, and nothing in this License Agreement shall be construed to give any Party the power or authority to act for, bind, or commit the other.

**19.11.** **Expenses.** Except as otherwise expressly provided in this License Agreement, each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this License Agreement.

**19.12.** **Extension to Affiliates.** Each of Novartis and Retrophin shall have the right to extend the rights, immunities and obligations granted in this License Agreement to one or more of its Affiliates. All applicable terms and provisions of this License Agreement shall apply to any such Affiliate to which this License Agreement has been extended to the same extent as such terms and provisions apply to the applicable Party. Each Party shall remain primarily liable for any acts or omissions of its Affiliates.

**19.13.** **Further Assurances.** Novartis and Retrophin hereby covenant and agree without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

**19.14.** **Compliance with Law.** Each Party shall perform its obligations under this License Agreement in accordance with all applicable Laws. No Party shall, or shall be required to, undertake any activity under or in connection with this License Agreement which violates, or which it believes, in good faith, may violate, any applicable Law.

http://ir.retrophin.com/secfiling.cfm?filingID=1193805-13-2298&CIK=1438533          4/10/2017

**19.15.**      **English Language.**   This License Agreement is written and executed in the English language.  Any translation into any other language shall not be an official version of this License Agreement and in the event of any conflict in interpretation between the English version and such translation, the English version shall prevail.

**19.16.**      **Counterparts.**   This License Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[ *Signature Page to Follow* ]

21

Case 1:15-cr-00637-KAM    Document 189-3    Filed 04/10/17    Page 30 of 66 PageID #: 2626

IN WITNESS WHEREOF, each of the Parties hereto, by its duly authorized representative, has executed this Agreement as of the date first set forth above.

**NOVARTIS AG**                                    **RETROPHIN, INC.**

**By :**   /s/ Andreas Bohrer                      **By :**   /s/ Martin Shreli

**Name:** Andreas Bohrer                           **Name:** Martin Shreli

**Title:** Authorized Signatory                    **Title:** Chief Executive Officer

**Date:** _____                 **Date:** _____


By:   /s/ Daniel Wipfli

Name:   Daniel Wipfli

Title:   Authorized Signatory

Date:   _____

**NOVARTIS PHARMA AG**

**By:**   /s/ Matt Owens

**Name:** Matt Owens

**Title:** Senior Legal Counsel

**Date:** _____


By:   /s/ Joan Fischer

Name:   Joan Fischer

Title:   _____

Date:   _____

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 31 of 66 PageID #: 2627

**SCHEDULE A**

**TRADEMARK**

Trademark Application SYNTOCINON

######## *

_____

\* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

A-1

Case 1:15-cr-00637-KAM    Document 189-3    Filed 04/10/17    Page 32 of 66 PageID #: 2628

**SCHEDULE B**

**DRUG SUBSTANCE**

######## *  [1 page omitted]

_____
\* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 33 of 66 PageID #: 2629

**EXHIBIT A**

**LETTER TO FDA**

B-2

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 34 of 66 PageID #: 2630

**EXHIBIT B**

**PHARMACOVIGILANCE AGREEMENT**

B-3

## EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (this "Agreement") is made effective the 12 th day of December, 2013 (the "Effective Date"), by and between Stuart Weg, MD, an individual ("Licensor"), and Retrophin, Inc. ("Licensee"), a corporation organized and existing under the laws of Delaware. Licensor and Licensee are each referred to herein individually as a "Party" and together as the "Parties".

**WHEREAS** , Licensor owns, or otherwise has the right to license certain intellectual property rights relating to ketamine.

**WHEREAS** , Licensor desires to grant a license to Licensee to the Licensed Assets as further provided below, and Licensee desires a license to and under such intellectual property.

**NOW, THEREFORE** , in consideration of the mutual covenants and agreements set forth below, the Parties covenant and agree as follows:

Section 1.          Definitions .

For the purpose of this Agreement, the Appendix A definitions shall apply.

Section 2.          Licenses

    A.          License Grant.

    (i)          The Licensor hereby grants to Licensee an exclusive license (with the right to sublicense (through multiple levels of Sublicensees)) under the Licensed Assets, including but not limited to the right to manufacture and have manufactured, make and have made, use, sell and have sold, offer for sale, distribute and have distributed, develop and have developed, market and have marketed and import and have imported Products and otherwise exploit the Licensed IP in the Licensed Field within the Licensed Territory (the "License").

    (ii)          To the extent an Improvement is conceived and reduced to practice by Licensor, any individuals or entities (whether business partners, consultants or other associated Parties or Affiliates) employed or engaged by, or otherwise working with, Licensor ("Licensor Improvements") ######## * .

    (iii)          Licensee shall retain ownership of any Improvements or inventions that are developed, conceived and reduced to practice by or on behalf of Licensee, its Affiliates and Sublicensees ("Licensee Improvements").

    B.          Reservation of Rights . Licensor hereby reserves a royalty-free, irrevocable, world-wide, non-exclusive right, without the right to sublicense except as approved in writing by Licensor, to practice and use the Licensed IP for Research Purposes.

---

* **######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 36 of 66 PageID #: 2632

Section 3.            Development .

A.      Licensee shall use commercially reasonable efforts to develop, manufacture, market, and sell Products in the Licensed Territory during the License Term.

B.      Licensor will make available to Licensee all experts used, to the best of its ability, at a reasonable consulting fee on an ongoing basis if and when requested by Licensee.

C.      Following the Effective Date, Licensor shall have ######## *  meetings with the Licensee's development team, including Licensee's Chief Executive Officer, during ######## * during the License Term.

Section 4.            Consideration .

A.      License Fee; License Maintenance Fee; Sublicense Fee .

(i)        Licensee agrees to pay to Licensor a license fee in the amount of ######## * within ######## * after the execution and delivery of this Agreement by both Parties.

(ii)        ######## * .

(iii)        For the duration of the License Term, if Licensee sublicenses the Licensed IP to a Sublicensee prior to approval of Products by the FDA and Licensee receives an upfront sublicense fee or payment (the "Upfront Payment") for a specific indication from the Sublicensee, Licensor shall be permitted to elect within ######## * of notification from Licensee of its receipt of the Upfront Payment to receive either (a) ######## * or (b) ######## * .

(iv)        For the duration of the License Term, if Licensee sublicenses the Licensed IP to a Sublicensee prior to approval of Products by the FDA and Licensee receives an annual sublicense fee or payment (the "Annual Payment") for a specific indication from the Sublicensee, Licensor shall be permitted to elect within ######## * of notification from Licensee of its receipt of the Annual Payment to receive the greater of (a) ######## * or (b) ######## * .

B.      Royalty .

(i)        For the duration of the License Term, Licensee agrees to pay to Licensor as "earned royalties" a royalty calculated as a percentage of the Selling Price of Products that are approved by the FDA ("FDA-Approved Products"), in accordance with the terms and conditions of this Agreement.  The royalty is deemed earned as of ######## * .  Subject to adjustment as provided in (ii) below, the royalty shall remain fixed for the duration of the License Term in each applicable country, at a rate of (a) ######## * , or (b) ######## * (in each case, as applicable, the "Royalty").

---

* ######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.

(ii)      Notwithstanding the foregoing, in the event Licensee is required to pay a royalty or similar payment to a Third Party (or multiple parties) to obtain a license or similar right in connection with the Products in a given country in a calendar year of the License Term, then the aggregate Royalty payable to Licensor hereunder for such Products shall be ######## * .

C.      Sublicensing Royalties .  With respect to sublicenses granted by Licensee under Section 2A, Licensee shall pay the applicable Royalty to Licensor ######## * .

D.      One-Time Milestones .  Within ######## * after the achievement of the applicable milestone and receipt of Licensor's invoice, Licensee shall pay to Licensor:

> (i)      ######## * ;
>
> (ii)      ######## * ;
>
> (iii)      ######## * .
>
> (iv)      ######## * ; and
>
> (v)      ######## * .

E.      Accounting; Payments .

(i)      Amounts owing to Licensor under Sections 4B and 4C shall be paid on a ######## * basis, with such amounts due and received by Licensor on or before the ######## * day following the end of the ######## * in which such amounts were earned.

(ii)      Except as otherwise directed, all amounts owing to Licensor under this Agreement shall be paid in U.S. dollars at the address provided in Section 12, or, paid via wire transfer if agreed upon by the Parties.  All royalties owing with respect to Selling Price and other fees stated in currencies other than U.S. dollars shall be converted at the rate shown in the ######## * .

(iii)      Reasonably promptly after receipt of written request from Licensor, but no more after than ######## * , an accounting showing how any amounts owing to Licensor under Sections 4B and 4C have been calculated shall be submitted to Licensor.

Section 5.      Representations and Warranties; Indemnitees; Insurance.

A.      Licensor represents and warrants to Licensee (on a continuing basis, unless otherwise provided below):

(i)      Licensor is the owner of the Licensed Assets or otherwise has the necessary right, title and power to grant the licenses and rights granted hereunder to Licensee, and the licenses and rights granted hereunder to Licensee are free and clear of any liens, claims or encumbrances;

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 38 of 66 PageID #: 2634

(ii)      it has not granted any option, license, right or interest in or to the License or the Licensed Assets and the execution and delivery of this Agreement and the performance of its obligations hereunder do not violate or breach any other agreement to which it is bound;

(iii)      (a) the Licensed Assets existing as of the Effective Date are subsisting, valid and as of the Effective Date enforceable, and (b) as of the Effective Date no claim has been made alleging that any Licensed Assets or any Product infringes or otherwise violates any intellectual property or proprietary right of any Third Party;

(iv)      as of the Effective Date, no Person is infringing the Licensed Assets;

(v)      the true inventors of the subject matter claimed are named in the patents and patent applications within the Licensed IP as of the Effective Date, and all such inventors have irrevocably assigned all their rights and interests therein to Licensor;

(vi)      the Licensed Assets constitute all rights owned or controlled (including by virtue of the licenses or other rights granted to it) at any time or prior to the Effective Date applicable to the Licensed Field; and

(vii)      as of the Effective Date, no patent or trademark application within the Licensed IP is the subject of any pending interference, opposition, cancellation, protest or other challenge or adversarial proceeding.

B.      Licensor (the "Indemnitor") shall indemnify, hold harmless and defend, Licensee, its officers, directors, employees, agents, representatives, members, managers, Affiliates and Sublicensees (collectively, "Licensee Indemnitees") from and against any liabilities, claims, suits, losses, damages, costs, fees, and expenses (including without limitation reasonable attorneys' fees and expenses, including without limitation any incurred in enforcement of this indemnity) (collectively, "Claims") resulting from or arising out of any breach of this Agreement by Licensor.

C.      The Licensee Indemnitees shall promptly notify the Indemnitor of any Claim with respect to which such Licensee Indemnitee is seeking indemnification hereunder and permit the Indemnitor, at the Indemnitor's cost, to defend against such Claim, and shall reasonably cooperate (at the Indemnitor's expense) in the defense thereof.  Neither the Indemnitor nor Licensee Indemnitees shall enter into, or permit, any settlement of any Claim without the express written consent of the other, which consent shall not be unreasonably withheld, conditioned or delayed. Each Licensee Indemnitee may, at its option and expense, have its own counsel participate in any proceeding which is under the direction of the Indemnitor and will reasonably cooperate with the Indemnitor or its insurer in the disposition of any such matter; provided, that, if the Indemnitor shall not defend such Claim, such Licensee Indemnitee shall have the right to defend such Claim on its own behalf and recover from the Indemnitor all reasonable attorneys' fees and expenses incurred by it during the course of such defense.  The Indemnitor shall not consent to, and no Licensee Indemnitee shall be required to agree to any settlement or compromise of, or the entry of any judgment with respect to, and the Indemnitor shall be required to appeal, unless otherwise agreed by the Licensee Indemnitee, any adverse decision with respect to, any Claim that (x) provides for injunctive or other non-monetary relief affecting Licensee or any Licensee Indemnitee, (y) includes any statement, admission or implication of any wrongful or improper act or omission by Licensee or any Licensee Indemnitee or (z) does not include as an unconditional term or result thereof the giving to Licensee and each the Licensee Indemnitee of a release from all liability with respect to such Claim by each Third Party that has claimed, or has a right to make a claim for, or with respect to any Claim.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 39 of 66 PageID #: 2635

D.       Licensee shall name Licensor as additional insured on the applicable insurance policy of Licensee solely in connection with Licensee's exploitation of the Licensed Assets.

Section 6.       Recordkeeping . Licensee shall keep reasonable books and records to verify the accuracy and completeness of Licensee's and its Sublicensee(s)'s accounting referred to above, including, without limitation, inventory, purchase and invoice records relating to the Products or their manufacture.  Such books and records shall be preserved for a period not less than ######## * .

Section 7.       Term and Termination .

A.       The term of this Agreement shall be the License Term.

B.       Licensee may terminate this Agreement at any time, with or without cause, by giving at least ######## * written notice of such termination to Licensor.

C.       If Licensee commits any material breach of any covenant in this Agreement, ######## * , Licensor may, at its option, terminate this Agreement by giving notice of termination to Licensee.

D.       In the event that Licensee elects to terminate this Agreement pursuant to Section 7B ######## * .

E.       If Licensee elects to terminate this Agreement pursuant to Section 7B ######## * .

F.       Upon the termination of this Agreement, ######## * .

G.       Waiver by either Party of a single breach or default, or a succession of breaches or defaults, shall not deprive such Party of any right to terminate this Agreement in the event of any subsequent breach or default.

H.       Notwithstanding anything to the contrary contained in this Agreement, ######## * .

---

* ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Section 8.          <u>Patent Filing, Prosecution and Maintenance; Patent Fees and Costs.</u>

A.          Following the Effective Date, Licensee shall control the preparation, prosecution (including, without limitation, any interferences, reissue proceedings and reexaminations) and maintenance of all Licensed IP, with counsel of its choice, all in Licensee's sole discretion.  Prior to or promptly following the Effective Date, the Parties shall cooperate to expeditiously transfer such responsibility for the further preparation, prosecution and maintenance of Licensed IP (including any Licensor Improvements) to Licensee.  Licensee shall be responsible for all costs incurred by Licensee with respect to such preparation, prosecution and maintenance of Licensed IP so long as Licensee remains responsible for such preparation, prosecution and maintenance. Subject to the foregoing sentence, Licensee will reimburse Licensor for any necessary and reasonable costs it incurs at Licensee's request with respect to the prosecution and maintenance of the Licensed IP following the Effective Date.   Licensor shall cooperate with Licensee, as may be requested by Licensee, with respect to the preparation, prosecution and maintenance of the Licensed IP reasonably prior to any deadline or action with the U.S. Patent & Trademark Office or any foreign patent office.

B.          Licensor (i) shall promptly provide Licensee and its counsel with copies of any official communications from the United States and any foreign patent office pertaining to the Licensed IP, and (ii) hereby provide Licensor and its counsel with a Power of Attorney (coupled with an Intent) and designates them as Licensor's attorneys in fact, to undertake any and all actions or necessary under this Section 8.

Section 9.          <u>Enforcement.</u>

A.          Licensor shall protect the Licensed IP against infringers and to otherwise act to eliminate infringement, in its reasonable determination or when requested by Licensee, in all cases in full consultation subject to the reasonable approval of Licensee at every stage, including without limitation, any settlement.  In the event that either Party believes there is infringement of any Licensed IP, such Party shall provide the other Party with notification and reasonable evidence of such infringement (such notice is hereinafter referred to as an "Infringement Notice").   Nothing herein shall permit or allow Licensor to commence any action for infringement of the Licensed IP without the approval of Licensee.

B.          If any infringement of the Licensed IP has not been discontinued within three (3) months after the Infringement Notice or Licensor has not by the end of such period taken reasonable action (as reasonably determined by Licensee) to abate or terminate the infringing action, or if Licensor informs Licensee that it will not be undertaking to end such infringement, Licensee shall have the right to bring an action to enforce the Licensed Patents at its own expense.  During such litigation Licensee shall act in good faith to preserve such Licensor's right, title and interest in and to the Licensed Patents, shall keep Licensor advised as to the status of the litigation. If Licensor is a necessary or indispensable party to any litigation or proceeding against a Third Party alleged to have infringed any of the Licensed IP, Licensee shall have the right to bring such litigation or proceeding in Licensor's name.

C.          In any infringement suit that Licensee may institute to enforce the Licensed IP pursuant to this Agreement, Licensor shall, at the request and expense of Licensee, cooperate in all respects and shall use all reasonable efforts to cause its employees to testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 41 of 66 PageID #: 2637

Section 10.          Assignability . This Agreement may not be transferred or assigned by Licensor, whether pursuant to a change of control event or otherwise, without the prior written consent of Licensee, which consent may be granted or withheld in Licensee's sole discretion.  Nothing herein shall impair or affect the rights of Licensee to transfer or assign its rights and responsibilities hereunder or to engage in any acts or transactions the results of which shall effect a change of ownership or control of Licensee. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties hereto or their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.

Section 11.          Miscellaneous .

A.          This Agreement shall be governed by and construed in all respects in accordance with the laws of the State of New York.  If any provisions of this Agreement are or shall come into conflict with the laws or regulations of any jurisdiction or any governmental entity having jurisdiction over the Parties or this Agreement, those provisions shall be deemed automatically revised to the minimum extent necessary to comply, and the remaining terms and conditions of this Agreement shall remain in full force and effect.  If such a revision is not so allowed or if such a revision leaves terms thereby made clearly illogical or inappropriate in effect, the Parties agree to substitute new terms as similar in effect to the present terms of this Agreement as may be allowed under the applicable laws and regulations.  The Parties hereto are independent contractors and not joint venturers or partners.

B.          Any dispute arising out of, or relating to, this Agreement or the breach thereof, or regarding the interpretation thereof, shall be finally settled by arbitration conducted in New York City in accordance with the rules of the American Arbitration Association then in effect before a single arbitrator appointed in accordance with such rules applying the laws of the State of New York.  Judgment upon any award rendered therein may be entered and enforcement obtained thereon in any court having jurisdiction. The arbitrator shall have authority to grant any form of appropriate relief (other than punitive damages), whether legal or equitable in nature, including specific performance.  For the purpose of any judicial proceeding to enforce such award or incidental to such arbitration or to compel arbitration, the Parties hereby submit to the exclusive jurisdiction of the Supreme Court of the State of New York, New York County, or the United States District Court for the Southern District of New York, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon it if sent by registered mail addressed to it at the addresses set forth herein.

Section 12.          Notices .

A.          Any notice required to be given pursuant to the provisions of this Agreement shall be in writing and shall be deemed to have been given at the earlier of the time when actually received as a consequence of any effective method of delivery, including but not limited to hand delivery, transmission by telecopier, or delivery by a professional courier service or the time when sent by certified or registered mail addressed to the Party for whom intended at the address below or at such changed address as the Party shall have specified by written notice, provided that any notice of change of address shall be effective only upon actual receipt.

Page 7 of 13

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 42 of 66 PageID #: 2638

Stuart Weg, M.D.
498 Island Way
Franklin Lakes, New Jersey 07417

Retrophin, Inc.
777 Third Avenue
Suite 22
New York, New York 10017
Attn: Martin Shkreli, Chief Executive Officer
Facsimile Number: 646-861-6485

With a copy (which shall not constitute notice) to:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
Attn: Evan L. Greebel, Esq.
Facsimile Number: 212-894-5883

Section 13.         Integration . This Agreement constitutes the full understanding between the Parties with reference to the subject matter hereof, and no statements or agreements by or between the Parties, whether orally or in writing, except as provided for elsewhere in this Section, made prior to or at the signing hereof, shall vary or modify the written terms of this Agreement. Neither Party shall claim any amendment, modification, or release from any provisions of this Agreement by mutual agreement, acknowledgment, or otherwise, unless such mutual agreement is in writing, signed by the other Party, and specifically states that it is an amendment to this Agreement.

Section 14.         Confidentiality .

The Parties hereto agree to keep any information identified as confidential by the disclosing Party confidential using methods at least as stringent as each Party uses to protect its own confidential information. "Confidential Information" shall include the terms of this Agreement, the "Ketamine Draft Term Sheet" executed by the Parties on September 20, 2013, Licensee's development plans and reports, royalty reports and forecasts, sublicenses, the Licensed IP and all information concerning them and any other information marked confidential or accompanied by correspondence indicating such information is exchanged in confidence between the Parties. Except as may be authorized in advance in writing by Licensor, Licensee shall only grant access to Licensor's Confidential Information to its Sublicensee(s) and those employees of Licensee and its Sublicensee(s) involved in research relating to the Licensed IP. Licensee shall require its Sublicensee(s) and all such employees, and Licensor shall require its personnel involved herewith, to be bound by terms of confidentiality no less restrictive than those set forth in this Section. The confidentiality and use obligations set forth above apply to all or any part of the Confidential Information disclosed hereunder except to the extent that:

(i)          Licensor, Licensee or its Sublicensee(s) can show by written record that it possessed the information prior to its receipt from the other Party;

Page 8 of 13

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 43 of 66 PageID #: 2639

(ii)      the information was already available to the public or became so through no fault of Licensor, Licensee or its Sublicensee(s);

(iii)      the information is subsequently disclosed to Licensor, Licensee or its Sublicensee(s) by a Third Party that has the right to disclose it free of any obligations of confidentiality;  or

(iv)      the information is required by law, rule, regulation or judicial process to be disclosed.

Section 15.      Severability . Without prejudice to any other rights that the Parties have pursuant to this License Agreement, every provision of this License Agreement is intended to be severable. If any provision of this License Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this License Agreement, which shall remain in full force and effect. The Parties hereto agree to consult each other and to agree upon a new stipulation which is permissible under the Law and which comes as close as possible to the original purpose and intent of the invalid, void or unenforceable provision.

Section 16.      Relationship of the Parties . Nothing contained in this License Agreement shall be deemed to constitute a partnership, joint venture, or legal entity of any type between Licensor and Licensee, or to constitute one as the agent of the other. Moreover, each Party agrees not to construe this License Agreement, or any of the transactions contemplated hereby, as a partnership for any tax purposes. Each Party shall act solely as an independent contractor, and nothing in this License Agreement shall be construed to give any Party the power or authority to act for, bind, or commit the other.

Section 17.      Expenses . Except as otherwise expressly provided in this License Agreement, each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this License Agreement.

Section 18.      Further Assurances . Each Party hereby covenant and agree without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement

Section 19.      Counterparts . This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 20.      Authority . The persons signing on behalf of Licensor and Licensee hereby warrant and represent that they have authority to execute this Agreement on behalf of the Party for whom they have signed.

*[ Signature Page to Follow ]*

Page 9 of 13

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 44 of 66 PageID #: 2640

**IN WITNESS WHEREOF** , the Parties hereto have duly executed this Agreement on the dates indicated below.


 /s/ Stuart Weg                                              Date: December 12, 2013
**STUART WEG**


**RETROPHIN, INC.**

By:/s/ Marc Panoff                                          Date: December 12, 2013
   Name: Marc Panoff
   Title: Chief Financial Officer


Page 10 of 13

## APPENDIX A

"Affiliate" shall mean, with respect to a specified Person, any other Person, (i) which is controlling, controlled by or under common control with, such specified Person or (ii) in which such specified Person owns ######## * or more of the equity or other ownership interests. The term "control" means possession, direct or indirect, of the powers to direct, cause or direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Annual License Maintenance Fee" shall have the meaning set forth in Section 4(A)(ii).

"Annual Payment" shall have the meaning set forth in Section 4(A)(iv).

"Bulk Payment" shall have the meaning set forth in Section 4(A)(iii).

"Claims" shall have the meaning set forth in Section 5B.

"Improvement" shall mean ######## * .

"Infringement Notice" shall have the meaning set forth in Section 9A.

"License" shall have the meaning set forth in Section 2A.

"License Term" shall mean the period commencing on and as of the Effective Date and continuing in perpetuity, unless sooner terminated in accordance with this Agreement.

"Licensed Assets" shall mean ######## * .

"Licensed Field" shall mean all uses and applications for any indication.

"Licensed IP" shall refer to and mean ######## * .

"Licensed Territory" shall mean worldwide.

"Licensee Improvements" shall have the meaning set forth in Section 2A(iii).

---

**\* ######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

"Licensee Indemnitees" shall have the meaning set forth in Section 5B.

"Licensor Improvements" shall have the meaning set forth in Section 2A(ii).

"Person" means an individual, sole proprietorship, partnership, limited partnership, limited liability partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or other similar entity or organization.

"Products" shall refer to and mean any and all products that employ or are in any way produced by the practice of an invention claimed in the Licensed IP or that would otherwise constitute infringement of any claims of the Licensed IP.

"Research Purposes" shall mean ######## [*] .

"Samples" shall man samples of the Product, such as for physician samples and indigent patient and similar programs (including registration samples), for which Licensee receives no compensation.

"Selling Price" shall mean ######## [*] .

"Sublicensee" means any Third Party sublicensed by Licensee pursuant to Section 2A.

"Third Party" means any Person other than Licensee or Licensor.

"Upfront Payment" shall have the meaning set forth in Section 4(A)(iii).

---

[*] ######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Page 12 of 13

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 47 of 66 PageID #: 2643

**APPENDIX B**

**LICENSED IP**

\#\#\#\#\#\#\#\# [*] [1 page omitted]

_____

[*] \#\#\#\#\#\#\#\# = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM    Document 189-3    Filed 04/10/17    Page 48 of 66 PageID #: 2644

### SPONSORED RESEARCH AGREEMENT

This Agreement is made by and between Retrophin, Inc. ("Company") with offices at _777 Third Avenue, 22nd Floor, New York, NY 10017, and The Regents of the University of California, on behalf of its San Diego campus, having its office at 9500 Gilman Drive, La Jolla, CA 92093-0934, ("University").

WHEREAS, University is engaged in a research study funded by the National Institutes of Health (NIH), ######## * ("Study") and Company desires to financially supplement the Study and related research projects conducted by ######## * at University ("Related Projects"), ######## *

NOW, THEREFORE, the parties agree as follows:

1.      **SCHEDULE** – The Study and Related Projects shall be conducted in accordance with the statement of work attached hereto as Exhibit "A" and incorporated into this Agreement by this reference solely for the purpose of describing the scope of work to be performed under this Agreement. The term of this Agreement shall begin on the date of last signature and is anticipated to be completed in approximately ######## * , unless sooner terminated as herein provided.

2.      **BUDGET** - Company shall support the Related Projects by a grant of $1,540,000 Dollars ($1,540,000 USD). ######## * . If the Related Projects period is more than one year, the balance of any funds remaining at the end of any Related Projects year may be carried over to subsequent years during the period of the Agreement to support the Related Projects.

3.      **PAYMENT** - After execution of this agreement and receipt of an invoice from University, Company will issue payment in the amount of ######## * within ######## * .

Payment shall be made to "The Regents of the University of California" and sent to the following address:

> The Regents of the University of California
> Cashier's Office
> University of California, San Diego
> 9500 Gilman Drive
> La Jolla, CA 92093-0009

University shall forward invoices to Company at the following address:

> ATTN: Marc Panoff, CFO, Retrophin, Inc.
> PHONE: 646-564-3671
> FAX: 646-861-6485
> E-MAIL: marc@ Retrophin.com

---

**\* ######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 49 of 66 PageID #: 2645

At least ######## *  prior to the beginning of each ######## * thereafter, University will forward an invoice to Company in an amount equal to ######## * . Company will submit payment to the address listed above, within the later of ######## * after receipt of such invoice or ######## * receipt of such invoice.

Company shall have ######## * from the completion of the Related Projects to request that University provide a report of expenditures shown by major cost categories.

4.      **PRINCIPAL INVESTIGATOR** - The research is to be conducted by University under the direction of ######## * ("Principal Investigator") who will be responsible for the direction of the Study and Related Projects, including all budgeting and revisions to the Budget, in accordance with applicable University policies.

5.      **CONFIDENTIALITY** - Subject to Clause 9 of this Agreement, it is the intent of the parties that neither party shall furnish any information considered confidential and/or proprietary by it and/or one or more third parties to the other party in connection with this Agreement.

Should Company deem it necessary to disclose information considered confidential and/or proprietary by it to University, it will be clearly marked by Company, in writing, as "Confidential Information" or the Company will advise University that such information is or shall be deemed to be confidential following delivery. Except as required by law, University will maintain the confidentiality of, and not use, such confidential information except for purposes of the Study and Related Projects. This obligation does not apply to information that was known to University prior to its receipt from Company, or that is independently developed by the University, or becomes known at any time to third parties through no fault of University, or is required to be disclosed by law. Such obligation of confidentiality shall be maintained for a period of ######## * from the date of disclosure.

6.      **RIGHTS IN DATA** - University and Company recognize the traditional freedom of all scientists to publish and present promptly the results of their research. Therefore, ######## * .

7.      **USE OF NAME/PUBLICITY** - It is agreed by each party that, except as required under applicable law or regulations (including, without limitation, disclosures, and filings required under securities laws and regulations) it will not under any circumstance use the name, logo, mark or image of the other party or its employees in any advertisement, press release or publicity with reference to this Agreement, without prior written approval of the other party.  California Education Code prohibits use of University's names to suggest that University endorses a product or service.

---

**\* ######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Page 2 of 8

8.      **PUBLICATION** - University shall have the right to publish the results of the work conducted by University under this Agreement to the extent such results do not contain Confidential Information of Company provided Company has the opportunity to review and comment on any proposed manuscripts describing said work at least ####### * prior to their submission for publication. University shall consider in good faith Company's reasonable comments prior to publication. However, if such proposed manuscript contains patentable information, University will, at its option, either delete the patentable information and publish immediately, or withhold publication until the filing of patent applications on all such patentable inventions or up to ####### * , whichever is earlier.

9.      **PATENT RIGHTS** - Title to inventions, developments or discoveries arising from research conducted under this Agreement or in connection with the Related Projects shall be determined in accordance with inventorship under United States Patent Law, Title 35 United States Code. For purposes hereof, inventorship shall only be allocated to Company or University, and any individuals under the control or otherwise engaged by one party shall be deemed to be such party

        a. Company Inventions - All rights to inventions or discoveries made solely by Company shall belong to Company and shall be disposed of in accordance with Company policy.

        b. University Inventions - All rights to inventions or discoveries made solely by University shall belong to the University and shall be disposed of in accordance with University policy.

        c. Joint Inventions - All rights to inventions or discoveries made jointly by University and Company shall be jointly-owned.

        To the extent that the University has the legal right to do so (and the University shall in all cases use reasonable efforts to ensure that it has such rights) and subject to the rights of the U.S. government, the University shall offer to the Company, in accordance with the provisions of the following Clause, the option to negotiate a commercial, royalty-bearing license (the "Option") under any University Inventions conceived and first reduced to practice in connection with the performance of research under this Agreement or the Related Projects.

####### *

10.     **INDEMNIFICATION** - Company agrees to defend, indemnify and hold University harmless from and against any and all liability, loss, expense, reasonable attorneys' fees, or claims for injury or damages arising out of the performance of this Agreement, but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from breach of this Agreement or the negligent or intentional acts or omissions of Company, its officers, agents or employees.

---

\* **####### = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 51 of 66 PageID #: 2647

University agrees to defend, indemnify and hold Company harmless from any claim, liability, loss, expense, reasonable attorneys' fees, or claims for injury or damages arising out of the performance of this Agreement, but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from breach of this Agreement or the negligent or intentional acts or omissions of University, its officers, agents, or employees.

11.     **SUPPLIES AND EQUIPMENT** - In the event that University purchases equipment hereunder, title to such equipment shall vest in University.

12.     **EXCUSABLE DELAYS** - In the event of a delay caused by inclement weather, fire, wildfire, earthquake, flood, strike or other labor dispute, act of God, military activity, act of governmental officials or agencies, or any other cause beyond the control of University, University shall be excused from performance hereunder for the period of time attributable to such delay, which may extend beyond the time lost due to one or more of the causes mentioned above.  In the event of any such delay, this Agreement may be revised by changing the Budget, performance period and other provisions, as appropriate, by mutual agreement of the parties.

13.     **NOTICE** - Whenever any notice is to be given hereunder, it shall be in writing and sent to the following address:

| | |
|---|---|
| University: | Attn:<br>Contract and Grant Officer<br>Office of Contract and Grant Administration<br>University of California, San Diego<br>La Jolla, CA 92093-0934 |
| for express mail: | use 10300 North Torrey Pines Road<br>La Jolla, CA  92037 |
| Company: | Retrophin, Inc.<br>777 Third Avenue, Suite 22<br>New York, New York 10017<br>Attn: Marc Panoff, Chief Financial Officer<br>Facsimile Number: 646-861-6485 |

With a copy (which shall not constitute notice) to:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
Attn: Evan L. Greebel, Esq.
Facsimile Number: 212-894-5883

Page 4 of 8

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 52 of 66 PageID #: 2648

14.       **TERMINATION** - This Agreement may be terminated by either party for material breach by the other party ######## * . In addition, this Agreement may be terminated by either party upon the giving of sixty (60) days prior written notice to the other party. Written notice shall be directed to the appropriate individual named in Clause 13 ("Notice") of this Agreement. Upon the giving of notice of termination by either party, ######## * . In the event of termination by Company pursuant to the second sentence hereof or by the University due to Company's uncured breach, ######## * . Upon the giving of notice of termination by University, as of the effective termination date, ######## * .

15.       **WARRANTIES** - ALL MATERIALS ARE PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR ANY WARRANTY THAT THE USE OF THE MATERIALS WILL NOT INFRINGE OR VIOLATE ANY PATENT OR OTHER PROPRIETARY RIGHTS OF ANY THIRD PARTY.

16.       Compliance with Federal Securities Laws . University hereby acknowledges that it is aware, and will advise each of its employees, agents or consultants who are informed as to the matters that are the subject of this Agreement, that the United States securities laws prohibit any person who or that has received from, or about, the Company material, non-public information from purchasing or selling securities of Company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

[Signatures on next page]

_____

**\* ######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Page 5 of 8

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 53 of 66 PageID #: 2649

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**          **RETROPHIN, INC.**

By:     /s/ Chris Loryman                                By:     /s/ Martin Shkreli
              (signature)                                              (signature)

Name:   Chris Loryman                                    Name:   Martin Shkreli
Title:  Contract Manager                                 Title:  Chief Executive Officer

Date:   December 12, 2013                                Date:   December 12, 2013

Page 6 of 8

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 54 of 66 PageID #: 2650

Exhibit A:  Statement of Work
UCSD Research Proposal for Translational Studies of Oxytocin

\######## * [2 pages omitted]

_____

\* \######## = **Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.**

Page 7 of 8

Exhibit B: Budget
UCSD Research Proposal for Translational Studies of Oxytocin

######## * [2 pages omitted]

_____
* ######## = Material omitted pursuant to a request for Confidential Treatment and submitted separately to the Commission on the date of submission of this Registration Statement on Form S-1.

Page 8 of 8

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 56 of 66 PageID #: 2652

## EMPLOYMENT AGREEMENT

This Employment Agreement dated as of December 16, 2013 (the " Agreement "), is made by and between Retrophin, Inc. (together with any successor thereto, the " Company "), a Delaware corporation, and Martin Shkreli (the " Executive ") (collectively referred to as the " Parties ").

In consideration of the mutual covenants herein contained and of the mutual benefits herein provided, the Company and the Executive agree as follows:

**1.**      **Term of Employment** .  The Company will employ the Executive and the Executive accepts continued employment by the Company on the terms and conditions herein contained for a period (the " Term ") provided in Section 4.

**2.**      **Duties and Functions** .

(a)      During the Term, the Executive shall serve as the Chief Executive Officer of the Company reporting directly to the Company's Board of Directors (the " Board ").  The Executive shall have effective supervision and control over, and responsibility for, the strategic direction and general and active day to day leadership and management of the business and affairs of the Company. The Executive shall have such other duties as are customarily performed by the Chief Executive Officer of a company similar to the Company, and also have such other powers and duties as may be, from time to time, reasonably prescribed by the Board. During the Term, the Executive shall devote substantially all his working time and efforts to the business and affairs of the Company. During the Term, the Company shall give the Executive appropriate support in the performance of his duties, including, but not limited to, home office support, and provision of salary and bonuses for support staff upon reasonable request.

(b)      The Executive agrees to observe and comply with the rules, policies and procedures of the Company as adopted by the Company from time to time.  The Executive may, so long as such activities do not interfere with his duties and responsibilities hereunder, invest, participate or engage in (for the Executive's own account or for the account of others), or may possess an interest in, other financial ventures and investment and professional activities of any kind or description, independently or with others, including (i) charities and passive investments, (ii) investment in, or the acquisition or disposition of, securities or real estate, (iii) investment and management counseling, (iv) the provision of brokerage and investment banking services and (v) serving as officers, directors, representatives or agents of any entity, partners of any partnership, or trustees of any trust (and in each case may receive fees, commissions, remuneration, profits and reimbursement of expenses in connection with such ventures and activities), in each case provided that such Person does not expressly or implicitly represent that he is acting for the Company.

**3.**      **Compensation and Benefits** .

(a)      Base Salary .  As compensation for his services hereunder, during the Term, the Executive shall receive a base salary at a rate of Three Hundred Thousand Dollars ($300,000) per annum (the " Annual Base Salary "), which shall be paid in accordance with the customary payroll practices of the Company. Such Annual Base Salary may be increased at the discretion of the Board after each anniversary of the Effective Date. In no event shall the Executive's Annual Base Salary be reduced below the then current Annual Base Salary.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 57 of 66 PageID #: 2653

(b)      <u>Bonus</u> .  The Executive shall be eligible to receive an annual cash bonus award during each fiscal year at the discretion of the Board and based upon specific goals and performance metrics discussed and agreed to with the Executive.

(c)      <u>Expenses</u> .  During the Term, the Company shall pay or reimburse the Executive for all reasonable travel and other business expenses incurred by him in the performance of his duties to the Company, in accordance with the Company's expense reimbursement policy in effect from time to time.

(d)      <u>Vacation</u> .  During the Term, the Executive shall be entitled to four (4) weeks of paid vacation per calendar year.  To the extent that the Executive does not use his vacation in a given calendar year, he shall be entitled to carry forward accrued unused vacation over from year to year; <u>provided</u> , <u>however</u> , that in no event may he at any time have more than 30 business days of vacation accrued and once he has 30 business days of accrued unused vacation, he shall no longer continue to accrue further vacation time until he has used some of his accrued vacation time.

(e)      <u>Employee Benefits</u> .  During the Term, the Executive shall be entitled to participate in all employee benefit plans, programs, and arrangements that the Company provides for its employees and are generally applicable to executive employees of the Company, including, by way of illustration, personal leave, paid holidays, sick leave, profit-sharing, pension plans, 401(k) matching programs, retirement, disability, dental, vision, group sickness, accident or family health insurance programs of the Company, subject, in each case, to the terms of each such program.

(f)      <u>Options</u> .  In addition to the Annual Base Salary, the Executive shall be granted, on and subject to the terms and conditions of an option award agreement to be entered into between the Executive and the Company (it being understood that such grant shall be conditioned upon the execution of such award agreement) options to purchase One Million Eighty Thousand (1,080,000) shares of restricted common stock of the Company (the " <u>Incentive Compensation</u> "), a pro rata portion of which shall vest quarterly during the three years following execution of this Agreement; <u>provided</u> , <u>however</u> , that if the Executive is no longer employed by the Company, any Incentive Compensation that has not vested prior to the date of termination shall be immediately cancelled and not subject to further vesting.

(g)      <u>Accelerated Vesting of Options</u> .  In the event of (i) a merger or consolidation of the Company with or into any other entity in which the Company is not the parent or, after giving effect to such transaction, the equity owners of the Company immediately prior to such transaction shall cease to own at least a majority of the outstanding equity securities of the Company, (ii) a sale of all or substantially all of the assets of the Company or (iii) any other change of control of the Company, the unvested portion, if any, of the Incentive Compensation shall immediately vest.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 58 of 66 PageID #: 2654

**4.      Term; Termination** .

(a)      Term .   The initial term of employment under this Agreement (the " Initial Term ") shall be for the period beginning on the date hereof (the " Effective Date ") and ending on the third anniversary thereof, unless earlier terminated as provided in this Section 4. The employment term hereunder shall automatically be extended for successive three-year periods (collectively with the Initial Term, the " Term ") unless either the Executive gives notice of non-extension to the Company no later than one hundred eighty (180) days prior to the expiration of the then applicable Term and subject to earlier termination as provided in this Section 4.

(b)      Termination .  The Executive's employment hereunder may be terminated by the Company or the Executive, as applicable, without any breach of this Agreement only under the following circumstances:

(i)      Death .  The Executive's employment hereunder shall terminate upon his death.

(ii)      Incapacity . If the Executive is unable to perform, with or without reasonable accommodation, the essential functions of his position hereunder for a total of 180 consecutive days as a result of incapacity due to any medically determinable mental or physical illness, the Company may terminate the Executive's employment.

(iii)      Termination for Cause .  The Company may terminate the Executive's employment for Cause. For the purposes of this Agreement, "Cause" shall mean the Executive's final conviction under United States federal or state laws for a felony or crime involving moral turpitude.

(iv)      Resignation for Good Reason .  The Executive may resign his employment for Good Reason. For the purposes of this Agreement, "Good Reason" shall mean (1) the Company's willful material breach of any provision of this Agreement; (2) any material adverse change in the Executive's position (including status, offices, titles and reporting requirements) authority, duties or responsibilities (other than a change due to the Executive's incapacity under Section 4(b)(ii)) which results in: (A) a diminution in any material respect in the Executive's position, authority, duties, responsibilities or compensation, which diminution continues in time over at least thirty (30) days such that it constitutes an effective demotion; or (B) a material diversion from the Executive's performance of the functions of the Executive's position, excluding for this purpose material adverse changes made with the Executive's written consent or due to the Executive's termination for Cause or termination by the Executive without Good Reason; or (3) relocation of the Company's headquarters and/or the Executive's regular work address to a location which requires him to travel more than forty (40) miles from the Executive's place of employment on the date hereof; provided, however, that it shall not constitute Good Reason unless the Executive shall have provided the Company with written notice of its alleged actions constituting Good Reason (which notice shall specify in reasonable detail the particulars of such Good Reason) within 30 days of the events alleged actions constituting Good Reason and Company has not cured any such alleged Good Reason or substantially commenced its effort to cure such breach within thirty (30) days of the Company's receipt of such written notice.

http://ir.retrophin.com/secfiling.cfm?filingID=1193805-13-2298&CIK=1438533                4/10/2017

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 59 of 66 PageID #: 2655

(v)     *Resignation without Good Reason* . The Executive may resign his employment without Good Reason.

(vi)     *Non-extension of Term by the Executive* . The Executive may give notice of non extension to the Company pursuant to Section 4(b).

In the event of any such termination, the Term will immediately end.

(c)     <u>Notice of Termination</u> . Any termination of the Executive's employment by the Company or by the Executive under this Section 4 (other than termination pursuant to paragraph (a)(i)) shall be communicated by a written notice to the other Party hereto indicating the specific termination provision in this Agreement relied upon, setting forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated, and specifying a Date of Termination which, if submitted by the Executive for a resignation other than for Good Reason, shall be at least sixty (60) days following the date of such notice (a " <u>Notice of Termination</u> "). A Notice of Termination submitted by the Executive for a termination for Good Reason may provide for a Date of Termination on the date the Company receives the Notice of Termination, or any date thereafter elected by the Executive in his sole discretion. A Notice of Termination submitted by the Company may provide for a Date of Termination on the date the Executive receives the Notice of Termination, or any date thereafter elected by the Company in its sole discretion. For the purposes of this Agreement, "Date of Termination" shall mean (i) if the Executive's employment is terminated by his death, the date of his death; (ii) if the Executive's employment is terminated pursuant to Section 4(b)(ii)-(v) the date indicated in the Notice of Termination; (iii) if the Executive's employment is terminated pursuant to Section 4(b)(vii), the expiration of the then-applicable Term

(d)     <u>Company Obligations Upon Termination</u> . Upon termination of the Executive's employment pursuant to any of the circumstances listed in Section 4(b), the Executive (or the Executive's estate) shall be entitled to receive the sum of: (i) the Executive's Annual Base Salary through the Date of Termination not theretofore paid; (ii) any expenses owed to the Executive under Section 3(d); (iii) any accrued vacation pay owed to the Executive pursuant to Section 3(c); and (iv) any amount earned, accrued and arising from the Executive's participation in, or benefits accrued under any employee benefit plans, deferred compensation plans, programs or arrangements under Section 3(e), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements.

If the Executive's employment is terminated by the Executive for Good Reason, the Executive shall continue to receive his Annual Base Salary, any unpaid bonus and health insurance coverage on the same terms as made available to the Company's employees for a period of twelve (12) months from the Date of Termination (such continuation of base salary and health insurance coverage being the " <u>Severance Benefits</u> "). Notwithstanding the foregoing, the Executive shall not be entitled to any Severance Benefits unless (i) the Executive complies with all of the restrictive covenants by which he is bound (whether pursuant to this Agreement or otherwise), including, but not limited to, any non-competition agreement, non-solicitation agreement or confidentiality agreement signed by the Executive, and (ii) the Executive executes, delivers and does not revoke a general release in form and substance acceptable to the Company. The parties hereto acknowledge that the Severance Benefits to be provided under this Section 4(d) are to be provided in consideration for the above-specified release.

http://ir.retrophin.com/secfiling.cfm?filingID=1193805-13-2298&CIK=1438533

4/10/2017

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 60 of 66 PageID #: 2656

(e)        Section 409A . Notwithstanding anything to the contrary in this Agreement, any cash severance payments otherwise due to the Executive pursuant to this Section 4 or otherwise on or within the six-month period following the Executive's termination will accrue during such six-month period and will become payable in a lump sum payment on the date that is six (6) months and one (1) day following the Executive's termination. In addition, this Agreement will be deemed amended to the extent necessary to avoid imposition of any additional tax or income recognition prior to actual payment to the Executive under Section 409A of the Internal Revenue Code of 1986, as amended, and any temporary, proposed or final Treasury Regulations and guidance promulgated thereunder and the parties agree to cooperate with each other and to take reasonably necessary steps in this regard.

**5.        Company Property** . All correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which come into the Executive's possession by, through or in the course of his employment, regardless of the source and whether created by the Executive, are the sole and exclusive property of the Company, and immediately upon the termination of the Executive's employment, or any time at the Company's reasonable request, the Executive shall return to the Company all such property of the Company.

**6.        Non-Competition, Non-Solicitation** .

(a)        The Executive agrees that, in consideration of his employment with the Company pursuant to this Agreement, and other good and valuable consideration, the receipt of which is hereby acknowledged, during the Executive's employment with the Company and for six (6) months after the Date of Termination, the Executive will not either on his own behalf or on behalf of any third party, except on behalf of the Company, directly or indirectly (other than through his ownership of equity in the Company), as an individual proprietor, principal, manager, agent, consultant, guarantor, advisor, member, owner, participant, partner, stockholder, officer, employee, director, joint venturer, lender, or in any other capacity whatsoever (other than as a passive holder of not more than five percent (5%) of the total outstanding stock of a publicly-held company), persuade or induce any client, customer, vendor, strategic or business partner or account of the Company to restrict or cease to do business with, invest in, participate with, or otherwise work with the Company, or to reduce the amount of business, investment, participation or work that any such client, customer, vendor, or strategic or business partner has customarily done or actively contemplates doing with the Company.

(b)        The Executive and the Company agree that this covenant not to compete is a reasonable covenant under the circumstances, and further agree that if in the opinion of any court of competent jurisdiction such restraint is not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of this covenant as to the court shall appear not reasonable and to enforce the remainder of the covenant as so amended.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 61 of 66 PageID #: 2657

(c)    The provisions of Section 6 shall survive termination of this Agreement.

**7.        Protection of Confidential Information** .

(a)    For purposes of this Section 7, " Confidential Information " shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), projects, customer lists, marketing plans, methodologies, business or vendor relationships, relationships with strategic or business partners, its high speed networks, or equipment, tools or other materials developed for use on such networks, and all information and know-how (whether or not patentable, copyrightable or otherwise able to be registered or protected under laws governing intellectual property) owned, possessed, or used by the Company, any affiliate or any customer, including, without limitation, any formula, method, procedures, composition, project, development, plan, market research, vendor information, customer or client lists or information, contacts at or knowledge of customers or clients, prospective customers and clients, business or strategic partners of the Company, trade secret, process, research, reports, financial data, technical data, test data, know-how, computer program, software, software documentation, source code, hardware design, technology, marketing or business plan, forecast, unpublished financial statement, budget, license, patent applications, contracts, joint ventures, price, cost and personnel data, any trade names, trademarks or slogans and other non-public, proprietary and confidential information of the Company, its affiliates or customers, that, in any case, is not otherwise available to the public (other than by the Executive's breach of the terms hereof). The Executive agrees (i) that all Confidential Information, whether or not in writing, shall be treated as being confidential and/or proprietary information and is the exclusive property of the Company and (ii) to hold in a fiduciary capacity for the sole benefit of the Company all Confidential Information.

(b)    Confidential Information shall not include information that (i) is or becomes public knowledge through legal means without fault by the Executive, (ii) is already public knowledge prior to the signing of this Agreement, or (iii) must be disclosed pursuant to applicable law or court order.

(c)    The Executive agrees that he will not at any time, either during the Term of this Agreement or after its termination, disclose to anyone any Confidential Information, or utilize such Confidential Information for his own benefit, or for the benefit of third parties without written approval by the Board.  The Executive further agrees that all memoranda, notes, records, data, schematics, sketches, computer programs, prototypes, or written, photographic, magnetic or other documents or tangible objects compiled by him or made available to him during the Term of his employment concerning the business of the Company and/or its clients, including any copies of such materials, shall be the property of the Company and shall be delivered to the Company on the termination of his employment, or at any other time upon request of the Company.

(d)    The Executive also agrees that any breach of the covenants contained in this Section 7 would irreparably injure the Company. Accordingly, the Executive agrees that the Company may, in addition to pursuing any other remedies it may have in law or in equity, cease making any payments or providing any benefits otherwise required by this Agreement and obtain an injunction against the Executive from any court having jurisdiction over the matter restraining any further violation of this Agreement by the Executive.

6

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 62 of 66 PageID #: 2658

**8.** **Binding Agreement; Assignment** . This Agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns. In the event the Company is acquired, is a non-surviving party in a merger, or transfers substantially all of its assets, this Agreement shall not be terminated and the transferee or surviving company shall be bound by the provisions of this Agreement. The parties understand that the obligations of the Executive are personal and may not be assigned by him.

**9.** **Entire Agreement** . This Agreement contains the entire understanding of the Executive and the Company with respect to employment of the Executive and supersedes any and all prior understandings, written or oral. This Agreement may not be amended, waived, discharged or terminated orally, but only by an instrument in writing, specifically identified as an amendment to this Agreement, and signed by all parties. By entering into this Agreement, the Executive certifies and acknowledges that he has carefully read all of the provisions of this Agreement and that he voluntarily and knowingly enters into said Agreement.

**10.** **Severability** . Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be deemed severable from the remainder of this Agreement, and the remaining provisions contained in this Agreement shall be construed to preserve to the maximum permissible extent the intent and purposes of this Agreement. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Any provisions determined to be invalid or unenforceable shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render the same valid and enforceable.  In the event any ambiguity or question of intent or interpretation arises under this Agreement, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**11.** **Governing Law; Arbitration** . This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as provided in Section 7.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 12.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 63 of 66 PageID #: 2659

12.      **Notices** .  Any notice or other communications required or permitted hereunder shall be in writing and shall be deemed effective (a) upon personal delivery, if delivered by hand and followed by notice by mail, e-mail or facsimile transmission, (b) three (3) days after the date of deposit in the mails, if mailed by certified or registered mail (return receipt requested), or (c) on the next business day, if mailed by an overnight mail service to the parties or sent by e-mail or facsimile transmission, as follows:

(a)      If to the Company:

Retrophin, Inc.
777 Third Avenue, 22 $^{nd}$ Floor
New York, New York 10017
Attn: Board of Directors

With a copy to:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attn: Evan L. Greebel, Esq.
Fax:  (212) 894-5883

(b)      If to the Executive:

Martin Shkreli
777 Third Avenue, 22 $^{nd}$ Floor
New York, New York 10017

13.    **Indemnification** .

(a)    Corporate Acts . In his capacity as a director, officer, or employee of the Company or serving or having served any other entity as a director, officer, or executive at the Company's request, the Executive shall be indemnified and held harmless by the Company to the fullest extent allowed by law, the Company's certificate of incorporation, bylaws or any indemnification agreement between the Company and the Executive, from and against any and all losses, claims, damages, liabilities, expenses (including reasonable legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Executive may be involved, or threatened to be involved, as a party or otherwise by reason of the Executive's status, which relate to or arise out of the Company, their assets, business or affairs, if in each of the foregoing cases, (i) the Executive acted in good faith and in a manner the Executive believed to be in the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe the Executive's conduct was unlawful, and (ii) the Executive's conduct did not constitute gross negligence or willful or wanton misconduct. The Company shall advance all reasonable expenses incurred by the Executive in connection with the investigation, defense, settlement or appeal of any civil or criminal action or proceeding referenced in this Section, including but not necessarily limited to, reasonable fees of legal counsel, expert witnesses or other litigation-related expenses.

(b)    Directors & Officers Insurance . During the Term and thereafter for six years after the Executive's employment terminates, the Executive shall be entitled to coverage under the Company's directors and officers liability insurance policy, subject to the terms of such policy, in effect at any time in the future to no lesser extent than any other officers or directors of the Company. Notwithstanding anything herein to the contrary, the provisions of this Section shall survive the termination of this Agreement and the termination of the Term for any reason.

(c)    Personal Guarantees . The Company shall indemnify and hold harmless the Executive for any liability incurred by him by reason of his execution of any personal guarantee for the Company's benefit (including but not limited to personal guarantees in connection with office or equipment leases, commercial loans or promissory notes). Notwithstanding anything herein to the contrary, the provisions of this Section shall survive the termination of this Agreement and the termination of the Term for any reason.

14.    **Miscellaneous** .

(a)    No delay or omission by either party in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by one party on any one occasion shall be effective only in that instance and shall not be construed as a bar or waiver of any right on any other occasion.

(b)    The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 65 of 66 PageID #: 2661

(c)      Any rights of the Executive hereunder shall be in addition to any rights the Executive may otherwise have under written benefit plans or agreements of the Company to which he is a party or in which he is a participant, including, but not limited to, any Company sponsored written employee benefit plans, option plans, grants and agreements.

(d)      The Company shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local or foreign withholding or other taxes or charges which the Company is required to withhold.

(e)      The Executive represents that he has had the opportunity to seek separate legal counsel of his own choosing in connection with the preparation, review and execution of this Agreement.

(f)      This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which when taken together shall constitute one agreement.

(g)      Each party to this Agreement agrees promptly to execute, acknowledge, deliver, file or record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by law, or that, in the opinion of the Company, may be necessary or advisable to carry out the intents and purposes of this Agreement.

(h)      In accordance with the Company's policies, the Executive shall sign and agree to be bound by the Company's Code of Ethics and Insider Trading Policy.

[Signature page follows]

10

Case 1:15-cr-00637-KAM   Document 189-3   Filed 04/10/17   Page 66 of 66 PageID #: 2662

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement on the date first identified above.

**COMPANY:**

RETROPHIN, INC.

By:  /s/ Marc Panoff
Name: Marc Panoff
Title:   Chief Financial Officer


**EXECUTIVE:**

/s/ Martin Shkreli
Martin Shkreli


Employment Agreement Signature Page