1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,    :   15-CR-637(KAM)
4                                :
                                 :   U.S. Courthouse
5                                :   Brooklyn, New York
         -against-               :
6                                :   TRANSCRIPT OF
                                 :   STATUS CONFERENCE
7                                :
                                 :
8    MARTIN SHKRELI and          :   April 7, 2017
     EVAN GREEBEL,               :   12:00 p.m.
9                                :
            Defendants.          :
10   - - - - - - - - - - - - - X
     BEFORE:
11              HONORABLE KIYO A. MATSUMOTO, U.S.D.J.
     APPEARANCES:
12   For the Government:        BRIDGET M. ROHDE, ESQ.
                                United States Attorney
13                              271 Cadman Plaza East
                                Brooklyn, New York 11201
14                              BY:  JACQUELYN KASULIS, ESQ.
                                     ALIXANDRA SMITH, ESQ.
15                                   WINSTON PAES, ESQ.
                                     GIRISH SRINIVASAN, ESQ.
16                                   Assistant U.S. Attorneys

17   For the Defendant
     Shrekli:                   BRAFMAN & ASSOCIATES, P.C.
18                              BY:  BENJAMIN BRAFMAN, ESQ.
                                     MARC AGNIFILO, ESQ.
19                                   ANDREA  ZELLAN, ESQ.
                                     JACOB KAPLAN, ESQ.
20

21
     Greebel:                   GIBSON, DUNN & CRUTCHER, LLP
22                              BY:  LISA RUBIN, ESQ.
                                     REED BRODSKY, ESQ.
23                                   WINSTON CHAN, ESQ.

24

25

*Proceedings*                                                    2

```
1   Court Reporter:      Holly Driscoll, CSR, FCRR
                         Official Court Reporter
2                        U.S. District Court - EDNY
                         225 Cadman Plaza East
3                        Brooklyn, NY  11201
                         (718) 613-2274
4

5   Proceedings recorded by mechanical stenography, transcript
    produced by Computer-Assisted Transcript.
6

7

8

9                           *    *    *

10          THE COURT:  Good afternoon.  Have a seat, everybody.

11          THE CLERK:  This is criminal cause for hearing,

12   15-CR-637, USA versus Martin Shkreli and Evan Greebel.

13          Will the government's attorney state your appearance

14   please.

15          MS. SMITH:  Good afternoon, Your Honor, Alixandra

16   Smith, Jacquelyn Kasulis, Winston Paes and Karthik Srinivasan

17   for the government.

18          THE COURT:  Good afternoon.

19          MR. BRAFMAN:  Good afternoon, Your Honor, Benjamin

20   Brafman, Mark Agnifilo, Andrea Zellan, Jake Kaplan and,

21   pending admission, Teny Geragos for Mr. Shkreli.

22          THE COURT:  Good afternoon, and good afternoon,

23   Mr. Shkreli.

24          MS. RUBIN:  Good afternoon, Your Honor, Lisa Rubin,

25   Reed Brodsky and Winston Chan for Mr. Greebel.
```

*Proceedings*                                                          3

1          THE COURT:  Good afternoon.

2          MR. BRODSKY:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon, Mr. Greebel.

4          I scheduled this conference because the government

5     had filed an application requesting a hearing to flesh out

6     some of the issues.  I have Mr. Shkreli's response and

7     although Mr. Greebel did not take a position, they submitted a

8     20 page brief and an affidavit from a law professor at

9     Georgetown stating a position on this which I've considered.

10          I think what I'd like to address is whether

11    Mr. Brafman objects outright to a hearing or whether he's

12    objecting to a hearing at this time.  Part of my thinking was

13    that if we were going to have a hearing, it would be

14    advantageous to all the parties to know well in advance of

15    trial rather than wait until two or three days before trial or

16    even in the middle of trial.  So, I'm happy to hear from the

17    parties.

18          MR. BRAFMAN:  Your Honor, thank you.  I think in the

19    letter reply which the government submitted last night I think

20    they essentially concede that they are not asking for a

21    hearing at this time.  I think holding a hearing three months

22    prior to trial where a defendant is essentially required to

23    produce his defense including the defense exhibits has never I

24    think been done and in the cases cited where a 104 hearing has

25    been required it's generally been held on the eve of trial or

1  certainly after discovery has been completed but, most

2  respectfully, Judge, what we have prepared which we would like

3  to submit in camera under seal for Your Honor's ex parte

4  review is a brief affidavit with attached exhibits which lays

5  out what we believe to be the uncontradictable evidence that

6  is in the government's own discovery that demonstrates that

7  there is a very valid reliance on counsel defense in this case

8  and indeed a compelling reliance on counsel defense.

9          So, I would object to the hearing and let me just

10  briefly make the following representations to the court:  The

11  discovery in this case includes tens of thousands of e-mails

12  between Mr. Shkreli and Mr. Greebel and other members of the

13  Katten law firm.  When you look just at the Greebel e-mails

14  alone, there is involvement by Mr. Greebel in virtually every

15  aspect of the government's case.  That firm billed over

16  $500,000 in connection with MSMB related work and close to

17  nine and a half million dollars with respect to Shkreli

18  related and Retrophin issues.  And the tone of the e-mails and

19  the subject matter of the e-mails covered virtually everything

20  that is in this indictment, whether it is MSMB related,

21  Fearnow related or Retrophin related.

22          And if I can, in very short manner, explain the

23  defense of Martin Shkreli; while it involves an advice of

24  counsel defense and I think we will meet the very low

25  threshold, more than the low threshold required to get that

1  jury charge at the end of the case, I think it is important

2  for the Court to focus on what we focused on in our written

3  response and that is the issue of criminal intent and I think

4  what the government has never understood, with respect, and

5  has never been willing to accept is the following argument,

6  which is no secret because I think we've made it clear in our

7  papers, if Martin Shkreli is charged with intentionally

8  defrauding a series of investors and also Retrophin, it is our

9  position that he never intended to defraud anyone and that

10  regardless of what argument they may make, if, for example,

11  assets under management, at the time Martin Shkreli made the

12  representation there's other documentary evidence to suggest

13  that it was not an accurate statement, we nevertheless are

14  entitled to an argument that even if that statement was either

15  mistaken or misunderstood by what Shkreli intended by assets

16  under management, because in addition to the MSMB assets he

17  had other assets which were under management which gave him

18  credibility as an investment or hedge fund entrepreneur and,

19  nevertheless, the issue is did he intend to defraud anyone by

20  making that statement and our argument is that Martin

21  Shkreli's whole life from the time of MSMB through Retrophin

22  is demonstrated by a Herculean effort to repay the people who

23  invested the money and I think, quite frankly, at the end of

24  the day he was successful and in order to repay them, they

25  either entered into settlement agreements or consulting

1   agreements.

2          Now, the government cavalierly rejects those

3   agreements as sham agreements and that's just not the case.

4   Based on our investigation, there was at least one arbitration

5   that upheld the agreement as being valid and ruled in favor of

6   the applicant in that case who was entitled to compensation

7   for the consulting services he provided under the terms of the

8   consulting agreement that is charged in the indictment as a

9   sham indictment.  But, on the issue at hand, it is beyond

10  dispute that with respect to the investors, with respect to

11  the consulting agreements and the settlement agreements, there

12  is correspondence by Evan Greebel directly with many of these

13  investors copying Martin Shkreli, there is correspondence in

14  the form of e-mails with Evan Greebel and many of the

15  investors' lawyers working out the terms of the settlement

16  agreements, working out the terms of the consulting

17  agreements.

18         So, Martin Shkreli, we have a right to argue, had a

19  right to assume that everything that was being done in

20  connection with the settlement agreements and the consulting

21  agreements was being passed on by his lawyer who he did not

22  consider to be part of a fraud, who he considered to be a very

23  capable lawyer, a partner in a large firm, and what's ironic

24  about this case is when you look at the statement of Evan

25  Greebel post-arrest which the government may or may not decide

*Proceedings*                                                           7

1   to attempt to introduce into the trial, and we'll get to that

2   on the severance argument, he tries very hard to distance

3   himself from Martin Shkreli in what as a former prosecutor I

4   would label a false exculpatory statement because despite his

5   statement to the agents that he had nothing to do with Martin

6   Shkreli or made it appear that he didn't provide any real

7   service, he's intimately involved in everything that happens.

8          So, on the issue of criminal intent, the law firm

9   providing the services billed Mr. Shkreli almost $10 million

10  for their services.  The billing records, the detailed time

11  records show that the work that they're billing for included,

12  among other things, the principal components of the

13  government's claim of fraud in this case.  The claim of fraud

14  is based in part on sham consulting agreements, sham

15  settlement agreements.  Now, these are going to be questions

16  of fact for a jury to decide, these are going to be questions

17  of fact for a jury to decide, A, credibility of the witnesses;

18  B, most importantly, Martin Shkreli's criminal intent.

19         So, most respectfully, Your Honor, when I saw the

20  Court's ruling and I read the government's papers, my first

21  instinct was, let's assume for the purposes of discussion that

22  we finish the government's case and we make the decision that

23  we want to put the defendant on the stand and the substance of

24  his testimony is I relied on Evan Greebel at every point in

25  this case and even though he may not have been my lawyer on

1    the very first day, I nevertheless believed that by paying

2    these people back, it was demonstrating my good faith at the

3    time I made these representations and I never intended to

4    defraud any of them, and I don't think that kind of defense

5    needs to be fronted and I don't think it can be fronted

6    without you holding, Your Honor, a trial within a trial.

7              Now, the cases they have cited are I think

8    distinguishable in large measure and we're not talking about

9    an affirmative defense, we're talking about a defense to an

10   element of the crime.  In a duress case, for example, if you

11   did everything --

12             THE COURT:  May I just stop you, sir, I don't mean

13   to interrupt your train of thought, but are you saying that

14   you're not going to assert an advice of counsel defense, you

15   just want to be able to present evidence relating to

16   Mr. Shkreli's lack of intent?

17             MR. BRAFMAN:  No, I think the advice of counsel

18   defense will be requested and it goes hand-in-hand with the

19   lack of criminal intent and I think they are joined at the hip

20   and cannot be separated and I think in this case in particular

21   it is really appropriate because you have Mr. Greebel

22   providing advice throughout the course of conduct which bears

23   on the issue of criminal intent and I think a jury has a right

24   to consider the following argument, if you are hiring a very

25   prominent law firm to advise you in how to proceed and if they

1   are drafting the settlement agreements and they are drafting

2   the consulting agreements and they are interfacing with

3   counsel for the investors, could a reasonable juror conclude

4   that Martin Shkreli had a right to assume and rely on the fact

5   that they were blessing these materials and for them to say,

6   well, you didn't tell me about A, you didn't tell me about B,

7   so therefore the reliance of counsel defense shouldn't apply,

8   that's a question of fact as to whether Mr. Greebel did in

9   fact have that information or whether Mr. Greebel did in fact

10  just want to ignore the materials because included in the

11  exhibits that we have and which will be submitted to Your

12  Honor, so important was Martin Shkreli as a client to Evan

13  Greebel during the time when he says I didn't really do much

14  for him is when he talks to the compensation committee in his

15  own firm about trying to get more money in several years

16  during the period in question, he is pointing to the Shkreli

17  work as evidence of how important this client and he is to the

18  firm.  Now, it just flies in the face of a statement by

19  Mr. Greebel, well, I didn't know about X, Y and Z and if you

20  have -- we'll get to the severance issue, I think, Your Honor,

21  if you read --

22          THE COURT:  How is the amount of billing that

23  Mr. Greebel and his firm did to Mr. Shkreli and the related

24  companies, how does that bear on your position that -- his

25  argument that he either received untrue information or that

1   Mr. Shkreli made material omissions, how does that relate?

2   I'm trying to understand the connection between what was

3   billed, as you argue, you seem to emphasize the amount of

4   money that Mr. Shkreli paid to the firm.

5              MR. BRAFMAN:  I think the amount of money is

6   relevant because when you look into the details of the time

7   records, a lot of the money that Mr. Shkreli paid for was work

8   performed by Katten in preparing consulting agreements that

9   the government claims are part of the fraud and preparing

10  settlement agreements that the government claims are part of

11  the fraud and you can't just cherry-pick moments in time in

12  this case.  Our argument from the beginning is that Martin

13  Shkreli never intended to defraud any of these investors.

14  We've spoken to some of the investors.  Many of these

15  investors came out smelling like a rose in this case.  This

16  may be the only fraud trial in the history of America where I

17  think the investors weren't really defrauded.

18             So, at the end of the day Mr. Greebel's position in

19  his own trial or as part of his own defense that I was never

20  told A, B or C is a question of fact for the jury, it's not

21  for the government to tell you in advance of trial, Your

22  Honor, that you must accept that as a fact in order to decide

23  your ruling in this case.  We have a right to present all the

24  evidence to the jury and then ask them to conclude whether you

25  believe that Mr. Shkreli acted reasonably in relying on

1    Mr. Greebel and whether or not Mr. Greebel was in fact

2    provided with all of the information because what you have in

3    some of the e-mail traffic is not just Mr. Shkreli doing

4    things, you have Mr. Greebel telling him how to do things.  I

5    mean this story that they've I think fabricated that he really

6    had nothing to do --

7            THE COURT:  Sorry, I think you bounced on the mic,

8    I'll turn it off.

9            MR. AGNIFILO:  I think it's better.

10           MR. BRAFMAN:  This claim that Mr. Shkreli deceived

11   Mr. Greebel I think is belied by the facts and I think it will

12   be a reasonable inference a jury could draw that Greebel knew

13   everything about everything at the time he came to be

14   Shkreli's attorney and I think that is a defense we have a

15   right to proffer to the jury.

16           Now, Your Honor, at the end of the trial after all

17   of the evidence has been heard if Your Honor concludes that we

18   haven't met the threshold of a reliance of counsel defense, we

19   may still have a good faith defense based on the lack of

20   criminal intent, that is a completely separate charge that

21   Your Honor can give even in the absence of an advice of

22   counsel defense but I think they are joined at the hip.  I

23   think Your Honor will see that the reliance on counsel

24   defense, the proof supporting it is very strong and somewhat

25   akin to an entrapment defense.  The courts have suggested that

1    there's a low threshold of proof that a defendant needs to

2    provide in order to get the defense.  Now, the jury may reject

3    the defense, the government may offer proof against the

4    defense but to cut us off at the pass before, A, discovery has

5    been completed, before we get the 3500 material, we're still

6    working with Retrophin's counsel to get additional materials,

7    I'm not being critical of anybody but that's the fact, but

8    just based on what we've seen, I would like to submit the

9    affidavit because what we've done is we've selected categories

10   of documents that clearly support what we believe to be the

11   proof of reliance of counsel defense and I don't think we

12   should be required to give the government our proof on the

13   lack of criminal intent by Martin Shkreli and proof that

14   supports the advice of counsel defense.

15          Now, after reading the submissions immediately prior

16   to trial Your Honor still wants to conduct a brief hearing,

17   that's different because then we will have the government's

18   3500 material, hopefully by then we will have finished the

19   discovery review.  So, right now we're objecting to a hearing.

20   We don't think it is required and we don't think the defendant

21   needs to prove a lack of criminal intent.  I think they have

22   to prove criminal intent.  And I think on the advice of

23   counsel defense, if we don't meet the threshold, the same

24   evidence is going to be introduced at trial to attack the

25   argument with respect to Shkreli's criminal intent, so it's

*Proceedings*                                                        13

1   not like it is going to be evidence that's going to be

2   inadmissible because it is strictly focused on a reliance of

3   counsel defense only.  That material is going to be introduced

4   and I think admissible because the authentication is not going

5   be an issue, most of it comes out of the government's

6   materials provided to counsel and most of it is going to be

7   used to confront witnesses who are going to testify who claim

8   that they were defrauded when their lawyers and Mr. Greebel

9   are in correspondence about the wording of the settlement

10  agreement, about the wording of the investor consulting

11  agreement.

12          So, I think to answer Your Honor's question

13  specifically, yes, we object to a hearing on 104 but if Your

14  Honor is going to hold it, we ask that Your Honor await, if

15  you must, until right before trial as any other judge who's

16  reviewed this issue has determined.  And in the cases cited by

17  the government, I don't think they stand for the propositions

18  that we are discussing here, certainly not the Judge Hurley

19  decision, that was a discrete question that he had to address,

20  it's nothing like the facts in this case.  So, I'd ask Your

21  Honor to accept our submission under seal.

22          THE COURT:  Who signed the affidavit?

23          MR. BRAFMAN:  Me, it is my affidavit.

24          THE COURT:  All right.  Well, don't we need to hear

25  from -- I'm just asking whether we should be hearing from the

*Proceedings*                                                          14

1    person who wants to assert the defense, because you don't have

2    personal knowledge about the elements that are necessary to

3    establish the advice of counsel defense which I think you cite

4    in your brief, that the party seeking to avail himself of the

5    defense must show that he honestly and in good faith sought

6    the advice of counsel.  You can't do that.

7              MR. BRAFMAN:  Right.  Your Honor, what we have done

8    in the affidavit is concluded based on the exhibits attached

9    that we would have a right to argue the advice of counsel but

10   if what Your Honor wants is a short affidavit in addition to

11   this from Mr. Shkreli that he relied on Evan Greebel, we would

12   be prepared to provide that by next week.

13             THE COURT:  Well, the second element is that the

14   party must establish that he fully and honestly put forth all

15   the facts before his counsel.

16             MR. BRAFMAN:  I understand that.

17             THE COURT:  So, again, I think it would be difficult

18   for you without having had personal knowledge to make that

19   statement under oath as a matter of fact.

20             MR. BRAFMAN:  I agree but I can make a statement

21   based on the materials I have reviewed that it is absolutely

22   clear to us that Mr. Shkreli provided Mr. Greebel with enough

23   information so that he had a right to rely on his information

24   and that the government then needs to show that we didn't

25   provide him with all of the information and I don't think they

1   will ever be able to show that but we can make that

2   representation based on the documents.  I think Your Honor can

3   draw from the documents the conclusion that is inescapable

4   that Mr. Greebel was not acting in the dark and if what Your

5   Honor needs is a statement by Mr. Shkreli or a short affidavit

6   that he provided all of the information to Mr. Greebel, we

7   would be prepared to consider that and provide it to Your

8   Honor as well.

9           THE COURT:  All right.  Thank you.

10          Ms. Smith.

11          MS. SMITH:  Yes, just to briefly respond because I

12  think our reply brief today really covers a lot of this

13  ground; as an initial matter, substantive motions can't be

14  decided on an ex parte submission and so if the Court

15  determines to hold a hearing or to consider this issue prior

16  to trial, it should do so with materials that both parties are

17  able to see.  It sounds like the materials attached to the

18  affidavit are materials we produced, I see no reason why we

19  shouldn't be able to consider them.  If Mr. Shkreli is going

20  to put in an affidavit or proffer what statements he would

21  testify to at trial, we obviously have a right to challenge

22  them, that is the point of the hearing.

23          So, if Mr. Brafman's objection is that the

24  particular collection of documents they've assembled to

25  support their claims, it's unfair to reveal those to us now

*Proceedings*                                                16

1   because it lays out their defense too far in advance of trial,

2   as we've said, we have no problem with delaying the hearing to

3   closer to trial.  I respectfully submit that two or three days

4   before trial, as in some of these other cases, wouldn't be

5   appropriate here because this is so complex but certainly

6   closer to trial, post-3500 seems like a reasonable suggestion.

7            THE COURT:  My concern, Mr. Brafman, from your point

8   of view is that the cases that have been cited by my

9   colleagues in the Eastern District were fairly simple cases

10  and were not the kind of complex paper heavy case that we have

11  here and if I were to hold a hearing three days before trial

12  and make rulings that could possibly cut the legs out from

13  under your primary defense, then you would want more time I

14  would think to regroup.  So, part of the reason for exploring

15  whether a hearing would be appropriate earlier rather than

16  later was to make sure that you didn't feel that you were in

17  an adverse position because you may not have received the

18  ruling that you wanted.  I'm not saying that I'm prejudging or

19  I'm hinting anything, I'm just saying that this is the kind of

20  case where I think the more notice you have the better as to

21  what the parameters of the case will look like and I think the

22  government as well, they will know how to prep their witnesses

23  and their cross-examinations or whatever.  Did we set a date

24  for 3500 material?

25            MS. SMITH:  Yes, there's a date in the schedule.

1          THE COURT:  Okay, so we can look at a date after

2     that when you have a chance.

3          MR. BRAFMAN:  Your Honor, just so the record is

4     clear, I'm not trying to interrupt but I just want to respond

5     to this, our position is that there should be no hearing on

6     this issue, that it is not necessary, that it is not required

7     as a matter of law and that we should not have to front our

8     defense to the government in advance of trial because at the

9     end of the day, Your Honor, I think based -- the reason why we

10    want to submit this ex parte is because although much of the

11    material comes from the government, the way it is put together

12    and the arguments we made is part of the defense argument that

13    they really don't have a right to see at this time but what we

14    are trying to do is convince Your Honor that we have a good

15    faith basis to suggest that a hearing is not necessary and

16    that the issues in question will allow for this evidence into

17    trial on the issue of advice of counsel and on the issue of

18    criminal intent and if at the end of trial Your Honor

19    concludes that an advice of counsel defense is not

20    appropriate, you will not charge it but how do you make this

21    determination before you hear, for example, from the defendant

22    or defense witnesses, should they choose to testify, on a

23    defense that may be uniquely available to him and him alone

24    and Evan Greebel and Evan Greebel alone, I don't know how you

25    can make a ruling on the basis of a hearing and I'm not aware

1    of any case that requires the defendant to provide his

2    testimony to the government in advance of trial or make the

3    decision as to whether he will or will not testify until the

4    government rests when those decisions are made.

5             Now, we may make a strategic decision to rest and

6    not call the defendant and argue from the testimony that we

7    have established a sufficient legal threshold for the charge

8    to apply but this is not a case as some of the cases where the

9    presence of the attorney's e-mails is going to confuse the

10   jury.  We have a co-defendant at present who is an attorney.

11   Even if you grant our severance, as we think you should, at

12   the end of the day the jury is going to hear about Evan

13   Greebel from many of the government witnesses, is going to see

14   much of the Greebel correspondence from which you can draw the

15   inference that he is giving substantial advice to Mr. Shkreli.

16            So, it is not a case where the injection of an

17   attorney from a prominent firm implies confusion to the jury

18   because they might rely on this even in the absence of an

19   advice of counsel defense.  I have a right to argue on the

20   issue of criminal intent the fact that he was working with the

21   prominent law firm allowed him to believe that he was not

22   doing anything illegal when these consulting agreements and

23   settlement agreements were being drafted even if you don't

24   give a reliance of counsel charge.

25            So, our position is that a hearing is not required,

1    that it is a waste of everyone's time because unless you force

2    the defendant, for example, to testify at a hearing, which I'm

3    not certain would be appropriate, you may not have the whole

4    evidence before you and I agree with you, most respectfully,

5    this is not a typical case of where reliance of counsel is

6    being proffered because the attorney of record is in this case

7    whether you give an advice of counsel charge or not because

8    they're going to try and target Mr. Shkreli with things that

9    Mr. Greebel did on his behalf and we're going to have to rebut

10   that.

11          THE COURT:  Thank you.

12          Ms. Smith.

13          MS. SMITH:  So, I'll try and make sure I cover the

14   points from both arguments.

15          THE COURT:  You can start over if you want.

16          MS. SMITH:  So, I actually think what Mr. Brafman

17   has said today illustrates exactly why a hearing is necessary

18   because what I've heard from him are statements about Evan

19   Greebel, who is charged as a co-defendant and who absolutely

20   will be present in the government's case-in-chief, e-mails and

21   conversations, but there are many, many other attorneys

22   involved here.  There were many other attorneys billing at

23   Katten, there were at least two or three law firms associated

24   with MSMB and with Retrophin in addition to Katten, and all I

25   have heard Mr. Brafman talk about is Mr. Greebel and the

1   settlement and consulting agreements.  That's one attorney and

2   that's one count which is Count Seven.  There's Count Eight

3   which involves the unrestricted shares schemes and there are

4   the first six counts which talk about the MSMB schemes and I

5   really think that was the focus of our initial motion.

6           There is a basic threshold that needs to be crossed

7   in order to advance an advice of counsel defense at trial and

8   Mr. Brafman is conflating kind of a general good faith defense

9   and advice of counsel which is a species of the good faith

10  defense.  An advice of counsel is more specific and the cases

11  are very clear that if you want to argue that you relied on a

12  particular attorney, you need to show that you consulted with

13  that attorney at the very least in connection with the charged

14  conduct and our motion was made in part because it seems clear

15  to us from the evidence that on certain of the counts and for

16  many of these attorneys Mr. Shkreli cannot make out that

17  threshold showing that he actually consulted with an attorney

18  before he did something and we spoke specifically about, for

19  example, sending out statements to MSMB capital investors

20  which were sent out prior to, for example, when Katten was

21  engaged.

22          So, given the number of attorneys that are kind of

23  in the mix here and the number of different counts, what our

24  concern is is that Mr. Brafman is going to get up in opening

25  statement and say something like Mr. Shkreli was lawyered up

*Proceedings*                                                    21

1   to the hilt, he had a hundred lawyers working for him, he paid

2   $10 million, there were 10,000 e-mails, everything he did was

3   blessed by an attorney and therefore he can rely on the

4   attorney and he didn't have the intent to commit the crime and

5   that is just so far beyond what he's actually permitted to

6   argue.  He may well be able to make that threshold showing on

7   certain counts particularly with respect to Mr. Greebel and

8   potentially with respect to other attorneys but he can't just

9   get up there and say Mr. Shkreli had a million attorneys and

10  therefore everything he did was blessed and everything should

11  be allowed to be considered as reliance of counsel.  It is

12  legally improper.

13          And I think that the cases where these pretrial

14  hearings were held, *Scully* and *Atias* I think are the two ones

15  that are kind of the closest; you know, in some cases, in

16  *Scully*, for example, the Court ruled that the threshold

17  showing had been met and in *Atias* there was a difference, they

18  were distinguishing between different attorneys involved.  So,

19  for some of those attorneys it had been met and for some it

20  hadn't and we're really just asking for that basic clarity

21  here.

22          I think, like I said, I think there's no question

23  that for Mr. Greebel on certain counts that showing may

24  potentially be there but for all of these other potentially

25  hundreds of attorneys and especially on the MSMB counts, it is

1   not clear from our own documents that that is something that

2   that threshold is going to be able to be crossed and that is

3   the reason that we have sought the hearing.  And as we've

4   said, these are evidentiary issues that are going to have to

5   be decided at some point no matter what, either they are

6   decided prior to trial or they are decided when Mr. Brafman

7   gets up and makes his opening argument and we argue for a

8   limiting instruction or when there's cross-examination of a

9   witness and there's discussion of an attorney and there's a

10  question that suggests reliance and we have to have a side-bar

11  to find out what's the proffer of evidence to even ask that

12  question because obviously the witness's response will be

13  evidence.

14          So, it just makes sense given the complexity of the

15  case to at least address to the extent possible these

16  threshold issues before we get started so that things like

17  opening statements aren't implicated by them.

18          I'm just trying to see if there was anything else

19  that Mr. Brafman said.

20          THE COURT:  He did raise a constitutional argument

21  that you were flipping the burden.

22          MS. SMITH:  Right, and I think the constitutional

23  argument is clearly answered in our response.  The burden of

24  guilt or innocence rests with the government, we embrace that

25  burden, it never shifts to the defendant.  However, when the

*Proceedings*                                                      23

1   defendant enters the courtroom, he is subject to the Federal

2   Rules of Evidence just as any other party is and when he is

3   affirmatively trying to put in evidence and he will be doing

4   that if he's advancing an advice of counsel defense, he is

5   responsible for meeting those basic evidentiary rules and it's

6   not the burden of guilt or innocence, it's the burden required

7   to get your evidence in.

8           THE COURT:  The rule, as I recall it, speaks about

9   the need to establish a fact that would be necessary to admit

10  evidence.  So, in terms of that paradigm in Rule 104, what

11  fact are you looking to have him establish and what particular

12  evidence, is it evidence of the elements that he needs to meet

13  to establish the advice of counsel and what sorts of facts

14  would you want to have a hearing on, I think the first one was

15  whether he consulted a lawyer with regard to some of the

16  charged conduct or all of the charged conduct; the second is

17  whether he truthfully disclosed to the lawyer the information

18  that the lawyer needed to render legal advice, I'm just trying

19  to understand the context of the rule.

20          MS. SMITH:  I think some of the contours of this may

21  need to get worked out closer to the hearing so I don't want

22  to over-promise or overstate what needs to be provided to meet

23  that threshold because I think it will be fact specific.  I

24  know one of Mr. Brafman's arguments is this is an unfair

25  preview of the defense and I think that we really are talking

*Proceedings*                                                    24

1   about these kind of threshold issues.

2           So, one threshold issue is is there any evidence

3   that Mr. Shkreli consulted with any attorney before sending

4   out, for example, statements to MSMB investors that were

5   misrepresentations or omissions.  That is a fact.  If they

6   cannot make that factual showing, there is no way they can

7   introduce evidence that they relied on that attorney for that

8   particular conduct.  That's an example I think of the kinds of

9   facts that the hearing would flush out.  (Pause.)  Yes, and

10  any attorney involved at all in connection with the MSMB

11  schemes.

12          One other thing I wanted to touch on was the

13  testimony of the defendant.  You know, in a lot of the duress

14  cases and affirmative defense cases it is very clear that if

15  the only evidence of a particular fact is going to be the

16  defendant's testimony, there are no documents, there's no one

17  else's testimony, then it can be required at a pretrial

18  hearing for the Court to evaluate whether or not that

19  testimony is reliable and can meet kind of that factual

20  threshold.  So, it will depend on how Mr. Shkreli wants to

21  proceed but there are instances in which he will if he wants

22  to advance certain evidence be required to submit an affidavit

23  or testify at a pretrial hearing.

24          MR. BRAFMAN:  Your Honor --

25          THE COURT:  One question I had was that, as we know,

*Proceedings*                                                    25

1    in suppression hearings the statements of a defendant

2    generally aren't going to be admissible at the trial, right,

3    so what is the rule with regard to testimony of a defendant at

4    a 104 hearing, if you can tell me?

5              MS. SMITH:  I believe it is similar, that it would

6    be for purposes of cross-examination or if a statement was

7    inconsistent later on as opposed to an affirmative statement

8    at trial.  I believe it is the same standard but I will need

9    to double-check that.

10             THE COURT:  All right.

11             MR. BRAFMAN:  Your Honor, I think this is not about

12   Rule 104.  Rule 104 is a discrete rule of evidence, as we have

13   laid out in our brief, that requires Your Honor to make a

14   ruling perhaps in mid-trial as to a discrete piece of evidence

15   that the defense or the government seeks to offer and then

16   there's a side-bar and there's argument.  Rule 104 was never

17   intended to ask for a hearing on whether or not an advice of

18   counsel defense can be proffered.  And I need to respond to

19   something else that was just said by the government.

20             THE COURT:  May I address that, sir?

21             MR. BRAFMAN:  Yes, Your Honor.

22             THE COURT:  As you know, the Federal Rules of

23   Evidence don't apply only to trials, they apply to any

24   proceedings, civil or criminal, in federal court and I think

25   that the rule, although it does talk about being out of the

1   hearing of the jury, it doesn't foreclose me from having a

2   hearing prior to trial in order to determine whether certain

3   evidentiary burdens have been met.  It is like a motion in

4   limine.

5          MR. BRAFMAN:  Except in a criminal proceeding you

6   are running up against the constitutional right of a defendant

7   to rely on a presumption of innocence and not be required to

8   testify in a manner in which the government says they could

9   use it if he testifies at trial to cross-examine him.  No

10  defendant should be required to make that statement to the

11  Court or to the government, but, Your Honor, the problem with

12  this case is from the government's perspective they see the

13  advice of counsel defense as if it applies, it applies only to

14  Count Six or Seven or Eight and not to the case-in-chief and

15  they can't pigeonhole it that way because the relationship

16  with Mr. Greebel covers the entire thrust of the indictment.

17  Yes, he wasn't the attorney of record when that statement went

18  out, however, if that statement went out and Martin Shkreli

19  lacked the criminal intent to defraud anyone and then after he

20  hires Katten he shares the information or they find the

21  documentation and they continue to deal with the very

22  investors who he is alleged to have defrauded, they can't say

23  Greebel has nothing to do with the MSMB count, the MSMB

24  investors are the people who are alleged to have had sham

25  consulting agreements and sham settlement agreements that

1   defrauded Retrophin and Greebel was the attorney of record

2   during all of this period.

3           THE COURT:  That goes to the government's argument

4   that we shouldn't sever the trial, it is overlapping,

5   intertwined inextricably so that severing the trial doesn't

6   make sense.

7           MR. BRAFMAN:  We can talk about the severance

8   issues --

9           THE COURT:  We'll get to that argument later.

10          MR. BRAFMAN:  -- in a minute but, Your Honor, with

11  respect to this argument that we are currently having, I think

12  what the government wants to do in its case-in-chief is to say

13  here's Exhibit A which we claim is fraudulent and therefore

14  Martin Shkreli is guilty of having defrauded the investor.

15  The investor in question is someone who then went on to settle

16  with Retrophin in a settlement agreement that Mr. Greebel had

17  worked on.  And with respect to who the attorneys are, we

18  don't intend to argue that there was an independent

19  conversation with all of the Katten attorneys by Martin

20  Shkreli because we don't need that.  The attorneys in Katten

21  who worked under Mr. Greebel were doing work he assigned to

22  them.  Mr. Greebel was still in charge of the case and the

23  principal attorney and if we have crossed the threshold of

24  reliance on counsel on the Katten firm, then the other lawyers

25  working at Mr. Greebel's direction, he has a right to presume

*Proceedings*                                                    28

1   that Greebel and those lawyers have worked together on this

2   project and I think that's an argument that we can present and

3   argue when and if it's appropriate.

4           THE COURT:  What I think she's getting at, if I

5   understand her argument, is that Mr. Greebel wasn't retained

6   until the summer of 2012, was it?

7           MS. SMITH:  2011.

8           THE COURT:  2011 and that some of this conduct that

9   is charged in the other counts, Counts One through Six may

10  predate in some respect the retention of the firm and so the

11  government wants to know whether Mr. Shkreli is raising an

12  advice of counsel defense as to those earlier counts and if

13  so, which attorneys did he consult and for what aspects of

14  those counts, the charged conduct did he rely on the advice of

15  his counsel.

16          MS. SMITH:  Your Honor, that's exactly correct and I

17  actually think Mr. Brafman is making my argument for me.  The

18  fact that he just said that all of this stuff happened, then

19  they retained Katten, then later on they engaged in the

20  settlement and consulting agreements, that really does not

21  bear on the question of whether or not Mr. Shkreli consulted

22  with an attorney in good faith prior to making

23  misrepresentations and omissions to the MSMB investors

24  starting in 2009.  So, this is the tension and this is the

25  concern, that you get up at opening and say Katten, Katten,

1    Katten and for some of the charged conduct you're never going

2    to be able to make out that reliance of counsel defense.  We

3    certainly have not seen that evidence so far.

4           THE COURT:  All right.  Thank you.

5           MR. BRAFMAN:  Your Honor, most respectfully, I don't

6    want to get into the discussion today and if we need to prior

7    to trial, there are other lawyers involved in part of the

8    process before Katten but at the end of the day, Judge, the

9    issue that I think the jury is going to have to decide is

10   whether or not Mr. Shkreli intentionally defrauded these

11   people and you don't make that decision based on a specific

12   piece of conduct at the time in question only.

13           We have a right to argue that when you look at all

14   of his conduct from the beginning until the end, that the

15   overwhelming evidence suggests that Martin Shkreli did not

16   intend to commit a crime and part of what the jury is allowed

17   to consider is the role that Evan Greebel played in counseling

18   him with respect to that specific conduct that he is charged

19   with that may have happened before he was retained but

20   nevertheless continues in a process of attempting to undo the

21   harm to these people which bears on the issue of did I intend

22   to defraud them or was I being too aggressive or was I using

23   poor judgment or was I acting with specific criminal intent

24   and I think you, Your Honor, need to really hear the evidence

25   before you can make this decision and if you want to be give

1   us certain restrictions in what we can and cannot say on

2   opening statement, we're willing to discuss that with Your

3   Honor and then you can make the decision after you've heard

4   the testimony as to what we can or cannot say and what Your

5   Honor will or will not do in a charging conference.

6            THE COURT:  Are you intending to raise the issue of

7   Mr. Shkreli's lack of intent based on an advice of counsel

8   argument with regard to the charges where Mr. Greebel is not

9   included?  His firm and Mr. Greebel didn't get involved in

10  representing Mr. Shkreli until after some of the charged

11  conduct regarding the MSMB entities, and I would like to

12  understand also whether you're making that argument or whether

13  you're just focusing it on the last two counts of the

14  indictment.

15           MR. BRAFMAN:  No, we're not.

16           THE COURT:  So, you intend to show that Mr. Shkreli

17  did consult with other lawyers regarding the conduct in the

18  first six counts?

19           MR. BRAFMAN:  We're mixing apples with oranges, I

20  want to focus on Greebel.

21           THE COURT:  I know but Mr. Shkreli is charged in all

22  the counts.

23           MR. BRAFMAN:  Yes.

24           THE COURT:  I'm just trying to understand how far

25  back or how extensive your defense is being raised.

*Proceedings*                                                          31

1        MR. BRAFMAN:  Your Honor, if you look at the

2   indictment, they may have chosen two specific counts to charge

3   Mr. Greebel in but our argument shows and we can show that

4   through extensive documentation that he's in the process, in

5   the mix way before the counts that they charge him

6   specifically in.

7              So, the fact that he's only charged in those two

8   counts is a decision the government made but if they had

9   wanted to involve him in a conspiracy from the moment he

10  became Martin Shkreli's lawyer and began to work with him,

11  they could have done that if they wanted to under the facts of

12  this case.  So, the fact that they made the discrete decision

13  not to charge him in those crimes, he's certainly involved and

14  he's involved throughout the period of negotiations and part

15  of what we have to deal with in this case is not just the

16  statement in 2009 as to whether he did or did not have

17  $35 million in assets under management and the government

18  hasn't I don't believe -- Your Honor perhaps has read the

19  Wells submission that was put in by Arnold & Porter, but they

20  had an expert opine on why that was not a false statement

21  given the state of affairs going on at MSMB at the time.  So,

22  it is not black and white that throwing out that piece of

23  information he committed a crime.  And then for the duration,

24  Your Honor, in '11, '12 and '13 and '14 Evan Greebel is

25  intimately involved in every decision Martin Shkreli makes and

*Proceedings*                                                                    32

1    those decisions are going to be used against Martin Shkreli,

2    the decisions he makes while represented by Evan Greebel are

3    going to be used to prove in their view why this is a fraud

4    and I think we have a right to defend against it and whether

5    it's partially reliance on counsel and partially on the issue

6    of criminal intent, you can decide once you've heard the

7    testimony what you will charge this jury at the end of the

8    trial but doing it in a hearing is almost impossible, it's

9    almost impossible because you need to put the government

10   witnesses on the stand so that you will also hear the

11   testimony from the people we are alleged to have defrauded how

12   their attorney communicated with Mr. Greebel and they relied

13   on the advice of their own counsel in entering into the

14   consulting agreement or the settlement agreement.  Now, they

15   may not have told the government that but we have

16   correspondence and the one arbitration that was resolved was

17   resolved in our favor in the Rosenfeld arbitration.  So, this

18   is not as clean cut a case as the government alleges.

19              (Continued on next page.)

20

21

22

23

24

25

*Proceedings*                                                      33

1          MS. SMITH:  Your Honor, just two quick points.

2          So once again, the settlement proposal agreements

3    are only to Count Seven for Retrophin.

4          And then with respect to Mr. Greebel, it is true

5    that he's not charged in the first six counts.  I actually

6    agree with Mr. Brafman's statement that he was involved in

7    MSMB and involved in some of the conduct; for example, he

8    backdated his documents to create an interest for MSMB Capital

9    in Retrophin.  However, that is distinct and separate from the

10   question of whether or not he was consulted with respect to

11   misrepresentations and omissions actually charged in the first

12   six counts.  So I think that's our point.

13         THE COURT:  All right, well, let's do this:  I think

14   what we should do, I know there's outstanding discovery

15   related to outstanding issues on this point.

16         Privilege, have the defendants and the government

17   been able to resolve with the Retrophin and the outstanding

18   issues regarding privileges, or is that still under

19   negotiation?

20         MS. SMITH:  Your Honor, the government's

21   understanding, we have not been involved, is that there are

22   still a few issues that the defendants are going back and

23   forth with Retrophin on with respect to Retrophin's privilege.

24         THE COURT:  All right, and the MSMB privilege has

25   been waived.

*Proceedings*                                                    34

1        MS. SMITH:  The MSMB privilege has been waived.

2        THE COURT:  And Mr. Shkreli has waived his privilege

3    as well.  All right.

4        So if we're going to have a hearing, let me hear

5    from the defendants, if I think it's necessary, after seeing

6    Mr. Shkreli's submissions, we'll schedule that at a time after

7    the 3500 material has been provided and before -- hopefully

8    substantially before trial.

9        MS. SMITH:  Your Honor, again, we would object to

10   any ex parte submission.  Your Honor cannot actually make a

11   substantive ruling without actually sharing with us, and I

12   don't see any reason for the defense to be able to preview and

13   prejudice the Court by providing its submission early, and so

14   again, if the objection is the compilation -- the specific

15   selection and compilation of documents, then we should just

16   wait until the time of the hearing and they can make their

17   pitch then.  I don't see that there's any basis to actually

18   submit the documents now and to not have us to be able to

19   respond.

20       THE COURT:  But I will say it helps me to hear from

21   all the parties, not just one side.  I just favor ex parte

22   submissions.

23       MR. AGNIFILO:  I'd like to make one point clear and

24   draw a distinction.  In all of the research I have done, and

25   God knows the last five days, I have never seen an issue

*Proceedings*                                                    35

1   raised that we raise in our point three of our recent

2   submission and the issue there is the burden shift, in the

3   context, Judge, of a defense that as the prosecution has said

4   is basically a subset of the defense of lack of criminal

5   intent, which is not a defense at all, and that's actually the

6   point.

7           So we keep talking in terms of an advice of counsel

8   defense and I think it's a shorthanded way of saying

9   something, but it's not an independent defense, it's a subset

10  of the fact that someone would have good faith, or there would

11  be no criminal intent.  And I've never seen the issue raised,

12  and I think the constitutional point that I think that we're

13  starting to flirt with here, is we are now in a position of

14  having to come forward in the first instance to provide

15  evidence of Mr. Shkreli's lack of intent because that's --

16  when we talk about -- first talk about the advice of counsel

17  defense, they're talking about in the context of a jury

18  charge.  So what you're really saying is has all of the

19  evidence in the trial passed the threshold level that the

20  defendant gets the jury charge.  It's not an independent

21  defense, and that's why it's different than a duress defense.

22          A duress defense is I admit that I committed all the

23  elements of the crime.  In the Dickson case, the person bought

24  a gun but said I bought the gun because I was under duress and

25  I was afraid.  In the first Supreme Court case, the Bailey

1  case, I ran away from prison, I admit that I ran away from

2  prison but I was afraid.

3          So you're admitting all the elements of the crime,

4  and there's a defense that exists outside the elements of the

5  crime that courts have said you can put that onus on the

6  defendant because it's not an element of the crime.  And

7  that's the distinction.  Here, it's not a standalone defense,

8  it's baked into intent.

9          So my concern, and I pulled all the Pacer motions of

10  all the other cases, and there are constitutional objections

11  raised, but not this one.  And this one is really sort of an

12  In Re Winship; you know, the government bears the burden of

13  production and proof on every element of the crime.  I've

14  never seen it raised.  And I think here we're flirting with a

15  constitutional line if -- and I understand from a practical

16  standpoint, I really do, why Your Honor wants this

17  information, you want to make the trial easier.  We want to

18  make the trial easier.  But I don't think we can make the

19  trial easier this way.  And what I mean by "this way," is

20  having Mr. Shkreli say here's why I don't think I had the

21  intent to commit a crime, because I thought it was true.  I

22  thought it was valid.  I spoke to a lawyer.  Because that's an

23  element of the crime.  And we never go first, when it's an

24  element of the crime.  So I think -- I think that's important

25  here, and I'm -- I understand Your Honor's concern, and what

*Proceedings*                                                    37

1    I'd like to do, if possible, is see if we can solve it another

2    way.  We talk.  We get along fine.  They don't surprise us.

3    We're going to get along much better once Winston leaves, but

4    we get along fine, Judge.

5            If we can solve this another way, we'll try to solve

6    it, but I don't think an affidavit from the defendant in a

7    criminal case about why he doesn't have the intent is the way

8    to solve the problem.

9            THE COURT:  Well, my concern, I wasn't trying to put

10   Mr. Shkreli in a position where he's having to waive his Fifth

11   Amendment right and shift burdens to him, because I understand

12   that the government has the burden and you have the absolute

13   right not to submit any statements at all, but my concern was

14   just having an attorney submit an affidavit on issues that

15   require personal knowledge.  I didn't see how Mr. Brafman was

16   going to do that, just given the elements of the advice of

17   counsel defense.  So I just wanted to him to think about it.

18   I'm not saying Mr. Shkreli should give an affidavit, you may

19   decide to try to make your pitch, you know, without.  But I do

20   think I have to think about those elements in the context of

21   the person who's asserting it.

22           All right, are we ready to talk about severance now?

23           MS. SMITH:  Yes, Your Honor.

24           MR. CHAN:  Your Honor, on this last issue before we

25   go on to severance, I did want to make just two points.

*Proceedings*                                                    38

1          Up until today, I think we were a little bit

2    confused about the government's submission as to this hearing

3    and the question of whether or not a codefendant can assert a

4    advice of counsel defense.  Frankly, I thought we were in a

5    parallel universe where the government was saying that they

6    have to make some showing and that there was advice of counsel

7    defense as to our client, when I thought that was pretty

8    clear.  Whatever threshold the Court decides needed to be met,

9    I thought that that threshold was supremely met, even after

10   the government called our -- described this relationship as an

11   attorney/client relationship, has referred to our client as

12   the attorney for Mr. Shkreli, and the press release has called

13   it that, so I was confused as to why there was this demand.

14          THE COURT:  Your client has taken the position that

15   he did not represent, and the firm did not represent

16   Mr. Shkreli, but rather they represented MSMB and Retrophin

17   so --

18          MR. CHAN:  No, I agree.

19          THE COURT:  -- it's still not entirely clear to me.

20   I think there are engagement letters between the Katten firm

21   or Mr. Greebel and MSMB and Retrophin, but there is not an

22   engagement letter, from what I've been told in the

23   submissions, between Mr. Greebel and Mr. Shkreli or for

24   Mr. Shkreli.

25          MR. CHAN:  I agree.  But insofar as the counts that

*Proceedings*                                                      39

1   our client is charged in, I didn't see why this would be an

2   issue and particularly raised a question, because it seemed to

3   me that the government was seeking to link this hearing with

4   the severance motion.  And to the extent that there was going

5   to be argument that severance -- a decision by the Court on

6   the severance should be delayed until after resolution of

7   these various issues in this hearing, I think that's why we

8   thought why is there a question as to our severance motion,

9   whether or not our argument that we have mutually antagonistic

10  defenses with our codefendant, in some way turn on a hearing

11  to demonstrate that, in fact, would be mutually antagonistic

12  defenses.  I thought it was clear that we were going to argue

13  that in the attorney/client relationship that existed as to

14  Retrophin, that there were lies made to one side, that's our

15  position, and our codefendant's position is that they made

16  full and fair statements to our clients about those issues.

17          So what I hear from today, and I wanted to just make

18  this clear, that the government is not challenging that aspect

19  of our codefendant's assertion of the advice of counsel

20  defense and so, therefore, our severance motion, until before

21  you decide, if that's different, then I think we should have a

22  discussion about that, but I just wanted to raise that point.

23          THE COURT:  Do you want to respond, Ms. Smith?

24          MS. SMITH:  I don't think we're linking the two,

25  Your Honor.  I mean as I said, you know, without conceding

1    anything, I think to the extent there is an advice of counsel

2    defense here, Counts Seven and Eight, Mr. Greebel that's kind

3    of what we see as the most likely universe-based delivered

4    threshold of showing, we're going to discuss it.  I don't see

5    any reason to hold up the severance motion.  We were frankly

6    very confused that Mr. Greebel decided to respond to a motion

7    that hadn't been directed at them and there was not any

8    suggestion in our motion that this somehow changes the

9    antagonistic defenses at trial.

10          I think, you know, even separate and apart, and

11   Mr. Brafman's made this point, from the specific advice of

12   counsel defense, the reliance of counsel, there is also going

13   to be lots of other evidence kind of in that realm and so

14   we're not making an argument that there should be any

15   different position with respect to the -- you know, position

16   taken on the antagonistic defenses or that the severance

17   motion shouldn't go forward.

18          MR. BRAFMAN:  Can I just say one thing in response

19   to the Court's observation about the retainer agreements.  It

20   is our position that whether or not if you are an owner of a

21   company or a member of the owner -- ownership of the company

22   or founder of the company, the fact that a law firm has a

23   retainer agreement with the company, does not preclude you

24   from being the client of that attorney as well, because in the

25   correspondence between Evan Greebel and Martin Shkreli, Martin

1    Shkreli is introducing Evan Greebel as his lawyer to other

2    lawyers who are working to resolve issues.  So the

3    nonexistence of a retainer agreement between Mr. Shkreli

4    personally and Mr. Shkreli's company personally is not

5    dispositive on the issue as to whether or not Evan Greebel was

6    acting as Martin Shkreli's lawyer, because Evan Greebel is

7    clearly giving Mr. Shkreli personal advice, but maybe advice

8    that is on behalf of the Retrophin company, but it certainly

9    impacts on what Shkreli is doing.  And the fact that the

10   company pays the fees is not dispositive of who the client is

11   either.

12            THE COURT:  No, I understand.  I was just noting

13   Mr. Chan's statement that Mr. Greebel was Mr. Shkreli's

14   attorney, which was something that was contra to the position

15   being made here.

16            MR. BRAFMAN:  Thank you.

17            THE COURT:  All right, so Mr. Brodsky?

18            Mr. Brodsky is out --

19            MS. RUBIN:  I thought we would go first in

20   severance, but if he wants to go first.

21            MR. BRAFMAN:  Whatever Your Honor wants.

22            THE COURT:  Do I ask, Mr. Brafman.

23            MR. BRAFMAN:  No, I'd like to do it.

24            THE COURT:  Okay.

25            MR. BRAFMAN:  Thank you.

*Proceedings* 42

1          Judge, I think the decision by Judge Spatt, although

2     a district court judge like Your Honor, and obviously I am not

3     in a position to have his case control Your Honor's

4     discretion, I think demonstrates quite clearly why a severance

5     in this case is required.  And first, and perhaps very

6     important, is the significant response that we always get from

7     the government when a motion for a severance is made is that

8     it will constitute a waste of judicial resources, it will

9     require two long trials instead of one long trial.

10          Your Honor, a trial of Mr. Shkreli alone, given the

11     submissions by Mr. Brodsky on behalf of Evan Greebel, a trial

12     of Mr. Shkreli alone will be much easier, much cleaner and

13     much quicker than a trial of Mr. Shkreli and Mr. Greebel, who

14     I think we'll spend half the day at sidebar discussing

15     limiting instructions that Mr. Greebel wants every time we, in

16     cross-examination, raise Mr. Greebel's name.

17          I think if ever there was a case, like the case

18     before Judge Spatt, the Aronson case, where there is mutually

19     antagonistic defenses that cannot be reconciled, it's this

20     case.  And the decision that the courts look at is if in order

21     to relieve one defendant's defense the jury must reject the

22     other defendant's defense, then a severance is required.  And

23     those courts who have denied that motion were ultimately

24     reversed for the reasons set forth in those respective

25     opinions.

*Proceedings*                                                43

1          Mr. Greebel in his papers -- and one thing I want to

2     assure the Court as a sidebar just for a moment since it's

3     unfortunately in the papers, I represent to Your Honor as an

4     officer of the court whose probably tried 25 cases to verdict

5     in this building, that there will be no disruption of these

6     proceedings by Mr. Shkreli.  He's not going to do anything to

7     undermine the integrity of these proceedings, as Mr. Brodsky

8     warns.  And I promise you, this case, if Mr. Shkreli goes to

9     trial alone, will have substantially less disruptions and less

10    difficulties than if we have a joint trial.  So I just want to

11    make sure that Your Honor understands that, because I was

12    taken aback by some of their arguments.

13          So purely on legal grounds, purely on legal grounds,

14    it is impossible to reconcile the defenses in this case.  And

15    whether you charge a -- whether you ultimately charge an

16    advice of counsel defense on two counts or all counts or on no

17    counts, it's still an impossible trial because they are going

18    to take the position from the onset that Mr. Greebel did

19    nothing wrong, that Mr. Greebel was -- that Mr. Shkreli lied

20    to him, that Mr. Greebel is among the people who were

21    defrauded by Mr. Shkreli.  So it's impossible, Judge, in that

22    atmosphere for us not to then have to attack Mr. Greebel as

23    not giving Mr. Shkreli the correct advice, as helping

24    Mr. Shkreli participate in the fraud.  So at the end of the

25    day, if the jury accepts their claim that Mr. Greebel was

*Proceedings*                                                      44

1    deceived, then they must convict Mr. Shkreli for, among other

2    things, deceiving his own lawyer.

3              If on the other hand we take the position that

4    Shkreli did not -- that Greebel is responsible for a fraud, if

5    there is a fraud, and that his advice was not only inaccurate

6    but it was, in effect, him either willingly or unwillingly or

7    implicitly participating in fraudulent conduct, then he gets

8    convicted.

9              And I also submit, just as a practical matter, and

10   then I'm going to stand on our written submissions because I

11   think they lay this out, unless Your Honor has specific

12   questions, but as a practical matter, if we have a trial with

13   Evan Greebel, there will be a lot of evidence that they will

14   attempt to introduce in order to dirty up Mr. Shkreli that at

15   his own trial the government could never introduce.  And at

16   the end of the day --

17             THE COURT:  Well, give me an example and tell me why

18   it wouldn't be admissible.

19             MR. BRAFMAN:  Excuse me?

20             THE COURT:  I said give me an example of the kind of

21   evidence that you suspect Mr. Greebel to introduce that the

22   government would not be able to introduce that would attempt

23   to cast dispersions on Mr. Shkreli.

24             MR. BRAFMAN:  Well, if Mr. Shkreli wants to testify

25   on his own behalf, they would attempt to cross-examine him

1   with matters that may go to his credibility that may not be

2   relevant to the crimes charged, but which they may have a

3   right to cross-examine with him about his credibility which

4   the government may not on a 403 balancing test.

5           THE COURT:  But do you have an example that you can

6   point to?  Because I know that there a lot of theoretical

7   arguments being made about the sort of adverse scenarios that

8   may occur if they're tried together, but not much on the

9   specifics.

10          MR. BRAFMAN:  But the government -- the affidavit of

11  Lisa Rubin lays out a litany of arguments that they have made

12  which would undermine Mr. Shkreli's presumption of innocence

13  separate and apart from anything that the government may

14  introduce in this courtroom.  And they would take the position

15  that Mr. Shkreli is reckless, that the conduct he has

16  demonstrated throughout his life shows you how reckless he is

17  and as a result you should understand that Evan Greebel was

18  dealing with someone whose conduct was so reckless and so

19  continuously reckless during the period in question that you

20  cannot rely on anything he says, and any claim that he told

21  Greebel what the facts are is a lie by the fact that Martin

22  Shkreli has no credibility with respect to the way he conducts

23  his life.  And they have provided Your Honor with example

24  after example of conduct that they claim that they could

25  introduce on the issue of Mr. Shkreli's credibility.

*Proceedings*                                                    46

1            Now, I don't think on a 403 balancing test the

2    government gets a lot of that in, but on a 403 balancing test,

3    you're doing a different balancing act when you're deciding

4    whether it's relevant to Mr. Greebel's defense, not to the

5    government's case, whether it's relevant to Mr. Greebel's

6    defense.  And as a consequence I have to attack Mr. Greebel,

7    and they have to essentially attack Mr. Shkreli.  And I was

8    taken aback by some of the things they said.  But if they are

9    on trial alone, they may well be able to introduce that

10   evidence to demonstrate to the jury why Greebel is the honest

11   lawyer just billing away and Shkreli is the crazy person who's

12   taking Greebel down the road where he would never ever go

13   down.  If we're on trial together, I have to show that Greebel

14   is the fraudster, if you will, and among the victims of the

15   fraud on Martin Shkreli in person.  So I think we have

16   attention in this case that I don't think is reconcilable.

17           I also point out that the government's faced with

18   the decision that they can sanitize, if they want to use the

19   post-arrest statement by Mr. Greebel, sanitize that statement

20   to avoid Bruton issues.  It's conceptually impossible.

21   Because the statement from the beginning to the end, as far as

22   I'm concerned, is a lie.  And if the government doesn't

23   introduce it, if there is a joint trial, and if they attack

24   Shkreli, I might introduce it as a 806 prior inconsistent

25   statement by Shkreli, even though normally an admission after

*Proceedings*                                                    47

1   trial -- after arrest is only admissible by the government as

2   an admission and otherwise a hearsay statement.

3        If Greebel in that statement takes the position that

4   he didn't do any of the things that I, for example, can show

5   he did, that's an 806 prior inconsistent statement and it

6   comes in as my evidence and they can't stop it and neither can

7   the government.  So it's an argument that's -- and I've given

8   this a great deal of thought and I believe I'm right and when

9   you look at 806, it provides, and if the government uses

10  evidence against Mr. Shkreli by Evan Greebel, for example, and

11  they say it's a coconspirator statement or a statement of a

12  codefendant and, therefore, it's admissible, I have a right to

13  use that statement if I want to.  But, Judge, that statement

14  cannot be sanitized by them.

15       So I don't know whether I need to use it or not, but

16  if I use it and Evan Greebel is on trial, they are going to

17  claim it's not admissible or it shouldn't be used.  So I think

18  the issues in this case that Your Honor's going to have to

19  confront and digest and rule on in the joint trial are not

20  necessary.

21       THE COURT:  Well, I think that much of the evidence

22  that's going to be admissible at a joint trial will also be

23  admissible in a separate trial.  And that's somewhat of the

24  difficulty with the argument that you make as though

25  Mr. Greebel and Mr. Shkreli are going to have different

*Proceedings*                                                   48

1    abilities to present evidence or to present evidence if

2    they're tried separately, I'm not sure that you're correct

3    about that --

4              MR. BRAFMAN:  But, Judge, if you look at --

5              THE COURT:  -- more specific examples.

6              Look, I don't even -- I think you're worried about

7    some of these examples of Mr. Shkreli's statements throughout

8    his life or the conduct.  I don't even see how that's going to

9    be relevant.

10             In terms of the fear that Mr. Shkreli will disrupt

11   this trial, I see no reason to think that he would do that.

12   He's demonstrated nothing but appropriate conduct throughout

13   all of his appearances here.  And, you know, he's entitled to

14   his opinions.  I think you as his attorney would be

15   responsible for counseling him about the downside of making

16   certain kinds of statements or engaging in certain types of

17   conduct, but I don't control his conduct right now outside the

18   courthouse as long as it's not having an adverse impact on the

19   proceedings before me.  But I have no reasonable to think that

20   Mr. Shkreli would do anything that would impact adversely on

21   the proceedings.

22             MR. BRAFMAN:  And he will not, but the effort by the

23   Greebel counsel to bring those to the attention of the Court

24   shows how this trial is going to ultimately play out where

25   they are going to use every resource available, and perhaps

*Proceedings*                                                    49

1    some of it won't be admissible, but in their opening statement

2    they are going to call Martin Shkreli a liar.  And in the

3    opening statement, they are going to take a position that's so

4    irreconcilable and so antagonistic to the defendant that I'm

5    going to have Gibson Dunn as a third prosecutor in the case.

6    And the difficulty in the case, is as Judge Spatt concluded,

7    is that if an order to believe the defense of Defendant A you

8    must disbelieve the defense of Defendant B, that a severance

9    is the appropriate remedy.

10           And I do not think that a separate trial, a Shkreli

11   and a separate trial in Greebel, will take more time than a

12   joint trial.  I really think that we are going to spend half

13   the day arguing legal issues presented at a joint trial that

14   will not presented at a separate trial.

15           THE COURT:  Did you want to address any of this

16   notice that the government sets forth at page 28 of their

17   memorandum in opposition where they dispute your argument that

18   these all lead to antagonistic defenses, they present a number

19   of standards where a jury could conclude that Mr. Shkreli's

20   defense is credibility but also acquit Mr. Greebel because the

21   government hasn't proven intent.

22           There are a number of scenarios where they argue

23   that the jury would not necessarily have to convict one

24   defendant if they believe the other.

25           MR. BRAFMAN:  Your Honor, the reason why those cases

*Proceedings*                                                    50

1   are distinguishable is because the Greebel briefs make it very

2   clear that they do not intend to defend this case on the

3   merits, they intend to defend this case by saying the one who

4   is guilty is Martin Shkreli, and Evan Greebel was a lawyer who

5   was misled by this boy genius, even though Greebel is the

6   sophisticated lawyer.

7         If their defense was we intend to defend this case

8   on the merits and not attack Martin Shkreli, I'm not certain

9   that we're having this conversation.  But they have taken the

10  position from the beginning that because we may intend to rely

11  in some respect on a Greebel advice, that they then must call

12  Martin Shkreli a liar to sort of undercut the integrity of

13  that defense.

14        So I think perhaps I should sit down and let

15  Mr. Greebel explain how he intends to defend this case.

16  Because if they were to take the position that both defendants

17  are not guilty, I think we're having a different dialogue.

18              THE COURT:  Yes, Mr. Brodsky.

19              MR. BRODSKY:  Yes, Your Honor.  Thank you, Your

20  Honor.

21        We've been quietly listening, Your Honor, and

22  Mr. Brafman has made a series of misstatements regarding our

23  client and it's just representative of what's going to happen

24  at a trial.

25        Your Honor, we have looked and searched wide in all

*Proceedings*                                                            51

1   federal court and all the state court cases, every single one

2   that's published, and we even looked for unpublished ones, and

3   the only scenario we have ever found where a lawyer and a

4   client or a client representative was charged together in a

5   crime, and the lawyer accused the client or the client

6   representative of deception and lying and fraud and material

7   omissions, and the client or client representative said they

8   acted in good faith in part because their communications with

9   their lawyer showed they would have never committed the crime

10  if they were communicating with their lawyer, there is only

11  one case, and that was Aronson.  And the government in that

12  case argued against severance and they lost, and they

13  criticized --

14          THE COURT:  What did they originally say?  He sat on

15  reconsideration and changed his decision.

16          MR. BRODSKY:  Correct.  Originally it was just a

17  spill over prejudice argument.  And when the counsel for

18  Mr. Aaron, the lawyer, came forward to Judge Spatt and said I

19  have evidence that Aronson, the CEO of the entity that Aaron

20  was representing, is actually going to assert a reliance on

21  the advice of the counsel defense, because Aronson wasn't

22  doing what Mr. Brafman's doing, which is making it very clear

23  that's his intent, Aronson actually said nothing for

24  severance.  But there was some papers filed in connection with

25  a parallel SEC proceeding, and so Aaron then asked Judge Spatt

*Proceedings*                                                    52

1   to reconsider and focus on what we ask Your Honor to focus on,

2   which is the mutually antagonistic defenses.  And when he did

3   that in a 16-page opinion that did go into deal about cases

4   and was thorough, and but no account should be criticized as

5   not being a thorough, thoughtful opinion, he found what is the

6   only logical conclusion to draw, that this is of a rare sort

7   of case where you have two defendants that will go at each

8   other's throats.

9          I promise you, Your Honor, we will open in this

10  courtroom and we will say in our opening statement

11  Mr. Shkreli's a liar and a deceiver, and we will prove it and

12  we are -- I'm going to take you through Your Honor specific

13  examples.  And Your Honor asked for examples in which we will

14  prove the case that Mr. Shkreli's a liar that the government

15  doesn't know about, and I will give you an example of that.

16  And it's just one of many examples.  Because the government

17  never spoke to Mr. Greebel before they indicted Mr. Shkreli

18  and Mr. Greebel.  And had they done that, maybe they'd have

19  this information.  But the information of Mr. Shkreli's lies

20  and his deceptions, for a large part of it, lie in our

21  possession here and not in the government's possession, and we

22  are going to show it.

23         So the problem here, Your Honor, is in the rarest of

24  circumstances, we have a situation where we are going to get

25  up and we are going to say Mr. Shkreli's guilty, and that

*Proceedings*                                                    53

1   distinguishes this case from all others, except for Aronson.

2   There was one other decision, actually two other decisions we

3   found.  The government doesn't cite a single decision in their

4   support in this circumstance, but there was two other

5   decisions we found that were similar to Aronson.  They're not

6   squarely on all fours like it is in Aronson.

7            Just as in Aronson, Aaron, the lawyer, represented

8   the entity, just as Mr. Greebel represented Retrophin and

9   MSMB.  And Mr. Chan, my colleague, when he was speaking, I

10  think the Court may have misunderstood him, because he was not

11  saying that Mr. Greebel ever represented Mr. Shkreli in his

12  personal capacity, he was saying that was the government's

13  statement.  The government indictment included that, the

14  government's press release said that, but the government is

15  dead wrong.  They are absolutely wrong.  The engagement

16  letters reflect that Mr. Greebel did not represent

17  Mr. Shkreli.  And I know Mr. Shkreli's going to argue

18  differently.  I know his very abled counsel is going to argue

19  differently, and they're going to look at emails and interpret

20  them differently.  But we are definitely not going to argue

21  that.  We are going to argue we represented Retrophin and we

22  represented MSMB.

23            But going back to my point, there were with other

24  cases we found.  One was W.R. Grace, which is out of the

25  District of Montana.  And when I say we searched wide and far,

*Proceedings* 54

1    we did, Your Honor, we went to the District of Montana cases.

2    And W.R. Grace, which is a multipage, complicated opinion with

3    many, many defendants, at the end said that Defendant Stringer

4    was a lawyer and Stringer was going to assert that the other

5    codefendants were wrong, that he was in-house counsel and he

6    was going to say the other codefendants, what their defenses

7    were were incorrect, were wrong and there was adversity and

8    mutual antagonism, and so Stringer was severed, the attorney

9    was severed.

10          The other third case we found was the Mark Bellman

11   case.  You may remember Tyco executives were charged with

12   crimes, and the government also charged Mark Bellman and

13   outside counsel with crimes.  But what the government did in

14   that case was they separated the indictments.  They never

15   charged Mark Bellman with the Tyco executives.  And that's

16   what should have happened in this case but it didn't.

17          Why it's so rare Your Honor, is that in this case,

18   it is going to be extraordinarily difficult for either

19   Mr. Greebel or Mr. Shkreli to get a fair trial when we are

20   going to allege he's guilty.  Unquestionably, Mr. Brafman is

21   going to argue our client is the actual deceiver, once we do

22   that.  And then every piece of evidence, every witness will be

23   cross-examined with that in mind.  Every cross-examination

24   will take longer, every opening statement will take longer.

25   We will have to call witnesses we wouldn't in a trial without

*Proceedings*                                                            55

1  Mr. Shkreli to undermine and undercut Mr. Shkreli's

2  credibility.  We will cross-examine Mr. Shkreli, should he

3  take the witness stand, with not just, not just the waived

4  privileged documents from MSMB and Retrophin, but we are going

5  to cross-examine him with all the information, the

6  confidential information that Mr. Shkreli conveyed about his

7  life and about who he is as a person and about anything else

8  that he did at Retrophin and MSMB when he was talking to

9  counsel for MSMB and counsel for Retrophin, Mr. Greebel, and I

10 submit to Your Honor --

11          THE COURT:  So your expert's affidavit that you

12 provided recently simply raises the issue of Mr. Greebel's

13 ability to do that because of attorney/client confidences is

14 really not correct, right, because Mr. Shkreli has waived his

15 privilege and Mr. Greebel would be free to reveal those

16 confidences, as you just asserted he would, or elicit having

17 this recording what would otherwise be protected by the

18 attorney/client privilege, but your expert's affidavit relies

19 in part on the ethical obligations that Mr. Greebel might

20 still withhold.

21          MR. BRODSKY:  Mr. Greebel has learned things outside

22 of MSMB and outside of Retrophin.  Remember Mr. Greebel was

23 representing Retrophin and MSMB over a long period of time.

24 Retrophin has not waived the privileges to everything.  They

25 waived the privileges to a series of narrow areas.  But there

*Proceedings*                                                    56

1   are other areas of representation where we learned information

2   where the privilege has not been waived.  And the MSMB is a

3   similar situation.  We waived all his privileges to MSMB, but

4   those documents don't contain all conversations.  And so when

5   Your Honor asked a very wise question, whether the

6   government -- whether Mr. Greebel will have evidence that the

7   government doesn't have, I respectfully submit we will.

8          Let me give you an example.  I will try to be

9   general because, Your Honor, we have a constitutional right,

10  and in footnote 2 of our principle motion, we lay out the case

11  law for it.  We have a constitutional right not to reveal all

12  our defenses.

13         THE COURT:  But isn't there reciprocal discovery

14  obligations?  Shouldn't they be providing at least documents

15  to the government?  They have served requests on the defense

16  for reasonable discovery.

17         MR. BRODSKY:  Sure.  We had documents --

18         THE COURT:  So you are going provide those

19  documents.

20         MR. BRODSKY:  I'm glad you raise that, Your Honor.

21  Defendant always has reciprocal discovery obligations, if they

22  intend to call witnesses affirmatively in their defense, and

23  they have documents in their possession, they should

24  affirmatively show them.  Right now we have not -- and we're

25  not sitting on documents, and the defense does not have an

1   obligation to disclose to the government what's in Mr. Greebel

2   head and the information he has.

3           THE COURT:  We're not talking about that, we're

4   talking about documents that you just talked about that you

5   were going to present those at a trial.

6           MR. BRODSKY:  Correct.

7           THE COURT:  I think whether or not Mr. Greebel is

8   tried separately or together with Mr. Shkreli would intend to

9   present documents that the government hasn't yet seen, and my

10  question is a very simple, when are you going to provide those

11  documents?

12          MR. BRODSKY:  If we have documents --

13          THE COURT:  You said you did.

14          MR. BRODSKY:  What I meant, Your Honor, I'm sorry,

15  let me be clear.  The documents we intend to introduce and

16  cross-examine Mr. Shkreli about came in the discovery from the

17  government.  And what the government produced was information

18  that they probably do not understand or realize with

19  respect -- because Mr. Greebel represented Retrophin and MSMB,

20  he has knowledge in his possession regarding communications

21  that the government doesn't have.  We have identified records

22  that Mr. Shkreli, for example, submitted to the SEC that are

23  false.

24          The government has never identified them.  We don't

25  believe the government knows about them.  We have been able to

1    identify them because for a period of time from -- you may

2    remember the deputy general counsel of Katten came in here and

3    said it started in or about mid-2013, Katten started

4    representing MSMB and representing Martin Shkreli before the

5    SEC, there was a partner who was a former federal prosecutor

6    from the Southern District of New York, and quite a capable

7    and brilliant lawyer, starting representing Mr. Shkreli in

8    connection with producing documents to the SEC starting in

9    about mid-2013.  And we have identified documents that we know

10   based on the communications between Katten and Mr. Shkreli and

11   MSMB that were fictitious.  We will cross-examine Mr. Shkreli

12   about it.  The government, we believe, have no reason to

13   believe that they know about them.

14            We also believe that we can prove Mr. Shkreli

15   engaged in trading that was illegal.  Now, we don't believe

16   the government knows about that.  It's not a charged crime.

17   But undoubtedly, if Mr. Shkreli takes that stand and he takes

18   the position, which his defense will be, that he acted in good

19   faith when he communicated with Mr. Greebel, he will

20   cross-examine him about his trading.  And we will show that

21   his trading in certain respects was not lawful, and that will

22   undermine his credibility.  But that's evidence the government

23   will be unable to obtain, because Mr. Greebel, they can't talk

24   to Mr. Greebel.

25            And, Your Honor, I want to back up one step.

*Proceedings*                                                    59

1    Besides additional evidence that we intend to offer that the

2    government doesn't have that will come out in

3    cross-examination, the case law is clear, if there's mutual

4    antagonism, genuine mutual antagonism, I'm not talking about

5    finger pointing, which is all the cases when you see finger

6    pointing where two defendants get up and say, hey, I'm

7    innocent, I don't know what's in that bag, I never knew.  And

8    the codefendant in Zafiro says, hey, I didn't know what was in

9    this bag, that was his bag.  And both say I never intended to

10   commit a crime and I don't know what's in the bag.  That's two

11   defendants who are saying I'm innocent and that bag's not

12   mine.  But they're not saying their codefendant is guilty, and

13   they're not saying their codefendant is a liar and a deceiver.

14           This is the extraordinary rare incident where we

15   will, and where defenses are generally mutually

16   irreconcilable, where if they accept our defense, I don't see

17   how the government can argue, if they accept Mr. Greebel's

18   defense that Mr. Shkreli's a liar and a deceiver, and that he

19   lied about the assets under management at MSMB, and they

20   ignored completely the government's evidence, they don't

21   believe the government's witnesses, but they believe our

22   evidence, they will find Mr. Shkreli guilty of crimes.

23           And that is classic quintessential, and that's

24   exactly the words that Judge Spatt used, quintessential

25   antagonism between two defendants.  And, Your Honor, I

*Proceedings*                                                             60

1   understand the case law and I recognize that there's a default

2   in favor of joint trials.  There's a default in the sense of

3   judicial economy.  There's a default that says, look, the

4   government's evidence is principally going to be the same

5   against Mr. Greebel and Mr. Shkreli, so why shouldn't we have

6   one trial?  Why shouldn't we just allow the witness -- why

7   should we allow a witness, Mr. Rosenfeld, for example if they

8   call him, why shouldn't we have Mr. Rosenfeld testify at one

9   trial and then another trial?  Why should that be?  We should

10  we have any government agent stand up in one trial and another

11  trial?

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    61

1           MR. BRODSKY:  But the Third Circuit I thought put

2    it best in the United States versus Bacha.  And certainly the

3    Supreme Court has said it, Justice Stevens said it in his

4    concurring opinion in *Zafiro*, quote, no defendant should ever

5    be deprived of a fair trial because it is easier or more

6    economical for the government to try several defendants in

7    one trial rather than protracted multiple trials.  W.R.

8    Grace, at the end of the decision, said the same thing.  That

9    fundamentally, at the end of the day judicial economy, when

10   it bumps up against due process and fairness, due process and

11   fairness wins.

12           THE COURT:  What fundamental trial right do you

13   believe is going to be comprised by the joint trial?  I think

14   that's one thing that was raised in the government's papers

15   that you haven't identified.  You've said it --

16           MR. BRODSKY:  Yes, Your Honor.

17           THE COURT:  -- you haven't really identified and

18   explained that position.

19           MR. BRODSKY:  I thank Your Honor for raising that.

20   In our reply brief, which I would like us to turn to in our

21   reply brief -- first, Your Honor, may I say that the case law

22   says that it is a legally cognizable prejudice.

23           THE COURT:  I beg your pardon?

24           MR. BRODSKY:  The case law, Your Honor --

25           THE COURT:  Yes.

*Proceedings*                                                          62

1          MR. BRODSKY:  -- says that when there is mutual

2    antagonism and it's inherently, quintessentially

3    irreconcilable it's legally cognizable, so you don't go to the

4    next step.  And, Your Honor, I quote Your Honor in *United*

5    *States* versus *Faltine*, where you made I think the wise

6    statement, I've said that, but let me -- let's assume for the

7    sake of argument that if you have quintessentially

8    irreconcilable defenses, what is the prejudice?  So we tried

9    to lay out some examples of them.

10         Stepping back for one minute, can you imagine the

11   prejudice to the jury if I argue in my opening that

12   Mr. Shkreli is guilty, the government of course has already

13   opened and argued Mr. Shkreli is guilty, and then

14   Mr. Greebel -- Mr. Shkreli's counsel gets up and says my

15   client, Mr. Greebel is the deceiver and my entire opening

16   should be thrown out.  What the case law says is that's two

17   defendants -- when a co-defendant faces an extra prosecutor in

18   the room, there's inherent prejudice, substantial prejudice.

19   And it's absolutely here.

20         And so, I mean we cite a number of cases including

21   Justice Stevens when he said the existence of this extra

22   prosecutor is particularly troublesome because the defense

23   counsel are not always held to the same limitations and the

24   standards.  We will hold ourselves to the same standards, but

25   when we get before the jury and we are argue Mr. Shkreli's

*Proceedings*                                                                    63

1    guilty and Mr. Shkreli blames us and says that Mr. Greebel is

2    the problem, often what juries do -- and this is just a

3    reality of nature of the way we know how the human mind works,

4    common sense, is the government will stand there and go they

5    are both guilty.  We will get up and say the other guy is

6    guilty and there are two people pointing their finger at

7    themselves saying they are each guilty.  What the jury will

8    say is they're all guilty.  And that possible risk is a risk

9    too great to bear.  And that's what the case law says, so

10   that's one, we'll both be extra prosecutors and we cite the

11   *Zafiro* case and *the Copeland* case in support of that.

12         There will be opening statements, again, that we

13   both attack each other.  On page 9 -- and I was citing on page

14   8.  On page 9, juries unjustifiably infer that antagonism

15   proves guilt.  We cite a number of cases standing for the

16   proposition where there is antagonism such that the two

17   defendants go -- I'm talking about going at each other on

18   everything and argue with each other on material points that

19   they're both lying and deceiving each other, that is

20   substantial prejudice and I don't think the government could

21   reasonably deny that.  No jury instruction can cure that.

22         Next, when co-defendants seek to mutually destroy

23   each other, their cross-examinations and their motions change.

24   We will call witnesses that we would not ordinarily call in a

25   trial just against Mr. Greebel.  Because we will have to spend

1   time focused on Mr. Shkreli and his defense.

2            Joinder may chill a defendant's right to testify.  I

3   don't see how that can't be true in this case.  And I think

4   that that is potentially -- we only want to do the trial once,

5   Your Honor.  We do not want to go to trial with Mr. Shkreli

6   and then have the Court of Appeals find that there should have

7   been severance.  What we want to do is we want to have one

8   trial and Mr. Shkreli will be able to argue, if he's found

9   guilty and he doesn't take the witness stand, that his right

10  to testify was chilled because he knew Evan Greebel had more

11  confidential, privileged information in his head that hadn't

12  been waived by MSMB or if MSMB has waived everything, hasn't

13  been waived by Retrophin.  And that Evan Greebel has

14  information in his head that even if there is a privileged

15  waiver, there were communications between Mr. Greebel and

16  Mr. Shkreli that only the two of them participated in.  Since

17  the government can't talk to Mr. Greebel, only Mr. Greebel

18  knows about them.

19           And so if we have a document where we know it's a

20  lie, the government doesn't know because all they have is the

21  email communication, but we have Mr. Greebel's advice and

22  knowledge and we can prove it's a lie, we will be able to

23  cross examine Mr. Shkreli about it.  And we have a hard time

24  believing that Mr. Shkreli will be able to take the stand

25  knowing we have all of this information and we, as lawyers,

*Proceedings*                                                    65

1  will be duty bound to do it.  We will be duty bound to destroy

2  Mr. Shkreli's credibility, because if he is found credible,

3  then our client is at risk that if the jury accepts the

4  alleged conduct as criminal and they accept Mr. Shkreli's

5  credibility, then we have a problem.  Because the jury will

6  potentially find -- I have a hard time saying it knowing my

7  client and knowing the evidence -- potentially find our

8  client, I would say, mistakenly guilty.

9          We raised other problems, Your Honor, on page 10.

10          THE COURT:  I've read that.  Okay, thank you.

11          MR. BRODSKY:  I did want to answer Your Honor's

12  other -- your other point.  You had a great question, Your

13  Honor, which is the government's hypotheticals and I'm glad

14  you raised it, because we in our brief try to outline the

15  fundamental problem with the government's theory.

16          First, there is no case they cite for the theory

17  that if we can come up with a hypothetical scenario,

18  speculating as to what the jury may do, then severance is

19  denied.  And the reason for that is two of their theories.

20  Their first theory -- and I think we should go through each

21  one.  Their first theory --

22          THE COURT:  I think they are trying to address your

23  mutually antagonistic defense argument --

24          MR. BRODSKY:  Yes, I agree, Your Honor.

25          THE COURT:  -- and trying to show why the jury would

1   not be able to find one defendant guilty if the jury accepts

2   the other's defense.  That was the point.

3           MR. BRODSKY:  Yes, Your Honor.  And what I'd like to

4   do is turn in our reply brief to where we laid out, I believe,

5   our view on page 15 of our reply brief, docket number 170, why

6   if Your Honor accepts the government's principle and the

7   government's approach, there will never be a severance ever

8   and that cannot be the standard.

9           The reason why is their first theory and their

10  fourth theory is that, quote, the jury may -- and I'll just

11  quote the relevant section -- also acquit Greebel because the

12  government did not meet its burden.

13          And then their fourth theory says, quote, the jury

14  may dot, dot, dot, also acquit Shkreli because the government

15  did not meet its burden.  Those are the government's first and

16  fourth theories as to why severance is not permissible.

17          I ask you, Your Honor, if the government can say

18  that and get out from under severance, then there will never

19  be a severance because the government can always stand in this

20  courtroom and always offer Your Honor we may not meet our

21  burden and if we don't meet our burden, then there can't be

22  severance.

23          So their first and second arguments -- their first

24  and fourth arguments essentially ask Your Honor to do the

25  following:  They ask Your Honor to conclude that if the

*Proceedings*                                                    67

1   government can say that if there's a theoretical possibility

2   that you might be able to get a fair trial, theoretical, then

3   both defendants could possibly be acquitted and we should deny

4   severance, and that fundamentally violates the constitution

5   and that violates due process and that violates inherent

6   fairness.  So their first and fourth theories should be

7   withdrawn, respectfully.

8            Their next theory that they have, Your Honor, that

9   we address is on page -- again, 15 -- I'm sorry, their second

10  and third theories are the ones where the burden of proving

11  the case they say they don't have the burden of proving the

12  case.

13           Their first theory is that they say the jury might

14  accept Mr. Shkreli's reliance on the advice of counsel defense

15  but find that Mr. Greebel was simply neglectful.

16           Now I ask Your Honor which party in this case is

17  going to argue Mr. Greebel was neglectful?  Not the

18  government, they are arguing he acted intentionally, wrong.

19  Not Mr. Greebel because we're going to say we took actions

20  based on the information we were provided and they charged us

21  with a conspiracy, a meeting of the minds between two guilty

22  people with a corrupt intent.  If we're able to show that we

23  weren't given full information, that we were deceived, we

24  weren't given material information, then there is no meeting

25  of the minds, there's no conspiracy and so we are not going to

1   argue ever that Mr. Greebel is neglectful.

2          And Mr. Shkreli, you heard his defense, he acted in

3   good faith relying on communications with Mr. Greebel.  He's

4   not going to argue Mr. Greebel was neglectful.  So we have a

5   theory with nobody arguing it and so that is pure speculation

6   and if the jury did that, they'd be violating their oath and

7   their jury instructions which is not to take some theory, not

8   to take some evidence that's not in the record and draw a

9   conclusion.  So that theory should be withdrawn.

10         Their fourth theory is that the jury might accept

11  our defense that Shkreli lied and deceived him.  But they

12  might acquit Shkreli, quote, because Shkreli was simply

13  passing along misinformation from another source and did not

14  have the intent to commit a crime.

15         I'd like to know who's going to say that when it

16  came to MSMB's assets under management Mr. Shkreli, who was

17  the head of MSMB, who was doing all the trading, who was

18  responsible for the assets, received information about the

19  assets from somebody else.  I'd like to know who they think

20  Mr. Shkreli is going to point a finger to when they ask him

21  about he's the founder and CEO of Retrophin.  It has about

22  five, seven, eight employees, they basically all report to

23  him.  We're talking about a company that was founded and

24  originated in the mind of Mr. Shkreli.  And, yes, it's now

25  nearly a billion dollar company, but at the time in 2012 it

*Proceedings*                                                      69

1   was a nothing.  The shares were worth nothing.  And so the

2   idea that in 2012, 2013, Mr. Shkreli is going to take a

3   defense that he's going to say, I didn't know what assets were

4   under MSMB is simply speculation and untrue.

5              And, Your Honor, we laid out in our brief in detail

6   in our motion -- and I understand why Mr. Brafman might have

7   been upset about it, if I were representing his client I would

8   be as well -- but we laid out in our brief evidence that's not

9   in the indictment, evidence that's completely admissible at

10  trial and it's evidence that are email communications where

11  they are proactive, affirmative lies.  The same lies the

12  government alleges were made -- that Mr. Shkreli made against

13  investors.  And we laid out it in our motion papers on

14  page 11, our first example, 11 and 12.  And the government has

15  not disputed it's a lie.  They're not coming forward and

16  saying, oh, that wasn't a lie to Mr. Greebel.  They're not --

17  they are ignoring it.  They are essentially saying, oh, there

18  might be evidentiary obstacles to Mr. Greebel's defense.

19  There are no evidentiary obstacles to that.  And we're going

20  to be able to prove, through all of those admissible email

21  communications, that Mr. Greebel directly asked in connection

22  with his representation of MSMB for activism work not for fund

23  formation, not for investor relations, not for communications

24  with others, but Mr. Greebel, on behalf of Katten and other

25  lawyers representing MSMB entities, was representing MSMB in

1   connection with activism work and the government has

2   acknowledged and conceded that.  They say in connection with

3   MSMB Capital and MSMB Healthcare, Mr. Greebel was not doing

4   fund formation work or doing investor relations, wasn't

5   participating in any alleged misrepresentations.  But we lay

6   out the emails in October of 2011 in connection with a

7   disclosure to the SEC regarding a proxy solicitation regarding

8   activism, that MSMB was taking an activist position with a

9   publicly traded entity.  They had to fill out a proxy

10  solicitation form and Mr. Greebel was directly asking him,

11  what is your assets under management.  What is your AUM?  And

12  undeniably, indisputably, and the government cannot dispute it

13  because they allege the same lie, Mr. Shkreli responded 40M

14  meaning $40 million.  Mr. Greebel had no idea it was a lie,

15  absolutely no idea according to the government and we agree.

16  He just started representing MSMB in the summer of 2011.  So

17  just a few months into the representation Mr. Shkreli lies to

18  him directly with a 40 million-dollar number.  The

19  government's evidence shows, and we will -- if the government

20  doesn't admit it we will, that he didn't have $40 million of

21  assets under management then.  And this is how the

22  relationship starts, a material lie about the assets under

23  management at MSMB in October of 2011.

24          And I tell, Your Honor, I tell you in good faith,

25  full proffer, it's not the first lie.  We know based on all

1   the discovery we received from the government, and based on

2   what Mr. Greebel was personally told by Mr. Shkreli, there are

3   many other lies.  And you can't look at the email and identify

4   the lie, but we can identify the lie because it is

5   inconsistent with what Mr. Greebel was told.

6           And Mr. Greebel follows up with questions about, I'm

7   going to make this statement to the SEC, is this accurate?

8   And Mr. Shkreli changes the statement to put approximately in

9   front of $40 million in assets under management.  Another lie.

10          Those documents are admissible and when we call

11  Mr. Greebel to the stand and, Your Honor, we have every intent

12  to do it, we put in -- and I heard Your Honor's statement

13  regarding an affidavit and I take your point, Your Honor, when

14  we looked at the case law, when we looked at the *United States*

15  versus *Paul* case, we looked at the *United States* versus *Scully*

16  case, we never saw a single incident, except for one case the

17  government cites, where the defendant voluntarily, on his own,

18  decided to take the witness stand in an evidentiary proceeding

19  before trial.  We haven't seen a single incident where anybody

20  has required a defendant to get on the witness stand and offer

21  up what their defense is and the reason for that is because it

22  is unconstitutional, I'll just say it.  I violates the Fifth

23  Amendment to force the defendant to take the witness stand if

24  they don't want to voluntarily do it.

25          And there's good reason for that.  And in

*Proceedings*                                                                 72

1    suppression hearings in this courthouse, in federal

2    courthouses across the country when there are suppression

3    hearings, the government never can call the defendant to

4    testify.  The defendant often takes the stand, no question,

5    and their statements can't be used against them.  I'm not so

6    sure it's true in a Rule 104 evidentiary hearing, but even

7    assuming it's true, the government sits there and listens to

8    Mr. Shkreli make statements and learns from that.  But that's

9    not my argument and we put in a submission, Your Honor, which

10   I can address why we did it.

11            The second -- why is it important that we can prove

12   a lie on MSMB?  And I think it's important, Your Honor, that

13   the government may stand up and say, well, that relates to

14   Counts One through Six, that has nothing to do with the next

15   count.  Why doesn't it have anything to do with Count Seven?

16   Notably, Your Honor, the government seems to take

17   contradictory positions.  On the one hand in many of their

18   papers they say that Mr. Greebel had nothing to do with Counts

19   One through Six, absolutely nothing.  He wasn't involved in

20   the hedge fund scheme charged in Counts One through Six in

21   terms of assets under management, but then they morph over on

22   the other hand and say, wait a second, he orchestrated it

23   because it's in paragraph 7.  He orchestrated Counts One

24   through Six they didn't charge him.  And how did he do that?

25   Well, he was involved, they say -- this is what they allege,

*Proceedings*                                                                73

1    that he was involved in backdating stock transfer agreements

2    in or about November of 2012.

3           Your Honor, imagine Mr. Greebel -- put aside the

4    fact that the government didn't have this evidence because the

5    evidence about the lie of $40 million came out after

6    indictment, after the waiver of privilege, so the government

7    didn't have this information.  Imagine Mr. Greebel, he's under

8    the impression that MSMB Capital has $40 million under

9    management.  We're heading into the fall of 2012.  Mr. Shkreli

10   is asking him to do some stock transfer agreements between

11   private parties relating to MSMB Capital having stock in

12   Retrophin.  If Mr. Greebel, in good faith believes, and we've

13   proven it, that MSMB Capital has $40 million, that changes the

14   entire perception of the government's theory.

15          Now the government's theory is that Mr. Shkreli in

16   October -- on or about October 4th, 2012 gets a subpoena from

17   the SEC and on his own, without counsel, without Katten as

18   counsel without, as far as we know, any counsel, does

19   something that nobody does.  Does something that nobody does

20   when he voluntarily came to the Eastern District of New York

21   to talk to Mr. Paes and his colleagues.  I haven't heard

22   anybody do that ever.  It never happened when I was in the

23   Southern District of New York, but Mr. Shkreli did that.  He

24   received the subpoena in October 2012 and he voluntarily, on

25   his own, without telling anybody, responds.

*Proceedings*                                                       74

1          And the government says he lied.  They said he lied

2    about the assets under management and, you know what, we

3    agree.  We didn't know about it, we never knew about that lie

4    but we learned about it later and we agree now that it is a

5    lie.  Why did we learn about it later?  We got the discovery

6    that he was lying about MSMB Capital and all the assets under

7    management, but the government's theory is that he lies to the

8    SEC, Mr. Shkreli, about the assets under management and after

9    lying he now needs to create some assets at MSMB Capital.  So

10   what does he do?  He arranges some stock transfers, they say,

11   made up, totally backdated in order to get assets to MSMB

12   Capital.

13          Now, assuming that theory is true, that's charged in

14   connection with the Retrophin scheme.  It's not charged in

15   connection with Counts One through Six.  The government can

16   try to go back and try to amend the indictment, but that's not

17   what the indictment says.  It's charged in Count Seven.

18          If, Your Honor, you take the standpoint of

19   Mr. Greebel, who doesn't know about the SEC subpoena, who has

20   no idea that Mr. Shkreli has lied to the SEC about the assets

21   under management at MSMB Capital and he actually believes

22   Mr. Greebel, based on lies told by Mr. Shkreli that MSMB

23   Capital has $40 million under management, then doesn't that

24   paint a completely different portrait of the conduct and

25   doesn't that exonerate our client from guilt and that is what

*Proceedings*                                                          75

1   we are going to argue at trial.  And to do that we need to

2   argue and establish that Mr. Shkreli lied about the assets

3   under management at MSMB and we're going to prove that and

4   we're going to do that.

5           We need to prove that Mr. Shkreli never told anybody

6   about that SEC subpoena.  We're going to do that.  We need to

7   prove that Mr. Shkreli on his own made up those lies.  We're

8   going to do that.  We need to prove that in the fall of 2012

9   it's not the only lie that Mr. Shkreli told Mr. Greebel and

10  we're going to do that too.  So that's the significance of

11  that lie.

12          We also, Your Honor, laid out evidence and, again,

13  this is in our motion brief on pages 13, 14 and 15, through

14  email communications the lie about a board member's loan.

15  Mr. Richardson was on the board at the time and Mr. Shkreli

16  communicated to him and said to Mr. Richardson, without

17  Mr. Greebel being on the communication, we need money and they

18  agreed that it was going to be a loan.  In separate

19  communications, Mr. Greebel, in connection with SEC filings

20  for Retrophin, was asking, as a good attorney would do, what

21  are your loans?  We need to report these loans, if you have

22  loans to Retrophin.  And what Mr. Shkreli did was lie.  He

23  turned Mr. Richardson's loan into an equity investment.

24          Now why do we care?  What does that have to do with

25  the case?  The government is saying that Mr. Greebel is

*Proceedings*                                                    76

1    responsible for the capitalization table.  The government is

2    saying that Mr. Greebel knows everything that is going on the

3    in the cap table.  He knows when there are a lies with respect

4    to the cap table, he controlled it, that's the government

5    theory.  If we're able to show, which this is one example of

6    many, that Mr. Greebel was lied to in connection with what's

7    an equity investment versus a loan, then it destroys the cap

8    table.  The cap table should not have reflected

9    Mr. Richardson's loan.  Mr. Shkreli lied to Mr. Greebel and

10   called it an equity investment; a total lie.  We're going to

11   prove that in court.

12          Then, Your Honor, in connection with that, the

13   government also alleges that Mr. Greebel and Mr. Shkreli were

14   not reporting what's true to the board.  Well, Mr. Greebel, in

15   email communications to Mr. Shkreli in connection with

16   Mr. Richardson, said you must report all loans to the board.

17   You have to, it's SEC's -- you have to disclose it.  And that

18   is another lie that we will say -- we will say that he turns

19   it into an equity investment unbeknownst to our client.

20          We then make out the following lie, Your Honor, it's

21   the third example -- and, again, the government hasn't

22   disputed any of this in their papers, page 15 and 16, all

23   these documents are admissible.  They're business records and

24   they're also records, Your Honor, that go to state of mind and

25   they are also statements that we're going to offer not for the

1   truth.  They are lies.  We don't need to offer them for the

2   truth, in fact, we're going to argue they're lies.  But with

3   respect to our third example, specific example we have

4   Mr. Shkreli lying to Mr. Greebel and Katten Muchin about

5   repaying a loan of $770,000 he says so that -- Mr. Shkreli

6   tells a partner at Katten and Mr. Greebel that he's going to

7   imminently repay the money and that they should tell that to

8   the SEC.  This other very prominent, former federal prosecutor

9   based on the information provided by Mr. Shkreli tells the SEC

10   what Mr. Shkreli told them.  And we've learned from the

11   discovery, from the Bank of America records that over a year

12   later those records show exactly when the transfer was made

13   and the transfer was not made when Mr. Shkreli told the Katten

14   Muchin partner, other than Mr. Greebel, and that Katten Muchin

15   partner conveyed it to the SEC.

16           Why is that relevant?  The government says they are

17   going to introduce evidence or they implied that Mr. Shkreli

18   obstructed the SEC investigation.  If they don't introduce it,

19   we are.  If they don't introduce evidence that Mr. Shkreli

20   lied to the SEC, we're going to do it.  If they don't

21   introduce evidence that he obstructed, through this lie to

22   this Katten partner, we're going to do.  And even if they do

23   it we're going to stand up and completely agree.  We're going

24   to be an echo chamber with the government in terms of

25   Mr. Shkreli's lies.

*Proceedings*                                                          78

1        We also submitted, Your Honor, a sworn declaration

2   laying out on Count Seven and Eight, that's where we are

3   charged, that we are -- I proffered to you in good faith not

4   only are those lies material to Seven and Eight, because as

5   the government says they are interrelated alleged schemes, if

6   we can prove lies about MSMB, we can prove the whole lies

7   flowing through.

8        I don't want to lay out all the evidence on Seven

9   and Eight, but we are going to prove that on the very material

10  points he didn't tell Mr. Greebel material information, on

11  very material points he lied to him and he deceived him.

12  That's going to be very important.

13       If the government's theory, again, is that

14  Mr. Greebel's legal advice or his communications were part of

15  a criminal conspiracy, we're going to show that there was no

16  meeting of the minds because Mr. Greebel was lied to.

17       I'm trying to see whether Your Honor has additional

18  questions that you wanted to address.  I think I addressed the

19  government's scenarios.  I did want to go back over a little

20  bit of some of Mr. Brafman's unfortunate statements regarding

21  our client.

22       THE COURT:  I think he was making the opposite

23  argument that your client made unfortunate statements about

24  his client.

25       MR. BRODSKY:  Right.  And I want to clear up from

1    our perspective what -- because that's important to us.

2    Mr. Greebel did not make a single misstatement after his

3    arrest.  There's no lie there.  And I know Mr. Brafman is

4    going to stand up before the jury and argue it was, well it's

5    an outrageous -- it's absolutely outrageous.

6            Mr. Greebel didn't know ever he was a subject of a

7    criminal investigation.  So he's woken out of his bed,

8    standard operating procedure for the FBI, I'm not criticizing

9    them, multiple FBI agents driving into a house, you know, this

10   is what the FBI does.  I worked for the government, I

11   understand they must care for their safety.  They grab the

12   person that they're going to grab and arrest, standard

13   operating procedure.  They bring him over to get

14   fingerprinted.  Mr. Greebel repeatedly asks in this condition,

15   in front of his family he's arrested, fine, that's procedure.

16   He didn't know at all he's under investigation for this.  He

17   goes down to get arrested and they put him in a room, of

18   course, they have handcuffs on him and they ask him a series

19   of questions.  And one he asks for the indictment and the

20   charges and they don't give it to him.  He asks for a lawyer

21   several times and they don't -- they ignore him.  Now he's a

22   lawyer and he doesn't -- he didn't do anything wrong so he's

23   answering the questions.  We're not moving to suppress the

24   statements, Your Honor.  You didn't get a motion from us to

25   suppress the statements.  Even though they asked him,

*Proceedings*                                          80

1   repeatedly, he asked for lawyer and they ignored him and kept

2   going, we're not moving to suppress the statements.  We

3   believe those statements were accurate.

4           He was asked a series of questions, he answered

5   them, but in the context of not even knowing why he was

6   arrested, they wouldn't tell him, they asked him about his

7   role.  At one point the FBI agent in the quote in the

8   government's brief, the FBI agent asks him if he's the general

9   counsel to Retrophin.  And if you look at that -- I just found

10  it absolutely remarkable.  This is the quote from the

11  government's brief.  On page 15 of the government's brief the

12  FBI agent said, all right, so now you're the general counsel

13  for Retrophin.  And Mr. Greebel says no.  And the FBI agent

14  says what's it called, sorry?  And Mr. Greebel says, I'm a

15  lawyer for the company, I don't work for the company.  And the

16  FBI agent says I was thinking outside general counsel.  And

17  Mr. Greebel goes nope.  Okay, so you're a lawyer that works

18  for your own company but you're consulting for Retrophin?  And

19  he says no, no, no.  This is an FBI agent who is either trying

20  to pretend he doesn't have any knowledge or misunderstanding

21  that Mr. Greebel is outside counsel for Retrophin and works

22  for Katten.  And that's all Mr. Greebel was doing in trying to

23  explain that.

24          When Mr. Greebel was asked about board meetings he

25  says, I participate by phone, I've been there twice.  All

1    true.  He doesn't know who else is in the room, if they

2    participate and he's by phone.  And so I don't -- I understand

3    Mr. Brafman is going to accuse him of false exculpatories in

4    connection with his post arrest statements, we're prepared to

5    defend each and every answer and we welcome the government

6    putting that into evidence because we believe it's true and we

7    think it will show very well what happened here.

8                THE COURT:  Does he take the position that the board

9    at Retrophin approved the consulting agreements and the loan

10   agreements?

11               MR. BRODSKY:  Well, Your Honor, there's the

12   settlement agreements.

13               THE COURT:  The settlement agreements, excuse me.

14               MR. BRODSKY:  Right.  There's the settlement

15   agreements for a period of time and then there are consulting

16   agreements.

17               THE COURT:  Yes.

18               MR. BRODSKY:  I'm not telling you anything the

19   government doesn't know, I'm in a challenging position here,

20   Your Honor.

21               THE COURT:  Okay.

22               MR. BRODSKY:  A unique challenge.  Let me put it

23   this way --

24               THE COURT:  He was secretary, wasn't he?  Didn't he

25   attend all the board meetings?

*Proceedings*                                                    82

1          MR. BRODSKY:  He was not an officer or director of

2    the company.  When a company is small -- and we get this from

3    our experts, when a company is a private company and they're

4    extraordinarily small and they have five, 10 employees and

5    they have outside counsel.  The outside counsel will serve --

6    they don't have a general counsel, they don't have an in-house

7    counsel, that's usually who goes to a board meeting, takes

8    notes and says what's happened at the meeting.  Mr. Greebel

9    was outside counsel, but he served as the note taker.  Those

10   notes have been produced, those notes exist.  The government

11   has different views of those notes.  We have a problem with

12   their view of the notes.  We intend to prove their view is

13   wrong.

14          The arbitrator before the Rosenfeld arbitration, the

15   government produced the transcript from that arbitration.

16   Retrophin, in that case just to be clear, the government has

17   said Mr. Rosenfeld had a sham agreement with Retrophin.

18   Mr. Rosenfeld -- Retrophin said it was a sham agreement as

19   well.  So this happened in October 2014 after Mr. Shkreli is

20   removed as CEO of Retrophin.  Mr. Rosenfeld demanded the rest

21   of his payment pursuant to the contract and said this is a

22   real agreement, I want my money.  I provided advice, I

23   provided counsel, this is a real agreement.

24          The government again calls it a sham.  They

25   interviewed -- the disclosures that were made during --

*Proceedings*                                                    83

1    pursuant to Brady disclosures they interviewed Mr. Rosenfeld

2    and they didn't believe him.  Mr. Rosenfeld carried it through

3    to arbitration.  Retrophin represented themselves.  They had

4    Cooley representing them.  And they argued the board notes

5    were a sham and that this agreement was a sham.  This

6    arbitrator heard evidence from the testimony of Retrophin's

7    CEO, heard the testimony of multiple witnesses including

8    Mr. Rosenfeld and after a multi-day hearing with many

9    submissions of documents in evidence, completely rejected

10   Retrophin's theory that it was false and a sham and completely

11   accepted the theory of Mr. Rosenfeld that it was real.

12            Now, Your Honor asked the question, are we going to

13   argue that the board knew?  I will tell you this, Your Honor,

14   what the evidence shows from the transcript of Mr. Rosenfeld's

15   arbitration is Mr. Rosenfeld's lawyer argued that the SEC

16   filings at a certain point, I think it was 2013 or maybe it

17   was 2014 -- I don't know sitting here, but I believe it's

18   2013, SEC filings signed by the now CEO of Retrophin,

19   Mr. Aselage, reflected those settlement of payments and I

20   think Mr. Rosenfeld's lawyer argued that those -- although

21   Retrophin argued that the settlement agreements were unknown

22   to the board, what persuaded the arbitrator, one of things

23   that persuaded the arbitrator, including credibility judgments

24   that every judge makes or arbitrator makes, is the fact that

25   the SEC filings reflected the settlement agreements and the

*Proceedings*                                                84

1    fact that Mr. Aselage's testimony that he didn't remember ever

2    discussing these settlement agreements seemed inconsistent

3    with the fact that he signed SEC filings, which reflected the

4    settlement agreements.

5           So to answer your question, will there be evidence

6    that the settlement agreements were known to the board?  I'd

7    tell you, Your Honor, it can be undisputed given that they

8    were disclosed in SEC filings, that they were known to the

9    board at a certain point.

10          But in terms of Seven and Eight, we do have evidence

11   with respect to Seven and Eight.

12          THE COURT:  These were settling liabilities that

13   were not Retrophin's, right?  They were settling debts that

14   arose because of MSMB or Elea or the other failed funds.

15          MR. BRODSKY:  Well, let me give you another example

16   Mr. Rosenfeld argued.

17          THE COURT:  I don't know whether it's a matter of

18   whether they disclosed it but rather whether they were

19   settlement agreements of matters for which Retrophin should

20   have been paying.

21          MR. BRODSKY:  Correct.  No, that is definitely the

22   nub of a critical issue.  We will have evidence on that issue,

23   we believe the evidence completely exonerates us.  We do

24   believe the evidence in connection with those settlement

25   agreements and consulting agreements, without laying out our

1   defense, as much as I want to lay out our defense and I'd like

2   to do --

3          THE COURT:  No, I'm not asking you to do that.  I'm

4   just curious about some of the things that you've said.  I

5   understand that the arbitrator found with regard to

6   Rosenfeld --

7          MR. BRODSKY:  Yes.

8          THE COURT:  -- that that was a legitimate consulting

9   agreement.

10          MR. BRODSKY:  Correct.

11          THE COURT:  Are you taking that position with the

12   other consulting agreements?

13          MR. BRODSKY:  Without compromising our defenses, I'm

14   saying what Mr. Rosenfeld -- what was found in the Rosenfeld

15   arbitration.  I'm not saying necessarily that we are going to

16   take a certain position on it.  I don't want the government to

17   know and I also don't want Mr. Shkreli to know in case there's

18   a joint trial.

19          I do believe that our defenses on Seven and Eight

20   are impregnable.  In other words, there is undeniable

21   reasonable doubt.  We are going to affirmatively prove our

22   client's innocence and I believe -- I mean, look, Your Honor,

23   this was a mistake.  The government makes mistakes, they are

24   not -- you know, they are not immune from doing so.  They're

25   human beings like anybody else, it's not intentional but we

*Proceedings*                                                    86

1   are going to affirmatively prove our client is innocent and I
2   don't want to lay out, for either the government or
3   Mr. Shkreli, evidence that will enable them to think, oh, this
4   is what they're going to argue on that so I get to repel it.
5   Happy to submit it ex parte and in camera for Your Honor.
6           THE COURT:  No, that's all right.
7           MR. BRODSKY:  I do think you're right, to address
8   your point on the settlement agreements, and I don't think I'm
9   telling the government anything they don't know.  There are
10  settlement agreements and consulting agreements and, let's put
11  it this way, Your Honor, not every consulting agreement the
12  government thinks Mr. Greebel was the author of every one.
13  Let me give a little tidbit of our defense.  That's not true.
14  That is a hundred percent false and we're going to prove it.
15  The government doesn't know this and the government doesn't
16  know how we're going to prove it and when the government
17  opens, and I believe they will open and I believe they will
18  say all these consulting agreements were arranged by
19  Mr. Greebel, we're going to affirmatively prove that's not
20  true.  They don't know that, they don't know how and I don't
21  want to lay out how, but we're going to be able to do it I
22  tell you in good faith because of the lies Mr. Shkreli told.
23          We're going to be able to prove, Your Honor,
24  Mr. Shkreli told third parties that Mr. Greebel gave certain
25  advice.  He said Mr. Greebel did this, Mr. Greebel says that

*Proceedings*                                                    87

1    when it was untrue.  Untrue.  And so I know the government,

2    when they see an email and it says Mr. Greebel says this, they

3    shouldn't take it as necessarily true unless they have a

4    credible third-party witness, unrelated to Mr. Shkreli, who is

5    going to say it.

6           We're also going to prove that Mr. Shkreli was

7    provided advice by Mr. Greebel and then told the opposite to

8    others, and that's part of our defense.  And we have to do it,

9    Your Honor.  I understand -- I'm not defending Mr. Shkreli.

10   We're in the position we didn't choose to be in this position

11   and so in our principle, a core of our defense is to attack

12   his credibility and to go after him for lies and deception and

13   material omissions.  We have absolutely no choice to do it in

14   order to affirmatively prove our client's innocence.

15          THE COURT:  All right.  Thank you.

16          Mr. Brafman, are you ready to be heard or

17   Mr. Agnifilo?

18          MR. AGNIFILO:  One brief point, Your Honor.

19          THE COURT:  Yes, you're welcome to argue.

20          MR. AGNIFILO:  That's okay as long as Your Honor can

21   hear me okay.

22          THE COURT:  I can hear you.

23          MR. AGNIFILO:  Okay.  Your Honor a few minutes ago

24   used a phrase "specific trial right" and so I just wanted to

25   talk about that in two contexts and I think you made reference

*Proceedings*                                                    88

1    to one of the government's briefs.

2          Let me tackle the term head on.  In this case after

3    listening to what Mr. Brodsky just said and I think coming to

4    terms with the fact that Mr. Brodsky and his client don't have

5    any discovery obligation to us certainly in terms of the four

6    years of conversations that our client had with their client,

7    the specific trial right that comes to mind first is the

8    specific trial right of testifying in one's own defense.  The

9    rules normally, obviously, is before people get to say bad

10   things about you when you're a criminal defendant in open

11   court, there are pretrial procedures for such a thing.  Also,

12   in the normal case you don't have the person saying bad things

13   about you as someone who was functionally your lawyer for four

14   years, who you spoke to every day, on the weekends, at night.

15         I mean, one of the things that's referenced in the

16   emails is not only the communication by email but the ongoing

17   relationship that Martin Shkreli had with Evan Greebel.  And

18   so there is a -- unprecedented is a very strong word, but a

19   highly unusual situation that we're in, because we're being

20   told flat out in no uncertain terms that Mr. Shkreli's lawyer

21   has information that only Mr. Shkreli's lawyer knows and that

22   if Mr. Shkreli testifies in his own defense, Mr. Shkreli's

23   lawyer is going to use that information to cross examine him.

24         THE COURT:  You meant to say Mr. Brodsky.

25         MR. AGNIFILO:  Mr. Shkreli's lawyer at the time, I'm

*Proceedings*                                                            89

1    talking at the time.

2              THE COURT:  At the time.

3              MR. AGNIFILO:  Yes, I'm talking about Mr. Greebel.

4    I'll use proper names.

5              THE COURT:  I was thinking Mr. Brafman would not be

6    cross examining and you would not be cross examining

7    Mr. Shkreli, you're talking about his former --

8              MR. AGNIFILO:  Yes.  Mr. Greebel with whom he spoke

9    for four years about a variety of subjects.

10             And I think Your Honor made a very good point,

11   what's the relevance of $10 million.  It's a big number, but I

12   think what it shows is it's a lot of work, it's a lot of

13   communication, it's on a variety of subjects and if we have to

14   come to terms with the fact that it would be relevant,

15   anything would be relevant if it tended to show some measure

16   of deception, some measure of dishonesty.  I think to

17   Mr. Brafman's point earlier, A, we're going to get in a very

18   confusing situation with, well, does Mr. Brodsky really get to

19   cross examine Mr. Shkreli on that point, is that too

20   tangential.  And then -- this is really the specific trial

21   right that I think we're most concerned about, is we have to

22   take strong notice of the fact that if Mr. Shkreli decides to

23   defend himself and get up on that witness stand, we have no

24   way of knowing what's coming.  Not from our colleagues at the

25   government because there are rules regarding that, but from

*Proceedings*                                              90

1    our co-defendant.  And I think that's really the heart of the

2    problem.

3            And I think there are other specific trial rights

4    but if I had to identify one where I think the problem has

5    ripened to the point, you know, beyond speculation to a point

6    where it's tangible and real and really the product of how

7    defense lawyers make decisions and how a client makes a

8    decision on whether to get up on the witness and testify in

9    his own defense, we're there now.  I think we're clearly there

10   now after listening to Mr. Brodsky's presentation.

11           In the normal case I haven't cited to the rule but

12   obviously 404(b) we'd have hearings on this, we'd know what's

13   coming.  We just don't know what's coming and we have no way

14   under the discovery rules to know what's coming.  And so I

15   think it's going to have a clear chilling effect I think on

16   his right to get up and testify.  So that's the first thing I

17   wanted to say.

18           The other thing, and this is, I think, a little more

19   an esoteric point but I think it's worth making.  The

20   government, in their principal brief on severance on page 22

21   lays out a three-step process that they encourage Your Honor

22   to file, and I'll let Your Honor get there.

23           THE COURT:  Yes, I'm there.

24           MR. AGNIFILO:  I don't think the three-step process

25   is legally sound.  I think the first step of the three-step

*Proceedings*                                                            91

1   process is the totality of the law in this area and I say that

2   because the cases such as *Serpoosh* S-E-R-P-O-O-S-H and *United*

3   *States* versus *Tutino*, T-U-T-I-N-O, are Second Circuit cases

4   that really only talk about not just antagonism, because that

5   under Zafiro is not enough, but antagonism to the extent of

6   accepting one defense precludes the other.  So I think that in

7   a sense is a second independent trial right, so if we're

8   looking at the different trial rights that are at issue and I

9   think what the government has done and I think what they're

10  doing is they're trying to flesh these things out but they're

11  suggesting that they're elements almost of the overall

12  analysis, which I don't think is true, is to basically say

13  that there are two additional steps.  But I think at the end

14  of the day we see this certainly in *the Aronson* case, the

15  specific trial right that is the right at issue is to have a

16  jury decide your own fate without a mutually antagonistic

17  co-defendant in the courtroom.  Because if you look at *the*

18  *Aronson* decision, and it's a fairly thorough review of the

19  law, they don't talk about specific trial rights, they don't

20  talk about things like that, they talk about what's here in

21  the government's first of three points here and I think that's

22  the totality of the law.

23          But if Your Honor were looking for things called

24  specific trial rights, I think there are at least two, right

25  to testify in one's own defense and the right to have a jury

*Proceedings* 92

1  evaluate yourself without an antagonistic defendant sitting

2  alongside you.  Thank you, Your Honor.

3  THE COURT:  Did you want to be heard further on your

4  motion?

5  MR. BRAFMAN:  No, Your Honor.

6  THE COURT:  Thank you.  The government.

7  MS. SMITH:  Your Honor, I just want to briefly

8  address, there were three other arguments other than

9  antagonistic defenses that were raised by the defendants.

10  Mr. Brafman referenced one, the other two of the spillover

11  evidence and this idea that Shkreli will cause so much chaos

12  in the courtroom that it will deny Mr. Greebel a fair trial.

13  And I just want to touch on those.

14  I do believe that the antagonistic defenses is

15  really the meat of the severance motion and, frankly, where

16  the severance motion will be decided, but just to touch on

17  these others.  And before I address those arguments I just

18  want to note that Mr. Greebel, in his reply brief, attached

19  the declaration of the law professor, which we have two

20  objections to.

21  First, I don't know why it wasn't attached to the

22  moving brief because it's not really a reply, it's just a

23  further argument of the initial statements and if it was meant

24  to do that, then we should have had the opportunity to respond

25  to it.

1            But second and, more importantly, conclusions of law

2    are not an appropriate subject for expert testimony.  There is

3    plenty of black letter law on that.  I have *United States*

4    versus *Scott*, which is 946 F2d 135, which is a Second Circuit

5    case and then just, generally, McCormick on Evidence, Fifth

6    Edition, Section 12, which says that the Federal Rules of

7    Evidence do not permit opinion testimony on matters of law.

8            The declaration doesn't add anything to the brief

9    that's not already argued by counsel and what it seeks to do

10   is impermissibly step into the role of the Court and assume

11   the black robe, basically substituting the professor's

12   judgment for the judgment of the Court by doing the same thing

13   that Your Honor would do by looking at the facts and the

14   relevant law and reaching a decision about whether or not

15   there is sufficient prejudice to warrant a severance.  So I'm

16   just going to raise this now because Mr. Greebel also attaches

17   a similar declaration to the motion response in connection

18   with the hearing and I just kind of want to flag that now

19   because as a general matter it's our position that those are

20   inappropriate.

21           Then just briefly with respect to the chaos

22   argument, which Mr. Brafman touched on, it's our position that

23   many of the materials that were attached are not admissible,

24   as Your Honor noted.  There were kind of two buckets of

25   admissible statements which is what we discussed in our brief.

1   There were some public statements that Mr. Shkreli made that

2   directly relate to the case itself, and there may be some

3   public statements that go to credibility in terms of

4   truthfulness, but the vast majority are not admissible.  So

5   statements about that whether Mr. Shkreli insulted a

6   particular individual or group or expressed what might be

7   considered an unpopular opinion, he's not being tried in this

8   case for his public persona, he's being tried for the crimes

9   that he committed with respect to MSMB and Retrophin.  And

10  there is a good reason that cases are tried in criminal court

11  and not newspapers because the Federal Rules of Evidence apply

12  here and the vast majority of what was attached would not ever

13  come in at Court.  And we obviously have full confidence in

14  the Court's ability to kind of be a gatekeeper of those

15  materials.

16          And further, in kind of support of that argument

17  Greebel cited to one New York County case kind of -- for the

18  idea that if your co-defendant is so notorious you can't be

19  possibly tried with them, but in the Second Circuit there are

20  cases like Alloyd, and Gotti.  You know, John Gotti was

21  considered too notorious to have his co-defendants be tried

22  with him.  So the case law really shows this as argument I

23  think is not persuasive.

24          The same with the spillover prejudice argument.  I

25  know Your Honor has already mentioned it, but the two schemes

*Proceedings*                                                        95

1    are inextricably intertwined.  Most of the evidence I'm

2    hearing the defendants talk about would be admissible at a

3    trial, a joint trial as well as at separate trials and so I

4    don't think the spillover evidence argument is persuasive.

5              And I just want to touch on the *Bruton* argument

6    really quickly because I think it's a red herring.  As we said

7    in our brief and in the statement of facts that we set

8    forward, most of Mr. Shkreli's statements barely mention

9    Mr. Greebel.  It would be very simple to leave out those

10   sections or sanitize them.  Mr. Greebel's post arrest

11   statement obviously does mention Mr. Shkreli in many respects,

12   however, there are portions of it where he's discussing, we've

13   already talked about his role on the board, what his role was

14   with respect to Retrophin, and I think that those statements

15   could be separated out and sanitized.  Should the case

16   actually proceed to a joint trial, we could litigate those

17   issues, we'll obviously abide by the Court's determination and

18   if for some reason there is a statement that the government

19   would want to introduce on its case in chief and we cannot

20   Brutonize it, then we will not introduce it.  So I just don't

21   think that the *Bruton* issue is going to actually exist in this

22   case.

23             So the heart of the defendants' motion is really the

24   antagonistic defenses argument.  And I understand what defense

25   counsel are saying about the kind of three steps, but the

*Proceedings*                                                    96

1   truth is the cases are a little bit of a morass.  Some cases

2   basically define antagonistic defenses, some talk about

3   mutually antagonistic defenses, sometimes the cases say the

4   core of the defenses are antagonistic that's enough, and then

5   there's also this language of you have to be able to say they

6   are so antagonistic that to convict one you'd have to acquit

7   another, which is the reasons set forth in kind of all the

8   examples where we don't think that's actually the case.

9            I think the cases that are most important are really

10  kind of two sets of cases.  One is where Courts have

11  specifically looked at the situation at hand.  Where you have

12  one defendant who is a client, the other defendant is an

13  attorney.  The client is asserting advice of counsel and the

14  attorney is basically saying I didn't get full information.

15  And there are cases, numbers of cases where a joint trial has

16  gone forward with those --

17           THE COURT:  Well, Mr. Brodsky claims he did an

18  exhaustive search with his firm's vast resources and only came

19  up with three cases.

20           MR. BRODSKY:  Yes, Your Honor, W.R. Grace, the

21  Belnick case, which the government has voluntarily severed,

22  and then *the Aronson* case.  And just to note, Your Honor, we

23  cited in our moving papers all the cases that I think the

24  government is about to cite and we put it in our moving papers

25  because we know Your Honor likes to see the vast range of

*Proceedings*                                                          97

1    cases that are out there.

2          We explained why each one in those cases the

3    attorneys were not alleging that the client was a liar and

4    deceiver, they are very different.  What they said in those

5    cases was they were finger pointing or the attorney was saying

6    I'm acting in good faith because I get the information and I

7    use it, I didn't commit the crime.  Those cases, like the

8    *Scott* case for example, the Second Circuit, was not a case

9    where the attorney was saying his client was a liar.  It's

10   very different, but I'll allow the government obviously to

11   proceed.

12         THE COURT:  All right, thank you.

13         MS. SMITH:  So that is actually the exact

14   distinction I was going to make, which is that there are cases

15   where an attorney and a client who are asserting -- attorneys

16   asserting that they didn't have full information, clients

17   asserting advice of counsel have gone to trial in a joint

18   trial, and that's the *Scott* case, the Abacoro case and that's

19   generally considered that they are not mutually antagonistic.

20         And the question is what makes this case different

21   than those.  I think the only answer to come up with is

22   exactly what Mr. Brodsky has said, is that the defendants in

23   this case have ramped up kind of the animosity to such an

24   extent in order to achieve a severance.  And it is not clear,

25   as we said in our brief -- or we are skeptical that at

*Proceedings*                                                      98

1   separate trials, particularly with respect to Mr. Greebel who

2   has gotten up here and said a fraud occurred, Mr. Shkreli

3   committed crimes, on and on and on, you know, in order to kind

4   of ramp up the finger pointing.  And I agree that the case

5   law -- and I think we conceded this in our brief, there is

6   case law that expresses concern about the third prosecutor

7   idea and about the idea that, you know, if one defendant is

8   saying the other defendant is actually guilty that that

9   creates a concern with respect to severance and that is what

10  the case law says.

11          Our feeling here is kind of two fold.  One is that

12  this is a particularly complex case and a lot of the cases

13  where the defendants are pointing at each other, cases like

14  *Serpoosh* and *Tootick* are cases where the crime is very clear,

15  it's a stabbing or it's a drug deal and there are two people

16  present at the crime and clearly one of them did it and they

17  are pointing at each other.  And one of the arguments we've

18  made was that this is an incredibly complex case with many,

19  many different issues and it is not clear at all that by

20  pointing at each other the Court -- or the jury would have to

21  conclude that one defendant was guilty and the other one was

22  not based on kind of the circumstances.

23          (Continued on the next page.)

24

25

Proceedings                                        99

1          MS. SMITH:  (Cont'g.) And so it is a very

2     different set of facts than any basic criminal cases where,

3     first of all, the crime is very clear.  I mean, here we have

4     a fraud that we need to show, and there are a lot of

5     elements to it.  And so I expect, and this is one of the

6     things that we're skeptical about, that defendants are going

7     to say in the first instance, we're not even sure there was

8     a crime because, for example, Retrophin had a responsibility

9     to pay back the MSMB investor for one reason or another.

10          So it is very surprising to us that Mr. Greebel is

11     saying, well, I'm not going to put the government to its

12     burden of proof on the crime itself.  It's very different

13     than a crime like a stabbing where everybody agrees that a

14     crime occurred.  So there's this amping up of the rhetoric

15     in order to achieve a severance, and we are not convinced I

16     think that in a separate trial Mr. Greebel would take the

17     same position.  For example, stipulating to the fact that

18     Mr. Shkreli committed multiple crimes and this was a fraud,

19     and that the only issue in question is whether or not

20     Mr. Greebel knew about it.  And so we're very concerned I

21     think that there has been kind of this heated rhetoric in

22     the severance phase that will not actually carry through.

23          THE COURT:  Well, how am I to discern whether this

24     is part of a strategy, and I say this with respect to the

25     defense lawyers who are experienced and know what they're

Proceedings                                    100

1   doing?  How am I to discern that, and should I even worry

2   about discerning it if they have said as officers of the

3   court that they intend to go after one another, they intend

4   to point the finger at their codefendant and argue that they

5   lied and that they're not trustworthy and that they are

6   guilty.

7           MS. SMITH:  Obviously, that's at the end of the

8   day, a decision that the Court has to make.  I think that we

9   are flagging the issue because we're concerned about

10  inconsistent litigation positions down the road.

11          THE COURT:  Well, then they may well change their

12  litigation strategy and they often do.

13          MS. SMITH:  Right.

14          And there's case law that suggests that that can

15  then be used against them if that's the case.

16          THE COURT:  Well, we'll see what happens.

17          MR. BRAFMAN:  Can I just say very briefly, Your

18  Honor.

19          After listening to Mr. Brodsky, the suggestion

20  that we are engaging in a joint strategy so that we can

21  obtain a severance I think is kind of a specious argument.

22  I will also say that I've been in cases where an attorney

23  and the client have been both defendants at bar, but they

24  were both intent on defending the integrity of the case and

25  they were both putting the government to their proof.

1          What we heard from Mr. Brodsky on behalf of

2     Mr. Greebel is not that he didn't get all of the

3     information.  It's different if their defense was, you know

4     what, on some of these things I was just not told.  Their

5     position is we were affirmatively lied to.  We were

6     affirmatively lied by to Mr. Shkreli.  Mr. Shkreli is

7     guilty.  And I think that is not ramping up the rhetoric,

8     that's his defense.  And if that's his defense, it can't be

9     undertaken I believe at a case where Mr. Shkreli is going to

10    proceed to his own trial on a presumption of innocence.

11          Thank you.

12          THE COURT:  All right.  Is there anything else

13    Ms. Smith?

14          MS. SMITH:  Your Honor, just very briefly I think.

15          Mr. Brodsky went through a series of lies that he

16    says that Mr. Shkreli told Mr. Greebel and, you know, we're

17    not engaging on the evidence right now.  We're not at trial.

18    But, you know, from the government's perspective, it's not a

19    lie if you're told something that you already know.  And so

20    to just say that clearly the documents show that it's a lie,

21    really the issue is going to be what did Mr. Greebel know,

22    and it sounds like he's going to need to take the stand to

23    say that he didn't actually know that information.  But I

24    don't think it can be shown from the documents necessarily

25    that there were certain lies that took place.

Proceedings                                    102

1           The other issue I just wanted to raise, which I

2    think is important, is this idea that Mr. Greebel has

3    confidential or privileged information that he is going to

4    cross examine Mr. Shkreli with.  I think the word

5    "privilege" is a problem and I'm concerned about the word

6    "confidential" as well.  I mean, Mr. Greebel says he didn't

7    have a personal attorney-client relationship with

8    Mr. Shkreli.  I mean, that's his position.

9           And we also know that Mr. Shkreli has waived on

10   the MSMB counts and that Retrophin has waived privilege with

11   respect to all of the issues that touch on the criminal

12   conduct here.  I am not sure what that bucket of additional

13   information would be that he would cross him with.  If it's

14   information that they shared as co-conspirators or as

15   friends or in late night conversation, I don't see how any

16   of that is privileged or confidential.

17          And if it's other areas of the Retrophin

18   representation, I mean, the other areas are things like drug

19   acquisitions and patent applications.  I mean, I just don't

20   know why that would be the subject of cross examination

21   specifically.  So I just wanted to kind of this idea that

22   there's an enormous amount of privileged information that

23   Mr. Greebel holds is actually contradictory to his own

24   statements that he wasn't Mr. Shkreli's personal attorney,

25   and I just think that's a misleading representation.

Proceedings                    103

1          THE COURT:  So what are you proposing to get to

2     the bottom of it?

3          MS. SMITH:  What am I proposing?

4          THE COURT:  Yes.  In terms of the evidence that

5     has not yet been produced to the government.  I think

6     Mr. Brodsky did later say that this was evidence that he

7     received from the government and you're not aware of it

8     somehow.

9          MS. SMITH:  I'm actually not sure.  I think it's

10    this idea that Mr. Greebel knows other information that

11    might show that certain things weren't true, and I

12    understand that's potentially for credibility.  But I still

13    think that would be encompassed in everything related to

14    MSMB and anything touching on Retrophin that's already been

15    charged, but I just am not sure what that extra bucket of

16    mysterious information might be.  And we agree with you,

17    obviously we have certain reciprocal requests for discovery.

18    And, you know, to the extent that the defendants are going

19    to actually produce exhibits at trial, we would expect that

20    those would be produced to us prior to trial.

21          MR. BRODSKY:  Your Honor, I'll touch on that point

22    and then the other points.

23          From the government's discovery, millions of

24    pages, and this is why the trial was delayed.  Our client is

25    going through every page.  We're going through every page.

Proceedings                                    104

1   I understand the government juggling 40, 50, 60 cases each

2   of them with investigations and everything else that they

3   can't possibly go through every page.  Moreover, if they go

4   through every page, they won't understand the significance

5   the way our client will.  And I proffer to Your Honor that

6   in the discovery lies evidence of Mr. Shkreli's other crimes

7   and misconduct that the government has not identified.

8            I also proffer to Your Honor that there is

9   privileged communications that are beyond what Retrophin has

10  waived, that Shkreli, in connection with providing

11  information to Mr. Greebel about other areas of

12  representation, and, remember, their -- Mr. Greebel, and the

13  government concedes this -- is outside counsel for

14  Retrophin.  He was outside counsel to him for numerous

15  matters.

16           Both the government and Mr. Shkreli bolstered up

17  the $10 million number and the hours for which Mr. Greebel

18  worked.  And Your Honor put their finger on it when you said

19  statistically why does that matter?  Well, it doesn't for

20  purposes of these charges, but it does matter in the sense

21  that it proves, if you go through the invoices, there are

22  lots of different conversations over lots of different

23  matters.  And we do have evidence that's privileged in the

24  possession of Retrophin, but it's also in Mr. Greebel's mind

25  and the privilege has not been waived.  And we will use that

Proceedings                                      105

1   offensively against Mr. Greebel.

2              THE COURT:  So you're saying Mr. Greebel didn't

3   know it at the time he received the information that

4   Mr. Shkreli was lying but now he does?

5              MR. BRODSKY:  Yes.  Yes.

6              And, Your Honor, I must say, I, I don't know how

7   to respond, really, I just don't know how to respond when

8   the government says that they think we're ramping up to get

9   a severance.

10              I commit to Your Honor -- I'm happy to take the

11   witness stand right here --

12              THE COURT:  It's all right.

13              MR. BRODSKY:  -- but I commit to you in a trial

14   against Mr. Greebel alone, our best defense is to prove the

15   lies.  I mean, if you think about it, Your Honor, we have

16   been accused -- my client has been accused of engaging in a

17   scheme with the principal, the client representative of his

18   client to commit criminal crimes.  What is the natural

19   defense to that?

20              The natural defense to -- if true, is how can I be

21   part of this scheme with this conniving guy if he lied to me

22   and he deceived me?  For the government to suggest we're not

23   going to say that would be to ignore their evidence that

24   they say he lied to auditors, he lied to Retrophin.  They

25   say he lied to the board.  They say he lied to lawyers.

Proceedings                                        106

1    They say he lied to MSMB Healthcare investors.  They say he

2    lied to MSMB Capital investors, they say he lied to

3    everybody, and then they say but not Mr. Greebel.  He's the

4    only one he didn't lie to.

5             I submit to Your Honor in a trial just of

6    Mr. Greebel, our defense will be the same.  It will be that

7    he was a liar and a deceiver.  And I don't know why the

8    government questions that when they acknowledge and admit on

9    their own that he is a liar and a deceiver.  That's what

10   they've charged him with.

11            Your Honor, with respect to the case law, it's not

12   a morass.  If you look at the case law, there are actually

13   core principals that are consistent throughout the cases,

14   and Your Honor has cited them in your own case, U.S. v.

15   Faltine.  Your Honor has cited them in other severance

16   cases.

17            Where there's mutual antagonism, the first

18   question any court looks at is:  Is there inherent mutual

19   antagonism or is it just finger pointing between two guys or

20   a man and a woman who are defendants?

21            The Scott case was finger pointing.  The Scott

22   case was the lawyer was saying, hey, I acted in good faith.

23   The guy gave me information and I followed it, but I don't

24   think he committed a crime.  And the client was saying,

25   look, I gave him information and just followed the advice.

Proceedings                    107

1   Nobody was accusing each other of being deceptive, and

2   that's the Scott case.

3          The Abakporo case, which the government relies on,

4   is -- and the government relies on it for a proposition but

5   ignores what it actually says.  The case, and I quote says,

6   "Defenses are mutually antagonistic when accepting one

7   defense requires that the jury must, of necessity, convict a

8   second defendant."  And then they say that is what is known

9   as "legally cognizable prejudice."

10         I submit to Your Honor all the cases have the same

11  pronunciation of what genuine mutual antagonism is, and that

12  it's not finger pointing.  It's if you accept the defense of

13  one defendant and that requires the jury to convict the

14  other, that is a legally cognizable prejudice.  Questions

15  are over.  And we laid out additional prejudices because we

16  thought we should.

17         When the government surprised us with their

18  opposition and they said it was a three-part test, which we

19  had never seen in any case anywhere, including in Your

20  Honor's, and when they suggested that even with mutual

21  antagonism, which is genuine and irreconcilable, you need to

22  find prejudice, we were shocked by it.  Truly.  It was the

23  first time we had seen the argument.  It didn't come up in

24  Aronson, it didn't come up in any other cases.

25         And so what we did was we put in Professor

Proceedings                                              108

1    Frisch's declaration, if they want to throw it out, that's

2    up to them.  In our view, what Professor Frisch says is

3    undisputable.  And Your Honor can find it as a matter of

4    law.  Your Honor can find it as a matter of logic.  We put

5    in Professor Frisch's declaration because we wanted to show

6    from somebody who has enormous experience in attorney-client

7    relationships in ethical advice as to the inherent problem

8    of having an attorney and a client representative charged

9    together where the attorney alleges deception and the client

10   says I acted in good faith on your communication.  And we

11   did it in response.

12            The other thing, Your Honor --

13            THE COURT:  Plus he's saying we'd likely see a

14   scenario though if an attorney and client are charged

15   together that they would raise this defense where each would

16   point the finger at the other and say, you know, the client

17   lied to me and the attorney knew but gave me bad advice,

18   that the whole issue about severance would sort of become a

19   situation where the Court would be compelled to grant

20   severance in every case where a defense lawyer got up and

21   said we're going to take these acts?  Don't I have to look

22   at whether there's really genuine antagonism and whether

23   there will be prejudice if --

24            MR. BRODSKY:  Yes.

25            THE COURT:  -- we try the defendants together?

Proceedings                              109

1          So I don't think the government is wrong in saying

2    that prejudice is part of the evaluation.

3          MR. BRODSKY:  I think finding out whether or not

4    it's a genuine mutual antagonism.  Maybe we're conflating

5    two different things, which is fine.

6          THE COURT:  Well, they had a three-part test so I

7    think you were troubled by the third factor.

8          MR. BRODSKY:  I was troubled by it.  If you find

9    genuine mutual antagonism, I definitely think you have to

10   look to see whether mutual antagonism is just mere finger

11   pointing or genuinely one defendant's lawyer will get up and

12   accuse the other defendant as -- with crimes and prove it.

13   I do think you have to look at that.

14         But once you find genuine mutual antagonism, I

15   think the case law shows from Abakporo to Serpoosh to your

16   case in Faltine, Your Honor, to every other case, it's

17   legally cognizable prejudice, and you don't need to go

18   beyond that to then say how are they going to prove that's

19   prejudicial because I think it's obvious, but nevertheless

20   we laid out the different prejudices.

21         What I hear the government saying, Your Honor,

22   what I hear the government saying is what they're not

23   saying.  They're not saying if you find genuine mutual

24   antagonism between us, and we're not ramping it up for

25   purposes of just ramping up, and we tell them as an officer

Proceedings                                      110

1    of the court, Your Honor, I tell them we're not.  That's why

2    we tried to put in specific examples, that's why I submitted

3    an declaration which I don't take lightly, that's why we

4    stand before Your Honor and we actually submitted all these

5    particulars.  The notion that we were ramping up, we

6    submitted -- we knew we were going to submit something that

7    was going to completely inflame and bother Mr. Shkreli.  We

8    didn't do it until we absolutely had to do it.  It's not

9    enjoyable sort of putting in all this evidence of somebody

10   being a fraud.  I'm on the defense side now so I don't

11   particularly enjoy it unless I'm a civil plaintiff and I'm

12   charging someone with fraud and they committed it, but I

13   don't particularly enjoy it.  But we had to do it, and we

14   did it in good faith, Your Honor.

15          And I think what the government is saying is if

16   you're convinced that Mr. Greebel is going to definitely

17   assert that Mr. Shkreli is a liar and a deceiver at trial,

18   genuinely, I think they're recognizing there has to be a

19   severance.

20          Finally, Your Honor, in terms of their argument

21   about the complexity of the case versus the simplicity of

22   the case, I don't think it makes sense.  Aronson, W.R.

23   Grace, both extraordinarily complex cases.  In a simple case

24   where you have a bag of drugs and people have to debate

25   about which two people actually controlled the bag, if

1    there's genuine mutual antagonism and they both say it's

2    yours and you knew it was drugs, fine, that's a simple case.

3    But in a complicated case it's far worse.

4          Why is it far worse?  We're going to not just

5    stand up in a one-day trial or a two-day trial and accuse

6    Mr. Shkreli of lies, we're going to do it every other hour

7    every chance we get in terms of cross examinations through

8    every witness on every day of trial.  Our narrative is going

9    to be clear, and it's going to be not just one day, but one

10   week and then the next week and the next week.

11         So the complexity of the case means the case is

12   going to be longer.  It's going to be that there are more

13   incidents and more examples of mutual antagonism.  And more

14   examples of mutual antagonism simply mean more confusion for

15   the jury and more likely prejudicial effect that they say,

16   ah, forget the both of them.  We're tired of them.  They're

17   both yelling at -- screaming at each other and they'll find

18   them both guilty.

19         Your Honor, my colleague, Mr. Chan, might address

20   or would address, if he wants to, the spillover and the --

21         MR. CHAN:  Sure.  Just really briefly.  I think

22   most of these points have been covered, but since Ms. Smith

23   brought up the other three points in our brief, I'll just

24   quickly say a few things.

25         I think that -- we can't too quickly dismiss the

Proceedings                    112

1    risk of spillover prejudice either.  I agree that the main

2    part of our argument is the mutual antagonism argument, but

3    I think that if you consider all of our other arguments as a

4    cumulative argument for severance, I think it is even

5    stronger.

6              With respect to the concept that just -- that the

7    government says that if we have two separate trials, we will

8    necessarily have the same evidence in both that we will seek

9    to admit against one defendant versus both defendants

10   together.  I think that's just not true.

11             Similar to Ms. Smith's point about saying

12   something in the context of a severance motion, the

13   government often says if you grant a severance, we'll put it

14   all in the same evidence anyway.  And as I think we all know

15   in this courtroom, that doesn't always happen because things

16   change, because the practicality has changed and because

17   404(b) says that you can't always do that.

18             So, for example, here concretely I do not think

19   that the government would seek, but even if it sought, we

20   would fight, their attempt to get in every detail about our

21   co-defendant's earlier MSMB-related frauds just to prove

22   context of the counts that we're charged in.  I think

23   there's a line and they can't cross it, and the line is

24   different in a solo case versus a joint case.  So I think

25   their statement that we'll put in all the same evidence is

1    overstating.

2          We didn't talk about a class of evidence today yet

3    which is the class of evidence that would not come in in the

4    solo case of ours that would come in in a joint case.  So,

5    for example, the government has relied often on evidence

6    that it says shows our co-defendant's propensity towards

7    violence and threatening witnesses.  They did that in

8    connection with discovery motions to oppose granting certain

9    discovery that both defendants requested.  That kind of

10   evidence would not be admissible in a solo trial against our

11   defendant.

12         They also say, you know what, there are post

13   arrest statements by our codefendant that we can sanitize to

14   avoid Bruton problems, but as Mr. Brafman says, I don't know

15   how they can do that.  So even though they can take out the

16   name of our client, you will have post arrest statements

17   involving the earlier MSMB-related frauds that they will --

18   that they have charged our codefendant with, that they have

19   admitted our client is not charged with or guilty of, but

20   they want to admit that conduct as context of the counts

21   that are charged against our client.  So they will have a

22   post arrest confession that relates to this earlier fraud

23   that they say is relevant, that earlier fraud is relevant to

24   our client and they will somehow want to keep that post

25   arrest statement out.  I don't think you can do that and I

Proceedings                                    114

1    don't think Bruton, the level of sanitation is possible in

2    that scenario because all those statements will go to

3    establish the earlier fraud which the government is arguing

4    is relevant and should be admitted against our client as

5    some sort of contextual evidence.

6              The last point I'll make is that with respect to

7    the argument about notoriety, we aren't -- we didn't make

8    that last argument as an evidentiary argument.  We're not

9    saying that that evidence is going to come in necessarily

10   one way or the other.  Although the government has said here

11   today that there are some instances in which they would seek

12   to use it as evidence of impeachment, depending how the

13   trial plays out.  So there is even another scenario where we

14   don't know now, but there could be evidence that wouldn't be

15   in our solo trial that might come in at the government's

16   request.

17             Putting that aside, our point was that that

18   conduct, which we detail in our appendix and I won't go over

19   it here, but that conduct effects the jury pool; that jury

20   pool effects us.  And so to the extent that we will be stuck

21   in a joint trial where that jury pool has already been

22   effected, notwithstanding the statements about what people

23   may or may not do in the future and what I know is the

24   Court's ability to control the courtroom.  But what has

25   already happened is that we have a jury pool that is skewed

Proceedings                                    115

1   to be predisposed to a case where we are with our

2   codefendant versus not.

3            THE COURT:  Why do you say that?  What's your

4   basis?

5            MR. CHAN:  The basis is that --

6            THE COURT:  Have you done research?

7            MR. CHAN:  I don't think I need to do true

8   research in the sense that if you just talk to anybody in

9   the public about whose name they know better, they know

10  one -- our co-defendant's name better, and they know it for

11  negative reasons.  Right?

12           And so I think that you have that well-established

13  notoriety for bad reasons.  And on top of that, you would

14  have the evidence we pointed out in our appendix that shows

15  a concerted effort by our codefendant to make that notoriety

16  happen.

17           THE COURT:  Well, I think during voir dire you're

18  going to have an opportunity to question potential jurors

19  about any knowledge or information or impression that they

20  may have, and you might be surprised to learn that many of

21  them have never heard of Mr. Shkreli.  It could be the case.

22  I just didn't know if you had actual information or evidence

23  that, in fact, he is as notorious as you all think he is.

24           MR. CHAN:  Not beyond what's cited in our briefs.

25           MR. BRAFMAN:  Your Honor, I just want to very,

Proceedings                                116

1    very briefly respond.

2            It's very hard as a defense lawyer to sit and

3    listen to a co-counsel for a co-defendant, not the

4    government, but co-counsel for a co-defendant say over and

5    over again that my client is a liar and my client is a

6    deceiver and my client is so notorious that they could not

7    get a fair trial sitting next to him.

8            I will tell you I believe there should be a

9    severance because of their position, but in fairness to

10   Mr. Shkreli, I will tell you that having spent a lot of time

11   with him in public arenas on occasion, the notoriety works

12   both ways.  Many people think he's the person who's going to

13   find the cure to certain dreaded diseases and stop us on

14   occasion, on many occasions, to take selfies because they

15   admire and respect him.  So I deny the notoriety even though

16   I'm going to want to participate in a careful voir dire.

17           I will also tell you that to the extent that they

18   have spent an hour calling my client a liar and a deceiver,

19   that may support the argument for severance, and I agree.

20   But just so the position is clear, we intend to take the

21   position at trial, one way or another, that my client hired

22   a very, very good lawyer from a very, very prominent firm to

23   which he paid $10 million for the distinction of getting

24   indicted.

25           THE COURT:  All right.  Thank you.

```
                        Proceedings                    117
```

1          Does anyone have anything else?

2          MS. SMITH:  Not unless you have any questions.

3          THE COURT:  All right.  Thank you.  I appreciate

4     your time.

5          MR. BRODSKY:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.

7          Have a good day.

8          (Proceedings adjourned at 2:44 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [5] - 7:7, 20:24, 89:11, 104:17, 116:23
**$35** [1] - 31:13
**$40** [7] - 70:14, 70:20, 71:9, 73:5, 73:8, 73:13, 74:23
**$500,000** [1] - 4:16
**$770,000** [1] - 77:5

## '

**'11** [1] - 31:20
**'12** [1] - 31:20
**'13** [1] - 31:20
**'14** [1] - 31:20

## 1

**10** [2] - 65:9, 82:4
**10,000** [1] - 20:24
**104** [8] - 3:24, 13:11, 23:7, 25:1, 25:9, 25:13, 72:6
**11** [2] - 69:14
**11201** [2] - 1:13, 2:3
**12** [2] - 69:14, 93:6
**12:00** [1] - 1:8
**13** [1] - 75:13
**135** [1] - 93:4
**14** [1] - 75:13
**15** [5] - 66:5, 67:9, 75:13, 76:22, 80:11
**15-CR-637** [1] - 2:12
**15-CR-637(KAM** [1] - 1:3
**16** [1] - 76:22
**16-page** [1] - 52:3
**170** [1] - 66:5

## 2

**2** [1] - 56:10
**20** [1] - 3:8
**2009** [2] - 28:21, 31:12
**2011** [5] - 28:4, 28:5, 70:6, 70:16, 70:23
**2012** [8] - 28:3, 68:25, 69:2, 73:2, 73:9, 73:16, 73:24, 75:8
**2013** [3] - 69:2, 83:16, 83:18
**2014** [2] - 82:19, 83:17
**2017** [1] - 1:8
**22** [1] - 90:20
**225** [1] - 2:2
**25** [1] - 43:4
**271** [1] - 1:13

**28** [1] - 49:16
**2:44** [1] - 117:8

## 3

**3500** [4] - 12:3, 12:16, 16:22, 34:7

## 4

**40** [2] - 70:18, 104:1
**403** [3] - 45:4, 46:1, 46:2
**404(b** [2] - 90:12, 112:17
**40M** [1] - 70:13
**4th** [1] - 73:16

## 5

**50** [1] - 104:1

## 6

**6** [1] - 28:6
**60** [1] - 104:1
**613-2274** [1] - 2:3

## 7

**7** [2] - 1:8, 72:23
**718** [1] - 2:3

## 8

**8** [1] - 63:14
**806** [3] - 46:24, 47:5, 47:9

## 9

**9** [2] - 63:13, 63:14
**946** [1] - 93:4

## A

**Aaron** [4] - 51:18, 51:19, 51:25, 53:7
**aback** [2] - 43:12, 46:8
**Abacoro** [1] - 97:18
**Abakporo** [2] - 107:3, 109:15
**abide** [1] - 95:17
**abilities** [1] - 48:1
**ability** [3] - 55:13, 94:14, 114:24
**able** [24] - 8:13, 14:24, 15:15, 15:17, 21:3, 21:24, 28:24, 33:17, 34:12, 34:18, 44:22, 46:9, 57:25, 64:8,

**64:22, 64:24, 66:1, 67:2, 67:22, 69:20, 76:5, 86:21, 86:23, 96:5
**abled** [1] - 53:18
**absence** [2] - 11:19, 18:16
**absolute** [1] - 37:12
**absolutely** [10] - 14:19, 19:17, 53:15, 62:19, 70:15, 72:19, 79:5, 80:10, 87:13, 110:8
**accept** [9] - 5:4, 10:20, 13:19, 59:16, 59:17, 65:4, 67:14, 68:10, 107:12
**accepted** [1] - 83:11
**accepting** [2] - 91:6, 107:6
**accepts** [4] - 43:25, 65:3, 66:1, 66:6
**according** [1] - 70:15
**account** [1] - 52:4
**accurate** [3] - 5:12, 71:7, 80:3
**accuse** [3] - 81:3, 109:12, 111:5
**accused** [2] - 51:5, 105:16
**accusing** [1] - 107:1
**achieve** [2] - 97:24, 99:15
**acknowledge** [1] - 106:8
**acknowledged** [1] - 70:2
**acquisitions** [1] - 102:19
**acquit** [5] - 49:20, 66:11, 66:14, 68:12, 96:6
**acquitted** [1] - 67:3
**act** [1] - 46:3
**acted** [7] - 10:23, 51:8, 58:18, 67:18, 68:2, 106:22, 108:10
**acting** [4] - 15:2, 29:20, 41:6, 97:6
**actions** [1] - 67:19
**activism** [3] - 69:22, 70:1, 70:8
**activist** [1] - 70:8
**acts** [1] - 108:21
**actual** [2] - 54:21, 115:22
**add** [1] - 93:8
**addition** [3] - 5:16, 14:8, 19:22
**additional** [6] - 12:4,

**59:1, 78:17, 91:13, 102:12, 107:15
**address** [14] - 3:10, 13:17, 22:12, 25:17, 49:15, 65:22, 67:9, 72:10, 78:18, 86:7, 92:8, 92:17, 111:19, 111:20
**addressed** [1] - 78:18
**adjourned** [1] - 117:8
**admire** [1] - 116:15
**admissible** [18] - 13:2, 24:24, 44:18, 47:1, 47:12, 47:17, 47:22, 47:23, 49:1, 69:9, 69:20, 71:10, 76:23, 93:23, 93:25, 94:4, 95:2, 113:10
**admission** [3] - 2:21, 46:25, 47:2
**admit** [7] - 23:6, 35:22, 36:1, 70:20, 106:8, 112:9, 113:20
**admitted** [2] - 113:19, 114:4
**admitting** [1] - 36:3
**advance** [7] - 3:14, 10:19, 15:24, 17:6, 17:25, 20:5, 24:19
**advancing** [1] - 23:1
**advantageous** [1] - 3:14
**adverse** [3] - 16:15, 45:7, 48:18
**adversely** [1] - 48:20
**adversity** [1] - 54:7
**advice** [53] - 4:23, 8:12, 8:15, 8:20, 11:19, 12:12, 12:20, 14:1, 14:4, 14:7, 17:15, 17:17, 18:13, 18:17, 19:5, 20:5, 20:7, 20:8, 23:1, 23:10, 23:15, 25:14, 26:10, 28:9, 28:11, 30:4, 32:9, 35:7, 35:16, 37:16, 38:4, 38:6, 39:19, 40:1, 40:11, 41:7, 43:16, 43:23, 44:5, 50:11, 51:21, 64:21, 67:14, 78:14, 82:22, 86:25, 87:7, 96:13, 97:17, 106:25, 108:7, 108:17
**advise** [1] - 8:23
**affairs** [1] - 31:17
**affidavit** [18] - 3:8, 4:4, 12:7, 13:20, 13:21, 14:6, 14:8, 15:3,

**15:16, 15:18, 24:19, 37:6, 37:14, 37:18, 45:10, 55:11, 55:18, 71:13
**affirmatively** [9] - 22:25, 56:22, 56:24, 85:21, 86:1, 86:19, 87:14, 101:5, 101:6
**afraid** [2] - 35:25, 36:2
**afternoon** [10] - 2:10, 2:15, 2:18, 2:19, 2:22, 2:24, 3:1, 3:2, 3:3
**agent** [7] - 60:10, 80:7, 80:8, 80:12, 80:13, 80:16, 80:19
**agents** [2] - 7:3, 79:9
**aggressive** [1] - 29:19
**Agnifilo** [2] - 2:20, 87:17
**AGNIFILO** [1] - 1:18, 11:7, 34:23, 87:18, 87:20, 87:23, 88:25, 89:3, 89:8, 90:24
**ago** [1] - 87:23
**agree** [14] - 14:18, 19:2, 33:6, 38:18, 38:25, 65:24, 70:15, 74:3, 74:4, 77:23, 98:4, 103:16, 112:1, 116:19
**agreed** [1] - 75:18
**agreement** [16] - 6:4, 6:7, 13:8, 13:9, 27:13, 32:10, 40:23, 41:3, 82:17, 82:18, 82:22, 82:23, 83:5, 85:9, 86:11
**agreements** [45] - 5:24, 5:25, 6:2, 6:10, 6:15, 6:16, 6:18, 6:19, 7:12, 7:13, 8:24, 8:25, 10:6, 10:8, 18:20, 18:21, 19:24, 26:22, 28:17, 33:2, 40:19, 73:1, 73:10, 81:9, 81:10, 81:12, 81:13, 81:15, 81:16, 83:21, 83:25, 84:2, 84:4, 84:6, 84:19, 84:25, 85:12, 86:8, 86:10, 86:18
**agrees** [1] - 99:13
**akin** [1] - 11:23
**ALIXANDRA** [1] - 1:14
**Alixandra** [1] - 2:15
**allege** [3] - 54:20, 70:13, 72:25
**alleged** [6] - 26:19, 26:21, 32:7, 65:4,

70:5, 78:5
**alleges** [4] - 32:14, 69:12, 76:13, 108:9
**alleging** [1] - 97:3
**allow** [4] - 17:14, 60:6, 60:7, 97:10
**allowed** [3] - 18:19, 21:8, 29:13
**Alloyd** [1] - 94:20
**almost** [4] - 7:7, 32:4, 32:5, 91:11
**alone** [8] - 4:14, 17:21, 17:22, 42:10, 42:12, 43:9, 46:9, 105:14
**alongside** [1] - 92:2
**amend** [1] - 74:16
**Amendment** [2] - 37:11, 71:23
**America** [2] - 10:14, 77:11
**AMERICA** [1] - 1:3
**amount** [4] - 9:20, 10:1, 10:3, 102:22
**amping** [1] - 99:14
**analysis** [1] - 91:12
**Andrea** [1] - 2:20
**ANDREA** [1] - 1:19
**animosity** [1] - 97:23
**answer** [5] - 13:10, 65:11, 81:5, 84:5, 97:21
**answered** [2] - 22:20, 80:4
**answering** [1] - 79:23
**antagonism** [23] - 54:8, 59:4, 59:25, 62:2, 63:14, 63:16, 91:4, 91:5, 106:17, 106:19, 107:11, 107:21, 108:22, 109:4, 109:9, 109:10, 109:14, 109:24, 111:1, 111:13, 111:14, 112:2
**antagonistic** [20] - 39:9, 39:11, 40:9, 40:16, 42:19, 49:4, 49:18, 52:2, 65:23, 91:16, 92:1, 92:9, 92:14, 95:24, 96:2, 96:3, 96:4, 96:6, 97:19, 107:6
**anyway** [1] - 112:14
**apart** [2] - 40:10, 45:13
**Appeals** [1] - 64:6
**appear** [1] - 7:4
**appearance** [2] - 2:13
**appearances** [1] -

48:13
**APPEARANCES** [1] - 1:11
**appendix** [2] - 114:18, 115:14
**apples** [1] - 30:16
**applicant** [1] - 6:5
**application** [1] - 3:5
**applications** [1] - 102:19
**applies** [2] - 26:10
**apply** [5] - 9:5, 18:6, 25:20, 94:11
**appreciate** [1] - 117:3
**approach** [1] - 66:7
**appropriate** [9] - 8:19, 16:3, 16:13, 17:18, 19:1, 27:25, 48:12, 49:9, 93:2
**approved** [1] - 81:9
**April** [1] - 1:8
**arbitration** [8] - 6:3, 32:12, 32:13, 82:14, 82:15, 83:3, 83:15, 85:15
**arbitrator** [6] - 82:14, 83:6, 83:22, 83:23, 83:24, 85:5
**area** [1] - 91:1
**areas** [5] - 55:25, 56:1, 102:17, 102:18, 104:11
**arenas** [1] - 116:11
**argue** [34] - 6:16, 10:1, 14:7, 18:4, 18:17, 20:9, 21:3, 22:4, 27:15, 27:25, 29:10, 39:12, 49:22, 53:17, 53:18, 53:20, 53:21, 54:21, 59:17, 62:11, 62:25, 63:18, 64:8, 67:17, 68:1, 68:4, 75:1, 75:2, 77:2, 79:4, 83:13, 86:4, 87:19, 100:4
**argued** [8] - 51:12, 62:13, 83:4, 83:15, 83:20, 83:21, 84:16, 93:9
**arguing** [4] - 49:13, 67:18, 68:5, 114:3
**argument** [52] - 5:5, 5:9, 5:13, 5:20, 6:25, 8:22, 9:23, 10:10, 12:23, 17:10, 22:4, 22:17, 22:20, 25:13, 26:25, 27:6, 27:8, 27:24, 28:2, 28:14, 30:5, 30:9, 30:25, 39:5, 39:9, 40:14,

47:7, 47:24, 49:17, 51:17, 62:7, 65:23, 72:9, 78:23, 92:23, 93:22, 94:16, 94:22, 94:24, 95:4, 95:5, 95:24, 100:21, 107:23, 110:20, 112:2, 112:4, 114:7, 114:8, 116:19
**arguments** [12] - 17:10, 19:12, 23:21, 43:12, 45:7, 45:11, 66:23, 66:24, 92:8, 92:17, 98:17, 112:3
**Arnold** [1] - 31:15
**aronson** [1] - 110:22
**Aronson** [13] - 42:18, 51:11, 51:19, 51:21, 51:23, 53:1, 53:5, 53:6, 53:7, 91:14, 91:18, 96:22, 107:24
**arose** [1] - 84:14
**arranged** [1] - 86:18
**arranges** [1] - 74:10
**arrest** [11] - 6:23, 46:19, 47:1, 79:3, 79:12, 81:4, 95:10, 113:13, 113:16, 113:22, 113:25
**arrested** [3] - 79:15, 79:17, 80:6
**Aselage** [1] - 83:19
**Aselage's** [1] - 84:1
**aside** [2] - 73:3, 114:17
**aspect** [2] - 4:15, 39:18
**aspects** [1] - 28:10
**assembled** [1] - 15:22
**assert** [6] - 8:12, 13:24, 38:3, 51:20, 54:4, 110:17
**asserted** [1] - 55:16
**asserting** [5] - 37:21, 96:13, 97:15, 97:16, 97:17
**assertion** [1] - 39:19
**assets** [22] - 5:10, 5:15, 5:16, 31:13, 59:19, 68:16, 68:18, 68:19, 69:3, 70:11, 70:21, 70:22, 71:9, 72:21, 74:2, 74:6, 74:8, 74:9, 74:11, 74:20, 75:2
**assigned** [1] - 27:18
**Assistant** [1] - 1:16
**Assisted** [1] - 2:5
**associated** [1] - 19:21
**ASSOCIATES** [1] -

1:17
**assume** [5] - 6:17, 7:19, 9:2, 62:6, 93:10
**assuming** [2] - 72:7, 74:13
**assure** [1] - 43:2
**Atias** [2] - 21:11, 21:14
**atmosphere** [1] - 43:22
**attached** [7] - 4:4, 14:6, 15:15, 92:18, 92:21, 93:23, 94:12
**attaches** [1] - 93:16
**attack** [8] - 12:22, 43:22, 46:6, 46:7, 46:23, 50:8, 63:13, 87:11
**attempt** [5] - 6:24, 44:14, 44:22, 44:25, 112:20
**attempting** [1] - 92:18
**attend** [1] - 81:25
**attention** [2] - 46:16, 48:23
**attorney** [40] - 2:13, 11:12, 18:8, 18:15, 19:4, 19:24, 20:10, 20:11, 20:15, 20:25, 21:1, 22:6, 23:25, 24:4, 24:7, 26:14, 26:23, 27:20, 28:19, 32:8, 37:14, 38:12, 40:24, 41:14, 48:14, 54:8, 75:20, 96:13, 96:14, 97:5, 97:9, 97:15, 100:22, 102:7, 102:24, 108:6, 108:8, 108:9, 108:14, 108:17
**Attorney** [1] - 1:12
**attorney's** [1] - 18:7
**attorney-client** [2] - 102:7, 108:6
**attorney/client** [4] - 38:11, 39:13, 55:13, 55:18
**Attorneys** [1] - 1:16
**attorneys** [15] - 19:19, 19:20, 20:14, 20:19, 21:5, 21:6, 21:15, 21:16, 21:22, 27:14, 27:16, 27:17, 28:10, 97:3, 97:15
**auditors** [1] - 105:24
**AUM** [1] - 70:11
**authentication** [1] - 13:2
**author** [1] - 86:12

**avail** [1] - 14:2
**available** [2] - 17:21, 48:25
**avoid** [2] - 46:20, 113:14
**await** [1] - 13:12
**aware** [2] - 17:23, 103:7

**B**

**Bacha** [1] - 61:2
**backdated** [2] - 33:8, 74:11
**backdating** [1] - 73:1
**bad** [4] - 88:9, 88:12, 108:17, 115:13
**bag** [6] - 59:7, 59:9, 59:10, 110:24, 110:25
**bag's** [1] - 59:11
**Bailey** [1] - 35:25
**baked** [1] - 36:8
**balancing** [4] - 45:4, 46:1, 46:2, 46:3
**Bank** [1] - 77:11
**bar** [3] - 22:7, 25:13, 100:23
**barely** [1] - 95:8
**based** [18] - 6:3, 7:12, 11:17, 12:6, 14:6, 14:19, 14:25, 17:7, 29:8, 30:4, 40:3, 58:10, 67:20, 70:25, 71:1, 74:22, 77:9, 98:22
**basic** [4] - 20:4, 21:17, 23:2, 99:2
**basis** [5] - 17:13, 17:23, 34:17, 115:4, 115:5
**bear** [3] - 9:22, 28:18, 63:9
**bears** [3] - 8:20, 29:18, 36:12
**became** [1] - 31:6
**become** [1] - 108:18
**bed** [1] - 79:7
**BEFORE** [1] - 1:10
**beg** [1] - 61:23
**began** [1] - 31:6
**beginning** [4] - 10:10, 29:11, 46:21, 50:10
**behalf** [6] - 19:7, 41:8, 42:11, 44:25, 69:24, 101:1
**beings** [1] - 85:25
**belied** [1] - 11:9
**believes** [2] - 73:12, 74:21

**Bellman** [3] - 54:10, 54:12, 54:15
**Belnick** [1] - 96:21
**Benjamin** [1] - 2:19
**BENJAMIN** [1] - 1:18
**best** [2] - 61:2, 105:14
**better** [5] - 11:7, 16:18, 37:3, 115:9, 115:10
**between** [14] - 4:12, 9:25, 21:15, 38:20, 38:23, 40:25, 41:3, 58:10, 59:25, 64:15, 67:21, 73:10, 106:19, 109:24
**beyond** [6] - 6:8, 21:2, 90:5, 104:9, 109:18, 115:24
**big** [1] - 89:11
**billed** [3] - 4:15, 7:7, 9:25
**billing** [5] - 7:8, 7:9, 9:20, 19:20, 46:11
**billion** [1] - 68:25
**bit** [3] - 38:1, 78:20, 96:1
**black** [3] - 31:18, 93:3, 93:11
**blames** [1] - 63:1
**blessed** [2] - 20:25, 21:7
**blessing** [1] - 9:3
**board** [15] - 75:14, 75:15, 76:14, 76:16, 80:24, 81:8, 81:25, 82:7, 83:4, 83:13, 83:22, 84:6, 84:9, 95:13, 105:25
**bolstered** [1] - 104:16
**bother** [1] - 110:7
**bottom** [1] - 103:2
**bought** [2] - 35:23, 35:24
**bounced** [1] - 11:5
**bound** [2] - 65:1
**boy** [1] - 50:5
**Brady** [1] - 83:1
**BRAFMAN** [37] - 1:17, 1:18, 2:19, 3:18, 8:15, 10:3, 11:8, 13:21, 14:5, 14:14, 14:18, 17:1, 24:21, 25:8, 25:18, 26:2, 27:4, 27:7, 29:2, 30:12, 30:16, 30:20, 30:23, 40:18, 41:16, 41:21, 41:23, 41:25, 44:19, 44:24, 45:10, 48:4, 48:22, 49:25, 92:5, 100:17, 115:25

**Brafman** [22] - 2:20, 3:11, 16:5, 19:14, 19:23, 20:6, 20:21, 22:3, 22:16, 28:14, 37:15, 41:22, 50:22, 54:20, 69:6, 79:3, 81:3, 87:16, 89:5, 92:10, 93:22, 113:14
**Brafman's** [7] - 15:21, 23:21, 33:6, 40:11, 51:22, 78:20, 89:17
**BRIDGET** [1] - 1:12
**brief** [27] - 3:8, 4:4, 12:14, 14:2, 15:10, 25:10, 61:20, 61:21, 65:14, 66:4, 66:5, 69:5, 69:8, 75:13, 80:8, 80:11, 87:18, 90:20, 92:18, 92:22, 93:8, 93:25, 95:7, 97:25, 98:5, 111:23
**briefly** [8] - 4:10, 15:9, 92:7, 93:21, 100:17, 101:14, 111:21, 116:1
**briefs** [3] - 50:1, 88:1, 115:24
**brilliant** [1] - 58:7
**bring** [2] - 48:23, 79:13
**BRODSKY** [38] - 1:22, 3:2, 50:19, 51:16, 55:21, 56:17, 56:20, 57:6, 57:12, 57:14, 61:1, 61:16, 61:19, 61:24, 62:1, 65:11, 65:24, 66:3, 78:25, 81:11, 81:14, 81:18, 81:22, 82:1, 84:15, 84:21, 85:7, 85:10, 85:13, 86:7, 96:20, 103:21, 105:5, 105:13, 108:24, 109:3, 109:8, 117:5
**Brodsky** [16] - 2:25, 41:17, 41:18, 42:11, 43:7, 50:18, 88:3, 88:4, 88:24, 89:18, 96:17, 97:22, 100:19, 101:1, 101:15, 103:6
**Brodsky's** [1] - 90:10
**Brooklyn** [3] - 1:5, 1:13, 2:3
**brought** [1] - 111:23
**Bruton** [5] - 46:20, 95:5, 95:21, 113:14, 114:1
**Brutonize** [1] - 95:20
**bucket** [2] - 102:12,

103:15
**buckets** [1] - 93:24
**building** [1] - 43:5
**bumps** [1] - 61:10
**burden** [15] - 22:18, 22:20, 22:22, 23:3, 35:2, 36:12, 37:12, 66:12, 66:15, 66:21, 67:10, 67:11, 99:12
**burdens** [2] - 25:25, 37:11
**business** [1] - 76:23
**BY** [3] - 1:14, 1:18, 1:22

# C

**Cadman** [2] - 1:13, 2:2
**camera** [2] - 4:3, 86:5
**cannot** [12] - 8:18, 20:14, 24:3, 29:23, 30:1, 34:10, 42:19, 45:20, 47:14, 66:8, 70:12, 95:19
**cap** [4] - 76:3, 76:4, 76:7, 76:8
**capable** [2] - 6:21, 58:6
**capacity** [1] - 53:12
**capital** [1] - 20:17
**Capital** [11] - 33:8, 70:3, 73:8, 73:11, 73:13, 74:6, 74:9, 74:12, 74:21, 74:23, 106:2
**capitalization** [1] - 76:1
**care** [2] - 75:24, 79:11
**careful** [1] - 116:16
**carried** [1] - 83:2
**carry** [1] - 99:22
**case** [141] - 4:7, 4:11, 4:15, 4:25, 6:2, 6:5, 6:22, 7:11, 7:20, 7:23, 8:8, 8:18, 10:10, 10:13, 10:21, 13:18, 16:8, 16:18, 16:19, 17:24, 18:6, 18:14, 19:3, 19:4, 19:18, 22:12, 26:9, 26:11, 27:9, 27:19, 31:8, 31:11, 32:14, 35:23, 35:25, 36:1, 37:7, 42:3, 42:5, 42:17, 42:18, 42:20, 43:8, 43:14, 46:5, 46:16, 47:18, 49:5, 49:6, 50:2, 50:3, 50:7, 50:15, 51:11, 51:12, 52:7, 52:14,

53:1, 54:10, 54:11, 54:14, 54:16, 54:17, 56:10, 59:3, 60:1, 61:21, 61:24, 62:16, 63:9, 63:11, 64:3, 65:16, 67:11, 67:12, 67:16, 71:14, 71:15, 71:16, 75:25, 82:16, 85:17, 88:2, 88:12, 90:11, 91:14, 93:5, 94:2, 94:8, 94:17, 94:22, 95:15, 95:19, 95:22, 96:8, 96:21, 96:22, 97:8, 97:18, 97:20, 97:23, 98:4, 98:6, 98:10, 98:12, 98:18, 100:14, 100:15, 100:24, 101:9, 106:11, 106:12, 106:14, 106:21, 106:22, 107:2, 107:3, 107:5, 107:19, 108:20, 109:15, 109:16, 110:21, 110:22, 110:23, 111:2, 111:3, 111:11, 112:24, 113:4, 115:1, 115:21
**case-in-chief** [3] - 19:18, 26:11, 27:9
**cases** [51] - 3:24, 8:5, 13:14, 16:2, 16:6, 16:7, 18:6, 20:8, 21:10, 21:12, 24:11, 36:10, 43:4, 49:25, 51:1, 52:3, 53:24, 54:1, 59:5, 62:20, 63:15, 91:2, 91:3, 94:10, 94:20, 96:1, 96:3, 96:9, 96:10, 96:15, 96:19, 96:23, 97:1, 97:2, 97:5, 97:7, 97:14, 98:12, 98:13, 98:14, 99:2, 100:22, 104:1, 106:13, 106:16, 107:10, 107:24, 110:23
**cast** [1] - 44:23
**categories** [1] - 12:7
**cavalierly** [1] - 6:1
**CEO** [5] - 51:19, 68:21, 82:20, 83:7, 83:18
**certain** [20] - 19:1, 20:13, 21:4, 21:20, 24:19, 25:24, 29:22, 48:16, 50:8, 58:21, 83:16, 84:9, 85:16,

86:24, 101:25, 103:11, 103:17, 113:8, 116:13
**certainly** [9] - 4:1, 13:16, 16:3, 28:25, 31:9, 41:8, 61:2, 88:5, 91:14
**challenge** [2] - 15:19, 81:22
**challenging** [2] - 39:18, 81:19
**chamber** [1] - 77:24
**CHAN** [8] - 1:23, 37:24, 38:18, 38:25, 111:21, 115:5, 115:7, 115:24
**Chan** [3] - 2:25, 53:9, 111:19
**Chan's** [1] - 41:13
**chance** [2] - 16:25, 111:7
**change** [3] - 63:23, 100:11, 112:16
**changed** [2] - 51:15, 112:16
**changes** [3] - 40:8, 71:8, 73:13
**chaos** [2] - 92:11, 93:21
**charge** [16] - 4:25, 11:18, 17:18, 18:5, 18:22, 19:5, 27:19, 30:24, 31:2, 31:9, 32:3, 35:18, 35:20, 43:15, 72:24
**charged** [36] - 5:6, 6:7, 19:17, 20:11, 23:13, 28:6, 28:11, 28:23, 29:15, 30:7, 30:18, 31:3, 33:5, 33:11, 39:1, 45:2, 51:4, 54:11, 54:12, 54:15, 58:16, 67:20, 72:20, 74:13, 74:14, 74:17, 78:3, 103:15, 106:10, 108:8, 108:14, 112:22, 113:18, 113:19, 113:21
**charges** [3] - 30:5, 79:20, 104:20
**charging** [2] - 30:2, 110:12
**check** [1] - 25:6
**cherry** [1] - 10:9
**cherry-pick** [1] - 10:9
**chief** [4] - 19:18, 26:11, 27:9, 95:19
**chill** [1] - 64:2
**chilled** [1] - 64:10

chilling [1] - 90:15
choice [1] - 87:13
choose [2] - 17:20,
87:10
chosen [1] - 30:24
Circuit [5] - 61:1, 91:3,
93:4, 94:19, 97:8
circumstance [1] -
53:4
circumstances [2] -
52:24, 98:22
cite [7] - 14:1, 53:3,
62:20, 63:10, 63:15,
65:16, 96:24
cited [10] - 3:24, 8:5,
13:14, 16:6, 90:11,
94:17, 96:23,
106:14, 106:15,
115:24
cites [1] - 71:17
citing [1] - 63:13
civil [2] - 25:21,
110:11
claim [9] - 7:11, 11:8,
13:5, 27:10, 43:25,
45:20, 45:24, 47:17
claims [4] - 10:7, 10:8,
15:23, 96:17
clarity [1] - 21:17
class [2] - 113:2,
113:3
classic [1] - 59:23
clean [1] - 32:14
cleaner [1] - 42:12
clear [25] - 5:6, 14:20,
17:2, 20:9, 20:12,
21:23, 24:11, 34:23,
38:8, 38:19, 39:12,
39:18, 50:2, 51:22,
57:15, 59:3, 78:25,
82:16, 90:15, 97:24,
98:14, 98:19, 99:3,
111:9, 116:20
clearly [7] - 12:8,
22:20, 41:7, 42:4,
90:9, 98:16, 101:20
CLERK [1] - 2:11
client [59] - 9:10, 9:15,
38:7, 38:11, 38:14,
39:1, 40:24, 41:10,
50:23, 51:4, 51:5,
51:7, 54:21, 62:15,
65:3, 65:7, 65:8,
69:7, 74:25, 76:19,
78:21, 78:23, 78:24,
86:1, 88:4, 88:6,
90:7, 96:12, 96:13,
97:3, 97:9, 97:15,
100:23, 102:7,
103:24, 104:5,

105:16, 105:17,
105:18, 106:24,
108:6, 108:8, 108:9,
108:14, 108:16,
113:16, 113:19,
113:21, 113:24,
114:4, 116:5, 116:6,
116:18, 116:21
client's [2] - 85:22,
87:14
clients [2] - 39:16,
97:16
close [1] - 4:16
closer [3] - 16:1, 16:4,
23:18
closest [1] - 21:12
co [16] - 18:8, 19:17,
62:17, 63:22, 90:1,
91:17, 94:18, 94:21,
102:14, 112:21,
113:6, 115:10,
116:3, 116:4
co-conspirators [1] -
102:14
co-counsel [2] -
116:3, 116:4
co-defendant [8] -
18:8, 19:17, 62:17,
90:1, 91:17, 94:18,
116:3, 116:4
co-defendant's [3] -
112:21, 113:6,
115:10
co-defendants [1] -
63:22, 94:21
coconspirator [1] -
47:11
codefendant [11] -
38:3, 39:10, 47:12,
59:8, 59:12, 59:13,
100:4, 113:13,
113:18, 115:2,
115:15
codefendant's [2] -
39:15, 39:19
codefendants [2] -
54:5, 54:6
cognizable [5] -
61:22, 62:3, 107:9,
107:14, 109:17
colleague [2] - 53:9,
111:19
colleagues [3] - 16:7,
73:21, 89:24
collection [1] - 15:22
coming [6] - 69:15,
88:3, 89:24, 90:13,
90:14
commit [9] - 21:1,
29:12, 36:21, 59:10,

68:14, 97:7, 105:10,
105:13, 105:18
committed [8] - 31:19,
35:22, 51:9, 94:9,
98:3, 99:18, 106:24,
110:12
committee [1] - 9:12
common [1] - 63:4
communicated [3] -
32:8, 58:19, 75:16
communicating [1] -
51:10
communication [5] -
64:21, 75:17, 88:16,
89:13, 108:10
communications [13]
- 51:8, 57:20, 58:10,
64:15, 68:3, 69:10,
69:21, 69:23, 75:14,
75:19, 76:15, 78:14,
104:9
companies [1] - 9:22
company [16] - 40:21,
40:22, 40:23, 41:4,
41:8, 41:10, 68:23,
68:25, 80:15, 80:18,
82:2, 82:3
compelled [1] -
108:19
compelling [1] - 4:8
compensation [2] -
6:5, 9:12
compilation [2] -
34:14, 34:15
completed [2] - 4:1,
12:3
completely [9] -
11:18, 59:20, 69:9,
74:24, 77:23, 83:9,
83:10, 84:23, 110:7
complex [5] - 16:3,
16:8, 98:12, 98:18,
110:23
complexity [3] -
22:11, 110:21,
111:11
complicated [2] -
54:2, 111:3
components [1] - 7:10
comprised [1] - 61:13
compromising [1] -
85:13
Computer [1] - 2:5
Computer-Assisted
[1] - 2:5
concede [1] - 3:20
conceded [2] - 70:2,
98:5
concedes [1] - 104:13
conceding [1] - 39:25

concept [1] - 112:6
conceptually [1] -
46:20
concern [9] - 16:5,
20:21, 28:22, 36:9,
36:25, 37:9, 37:13,
98:6, 98:9
concerned [5] - 46:22,
89:21, 99:20, 100:9,
102:5
concerted [1] - 115:15
conclude [5] - 9:1,
10:22, 49:19, 66:25,
98:21
concluded [2] - 14:6,
49:6
concludes [2] - 11:15,
17:17
conclusion [3] - 15:1,
52:6, 68:9
conclusions [1] - 93:1
concretely [1] -
112:18
concurring [1] - 61:4
condition [1] - 79:14
conduct [29] - 8:20,
12:14, 20:12, 23:13,
24:5, 28:5, 28:11,
28:23, 29:9, 29:10,
29:15, 30:8, 30:14,
33:7, 44:7, 45:15,
45:18, 45:24, 48:8,
48:12, 48:17, 65:4,
74:24, 102:12,
113:20, 114:18,
114:19
conducts [1] - 45:22
CONFERENCE [1] -
1:6
conference [2] - 3:4,
30:2
confession [1] -
113:22
confidence [1] - 94:13
confidences [2] -
55:13, 55:16
confidential [5] - 55:6,
64:11, 102:3, 102:6,
102:16
conflating [2] - 20:6,
109:4
confront [2] - 13:5,
47:19
confuse [1] - 18:7
confused [3] - 38:2,
38:13, 40:6
confusing [1] - 89:18
confusion [2] - 18:15,
111:14
connection [22] -

4:16, 6:18, 9:25,
20:11, 24:7, 51:24,
58:8, 69:21, 70:1,
70:2, 70:6, 74:14,
74:15, 75:19, 76:6,
76:12, 76:15, 81:4,
84:24, 93:17,
104:10, 113:8
conniving [1] - 105:21
consequence [1] -
46:6
consider [7] - 6:20,
8:22, 15:5, 15:13,
15:17, 29:13, 112:3
considered [6] - 3:9,
6:20, 21:8, 94:7,
94:21, 97:19
consistent [1] -
106:13
conspiracy [4] - 31:5,
67:21, 67:25, 78:15
conspirators [1] -
102:14
constitute [1] - 42:8
constitution [1] - 67:4
constitutional [8] -
22:17, 22:19, 26:3,
35:12, 36:10, 36:15,
56:9, 56:11
consult [2] - 28:10,
30:14
consulted [6] - 20:10,
20:15, 23:12, 23:25,
28:18, 33:10
consulting [24] - 5:25,
6:6, 6:7, 6:10, 6:15,
6:18, 7:12, 8:25,
10:6, 13:8, 18:20,
19:24, 26:22, 28:17,
32:10, 80:18, 81:9,
81:15, 84:25, 85:8,
85:12, 86:10, 86:11,
86:18
Cont'g [1] - 99:1
contain [1] - 56:4
context [8] - 23:16,
35:3, 35:17, 37:20,
80:5, 112:12,
112:22, 113:20
contexts [1] - 87:25
contextual [1] - 114:5
continue [1] - 26:18
Continued [2] - 60:12,
98:23
continued [1] - 32:15
continues [1] - 29:16
continuously [1] -
45:19
contours [1] - 23:17
contra [1] - 41:14

**contract** [1] - 82:21
**contradictory** [2] - 72:17, 102:23
**control** [3] - 42:3, 48:17, 114:24
**controlled** [2] - 76:4, 110:25
**conversation** [3] - 27:16, 50:9, 102:15
**conversations** [4] - 19:19, 56:4, 88:6, 104:22
**conveyed** [2] - 55:6, 77:15
**convict** [5] - 44:1, 49:23, 96:6, 107:7, 107:13
**convicted** [1] - 44:8
**convince** [1] - 17:12
**convinced** [2] - 99:15, 110:16
**Cooley** [1] - 83:4
**Copeland** [1] - 63:11
**copying** [1] - 6:12
**core** [3] - 87:11, 96:4, 106:13
**Correct** [4] - 51:16, 57:6, 84:21, 85:10
**correct** [4] - 28:13, 43:23, 48:2, 55:14
**correspondence** [6] - 6:11, 6:12, 13:7, 18:12, 32:12, 40:25
**corrupt** [1] - 67:22
**counsel** [84] - 4:7, 4:8, 4:23, 8:12, 8:15, 9:1, 9:5, 11:16, 11:20, 11:21, 12:4, 12:9, 12:12, 12:21, 13:1, 13:4, 14:1, 14:4, 14:7, 14:13, 17:15, 17:17, 18:17, 18:22, 19:3, 19:5, 20:5, 20:7, 20:8, 21:8, 23:1, 23:10, 25:15, 26:10, 27:21, 28:9, 28:12, 28:24, 30:4, 32:1, 32:9, 35:7, 35:16, 37:17, 38:4, 38:6, 39:19, 40:1, 40:12, 43:16, 48:23, 51:17, 51:21, 53:18, 54:5, 54:13, 55:9, 58:2, 62:14, 62:23, 67:14, 73:17, 73:18, 80:9, 80:12, 80:16, 80:21, 82:5, 82:6, 82:7, 82:9, 82:23, 93:9, 95:25, 96:13, 97:17, 104:13,

104:14, 116:3, 116:4
**counseling** [2] - 29:14, 48:15
**count** [3] - 19:25, 26:20, 72:15
**Count** [7] - 19:25, 26:11, 33:3, 72:15, 74:17, 78:2
**country** [1] - 72:2
**Counts** [7] - 28:6, 40:2, 72:14, 72:18, 72:20, 72:23, 74:15
**counts** [24] - 20:2, 20:13, 20:20, 21:4, 21:20, 21:22, 28:6, 28:9, 28:11, 30:10, 30:15, 30:19, 30:24, 31:2, 31:4, 33:5, 33:12, 38:25, 43:16, 43:17, 102:10, 112:22, 113:20
**County** [1] - 94:17
**course** [3] - 8:20, 62:12, 79:18
**Court** [23] - 2:1, 2:1, 2:2, 5:1, 15:12, 21:13, 24:15, 26:8, 34:13, 35:25, 38:8, 39:5, 43:2, 48:23, 53:10, 61:3, 64:6, 93:10, 93:12, 94:13, 98:20, 100:8, 108:19
**court** [12] - 4:10, 25:21, 42:2, 43:4, 51:1, 76:11, 88:11, 94:10, 100:3, 106:18, 110:1
**COURT** [106] - 1:1, 2:10, 2:18, 2:22, 3:1, 3:3, 8:10, 9:20, 11:5, 13:20, 13:22, 14:11, 14:15, 15:7, 16:5, 16:24, 19:9, 19:13, 22:17, 23:5, 24:22, 25:7, 25:17, 25:19, 26:25, 27:6, 28:1, 28:5, 29:1, 30:3, 30:13, 30:18, 30:21, 33:13, 33:24, 34:2, 34:20, 37:9, 38:14, 38:19, 39:23, 41:12, 41:17, 41:22, 41:24, 44:17, 44:20, 45:5, 47:21, 48:5, 49:15, 50:18, 51:14, 55:11, 56:13, 56:18, 57:3, 57:7, 57:13, 61:12, 61:17, 61:23, 61:25, 65:10, 65:22, 65:25, 78:22, 81:8, 81:13,

81:17, 81:21, 81:24, 84:12, 84:17, 85:3, 85:8, 85:11, 86:6, 87:15, 87:19, 87:22, 88:24, 89:2, 89:5, 90:23, 92:3, 92:6, 96:17, 97:12, 99:23, 100:11, 100:16, 101:12, 103:1, 103:4, 105:2, 105:12, 108:13, 108:25, 109:6, 115:3, 115:6, 115:17, 116:25, 117:3, 117:6
**Court's** [5] - 7:18, 40:19, 94:14, 95:17, 114:24
**courthouse** [2] - 48:18, 72:1
**Courthouse** [1] - 1:4
**courthouses** [1] - 72:2
**courtroom** [8] - 22:23, 45:14, 52:10, 66:20, 91:17, 92:12, 112:15, 114:24
**courts** [4] - 11:23, 36:5, 42:20, 42:23
**Courts** [1] - 96:10
**cover** [1] - 19:11
**covered** [2] - 4:19, 111:22
**covers** [2] - 15:10, 26:13
**crazy** [1] - 46:11
**create** [2] - 33:8, 74:9
**creates** [1] - 98:9
**credibility** [15] - 5:17, 7:15, 45:1, 45:3, 45:22, 45:25, 49:20, 55:2, 58:22, 65:2, 65:5, 83:23, 87:12, 94:3, 103:12
**credible** [2] - 65:2, 87:4
**crime** [26] - 8:8, 21:1, 29:12, 31:19, 35:23, 36:3, 36:5, 36:6, 36:13, 36:21, 36:23, 36:24, 51:5, 51:9, 58:16, 59:10, 68:14, 97:7, 98:14, 98:16, 99:3, 99:8, 99:12, 99:13, 99:14, 106:24
**crimes** [11] - 31:9, 45:2, 54:12, 54:13, 59:22, 94:8, 98:3, 99:18, 104:6, 105:18, 109:12

**criminal** [29] - 2:11, 5:2, 7:6, 7:16, 8:17, 8:21, 11:18, 12:11, 12:19, 12:20, 12:23, 17:16, 18:18, 25:21, 26:2, 26:16, 29:20, 32:2, 35:4, 35:11, 37:7, 65:4, 78:15, 79:7, 88:10, 94:10, 99:2, 102:11, 105:18
**critical** [2] - 12:5, 84:22
**criticized** [2] - 51:13, 52:4
**criticizing** [1] - 79:8
**cross** [16] - 16:21, 22:5, 25:3, 26:6, 42:16, 44:25, 45:3, 54:23, 55:2, 55:5, 57:16, 58:11, 58:20, 59:3, 63:23, 64:23, 88:23, 89:6, 89:19, 102:4, 102:13, 102:20, 111:7, 112:23
**cross-examination** [5] - 22:5, 25:3, 42:16, 54:23, 59:3
**cross-examinations** [2] - 16:21, 63:23
**cross-examine** [8] - 26:6, 44:25, 45:3, 55:2, 55:5, 57:16, 58:11, 58:20
**cross-examined** [1] - 54:23
**crossed** [3] - 20:4, 21:24, 27:20
**CRUTCHER** [1] - 1:21
**CSR** [1] - 2:1
**cumulative** [1] - 112:4
**cure** [2] - 63:21, 116:13
**curious** [1] - 85:4
**cut** [3] - 12:2, 16:10, 32:14

## D

**dark** [1] - 15:2
**date** [3] - 16:21, 16:23, 16:24
**days** [4] - 3:15, 16:1, 16:9, 34:25
**dead** [1] - 53:15
**deal** [5] - 26:18, 31:11, 47:8, 52:3, 98:15
**dealing** [1] - 45:18
**debate** [1] - 110:24
**debts** [1] - 84:13

**deceived** [6] - 11:8, 44:1, 67:23, 68:11, 78:11, 105:22
**deceiver** [11] - 52:11, 54:21, 59:13, 59:18, 62:15, 97:4, 106:7, 106:9, 110:17, 116:6, 116:18
**deceiving** [1] - 44:2, 63:19
**deception** [4] - 51:6, 87:12, 89:16, 108:9
**deceptions** [1] - 52:20
**deceptive** [1] - 107:1
**decide** [9] - 6:23, 7:14, 7:15, 10:20, 29:6, 32:2, 37:19, 39:21, 91:16
**decided** [7] - 15:12, 22:2, 22:3, 40:6, 71:18, 92:16
**decides** [2] - 38:8, 89:22
**deciding** [1] - 46:3
**decision** [22] - 7:20, 13:17, 18:1, 18:3, 29:8, 29:22, 29:25, 31:4, 31:8, 31:21, 39:5, 42:1, 42:20, 46:18, 51:15, 53:2, 53:3, 61:8, 90:8, 91:18, 93:14, 100:8
**decisions** [8] - 18:2, 31:22, 31:23, 53:2, 53:5, 90:7
**declaration** [7] - 78:1, 92:19, 93:8, 93:17, 108:1, 108:15, 110:3
**default** [3] - 60:1, 60:2, 60:3
**defend** [7] - 31:25, 50:2, 50:3, 50:7, 50:15, 81:5, 89:23
**Defendant** [5] - 1:17, 49:7, 49:8, 54:3, 56:21
**defendant** [47] - 3:22, 7:21, 11:24, 12:18, 17:19, 17:24, 18:4, 18:8, 18:25, 19:17, 22:22, 22:23, 24:10, 24:23, 24:25, 26:3, 26:7, 35:20, 36:6, 37:6, 49:4, 49:24, 61:4, 62:17, 66:1, 71:17, 71:20, 71:23, 72:3, 72:4, 88:10, 90:1, 91:17, 92:1, 94:18, 96:12, 98:7, 98:8, 98:21, 107:8,

107:13, 109:12,
112:9, 113:11,
116:3, 116:4
**defendant's** [8] -
24:13, 42:21, 42:22,
64:2, 109:11,
112:21, 113:6,
115:10
**defendants** [27] - 1:9,
33:16, 33:22, 34:5,
50:16, 52:7, 54:3,
59:6, 59:11, 59:25,
61:6, 62:17, 63:17,
63:22, 67:3, 92:9,
94:21, 95:2, 97:22,
98:13, 99:6, 100:23,
103:18, 106:20,
108:25, 112:9, 113:9
**defendants'** [1] -
95:23
**defending** [2] - 87:9,
100:24
**defense** [120] - 3:23,
4:7, 4:8, 4:22, 4:23,
8:2, 8:7, 8:12, 8:16,
9:5, 10:17, 11:12,
11:16, 11:17, 11:20,
11:22, 11:23, 11:25,
12:1, 12:2, 12:9,
12:12, 12:21, 13:1,
13:24, 14:1, 14:3,
15:24, 16:11, 17:6,
17:10, 17:17, 17:20,
17:21, 18:17, 20:5,
20:6, 20:8, 23:1,
23:22, 24:11, 25:12,
25:15, 26:10, 28:9,
28:24, 30:22, 34:12,
35:3, 35:4, 35:5,
35:8, 35:9, 35:17,
35:21, 35:22, 36:4,
36:7, 37:17, 38:4,
38:7, 39:20, 40:2,
40:12, 42:21, 42:22,
43:16, 46:4, 46:6,
49:7, 49:8, 49:20,
50:7, 50:13, 51:21,
56:15, 56:22, 56:25,
58:18, 59:16, 59:18,
62:22, 64:1, 65:23,
66:2, 67:14, 68:2,
68:11, 69:3, 69:18,
71:21, 85:1, 86:13,
87:8, 87:11, 88:8,
88:22, 90:7, 90:9,
91:6, 91:25, 95:24,
99:25, 101:3, 101:8,
105:14, 105:19,
105:20, 106:6,
107:7, 107:12,

108:15, 108:20,
110:10, 116:2
**Defenses** [1] - 107:6
**defenses** [20] - 39:10,
39:12, 40:9, 40:16,
42:19, 43:14, 49:18,
52:2, 54:6, 56:12,
59:15, 62:8, 85:13,
85:19, 92:9, 92:14,
95:24, 96:2, 96:3,
96:4
**define** [1] - 96:2
**definitely** [4] - 53:20,
84:21, 109:9, 110:16
**defraud** [6] - 5:9, 5:19,
8:2, 10:11, 26:16,
29:18
**defrauded** [8] - 10:15,
13:6, 26:19, 26:23,
27:11, 29:7, 32:7,
43:21
**defrauding** [1] - 5:7
**delayed** [2] - 39:6,
103:24
**delaying** [1] - 15:25
**delivered** [1] - 40:3
**demand** [1] - 38:13
**demanded** [1] - 82:20
**demonstrate** [2] -
39:11, 46:10
**demonstrated** [3] -
5:21, 45:16, 48:12
**demonstrates** [2] -
4:6, 42:4
**demonstrating** [1] -
7:25
**denied** [2] - 42:23,
65:19
**deny** [4] - 63:21, 67:3,
92:12, 116:15
**deprived** [1] - 61:5
**deputy** [1] - 58:2
**described** [1] - 38:10
**despite** [1] - 7:2
**destroy** [2] - 63:22,
65:1
**destroys** [1] - 76:7
**detail** [3] - 69:5,
112:20, 114:18
**detailed** [1] - 7:8
**details** [1] - 10:4
**determination** [2] -
17:19, 95:17
**determine** [1] - 25:24
**determined** [1] - 13:14
**determines** [1] - 15:13
**dialogue** [1] - 50:17
**Dickson** [1] - 35:23
**difference** [1] - 21:14
**different** [24] - 12:15,

20:20, 21:15, 35:21,
39:21, 40:15, 46:3,
47:25, 50:17, 74:24,
82:11, 91:8, 97:4,
97:10, 97:20, 98:19,
99:2, 99:12, 101:3,
104:22, 109:5,
109:20, 112:24
**differently** [3] - 53:18,
53:19, 53:20
**difficult** [2] - 14:15,
54:18
**difficulties** [1] - 43:10
**difficulty** [2] - 47:24,
49:6
**digest** [1] - 47:19
**dire** [2] - 115:17,
116:16
**directed** [1] - 40:7
**direction** [1] - 27:22
**directly** [5] - 6:11,
69:21, 70:10, 70:18,
94:2
**director** [1] - 82:1
**dirty** [1] - 44:14
**disbelieve** [1] - 49:8
**discern** [2] - 99:23,
100:1
**discerning** [1] - 100:2
**disclose** [2] - 57:1,
76:17
**disclosed** [3] - 23:14,
84:8, 84:18
**disclosure** [1] - 70:7
**disclosures** [2] -
82:25, 83:1
**discovery** [20] - 4:1,
4:6, 4:11, 12:2,
12:17, 33:14, 56:13,
56:16, 56:21, 57:16,
71:1, 74:5, 77:11,
88:5, 90:14, 103:17,
103:23, 104:6,
113:8, 113:9
**discrete** [4] - 13:17,
25:9, 25:11, 31:8
**discretion** [1] - 42:4
**discuss** [2] - 29:24,
40:4
**discussed** [1] - 93:25
**discussing** [4] -
13:16, 42:14, 84:2,
95:12
**discussion** [4] - 7:19,
22:6, 29:3, 39:22
**diseases** [1] - 116:13
**dishonesty** [1] - 89:16
**dismiss** [1] - 111:25
**dispersions** [1] -
44:23

**dispositive** [2] - 41:5,
41:10
**dispute** [3] - 6:9,
49:17, 70:12
**disputed** [2] - 69:15,
76:22
**disrupt** [1] - 48:10
**disruption** [1] - 43:5
**disruptions** [1] - 43:9
**distance** [1] - 6:25
**distinct** [1] - 33:9
**distinction** [4] - 34:24,
36:7, 97:14, 116:23
**distinguishable** [2] -
8:6, 50:1
**distinguishes** [1] -
53:1
**distinguishing** [1] -
21:15
**district** [1] - 42:2
**District** [7] - 2:2, 16:7,
53:25, 54:1, 58:6,
73:20, 73:23
**DISTRICT** [2] - 1:1, 1:1
**docket** [1] - 66:5
**document** [1] - 64:19
**documentary** [1] -
5:12
**documentation** [2] -
26:18, 31:1
**documents** [28] -
12:8, 14:25, 15:1,
15:22, 21:23, 24:13,
33:8, 34:15, 34:18,
55:4, 56:4, 56:14,
56:17, 56:19, 56:23,
56:25, 57:4, 57:9,
57:11, 57:12, 57:15,
58:8, 58:9, 71:10,
76:23, 83:9, 101:20,
101:24
**dollar** [2] - 68:25,
70:18
**dollars** [1] - 4:17
**done** [9] - 3:24, 6:17,
12:7, 14:5, 31:7,
34:24, 52:18, 91:9,
115:6
**dot** [1] - 66:14
**double** [1] - 25:6
**double-check** [1] -
25:6
**doubt** [1] - 85:21
**down** [5] - 46:12,
46:13, 50:14, 79:17,
100:10
**downside** [1] - 48:15
**drafted** [1] - 18:21
**drafting** [2] - 8:24
**draw** [6] - 11:10, 15:1,

18:12, 34:24, 52:6,
68:8
**dreaded** [1] - 116:13
**Driscoll** [1] - 2:1
**driving** [1] - 79:9
**drug** [2] - 98:15,
102:18
**drugs** [2] - 110:24,
111:2
**due** [3] - 61:10, 67:5
**Dunn** [1] - 49:5
**DUNN** [1] - 1:21
**duration** [1] - 31:19
**duress** [5] - 8:8,
24:10, 35:21, 35:22,
35:24
**during** [6] - 9:11, 9:14,
26:24, 45:19, 82:25,
115:17
**duty** [2] - 65:1

---

## E

**e-mail** [1] - 11:1
**e-mails** [8] - 4:11,
4:13, 4:18, 4:19,
6:13, 18:7, 19:18,
20:24
**early** [1] - 34:13
**easier** [5] - 36:17,
36:18, 36:19, 42:12,
61:5
**East** [2] - 1:13, 2:2
**Eastern** [2] - 16:7,
73:20
**EASTERN** [1] - 1:1
**echo** [1] - 77:24
**economical** [1] - 61:6
**economy** [2] - 60:3,
61:9
**Edition** [1] - 93:6
**EDNY** [1] - 2:2
**effect** [3] - 44:6,
90:15, 111:15
**effected** [1] - 114:22
**effects** [2] - 114:19,
114:20
**effort** [3] - 5:21, 48:22,
115:15
**eight** [1] - 68:22
**Eight** [9] - 19:25,
26:11, 40:2, 78:2,
78:4, 78:9, 84:10,
84:11, 85:19
**either** [10] - 5:14, 5:24,
9:23, 22:2, 41:11,
44:6, 54:18, 80:19,
86:2, 112:1
**Elea** [1] - 84:14
**element** [6] - 8:8,

14:11, 36:6, 36:13, 36:23, 36:24
**elements** [9] - 13:25, 23:9, 35:23, 36:3, 36:4, 37:16, 37:20, 91:11, 99:5
**elicit** [1] - 55:16
**email** [8] - 64:21, 69:10, 69:20, 71:3, 75:14, 76:15, 87:2, 88:16
**emails** [3] - 53:19, 70:6, 88:16
**embrace** [1] - 22:21
**emphasize** [1] - 10:1
**employees** [2] - 68:22, 82:4
**enable** [1] - 86:3
**encompassed** [1] - 103:13
**encourage** [1] - 90:21
**end** [18] - 4:25, 5:23, 10:16, 11:14, 17:7, 17:16, 18:10, 29:5, 29:11, 32:3, 43:24, 44:16, 46:21, 54:3, 61:8, 61:9, 91:13, 100:7
**engaged** [3] - 20:19, 28:16, 58:15
**engagement** [3] - 38:20, 38:22, 53:15
**engaging** [4] - 48:16, 100:20, 101:17, 105:16
**enjoy** [2] - 110:11, 110:13
**enjoyable** [1] - 110:9
**enormous** [2] - 102:22, 108:6
**entered** [1] - 5:24
**entering** [1] - 32:9
**enters** [1] - 22:23
**entire** [3] - 26:13, 62:15, 73:14
**entirely** [1] - 38:19
**entities** [2] - 30:8, 69:25
**entitled** [3] - 5:13, 6:5, 48:13
**entity** [3] - 51:19, 53:8, 70:9
**entrapment** [1] - 11:23
**entrepreneur** [1] - 5:18
**equity** [4] - 75:23, 76:7, 76:10, 76:19
**esoteric** [1] - 90:19
**especially** [1] - 21:22
**ESQ** [11] - 1:12, 1:14,

1:14, 1:15, 1:18, 1:18, 1:19, 1:19, 1:22, 1:22, 1:23
**essentially** [5] - 3:20, 3:22, 46:7, 66:24, 69:17
**establish** [7] - 14:1, 14:12, 23:6, 23:8, 23:10, 75:2, 114:3
**established** [2] - 18:5, 115:12
**ethical** [2] - 55:19, 108:7
**evaluate** [2] - 24:15, 92:1
**evaluation** [1] - 109:2
**EVAN** [1] - 1:8
**Evan** [27] - 2:12, 6:11, 6:13, 6:22, 7:22, 9:10, 14:9, 17:22, 18:10, 19:16, 29:14, 31:20, 31:23, 40:25, 41:1, 41:5, 41:6, 42:11, 44:13, 45:17, 47:10, 47:16, 50:4, 64:10, 64:13, 88:17
**eve** [1] - 3:25
**Evidence** [5] - 22:24, 25:20, 93:5, 93:7, 94:11
**evidence** [92] - 4:5, 5:12, 8:13, 9:15, 10:22, 11:15, 12:22, 12:24, 17:14, 19:2, 20:13, 22:8, 22:10, 22:25, 23:4, 23:7, 23:9, 23:24, 24:4, 24:12, 24:19, 25:9, 25:11, 28:25, 29:11, 29:21, 35:15, 35:19, 40:13, 44:13, 44:21, 46:10, 47:6, 47:10, 47:21, 48:1, 51:19, 54:22, 56:6, 58:22, 59:1, 59:20, 59:22, 60:4, 65:7, 68:8, 69:8, 69:9, 69:10, 70:19, 73:4, 73:5, 75:12, 77:17, 77:19, 77:21, 78:8, 81:6, 83:6, 83:9, 83:14, 84:5, 84:10, 84:22, 84:23, 84:24, 86:3, 92:11, 95:1, 95:4, 101:17, 103:4, 103:6, 104:6, 104:23, 105:23, 110:9, 112:8, 112:14, 112:25, 113:2, 113:3, 113:5,

113:10, 114:5, 114:9, 114:12, 114:14, 115:14, 115:22
**evidentiary** [8] - 22:1, 23:2, 25:25, 69:18, 69:19, 71:18, 72:6, 114:8
**ex** [6] - 4:3, 15:12, 17:8, 34:10, 34:21, 86:5
**exact** [1] - 97:13
**exactly** [5] - 19:15, 28:13, 59:24, 77:12, 97:22
**examination** [6] - 22:5, 25:3, 42:16, 54:23, 59:3, 102:20
**examinations** [3] - 16:21, 63:23, 111:7
**examine** [12] - 26:6, 44:25, 45:3, 55:2, 55:5, 57:16, 58:11, 58:20, 64:23, 88:23, 89:19, 102:4
**examined** [1] - 54:23
**examining** [2] - 89:6
**example** [32] - 5:10, 8:8, 17:19, 18:25, 20:17, 20:18, 21:13, 24:1, 24:5, 33:7, 44:17, 44:20, 45:5, 45:23, 45:24, 47:4, 47:10, 52:15, 56:8, 57:22, 60:7, 69:14, 76:5, 76:21, 77:3, 84:15, 97:8, 99:8, 99:17, 112:18, 113:5
**examples** [10] - 48:5, 48:7, 52:13, 52:16, 62:9, 96:8, 110:2, 111:13, 111:14
**except** [3] - 26:2, 53:1, 71:16
**exculpatories** [1] - 81:3
**exculpatory** [1] - 7:2
**excuse** [1] - 81:13
**Excuse** [1] - 44:19
**executives** [2] - 54:11, 54:15
**exhaustive** [1] - 96:18
**Exhibit** [1] - 27:10
**exhibits** [5] - 3:23, 4:4, 9:9, 14:6, 103:19
**exist** [2] - 82:10, 95:21
**existed** [1] - 39:13
**existence** [1] - 62:21
**exists** [1] - 36:4

**exonerate** [1] - 74:25
**exonerates** [1] - 84:23
**expect** [2] - 99:5, 103:19
**experience** [1] - 108:6
**experienced** [1] - 99:25
**expert** [2] - 31:16, 93:2
**expert's** [2] - 55:11, 55:18
**experts** [1] - 82:3
**explain** [3] - 4:22, 50:15, 80:23
**explained** [2] - 61:18, 97:2
**exploring** [1] - 16:12
**expressed** [1] - 94:6
**expresses** [1] - 98:6
**extensive** [2] - 30:22, 31:1
**extent** [8] - 22:12, 39:4, 40:1, 91:5, 97:24, 103:18, 114:20, 116:17
**extra** [4] - 62:17, 62:21, 63:10, 103:15
**extraordinarily** [3] - 54:18, 82:4, 110:23
**extraordinary** [1] - 59:14

**F**

**F2d** [1] - 93:4
**fabricated** [1] - 11:3
**face** [1] - 9:16
**faced** [1] - 46:17
**faces** [1] - 62:17
**fact** [35] - 7:14, 7:15, 9:2, 9:6, 9:7, 10:18, 10:20, 10:24, 12:5, 14:17, 18:18, 23:6, 23:8, 23:20, 24:2, 24:12, 28:15, 31:3, 31:8, 35:10, 39:11, 40:22, 41:9, 45:21, 73:4, 77:2, 83:24, 84:1, 84:3, 88:4, 89:14, 89:22, 99:17, 115:23
**factor** [1] - 109:7
**facts** [10] - 11:9, 13:18, 14:13, 23:10, 24:6, 31:7, 45:21, 93:13, 95:7, 99:2
**factual** [2] - 24:3, 24:16
**failed** [1] - 84:14
**fair** [6] - 39:16, 54:19,

61:5, 67:2, 92:12, 116:7
**fairly** [2] - 16:7, 91:18
**fairness** [4] - 61:10, 61:11, 67:6, 116:9
**faith** [19] - 7:25, 11:17, 14:3, 17:13, 20:6, 20:7, 28:19, 35:10, 51:8, 58:19, 68:3, 70:24, 73:12, 78:3, 86:22, 97:6, 106:22, 108:10, 110:14
**fall** [2] - 73:9, 75:8
**false** [6] - 7:2, 31:16, 57:23, 81:3, 83:10, 86:14
**Faltine** [2] - 62:5, 106:15, 109:16
**family** [1] - 79:15
**far** [9] - 15:24, 21:2, 28:25, 30:21, 46:21, 53:25, 73:18, 111:3, 111:4
**fate** [1] - 91:16
**favor** [4] - 6:4, 32:13, 34:21, 60:2
**FBI** [9] - 79:8, 79:9, 79:10, 80:7, 80:8, 80:12, 80:13, 80:16, 80:19
**FCRR** [1] - 2:1
**fear** [1] - 48:10
**Fearnow** [1] - 4:21
**federal** [5] - 25:21, 51:1, 58:5, 72:1, 77:8
**Federal** [4] - 22:23, 25:19, 93:6, 94:11
**fees** [1] - 41:10
**few** [4] - 33:22, 70:17, 87:23, 111:24
**fictitious** [1] - 58:11
**Fifth** [3] - 37:10, 71:22, 93:5
**fight** [1] - 112:20
**file** [1] - 90:22
**filed** [2] - 3:5, 51:24
**filings** [5] - 75:19, 83:16, 83:18, 83:25, 84:3, 84:8
**fill** [1] - 70:9
**finally** [1] - 110:20
**fine** [5] - 37:2, 37:4, 79:15, 109:5, 111:2
**finger** [13] - 59:5, 63:6, 68:20, 97:5, 98:4, 100:4, 104:18, 106:19, 106:21, 107:12, 108:16, 109:10

fingerprinted [1] - 79:14
finish [1] - 7:20
finished [1] - 12:16
firm [18] - 4:13, 4:15, 6:21, 7:6, 8:23, 9:13, 9:16, 9:21, 10:2, 18:15, 18:19, 27:21, 28:7, 30:6, 38:15, 38:20, 40:22, 116:22
firm's [1] - 96:18
firms [1] - 19:21
First [2] - 65:16, 92:21
first [33] - 7:18, 7:24, 20:2, 23:11, 30:15, 33:5, 33:11, 35:14, 35:16, 35:25, 36:23, 41:19, 41:20, 42:5, 61:21, 65:20, 65:21, 66:9, 66:15, 66:23, 67:6, 67:13, 69:14, 70:25, 88:7, 90:16, 90:25, 91:21, 99:3, 99:7, 106:17, 107:23
five [3] - 34:25, 68:22, 82:4
flag [1] - 93:18
flagging [1] - 100:9
flat [1] - 88:20
flesh [2] - 3:5, 91:10
flies [1] - 9:16
flipping [1] - 22:18
flirt [1] - 35:13
flirting [1] - 36:14
flowing [1] - 78:7
flush [1] - 24:6
focus [5] - 5:1, 20:3, 30:17, 52:1
focused [3] - 5:1, 12:25, 64:1
focusing [1] - 30:10
fold [1] - 98:11
followed [2] - 106:23, 106:25
following [5] - 4:10, 5:4, 8:22, 66:25, 76:20
follows [1] - 71:6
footnote [1] - 56:10
force [2] - 18:24, 71:23
foreclose [1] - 25:23
forget [1] - 111:16
form [2] - 6:13, 70:10
formation [2] - 69:23, 70:4
former [4] - 7:1, 58:5, 77:8, 89:7
forth [5] - 14:12, 33:23, 42:24, 49:16,
96:7
forward [6] - 35:14, 40:17, 51:18, 69:15, 95:8, 96:16
founded [1] - 68:23
founder [2] - 40:22, 68:21
four [3] - 88:5, 88:13, 89:9
fours [1] - 53:6
fourth [6] - 66:10, 66:13, 66:16, 66:24, 67:6, 68:10
frankly [3] - 5:23, 40:5, 92:15
Frankly [1] - 38:4
fraud [20] - 6:20, 7:11, 10:7, 10:9, 10:14, 31:24, 43:24, 44:4, 44:5, 46:15, 51:6, 98:2, 99:4, 99:18, 110:10, 110:12, 113:22, 113:23, 114:3
frauds [2] - 112:21, 113:17
fraudster [1] - 46:14
fraudulent [2] - 27:10, 44:7
free [1] - 55:15
friends [1] - 102:15
Frisch [1] - 108:2
Frisch's [2] - 108:1, 108:5
front [3] - 17:5, 71:9, 79:15
fronted [2] - 8:3
full [6] - 39:16, 67:23, 70:25, 94:13, 96:14, 97:16
fully [1] - 14:12
functionally [1] - 88:13
fund [4] - 5:18, 69:22, 70:4, 72:20
fundamental [2] - 61:12, 65:15
fundamentally [2] - 61:9, 67:4
funds [1] - 84:14
future [1] - 114:23

## G

gatekeeper [1] - 94:14
general [8] - 20:6, 56:9, 58:2, 80:8, 80:12, 80:16, 82:6, 93:19
generally [5] - 3:25,
24:24, 59:15, 93:5, 97:19
genius [1] - 50:5
genuine [9] - 59:4, 107:11, 107:21, 108:22, 109:4, 109:9, 109:14, 109:23, 111:1
genuinely [2] - 109:11, 110:18
Georgetown [1] - 3:9
Geragos [1] - 2:21
GIBSON [1] - 1:21
Gibson [1] - 49:5
GIRISH [1] - 1:15
given [9] - 20:19, 22:11, 31:17, 37:16, 42:10, 47:7, 67:23, 67:24, 84:7
glad [2] - 56:20, 65:13
God [1] - 34:25
Gotti [2] - 94:20
government [160] - 2:17, 3:4, 3:19, 5:3, 6:1, 6:23, 10:7, 10:8, 10:19, 12:1, 12:10, 13:15, 14:22, 16:20, 17:6, 17:9, 17:25, 18:2, 18:11, 22:21, 25:12, 25:16, 26:5, 26:8, 27:9, 28:8, 31:4, 31:13, 32:5, 32:11, 32:14, 33:16, 36:12, 37:12, 38:5, 38:10, 39:3, 39:18, 42:7, 44:15, 44:22, 45:4, 45:10, 45:13, 46:2, 46:22, 47:1, 47:7, 47:9, 49:16, 49:21, 51:11, 52:14, 52:16, 53:3, 53:13, 54:12, 54:13, 56:6, 56:7, 56:15, 57:1, 57:9, 57:17, 57:21, 57:24, 57:25, 58:12, 58:16, 58:22, 59:2, 59:17, 60:10, 61:6, 62:12, 63:4, 63:20, 64:17, 64:20, 66:12, 66:14, 66:17, 66:19, 67:1, 67:18, 69:12, 69:14, 70:1, 70:12, 70:15, 70:19, 71:1, 71:17, 72:3, 72:7, 72:13, 72:16, 73:4, 73:6, 74:1, 74:15, 75:25, 76:1, 76:4, 76:13, 76:21, 77:16, 77:24, 78:5, 79:10, 81:5, 81:19,
82:10, 82:15, 82:16, 82:24, 85:16, 85:23, 86:2, 86:9, 86:12, 86:15, 86:16, 87:1, 89:25, 90:20, 91:9, 92:6, 95:18, 96:21, 96:24, 97:10, 99:11, 100:25, 103:5, 103:7, 104:1, 104:7, 104:13, 104:16, 105:8, 105:22, 106:8, 107:3, 107:4, 107:17, 109:1, 109:21, 109:22, 110:15, 112:7, 112:13, 112:19, 113:5, 114:3, 114:10, 116:4
Government [1] - 1:12
government's [41] - 2:13, 4:6, 4:15, 7:11, 7:18, 7:20, 12:15, 13:3, 19:18, 26:9, 26:25, 33:20, 38:2, 46:5, 46:17, 52:21, 53:12, 53:14, 59:20, 59:21, 60:4, 61:14, 65:13, 65:15, 66:6, 66:7, 66:15, 70:19, 73:14, 73:15, 74:7, 78:13, 78:19, 80:8, 80:11, 88:1, 91:21, 101:18, 103:23, 114:15
grab [2] - 79:11, 79:12
Grace [5] - 53:24, 54:2, 61:8, 96:20, 110:23
grant [3] - 18:9, 108:19, 112:13
granting [1] - 113:8
great [3] - 47:8, 63:9, 65:12
GREEBEL [1] - 1:8
Greebel [204] - 1:21, 2:12, 2:25, 3:3, 3:7, 4:12, 4:13, 4:14, 6:11, 6:13, 6:23, 7:22, 8:19, 9:6, 9:7, 9:11, 9:17, 9:21, 10:24, 11:2, 11:9, 11:10, 13:6, 14:9, 14:20, 15:2, 15:4, 17:22, 18:11, 18:12, 19:7, 19:17, 19:23, 21:4, 21:20, 26:13, 26:20, 26:23, 27:13, 27:18, 27:19, 27:23, 28:2, 29:14, 30:5, 30:6, 30:17, 30:25,
31:20, 31:23, 32:8, 33:4, 38:21, 38:23, 40:2, 40:6, 40:25, 41:1, 41:5, 41:6, 41:13, 42:11, 42:13, 42:15, 43:1, 43:18, 43:19, 43:20, 43:22, 43:25, 44:4, 44:13, 44:21, 45:17, 45:21, 46:6, 46:10, 46:12, 46:13, 46:19, 47:3, 47:10, 47:16, 47:25, 48:23, 49:11, 49:20, 50:1, 50:4, 50:5, 50:11, 50:15, 52:17, 52:18, 53:8, 53:11, 53:16, 54:19, 55:9, 55:15, 55:19, 55:21, 55:22, 56:6, 57:1, 57:7, 57:19, 58:19, 58:23, 58:24, 60:5, 62:14, 62:15, 63:1, 63:25, 64:10, 64:13, 64:15, 64:17, 66:11, 67:15, 67:17, 67:19, 68:1, 68:3, 68:4, 69:16, 69:21, 69:24, 70:3, 70:10, 70:14, 71:2, 71:5, 71:6, 71:11, 72:18, 73:3, 73:7, 73:12, 74:19, 74:22, 75:9, 75:17, 75:19, 75:25, 76:2, 76:6, 76:9, 76:13, 76:14, 77:4, 77:6, 77:14, 78:10, 78:16, 79:2, 79:6, 79:14, 80:13, 80:14, 80:17, 80:21, 80:22, 80:24, 82:8, 86:12, 86:19, 86:24, 86:25, 87:2, 87:7, 88:17, 89:3, 89:8, 92:12, 92:18, 93:16, 94:17, 95:9, 98:1, 99:10, 99:16, 99:20, 101:2, 101:16, 101:21, 102:2, 102:6, 102:23, 103:10, 104:11, 104:12, 104:17, 105:1, 105:2, 105:14, 106:3, 106:6, 110:16
Greebel's [12] - 10:16, 27:22, 42:16, 46:4, 46:5, 55:12, 59:17, 64:21, 69:18, 78:14, 95:10, 104:24
ground [1] - 15:11
grounds [2] - 43:13
group [1] - 94:6

guilt [4] - 22:21, 23:3, 63:15, 74:25

guilty [24] - 27:11, 50:4, 50:17, 52:25, 54:20, 59:12, 59:22, 62:12, 62:13, 63:1, 63:5, 63:6, 63:7, 63:8, 64:9, 65:8, 66:1, 67:21, 98:8, 98:21, 100:6, 101:7, 111:18, 113:19

gun [2] - 35:24

guy [3] - 63:5, 105:21, 106:23

guys [1] - 106:19

## H

half [3] - 4:17, 42:14, 49:12

hand [7] - 6:8, 8:16, 44:3, 72:17, 72:22, 96:11

hand-in-hand [1] - 8:16

handcuffs [1] - 79:18

Happy [1] - 86:5

happy [2] - 3:16, 105:10

hard [4] - 6:25, 64:23, 65:6, 116:2

harm [1] - 29:17

head [5] - 57:2, 64:11, 64:14, 68:17, 88:2

heading [1] - 73:9

Healthcare [2] - 70:3, 106:1

hear [13] - 3:16, 13:22, 17:19, 18:10, 29:21, 32:6, 34:4, 34:20, 39:17, 87:21, 87:22, 109:21, 109:22

heard [14] - 11:15, 19:16, 19:23, 29:25, 32:2, 68:2, 71:12, 73:21, 83:6, 83:7, 87:16, 92:3, 101:1, 115:21

hearing [45] - 2:11, 3:5, 3:11, 3:12, 3:13, 3:21, 3:24, 4:9, 12:14, 12:17, 13:11, 13:23, 15:13, 15:20, 15:25, 16:9, 16:13, 17:3, 17:13, 17:23, 18:23, 18:25, 19:15, 21:25, 23:11, 23:18, 24:6, 24:15, 24:20, 25:1, 25:14, 25:23, 25:24, 32:4, 34:4,

34:16, 38:2, 39:3, 39:7, 39:10, 72:6, 83:8, 93:18, 95:2

hearings [5] - 21:11, 24:23, 72:1, 72:3, 90:12

hearsay [1] - 47:2

heart [2] - 90:1, 95:23

heated [1] - 99:21

heavy [1] - 16:8

hedge [2] - 5:18, 72:20

held [3] - 3:25, 21:11, 62:23

helping [1] - 43:23

helps [1] - 34:20

Herculean [1] - 5:21

herring [1] - 95:6

highly [1] - 88:19

hilt [1] - 20:23

himself [3] - 7:1, 14:2, 89:23

hinting [1] - 16:17

hip [2] - 8:17, 11:20

hired [1] - 116:21

hires [1] - 26:17

hiring [1] - 8:22

history [1] - 10:14

hold [5] - 13:12, 15:13, 16:9, 40:5, 62:24

holding [2] - 3:21, 8:4

holds [1] - 102:23

Holly [1] - 2:1

honest [1] - 46:10

honestly [2] - 14:3, 14:12

Honor [161] - 2:15, 2:19, 2:24, 3:2, 3:18, 7:17, 8:4, 9:10, 9:18, 10:20, 11:14, 11:15, 11:19, 11:21, 12:14, 13:12, 13:19, 14:5, 14:8, 14:25, 15:3, 15:6, 17:1, 17:7, 17:12, 17:16, 24:21, 25:8, 25:10, 25:18, 26:8, 27:7, 28:13, 29:2, 29:21, 29:24, 30:1, 30:23, 31:14, 31:20, 33:1, 33:20, 34:9, 34:10, 36:16, 37:23, 37:24, 39:25, 41:21, 42:2, 42:10, 43:3, 43:11, 44:11, 45:23, 49:25, 50:19, 50:20, 50:21, 50:25, 52:1, 52:9, 52:12, 52:13, 52:23, 54:1, 54:17, 55:10, 56:5,

56:9, 56:20, 57:14, 58:25, 59:25, 61:16, 61:19, 61:21, 61:24, 62:4, 64:5, 65:9, 65:13, 65:24, 66:3, 66:6, 66:17, 66:20, 66:24, 66:25, 67:8, 67:16, 69:5, 70:24, 71:11, 71:13, 72:9, 72:12, 72:16, 73:3, 74:18, 75:12, 76:12, 76:20, 76:24, 78:1, 78:17, 79:24, 81:11, 81:20, 83:12, 83:13, 84:7, 85:22, 86:5, 86:11, 86:23, 87:9, 87:18, 87:20, 87:23, 89:10, 90:21, 90:22, 91:23, 92:2, 92:5, 92:7, 93:13, 93:24, 94:25, 96:20, 96:22, 96:25, 100:18, 101:14, 103:21, 104:5, 104:8, 104:18, 105:6, 105:10, 105:15, 106:5, 106:11, 106:14, 106:15, 107:10, 108:3, 108:4, 108:12, 109:16, 109:21, 110:1, 110:4, 110:14, 110:20, 111:19, 115:25, 117:5

Honor's [8] - 4:3, 13:10, 36:25, 42:3, 47:18, 65:11, 71:12, 107:20

HONORABLE [1] - 1:11

hopefully [2] - 12:16, 34:7

hour [2] - 111:6, 116:18

hours [1] - 104:17

house [3] - 54:5, 79:9, 82:6

human [2] - 63:3, 85:25

hundred [2] - 20:23, 86:14

hundreds [1] - 21:22

Hurley [1] - 13:16

hypothetical [1] - 65:17

hypotheticals [1] - 65:13

## I

idea [11] - 69:2, 70:14, 70:15, 74:20, 92:11, 94:18, 98:7, 102:2, 102:21, 103:10

identified [6] - 57:21, 57:24, 58:9, 61:15, 61:17, 104:7

identify [4] - 58:1, 71:3, 71:4, 90:4

ignore [3] - 9:8, 79:21, 105:23

ignored [2] - 59:20, 80:1

ignores [1] - 107:5

ignoring [1] - 69:17

illegal [2] - 18:20, 58:15

illustrates [1] - 19:15

Imagine [1] - 73:7

imagine [2] - 62:10, 73:3

immediately [1] - 12:13

imminently [1] - 77:7

immune [1] - 85:24

impact [2] - 48:18, 48:20

impacts [1] - 41:9

impeachment [1] - 114:12

impermissibly [1] - 93:10

implicated [1] - 22:14

implicitly [1] - 44:7

implied [1] - 77:17

implies [1] - 18:15

important [11] - 5:1, 9:10, 9:15, 36:24, 42:6, 72:11, 72:12, 78:12, 79:1, 96:9, 102:2

importantly [2] - 7:16, 93:1

impossible [6] - 32:4, 32:5, 43:14, 43:17, 43:21, 46:20

impregnable [1] - 85:20

impression [2] - 73:8, 115:19

improper [1] - 21:9

in-house [2] - 54:5, 82:6

inaccurate [1] - 44:5

inadmissible [1] - 12:25

inappropriate [1] - 93:20

incident [3] - 59:14, 71:16, 71:19

incidents [1] - 111:13

included [4] - 7:9, 9:8, 30:6, 53:13

includes [1] - 4:11

including [5] - 3:23, 62:20, 83:7, 83:23, 107:19

inconsistent [6] - 25:4, 46:24, 47:5, 71:5, 84:2, 100:10

incorrect [1] - 54:7

incredibly [1] - 98:18

indeed [1] - 4:8

independent [4] - 27:15, 35:9, 35:20, 91:7

indicted [2] - 52:17, 116:24

indictment [12] - 4:20, 6:7, 6:8, 26:13, 30:11, 30:24, 53:13, 69:9, 73:6, 74:16, 74:17, 79:19

indictments [1] - 54:14

indisputably [1] - 70:12

individual [1] - 94:6

inescapable [1] - 15:1

inextricably [2] - 27:2, 95:1

infer [1] - 63:14

inference [2] - 11:10, 18:13

inflame [1] - 110:7

information [47] - 9:7, 9:23, 10:25, 14:21, 14:23, 15:4, 23:15, 26:17, 31:19, 36:17, 52:19, 55:5, 55:6, 56:1, 57:2, 57:17, 64:11, 64:14, 64:25, 67:20, 67:23, 67:24, 68:18, 73:7, 77:9, 78:10, 88:21, 88:23, 96:14, 97:6, 97:16, 101:3, 101:23, 102:3, 102:13, 102:14, 102:22, 103:10, 103:16, 104:11, 105:3, 106:23, 106:25, 115:19, 115:22

inherent [4] - 62:18, 67:5, 106:18, 108:7

inherently [1] - 62:2

initial [3] - 15:11, 20:3, 92:23

injection [1] - 18:14
innocence [7] - 22:21, 23:3, 26:4, 45:12, 85:22, 87:14, 101:10
innocent [3] - 59:7, 59:11, 86:1
insofar [1] - 38:25
instance [2] - 35:14, 99:7
instances [2] - 24:18, 114:11
instead [1] - 42:9
instinct [1] - 7:19
instruction [2] - 22:5, 63:21
instructions [2] - 42:15, 68:7
insulted [1] - 94:5
integrity [3] - 43:7, 50:12, 100:24
intend [17] - 5:19, 27:15, 29:12, 29:18, 30:13, 50:2, 50:3, 50:7, 50:10, 56:22, 57:8, 57:15, 59:1, 82:12, 100:3, 116:20
intended [6] - 5:8, 5:15, 8:1, 10:11, 25:14, 59:9
intending [1] - 30:3
intends [1] - 50:15
intent [30] - 5:2, 7:6, 7:16, 8:14, 8:17, 8:21, 11:18, 12:11, 12:19, 12:20, 12:23, 17:16, 18:18, 21:1, 26:16, 29:20, 30:4, 32:2, 35:5, 35:11, 35:15, 36:8, 36:21, 37:7, 49:21, 51:23, 67:22, 68:14, 71:11, 100:24
intentional [1] - 85:25
intentionally [3] - 5:7, 29:7, 67:18
interest [1] - 33:8
interfacing [1] - 8:25
interpret [1] - 53:19
interrelated [1] - 78:5
interrupt [2] - 8:11, 17:2
intertwined [1] - 27:2, 95:1
interviewed [1] - 82:25, 83:1
intimately [2] - 7:5, 31:21
introduce [18] - 6:24, 24:4, 44:14, 44:15, 44:21, 44:22, 45:14,

45:25, 46:9, 46:23, 46:24, 57:15, 77:17, 77:18, 77:19, 77:21, 95:19, 95:20
introduced [2] - 12:22, 13:1
introducing [1] - 41:1
invested [1] - 5:22
investigation [4] - 6:3, 77:18, 79:7, 79:16
investigations [1] - 104:2
investment [5] - 5:17, 75:23, 76:7, 76:10, 76:19
investor [6] - 13:8, 27:11, 27:12, 69:23, 70:4, 99:9
investors [16] - 5:7, 6:9, 6:12, 9:1, 10:11, 10:12, 10:13, 10:15, 20:17, 24:1, 26:19, 26:21, 28:20, 69:13, 106:1, 106:2
investors' [1] - 6:14
invoices [1] - 104:21
involve [1] - 31:5
involved [15] - 7:5, 19:20, 21:15, 24:7, 29:4, 30:6, 31:9, 31:10, 31:21, 33:6, 33:7, 33:21, 72:19, 72:25, 73:1
involvement [1] - 4:14
involves [2] - 4:23, 20:1
involving [1] - 113:17
ironic [1] - 6:21
irreconcilable [5] - 49:4, 59:16, 62:3, 62:8, 107:21
issue [36] - 5:2, 5:18, 6:8, 7:6, 8:21, 9:18, 13:3, 13:14, 15:13, 17:4, 17:15, 18:18, 23:24, 29:6, 29:18, 30:3, 32:1, 34:25, 35:2, 35:11, 37:24, 39:2, 41:5, 45:25, 55:12, 84:22, 91:8, 91:15, 95:21, 99:19, 100:9, 101:21, 102:1, 108:18
issues [20] - 3:6, 4:18, 17:14, 22:1, 22:13, 23:23, 27:5, 33:15, 33:18, 33:22, 37:14, 39:7, 39:16, 41:2, 46:20, 47:18, 49:13, 95:17, 98:19, 102:11

itself [2] - 94:2, 99:12

**J**

JACOB [1] - 1:19
JACQUELYN [1] - 1:14
Jacquelyn [1] - 2:16
Jake [1] - 2:20
John [1] - 94:20
Joinder [1] - 64:2
joined [2] - 8:17, 11:20
joint [17] - 43:10, 46:23, 47:19, 47:22, 49:12, 49:13, 60:2, 61:13, 85:18, 95:3, 95:16, 96:15, 97:17, 100:20, 112:24, 113:4, 114:21
judge [3] - 13:13, 42:2, 83:24
Judge [15] - 4:2, 13:16, 29:5, 35:3, 37:4, 42:1, 42:18, 43:21, 47:13, 48:4, 49:6, 51:18, 51:25, 59:24
judgment [3] - 29:19, 93:12
judgments [1] - 83:23
judicial [3] - 42:8, 60:3, 61:9
juggling [1] - 104:1
juries [2] - 63:2, 63:14
juror [1] - 9:1
jurors [1] - 115:18
jury [49] - 4:25, 7:14, 7:15, 8:21, 10:18, 10:22, 11:10, 11:13, 11:25, 18:8, 18:10, 18:15, 25:23, 29:6, 29:13, 32:3, 35:17, 35:20, 42:21, 43:25, 46:10, 49:19, 49:23, 62:11, 62:25, 63:7, 63:21, 65:3, 65:5, 65:18, 65:25, 66:1, 66:10, 66:13, 67:13, 68:6, 68:7, 68:10, 79:4, 91:16, 91:25, 98:20, 107:7, 107:13, 111:15, 114:19, 114:21, 114:25
Justice [1] - 61:3, 62:21

**K**

Kaplan [1] - 2:20
KAPLAN [1] - 1:19
Karthik [1] - 2:16
KASULIS [1] - 1:14
Kasulis [1] - 2:16
Katten [26] - 4:13, 10:6, 19:21, 19:22, 20:18, 26:17, 27:16, 27:17, 27:21, 28:16, 28:22, 28:23, 29:5, 38:20, 58:2, 58:3, 58:10, 69:24, 73:17, 77:4, 77:6, 77:13, 77:14, 77:22, 80:22
keep [2] - 35:7, 113:24
kept [1] - 80:1
kind [27] - 8:2, 16:8, 16:17, 20:6, 20:19, 21:12, 23:23, 24:16, 40:2, 40:13, 44:20, 93:18, 93:24, 94:14, 94:16, 94:17, 95:25, 96:7, 96:10, 97:23, 98:3, 98:11, 98:22, 99:21, 100:21, 102:21, 113:9
kinds [2] - 24:5, 48:16
KIYO [1] - 1:11
knowing [5] - 64:25, 65:6, 65:7, 80:5, 89:24
knowledge [7] - 13:25, 14:16, 37:15, 57:20, 64:22, 80:20, 115:19
known [3] - 84:6, 84:8, 107:8
knows [8] - 34:25, 57:25, 58:16, 64:18, 76:2, 76:3, 88:21, 103:10

**L**

label [1] - 7:2
lack [6] - 8:14, 8:17, 11:17, 12:11, 12:19, 30:4, 35:4, 35:15
lacked [1] - 26:16
laid [8] - 25:10, 66:4, 69:5, 69:8, 69:13, 75:12, 107:15, 109:20
language [1] - 96:5
large [3] - 6:21, 8:6, 52:20
last [6] - 3:19, 30:10, 34:25, 37:24, 114:6,

114:8
late [1] - 102:15
law [33] - 3:8, 4:13, 7:6, 8:23, 17:5, 18:19, 19:21, 40:22, 56:11, 59:3, 60:1, 61:21, 61:24, 62:16, 63:9, 71:14, 91:1, 91:19, 91:22, 92:19, 93:1, 93:3, 93:7, 93:14, 94:22, 98:5, 98:6, 98:10, 100:14, 106:11, 106:12, 108:4, 109:15
lawful [1] - 58:21
lawyer [39] - 6:19, 6:21, 7:23, 23:12, 23:14, 23:15, 31:6, 36:22, 41:1, 41:6, 44:2, 46:11, 50:4, 50:6, 51:3, 51:5, 51:9, 51:10, 51:18, 53:7, 54:4, 58:7, 79:20, 79:22, 80:1, 80:15, 80:17, 83:15, 83:20, 88:13, 88:20, 88:21, 88:23, 88:25, 106:22, 108:20, 109:11, 116:2, 116:22
lawyered [1] - 20:22
lawyers [13] - 6:14, 13:6, 20:23, 27:21, 27:23, 29:4, 30:14, 41:2, 64:25, 69:25, 90:7, 99:25, 105:25
lay [8] - 44:11, 56:10, 62:9, 70:5, 78:8, 85:1, 86:2, 86:21
laying [2] - 78:2, 84:25
lays [4] - 4:4, 15:24, 45:11, 90:21
lead [1] - 49:18
learn [2] - 74:5, 115:20
learned [4] - 55:21, 56:1, 74:4, 77:10
learns [1] - 72:8
least [6] - 6:3, 19:21, 20:11, 22:12, 56:14, 91:24
leave [1] - 95:9
leaves [1] - 37:3
legal [6] - 18:5, 23:15, 43:13, 49:13, 78:14
legally [7] - 21:9, 61:22, 62:3, 90:25, 107:9, 107:14, 109:17
legitimate [1] - 85:8

**legs** [1] - 16:10
**less** [2] - 43:9
**letter** [3] - 3:19, 38:22, 93:3
**letters** [2] - 38:20, 53:16
**level** [2] - 35:19, 114:1
**liabilities** [1] - 84:12
**liar** [13] - 49:2, 50:12, 52:11, 52:14, 59:13, 59:18, 97:3, 97:9, 106:7, 106:9, 110:17, 116:5, 116:18
**lie** [30] - 45:21, 46:22, 52:20, 64:20, 64:22, 69:15, 69:16, 70:13, 70:14, 70:22, 70:25, 71:4, 71:9, 72:12, 73:5, 74:3, 74:5, 75:9, 75:11, 75:14, 75:22, 76:10, 76:18, 76:20, 77:21, 79:3, 101:19, 101:20, 106:4
**lied** [24] - 43:19, 59:19, 68:11, 74:1, 74:20, 75:2, 76:6, 76:9, 77:20, 78:11, 78:16, 100:5, 101:5, 101:6, 105:21, 105:24, 105:25, 106:1, 106:2, 108:17
**lies** [23] - 39:14, 52:19, 69:11, 70:17, 71:3, 74:7, 74:22, 75:7, 76:3, 77:1, 77:2, 77:25, 78:4, 78:6, 86:22, 87:12, 101:15, 101:25, 104:6, 105:15, 111:6
**life** [5] - 5:20, 45:16, 45:23, 48:8, 55:7
**lightly** [1] - 110:3
**likely** [3] - 40:3, 108:13, 111:15
**limine** [1] - 26:1
**limitations** [1] - 62:23
**limiting** [2] - 22:5, 42:15
**line** [3] - 36:15, 112:23
**link** [1] - 39:3
**linking** [1] - 39:24
**Lisa** [2] - 2:24, 45:11
**LISA** [1] - 1:22
**listen** [1] - 116:3
**listening** [4] - 50:21, 88:3, 90:10, 100:19
**listens** [1] - 72:7
**litany** [1] - 45:11

**litigate** [1] - 95:16
**litigation** [2] - 100:10, 100:12
**LLP** [1] - 1:21
**loan** [7] - 75:14, 75:18, 75:23, 76:7, 76:9, 77:5, 81:9
**loans** [2] - 75:21, 75:22, 76:16
**logic** [1] - 108:4
**logical** [1] - 52:6
**Look** [1] - 48:6
**look** [21] - 4:13, 6:22, 10:4, 16:19, 16:24, 29:10, 30:23, 42:20, 47:9, 48:4, 53:19, 60:3, 71:3, 80:9, 85:22, 91:17, 106:12, 106:25, 108:21, 109:10, 109:13
**looked** [6] - 50:25, 51:2, 71:14, 71:15, 96:11
**looking** [4] - 23:8, 91:8, 91:23, 93:13
**looks** [1] - 106:18
**lost** [1] - 51:12
**low** [3] - 4:24, 11:24
**lying** [6] - 51:6, 63:19, 74:6, 74:9, 77:4, 105:4

## M

**mail** [1] - 11:1
**mails** [8] - 4:11, 4:13, 4:18, 4:19, 6:13, 18:7, 19:18, 20:24
**main** [1] - 112:1
**majority** [2] - 94:4, 94:12
**man** [1] - 106:20
**management** [18] - 5:10, 5:15, 5:17, 31:13, 59:19, 68:16, 70:11, 70:21, 70:23, 71:9, 72:21, 73:9, 74:2, 74:7, 74:8, 74:21, 74:23, 75:3
**manner** [2] - 4:22, 26:5
**MARC** [1] - 1:18
**Mark** [4] - 2:20, 54:10, 54:12, 54:15
**Martin** [32] - 2:12, 4:22, 5:6, 5:11, 5:20, 6:12, 6:16, 7:1, 7:3, 7:16, 9:2, 9:10, 10:10, 12:11, 26:15,

27:11, 27:16, 29:12, 31:6, 31:21, 31:22, 40:25, 41:6, 45:21, 46:15, 49:2, 50:4, 50:8, 50:12, 58:4, 88:17
**MARTIN** [1] - 1:8
**material** [16] - 9:24, 12:3, 12:16, 13:1, 16:22, 17:9, 34:7, 51:6, 63:18, 67:24, 70:22, 78:4, 78:9, 78:10, 78:11, 87:13
**materials** [10] - 9:3, 9:8, 12:4, 13:4, 14:19, 15:14, 15:15, 15:16, 93:23, 94:15
**MATSUMOTO** [1] - 1:11
**matter** [13] - 4:19, 14:17, 15:11, 17:5, 22:2, 44:9, 44:12, 84:17, 93:19, 104:19, 104:20, 108:3, 108:4
**matters** [4] - 45:1, 84:19, 93:7, 104:15, 104:23
**McCormick** [1] - 93:5
**mean** [14] - 8:10, 11:3, 36:19, 39:25, 62:20, 85:22, 88:15, 99:3, 102:6, 102:8, 102:18, 102:19, 105:15, 111:14
**meaning** [1] - 70:14
**means** [1] - 111:11
**meant** [3] - 57:14, 88:24, 92:23
**measure** [3] - 8:6, 89:15, 89:16
**meat** [1] - 92:15
**mechanical** [1] - 2:5
**meet** [9] - 4:23, 12:21, 23:9, 23:19, 24:16, 66:12, 66:15, 66:20, 66:21
**meeting** [6] - 23:2, 67:21, 67:24, 78:16, 82:7, 82:8
**meetings** [2] - 80:24, 81:25
**member** [1] - 40:21
**member's** [1] - 75:14
**members** [1] - 4:12
**memorandum** [1] - 49:17
**mention** [2] - 95:8, 95:11
**mentioned** [1] - 94:25

**mere** [1] - 109:10
**merits** [2] - 50:3, 50:8
**met** [6] - 11:16, 21:14, 21:16, 25:25, 38:8, 38:9
**mic** [1] - 11:5
**mid** [1] - 25:11
**mid-2013** [2] - 58:3, 58:9
**mid-trial** [1] - 25:11
**middle** [1] - 3:16
**might** [15] - 18:16, 46:24, 55:19, 67:2, 67:13, 68:10, 68:12, 69:6, 69:18, 94:6, 103:11, 103:16, 111:19, 114:15, 115:20
**million** [16] - 4:17, 7:7, 20:24, 21:6, 31:13, 70:14, 70:18, 70:20, 71:9, 73:5, 73:8, 73:13, 74:23, 89:11, 104:17, 116:23
**million-dollar** [1] - 70:18
**millions** [1] - 103:23
**mind** [6] - 54:23, 63:3, 68:24, 76:24, 88:7, 104:24
**minds** [3] - 67:21, 67:25, 78:16
**mine** [1] - 59:12
**minute** [2] - 27:7, 62:10
**minutes** [1] - 87:23
**misconduct** [1] - 104:7
**misinformation** [1] - 68:13
**misleading** [1] - 102:25
**misled** [1] - 50:5
**misrepresentations** [4] - 24:2, 28:20, 33:11, 70:5
**misstatement** [1] - 79:2
**misstatements** [1] - 50:22
**mistake** [1] - 85:23
**mistaken** [1] - 5:14
**mistakenly** [1] - 65:8
**mistakes** [1] - 85:23
**misunderstanding** [1] - 80:20
**misunderstood** [2] - 5:14, 53:10
**mix** [2] - 20:20, 31:2
**mixing** [1] - 30:16

**mere** [1] - 109:10
**moment** [2] - 31:5, 43:2
**moments** [1] - 10:9
**money** [8] - 5:22, 9:13, 10:1, 10:3, 10:5, 75:17, 77:7, 82:22
**Montana** [2] - 53:25, 54:1
**months** [2] - 3:21, 70:17
**morass** [2] - 96:1, 106:12
**moreover** [1] - 104:3
**morph** [1] - 72:21
**Most** [1] - 95:1
**most** [12] - 4:1, 7:16, 7:17, 13:3, 13:4, 19:2, 29:2, 40:3, 89:21, 95:8, 96:9, 111:22
**motion** [23] - 20:3, 20:12, 25:25, 39:4, 39:8, 39:20, 40:5, 40:6, 40:8, 40:17, 42:7, 42:23, 56:10, 69:6, 69:13, 75:13, 79:24, 92:4, 92:15, 92:16, 93:17, 95:23, 112:12
**motions** [4] - 15:11, 36:9, 63:23, 113:8
**moving** [5] - 79:23, 80:2, 92:22, 96:23, 96:24
**MR** [88] - 2:19, 3:2, 3:18, 8:15, 10:3, 11:7, 11:8, 13:21, 14:5, 14:14, 14:18, 17:1, 24:21, 25:8, 25:18, 26:2, 27:4, 27:7, 29:2, 30:12, 30:16, 30:20, 30:23, 34:23, 37:24, 38:18, 38:25, 40:18, 41:16, 41:21, 41:23, 41:25, 44:19, 44:24, 45:10, 48:4, 48:22, 49:25, 50:19, 51:16, 55:21, 56:17, 56:20, 57:6, 57:12, 57:14, 61:1, 61:16, 61:19, 61:24, 62:1, 65:11, 65:24, 66:3, 78:25, 81:11, 81:14, 81:18, 81:22, 82:1, 84:15, 84:21, 85:7, 85:10, 85:13, 86:7, 87:18, 87:20, 87:23, 88:25, 89:3, 89:8, 90:24, 92:5, 96:20, 100:17,

103:21, 105:5,
105:13, 108:24,
109:3, 109:8,
111:21, 115:5,
115:7, 115:24,
115:25, 117:5
**MS** [27] - 2:15, 2:24,
15:9, 16:23, 19:11,
19:14, 22:19, 23:17,
25:2, 28:4, 28:13,
33:1, 33:20, 34:1,
34:9, 37:23, 39:24,
41:19, 92:7, 97:13,
99:1, 100:7, 100:13,
101:14, 103:3,
103:9, 117:2
**MSMB** [66] - 4:16,
4:20, 5:16, 5:21,
19:22, 20:2, 20:17,
21:22, 24:1, 24:7,
26:20, 28:20, 30:8,
31:17, 33:7, 33:8,
33:24, 34:1, 38:16,
38:21, 53:9, 53:22,
55:4, 55:8, 55:9,
55:22, 55:23, 56:2,
56:3, 57:19, 58:4,
58:11, 59:19, 64:12,
68:17, 69:4, 69:22,
69:25, 70:3, 70:8,
70:16, 70:23, 72:12,
73:8, 73:11, 73:13,
74:6, 74:9, 74:11,
74:21, 74:22, 75:3,
78:6, 84:14, 94:9,
99:9, 102:10,
103:14, 106:1,
106:2, 112:21,
113:17
**MSMB's** [1] - 68:16
**MSMB-related** [2] -
112:21, 113:17
**Muchin** [3] - 77:4,
77:14
**multi** [1] - 83:8
**multi-day** [1] - 83:8
**multipage** [1] - 54:2
**multiple** [4] - 61:7,
79:9, 83:7, 99:18
**must** [12] - 10:20,
13:13, 14:3, 14:12,
42:21, 44:1, 49:8,
50:11, 76:16, 79:11,
105:6, 107:7
**mutual** [17] - 54:8,
59:3, 59:4, 62:1,
106:17, 106:18,
107:11, 107:20,
109:4, 109:9,
109:10, 109:14,

109:23, 111:1,
111:13, 111:14,
112:2
**mutually** [11] - 39:9,
39:11, 42:18, 52:2,
59:15, 63:22, 65:23,
91:16, 96:3, 97:19,
107:6
**mysterious** [1] -
103:16

---

## N

**name** [4] - 42:16,
113:16, 115:9,
115:10
**names** [1] - 89:4
**narrative** [1] - 111:8
**narrow** [1] - 55:25
**natural** [2] - 105:18,
105:20
**nature** [1] - 63:3
**nearly** [1] - 68:25
**necessarily** [6] -
49:23, 85:15, 87:3,
101:24, 112:8, 114:9
**necessary** [7] - 13:25,
17:4, 17:13, 19:15,
23:6, 34:5, 47:20
**necessity** [1] - 107:7
**need** [23] - 13:22,
20:10, 23:6, 23:18,
25:5, 25:15, 27:17,
29:3, 29:21, 32:5,
47:15, 75:1, 75:5,
75:6, 75:8, 75:17,
75:21, 77:1, 99:4,
101:22, 107:21,
109:17, 115:7
**needed** [2] - 23:15,
38:8
**needs** [9] - 8:3, 11:24,
12:19, 14:22, 15:3,
20:4, 23:9, 23:19,
74:9
**negative** [1] - 115:11
**neglectful** [4] - 67:15,
67:17, 68:1, 68:4
**negotiation** [1] - 33:19
**negotiations** [1] -
31:10
**never** [31] - 3:23, 5:3,
5:4, 5:8, 8:1, 10:11,
10:17, 22:22, 25:13,
28:23, 34:25, 35:11,
36:14, 36:23, 44:15,
46:12, 51:9, 52:17,
54:14, 57:24, 59:7,
59:9, 66:7, 66:18,
71:16, 72:3, 73:22,

74:3, 75:5, 107:19,
115:21
**nevertheless** [5] -
5:13, 5:18, 7:24,
29:16, 109:19
**NEW** [1] - 1:1
**New** [6] - 1:5, 1:13,
58:6, 73:20, 73:23,
94:17
**newspapers** [1] -
94:11
**Next** [1] - 63:22
**next** [10] - 14:10,
32:15, 60:12, 62:4,
67:8, 72:14, 98:23,
111:10, 116:7
**night** [3] - 3:19, 88:14,
102:15
**nine** [1] - 4:17
**nobody** [4] - 68:5,
73:19, 107:1
**nonexistence** [1] -
41:3
**normal** [2] - 88:12,
90:11
**normally** [2] - 46:25,
88:9
**Notably** [1] - 72:16
**note** [3] - 82:9, 92:18,
96:22
**noted** [1] - 93:24
**notes** [6] - 82:8,
82:10, 82:11, 82:12,
83:4
**nothing** [12] - 7:3,
11:4, 13:18, 26:20,
43:19, 48:12, 51:23,
69:1, 72:14, 72:18,
72:19
**notice** [3] - 16:18,
49:16, 89:22
**noting** [1] - 41:12
**notion** [1] - 110:5
**notoriety** [5] - 114:7,
115:13, 115:15,
116:11, 116:15
**notorious** [4] - 94:18,
94:21, 115:23, 116:6
**notwithstanding** [1] -
114:22
**November** [1] - 73:2
**nub** [1] - 84:22
**number** [10] - 20:19,
20:20, 49:18, 49:22,
62:20, 63:15, 66:5,
70:18, 89:11, 104:17
**numbers** [1] - 96:15
**numerous** [1] - 104:14
**NY** [1] - 2:3

## O

**oath** [2] - 14:17, 68:6
**object** [3] - 4:9, 13:11,
34:9
**objecting** [2] - 3:12,
12:17
**objection** [2] - 15:21,
34:14
**objections** [2] - 36:10,
92:20
**objects** [1] - 3:11
**obligation** [2] - 57:1,
88:5
**obligations** [3] -
55:19, 56:14, 56:21
**observation** [1] -
40:19
**obstacles** [2] - 69:18,
69:19
**obstructed** [2] -
77:18, 77:21
**obtain** [2] - 58:23,
100:21
**obvious** [1] - 109:19
**obviously** [10] - 15:19,
22:9, 42:2, 88:9,
90:12, 94:13, 95:11,
95:17, 97:10, 103:17
**Obviously** [1] - 100:7
**occasion** [2] - 116:11,
116:14
**occasions** [1] -
116:14
**occur** [1] - 45:8
**occurred** [2] - 98:2,
99:14
**October** [6] - 70:6,
70:23, 73:16, 73:24,
82:19
**OF** [3] - 1:1, 1:3, 1:6
**offensively** [1] - 105:1
**offer** [7] - 12:1, 25:12,
59:1, 66:20, 71:20,
76:25, 77:1
**officer** [3] - 43:4, 82:1,
109:25
**officers** [1] - 100:2
**official** [1] - 2:1
**often** [5] - 63:2, 72:4,
100:12, 112:13,
113:5
**omissions** [6] - 9:24,
24:2, 28:20, 33:11,
51:7, 87:13
**once** [6] - 32:2, 33:2,
37:3, 54:21, 64:4,
109:14
**One** [10] - 28:6, 53:24,
72:14, 72:19, 72:20,

72:23, 74:15, 87:18,
96:10, 98:11
**one** [71] - 6:3, 19:24,
19:25, 23:11, 23:21,
23:24, 24:9, 24:13,
24:22, 32:12, 34:21,
34:23, 36:11, 39:14,
40:18, 42:9, 42:21,
43:1, 49:23, 50:3,
51:1, 51:11, 52:16,
53:2, 58:25, 60:6,
60:8, 60:10, 61:7,
61:14, 62:10, 63:10,
64:7, 65:21, 66:1,
71:16, 72:17, 76:5,
79:19, 80:7, 83:22,
86:12, 88:1, 88:15,
90:4, 91:6, 92:10,
94:17, 96:6, 96:12,
97:2, 98:7, 98:16,
98:17, 98:21, 99:5,
99:9, 100:3, 106:4,
107:6, 107:13,
109:11, 111:5,
111:9, 112:9,
114:10, 115:10,
116:21
**one's** [2] - 88:8, 91:25
**one-day** [1] - 111:5
**ones** [3] - 21:11, 51:2,
67:10
**ongoing** [1] - 88:16
**onset** [1] - 43:18
**onus** [1] - 36:5
**open** [3] - 52:9, 86:17,
88:10
**opened** [1] - 62:13
**opening** [12] - 20:21,
22:4, 22:14, 28:22,
29:23, 49:1, 49:3,
52:10, 54:24, 62:11,
62:15, 63:12
**opens** [1] - 86:17
**operating** [2] - 79:8,
79:13
**opine** [1] - 31:16
**opinion** [6] - 52:3,
52:5, 54:2, 61:4,
93:7, 94:7
**opinions** [2] - 42:25,
48:14
**opportunity** [2] -
92:24, 115:18
**oppose** [1] - 113:8
**opposed** [1] - 25:4
**opposite** [2] - 78:22,
87:7
**opposition** [2] - 49:17,
107:18
**oranges** [1] - 30:16

**orchestrated** [2] - 72:22, 72:23
**order** [13] - 5:23, 10:20, 11:25, 20:5, 25:24, 42:20, 44:14, 49:7, 74:11, 87:14, 97:24, 98:3, 99:15
**ordinarily** [1] - 63:24
**originally** [1] - 51:14
**Originally** [1] - 51:16
**originated** [1] - 68:24
**otherwise** [2] - 47:2, 55:17
**ourselves** [1] - 62:24
**outline** [1] - 65:14
**outrageous** [2] - 79:5
**outright** [1] - 3:11
**outside** [12] - 36:4, 48:17, 54:13, 55:21, 55:22, 80:16, 80:21, 82:5, 82:9, 104:13, 104:14
**outstanding** [3] - 33:14, 33:15, 33:17
**over-promise** [1] - 23:19
**overall** [1] - 91:11
**overlapping** [1] - 27:1
**overstate** [1] - 23:19
**overstating** [1] - 113:1
**overwhelming** [1] - 29:11
**own** [23] - 4:6, 9:13, 10:17, 21:23, 32:9, 44:2, 44:15, 44:25, 71:17, 73:17, 73:25, 75:7, 80:18, 88:8, 88:22, 90:9, 91:16, 91:25, 101:10, 102:23, 106:9, 106:14
**owner** [2] - 40:20, 40:21
**ownership** [1] - 40:21

**P**

**P.C** [1] - 1:17
**p.m** [2] - 1:8, 117:8
**Pacer** [1] - 36:9
**Paes** [2] - 2:16, 73:21
**PAES** [1] - 1:15
**page** [19] - 3:8, 32:15, 49:16, 60:12, 63:13, 63:14, 65:9, 66:5, 67:9, 69:14, 76:22, 80:11, 90:20, 98:23, 103:25, 104:3, 104:4
**pages** [2] - 75:13, 103:24

**paid** [4] - 10:2, 10:5, 20:23, 116:23
**paint** [1] - 74:24
**paper** [1] - 16:8
**papers** [11] - 5:6, 7:18, 43:1, 43:3, 51:24, 61:14, 69:13, 72:18, 76:22, 96:23, 96:24
**paradigm** [1] - 23:7
**paragraph** [1] - 72:23
**parallel** [2] - 38:5, 51:25
**parameters** [1] - 16:19
**pardon** [1] - 61:23
**part** [23] - 3:12, 6:20, 7:12, 10:7, 10:8, 10:17, 16:12, 17:10, 20:12, 29:4, 29:13, 31:10, 51:8, 52:20, 55:19, 78:14, 87:8, 99:24, 105:21, 107:18, 109:2, 109:6, 112:2
**parte** [6] - 4:3, 15:12, 17:8, 34:10, 34:21, 86:5
**partially** [2] - 32:1
**participate** [1] - 43:24, 80:25, 81:2, 116:16
**participated** [1] - 64:16
**participating** [2] - 44:7, 70:5
**particular** [7] - 8:18, 15:22, 20:10, 23:8, 24:5, 24:12, 94:6
**particularly** [7] - 21:4, 39:2, 62:22, 98:1, 98:12, 110:11, 110:13
**particulars** [1] - 110:5
**parties** [6] - 3:14, 3:17, 15:14, 34:21, 73:11, 86:24
**partner** [6] - 6:21, 58:5, 77:6, 77:14, 77:15, 77:22
**party** [5] - 14:2, 14:12, 22:24, 67:16, 87:4
**pass** [1] - 12:2
**passed** [2] - 6:19, 35:19
**passing** [1] - 68:13
**patent** [1] - 102:19
**Paul** [1] - 71:15
**pause** [1] - 24:6
**pay** [1] - 99:9
**paying** [2] - 7:24, 84:20
**payment** [1] - 82:21

**payments** [1] - 83:19
**pays** [1] - 41:10
**pending** [1] - 2:21
**people** [15] - 5:22, 7:25, 26:21, 29:8, 29:17, 32:7, 43:20, 63:6, 67:22, 88:9, 98:15, 110:24, 110:25, 114:22, 116:12
**percent** [1] - 86:14
**perception** [1] - 73:14
**performed** [1] - 10:6
**perhaps** [5] - 25:11, 31:14, 42:5, 48:25, 50:14
**period** [7] - 9:14, 26:24, 31:10, 45:19, 55:23, 58:1, 81:15
**permissible** [1] - 66:16
**permit** [1] - 93:7
**permitted** [1] - 2:15
**person** [9] - 13:24, 35:23, 37:21, 46:11, 46:15, 55:7, 79:12, 88:12, 116:12
**persona** [1] - 94:8
**personal** [7] - 13:25, 14:16, 37:15, 41:7, 53:12, 102:7, 102:24
**personally** [3] - 41:4, 71:2
**perspective** [3] - 26:9, 79:1, 101:18
**persuaded** [2] - 83:22, 83:23
**persuasive** [2] - 94:23, 95:4
**phase** [1] - 99:22
**phone** [2] - 80:25, 81:2
**phrase** [1] - 87:24
**pick** [1] - 10:9
**piece** [4] - 25:11, 29:9, 31:18, 54:22
**pigeonhole** [1] - 26:12
**pitch** [2] - 34:17, 37:19
**place** [1] - 101:25
**plaintiff** [1] - 110:11
**play** [1] - 48:24
**played** [1] - 29:14
**plays** [1] - 114:13
**Plaza** [2] - 1:13, 2:2
**plenty** [1] - 93:3
**plus** [1] - 108:13
**point** [36] - 7:22, 15:20, 16:5, 22:2, 33:12, 33:15, 34:23,

35:1, 35:6, 35:12, 39:22, 40:11, 45:6, 46:17, 53:23, 65:12, 66:2, 68:20, 71:13, 80:7, 83:16, 84:9, 86:8, 87:18, 89:10, 89:17, 89:19, 90:5, 90:19, 100:4, 103:21, 108:16, 112:11, 114:6, 114:17
**pointed** [1] - 115:14
**pointing** [13] - 9:14, 59:5, 59:6, 63:6, 97:5, 98:4, 98:13, 98:17, 98:20, 106:19, 106:21, 107:12, 109:11
**points** [10] - 19:12, 33:1, 37:25, 63:18, 78:10, 78:11, 91:21, 103:22, 111:22, 111:23
**pool** [4] - 114:19, 114:20, 114:21, 114:25
**poor** [1] - 29:19
**Porter** [1] - 31:15
**portions** [1] - 95:12
**portrait** [1] - 74:24
**position** [42] - 3:7, 3:9, 5:8, 9:22, 10:16, 16:15, 17:3, 18:23, 35:13, 37:10, 38:14, 39:15, 40:15, 40:20, 41:14, 42:3, 43:18, 44:3, 45:14, 47:3, 49:3, 50:10, 50:16, 58:18, 61:18, 70:8, 81:8, 81:19, 85:11, 85:16, 87:10, 93:19, 93:22, 99:17, 101:5, 102:8, 116:9, 116:20, 116:21
**positions** [2] - 72:17, 100:10
**possession** [5] - 52:21, 56:23, 57:20, 104:24
**possibility** [1] - 67:1
**possible** [4] - 22:12, 37:1, 63:8, 114:1
**possibly** [4] - 16:10, 67:3, 94:19, 104:3
**post** [8] - 6:23, 46:19, 81:4, 95:10, 113:12, 113:16, 113:22, 113:24
**post-3500** [1] - 16:4
**post-arrest** [2] - 6:23,

46:19
**potential** [1] - 115:18
**potentially** [7] - 21:5, 21:21, 64:4, 65:6, 65:7, 103:12
**practical** [2] - 36:15, 44:9, 44:12
**practicality** [1] - 112:16
**preclude** [1] - 40:23
**precludes** [1] - 91:6
**predate** [1] - 28:7
**predisposed** [1] - 115:1
**prejudging** [1] - 16:16
**prejudice** [17] - 34:13, 51:17, 61:22, 62:8, 62:11, 62:18, 63:20, 93:15, 94:24, 107:9, 107:14, 107:22, 108:23, 109:2, 109:17, 112:1
**prejudices** [2] - 107:15, 109:20
**prejudicial** [2] - 109:19, 111:15
**prep** [1] - 16:20
**prepared** [4] - 4:2, 14:10, 15:5, 81:4
**preparing** [2] - 10:6, 10:7
**presence** [1] - 18:7
**present** [11] - 8:13, 10:21, 18:8, 19:18, 27:24, 48:1, 49:18, 57:5, 57:9, 98:16
**presentation** [1] - 90:10
**presented** [2] - 49:13, 49:14
**press** [2] - 38:12, 53:14
**presume** [1] - 27:22
**presumption** [3] - 26:4, 45:12, 101:10
**pretend** [1] - 80:20
**pretrial** [4] - 21:10, 24:14, 24:20, 88:11
**pretty** [1] - 38:7
**preview** [2] - 23:22, 34:12
**primary** [1] - 16:11
**principal** [4] - 7:10, 27:20, 90:20, 105:17
**principally** [1] - 60:4
**principals** [1] - 109:22
**principle** [3] - 56:10, 66:6, 87:11
**prison** [2] - 36:1, 36:2
**private** [2] - 73:11,

82:3
**Privilege** [1] - 33:16
**privilege** [11] - 33:23, 33:24, 34:1, 34:2, 55:15, 55:18, 56:2, 73:6, 102:5, 102:10, 104:25
**privileged** [8] - 55:4, 64:11, 64:14, 102:3, 102:16, 102:22, 104:9, 104:23
**privileges** [4] - 33:18, 55:24, 55:25, 56:3
**proactive** [1] - 69:11
**problem** [12] - 15:25, 26:8, 37:8, 52:23, 63:2, 65:5, 65:15, 82:11, 90:2, 90:4, 102:5, 108:7
**problems** [2] - 65:9, 113:14
**procedure** [3] - 79:8, 79:13, 79:15
**procedures** [1] - 88:11
**proceed** [5] - 8:23, 24:18, 95:16, 97:11, 101:10
**proceeding** [3] - 26:2, 51:25, 71:18
**Proceedings** [2] - 2:5, 117:8
**proceedings** [5] - 25:21, 43:6, 43:7, 48:19, 48:21
**process** [9] - 29:5, 29:17, 31:1, 61:10, 67:5, 90:21, 90:24, 91:1
**produce** [2] - 3:23, 103:19
**produced** [7] - 2:5, 15:16, 57:17, 82:10, 82:15, 103:5, 103:20
**producing** [1] - 58:8
**product** [1] - 90:6
**production** [1] - 36:13
**professor** [2] - 3:8, 92:19
**Professor** [3] - 107:25, 108:2, 108:5
**professor's** [1] - 93:11
**proffer** [6] - 11:13, 15:18, 22:8, 70:25, 104:5, 104:8
**proffered** [2] - 19:4, 25:15, 78:3
**project** [1] - 27:24
**prominent** [5] - 8:23, 18:15, 18:19, 77:8, 116:22

**promise** [3] - 23:19, 43:8, 52:9
**pronunciation** [1] - 107:11
**proof** [9] - 11:22, 11:24, 12:1, 12:9, 12:10, 12:11, 36:13, 99:12, 100:25
**propensity** [1] - 113:6
**proper** [1] - 89:4
**proposal** [1] - 33:2
**proposing** [2] - 103:1, 103:3
**proposition** [2] - 63:16, 107:4
**propositions** [1] - 13:15
**prosecution** [1] - 35:3
**prosecutor** [7] - 7:1, 49:5, 58:5, 62:17, 62:22, 77:8, 98:6
**prosecutors** [1] - 63:10
**protected** [1] - 55:17
**protracted** [1] - 61:7
**prove** [30] - 12:19, 12:20, 31:24, 52:11, 52:14, 58:14, 64:22, 69:20, 72:11, 75:3, 75:5, 75:7, 75:8, 76:11, 78:6, 78:9, 82:12, 85:21, 86:1, 86:14, 86:16, 86:19, 86:23, 87:6, 87:14, 105:14, 109:12, 109:18, 112:21
**proven** [2] - 49:21, 73:13
**proves** [2] - 63:15, 104:21
**provide** [9] - 7:4, 11:25, 14:10, 14:23, 15:5, 17:24, 35:14, 56:18, 57:10
**provided** [14] - 6:6, 10:25, 13:4, 14:20, 15:4, 23:19, 34:7, 45:23, 55:12, 67:20, 77:9, 82:22, 82:23, 87:7
**provides** [1] - 47:9
**providing** [5] - 7:7, 8:20, 34:13, 56:14, 104:10
**proving** [2] - 67:10, 67:11
**proxy** [2] - 70:7, 70:9
**public** [5] - 94:1, 94:3, 94:8, 115:9, 116:11
**publicly** [1] - 70:9

**published** [1] - 51:2
**pulled** [1] - 36:9
**pure** [1] - 68:5
**purely** [2] - 43:13
**purposes** [4] - 7:19, 25:3, 104:20, 109:25
**pursuant** [2] - 82:21, 83:1
**put** [25] - 7:21, 14:12, 15:18, 17:9, 22:25, 31:15, 32:5, 36:5, 37:9, 61:1, 71:8, 71:12, 72:9, 73:3, 79:17, 81:22, 86:10, 96:24, 99:11, 104:18, 107:25, 108:4, 110:2, 112:13, 112:25
**putting** [4] - 81:6, 100:25, 110:9, 114:17

### Q

**questions** [11] - 7:13, 7:14, 44:12, 71:6, 78:18, 79:19, 79:23, 80:4, 106:8, 107:14, 117:2
**quick** [1] - 33:1
**quicker** [1] - 42:13
**quickly** [3] - 95:6, 111:24, 111:25
**quietly** [1] - 50:21
**quintessential** [2] - 59:23, 59:24
**quintessentially** [2] - 62:2, 62:7
**quite** [3] - 5:22, 42:4, 58:6
**quote** [9] - 61:4, 62:4, 66:10, 66:11, 66:13, 68:12, 80:7, 80:10, 107:5

### R

**raise** [9] - 22:17, 30:3, 35:1, 39:22, 42:16, 56:20, 93:16, 102:1, 108:15
**raised** [10] - 30:22, 35:1, 35:11, 36:11, 36:14, 39:2, 61:14, 65:9, 65:14, 92:9
**raises** [1] - 55:12
**raising** [2] - 28:8, 61:19
**ramp** [1] - 98:4
**ramped** [1] - 97:23

**ramping** [5] - 101:7, 105:8, 109:24, 109:25, 110:5
**ran** [2] - 36:1
**range** [1] - 96:25
**rare** [3] - 52:6, 54:17, 59:14
**rarest** [1] - 52:23
**rather** [5] - 3:15, 16:13, 38:16, 61:7, 84:18
**Re** [1] - 36:12
**reaching** [1] - 93:14
**read** [4] - 7:18, 9:19, 31:14, 65:10
**reading** [1] - 12:13
**ready** [2] - 37:22, 87:16
**real** [5] - 7:4, 82:22, 82:23, 83:11, 90:6
**reality** [1] - 63:3
**realize** [1] - 57:18
**really** [32] - 8:19, 9:11, 10:15, 11:3, 15:10, 17:11, 20:3, 21:17, 23:22, 28:17, 29:21, 35:18, 36:11, 36:16, 49:12, 55:14, 61:17, 89:18, 89:20, 90:1, 90:6, 91:4, 92:15, 92:22, 94:22, 95:6, 95:23, 96:9, 101:21, 105:7, 108:22, 111:21
**realm** [1] - 40:13
**reason** [16] - 15:16, 16:12, 17:7, 21:25, 34:12, 40:5, 48:11, 49:25, 58:12, 65:19, 66:9, 71:21, 71:25, 94:10, 95:18, 99:9
**reasonable** [6] - 9:1, 11:10, 16:4, 48:19, 56:16, 85:21
**reasonably** [2] - 10:23, 63:21
**reasons** [4] - 42:24, 96:7, 115:11, 115:13
**rebut** [1] - 19:7
**received** [7] - 9:23, 16:15, 68:18, 71:1, 73:24, 103:7, 105:3
**recent** [1] - 35:1
**recently** [1] - 55:12
**reciprocal** [2] - 56:13, 56:21, 103:17
**reckless** [4] - 45:15, 45:16, 45:18, 45:19
**recognize** [1] - 60:1
**recognizing** [1] -

110:18
**reconcilable** [1] - 46:16
**reconcile** [1] - 43:14
**reconciled** [1] - 42:19
**reconsider** [1] - 52:1
**reconsideration** [1] - 51:15
**record** [5] - 17:1, 19:4, 26:14, 26:23, 68:8
**recorded** [1] - 2:5
**recording** [1] - 55:17
**records** [8] - 7:8, 7:9, 10:5, 57:21, 76:23, 76:24, 77:11, 77:12
**red** [1] - 95:6
**Reed** [1] - 2:25
**REED** [1] - 1:22
**reference** [1] - 87:25
**referenced** [2] - 88:15, 92:10
**referred** [1] - 38:11
**reflect** [1] - 53:16
**reflected** [4] - 76:8, 83:19, 83:25, 84:3
**regard** [4] - 23:12, 24:25, 30:5, 85:5
**regarding** [10] - 30:8, 30:14, 33:18, 50:22, 57:20, 70:7, 71:13, 78:20, 89:25
**regardless** [1] - 5:9
**regroup** [1] - 16:12
**reject** [2] - 11:25, 42:21
**rejected** [1] - 83:9
**rejects** [1] - 6:1
**relate** [2] - 9:24, 94:2
**related** [10] - 4:16, 4:18, 4:20, 4:21, 9:21, 33:15, 103:13, 112:21, 113:17
**relates** [2] - 72:13, 113:22
**relating** [2] - 8:13, 73:11
**relations** [2] - 69:23, 70:4
**relationship** [7] - 26:12, 38:10, 38:11, 39:13, 70:22, 88:17, 102:7
**relationships** [1] - 108:7
**release** [2] - 38:12, 53:14
**relevance** [1] - 89:11
**relevant** [13] - 10:4, 45:2, 46:4, 46:5, 48:9, 66:11, 77:16,

89:14, 89:15, 93:14, 113:23, 114:4
**reliable** [1] - 24:16
**reliance** [17] - 4:7, 4:8, 9:5, 11:16, 11:21, 12:9, 12:25, 18:22, 19:3, 21:8, 22:7, 27:21, 28:24, 32:1, 40:12, 51:20, 67:14
**relied** [6] - 7:22, 14:9, 20:9, 24:4, 32:8, 113:5
**relies** [3] - 55:18, 107:3, 107:4
**relieve** [1] - 42:21
**rely** [8] - 9:2, 14:21, 18:16, 20:25, 26:4, 28:11, 45:20, 50:10
**relying** [2] - 10:23, 68:3
**remarkable** [1] - 80:10
**remedy** [1] - 49:9
**remember** [4] - 54:11, 58:2, 84:1, 104:12
**Remember** [1] - 55:22
**removed** [1] - 82:20
**render** [1] - 23:15
**repay** [3] - 5:22, 5:24, 77:7
**repaying** [1] - 77:5
**repeatedly** [2] - 79:14, 80:1
**repel** [1] - 86:4
**reply** [8] - 3:19, 15:10, 61:20, 61:21, 66:4, 66:5, 92:18, 92:22
**report** [3] - 68:22, 75:21, 76:16
**Reporter** [2] - 2:1, 2:1
**reporting** [1] - 76:14
**represent** [4] - 38:15, 43:3, 53:16
**representation** [8] - 5:11, 14:25, 56:1, 69:22, 70:17, 102:18, 102:25, 104:12
**representations** [2] - 4:10, 8:1
**representative** [6] - 50:23, 51:4, 51:6, 51:7, 105:17, 108:8
**represented** [9] - 31:23, 38:16, 53:7, 53:8, 53:11, 53:21, 53:22, 57:19, 83:3
**representing** [11] - 30:7, 51:20, 55:23, 58:4, 58:7, 69:7, 69:25, 70:16, 83:4

**request** [1] - 114:16
**requested** [2] - 8:16, 113:9
**requesting** [1] - 3:5
**requests** [2] - 56:15, 103:17
**require** [2] - 37:15, 42:9
**required** [15] - 3:22, 3:25, 4:24, 12:10, 12:18, 17:4, 18:23, 23:3, 24:14, 24:19, 26:4, 26:7, 42:5, 42:22, 71:20
**requires** [4] - 17:24, 25:10, 107:7, 107:13
**research** [3] - 34:24, 115:6, 115:8
**resolution** [1] - 39:6
**resolve** [2] - 33:17, 41:2
**resolved** [2] - 32:12, 32:13
**resource** [1] - 48:25
**resources** [2] - 42:8, 96:18
**respect** [32] - 4:17, 5:4, 6:9, 12:23, 21:4, 21:5, 27:8, 27:14, 28:7, 29:14, 33:4, 33:10, 33:23, 40:15, 45:22, 50:11, 57:19, 76:3, 77:3, 77:3, 84:11, 93:21, 94:9, 95:14, 98:1, 98:9, 99:24, 102:11, 106:11, 112:6, 114:6, 116:15
**respectfully** [7] - 4:2, 7:17, 16:1, 19:2, 29:2, 56:7, 67:7
**respective** [1] - 42:24
**respects** [2] - 58:21, 95:11
**respond** [10] - 15:9, 17:2, 25:15, 34:19, 39:23, 40:6, 92:24, 105:7, 116:1
**responded** [1] - 70:13
**responds** [1] - 73:25
**response** [8] - 3:6, 5:2, 22:9, 22:20, 40:18, 42:6, 93:17, 108:11
**responsibility** [1] - 99:8
**responsible** [5] - 23:2, 44:4, 48:15, 68:18, 76:1
**rest** [2] - 18:3, 82:20
**restrictions** [1] - 29:23

**rests** [2] - 18:2, 22:21
**result** [1] - 45:17
**retained** [3] - 28:2, 28:16, 29:16
**retainer** [3] - 40:19, 40:23, 41:3
**retention** [1] - 28:7
**Retrophin** [53] - 4:18, 4:21, 5:8, 5:21, 19:22, 26:23, 27:13, 33:3, 33:9, 33:17, 33:23, 38:16, 38:21, 39:14, 41:8, 53:8, 53:21, 55:4, 55:8, 55:9, 55:22, 55:23, 55:24, 57:19, 64:13, 68:21, 73:12, 74:14, 75:20, 75:22, 80:9, 80:13, 80:18, 80:21, 81:9, 82:16, 82:17, 82:18, 82:20, 83:3, 83:18, 83:21, 84:19, 94:9, 95:14, 99:8, 102:10, 102:17, 103:14, 104:9, 104:14, 104:24, 105:24
**Retrophin's** [5] - 12:4, 33:23, 83:6, 83:10, 84:13
**reveal** [3] - 15:23, 55:15, 56:11
**reversed** [1] - 42:24
**review** [3] - 4:4, 12:17, 91:18
**reviewed** [2] - 13:14, 14:19
**rhetoric** [3] - 99:14, 99:21, 101:7
**Richardson** [3] - 75:15, 75:16, 76:16
**Richardson's** [2] - 75:23, 76:9
**rights** [4] - 90:3, 91:8, 91:19, 91:24
**ripened** [1] - 90:5
**risk** [4] - 63:8, 65:3, 112:1
**road** [2] - 46:12, 100:10
**robe** [1] - 93:11
**ROHDE** [1] - 1:12
**role** [5] - 29:13, 80:7, 93:10, 95:13
**room** [3] - 62:18, 79:17, 81:1
**rose** [1] - 10:13
**Rosenfeld** [15] - 32:13, 60:7, 60:8, 82:14, 82:17, 82:18,

82:20, 83:1, 83:2, 83:8, 83:11, 84:16, 85:6, 85:14
**Rosenfeld's** [3] - 83:14, 83:15, 83:20
**Rubin** [2] - 2:24, 45:11
**RUBIN** [3] - 1:22, 2:24, 41:19
**rule** [7] - 23:5, 23:16, 24:25, 25:9, 25:22, 47:19, 90:11
**Rule** [5] - 23:7, 25:9, 25:13, 72:6
**ruled** [2] - 6:4, 21:13
**Rules** [4] - 22:24, 25:19, 93:6, 94:11
**rules** [4] - 23:2, 88:9, 89:25, 90:14
**ruling** [6] - 7:18, 10:21, 16:16, 17:23, 25:11, 34:11
**rulings** [1] - 16:10
**running** [1] - 26:3

---

**S**

**safety** [1] - 79:11
**sake** [1] - 62:7
**sanitation** [1] - 114:1
**sanitize** [4] - 46:18, 46:19, 95:10, 113:13
**sanitized** [2] - 47:14, 95:15
**sat** [1] - 51:14
**saw** [2] - 7:17, 71:16
**scenario** [5] - 51:3, 65:17, 108:14, 114:2, 114:13
**scenarios** [3] - 45:7, 49:22, 78:19
**schedule** [2] - 16:23, 34:6
**scheduled** [1] - 3:4
**scheme** [4] - 72:20, 74:14, 105:17, 105:21
**schemes** [5] - 20:1, 20:2, 24:8, 78:5, 94:25
**Scott** [6] - 93:4, 97:8, 97:18, 106:21, 107:2
**screaming** [1] - 111:17
**Scully** [3] - 21:11, 21:13, 71:15
**seal** [2] - 4:3, 13:19
**search** [1] - 96:18
**searched** [2] - 50:25, 53:25
**seat** [1] - 2:10

**SEC** [22] - 51:25, 57:22, 58:5, 58:8, 70:7, 71:7, 73:17, 74:8, 74:19, 74:20, 75:6, 75:19, 77:8, 77:9, 77:15, 77:18, 77:20, 83:15, 83:18, 83:25, 84:3, 84:8
**SEC's** [1] - 76:17
**second** [9] - 14:11, 23:13, 66:23, 67:9, 72:11, 72:22, 91:7, 93:1, 107:8
**Second** [4] - 91:3, 93:4, 94:19, 97:8
**secret** [1] - 5:5
**secretary** [1] - 81:24
**Section** [1] - 93:6
**section** [1] - 66:11
**sections** [1] - 95:10
**see** [27] - 11:21, 15:15, 15:16, 17:11, 18:11, 22:15, 26:9, 34:12, 34:17, 37:1, 37:15, 39:1, 40:3, 40:4, 48:8, 48:11, 59:5, 59:16, 64:3, 78:17, 87:2, 91:14, 96:25, 100:16, 102:15, 108:13, 109:10
**seeing** [1] - 34:5
**seek** [4] - 63:22, 112:8, 112:19, 114:11
**seeking** [2] - 14:2, 39:3
**seeks** [2] - 25:12, 93:9
**seem** [1] - 10:1
**selected** [1] - 12:7
**selection** [1] - 34:15
**selfies** [1] - 116:14
**sending** [2] - 20:17, 23:25
**sense** [8] - 22:11, 27:3, 60:2, 63:4, 91:7, 104:20, 110:22, 115:8
**sent** [1] - 20:18
**separate** [13] - 11:18, 33:9, 40:10, 45:13, 47:23, 49:10, 49:11, 49:14, 75:18, 95:3, 98:1, 99:16, 112:7
**separated** [3] - 8:18, 54:14, 95:15
**separately** [2] - 48:2, 57:8
**series** [6] - 5:7, 50:22, 55:25, 79:18, 80:4, 101:15

Serpoosh [3] - 91:2, 98:14, 109:15
SERPOOSH [1] - 91:2
serve [1] - 82:5
served [2] - 56:15, 82:9
service [1] - 7:5
services [3] - 6:6, 7:7, 7:8
set [5] - 16:21, 42:24, 95:7, 96:7, 99:2
sets [2] - 49:16, 96:10
settle [1] - 27:12
settlement [28] - 5:24, 6:10, 6:14, 6:18, 7:13, 8:24, 10:8, 13:7, 18:21, 19:24, 26:22, 27:13, 28:17, 32:10, 33:2, 81:12, 81:13, 81:14, 83:19, 83:21, 83:25, 84:2, 84:4, 84:6, 84:19, 84:24, 86:8, 86:10
settling [2] - 84:12, 84:13
seven [1] - 68:22
Seven [19] - 19:25, 26:11, 33:3, 40:2, 72:15, 74:17, 78:2, 78:4, 78:8, 84:10, 84:11, 85:19
sever [1] - 27:1
several [3] - 9:13, 61:6, 79:21
severance [47] - 6:25, 9:18, 18:9, 27:4, 37:22, 37:25, 39:4, 39:5, 39:6, 39:8, 39:20, 40:5, 40:16, 41:20, 42:4, 42:7, 42:22, 49:8, 51:12, 51:24, 64:7, 65:18, 66:7, 66:16, 66:18, 66:19, 66:22, 67:4, 90:20, 92:15, 92:16, 93:15, 97:24, 98:9, 99:15, 99:22, 100:21, 105:9, 106:15, 108:18, 108:20, 110:19, 112:4, 112:12, 112:13, 116:9, 116:19
severed [3] - 54:8, 54:9, 96:21
severing [1] - 27:2
sham [12] - 6:2, 6:8, 7:12, 26:21, 26:22, 82:17, 82:18, 82:24, 83:5, 83:10

shared [1] - 102:14
shares [3] - 20:1, 26:17, 69:1
sharing [1] - 34:11
shift [2] - 35:2, 37:11
shifts [1] - 22:22
SHKRELI [1] - 1:8
Shkreli [191] - 2:12, 2:21, 2:23, 4:12, 4:17, 4:22, 5:6, 5:11, 5:15, 6:12, 6:16, 7:1, 7:4, 7:7, 9:2, 9:10, 9:14, 9:21, 9:24, 10:2, 10:5, 10:11, 10:23, 11:1, 11:8, 12:11, 14:9, 14:20, 15:3, 15:17, 18:13, 19:6, 20:14, 20:22, 21:6, 23:25, 24:17, 26:15, 27:11, 27:17, 26:8, 28:18, 29:7, 29:12, 30:7, 30:13, 30:18, 31:21, 31:22, 34:2, 36:20, 37:10, 37:18, 38:12, 38:16, 38:23, 38:24, 40:25, 41:1, 41:3, 41:7, 41:9, 42:10, 42:12, 42:13, 43:6, 43:8, 43:19, 43:21, 43:23, 43:24, 44:1, 44:4, 44:14, 44:23, 44:24, 45:15, 45:22, 46:7, 46:11, 46:15, 46:24, 46:25, 47:10, 47:25, 48:10, 48:20, 49:2, 49:10, 50:4, 50:8, 50:12, 52:17, 53:11, 53:17, 54:19, 55:1, 55:2, 55:6, 55:14, 57:8, 57:16, 57:22, 58:4, 58:7, 58:10, 58:11, 58:14, 58:17, 59:22, 60:5, 62:12, 62:13, 63:1, 64:1, 64:5, 64:8, 64:16, 64:23, 64:24, 66:14, 68:2, 68:11, 68:12, 68:16, 68:20, 68:24, 69:2, 69:12, 70:13, 70:17, 71:2, 71:8, 72:8, 73:9, 73:15, 73:23, 74:8, 74:20, 74:22, 75:2, 75:5, 75:7, 75:9, 75:15, 75:22, 76:9, 76:13, 76:15, 77:4, 77:5, 77:9, 77:10, 77:13, 77:17, 77:19, 82:19, 85:17, 86:3, 86:22,

86:24, 87:4, 87:6, 87:9, 88:17, 88:22, 89:7, 89:19, 89:22, 92:11, 94:1, 94:5, 95:11, 98:2, 99:18, 101:6, 101:9, 101:16, 102:4, 102:8, 102:9, 104:10, 104:16, 105:4, 110:7, 110:17, 111:6, 115:21, 116:10
Shkreli's [37] - 3:6, 5:20, 7:16, 8:14, 11:12, 12:23, 30:4, 31:6, 34:6, 35:15, 41:4, 41:6, 41:13, 45:12, 45:25, 48:7, 49:19, 52:11, 52:14, 52:19, 52:25, 53:17, 55:1, 59:18, 62:14, 62:25, 65:2, 65:4, 67:14, 77:25, 88:20, 88:21, 88:22, 88:25, 95:8, 102:24, 104:6
shocked [1] - 107:22
short [3] - 4:22, 14:8, 15:3
shorthanded [1] - 35:8
show [23] - 7:9, 14:3, 14:22, 14:24, 20:10, 30:13, 30:25, 46:13, 47:4, 52:22, 56:24, 58:20, 65:25, 67:22, 76:5, 77:12, 78:15, 81:7, 89:15, 99:4, 101:20, 103:11, 108:5
showed [1] - 51:9
showing [7] - 20:15, 21:3, 21:14, 21:20, 24:3, 38:6, 40:4
shown [1] - 101:24
shows [10] - 30:25, 45:16, 48:24, 70:19, 83:14, 89:12, 94:22, 109:15, 113:6, 115:14
Shrekli [1] - 1:17
side [5] - 22:7, 25:13, 34:21, 39:14, 110:10
side-bar [2] - 22:7, 25:13
sidebar [2] - 42:14, 43:2
signed [3] - 13:20, 83:18, 84:3
significance [2] - 75:10, 104:4

significant [1] - 42:6
similar [5] - 25:2, 53:5, 56:3, 93:17, 112:11
simple [5] - 16:7, 57:10, 95:9, 110:23, 111:2
simplicity [1] - 110:21
simply [5] - 55:12, 67:15, 68:12, 69:4, 111:14
single [5] - 51:1, 53:3, 71:16, 71:19, 79:2
sit [2] - 50:14, 116:2
sits [1] - 72:7
sitting [4] - 56:25, 83:17, 92:1, 116:7
situation [6] - 52:24, 56:3, 88:19, 89:18, 96:11, 108:19
six [4] - 20:2, 30:15, 33:5, 33:12
Six [6] - 26:11, 72:14, 72:19, 72:20, 72:24, 74:15
skeptical [2] - 97:25, 99:6
skewed [1] - 114:25
small [2] - 82:2, 82:4
smelling [1] - 10:13
SMITH [26] - 1:14, 2:15, 15:9, 16:23, 19:11, 19:14, 22:19, 23:17, 25:2, 28:4, 28:13, 33:1, 33:20, 34:1, 34:9, 37:23, 39:24, 92:7, 97:13, 99:1, 100:7, 100:13, 101:14, 103:3, 103:9, 117:2
Smith [6] - 2:16, 15:8, 19:10, 39:23, 101:13, 111:22
Smith's [1] - 112:11
solicitation [2] - 70:7, 70:10
solo [4] - 112:24, 113:4, 113:10, 114:15
solve [4] - 37:1, 37:5, 37:8
someone [5] - 27:12, 35:10, 45:18, 88:13, 110:12
sometimes [1] - 96:3
somewhat [2] - 11:22, 47:23
sophisticated [1] - 50:6
sorry [4] - 11:5, 57:14,

67:9, 80:14
sort [7] - 36:11, 45:7, 50:12, 52:6, 108:18, 110:9, 114:5
sorts [1] - 23:10
sought [3] - 14:3, 21:25, 112:19
sound [1] - 90:25
sounds [2] - 15:15, 101:22
source [1] - 68:13
Southern [2] - 58:6, 73:23
Spatt [6] - 42:1, 42:18, 49:6, 51:18, 51:25, 59:24
speaking [1] - 53:9
speaks [1] - 23:5
species [1] - 20:7
specific [21] - 20:8, 23:20, 29:8, 29:15, 29:20, 30:24, 34:14, 40:11, 44:11, 48:5, 52:12, 77:3, 87:24, 88:7, 88:8, 89:20, 90:3, 91:15, 91:19, 91:24, 110:2
specifically [5] - 13:11, 20:16, 31:3, 96:11, 102:21
specifics [1] - 45:9
specious [1] - 100:21
speculating [1] - 65:18
speculation [3] - 68:5, 69:4, 90:5
spend [3] - 42:14, 49:12, 63:25
spent [2] - 116:10, 116:18
spill [1] - 51:17
spillover [5] - 92:10, 94:24, 95:4, 111:20, 112:1
spoken [1] - 10:12
squarely [1] - 53:6
Srinivasan [1] - 2:16
SRINIVASAN [1] - 1:15
stabbing [2] - 98:15, 99:13
stand [24] - 7:21, 13:15, 32:6, 44:10, 55:3, 58:17, 60:10, 63:4, 64:9, 64:24, 66:19, 71:11, 71:18, 71:20, 71:23, 72:4, 72:13, 77:23, 79:4, 89:23, 101:22, 105:11, 110:4, 111:5

**standalone** [1] - 36:7
**standard** [4] - 25:5, 66:8, 79:8, 79:12
**standards** [3] - 49:19, 62:24
**standing** [1] - 63:15
**standpoint** [2] - 36:16, 74:18
**start** [1] - 19:13
**started** [4] - 22:13, 58:3, 70:16
**starting** [4] - 28:21, 35:13, 58:7, 58:8
**starts** [1] - 70:22
**state** [4] - 2:13, 31:17, 51:1, 76:24
**statement** [46] - 5:13, 5:14, 5:19, 6:22, 7:2, 7:3, 9:16, 14:17, 14:18, 15:3, 20:22, 25:3, 25:4, 26:7, 26:14, 26:15, 29:24, 31:12, 31:16, 33:6, 41:13, 46:19, 46:21, 46:25, 47:2, 47:3, 47:5, 47:11, 47:13, 49:1, 49:3, 52:10, 53:13, 54:24, 62:6, 71:7, 71:8, 71:12, 95:7, 95:11, 95:18, 112:25, 113:25
**statements** [33] - 15:18, 19:16, 20:17, 22:14, 24:1, 24:23, 37:13, 39:16, 48:7, 48:16, 63:12, 72:5, 72:8, 76:25, 78:20, 78:23, 79:24, 79:25, 80:2, 80:3, 81:4, 92:23, 93:25, 94:1, 94:3, 94:5, 95:8, 95:14, 102:24, 113:13, 113:16, 114:2, 114:22
**STATES** [2] - 1:1, 1:3
**States** [7] - 1:12, 61:2, 62:5, 71:14, 71:15, 91:3, 93:3
**stating** [1] - 3:9
**statistically** [1] - 104:19
**STATUS** [1] - 1:6
**stenography** [1] - 2:5
**step** [7] - 58:25, 62:4, 90:21, 90:24, 90:25, 93:10
**Stepping** [1] - 62:10
**steps** [2] - 91:13, 95:25
**Stevens** [1] - 61:3,

62:21
**still** [10] - 11:17, 12:3, 12:14, 27:19, 33:18, 33:22, 38:19, 43:17, 55:20, 103:12
**stipulating** [1] - 99:17
**stock** [4] - 73:1, 73:10, 73:11, 74:10
**stop** [3] - 8:10, 47:6, 116:13
**story** [1] - 11:3
**strategic** [1] - 18:3
**strategy** [3] - 99:24, 100:12, 100:20
**strictly** [1] - 12:25
**Stringer** [3] - 54:3, 54:4, 54:8
**strong** [3] - 11:22, 88:18, 89:22
**stronger** [1] - 112:5
**stuck** [1] - 114:20
**stuff** [1] - 28:15
**subject** [5] - 4:19, 22:23, 79:6, 93:2, 102:20
**subjects** [2] - 89:9, 89:13
**submission** [8] - 13:19, 15:12, 31:15, 34:10, 34:13, 35:2, 38:2, 72:9
**submissions** [7] - 12:13, 34:6, 34:22, 38:23, 42:11, 44:10, 83:9
**submit** [15] - 4:3, 12:6, 16:1, 17:8, 24:19, 34:18, 37:13, 37:14, 44:9, 55:10, 56:7, 86:5, 106:5, 107:10, 110:6
**submitted** [8] - 3:7, 3:19, 9:9, 57:22, 78:1, 110:2, 110:4, 110:6
**subpoena** [4] - 73:16, 73:24, 74:19, 75:6
**subset** [2] - 35:4, 35:9
**substance** [1] - 7:21
**substantial** [3] - 18:13, 62:18, 63:20
**substantially** [2] - 34:8, 43:9
**substantive** [2] - 15:11, 34:11
**substituting** [1] - 93:11
**successful** [1] - 5:23
**sufficient** [2] - 18:5, 93:15

**suggest** [3] - 5:12, 17:13, 105:22
**suggested** [2] - 11:23, 107:20
**suggesting** [1] - 91:11
**suggestion** [5] - 16:4, 40:8, 100:19
**suggests** [3] - 22:7, 29:12, 100:14
**summer** [2] - 28:3, 70:16
**support** [6] - 12:8, 15:23, 53:4, 63:11, 94:16, 116:19
**supporting** [1] - 11:22
**supports** [1] - 12:12
**suppress** [2] - 79:23, 79:25, 80:2
**suppression** [3] - 24:23, 72:1, 72:2
**Supreme** [2] - 35:25, 61:3
**supremely** [1] - 38:9
**surprise** [1] - 37:2
**surprised** [2] - 107:17, 115:20
**surprising** [1] - 99:10
**suspect** [1] - 44:21
**sworn** [1] - 78:1

**— T —**

**table** [5] - 76:1, 76:3, 76:4, 76:8
**tackle** [1] - 88:2
**taker** [1] - 82:9
**talks** [1] - 9:12
**tangential** [1] - 89:20
**tangible** [1] - 90:6
**target** [1] - 19:6
**tended** [1] - 89:15
**tens** [1] - 4:11
**tension** [1] - 28:21
**Teny** [1] - 2:21
**term** [1] - 88:2
**terms** [17] - 6:6, 6:14, 6:15, 23:7, 35:7, 48:10, 72:21, 77:24, 84:10, 88:4, 88:5, 88:20, 89:14, 94:3, 103:4, 110:20, 111:7
**test** [5] - 45:4, 46:1, 46:2, 107:18, 109:6
**testifies** [2] - 26:6, 88:22
**testify** [15] - 13:5, 15:19, 17:20, 18:1, 18:25, 24:20, 26:5, 44:24, 60:8, 64:2, 64:10, 72:4, 90:8,

90:16, 91:25
**testifying** [1] - 88:8
**testimony** [16] - 7:22, 17:25, 18:4, 24:10, 24:13, 24:14, 24:16, 24:25, 30:1, 32:3, 32:7, 83:6, 83:7, 84:1, 93:2, 93:7
**THE** [106] - 2:10, 2:11, 2:18, 2:22, 3:1, 3:3, 8:10, 9:20, 11:5, 13:20, 13:22, 14:11, 14:15, 15:7, 16:5, 16:24, 19:9, 19:13, 22:17, 23:5, 24:22, 25:7, 25:17, 25:19, 26:25, 27:6, 28:1, 28:5, 29:1, 30:3, 30:13, 30:18, 30:21, 33:13, 33:24, 34:2, 34:20, 37:9, 38:14, 38:19, 39:23, 41:12, 41:17, 41:22, 41:24, 44:17, 44:20, 45:5, 47:21, 48:5, 49:15, 50:18, 51:14, 55:11, 56:13, 56:18, 57:3, 57:7, 57:13, 61:12, 61:17, 61:23, 61:25, 65:10, 65:22, 65:25, 78:22, 81:8, 81:13, 81:17, 81:21, 81:24, 84:12, 84:17, 85:3, 85:8, 85:11, 86:6, 87:15, 87:19, 87:22, 88:24, 89:2, 89:5, 90:23, 92:3, 92:6, 96:17, 97:12, 99:23, 100:11, 100:16, 101:12, 103:1, 103:4, 105:2, 105:12, 108:13, 108:25, 109:6, 115:3, 115:6, 115:17, 116:25, 117:3, 117:6
**themselves** [2] - 63:7, 83:3
**theoretical** [3] - 45:6, 67:1, 67:2
**theories** [2] - 65:19, 66:16, 67:6, 67:10
**theory** [21] - 65:15, 65:16, 65:20, 65:21, 66:9, 66:10, 66:13, 67:8, 67:13, 68:5, 68:7, 68:9, 68:10, 73:14, 73:15, 74:7, 74:13, 76:5, 78:13, 83:10, 83:11

**therefore** [6] - 9:5, 20:25, 21:7, 27:10, 39:20, 47:12
**they've** [3] - 11:3, 15:22, 106:10
**thinking** [3] - 3:12, 80:16, 89:5
**thinks** [1] - 86:12
**Third** [1] - 61:1
**third** [9] - 49:5, 54:10, 67:10, 76:21, 77:3, 86:24, 87:4, 98:6, 109:7
**third-party** [1] - 87:4
**thorough** [3] - 52:4, 52:5, 91:18
**thoughtful** [1] - 52:5
**thousands** [1] - 4:11
**threatening** [1] - 113:7
**three** [16] - 3:15, 3:21, 16:1, 16:9, 19:21, 35:1, 90:21, 90:24, 90:25, 91:21, 92:8, 95:25, 96:19, 107:18, 109:6, 111:23
**three-part** [2] - 107:18, 109:6
**three-step** [3] - 90:21, 90:24, 90:25
**threshold** [21] - 4:24, 11:16, 11:24, 12:21, 18:5, 20:4, 20:15, 21:3, 21:13, 21:24, 22:13, 23:20, 23:23, 23:24, 24:17, 27:20, 35:19, 38:8, 38:9, 40:4
**throats** [1] - 52:8
**throughout** [6] - 8:20, 31:10, 45:16, 48:7, 48:12, 106:13
**throw** [1] - 108:1
**throwing** [1] - 31:18
**thrown** [1] - 62:16
**thrust** [1] - 26:13
**tidbit** [1] - 86:13
**tired** [1] - 111:16
**today** [7] - 15:10, 19:15, 29:3, 38:1, 39:17, 113:2, 114:11
**together** [10] - 17:9, 27:23, 45:8, 46:13, 51:4, 57:8, 108:9, 108:15, 108:25, 112:10
**tone** [1] - 4:18
**took** [2] - 67:19, 101:25

**Tootick** [1] - 98:14
**top** [1] - 115:13
**total** [1] - 76:10
**totality** [2] - 91:1, 91:22
**totally** [1] - 74:11
**touch** [6] - 24:9, 92:13, 92:16, 95:5, 102:11, 103:21
**touched** [1] - 93:22
**touching** [1] - 103:14
**towards** [1] - 113:6
**traded** [1] - 70:9
**trading** [4] - 58:15, 58:20, 58:21, 68:17
**traffic** [1] - 11:1
**train** [1] - 8:11
**TRANSCRIPT** [1] - 1:6
**transcript** [3] - 2:5, 82:15, 83:14
**Transcript** [1] - 2:5
**transfer** [4] - 73:1, 73:10, 77:12, 77:13
**transfers** [1] - 74:10
**trial** [124] - 3:15, 3:16, 3:22, 3:25, 6:24, 8:4, 10:14, 10:17, 10:19, 11:14, 12:14, 12:22, 13:13, 15:14, 15:19, 15:24, 16:1, 16:2, 16:4, 16:9, 17:6, 17:15, 17:16, 17:25, 20:5, 22:3, 24:24, 25:5, 25:11, 25:24, 26:6, 27:1, 27:2, 29:4, 32:4, 34:8, 35:19, 36:17, 36:18, 36:19, 40:9, 42:9, 42:10, 42:11, 42:13, 43:9, 43:10, 43:17, 44:12, 44:15, 46:9, 46:13, 46:23, 47:1, 47:16, 47:19, 47:22, 47:23, 48:11, 48:24, 49:10, 49:11, 49:12, 49:13, 49:14, 50:24, 54:19, 54:25, 57:5, 60:6, 60:9, 60:10, 60:11, 61:5, 61:7, 61:12, 61:13, 63:25, 64:4, 64:5, 64:8, 67:2, 69:10, 71:19, 75:1, 85:18, 87:24, 88:7, 88:8, 89:20, 90:3, 91:7, 91:8, 91:15, 91:19, 91:24, 92:12, 95:3, 95:16, 96:15, 97:17, 97:18, 99:16, 101:10, 101:17, 103:19,

103:20, 103:24, 105:13, 106:5, 110:17, 111:5, 111:8, 113:10, 114:13, 114:15, 114:21, 116:7, 116:21
**trials** [7] - 25:20, 42:9, 60:2, 61:7, 95:3, 98:1, 112:7
**tried** [11] - 43:4, 45:8, 48:2, 57:8, 62:8, 94:7, 94:8, 94:10, 94:19, 94:21, 110:2
**tries** [1] - 6:25
**troubled** [2] - 109:7, 109:8
**troublesome** [1] - 62:22
**true** [17] - 33:4, 36:21, 64:3, 72:6, 72:7, 74:13, 76:14, 81:1, 81:6, 86:13, 86:20, 87:3, 91:12, 103:11, 105:20, 112:10, 115:7
**truly** [1] - 107:22
**trustworthy** [1] - 100:5
**truth** [3] - 77:1, 77:2, 96:1
**truthfully** [1] - 23:14
**truthfulness** [1] - 94:4
**try** [10] - 19:6, 19:11, 37:5, 37:19, 56:8, 61:6, 65:14, 74:16, 108:25
**trying** [15] - 9:13, 9:25, 17:2, 17:12, 22:15, 22:25, 23:16, 30:21, 37:9, 65:22, 65:25, 78:17, 80:19, 80:22, 91:10
**turn** [4] - 11:6, 39:10, 61:20, 66:4
**turned** [1] - 75:23
**turns** [1] - 76:18
**Tutino** [1] - 91:3
**TUTINO** [1] - 91:3
**twice** [1] - 80:25
**two** [39] - 3:15, 16:1, 19:21, 21:11, 30:10, 30:24, 31:4, 33:1, 37:25, 39:24, 42:9, 43:16, 52:7, 53:2, 53:4, 59:6, 59:10, 59:25, 62:16, 63:6, 63:16, 64:16, 65:19, 67:21, 87:25, 91:13, 91:24, 92:10, 92:19,

93:24, 94:25, 96:10, 98:11, 98:15, 106:19, 109:5, 110:25, 111:5, 112:7
**two-day** [1] - 111:5
**Tyco** [2] - 54:11, 54:15
**types** [1] - 48:16
**typical** [1] - 19:3

## U

**U.S** [4] - 1:4, 1:16, 2:2, 106:14
**U.S.D.J** [1] - 1:11
**ultimately** [3] - 42:23, 43:15, 48:24
**unable** [1] - 58:23
**unbeknownst** [1] - 76:19
**uncertain** [1] - 88:20
**unconstitutional** [1] - 71:22
**uncontradictable** [1] - 4:5
**undeniable** [1] - 85:20
**undeniably** [1] - 70:12
**under** [33] - 4:3, 5:10, 5:15, 5:17, 6:6, 13:19, 14:17, 16:11, 27:18, 31:7, 31:13, 33:18, 35:24, 59:19, 66:18, 68:16, 69:4, 70:11, 70:21, 70:22, 71:9, 72:21, 73:7, 73:8, 74:2, 74:6, 74:8, 74:21, 74:23, 75:3, 79:16, 90:14, 91:5
**undercut** [2] - 50:12, 55:1
**undermine** [4] - 43:7, 45:12, 55:1, 58:22
**understood** [1] - 5:3
**undertaken** [1] - 101:9
**undisputable** [1] - 108:3
**undisputed** [1] - 84:7
**undo** [1] - 29:17
**undoubtedly** [1] - 58:17
**unfair** [2] - 15:23, 23:21
**unfortunate** [2] - 78:20, 78:23
**unfortunately** [1] - 43:3
**unique** [1] - 81:22
**uniquely** [1] - 17:21
**UNITED** [2] - 1:1, 1:3
**United** [7] - 1:12, 61:2,

62:4, 71:14, 71:15, 91:2, 93:3
**universe** [2] - 38:5, 40:3
**universe-based** [1] - 40:3
**unjustifiably** [1] - 63:14
**unknown** [1] - 83:21
**unless** [5] - 18:24, 44:11, 87:3, 110:11, 117:2
**unpopular** [1] - 94:7
**unprecedented** [1] - 88:18
**unpublished** [1] - 51:2
**Unquestionably** [1] - 54:20
**unrelated** [1] - 87:4
**unrestricted** [1] - 20:1
**untrue** [3] - 9:23, 69:4, 87:1
**Untrue** [1] - 87:1
**unusual** [1] - 88:19
**unwillingly** [1] - 44:6
**Up** [1] - 38:1
**up** [46] - 20:21, 20:22, 21:6, 22:4, 26:3, 28:22, 40:5, 44:14, 52:25, 58:25, 59:6, 60:10, 61:10, 62:14, 63:5, 65:17, 71:6, 71:21, 72:13, 74:11, 75:7, 77:23, 78:25, 79:4, 89:23, 90:8, 90:16, 96:19, 97:21, 97:23, 98:2, 98:4, 99:14, 101:7, 104:16, 105:8, 107:23, 107:24, 108:2, 108:20, 109:11, 109:24, 109:25, 110:5, 111:5, 111:23
**upheld** [1] - 6:4
**upset** [1] - 69:7
**USA** [1] - 2:12
**uses** [1] - 47:9

## V

**valid** [3] - 4:7, 6:4, 36:22
**variety** [2] - 89:9, 89:13
**various** [1] - 39:7
**vast** [4] - 94:4, 94:12, 96:18, 96:25
**verdict** [1] - 43:4
**versus** [12] - 2:12,

61:2, 62:5, 71:15, 76:7, 91:3, 93:4, 110:21, 112:9, 112:24, 115:2
**victims** [1] - 46:14
**view** [6] - 16:6, 31:24, 66:5, 82:12, 108:2
**views** [1] - 82:11
**violates** [4] - 67:4, 67:5, 71:22
**violating** [1] - 68:6
**violence** [1] - 113:7
**virtually** [2] - 4:14, 4:19
**voir** [2] - 115:17, 116:16
**voluntarily** [5] - 71:17, 71:24, 73:20, 73:24, 96:21

## W

**W.R** [5] - 53:24, 54:2, 61:7, 96:20, 110:22
**wait** [3] - 3:15, 34:16, 72:22
**waive** [1] - 37:10
**waived** [16] - 33:25, 34:1, 34:2, 55:3, 55:14, 55:24, 55:25, 56:2, 56:3, 64:12, 64:13, 102:9, 102:10, 104:10, 104:25
**waiver** [2] - 64:15, 73:6
**wants** [13] - 12:14, 13:24, 14:8, 24:17, 24:18, 27:9, 28:8, 36:16, 41:20, 41:21, 42:15, 44:24, 111:20
**warns** [1] - 43:8
**warrant** [1] - 93:15
**waste** [2] - 18:24, 42:8
**ways** [1] - 116:12
**week** [4] - 14:10, 111:10
**weekends** [1] - 88:14
**welcome** [2] - 81:5, 87:19
**well-established** [1] - 115:12
**Wells** [1] - 31:15
**white** [1] - 31:18
**whole** [4] - 5:20, 19:1, 78:6, 108:18
**wide** [2] - 50:25, 53:25
**willing** [2] - 5:4, 29:24
**willingly** [1] - 44:6
**wins** [1] - 61:11

**Winship** [1] - 36:12
**Winston** [3] - 2:16, 2:25, 37:3
**WINSTON** [2] - 1:15, 1:23
**wise** [2] - 56:5, 62:5
**withdrawn** [2] - 67:7, 68:9
**withhold** [1] - 55:20
**witness** [14] - 22:6, 54:22, 55:3, 60:6, 60:7, 64:9, 71:18, 71:20, 71:23, 87:4, 89:23, 90:8, 105:11, 111:8
**witness's** [1] - 22:9
**witnesses** [12] - 7:15, 13:5, 16:20, 17:20, 18:11, 32:6, 54:25, 56:22, 59:21, 63:24, 83:7, 113:7
**woken** [1] - 79:7
**woman** [1] - 106:20
**word** [3] - 88:18, 102:4, 102:5
**wording** [2] - 13:7, 13:8
**words** [2] - 59:24, 85:20
**works** [4] - 63:3, 80:17, 80:21, 116:11
**worried** [1] - 48:6
**worry** [1] - 100:1
**worse** [2] - 111:3, 111:4
**worth** [2] - 69:1, 90:19
**written** [2] - 5:2, 44:10

## Y

**year** [1] - 77:11
**years** [4] - 9:13, 88:6, 88:14, 89:9
**yelling** [1] - 111:17
**YORK** [1] - 1:1
**York** [6] - 1:5, 1:13, 58:6, 73:20, 73:23, 94:17
**yourself** [1] - 92:1

## Z

**Zafiro** [4] - 59:8, 61:4, 63:11, 91:5
**ZELLAN** [1] - 1:19
**Zellan** [1] - 2:20