UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

UNITED STATES OF AMERICA,

                                <u>MEMORANDUM AND ORDER</u>

       - against -

MARTIN SHKRELI,                       15-CR-637 (KAM)

           Defendant.

-----------------------------------------X

**MATSUMOTO, United States District Judge:**

        Before the court are Martin Shkreli's motion to suppress certain materials produced to the government by Retrophin, Inc. and motion for prompt production of *Brady* materials (ECF No. 174.) As part of his motion to suppress, Mr. Shkreli requests the production of email correspondence between Retrophin and the government, and a hearing at which he would seek to show that Retrophin acted as the government's agent.  For the reasons stated below, Mr. Shkreli's motion to suppress is denied, and the associated requests, including his request for emails between Retrophin and the government, are denied as moot.  His motion for prompt production of *Brady* materials is denied without prejudice.

## Discussion

### I.  Background

        The court assumes familiarity with the facts of this case, which it has described in greater detail in a prior order granting the defendants' motions to sever.  (ECF No. 198.)  The

following summary, drawn from the parties' submissions, provides background for the issues raised in the instant motions.

Beginning in approximately 2009 and continuing until approximately 2012, Mr. Shkreli founded, and served as the managing member and portfolio manager of, two separate hedge funds based in New York that focused their investments in the healthcare sector: MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare") (collectively "MSMB"). In approximately 2011, Mr. Shkreli also founded a biopharmaceutical company called Retrophin LLC, which later became a publicly-traded company, Retrophin, Inc. (collectively "Retrophin"). Mr. Shkreli served as the Chief Executive Officer ("CEO") of Retrophin from December 2012 until September 30, 2014.

Mr. Shkreli operated all three entities from the same physical space (first at 111 Broadway, New York, N.Y. and then at 777 Third Avenue, New York, N.Y.) from spring 2011 until December 2012, when Retrophin went public and Mr. Shkreli "wound down" the MSMB entities. The government also alleges that Mr. Shkreli used an MSMB Capital email address to conduct business on behalf of both the MSMB entities and Retrophin, even after MSMB Capital had ceased functioning. As described in the Superseding Indictment, the government charges, among other things, that Mr. Shkreli (along with Evan Greebel, his co-defendant) fraudulently misused

2

Retrophin assets to repay MSMB investors and to satisfy certain of MSMB's obligations.  The Superseding Indictment also charges them with conspiracy to commit securities fraud with regard to Retrophin.

The government alleges that in the spring of 2013, Mr. Shkreli and Mr. Greebel caused Retrophin to enter into a series of settlement agreements with several MSMB Capital and MSMB Healthcare investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Mr. Shkreli had reported on those investments.  The government asserts that defendants did not seek or obtain approval from Retrophin's Board of Directors for the settlement agreements.  The government further alleges that in the fall of 2013, after Retrophin's external auditor questioned the propriety of the settlement agreements and concluded that Retrophin was not responsible for repayment of the defrauded MSMB Capital and MSMB Healthcare investors, the defendants cause Retrophin to enter into a series of "sham consulting agreements" with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse investors for their lost investments in Mr. Shkreli's hedge funds.  (Superseding Indictment, ECF No. 60 at ¶¶ 21, 31-35.)  The government contends

3

that the defrauded investors who entered into the sham consulting agreements did not perform any legitimate consulting services for Retrophin.

In 2014, the United States Attorney's Office for the Eastern District of New York issued grand jury subpoenas to various parties including Retrophin, and met with alleged victims, also including Retrophin.  The government states that Retrophin responded to the government's subpoenas with hundreds of thousands of records that were "in the company's custody, possession and/or control," specifically, records located on the company's servers or in hard copy in the company's offices.  (The Government's Memorandum of Law in Response to the Defendants' Remaining Substantive Motions ("Gov't Br."), ECF No. 189 at 14.)  Included in Retrophin's production in response to the subpoenas were three documents retrieved from Mr. Shkreli's former office: two MSMB Healthcare subscription agreements and a letter sent by Mr. Shkreli to an MSMB Capital investor.  (*Id.*)

Mr. Shkreli alleges that Retrophin was subpoenaed and began producing documents in May of 2014.  Although he states that he is "not aware of any MSMB materials that were provided to the Government as a result" of Retrophin's productions in May and September 2014, he alleges that by the time he was removed as CEO of Retrophin on September 30, 2014, "Retrophin executives were

4

working with the U.S. Attorney without [his] knowledge." (Memorandum of Law in Support of Martin Shkreli's Motion to Suppress, Motion for Brady Materials, and Motion to Compel ("Shkreli Br."), ECF No. 174-1 at 3.)   Mr. Shkreli alleges that over the course of the following Retrophin productions, the company "provided the Government with documents, emails and other records that were the property of the MSMB entities," such as investor statements, subscription agreements, and MSMB email correspondence.  (Shkreli Br. at 5-6).

## II. Motion to Suppress

Mr. Shkreli moves to suppress "the entirety of the MSMB material that Retrophin has produced," on the basis that Retrophin was acting as a government agent and that its actions in accessing and producing these materials amount to "computer trespass and misappropriation of MSMB's and Shkreli's property".  (Shkreli Br. at 2.)  He asks that if this court does *not* find that Retrophin was a government agent, the court hold a hearing on the issue, and further requests "all emails between representatives of the Government and representatives of Retrophin" in advance of such hearing.  (*Id.* at 2-3.)

In opposition to the suppression motion, the government asserts that Retrophin's production of MSMB material is not the result of an unlawful search and that Retrophin is not a government

5

agent.  The government also argues that even if Retrophin's conduct amounts to a search, Mr. Shkreli does not have standing to challenge the search and, further, that the MSMB materials are admissible in any event under the doctrine of inevitable discovery. (Gov't Br. at 20-33.)  Mr. Shkreli replied on April 17, 2017, and the court heard oral arguments on the motion on April 26, 2017.

### A. Standard of Review

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978).  The burden then shifts to the government to justify its conduct.  *See, e.g., United States v. Lambus*, No. 15-CR-382, 2016 WL 7422299 at *8 (E.D.N.Y. Dec. 22, 2016); *United States v. Bayless*, 921 F. Supp. 211, 212 (S.D.N.Y. 1996) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). However, "evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation."  *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (internal quotation marks and citations omitted); *see also United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (citing *Nix v. Williams*, 467 U.S. 431 (1984)).

## B. Analysis

As a threshold matter, Mr. Shkreli does not specify what "MSMB material" he seeks to suppress, even though all documents the government has received from Retrophin were so identified in their Bates numbers and in production cover letters, and were produced to the defendants. (Transcript of Oral Argument on Motions held on April 26, 2017 ("Tr.") at 18.) Mr. Shkreli was the key corporate officer for both MSMB entities and Retrophin until his removal from Retrophin in late September 2014. The government asserts, and Mr. Shkreli does not dispute, that he conducted business for all three companies from the same office and using the same digital resources at Retrophin. For example, the government asserts that while at Retrophin, Mr. Shkreli used an MSMB email address to conduct Retrophin business. Moreover, Mr. Shkreli's own motion appears to claim – without any detail or further argument – that Retrophin also misappropriated "Shkreli's property." (Shkreli Br. at 2.) It is not clear what, if any, email communication Mr. Shkreli seeks to suppress. Thus, although the court will refer to the materials at issue as the "MSMB materials" for the sake of convenience, it notes that Mr. Shkreli's failure clearly to specify what material he is seeking to suppress constitutes a vague and overbroad suppression request and complicates the analysis of his motion.

*1. Standing and Search*

The analysis of whether certain government conduct constitutes a "search" within the meaning of the Fourth Amendment is "intertwined" with the analysis of a given defendant's standing to challenge the search based on an infringement of the defendant's Fourth Amendment rights. *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990) (citing *Rakas*, 439 U.S. at 139). "[T]he proper inquiry turns on whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect," *id.* (internal quotation marks and citations omitted) – that is, whether there was a "search" within the meaning of the Fourth Amendment.

"A Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable" *Kyllo v. United States*, 533 U.S. 27, 33 (2001), and the individual whose subjective expectation of privacy is violated has standing to challenge the evidence resulting from that search. In general, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights

infringed." *Rakas*, 439 U.S. at 133-34 (internal quotation marks and citations omitted).  Furthermore, aside from Fourth Amendment protection against overbroad subpoenas, "neither the officers of a corporation, the shareholders . . . nor the corporation itself has any other Fourth Amendment interest in corporate records." *United States v. Lartey*, 716 F.2d 955, 961 (2d Cir. 1983) (citations omitted).

A corporate officer or employee, however, "may assert a reasonable expectation of privacy in his corporate office, and may have standing with respect to searches of corporate premises and records." *Chuang*, 897 F.2d at 649.  To demonstrate a legitimate privacy interest in a corporate office or records, the individual must make "a sufficient showing of a possessory or proprietary interest in the area searched" and demonstrate "a sufficient nexus between the area searched and [his own] work space." *Id.* at 649-50 (citations omitted).  "Generally, courts tend to find that these elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office. However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched." *United States v. Hamdan,* 891 F. Supp. 88, 94-95 (E.D.N.Y.1995), *aff'd*, 101 F.3d 686 (2d Cir. 1996) (citations omitted).  The courts will

also consider other factors that weigh on the reasonableness of the individual's expectation of privacy.

In *Chuang*, for example, the Second Circuit found that the chairman, president, and chief executive of a bank did not have even a subjective expectation of privacy in certain records produced by the bank to the Office of the Comptroller of the Currency during a warrantless bank examination, in part because the records were stored in another employee's office and Chuang knew that such documents were subject to periodic examinations by the Comptroller. The *Chuang* court also affirmed the district court's denial of the suppression of documents obtained in a second search of Chuang's law office, located on a different floor of the bank building, based in part on a finding that Chuang "voluntarily reduced the expectation of privacy" in the law firm's premises by operating his law firm from the same offices from which he conducted bank business. *Chuang*, 897 F.2d at 647, 651-52.

Mr. Shkreli cannot demonstrate a legitimate or reasonable expectation of privacy in the MSMB materials maintained and produced by Retrophin in response to government subpoena. His role as the former CEO of the defunct MSMB entities does not provide him plenary standing to challenge the search of all MSMB records or property maintained by Retrophin, absent an individual possessory or proprietary interest in the areas searched. *See*

10

*United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 54 (D. Conn. 2002) (finding that the defendant CEO and controlling shareholder of a corporation did not have standing to challenge the use of evidence contained on a laptop issued by the corporation to his co-defendant). By Mr. Shkreli's own admission, as of September 30, 2014, he was no longer serving as CEO of Retrophin, and the company did not begin producing the MSMB material he now seeks to suppress until February 2, 2015, in response to a government subpoena served in January 2015. (Shkreli Br. at 3, describing the timeline of Retrophin's subpoena productions and the timing of Mr. Shkreli's termination.) In other words, Mr. Shkreli had *no* possessory or proprietary interest either in his former office at Retrophin or the digital records that Retrophin accessed from its digital systems, which are essential elements for a defendant asserting a privacy right in the context of a corporate office. *Chuang*, 897 F.2d at 649 ("the corporate officer or employee must show that he had a possessory or proprietary interest in the area searched"); *see also Hamdan*, 891 F. Supp. at 97 (finding that a defendant who had a "decidedly secondary role in the overall management" of a warehouse did not have the requisite "possessory or proprietary interest" to challenge the introduction of evidence seized from the warehouse).

To the extent that any physical records were retrieved from Retrophin's office space over which Mr. Shkreli may have once asserted a possessory or proprietary interest, such as his former office, he lost that interest when he was removed as CEO. The court respectfully disagrees with Mr. Shkreli's characterization as "computer trespass" (Shkreli Br. at 2) the efforts of Retrophin personnel to comply with a government subpoena by accessing materials on Retrophin's own servers and from Retrophin's premises.

The cases Mr. Shkreli cites provide little support for his objections to Retrophin's response to a subpoena from its own servers and premises. For example, in *Mancusi v. DeForte*, 392 U.S. 364 (1968), DeForte, a union official, claimed standing to challenge the introduction of union records seized without a warrant by state officials, pursuant to the District Attorney's subpoena, from an office area he shared with other union officials. The court concluded that "DeForte . . . could reasonably have expected that only [other union officials] and their personal or business guests would enter the office, and that the records would not be touched except with their permission or that of union higher-ups." *Id*. at 369. Similarly, in *United States v. Lefkowitz*, the court found that two corporate officers had standing to challenge evidence seized from their shared but "private" office

12

suite when that evidence was not specified in the search warrant. 464 F. Supp. 227, 231 (C.D. Cal. 1979), *aff'd*, 618 F.2d 1313 (9th Cir. 1980).

In these cases, the parties were able to demonstrate that they had a privacy interest in the *physical* space in which the records at issue were located – not merely a general proprietary interest in the records of a business entity. Here, Retrophin complied with a subpoena and provided documents and records under its control. Mr. Shkreli could not have reasonably expected that, after his termination, he maintained a privacy interest in MSMB records at Retrophin offices and on Retrophin servers.

In addition, Mr. Shkreli's own actions demonstrate that he lacked a subjective expectation of privacy in the MSMB materials, and that to the extent he had such an expectation it was unreasonable. The Supreme Court "has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984) (citing *United States v. Miller*, 425 U.S. 435, 443 (1976)). As CEO of the MSMB entities and

13

Retrophin, Mr. Shkreli chose to commingle the MSMB and Retrophin records and files, such that they were available for Retrophin to produce in response to the subpoena.

Moreover, Mr. Shkreli left MSMB materials at Retrophin after his termination.[1]  At the time of Mr. Shkreli's termination, his storage of digital MSMB materials on Retrophin servers was governed by Retrophin's email, internet and other corporate policies, to which he agreed in his employment agreement.  (Gov. Br., Ex. C at 55 ¶ 2 (b).)  The government argues that pursuant to Retrophin's policies, the MSMB records were Retrophin property and that Mr. Shkreli had waived any right to privacy and consented to the possible disclosure of the information.  (Gov't Br. at 26, Ex. A at 4, Ex. B at 6, Ex. C at 55.)  Specifically, Retrophin's Email Policy states that "[a]ll electronic data . . . that are transmitted through Company facilities and/or stored on a Company computer or storage media are the property of the Company . . . . By using the Company's communications facilities, employees and others using the system . . . waive any right to privacy in electronic communications." (Gov't Br. Ex. A at 4).  In addition,

---

[1] At oral argument, Mr. Shkreli's counsel asserted that Mr. Shkreli's previous legal team, from the law firm Arnold & Porter, requested the MSMB documents from Retrophin.  (Tr. at 13).  Counsel provided no details or basis for this assertion, and the court cannot conclude based only on this representation that Mr. Shkreli took reasonable steps to secure material in which he now claims a personal privacy interest.

Retrophin's Code of Business Conduct and Ethics, issued in September 2013, makes clear that "[e]ven personal messages on the Company's e-mail and voicemail systems are Company property." (Gov't Br. Ex. B at 6.)  Although Mr. Shkreli argues that the policies should not be read to apply retroactively (Reply Memorandum of Law in Support of Martin Shkreli's Motion to Suppress, Motion for Brady Materials, and Motion to Compel ("Reply Br."), ECF No. 192 at 3), the court need not parse the policies to conclude that Mr. Shkreli was on notice that the MSMB materials stored on Retrophin's servers or utilizing its facilities were being shared with Retrophin and were subject to disclosure. Indeed, Mr. Shkreli's employment agreement with Retrophin in December 2013 provided, *inter alia*, that he agreed to observe and comply with Retrophin's rules, policies and procedures.  (*Id.* Ex. C at 55.)

        *Leventhal v. Knapek*, which Mr. Shkreli cites in support of his motion, does not provide support for his position.  First, the case is distinguishable because it involved the Department of Transportation ("DOT"), which as a public employer is subject to the Fourth Amendment.  266 F.3d 64, 72-75 (2d Cir. 2001) (concluding that, although the employee had "some expectation of privacy" in his office of computer, the warrantless search at issue was reasonable under the "special needs" Fourth Amendment analysis

15

applied to public employers). Retrophin – which, at the time of the subpoena responses in question, no longer employed Mr. Shkreli – is not a public employer subject to the Fourth Amendment. Furthermore, the Second Circuit specifically found that the DOT had not "placed Leventhal on notice that he should have no expectation of privacy in the contents of his office computer," and noted in comparison cases in which an employer's "known policy" permitted monitoring. *Id.* at 74 (citing *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000)). Here, Retrophin's policies were unambiguous: employees could not expect that communications or data stored on Retrophin's servers would remain private. (Gov't Br. Ex. A at 4; Ex. B at 6.) *See also Muick v. Glenayre Electronics*, 280 F.3d 741, 743 (7th Cir. 2002) (finding that a corporate policy that "announced that [the corporation] could inspect the laptops that it furnished for the use of its employees . . . destroyed any reasonable expectation of privacy" that an employee might have had.)

Mr. Shkreli's affirmative decision to place MSMB materials at Retrophin "voluntarily reduced the expectation of privacy in the firm's premises" by operating and storing MSMB business materials at the same office as Retrophin. *See Chuang*, 897 F.2d at 651. Mr. Shkreli's failure to take action to move what he now considers separate MSMB material from Retrophin's

16

computing resources or physical space demonstrates that either he did not have a subjective expectation of privacy in that material at the time, or that such expectation was objectively unreasonable under the circumstances.[2]

*2. Retrophin's Role*

Mr. Shkreli acknowledges that the MSMB materials were recovered by Retrophin, not the government, but argues that the company acted as a government agent in conducting the search in response to the government's subpoenas.  "Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989).  In *Skinner*, a case involving drug and alcohol tests of railway employees, the

---

[2] At oral argument, Mr. Shkreli's counsel asserted, for the first time and without further detail, that the MSMB emails were protected by a "separate password[]" and were located "on a serving platform [Mr. Shkreli] paid for and created."(Tr. at 3, 24.)  Thereafter, Retrophin submitted an affidavit, sworn to by an attorney at its outside law firm, stating that Retrophin's email archive did *not* require a separate password to "access emails relating to MSMB or msmbcapital.com" and that "Retrophin, not MSMB, paid the bills for the e-mail archive."  (Supplemental Declaration of Nicholas Flath in Opposition to Defendant Shkreli's Motion to Compel, ECF No. 218-1 ¶¶ 9-12.)  Even if Mr. Shkreli's unsworn assertions at oral argument are true, and the court does not consider the recent Retrophin affidavit, it would not change the fact that Mr. Shkreli maintained MSMB email on servers to which he would reasonably have expected Retrophin personnel to have access.  Nor does it alter the fact that in securing MSMB corporate materials with a password, Mr. Shkreli was presumably acting in his corporate capacity as an MSMB officer, whereas here he is seeking to assert a *personal* Fourth Amendment interest in the materials for the purposes of suppression.

Supreme Court held that whether a private party acted as a government agent was a fact-dependent inquiry that turned on the "[g]overnment's participation in the private party's activities," and considered the government's "encouragement, endorsement, and participation" in the drug and alcohol tests at issue sufficient to implicate the Fourth Amendment. *Id.* at 614-16.  In the Second Circuit, "private individuals may be considered [to be] acting as government agents if the government directs their actions or tacitly approves of whatever measures were taken to seize the evidence." *United States v. RW Prof'l Leasing Servs. Corp.*, 384 F. Supp.2d 566, 570 (E.D.N.Y. 2005) (citing *United States v. Knoll*, 16 F. 3d 1313, 1320 (2d Cir. 1994)).

Mr. Shkreli argues that the government not only "conferr[ed]" but also "partner[ed]" with Retrophin, and that the constitutional violation occurred at the point where Retrophin "acted in concert" with the government when it allegedly "misappropriated" MSMB property. (Reply Br. at 5.)  The government represents that Retrophin responded to subpoenas by producing "responsive documents that it had in its possession, custody and control." (Gov't Br. at 32.)[3]  Mr. Shkreli, therefore, bases his

---

[3] The government has submitted a list of the subpoena requests served on Retrophin.  The government requested broad categories of Retrophin's corporate documents and communications, including documents and communications relating to Mr. Shkreli.  (ECF No. 220-1.)  The requests only touch on MSMB indirectly – for example, a request for "Retrophin's and MSMB's top 10 private equity

claim on the government's knowledge of and acquiescence in Retrophin's retrieval of MSMB materials, and its having "accepted" the materials (Shkreli Br. at 6, 10.)  He focuses on Retrophin's actions in producing documents and making presentations to the government in response to the subpoenas, conceding that "the Government relied exclusively on Retrophin to provide whatever Retrophin saw fit."  (Reply Br. at 6.)

As stated above, Mr. Shkreli did not have a reasonable expectation of privacy in the records searched and produced by Retrophin.  The court, therefore, need not reach the issue of whether Retrophin acted as a government agent in responding to the subpoena because, even if it had, there would be no Fourth Amendment violation.  The production of files in a corporation's possession and control in response to a valid government subpoena, without more, is not corporate conduct governed or barred by the Fourth Amendment.  This is particularly true where, as here, the subpoenas in question request only documents pertaining to the corporation being served, and where the defendant has conceded that the party responding to the subpoena only provided what it "saw fit" to produce.  (*Id.*)  Nor does corporate compliance with a government subpoena transform the complying entity into a

---

investors," which was followed by a request for "records concerning payments . . . by Retrophin to MSMB or MSMB's investors." (*Id.* at 3.)

government agent.  In addition, the Constitution does not forbid the government from meeting with a purported victim of an offense.

Relatedly, Mr. Shkreli requests that the government turn over communications between the government and Retrophin, and requests a hearing on that relationship, (Shkreli Br. at 10-11.), but he fails to provide a sufficient factual basis to warrant the hearing he seeks.  As the court finds that there was no Fourth Amendment search on other grounds, there is no need for such production or a hearing, which is likely to be an unnecessary fishing expedition. *See, e.g.*, *United States v. Ciriaco*, 121 F. App'x 907, 909 (2d Cir. 2005) (summary order) ("[a] suppression hearing is required if the defendant presents moving papers that are sufficiently definite, specific, detailed, and nonconjectural as to indicate relevant contested issues of fact"); *United States v. Shine*, No. 15-cr-728, 2016 WL 889308 at *1 (S.D.N.Y. Mar. 4, 2016) ("an evidentiary hearing is proper only when the petition alleges facts which if proved would require the grant of relief" (internal quotation marks and citation omitted)).

### 3. Inevitable Discovery

"Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the

constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (citing *Nix v. Williams*, 467 U.S. 431, 447 (1984)).  The government bears the burden on the "central question: Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation?" *Id.*  The government's burden, however, is made unreasonably difficult, if not impossible, because Mr. Shkreli has not identified any MSMB documents that he seeks to suppress.

The government argues that the "categories" of documents Mr. Shkreli seeks to suppress are the same categories that "Shkreli already provided to the SEC, Katten, defrauded MSMB investors and/or other third parties, and that the government obtained lawfully from those sources."  (Gov't Br. at 32.)  Mr. Shkreli argues in response that "had the Government not utilized Retrophin to take MSMB documents, the Government would never have gotten them," because "the Government relied exclusively on Retrophin to provide whatever Retrophin saw fit."  (Reply Br. at 6.)

Although Mr. Shkreli claims that the government provides "no analysis" to bolster its argument, *id.*, the government has at least asserted that certain categories of documents would not only have been inevitably discovered, but were in fact already "lawfully obtained" from other sources.  (Gov't. Br. at 32.)  Without more specifics, however, as to the set of documents Mr. Shkreli seeks

to suppress and its overlap with those "categories" of documents received by the government from other sources, the court cannot reach a conclusion about what specific documents would be included in an "inevitable discovery" analysis. In any event, because the court finds that there was no Fourth Amendment search as to Mr. Shkreli, it need not reach this issue.

### III. Motion for Prompt Production of *Brady* Materials

On March 27, 2017, Mr. Shkreli moved for production of materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), on the grounds that this is a "complicated case" and his counsel "should not have to wait until the eve of trial to be privy to exculpatory information." (Shkreli Br. at 13.) In his motion, Mr. Shkreli specifically requests "documents, information, or statements relating to the arbitration with Dr. Thomas Koestler . . . and statements made by consultants defending the validity of their agreements," and also claims that "all evidence contradicting the Government's theory that any settlement agreements, consulting agreements, and/or share transfer agreements were fraudulent" is *Brady* material. (*Id.* at 11, 13.)

The government opposed Mr. Shkreli's motion for early disclosure of certain material on April 10, 2017.[4]   In its

---

[4] Mr. Shkreli's reply brief did not address the government's opposition to his motion for production of *Brady* materials.

opposition, the government represented that it "has continued to recognize and comply with its *Brady* obligations in a timely manner." (Gov't Br. at 35). It further represented that specific materials requested in Mr. Shkreli's motion – materials relating to the Koestler arbitration – are not in the government's possession.

At oral argument on April 26, 2017, after the conclusion of briefing on the motion, Mr. Shkreli's counsel requested that the government turn over testimony and statements made to government agencies by individuals identified as Steve Richardson and Seymour Bloch. (Tr.at 27-28.)  The government noted that materials relating to these individuals were not requested in Mr. Shkreli's motion, and reiterated that it was in compliance with its *Brady* obligations.[5]  (*Id.* at 30.)

## A.  Legal Standard

Mr. Shkreli's motion refers generally to disclosure of "*Brady*" material, but there appear to be three categories of disclosures at issue:  *Brady* disclosures, *Giglio* disclosures, and disclosure of Jencks Act/§ 3500 statements.  In general, as this

---

[5] After some discussion, Mr. Shkreli's counsel suggested he might postpone the motion.  (Tr. at 35 ("I will leave it where it is . . . [if] we need to . . . revisit this and suggest why their understanding of *Brady* is really not consistent with what in fact is *Brady*, we will revisit it then.")) Nevertheless, out of an abundance of caution, the court will address the issues raised in Mr. Shkreli's motion and at oral argument.

court noted when it denied a similar motion by Mr. Shkreli's co-defendant, the prosecution has "a due process obligation to disclose" both exculpatory and impeachment evidence. *United States v. Shkreli*, No. 15-CR-637 (KAM), 2016 WL 8711065 at *2 (E.D.N.Y. Dec. 16, 2016) (citing *Ranta v. Bennett*, 189 Fed. App'x 54, 56 (2d Cir. 2006)).  The court was, and remains, satisfied with the representations of the government that it is aware of its disclosure obligations and has met and will continue to meet its *Brady* obligations.

### B. Analysis

#### 1. *Brady* and *Giglio disclosure obligations*

The government must disclose all *Brady* and *Giglio* material "in time for its effective use at trial." *Id.* (citing *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001).  The required timing for disclosure depends on the materiality of the evidence and the particular circumstances of the case; accordingly, because the Second Circuit has "declined to specify a precise meaning for the phrase 'in time for effective use' . . . a district court has the discretion to order *Brady/Giglio* disclosure at any time as a matter of sound case management." *United States v. Taylor,* No. 10-CR-268 (DLI), 2014 WL 1653194, at *10 (E.D.N.Y. Apr.24, 2014) (citing *United States v. Nogbou,* No. 07-CR-814 (JFK), 2007 WL 4165683, at *3–4 (S.D.N.Y.

Nov. 19, 2007), *appeal filed sub nom. United States v. Yelverton*, 16-4088 (2d Cir. Dec. 6, 2016); *United States v. Giffen,* 379 F. Supp.2d 337, 347 (S.D.N.Y. 2004)), *appeal dismissed on other grounds*, 473 F.3d 30 (2d Cir. 2006). In particular, as this court previously noted, "[t]here is no pre-trial right to *Giglio* material, which specifically concerns impeachment." *Shkreli*, 2016 WL 8711065, at *2-3 (E.D.N.Y. Dec. 16, 2016) (citations omitted).

The government has represented throughout this case that it is aware of and will remain in compliance with its obligations under *Brady*. (ECF No. 90 at 46, 50; Gov't Br. at 35). As this court has stated, "the courts of this Circuit repeatedly have denied pretrial requests for discovery orders pursuant to *Brady* where the Government has made such good faith representations." *Shkreli*, 2016 WL 8711065 at *2 (collecting cases). Mr. Shkreli has not provided information that indicates that the government has not complied with its *Brady* obligations.

The court is mindful of the complex nature of this case, and will continue to accept the government's good faith representations that it will continue to comply with its disclosure obligations.

### 2. *Jencks Act/§ 3500 Materials*

As part of his motion, Mr. Shkreli requests "statements made by consultants defending the validity of their agreements,"

25

(Shkreli Br. at 11) and at oral argument also requested the "testimony and statements" of Steve Richardson to the Securities and Exchange Commission, and statements of Seymour Bloch to the Federal Bureau of Investigation (Tr. at 27-28).  To the extent Mr. Shkreli is seeking statements or reports by government witnesses in the government's possession, the Jencks Act, 18 U.S.C. § 3500, prescribes the government's disclosure obligations.  District courts are not authorized to order the pre-trial disclosure of such statements in contravention of § 3500.  *Shkreli*, 2016 WL 8711065 at *2-3, citing *United States v. Coppa*, 267 F.3d 132, 145-46 (2d Cir. 2001).  "Under the Jencks Act, no witness statement or report in the possession of the Government shall be 'the subject of subpoena, discovery, or inspection' until the witness has testified on direct examination at trial."  *Id.* (citing 18 U.S.C. § 3500(a).)  In this district, the government generally will voluntarily disclose § 3500 material in advance of trial, but may withhold the material until after the witness testifies on direct examination.  Under the court's Amended Pre-Trial Scheduling Order, the government will attend the final pretrial conference with Jencks Act material and will either "make such material available to [Mr. Shkreli] . . . or put on the record the reasons for withholding the material."  (ECF No. 147 at 6.)  The court will not disturb that schedule.

## <u>Conclusion</u>

For the foregoing reasons, Mr. Shkreli's Motion to Suppress is **DENIED** and his requests for a hearing and for production of emails between the government and Retrophin are **DENIED AS MOOT.** His Motion for Prompt Production of *Brady* Materials is **DENIED WITHOUT PREJUDICE.**


**SO ORDERED.**

Dated:      May 16, 2017
            Brooklyn, New York

                                    _____
                                              /s/
                                    Hon. Kiyo A. Matsumoto
                                    United States District Judge

27