UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ECF Case |
| -against- | No. 15-cr-00637 (KAM) |
| EVAN GREEBEL, | <u>ORAL ARGUMENT REQUESTED</u> |
| *Defendant.* | |

**MR. GREEBEL'S MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION TO DISMISS COUNT SEVEN OF THE SUPERSEDING INDICTMENT**

## TABLE OF CONTENTS

Page

I.  Legal Standard for Motion to Dismiss ................................................................. 4

II.  Count Seven Must be Dismissed Because the Mastermind of the Alleged Wire Fraud Conspiracy Has Been Acquitted by an Eastern District of New York Jury ............. 5

III.  The Government's Theory in Count Seven That Retrophin Was Defrauded Because of the Alleged Transfer of Retrophin Shares to MSMB Capital Is Impossible as a Matter of Law And Thus Should Be Stricken ................... 13

    A.  Allegations of Backdated Stock Transfers in Late 2012 ...................................... 13

    B.  The Government's Theory That Alleged Backdated Stock Transfers Defrauded Retrophin By Transferring Shares to MSMB Capital ........................ 15

    C.  The Allegedly Backdated Stock Agreements Transferred Retrophin Shares From Private Individuals to MSMB Capital And Thus It Is Impossible as a Matter of Law for These Transfers to Have Defrauded Retrophin ....................... 16

    D.  Allegations of Backdated Stock Transfer Agreements Are Not Relevant to the Charges Under Rule 401 and Any Probative Value Is Outweighed by the Danger of Unfair Prejudice Under Rule 403 ................................................... 17

IV.  The Government's Theory in Count Seven That Retrophin Was Defrauded Because of Alleged Settlement Agreements With MSMB Capital and MSMB Healthcare to Settle Liabilities Owed by The MSMB Funds and Shkreli Should Be Stricken ................................................................................................... 21

    A.  There Was No Clear Duty to Disclose the Settlement and Consulting Agreements to Retrophin's Board of Directors ................................................... 22

    B.  The Government's "Right to Control Theory" Is Flawed Because Retrophin Received the Benefit of the Bargain in the Agreements at Issue ........ 23

    C.  The Government's "Right to Control" Theory Violates Due Process and the Rule of Lenity ................................................................................................ 26

V.  The Government's Theory that Retrophin Was Defrauded Because of Alleged Consulting Agreements with Defrauded MSMB Capital or Elea Capital Investors To Settle Liabilities Owed to the MSMB Funds and Shkreli Should Be Stricken .......... 27

VI.  Count Seven Should Be Dismissed Because the Indictment and The Evidence Reflect Multiple Alleged Conspiracies Within One Count ............................................. 28

VII.  Conclusion ........................................................................................................ 29

# TABLE OF AUTHORITIES

Page

**Cases**

*Apfel v. Prudential–Bache Sec.*,
  81 N.Y.2d 470 (1993) ...............................................................28

*Baird v. Comm'r*,
  68 T.C. 115 (1977) ("The fact that the formal documents were all backdated
  to August 29, 1970, also supports the conclusion that the parties intended the
  transaction to be closed as of that date.") ..............................................19

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
  891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006)............................22

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
  138 F. Supp. 2d 357 (E.D.N.Y. 2001) ............................................17, 18

*Henry v. Wyeth Pharm., Inc.*,
  616 F.3d 134 (2d Cir. 2010)........................................................18

*Old Chief v. United States*,
  519 U.S. 172 (1997)..............................................................18

*In re Toscano*,
  799 F. Supp. 2d 230 (E.D.N.Y. 2011) ................................................28

*In re Tyson Foods, Inc.*,
  919 A.2d 563 (Del. Ch. 2007)......................................................28

*Ultegra LLC v. Mystic Fire Dist.*,
  676 Fed. App'x 33 (2d Cir. 2017)..................................................17

*United States v. Batista*,
  No. 06 CR 265 (S-5), 2010 WL 1193314 (E.D.N.Y. Mar. 24, 2010) ...............2, 6, 7, 8, 9, 13

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015)........................................................25

*United States v. Bongiorno*,
  No. 05 Cr. 390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006)......................4

*United States v. Dauray*,
  215 F.3d 257 (2d Cir. 2000).........................................................26

*United States v. Davis*,
  No. 13-cr-923, 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) .........................21, 24, 25, 26, 27

## TABLE OF AUTHORITIES

Page

*United States v. Dinome,*
    86 F.3d 277 (2d Cir. 1996)........................................................................25

*United States v. Elfgeeh,*
    515 F.3d 100 (2d Cir. 2008).....................................................................18

*United States v. Geibel,*
    369 F.3d 682 (2d Cir. 2004).....................................................................29

*United States v. Hoey,*
    No. S3 11-CR-337, 2014 WL 2998523 (S.D.N.Y. July 2, 2014)...........23

*United States v. Kasper,*
    No. 10-CR-318S, 2011 WL 7098042 (W.D.N.Y. June 20, 2011)..........23

*United States. v. Micke,*
    859 F.2d 473 (7th Cir. 1988) ...................................................................19

*United States v. Plaza Health Labs., Inc.,*
    3 F.3d 643 (2d Cir. 1993) ........................................................................26

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970)...................................................................25

*United States v. Rodriguez,*
    983 F.2d 455 (2d Cir. 1993)...................................................2, 5, 6, 13

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007).......................................................................24

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987).......................................................................25

*United States v. Thompson,*
    141 F. Supp. 3d 188 (E.D.N.Y. 2015) ......................................................5

*United States v. Velastegui,*
    199 F.3d 590 (2d Cir. 1999).....................................................................26

**Statutes**

Delaware General Corporation Law § 144 ....................................................21, 22, 23

**Rules**

Federal Rules of Criminal Procedure 7(c) and 12(b)(3)(B).................................3

Rule 10b–5 ..............................................................................................................3

## TABLE OF AUTHORITIES

<u>Page</u>

Rule 29 .................................................................................................................................15

Rule 144 ..................................................................................................................................9

Rule 401 ...............................................................................................................................17

Rule 403 ..........................................................................................................................17, 18

**Treatises**

13 Samuel Williston & Richard A. Lord, Williston on Contracts § 6:60 (4th ed.,
    supp. 2007)......................................................................................................................19

iv

Evan Greebel now moves to dismiss Count Seven to prevent a miscarriage of justice.  We are shocked and dismayed that the U.S. Attorney's Office for the Eastern District of New York has not dropped the Count Seven conspiracy charge against Mr. Greebel following the recent acquittal of Martin Shkreli—the person whom the government itself argued during the *United States v. Shkreli* trial was the mastermind and orchestrator of this alleged conspiracy to defraud Retrophin.  Indeed, the government argued to the jury that this was a conspiracy of two—Mr. Shkreli and Mr. Greebel—but the jury then acquitted Mr. Shkreli, rejecting the government's conspiracy theory altogether.  Thus, it necessarily follows that, because Mr. Shkreli did not commit the crime of conspiracy, Mr. Greebel could not have either.  Yet, incredibly, the government has insisted on going forward with its conspiracy charge against Mr. Greebel anyway.

The government's continued pursuit of Mr. Greebel following the acquittal of Mr. Shkreli on this conspiracy count shocks the conscience.  It is contrary to the interests of justice and frightening for every corporate lawyer in America simply doing their jobs representing clients, as Mr. Greebel did, only to find themselves then indicted, without any prior notice, over the alleged conduct of their client's former CEO.  And according to the government, even after this acquittal, the lawyer still has to face trial anyway on the same charge of which the client's CEO has just been acquitted.  It is a Kafkaesque scenario—stranger than fiction but all too real for Mr. Greebel.

The government would prefer to ignore the jury in the Eastern District of New York, which recently listened carefully to the government's case and rejected its theory of an illegal conspiracy between Mr. Shkreli and Mr. Greebel to defraud Retrophin.  But as Your Honor is well aware, during the trial of Mr. Shkreli, it became clear that the government's evidence and

theories of prosecution on Count Seven were fatally flawed, as a matter of both law and fact. After several weeks of trial, Your Honor raised questions about the government's legal theory and evidence with respect to Count Seven.  And the government's response was that a Delaware statute supposedly imposed a duty on Mr. Shkreli and Mr. Greebel to obtain the consent of the three-person board of directors of Retrophin (which included Mr. Shkreli) before entering into certain settlement agreements.  But, as Your Honor ruled, in truth and fact, this Delaware statute did no such thing.

The government already tried this conspiracy case and lost it.  There can be no do-over, especially where, as here, a lawyer's liberty and livelihood are at stake.  Justice requires dismissal of this unfounded, now-barred conspiracy count against Mr. Greebel.  Since the government has refused to do justice, we are therefore compelled to seek it from this Court.

While ordinarily the government can pursue inconsistent verdicts, under the unique circumstances of this case where a co-conspirator has been acquitted (Mr. Shkreli) and there is an absence of evidence that the remaining defendant (Mr. Greebel) conspired with anyone else to commit the charged offense, dismissal is warranted.  *See United States v. Rodriguez*, 983 F.2d 455, 458–59 (2d Cir. 1993).  Indeed, in *United States v. Batista*, No. 06 CR 265 (S-5), 2010 WL 1193314, at *10–12 (E.D.N.Y. Mar. 24, 2010), Judge Irizarry granted a judgment of acquittal in similar circumstances where the evidence was far more favorable to the government than here. Although the government opened and summed up its case declaring that Mr. Shkreli and Mr. Greebel conspired together to defraud Retrophin, the actual testimonial evidence about Mr. Greebel's participation in this so-called wire fraud conspiracy was non-existent, other than of course testimony that Mr. Greebel was a "capable lawyer" working for a "very well respected law firm."  Shkreli Trial Tr. 2289:19–23; 2514:7–9.  Not a single witness testified that he or she

observed, or even heard from someone else, that Mr. Greebel had done anything illegal, improper, or unethical.  All witnesses who testified about the stock transfer agreements, the settlement agreements, and the consulting agreements offered testimony only about Mr. Greebel's acting as an attorney providing legal services.

The paucity of evidence against Mr. Greebel would be shocking but for the reality of how the government initiated this case against him.  While the U.S. Attorneys' Manual mandates that a U.S. Attorney's Office must obtain *prior* approval of the U.S. Department of Justice in Washington, D.C. before even serving *a single subpoena* for documents or testimony on an attorney, and in circumstances when an office seeks charges "based, in whole or in part, on actions or omissions by the attorney during the representation of a current or former client," USAM § 9-2.032, the U.S. Attorney's Office for the Eastern District of New York in its pursuit of Mr. Shkreli chose not to go to Washington, D.C., before indicting Mr. Greebel.  Indeed, the government never even attempted to speak with Mr. Greebel, *or a single person* at Katten Muchin Rosenman LLP, before indicting and then arresting him.  In our country, that is simply unacceptable.  Given that history of the case, and the acquittal of Mr. Shkreli on Count Seven (and four other counts), one would reasonably expect the U.S. Attorney to agree to at least meet with us to discuss our impassioned view that the government should drop, at a minimum, Count Seven in the interests of justice and to prevent unwarranted disparities.  But the U.S. Attorney declined even to meet.[1]

There is something truly wrong with this picture.  While we will fight for Mr. Greebel, to prove not only that the government cannot possibly meet its burden of proof, but that he is an

---

[1] *See* Ex. A (Letter and Emails between Randy M. Mastro and U.S. Attorney Bridget M. Rohde, dated August 11–16, 2017).

innocent man who has been unjustly accused, this case is about more than Mr. Greebel.  It is about a higher principle that proceeding against Mr. Greebel on Count Seven in the face of Mr. Shkreli's acquittal belies common sense and calls out for judicial intervention.  It is about demonstrating the danger of indicting a family man and attorney with an unblemished record (who is indisputably not a flight risk) without giving that person any chance to be heard, and without even speaking with anyone with whom he worked at his law firm.  It is about demonstrating that, before indicting an attorney for the legal work done on behalf of a corporate client, more should be required than interpreting emails.  It is about demonstrating that we as a society all lose when an innocent person is charged and the government declines to even reconsider its position after changed circumstances.

For the reasons explained herein, we respectfully ask Your Honor to dismiss Count Seven pursuant to Federal Rules of Criminal Procedure 7(c) and 12(b)(3)(B).  In the alternative, with respect to the government's legal theories relating to the transfer of Retrophin Shares to MSMB Capital and to the settlement and consulting agreements, which fail as a matter of law, we move *in limine* to strike those theories from the government's case.  We also request oral argument on this motion.

## I.    Legal Standard for Motion to Dismiss

A defendant's motion to dismiss must be granted where "the facts alleged do not state an offense as a matter of law."  *United States v. Bongiorno*, No. 05 Cr. 390 (SHS), 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006); *see also id.* at *7–8 (dismissing charge where government "fail[ed] to allege material misstatements or omissions" constituting Rule 10b–5 violation).  "[I]t would be improper and a waste of resources for everyone involved to conduct a lengthy trial . . . and submit the case to a jury only to rule on a post-trial motion that the

government's theory of criminal liability fails no matter what facts it was able to adduce at trial."
*Id.* at *4; *see also United States v. Thompson*, 141 F. Supp. 3d 188, 195 (E.D.N.Y. 2015)
("Where, as here, a defendant objects to the indictment before trial, the defendant is entitled to a
more exacting review of the indictment than one who waits until after trial to object.") (citation
and internal quotation marks omitted).  Taking into account the interests of justice, the acquittal
of Mr. Shkreli on Count Seven, and the now-abundantly clear legally invalid bases for the
schemes alleged, Count Seven should be dismissed.

**II.   Count Seven Must Be Dismissed Because the Mastermind of the Alleged Wire
        Fraud Conspiracy Has Been Acquitted by an Eastern District of New York Jury**

Now that the mastermind and orchestrator of the alleged wire fraud conspiracy in Count
Seven has been acquitted, this Court should dismiss that count against Mr. Greebel.  Shkreli Trial
Tr. 856:17–23.

In the Second Circuit, inconsistent conspiracy verdicts cannot stand where there is an
absence of evidence that the remaining defendant conspired with anyone else to commit the
charged offense.  Here, because a jury in the Eastern District of New York has acquitted the
alleged mastermind (Mr. Shkreli) of the charged wire fraud conspiracy in Count Seven and there
is absolutely no evidence that Mr. Greebel conspired with anyone else to commit this alleged
crime, Count Seven must be dismissed against Mr. Greebel.

In *United States v. Rodriguez*, the Second Circuit Court of Appeals explained that
inconsistent conspiracy verdicts are prohibited where there is no probative evidence
demonstrating beyond a reasonable doubt that the defendant conspired with anyone else to
commit the crime.  983 F.2d at 459.  There, Maritza Rodriguez was returning from a two-week
trip in Venezuela when she was arrested at JFK airport with 1,939 grams of cocaine in a bulging
suitcase.  *Id*. at 456.  Upon arrest, Rodriguez gave a patently absurd account that she bought the

suitcase at a flea market in Venezuela, had no knowledge of what was inside, and flew back to the United States without having examined its contents. *Id*. After the district court dismissed the indictment against Rodriguez's co-defendant (Yesenia Maria Taveras) who traveled with Rodriguez back to the United States, having found no probative evidence that Taveras agreed to commit any narcotics offenses, the district court instructed the jury that it could find Rodriguez guilty of conspiracy only if the government proved that Rodriguez had entered into an illegal agreement with someone *other than Tavares* to possess and import cocaine. *Id*. at 459. Because the government proved beyond a reasonable doubt that Rodriguez had conspired with someone other than Tavares, Rodriguez's conspiracy conviction withstood scrutiny. *Id.*

Applying the principle set forth in *Rodriguez*, Judge Irizarry granted Luis Batista's motion for a judgment of acquittal of conspiracy, because Batista could not be found guilty as a matter of law where his co-defendant had been acquitted and there was no probative evidence that any other person had conspired with Batista himself. *Batista*, 2010 WL 1193314, at *10–12. In that case, the government alleged that Batista, an NYPD detective at the time, had conspired with co-defendants Henry Conde and William Valerio to obstruct an EDNY grand jury investigation into a narcotics trafficker. *Id*. at *11. When the jury acquitted Conde of the conspiracy charge, Batista argued over the government's strong objection that his conviction had to be dismissed. Batista asserted that the verdicts were inconsistent and "Conde's acquittal negates the possibility of an agreement between Batista and Conde, and thereby denies the existence of any conspiracy at all." *Id*. at *10.

Quoting *United States v. Rodriguez*, Judge Irizarry explained that "superficially inconsistent conspiracy determinations" were not permissible where the government failed to satisfy its burden of proving beyond a reasonable doubt that the defendant at issue conspired

with someone other than the acquitted person to commit the crime. *Id*. at *11. Faced with inconsistent verdicts against Conde (who was acquitted) and Batista (who was convicted), the government argued that Batista conspired with Valerio, who testified at trial pursuant to a cooperation agreement that he (Valerio) had conspired with Batista to obstruct justice. *Id*. Valerio's testimony, however, did not satisfy the government's burden. Judge Irizarry scrutinized Valerio's testimony carefully to determine whether he had "ever entered into any agreement with Batista to obstruct justice" and held that, despite Valerio's conclusory statement to the contrary, there was no evidence of an illegal agreement between Valerio and Batista. *Id*. Moreover, "a thorough review of the record [did not] support an inference that Batista conspired to obstruct with others apart from Conde, who was acquitted." *Id*. at *12. As a result, Judge Irizarry granted Batista's motion for a judgment of acquittal on the charged conspiracy to obstruct justice. *Id.*

Judge Irizarry's decision in *Batista* is squarely on all fours with the government's wire fraud conspiracy charge against Mr. Greebel and, therefore, the same outcome of dismissal is warranted. First, just as in *Batista*, the government here has alleged a conspiracy charge. Second, just as in *Batista*, the co-defendant was acquitted of the conspiracy charge. Indeed, the facts in favor of dismissal are stronger here. In *Batista*, the co-conspirator who played a lesser role, Conde, was acquitted whereas, in the instant case, the alleged mastermind and orchestrator, Mr. Shkreli, was acquitted. Third, just as in *Batista*, the government cannot prove beyond a reasonable doubt—as a matter of law—that there was a third co-conspirator who committed the charged wire fraud conspiracy with Mr. Greebel. In *Batista*, the district court examined the record, finding no evidence other than a conclusory assertion by a cooperating witness that Batista had engaged in the conspiracy to obstruct justice other than with the acquitted defendant.

Here, as explained below, the government's position is far worse since the government does not even have a conclusory statement from a cooperating witness supporting a conspiracy charge against Mr. Greebel.  Accordingly, just as in *Batista*, this Court should dismiss the charged wire fraud conspiracy against Mr. Greebel.

Indeed, the extensive record from the trial of *United States v. Martin Shkreli* makes it plainly obvious as a matter of law that the government does not have a scintilla of evidence, much less probative evidence, that anyone other than Mr. Shkreli allegedly entered into an illegal agreement to commit wire fraud with Mr. Greebel.  During its opening statement, the government argued that it was going to prove that Mr. Shkreli and Mr. Greebel conspired to defraud Retrophin as alleged in Count Seven:  Mr. Shkreli acted "together with a lawyer, a co-conspirator named Evan Greebel, to use Retrophin's money to pay off his hedge fund investors." Shkreli Trial Tr. 856:21–22.  Further, during its case-in-chief, the government did not call a single witness who testified that he or she had an illegal agreement with Mr. Greebel to defraud Retrophin.  Similarly, during the government's case-in-chief, no exhibits were received into evidence that purportedly demonstrated the existence of an illegal agreement between Mr. Greebel and anyone, including Mr. Shkreli, to commit wire fraud.

Indeed, during the government's main summation, it was very clear that the charged conspiracy in Count Seven was between Mr. Shkreli and Mr. Greebel:

> [A]nd then the defendant and Evan Greebel, who
> is a co-conspirator for Count Seven and Count Eight and who
> you're going to hear a lot about, they begin to discuss
> something called share transfers . . . .
>
> And he did it in connection with [] his co-conspirator Evan
> Greebel, the attorney, and you saw a lot of the e-mails that went
> through Agent Braconi between the two of them where it's clear
> that Evan Greebel is aware of the concerns that everyone knows
> about the MSMB funds, about the Merrill Lynch settlement and he

> is working with the defendant, and we'll talk a little bit about that
> relationship . . . .

Shkreli Trial Tr. 5247:3–6, 5269:25–5270:7.  Similarly, during its rebuttal, the government made

it clear that the charged conspiracy in Count Seven was between two people, Mr. Shkreli and

Mr. Greebel:

> [T]he evidence could not be more clear, Martin Shkreli wasn't
> relying on Evan Greebel.  Evan Greebel wasn't leading him around
> by the nose.  You saw the e-mail.  You saw the way Martin treated
> Evan Greebel.  You embarrass me.  You're lazy and stupid.  More
> business for another firm.  Good job, Even [sic].  God bless
> America.  **Martin was the dominant person in that relationship
> and that relationship was a criminal conspiracy.**  There is no
> doubt about it.

Shkreli Trial Tr. 5515:5–13 (emphasis added).

The government never alluded to, much less mentioned, any other alleged co-conspirator

in Count Seven until its rebuttal summation, during which, for the first time, it stated that Mr.

Yaffe conspired with Mr. Shkreli and Mr. Biestek with respect to Mr. Yaffe's consulting

agreement.  Shkreli Trial Tr. 5513:2–6.  Yet Mr. Yaffe's testimony does not save the government

from the dismissal of Count Seven.  Mr. Yaffe never testified that he entered into an illegal

agreement with Mr. Greebel to defraud Retrophin.  *See generally* Shkreli Trial Tr. 4360–4562.

Just as Judge Irizarry scrutinized the testimony of the cooperating witness in *United States v.*

*Batista* carefully to determine whether that witness had provided evidence—beyond conclusory

assertions—that he had entered into any agreement, much less an illegal agreement, with Batista

to obstruct justice, this Court should do the same with Mr. Yaffe's testimony and reach exactly

the same conclusion.  A review of Mr. Yaffe's testimony demonstrates that Mr. Yaffe offered

absolutely no evidence that Mr. Greebel had entered into an illegal conspiracy with Mr. Yaffe to

defraud Retrophin.  Indeed, Mr. Yaffe did not even offer the conclusory assertions of an illegal

agreement with Mr. Greebel that the cooperating witness Valerio had testified about in *Batista*

9

and that Judge Irizarry then rejected as a sufficient basis to find that there was evidence of a conspiracy with someone other than the acquitted defendant.

Mr. Yaffe mentioned Mr. Greebel in the context of questions **about one document, and one document only** on *only approximately 4 pages* of nearly 200 pages of trial testimony.  *See* Shkreli Trial Tr. 4397-98; 4475-76; GX 116-22.  And that document is exculpatory for Mr. Greebel, not inculpatory.  That document reflects that, during email exchanges between Mr. Shkreli and Mr. Yaffe relating to a consulting agreement, Mr. Shkreli asked Mr. Greebel a legitimate legal question:  "Evan, do you want to chime in?  If we give a consultant stock, how long does it take to get registered?"  Shkreli Trial Tr. 4397:24–4398:1; GX 116-22.  And Mr. Greebel responded with accurate and proper legal advice:  "The stock is restricted for six months, after which it can be sold under Rule 144."  Shkreli Trial Tr. 4398:7-9; GX 116-22. Following Mr. Greebel's response, Mr. Shkreli and Mr. Yaffe promptly removed Mr. Greebel from all further correspondence.  Indeed, on cross-examination, Mr. Yaffe testified that Mr. Greebel's advice that the stock would be restricted under Rule 144 was correct.  Shkreli Trial Tr. 4475:21-25.  Mr. Yaffe did not even seem to know who Mr. Greebel was exactly—testifying with some equivocation and without any specificity when asked "Who is Evan Greebel?":  "I *believe* he was counsel or the counsel that was advising or working with Martin."  Shkreli Trial Tr. 4398:4-6 (emphasis added).  This hardly sounds like the testimony of someone whom the government could possibly claim had been involved in a criminal partnership with Mr. Greebel.

Weeks into the government's case-in-chief against Mr. Shkreli, because the government had offered no proof that anyone had conspired with even Mr. Shkreli to commit the wire fraud conspiracy charged in Count Seven, this Court raised questions about the identity of any alleged

co-conspirators, and in response the government only identified Mr. Greebel.  The following

colloquy took place between the Court and the government:

> The Court:   For Count 7, . . . who are the co-conspirators with
> Mr. Shkreli on that?
>
> Government:  Mr. Greebel.  I mean, there are others, but it's
> primarily Mr. Greebel.
>
> . . .
>
> The Court:   I mean, honestly, it was not really clear to me going
> into this trial, other than those that you specifically
> mentioned, who your co-conspirators were and even
> though you identified some of them, I am not sure
> what evidence there is to show that they are co-
> conspirators.
>
> Government:  I would say the majority of the e-mails are with Mr.
> Greebel, but to the extent that there are others, we'll
> let you know.

Shkreli Trial Tr. 4488:9–13, 4515:5–13.  This colloquy demonstrated that the government's

evidence of an illegal conspiracy was thin at best, and almost entirely based on communications

between Mr. Shkreli and Mr. Greebel.  Notwithstanding the government's commitment to

provide names of other co-conspirators, at no point following the discussion above did the

government either provide such names or provide any documentary support indicating that there

were other co-conspirators.  In fact, the government did not even attempt to offer to the Court the

name of a co-conspirator in Count Seven other than Mr. Shkreli and Mr. Greebel.

Notably, none of the government's references to additional unindicted co-conspirators

during the trial of *United States v. Shkreli* related to Count Seven.  The government, for example,

identified Marek Biestek, Kevin Mulleady, Ron Tilles, and Andrew Vaino as possible co-

conspirators at various times, but not once did the government identify these individuals as co-

conspirators in Count Seven.[2]  If there were evidence of anyone else conspiring with Mr. Greebel in Count Seven, the government would have surely offered it during the trial, especially since there was barely any evidence of an alleged conspiracy in Count Seven beyond certain email communications and Mr. Yaffe's testimony.  It is no surprise, therefore, that the jury acquitted Mr. Shkreli of Count Seven.  Dkt. No. 305 (finding Mr. Shkreli not guilty on Count Seven).

We recognize that the Court is faced with a rare situation where the government's case has been laid bare prior to trial in our case.  But the parties do not need to pretend that the government's case against Mr. Greebel exists on a blank slate.  We have seen the government's proffers of alleged co-conspirators involved in Count Seven, and the evidence—at most—does not even suggest that anyone other than Mr. Shkreli allegedly conspired with Mr. Greebel to commit the charged crime of wire fraud in Count Seven.  Nor can the government, in good faith, suggest that it has in its possession additional evidence of "other" co-conspirators for Count Seven that, for some reason, was held back during Mr. Shkreli's trial.  As evidenced by the government's ample references to additional co-conspirators for Counts One, Two, Four, Five, and Eight, surely the government would have offered the names of other alleged co-conspirators

---

[2] *See* Shkreli Trial Tr. 5239 (alleging Marek Biestek and Kevin Mulleady are co-conspirators for Count Eight); *id*. 2144 (connecting Kevin Mulleady to the "conspiracy counts with respect to the fund" (Counts One, Two, Four, and Five)); *id*. 4597 (alleging that Ron Tilles is a co-conspirator for Count Eight); *id*. 4744-45 (identifying Andrew Vaino as an alleged co-conspirator for Count Eight); *id*. 4456 ("Mr. Mulleady . . . would talk to potential investors and make misrepresentations regarding the funds." (Counts One, Two, Four, and Five)); 4248 (alleging Marek Biestek as a co-conspirator for Count Eight); *id*. 4732 (describing Mulleady's knowledge of Mr. Shkreli's misrepresentations (Counts One, Two, Four, and Five)); *id*. 5230–31 (Mulleady's role in editing the MSMB pitch book (Counts One, Two, Four, and Five)); id. 5239 ("for MSMB Healthcare, the co-conspirators involved again are Marek Biestek and . . . Kevin Mulleady" (Counts Four and Five));  *id.* 5204 (discussing "the conspiracy between [Mr. Shkreli] and Marek Biestek" for MSMB Capital (Counts One and Two)); *id.* 5215 (describing Mr. Shkreli's "co-conspirator, Kevin Mulleady" with respect to MSMB Healthcare (Counts Four and Five)).

for Count Seven had there been sufficient evidence to do so.  The government has therefore effectively conceded that Mr. Shkreli is the only possible alleged co-conspirator to Mr. Greebel.

Accordingly, based on *United States v. Rodriguez* and *United States v. Batista*, Mr. Shkreli's acquittal on Count Seven mandates the dismissal of the charged wire fraud conspiracy where there is no probative evidence that anyone other than Mr. Shkreli allegedly entered into an illegal agreement with Mr. Greebel to defraud Retrophin.

III.    **The Government's Theory in Count Seven That Retrophin Was Defrauded Because of the Alleged Transfer of Retrophin Shares to MSMB Capital Is Impossible as a Matter of Law And Thus Should Be Stricken**

The evidence and trial in *United States v. Shkreli* has demonstrated that the government's theory in Count Seven that Retrophin was defrauded by the alleged actions of Mr. Shkreli, along with Mr. Greebel, by causing Retrophin to "transfer Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin" is ***impossible as a matter of law***.  Even assuming *arguendo* the alleged backdating of stock transfers in late November and early December 2012—which purportedly transferred shares of Retrophin from Marek Biestek, Kevin Mulleady, and Tom Fernandez to Mr. Shkreli, and then from Mr. Shkreli to MSMB Capital—it is impossible for Retrophin to have been defrauded.  The Retrophin shares that the government claims were illegally transferred to MSMB Capital *were neither owned by Retrophin nor in its possession custody, or control*—they were indisputably held by *private individuals* (Biestek, Mulleady, Fernandez, and Shkreli) and thus Retrophin could not have been "defrauded" as a result of these stock transfers.

A.    **Allegations of Backdated Stock Transfers in Late 2012**

For purposes of this motion, we assume the government's allegations and the evidence it offered in support of those allegations during the trial of *United States v. Shkreli* are true.  The government alleged and argued the following:

13

(1) MSMB Capital was no longer operating as of February 2011 following the OREX short sale trade, and MSMB Capital never invested in Retrophin.  Ind., Dkt. No. 60 ¶ 27; Shkreli Trial Tr. 4777:2–4 (Testimony by Special Agent Braconi:  "Q:  Now, what was the total amount of money transferred from MSMB Capital to Retrophin?  A:  Zero."); 4798:21–24 (Testimony by Special Agent Braconi:  "Q:  And with respect to that difference with MSMB Capital in your chart, is that because MSMB Capital never invested in Retrophin?  A:  That's correct."); 5175:17–22 (Government's Summation:  "And we know that the statement that MSMB Capital invested in Retrophin was a lie.  Because from the bank and brokerage records, we know that no money was transferred from MSMB Capital to Retrophin, and we also heard that from the testimony of Wendy Spaulding as she was going through the bank accounts.").

(2) On or about November 29, 2012, Mr. Shkreli allegedly backdated an agreement transferring 4,167 shares of Retrophin stock *from Mr. Biestek to Mr. Shkreli*.  Ind., Dkt. No. 60 ¶ 25.c; Shkreli Trial Tr. 2211:14–2215:20 (Testimony by Jackson Su); 2222:9–2223:3 (Testimony by Jackson Su); GX 119-25; GX 119-17; Shkreli Trial Tr. 5247:12–5250:23; 5253:2–7 (Government's Summation).

(3) On or about December 3, 2012, Mr. Shkreli allegedly backdated agreements transferring 10,000 shares of Retrophin stock *from Mr. Mulleady to Mr. Shkreli*, and 50,000 shares of Retrophin stock *from Mr. Fernandez to Mr. Shkreli*.  Ind., Dkt. No. 60 ¶ 25.j; Shkreli Trial Tr. 2228:18–2229:18 (Testimony by Jackson Su); GX 119-25; Shkreli Trial Tr. 5253:7–5254:10 (Government's Summation).

(4) On or about December 3, 2012, Mr. Shkreli allegedly backdated an agreement transferring 75,000 shares of Retrophin stock *from Mr. Shkreli to MSMB Capital*.  Shkreli Trial

Tr. 2233:6–21 (Testimony by Jackson Su); GX 119-24; Shkreli Trial Tr. 5255:2–15 (Government's Summation).

(5) Following the aforementioned transactions, Mr. Shkreli allegedly transferred the 4,167 Retrophin shares that he received from Mr. Biestek to MSMB Capital; the 10,000 Retrophin shares that he received from Mr. Mulleady to MSMB Capital; the 50,000 Retrophin shares that he received from Mr. Fernandez to MSMB Capital; and an additional 10,000 shares that were held by Mr. Shkreli to MSMB Capital, for a total of 75,000 shares.  Shkreli Trial Tr. 5255:2–15 (Government's Summation).

### B.  The Government's Theory That Alleged Backdated Stock Transfers Defrauded Retrophin By Transferring Shares to MSMB Capital

The government's theory is that the alleged backdated stock transfers on or about November 29, 2012, and on or about December 3, 2012, defrauded Retrophin by causing Retrophin to transfer Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin.

During the trial of *United States v. Shkreli*, the Court instructed the jury at the government's request—and without objection from Mr. Shkreli—in relevant part:

> Specifically, as to Count Seven, the government alleges that Mr. Shkreli, together with others, conspired to ***defraud Retrophin*** by causing it to: (i) ***transfer Retrophin shares to MSMB Capital*** even though MSMB Capital never invested in Retrophin . . . .

Final Jury Instructions, Dkt. No. 295 at 73 (emphasis added).  During oral argument in connection with Mr. Shkreli's Rule 29 motion to dismiss Count Seven, the government explained its theory about how the allegedly backdated stock transfers defrauded Retrophin:

> And then I think that there were two other means in Count Seven by which Retrophin was defrauded, neither of which the defense has argued about, which is the backdated creation of the MSMB Capital interest in order to try to compensate or to pay off MSMB Capital investors who had been defrauded.

15

Shkreli Trial Tr. 5061:15–20.

During summations, the government argued that the backdated stock transfers enabled MSMB Capital to show up on the capitalization table of Retrophin in December 2012.  The government argued:  "So based on that backdated interest, basically -- MSMB Capital showing up on a cap table for Retrophin Standard Registrars would be a transfer agent actually transferred and issues shares to MSMB Capital as a result of them being on the cap table at that point."  Shkreli Trial Tr. 5257:7–11.  The government further explained:

> There's absolutely no money in MSMB Capital all the way through to December of 2012 and ***then there's this fraudulent backdated interest in MSMB Capital which let the defendant distribute shares of Retrophin for MSMB Capital as if the MSMB Capital investors had actually invested in Retrophin***, which did not happen.  So [the backdated stock transfer] accomplishes both of those goals.  It justifies or tries to justify that statement to the SEC in November and then also gives the defendant something to actually give the MSMB Capital investors after he sends that wind down in September saying you're going to get shares or cash or combination.

Shkreli Trial Tr. 5258:1–11 (emphasis added).

## C.   The Allegedly Backdated Stock Agreements Transferred Retrophin Shares From Private Individuals to MSMB Capital And Thus It Is Impossible as a Matter of Law for These Transfers to Have Defrauded Retrophin

Even assuming *arguendo* that the government's allegations about the backdating of the stock transfers in November and December 2012 were true—and putting aside that the government's claims relating to the alleged "backdating" *backfired* during the testimony of Jackson Su and Corey Masella—it is impossible as a matter of law to find that Retrophin was defrauded because the Retrophin shares at issue were held by private individuals and not Retrophin at the time of the allegedly backdated stock transfers.  As of November and December 2012, when the government alleges Mr. Shkreli, along with Mr. Greebel, backdated stock

16

transfer agreements to cause the transfer of 75,000 shares to MSMB Capital, the Retrophin shares that were transferred to MSMB Capital came from Messrs. Biestek, Mulleady, Fernandez, and Shkreli.  The 75,000 shares at issue were not held, owned, or possessed by Retrophin.  Had these allegedly backdated stock transfer agreements never happened in November and December 2012, these 75,000 shares at issue would have been held and owned by Messrs. Biestek, Mulleady, Fernandez, and Shkreli.  These 75,000 shares at issue would not have been held, owned, or possessed by Retrophin.  As a result, the government's theory that Retrophin was defrauded from the backdated stock transfer agreements is impossible as a matter of law. Accordingly, the Court should strike the government's theory in Count Seven that Mr. Shkreli, along with Mr. Greebel, "conspired to defraud Retrophin by causing it to: (i) transfer Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin."  Final Jury Instructions, Dkt. No. 295 at 73.

> **D.    Allegations of Backdated Stock Transfer Agreements Are Not Relevant to the Charges Under Rule 401 and Any Probative Value Is Outweighed by the Danger of Unfair Prejudice Under Rule 403**

As demonstrated above, the allegedly backdated stock agreements in November and December 2012 did not defraud Retrophin of any shares and thus the allegations of backdating should not be admitted into evidence pursuant to Federal Rules of Evidence ("FRE" or "Rule") 401 and 403.

Under Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  FRE 401; *see also Ultegra LLC v. Mystic Fire Dist.*, 676 Fed. App'x 33, 35 (2d Cir. 2017).  Evidence is relevant only if it is "logically related, either directly or through an inferential chain of proof, to at least one of the formal elements of the charges made or defenses raised in the case—*e.g.*, a material proposition of fact."  *Blue Cross & Blue Shield of N.J., Inc. v.*

*Philip Morris, Inc.*, 138 F. Supp. 2d 357, 365 (E.D.N.Y. 2001).  Evidence has probative value only if it "has any tendency to establish a legally necessary (material) proposition in the case through proof of the probability that the proposition is true (or untrue)."  *Id.* at 366.

Having demonstrated that it is impossible for Retrophin to have been defrauded by the allegedly backdated agreements transferring stock from private individuals to Mr. Shkreli and then to MSMB Capital, the evidence relating to the alleged backdating of share transfers does not have a tendency to make any fact of consequence in proving that Retrophin was allegedly defrauded more or less probable.  Therefore, the evidence relating to the alleged backdating of the stock transfer agreements should not be admitted at trial.

Further, even assuming *arguendo* that there is some scintilla of relevance to the backdating evidence (which there is not), any probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  Under Rule 403, evidence must be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading a jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FRE 403; *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  Your Honor has broad discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  *See, e.g.*, *United States v. Elfgeeh*, 515 F.3d 100, 127–28 (2d Cir. 2008) (*citing Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997)).  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *Id.* (internal citations omitted).

Here, the danger of unfair prejudice, confusion of the issues, and misleading the jury arises from the allegation of "backdating" as something that conjures up the notion of improper and unlawful conduct.  The term "backdating" undoubtedly has negative connotations that will result in the jury assuming that Mr. Greebel was involved in improper activity even though backdating of agreements that transfer shares from private individuals (Biestek, Mulleady, and Fernandez) to another private individual (Shkreli) and then by Shkreli to MSMB Capital cannot defraud Retrophin.  Indeed, given that the allegedly backdated stock agreements are not probative of whether Mr. Shkreli, along with Mr. Greebel, entered into an agreement to defraud Retrophin (or to misappropriate Retrophin assets), evidence regarding the alleged backdating will result in unfair prejudice against Mr. Greebel, confusion of the issues relevant to Count Seven, and mislead the jury about any alleged scheme to defraud Retrophin of its assets.

Furthermore, **backdating as a practice is not *per se* improper and indeed is accepted practice and can be entirely proper**.  The backdating of documents for the purpose of memorializing an agreement or a transaction that actually occurred on the "backdated" date is legitimate.  In *United States. v. Micke*, 859 F.2d 473, 478 (7th Cir. 1988), the United States Court of Appeals for the Seventh Circuit explained:

> The parties agreed that documents reflecting the acquisitions (and leases) had been executed in January, but backdated to December by defendant.  The sole issue at trial was whether the deal had been agreed on in December, or subsequently in January.  If the former, the backdating was legitimate and the returns were not fraudulent; if the latter, the backdating and the returns were fraudulent.

*See also Baird v. Comm'r*, 68 T.C. 115, 120–28 (1977) ("The fact that the formal documents were all backdated to August 29, 1970, also supports the conclusion that the parties intended the transaction to be closed as of that date."); 13 Samuel Williston & Richard A. Lord, Williston on Contracts § 6:60 (4th ed., supp. 2007) ("[I]t seems clear that, where the parties themselves agree

that a contract between them should be given effect as of a specific date, absent the intervention of third party rights, there is no sound reason why that agreement should not be given effect.").

We proffer to the Court that, if necessary, we may call the Dean of University of San Diego Law School to testify as an expert regarding, in relevant part, the common and legitimate practice of backdating agreements to reflect past oral understandings. Before becoming Dean of the law school, Dean Stephen Ferruolo was a partner and co-chair of the Corporate/VLG Practice Group at Heller Ehrman LLP from 1993 to 2007; he then served as the founding partner and chair of the San Diego office of Goodwin Procter LLP from 2007 to 2011; and then he served as vice president and outside general counsel of BIOCOM, the world's largest regional life sciences association, and then as its vice chairman from 2011 to 2014. Dean Ferruolo teaches, among other things, about the practice of corporate governance and the role of outside counsel to private and public companies. Dean Ferruolo will testify in relevant part, and in sum and substance, that it is industry practice to backdate stock transfer and other agreements to reflect when the oral understanding was reached and thus it is not a red flag of improper or illegal conduct.

Throwing around the allegation that Mr. Greebel was copied on emails that allegedly backdated stock transfer agreements—agreements that could ***not*** have defrauded Retrophin of any assets since the Retrophin shares allegedly being transferred through the backdated agreements were held by private individuals—will create the misimpression to the jury that Mr. Greebel became aware of improper and unlawful conduct when, in fact, backdating is not *per se* improper, and is indeed accepted practice and often entirely proper. As a result, the admission of evidence relating to allegedly backdated stock transfer agreements will be unduly and improperly prejudicial, create confusion for the jury, and mislead the jury regarding the charges against Mr. Greebel.

20

IV.    **The Government's Theory in Count Seven That Retrophin Was Defrauded Because of Alleged Settlement Agreements With MSMB Capital and MSMB Healthcare to Settle Liabilities Owed by The MSMB Funds and Shkreli Should Be Stricken**

The government's theory on Count Seven that the settlement agreements "defrauded" Retrophin cannot stand as a matter of law.  Based on the government's summations and the theory in the final jury instructions given in *United States v. Shkreli*, it is now clear that the government's case is based on a "right to control" theory.  In short, the government alleges and argues that Retrophin was defrauded because Mr. Shkreli, along with outside counsel Mr. Greebel, failed to disclose to and obtain approval from Stephen Aselage and Steven Richardson (Retrophin board members) before entering into the settlement agreements and, therefore, Mr. Shkreli and Mr. Greebel deprived Retrophin's board of directors of the right to control the assets of the company.

But the government's theory that Mr. Shkreli and Mr. Greebel had a duty to seek the approval of Messrs. Aselage and Richardson before entering into the settlement agreements is fatally flawed.  The government mistakenly relied on Delaware General Corporation Law ("DGCL") § 144 for its theory that Mr. Shkreli and Mr. Greebel had a statutory obligation to seek approval from Retrophin's board of directors.  As Your Honor ruled, however, DGCL § 144—which applies to related-party transactions—does not apply to the settlement and consulting agreements at issue in Count Seven.  July 21, 2017 Dkt. Entry Order ("The court has reviewed Delaware General Corporation Law (DGCL) Section 144, cited by the government during the 7/21 conference, and is not convinced that the plain text of this provision applies to the settlement and consulting agreements.").

In addition, as a matter of law, the government cannot prevail on its "right to control" theory because Retrophin received the benefit of the bargain.  *See United States v. Davis*, No. 13-cr-923, 2017 WL 3328240, at *9 (S.D.N.Y. Aug. 3, 2017) ("[W]e have repeatedly rejected

application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain.").

Finally, the government's "right to control" theory as applied in this case violates due process and the rule of lenity, and raises fundamental issues with how corporate counsel interacts with and provides legal advice to clients.

### A. There Was No Clear Duty to Disclose the Settlement and Consulting Agreements to Retrophin's Board of Directors

It is now beyond dispute based on the Shkreli trial that the fundamental premise of the government's theory in Count Seven is based on a fallacy of law. Mr. Shkreli and Mr. Greebel were under no clear duty to disclose the settlement and consulting agreements to Retrophin's board of directors, and the government appears to have obtained an Indictment in Count Seven based on an incorrect understanding of Delaware law.

Almost four weeks into Mr. Shkreli's trial, the government for the first time disclosed that it had been relying on DGCL § 144 for the proposition that Mr. Shkreli and Mr. Greebel had a duty to disclose the settlement and consulting agreements to Retrophin's board of directors before executing them. Shkreli Trial Tr. 4576:2–5. But as Your Honor ruled in a docket entry order, DGCL § 144 does not apply to the settlement and consulting agreements. July 21, 2017 Dkt. Entry Order. Section 144 does not create disclosure obligations or mandate any particular conduct by an officer or director; it "merely protects against invalidation of a transaction 'solely' because it is an interested one." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 185 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).

Given that the government appears to have obtained an Indictment on Count Seven based on a faulty understanding of the law, we respectfully submit that the Court should review the instructions that the government provided to the grand jury before they voted on the proposed

Indictment.  This review is necessary to confirm whether the grand jury indicted Mr. Greebel based on an incorrect and invalid premise of the law.  If so, Count Seven must be dismissed. *See*, *e.g.*, *United States v. Hoey*, No. S3 11-CR-337, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) ("[C]ourts have found error where the government incompletely or erroneously provides legal instruction to the grand jury."); *United States v. Kasper*, No. 10-CR-318S, 2011 WL 7098042, at *7 (W.D.N.Y. June 20, 2011) ("[W]hile the Government need not instruct the Grand Jury on the pertinent law, error may arise if the Government endeavors to instruct but does so incompletely or erroneously.").

We are not alleging at this time that the government provided false or inaccurate information, or failed to disclose *Brady* material, to the grand jury before obtaining an indictment.  If there *were* evidence that the government provided false or inaccurate information to the grand jury, or failed to disclose *Brady* material prior to indictment, we would seek a hearing.  At this time, we are alleging that, based on the government's statements during Mr. Shkreli's trial that it had relied on Delaware law (specifically, DGCL § 144) for the incorrect proposition that there was a clear statutory duty to disclose the agreements to Retrophin's board of directors, we would ask Your Honor to review the government's instructions to the grand jury *in camera*.

### B.   The Government's "Right to Control Theory" Is Flawed Because Retrophin Received the Benefit of the Bargain in the Agreements at Issue

Even assuming *arguendo* that Mr. Shkreli and Mr. Greebel had a duty to disclose the agreements to Retrophin's board of directors, and assuming that they concealed these agreements to misappropriate Retrophin assets, the government's legal theory cannot withstand scrutiny. The government cannot establish that Mr. Shkreli and Mr. Greebel conspired to deny Retrophin the right to control its assets by depriving it of information necessary to make discretionary

economic decisions.  This is especially true in light of the decision issued just this month by the

Honorable Loretta A. Preska in *United States v. Davis*, No. 13-cr-923, 2017 WL 3328240

(S.D.N.Y. Aug. 3, 2017).

In *Davis*, the government had alleged that the defendants engaged in wire fraud and

conspiracy to commit wire fraud in connection with the construction of Tower 1 of the World

Trade Center by depriving the Port Authority of the right to control its assets.  *Id.* at *5.

Specifically, the government alleged that defendants—a steel company and its owner—

misrepresented the extent to which it subcontracted with minority-owned and woman-owned

businesses.  *Id.*  Judge Preska vacated the convictions of both defendants after a jury trial,

finding that "the evidence was not sufficient for a rational jury to find that the alleged

misrepresentations went to an essential element of the contract or that they exposed the Port

Authority to potential or actual economic harm."  *Id.* at *15.  The *Davis* decision relied on a line

of cases in which convictions for wire fraud had been reversed where the "purported victim[s]

received the full economic benefit of [their] bargain, [] *even if* the alleged victims would not

have entered the transactions had they been aware of the defendant's deceit."  *Id.* at *12 (internal

citations omitted) (emphasis added).  The Second Circuit has stated:  "Our cases have drawn a

fine line between schemes that do no more than cause their victims to enter into transactions they

would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that

depend for their completion on a misrepresentation of an essential element of the bargain—

which do violate the mail and wire fraud statutes."  *United States v. Shellef*, 507 F.3d 82, 108 (2d

Cir. 2007).

Proof of fraudulent intent, or the specific intent to harm or defraud the alleged victim of

the scheme, is an essential component of the "scheme to defraud" element of a conspiracy to

commit wire fraud charge.  *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  Accordingly, the government must prove beyond a reasonable doubt that Mr. Greebel had fraudulent intent—***i.e.*, a specific intent to harm or defraud Retrophin**.  Even proof of deceit, without more, is not sufficient to find a scheme to defraud.  *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir. 1970).  "It is not required that the [alleged] victim[ ] of the scheme in fact suffered harm, but 'the Government must, at a minimum, prove that [Mr. Greebel] contemplated some actual harm or injury to [the alleged] victim[ ].'"  *See United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015).

Here, the government's theory that Retrophin was defrauded based on the settlement agreements fails as a matter of law, because there were no misrepresentations regarding the essence of the agreement.  Indeed, Retrophin received the benefit of the bargain—the release of any claims from MSMB investors.  A "right to control" theory requires the government to prove that there was a conspiracy to deny Retrophin the right to control its assets by depriving the company of information necessary to make discretionary economic decisions.  But as Judge Preska held in *Davis*, merely showing that an alleged victim "would not have entered into a discretionary economic transaction but for the defendant's misrepresentations is not enough to prove deprivation of the right to control one's assets."  2017 WL 3328240, at *8.  Where the alleged victim received the full economic benefit of its bargain, there can be no wire fraud.

Assuming the government's allegations are true, and based on the government's evidence received during Mr. Shkreli's trial, the Retrophin Board came to learn about the agreements at issue by no later than September 2013 and thereafter.  And the government cannot show that, but for the alleged misrepresentations or omissions, Retrophin would not have entered into these agreements.  Indeed, the government cannot even show that Retrophin would not have entered

into these agreements had it learned all relevant information in early 2013. Moreover, there is "insufficient evidence for a rational jury to find that [Retrophin] did not receive the full benefit of its bargain"—the avoidance of any litigation. *See Davis*, 2017 WL 3328240, at *16. Accordingly, there was no contemplated or actual economic harm to the company and the charge at issue in Count Seven is legally invalid.

### C.    The Government's "Right to Control" Theory Violates Due Process and the Rule of Lenity

The government's right to control theory violates due process and the rule of lenity. The rule of lenity "requires that ambiguities in [a] statute be resolved in the defendant's favor" and derives from the due process requirement that a criminal statute "give fair warning of the conduct that it makes a crime." *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) (citing *United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 649 (2d Cir. 1993) and *United States v. Velastegui,* 199 F.3d 590, 593 (2d Cir. 1999)).

The government's allegation that the settlement agreements defrauded Retrophin relies on, among others, the following three amorphous predicates: (1) that there was a clear duty to disclose the settlement agreements to the remaining two board members of Retrophin; (2) that there was a clear duty for outside counsel to override the CEO's/Director's decision not to disclose the settlement agreements to the other two board members; and (3) that the alleged omission here went to an essential part of the settlement agreements such that the Board would not have entered into these agreements had they been disclosed to them before execution. The right to control theory itself is simply too vague to satisfy due process.

Given the absence of any clear duty to disclose the agreements at issue to Retrophin's board of directors, any criminal liability would violate due process and the rule of lenity. There are no criminal statutes covering these predicates that would give Mr. Greebel fair warning or

adequate notice that his conduct could constitute a crime.  Holding Mr. Greebel criminally liable

for the government's theory of the case threatens to change the fundamental manner in which

outside corporate counsel act and will serve as a chilling effect on the legal profession generally.

**V.    The Government's Theory that Retrophin Was Defrauded Because of Alleged
       Consulting Agreements with Defrauded MSMB Capital or Elea Capital Investors
       To Settle Liabilities Owed to the MSMB Funds and Shkreli Should Be Stricken**

The same analysis with respect to the settlement agreements applies to the consulting

agreements.  Just as with the settlement agreements, the facts do not support the government's

theory that Mr. Shkreli and Mr. Greebel conspired to deny Retrophin the right to control its

assets by depriving it of information necessary to make discretionary economic decisions

through the consulting agreements with MSMB and Elea investors.  The essential element and

the economic benefit derived from the consulting agreements includes a combination of both

releases from legal claims and the availability of consulting services.  Given that Retrophin

derived these benefits and that there was no deceit as to either essential element of the bargain,

there can be no scheme to defraud and thus, there can be no conspiracy to commit wire fraud.

As Judge Preska stated in *Davis*, courts "have repeatedly rejected application of the mail and

wire fraud statutes where the purported victim received the full economic benefit of its bargain."

2017 WL 3328240, at *9.  The company accepted any services provided pursuant to the

consulting agreements, as well as the benefit from the release of legal claims; therefore

Retrophin has received the "full economic benefit of its bargain."

Regardless of whether consulting services were in fact provided—as the government

claims they were not—the consulting agreements operated essentially as option agreements.  The

agreements provided that certain individuals would be available to consult, but they were not

*required* to provide consulting services, let alone with any level of specificity.  Retrophin (and

Mr. Shkreli) had the option to use the consulting services of the relevant individuals, but were

under no obligation to do so.  Further, the government should not substitute its judgment on the value conveyed pursuant to the consulting agreement.  Specifically, it is inappropriate for the government to contend that Mr. Shkreli agreed to pay the consultants "too much" for their services.  "It is a well established principle of contract law that 'the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value.'"  *In re Toscano*, 799 F. Supp. 2d 230, 249–50 (E.D.N.Y. 2011) (quoting *Apfel v. Prudential–Bache Sec.,* 81 N.Y.2d 470, 475 (1993)).  Accordingly, the parties are free to bargain as they see fit, and it is not the government's place to question the sufficiency of that bargain.

The Delaware Chancery Court has recognized that consulting agreements could effectively operate as option agreements.  *See In re Tyson Foods, Inc.*, 919 A.2d 563 (Del. Ch. 2007).  Specifically, in rejecting plaintiffs' contention that disclosures of the agreements in SEC filings were insufficient because neither of the consultants were "required" to do any work, the Vice Chancellor explained that the agreements themselves made clear the services were optional ("Executive may be required to devote up to twenty (20) hours per month to Employer") and at the company's discretion ("Executive will, upon reasonable request, provide advisory services").  Comparing the consulting agreements to "option[s] on the employees' time," the court stated that this feature "does not make the[] [agreements] illusory, nor is the nature of the agreement obscure."  *Id.* at 586.  Based on *Tyson Foods*, the option to take advantage of consulting services is enough in and of itself to constitute economic benefit.  Thus, the government cannot show that Retrophin did not receive the full economic benefit of its bargain.

## VI.   Count Seven Should Be Dismissed Because the Indictment and The Evidence Reflect Multiple Alleged Conspiracies Within One Count

The Second Circuit has made clear that, "In order to prove a single conspiracy, the government must show that *each alleged member agreed to participate in what he knew to be a*

28

*collective venture directed toward a common goal*." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004) (emphasis added).

The problem for the government, however, is that Count Seven alleges three different aspects of the alleged "Retrophin Misappropriation Scheme," only two of which could possibly relate to an alleged defrauding of Retrophin. *See* Ind. ¶¶ 11-19 (dividing the alleged conspiracy into three sub-parts: "(i) The Fabricated MSMB Capital Interest"; "(ii) The Fraudulent Settlement Agreements"; and "(iii) The Sham Consulting Agreements"). Only the allegations in parts (ii) and (iii) regarding the settlement and consulting agreements relate to an alleged scheme to defraud Retrophin.

By contrast, sub-part (i) "The Fabricated MSMB Capital Interest"—relating to the alleged backdated stock transfer agreements that is legally flawed for other reasons as explained above—has *nothing* to do with a scheme to defraud Retrophin. The very language of the Indictment says, "Faced with an SEC inquiry," the defendants "engaged in a scheme to fabricate an investment by MSMB Capital in Retrophin." Ind. ¶ 25. Even taking the Indictment at face value, the goal or purpose of this sub-part of the charged wire fraud conspiracy in Count Seven was to defraud the SEC, by concealing Mr. Shkreli's conduct relating to his hedge funds from the SEC Staff. Thus, the conduct alleged in sub-part (i) is an entirely separate "common goal" from the one alleged in sub-parts (ii) and (iii).

Accordingly, because Count Seven is facially defective in that it fails to charge only a single conspiracy, it should be dismissed. *See Geibel*, 369 F.3d at 689.

## VII.  Conclusion

For all the reasons set forth above, we respectfully request the entry of an order dismissing Count Seven of the Superseding Indictment.

Dated:  New York, New York
          August 18, 2017

*/s/* Reed Brodsky
Reed Brodsky
Winston Y. Chan
Randy M. Mastro
Lisa H. Rubin

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
rbrodsky@gibsondunn.com
*Counsel for Defendant Evan Greebel*