UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -against-

EVAN GREEBEL,

                *Defendant.*

ECF Case

No. 15-cr-00637 (KAM)

<u>ORAL ARGUMENT REQUESTED</u>

**MR. GREEBEL'S MOTION FOR A WRITTEN JURY QUESTIONNAIRE**

## TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................................... 1

II. Argument ..................................................................................................................... 2

    A.    Background ........................................................................................................ 2

    B.    Applicable Law ................................................................................................. 7

    C.    Use of A Jury Questionnaire Here Would Be Highly Efficient and Beneficial .............. 10

    D.    Proposed Protocol .......................................................................................... 12

III. Conclusion ................................................................................................................ 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldridge v. U.S.*,
  283 U.S. 308 (1931)............................................................................................8

*Chevron Corp. v. Donziger, et al.*,
  11 Civ. 0691 (S.D.N.Y. 2011) (Dkt. No. 1327, dated July 30, 2013) ....................................14

*Cook v. U.S.*,
  379 F.2d 966 (5th Cir. 1967) ...............................................................................8

*Day v. NLO, Inc.*,
  147 F.R.D. 148 (S.D. Ohio 1993)..........................................................................14

*King v. Jones*,
  824 F.2d 324 (4th Cir. 1987) ...............................................................................7

*Morgan v. Ill.*,
  504 U.S. 719 (1992)........................................................................................7, 8

*Ne. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)..........................................................................................10

*Rosales-Lopez v. U.S.*,
  451 U.S. 182 (1981)........................................................................................7, 8

*Skilling v. United States*,
  561 U.S. 358 (2010)..........................................................................................10

*Turner v. Murray*,
  476 U.S. 28 (1986)............................................................................................8

*United States v. Ashburn*,
  13-CR-0303 (NGG), 2014 WL 5800280 (E.D.N.Y. Nov. 7, 2014) ....................................11

*United States v. Baldwin*,
  607 F.2d 1295 (9th Cir. 1979) .............................................................................8

*United States v. Brooks*,
  670 F.2d 148 (11th Cir. 1982) .............................................................................8

*United States v. Cromitie*,
  09 Cr. 558 (S.D.N.Y. 2010)................................................................................14

iii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Cromitie*,
09 Cr. 558 (S.D.N.Y. 2010) (Dkt. No. 61, dated May 19, 2010) ............................................11

*United States v. Cromitie et al.*,
09 Cr. 558 (S.D.N.Y. 2010) (Dkt. No. 61, dated May 19, 2010) ............................................9

*United States v. Dean Skelos et al.*,
15-CR-317 (S.D.N.Y. 2015) (Dkt. No. 58, dated Oct. 26, 2015) ............................................9

*United States v. Gambino*,
818 F. Supp. 536 (E.D.N.Y. 1993) .................................................................................9, 10

*United States v. Gilberto Valle*,
No. 12-CR-847 (S.D.N.Y. 2012) (Dkt. No. 90, dated Feb. 8, 2013, Dkt. No.
249, dated Feb. 5, 2014.)......................................................................................................9

*United States v. Hassoun*,
No. 04-60001-CR-BROWN, 2007 WL 4180847 (S.D. Fla. Nov. 20, 2007) ........................14

*United States v. Quinones*,
511 F.3d 289 (2d Cir. 2007)............................................................................................8, 11

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999)...............................................................................................8, 10

*United States v. Skilling*,
130 S. Ct. 2896 (2010).............................................................................................................8

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006).........................................................................................7, 9, 10

*United States v. Tegzes*,
715 F.2d 505 (11th Cir. 1983) ................................................................................................8

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994)......................................................................................................9

*United States v. Ulbricht*,
No. 14-CR-68 (S.D.N.Y. 2014) (Dkt. No. 61, dated Sept. 15, 2015)......................................9

*United States v. Washington*,
819 F.2d 221 (9th Cir. 1987) ..................................................................................................8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Whitten,*
    610 F.3d 168 (2d Cir. 2010).................................................................................7

*United States v. Wilson,*
    493 F. Supp. 2d 537 (E.D.N.Y. 2007) ...............................................................9

*In Re Visa Check/Mastermoney Antitrust Litig.,*
    No. 96-CV-5238 (JG), 2003 WL 1712567 (E.D.N.Y. Apr. 1, 2003) ......................14

**Other Authorities**

Barbra Allen Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27
    Stan.L.Rev. 545, 563-64 & n. 70 (1975) ............................................................11

Gregory P. Joseph, *American Bar Association Principles for Juries & Jury Trials,*
    SL044 ALI-ABA 653, 730 (2005)......................................................................12

Hon. Barbara M.G. Lynn (N.D. Tex.), *From the Bench: A Case for Jury*
    *Questionnaires*, 33 LITIGATION MAGAZINE No. 4 (Summer 2007 .........................11, 12

July 25, 2017, *CNBC,* "Martin Shkreli nastily berated lawyer, said his attorneys
    are 'lazy and stupid and paid too much.'"
    https://www.cnbc.com/2017/07/25/martin-shkreli-nastily-berated-lawyer-said-
    his-attorneys-are-lazy.html?view=story&%24DEVICE%24=native-android-
    mobile ...........................................................................................................6

July 25, 2017, *New York Daily News,* "Pharma Bro Martin Shkreli called lawyers
    'lazy and stupid' in talks with investors."
    http://www.nydailynews.com/news/national/shkreli-called-lawyers-lazy-
    stupid-talks-investors-article-1.3354972 ..........................................................7

July 26 2017, *Bloomberg,* "Shkreli Prosecutors Finish Four Weeks of Evidence,
    Trial Nears End."
    https://www.bloomberg.com/news/articles/2017-07-26/shkreli-prosecutors-
    end-four-weeks-of-evidence-as-case-nears-end ...............................................6

June 26, 2017, *New York Daily News*, "Potential jurors in 'Pharma Bro' trial too
    disgusted to serve"
    http://www.nydailynews.com/new-york/brooklyn/pharma-bro-martin-shkreli-
    arrives-court-fraud-trial-article-1.3278308 ......................................................4

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

June 26, 2017, *The New York Post,* "Potential jurors on Pharma Bro: He's 'evil,' a
   'snake' and a 'd-k.'"
   http://nypost.com/2017/06/26/prospective-jurors-keep-calling-pharma-bro-
   bad-names/ .................................................................................................................4

June 26, 2017, *The New York Times*, "Jury Selection in Martin Shkreli Trial
   Begins With Name Calling"
   https://www.nytimes.com/2017/06/26/business/dealbook/martin-shkreli-trial-
   jury-selection.html ......................................................................................................3

June 27, 2017, *New York Daily News,* "Pharma Bro Martin Shkreli's lawyers
   request a mistrial over 'tainted' coverage as more jurors are called into the
   pool."
   http://www.nydailynews.com/new-york/brooklyn/shkreli-lawyers-wanted-
   mistrial-tainted-pool-jurors-article-1.3281530 ..........................................................5

June 27, 2017, *The New York Post,* "'Pharma Bro' still can't find jurors that won't
   trash talk him."
   http://nypost.com/2017/06/27/pharma-bro-still-cant-find-jurors-that-wont-
   trash-talk-him/............................................................................................................5

Lin S. Lilley, *Let Jurors Speak the Truth, In Writing*, 41 TRIAL 64 (July. 2005).......................12

Sept. 2017, *Harper's Magazine*, "Public Enemy."
   https://harpers.org/archive/2017/09/public-enemy/ ...................................................3

# I. Introduction

We respectfully request that the Court issue a targeted written questionnaire to the jury pool of prospective jurors due to the intense media coverage surrounding this case and the resulting possibility of bias or prejudice.  We submit that this process will be highly efficient and will potentially save a significant amount of the Court's time.

Moreover, the use of a written jury questionnaire (in addition to the Court's individualized *voir dire* employed during the trial of *United States v. Martin Shkreli*) is especially appropriate in this case since Mr. Greebel's co-defendant and alleged co-conspirator – Martin Shkreli – will be the elephant in the room at the trial of Mr. Greebel.  There is no question Mr. Shkreli will figure prominently throughout the trial from start to finish.  Both before, during, and after his trial, Mr. Shkreli received an enormous amount of media coverage – the vast majority of it being negative. In particular, the overwhelmingly negative and unfairly prejudicial press coverage of this case intensified during and after Mr. Shkreli's trial and makes it even more difficult to empanel a fair and impartial jury for Mr. Greebel's case. For that reason, we request the additional protection of a written questionnaire.

The government has charged Mr. Greebel with engaging in two separate criminal conspiracies with Mr. Shkreli, with Mr. Shkreli the alleged mastermind and orchestrator.  Thus, there is a significant likelihood that prospective jurors who have prejudicial preconceptions about Mr. Shkreli will have similar negative views about someone who is alleged to have entered into a criminal partnership with Mr. Shkreli.

As this Court knows, jury selection in the Shkreli trial lasted nearly three entire trial days. Literally hundreds and hundreds of jurors were appropriately dismissed because it became clear to the Court that they had preconceived negative views of Mr. Shkreli and could not serve impartially.

1

The Court's use of a written jury questionnaire would be a highly efficient process that would save the Court days of trial time, allowing many jurors to be struck for cause before even setting foot in the courtroom.

We have set forth below in Section D a proposed protocol for use of the written questionnaire and individual sequestered *voir dire*.  Application of the proposed protocol will lead to a shorter and more efficient jury selection process, will conserve judicial resources, and will protect Mr. Greebel's constitutional right to a fair and impartial jury.

## II. Argument

**A.    Background**

In cases involving extensive pretrial publicity, a written questionnaire is the best tool for identifying those prospective jurors who have both been exposed to media coverage and formed an opinion as to the defendant's innocence or guilt.

In this case, there is no question that Mr. Shkreli's trial received enormous amounts of media coverage in publications around the world, including in the United Kingdom, Europe, Australia, and Asia.

For the purposes of this analysis, the publications that receive the greatest circulation in New York City were used to analyze Mr. Shkreli's media coverage.  These are: *The Wall Street Journal*; *The New York Times*; *The New York Post*; *New York Daily News* and *Newsday*.  All these publications, with the exception of *The New York Post*, also reposted stories from *The Associated Press* to supplement their own in-depth reporting on Mr. Shkreli.  We have saved and archived these articles.  In the five papers, there were 219 individual posts between April 26, 2017 and August 7, 2017.  *The Wall Street Journal* published 35 articles; *The New York Times* published 49 articles; *The New York Post* published 51 articles; *New York Daily News* published

70 articles; and *Newsday* published 14 articles.  These statistics do not even include Mr. Shkreli's extensive social media activity during this time period, including posts from his YouTube, Facebook and multiple Twitter accounts.

Much of the trial coverage of Mr. Shkreli was highly negative.  Jury selection was the first, most extensively written about media event during the trial.  Reporters took full advantage of the proceedings in their coverage of jury selection, as the attorneys and the judge dismissed hundreds of potential jurors for a multitude of reasons.  Though it proved to be incredibly difficult to find impartial citizens to serve on Mr. Shkreli's jury, journalists saw this as an opportunity to find inspiration in composing their stories.  Direct quotes from dismissed jurors voicing their hatred for Mr. Shkreli landed squarely on the front pages of newspapers and websites.  This negative coverage continues today, as just this week *Harper's Magazine* published extensive quotations from prospective jurors describing Shkreli as, among other things, "a greedy little man" who "deserves to go to jail."[1]

On June 26, 2017, *The New York Times* published, "Jury Selection in Martin Shkreli Trial Begins With Name Calling."[2]  The article began by stating that "More than 120 potential jurors in the fraud trial of Martin Shkreli were dismissed Monday," and explained the various reasons why these potential jurors could not serve.  The most notable reason however, was because many prospective jurors exhibited an extreme bias against Mr. Shkreli.  Jurors called him a "snake," "the most hated man in America," and "the face of corporate greed."  The article explains that many potential jurors blamed Mr. Shkreli for issues in the pharmaceutical industry, "Three, for

---

[1] Sept. 2017, *Harper's Magazine*, "Public Enemy." https://harpers.org/archive/2017/09/public-enemy/
[2] June 26, 2017, *The New York Times*, "Jury Selection in Martin Shkreli Trial Begins With Name Calling" https://www.nytimes.com/2017/06/26/business/dealbook/martin-shkreli-trial-jury-selection.html

instance, castigated him for raising the price of the EpiPen. (He did not.)"  Several jurors stated that the price increase of Daraprim affected them personally, while another juror made a strangling motion when talking about Mr. Shkreli and said, "Who does that?  A person that puts profit over everything else?" Another juror said, "you'd have to convince me he was innocent." The article mentions that Mr. Brafman tried to stop jurors from going, "on a tirade against Mr. Shkreli."

The *New York Daily News* also published excerpts from the jury selection process in an article titled, "Potential jurors in 'Pharma Bro' trial too disgusted to serve."[3]  This article repeated many of the same quotes from *The New York Times* article and added several more, including "He kind of looks like a d--k. Sorry."  Another potential juror said, "I don't think I'd be able to be impartial. I feel very strongly about the issues."  The article notes "Shkreli's lawyer Benjamin Brafman probably sensed at that moment it was going to be a long day" and quoted Mr. Brafman when he said, "So much for the presumption of innocence."  The article states that approximately 40 people made the cut from a pool of 178 potential jurors, while the rest were dismissed due to work obligations, negative views of Mr. Shkreli, or for other reasons.

*The New York Post's* article included several of the most colorful quotes from jury selection directly in their headline, "Potential jurors on Pharma Bro: He's 'evil,' a 'snake' and a 'd-k.'"[4]  The article also detailed the sentiments from several dismissed jurors and echoed defense counsel's frustration with having the media present at sidebars.  "Shkreli defense attorney Ben Brafman – who previously tried to bar press from portions of the jury selection –

---

[3] June 26, 2017, *New York Daily News*, "Potential jurors in 'Pharma Bro' trial too disgusted to serve" http://www.nydailynews.com/new-york/brooklyn/pharma-bro-martin-shkreli-arrives-court-fraud-trial-article-1.3278308
[4] June 26, 2017, *The New York Post,* "Potential jurors on Pharma Bro: He's 'evil,' a 'snake' and a 'd-k.'" http://nypost.com/2017/06/26/prospective-jurors-keep-calling-pharma-bro-bad-names/

4

again bemoaned the presence of the press at the sidebars, saying jurors' answers would result in coverage that could 'further complicate' his job."

Media coverage of the second day of jury selection mirrored the first, but began with Mr. Brafman's request for a mistrial due to the media's coverage of the case.  On July 27, 2017, *New York Daily News* published, "Pharma Bro Martin Shkreli's lawyers request a mistrial over 'tainted' coverage as more jurors are called into the pool."[5]  This article noted that the Court "asked for another 150 juror hopefuls" and they "burned through about 20 potential jurors Tuesday after some 130 had been excused."  The article reported that, "Brafman said the jury pool had been 'irreparably tainted' from the exposure to the coverage that, he contended, questioned how anyone could fairly be a juror on a Shkreli trial."

*The New York Post's* article once again summed up the second day of jury selection in their headline, "'Pharma Bro' still can't find jurors that won't trash talk him."[6]  The article referenced Mr. Brafman's request for a mistrial, "Shkreli's lawyer had moved for a mistrial Tuesday morning, claiming coverage by *The Post* and other outlets that documented potential jurors on Monday deriding his client as a 'snake' and 'evil' meant his client couldn't possibly enjoy a fair trial."

Throughout Mr. Shkreli's trial, our client Mr. Greebel also received extensive press coverage.  By way of example, on July 26, 2017, *Bloomberg* covered e-mails between Mr. Shkreli and Mr. Greebel in an article entitled, "Shkreli Prosecutors Finish Four Weeks of

---

[5] June 27, 2017, *New York Daily News,* "Pharma Bro Martin Shkreli's lawyers request a mistrial over 'tainted' coverage as more jurors are called into the pool." http://www.nydailynews.com/new-york/brooklyn/shkreli-lawyers-wanted-mistrial-tainted-pool-jurors-article-1.3281530
[6] June 27, 2017, *The New York Post,* "'Pharma Bro' still can't find jurors that won't trash talk him." http://nypost.com/2017/06/27/pharma-bro-still-cant-find-jurors-that-wont-trash-talk-him/

Evidence, Trial Nears End."[7]  The article recapitulates the trial, especially the testimony of FBI Special Agent Michael Braconi who testified about e-mails exchanged between Mr. Shkreli and Mr. Greebel.  Several excerpts from these e-mails were quoted including the following exchange: "'You are the director and CEO of a public company,' Greebel wrote to Shkreli. 'You now have a duty of loyalty and related issues.  Getting stock below market could be problematic. F that,' Shkreli responded."

*CNBC* also covered the emails extensively in its July 25, 2017 article titled, "Martin Shkreli nastily berated lawyer, said his attorneys are 'lazy and stupid and paid too much.'"[8]  The article explains that Mr. Shkreli habitually "berated his current criminal case co-defendant Evan Greebel" and references "One email chain in particular between the two men shows Shkreli excoriating Greebel for not promptly sending him a copy of a purportedly sham consulting agreement that Shkreli allegedly was using to pay off a defrauded investor."  The article concludes with the fact that Mr. Greebel "has plead not guilty to charges that accuse him of helping Shkreli's allegedly fraudulent scheme to pay off investors, is expected to go on trial later this year."

The *New York Daily News* story about the e-mails included a picture of Mr. Greebel. Their July 25, 2017 article titled, "Pharma Bro Martin Shkreli called lawyers 'lazy and stupid' in

---

[7] July 26 2017, *Bloomberg,* "Shkreli Prosecutors Finish Four Weeks of Evidence, Trial Nears End." https://www.bloomberg.com/news/articles/2017-07-26/shkreli-prosecutors-end-four-weeks-of-evidence-as-case-nears-end
[8] July 25, 2017, *CNBC,* "Martin Shkreli nastily berated lawyer, said his attorneys are 'lazy and stupid and paid too much.'" https://www.cnbc.com/2017/07/25/martin-shkreli-nastily-berated-lawyer-said-his-attorneys-are-lazy.html

talks with investors,"[9] provides examples of how Mr. Shkreli's emails to Mr. Greebel got tense and nasty.  The article also quoted Mr. Shkreli calling Mr. Greebel "inept."

Given all of the intense media scrutiny that already permeates the public domain, much of it in the months leading up to Mr. Greebel's scheduled trial, well-established law, as discussed below, suggests the use of both written questionnaires and individualized *voir dire* to inquire as to the extent to which each potential juror has been exposed to pretrial publicity and whether they have formed any prejudicial opinions about Mr. Greebel, particularly because of his association with Mr. Shkreli, and whether they have formed any views about Mr. Greebel's guilt or innocence.

**B.      Applicable Law**

A "part of the guarantee of a defendant's Sixth Amendment right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Ill.,* 504 U.S. 719, 729 (1992). "Fundamental unfairness arises if *voir dire* is not adequate to identify unqualified jurors." *United States v. Whitten*, 610 F.3d 168, 185 (2d Cir. 2010) (internal citations and quotation marks omitted).

To protect the constitutional right to a fair trial, adequate *voir dire* should seek to expose prejudice and/or bias on the part of the potential jurors.  *See United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) (*voir dire* serves to protect constitutional rights "by exposing possible biases, both known and unknown. . . .").  "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's

---

[9] July 25, 2017, *New York Daily News,* "Pharma Bro Martin Shkreli called lawyers 'lazy and stupid' in talks with investors." http://www.nydailynews.com/news/national/shkreli-called-lawyers-lazy-stupid-talks-investors-article-1.3354972

instructions and evaluate the evidence cannot be fulfilled." *Morgan*, 504 U.S. at 729-30 (quoting *Rosales-Lopez*, 451 U.S. at 188).

District courts have broad discretion in conducting *voir dire*. *See United States v. Quinones*, 511 F.3d 289, 299-300 (2d Cir. 2007); *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir. 1983) ("The conduct of *voir dire* of a jury panel is a matter directed to the sound discretion of the trial judge, subject to the essential demands of fairness.") (citing *United States v. Brooks*, 670 F.2d 148, 152 (11th Cir. 1982)). However, the Supreme Court and circuit courts have reversed trial court decisions where limitations on *voir dire* unreasonably infringed on a defendant's right to a neutral and impartial jury. *See, e.g., Turner v. Murray*, 476 U.S. 28 (1986); *Aldridge v. U.S.*, 283 U.S. 308 (1931); *United States v. Washington*, 819 F.2d 221 (9th Cir. 1987); *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979); *Cook v. U.S.*, 379 F.2d 966 (5th Cir. 1967).

As a part of the *voir dire* process, district courts routinely provide potential jurors with written questionnaires when there has been extensive pretrial publicity. *See United States v. Skilling*, 561 U.S. 358, 388 (2010) (approving the trial court's use of questionnaire in *voir dire* proceedings to screen jurors in a high profile case).

There is abundant precedent in the Second Circuit supporting a District Court's decision to use a jury questionnaire as being a determination squarely within the trial court's discretion. *See, e.g., United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007) (finding use of a written questionnaire in the *voir dire* process to be "within the district court's broad discretion"); *United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999) (approving of district court's use of jury questionnaire and individual *voir dire* after prospective jurors were excused for cause based on answers to the questionnaires); *United States v. Gambino*, 818 F. Supp. 536, 540 (E.D.N.Y.

8

1993) (in prosecution of alleged organized crime family members, court granted government and

defendants' joint request for an individualized *voir dire* and use of a jury questionnaire); *United*

*States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994) (use of 68-question juror questionnaire was not

abuse of district court's discretion ); *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006);

*United States v. Ulbricht*, No. 14-CR-68 (S.D.N.Y. 2014) (Dkt. No. 61, dated Sept. 15, 2015)

(granting Defendant's application for a questionnaire); *United States v. Gilberto Valle*, No. 12-

CR-847 (S.D.N.Y. 2012) (Dkt. No. 90, dated Feb. 8, 2013, Dkt. No. 249, dated Feb. 5, 2014.);

*United States v. Dean Skelos et al.*, 15-CR-317 (S.D.N.Y. 2015) (Dkt. No. 58, dated Oct. 26,

2015).

For example, in *United States v. Cromitie et al.*, Judge Colleen McMahon explained her

rationale for using a detailed jury questionnaire in a high-profile trial as follows:

> *First, it makes no sense to do a questionnaire that does not reveal*
> *what the case is. The whole point of a questionnaire, for me at*
> *least, is to eliminate quickly and without any fuss people who*
> *simply cannot or will not sit on this case, or who might taint the*
> *jury pool by making inflammatory statements in front of other*
> *jurors during voir dire. So I cannot acquiesce in the Government's*
> *proposal to eliminate from defendants' draft questionnaire the*
> *page that tells the jurors what case this is.*

*United States v. Cromitie et al.*, 09 Cr. 558 (S.D.N.Y. 2010) (Dkt. No. 61, dated May 19, 2010)

(emphasis added).

In the high-profile securities fraud trial of Enron executive Jeffrey Skilling, the district

court issued a 14-page questionnaire that included 77 questions asking prospective jurors about

"their sources of news and exposure to Enron-related publicity, beliefs concerning Enron and

what caused its collapse, opinions regarding the defendants and their possible guilt or innocence,

and relationships to the company and to anyone affected by its demise." *Skilling v. United*

*States*, 561 U.S. 358, 371 (2010). The Supreme Court determined on appeal that the extensive

screening questionnaire and follow-up *voir dire* overcame a presumption of juror prejudice based on pretrial publicity or the widespread community impact of the company's bankruptcy.  *See id.* at 384.

Individualized *voir dire* is also appropriate and within the court's discretion in cases where the potential jury pool has been exposed to extensive pretrial publicity and may harbor prejudice against the defendant.  The Supreme Court has stated "it may sometimes be necessary to question on *voir dire* prospective jurors individually or in small groups, both to maximize the likelihood that members of the venire will respond honestly to questions concerning bias, and to avoid contaminating unbiased members of the venire when other members disclose prior knowledge of prejudicial information." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 602 (1976); *see also Stewart*, 433 F.3d at 303; *Rahman*, 189 F.3d at 121; *Gambino*, 818 F. Supp. at 540.

## C.     Use of A Jury Questionnaire Here Would Be Highly Efficient and Beneficial

Applying these legal principles makes clear that it is well within the Court's discretion to use a written jury questionnaire for Mr. Greebel's upcoming trial.  In addition to guarding against bias resulting from the avalanche of publicity surrounding Mr. Shkreli and his trial, the use of a written jury questionnaire and individualized *voir dire* will decrease the time necessary to complete the jury selection process and will facilitate the gathering of important, candid, and relevant information necessary to afford the parties a fair trial.

First, using a written questionnaire is more efficient than oral examination alone in highly-publicized cases.  Where a potential juror's questionnaire responses reveal biases that "render[s] superfluous further oral inquiry about the juror's ability to follow legal instructions and to serve impartially," he or she can be removed for cause prior to oral *voir dire*, saving time and resources.  *United States v. Quinones*, 511 F.3d 289, 302 (2d Cir. 2007); *see also United States v. Cromitie*, 09 Cr. 558 (S.D.N.Y. 2010) (Dkt. No. 61, dated May 19, 2010) (stating, "*The*

whole point of a questionnaire, for me at least, is to eliminate quickly and without any fuss people who simply cannot or will not sit on this case, or who might taint the jury pool by making inflammatory statements in front of other jurors during voir dire.") (emphasis added); *United States v. Ashburn*, 13-CR-0303 (NGG), 2014 WL 5800280, at *18 (E.D.N.Y. Nov. 7, 2014) ("[U]tilizing a questionnaire will conserve judicial resources by saving a substantial amount of time relative to a jury selection process in which the entire *voir dire* is conducted orally.").

Administering a questionnaire also would decrease the time necessary to complete the jury selection process because it can be completed without the Court's involvement and the parties can then use the responses to eliminate jurors "quickly and without any fuss" while also pinpointing any targeted areas requiring follow-up inquiry. *See* Barbra Allen Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan.L.Rev. 545, 563-64 & n.70 (1975) ("A sworn questionnaire . . . might gather from jurors answers to basic questions about themselves with face-to-face inquiry reduced to certain key issues on which the reactions of the individual and observation of her or his manner are important . . . A more extensive questionnaire would be more revealing and would concomitantly reduce the need for extended face-to-face questioning . . . Face-to-face questioning would then be reserved for the issues on which probing is necessary, such as prejudice against the litigant or bias arising from the facts of the particular case."); *see also* Hon. Barbara M.G. Lynn (N.D. Tex.), *From the Bench: A Case for Jury Questionnaires*, 33 Litig. Mag. 4, at 4 (Summer 2007) (questionnaires provided "more information, in a faster and more organized way, than could be gathered in a reasonable amount of time by questioning in court").

Moreover, a jury questionnaire encourages jurors to answer questions more honestly because each juror responds to their questionnaire individually, without being influenced by the

answers given by their fellow jurors.  *See* Lynn, *From the Bench: A Case for Jury Questionnaires*, *supra* (questionnaires "mitigate the very real problem of jurors mimicking one another's answers, which often occurs in *voir dire*").  A jury questionnaire also protects juror privacy and encourages candor because it spares jurors the potential embarrassment of answering intrusive questions in front of a large group of strangers.  Potential jurors avoid the pressure to give "right" or socially acceptable answers and are therefore more likely to answer questions honestly about difficult subjects.  *See* Gregory P. Joseph, *American Bar Association Principles for Juries & Jury Trials*, SL044 ALI-ABA 653, 730 (2005); Lin S. Lilley, *Let Jurors Speak the Truth, In Writing*, 41 TRIAL 64 (July. 2005).

Moreover, because there is always the fear that a public discussion of pretrial publicity in front of the entire jury pool will contaminate those few jurors who have not been subjected to it, individualized *voir dire* in a case such as this is particularly warranted.

**D.  Proposed Protocol**

**Step 1 (distribution and collection of questionnaire):** Jurors assemble in court (either in a courtroom or the jury assembly room) and the written questionnaire is distributed to be filled out.  Jurors are excused as they complete the questionnaire.  The collected questionnaires are photocopied and distributed to counsel and the Court.  The jurors are instructed to return two-three days later, perhaps from Friday to Monday.  The government or counsel can agree to take responsibility for the distribution, collection, and copying of all questionnaires, to relieve the Court of any significant administrative burden or cost.

**Step 2 (agreed upon for cause challenges):** The jurors return to court after the parties have independently reviewed the questionnaires and conferred on which jurors should be excused for obvious for cause challenges (*e.g.*, personal relationships with the parties or counsel,

bias or hostility towards either of the parties, or insurmountable language, health, or family issues). These jurors can be quickly identified and reviewed by the Court for excusal.

**Step 3 (disputed for cause challenges and individualized follow-up):** The parties identify for the Court remaining jurors on which the parties cannot agree should be excused for cause and the Court can rule on those jurors and conduct individualized *voir dire*, if necessary. The remaining jurors will represent a qualified venire from which a jury can be rapidly selected.

**Step 4 (peremptory challenges):** The parties exercise their peremptory challenges.

A protocol nearly identical to the one we are proposing was adopted by Judge Gleeson in *In Re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712567, at *1 (E.D.N.Y. Apr. 1, 2003); *see also Chevron Corp. v. Donziger, et al.*, 11 Civ. 0691 (S.D.N.Y. 2011) (Dkt. No. 1327, dated July 30, 2013) (similar protocol adopted); *United States v. Cromitie*, 09 Cr. 558 (S.D.N.Y. 2010) (using similar protocol); *United States v. Hassoun*, No. 04-60001-CR-BROWN, 2007 WL 4180847, at *1-3 (S.D. Fla. Nov. 20, 2007) (using similar protocol); *Day v. NLO, Inc.*, 147 F.R.D. 148, 152 (S.D. Ohio 1993) (using similar protocol).

### III. Conclusion

In sum, we respectfully submit that this proposed protocol will result in a more efficient jury selection process, will save the Court significant trial time, and will adequately protect the rights of the parties to a fair and impartial jury.[10]  For the reasons stated above, we respectfully request that the Court grant our motion for a written jury questionnaire.

---

[10] If the Court grants our motion for use of a jury questionnaire, we will seek agreement with government counsel in the preparation of a draft questionnaire that can then be submitted to the Court for its review.

13

Dated:   New York, New York
         August 18, 2017

                              */s/ Reed Brodsky*
                              Reed Brodsky
                              Winston Y. Chan
                              Randy M. Mastro
                              Lisa H. Rubin

                              GIBSON, DUNN & CRUTCHER LLP
                              200 Park Avenue
                              New York, NY 10166
                              (212) 351-4000
                              rbrodsky@gibsondunn.com
                              *Counsel for Defendant Evan Greebel*