JMK:AES/DCP/DKK
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                   15 CR 637 (KAM)

EVAN GREEBEL,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S PRE-TRIAL MOTIONS

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ALIXANDRA E. SMITH
DAVID C. PITLUCK
DAVID K. KESSLER
Assistant U.S. Attorneys
      (Of Counsel)

<u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .............................................................................................. i

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 2

I.      The Court Should Admit as Direct Evidence Shkreli's Harassment of a Fearnow
        Share Recipient ............................................................................................. 2

II.     The Court Should Preclude the Defendant from Introducing His Co-Conspirator's
        Post-Arrest Statements and Statements to the SEC ...................................... 8

III.    The Government May Offer Certain of the Defendant's Post-Arrest Statements
        During Its Case-in-Chief and May Seek to Preclude the Defendant from Introducing
        Additional Such Statements .......................................................................... 13

IV.     The Court Should Preclude the Defendant from Testifying about His Review of
        Evidence in the Case Or His Conclusions Based Upon that Review .......................... 14

V.      The Court Should Preclude the Defendant from Introducing Evidence that His Co-
        Conspirator Lied to Others Or Arguing that Any Such Lies Show the Co-Conspirator
        Lied to the Defendant ................................................................................... 19

VI.     The Court Should Preclude Evidence about the Circumstances of the Defendant's
        Arrest ........................................................................................................... 24

VII.    The Court Should Preclude Evidence of Irrelevant Details about the Defendant's
        Background ................................................................................................... 26

VIII.   The Court Should Preclude Hearsay Evidence of Arbitrations Relating to the Sham
        Retrophin Consulting Agreements ............................................................... 28

IX.     The Defendant Should Produce the Documents He Intends to Admit During His Case-
        in-Chief ........................................................................................................ 31

X.      The Court Should Preclude Defense Counsel from Taking Two Limited Actions
        Related to Their Prior Roles as Assistant United States Attorneys .............. 36

XI.     The Court Should Preclude Certain Testimony Noticed by the Defendant as Expert
        Testimony ..................................................................................................... 40

CONCLUSION .......................................................................................................... 50

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits the following motions in connection with the trial of this matter.[1]  Specifically, the government respectfully requests that this Court: (1) admit certain evidence as direct evidence at trial; (2) preclude the defendant Evan Greebel from offering in evidence any portion of his co-conspirator and co-defendant Martin Shkreli's post-arrest statement or testimony before the U.S. Securities and Exchange Commission ("SEC"); (3) allow it to offer certain portions of the defendant's post-arrest statement and preclude the defendant from offering other portions of his statement; (4) preclude the defendant from testifying about his review of discovery produced in this case; (5) preclude the defendant from introducing evidence or argument that Shkreli lied to others and so must have lied to the defendant; (6) preclude evidence about the circumstances of the defendant's arrest; (7) preclude evidence of irrelevant details about the defendant's background; (8) preclude evidence of arbitrations related to shame Retrophin consulting agreements; (9) order the defendant to produce documents he intends to use in his case-in-chief pursuant to Federal Rule of Criminal Procedure 16; (10) to preclude defense counsel from taking two actions related to their prior roles as Assistant United States Attorneys; and (11) to preclude certain testimony proffered by the defendant as expert testimony.

---

[1] The government reserves its right to file additional motions <u>in</u> <u>limine</u> following the exchange of 18 U.S.C. § 3500 material, any additional exhibits, or as otherwise discussed herein.  Additionally, the government intends to file motions <u>in</u> <u>limine</u> seeking the preclusion of cross examination of certain government witnesses regarding specific topics pursuant to Rules 608 and 609 of the Federal Rules of Evidence, and will meet and confer with defense counsel to seek to resolve any issues short of motion practice.  Finally, as detailed in Section XI, the parties will propose a separate briefing schedule to the Court regarding any <u>Daubert</u> issues for the parties' expert witnesses.

<u>ARGUMENT</u>

I.     <u>THE COURT SHOULD ADMIT AS DIRECT EVIDENCE SHKRELI'S
       HARASSMENT OF A FEARNOW SHARE RECIPIENT</u>

As the parties and the Court have recognized, this trial will include, as direct evidence of the charges against the defendant, substantial evidence about Shkreli's conduct with respect to investors in MSMB Capital and MSMB Healthcare, as well as other conduct Shksreli undertook during the course of and in furtherance of the conspiracies charged in Count Seven and Count Eight of the Superseding Indictment.  <u>See, e.g.</u>, Memorandum and Order Granting Def.'s Mot. for Severance, Dkt. No. 198, at 17-18 ("Greebel does not identify evidence that would be admissible in a trial against Shkreli, but would not be admissible in a separate trial against Greebel. . . . The conduct charged against Shkreli and Greebel in the Retrophin conspiracies was allegedly undertaken to compensate some of the alleged victims, the investors, of the MSMB Capital and the MSMB Healthcare conspiracies. Thus, evidence relating to the MSMB Capital and the MSMB Healthcare conspiracies, with which Greebel is not charged, is likely to be admissible on relevance grounds because the evidence will provide context as to the conduct charged in the Retrophin conspiracies.").  The government does not intend to move <u>in limine</u> to catalog all of this direct evidence, which has already been the subject of extensive disclosure during the trial of Shkreli.[2]

_____

[2] For example, the government intends to introduce evidence of Shkreli's misrepresentations to MSMB Capital investors, MSMB Healthcare investors and the SEC about various aspects of the funds—including but not limited to misrepresentations about the assets under management ("AUM") of the funds (including the representation that Shkreli was "managing" assets for Elea Capital investor JA); Shkreli's track record in the industry (including the failure of Elea Capital); the ability of investors to redeem their investments; and the performance of the funds—as well as evidence that proves that such statements were misrepresentations, including bank and brokerage records and witness testimony.

Nevertheless, the government respectfully moves in limine to admit Shkreli's repeated harassment of and threats to a Fearnow share recipient and his family after said recipient refused to return his Fearnow shares to Shkreli.  For the reasons set forth below, all of this evidence is direct evidence of the charged crimes in the Superseding Indictment.  In the alternative, evidence of such actions is admissible pursuant to Federal Rule of Evidence ("FRE" or "Rule") 404(b).

A.   Relevant Facts[3]

In 2011, Shkreli hired an individual ("Fearnow Share Recipient TP") to run a fund that Shkreli founded called MSMB Consumer.  After that fund was wound down in mid-2012, Fearnow Share Recipient TP worked with others on a series of potential acquisitions in which Shkreli had agreed to invest money.  Fearnow Share Recipient TP was formally let go as an employee of MSMB Consumer[4] in October 2012, but continued to work on these acquisitions out of the offices of Retrophin throughout the fall of 2012.

In December 2012, Shkreli, working with the defendant, distributed free-trading Fearnow Shares to Fearnow Share Recipient TP, along with six other individuals who were either employees of or affiliated with Retrophin in an attempt to control the price and trading volume of shares of the newly-public Retrophin.  After receiving the Fearnow Shares,

---

[3] A more detailed description of this evidence is included in the government's motion in limine to admit evidence related to Shkreli's harassment of Fearnow Share Recipient TP during the Shkreli trial.  See Dkt. No. 230, at 2-12.

[4] Fearnow Share Recipient TP was hired to work for, and did work for, MSMB Consumer.  He did not do any work for the MSMB Healthcare fund.  However, the employment agreement and separation agreements for Fearnow Share Recipient TP were with, among other entities, MSMB Healthcare.

however, Fearnow Share Recipient TP refused to follow Shkreli's instructions not to trade those shares, proceeding to sell some of them on the open market.

When Shkreli learned in approximately late December 2012 that Fearnow Share Recipient TP had sold some of the Fearnow Shares, he demanded that Fearnow Share Recipient TP return the remaining shares to his control.  After Fearnow Share Recipient TP refused, Shkreli sent Fearnow Share Recipient TP's wife a letter that stated, inter alia, "Your husband has stolen $1.6 million from me and I will get it back. I will go to any length necessary to get it back … I hope to see you and your four children homeless and will do whatever I can to assure this."

Subsequently, Shkreli and the defendant caused Retrophin to sue Fearnow Share Recipient TP for the return of the Fearnow Shares, falsely claiming that Former Employee TP had promised to work for Retrophin in return for those shares.  During the pendency of the lawsuit, Shkreli continued to harass Fearnow Share Recipient TP and his family, including by sending threatening messages to Fearnow Share Recipient TP, his wife and his children via social media and text message.  Then, the day after Christmas in 2013, Shkreli simultaneously hacked into five email and social media accounts held by Fearnow Share Recipient TP in order to post information about the lawsuit on Fearnow Share Recipient TP's Facebook page.  When Fearnow Share Recipient TP contacted the local police department to report Shkreli's harassment, that department reached out to Shkreli directly; Shkreli initially denied knowing Fearnow Share Recipient TP, then agreed to call him to apologize.  Subsequently, Shkreli caused Retrophin to settle its lawsuit with Fearnow Share Recipient TP; the defendant helped facilitate that settlement.

B.     Applicable Law

1.     Direct Evidence

Evidence of the defendant's interactions with Shkreli and of Shkreli's harassment of and threats to Fearnow Share Recipient TP is properly admissible "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)).  The Second Circuit has repeatedly held that evidence of "other" or "uncharged" acts or crimes is admissible to complete the story of the charged crimes and to establish the existence of the charged conspiracy.  "[W]here, as here, a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (internal quotation marks omitted) (upholding district court's admission of sixteen uncharged robberies).

2.     FRE 404(b) Evidence

Evidence of uncharged "other" acts is admissible pursuant to Rule 404(b) if relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  See United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).  The Second Circuit has adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate a defendant's "criminal propensity." United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002); see also United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992).  Such evidence is correctly admitted if: (1) it is offered for a proper purpose; (2) it is relevant to a

5

disputed trial issue; (3) its probative value substantially outweighs any possible prejudice; and (4) the trial court administers an appropriate limiting instruction.  United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003).

    C.    <u>Argument</u>

        Evidence of Shkreli's harassment of Fearnow Share Recipient TP and his family is direct evidence of the crime charged in Count Eight of the Superseding Indictment. As detailed in the Superseding Indictment, Shkreli and the defendant arranged for the Fearnow Shares to be distributed to a small group of Retrophin employees and affiliates in an attempt to control the price and trading volume of Retrophin following the reverse merger. Shkreli's extreme reaction to Fearnow Share Recipient TP's refusal not to sell the Fearnow Shares or return them to Shkreli—which consisted of falsely stating in a lawsuit that Fearnow Share Recipient TP had agreed to be an employee of Retrophin, insisting that Fearnow Share Recipient TP return the shares to him, and then engaging in a series of escalating acts of harassment including sending a threatening letter to Fearnow Share Recipient TP's wife, causing Retrophin to file a lawsuit to try and regain control over the shares, and ultimately hacking into Fearnow Share Recipient TP's personal social media and email accounts to try and embarrass him into conceding the lawsuit—is clear evidence that Shkreli, with the defendant's assistance, intended to retain control over the Fearnow Shares even though they had been allegedly distributed to others, including Fearnow Share Recipient TP.  Such evidence is thus "inextricably intertwined with the evidence regarding" Count Eight and "is necessary to complete the story of [that] crime[s] on trial."  Carboni, 204 F.3d at 44.

        In the alternative, evidence of Shkreli's harassment of Fearnow Share Recipient TP, aided by the defendant, is admissible pursuant to FRE 404(b) as evidence of the

defendant's knowledge of the object of the conspiracy he agreed to join, the defendant's

intent, and his lack of mistake in assisting Shkreli in seeking to control the Fearnow Shares.

See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may

be admitted to provide the jury with the complete story of the crimes charged by

demonstrating the context of certain events relevant to the charged offense").[5]

---

[5] During a telephone conference, defense counsel stated that certain other evidence of the defendant's involvement in or knowledge of the charged conspiracies is admissible, if at all, under Rule 404(b). Specifically, defense counsel contended that evidence that the defendant was involved in discussions directing employees of Citrin Cooperman to classify certain Retrophin expenses in a particular manner that helped to conceal the charged frauds—for example, testimony that the backdated interest that the defendant and Shkreli created in MSMB Capital should be classified as a "gift" and thus not disclosed (Tr. 3915-16) or documents showing that Shkreli classified money taken from Retrophin to repay the Merrill Lynch settlement as either "compensation" or "debt repayment" (Shkreli Government Exhibits 123-7 and 123-8)—was, in fact, Rule 404(b) evidence. This is plainly incorrect. Evidence of the concealment of a fraud by a perpetrator of a fraud is clearly not "a crime, wrong or other act" pursuant to Rule 404(b). On the contrary, it is evidence of the fraud itself. See, e.g., United States v. Deutsch, 451 F.2d 98, 116 (2d Cir. 1975) (evidence of failure to report transaction was "independently probative of [the defendant's] guilt" because it "showed evasive conduct aimed at concealing the transaction and constituted circumstantial evidence of guilty consciousness"); United States v. Dupree, No. 10 Cr. 627, 2012 WL 5333946, at *27 (E.D.N.Y. Oct. 26, 2012) (evidence of "concealment of the fraud" among the legitimate bases for the jury to find the defendant guilty; rejecting Rule 29 motion). At trial, the government intends to introduce similar evidence of the defendant's involvement in, knowledge of and/or concealment of the charged frauds (much of which was introduced during the trial of Shkreli), including but not limited to the defendant's concealment of ongoing SEC and U.S. Attorney's Office investigations related to Shkreli from members of Retrophin's Board of Directors (the "Board"); the defendant's involvement in concealing aspects of the settlement agreements from Marcum; and actions taken by the defendant to shield Shkreli's actions from scrutiny and/or reprisal by the Board and/other Retrophin employees.

II.    THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING
       HIS CO-CONSPIRATOR'S POST-ARREST STATEMENTS AND STATEMENTS
       TO THE SEC

   The defendant has repeatedly signaled his intention to admit in evidence certain

of Shkreli's post-arrest statements and statements to the SEC.  (See, e.g., Def.'s Mem. of Law

in Support of His Mot. For Severance, Dkt. No. 163 ("Severance Br.") at 25 ("we will be

offering into evidence certain post-arrest statements made by Mr. Shkreli to law enforcement

that inculpate Mr. Shkreli but exculpate Mr. Greebel"); id. at 3 (same); Def.'s Reply Mem. of

Law in Support of His Mot. For Severance, Dkt. No. 170 ("Severance Reply") at 18 ("we

expect to offer portions of Mr. Shkreli's SEC testimony").)  For example, the defendant has

suggested that he will offer Shkreli's post-statements that purportedly "inculpate Mr. Shkreli

but exculpate Mr. Greebel," and provided the following examples: "Mr. Shkreli expresses

shock that Mr. Greebel was arrested, describing the government's decision to charge Mr.

Greebel as 'just bizarre,' and stating that the fact that Mr. Greebel was charged proves

Retrophin engendered the investigation and charges against Mr. Shkreli and Mr. Greebel.'"

(Id. at 25.)

   For the reasons set forth below, the defendant should be precluded from

offering any of these statements.

  B. Shkreli's Post-Arrest Statements

   The defendant plainly intends to offer Shkreli's post-arrest statements for their

truth.  For example, Shkreli's profession of "shock" at the defendant's arrest is relevant, under

the defendant's theory, because Shkreli was in fact shocked.  As a result, these statements are

inadmissible because they constitute hearsay.

Recognizing that these statements would constitute hearsay, the defendant has suggested the statements would be admissible "pursuant to Rule 804(b)(3)," an exception to the prohibition against hearsay that "applies [to an otherwise prohibited hearsay statement] in the event the declarant is unavailable and the statement was made against the declarant's interest." (Severance Reply at 18.)  Even assuming that Shkreli will be "unavailable," the kinds of statements the defendant intends to admit do not qualify as statements "against interest" pursuant to Rule 804(b)(3).[6]

A statement is "against interest" if it is "so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  But statements about Shkreli's surprise at the defendant's arrest, or accusation that the government was being pushed by Retrophin to bring charges, are not "contrary to" Shkreli's "proprietary or pecuniary interest."  They are unrelated to it.  Similarly, a statement that tended to "inculpate" Shkreli would not necessarily "exculpate" the defendant.  To be sure, it is possible to make such a statement—"I committed fraud alone, Mr. Greebel had nothing to do with it"—but Shkreli did not make any such statements.  Instead, what the defendant attempts to do is characterize statements that are helpful to his perceived defense as

---

[6] Even if Shkreli were to testify, there is no guarantee that his prior statements would be <u>admissible</u>, as opposed to the subject of cross-examination.  The government does not concede that, during its examination of Shkreli, the defendant would automatically be entitled to show to the jury or otherwise introduce Shkreli's prior statements.

being ones that are against Shkreli's "interest."  Therefore, Shkreli's post-arrest statements are inadmissible hearsay and not subject to the exception in Rule 804(b)(3).

Shkreli's post-arrest statements also are not admissible pursuant to Rule 806 "for purposes of attacking Mr. Shkreli's credibility," as the defendant has suggested. (Severance Reply at 18.)  Rule 806 states that, after a hearsay statement has been admitted, "the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.  The court may admit evidence of the declarant's inconsistent statement or conduct . . . ."  The rule does not apply here because, even assuming the defendant had identified "inconsistent" statements, the kinds of statements that the defendant has signaled he intends to offer are not intended to "attack[]" Shkreli's credibility.  Instead, they are offered to establish the defendant's innocence.  Indeed, the potential relevance of the statements identified by the defendant depends on whether Shkreli was <u>telling the truth</u>, for example, when he said he was shocked at the defendant's arrest.  The defendant should not be allowed to use Shkreli's statements for their truth—as evidence of the defendant's innocence—pursuant to a rule that allows for the admission of statements to attack the truthfulness of the declarant.

Nor is there any non-hearsay purpose for which the defendant could claim to offer Shkreli's post-arrest statements.  Shkreli's state of mind during his post-arrest interview, for example, is irrelevant.  Shkreli's statements also do not constitute an "excited utterance" because they relate to events that happened months or years earlier, not to the circumstances

of his arrest.[7]   As a result, the defendant should not be allowed to introduce Shkreli's post-arrest statements at all.

C.   Shkreli's SEC Testimony

The defendant also has stated that he "expect[s] to offer portions of Mr. Shkreli's SEC testimony" pursuant to Rule 804(b)(1).[8]  (Severance Reply at 18.)  That exception to the prohibition against hearsay applies only to prior testimony from an unavailable declarant where such testimony was given at a lawful deposition and "is now

---

[7] An excited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2) (emphasis added); see, e.g., United States v. Petrucelli, 97 F. App'x 355, 359 (2d Cir. 2004).  The exception is based on the "belief that contemporaneous statements about observed events leave less time to forget or fabricate and, therefore, tend to be reliable."  United States v. Gonzalez, 764 F.3d 159, 169 (2d Cir. 2014).  The exception does not apply to any portion of Shkreli's post-arrest statements that relate to the defendant because those statements do not relate to the "startling event or condition" of Shkreli's arrest but rather to events that occurred years earlier.  See, e.g., United States v. Vargas, 689 F.3d 867, 877 (7th Cir. 2012) (defendant's post-arrest statement not admissible as excited utterance because, "[e]ven assuming that the arrest qualifies as a 'startling event,' we agree with the district court that [defendant's] statement did not relate to the arrest"); United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir. 2002) (defendant's post-arrest statement was not admissible as excited utterance because it "did not relate to any incident that occurred at the time of his arrest. Instead, it related to earlier events."); United States v. Elem, 845 F.2d 170, 174 (8th Cir. 1988) (post-arrest statement was not admissible as excited utterance where statement was made "after [defendant] was in custody and was the focus of a criminal investigation").  In other words, any stress Shkreli felt when he was arrested was not "caused" by the events described in his post-arrest statement.  See Fed. R. Evid. 803(2).

[8] Shkreli testified before the SEC on October 12, 2011; August 7, 2013; and February 24, 2014.  The defendant has not identified to the government which specific portions of that testimony he expects to offer.

11

being offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination."    Rule 804(b)(1) is not applicable here.

As an initial matter, the government was not a "party" to Shkreli's SEC depositions.  The government was not present at the depositions, and neither instructed the SEC about what questions to ask or otherwise provided guidance about the conduct of the depositions.  In those circumstances, the law is clear that the government is not a "party" for purposes of Rule 804(b)(1).  For example, in United States v. Martoma, the court denied the defendant's effort to introduce the SEC deposition of Steve Cohen, the hedge fund investor, because the government was not a "party" to that deposition.  No. 12 CR 973 (PGG), 2014 WL 5361977, at *3–4 (S.D.N.Y. Jan. 8, 2014).  The court reached that conclusion because the prosecutor, conducting a criminal investigation "parallel" to the SEC, did not provide the SEC with direction about questions to ask, and did not attend the deposition or participate "in any fashion."  Id.; see United States v. Whitman, 555 F. App'x 98, 103 (2d Cir. 2014) (affirming district court's decision not to allow prior SEC deposition testimony pursuant to Rule 804(b)(1)).  Those circumstances apply here as well.

Moreover, the SEC did not have a "similar motive" in examining Shkreli in his depositions as the government would have at trial.  The SEC questioning focused on whether Shkreli had committed fraud, not on whether and to what extent the defendant had conspired with Shkreli to commit a fraud.  In addition, although both the SEC and the government had an interest in the question of whether Shkreli had committed fraud, the SEC depositions were designed to engage in investigation, not to subject Shkreli to the kind of rigorous cross-examination he might be subject to were he to testify at a trial.  See Whitman, 555 F. App'x at 103 (affirming district court's decision not to allow prior SEC deposition testimony pursuant

12

to Rule 804(b)(1) because "the SEC's motive was investigatory, . . . rather than that of a

prosecutor cross-examining a defense witness at a criminal trial.").[9]

\*   \*   \*

For the foregoing reasons, the defendant should be precluded from offering

Shkreli's post-arrest statements or testimony to the SEC.

III.   THE GOVERNMENT MAY OFFER CERTAIN OF THE DEFENDANT'S POST-
ARREST STATEMENTS DURING ITS CASE-IN-CHIEF AND MAY SEEK TO
PRECLUDE THE DEFENDANT FROM INTRODUCING ADDITIONAL SUCH
STATEMENTS

The defendant made a videotaped statement to law enforcement on the day of

his arrest.  The government anticipates that it may offer certain portions of that post-arrest

statement during its case-in-chief pursuant to Federal Rule of Evidence 801(d)(2).   See, e.g.,

United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982); United States v. Gotti, 457 F. Supp.

2d 395, 397 (S.D.N.Y. 2006).  Should the defendant seek to offer any additional portions of

that post-arrest statement in evidence, the government anticipates that it may move to

preclude such additional portions of the post-arrest statement as inadmissible hearsay.  See

Marin, 669 F.2d at 84.

---

[9] It is not clear whether the defendant intends to introduce other statements by Shkreli.  For
example, the defendant's Severance Motion discussed a February 2015 statement in which
Shkreli purportedly "admitted publicly that he had plans to blame counsel if he was accused
of doing anything improperly."  (Severance Br. at 17.)  Such a statement would plainly be
inadmissible hearsay because its relevance, if any, would be to establish that there was such a
plan.  The government reserves the right to move to preclude, or to object to the introduction
of, additional statements of Shkreli such as this one.

At this time, however, the government does not yet know exactly which witnesses it may call at trial or which evidence it may seek to admit.  As a result, the government has not yet determined what portions of the defendant's post-arrest statement, if any, it will offer during its case-in-chief.  The government will provide this information – along with any portions of Shkreli's testimony to the SEC or in the Financial Industry Regulatory Authority ("FINRA") arbitration that the government may seek to admit in its case-in-chief, as detailed below – by September 6, 2017, approximately six weeks prior to trial, and respectfully suggests that any motions the defendant may wish to make pursuant to Federal Rule of Evidence 106 may be briefed on the same schedule as may ultimately be proposed by the parties for briefing on expert witnesses (see Section XI).  The government notes that in connection with the trial of Shkreli, the government provided counsel for Shkreli with the portions of his statements that the government anticipated it might seek to introduce in its case-in-chief four weeks prior to trial.

IV.    THE COURT SHOULD PRECLUDE THE DEFENDANT FROM TESTIFYING ABOUT HIS REVIEW OF EVIDENCE IN THE CASE OR HIS CONCLUSIONS BASED UPON THAT REVIEW

Defense counsel has represented to the Court that the defendant intends to testify about, among other things, his review of documents produced in discovery in this case. (See, e.g., Decl. of Reed Brodsky in Support of Def's Mot. Severance, Dkt. No. 159 ("Brodsky Aff.") ¶ 3.)  Specifically, the defendant intends to testify that Shkreli lied to him and used him as a "pawn[]," and that he "discovered" that "Shkreli lied to him . . . from his review of documents produced in discovery in this case that he had never seen before prior to the charges filed against him."  (Id. ¶ 3(b), (d).)  This proposed testimony conflicts with defense counsel's representation to this Court that "of course . . . Mr. Greebel nor any other

14

witness will be able to testify about another person's state of mind." (Severance Reply at 12.) Moreover, such testimony represents an improper attempt to allow the defendant to make the kinds of closing arguments for which his attorneys are the appropriate vehicle. As explained below, the defendant's proposed testimony at issue here attempts to circumvent the rules of evidence and usurp the function of the jury. As a result, the defendant should be precluded from testifying about alleged "lies," or anything else, that he "discovered" through his review of discovery.[10]

A.    <u>Legal Standard</u>

Although a non-expert witness must generally testify only about facts about which he has personal knowledge, the Federal Rules of Evidence allow a non-expert witness to testify in the form of an opinion in certain circumstances. <u>See, e.g.</u>, <u>United States v. Rea</u>, 958 F.2d 1206, 1214 (2d Cir. 1992). But that "lay opinion" testimony is permissible only to the extent the opinion is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule

---

[10] It does not appear that the defendant intends to use his own testimony to offer into evidence documents he reviewed for the first time during discovery, and with good reason. Any such an attempt would be improper because, by definition, the defendant would lack first-hand knowledge of a document he saw only after his attorneys provided it to him. For example, if the defendant reviewed an email from Shkreli to a third party, the defendant would lack contemporaneous, first-hand knowledge of that email. The defendant could neither authenticate such a document nor explain its provenance. Similarly, to the extent testimony about the defendant's "review of documents produced in discovery" is intended to describe the contents of documents that are <u>not</u> in evidence, his testimony would violate both the so-called "best evidence" rule, Fed. R. Evid. 1002, and prohibitions against hearsay, <u>see, e.g.</u>, Fed. R. Evid. 802.

702." United States v. Kaplan, 490 F.3d 110, 118 (2d Cir. 2007) (quoting Fed. R. Evid. 701).

In interpreting these requirements, the Second Circuit has "observed that (a) the rational-basis

requirement is the familiar requirement of first-hand knowledge or observation, (b) the

helpfulness requirement is principally designed to provide assurance[ ] against the admission

of opinions which would merely tell the jury what result to reach, and (c) the 'not based on

specialized knowledge' requirement requires that a lay opinion must be the product of

reasoning processes familiar to the average person in everyday life." Id. (internal quotation

marks omitted).  Finally, the "likely benefits" of lay opinion testimony "must outweigh its

costs," and "the costs of lay opinion increases and the benefits diminish the closer the opinion

approaches the crucial issues in the case." Hester v. BIC Corp., 225 F.3d 178, 182 (2d Cir.

2000) (internal quotation marks omitted).

    B.    <u>Analysis</u>

       There is no indication that the defendant intends to offer himself as an expert

witness.  See Fed. R. Evid. 702.  Therefore, any opinion testimony the defendant intends to

offer about documents he reviewed during discovery would be admissible only if that

testimony qualified as a "lay opinion." See Fed. R. Evid. 701.  But the defendant's proffered

testimony about the conclusions he drew from his review of discovery would not qualify as

lay opinion testimony.

          First, the defendant's testimony about documents he reviewed for the first time

during discovery would not be based on "first-hand knowledge or observation." See Kaplan,

490 F.3d at 118.  The defendant, by definition, lacked first-hand knowledge of the documents

he reviewed "for the first time" in discovery.  Similarly, because the defendant lacks

contemporaneous knowledge of the documents, he also lacks first-hand, contemporaneous

knowledge of whether assertions in any such documents are true. Indeed, defense counsel has previously conceded that "Mr. Greebel will testify based on his personal knowledge at the time of the relevant events." (Severance Reply at 11.) As a result, the defendant may not offer opinions based upon the facts in those newly discovered documents. For example, if the defendant saw an email from 2009 in his review of discovery that stated that MSMB Capital's assets under management in 2009 were a certain amount, he would lack personal knowledge from which to conclude whether MSMB Capital actually had that amount of assets under management at that time.

Second, the defendant's opinion that certain documents he reviewed for the first time during discovery show that other statements made by Shkreli were lies would "merely tell the jury what result to reach." See Kaplan, 490 F.3d at 118. In other words, rather than provide the jury with admissaible facts it could use in determining whether Shkreli provided the defendant incomplete or misleading information, the defendant would be telling the jury that Shkreli lied.[11] For example, if the defendant received an email stating a fact in 2012, but saw in discovery another document from the same period stating the fact was not

_____

[11] In contrast to this conclusory testimony, a typical example of lay opinion testimony that is "helpful" to the jury is where a witness offers an opinion to help the jury understand a relevant piece of evidence so that the jury can then use that piece of evidence to reach a conclusion. For example, in United States v. Urlacher, 979 F.2d 935, 939 (2d Cir. 1992), the defendant's co-conspirator was allowed to give an "explanation of statements or words on the tape [recording of a conversation with the defendant] that would be ambiguous or unclear to someone who was not a participant in the conversation." These tapes indicated that the defendant, charged with embezzlement, had stolen money from the Rochester Police Department. The co-conspirator did not, on the other hand, actually testify that the defendant had embezzled or stolen money, leaving the jury to consider the importance of those facts.

17

true, or asserting an inconsistent fact, the jury would not need the defendant's opinion testimony to determine that one of the documents was inconsistent with the other, or, depending on other evidence, that one was false. <u>Rea</u>, 958 F.2d at 1216 ("Lay opinion testimony will probably be more helpful when the inference of knowledge is to be drawn not from observed events or communications that can be adequately described to the jury"). The defendant's testimony that he has concluded that Shkreli lied to him would "amount to little more than choosing up sides," exactly the kind of testimony that the Second Circuit has recognized as "unhelpful," and therefore improper, opinion testimony. <u>Id.</u> at 1215-16.[12]

Finally, even if the defendant's proffered testimony about his discovery of "lies" somehow could be construed to constitute a proper lay opinion, the prejudice of such testimony would outweigh any potential benefit, particularly where the proffered testimony is "close" to "crucial issues" in this case. <u>See</u> <u>Hester v. BIC Corp.</u>, 225 F.3d 178, 182 (2d Cir. 2000); <u>see generally</u> Fed. R. Evid. 403. Because the defendant is an attorney, there is a significant risk that his "lay" opinion testimony will be misinterpreted by the jury as some form of expert legal opinion that should be accorded significant weight. Given that the opinion the defendant intends to offer could easily—and undoubtedly will—be argued by

---

[12] In oral argument about the defendant's severance motion, defense counsel suggested: "[W]e have identified documents that we know based on the communications between Katten and Mr. Shkreli and MSMB that were fictitious. . . . The government, we believe, have no reason to believe that they know about them." (4/7/17 Tr. 58.) To the extent defense counsel wants to argue that certain documents are "fictitious" based on an analysis of "communications between Katten and Mr. Shkreli and MSMB," that may be an appropriate argument for counsel to make to the jury. But it is not an appropriate argument for <u>the defendant</u> to make during his own testimony.

defense counsel, precluding the defendant's testimony will not prevent the jury from hearing

such an argument but will alleviate any risk of confusion or prejudice that might arise if the

opinion were delivered by the defendant himself.

    For the foregoing reasons, the Court should preclude the defendant from

testifying about his opinions based upon his review of documents for the first time during

discovery.

V. THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING
  EVIDENCE THAT HIS CO-CONSPIRATOR LIED TO OTHERS OR ARGUING
  THAT ANY SUCH LIES SHOW THE CO-CONSPIRATOR LIED TO THE
  DEFENDANT

    The defendant has represented to the Court that core elements of his defense

will be evidence and argument that (1) Shkreli lied or failed to disclose material information

to individuals in addition to the defendant and (2) Shkreli "has a long-term pattern and

practice of blaming others for his own misconduct."[13]  (See, e.g., Brodsky Aff. at 1-2;

Severance Br. at 9; id. at 16-17 ("part of Mr. Shkreli's modus operandi was to maintain

'plausible deniability' about giving others directives to take action and to blame others

including outside counsel if something went wrong."); Severance Reply at 13 ("By way of

example, we will be able to introduce admissible evidence relating to the subject matters of

---

[13] The government does not seek to preclude otherwise admissible evidence that Shkreli lied
to the defendant.  In addition, in various pre-trial filings, the defendant has referred to
purported lies Shkreli made to "Mr. Greebel and other attorneys at Katten Muchin."
(Severance Br. at 9.)  To the extent the defendant can show that a lie to "other attorneys at
Katten Muchin" affected his own conduct—for example, that another Katten attorney passed
false information to the defendant—then evidence of lies to "other attorneys" could constitute
a lie to the defendant.  But if the "lie" did not influence the defendant, then evidence about it
should be precluded for the reasons stated herein.

the indictment where Mr. Shkreli, in fact, blamed others for his misconduct.").)  This strategy

is plainly not limited to evidence about lies Shkreli may have told to the defendant.  <u>See</u>

Severance Br. at 10 ("Mr. Greebel will be offering into evidence numerous examples of

admissible evidence of Mr. Shkreli's deception toward Mr. Greebel, <u>other attorneys at Katten</u>

<u>Muchin, and other professionals</u>.") (emphasis added).

   The government respectfully moves to preclude the introduction of either

category of evidence and to preclude the defendant from arguing that such evidence shows

that Shkreli lied to the defendant with respect to the charged conduct.  Such evidence or

argument is inadmissible pursuant to Federal Rules of Evidence 404(b)(1) and 403.

  A. <u>Legal Standard</u>

  Rule 404(b) provides in relevant part that:

> [e]vidence of other crimes, wrongs, or acts is not admissible to
> prove the character of a person in order to show action in
> conformity therewith. It may, however, be admissible for other
> purposes, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity, or absence of mistake or
> accident....

The Second Circuit has applied Rule 404(b) broadly, but also has stated clearly that evidence

of prior bad acts is inadmissible to demonstrate "criminal propensity."  <u>United States v.</u>

<u>Edwards</u>, 342 F.3d 168, 176 (2d Cir. 2003); <u>see, e.g.</u>, <u>United States v. Barret</u>, No. 10 CR 809

(S-4) (KAM), 2011 WL 6935500, at *4 (E.D.N.Y. Dec. 31, 2011) (Uncharged bad acts "may

be admitted into evidence for any relevant purpose <u>other than propensity</u>, provided that the

probative value of the evidence outweighs the danger of unfair prejudice.") (emphasis added).

The Second Circuit also has "cautioned" that "even under this inclusionary approach, district

courts should not presume the relevance or admissibility of evidence under Rule 404(b)

simply because the evidence does not serve the sole purpose of showing" bad character.  Id.

B.  Argument

The Court should preclude the defendant from introducing evidence that the

defendant lied to other individuals or from making the inference he intends to draw from such

evidence, which is the classic, prohibited propensity inference:  Because Shkreli lied to

others, he must have been lying to the defendant as well.  That inference is prohibited by Rule

404(b)(1) because it constitutes an effort to prove, through evidence of "other acts" (lies to

others), that Shkreli has the character trait of being a liar and that he acted in "accordance

with that character" when he spoke to the defendant.

Of course evidence of prior bad acts may be admissible for purposes other than

to support a prohibited propensity inference, but the defendant has pointed to no such other

purpose.  See Fed. R. Evid. 404(b)(2) (evidence of prior bad acts may be admissible to prove

"motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

lack of accident.").  Nor is one apparent.  For example, neither Shkreli's "motive" nor "intent"

in making statements to the defendant is relevant.  Under the defendant's own view of the

case, the relevant question is whether Shkreli actually did lie to him, such that the defendant's

agreement to help the defendant commit fraud was unknowing.  Nor is this a case in which

there is a doubt about who made certain statements or took certain actions, such that there

might be a need to prove the identity of a criminal through evidence of a consistent "modus

operandi."  See, e.g., United States v. Carlton, 534 F.3d 97, 101–02 (2d Cir. 2008) (evidence

of prior bad acts admissible to prove identity of bank robber by establishing consistent

"modus operandi"); United States v. Serrano, 640 F. App'x 94, 99 (2d Cir. 2016) ("Serrano's

discussion of his *modus operandi* was properly admitted to show his participation in the charged robbery conspiracy through this same method.").  Nor is evidence that Shkreli lied to others relevant to establishing general "background" in the case or the "relationship among" the defendant, Shkreli, and others.  See, e.g., Barret, No. 10-CR-809 (S-4) (KAM), 2011 WL 6935500, at *4.[14]

Moreover, despite the defendant's broad references to lies to third parties, the defendant's severance motion, which includes a detailed discussion of his trial strategy, identifies only three specific lies that Shkreli supposedly made, and all three of those statements were made at least in part to the defendant himself.  (Severance Br. at 11-16.)  If the defendant intends to present evidence of specific prior bad acts—misrepresentations that Shkreli made to third parties that are relevant and admissible for a permissible purpose under Rule 404(b)—then the defendant should identify those bad acts in a pre-trial filing, as is standard practice for the use of Rule 404(b) evidence.

Finally, even if there were some potentially proper purpose for admitting evidence about Shkreli's purported lies to others, at least some of that evidence should still be precluded pursuant to Rule 403.  Because the defendant has not yet identified which prior bad acts he intends to offer, it is difficult to fully to address this issue.  But to the extent these purported lies relate to issues collateral to the evidence that will otherwise be developed at the trial, their admission would lead to unnecessary delay and juror confusion.

---

[14] Other purposes for which "other acts" evidence is admissible under Rule 404(b)(2)—including to establish absence of a mistake, or show a preparation or plan, or show access to weapons or drugs—also are not applicable in this case.

The Court also should preclude evidence that Shkreli had a "long-term pattern and practice of blaming others for his own misconduct" or from making a propensity argument based on that evidence.  (Severance Br. at 9.)  Such "pattern and practice" evidence could not be anything other than a subset of the "lies to third parties" evidence discussed above, because "blaming others for his own misconduct" is just another kind of lying.  As such, this "pattern and practice" evidence should be precluded for the reasons given above.

It is also possible that the defendant intends to offer such "pattern and practice" evidence to support the tortured argument that: (a) Shkreli blames others for his misconduct and (b) Shkreli blamed Greebel, therefore (c) Shkreli, and not the defendant, must be at fault.  Indeed, the defendant has suggested he intends to make such an argument: "We will also demonstrate through the evidence obtained during discovery that Mr. Shkreli is seeking to have the defendant found responsible for his misconduct in the same way that, over the years, he has repeatedly shifted the blame from himself to anyone and everyone around him."  (Severance Brief at 1.)  But that argument would run afoul of the prohibition against propensity evidence.  And any attenuated probative value would also be far outweighed by the confusion and delay required to establish (and perhaps rebut) a "long-term pattern and practice of blaming others" unrelated to the defendant.  See Fed. R. Evid. 403.

\*       \*       \*

For the foregoing reasons, this Court should preclude the defendant from offering evidence that Shkreli lied to individuals other than to the defendant or evidence that Shkreli "has a long-term pattern and practice of blaming others for his own misconduct."  The defendant also should be precluded from arguing that evidence of such lies or practice shows that Shkreli lied to the defendant.

23

VI.     THE COURT SHOULD PRECLUDE EVIDENCE ABOUT THE
        CIRCUMSTANCES OF THE DEFENDANT'S ARREST

        The defendant's briefing and oral arguments in this case have been replete with

references to the circumstances of his arrest and to the government's decision not to inform

the defendant he was under investigation before that arrest.  See, e.g., 4/7/2017 Tr. 79

(discussing the defendant's location on the morning of his arrest); 7/14/2016 Tr. 32

(discussing the defendant's feelings on the day of his arrest); id. Tr. 32 (noting that the

government did not speak to the defendant before his arrest); Def.'s Mem. of Law in Support

of His Motion for a Bill of Particulars at 3 (noting both his "early morning" arrest and the

government's decision not to "interview" the defendant before that arrest).  The defendant has

also indicated that he intends to call an expert to opine on "the general customs and practices

of the FBI in conducting a thorough and complete investigation" generally and, specifically,

the fact that "the FBI will speak with the subjects of the investigation."  (Def.'s Expert

Disclosures, Aug. 11, 2017, Dkt. No 312-2.)  The defendant should be precluded from

offering evidence about or discussing these irrelevant matters at trial.

        The circumstances surrounding the defendant's arrest are inadmissible because

they are irrelevant.  The fact that the defendant was arrested at a certain time or location, for

example, says nothing to make a fact of consequence in the case, such as whether and to what

extent the defendant conspired with Shkreli, more or less true.  See Fed. R. Evid. 401; see also

United States v. Reevey, 364 F.3d 151, 157–58 (4th Cir. 2004) (evidence of circumstances of

defendant's arrest was inadmissible as confusing and misleading because the defendant "was

not charged with any offense arising out of the circumstances surrounding his arrest").

Moreover, the clear purpose for the defense to introduce evidence about the circumstances of

the defendant's arrest would be to attempt to invoke sympathy from the jury, an improper

purpose that should be precluded not just because it is irrelevant but also because any

conceivable probative value of such evidence would be substantially outweighed by the unfair

prejudice of such a ploy for sympathy.  See Fed. R. Evid. 403.  This is especially true where,

as defense counsel conceded, "I'm not criticizing" the manner in which the FBI executed the

arrest and that it was "standard operating procedure."  (4/7/17 Tr. 79.)

       Evidence and argument concerning the reasons for or timing of the defendant's

arrest and of this prosecution also would confuse the jury, distract from the evidence at trial

and encourage jury nullification.  Such evidence should be precluded for those reasons as

well.  See United States v. Stewart, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1

(S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments

or evidence that would invite the jury to question the Government's motives in investigating

and indicting" the defendant); see also United States v. Regan, 103 F.3d 1072, 1082 (2d Cir.

1997) (a "selective prosecution defense is an issue for the court rather than the jury"); see

generally United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by

definition, a violation of a juror's oath to apply the law as instructed by the court—in the

words of the standard oath to jurors in the federal courts, to render a true verdict according to

the law and the evidence.  We categorically reject the idea that, in a society committed to the

rule of law, jury nullification is desirable or that courts may permit it to occur when it is

within their authority to prevent.") (internal quotation marks and citation omitted; emphasis in

original).

       As with evidence related to the circumstances of the defendant's arrest,

evidence related to the government's decision not to inform the defendant he was under

investigation is irrelevant.  Such evidence does nothing to make a fact of consequence in the

case more or less true.  See Fed. R. Evid. 401.  Nor has the defendant suggested that the

government's decision not to inform him of the investigation was improper.  Defense counsel

even acknowledged that the government "often," but not always, informs a putative defendant

of an ongoing investigation.  (See 7/14/2016 Tr. 32.)  As with evidence of the circumstances

of the defendant's arrest, evidence about the government's decision not to contact the

defendant prior to his arrest would plainly be offered for the improper purpose of suggesting

to the jury that there is something unfair about the defendant's prosecution, an improper

purpose.  See, e.g., Stewart, 2004 WL 113506, at *1; Regan, 103 F.3d at 1082.

## VII.   THE COURT SHOULD PRECLUDE EVIDENCE OF IRRELEVANT DETAILS ABOUT THE DEFENDANT'S BACKGROUND

The defendant has alluded to his family circumstances and background in

filings in this case.  For example, the defendant's motion to sever his trial states that the

defendant "comes from a long line of attorneys going back at least three generations,

including his father and grandfather.  He is a family man, husband, and father of three young

children."  (Severance Br. at 4.)  The defendant should be precluded from introducing

evidence about such details at trial.

Evidence is admissible only if it is relevant.  See Fed. R. Evid. 401.  Moreover,

"[d]istrict courts have broad discretion to balance the probative value of evidence against

possible undue sympathy or bias as well as prejudice."  United States v. Miller, 641 F. Supp.

2d 161, 167 (E.D.N.Y. 2009).  Courts have broad discretion to exclude evidence if it has "an

undue tendency to suggest decision on an improper basis, commonly, though not necessarily,

an emotional one[.]"  Fed. R. Evid. 403, Adv. Comm. Notes.  Indeed, when evidence is of

limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses." Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Battaglia, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

Details about the defendant's family or about his non-legal background have no bearing on the issues in this case because they are not probative of whether the defendant conspired with Shkreli to defraud Retrophin.[15]  For example, that the defendant "comes from a long line of attorneys going back three generations" does not make it more or less likely that he helped Shkreli improperly control Retrophin's publicly-traded shares.  See Fed. R. Evid. 401.  Moreover, the clear purpose for introducing evidence at trial of these extraneous details would be to elicit sympathy for the defendant or distract from the facts at issue.  The risk of juror confusion and unfair prejudice is manifest because the jury would be asked to look past the defendant's conduct in this case.  This sort of emotional appeal to the jury's sympathy should be excluded under Rule 403.

---

[15] The government does not contest that otherwise admissible evidence about the defendant's legal education and practice experience may be relevant.

VIII.   THE COURT SHOULD PRECLUDE HEARSAY EVIDENCE OF ARBITRATIONS
        RELATING TO THE SHAM RETROPHIN CONSULTING AGREEMENTS

        The Court should preclude as inadmissible hearsay evidence of two separate

arbitrations regarding consulting agreements with Retrophin—one brought a defrauded

MSMB Healthcare investor ("Defrauded Investor SR") and the other brought by a former

Retrophin employee ("Defrauded Employee TK").  Alternatively, the Court should preclude

such evidence as irrelevant and unduly prejudicial.

        As set forth in the Superseding Indictment, after Shkreli dissolved MSMB

Capital and MSMB Healthcare and investors demanded the returns on their investments

reported to them by Shkreli, he and the defendant devised a scheme to misappropriate

Retrophin assets to repay some of Shkreli's defrauded investors.  One of the major

components of this scheme was the creation of a series of sham consulting agreements with

MSMB Capital and MSMB Healthcare investors (and one investor in a prior fund run by

Shkreli, Elea Capital), which caused Retrophin to reimburse those investors for their lost

investments in Shkreli's funds.  Notably, the defrauded investors who entered into these sham

consulting agreements did not perform any legitimate consulting services for Retrophin.

        The Superseding Indictment alleges a total of four sham consulting agreements

(SI at ¶ 32); Defrauded Investor SR's consulting agreement is one of those agreements.  In the

arbitration proceeding brought by Defrauded Investor SR, the arbitrator found that Retrophin

owed money to him pursuant to his consulting agreement.  As set forth more fully in the

government's opposition to Shkreli's Motion for Prompt Brady Disclosure (Dkt. No. 189 at

18-19), Defrauded Investor TK had done work related to Retrophin at Shkreli's direction, and

Shkreli had promised to personally provide him with Retrophin shares as compensation for

28

his work.  Shkreli and the defendant attempted to cause Retrophin to repay the obligations that Shkreli personally owed to Defrauded Employee TK via a consulting agreement with Retrophin, which was never finalized because Shkreli was removed as Retrophin CEO and the defendant was fired as outside counsel.  Defrauded Employee TK ultimately sued Retrophin and Shkreli to recover the money owed to him by Shkreli. The arbitrator determined that it was solely Shkreli's personal obligation to provide Retrophin shares to Defrauded Employee TK, and that Retrophin was not responsible for providing any shares to Defrauded Employee TK.  Notably, the Superseding Indictment does not include Defrauded Employee TK's draft consulting agreement as one of the four sham consulting agreements alleged in support of Count Seven.

The government has been advised by the defendant that he will seek to introduce evidence of the outcomes of the arbitrations brought by Defrauded Investor SR and Defrauded Employee TK.  Such evidence is, however, inadmissible hearsay pursuant to Rules 801 and 802 of the Federal Rules of Evidence.  Hearsay is a "statement that the declarant does not make while testifying at the current trial or hearing and a party offers in evidence to prove the truth of the matter asserted in the statement." FRE 801(c).  Courts have routinely precluded the introduction of arbitration findings as hearsay.  In Park W. Radiology v. Carecore, for example, the court noted that the "arbitrator will not be testifying at trial and [the proponent does] not seek to use the arbitration decision for any purpose other than to prove the substance and outcome of the arbitration, in other words, for the truth of the matter asserted."  675 F. Supp. 2d 314, 329-30 (S.D.N.Y. 2009).  Arbitration decisions are thus pure hearsay. Indeed, they are not "subject to admission as nonhearsay through an exception."  Id.

Courts have further determined that arbitration decisions should be precluded as irrelevant and unduly prejudicial under Rule 403. In <u>Carecore</u>, the court held that an arbitration decision should be precluded because it "could encourage the jury to make a decision [on guilt] based on the arbitration panel's findings, not on the jury's own deliberations." <u>Id.</u> In <u>Cary Oil Co. v. MG Ref. & Mktg., Inc.</u>, 257 F. Supp. 2d 768, 773-74 (S.D.N.Y. 2003), the court found that the introduction of an arbitration decision could "have a prejudicial effect on the jury's deliberations, creating an impression that an official decision-maker" has already made a finding on culpability. Indeed, the risk of prejudice was so great that the court precluded the introduction of testimony from the arbitration that "essentially serve[d] as a backdoor means to read the arbitration panel's hearsay and unduly prejudicial findings into the record of this case." <u>Id.</u>

In this case, the defendant's purpose in introducing evidence of the aforementioned arbitrations is transparent and strictly prohibited under the Federal Rules of Evidence and cases like <u>Carecore</u> and <u>Cary Oil</u>. With respect to the arbitration regarding Defrauded Investor SR, the government anticipates that the defendant will seek to admit evidence of the arbitration to argue that one of the sham consulting agreements alleged in the Superseding Indictment as fraudulent was in fact legitimate, as shown by the findings of a third-party factfinder. The government also anticipates that the defendant will seek to admit the result of Defrauded Employee TK's arbitration, even though Defrauded Employee TK's consulting agreement is not at issue here and the result of the arbitration actually disfavors the defendant (who assisted Shkreli in his attempt to provide a consulting agreement to an individual who was owed an obligation by Shkreli personally, and not by Retrophin), to argue generally that the sham consulting agreements alleged in the Superseding Indictment were not

fraudulent.  These arbitrators' findings, however, are pure hearsay and not subject to any exception to the rule against hearsay.[16]  And, as in <u>Carecore</u> and <u>Cary Oil</u>, the findings are also unduly prejudicial because the defendant will essentially ask the jury to abandon its independent review of the evidence and accept the findings of the arbitrators.  On these bases, evidence of both arbitrations should be precluded.

## IX.   THE DEFENDANT SHOULD PRODUCE THE DOCUMENTS HE INTENDS TO ADMIT DURING HIS CASE-IN-CHIEF

As of August 18, 2017, the government has been unable to identify any specific documents that have been provided to the government by the defendant pursuant to his own Rule 16 discovery obligations, which require the defendant to provide evidence he intends to use in his case-in-chief.  In addition, the defendant has not identified any documents he intends to admit during cross-examination of the government's witnesses.  Pursuant to Rule 16(b), the government respectfully requests the Court to order the defendant to provide in discovery any documents he intends to introduce during his case-in-chief, including during the cross-examination of any government witnesses, other than those already produced by the government.

_____

[16] The arbitration agreements in this case are not relevant to the defendant's knowledge or state of mind because they occurred after the charged frauds had occurred.  <u>Cf.</u> <u>United States v. Dupree</u>, 706 F.3d 131 (2d Cir. 2013) (evidence related to TRO was admissible in criminal trial to show its effect on the defendant at the time he committed the charged crimes); <u>United States v. Fisher</u>, 106 F.3d 622, 633-34 (5th Cir. 1997) (reversing decision not to introduce evidence of prior arbitrations because those arbitrations, which predated the charged criminal conduct, went to the heart of the defendants' belief at the time of the charged conduct").

A.      Background

In February 2017, defense counsel represented that the defense intended to introduce extensive evidence in support of its theory of the case, that Shkreli deceived the defendant into helping him commit fraud.  (See, e.g., Severance Br. at 10 ("Mr. Greebel will be offering into evidence numerous examples of admissible evidence of Mr. Shkreli's deception . . . ."); id. at 36 ("Mr. Greebel's defense will focus on admissible evidence involving Mr. Shkreli's lies, deception, and pattern of blaming others for his own misdeeds . . . .").)

In April 2017, defense counsel explained to this Court:

> And Your Honor asked for examples in which we will prove the case that Mr. Shkreli's a liar that the government doesn't know about, and I will give you an example of that.  And it's just one of many examples. Because the government never spoke to Mr. Greebel before they indicted Mr. Shkreli and Mr. Greebel. And had they done that, maybe they'd have this information. But the information of Mr. Shkreli's lies and his deceptions, for a large part of it, lie in our possession here and not in the government's possession, and we are going to show it.

 (Id. Tr. 52 (emphasis added).)  Despite that statement, defense counsel also explained:

> Defendant always has reciprocal discovery obligations, if they intend to call witnesses affirmatively in their defense, and they have documents in their possession, they should affirmatively show them. Right now we have not -- and we're not sitting on documents, and the defense does not have an obligation to disclose to the government what's in Mr. Greebel's head and the information he has.

(4/7/2017 Tr. 56-57 (emphasis added).)  Since the time of that court appearance, the government understands that the defense has served multiple Rule 17 subpoenas, worked with 10 expert witnesses to develop their testimony, and continued to review the voluminous discovery produced by the government.

On August 11, 2017, the defendant provided the government with a witness list that identifies 354 fact witnesses and 10 expert witnesses.  The defendant also provided the government with a hard drive that contained approximately 100,000 pages of documents, many of which appear to have Bates stamps that indicate that they were initially produced to the defendant by the government.  However, the defendant provided the government with no exhibit list or description of the contents of the hard drive that could be used to identify whether there were any documents on that hard drive that were being produced to the government by the defendant for the first time, much less the source of those documents.[17]

On August 16, 2017, the government asked the defendant whether the drive contained any documents that the defendant was producing to the government for the first time, and reiterated an earlier written request for an exhibit list.  In response, defense counsel stated that there were such documents on the drive, but that those documents may be merely "duplicates" of documents already produced by the government; defense counsel further stated that they would circle back to the government regarding an exhibit list or any additional information about the documents on the drive.  On August 17, 2017, defense counsel informed the government that they would begin the process of identifying the documents provided on August 11 that had not previously been produced by the government at some point after motions in limine were filed.  The government appreciates defense counsel's willingness to identify those documents but submits this motion now both to avoid waiving

---

[17] Without such information, the government is unable to evaluate whether it will have any objections to the admissibility of any such documents, including to authenticity.

the issue and because the motion seeks more than just the identification promised by defense counsel.

    B.    <u>Applicable Law</u>

        Rule 16(b) governs the defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A); <u>see</u> 4/7/2017 Tr. 56-57 ("Defendant always has reciprocal discovery obligations, if they intend to call witnesses affirmatively in their defense, and they have documents in their possession, they should affirmatively show them.").

        Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit in evidence a document during the cross-examination of a witness during the government's case-in-chief to affirmatively support the defendant's theory of the case, such a document does fall within the ambit of Rule 16.  As explained in <u>United States v. Hsia</u>, No.  98 CR 0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Blacks Law Dictionary 207 (7th ed. 1999).  Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense … The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

<u>Id.</u>  The <u>Hsia</u> court distinguished documents introduced via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the

defendant's] theory of the case, it is not part of [the defendant's] case-in-chief." Id. at *2 n.1. Numerous other district courts have recognized this same distinction. See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes."); United States v. Holden, No. 13 CR 00444, 2015 WL 1514569, at *4 (D. Or. Mar 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose nonimpeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 2:12 CR 319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (approach adopted in Holden, Swenson and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15 CR 00568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same); United States v. Huntress, No. 13 CV 199S, 2015 WL 631976, at *33 (W.D.N.Y. Feb. 13, 2015) (observing that "it is not clear that defendants' case-in-chief would be limited to any case they may present after the government rests").

The Hsia court also observed that a defendant does not "satisfy her obligations under the Rule merely by providing the government with the thousands of pages of discovery she received from the government and stating that the documents upon which she intends to rely are found somewhere therein. Although the Rule does not specifically say that the parties must identify the specific documents upon which they may rely at trial, its purpose is to avoid surprise and gamesmanship; 'it definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial.'" Hsia, 2000 WL 195067, at *1.

C.     <u>Argument</u>

The government is surprised that the defendant has still not identified a single document he "intends to use" during his case-in-chief that was not produced to him by the government, given defense counsel's prior representation that "a large part" of the information critical to the defense "lie[s] in our possession here and not in the government's possession."  This is particularly true given the vast number of witnesses the defendant is considering calling.  The government understands that trial strategies develop over time and that additional events, such as disclosure of 3500 material and Rule 16 discovery, may alter a defendant's strategy or present plans.  But those considerations do not allow a defendant to avoid complying with either the spirit or the letter of Rule 16.

Accordingly, the government respectfully requests that the defendant be ordered to produce any additional documents the defendant intends to use in his case-in-chief—whether the defendant intends to use that evidence after the government rests or during cross-examination of government witnesses.

X.     <u>THE COURT SHOULD PRECLUDE DEFENSE COUNSEL FROM TAKING TWO LIMITED ACTIONS RELATED TO THEIR PRIOR ROLES AS ASSISTANT UNITED STATES ATTORNEYS</u>

The government moves to preclude defense counsel from taking two specific actions related to the status of certain defense attorneys as former Assistant United States Attorneys in the Eastern District of New York ("EDNY") and the Southern District of New York ("SDNY").  First, the government respectfully submits that, where applicable, each attorney for the defense should be precluded from referring to himself or herself in front of the jury as a "former federal prosecutor."  Second, the government moves to preclude Reed Brodsky, a former Assistant United States Attorney ("AUSA") in the SDNY, from cross-

examining a one specific government witness ("Fearnow Share Recipient TP") with whom Mr. Brodsky interacted in the context of a case Mr. Brodsky was prosecuting in the SDNY.[18]

A.   "Former Federal Prosecutor"

Several attorneys for the defendant served as Assistant United States Attorneys before entering private practice.  The government respectfully requests that this Court preclude those attorneys from referring to their prior roles in front of the jury.

First, a defense counsel reference to being a "former federal prosecutor" would be improper because it could suggest to the jury that an argument or question should be given greater weight simply because of defense counsel's background.  Cf. United States v. Newton, 369 F.3d 659, 681 (2d Cir. 2004) (prosecutor's vouching for the credibility of a witness is improper in part because it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence").  But a defense argument is not entitled to more or less weight because of the resume of the attorney making the argument.  Precluding references to being a "former federal prosecutor" eliminates this risk.

Second, references by defense counsel to being a "former federal prosecutor" may improperly suggest to the jury that the government's conduct in the investigation or prosecution of this case was improper.  As described in the government's motion to preclude evidence related to the circumstances of the defendant's arrest, the government's investigation

---

[18] The government and defense counsel have met and conferred about these issues.  Defense counsel did not agree to refrain from references to being "former federal prosecutors." Similarly, defense counsel did not commit that a defense attorney other than Mr. Brodsky would cross-examine Witness TP.

and prosecution of this case is not on trial and is not before the jury.  See supra Section VI.

Accordingly, any attempt by defense counsel to cast doubt on the government's investigation

and prosecution of the defendant by implying that defense counsel, as "former federal

prosecutors," would not have made the same investigative or charging decisions when they

themselves were prosecutors is entirely inappropriate.

      Finally, on the other side of the scale, there is no legitimate reason for defense

counsel to refer to their prior roles as AUSAs.  Where there is no prejudice to the defendant in

precluding such references and significant potential prejudice in allowing such references, the

references should be precluded.

    B.     Cross-Examination of Witness TP

      As reflected in testimony during the Shkreli trial, Fearnow Share Recipient TP

was subpoenaed to be a witness in a case in the SDNY in which Mr. Brodsky was part of the

prosecution team.  (Tr. 4210-12).  Fearnow Share Recipient TP met with the prosecution team

on a number of occasions and, shortly before his anticipated testimony, was provided with

and asked to sign a non-prosecution agreement ("NPA"), which Fearnow Share Recipient TP

had not requested and which protected him from prosecution related to a securities transaction

in which he had engaged.  Id.  The government respectfully submits that, given his prior

interaction with Fearnow Share Recipient TP and the likelihood that the defense cross-

examination of Fearnow Share Recipient TP will involve questions about the securities

transaction that is the subject of the NPA, Mr. Brodsky should be precluded from cross-examining Fearnow Share Recipient TP in the defendant's trial.[19]

Although the government is not aware of any specific information to which Mr. Brodsky had access in his role as prosecutor that he would use to his advantage in cross-examining Fearnow Share Recipient TP, his involvement in the cross-examination would inevitably bring with it the appearance of impropriety.  See United States v. Abramoff, 55 F. Supp. 3d 84, 88 (D.D.C. 2014) ("the revolving door rule is designed to address at least a reasonable possibility that some specifically identifiable impropriety would occur ... if specific information (as distinguished from general agency expertise or contacts) that a former government attorney may have had access to in one matter is likely to be useful in a subsequent matter . . . ."); see generally N.Y. Rule of Professional Responsibility 1.9 ("Duties to Former Clients").  Indeed, the government is not aware of any instance in which a former AUSA from the SDNY or EDNY, now acting as a defense attorney, cross-examined a witness who had been involved in a prosecution overseen by that AUSA.  This trial, whose outcome is important both to the defendant and to the government, should be conducted free of such apparent impropriety.

Moreover, as one of the prosecutors in the SDNY, Mr. Brodsky has significant familiarity with the underlying prosecution and with Fearnow Share Recipient TP's involvement in the case and his role as a testifying witness.  Accordingly, Mr. Brodsky could act as an unsworn witness because he has "first-hand knowledge of the events presented at

---

[19] The government does not seek to disqualify Mr. Brodsky from this case more broadly or to prevent any other defense attorney from cross-examining Fearnow Share Recipient TP.

trial." United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993).   This role could give the defendant "an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." Id.  This scenario is not remote.  In the event Fearnow Share Recipient TP testifies regarding his involvement or testimony in the SDNY prosecution, as he did in the Shkreli trial, and his testimony differs from Mr. Brodsky's recollection or understanding, Mr. Brodsky could cross-examine Fearnow Share Recipient TP on his testimony in a way that "subtly imparts" to the jury that Fearnow Share Recipient TP is not testifying accurately. This concern is particularly acute in the event that defense counsel is permitted to reference their past experience as AUSAs.

Finally, defense counsel has informed the government that they do not believe Mr. Brodsky is the only defense attorney capable of or qualified to cross-examine Witness TP.  As a result, there is no apparent prejudice from having another defense attorney conduct the cross-examination.

For the foregoing reasons, the government respectfully requests that Mr. Brodsky be precluded from cross-examining Fearnow Share Recipient TP.

XI.   THE COURT SHOULD PRECLUDE CERTAIN TESTIMONY NOTICED BY THE DEFENDANT AS EXPERT TESTIMONY

On August 11, 2017, the defendant noticed 10 expert witnesses whose testimony is intended to address a variety of topics, including "Mr. Shkreli's and Mr. Greebel's individual linguistic habits," the "general custom and practices of the FBI in conducting a thorough and complete investigation," and a "scientific identification and

40

analysis of consulting agreements disclosed publicly through SEC filings."  (Def.'s Expert

Disclosures, Dkt. No. 312-2 ("Def.'s Disclosures").)

       The parties have been concurring in good faith and expect to advance a briefing

schedule to the Court to address challenges raised pursuant to <u>Daubert</u>, but have agreed that

other challenges to the admissibility of the proffered expert testimony be resolved on the

previously-established briefing schedule.  As a result, the government moves to preclude

some of the defendant's proposed expert testimony pursuant to Rules 401 and 403, and

because certain of the proffered testimony is not in fact appropriate expert testimony.[20]

A.    <u>Applicable Law</u>

       Federal Rule of Evidence 702 provides the requirements for expert testimony:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence
> or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and
> methods; and
> (d) the expert has reliably applied the principles and methods to
> the facts of the case.

---

[20] The government does not at this point seek to preclude the testimony of one proffered
defense expert, Stephen Gillers, but reserves the right to do so closer to trial as the contours of
Professor Gillers' testimony becomes more clear.  More generally, counsel for the defense has
offered to provide supplementary disclosures to the government about the testimony of
proffered defense experts.  The government appreciates the offer from defense counsel and
intends to continue discussing with counsel the proffered testimony, just as the government
intends to provide supplementary disclosures on its disclosed experts.  The government
reserves the right to amend and/or supplement this motion to preclude testimony pursuant to
Rules 401 and 403, or as testimony not appropriate for an expert, if additional discussions
with defense counsel reveal additional grounds for preclusion.

The proponent of expert testimony "has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

It is up to the district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). Daubert "enumerated a list of additional factors bearing on reliability that district courts may consider: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." Williams, 506 F.3d at 160.

Expert testimony also is subject to Rule 403, and should be excluded where it is unduly "prejudicial, confusing, and misleading to the jury within the meaning of Rule 403." Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005).

1.   Argument

a.   Joseph P. Dooley

The defense offers Mr. Dooley for two purposes: (1) to testify, "as Special Agent Braconi testified during the" Shkreli trial, "with summary charts of certain evidence admitted in this case"; and (2) to opine about the general custom and practice of FBI investigations, and specifically that "prior to determining whether to arrest an individual, if there is no flight risk or risk of destruction of evidence, the FBI will speak with the subjects of

the investigation and will seek to subpoena the entities where the subjects worked during the relevant period of investigation."  Both areas of testimony should be precluded.

First, "expert" testimony is neither necessary nor the proper basis for submitting "summary charts."  Indeed, FBI Special Agent Braconi did not testify as an expert in the Shkreli trial.  If Mr. Dooley is being offered merely to introduce summary charts, as stated in the expert disclosure, then he need not be qualified as an expert.  Indeed, he should not be qualified as an expert lest that qualifying process give the jury the misimpression that he is doing anything other than summarizing evidence.

Second, as discussed in the government's motion to preclude evidence about the circumstances of the defendant's arrest, the FBI's conduct in this case is irrelevant.  (See supra Section VI.)  As a result, Mr. Dooley's proffered testimony about the general custom and practice of FBI investigations also is irrelevant and would not help the trier of fact "determine a fact in issue."  Daubert, 509 U.S. at 589.

> b.  Stephen C. Ferruolo

The defendant intends to call Dean Ferruolo to opine about various topics related to "the customs and practices of outside counsel advising startup and small public companies" as well as about "the customs and practices of the business and management of major law firms."  (Def.'s Disclosures at 1-2.)  This proffered testimony appears to be irrelevant.  For example, this case does not involve a charge of negligence or malpractice, in which some deviation from a standard of care or common practice might be relevant.  Instead, the central issue in this case is the existence and extent of an agreement between the defendant and his co-conspirators.  The government will renew this motion after further discussions with defense counsel about the specific nature of Dean Ferruolo's testimony.

c.      Bryan A. Garner

The defense intends to call Mr. Garner to testify about his "linguistic analysis of written communications between Mr. Shkreli and other participants" in the Superseding Indictment, including that "Mr. Shkreli's and Mr. Greebel's individual linguistic habits affect the meaning of communications between them; that the meaning of Mr. Shkreli's and Mr. Greebel's communications is also impacted by reading them in their proper context; and that his analysis of Mr. Greebel's written communications as a corporate attorney must be read from the context of outside counsel terminology." (Def.'s Disclosures at 2.)

As an initial matter, to be admissible, expert testimony must not only be on a relevant subject, and sufficiently connected to the particular facts of the case; it must also be appropriate as expert testimony.  The Federal Rules of Evidence preclude a party from "admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."  United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994); see also United States v. Nouri, 711 F.3d 129, 145 (2d Cir. 2013) (district court was "well within its discretion" to preclude testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); United States v. Collins, 581 F. App'x 59, 60 (2d Cir. 2014) (affirming preclusion of testimony by lawyers on the materiality of an agreement and "the work of transactional lawyers" generally, where "fact witnesses" covered the same ground).  Here, it is not "beyond the ken of the average juror" to understand non-technical email communications between the defendant and Shkreli regarding the two charged schemes. On the contrary, the communications speak for themselves.  Consequently, the proposed testimony of Mr. Garner is not appropriate expert testimony.

In addition, Mr. Garner's proposed testimony should be precluded as an irrelevant and improper effort to have Mr. Garner opine about the defendant's state of mind during his communications with Mr. Shkreli. The jury does not need Mr. Garner to tell it what Mr. Greebel meant when he wrote an email—the jury will have the email itself to review and, if he so desires, Mr. Greebel's testimony about the email as well. Moreover, in a criminal case, an expert witness may not "opine about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." See Fed. R. Evid. 704(b). But Mr. Garner's testimony here is plainly an effort to have Mr. Garner opine about whether the defendant's communications reflect an agreement to participate in a conspiracy.

### d. Alan Johnson

The defendant intends to offer Mr. Johnson's testimony about the "customs and practices surrounding the use of consulting agreements in private and public companies," as well as about Mr. Johnson's purported "scientific analysis" of publicly filed consulting agreements that shows that the consulting agreements "at issue in Count [Seven of the Superseding Indictment]" have "multiple similarities to consulting agreements entered into by a variety of companies." (Def.'s Disclosures at 2-3.)

This testimony should be excluded because it is irrelevant. There is no dispute in this case that the consulting agreements prepared by the defendant in order to help Shkreli use Retrophin funds to repay defrauded MSMB investors appear on their face to be legitimate consulting agreements. The issue here is whether the defendant and Shkreli agreed to use those consulting agreements for an improper purpose, stealing money from Retrophin to repay Shkreli's personal debts. As a result, no amount of comparison between the Count Seven

consulting agreements and consulting agreements filed by other companies in other contexts

makes the existence of that improper agreement more or less likely.  See Fed. R. Evid. 401.

Consider an analogy: a fraudulent check, signed by a fraudster in order to steal money from

the bank account of a victim, appears on its face to be completely legitimate.  As a result,

expert testimony that the check had all the features and appearances of numerous other checks

used by numerous other individuals in numerous other transactions would say nothing of

relevance in the check fraud case.

Similarly, opinions such "companies entering into consulting agreements often

expect to obtain minimal to no work from their consultants," even if true, are irrelevant.

(Def.'s Disclosures at 3.)  The issue in this case is what the defendant and Shkreli believed to

be the purpose of the consulting agreements entered into in this case.  If the purpose was to

defraud Retrophin, then Mr. Minkoff's testimony will not prove otherwise.  If the purpose

was legitimate, then Mr. Minkoff's testimony is unnecessary.  Either way, Mr. Minkoff's

testimony does not move the needle on a fact of consequence in the case.

e.      Gayle Klein

The defense intends to call Ms. Klein to testify that various actions taken by

Shkreli with respect to MSMB Capital and MSMB Healthcare "gave rise to colorable claims

against Retrophin, its officers and directors under various theories of New York and Delaware

law, including but not limited to, tortious interference, fraud-related, and breach of fiduciary

duty-related claims."  (Def.'s Disclosures at 3.)  This proposed testimony should be precluded

as both irrelevant and because it will lead to undue delay and jury confusion.

First, the fact that investors in MSMB Capital and MSMB Healthcare might,

hypothetically, have had a claim against Retrophin is irrelevant because there is no evidence

that the defendant himself considered that possibility (as opposed to the possibility that the investors might have had a claim against MSMB Capital, MSMB Healthcare or Shkreli in his personal capacity) in preparing settlement and consulting agreements at the behest of Shkreli.

Second, even if Ms. Klein's proposed testimony had marginal relevance, any relevance would be far outweighed by the risk of delay and juror confusion. Ms. Klein's proposed testimony would require the jury to hear direct and cross-examination about numerous laws they will not need to consider in deliberating (various tort, contract, and corporate legal frameworks in two different states), as well as the application of those laws to facts about Shkreli's actions that are not the focus of this case. In other words, this testimony would create a sideshow trial in which defense counsel will, as it promised to do in its severance motion, attempt to "prosecute" Shkreli for actions not charged in this case. <u>See, e.g.</u>, Severance Br. at 11 ("[W]e intend to, in effect, prosecute Mr. Shkreli at trial for committing these acts of deception.").

     f.    <u>Craig Lewis</u>

The defense intends to offer Professor Lewis to testify about "his review and analysis of trading in Retrophin common stock between in or about November 2012 through in or about September 2014" and to opine that such "trading activity, in the aggregate, would be expected to put downward pressure on the price of Retrophin common stock; and that the trading behavior of those shareholders is inconsistent with an agreement . . . to control the price of or the volume of trading in Retrophin stock." (Def's Disclosures at 3.)

This testimony should be precluded because it is irrelevant. The defendant is not charged with securities fraud related to the price or trading of Retrophin stock—he is charged with <u>conspiracy to commit</u> securities fraud, specifically to control the price and

trading of Retrophin stock, including propping up the price of Retrophin stock.  Therefore, even assuming that Prof. Lewis's analysis were correct, it is at best evidence that the conspiracy was unsuccessful.  But whether a conspiracy ultimately succeeded is not an element of the charge of conspiracy.  Put another way, whether the trading patterns of the co-conspirators had the effect of lowering the price of Retrophin stock does not make it more or less likely that the conspiracy existed.

g.   Ronald Minkoff

The defense intends to offer Mr. Minkoff to testify about "industry customs and practices governing the preparation of settlement agreements in the context of actual or threatened litigation" and that a lawyer who failed to prepare a settlement agreement or "obtain broad releases" in such an agreement "potentially would be exposed to malpractice liability."  (Def.'s Disclosures at 3-4.)  This proffered testimony should be excluded both because it is irrelevant and because it would lead to juror confusion.

First, this testimony is irrelevant.  The defendant is not charged with preparing faulty settlement agreements, or with refusing to prepare such agreements, and there is no dispute that "it is typical and reasonable for a lawyer to prepare" settlement agreements at his or her client's direction.  The issue in this case is whether the defendant agreed to help Shkreli to defraud Retrophin of funds, in part through the use of settlement agreements, in order to repay debts incurred by Shkreli personally.  Nothing in Mr. Minkoff's proffered testimony addresses that issue.

Second, testimony about the defendant's potential exposure to malpractice liability could mislead the jury into believing that the defendant cannot be found guilty of the charged crimes because he was compelled to assist Shkreli out of fear of committing

48

malpractice.  See Fed. R. Evid. 403.  But no attorney commits malpractice by refusing to help his client to commit a crime, and suggesting anything else to the jury would create improper and unwarranted uncertainty about the applicable law.

        h.      Lori Smith

The defense intends to offer Professor Smith to testify about the "customs and practices of an independent auditor of a small public company."  (Def.'s Disclosures at 4.) This testimony should be precluded as irrelevant and will lead to jury distraction.

This trial is not about accounting fraud, and Retrophin's auditors are not on trial.  Nor has the defendant ever indicated that he will employ a "reliance on auditors" defense.  Moreover, the auditors who reviewed Retrophin's books and were involved in the preparation of SEC filings are available to testify at the trial to explain their own actions and whether those actions were consistent with their standard practices.  Professor Smith's testimony would add nothing of relevance to such testimony, and it could serve to distract the jury from the defendant's actions by creating a sideshow trial about whether the auditors' actions were appropriate.

Moreover, Professor Smith's proffered opinion that "the financial reporting of early-stage or small public companies often contain more errors or discrepancies than those of more mature or larger companies due to a lack of personnel, expertise, and/or internal controls over such financial reporting" appears to be an opinion not about "the customs and practices of an independent auditor of a small public company" but rather an opinion about the customs and practices of small public companies themselves, a subject in which Professor Smith does not appear to be offered as an expert.

CONCLUSION

      For the foregoing reasons, the government respectfully submits that the foregoing motions should be granted.


Dated:  Brooklyn, New York
       August 18, 2017


              Respectfully submitted,

              BRIDGET M. ROHDE
              Acting United States Attorney
              Eastern District of New York

By:     /s/_____
              Alixandra E. Smith
              David C. Pitluck
              David K. Kessler
              Assistant U.S. Attorneys
              (718) 254-7000


cc:   Clerk of the Court (KAM)
       Defense Counsel (By ECF and Email)