# EXHIBIT E

**EXHIBIT D**

RETROPHIN, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

**Dated as of March 31, 2011**

BOS111 12566709.10

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE 7    DESIGNATION, RIGHTS, AUTHORITIES, POWERS,
             RESPONSIBILITIES AND DUTIES OF THE MANAGERS......... 23

7.1    Authority of Managers.......................................................................... 23

7.2    Officers; Agents .................................................................................. 24

7.3    Appointment of Managers ................................................................... 25

7.4    Resignation and Removal .................................................................... 25

7.5    Manager Meetings............................................................................... 25

7.6    Actions by Managers ........................................................................... 26

ARTICLE 8    BOOKS, RECORDS, TAX MATTERS, ETC................................ 26

8.1    Books and Records.............................................................................. 26

8.2    Delivery to Member; Inspection; etc................................................... 26

8.3    Fiscal Year; Financial Statements ....................................................... 26

8.4    Non-Disclosure.................................................................................... 27

8.5    Tax Returns; Filings ............................................................................ 27

8.6    Tax Matters Member ........................................................................... 27

8.7    Indemnity of Tax Matters Member ...................................................... 27

ARTICLE 9    TRANSFER OF INTERESTS ......................................... 27

9.1    Transfer Requirements......................................................................... 27

9.2    Effect of Prohibited Transfers ............................................................. 29

9.3    Right of First Refusal........................................................................... 29

9.4    Admission and Withdrawal; No Dissolution ......................................... 30

9.5    Amendment of Exhibit 3.1.................................................................... 30

ARTICLE 10   DISSOLUTION OF COMPANY....................................... 30

10.1   Termination of Membership ................................................................. 30

10.2   Events of Dissolution........................................................................... 30

10.3   Liquidation; Distributions Upon Liquidation.......................................... 30

10.4   No Further Claim.................................................................................. 31

ARTICLE 11   INDEMNIFICATION; FIDUCIARY DUTIES.............................. 31

11.1   General................................................................................................ 31

11.2   Exculpation ......................................................................................... 32

BOS111 12566709.10

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **ARTICLE 1** | DEFINITIONS .................................................................................... 1 | |
| **ARTICLE 2** | FORMATION AND PURPOSE ............................................................ 7 | |
| 2.1 | Formation ........................................................................................... 7 | |
| 2.2 | Name ................................................................................................... 7 | |
| 2.3 | Registered Office/Agent .................................................................... 7 | |
| 2.4 | Term .................................................................................................... 7 | |
| 2.5 | Purpose ................................................................................................ 7 | |
| 2.6 | Certificate ........................................................................................... 8 | |
| 2.7 | Principal Office .................................................................................. 8 | |
| **ARTICLE 3** | MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS ......... 8 | |
| 3.1 | Members ............................................................................................. 8 | |
| 3.2 | Units ................................................................................................... 8 | |
| 3.3 | Additional Members and Units .......................................................... 9 | |
| 3.4 | Vesting, Forfeiture and Repurchase of Incentive Units Held by Incentive Members ............................................................................ 9 | |
| 3.5 | Capital Contributions ....................................................................... 12 | |
| **ARTICLE 4** | CAPITAL ACCOUNTS ................................................................... 12 | |
| 4.1 | Capital Accounts .............................................................................. 12 | |
| **ARTICLE 5** | ALLOCATIONS OF PROFIT AND LOSS; DISTRIBUTIONS ..... 14 | |
| 5.1 | Allocation of Net Profits and Net Losses ........................................ 14 | |
| 5.2 | Distributions ..................................................................................... 18 | |
| **ARTICLE 6** | STATUS, RIGHTS AND POWERS OF MEMBERS ..................... 20 | |
| 6.1 | Limited Liability .............................................................................. 20 | |
| 6.2 | Return of Distributions of Capital ................................................... 21 | |
| 6.3 | No Management or Control ............................................................... 21 | |
| 6.4 | Specific Limitations ......................................................................... 21 | |
| 6.5 | No Automatic Termination on Bankruptcy ...................................... 22 | |
| 6.6 | Member Meetings ............................................................................. 22 | |
| 6.7 | Actions by Members ......................................................................... 23 | |
| 6.8 | Rights of Holders of Economic Interest .......................................... 23 | |

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 11.3 | Persons Entitled to Indemnity | 32 |
| 11.4 | Procedure Agreements | 32 |
| 11.5 | Fiduciary and Other Duties | 32 |
| ARTICLE 12 | AMENDMENTS | 33 |
| 12.1 | Amendments to this Agreement | 33 |
| 12.2 | Corresponding Amendment of Certificate | 33 |
| 12.3 | Binding Effect | 33 |
| ARTICLE 13 | GENERAL | 33 |
| 13.1 | Successors; Delaware Law; Etc | 33 |
| 13.2 | Notices, Etc | 34 |
| 13.3 | Execution of Documents | 34 |
| 13.4 | Disputed Matters | 35 |
| 13.5 | Severability | 35 |
| 13.6 | Table of Contents; Headings | 35 |
| 13.7 | No Third Party Rights | 35 |

BOS111 12566709.10

## RETROPHIN, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement of Retrophin, LLC (the "Company"), dated as of March 31, 2011, is made by and among the Members (as defined below).

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act on March 11, 2011 by the filing of Certificate with the Secretary of State of the State of Delaware; and

WHEREAS, the Members wish to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the allocation of profits and losses among the Members, the respective rights and obligations of the Members to each other and to the Company, and certain other matters;

NOW, THEREFORE, the Members hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement (a) certain capitalized terms have specifically defined meanings which are either set forth or referred to below in this Article 1, (b) references to "Articles", "Exhibits" and "Sections" are to Articles, Exhibits and Sections of this Agreement unless explicitly indicated otherwise, (c) references to statutes include all rules and regulations thereunder, and all amendments and successors thereto from time to time, (d) accounting terms not otherwise defined herein have the meaning provided under generally accepted accounting principles in the United States and (e) the word "including" shall be construed as "including without limitation".

"Act" means the Delaware Limited Liability Company Act.

"Adjusted Capital Account" for a Member means such Member's Capital Account reduced by the net adjustments, allocations and distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) which, as of the end of the Company's taxable year are reasonably expected to be made to such Member, and increased by the sum of the amounts a Member is deemed obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or is deemed obligated to restore pursuant to the penultimate sentence of Treasury Regulation Section 1.704-2(g)(1) and the penultimate sentence of Treasury Regulation Section 1.704-2(i)(5). This definition of "Adjusted Capital Account" is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted EBITDA" means, with respect to any fiscal period (or portion thereof), the EBITDA of the Company for such fiscal period, reduced by any interest, taxes and

capitalized costs of the Company for such fiscal period, as determined by the Managers for book purposes.

"Affiliate" means with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Liability Company Agreement of the Company, as amended, restated or modified from time to time.

"Book Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

        (i)    the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the contributing Member and the Board;

        (ii)    for purposes of "booking up" the Capital Accounts of Members to reflect increases in the value of the Company upon certain occasions, the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or as consideration for services performed on behalf of the Company; (b) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-l(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (a) and clause (b) of this sentence shall be made only if the Board reasonably determines such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

        (iii)    the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined in good faith by the Board.

If the Book Value of an asset has been determined or adjusted pursuant to paragraph (i) or paragraph (ii) above, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Board" or "Board of Managers" is defined in Section 7.1.

"Capital Account" means, as to each Member, the Capital Account maintained on the books of the Company for such Member in accordance with Section 4.1.

"Capital Contribution" means with respect to any Member, the sum of (a) the amount of money plus (b) the fair market value of any other property (net of liabilities assumed or to which the property is subject) contributed to the Company with respect to the Interests held by such Member pursuant to this Agreement.

"Cause" shall mean, with respect to an Incentive Member who is providing services to the Company, one or more of the following:

(a) such Member fails to perform diligently and competently (at a level of quality reasonably expected by the Board of Managers) his or her substantive duties to the Company following written notice from the Company specifying such failure and a reasonable opportunity (not to exceed 30 days) to cure such failure;

(b) such Member commits any fraud, embezzlement or other act of dishonesty or moral turpitude against the Company or any of its equity holders or clients or shall attempt to profit from any transaction in which he or she has an undisclosed interest adverse to the Company or any of its equity holders or clients;

(c) any act or omission by such Member that, in the Company's reasonable judgment, is an act or omission of moral turpitude or has had or is having or is likely to have a material adverse impact on the Company's business interests or reputation; or

(d) such Member is convicted of, or pleads guilty to or admits to sufficient facts concerning any allegation of, fraud, embezzlement, theft, or other felony.

"Certificate" means the Certificate of Formation of Retrophin, LLC and any amendments thereto and restatements thereof filed on its behalf with the Delaware Secretary of State pursuant to the Act.

"Class A Common Unit" means a Unit with ten (10) votes per each Unit outstanding.

"Class B Common Unit" means an Incentive Unit or an Investment Unit, each with one (1) vote per each Unit outstanding.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means the limited liability company formed by the filing of the Certificate in accordance with the Act.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year; provided, however, that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction with

respect to such asset for such Fiscal Year bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year is zero, "Depreciation" shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board.

"Disability" shall have the meaning set forth in any policy of disability buy-out insurance purchased by the Company, if any, and, in the absence of such insurance, shall mean an Incentive Member's physical or mental disablement, as determined by any independent qualified physician mutually acceptable to the Company and such Incentive Member (or his or her personal representative) or, if the Company and such Incentive Member (or his or her personal representative) are unable to agree on an independent qualified physician, as determined by a panel of three physicians, one designated by the Company, one designated by such Incentive Member (or his or her personal representative) and one designated by the two physicians so designated, pursuant to which such Incentive Member is and has been continuously for at least six (6) months unable to perform the substantial and material duties of his or her employment with the Company.

"Distribution Threshold Amount" means with respect to each grant of Incentive Units the aggregate amount of distributions to be paid to Members with respect to all Units outstanding immediately prior to the grant of such Incentive Units before any distributions (other than Tax Distributions) may be made with respect to such Incentive Units.

"EBITDA" means, for any period, (a) the net income of the Company for such period, plus (b) to the extent deducted in calculating net income, the sum of the following (calculated without duplication): (i) income taxes during such period, (ii) interest expense during such period, (iii) depreciation, amortization and other non-cash charges for such period, (iv) extraordinary losses for such period, and (iv) nonrecurring, one-time employee termination and severance costs incurred and paid by the Company, minus (c) to the extent such items were added in calculating net income (i) extraordinary gains during such period, (ii) proceeds received during such period in respect of casualty events, (iii) non-cash income for such period and (iv) interest income for such period.

"Fair Unit Value" is defined in Section 3.4.8.

"Fiscal Year" means the fiscal year of the Company, which shall be the calendar year, or such other fiscal year as determined by the Managers.

"Indemnified Persons" is defined in Section 11.1.

"Interest" means all legal and beneficial ownership interests in, and rights and duties as a Member of, the Company, including, without limitation, the right to share in Net Profits and Net Losses, the right to receive distributions of cash and other property from the Company, the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from the Company, and, to the extent entitled under this Agreement, the right to vote on any matters that the Members are entitled to

under this Agreement. For the avoidance of doubt, a Member's Interest includes the Units owned by such Member.

"Incentive Members" means Members who hold Incentive Units.

"Incentive Units" shall mean those Class B Common Units that are issued by the Company for services and identified as Incentive Units in Exhibit 3.1.

"Investment Units" shall mean those Class B Common Units that are issued by the Company for contribution of cash or other assets and identified as Investment Units in Exhibit 3.1.

"Majority Vote" shall mean an affirmative vote consisting of, in the aggregate, over 50% of all votes entitled to be cast by the holders of Units on a particular matter, taking into account all the votes entitled to be cast by the holders of Class A Common Units.

"Manager" or "Managers" means the manager or the managers of the Company identified or appointed as provided in Section 7.3.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a liability owed to or guaranteed by a Member within the meaning and intent of Treasury Regulation Section 1.704-2(i).

"Members" means the individuals listed as Members in Exhibit 3.1 and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member.

"Minimum Gain" means such amount as determined in accordance with the provisions of Treasury Regulation Section 1.704-2(d).

"Net Profits" and "Net Losses" mean the taxable income or loss, as the case may be, for a period as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be separately stated pursuant to Code Section 703(a) (1) shall be included in taxable income or loss) computed with the following adjustments:

     (i)     To the extent required by Treasury Regulation Section 1.704-1(b) (2), items of gain, loss, and deduction shall be computed based upon the Book Values of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes (if different);

     (ii)     Any tax-exempt income received by the Company shall be included as an item of gross income;

(iii)     The amount of any adjustments to the adjusted bases (or Book Values if clause (i) above applies) of any assets of the Company pursuant to Code Section 743 shall not be taken into account; and

(iv)     Any expenditure of the Company described or treated as being described in Code Section 705(a)(2)(B) shall be treated as a deductible expense.

(v)     Upon adjustment of the Book Value of Company property pursuant to clauses (ii) and (iii) in the definition of Book Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property

Any items which are specially allocated pursuant to Section 5.1.4 hereof shall not be taken into account in computing Net Profits or Net Losses. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.1.4 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (iv) of this definition.

"Nonrecourse Deduction" means such amount as determined in accordance with the provisions of Treasury Regulation Section 1.704-2(b)(1).

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, unincorporated entity of any kind, governmental entity or any other legal entity.

"Regulatory Allocations" is defined in Section 5.1.4.(e).

"Subsidiary" means any Person which is controlled, either directly or indirectly, by the Company.

"Tax Distribution" means distributions to Members made by the Company pursuant to Section 5.2.3.

"Tax Matters Member" is defined in Section 8.6.

"Termination Event" shall mean, with respect to a Member holding Incentive Units, (i) any event causing the termination of such Member's relationship with the Company or any of its Affiliates (as an employee, consultant, member of the Board of Managers, officer or otherwise) as set forth in such Member's Incentive Unit Agreement or (ii) in the event that such Investment Unit Agreement is silent as to the termination of such Member's relationship with the Company, any termination of such Member's employment or engagement as a consultant, an officer or a member of the Board of Managers with the Company or any of its Affiliate for any reason (or without reason).

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition, and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, or otherwise dispose of, whether

for consideration or gratuitously. "Transferred" shall have meaning corresponding to the foregoing.

"Treasury Regulations" means the regulations promulgated by the United States Department of the Treasury under the Internal Revenue Code, as amended from time to time.

"Units" means, collectively, all the Class A Common Units and the Class B Common Units.

"Unvested Incentive Units" is defined in Section 3.4.1.

"Vested Incentive Units" is defined in Section 3.4.1.

## ARTICLE 2
## FORMATION AND PURPOSE

2.1     Formation. The Company was formed as a limited liability company in accordance with the Act by the filing of the Certificate with the Delaware Secretary of State. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company is Retrophin, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managers deem appropriate. The Managers shall file, or shall cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Managers consider appropriate.

2.3     Registered Office/Agent. The address of the Company's registered office in the State of Delaware is: c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The name and address of the Company's registered agent for service of process are: Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

2.4     Term. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. If the filing of a certificate of cancellation is required by the Act, the existence of the Company as a separate legal entity shall continue until the filing of such certificate in the manner required by the Act.

2.5     Purpose. The general purpose of the Company is to (i) conduct research on, develop, manufacture, license and sell pharmaceuticals and (ii) engage in any business or activities related thereto or useful in connection therewith. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and to operate its business.

2.6     Certificate.  Such individuals as may be designated from time to time by the Managers are hereby designated as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate and any other certificates and any amendments or restatements thereof which are allowed or required to be filed pursuant to the Act and any other certificates and any amendments or restatements thereof necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.7     Principal Office.  The principal executive office of the Company shall be located initially at 330 Madison Avenue, 6th Floor, New York, New York 10017. The Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

### ARTICLE 3
### MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS

3.1     Members.  The Members of the Company are those Persons listed in Exhibit 3.1 attached hereto, as amended from time to time.  Except as otherwise provided for in this Agreement, the right of a Member to share in the profits and losses of, and the right to receive distributions from, and voting rights in, the Company shall be represented by such Member's "Units" which shall be set forth after such Member's name in Exhibit 3.1 or in the document pursuant to which such Units were issued to such Member; provided, however, that in case of any conflict between Exhibit 3.1 and any such document, the record set forth in Exhibit 3.1 shall control.  The initial number of Units shall equal 27,000,000, of which 2,000,000 Units shall be Class A Common Units and 25,000,000 Units shall be Class B Common Units.  5,000,000 Class B Common Units shall be reserved for issuance as Incentive Units and the remainder may be issued as Investment Units.  Notwithstanding any provision to the contrary contained herein, each Class A Common Unit shall have ten (10) votes and each Class B Common Unit shall have one vote.  Each Member has contributed, or shall contribute upon admission to the Company, to the Company the amount set forth opposite such Member's name in Exhibit 3.1.  The Company records shall be amended from time to time so that it sets forth the total amount of Capital Contributions made by each Member and the Units held by such Member.  Upon approval by the Managers, a Member may make additional contributions to the Company and such Member shall be entitled to receive additional Common Units from the Company as determined by the Managers.  Except as otherwise set forth herein, no Member shall be obligated to make additional contributions to the Company.

3.2     Units.  All of the issued and outstanding Units are held by the Persons and in the amounts set forth in Exhibit 3.1 or in the document pursuant to which such Units were issued to such Member; provided, however, that in case of any conflict between Exhibit 3.1 and any such document, the record set forth in Exhibit 3.1 shall control.  No Units or other interests purporting to confer rights as a Member shall be issued unless they have been authorized for issuance by the Board of Managers under the terms of this Agreement.

3.3 <u>Additional Members and Units</u>. The Board of Managers may issue Class A Common Units or Class B Common Units and admit Persons as Members in exchange for such contributions to capital (including commitments to make contributions to capital) or such other consideration (including past or future services) and on such terms and conditions (including in the case of Units issued to employees and consultants such vesting and forfeiture provisions) as the Board of Managers shall determine to be appropriate. Promptly following the issuance of Units, the Board of Managers shall cause the books and records of the Company to reflect the number of Units issued, the type of Units issued, the Members holding such Units, and the Capital Contribution per Unit, if any. The Board of Managers may from time to time issue Incentive Units to current or future Members from time to time pursuant to the terms of agreements setting forth the terms and conditions governing such Incentive Units, as approved by the Board of Managers (each a "<u>Incentive Unit Agreement</u>"). All of the Units issued as Incentive Units hereunder shall be issued on terms and conditions specified in an Incentive Unit Agreement. As a condition to receiving an Incentive Unit in connection with the performance of services, each Member receiving an Incentive Unit shall make a timely election under Section 83(b) of the Code with respect to the issuance of such Incentive Unit and shall file such election with the Internal Revenue Service. Allocations of Profit or Loss pursuant to Section 5.1 shall be made with respect to such Incentive Units, whether vested or unvested. Subject to Section 5.2.3, any distributions pursuant to Section 5.2 hereof with respect to any Unvested Incentive Units (as described below) shall be held by the Company until such Units vest, at which time any such retained distributions shall be released to the holder of such then vested Units. Any retained distributions pursuant to the foregoing sentence that relate to Unvested Incentive Units that are forfeited or fail to vest for whatever reason shall become unrestricted funds of the Company and may be used for whatever purpose determined by the Board of Managers. The Incentive Units are intended to qualify as "profits interests" within the meaning of Revenue Procedure 93-27 as clarified by Revenue Procedure 2001-43. Accordingly, each Incentive Unit shall include a Distribution Threshold Amount, which shall be determined on the date of grant by the Board of Managers consistent with the principles set forth in the preceding sentence. None of the Members issued Incentive Units shall make Capital Contributions in connection with the acquisition of such Units and the Company shall treat such Members as holding "profits interests" for all purposes of this Agreement. In the event that the Internal Revenue Service issues any additional guidance concerning the taxation of the Incentive Units after the execution of this Agreement, the Board of Managers is hereby authorized to take any action required by such guidance, including the filing of tax elections thereunder and the adoption of additional provisions to this Agreement that are binding on the Company and the Members under the Act, to achieve the same tax treatment for the Incentive Units as is applicable on the date of execution of this Agreement.

3.4 <u>Vesting, Forfeiture and Repurchase of Incentive Units Held by Incentive Members</u>. The following vesting, forfeiture and repurchase provisions of this Section 3.4 apply only to Incentive Units held by Incentive Members, except as otherwise determined by the Board of Managers at such time that such Incentive Units are issued by the Company.

3.4.1    The Members acknowledge that Incentive Units held by an Incentive Member shall vest as set forth on a separate Incentive Unit Agreement between the Company and such Incentive Member (such vested Incentive Units to be referred to herein as "Vested Incentive Units" and such unvested Incentive Units to be referred to as "Unvested Incentive Units"). All Incentive Units failing to vest as set forth on such separate Incentive Unit Agreement or herein shall be forfeited effective as of the respective dates or times set forth therein or herein and no payment on remuneration shall be paid for such forfeited Incentive Units.

3.4.2    Upon the occurrence of a Termination Event of an Incentive Member, such Incentive Member shall forfeit all Incentive Units which are unvested as of the date of the termination.

3.4.3    Upon the occurrence of a Termination Event of an Incentive Member due to such Incentive Member's death or Disability or due to termination of such Incentive Member by the Company with or without Cause, the Company or its designee shall have the right, but not the obligation, to repurchase by delivering a written notice (each a "Purchase Notice"), within 180 days after termination of employment or engagement, to such terminated Incentive Member, and such Incentive Member shall, upon such election, be obligated to sell, all, but not less than all, of the Vested Incentive Units then owned by such Incentive Member, at the Repurchase Price calculated in the manner set forth below. The "Repurchase Price" for such Vested Incentive Units redeemed in connection with the exercise of the repurchase right as set forth in this Section 3.4.3 shall be an amount equal to the "Fair Unit Value" calculated in the manner set forth in Sections 3.4.8, 3.4.9, 3.4.10 and 3.4.11.

3.4.4    Upon the occurrence of a Termination Event of an Incentive Member due to termination by such Incentive Member, the Company or its designee shall have the right, but not the obligation, by delivering a written notice (each a "Purchase Notice"), within 180 days after termination of employment or engagement, to such Incentive Member, to repurchase, all, but not less than all, of the Vested Incentive Units then owned by such Incentive Member, at the Repurchase Price calculated in the manner set forth in Sections 3.4.8, 3.4.9 and 3.4.10.

3.4.5    In connection with any repurchase of Vested Incentive Units described above, the Vested Incentive Units subject to repurchase (the "Surrendered Units") shall be repurchased on a date determined by the Company (the "Repurchase Date") no later than the later of (a) (i) if the termination is upon death, Disability or by the Company, the fifteenth (15th) day after the date of the applicable Purchase Notice and (ii) if the termination is by such Incentive Member, the fifteenth (15th) day after the date of the applicable Purchase Notice or (b) the fifteenth (15th) day after the date on which the Fair Unit Value is determined as set forth in Section

3.4.8, as the case may be. On the Repurchase Date, the Incentive Member or Incentive Member's representative shall deliver to the Company or its designee the certificate or certificates representing the Units owned by the Incentive Member or Incentive Member's representative on such date against delivery by the Company or by its designee of the purchase price. All certificates for Surrendered Units shall be duly endorsed in favor of the Company or its designee by the Incentive Member or Incentive Member's representative accompanied by (i) a duly executed assignment in favor of the Company or its designee and (ii) a written certification, in form and substance satisfactory to the Company or its designee, pursuant to which the Incentive Member or the Incentive Member's representative shall represent and warrant that he or she is the record and beneficial owner of such Surrendered Units and has good and valid title to such Surrendered Units free and clear of any and all liens, claims, charges, assessments, pledges, options and other legal and equitable encumbrances of any kind whatsoever.

3.4.6  The purchase price payable under Section 3.4.3 may be paid in cash and/or with an unsecured, subordinated promissory note of the Company, as determined by the Managers in their sole discretion, with such note payable over a period not to exceed ten (10) years, with payments to be made in annual installments commencing on the first anniversary of the closing date, with interest accruing daily at the rate equal to the greater of the applicable federal rate described in I.R.C. Section 1274(d) or the rate of 5-year U.S. Treasury Bonds on or immediately prior to the closing date and payable on each anniversary. Such promissory note shall be subordinated to the Company's obligations to its lenders.

3.4.7  From and after the forfeiture of any Unvested Incentive Units or the repurchase of the Surrendered Units, the Incentive Member whose Unvested Incentive Units were forfeited or sold his or her Surrendered Units shall have no rights as a Member or otherwise with respect to such forfeited Incentive Units and Surrendered Units. If and to the extent that the Capital Account balance (as determined in accordance with Section 4) of any Member is forfeited as a result of the operation of Section 3.4 (a "Forfeiture Event"), the Capital Account balances of the other Members shall be increased by an aggregate amount equal to the amount of the reduction in the Capital Account (as determined in accordance with Section 4) of the Member for whom such Forfeiture Event occurred. Such aggregate increase shall be allocated among such Members proportionately based on each of their respective Capital Accounts determined immediately prior to the occurrence of the Forfeiture Event which caused the adjustment.

3.4.8  Except as otherwise set forth in Sections 3.4.8, 3.4.9, 3.4.10 or 3.4.11, the purchase price for the Vested Incentive Units shall be based

on the fair market value of the Incentive Units determined in good faith by the Board of Managers, taking into account the amount payable as set forth in Section 5.2.2(a) and any Distribution Threshold Amount for such Vested Incentive Units (the "Fair Unit Value"). The determination of the Fair Unit Value as provided herein shall be final and binding on the parties.

3.4.9  Upon the occurrence of a Termination Event of an Incentive Member due to termination for Cause by the Company pursuant to paragraph (a) of the definition of "Cause," the purchase price for the Vested Incentive Units shall be 50% of the Fair Unit Value as provided herein.

3.4.10  Upon the occurrence of a Termination Event of an Incentive Member due to termination for Cause by the Company pursuant to paragraphs (b), (c) or (d) of the definition of "Cause" or is voluntarily terminated by such Incentive Member, the purchase price for the Vested Incentive Units of such Incentive Member shall be 0% of the Fair Unit Value as provided herein.

3.4.11  The rights and remedies provided by this Section 3.4 or otherwise in this Agreement are cumulative and the use of any one right or remedy by the Company shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the Company may have at law or in equity.

3.5    Capital Contributions.   Each Member's Capital Contribution, if any, whether in cash or in-kind, and the number of Units issued to such Member shall be as set forth in Exhibit 3.1 or in the document pursuant to which such Units were issued to such Member; provided, however, that in case of any conflict between Exhibit 3.1 and any such document, the record set forth in Exhibit 3.1 shall control. Any in-kind Capital Contributions shall be effected by a written assignment or such other documents as the Board of Managers shall direct. Any Member making an in-kind Capital Contribution agrees from time to time to perform such further acts and execute such further documents as the Managers may direct to perfect the Company's interest in such in-kind Capital Contribution.

## ARTICLE 4
## CAPITAL ACCOUNTS

4.1    Capital Accounts.

4.1.1  A separate account (a "Capital Account") shall be maintained for each Member and adjusted in accordance with Treasury Regulation Section 1.704-1(b). Without limitation of the foregoing, there shall be credited to each Member's Capital Account the amount of such Member's Capital Contribution as of the date, and to the extent, that such

Capital Contribution has been received, and such Member's allocable share of Net Profits (and any items in the nature of income or gain separately allocated to such Member); and there shall be charged against each Member's Capital Account the amount of all distributions to such Member (including the fair market value of assets distributed in kind net of liabilities secured by such assets that such Member is considered to assume or take subject to) and such Member's allocable share of Net Losses (and any items in the nature of losses or deductions separately allocated to such Member).

4.1.2  If the Company at any time distributes any of its assets in kind to any Member, the Capital Account of each Member shall be adjusted immediately prior to such distribution to account for each Member's allocable share of the Net Profits or Net Losses that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values on the date of the distribution, as determined in good faith by the Managers.

4.1.3  The Managers may cause the Capital Accounts of the Members to be adjusted in the manner provided by applicable Treasury Regulations to reflect the difference between the value of the Company's assets as previously reflected on the books of the Company and the fair market value of such assets, as determined in good faith by the Managers, (i) when such adjustments are permitted under Treasury Regulation Section 1.704-1(b) and (ii) at such other times as the Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members (including, without limitation, upon the issuance of new Units in exchange for cash, property or services to a new or existing Member and upon the redemption of the Units of a Member).  The unrealized income, gain, loss or deduction taken into account as a result of a revaluation made in accordance with the first sentence of this Section 4.1.3 shall be allocated among the Members in accordance with Sections 5.1 and 4.1.1 as if there were a taxable disposition of the revalued assets for their fair market value as determined by the Managers. Following an adjustment described in 4.1.2 or this 4.1.3, gain, loss, depreciation and amortization with respect to such revalued assets shall be determined and credited or charged to the Members' Capital Accounts based upon the restated values of such assets, rather than the adjusted basis of such assets for tax purposes.  Taxable gain, loss, depreciation or amortization with respect to such assets shall, however, be allocated among the Members so as to take into account the difference between the restated values of such assets and their adjusted tax basis, consistent with the principles of Section 704(c) of the Code, but shall not be credited or charged to the Members' Capital Accounts.  Valuation determinations made in accordance with Section 4.1.2 and this Section 4.1.3 shall be final and binding upon all Members.

4.1.4   In the event that all or a portion of the Units of a Member are transferred in accordance with this Agreement, the transferee of such Units shall also succeed to all or the relevant portion of the Capital Account of the transferor (based on the ratio of the number of Units of each class held by the transferor immediately before the transfer to the number of Units of such class transferred). Units held by a Member may not be transferred independently of the Interest to which the Units relate.

4.1.5   No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company). Except as otherwise set forth herein, no interest shall be paid to any Member with respect to such Member's Capital Contributions or Capital Account.

4.1.6   As of the date of this Agreement, the Capital Account of each Member holding one or more Investment Units is set forth in Exhibit 3.1 and the Capital Account of each of the Incentive Members is $0.

## ARTICLE 5
## ALLOCATIONS OF PROFIT AND LOSS; DISTRIBUTIONS

5.1     Allocation of Net Profits and Net Losses.

5.1.1   Except as otherwise provided in Section 5.1.4, Net Profits and Net Losses shall be allocated among the Members in such a manner that, as of the end of each taxable year of the Company (or as of such earlier date on which an allocation is required or appropriate), the sum of (i) the Capital Account of each Member, (ii) such Member's share of Minimum Gain determined pursuant to Treasury Regulation Section 1.704-2(g)) and (iii) such Member's share of "partner non-recourse debt minimum gain" (as determined according to Treasury Regulation Section 1.704-2(i)(5)) shall be equal to the amount which would be distributed to such Member under this Agreement if the Company were to sell all its assets for an amount of cash equal to the Book Value of those assets and all of the cash of the Company remaining after payment of all liabilities (in the case of nonrecourse liabilities limited to the Book Value of assets securing repayment of such liabilities) of the Company were distributed in liquidation immediately following the end of the taxable year in accordance with Section 5.2.2 below.

5.1.2   Subject to the provisions of Section 5.1.3 below, with respect to the allocation of Net Losses or Net Profits pursuant to this Section 5.1 among the Members for any fiscal year in which an additional or substitute Member is admitted to the Company or in which a transfer of Units is made, all Net Losses or Net Profits so allocable shall be allocated in a manner that takes into account the varying ownership of Units during

such fiscal year as determined by the Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder. In no event shall a retroactive allocation of Net Losses be made pursuant to this Section 5.1.

5.1.3 Upon each admission of an additional Member or upon each transfer of Units after the execution of this Agreement by the parties hereto, the Company's Net Profits or Net Losses for the fiscal period ending on the day before such admission or transfer shall be allocated among the Members immediately before such admission or transfer. Thereafter a Capital Account shall be established for any newly-admitted Member.

5.1.4 Special Allocations. Notwithstanding the provisions of Sections 5.1.1 through 5.1.3 above, the following special allocations shall be made in the following order:

(a) Limitation on Losses. In no event shall Net Losses (or items thereof) of the Company be allocated to a Member if such allocation would cause or increase a negative balance in such Member's Adjusted Capital Account. Instead, any such Net Losses (or items thereof) shall be reallocated to a Member with positive balances in their Adjusted Capital Accounts in proportion to such positive balances.

(b) Minimum Gain Chargeback. Except as set forth in Treasury Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, before any other allocation pursuant to this Article 5, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Treasury Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 5.1.4(b) shall be made first from gain recognized from the disposition of Company assets subject to non-recourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 5.1.4(b) shall constitute a "minimum gain chargeback" under Treasury Regulation Section 1.704-2(f). With respect to a net decrease in partner loan minimum gain (determined in accordance with the provisions of Treasury Regulation Section 1.704-2(i)), items of gross income or gain shall be specially

allocated in a manner consistent with the principles of the preceding sentence and Treasury Regulation Section 1.704-2(i)(4).

(c) <u>Qualified Income Offset</u>. If, during any year a Member receives any adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and, as a result of such adjustment, allocation or distribution, such Member's Adjusted Capital Account has a negative balance, then items of gross income and gain for such year (and, if necessary, subsequent years) shall first be allocated to such Member in the amount necessary to eliminate such negative balance as quickly as possible. This Section 5.1.4(c) is intended to constitute a "qualified income offset" provision within the meaning of the above Treasury Regulations, and shall be so interpreted.

(d) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any taxable year shall be allocated to the Members pro rata according to their Units and in a manner consistent with the principles of Treasury Regulations Section 1.704-2(e). Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i)(1).

(e) <u>Gross Income Allocation</u>. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 5.1.4(e) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5.1.4 have been tentatively made as if this Section 5.1.4(e) and Section 5.1.4(c) hereof were not in the Agreement.

(f) <u>Curative Allocations</u>. The allocations set forth in subsections (a) through (e) of this Section 5.1.4 (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 5.1.4(f). Therefore, notwithstanding any other provision of

this Section 5.1 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 5.1.1. In exercising their discretion under this Section 5.1.4(f), the Managers shall take into account future Regulatory Allocations under Section 5.1.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 5.1.4(d).

5.1.5 Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulation Section 1.752-3(a)(3), the Members' interests in Company profits shall be in proportion to their ownership of Units, unless otherwise determined by the Managers.

5.1.6 Tax Allocations. The respective interests of the Members in the Net Profits and Net Losses and specially allocated items or items thereof shall remain as set forth above unless changed by amendment to this Agreement or by an assignment of interests as authorized by the terms of this Agreement. Except as otherwise provided herein, for tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Members in the same manner as are Net Profits and Net Losses and specially allocated items; provided, however, that if, as a result of clause (i) of the definition of Net Profits and Net Losses, the Book Value of any property of the Company was used in computing Net Profits or Net Losses, then items of income, gain, deduction or credit related to such property for tax purposes shall be allocated among the Members so as to take account of the variation between the adjusted basis of the property for tax purposes and its Book Value in the manner provided for under Code Section 704(c) ("Section 704(c) Allocations"). The Managers shall elect the method under which Section 704(c) Allocations will be made for each item of Company property. A Code Section 754 election may be made for the Company at the sole discretion of the Managers. In the event of any adjustment to the adjusted tax basis of any Company asset under Code Section 734(b) or Code Section 743(b) pursuant to a Code Section 754 election by the Company, subsequent allocations of tax items shall reflect such adjustment consistent with the Treasury Regulations promulgated under Sections 704, 734 and 743 of the Code.

5.1.7 Limitations on Allocations to Holders of Incentive Units. Notwithstanding any other provision of this Article 5, to the extent that any Member has been granted any Incentive Units that, by the terms

-17-

of such grant or by agreement, entitle the holder, once such Incentive Units vest, to receive less than the full amount of allocations of Net Profits otherwise allocable with respect to such class or series of Incentive Units generally, then the provisions of such grant or agreement shall supersede such holder's rights under this Article 5 and the amount of reduction in allocations to such holder shall be made to all other Members in accordance with this Article 5.

5.2     Distributions.

      5.2.1     Distribution from Operations or Transactions.     Except as provided in Section 10.3.2 and subject to Section 5.2.7, distributions of cash from operations or capital transactions in excess of the reasonable business needs of the Company and such reserves as may be necessary and distributions of securities and other non-cash assets held by the Company may be made at such times and in such amounts as may be determined from time to time by the Board of Managers, in its sole discretion, to the Members proportionately, according to their respective ownership of Units.

      Notwithstanding the foregoing, except for payments as set forth in Section 5.2.3, with respect to any Unvested Incentive Units, the Board of Managers may, in its discretion, decide to withhold any payment of any distributions from the Company until such Unvested Incentive Units have become Vested Incentive Units.     Upon such Unvested Incentive Units being forfeited as set forth herein or in an applicable separate Incentive Unit Agreement between the Company and the holder of such Unvested Incentive Member, such unpaid distributions shall be paid to the Incentive Members pro rata according to their ownership of Vested Incentive Units.

      5.2.2     Distribution upon Liquidation.     After payment of or adequate provision for the debts and obligations of the Company, including the expenses of liquidation and dissolution, and the funding of such reserves as are deemed reasonably necessary by the Managers or the liquidating trustee for any contingent, conditional or unmatured liabilities or other obligations of the Company and subject to Section 5.2.7, in the following order and priorities:

(a)     First, to each Member in proportion to its respective Capital Contributions made on or after the date of this Agreement until such Member has received distributions pursuant to Sections 5.2.1 and 5.2.2(a) in an aggregate amount equal to such Member's Capital Contributions made on or after the date of this Agreement; and

(b)     Thereafter, to the Members pro rata according to their ownership of Units.

Notwithstanding the foregoing, except for payments as set forth in Section 5.2.3, with respect to any Unvested Incentive Units the Board of Managers may, in its discretion, decide to withhold any payment of any distributions from the Company until such Unvested Incentive Units have become Vested Incentive Units. Upon such Unvested Incentive Units being forfeited as set forth herein or in an applicable separate Incentive Unit Agreement between the Company and the holder or holders of such Unvested Incentive Units, the Board of Managers may, in its discretion, decide that such unpaid distributions shall be paid to the Members pro rata according to their ownership of Investment Units and Vested Incentive Units.

5.2.3 <u>Tax Distribution</u>. The Board of Managers shall cause the Company to distribute to all Members to whom items of taxable income or gain have been allocated for a taxable year (or for any portion thereof) an amount intended to enable such Members to pay their respective federal, state and local tax liabilities resulting from the allocation. The Board of Managers shall calculate the amount of such tax distributions by assuming that each Member will pay taxes at the same rate, as determined by the Board of Managers. Amounts distributed to a Member pursuant to this Section 5.2.3 shall be treated as advances against amounts distributable to such Member pursuant to Sections 5.2.1 and 5.2.2, and shall be applied against any such future distributions until all such advances have been repaid.

5.2.4 <u>Certain Payments</u>. Payment of the following amounts shall be treated as distributions made (pursuant to Sections 5.2.1, 5.2.2 and 5.2.3) to any Member on whose behalf such payments were made:

(a) expenses incurred by the Company in connection with the preparation and filing of any tax returns or similar reports required to be filed by or on behalf of such Member by reason of such Member's participation in the Company, with any related deductions deemed a deduction of such Member and not of the Company for the purpose of computing Company Net Profits or Net Loss;

(b) amounts properly withheld by the Company to be paid to any governmental entity as a withholding tax with respect to such Member's income from the Company, with any related deductions deemed a deduction of such Member and not of the Company for the purpose of computing Company Net Profits or Net Loss; and

(c) any tax paid by the Company because of such Member's particular status, with any related deductions deemed a deduction of such Member and not of the Company for the purpose of computing Company Net Profits or Net Loss.

5.2.5 <u>Form of Distributions; Accounting for Distributions</u>. The Managers may elect to distribute cash, securities or other non-cash assets or any combination thereof pursuant to Section 5.2. No fractional shares of securities shall be distributed. To the extent reasonably practicable, distributions of securities or other non-cash assets shall be made on a pro rata basis based on the amount that each such Member receiving a distribution is entitled. In the event any portion of a distribution pursuant to Section 5.2 hereof is made in securities or non-cash assets, the fair market value of such securities or non-cash assets shall be determined as of the date of distribution by the Managers and each Member receiving such distribution shall have his or her Capital Account debited with the fair market value of the securities or non-cash assets distributed to him or her.

5.2.6 <u>No other Distributions or Withdrawals</u>. Except as the Managers may determine pursuant to this Section 5.2, or as may otherwise be expressly provided in this Agreement, no Member shall have any right to withdraw or receive any cash or other property from the Company.

5.2.7 <u>Limitations on Distributions to Incentive Members; Withholding</u>.

(a)   <u>Limitation on Distributions.</u> Notwithstanding any other provision of this Article 5, no distributions (other than Tax Distributions) shall be made with respect to any Incentive Unit unless or until the aggregate distributions made after the issuance of such Incentive Unit equals the Distribution Threshold Amount established by the Board of Managers at the time of granting such Incentive Unit, and the amount of reduction in distributions to such holder shall be available to all other Members in accordance with this Article 5.

(b)   <u>Withholding</u>. All amounts withheld pursuant to the Code or any other provision of tax laws with respect to any payment or distribution to the Members of the Company shall be treated as amounts distributed to the Member or Members subject to such withholding obligation in accordance with this Agreement and, accordingly, shall be credited to each Member as if such Member had received such distribution in accordance with Section 5.2.7(a).

## ARTICLE 6
## STATUS, RIGHTS AND POWERS OF MEMBERS

6.1   <u>Limited Liability</u>. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, expenses, obligations and liabilities of the Company, and no Member or Indemnified Person shall be obligated personally for any such debt, expense, obligation or liability of the Company solely by reason of being a Member or

Indemnified Person. All Persons dealing with the Company shall have recourse solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company. In no event shall any Member be required to make up any deficit balance in such Member's Capital Account upon the liquidation of such Member's Units or otherwise.

6.2     Return of Distributions of Capital. Except as otherwise expressly required by law, a Member, in such capacity, shall have no liability for obligations or liabilities of the Company in excess of (a) the amount of such Member's Capital Contributions, (b) such Member's share of any assets and undistributed profits of the Company and (c) to the extent required by law, the amount of any distributions wrongfully distributed to such Member. Except as required by law, no Member shall be obligated by this Agreement to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company; provided, however, that if any court of competent jurisdiction holds that, notwithstanding this Agreement, any Member is obligated to return or pay any part of any distribution, such obligation shall bind such Member alone and not any other Member or any Manager; provided, further, however, that if any Member is required to return all or any portion of any distribution under circumstances that are not unique to such Member but that would have been applicable to all Members if such Members had been named in the lawsuit against the Member in question (such as where a distribution was made *pro rata* to all Members and rendered the Company insolvent, but only one Member was sued for the return of such distribution), the Member that was required to return or repay the distribution (or any portion thereof) shall be entitled to reimbursement from the other Members that were not required to return the distributions made to them *pro rata* based on each such Member's share of the distribution in question. The provisions of the immediately preceding sentence are solely for the benefit of the Members and shall not be construed as benefiting any third party. The amount of any distribution returned to the Company by a Member or paid by a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member.

6.3     No Management or Control. No Member, in his or her capacity as a Member, shall take part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company.

6.4     Specific Limitations. No Member shall have the right or power to: (a) withdraw or reduce such Member's Capital Contribution or demand any distribution from the Company except as a result of the dissolution of the Company or as set forth in this Agreement, (b) except as approved by the Managers, make voluntary loans to the Company, make Capital Contributions or make voluntary contributions of any property to the Company other than cash, (c) bring an action for partition against the Company or any Company assets, (d) cause the termination and dissolution of the Company, except as set forth in this Agreement, (e) demand employment with or compensation from the Company, or (f) upon the distribution of such Member's Capital Contribution require that property other than cash be distributed in return for such Member's Capital Contribution.

Each Member hereby irrevocably waives any rights that such Member may have to maintain an action for partition of any of the Company's property. Except as otherwise set forth in this Agreement, no Member shall have priority over any other Member either as to the return of such Member's Capital Contribution or as to Net Profits, Net Losses or distributions. Other than upon the termination and dissolution of the Company as provided by this Agreement, no time has been agreed upon when the Capital Contribution of any Member will be returned.

6.5    No Automatic Termination on Bankruptcy. A Person shall not cease to be a Member upon the happening of any of the following events with respect to such Member:

        (a)    making an assignment for the benefit of creditors;

        (b)    filing a voluntary petition in bankruptcy;

        (c)    being adjudged a bankrupt or insolvent, or having entered against such Member an order for relief, in any bankruptcy or insolvency proceeding;

        (d)    filing a petition or answer seeking for such Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

        (e)    filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding described in Section 6.5(d);

        (f)    seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of such Member's property;

        (g)    having a proceeding commenced against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

        (h)    the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of the Member or of all or any substantial part of such Member's properties; or

        (i)    dissolution.

6.6    Member Meetings. A meeting of the Members may be called at any time by a Manager or by the Members by a Majority Vote. Any such call shall state the place, date, hour and purposes of the meeting, provided that such notice shall be given in writing (by U.S. mail, personal delivery, facsimile or email) to the Members no less than

five (5) days nor more than sixty (60) days prior to the meeting so called. A meeting of the Members may be held at such place within or without the State of Delaware as may be determined from time to time by the Managers. At any meeting duly called, except as otherwise specifically set forth in this Agreement or under applicable law, any action required or permitted to be taken at a meeting of the Members shall be decided by a Majority Vote. Whenever notice is required to be given to a Member, a written waiver therefore, signed by such Member entitled to notice, whether before, during or after the time of the meeting shall be deemed equivalent to notice. Attendance of a Member at any meeting shall constitute a waiver of notice of that meeting and no written waiver need be obtained from such Member, except when such Member attends the meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened. Members may, by means of remote communication, participate in a meeting of the Members and be deemed present in person and vote at a meeting of the Members, provided that all Members participating in the meeting can hear one another. To the extent that any dispute shall arise with respect thereto, the Managers shall be entitled to decide all issues such as the existence of a quorum, the number of votes, the Members entitled to vote, and other similar procedural questions that are raised at any meeting of Members.

6.7     Actions by Members. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all the Members entitled to authorize or take such action and shall be delivered to the Company in accordance with Section 13.3 below.

6.8     Rights of Holders of Economic Interest. A holder of any economic interest in the Company who does not become a Member shall succeed only to the rights of the Member to receive allocations and distributions from the Company as provided in this Agreement, and shall not have the right to attend any meeting of the Members or Managers or vote on any matter and shall not have the right to access the information described in Section 8.1 or 8.3, and any interest in the Company held by such Holder shall not be included in the calculation of Units for purposes of any action, to be taken by the Members hereunder.

## ARTICLE 7
## DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF THE MANAGERS

7.1     Authority of Managers. The Managers then in office (the "Board of Managers," the "Board" or the "Managers") shall have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. No Manager shall act or execute documents on behalf of the Company without a prior approval by the Board. Except as otherwise expressly provided in this Agreement, the Board of Managers or individuals designated by the Board of Managers, including officers and agents appointed by the Board of Managers, if any, shall be the only individuals authorized to execute documents which shall be binding on the Company. To the fullest extent permitted by Delaware law, but subject to any specific provisions hereof

granting rights to Members, the Board of Managers shall have the power to do any and all acts, statutory or otherwise, with respect to the Company or this Agreement, which would otherwise be possessed by the Members under the laws of the State of Delaware and the Members shall have no power whatsoever with respect to the management of the business and affairs of the Company. Subject to the provisions of this Agreement which require the consent or approval of one or more Members, the power and authority granted to the Board of Managers hereunder shall include all those necessary or convenient for the furtherance of the purposes of the Company and shall include the power, in its discretion, to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company, including without limitation, the power and authority to undertake and make decisions concerning: (a) hiring and firing of employees, attorneys, accountants, brokers, investment bankers and other advisors and consultants, (b) entering into of leases for real or personal property, (c) opening of bank and other deposit accounts and operations thereunder, (d) purchasing, constructing, improving, developing and maintaining of real property, (e) purchasing of insurance, goods, supplies, equipment, materials and other personal property, (f) borrowing of money, obtaining of credit, issuance of notes, debentures, Units or other securities, equity or interests of or in the Company and securing of the obligations undertaken in connection therewith with mortgages on and security interests in all or any portion of the real or personal property of the Company, (g) making of investments in or the acquisition of securities of any Person, (h) giving of guarantees and indemnities, (i) entering into of contracts or agreements whether in the ordinary course of business or otherwise, (j) forming subsidiaries or joint ventures, (k) make any loans or advances to, or guaranty or become contingently liable for obligations of, any employee of the Company, (l) compromising, arbitrating, adjusting and litigating claims in favor of or against the Company, and (m) all other acts or activities necessary or desirable for the carrying out of the purposes of the Company. Except as otherwise specifically required by the Board of Managers, each Manager may sign documents on behalf of, and bind, the Company.

7.2 Officers: Agents. The Board of Managers shall have the power to appoint agents (who may be referred to as officers) to act for the Company with such titles, if any, as the Board of Managers shall deem appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may in its sole discretion determine; provided, however, that no such delegation by the Board of Managers shall cause the individuals constituting the Managers to cease to be the "managers" of the Company within the meaning of the Act. The officers or agents so appointed may include individuals holding titles such as Chief Executive Officer, President, Executive Vice President, Vice President, Chief Operating Officer, Chief Financial Officer, Treasurer or Controller. Unless the authority of the agent designated as the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a Delaware corporation in the absence of a specific delegation of authority; provided, however, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue

notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the Company or to sell or lease all or any substantial portion of the assets of the Company. The Board of Managers, in their sole discretion, may, by written instrument signed by the Managers, ratify any act previously taken by an officer or agent acting on behalf of the Company.

7.3    Appointment of Managers. Initially, the Board of Managers shall consist of up to five (5) Managers. The Board, or the Members by a Majority Vote may increase or decrease the number of Managers on the Board, provided that neither the Board nor the Members may decrease the number of Managers on the Board unless there is sufficient vacancy on the Board due to resignation, removal or death. Brent Saunders, Martin Shkreli, Darren Blanton and Kevin Mulleady shall be the Initial Managers of the Company. In the event that a Manager is removed, dies, or is unable or unwilling to serve in that capacity, if desired, a new Manager shall be appointed either by a majority of the remaining Managers or by the Members by a Majority Vote.

7.4    Resignation and Removal. A Manager may be removed from office with or without cause by the Members by a Majority Vote. The Board of Managers may at any time remove any officer either with or without cause. The Managers may at any time terminate or modify the authority of any agent. Any officer may resign at any time by delivering his or her resignation in writing to a Manager. Such resignation shall be effective upon receipt unless specified to be effective at some other time, and without in either case the necessity of its being accepted unless the resignation shall so state.

7.5    Manager Meetings. A meeting of the Board of Managers may be called at any time by a Manager. Any such call shall state the place, date, hour and purposes of the meeting and the notice shall be given (by U.S. mail, personal delivery, verbal message, facsimile or electronic mail) by the Managers not less than forty-eight (48) hours nor more than thirty (30) days prior to the meeting so called.. A meeting of the Board of Managers may be held at such place within or without the State of Delaware as may be determined from time to time by the Managers. At any meeting duly called, except as otherwise set forth in this Agreement, any action required or permitted to be taken at a meeting of the Board of Managers shall be decided by a vote approved by a majority of the Managers then in office. Whenever notice is required to be given to a Manager, a written waiver therefore, signed by such Manager entitled to notice, whether before, during or after the time of the meeting shall be deemed equivalent to notice. Attendance of a Manager at any meeting shall constitute a waiver of notice of that meeting and no written waiver need be obtained from such Manager, except when such Manager attends the meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened. Managers may, by means of remote communication, participate in a meeting of the Board of Managers and be deemed present in person and vote at a meeting of the Board of Managers, provided that all Managers participating in the meeting can hear one another.

7.6    Actions by Managers. Any action required or permitted to be taken at a meeting of the Managers may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all the Managers.

## ARTICLE 8
## BOOKS, RECORDS, TAX MATTERS, ETC.

8.1    Books and Records. The Company shall maintain at its principal office all of the following:

(a)    Information regarding the status of the business and financial condition of the Company, including the annual financial statements of the Company for the six (6) most recent Fiscal Years and the Company's books and records for at least the current and past three Fiscal Years;

(b)    A copy of the Company's federal, state and local income tax returns for each of the past six (6) most recent taxable years;

(c)    A current list of the name and last known business, residence or mailing address of each Member and each Manager;

(d)    A copy of this Agreement and the Certificate and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which this Agreement, the Certificate and any such amendments have been executed;

(e)    All information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member, and which each Member has agreed to contribute in the future and the date on which each Member became a Member;

(f)    All other information that must be maintained by the Company under the Act.

8.2    Delivery to Member; Inspection; etc. Upon the request of any Member for any purpose reasonably related to such Member's Interest, the Managers shall cause to be delivered to the requesting Member, at the expense of the requesting Member, a copy of the information required to be maintained by Section 8.1.

8.3    Fiscal Year; Financial Statements. Unless changed by the Managers, the Fiscal Year of the Company shall end on December 31 in each year. The Managers shall cause books of account to be maintained reflecting the operations of the Company and shall cause to be prepared for the Members at least annually, at the Company's expense, financial statements of the Company and its Subsidiaries prepared in accordance with generally accepted accounting principles in the United States.

8.4     Non-Disclosure.  Each Member agrees that, except as otherwise consented to by the Managers, all non-public information furnished to such Member pursuant to this Agreement or in connection with his or her ownership of Units or in connection with his or her services rendered to the Company or its clients will be kept confidential and will not be disclosed by such Member, or by any of such Member's agents, representatives or employees, in any manner, in whole or in part, except that (a) each Member shall be permitted to disclose such information to those of such Member's legal counsel or accountants who need to be familiar with such information in connection with such Member's investment in the Company and who are charged with an obligation of confidentiality, (b) each Member shall be permitted to disclose information to the extent required by law, so long as such Member shall have first provided the Company a reasonable opportunity to contest the necessity of disclosing such information, and (c) each Member shall be permitted to disclose information to the extent necessary for the enforcement of any right of such Member arising under this Agreement.

8.5     Tax Returns; Filings.  At the Company's expense the Managers shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities and to have prepared and to furnish to each Member such information with respect to the Company (including a schedule setting forth such Member's distributive share of the Company's income, gain, loss, deduction and credit as determined for federal income tax purposes) as is necessary to enable such Member to prepare such Member's federal, state and local income tax returns.  Unless otherwise agreed by the Managers, all tax returns of the Company shall be prepared by the Company's independent certified public accountants.  The Managers, at the Company's expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative authorities, all reports required to be filed by the Company with those entities under then current applicable laws, rules and regulations.

8.6     Tax Matters Member.  The Managers shall, in their discretion, designate a Member as the tax matters partner of the Company as provided in the Regulations under Code Section 6231 and any analogous provisions of state law and in such capacity is referred to as the "Tax Matters Member".

8.7     Indemnity of Tax Matters Member.  The Company shall indemnify and reimburse the Tax Matters Member for all expenses (including legal and accounting fees) incurred as Tax Matters Member pursuant to this Article 8 in Connection with any administrative or judicial proceeding with respect to the tax liability of the Members attributable to interest in the Company.

## ARTICLE 9
## TRANSFER OF INTERESTS

9.1     Transfer Requirements.  No holder of any Interest shall Transfer all or any part of the economic or other rights that comprise any Interest represented by such Interest unless (a)(i) such holder shall have complied with the provisions of Section 3.4 or (ii) the Board of Managers shall have consented to the Transfer in writing, in its sole discretion, and (b) such holder shall have complied with the following:

9.1.1   Unless expressly waived by the Board of Managers in writing, in its sole discretion, a transferor may not Transfer all or a portion of such transferor's Units or Interest without obtaining an opinion of counsel in form and substance reasonably acceptable to the Company and its counsel as to the availability of an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws in connection with such Transfer and stating the factual and statutory bases relied upon by such counsel;

9.1.2   Unless expressly waived by the Board of Managers in writing, in its sole discretion, in no event shall a transferor Transfer all or any portion of his, her or its Interest to any Person if such Transfer would cause the Company to be taxed as an association for federal income tax purposes under Section 7704 of the Code or as a corporation or to be considered as having terminated pursuant to Section 708(b)(1)(B) of the Code (and, if requested by the Board of Managers, such transferor shall deliver an opinion of its counsel in form and substance reasonably acceptable to the Company and its counsel to the effect that such Transfer will not cause the Company to be so taxable as an association or corporation or to be considered as having been so terminated);

9.1.3   Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to recognize any Transfer until the instrument conveying such Interest has been delivered to a Manager for recording on the membership register and the Company records and unless that proposed transferee executes and delivers such instruments, in form and substance satisfactory to the Board of Managers and counsel to the Company, in their sole discretion, as the Board of Managers or counsel may deem necessary or desirable to confirm the agreement of such proposed transferee to be bound by all of the terms and provisions of this Agreement and to confirm that the Transfer will not violate any provisions of Article 9 hereof;

9.1.4   Any proposed transferee who is to receive Units, Interests or any part thereof must executed and deliver to the Company a joinder signature page, agreeing to be bound by the terms of this Agreement. The Company's receipt of such joinder signature page shall not constitute a waiver or amendment under this Agreement unless and until agreed to and acknowledged in writing by the Company;

9.1.5   Notwithstanding any other provision of this Agreement to the contrary, no Unvested Incentive Unit or any portion thereof may be Transferred;

9.1.6   Upon transfer of all of the Vested Incentive Units held by an Incentive Member, all of the Unvested Incentive Units held by such Incentive Member shall be forfeited; and

9.2     Effect of Prohibited Transfers. Any Transfer in contravention of any of the provisions of this Agreement shall be void and of no effect, and shall not bind nor be recognized by the Company. The provisions of Article 9 shall supersede, and shall be controlling with respect to, any conflict provisions contained in any other agreement between or among the Company, the Members and other Persons.

9.3     Right of First Refusal.

9.3.1     Except as otherwise permitted under Sections 3.4 or except as otherwise waived by all of the Managers or except as otherwise prohibited under Section 9.1, before any Interest may be Transferred, including any Transfer by operation of law or by order of court or by an executor or administrator, to any Person, the transferor shall first give written notice (the "Transfer Notice") thereof to the Managers at least sixty (60) days prior to the proposed date of Transfer stating the proposed transferee, the Interests proposed to be Transferred, the purchase price, if any, and the terms of the proposed transaction. The Company or its designee shall upon delivery of such notice have the option, but not the obligation, to acquire all, but not less than all, of the Interests proposed to be Transferred for the Purchase Price (as defined in Section 9.3.4). Within thirty (30) days after the delivery of the Transfer Notice by the transferor, the Company shall give written notice to the transferor stating whether or not it elects to exercise the option. Failure by a Company to give notice within such time period shall be deemed an election by the Company or its designee not to exercise the option. The consummation of the sale and purchase of the Interests shall take place on or before the later to occur of (x) ninety (90) days after the giving of the Transfer Notice by the transferor or (y) in the case of any proposed transfer to which Section 3.4.8 hereof applies, thirty (30) days after being notified of the determination of the Fair Unit Value.

9.3.2     If the Company or its designee does not purchase all of the Interests being offered hereunder, the transferor may Transfer all the Interests being offered hereunder at any time during the sixty (60) day period beginning after the expiration of period during which the other Incentive Members may elect to purchase, but only upon the terms and to the proposed transferee stated in the Transfer Notice. After the Interests are so Transferred, or if the Transfer is not consummated within such sixty (60) day period, such Interests shall again become subject to the terms of this Agreement.

9.3.3     The "Purchase Price" shall be determined as follows:

(a)     In the case of a proposed Transfer of the Interests under Section 9.3.1 hereof to a third party in a bona fide transaction payable in cash or the equivalent, currently or in future installments, the

Purchase Price for such Interests shall be the value offered by such third party for such Interests payable upon the same terms.

(b)     In all other cases, the Purchase Price for such Interests shall be the most recent Fair Unit Value for such Interests as determined pursuant to Section 3.4.8.

9.4     Admission and Withdrawal; No Dissolution. If a Member Transfers all or a portion of such Member's Interests to a transferee in accordance with this Article 9, such transferee may be admitted to the Company as a Member, but only as determined by the Board of Managers, in its sole discretion, effective on the effective date of the Transfer or such other date as may be specified when the transferee is admitted. Effective upon a Member Transferring all of such Member's Interests in accordance with this Article 9, the transferor Member shall cease to be a Member of the Company. Upon the transferor Member's withdrawal from the Company, the withdrawing Member shall not be entitled to any distributions from and after the date of such withdrawal or Transfer.

9.5     Amendment of Exhibit 3.1. In the event of the admission of any transferee as a Member of the Company in accordance with the terms of this Agreement, the Managers shall promptly amend Exhibit 3.1 to reflect such Transfer or admission, as the case may be.

## ARTICLE 10
## DISSOLUTION OF COMPANY

10.1     Termination of Membership. No Member may resign or withdraw from the Company except as a result of any Transfer of 100% of such Member's Interests in the Company in accordance with the provisions of Article 9.

10.2     Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events: (a) the entry of a decree of judicial dissolution under Section 18-802 of the Act, (b) the vote or written determination of Members by a Majority Vote or (c) the disposition of all of the Company's assets. The Company shall not be automatically dissolved upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or any other termination of a Member, but shall continue its existence until dissolved as provided in the foregoing sentence.

10.3     Liquidation; Distributions Upon Liquidation.

10.3.1 Liquidation. Upon dissolution of the Company for any reason, the Company shall immediately commence to wind up its affairs. A reasonable period of time shall be allowed for the orderly termination of the Company's business, discharge of its liabilities, and distribution or liquidation of the remaining assets so as to enable the Company to minimize the normal losses attendant to the liquidation process. The Company's property and assets or the proceeds from the liquidation thereof shall be distributed so as not to contravene the Act and shall be otherwise in compliance with Section 10.3.2. A full accounting of the

assets and liabilities of the Company shall be taken and a statement thereof shall be furnished to each Member within thirty (30) days after the distribution of all of the assets of the Company. Such accounting and statements shall be prepared under the direction of the Managers. Upon such final accounting, the Company shall terminate and an authorized individual, appointed pursuant to Section 2.6, shall cancel the Certificate in accordance with the Act.

10.3.2 Distributions Upon Dissolution. Upon the occurrence of an event of dissolution of the Company as set forth in Section 10.2, and after payment of liabilities owing to creditors, the Managers shall set up reserves as they deem necessary for any contingent or unforeseen liabilities or obligations of the Company. After these payments are made, the Managers shall cause the remaining net assets of the Company to be liquidated and any such proceeds shall be distributed to and among the Members in accordance with Section 5.2.2. Notwithstanding the foregoing, in the event the Managers shall determine that an immediate sale of part of or all of the remaining assets would cause undue loss to the Members, or the Managers shall determine that it would be in the best interest of the Members to distribute the remaining assets to the Members in-kind (which distributions do not, as to the in-kind portions, have to be in the same proportions as they would be if cash were distributed, but all such in-kind distributions shall be equalized, to the extent necessary and as determined in good faith by the Managers, with cash), then the Managers may either defer liquidation of, and withhold from distribution for a reasonable time, any of the remaining assets except to the extent necessary to satisfy the Company's debts and obligations, or distribute the remaining assets to the Members in-kind.

10.4 No Further Claim. Upon dissolution, each Member shall have recourse solely to the assets of the Company for the return of such Member's Capital Account, and if the Company's property remaining after payment or discharge of the debts and liabilities of the Company, including debts and liabilities owed to one or more of the Members, is insufficient to return the aggregate Capital Contributions of each Member, such Member shall have no recourse against the Company, the Managers or any other Member.

## ARTICLE 11
## INDEMNIFICATION; FIDUCIARY DUTIES

11.1 General. The Company shall indemnify, defend and hold harmless, to the extent permitted by applicable law, each Manager and the Tax Matters Member in such Member's capacity as such, each such Person's officers and directors (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Article 11), from any liability, loss or damage incurred by the Indemnified Person as a result of a third party claim by reason of any act performed or omitted to be performed by the Indemnified Person in connection with the business of the Company and from liabilities

or obligations of the Company imposed on such Person by reason of such Person's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such third party claim of liability, loss or damage; provided, however, that the Company shall provide no indemnification with respect to any matter as to which such Indemnified Person shall be finally adjudicated in any action, suit or proceeding not to have acted in good faith in the reasonable belief that his or her action was in the best interests of the Company, provided, further, however, that indemnification under this Section 11.1 shall be recoverable only from the assets of the Company and not from any assets of the Members. Unless the disinterested Managers determine in good faith that the Indemnified Person is unlikely to be entitled to indemnification under this Article 11, the Company shall pay or reimburse reasonable attorneys' fees of an Indemnified Person as incurred, provided that such Indemnified Person executes an undertaking, with appropriate security if requested by the disinterested Managers, to repay the amount so paid or reimbursed in the event that a final non-appealable determination by a court of competent jurisdiction that determines such Indemnified Person is not entitled to indemnification under this Article 11. The Company may pay for insurance covering liability of the Indemnified Persons for negligence in operation of the Company's affairs.

11.2    Exculpation.    No Indemnified Person shall be liable, in damages or otherwise, to the Company or to any Member for any loss that arises out of any act performed or omitted to be performed in good faith by him or her pursuant to the authority granted by this Agreement, unless such act or omission was not in good faith or involved intentional misconduct or a knowing violation of law or unless such Indemnified Person derived an improper personal benefit from such act or omission.

11.3    Persons Entitled to Indemnity.    Any Person who is within the definition of "Indemnified Person" at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this Article 11 as an "Indemnified Person" with respect thereto, regardless whether such Person continues to be within the definition of "Indemnified Person" at the time of such Indemnified Person's claim for indemnification or exculpation hereunder.

11.4    Procedure Agreements.    The Company may enter into an agreement with any of its Managers, officers, employees, consultants, counsel or agents, setting forth procedures consistent with applicable law for implementing the indemnities provided in this Article 11.

11.5    Fiduciary and Other Duties.

11.5.1    Reliance on Agreement.    An Indemnified Person acting under this Agreement shall not be liable to the Company or to any other Indemnified Person for his or her good faith reliance on the provisions of this Agreement.

11.5.2    Standard of Conduct.    Except as otherwise set forth in Section 11.5.3, each Manager shall in the discharge of his or her duties

have a duty of fiduciary care to the Company and its Members as would a director of a corporation incorporated under Delaware law.

11.5.3 Other Business Ventures. The Managers and the Members may engage in or possess a significant interest in other business ventures of any nature and description, independently or with others.

## ARTICLE 12
## AMENDMENTS

12.1 Amendments to this Agreement. This Agreement may be modified or amended with the written consent of the Managers and the written consent approved by the Members by a Majority Vote. Notwithstanding the foregoing provisions of this Section 12.1, this Agreement may not be amended without the approval of each Member directly affected thereby if the amendment: (a) would reduce any such Member's Interests or would reduce the allocation to such Member of Net Profit or Net Loss, or would reduce the distributions of cash or property to such Member from that which is provided or contemplated herein, unless (i) such amendment is being executed to reflect any dilution in such Member's Interests resulting from the issuance of Units as contemplated by Article 3, (ii) such amendment is being executed to reflect the acceptance of a new Member pursuant to Article 9 or (iii) such amendment treats all Members ratably based on their Interests, or (b) would increase such Member's obligation to make Capital Contributions or obligation with respect to other liabilities. All amendments to this Agreement will be sent to each Member promptly after the effectiveness thereof. Notwithstanding any provision to the contrary in this Agreement, the Managers may (i) amend this Agreement to comply, or permit compliance, with applicable provisions of the Code and Treasury Regulations relating to the valuing of Interests issued in exchange for services rendered at the liquidation value of such Interests, and (ii) make any appropriate election on behalf of the Company with respect to such issuance(s). By becoming a party to this Agreement, each Member consents to the actions contemplated in the foregoing sentence and agrees to comply with the terms of any such election or amendment.

12.2 Corresponding Amendment of Certificate. The Managers shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any amendment to this Agreement.

12.3 Binding Effect. Any modification or amendment to this Agreement pursuant to this Article 12 shall be binding on all Members.

## ARTICLE 13
## GENERAL

13.1 Successors; Delaware Law; Etc. This Agreement: (a) shall be binding upon the successors, permitted assigns, executors, administrators, estates, heirs and legal successors of the Members; (b) shall be governed by and construed in accordance with the laws of the State of Delaware without any reference to any conflicts or choice of laws

provisions; (c) may be executed in more than one counterpart, all of which together shall constitute one agreement; and (d) contains the entire contract among the Members as to the subject matter hereof. The waiver of any of the provisions, terms or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms or conditions hereof.

13.2    Notices, Etc. Except as specifically set forth herein, all notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or receipt (which may be evidenced by a return receipt if sent by registered mail or by signature if delivered by courier or delivery service), addressed (a) if to any Member, at the address of such Member set forth in the records of the Company or at such other address as such Member shall have furnished to the Company in writing as the address to which notices are to be sent hereunder, and (b) if to the Company or to the Managers to them at:

13.3    Execution of Documents. From time to time after the date of this Agreement, upon the request of the Managers, each Member shall perform, or cause to be performed, all such additional acts, and shall execute and deliver, or cause to be executed and delivered, all such additional instruments and documents, as may be required to effectuate the purposes of this Agreement. Each Member, including each new and substituted Member, by the execution of this Agreement or by agreeing in writing to be bound by this Agreement, irrevocably constitutes and appoints each Manager or any Person designated by the Managers to act on such Member's behalf for purposes of this Section 13.3 as such Member's true and lawful attorney-in-fact with full power and authority in such Member's name and stead to execute, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out this Agreement, including:

(a)    all certificates and other instruments (specifically including counterparts of this Agreement), and any amendment thereof, that the Managers deem appropriate to qualify or to continue the Company as a limited liability company in any jurisdiction in which the Company may conduct business or in which such qualification or continuation is, in the opinion of the Managers, necessary to protect the limited liability of the Members;

(b)    all amendments to this Agreement adopted in accordance with the terms hereof and all instruments that the Managers deem appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement; and

(c)    all conveyances and other instruments that the Managers deem appropriate to reflect the dissolution of the Company.

The appointment by each Member of any Person designated by the Managers to act on their behalf for purposes of this Section 13.3 as such Member's attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that

each of the Members under this Agreement will be relying upon the power of the Managers to act as contemplated by this Agreement in any filing and other action by him or her on behalf of the Company, and shall survive the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Member giving such power and the Transfer of all or any part of such Member's Interests; provided, however, that in the event of a Transfer by a Member of all of its Interest, the power of attorney given by the transferor shall survive such assignment only until such time as the assignee shall have been admitted to the Company as a substitute Member and all required documents and instruments shall have been duly executed, filed, and recorded to effect such substitution.

13.4    Disputed Matters. Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member hereunder shall be submitted to arbitration in New York, New York before the American Arbitration Association under the commercial arbitration rules then obtaining of said Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. To the fullest extent permitted by law, no action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by any Member except (a) an action to compel arbitration pursuant to this Section 13.4 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.4.

13.5    Severability. In case any provision of this Agreement is determined by a court to be invalid, illegal or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

13.6    Table of Contents; Headings. The table of contents and headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing this Agreement.

13.7    No Third Party Rights. The provisions of this Agreement are for the benefit of the Company, the Managers and the Members and no other Person, including creditors of the Company, shall have any right or claim against the Company, the Managers or any Member by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement. In particular, nothing expressed by or mentioned in this Agreement is intended or shall be construed to give any Member any legal or equitable right, remedy or claim for continued employment with the Company or with any of its Affiliates. There are no third party beneficiaries of this Agreement.

*[The remainder of this page is intentionally blank]*

The parties have executed this Agreement as of the date first set forth above.

_____

Name:

_____

Name:

BOS111 12566709.10

## JOINDER

The undersigned have joined this Agreement as Members as of the respective dates set forth below their signatures:

Name: _____

Date:

Name: _____

Date:

Name: _____

Date:

Exhibit 3.1

## Members and Capital Contributions

| Name and Address of Member | Dates and Amounts of Initial Capital Contributions | Units |
|---|---|---|
| **Investment Members** | | Investment Units |
| | | |
| **Incentive Members** | | Incentive Units Vested and (Unvested) |

**Exhibit A**

**Specimen Unit Certificate**

BOS111 12566709.10