UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -against-

EVAN GREEBEL,

              *Defendant.*

ECF Case

No. 15-cr-00637 (KAM)

<u>ORAL ARGUMENT REQUESTED</u>


**MR. GREEBEL'S MOTION *IN LIMINE* TO PRECLUDE LAY OPINION TESTIMONY
THAT VIOLATES RULES 701, 401, AND 403**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................. 1

II. ARGUMENT ................................................................................................. 1

    A.    The Test of Admissibility of Lay Opinion Testimony Under Rule 701 ................. 1

    B.    The Court Should Preclude Specific Lay Opinion Testimony Elicited From Jackson Su, Stephen Aselage, and Corey Massella During Shkreli's Trial ........................................................................................................ 3

        1.    Jackson Su's Lay Opinion Testimony About the Relationship Between Mr. Shkreli and Mr. Greebel Is Inadmissible Under Rules 701, 401, and 403 ....................................................................... 4

        2.    Stephen Aselage's Lay Opinion Testimony About the Relationship Between Mr. Shkreli and Mr. Greebel Is Inadmissible Under Rules 701, 401, and 403 ....................................................................... 8

        3.    Stephen Aselage's Lay Opinion Testimony About the Relationship Between Mr. Shkreli and Mr. Panoff Is Inadmissible Under Rules 701, 401, and 403 ....................................................................... 12

        4.    This Court Should Preclude Stephen Aselage's Lay Opinion Testimony that Katten Muchin's Legal Bills "Seemed Extremely High" ......................................................................................... 13

        5.    The Court Should Preclude Corey Massella's Lay Opinion Testimony Relating to the Stock Transfer Agreement Between Mr. Shkreli and Marek Biestek ........................................................ 14

        6.    This Court Should Preclude Timothy Pierotti's Lay Opinion Testimony Relating to "Trading Stock Back and Forth" and "Going Over The Wall" ....................................................................... 18

III. CONCLUSION .......................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. City of N.Y.*,
    993 F. Supp. 2d 306 (E.D.N.Y. 2014) ...................................................................3

*Baumgart v. Transoceanic Cable Ship Co., Inc.*,
    No. 01 CIV.5990 LTS HBP, 2003 WL 22520034 (S.D.N.Y. Nov. 7, 2003) ...........2

*United States v. Collins*,
    581 Fed. App'x 59 (2d Cir. 2014) ........................................................................3

*United States v. Garcia*,
    413 F.3d 201 (2d Cir. 2005) .................................................................................2

*United States v. Grinage*,
    390 F.3d 746 (2d Cir. 2004) .................................................................................1

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007) ...........................................................................1, 2, 4

*United States v. McDarrah*,
    351 F. App'x 558 (2d Cir. 2009) ..........................................................................3

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ...............................................................................3

**Rules**

Fed. R. Evid. 701 ......................................................................................................1

Fed. R. Evid. 701, 401, and 403 ...............................................................................3

Fed. R. Evid. 701(a) ..................................................................................................1

Fed. R. Evid. 701(b) ..................................................................................................2

Rule 401 and Rule 403 ............................................................................................14

# I. INTRODUCTION

Pursuant to Federal Rules of Evidence ("Rules" or "FRE") 701, 401, and 403, Mr. Greebel moves to preclude the government from offering specific lay opinion testimony elicited from Jackson Su, Stephen Aselage, Steven Richardson, Corey Massella, and Timothy Pierotti during the trial of *United States v. Shkreli*.

# II. ARGUMENT

## A.       The Test of Admissibility of Lay Opinion Testimony Under Rule 701

Pursuant to Rule 701, the government may not elicit lay opinion testimony from a percipient witness unless the government can establish such testimony satisfies three prerequisites.  Rule 701 states:  "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The burden is on the government as the party offering the lay opinion testimony to establish that the witness's proffered perception is "rationally based" and "helpful to a clear understanding of the witness's testimony or to determining a fact in issue."  *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (quoting Rule 701).

With respect to the first prerequisite under Rule 701(a), lay opinion testimony that is not "rationally based on the perception of the witness" is inadmissible.  *Id.*; *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004).  To determine whether the testimony meets the first prerequisite, the Second Circuit requires that the testimony must be "both (a) based on the witness's first-hand perceptions and (b) rationally derived from those first-hand perceptions." *Kaplan*, 490 F.3d at 119.  Plainly, it is not enough for a witness to have observed something to

offer a lay opinion about the significance of, inferences from, or conclusions based on his or her observations.  What is required is that such an opinion be "rationally derived from those first-hand perceptions."  *Id.*  For example, observations of two people speaking a limited number of times without overhearing the subject matter of the discussions or the statements made by both people does not entitle the witness to testify about the nature of the relationship.  For example, if someone visited Your Honor's courtroom on three occasions during the trial of *United States v. Shkreli*, and observed Your Honor speaking with your law clerk in hushed tones without overhearing the conversations, that visitor would not be entitled to offer lay opinion testimony about the nature of Your Honor's relationship with the law clerk.

With respect to the second prerequisite under Rule 701(b), any lay opinion must be helpful to clearly understanding the witness's testimony or to determining a fact in issue.  Rule 701(b) prohibits lay opinion testimony when "personal perceptions [take the] form of inferences or conclusory opinions."  *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005); *see Baumgart v. Transoceanic Cable Ship Co., Inc.*, No. 01 CIV.5990 LTS HBP, 2003 WL 22520034, at *2 (S.D.N.Y. Nov. 7, 2003) (precluding testimony about wages and potential earnings because witness lacked personal knowledge of the plaintiff's actual employment history and instead drew conclusions through extrapolations and inferences); *see also Kaplan*, 490 F.3d at 117–19 (district court abused its discretion admitting lay opinion testimony about what the defendant lawyer meant when he said "these kinds of cases"; the government failed to lay sufficient foundation that the witness had personal knowledge about what the defendant lawyer meant).  To continue with the example of someone who visits Your Honor's courtroom on a few occasions and observes Your Honor speaking with a law clerk, that visitor would not be entitled to offer lay opinion testimony about the inferences and conclusory opinions that such visitor

drew about Your Honor, your law clerk, and the nature of the discussions between Your Honor and the law clerk.

Moreover, the Second Circuit has held that "[a]n opinion is unhelpful and therefore may not be received in evidence if, for example, the testimony would merely recapitulate aspects of the evidence that the jury can already perceive on its own." *United States v. Collins*, 581 Fed. App'x 59, 60 (2d Cir. 2014) (summary order); *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) ("[Rule 701(b)] is designed to provide 'assurance[] against the admission of opinions which would merely tell the jury what result to reach.'" (quoting Fed. R. Evid. 704 Advisory Committee Notes on 1972 Proposed Rules)).

Finally, pursuant to Rule 701(a), a lay opinion founded in "the totality of information gathered by various persons in the course of an investigation, was not admissible before a jury." *Adams v. City of N.Y.*, 993 F. Supp. 2d 306, 324–25 (E.D.N.Y. 2014). Lay opinion testimony is also improper when it leans too heavily on information or observations from other sources, including other colleagues in an investigation. *See United States v. McDarrah*, 351 F. App'x 558, 562 (2d Cir. 2009) (agent's testimony about the defendant's state of mind was improper "lay" opinion testimony).

**B.    The Court Should Preclude Specific Lay Opinion Testimony Elicited From Jackson Su, Stephen Aselage, Corey Massella, and Timothy Pierotti During Shkreli's Trial**

Applying the legal principles set forth above, pursuant to Rules 701, 401, and 403, we move to preclude the government from offering certain lay opinion testimony elicited during the trial of *United States v. Shkreli* from Jackson Su, Stephen Aselage, Corey Massella, and Timothy Pierotti.[1]

---

[1]    While we are moving to preclude specific testimony based on the trial of *United States v. Shkreli*, we reserve the right to object at trial to other testimony that may or may not have been

*(Cont'd on next page)*

1.     **Jackson Su's Lay Opinion Testimony About the Relationship Between Mr. Shkreli and Mr. Greebel Is Inadmissible Under Rules 701, 401, and 403**

Although Mr. Shkreli did not object, the following testimony of Jackson Su during the

trial of *United States v. Shkreli* is inadmissible in evidence:

> Q:     And in terms of their relationships, between Mr. Shkreli and Mr. Greebel that you observed, did you actually observe them interacting together?
> A:     Yes.
> Q:     And did you observe anything about their relationship?
> A:     *Martin was the one that mostly directed Evan to do whatever he needed and he, Martin controlled the conversation more, normally.*

Shkreli Trial Tr. 2178:13–20 (emphasis added).  Mr. Su's testimony that "Martin was the one

that mostly directed Evan to do whatever he needed and he, Martin controlled the conversation

more, normally" ("Mr. Su's Relationship Testimony") is inadmissible under Rules 701, 401, and

403.

First, Mr. Su's Relationship Testimony does not meet the first requirement of Rule

701(a).  Mr. Su's opinion lacks foundation that he has sufficient first-hand perceptions of Mr.

Shkreli and Mr. Greebel to offer a lay opinion about the nature of their relationship.  (1) There is

no evidence about how many times Mr. Su observed Mr. Shkreli and Mr. Greebel "interacting

together."  *See, e.g.*, *Kaplan*, 490 F.3d at 117–19 (district court abused its discretion when it

admitted lay opinion testimony because the government did not lay a sufficient foundation to

---

*(Cont'd from previous page)*

elicited from witnesses at Mr. Shkreli's trial.  Further, in some instances described herein, Mr. Shkreli's decision not to object cannot have any bearing on our motion to preclude the testimony and any of our objections or arguments at trial.  During Mr. Shkreli's trial, both the government and Mr. Shkreli had reasons to enlarge the role of Mr. Greebel in connection with certain events. Enlarging Mr. Greebel's role supported Mr. Shkreli's contention that he relied on the advice of counsel; enlarging Mr. Greebel's role supported the government's contention that Mr. Greebel knowingly, intentionally, and willfully joined Mr. Shkreli's alleged schemes (the jury of course found that Mr. Shkreli had not engaged in certain of those alleged schemes, including acquitting Mr. Shkreli of conspiring with Mr. Greebel in the charged wire fraud conspiracy in Count Seven).

demonstrate that the witness had personal knowledge).  Based on the limited amount of time that

Mr. Su worked at MSMB Capital, MSMB Healthcare, and Retrophin from early January 2012

through December 2012, and our investigation, we proffer to the Court that we believe that Mr.

Su observed Mr. Shkreli and Mr. Greebel together on fewer than a handful of occasions.  The

absence of any attempt to elicit the number of times that Mr. Su observed them together, along

with any details relating to those observations, speaks volumes.  (2) Further, based on Mr. Su's

testimony, it is apparent that Mr. Su did not overhear and/or does not recall any of the

conversations that he observed between Mr. Shkreli and Mr. Greebel and thus there is a complete

absence of knowledge of the subject matter and the content of the communications.

(3) Moreover, there is no evidence about when Mr. Su observed Mr. Shkreli speaking with Mr.

Greebel—the timing of such conversations is important and must be taken into account before

determining whether the government has satisfied its burden of meeting the first prerequisite in

Rule 701(a).

Second, Mr. Su's Relationship Testimony does not meet the requirement of Rule 701(a)

that the lay opinion testimony must be "rationally derived from those first-hand perceptions."

Mr. Su's opinion that "Martin was the one that mostly directed Evan to do whatever he needed"

is not a rationally derived opinion from observing Mr. Shkreli and Mr. Greebel "interacting

together."  Mr. Su should not be permitted to testify to the first part of his opinion that Mr.

Shkreli was the one who "mostly directed" Mr. Greebel "to do whatever he needed" based on

whatever number of observations Mr. Su had of them together without any testimony about the

subject-matter, content, context, and timing of the communications that Mr. Su allegedly

observed.  Further, Mr. Su's testimony that Mr. Shkreli was the one who "mostly directed" Mr.

Greebel seems to reflect that Mr. Su believed that, on at least one or more occasion, Mr. Shkreli

did not direct Mr. Greebel what to do. Whether Mr. Shkreli directed Mr. Greebel on at least one occasion to do lawful projects—such as work on the reverse merger—is entirely unclear from the testimony; whether Mr. Greebel on at least one occasion directed Mr. Shkreli to take actions that Mr. Shkreli did or did not do is entirely unclear from the testimony. Moreover, Mr. Su cannot offer a lay opinion about whether one party to the conversation directed another party to do something, much less "whatever is needed"—that is not rationally based. And one cannot rationally draw such conclusions without knowing the subject-matter of the communications, the content of the dialogue, the context of the communications, and/or the timing of those communications. Certainly if Mr. Su observed, but did not overhear, does not know, or does not recall the content of any communications between Mr. Shkreli and Mr. Greebel, then Mr. Su cannot testify based on observations alone as to whether one person dominated the conversation or directed the other person what to do. Undoubtedly, Mr. Su's testimony was based principally, if not wholly, on his personal interactions and views of Mr. Shkreli. As a result, it violates Rule 701(a) to elicit the lay opinion testimony.

The second part of Mr. Su's lay opinion that "he, Martin controlled the conversation more, normally" is similarly impermissible under Rule 701(a) for the same reasons. That lay opinion is not rationally based without any understanding of what Mr. Su observed on each occasion, the subject-matter of the communications, the content of the dialogue, the context of the communications, and/or the timing of the communications.

Third, Mr. Su's lay opinion testimony about the nature of the relationship between Mr. Shkreli and Mr. Greebel does not meet the additional requirement under Rule 701(b) that the lay opinion must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Mr. Su's conclusory opinion without any substantive basis to back it up will not

be helpful to clearly understanding Mr. Su's testimony.  It will also not be helpful to determining "a fact in issue."  Mr. Su *speculates* about the nature of the relationship between Mr. Shkreli and Mr. Greebel based on a highly limited number of observations without participating in the conversations and without an understanding of the subject matter, content of the dialogue, the context of the communications, and/or the timing of the communications.  Such speculation is not only impermissible, but it is also not helpful to determining whether Mr. Greebel knowingly, intentionally, and willfully agreed to join the charged conspiracy in Count Seven and the charged conspiracy in Count Eight.

Finally, Mr. Su's lay opinion testimony should also be precluded under Rule 401 and Rule 403.  The government elicited the testimony for purposes of arguing that Mr. Shkreli was the dominant personality and directed Mr. Greebel to do whatever was needed, implying that Mr. Greebel followed Mr. Shkreli's directives even when such directives were unlawful.  But Mr. Su's lay opinion that "Martin was the one that mostly directed Evan to do whatever he needed and he, Martin controlled the conversation more, normally" does not make a fact of consequence more likely or less likely—particularly given that outside counsel for companies are supposed to listen to the management of their clients and follow their directives unless, of course, directed to do something unlawful.  Mr. Su's lay opinion could apply to numerous uncharged indisputably innocent attorneys working at law firms that counsel corporate clients every day.  Mr. Su's lay opinion testimony adds nothing of consequence about whether Mr. Shkreli directed Mr. Greebel to do anything unlawful.  The same relationship applies to line assistants working for United States Attorneys; just because someone opines that, based on observing conversations between a line Assistant United States Attorney and the United States Attorney on a few occasions, the line Assistant United States Attorney took direction from the United States Attorney, listened when

the United States Attorney spoke, and the United States Attorney "controlled" the

conversation—whatever that may mean—it does not mean that the line Assistant United States

Attorney agreed to follow an improper directive.  To the extent that the Court finds that there is a

scintilla of probative value in Mr. Su's lay opinion testimony of his observations of Mr. Shkreli

and Mr. Greebel interacting, we respectfully submit that the danger of unfair prejudice,

confusion of the issues, and misleading the jury substantially outweighs such limited, if any,

probative value.  It is improper for the government to ask the jury to draw the conclusion that

Mr. Greebel agreed to an unlawful objective of Mr. Shkreli based on such lay opinion testimony

that lacks foundation, and requires endless speculation.

### 2. Stephen Aselage's Lay Opinion Testimony About the Relationship Between Mr. Shkreli and Mr. Greebel Is Inadmissible Under Rules 701, 401, and 403

This Court should preclude the government from eliciting the following testimony from

Stephen Aselage at trial:

> Q:   Did you have the opportunity to observe the defendant and Mr. Greebel interact in person?
> A:   I did.
> Q:   Where was that?
> A:   Board meetings and occasionally in the office.  But mostly either at dinner before a Board meeting or the Board meeting itself.
> Q:   Based on those interactions, what was the relationship like from what you could observe between the defendant and Mr. Greebel?
> A:   *They seemed very close.*
> Q:   In terms of which of the two individuals was the individual who kind of, who was the leader in the relationship?
> A:   *Mr. Shkreli was the dominant personality.*
> Q:   What makes you say that?
> A:   *Just the interaction, the tone.  When there was an issue to be decided, Mr. Shkreli was directive to Mr. Greebel; and Mr. Greebel was responsive.*

Shkreli Trial Tr. 3394:17–3395:10 (emphasis added).  Mr. Aselage's testimony that Mr. Shkreli

and Mr. Greebel "seemed very close," that "Mr. Shkreli was the dominant personality," and that

from "the interaction, the tone[,] [w]hen there was an issue to be decided, Mr. Shkreli was

directive to Mr. Greebel; and Mr. Greebel was responsive" ("Mr. Aselage's Relationship Testimony") is inadmissible under Rules 701, 401, and 403.

First, Mr. Aselage's Relationship Testimony does not meet the first requirement of Rule 701(a). Mr. Aselage's opinion lacks foundation that he has sufficient first-hand perceptions of Mr. Shkreli and Mr. Greebel to offer a lay opinion about the nature of their relationship. Mr. Aselage's testimony that he observed Mr. Shkreli and Mr. Greebel together at "Board meetings and occasionally in the office. But mostly either at dinner before a Board meeting or the Board meeting itself" is proof that Mr. Aselage did not have sufficient observations of Mr. Shkreli and Mr. Greebel together to draw reliable inferences therefrom. (1) The government has not laid a sufficient foundation that Mr. Aselage observed Mr. Shkreli and Mr. Greebel interacting together for anything but an immaterial amount of time. Indisputably, Mr. Aselage worked and lived in San Diego (Shkreli Trial Tr. 3298:6–7; 3309:23–3310:20) while Mr. Shkreli worked and lived in New York (Shkreli Trial Tr. 4759:12–16); almost all Board meetings were held by telephone and not in person (Shkreli Trial Tr. 3347:6–13); and Mr. Aselage testified that he "was only physically with [Mr. Greebel] once or twice" for Board meetings" (Shkreli Trial Tr. 3085:3–9). We proffer to the Court that, at the dinner prior to the Board meeting about which Mr. Aselage testified, we believe that Mr. Greebel and Mr. Shkreli did not sit together.[2] (2) Mr. Aselage does not appear to be able to testify about the subject matter and/or the content of any in-person discussions that Mr. Aselage observed.

Second, Mr. Aselage's Relationship Testimony does not meet the requirement of Rule 701(a) that the lay opinion testimony must be "rationally derived from those first-hand

---

[2]    Stephen Richardson testified that he met Mr. Greebel in February 2014 at a dinner the night before the Board meeting at the Norwood Club. *See* Shkreli Trial Tr. 2925:2–2926:13; 2934:18–2935:3.

perceptions." Mr. Aselage's testimony that Mr. Shkreli and Mr. Greebel "seemed very close" and that "Mr. Shkreli was the dominant personality" does not appear to be "rationally derived" from limited in-person observations where there is a complete absence of knowledge of the subject-matter and the content of the conversations. Mr. Aselage testified that he drew his opinions about the nature of the relationship between Mr. Shkreli and Mr. Greebel from the "interaction, the tone" but those are conclusory statements without foundation. There was no *voir dire* on what exactly Mr. Aselage observed regarding the "interactions, the tone" including but not limited to the length of time of Mr. Aselage's observations, the nature of the tone of Mr. Shkreli and Mr. Greebel, whether others were present for the conversation, and, of course, the subject-matters and/or content of the conversations.

Third, Mr. Aselage's Relationship Testimony does not meet the requirement of Rule 701(b) that the lay opinion must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." It is entirely unclear what it means that two people "seemed very close"—such testimony based on speculation, extrapolation, and inference can mean almost anything. Further, it is entirely unclear what it means when someone testifies that Mr. Shkreli was the "dominant personality." It seems apparent that there was a perception that Mr. Shkreli was the "dominant personality" with everyone, including Stephen Richardson, Mr. Aselage, and all employees. Moreover, for the same reasons that Mr. Su's Relationship Testimony was not helpful, Mr. Aselage's Relationship Testimony, including his opinion that "when there was an issue to be decided, Mr. Shkreli was directive to Mr. Greebel; and Mr. Greebel was responsive," is not helpful to the jury in making a determination regarding a fact at issue in the case.

Indeed, Mr. Aselage used the very same language to describe Mr. Shkreli's relationship with Mr. Greebel and Mr. Shkreli's relationship with Mr. Panoff, and this Court struck Mr.

Aselage's observations of Mr. Panoff's reactions to a conversation with Mr. Shkreli based on the absence of any foundation.  Shkreli Trial Tr. 3408:11–20.  In describing Mr. Shkreli's relationship with Mr. Greebel, Mr. Aselage testified:  "Mr. Shkreli was the dominant personality."  Shkreli Trial Tr. 3395:6.  In describing Mr. Shkreli's relationship with Mr. Panoff, Mr. Aselage said exactly the same thing:  "Mr. Shkreli was the dominant personality."  Shkreli Trial Tr. 3405:22.  Based on how Mr. Aselage viewed Mr. Shkreli, it seems likely that Mr. Aselage would say that Mr. Shkreli was the "dominant personality" with anyone and everyone.  In describing how Mr. Shkreli was "dominant" with Mr. Greebel, Mr. Aselage testified:  "Mr. Shkreli was directive to Mr. Greebel; and Mr. Greebel was responsive."  Shkreli Trial Tr. 3395:9–10.  Similarly, in describing how Mr. Shkreli was "dominant" with Mr. Panoff, Mr. Aselage testified:  "[Mr. Shkreli] was very directive toward Mr. Panoff, and somewhat dismissive toward Mr. Panoff."  Shkreli Trial Tr. 3405:23–24.  Again, it seems likely that Mr. Aselage would offer the same reasoning for Mr. Shkreli's relationship with anyone and everyone.  Moreover, it is the role of outside counsel to listen and respond to questions at Board meetings, not to lead discussions.

Finally, Mr. Aselage's Relationship Testimony should also be precluded under Rule 401 and Rule 403.  As with Mr. Su's Relationship Testimony, the government elicited Mr. Aselage's Relationship Testimony for purposes of arguing that Mr. Shkreli was the dominant personality and that Mr. Greebel did whatever Mr. Shkreli directed him to do, implying that Mr. Greebel followed Mr. Shkreli's directives even when such directives were unlawful.  But, as with Mr. Su's Relationship Testimony, Mr. Aselage's Relationship Testimony does not make a fact of consequence more likely or less likely.  Mr. Aselage used exactly the same language to describe Mr. Shkreli's relationship with Mr. Panoff, and the government never contested Mr. Shkreli's

11

counsel's statement to the Court during a sidebar that Mr. Panoff was "not charged with being a co-conspirator, unindicted co-conspirator."  Shkreli Trial Tr. 3407:21–22.  Indeed, the "fact" that a client's CEO was observed to be "dominant" and "directive" toward outside counsel is probative of nothing.  Outside counsel for companies are supposed to listen to the management of their clients and follow their directives unless, of course, directed to do something unlawful.  Mr. Aselage's lay opinion could apply to numerous uncharged indisputably innocent attorneys working at law firms that counsel corporate clients every day.  Mr. Aselage's lay opinion testimony adds nothing of consequence about whether Mr. Shkreli directed Mr. Greebel to do anything unlawful.  To the extent that the Court finds that there is a scintilla of probative value in Mr. Aselage's lay opinion testimony of his observations of Mr. Shkreli and Mr. Greebel interacting, we respectfully submit that the danger of unfair prejudice, confusion of the issues, and misleading the jury substantially outweighs such limited, if any, probative value.  It is improper for the government to ask the jury to draw the conclusion that Mr. Greebel agreed to an unlawful objective of Mr. Shkreli based on such lay opinion testimony that lacks foundation and requires endless speculation.

3.    **Stephen Aselage's Lay Opinion Testimony About the Relationship Between Mr. Shkreli and Mr. Panoff Is Inadmissible Under Rules 701, 401, and 403**

This Court should preclude the government from eliciting the following testimony from Stephen Aselage at trial:

Q:    Let me ask you about Marc Panoff.  In the summer of 2014, what was the relationship between Marc Panoff and the defendant?

A:    Marc Panoff worked for Mr. Shkreli.  Marc Panoff was the Chief Financial Officer.

Q:    What was the relationship like in the summer of 2014 time period?

A:    *Well, it was Mr. Shkreli was the dominant personality.  He was very directive toward Mr. Panoff, and somewhat dismissive toward Mr. Panoff.*

Shkreli Trial Tr. 3405:15–24.  Mr. Aselage's lay opinion testimony about Mr. Shkreli's

relationship with Mr. Panoff is inadmissible under Rules 701, 401, and 403.  Following Mr.

Aselage's lay opinion testimony, this Court struck the next question from the government ("Did

you observe any interactions between Mr. Panoff and Mr. Shkreli that were disconcerting to

you?" (Shkreli Trial Tr. 3405:25–3406:1)) and Mr. Aselage's answer.  Shkreli Trial Tr. 3408:11–

20.

      Mr. Aselage's lay opinion testimony about the nature of the relationship between Mr.

Shkreli and Mr. Panoff does not satisfy the elements of Rule 701.  First, there is no evidence that

Mr. Aselage was able to observe Mr. Panoff and Mr. Shkreli together on a sufficient number of

occasions to offer any lay opinion testimony about their relationship.  Second, Mr. Aselage's lay

opinion testimony is not "rationally derived from those first-hand perceptions."  Similar to Mr.

Su's Relationship Testimony and Mr. Aselage's Relationship Testimony, Mr. Aselage's

statements that Mr. Shkreli was the "dominant personality" and "very directive toward Mr.

Panoff, and somewhat dismissive toward Mr. Panoff" cannot be "rationally derived" without any

understanding of the subject matters, the content, and the context of their conversations.  Finally,

for the reasons stated above, Mr. Aselage's opinions about Mr. Shkreli's relationship with Mr.

Panoff does not meet the requirement of Rule 701(b) that the lay opinion must be "helpful to

clearly understanding the witness's testimony or to determining a fact in issue."  And it would

violate both Rule 401 and Rule 403.

### 4.    This Court Should Preclude Stephen Aselage's Lay Opinion Testimony that Katten Muchin's Legal Bills "Seemed Extremely High"

      The Court should preclude the government from eliciting from Mr. Aselage that Katten

Muchin Rosenman LLP's ("Katten Muchin") legal bills "seemed extremely high, relative to

what you would expect legal costs would be for a firm our size."  Shkreli Trial Tr. 3394:7–9.

While Mr. Aselage may testify that Retrophin did not continue with Katten Muchin's services because of the costs, Mr. Aselage's testimony that they were "extremely high, relative to what you would expect legal costs would be for a firm our size" constitutes impermissible lay opinion testimony.  First, the government failed to lay a sufficient foundation for Mr. Aselage's lay opinion about the expected legal costs of a firm that was the size of Retrophin in 2012 to 2014. Second, Mr. Aselage's opinion that Katten Muchin's legal bills were "extremely high, relative to what you would expect" is not helpful to determining a fact at issue.  Whether or not Katten Muchin's legal bills are low, medium, or high as compared with other firms does not make a fact of consequence about whether Mr. Greebel agreed to join Mr. Shkreli's alleged illegal schemes more or less likely.  Third, Mr. Aselage's lay opinion testimony about the relative expense of the law firm's services violates both Rule 401 and Rule 403.  Its probative value is unclear, at best, and any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  There is a considerable danger that the jury will jump to the inappropriate conclusion that Mr. Greebel did something improper as a result of the "extremely high" legal bills.  For example, there is a real danger that the jury will infer that Mr. Shkreli was overpaying Katten Muchin in order to gain Mr. Greebel's participation in the charged conspiracies.  There is no evidence to support such a claim and nothing could be further from the truth.

### 5.     The Court Should Preclude Corey Massella's Lay Opinion Testimony Relating to the Stock Transfer Agreement Between Mr. Shkreli and Marek Biestek

The Court should preclude the government from eliciting the following different portions of lay opinion testimony from Corey Massella at trial:

Q:      Was there anything unusual about an employee or officer providing shares to the CEO of a company?

14

> A:      *It's unusual from – from my experience.*
> Q:      And why is it unusual?
> A:      *Usually, if anything, the CEO would be giving to employees, not the reverse.*

Shkreli Trial Tr. 3911:14–19 (hereinafter "Mr. Massella's Gifting Opinion").

> Q:      In the normal course of a company going public, how far in advance of that event
>         is the cap table usually set?
> A:      *It's usually set pretty solid before you go public.*
> Q:      And why is that?
> A:      *Because – because the cap table not only affects us when we're doing the*
>         *financial statement, it affects the SEC document when they put it to the – the*
>         *lawyers are going to be working with that cap table when they go – when they go*
>         *public.  And also for what they're offering and what they're gonna be doing in*
>         *terms of the reverse merger that affects the percentages of what happens.*

Shkreli Trial Tr. 3914:12–22 (hereinafter "Mr. Massella's Cap Table Opinions").

> Q:      Would you have been concerned if you did notice the date had been changed from
>         a later date, November of 2012, to an earlier date in June of 2012?
> A:      Yes.
> Q:      And why is that?
> A:      *Because you can't change the date.  That would be called backdating.*
> Q:      What is the problem with backdating?
> A:      *It's not allowed and we are not allowed to go back and retroactively change a*
>         *legal document.*
> Q:      What is the effect of backdating a document like this?
> A:      *There are SEC rules that just – just do not allow it legally.*
> Mr. Agnifilo:  Judge, I am objecting to all of this.
> The Court:  Al[right], we will strike that last response.

Shkreli Trial Tr. 3919:23–3920:13 (hereinafter "Mr. Massella's Backdating Opinion").

Mr. Massella's Gifting Opinion, Cap Table Opinions, and Mr. Massella's Backdating

Opinion are inadmissible under Rules 701, 401, and 403.

First, Mr. Massella's Gifting Opinion, Cap Table Opinions, and Backdating Opinion do

not satisfy the first requirement of Rule 701(a).  The government failed to lay a sufficient

foundation for Mr. Massella's lay opinions.  It is entirely unclear how many times Mr. Massella

worked with private companies going public.  The fact that Mr. Massella is dead wrong about his

opinions corroborates that the government did not and cannot lay a sufficient foundation for

them.  For example, Mr. Massella's opinion that the capitalization table is "usually set pretty solid before you go public" is directly contrary to industry practice.  We proffer to the Court that, in sum and substance, Dean Stephen Ferruolo will testify that, in his expert opinion, the capitalization tables of private companies are often changing right up through the last weeks-to-days before the public offering.  And Dean Ferruolo will explain why to the jury.  Indeed, Mr. Massella's testimony acknowledges that his lay opinion is based on what he thinks "the lawyers are going to be working with," and Dean Ferruolo (unlike Mr. Massella) represented companies and counseled them about, among other things, changing capitalization tables on an innumerable number of occasions during the course of his 20 years as outside corporate counsel to startup companies.  Moreover, Mr. Massella's opinion that "SEC rules" prohibit backdating is inaccurate.  There is no SEC rule prohibiting "backdating" and, as Dean Ferruolo will testify and as the case law reflects, legal agreements are "backdated" to reflect the date of the understanding between the parties.

Second, Mr. Massella's Gifting Opinion, Cap Table Opinions, and Backdating Opinion do not meet the requirement of Rule 701(a) that the lay opinion testimony must be "rationally derived from those first-hand perceptions."  The government did not lay a sufficient foundation to show that Mr. Massella's prior experiences from first-hand perceptions enabled him to offer a "rationally derived" lay opinion regarding whether it is common or uncommon for employees to gift stock to CEOs; whether a private company's capitalization table undergoes changes right up to the very last moments prior to the public offering; and whether backdating violates the SEC's rules.  Further, Mr. Massella should not be permitted to offer a lay opinion about the alleged backdating of the stock transfer agreement between Mr. Shkreli and Mr. Biestek when Mr. Massella testified that he did not recall noticing any changes to the date of the agreement.

16

Shkreli Trial Tr. 3919:11–14.  Having failed to remember whether he noticed any changes to the date of the agreement, Mr. Massella's opinions about whether he "would have been concerned" about them are not "rationally derived" from "first-hand perceptions."

Third, Mr. Massella's Gifting Opinion, Cap Table Opinions, and Backdating Opinion do not meet the requirement of Rule 701(b) that such lay opinions must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue."  With respect to Mr. Massella's Gifting Opinion, Mr. Massella never testified that he had concerns at the time about the gifting of Retrophin shares from one private individual to another.  In fact, he testified that his "WTF" reaction in Government Exhibit 123-2 was "[o]ut of frustration that everything kept changing" (Shkreli Trial Tr. 3913:11–19) and a stock transfer from one private party to another was a gift that did not need to be disclosed (Shkreli Trial Tr. 3916:2–11).  Accordingly, Mr. Massella's lay opinion about whether it was common for an employee to gift shares to a CEO was not "helpful to clearly understanding the witness' testimony or to determining a fact in issue."  With respect to Mr. Massella's Cap Table Opinions and Backdating Opinion, they are not "helpful" in any respect since they are wrong and the government should not be permitted to elicit such controversial (and inaccurate) opinion testimony except otherwise through an expert witness.

Finally, Mr. Massella's Gifting Opinion, Cap Table Opinions, and Backdating Opinion violate Rule 401 and 403.  For the aforementioned reasons, none of these lay opinions make a fact of consequence more or less likely.  Moreover, any scintilla of probative value of such opinions is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, since Mr. Massella's lay opinions are inaccurate and contrary to industry practice.

**6.      This Court Should Preclude Timothy Pierotti's Lay Opinion Testimony Relating to "Trading Stock Back and Forth" and "Going Over The Wall"**

The Court should preclude the government from eliciting the following lay opinion

testimony from Timothy Pierotti at trial relating to trading stock back and forth to create volume:

> Q:    What do you mean by "trade the stock"?
>
> A:    Stocks are more valuable if they have more liquidity.  And
> the liquidity is measured by the volume of the stock.  So, if
> a group of people decided to just trade stock back and forth
> amongst themselves for the purpose of creating volume,
> that would be insider trading.

Shkreli Trial Tr. 4265:1-6.  During Mr. Shkreli's trial, the government stated that it had "no

objection to striking the answer, which we've stricken other kind of similar legal conclusions

along these lines from other witnesses at other points."  Shkreli Trial Tr. 4267:12-15; *see also*

4269:12-17 (wherein the government stated that it "had this conversation, but I will speak to

[Mr. Pierotti] again about any kind of legal conclusions or phrases along those lines" and the

Court stated:  "I appreciate what you're dealing with.  From the early get-go it was clear he's

somebody who likes to talk.").

The Court should also preclude the government from eliciting the following lay opinion

testimony from Mr. Pierotti relating to how the "over-the-wall" process works on Wall Street:

> Q:    You think that is what a responsible person who has
> received an email that contains inside information does, is
> they delete the email?
>
> A:    . . . It never happens on Wall Street that somebody tells
> you that you are going over the wall.  That is not the way it
> works.  You are asked, may I bring you over the wall.  That
> is how it works on Wall Street.

Shkreli Trial Tr. 4321:9-19.  The government did not elicit this testimony as it came out on

cross-examination.  However, Mr. Pierotti should be precluded from offering his lay opinions

about how the over-the-wall process "works on Wall Street."

18

## III. CONCLUSION

For all these reasons, the Court should preclude the government from offering specific

lay opinion testimony elicited from Jackson Su, Stephen Aselage, Steven Richardson, Corey

Massella, and Timothy Pierotti during the trial of *United States v. Shkreli*.


Dated:   New York, New York
         August 18, 2017

                                    */s/ Reed Brodsky*
                                    Reed Brodsky
                                    Winston Y. Chan
                                    Randy M. Mastro
                                    Lisa H. Rubin

                                    GIBSON, DUNN & CRUTCHER LLP
                                    200 Park Avenue
                                    New York, NY 10166
                                    (212) 351-4000
                                    rbrodsky@gibsondunn.com
                                    *Counsel for Defendant Evan Greebel*