# EXHIBIT A

September 18, 2013

Retrophin, Inc. and Subsidiary
777 Third Avenue,
New York, NY 0017

In connection with our review of the interim condensed consolidated financial statements of Retrophin, Inc. and Subsidiary (the "Company"), for the quarterly period ended June 30, 2013, professional standards require that certain matters related to the conduct of our review are communicated to those who have responsibility for oversight of the financial reporting process (hereafter referred to as the "Audit Committee"). As required by those standards, the objectives of the review, our responsibilities under standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), and management's responsibilities have been communicated to you in our engagement letter dated July 22, 2013. Such standards also require the Independent Registered Public Accountant (the "Accountant") to ensure that the Audit Committee receives additional information regarding the review that may assist the Audit Committee in overseeing the financial reporting and disclosure process, for which management is responsible.

The objective of a review of interim condensed consolidated financial statements differs significantly from that of an audit. Therefore, any communication the Accountant may make about the quality, not just the acceptability, of the entity's accounting principles or other matters as applied to its interim financial reporting generally would be limited to the effects of significant events, transactions, and changes in accounting estimates that the Accountant considered when conducting the review of interim financial information. Further, interim review procedures do not provide assurance that the Accountant will become aware of all matters that might affect the Accountant's judgments about the quality of the entity's accounting principles or other matters that would be identified as a result of an audit.

1. Significant Accounting Policies and Practices

    The Accountant should determine that the Audit Committee is informed about the initial selection of and changes in significant accounting policies or the application of such policies in the current period and the effect on the financial statements or disclosures of significant policies in controversial areas and areas for which there is a lack of authoritative guidance. Additionally, the Accountant should communicate all alternative treatments permissible pursuant to accounting principles generally accepted in the United States ("GAAP") for policies and practices related to material items that have been discussed with management, including the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Accountant. The Company's significant accounting policies are disclosed in the notes to the year-end and/or interim financial statements as required by GAAP and the Securities and Exchange Commission. The Accountant should also communicate the results of the Accountant's evaluation of, and conclusions about, the qualitative aspects of the Company's significant accounting policies and practices, including situations in which the Accountant identified bias in management's judgments about the amounts and disclosures in the condensed consolidated financial statements.

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 2

*Except as discussed in Item 6 of this letter, there have been no other new accounting policies adopted or changes in existing significant accounting policies or their application noted.*

*During the course of performing our quarterly review, we identified certain material transactions that led to the Company's adoption of the new accounting standard more fully described in Item 6 of this letter. Marcum also noted that the Company should have disclosed these material transactions in the notes to the financial statements for the year ended December 31, 2012 and for the quarterly period ended March 31, 2013. More specifically, the Company was a party to a series of settlement agreements with certain investors that it entered into subsequent to the balance sheet dates for each of those reporting periods. The settlement agreements were finalized prior to filing the Form 10K and March 31, 2013 Form 10Q. The aggregate amount the settlements are material to the Company's financial position and results of operations. Marcum also noted that the Company did not identify a requirement to allocate a portion of the proceeds received in a financing transaction completed in February 2013 to a registration payment obligation in accordance with applicable GAAP. Accordingly, the Company made a correction to its March 31, 2013 balance sheet in connection with amending the Form 10Q for that period. We direct your attention to Items 3, 4, 5 and 6 of this letter for further information.*

2. <u>Critical Accounting Policies and Practices</u>

The Accountant should discuss with the Audit Committee all critical accounting policies and practices, including the reasons certain policies and practices are considered critical, and how current and anticipated future events might affect the determination of whether certain policies and practices are considered critical. Critical accounting policies and practices are those that are both most important to the portrayal of the company's financial condition and results, and require management's most difficult, subjective, or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain. Critical accounting policies and practices might change from year to year. The Accountant should also communicate the Accountant's assessment of management's disclosures related to the critical accounting policies and practices, along with any significant modifications to the disclosure of those policies and practices proposed by the Accountant that management did not make.

*There are no specific matters that we believe should be communicated to you, other than the adoption of the accounting standard applicable to joint and several liability arrangements which is more fully described in Items 4 and 6 of this letter. We would be pleased to meet with you at your convenience to discuss these matters in detail. Since the primary responsibility for establishing the Company's accounting principles and practices rest with management, such a discussion should generally include the Company's management as a participant.*

3. <u>Critical Accounting Estimates</u>

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 3

A critical account estimate is an accounting estimate where (a) the nature of the estimate is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change and (b) the impact of the estimate on financial condition or operating performance is material. The Audit Committee should be informed about the process used by management in formulating critical accounting estimates, including significant assumptions used and any significant changes management made to the processes used to develop critical accounting estimates or significant assumptions, a description of management's reasons for the changes, and the effects of the changes on the financial statements. The Accountant should also communicate the results of the Accountant's evaluation of the differences between (i) estimates best supported by the evidence and (ii) estimates included in the financial statements, which are individually reasonable, that indicate a possible bias on the part of the Company's management. The basis for the Accountant's conclusions regarding the reasonableness of the critical accounting estimates should also be communicated.

*The following are the critical accounting estimates made by management:*

**Fair value of warrants issued in connection with the equity financing in first quarter 2013**
*During the quarter ended March 31, 2013, the Company sold shares of its common stock and common stock purchase warrants to investors in private placement transactions. The warrants contain variable settlement features that require them to be accounted for as derivative liability instruments. Derivative liabilities are stated at fair value in an issuer's balance sheet at each reporting date with changes in fair value reported in earnings or loss. The Company calculated the fair value of the warrants using a probability-weighted Black-Scholes option pricing model which is comparable to Binomial Lattice pricing model on the date of issuance of warrants and at June 30, 2013. The assumptions used in the probability-weighted Black-Scholes option pricing model were based on certain estimates, such as expected volatility, expected life and expected interest yield.*

**Fair value of stock option granted to officers and employees of the Company**
*During the quarter ended June 30, 2013, the Company granted options to purchase 120,000 shares of common stock to its employees. The fair value of these options was calculated using Black-Scholes option pricing model on the date of issuance of such options. The assumptions used in the Black-Scholes option pricing model were based on certain estimates, such as expected volatility, expected term of the options and expected interest yield.*

**Accounting for full exposure of settlement agreements**
*During the quarter ended June 30, 2013, the Company, its Chief Executive Officer and MSMB Capital ("MSMB") became parties to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of MSMB. The Company adopted Accounting Standards Update ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed" ("ASU 2013-04"). This guidance generally states that a participant in a joint and several liability arrangement should record the greater of its contractual obligation under the agreement or the amount it expects to pay. Making a*

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 4

*determination of the amount that the Company would expect to pay in excess of the fixed contractual minimum is a matter of judgment. Company estimated that its range of exposure could be up to the full amount of the liabilities stipulated under these agreements. Accordingly, the Company recorded the the full amount of the settlement liabilities stated under these agreements as the amount it expects to pay on behalf of itself and its co-obligors.*

***Registration Payment Arrangement***
*As described elsewhere herein, the Company entered into a registration rights agreement in connection with a financing transaction it completed in February 2013. The Company specifically agreed to register the common shares issued in that transaction and common shares underlying warrants issued in that transaction on Form S-1, and to cause such Form S-1 to be declared effective by the SEC within certain contractually defined timeframes. The registration rights agreement further provided for the Company to make liquidated damage payments in the event of its non-compliance with the registration rights agreement. The accounting guidance for registration payment arrangements requires, among other things, for issuers to allocate a portion of proceeds received in financing transactions to a registration payment liability if it is probable that the issuer will not be able to comply with the registration payment arrangement. During the quarter ended June 30, 2013, Management determined that the Company should have identified that it was probable that the Company would not be able to comply with the registration rights agreement at the time the financing transaction was completed. Accordingly, the Company made a correction to its March 31, 2013 balance sheet to reallocate a portion of the proceeds received in that transaction to a registration payment obligation, which was filed as part of the amended Form 10Q discussed in Item 1 above. The liability remained on the balance sheet at June 30, 2013 but was settled in connection with an amended registration rights agreement completed in August 2013.*

***Depreciable and Amortizable Assets***
*In addition, management of the Company made estimates and assumptions with respect to the useful lives of depreciable and amortizable assets, determining whether long-lived assets could be impaired, and establishing a valuation allowance for net deferred tax assets.*

4. Significant Unusual Transactions

   The Accountant should communicate the policies and practices management used to account for significant unusual transactions, including those outside the normal course of business or that otherwise appear to be unusual due to their timing, size or nature. The Accountant should also communicate the Accountant's understanding of the business rationale for such transactions.

   1. *During the quarter ended March 31, 2013, the Company sold an aggregate of 3,318,150 shares of its common stock, at a price of $3.00 per share in certain private placement transactions, for aggregate proceeds of approximately $9.275 million (net of financing costs of approximately $0.679 million. In connection with the sale of shares of common stock, the Company issued warrants to purchase 1,597,969 shares of its common stock at*

*an exercise price of $3.60 per share. On the date of sale, the fair value of the warrants was estimated approximately $4.506, allocated and classified as a derivative liability. Subsequently on March 31, 2013, the fair value of the warrants was re-measured and change in the estimated fair value was recorded as loss on change in the estimated fair value of warrants of approximately $2.452 million.*

*A portion of the proceeds received in that financing transaction were used settle a technology license liability, repay outstanding notes and related accrued interest, and settle trade payables and accrued liabilities.*

2. *During the second quarter of 2013, the Company, its Chief Executive Officer and MSMB became parties to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of MSMB. The Company and MSMB have entered into indemnification agreements whereby MSMB has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. Notwithstanding the indemnification, the Company recorded a $2,286,511 charge to operations during the quarter ended June 30, 2013 that was offset by a corresponding liability of $1,691,400 for the difference between (a) the aggregate amount of all such settlements, and (b) $593,111 of cash and non-cash consideration that the Company paid to immediately settle a portion of the agreement on behalf of MSMB. The $1,691,400 is past due as of the date of this letter and there is uncertainty as to whether the MSMB will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.*

   *Concurrent with the execution of such settlement agreements, the Company received promissory notes from MSMB whereby MSMB agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.*

   *We were advised by Company management that MSMB is currently in the process of dissolving its operations. In accordance with the newly adopted accounting standard update 2013-04, the Company has recorded the full amount of the settlements as a charge to its operations due uncertainty as to whether the affiliate will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary. Any amounts that the Company may recover under the note due from MSMB or under the terms of the indemnification agreement, if in fact any amounts are recovered at all, would be characterized as a capital contribution at the date such payments are received.*

3. *The Company and the investors who participated in the private placement transaction that the Company completed on February 14, 2013, entered into the Amended Registration Rights Agreement which provides, among other things, for (i) a waiver of any and all liquidated damages that the Company incurred for its inability to cause the registration statement from its February 14, 2013 private placement to be declared*

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 6

*effective within certain contractually defined time-frames; (ii) a commitment on the part of the investors in the February private placement to participate in a private placement transaction that the Company completed on August 15, 2013, and (iii) a covenant on the part of the Company to proceed with the sale of shares that were issued under the August 15, 2013 private placement transaction. In exchange, the Company paid an aggregate fee to these investors of $2,495,256 consisting of (i) 73,710 shares of the Company's common stock with an aggregate fair value of $331,695 (based on the selling price of $4.50 per share in the August financing transaction); (ii) cash in the amount of $1,835,000; and (iii) warrants to purchase 98,756 shares of common stock with a fair value of $328,561. The investors were also given the option to purchase shares of the Company's common stock at $4.50 as a use of the cash portion of the payment arrangement. Accordingly, $946,196 of the cash portion of the fee was settled in cash and the remainder was settled by the issuance of 197,512 shares. Additionally, the Company paid $103,425 to an investor to whom the Company sold shares in a private placement transaction in January 2013 and who also participated in the August 2013 private placement transaction. This payment was settled entirely by the issuance of 20,685 shares of the Company's common stock at a value of $5.00 per share. The Company will record the aggregate amount of the payments made to the investors by allocating approximately $360,000 to the waiver of the original registration payment obligation to be taken as a charge to operations and the remaining amount of $2,238,681 will be treated as reduction of the proceeds received in the August financing transaction.*

5. <u>Financial Statement Presentation</u>

The Accountant should communicate the results of the Accountant's evaluation of whether the presentation of the financial statements and the related disclosures are in conformity with GAAP, including the Accountant's consideration of the form, arrangement, and content of the financial statements (including the accompanying notes), encompassing matters such as the terminology used, the amount of detail given, the classification of items, and the bases of amounts set forth.

*On September 16, 2016, the Company filed an amendment to its previously filed Form 10K for the year ended December 31, 2012 and quarterly period ended March 31, 2013 to include an omitted disclosure with respect to its accounting for a series of settlement agreements that the Company, along with certain of its related parties, entered into between April 2013 and June 2013. The Company also restated its condensed consolidated balance sheet as of March 31, 2013 to reallocate approximately $360,000 of the proceeds received in a February 2013 financing transaction to a registration payment obligation what was deemed probable at the date that the financing transaction was completed.*

*Except as noted above, there are no other matters regarding the financial statement presentation that we believe should be communicated to you.*

6. <u>Adoption of New Accounting Standards That Are Not Yet Effective</u>

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 7

The Audit Committee should be informed about situations in which the Accountant identified a concern regarding management's anticipated application of accounting standards that have been issued but are not yet effective and might have a significant effect on future financial reporting;

*Except to the following, to our knowledge there has not been any new anticipated application of accounting standards that have been issued but are not yet effective that might have a significant effect on future financial reporting.*

*Subsequent to identifying the settlement agreement, the Company became party of, during the second quarter the Company adopted Accounting Standards Update ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed"). The guidance in this update requires companies to measure obligations resulting from joint and several liability arrangements as the sum of the amount the entity has a)contractually agreed to pay and b) any additional amounts that the entity expect to pay on behalf of its co-obligors.*

7. Other Information in Documents Containing Reviewed Financial Statements

When other information is presented in documents containing reviewed financial statements, the Accountant should communicate to the Audit Committee the Accountant's responsibility under PCAOB rules and standards for such information, any related procedures performed, and the results of such procedures. We are required to read the other information included in the Company's Form 10-Q and to conclude whether there is any material inconsistency or material misstatement with the information presented in the Company's financial statements.

*With respect to our review of the Company's condensed consolidated financial statements, we are aware of no such material inconsistencies or material misstatements included in the other information contained in the documents with the reviewed financial statements.*

8. Uncorrected and Corrected Misstatements

The Accountant should provide the Audit Committee with the schedule of uncorrected misstatements related to accounts and disclosures that the Accountant presented to management. The Accountant should discuss with the Audit Committee (or determine that management has adequately discussed with the Audit Committee) the basis for the determination that the uncorrected misstatements were immaterial, including the qualitative factors considered. The Accountant also should communicate that uncorrected misstatements or matters underlying those uncorrected misstatements could potentially cause future-period financial statements to be materially misstated, even if the Accountant has concluded that the uncorrected misstatements are immaterial to the financial statements being reviewed.

The Accountant should also communicate to the Audit Committee those corrected misstatements, other than those that are clearly trivial, related to accounts and disclosures

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 8

that might not have been detected except through the review procedures performed, and discuss with the Audit Committee the implications that such corrected misstatements might have on the Company's financial reporting process.

*During the current quarter review, there were no uncorrected and corrected misstatements noted.*

9. Disagreements with Management

The Accountant should communicate to the Audit Committee any disagreements with management about matters, whether or not satisfactorily resolved, that individually or in the aggregate could be significant to the Company's financial statements. Disagreements with management do not include differences of opinion based on incomplete facts or preliminary information that are later resolved by the Accountant obtaining additional relevant facts or information prior to the completion of their review procedures.

*There were no such disagreements.*

10. Consultation with Other Accountants about Significant Matters

When the Accountant is aware that management has consulted with other accountants about significant accounting or auditing matters, the Accountant's views about the subject of the consultation should be communicated to the Audit Committee and should only be related to those matters which the Accountant has identified a concern.

*To our knowledge, no such consultations were made by management.*

11. The Accountant's Evaluation of Going Concern

The Accountant should communicate to the Audit Committee whenever events or circumstances are identified that may affect the Company's ability to continue as a going concern.

*The Company is in the development stage and as such has incurred a net loss since inception. With conditions such as a net loss, working capital deficiency and stockholders' deficiency, there is substantial doubt about the Company's ability to continue as a going concern. The Company has principally financed its operations using proceeds from sales of its equity units in a series of private placement transactions. Management believes the Company's ability to continue its operations is dependent upon its ability to raise capital. The Company is developing pre-clinical and clinical studies of drug candidates. The Company's future depends on the costs, timing, and outcome of regulatory reviews of its product candidates and the costs of commercialization activities, including product marketing, sales and distribution. The Company expects to finance the cash needs through private equity offerings and debt financings, corporate collaboration and licensing*

*arrangements, grants from patient advocacy groups and foundations and government agencies, however there is no guarantee that such financing is available and assured.*

12. <u>Difficulties Encountered in Performing the Review</u>

Significant difficulties encountered in dealing with management that related to the performance of the review are required to be brought to the attention of the Audit Committee, including matters that are contentious for which the Accountant consulted outside the engagement team and the Accountant reasonably determined are relevant to the Audit Committee's oversight of the financial reporting process.

*We did not encounter any client imposed difficulties during our review; however, the Company itself experienced significant difficulty in analyzing the settlement agreements discussed in Item 3 and establishing the proper accounting for such agreements. The Company's failure to (a) identify a requirement to disclose these agreements in previous filings, (b) apply recent accounting standards for joint and several liability arrangements during the quarterly period ended June 30, 2013, and (c) properly account for the registration payment arrangement during the quarterly period ended March 31, 2013, extended the duration of the review well beyond the originally planned time frame. The significance of these issues to the Company and the extent of the consultations required resulted in the Form 10Q for the six month period ending June 30, 2013, not being filed on a timely basis.*

13. <u>Fraud and Illegal Acts</u>

The Audit Committee should be adequately informed of fraud and illegal acts coming to the Accountant's attention during the course of the review.

*No fraud or illegal acts were noted.*

14. <u>Material Written Communications Between the Accountants and Management</u>

In addition to the engagement letter and independence letter which have been provided to the Audit Committee, the Accountant is required to communicate to the Audit Committee other written communications between the Accountant and the Company's management.

*During the course of our review we have made the following written communications with management:*

   *a. Management representation letter*

15. <u>Independence and Non-Audit Services</u>

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 10

The Audit Committee should be provided with a description of the types of non-audit services rendered during the quarterly period and total fees received for such services.

*We hereby confirm that as of the date of this letter, we are independent accountants with respect to the Company, within the meaning of the Securities Acts administered by the Securities and Exchange Commission, and the requirements of the Public Company Accounting Oversight Board (including compliance with Rule 3520).*

*We have not provided any non-audit services to the Company.*

16. <u>Deficiencies in Financial Controls</u>

The Audit Committee should be informed of any material weaknesses or significant deficiencies in controls over the financial reporting process.

*In planning and performing our audit of the financial statements of the Company for the year ended December 31, 2012 and period of March 11, 2011(inception) through December 31, 2012, and review of the financial statements for the six months period ended June 30, 2013, we considered its internal control in order to determine our auditing procedures for the purpose of expressing our opinion on the financial statements and not to provide assurance on the internal control. However, we noted certain matters involving the internal control and its operation that we consider to be significant deficiencies or material weaknesses under standards established by the Public Company Accounting Oversight Board.*

*A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the Company's annual or interim financial statements that is more than inconsequential will not be prevented or detected. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.*

*In performing our audit and reviews, we observed conditions that we believe constitute a material weakness in the Company's internal controls over financial reporting. We specifically observed that the Company's accounting systems as they are currently designed lack the structure needed to address the accounting complexities that typically are associated with early stage companies. A synopsis of our most critical observations is as follows:*

<u>Segregation of duties</u>
*The Company, as a startup operation, has limited capital resources, which limits the extent to which it can segregate incompatible duties; however, compensating procedures should be established to ensure that no one individual has a concentration of record keeping, authorization and asset custody duties. There is a risk under the current circumstances that intentional or unintentional errors could occur and not detected.*

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 11

*Through June 30, 2013, the Company had no internal accounting staff and a significantly and a significantly limited financial reporting structure. The Company engaged a engaged a third party financial reporting advisor who assisted the Company with compiling the records it needed to prepare financial reports and applicable SEC Filings. In June 2013, the Company hired Mark Panoff as its full-time Chief Financial Officer in an effort totake the initial steps it needed to develop a system of internal control. The absence of system and a sufficiently trained finance staff through this period of time was detrimental to the Company's ability to prepare accurate financial reports on timely basis.*

*As discussed elsewhere herein, the Company specifically experienced difficulty in applying various complex accounting standards including those relating specifically to financial instruments and related valuation issues, income taxes, joint and several liability arrangement, the implications of related party transactions and related disclosure requirements under GAAP and applicable SEC pronouncements. We proposed, and the Company recorded extensive adjustments to the financial statements. Examples include, share based payment arrangements, derivative liabilities, income tax accounting and related disclosures, joint and several liability arrangements, and registration payment obligations. As described elsewhere herein, management determined that previously issued financial statements required restatement as a result of accounting errors.*

<u>Risk Assessment and Identification of Key Accounting Principles</u>
*We are aware of the fact that Company has undergone the initial audit of its financial statements (for 2011) in part, for the purposes of becoming a public company through the completion of its reverse merger on December 12, 2012, and that the Company has limited capital resources. Notwithstanding these factors, the Company filed in its initial Form 10k in June 2013 and is now required to comply with certain minimum standards of internal control under the applicable provision of the Sarbanes Oxley Act of 2002. These standards require management to perform a quarterly assessment of internal control over financial reporting and disclosure controls.  Accordingly, Marcum LLP recommends that the Company commence its plan to design an effective system of internal control by completing an initial risk assessment. The Company can then use its initial risk assessment to define key controls and proceed with designing controls to address key risks and subsequently test such controls for operating effectiveness. We also recommend that the CEO in conjunction with those responsible for corporate governance establish an oversight process to ensure that progress on developing s system of internal control is being made within a reasonable period of time. Additionally, the Company should immediately compile a registry oof major agreements and establish a process to ensure that all material transactions and agreements that it enters into undergo an accounting, business and legal reviewpriot to the approval of the board of directors.*

<u>Management override of controls</u>
*The ability to override controls should be limited, restricted and documented. An audit trail or written authorization and explanation should be maintained.*

Retrophin, Inc. and Subsidiary
September 18, 2013
Page 12

*Our consideration of internal control would not necessarily disclose all matters in internal control that might be reportable to you and, accordingly, would not necessarily disclose all significant deficiencies or material weaknesses as defined above.*

17. <u>Other Matters</u>

The Accountant should communicate to the Audit Committee other matters arising from the review that are significant to the oversight of the Company's financial reporting process. This communication includes, among other matters, complaints or concerns regarding accounting or our review that have come to the Accountant's attention during the review and the results of the Accountant's procedures regarding such matters.

*We are not aware of any such other matters.*

This report is intended solely for the use of the Audit Committee, Board of Directors, management, and others within the Company, and should not be used by anyone other than these specified parties.

Very truly yours,

Marcum LLP


Edward F. Hackert, CPA
PTN/