JMK:AES/DCP/DKK
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        15 CR 637 (KAM)

EVAN GREEBEL,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*


                                          BRIDGET M. ROHDE
                                          Acting United States Attorney
                                          Eastern District of New York
                                          271 Cadman Plaza East
                                          Brooklyn, New York 11201


ALIXANDRA E. SMITH
DAVID C. PITLUCK
DAVID K. KESSLER
Assistant U.S. Attorneys
       (Of Counsel)

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................ 2

I.   The Court Should Preclude Evidence from Two Arbitrations ................................ 2

II.  Statements by the Government Made In Legal Briefs In Response To A Motion Made By Shkreli About "Commingling" Are Inadmissible .................................. 11

III. The Defendant Should Not Be Permitted to Offer His Co-Conspirator's Post-Arrest Statements and Statements to the SEC ........................................... 15

IV.  The Defendant's Motion to Preclude Lay Opinion Testimony Should Be Denied ............... 20

V.   The Defendant Was Personally Liable to MSMB Investors ................................ 37

VI.  The Defendant's Motion to Preclude Co-Conspirator Statements Should Be Denied ........... 40

VII. Evidence Related to Retrophin's Auditors Should Be Admitted .......................... 48

VIII.The Defendant's Motion Related to "Affiliates" Should Be Denied .................... 52

IX.  The Defendant's Motion to Preclude "Irrelevant, Misleading, and Unfairly Prejudicial Evidence" Should Be Denied ............................................................ 57

X.   The Defendant's Motion to Preclude "Inadmissible" Testimony and Expert Testimony Should Be Denied ................................................................. 68

CONCLUSION ........................................................................................................ 81

PRELIMINARY STATEMENT

The government respectfully submits this opposition to ten motions in limine that

the defendant Evan Greebel filed on August 18 and August 19, 2017, in connection with the trial

of this matter, as follows:  (1) to admit evidence from two arbitrations between Retrophin and

certain individuals (Dkt. No. 330 ("Arbitration Motion"), filed on August 18, 2017); (2) to admit

statements by the government from legal briefs (or in support of such briefs) in response to a

motion filed by co-defendant and co-conspirator Martin Shkreli (Dkt. No. 331 ("Commingling

Motion"), filed on August 18, 2017); (3) to admit Shkreli's post-arrest statements and statements

to the Securities and Exchange Commission (the "SEC") (Dkt. No. 332 ("Shkreli Statements

Motion"), filed on August 18, 2017); (4) to preclude certain testimony of witnesses characterized

as "lay opinion testimony" (Dkt. No. 333 ("Lay Opinion Motion"), filed on August 19, 2017); (5)

to preclude argument that Shkreli had any personal liability to MSMB Capital and MSMB

Healthcare investors (Dkt. No. 334 ("Shkreli Liability Motion"), filed on August 19, 2017); (6) to

preclude admission of certain statements of the defendant's co-conspirators (Dkt. No. 335 ("Co-

Conspirator Motion"), filed on August 19, 2017); (7) to preclude evidence related to Retrophin's

auditors (Dkt. No. 336 ("Auditor Motion"), filed on August 19, 2017); (8) to preclude argument

that Fearnow Share recipients were affiliates (Dkt. No. 337 ("Affiliates Motion"), filed on August

19, 2017); (9) to preclude evidence related to conduct by Shkreli, the defendant's compensation

during the charged conspiracies and Katten's legal fees for work done by the defendant and others

for Shkreli, Retrophin and the MSMB Entities (Dkt. No. 338 ("Evidence Motion"), filed on

August 19, 2017); and (10) to preclude fact and expert witness testimony, including testimony

admitted during the trial of Shkreli (Dkt. No. 340 ("Testimony Motion"), filed on August 19,

2017).  For the reasons set forth below, all of the defendant's motions should be denied.

<u>ARGUMENT</u>

I.   <u>THE COURT SHOULD PRECLUDE EVIDENCE FROM TWO ARBITRATIONS</u>

The defendant seeks to admit evidence of the "arbitration decision and awards" in arbitration proceedings for Dr. Steven Rosenfeld and Thomas Koestler against Retrophin (the "Arbitration Decisions").[1]  For the reasons set forth below, the Arbitration Decisions constitute inadmissible hearsay.  To the extent any part of them is subject to a hearsay exception, the Arbitration Decisions have minimal probative value and are extremely prejudicial, and should therefore be precluded.

A.   <u>Relevant Facts</u>

As set forth in the Superseding Indictment, after Shkreli dissolved MSMB Capital and MSMB Healthcare, his investors demanded the returns on their investments promised to them by Shkreli.  Having lost their money and lied about it, however, Shkreli worked with the defendant to devise a scheme to misappropriate Retrophin assets to repay some of those defrauded investors.

One of the major components of this scheme was the creation of a series of sham consulting agreements with MSMB Capital and MSMB Healthcare investors, which caused Retrophin to reimburse those investors for their lost investments in Shkreli's funds.  Notably, the

---

[1] The defendant does not explain what documents or portions of documents he seeks to admit at trial related to these arbitrations.  Although he suggests that the Court should admit the "evidence of the decisions, awards and orders" in the two arbitrations (Arbitration Motion at 25), it is not clear what that means.  If the defendant seeks to admit into evidence the full copy of the arbitrators' decisions, he has not articulated that specifically.  Nor has he argued that he seeks to admit the evidence underlying those decisions as provided to the arbitrator, or legal briefing submitted to the arbitrator.  The government respectfully submits that the defendant should be required to identify exactly <u>what</u> evidence he seeks to admit, and the government also requests that it be permitted to respond in a supplemental submission should the set of materials actually identified by the defendant warrant additional objection.

defrauded investors who entered into these sham consulting agreements did not perform any legitimate consulting services for Retrophin.

The Superseding Indictment alleges a total of four sham consulting agreements, including the consulting agreement of Dr. Rosenfeld, a former MSMB Healthcare investor. (Superseding Indictment at ¶ 32). After Retrophin detected the sham agreement and refused to pay Rosenfeld the final installment due to him under the contract, Rosenfeld brought an arbitration against Retrophin seeking that final payment under the contract. The arbitrator found that the agreement was facially enforceable and that Retrophin owed money to Rosenfeld pursuant to his consulting agreement. The arbitrator did not squarely consider whether the agreement was a sham based on illegal conduct, let alone whether, regardless of whether the contract was enforceable, the defendant and Shkreli conspired to use such agreements to defraud Retrophin. Instead, the arbitrator simply applied New York state contract law to determine whether the contract was void for illegality. (Arbitration Motion, Ex. A at 7).

Thomas Koestler, the subject of the second arbitration at issue here, did work for Retrophin at Shkreli's direction. In return, Shkreli promised to provide Koestler with Shkreli's personal Retrophin shares as compensation for his work. Shkreli and the defendant attempted to cause Retrophin to repay the obligations that Shkreli personally owed to Koestler via a consulting agreement with Retrophin, but the agreement was not finalized because Shkreli resigned from Retrophin. Koestler ultimately brought an arbitration against Retrophin and Shkreli to recover the money Shkreli owed him. The arbitrator determined that it was solely Shkreli's personal obligation to provide Retrophin shares to Koestler, and that Retrophin was not responsible for providing any shares to Koestler. The Superseding Indictment does <u>not</u> include Koestler's draft

consulting agreement as one of the four sham consulting agreements alleged in support of Count Seven.

      B.     <u>The Arbitration Proceedings Constitute Inadmissible Hearsay That Are Not Subject to an Exception</u>

The government explained in its motion <u>in</u> <u>limine</u> to preclude evidence and argument related to the Rosenfeld and Koestler arbitrations that the Arbitration Decisions are hearsay.  (<u>See</u> Dkt. No. 329 at 28-31).  Moreover, as discussed in that motion and below, courts have routinely precluded the introduction of arbitration findings as hearsay.  For example, in <u>Park W. Radiology v. Carecore</u>, the court noted that the "arbitrator will not be testifying at trial and [the proponent does] not seek to use the arbitration decision for any purpose other than to prove the substance and outcome of the arbitration, in other words, for the truth of the matter asserted." 675 F. Supp. 2d 314, 329-30 (S.D.N.Y. 2009).  As a result, arbitration decisions are pure hearsay and are not "subject to admission as nonhearsay through an exception."  <u>Id.</u>

The defendant does not dispute that the Arbitration Decisions are hearsay but contends that they are admissible pursuant to two narrow exceptions to the hearsay rule to argue that the arbitrator's decision should be admitted.[2]  Neither are applicable here, certainly to the extent that the defendant seeks to utilize the exceptions.

First, the defendant seeks to admit the Arbitration Decisions as "verbal acts" that established "the legal rights and obligations of the parties of the consulting agreement, Retrophin and Dr. Rosenfeld."  (Arbitration Motion at 19).  In support of that contention, the defendant relies on <u>dicta</u> from <u>United States v. Dupree</u>, 706 F.3d 131, 137 (2d Cir. 2013), that a legal order

---

[2] The defendant's reliance on <u>United States v. Fisher</u>, 106 F.3d 622, 634 (5th Cir. 1997), is irrelevant.  <u>Fisher</u> is an out-of-circuit case that is neither binding on this Court nor directly applicable because, among other things, the <u>Fisher</u> court did not even consider whether the arbitration evidence constituted hearsay under Rule 801 or 802.

from a court is not hearsay because it "imposes legal obligations on a party."  (Id. (citing United States v. Boulware, 384 F.3d 794, 806 (9th Cir. 2004) ("A prior judgment is not hearsay ... to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties."))).  This over-reads the holding in Dupree, which addressed (in dicta) the hearsay implications of a restraining order.  Dupree at most stands for the proposition that the operative portion of an arbitration award—the sentence that imposes a specific obligation—could be admissible as a "verbal act."[3]  But Dupree plainly does not stand for the broader proposition that the entire contents of any arbitration or court memorandum, replete with factual and legal analysis, is admissible notwithstanding the hearsay rule.  Nor would that make any sense— virtually all court and arbitration decisions address or impose legal obligations, and it cannot be the law that the full contents of all such documents are admissible as the defendant would have them be.

Similarly, the defendant argues that the Arbitration Decisions are admissible pursuant to FRE 803(15), which applies to "a statement contained in a document that purports to establish or affect an interest in property."  The plain text of that rule precludes admission of the Arbitration Decisions, because virtually none of the contents of those documents constitute a "statement . . . that purports to establish or affect an interest in property."  Indeed, FRE 803(15) expressly contemplates admitting only a specific "statement" that is "contained in a document," rather than the entire document.  This makes sense generally, and particularly in the case of arbitration and court decisions.  As discussed, virtually every decision in a civil case from a fact-

_____

[3] For example, a sentence saying "Party A owes Party B money" might conceivably be admissible as a verbal act, but the recitation of facts, law, and application of facts to law would not be, because those sections of an award would not actually "act"—they would justify or explain an "act."

finder affects a property interest of the parties to that decision.  Admitting the substance of the

Arbitration Decisions because they happen to affect a property right of Retrophin, Koestler and/or

Rosenfeld is expanding Rule 803(15) far beyond any rational application.  If there were any

dispute regarding whether Retrophin was responsible for the obligations under the consulting

agreements, the Arbitration Decisions might be admissible under Rule 803(15).  But to admit

them for the purpose the defendant seeks is legally improper.[4]

       C.    <u>The Arbitration Decisions Have Little Probative Relevance</u>

Even if some portion of the Arbitration Decisions could be admissible subject to a

hearsay exception, they would still be inadmissible because they are irrelevant.  Simply put, the

Arbitration Decisions address the wrong question:  whether the two consulting agreements are

enforceable as a matter of contract law.  But this case has nothing to do with the question of

whether the consulting agreements are enforceable as a matter of contract law.  Indeed, part of the

fraud was that Shkreli used his position of authority at Retrophin to bind Retrophin in to paying

the disgruntled investors.  This case is about whether the agreements are evidence of a conspiracy

to defraud Retrophin using, in part, consulting agreement contracts.

Further demonstrating this lack of relevance, each of the arbitrators declined to

consider the issues more central to this case.  The arbitrator in the Rosenfeld arbitration

acknowledged Retrophin's contentions that, for example, the "predominant purpose" of the

---

[4] The cases on which the defendant relies do not involve the sort of sweeping admission he
appears to seek in this case.  The cases cited by the defendant are cabined to the very specific
purpose of admitting a document that affects a specific dispute regarding a discrete property
interest.  <u>See, e.g.</u>, <u>Silverstein v. Smith Barney, Inc.</u>, No. 96-CV-8892 (JSM), 2002 WL 1343748,
at *2 (S.D.N.Y. June 18, 2002) (admitting a "Cancellation of Indebtedness" written by two family
members after the surviving family member was too ill to attend the trial); <u>see also</u> <u>United States
v. Weinstock</u>, 863 F.Supp. 1529, 1531 (D. Utah 1994) (admitting pursuant to Rule 803(15), the
affidavit of a deceased man confirming that he was the owner of shares of stock and that he
needed new certificates).

consulting agreement "was to resolve Claimant's dissatisfaction with the MSMB Healthcare

Investment: and "the consulting efforts were 'window dressing' . . . and conferred no benefit on

Retrophin," but explained that "[e]ven if" those points "were true, they would not suffice to

establish that the Consulting Agreement is void for illegality."  (Arbitration Motion, Ex. A at 7).

And the arbitrator in the Koestler arbitration explained that, although Retrophin counterclaimed

that Shkreli breached his fiduciary duty by attempting to "consummate a 'sham consulting

agreement' . . . in an effort to transfer to Retrophin his personal obligation," that argument

"cannot properly be addressed in this arbitration."  (Arbitration Motion, Ex. D at 4).  Thus, the

awards do not just address an irrelevant question; they affirmatively ignore more relevant

questions.

      Accordingly, the defendant's conclusory argument that Retrophin's legal rights are

relevant because it makes "a significant fact of consequence – whether the agreement was a

'sham' less likely," is patently incorrect.  At most, the Arbitration Decisions establish an

obligation to comply with the terms of the contract.  They say absolutely nothing about the

underlying fraud, in which the defendant and Shkreli engaged to enter into the contracts.

    D.    <u>Admission of the Arbitration Decisions Would Be Unduly Prejudicial</u>

      The Arbitration Decisions, or portions thereof and related documents, also are

inadmissible because any limited probative value associated with that evidence would be

substantially outweighed by the risk of undue delay and juror confusion.  <u>See</u> FRE 403 (relevant

evidence may be excluded "if its probative value is substantially outweighed by the danger

of…unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence").  As a result, this Court should exercise its discretion

and exclude this evidence.  <u>See</u> <u>United States v. Awadallah</u>, 436 F.3d 125, 133 (2d. Cir. 2006);

<u>accord</u> <u>United States v. Al-Moayad</u>, 545 F.3d 139, 159-60 (2d Cir. 2008) ("[S]o long as the

7

district court has conscientiously balanced the proffered evidence's probative value with the risk

for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational") (quotation marks

omitted); Abramowitz v. Inta-Boro Acres Inc., No. 98-CV-4139 (ILG), 1999 WL 1288942, at *6

(E.D.N.Y. Nov. 16, 1999) (trial judge has the discretion to exclude evidence falling under an

exception to the hearsay rule where the evidence's probative value is substantially outweighed by

the danger of unfair prejudice).

       Courts have recognized that arbitration decisions should be precluded as unduly

prejudicial under Rule 403.  In Carecore, the court held that an arbitration decision should be

precluded because it "could encourage the jury to make a decision [on guilt] based on the

arbitration panel's findings, not on the jury's own deliberations."  Id.  And in Cary Oil Co., the

court found that the introduction of an arbitration decision could "have a prejudicial effect on the

jury's deliberations, creating an impression that an official decision-maker" has already made a

finding on culpability.  257 F. Supp. 2d at 773-74.  Indeed, the risk of prejudice was so great that

the court precluded the introduction of testimony from the arbitration that "essentially serve[d] as

a backdoor means to read the arbitration panel's hearsay and unduly prejudicial findings into the

record of this case."  Id.

       Although the defendant takes issue with the decisions in Cary Oil Co. and

CareCore, he does not refute those courts' reasoning or holding.  And the concerns in those case

are amplified in this one.

       First, evidence related to the Arbitration Decisions poses the very real risk of

confusing the jury by suggesting (falsely) that the Arbitration Decisions somehow answer a

relevant question presented to the jury.  For example, the jury may be misled into believing that

the Arbitration Decisions represent a determination that the consulting agreements were not

8

"shams," were not part of a conspiracy to defraud Retrophin, or that no such conspiracy existed. Moreover, there is a real danger that the jury will be misled or confused into believing that the arbitrators' factual determinations or conclusions are entitled to deference. The Arbitration Decisions would unjustifiably enjoy an aura of special reliability and trustworthiness, which is not commensurate with their actual reliability.

Second, evidence of the Arbitration Decisions may also lead the jury to make inappropriate credibility determinations, including giving undue deference to the arbitrators who handled the proceedings. It is likely to lead the jury to conclude that the arbitrators, particularly when the defense focuses on the arbitrators' independence, had some particular expertise in judging credibility, therefore making it more likely that the jury would believe the arbitrator's conclusions, as opposed to evaluating the totality of the evidence. Assessing witness credibility is the core function of the jury and should not be replaced with an arbitrator's decision based on incomplete evidence. See e.g., United States v. Tuttle, 646 Fed. Appx. 120, 122 (2d Cir. 2016) (deference to the jury's resolution as to the weight of evidence and credibility of the witnesses); United States v. Memoli, 648 Fed. Appx. 91, 95-96 (2d Cir. 2016) ("the assessment of witness credibility 'lies solely within the province of the jury'") (quoting United States v. Josephberg, 562 F.3d 478, 487 (2d Cir. 2009)); Streber v. Hunter, 221 F.3d 701, 737-38 (5th Cir. 2000) (holding that district court's exclusion of tax court opinion opining on defendant's credibility was proper because it would mislead the jury and may lead the jury to believe that the tax court had some particular expertise in judging credibility).

Third, and perhaps most significant, admission of evidence related to the Arbitration Decisions would lead to a distracting, wasteful, and inefficient trial within a trial that would also serve further to confuse the jury. See, e.g., United States v. Aboumoussallem, 726

9

F.2d 906, 912 (2d Cir. 1984).  The Arbitration Decisions were based on different evidence, different substantive legal frameworks (state contract law rather than federal criminal law), different rules of evidence, and a different standard of proof than applies in a criminal trial. Unpacking and explaining all of those differences—an exercise that would be required fairly to explain to the jury why the Arbitration Decisions should be ignored or discounted—would require the government to put on a lengthy presentation of evidence to demonstrate that the proceedings were based on evidence in the criminal case, that witnesses may have provided inaccurate testimony and that certain key facts were not brought forth during the proceeding.  The trial-within-a-trial would also require exposing the jury to various tangential legal issues, such as the difference between a decision that a contract is enforceable and that one of the parties might have been engaged in fraud when he signed the contract.  In other words, admission of the Arbitration Decisions would effectively require a recreation of the arbitration proceedings in the midst of a criminal trial for the same conduct.

Because any probative value of evidence of the Arbitration Decisions would be substantially outweighed by the risk of undue delay and juror confusion, evidence of those decisions should not be admitted.

II.   **STATEMENTS BY THE GOVERNMENT MADE IN LEGAL BRIEFS IN RESPONSE TO A MOTION MADE BY SHKRELI ABOUT "COMMINGLING" ARE INADMISSIBLE**

The defendant moves to admit into evidence at trial "the government's statements and briefs and on the record in open court regarding the comingling between Retrophin . . . and MSMB entities . . . as statements of a party opponent."  Commingling Motion at 1.  In particular, the defendant has identified 10 separate statements made by the government in submissions to the Court or during the Shkreli trial that he believes are "admissions" and should be admitted at trial as affirmative evidence.  Id. at Ex. A.  As set forth below, the defendant's argument rests on a fundamental misunderstanding of the applicable law and, accordingly, should be denied.

A.   Applicable Law

Rule 801(d)(2) of the Federal Rules of Evidence ("Rule 801(d)(2)") excludes from the definition of hearsay the following types of out-of-court statements:

> Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Although a government attorney's statements may be admitted against the government as a litigant under FRE 801(d)(2) under certain circumstances, such statements must meet three criteria:

> First, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Second, the court must determine that the statements of counsel were such as to be the equivalent of testimonial statements made by the client.  Last, the district court must determine by a preponderance of the evidence that the inference that the proponent of the statements wishes to draw is a fair one and that an innocent explanation for the inconsistency does not exist.

United States v. Ford, 435 F.3d 204, 215 (2d Cir. 2006) (internal quotations omitted) (quoting United States v. McKeon, 738 F.2d 26, 33 (2d Cir. 1984)); see also United States v. GAF Corporation, 928 F.2d 1253, 1262 (2d Cir. 1991).

B.     Argument

The defendant's arguments that the government's statements are party admissions completely ignore the applicable legal standard and selectively distorts the legal framework to advance the notion that the government's statements are per se admissible at trial as statements of a party opponent if the elements of Rule 801(d)(2) are satisfied.  That is simply not the law.  As the case law makes plain, including in some cases that the defendant selectively cites, before admitting the statement of a government attorney as a prior admission, a district court must first determine that a prior argument exists which involves an assertion of fact inconsistent with similar assertions in a subsequent trial.  See Ford,  435 F.3d at 215; see also United States v. Williams, 496 Fed. Appx. 147, 148 (2d Cir. 2012) (summary order) (upholding a district court's decision to exclude statements made by a government attorney at a pre-trial conference that "purportedly conflicted with arguments at trial" because they were "not admissions by a party opponent under Federal Rule of Evidence 801(d)(2)");  United States v. Alston, No. 15 CR 435 (CM), 2016 WL 5806790, at *6 (S.D.N.Y. Sept. 27, 2016) ("Although a prior statement by an attorney during litigation may under some circumstances be considered a party admission under Federal Rule of Evidence 801(d)(2), the Second Circuit has carefully circumscribed the use of such statements.") (citing McKeon, 738 F.2d at 30-36).  The defendant has not cited a single case where a court permitted a defendant to offer the statements of a government attorney as evidence absent such an inconsistency.  Nor has the defendant identified any way in which the

government's statements in briefs or at the Shkreli trial are at all inconsistent with any other prior or subsequent argument made by the government.

The defendant's attempt to expand Rule 801(d)(2) to any statement in a legal brief made by a government attorney utterly ignores this requirement, even though it is employed in the very cases cited by the defendant. For instance, in <u>United States v. Paloscio</u>, No. 99-CR-1199 (LMM), 2002 WL 1585835 (S.D.N.Y. July 17, 2002), the district court applied the standard set forth in <u>McKeon</u> and reiterated in <u>Ford</u> and ruled that certain pretrial government statements concerning the role of the boss of an organized crime family in a particular murder were admissible at trial.[5] The defendant in <u>Paloscio</u> was a soldier from the same family charged with that murder. The <u>Paloscio</u> court found a discrepancy between the government's pretrial statements at the bail arguments for the boss and the government's position at trial regarding the defendant, and admitted the government's pretrial statements because it was thought to be fair to allow the defense to draw out the government's inconsistent positions and argue the inference that its theory as to the defendant's case was similarly flawed.

Similarly, in another case cited by the defendant, <u>United States v. GAF Corp.</u>, 928 F.2d 1253 (2d Cir. 1991), a securities fraud case, the Second Circuit held that the district court should have admitted, as an admission of a party opponent under Rule 801(d)(2), the government's original bill of particulars for the jury to compare to the amended bill of particulars. <u>See</u> 928 F.2d at 1262. The original bill of particulars detailed certain basic facts for the

---

[5] The defendant claims that the <u>McKeon</u> standard only applies to defense counsel's statements during opening statements. Commingling Motion at 4, n. 1 (citing <u>United States v. Amato</u>, 356 F.3d 216, 219 (2d Cir. 2004)). The defendant's argument ignores the case law applying that standard to statements by government attorneys in criminal prosecutions. <u>See Ford</u>, 435 F.3d at 215; <u>see also Alston</u> 2016 WL 5806790, at *6 ("[i]n particular, a statement of a Government attorney is only considered a party admission if [the <u>McKeon</u>] criteria are satisfied").

transactions referred to in the indictment, including trades made in both October and November of 1986.  Id. at 1257-58.   At the second trial in GAF, which resulted in a mistrial, defense counsel argued that if there was reasonable doubt about whether the defendants were responsible for the November stock purchases, then there must be reasonable doubt regarding the October trades.  Id. Between the second and third trials, the government filed an amended bill of particulars, which included only the October trades.  Id.  At the third trial, the defense sought to introduce the original bill of particulars that included the November trades as part of the series of fraudulent and manipulative transactions.  Id.  The district court denied the request, finding that the bill of particulars was not a pleading and that the government was not bound by it.  Id.  However, the Second Circuit reversed, concluding that the original bill of particulars was admissible under Rule 801(d)(2).  Id. at 1260-62.  The GAF court recognized that the prior statement had to involve "an assertion of fact clearly inconsistent with similar assertions in a subsequent trial" and held that the "prior inconsistent bill of particulars be considered an admission by the government in an appropriate situation."  928 F.2d at 1260-61 & n.3.

The defendant has instead ignored this precedent and argued that the government's factual assertions should be admitted as statements of a party opponent under Rule 801(d)(2).  He has not and cannot point to any prior inconsistent argument that the government has advanced at a prior proceeding that satisfies the first part of the standard set forth in Ford and McKeon. Accordingly, the defendant's motion to admit the statements should be denied.[6]

---

[6] In light of the defendant's misunderstanding of the law, it is not necessary at this time to litigate why the defendant's interpretation of the government's statements is legally and factually deficient or to engage in a relevance analysis under FRE 401 and 403.  However, in the event the defendant asserts a purported inconsistency in argument by the government after the evidence is presented at trial, the government respectfully reserves the right to contest the admissibility of those statements at trial.

III.   THE DEFENDANT SHOULD NOT BE PERMITTED TO OFFER HIS CO-
       CONSPIRATOR'S POST-ARREST STATEMENTS AND STATEMENTS
       TO THE SEC

      The defendant seeks to introduce 28 excerpts of statements that his co-conspirator

Martin Shkreli made to the SEC or to the Federal Bureau of Investigation ("FBI") on the grounds

that "[a]ll of the statements we intend to offer are admissible under multiple exceptions to the

hearsay rule." (Shkreli Statements Motion at 1). Although he identifies the statements he wants

to admit and identifies various exceptions to the general prohibition against hearsay testimony,

the defendant does not identify which hearsay exceptions apply to which statements he seeks to

admit. As a result, the defendant's motion leaves the government (and the Court) to guess which

hearsay exceptions the defendant believes apply to each statement the defendant offers. This

vague motion should be denied on its face for the reasons described below and for the reasons

provided in the government's motion to preclude the defendant from offering Shkreli's

statements. (See Government's Motions In Limine, dated August 18, 2017 at 8-13). In the

alternative, the government respectfully requests that the Court allow the government to file a sur-

reply after the defendant provides a revised motion that explains which hearsay exceptions

purportedly apply to each of the statements he seeks to offer.

      First, the defendant argues that "several of Mr. Shkreli's statements" are not

offered for their truth because they "reflect" that he "alone was aware of various facts or his

awareness of certain obligations under the securities laws." (Shkreli Statements Motion at 1

(emphasis added)). The defendant does not identify the "several" statements being offered under

this theory. Nor does he explain the relevance of Shkreli's "awareness of certain obligations

under the securities laws" or Shkreli's being purportedly "alone . . . aware of various facts." (Id.).

The government and the Court should not have to guess about what "certain obligations" or

"various facts" the defendant refers or about why the defendant believes they are relevant when no relevance is apparent.[7]

Second, the defendant argues that "the statements include those that demonstrate" Shkreli's "present sense impressions" of "certain conditions such as the relationship between MSMB Capital and Retrophin or his perception of Mr. Greebel's role as counsel to MSMB Healthcare LP." (Shkreli Statements Motion at 1). It is not at all clear to which statements this argument is intended to apply. The "present sense impression" exception to the prohibition against hearsay applies only where the declarant is "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." E.g., United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory."). None of the statements identified by the defendant describe contemporaneous events, let alone to be a description of an event while Shkreli was experiencing it.

Third, the defendant argues that the 28 statements he offers "include" those that demonstrate Shkreli's "then-existing state of mind." (Shkreli Statements Motion at 1). But Shkreli's "state of mind" is not relevant in the abstract. Again, the government and the Court are left to guess which statements supposedly show Shkreli's state of mind in a relevant way.

_____

[7] The inefficiency involved in this guesswork is clear. For example, the defendant seeks to offer Shkreli's confirmation that he, and he alone, was "placing these trades in OREX securities on February 1, 2011." (Shkreli Statements Motion Ex. A at 6). Without further guidance, the government and the Court are left to guess as to the purported grounds of admissibility of this statement and its alleged relevance. Notable, the statement does not show a fact of which Shkreli "alone" was aware. Nor is it relevant in this trial whether someone other than Shkreli (and his brokers) knew he was trading OREX securities in February 2011.

Fourth, the defendant contends that "nearly all" of the 28 statements are admissible as either "former testimony," pursuant to FRE 804(b)(1), or because they were statements against interest, pursuant to FRE 804(b)(3). (Shkreli Statements Motion at 1-2). The government's motion to exclude Shkreli's statements explains why the defendant's SEC testimony is not admissible under FRE 804(b)(1) and why the excerpts of the defendant's SEC testimony and post-arrest statements identified by the defendant are not statements "against interest." (See Government's Motions In Limine, dated August 18, 2017 at 9). For example, Shkreli's self-serving statement, paraphrased by the FBI, that he "could not imagine [the defendant] doing anything wrong" is neither "testimony" nor a statement "against" Shkreli's interest. (See Shkreli Statements Motion Ex. B at 5).

Fifth, recognizing that no actual exception to the prohibition against hearsay applies, the defendant contends that "one or more" of Shkreli's statements should also be admitted under the "catch all" provision of FRE 807. (Shkreli Statements Motion at 2). The defendant contends that this provision applies because, among other things, all of the statements identified have "guarantees of trustworthiness" or are "particularly trustworthy." (Shkreli Statements Motion at 2, 3). The defendant does not explain why these statements are particularly worthy of trust. To the contrary, the defendant's argument rings hollow where he has elsewhere accused Shkreli of engaging in a campaign of lies to numerous parties generally and to the SEC specifically. (See generally Defendant's Memorandum in Law in Support of his Severance Memorandum, dated February 17, 2017; id. at 15-16; Def.'s Reply Memorandum of Law in Support of his Severance Motion, dated March 10, 2017, at 11 ("Mr. Greebel's core defense that Mr. Shkreli lied, stated half-truths, omitted material facts and deceived him")). The defendant

should not be able to decide which of his co-conspirator's statements are trustworthy where he himself has repeatedly characterized Shkreli as a serial liar.

More fundamentally, however, the defendant has failed to explain the relevance of all of these 28 statements when offered through the "catch all" provision.  The defendant merely asserts that each statement either "exculpate[s] Mr. Greebel" or "demonstrate[s] that Mr. Shkreli made some of the same representations (or misrepresentations) to federal law enforcement agencies that he did to Mr. Greebel."  (Shkreli Statements Motion at 3).  A hearsay statement does not become relevant and admissible simply because the defendant claims that statement "exculpates" him.  Indeed, false exculpatory statements are classically inadmissible.  Nor does the defendant identify which representations were made both to law enforcement and to him, or why it is relevant that Shkreli made such representations to both him and to law enforcement.

The defendant also opines that "justice requires that Mr. Shkreli's statements should be admitted under FRE 807."  (Shkreli Statements Motion at 3).  But, again, the defendant does not explain why "justice" requires admission of all of these statements, other than by the hand-waiving assertion that the statements are critical and Shkreli will likely not testify.  Does "justice" require that Shkreli's statement that Elea Capital performed poorly be admitted? (Shkreli Statements Motion, Ex. A at 4).  Does "justice" require the admission of Shkreli's statement that NAV Consulting did no work for MSMB Capital?  (Id. at 6).  Does "justice" require the admission of Shkreli's statement that he consulted with Evan Greebel about the [unnamed] transaction?  (Shkreli Statements Motion Ex. B at 4).  Indeed, the last example here highlights another flaw in the defendant's argument:  While the defendant is not obligated to testify and has no burden of proof, the defendant can establish many of the same facts through his own testimony at trial that he seeks instead to establish by offering his co-conspirator's

statements.  Shkreli's unavailability does not prevent the defendant from taking the stand and putting apparently critical facts before the jury, or from offering other evidence to establish those facts.[8]

In sum, the instant motion asks this Court to allow the defendant to admit 28 hearsay statements without identifying the relevance of any specific statement and without explaining which, if any, exceptions to the prohibition against hearsay apply to each relevant statement.  The motion should therefore be denied.[9]

---

[8] For example, in litigating his motion to sever his trial, the defendant contended that "Through documentary evidence alone, we will be able to prove that Mr. Shkreli lied to Mr. Greebel about the amount of assets that MSMB Capital and MSMB Healthcare had in the fall of 2011; that Mr. Shkreli lied to and deceived Mr. Greebel relating to a loan that a former member of Retrophin's Board of Directors made to Retrophin; and that Mr. Shkreli lied to and deceived both Mr. Greebel and another partner at Katten about repaying a loan from MSMB Healthcare that caused the other partner to unknowingly provide false information to the SEC."  (Def.'s Reply Memorandum of Law in Support of his Severance Motion, dated March 10, 2017, at 12).  Many of these facts, which the defendant represented that he would prove "through documentary evidence alone," are now the subject of the Shkreli statements he seeks to admit in this motion.

[9] The defendant also argues that some of these 28 statements might be admissible pursuant to Rule 806 in order to impeach the statements of a co-conspirator.  (Shkreli Statements Motion at 3).  To the extent the defendant attempts to make such an offer during the trial, the government will address that offer at that time in the context of the trial.

IV.    **THE DEFENDANT'S MOTION TO PRECLUDE LAY OPINION TESTIMONY SHOULD BE DENIED**

The defendant seeks to preclude certain testimony elicited from witnesses at the Shkreli trial either by mischaracterizing fact testimony as opinion testimony, or by contending that certain lay opinion testimony does not comport with FRE 701.  (See Lay Opinion Motion, filed on August 19, 2017).[10]  In the alternative, the defendant contends that some of this testimony is also barred by Federal Rules of Evidence 401 and/or 403, as either irrelevant or unduly prejudicial.  (Id.).

To the contrary, the majority of the testimony that the defendant seeks to preclude is admissible because it is: (1) based on the personal observations of the witness from whom it was elicited, (2) relevant and (3) not unduly prejudicial.  Some of the testimony that the defendant seeks to preclude is, in actuality, admissible fact testimony.  To the extent that some of the testimony in question is opinion testimony, it is properly admissible under FRE 701, as it is rationally based on the witness's perception, helpful to understanding either the witness's testimony or a fact in issue and not expert testimony within the scope of FRE 702.

Many of the defendant's arguments for preclusion ring hollow because the defendant has sought to exclude only certain portions of a witness's testimony on a particular subject, and has not sought to preclude other similar testimony that has the same foundational and/or experiential basis.  Moreover, some of the arguments that the defendant advances—for example, that witnesses who testified about interactions they personally observed between the defendant and Shkreli did not spend enough time with the two co-conspirators to fully understand

---

[10] The defendant's motion states that it seeks to preclude testimony elicited at the Shkreli trial from a number of witnesses, including Steven Richardson.  (Lay Opinion Motion at 1).  However, the motion does not specifically address or challenge any testimony elicited from Mr. Richardson.

the nature and scope of their entire relationship—are points that the defendant may seek to make during cross-examination, or that can be argued to the jury in summation, but do not form a legal basis for preclusion of the testimony in question.

For these reasons, as set forth in greater detail below, the defendant's motion should be denied in its entirety.

A.   Legal Standard

1.   Federal Rule of Evidence 701

The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, see FRE 602, while opinion testimony can be presented by either a lay or expert witness, see FRE 701 & 702.  The initial question in determining whether particular testimony is admissible "is therefore whether the contested testimony should be characterized as fact or opinion."  United States v. Cuti, 720 F.3d 453, 457–58 (2d Cir. 2013). "[T]he distinction between statements of fact and opinion is, at best, one of degree."  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 168 (1988).

To this end, FRE 701 recognizes that "eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts" and, as such, "permits such witnesses to testify to their personal perceptions in the form of inferences or conclusory opinions."  United States v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005).  In other words, an opinion proffered by a lay witness is an acceptable "shorthand" for the "rendition of facts that the witness personally perceived."  Id. (citing 4 Weinstein's Federal Evidence § 701.03[1])).  Such an opinion may be offered by a lay witness "with or without specialized knowledge."  United States v. Thornhill, 667 Fed. Appx. 310, 311 (2d. Cir. 2016) (citing Federal Rules of Evidence 602 and 701).

A lay witness's testimony in the form of an opinion is permissible pursuant to FRE 701 if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  In "interpreting these requirements," the Second Circuit has made the following observations: "(a) the rational-basis requirement 'is the familiar requirement of first-hand knowledge or observation,' United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting FRE 701 Advisory Committee's Note on 1972 Proposed Rules); (b) the helpfulness requirement is principally 'designed to provide assurance[ ] against the admission of opinions which would merely tell the jury what result to reach,' id. (quoting FRE 704 Advisory Committee's Note on 1972 Proposed Rules); and (c) the 'not based on specialized knowledge' requirement requires that 'a lay opinion must be the product of reasoning processes familiar to the average person in everyday life,' Yuri Garcia, 413 F.3d at 215."  United States v. Kaplan, 490 F. 3d 110, 119 (2d Cir. 2007).

In Garcia, the Second Circuit provided the following example of permissible opinion testimony by a lay witness:

> To illustrate: when an undercover agent participates in a hand-to-hand drug exchange with a number of persons, the agent may well testify that, in his opinion, a particular participant, "X," was the person directing the transaction. Such an opinion is based on his personal perception of such subjective factors as the respect various participants showed "X," their deference to "X" when he spoke, and their consummation of the deal only upon a subtly signaled approval by "X."  By allowing the agent to state his opinion as to a person's role in such circumstances, Rule 701 affords the jury an insight into an event that was uniquely available to an eyewitness. In this respect, the rule recognizes the common sense behind the saying that, sometimes, "you had to be there."

413 F.3d at 211-12.  Additional cases decided by the Second Circuit offer further examples of permissible opinion testimony by lay witnesses, including (1) a witness who had worked for a

company and was familiar with its books and records and who testified, based on his personal experience and his review of those documents, to the effects of debt reclassifications that the government alleged were fraudulent on the company's books and records, United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007); (2) witnesses who served as an in-house accountant and an outside auditor for a company and who testified, based on their personal experience doing work for the company, how they accounted for the proceeds of fraudulent transactions, how they would have accounted for the transactions had they been aware of the full facts and how certain information that was withheld from them led to misstatements in the company's financial statements, Cuti, 720 F.3d at 456-61; (3) a witness who was a member of an organized crime family and who testified, based on his involvement in loansharking activities with that family, to the meaning of coded comments made by the defendant on intercepted phone conversations, United States v. Yannotti, 541 F.3d 112, 125-26 (2d Cir. 2008); and (4) a law enforcement witness who personally observed a suspect with a weapon and who testified that, based on his work experience as a regiment weapons officer for an army unit in the Jamaica Defense Force, the weapon appeared to be a "22 long rifle target pistol," Thornhill, 667 Fed. Appx. at 310.

A district court's decision to admit evidence, including lay opinion testimony, is reviewed for abuse of discretion.  See, e.g., Old Chief v. United States, 519 U.S. 172, 174 n.1 (1997); Garcia, 413 F.3d at 210.

### 2.    Federal Rules of Evidence 401 and 403

FRE 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Relevant evidence generally is admissible, see FRE 402, and there is a "very low standard for relevance."  United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008); see, e.g., United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006)

23

("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

   Relevant evidence may be excluded based on the potential for unfair prejudice only when the risk of unfair prejudice "substantially outweighs" its probative value.  FRE 403.  The Supreme Court has observed that "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief, 519 U.S. at 180.  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).  "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."  Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original).  "The prejudice resulting to defendants from the fact that introduction of" relevant evidence is "damaging to their case is, of course, not the kind of prejudice against which Fed. R. Evid. 403 protects defendants."  See United States v. DeLillo, 620 F.2d 939, 947 n.2 (2d Cir. 1980).

   A trial judge's evidentiary rulings, including determinations of relevance and assessments of whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, are reviewed only for abuse of discretion.  See, e.g., United States v. Abreu, 342 F.3d 183 (2d Cir. 2003); United States v. Khalil, 214 F.3d 111, 122 (2d Cir. 2000).  "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational."  United States v. Awadallah, 436 F.3d 125, 131 (2d Cir. 2006).

B.      Argument

1.      Testimony of Su and Aselage Regarding Personal Observations of
        Interactions Between the Defendant, Shkreli and Others Is Admissible

The defendant contends that certain lay opinion testimony from witnesses Jackson

Su and Stephen Aselage regarding their observations about the interactions between the defendant

and Shkreli and/or the defendant and Retrophin's Chief Financial Officer Marc Panoff should be

precluded as inadmissible pursuant to Rule 701 because they were not based on "sufficient" first-

hand observations, were not "rationally derived from those first-hand perceptions" and/or were

not "helpful" to the jury.  (Lay Opinion Motion at 4-13).  The defendant further contends that the

testimony was either not relevant under Rule 401 or unduly prejudicial pursuant to Rule 403.

(Id.).  These arguments are unavailing.

First and foremost, it is significant and revealing that the defendant has sought to

preclude only certain portions of Su and Aselage's testimony about these interactions, and has not

sought to preclude other testimony about these interactions that was based on the exact same

personal observations that are allegedly "insufficient" to support the testimony he seeks to

preclude.  For example, Su's complete testimony regarding his observations of the interactions

between Shkreli and the defendant is as follows:

> Q      And what did you observe about those interactions between Mr. Greebel
>        and Mr. Shkreli?
>
> A      They were professional. They talked about the business or anything that
>        had to do with Retrophin.
>
> Q      What was your impression of Mr. Greebel?
>
> A      He was a smart, smart lawyer, yes. Yeah.
>
> Q      And in terms of their relationships, between Mr. Shkreli
>        and Mr. Greebel that you observed, did you actually observe
>        them interacting together?

25

A  Yes.

*Q*  *And did you observe anything about their relationship?*

*A*  *Martin was the one that mostly directed Evan to do whatever he needed and he, Martin controlled the conversation more, normally.*

Tr. 2178:4-20.  The defendant seeks to preclude the testimony in italics (lines 17-20).  The

defendant does not, however, make any of these arguments or seek to preclude Su's <u>other</u>

testimony about the interactions between the defendant and Shkreli—for example, that "[t]hey

were professional. They talked about the business or anything that had to do with Retrophin"—

despite the fact that such opinion testimony is based on and derived from the same first-hand

perceptions.  That is, the defendant has only claimed that certain testimony about interactions

between the defendant and Shkreli fails to meet the requirements for lay opinion testimony—

perhaps because the defendant perceives the content of such testimony as damaging to his case—

but other testimony on the same interactions, based on the witness's same opportunities to

observe the defendant and Shkreli, is somehow permissible.

  Even setting aside the inconsistent positions that the defendant has taken, there is

no question that the testimony of Su and Aselage regarding their first-hand observations of the

interactions between the defendant and Shkreli and/or the defendant and Panoff constitutes the

kind of clearly permissible opinion testimony that is within the heartland of Rule 701.  Both

witnesses testified that they had the opportunity to see and hear those individuals interacting with

each other on numerous occasions:  for Su, it was during his almost year-long tenure at Retrophin,

and for Aselage, it was during Board meetings and other Board functions over a period of more

than 18 months.[11]  Su and Aselage then simply testified to their "personal perceptions" of those interactions "in the form of inferences or conclusory opinions," as Rule 701 contemplates. Garcia, 413 F.3d at 211.  The testimony was based directly on what the witnesses observed; was drawn from those personal observations; and was helpful to the jury to understand the nature of the relationships between these individuals.  At the Shkreli trial, Shkreli advanced an advice-of-counsel defense on Counts 7 and 8 of the Superseding Indictment, so it was particularly helpful for the jury to understand the nature of the relationship between the defendant and Shkreli.  It will be similarly helpful at this trial, where the jury will need to evaluate the defendant's contention that he and Shkreli were not co-conspirators, were not close and that the defendant was misled by Shkreli.

The defendant suggests on several occasions that the witnesses could not testify to such interactions because they did not have "sufficient first-hand perceptions" of those relationships.  (See, e.g., Lay Opinion Motion at 4, 9).  In doing so, the defendant suggests that there is an unwritten "time" requirement for lay opinion testimony; that is, the witness must spend a certain amount of time with individuals in order to provide a lay opinion about how the witness observed them during those interactions.  This assertion is unsupported by the caselaw.  In fact, a witness who observes individuals together on a single occasion, or small number of occasions, can draw an inference about the role of each individual on those occasions or the manner in which

_____

[11] The government strongly disagrees with the defendant that the government laid an insufficient foundation for the challenged testimony of Su and Aselage.  However, at the trial in this case, the defendant will have the opportunity to ask for additional foundation to be laid on these subjects and, should the Court agree, the government will ask additional questions of the witnesses.  The defendant offers no legal basis to preclude opinion testimony in a forthcoming trial because the defendant believes that additional foundation should have been laid for such opinion testimony when it was offered in a prior trial.

the individuals relate to one another.  Garcia, 413 F.3d at 211-12 (providing as example of permissible lay opinion testimony the testimony of a witness to a drug transaction who testified to the individual who was "directing" the transaction); see generally 29 Fed. Prac. & Proc. Evid. § 6255 (2d ed.) ("[L]ay opinion traditionally has been received as to the mental, emotional or physical condition of a person observed by the witness.  Thus, the courts have admitted lay opinion as to sanity, insanity, feelings, knowledge, intent, character, appearance, age, suffering, intoxication, and the like." (citations omitted)).[12]  The defendant may, if he wishes, cross-examine the witnesses about how often they had the opportunity to observe the defendant with Shkreli, or whether they were privy to all such interactions, and then argue to the jury about the weight that such testimony should be assigned.

Finally, there is no basis to preclude the testimony of Su and Aselage pursuant to Rules 401 and 403.  Su and Aselage testified about the interactions they observed between the defendant, Shkreli and/or Panoff during the course of the charged conspiracies, which is clearly relevant to those charged conspiracies.  Moreover, the testimony that Su and/or Aselage observed Shkreli giving direction to the defendant and/or Panoff, that the defendant and Panoff seemed to follow Shkreli's lead, and/or that Shkreli appeared to be the "dominant personality" among the group is no more prejudicial than other similar evidence in the case (e.g., the many emails between those three individuals that reflect a similar dynamic).  The defendant is free to argue, as

---

[12] In Kaplan, the Second Circuit found that a witness's extensive opinion testimony about the nature of, and the defendant's knowledge of, a charged fraud conspiracy based on a single in-person conversation with the defendant was not "rationally derived" from that conversation.  490 F.3d at 117.  The opinion testimony in Kaplan, however, is clearly distinguishable from the opinion testimony challenged here.  First, in the challenged testimony, Su and Aselage were not testifying broadly about the charged frauds, but specifically about the very interactions they observed.  Nor were Su and Aselage speculating about the knowledge of another individual; instead, they were describing how the individuals they observed interacted with each other.

he does in his brief, that simply because Shkreli was observed by witnesses to provide the defendant or Panoff with directives does not mean that either would have followed "improper" directives.  (See, e.g., Lay Opinion Motion at 8).  Such an argument goes to the weight of the evidence, not its admissibility.  See, e.g., United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998) (noting that it the purview of the jury to determine what inferences to draw from the evidence).

### 2.    Testimony of Aselage Regarding Katten's Bills Is Admissible

The defendant seeks to preclude Aselage's testimony that the legal bills submitted by Katten, the defendant's law firm, to Retrophin for work "seemed extremely high."  (Lay Opinion Motion at 13-14).  Such testimony is clearly admissible pursuant to Rule 701.

Aselage began serving as the Chief Operating Officer ("COO") of Retrophin in the spring of 2014, and testified that in that role, he was responsible for instituting processes and controls at the company.  (Tr. 3393).  He was also responsible for hiring a general counsel because he was "increasingly concerned" about the work that the defendant and his firm were doing for Retrophin.  (Tr. 3393-94).  When asked why he had become concerned, Aselage gave two primary reasons:  (1) the bills issued by the defendant's firm, which Aselage himself saw, "seemed extremely high, relative to what you would expect legal costs would be for a firm our size"; and (2) the defendant was "functioning really not as responsive to the entire Board but only to Mr. Shkreli."  (Tr. 3394).

The contested testimony meets all the requirements of Rule 701.  First, as the COO who reviewed the legal bills, Aselage's statement about the bills was based on his personal perception.  Second, his opinion that the bills appeared to be "extremely high, relative to what you would expect legal costs would be for a firm our size" was rationally based on his knowledge as COO of Retrophin's operations and the expected attendant legal costs of a pharmaceutical

company at that stage of development.  As the Court is aware, Aselage spent more than 30 years before he joined Retrophin working in the business and operations functions of various-sized pharmaceutical companies.  (Tr. 3299-3302).  Finally, Aselage's testimony about the nature of Katten's legal bills was helpful for the jury to understand why, in the spring of 2014, he had become concerned about the role that the defendant played at Retrophin and sought to hire a general counsel for the company.

Moreover, Aselage's testimony is clearly admissible pursuant to Rules 401 and 403.  See, e.g., Quattrone, 441 F.3d at 188; Figueroa, 618 F.2d at 943.  The reasons why Aselage became concerned about the defendant's role at Retrophin are clearly relevant to explain steps that he, other Board members and other Retrophin employees took to ultimately terminate the defendant as counsel to Retrophin and to investigate the relationship between the defendant and Shkreli.  Those steps ultimately led to the discovery of, inter alia, the settlement and consulting agreements that are at issue in Count Seven of the Superseding Indictment.[13]

### 3.   Testimony of Massella Regarding Stock Transfer Agreements Is Admissible

The defendant also moves to preclude testimony of Massella regarding transactions he worked on while serving as the accountant for Retrophin, including some of the transactions that comrpise the fraudulent scheme charged in Count Seven of the Superseding Indictment.  (Lay Opinion Motion at 14-16).  Such testimony is clearly admissible pursuant to Rule 701.

---

[13] As detailed in Section IX below, the government also anticipates that it will introduce in evidence many of the bills issued by Katten that reflect the defendant's work for Retrophin; as a result, Aselage's testimony about those bills can be considered in conjunction with the bills themselves.

In 2012 and 2013, Retrophin was a client of SEC Solutions, a division of the accounting firm Citrin Cooperman.  SEC Solutions/Citrin Cooperman put Retrophin's books and records in order and created the company's financial statements, and Massella was the relationship partner for that engagement.  (Tr. 3873-84, 3893-96, 3950-51).  In that role, Massella received documents and information from Retrophin, including the capitalization table (which he received at various points and in various forms between February 2012 and December 2012) and share transfer agreements between Shkreli and MSMB Capital, Kevin Mulleady, Marek Biestek and Thomas Fernandez.  Massella testified about, inter alia, the content of the share transfer agreements, the fact that the share transfer agreements were backdated, and the fact that the capitalization table for Retrophin was changed at various points up until the reverse merger with Desert Gateway.  The testimony that the defendant seeks to preclude relates to these subjects, including (1) that in Massella's experience, it was unusual for an employee to transfer shares back to the company CEO as Mulleady, Fernandez and Biestek did with the share transfer agreements; (2) that in his experience, the capitalization table for a company tends to be set before a company goes public; and (3) that Massella would have been concerned if he had realized that the share transfer agreements were backdated.  (Lay Opinion Motion at 14-15).[14]

Massella's testimony on these subjects clearly satisfies Rule 701.  Massella was testifying pursuant to his personal knowledge of certain transactions related to Retrophin, based on his time working with Retrophin's books and records and on its financial statements, and his opinions were rationally derived from those observations and as well as his own experience as an

---

[14] The defendant also seeks to preclude Massella's testimony that SEC rules prohibit backdating.  (Lay Opinion Motion at 16).  As the Court is aware, there was a sustained objection to that answer during the Shkreli trial, and the government does not intend to elicit that testimony at the forthcoming trial.

accountant for Retrophin and other similarly-situated companies.  See Cuti, 720 F.3d at 457-58

(opinion testimony of company employee admissible pursuant to Rule 701 because it was based

on personal experience working on the books and records of a company, and rationally derived

from those observations); Rigas, 490 F.3d at 224-25 (same for opinion testimony of company

employee who worked on company's books and records).  Furthermore, Massella's testimony

was helpful to the jury to understand both his work for Retrophin on those transactions and his

understanding of the impact of such transactions on both Retrophin's capitalization table and the

ultimate distribution of Retrophin's shares during the reverse merger.  See, e.g., Rigas, 720 F.3d

at 225.

        The defendant's arguments to preclude Massella's testimony are unavailing.  First,

the defendant contends that there was not sufficient foundation for the disputed testimony because

it is "entirely unclear how many times Mr. Massella worked with private companies going

public." (Lay Opinion Motion at 15).  To the contrary, it is entirely clear the number of times

Massella worked with companies that went public; he testified at length about his experience

working with such companies, and specifically testified that he had worked with approximately

50 companies that were in the process of transitioning from private to public companies.  (Tr.

3873).

        Second, the defendant asserts that some of Massella's statements are "wrong"

because the defendant has an expert, Stephen Ferruolo, who will provide some testimony that is

contrary to those statements.  (Lay Opinion Motion at 16).  As an initial matter, it is possible that

two people may have had different experiences without one person being "wrong"—for example,

while it was Massella's experience in the 20 years that he worked as an accountant with small

companies like Retrophin looking to go public that the capitalization tables for those companies

32

did not tend to change significantly close to the time that such companies went public, Mr. Ferruolo may well have had a different experience.  In any event, there is no legal basis to preclude one witness's testimony because another witness might provide testimony that is different.  It is ultimately the purview of the jury to determine which witness's testimony should be afforded more weight.

Third, the defendant contends that Massella should not be permitted to offer testimony about the backdated stock transfer agreements because he "did not recall noticing any changes to the date of the agreement."  (Lay Opinion Motion at 16).  However, it is permissible to ask a lay witness hypothetical questions about facts that are independently established in the record.  For example, in <u>Cuti</u>, the Second Circuit found that hypothetical questions posed to a company's auditor and accountant about whether they would have reached a different conclusion about the proper way to account for a transaction had they realized certain facts that had been concealed from them were proper:

> Each [witness] was a certified and experienced accountant personally familiar with the accounting of the transactions at issue. The hypothetical questions utilized facts that had been independently established in the record. If the facts as the witnesses had understood them were A and the true facts were B, it was not inappropriate to ascertain, from the very witnesses responsible for their accounting, whether B would have affected that accounting under the same, undisputed accounting rules. And, since the applicable accounting rules were explained in detail, the reasoning process that the witnesses employed in answering the hypotheticals was straightforward and transparent to the jurors, who could readily discern whether the responses given were reliable.

33

720 F.3d at 458.  Here, Massella was similarly asked what his reaction would have been had he realized that the share transfer agreements had been backdated, and his response constituted proper lay opinion testimony.[15]

Finally, the defendant's arguments about Rules 401 and 403 are unpersuasive. Massella's testimony is clearly relevant to the charged conspiracies, clarifies other admissible evidence related to the backdated share transfer agreements and the capitalization table, and the probative value of such testimony is substantially outweighed by any risk of unfair prejudice. See, e.g., Quattrone, 441 F.3d at 188;  Figueroa, 618 F.2d at 943.

      4.    Testimony of Pierotti Regarding Trading and the Term "Over-the-Wall" Is Admissible

Finally, the defendant seeks to preclude testimony by Pierotti regarding two concepts:  "trade the stock" and "over the wall."  (Lay Opinion Motion at 18).  The defendant provides no law or argument to support this motion.  (Id.).  Pursuant to Rule 701, Pierotti may properly testify as to the meaning of both terms—which were raised in communications with Shkreli and/or the defendant—based on his experience and the context of the communications in which those terms were raised.

During the Shkreli trial, Pierotti testified that he had conversations with Shkreli about the Fearnow Shares he had purchased, and Shkreli told him that people "who have trading

---

[15] For the reasons set forth in the government's response to the defendant's motion to dismiss Count Seven of the Superseding Indictment (Dkt. No. 327), the defendant's contention that backdating documents is legally permissible when such backdating merely memorializes an oral agreement that was made previously is entirely irrelevant given the circumstances of this case. As detailed in that response, the evidence clearly demonstrates that the backdated share transfers that occurred in November and December 2012 did not memorialize oral agreements that had taken place in either June or July of 2012; rather, those share transfers were agreed to (either orally or in written emails) by Shkreli, Biestek, Mulleady and Fernandez in November or December 2012.

experience should trade the stock."  (Tr. 4265).  In response to a follow-up question about what "trade the stock" meant, Pierotti testified that "Stocks are more valuable if they have more liquidity.  And the liquidity is measured by the volume of the stock.  So, if a group of people decided to just trade stock back and forth amongst themselves for the purpose of creating volume, that would be insider trading."  (Tr. 4266).  As the defendant notes, the government agreed to strike the answer to the question as it was given at the Shkreli trial because it contained a conclusion about the legal implications of trading the stock in the manner that the witness described, and the witness was not qualified to provide such a conclusion.  (Tr. 4267-69).  The government also agrees to warn the witness not to provide such a legal conclusion at the upcoming trial of the defendant.

However, Pierotti's testimony other than that legal conclusion was entirely appropriate and admissible pursuant to Rule 701.  That is, if Pierotti had simply explained that he understood "trade the stock" to mean that the recipients of the Fearnow Shares should trade the shares back and forth between them to increase the liquidity, and thus the value of the stock— without the legal conclusion—such testimony would have been proper.  This is because his testimony about what he understood the defendant to mean was based on his own experience, was "derived from a reasoning process familiar to average persons," and did not "depend on the sort of specialized training that scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations."  Yannotti, 541 F.3d at 1226; see also United States v. Lumiere, -- F. Supp. 3d. --, 2017 WL 1391126 (S.D.N.Y. Apr. 18, 2017).

Similarly, the defendant seeks to preclude testimony elicited by counsel for Shkreli on cross-examination in which Pierotti discussed what it meant to be brought "over the wall" in connection with a particular transaction.  (Lay Opinion at 18).  The term was discussed at length

35

on both direct and cross-examination because Shkreli and the defendant discussed and then sent to Pierotti in January 2012 an email that was designed to provide Pierotti with inside information about Retrophin that would have the effect of bringing him "over the wall" and preventing him from trading his Fearnow Shares.  The defendant objects to Pierotti's testimony that "It never happens on Wall Street that somebody tells you that you are going over the wall.  That is not the way it works.  You are asked, may I bring you over the wall.  That is how it works on Wall Street."  (Tr. 4321).

       Such testimony is appropriate and admissible pursuant to Rule 701.  Pierotti's testimony about what it meant for the defendant to try and bring him "over the wall" was "based on personal observations" (i.e., his receipt from the defendant and Shkreli of the email in question) and "informed by life experiences" (i.e., his experience as a trader), and as such it was "appropriate lay testimony and did not require qualification under Rule 702."  Thornhill, 667 Fed. Appx. at 311; see also United States v. Brewer, 36 F.3d 266, 271 (2d Cir. 1994).

## V.        THE DEFENDANT WAS PERSONALLY LIABLE TO MSMB INVESTORS

The defendant seeks to preclude the government from arguing that Shkreli was "personally liable for losses by" the MSMB funds.  (Shkreli Liability Motion at 1).  According to the defendant, the private offering memoranda ("PPMs") governing those funds "expressly stated that Mr. Shkreli was not personally liable."  (Id.).  As a result, the defendant contends, any argument about his personal liability would "contradict the PPMs" and "mislead and confuse the jury."  (Id.).  This argument fails as a matter of fact and law.

First, the PPMs do not absolve Mr. Shkreli of personal liability for MSMB losses. Those PPMs state only that the General Partner of each fund "are organized as a limited liability company" whose members "do not generally have individual liability for its debts and obligations, except as may be specifically provided by law."  (Id. at 2 (emphasis added); see Ex. A).  Such a sentence does not "expressly state" that Shkreli, a "member" of each relevant General Partner, "was not personally liable."  Instead, this provision merely states a fact, that a member's liability is generally limited.[16]

The defendant's argument that Shkreli was immune from personal liability for MSMB debts as a matter of "basic contract law" is also surprising given that the defendant and

---

[16] The defendant suggests that the government "acknowledged" in its rebuttal in the Shkreli trial that the PPM made Shkreli immune from personal liability.  (Shkreli Liability Motion at 4).  That is not a fair reading of the rebuttal.  The government statement about the defendant's liability was made while repeating an argument that Shkreli's counsel had made: "Mr. Brafman asked why Martin didn't just tell the MSMB Capital investors that he had blown up the fund on that Orex trade in February of 2011?  He couldn't be sued, according to the PPM if he had just told them that."  (Tr. 5504:22-25).  The government then went on to explain: "And I want you to look closely at the PPM. We talked so much about that and Mr. Brafman talked so much about it in his summation. Show me where in those PPM's the manager's allowed to lie?  Look at every single one. Nowhere in PPM's are you allowed to lie to your investors."  (Tr. 5505:10-14).  In other words, the government made clear that Shkreli was not immune from suit based on, at a minimum, his fraudulent conduct.

Shkreli arranged for numerous "settlement agreements" with MSMB and Elea Capital investors in which those investors waived the right to sue Shkreli personally. Such protection would, presumably, be unnecessary if Shkreli were immune from suit.

> Second, even as a member of a limited liability company ("LLC"), Shkreli was personally liable for his fraudulent conduct related to the MSMB investors. The defendant cites Del. Code Ann. tit. 6, § 18-303(a) ("Section 18-303") in his discussion of limited liability, but tellingly does not argue that Section 18-303 actually absolves him of liability, because it does not. Section 18-303 merely states that "no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company." Id. (emphasis added). The law is clear that, when a member has done more to cause a loss than by "solely" being a member of an LLC that has suffered a loss, he is not shielded from liability by Section 18-303. E.g., Weber v. U.S. Sterling Securities, Inc., 282 Conn. 722 (2007) ("[A]lthough § 18–303(a) . . . shields the defendants from personal liability based solely on their affiliation with [an LLC], it does not shield them from personal liability for their own tortious conduct.").[17] This

---

[17] Accord, e.g., Pepsi-Cola Bot. Co. of Salisbury, Md. v. Handy, No. 1973-S, 2000 WL 364199, at *3 (Del. Ch. Mar. 15, 2000) ("The word 'solely,' which is used in Section 18-303, indicates that a member or manager will not be liable for the debts, obligations, or liabilities of a Delaware LLC only by reason of being a member or manager; however, other acts or events could result in the imposition of liability upon or assumption of liability by a member or manager.") (quoting R. Franklin Balotti and Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations 20-6 (3rd ed.1998) (emphasis added)); Jorgensen & Company v. Sutherland, No. No. 15-CV-7373 (CCC), 2017 WL 1395485, at *4 (D.N.J. Apr. 17, 2017) (summarizing Delaware case law on section 18-303(a) and rejecting argument that section 18-303(a) shields LLC's member from liability where alleged wrongful conduct was taken exclusively in furtherance of LLC's corporate purpose); Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P., No. 13-CV-1654 (RA), 2014 WL 2610608, at *28 (S.D.N.Y. June 10, 2014) (rejecting motion to dismiss breach of fiduciary duty claim against sole member of LLC based on section 18-303(a) and stating that the member "would not be held liable 'solely by reason of being a member' of

liability is not surprising, and even the defendant does not appear actually to argue that Shkreli could not have been sued by investors alleging fraud.

Third, explaining to the jury that Shkreli sought to pay off angry MSMB investors with Retrophin assets will not "confuse and mislead the jury."  (Shkreli Liability Motion at 5). The story is a simple one that the government is confident the jury, with legal guidance from the Court, will be able to follow without confusion.  To the extent the defendant wants to argue that Shkreli could not actually have been sued by angry MSMB investors who believed Shkreli had lied to them, he is free to make that argument.[18]

---

[the LLC], but rather because [the member] knowingly caused [the LLC] to breach its fiduciary duties"); Duffield Assocs., Inc. v. Meridian Architects & Eng'rs, LLC, No. S10C-03-004 (RFS), 2010 WL 2802409, at *4  (Del. Ch. July 12, 2010) (stating, in the context of claims against members of a Delaware LLC, that "[t]he common law rule is that corporate officials may be held individually liable for their tortious conduct, even if undertaken while acting in their official capacity"); Sewell v. Coviello, No. CPU5-15-001302, 2016 WL 3152567, at *2 (Del. Ct. of Common Pleas Mar. 8, 2016) (rejecting motion to dismiss based on Section 18-303(a) and noting that "[u]nder Delaware laws of agency, Delaware courts have held corporate officials and directors liable for their participation in tortious conduct, such as fraud, even if they are acting in an official capacity.").

[18] To the extent the defendant is attempting to draw a distinction between the defendant's liability for his fraudulent conduct and his liability for investment losses suffered by the MSMB funds, that is a distinction of no significance.  The MSMB funds were built on fraud, as shown during the Shkreli trial.

VI.   THE DEFENDANT'S MOTION TO PRECLUDE CO-CONSPIRATOR STATEMENTS SHOULD BE DENIED

The defendant moves for a pretrial evidentiary hearing to litigate the admissibility of all statements of unindicted co-conspirators that the government may seek to introduce at trial. (Co-Conspirator Motion at 8-11).  The defendant also moves, without citation to any legal authority, to preclude the government from presenting evidence or arguing at trial that there are co-conspirators other than the defendant and Shkreli in the conspiracies charged in the Superseding Indictment based on the evidence introduced at the Shkreli trial.  (Co-Conspirator Motion at 1-7).[19]

The defendant's request for a pre-trial hearing regarding co-conspirator statements that may be introduced at trial is based entirely on a procedure employed in other Circuits but explicitly rejected by the Second Circuit, which has consistently held that the admissibility of co-conspirator statements should be determined at trial.  In the alternative, the defendant asks this Court to summarily preclude the government from introducing at trial evidence of unindicted co-conspirators based on the defendant's characterization of the evidence introduced at an entirely separate trial of a co-defendant.  The defendant cites no legal authority that would permit the Court to treat the evidence admitted at the Shkreli trial as if it is the only evidence that is available for introduction at the trial of the defendant—and construe all of that evidence in the defendant's

_____

[19] The part of the motion that addresses co-conspirators for Count Seven appears to be largely duplicative of the arguments advanced in the defendant's Motion to Dismiss Count Seven of the Superseding Indictment (Dkt. No. 327), in which the defendant asks this Court to dismiss Count Seven in part because the defendant contends that the government did not prove at the Shkreli trial that there were any co-conspirators other than the defendant and Shkreli for that count; the defendant also asked the Court to construe that motion in the alternative as a motion in limine. The government therefore also refers the Court to its response to that motion.

favor—to block evidence related to unindicted co-conspirators in this case.  For these reasons, as set forth more fully below, the Court should deny this motion in its entirety.

A.    Legal Standard

The well-established practice in the Second Circuit—known as the Geaney rule after the seminal case—is for the government to conditionally admit co-conspirator statements at trial "subject to the later submission of the necessary evidence" to meet the requirements of Rule 801(d)(2)(E).  United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969)); see also United States of America v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979) ("The law is well settled within this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances.").  "If the government succeeds in persuading the court that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy . . . the statements are allowed to go to the jury."  Id.; see also United States v. Hempstead, No. 15-CR-117 (VAB), 2017 WL 401938, at *1 (D. Ct. Jan. 30, 2017) (noting that district courts in the Second Circuit almost universally reject requests for pre-trial hearings on the admissibility of co-conspirator statements); United States v. Fallas, No. 09-CR-342 (LAP), 2010 WL 346805, at *4 (S.D.N.Y. Aug. 19, 2010) (rejecting defendant's request for a pre-trial hearing because "[i]n the Second Circuit, statements proffered into evidence as co-conspirator statements are admitted on a conditional basis . . .").

At the time that a Geaney determination is made, the Court "must find two factors by a preponderance of the evidence:  first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in

furtherance of the conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999). "The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." Id. Statements that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible. Id. However, the "Government need not show that the listener, or the person who heard the declarant's statement, was also a member of the conspiracy." United States v. Paredes, 176 F. Supp. 2d 183, 187 (2001). Indeed, a communication "with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the plan's goals" is admissible. Id. Moreover, a disagreement along the way towards communications and actions in furtherance of the conspiracy is irrelevant and not a bar to admission. See, e.g., United States v. Kassir, No. 04-CR-356 (JFK), 2009 WL 2913651, at *6 (S.D.N.Y. Sep. 11, 2009) ("Although [the co-conspirators] had a number of disagreements during the course of the conspiracy, it was within the jury's discretion to conclude that these did not rise to the level of nullifying the conspiracy itself.").

"[W]hile the hearsay statement itself may be considered in establishing the existence of the conspiracy, 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" Id. (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)). This requirement that there be "some independent corroborating evidence" does not require that the government must establish fully that an individual is a co-conspirator before admitting hearsay statements of such co-conspirator. That requirement would swallow the hearsay exception because it is often the communications among individuals that fully establish the scope, nature and duration of the conspiracy. Indeed, conspiracy depends on a verbal or non-verbal communicative act—an agreement. Rather, as Cambindo Valencia, Paredes and Gigante

demonstrate, there must be "some independent corroborating evidence of the defendant's

participation in the conspiracy" and the totality of the evidence—both the independent

corroborative evidence and the hearsay statements themselves—must be considered when the

Court determines whether a particular individual is a co-conspirator.  Gigante, 166 F.3d at 82.

> B.     The Second Circuit Has Explicitly Rejected The Use of Pretrial Evidentiary
>        Hearings for Determining the Admissibility of Co-Conspirator Statements

The defendant urges this Court to order a pre-trial evidentiary hearing at which the

government would be forced to identify and litigate the admissibility of all co-conspirator

statements prior to any evidence or testimony being introduced at trial.  (Co-Conspirator Motion

at 8-11).  The request for such a hearing is based entirely on cases from other Circuits, including

United States v. James, 590 F.2d 575, 582 (5th Cir. 1979).  What the defendant fails to

acknowledge in his brief is that both the Second Circuit and district courts therein have explicitly

and repeatedly rejected requests for such hearings—often called "James hearings" after the Fifth

Circuit case upon which the defendant heavily relies in advancing his argument—as improper and

inconsistent with Second Circuit precedent as established by Geaney and its progeny.  As

explained in United States v. Feola,

> In this Circuit, the functional equivalent of what the Fifth Circuit
> calls a James hearing and requires before trial is provided by a
> Geaney ruling, which is provided only during trial, and relies for its
> basis on the facts adduced at trial, including evidence received
> subject to a motion to strike at the close of the Government's case. .
> . . Defendants who want James hearings should so conduct their
> business as to be tried in the Fifth or Eleventh Circuits.

651 F. Supp. 1068, 1129, 1130 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).  See also

United States v. Parris, No. 13-CR-17 (DAB), 2014 WL 2745332, at *16 (S.D.N.Y. June 14,

2014) (denying hearing; The defendant "seeks a pre-trial hearing regarding the existence of a

conspiracy and regarding the admissibility of coconspirators' statements pursuant to United States

43

v. James, 590 F.2d 575 (5th Cir. 1979).  It is well-established, however, that the Second Circuit does not follow James."); United States v. Miller, No. 12-CR-368 (PAC), 2012 WL 4791992, at *4 (S.D.N.Y. Oct. 9, 2012) (denying motion; The defendant "requests that a 'James hearing' be held regarding whether independent evidence exists as to the existence of the charged conspiracy. That is not the standard [in this Circuit]." (citations omitted)); United States v. Giovanelli, 747 F. Supp. 875, 879 (S.D.N .Y. 1989) (denying hearing; explaining that, in this Circuit, "the functional equivalent" of the pre-trial hearing available in certain other circuits "is provided by a court's determination—at the close of the Government's case—that a preponderance of the evidence demonstrates 'that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made in furtherance of the conspiracy.'" (quoting United States v. Daly, 842 F.2d 1380, 1386 (2d Cir. 1988))).[20]  Such pre-trial hearings are not the standard in this Circuit because they require the district court to "undertake a mini-trial" of all of the evidence in the case—as the question of whether an individual is a co-conspirator is based on a review of all of the relevant evidence admitted at trial—that would result in "significantly prolonging the proceedings in the case and

---

[20] The defendant suggests that a James hearing is appropriate because there was some motion practice towards the end of the government's case during the Shkreli trial about the admissibility of certain statements made by the defendant and Shkreli's unindicted co-conspirators.  (Co-Conspirator Motion at 10).  As an initial matter, that motion practice addressed a variety of evidentiary objections raised by Shkreli, including to the admissibility of certain legal documents; to Shkreli's own statements; and to documents received by MSMB Capital and MSMB Healthcare investors who did not testify; etc.  (See Dkt Nos. 273, 274, 276 and 278).  Moreover, pursuant to Geaney, any attempt to reach a final determination as to whether certain statements were admissible as co-conspirator statements that occurred during that motion practice was actually premature; such decisions should have been made right before the close of the government's case.  See, e.g., Giovanelli, 747 F. Supp. 875, 879 (S.D.N.Y. 1989) (a Geaney determination "is provided … at the close of the Government's case").

affording the defendant[] a complete preview of the government's evidence." United States v. Ianiello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985).

As the defendant's request for a pre-trial hearing to determine the admissibility of co-conspirator statements is contrary to the well-settled standard in the Second Circuit, it should be denied.

C.    There Is No Legal Basis To Preclude The Introduction of Evidence Related to Unindicted Co-Conspirators for Counts Seven and Eight Based on the Shkreli Trial

With respect to Count Seven, the defendant baldly asserts that the government should be precluded at trial from introducing any evidence of or making any argument about any unindicted co-conspirators based solely on the evidence and arguments presented at the Shkreli trial.  The defendant asserts that the government's case "has been laid bare" in the Shkreli trial; that no evidence of or argument about other co-conspirators was introduced at the Shkreli trial;[21] and thus the Court may rule prior to the separate trial of this defendant as if all of the available, relevant evidence on Count Seven had already been presented to a jury.  (Co-Conspirator Motion at 1-3).  With respect to Count Eight, the defendant similarly asserts that, "[b]ased on the testimony and documents received into evidence during the [Shkreli] trial," he can seek preclusion of any statements of the six unindicted co-conspirators that the government has identified.  (Co-Conspirator Motion at 4-7).

These arguments advocate for an approach that is even more extreme than the defendant's request for the sort of pre-trial hearing on co-conspirator statements that is explicitly

---

[21] The defendant's assertion that the government did not argue at the Shkreli trial that there were any unindicted co-conspirators for Count Seven is inaccurate.  As the defendant himself acknowledges in his Motion to Dismiss Count Seven, the government argued that Lee Yaffe— who received a non-prosecution agreement for his role in defrauding Retrophin—was a co-conspirator.  (See Dkt. No. 327 at 9-11).

barred under Second Circuit precedent.  Such an approach would require this Court to assume that the evidence and argument at the Shkreli trial is identical in every way to the evidence and argument that the government will offer at the trial of this defendant; accept wholesale the defendant's interpretation of that evidence and argument; and base an evidentiary determination on those assumptions.  Not surprisingly, the defendant offers no legal authority for this approach, nor does any exist.[22]  Moreover, these assumptions are wrong—not only does the government disagree with the defendant's interpretation of the evidence introduced at the Shkreli trial, but the government will offer evidence at the trial of the defendant that was not introduced at Shkreli's trial, including testimony from witnesses who did not testify at the Shkreli trial.[23]

---

[22] Notably, the only time that the defendant suggests that the Shkreli trial should <u>not</u> be given preclusive effect is with respect to the Court's admission at the Shkreli trial of the very co-conspirator statements related to Count Eight that the defendant seeks to preclude via this motion. With respect to those statements, the defendant contends that the Court made no finding about the existence of a conspiracy between the defendant, Shkreli and the unindicted co-conspirators, and that there were alternate bases for the admission of some of those statements.  (Co-Conspirator Motion at 6 and n.2).  In support of this proposition, the defendant cites <u>United States v. Al-Moayad</u>, 545 F.3d 139 (2d Cir. 2008), which is entirely inapposite; the decision has nothing to do with a district court evaluating the admissibility of co-conspirator statements that were admitted at the trial of one co-defendant but which were subsequently challenged as inadmissible at the separate trial of a second co-defendant.  Moreover, in <u>Al-Moayad</u>, the Second Circuit did not conclude that the admission of either alleged co-conspirator statement addressed in the defendant's brief constituted an independent ground for reversal, but rather concluded that other evidentiary errors in the case "'cast such a serious doubt on the fairness of the trial' as to warrant reversal."  <u>Id.</u> at 178.

[23] The defendant does offer a number of more specific arguments, based on evidence introduced in the Shkreli trial, as to why certain co-conspirator statements for the six unindicted co-conspirators identified for Count Eight should be precluded.  As explained above, there is no legal authority that permits the preclusion of co-conspirator statements based on evidence introduced at a separate, prior trial—and even if the defendant could seek such preclusion, such arguments are premature pursuant to <u>Geaney</u>.  Moreover, the government will be able to establish by a preponderance of the evidence introduced at this trial that a conspiracy existed that between the defendant and each unindicted co-conspirator at issue, and that statements made by unindicted co-conspirators that the government seeks to admit were made during the course of and in furtherance of the conspiracy.  <u>See Gigante</u>, 166 F.3d at 82.  For certain co-conspirator statements, the government anticipates that there will also be alternate grounds for admission.

For these reasons, the government respectfully requests that the Court must deny the defendant's motion to preclude the government from introducing evidence or argument of other unindicted co-conspirators for Count Seven, or of statements of unindicted co-conspirators for Count Eight, based solely on the evidence presented at the Shkreli trial.

VII.   EVIDENCE RELATED TO RETROPHIN'S AUDITORS SHOULD BE ADMITTED

The defendant asks this Court to preclude evidence or argument about a very narrow subject:  that "Retrophin's outside auditor (Marcum LLP) determined that the settlement agreements at issue in Count Seven <u>were improper</u>, including any assertion or evidence that Marcum believed there was a violation of GAAP."  (Auditor Motion at 2 (emphasis added)).  The defendant does not seek more broadly to exclude evidence or argument related to Marcum's analyses or conclusions.  As discussed below, the defendant's argument to preclude this "were improper" evidence is meritless and should be rejected.

A.   Background

In relevant part, Count Seven charges the defendant with conspiring with Shkreli to defraud Retrophin using sham settlement agreements to repay angry MSMB investors with approximately $2.286 million in Retrophin assets.  In other words, the defendant and Shkreli arranged to use Retrophin assets to pay off individuals who believed they were owed money as a result of investments in MSMB, rather than in Retrophin or because of anything that Retrophin had done.  Not surprisingly, by August 2013, Marcum detected some of these settlement agreements after they had been paid out and determined that the debts being repaid were in fact the "primary obligation" of MSMB rather than of Retrophin.

Once this issue was detected, the defendant proposed what he called "a solution using notes" (GX 320), pursuant to which Shkreli agreed to cause MSMB Capital Management LLC, MSMB Capital Management LP, MSMB Healthcare Management LLC, MSMB Healthcare LP and MSMB Healthcare Investors LLC to sign agreements to repay Retrophin although neither the MSMB Capital nor the MSMB Healthcare entities had any assets and so could not actually repay Retrophin.  As the defendant explained, "if the fund [MSMB] cant fulfill the note rtrx

[Retrophin] will write it off as bad debt." (GX 322). Notably the defendant did not suggest that

Shkreli repay the debt himself or question the propriety of the original settlement agreements.

Marcum described the ultimate arrangement this way in a November 2013 letter to

Retrophin, which the defendant also received:

> During the second quarter of 2013, the Company [Retrophin], its Chief Executive Officer and MSMB became parties to a series of agreements to settle up to $2,286,511 of liabilities which Company management believes are the primary obligation of MSMB. The Company and MSMB have entered into indemnification agreements whereby MSMB has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid of unpaid, arising from these arrangements. . . . Concurrent with the execution of such settlement agreements, the Company received promissory notes from MSMB whereby MSMB agreed to pay the Company the principal amount of $593,111 plus interest . . . We are advised by the Company management that MSMB is currently in the process of dissolving its operations. . . . the Company has recorded the full amount of the settlements as a charge to its operations due to uncertainty as to whether the affiliate will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.

(Auditors Motion, Ex. B at 5). In plain English, the auditors described a fraud in which Shkreli

caused Retrophin to pay MSMB investors and then agreed to reimburse Retrophin using

worthless promissory notes. In another section of each of its letters to the Board of Directors,

Marcum also explained that "no fraud or illegal acts were noted."

After Marcum's report to the Board of Directors, the defendant suggested that

Shkreli arrange to repay additional disgruntled MSMB investors using sham consulting

agreements rather than the settlement agreements that had been caught by Marcum. According to

the defendant, "we can call it a settlement agreement, but given Marcum's recent behavior they

may require it to be disclosed in the financials. I was trying to prevent that issue." (GX 332).

A.     <u>Analysis</u>

Evidence of the brazen fraud on Retrophin, blandly described by Marcum, is plainly relevant to the conspiracy charged in Count Seven, and the defendant does not suggest otherwise.  Nor could he.  Among other things, evidence of the auditor's determination, letters to the Board, and work on restating SEC filings, all help establish the defendant's knowledge of the fraud that was the object of the conspiracy.  In addition, the defendant chose to sit on the sidelines, neither investigating nor explaining to Marcum or the Board of Directors—his client— the true purpose of these agreements.  The defendant may offer excuses for his actions (or inactions), but they are relevant.

Instead, the defendant argues that the government should be precluded from arguing that Marcum determined the settlement agreements "weren't proper" because such an argument "misstates Marcum's actual assessment that no fraud or illegal acts occurred."  (Auditor Motion at 4).  As a result, according to the defendant, "there is a substantial risk of undue prejudice to Mr. Greebel, confusion of the issues, and misleading the jury."  (<u>Id.</u>).  That sentence is the sum total of the argument the defendant offers.  He does not identify the "undue prejudice," explain what issues would be confused, or how the jury would be misled.

But FRE 403 does not allow the exclusion of an argument—a reasonable gloss or interpretation of the facts—with which the defendant disagrees.  Reasonable minds may differ about whether Marcum's conclusions are properly characterized as a determination that the settlement agreements "weren't proper."  Certainly Marcum disagreed with the initial accounting for those agreements and required a restatement of certain SEC filings by Retrophin.  And the defendant is free to offer his own interpretation or summary of Marcum's conclusions or explain to the jury why it should disregard the government's argument.  But it is counterargument, not preclusion, that is the proper vehicle for the defendant to address this purported concern.

The defendant also seeks to preclude the government arguing or offering evidence "that Marcum had determined that Retrophin's failure to include the settlement agreements in its financial reporting for year-end 2012 and the first quarter of 2013 violated GAAP" because a "violation of GAAP is not an element" of a conspiracy to commit wire fraud or securities fraud and is not "per se" evidence of fraudulent intent.  (Auditors Motion at 4-5).  The defendant does not explain whether he objects to the <u>relevance</u> of this evidence or instead believes that any probative value is substantially outweighed by an unspecified risk of unfair prejudice.  Either way, the evidence is admissible.

To be relevant, evidence need not constitute an "element" of a charged crime or "per se" proof of such an element.  <u>See</u> FRE 401.  Here, evidence of a GAAP violation is relevant, at a minimum, to explain Marcum's analysis and conclusions related to the settlement agreements, which were conveyed to the defendant and the Retrophin Board of Directors.  <u>See</u> <u>United States v. Forbes</u>, No. 02-CR-264 (AHN), 2006 WL 2850413, at *2 (D. Conn. Oct. 3, 2006) ("evidence about the conspirators' GAAP violations and the quantitative effects of those GAAP violations . . . , when viewed in combination with other evidence in the case, is relevant and admissible as circumstantial evidence of [the defendant's] knowledge of the fraud").  Moreover, evidence of a GAAP violation also will not lead to jury confusion or undue prejudice.  The government will not argue that the defendant is guilty because there was a GAAP violation or that a GAAP violation itself establishes the relevant <u>mens rea</u>, and the jury would easily follow the Court's instructions about the elements of the charged crimes.  As a result, this evidence should not be precluded pursuant to FRE 403.

VIII.   THE DEFENDANT'S MOTION RELATED TO "AFFILIATES" SHOULD BE DENIED

The defendant's Affiliate Motion seeks three forms of relief: (1) preclude the government from argument that the recipients of Fearnow Shares were "affiliates" for purposes of the securities laws "merely because they allegedly were Retrophin employees"; (2) preclude the government from offering a single email from the defendant's co-conspirator; and (3) review the grand jury minutes related to the Count Eight to "evaluate whether the grand jury was incorrectly informed about the law" related to affiliates.  (Affiliate Motion at 1, 7).  These requests should be denied.

A.   The "Affiliate" Argument

The defendant seeks only to preclude the government from arguing that certain Fearnow Share recipients were "affiliates" of Retrophin solely because they were Retrophin employees.  The government does not intend to make such an argument.  As this Court instructed the jury in the Shkreli trial:

> You have also heard the parties use the term affiliate. An affiliate of an issuer under the law means a person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such issuer. Whether a person is an affiliate of Retrophin is a question of fact for the jury.

(Tr. 5596:15-20).[24]  Depending on the evidence introduced at the defendant's trial—and not at the Shkreli trial that is now complete—the parties will be able to argue in summation whether certain individuals were "affiliates" of Retrophin.

---

[24] Securities and Exchange Commission Rule 144 "establishes that 'securities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering' are 'restricted securities.'" Phlo Corp. v. Stevens, 62 F. App'x 377, 382 (2d Cir. 2003) (quoting 17 C.F.R. § 230.144).  "To comply with Rule 144, a person ordinarily must meet numerous requirements concerning public information, holding periods, number of shares, manner of sales, and notice to the [Securities and Exchange] Commission.  However, under subsection (k) of the Rule, if a person is not now and has not been

But the central relevance of the "affiliates" issue is not the question of whether certain individuals were "affiliates."  Instead, the primary issue is the fact that the defendant and Shkreli acted as if they needed to prevent the Fearnow Share recipients from remaining or becoming "affiliates" such that those individuals could receive free-trading shares.  For example, one of the overt acts alleged in the Superseding Indictment is the defendant's December 13, 2012 email to certain Fearnow Share recipients asking each recipient to certify that "I represent that I am not an officer, a director, or holder of 10% or more of the outstanding equity securities of Desert Gateway [Retrophin] and do not, alone or together with any other person, exercise control over Desert Gateway."  (Superseding Indictment ¶ 59(b)).  The next sentence of that email (GX 236 in the Shkreli trial) was: "I am not an affiliate (as such term is defined in the Securities Act of 1933) of Desert Gateway."  Another overt act is Shkreli's December 17, 2012 email to certain Fearnow Share recipients stating that they were no longer Retrophin employees, which email was forwarded to the defendant.  In other words, the "affiliates" issue arises because the defendant and Shkreli took steps to ensure that Fearnow Share recipients were not and would not be affiliates, not because the recipients' status as "affiliates" is an element of the charged crime or a fact the government needs to prove at trial.

---

an affiliate of the issuer within the last three months, and at least two years have elapsed since the securities to be sold were last acquired from an issuer or affiliate of the issuer, then that person need not comply with the other Rule 144 requirements."  S.E.C. v. Kern, 425, F.3d 143, 148 (2d Cir. 2005); see 17 C.F.R. §§ 230.144(b), 230.144(c)-(h), 230.144(k).  "An affiliate of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).

B.    GX 242 Is Admissible

The defendant seeks to preclude the aforementioned December 17, 2012 email, which was Government Exhibit 242 during the Shkreli trial, on the grounds that it is hearsay and does not fall within a hearsay exception.  (Affiliates Motion at 5-7).  This argument should be rejected for two reasons.

First, the email would not be hearsay.  As the defendant acknowledges, the purpose of the email would be to "show that Mr. Shkreli allegedly terminated the employment at Retrophin of Messrs. Fernandez, Mulleady, Biestek, Tilles, Pierotti, and Vaino on or about December 17, 2012."  (Affiliates Motion at 6).  In other words, the text of the email is the way the defendant terminated the employees.  (See GX 242 ("Effective immediately . . . Retrophin has 4 employees . . . If you are not on this list, you are not an employee or consultant to Retrophin.")).  Shkreli's words are not offered to prove the truth of the matter asserted in the email but rather because the words themselves constitute a verbal action with legal consequences.  United States v. DiMaria, 727 F.2d 265, 270 (2d Cir. 1984) ("verbal act" doctrine applies when "the utterance is an operative fact which gives rise to legal consequences"); see United States v. Cardascia, 951 F.2d 474, 486 (2d Cir. 1991) ("[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay.").

The email also is not hearsay because it constitutes the statement of a co-conspirator made during and in furtherance of the conspiracy charged in Count Eight.  See FRE 801(d)(2)(E).  Indeed, the sending of this email is one of the alleged overt acts taken in furtherance of the conspiracy.  This email was part of the plan to create the appearance of distance between Shkreli and the individuals who would hold the Fearnow Shares that were secretly

controlled by Shkreli.  The defendant argues that this email could not have been part of the charged conspiracy because "Mr. Shkreli did not have to terminate the Fearnow recipients in order to prevent them from becoming 'affiliates.'"  Even if that were true, it is irrelevant.  The defendant <u>did</u> terminate those people (as part of an effort to satisfy his and the defendant's concerns that they not be considered affiliates) and he <u>did</u> do it as part of the conspiracy.  The statement is admissible.

Second, even if the email were hearsay, it would still be relevant and admissible not for its truth but rather to describe the defendant's and Shkreli's states of mind, namely that they believed it was important to create the appearance of distance between Shkreli and the Fearnow Share recipients.

Finally, the defendant argues that this email should be precluded under FRE 403 because there is a "significant risk that they jury will infer from GX 242 that Mr. Shkreli fired the Fearnow share recipients in order to prevent them from becoming 'affiliates'—which is contrary to law, will create confusion, and will mislead the jury."  (Affiliates Motion at 7).  The defendant provides no basis for believing that the admission of GX 242 will have any of those consequences.  To the extent the government later makes an argument about the significance of GX 242 that the defendant believes will mislead the jury, the defendant should object at that point.

C.    <u>There Is No Basis for Reviewing the Instructions to the Grand Jury for Count Eight</u>

The defendant suggests that this Court should "review the government's instructions to the grand jury <u>in camera</u> and evaluate whether the grand jury was incorrectly informed about the law before returning the charge of Count Eight in the superseding indictment." (Affiliate Motion at 7).

55

Grand jury proceedings carry a "presumption of regularity."  Hamling v. United States, 418 U.S. 87, 139 n. 23 (1974).  Generally, defendants in criminal cases have no absolute right to inspect the grand jury minutes, and any such disclosure should be made upon a showing of a "particularized need."  See Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399-400 (1959); United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1978).  Although grand jury minutes may be disclosed in limited circumstances pursuant to Federal Rule of Criminal Procedure 6(e)(3), the power of the court to order such disclosure for the use of the defense should rarely be exercised.  See, e.g., United States v. Rosen, 259 F. Supp. 942 (S.D.N.Y. 1966).  "A review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  United States v. Torres, 901 F.2d 205, 232–33 (2d Cir. 1990), overruled on other grounds as recognized by United States v. Marcus, 628 F.3d 36 (2d Cir. 2010).  "Mere speculation that the grand jury may have heard insufficient evidence, or that the Government may have improperly instructed the grand jury on materiality, falls far short of the showing to overcome the presumption of secrecy."  United States v. Forde, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010).

Here, the defendant offers nothing more than "speculation" to support his request.  The phrase "affiliate" does not appear in the Superseding Indictment, and nothing in Count Eight refers to or relies on the legal definition of affiliate.  Even if the statements identified by the defendant from the government's summation in some way misstated the law, there is no reason to believe that the concept of an "affiliate" was even put before the Grand Jury, let alone that any legal instructions were improper.

IX.     THE DEFENDANT'S MOTION TO PRECLUDE "IRRELEVANT, MISLEADING, AND UNFAIRLY PREJUDICIAL EVIDENCE" SHOULD BE DENIED

      The defendant seeks to preclude four categories of evidence: (1) Shkreli's harassment of Pierotti in furtherance of the conspiracy charged in Count Eight; (2) Shkreli's conduct in other contexts, including his raising the price of the drug Daraprim; (3) evidence of the defendant's compensation at Katten; and (4) evidence of legal fees Katten incurred working for Retrophin.  (Evidence Motion at 1).  With the exception related to Shkreli's conduct in other contexts, the government should not be precluded from offering any of this evidence at trial.

D.     Shkreli's Harassment of Pierotti in Furtherance of the Conspiracy Charged in Count Eight

      The defendant first contends that evidence about Mr. Shkreli's campaign of harassment against Pierotti should be precluded because it "bears no connection whatsoever to any of the government's allegations related to" the defendant and is "highly charged and inflammatory."  (Evidence Motion at 2).  The defendant relies on the contention that the evidence is irrelevant because the "government has not offered (nor could it offer) any evidence" that the defendant "condoned, authorized, and/or knew in advance about Mr. Shkreli's alleged threats to and harassment of [Pierotti's] family."  (Id.).  These arguments should be rejected because this evidence is relevant, and its probative value is not substantially outweighed by the risk of undue prejudice.

1.     Relevant Background

      Count Eight alleges that the defendant, Shkreli, and others conspired to commit securities fraud by controlling the trading and price of Retrophin stock.  As part of that plan, in December 2012, Shkreli worked with the defendant to distribute free-trading Fearnow Shares to Pierotti, along with six other individuals who were either employees of or affiliated with Retrophin.  After receiving the Fearnow Shares, Pierotti refused to follow Shkreli's instructions

not to trade the Fearnow Shares, and proceeded to sell on the open market some of the shares he had received.  When Shkreli learned in approximately late December 2012 that Pierotti had sold some of the Fearnow Shares, he immediately demanded that Pierotti return the remaining shares to his control.

On December 29, 2012, Shkreli discussed with the defendant a plan to trick Pierotti into reading an email that, if read, would have exposed Pierotti to inside information related to Retrophin in an effort to prevent Pierotti from further trading.  The defendant told Shkreli: "I like it."

On January 2, 2013, Shkreli emailed the defendant a proposed message to Pierotti in which Shkreli asked Pierotti to "honor the agreement we made in our office on December 10th" and gave the employee the choice of returning the remaining Fearnow Shares or of being sued in the Southern District of New York.  The defendant responded: "Very risky given what you [sic] agreement was-could be opening a much bigger can of works."  Shkreli sent a version of the email later that day and copied the defendant.

On approximately January 15, 2013, after Pierotti refused to return the shares, Shkreli sent Pierotti's wife a letter that stated, inter alia, "Your husband has stolen $1.6 million from me and I will get it back. I will go to any length necessary to get it back … I hope to see you and your four children homeless and will do whatever I can to assure this."

In February 2013, the defendant negotiated with Pierotti on behalf of Shkreli.  In a February 14, 2013 email, the defendant represented to Pierotti that, among other things, "the Company" wanted the Fearnow Shares "assigned to it."  (SU000640-646).  Pierotti responded that same day, in relevant part that:

> On another note, but very much related note, I want to make you
> aware that Martin has threatened my wife in writing.  Allow me to

quote excerpts from his letters from January this year delivered via
both Federal Express and the US Postal Service:

"I hope to see you and your four children homeless and will do
whatever I can to assure this."

"I had Tim's stock account frozen at his brokerage firm.  I am a
very determined person [Pierotti's wife]."

"I will go to any length necessary to get it back."

Perhaps you were already aware of this letter, but I share this with
you to illustrate why I would be willing to rid myself, at an 80%
discount, these RTRX shares, a company led by this person,
immediately.

(Id.).[25]  Later that day, the defendant forwarded Pierotti's email to Shkreli and wrote, "His

response."  The defendant and Shkreli then considered a discussion about the negotiation,

including Shkreli's offer to "sign a restraining order enjoining me from being within 2 miles from

his home."  (Id.).

On March 11, 2013, Shkreli wired money to Katten and told the defendant that he

"expect[ed] [the defendant] and [another lawyer at Katten] to bury" Pierotti.  (GX 275).  On

March 26, 2013, Katten sued Pierotti on behalf of Retrophin.  (PIEROTTI000109).  In December

2013, the defendant and Shkreli arranged to prevent Pierotti from receiving an additional 50,000

Fearnow Shares that had previously been promised to him.

In January 2014, Pierotti filed an affidavit as part of the litigation against

Retrophin in which he discussed not just Shkreli's harassing letters but also other instances of

harassment by Shkreli against Pierotti and his family.  After January 2014, the defendant

---

[25] This email is but one example of evidence that the government chose not to use during the
Shkreli trial, but would be relevant and admissible in the defendant's trial.

continued to work with Shkreli to allocate and reallocate Fearnow Shares.  Pierotti and Retrophin

ultimately settled the lawsuit that Shkreli had the defendant commence.[26]

    2.   <u>Analysis</u>

    Evidence related to Shkreli's harassment of Pierotti is relevant for several reasons.

    First, with respect to Count Eight, the government must prove, among other things,

that the goal of the conspiracy between the defendant, Shkreli and others was to control the

trading of the Fearnow Shares.  Evidence that Shkreli was willing to harass Pierotti's family in an

effort to force Pierotti to stop trading Fearnow Shares and return them to Shkreli is relevant,

powerful evidence of the object of the conspiracy.

    Second, the evidence is relevant to show that the defendant was aware of the goal

of the conspiracy (or was willfully blind to it) and willingly participated in it.  The defendant

carefully asserts that the "government has not offered (nor could it offer) any evidence" that he

"condoned, authorized, and/or knew <u>in advance</u> about Mr. Shkreli's alleged threats to and

harassment of [Pierotti's] family."  (Evidence Mot. at 3 (emphasis added)).  We have only the

defendant's unsworn word that he did not know "in advance" about the threats.  But, in any event,

the defendant does not and could not deny that by February 2013 at the latest he "knew about"

Shkreli's harassment, or that he appeared to "condone[]" that harassment by failing to criticize

Shkreli or otherwise address his conduct.  These are relevant facts given that the defendant

continued unquestioningly to pursue Pierotti at Shkreli's behest for months thereafter and

---

[26] Directly following the harassment of Pierotti's family by Shkreli, Pierotti also contacted a news publication to provide it with information about Shkreli's fraudulent conduct at Retrophin.  As part of the settlement agreement with Retrophin, Pierotti agreed to call the news publication and advise that he would not provide any additional information about Shkreli.  To the extent that Pierotti is asked about his contact with the news publication during trial, Shkreli's harassment of Pierotti's family will be an inextricable part of the story of how that contact, and the related portion of the settlement with Retrophin, came about.

continued to work with Shkreli to allocate and reallocate Fearnow Shares assigned to other individuals (but controlled by the defendant).  In context, the defendant's complicit behavior makes it more likely that the defendant was part of the conspiracy.  See FRE 401.

Third, the evidence is relevant because it will corroborate Pierotti's testimony, including that Shkreli did in fact freeze his brokerage account.

The probative value of this evidence is not substantially outweighed by the risk that the defendant might suffer "undue prejudice" if it is introduced.  See FRE 403.  This is not a case in which the "threats" at issue involved death or violence, the kinds of threats that generally raise concerns about unnecessary prejudice.  See, e.g., United States v. Curley, 639 F.3d 50, 63 (2d Cir. 2011) (unduly prejudicial evidence "introduced the notion of guns into the case"); United States v. Khan, 591 F. Supp. 2d 202, 206 (E.D.N.Y. 2008) (precluding under FRE 403 certain evidence of "uncharged, primarily violent conduct, against a defendant who is not charged with any crimes of violence, intimidation, or violence").  Instead, the threats are financial in nature.  In addition, they are commensurate with the crimes charged and the other conduct discussed, especially given the defendant's stated plan to attack Shkreli as a disreputable liar at every turn.

The defendant also argues that when there is "alternative evidence with the same or greater probative value, but with a lesser threat of unfairly prejudicing the defendant . . . the court must discount the probative value."  (Evidence Motion at 4).  The defendant does not, however, identify the "alternative evidence" that he believes has "the same or greater probative value."  Finally, to the extent there is a concern about prejudice, a "proper limiting instruction will lessen the prejudice of this evidence" and is the appropriate remedy.  E.g., Khan, 591 F. Supp. 2d at 206 ("In such a case, if the probative value is particularly high, a judge can remedy potential prejudice with a limiting instruction.").

E.      Shkreli's Conduct in Other Contexts

The defendant seeks to preclude the government from offering, at any point in the trial, evidence related to Shkreli's purchase of shares in KaloBios Pharmaceuticals, Inc., to his raising the price of Daraprim, and to other "controversial public statements."  (Evidence Motion at 5-6).  With one exception discussed below, the government does not intend to introduce any of this evidence during its case-in-chief.

The defendant's effort to preclude the government from introducing any of this evidence during a cross-examination of the defendant or in a rebuttal case is, however, premature. It is possible that the defendant's testimony, or other evidence introduced during the defense case, could implicate the topics or statements the defendant now seeks to preclude.  The defendant's motion on those points should be held in abeyance until after the defendant's direct testimony or the close of the defense case, at which point the parties and the Court will actually be able to evaluate whether any of this evidence is admissible.

The only potential exception to the government's use of evidence about Shkreli's "controversial statements" in its case-in-chief would be to the extent that the defense believes those "controversial statements" include the set of statements Shkreli made on Twitter or otherwise that were relevant to the Retrophin Board of Director's decision to suspend Shkreli as CEO of Retrophin in September 2014.  All of the statements identified in the appendix to the defendant's severance motion were made after that date, and so this potential exception appears not to implicate this motion.  (See Dkt. No. 162 (listing statements)).  Nevertheless, to the extent the government seeks to introduce a specific and potentially "controversial" statement by Shkreli during its case-in-chief, the government will provide the defendant with notice of that intention so that the defendant can determine whether to challenge admission of the specific statement.

F.   The Defendant's Compensation and Legal Fees Owed to Katten

The defendant made hundreds of thousands of dollars from his work for entities controlled by Shkreli.  The defendant also received some credit for the millions of dollars in fees that his law firm, Katten, made from Shkreli-related work.  All of this money provided a strong motive for the defendant to work with Shkreli to accomplish the goals of the charged conspiracies.  The defendant stood to receive a substantial benefit, and to avoid losing a benefit, by agreeing to do what Shkreli wanted.  Use of evidence about a defendant's compensation to establish motive is unquestionably proper.  See, e.g., United States v. Quattrone, 441 F.3d 153, 187 (2d Cir. 2006) ("The district court concluded that evidence of Quattrone's compensation for 1999 and 2000 was relevant to Quattrone's motive to protect his reputation and that of CSFB's Tech group. Despite Quattrone's protests to the contrary, the compensation evidence was not unduly prejudicial. As the government highlights, its references to Quattrone's compensation during its opening statement and summation specified that evidence of his compensation was to be used for the limited purpose of establishing a motive to obstruct and could not be used to convict Quattrone simply because of his wealth."); United States v. Bulgin, 563 F. App'x 843, 846 (2d Cir. 2014) ("we have upheld a district court's decision to allow evidence of monetary gain when 'a defendant is on trial for a crime in which pecuniary gain is the usual motive....'").

The defendant does not contest that evidence of his motive would be relevant. Instead, he argues that evidence about the defendant's compensation and Katten's billing should be precluded because it is not evidence of his motive and because it is unduly prejudicial.  These arguments are meritless.

First, the defendant argues that evidence related to his compensation is irrelevant because "the evidence clearly shows that Mr. Greebel's compensation is not based on his billable work for Retrophin and the MSMB Entities, since his compensation actually decreases for the

63

years in which he did the most work for these companies." (Evidence Motion at 9). But there is

no question that Greebel's compensation was tied at least in part to the amount of hours he billed,

as well as to the hours those working on his matters billed.

Indeed, the evidence actually shows that, each year, the defendant submitted a

memorandum to Katten's Compensation Committee to document his achievements and to ask for

greater compensation. For example, in his February 2013 memorandum, the defendant boasted

that his "total collection" of revenue from clients was $1.41 million, including "$546,000 from

MSMB capital and that "[m]y share on clients generated approximately $1.5 million in billable

hours and approximately $1.2 million in revenue." (GR_0000054). The defendant also stated

that "Based upon the new client relationships that I developed or significantly assisted in

developing, revenues I generated and hours I billed, I believe that I should receive a significantly

higher bonus than last year and a significant increase in base salary." (Id. at 2 (emphasis added)).

The defendant made similar statements and requests in other years. Therefore, the defendant

plainly believed that his compensation was related to the hours he billed and the overall revenue

he brought in. This evidence is relevant to the defendant's motive.[27]

The defendant's argument that his compensation was not related to his work for

Shkreli because his compensation decreased in years in which he billed more to Shkreli work

goes to the weight of compensation-related evidence, not to its admissibility. The defendant's

compensation was determined by a committee of attorneys evaluating multiple considerations in

---

[27] Evidence related to the defendant's billing and the contents of his bills also is relevant to show the subjects and projects on which he worked and the amount of time he devoted to that work. For example, in the twelve months between February 2012 and February 2013, Greebel billed a total of approximately 2400 hours, of which approximately 1500 hours was spent on work for "Retrophin, Inc." (GR_0000078). In other words, two-thirds of the defendant's work that year was devoted to Shkreli-controlled entities.

addition to his billable hours.  For example, although the defendant was responsible for

significant billing related to Retrophin, Shkreli routinely did not pay his bills or paid those bills

late, reducing the amount of actual revenue the defendant could bring to the firm.  As the

defendant himself explains, "While Katten actually billed approximately $9 million with respect

to Retrophin/MSMB matters, the firm only collected somewhere between $5 and $6 million in

fees."  (See Evidence Motion at 10).  Moreover, the defendant's argument about relevance makes

no sense because, if the defendant did not benefit by doing more work for Shkreli, it is unclear

why he continued to do work for him.  In any event, the extent to which the defendant's

compensation was affected by his work for Shkreli is a question of fact for the jury, and there is

plainly enough evidence—including in memoranda that the defendant himself wrote and that the

defendant's motion ignores—to put the question to the jury.

Second, the defendant argues that evidence of Katten's overall billing and fees

related to Shkreli is irrelevant.  (Evidence Motion at 9-10).  But the overall revenue that Katten

received, or sought to receive, from Shkreli-related work is relevant as discussed above, because,

among other reasons, it relates to the defendant's motive in working with Shkreli and his

incentive to aid or turn a blind eye to the goals of the conspiracies.

Third, the defendant argues that any probative value of evidence about his

compensation or about Katten's overall fees is outweighed by the risk of unfair prejudice.  Not so.

With respect to his direct compensation, the defendant argues there is a

"significant risk that jurors will make their decision based not on evidence relating to the charged

conduct but on an 'emotional' or other 'improper basis'—i.e., due to bias or prejudice toward

someone they perceive to have earned a disproportionately high income."  (Evidence Motion at

8).  This risk is illusory.  There is no reason to believe the jury will be unable to follow

65

instructions from the Court in their review of the evidence, and the government does not intend to argue or suggest that the defendant should be found guilty because he makes more money than the average New Yorker.  In addition, in a case in which jurors will hear about million-dollar investments and about a public company worth hundreds of millions of dollars, the scale of the defendant's compensation is unlikely to stand out.

Moreover, the central relevance of evidence related to Greebel's motive far outweighs any risk of bias.  This is not a case, for example, in which evidence related to the defendant's compensation serves no real purpose other than to bias the jury or where the government's trial strategy is to "engage[] in calculated and persistent efforts to arouse such prejudice throughout the trial," as was the case in United States v. Stahl, 616 F.2d 30, 32 (2d Cir. 1980).[28]

With respect to evidence about Katten's overall fees, the defendant makes a similar argument:  such evidence should be precluded because "it serves only to prejudice or bias the jury against him, by giving the unfair and incorrect perception that Mr. Greebel was paid $10 million for his work on behalf of Retrophin and MSMB."  (Evidence Motion at 9).  But the government will not argue that the defendant "was paid $10 million" for his work for Shkreli, and, presumably, neither will the defendant.  A jury in this District is more than capable of understanding the difference between fees owed to Katten and compensation paid to the

---

[28] The defendant also relies on Hart v. RCI Hosp. Holdings, Inc., 90 F. Supp. 3d 250, 264 (S.D.N.Y. 2015), which addressed the concern that a discussion of a cabaret dancer's income tax forms "could also prompt the jury to be angry at the dancer for not reporting the performance fees paid in cash, but only the subset of those fees reported by [her employer] on her 1099 form."  No such similar concern exists here.

defendant, especially when the jury will be presented with evidence of both amounts and an explanation of their relationship.

X.   THE DEFENDANT'S MOTION TO PRECLUDE "INADMISSIBLE" TESTIMONY AND EXPERT TESTIMONY SHOULD BE DENIED

The defendant's final motion consists of three separate motions to preclude (1) an assortment of evidence admitted at the Shkreli trial, (2) testimony of Deborah Oremland, and (3) any additional expert testimony in either the government's case-in-chief or its rebuttal case.  For the reasons set forth below, each of these motions should be denied.

A.   Evidence Identified By The Defendant That Was Admitted At The Shkreli Trial is Also Admissible At The Defendant's Trial

1.   Pierotti Testimony Is Admissible With Exception Of Mistaken Testimony Regarding Recipients of Fearnow Shares

The defendant seeks to preclude additional testimony from Timothy Pierotti on four subjects: (1) his understanding of who received the Fearnow Shares; (2) his understanding of the relationship between Michael and Troy Fearnow; (3) his understanding of whether Greebel's client was Retrophin and/or Shkreli; and (4) a statement made by Michael Fearnow on a conference call and related evidence.[29]

First, the defendant seeks to preclude Pierotti's testimony that he believed that the defendant was one of the individuals who was given the opportunity to and did purchase Fearnow Shares.  (Testimony Motion at 1-3.)  This testimony represents Pierotti's mistaken understanding, based on a "list of the group that was getting" shares that he saw at the time, about which individuals were given the opportunity to and did purchase Fearnow Shares.  (Tr. 4359)  There is evidence that the defendant initially requested that all of the certificates for the Fearnow Shares be sent to him, and also evidence that at least one such certificate was in fact shipped to him from

---

[29] The first motion in this brief has two sub-section "Bs" – one that seeks to preclude Pierotti's testimony of the relationship between the Fearnow brothers and one that seeks to preclude Pierotti's testimony about who was Greebel's client.  (Testimony Motion at 3.)

Standard Registrar.  (See GX 125-4).  Consequently, the document Pierotti described as a "list of the group that was getting" the shares could have simply been a document showing that some or all of the Fearnow Shares were going to be mailed to, or were in fact mailed to, the defendant.

That said, the government agrees that this testimony reflects a mistaken understanding by Pierotti of who received Fearnow Shares.  The government will instruct Pierotti not to testify that the defendant received Fearnow Shares—without explaining why, so as not to provide him with information that he does not have—and will also lead the witness through that portion of his direct examination, with the Court's permission, in order to avoid any issues.

Second, the defendant seeks to preclude Pierotti from testifying about the relationship between Michael Fearnow and Troy Fearnow as not based on his personal knowledge pursuant to Federal Rule of Evidence 602.  (Testimony Motion at 3.)  Specifically, the defendant construes Pierotti's phrase "best I've come to learn" to mean that Pierotti did not himself know whether Michael Fearnow and Troy Fearnow are related.  This argument is unavailing.  As an initial matter, after Pierotti testified about Troy Fearnow that, "[t]o the best I've come to learn, he's a relative of Michael Fearnow."  The Court then specifically advised him to testify to what he knew, and Pierotti clarified that he did know whether Troy and Michael Fearnow are relatives. (Shkreli Tr. 4262).  There is no basis to conclude from that colloquy that Pierotti was being untruthful.  Moreover, "personal knowledge" pursuant to Federal Rule of Evidence 602 is not as circumscribed as the defendant suggests; it includes information that a person learns through interactions with others.  See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, No. 00 CIV. 4763 RMB JCF, 2006 WL 2136249, at *11 (S.D.N.Y. Aug. 1, 2006), adhered to on reconsideration, No. 00 CIV.4763 RMB JCF, 2006 WL 2556339 (S.D.N.Y. Sept. 5, 2006) ("The defendants seek to strike evidence given by witnesses who obtained their knowledge of

events through interactions with other people. Personal knowledge however, is not so narrowly

defined. . . . In Agfa-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1523 (7th Cir.1989), Judge

Posner pointed out that business executives' testimony about their products was not hearsay, even

though their knowledge came from engineers instead of from first hand inspection[:] 'Knowledge

acquired through others may still be personal knowledge within the meaning of Fed. R. Evid. 602,

rather than hearsay' . . . [T]he defendants' hearsay objections are without merit because the cited

testimony is founded on personal knowledge acquired through others.").  Otherwise, no one other

than an immediate family member could testify that two individuals were relatives, since they

would have to necessarily learn that information from someone else.

 Third, the defendant seeks to preclude Pierotti from testifying as to his impressions

as to whether Retrophin or Shkreli was the defendant's client.  (Testimony Motion at 3-4).

Pierotti first testified that the defendant "was Retrophin's attorney or Martin's attorney," and then,

after a follow-up question, "I guess I thought he was both."  (Tr. 4280).  The defendant states that

Pierotti's answer reflects that he "does not actually know" whom the defendant represented and

that his testimony should therefore be precluded pursuant to FRE 602.  (Testimony Motion at 4).

 This is incorrect.  Rule 602 "does not require the witness's personal knowledge to

rise to the level of certainty to be admissible."  SEC v. Singer, 786 F. Supp. 1158, 1167 (S.D.N.Y.

1992); see also Cuti, 720 F.3d at 458 ("personal knowledge of a fact 'is not an absolute' to Rule

602's foundational requirement, which 'may consist of what the witness thinks he knows from

personal perception'" (quoting Fed. R. Evid. 602 Advisory Committee's Note)); United States v.

Reitano, 862 F.2d 982, 987 (2d Cir. 1988) ("it has long been established that the result of the

witness['s] observations need not be positive or absolute certainty") (quoting United States v.

Evans, 484 F.2d 1178, 1181 (2d Cir. 1973)).   Testimony is admissible "even though the witness

is not positive about what he perceived, provided the witness had an opportunity to observe and

obtained some impressions based on his observations." Id.; see also Evans, 484 F.2d at 1181.

Here, there is no question that Pierotti had the opportunity to personally observe the defendant in

his role as an attorney on numerous occasions. Pursuant to Rule 701, he is permitted to testify to

his understanding that the defendant was serving as an attorney to Retrophin or to the defendant

during those interactions. (See Section IV).

Fourth, the defendant seeks to preclude Pierotti's testimony about a conference call

that he attended at Retrophin's offices with Shkreli and others in person and Michael Fearnow on

the phone. (Testimony Motion at 8-9 (citing Tr. 4272-76)). Specifically, the defendant seeks to

preclude testimony about the "topics" that were discussed during the conference call as well as

about Michael Fearnow's statement, in reference to the Fearnow Shares, that "some of the shares

will be held back." (Id.) As an initial matter, Pierotti's recollection was that Shkreli attended the

meeting. Therefore, any statements made by Shkreli in the course of the meeting would be

admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E), and any responses to those

statements would be admissible for completeness. Moreover, any statements at the meeting

would be admissible to show Shkreli's knowledge of certain facts and/or his state of mind. See,

e.g., Paredes, 176 F. Supp. at 187 (the government "need not show that the listener, or the person

who heard the declarant's statement, was also a member of the conspiracy"); United States v.

Sorrentino, 72 F.3d 294, 298 (2d Cir. 1995) (statements offered by the other side in conversations

"to render what [the declarant] said in [the] conversations intelligible" are not offered for truth).

Moreover, hearsay is limited to an out-of-court statement that is offered for the

truth of the matter asserted. Fed. R. Evid. 801(c). No hearsay exception is required, therefore, for

Pierotti to testify about aspects of the meeting that are not out-of-court statements offered for the

truth, including: a meeting occurred; who attended the meeting; what subjects were discussed; and his understanding of certain facts as a result of the meeting.  None of this testimony would turn on whether a statement asserted in the meeting was "true."  "When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed."  United States v. Pedroza, 750 F.2d 187, 200 (2d Cir. 1987).  Were the rule otherwise, no witness could ever testify to having attended a meeting or participated in a conversation on a subject, even if the reason he or she took a certain step was precisely because he or she was at the meeting or in the conversation.  The result would be disjointed testimony, divorced from reality, and without context.  The defendant is not entitled to have government witnesses testify in such a manner.

Finally, the fact that Pierotti does not have perfect recollection of the meeting itself—which took place more than four and a half years ago—is not a bar to the admission of that recollection.  It is an appropriate avenue for cross-examination.  See Reitano, 862 F.2d at 987.

## 2.  GX 120-14 Is Admissible

The defendant next seeks to preclude GX 120-14 (attached as Exhibit A to the Testimony Motion), an email from Shkreli to a number of individuals including Fearnow Share recipients Pierotti, Mulleady, Biestek, Fernandez and Sullivan, in which Shkreli stated: "One of the priorities for the future is increasing the trading volume in our stock—anything anyone can do to help in this regard is welcome."  (GX 120-14).  The defendant contends this email is irrelevant and unduly prejudicial, having nothing to do with Count Eight, because Pierotti testified that he "didn't remember getting the email" and that "[w]hen I said that there was discussions about

trading the stock, it's not—it's unrelated to that email."  (Tr. 4357-58).  This argument is meritless.

One witness's interpretation of an email sent by another individual, which the witness did not even remember receiving, is not "proof" of what the email's author intended in writing the email.  That interpretation is but one fact for the jury to consider in determining what the weight to assign to the document.

Moreover, Pierotti's testimony that he thought GX 120-14 was "unrelated" to his testimony about Shkreli telling him to trade the stock back-and-forth between Fearnow Share recipients makes sense, because Shkreli made those specific statements to Pierotti in person.  But Pierotti's experience does not render the email at issue either irrelevant or somehow not in furtherance of the conspiracy, the object of which was to control the price and trading volume of Retrophin stock.  To the contrary, the email shows that Shkreli was actively involved in trying to increase the volume of Retrophin stock by encouraging as many people as possible—people who already held some free-trading shares (the Fearnow Share recipients) and those who did not—to purchase the remaining 20 percent of free-trading Retrophin shares that Shkreli did not directly control.

As a result, the defendant's request to preclude GX 120-14 should be denied.

3.      GX 120-11 Is Admissible

The defendant seeks to preclude GX 120-11 (attached as Exhibit B to the Testimony Motion), an email titled "Compliance for Personal Trading Accounts."  In that email, a Retrophin employee named Michael Smith directed Fearnow Share recipients, Shkreli and Shkreli's sister, Leonora Izerne, to give him a "summary of their holdings every morning."  (GX 120-11).  The defendant claims that the email "constitutes hearsay for which there is no applicable exception."  (Testimony Motion at 8).

73

The document is not hearsay because it is offered as evidence of a command directed at Pierotti, not for any "truth" it contains. United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). In other words, the relevance of the email is simply that Pierotti was instructed to report his holdings.[30]

Even if the document could somehow be construed as hearsay, it would be admissible as background to explain the steps that Pierotti took after he first received Fearnow Shares. Specifically, Pierotti testified that this email was one of the reasons he became concerned that Shkreli wanted to improperly control his Fearnow Shares. See, e.g., Pedroza, 750 F.2d at 200 (statements admitted as background are not admitted "as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed.").

4.    Evidence Related to Shkreli's Communications With The SEC Is Admissible

Finally, the defendant seeks to preclude the government from "offering into evidence an October 20, 2012 letter from the Securities and Exchange Committee ('SEC')" to Shkreli, as well as testimony by Jackson Su about posting such "letter" to a publicly-available website. (Testimony Motion at 9-10). The defendant has not attached the letter it seeks to preclude, but the government believes the defendant is referring to a letter sent by the SEC to Shkreli on October 1, 2012, which was introduced at the Shkreli trial as GX 347. That letter attached a subpoena seeking information from Shkreli related to the SEC's investigation into the fraud perpetrated by the defendant on the MSMB Capital investors. Shkreli responded to that

---

[30] Pierotti also explained that Fearnow Share recipients were unable to open Scottrade accounts for the Fearnow Shares because the stock was at that point a penny stock. (Shkreli Tr. 4279.)

subpoena on November 4, 2012 (introduced at the Shkreli trial as GX 218), with a document production as well as a letter providing false information about, inter alia, the assets under management of MSMB Capital and MSMB Healthcare and the valuation of Retrophin.[31]  The defendant subsequently testified in connection with that investigation before the SEC in August 2013 and in February 2014, where he provided false information about MSMB Capital and MSMB Healthcare.  He was represented by a colleague of the defendant at Katten, and the defendant was involved in (and billed Retrophin for) helping to prepare Shkreli for that testimony and to respond to ongoing SEC requests related to that investigation, including for information related to Retrophin.

The SEC's letter and attached subpoena, which address the events that precipitated the fraud alleged in Count Seven of the Superseding Indictment, are relevant to show that the defendant knew about the ongoing SEC investigation of the defendant and concealed material information from the Retrophin board, his client.  Indeed, Aselage and Richardson, two of Retrophin's Board members, testified at the Shkreli trial, and are expected to testify at the trial of the defendant, that, as of January 2014, neither the defendant nor Shkreli advised them of the ongoing SEC investigation into the frauds perpetuated by Shkreli on the MSMB Capital and MSMB Healthcare investors—the very fraud detailed in Count Seven (via the backdated MSMB Capital interest, the settlement agreements and the consulting agreements).

Su's testimony regarding his posting of the SEC letter and attached subpoena to a public website is also relevant to the conspiracies charged in both Counts Seven and Eight.  Specifically, Su testified that he posted the letter and attached subpoena in January 2014 because

---

[31] The document the defendant seeks to preclude, GX 347, was not attached to the defendant's motion.  The government therefore attaches this document as Exhibit A to this motion.

he noticed that Retrophin had not disclosed in its SEC filings that "the company or the principals were under investigation by any law enforcement or regulatory authorities." (Tr. 2251-52). The government intends to introduce evidence at the defendant's trial that Shkreli and the defendant took steps to have the SEC letter and attached subpoena that Su had posted removed from the public website, and were ultimately successful in doing so. Su's testimony about posting the SEC letter and subpoena is relevant to show that the defendant and Shkreli took steps to actively conceal the SEC investigation from Retrophin's Board of Directors and its shareholders.

B.     Deborah Oremland May Be Qualified As An Expert On The Identified Subjects

The defendant has moved to preclude expert testimony from Deborah Oremland because, he argues, Ms. Oremland's employer, the Financial Industry Regulatory Agency ("FINRA"), precludes her from offering opinion testimony. (Testimony Motion at 11). The defendant's argument conflates FINRA's policies with the applicable law and should be rejected.

At the Shkreli trial, the government called Ms. Oremland as a lay witness to explain certain SEC rules, regulations and forms, including Rule 144, which governs the holding and sale of restricted securities, and Schedule 13D forms, which require the disclosure of ownership, including beneficial ownership, of stock of a publicly-traded company. As the government noted prior to trial, Ms. Oremland and her colleagues are regularly permitted to offer such lay testimony under FRE 1006. See July 14, 2017 Oremland Letter to the Court (citing cases allowing Ms. Oremland's testimony on similar topics). As explained in briefing submitted during the trial, the government had not noticed Ms. Oremland as an expert because it did not intend for Ms. Oremland to provide expert opinion testimony applicable to the facts of the case, pursuant to Federal Rules of Evidence 701 and 702. (See Dkt. Nos. 267, 270). For instance, while Ms. Oremland was going to describe relevant principles, rules and regulations as well as their purposes, she was not going to apply them to the specific facts of this case. The Court

76

subsequently held that certain anticipated testimony from Ms. Oremland might tread into expert opinion testimony and precluded her from offering testimony on the "purpose of the regs" or to "paint scenarios about why the regs would be necessary to prevent certain problems that affect the market and the investing public." (Tr. 3857-58).

Although the government continues to respectfully disagree with the Court's decision on that point, and respectfully requests that the Court reconsider that decision, in an abundance of caution, the government noticed Ms. Oremland as an expert so that she can explain certain SEC regulations and their purposes. (See Dkt. No. 311). The defendant now objects to this testimony not based on any legal principle, but instead based on FINRA's policy of not permitting their employees to render expert opinions. (Testimony Motion at 11).

The defendant's circular argument is without legal basis and the motion should be denied. FINRA's policy is to prohibit its employees from offering expert opinion testimony on the application of the regulations to the specific facts of a case, consistent with the applicable legal principles of FRE 701 and 702. Ms. Oremland will do no such thing in this case. In order to comply with the Court's ruling that certain aspects of her anticipated testimony at the Shkreli trial constituted expert testimony, the government will call her as an expert witness to provide the very same testimony that she was going to offer in the Shkreli trial—which was approved by FINRA—but she still will still not offer testimony applying her knowledge to factual issues in the case, consistent with FINRA's policies. Much as she has in previous testimony, Ms. Oremland will provide lay testimony of the applicable regulations to aid in the jury's understanding of the factual terms.

Finally, the defendant moves to preclude Ms. Oremland from testifying on two subject matters: (1) the definition of an "affiliate" pursuant to Rule 144; and (2) obligations of

members of the board of directors of a public company regarding the review of public filings for the company.  (Testimony Motion at 12).  This request should also be denied.  The defendant provides absolutely no legal basis for precluding the testimony, other than his tautological opinion that Ms. Oremland "crossed the line into impermissible legal opinion."  (Id.).  Moreover, with regard to the testimony regarding Rule 144, this is permissible lay person testimony under Rule 1006 that is in line with the Court's ruling at the Shkreli trial and the current state of the law.  And the testimony regarding the board of directors was in response to a question on cross-examination in which Ms. Oremland testified that she "was not sure" and could not "say whether all the board reviews them."  The defendant thus seeks to preclude Ms. Oremland from answering a question at his trial that she could not answer at the previous trial.

      For the reasons set forth above, the defendant's motion to preclude testimony from Ms. Oremland should be denied.

    C.      <u>The Government Is Not Precluded From Calling An Expert At Trial</u>

      Pursuant to this Court's amended pre-trial scheduling order, the government provided the defendant with a revised witness list on August 11, 2017.  (See Dkt. No. 311 at 1.) The government explained that it might "add or subtract from its . . . preliminary witness list . . . as it continues trial preparation."  (Id.)  The defendant did the same.  (See Dkt. No. 312 ("we reserve all rights to supplement and amend our . . . witness list").)  The government further disclosed that it might "call, either on its direct case or as a rebuttal witness, an expert in the areas of professional responsibility and/or legal ethics for outside counsel representing companies and/or the Board of Directors" and that "[o]nce the identity and particular subject matter of the expert witness, if any, is identified, the government will provide additional notice to the defendant pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G)."  (Dkt. No. 311 at 1).

The defendant now moves to preclude the government from calling any such expert, including even on a rebuttal case, because the government "failed to comply" with the pre-trial scheduling order.   (Testimony Motion at 12-13).  No such preclusion is warranted.  The government has provided the defendant with ample notice of a potential expert witness, who appears likely to testify on the same or similar subjects as at least one expert witness the defendant has already retained, Stephen Gillers.

The defendant has not cited any basis for preclusion other than the timing of the pre-trial scheduling order.  The defendant also does not explain how the government could ever be precluded <u>now</u> from calling an expert witness in its rebuttal case, given that the scope of such rebuttal case will not be known by the government until after the close of the defendant's case.  As both the government and the defendant recognize, the August 11 submissions will of course evolve as the trial date nears.  Surely the defendant will not agree to be held to a rule in which it is barred from adding witnesses or evidence (or modifying expert opinions) after August 11.  Nevertheless, to the extent the government determines it will call in its case-in-chief an expert as described in its August 11, 2017 disclosure, the government will provide a supplemental witness list including that expert, his or her qualifications and a summary of his or her anticipated testimony by September 8, 2017.

The defendant also discusses its own expert disclosures.  But the fact that the defendant has noticed specific purported experts on specific topics is largely a matter of form over substance because the defendant contends that none of its experts have finalized or will finalize opinions or disclosures until after the government's case.   (Testimony Motion at 14).  The government appreciates the defendant's commitment to "provide more disclosures," and intends to provide the defendant with a list of additional disclosures after the pre-trial briefing is complete

next week, as well as propose to the Court a motion schedule for briefing on expert issues (as detailed in the government's motions in limine).

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendant's

motions <u>in limine</u> should be denied.


Dated:  Brooklyn, New York
         August 25, 2017


                                        Respectfully submitted,

                                        BRIDGET M. ROHDE
                                        Acting United States Attorney
                                        Eastern District of New York

                              By:       /s/_____
                                        Alixandra E. Smith
                                        David C. Pitluck
                                        David K. Kessler
                                        Assistant U.S. Attorneys
                                        (718) 254-7000


cc:    Clerk of the Court (KAM)
       Defense Counsel (By ECF and Email)