UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -against-

EVAN GREEBEL,

                  *Defendant.*

ECF Case

No. 15-cr-00637 (KAM)

<u>ORAL ARGUMENT REQUESTED</u>

**MR. GREEBEL'S MEMORANDUM OF LAW
IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*, AND CROSS-
MOTION TO PRECLUDE THE GOVERNMENT FROM INTRODUCING
INADMISSIBLE EVIDENCE FROM MR. SHKRELI'S TRIAL**

# TABLE OF CONTENTS

Page

Preliminary Statement ........................................................................................... 1

Cross-Motion to Preclude the Government from Introducing Inadmissible Evidence
From Mr. Shkreli's Trial ....................................................................................... 1

Opposition to the Government's Eleven Motions *in Limine* ........................................ 6

I.      The Court Should Preclude Evidence of Mr. Shkreli's Threats to and
        Harassment of Timothy Pierotti's Family ............................................................ 6

II.     The Court Should Admit Mr. Shkreli's Post-Arrest Statements and Prior
        Testimony to the SEC .................................................................................... 10

        A.      Mr. Shkreli's Post-Arrest Statements Are Admissible ......................... 11

        B.      Mr. Shkreli's SEC Testimony Is Admissible ..................................... 19

III.    The Court Should Preclude Mr. Greebel's Post-Arrest Statements ..................... 23

IV.     The Government's Motion *in Limine* to Preclude Mr. Greebel's Testimony
        About His Review of Evidence Is Premature ..................................................... 24

V.      The Government's Motion to Preclude Mr. Greebel From Admitting Evidence
        of Mr. Shkreli's Lies to Others Is Shocking, Contrary to the Rule of Law, and
        Inconsistent with the Government's Own Prosecution of Mr. Shkreli ..................... 24

VI.     The Court Should Reject the Government's Ambiguous Motion to Preclude
        Evidence Relating to the "Circumstances" of Mr. Greebel's Arrest, and to
        Preclude the Government From Violating Mr. Greebel's Constitutional Rights
        of Self-Defense ............................................................................................. 27

VII.    This Court Should Deny the Government's Motion to Depersonalize
        Mr. Greebel ................................................................................................. 29

VIII.   This Court Should Admit the Rosenfeld and Koestler Arbitrations ..................... 32

IX.     The Government's Motion to Require the Defense to Produce Mr. Greebel's
        Case-in-Chief Exhibits Is Moot ...................................................................... 33

X.      The Court Should Reject the Government's Motion to Handcuff the Defense's
        Right to Make Arguments to the Jury, and From Denying Mr. Greebel the
        Right to Select Counsel to Cross-Examine Witnesses ....................................... 36

# TABLE OF CONTENTS
## (continued)

Page

A. The Government Should Not Preclude the Defense Counsel From Referring to Prior Experience and Take Unfair Advantage of Their Prosecutorial Titles and Positions ................................................................ 37

B. Mr. Greebel Should Be Entitled to Select His Counsel of Choice to Cross-Examine Timothy Pierotti ........................................................ 38

XI. The Court Should Deny the Government's Motion to Preclude Nine of Mr. Greebel's Ten Expert Witnesses From Testifying ........................................... 40

A. Procedural Background Relating to Expert Disclosures, and Meet and Confers with the Government .................................................................. 41

B. The Principles From *United States v. Litvak* ........................................ 43

C. The Testimony of the Proposed Experts Easily Meets the Rule 401 Threshold and Satisfies Rule 403 ........................................................ 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Blech Sec. Litig.*,
   No. 94 Civ. 7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ..........................................46

*Brinson v. Walker*,
   547 F.3d 387 (2d Cir. 2008)........................................................................................12

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
   257 F. Supp. 2d 768 (S.D.N.Y. 2003)........................................................................32

*Chevron Corp. v. Donziger*,
   974 F. Supp. 2d 362 (S.D.N.Y. 2014)........................................................................53

*Government of Virgin Islands v. Grant*,
   775 F.2d 508 (3d Cir. 1985)........................................................................................31

*Kumho Tire v. Carmichael*,
   526 U.S. 137 (1999)....................................................................................................45

*McConnell v. Lassen Cty., California*,
   No. CIV S-05-0909, 2009 WL 3365912 (E.D. Cal. Oct. 16, 2009) ..................................53, 56

*Morpurgo v. Inc. Vil. of Sag Harbor*,
   697 F. Supp. 2d 309 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011)......................19

*Park W. Radiology v. CareCore Nat'l LLC*,
   675 F. Supp. 2d 314 (S.D.N.Y. 2009)........................................................................32

*SEC v. U.S. Envtl., Inc.*,
   No. 94 Civ. 6608, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ..........................................46

*Silverstein v. Chase*,
   260 F.3d 142 (2d Cir. 2001)........................................................................................18

*Theranos, Inc. v. Fuisz Pharma LLC*,
   2014 WL 12695908 (N.D. Cal. Mar. 10, 2014)........................................................53

*United States v. Baez*,
   349 F.3d 90 (2d Cir. 2003)............................................................................................8

*United States v. Bakhtiar*,
   994 F.2d 970 (2d Cir. 1993)........................................................................................13

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Blackwell*,
   853 F.2d 86 (2d Cir. 1988)..................................................................................31

*United States v. Bonventre*,
   No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013)..............................35, 36

*United States v. Boulware*,
   384 F.3d 794 (9th Cir. 2004) ..............................................................................32

*United States v. Bryce*,
   208 F.3d 346 (2d Cir. 1999)..................................................................................18

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000)....................................................................................8

*United States v. Cardascia*,
   951 F.2d 474 (2d Cir. 1991)..................................................................................16

*United States v. Certified Environmental Services, Inc.*,
   753 F.3d 72 (2d Cir. 2014)....................................................................................44

*United States v. Chan*,
   184 F. Supp. 2d 337 (S.D.N.Y. 2002)..................................................................13

*United States v. Deutsch*,
   451 F.2d 98 (2d Cir. 1971)....................................................................................8

*United States v. DiMaria*,
   727 F.2d 265 (2d Cir. 1984)..................................................................................15

*United States v. Dupree*,
   706 F.3d 131 (2d Cir. 2013)..................................................................................32

*United States v. Dupree*,
   No. 10 Cr. 627, 2012 WL 5333946 (E.D.N.Y. Oct. 26, 2012)..................................8

*United States v. Edwards*,
   342 F.3d 168 (2d Cir. 2003)..................................................................................8

*United States v. Farhane*,
   634 F.3d 127 (2d Cir. 2011)..................................................................................16

*United States v. Fell*,
   531 F.3d 197 (2d Cir. 2008)..................................................................................17, 18

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*United States v. Fisher*,
106 F.3d 622 (5th Cir. 1997*), abrogated on other grounds by Ohler v. United States*, 529 U.S. 753 (2000) ...................................................................................32

*United States v. Garcia*,
291 F.3d 127 (2d Cir. 2002).................................................................................8

*United States v. Gil*,
680 F. App'x 11 (2d Cir. 2017) ....................................................................42, 43

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006).............................................................................................38

*United States v. Graham*,
No. 14-CR-500 NSR, 2015 WL 6161292 (S.D.N.Y. Oct. 20, 2015) ...................15

*United States v. Gupta*,
747 F.3d 111 (2d Cir. 2014)...........................................................................13, 14

*United States v. Gupta*,
848 F. Supp. 2d 491 (S.D.N.Y. 2012) .................................................................21

*United States v. Hatfield*,
No. 06 Cr. 0550 (JS), 2010 WL 2545828 (E.D.N.Y. June 21, 2010) ...................21

*United States v. Inserra*,
34 F.3d 83 (2d Cir. 1994.......................................................................................8

*United States v. Jones*,
299 F.3d 103 (2d Cir. 2002)..................................................................................16

*United States v. Katsougrakis*,
715 F.2d 769 (2d Cir. 1983).................................................................................12

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015).........................................25, 40, 44, 45, 46, 57, 59

*United States v. Matthews*,
20 F.3d 538 (2d Cir. 1994)...................................................................................13

*United States v. Medina*,
No. S3 13 CR. 272 PGG, 2014 WL 3384630 (S.D.N.Y. July 10, 2014)..........13, 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Miller*,
    641 F. Supp. 2d 161 (E.D.N.Y. 2009) ...................................................................31

*United States v. Morgan*,
    385 F.3d 196 (2d Cir. 2004)...................................................................................18

*United States v. Morgan*,
    786 F.3d 227 (2d Cir. 2015)...............................................................................9, 18

*United States v. Obayagbona*,
    627 F. Supp. 329 (E.D.N.Y. 1985) ....................................................15, 16, 17, 18

*United States v. Ortiz*,
    857 F.2d 900 (2d Cir. 1988)....................................................................................8

*United States v. Persico*,
    645 F.3d 85 (2d Cir. 2011).....................................................................................14

*United States v. Pitre*,
    960 F.2d 1112 (2d Cir. 1992)..................................................................................8

*United States v. Regan*,
    103 F.3d 1072 (2d Cir. 1997).................................................................................27

*United States v. Romano*,
    794 F.3d 317 (2d Cir. 2015)...................................................................................46

*United States v. Spinelli*,
    551 F.3d 159 (2d Cir. 2008)...................................................................................40

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008)...................................................................................39

*United States v. Stewart*,
    No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)....................27

*United States v. Thomas*,
    No. 3:13-CR-00141 VLB, 2014 WL 2168468 (D. Conn. May 23, 2014)..............17

*United States v. Tocco*,
    135 F.3d 116 (2d Cir. 1998)...................................................................................16

*United States v. Watts*,
    934 F. Supp. 2d 451 (E.D.N.Y. 2013) ...................................................................12

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Wexler,*
    522 F.3d 194 (2d Cir. 2008)..................................................................12, 14, 19

*United States v. White,*
    692 F.3d 235 (2d Cir. 2012)................................................................................44

*United States v. Whitman,*
    555 F. App'x 98 (2d Cir. 2014) .........................................................................21

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007)..........................................................................12, 13

*United States v. Wolfson,*
    437 F.2d 862 (2d Cir. 1970)................................................................................40

*United States v. Zapata,*
    164 F.3d 620, 1998 WL 681311 (2d Cir. 1998) ...............................................28

*Wheat v. United States,*
    486 U.S. 153 (1988)............................................................................................38

*Williamson v. United States,*
    512 U.S. 594 (1999)......................................................................................13, 14

**Rules**

Fed. R. Crim. P. 16(b)...........................................................................................33

Fed. R. Evid. 401 ...............................................................................43, 44, 52, 55, 56

Fed. R. Evid. 403 .....................................................................................43, 55, 56

Fed. R. Evid. 404(b)...............................................................................................26

Fed. R. Evid. 404(b), advisory committee notes (1991)..........................................8

Fed. R. Evid. 404(b)(2)(A) ...................................................................................26

Fed. R. Evid. 406 ...................................................................................................26

Fed. R. Evid. 608 .....................................................................................11, 20, 26

Fed. R. Evid. 608(a) ..............................................................................................11

Fed. R. Evid. 608(b)...............................................................................................11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Fed. R. Evid. 609 ................................................................................................................11

Fed. R. Evid. 801 (d)(2)(C) .................................................................................................11

Fed. R. Evid. 801 (d)(2)(D) .................................................................................................11

Fed. R. Evid. 804(b)(1) ........................................................................................................20

Fed. R. Evid. 804(b)(3) ........................................................................................................19

Fed. R. Evid. 806 ...................................................................................................11, 19, 26

Fed. R. Evid. 806, advisory committee notes (1972) .........................................................11

Fed. R. Evid. 807 ..................................................................................................................18

**Constitutional Provisions**

U.S. Const. amend. VI ....................................................................................................12, 38

**Preliminary Statement**

We respectfully submit this response to the government's eleven different motions *in limine*.  The government wrote its motions as if the *United States v. Shkreli* trial did not occur, as if no severance had been granted, and as if Mr. Shkreli was not acquitted on all conspiracy counts relating to MSMB Capital and MSMB Healthcare and the wire fraud conspiracy charge in Count Seven.  In light of the government's statements in footnotes that it intends to re-try Mr. Shkreli *in absentia* during Mr. Greebel's trial, we cross-move to preclude the government from introducing inadmissible evidence from Mr. Shkreli's trial.  We also respectfully request oral argument.

**Cross-Motion to Preclude the Government from Introducing Inadmissible
Evidence From Mr. Shkreli's Trial**

In several footnotes, the government reveals its intent to re-try its case against Mr. Shkreli—which resulted in acquittals on five conspiracy counts including Count Seven, two substantive convictions relating to MSMB entities, and a conviction on the conspiracy charge in Count Eight—at this trial.  But this is a different trial against someone other than Mr. Shkreli, and the government must abide by the Federal Rules of Evidence and cannot simply allege that everything and anything against Mr. Shkreli is "background" to the alleged conspiracies in Count Seven and Count Eight.  Accordingly, we now move to preclude the government from introducing the bulk of its evidence relating to MSMB Capital and MSMB Healthcare at this trial, along with alleged extrinsic acts by Mr. Shkreli which cannot possibly be in furtherance of the alleged charged conspiracies against Mr. Greebel.

In footnote 2 of its motion, the government asserts that it intends "to introduce evidence of Shkreli's misrepresentations to MSMB Capital investors, MSMB Healthcare investors and the SEC about various aspects of the funds . . . as well as evidence that proves that such statements

were misrepresentations, including bank and brokerage records and witness testimony."
Government's Pre-Trial Motions ("Gov't MIL"), Dkt. No. 329 at 2 n.2.  It thus appears that the
government intends to introduce much of its evidence of Mr. Shkreli's misrepresentations
relating to MSMB Capital and MSMB Healthcare, including but not limited to Mr. Shkreli's
prior claims relating to Elea Capital, into evidence.

Similarly, in footnote 5, the government alleges that it will introduce a smorgasbord of
evidence of allegedly bad acts that Mr. Shkreli committed.[1]  Specifically, the government alleges
that it will introduce evidence regarding the classification of expenses of MSMB entities and
Retrophin, the classification of "the backdated interest that the defendant and Shkreli created in
MSMB Capital . . . as a 'gift' and thus not disclosed", and "documents showing that Shkreli
classified money taken from Retrophin to repay the Merrill Lynch settlement as either
'compensation' or 'debt repayment'"—without explaining how such evidence is relevant and/or
admissible at this trial against Mr. Greebel.  Finally, in footnote 5, the government alleges that it

---

[1]     The government mistakenly states in footnote 5 that we suggested Mr. Greebel was
involved in the reclassification of expenses relating to MSMB entities and Retrophin.  *See* Gov't
MIL at 7 n.2 ("[D]efense counsel contended that evidence that the defendant was involved in
discussions directing employees of Citrin Cooperman to classify certain Retrophin expenses in a
particular manner that helped to conceal the charged frauds . . . .").  Obviously the government
misspoke, and we assume that this was an inadvertent mistake.  We are unaware of any evidence
that Mr. Greebel directed any employees of Citrin Cooperman to classify any expenses, and the
government has neither proffered nor alleged that such evidence exists.  Certainly Mr. Massella
did not testify that Mr. Greebel directed him to do anything of the kind.  *See* Shkreli Trial Tr.
3883:14-17 (Testimony of Mr. Massella:  "Q:  Is the determination of how certain expenses are
classified, personal versus business expenses, one of the decisions that ultimately rests with
management?  A:  Yes."); 3887:8-11 (Testimony of Mr. Massella:  "Q:  Where did the
information come from originally?  A:  The information came from the bank accounts and then
Jackson [Su] was reviewing it with Martin [Shkreli] to decide where the classifications would
be."); 3906:8-10 (Testimony of Mr. Massella:  "Q:  And who would have classified it as a
miscellaneous expense? A:  Jackson Su.").  During one of our meet and confer telephone
conversations, the government mentioned that it would be introducing reclassification of
expenses by Mr. Shkreli at our trial, and we said that such conduct by Mr. Shkreli constituted
other bad acts for which the government had failed to provide notice pursuant to Rule 404(b).

2

will introduce evidence regarding "the defendant's concealment of ongoing SEC and U.S. Attorney's Office investigations related to Shkreli from members of Retrophin's Board of Directors (the 'Board'); the defendant's involvement in concealing aspects of the settlement agreements from Marcum; and actions taken by the defendant to shield Shkreli's actions from scrutiny and/or reprisal by the Board and/or other Retrophin employees."  Gov't MIL at 7 n.5.

*First*, the government cannot offer evidence relating to the MSMB Capital Hedge Fund Scheme and the MSMB Healthcare Hedge Fund Scheme as background to the charged conspiracy *where the government has no good faith basis to assert that Mr. Greebel was aware of and/or participated in such extrinsic conduct, and the government cannot connect such conduct to the charged conspiracy in Count Seven of the indictment.*  For example, the government should not be permitted to introduce Mr. Shkreli's reclassification of expenses between MSMB entities and Retrophin unless it can show that such evidence relates to Mr. Greebel and the charged wire fraud conspiracy in Count Seven; the government cannot introduce evidence relating to the classification of "the backdated interest that the defendant and Shkreli created in MSMB Capital . . . as a 'gift' and thus not disclosed" without making a proffer that such evidence has something to do with Mr. Greebel's conduct; and the government cannot introduce evidence "showing that Shkreli classified money taken from Retrophin to repay the Merrill Lynch settlement as either 'compensation' or 'debt repayment'" without showing that Mr. Greebel had knowledge of how Mr. Shkreli paid for the settlement and how such evidence is connected to Count Seven.

*Second*, because Mr. Shkreli has now been acquitted of the conspiracy charges relating to the MSMB Capital Hedge Fund Scheme and the MSMB Healthcare Hedge Fund Scheme, the government cannot offer statements of alleged co-conspirators such as Marek Biestek and Kevin

Mulleady in furtherance of these acquitted conspiracy counts. The jury has found that Mr. Shkreli acted alone in connection with his misrepresentations relating to MSMB Capital and MSMB Healthcare, and thus any alleged statements by other individuals are not admissible at this trial. Similarly, the government cannot offer statements of Mr. Shkreli as admissions of a party-opponent or statements of agents acting on Mr. Shkreli's behalf pursuant to Rule 801(d)(2) at this trial, because Mr. Shkreli will not be a defendant at this trial.

*Third*, the government cannot retry Mr. Shkreli during Mr. Greebel's trial. At some point, the government's introduction of evidence (even assuming admissibility under the Federal Rules of Evidence including but not limited to the hearsay rules, Rule 401, and Rule 403) relating to Mr. Shkreli's lies and deceptions to MSMB Capital and MSMB Healthcare investors will become unduly and unfairly prejudicial to Mr. Greebel. At the point when the government's purportedly admissible evidence against Mr. Shkreli relating to MSMB Capital and MSMB Healthcare has diminishing returns of probative value that is offset by the substantial risk of unfair prejudice, confusion, and misleading the jury, we intend to object and raise the matter with the Court.

For example, the government called Caroline Stewart at Mr. Shkreli's trial, but we do not see a basis to call Ms. Stewart at Mr. Greebel's trial. Ms. Stewart does not appear to know Mr. Greebel; Mr. Shkreli's statements to Ms. Stewart are not admissible at a trial against Mr. Greebel; and any statements or conversations that Ms. Stewart had with Mr. Mulleady are inadmissible. Such statements were not in furtherance of the conspiracy charges in Counts Seven and Eight; such statements were not admissions of the party-opponent at this trial (Mr. Greebel) as they were made by Mr. Shkreli or Ms. Stewart herself; and such statements are not admissible as an agent of Mr. Greebel (as Ms. Stewart worked for Mr. Shkreli). For

4

example, Ms. Stewart's instant message exchange with Mr. Mulleady in Government Exhibit 349A would be inadmissible at Mr. Greebel's trial. *See* Shkreli Trial Tr. 2081-86. The exchange is hearsay; it contains hearsay within hearsay within hearsay; and there are no hearsay exceptions applicable.

**Finally**, the government cannot simply ask witnesses—as they did during Mr. Shkreli's trial—whether Mr. Greebel informed them about an SEC investigation and/or a USAO investigation without first demonstrating (or, at a minimum, proffering to the Court outside the presence of the jury) (a) the relevance of the SEC investigation and/or USAO investigation to Retrophin, Inc., at the time, (b) Mr. Greebel's knowledge of the SEC investigation and/or the USAO investigation at the time, and (c) that Mr. Greebel owed some overt duty to discuss investigations that did not target Retrophin. The question alone assumes facts not in evidence, and would be unfairly prejudicial to Mr. Greebel. Similarly, the government seems to claim that Mr. Greebel had "involvement in concealing aspects of the settlement agreements from Marcum" but saying so does not make it so, and it is unclear what the government intends to allege here, making it impossible for us to raise issues with the Court at this time. Further, the government's statement that it intends to introduce evidence of "actions taken by the defendant to shield Shkreli's actions from scrutiny and/or reprisal by the Board and/or other Retrophin employees," Gov't MIL at 7 n.5, is vague and ambiguous. To the extent the government made this statement to provide us with notice, we do not understand it and thus it cannot constitute adequate notice.

Opposition to the Government's Eleven Motions *in Limine*

I.   **The Court Should Preclude Evidence of Mr. Shkreli's Threats to and Harassment of Timothy Pierotti's Family**

During Mr. Shkreli's trial, the government extensively discussed Mr. Shkreli's inflammatory threats and harassment of Mr. Pierotti's wife and children.  However, at no time during such extensive discussion and testimony, did the government or anyone else allege that Mr. Greebel had knowledge of, condoned, or participated in such threats and harassment. Accordingly, pursuant to Rule 403, we have moved to preclude such evidence and testimony due to the incendiary and incredibly prejudicial nature of such statements.  *See* Greebel MIL to Preclude Irrelevant, Misleading, and Unfairly Prejudicial Evidence, Dkt. No. 338, at 2-5.  By contrast, pursuant to Rule 401 and Rule 404(b), the government has moved to admit such threats and harassment.  *See* Gov't MIL at 2-7.

This is an issue of first impression for the Court because, although Mr. Shkreli initially raised objections, Mr. Shkreli and the government later discussed the issue (*see* Shkreli Trial Tr. 3580:25 to 3581:22), worked out their differences, and Mr. Shkreli then withdrew his objection to evidence of his threat to Mr. Pierotti's wife and children.  *See* Shkreli Trial Tr. 4294-95 (Defense stating "no objection").  We are objecting to the inclusion of such outlandish statements, and we will not be withdrawing that objection.  We respectfully ask the Court to rule on the issue prior to trial.

*First*, the government's conclusory statements ignore the fact that Mr. Greebel had no advance knowledge of, and did not condone, Mr. Shkreli's harassment of Mr. Pierotti's family. Indeed, the government's description of Mr. Shkreli's threats toward Mr. Pierotti is all about Mr. Shkreli and says nothing about Mr. Greebel.  *See* Gov't MIL at 2-7.  This speaks volumes, and demonstrates that the government has not met its burden of showing that the evidence of

Mr. Shkreli's harassment and threats is relevant to Mr. Greebel even under the low-threshold of Rule 401.  The government argues that "*[e]vidence of the defendant's interactions with Shkreli* and of Shkreli's harassment of and threats to Fearnow Share Recipient TP is properly admissible . . ."  Gov't MIL at 5 (emphasis added).  But the government does not connect any "evidence of the defendant's *interactions* with Shkreli" with Mr. Shkreli's harassment of and threats to Mr. Pierotti and his family.  Indeed, conspicuously absent from the government's motion is any evidence that Mr. Shkreli's threats to Mr. Pierotti and his family are probative of Mr. Greebel's actions, mental state, and/or alleged agreement to commit fraud with Mr. Shkreli.  The government tries to bypass this deep and dark hole in its argument by the vague allegation that it will introduce "[e]vidence of the defendant's interactions with Shkreli" as if "interactions" alone are sufficient to show relevance to Mr. Greebel.  They are not.

**Second**, the government's argument that evidence and testimony of *Mr. Shkreli's harassment of and threats to Mr. Pierotti* are admissible under Rule 404(b) misses the mark. Specifically, the government asserts:  "In the alternative, evidence of Shkreli's harassment of Fearnow Share Recipient TP, *aided by the defendant*, is admissible pursuant to FRE 404(b) as evidence of *the defendant's knowledge of the object of the conspiracy he agreed to join*, the *defendant's intent*, and *his lack of mistake in assisting Shkreli* in seeking to control the Fearnow shares."  Gov't MIL at 6-7 (emphasis added).  But the government offers no evidence—and there is none—that Mr. Greebel aided Mr. Shkreli in the harassment and threats to Mr. Pierotti's family.  The government offers no evidence—and there is none—that Mr. Greebel knew about, sanctioned, approved, intended to help, and/or assisted Mr. Shkreli in threatening Mr. Pierotti's wife and children.

And the government cannot seek to admit such grotesque, uncharged bad acts of Mr. Shkreli to be used against Mr. Greebel. The Advisory Committee Notes for Rule 404(b) state that the rule relates only to "evidence of an *accused's extrinsic acts*"—*i.e.*, not the extrinsic acts of a person not on trial. Fed. R. Evid. 404(b), Advisory Committee Notes (1991). Indeed, all of the cases relied on by the government pursuant to Rule 404(b) are about the admission of uncharged conduct **by the defendant in a trial against the defendant**. In *United States v. Carboni*, for example, the uncharged conduct related to Carboni, the defendant: "The additions to the perpetual inventory—*which Carboni acknowledged making* . . . occurred at about the same time [his company] entered into the loan agreement." 204 F.3d 39, 44 (2d Cir. 2000) (emphasis added). The same is true for *United States v. Baez*, where the government introduced uncharged robberies committed by the charged defendant. 349 F.3d 90, 93 (2d Cir. 2003).[2]

**Third**, even assuming *arguendo* that Mr. Shkreli's inflammatory harassment and threats to Mr. Pierotti were admissible under Rule 401 and/or Rule 404(b) against Mr. Greebel, the government does not address that any probative value is substantially outweighed by the danger of unfair prejudice, confusion, and misleading the jury about Mr. Greebel's state of mind and Mr. Greebel's conduct. Such evidence, therefore, is inadmissible under Rule 403. *See, e.g.*, *Garcia*, 291 F.3d R 130–39 (2d Cir. 2002) (vacating conviction in part based on admission of

---

[2]     *See United States v. Ortiz*, 857 F.2d 900, 901 (2d Cir. 1988) (404(b) evidence was the defendant's prior conviction); *United States v. Garcia*, 291 F.3d 127, 130 (2d Cir. 2002) (same); *United States v. Pitre*, 960 F.2d 1112, 1117-18 (2d Cir. 1992) (404(b) evidence was the defendant's prior narcotics transactions); *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (404(b) evidence was the defendant's prior conviction and involvement in a real estate transaction); *United States v. Deutsch*, 451 F.2d 98, 116 (2d Cir. 1971) (evidence of the defendant Frank Mills was "received solely as proof of the guilt of Mills" and not of the co-defendants); *United States v. Dupree*, No. 10 Cr. 627, 2012 WL 5333946, at *27 (E.D.N.Y. Oct. 26, 2012) (evidence was against the defendant); *United States v. Edwards*, 342 F.3d 168, 176–78 (2d Cir. 2003) (404(b) evidence was against the defendant).

prior conviction where "the risk of prejudice arising from the admission of [the proffered evidence] clearly substantially outweigh[s] any marginal probative value of the evidence"); *United States v. Morgan*, 786 F.3d 227, 234–235 (2d Cir. 2015) (vacating conviction on narcotics and weapons charges because of the unfair prejudice from the "death threat" letter).

**Fourth**, the government's assertion that Retrophin's lawsuit against Mr. Pierotti is evidence of Mr. Greebel's intent to help Mr. Shkreli control the Fearnow shares, Gov't MIL at 6–7, is mystifying.  Mr. Pierotti has personal knowledge that Retrophin filed a lawsuit against him, and he can testify regarding that lawsuit.  However, the government overlooks that senior litigation partners from Katten Muchin Rosenman LLP, including one with over 30 years of experience—not Mr. Greebel—filed, signed, supervised, and were responsible for handling the lawsuit against Mr. Pierotti at Retrophin's direction.  It is incomprehensible that the government is somehow alleging that this lawsuit—filed by two partners, both senior to Mr. Greebel, at a national law firm—against Mr. Pierotti based on representations made in part by Mr. Shkreli is somehow imputable to Mr. Greebel's *mens rea* and Mr. Greebel's conduct.

**Finally**, in a conclusory and unclear fashion, the government contends that Mr. Shkreli's hacking of Mr. Pierotti's "five email and social media accounts . . . to post information about the lawsuit on Fearnow Share Recipient TP's Facebook page" is also admissible against Mr. Greebel.  *See* Gov't MIL at 4, 6.  There are multiple fatal flaws to the government's attempt to admit such evidence at this trial:  (1) The government (once again) fails to connect Mr. Greebel to this alleged hacking by Mr. Shkreli.  The government does not claim that Mr. Greebel had any knowledge of and/or involvement in the alleged hacking.  Accordingly, such hacking evidence is inadmissible pursuant to Rule 401, Rule 403, and Rule 404(b).  (2) If the Court admits the evidence relating to hacking of Mr. Pierotti's email and social media

9

accounts, there will have to be a mini-trial within the trial regarding who hacked into

Mr. Pierotti's accounts.  Mr. Shkreli repeatedly denied responsibility.  The government has not

proffered Mr. Pierotti will be able to testify based on personal knowledge that Mr. Shkreli

hacked into his email and social media accounts, and we proffer to the Court that our

investigation reflects that Mr. Pierotti will *not* be able to make such claims.  The government,

therefore, would have to call one or more expert witnesses to testify regarding the alleged

hacking into Mr. Pierotti's accounts.  And, as Your Honor knows from other matters, whether

someone hacked into email and social media accounts is not a simple matter and requires

complicated and often conflicting evidence.  (3) The government has failed to notice any experts

for purposes of introducing this alleged hacking.

## II.     The Court Should Admit Mr. Shkreli's Post-Arrest Statements and Prior Testimony to the SEC

We have moved *in limine* to admit certain statements of Mr. Shkreli's post-arrest

statements and prior testimony to the SEC pursuant to multiple exceptions to the hearsay rule.

*See* Greebel MIL to Admit Martin Shkreli's Prior Testimonial Statements and Statements to Law

Enforcement Under Multiple Exceptions to the Hearsay Rule, Dkt. No. 332.  The government

opposes.  *See* Gov't MIL at 8-13.  Mr. Shkreli is unavailable as a witness given that we have

been informed by his counsel that he will invoke his rights not to testify.  Thus, we should be

given latitude to attack Mr. Shkreli's credibility with his own prior statements under Rule 806

and Rule 608, and offer statements by Mr. Shkreli made against his interests under Rule

804(b)(3), reflecting Mr. Shkreli's then-existing state of mind under Rule 803(3), as excited

utterances following arrest under Rule 803(2), as prior sworn testimony pursuant to Rule

804(b)(1), and under the residual hearsay exception pursuant to Rule 807.

### A.      Mr. Shkreli's Post-Arrest Statements Are Admissible

*First*, Mr. Shkreli's post-arrest statements are admissible pursuant to Rule 806.  Rule 806 provides that "[w]hen a hearsay statement—or a statement described in Rule 801(d)(2)(C), (D), or (E)—has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness."  Fed. R. Evid. 806.  Under Rule 806, "[t]he court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it."  *Id.*  As the Advisory Committee explained, "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness.  His credibility should in fairness be subject to impeachment and support as though he had in fact testified.  See Rules 608 and 609."  *Id.*, Advisory Committee Notes (1972).  Once a declarant's out-of-court statement has been admitted, his credibility can be attacked by reputation or opinion evidence, Fed. R. Evid. 608(a), or by specific instances of conduct probative of the declarant's character for truthfulness, Fed. R. Evid. 608(b).

There is no dispute that the government will be offering Mr. Shkreli's statements and actions into evidence at this trial.  As a result, pursuant to Rule 806, the post-arrest statements of Mr. Shkreli that we have identified are admissible to attack Mr. Shkreli's credibility.  Without having seen the post-arrest statements we intended to offer, the government argued that we are not offering them to attack Mr. Shkreli's credibility, but rather "to establish the defendant's innocence."  Gov't MIL at 10.  Given that a core part of Mr. Greebel's defense is that Mr. Shkreli lied to, deceived, and omitted material information from him, the government fails to recognize that evidence which attacks Mr. Shkreli's credibility also simultaneously establishes Mr. Greebel's innocence.  In other words, in a charged conspiracy where the government alleges that Mr. Shkreli is the mastermind and orchestrator of the conspiracy, evidence attacking

11

Mr. Shkreli's credibility by showing that Mr. Shkreli had engaged in deception in the past simultaneously demonstrates that Mr. Greebel was duped and thus is not guilty.

Mr. Greebel is also entitled to attack Mr. Shkreli's credibility under the Sixth Amendment.  As Your Honor recognized in *United States v. Watts*, "[i]t is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony."  934 F. Supp. 2d 451, 483 (E.D.N.Y. 2013) (quoting *Brinson v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008)) (internal citations omitted). Accordingly, to the extent the government introduces hearsay statements of Mr. Shkreli, both Rule 806 and the Confrontation Clause afford Mr. Greebel wide latitude with respect to his ability to attack Mr. Shkreli's credibility.

***Second***, as we set out in our motion to admit Mr. Shkreli's statements, Mr. Shkreli's post-arrest statements are admissible as statements against interest pursuant to Rule 804(b)(3). *See* Greebel MIL to Admit Martin Shkreli's Prior Testimonial Statements and Statements to Law Enforcement Under Multiple Exceptions to the Hearsay Rule, Dkt. No. 332, at 2.  To satisfy the 804(b)(3) exception for a statement against interest, "the proponent [of the statement] must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in the declarant's position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement."  *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (citing *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983)) (internal marks omitted).  Key to this analysis is whether the statement is "sufficiently self-inculpatory," which "can only be answered by viewing it in context."  *United States v. Williams*, 506 F.3d 151,

155 (2d Cir. 2007).  The premise of the exception under Rule 804(b)(3) is that "reasonable people, even reasonable people *who are not especially honest*, tend not to make self-inculpatory statements unless they believe them to be true."  *United States v. Gupta*, 747 F.3d 111, 129 (2d Cir. 2014) (quoting *Williamson v. United States*, 512 U.S. 594, 599 (1999)) (emphasis added).

At the outset, there should be no dispute that Mr. Shkreli is unavailable as a witness.  "It is well settled that when a witness invokes their Fifth Amendment rights, the witness is 'unavailable' as defined by Rule 804(a)(1)."  *United States v. Chan*, 184 F. Supp. 2d 337, 341 (S.D.N.Y. 2002) (citing *United States v. Matthews*, 20 F.3d 538, 545 (2d Cir. 1994); *United States v. Bakhtiar*, 994 F.2d 970, 977 (2d Cir. 1993).  Counsel for Mr. Shkreli has informed us that Mr. Shkreli is not available to testify at Mr. Greebel's trial and, if called as a witness, Mr. Shkreli will invoke his right not to testify.

Moreover, the post-arrestment statements we are offering into evidence are sufficiently reliable to warrant an inference that a reasonable man in Mr. Shkreli's position would not have made the statements unless he believed them to be true.  "The Second Circuit has noted . . . that statements may be 'sufficiently self-inculpatory to satisfy the [804(b)(3)] exception, if they describe acts that the declarant and the defendant committed jointly,' particularly where 'the context of these statements shows that the declarant was not attempting to minimize his own culpability, shift blame onto the defendant, or curry favor with authorities.'"  *United States v. Medina*, No. S3 13 CR. 272 PGG, 2014 WL 3384630, at *3 (S.D.N.Y. July 10, 2014) (citing *Williams*, 506 F.3d at 155).  Mr. Shkreli's post-arrest statement that it was "bizarre" that Mr. Greebel was arrested, reflecting a lack of surprise that he [Mr. Shkreli] was arrested, is inculpatory.  By stating that it was bizarre that Mr. Greebel was arrested, Mr. Shkreli was not attempting to (i) minimize his own culpability (but rather did the opposite), (ii) shift the blame to

13

Mr. Greebel, or (iii) curry favor with the FBI. "The proffered statement 'need not have been sufficient, standing alone, to convict the declarant of any crime,' so long as it would have been 'probative' in a criminal case against him." *Gupta*, 747 F.3d at 127 (quoting *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011)). Rule 804(b)(3) also "does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution." *Persico*, 645 F.3d at 102. To the extent that the government argues that Mr. Shkreli's statement is not sufficiently exculpatory to Mr. Greebel or inculpatory to Mr. Shkreli, that is an issue for the jury to decide.

*Third*, there can be no serious dispute that the corroborating circumstances clearly indicate the trustworthiness of Mr. Shkreli's statements. Here, "the time of the declaration and the party to whom the declaration was made" reflect trustworthiness—a self-inculpatory statement to the FBI following his arrest that simultaneously exculpates Mr. Greebel has all indicia of trustworthiness. *Medina*, 2014 WL 3384630, at *6; *Wexler*, 522 F.3d at 202–03. The statements were not designed to "curry favor" with the authorities who had just arrested Mr. Greebel. *See Williamson*, 512 U.S. at 603. And by inculpating himself and exculpating Mr. Greebel, Mr. Shkreli did not attempt to shift blame to Mr. Greebel or minimize his own culpability. *Id.* at 603.

*Fourth*, Mr. Shkreli's statement that "the Evan thing was just bizarre"—referring to Mr. Greebel's arrest—is a statement of Mr. Shkreli's then-existing mental state. Pursuant to Rule 803(3), "'a statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or

14

believed' is admissible for the truth of the matter asserted." *United States v. Graham*, No. 14-CR-500 NSR, 2015 WL 6161292, at *7 (S.D.N.Y. Oct. 20, 2015) (quoting Fed. R. Evid. 803(3)).

*United States v. DiMaria*, 727 F.2d 265 (2d Cir. 1984), is analogous. In that case, the Second Circuit vacated a defendant's conviction for conspiracy and substantive counts relating to contraband cigarettes because the defense was not permitted to introduce a critical statement of the defendant's state of mind on the cusp of his arrest. *Id.* at 270–272. The defense moved to admit DiMaria's statement to several FBI agents as they approached him the night of his arrest: "I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap." *Id.* at 272. The district court's exclusion of this statement constituted reversible error, because "the jury could find, that his existing state of mind was to possess bootleg cigarettes, not stolen cigarettes. It was not offered to prove that the cigarettes were not stolen cigarettes but only to show that DiMaria did not think they were. . . . DiMaria's remark was not a statement . . . of what he or someone else had done in the past. It was a statement of what he was thinking in the present." *Id.* at 271. The Second Circuit rejected the government's argument that DiMaria's statement was a "false exculpatory statement[.]" *Id.* "False it may well have been but if it fell within Rule 803(3), as it clearly did if the words of that Rule are read to mean what they say, its truth or falsity was for the jury to determine." *Id.*

Like the statements in *DiMaria*, Mr. Shkreli's post-statement to the FBI that Mr. Greebel's arrest was "bizarre" is a "statement of what he was thinking in the present." 727 F.2d at 271. These were not statements of what Mr. Shkreli or Mr. Greebel "had done in the past," *id.*, but rather were statements of his "current feelings" regarding Mr. Greebel's arrest or alleged involvement in the alleged conspiracies, *Graham*, 2015 WL 6161292, at *7. The government's argument that "the potential relevance of [Mr. Shkreli's] statements . . . depends

15

on whether Shkreli was *telling the truth*, for example, when he said he was shocked at the

defendant's arrest," Gov't MIL at 10 (emphasis in original), is incorrect as a matter of law.  The

Second Circuit has recognized for decades that statements admitted under 803(3) are admissible

"without any preliminary credibility finding by the judge . . .  [i]nstead, the self-serving nature of

a statement is considered when the jury weighs the evidence at the conclusion of the trial."

*United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991); *see also United States v. Farhane*,

634 F.3d 127, 172 (2d Cir. 2011) ("[T]he self-serving nature of a statement expressing a state of

mind does not automatically preclude application of Rule 803(3).  That concern is properly

considered by the jury in deciding what weight to accord the statement.").  These statements of

Mr. Shkreli's then-existing state of mind are thus archetypal examples of admissible statements

contemplated by Rule 803(3).

      ***Fifth***, certain of Mr. Shkreli's post-arrest statements meet the requirements of Rule

803(2).  Pursuant to Rule 803(2), an "excited utterance" is "[a] statement relating to a startling

event or condition made while the declarant was under the stress of excitement caused by the

event or condition."  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (quoting Fed. R.

Evid. 803(2)).  As the Second Circuit has explained, "[t]he rationale for this hearsay exception is

that the excitement of the event limits the declarant's capacity to fabricate a statement and

thereby offers some guarantee of its reliability."  *Id.* (quoting *United States v. Tocco*, 135 F.3d

116, 127 (2d Cir. 1998)).  "Unlike present sense impressions, an excited utterance need not be

contemporaneous with the startling event to be admissible."  *Id*.  Rather "[t]he length of time

between the event and the utterance is only one factor to be taken into account in determining

whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement

caused by the event or condition.'"  *Id.*

In *United States v. Obayagbona*, the district court admitted the post-arrest statement pursuant to Rule 803(2), because the circumstances surrounding the statement "engenders excitement." 627 F. Supp. 329, 339 (E.D.N.Y. 1985).  Indeed, such circumstances provided "valid psychological guarantees against fabrication." *Id.*  "It [was] not likely that the witness was deliberately fabricating evidence.  He was too excited to do so." *Id.*  Similarly, in *United States v. Fell*, the Second Circuit affirmed the admission of an out-of-court statement by the defendant's mother that "she was afraid of [the defendant]." 531 F.3d 197, 231 (2d Cir. 2008). The statement came after the defendant was arrested for a physical altercation with his mother and was made after significant time had passed between the altercation and the defendant's arrest. *Id.*  Despite the defendant's argument that his mother's statement was "too attenuated to qualify as an excited utterance," the Second Circuit held that "an excited utterance need not be contemporaneous with the startling event to be admissible" and explained that the "stressful events surrounding the statement" were sufficient to admit the statement under Rule 803(2). *Id.*

Mr. Shkreli's statement that Mr. Greebel's arrest and involvement was "bizarre" occurred on the heels of his arrest, (i) while handcuffed to a wall in FBI headquarters and (ii) while being interrogated by a Special Agent in FBI headquarters in Manhattan, and having just learned that Mr. Greebel had been arrested or charged with him.  Such a context meets the requirements for an excited utterance.  Indeed, at the time of the statement, Mr. Shkreli was clearly still "agitated and operating under the stress and psychological impact of the events which he was relaying." *United States v. Thomas*, No. 3:13-CR-00141 VLB, 2014 WL 2168468, at *5 (D. Conn. May 23, 2014) (admitting certain 911 phone calls).  Like the post-arrest statements in *Obayagbona*, Mr. Shkreli's were made at a time of genuine surprise—not surprise regarding his own arrest so much as genuine shock that the government had implicated Mr. Greebel, a partner at a premier

17

national law firm and former outside counsel for Retrophin.  Surely Mr. Shkreli's arrest itself

was also the sort of "stressful event," *Fell*, 531 F.3d at 231, that "engenders excitement,"

*Obayagbona*, 627 F. Supp. at 339, especially where Mr. Shkreli had never been arrested before.

Mr. Shkreli's statement is thus an excited utterance and may be admitted under Rule 803(2).

      ***Finally,*** Mr. Shkreli's post-arrest statements are admissible under the residual hearsay

exception pursuant to Rule 807.  Under Rule 807, a statement "not specifically covered by Rule

803 or 804 but having equivalent circumstantial guarantees of trustworthiness," is admissible if

"(A) the statement is offered as evidence of a material fact; (B) the statement is more probative

on the point for which it is offered than any other evidence which the proponent can procure

through reasonable efforts; and (C) the general purposes of these rules and the interests of justice

will best be served by admission of the statement into evidence."  *United States v. Morgan*, 385

F.3d 196, 208 (2d Cir. 2004) (citing Fed. R. Evid. 807).  The Second Circuit has explained that a

statement is admissible under this "catch-all" provision if "'(i) it is particularly trustworthy; (ii) it

bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its

admission is consistent with the rules of evidence and advances the interests of justice; and (v) its

proffer follows adequate notice to the adverse party.'"  *Id.* at 208–09 (admitting defendant's

letter to boyfriend) (quoting *United States v. Bryce*, 208 F.3d 346, 350–51 (2d Cir. 1999)

(admitting recorded telephone conversations between co-defendants)); *see also Silverstein v.

Chase*, 260 F.3d 142, 148-49 (2d Cir. 2001) (suggesting that district court, on remand, admit

portion of unsigned document bearing on ownership of brokerage account at issue).

      Here, Mr. Shrkeli's statements—made while in FBI custody and immediately after his

arrest—are clearly trustworthy.  Indeed, there is no incentive for someone under indictment to

offer an explicit and unprovoked exculpation of one of his alleged co-conspirators.  Nor is there

any alternative, more probative evidence of Mr. Shkreli's genuine shock that Mr. Greebel had

been arrested.  Additionally, his statement that Mr. Greebel's arrest was "bizarre" is not merely

material to the charged conspiracies; it is crucial to the fundamental question before the jury—

*i.e.*, whether there was a "meeting of the minds" between Mr. Shkreli and Mr. Greebel.  *See*

*Morpurgo v. Inc. Vil. of Sag Harbor*, 697 F. Supp. 2d 309, 337 (E.D.N.Y. 2010), *aff'd*, 417 F.

App'x 96 (2d Cir. 2011) (holding that plaintiff failed to plead a conspiracy because she did not

allege any facts that there was a "meeting of the minds" between certain defendants).  Such

trustworthy evidence should be admitted in the interest of justice.  Mr. Shkreli's statement is thus

admissible under the residual hearsay exception.

### B.     Mr. Shkreli's SEC Testimony Is Admissible

The statements of Mr. Shkreli to the SEC that we have offered into evidence are

admissible under a number of rules.

*First*, for the reasons explained above, these statements are admissible pursuant to Rule

806.  They are statements offered into evidence to attack Mr. Shkreli's credibility and,

simultaneously, demonstrate that Mr. Greebel is innocent.

*Second*, for the reasons explained above, these statements are admissible pursuant to

Rule 804(b)(3).  The government offered the same statements into evidence at Mr. Shkreli's trial

and argued that they proved that Mr. Shkreli's statements to MSMB Capital and MSMB

Healthcare investors were false and misleading.  They are statements against Mr. Shkreli's

interest pursuant to Rule 804(b)(3) because (1) Mr. Shkreli is unavailable as a witness, (2) the

statements that Mr. Shkreli made under oath to the SEC are sufficiently reliable to warrant an

inference that a reasonable man in Mr. Shkreli's position would not have made the statements

unless he believed them to be true, and (3) the corroborating circumstances clearly indicate the

trustworthiness of the statements.  *Wexler*, 522 F.3d at 202.

19

*Third*, Mr. Shkreli's statements are admissible pursuant to Rule 608 to attack Mr. Shkreli's credibility and demonstrate that Mr. Shkreli had lied to and deceived Mr. Greebel by making contrary statements to Mr. Greebel.

*Fourth*, Mr. Shkreli's statements under oath to the SEC Staff are admissible under Rule 804(b)(1). The statements were given by Mr. Shkreli under oath and are now being offered against the government where the SEC had exactly the same interest, opportunity, and motive to develop evidence that Mr. Shkreli had lied to and deceived MSMB Capital and MSMB Healthcare investors. The government moved to admit and relied heavily on Mr. Shkreli's sworn statements to the SEC Staff in proving that Mr. Shkreli had lied to and deceived MSMB investors regarding the assets under management, whether the funds had an auditor, the performance of the funds, and Mr. Shkreli's track record and education. *See* Shkreli Trial Tr. 4757:22-4758:9 (Testimony of Special Agent Braconi); 4762:18-4766:21 (Testimony of Special Agent Braconi); 5160:22-25 (Government Summation); 5169:10-16 (Government Summation); 5169:24-5170:4 (Government Summation); 5201:24-5202:4 (Government Summation); 5238:13-24 (Government Summation); 5246:11-25 (Government Summation).

Both the criminal authorities and the SEC Staff were investigating the same lies that Mr. Shkreli told to MSMB investors; both interviewed the same MSMB witnesses to find out what statements Mr. Shkreli made to them; and both the criminal authorities and the SEC Staff charged Mr. Shkreli with the same lies to MSMB investors. There can be no serious dispute that the SEC Staff had the same interest, opportunity, and motive as the criminal authorities to cross-examine Mr. Shkreli during his SEC testimony to find out about his true assets under management, whether he had an auditor, the true performance of the funds, his track record, and his education. Any conclusory assertions to the contrary by the government are insufficient; the

government needs to proffer to the Court how it would have cross-examined Mr. Shkreli differently regarding these fundamental points which the government moved to admit during Mr. Shkreli's trial and that we are moving to admit for Mr. Greebel's trial.  *See United States v. Whitman*, 555 F. App'x 98, 103 (2d Cir. 2014) ("In some situations, a civil deposition may well mirror the testimony that would be elicited at trial, or other evidence may suggest that the lawyer taking the deposition had a 'similar motive' to develop the testimony as the same party would later have at trial.").

Moreover, there is no question that the criminal authorities had the "opportunity" to question Mr. Shkreli regarding his sworn statements to the SEC Staff when the criminal authorities interviewed Mr. Shkreli thereafter on two separate occasions.  So found the district court in *United States v. Hatfield*, No. 06 Cr. 0550 (JS), 2010 WL 2545828, at *1-2 (E.D.N.Y. June 21, 2010), where the government, while not present for the SEC's deposition of the unavailable witness (Nadelman), "later enjoyed such an 'opportunity' when it interviewed Mr. Nadelman [subsequent to the SEC testimony] . . . and memorialized these conversations as proffer notes."  Here, as in *Hatfield*, even assuming that the criminal authorities did not have any input into the SEC Staff's depositions of Mr. Shkreli on or about October 12, 2011, August 7, 2013, and February 24, 2014, they subsequently had the opportunity to question Mr. Shkreli regarding his sworn statements when they interviewed Mr. Shkreli on or about January 29, 2015 and when they interviewed him after Mr. Shkreli's arrest.

Finally, the government makes conclusory assertion that they were not a "party" to the SEC deposition of Mr. Shkreli.  The problem with that claim is that there are instances when the federal criminal authorities and the SEC Staff conduct joint investigations, and the government has failed to present evidence through affidavits to the contrary.  *See United States v. Gupta*, 848

21

F. Supp. 2d 491, 495–97 (S.D.N.Y. 2012) (ordering the SEC to turn over to the USAO the SEC memoranda relating to 44 witness interviews from a joint investigation and ordering the USAO to review and disclose any Brady material to the defendant).  Here, there are significant indicia of a joint investigation between the criminal authorities and the SEC.  We understand that the USAO and the SEC jointly interviewed many witnesses.  A significant percentage of the government's discovery in the criminal case came from the SEC.  Moreover, the SEC Staff provided the USAO with access to all of its evidence and the USAO selected what information it would take to provide to the defendants in this case.[3]  The USAO and the SEC charged Mr. Shkreli and Mr. Greebel on exactly the same day; and their charges substantially mirror each other.  The USAO and the SEC also jointly gave a press conference announcing the arrests of Mr. Shkreli and Mr. Greebel.  *See* DOJ Press Conference, Former Hedge Fund Manager Martin Shkreli and Attorney Indicted In Multimillion Dollar Fraud Scheme (Dec. 17, 2015), *available at* https://www.justice.gov/usao-edny/video/former-hedge-fund-manager-martin-shkreli-and-attorney-indicted-multimillion-dollar.

*Finally,* for the reasons explained above, Mr. Shkreli's statements to the SEC are admissible pursuant to the residual hearsay exception under Rule 807.  They were offered under oath pursuant to formal proceedings; the substance of Mr. Shkreli's testimony is not available

---

[3]      Specifically, in response to a trial subpoena to the SEC, the SEC wrote a letter dated August 23, 2017 stating, among other things, that "SEC staff gave the USAO access to all non-privileged documents in its files for the three SEC investigations identified in the subpoena, and the USAO identified the documents it wanted the SEC to provide to it.  Any documents the SEC did not provide to the USAO are likely not relevant to the United States' case against Mr. Greebel."  We are meeting and conferring with the SEC Staff in an attempt to resolve our differences over our trial subpoena to them; should we fail to do so, we will raise the matter with the Court.

through other sources, and has sufficient guarantees of trustworthiness as required under the Rules.

### III.     The Court Should Preclude Mr. Greebel's Post-Arrest Statements

The government has not met its deadline of identifying any post-arrest statements of Mr. Greebel that it intends to offer into evidence as a trial exhibit.  *See* Amended Criminal Pretrial Scheduling Order, Dkt. No. 266, at 1-2; Gov't MIL at 13-14.  The government does not offer any good cause for delay.  Amended Pretrial Scheduling Order, Dkt. No. 266, at 1.  And there can be no "good cause" for delay here given that the government indicted this case over nineteen months ago; the government has had over nineteen months to examine the statements and determine which ones it intends to seek to admit against Mr. Greebel; and the government never asked the Court for permission to postpone its identification of Mr. Greebel's statements. Accordingly, this Court should preclude the government from admitting any of Mr. Greebel's post-arrest statements.

Assuming *arguendo* that this Court allows the government to identify the post-arrest statements of Mr. Greebel that it intends to move to admit into evidence, the Court should take into account the government's premature and unfair argument that any additional statements that we may offer into evidence to complete the statements identified by the government should be denied.  Specifically, before the government has even identified the post-arrest statements it intends to offer and obviously before we have reviewed them, had a chance to meet and confer with the government about them, and potentially identify other statements to complete them, the government asserts that it "anticipates that it may move to preclude such additional portions . . . ."  Gov't MIL at 13.  The government's position is telling and this Court should look with skepticism at the government's opposition to any motion we may make seeking to include other portions of Mr. Greebel's post-arrest statements to make them complete given the government's

apparent position—before even hearing from us—that it will oppose whatever we say in any opposition.

## IV.   The Government's Motion *in Limine* to Preclude Mr. Greebel's Testimony About His Review of Evidence Is Premature

The government's motion to preclude Mr. Greebel from testifying about his review of evidence in this case is premature.  If and when Mr. Greebel decides to testify, the Court can take the matter up on a question-by-question basis.  Should Mr. Greebel testify, we do not intend to provide a preview of our questions or of Mr. Greebel's anticipated responses.  We understand the Federal Rules of Evidence, and we commit to Your Honor that we intend to comply with them. If the government has an objection to a question, the government should make its objection at the time.  The government's suggestion that Mr. Greebel would testify to someone else's state of mind makes no sense.  When the government made this argument previously, we informed the Court that Mr. Greebel cannot of course testify about someone else's state of mind.  *See* Greebel Reply Br. in Supp. of Mot. for Severance, Dkt. No. 170, at 12.

## V.   The Government's Motion to Preclude Mr. Greebel From Admitting Evidence of Mr. Shkreli's Lies to Others Is Shocking, Contrary to the Rule of Law, and Inconsistent with the Government's Own Prosecution of Mr. Shkreli

In an unusual and quite shocking motion, the government attempts to move to preclude us from introducing evidence that Mr. Shkreli lied to people other than Mr. Greebel.  The government's argument is contrary to the rule of law, and directly and dramatically inconsistent with the government's own prosecution of Mr. Shkreli.

*First*, the government appears to have overlooked its own statements about Mr. Shkreli's lies during the trial of *United States v. Shkreli*.  In its opening statement, the government argued that Mr. Shkreli told "lies on top of lies on top of lies."  Shkreli Trial Tr. 850:3.  Indeed, the government believes that Mr. Shkreli told lies to everyone and anyone—except to Mr. Greebel—

even when there is documentary proof to the contrary.  The government further exclaimed in its

opening statement against Mr. Shkreli:  "***Lying*** to get investors' money.  Stealing from a public

company and its shareholders to pay off the investors he stole from.  ***Piling lies on top of lies on***

***top of lies***.  This is what that man, the Defendant, Martin Shkreli, ***did for years***."  Shkreli Trial

Tr. 850:1-5 (emphasis added).  The government's summation was no different.  The government

argued:

> Just about one month ago, my colleague, Mr. Srinivasan, stood
> before you and told you how ***the defendant told lies, upon lies,***
> ***upon lies*** in connection with four related fraud schemes that he and
> his co-conspirators carried out over a period of years.  He told you
> that the evidence would show that ***the defendant lied to investors***
> in MSMB Capital and MSMB Healthcare in order to get them to
> invest in the funds and that ***he told more lies to*** prevent them
> taking their money out of the funds.  He told you that the evidence
> would show that when some of the investors in the funds weren't
> happy with how the funds performed because they believed the
> ***defendant's lies*** the defendant doubled down using another
> fraudulent scheme to force Retrophin ***to pay for those lies***.  And he
> told you that the evidence would prove beyond a reasonable doubt
> that the defendant also engaged in a fraud to try and control the
> price and trading volume of Retrophin stock and ***that he lied*** about
> who actually owned the free-trading shares of the company.  That
> is exactly what we have done.

Shkreli Trial Tr. 5150:15-5151:9 (emphasis added).  Indeed, nearly every other word out of the

government's summation was about Mr. Shkreli's lies.  Thus, it is indeed surprising, unfair, and

contrary to the interests of justice that the government would seek to preclude Mr. Greebel from

introducing evidence of Mr. Shkreli's lies to others.

> ***Second***, evidence of Mr. Shkreli's lies to others is potentially admissible under a number

of Federal Rules of Evidence.  Among other things, Mr. Shkreli's lies to others may be

admissible under Rule 401 and certainly would pass the Rule 403 balancing test.  *See*, *e.g.*,

*United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (evidence that defendant's supervisors

approved of identical conduct with others was a fair basis upon which to infer that the

defendant's supervisors approved the same conduct for him).  Mr. Shkreli's lies to others may also be admissible under Rule 406 as evidence of Mr. Shkreli's habit or routine practice.  *See* Fed. R. Evid. 406.  Given the government's prosecution of Mr. Shkreli, and the government's statements that Mr. Shkreli said "lies upon lies upon lies" to anyone and everyone around him, it is quite extraordinary to hear the government assert that Mr. Shkreli did not have a habit or routine practice of lying.  Further, Mr. Shkreli's lies to others may be admissible pursuant to Rule 806 as evidence that attacks Mr. Shkreli's credibility in response to the government's attempt to admit evidence of Mr. Shkreli's statements.  Moreover, Mr. Shkreli's lies to others may be admissible pursuant to Rule 608 as specific instances of conduct to attack Mr. Shkreli's character for truthfulness.

*Third*, the government has the temerity to argue that Mr. Greebel "should identify those bad acts in a pre-trial filing, as is standard practice for the use of Rule 404(b) evidence," Gov't MIL at 22, when, in fact, the rule about disclosure of 404(b) evidence *expressly only applies to the prosecutors*.  Rule 404(b)(2)(A) states:  "***On request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice*** of the general nature of any such evidence that ***the prosecutor intends to offer at trial***; and (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice."  There is no requirement that an accused provide notice to the government about 404(b) evidence, and the government cites no authority at all for its contention that we should provide the government such notice.  The government's argument turns an accused's constitutional rights upside down.

*Finally*, the government's objections here are in the abstract.  The government filed the motion in a broad, sweeping way without any legal support and contrary to law.  We respectfully submit that we will introduce relevant, admissible evidence relating to Mr. Shkreli's lies to

others and such evidence will often respond to the government's case-in-chief, which we have

not seen or heard yet.

**VI.    The Court Should Reject the Government's Ambiguous Motion to Preclude Evidence Relating to the "Circumstances" of Mr. Greebel's Arrest, and to Preclude the Government From Violating Mr. Greebel's Constitutional Rights of Self-Defense**

This Court should reject the government's ambiguous motion to preclude evidence about

"the circumstances of [Mr. Greebel's] arrest", Gov't MIL at 24-26, and to preclude the

government from violating Mr. Greebel's constitutional right of self-defense and demonstrating

to the jury that the government has not met its burden of proof.

The government cites no applicable authority in the Second Circuit to preclude

Mr. Greebel from eliciting evidence about "the circumstances" of his arrest.  Instead, the

government dresses up its motion by relying on cases that stand for the proposition that we

should not question the government's motives in prosecuting any particular defendant or argue

for selective prosecution.  *See* Gov't MIL at 25 (citing *United States v. Stewart*, No. 03 Cr. 717

(MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004); *United States v. Regan*, 103 F.3d

1072, 1082 (2d Cir. 1997).  Since we will not question the government's motives for prosecuting

this case or argue that there was selective prosecution here, these cases and objections are

inapposite.

The government's ambiguous argument that the defense should not raise that "the

defendant was arrested at a certain . . . location," Gov't MIL at 24, makes no sense.  The

government cites no support for this contention, and it is not clear what the government is

seeking to preclude.

Finally, in what would violate Mr. Greebel's constitutional rights of self-defense, the

government seems to be arguing that Mr. Greebel cannot make any arguments or elicit any

evidence relating to the nature of the government's investigation.  The government obliquely refers to this as arguments that "the defendant was arrested at a certain time" (Gov't MIL at 24), "reasons for or timing of the defendant's arrest" (*id.* at 25), and defendant's knowledge of the investigation (*id.* at 26).  The government cites no cases in support for this proposition, and it would be remarkable if the government were truly persisting in making this argument.  It would be a violation of an accused's constitutional right of self-defense to preclude an accused person from arguing to the jury that the government failed to meet its burden of proof.  Defendants across this country in federal and state courtrooms have argued for decades and should be able to continue to argue that the government did not take sufficient steps in its investigation; that the government did not use its subpoena power and other investigative techniques to find the truth; that the government's investigation was not thorough or complete; and/or that the government should have done other things during the course of its investigation.

In *United States v. Zapata*, 164 F.3d 620, 1998 WL 681311, at *7 (2d Cir. 1998), the Second Circuit noted that the district court "fully permitted defendants to attack the government's investigative techniques" including the argument that "by failing to use certain methods of investigation, the government had failed to establish the existence of a conspiracy and each defendants *[sic]* participation in it."  In addition, defendants were permitted "to argue in summation that the jury should draw certain inferences from the government's failure to use other investigative techniques."  *Id.*, at *6.  While, as in *Zapata*, the government may request and be granted a jury instruction that it is not required to use any particular investigative technique, this does not preclude the defendant from making arguments regarding the government's failure to use certain investigation techniques.  *Id.*

Notably, the government did not object when Mr. Shkreli's counsel argued in its summation that numerous witnesses were not called at trial: "Brent Saunders is one of the most important witnesses in this case and he hasn't been called and nobody around Fred Hassan has been called, [Thomas] Koestler wasn't called, Brent Saunders wasn't called, Robert Bertolini wasn't called, Ken Banta wasn't called," Shkreli Trial. Tr. 5351:16-20; "None the people who are part of this alleged conspiracy, Fearnow shares, only Pierotti—and we'll get to him in a minute—Biestek, Mulleady, Fernandez, Vaino, Sullivan, Tilles, all the people who are supposed to be involved in this conspiracy to manipulate the shares of this stock, they're all available to the government.  Their names are all over everything and they're not called as witnesses," *id.* at 5412:6-13.

Precluding arguments regarding the circumstances and sufficiency of the investigation would run afoul of Mr. Greebel's fundamental ability to attack the government's failure to meet its burden of proof.  To our knowledge, the government has never moved to preclude such argument before, and no court has granted an application to foreclose the defense from raising issues about the thoroughness, or lack thereof, of the government's investigation.  This Court should not do so now.

## VII.    This Court Should Deny the Government's Motion to Depersonalize Mr. Greebel

This Court should deny the government's motion to depersonalize and dehumanize Mr. Greebel.  It is not the first time in this case that the government has complained that we have mentioned that Mr. Greebel is a father and a husband.  The last time the government complained, this Court reminded the government: "You know, you have to accept the reality that [Mr. Greebel] is a father, a husband, a lawyer . . . .  We have to remember that these are human beings that come before us. . . . He is a human being, and he's got realities about defending

himself from these charges.  So I'm not going to mock him for that, and you shouldn't."  Hearing

Tr. 19:22-20:18 (Oct. 14, 2016).  This Court should remind the government again.

What is most astonishing about the government's motion to preclude us from making any

mention that Mr. Greebel is a husband and a father is that the government did the very same

thing over and over and over and over again with nearly all of the witnesses whom the

government called during Mr. Shkreli's trial.  The government elicited evidence about the family

of the Retrophin Board members:

- Testimony of Stephen Aselage, Shkreli Trial Tr. 3298:2-5 ("Q:  Are you married?  A: I am.  Q:  Do you have any children?  A:  I have three."); and

- Testimony of Steven Richardson, Shkreli Trial Tr. 2743:1-6 ("Q:  Are you married? A:  No, I have a domestic partner. . . .  Q:  How long have you been with your partner for?  A:  Twenty-five years.").

The government elicited evidence about the family of the MSMB investors.

- Testimony of Darren Blanton, Shkreli Trial Tr. 1546:4-9 ("Q:  Are you married? A:  Yes.  Q:  Do you have any children?  A:  Yes.  Q:  How many children do you have?  A:  Three.");

- Testimony of David Geller, 3094:6-9 ("Q:  Are you married?  A:  I am.  Q:  Do you have any children?  A:  I do, I have a 12-and-a-half year old boy.");

- Testimony of Fred Hassan, Shkreli Trial Tr. 1286:7-16 ("Q:  Are you married? A:  Yes.  Q:  And what is your spouse's name?  A:  Noreen.  Q:  Do you have any children?  A:  Yes.  Q:  How many children to you have?  A:  Three.  Q:  And what are their names?  A:  Sabrina, Daniel and Sarah.")

- Testimony of Sarah Hassan, Shkreli Trial Tr.  910:10-13 ("Q:  Are you currently married?  A:  Yes, I am.  Q:  What is your spouse's name?  A:  Melissa.");

- Testimony of Richard Kocher, Shkreli Trial Tr. 2311:23-2312:6 ("Q:  Are you married?  A:  Yes, I am.  Q:  What's your spouse's name?  A:  Her name is Barbara Kocher.  Q:  Does she go by any other names?  A:  Her, yeah.  I call her Fulda and her friends call her Fulda.  Q:  Do you have any children, sir?  A:  Yes.  I have one.");

- Testimony of Schuyler Marshall, Shkreli Trial Tr. 2423:23-2424:3 ("Q:  Are you married?  A:  Yes.  Q:  Any kids?  A:  Three children.  Q:  Any grandkids? A:  Two.");

- Testimony of John Neill, Shkreli Trial Tr. 3988:11-16 ("Q:  Are you married? A:  Yes.  Q:  What's your wife's name?  A:  Barbara Warner Neill.  Q:  Do you have any children?  A:  We have three children.");

- Testimony of Lindsey Rosenwald, Shkreli Trial Tr. 1927:11-14 ("Q:  Are you married?  A:  Yes.  Q:  Do you have any children?  A:  Five."); and

- Testimony of Lee Yaffe, Shkreli Trial Tr. 4361:3-6 ("Q:  Do you have any children? A:  I do.  Q:  How many children do you have?  A:  Four").

The government also elicited evidence about the family of people who worked with or for Mr. Shkreli.

- Testimony of Timothy Pierotti, Shkreli Trial Tr. 4206:3-7 ("Q:  Are you married? A:  I am.  I've been married for  21 years.  Q:  Do you have any children?  A:  I have four children, ages 20 to 12 or about to be 20 to 12.");

- Testimony of Caroline Stewart, Shkreli Trial Tr. 2027:23-25 ("Q:  Do you have any children?  A:  Yes.  I have twin girls who are currently eight years old."); and

- Testimony of Jackson Su, Shkreli Trial Tr. 2108:2-5 ("Q:  Are you married?  A:  Yes. Q:  Do you have any children?  A:  Not yet.").

The fact that the government elicited evidence about the marital status and/or family of nearly all of its witnesses and yet attempts to preclude us from making any mention of the same thing speaks for itself.  Out of respect for the humanity of an accused on trial, we hope the government reconsiders this motion and withdraws it.

Finally, the government's reliance on *United States v. Miller* is ill-founded.  There, the "government move[d] to exclude evidence that the defendant's *motive* in acquiring the fraudulent passport . . . was to visit his family members."  641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009) (emphasis added); *see also United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988) (district court properly allowed accused to admit evidence of his service in the Marines and his completion of two years of college; and should have allowed testimony about his lack of criminal record).  The Third Circuit Court of Appeals in *Government of Virgin Islands v. Grant*, 775 F.2d 508 (3d Cir. 1985), explained: "During the course of a trial, it is customary for the

defendant to introduce evidence concerning his background, such as information about his education and employment.  Such evidence is routinely admitted without objection, and testimony that an accused has never been arrested is commonly admitted as part of this background evidence."  The Court should deny the government's request here to dehumanize Mr. Greebel and preclude us from doing things that are customary in trials across the country.

## VIII.   This Court Should Admit the Rosenfeld and Koestler Arbitrations

For the reasons stated in our motion, the Court should admit evidence about the Rosenfeld and Koestler arbitrations—both the Fifth Circuit and the Ninth Circuit vacated criminal convictions for excluding exactly the same type of evidence.  *See* Greebel MIL to Admit the Steven Rosenfeld Arbitration and the Thomas Koestler Arbitration, Dkt. No. 342. Notably, the government's motion to preclude the Rosenfeld and Koestler arbitrations—which strike directly at the heart of Count Seven on which the jury acquitted Mr. Shkreli—relies principally on two civil cases before Judge Victor Marrero, *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009) and *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 768 (S.D.N.Y. 2003), that are inapposite.  Moreover, the government relegates its discussion of the critically important and on-point decisions by the Fifth Circuit in *United States v. Fisher*, 106 F.3d 622, 633–34 (5th Cir. 1997*), abrogated on other grounds by Ohler v. United States*, 529 U.S. 753, 758–59 (2000), and the Second Circuit in *United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013), to three sentences in a footnote.  *See* Gov't MIL at 31 n.16. And the government conspicuously omits any mention of the Ninth Circuit's critical decision in *United States v. Boulware*, 384 F.3d 794 (9th Cir. 2004).  We respectfully submit that the government's position is dangerously asking this Court to preclude highly relevant arbitrations where the preclusion of similar evidence resulted in vacating criminal convictions by the Fifth Circuit and the Ninth Circuit.  The government's colleagues in those circuits made the wrong

32

judgment call to move to preclude such evidence, and we respectfully submit this government is making the same mistake.

## IX.   The Government's Motion to Require the Defense to Produce Mr. Greebel's Case-in-Chief Exhibits Is Moot

We have complied and will continue to comply with our discovery obligations under Federal Rule of Criminal Procedure 16(b) ("Rule 16"); we have produced and will continue to produce our trial exhibits for our case-in-chief; and we will follow the Court-ordered procedure reflected in the July 4, 2017 docket entry for potential cross-examination exhibits.  Accordingly, the government's motion is moot.

At the same time that the government moves for the production of the defense exhibits for its case-in-chief, the government has informed us that it will be continuing to produce discovery (as it did on August 11, 2017 from multiple third-parties); that it will continue to identify trial exhibits and produce them to us as the trial approaches; and that it does not view the Court's August 11 schedule for the production of trial exhibits as the final deadline for the parties to submit potential trial exhibits.  It is nearly impossible for the defense to identify all potential trial exhibits for its case-in-chief when the government has not produced all its discovery, identified all government trial exhibits, not produced the 3500 material yet, and not called a single witness at trial.[4]

We have provided the government with copies of thousands of potential defense trial exhibits, and we will continue to provide the government with copies of additional potential trial

---

[4]     During the trial of Mr. Shkreli, the government offered into evidence exhibits that never appeared on its trial exhibit list.  For example, during the re-direct examination of Stephen Aselage, the government offered into evidence GX 617 that was not on the government's exhibit list and, as we understand it, had never been produced to counsel for Mr. Shkreli or Mr. Greebel in discovery.  *See* Shkreli Trial Tr. 3561:4-8; 3564:9-10.  We received a copy of that document for the first time on or about August 11, 2017 when the government produced additional discovery from multiple third-parties.

exhibits for our case-in-chief as we identify them.  Our exhibits are extensive, because the

government's allegations are unclear and we remain uncertain as to which theory or theories the

government will pursue against our client.  Given the large volume of our potential trial exhibits,

in response to the government's request, we agreed to identify those documents within our

production that the government may not have produced in discovery.  Given the manner in which

the government produced its discovery, however, we let them know that we will not be certain

that documents we added to what was produced in the government's discovery are not duplicates

of what the government already produced.

On or about April 21, 2017, the government provided us with an initial witness list of *96*

*individuals*.  On or about August 11, 2017, the government provided us with a new witness list

of *87 individuals* and two additional categorical placeholders that seem to anticipate multiple

witnesses for each category.  Based on the government's list of over 90 witnesses, the defense

needs to be prepared to call witnesses to respond to each and every witness on the government's

witness list.  To the extent that the government reduces the number of individuals on its witness

list, we will endeavor to do the same with our witness list without compromising Mr. Greebel's

constitutional rights to defend himself.

The government appears to reargue an issue that it lost before Your Honor in connection

with the defendant's right not to disclose potential cross-examination exhibits of the government

witnesses in advance of such cross-examinations.  *See* Shkreli Trial Tr. 1466:3–1475:5; Shkreli

7/4/2017 Letter Submission, Dkt. No. 264.  In his letter, Mr. Shkreli's counsel explained the

matter extremely well:

> In closing, the defendant should not be required to preview his
> cross-examination of Government witnesses.  Such a requirement
> would violate his fundamental right to Due Process and would also
> be in violation of Fed. R. Crim. P. 16(b)(A)(i) and (ii), which

> provides that a criminal defendant must disclose only those
> materials it intends to use on the defendant's case in chief.
> Conversely, there is no requirement – statutory or otherwise – to
> compel a criminal defendant to provide discovery or advance
> notice of the materials he intends to use to cross-examine
> Government witnesses during the prosecution's case in chief.

Shkreli 7/4/2017 Letter Submission, Dkt. No. 264 at 2.

On or about July 5, 2017, Your Honor adopted a special procedure with respect to potential cross-examination exhibits: "***Should the defense wish to offer into evidence a lengthy series or set of documents, however, it shall provide the documents pre-marked with exhibit numbers to the court for in camera review, accompanied by a brief explanation of the bases for their admissibility, with sufficient time to enable the court to issue a prompt ruling and avoid lengthy sidebar.***" This Court should adopt the same procedure for our cross-examination exhibits.

The defense has an indisputable right to cross-examine the government's witnesses and, if necessary, challenge their credibility. The government has no right to know which exhibits we intend to use in advance to do so. It would violate Mr. Greebel's fundamental constitutional rights if we were required to preview our cross-examination exhibits for the government. And if we intend to cross-examine a witness about a document to test that person's credibility, we should be able to offer that document into evidence during the cross-examination if such document is admissible pursuant to the federal rules of evidence. If we were unable to do that, we would have to recall the witness during our case-in-chief, and that makes no sense.

While relying on cases outside the Second Circuit, the government conspicuously omits mention of Judge Swain's decision exactly on point in *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013). In *Bonventre*, Judge Swain held that the defense had to disclose exhibits in connection with its case-in-chief thirty days in advance of

35

trial, at the government's request, but that the defense ***did not have to disclose documents it***

***intended to use on cross-examination*** and that the obligation to disclose exhibits generally only

existed "upon the earlier of their determination to use particular exhibits and the close of the

[g]overnment's case." *Id.* at *10.  Judge Swain therefore held that (1) the defense had no

obligation to disclose their cross-examination exhibits in advance of the testimony of the witness,

and (2) the defense did not have to disclose the exhibits identified for potential cross-

examination until determining whether and when they would use any such exhibits—the timing

of which may not be until the close of the government's case-in-chief.  *Id.*

X.   **The Court Should Reject the Government's Motion to Handcuff the Defense's Right to Make Arguments to the Jury, and From Denying Mr. Greebel the Right to Select Counsel to Cross-Examine Witnesses**

The Court should reject the government's motion to handcuff the right of defense counsel

to make arguments to the jury including, but not limited to, mentioning that defense counsel

were former federal prosecutors.  The government appears to want to cloak themselves as public

servants to take some improper advantage of the fact that they are federal prosecutors by

precluding the defense counsel from mentioning that they used to be federal prosecutors.  In

essence, the government wants to muzzle us from speaking about personal experiences to

communicate with the jury, and we are aware of no case—and the government does not cite

any—where the government has ever moved to preclude a former federal prosecutor from

mentioning her/his background to a jury and no case where the court actually ordered the defense

counsel not to disclose to the jury that she/he was a former federal prosecutor.  The

government's request is wrong, dangerous, and offensive.

Further, the Court should reject the government's motion that would deny Mr. Greebel

his right to select the counsel of his choice to cross-examine Mr. Pierotti.  The government

concedes that it has no reason to believe Mr. Brodsky has confidential information relating to

Mr. Pierotti; and we represent to Your Honor as officers of the Court that Mr. Brodsky has no

such confidential information.  And there is no confidential information relating to Mr. Pierotti's

non-prosecution agreement with the government and Mr. Pierotti's conduct relating thereto in

connection with the Galleon-related cases—facts about which Mr. Pierotti testified at Mr.

Shkreli's trial and have been made known to defense counsel by the government.  Moreover, we

further represent as officers of the Court that Mr. Brodsky would never disclose to the jury that

he was involved in the Galleon-related cases if Mr. Greebel decides that Mr. Brodsky should do

the cross-examination and the Court permits it, even if he did possess confidential information

relating to Mr. Pierotti (which he does not).

   A.   **The Government Should Not Preclude the Defense Counsel From Referring to Prior Experience and Take Unfair Advantage of Their Prosecutorial Titles and Positions**

We believe the government's motion to preclude defense counsel from referring to their

prior experience is an issue of first impression, because never before to our knowledge has the

federal government ever attempted to preclude former federal prosecutors from making any

reference to their prior positions.  The government cites no case for the proposition that a defense

lawyer cannot mention his or her prior positions and/or refer to prior experiences as part of

argument to the jury in connection with evaluating and reviewing the evidence in the case.

Defense counsel often tell anecdotes and stories to crystalize issues, connect with the jury, and

argue significant points before the jury.  Here, the government asks the Court to handcuff the

defense counsel's ability to refer to their prior experiences, and specifically to the fact that the

defense counsel are former federal prosecutors.  That would be an unprecedented ruling.

   Following the government's logic, the government could argue that defense counsel

should be precluded from referring to the fact that they have been defense counsel for decades;

that they are married; that they have children; that they cannot tell anecdotes or stories to the jury

about their experiences in a manner aimed to persuade the jury about how to view certain evidence; and that any potential juror would have to be recused if they had read about or heard about a well-known former federal prosecutor serving as defense counsel in the case because then the jury would know that there was a former federal prosecutor serving as part of the defense team.  Moreover, what is particularly troubling here is that the federal prosecutors seemingly want to convey to the jury that they alone hold a special position as federal prosecutors that deserves some favor, special respect, or recognition that should not be afforded to defense counsel.  For all of these reasons, this Court should deny the government's motion.

**B.      Mr. Greebel Should Be Entitled to Select His Counsel of Choice to Cross-Examine Timothy Pierotti**

The government's motion to preclude Mr. Brodsky from cross-examining Mr. Pierotti would deny Mr. Greebel his right to select counsel of his choice.  Where there is no conflict of interest, where the government does not claim that Mr. Brodsky has any confidential information relating to Mr. Pierotti, and where we have represented as officers of the Court that Mr. Brodsky has no such confidential information, the government has no basis to prevent Mr. Greebel from selecting his counsel of choice to conduct the cross-examination.

*First*, Mr. Greebel has a right to counsel of his choice, including with respect to the cross-examination of witnesses.  As the Supreme Court held in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006), "[t]he Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)) (internal quotation marks omitted).  A key element of this Sixth Amendment right "is the right of a defendant who does not require appointed counsel to choose who will represent him."  *Id.* at 148, 152 (holding the right to counsel of one's choice exists "when the defendant is erroneously prevented from being

represented by the lawyer he wants, regardless of the quality of the representation he received"
and that the erroneous deprivation of this right was "not subject to harmless-error analysis"); *see
also United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (affirming district court holding that the
government infringed defendants' right to counsel of their choice after the "Thompson
Memorandum" issued by the Department of Justice obliged federal prosecutors to consider the
negative implications of the "advancing of legal fees by business entities," thereby leading
defendants' employer to cut off legal fees and expenses to any indicted individuals).

*Second*, the government does not allege, and we have no reason to believe, that
Mr. Brodsky has any confidential information relating to Mr. Pierotti.  Mr. Brodsky did not
represent Mr. Pierotti, and thus whatever information Mr. Pierotti provided to the government
when Mr. Brodsky served as a federal prosecutor in the United States Attorney's Office for the
Southern District of New York was in the presence of at least one or more FBI agents and at
least one or more other federal prosecutors.  None of the information that Mr. Pierotti conveyed
would have been confidential and/or protected by any privilege.

*Third*, the government's contention that "Mr. Brodsky could act as an unsworn witness
because he has 'first-hand knowledge of the events presented at trial'" is not true.  After the
government raised the question of whether Mr. Brodsky was going to cross-examine Mr. Pierotti,
we informed the government that, if Mr. Greebel decided that he wanted Mr. Brodsky to conduct
the cross-examination, Mr. Brodsky would not make any reference to first-hand knowledge of
those cases.  As a result, Mr. Brodsky will not under any circumstances act as an unsworn
witness.

*Fourth*, the government appears to be trying to protect Mr. Pierotti from a vigorous
cross-examination by a person's potential counsel of choice and attacks on Mr. Pierotti's

credibility.  Given that Mr. Pierotti appears to be the government's sole witness with respect to Count Eight, the government should not be blocking the accused's right to defend himself and select his counsel of choice to conduct cross-examinations.  While there are well-developed restrictions on prosecutors vouching for the credibility of witnesses, "[i]n criminal cases especially, defense counsel should be given great latitude in adducing proof which might bear on credibility."  *United States v. Wolfson*, 437 F.2d 862, 874–75 (2d Cir. 1970).  Indeed, the Second Circuit has endorsed the role of defense counsel to cross-examine witnesses vigorously and attacking their credibility during summation while simultaneously precluding prosecutors from vouching for the credibility of those same witnesses:

> It is not misconduct for a defense attorney to argue on the basis of inferences drawn from the evidence (or the witness's demeanor) that a witness for the government has lied.  When an accomplice in a criminal venture makes a cooperation agreement with the government and testifies against his prior criminal confederate, there is no impropriety in the defense attorney arguing to the jury that the cooperating witness has falsely accused the defendant in order to get a better deal for himself.  Such arguments are made in virtually every case in which an accomplice testifies for the government under a cooperation agreement.  They do not justify the prosecutor's telling the jury that the government's witnesses have never "falsely implicated anyone in a crime [or] lied under oath or perjured themselves."

*United States v. Spinelli*, 551 F.3d 159, 169 (2d Cir. 2008).

## XI.    The Court Should Deny the Government's Motion to Preclude Nine of Mr. Greebel's Ten Expert Witnesses From Testifying

The government's motion to preclude the defense from calling nine of ten expert witnesses is meritless.  Indeed, the government asks this Court to do what the Second Circuit ruled against very recently in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), and which required the Second Circuit to vacate Jesse Litvak's criminal convictions because the district court had excluded both of the defendant's expert witnesses.

### A.    Procedural Background Relating to Expert Disclosures, and Meet and Confers with the Government

On or about July 14, 2017, this Court issued an amended pretrial scheduling order—granting the government's request for a three-week postponement of the deadlines—requiring the parties to, among other things, identify expert witnesses by August 11, 2017.  Dkt. No. 266, at 1 (referring to Dkt. No. 147, at 2).  On or about August 11, 2017, we provided timely disclosures of our potential experts.  Dkt. No. 312-2.  By contrast, the government did not.  The government stated that Deborah Oremland would testify as a fact witness, or alternatively as an expert witness, regarding "an explanation" of certain rules, regulations and forms.  Dkt. No. 311, at 2.  Moreover, the government stated that it "may" call an expert witness "in the areas of professional responsibility and/or legal ethics for outside counsel representing companies and/or the Board of Directors."  *Id.*  On or about August 18, 2017, we moved to preclude the government from calling Ms. Oremland as an expert witness and from testifying about certain areas in accordance with this Court's ruling relating to her testimony during the trial of *United States v. Shkreli*.  *See* Mr. Greebel's Motion to Preclude Expert Testimony, Dkt. No. 340, at 10-12.  We also moved to preclude the government from calling an expert witness "in the areas of professional responsibility and/or legal ethics for outside counsel representing companies and/or the Board of Directors" because it failed to identify and notify the expert pursuant to the Court's deadline.  *Id*. at 12-15.

Between August 11 and August 18, we had a number of meet and confer discussions with the government relating to, among other things, expert witnesses.  We informed the government that we would be moving to preclude Ms. Oremland from testifying as an expert witness and in the areas that went beyond what the Court permitted in *United States v. Shkreli*.  We also informed the government that we would be moving to preclude the government from calling an

expert in legal ethics because the deadline had passed.  The government informed us in writing that they "would like to propose a schedule for dealing with final expert disclosures, objections and/or *Daubert* hearings" and proposed "final expert disclosures for both parties (with accompanying charts, documents, resumes, etc.)" by September 8, related motion practice by September 22, and *Daubert* hearings to follow.  *See* Exh. A (Gov't 8/14/2017 Email to GDC; GDC 8/15/2017 Letter Response to Gov't).  In response, we respectfully declined and explained our reasons in a letter to the government.  *See id*.  We explained that: (1) The government had failed to meet its expert disclosure deadline and that we would be moving to preclude Ms. Oremland's testimony as an expert in certain areas; (2) Our experts, should we call them, will be responding to the government's case-in-chief and, therefore, it would be highly prejudicial and premature for the defense to provide "final expert disclosures" in September before we had even received all of the government's discovery, trial exhibits, 3500 material, and before we even observed the government's case-in-chief; and (3) The government's proposal interfered with the defendant's right not to disclose all of our defenses prior to the government's case-in-chief.  *Id*.

Notably, we offered in our letter, and subsequently by telephone, to provide further disclosures relating to our expert witnesses, bearing in mind that we had not received all of the government's discovery, trial exhibits, 3500 material, and/or observed its case-in-chief.  And we asked the government to identify the expert witnesses for which they wanted additional disclosures and what further information they would like us to disclose relating to such experts. To date, the government has not asked us for additional disclosures relating to any expert witness.[5]

---

[5]      We respectfully submit that *Daubert* hearings will not be necessary for most, if not all, of the experts, should we decide to call any assuming there is a case-in-chief.  In *United States v.*

Instead of seeking additional disclosures and meeting and conferring further regarding our experts, however, the government decided to move to preclude all of our expert witnesses (with one exception) primarily on the grounds of the low-threshold of relevance under Rule 401. Interestingly, the one exception—Professor Stephen Gillers—is an expert in the area in which the government is apparently searching for an expert witness to call at trial.  *See* Gov't MIL at 41 n.20.

### B.    The Principles From *United States v. Litvak*

Notably, as in *United States v. Litvak*, the government does not challenge the qualifications of our expert witnesses given their extraordinary experience and accomplishments. Instead, the government argues that nine of the ten experts offer "irrelevant" testimony pursuant to Rule 401, and four of the nine experts offer testimony that will create confusion pursuant to Rule 403.  Based on *United States v. Litvak*, and the cases cited therein by the Second Circuit, the government is wrong.

*United States v. Litvak* is the Second Circuit's seminal decision on the admissibility of expert testimony at a criminal trial.  At the outset, the Court explained the evidentiary standard for relevance:

> "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."  "[U]nless an exception applies, all 'relevant evidence is admissible.'"

---

*Gil*, the Second Circuit held that the district court is not required to hold a separate hearing to admit expert testimony, "particularly . . . if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record."  680 F. App'x 11, 13–14 (2d Cir. 2017) (Internal citations omitted).

808 F.3d at 179-80 (internal citations omitted).  The definition of relevance is "very broad," *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir. 2014), and Rule 401 prescribes a "very low standard."  *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (citation omitted).

In *Litvak*, the Second Circuit vacated the criminal convictions because the district court excluded the proffered expert testimony of Ram Willner.  Mr. Willner was a professor with extensive practical experience as a former participant in RMBS securities transactions.  The Second Circuit held that "the District Court exceeded its allowable discretion in excluding Willner's testimony in respect of ***the process by which investment managers value RMBS*** and ***the likely impact*** on the final purchase price of a broker's statements made to a counterparty during the course of negotiating a RMBS transaction."  808 F.3d at 182.  "***The full context and circumstances in which RMBS are traded*** were undoubtedly relevant to the jury's determination of materiality." *Id*. at 183.  "Aside from Willner's testimony in respect of the nature of the RMBS market, there are a few ways in which Litvak could put forth evidence ***to rebut the alleged victims' testimony*** that Litvak's misstatements were important to them, or otherwise ***counter the government's argument*** that a reasonable investor would have found Litvak's statements material.  The District Court's 'relevance' concerns were unfounded." *Id*.  The Court further found that testimony that "minor price variances would not have mattered to sophisticated investors" also would have been relevant to the element of materiality.  *Id*. at 185.

In addition, the Second Circuit found that the district court improperly excluded the proffered expert testimony of Marc Menchel.  Mr. Menchel was an attorney who served in various legal and compliance positions for broker-dealers and securities-industry regulators.  *Id*. at 186.  The defense proffered that Mr. Menchel was going to testify about, among other things,

*the nature of the relationship between a broker-dealer and a counterparty* in terms of whether Mr. Litvak was acting as an agent versus a principal.  *Id.* at 186.  "While the issue of whether Litvak was acting as an agent or principal is not an element of any offense charged," the Court held that this testimony would have been "relevant."  *Id.*  Further, Mr. "Menchel was prepared to testify that, *contrary to the government's characterization* in summation that Jefferies's profits on the trades at issue were 'commissions,' Jefferies's role was that of a principal (not an agent or broker) earning a profit as any other buyer or seller."  *Id.* at 187.  Accordingly, "*[w]ithout the aid of Menchel's testimony, the jury might easily have misconstrued the nature of the transactions at issue*, believing (mistakenly, according to Menchel) that Jefferies's profits were commissions paid for Litvak's facilitation of the transactions, rather than ordinary profits earned in a standard buyer-seller context."  *Id.*  The proffered expert testimony of the nature of the transactions at issue was "relevant" to Mr. Litvak's materiality defense and "could have rebutted" testimony. *Id.* at 187–88.

Although the government has not challenged the qualifications and methodology of our expert witnesses, we respectfully draw the Court's attention to the Second Circuit's explanation about how "expert testimony does not [have to] rest on traditional scientific methods."  *Id.* at 180 n.25 (quoting authority omitted).  Indeed, the Second Circuit quoted the Supreme Court in *Kumho Tire v. Carmichael*, 526 U.S. 137, 148–49 (1999):  "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'"  "Thus, district courts must be mindful that 'the *Daubert* factors do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert.'"  *Litvak*, 808 F.3d at 180 n.25.  Mr. Willner's

testimony in Litvak, for example, was primarily based on first-hand experience as a trader in RMBS securities at issue in the case. *Id.* at 180. And the Second Circuit cited numerous decisions that reflect the expansive view of an expert's experience: *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015) (finding no abuse of discretion admitting expert testimony of coin valuation even though "it is possible that [the expert's] methods are not entirely replicable because they are based in part on his personal experiences as a coin dealer"); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (admitting securities industry expert's testimony "as to what ordinary broker activity entails and as to the customs and practices of the industry"); *SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert testimony that "certain trading patterns would raise 'red flags'" based on the expert's "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular, and as such, are supported by his 30 years of experience in the securities industry").

### C. The Testimony of the Proposed Experts Easily Meets the Rule 401 Threshold and Satisfies Rule 403

All of our proffered experts and their testimony will easily pass the low-threshold of Rule 401, and will not create confusion for the jury pursuant to Rule 403. Indeed, we may call these experts because it is the government's presentation of evidence about the transactions at issue that may create confusion for the jury, and our experts with their extensive practical and academic experience will clear up that confusion. All of our proffered experts, furthermore, will fall within the scope of what the Second Circuit held was relevant testimony in *United States v. Litvak*.

The government is interpreting Rule 401 too narrowly and contrary to law. While we address each of the government's expressed views regarding the proffered experts below, we

respectfully submit that the government's misinterpretation of Rule 401—and oversight of *United States v. Litvak*—becomes apparent by analyzing in detail its view of the proffered testimony of Professor Craig Lewis.  It is a microcosm of the government's faulty understanding of Rule 401 and the *Litvak* Court's decision.  While we direct the Court's attention to Professor Lewis's *curriculum vitae* which is fourteen pages, *see* Dkt. No. 312-2, at 49-62, we highlight Professor Lewis's extraordinary qualifications as the former SEC's Chief Economist and Director of the Division of Economic and Risk Analysis from 2011 through 2014, and current Professor of Finance at Vanderbilt University's Owen Graduate School of Management.

We provided the government on August 11 with the following information relating to Professor Lewis's anticipated testimony:  "If called as a witness, Professor Lewis will testify about his review and analysis of trading in Retrophin common stock between in or about November 2012 through in or about September 2014, including trading during this period by the individuals who purchased the so-called Fearnow shares in or around December 2012.  In sum and substance, Professor Lewis will testify that it is his opinion that such individuals were net sellers of Retrophin common stock; that their trading activity, in the aggregate, would be expected to put downward pressure on the price of Retrophin common stock; and that the trading behavior of those shareholders is inconsistent with an agreement between and among Mr. Shkreli, those shareholders, and/or anyone else, including Mr. Greebel, to control the price of or the volume of trading in Retrophin stock."  Dkt. No. 312-2, Ex. B at 4.

The government's argument that "[t]his testimony should be precluded because it is irrelevant," Gov't MIL at 47; belies common sense and Rule 401; is contrary to *United States v. Litvak*; contradicts the government's charge that the conspiracy was from "[i]n or about November 2012" to "September 2014"  (Superseding Ind. ¶ 58), and the government's own

47

evidence submitted in the trial of *United States v. Shkreli*; and is diametrically opposite to the government's own arguments seeking the admission of Mr. Shkreli's threats to Mr. Pierotti's wife and children.  In the Superseding Indictment, the government alleges that the conspiracy for Count Eight ran from November 2012 to September 2014.  However, the government has apparently altered its theory and now argues that what happened after December 2012 does not matter:  "[E]ven assuming that Prof. Lewis's analysis were correct, it is at best evidence that the conspiracy was unsuccessful.  But whether a conspiracy ultimately succeeded is not an element of the charge of conspiracy.  Put another way, whether the trading patterns of the co-conspirators had the effect of lowering the price of Retrophin stock does not make it more or less likely that the conspiracy existed."  Gov't MIL at 48.  It is remarkable that the government made this statement.

A critical element in dispute relating to Count Eight is whether there was ever an agreement between and among Mr. Shkreli, Mr. Greebel, and the other alleged co-conspirators (which the government alleges excludes Mr. Pierotti) to control the price and trading of Retrophin stock.  Evidence that the Fearnow recipients acted in trading Retrophin shares in a manner that was entirely inconsistent with having had an agreement to control the price and trading of Retrophin stock has a "tendency" to make a fact of consequence—whether there was an agreement in the first place—less probable than it would be without the evidence.  The government's attempt to assert that conduct following an alleged conspiracy would not be "relevant" to whether there was a conspiracy in the first place is nothing short of bizarre.  It is patently clear that what happens after an alleged illegal conspiracy hatches is directly relevant to whether there was any conspiracy at all.  Further, pursuant to *United States v. Litvak*, Professor Lewis's testimony relating to the trading of Retrophin shares by the Fearnow recipients would

48

fall well within what the Second Circuit deemed to be admissible relating to the excluded experts in that case. Professor Lewis's analysis will educate the jury about the highly-specialized field of securities trading, how the net aggregate effect of the trading by Fearnow share recipients put downward pressure on the stock, and how such trading was inconsistent with any agreement to control the price and trading of the stock. The full context and circumstances of trading by Fearnow share recipients, as the Court similarly found in *United States v. Litvak*, would be undoubtedly relevant to the jury's determination of whether there was ever an agreement to control the price and trading of Retrophin stock.

Moreover, the government overlooks that it moved into evidence the exact same type of evidence in the trial of *United States v. Shkreli* that it now calls "irrelevant." Specifically, the government moved into evidence the trading of "select" Fearnow recipients from December 2012 through September 2014. Government Exhibits 702 and 703 at the Shkreli trial were government charts of Retrophin trading activity from December 2012 through September 2014 including trading by the alleged Fearnow shareholders. Ms. Oremland testified about the trading activity reflected in Government Exhibits 702 and 703. *See* Shkreli Trial Tr. 4187:24-4192:9. The government also moved into evidence Government Exhibit 631 to 634 which were the records of the trading in Retrophin stock from December 2012 through September 2014. *See* Shkreli Trial Tr. 4151:5-20.

Finally, the government's argument that post-conspiracy activity is "irrelevant" contradicts the indictment, as paragraph 58 alleges that Count Eight's conspiracy is from November 2012 through 2014. Moreover, the government itself admitted testimony and exhibits at the trial of *United States v. Shkreli* relating to Mr. Shkreli's harassment of and threats to Mr. Pierotti in 2013, and the government's attempts to admit the same evidence against

Mr. Greebel.[6]  For example, the government argued in the Shkreli trial, and seeks to admit at this trial, that Mr. Shkreli's harassment of and threats to Mr. Pierotti in 2013 constitute "direct evidence" of the charged conspiracy in Count Eight.  *See* Gov't MIL at 3.  The government also argued in the Shkreli trial, and seeks to admit at this trial, that Mr. Pierotti was not a member of the conspiracy because "Fearnow Share Recipient TP refused to follow Shkreli's instructions not to trade those shares, proceeding to sell some of them on the open market."  Gov't MIL at 4.

The government's arguments to preclude the proffered testimony of the other expert witnesses suffers from the same flawed understanding of Rule 401 and lack of recognition of the lessons learned from *United States v. Litvak*.  In brief:

Joseph P. Dooley.  With respect to former Supervisory FBI Special Agent Joseph P. Dooley, the government argues that it is "irrelevant" that "in conducting such an investigation prior to determining whether to arrest an individual, if there is no flight risk or risk of destruction of evidence, the FBI will speak with the subjects of the investigation and will seek to subpoena the entities where the subjects worked during the relevant period of the investigation."  Dkt. No. 312-2 at 2.  However, there are critical facts in dispute regarding the government's evidence against Mr. Greebel, and the defense is allowed to attack the government's investigation at trial.  Depending on the government's case-in-chief, Mr. Dooley's expertise and opinion may form a critical part of our defense, and may assist in demonstrating that the government has failed to meet its burden of proof on each of the elements charged in Count Seven and Count Eight.  The government also argues that one cannot submit "summary charts" through an expert witness, but

---

[6]     If the government were correct that evidence following the alleged hatching of the conspiracy in Count Eight were inadmissible to demonstrate that the conspiracy did not exist, then any and all evidence relating to Count Eight following early December 2012 should be inadmissible.

the government fails to cite any legal support for that proposition, and we anticipate that Mr. Dooley's summary charts may require his extensive forensic expertise and CPA, CFF, and CFE certifications.

     <u>Stephen C. Ferruolo</u>.  With respect to Dean Stephen C. Ferruolo of the University of San Diego Law School, and former corporate partner at Heller Erhman and then Goodwin Procter, the government asserts that Dean Ferruolo's testimony "appears to be irrelevant."  Gov't MIL at 43.  However, the government overlooks that Dean Ferruolo's—like Mr. Willner's opinions in *United States v. Litvak*—opinions will directly contradict several of the government's anticipated theories about how Mr. Greebel allegedly knowingly, willfully, and intentionally agreed to help Mr. Shkreli (i) transfer Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin; (ii) enter into settlement agreements with allegedly defrauded MSMB investors to settle liabilities purportedly owed by the MSMB entities and Mr. Shkreli; and (iii) enter into allegedly sham consulting agreements with defrauded MSMB investors to settle lawsuits.

     As we proffered to the government, Dean Ferruolo will testify, in sum and substance that: it is common for outside corporate counsel to manage the capitalization table and issue stock for small private startup companies; that it is common for startup companies to have oral understandings including verbal stock transfer agreements, to date written agreements with the date when the oral understandings were made, to rely on consultants, to use stock as compensation, to frequently settle lawsuits and to use broad general releases; that it is not unusual for outside corporate counsel to interact primarily with the CEO of a small public company; that it is not unusual for outside counsel or a company to push back on outside auditors; and that board members have certain duties and responsibilities.  All of these opinions

provide significant evidence about industry practices necessary for the jury to evaluate several of the elements of the charged crimes.  In addition, Dean Ferruolo, having served as a member of the Executive Committee of Goodwin Procter, will testify as to the customs and practices of the business and management of major law firms.  The government's conclusory assertion that all of this testimony is "irrelevant" disregards Rule 401 and the *Litvak* decision.

      <u>Bryan Garner</u>.  With respect to Professor Bryan Garner, the Chief Editor of Black's Law Dictionary and extensive author of the use of grammar, usage, and punctuation, the government asserts that an expert's analysis of the meaning of legal terminology and communications in email exchanges between Mr. Greebel and Mr. Shkreli upon which the government heavily relies—without any witness—is irrelevant because interpreting such language "is not beyond the ken of the average juror."  Gov't MIL at 44 (quotation omitted).  However, the government overlooks that the use of legal language by corporate counsel is, in fact, beyond the knowledge of the average juror, and goes to the very heart of the government's proof that Mr. Greebel allegedly knowingly, willfully, and intentionally agreed to join Mr. Shkreli's charged conspiracy in Count Seven and Count Eight.  As we proffered, Professor Garner will testify about his "linguistic analysis", that it is his opinion that Mr. Shkreli's and Mr. Greebel's individual linguistic habits affect the meaning of communications between them, that the meaning of their communications is also impacted by reading them in the proper context, and that Mr. Greebel's written communications as a corporate attorney must be read from the context of outside counsel terminology.  Dkt. No. 312-2 at 3.  Indeed, the government contends—mistakenly—that the language in the email communications are all "non-technical," Gov't MIL at 44, when, in fact, legal terms were used.

Courts have permitted linguistic expert testimony in multiple contexts.  In *Chevron Corp. v. Donziger*, for instance, Dr. Robert Leonard analyzed the linguistic overlap between the challenged foreign judgment and the plaintiffs' unfiled work product.  *See* 974 F. Supp. 2d 362, 648-50 (S.D.N.Y. 2014).  The court found that Dr. Leonard's methodologies, consulting with computational experts and identifying matching or similar word strings whose presence was not explainable by chance, "were reliable and admissible."  *Id*.  The court "credit[ed his] testimony, and adopt[ed his] findings," *id.*, that there was a plagiaristic overlap.  *See also Theranos, Inc. v. Fuisz Pharma LLC*, 2014 WL 12695908, at *4 (N.D. Cal. Mar. 10, 2014) (permitting Dr. Leonard to "offer expert testimony on linguistic and semantic similarities of the disputed language subject to cross-examination"); *McConnell v. Lassen Cty., California*, No. CIV S-05-0909 FCDDAD, 2009 WL 3365912, at *1 (E.D. Cal. Oct. 16, 2009) (linguistic expert testimony as to the authorship of documents).  As to the government's argument that Professor Garner cannot opine about Mr. Greebel's state of mind, we will not elicit testimony from Professor Garner about what Mr. Greebel's state of mind was at the time.

Alan Johnson.  With respect to the proffered testimony of Alan Johnson—one of the foremost and leading experts about the use of consulting agreements by private and public corporations—the government once again argues that the proffered testimony relating to the use of consulting agreements is "irrelevant" but overlooks that Mr. Johnson's expert opinions on the custom and practices of the use of such agreements directly contradict anticipated government theories/arguments as to why the consulting agreements at issue were "shams."  We should be able to call an expert witness who will testify that the government's claims about how consulting agreements are used and ought to be used contradicts the reality of the industry practices for

startup companies, and thus goes directly to Mr. Greebel's intent, knowledge, and willfulness in entering into an illegal agreement with Mr. Shkreli regarding the use of consulting agreements.

Specifically, we proffered that Mr. Johnson will testify, in sum and substance, that it is his opinion that consulting agreements are frequently utilized by private and public companies in the context of a threat or concern about litigation; that one of the principal goals of such agreements is to obtain broad releases, non-disparagement obligations, and confidentiality provisions; that a common market practice is to use such agreements to obtain an option of potentially conferring with the consultant even if it never actually happens; that companies entering into consulting agreements often expect to obtain minimal to no work from their consultants; and that it is common practice for outside experts like him who negotiate these agreements to communicate with the CEO of the company who is on the Board—and not with the entire Board—about them.  Each of these opinions contradict the government's anticipated arguments and the implications that they want the jury to draw from the use of the consulting agreements in this case which they have labeled "shams"—contrary to widespread and accepted industry practice.

As in *United States v. Litvak*, these customs and practices are critical to educating the jury about a specialized area; contradict the government's characterization of the use of these agreements; and provide the context in which the jury should consider whether they were, in fact, "shams."  Moreover, we proffered that Mr. Johnson will offer testimony of a scientific analysis of the many consulting agreements published in SEC filings, and compare them with the ones at issue in this case.[7]  The government should not seek to conceal from the jury how

---

[7]     The government's admission that "[t]here is no dispute in this case that the consulting agreements prepared by the defendant in order to help Shkreli use Retrophin funds to repay

consulting agreements are used in the industry as such testimony is critical to evaluating Mr.

Greebel's intent and whether there was an illegal agreement in this case.

Gayle Klein.  With respect to the proffered testimony of Gayle Klein, a plaintiff's lawyer

with extensive experience filing lawsuits against parties to pierce the corporate veil, the

government argues incorrectly that her testimony would not be relevant under Rule 401 and

would confuse the jury under Rule 403.  We informed the government that, if called as a witness,

Ms. Klein would testify, in sum and substance, that following the announced decision by the

general partners of MSMB Capital Management LP and MSMB Healthcare LP to dissolve,

liquidate, and wind down the hedge funds, the general partners' refusal or inability to distribute

its investors' limited partners interests for cash and the unauthorized distribution of Retrophin

shares to those investors gave rise to colorable claims against Retrophin, its officers and directors

under various theories of New York and Delaware law, including but not limited to, tortious

interference, fraud-related, and breach of fiduciary duty-related claims.

The government disregards its own evidence in arguing that "the fact that investors in

MSMB Capital and MSMB Healthcare might, hypothetically, have had a claim against

Retrophin is irrelevant because there is no evidence that the defendant himself considered that

possibility (as opposed to the possibility that the investors might have had a claim against

MSMB Capital, MSMB Healthcare or Shkreli in his personal capacity) in preparing settlement

and consulting agreements at the behest of Shkreli."  Gov't MIL at 46-47.  The government

---

defrauded MSMB investors appear on their face to be legitimate consulting agreements," Gov't
MIL at 45, is significant.  We will ask the government for a stipulation to that effect and, should
they fail to agree, seek to admit the government's statement in evidence.

admitted evidence at the Shkreli trial to the contrary.[8]  Moreover, we proffer to the Court that we will establish evidence to the contrary.  The government's additional argument that the testimony would create "the risk of delay and juror confusion" is plainly wrong.  *Id.* at 47.  Ms. Klein's testimony will be short and simple.  Moreover, Ms. Klein does not need to testify about the various elements and laws from which one could file suit against Retrophin; if the Court prefers, she can testify generally about piercing the corporate veil, and how it would likely have been successful in a suit against Retrophin.  Indeed, the government itself made significant admissions during prior briefing and oral argument relating to commingling between MSMB entities and Retrophin, and submitted significant evidence at the trial of Mr. Shkreli proving this point.

Ronald Minkoff.  With respect to the proffered testimony of Ronald Minkoff, like the testimony of Marc Menchel in the case of *United States v. Litvak*, Mr. Minkoff's proffered testimony is both relevant under Rule 401 and admissible under Rule 403.  Mr. Minkoff will testify as to the customs and practices governing the preparation of settlement agreements in the context of actual or threatened litigation and will testify, in sum and substance, that it is typical and reasonable for a lawyer to prepare such agreements at his or her client's direction; to include

---

[8]   The government surprisingly ignores the sworn testimony of its own witnesses at Mr. Shkreli's trial that they threatened to sue Retrophin.  *See* Shkreli Trial Tr. 2007:23–2008:3 (Testimony of Lindsay Rosenwald:  "Q:  And at one point you said that you thought you engaged a lawyer, whether it be an external lawyer, an internal lawyer.  Some lawyer on your behalf was brought into the picture; correct?  A:  Correct."); 2377:18–2378 (Testimony of Richard Kocher:  "Q:  You said if I don't see an agreement from you by tomorrow, then the deal we have agreed to will be off and I will be forced to have you deal with my lawyer.  Do you see that?  A:  Yes.  Q:  Did you, in fact, use a lawyer  -  A:  Yes"); GX 107-29 (email exchange discussed during Mr. Kocher's testimony); GX 107-22 (Mr. Kocher's email states: "I have already been in touch with council [sic] that is versed in this kind of litigation.  You should be hearing from them soon."); GX 107-15 (Mr. Kocher's email states: "As this is a formal request, I have CC-ed your attorney, Evan Greebel, and my attorney Jim Burke."); GX 104-7 (Schuyler Marshall requests a litigation hold: "Evan, my position is that no privilege would apply to communications with attorneys representing MSMB and RTRX as those attorneys owe a duty to the entities and their owners, including limited partners and minority shareholders.").

broad releases in such agreements; and a lawyer who refuses to prepare such agreements with broad releases at a client's direction would potentially be exposed to malpractice liability.  The government's argument that this is "irrelevant" because the government is alleging that Mr. Greebel "agreed to help Shkreli to defraud Retrophin of funds, in part through the use of settlement agreements, in order to repay debts incurred by Shkreli personally," Gov't MIL at 48, has been rejected by the *Litvak* Court.

Although the district court precluded Mr. Menchel's testimony because in relevant part the government alleged that Mr. Litvak had deceived counterparties in RMBS transactions and thus the industry practice was not relevant, the Second Circuit vacated Mr. Litvak's conviction and held that Mr. Menchel's testimony about industry practices was important for the jury to understand the "nature of the transactions at issue," provided a view "contrary to the government's characterization" of such transactions, and provided "context" for the transactions. 808 F.3d at 187.  Similarly, although the government has alleged that Mr. Greebel and Mr. Shkreli arranged for settlement and consulting agreements "to repay the debts incurred by Shkreli personally"—putting aside that the latter statement is contrary to the actual Private Placement Memoranda of the MSMB subscription agreements and contradicts the government's admission to the contrary during its rebuttal at the Shkreli trial—Mr. Minkoff's proffered testimony is important for the jury to evaluate the settlement agreements, the broad releases within those agreements that the government highlighted during the Shkreli trial as unusual,[9] to

---

[9]     *See*, *e.g.*, Shkreli Trial Tr. 4480:12–13 (Government during oral argument on the admissibility of evidence through Special Agent Braconi's testimony:  "We are arguing that they weren't approved by the Board and that they also had the same release in them."); 5280:2–12 (Government Summation:  "And there's the release in the settlement agreement, which releases Retrophin, which is a fraud, because Retrophin doesn't owe Sara Hassan anything.  And it also releases the defendant and MSMB entities."); 1046:19–22 (government read the release language

counter what we anticipate to be the government's arguments against Mr. Greebel for preparing

such agreements at Mr. Shkreli's direction, and to understand the context of a lawyer's job when

responding to the CEO of a client in connection with the preparation of such agreements.  Once

again, it is the government who wants to conceal industry practices relating to corporate lawyers

from the jury, and that is simply unacceptable and contrary to the Second Circuit's decision in

*Litvak*.

       Finally, the government's argument that "potential exposure to malpractice liability could

mislead the jury into believing that the defendant cannot be found guilty of the charged crimes

because he was compelled to assist Shkreli out of fear of committing malpractice," Gov't MIL at

48–49, makes no sense.  The Court will instruct the jury on the elements of each charged offense,

and Mr. Minkoff will not be testifying that a lawyer must obey a client's direction knowing that

client is committing a crime.  That would be absurd.  Indeed, the government's argument is, once

again, contrary to *United States v. Litvak*; it would be analogous to seeking to preclude Mr.

Willner's and Mr. Menchel's proffered testimony about industry practices relating to RMBS

transactions on the ground that the jury might be led to believe that deceiving counterparties was

permissible.

       <u>Lori Smith</u>.  With respect to the proffered testimony of Professor Lori Smith, an expert in

financial accounting and reporting, and auditing in both public accounting and as a company

executive, the government argues incorrectly that her testimony would be "irrelevant" and "lead

to jury distraction."  Gov't MIL at 49.  We proffered that Ms. Smith will testify to the general

customs and practices of an independent auditor of a small public company; that in her opinion it

---

to Sarah Hassan); 1984:11–14 (government read the release language to Lindsay Rosenwald)
2381:1–7 (Mr. Kocher read the release language at the government's request); 3164:22–3165:11
(government read release language to Mr. Geller).

is not the responsibility of an independent auditor to assess a company's legal responsibility for a given loss or liability, including a settlement of actual or threatened litigation; that it is common for an independent auditor to identify information that warrants disclosure or expanded disclosure in a company's financial statements; that company management and/or its legal counsel often advocate for more limited public disclosures to guard against competitive disadvantage; and that the financial reporting of early-stage or small public companies often contain more errors or discrepancies than those of more mature or larger companies due to a lack of personnel, expertise, and/or internal controls over such financial reporting.  Dkt. No. 312-2 at 5.  In response, the government states in a conclusory manner without explanation that such testimony "would add nothing of relevance" and "could serve to distract the jury."  Gov't MIL at 49.  The government is wrong and the Second Circuit's decision in *United States v. Litvak* is to the contrary.  The government further argues Ms. Smith does not have the expertise to offer an opinion about the "financial reporting of early-stage or small public companies."  *Id*.  However, the government overlooks that Ms. Smith has over 25 years of experience in accounting; that a significant portion of her experience relates to financial reporting of early-early stage or small public companies; that she was a staff accountant and then a partner for many years at Deloitte & Touche LLP; that she has and continues to serve as an independent consultant for financial reporting; that she has extensive experience in both public accounting and as a company executive.  *See* Dkt. No. 312-2 at 81-82.

In sum, the government's motion to preclude nine out of ten of the defense's experts form offering their relevant, admissible expert opinions to the jury should be denied.

Dated:   New York, New York
          August 25, 2017

                              */s/ Reed Brodsky*
                              Reed Brodsky
                              Winston Y. Chan
                              Randy M. Mastro
                              Lisa H. Rubin

                              GIBSON, DUNN & CRUTCHER LLP
                              200 Park Avenue
                              New York, NY 10166
                              (212) 351-4000
                              rbrodsky@gibsondunn.com

                              *Counsel for Defendant Evan Greebel*