JMK:AES/DCP/DKK
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                        15 CR 637 (KAM)

EVAN GREEBEL,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S REPLY IN FURTHER SUPPORT OF ITS PRE-TRIAL MOTIONS AND OPPOSITION TO THE DEFENDANT'S "CROSS MOTION"

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ALIXANDRA E. SMITH
DAVID C. PITLUCK
DAVID K. KESSLER
Assistant U.S. Attorneys
     (Of Counsel)

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ......................................................................................................... 2

I.   The Defendant's "Cross-Motion" to Preclude Certain Evidence Is Both Untimely and Meritless ....................................................................................................... 2

II.  The Court Should Admit as Direct Evidence Shkreli's Harassment of a Fearnow Share Recipient .............................................................................................. 9

III. The Court Should Preclude the Defendant from Introducing His Co-Conspirator's Post-Arrest Statements and Statements to the SEC ................................................ 11

IV. The Government May Offer Certain of the Defendant's Post-Arrest Statements During Its Case-in-Chief and May Seek to Preclude the Defendant from Introducing Additional Such Statements ....................................................................................... 21

V.  The Court Should Preclude the Defendant from Testifying about His Review of Evidence in the Case Or His Conclusions Based Upon that Review ............................... 23

VI. The Court Should Preclude the Defendant from Introducing Evidence that His Co-Conspirator Lied to Others Or Arguing that Any Such Lies Show That Shkreli Lied to the Defendant ..................................................................................................... 25

VII. .The Court Should Preclude Evidence about the Circumstances of the Defendant's Arrest ..................................................................................................... 29

VIII.   The Court Should Preclude Evidence of Irrelevant Details about the Defendant's Background ............................................................................................... 33

IX. The Court Should Preclude Hearsay Evidence of Arbitrations Relating to the Sham Retrophin Consulting Agreements ....................................................................... 36

X.  The Defendant Should Produce the Documents He Intends to Admit During His Case-in-Chief ..................................................................................................... 40

XI. The Court Should Preclude Defense Counsel from Taking Two Limited Actions Related to Their Prior Roles as Assistant United States Attorneys ............................... 44

XII. The Court Should Preclude Certain Testimony Noticed by the Defendant As Expert Testimony ................................................................................................ 49

CONCLUSION ..................................................................................................... 61

i

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum is further support of its pre-trial motions filed on August 18, 2017 (see Dkt. No. 329 ("Pre-Trial Motions Br.")) and in opposition to the defendant Evan Greebel's responses to the government's motions and inexplicably untimely "cross-motion" to preclude various evidence (see Dkt. No. 347 ("Def's Opp.")).

Several themes emerge from the defendant's opposition briefs.  Most notably, after boldly taking certain positions during the severance litigation, the defendant now retreats from or reverses many of those positions.  For example, having previously provided a preview of the defendant's expected testimony, defense counsel now argues it is premature to litigate a motion to preclude exactly that promised testimony because it is not clear what the defendant's testimony would be.  The defendant also largely tries prevent the Court from providing any pre-trial legal guidance regarding the government's motions, declining to identify the specific bases for offering evidence, asserting that none of the expert opinions it has proffered are "final" and so cannot be challenged, and vaguely promising to offer only fully admissible evidence and not to ask improper questions.

This should not be how pre-trial litigation works.  The government's motions laid out legal challenges to targeted evidence and arguments the defendant might make.  The defendant has failed to address those arguments.  The Court should grant the government's motions.

ARGUMENT

I.    THE DEFENDANT'S "CROSS-MOTION" TO PRECLUDE CERTAIN EVIDENCE IS BOTH UNTIMELY AND MERITLESS

In addition to opposing the government's motions, the defendant has filed what he terms a "cross-motion," seeking to preclude "the bulk of [the] evidence related to MSMB Capital and MSMB Healthcare at this trial," including (a) evidence of the two schemes to the extent it may be offered as "background to the charged conspirac[ies]," and (b) evidence of statements by any of Martin Shkreli's co-conspirators for the MSMB Capital and MSMB Healthcare schemes on the ground that Shkreli "has now been acquitted of the conspiracy charges related" to those schemes.  (Def's Opp. at 1-5).  This motion is untimely.  It is also, in any event, meritless.

While the government intends to streamline its presentation of evidence related to the MSMB Capital and MSMB Healthcare schemes, such evidence is plainly relevant, and thus admissible, both as background to complete the story of the conspiracies charged in Counts Seven and Eight and as direct evidence of those conspiracies (including, but not limited to, evidence of the defendant's knowledge and intent).  Given the obvious relevance of such evidence, and that the defendant's "cross-motion" is inconsistent with the Court's decision to sever the defendant from Shkreli and has no basis whatsoever in law—as evidenced by the fact that the defendant cites not a single legal authority in support of his arguments—to the extent the Court reaches the motion's merits, it should be denied.[1]

---

[1] The defendant also seeks to preclude the government from asking witnesses about the defendant's concealment from the Retrophin Board of Directors and others of the Securities and Exchange Commission ("SEC") investigation and/or the U.S. Attorney's Office ("USAO") investigation of the MSMB entities, Retrophin and/or Shkreli.  (Def's Opp. at 5).  The defendant contends that these questions "assume facts not in evidence," but there will be ample evidence at trial of the defendant's knowledge of the existence and scope of the SEC and USAO investigations, and how those investigations impacted Retrophin—including, for example, billing records and emails that show that the defendant was the relationship partner for his firm's

First, the defendant's self-styled "cross-motion" is untimely. The defendant has been on notice since as early as March 3, 2017 (nearly six months ago) that, if the severance he sought was granted, the government intended to introduce evidence of the MSMB Capital and MSMB Healthcare hedge fund schemes at the separate trial of the defendant. (See, e.g., Gov't Opp. to Severance Motion, Dkt. No. 166, at 19-20 (arguing for a joint trial for the sake of efficiency because "while [the defendant] is not charged in the counts that relate to the MSMB Capital and MSMB Healthcare Hedge Fund schemes, those frauds are inextricably intertwined with the Retrophin Misappropriation and Unrestricted Shares schemes . . . neither [Count Seven nor Count Eight] can be explained without first detailing the MSMB schemes . . . Consequently, evidence of the two MSMB funds schemes is evidence against both [Shkreli and the defendant] in connection with the Retrophin schemes").) The defendant provides no cogent reason why he waited until responsive briefs were due to file a "cross-motion," rather than filing it on August 18, 2017, along with his other motions, including multiple other motions to preclude evidence introduced at the Shkreli trial (see, e.g., Dkt. No. 333 (preclude "specific lay opinion testimony elicited from Jackson Su, Stephen Aselage, Steven Richardson, Corey Massella, and Timothy Pierotti during the trial of United States v. Shkreli"); Dkt. No. 340 (preclude "certain testimony and documents" from the Shkreli trial)).

Second, in finding unavailing the defendant's argument that there was a risk of spillover prejudice at a joint trial of Shkreli and the defendant, the Court explained that the "four charged conspiracies are inextricably interrelated and evidence relating to the MSMB Capital and

---

representation of Shkreli, the MSMB entities and/or Retrophin in connection with both investigations; that the defendant billed Retrophin for the time he spent working to respond to both investigations on behalf of Shkreli and the MSMB entities; and that the defendant met with Shkreli and others to prepare him for his SEC testimony.

3

MSMB Healthcare conspiracies are likely to be admissible in a trial against Greebel." (Court's April 19, 2017 Order, at 18 (Dkt. No. 198)). The Court explicitly rejected the defendant's broad arguments from his severance motion suggesting that evidence of the MSMB Capital and MSMB Healthcare schemes would be inadmissible at his trial—for example, the defendant's assertion that "much of the information introduced in the joint trial will be so far afield from the facts of [the defendant's] case that it would be inadmissible in a single trial of" the defendant (Def's Mem. of Law in Support of His Mot. for Severance, Dkt. No. 163 ("Def.'s Severance Mot.") at 29-30)—in holding that "the [C]ourt is unpersuaded by Greebel's argument that he would suffer spillover prejudice in a joint trial," and denying the defendant's motion for a severance on that basis. (Court's April 19, 2017 Order, at 18). The defendant offers no reason why the Court should re-visit its prior rulings, which were manifestly correct.

Third, the defendant cites no legal authority whatsoever for his arguments, including that certain so-called "background evidence" should be precluded and that evidence of conduct committed by Shkreli is not relevant unless the government can show that the defendant was personally and contemporaneously "aware of" such conduct. This failure is unsurprising, because these broad contentions are contrary to the basic principles of law. The law is in accord with common sense: admissible evidence is not limited to "that which directly establishes an element of the crime." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Rather, evidence is admissible, as direct evidence, if it "arose out of the same transaction or series of transactions as the charged offense[s], if it is inextricably intertwined with the evidence regarding the charged offense[s], or if it is necessary to complete the story of the crime[s] on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000). Moreover, evidence of a co-conspirator's actions in furtherance of a conspiracy—even actions entirely unknown to others, and taken prior

to when a defendant joined the conspiracy—is relevant and admissible because co-conspirators are liable, as a matter of law, for "all unlawful acts of the conspiracy that are reasonably foreseeable, even without direct knowledge of them." United States v. Mittelstaedt, 31 F.3d 1208, 1219 (2d Cir. 1994). Indeed, contrary to the premise underlying the defendant's motion, a defendant "need not know the identities of all of the other conspirators, nor all of the details of the conspiracy, and a defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member." United States v. Santos, 541 F.3d 63, 73 (2d Cir. 2008) (internal quotation marks and citations omitted; alteration incorporated); see also United States v. Yakovlev, No, 09 Cr. 587 (ILG), 2011 WL 13130434, at *6 (E.D.N.Y. July 28, 2011) (by agreeing to join a conspiracy, the defendant "became liable as a conspirator for all the acts in furtherance of the conspiracy before he became one, even if he didn't know who the other conspirators were").

In short, evidence in a criminal case need not, and in a conspiracy case is not, limited to the specific acts undertaken by the defendant himself. Rather, proving a conspiracy necessarily requires the presentation of evidence that puts that charged scheme in context so that the jury can understand in full those facts critical to their determination of the defendant's guilt or innocence, including those facts that go to a defendant's and co-conspirators' motives, knowledge, intent, and/or relationship with each other. For example, in a case charging conspiracy to commit murder, if the government were limited solely to presenting evidence of the literal moment of the murder itself—just the murder weapon, the victim's body, and evidence from the murder scene at that time—it would be nearly impossible to prove a defendant who was not present at the scene of the crime guilty of conspiracy. Necessarily, the government must be and is permitted to introduce evidence relevant to show where the defendant, his co-conspirators

and the victim were before (and, in the case of the defendant and his co-conspirators, after) the murder took place; interactions and pre-existing relationships between the defendant, his co-conspirators, the victim and others; and the motivation for the agreement to murder.

So too here.  In this case, as detailed at length in the government's response to the defendant's and Shkreli's severance motions, and as correctly explained by the Court in its decision granting severance, there is no real question that evidence of the MSMB Capital and MSMB Healthcare schemes is inextricably intertwined with the evidence of the frauds charged in Count Seven and Count Eight, and thus is relevant and admissible to complete the story of those conspiracies.  In short, without the context of the MSMB Capital and MSMB Healthcare frauds, the stories of the conspiracies charged in Count Seven and Count Eight make little to no sense. For example, it is impossible to explain why the defendant and Shkreli conspired to misappropriate funds from Retrophin to repay defrauded MSMB Capital and MSMB Healthcare investors as charged in Count Seven without also explaining how there were no assets in either hedge fund (as a result of the loss of all funds in MSMB Capital and the use of MSMB Healthcare to funnel money to Retrophin) to repay such investors.  It is similarly impossible to explain the desperate need for the defendant, Shkreli and others to conspire to control the share price and trading volume of Retrophin stock in order to prevent it from collapsing without the context that such activity was happening at the exact same time that otherwise worthless Retrophin shares were being distributed to defrauded MSMB Capital and MSMB Healthcare as the alleged "redemption" of their investments in those funds.[2]

_____

[2] In his severance motion, the defendant not only agreed that the MSMB Capital and MSMB Healthcare schemes constituted frauds on the investors in those two funds, but contended that his own case in defense of the crimes charged in Counts Seven and Eight would include proving the existence of those frauds.  (See, e.g., Def's Severance Mot. at 22 (the defendant's

Finally, the defendant improperly asserts—again, without citing any legal authority of any kind—that Shkreli's acquittal on conspiracy counts related to the MSMB Capital and MSMB Healthcare schemes precludes the government from introducing certain evidence related to those schemes.  (Def's Opp. at 3-4).  As set forth at length in the government's response to the defendant's motion to dismiss Count Seven, the defendant's assertion fails as a matter of law.  The jury's verdict in the separate trial of Shkreli has no preclusive effect on evidence that may be presented at the defendant's trial.  (Govt's Opp. to Def.'s Mot. to Dismiss Count Seven, Dkt. No. 345, at 4-10).  The jury's verdict does not mean, as the defendant suggests, that, as a matter of fact, no one conspired to commit the MSMB Capital and MSMB Healthcare schemes or that Shkreli must be factually "innocent" of conspiracy with respect to those schemes.

For the same reason, the jury's verdict at Shkreli's trial is also not admissible in any form at the defendant's trial, and the defendant should be precluded from introducing at his trial any evidence or argument regarding the acquittal of Shkreli on certain charged counts.  It is settled law that such evidence or argument is inadmissible under Federal Rule of Evidence ("FRE") 802.  See, e.g., United States v. Mahaffy, 693 F.3d 113, 126 n. 9 (2d Cir. 2012) (The defendant "was acquitted at the first trial of making false statements to the SEC.  He argues that evidence of that acquittal should have been admitted at the retrial.  That argument fails.") (citing United States v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979)); Viserto, 596 F.2d at 538 ("[A] judgment of acquittal is hearsay."); United States v. Ashburn, No. 11 Cr. 303, 2015 WL 729818,

_____

"defenses will include arguments and concomitant proof that Mr. Shkreli committed fraud unbeknownst to [the defendant]—against investors").  Unless the defendant no longer seeks to advance such a defense or to affirmatively introduce any evidence related to the MSMB Capital and MSMB Healthcare schemes, it is unclear how the defendant can now claim such evidence is irrelevant and inadmissible.

at *3 n.4 (E.D.N.Y. Feb. 19, 2015) ("[E]vidence of [the defendant's] prior acquittal . . . is . . . inadmissible as hearsay evidence.  The Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, not judgments of acquittal.") (citing Federal Rule of Evidence 803(22)); United States v. Amato, No. 03 Cr. 1382 (NGG), 2006 WL 1495497, at *3 (E.D.N.Y. May 26, 2006) (state court acquittal on murder charges not relevant in federal racketeering prosecution in which same murder was charged as predicate act); United States v. Giovanelli, 747 F. Supp. 875, 887 (S.D.N.Y. 1989) ("[E]vidence of a judgment of acquittal [is] hearsay under the Federal Rules of Evidence[.]").

For all these reasons, the defendant's "cross-motion" should be denied in its entirety.

II.     THE COURT SHOULD ADMIT AS DIRECT EVIDENCE SHKRELI'S
        HARASSMENT OF A FEARNOW SHARE RECIPIENT

         The government moved to admit evidence related to Shkreli's harassment of

Timothy Pierotti, and the defendant moved to preclude such evidence.  As a result, the

defendant's arguments have thoroughly been addressed in the government's pre-trial motion and

in the government's opposition to the defendant's motion to preclude, Dkt. No. 346 ("Govt's

Opp.").  The government incorporates those arguments here by reference and offers only a few

additional responses to the defendant's opposition brief.

         First, the defendant contends that evidence of harassment is irrelevant because

"had no advance knowledge of" the harassment and "did not condone" it.  (Def's Opp. at 6).  As

discussed in the government's opposition briefing, the evidence is relevant even if the defendant

did not know about the harassment because, among other things, it is highly probative of the

conspirators' desire to deceive the market about who controlled the Fearnow Shares.  But, in any

event, the defendant received an email from Pierotti approximately one month after Shkreli sent a

letter threatening Pierotti's family, and that email contained excerpts from the threatening letter.

(Govt's Opp. at 57-61).  The defendant therefore knew of, and did not object to or criticize the

defendant's conduct.

         Second, the defendant argues this harassment evidence is inadmissible because

there is "no evidence" that the defendant "knew about, sanctioned, approved, intended to help,

and/or assisted" Shkreli.  (Def's Opp. at 7).  As discussed, the defendant learned of the conduct,

did not object, and continued to help Shkreli pursue Pierotti.

         Third, the defendant contends the evidence is inadmissible pursuant to FRE 403.

The government addressed this argument in its motion and opposition briefing.  (See, e.g., Govt's

Opp. at 61.)

Fourth, the defendant argues that Retrophin's lawsuit against Pierotti is "not evidence" that the defendant intended to help Shkreli control the Fearnow Shares because the lawsuit was "filed, signed, supervised, and were . . . handl[ed]" by "senior litigation partners" from Katten.  (Def's Opp. at 9).  The involvement of additional lawyers is irrelevant.  The defendant worked with other Katten lawyers on, for example, maintaining the Retrophin "cap table," and the defendant has never suggested nor could suggest that the involvement of another attorney renders the defendant's involvement irrelevant.  Moreover, Shkreli told the defendant to "bury" Pierotti (Govt's Opp. at 59), the defendant continued negotiating with Pierotti while the lawsuit was ongoing, and the defendant was involved in the litigation.  For example, the defendant billed Retrophin for 3.10 hours—approximately $1900—on March 26, 2013 for "Conversations w/ M. Shkreli, H. Cotton, M. Gordon, J. Kern, review letter and summons, review offer."  (R048519-20.)  That same day, Katten commenced the lawsuit against Pierotti by a summons signed by "H. Cotton" and "M. Gordon."  If the defendant nevertheless wishes to argue that he had no knowledge of or involvement in the Pierotti lawsuit, he should say so.

Finally, the defendant contends that evidence Shkreli hacked various electronic accounts related to Pierotti and his family is inadmissible because the defendant was unaware of that conduct and because proving the hacking would require a trial-within-a-trial.  Although the defendant was certainly aware of this conduct, described in detail in an affidavit Pierotti filed as part of the litigation against him that was initiated by Katten, the government does not intend to offer evidence of Shkreli's hacking of accounts related to Pierotti and his family unless the defendant somehow opens the door during its cross-examination of Pierotti.

III.    THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING HIS
        CO-CONSPIRATOR'S POST-ARREST STATEMENTS AND STATEMENTS TO THE
        SEC

        The government moved to preclude the defendant from offering any portion of

Shkreli's videotaped, post-arrest statement or of Shkreli's deposition testimony to the SEC.  (Pre-

Trial Motions Br. at 8-13.)  The defendant cross-moved to admit certain post-arrest statements

(the "Post-Arrest Statements") and excerpts from the depositions (the "SEC Statements").  The

defendant's opposition to the government's motion is flawed for a number of reasons, most

notably its failure, with one exception, to identify which hearsay exception he believes applies to

which Post-Arrest Statements or SEC Statements. But even if the government (and the Court)

should be required to guess which exceptions the defendant wants to apply to which statements, it

is clear the exceptions are inapplicable.  And the one specific statement to which the defendant

points over and over again—Shkreli's cryptic observation that "the Evan thing is just bizarre"—is

neither exculpatory nor admissible under any of the myriad theories advanced by the defendant.

        A.      Post-Arrest Statements

        The defendant contends that the various excerpts from Shkreli's videotaped post-

arrest interview with the FBI (the "Post-Arrest Statements") should be admitted "under a number

of rules."  The defendant has not attempted to explain which of the "number of rules" apply to

which Post-Arrest Statements, but none are applicable.

        First, certain Post-Arrest Statements are admissible pursuant to FRE 806 to attack

Shkreli's credibility.  (Def's Opp. at 11).  There are several flaws in that application.  As an initial

matter, the defendant has failed to explain how the statements he proposes to offer directly attack

Shkreli's credibility or are inconsistent with other Shkreli statements the government may offer.

As the Second Circuit has explained, "[s]pecific issues of whether a declarant's past conduct may

actually 'cast doubt on the credibility of [his] statements' . . .  must be determined by comparing

11

the circumstances of the past conduct with those surrounding the hearsay statements admitted into evidence . . . ."  United States v. Friedman, 854 F.2d 535, 570 (2d Cir. 1988).  The defendant has offered no such explanations.

The defendant also concedes he intends to offer Shkreli's "inconsistent" statements for a plainly improper purpose:  to argue that evidence Shkreli "had engaged in deception in the past simultaneously demonstrates that Mr. Greebel was duped and thus is not guilty."  (Def's Opp. at 11-12 (emphasis added)).  That does not follow as a matter of logic or common sense.  To the contrary, the propensity argument the defendant makes is explicitly prohibited by the rules of evidence.  See infra Section VI.  The defendant also argues that he must be "entitled to attack Mr. Shkreli's credibility" under the Sixth Amendment.  (Def's Opp. at 12).  Again, that general proposition is not in dispute, but the Sixth Amendment does not give a defendant a right to introduce any hearsay statements he wants, regardless of the rules of evidence.  If it did, then a defendant could always introduce any hearsay statements made by a government witness the defendant believes attack that witness's credibility.

Second, the Post-Arrest Statements are not admissible as "statements against interest" pursuant to FRE 804(b)(3).  The defendant does not actually explain how any of these statements were "against" Shkreli's interest.  He appears to suggest that any post-arrest statement a defendant makes that does not minimize his own culpability or "curry favor with the FBI" qualifies as a statement against interest.  (Def's Opp. at 13-14).  That is not the law.  A statement against interest must be one that a "reasonable person in the declarant's shoes would perceive . . . as detrimental to his or her own penal interest," not one that a party later can shoe-horn into a

12

theory of the defendant's guilt or innocence.  United States v. Gupta, 747 F.3d 111, 127 (2d Cir. 2014).[3]

The only specific Post-Arrest Statement the defendant identifies—Shkreli's statement about the charges related to Retrophin being "bizarre"—clearly fails the Gupta test. Consider the entire statement and its context:

> I mean I talked to [my defense attorney] and he said that there's nothing in there [the indictment] that's going to surprise me too much. You know, it's just from our perspective, I just don't think we, we think that this is an extremely weak case. We thought it was very unlikely that it would ever get filed. I mean 100 million times more likely that it would be won. So we're just scratching our heads like, are we missing something? And, uh, especially the Evan thing is just bizarre because that's where the Cooley and their lawyers and Steve and the Retrophin guys kind of really didn't like him, and they owe his firm money and stuff, and it really feels like there's this -- i mean it would be one thing if it were just strictly focused on MSMB, but you know the Evan dimension, and what I've heard about this thus far really makes me believe that--that's what kind of annoys me. Otherwise I would sort of understand your perspective, however extremely wrong it is, but this just feels like you guys got played by a company that we've been fighting. They owe me money. It's crazy. . . . [The SEC] told us that they were surprised how strong our case was, and then this. It just definitely feels a little counterintuitive and surprising. Being more of a public figure obviously than-- and a big job you guys have is deterrence. But losing this case is gonna be embarrassing. I'm going to throw a big parade and party when I win. You're invited.

---

[3] In Gupta, the case the defendant cites, the "statement against interest" consisted of, among other things, the following statement about a call the defendant in an insider trading case received from a Goldman Sachs board member: "I got a call at 3:58.... [s]aying something good might happen to Goldman.... [S]o, I told Ananth to buy some."  United States v. Gupta, 747 F.3d at 128.  That statement is not a confession to insider trading, but it is close to it.

(Ex. A at 6-7.)[4]  This statement is not one that would be perceived reasonably perceived as underline(against) the declarant's penal interest—it is instead an effort to deny guilt and to argue that the government's entire prosecution is misguided.  A person who believes he is inculpating himself generally would not say the government's view is "extremely wrong" or promise that "I'm going to throw a big parade and party when I win."  Nor does the statement tend to exculpate the defendant.  Read in the context above, the "Evan thing" is short-hand for criminal charges related to Shkreli's Retrophin-related conduct, rather than to his MSMB-related conduct.  The defendant also contends that the jury should decide whether a statement is "sufficiently exculpatory to Mr. Greebel or inculpatory to Mr. Shkreli."  (Def's Opp. at 14).  But it is the Court, not the jury, who serves as the gatekeeper for admissible evidence.  <u>United States v. Williams</u>, 506 F.3d 151, 155 (2d Cir. 2007) ("this determination must be made on a case-by-case basis").

To admit Post-Arrest Statements under FRE 804(b)(3), the defendant also must show "corroborating circumstances indicating 'both the declarant's trustworthiness and the truth of the statement.'"  <u>Gupta</u>, 747 F.3d at 127.  He has not done so.  Shkreli's conviction on Count Eight, for example, suggests that, even if "the Evan thing" were meant to exculpate the defendant, the statement is not to be trusted.  More generally, the defendant has repeatedly argued that Shkreli is a serial liar who has lied to, among other entities, the SEC and the government.  For example, in his severance motion, the defendant promised to argue that Shkreli <u>had</u> defrauded his

---

[4] Exhibit A to this reply memorandum is a full transcript of Shkreli's videotaped, post-arrest interview, and the government can also provide the Court with a copy of the recording itself at the Court's request.  To the extent the Court rules that the "Evan thing is just bizarre" statement is admissible, the government respectfully submits that the entire paragraph quoted above should be admitted pursuant to Federal Rule 106 in order to show the actual context of that statement, in which the "Evan thing" is a reference to charges related to Shkreli's Retrophin-related conduct rather than his MSMB-related conduct.

MSMB investors, something Shkreli <u>denies</u> in the full "the Evan thing" statement that the defendant labels reliable.  Having emphasized Shkreli's lying at every turn, the defendant should not also be heard to praise Shkreli's "trustworthiness."

Nor does the defendant identify what "corroborating circumstances" show, or could show, the truth of statements such as "the Evan thing is just bizarre."  That is not the kind of statement that could be corroborated by, for example, phone records or bank statements or other witness testimony.  <u>See, e.g.</u>, <u>Gupta</u>, 747 F.3d at 128 ("The corroborating evidence included proof that Rajaratnam did receive a call minutes before the close of trading on September 23; that the call was from Gupta . . .").  In sum, a declarant's statement does not become "against interest" simply because a defendant interprets the statement as being helpful to the defense.

<u>Third</u>, the "Evan thing is just bizarre" was not a statement of Shkreli's "then-existing state of mind."  (Def's Opp. at 14).   FRE 803(3) does not apply to "statement of . . . belief to prove the fact . . . believed."[5]  <u>See, e.g.</u>, <u>United States v. DiMaria</u>, 727 F.2d 265, 270 (2d Cir. 1984) (noting this "banning 'a statement of memory or belief to prove the fact remembered or believed'").  But that is exactly what the defendant offers: a statement of Shkreli's purported belief that the "Evan thing is just bizarre" to prove that the defendant's prosecution is in fact "bizarre" (meaning, presumably, improper).  There could be no other purpose because Shkreli's own "state of mind" after his arrest is irrelevant.  The charged crimes were over at that point.  <u>See, e.g.</u>, <u>United States v. Taubman</u>, 297 F.3d 161, 164 (2d Cir. 2002) (court did not abuse its discretion in excluding hearsay statement about a meeting to establish declarant's state of mind

---

[5] The notes to FRE 803(3) explain that this carve-out is "necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind."

during a meeting "because it was not made contemporaneously with that meeting").  What the defendant characterizes as Shkreli's "state of mind" is really just another version of Shkreli's "belief."

                    <u>Fourth</u>, the defendant contends that "certain" Post-Arrest Statements are "excited utterances."  (Def's Opp. at 16).  The only specific statement he identifies in this category is, again, the "Evan thing" statement.  But neither that statement nor any other Post-Arrest Statement qualifies as an excited utterance.  The "excited utterance" exception applies to a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  (Pre-Trial Motions Br. at 11 n.7).  "The Evan thing was just bizarre" is not a statement made while Shkreli was "under the stress of excitement" that the "Evan thing" caused.  The defendant responds that Shkreli was animated by "genuine shock that the government had implicated Mr. Greebel, a partner at a premier national law firm."  (Def's Opp. at 17).  It is beyond implausible that Shkreli was <u>not</u> shocked or excited by his own arrest, which led to being handcuffed in a Federal Bureau of Investigation ("FBI") office, but became shocked only upon considering the arrest of the defendant.  Nothing in Shkreli's words or his demeanor on the recording of his questioning evinces "shock" at the charging of a "partner at a premier national law firm," or at anything else related to the defendant.  Instead, the evidence shows that, far from shocked, Shkreli was thinking about himself and was eager to talk his way out of the situation. <u>See</u>, <u>e.g.</u>, <u>United States v. Obayagbona</u>, 627 F. Supp. 329, 338 (E.D.N.Y. 1985) ("excited utterance" exception applies only where the event leading to the utterance was "sufficiently startling to <u>render inoperative the normal reflective thought processes</u> of an observer").  For example, Shkreli's videotaped interview begins with Shkreli agreeing that he "wanted to talk about the case" and that "I have a lot to say," hardly evidence of Shkreli's shock.  And his

statement about the "Evan thing" comes long after, among other things, a casual discussion about stock prices.  (See Ex. A at 3-4).

Fifth, the Post-Arrest Statements are not admissible under the "residual exception" in FRE 807.  The defendant asserts that the "Evan thing" statement—the only specific Post-Arrest Statement he argues is admissible pursuant to FRE 807—is "clearly trustworthy" because "there is no incentive for someone under indictment to offer an explicit and unprovoked exculpation of one of his alleged co-conspirators."  (Def's Opp. at 18).  But even a cursory review of Shkreli's post-arrest statement reveals no "explicit and unprovoked exculpation" of anyone.  Taken out of context, the statement "the Evan thing is just bizarre" is nonsensical; taken in context, as discussed above, it is clearly a reference to the decision to charge Shkreli for crimes related to Retrophin in addition to crimes related to the MSMB funds.  In other words, Shkreli does not admit his guilt while exonerating the defendant; he denies everything and mentions the defendant in passing.  None of the cases cited by the defendant address situations remotely similar.

B.    SEC Statements

The defendant also contends that the various excerpts from Shkreli's SEC depositions that he has identified (the "SEC Statements") should all be admitted "under a number of rules."  The defendant has not attempted to explain which of the "number of rules" apply to which statements made by Shkreli to the SEC.  None do.

First, none of the SEC Statements plausibly constitute the kind of "inconsistent statement" that the defendant could use to attack Shkreli's credibility about other, relevant statements pursuant to FRE 806.  (See Def's Opp. at 19.)  And even if some of these statements purportedly "demonstrate that Mr. Greebel is innocent," they would not be admissible under FRE 806 because they would not be offered to impeach Shkreli's credibility—Shkreli never said the defendant was guilty.

Second, the defendant argues the SEC Statements are admissible as "statements against interest" pursuant to FRE 804(b)(3) but does not explain how the statements were against Shkreli's interest.  Nor does the defendant identify the "corroborating circumstances" related to each statement that "clearly indicate the trustworthiness of the statements."  (Def's Opp. at 19). The defendant also argues for purposes of this motion that Shkreli's statements are "sufficiently reliable" because he would not have lied to the SEC, yet in his severance briefing the defendant accused Shkreli of lying to SEC.  (See Severance Br. at 15-16.)  In short, the defendant has provided no basis for applying FRE 804(b)(1).

Third, the SEC Statements are not admissible pursuant to FRE 608 "to attack Shkreli's credibility" and "demonstrate that Mr. Shkreli had lied to and deceived Mr. Greebel by making contrary statements to Mr. Greebel."  FRE 608(b) allows the use of evidence of "specific instances of the witness's conduct" during cross-examination if "they are probative of the character for truthfulness."  See, e.g., United States v. Vasquez, 840 F. Supp. 2d 564, 574 (E.D.N.Y. 2011).  This rule does not apply for two reasons.  "Under the plain mandate of Rule 608(b), extrinsic evidence of a witness's prior conduct may not be admitted to attack his truthfulness."  E.g., United States v. Brown, No. 07 Cr. 874 (KAM), 2009 WL 497606, at *3 (E.D.N.Y. Feb. 26, 2009) (emphasis added).  But that is exactly the kind of evidence offered here. Second, as discussed above, the SEC Statements are not "probative of [Shkreli's] character for [un]truthfulness."  If anything, the defendant wants to offer the SEC Statements as true, making it difficult to see how they also could be offered to attack Shkreli's character for truthfulness.[6]

_____

[6] FRE 608(a) clearly does not apply because it relates to "testimony about the reputation for having a character for truthfulness."  It does not appear that the defendant intends to offer testimony to argue that Shkreli has a truthful character.

Fourth, the SEC Statements are not admissible as "former testimony" pursuant to

FRE 804(b)(1) because those statements are being offered "against a party," the government, that

did not have "an opportunity and similar motive to develop [the testimony] by direct, cross-, or

redirect examination." Id. The government did not attend Shkreli's SEC depositions, and did not

instruct or guide the SEC in those depositions. (See Pre-Trial Motions Br. at 11-12.) The

defendant suggests these facts do not matter because the government and the SEC were

conducting a "joint investigation.". (Def's Opp. at 21-22.) But there is no evidence that the

government's and the SEC's investigations were anything but parallel in nature.

Nor did the government have an "opportunity and similar motive" to develop the

testimony at issue in the deposition. The government was not even there. The SEC did not focus

its questioning on the kinds of challenging questions that would have been asked in a cross-

examination at trial as opposed to in the fact-gathering stage. As explained in United States v.

Whitman, a case cited by the defendant that considered whether statements at an SEC deposition

were admissible in a criminal prosecution pursuant to FRE 804(b)(1), even if "the SEC lawyers

and the trial prosecutors" conducting a deposition could have been "treated as the same party,"

they had "differing motivations to develop testimony by cross-examination." 555 F. App'x 98,

103 (2d Cir. 2014). In Whitman, as in this case, the SEC questioners offered only a few leading

questions and generally asked questions "many of which elicited long, descriptive answers . . . A

prosecutor seeking to rebut a trial defense would have pressed the witness, but the SEC examiner

rarely did." (Id.) That difference is enough to render the narrow exception in FRE 804(b)(1)

inapplicable.

The only case cited by the defendant that appears to support his overly broad

reading of FRE 804(b)(1), United States v. Hatfield, No. 06 Cr. 0550 (JS), 2010 WL 2545828, at

*2 (E.D.N.Y. June 21, 2010), is an unpublished decision that the defendant reads as holding that a witness's former testimony is always admissible against the government pursuant to FRE 804(b)(1) so long as the government interviewed the witness at some point after the testimony. Hatfield appears to be in direct conflict with the text of FRE 804(b)(1). The rule applies only to "[t]estimony that . . . was given as a witness <u>at a trial, hearing, or lawful deposition</u>" and "is now offered against a party who had . . . an opportunity and similar motive to develop <u>it</u> by direct, cross-, or redirect examination." FRE 804(b)(1) (emphasis added). The references to "develop it," meaning the testimony, and to "direct, cross-, or redirect examination" show that the "opportunity" must be an opportunity during the same testimony at a "trial, hearing, or lawful deposition." The rule does not refer to proffers, interviews, or other subsequent opportunities to question a witness. And with good reason. Proffers and interviews are not under oath. And the "motive" in a proffer is not "similar" to that in a cross-examination: The government may well not challenge a witness in a proffer for strategic reasons, just as the SEC may not challenge a witness in a deposition, such as developing evidence or locking a witness into a story. And the rule the defendant proposes would have the perverse effect of <u>requiring</u> the government to inquire about all subjects covered in a prior, even tangentially related SEC deposition at a subsequent proffer or risk having the witness's SEC testimony introduced against the government in a wholesale fashion. For all of these reasons, Hatfield does not help the defendant.

Fifth, the SEC Statements are not admissible pursuant to FRE 807. For the reasons stated above and in the government's opposition, this conclusory argument is meritless and should be rejected. A statement is not required to be admitted in "the interests of justice" simply because the defendant believes the statement is helpful to his defense.

IV.  THE GOVERNMENT MAY OFFER CERTAIN OF THE DEFENDANT'S POST-
ARREST STATEMENTS DURING ITS CASE-IN-CHIEF AND MAY SEEK TO
PRECLUDE THE DEFENDANT FROM INTRODUCING ADDITIONAL SUCH
STATEMENTS

As part of its pre-trial motion filing, the government advised the defendant and the

Court that it anticipated offering certain of the defendant's post-arrest statements during its case-

in-chief and would identify any such statements by September 6, 2017, six weeks before

trial.  (Pre-Trial Motions Br. at 13).  The government gave this notice so that the parties and the

Court would be aware of the government's intention and to give the defendant ample time to

address any concerns related to those statements. Neither the Pre-Trial Order nor any other order

obligated the government to disclose the statements on a particular date, and the timing of the

government's proposed disclosure gives the defendant more time than Shkreli had during his

trial.  In an effort to allow the parties and the Court best to plan for any efforts by the defendant to

object or supplement the post-arrest statements offered by the government, the government

explained that it "may move to preclude such additional portions" as hearsay and suggested that,

if the defendant "wish[ed]" to offer additional statements pursuant to FRE 106, that motion could

be briefed on the same schedule as the schedule for Daubert hearings.  (Pre-Trial Motions Br. at

14).

In response to this effort at transparency, the defendant accuses the government of

violating the Pre-Trial Order.  (Def's Opp. at 23).  There is no basis for such an objection.  The

government was not even required to move in limine to admit the defendant's statements or

provide pre-trial notice of what statements it would seek to admit, so there is nothing to

violate.  The defendant also urges the Court to reject "the government's premature and unfair

argument that any additional statements that we may offer into evidence" pursuant to FRE 106

"should be denied."  (Def's Opp. at 23).  The government made no such argument.  The

government merely proposed a schedule for addressing any FRE 106 motion and said it <u>might</u> move to preclude additional statements purportedly offered under hearsay exceptions.  This is neither unfair nor worthy of "skepticism."  It is simply an effort to manage a schedule and expectations.

V.      THE COURT SHOULD PRECLUDE THE DEFENDANT FROM TESTIFYING
        ABOUT HIS REVIEW OF EVIDENCE IN THE CASE OR HIS CONCLUSIONS
        BASED UPON THAT REVIEW

       In litigating his severance motion, defense counsel represented to the Court that:

> [I]f Mr. Greebel takes the witness stand to testify, I anticipate
> asking Mr. Greebel the following questions, and I would anticipate
> that Mr. Greebel would give the following answers:
>
> If asked whether during the period from 2011 through 2014, Mr.
> Greebel has come to learn that Mr. Shkreli lied to him, I anticipate
> that Mr. Greebel would answer yes.
>
> If asked whether during the period from 2011 through 2014, how
> Mr. Greebel has come to learn that Mr. Shkreli lied to him, I
> anticipate that Mr. Greebel would answer that he discovered these
> lies from his review of documents produced in discovery in this
> case. . . .

(Decl. of Reed Brodsky in Support of Def's Mot. Severance, Dkt. No. 159 ¶¶ (a), (b)).  As a result

of these representations, and to receive appropriate legal guidance from the Court in advance of

trial, the government moved to preclude the defendant from testifying about his conclusion that

Shkreli "lied" to him or about other conclusions he reached through his review of discovery in the

case.

       The defense now objects to the government's motion on the grounds that it is

"premature."  (Def's Opp. at 24).  Specifically, despite having provided a preview of the

defendant's testimony in an affidavit to this Court, the defense now insists that "we do not intend

to provide a preview of our questions or of Mr. Greebel's anticipated responses."  (Id.)  There is

nothing premature about the government's request, which is addressed directly to the testimony

that defense counsel told this Court would occur if the defendant chooses to testify.  The

23

defendant's opposition brief does not provide any other basis for denying the government's motion at this time.[7]

        The defendant also states that "we informed the Court that Mr. Greebel cannot of course testify about someone else's state of mind." (Def's Opp. at 24). We agree. There is no basis, therefore, to object to an order that precludes the defendant from testifying that Shkreli "lied," which is plainly testimony about Shkreli's intent and, therefore, his state of mind.

---

[7] If the defendant identifies changed circumstances later in the case that warrant revisiting its prior representation to the Court or this Court's decision on the instant motion, then the parties can address that argument when it arises.

VI.  **THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING EVIDENCE THAT HIS CO-CONSPIRATOR LIED TO OTHERS OR ARGUING THAT ANY SUCH LIES SHOW THAT SHKRELI LIED TO THE DEFENDANT**

In his severance briefing, the defendant promised to offer "admissible evidence" of "numerous examples" of Shkreli's lying to others and of Shkreli's "long-term pattern and practice" of blaming others for his conduct.  (Pre-Trial Motions Br. at 19).  The government moved to preclude this evidence and argument as supporting the improper propensity argument that Shkreli must have lied to the defendant because he lied to others.  The defendant does not deny he intends to make such an improper argument or contend that the argument would be proper under FRE 404(b)(1).  Moreover, although he promised "numerous example" of such evidence, he now refuses to identify any because "such evidence will often respond to the government's case-in-chief, which we have not seen or heard yet."  In other words, the defendant previously claimed to have identified "numerous examples" of evidence and now claims he cannot (or will not) do so.  For the reasons in the government's initial brief and set forth below, the defendant should be precluded from arguing that Shkreli's lies to others means he lied to the defendant, and from offering otherwise irrelevant evidence to support that argument or establish a "long-term pattern and practice" of blaming others.

First, the defendant describes the government's motion as "shocking" and "inconsistent" with its approach to the Shkreli trial.  (Def's Opp. at 25).  But there is nothing shocking or inconsistent here.  In the Shkreli trial, the government admitted evidence of Shkreli's lies because it bore the burden of proving that Shkreli lied to investors, as alleged in Counts One through Six of the Superseding Indictment.  Of course proof of lies was relevant there.  But the government never argued that Shkreli's lies to investors prove that he lied to anyone else, as the defendant now seeks to do.  Some of the evidence the defendant seeks to admit may be relevant in this trial too, but not for the purposes for which the defense intends to use it.  Indeed, despite the

scorched-earth tactics of the severance briefing, in which the defendant again and again assailed Shkreli as a liar, the defendant has <u>still</u> not identified a single purportedly false statement that Shkreli purportedly made to him related to the conduct charged in Count Seven or Count Eight.[8]

   <u>Second</u>, although the defendant argues that evidence of Shkreli's lies "is <u>potentially</u> admissible" under various theories, he neither commits to nor explains any such theory.  (Def's Opp. at 25 (emphasis added)).  The defendant suggests that certain evidence "may be" admissible pursuant to FRE 406 as evidence of habit or practice.  Evidence that Shkreli has told lies or has a "pattern and practice" of lying is not admissible under FRE 406.  For that rule to apply, the <u>defendant</u> would have to establish evidence of "semi-automatic" conduct, meaning a "person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time."  <u>United States v. Al Kassar</u>, 660 F.3d 108, 123 (2d Cir. 2011); <u>see</u> <u>Zubulake v. UBS Warburg LLC.</u>, 382 F. Supp. 2d 536, 542 (S.D.N.Y. 2005) (party offering FRE 406 evidence bears burden).[9]  Nothing in the defendant's severance briefing, pre-trial briefing, or otherwise comes close to establishing that

---

[8] The three specific "lies" the defendant identified in his severance briefing do not address the core issues for Counts Seven or Eight.  For example, Shkreli has not pointed to a lie about whether individuals receiving settlement agreements were actually MSMB investors, or about who controlled the Fearnow Shares the defendant was distributing.

[9] As one court has thoughtfully explained, "Habit is conduct that is situation-specific, *i.e.,* specific, particularized conduct capable of almost identical repetition," whereas "character" is a "generalized description of a person's disposition or a general trait such as honesty, violence or peacefulness."  <u>Zubulake</u>, 382 F. Supp. 2d at 542.  To qualify Shkreli's lies as admissible "habit" evidence rather than as inadmissible "character" evidence, the <u>defendant</u> would have the burden of "establish[ing] the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature."  <u>Id.</u>

Shkreli's alleged lies or "pattern and practice" of lying constitutes the kind of "semi-automatic" conduct contemplated by the rule.

The defendant also argues that evidence of lies "may be" admissible pursuant to FRE 806 to attack Shkreli's credibility. But the defendant has not identified any Shkreli statements he intends to attack. To the contrary, the defendant urges this Court to admit certain Shkreli statements <u>because they are truthful</u>. (Def's Opp. at 14 (arguing that "circumstances clearly indicate the trustworthiness of Mr. Shkreli's statements"). The defendant does not even acknowledge the inconsistency; he should not be allowed to offer some statements because he has determined they are true and to offer other statements by the same person to prove he is a serial liar. Moreover, it is not the case that a party may offer evidence under FRE 806 of an unrelated lie in order to impeach a declarant's statement. FRE 806 evidence is admissible only to "show[] that the declarant made inconsistent statements." <u>United States v. Trzaska</u>, 111 F.3d 1019, 1024 (2d Cir. 1997) (declining to admit statement pursuant to FRE 806 because the proffered statements "are not inconsistent"). The government does not disagree that certain evidence of Shkreli's lies "may" be admissible to attack the credibility of statements Shkreli made. Should the defendant identify a statement he wishes to attack during the trial and identifies an allegedly "inconsistent" statement, the parties can then litigate the admissibility of that evidence. In the absence of any such evidence, the defendant should be precluded from offering evidence of "lies."

<u>Third</u>, the defendant's refusal to identify any of the evidence of "lies" he promised this Court he would admit is puzzling. The purpose of pre-trial motions is to resolve or receive guidance about legal issues before the trial to avoid wasting the jury's, the Court's, and the parties' time during trial. The defendant's protestation that he does not know any of the evidence he will offer is inconsistent with both his guarantee that whatever he offers will be admissible and

27

also his prior representations to the Court that such evidence had been identified.[10]  As a result, this Court should preclude the defendant from making the prohibited propensity argument in his opening statement and from offering otherwise irrelevant evidence of "lies" or a "pattern and practice" (including through questions on cross-examination) unless and until the defendant identifies specific evidence to which the government can object and that the Court can evaluate.

---

[10] The defendant also argues that he is not <u>required</u> by FRE 404(b) to disclose in advance the "bad acts" he intends to offer.  Even if the text of Rule 404(b) does not contain such a requirement, the more general point that pre-trial motions should be used to resolve evidentiary issues and receive legal guidance stands.  If the defendant does not want to identify the evidence he intends to use in pursuit of his plainly improper propensity argument, he should be precluded from offering the evidence or making the argument until the Court and the parties can evaluate the defendant's actual position.

## VII.   THE COURT SHOULD PRECLUDE EVIDENCE ABOUT THE CIRCUMSTANCES OF THE DEFENDANT'S ARREST

The government moved in limine to preclude the defendant from offering evidence or making certain arguments about the defendant's arrest on December 17, 2015, based on specific representations the defendant made in prior filings.  (Pre-Trial Motions Br. at 24-26).  In response, the defendant states that he will "not question the government's motive for prosecuting the case or argue that there was selective prosecution," but contends that there is no basis for precluding any attack by the defendant on certain so-called "techniques" used in the government's investigation because the defendant is entitled to ask to the jury to conclude that "the government failed to meet its burden of proof."  (Def's Opp. at 27-29).  This contention is baseless.  Contrary to the defendant's suggestion, the government did not (and does not) ask this Court to preclude the defendant from making standard arguments about the evidence or lack thereof presented to the jury or whether the government has met its burden of proof.[11]  The government seeks only an order precluding the defendant from introducing certain facts and making certain arguments that have nothing to do with the evidence, have no bearing on what the jury will have to decide, and would serve no purpose other than to seek to engender sympathy or to confuse the jury into thinking—incorrectly—that the government acted improperly, including:  (1) that the defendant was arrested at his home, (2) the defendant's feelings or reactions to being arrested, and (3) that

---

[11] For example, in support of his response, the defendant notes that the government did not object during Shkreli's counsel's summation when counsel argued that "numerous witnesses were not called at trial."  (Def's Opp. at 29).  Counsel's argument had nothing to do with the government's investigation of the case itself, but was rather an argument that the government had not met its burden of proof at trial.  Moreover, the government not only addressed this issue in its rebuttal—"[Shkreli's counsel] harped on who did not testify instead of truly dealing fairly with the witnesses who did. The Judge will also instruct you … [that] both the Government and the defense have the same right to subpoena witnesses to testify on their behalf"—but it also requested and received a "witnesses equally available" instruction.  (Tr. 5538-39).

the government did not interview the defendant prior arresting him, but rather sought to do so after.  (Pre-Trial Motions Br. at 24-26).

In opposing the government's motion, the defendant suggests that it is so broad that granting it would violate the United States Constitution.  (Def's Opp. at 27).  The Court should reject this hyperbolic suggestion.  The Constitution does not require a court to permit a defendant to introduce whatever evidence he wants in whatever form he wants for whatever purpose he wants—regardless of whether it is connected to what the jury will have to decide.  See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence").

As the defendant states, he is permitted to argue that the government could and/or should have used certain investigative techniques to try to show that the government has not met its burden of proof.  For example, in United States v. Zapata, 164 F.3d 620, 1998 WL 681311, at *6 (2d Cir. Jan. 30, 1998), the court allowed the defendant to argue that the government should have conducted handwriting and fingerprint analyses of items seized as evidence.  But the defendant omits that the Second Circuit also explained in Zapata that the government "is under no legal obligation to use any particular investigative technique in preparing its case" and affirmed the court's giving of a "no duty to use particular investigative techniques" instruction.  Id. at *6 (citing United States v. Cheung Kin Ping, 555 F.2d 1069, 1073-74 (2d Cir. 1977)); see also United States v. Saldarriaga, 204 F.3d 50, 52-53 (2d Cir. 2000) (per curiam) ("The Court properly charged the jury to base its decision on the evidence or lack of evidence that had been presented at trial, and to focus solely on whether, in light of that evidence or lack of evidence, the jury was convinced beyond a reasonable doubt that the defendant was guilty of the crimes with

30

which he was charged.  The jury correctly was instructed that the government has no duty to

employ in the course of a single investigation all of the many weapons at its disposal, and that the

failure to utilize some particular technique or techniques does not tend to show that a defendant is

not guilty of the crime with which he has been charged.").[12]

The government is unaware of any authority—and the defendant cites none—

suggesting that a defendant may, under the guise of attacking the government's evidence, elicit

testimony or make arguments about matters that have no bearing on the evidence, such as who

was present at the time of the defendant's arrest, the location of that arrest, the defendant's

feelings about that arrest (which would also be inadmissible hearsay if introduced in the form of a

witness for the defendant testifying to what he said), whether the defendant was aware he might

be arrested, and whether the defendant was interviewed before or after the arrest.  These

purported facts are irrelevant, and should be precluded on that basis alone.

In any event, even if somehow minimally relevant (and they are not), such

evidence and argument should be precluded under Rule 403, as unfairly prejudicial, confusing,

and distracting.  See, e.g., United States v. Reevey, 364 F.3d 151, 157-58 (4th Cir. 2004)

(affirming preclusion of circumstances of defendant's arrest as confusing and misleading because

the defendant "was not charged with any offense arising out of the circumstances surrounding his

arrest").  The only conceivable inference that defendant would have the jury draw from the facts

that he seeks to admit is that government acted improperly, by, for example, arresting the

defendant at home or seeking to interview him after arrest rather than before (notwithstanding that

both of these procedures are routine).  But the government is not on trial.  And the only

_____

[12] The government sought and received such a charge at the Shkreli trial (Tr. 5538), and
has similarly sought such a charge for this trial.  (See Dkt. No. 311, Exhibit B).

31

conceivable purpose—again, regardless of whether the defendant expressly makes the argument—from certain other facts that he seeks to admit is that the jury should feel bad for the defendant, because the defendant felt bad when he was arrested (as virtually all people would).  Moreover, to counter these improper inferences and sympathies, the government would have no choice but to introduce evidence concerning arrest procedures and factors that determine whether to approach someone prior to arrest. The government expects that the defendant might then respond with his view of the same procedures and factors.[13]  The inevitable result would be a mini-trial on matters having no bearing on the defendant's guilt.  There is no need for the trial of the defendant to devolve into a contentious, complicated, and lengthy mini-trial about arrest procedures and investigative considerations that involve far more than this particular case.

---

[13] Indeed, the defendant has proffered a purported expert who will opine that "in conducting [a criminal] investigation prior to determining whether to arrest an individual, if there is no flight risk or risk of destruction of evidence, the FBI will speak with the subjects of the investigation and will seek to subpoena the entities where the subjects worked during the relevant period of the investigation."  (Def's Opp. at 50-51; see Section XII).

VIII.   THE COURT SHOULD PRECLUDE EVIDENCE OF IRRELEVANT DETAILS
ABOUT THE DEFENDANT'S BACKGROUND

The government moved in limine to prevent the defendant from introducing irrelevant details about the defendant's background, such as the number and age of his children; his status as a "family man"; and the fact that he comes from a "long line of attorneys."  (Pre-Trial Motions Br. at 26-27).  In response, the defendant does not provide a permissible legal basis for eliciting such information, but seeks to conflate the entirely permissible practice of eliciting background information of a testifying witness with the improper practice of seeking to introduce background information about a non-testifying defendant that has no bearing on the defendant's guilt or innocence.  (Def's Opp. at 29-32).  Such response is without merit, and the government's motion should be granted.

The majority of the defendant's response focuses on the observation that the government elicited background information about testifying witnesses during the Shkreli trial.  (Def's Opp. at 29-31).  However, it is both common and proper for a party who calls a testifying witness to elicit brief background information from the witness before moving on to substantive questions.[14]  It is also both common and proper for a party who calls a testifying witness to elicit brief background information from the witness before moving to substance questions.  What is not at all common, and plainly improper, is for a defendant who elects not to testify nevertheless

_____

[14] In many cases, moreover, the "background" information provided by those testifying witnesses was directly relevant to the case.  For example, Stephen Aselage's daughter was hired by Shkreli to work at Retrophin; Fred Hassan's daughter, Sarah, was an investor in MSMB Capital who received a settlement agreement; the wives of Richard Kocher, Darren Blanton and John Neill were co-investors whose name appeared on relevant documents; Jackson Su met his wife, who worked at Citrin Cooperman, during the period that he worked at Retrophin and while Citrin Cooperman was serving as Retrophin's outside accountants; and Pierotti's wife and four children were directly threatened by Shkreli in connection with the conspiracy charged in Count Eight.

to put before the jury personal facts that have no conceivable relevance to what the jury will have to decide, in the apparent hope that by doing so, the jury will be less likely to convict, regardless of the strength of the evidence.  See, e.g., United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Battaglia, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged").  There is one proper way, and only one proper way, for a defendant, who elects not to testify, to present evidence of personal factors for a jury's consideration: character witnesses.  But for good reason, the Federal Rules of Evidence tightly constrain the nature and scope of such evidence.  See, e.g., United States v. Benedetto, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (defense-proffered character evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); United States v. Rivera, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving).

The defendant should not be permitted to avoid these limitations in the guise of seeking to "humanize" himself.  (Def's Opp. at 29).  He has provided no factual reason, or legal basis, for eliciting such information.  The defendant does not engage with the caselaw in the government's brief that eliciting such information is improper, other than by seeking to distinguish United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).  The defendant is correct that in Miller, the district court precluded the defendant from introducing information about his family in order to further a particular motive that would tend to engender bias and/or sympathy.  Id.  In other words, even where the defendant had articulated a particular reason to

34

introduce such evidence, the Court found it was improper; <u>Miller</u> cannot therefore be read to suggest that such information could be properly elicited in the absence of any such reason.

The only cases offered affirmatively by the defendant do not support his position about the admissibility of "humanizing" evidence for defendant who does not testify, because those cases involve a defendant who did testify.  In <u>Gov't of Virgin Islands v. Grant</u>, the court explained that it was common for a defendant to testify about his own background, although the court also affirmed the district court's decision to preclude the defendant from testifying that "he had no prior arrests."  775 F.2d 508, 513 (3d Cir. 1985).  Similarly, in <u>United States v. Blackwell</u>, 853 F.2d 86, 88 (2d Cir. 1988), the court noted that the district court properly allowed a defendant to testify about certain aspects of his own background (military service and education), although it held the defendant also should have been able to testify he had not been arrested before.  In sum, these cases deal with the propriety of a defendant's testimony about his own background and criminal record; they do not hold, or even suggest, that a defendant may have other witnesses offer evidence about his background if he decides not to testify.

For these reasons, the government's motion should be granted.

IX.     THE COURT SHOULD PRECLUDE HEARSAY EVIDENCE OF ARBITRATIONS
        RELATING TO THE SHAM RETROPHIN CONSULTING AGREEMENTS

        The government moved to preclude evidence related to two arbitrations involving

Retrophin, and the defendant moved to admit such evidence.  As a result, the defendant's

arguments have thoroughly been addressed in the government's pre-trial motion and in the

government's opposition to the defendant's motion to preclude.  (See Govt's Opp. at 2-11.)  The

government incorporates those arguments here by reference and offers only a few additional

responses to the defendant's opposition brief.

        First, the purpose of the arbitrations was to determine whether the contracts at

issue were enforceable as a matter of New York or Delaware contract law.  That question is not

relevant to this trial, which addresses the question of whether the defendant, Shkreli, and others

conspired to defraud Retrophin through the use of contracts.  If anything, the enforceability of the

contracts is evidence of the fraud, not the absence of fraud, because a contract that was

unenforceable against Retrophin would have been a poor way to steal money from Retrophin to

repay MSMB investors.  Indeed, part of the scheme was Shkreli's abuse of his apparent authority

to bind Retrophin to take steps that benefitted him, not the company.  At a minimum, whether the

contracts are enforceable says nothing either way about a "fact of consequence."  See FRE 401.

        Second, although it is clear that the arbitrations were conducted under different

sets of substantive laws and procedural rules than will apply at this trial, involved different

evidence, and addressed different questions, those differences are complicated and will not be

clear, let alone necessarily make sense, to the jury.  Significant collateral effort would be required

to even attempt to address that risk of confusion and warrants precluding the arbitration awards

pursuant to FRE 403.  Similarly, it asks too much of the jury to expose them to the factual and

credibility analysis by two arbitrators but then to instruct the jury to ignore all of that analysis and

reach its own view of the facts and credibility of witnesses.  The risk that the jury would allow the conclusions of a single civil arbitrator to substitute for its own conclusions is extremely high under these circumstances, and provides an additional basis for preclusion pursuant to Rule 403.[15]

Third, refusing to acknowledge two on-point decisions from within this Circuit, the defendant continues to rely on cases that do not address the issue of whether "evidence about the Rosenfeld and Koestler arbitrations" should be admitted.

United States v. Fisher, which did not address a hearsay argument at all, involved the admission of "[e]vidence that an arbitration proceeding occurred and that the defendants were not found obliged to repurchase the Players' shares," evidence that was deemed relevant to show "the legitimacy of [the defendant's] position the athletes had breached their contracts."  106 F.3d 622, 633 (5th Cir. 1997).  But here, as discussed above, the enforceability of the consulting agreements does not lend "legitimacy" to the defendant's "position" that he did not agree to commit a fraud because the enforceability of the contract does not make fraud more or less likely. Moreover, even if Fisher were the law of this Circuit and otherwise applied—a dubious proposition considering that it appears never to have been cited for any proposition in this Circuit—it stands for no more than that the defendant should be able to introduce evidence that "an arbitration proceeding occurred" and the relevant contract was deemed enforceable, not that

---

[15] One can hear the strains of this argument in the defendant's moving brief, which praises the "15-page detailed and thoughtful written opinion" by a "neutral, independent arbitrator with decades of legal experience who has resolved hundreds of disputes across a variety of subject matters."  (Arbitration Motion at 12-13).

the defendant should be able to introduce anything else related to the arbitrator's analysis or conclusion.[16]

United States v. Dupree held that a temporary restraining order against the defendant was admissible not for its "truth" but rather to show that a defendant charged with bank fraud had knowledge of certain obligations related to the conduct in the TRO.  706 F.3d 131, 136–37 (2d Cir. 2013).  Dupree does not help the defendant for at least two reasons.  First, the defendant is not offering the arbitration awards to show his knowledge, or Shkreli's knowledge, or anyone else's knowledge, about the potential legal enforceability of the consulting agreements.  Second, the defendant does not offer merely the equivalent of a "restraining order," but rather the entire written decisions underlying the "orders."  Dupree provides no support for that.

And United States v. Boulware addressed the admissibility of a "prior civil judgment," which the government conceded was relevant and which determined the defendant had given another person ("Individual 1") money to hold in trust.  United States v. Boulware, 384 F.3d 794, 802 (9th Cir. 2004).  The judgment, one sentence long, was directly relevant to the defendant's prosecution for tax fraud because it supported his trial defense that he had transferred that money to Individual 1 to hold in trust and not as a gift.[17]  Id.  Boulware is irrelevant here because the enforceability of the consulting agreements is not at issue in the trial.  Boulware

---

[16] Even introducing such limited evidence, however, runs afoul of FRE 403 because of the distraction and effort required to explain the difference between the arbitrators' decisions and the issues at trial.

[17] This is the text of the judgment: "As to Counts I, III, IV and V, judgment in favor of Defendant/Counterclaimant HAWAIIAN ISLES ENTERPRISES, INC. and against Plaintiff [Lee] in the amount of $4,551,931.00, said amount being the property of Defendant/Counterclaimant HAWAIIAN ISLES ENTERPRISES, INC. which has been and is being held in constructive trust by Plaintiff and by which Plaintiff has been and is being unjustly enriched[.]"  United States v. Boulware, 384 F.3d at 802.

shows at most that the "judgment" portion of the arbitration awards is admissible, not the entire opinion.

It is telling that, although he relies on these cases that establish, at most, a court or arbitration order is admissible under a hearsay exception, the defendant has suggested that what is relevant is not the existence of the order or the enforceability of the contract, but rather the arbitrator's purported "determin[ation] that Retrophin received the benefit of the terms of the consulting agreement."  (Arbitration Motion at 17).  That determination is not an "order" or a "judgment."  It is a predicate for the arbitrator's ultimate decision.  In other words, it is the kind of applying-facts-to-law analysis that, if it should be undertaken at all in this case, should be undertaken by the jury.  Evidence such as the portion of the arbitrator's decision determining that "Retrophin received the benefit" of the bargain is not admissible under any of the cases by the defendant.

For these reasons, evidence related to the two arbitrations should be precluded in full.

39

X.    THE DEFENDANT SHOULD PRODUCE THE DOCUMENTS HE INTENDS TO ADMIT DURING HIS CASE-IN-CHIEF

The government asked this Court to ensure that the defendant complied with his Rule 16 obligations by producing documents in his possession that he intends to use in his case-in-chief at trial, and to provide a list of anticipated trial exhibits.  (Pre-Trial Motions Br. at 31-36). The defendant contends that this motion is "moot" because the defendant "has complied and will continue to comply with our discovery obligations" and has "provided the government with copies of thousands of potential defense trial exhibits."  (Def's Opp. at 33-36).  The defendant's response does not clarify for the government what specific documents the defendant has produced to date pursuant to his Rule 16 obligations, and the defendant has also not provided the government or the Court with any list of its potential trial exhibits.  As a result, the government's motion is not "moot" and should be granted.

First, with respect to the defendant's Rule 16 obligations, the government has simply asked the defendant to identify what documents have been provided to the government by the defendant.  As detailed in the government's initial filing, the defendant provided the government with a hard drive containing approximately 100,000 pages of documents.  Each page has an "EG" Bates number, and some pages also have additional Bates stamps that indicate that they were originally produced to the defendant by the government in discovery as part of the government's Rule 16 obligations.  However, some pages—interspersed throughout—have only "EG" Bates stamps, perhaps indicating that the document is a new document being produced to the government for the first time, or perhaps showing a document from the government's own discovery production that is being re-produced (as certain native files from the government's discovery production do not have visible Bates stamps, but rather were identified to the defendant by the titles of the underlying native files).  Despite the government's request, the defendant has

40

not to date provided the government with a cover letter or key that describes the documents on the hard drive, so the government has no way of knowing the source of the documents without Bates stamps.

The defendant states that "we agreed to identify those documents within our production that the government may not have produced in discovery" and "we will not be certain that documents we added to what was produced in the government's discovery are not duplicates of what the government already produced." (Def's Opp. at 34). Every time the government made a production of documents to Shkreli and the defendant, it clearly identified the source of those documents by Bates range and in many cases provides additional information. (See Dkt Nos. 16, 21, 45, 49, 57, 63, 68, 76, 88, 135, 155, 200, 226, 233, 236, 250 and 309.) To similarly be in compliance with its Rule 16 obligations, the defendant needs to identify—at a minimum—the source of the various Bates ranges of documents being produced to the government. There is no explanation for this failure.

It is inconceivable that defense counsel do not know exactly which documents they produced to the government for the first time and the source of those documents. Indeed, as a result of the process that defense counsel went through to create the hard drive of potential trial exhibits that was sent to the government—they obtained the documents, reviewed them, selected them as potential trial exhibits, Bates-stamped them and then transferred them to the hard drive—the defendant knows whether those documents (1) came from the discovery previously produced by the government or (2) came from one or more additional sources. The defense team knows whether there are any documents that fall in the second category, or if everything on the drive originally came from the government; and whether, if there are documents that fall in the second category, where they came from and the corresponding Bates ranges. Whether documents in the

second category are duplicates of documents in the first category would be useful information, and the government would appreciate that information if the defendant has it, but is secondary to the identify and source of the new documents.

Moreover, contrary to the defendant's response, the government does not suggest that the defendant's Rule 16 obligations extend to evidence it might seek to use to simply cross-examine and/or impeach government witnesses. (Def's Opp. at 35-36). The cases cited by the government—with which the defense does not engage—stand for the limited proposition that the defendant's Rule 16 obligations extend only to that evidence that the defendant might seek to introduce <u>affirmatively</u> through the government's witnesses. (<u>See</u> Pre-Trial Motions Br. at 34-35 (collecting cases).) The <u>Bonaventre</u> case cited by the defendant does not require a different outcome, as it does specifically address disclosure of documents that the defendant seeks to affirmatively introduce through the government's witnesses. United States v. Bonaventre, No. 10 Cr. 228, 2013 WL 2303726, at *10 (S.D.N.Y. May 28, 2013).[18]

---

[18] The defense cites to an order on the docket that the Court issued on July 5, 2017 in connection with the Shkreli trial that states "[s]hould the defense wish to offer into evidence a lengthy series or set of documents, however, it shall provide the documents pre-marked with exhibit numbers to the court for <u>in camera</u> review, accompanied by a brief explanation of the bases for their admissibility, with sufficient time to enable the court to issue a prompt ruling and avoid lengthy sidebar." This procedure was not in fact adopted during the Shkreli trial because, after the date of the order, Shkreli did not seek to admit large numbers of exhibits without previewing them for both the Court and the government at a break in the trial. Nevertheless, the defendant urges the Court to "adopt this procedure" for the upcoming trial. (Def's Opp. at 35). The government respectfully disagrees with the institution of this procedure to the extent that the Court might rule on the admissibility of any documents <u>before</u> the government has the ability to so object (on any grounds, including but not limited to, relevance, prejudice, hearsay and/or authenticity). If the defendant does not provide documents to the government until just prior to attempting to use the said documents with the witness, then the parties' arguments about the authenticity and/or admissibility of such documents will necessarily need to take place at a sidebar.

Second, with respect to the defendant's trial exhibits, the government does not suggest that either party could, at this early date, have identified all of the exhibits that the party will introduce in its case-in-chief.  As the government stated in its pre-trial disclosures, the government has made a good-faith effort to identify by Bates number and Shkreli exhibit number the documents it anticipates that it may introduce during its case-in-chief and will provide copies of marked trial exhibits on October 3, 2017, but it will continue to identify potential trial exhibits up to and during trial, depending on how the evidence at trial develops.  (See Dkt. No. 311.)  The government fully expects the defendant to similarly revise and add to its trial exhibit list as the trial progresses.  However, the government has to date received no actual list of potential defense trial exhibits; it has only received the hard drive containing more than 100,000 pages described above, with no corresponding information about what is on the hard drive.  By contrast, as noted above, the government provided actual lists of documents it may use as trial exhibits (see Dkt. Nos. 207 and 311), and also previously provided the defendant with information, by Bates number, about each and every document it has produced, including the source of those documents.

XI.     THE COURT SHOULD PRECLUDE DEFENSE COUNSEL FROM TAKING TWO
        LIMITED ACTIONS RELATED TO THEIR PRIOR ROLES AS ASSISTANT UNITED
        STATES ATTORNEYS

              The government moved to (1) where applicable, preclude defense counsel from

referring to him or herself as a "former federal prosecutor" or otherwise informing the jury of his

or her prior work for the Department of Justice and (2) with respect to the testimony of Timothy

Pierotti, preclude Mr. Brodsky—who interacted with Pierotti in the context of a different case that

Mr. Brodsky prosecuted as an Assistant United States Attorney, in which Pierotti was a witness—

from cross-examining Pierotti about that case or their prior interactions.  (Pre-Trial Motions Br. at

36-40).  In response, the defendant contends that the government's motion seeks to "improperly

cloak [the government] as public servants," to "muzzle" defense counsel from speaking about

"personal experiences" and "anecdotes," and that because Mr. Brodsky does not possess

confidential information about Pierotti, there is no appearance of impropriety, and Mr. Brodsky

will not become an unsworn witness.  (Def's Opp. at 36-40).  These arguments are meritless, and

the government's motion should be granted in both respects.

              As an initial matter, the defendant's contention that the prosecutors in this case are

seeking to "improperly cloak" themselves "as public servants" may reasonably be characterized

as frivolous.  The government is the government, and the case against the defendant is brought in

the name of the United States.  But the prosecutors in this case do not intend to refer to

themselves as "public servants" or to ask the jury to believe what they say because they work for

the Department of Justice.  That would be improper.  It is just as improper for defense counsel to

suggest that what they say should be believed because they used to work for the Department of

Justice or have experiences that lend weight to their words.  A lawyer's arguments must be based

on admissible evidence, not his or her current or former title, or current or former experience.

That fundamental principle—which ensures that lawyers are seen by the jury as lawyers, not witnesses with personal knowledge—applies equally to both sides.[19]

The only reason the defendant offers as to why it would be remotely necessary for defense counsel to refer to themselves as former federal prosecutors during the course of the trial is because defense counsel wants to share unidentified "personal experiences" and/or "anecdotes" during jury addresses.  (Def's Opp. at 37).  But lawyers, whatever their background, cannot share "personal experiences" or personal "anecdotes" with the jury, as defense counsel asserts, without citation to authority of any kind.  Lawyers are not witnesses, whose recitation of facts is tested through cross-examination.  In any event, the government's motion does not seek to preclude defense counsel from using anecdotes, or metaphors, or similar methods of making an argument. The government merely seeks to preclude defense counsel from invoking their prior work as federal prosecutors in doing so.  It would be just as improper for defense counsel to do this as it would be for a current prosecutor to say, "In my experience as a prosecutor," and then make an argument grounded in that experience.  The defendant has not offered—and cannot offer—any legitimate reason why his counsel should be permitted to do what the government cannot.  Any reference to defense counsel's prior experience as federal prosecutors in the context of, for example, arguing about what is or is not standard government practice or passing judgment on the propriety of investigative techniques—which the defendant has indicated he will seek to place at

---

[19] The defendant's suggestion that the government attorneys are "federal prosecutors [who] seemingly want to convey to the jury that they alone hold a special position as federal prosecutors that deserves some favor" is baseless.  (Def's Opp. at 38).  Government attorneys cannot avoid being identified as federal prosecutors, as is the case in every federal prosecution. This is not an effort to seek "favor."

issue in this case—would impermissibly turn defense counsel into witnesses, while shielding

them from cross-examination.  It would be extraordinarily improper, and should be precluded.

The defendant is correct that the government has found no other case where a court

has ruled on a similar motion in limine.  But that is unsurprising, because what the defendant

seeks to do is so radical.  The government has never previously encountered or heard of defense

counsel who sought to identify themselves to the jury as former federal prosecutors in any case, in

any court, for any purpose.  The closest case of which the government is aware is that, in a recent

trial in the Southern District of New York brought by the civil division of the United States

Attorney's Office in that district, the government made a motion to preclude reference to former

federal judge John Gleeson, now a defense attorney at the law firm Debevoise & Plimpton, as

"Judge Gleeson" during the proceedings, noting that such references would be "unduly

prejudicial."  See In Re 650 Fifth Avenue and Related Properties, No. 08 Cv. 10934, Dkt. No.

1620, at 18.  Defense counsel immediately (and properly) consented.  Id., Dkt. No. 1671 at 6.

There was never even the suggestion that former Judge Gleeson would seek to refer to himself as

such in front of the jury.

Second, with respect to the government's motion to preclude cross-examination of

Pierotti by Mr. Brodsky, the defendant contends that he has a Constitutional right to counsel of

his choice, and there is no impediment to Mr. Brodsky's cross-examination of Pierotti because

Mr. Brodsky has no confidential information as a result of his interactions with Pierotti and would

not make himself an unsworn witness.  (Def's Opp. at 38-40).  As an initial matter, a defendant's

Constitutional right to counsel is not entirely unfettered; if it were, then no attorney could ever be

disqualified as a result of, for example, having an unwaivable conflict.  See, e.g., United States v.

Jones, 381 F.3d 114, 121 (2d Cir. 2004). The unsworn witness problem is another example of a

situation where circumstances can exist that can force the disqualification of an attorney that a defendant would otherwise choose to have represent him or her.  See, e.g., United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993) (affirming disqualification of attorney due to the unsworn witness problem).

Here, the latent unsworn witness problem presented by the prior interactions between Pierotti and Mr. Brodsky during the case that Mr. Brodsky prosecuted—which, as is clear from the defendant's response, will be the subject of cross-examination at trial—is not as simple to avoid as the defendant posits.  Mr. Brodsky has stated that he will commit to not making "any reference to [his] first-hand knowledge of" the case about which he may seek to cross-examine Pierotti and thus there is no unsworn witness problem.  (Def's Opp. at 39). Despite that commitment, unless Mr. Brodsky is willing to preview the exact questions he will seek to ask on cross-examination about this subject, there is still the distinct possibility that Mr. Brodsky will pose a question in a way that the only truthful answer the witness can give—either on cross-examination, or on re-direct examination in response to a follow-up question—will require a reference to a personal interaction with Mr. Brodsky.  For example, if Mr. Brodsky asks "And you felt you needed a non-prosecution agreement in that case to protect you, correct?," Pierotti's truthful answer might be, "You told me that I should have one, Mr. Brodsky."  If that happens, and Mr. Brodsky does become an unsworn witness, Locascio and its progeny would require Mr. Brodsky's disqualification, an outcome that the government is seeking to avoid. Notably, the defendant also does not address the government's argument that a situation where a witness is forced to be cross-examined by a former prosecutor who developed the witness for a

prior case about the witness's actions in connection with that prior case creates the appearance of impropriety.  (See Pre-Trial Motions Br. at 39.)

For these reasons, the government's motion should be granted.

XII.   THE COURT SHOULD PRECLUDE CERTAIN TESTIMONY NOTICED BY THE
       DEFENDANT AS EXPERT TESTIMONY

The government objected to nine of the defendant's proposed expert witnesses
pursuant to FRE 401 and FRE 403 and based on the limited disclosure provided by the defendant
as of August 11, 2017.  The government reserved Daubert challenges for a separate briefing
schedule after the defendant has provided additional disclosures about these experts.

The defendant argues that the law in the Circuit is that a defendant may offer
essentially any expert testimony he wants and by largely failing to explain the relevance of its
proffered experts.  The defendant's assertion that the experts' testimony will be relevant and
significant also is in tension with the defendant's protestations that his experts have not
"finalized" their opinions because they do not yet know what the government's case will be.[20]
All of this proposed expert testimony should be precluded now.  In the alternative, the defendant
should be precluded from mentioning in his opening or by otherwise addressing "unfinalized"
expert opinions unless and until the "finalized" opinions have been the subject of litigation related
to FRE 401, FRE 403, and Daubert.

C.   Legal Standard

The defendant suggests that United States v. Litvak, 808 F.3d 160, 185–86 (2d Cir.
2015). establishes that virtually any testimony proffered by a defendant is admissible at trial.
That is not the case.

---

[20] The defendant also alludes to a "right not to disclose all of our defenses."  (Def's Opp.
at 42).  There is no such "right."  A defendant's proposed expert testimony is subject to the
Federal Rules of Criminal Procedure, the Federal Rules of Evidence, and the other rules that
govern this and every trial.

Litvak addressed a prosecution for securities fraud involving complex Residential Mortgage-Backed Securities.  The Second Circuit reversed the district court's decision to exclude expert testimony about the process by which investment managers evaluate securities because, the Circuit held, such testimony was relevant to address whether certain statements the defendant made would have been material to a reasonable investor.  808 F.3d at 181.  The materiality of the defendant's statements was a "central issue" in the case and element of the crime charged. Moreover, the Circuit held that the preclusion of the expert testimony left him with "little opportunity to present his non-materiality defense," which required evidence of what reasonable investors would think.  Id. at 184.  The Circuit also reversed the decision to exclude a second expert who opined about other issues the bore directly on whether the defendant's allegedly fraudulent statements would have been material to a reasonable investor.  Id. at 187.

But the Circuit affirmed the exclusion of other expert testimony.  Specifically, the Circuit held that expert testimony about whether prices were "fair" was properly excluded because:

> Whether the prices were 'fair' was not an element of any of the crimes . . . and the potential confusion from such testimony might have outweighed any probative value.  The principal issues at trial were whether a reasonable investor might have found the misstatements important and whether [the defendant] intended to deceive the purported victims. This testimony would not have addressed either.

Id. at 185.  Similarly, the Circuit affirmed the exclusion of testimony about some of the bonds sold "were profitable" because that testimony was "of minimal relevance" and "any probative value would likely have been outweighed by its potential for confusion. Whether a victim later made a profit or loss . . . has no bearing on whether [the defendant's] misrepresentations were material or whether [the defendant] intended to deceive the purported victims."  Id.

Therefore, Litvak stands for a few unremarkable propositions: otherwise proper expert testimony that squarely addresses the elements of the crimes charged is admissible; testimony about tangential issues or that is likely to confuse the jury may properly be excluded. In addition, the expert testimony in Litvak was particularly important given that the standard for materiality, an element of the crime, refers to a "reasonable person."  It makes sense that expert testimony could play an important role in establishing such a general, objective standard, especially when the investment at issue was a complex security.  See id. at 162 (expert testimony particularly important given "the meaningful distinction between the complex securities at issue in this case and the common equities and bonds traded in 'traditional,' efficient markets (e.g., shares of corporate entities traded on the New York Stock Exchange).").  As the Litvak court observed, once the expert was precluded, the defendant "was left with little opportunity to present his non-materiality defense."  808 F.3d at 184.

It is not surprising that, in contexts other than a substantive fraud case in which materiality is at issue, the Second Circuit has repeatedly affirmed the exclusion of irrelevant or prejudicial expert testimony.  For example, in United States v. Newkirk, 684 F. App'x 95, 96 (Mar. 29, 2d Cir. 2017), the defendant was charged with wire fraud arising from his attempt to buy Maxim magazine.  The Second Circuit affirmed the district court's exclusion of expert testimony "on the role and duties of a transactional lawyer and [on] financial terms."  Id. Distinguishing that case from Litvak, the Circuit explained that the defense in Newkirk "was not that [the defendant's] misrepresentations were immaterial" but rather "that he was unwittingly manipulated" by another person and "therefore, was not a knowing or intentional participant in the charged fraud."  As a result, the proposed expert testimony was properly excluded because it did not address a "central issue" in the case.

Similarly, in United States v. Collins, 581. App'x 59 (2d Cir. Oct. 22, 2014), the Second Circuit affirmed the district court's exclusion of expert testimony in a securities fraud case against an attorney who was outside counsel to Refco. The defendant supported Refco executives' schemes to conceal large amounts of intercompany debt.  At trial, the defendant sought to elicit opinion testimony (both lay and expert) from two lawyers regarding (i) the materiality of a document (the "PPA") that the defendant worked on drafting but failed to disclose during a leveraged buy-out; and (ii) the work of transactional lawyers in general.  The Circuit affirmed the exclusion of that evidence:

> The district court rejected both proffers on the grounds that the testimony would not be helpful to the jury, that the opinions depicting the PPA as immaterial would be conclusory, that [the defendant] could alternatively establish immateriality through cross-examination of government witnesses, that a 'war of experts' should be avoided, and that the materiality vel non of the PPA was within the competence of a jury unassisted by opinion testimony. As it transpired, fact witnesses proved sufficient for [the defendant's] counsel to present the defense view of the PPA's materiality, including testimony that rights under the PPA were 'extinguished' before the leveraged buyout closed. The district court's evidentiary rulings were valid exercises of its discretion.

581 Fed. Appx. at 60.

In sum, Litvak applies where expert testimony may help the jury to understand a complex, foreign system, where a certain aspect of that system bears directly on a "central issue" in the case, such as an element of the crimes charged.  Moreover, that expert testimony is valuable where the issue is something where general testimony is helpful, such as establishing the view of a reasonable investor, rather than where the key question is what the defendant believed in a particular case, see, e.g., Newkirk, 684 F. App'x at 96.  Litvak does not give a defendant blanket license to argue that, because an expert will "educate" the jury about some issue that arises in the case, the testimony should be admitted.

52

D.     The Defendant Has Not Shown the Testimony of His Proffered Experts Should Be Admitted

The defendant devotes pages to the resumes of its proffered experts and to repeating the areas of potential testimony identified in his expert disclosure.  But the defendant provides precious little explanation of why any of the potential testimony is relevant, as defined by the applicable law, and would not confuse or distract the jury.  To the extent he does provide arguments, however, they are unconvincing.  Accordingly, this proffered expert testimony should be precluded.

Before addressing the defendant's specific responses, we address the defendant's frequent citations to Litvak.  The key questions in this case is whether the defendant agreed with Shkreli and others to defraud Retrophin and to manipulate Retrophin stock.  Unless the defendant can show proffered expert testimony that addresses those central issues—the defendant's subjective intent—the testimony is likely not relevant under Litvak and the other cases discussed above.  Nor does the defendant's proffered expert testimony become relevant simply because it may "educate" the jury about some complex system the defendant believes to be important.  Finally, excluding the expert testimony below would not leave the defendant with "little opportunity to present his" defense, because there are numerous other ways the defendant can rebut evidence of his subjective intent, including through cross-examination of witnesses who interacted with him or even by direct testimony about his intent.  See Litvak, 808 F.3d at 184.

1.     Joseph P. Dooley

The government objected to Dooley on the grounds that his unidentified critiques of the government's investigation are irrelevant and that the defendant had not identified any of the subjects about which Dooley might offer charts based on expert opinions.  The defendant rebuts neither of these concerns.  First, the defendant justifies Dooley's testimony as relevant only

through the conclusion assertion that it will "attack the government's investigation at trial." (Def's Opp. at 51).  As discussed above, the defendant may make certain arguments about alleged flaws in the investigation; but there is no basis to introduce <u>evidence</u> about those flaws.  <u>See</u> <u>supra</u> VII.  The defendant has not even tried to justify how those "attacks" make any fact of consequence more or less true.  FRE 401.  For example, whether the government subpoenaed a certain witness says nothing about the truth or falsity of <u>any</u> fact in the case.   Second, the defendant provides no explanation of what charts Dooley might introduce that "may require his extensive forensic expertise."  (Def's Opp. at 51).  In other words, the defendant says Dooley may present expert testimony but refuses to identify even the vaguest nature of that testimony.  It should be precluded as irrelevant.

   2. <u>Stephen C. Ferruolo</u>

   The government objected to the vague descriptions of Ferruolo's testimony on the grounds that the testimony appeared to be irrelevant.  The defendant asserts that Ferruolo's testimony will "directly contradict several of the government's anticipated theories" about the defendant's participation in the charged conspiracies, but he does not explain how Ferruolo's proffered testimony will do that.  (Def's Opp. at 51-52).  Instead, the defendant simply repeats the proffered testimony.  That does not establish relevance.  For example, the defendant does not explain how the fact that outside corporate counsel "frequently settles lawsuits" bear on the guilt or innocence of the defendant's agreement to use improper settlement and sham consulting agreements to discharge Shkreli's and the MSMB funds' debts and liabilities.  Similarly, the defendant asserts that Ferruolo will "testify as to the customs and practices of the business and management of major law firms," but does not attempt to explain the relevance of such testimony. All of this testimony should be precluded on this record as irrelevant.

3.    Bryan A. Garner

The government objected to the relevance of Garner's purported "expert" testimony about his interpretation of the defendant's emails.  Garner, whose primary qualification is that he is an "extensive author of the use of grammar, usage, and punctuation" (Def's Opp. at 52), is clearly being offered to provide his own spin on the meaning of otherwise inculpatory emails between the defendant and Shkreli.  Even the defendant concedes that Garner will opine about "the meaning of communications" between the defendant and Shkreli.  (Def's Opp. at 52).  This is patently improper and irrelevant.  Garner has no idea what the defendant and Shkreli "meant" when they wrote emails.  It is telling that the defendant has found no case in which such vague "email reading" testimony was accepted.[21]

The defendant also now asserts that Garner will testify about the "use of legal language by corporate counsel" and "legal terms."  (Id.)  But the defendant identifies no such language and no such terms, nor does he explain how such testimony could explain

---

[21] The three cases the defendant cites addressed actual "linguistic expert testimony" about the very narrow question of whether certain documents were authored or plagiarized based on an analysis of other similar work.  See Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 648 (S.D.N.Y. 2014), aff'd, 833 F.3d 74 (2d Cir. 2016) ("professor of forensic linguistics" allowed to opine about whether internal work product from one party in arbitration appeared in purportedly neutral report of arbitrator"); Theranos, Inc. v. Fuisz Pharma LLC, No. 11 Cv.  05236 (PSG), 2014 WL 12695908, at *4 (N.D. Cal. Mar. 10, 2014) (professor of forensic linguistics could testify about "linguistic and semantic similarities" between documents in a case where one issue was plagiarism); McConnell v. Lassen Cty., California, No. 05 Cv. 0909 (FCD) (DAD), 2009 WL 3365912, at *1 (E.D. Cal. Oct. 16, 2009), aff'd sub nom. McConnell ex rel. A.B. v. Lassen Cty., 442 F. App'x 264 (9th Cir. 2011) (allowing testimony from a "forensic linguistics expert and a forensic document examiner" that a document was not actually written by the purported author).  The defendant does not suggest that Garner will or could offer such testimony, which would be of no relevance in any event.  Indeed, the experts in these cases were experienced forensic linguists who were asked to testify about issues related to forensic linguistics.

communications <u>between</u> the defendant and Shkreli (a non-lawyer), nor does he explain how any such testimony would be relevant to any issue in this case.

The defendant has provided no basis for concluding that Garner's testimony could make any fact of consequence more or less true.  His testimony should be precluded.

4.    Alan Johnson

The government argued that Johnson's testimony is irrelevant.  Johnson's testimony comes from the perspective of a non-lawyer who negotiates consulting agreements. The defendant argues that, by "educating" the jury about the "reality of the industry practices for startup companies," Johnson will "contradict . . . the implications" that the government purportedly "want[s] the jury to draw from the use of consulting agreements."  (Def's Opp. at 54). The defendant, however, does not explain how Johnson will do that.

For example, there is no predicate at this time from which to conclude that the defendant, who was not an employment lawyer, was steeped in the "industry practices for startup companies" related to consulting agreements, let alone that he complied with them.  Educating the jury about "customs and practices" that were not considered by the defendant and did not play a role in this case is irrelevant and does nothing but distract and confuse.  Similarly, even if it were true that "it is common practice" for "outside experts" like Johnson who negotiate these agreements "to communicate with the CEO of the company who is on the Board," that would say nothing about the defendant, who was not an "outside expert" about consulting agreements. Relevance is not a meaningless concept, and the defendant has not established relevance merely by describing testimony and asserting it is relevant.[22]

---

[22] The government also explained that Johnson's "scientific analysis" of consulting agreements is irrelevant.  (Pre-Trial Motions Br. at 45-46).  The defendant replies only that "the government should not seek to conceal from the jury how consulting agreements are used in the

5.    Gayle Klein

The government objected to Klein's testimony about "colorable" legal claims against Retrophin as irrelevant and likely to lead to undue delay and confusion.  The defendant's response misstates the government's argument.  It is true that certain investors threatened to sue Shkreli.  But there is no evidence that either the defendant or Shkreli were motivated to secure settlement or consulting agreements to protect Retrophin from potential suits, as opposed to protecting Shkreli.  Absent that factual predicate, Klein's testimony could not possibly be relevant.  Put another way, whether there was a valid claim against Retrophin does not matter; what matters is what the defendant believed.  Cf., e.g., United States v. Berg, 710 F. Supp. 438, 445 (E.D.N.Y. 1989) (testimony concerning the "custom of other arms dealers in complying with arms export laws" precluded on the ground that such evidence was irrelevant to the state of mind of the defendants).  Absent a valid explanation for the relevance of Klein's testimony, that testimony should be precluded.

In addition, the defendant addresses the government's concern that direct and cross-examination about other legal frameworks and other laws by assuring the Court that Klein's testimony could be pared down.  But the less specific her testimony is, the longer and more involved a cross-examination might be.  Distraction and confusion are inevitable with an "expert" purported to apply tangential facts to inapplicable legal frameworks in order to answer questions not before the jury.

---

industry as such testimony is critical to evaluating Mr. Greebel's intent."  (Def's Opp. at 54).  The defendant does not explain how such "scientific analysis" is "critical" to evaluating the defendant's intent.  The government will reserve its challenge to this analysis, which appears to be complete and ready for scrutiny, for a Daubert hearing.

Finally, in any event, Klein's testimony runs afoul of the well-established rule that an expert may not instruct the jury about applicable law or how to apply facts to that law. <u>See</u>, <u>e.g.</u>, <u>Nimely v. City of New York</u>, 414 F.3d 381, 397 (2d Cir. 2005) ("We have consistently held . . . that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." (internal quotation marks omitted; alteration incorporated) (citing <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991)); <u>United States v. Duncan</u>, 42 F.3d 97, 101 (2d Cir. 1994)).

6.   <u>Craig Lewis</u>

The government objected to Lewis's testimony on the grounds that it appeared to be irrelevant.  Nothing in the defendant's opposition assuages the concern that Lewis's opinion appears to be an effort to opine on the mental state of the various co-conspirators—to testify about whether and to what they agreed.[23]  That is not relevant expert testimony (or fact testimony, for that matter).  But it is impossible fully to evaluate Lewis's proffered testimony on this record, without a review of his report and/or analyses, and the government has reserved its <u>Daubert</u> objections and any supplemental relevance objections until that review occurs.  The defendant also suggests that Lewis's testimony will be similar to Deborah Oremland's testimony at the Shkreli trial.  But Oremland offered testimony as a lay witness.  It is not clear what analysis Lewis has conducted that actually vaults his opinions into the "expert" category.

---

[23] The defendant responds that the government's objection appears to be based at least in part on the view that actions taken after November 2012 are irrelevant.  To be clear, that is not the government's objection or position.

Finally, it is clear from the defendant's descriptions of Lewis's analysis that it is not premature to determine the admissibility of that testimony; it does not seem that Lewis and the defendant decided to "wait" until the government's case-in-chief is over for him to "finalize" his opinions.

7.   Ronald Minkoff

The government moved to preclude Minkoff's proposed testimony about "the customs and practices governing the preparation of settlement agreements" as irrelevant and likely to lead to juror confusion.  The fact that settlement agreements were intended to be one tool of achieving the goals of the conspiracy does not make testimony about the "custom and practices governing the preparation of settlement agreements" relevant.  Litvak certainly does not stand for the proposition that expert testimony about a topic that is mentioned in a case is per se relevant. The defendant does not actually explain the relevance of this testimony, merely asserting that Minkoff's testimony "is important for the jury to evaluate the settlement agreements, the broad releases . . . the government highlighted during the Shkreli trial as unusual."  (Def's Opp. at 57).

It is not clear whether Minkoff will merely opine that "broad" releases—whatever that means—are standard, or whether he will opine that it is "custom and practice" for a company to pay off a CEO's debts from former unrelated ventures through "the preparation of settlement agreements."  We think not, but the defendant should say one way or another so that the parties can evaluate the defendant's assertion of relevance.  Absent an actual argument about why Minkoff's testimony is relevant, it should be precluded.

8.   Lori Smith

The government objected to Smith on the grounds that her testimony about accounting was not relevant and would distract the jury.  (Pre-Trial Motions Br. at 49).  The defendant does not address these arguments.  After reciting Smith's resume and proffered

testimony, he merely states in a single sentence that the government's argument is conclusory. (Def's Opp. at 59).  But the defendant bears the burden of showing that anything Smith says will make a material fact more or less true, and that any probative value will outweigh the risk of jury distraction and confusion with collateral account issues.  See, e.g., United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) ("the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of FRE 702 are met").  He does not attempt to do so.  Accordingly, Smith's testimony should be precluded pursuant to FRE 401 and 403.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the foregoing motions should be granted.

Dated:  Brooklyn, New York
        August 30, 2017

                                       Respectfully submitted,

                                       BRIDGET M. ROHDE
                                       Acting United States Attorney
                                       Eastern District of New York

                        By:      /s/_____
                                         Alixandra E. Smith
                                       David C. Pitluck
                                       David K. Kessler
                                       Assistant U.S. Attorneys
                                       (718) 254-7000

cc:    Clerk of the Court (KAM)
        Defense Counsel (By ECF and Email)

61