

U.S. Department of Justice

United States Attorney
Eastern District of New York

JMK:AES/DCP/DKK
F.#2014R00501

271 Cadman Plaza East
Brooklyn, New York 11201

September 7, 2017

By E-mail
Reed Brodsky, Esq.
Winston Chan, Esq.
Jason Halperin, Esq.
Randy Mastro, Esq.
Lisa Rubin, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Re:  United States v. Evan Greebel
     Criminal Docket No. 15-637 (KAM)

Dear Counsel:

The government writes in response to your offer "to provide further disclosures relating to our expert witnesses" in connection with the government's Daubert motions and any supplemental challenges to the relevance of such experts.  (See, e.g., Def's Mem. of Law in Opp. to the Government's Motions In Limine, Dkt. No. 347 ("Def.'s Opp."), at 42).  The government requests that the following additional disclosures, which are required by Federal Rule of Criminal Procedure 16(b)(1)(C), be provided by September 18, 2017.[1]  See, e.g., United States v. Valle, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); United States v. Duvall, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics.").

As discussed during our meet-and-confer in August 2017, the government will request that the Court set a schedule for Daubert motions related to the defendant's proffered experts.  The government further advises the defendant that it does not intend to call an expert in its case-in-chief, except to the extent that the Court determines that certain testimony offered by Deborah Oremland should be characterized as expert testimony.  (See Govt's Ltr., Aug. 11, 2017, Dkt. No. 311, at 2).  Once the defense has provided supplemental disclosures and the Court has determined which, if any, testimony may be offered at trial by the experts noticed by

---

[1] The government reserves the right to request additional disclosures and does not concede any of the materials requested herein are relevant or admissible, or that any of the defendant's proffered expert testimony is the proper subject of expert testimony.

the defendant, the government will identify and provide relevant disclosures for any rebuttal experts it may seek to call.

For each of the defendant's proffered experts, please provide the following additional disclosures pursuant to Rule 16:

A. <u>Joseph P. Dooley</u>

1. A summary of any expert opinions, along with the bases and reasons for those opinions, that Dooley may offer in connection with summary charts containing analysis using his "forensic expertise and CPA, CFF, and CFE certifications" (Opp. at 51), as opposed to testimony that merely summarizing evidence in the case pursuant to FRE 1006.

2. A summary of the specific opinions, along with the bases and reasons for those opinions, that Dooley will offer regarding the following proffered topics for testimony (Def's Aug. 11, 2017 Ltr. Ex. B, Dkt. No. 312-2 ("Disclosures") at 2):
    a. "[G]eneral customs and practices of the FBI in conducting a thorough and complete investigation."
    b. "[I]f there is no flight risk or risk of destruction of evidence, the FBI will speak with the subjects of the investigation and will seek to subpoena the entities where the subjects worked during the relevant period of investigation."

B. <u>Matthew Ferrante</u>

1. For the proffered testimony that "commonly available types of metadata and other electronic evidence, <u>such as those present in the documents included in [Ferrante's] analysis</u>, are reliable indicia of the timing of modifications and the identifies of the documents' authors and editors," (Disclosures at 2 (emphasis added)), provide (1) a summary of Ferrante's analysis, (2) the documents included in or reviewed in connection with his analysis (or identify such documents by Bates number), and (3) a summary of any specific opinions related to the proffered testimony, along with the bases and reasons for those opinions.

2. To the extent Ferrante used any computer or other program(s) to examine the metadata of documents in this case, please identify those program(s) and provide any final output from those program(s).

C. <u>Stephen C. Ferruolo</u>

1. A summary of the specific opinions, along with the bases and reasons for those opinions, that Ferruolo will offer regarding the following proffered topics for testimony (Disclosures at 2-3):

2

    a.    "[T]he customs and practices of the business and management of major law firms."

    b.    That "it is common for outside corporate counsel to manage the capitalization table and issue stock for small private startup companies."

    c.    That "it is common for startup companies to have oral understandings including verbal stock transfer agreements."

    d.    That it is common for startup companies "to date written agreements with the date when the oral understandings were made."

    e.    That it is common for startup companies "to rely on consultants."

    f.    That it is common for startup companies to "use stock as compensation."

    g.    That it is common for startup companies to "frequently settle lawsuits and use broad general releases."

    h.    That it is "not unusual for outside corporate counsel to interact primarily with the CEO of a small public company."

    i.    That it is "not unusual for outside corporate counsel or a company to push back on outside auditors."

    j.    That "board members have certain duties and responsibilities."

D.    <u>Bryan Garner</u>

1. With respect to Garner's "linguistic analysis of written communications between Mr. Shkreli and other participants in the facts and events alleged in the indictment," including any analysis of "Mr. Shkreli's and Mr. Greebel's individual linguistic habits" (Disclosures at 3), provide (1) a summary of Garner's analysis, (2) the documents included in or reviewed in connection with his analysis (or identify such documents by Bates number), and (3) a summary of any specific opinions related to that analysis, along with the bases and reasons for those opinions.

2. To the extent Garner used any computer or other program(s) to conduct or support his analysis, please identify those program(s) and provide any final output from those program(s).

3. Please identify any courses or classes Garner has either taken or taught related to forensic linguistics.

4. A summary of the specific opinions, along with the bases and reasons for those opinions, that Garner will offer regarding the following proffered topics for testimony (<u>id.</u> at 3):
    a.    That Shkreli's and the defendant's "individual linguistic habits affect the meaning of communications between them."
    b.    That the meaning of Shkreli's and the defendant's communications "is also impacted by reading them in their proper context."
    c.    That an analysis of the defendant's "written communications as a

3

      corporate attorney must be read from the context of outside counsel terminology."

E. <u>Alan Johnson</u>

1. Johnson was proffered to testify about publicly disclosed consulting agreements, including through <u>his scientific identification and analysis of consulting agreements disclosed publicly through SEC filings</u>." (Disclosures at 4 (emphasis added)); provide the referenced analysis.

2. Johnson was proffered to testify about a "comparison" he conducted between the consulting agreements at issue in Count Seven of the Superseding Indictment and agreements disclosed in the public filings of "a variety of companies" (Disclosure at 5); provide the referenced comparison, as well as the "variety of companies" whose publicly-disclosed consulting agreements were used as a basis for that comparison.

3. Please provide any backup data, such as spreadsheets, used in conducting the "analysis" (described in paragraph E1 above) and/or "comparison" (described in paragraph E2 above) as well as identify each "consulting agreement[] disclosed publicly through SEC filings" included in the analysis and/or comparison, to the extent Johnson and/or your firm has an electronic set of such filings, please provide a copy.

4. A summary of the specific opinions, along with the bases and reasons for those opinions, that Johnson will offer regarding the following proffered topics for testimony (Disclosures at 3-4):
   a. "[C]ustoms and practices surrounding the use of consulting agreements in private and public companies."
   b. "Publicly disclosed consulting agreements."
   c. That "consulting agreements are frequently utilized by private and public companies in the context of a threat or concern about litigation."
   d. That "one of the principal goals of such agreements is to obtain broad releases, non-disparagement obligations and confidentiality provisions."
   e. That a "common market practice is to use [consulting] agreements to obtain an option of potentially conferring with the consultant even if it never actually happens."
   f. That "companies entering into consulting agreements often expect to obtain minimal to no work from their consultants."
   g. That it is common practice for "outside experts like [Johnson] who negotiate these [consulting] agreements to communicate with the CEO of the company who is on the Board—and not the entire Board—about them."
   h. That "the consulting agreements at issue in Count 7 of the indictment have multiple similarities to consulting agreements

4

      entered into by a variety of companies [and] that sometimes but not always companies disclose such agreements."

F. Gayle Klein

  1. Identify the "various theories of law" pursuant to which Klein believes there were "colorable claims against Retrophin, its officers and directors" by the defrauded MSMB investors (Disclosures at 4), a summary of any specific opinions that Klein will offer regarding these "various theories of law," and the bases and reasons for any such opinions.

  2. The reasons and bases for the following proffered testimony: "following the announced decision by the general partners of MSMB Capital Management LP and MSMB Healthcare LP to dissolve, liquidate and wind down the hedge funds, the general partners' refusal or inability to distribute the investors' limited partnership interests for cash and the unauthorized distribution of Retrophin shares to those investors gave rise to colorable claims against Retrophin, its officers and directors." (Id.).

G. Craig Lewis

  1. A summary of the specific opinions, along with the bases and reasons for those opinions, that Lewis will offer regarding the following proffered topics for testimony (Disclosures at 4):
    a. Lewis's "review and analysis of trading in Retrophin common stock between in or about November 2012 through in or about September 2014."
    b. That the trading activity of the Fearnow shareholders "in the aggregate, would be expected to put downward pressure on the price of Retrophin common stock."
    c. That "the trading behavior" of the Fearnow shareholders "is inconsistent with an agreement between and among Mr. Shkreli, those shareholders, and/or anyone else, including [the defendant], to control the price or the volume of trading in Retrophin stock."

  2. Any and all trading records upon which Lewis relied in preparing for his testimony, including in the course of conducting analyses or forming opinions.

H. Ronald Minkoff

  1. A summary of the specific opinions, along with the bases and reasons for those opinions, that Minkoff will offer regarding the following proffered topics for testimony (Disclosures at 4-5):
    a. "[I]ndustry customs and practices governing the preparation of settlement agreements in the context of actual or threatened litigation."

5

      b.    "[I]ndustry customs and practices relating to potential malpractice exposure."

      c.    That it is "typical and reasonable for a lawyer to prepare such settlement agreements at his or her client's direction and to include broad releases in such settlement agreements."

      d.    That a lawyer "who refuses to prepare settlement agreements at a client's direction in the context of actual or threatened litigation and/or who fails to obtain broad releases in the context of such agreements potentially would be exposed to malpractice liability."

I. <u>Lori Smith</u>

1. A summary of the specific opinions, along with the bases and reasons for those opinions, that Minkoff will offer regarding the following proffered topics for testimony (Disclosures at 5):

      a.    "[G]eneral customs and practices of an independent auditor of a small public company."

      b.    That "it is not the responsibility of an independent auditor to assess a company's legal responsibility for a given loss or liability, including a settlement of actual or threatened litigation."

      c.    That "following conventional audit procedures, it is common for an independent auditor to identify information that warrants disclosure or expanded disclosure in a company's financial statements."

      d.    That "company management and/or its legal counsel often advocate for more limited public disclosures to guard against competitive disadvantage."

      e.    That "the financial reporting of early-stage or small public companies often contain more errors or discrepancies than those of more mature or larger companies due to a lack of personnel, expertise and/or internal controls over such financial reporting."

\*    \*    \*

In addition to the disclosures requested above, the government requests that, for each expert, you identify the federal and state court proceedings, and any arbitration proceedings, in which one of the above-discussed experts offered substantially similar testimony to the testimony noticed in this case.

       Thank you again for your agreement to provide further disclosures related to the noticed expert witnesses.

                                   Respectfully submitted,

                                   BRIDGET M. ROHDE
                                   Acting United States Attorney

By:    /s/_____
            Alixandra E. Smith
            David C. Pitluck
            David K. Kessler
            Assistant U.S. Attorneys
            (718) 254-7000