**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

September 12, 2017

BY ECF AND BY HAND

The Honorable Kiyo A. Matsumoto
United States District Court Judge for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     *United States v. Greebel,*  S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter in opposition to the government's request today asking the Court to schedule a briefing schedule and *Daubert* hearing at this juncture.  Scheduling the filing of briefs and a *Daubert* hearing before oral argument on October 3, 2017, is premature, unwarranted, and unfair.  Instead, we respectfully request that we provide supplemental expert disclosures on or before September 28, 2017, that the parties can discuss those disclosures with the Court during oral argument on October 3 in connection with the government's motion to preclude nine of ten experts on relevance grounds and, if necessary, then schedule a briefing schedule and any *Daubert* hearings (should the Court view them as necessary, which we do not believe they will be) at the close of the government's case-in-chief.  Our proposal is more efficient and will save court time (by avoiding *Daubert* hearings for experts we do not intend to call at trial having heard the government's case-in-chief, and by preventing **two** *Daubert* hearings for each potential expert we actually call at trial because our experts will likely supplement their opinions based on the government's case-in-chief), and will ensure that the government does not gain impermissible insight into our legal defenses and strategies.

## Procedural Background

On or about August 11, 2017, we provided timely disclosures of our potential experts.  Greebel Pretrial Disclosures, Dkt. No. 312-2.  Between on or about August 11 and on or about August 18, we sought and obtained a number of meet and confer telephonic meetings with the government relating to, among other things, expert witnesses.

On or about August 14, 2017, the government proposed "a schedule for dealing with final expert disclosures, objections and/or *Daubert* hearings" and proposed "final expert disclosures for both parties (with accompanying charts, documents, resumes, etc.)" by September 8, related motion practice by September 22, and *Daubert* hearings to follow.  *See* Ex. A to Greebel Opp'n to Gov't MIL, Dkt. 347-1.

GIBSON DUNN

The Honorable Kiyo Matsumoto
September 12, 2017
Page 2

The next day, on or about August 15, we respectfully declined and explained our reasons in a letter to the government.  *See id.*  We explained that we may or may not call our expert witnesses and, if we called any of them, our experts will be *responding* to the government's case-in-chief and, therefore, it would be highly prejudicial and premature for the defense to provide "final expert disclosures" in September *before we had even received* (according to the government's representations to us) all of the government's discovery, trial exhibits, 3500 material, and before we even heard the government's case-in-chief.   Moreover, we explained our strong position that the government's proposal interfered with our client's right not to disclose all his defenses prior to the government's case-in-chief.  *Id.*  Despite this, we offered in our letter, and subsequently by telephone, to provide further disclosures relating to our expert witnesses.  And we asked the government to identify the expert witnesses for which they wanted additional disclosures and what further information they would like us to disclose relating to such experts.

In lieu of seeking additional disclosures and meeting and conferring further regarding a mutually agreeable approach to briefing and/or any *Daubert* hearings (if necessary, which we do not believe they will be), the government moved to preclude nine of our ten potential expert witnesses.  The government argued primarily that our potential experts did not meet the low threshold of relevance under Rule 401.  For example, the government argued that Professor Craig Lewis, the former Chief Economist of the SEC, who will testify in sum and substance that his review and analysis of trading in Retrophin common stock from in or about November 2012 through in or about September 2014 was inconsistent with any alleged agreement between and/or among the Fearnow-share recipients.  The government argued Professor Lewis's testimony was "irrelevant" because the trading came after the alleged conspiracy was hatched and "even assuming that Prof. Lewis's analysis were correct, it is at best evidence that the conspiracy was unsuccessful."  Gov't MIL, Dkt. 329, at 47-48.

But the government's argument contradicted (a) the Superseding Indictment, which charges a conspiracy from in or about November 2012 through September 2014 in Count Eight—the exact period of time covering Professor Lewis's analysis, (b) the government's own evidence submitted in the trial of *United States v. Shkreli* regarding the trading after the alleged conspiracy, and (c) the government's own arguments seeking admission of Mr. Shkreli's grotesque threats to Mr. Pierotti's wife and children after the alleged conspiracy was hatched. The only expert that the government did not move to preclude, Professor Stephen Gillers, is an expert in the area in which the government was considering calling an expert witness at trial.  *See* Gov't MIL, Dkt. 329, at 41 n.20.  Notably, although we know that the government reached out and spoke to potential legal ethics experts, the government has informed us that it will not be calling one during its case-in-chief.

After briefing on the government's motions to preclude nine of our ten expert witnesses was complete, the government on or about September 7 requested additional disclosures on our experts.  Yesterday at approximately 1 p.m., the government proposed a briefing schedule for its *Daubert* motions and hearings, and told us that it would be filing a schedule at 10 a.m. today.  We responded by asking to meet and confer about the matter so that we could avoid

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
September 12, 2017
Page 3

further briefing for a court that already has a significant number of motions pending. During the meet and confer, the government listened but rejected our points and stated that it would be filing a proposed briefing and *Daubert* schedule.

**Argument**

For the reasons described below, we respectfully oppose the government's request for a briefing/*Daubert* hearing schedule prior to oral argument on October 3 before the government has produced all discovery, 3500 material, trial exhibits, and before the government's case-in-chief. We propose to supplement our expert disclosures on or about September 28 so that the government and the Court may review them, and then discuss with the Court on October 3 whether to have a further briefing schedule and whether and when to hold any *Daubert* hearings.

***First***, the government's motion for *Daubert* briefing and hearings is premature. Pending before this Court are approximately 25 different motions *in limine*, including the government's motion to preclude nine of the ten potential experts. Given that the Court's ruling on those motions will affect the scope of Mr. Greebel's permitted expert testimony, we submit that the more practical approach would be to address the need for any *Daubert* motions or hearings following the Court's motion *in limine* rulings, following the Court's ruling on our motion to dismiss Count Seven, and after the government's case-in-chief.

For example, should the Court grant our motion to dismiss Count Seven, the case will be streamlined significantly and there will be no need for most of the experts. As such, it is premature to impose a briefing schedule (a) before we provide our supplemental disclosures in response to the government's September 7 request, (b) before the Court hears oral argument on the government's motion to preclude these experts on relevance grounds, and (c) before the parties obtain guidance from the Court regarding such experts.

***Second***, the government has challenged the relevance of our experts pursuant to Rule 401 and Rule 403. *Daubert* hearings are not necessary for the Court to determine whether the proffered testimony of an expert is "relevant" under Rule 401 and Rule 403. The government therefore improperly presumes the need for *Daubert* hearings. The government has had all the information necessary to decide whether it wanted to challenge the qualifications of our experts. Moreover, even if experts like Professor Craig Lewis offer trading analysis, the Second Circuit has noted that "the *Daubert* factors do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." *United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015) (internal quotation marks and citation omitted). Almost all of Mr. Greebel's potential experts rely on their personal knowledge and experience as opposed to traditional scientific methods like DNA analysis. While the Court has a gate-keeping role for experts that are not relying on traditional scientific methods, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
September 12, 2017
Page 4

149–50 (1999), the government has not once suggested—nor could it credibly contend—that it intends to challenge the personal knowledge and experience of our proposed experts.

Indeed, this Court should hear oral argument on the government's motion to preclude nine of our ten experts on relevance grounds before setting any *Daubert*-related briefing schedule, because the government is narrowly interpreting *Litvak* and mistakenly relying on two Second Circuit summary orders. With respect to *Litvak*, the government has not addressed the Second Circuit's liberal and "very low standard" of relevance. 808 F.3d at 180 (internal quotation marks and citation omitted). The government also narrowly construes the *Litvak* Court's fulsome explanation of why the exclusion of the proffered testimony of Mr. Litvak's experts warranted a new trial. For example, the government has overlooked the *Litvak* Court's thorough analysis that the proffered testimony of Marc Menchel was relevant because it was about the nature of the relationship of the parties to certain transactions, it was contrary to the government's characterization of the transactions at issue, and it "could have rebutted" the testimony of witnesses called by the government. *Id.* at 186–88. In attempting to distinguish *Litvak*, the government relies on an inapposite (and non-precedential) summary order in *United States v. Collins*, 581 F. App'x 59 (2d Cir. 2014). A substantial portion of the *Collins* summary order has been arguably overruled by *Litvak*: while *Collins* held that fact witnesses were sufficient to present Mr. Collins' view of materiality, the *Litvak* Court held that it was error to leave testimony regarding materiality solely to the alleged victims of the conduct. *Compare Collins*, 581 F. App'x at 60, *with Litvak*, 808 F.3d at 183–84. Moreover, the government's reliance on the non-precedential summary order in *United States v. Newkirk*, 684 F. App'x 95 (2d Cir. 2017), is misplaced. In that case, the Second Circuit held that the proffered expert testimony of transactional terms was irrelevant because it was cumulative of lay opinion testimony that Mr. Newkirk never objected to, and it did not go to any element in dispute. *Id.* at 97. By contrast, we have proffered experts whose opinions contradict the government's prior theories of prosecution, go directly to allegations in the Indictment and elements of the charged crimes, and likely will rebut anticipated testimony.

Although the government has not challenged the qualifications and methodology of our expert witnesses at this juncture, we respectfully draw the Court's attention to the Second Circuit's explanation about how "expert testimony does not [have to] rest on traditional scientific methods." *Litvak*, 808 F.3d at 180 n.25 (internal quotation marks and citation omitted). Indeed, the Second Circuit quoted the Supreme Court in *Kumho Tire*, 526 U.S. at 148–49: "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from. . . specialized experience.' Thus, district courts must be mindful that 'the *Daubert* factors do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert.'" *Litvak*, 808 F.3d at 180 n.25. Mr. Willner's testimony in *Litvak*, for example, was primarily based on first-hand experience as a trader in RMBS securities at issue in the case. *Id.* at 180. And the Second Circuit cited numerous decisions that reflect the expansive view of an expert's experience:

> *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015) (finding no abuse of discretion admitting expert testimony of coin valuation even though "it is possible that [the expert's] methods are not entirely replicable because they are based in part on his personal experiences as a coin dealer"); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (admitting securities industry expert's testimony "as to what ordinary broker activity entails and as to the customs and practices of the industry"); *SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert testimony that "certain trading patterns would raise 'red flags'" based on the expert's "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular, and as such, are supported by his 30 years of experience in the securities industry").

*Litvak*, 808 F.3d at 180 n.25.

**Third**, we are deeply concerned that, in seeking to conduct pre-trial *Daubert* hearings, the government is obtaining an unfair and unwarranted opportunity to confront our witnesses early and preview Mr. Greebel's defenses while the government still has time to make adjustments to its case-in-chief. At the same time, the government's approach improperly freezes the expert's testimony before those experts have yet had the chance to respond to the government's case-in-chief—which is of course the very purpose of our expert witnesses.

Courts have warned against this form of abuse as prejudicial in its unfairness to people accused of crimes:

> Nonetheless, the Court remains concerned about the use of pre-trial *Daubert* hearings in criminal cases. Although the Court does not believe that any abuse occurred here***, there remains a risk that the Government could seek a* Daubert *hearing improperly to gain otherwise impermissible insight into a defendant's strategy. Confronted with a motion for a* Daubert *hearing, a criminal defendant could be presented with a difficult choice between revealing trial strategy in advance or taking the risk that resisting a pre-trial* Daubert *determination will prejudice his or her right to present expert testimony at trial.*  *Cf. United States v. Nacchio,* 555 F.3d 1234, 1259 (10th Cir. 2009) (McConnell, J., dissenting). The Court is also cognizant that pre-trial *Daubert* hearings could be used to bring pressure on the financial ability of criminal defendants to put on a defense. *Cf. United States v. Stein,* 541 F.3d 130 (2nd Cir. 2008). Again, the Court notes that the Government did not exploit the *Daubert* hearing in this case, but the risk remains for future cases.

*United States v. St. Pierre*, No. CRIM. 09-374, 2011 WL 2199375, at *2 (E.D. La. June 6, 2011) (emphasis added) (finding that the court could not order the government to pay for defendant's expert witness fees for the *Daubert* hearing due to sovereign immunity); *see also*

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
September 12, 2017
Page 6

*Wardius v. Oregon*, 412 U.S. 470, 475 n.9 (1973) (noting there are inherent discovery advantages for the prosecutors, and concluding "if there is to be any imbalance in discovery rights, it should work in defendant's favor.").[1]

Similarly, in *United States v. Mehta*, the district court vacated the magistrate judge's order granting the government's request that the defendant supplement his expert disclosures. 236 F. Supp. 2d 150, 155–57 (D. Mass. 2002). The court specifically took issue with the requirement that the expert predict what his final opinion will be at trial "without having access to all of the information on which he will base his opinion at that time," such as *Jenks* material. *Id*. at 157*; see also id*. at 155 ("The difference between the civil and criminal rules derives from the special constitutional constraints of criminal proceedings."). Forcing "production of an incomplete opinion and set[ting] a potential impeachment trap for the defense expert" would result in "grossly incongruent and inequitable disclosure obligations." *Id.* at 157. Here, like in *Mehta*, *Daubert* hearings will impermissibly force the our experts to predict their final opinions without having access to all of the government's discovery, trial exhibits, 3500 material, and before the government's case-in-chief. We respectfully request that the Court reject the government's attempts to use the *Daubert* hearing process to gain improper advantage over trial strategies.

This is completely different than the circumstances in *United States v. Yousef*, 327 F.3d 56, 147–48 (2d Cir. 2003), wherein the defendant's expert witness was being called to challenge the government's expert about whether the chemicals found in an apartment matched the ones used in the World Trade Center bomb. The government had disclosed the opinions and basis therein of its expert, and there was no abuse of discretion for the district court to hold a pretrial hearing regarding the defense expert's response to the government's expert. *Id.* at 148. By contrast, we have identified ten potential experts to respond multiple different potential government theories for its case-in-chief, because we are unsure of what the government's case against Mr. Greebel will actually be in terms of the evidence. Not only has the government told us that the trial against Mr. Greebel will be different with different evidence than the trial against Mr. Shkreli, but we expect that must be the case since there was a total lack of evidence relating to Mr. Greebel at Mr. Shkreli's trial. Accordingly, we do not know whether and how many experts we will call at the trial. For example, if the government has no plans to call the witnesses from Marcum, as they decided to do during Mr. Shkreli's trial, that will likely eliminate certain experts from our side, should we decide to put on a case.

---

[1] Indeed, we respectfully submit that pursuant to Rule 16(b)(1)(C), because the government has not complied with our request for expert disclosures from the government, we arguably do not have an obligation to provide supplemental expert disclosures. We are not taking that position because we believe that it is in the best interests of this case for us to supplement our disclosures which will make it obvious—to the extent it is not already so—that the proffered testimony of our experts is relevant under Rule 401 and admissible.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
September 12, 2017
Page 7

Moreover, the government's argument that the Court should "resolve *Daubert* challenges in advance of trial in order to avoid unnecessary uncertainty about legal and factual issues in the case...", Gov't Letter at 2, makes no sense. Only the Court can instruct the jury on the applicable law. And our experts will not create "uncertainty" about "factual issues" because they are going to respond to the government's case-in-chief and the elements in the case. The government's statement about "uncertainty" suggests that the government is looking for a preview into how we plan to defend the case, and that is not the purpose of Rule 16's expert disclosures and *Daubert* hearings in criminal cases. Because the government has nearly all the one-sided power to obtain discovery in connection with a criminal case and because the government bears the burden of proof at all times in a criminal case, government requests to ferret out information about the accused's legal defenses and strategies should be reviewed with scrutiny and denied without compelling reasons. Here, the government cannot meet its burden of demonstrating why it needs discovery into our experts, including cross-examination at hearings, prior to trial.

*Fourth*, the government's proposal would require two rounds of hearings—an initial round of hearings prior to the start of trial and then a second round of hearings after the government's case-in-chief. The government does not dispute that we have the right to supplement the expert disclosures after the government's case-in-chief to respond to the government's evidence at trial. Accordingly, under the government's proposed approach, this Court would end up holding *Daubert* hearings right before trial and then additional *Daubert* hearings for the same expert witnesses based on supplemental disclosures after the government's case-in-chief. That is an inefficient and unnecessary method to deal with challenges to proffered expert testimony.

*Finally*, to the extent the Court is concerned that these issues need to be resolved in advance of the government's case-in-chief in order to prevent us from referring to unadmitted potential experts in its opening or during the government's case-in-chief, we represent to the Court that, if the Court is unsure about the admissibility of any expert witness (based on relevance or any other ground), we will not refer to such expert or experts during opening statements or the government's case in chief.

We thank Your Honor for your attention to and consideration of our request.

Respectfully submitted,

/s/ Reed Brodsky


Reed Brodsky

cc:     All counsel (via ECF)