

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMK:AES/DCP/DKK                         *271 Cadman Plaza East*
F.#2014R00501                                  *Brooklyn, New York 11201*

September 25, 2017

By Hand and ECF

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   United States v. Evan Greebel
>        Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

On September 15, 2017, in response to the government's request for a briefing schedule on Daubert motions, the Court ordered the defendant to provide supplemental expert disclosures by September 19, 2017, and set a briefing schedule to address those supplemented disclosures.  The defendant accordingly provided a letter containing additional information about his noticed experts, which is attached hereto as Exhibit A ("Supplemental Disclosures").  As discussed below, these disclosures still fail to satisfy the requirements of Federal Rule of Criminal Procedure 16 and fail to establish that at least five of the defendant's experts—Craig Lewis, Alan Johnson, Matthew D. Ferrante, Bryan A. Garner, and Gayle R. Klein (collectively, the "Subject Experts")—will offer testimony that satisfies the requirements of Rule 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  As a result of these failures, the government respectfully requests that those experts be precluded from testifying.  In the alternative, the government requests that this Court order the defendant to immediately provide the information required by Rule 16 regarding the Subject Experts and schedule a Daubert hearing to address the testimony of the Subject Experts.[1]

---

[1] In requesting Daubert hearings for only five of the ten experts noticed by the defendant, the government does not concede the relevance or admissibility of the opinions proffered by the defendant in connection with the other five experts or concede that the Supplemental Disclosures comply with Rule 16.  The government will meet and confer with the defendant to address any additional disclosures the government believes are required for those other five experts.  Moreover, the government reserves the right to raise Daubert challenges to those other five experts should additional disclosures by the defendant reveal new analyses or other issues that are properly addressed in a Daubert hearing.

Specifically, the defendant's August 11, 2017 initial disclosures stated that:  (i) Matthew Ferrante would testify about "his digital analysis of documents and related metadata" in this case; (ii) Bryan Garner would testify about "his linguistic analysis of written communications" involving the defendant and others; (iii) Alan Johnson would testify about "his scientific identification and analysis of consulting agreements disclosed publicly though SEC filings"; (iv) Craig Lewis would testify about "his review and analysis of trading in Retrophin common stock"; and (v) Gayle Klein would testify about the viability of "colorable claims against Retrophin" under "various theories of New York and Delaware law."  Def.'s Expert Disclosures, Dkt. No. 312-2 ("Initial Disclosures").  The Initial Disclosures strongly suggested that these analyses had already been performed and that the defendant was apprising the government and the Court of the results of those analyses.

Notwithstanding the analyses described in the Initial Disclosures, the defendant's Supplemental Disclosures indicate that these analyses have not happened, will not happen, or are still in progress.  More troubling, the Supplemental Disclosures do not permit the Court to perform its gatekeeping function under Daubert and its progeny; do not allow the government to prepare for cross-examination or Daubert hearings; and do not meet the requirements under Rule 16(b)(1)(C).  Especially in light of the number of expert witnesses that the defendant has noticed and the breadth and complexity of topics upon which the experts apparently intend to opine, the defendant should not be permitted to withhold the bases for his experts' opinions until the eve of trial.

I.    Background

On August 11, 2017, the defendant disclosed that he might call as many as ten expert witnesses in his case-in-chief.  The Initial Disclosures provided a one-paragraph summary of each witness's expected testimony and attached each witness's resume.  The Initial Disclosures stated that "the opinions offered by the experts will be the product of reliable principles and methods," but did not identify what those principles and methods were.  Id.  The natural inference to be drawn from that purported guarantee is that the defendant was already fully aware of the "reliable principles and methods" each expert would use.

On September 7, 2017, the government requested that the defendant make additional disclosures regarding nine of the defendant's ten expert opinions.  Dkt. No 365-1.  Among other things, the government requested that the defendant disclose the analyses underlying the Subject Experts' proffered testimony and identify the documents upon which the Subject Experts rely.

On September 20, 2017, the defendant provided Supplemental Disclosures regarding nine of his ten expert witnesses.  See Ex. A.[2]  The Supplemental Disclosures do not

---

[2] The 94-page Supplemental Disclosures include 27 pages of disclosures and an additional 67 pages that merely contain resumes that were previously produced in connection with the defendant's Initial Disclosures.  See Dkt. No. 312-2.  The government has omitted those resumes from Exhibit A.

include the analyses underlying the Subject Experts' proffered opinions and do not identify the specific documents upon which the opinions are based. A summary of the Subject Experts' proffered opinions and bases for those opinions are set forth below.

### A. Craig Lewis

The Supplemental Disclosures state that Lewis will testify that, based on his analysis of Retrophin trading data, the trading behavior of the Fearnow share recipients was inconsistent with an agreement to control the price or volume of Retrophin stock. The Supplemental Disclosures do not provide Lewis's analysis, but rather provide a general overview of steps Lewis purportedly took (or will take) and state that his analysis of Retrophin trading shares is "ongoing." Id. at 7-8. For example, the Supplemental Disclosures state that Lewis's trading analysis involves "analyzing the trading accounts appearing more frequently as net buyers on high volume trading dates" and "analyzing the Fearnow share recipients' trading behavior, in the aggregate and as individuals, following a decrease in Retrophin's share price."

The Supplemental Disclosures further state that Lewis's trading analysis is based on Retrophin blue sheet data produced by the government and share price data obtained from Bloomberg Terminal. However, the Supplemental Disclosures do not detail the methodology underlying Lewis's analysis.[3]

### B. Alan Johnson

The Supplemental Disclosures state that Johnson will provide various opinions about the use of consulting agreements by public and private companies. The Supplemental Disclosures further state that Johnson will testify that "[b]ased on a review of the consulting agreements at issue in this matter and his ongoing analysis of publicly disclosed consulting agreements, the consulting agreement at issue have multiple similarities to consulting agreements entered into by a variety of companies." Id. at 11. It is hard to imagine that Johnson has already reached the purported opinion about "similarities" had his "review" and "analysis of publicly disclosed consulting agreements" not taken place.

The Supplemental Disclosures do not provide Johnson's analysis, but rather provide a general overview of Johnson's methodology and state that his analysis is "ongoing." For example, the Supplemental Disclosures state that Mr. Johnson's ongoing analysis involves "analyzing the consulting agreements at issue in this case, including the specific terms included"; "using keyword searches in the SEC's EDGAR database . . . to identify the disclosure of consulting agreements that are potentially comparable"; and "analyzing the universe of

---

[3] The Supplemental Disclosures also do not specify the specific share price data from Bloomberg that Lewis will rely on for his analysis. The government and Shkreli stipulated to the admission of certain share price data from Bloomberg at the Shkreli trial, and the government anticipates it will seek a similar stipulation in this trial. In connection with that stipulation, the government will discuss with the defendant what specific Bloomberg data the parties will seek to use in this trial, including any data upon which Lewis may rely.

potentially comparable consulting agreements to identify agreements that have similar key terms." Id. at 11.

The Supplemental Disclosures do not identify any of the "potentially comparable" consulting agreements upon which Johnson's analysis is based, disclose the keywords he used, or provide any other detail about the "analysis" he conducted.

C.  Bryan Garner

The Supplemental Disclosures state that, if "the government's case-in-chief raises issues regarding the meaning of terms in communications between Mr. Shkreli and Mr. Greebel, we would consider calling Professor Garner to analyze those communications."  The Supplemental Disclosures further state that Garner may opine that "the context of a communication is a primary determinant of interpreting meaning"; "the meaning of communications between Mr. Shkreli and Mr. Greebel is affected by the linguistic habits of each participant and by the context in which each communication took place"; and that "the meaning of written communications from an outside corporate counsel, such as Mr. Greebel, to the Chief Executive Officer of his client, such as Mr. Shkreli, must be read in the context of outside counsel terminology." Id. at 17-18.

Unlike the Initial Disclosures, the Supplemental Disclosures do not include any opinion Garner may offer regarding the meaning of particular communications in this case; the "linguistic habits" of the defendant, Shkreli, or anyone else; or the analysis of "outside corporate counsel terminology."

The Supplemental Disclosures state that Garner's expert opinion will be based on his experience, the use of online "tools" such as the Oxford English Dictionary Online, and his "review of documents relating to this matter."  None of the documents related to this matter are identified, and the defendant provides no explanation of how the review of documents in this matter inform Garner's opinions, which, as described, do not relate to specific documents.

D.  Matthew Ferrante

The Supplemental Disclosures state that Ferrante will explain various concepts relating to electronic metadata and that, if the government's case-in-chief raises "computer and/or electronic forensic issues," the defendant "would consider calling Mr. Ferrante to analyze the documents or materials in question, and to testify about them."  The Supplemental Disclosures state that Ferrante's "review and analysis" will be based on a "methodology" that includes "processing of document data using acceptable tools." Id. at 15-16.  The Supplemental Disclosures identify five such "tools"; it is not clear which, if any, have been employed by Ferrante in this case or the methodology he used to reach his opinion.

As with Garner, the Supplemental Disclosures state that Ferrante's expert opinion will be based in part on his "review and analysis of documents relating to this matter."  None of the documents relating to this matter are identified.

E. Gayle Klein

The Supplemental Disclosures state that Klein may "testify to the likelihood that a reasonable plaintiff's attorney would, on behalf of MSMB investors, bring a variety of colorable claims against Retrophin and its officers and directors." Id. at 19. The Supplemental Disclosures further state that Klein will not testify to the laws that might apply to such claims, but rather only that she would bring (unidentified) claims on behalf of MSMB investors against Retrophin because she would have a "good faith basis to do so in fact"; that these claims would "likely engender negative publicity against Retrophin," which might seek to resolve such claims via settlement; and that, in general, a plaintiff's lawyer brings claims that not only have a good-faith basis in fact, but also are against companies that have the ability to pay damages. The Supplemental Disclosures do not identify which specific claims Klein would bring or explain how the facts of this case would fit within the elements of such claims. In fact, the Supplemental Disclosures do not even state whether Klein actually conducted such an analysis of fitting facts to claims.

As with Garner and Ferrante, the Supplemental Disclosures state that Klein's expert opinion will be based in part on her "review of documents relating to this matter," none of which are identified. Id. at 20.

II.     Standards Governing the Disclosure and Admission of Expert Testimony

In Daubert and its progeny, the Supreme Court focused on a district court's gatekeeping obligation when considering the admissibility of expert testimony based on specialized knowledge under Rule 702 of the Federal Rules of Evidence. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999). Although the Second Circuit applies a liberal approach with respect to the admission of expert evidence, see, e.g., United States v. Jakobetz, 955 F.2d 786, 794 (2d Cir. 1992), the Supreme Court has explained that a district court, in executing its gatekeeping function, must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The proponent of the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10.

As the Second Circuit recently stated, "[t]he district court cannot perform [the] complex evaluation of an expert's proposed methodology without a clear articulation of what the expert's opinions are and, even more importantly, of the bases for those opinions." United States v. Ulbricht, 858 F.3d 71, 115 (2d Cir. 2017). Thus, in order for a court to evaluate an expert's methodology, the proponent of the expert's testimony must comply with Federal Rule of Criminal Procedure 16(b)(1)(C), which requires that a written summary of expert testimony describe the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The purpose of the rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." United States v. Wilson, 493 F. Supp. 2d 484, 486-87 (E.D.N.Y. 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment); see also United States v. Ulbricht, No. 14-CR-68 (KBF), 2015 WL 413318, *5 (S.D.N.Y. Feb. 1, 2015), aff'd 858 F.3d 71 (2d Cir. 2017).

It is well settled that Federal Rule of Criminal Procedure 16(d)(2)(C) gives a district court the discretion to preclude expert testimony about any topics or opinions not properly disclosed.  See, e.g., Ulbricht, 2015 WL 413318 at *5; United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (citing United States v. Barile, 286 F.3d 749, 758–59 (4th Cir. 2002)); United States v. Valle, No. 12-CR-847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y.  Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions.").  A court may preclude the testimony as a whole, or any part that it determines was not properly disclosed to the government.  See Mahaffy, 2007 WL 1213738, at *2.  Moreover, even if the disclosure provides a sufficient summary of any opinions to be offered by the witness, the testimony may be excluded if the defendant "has made no attempt at all to describe the bases and reasons for those opinions as required by [Rule 16(b)(1)(C)]."  Wilson, 493 F. Supp. 2d at 487 (internal quotation omitted).  "'[P]roviding the government with a list of sources from which the experts drew their opinions' but not 'specify[ing] which sources the expert used to reach the different opinions identified' is insufficient."  United States v. Ahmed, No. 12-CR-661 (SLT), 2015 WL 1611947, at * 1 (E.D.N.Y. 2015) (quoting United States v. Ferguson, No. 06-CR-137 (CFD), 2007 WL 4539646, at *2 (D.Conn. Dec.14, 2007)).

With respect to the admission of expert testimony, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has explained that Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 590. "[W]hether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'" Kumho Tire, 526 U.S. at 149 (internal citation omitted).  Therefore, an expert's testimony must be relevant, reliable, and of such a foreign subject matter that the testimony would assist the trier of fact.

With regard to expert testimony that is based upon experience, and not upon professional studies, the Sixth Circuit has cautioned:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . reliably applied to the facts.  The trial court's

gatekeeping function requires more than simply "taking the expert's word for it."

Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005) (quoting Fed. R. Evid. 702, Advisory Committee Note).  In other words, expert opinions are inadmissible if based on speculative assumptions.  See Daubert, 509 U.S. at 589-590 (noting that "knowledge" within the meaning of Rule 702 means more than subjective belief and unsupported speculation); see also Kumho Tire, 526 U.S. at 157 (1999) (noting that "[o]pinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be admitted).

III.    The Defendant's Supplemental Disclosures Are Inadequate Under Rule 16

The Supplemental Disclosures are inadequate under Rule 16 for numerous reasons.

First, the Supplemental Disclosures for Ferrante and Garner do not adequately state those witnesses' opinions, as required by Rule 16.  At best, the disclosure for Ferrante identifies the subject matter of his testimony, i.e. "computer and/or electronic forensic issues."  But other than stating that Ferrante will "analyze" and "testify about" documents, the defendant provides no insight into what opinion Ferrante is expected to offer.[4]  This is plainly insufficient.  Valle, 2013 WL 440687, at *5 ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); see also Mahaffy, 2007 WL 1213738, at *3 (excluding an expert's testimony because "the disclosure statement only proffered general topics and did not describe any opinions that would be offered by the witness on these topics.").

Similarly, the disclosure that Garner may "analyze" communications between the defendant and Shkreli fails to disclose any actual analysis of those communications that Garner will offer.  To the extent the defendant is offering Professor Garner solely for the purpose of opining that the "context of a communication" is important in determining its meaning and that the "linguistic habits" of the defendant and Shkreli affect their communications, those opinions are meaningless without a concurrent opinion regarding the "context" of a particular communication and the "linguistic habit" of a particular person.  The Supplemental Disclosures identify no such opinions, and a jury does not need an expert to tell it merely that communications depend on context.

Second, the Supplemental Disclosures do not adequately provide information relating to the methodology underlying the analyses of Lewis, Johnson, or Klein.

The disclosure for Lewis states that his "analysis" will include "analyzing the trading accounts appearing more frequently as net buyers on high volume trading dates" and "analyzing the Fearnow share recipients' trading behavior, in the aggregate and as individuals following a decrease in Retrophin's share price."  But "analyzing" something is not a

---

[4] The absence of such an opinion is curious in light of the defendant's initial disclosure that Ferrante "will testify about his digital analysis of documents and related metadata, as produced by the government in this case."  Initial Disclosures at 1.

methodology—it is merely an indication that some methodology was used.  Similarly, stating that an expert's opinion will be based on various analyses is not a substitute for providing those analysis.  And stating than an expert will analyze a particular subject is not a substitute for specifying how that analysis will take place.

The disclosure for Johnson similarly lacks a clear articulation of what Mr. Johnson did and why he did it.  According to the Supplemental Disclosures, Johnson's analysis includes:

(i)     "analyzing the consulting agreements at issue in this case," but the defendant has not disclosed how that analysis was performed;

(ii)    "using keyword searches in the SEC's EDGAR database," but the defendant has not identified those key words or even described generally the nature of the searches;

(iii)   "analyzing the universe of potentially comparable consulting agreements to identify agreements that have similar key terms," but the defendant has not identified what constitutes a "key term" or the "universe of potentially comparable consulting agreements";

(iv)    "analyzing the prevalence of certain terms that are common in comparable consulting agreements," but the defendant has not identified either the terms or the agreements, or explained how Johnson determined which agreements are "comparable"; and

(v)     "analyzing the types of companies that have entered into comparable consulting agreements," but the defendant has not identified what this analysis entails, as discussed above.

In short, the Supplemental Disclosures state that Johnson performed (or is performing) an analysis, but fail to provide the information necessary for the government to test that analysis or for the Court to make the requisite "preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and . . . can be applied to the facts."  Ulbricht, 2015 WL 413318, at *7.[5]

Finally, the disclosure for Klein contains no information about the analysis underlying her opinion regarding the viability of legal claims against Retrophin.  In reaching that opinion, Klein presumably employed some sort of methodology, such as legal research and

---

[5] It is also not clear that Johnson is qualified to perform this type of "scientific" analysis (or to testify about topics beyond "executive compensation consulting" (Ex. A at 10)).  It is one thing to be an expert in the field of "executive compensation consulting services"; it is another to conduct a data-driven study.

8

analysis.  But the Supplemental Disclosures provide no window into her methodology or any analysis she may have performed.[6]

   Third, the Supplemental Disclosures do not adequately provide the bases for the Subject Experts' opinions.  For Garner, Ferrante and Klein, the disclosures state that their opinions are based on a combination of (i) their experience, and (ii) their review of documents related to this case.  But the disclosures do not identify which documents the experts reviewed, or how those documents form the basis of any of the opinions the experts intend to offer.[7]  The defendant is required to provide both kinds of information; to date, he has offered neither.  Ahmed, 2015 WL 1611947, at *1 ("[P]roviding the government with a list of sources from which the experts drew their opinions but not specify[ing] which sources the expert used to reach the different opinions identified is insufficient.") (internal quotation marks and citation omitted)).[8]  For example, the defendant does not explain which documents Garner used to develop a view of the defendant and Shkreli's communication habits, which documents Ferrante examined, or upon which documents Klein relied to determine colorable claims existed.

   In sum, the Supplemental Disclosures do not meet the requirements under Rule 16(b)(1)(C) and do not permit the Court to perform its gatekeeping function under Daubert.  The remedy for Rule 16 violations is within the Court's discretion.  The government requests that the Court preclude the Subject Experts from testifying or, in the alternative, order the defendant to immediately disclose the information and analysis required by the Rule.

---

[6] In the Supplemental Disclosures, the defendant states that Klein will offer expert testimony about the viability of legal claims without providing legal analysis as to what those claims are and why they are viable.  As a preliminary matter, that is impermissible ipse dixit testimony.  Kumho Tire, 526 U.S. at 157.  Moreover, even if Klein were to testify solely about her opinion that viable legal claims existed, that opinion must be based on a legal analysis that Klein presumably conducted.  Like any other expert, Klein's methodology must be reliable, and there is no way to make that determination on the current record.

The defendant presents its proposal to limit Klein's testimony as an "accommodation" to the government's argument that Klein's testimony would require the jury to hear testimony regarding numerous laws that they will not need to consider in deliberation.  Ex. A at 19-20.  But, as the government stated in its motion in limine, Klein's testimony requires such analysis.  The question for purposes of Daubert and Rule 702 is not whether or how Klein would explain her opinions to the jury, but rather whether she should be allowed to offer them at all.  For the reasons set forth in the government's motions in limine, Klein's testimony should be precluded.

[7] The Supplemental Disclosures also state that Minkoff's testimony relies, in part, on his review of unidentified documents related to this matter.  Ex. A at 23.  For the same reasons, that disclosure is inadequate.

[8] Similarly, Johnson's analysis of consulting agreements is based on the review of agreements that the defendant has not disclosed.  And both Johnson and Lewis's testimony is based in part on "academic research and literature" that the defendant has not identified.

The defendant may contend that these analyses cannot be provided because they are "ongoing" or dependent upon evidence the government offers at trial, but that argument should be rejected for two reasons.  First, as discussed above, the defendant has described various opinions reached by its experts that depend upon the results of analyses; in other words, the defendant has implicitly conceded those analyses <u>have been</u> conducted.  Second, the defendant has guaranteed that the experts will use "reliable principles and methods."  He could not have made that guarantee without having first identified the "reliable principles and methods" his experts would use, and it is those methods, rather than the specific documents analyzed by the methods, that are at issue now.

IV.   <u>The Defendant Has Not Met His Burden to Show that the Subject Experts' Testimony is Admissible</u>

It is the defendant's burden to prove, by a preponderance of the evidence, that his proffered expert testimony is admissible.  <u>Daubert</u>, 509 U.S. at 592 n.10.  In order to be admissible, expert testimony must be both relevant and reliable.  <u>United States v. Williams</u>, 506 F.3d 151 ("The Federal Rules of Evidence assign to [the trial court 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting <u>Daubert</u>, 509 U.S. at 597).  For the reasons set forth in the government's motions <u>in limine</u>, Dkt. No. 329, the defendant has not shown that his proffered expert testimony is relevant. [9]  And for the reason set forth above, the defendant has not shown that the Subject Experts' testimony is reliable.  Without sufficient information detailing an expert's methodology and analysis, the expert's opinion cannot be assessed.  When an expert's opinion cannot be assessed, it is inherently unreliable and should be precluded.  <u>E.g.</u>, <u>Estate of Jacquez v. City of New York</u>, 104 F.Supp.3d 414, 431 (S.D.N.Y. 2015) (expert opinion unreliable where based on unidentifiable methodology).  And, if the defendant contends that the disclosures he provided are the only disclosures he can provide, this Court should preclude the proffered testimony based upon the defendant's failure to meet his burden to show the testimony is admissible.

At a <u>Daubert</u> hearing, the Court could consider, for example: (i) whether Garner has a sufficient basis to opine about the meaning of communications between two individuals, one of whom is not a lawyer and neither of whom he has ever met, and whether Garner's opinions about the meaning of communications between the defendant and Shkreli are based on "reliable principles and methods" (Rule 702(c)); (ii) whether Johnson's and Lewis's ongoing "analyses" of consulting agreements and trading data have "acceptance within the relevant scientific community" and are otherwise reliable (<u>Daubert</u>, 509 U.S. at 594); (iii) whether Ferrante's methodology for analyzing metadata is subject to industry standards; and (iv) whether Klein's legal opinions are based on a reliable legal analysis.  But, again, a methodology must be disclosed in order for it to be subject to appropriate scrutiny.  The defendant's current disclosures make that inquiry impossible.

---

[9] For the reasons set forth in the government's motions <u>in limine</u> (<u>see</u> Dkt No. 329), nine of the defendant's expert witnesses should be precluded from testifying at trial because their testimony is, among other things, irrelevant.  We do not repeat those arguments here, but note that they apply with equal force to the defendant's Supplemental Disclosures.

V.       Conclusion

        For the reasons set forth above, the government respectfully requests that the Court preclude the Subject Experts from testifying in this case.  In the alternative, the government respectfully requests that the Court order the defendant to immediately provide supplemental disclosures detailing the Subject Experts' actual opinions and the bases for those opinions.  Provided that such additional disclosures are made, the government further requests that the Court schedule Daubert hearings for the Subject Experts.[10]

                                        Respectfully submitted,

                                        BRIDGET M. ROHDE
                                        Acting United States Attorney

                        By:     /s/_____
                                        Alixandra E. Smith
                                        David C. Pitluck
                                        David K. Kessler
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

---

[10] Should additional disclosures establish that the proffered testimony of one or more of the Subject Experts complies with Rule 702 and Daubert, the government will withdraw its motion for a Daubert hearing with respect to those experts.