# EXHIBIT A

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

September 19, 2017

SERVED BY EMAIL

Alixandra Smith, Esq.
David Pitluck, Esq.
David Kessler, Esq.
Assistant United States Attorneys
U.S. Attorney's Office for the Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Re:    *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Counsel:

In response to your request for supplemental disclosures with respect to certain expert witnesses, we submit the following proffer of additional information.

As we have discussed with and written to you, if and only if we decide to present a case-in-chief, any of the experts whom we call as witnesses will be responding in substantial part to the government's case-in-chief.  Accordingly, we must reserve the right to supplement our disclosures further based on the evidence and testimony admitted in the government's case-in-chief.

It is unlikely that we will call all of our proffered experts in any case-in-chief.  Of the ones for whom you have sought supplemental disclosures, please be advised that, if we present a case-in-chief, it is highly likely that we will call Dean Stephen C. Ferruolo, Professor Craig Lewis, and Alan Johnson and we anticipate supplementing the disclosures relating to them based on the government's case-in-chief.  We will make a decision regarding whether to call any of the other proffered experts below based on the government's theories and evidence presented in its case-in-chief.

**GIBSON DUNN**

September 19, 2017
Page 2

**Dean Stephen C. Ferruolo**

A.       Background and Qualifications

From in or about 1997 through in or about 2007, Dean Ferruolo was a partner at Heller
Ehrman LLP in its Palo Alto and San Diego offices.  From in or about 1997 through in or
about 2005, Dean Ferruolo was the co-chair of the Life Sciences Practice.  From in or about
2005 through in or about 2007, Dean Ferruolo served as the co-chair of the Corporate
Practice.  He also worked on the Policy and Compensation Committees at Heller Ehrman.

From in or about 2007 through in or about 2011, Dean Ferruolo served as a partner in the
San Diego office of Goodwin Procter LLP.  During that period of time, he also served on the
firm's Management Committee.

For approximately twenty years, Dean Ferruolo represented hundreds of private and public
companies.  His law practice focused on serving as outside counsel to early-stage life
sciences, biotech, and technology companies.  As outside counsel to such companies, he
prepared and reviewed thousands of agreements on behalf of his clients.  Those agreements
included stock transfer agreements, stock purchase agreements, settlement agreements,
consulting agreements, and employment agreements.  Moreover, as outside counsel to
companies, Dean Ferruolo served as Corporate Secretary and Acting Corporate Secretary;
attended board meetings; he prepared SEC filings; and he worked on major financing events,
including private equity and venture capital investments, reverse mergers, initial public
offerings, shelf offerings, and private investment in public entities (PIPEs).

From in or about 2011 through the present, Stephen Ferruolo has been the Dean of the
University of San Diego Law School.  Among other things, for the past three years, Dean
Ferruolo has been teaching a course about counseling corporations.  His courses include
presentations from and discussions with approximately twenty different corporate counsel.

Dean Ferruolo currently serves as a board member of non-profit boards and for-profit boards
of small private companies.  In addition, he is on the Board of Directors for the Corporate
Directors Forum, an organization which educates boards on best board practices.  Dean
Ferruolo's *curriculum vitae* is re-attached hereto as Exhibit A.

B.       Summary of Opinions

    1.       Mr. Ferruolo would testify as to the role of an outside corporate lawyer
representing small and early-stage private and public companies, including
but not limited to the following opinions:

**GIBSON DUNN**

September 19, 2017
Page 3

a.   As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel "engaged in a scheme to fabricate an investment by MSMB Capital in Retrophin LLC and engineered a series of fraudulent transactions that were backdated to the summer of 2012 to create the appearance of an investment by MSMB Capital," Superseding Ind. ¶¶ 22-25, Dean Ferruolo would testify that:

(i)   Early-stage companies are commonly disorganized in their record-keeping, often engaging in clean-up immediately prior to a financing event.

(ii)   This disorganization extends to the issuance and transfer of shares.

(iii)   Founders commonly provide employees and consultants with shares in the company as compensation, and often pursuant to oral understandings that do not get memorialized until later.  If subsequently memorialized, the documents typically reflect the date the agreement was made or understanding was reached.

(iv)   It is common for the composition and allocation of shareholders of an early-stage private company to change frequently.  At the same time, the actual updates to the company's capitalization table are made less frequently, and often only immediately prior to financing events.

(v)   It is common for private companies to have their outside corporate counsel maintain a capitalization table, making updates only upon the company's request and in accordance with the information provided by the company.  The accuracy of the capitalization table remains the responsibility of the company, and generally law firms do not give opinions on a company's capitalization table, for example when requested in connection with a financing event.

b.   As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel "caused Retrophin to enter into settlement agreements . . . to resolve claims and threats of claims made by the

**GIBSON DUNN**

September 19, 2017
Page 4

limited partners against Shkreli and the MSMB Funds," Superseding Ind. ¶ 26, Dean Ferruolo would testify that:

(i)    Companies, particularly early-stage companies, frequently settle potential lawsuits even if the claims appear to be frivolous, in part to avoid costly litigation and to prevent any disruption or delays during crucial periods for the company (e.g., financing).

(ii)    Broad general releases are a common provision in agreements seeking to resolve potential litigation, as they constitute consideration for the company.

(iii)    Outside corporate counsel may be involved in settlement agreements even if they are not litigators, including in the negotiation and formalization of the agreement.

(iv)    Outside corporate counsel take direction from their clients with regards to the parties of an agreement and the material terms of the agreement.  It is not appropriate for an outside counsel to substitute its business judgment for the client's.

c.    Dean Ferruolo would testify to certain practices concerning meetings of a company's board of directors, including that:

(i)    Outside corporate counsel often acts as Corporate Secretary and, if in attendance, will take notes during board meetings.

(ii)    The minutes of board meetings are drafted after the meetings, often by outside counsel, and sent to an officer of the company. Sometimes, there is considerable delay before the minutes are drafted, and this is particularly common in early-stage companies.

(iii)    It is not typically the responsibility of outside corporate counsel to set the agenda for board meetings or to send the draft minutes to the Board of Directors for approval.  Often times, part of the duty of the Lead Director or Chairman is to set the board meeting agenda, including requesting minutes and ensuring approval.

**GIBSON DUNN**

September 19, 2017
Page 5

(iv)    Actions that take place at a board meeting are not invalidated by the board's failure to approve the minutes of that meeting.

(v)    The Board members must sign certain SEC filings, such as registration statements and annual reports, and are responsible for the disclosures therein.  The audit committee members are responsible for reviewing and understanding all periodic filings, particularly any financial restatements.

d.    As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli allowed "seven of his employees and contractors . . . to each purchase, for a nominal amount, a portion of Retrophin's 2.5 million unrestricted or free trading shares from John Doe 1," Superseding Ind. ¶ 36, Dean Ferruolo would testify that:

(i)    Early-stage companies regularly use stock as a means to incentivize employees and consultants, with the hope and expectation that those recipients will work hard and stay with company.

(ii)    It is usual for early-stage companies to distribute shares to individuals who are friendly and loyal to the company and who are committed to remain long-term shareholders.

(iii)    Brokering a transaction allocating stock, whether restricted or unrestricted, among employees and other parties, is not prohibited and may be in the interest of both the company and those parties.

(iv)    Management commonly brokers private agreements transferring unrestricted shares between holders for a variety of legitimate reasons, including for the mutual benefit of the shareholders and company.

(v)    A transfer of unrestricted stock to an employee, who is not an "affiliate"—an executive officer, director, or large shareholder—would not make the stock restricted.

e.    As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli

**GIBSON DUNN**

September 19, 2017
Page 6

and Mr. Greebel "concealed and failed to disclose Shkreli's beneficial ownership and control over any of the unrestricted or free trading shares in Schedule 13Ds," Superseding Ind. ¶ 40, Dean Ferruolo would testify that:

(i)     The purpose of a Schedule 13D filing is to provide an early warning signal of a potential change in control (e.g., hostile takeover).

(ii)    A lawyer preparing a Schedule 13D filing for a client is similar to an accountant preparing a tax filing, in that the lawyer would rely on the information provided by the client.  The filings themselves are commonly prepared and filed by paralegals or junior associates.

(iii)   Merely brokering a private share transaction between third parties does not give rise to control over those shares.

2.     Dean Ferruolo would explain (a) certain complex and esoteric terms, and (b) certain complex concepts relating to the practice of outside corporate counsel, including but not limited to the following:

a.     the distinction between outside corporate counsel and internal general counsel;

b.     the mechanics of reverse mergers;

c.     Over-the-Counter ("OTC") markets, including the types of investors that trade and the types of securities traded in these markets;

d.     types of financing for companies, including Private Investment in Public Entity ("PIPE") investments; and

e.     the role of relationship partner and compensation at a law firm.

C.     <u>Bases and Reasons</u>

Dean Ferruolo's potential testimony will be based on his extensive professional experience.

**GIBSON DUNN**

September 19, 2017
Page 7


**Professor Craig M. Lewis**

A.     Background and Qualifications

Craig Lewis is the Madison S. Wigginton Professor of Finance at Owen Graduate School of
Management at Vanderbilt University, where he teaches a variety of graduate-level finance
courses for the University's M.B.A. and Ph.D. programs.  In addition to publishing
extensively in academic journals, Professor Lewis serves on the editorial board of the Journal
of Corporate Finance, Journal of Business Accounting and Finance, The North-American
Journal of Economics and Finance, and The Journal of Financial Research.  He frequently
presents and speaks on financial markets and institutions.

From in or about 2011 to in or about 2014, Professor Lewis served as the Chief Economist
and the Director of the Division of Economic and Risk Analysis at the U.S. Securities and
Exchange Commission.  In that role, Professor Lewis ran economic analyses to support SEC
rule-making, developed risk assessment models to catch accounting fraud, and managed a
team of economists who focused on SEC enforcement actions.

Professor Lewis received his M.S. and Ph.D. in Finance from University of Wisconsin-
Madison and his B.S. in Accounting at Ohio State University.  Professor Lewis's *curriculum
vitae* is re-attached hereto as Exhibit B.

B.     Summary of Opinions

1.     As a potential response in the event the government's case-in-chief includes
the allegation in the Superseding Indictment that Mr. Shkreli "wanted to
exercise control over the price and trading of Retrophin stock" through the
Fearnow share recipients, Superseding Ind. ¶¶ 36-40, Professor Lewis would
testify to the following:

a.     In order to artificially raise the price of a stock, an individual would
typically buy a large volume of shares.  Based on Professor Lewis's
ongoing analysis of the Retrophin trading data as described below, the
Fearnow share recipients were net sellers of Retrophin common stock
and thus their trading activity, in the aggregate, would not be expected
to have a positive effect on the price of Retrophin common stock.

b.     Evidence of coordination between and among individuals to affect the
price of a stock includes (1) one individual selling the same amount of
shares that a second individual simultaneously buys in order to create
market activity, (2) coordinated buying activity on the same dates, (3)

**GIBSON DUNN**

September 19, 2017
Page 8

coordinated buying activity on high volume trading dates and/or following a decrease in share price.  Based on an ongoing analysis of the Retrophin trading data as described below, the trading behavior of the Fearnow share recipients is inconsistent with an agreement between and among Mr. Shkreli, the Fearnow share recipients, and/or anyone else, including Mr. Greebel, to control the price or volume of trading in Retrophin stock.

    c.    Specifically, Fearnow share recipients (1) did not buy and sell the same amount of Retrophin shares on the same date, (2) they did not buy a large volume of Retrophin shares in the aggregate on the same dates, (3) they were not net buyers in the aggregate or as individuals on the highest volume trading dates, and (4) they did not buy in the aggregate or as individuals a large volume of Retrophin shares following any decreases in Retrophin's share price.

    2.    In addition, Professor Lewis would explain certain complex and esoteric concepts that relate to the price and trading of Retrophin shares:

    a.    supply and demand principles of stock markets, including their application to the trading and price of Retrophin shares; and

    b.    factors that affect share price.

C.    <u>Bases and Reasons</u>

Professor Lewis's expert testimony will be based on his extensive professional and academic experience; his own academic research and literature; outside academic research and literature; and his education.

In addition, his testimony will be based on the following ongoing analysis of Retrophin's trading activity:

- compiling trading data from Retrophin's Blue Sheet data produced by the government on or about April 19, 2017 and share price data on Retrophin from Bloomberg Terminal;

- analyzing the Blue Sheet data to determine the trading activity of each Fearnow share recipient;

**GIBSON DUNN**

September 19, 2017
Page 9

- aggregating the Fearnow share recipients' trading volume, in the aggregate and as individuals, by day and by month to examine trading behavior;

- comparing each Fearnow share recipient's trading behavior to the other Fearnow share recipients and to other accounts buying and selling Retrophin shares during multiple periods;

- analyzing the trading accounts appearing more frequently as net buyers on high volume trading dates; and

- analyzing the Fearnow share recipients' trading behavior, in the aggregate and as individuals, following a decrease in Retrophin's share price.

**GIBSON DUNN**

September 19, 2017
Page 10


**Alan Johnson**

A.      Background and Qualifications

Alan Johnson has spent his entire career advising private and public companies about, among
other things, consulting agreements.  Moreover, Mr. Johnson has developed an expertise in
consulting agreements containing broad general releases.  For the past 25 years, he has
served as the Managing Director of Johnson Associates, Inc., an executive compensation
consulting firm he founded in 1992.  Over his 37-year career, Mr. Johnson has provided
executive compensation consulting services to over a thousand client companies, which for
approximately 80% of these companies he actively reviewed the company's various
employment, severance, and consulting-related agreements.  His consulting efforts focus on
advising major financial and professional service firms and he has advised on executive
compensation issues for a wide-range of industries, including but not limited to energy,
health care, pharmaceutical, technology, and basic manufacturing.

Mr. Johnson's *curriculum vitae* is re-attached hereto as Exhibit C.

B.      Summary of Opinions

1.      As a potential response in the event the government's case-in-chief includes
        the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel
        "caused Retrophin to enter into four sham consulting agreements with
        defrauded investors," Superseding Ind. ¶ 32; *see also* ¶¶ 31, 33-35, Mr.
        Johnson would testify that:

        a.      Consulting agreements are frequently utilized by private and public
                companies in the context of a threat or concern about litigation.

        b.      One of the principal goals of such agreements is to obtain broad
                general releases, non-disparagement obligations, non-compete
                provisions, and confidentiality provisions.  Because of the importance
                to the company of obtaining these favorable terms in the context of a
                threat or a concern about litigation, more of the agreement in that
                context discusses these terms as compared to consulting agreements in
                other circumstances.

        c.      It is common for there to be a very broad description of the consulting
                services in such agreements.

**GIBSON DUNN**

September 19, 2017
Page 11

      d.      A common market practice is to use such agreements to obtain an option of potentially conferring with the consultant even if it never actually happens.

      e.      Companies entering into consulting agreements often expect to obtain minimal to no work from their consultants

      f.      It is common practice for outside consultants like Mr. Johnson, and others who advise on such consulting agreements, to primarily communicate with the CEO of the company who is on the Board—not with the entire Board—about the terms of the agreements.

      g.      Based on a review of the consulting agreements at issue in this matter and his ongoing analysis of publicly disclosed consulting agreements, the consulting agreements at issue have multiple similarities to consulting agreements entered into by a variety of companies.  In addition, companies sometimes but not always, disclose such agreements.

C.      <u>Bases and Reasons</u>

Mr. Johnson's expert testimony will be based on his extensive professional experience, including advising on approximately 100 executive separation agreements that were structured as consulting agreements with broad general releases and little expectation of consulting services; academic research and literature; his review of the consulting agreements at issue in this case; and his education.

In addition, Mr. Johnson's testimony will be based on the following ongoing analysis of consulting agreements disclosed publicly through SEC filings:

- analyzing the consulting agreements at issue in this case, including the specific terms included;

- using keyword searches in the SEC's EDGAR database of public SEC filings to identify the disclosure of consulting agreements that are potentially comparable to those at issue in this case;

- analyzing the universe of potentially comparable consulting agreements to identify agreements that have similar key terms;

GIBSON DUNN

September 19, 2017
Page 12

- analyzing the prevalence of certain terms that are common in comparable consulting agreements; and

- analyzing the types of companies that have entered into comparable consulting agreements.

**GIBSON DUNN**

September 19, 2017
Page 13


**Joseph P. Dooley, CPA, CFF, CFE**

A.    Background and Qualifications

Mr. Dooley served in the Federal Bureau of Investigation ("FBI") for approximately 21
years, from in or about 1984 through in or about 2005, and he was the Supervisory Special
Agent in the New Haven, Connecticut Division for approximately five years.  Over the
course of Mr. Dooley's extensive and distinguished career, he has supervised and conducted
hundreds of white collar criminal investigations.  During Mr. Dooley's lengthy FBI career,
he directly handled and oversaw investigations and arrests in a host of complex areas,
including real-estate, banking, insurance, and financial services.  The vast majority of Mr.
Dooley's FBI experience involved white-collar crime investigations.

As a Supervisory Special Agent in New Haven, Mr. Dooley created and led the FBI's
Computer Crime Squad and the Connecticut Computer Crimes Task Force ("CCCTF"),
which was comprised of dozens of federal, state, and local criminal investigators, responsible
for investigating internet fraud and computer intrusions, among other things.

Since retiring from the FBI in 2005, Mr. Dooley has continued to work for numerous
investigative firms conducting and overseeing dozens of internal investigations.  He served
as a managing director of KPMG LLP ("KPMG"), from 2005 to 2010.  At KPMG, he
provided investigative advisory services and compliance reviews, traced assets, and
conducted internal money-laundering and fraud investigations.  In 2010, Mr. Dooley joined
Stroz Friedberg Business Intelligence & Investigations, where he established the firm's
forensic-accounting practice and supervised investigations regarding the Foreign Corrupt
Practices Act, securities laws, and improper financial transactions.  In 2013, he founded JPD
Forensic Accounting LLC, which provides investigative advisory services, compliance
reviews, asset tracing investigations, and fraud investigations.

He is also a member of the Society of Former Special Agents of the FBI.

Mr. Dooley received his B.S. from the New York Institute of Technology and was trained at
the FBI Academy.  He has been a Certified Public Accountant ("CPA") since 1982, a
Certified Fraud Examiner ("CFE") since 2003, and Certified in Financial Forensics ("CFF")
since 2008.  His *curriculum vitae* is re-attached hereto as Exhibit D.

B.    Summary of Opinions

As described in our pre-trial disclosure, Dkt. 312-2, at 2, Mr. Dooley would testify to the
general practices and customs of the FBI in conducting thorough and complete
investigations, including but not limited to the following:

**GIBSON DUNN**

September 19, 2017
Page 14

1.    It is the general practice and custom of the FBI to interview as many subjects of interest, as well as to obtain and review as many relevant documents, as is practicable before determining whether to make an arrest.

2.    In conducting a complex white-collar criminal investigation such as this one, before determining whether to arrest an individual, who poses no risk of either fleeing from the jurisdiction or destroying evidence, the custom and practice of the FBI is to endeavor to interview the subjects of the investigation in order to obtain as much information and evidence as possible about any crimes that may or may not have been committed.

3.    Under such circumstances, the custom and practice of the FBI is to seek to subpoena the entities where the subjects of the investigation worked during the relevant time period, in order to gather as much documentary evidence as possible.  The subpoena to the entities would typically be for both documents as well as interviews with other individuals at the entities who could shed more light on the subjects of the investigation and on the relevant issues pertaining to the investigation.

C.    <u>Bases and Reasons</u>

Mr. Dooley's testimony will be based on his more than 20 years of experience as a Special Agent in three FBI field offices, and in particular his experience conducting complex white-collar criminal investigations, and as a Supervisory Special Agent in New Haven, Connecticut, and in particular his experience managing and leading complex white-collar criminal investigations.  As noted above, Mr. Dooley has supervised and participated in hundreds of arrests and investigations and is intimately familiar with FBI customs and practices.

**GIBSON DUNN**

September 19, 2017
Page 15


**Matthew D. Ferrante**

A.      Background and Qualifications

Matthew Ferrante is the founder of Aurora Information Security & Risk, LLC where he
provides computer forensic, security, and security assurance consulting services to global
corporations, including major financial institutions, and government entities.

Mr. Ferrante was a Special Agent with the United States Secret Service in the Electronic
Crimes Special Agent Program for approximately eight years, where he served on several
successful high profile, high-tech investigation operations related to, among other things,
cybercrime, online surveillance & counter surveillance, and counterfeit instruments.  Mr.
Ferrante has an extensive background in analyzing e-crime, computer forensics, data loss
prevention/detection, breach investigations, physical and network infrastructure protection,
fraud, employee misconduct, cyber warfare, corporate espionage, protective intelligence,
threat assessments, international organized crime incident response, extreme hacking,
remediation, and asset identification.

Mr. Ferrante was educated at the United States Secret Service Academy, Federal Law
Enforcement Training Center, Electronic Crimes Special Agent Program, and Mercy College
for Criminal Justice.  Mr. Ferrante's *curriculum vitae* is re-attached hereto as Exhibit E.

B.      Summary of Potential Expert Testimony

    1.      Should the government's case-in-chief raise computer and/or electronic
            forensic issues, we would consider calling Mr. Ferrante to analyze the
            documents or materials in question, and to testify about them.

    2.      In addition, Mr. Ferrante would explain certain background concepts relating
            to the specialized field of interpretation of electronic metadata, including but
            not limited to:

            a.      common metadata fields, such as Author, User ID, and Date and Time
                    Modification;

            b.      document management systems, including iManage;

            c.      common practices regarding the interpretation of digital evidence; and

            d.      the discovery and recovery of any hidden electronic data.

**GIBSON DUNN**

September 19, 2017
Page 16


C.     <u>Bases and Reasons</u>

Mr. Ferrante's expert testimony would be based on his education; his extensive professional experience; and his review and analysis of documents relating to this matter.

Specifically, his review and analysis will be based on the following methodology:

- collection of files and preservation of information in a secured data container;

- processing of document data using acceptable tools, including software such as Access Data's FTK Imager, Access Data's Forensic Tool Kit, Magnet AXIOM Forensics, and WetStone Stego-Hunt;

- forensic analysis of document data, including at the code and bits level, to determine the authenticity of the file, such as whether the document has been corrupted, edited, or other modified; and

- analysis of document management programs, such as iManage.

**GIBSON DUNN**

September 19, 2017
Page 17


**Bryan A. Garner**

A.      Background and Qualifications

Professor Garner has built his distinguished 35-year career examining how the English language is used, in particular in the legal profession.  As a linguistics expert who focuses on legal writing, Professor Garner possesses specialized knowledge relating to legal terms and their usage.

Professor Garner is the chief editor of the authoritative *Black's Law Dictionary*, the Tenth Edition containing more than 2,000 pages and 50,000 terms, and he is the author of *Garner's Dictionary of Legal Usage*, the Third Edition containing more than 1,000 pages and 8,000 terms.  He is also a consultant for legal terminology to the *Oxford English Dictionary*.  He has reviewed thousands of other dictionaries and analyzed word usage in the context of law reviews and judicial opinions.

He is the author of many leading works on legal writing, including *The Chicago Guide to Grammar, Usage, and Punctuation*; *The Elements of Legal Style*; and *The Redbook: A Manual on Legal Style*.  He is the co-author, with the late Justice Antonin Scalia, of *Reading Law: The Interpretation of Legal Texts*.

Professor Garner is also the President of LawProse Inc., a provider of CLE training in legal writing, editing, and drafting.  LawProse's many courses include *Legal Writing in Plain English* and *Ethical Communications for Lawyers*.

He is a Distinguished Research Professor of Law at Southern Methodist University, and he lectures at various law schools.  His course topics include English grammar, usage, legal drafting, and legal interpretation.

Professor Garner's *curriculum vitae* is re-attached as Exhibit F.  He has testified in open court as a linguistic expert in three unreported state actions from before 2010.  During the past four years, he has given expert affidavits in *Pima Oil & Gas LLC v. Jones Energy Inc.* (Texas); *Nevada Restaurant Services, Inc. dba Dotry's v. City of Las Vegas et al.* (Nevada); in the interpretation of the will of Louis R. Lurie (California); and in *Davidoff v. Spiritas* (Texas).  He has also testified as an expert in arbitrations.

B.      Summary of Potential Expert Testimony

Should the government's case-in-chief raise issues regarding the meaning of terms in communications between Mr. Shkreli and Mr. Greebel, we would consider calling Professor

**GIBSON DUNN**

September 19, 2017
Page 18

Garner to analyze those communications.  Professor Garner's opinions would include, but are not limited to, the following:

1.  Professor Garner would testify that, as explained in his book *Reading Law*, co-authored with Justice Antonin Scalia, the context of a communication is a primary determinant of interpreting meaning.

2.  Professor Garner would testify to the particular linguistic habits of corporate lawyers communicating legal issues to their clients.

3.  As a potential response in the event the government's case-in-chief includes the allegations in the Superseding Indictment that Mr. Greebel entered into a criminal agreement—a "scheme"—with Mr. Shkreli to "to defraud Retrophin" and to violate the securities laws, *see, e.g.*, Superseding Ind. ¶¶ 7(c), 7(d), 21, 36, Professor Garner would testify that the meaning of communications between Mr. Shkreli and Mr. Greebel is affected by the linguistic habits of each participant and by the context in which each communication took place.  Moreover, Professor Garner would testify, the meaning of written communications from an outside corporate counsel, such as Mr. Greebel, to the Chief Executive Officer of his client, such as Mr. Shkreli, must be read in the context of outside counsel terminology.

C.   <u>Bases and Reasons</u>

Professor Garner would base his opinions on his education and training; his professional experience as among the foremost living authorities on English usage, grammar, and punctuation, especially in legal communications; his linguistic expertise; the use of online tools such as *Google Books Ngram Viewer* and *Oxford English Dictionary Online*; and his review of documents relating to this matter.

**GIBSON DUNN**

September 19, 2017
Page 19

**Gayle R. Klein**

A.      Background and Qualifications

Ms. Klein is a shareholder in McKool Smith, P.C., and has co-led the firm's nationally
acclaimed financial-litigation practice since 2008.  The firm's banking and financial
litigation practice is ranked "Tier 1" both nationally and in New York City by *U.S. News –
Best Lawyers* in the 2016 edition of *Best Law Firms*.  Ms. Klein herself is recognized for
commercial litigation in New York by *Chambers USA*.  At her previous firm, Weil, Gotshal
& Manges LLP, she was the youngest woman elected litigation partner in 2005.  She is an
accomplished trial lawyer with twenty-one years of experience representing plaintiffs and
defendants in complex commercial and securities actions.  In particular, Ms. Klein
specializes in representing investors.  She has settled hundreds of cases, and she has
recovered hundreds of millions of dollars for investors, including but not limited to
institutional investors.  She is a Fellow of the Litigation Counsel of America, a distinction
based upon effectiveness and accomplishment in litigation and trial work, along with an
ethical reputation.

Ms. Klein's *curriculum vitae* is re-attached hereto as Exhibit G.

B.      Summary of Opinions

1.      As a potential response in the event the government's case-in-chief includes
the allegation from the Superseding Indictment that the settlement agreements
reached in or about and between February and August 2013 between
Retrophin and its investors were "fraudulent" and part of a "scheme" to
"defraud Retrophin" by "settl[ing] claims . . . even though Retrophin was not
responsible for those claims," *see* Superseding Ind. ¶¶ 26-30,  Ms. Klein
would testify to the likelihood that a reasonable plaintiff's attorney would, on
behalf of the MSMB investors, bring a variety of colorable claims against
Retrophin and its officers and directors arising out of the decision by the
general partners of MSMB Capital Management LP and MSMB Healthcare
LP to dissolve, liquidate, and wind down the hedge funds, the general
partners' refusal or inability to distribute its investors' limited partnership
interests for cash and the unauthorized distribution of Retrophin shares to
those investors, in addition to the MSMB Funds and Mr. Shkreli.

2.      To accommodate the government's objection that testimony relating to
various potential legal theories of liability might risk "delay and juror
confusion" by "requir[ing] the jury to hear direct and cross-examination about
numerous laws they will not need to consider in deliberating (various tort,

**GIBSON DUNN**

September 19, 2017
Page 20

contract, and corporate legal frameworks in two different states), as well as the application of those laws to facts about Shkreli's actions that are not the focus of this case," Gov't's Pre-Trial Mots., Dkt. 329, at 47, Ms. Klein would not testify as to the "numerous laws" and "various . . . legal frameworks" that might apply to an investor suit, but instead would testify that:

a.   She would bring claims on behalf of MSMB investors against Retrophin because she would have a good faith basis to do so in fact.

b.   These claims would likely engender negative publicity against Retrophin, which would be an additional basis that, in her experience, may cause Retrophin to seek to resolve the claims early, including but not limited to a settlement with MSMB investors.

c.   In general, a plaintiff's lawyer brings claims on behalf of clients that, not only have a good-faith basis in fact, but also run against companies that will have the ability to pay damages if the claims are successful.

C.   <u>Bases and Reasons</u>

Ms. Klein will base her opinions on her approximately 21 years of wide ranging experience as both a plaintiff and defense attorney representing investors as well as successfully litigating and settling claims totaling hundreds of millions of dollars on their behalf and her review of documents relating to this matter.

**GIBSON DUNN**

September 19, 2017
Page 21


**Ronald C. Minkoff**

A.      Background and Qualifications

Mr. Minkoff has over thirty-five years of experience counseling corporate and individual clients as plaintiffs or defendants in matters involving complex commercial litigation.  In addition to being a shareholder/director at Frankfurt Kurnit Klein & Selz, P.C. ("Frankfurt Kurnit" or the "Firm") since in or about 2002, Mr. Minkoff has served as the Firm's general counsel for the last seven years.  As general counsel, Mr. Minkoff advises the Firm regularly on the Firm's ethical obligations, fiduciary duties, and risk management, including handling any potential and actual malpractice claims.  Mr. Minkoff's areas of expertise include advising lawyers facing potential malpractice claims in private practice, defending lawyers against malpractice claims, and bringing malpractice claims.  He also is an expert in the area of professional responsibility.  Over the last three decades, Mr. Minkoff has represented hundreds of clients, including both lawyers accused of malpractice and clients accusing lawyers of malpractice, and he has drafted numerous settlement agreements, including releases of liability.

Mr. Minkoff also taught courses on professional responsibility at Brooklyn Law School, Benjamin N. Cardozo School of Law, Fordham University School of Law, and New York University School of Law for many years.  A basic concept always covered in the course is a lawyer's ethical and fiduciary obligations to faithfully execute his client's directives regarding settlement of claims and potential claims.  He also regularly teaches CLE courses about professional responsibility.  Mr. Minkoff has published extensively on issues of professional responsibility, legal ethics, and malpractice, and he is the co-managing editor of *The New York Legal Ethics Reporter*, a monthly periodical co-published by Frankfurt Kurnit and Hofstra University's School of Law.  A representative sample of Mr. Minkoff's lectures includes: "Ethics for In-House Counsel," New York City Bar Association (June 2017); "The Interplay Between Legal Ethics and Legal Malpractice," American Conference Institute (Oct. 2016); and "Anatomy of a Legal Malpractice Case," PLI (Dec. 2015).

He is actively involved in various professional associations.  He serves on the professional-responsibility and professional-discipline committees (among numerous other committees) of the New York City, New York County, and New York State Bar Associations.  He serves on the Policy Implementation Committee of the American Bar Association's Center for Professional Responsibility.  He is the former President of the Association of Professional Responsibility Lawyers.  He regularly attends and is invited to speak at a variety of national conferences, as well as to the New York State House of Delegates, on issues of professional responsibility.

Mr. Minkoff's *curriculum vitae* is re-attached hereto as Exhibit H.

**GIBSON DUNN**

September 19, 2017
Page 22


B.      Summary of Opinions

Mr. Minkoff would testify to the role and obligations of a lawyer in preparing settlement
agreements and releases of liability at the direction of his client, including but not limited to
the following:

1.      As a potential response in the event the government's case-in-chief includes
        the allegation from the Superseding Indictment that the settlement agreements
        reached in or about and between February and August 2013 between
        Retrophin and its investors were "fraudulent" and part of a "scheme to
        defraud Retrophin" by "settl[ing] claims . . . even though Retrophin was not
        responsible for those claims," *see* Superseding Ind. ¶¶ 27-28,

        a.      Mr. Minkoff would testify that pursuant to applicable professional
                responsibility rules, e.g. N.Y. Rules of Prof'l Conduct (22 N.Y.C.R.R.
                § 1200.0) r. 1.2(a)., it is reasonable and necessary for a lawyer to
                "abide by a client's decision whether to settle a matter," and that a
                lawyer who fails to abide by his client's decision risks both
                malpractice liability and disciplinary action for violating the applicable
                rules of professional responsibility.

        b.      Mr. Minkoff would testify to the reasonableness of seeking broad
                releases from liability, including not only for the company but also its
                affiliates, directors, and managers, employees and officers in the
                context of negotiating settlement agreements on behalf of a corporate
                client that directs its lawyer to settle actual or threatened litigation.

        c.      Mr. Minkoff would further testify that, although a lawyer has some
                discretion in determining certain aspects of litigation, such as trial
                strategy, a lawyer who refuses to follow his client's direction in
                settling actual or threatened litigation, or who fails to adequately
                protect his client with appropriate releases from future claims, risks
                malpractice liability arising out of any damages the client
                subsequently suffers as a result, disciplinary action, as well as
                reputational harm in the legal community for failing to adhere to the
                highest standards of professional conduct.

2.      As a potential response in the event the government's case-in-chief includes
        the allegation it raised during *United States v. Shkreli*, that the broad releases

**GIBSON DUNN**

September 19, 2017
Page 23

within the above-referenced settlement agreements were unusual,[1] Mr. Minkoff would testify that it is standard practice to obtain as broad a release as possible, especially when threats exist and/or litigation may be contemplated.

3.  As a potential response in the event the government's case-in-chief includes the allegation from the Superseding Indictment that the above-referenced settlement agreements included broad releases from liability, *see* Superseding Ind. ¶ 32, Mr. Minkoff would testify to the reasonableness of a lawyer's decision to include broad language releasing an entity, such as Retrophin, which the government alleges was not responsible for any claims of fraud, *id.* ¶ 28, for a host of reasonable reasons, including but not limited to reducing the risk of future litigation and preventing reputational harm from the potential filing of a lawsuit.

C.  <u>Bases and Reasons</u>

Mr. Minkoff would base his testimony on his expertise in handling malpractice claims involving lawyers as well as ethics complaints based on his decades of actual experience; his teaching experience; his research, writing, and speaking on issues of professional responsibility and legal malpractice; and his review of documents related to this matter.

---

[1] *See, e.g.*, Shkreli Trial Tr. 4480:12–13 (Government during oral argument on the admissibility of evidence through Special Agent Braconi's testimony: "We are arguing that they weren't approved by the Board and that they also had the same release in them."); 5280:2–12 (Government Summation: "And there's the release in the settlement agreement, which releases Retrophin, which is a fraud, because Retrophin doesn't owe Sara Hassan anything. And it also releases the defendant and MSMB entities."); 1046:19–22 (government read the release language to Sarah Hassan); 1984:11–14 (government read the release language to Lindsay Rosenwald) 2381:1–7 (Mr. Kocher read the release language at the government's request); 3164:22–3165:11 (government read release language to Mr. Geller).

**GIBSON DUNN**

September 19, 2017
Page 24

**Professor Lori Smith, C.P.A.**

A.      Background and Qualifications

Lori Smith is the Director of the SEC and Financial Reporting Institute and an Assistant
Professor of Clinical Accounting at the Leventhal School of Accounting at the University of
Southern California.  Her courses focus on Professional Responsibilities in Accounting,
Ethics for Professional Accountants, Intensive Accounting Principles and Practices-
Advanced Accounting, and Financial Statement Analysis, and she has extensively studied
and applied accounting and auditing principles.

Prior to academia, Professor Smith was an Audit and Assurance Partner at Deloitte and
Touche LLP where she was responsible for the effective planning, execution and delivery of
audit and consulting services to both publicly traded and privately held firms ranging from
start-up companies, to family-owned businesses, to multi-national corporations.  In addition,
she was the engagement leader for the examinations of controls and Sarbanes-Oxley
compliance.

For approximately four years, Professor Smith served as Director of Accounting at Bergen
Brunswick Corporation, a public Fortune 500 medical equipment and device company,
where she, among other things, was responsible for the accounting and reporting, re-
engineered the organizational structure and internal control policies of the accounting and
finance departments, and implemented the company's financial planning and reporting
systems.

Professor Smith has been a practicing accountant for over 30 years and in academia for over
six years.  Over the course of her career, she has served over 200 audit clients.  Professor
Smith's *curriculum vitae* is re-attached hereto as Exhibit I.

B.      Summary of Opinions[2]

      1.      Professor Smith would testify to the general customs and practices of an
independent auditor of a small public company, including but not limited to
the following opinions:

            a.      As a potential response in the event the government's case-in-chief
includes the allegation in the Superseding Indictment that "Retrophin's
external auditor . . . determined that Retrophin was not responsible for

---

[2] Professor Smith's potential testimony may also include her review and responses to the testimony of any
Marcum or accounting witnesses called to testify during the government's case-in-chief.

**GIBSON DUNN**

September 19, 2017
Page 25

the claims resolved in the settlement agreements," Superseding Ind.
¶ 29, Professor Smith would testify that, in her experience, it is not the
responsibility—and indeed, beyond the ability or training—of an
independent auditor to assess a company's legal responsibility for a
given loss or liability, or a company's legal strategy as to the
settlement of actual or threatened litigation.

b.  As a potential response in the event the government's case-in-chief
includes the allegation in the Superseding Indictment that "Retrophin's
external auditor questioned the settlement agreements that had been as
of that time," Superseding Ind. ¶ 29; *see also* Shkreli Trial Tr. 859:25-
860:3 (assertion during government's opening statement that
"Retrophin's accountants told the Defendant that . . .[the settlement]
agreements weren't proper because Retrophin owed MSMB investors
nothing"), Professor Smith would testify that, in her experience, (a) it
is common for an independent auditor following conventional audit
procedures to identify information that the auditor believes should be
accounted for differently and/or warrants disclosure or expanded
disclosure, and (b) such oversights are especially common in early-
stage or small public companies, which lack the resources, expertise,
and/or developed internal controls of more mature and larger
companies.  Professor Smith would further testify that, in her
experience and pursuant to applicable accounting and auditing
principles, *e.g.* AS sections 3, 16, any suspicion of fraud must be
recorded in the auditor's official workpapers and reported to the Audit
Committee of the Board of Directors (or the Board of Directors in the
absence of an Audit Committee), but the workpapers of Retrophin's
independent auditor do not indicate any fraud was found and no report
of fraud was made to the Audit Committee of the Board of Directors
(or the Board of Directors in the absence of an Audit Committee).

c.  As a potential response in the event the government's case-in-chief
includes the allegation in the Superseding Indictment that Mr. Shkreli
and Mr. Greebel conspired to conceal information and transactions
from Retrophin's external auditor, *see* Superseding Ind. ¶¶ 29-31,
Professor Smith would testify that, in her experience, company
management and/or its legal counsel often advocate for more limited
public disclosures, including to guard against competitive
disadvantage, analyze whether the standard for disclosure has been
met, and/or ensure that any resulting restatements are truly warranted.

**GIBSON DUNN**

September 19, 2017
Page 26

Professor Smith would further testify that it is typical for auditors and company management/legal counsel to engage in protracted discussions concerning a proposed disclosure and to determine its exact wording.

d.  As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel "caused MSMB Capital and MSMB Healthcare to execute indemnification agreements and promissory notes for the benefit of Retrophin even though they knew that the MSMB Funds had no assets" and "assured Retrophin and the auditors that the promissory notes would be repaid," Superseding Ind. ¶ 30, Professor Smith would testify that Retrophin fully disclosed in its public filings that company management believed there was uncertainty as to whether the promissory notes could be repaid, which caused Retrophin and the auditor to book the unpaid note amounts as expenses.

2.  Finally, Professor Smith would explain certain complex and esoteric terms and procedures that relate to Marcum's audit of Retrophin, including, but not limited to the following:

a.  applicable accounting and auditing principles relevant to companies similar to Retrophin;

b.  conventional audit procedures, including identification of risks associated with an audit;

c.  conventional analysis of internal control procedures, including that smaller companies typically have less internal controls;

d.  related party transactions, including that they are common and do not, on their own, constitute fraudulent conduct;

e.  adoption of forthcoming auditing standards, including ASU 2013-2014 Obligations Resulting from Joint and Several Liability Arrangements; and

f.  the difference, from an accounting and auditing perspective, between the legal liability associated with a potential legal claim and monetary contractual obligations associated with an agreement settling that potential legal claim.

**GIBSON DUNN**

September 19, 2017
Page 27


C.      Bases and Reasons

Professor Smith's potential testimony would be based on her education and training; her extensive professional experience, including her experience auditing early-stage and small public companies; her academic research, literature and teaching; applicable accounting and auditing standards and principles; and her review of documents relating to this matter.


*       *       *

Sincerely,


/s/ Reed Brodsky
Reed Brodsky


cc:      Clerk of the Court (KAM)