UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 15-CR-00637(KAM)

-against- : United States Courthouse
: Brooklyn, New York

EVAN GREEBEL, : Friday, October 6, 2017
: 2:00 p.m.

Defendant.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR PRE-TRIAL CONFERENCE
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BRIDGET M. ROHDE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: ALIXANDRA ELEIS SMITH, ESQ.
DAVID PITLUCK, ESQ.
DAVID K. KESSLER, ESQ.
Assistant United States Attorney

For the Defendant: GIBSON, DUNN & CRUTCHER
200 Park Avenue
48th Floor
New York, New York 10166
BY: REED M. BRODSKY, ESQ.
RANDY MASTRO, ESQ.
WINSTON Y. CHAN, ESQ.
MYLAN LEE DENERSTEIN, ESQ.
JOSHUA EVAN DUBIN, ESQ.
GRACE TSOU, ESQ.

(In open court.)

(Judge KIYO A. MATSUMOTO enters the courtroom.)

THE COURT: Good afternoon, please have a seat.

THE COURTROOM DEPUTY: This is a final Pre-Trial conference in Docket 15-CR-637, United States versus Evan Greebel.

Will the Government's attorneys state your appearances, please.

MS. SMITH: Good afternoon, Your Honor.

Alixandra Smith for the Government and with me are Assistant United States Attorneys David Pitluck and David Kessler along with paralegal Gabriela Balbin and special agents Matthew Mahaffey and Sean Sweeny.

THE COURT: Thank you, good afternoon.

MR. BRODSKY: Good afternoon, Your Honor.

Reed Brodsky on behalf of Evan Greebel, who is with us. At counsel's table is Randy Mastro, also from Gibson Dunn, as well as my colleagues, Winston Chan, Mylan Denerstein, Joshua Dubin and Grace Tsou.

THE COURT: All right. Thank you.

Good afternoon.

MR. BRODSKY: Thank you, Your Honor.

THE COURT: I am here to hear argument on the numerous motions. I will say that I am somewhat dismayed that the parties have just continued, despite my pre-trial orders,

to pummel the Court with documents for me to decide in advance of this trial that is coming up. I thought maybe the first thing we should do is talk about jury selection.

I had asked that the parties try to confer on particular questions which I think should focus exclusively, for purposes of a questionnaire, on juror hardship or availability. I think that way we could save a lot of time.

So, for example, if a juror is not going to be able to be paid for his or her service by his or her employer, or if a juror has plans to be unavailable because of medical conditions or care or procedures or because of vacations, that we should excuse those jurors.

What I am proposing, we have 200 jurors coming in on Monday the 16th for selection. I would ask the Government to undertake the labor of printing 200 juror questionnaires with the number 1 through -- why don't you just go up to 300, in case.

I do not think the other questions that the defense is proposing regarding their knowledge about Mr. Greebel and his associations with Mr. Shkreli are going to be helpful in a questionnaire form. I think that to the extent we have jurors who would clear the first hurdle of availability and hardship, they could be examined at side-bar or in open court if they have issues, or if the parties wish me to inquire about any views a juror may have about Mr. Shkreli.

MR. BRODSKY: Your Honor, Josh Dubin from Dubin Consulting, whose pro hac motion is pending before Your Honor, has done extreme analytic -- great analytics with respect to the media coverage relating to Mr. Shkreli. And if we could ask you for a few minutes of his time that, he could present to Your Honor, perhaps, an explanation of why we were just making the additional request of a few questions relating to Mr. Shkreli.

THE COURT: All right. I will hear from him.

MR. BRODSKY: Thank you, Your Honor.

MR. DUBIN: Thank you, Your Honor.

May I approach and use the lectern.

THE COURT: You may stand wherever you wish.

MR. DUBIN: Thank you, Your Honor. I will try to be brief.

I have a proposed order if you would like --

THE COURT: Hand it up to the Government and hand it up to me, please.

MR. DUBIN: Just for my pro hac admission.

(Pause in the proceedings.)

MR. DUBIN: Your Honor, briefly.

We have one minor concern with only having a questionnaire that deals with hardship. As the Court is aware, we filed a motion for a jury questionnaire and/or individual voir dire back in August. I'm sure the Court is

painfully aware that this case has, and continues to receive, an extensive amount of media coverage.

Since we filed that motion alone, there have been 78 articles just in New York papers; the Times, the Daily News. If it will assist the Court, and I will hand a copy to the Government, this is just a chart that shows, just since filing our motion, how many articles have appeared in the Post, the Daily News, the Times, the Wall Street Journal and Newsday. Not a single one of these articles is good for Mr. Greebel.

THE COURT: Well, do they mention Mr. Greebel?

How many of these mention Mr. Greebel?

MR. DUBIN: I can endeavor to find out.

THE COURT: That would be important for me to know.

MR. DUBIN: Okay. And in my last count, and I don't want to be held to it, I think more than half of them, but I will endeavor to find out and make them available to the Court before this hearing is over.

Without belaboring the point or reiterating all of the arguments we made in our motion for a jury questionnaire, we don't know quite how to handle this avalanche of media coverage that continues to this day. And I know that the Supreme Court has recognized that it's inadequate voir dire to find out what the bias is. And our concern is that the only way for there to be an adequate voir dire, in order for us to really find out what the potential jurors' bases are, is to

have an extensive questionnaire.

And my concern is that only including questions about hardship, is going to syphon off a segment of the prospective jury pool that just wants to get out of here. And I understand that that happens, even if there's individual voir dire, or a questionnaire. But I think that the anonymity that the questionnaire provides, and sort of the candor that prospective jurors often give in a questionnaire that they sometimes feel intimidated being forthright about, even if it's at a side-bar, is something that is just critical to Mr. Greebel's Sixth Amendment right to a fair and impartial trial, and I understand -- to a fair and impartial jury, excuse me.

I understand fully, Your Honor, that the Court wants to proceed in an efficient manner, but Mr. Greebel has waited two long years to have his day here.

THE COURT: It could have been tried earlier, as you know.

MR. DUBIN: Understood.

THE COURT: So do not complain about that, please.

MR. DUBIN: I'm not complaining.

THE COURT: All right.

MR. DUBIN: But I think that to take a couple of extra days, if it takes that, to make sure that we exercise an abundance of caution and include, even if it's just a subset

of the questionnaires -- excuse me, of the questions that we listed for the Court, are just critical, because they know of Mr. Shkreli, I'm sure, people that have read press coverage about it, in many different ways.

Some people don't recognize his name, but they recognize him as Pharma Bro, or the greatest expletive in America, the biggest expletive in America. There was just an article in New York Magazine referring to him as that.

They know him as that guy that hiked the price of the HIV drug. They know him in many different ways, and I think that by having a questionnaire that addresses some of these issues, that will speed up the process, so that we don't have to be stuck with someone who, during the trial, says, you know what, I didn't recognize him as Mr. Shkreli, or I didn't recognize him as the guy that hiked up the price of the AIDS drug, but oh, it's Pharma Bro. Oh, and this guy is accused of being in a conspiracy with him?

We just fear that it is impossible, in the format that I understand that the Court followed at the previous trial, it is just literally impossible to get to true bias if we don't have, at very minimum, a questionnaire that goes beyond hardship.

And I think that, look, the Supreme Court recognizes that there are certain cases that individual voir dire is called for, and I'm very respectful of Your Honor's wide

latitude in how voir dire should be conducted, but if there were ever a case that cried out for it, this is it. The media coverage has been more than, perhaps, any case I've ever been involved in. And a lot of the trials that I've been involved in have extensive media coverage. I've never seen anything quite like it.

THE COURT: Well, assuming that we were to ask the questions which you propose, which I believe is appended to document 385-3 filed on September 28th, the questions you proposed are:

"Martin Shkreli is a name you will hear in this case. He has been referred to in the media as Pharma Bro. Have you seen, read or heard anything about Mr. Shkreli in newspapers, the Internet, on television, on the radio or a magazine; yes or no? If yes, please describe what you have heard or read."

And the next question. "If yes: Have you formed any opinion about Mr. Shkreli; yes or no? If yes, please explain."

It seems to me that a more effective and, perhaps, useful way of teasing out juror bias would be to see them answer that under oath in open court so you could look at their reaction, and so that when they come to side-bar and explain to you the details of this answer, they will not -- they will be less likely to withhold information.

I think that the concern, obviously, in the last trial was that jurors might be intimidated by saying what they really thought, and that simply was not the case. In fact, I think Mr. Shkreli's attorney complained that the jurors were too candid.

And so it seems to me that we can ask those same questions to the jurors in open court, and you would then have an opportunity to come to side-bar and we could probe the juror with further questions, and you could see how that juror reacts.

You are the consultant. I mean, what is to be gained by trying to discern a juror's views from a plain piece of paper, when you can see them and we can ask questions and look at their reactions?

MR. DUBIN: Because I think that in study after study, and some of them were cited in our, I believe, our motion for severance, but I can certainly provide them to the Court, at the risk of drawing Your Honor's ire, I just simply disagree; that it has been well-founded in social psychology that people just feel intimidated by an authority figure asking them questions and surrounded by strangers, and they are just a lot less likely to be candid.

And I understand that Mr. Brafman said that they were too candid. Those were for the ones that were candid. Others, I would argue, did feel intimidated and might not just

have been as comfortable to say what they would with the seeming anonymity of a questionnaire medium or to write it without an open room full of strangers where they have to stand up.

Look, nobody is comfortable. It's just basic psychology, saying I don't think I can be fair. What I've read might affect me.

And, you know, I just respectfully disagree with Your Honor. I think a questionnaire will certainly help tease it out better, because someone will write on there how they really feel without being surrounded by lawyers that they don't know and, you know, who they perceive to be, rightfully so, an authority figure.

THE COURT: I think you run the risk with this first question of having jurors who may never have heard of Mr. Shkreli or Pharma Bro, or even Mr. Greebel, really. I think there are little media reports about Mr. Greebel, except in passing, perhaps.

And I understand that that is a concern. I am not minimizing that. But what is then to stop a juror who hasn't really heard of him, to go home that night and Google him and try to find out more about him? I mean, from what I understand in reading the media reports, the jurors in the last case complied with my directives not to read the media, and after the trial, when they were able to go back and read

about Mr. Shkreli, some of them were upset.

So I just think that there is, you know, by asking these other questions on a jury questionnaire, the benefit of seeing the jurors' reaction, and assessing the jurors' reaction, is going to be somewhat circumscribed. I am not saying there would not be an opportunity for follow-up, but suppose a juror says, yes, I have heard of him.

Describe what you've heard or read. That he's involved in some drug pricing issues.

Have you formed an opinion? No? Or yes?

I mean, how is that going to help you or how is it going to save time to have that questionnaire answered?

MR. DUBIN: May I?

THE COURT: Yes, go ahead.

MR. DUBIN: Two things.

One, I think that we can certainly have an admonition on the questionnaire -- and whether it's Your Honor that does it, or the jury clerk that disseminates the questionnaire -- instruct them that they are not to research anything about the case from the time they receive the questionnaire. So I think that that would take care of that.

Second, if somebody says, yes, I've heard about this case. I've read about it and says, any incarnation of some of the things that they said to Your Honor at Mr. Shkreli's trial. I just want to strangle him; right? I don't like him.

Whatever they say. When they say, yes, I've read about it, I think that there can be a process, and a very efficient process that I've been through before, where the Government and the defense can collaborate and trade lists of people that are clearly going to be all for cause. And it would avoid that process of having people come to side-bar, one after another, after another.

There are going to be some people that clearly have strong opinions about this case, and this has already been for sort of a test drive, if you will, Your Honor. There are some people that, you know, you saw them and they answered the question and they're out. It's not even a close call.

And I think that -- and look, we understand that we have to be reasonable and not waste the Court's time. So if somebody says, look, I've read a few things about it, but, anecdotally, and I don't think that it's going to be an issue. The onus is on the defense to not say, well, we think that person should be off, too.

But I think that there are just going to be some clear-cut prospective jurors that aren't even a close call. It will speed up the process and, you know, we can certainly coordinate with the Government and agree to a very short questionnaire that I think addresses our concerns about cause, addresses our deep, deep concerns about Mr. Greebel's right to a fair and impartial jury, and at the same time, include

questions that the Government wants on there that, you know, maybe they're not all of the question that we put in a proposed questionnaire that get asked. But I think that the Government probably has questions that they might want to ask and I really do think it will speed up the process and address our concerns.

THE COURT: Well, what it will mean is that the questionnaires will have to be completed. They will have to be copied. They will have to meet and confer. You will have to decide which pile is excuse or not excuse, the juror goes into, and then they're going to have to come back and go through additional questions.

I am just wondering if I were to ask these questions -- again, I guess I am not convinced that you would not get a better clue about someone's thinking, if I were to ask the questions and you would hear the answers, and be able to read their body language or their facial expressions, or whatever else you people do in choosing jurors. I think that a naked page is going to be of less help and, ultimately, probably, depending on these answers, you are going to want to see them anyway at side-bar; right?

MR. DUBIN: No. I think there is some of them that-- most of them that have read about this case and have an opinion, it's not going to be pretty for Mr. Greebel.

Simple. I mean, the takeaway that we have seen from

the media coverage, and we have done extensive analysis of the coverage in this case, has all been awful. There hasn't been a single article that says, you know what, we should give Mr. Greebel the benefit of the doubt here, or Mr. Shkreli the benefit of the doubt. It's been awful.

So I've done it in this courthouse before with Judge Korman in the Murderer, Inc. case where we did a questionnaire, and I think it sped up the process quite a bit.

Yes, there will have to be a meet and confer, and I think we have to be reasonable and the Government will be reasonable and I think we can get through it. And I don't think it's just those questions. There would be enough follow-up, a few other questions that we could ask, that would give us the basis upon which to say, this person -- there's no --

THE COURT: What are those other questions, because I was just dealing with these questions that I thought was the joint statement of the parties, as to what questions they would want? I mean, don't start throwing in more questions.

MR. DUBIN: Oh, no, no, no, no.

THE COURT: What are you proposing?

MR. DUBIN: Can you indulge me one moment, Your Honor, to grab a copy of it?

THE COURT: Okay.

(Pause in the proceedings.)

MR. DUBIN: So there were two attachments to our letter, as Mr. Brodsky just reminded me. Attachment A was just about hardship. Attachment B was just about, you know, bias as a result of reading about the case. So I don't think that we would be asking to add too many, or if any, additional questions.

THE COURT: Okay. I mean, that is what I thought we were dealing with, was just these two.

All right. So Ms. Smith, or just one of the prosecutors, what is -- what downside -- I mean, this might be a more efficient way to proceed -- it might eliminate, I mean, if somebody writes something very clearly biased, they are gone, and we do not even have to bother to have them back.

MS. SMITH: Your Honor, I think we, you know, we filed motions on this. So we made our position pretty clear. I think that the way that voir dire was conducted during the Shkreli trial, as you yourself just pointed out, you know, resulted in a jury that actually did not know who Mr. Shkreli was, and was able to be fair and impartial.

It did take us three days. It is hard for me to see, having done a questionnaire myself, that this is going to take less time because, as you said, it has to be passed out. Then we have to take them. We have to make photocopies. We have to pass them out to the defense. We all have to discuss. I mean, it's going to be a full day just on the questionnaire

part.

And I think that the questions on -- I personally think the questions are hardship are better done not on a piece of paper, because I think that when you have four questions about how to get out of jury duty, it kind of gives the suggestion that this is the opportunity to do that. But we're happy with the four questions that were submitted if the Court wants to do that on the question of hardship.

The two additional questions that were included are highly problematic in the way that they're drafted. I know that they had a jury consultant do that for a particular reason. But, for example, the question about Mr. Greebel includes the date of his arrest, and the fact that he's an attorney.

The question about Mr. Shkreli includes the fact that there was a case against him, which suggests that he went to trial, or might have gone to trial. I mean, it's very suggestive.

And so if there are going to be two additional questions on the defendant, it certainly could just be, as we suggested for the Shkreli trial originally when we were thinking about a jury questionnaire, just do you know this person? If so, what have you heard?

Do you know this person? If so, what have you heard?

THE COURT: So one targeted toward Mr. Greebel and one targeted toward Mr. Shkreli, and that is it.

MS. SMITH: Yes. And I think that in the joint proposal that was in kind of the text of the letter, just like a very basic question. Have you heard of Evan Greebel; yes or no?

If so, what?

Have you heard of Martin Shkreli; yes or no? If so, what?

THE COURT: What about the reference to Pharma Bro?

MS. SMITH: I think it's unnecessary. I'm not sure. We didn't do that at the last trial. I don't know why you would make that suggestion.

THE COURT: I mean, actually, we tried very hard to talk to jurors about that during voir dire and advise them that Mr. Shkreli is not on trial for drug pricing. At least he was not being charged with that, and probing whether if the door were to be opened and evidence came in, could they, nonetheless, be fair and impartial, and set aside anything they might have read or heard about or felt about drug pricing.

So we really did try to not taint the jurors, but rather to tease out any bias. We tried not to enhance or inflame any coverage that Mr. Shkreli might find objectionable. Obviously, I have no control over the press

Case 1:15-cr-00637-KAM Document 400 Filed 10/11/17 Page 18 of 215 PageID #: 11310



and I would not try to control the press on what they could write.

But I do think that -- I think the Government's proposing perhaps middle ground that, if I were you, I would consider seriously.

(Continued on following page.)

(Continuing)

MR. DUBIN: Can I clarify briefly why? The only reason we put Pharma Bro is because even when we described this case, have you heard about this case, if you're talking to someone you'd say, Have you heard of Martin Shkreli? No. Have you heard of Pharma Bro? Oh, that's him?

It was just merely as a way that they could identify their own knowledge of what they have read about the case. But I hear what Your Honor is saying. It was merely as a way to be able to identify who has read about the case and what have they read, because if you just say Martin Shkreli some people don't recognize it. If you say Pharma Bro, they might, as the guy that's been referred to as the biggest so-and-so in America. People say, Oh, that guy. It was just as a way to identify, not to inflame.

And, respectfully, if it takes another day or two, you know, the Supreme Court, and I think it was in the Morgan case and the Litton case, has said -- I mean, this is the part of the problem. I understand the wheels of justice often grind slow, but this is, you know -- there is a lot at stake here for Mr. Greebel and if we take an extra day --

THE COURT: There is a lot at stake for every defendant, sir.

MR. DUBIN: Understood.

THE COURT: And I am not minimizing Mr. Greebel's

interest in having a fair and impartial jury --

MR. DUBIN: Understood.

THE COURT: -- which is a right and something that I strive for in every case.

MR. DUBIN: Understood.

THE COURT: It is no different.

MS. SMITH: And, Your Honor, the Government doesn't have any objection to exploring these things at voir dire. I'm not sure if Mr. Dubin is aware that when we are discussing these questions, they are at individual voir dire at sidebar, so they are not up in front of a room of strangers.

MR. DUBIN: I am aware.

MS. SMITH: And we did, in fact, speak to every juror in the Shkreli trial. I am not suggesting that we don't do a questionnaire because it might take more time. I just think all in, you know, the process that we did last time allowed us to actually speak to every juror and get the reactions that Your Honor is talking about without taking the additional time of a questionnaire. And I'm just not sure what it adds, other than the hardship of knocking people out who have a vacation when you are going to want to follow up anyway because the question is, of course: Given what you know, can you still be fair and impartial?

MR. DUBIN: I think what it does is it gets rid of, Your Honor, people that have a clear bias. And I attended

part of Your Honor's jury selection at the prior trial and I know it was done at sidebar, but there were a lot of people. There was a long line of them lining up to tell you about what they read about the case and all the things they didn't like about Mr. Shkreli, and I think that it eliminates that process. And I think that, in the end, we might end up taking the same amount of time, but I certainly didn't mean to suggest that Mr. Greebel has more at stake than any other defendant. I'm just saying that the media coverage in this case is anomalous.

THE COURT: I don't know what kind of media coverage there will be in this case. I have a sense that the media is not as interested in this case as they were in Mr. Shkreli. I don't think Mr. Greebel has sought media attention in the same way that Mr. Shkreli has. And so I understand your concern, that he has been charged in an indictment with Mr. Shkreli, but you have a separate trial and I think we can proceed in a way that will ensure his right to a fair and impartial jury.

I am going to suggest that the Government maybe consider what you had said earlier, and I think you can as well --

MR. DUBIN: Very well, Your Honor.

THE COURT: -- on behalf of Mr. Greebel that we ask those two additional questions. Have you heard of Mr. Shkreli? If so, what? And I think that, perhaps, maybe

asking what their opinion is based on what they have heard. Even if they have heard something and have an opinion, the question is can you set aside your opinions or what you have heard or read and be fair and impartial. So we are going to want to talk to these folks anyway, aren't we?

Unless someone is clearly --

MR. DUBIN: I think that there are going to be some opinions that are hard to set --

THE COURT: Well, there always are.

MR. DUBIN: -- but I think, Your Honor, there are some opinions that are hard to set aside. There just are.

THE COURT: Well, then they will be excused, right?

MR. DUBIN: Yes, and I think if we can add -- we can agree with that middle ground, I believe.

THE COURT: All right, well, why don't you do this, why don't you propose something for me?

MS. SMITH: Your Honor, we are fine with the four questions we had and the two additional ones. I just don't know want to have this be a whole additional set of briefing, I would rather just decide it here.

THE COURT: Yes, okay.

MR. DUBIN: Yes.

THE COURT: What about Exhibit C to this letter? I'm thinking maybe we just delete the reference to Pharma Bro because, honestly, it is not part of this case, and if a juror

makes an association with Pharma Bro, I mean it is really not charged and it is not going to be in evidence.

MR. DUBIN: I am fine not to ask the question on the questionnaire, but it is our position that it's critically important. Because some people -- we then run the risk, Your Honor, of having someone seated on the jury that realizes during the trial that this is Pharma Bro or this is the guy. It is merely there to try to jog people's memory or their awareness of what they have or haven't read, and the headlines rarely call him Shkreli. They often refer to him as Pharma Bro or something else and it just won't identify. It doesn't cast nearly a wide enough net. And believe me, Your Honor, if we thought it was going to inflame prospective jurors, it would be the last thing that we were going to ask.

MS. SMITH: Your Honor, I'd just point out that in the trial of Martin Shkreli this was unnecessary. So this just seems far afield of what actually needs to get done to get a fair and impartial.

THE COURT: Well, I am inclined to have the hardship questionnaire because, yes, some jurors might try to get out of jury duty to answer these questions. They will be under oath. We will have all the usual language about the penalties of perjury and all of that, but we also will ask whether they have heard of Mr. Shkreli. And if so, what they have heard and what their opinions are; and we will do the same for

Mr. Greebel and that will be it.

MR. DUBIN: Very well, Your Honor.

MS. SMITH: And, Your Honor, I just want to talk about logistics then.

THE COURT: Yes.

MS. SMITH: So the jurors will come in on the 16th.

THE COURT: Yes.

MS. SMITH: They will fill out their questionnaires.

Are you going to have all of the individuals at the table for the trial introduced to the jurors at that point, as well? Are you going to do it in the ceremonial courtroom? Just because we have to coordinate the copying and --

THE COURT: Right, I know. I think generally the parties are present at all phases of the proceeding.

MS. SMITH: Right.

THE COURT: I don't think it is problem if some of the lawyers aren't going to be present for that preliminary meet-and-greet introductions, et cetera, but I will induce everybody. We will swear the jury. I will emphasize the importance of not sharing their answers and not discussing the case amongst themselves or with anyone else and answering truthfully, and then we will gather the questionnaires. And we will ask you to make copies for the defense and the Court and yourselves, and then you will let me show when you are ready to proceed.

MS. SMITH: Yes.

THE COURT: If there are issues where you disagree as to whether a juror should stay or be excused, I will resolve those, but I think, generally, you tend to work those things out.

MS. SMITH: And just scheduling-wise, are you having the jurors come back the morning of the 17th?

THE COURT: They might have to come back, yes.

MS. SMITH: No, are you going to have them sit during the jury questionnaire process? Because depending on, I mean it needs to be copied, everyone needs to look at them, we need to go through them, then we need to meet. So are they going to be called back? I am trying to get a sense of timing.

THE COURT: What we thought we would do, and I don't know how long it would take you to make those copies, but what I would like to do is keep them here, send them back to the jury room, we then figure out, once you have the questionnaires copied and distributed among the counsel, we will figure out who is excused and who stays.

MS. SMITH: Okay, so just all in one day? Because we've done it both ways, having them come in and come back.

THE COURT: Right, I think that was a longer questionnaire.

MS. SMITH: It was, yes.

THE COURT: It was a more difficult situation and we had far more questions.

MS. SMITH: Okay, so I will make sure we are prepared to copy and bring them back as quickly as possible.

THE COURT: Thank you. And then, hopefully, we can start the actual individual voir dires --

MS. SMITH: In the afternoon.

THE COURT: -- in the afternoon.

MS. SMITH: Okay.

MR. DUBIN: Your Honor, would be it be okay to add an admonition on the questionnaire? Once they've filled out the questionnaire, our concern would be that their curiosity gets the best of them and they start looking on their phones in the jury room, that they should not --

THE COURT: They are not going to have their phones.

MR. DUBIN: Oh, that's true.

THE COURT: Nobody in this courtroom should have their phone --

MR. DUBIN: Got it, you're right.

THE COURT: -- or should be using them, except for lawyers.

MR. BRODSKY: Your Honor, with respect to logistics, I'm sorry to jump in on this, in one of your pretrial orders you had indicated that we would begin on the 16th if we had chosen a magistrate judge for jury selection and the 18th

before Your Honor. We were choosing before Your Honor and not the magistrate judge, with all respect to the magistrate judges, so we didn't bring this up because we understood we were starting on the 18th.

The 16th is Simchat Torah and that presents just an issue for our side in light of that. We would have brought it up earlier, but --

THE COURT: Well, so you are saying Monday, the 16th is a holiday, so we can't select a jury on that date?

MR. BRODSKY: What I would suggest, Your Honor, given what we had understood the proceeding would be, this is just a suggestion.

THE COURT: Well, we were going to select the jury on the 16th anyway.

MR. BRODSKY: What I suggest is that in the ceremonial courtroom the questionnaires are handed out or in the jury room the questionnaires are handed out to the 200 or so jurors. The jury clerk or Your Honor instructs them not to read the Internet. You can read them the instructions. They fill it out. Then, we are certainly okay to take the burden if the Government doesn't want to take the burden of making the copies, we will make the copies or we can join them in making the copies. That night, just a suggestion --

THE COURT: I just envision you sitting at the copy machine.

MS. SMITH: Your Honor, I am just confused because we have always been choosing a jury on the 16th.

THE COURT: I know.

MS. SMITH: Is this just because you would like the questionnaires overnight?

MR. BRODSKY: No, no, that's not it at all.

MS. SMITH: Okay.

MR. BRODSKY: Re-reading Your Honor's pre-trial order, we actually put in our trial subpoenas to people that the returns had to be on the 18th because we understood --

MS. SMITH: Yes, because that's when the openings were starting, but not when we were choosing a jury.

MR. BRODSKY: Well, what we understood, Your Honor, from Your Honor's order, and with all respect to the Government, is that you had said the 16th before a magistrate judge for jury selection, the 18th before Your Honor for jury selection. So what my suggestion is, in light of the fact that this is coming up for the first time, is the questionnaires be distributed on the 16th. They're filled out. We meet and confer and try to eliminate as many of the obvious ones who are prejudiced and biased.

THE COURT: Well, are you not going to be present on the 16th?

MS. SMITH: Yes, I am confused.

THE COURT: That is news to me, honestly, because

whether or not I select or a magistrate judge selects, the parties are present at jury selection.

MR. BRODSKY: We are a little bit concerned, Your Honor, in light of Simchat Torah to eliminate some of the potential jurors who don't show up on the 16th.

MS. SMITH: But they have to show up on the 16th to fill out the questionnaires, so I am very confused.

MR. BRODSKY: Right. What I would suggest, respectfully, because of Simchat Torah is to put it on for the 17th then for the questionnaire. We are concerned that some of the jury pool will not be there because it's Simchat Torah and we wouldn't want to eliminate some of the jury pool as a result of landing on a Jewish holiday. There is a large Orthodox community. There is a Jewish community, a significant Jewish community in the Eastern District.

THE COURT: I know that, and they would let the jury folks know when they call him. I want 200, so I am going to get 200.

MR. BRODSKY: Understood, Your Honor.

THE COURT: And they are expected to be here and if they have a reason not to come, they are going to work that out with the jury clerks.

Do you have a copy of my pretrial order? I just do not understand --

MR. BRODSKY: I suppose what I am saying --

THE COURT: -- how there could have been an ambiguity about the jury selection date.

MS. SMITH: Your Honor, the Government is just confused. Is it a problem with defense counsel or is it a problem with the jury --

MR. BRODSKY: I am looking at the order, Your Honor. The way I read the order, and I apologize, Your Honor, was that --

THE COURT: Just read it into the record just so I can be refreshed.

MR. BRODSKY: It says: The defendant in the above-captioned criminal case interposed a plea of not guilty. The parties are directed: (1) to appear with counsel ready to select a jury and to try the case and to have available witnesses and exhibits on October 16th, 2017 at 9:00 a.m. United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York.

THE COURT: Mr. Brodsky, I know you are very experienced and you are very smart, how could you misunderstand?

MR. BRODSKY: I think it must have been a prior order, Your Honor, I apologize. It must have been a prior order.

THE COURT: Well, a prior order would have had a different start date and it would not have been Simchat Torah,

with all due respect.

MR. BRODSKY: Understood, Your Honor.

THE COURT: We had changed the trial date --

MR. BRODSKY: Understood.

THE COURT: -- because of this deference with --

MR. BRODSKY: Understood. I understand, Your Honor, and I apologize for the confusion. I really do. My only concern --

THE COURT: So you are saying go ahead with jury selection without the lawyers for the defendant present?

MR. BRODSKY: I guess my only concern, Your Honor -- no, I am not suggesting that at all.

THE COURT: All right, so then you are saying the jury selection has to be adjourned until there is not a holiday or some other conflict, but I am just hearing about this now. So --

MR. BRODSKY: Understood.

THE COURT: What are you asking?

MR. BRODSKY: Your Honor, because of my confusion, that's why we're -- I apologize.

What I am asking for is given that it's Simchat Torah, given that some of the potential jury pool in the Jewish community would call in on the 16th or before the 16th and say I can't make it because it's Simchat Torah, that we start on the 17th with jury selection, all parties available,

everybody present, and we just start on the 17th. I am just trying to avoid the possibility that the significant members of the Jewish community call in the week before and say, I'm not showing up, it's Simchat Torah.

MS. SMITH: Your Honor, it's our understanding that Simchat Torah starts on Thursday, October 12th, and ends on Friday, October 13th, so I don't know if it's a different Jewish holiday that you're thinking of.

MR. BRODSKY: One moment, Your Honor.

(Pause.)

MR. BRODSKY: Your Honor, the issue we have is that -- you are correct, and the issue we have is that, as we understand it, significant parts of the Jewish community leave and they don't return and they can't fly on Saturday, so they won't be returning.

MS. SMITH: Your Honor, this has changed. I thought it was an issue with defense counsel and the defendant, but it sounds like --

THE COURT: I want to have a situation and a relationship with you, Mr. Brodsky, and your team that I can trust and rely on.

MR. BRODSKY: No, I agree with that. I apologize, Your Honor. I was told Simchat Torah. I apologize, Your Honor. I do apologize.

THE COURT: So I understand that we have a very

diverse community in the Eastern District. There are many folks of many faiths and different religions. I would bet for almost any day in a calendar year on a jury selection date you are going to have a significant number of individuals who observe a holiday.

MR. BRODSKY: I understand, Your Honor. I apologize for confusing the Court.

THE COURT: I am concerned that if we keep eliminating jury selection dates based on religious holidays and the fact that some jurors may be observant and may not be available for jury service, we could perhaps go through the whole year without a single day when we can select a jury because we would not want to eliminate other religions either. This is not something that appears to be an actual religious holiday, the 16th.

MR. BRODSKY: I got that wrong and I apologize, Your Honor. I will withdraw the application. I apologize for getting it wrong, I really do.

THE COURT: All right. Let's go forward then.

MR. BRODSKY: Your Honor, what we thought we would do, we consulted the Government and they had no objection because Mr. Mastro has to leave at some point early for a prior engagement on Long Island.

THE COURT: Today?

MR. BRODSKY: We thought we would start with the

motion to dismiss, if Your Honor was okay with that.

THE COURT: Anything you want.

MR. MASTRO: Thank you, Your Honor.

MR. BRODSKY: All right.

MR. MASTRO: Thank you, Your Honor. I am newer to this proceeding, but I come here perhaps with a fresh perspective. Your Honor, I wanted to be heard briefly on the motion to dismiss Count Seven. I start on the basis that our client is an innocent man and we intend to prove that at trial.

THE COURT: You do not have to prove it. Do not forget, the Government has the burden.

MR. MASTRO: I understand, but we intend to prove it anyway, Your Honor. I want to say Evan Greebel should not have to go to trial on Count Seven after what happened at the Shkreli trial. He should not have to go to trial on Count Seven after the case the Government presented there, the representations it made to the jury there, the proof it presented there.

As you know, Your Honor, you having witnessed that trial, the Government alleged a conspiracy of two. It argued to the jury -- the Government argued to the jury that Martin Shkreli was the, quote, dominant person, even read to the jury evidence of Martin Shkreli berating Evan Greebel and saying that you embarrass me and calling him names and saying this

wasn't -- the Government's words at closing; this wasn't Evan Greebel. Martin was the dominant person in the relationship, no doubt about it.

What happened at the end of that trial? The conspiracy of two on Count Seven; Count Seven, a conspiracy to defraud Retrophin. That was the allegation in the bare-bones indictment.

THE COURT: Doesn't the indictment say Martin Shkreli and Evan Greebel, together with others --

MR. MASTRO: It does, Your Honor. I'm coming to that. Yes, that's the bare-bones pleading; that it's Martin Shkreli and Evan Greebel together with others and then boilerplate about defrauding Retrophin an nothing more.

Your Honor sat here on that case. Your Honor knows what the Government argued to that jury was a conspiracy of two, Shkreli and Greebel. In fact, not until rebuttal summation was anyone else, Mr. Yaffe, even mentioned in connection with this and Your Honor saw his testimony.

This is someone who had a consulting agreement who testified he barely knew who Evan Greebel was and didn't deal with Evan Greebel at all in connection with a consulting agreement. He executed, with Martin Shkreli, off a template, never had any dealings with Evan Greebel.

This brings us, Your Honor, precisely to the point of the matter. Your Honor, I'm a former federal prosecutor.

Apparently, the Government doesn't want me to mention that again in this case, but we'll come back to that later.

THE COURT: I know who you are, Mr. Mastro. The question is whether you get to mention it in front of the jury.

MR. MASTRO: I understand. We're going to discuss that. I was making a little joke, Your Honor.

THE COURT: And weren't you in the civil division?

MR. MASTRO: I was, Your Honor, but I also did criminal case. I appreciate Your Honor's reference and I know Your Honor was in the civil division, too.

THE COURT: And also in the criminal, so --

MR. MASTRO: It's a very distinguished tradition to be in the civil division. I was also the acting chief, but that's neither here nor there. We will come back to that.

Your Honor, the fact of the matter is that I remember that one of the guiding principles in the U.S. Attorney's manual was to, quote, prevent unwarranted disparities. There is a huge disparity when the Government presented a case, Martin Shkreli is the dominant conspirator in a conspiracy where the Government argued a conspiracy of two and only mentioned a third party who could not possibly have conspired with Evan Greebel because he had no dealings with Evan Greebel.

The jury rejected that conspiracy charge against the

dominant party and now we are left with the Government saying they intend to go forward anyway and apparently argue that Shkreli was guilty. Well, they lost the Shkreli case.

THE COURT: Would you agree, sir, if they had been tried together and if Mr. Shkreli had been acquited and Mr. Greebel had been convicted of Count Seven that the courts would not find a reason to upset the inconsistent verdicts. It is not ideal, but there is case law that would not set aside the guilty verdict in such a situation; would you agree?

MR. MASTRO: I wouldn't agree with that, Your Honor, for the following reason: This case presents that unique situation where the only evidence that was presented to the jury was a conspiracy of two. This is very much like the Batista case, Judge Irizarry, right in the Eastern District.

Based on Rodriguez, where Judge Irizarry concluded two defendants go to trial -- in fact, the case is even more compelling here than in that case. Two defendants go to trial. The lesser player, not the dominant player, is the one who gets acquitted. The Government's theory of the dominant player, Batista, he is convicted and the Government mentions in that case a third potential co-conspirator who testifies for the Government in the case and says repeatedly that Batista did not encourage him to conspire to obstruct justice.

So what does Judge Irizarry do after that case, the very situation that Your Honor just posited to me? Judge

Irizarry entered judgment dismissing the conspiracy charge, the conviction of Batista because the jury found the other defendant acquitted, so they couldn't have conspired together, and found that the only other party mentioned as being involved in the conspiracy, in fact, he exonerated Batista. Your Honor, that's exactly what we have here.

THE COURT: What you are doing, though, is you are asking me to preclude the Government from making its case. They do not agree that the only conspirator in this Count Seven conspiracy are the two. The Government has represented that, I believe, if I understand the position, that there are other conspirators, and Judge Irizarry decided the Batista case after she heard the evidence on a Rule 29 motion and I don't know what other evidence they have.

They have stated in their papers that they have other evidence that they intend to offer on Count Seven against Mr. Greebel that was not offered in the Shkreli case.

(Continued on following page.)

(Continuing)

MR. MASTRO: I respectfully suggest, Your Honor -- and I say this very respectfully -- against the dominant player, they held back all this great evidence and didn't present it to that jury and he gets acquitted? But now they get a do over and they're going to say, now I'm going to present new evidence of other people? I don't think so, Your Honor.

And I think this -- and I think it's very clear from Rodriguez and otherwise, Second Circuit, that they do not get to argue any longer that Martin Shkreli was a co-conspirator with Evan Greebel. There should be a jury charge that says they cannot find conspiracy about Evan Greebel -- if you're going to allow this to go to trial -- against Evan Greebel, that he conspired with Martin Shkreli, because they lost that case. They don't get to do that over, and that's exactly what in Rodriguez, Judge Nickerson did. He charged the jury that the co-conspirator who the charges were dismissed against, that the jury could not base a conspiracy charge against Rodriguez on a conspiracy with that individual.

But I submit to Your Honor that if there was this great evidence of someone else having been involved -- and again, the only other person they mentioned at any point in the Shkreli trial, the trial against the headliner, the marquee player, the dominant party, the Government's words,

that was a reference to Yaffee in rebuttal summation. Your Honor heard it all. I'm not telling Your Honor anything you don't know, and that Yaffee testified he barely knew who Evan Greebel was and had no dealings with him. So they can't have been the co-conspirators.

The Government doesn't get a do over. This is about fairness and justice, Your Honor.

THE COURT: I understand. But, you know, conspiracy law does not require that every member of the conspiracy have dealings with, or have knowledge of, every other co-conspirator.

MR. MASTRO: But Your Honor, that's not -- in this unique circumstance, the evidence, the only evidence is Shkreli and Greebel. Shkreli dominant party, and acquitted, and a third person who had nothing to do with Evan Greebel. So you have to find that Evan Greebel conspired with some third-party now. Not with Shkreli.

The acquittal was Shkreli isn't a conspirator now.

THE COURT: I understand that.

MR. MASTRO: So they cannot possibly show, based on the evidence you already know and heard, that Yaffee was a conspirator with Greebel because Yaffee says he didn't -- he basically didn't know Greebel, and he had no dealings with Greebel.

So what is left? They are allowed now to come in

with whole new individuals they are going to suggest might have been co-conspirators when, against the dominant party, the mastermind of the conspiracy, the one they said pulled all the strings and berated Greebel, and Greebel was, you know, just the underling to the dominant player. They're going to come in now here -- I'm talking fairness and justice, Your Honor -- and they're going to say to that jury, okay, Shkreli, can't say he was the one who was conspiring with. Can't say Yaffee, because he didn't have anything to do with Yaffee, Evan Greebel.

Now we are going to offer a whole bunch of new people who were never even mentioned before in the first trial? I don't think that's the way it's supposed to work, Your Honor. I don't think that's fair and I don't think it's just.

But in any event, I submit to Your Honor, they tried their case against Shkreli. They lost their case. Even if Your Honor is going to allow Count 7 to go to trial, which I think would be a huge, with all due respect, a hugely unfair thing to do to someone, who even the Government characterized as the underling, not the dominant party. To make him go to trial on that when based on the evidence at trial that Your Honor presided over, where they had every incentive to prove every co-conspirator and lay it on as much as they could to get the dominant party, the real target, and they failed,

and he was acquitted. For Evan Greebel to have to go to trial now on that, and the Government constantly during this trial to be saying they get a do over. And they will try to sneak in that Martin Shkreli was a co-conspirator. They will try to sneak in new names that never came up before.

And, Your Honor, they should be estopped from doing that. We should be allowed to tell this jury that Shkreli cannot be considered a co-conspirator of Evan Greebel because he was acquitted, and the jury should be so charged from inception of the case to end of the case, consistent with Rodriguez.

But we believe, Your Honor -- and I know this has been a hard-fought case on all sides, and it was a really hard-fought case in Shkreli, I understand that. I'm just here asking for fairness and something in the interest of justice.

They will go to Count 8. We are going to go to trial on Count 8. We'll have it out there. But Your Honor knows the evidence on Count 7, and I have to come now to a second reason why Count 7 should be dismissed.

But Your Honor knows that evidence, knows how that trial went for the Government, and what they had to say and they shouldn't get a do over. And the only way that Evan Greebel could get a fair trial if he has to go to trial on Count 7, is for that jury to know that Martin Shkreli cannot be considered his co-conspirator after the verdict in the

prior case. And know that from inception.

Now, Your Honor, second point. The conspiracy to defraud Retrophin. Supposedly has three elements that really fall into two buckets. I know Your Honor knows them.

One is the conspiracy to defraud Retrophin because of the movement of Retrophin shares. The second element of it has to do with settlement agreements and consulting agreements.

Now, Your Honor, let's take the first bucket.

The first bucket on transfers of Retrophin shares. Your Honor knows the evidence. The Government had to show it at the last trial. Private parties have Retrophin shares. They transfer the shares to another private party who transfers them to another private party. Your Honor, that's their case. They're not saying anything differently now. That cannot possibly be defrauding Retrophin since they weren't Retrophin-owned shares in the first place.

THE COURT: Well, let's back up. I am sorry to interrupt you --

MR. MASTRO: No problem, Your Honor.

THE COURT: -- but I think what I understood the Government's case to be -- and the Government can certainly correct me if I'm wrong -- but my understanding is that Mr. Shkreli hand-picked individuals to receive Retrophin shares. They either paid nothing, or they paid a penny a

share. The value that was supposed to be assigned to these shares once the company went public, I believe, was three dollars a share. So they got a huge discount. These shares purportedly to reward Retrophin employees so there was consideration; i.e., work to bring Retrophin public in exchange for these shares that were provided to them at Mr. Shkreli's request for one penny a share, when he could have traded them for $3 a share.

And then when the Retrophin employees were in possession of those shares, there were attempts made to distance themselves and to make it appear as though they were not affiliated with Retrophin. They were instructed not to use Retrophin's e-mails. They were instructed to -- you can work in the office, but you're not really an employee. And then at some point Mr. Shkreli requested that those shares be transferred to him.

There is no evidence that there was consideration, paid for those shares. So certainly if they were shares to which a true shareholder weren't entitled, you would think that there would have been payment of consideration, but there was none, I don't believe.

I mean, I think the evidence -- what you are doing is you are taking one link in a chain, that is the conspiracy, and you are saying based on this link it is impossible --

MR. MASTRO: I am not, Your Honor. And Your Honor

has an excellent memory, but I believe what Your Honor is describing, is the Government's allegations concerning Count 8, and a conspiracy to commit securities fraud by movement of shares and manipulation of markets.

It is not Count 7, Your Honor. Count 7 is conspiracy to defraud Retrophin by transfers of shares that were already privately held, transferred to another private party, and then transferred to a third private party, or parties.

Your Honor, that is not the manipulation of the stock price that Your Honor is describing, and we'll prove that that didn't happen. But that's Count 8.

Count 7 has these elements. A fraud of Retrophin. A fraud of Retrophin. Not securities fraud. Fraud of Retrophin. One. The share movement. The share movement is from one private party to another to another. That can't possibly have defrauded Retrophin.

THE COURT: How did that first private party get the shares?

MR. MASTRO: Your Honor, there were privately held shares.

THE COURT: Well, why don't we talk about how that -- the first private party that you claim.

MR. MASTRO: Martin Shkreli and two other individuals owned the shares at inception, and it was shares

from those groups. They owned the shares already. They were the ones that were moved in sequence.

And, Your Honor, the allegation that that could have defrauded Retrophin when they were privately held, it just cannot possibly be. Those, I believe are the facts, Your Honor.

Now, Count 8, Your Honor has articulated, the Government's theory of Count 8, and we will address that with the jury and we will debunk it then. But Count 7 is a defrauding of Retrophin. And the Retrophin shares were not, you know, held by Retrophin. They were privately held as they transferred from one private party to another.

Now, the second part of this -- and we've described this, Your Honor, in our briefing on page 14 and we described the sequence of the shares.

Now, Your Honor, the second part of this is the notion that settlement agreements and consulting agreements defrauded Retrophin. But as Your Honor knows that the Government's theory is that they shouldn't be disclosed to the board. They weren't disclosed. There was a defrauding of Retrophin in the process; that's the Government's theory.

Your Honor knows what the facts are in this regard, and the fact of the matter is that Your Honor questioned the Government about what -- where they said the legal duty emanated from to have had such disclosures. The Government

told you Delaware general corporation law 144. Your Honor read that and ruled that's not what it says.

The settlement agreements were ultimately something that was surfaced at the board level and I know Your Honor knows that, as to the settlement agreements, that they were general releases to multiple parties, including Retrophin, of any and all claims. The consulting agreements obligated individuals to, you know, make themselves available as consultants, sophisticated investors, some of them doctors and in the pharmaceutical field, available. Retrophin, in that instance, got the benefit of the bargain. It got general releases of all claims.

THE COURT: What about the Government's argument that Retrophin did not bargain because they were unaware that this negotiation between Mr. Shkreli and his MSMB Capital and Elea Capital investors was going on? He was bargaining, but this was not a Retrophin bargain.

MR. MASTRO: Well, Your Honor knows what Mr. Shkreli's role was at Retrophin and that he also was one of the three board members and Your Honor knows that, through a process of accounting and auditing and reconciliation, that those agreements were ultimately disclosed and ratified. So, from our perspective, Your Honor, I think to base a defrauding of Retrophin case on that record, where you have a CEO and board member involved in negotiation, where there is the

benefit -- this is a fledgling, you know, a start-up. To have those kind of claims out there with a start-up, thank goodness they didn't derail the start-up, because it made huge amounts of money for their investor witnesses.

The fact of the matter is, Retrophin got the benefit of the bargain of general releases, got the benefit of the bargain on consulting relationships with multiple parties.

THE COURT: What legal theories would there be for an Elea Capital investor to sue Retrophin, or an MSMB Capital investor to sue Retrophin? What would the legal theory be?

MR. MASTRO: Oh, I think Your Honor knows what was going on at the time and --

THE COURT: I am asking you.

MR. MASTRO: Yes.

THE COURT: Just to articulate your view, the defense view, as to what exposure Retrophin really faces.

MR. MASTRO: Two things. First of all, we know that there were lawyers and parties who threatened to sue Retrophin among the investors --

THE COURT: Sue Mr. Shkreli.

MR. MASTRO: And to include Retrophin, because MSMB Capital and Retrophin, at the time, were undergoing a restructuring and these parties knew of Retrophin's role and if I were a party concerned about MSMB Capital, and knowing of what the change that was occurring with Retrophin, the two

having been managed together, I think, Your Honor, I would have sued any party I thought I would have a right to sue.

THE COURT: Well, I think you are confusing MSMB Capital with MSMB Healthcare. I think you meant to say MSMB Healthcare, maybe; maybe?

MR. MASTRO: Your Honor, I certainly would have included MSMB Healthcare.

I am a party who thinks that there's restructurings going on of related entities resulting in Retrophin ultimately being the place where one might actually end up being able to get a recovery. I am thinking I'm entitled to recovery. I'm going to -- like lawyers did and I know Your Honor saw this evidence -- lawyers said, we're going to sue. Some lawyers said we're going to sue everybody, including Retrophin. Of course they did. And the evidence is there for that. Your Honor saw it at the last trial.

So I simply submit to Your Honor that, both as to the argument that the transfer of privately held shares from one private party to another to another, could possibly be a defrauding of Retrophin; it can't. And because of the lack of any actual legal duty and the -- the fact that Retrophin itself got the benefit of the bargain in those deals, you should be dismissing Count 8 on those bases.

But, Your Honor, more importantly, Count 7 has these multiple elements. It's not alleged as a single conspiracy.

They didn't allege a conspiracy about the settlement agreements. They didn't allege separately a conspiracy about the consulting agreements. They didn't allege separately a conspiracy about the private transfers of shares, which they claim defrauded Retrophin.

It's all glommed together. That is a defective way to plead a conspiracy to defraud Retrophin. At a minimum, those pieces Your Honor finds not well grounded, would have to be dismissed and there is Second Circuit law that would dismiss the entire count, because it combines together different alleged conspiracies of, you know, differing activities that do not hold up together. That's, Your Honor, what we have to say about that.

I just want to come back for one second, Your Honor. We're going to have a trial about Count 8 and what you described on Count 8. But we implore Your Honor, understanding the reality of what happened in the Shkreli trial, understanding, I hope, now that the transfers of shares referred to in Count 7 were one private party to another to another, so that can't possibly be a defrauding of Retrophin, because they weren't Retrophin-owned shares. That's Count 8.

Your Honor, Count 7 shouldn't be going forward against Evan Greebel anymore. And in our sense of justice and fairness, we implore the Court to intervene, as Judge Irizarry intervened, and as Rodriguez counsels, that where you have a

tight group, here, two, at most, three, and Evan Greebel was not the dominant player, the dominant player has been acquitted, and the only other party ever mentioned in that Shkreli trial had nothing to do with Evan Greebel. You cannot possibly have a conspiracy count that goes forward.

So we really implore Your Honor. We look forward to trying the case in front of Your Honor, but Count 7 should be no part of this case. And if it is, we ask Your Honor to let us tell that jury about Shkreli being acquitted, and just as importantly, charging that jury that they cannot, based on what's happened already, they cannot find that Martin Shkreli is a co-conspirator of Evan Greebel. They should be told at the outset of the case and at the end of case, just as Judge Nickerson did in Rodriguez.

Thank you, Your Honor.

THE COURT: Thank you.

MR. KESSLER: Should I stand here or there?

THE COURT: Whatever you want to do.

MR. KESSLER: Sure. So these issues have been briefed extensively. So I'm going to be extremely brief, but I'll start where Mr. Mastro ended.

There is no request in the defendant's briefing for a jury charge related to Mr. Shkreli's acquittal. So that's something we're hearing the first time, but it's foreclosed by the law. This is a different trial. That's what they wanted.

There's different evidence. We intend to introduce different evidence. There's been litigation about the different evidence. So we can set that aside.

The case law here, and the Court is completely familiar with it and asks the question related to Acosta, is such that even if Mr. Shkreli and Mr. Greebel had been tried together, and Mr. Shkreli had been acquitted and Mr. Greebel had been convicted, the same count that would not have been a basis to dismiss the case.

There is no sort of challenge from the defense about Acosta. They just talk about Rodriguez, which is a sort of subspecies of Acosta, where Judge Nickerson held in a Rule 29 motion that there was insufficient evidence to conclude that one of the co-conspirators was a co-conspirator. That's why the whole question about were there other conspirators came up.

Here there's been no Rule 29 motion, certainly in this case. Not in the Shkreli case. There's been no judicial determination, that I'm aware of, that there is insufficient evidence to proceed with Mr. Shkreli as a co-conspirator.

THE COURT: May I just ask you a question, though.

MR. KESSLER: Sure.

THE COURT: I think that the question is whether you do have other conspirators beyond Mr. Shkreli, Mr. Greebel and Mr. Yaffee.

MR. KESSLER: So, yes.

THE COURT: For Count 7.

MR. KESSLER: So, yes. But I believe the case law doesn't need to ask that question.

THE COURT: Right. But just, you know, I guess assuming that you do have other conspirators, I am just concerned about the idea that I would have the authority to dismiss a count outright at this point without allowing the evidence to be vetted and admitted. And after the Government rested on Count 7, and assuming the defense is right, that you probably do not have more evidence because you would have certainly presented it at the Shkreli trial, if you had it, because I think the Government did argue that he was the dominant party, Mr. Shkreli dominated Mr. Greebel, and we certainly saw e-mails where he was very demeaning and nasty to Mr. Greebel.

I think that, at that point, I would suppose, that if they made a motion to dismiss for insufficiency, it would be a more appropriate time rather than ask me, at this point. Since I don't know what your proof is.

MR. KESSLER: I see what the Court is saying. Yes.

THE COURT: Yes. You represented that you have more evidence and there are other conspirators beyond Greebel, Yaffee and Shkreli.

MR. KESSLER: Yes. But I think the way I would

frame the Court's question is that at the end of Government's case, in this case --

THE COURT: Yes.

MR. KESSLER: -- there will be a Rule 29 motion, I assume.

THE COURT: Right.

MR. KESSLER: And the Court will have before it the evidence of whether there's sufficient evidence to proceed with a charge to the jury that Mr. Greebel conspired with Mr. Shkreli and the others. And that's the point at which this question comes up.

But the record from the Shkreli case can't be imported into this case before there's been a trial, evaluated for whether there's sufficient evidence of Shkreli being a co-conspirator, at this point, as if there had been a Rule 29 motion in a trial that hadn't happened.

Moreover, if there actually is such an analysis, there is more than enough evidence to proceed to the jury with Mr. Shkreli as a co-conspirator. I mean, the cases that we've been discussing, Acosta, Rodriguez, they're all animated by the principle that a jury can acquit someone for whom there is sufficient evidence to bring the charge to the jury, and even for reasons other than that the jury determined the Government had not proven its case beyond a reasonable doubt.

I mean, without taking a position on any of the news

articles that Mr. Dubin talked about, I think everyone in the courtroom is familiar that there are articles where jurors from the Shkreli trial discussed possibly misunderstanding the legal standard. That's, you know, double-jeopardy attaches. No one's challenging the decision there. But that's just an illustration of exactly why the law does not support the argument that because a co-conspirator was acquitted in a different case, with different evidence, you know, let alone in the same case with the same evidence, that that's a basis to dismiss a count in an indictment. It might be grounds for a Rule 29 motion at the time that the Government's entered its evidence.

So, I mean, I'm happy to answer other questions on that point, but I think this issue has been --

THE COURT: Well, what about Mr. Mastro's application that they be allowed to state to the jury that Mr. Shkreli has been acquitted of the conspiracy in Count 7?

MR. KESSLER: There is no law to support that. It is foreclosed by the case law. I assume, in any event, he'd also asked that the jury be instructed that Mr. Shkreli was convicted of conspiring with Mr. Greebel in Count 8, which I don't think they're going to ask.

But this is far afield, Your Honor. The Second Circuit case law, Acosta and Rodriguez, are completely clear that there is no basis to dismiss a correctly pleaded

indictment in this situation.

THE COURT: Well, let's get to their argument that this is an indictment that alleges no harm, or charges no harm to Retrophin, because the shares that were transferred as part of Count 7 were not Retrophin's shares.

I just want to point out for the record that paragraph 25 of the superseding indictment does allege that Mr. Shkreli got the Retrophin shares that were backdated by, quote, enticing those employees with the opportunity to acquire for a nominal amount approximately 5 percent of Retrophin's unrestricted or free-trading shares.

I think what I am understanding is that these transfers were then the result of a promise to give employees Retrophin shares. And the question is, are these -- those shares were Retrophin property, I believe.

(Continued on following page.)

(Continuing)

MR. BRODSKY: Your Honor, just to be very clear from our side, in our motion paperwork, we were talking about with respect to Count Seven. You charged the jury with respect to three theories. You said there was an MSMB Capital theory, there was a settlement theory and there was a consulting theory. Your jury instructions are very clear to the jury that if they found one of those theories to be true beyond a reasonable doubt, they would convict him. The MSMB Capital theory is the one we are focusing on, not the Fearnow shares for Count Eight. And the MSMB Capital theory, assuming all the facts that the Government says are true, including the backdate, we are assuming it's all true as alleged by the Government, it doesn't defraud Retrophin. The reason why is that in February of 2012, when Martin Shkreli had these alleged shares of Retrophin, he possessed them, he was the dominant party of -- it was a private company. He held the shares. He had the authority to give himself as many shares as he wanted. He created the company. So he held these shares. The Government does not say that Martin Shkreli should not have held these shares. Marek Biestek held shares. The Government does not say Marek Biestek was defrauding Retrophin out of those share. Kevin Mulleady held shares. Tom Fernandez held shares.

We fast forward several months and we go to November

9, 2012 where the Government alleges -- and we will take it all as true -- the Government alleges that 4,167 shares of Marek Biestek were transferred, backdated to Martin Shkreli and they were backdated to a date in June. First it was July with redacted dates and then it was June. Assume that's true. Assume Martin Shkreli backdated that. And those shares should really be in the hands of Marek Biestek.

On December 5th of 2012, we assume it's all true, that the shares that Thomas Fernandez held and that Kevin Mulleady held that were transferred to Martin Shkreli should not have. But those are all individuals holding shares. And assuming all the backdating is true, they were the only shares, these 75,000 shares were transferred to MSMB Capital. The Government's theory is legally impossible. If you assume all of those facts to be true, Retrophin was not defrauded.

Our fear, Your Honor -- and, look, I don't know why the Government is defending this theory because it's reversible. I'm sorry to use the word. But it is reversible error on appeal. These are three theories they're taking to the jury and they're telling the jury and they're arguing to the jury that Retrophin is defrauded, even though, as a matter of fact, based on all their allegations and all the evidence they submitted at the trial, individuals held the shares of Retrophin. Nobody is accusing those individuals of defrauding Retrophin. They are backdated transfers between individuals

and then they're sent to MSMB Capital. Retrophin is not defrauded of any of those shares because they never held possession of it. And that is why we say it's legally impossible. And if this goes to the jury -- and the Government wants to take this theory to the jury, we are preserving it because we think they're making a fatal mistake. They cannot -- in their reply papers and their opposition papers, they never explain once why Retrophin was defrauded of those shares, not once.

And during the trial of Martin Shkreli, when Ben Brafman argued in summation that Retrophin was never defrauded, there was no response in rebuttal. So, we respectfully submit, under the MSMB Capital theory, Your Honor, it is legally impossible, based on all of the facts that they say, for Retrophin to be defrauded. That's our argument.

THE COURT: Do you want to respond?

MR. KESSLER: So, this is all in our papers. But very simply, the backdated shares create an interest that MSMB Capital holds in Retrophin that it never had. That interest is then used as a pretext to give Retrophin shares to various investors. That's one of the reasons Retrophin is defrauded through the backdating, setting aside there's no longer dispute that the settlement agreements and consulting agreements defrauded Retrophin.

In addition, the evidence, we submit, is coming in any way for a number of different reasons that are laid out in the papers, including Mr. Greebel's knowledge. But there's a legally viable theory that is pleaded on the face of the indictment.

MR. BRODSKY: Your Honor, if I could just jump in there. How does that defraud Retrophin?

THE COURT: Why doesn't he get to speak?

MR. BRODSKY: I apologize.

THE COURT: Your colleague got uninterrupted time.

MR. BRODSKY: I apologize, Your Honor.

THE COURT: Let's be courteous.

MR. KESSLER: Mr. Mastro also mentioned a duty to disclose as a reason that the settlement agreement theory is invalid. I assume Mr. Mastro and Gibson Dunn are not taking a position that an attorney in New York State does not have a duty to his client, a fiduciary to his client to disclose material and information. There are Second Circuit cases on that, there's New York State cases, there's Bar Associations advisories on that. So there's certainly a duty to disclose for Mr. Greebel. Mr. Shkreli had a duty to disclose. That was addressed in the previous trial. There may have been other duties as well. So we can move on from that.

The benefit of the bargain argument: The benefit of the bargain issue only arise if there's a right to control

theory. That's not even the primary theory the Government is proceeding on. Certainly Retrophin did not get the benefit of any bargain. The only reason the investors were going to sue Retrophin was because of Mr. Shkreli's fraud, including through this backdating that created interest that didn't exist. But these are evidence-based arguments. These are closing arguments. These are jury arguments. The indictment is pleaded properly on its face. If there's a concern with multiple conspiracies later, there are multiple conspiracy jury instructions. But there's one conspiracy charge, the indictment lays out different steps that were taken in pursuit of that conspiracy.

I am happy to answer any other questions.

THE COURT: All right. Mr. Mastro.

MR. MASTRO: Your Honor, very briefly. I heard some things, that even for only somebody who was only in the civil division, I found pretty shocking. I think it is pretty shocking that Government is taking the position in this case that it gets a do-over on Shkreli after the jury exonerated, acquitted Shkreli of being part of that conspiracy. I find it pretty shocking that the Government is going to take the position that it gets to reargue to a second jury, after it presented all of its best evidence against Shkreli and the jury rejected a conspiracy count against Shkreli on Count Seven, that it gets a do-over. The last time I looked the

standard was that we can't make misrepresentations to the jury. That's why I say to Your Honor there has to be the ability to tell that jury, through charge or otherwise, that they cannot find that Shkreli was one of the co-conspirators. Now, why --

THE COURT: Is there authority for this instruction?

MR. MASTRO: Yes. Completely, Your Honor. It comes right out of Rodriguez. Right out of Rodriguez. Rodriguez stands for this proposition. The Court ultimately -- the Second Circuit found that what Judge Nickerson did was fine because this is what he did, Rodriguez. In this case -- this is page 459 -- "In this case, the indictment charged Rodriguez, Tavares and others with a narcotics conspiracy. Judge Nickerson properly charged the jury that" -- because he had dismissed the charges against Tavares as being a conspirator -- "Judge Nickerson charged the jury that, quote, In determining whether two or more persons knowingly and willfully conspired, do not consider Tavares. In other words, you must find beyond a reasonable doubt that two or more persons besides Tavares knowingly and willfully conspired.'" And he said, "You will recall that this count says that the conspiracy was between Rodriguez, Tavares and others. You cannot consider, in determining whether there is a conspiracy, Tavares." And the Second Circuit ultimately concluded that, you know, that stood because of the carve out of Tavares and

that instruction was given.

Now, Your Honor, I heard it said here that because it was a jury verdict they get to do a do-over. That maybe the jury had lenity or some other rationale for acquitting and exonerating Shkreli of the conspiracy charge. Your Honor knows darn well that this jury had no lenity for Shkreli. He was convicted of very serious charges. He just wasn't convicted of being a conspirator. He was convicted of being a fraudster multiple times, but not of a conspiracy with Evan Greebel or Mr. Yaffe on Count Seven to defraud Retrophin.

Now, Your Honor, the case law is clear and it is what Judge Irizzary picked up on so clearly in the Batista case, she held that while inconsistent conspiracy determinations for same proceedings can be permissible, she wrote so long as the indictment mentions others where, quote -- and she is quoting Rodriguez -- "There is evidence that the defendant conspired with others unknown." That's 459 from Rodriguez and that is Batista, page 11. In other words, Your Honor, there has to be that evidence. It's got to be somebody else that conspired with besides Shkreli.

THE COURT: How do we know now as we sit here without hearing the trial evidence against Mr. Greebel there isn't such a person?

I think the Government is saying, yes, if at the end of the day, after the Government rests, if I find insufficient

evidence to support Count Seven, I am going to dismiss it.

MR. MASTRO: And, Your Honor, if that's all the Government said, we might not be having quite the same argument, although I still think as a matter of fairness and justice this should be dismissed against Mr. Greebel, but that's not all they said. They not only said we get to present evidence of wholly new people we never even mentioned to the Shkreli jury, but we get to retry Shkreli as a co-conspirator. That is wrong. That is against Rodriguez. It is against Batista and they cannot do it as a matter of justice. This whole trial will be poisoned if they were allowed to do that and this jury isn't told the truth that they cannot take into account Martin Shkreli as a co-conspirator. And they need to be told that at inception if we're going to go forward to trial.

Now, Your Honor, also on Count Seven, Your Honor, my colleague said it more passionately and concisely than I could say it, but, Your Honor, it is the case that as to these privately held shares what a convoluted theory. At the point where -- the MSMB Capital theory is a theory about shares that are at that point privately held and transferred from one private party to another to another. It is legal impossibility. There was no conspiracy to defraud Retrophin by, at that moment in time, private parties transferring shares from one private party to another private party. Could

not have happened. Factually, it makes no sense. And if Count Seven goes forward with that as one of the three options to find even Evan Greebel guilty of conspiracy to defraud Retrophin, that is also poisoning the well. I'm simply saying to Your Honor --

THE COURT: I think it is just the transfers, it is the backdating of the transfers that make it appear as though it happened.

MR. MASTRO: But, Your Honor, even accepting the backdating, it's private parties transferring to private parties. That doesn't defraud Retrophin. Whatever other evidence they intend to offer that for on Count Eight, that doesn't defraud Retrophin one wit, whether they backdated privately held shares to transfer them to some other private party. It cannot possibly have done that. And you cannot have a conspiracy to defraud Retrophin when this was being done with privately held shares to other private parties. Maybe they're going to introduce this in some other context. So what? Let them try to get it on Count Eight. But it doesn't come in on Count Seven and it's prejudicial if it comes in on Count Seven and it will poison these proceedings.

I don't know why the Government is insisting on going forward on Count Seven under these circumstances. I don't know why it is not heeding the words of the U.S. Attorney at the time of the Shkreli conviction. They're

gratified by the jury's verdict and they stand by it. But they're not standing by it now and they're trying to get you to go down a well that will destroy these proceedings from inception. They should not be able to bring Count Seven against Evan Greebel. They can't bring Count Seven unless that jury knows from inception that it can't be a conspiracy with Martin Shkreli that they find for Evan Greebel, he is out of the picture. And it can't have been that one of their three legs of the stool goes to the jury that private shares transferred to private parties somehow defrauded Retrophin.

Thank you, Your Honor.

THE COURT: Well, with that, Mr. Mastro, let me ask you about the Supreme Court's decision in Standefer versus United States.

MR. MASTRO: Yes, Your Honor.

THE COURT: It was the same kind of estoppel argument that was being made. They held that the Government is not barred from relitigating the issue of whether the IRS agent accepted unlawful compensation. They note that in a criminal case the Government is without the kind of opportunity to correct errors. They aren't able to appeal an acquittal and argue to the appellate court that there were errors in my rulings perhaps or that the evidence -- they make arguments about the evidence, they don't have the right to a review. And it seems to me that the Supreme Court in that

case was reluctant to give an acquittal preclusive of that. In fact, they so held.

MR. MASTRO: Yes.

THE COURT: So why doesn't that Supreme Court decision govern my decision as to whether or not the Government should be precluded from arguing that Mr. Shkreli is involved in a conspiracy with Mr. Greebel?

MR. MASTRO: For the following reasons, Your Honor: Non-mutual collateral estoppel as a result of the Standefer is disfavored, not precluded. The Supreme Court made clear there that because of the reach of the Government geographically and so many related cases potentially around the country that there were differences in applying collateral estoppel to the Government in the normal course as it would be to private litigants. But what has come out since is two things. The law in this Circuit -- and the law in this Circuit as applied to the kind of unique circumstances we present here -- there is no geographic reach. It is the same U.S. Attorney's Office under the same indictment charging two people as alleged co-conspirators and, because of the severance, going to two juries. But Rodriguez tells us that when you have co-defendants and you have one who has been acquitted or dismissed --

THE COURT: Acquitted by the judge based on insufficient evidence, not acquitted by the jury.

MR. MASTRO: Yes, and, Your Honor, I was coming to that.

THE COURT: Okay. Because they do make that distinction.

MR. MASTRO: The Supreme Court also made the point it is not as easy to tell on a jury verdict as it is when a judge rules. That's part of Rodriguez. It is not as easy to tell whether the jury may have had some other agenda, some other agenda like lenity for certain of the co-conspirators, whether there was some other argument made to the jury, incapacity or something like that. You know in this case none of that applies. Martin Shkreli was public enemy number one, the Government's dominant party. They told that jury this is the worst guy. This is the leader of the conspiracy, the dominant party, and he got convicted of multiple acts of fraud. But guess what? He didn't get convicted of conspiracy. And there is no other way to interpret that jury verdict, based on the way both the Government and the defense argued the case, that it could have been lenity, that it could have been incapacity, that it could have been any other reason other than they rejected the Government's conspiracy charge and exonerated Shkreli in that respect when they otherwise hated his guts. Now, Your Honor, that brings us --

THE COURT: The jury did not hate Mr. Shkreli's guts. You get carried away. I appreciate your passion.

MR. MASTRO: I know. I know. Your Honor, I'm trying to make -- the point I'm trying to make is that there isn't any question the jury was prepared to convict Mr. Shkreli on very serious charges of fraud but not on conspiracy with Evan Greebel. That's who they alleged he conspired with to defraud Retrophin. They acquitted him on that. There is no argument to be made that that was a matter of lenity because Shkreli was alleged to be the dominant party. There was no argument made at the trial that there was any other reason other than the sufficiency of the evidence. That puts us in the wheelhouse of Rodriguez and Batista. And, Your Honor, if justice is going to be done here -- and I do argue with passion, so please forgive me, Your Honor. But if justice is going to be done here, fairness is to be done here. This charge should either be dismissed against Evan Greebel or that jury has to know it cannot, consistent with Rodriguez and Batista, it cannot find that Evan Greebel committed conspiracy on Count Seven with Martin Shkreli. Martin Shkreli has to be taken off the table. Thank you, Your Honor.

MR. KESSLER: Your Honor, may I make one additional point?

THE COURT: Yes.

MR. KESSLER: Martin Shkreli is a valid co-conspirator for the upcoming trial. It is the trial of Evan Greebel. It is the severed trial they wanted. There has

been no preclusive finding whatsoever that there is insufficient evidence to proceed with Martin Shkreli as a co-conspirator. The jury verdict cannot be interpolated with mind reading to decide why they decided what they did. That's what the Supreme Court says one should not be doing. What Mr. Mastro is doing, and the Supreme Court points out in Powell, which is after Standefer, and addresses the same issues, inconsistent jury verdicts can either result in lenity or mistake or comprise. That's the background here. So let me just read the one portion of the sentence from Rodriguez that Mr. Mastro did not read. What Rodriguez holds is that superficially inconsistent conspiracy determinations in the same proceeding resulting from -- and this is what was omitted -- a judge's setting aside of a jury verdict against a co-conspirator. That's permissible if there are -- the Government can proceed if there are other co-conspirators. That predicate, which Judge Irizzary did not address in Batista. That part of the sentence is left out in the Batista opinion. That's the issue here. If this had been the same trial and they made a Rule 29 motion and you had determined that there was insufficient evidence to proceed against Mr. Shkreli, we would be in the Rodriguez situation. But there's a separate trial. There is no record in this trial. The Shkreli record amply supports a Rule 29 defeating level of evidence to proceed against Mr. Greebel. That's the end of

the story. That's what the law says. That's what Acosta says. I mean, Acosta, which has not been discussed, really says -- it is the clearest sentence in the case -- if every other co-conspirator is acquitted, the conviction against the sole remaining co-conspirator. So we just wanted to be clear that we intend to proceed with Mr. Shkreli as a co-conspirator and none of these cases preclude that in any way that as a matter of law. There may be evidentiary issues at the Rule 29 stage of the law.

MR. MASTRO: Your Honor, can I just ask one thing?

THE COURT: Yes.

MR. MASTRO: Your Honor, they have other co-conspirators they want to name. We've heard it today there are other names besides the ones. Have them tell us the names because we are not aware of any. They didn't tell any of the other jury when they were trying Shkreli, who they said was the mastermind here. And we should have the right to know who they are saying they are. Apparently they know them here. Why don't they tell you? Because if they can't name anybody else, then you'll know that it was just those two. I did tell you that Rodriguez was a bench trial ruling and I read you what Judge Nickerson did, which was to instruct the jury that they could not find a conspiracy with the acquitted party, and I explained to Your Honor why this particular jury verdict under these circumstances is the equivalent of what Judge

Nickerson did in the Rodriguez trial. So Your Honor, we ask you for dismissal jury charge and, just as importantly, tell us who it is, because I don't know of anybody else. So tell us the names.

THE COURT: Ms. Smith.

MS. SMITH: Your Honor, I just wanted to point out this argument about the jury charge, it's not one that was actually made in the papers. This is the first time we are hearing about it today. This idea of a preview that Martin Shkreli can't be a co-conspirator, I think Mr. Kessler just addressed that I think ably. I just wanted to point out that the defendants made a cross motion on the MSMB evidence and in responding to that in our motion in limine reply, which I think is at page 7 or 8, the Mahaffy and Viserto cases make it very clear that when there are two separate trials, an acquittal in one trial cannot be presented to the jury in a second trial. And we had moved in connection with what we were perceiving was coming up in the cross motion, that the defendant is precluded from introducing any evidence or argument regarding the acquittal of Shkreli on any count, and those cases make that very, very clear.

MR. MASTRO: Your Honor, I just cite to you United States versus Universita, Second Circuit, 298 F.2d 365, quote, The prosecutor has a special duty not to mislead. The government should, of course, never make affirmative

statements contrary to what it knows to be the truth, and I respectfully suggests that it knows that Shkreli was exonerated in that last trial. Thank you, Your Honor.

THE COURT: All right. Thank you. I'm sorry. I know you need to know and I will certainly issue a decision very soon on this issue. I think it is rather complicated, but I think what we find ourself in is an area where there isn't clear guidance because this is a pretty unique situation.

(Continued on following page.)

(Continuing)

THE COURT: And I expect that, my gut feeling, I will tell you, frankly, is that the Government has represented as officers of the Court that it has evidence that it did not present at the Shkreli trial, that they are prepared to present against Mr. Greebel, and that there are other co-conspirators besides Mr. Shkreli and Mr. Yaffee that they are prepared to present evidence on. And it does not seem to me appropriate to dismiss Count 7 at this stage. I am certainly open to hearing from the defense after the Government rests. If the evidence is insufficient, I will not hesitate to dismiss Count 7, and it will not go to the jury.

But I thank the parties for their advocacy, but I do think that, given the procedural posture of this case versus the other cases where judges have had the benefit of hearing the evidence, I have nothing more than the Government's representations as to what their evidence is, and they intend to try this case with some of the same evidence, and evidence that we have not heard before, is what I am hearing the Government tell us.

So I do not think it would be appropriate for me to make a decision at this stage to say that Count 7 is out of the picture.

MR. MASTRO: Your Honor, I appreciate that guidance, but I come back to two points that I hope Your Honor will

consider further.

Why aren't they telling you, and us, who those other parties are? Because we don't have any idea who they are and you've sat through a long trial and they didn't say any of the names. So I'm wondering where this magic evidence is that's going to come from, that wasn't good enough to put it in the Shkreli trial who was the dominant party, they said was the big bad guy.

Two -- and I think they should be directed to tell you and us those names.

Two, Your Honor, I think when you read Rodriguez and Batista again, again -- I'm sure you've read them many times -- it is appropriate for there to be some form of instruction to the jury about Mr. Shkreli cannot be the co-conspirator, that Evan Greebel is tied to in Count 7 because of his acquittal.

So we ask, Your Honor, to please consider that, too.

Thank you so much, Your Honor, for all the time. I really appreciate it.

THE COURT: All right. Thank you.

MS. SMITH: And Your Honor, we would just suggest that that's the jury charge they're seeking, if we could just brief that in connection with the actual jury instructions.

THE COURT: All right.

MS. SMITH: I don't think that they're asking for an

instruction prior to trial, since I've never heard that before.

THE COURT: Well, they might want to say that in their openings. Is that what I am --

MR. MASTRO: Yeah, absolutely, Your Honor.

MS. SMITH: Your Honor, then we need to brief this issue. I have no idea why it wasn't raised with their other motions.

THE COURT: I know. I will say that I found that the defendants are bringing up motions that probably should have been brought according to the deadlines that I set previously. It really is not fair to the Government or the Court to think of different ideas and arguments and expect that, a week before the trial basically, we are going to have a whole round of briefing. It is almost virtually physically impossible to expect, with all the motions in limine, the Daubert motions and this group of motions that are set forth, to have adequate time.

And I do have the discretion to just say no more. No more briefing. Motion time is over. It's go time for the trial.

MR. MASTRO: Your Honor, I appreciate what Your Honor is saying.

THE COURT: But what you are doing is you are changing -- I mean, you have known and you have had the

advantage of seeing the entire Shkreli trial, and I know that you are using a lot of the evidence and making assumptions about what the evidence will be against Mr. Greebel.

There is -- I am not envying Mr. Greebel's position at all. I am not minimizing how difficult his position is, but that you did get an advantage by getting a severed trial and I would expect with all the lawyers at your table that you would have made timely motions, or brought up issues that you knew were going to be controversial.

It does seem to me that when I asked for draft charges, that this is something that you could have briefed and brought to our attention in a timely way. And there are just limits as to how long I am going to indulge all these late-filed motions. I do not have to do it. I want to do it because I want to make sure that the parties feel that they are heard. But we are not going to try the case this way. We are just not going to do it, and I am not going to be here every night dealing with motions that you all think up at the last minute. I do not think it is an appropriate way to try the case.

I had a Pre-Trial order for the specific reasons of getting everything decided beforehand. You had the advantage of going after Mr. Shkreli and seeing all of the evidence that the Government had against Mr. Shkreli; but it does not necessarily mean that everything that happened in that trial

is determinative of what is going to be presented or argued here.

But you certainly had enough time, given the evidence that you were provided by the Government through discovery, to make timely motions. And with all of you sitting there, all these lawyers and given Gibson's stellar reputation, I would have expected a more timely presentation of some of the issues that are now, again, being raised for the first time at 5:00 o'clock on a Friday a week before the trial.

MR. MASTRO: Your Honor, I will just say this and, you know, we're here fighting hard for just a client we're deeply, deeply committed to.

Your Honor, we made a motion to dismiss. That was the motion that we made. I went to the podium. Your Honor expressed some reservations about my position, and in a colloquy with the Court, I suggested that, well, okay, if you don't think it should be dismissed, here's something that minimum we should be doing.

We're not making a motion on this other issue, which is a jury charge issue, eventually. And, in fact, the Government never raised until footnote on reply that it was going to have an issue with the Shkreli verdict coming in here. So I just submit to Your Honor that, please don't hold it against our client --

THE COURT: I am not holding it against your client.

MR. MASTRO: -- that we chose to brief it this way, but we're trying to get the count dismissed. We're not trying to go for the middle ground.

But when Your Honor expressed the views that Your Honor expressed, and I understand them and respect them, we suggested that this was an alternative approach to ensure a fair trial. That's what happened today. That's, I hope, Your Honor understands that and will consider it.

THE COURT: Nothing is being held against Mr. Greebel or his counsel. I am just trying to express that at some point this has to stop.

The last trial in which a defendant was charged with eight counts was hard fought and certainly with more efficiency. I just am concerned about the assumptions that counsel may have about how long this motion practice is going to be allowed to continue, because I do have discretion to reject certain motions that I think are untimely.

But I am prepared to go forward with other motions, if you would like.

MS. SMITH: Your Honor, I just wanted to point out that the middle ground that Mr. Mastro suggested here for the first time today is prevented by black letter law. And we mentioned it in our response to the --

THE COURT: Would you give me that cite again,

please.

MS. SMITH: It's Viserto and Mahaffey, and we reference them in our motions in limine reply in response to the defendant's cross-motion, which they made it for the first time in their response, and to be perfectly frank, since it's black letter law that it can't come in, we didn't think we had to move on it once it became clear from the cross-motion that that was something that they were considering. We wanted to make sure we brought those cases to your attention.

I just wanted to point out that that sort of middle ground is, you know, not appropriate and barred by law. So -- since it came up for the first time today.

With respect to the other motions, Your Honor, we're happy to hear any questions that you have, but we don't have anything particular.

MR. MASTRO: Your Honor, if I may, just for one second.

And, Your Honor, I simply cited Rodriguez where that was the procedure that was done with the jury instructions. So I thought that was Second Circuit law on an instruction about a co-conspirator who had been acquitted or exonerated. So I think I was giving Your Honor Second Circuit law on point.

THE COURT: Well, it is a difference, I think, between an instruction which -- we will have a charging

conference and the ability to make this part of your opening theme.

MR. MASTRO: I understand.

THE COURT: And sort of repeat it throughout the trial.

MR. MASTRO: I understand. We have the benefit in this case of knowing that Mr. Shkreli was acquitted and exonerated on Count 7. So that's something that didn't happen in Rodriguez until later in the case, so.

Your Honor, if I may -- and I really appreciate the Court's indulgence -- I don't know which issues on their in limine motions Your Honor is going to want to hear argument on, but I am the one who is going to be arguing, if Your Honor wants to hear more argument, on the Government's motion to prevent Defense from referring to our client being a father and a husband, the Government moving to preclude the Defense from referring to Mr. Greebel as a father, a husband and other personal characteristics.

THE COURT: I do not have any issue with that --

MR. MASTRO: Okay.

THE COURT: -- all right, in the opening. And is that the extent of what you are going to say about Mr. Greebel; an attorney --

MR. MASTRO: Right. We would just be talking in those general terms.

THE COURT: In terms of your status as a former prosecutor, Mr. Brodsky, Mr. Chan and Ms. Denerstein, and whoever else at the table might be a former AUSA, I do not think that is appropriate. I think that it is an issue that is not relevant to the jury's consideration. They are to decide the case based on the evidence.

You are here as counsel for Mr. Greebel, and I do not believe that your backgrounds are relevant or should be considered by the jury. The case is to be based and decided on the evidence. And whatever your backgrounds may be, I think, is not relevant.

So that is not going to be admissible.

MR. MASTRO: Okay. I am going to be uncharacteristically silent on the point and move on to the third area.

THE COURT: What is your other area?

MR. MASTRO: It's the Government's motion concerning Mr. Pierotti and whether my colleague, Mr. Brodsky, should be precluded from cross-examining Mr. Pierotti.

THE COURT: Do you want to argue that, Mr. Brodsky, since you know best?

MR. BRODSKY: I feel like I should recuse myself.

THE COURT: All right. Fine.

I think that Mr. Brodsky should be allowed to cross-examine Mr. Pierotti, but what he needs to be very

careful of is using his former encounters or knowledge of Mr. Pierotti, and in the process, making himself a witness. Because you will be disqualified if you do that, all right? So be careful.

MR. MASTRO: Much appreciated, Your Honor. I know when to sit down and shut up. So thank you.

THE COURT: Okay. I think Mr. Brodsky knows where the line is.

MR. BRODSKY: Yes, Your Honor.

MR. MASTRO: He most definitely does.

MS. SMITH: Your Honor, I just want to say that if it's an honest answer then of Mr. Pierotti -- I am just concerned. I find it very concerning that with this number of attorneys, there is no one else who can cross-examine Mr. Pierotti. I think it's being done to potentially be intimidating.

And I also am concerned that --

THE COURT: Wait, I do not understand.

MS. SMITH: The cross-examination of Mr. Pierotti by Mr. Brodsky.

THE COURT: Yes.

MS. SMITH: See, if they intend to go into the Galleon, which I believe they do intend to go into --

THE COURT: Well, because it is as part of his direct testimony.

MS. SMITH: I completely agree. I think it's appropriate.

THE COURT: Right.

MS. SMITH: It was brought out on direct because defense counsel in the Shkreli trial said that they were going to cross-examine.

THE COURT: Right.

MS. SMITH: If Mr. Brodsky is not going to cross-examine on that point, then I don't need to talk about it on direct.

THE COURT: Well, what is it going to be, Mr. Brodsky?

MR. BRODSKY: I'm sorry. I didn't hear the last question.

THE COURT: She brought it out on direct in the Shkreli case because Mr. -- his defense team indicated they wanted to cross-examine him about his involvement in the Galleon case.

MR. BRODSKY: Yes. We've informed the Government that we had the same plan and we actually requested from the Government on a few occasions to provide us with the FBI reports of Mr. Pierotti's interviews with the FBI. So before Mr. Pierotti signed a non-prosecution agreement with the Government, Mr. Pierotti must have interviewed with the Government, there must be FBI reports.

Now, they said they asked the Southern District of New York to produce the reports, but they couldn't find them. We were going to appeal to Your Honor that we know, not that we're going to tell the jury, but from being former Federal prosecutors, we know the FBI has a database, electronically, where the FBI reports exist and they're there. And even though they may not be signed, initialed as the original, the FBI can print those FBI reports and provide them.

So that was what we were going to request. But to answer your direct question, would we cross-examine Mr. Pierotti about his participation in trading on inside information as it was elicited on the direct? The answer is yes.

MS. SMITH: And his non-prosecution agreement. Is he going to be asked about the non-prosecution agreement.

MR. MASTRO: He has one.

MS. SMITH: I know. So I'm asking, because that is the concern, because having spoken to Mr. Pierotti, he feels that Mr. Brodsky is one of the people who said that he needed one. And so if there is an argument made in cross-examination about, did you really need one? Did you have exposure? That is the concern which we laid out in our brief.

And I want to flag it because Mr. Brodsky is now potentially inviting this, and we will be instructing Mr. Pierotti, and we can do it ahead of time; but a truthful

answer may, in fact, require, depending on how it's phrased, require identification of Mr. Brodsky as one of the prosecutors.

So I just want -- that was always the concern, and I hope that we can make that very clear. And also, you know, we will, obviously, be watching it closely for objections.

But, you know, the -- we felt, and what we briefed was the appearance of impropriety. There was a D.C. circuit case where it's very common for people to kind of go in Government and out Government. The idea that a former Federal prosecutor would be cross-examining someone who was brought in as a witness and given an NPA, we think that appearance of impropriety is highly problematic. If the Court wants to go forward, you know, we just want to make sure that we're very careful about that issue with the witness.

THE COURT: Well, I believe that Mr. Brodsky knows the risks that he runs if he elicits testimony that would make him a fact witness. And if Mr. Pierotti is asked questions where he discloses actions or words of Mr. Brodsky, I think that there are strong grounds for disqualification at that point.

So he needs to be careful, and I think he is skillful enough to know what not to do, and how to avoid it. And I am sure the Government can also help Mr. Pierotti understand that he has to be truthful in his answers. But if

he can avoid identifying or outing Mr. Brodsky as the prosecutor in the case, that he should do so.

But if he is pressed and it comes out because he feels that it is an appropriate answer to a question, then we have to take appropriate action.

MR. MASTRO: Your Honor, just to clarify one thing. I think the easiest way to avoid all of this is for that which must exist, non-pros agreement and FBI 302s, that are on a database, even if the U.S. Attorney's Office hasn't been able to locate them yet, that they should be directed to find them.

THE COURT: Did you produce them as part of his 3500 material and Giglio?

MS. SMITH: Your Honor, the first thing is the non-prosecution agreement. As we disclosed in the first trial, I believe you remember, Mr. Pierotti was given a non-prosecution agreement. He doesn't have it in his records. We did ask -- because that is a document that he would normally have in his own records, we did ask the Southern District to look for it. They were unable to find a signed copy.

THE COURT: Does his attorney have a copy?

MS. SMITH: His attorney does not. This all was in the letter that was disclosed in connection with the first trial, and was given to the defense prior to filing motions in limine in this case. So, you know, this has been an issue

for a while.

The FBI 302s, we've never said we can't find them. They are not in the possession, custody or control of this progress team. They are not Mr. Pierotti's 3500 in this case. It's a completely unrelated case.

The issue here is a Giglio issue. We provided the Giglio information that Mr. Pierotti had been given a non-prosecution agreement in connection with that one Smucker's trade in the Galleon case. There is no further disclosure that's required.

Part of the problem here is that Mr. Brodsky was a prosecutor on that case, and may have information that we don't have from his interactions with Mr. Pierotti. The 302s that were created in connection with that case are completely tangential. They are not 3500 in this case, and we are not required to go and get them and give them to Mr. Brodsky; not to mention Mr. Brodsky has the information that's in those, because he was one of the prosecutors that met with Mr. Pierotti for the case.

So, we have never said that we couldn't locate the 302s. We said we couldn't locate the NPA, which they've known since August and, in fact, they've known since July, since that was part of the cross-examination. And the 302s are not appropriate. They're not 3500 in this case.

MR. MASTRO: Your Honor, just very briefly.

First, they say they don't have a signed non-pros agreement. We'll take whatever copy they have, because we know -- we know if Counsel, in other cases where Mr. Pierotti was potentially a witness, have those documents, but they're under some form of Court Protective Order. So it exists.

Number two, this is classic Giglio material. It goes very much to his veracity, honesty. The kind of thing you have to give on a witness to the defense, so the defense, you know, would have that ability. This isn't some unrelated, earlier case, benign witness. This is somebody who had a non-pros because he was, apparently, involved in activities that reflect on his credibility and veracity. So that's classic Giglio.

THE COURT: So where should they -- if I were to order them --

MR. MASTRO: They're right there at the end of table.

THE COURT: The non-prosecution agreement. Are you saying the FBI has it?

MR. MASTRO: I'm saying they have only said they don't have the signed version. Even the unsigned version would be helpful to us, because we show it to the witness and say, is this your non-pros agreement? Number one.

Number two, on the Giglio, those guys, at the end of table, the FBI agents, they can go into their database right

now and get that. That is classic Giglio.

When the Government has documents that reflect on the veracity and honesty of a witness, and involves potentially the witness being involved in fraud, of course the Government has to produce that.

So, Your Honor, I think that what should be happening here, and it will resolve all these other issues the Government is talking about, is Mr. Brodsky actually doesn't have any particular recollections of Mr. Pierotti and what he said or didn't say. He had only the most passing acquaintance with Mr. Pierotti.

But we know from the first trial there's a non-pros. We know they have very carefully said they don't have the signed version. And we know there were 302s from that earlier case. They are classic Giglio. So they should have to be produced.

Now I've heard for the first time -- I actually heard before, what we heard before was they were having trouble locating it. Now we hear for the first time, it's not a question of locating it. It's a question of they're taking the position they don't have to produce it. Classic Giglio. Has to be produced.

Please, gentlemen at the end of table, produce it.

MS. SMITH: Your Honor, to be very clear.

(Continued on following page.)

(Continuing)

MS. SMITH: Your Honor, to be very clear, we have neither a signed or non-signed copy of the MPA. I have never had a conversation with Mr. Mastro about the 302s, but I did not represent that we could not find the 302s. In fact, we had a very frank conversation on August 15, 2017, where I said we didn't think we were required to produce them. They didn't move in limine to get them. The Giglio material has been disclosed. Giglio means what's the information. They don't need the 302s. They have the information. They, in fact, have his testimony from the first trial.

So, again, we got an e-mail about this this week, when it is something that could have been raised in the motions in limine. They have the information. It's not that we have the signed MPA and won't give it to them. Nobody seems to have a copy of it. It is five or six years ago at this point. That is the position on the ground. I just want to make sure that is all very clear for the record.

THE COURT: So does the lawyer for Mr. Pierotti have it?

MS. SMITH: We asked. He cannot find a copy.

MR. BRODSKY: Your Honor, if I may, just for a moment.

THE COURT: Yes.

MR. BRODSKY: I remember meeting Mr. Pierotti once

but not the second time, which is apparently when he signed the non-pros. But, respectfully, Your Honor, I did listen to his testimony when he testified here during the Shkreli trial. I was in the audience. He testified, in sum and substance, that he knew the information was coming ultimately from Rajat Gupta, a member of the board of directors of Proctor & Gamble. He knew it was non-public. He knew it related to a merger. But he said, according to his testimony, it was not material and he didn't commit a crime. That was what he said.

Respectfully, Your Honor, knowing I was in the Southern District of New York, I find it hard to believe that a federal prosecutor would sign a person like that up knowing the information was ultimately coming from a member of the board of directors to a non-pros. What I suggest, Your Honor, is it goes ultimately to Mr. Pierotti's credibility. He took the witness stand and he testified to that. The federal prosecutors have a duty and obligation before they put any witness on the stand to test their credibility.

In their possession, in the FBI's possession are Mr. Pierotti's statements about his prior acts before he received the non-pros. For the life of me, I don't understand why they don't obtain it for their own reasons. But certainly, without question, a defense has a right, when it is going to come out on direct and you know it is going to come out because it reflects his credibility about what he did in the past, if the

FBI reports in the possession of this Government sitting at this table are inconsistent with what Mr. Pierotti testifies to about that, that is classic credibility cross-examination. How in the world could we not want to obtain that and have the right to obtain that?

If this means, Your Honor, I can't do the cross-examination, let's get the 302s. It is worth it to us. We want to have access to the FBI reports reflecting the statements of Mr. Pierotti because Mr. Pierotti's credibility is at issue. He is the single and only witness on Count Eight. He is the only witness the Government called.

If you remember, Your Honor asked what's the other evidence on Count Eight and they told you it was going to be Timothy Pierotti and some e-mails through Special Agent Braconi. Given the significance of his testimony, the only witness, and given that he participated in criminal activity for which he received the non-pros, how in the world can we sit here and know that these 302s with his statements are in their possession. They are accessible to them but they won't produce them. I have never heard of such a thing.

MS. SMITH: Your Honor, this is part of the problem, I think, with the appearance of impropriety, Mr. Brodsky using information he knows about the case to think about how he is going to cross examines Mr. Pierotti, who he brought in as a witness for the case and who he gave the non-prosecution

agreement to.

THE COURT: I think he just said, though, he was willing not to cross-examine if he could get the 302s.

Did you say that?

MR. BRODSKY: Your Honor, I did say that. And having prosecuted the Rajat Gupta case, I know from prosecuting that case Timothy Pierotti was never called as a witness. I don't remember Timothy Pierotti in connection with that case. Honestly, Your Honor, I don't. Swear me in and I will say that.

THE COURT: Do you have a doubt as to whether he has a non-pros?

MR. BRODSKY: No, I don't have a doubt that he has non-pros. But when Gary Naftalis opened in the trial of Rajat Gupta, he referred to the fact that there was going to be a witness who has traded in Smucker's based on a non-pros. So having read the opening and knowing that's the reference to Timothy Pierotti, we believe that Timothy Pierotti has non-pros.

We believe there is an electronic copy at the Southern District of New York. There's an unsigned copy. Not only that, Your Honor, but the practice of the Southern District of New York in every trial, and this was no different, was to keep -- and I'm sure this prosecution team at its very best does the same thing -- was to keep electronic

copies of all the 3500 material. So, undoubtedly, there is an electronic copy at the Southern District of New York. But at a minimum, Your Honor, sitting in the possession of this prosecution team, which includes the FBI, they have the 302s, but they are blindly, consciously avoiding getting them. They don't want to see what's there. And how can we allow that with the singular sole witness and his credibility on Count Eight?

MS. SMITH: Just respectfully, Your Honor, we did check with the Southern District. Whatever file system Mr. Brodsky and his colleagues were using for that trial does not have a copy of the non-prosecution agreement. We have tried to find it. I don't have an answer for that.

THE COURT: Mr. Naftalis doesn't have it?

MR. MASTRO: Mr. Naftalis, who I spoke to in his office, they are under a protective order in that case. If Your Honor were to direct something, that might be a different issue.

My point is this, Your Honor, apparently they can go to the FBI's files. The FBI has the 302s. I'm hearing something a little different. I heard that we were supposedly told they wouldn't produce them but then we were told they tried to get them and couldn't get them.

MS. SMITH: Because Mr. Mastro was not on the call.

MR. MASTRO: Your Honor --

MS. SMITH: Excuse me, I would like to make the record clear --

MR. MASTRO: I was in the middle of speaking.

THE COURT: Let's just let him speak. He was speaking first.

MR. MASTRO: All I want to say, Your Honor, was that apparently it didn't go to the FBI, which keeps all of its 302s electronically. And, by the way, wouldn't that be the easiest way to clear up entirely this issue of what Mr. Brodsky knows or doesn't know and he has no recollection of dealings with Mr. Pierotti, having met him once. It's in the 302s and that's what he would be cross-examined on they were to be produced. The FBI definitely has them, Your Honor.

THE COURT: It seems to me that if he is going to testify on a specific subject, that the Southern District prosecution in the non-pros, it seems to me that his 302s, his prior statement about that should be disclosed. I understand that this is not about that case, but it certainly is in this case. He is going to testify about it and it is being elicited on direct. Generally, when a witness testifies, their prior statements are disclosed. I understand the distinction that you are making, but he is talking about the Southern District non-pros.

MS. SMITH: Well, he's talking about it because the defense is going to cross him on it.

THE COURT: Right. It seems to me they should have the 302s because in order for them to meaningfully cross-examine him and determine whether he is telling the truth about what happened in the Southern District, whatever that may be, they have the right to see what he told the FBI, if he is saying something different here before the jury than he did in the Southern District.

MS. SMITH: So it's our understanding that Mr. Brodsky is not going to cross Mr. Pierotti. I will have to try to get those 302s. I can't represent that I can, but we certainly will ask the FBI if they have them.

THE COURT: Well, he did say that and he did confirm that when I asked him.

MR. MASTRO: But, Your Honor, and I said for Mr. Brodsky, if the 302s are produced, how can there possibly be any issue about him doing the cross-examination based on the 302s, which are FBI reports, not something he would have known separately? Actually, the 302s are the cleansing process here to make sure there isn't any percipient witness issue.

And Mr. Brodsky, by the say, says I will not cross that line and says also that he doesn't recall any particular interactions other than meeting the guy once. But the 302s are the record of the FBI of what the guy said. That takes Mr. Brodsky's past experience out of the equation, but it's classic Giglio going to veracity and honestly. So I think the

notion that they should have to produce the 302s exist regardless of who does the cross-examination. And that Mr. Brodsky or I, whichever one we decide to have, but Mr. Brodsky should have the right to do that cross-examination off the 302s, which have nothing to do with a percipient witness.

MS. SMITH: Your Honor, if Your Honor orders us to produce the 302s, we will go get them. If the 302s reflect that Mr. Brodsky was at meetings with Mr. Pierotti, we do have the percipient witness. Then they are going to be cross-examining him with a document that says Mr. Brodsky was present.

And, first of all, that is a whole other separate issue that we can deal with down the lines in terms of extrinsic evidence on impeachment material. So I have heard one thing and I heard them backing off. It's all over the place.

THE COURT: I understand.

MS. SMITH: If Your Honor orders us to get the 302s, we will. I don't want to belabor this any further.

THE COURT: All right. Get the 302s. I don't know what they are going to show and I don't know what Mr. Brodsky is going to do with them. He is on fair notice of the consequences if he crosses the line.

MR. MASTRO: Thank you, Your Honor.

MR. BRODSKY: And I know the time is running late

and we had a lot of motions pending.

THE COURT: Yes, you do. Don't you want to know my rulings?

MR. BRODSKY: Yes.

THE COURT: What did you want to say?

MR. MASTRO: If I may please be excused, Your Honor, I'd really appreciate it.

THE COURT: Yes, of course. Have a nice weekend.

MR. MASTRO: And I look forward to seeing you next time.

THE COURT: Did you want to make an argument? I don't want to cut you off if you have something more to add. I have read your papers.

MR. BRODSKY: Well, with respect to the remaining motions in limine, I was going to highlight the ones that were, from our perspective, extremely -- you know, we have a long list of priorities, the most important of the most important, and I didn't want to minimize some others, but that's what I was hoping to do. But I know it is running late.

THE COURT: The last trial group was able to come to a lot of understandings. For some reason, this group is not. All that happens is more motions. I would be happy if you want to focus on certain materials or certain aspects of your motion.

MR. BRODSKY: Yes, Your Honor.

THE COURT: This is from the big binder?

MR. BRODSKY: It is from the large chart, yes. If I had to highlight a few, and, Your Honor, respectfully --

THE COURT: I will try to make rulings.

MR. BRODSKY: -- we would love to come to agreement with the Government on issues, but some of these are legal issues where we feel we have the absolute right to introduce the evidence and the Government says no. Some of them are where the Government says we have no right to introduce evidence and we say we do, so we are at loggerheads on those issues. The first one I would point out, Your Honor, respectfully is with respect to the arbitration.

THE COURT: Yes, that is B-1 and C-1.

MR. BRODSKY: Correct.

THE COURT: Cross motions.

MR. BRODSKY: And the reason why I highlight this, Your Honor, and I emphasize it is because I do believe we have instruction from three different courts: One in the Second Circuit, one in the Fifth Circuit, and one in the Ninth Circuit, where two of them are criminal cases, and those convictions were vacated, United States versus Fisher in the Fifth Circuit and the United States versus Boulware in the Ninth Circuit. And those convictions were vacated for one reason and one reason only and that is because the exact same

evidence we are seeking to introduce was not introduced for the exact same reasons that this Government offers that the Government offered in those cases.

(Continued on following page.)

(Continuing)

THE COURT: All right. So let's talk about Mr. Rosenfeld, shall we?

MR. BRODSKY: Yes, Your Honor.

THE COURT: I think that the arbitrator in that decision, you know, made specific statements about what she was not deciding.

MR. BRODSKY: Correct.

THE COURT: And I am not really sure because there seems to be inconsistency within your submissions as to whether you want to admit the entire decision or just portions of it. It is a little difficult to for me to decide what is at issue when I do not think the dispute has been clearly framed.

MR. BRODSKY: Understood, Your Honor.

THE COURT: So what is it that you want to do? Because you have said inconsistent things. You have said parts of it, then you said all of it.

MR. BRODSKY: Right. What we wanted to do initially, Your Honor, is state what the law was, which is that when legal rights and responsibilities -- what I think the law requires, and then we can talk about the scope of it -- what I think the law requires, based on United States versus Dupree and Boulware in the Ninth Circuit, what I think those cases say -- and the Government cites it for other

propositions, United States versus DiMaria -- what those cases say is that legally operative conduct, verbal operative conduct or rulings, for example, by State Court proceedings, arbitrations that define the legal rights and responsibilities of the party, those are admissible as nonhearsay; and respectfully, under 803 subsection -- forgive me if I forget the subsection here, I believe it's Subsection 15, and that's relying on the United States versus, I believe, Boulware decision, that exception actually applies. 803(15).

And so what I would suggest at a minimum, Your Honor, what would be admissible, is the fact that there was an arbitration; the fact that Dr. Rosenfeld filed the arbitration against Retrophin to enforce the consulting agreement that he had; that he won his -- that Retrophin argued that the consulting agreement was a sham; the arbitrator ruled in favor of Dr. Rosenfeld, finding that it was not a sham, and finding that Retrophin owed the remaining amount of money on the consulting agreement. And I think there are certain portions that directly make this statement and, at a minimum, those portions that find that the consulting agreement is an enforceable agreement that was breached by Retrophin; that the demands on Rosenfeld -- this is on the bottom of page 6, for example, if I had to point out the specific areas that I think would absolutely be required to be admissible, on page 6.

THE COURT: Well, do you want to just highlight --

MR. BRODSKY: I can highlight them for you and submit them to the Court.

THE COURT: Because this is the thing.

MR. BRODSKY: Yes, Your Honor.

THE COURT: I think Rosenfeld's agreement is certainly noted in the indictment, and I think the arbitrator was very clear in saying I am looking at whether this is an enforceable agreement as a matter of contract. I am not making any findings about whether there was illegality or fraud.

What I am looking at is the terms of this agreement, and I think that this decision can come in, but it has to be a balanced admission. So as much as the rights and -- the rights of the parties would be admissible in terms of what you have just articulated, that there was an arbitration, that Dr. Rosenfeld wanted to enforce the agreements that the arbitrator found that he had given minimal services in exchange for the consideration that he received, and it is rejecting the sham argument of Retrophin, and ruling that Retrophin owed him money, I think that the qualifications that she made also would have to, in fairness, be admissible as to what she did not find.

MR. BRODSKY: Certainly.

THE COURT: And that she had other information that

-- other than that which might be presented here.

MR. BRODSKY: Certainly. I think we can include the fact that she held the hearing on a number of days, and listened to X number of witnesses, and include that. We have no issue with that, Your Honor, and it certainly should be balanced. We are perfectly fine with it being balanced.

THE COURT: All right.

So, why don't I make a ruling on that and I will look at what the parties have said. I think the Government is standing and wants to go be heard on this --

MR. BRODSKY: Yes, Your Honor.

THE COURT: -- in order to give the balance and then we will move on to Mr. Koestler.

MR. KESSLER: Sure, Your Honor. I'll be very brief.

THE COURT: Yes.

MR. KESSLER: First, I think to the extent a hearsay exception applies, what the case is that Mr. Brodsky cited, establishes that the operative part of the award should come in. So in the Rosenfeld arbitration, it would be that there's a -- there was an arbitration for breach of contract claim for the consulting agreement, and damages were awarded to one party or another.

Finding, such as, there were minimal consulting services are factual findings that the arbitrator made that, you know, could well be the province of the jury instead, and

that's where intra-trial litigation could arise.

I will also just note so that the Court and the defense are on notice. We do not intend to introduce evidence related to the Rosenfeld consulting agreement. So to the extent the Court allows some portion that this agreement to come in, it would be on the defense case.

THE COURT: All right.

And with regard to Mr. Koestler, I do not think that his agreement is at issue or noted or part of the indictment.

MR. KESSLER: It is not.

THE COURT: And the Government is not alleging that this is fraudulent.

Do you still want this in?

MR. BRODSKY: Your Honor, what I would suggest is that we revisit that in connection with our case in chief and if -- we reserve the right to come back to, Your Honor, if we plan to introduce it.

The reason why I'm saying that, Your Honor, is we don't know what the Government's case-in-chief is. We have the general picture. They say it's a new trial. They say they have new evidence. And so we want to reserve the ability, that if they make some arguments about Evan Greebel and what he knew or didn't know, and Koestler becomes relevant to that, we would like the ability to use that evidence.

Sitting here today, I would tell you, based on if

they retried the Shkreli case, we wouldn't introduce evidence relating to Mr. Koestler. But without knowing their case, it's hard to just stipulate that we're not going to introduce it.

THE COURT: No, I understand. But I think they are representing that they are not going to be discussing the Koestler agreement.

Am I right?

MR. KESSLER: Yes. Well, I don't think we should make that representation.

THE COURT: Okay.

MR. KESSLER: For Rosenfeld, we agree.

THE COURT: All right.

MR. KESSLER: That we are not going to --

THE COURT: It is not coming in, in your case-in-chief.

MR. KESSLER: No.

MR. BRODSKY: Well, Your Honor, if they are now suggesting that they are bringing in Mr. Koestler, then I do think it -- because it affects the opening -- I do think we should discuss what they're going to bring in, and then we can argue about the relevance of Mr. Koestler's arbitration.

MR. KESSLER: We're not arguing that the Koestler arbitration -- the Koestler settlement consulting agreement is one of the charged consulting agreements that fits in the

bucket. There may be evidence related to Koestler that comes in for other reasons.

THE COURT: About other --

MR. KESSLER: Other arrangements with Mr. Shkreli and Mr. Greebel. And what generally was discussed.

THE COURT: But not that agreement.

MR. KESSLER: That's correct.

MR. BRODSKY: Well, what happened in the arbitration, as Your Honor knows, is that Mr. Koestler had a consulting arrangement and also had a direct stock transfer agreement with Mr. Shkreli. The Court made certain findings as a result of that in a heated litigation between Mr. Koestler and Retrophin.

And what I'm hearing now suggests that it is relevant. Relevancy, of course, being the lowest threshold available where there is any tendency to make a fact of consequence more or less likely. So if I'm hearing that they're going to bring in evidence relating to Mr. Koestler, I do believe that we should discuss the admissibility of the arbitration so that we have the ability it open on it.

MR. KESSLER: Well, so I'm not representing that our opening will include the Koestler arbitration. I'm just saying we don't want to take the position today that there will be no evidence related to Mr. Koestler at any point in the Government's case.

THE COURT: But you have represented there will not be evidence regarding the agreement.

MR. KESSLER: For Rosenfeld. And the Koestler Consulting.

THE COURT: And Koestler's agreement.

MR. KESSLER: There will be no allegation that the consulting agreement was one of the same sham consulting agreements that are discussed in the indictment.

THE COURT: All right.

MR. KESSLER: Just also to be clear, if the Rosenfeld arbitration comes in on the defense case, I don't understand the Court to be saying we would not be allowed to cross-examine whichever witness put the agreement in about the facts and circumstances of everything that happened in that arbitration, or to offer rebuttal evidence to address problems with that arbitration. That would all be permissible.

THE COURT: Right. You would not be precluded from cross-examination of the witness.

MR. KESSLER: And offering evidence on a rebuttal case.

THE COURT: Yes.

MR. KESSLER: To the extent we needed to do that.

THE COURT: Yes. You would be allowed to do that. I understand that.

MR. KESSLER: Okay, thank you.

THE COURT: All right.

Should we move on? What else do you feel passionate about, Mr. Brodsky?

MR. BRODSKY: Thank you, Your Honor.

THE COURT: It seems everything, but that is all right.

MR. BRODSKY: I do. I do.

THE COURT: All right.

MR. BRODSKY: The next one I would go to, Your Honor, are F-1, if I had to select. And the reason why I go to it, Your Honor, is there's two parts to it.

MR. PITLUCK: Sorry to interrupt, we're not following. We're kind of organized our own way, so if you could just tell us which motion.

MR. BRODSKY: Absolutely.

THE COURT: Can I just make a ruling on the motion that Mr. Greebel made to admit statements by Mr. Shkreli.

I do not believe that this motion should be granted. I do not believe that if it is the description of a present sense impression, Mr. Shkreli's statements are not describing the events as they occurred. He is testifying or speaking about events in the past. So I do not think that rule provides a route for admissibility.

I also do not find that his statements will be admissible as admissions against his interest. He is not

making inculpatory statements that would impair his own penal interests in his series of statements.

And finally, I do not find these to be given -- the statements to have been given in a situation where one can say that these are trustworthy statements.

MR. BRODSKY: Understood, Your Honor.

If I had to emphasize one among them, and obviously, if something -- the Government opens the door to Mr. Shkreli's credibility and we feel that under one of the rules of evidence we want to attack Mr. Shkreli's credibility in a certain way, I just want -- for example, under Rule 806, I believe that if the Government tries to introduce evidence relating to -- and we briefed, this, Your Honor, in our brief. But if there is -- or -- and Rule 608. If the Government is going to try to introduce evidence relating to Mr. Shkreli or statements of Mr. Shkreli, and we have evidence based on Mr. Shkreli's statements that undermine that credibility, I think the Government opens the door to that. I would just note that.

Your Honor, if I had to identify one statement that I would ask you to revisit briefly, it is Mr. Shkreli's statement after his arrest that it was bizarre that Evan Greebel was arrested.

The reason why I say it, and I cite the United States V DiMaria case, 727 F.2d 265 Second Circuit

1984. In that case, the Second Circuit vacated the defendant's conviction for conspiracy and substantive counts relating to contraband cigarettes. And for the sole reason that the defense was not allowed to introduce a single statement of the defendant when he was arrested, and the statement of the defendant when he was arrested was, I thought you guys were investigating white collar crime. What are you doing here? I only came here to get some cigarettes real cheap.

The Second Circuit said, the Government argued that was a false statement. Totally false. It was wrong. It was contradictory to other evidence. And the Second Circuit said, false as it may be, whatever it may be, it squarely fits Rule 803(3).

It was a present state of mind of the defendant, at the time the defendant was making the statement. And it didn't go to whether or not the jury could find the state of mind -- that this particular state of mind was this individual thought that bootlegging cigarettes was what he was doing not stealing cigarettes -- not buying stolen cigarettes, but cheap cigarettes.

So it's our respective view that based on that case, Mr. Shkreli's statement at the time of his arrest, that it's bizarre that Evan Greebel was arrested, which is a -- it's a state of mind of Mr. Greebel at that time comes in under

DiMaria. That's all I would note and I would ask, Your Honor, to look at that case.

And I will quote from DiMaria where it says, quote, False it may well have been, but it fell within Rule 803(3) as it clearly did if the words that rule are read to mean what they say. Its truth or falsity was for the jury to determine.

(Continued on following page.)

(Continuing)

MR. BRODSKY: I think the statement is so compelling by Mr. Shkreli, what he said upon his arrest, learning about Evan Greebel, not having received the charging instrument, not having received the indictment. That's his statement. I think that is so compelling that we should be permitted to reflect that state of mind of Mr. Shkreli. This case is going to be a lot about the relationship between Mr. Shkreli and Mr. Greebel. The Government has one view of it. We have a completely different and opposite view of it. I think this state of mind evidence should come, but I'm happy to turn --

MR. KESSLER: We understand the Court to have ruled on this, but if there are other things that would be helpful for the Court to hear at this point, I'm happy to address them.

THE COURT: Well, I am happy to hear from you on this particular point because this is important statement to the defense.

MR. KESSLER: Sure. The statement in context comes in the middle of a long post-arrest interview which we attached as Exhibit A to our reply brief. It comes after the defendant jokes with the FBI. He talks about stock prices. He talks about talking with his lawyer before the FBI talked with him and then he goes on to give this long, rambling answers, I talked with Asler. That is his lawyer. That was

his original lawyer. He goes on to talk about handicapping his chances of being acquitted. He talks about how if he had just been charged with conduct with MSMB he would understand how the Government could have made that mistake, but the Evan thing, meaning the charges with Retrophin are just bizarre. This is not someone who was surprised on a street corner with agents with a bunch of cigarettes and blurted something out. This is a calculated, long discussion in the middle of a long, calm post-arrest interview. The circumstances are not the same.

THE COURT: Is this one videotaped?

MR. KESSLER: Yes, and we're also happy to provide the video to the Court.

THE COURT: I have looked at it.

MR. KESSLER: The one other thing I would say, Your Honor, is 803(3) does not allow -- it is quoted in DeMaria -- the offering of a statement of belief, such as the Evan thing is bizarre -- that is the little snippet that we have been discussing -- to prove the fact believed, but that's what they are doing. The relevance is not what Mr. Shkreli himself thought. The relevance is whether it was odd, whether that can be used in some way to argue it was odd. So it is just a circular effort to get around the 803(3) prohibition, which doesn't apply any because this isn't some surprised defendant describing his state of mind. He is giving a calculated -- I

mean, the statement ends with "I'm going to throw a big parade and party when I win; you're invited." This is not some off of the cuff kind of statement.

MR. BRODSKY: DeMaria, you will note upon reviewing the case, was not an excited utterance case. It was not, as Mr. Kessler is suggesting, a decision made about somebody making the statement off the cuff. It was a case about strictly 803(3) state of mind. And the relevance is clear, regardless of whether it was calculated, because in DeMaria, the Government said it was false, and regardless of whether it was exculpatory or inculpatory, because in DeMaria, the Government argued it is totally inculpatory. The reality is, under DeMaria, the state of mind of this particular person saying it's bizarre Evan was arrested is relevant. In this case, it makes a fact of consequence more likely that these two individuals engaged in an illegal conspiracy. But yet, when one is arrested, the dominant person, the one who's making all of the decisions who the Government is going to allege was directing people to do things in a conspiracy, he finds it bizarre. And, so, while the Government can argue to the jury oh, this was just a false exculpatory, this isn't really true, he was making it up, that's an issue for the jury and that's what they said in DeMaria. And I think the Government's argument about the truth of the statement was exactly what the Government argued to the district court in

DeMaria that resulted in vacating the conviction.

THE COURT: Let me think about it because I think generally the statements that you have proffered would not be admissible. This particular statement, since it is part of a videotape and I do remember looking at, I don't know whether it was the entire one or just an excerpt, I am going to look at it again and hope that I can be guided by the DeMaria case.

MR. BRODSKY: Thank you, Your Honor.

THE COURT: When I decide in terms of the Government's argument and the defense argument whether this is as issue of admissibility or whether it is an issue of weight and context and credibility is something that I would like to be refreshed on.

MR. BRODSKY: Thank you, Your Honor.

THE COURT: I think you have provided me that disc before.

MR. KESSLER: We can re-provide it.

The one thing I had, while the Court is considering this, if what Mr. Brodsky said is actually, the hearsay exception and the truth or falsity of the statement doesn't matter, then anything Martin Shkreli said at any point could be admitted because it would be what he was saying, true or false. The rule is circumscribed. The rule is very specific and it limits the kind of admissibility. We are happy to provide the video.

MR. BRODSKY: That argument also was made in DeMaria.

THE COURT: What else?

MR. BRODSKY: What I would turn to next, Your Honor, is really critically important. It came up in pretrial motions before Your Honor with respect to Mr. Brafman to move for it but then withdrew the motion.

THE COURT: Which one is this?

MR. BRODSKY: This is the grotesque threat that Mr. Shkreli made to make Tim Pierotti and his four children homeless. There is no question it's abominable, it's grotesque, it's unconscionable. When you tell that to the average person, that this is what a human being did to another human being and they wanted to make them homeless and their four children homeless, you get emotional reactions. Having three children myself, I have an emotional reaction immediately to it. It's not a financial threat when you make somebody homeless. It is just completely devastating to the family. It is complete destruction. So what we ask, Your Honor, is that particular evidence that Mr. Shkreli, not Mr. Greebel, but Mr. Shkreli made this threat in that letter and other locations, maybe by e-mail, maybe otherwise, he made this threat to make Mr. Pierotti's family, wife and four children homeless, that should not be in this trial.

First, the Government concedes that they don't have any evidence, not a shred, not a shred of evidence that Mr.

Greebel knew about, in advance, Mr. Shkreli's threat to Mr. Pierotti to make his wife and children homeless. And that is critical, because this isn't a case about Mr. Shkreli, this is a case about Mr. Greebel and Mr. Greebel did not make this threat. That is point number one.

Point number two, Your Honor, is the Government relied on 404(b) in their motion. They said that, "Evidence of Shkreli's harassment of Fearnow share recipient TP, aided by the defendant," referring to Mr. Greebel, "is admissible pursuant to Rule FRE 404(b) as evidence of the Defendant's knowledge of the object of the conspiracy he agreed to join, the Defendant's intent and his lack of mistake in assisting Mr. Shkreli in seeking to control the Fearnow shares." That's the Government's motion in limine at page 6 to 7. The problem with that is that the case law is clear, it is unmistakable and it is in the advisory committee notes of 404(b), that this rule of 404(b) only relates to evidence of an accused extrinsic acts; it doesn't relate to a non-defendant's extrinsic act. This is an extrinsic act of Mr. Shkreli. It is not an extrinsic act of Mr. Greebel that this threat was made.

The third point I would make, Your Honor, is that the probative value of this, of this highly charged and inflammatory evidence is outweighed by its prejudicial effect in spades and we cite United States v. Garcia which vacated a

conviction based on the risk of prejudice arising from the admission of evidence that is clearly outweighed by any marginal probative value. Since this is a threat by Mr. Shkreli, which there is no evidence that Mr. Greebel had advance knowledge of or condoned or supported in advance, what is the probative value to Mr. Greebel.

They are arguing in their papers that when Mr. Greebel learned about it after the fact, because in the course of what happened was, Your Honor, apparently this threat was made in or about December of 2012 or early 2013, at some point in the spring of 2013, the Katten law firm, not just Mr. Greebel, but the Katten law firm, with some senior litigators at Katten, decided to file a lawsuit against Mr. Pierotti based on what information they had from e-mails and other documents and talking to Mr. Shkreli. So they filed this lawsuit. I understand the Government's going to introduce evidence of the lawsuit and they are going to be able to have Mr. Pierotti testify that a lawsuit was filed against him and that this was intimidating and they are going to go through the lawsuit, but what they shouldn't be able to do is when Mr. Greebel learned about it, when other Katten lawyers learned about it, and they learned about an allegation that was made between two litigants against each other, they should have -- Mr. Greebel should have done something about the threat made by Mr. Shkreli to Mr. Pierotti's family. The problem is, in

litigation, with two people yelling and screaming at each other, we represent parties all the time that have disputes over the facts, the Government should not be able to allege or infer to the jury that Mr. Greebel's guilty of a criminal conspiracy because, and others at Katten, when they learned about this alleged threat, they don't go to Mr. Shkreli and fire him when Mr. Shkreli's firm -- his company is a client. So I don't think there is any probative value and the prejudicial effect is huge.

And, finally, Your Honor, the Government seems to rely throughout their briefing on United States versus Al-Moayad, 545 Fed 3rd 139, Second Circuit case, 2008. And that's a case where the Second Circuit vacated convictions because "Highly charged and emotional," testimony with, "minimal evidentiary value," was introduced. This is squarely that. The Government has the evidence of Mr. Pierotti. They have the evidence of Mr. Pierotti's testimony and the lawsuit that was filed against him. To bring up this threat to make the family homeless goes an extreme step too far and will poison the jury against our client. That's how we feel about that, Your Honor.

THE COURT: Thank you.

MS. SMITH: Your Honor, I want to kind of -- I think there were some aspects of the facts that were not -- we disagree about the facts related to the original harassment

and then the hacking, which I do want to raise, because we had said in our reply brief that we were not going to discuss the hacking if the defense didn't go into it. I think the information that we have learned in the past few weeks has changed our position on that. I just want to make it clear kind of the timeline of events and why we think that this is actually very important evidence of the conspiracy charged in Count Eight.

Mr. Shkreli was trying to get the shares back from Mr. Pierotti, as you remember, and there was an escalating series of events and it culminated in January of 2013, in part, in this letter that was sent threatening to make him homeless. Mr. Pierotti and Mr. Shkreli continue to try and discuss whether or not he's going to return the shares; Mr. Shkreli kept asking for them. Mr. Greebel gets involved before the Katten firm gets involved. He was involved before. He was advising Mr. Shkreli regarding the "over the wall e-mail" and all of these other threats to try and get it back. He is on the original e-mail that says I am going to sue you. And then Mr. Pierotti, in dealing with Mr. Greebel, advises Mr. Greebel specifically, not lawyers at Katten, about the threat. He cuts and pastes part of the letter and I think that is in our briefs. Mr. Greebel does not share that information with other attorneys at Katten. That is not information that is known generally. It is information that

is kept between Mr. Shkreli and Mr. Greebel.

It is not known to the Katten attorneys until Mr. Pierotti files an affidavit in January or February of 2014 which lays out both these original threats and then the hacking. So this threat is right in the middle of where Mr. Greebel and Mr. Shkreli are working together to get the shares back. Ultimately, Mr. Greebel pulls in the Katten firm to try to actually effectuate the lawsuit. But in the beginning, in this crucial time period, it's the two of them and that threat is, like I said, kind of the culmination of this course of behavior that Mr. Greebel is involved in at that same time period.

With respect to the hacking, it's our understanding that the hacking occurred around Christmas of 2013. Mr. Shkreli hacked a number of Mr. Pierotti's personal accounts, as well as accounts of his family. The Katten law firm, not only Mr. Greebel, but also other individuals at Katten, learn of the hacking. In fact, Mr. Shkreli confesses that he was the one who did the hacking and this is part of the reason why the lawsuit wound up getting settled, obviously because this accusation that there was this hacking. And when Mr. Greebel is describing the settlement to the board, he not only describes the settlement incorrectly and leaves out information related to the Fearnow shares and affirmatively misrepresents the Fearnow shares that are involved in the

settlement, but he also fails to mention his knowledge of the hacking, which obviously is a federal crime, that, you know, their client is running around doing this with the CEO of Retrophin. So that is actually also relevant in the sense that it is not only this initial threat and attempts to control the Fearnow shares, but at the end of the entire process with the settlement, which involves 50,000 Fearnow shares that were held in escrow that belonged to Mr. Pierotti that Mr. Greebel and Mr. Shkreli conspired to prevent him from getting at the end, which further shows control.

(Continued on next page.)

(Continuing)

MS. SMITH: There are also affirmative misrepresentations, as well as omissions made to the board members about the settlement of that lawsuit.

So I just wanted to kind of lay out those facts in full. I think that the legal arguments have been made pretty clearly in our brief. I will just say that the 404(b) was in the alternative, and I certainly think that Mr. Greebel's aiding and abetting of this course of conduct, you know, we don't believe that has 404(b). We believe it's direct evidence, but we threw that in as kind of a backstop. In addition, it would be evidence that would fall under 404(b).

MR. BRODSKY: And, Your Honor, what I'd like to do in response is hand up to Your Honor the 3500 material that we just received this week.

For the first time Your Honor should know that the Government, prior to the indictment -- we've already told you this -- the Government never spoke to anybody at Katten, and never saw documents from anybody at Katten. Before the Shkreli trial, they never spoke to anybody at Katten. They never got documents. They did get documents through this discovery process.

The first time after the Shkreli trial they spoke to witnesses from Katten, which is a good thing, and two of them are specifically in those 3500 material. And the reason why I

point it out to Your Honor is, I do think it's relevant specifically to this.

So what Ms. Smith said was, she put a lot of things on the board, you know. She threw a lot of stuff in there. There was at threat. Then there was the hacking. Then there was representations to the board. So I just want to unpack that, because our motion is about the threat, and I think we should focus on the threat.

I heard Ms. Smith say that Mr. Greebel learns about the threat from Mr. Pierotti before other partners at the law firm. And then I heard her say that he doesn't share it with the other partners. That's factually inaccurate, and we can prove it.

But put that aside. Mr. Greebel's other partners learn about the same threat, exactly the same threat, that Mr. Shkreli allegedly makes, and makes with the same information. Because what happens, Your Honor, is when Mr. Greebel is representing Retrophin and the Pierotti dispute arises, Mr. Greebel doesn't keep it for himself, between himself, and Mr. Shkreli.

What he does, in an unusual move, according to the Government being a co-conspirator, an alleged illegal conspiracy, what he does is bring in two senior partners, litigators at the law firm, and he asks those litigators to take charge of the litigation. And those litigators -- and

those are the 3500 material that I handed up to you -- those litigators who were interviewed within the last couple of weeks by the Government, those litigators take charge of the litigation. And at some point, they learn about this exact same threat.

And the Government doesn't allege, because they learned about the threat, that Mr. Shkreli apparently makes to make Mr. Pierotti's family and his wife and his children homeless, that somehow that implicates those two partners. And somehow that makes those two partners involved in something vial and inappropriate. I'll put that aside. Or illegal.

And so I'd like to focus on that. Ms. Smith said that threat makes Mr. Greebel involved in it. That's a quote.

Now, Mr. Greebel was not involved in the threat. He didn't know about the threat in advance. Did he learn about it afterwards? Yes.

Did other Katten partners learn about it afterwards? Yes.

The knowledge about the threat in the context of litigation between two parties who are fighting each other, and killing each other, over very different views about those Fearnow shares, that does not make evidence probative of what's in Mr. Greebel's state of mind. And even if there was some minimal probative value to it, how depressing and sad is

it, that we can't recognize how highly inflammatory and grotesque that evidence will have on a jury which will undoubtedly have members who have families.

And anybody who learns about that you want to make somebody homeless, and make them -- their kids homeless, will have a visceral emotional reaction.

And so we respectfully, Your Honor, they can get in the litigation. They can get in this alleged -- they want to get in alleged hacking evidence. They can try to get in alleged hacking evidence. We certainly know a lot about that and we are certainly prepared to defend it.

But if they want to get into this threat to make some kid homeless? That goes one step too far and that should not be permitted.

Now, with respect to their allegations, with respect to what representations were made to the board, or not made to the board by Mr. Greebel, we're a hundred percent prepared to address that. That's not part of our motion.

Our motion is squarely concerned about this threat to make a family and children homeless. And I haven't heard why that is so much -- that that has so much probative value that it outweighs the highly inflammatory affect it will have on the jury, especially when other Katten partners learn about it.

THE COURT: Okay. What I am understanding is that

Mr. Greebel became aware of this threat at least by February 14th, 2013.

MR. PITLUCK: That's right, Judge.

MS. SMITH: Yes, that's correct.

THE COURT: And that at that point -- and that was when Mr. Pierotti informed Mr. Greebel that this happened.

MR. BRODSKY: Correct.

THE COURT: The threat was made on January 15th, 2013, or at least that is when the letter was dated.

MR. BRODSKY: He doesn't receive a copy of the letter, as I understand it, Your Honor. He receives some quotes in an e-mail.

THE COURT: So, yes. But the part that you find to be terribly inflammatory.

MR. BRODSKY: Correct. Those parts.

THE COURT: And worthy of exclusion, is revealed to Mr. Greebel on February 14th, during the time that he is negotiating with Mr. Pierotti about getting those shares back.

MR. BRODSKY: There was unquestionably two versions of what happened at MSMB and Retrophin when Mr. Pierotti, as he testified, said what Mr. Shkreli said, and Mr. Shkreli had a completely different view. And in that context -- Mr. Greebel is not present for that. But in that context of the heated litigation between two people who are warring against each other, where Mr. Shkreli, on the one hand says, I

arranged to broker and provide these shares, these freely tradable shares, to a number of individuals in exchange for their commitment to work for the company, because I have no money.

This is what Mr. Shkreli is telling people.

THE COURT: I know, but you interrupted me.

MR. BRODSKY: Oh, I'm sorry, Your Honor. I apologize.

THE COURT: That same day, Mr. Greebel forwards the e-mail to Mr. Pierotti, to Mr. Shkreli, and says his response. That's it. I mean, that is all he says, his response.

MR. BRODSKY: Yes.

THE COURT: And then Mr. Shkreli directs him to bury Mr. Pierotti; sends money a month later to Katten and wants to sue Mr. Pierotti. And they do so on March 26th, after receiving the money and the directive from Mr. Shkreli.

Now, the 3500 material that you handed up --

MR. BRODSKY: Yes.

THE COURT: -- from Mr. Cotton indicates that, Mr. Howard Cotton, becomes aware of this harassing e-mail in a court filing. And he would have expected that E.G. -- I am assuming Mr. Greebel?

MR. BRODSKY: Yes.

THE COURT: -- to have made him aware of such an issue beforehand. Had it been known, because it would have

had significant influence on the litigation.

So it appears at least Mr. Cotton was not aware of this until the court filing by Mr. Pierotti.

MR. BRODSKY: When we proffered to Your Honor without laying out all our evidence --

THE COURT: I mean, I am just seeing this.

MR. BRODSKY: I hear you, Your Honor.

We proffering to Your Honor, without laying out our evidence, because we don't want to lay out what our sources of information, and all our documents that point out to the Government where they're missing stuff, and where they're misstating facts, we will let them do that in their opening. But I proffer to Your Honor that we will introduce evidence, through either testimony or otherwise, that Mr. Greebel informs people, and that this threat, in the context of heated litigation between two parties, does not stop the litigators from Katten from representing Retrophin in filing their lawsuit against Tim Pierotti. The lawsuit is Retrophin against Tim Pierotti --

THE COURT: The threat is made before the litigation --

MR. BRODSKY: Correct.

THE COURT: -- starts in January.

MR. BRODSKY: Correct.

But they learn about it -- without dispute, these

senior litigators at Katten learn about it and they continue with the lawsuit. And so the probative value that this -- what the Government says is that this threat by Shkreli somehow evidences that Mr. Greebel did something wrong.

THE COURT: Well, I think what they are arguing is that it is evidence that he continued to conspire with Mr. Shkreli to obtain control over the Fearnow shares.

MR. BRODSKY: But, Your Honor, if you're in a conspiracy -- and I don't mean to interrupt you -- but if you're in a conspiracy, if you're in a legal conspiracy, in a legal conspiracy with Mr. Shkreli -- I'm at a premier law firm, one of the best law firms in the world, with some of the best litigators in the world -- I will exclude other law firms, one of the best law firms in the world, and they are -- would you include your senior litigators and they learn about this alleged threat and somehow that's still evidence that Mr. Greebel did something wrong?

What the Government wants you to do is transport yourself into the mind of Mr. Shkreli, and have them acting parallel with each other. But we all know Mr. Shkreli duped people all the time.

And so the Government doesn't want to accept that fact about Mr. Shkreli, that he duped Mr. Greebel, and the problem is, Your Honor, they're going to get into the evidence.

Let me put it this way, Your Honor. They're going to get in the evidence of the lawsuit. They're going to get in the evidence, apparently, of some hacking. They're going to get in evidence, apparently, of misrepresentations to the board over the litigation.

What I have -- what we have a real problem with is the highly inflammatory part about making your kids homeless. That's going to cause jurors to have an emotional reaction and that's our problem with it.

It's 404(b) extrinsic conduct done by Shkreli.

THE COURT: But it is direct evidence of the conspiracy as well, because the idea -- the whole point of the conspiracy was to control these shares, and Mr. Shkreli, you know, is trying very hard to get those shares back from Mr. Pierotti.

MR. BRODSKY: Understood.

THE COURT: Right?

MR. BRODSKY: But in the context of the litigation, Mr. Greebel learns about it. The Government admits it acknowledges that he doesn't know in advance.

THE COURT: No, he does know about it as of February 14th.

MR. BRODSKY: But not before.

MS. SMITH: Your Honor, this is --

MR. BRODSKY: I'm sorry. If you allow me. If you

allow me.

The threat occurs; right?

THE COURT: In January. Mr. Greebel learns about it at least by February 14th. The litigation starts --

MR. BRODSKY: But that's after the fact.

THE COURT: Yes. But the -- he continues to try to negotiate with Mr. Pierotti to get those shares back, and then brings his firm into it and they start a litigation.

I mean, I think that the Government has proffered this as direct evidence of Mr. Greebel's participation in this conspiracy that has a number of different evolving actions by Mr. Shkreli and Mr. Greebel, vis-a-vis Mr. Pierotti, to get control of those shares.

MR. BRODSKY: I understand, Your Honor. But he's a partner, an income partner, at a law firm. He brings in a senior equity partner at the law firm to litigate the case. They get access to all of Mr. Shkreli's documents. They get access to all his e-mails and they pull them.

They write the complaint, not Mr. Greebel. They learn about the alleged threats and continue with the litigation. Their clear view, as reflect would in the 3500 material, is that this lawsuit was valid and just. They don't say it was an invalid lawsuit. They don't drop the lawsuit when they learn about this alleged threat. They continue on with the lawsuit.

And so the notion that somehow after the fact, if you learn about it --

THE COURT: So maybe the Katten partners did not find it as inflammatory and difficult as you claim. You know, it did not deter them. If your argument is carried out, it did not deter them from continuing the litigation, even knowing, after the fact, that he had made this threat.

MR. BRODSKY: Yes, Your Honor.

(Continued on following page.)

(Continuing)

MR. BRODSKY: Yes, Your Honor. To litigators like me, you would have to really stretch it to shock the conscience because we have seen lots of things, but to a jury that doesn't know litigation and how heated it is between parties, if they learn about this threat, I am afraid that it doesn't matter what the evidence will be after that. It will all won't matter. What the jury will say is, you know what, you Katten, you lawyer, you shouldn't have represented anybody in this. I had enough of you.

THE COURT: Are you finished?

MR. BRODSKY: Yes, Your Honor.

THE COURT: Okay.

MS. SMITH: Your Honor, I just wanted to make sure that the timing is clear, but I think you have it, that the threat happened in January. In February, Mr. Greebel learns about it. The lawsuit isn't brought until March. So in terms of the heat of the litigation, there is no litigation at that point. The other partners don't find out about it until January of 2014.

Mr. Brodsky just keeps retreating to prejudice, saying it is really going to make your family homeless, which was discussed, which came in at the last trial. I think these are all jury arguments, frankly, but they are not a basis to preclude this evidence.

MR. BRODSKY: The partners of the law firm learn about it long before January 2014, long before. We will be able to prove that.

THE COURT: Mr. Cotton does not learn about it until the Court filing. He is described here as an equity partner and says it wouldn't have had an effect on his decision to involve the firm in this litigation or, at least, it was a significant piece of knowledge that he was not aware of.

MR. BRODSKY: I understand, Your Honor, but the threat itself is so vile and what is the probative value of it?

THE COURT: It is being proffered as direct evidence of Mr. Greebel's involvement in the conspiracy.

MR. BRODSKY: If they had evidence -- I won't repeat myself and move on to the next point, but if they had evidence he knew about it in advance, that's one thing. But when you're a lawyer and you represent a company and you learn that the CEO of the company has made an alleged threat against somebody and they are both in heated litigation, from my perspective, where I sit, that can happen to me. And does it suggest that somehow that can be used as evidence, that if you are the lawyer and you continue with a lawsuit in the context of heated litigation, learning about it after the fact that can be probative of your mindset?

THE COURT: No, Mr. Brodsky. I think the timing,

again. The lawsuit is not brought until a month later, after the attempts by Mr. Shkreli and Mr. Greebel to retrieve the shares from Mr. Pierotti. They are not successful, so they bring this lawsuit and they talked about a restraining order. My point is is that the evidence that the Government wishes to proffer is among a series of steps and communications and plans and agreements to wrest those shares back from Mr. Pierotti. And I believe there is not evidence, as the Government admits, that Mr. Greebel did not know about it in advance, but once he did learn about it, all he said to Mr. Shkreli was his response. He did not say this is going to make it very difficult to litigate, I'm not going to bring this lawsuit to my partners to bring, I think that you might have put yourself in danger or crossed the line.

I think when he did the "over the wall" e-mail, that is what it is being referred to, he says he likes it, that the notion of trying to get Mr. Pierotti to become an insider and to be restricted in how he uses the Fearnow shares.

So I think that in context this is the Government's evidence of the conspiracy and I do not find that this alone is particularly so outrageous or so shocking that it certainly was not enough to deter the law firm from taking on the lawsuit or even -- I mean, they did not know about it. So it did not deter Mr. Greebel from recommending that the suit be filed and I think that is evidence of, as the Government says,

of the conspiracy.

MR. BRODSKY: But what the Government learned from Mr. Cotton and Mr. Howard was before the lawsuit was filed. They were in charge of it and they did their own due diligence and they did their own work on it. So they put their names, not Mr. Greebel's name, on the litigation.

They filed the litigation, proceeded with the litigation, even after learning about the threat. Again, that's in the context of two heated parties against each other. All I would ask, Your Honor, is that you consider, as you look at this -- you will have all these pieces of evidence of litigation and so on and all of this effort made to stop Pierotti. They have all of that. That is a mountain according to them.

But the lines in the letter and in the e-mail that talk about making you and your four children homeless and I will do whatever it takes, those are the ones that we are asking to redact. Those are the ones we are asking Your Honor because we really feel that a jury will not look at the evidence fairly and all they are going to do is have an emotionally visceral reaction and that is human nature.

I will move on to my next issue, Your Honor, and that respectfully is with respect to compensation. And I start with this Your Honor: What we are moving to preclude is evidence that of the particular salary that Mr. Greebel made

each year, the bonus that he received each year and the total amount of money billed, the dollar value that was billed to Retrophin.

And the reason, Your Honor, we rely on the United States versus Ferguson case, Judge Droney, then a district court judge in Connecticut now on the Second Circuit laid out the critical test on the admissibility of alleged evidence of compensation in connection with charges and there were two specific things in United States versus Ferguson the judge said.

Before I get into Ferguson, I should tell Your Honor what we're really concerned about is, as we know, lawyers are not beloved. I can hand up to Your Honor a Pew Research study. And we laugh about these things, but this is a jury that is reflective of the public. And this is a study that was done by the Pew Research Center on July 11, 2013 and I'm sure the statistics aren't better today. And in the third paragraph, they said among the 10 occupations the survey asks respondents to rate, lawyers are at the bottom of the list. About one in five Americans, 18 percent, say lawyers contribute a lot to society. While 43 percent say they make some contribution, fully 34 percent say lawyers contribute not very much or nothing at all.

And if you look at the list for all the trends in perceived contributions to the society, lawyers are at the

bottom. Now, respectfully, I submit Your Honor, most of us being lawyers in here, they are wrong, but nevertheless, that's the public perception and the public perception is that lawyers are greedy, right? So most people say lawyers are a bunch of greedy people; they're not to be trusted. And let's not forget we have an attorney as a client.

So in United States versus Ferguson, which I will turn back to, what Judge Droney said was there were two types of evidence about compensation the Government wanted to admit: One had a direct linkage between the compensation and the actual charge; the other had no linkage. In that case the defendant, Milton, moved to preclude the admission of his salary and bonus at AIG. The Government had alleged a big fraud, that he was inflating the price of AIG stock.

Without a doubt, the Government argued, hey look, by inflating the price of AIG stock he know he was going to get a bigger bonus. Now, maybe logically that could make sense, what Judge Droney knew was the Second Circuit case law, which he cites that says evidence of wealth is inadmissible. Evidence of your compensation is inadmissible. That is United States versus Stahl, 616 Fed 3rd 30, Second Circuit 1980, which reversed a conviction because of that.

THE COURT: What rule did he invoke to make that ruling?

MR. BRODSKY: What he said was there is no evidence

directly correlating the compensation, the salary, the bonus and the inflation of the AIG stock. There was no one-to-one correlation. You could come up with a theory, but there was no one-to-one correlation.

What he said was, it wasn't direct. It was attenuated. And he said what could come into evidence was the deferred compensation of Milton because Milton had AIG stock in his deferred compensation plan and if he inflated the value of the stock, his compensation plan was richer. So that was just direct evidence.

Here, Your Honor, what the Government wants to argue, and I have a series of documents for you because the Government just produced them with a particular chart -- it was just produced yesterday for the first time. What we respectfully submit, Your Honor, is without a direct tie between the compensation and the bonus to Retrophin, it should not be admissible.

What the Government wants to argue is Mr. Greebel was making a lot of money, that he then got a bonus and then the bonus went up at some point and that was at the same time that he brought in this business with Retrophin and, therefore -- and he was working hard and, therefore, that's the tie. That's what Judge Droney precluded: Speculation, inference upon inference. What I have to rely on, Your Honor, in that regard is the evidence that the Government just

produced to us yesterday which fully supports our case.

Now, the Government also produced 3500 material of the head of -- one of the heads of the compensation partner committee, the income compensation partner committee from Katten that they just talked to within the last few weeks at the time. And this person said, if you read it, that there is no -- in sum and substance, that they look on a lot of wholistic factors to determine the income and bonus of an income partner. There is no one factor. They talked about there's performance, there's contribution. There's lots of different data that they look at: Billable hours, receipts, realization rates.

And there is no evidence, to our knowledge, that any witness is going to say at Katten your compensation was directly determined based on a particular company or a particular client or a particular billable number.

And the proof of that, Your Honor, is in the actual numbers. And I bring this up, Your Honor, because I just got it yesterday and I asked Your Honor to put it under seal; in other words, I don't think this information should be publicly disclosed. I think that this information, respectfully, contains data and private information of individuals that should not be for the public consumption.

MS. SMITH: Your Honor, just to be clear, I don't know what version Mr. Brodsky has, but in the version that we

produced, we have redacted all of the names of all of the partners who are not Mr. Greebel. Because it is a list -- and I can go into it -- each year of all of the income partners. I believe we got 2013 and 2014.

MR. BRODSKY: Yes.

MS. SMITH: So it includes every income partner in the entire country for Katten, and when we produced it to Mr. Brodsky, it doesn't look like this; we had it in a different format from Katten. So I don't know where this came from. It actually has all of the names redacted so that we wouldn't have to worry about this issue.

MR. BRODSKY: Your Honor, what I want to do is hand it up to you and take it back. I won't name any of the people. We got this information from Katten because Katten said they produced it to the Government.

THE COURT: Was that a document from Katten or did you recreate the document?

MR. BRODSKY: I didn't recreate anything. They say it's the same information that was given to the Government. I asked them could you give us a copy, we haven't received it from -- what happened was, Your Honor, we learned from Katten that they produced documents to the Government. We had not received it yet. So I asked Katten would you mind giving me exactly what you produced to the Government because I would like to get that information, I haven't received it from the

Government yet.

And I'm glad I did because I got it in time for the oral arguments. I am handing it up, Your Honor, only because I feel that this information is proof --

THE COURTROOM DEPUTY: Do you have another set?

MR. BRODSKY: I do have another set. Yes, of course. I'm sorry. I feel this information, Your Honor, is exactly what the income partner committee head was talking about when he spoke to the Government. We have not spoken to the income partner head, but if you indulge me for one moment, Your Honor, and you take a look at the first document which, in the upper left hand corner, says, "Sorted by FYE 2013 target compensation." It has one of ten pages and it has a Bates number of KAT USAO 398 through 407. So those are the USAO Bates numbers that are on the documents given to the Government that we then asked for because we hadn't received them from the Government.

And if you look at the second page of that first document highlighted at the bottom, you see the compensation of Mr. Greebel, and I direct your attention, Your Honor, at the bottom of the second page, 2 of 10, it has Evan Greebel's name and it is highlighted. It has a list of all these other income partners of all sorts. It has at the top, "Note: All compensation is annualized deal" and the first column there says "Fiscal year end 1/31/2010." (Continued on next page.)

(Continuing)

MR. BRODSKY: So that applies for 2009 through the end of January of 2010.

The next column, FYE 1/31/2011, is the fiscal year of 2010 through January 2011. The next column is through January of 2012, and the next column is through January of 2013.

And so if I think about it this way, it's really calendar year 2009 plus a month, 2010, 2011 and 2012.

And if you look at Mr. Greebel's compensation -- and again, I'm just not going to say the numbers -- you notice that in 2010 it goes up; right? It goes up. But then it goes down. It drops. It drops over the next two years.

And what I note for Your Honor is that exactly what Mr. Silverman told the Government, there is no way to correlate compensation with particular billings or particular numbers. Example one, I offer, Your Honor -- and I'm not going to name who the person is -- but example number one highlighted on the fifth item, line item down, after it says officer. Five line items of people, five different names.

Without the naming the initials of the particular person in that fifth line item, what you see there is an example of somebody who has the same hours as Mr. Greebel back then for two years. He had almost no receipts, what they called shared receipts, which is billable work coming in. He

had almost no principle receipts. But he made more money. And his compensation went up.

And then example number two at the top, the very first line.

THE COURT: I think we are on a different page. Oh, I see, okay. You are on page 2, sorry.

MR. BRODSKY: Yes, I am on page 2. Again, page 2, fifth person.

THE COURT: Yes.

MR. BRODSKY: If you look over at the hours, they have billable hours.

THE COURT: Yes.

MR. BRODSKY: And the total of hours, that's a person who worked extremely hard. And over a two-year period worked the same amount of time as Mr. Greebel.

And in the last period of time, increased it. And yet, despite working the same amount of hours with almost no receipts, shared receipts as compared to Mr. Greebel who had a lot more shared receipts and principle receipts, which, as I understand it, is sort of credit for work coming in, that person makes a lot more money.

And then the first line of the first person there, you see this person's salary bounced up and down a little bit, but that person worked very little hours. I mean, I'm sorry to say that, but I'm not naming who they are. That person in

the first line certainly compared to a Gibson Dunn lawyer, and compared to every other Katten lawyer I see, they didn't work that hard that year. But despite not working that hard and certainly compared to Mr. Greebel, they were making a lot more money. And their receipts were not as high as Mr. Greebel.

And then I turn to the first page, and I offer two more examples, Your Honor. And I did this last night at 11:00 p.m. with about 30 minutes to do it before I wanted to get home and get to sleep before today's hearings. I could crunch these numbers in a thousand different ways, and it appears that people, no matter what their receipts are, or the amount of their hours are, the income partners are making money in a variety of ways. So there's no correlation between your actual compensation and bonus to a particular billable hour.

And what the Government wants to do -- and very respectfully, Your Honor, I know your time is short -- but this issue is so critical to us because, given the pure research and given how people think lawyers are greedy, and given that they think only 18 percent of the country apparently respects a lawyer today, the Government wants to introduce a series of compensation memos, which I will hand up to Your Honor. And I will provide copies to everybody. But they want to put in a series of compensation memos, Your Honor, which are pro forma, which are compensation memos

that the Government is very familiar with. They're compensation memos which every partner at the law firm, income partner, or partner, has to submit at year-end, or whatever the time period is at Katten. It appears to be early the following year. And what this information does is, you are supposed to lay out in a pro forma style, the information that your compensation and what work you've contributed and what you've done.

And the problem, Your Honor, is admitting this testimony is inherently prejudicial because of the Stahl decision and related progeny that say that somebody's wealth is inherently prejudicial for a jury to see.

You add on the fact that there's no way to tie bonus and income directly to Retrophin, or directly to a particular client, or a particular matter, and you look at the compensation memos. And this first one, for example, year-end February 10, for fiscal year end January 31, 2012. There's a lot of information there completely unrelated to Retrophin.

When Mr. Greebel was talking -- and this is for the year of 2011 -- Mr. Greebel's numbers, for the most part, don't reflect MSMB at that time. And a lot of what he's talking about are matters totally unrelated to Retrophin. Yes, he talks about Retrophin on the bottom of the first page, I believe, although it's redacted. I think he's talking about actually MSMB.

But on the second page, you have references to all this type of work that Mr. Greebel is doing; business development work, 1,100 hours on client development, on roundtables, on dinners. He's authored two articles at the request of Thomson Reuters for two books. He's doing all of this work for all these different places exhaustively.

And then he's given the two pages in the last part of what his compensation is. And there's no explanation. There's no formula. There's no section that says plug these numbers in and this is the amount of money you're going to get.

And it's compensation memo after compensation memo, with all respect to the Government, that proves that you can't tie exactly what Mr. Silverman told the Government. You can't tie a particular client or a particular matter to a dollar value.

And so, with that, Your Honor, we respectfully ask you to preclude the compensation. The evidence that the Government has is not -- it's not going to tie to a particular client. All it's going to do is potentially inflame the jury that we have a lawyer who makes hundreds of thousands of dollars, a bonus of significance, and you can't tie it. And then what we'll have to do on our case-in-chief is try to put on evidence that he had other clients. He had other matters. His compensation was driven by a lot of different factors.

And I would respectfully add, Your Honor, to all of this, that the Ferguson case expressly talks about memos like this. The Government wanted to admit in Ferguson before Judge Droney that Maurice Greenberg, then the CEO of AIG sent out these pro forma messages to people like Milton about what you should do to perform. And the Government wanted to admit them as evidence of incentive to commit a crime.

And what Judge Droney found in Ferguson was that's pro forma. He wasn't going to allow the Government to imply to the jury that these pro forma documents are somehow evidence that someone has an incentive to commit a crime.

I personally, as a partner and my other partners in the firm, find it quite scary that you can be a transactional attorney, you can represent a company, the CEO of the company could get into trouble for alleged fraud, and you automatically are -- there's evidence that you're incentivized to commit a crime because one factor, among many factors that affect your compensation, is your work for this company.

THE COURT: Okay. Thank you.

MR. BRODSKY: Thank you.

THE COURT: Ms. Smith.

MS. SMITH: Your Honor, just briefly because it is getting quite late.

THE COURT: I know.

MS. SMITH: In the Ferguson case, the case that the

defense cites, the ruling was that information about the defendant's wealth was not probative of any financial incentive the defendant may have had to participate in the alleged fraud scheme.

And then we have our own cases that we cited. Quattrone and Bulgin, where the compensation was found to be relevant to a motive to protect a reputation, or because a defendant might participate in the crime because of pecuniary motive. So that's what the cases say.

And here, Your Honor, I think, you know, Mr. Brodsky has cherry-picked the evidence a little bit on the compensation. And he also left out some other important evidence.

As you know from the first trial, there are a number of e-mails -- and I believe there will be many, many more at this trial -- particularly in the time period around the time of the Fearnow shares. So -- and the reverse merger, so kind of November, December 2012, January of 2013, Mr. Greebel is desperately hounding Mr. Shkreli to pay his legal fees. And there's e-mail after e-mail and it's pay me this and pay me that.

And MSMB no money, as Mr. Greebel knows. Retrophin basically has no money at that point, as Mr. Greebel also knows. So it's this constant back and forth about money. And it's very clear that it's very important to Mr. Greebel. In

fact, he says it. He says he's getting hounded by his firm. There's this entire context of it.

In fact, with the accountants, there's a whole situation where Mr. Greebel is owed, I believe, close to $600,000 in legal fees for Katten for the MSMB entities. They wind up -- Mr. Shkreli and Mr. Greebel wind up having that paid out of Retrophin. And then that -- there's a whole back and forth with the accountants because they don't understand why Katten has been paid more than what the Retrophin bills show, and Mr. Greebel is unwilling to explain that difference to them.

So it's very clear that the comp was important from the evidence that you have already seen.

THE COURT: Well, why can't that evidence just come in without reference to Mr. Greebel's actual compensation?

MS. SMITH: So I'm going to explain that, because I think that's the piece that's new for this trial.

THE COURT: Okay.

MS. SMITH: You know the comp memos, Mr. Brodsky started in 2010, but the ones that are really kind of probative of the conduct are the ones in 2012, 2013, 2014, where Mr. Greebel is talking about his relationship with Retrophin. And the comp memos are not viewed in a vacuum. They're also viewed in connection with Mr. Greebel's time sheets, which show that he was the principle timekeeper for

Retrophin, which means that he gets credit not only for the hours that he works, but for all the other hours that all the other lawyers work on that matter. And that his number one client, both for himself and for everything else, was Retrophin by a mile.

And, you know, I haven't looked at those stats recently, but I believe it's significantly -- the most work that's being done, the most number of hours that are attributed to him, by far, is Retrophin. And that was a change from prior years where he did not have a client in that way.

And the comp memo asks for more money based, in part, on his success with Retrophin. And the numbers themselves are very significant.

So in the 2010, 2011, 2012, he's in the $300,000 range for salary. In 2014, the comp memo in 2014, which looks back on the time period of the Fearnow shares, the settlement agreements, the consulting agreements, when Retrophin is kind of becoming this major client for him, his billables shoot up. His compensation shoots up to $900,000. In fact, he's the number one income partner at Katten that year, based, in large part, on his work for Retrophin.

What happens, it then goes down in 2015, because they're unable to collect from Retrophin after Retrophin fires Katten, and it goes back down to $400,000. So those numbers

alone show you how significant this client was to Mr. Greebel. And we'll, obviously, have a live witness to explain the comp pieces of this and, they're obviously available to cross-examine that person on, you know, the percentages and that he had other clients. I believe he had the Winklevoss brothers at one time --

THE COURT: The Bitcoin twins.

MS. SMITH: The twins, exactly.

And so this just shows it's this incredible motive. I mean, he more than doubled his salary in a year, based on the fact that this client was becoming this huge generator of money for Katten. I mean, across all of the different, you know, all the different areas that Katten was doing work, they billed $6.3 million to Retrophin.

This is a significant motive for Mr. Greebel. It's, like I said, more than doubling his salary. It's giving him prestige in the sense that he now has this major client that's producing for the firm. And we think it's directly tied to his motive to something crimes.

What he's doing in December, January of 2012, is keeping Retrophin afloat so that it can be a client for him in the future. That's why the money is important, so that he can, you know, keep his job, frankly, because as we'll show, Retrophin owed -- Retrophin and MSMB owed over a million dollars in that time period. And it's a motive for him to

participate to keep Mr. Shkreli and Retrophin afloat so that he can benefit from them in the future.

And all of those arguments about, you know, that he was billing other people and these other factors, those are jury arguments. You can argue that that, is not, in fact, a motive, because it didn't matter that much to Mr. Greebel. But I think that the numbers very clearly show otherwise.

(Continued on following page.)

MR. BRODSKY: Your Honor, I'm sorry.

THE COURT: Would you consider submitting evidence without reference to the actual number by saying in this given year he was the highest billing partner by such-and-such percent or are you stating it's important for the jury to hear the actual number that he was compensated?

MS. SMITH: I think it's important to hear the actual numbers because I think they are tied to exactly the number of billables, and you can see that it moves significantly from one year to the next. I mean, it goes back down again and I'm sure they are going to have an argument about that, but I do think they're significant.

There was also a comment about the bills that Retrophin received. That's incredibly significant. There are line items in those bills that describe the work that different attorneys were doing. There were periods where there was very little billing and there is a lot of illegal activity going on. So those bills and the invoices that show what is being worked on at what time is really significant, the amount of time that is being billed is really, really significant. I mean as you know, that was part of the concern on the board members that the bills were very high and they felt that Mr. Greebel was not kind of paying attention to the board or really supporting Mr. Shkreli. I mean I think that there is no question that the bills are relevant and

admissible to show everything that was going on between Katten and Retrophin.

But I do think that the numbers are important because I do think that it shows in a lot of detail how the correlation between this enormous client coming up and these millions of dollars being billed and the impact on the salary.

MR. BRODSKY: Your Honor, very respectfully.

THE COURT: Okay, it has to be short, Mr. Brodsky.

MR. BRODSKY: Very short, Your Honor, a few points.

One, they are going to submit in the invoices and the bills.

THE COURT: I beg your pardon?

MR. BRODSKY: They are going to submit the invoices and the bills. If they don't, we will. The invoices and the bills will show the amount of hours worked; fine. The invoices and the bills will show that he is working on various days; fine. They want to argue to the jury based on the invoices without the dollar amounts this was a big client; fine. They want to elicit that it was a big client of the firm, they can go ahead and do that. They can actually elicit, if they want, they said that what they wanted to do is show that it was a major client producing for the firm and a lot of attorneys were working on it. They have all of that. The invoices will reflect that. They can have witness testimony.

But most respectfully, Your Honor, it is simply not true that the income partner bonus, the salary and bonus -- the salary was already determined, but the bonus was correlative of Retrophin. And I believe they know that to be true.

We are willing to put, Your Honor, before they allow any of this evidence in, put on the income partner committee Mr. Silverman who they spoke to. Let him tell you, Your Honor, outside the presence of the jury that it was holistic, that it didn't involve any particular formula, because we are 100 percent confident that it's true.

THE COURT: Even if the firm does not necessarily agree with Mr. Greebel's compensation memo in which he pitches why he should receive certain compensation, even if they do not agree, that is actually less relevant than Mr. Greebel's perception of why he should be compensated at a certain amount and what work he did and why he thinks certain clients warrant his compensation. So --

MR. BRODSKY: It is the numbers --

THE COURT: -- it is the numbers that he seeks and the numbers that he uses in terms of his billings, his receipts, the amount of money that he brings in from particular clients or from particular efforts that go to Mr. Greebel's, arguably, state of mind. And it seems to me that the motive, which is what the Government is proffering

this evidence for, is part of its case. It is relevant, and whether or not arguments can be made after you cross-examine the partners who are going to testify to explain the compensation, I think the jury is entitled to weigh that evidence, but it does not mean it is excludable. I think it is relevant --

MR. BRODSKY: Well, I would point to --

THE COURT: -- according to the cases cited by the Government.

MR. BRODSKY: Well, the cases cited by the Government are, for example, the Quattrone case, which is completely distinguishable, I would direct Your Honor to Stahl and Ferguson, which I think set the standard, but if you look at the compensation memo, for example, for 2014, February 7, 2014, Mr. Greebel was talking about, you know, one of the most significant things, which is the firm's virtual currency practice. You referred to the Winklevoss twins, that was a significant part. So if a memo like this is going to come in, we are going to have a lot of talk and evidence and discussion and witnesses about who all his clients are, what other work is being done. And to me, what is that relevant? Does it make a fact more likely or less likely? And the prejudicial value is extremely high.

Does this suggest that every partner in every law firm, simply because they have a compensation salary and a

bonus based on a multitude of factors, is motivated to commit a crime with their client? It just seems so attenuated. It just suggests, just like Judge Droney found with respect to Mr. Milton's compensation and bonus, that there is not a direct tie. Had this been a law firm and there are law firms, Your Honor, which are known as eat what you kill. You bring in $10 million, you are going to get 33 percent. You bring in this number -- it's formulaic. And what the Government's evidence presented through Mr. Silverman, what those statistics show is it's not that.

And this is such prejudicial evidence, Your Honor, that it will distract and overwhelm the jury from actual evidence. They can get in 98 percent of it. They can get in his time. They can get in what work he is doing. They can get in the number of lawyers working on the matter. Why do they need to get in the actual dollar amount, which, by the way, is larger for fiscal year 2010 as a base salary than it is later. It just seems like you can move these statistics in so many ways and the numbers are inherently prejudicial. That's what we object to.

THE COURT: I think it is common knowledge that lawyers at a law firm like Katten are highly compensated, and I do not think that in New York this would be particularly shocking or prejudicial to a jury. It seems to me that the Government proffers this evidence as probative of

Mr. Greebel's mindset, in terms of why he perceived Retrophin and MSMB and its CEO, Mr. Shkreli, to be a very important client and, according to the Government's theory, a reason why Mr. Greebel may have, as the Government charges, gotten involved in a conspiracy to defraud one of Mr. Greebel's clients, Retrophin.

Respectfully, I am going to overrule that motion and rule that Mr. Greebel's compensation is relevant evidence and you are free to cross-examine --

MR. BRODSKY: Understood, Your Honor.

THE COURT: -- and make any arguments that you would like.

What else is important? Because I am hoping we can finish up here.

MR. BRODSKY: Thank you, Your Honor. Thank you for your patience. I appreciate it.

If I had to highlight in the press of time what was extremely important, I would say that --

THE COURT: I mean there are certain things that I can tell you I am going to reserve on just so we can cut through it.

MR. BRODSKY: Sure, that would be helpful.

THE COURT: Item Q-1, I think what we have to do is we --

MS. SMITH: Your Honor, I'm sorry, we don't have the

chart. Can you just tell us what --

MR. BRODSKY: We did produce the chart to them.

THE COURT: They don't have it with them.

I think that the defense should specify what evidence it specifically wishes to preclude. It is something that I cannot decide given what you have briefed, so I think that we should reserve on that.

On the motion to preclude certain inadmissible testimony and expert testimony by Mr. Greebel, to preclude exhibits and testimony by Mr. Pierotti, I think that he did make some, I thought, gratuitous comments and unsolicited comments in response to the Government's direct and I am sure that is one of these witnesses that may be difficult to control and guide. I would not allow him or I would caution the parties in having Mr. Pierotti offer statements and editorial comments, as he did from time to time in the other trial.

I do not find any reason to exclude Ms. Oremland's testimony. I thought that she was appropriate. She testified to an area that I think was helpful to the fact-finders, whether or not she was designated an expert or not, but I am not going to preclude her testimony.

We have the Government's motion to admit and later identify Mr. Greebel's post-arrest statements and preclude him from introducing additional post-arrest statements.

Have you come any closer to that, deciding or agreeing?

MS. SMITH: Your Honor, I believe, and this was something that we were going to raise, the defense made a filing that they didn't file publicly on Wednesday and just delivered to your chambers. I'm not sure whether you received it. It is the chart. It is like a Rule 106, the same thing we did in the Shkreli trial with the statements.

We had said that we would respond by Monday. We are happy to go through the chart now without actually responding. I don't know if you are prepared to do that. We can put in a brief filing on Monday to respond.

THE COURT: I mean are you planning to agree to anything here?

MS. SMITH: No, we did have a discussion and this was the outcome. So we will just put in that brief on Monday.

The one thing I will say is the defense did not file it on ECF. We don't agree with that. There's a chart of statements that's attached to the motion, and what we did in the last trial is we just didn't file the chart publicly, but the kind of argument of why statements come in or don't come in was filed publicly. I don't know that there is any justification for keeping this briefing under seal.

So I just wanted to just raise that issue. We are happy to not file the chart and statements publicly on the

idea that the press might pick up the specific post-arrest statements or publish them prior to jury selection, which I think is the concern, but I don't know that there is that same concern about the brief itself. But I just wanted to clarify that before we file on Monday.

MR. BRODSKY: This was the one, Your Honor, where there was a deadline, and I understand Your Honor and the Government didn't meet the motion deadline and then they provided us with notice in September of -- they moved to delay the notice to us of their post-arrest statements that they wanted to admit.

In September they gave us the post-arrest statements. We evaluated them. We agreed to a briefing schedule. And what I would say to it, Your Honor, is we are happy to file this publicly once the jury is impaneled and in. What we don't want to do, certainly between now -- nobody writes about our legal arguments, but when you write about any kind of statement that somebody made or somebody else made, it may create publicity and articles and we are trying to avoid that in advance of jury selection.

And so we are happy to file all of these. Our motion, which it comments on, quotes and cites, parts of the attached statements, so it defeats the purpose to file the motion but not file the attachment. We will file it all publicly once the jury is impaneled. That's our request.

Obviously, if you direct us to file it, we'll file the whole thing publicly.

THE COURT: All right, I do want to address this whole issue of late filings because it seems to me that the parties have blown my deadlines that I set forth in the pretrial orders, and I am just not sure this is something that could not have and should not have been brought up when, according to the deadlines, this is not news or evidence that was not available before.

(Continued on next page.)

(Continuing)

THE COURT: I do think that it is difficult. Really, we are so close to trial, really, one week away, in effect. Since it is now so late, but I am not sure whether I will think about just rejecting the outright motions that were filed beyond the time.

But I am happy to consider your response just in case I decide to go ahead and consider it.

MR. BRODSKY: Your Honor, I just want to respond to that. It is the Government that didn't meet the deadline in producing the statements. We moved to preclude. We filed a motion which is in E-1 of our chart, which moved to preclude the admission of certain statements.

The Government filed a motion, which we opposed, which said that they were going to -- and I will find the motion. The Government filed a motion that said we want to identify the post-arrest statements after the deadline. That's the motion they filed on the deadline. They said that they would produce -- and I can't find it at this very moment -- but that's on R-1.

The Government moved to offer Mr. Greebel's post-arrest statements in R-1, docket 329, on the deadline. We filed a response in opposition and said you didn't meet the deadline, so you shouldn't be able to admit any post-arrest statements.

It is then, despite our opposition and their reply to that. We respectfully believe they should have given us the post-arrest statements they wanted, so we could meet this deadline. And so I don't want you to harm us --

THE COURT: I am not blaming anybody. I am just saying that in response to this, you, yourself, made a cross-motion; right?

MR. BRODSKY: We made a motion to preclude them from introducing post-arrest statements because they did not meet the deadline in identifying for us what they were, so that we could file a motion before Your Honor. So it wouldn't have to be briefed the week before.

THE COURT: All right.

What I am trying to get to are the motions that really, absolutely, need to be decided before we start this trial because --

MR. BRODSKY: Understood, Your Honor.

If there was --

THE COURT: This was filed October 3rd. I mean, you know, your papers here -- and I am just concerned about how much more I am supposed to consider. I am not blaming you. I am accepting your statement that the Government did not give you information that you needed to make the motion until late.

But I just, again, I am not going to continue indulging this by either side.

MR. BRODSKY: Understood, Your Honor.

If I had to identify another motion, I would say that we believe in K-1, which is our motion on personal liability of MSMB losses. We move to preclude the Government from opening on and arguing to the jury that Mr. Shkreli had personal liability for MSMB losses, without completing the sentence, which is without telling them that he only had personal liability if there were proof of fraud.

And to the Government, they have a footnote 18 in their responsive brief, which I think is in tab L-2, Docket Number 346. In footnote 18 they say it doesn't really matter whether they tell the Government -- whether they tell the jury that there's personal liability for Mr. Greebel for MSMB losses, because there is or because of fraud. And to us it does matter.

And the reality is the truth is under the PPMs and under Delaware law, it's very clear that Mr. Shkreli was only going to be personally liable for MSMB losses if there was proof of fraud. Now, that's important to us, and it's important for us to be accurate before the jury. And that's our request there. And I think you can see our arguments on that there.

If I had to point out another one that we'd ask you to address, is it would be our motion requesting that either you review in camera, or see the Grand Jury subpoenas that

were issued by the Government after the superseding indictment on or about June 3rd, 2016.

We filed a motion. We gave an example of one that they issued to Retrophin, which was for the predominant purpose of getting discovery. We understand the Grand Jury process is uniquely in the control of the Court, and it's under the Court's supervision.

We laid out the case law as to why we believe when there's a predominant purpose for a Grand Jury subpoena, which is really to get discovery for a trial, that that's not appropriate. And we ask for copies ourselves, but in an effort to try to expedite, we would just like Your Honor to review them.

THE COURT: All right. I do not know who -- which of the AUSAs is the most well-versed in this -- on these Grand Jury subpoenas. But I think that there had been previous representations made to the Court that the subpoenas were part of an ongoing investigation, and were not being issued to obtain further information relevant to this case.

I will hear from the Government. Maybe you know the answer. I do not know if it is Ms. Smith that is going to be --

MR. PITLUCK: No, Your Honor, those representations are accurate.

THE COURT: All right. I mean, there is a

presumption of regularity unless the Defense comes forward and shows me why I should doubt the Government's representation that they served these subpoenas as part of a separate ongoing investigation.

MR. BRODSKY: We put in our motion papers. The Grand Jury subpoena that we did receive from the Government that they issued after the indictment, it was earlier this year. The sole request in the Grand Jury subpoena was to get Mr. Rosenfeld's arbitration materials.

And with all respect to the Government, they had already spoken to Mr. Rosenfeld. They had already given all information about Mr. Rosenfeld prior to indictment.

And then in January of this year, they sent a Grand Jury subpoena to Retrophin -- Grand Jury, not trial -- seeking all the -- to whether it was to Retrophin or to Mr. Rosenfeld, I think it was to Retrophin, Dr. Rosenfeld, and they got all Dr. Rosenfeld's arbitration materials.

And so that is the evidence of potential irregularity that we point to, Your Honor, in our motion paperwork. We find it -- that there's no basis, other than for preparation of trial, to have that Grand Jury subpoena. We also note in our motion paperwork the statements the Government made in June, prior to the superseding indictment, where they told Your Honor there will be no more defendants, there will be no more superseders.

And so with all respect, Your Honor, all we're asking for, we're not asking for copies now, we're asking for Your Honor to review them and make your own independent determination, because it is the unique role of the Court to supervise the Grand Jury process.

MR. PITLUCK: Your Honor, that's just patently based upon speculation and nothing more. We continue to stand by our representations that those Grand Jury subpoenas were issued properly and for proper purposes. They were issued as part of a separate but related investigation. They are not used to gain evidence for trial.

There is simply nothing but rank speculation and, Your Honor, there is no basis to order those productions.

THE COURT: Well, can you explain his point about the Rosenfeld investigation?

MR. PITLUCK: I can, Your Honor. We would prefer to do it ex parte and under seal, because it is an active investigation.

THE COURT: Right.

MR. PITLUCK: But we can certainly write you a very brief letter explaining that and it will on abundantly clear.

THE COURT: Okay. All right.

The argument that Mr. Brodsky made in his motion to preclude the Government from asserting that Mr. Shkreli had personal liability for the MSMB losses. I think that the

memoranda, the private placement memoranda, did allow for personal liability of a general partner for gross negligence, willful misconduct or willful breach of the partnership agreement.

And I think that, in addition, I am not sure that is an issue so much under Delaware law as it is the agreements that he proffered to potential MSMB investors.

MR. BRODSKY: Those were the PPMs.

THE COURT: Yes.

MR. BRODSKY: The private placement memos that he gave to --

THE COURT: And it did clearly specify that there is personal liability. This is the MSMB Capital Management private placement memos and at page 21 it specifies the conditions under which a general partner could be liable for losses.

MR. BRODSKY: Understood, Your Honor.

And all we would ask is that they accurately say that their personal liabilities of Mr. Shkreli, they accurately quote what the PPMs require, and that is, that there has to be some gross negligence, fraud, or the other item Your Honor mentioned.

THE COURT: All right. Willful misconduct.

MR. BRODSKY: Willful misconduct.

MR. KESSLER: I'm sorry, Your Honor. Is that a

ruling or was that?

THE COURT: Well, he is asking me to order that if you are going to allege that Mr. Shkreli is personally liable for the MSMB losses, that you indicate that by reference to the PPM for the MSMB Capital offering memorandum.

MR. KESSLER: Your Honor, with respect, we're not misrepresenting his liability if we say he's personally liable, and there's no legal authority that's been cited in court that says that defense gets to edit the Government's arguments to make them what they believe to be more legally accurate.

THE COURT: It is an argument which you can point out; right? You can point out.

It is not that it is inadmissible. It is just an argument that you are going to make to the jury as to the conditions under which the general partner could be found liable. Here, Mr. Shkreli, personally liable. So it does not -- it should not be precluded.

MR. BRODSKY: I'm not trying to preclude it, Your Honor. But I think if the Government misstates a fact that's in evidence, which if the PPMs come into evidence and they misstate the fact, it's objectionable.

So if they sum up and they want to say it's personal liability, and they stop there, I think it's misleading the jury and it's objectionable. I think we're duty-bound to

object if the Government is going to mislead the jury.

And all I'm suggesting is I know Your Honor has the authority to direct them to be accurate in their statement.

If you make an argument to the jury, which is not based on the evidence, which is totally misleading to the jury, it's certainly within your province, Your Honor, both to us and to the Government, to ensure that we don't do that.

MR. KESSLER: Your Honor, it is the position of the defendant that Mr. Shkreli, in fact, committed fraud. They have talked all about his frauds and his lies. So this all just seems to be an effort to hamstring us by making us add words to things we might say.

THE COURT: No. I think, at this point, I am going to wait and hear what the statements are and whether it draws an objection, and what ruling I will make at that point. But it does seem to me that a lot of this is about arguments that the parties are able to make, and I am not going to preclude or direct statements at this time.

Is there anything else, because, honestly, I am way overdue for something that I should have been out an hour ago, but I am happy to hear from you.

MR. BRODSKY: No. We will submit the rest of our arguments on its papers. I know a lot of that can be properly reserved for the evidence at trial.

We put in motions with respect to particular lay

opinion testimony we think is inadmissible. We wanted to address as much as we could in advance of the trial, in advance of witness testimony.

MR. KESSLER: Your Honor --

THE COURT: Yes.

MR. KESSLER: -- we have one additional brief issue, and then there may be some housekeeping.

THE COURT: Yes.

MR. KESSLER: Not on the motions. We're happy to rest on the papers.

We had filed a motion about Rule 16 discovery at one of the motions.

THE COURT: The experts?

MR. KESSLER: No, no. Just early on that the defendant had to produce the exhibits that he needs to use in his case in chief.

The defendant produced hundreds of thousands of pages as potential exhibits more than a month ago. There was no metadata in any of the documents, including documents that we had produced to defendant with metadata. So it had all been surfed out. We asked for an explanation. Haven't gotten one yet.

But more important, Your Honor, and this is the think we're bringing up. The defendant ultimately identified to us a list of Bates numbers, that were sort of randomly

scattered through the production, that the defendant represented had not been produced by the Government to the defendant. That is, these were documents the defendant intended to use in his case-in-chief that had not -- had come from some other source other than the Government.

We asked what was the source. The defendant first said they would think about it. I believe then they asked us what our authority was to note the source. Then they said they would research it. Still don't have an answer and --

MR. BRODSKY: Your Honor, I can moot the whole thing because I know that time is short.

We told them in a letter this week. We sent it two days ago. We are going to narrow our trial exhibits for them. They will have metadata for all of it.

THE COURT: Okay. Let's put a date on it, shall we?

MR. BRODSKY: Yes.

THE COURT: How about on Tuesday?

MR. BRODSKY: Yes.

MS. SMITH: Your Honor, we're supposed to get trial Exhibits today. We have ours, actually. We have our trial Exhibits and some supplemental 3500 from this week, and we expected get the defendant's Exhibits today too.

MR. KESSLER: Our Exhibits are all in the back.

MS. SMITH: And our Exhibits are in the back for Your Honor. They were due on the 3rd. We agreed we would

exchange them on the 6th at the Pre-Trial Conference --

MR. BRODSKY: Let me ask our people when we think we can get it done.

MS. SMITH: We were going to talk about off-loading those for you.

(Continued on following page.)

MR. BRODSKY: Your Honor, we have our list. We can provide an electronic copy. We did have our list ready today for the trial exhibits. We have it ready for them. We are happy to give it electronically with the metadata.

MS. SMITH: When are we going to get the electronic exhibits?

MR. BRODSKY: First thing tomorrow.

MR. KESSLER: Your Honor, I don't think the source question is resolved.

MR. BRODSKY: Because the metadata will be there. We will give you the source material.

MR. KESSLER: All we are asking for is for the list of documents that come from someone other than the Government, that the defendant do what we have done in every production in all of these cases, which is next to the Bates number, we just put the source.

THE COURT: Tomorrow you will provide that, all of that information, Mr. Brodsky.

MR. BRODSKY: Correct.

MS. SMITH: Your Honor, just one other issue I want to raise related to this. The documents that were produced to us as the new documents, a lot of them are e-mails from Mr. Greebel. They were not produced, as far as we can tell, by Katten or by Retrophin. I don't know -- I guess we are going to find out the source of them tomorrow. The problem is

because they didn't come from Katten or Retrophin but a lot of them are Retrophin documents, there appear to be documents that were produced to us that are, in fact, privileged, where Retrophin has not yet waived the privilege and I do not want to be in a situation at trial where either they are trying to introduce an exhibit or there is something being used on cross where we have a question about whether it is within or not within the scope of the Retrophin privilege waiver. I just want to raise that issue.

I don't know if they are going to be work with Retrophin on their trial exhibits. There are a lot of e-mails. Some of them seem to be bcc'ed to Mr. Greebel's personal account but they're actually Retrophin's e-mails. When they were produced to us, we have confirmed at least some of them, the privilege has not yet been waived. I don't want it to be an issue at trial.

MR. DENERSTEIN: Respectfully, I do believe that that issue has been mooted by our exhibit list which should substantially reduce from the $3 million documents that were produced to us.

THE COURT: Has Katten agreed that these documents can be used?

MS. SMITH: Retrophin.

THE COURT: I am sorry, Retrophin.

MS. SMITH: I'm just talking about the new

documents. Obviously anything that was produced by Katten or Retrophin after all of that negotiation is fine because we wouldn't have gotten them otherwise.

MR. BRODSKY: Your Honor, we produced a very large initial exhibit list on a hard drive. We have reduced it so much that I don't believe there is going to be any question that the documents on here will be acceptable to Katten, will be acceptable to Retrophin in terms of within the privilege. And if there is an issue with their review of this narrowed list, then they can raise it.

THE COURT: Who? Katten?

MR. BRODSKY: No. I'm sorry. I don't believe there will be an issue with Katten.

MS. SMITH: It is actually Retrophin's privilege.

THE COURT: It is.

MR. BRODSKY: Or Retrophin.

THE COURT: But they are defending Retrophin's privilege.

MS. SMITH: Right.

THE COURT: As is the Cooley lawyer.

MS. SMITH: Cooley is the one defending. I wanted to raise that. That came up in the last trial as well. We want to make sure we are not having that issue in the middle of trial.

THE COURT: So make sure that you have clearance

from Retrophin --

MR. BRODSKY: Yes, Your Honor.

THE COURT: -- on the documents that you expect to admit.

MR. BRODSKY: Understood, Your Honor. And we are talking to Retrophin's outside counsel about documents and what comes within privilege and without privilege. We are asking them at times to expand what they have their waivers of prior privilege. So we are in discussion with them, Your Honor.

THE COURT: All right.

MR. DENERSTEIN: Your Honor, may I raise a housekeeping issue?

THE COURT: Yes.

MR. DENERSTEIN: It is not related to the motion. At this point, as Your Honor points out, we are a week away from trial. The Government presents its case in-chief and then obviously the defense will decide whether to present a case in-chief or not. But it would be extremely helpful, important and crucial to get a meaningful list of witnesses from the Government. I know in the last trial they agreed to provide who they were calling the first week of trial in advance. That would also be extremely important to us. We would hope that they would extend the same courtesy to us so that we can properly prepare.

Today we are just learning that certain witnesses -- and I'm not casting aspersions -- that were in the past trial may not be in this trial. And, you know, just, in addition, last night, they produced 2,000 documents related to Sara Hassan. Obviously, if she's a witness in the first week, we'd like to know. We do want a fair trial and we want to proceed in an efficient manner and we respectfully ask the Government to help us with this.

MS. SMITH: We have a revised witness list. I know that Ms. Williams asked both parties to provide a revised witness list. We have ours here. We expect there to be one from the defense as well.

And just to be clear, I do want to clarify that the Sara Hassan documents, most of them we believe are duplicates. 1,000 pages of that is a book that Mr. Shkreli sent to Ms. Hassan which had already been produced. But just so that you know, most of that production is that book, apparently. But we have our revised witness list. We will provide it now and we expect one to receive one in return. The last witness list that we got from the defense had 364 fact witnesses on it.

MR. BRODSKY: The Government's witness list had 89. We weren't sure what the Government was doing.

THE COURT: You are going to give them a witness list. What is the date by which you can do that? Let's have a date by which you are going to provide the witness list.

MR. DENERSTEIN: Monday.

Your Honor, there was a second part to my request which I don't believe Ms. Smith responded to, which is just the first week's witnesses.

MS. SMITH: Some time next week we will be able to give them. By Wednesday of next week --

THE COURT: Would you let us know as well?

MS. SMITH: Yes, I will.

-- who we anticipate calling in the first week. It may change. I do think the jury questionnaire is going to add time and we have witnesses with travel --

THE COURT: Adjust the order that you are going to call the witnesses in.

MR. DENERSTEIN: Is there a way we can get that sooner than Wednesday? That's very little time and I know that you said you think the documents are duplicate, but we will obviously have to spend time figuring out whether the thousand documents are duplicates or not.

MS. SMITH: It is 2,000 pages, not 2,000 documents.

MR. DENERSTEIN: But still, if thousand of it is a book, that leaves another thousand to go through.

MS. SMITH: I believe most of it are duplicates. We will try and do it before Wednesday. I'm telling you we are having a bunch of travel discussions with people. Also, we were waiting until today to see how the rulings went too in

terms of our case. We can try to do it before Wednesday, but we will certainly do it by Wednesday. It was our understanding that we weren't going to be opening until the 18th; is that right?

THE COURT: Yes. Hopefully we have the jury selected by that date.

MR. BRODSKY: Your Honor, what day would you like us to come to an agreement with the Government? There are just two additional questions or one that we have to add for Mr. Greebel. On Monday, can we get that to you by?

THE COURT: Monday is fine.

What I would suggest you do is agree on a form questionnaire, then the Government or the defense will arrange to put the numbers up to 300 on them. We really have called 200 in. Should we call more?

MR. DUBIN: We think so.

MS. SMITH: I think so.

THE COURT: We will try to get more jurors, but I can't promise. Usually what we do is we recycle jurors from other cases. Hopefully there will be enough. We were able to manage the first day in the other trial, so hopefully we can do that.

MS. SMITH: Your Honor, we wanted to also, the sitting schedule, I believe November 10th is Veterans day.

THE COURT: Yes.

MS. SMITH: I wanted to confirm that we are not --

THE COURT: Let me give you some guidance on that. We will sit the full week of October 16th. The following week of October 23rd, I, unfortunately, have an obligation where I am not going to be able to sit on Friday. So I am not sitting the 26th and 27th. I apologize for that.

Also, I thought we had a three-week trial. For some reason, now we are at five.

The week after that, on November 3rd, I will not be sitting, Friday. November 10th is Veterans day, so I will not be sitting.

I am going to sit during Thanksgiving week, except for Thursday and Friday. We will sit Monday, Tuesday and Wednesday. And if we were still going by the week of November 27th, I will not be sitting the 30th and the 1st of December. And we will be finished by December 4th, won't we?

MR. BRODSKY: We do hope so, Your Honor.

THE COURT: I don't have how this grew into a five-week trial with two counts when we had eight counts in the other case and we got it done in six weeks.

MS. SMITH: Your Honor, we had said the Government expects its case to be three weeks instead of five weeks. Defense counsel said, at least they represented to us, that their defense case may be five to seven trial days, but they don't know, which is fine. But then given that, we need to

account for deliberations. I just don't want to tell the jury less time --

THE COURT: Right.

MS. SMITH: -- and then have them stay longer. That's where the math comes from.

THE COURT: We will tell them five weeks. Is that acceptable to everybody?

MR. BRODSKY: Your Honor, it's acceptable. We had suggested to the Government we inform the jury four weeks. We defer to Your Honor and we are happy to do five.

THE COURT: I just don't want them to be lulled into a false sense this will be over. Plus, since I am not sitting on those days.

MS. SMITH: Yes, we had expected full trial weeks.

THE COURT: This is a little different from the other trial. I just have other obligations.

MR. BRODSKY: I would like to say, Your Honor, just to make sure in connection with what you tell the jury, we are not making a decision today we are definitely going to put on a case in-chief, so we do reserve the right --

THE COURT: No, I am not going to tell them anything about what you are going to do. In fact, we will be clear that you don't have to do anything, that is not your obligation.

MR. BRODSKY: Thank you.

MR. DENERSTEIN: Your Honor, if I may raise one more housekeeping matter, we had sent the Government a letter yesterday about 3500 material because some of it is in decipherable because, for example, it refers to tab A, was a problem with post-option pool.

MS. SMITH: Your Honor, there has been a lot of stuff going back and forth. We are happy to provide what they ask for in terms of clarifying some of the documents that are referenced in the 3500.

MR. DENERSTEIN: And when would that be?

MS. SMITH: We can certainly do it this weekend. Some of the documents you identified I think you have, but we will make that clear.

MR. DENERSTEIN: Great.

MS. SMITH: I mean, I think you have all of the documents. We will we provide Bates numbers.

MR. DENERSTEIN: All right.

THE COURT: I think I should try to zip through the rest of these. I am sorry. I am very grateful to the Court reporters for their indulgence.

Mr. Greebel made a motion to admit statements of the Government regarding commingling between Retrophin and MSMB. I think the best thing on this is to defer at least until the defendant can convince me that they have no evidence to show the commingling. I think there is evidence that doesn't

require the admission of Government statements on this point.

MR. BRODSKY: Understood, Your Honor.

THE COURT: And then there is a motion to preclude lay opinion testimony of Mr. Jackson Su, Steven Aselage, Corey Massella, and Timothy Pierotti. Respectfully, I am going to deny this motion because I believe the opinions of lay witnesses is admissible generally under the rules on certain issue of which they have personal knowledge and it would go to the weight, not admissibility, and in addition, the defense is free to argue that the Government has not laid an appropriate foundation.

I am not prepared to bar the Government, as Greebel moves, from presenting evidence regarding other conspirators relative to Count Seven. As counsel are aware, the admission of co-conspirators statements may be admissible subject to connection. I would note that many of the witnesses whose statements were admissible at the last trial are not agents of Mr. Greebel's and there may not be ready admission of their statements, so please be advised.

(Continued on next page.)

(Continuing)

THE COURT: Mr. Greebel, wants to preclude argument or evidence that outside auditors determined that settlement agreements were improper. I do not think that that is what the auditors said.

The auditors just noted that there was an indemnification agreement between MSMB and Retrophin, and that it was not clear whether MSMB would be able to pay the amounts agreed to. And I believe the auditor also stated there was no fraud or illegal acts noted.

So I think that the characterization of the auditors' statement by Mr. Greebel are not accurate. I do not know really how you were intending to frame this argument, but there has not been an actual conclusion by the auditors that those settlement agreements were improper. I think they just noted it and wondered and asked questions about it.

MR. BRODSKY: The Government opened on that in Mr. Shkreli's trial. In light of that, they never decided to call Marcum in that case. They had been meeting with the Marcum witnesses from the 3500 material. We were trying to move to preclude them from opening on the fact that the external auditors said they were improper. I think Your Honor has answered that question with your analysis.

THE COURT: I do not think they have made that statement, so.

MR. KESSLER: I don't think there's a document in which the auditors use the phrase "weren't proper." What we were arguing in our response is that it's an argument or a conclusion based on what they did find.

THE COURT: Yes. There were findings, but I do not think they said it in a way that you characterized it, frankly. So that is why I -- I think that the parties are going to be governed by the evidence, both in their openings and their closings.

MR. BRODSKY: Thank you, Your Honor.

THE COURT: There was a motion by Mr. Greebel to preclude the Government from arguing that the Fearnow recipients became affiliates by working for Retrophin and to preclude admission of Government's Exhibit 242.

MR. BRODSKY: In light of the first part of that motion is moot, because the Government said they wouldn't argue the -- that Fearnow recipients became affiliates by working for Retrophin. So the only two pending are our motion to preclude the admission of Government's Exhibit 242, and the in camera review of the legal instructions.

THE COURT: I think we touched on the Grand Jury proceedings. I do not have, in my view, sufficient evidence to require the Government or the Grand Jury to disclose instructions that may have been provided to the Grand Jury.

There is a presumption of regularity in those

proceedings, and it does not seem to me that that would be an appropriate -- you know, if you came forward with something else I would reconsider; but at this point, I am not prepared to order a review of the legal instructions.

MR. BRODSKY: The other one was Government's Exhibit 242, Your Honor. I don't know if you want to reserve on that or you want --

THE COURT: I might reserve on that; all right? Unless you wanted to offer argument.

MR. BRODSKY: We don't need to do it now, Your Honor. That's why if you want to reserve, it's fine to reserve for now.

THE COURT: Okay.

We ruled on Mr. Greebel's motion to preclude use of discovery obtained by post-indictment Grand Jury subpoenas. That has been an issue that I think is mooted by the Government's representation that they did not serve any Grand Jury subpoenas relevant to this indictment; but rather have served subpoenas relevant to an ongoing investigation.

And I think you were going to make a in camera proffer; is that right?

MR. PITLUCK: If you'd like, Your Honor.

THE COURT: I do not.

MR. PITLUCK: Quite frankly, I don't think it's necessary. Our representation is firm and there is absolutely

nothing to suggest otherwise, other than the mere fact that a Grand Jury subpoena was issued.

THE COURT: All right.

The Government moves to offer Mr. Greebel's post-arrest statements. I think that is an issue that should be reserved. I do not know which statements are going to be offered.

Did you want to offer all of the ones that were attached?

MR. KESSLER: Your Honor, it's -- that question is related to the motion that was put up earlier.

THE COURT: Okay.

MR. KESSLER: The 106 briefing.

THE COURT: All right.

So we are reserving on that. Okay.

There was another motion by the Government to preclude Mr. Greebel from testifying about documents that he reviewed after this case was indicted and any conclusions he reached based on his review.

I do not know, really, what types of testimony you would offer for Mr. Greebel on this. Should I reserve, or are you prepared to tell me now?

MR. BRODSKY: Your Honor, this is extremely premature to be discussing whether or not Mr. Greebel will take the stand. And if he takes the stand, we just commit to

you, Your Honor, every question -- in our good faith representation, every question we ask will have a good faith basis under the rules of evidence and every answer will be the answer.

And to the extent that there is inadmissible question or inadmissible testimony, Your Honor will be overseeing the trial.

MR. KESSLER: Your Honor, the Government does not believe there's a need for the Court to rule today.

THE COURT: Okay. Good.

MR. KESSLER: However, we do want to note that Mr. Brodsky filed an affidavit in connection with the severance motion --

THE COURT: Yes.

MR. KESSLER: -- when he described exactly the questions he would ask Mr. Greebel, and the answers Mr. Greebel would give.

THE COURT: Right.

MR. KESSLER: And it is just those specific questions and answers we've addressed here.

So we do know from Mr. Brodsky's representation what the questions and likely answers will be, on those four.

MR. BRODSKY: I was giving a summary very brief summary, Your Honor, for the severance.

THE COURT: Okay.

MR. BRODSKY: That is not the question and answer form that we will use. We may use some of the same questions, but they will --

THE COURT: You mean, you hoodwinked me into severing the trial? No, I am kidding.

MR. BRODSKY: You are going to see evidence and you are going to see argument that, you know, our faces would light up if your Mr. Brafman and Mr. Agnifilo and Ms. Zellan, they would be going a little bit wild by some of our arguments. So I think the severance was appropriate.

THE COURT: All right. Next, the Government moves to preclude Mr. Greebel from introducing evidence that Mr. Shkreli lied to others, or arguing that such lies show that Mr. Shkreli lied to him.

I think this sounds like propensity evidence and, generally, as you know, that is not admissible. I would be content if the parties are to reserve on this until I know specifically what alleged lies were told by Mr. Greebel.

MR. KESSLER: Your Honor, we are happy with that reservation with one exception.

THE COURT: Okay.

MR. KESSLER: If the defense opening is going to make the argument that Mr. Shkreli lied to Greebel left and right, and we are going to -- and talks about specific lies or makes the propensity argument, then that is something we would

like the Court to address before the opening. It doesn't have to be today.

If that's not going to be an issue, then there's no reason to address it before the opening.

MR. BRODSKY: I just heard Mr. Kessler say that if the defense opens and says Mr. Shkreli lied to Mr. Greebel that wouldn't be appropriate. I don't think you meant to say that.

MR. KESSLER: I'm sorry. That's not what I meant.

What I meant is if the opening contains the propensity argument. Then that is something we would like.

MR. BRODSKY: I mean, we understand the Government is going to open and the Government is going to say that Mr. Shkreli -- the whole purpose of the scheme was Mr. Shkreli had lied to MSMB investors. And so that's coming out in the Government's case. And I don't know -- if the Government is moving us to preclude from addressing the evidence that is coming out in this case through Ms. Hassan, or other witnesses, that Mr. Shkreli lied to them about performance --

MR. KESSLER: Not at all. Not at all.

THE COURT: I think the issue is whether you are going to argue or open that Mr. Shkreli lied to Mr. Greebel.

MR. KESSLER: I'm sorry. If there was evidence of a lie that Mr. Shkreli told to Mr. Greebel, so be it. We are talking about the argument that how do you know Mr. Shkreli

lied to Mr. Greebel? Because he lied to other people. That's the argument that we're trying to preclude.

If that argument's not being made, then the motion is moot. Then that's what the motion is directed to. That suggestion that there must have been lies to Mr. Greebel, because there were lies to others.

If there's a specific lie to Mr. Greebel, or a general statement that Shkreli lied to Greebel, that doesn't implicate the propensity argument.

MR. BRODSKY: Your Honor, you're not going to hear us say, in opening or summation, that Mr. Shkreli must have lied to Mr. Greebel because he lied to somebody else. What you will hear us say is what the evidence shows. And I think the evidence in the trial is going to show what we learned from the last trial, which is that Mr. Shkreli lied to many people, and Mr. Shkreli lied to MSMB investors. And we should not be precluded from talking about the evidence in the case, which will be Mr. Shkreli lying to people.

THE COURT: I do not think the Government has a problem with that.

MR. KESSLER: No.

THE COURT: All right. We next have the Government motion to preclude evidence about the circumstances of Mr. Greebel's arrest.

You know, it does seem to me that it starts to sound

like putting the Government on trial, which we are not going to do and it is not appropriate to do. I am tending toward granting this motion.

MR. BRODSKY: Well, if they are going to put in post-arrest statements, then I think that moots the issue. Because if somebody puts in post-arrest statements, then the Government's going to argue that they're incomplete, or they're inaccurate, or they're misleading, or anything else, then the circumstances that led to that interview, the background context that led to it, the actual interview itself, the conditions of the interview, are all relevant.

During the post-arrest statement period, Special Agent Braconi actually said multiple times to Mr. Greebel, I'm off. I'm not sure what's going on. I woke up at five a.m. and he was, in his own -- if you look at the entire interview -- he himself was affected by the prior events.

I think the case law is clear. If they want to put in post-arrest statements, then the conditions that led to that are all admissible and it moots the issue. But if they're not going to put in post-arrest statements, Your Honor, we will not open on the issue. But we would ask Your Honor to keep an open mind throughout the trial as to whether or not evidence relating to the circumstances of arrest go to reasonable doubt.

In other words, if the Government didn't do certain

things that resulted in not having certain evidence, then that goes to reasonable doubt.

MR. PITLUCK: Your Honor, this is actually a wholly new argument. This wasn't addressed in the brief; that there's some sort of connection between the post-arrest interview and the circumstances of the arrest. Regardless of whether we introduce the post-arrest interview, the circumstances of arrest are inappropriate, irrelevant. It should be precluded. We're making that clear.

However, if we start to go into the province of the arrest, then we're going to have to go into playing the actual video so that the jury can see Mr. Greebel's behavior, his demeanor firsthand, which we've now agreed to take out because he was handcuffed. But that's abundantly relevant.

If you look at their brief, it does not reference this issue at all. It just simply says it's relevant and they cite no authority to preclude it.

We have cited authority to preclude it. We don't believe it's relevant. Regardless of whether we plan to introduce any post-arrest statements, it's just not appropriate here.

MR. BRODSKY: Your Honor, of course it's appropriate.

First of all, when we made our motion, when we responded, they hadn't identified the post-arrest statements

yet. Their post-arrest statements came later in September, where they identified them.

We have reason to believe -- and it sounds like they are going to argue -- that what Mr. Greebel said was either misleading or incomplete. How can it possibly be that if you are awoken up at five a.m. and then you're brought to the FBI, you're not told would what the charges are. You're told in general terms. You're not given the indictment. You're not given any documents. This special agent himself is saying, God, I'm exhausted. I'm losing myself. I don't know what I am talking about.

How can it be that we can't introduce the context if they're going to argue that Mr. Greebel should have remembered several years ago what all the information was? When you're wakened up in the middle of the night and you're dragged to the FBI headquarters, of course it's relevant.

If they're going to argue -- and I don't know if they are -- so if they don't argue it, then it becomes less relevant. But if they argue that somehow his statement to an FBI agent in the vicinity of a holding pen, where they have him, you probably saw, chained to a bar in which two agents are asking questions, and they're going to say that he was asked about what happened three or four years ago, and that what he did was omit some fact or omit something without being shown any documents, how can it possibly be that we're not

allowed to bring the context in?

It's just literally -- the Government wants to strip the context and say this is what happened in this context. This was not a deposition. This was an arrest in which he was put in a holding cell, an area with this handcuffed chain, and asked questions and answered them.

MR. PITLUCK: Judge, if they want to introduce evidence of the circumstances of his arrest and the post-arrest interview, we feel we are absolutely entitled to introduce the video of Mr. Greebel's post-arrest interview.

THE COURT: Well, of course then it becomes an issue in dispute and the jury has to sort it out.

MR. PITLUCK: Absolutely.

THE COURT: If that becomes an issue, they will have to see that video.

MR. PITLUCK: They are entitled to address his demeanor; whether he was answering those questions truthfully, and in order to do that, they need to see him. So we can't create this aura that he was under some sort of duress without actually showing it to them.

So if that part comes in, then, Your Honor, our position is it should all come in.

MR. BRODSKY: What we had asked the Government was are you going to actually show him before a jury in handcuffs? Because there's pretty good case law in the Second Circuit

that if you are going to try not to demonize and dehumanize an individual, you don't show him in handcuffs.

THE COURT: Well, I thought you were going to argue that he was in handcuffs.

MR. BRODSKY: No, no. I'm not going to argue that. I'm not going to introduce that.

THE COURT: I thought you just said that you were. You were going to argue that he was chained and --

MR. BRODSKY: No, I'm sorry. I would not argue that.

What I would argue is the context that led to it. How much sleep did he get? What happened preceding the interview? What was he told about the interview?

I'm not going to argue that because he was chained, that he couldn't remember something. And I apologize for bringing that up and creating the confusion.

THE COURT: All right. So maybe the Government can put that little digital blurring thing on the handcuffs and show the interview so it is not going to be shown. The jury will not see him in handcuffs, but the room, the demeanor, the conversation, the questions, the interchange, will be something for the jury to decide.

(Continued on following page.)

MR. PITLUCK: Judge, assuming that we have the technical capability to do that, that's fine with us. We will advise the Court if it's otherwise.

THE COURT: All right. Call one of the news stations, see how they do it. I'm sure the FBI can figure it out.

MR. PITLUCK: I'm looking at the agents, Judge.

THE COURT: They are very smart. I'm sure they can figure it out.

All right now, the Government moved to preclude evidence and details of Mr. Greebel's background. I think we talked about that.

MR. BRODSKY: That was the husband, the father, they didn't want that and you said it was okay.

THE COURT: Yes. Is he planning to introduce character witnesses?

MR. BRODSKY: We do not know, Your Honor.

THE COURT: Okay.

Next, Mr. Greebel is going to produce their exhibit list and documents that they will be introducing. So that is resolved.

MR. DENERSTEIN: Your Honor, if it would be possible, we have provided the Government with an index which has Bates numbers on it. We would request more time to physically produce the actual documents.

MS. SMITH: You have our CD.

MR. KESSLER: We are confused because the pretrial order requires the exhibits for today.

THE COURT: I thought you had said you would produce them or I had ordered that they be produced tomorrow --

MR. DENERSTEIN: Tomorrow.

THE COURT: -- with source information. Mr. Brodsky indicated he had that available.

MR. BRODSKY: I thought it was possible, then our technical people tell us doing it tomorrow is challenging. We provided them with a list. We will do everything to get it tomorrow, but we are asking for some leeway in the case.

MR. DENERSTEIN: In all due fairness, Your Honor, we have not said what our case is going to be. We are in a slightly different posture. We are not trying to -- we will make sure they have everything well in advance before we present our case. I don't believe this will be an issue. We are trying to narrow the list from a huge universe of documents. I think we are saying we are using best efforts. I just don't want -- I just want to be clear with the Court and the Government.

THE COURT: We have had this order in place for quite some time.

MR. BRODSKY: In all fairness, Your Honor, they're getting our exhibits way in advance of any case-in-chief that

we put on; whereas, they are giving their exhibits to us a week and a few days before, and we don't even know who their first week of witnesses are and we're not going to find out until Tuesday, Wednesday of next week. So, in all fairness, we are doing everything we can. We gave them a printout of all the documents.

THE COURT: Don't you think the right thing to do would have been to apply to the Court for an extension because you were having an issue for some reason?

MR. BRODSKY: Yes, Your Honor.

THE COURT: I have ordered this. We have adjourned this trial several times and we have adjourned the deadlines, but certainly with all of the lawyers and the support at Gibson, there should have been an effort made where you would have been ready to provide and comply with the Court's orders by today.

MR. BRODSKY: Yes, Your Honor.

THE COURT: So, if not Saturday, what, Monday? Monday, noon?

MR. BRODSKY: Yes, Your Honor.

MS. SMITH: Your Honor, as I said before, we also have hard copies for the Court in the back.

THE COURT: Thank you. You can leave them there. Are there two copies?

MS. SMITH: Two copies of everything, the 3500 and

exhibits. Can we pick up the carts on Monday. We can leave the carts for now. I will e-mail.

THE COURT: We will work it out.

We have defense experts. We have a lot of litigation about that. I will say that I am going to grant the Government's motion to preclude testimony of Bryan Garner. I believe this is the linguistic expert who is purportedly going to offer testimony to the jury about what Mr. Shkreli and Mr. Greebel meant when they discussed different matters and I think that would be a gross usurping of the jury's job here, which is to look at the evidence and to decide disputed issues about what the intentions were of the parties and I don't think Mr. Garner's testimony is appropriately admissible. The other issue is the testimony of Mr. Dooley. He is supposed to be testifying about how the FBI conducts or should conduct an investigation. Again, it is inappropriate for the jury to consider the methodology of the investigation. There is a specific instruction that is a standard instruction to all jurors that they are not to speculate or wonder why certain evidence was not presented or to second guess investigatory techniques and it would be inappropriate for them to hear from Mr. Dooley about the FBI's investigation.

So, with regard to the other experts, I would ask or order, in fact, that the defense experts have to provide information regarding their methodology, the documents or data

they considered and to provide a more fulsome disclosure as required under Rule 16. I am not convinced that the defense argument about who asked for what or who didn't ask is appropriate. It appears that there are going to be experts proffered by the defense and they do have an obligation to make disclosures and I do not believe that the disclosures thus far have been adequate. So if the defense wishes to proceed with these experts, they will have to provide additional disclosures or be precluded.

Now, you should have this information readily available, so I would like to know when you can provide this information to the Government. And I accept that there may be adjustments to the opinions of the experts based on the Government's case-in-chief, but certainly the methodology should be disclosable by now.

MR. CHAN: I understand the Court's rulings on all of these issues. In terms of timing, some are easier than others. Some of our experts analyses are ongoing more so than others. So I think that maybe if we can do a two-part disclosure. The one we can do earlier, we will do on Wednesday. The one that we need a little more time, we will do by Friday.

THE COURT: October 11th and Friday the 13th.

MR. KESSLER: Your Honor, the only additional request I have to that is can we know which of the experts are

the easy and the hard so we know what to expect when?

THE COURT: Why don't we just name them so we can have a so ordered list.

MR. CHAN: To put them in two buckets, the people who are testifying based on their experience solely, so, for example, Dean Ferruolo, who is testifying more on their experience, we can do on the Wednesday bucket, people who are like him.

People on Friday would be people who have to actually manipulate and look at data and documents. Friday would be more like Lewis, Johnson. I have to pull up my list that I prepared for argument on this. One second.

THE COURT: Let's get it straightened out right now.

MR. CHAN: Klein, we can do on Wednesday. Gillers, we can do on Wednesday.

THE COURT: Who?

MR. CHAN: Gillers.

THE COURT: Thank you. Wednesday.

MR. CHAN: Ferrante.

Garner, Friday. Wait. Did you just preclude Garner, Your Honor? That makes that easier.

THE COURT: Garner is out and Dooley is out.

MR. CHAN: Did I cover eight?

MR. KESSLER: Six.

MR. CHAN: Minkoff, Wednesday.

Smith, Wednesday.

THE COURT: I would just advise you to read the Government's letter identifying specific deficiencies and order that you provide that information to the Government on Wednesday and Friday.

MR. CHAN: Yes, Your Honor.

THE COURT: Thank you.

Is there anything else? I think that's it, right?

MS. SMITH: Just to be clear, where and what time on the 16th? Are we doing it in the ceremonial courtroom? If you can just put it in an order so we know where to bring all of the questionnaires.

THE COURT: We are going to do it in the ceremonial courtroom because we can't fit everybody. Hopefully, we can get it for two days if we have to. I'm really urging the parties to look for a way to finish this in a day.

MS. SMITH: Do you want us at 9 o'clock?

THE COURT: Yes, 9 o'clock.

May I say to the jury consultant, sometimes jury consultants will ask for permission to do social media searches on the jurors.

MR. DUBIN: Yes, Your Honor.

THE COURT: I am very reluctant to the extent there could be any footprint or disclosure to a jury that somebody is looking on their Facebook who is not authorized to do it on

the Facebook owner.

MR. DUBIN: I can submit a letter to the Court, if you'd like, by Tuesday. I think that we have an ethical obligation to comply not only with recent ethics opinions that guide us on how we need to go about that. I am keenly aware if we look on a Facebook page, if it's a public page, that's acceptable. If it's something that requires us to login, thereby leaving a footprint, unacceptable. But as long as the juror is making that information available, I think it is incumbent upon us and even raises the specter of malpractice if we don't do it. I'm happy to provide a letter to the Court. But I think that we are duty bound do it. I think that, again, recent ethic opinions require us to do it. I think my letter will make that clear. I completely agree with Your Honor that we cannot leave a footprint such that a prospective juror or a sitting juror would know that we are looking at information that they don't otherwise want looked at.

Here's a good example, Your Honor: Linkedin, if you are a member of Linkedin and you can look at other Linkedin profiles and then that member whose profile has been looked at knows Josh Dubin looked at your profile. If they have made their page public and it doesn't require a login, there is New York law and, you know, various American Bar Association and other ethics' opinions that I'm sure the Court is aware of

that, again, I think require us to do that due diligence on behalf of Mr. Greebel, but I will make our position clear.

THE COURT: In that situation with Linkedin, if it is a public page, is there a footprint --

MR. DUBIN: If it is a public page, no.

THE COURT: -- of who logged in and looked at them?

MR. DUBIN: No, they cannot. And, listen, we bear the responsibility and I am more sensitive than I care to admit to ensure, A, it is not a good look, first of all, that they're being looked at. And, second of all, we have an ethical obligation not to do that.

THE COURT: All right.

MR. DUBIN: Just so the Court is aware, I will be staying through the duration. I happen to be an attorney, as well as you know because I entered an appearance. I will be staying throughout. I don't know. Maybe it's me just like feeling oh, a jury consultant. I'm a lawyer.

THE COURT: You made that clear in the beginning.

(Continued on next page.)

(Continuing)

THE COURT: You made that clear from the beginning.

MR. DUBIN: Your Honor, the last thing is I noticed at the first trial that there was a metal detector outside of the courtroom itself. That concerns us. And I don't know if that was in response to Mr. Shkreli, but it didn't seem like that was going on for other trials.

Our concern is that although jurors don't enter the courtroom that way, that they do pass in the hall from time to time, and if they see a metal detector outside the courtroom, that that somehow raises the inference in their mind that, you know -- and especially since it's not outside other courtrooms -- that there's some sort of danger, that Mr. Greebel could be some sort of danger, or that this case has some significance that we feel it doesn't.

So we just want to know if Your Honor planned on installing that security measure at this trial as well.

THE COURT: The reason that we did it was not to -- not because we had concerns that there would be weapons brought into the courtroom, or something that could harm or jeopardize the security of the courtroom. Rather, it was really to make sure that folks, other than the attorneys, did not bring recording devices into the courtroom.

The sketch artists were ordered not to draw pictures of the jurors, and they were not allowed to bring their

devices into this courtroom. Only lawyers who were counsel of record were allowed to do that.

I do not expect there to be as much media attention to this case. I know you have raised that specter, but it just does not feel like a likelihood. I was not planning to have metal detectors outside, but I would require that those who are not counsel surrender their phones.

MR. DUBIN: Very well, Your Honor.

THE COURT: With the exception of the supervisor. So if the U.S. Attorneys wants to bring her phone, she's allowed to do that.

MR. DUBIN: Understood, Your Honor, thank you.

THE COURT: All right. Is there anything else?

MR. BRODSKY: Is it okay if Mr. Greebel's wife attends the trial? Could she have her phone if there's some contact and the kids...

THE COURT: Our rules are that only lawyers can have phones in the courthouse.

MR. BRODSKY: Understood. Okay, Your Honor.

MS. SMITH: Your Honor, I only raise this because Mr. Greebel's wife was on the original witness list. I don't know if she's going to be on the future witness list; but generally potential witnesses are not in the courtroom for trial.

THE COURT: Right.

MS. SMITH: So I just wanted to raise that. I don't know whether that's going to be an issue or not.

MR. BRODSKY: Well, if she was going to be a witness, she wouldn't be a percipient witness. She would only be a character witness. Therefore, I don't think that, with respect to a spouse, that should be an exception. But if Your Honor is asking us to make a determination before the trial whether the wife is going to take the stand or not, we will make that determination.

THE COURT: All right.

MR. BRODSKY: You want us to make that determination?

THE COURT: Yes, if you would.

MR. BRODSKY: Okay, Your Honor. So if she's present for the trial, she will not be a witness.

THE COURT: Well, it is the general rule, because I know experts do not have that restriction; but if a fact witness or a character witness, generally would not be present.

Now, I also recognize that the defendant has a right to have family members here in their support, or to have support from those friends or colleagues who may be supportive; but they are generally not called as witnesses.

So I think it is really up to you and your client to talk about this issue and decide what you want to do.

MR. BRODSKY: Understood, Your Honor.

THE COURT: Okay.

Is there anything else?

MS. SMITH: No, your, thank you.

THE COURT: All right. Thank you.

ALL: Thank you, Your Honor.

(Matter concluded.)

oooOooo