# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Winston Y. Chan
Direct: +1 415.393.8362
Fax: +1 415.374.8460
WChan@gibsondunn.com

October 13, 2017

SERVED BY ECF

Alixandra E. Smith, Esq.
David C. Pitluck, Esq.
David K. Kessler, Esq.
Assistant United States Attorneys
U.S. Attorney's Office for the Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Re:    *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Counsel:

We write pursuant to the Court's minute-entry order, dated October 6, 2017, that Mr. Greebel provide certain additional information requested by the government in its October 4 letter (Dkt. No. 390) regarding Mr. Greebel's potential experts. Although the order did not reference the government's September 25 letter, we include responses to the requests set forth therein as well. This letter thus further supplements our expert disclosures already provided as to Matthew Ferrante, Alan Johnson, and Craig Lewis. It also amends our October 11 supplemental disclosure with respect to Stephen Ferruolo.

Below, we reproduce in **bold** typeface the government's specific requests for information. Our responses follow each request, in normal typeface. As we have discussed with and written to you, if and only if we decide to present a case-in-chief, any of the experts whom we call as witnesses will be responding in substantial part to the government's case-in-chief. Accordingly, we reserve the right to amend or expand the potential testimony of our potential experts based on the evidence and testimony admitted in the government's case-in-chief.

**GIBSON DUNN**

October 13, 2017
Page 2

A.   **Matthew Ferrante**

1.   **The Supplemental Disclosures state that Ferrante will explain various concepts relating to electronic metadata and that, if the government's case-in-chief raises "computer and/or electronic forensic issues," the defendant "would consider calling Mr. Ferrante to analyze the documents or materials in question, and to testify about them." The Supplemental Disclosures state that Ferrante's "review and analysis" will be based on a "methodology" that includes "processing of document data using acceptable tools." [Mr. Greebel's Supplemental Disclosures] at 15-16. The Supplemental Disclosures identify five such "tools"; it is not clear which, if any, have been employed by Ferrante in this case or the methodology he used to reach his opinion.**

Mr. Ferrante will perform a confirmatory analysis of the metadata of minutes from certain meetings of Retrophin's Board or Audit Committee. Mr. Ferrante will compare the iManage metadata history contained in the spreadsheet, Bates numbered GR_0000144, produced to the government by Katten Muchin Rosenmann LLP ("Katten") with the metadata contained in each of the native files associated with the minutes produced by Katten in the Bates range GR_0000099–143.

Mr. Ferrante will explain that the iManage system assigns a unique identification number ("Doc. No.") to each newly created document and that it logs, among other things, various types of activity ("Activity") with respect to each document, as well as who performed it ("Doc. User"). Mr. Ferrante will examine the "Doc. No.," "Activity," and "Doc. User" fields in both the iManage history spreadsheet and each native file's metadata. Specifically, Mr. Ferrante will compare the "Doc. User" entries for each "Create" and "Modify" entry relating to the document numbers associated with the relevant minutes with the corresponding metadata fields contained in the native files of the corresponding minutes (at Bates range GR_0000099–143).

Mr. Ferrante would testify that, in his opinion, there is no evidence of tampering with the metadata in the native files of meeting minutes at Bates range GR_0000099–143, or any modifications of such metadata beyond what is indicated on GR_0000144. Moreover, Mr. Ferrante would testify that, in his opinion, the iManage metadata history contained in GR_0000144 is consistent with the metadata contained in the native files at Bates range GR_0000099–143, and *vice versa*.

**GIBSON DUNN**

October 13, 2017
Page 3

As his methodology, Mr. Ferrante first extracted the native versions of Retrophin board minutes as produced on a DVD disc by the government on June 2, 2016. In order to preserve only the metadata from Katten's own servers and files, he then extracted the files from the disc using an AD1 forensic image of the files. He then processed and reviewed the metadata of the underlying files using two software products by made by AccessData: (1) FTK Forensic Imager and the Forensic Tool Kit 5.4.0.3.7. Using the metadata identified by these software packages, Mr. Ferrante then compared the underlying native metadata with the information listed in GR_0000144 for the "Activity" ("Create" and "Modify" entries) and "Doc. User" metadata fields.

2.  **[T]he Supplemental Disclosures state that Ferrante's expert opinion will be based in part on his "review and analysis of documents relating to this matter." None of the documents relating to this matter are identified.**

    Mr. Ferrante will base his opinions on his experience, as set forth in Mr. Greebel's September 19, 2017 letter, and on his review of documents relating to this matter, including communications between Mr. Greebel and Retrophin, Inc., including documents with the following beginning Bates numbers: GR_0000099, GR_0000100, GR_0000101, GR_0000102, GR_0000103, GR_0000104, GR_0000105, GR_0000106, GR_0000107, GR_0000108, GR_0000109, GR_0000110, GR_0000111, GR_0000112, GR_0000113, GR_0000114, GR_0000115, GR_0000116, GR_0000117, GR_0000118, GR_0000119, GR_0000120, GR_0000121, GR_0000122, GR_0000123, GR_0000124, GR_0000125, GR_0000126, GR_0000127, GR_0000128, GR_0000129, GR_0000130, GR_0000131, GR_0000132, GR_0000133, GR_0000134, GR_0000135, GR_0000136, GR_0000137, GR_0000138, GR_0000139, GR_0000140, GR_0000141, GR_0000142, GR_0000143, GR_0000144.

3.  **In addition to the disclosures requested above, the government requests that, for each expert, you identify the federal and state court proceedings, and any arbitration proceedings, in which one of the above-discussed experts offered substantially similar testimony to the testimony noticed in this case.**

    Mr. Ferrante has testified in numerous cases, some of which are publicly available, but he has not provided this specific analysis in any prior proceedings.

**GIBSON DUNN**

October 13, 2017
Page 4

    **B.**    **Stephen Ferruolo (Amended)**

    **1.**    **One of Ferruolo's opinions is that the "transfer of unrestricted stock to an employee, who is not an 'affiliate'—an executive officer, director, or large shareholder—would not make the stock restricted." (Supplemental Disclosures at 5). Please provide the bases for this opinion about what "make[s] the stock restricted," including any applicable laws or regulations that Ferruolo applied.**

    The basis for this opinion is Dean Ferruolo's extensive professional experience, including his understanding and interpretation of Section 16 of the Securities Act of 1934 and Rule 144 of the Securities Act of 1933.

    **2.**    **One of Ferruolo's opinions is that the "The purpose of a Schedule 13D filing is to provide an early warning signal of a potential change in control (e.g., hostile takeover)." (Supplemental Disclosures at 6). Please provide the bases for this opinion, including any applicable laws or regulations that Ferruolo applied.**

    The basis for this opinion is Dean Ferruolo's extensive professional experience, including his understanding and interpretation of Section 13(d) of the Securities Exchange Act of 1934.

    **3.**    **In addition to the disclosures requested above, the government requests that, for each expert, you identify the federal and state court proceedings, and any arbitration proceedings, in which one of the above-discussed experts offered substantially similar testimony to the testimony noticed in this case.**

    Dean Ferruolo has not previously testified as an expert.

    **C.**    **Alan Johnson**

    **1.**    **Johnson was proffered to testify about publicly disclosed consulting agreements, including through his scientific identification and analysis of consulting agreements disclosed publicly through SEC filings." (Disclosures at 4 (emphasis added)); provide the referenced analysis.**

    Mr. Johnson closely reviewed the consulting agreements that the government has identified as "sham consulting agreements," Gov't Sept. 30, 2016 Letter at 4, and identified key provisions in those agreements:

**GIBSON DUNN**

October 13, 2017
Page 5

    a. Title of the Agreement: three of four contain release in the title of the agreement
    b. Consulting Fees: varying in amount
    c. Consulting Services: brief and non-specific description of consulting services
    d. Restrictive Covenants and Releases: confidentiality, non-disparagement, and a broad general release

Based on his extensive professional experience in executive compensation consulting, he determined that these agreements are comparable to many publicly filed consulting agreements with departing executives. These publicly filed consulting agreements are comparable because (1) there was little expectation of work based on the description of the work and the circumstances and (2) the company benefitted from the restrictive covenants and releases.

Through Mr. Johnson's ongoing analysis, he has thus far identified 50 consulting agreements comparable to the agreements at issue in this case, and may identify more. A summary chart of the comparable agreements is attached hereto as Exhibit A.[1] These comparable agreements were identified through a combination of two search processes.

The first process began with a search of SEC EDGAR data using the following terms:

    a. "consulting"
    b. "agreement"
    c. "release"
    d. "compensation"
    e. "non-disparagement"

This search yielded 1,635 documents. The summary of results is attached hereto as Exhibit B. Of these documents, those that were operative agreements or referenced an operative agreement were reviewed to identify consulting agreements with former company executives that contained key

---

[1] A folder containing files of the agreements referenced in Exhibit A will be provided to the government as a courtesy but is not filed on ECF.

**GIBSON DUNN**

October 13, 2017
Page 6

provisions similar to those identified above. This process yielded 41 of the 50 comparable consulting agreements.

For the second process, Mr. Johnson searched for and reviewed media reports of high-profile executive separation consulting agreements through Google.[2] He pulled and reviewed the agreements referenced in those articles to identify any that were comparable to the agreements at issue in this case based on the key provisions identified above. This process yielded nine of the 50 comparable consulting agreements.

2. **Johnson was proffered to testify about a "comparison" he conducted between the consulting agreements at issue in Count Seven of the Superseding Indictment and agreements disclosed in the public filings of "a variety of companies" (Disclosure at 5); provide the referenced comparison, as well as the "variety of companies" whose publicly-disclosed consulting agreements were used as a basis for that comparison.**

   See description of analysis at #1.

3. **Please provide any backup data, such as spreadsheets, used in conducting the "analysis" (described in paragraph E1 above) and/or "comparison" (described in paragraph E2 above) as well as identify each "consulting agreement[] disclosed publicly through SEC filings" included in the analysis and/or comparison, to the extent Johnson and/or your firm has an electronic set of such filings, please provide a copy.**

   See description of exhibits at #1.

---

[2] Max Nisen, *Ex-CEOs Are Cashing In Big Time For Doing Almost Zero Work*, Business Insider (Nov. 23, 2012, 4:26 pm), http://www.businessinsider.com/ceo-consulting-fees-2012-11; Joann S. Lublin, *Lucrative Consulting Fees Reach Bigger Set*, Wall Street Journal (Nov. 19, 2012, 7:45 pm), https://www.wsj.com/articles/SB10001424127887324073504578115163336933032; David Yermack, *Golden Handshakes: Separation Pay for Retired and Dismissed CEOs*, London School of Economics (Nov. 2005), http://www.lse.ac.uk/fmg/documents/events/seminars/corporateGovernance/640_D_Yermack.pdf.

**GIBSON DUNN**

October 13, 2017
Page 7

    **4.**    **A summary of the specific opinions, along with the bases and reasons for those opinions, that Johnson will offer regarding the following proffered topics for testimony (Disclosures at 3-4):**

        **a.**    **"[C]ustoms and practices surrounding the use of consulting agreements in private and public companies."**

        **b.**    **"Publicly disclosed consulting agreements."**

        **c.**    **That "consulting agreements are frequently utilized by private and public companies in the context of a threat or concern about litigation."**

        **d.**    **That "one of the principal goals of such agreements is to obtain broad releases, non-disparagement obligations and confidentiality provisions."**

        **e.**    **That a "common market practice is to use [consulting] agreements to obtain an option of potentially conferring with the consultant even if it never actually happens."**

        **f.**    **That "companies entering into consulting agreements often expect to obtain minimal to no work from their consultants."**

        **g.**    **That it is common practice for "outside experts like [Johnson] who negotiate these [consulting] agreements to communicate with the CEO of the company who is on the Board—and not the entire Board—about them."**

        **h.**    **That "the consulting agreements at issue in Count 7 of the indictment have multiple similarities to consulting agreements entered into by a variety of companies [and] that sometimes but not always companies disclose such agreements."**

<u>Summary of Opinions</u>

As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel "caused Retrophin to enter into four sham consulting agreements with defrauded investors," Superseding Ind. ¶ 32; *see also* ¶¶ 31, 33-35, Mr. Johnson would testify that:

**GIBSON DUNN**

October 13, 2017
Page 8

    a.    Consulting agreements are frequently utilized by private and public companies in the context of a threat or concern about litigation.

    b.    One of the principal goals of such agreements is to obtain broad general releases, non-disparagement obligations, non-compete provisions, and confidentiality provisions. Because of the importance to the company of obtaining these favorable terms in the context of a threat or a concern about litigation, more of the agreement in that context discusses these terms as compared to consulting agreements in other circumstances.

    c.    It is common for there to be a very broad description of the consulting services in such agreements.

    d.    A common market practice is to use such agreements to obtain an option of potentially conferring with the consultant even if it never actually happens.

    e.    Companies entering into consulting agreements often expect to obtain minimal to no work from their consultants

    f.    It is common practice for outside consultants like Mr. Johnson, and others who advise on such consulting agreements, to primarily communicate with the CEO of the company who is on the Board—not with the entire Board—about the terms of the agreements.

    g.    Based on a review of the consulting agreements at issue in this matter and his ongoing analysis of publicly disclosed consulting agreements, the consulting agreements at issue have multiple similarities to consulting agreements entered into by a variety of companies. In addition, companies sometimes but not always, disclose such agreements.

<u>Bases and Reasons</u>

Alan Johnson has spent his entire career advising private and public companies about, among other things, consulting agreements. Moreover, Mr. Johnson has developed an expertise in consulting agreements containing broad general releases. For the past 25 years, he has served as the Managing

**GIBSON DUNN**

October 13, 2017
Page 9

Director of Johnson Associates, Inc., an executive compensation consulting firm he founded in 1992. Over his 37-year career, Mr. Johnson has provided executive compensation consulting services to over a thousand client companies, which for approximately 80% of these companies he actively reviewed the company's various employment, severance, and consulting-related agreements. His consulting efforts focus on advising major financial and professional service firms and he has advised on executive compensation issues for a wide-range of industries, including but not limited to energy, health care, pharmaceutical, technology, and basic manufacturing.

Mr. Johnson's expert testimony will be based on his extensive professional experience, including advising on approximately 100 executive separation agreements that were structured as consulting agreements with broad general releases and little expectation of consulting services; academic research and literature; his review of the consulting agreements at issue in this case; and his education.

In addition, Mr. Johnson's testimony will be based on the ongoing analysis of consulting agreements disclosed publicly through SEC filings described at #1.

5.  **In addition to the disclosures requested above, the government requests that, for each expert, you identify the federal and state court proceedings, and any arbitration proceedings, in which one of the above-discussed experts offered substantially similar testimony to the testimony noticed in this case.**

    Mr. Johnson has testified numerous times, some of which are publicly available, *see e.g., In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693 (Del. Ch. 2005)., but he has never provided the specific analysis relating to the type of agreements outlined above.

**GIBSON DUNN**

October 13, 2017
Page 10

**D.     Craig Lewis**

1.      **The Supplemental Disclosures state that Lewis will testify that, based on his analysis of Retrophin trading data, the trading behavior of the Fearnow share recipients was inconsistent with an agreement to control the price or volume of Retrophin stock.  The Supplemental Disclosures do not provide Lewis's analysis, but rather provide a general overview of steps Lewis purportedly took (or will take) and state that his analysis of Retrophin trading shares is "ongoing." Id. at 7-8.  For example, the Supplemental Disclosures state that Lewis's trading analysis involves "analyzing the trading accounts appearing more frequently as net buyers on high volume trading dates" and "analyzing the Fearnow share recipients' trading behavior, in the aggregate and as individuals, following a decrease in Retrophin's share price.**

Mr. Lewis's analysis is based on his review of (i) publicly available Bloomberg price data from November 2012 through September 2014, a copy of which is attached hereto as Exhibit D and (ii) Bluesheet trading data ("RTRX Bluesheets 11142012 to 09192014"), as produced by the government on April 19, 2017.  *See* Gov't Production Cover Letter (Dkt. 200), at 2.  In reaching his conclusions, Mr. Lewis also relied on his experience, as detailed in prior disclosures, and his understanding of certain fundamental concepts of economics as explained in basic economic texts and treatises—*e.g.*, McConnell, C., *et al., MicroEconomics*, 19th Edition (McGraw-Hill/Irwin, new York, NY, 2012) and Thompson, A., *Economics* (Addison-Wesley Publishing Company, Inc.).  Mr. Lewis did not conduct an event study or statistical analysis, and his analysis and findings are based solely on his experience and his review of the documents described below.

As previously disclosed, Mr. Lewis will testify, in sum and substance, that the trading behavior of the "Fearnow recipients" is inconsistent with the expected trading behavior of a so-called "control group"—*i.e.*, a group of individuals acting in knowing concert to artificially inflate the price of particular security.  Specifically, Mr. Lewis will testify that although a likely proxy for coordinated trading behavior would be high net purchase activity on the highest volume trading days, the Fearnow recipients do not appear to be among the most active purchasers on those days.  Mr. Lewis will testify, in sum and substance, that based on his review of the individual and aggregate trading behavior of the Fearnow recipients—as reflected in RTRX Bluesheets 11142012 to 09192014—the Fearnow recipients do not appear to be net

GIBSON DUNN

October 13, 2017
Page 11

purchasers on the highest volume trading days in the period at issue. A copy of charts reflecting Mr. Lewis's findings are attached hereto as Exhibit C.

Additionally, Mr. Lewis will testify that another likely proxy of a control group's coordinated effort to manipulate the market and/or control the price and trading of Retrophin stock would be net purchasing activity on trading days after a price decline, as measured by a market-close-to-market-close price comparison of the Retrophin (RTRX) stock price. Based on his review and analysis of the Retrophin Bluesheets and publicly available Bloomberg pricing data, Mr. Lewis will testify, in sum and substance, that the Fearnow recipients do not appear as coordinated net purchasers for the trading days after a price decline in Retrophin stock. A copy of the Bloomberg pricing data for the period in question is attached hereto as Exhibit D.

Mr. Lewis will also testify that, based on his review of the above-referenced data, the disparate and distinct trading behavior of the individual Fearnow recipients is inconsistent with a control group's alleged intent to act in concert to artificially inflate Retrophin share price. He will testify that the individual Bluesheet data of the Fearnow recipients is inconsistent with what would reasonably be expected for an alleged scheme to engage in "washed trades."

2. **In addition to the disclosures requested above, the government requests that, for each expert, you identify the federal and state court proceedings, and any arbitration proceedings, in which one of the above-discussed experts offered substantially similar testimony to the testimony noticed in this case.**

Mr. Lewis has not provided the same or substantially similar testimony in another matter.

\*   \*   \*

Please let us know if you have any additional questions.

Sincerely,

*/s/ Winston Y. Chan*
Winston Y. Chan

**GIBSON DUNN**

October 13, 2017
Page 12

cc: Clerk of the Court (via ECF)