

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| JMK:AES/DCP/DKK | *271 Cadman Plaza East* |
| F.#2014R00501 | *Brooklyn, New York 11201* |

October 23, 2017

<u>By Hand and ECF</u>

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Evan Greebel
     <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

   The government respectfully submits this supplemental brief in further support of its motion for a <u>Daubert</u> hearing for the defendant's noticed expert witness Alan Johnson.

   On August 11, 2017, the defendant noticed Alan Johnson to testify about consulting agreements in general and, more specifically, his "scientific identification and analysis of consulting agreements disclosed publicly through SEC filings." Dkt. No. 312-2 at 3-4. On September 20, the defendant disclosed that Johnson was actually conducting an "ongoing analysis of consulting agreements," and that his ongoing analysis involved: "analyzing the consulting agreements at issue in this case, including the specific terms included"; "using keyword searches in the SEC's EDGAR database . . . to identify the disclosure of consulting agreements that are potentially comparable"; and "analyzing the universe of potentially comparable consulting agreements to identify agreements that have similar key terms." Dkt. No. 383-1 at 11. Finally, on October 13, the defendant made a second supplemental disclosure, <u>see</u> Dkt. No. 405 (the "Second Supplemental Disclosures"), which disclosed the "keywords" Johnson used and the agreements he purported to "analyze."

   It is now clear that the defendant seeks to offer Johnson to provide expert testimony that the consulting agreements now at issue in this case—given to former investors in Martin Shkreli's hedge funds[1]—are similar to other consulting agreements given to "departing executives." To reach this conclusion, Johnson, the managing director of an executive compensation consulting firm, applied a methodology he created for purposes of this case

---

[1] These are the consulting agreements given to investors AG and DB.

without any discernable basis.  For example, Johnson's study apparently concludes that the consulting agreements at issue in this case are "comparable" to the "retirement and consulting agreement" provided by McDonald's to its retiring Chief Executive Officer because all of the agreements include some form of "release" provision.  Nor does it appear that Johnson has experience performing the analyses he purports to use in this case or that he is qualified to offer expert testimony beyond the subject of "executive compensation," which is not at issue here.

As discussed in the government's prior filings, a district court serves as the gatekeeper for expert testimony, scrutinizing whether the expert is qualified to offer that testimony and whether the testimony is based on a reliable methodology.  Dkt. Nos. 383, 390.  In light of the record related to Johnson, this Court should exercise its gatekeeping function under Daubert and its progeny to determine whether the defendant has met his burden of showing that Johnson's testimony is admissible.  The need for gatekeeping is particularly clear here, where the defendant's opening statement relied on Johnson's purported expert testimony.[2]  Before the jury can hear more about Johnson's proffered testimony, a Daubert hearing is necessary to determine whether that testimony is admissible.

      I.        A Daubert Hearing Is Necessary to Evaluate Johnson's Qualifications

The defendant intends for Johnson to (i) offer opinions about consulting agreements in general; and (ii) testify about his ongoing analysis of consulting agreements described above.  Johnson does not appear to be qualified to testify about either topic.

According to the defendant's disclosures, Johnson is the managing director of an "executive compensation" consulting firm, has provided "executive compensation" consulting, has advised on "executive separation" agreements, and has advised on "executive compensation" issues for numerous industries.  See Second Supplemental Disclosures at 8-9.  But Johnson is not being offered as an expert on "executive compensation."  Instead, the defendant has offered Johnson as an expert in the field of "consulting agreements."  Just as a doctor is qualified to testify about her particular field of medicine but not all of "medicine," there is no reason to believe that Johnson's apparent expertise in "executive compensation" makes him an expert in all consulting agreements.

The defendant has attempted to remedy this lack of expertise by stating that, for most of the companies for which Johnson has provided "executive compensation" services, he also "actively reviewed the company's various employment, severance, and consulting-related agreements."  Id. at 9.  It is not clear what this "active review" entailed or how, if at all, it forms

---

[2] See Trial Tr. at 1156:13-21 ("[I]t's not uncommon, you will learn, it's not uncommon in industries, you will see it, where there's a threat of litigation if the air and frequently it's with corporate executives who leave companies.  And it's not uncommon.  The evidence will show, that these former company executives want to continue to consult with the company, or be available to consult with the company.  But there's also a threat of litigation and so as part of the consulting agreement, they release any and all claims against each other.").

a basis of Johnson's opinions in this case. What is clear, however, is that Johnson's area of expertise is "executive compensation" and that "executive compensation" plays no role in this case, because none of the consulting agreements involve Retrophin executives. Before Johnson should be permitted to offer broad opinions such as "[c]ompanies entering into consulting agreements often expect to obtain minimal to no work from their consultants" (id. at 8), a Daubert hearing is necessary to determine whether Johnson is qualified to offer opinions about consulting agreements outside of the field of executive compensation.

Johnson also does not appear qualified to conduct a study such as his "ongoing analysis" of consulting agreements in this case.[3] According to the Second Supplemental Disclosures, Johnson has "never provided the specific analysis relating to the type of agreements outlined above." Id. at 9. Even if Johnson were an expert in the broad field of consulting agreements, it is not clear that he is qualified to conduct a study to determine "comparable agreements" based on Internet searches of "key terms." Before Johnson should be permitted to testify about his "scientific identification and analysis" of consulting agreements, a Daubert hearing is necessary to determine whether Johnson is qualified to conduct such an analysis.

II.     A Daubert Hearing Is Necessary to Evaluate Johnson's Methodology

Johnson's purported methodology, which he has never used before, consists of identifying "key provisions" in consulting agreements in this case and comparing those provisions to provisions in consulting agreements for departing corporate executives that he identified in SEC databases and by using Google. Even if Johnson were qualified to testify about the topics identified in the Second Supplemental Disclosures, a Daubert hearing would still be necessary in order to test the methodology underlying Johnson's analysis.

First, the defendant has not explained why comparing consulting agreements offered to "departing executives" to the consulting agreements in this case is likely to provide any relevant information.[4] None of the individuals who received the consulting agreements in this case was a "departing executive." Nor does the defendant explain why he did not also attempt to compare the consulting agreements at issue in this case with agreements offered by Retrophin or other companies to scientists, engineers, human resource executives, former investors, or to any other set of consultants. Nor does the defendant explain the relevance of a comparison of consulting agreements issued by Retrophin, an early stage company, with consulting agreements issued by McDonald's or other Fortune 500 companies. A comparison is not reliable simply because each set of agreements involves individuals called "consultants."[5]

---

[3] The defendant has not explained the ways in which Johnson's analysis is "ongoing."

[4] Neither of the defendant's first two disclosures stated that Johnson's analysis is limited to consulting agreements for departing executives. The defendant made this disclosure only after the Court ordered the defendant to identify the agreements underlying Johnson's opinions.

[5] The defendant also states that Johnson identified a universe of 1,635 documents on EDGAR, from which he distilled a set of 50 agreements he believes to be "comparable." But the defendant does not identify how many agreements he believes were not comparable. In other

3

Second, the defendant provided no explanation of how or why Johnson identified the four "key provisions" in the consulting agreements at issue in this case.[6]

Third, Johnson's methodology for determining that the executive separation agreements he identified "contained provisions similar" to provisions in consulting agreements in this case appears based on nothing more than his own say-so. For example, Johnson claims that one of the "key provisions" relates to "consulting fees" and then states that, in the consulting agreements in this case, the consulting fees were "varying in amounts." Id. at 5. It is not clear how, if at all, Johnson determined that the fee provisions in the executive separation agreements he identified are "comparable." It should not be surprising that different consulting agreements provide for different "fees."

Similarly, the Second Supplemental Disclosures state that Johnson determined that the consulting agreements at issue here were "comparable to many publicly filed consulting agreements with departing executives" because (1) "there was little expectation of work based on the description of the work and the circumstances" and (2) "the company benefited from the restrictive covenants and releases." Id. But it is clear from the defendant's own disclosures that Johnson reviewed nothing beyond the four corners of each contract, which do not include a "little expectation of work" provision or a description of "the circumstances" of each agreement. The defendant therefore has provided no basis for Johnson's determination that there "was little expectation of work" from the departing executives or the consultants here. Similarly, Johnson's "opinion" that each company "benefitted from the restrictive covenants and releases" appears based on nothing more than the fact that the contracts included such provisions. He does not appear, for example, to have analyzed the reasons for including those releases, such as whether the various individuals receiving consulting agreements actually posed some sort of legal threat to the company. This is not analysis, and certainly not reliable analysis. The methodology is plainly subject to challenge.[7]

---

words, if 50 agreements were "comparable" but 500 were not comparable, then the consulting agreements at issue in this case would appear even more to be outliers.

[6] The four "key provisions" identified by Johnson are: (i) title of the agreement; (ii) consulting fees; (iii) consulting services; and (iv) restrictive covenants and releases. Dkt. No. 405 at 5. According to Johnson, the agreements in this case provide for fees of "varying amounts"; contain "brief and non-specific description[s] of consulting services"; and include provisions relating to confidentiality, non-disparagement, and a broad general release. Id.

[7] It does no good to suggest that Johnson's "methodology" was really just an application of his "expertise" or "experience," because, as discussed above, he does not have expertise or experience with "consulting agreements" in general.

III. <u>Conclusion</u>

        For the reasons set forth above, the government respectfully requests that the Court schedule a <u>Daubert</u> hearing in order to test Johnson's qualifications and the reliability of his expert testimony.

        Respectfully submitted,

        BRIDGET M. ROHDE
        Acting United States Attorney

By:   /s/_____
      Alixandra E. Smith
      David C. Pitluck
      David K. Kessler
      Assistant U.S. Attorneys
      (718) 254-7000