# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

October 3, 2017

<u>VIA HAND DELIVERY</u>

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     <u>*United States v. Evan Greebel*, S1 15 Cr. 637 (KAM)</u>

Dear Judge Matsumoto:

We respectfully submit this letter in connection with the government's effort to offer into evidence at trial several selectively edited excerpts of Mr. Greebel's post-arrest interrogation by two Federal Bureau of Investigation ("FBI") special agents on December 17, 2015.[1]

On or about September 8, 2017, the government sent a letter outlining various statements of Mr. Greebel's and Mr. Shkreli's that it sought to offer in its case-in-chief.[2]  On or about September 26, the parties held a meet-and-confer by teleconference, at which the government agreed to consider excluding video images of Mr. Greebel's FBI interrogation, we agreed to provide the government with a chart summarizing our proposed additional statements, and the government agreed to provide its bases for the admissibility of the various Shkreli statements.  On or about September 27, 2017, we provided the government with a chart identifying several contextual and explanatory statements from Mr. Greebel's post-arrest interrogation that should fairly be included along with the government's proposed excerpts,

---

[1]     We have not publicly filed this letter and the attachments since they contain Mr. Greebel's nonpublic post-arrest statements.  We have conferred with the government and the parties jointly propose for the Court's consideration the following schedule for briefing on this matter:  the government will submit any response by Monday, October 9, 2017, and we will submit any reply by Thursday, October 12, 2017.  We respectfully submit that this letter, the government's opposition, and our reply should remain nonpublic until the Court has an opportunity to consider whether they should be publicly filed prior to jury selection.

[2]     The government's September 8, 2017 letter and attached exhibit are attached herein as Exhibit A.

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 2

as well as one proposed excerpt that should be excluded altogether based on our review of the excerpts in isolation.

On or about September 28, the parties held another meet and confer by teleconference, at which the government agreed not to seek to offer any video recording of Mr. Greebel's FBI interrogation. Instead, the parties agreed that, if the government were to offer any of Mr. Greebel's post-arrest statements into evidence and the Court admitted such evidence, the government would play an audio recording while showing the jury written transcripts of the excerpts. The government further offered to withdraw one of its proposed statements of Mr. Greebel's and to include one of our proposed additional statements. In addition, the government informed us that it would no longer seek to offer any of Mr. Shkreli's oral statements (from his Merrill Lynch testimony or any SEC testimony) in its case-in-chief. On or about September 28, the government provided us with a revised chart reflecting these changes.[3]

In light of the parties' disagreement on the scope of Mr. Greebel's statements to be offered into evidence in the government's case-in-chief, and for the following reasons, we respectfully request that the Court admit certain of Mr. Greebel's statements in their proper context, exclude certain of Mr. Greebel's statements, and ensure accurate transcriptions of all statements that are ultimately received into evidence by the Court. We respectfully reserve the right to argue against the admissibility of the government's proposed excerpts at the time that the government offers them during the trial based on Federal Rules of Evidence 401 and 403.

## A.    Overview

The government seeks to offer into evidence 14 excerpts of the December 17, 2015 FBI interrogation of Mr. Greebel. *See* Ex. B. As discussed below, subject to proper authentication and demonstration of relevance, we object only to the admission of two of them. With respect to six more of the government's selections, we respectfully request that additional surrounding statements be included, in fairness, to explain the government's proposed excerpts, to place such excerpts in context, to avoid misleading the jury, and/or to ensure fair and impartial understanding of the government's proposed excerpts. We also propose to add three additional excerpts. Finally, we request that if the Court admits any of the recorded statements, accurate, verbatim transcripts of the statements be provided to the jury as aids; in our view, the government's proposed transcriptions contain a number of errors and omissions in Mr. Greebel's statements (some of which alter the meaning). Our

---

[3]     The government's revised chart of proposed statements by Mr. Greebel is attached herein as Exhibit B.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 3

proposed additions to the government's selections, as well as our redlined corrections of the
government's transcriptions, are compiled in the chart attached as Exhibit C.

      **B.**     **Legal Standard**

Rule 106 states:

> If a party introduces all or part of a writing or recorded statement, an adverse
> party may require the introduction, at that time, of any other part—or any
> other writing or recorded statement—that in fairness ought to be considered at
> the same time.

Fed. R. Evid. 106.  Pursuant to this "rule of completeness," once the government seeks to
offer selected portions of recorded statements to government officials, the court must also
admit, over a hearsay objection, other portions of the same statements that are "necessary to
explain the admitted portion, to place the admitted portion in context, to avoid misleading the
jury, or to ensure fair and impartial understanding of the admitted portion." *United States v.
Klein*, No. 16-cr-442 (JMA), 2017 WL 839765, at *2 (E.D.N.Y. Mar. 1, 2017) (admitting
additional portions of defendant's statements to financial regulators) (internal quotation
marks and citation omitted); *see also United States v. Walia*, No. 14–CR–213 (MKB), 2014
WL 3734522, at *8 (E.D.N.Y. July 25, 2014) (if the government offered into evidence the
defendant's allegedly inculpatory statements to law-enforcement officials, then the court
would also receive the defendant's allegedly exculpatory statements from the same
interview).

Moreover, pursuant to Rules 401 and 403, irrelevant evidence is inadmissible, and the Court
may exclude relevant evidence if its probative value is substantially outweighed by certain
dangers, including "confusing the issues" and "misleading the jury." *See* Fed. R. Evid. 401-
403.

      **C.**     **Mr. Greebel's Corrections to the Government's Proposed Excerpts,[4]
Proposed Additional Statements, and Proposed Exclusions of
Government-Proposed Statements**

We take each of Mr. Greebel's statements listed in the chart at Exhibit C in turn.  The
numbered section headings below correspond to the numbered rows in the chart at Exhibit C.

---

    [4]    Our corrections to the government's transcripts are indicated in redline on Exhibit C.
In this letter, we note in section headings where we have provided corrections.

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 4

      **1.**    **Mr. Greebel's Proposed Additional Statements for Context,
Beginning at 7:23:07 and 7:46:40**

None of the government's proposed excerpts explains the purpose of or gives context for the
interview itself.  These short exchanges are necessary to (a) explain why the FBI was
interrogating Mr. Greebel, and (b) provide context for the entire interview and all of Mr.
Greebel's statements.  Moreover, the failure to include this excerpt could mislead the jury
into believing that the government had interviewed Mr. Greebel before his arrest.  Since this
impression would be false, it risks misleading the jury to exclude this excerpt.

      **2.**    **Mr. Greebel's Corrections to the Government's Proposed Excerpt
Beginning at 7:47:00 and Proposed Additional Statement
Beginning at 7:50:07**

The government's proposed excerpt begins at 7:47:00 with a broad question: "How do you
know Martin Shkreli?"  Ex. C at 1.  Mr. Greebel responds that he was introduced to Mr.
Shkreli in "Spring 2011 . . . [i]n connection with [Shkreli's] desire to become an activist
investor," a field in which Mr. Greebel had experience.  *Id.*  The agent then asks Mr. Greebel
"which company" Mr. Shkreli wanted "to attack."  *Id.* at 2.  Mr. Greebel explains that it was
a "public company" called "SeraCare."  *Id.*

After a brief aside regarding how Mr. Shkreli "found" Mr. Greebel, *id.* at 2-3, the agent
returns to the topic of SeraCare, asking, "Uh, that falls through with that company, right?"
*Id.* at 3.  After Mr. Greebel responds in the negative, the agent asks, "Okay.  So can you tell
me about that a little bit?"  *Id.*  Mr. Greebel explains, in sum and substance, that he worked
with Mr. Shkreli and MSMB Capital in an ultimately unsuccessful effort at an activist
investment in SeraCare, through public filings with the Securities and Exchange Commission
("SEC") and participation in the auction.  *Id.*

The agent asks, "So how, so that's how you first met him and became involved and you
represented MSMB Capital?  Or?"  *Id.*  Mr. Greebel responds, "I don't know it was just--,"
and the agent interrupts him: "You don't know which entity?"  *Id.*  The government's
proposed excerpt cuts off Mr. Greebel's fulsome response after "It was a discrete
engagement."  *Id.* at 3-4.  But Mr. Greebel's explanation continues for some period, with the
agent apparently encouraging his further elaboration by saying, "Okay. . . . Okay. . . . Mm
hmm. . . . Yeah."  *Id.* at 4.

Our proposed addition, running from approximately 7:50:07 to approximately 7:50:35, is
necessary to complete Mr. Greebel's answer and further explain the SEC filings Mr. Greebel
noted moments before.  The government's selective editing of Mr. Greebel's full response to

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 5

the question, which was encouraged by the agent's own affirmative interjections, risks misleading the jury by painting an incomplete picture.

> 3.      **The Government's Proposed Excerpt Beginning at 7:52:10**

We do not have any corrections or proposed additions to the government's proposed excerpt beginning at 7:52:10.

> 4.      **Mr. Greebel's Proposed Additions Beginning at 7:57:10**

We propose a further addition to complete the government's proposed excerpt (number 2) beginning at 7:47:00, which begins with the question, "How do you know Martin Shkreli?" Ex. C at 1.  In the excerpt, Mr. Greebel explains, in sum and substance, that he met Mr. Shkreli in the context of doing an "activist campaign[]" for MSMB Capital relating to SeraCare. *See id.* at 1-2.  Approximately ten minutes later, the FBI agent asks Mr. Greebel about his activist-investment work for other "deal[s]," including AMAG and Myrexis. *See id.* at 4-5.  Mr. Greebel's statements in excerpt number 4 regarding AMAG, Myrexis, and Mr. Shkreli's request for Mr. Greebel's help "raising money for private companies and making them public" explain how Mr. Greebel got to know Mr. Shkreli. *See id.*

While we recognize that our proposed addition comes approximately ten minutes later, we submit that the continued dialogue about Mr. Greebel's work on "activist investor"-related matters for MSMB Capital is necessary to explain, provide context, and complete his prior statements about how he knew Mr. Shkreli.

> 5.      **Mr. Greebel's Corrections to the Government's Proposed Excerpt**
>         **Beginning at 8:02:04 and Proposed Addition Beginning at 8:02:45**

The government's proposed excerpt begins at 8:02:04 with the question, "what was the next step after that meeting?" Ex. C at 5.  Mr. Greebel responds that his firm, Katten Muchin, was "engaged by Retrophin for general corporate matters." *Id.*  After confirming that Retrophin is a limited liability company ("LLC"), the FBI agent asks Mr. Greebel, "Did you help change it from an--into an LLC?" *Id.* at 5-6.  Mr. Greebel responds, "No." *Id.* at 6.

In response to the agent's follow-up question, "Did it start as a partnership or--," Mr. Greebel responds that (1) he was not "predecessor counsel," (2) Retrophin "was always an LLC," (3) he was not "general counsel," (4) he was "a lawyer for--for the company," (5) he "[did not] work [as an employee] for the company," and (6) he was a "partner" at the law firm "engaged . . . by Retrophin." *Id.* at 6-7.

The government's proposed excerpt, however, excludes most of Mr. Greebel's explanation of his role.  It risks misleading the jury into assuming, as the FBI agent incorrectly did, that

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 6

Mr. Greebel was "general counsel" of Retrophin.  Our proposed addition completes Mr. Greebel's entire response to the agent's question and explains/provides context for Mr. Greebel's role.

> **6.   Mr. Greebel's Corrections to the Government's Proposed Excerpt Beginning at 8:09:26**

We have corrections to the government's transcript of this excerpt, *see* Ex. C at 7-8, but we do not propose any additions.

> **7.   Mr. Greebel's Proposed Addition Beginning at 8:10:24, Corrections to the Government's Transcript Beginning at 8:11:40, and Proposed Addition Beginning at 8:15:19**

The government's proposed excerpt begins at 8:11:40 with the following colloquy:

| | |
|---|---|
| Question (8:11:40): | Okay.  Alright, so the next step in your timeline. |
| Answer: | I think some investors started complaining about the valuation they received. |
| Question: | Okay.  Uh, so let's just unpack that a little bit I guess.  So the investors being, investors in the PIPE? |
| Answer: | No. |

Ex. C at 9.  Our first proposed addition, beginning at 8:10:24, is necessary to explain the PIPE transaction the agent refers to in the government's proposed excerpt.  *See id.* at 8-9. Without our proposed addition, the jury will have no idea about what PIPE the agent is asking about, or the context of the discussion.

In response to further questioning, Mr. Greebel explains, in sum and substance, that the "complaining" investors were a "small fraction" of "Retrophin investors . . . who were on the cap table," and Mr. Greebel "worked with people to write [settlement agreements] up" based on terms given by Mr. Shkreli.  *See id.* at 9-12.  The agent asks, "Did you have any knowledge that they were MSMB investors?"  The government's proposed excerpt ends with Mr. Greebel's response: "Not at the time."  *Id.* at 12.

Our second proposed addition, beginning at 8:15:19, completes Mr. Greebel's response: he did, "at some point," come to understand that the settlement agreements were made with Retrophin investors who "were also" investors in MSMB Capital.  *See id.* at 12-13.  Mr. Greebel's initial response, "Not at the time," which is all the government includes in its

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 7

proposed excerpt, was confusing enough to the FBI agent himself that he told Mr. Greebel "thank you for the clarification." *Id.* at 13. To include the government's proposed excerpt without Mr. Greebel's clarification would mislead the jury to believe that Mr. Greebel told the FBI that he did not know at some point that the investors were both MSMB investors and investors in Retrophin. In short, our proposed addition is important to explain the government's proposed excerpt, to place such excerpt in context, to avoid misleading the jury, and to ensure a fair and impartial understanding of the government's proposed excerpt.

> **8.     Mr. Greebel's Proposed Addition Beginning at 8:16:40 and Corrections to the Government's Proposed Excerpt Beginning at 8:17:50**

An accurate transcription of the government's proposed excerpt beginning at 8:17:50 begins with the question, "Sure. Yeah. I mean it's more of an accountant's aspect … I'm just trying to understand if you're wearing more than one hat or if you're, if, what your role is cause it's such a small company at the time." Ex. C at 14. Mr. Greebel responds, "My role was not significant." *Id.* The agent asks, "Okay. With the Q's and K's?" *Id.*

An accurate transcription of Mr. Greebel's response reads, "I would say with anything, but with the Q's and K's." *Id.* In contrast, the government's erroneous transcription reads, "I didn't have anything to do with the Q's and K's." Ex. B at 7. Either way, the government's selectively edited excerpt would mislead the jury into believing that Mr. Greebel said he had nothing to do with SEC filings.

In fact, however, Mr. Greebel had told the FBI agent the opposite just moments before. As reflected in our proposed addition, beginning at 8:16:40, Mr. Greebel stated that he did help with the Qs and the Ks, although his role was limited. Our proposed addition begins:

> Question (8:16:40):   Did you help with the Q's and the K's or--?
>
> Answer:                Yes, but I don't believe any--I don't know when the first Q was even filed.

*Id.* at 13. Our proposed addition is necessary to avoid misleading the jury and to ensure a fair and impartial understanding of the government's proposed excerpt.

Moreover, our proposed addition provides necessary context to understand the agent's initial observation, "Sure. Yeah. I mean it's more of an accountant's aspect," *id.* at 14, by including Mr. Greebel's statements distinguishing his role as a lawyer ("We're not qualified to do numbers. We don't review numbers. . . . We look at words.") from that of an accountant. *Id.* at 14.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 8

9.   **Mr. Greebel's Corrections to the Government's Proposed Excerpt Beginning at 8:21:25**

We have corrections to the government's transcript of this proposed excerpt, *see* Ex. C at 14-15, but we do not propose any additions to it.

10.   **Mr. Greebel's Corrections to the Government's Proposed Excerpt Beginning at 8:39:31**

We have corrections to the government's transcript of this proposed excerpt, *see* Ex. C at 15-16, but we do not propose any additions to it.

11.   **Mr. Greebel's Corrections to the Government's Proposed Excerpt Beginning at 8:41:55**

We have corrections to the government's transcript of this proposed excerpt, *see* Ex. C at 16-17, but we do not propose any additions to it.

12.   **Mr. Greebel's Corrections to the Government's Proposed Excerpt Beginning at 8:43:26**

We have corrections to the government's transcript of this proposed excerpt, *see* Ex. C at 17-18, but we do not propose any additions to it.

13.   **Mr. Greebel's Objection to the Admission of the Government's Proposed Excerpt Beginning at 8:46:22**

The government's proposed excerpt (beginning at 8:46:22) should be excluded for four reasons.

First, the FBI agent's convoluted statement is just that: an inadmissible statement, rather than a question. "And then, so—October 14th, you're kind of done. When—do you continue to talk to Martin sporadically because I know you guys had a relationship on different deals for different companies before. Or is he…" Because the excerpt is an FBI statement and not a question, it is inadmissible.

Second, the agent's question "do you continue to talk to Martin sporadically" is never actually answered. Accordingly, the government's proposed excerpt will create confusion.

Third, the agent's statement "because I know you guys had a relationship on different deals for different companies before" is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Mr. Greebel is not asked to comment about the FBI agent's opinion about the "relationship on

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 9

different deals for different companies" between Mr. Shkreli and Mr. Greebel, and such statement is also confusing and ambiguous.

Fourth, Mr. Greebel's statement in response to the agent's statement/question is the following: "Again, I represent companies. I don't represent . . ." Mr. Greebel's response is meaningless, is clearly not responsive to any question, and will create confusion among the jury as to its meaning. The government's proposed excerpt cuts off Mr. Greebel's response, and Mr. Greebel never provides a complete response such that the proposed excerpted answer is an incomplete thought.

If the Court nonetheless finds these statements admissible, which it should not, the Court should also include the preceding exchange, beginning at 8:46:16, regarding Mr. Greebel's lack of a personal relationship with Mr. Shkreli, for explanatory context. This is particularly true given that the FBI agent's hearsay statement refers to a "relationship" between Mr. Greebel and Mr. Shkreli which would be misleading without the prior statement by Mr. Greebel that Mr. Greebel had no personal relationship with Mr. Shkreli.

> **14. Mr. Greebel's Proposed Additions Beginning at 8:48:48 and 8:52:09 and Corrections to the Government's Proposed Excerpt Beginning at 8:49:00**

The government's proposed excerpt beginning at 8:49:00 begins, "Okay, so can you just tell me about the consulting agreements[5]." Ex. C at 19. In response, Mr. Greebel explains in sum and substance, the reasons for entering into consulting agreements: "Retrophin when it goes public has virtually no money. . . . Martin needs help, so Martin decides to hire people via consulting agreements . . . who can be helpful to help the company grow." *Id.* He further explains that "some of these people had also been employed by MSMB . . . previously," and "MSMB was one of the largest stockholders of Retrophin" at the time, so "there was a concern that they would have some of the claims against any of these parties. So as would be customary in that context, you get a release in the agreement, so they're not getting paid by Brother A and suing Brother B simultaneously." *Id.* at 20.

Our first proposed addition, beginning at 8:48:48, clarifies any latent misunderstanding about the relative timing of consulting agreements and settlement agreements. Indeed, the FBI agent himself had such a misunderstanding:

---

[5]     The government's transcript erroneously lists this phrase as "settlement agreements." *See* Ex. B at 12.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 10

> Question (8:48:48):  So what--in the timeline, what my understanding is, is
> that the consulting agreements come a little bit later than
> the--
>
> Answer:  That's not correct.
>
> Question:  --settlement agreements.  Not true?
>
> Answer:  Not true.

*Id.* at 18-19.  This statement gives context for and completes the later statements, in the
government's proposed excerpt, regarding the reasons for entering into each type of
agreement.

Our second proposed addition, beginning at 8:52:09 and ending two seconds later, merely
completes the FBI agent's question, "So . . . CFO would have to be approved," to which Mr.
Greebel responds, "Exactly." *Id.* at 22.  This example is helpful in illustrating Mr. Greebel's
immediately preceding explanation of the "broad context" of "executive officers" which Mr.
Shkreli required board approval to hire.  *Id.*  Excluding this exchange would also unnaturally
crop the agent's final question mid-sentence.

> 15.  **Mr. Greebel's Corrections to the Government's Proposed Excerpt
> Beginning at 9:00:17 and Proposed Additions Beginning at
> 9:04:25 and 9:06:58**

The government's proposed excerpt beginning at 9:00:17 begins with a broad question: "Are
there any consulting agreements that stand out to you?"  Ex. C at 23.  Mr. Greebel responds,
"Oh sure.  There's a whole litany that stand out," and he proceeds to describe the types of
agreements that stood out, including "at least three to four particular cases [in which he] said
[he] wanted board consent for them," because they involved Mr. Shkreli's "personal
contacts, not necessarily professional contacts."  *Id.*  Later in the government's proposed
excerpt, Mr. Greebel explained that, although Mr. Shkreli had "plenary authority" to hire
consultants, Mr. Greebel had nonetheless "recommended on multiple occasions to get board
consent." *Id.* at 26.

The first segment of our proposed addition, beginning at 9:04:25, provides context and
explains the process for the board approval being discussed in the government's excerpt. *See
id.* at 26-27.  The FBI agent asks for examples of prior consulting agreements that the board
approved, and Mr. Greebel explains that the agreements with "Geller and Banta" were
"circulated to the board" and "brought up at the board meeting," where the board made
"comments" and "wanted substantive changes made," including "insert[ing] a maximum

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 11

amount of time that [the consultants] would be working for the company" to avoid
classifying them as employees and ensuring that the consultants "sign[ed] the company's
inside-trading policy and code of ethics." *See id.* at 27-28. These statements are an
explanatory continuation of the government's proposed excerpt about consulting agreements
and board approval of the same, and thus logically should be included with it.

The second segment of our proposed addition, beginning at 9:06:58, is a continuation of the
question, in the government's proposed excerpt, "Are there any consulting agreements that
stand out to you?" Indeed, in our proposed addition, the FBI agent rephrases his question,
"So we mentioned three. Do you remember any other people that kind of stood out, that you
had to--that you wanted to present to the board?" Mr. Greebel responds, in sum and
substance, that approval of the Geller and Banta consulting agreements occurred at one board
meeting, and approval of Blanton's agreement occurred "probably a year or so later." *Id.* at
28-29. Importantly, Mr. Greebel clarifies that "we didn't need [board approval] for any of
them. . . . It's just recommended from a course of prudence to get it." *Id.* at 29. He further
explains that he did not believe Dr. Rosenfeld's consulting agreement required board
approval, because Mr. Greebel "had known him unrelated to Martin [Shkreli], I knew what
he was there to do he could do . . . . He finds target opportunities, so I knew what he was
being brought in to do was what he's capable of doing." *Id.*

> **16.    Mr. Greebel's Objection to the Government's Proposed Excerpt
>          Beginning at 9:13:20**

The government's proposed statements regarding Marek Biestek beginning at 9:13:20, *see*
Ex. C at 30, should be excluded under Federal Rules of Evidence 401 and 403.[6] The agent's
question, "What about Marek Biestek?" *id.*, is ambiguous and confusing.

First, the meaning of the FBI agent's question is ambiguous. It is entirely unclear what the
FBI agent was asking—whether he wanted to know the number of significant interactions
with Mr. Biestek; whether he wanted to understand the nature of the relationship between
Mr. Biestek and Mr. Greebel, or Mr. Biestek and someone else; and/or whether he wanted
something else relating to Mr. Biestek.

Second, it is hard to imagine how the FBI agent's question and Mr. Greebel's response in the
proposed excerpt are relevant pursuant to Rule 401. It is unclear how the statement makes a
fact of consequence more or less likely. When asked during the meet and confer about the

---

[6]     We object to this proposed excerpt pursuant to Rule 401 and Rule 403 because it is
apparent from the excerpt in isolation that it should not be admitted into evidence. As noted
before, we respectfully reserve the right to object to the other proposed excerpts pursuant to
Rule 401 and Rule 403 to the extent the government offers the excerpt at trial.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 12

relevance, the government stated that Mr. Biestek was involved in the "backdating" and Mr. Biestek is an uncharged co-conspirator in Count Eight of the Superseding Indictment. Putting aside our pending motion to dismiss the government's MSMB Capital theory as a legal impossibility, *see* Mr. Greebel's Mem. of Law in Supp. of the Mot. to Dismiss Count Seven of the Superseding Indictment, Dkt. 327, at 18-25, the government's response that Mr. Biestek was involved in the "backdating" and that Mr. Biestek is an uncharged co-conspirator does not make the FBI agent's question "What about Marek Biestek?" and Mr. Greebel's ambiguous answers relevant to either the "backdating" or Count Eight. Neither the question nor the answer make a fact of consequence relating to the backdating or Count Eight more or less likely. Indeed, the FBI agent did not ask a single question about the purported backdating, did not show Mr. Greebel any documents at all (including but not limited to the purported "backdating" emails, and did not ask questions about Count Eight (as Count Eight was not charged at the time). It is hard to imagine how the government can assert that Mr. Greebel's responses—years after the allegations at issue—to the question "What about Marek Biestek" is somehow relevant to the charges.

Third, to the extent the FBI agent was asking about the number of interactions or nature of the relationship with Mr. Biestek, it is entirely unreasonable for the government to offer the ambiguous response by Mr. Greebel to the FBI agent's ambiguous question as proof of anything. The meaning of Mr. Greebel's response that he had "nominal interactions" with Mr. Biestek is unclear and will create confusion for the jury; there will have to be a mini-trial about the meaning of "nominal." The meaning of Mr. Greebel's further response that "I never really had any direct interaction with him" is also unclear and will create confusion for the jury. The FBI agent does not follow up to question Mr. Greebel about the meaning of "direct" versus "indirect" interaction, or the meaning of "nominal."

In short, given that the FBI agent's question is ambiguous, and Mr. Greebel's responses are ambiguous, this Court should exclude the government's proposed excerpt beginning at 9:13:20 pursuant to Rule 401 and Rule 403.

### 17.   Mr. Greebel's Proposed Additional Statements for Context, Beginning at 9:13:35

We propose to add one final excerpt from near the end of Mr. Greebel's FBI interview, beginning at approximately 9:13:35. *See* Ex. C at 30-31. Here, when asked whether there is "anything else that [he] can think of during [his] time working with Martin Shkreli," Mr. Greebel reiterates that he is "still confused why I'm here." *Id.* at 30. The agent follows up with a question noting that Shkreli "didn't really offer too much up to you." *Id.* at 31. Mr. Greebel confirms, "I didn't have that kind of . . . interaction with him." *Id.*

The Honorable Kiyo A. Matsumoto
October 3, 2017
Page 13

Like our first proposed addition, this excerpt provides helpful context for the entire interview.  It is also relevant to establishing Mr. Greebel's consciousness of innocence:  he expresses genuine confusion both at the beginning and end of the two-hour interview as to why he is even being questioned.

*        *        *

For all these reasons, should the government seek to offer the proposed excerpts at trial and should the Court receive such excerpts in evidence, we respectfully submit that the Court admit the foregoing additional statements as "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion," *United States v. Klein*, 2017 WL 839765, at *2 (E.D.N.Y. Mar. 1, 2017), exclude two of the government's proposed statements, and ensure accurate transcriptions of all statements received into evidence.

Respectfully submitted,

Reed Brodsky

Enclosures

cc: Alixandra E. Smith, Esq. (by e-mail)
    David C. Pitluck, Esq. (by e-mail)
    David K. Kessler, Esq. (by e-mail)