

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMK/AES                                    *271 Cadman Plaza East*
F. #2014R00501                             *Brooklyn, New York 11201*


September 8, 2017

<u>By E-mail</u>
Reed Brodsky, Esq.
Winston Chan, Esq.
Jason Halperin, Esq.
Randy Mastro, Esq.
Lisa Rubin, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

       Re:   United States v. Evan Greebel
             <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Counsel:

       Attached please find a chart (titled Exhibit A) detailing (1) statements made by the defendant Evan Greebel in his post-arrest interview dated December 17, 2017, and (2) statements made by co-conspirator Martin Shkreli under oath before the Securities and Exchange Commission ("SEC") on August 7, 2013 and/or February 24, 2014, which the government may seek to introduce during its case-in-chief in the above-captioned matter.

       The government does not expect to seek to introduce in its case-in-chief any additional statements from the defendant's post-arrest interview, or from Shkreli's SEC testimony on October 12, 2011, August 7, 2013 and/or February 24, 2014, but may do so depending on arguments made or evidence introduced by the defendant during the government's case-in-chief.  In addition, the government may either introduce or refer to additional statements from the defendant's post-arrest interview or Shkreli's SEC testimony during the defense case and/or during the government's rebuttal case.  The inclusion of

statements on this chart does not constitute an admission by the government that such statements would be admissible at trial if sought to be introduced by the defendant.

Very truly yours,

BRIDGET M. ROHDE
Acting United States Attorney

By:     /s/_____
Alixandra E. Smith
David C. Pitluck
David K. Kessler
Assistant U.S. Attorneys
(718) 254-7000

Enclosure – Exhibit A

2

**EXHIBIT A – STATEMENTS FOR GOVERNMENT'S CASE-IN-CHIEF**

| Source | Citation | Text | |
|--------|----------|------|---|
| Greebel Post-Arrest Interview, December 17, 2015[1] | Excerpt begins at approximately 7:47:00 | Question: | How do you know Martin Shkreli? |
| | | Answer: | I was introduced to him circa Spring 2011. In connection with his desire to become an activist investor. And I had done a number of activist campaigns previously. Both attack and defense, primarily defense. And he wanted to become an activist investor. |
| | | Question: | Okay. And for which company did he want to become an activist investor for? |
| | | Answer: | Uh, I'm sorry, when you say… who did he want to attack? |
| | | Question: | Yeah. |
| | | Answer: | It was a company called SeraCare. It was a public company and I met him late May 2011. Did an analysis of SeraCare, and then I was flying to a wedding in mid-June and he reached out to me. He wanted to start the campaign. And I worked on the flight to the wedding and then when I got there, to write a quote-unquote letter to advise the board that he was interested in change in management, and that was the first time I represented MSMB. |
| | | Question: | So if I … trying to get it in my head correctly, so he, because you had done this before, he found you. |
| | | Answer: | Correct. |
| | | Question: | Okay. Do you know how he found you? Through the Internet? |
| | | Answer: | I do. No, no, no. I had a partner who knew one of his colleagues. And they had had a social interaction and she said, yes, we have people who do this. And I |

---

[1] For the post-arrest interview of the defendant, the government has identified the portions of the post-arrest video that it would seek to introduce by setting forth the text of those statements.  In the text, the questioner is the FBI agent and the answer is given by the defendant.  The timestamps provided are the timestamps displayed on the video itself during the interview.

| Source | Citation | Text |
|--------|----------|------|
| | | didn't, when I first met him, I did not realize that he was the head of the fund. There were two people in the room, I didn't know who was who. So I merely pitched the way I would pitch, you know, present my beliefs to any potential client. |
| | Question: | Okay. Who was the other person in the room? Do you remember? |
| | Answer: | Kevin Mulleady, I believe. |
| | Question: | Okay. So then you help him become an activist investor. Uh, that falls through with that company, right? |
| | Answer: | Mm-mm [*Shakes head no*]. |
| | Question: | Okay. So can you tell me about that a little bit. |
| | Answer: | Sure. So, we wrote the letter to SeraCare and it was sent in late June. Publicly filed with EDGAR, sec.gov, and within two weeks or so, they terminated management and they put the company up for auction. |
| | Question: | Okay. |
| | Answer: | And, we, or MSMB participated in the auction, did not ultimately prevail. The company ultimately sold, but I don't remember who the acquirer was. Shortly thereafter, that was how I, first was… |
| | Question: (7:49:54) | Yeah. That's how you first met him. So how, so that's who you first met him and became involved and you represented MSMB Capital? Or? |
| | Answer: | I don't know it was just. |
| | Question: | You don't know the entity? |
| | Answer: | It was a discrete engagement. |

| Source | Citation | Text | |
|--------|----------|------|--|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 7:52:10 | Question: | Okay. And you were representing the fund and not Martin personally? |
| | | Answer: | I've never represented Martin personally. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:02:20 | Question: | Okay. And Retrophin is obviously still a private company. |
| | | Answer: | Mhhm-hmm. |
| | | Question: | Is it an LLC or… |
| | | Answer: | It's an LLC. |
| | | Question: | Did you help change it into an LLC? |
| | | Answer: | No. |
| | | Question: | Did it start as a partnership or .. |
| | | Answer: | I was not present as counsel. To my understanding based on the documents, it was always an LLC. I didn't form it. I didn't create it. I didn't do its initial rounds of financing. I didn't do its initial cap table. I didn't do any of that stuff. I literally got all that given to me. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:09:26 | Question: | Were you aware at the time that he had a note attached to the shell? That he converted... |
| | | Answer: | Yeah. Mhhm-hmm. |
| | | Question: | Do you have any understanding what the note would be used for? Or … |
| | | Answer: | He told me the note was going to be used for quote-unquote I guess paying the employees. Paying people who were going to work for Retrophin for services they would be providing going forward. |

| Source | Citation | Text | |
|--------|----------|------|--|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:11:40 | Question: | Alright, so the next step in your timeline. |
| | | Answer: | I think some investors started complaining about the valuation they received. |
| | | Question: | Uh, so just unpack that a little bit I guess. So the investors being, the investors in the PIPE? |
| | | Answer: | No. Historic investors who were… |
| | | Question: | MSMB investors? |
| | | Answer: | No, no. I have no insight on that. |
| | | Question: | Okay I don't want to put any words in your mouth. What investors? |
| | | Answer: | Retrophin investors. Who were there … |
| | | Question: | At the beginning? |
| | | Answer: | I don't know. I have no clue on that but who were on the cap table. |
| | | Question: | Okay, Retrophin, correct me if I'm wrong. So you get a cap table and you see Joe Smith has a thousand shares— a thousand units, or whatever it was. So now Joe Smith or whatever I said his name was in the first place is complaining that he thought his thing would be worth or he thought he was getting this many shares and he was only getting this many shares or he thought they were going to be worth $100,000 and they're only worth $50,000 so that, is that what you mean by they're complaining or, about the cap table basically. [*Greebel shakes head yes*] And what is your role in these complaints, I guess? Or how does, does Martin rope you in? |
| | | Answer: | No. I'm told whatever their agreed resolution is. I don't negotiate anything. I'm just told; this is their agreed resolution. |
| | | Question: | And was that, did you know was that cash or shares or… |

| Source | Citation | Text |
|--------|----------|------|
| | | Answer: Different. |
| | | Question: So this was, Retrophin's public now. So he, I'm just trying to understand without putting any of my words in your mouth. So, Martin comes to you and says Joe's complaining about his— the cap table and how he was compensated or you know, whatever it is. We've agreed that he's going to get this amount of money or this amount of shares. And then what is your role? Do you review the documents? Or— |
| | | Answer: I worked with people to write them up. |
| | | Question: Okay. Were these the settlement agreements? |
| | | Answer: Mhhm-hmm. |
| | | Question: Okay. Do you know approximately how many people complained? Or was it 100% of the investors or… |
| | | Answer: No, it was a small… |
| | | Question: One percent? |
| | | Answer: It was a small fraction. That's why the decision was made to settle with them than to fight with them. |
| | | Question: Alright. So, Martin comes to you and says he'll settle for a thousand shares or something like that and then, does he bring the settlement agreement to you and say this is what I'm thinking, can you review it? |
| | | Answer: No. He tells me the terms and tells me to write it up. |
| | | Question: Okay. So, I'm just trying to think of terms that would be in, so, he would get paid this much over the quarters? Or is it a lump sum? Was it different in each case? |

| Source | Citation | Text | |
|---|---|---|---|
| | | Answer: | I don't believe anyone had a protracted payment settlement, so lump sums. I don't recall, but I don't have them in front of me. You— you do. |
| | | Question: | I don't have them here. But, okay. So then, you go through these settlement agreements. You don't— the only thing you know about these people is that they are on the cap table. |
| | | Answer: | Mhhm-hmm. |
| | | Question: | That's the only thing you know them from. Do you have an understanding of who they are now? I'm just trying to understand different— whether you knew something different then or— not. To this date, you just know them from the… |
| | | Answer: (8:15:13) | They were just people on the cap. |
| | | Question: | Do you have any knowledge of the MSMB investors? |
| | | Answer: | Not at the time. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:17:50 | Question: | Yeah. I mean it's more of an accountant's … I'm just trying to understand if you're wearing more than one hat or if you're, if, what your role is cause it's such a small company at the time. |
| | | Answer: | My role was not significant. |
| | | Question: | Okay. With the Q's and K's? |
| | | Answer: | I didn't have anything to do with the Q's and K's. |

6

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:21:25 | Question: | No—and do you know who's on the board at this point? |
| | | Answer: | Steve Richardson, Steve Aselage, and Martin. |
| | | Question: | And for the board meetings do you take notes as the outside counsel? [*Greebel shakes his head yes*] Alright so when does the 10K get approved? Or the first kind of filing with substance? |
| | | Answer: | I don't know when the Q was done. The 10-K I believe in done in September. |
| | | Question: | Was there a meeting before the K was filed to approve the K? |
| | | Answer: | There was—there was a meeting. |
| | | Question: | A board meeting? |
| | | Answer: | A board meeting first to review settlement agreements that we talked about because Marcum felt for GAAP purposes that they should not be a Retrophin liability. That was a GAAP interpretation and so— what Marcum recommended and the board approved was that MSMB indemnify the company for the value of those settlement agreements. |

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | | Question: | And then the outside counsel—or the general counsel, I'm sorry. Do you remember who that was? |
| | | Answer: | Meg. Something. She's still there I don't know her name. |
| | | Question: | Okay. Did you ever meet her? |
| | | Answer: | No. |
| | | Question: | Just on the phone or… |
| | | Answer: | Yeah. |
| | | Question: | She's hired in late June? |
| | | Answer: | I don't know. They never—I was never told she was even hired. She was a consultant. So I—it was never disclosed, so I have no idea of what's going on. What her role is, or is not. |

| Source | Citation | Text | |
|--------|----------|------|--|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:42:00 | Question: (8:42:00) | Alright so we're in September. Martin—can you just walk me through what happened with Martin? Or how you came to know? |
| | | Answer: | I don't know if he called me, if she called one of my colleagues or—I don't remember how she, being the general counsel. I don't remember how we learned about it, but we learned that the board had decided to terminate him. It was not clear to us who—who was the proper person in that context to be making that decision. He said he wants to stay at the company. He's still a board member. And he, you know, asks us to look at ways to change the board composition. He ultimately determined not to go forward with that. And then, I'm pretty much out of the picture at that point. |
| | | Question: | Okay. So he was put on leave, right? |
| | | Answer: | I have nothing to do with this. I only know what I read in the papers and in the filings. |
| | | Question: | So when do you stop representing Retrophin? |
| | | Answer: | We get a notice of suspension—like, two weeks later. |

| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:43:26 | Question: | So were you involved with Martin's employment agreement, being… |
| | | Answer: | Only on behalf of the company. The company asked me to prepare the conversations between him and Steve Richardson, who acted as the board spokesman. |
| | | Question: | So late in the game… |
| | | Answer: | I—I—I don't know. I don't know when—I was given terms. I don't know—I was just given terms and then asked to circulate to the board, which is what I did—I circulated to the board via email deliberately so they could have their own time on it and engage me without Martin. |
| | | Question: | When are we talking about here? |
| | | Answer: | November—October-November—late October, early November, 2013. Before the uplisting. |
| | | Question: | Okay. Is that when Martin's employment agreement is drafted? |
| | | Answer: | Mhhm-hmm. |
| | | Question: | Okay. |
| | | Answer: | There may have been a prior one in place before me, which I think it was cloned against. I think the basic agreement between them was take the old one, update the comp terms. |
| | | Question: | Okay. So you were involved basically to just update—you were given a template and you updated it for Martin's employment—I'm just asking because—I don't know if you remember but—I think he could only be fired if he was convicted of a felony. |
| | | Answer: | Mhhm-hmm. |

| Source | Citation | Text | |
|---|---|---|---|
| | | Question: | Is that normal? |
| | | Answer: | I have no view on that. |
| | | Question: | Okay I just—I didn't know how often you worked with employment contracts but… |
| | | Answer: | I have no clue—I don't, but I think they run the gamut. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:46:22 | Question: | Okay. And then, so—October 14th, you're kind of done. When—do you continue to talk to Martin sporadically because I know you guys had a relationship on different deals for different companies before. Or is he… |
| | | Answer: | Again, I represent companies. I don't represent… |

| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:49:00 | Question: | Okay, so can you just tell me about the settlement agreements. |
| | | Answer: | Sure. |
| | | Question: | When they first start? |
| | | Answer: | Sure. So Retrophin when it goes public has virtually no money. Literally $10,000, literally no money. Martin needs help, so Martin decides to hire people via consulting agreements who can be helpful to help the company grow. So we start preparing consulting agreements for these people. |
| | | Question: (8:49:31) | And this is right when Retrophin starts? |
| | | Answer: | Yes. |
| | | Question: | Just trying to keep— |
| | | Answer: | Not when it starts. |
| | | Question: | I mean, when it goes public. |
| | | Answer: | Exactly. |
| | | Question: | Sorry just trying to keep… |
| | | Answer: | So, some of these people had also been employed by MSMB previously. |
| | | Question: | Do you know any names? |
| | | Answer: | Andy Vaino, for example. |
| | | Question: | Okay. Yeah. |
| | | Answer: | Was at MSMB. And they were-there was a sensitivity that they had—at this point, MSMB was one of the largest stockholders of Retrophin. And there was |

12

|  |  |  | a concern that they would have some of the claims against any of these parties. So as would be customary in that context, you get a release in the agreement, so they're not getting paid by Brother A and suing Brother B simultaneously. It's not an uncommon concept. |
|  |  | Question: | Alright, just to explain that to me. This is one of those things that—I know you said you take it for granted that I know a lot of things but—so, let's just take Andy Vaino for example, or anyone that works for MSMB. So we bring him over as a consultant to kind of save on cash, because you said they have no cash, so pay him in shares. |
|  |  | Answer: | A combination of cash and stock. He was an employee. He was not full time; he was part time. |
|  |  | Question: | And then—I'm just so, explain to me again about Brother A suing Brother B. So Brother A would be MSMB and Brother B would be Retrophin but— |
|  |  | Answer: | —The concern would be |
|  |  | Question: | Just trying to understand— |
|  |  | Answer: | —The concern would be if they historically have a relationship with MSMB that they would have some claims for what—that I don't even know about. That there was some historical claim that I'm not even aware of. |
|  |  | Question: | So—I'm just trying to give an example that… |
|  |  | Answer: | Not paid full salary. |
|  |  | Question: | At MSMB… |
|  |  | Answer: | Mhhm-hmm. |
|  |  | Question: | And then they come here and they say you owe me for my time there. Okay. I understand. Okay. So those consulting agreements start pretty much when Retrophin goes public. |

| Source | Citation | Text | |
|--------|----------|------|------|
| | | Answer: | And the board provides Martin with plenary authority to hire employees and consultants other than executive officers, which require board approval. A standard thing to do for a CEO of a company. Giving them authority to— hire the people. It's not uncommon. |
| | | Question: | So the board gave authority to the CEO, Martin Shkreli, to hire consultants. Was there any sort of cap on the number of shares or money or anything like that? |
| | | Answer: | No. Just not executive officers, whatever that—would imagine in the broad context. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:59:18 | Answer: | There were a variety of consultants being brought in. All people from management consultants to help him run a business to PR consultants to acquisition consultants to disease-related consultants. A wide gamut of people. |
| | | Question: | How many consultants are you thinking? |
| | | Answer: | Professors, PhD's. No idea. I couldn't even give you a ballpark. |
| | | Question: | I just didn't know if it was ten or a hundred or … |
| | | Answer: | There was—literally there's a form. There's a form agreement and I populate it by name. It was—this was how his business was going to be operated for the near term because there was no cash, so it was bring people in on an as-needed basis. |

| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 9:00:17 | Question: | Are there any consulting agreements that stand out to you? |
|---|---|---|---|
| | | Answer: | Oh sure. There's a whole litany that stand out. Because we would be dealing with people from well-known college professors to top medical professionals to you know—people that were known to Martin and in that—and in cases… In two particular cases. actually that's not true. In at least three to four particular cases, I said I wanted board consent for them. Because I thought given the situation, I thought it was important for the board to review them, because I thought they were personal contacts, not necessarily professional contacts. |
| | | Question: | Okay. Do you remember any of the people who were personal contacts? |
| | | Answer: | Sure. Al Geller and Ken Banta are the first who come to mind. |
| | | Question: | And were they… |
| | | Answer: | And Darren Blanton also. |
| | | Question: | And when you say personal. was it like… I'm just wondering the extent of their relationship. Was it friends of his, or … |
| | | Answer: | I have no view. I don't know who his friends are or are not. I just got the sense from them that there was—that they had prior relationships with him. |
| | | Question: | Okay. So it wasn't just a professor they were calling… |
| | | Answer: | Exactly. |
| | | Question: (9:01:39) | So a referral from Martin or an introduction at least… I'm just wondering—I'm trying to put the two people you listed into a separate box from the professors maybe that—oh it's a great college. He works on these drugs… let's see if he'll be interested in consulting for us. Whereas there's some people you said you felt, you know, a little differently about. Where these are acquaintances of Martin from prior, not just some guy who has an Internet page on something. |

15

| | | | |
|---|---|---|---|
| | | Answer: | Yes. |
| | | Question: | Alright. So those people you mentioned. You brought their consulting agreements to the board? And they were approved by the board? |
| | | Answer: | [*Shakes his head yes*] |
| | | Question: | Did you have any understanding, I mean, I think we just went through this and you said no, but do you have any understanding of their relationship prior with any of those three or with any of the— |
| | | Answer: | —So Al was an investor—Al was on the cap table. I don't know what his prior relationship was or was not. Because I'd never heard that from Martin and I don't recall if I'd ever had heard that anywhere else. I knew his brother had been an investor at multiple levels so I don't know if he was also. But again, that was why I said that required board approval. |
| | | Question: | Okay. and then, so that's Al. So you mentioned Ken Banta. Do you have an understanding of what his relationship was? |
| | | Answer: | Other than—similar to Al he'd been on the cap table. He was a person I'd met previously at—I don't even remember even where I met him. Then I knew that the board members knew him, so I thought it was important to have it properly vetted. |
| | | Question: | So he knew the board members too? |
| | | Answer: | Mhmm-hmm. |
| | | Question: | And then a third person you mentioned… |
| | | Answer: | Darren Blanton. |

| Source | Citation | Text | |
|---|---|---|---|
| | | Question: | Did you have an understanding of how Martin knew him? |
| | | Answer: | I don't have an understanding. I know they have a complicated history. I know that I previously stripped him of his shares. That he was offered so—he was apparently the person who had been involved in the formation of Retrophin. He had been allocated stock based on the records that I was given. He never signed the documentation to accept the stock. So I sent him a letter stripping him of those shares which to me meant that he might have had some valid claim against the company. So when the company was bringing him as a consultant, that was not uncommon—not uncommon or unwise—but I also thought it required board consent, which I told Martin repeatedly. He did not get it. He didn't need it, because he had the plenary authority. But I recommended on multiple occasions to get board consent. And he was slated at the board meeting, his agreement had been circulated to the board so it was slated at the board meeting to be discussed. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 9:13:20 | Question: | Um, what about Marek Biestek? |
| | | Answer: | I had nominal interactions with him. He was an employee of the company. He was the co-founder of the MSMB Capital. I never really had any direct interaction with him. |
| 5/15/2012 Merrill Lynch Testimony | Page 14, Lines 14-23 | • Q. Why did you leave Intrepid after a year?<br>• A. I left Intrepid to launch my own hedge fund, Elea Capital.<br>• Q. That's E-L-E-A?<br>• A. Yes.<br>• Q. When did you start operating Elea Capital?<br>• A. March 1, 2006 was the first day.<br>• Q. For what period of time did you continue to operate Elea Capital?<br>• A. Approximately a year and a half. | |

| Source | Citation | Text |
|---|---|---|
| 5/15/2012 Merrill Lynch Testimony | Page 15, Line 14 to Page 16, Line 7 | <ul><li>Q. Were the investment results of Elea Capital favorable or unfavorable?</li><li>A. Unfavorable.</li><li>Q. Unfavorable in what respect? How did it perform?</li><li>A. The investors lost their entire principal.</li><li>Q. Was that due to one particular trade?</li><li>A. Yes.</li><li>Q. And did the firm shut down as a result of that loss?</li><li>A. Yes.</li><li>Q. And what was the nature of the trade that caused the loss of the investors' principal?</li><li>A. It was a loss that resulted in greater losses than the firm had in assets.</li></ul> |
| 5/15/2012 Merrill Lynch Testimony | Page 27, Lines 7-8 | <ul><li>Q. When did you start MSMB Capital?</li><li>A. The middle of 2009.</li></ul> |

18

| Source | Citation | Text |
|---|---|---|
| 5/15/2012 Merrill Lynch Testimony | Page 37, Line 3 to Page 38, Line 15 | • Q.  There's a document that you're familiar with called a private offering memorandum for MSMB Capital Management LP?<br>• A.  Yes.<br>• Q.  And who prepared that document?<br>• A.  I prepared that document.<br>• Q.  How did you go about preparing it?<br>• A.  I used the private placement memorandum that was furnished to me by my law firm when I created Elea Capital.<br>• Q.  So a law firm had prepared the Elea Capital offering memo and you used that as a template.<br>• A.  Correct.<br>• Q.  What law firm had prepared the Elea Capital offering memo?<br>• A.  It was a law firm called Cobb & Eisenberg at the time.<br>• Q.  But Cobb & Eisenberg did not have any involvement or participation in the preparation of the MSMB offering memo?<br>• A.  I can't recall. I don't think so though.<br>• Q.  Did the Cobb law firm ever provide any legal representation to MSMB, that you are aware of?<br>• A.  No.<br>• Q.  Did MSMB, at any time from the time of its formation in 2009 through February of 2011 – let's focus on that period – at any time in that period did MSMB engage the services of any auditors or CPAs?<br>• A.  I don't know.<br>• Q.  Did Rothstein Kass ever do any work for MSMB?<br>• A.  How do you define "do any work"?<br>• Q.  Did they perform any services for which MSMB paid them?<br>• A.  No. Specifically related to MSMB Capital Management LP. No. |
| 5/15/2012 Merrill Lynch Testimony | Page 45, Lines 15-22 | • Q.  Are you familiar with an entity called NAV Consulting?<br>• A.  Yes.<br>• Q.  What is NAV Consulting?<br>• A.  They are a third-party administrator.<br>• Q.  Has NAV Consulting ever performed any services for MSMB Capital Management LP?<br>• A.  Not to my recollection, no. |

| Source | Citation | Text |
|---|---|---|
| 5/15/2012 Merrill Lynch Testimony | Page 72, Line 24 to Page 73, Line 15 | <ul><li>Q.  During 2010 and the first couple of months of 2011, did MSMB maintain any – any kind of software systems that would – that enabled you as a portfolio manager to track the status and performance of MSMB's portfolio?</li><li>A.  Yes.</li><li>Q.  What systems did MSMB maintain along those lines?</li><li>A.  Microsoft Excel spreadsheets.</li><li>Q.  And what were the nature of those spreadsheets that – was there anything else besides Microsoft Excel spreadsheets in place?</li><li>A.  No. Not that I can recall.</li><li>Q.  Who created these Microsoft Excel spreadsheets?</li><li>A.  Me and me alone.</li></ul> |
| 5/15/2012 Merrill Lynch Testimony | Page 74, Line 24 to Page 75, Line 14 | <ul><li>Q.  Did MSMB ever send out periodic reports to its investors in the form of, for example but not exclusively limited to, quarterly letters or annual letters?</li><li>A.  Yes.</li><li>Q.  And did it do that during 2010 and 2011?</li><li>A.  To the best of my recollection, yes.</li><li>Q.  And was there a particular frequency with which the letters were sent out? IN other words, was there a monthly "letter," a quarterly letter, or anything like that?</li><li>A.  Monthly.</li><li>Q.  Monthly letter, okay. And who prepared those letters?</li><li>A.  I and I alone.</li></ul> |
| 5/15/2012 Merrill Lynch Testimony | Page 146, Lines 20-23 | <ul><li>Q.  You said that you and you alone were placing these trades in OREX securities on February 1, 2011. Correct?</li><li>A.  Yes.</li></ul> |
| 08/17/2013 SEC Trial Transcript | Page 17, Lines 18-21 | <ul><li>Q.  And were you primarily responsible for locating investors [for MSMB Capital Management LP]?</li><li>A.  I'd say 100 percent of those investors were related to my relationships and not anyone else's.</li></ul> |

| Source | Citation | Text |
|---|---|---|
| 08/17/2013 SEC Trial Transcript | Page 18, Lines 2-25 | <ul><li>Q. Mr. Shkreli, I'm handing you what's been marked as Exhibit Number 5, which purports to be a Confidential Offering Memorandum of Limited Partnership Interest in MSMB Capital Management LP. Have you seen this document before?</li><li>A. Yes.</li><li>Q.  Who prepared this document?</li><li>Myself.</li><li>Q.  Was counsel involved in preparing this document?</li><li>Any counsel or present counsel?</li><li>Q.  Any counsel.</li><li>A.  Well, this document was basically a marked version of the PPM of my first hedge fund, Elea Partners, so no counsel prepared this specific document.  Certainly counsel prepared the prior document. I can identify that counsel if you like.</li><li>Q.  Sure.  Who identified the Elea Capital PPM – who prepared it, I'm sorry?</li><li>A.  A law firm called Cobb and Eisenberg prepared that document, and this document was generated by, in sum and substance, replacing the words of some – changing some of the words by myself and myself alone.</li></ul> |
| 08/17/2013 SEC Trial Transcript | Page 20, Lines 10-11 | <ul><li>Q.  Each of the investors received [the Confidential Offering Memorandum of Limited Partnership Interest in MSMB Capital Management LP] before they invested?</li><li>A.  Yes, definitely.</li></ul> |
| 08/17/2013 SEC Trial Transcript | Page 105, Line 21 to Page 106, Line 8 | <ul><li>Q. Mr. Shkreli, were you the only person at MSMB who traded OREX that day?</li><li>A.  Yes.</li><li>Q.  And I think you said that you thought Mr. Biestek came into the office at about 10 is your recollection?</li><li>A.  That's correct.</li><li>Q.  Was there anyone else who was in the MSMB office that day?</li><li>A.  Yes.</li><li>Q.  Who was that?</li><li>A.  We had two other coworkers at the time.  One was named Andre Logan and one was named Caroline Stuart.</li></ul> |
| 08/17/2013 SEC Trial Transcript | Page 172, Lines 15-19 | <ul><li>Q.  We are referring to Mr. Austin's investments, Mr. Shkreli.  Did you ever have trading discretion over any of his money?</li><li>A.  No, not specifically, no.</li></ul> |

| Source | Citation | Text |
|---|---|---|
| 08/17/2013 SEC Trial Transcript | Page 178, Lines 18-22 | • Q.  So what was the maximum asset value for MSMB Capital Management or do you know what it was in December of 2010?<br>• A.  I don't, but the fund was never more than 3 million or so. |
| 08/17/2013 SEC Trial Transcript | Page 188, Line 21 to Page 189, Line 1 | • Did Rothstein Kass ever do any work for MSMB Capital Management LP?<br>• A.  No.<br>• Q.  And did NAV Consulting ever do any work for MSMB Capital Management LP?<br>• A.  No. |
| 08/17/2013 SEC Trial Transcript | Page 194, Lines 5-17 | • Q.  Did you inform the limited partners of MSMB [Capital Management] LP that you were not going to retain an auditor?<br>• A.  I don't remember if I gave out an official statement to all the partners or something like this, but I believe they were all aware of that, that that was going to be the case.<br>• Q.  What's the basis for your belief that they were aware of that?<br>• A.  I think conversations with the limited partners.  There are only seven or eight of them, nine of them.<br>• Q.  Conversations that you had with them?<br>• A.  Yes. |
| 08/17/2013 SEC Trial Transcript | Page 205, Line 16 to Page 206, Line 9 | • Q.  Mr. Shkreli, I'm handing you an exhibit which has been marked as Exhibit 20, which is a collection of e-mails.  Actually, they bear the Bates numbers MSMB 1 through 91, although they have been reorganized so that they're organized by customer and chronologically.  I think they all bear the subject matter:  MSMB Capital Management LP performance estimate or MSMB performance estimate.  Have you had a chance to look through those?<br>• A.  Yes.<br>• Q.  Did you write these?<br>• A.  Yes, I wrote all of these.<br>• Q.  What are they?<br>• A.  They were my attempt to keep the investors apprised of their account values and the performance of the hedge fund.<br>• Q.  Did you perform the calculations yourself or did you have someone else do it?<br>• A.  Yeah, I did it all by myself. |
| 08/17/2013 SEC Trial Transcript | Page 209, Lines 13-17 | • Q.  Did you speak to any other investors [in addition to Darren Blanton] to discuss the trading losses on February 2nd?<br>• A.  Yes.<br>• Q.  Who else?<br>• A.  I would say all of them. |

| Source | Citation | Text |
|---|---|---|
| 08/17/2013 SEC Trial Transcript | Page 214, Lines 11-17 | <ul><li>Q.   After February 2, 2011, did you continue to trade stocks for the hedge fund?</li><li>A.   For that hedge fund, MSMB Capital Management LP?</li><li>Q.   Yes.</li><li>A.   The answer is no.  I focused on Retrophin, growing Retrophin, taking it public.</li></ul> |
| 02/24/14 SEC Trial Transcript | Page 247, Line 12 to Page 248, Line 15 | <ul><li>Q.     Was there a reason you started a new hedge fund at the time you started MSMB Healthcare rather than simply soliciting new investors for MSMB Capital Management?</li><li>A.     Sure, the MSMB Capital Management LP was the subject of a potential litigation with Merrill Lynch which was subsequently settled and paid and a new fund entity would not have any liability associated with that specific litigation.</li><li>Q.     What is MSMB Healthcare's current status?</li><li>A.     The fund has distributed it's capital to its limited partners with a resounding success and will be distributing its final distribution after the repayment of the loan that's the subject of some of today's discussion in the next few weeks and that a fund will be sort of more appropriately wound down and dissolved but for all intents and purposes it hasn't operated in a manner worthy of the term "operation" in over a year.  It's just been a holding company, the only asset it has remaining is the personal loan to myself.</li><li>Q.     So it's no longer trading.  Is that correct?</li><li>A.     It hasn't traded in well over a year.</li><li>Q.     Other than the loan you mentioned which we'll get into, when were the other assets of the fund distributed?</li><li>A.     They were distributed shortly after Retrophin's public listing which was on December 12, 2012, 12/12/12, and that marked sort of the liquidity of that investment and shares were distributed pro rata to the limited partners and really that was it as far as I recall.</li></ul> |

| Source | Citation | Text |
|---|---|---|
| 02/24/14 SEC Trial Transcript | Page 255, Line 7 to Page 256, Line 5 | • Q.    You mentioned a personal loan, why don't you describe that for me.<br>• A.    Sure, it was a loan of $775,000, it was made to me personally but it was really not -- it didn't have to be a personal loan, at the end of the day this was a loan to satisfy a settlement on a related entity and it beared a ten percent interest.  I recall discussing the loan with one of my partners, Marek Biestek, who I believe this Commission is aware of.  The loan is soon to be paid back, sort of a function of my own personal liquidity which is just freed up and the type of loan as it was described was to complete a settlement payment which after the repayment of this loan I almost completely paid myself which is something I didn't have to do, this was a loss suffered by a fund, MSMB Capital Management LP.  As I mentioned after the next few weeks are done, Mr. Biestek and myself will pay 100 percent of the fund's losses personally.<br>• Q.    When was -- was this loan documented?<br>• A.    It's a great question.  We certainly spent time thinking about how to transact this loan and we did the best we could to document it.  As you know, we had not produced documentation of the loan.  I remember attempting to document this loan, we did our best to try to do that. We have been unable to produce any such documentation. |
| 02/24/14 SEC Trial Transcript | Page 256, Lines 15-19 | • Q    Where did you -- you say you drafted the [personal] loan [from MSMB Healthcare] personally?<br>• A    I did.<br>• Q    Was counsel involved?<br>• A    No. |
| 02/24/14 SEC Trial Transcript | Page 260, Lines 2-4 | • Q.    Did you make any written disclosure [of the personal loan from MSMB Healthcare] to the limited partners?<br>• A.    No. |
| 02/24/14 SEC Trial Transcript | Pages 260, Lines 20 -22 | • Q.    Did you consult with counsel concerning whether you should make disclosure [of the personal loan from MSMB Healthcare] to limited partners?<br>• A.    No. |

| Source | Citation | Text |
|---|---|---|
| 02/24/14 SEC Trial Transcript | Page 261, Line 22 to Page 262, Line 16 | • Q.   You said earlier that but for that personal loan the assets of the MSMB Healthcare fund have been distributed pro rata to the limited partners.<br>• A.   Correct.<br>• Q.   When was that?<br>• A.   As I mentioned earlier in testimony, it was either on or about December 12, 2012 or shortly thereafter, within say weeks, months.<br>• Q.   The distribution was in the form of shares of Retrophin?<br>• A.   Correct.<br>• Q.   What was the valuation placed on the amount of shares that were distributed?<br>• A.   There was no specific valuation because the number of shares were simply shares and the stock itself would -- that was the point of sort of doing this, the stock would be the vehicle for my continuing activities and daily liquidity, a stock price you could look up any minute.  The stock price at the time was $3 a share, today the stock price is almost $20 per share. |
| 02/24/14 SEC Trial Transcript | Page 265, Lines 2-9 | • Q.   [D]id you read through this private offering memorandum to make sure that it was accurate with respect to MSMB Healthcare?<br>• A.   I did.<br>• Q.   Did you have any counsel review this document before you distributed it?<br>• A.   I can't remember, probably not, at least initially. |
| 02/24/14 SEC Trial Transcript | Page 266, Line 18 to Page 267, Line 4 | • Q.   Did you revise this document in order to use it for an offering of MSMB Healthcare interests?<br>• A.   Yes.<br>• Q.   Did anyone else participate in revising the document?<br>• A.   No.<br>• Q.   As part of that process, did you read through the document to make sure that it was appropriate for MSMB Healthcare?<br>• A.   Yes.<br>• Q   Did anyone else review it?<br>• A.   I don't think so. |

| Source | Citation | Text |
|--------|----------|------|
| 02/24/14 SEC Trial Transcript | Page 272, Line 20 to Page 273, Line 6 | • Q.    If you look at Section 1 of this [settlement] agreement [with Merrill Lynch], it refers to an additional payment by the MSMB parties of $125,000 and Section 2 provides that the extension upon the payment of that additional amount of the due date from the original date of December 15, 2012 to a new due date of March 1, 2013.  What was the purpose of this agreement?<br>• A.    It was to facilitate more time to make the settlement payments.<br>• Q.    So was -- am I correct that you were unable to make payments, the payment due to Merrill Lynch prior to December 31, 2012.  Is that right?<br>• A.    Correct. |
| 02/24/14 SEC Trial Transcript | Page 285, Lines 15-17 | • Q.    Who authorized the payment of $775,000 by MSMB Healthcare to Merrill Lynch?<br>• A.    I did. |
| 02/24/14 SEC Trial Transcript | Page 301, Lines 13-22 | • Q    Mr. Shkreli, let me hand you what previously has been marked as Exhibit No. 32.  These are copies of monthly account statements from MSMB Capital Management's bank account at J.P. Morgan Chase I think starting in September of 2009 and going through July 2011.  Have you ever seen these documents before?<br>• A    Absolutely.<br>• Q    Let me ask you, who had signatory privileges on this account?<br>• A    Myself and myself alone. |
| 02/24/14 SEC Trial Transcript | Page 381, Lines 4-16 | • Q.  Did the factual content [in the Desert Gateway Form 8-K dated December 12, 2012] about Retrophin come from you?<br>• A.  I wouldn't even go that far, I think it probably came from some of my colleagues, I might written some of it but at that point Retrophin was already starting to grow as a company and we had some people who wrote some of the technical information.  I certainly could have written it and probably did write some of it.<br>• Q    When you say some of your colleagues, who are you referring to?<br>• A    Andrew V[a]ino, Marek Biestek and others.  I absolutely probably wrote some of the technical information in here. |
| 02/24/14 SEC Trial Transcript | Page 390, Lines 10-13 | • Q.  Would there have been enough cash if everybody [in the MSMB funds] had elected for cash [in September 2012]?<br>• A.  No. |

| Source | Citation | Text |
|---|---|---|
| 02/24/14 SEC Trial Transcript | Page 412, Lines | <ul><li>Q.   After the date of the September 2012 e-mail and letter you sent out, did you redeem LP interests in MSMB Capital Management for Retrophin shares with limited partners?</li><li>A.  Yes.  As soon as Retrophin went public or shortly thereafter we -- every MSMB entity, both MSMB entities, every one was redeemed for shares and then basically I think the way we looked at it from there was we'd let the market determine sort of what the value of their ownership was.</li><li>Q.   When you say it was redeemed for shares, you mean there was a distribution of shares to them?</li><li>A   Correct.</li><li>Q   Did anyone take a cash payout?</li><li>A   As far as I can remember, no one asked for a cash payout.</li></ul> |