# **EXHIBIT C**

**STATEMENTS FOR GOVERNMENT'S CASE-IN-CHIEF (revised 9/28/2017)**

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015[1] | Excerpt begins at approximately 7:47:00 | Question: | How do you know Martin Shkreli? |
| | | Answer: | I was introduced to him circa Spring 2011. In connection with his desire to become an activist investor. And I had done a number of activist campaigns previously. Both attack and defense, primarily defense. And he wanted to become an activist investor. |
| | | Question: | Okay. And for which company did he want to become an activist investor for? |
| | | Answer: | Uh, I'm sorry, when you say… who did he want to attack? |
| | | Question: | Yeah. |
| | | Answer: | It was a company called SeraCare. It was a public company and I met him late May 2011. Did an analysis of SeraCare, and then I was flying to a wedding in mid-June and he reached out to me. He wanted to start the campaign. And I worked on the flight to the wedding and then when I got there, to write a quote-unquote letter to advise the board that he was interested in change in management, and that was the first time I represented MSMB. |
| | | Question: | So if I … trying to get it in my head correctly, so he, because you had done this before, he found you. |
| | | Answer: | Correct. |
| | | Question: | Okay. Do you know how he found you? Through the Internet? |
| | | Answer: | I do. No, no, no. I had a partner who knew one of his colleagues. And they had had a social interaction and she said, yes, we have people who do this. And I |

---

[1] For the post-arrest interview of the defendant, the government has identified the portions of the post-arrest video that it would seek to introduce by setting forth the text of those statements. In the text, the questioner is the FBI agent and the answer is given by the defendant. The timestamps provided are the timestamps displayed on the video itself during the interview.

1

| Source | Citation | Text | | |
|---|---|---|---|---|
| | | | didn't, when I first met him, I did not realize that he was the head of the fund. There were two people in the room, I didn't know who was who. So I merely pitched the way I would pitch, you know, present my beliefs to any potential client. |
| | | Question: | Okay. Who was the other person in the room? Do you remember? |
| | | Answer: | Kevin Mulleady, I believe. |
| | | Question: | Okay. So then you help him become an activist investor. Uh, that falls through with that company, right? |
| | | Answer: | Mm-mm [*Shakes head no*]. |
| | | Question: | Okay. So can you tell me about that a little bit. |
| | | Answer: | Sure. So, we wrote the letter to SeraCare and it was sent in late June. Publicly filed with EDGAR, sec.gov, and within two weeks or so, they terminated management and they put the company up for auction. |
| | | Question: | Okay. |
| | | Answer: | And, we, or MSMB participated in the auction, did not ultimately prevail. The company ultimately sold, but I don't remember who the acquirer was. Shortly thereafter, that was how I, first was… |
| | | Question: (7:49:54) | Yeah. That's how you first met him. So how, so that's who you first met him and became involved and you represented MSMB Capital? Or? |
| | | Answer: | I don't know it was just. |
| | | Question: | You don't know the entity? |
| | | Answer: | It was a discrete engagement. |

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 7:52:10 | Question: | Okay. And you were representing the fund and not Martin personally? |
| | | Answer: | I've never represented Martin personally. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:02:04 | Question: | Okay, so then why don't— I guess the next step, uh. What was the next step after that meeting? |
| | | Answer: | We get engaged by Retrophin for general corporate matters. |
| | | Question: | Okay. And Retrophin is obviously still a private company. |
| | | Answer: | Mhhm-hmm. |
| | | Question: | Is it an LLC or… |
| | | Answer: | It's an LLC. |
| | | Question: | Did you help change it into an LLC? |
| | | Answer: | No. |
| | | Question: | Did it start as a partnership or .. |
| | | Answer: | I was not present as counsel. To my understanding based on the documents, it was always an LLC. I didn't form it. I didn't create it. I didn't do its initial rounds of financing. I didn't do its initial cap table. I didn't do any of that stuff. I literally got all that given to me. |

3

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:09:26 | Question: | Were you aware at the time that he had a note attached to the shell? That he converted... |
| | | Answer: | Yeah. Mhhm-hmm. |
| | | Question: | Do you have any understanding what the note would be used for? Or … |
| | | Answer: | He told me the note was going to be used for quote-unquote I guess paying the employees. Paying people who were going to work for Retrophin for services they would be providing going forward. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:11:40 | Question: | Alright, so the next step in your timeline. |
| | | Answer: | I think some investors started complaining about the valuation they received. |
| | | Question: | Uh, so just unpack that a little bit I guess. So the investors being, the investors in the PIPE? |
| | | Answer: | No. Historic investors who were… |
| | | Question: | MSMB investors? |
| | | Answer: | No, no. I have no insight on that. |
| | | Question: | Okay I don't want to put any words in your mouth. What investors? |
| | | Answer: | Retrophin investors. Who were there … |
| | | Question: | At the beginning? |
| | | Answer: | I don't know. I have no clue on that but who were on the cap table. |
| | | Question: | Okay, Retrophin, correct me if I'm wrong. So you get a cap table and you see Joe Smith has a thousand shares— a thousand units, or whatever it was. So now Joe Smith or whatever I said his name was in the first place is |

| Source | Citation | Text | |
|---|---|---|---|
| | | | complaining that he thought his thing would be worth or he thought he was getting this many shares and he was only getting this many shares or he thought they were going to be worth $100,000 and they're only worth $50,000 so that, is that what you mean by they're complaining or, about the cap table basically. [*Greebel shakes head yes*] And what is your role in these complaints, I guess? Or how does, does Martin rope you in? |
| | | Answer: | No. I'm told whatever their agreed resolution is. I don't negotiate anything. I'm just told; this is their agreed resolution. |
| | | Question: | And was that, did you know was that cash or shares or… |
| | | Answer: | Different. |
| | | Question: | So this was, Retrophin's public now. So he, I'm just trying to understand without putting any of my words in your mouth. So, Martin comes to you and says Joe's complaining about his— the cap table and how he was compensated or you know, whatever it is. We've agreed that he's going to get this amount of money or this amount of shares. And then what is your role? Do you review the documents? Or— |
| | | Answer: | I worked with people to write them up. |
| | | Question: | Okay. Were these the settlement agreements? |
| | | Answer: | Mhhm-hmm. |
| | | Question: | Okay. Do you know approximately how many people complained? Or was it 100% of the investors or… |
| | | Answer: | No, it was a small… |
| | | Question: | One percent? |

| Source | Citation | Text | |
|---|---|---|---|
| | | Answer: | It was a small fraction. That's why the decision was made to settle with them than to fight with them. |
| | | Question: | Alright. So, Martin comes to you and says he'll settle for a thousand shares or something like that and then, does he bring the settlement agreement to you and say this is what I'm thinking, can you review it? |
| | | Answer: | No. He tells me the terms and tells me to write it up. |
| | | Question: | Okay. So, I'm just trying to think of terms that would be in, so, he would get paid this much over the quarters? Or is it a lump sum? Was it different in each case? |
| | | Answer: | I don't believe anyone had a protracted payment settlement, so lump sums. I don't recall, but I don't have them in front of me. You— you do. |
| | | Question: | I don't have them here. But, okay. So then, you go through these settlement agreements. You don't— the only thing you know about these people is that they are on the cap table. |
| | | Answer: | Mhhm-hmm. |
| | | Question: | That's the only thing you know them from. Do you have an understanding of who they are now? I'm just trying to understand different— whether you knew something different then or— not. To this date, you just know them from the… |
| | | Answer: (8:15:13) | They were just people on the cap. |
| | | Question: | Do you have any knowledge of the MSMB investors? |
| | | Answer: | Not at the time. |

6

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:17:50 | Question: | Yeah. I mean it's more of an accountant's … I'm just trying to understand if you're wearing more than one hat or if you're, if, what your role is cause it's such a small company at the time. |
| | | Answer: | My role was not significant. |
| | | Question: | Okay. With the Q's and K's? |
| | | Answer: | I didn't have anything to do with the Q's and K's. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:21:25 | Question: | No—and do you know who's on the board at this point? |
| | | Answer: | Steve Richardson, Steve Aselage, and Martin. |
| | | Question: | And for the board meetings do you take notes as the outside counsel? [*Greebel shakes his head yes*] Alright so when does the 10K get approved? Or the first kind of filing with substance? |
| | | Answer: | I don't know when the Q was done. The 10-K I believe in done in September. |
| | | Question: | Was there a meeting before the K was filed to approve the K? |
| | | Answer: | There was—there was a meeting. |
| | | Question: | A board meeting? |
| | | Answer: | A board meeting first to review settlement agreements that we talked about because Marcum felt for GAAP purposes that they should not be a Retrophin liability. That was a GAAP interpretation and so— what Marcum recommended and the board approved was that MSMB indemnify the company for the value of those settlement agreements. |

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | | Question: | And then the outside counsel—or the general counsel, I'm sorry. Do you remember who that was? |
| | | Answer: | Meg. Something. She's still there I don't know her name. |
| | | Question: | Okay. Did you ever meet her? |
| | | Answer: | No. |
| | | Question: | Just on the phone or… |
| | | Answer: | Yeah. |
| | | Question: | She's hired in late June? |
| | | Answer: | I don't know. They never—I was never told she was even hired. She was a consultant. So I—it was never disclosed, so I have no idea of what's going on. What her role is, or is not. |

8

| Source | Citation | Text | |
|---|---|---|---|
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:42:00 | Question: (8:42:00) | Alright so we're in September. Martin—can you just walk me through what happened with Martin? Or how you came to know? |
| | | Answer: | I don't know if he called me, if she called one of my colleagues or—I don't remember how she, being the general counsel. I don't remember how we learned about it, but we learned that the board had decided to terminate him. It was not clear to us who—who was the proper person in that context to be making that decision. He said he wants to stay at the company. He's still a board member. And he, you know, asks us to look at ways to change the board composition. He ultimately determined not to go forward with that. And then, I'm pretty much out of the picture at that point. |
| | | Question: | Okay. So he was put on leave, right? |
| | | Answer: | I have nothing to do with this. I only know what I read in the papers and in the filings. |
| | | Question: | So when do you stop representing Retrophin? |
| | | Answer: | We get a notice of suspension—like, two weeks later. |

9

| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:43:26 | Question: | So were you involved with Martin's employment agreement, being… |
|---|---|---|---|
| | | Answer: | Only on behalf of the company. The company asked me to prepare the conversations between him and Steve Richardson, who acted as the board spokesman. |
| | | Question: | So late in the game… |
| | | Answer: | I—I—I don't know. I don't know when—I was given terms. I don't know—I was just given terms and then asked to circulate to the board, which is what I did—I circulated to the board via email deliberately so they could have their own time on it and engage me without Martin. |
| | | Question: | When are we talking about here? |
| | | Answer: | November—October-November—late October, early November, 2013. Before the uplisting. |
| | | Question: | Okay. Is that when Martin's employment agreement is drafted? |
| | | Answer: | Mhhm-hmm. |
| | | Question: | Okay. |
| | | Answer: | There may have been a prior one in place before me, which I think it was cloned against. I think the basic agreement between them was take the old one, update the comp terms. |
| | | Question: | Okay. So you were involved basically to just update—you were given a template and you updated it for Martin's employment—I'm just asking because—I don't know if you remember but—I think he could only be fired if he was convicted of a felony. |
| | | Answer: | Mhhm-hmm. |

10

| Source | Citation | Text | |
|---|---|---|---|
| | | Question: | Is that normal? |
| | | Answer: | I have no view on that. |
| | | Question: | Okay I just—I didn't know how often you worked with employment contracts but… |
| | | Answer: | I have no clue—I don't, but I think they run the gamut. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:46:22 | Question: | Okay. And then, so—October 14th, you're kind of done. When—do you continue to talk to Martin sporadically because I know you guys had a relationship on different deals for different companies before. Or is he… |
| | | Answer: | Again, I represent companies. I don't represent… |

| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 8:49:00 | Question: | Okay, so can you just tell me about the settlement agreements. |
|---|---|---|---|
| | | Answer: | Sure. |
| | | Question: | When they first start? |
| | | Answer: | Sure. So Retrophin when it goes public has virtually no money. Literally $10,000, literally no money. Martin needs help, so Martin decides to hire people via consulting agreements who can be helpful to help the company grow. So we start preparing consulting agreements for these people. |
| | | Question: (8:49:31) | And this is right when Retrophin starts? |
| | | Answer: | Yes. |
| | | Question: | Just trying to keep— |
| | | Answer: | Not when it starts. |
| | | Question: | I mean, when it goes public. |
| | | Answer: | Exactly. |
| | | Question: | Sorry just trying to keep… |
| | | Answer: | So, some of these people had also been employed by MSMB previously. |
| | | Question: | Do you know any names? |
| | | Answer: | Andy Vaino, for example. |
| | | Question: | Okay. Yeah. |
| | | Answer: | Was at MSMB. And they were-there was a sensitivity that they had—at this point, MSMB was one of the largest stockholders of Retrophin. And there was |

| | | |
|---|---|---|
| | | a concern that they would have some of the claims against any of these parties. So as would be customary in that context, you get a release in the agreement, so they're not getting paid by Brother A and suing Brother B simultaneously. It's not an uncommon concept. |
| | Question: | Alright, just to explain that to me. This is one of those things that—I know you said you take it for granted that I know a lot of things but—so, let's just take Andy Vaino for example, or anyone that works for MSMB. So we bring him over as a consultant to kind of save on cash, because you said they have no cash, so pay him in shares. |
| | Answer: | A combination of cash and stock. He was an employee. He was not full time; he was part time. |
| | Question: | And then—I'm just so, explain to me again about Brother A suing Brother B. So Brother A would be MSMB and Brother B would be Retrophin but— |
| | Answer: | —The concern would be |
| | Question: | Just trying to understand— |
| | Answer: | —The concern would be if they historically have a relationship with MSMB that they would have some claims for what—that I don't even know about. That there was some historical claim that I'm not even aware of. |
| | Question: | So—I'm just trying to give an example that… |
| | Answer: | Not paid full salary. |
| | Question: | At MSMB… |
| | Answer: | Mhhm-hmm. |
| | Question: | And then they come here and they say you owe me for my time there. Okay. I understand. Okay. So those consulting agreements start pretty much when Retrophin goes public. |

13

| Source | Citation | Text | |
|---|---|---|---|
| | | Answer: | And the board provides Martin with plenary authority to hire employees and consultants other than executive officers, which require board approval. A standard thing to do for a CEO of a company. Giving them authority to— hire the people. It's not uncommon. |
| | | Question: | So the board gave authority to the CEO, Martin Shkreli, to hire consultants. Was there any sort of cap on the number of shares or money or anything like that? |
| | | Answer: | No. Just not executive officers, whatever that—would imagine in the broad context. |

| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 9:00:17 | Question: | Are there any consulting agreements that stand out to you? |
|---|---|---|---|
| | | Answer: | Oh sure. There's a whole litany that stand out. Because we would be dealing with people from well-known college professors to top medical professionals to you know—people that were known to Martin and in that—and in cases… In two particular cases. actually that's not true. In at least three to four particular cases, I said I wanted board consent for them. Because I thought given the situation, I thought it was important for the board to review them, because I thought they were personal contacts, not necessarily professional contacts. |
| | | Question: | Okay. Do you remember any of the people who were personal contacts? |
| | | Answer: | Sure. Al Geller and Ken Banta are the first who come to mind. |
| | | Question: | And were they… |
| | | Answer: | And Darren Blanton also. |
| | | Question: | And when you say personal. was it like… I'm just wondering the extent of their relationship. Was it friends of his, or … |
| | | Answer: | I have no view. I don't know who his friends are or are not. I just got the sense from them that there was—that they had prior relationships with him. |
| | | Question: | Okay. So it wasn't just a professor they were calling… |
| | | Answer: | Exactly. |
| | | Question: (9:01:39) | So a referral from Martin or an introduction at least… I'm just wondering—I'm trying to put the two people you listed into a separate box from the professors maybe that—oh it's a great college. He works on these drugs… let's see if he'll be interested in consulting for us. Whereas there's some people you said you felt, you know, a little differently about. Where these are acquaintances of Martin from prior, not just some guy who has an Internet page on something. |

15

| | |
|---|---|
| Answer: | Yes. |
| Question: | Alright. So those people you mentioned. You brought their consulting agreements to the board? And they were approved by the board? |
| Answer: | [*Shakes his head yes*] |
| Question: | Did you have any understanding, I mean, I think we just went through this and you said no, but do you have any understanding of their relationship prior with any of those three or with any of the— |
| Answer: | —So Al was an investor—Al was on the cap table. I don't know what his prior relationship was or was not. Because I'd never heard that from Martin and I don't recall if I'd ever had heard that anywhere else. I knew his brother had been an investor at multiple levels so I don't know if he was also. But again, that was why I said that required board approval. |
| Question: | Okay. and then, so that's Al. So you mentioned Ken Banta. Do you have an understanding of what his relationship was? |
| Answer: | Other than—similar to Al he'd been on the cap table. He was a person I'd met previously at—I don't even remember even where I met him. Then I knew that the board members knew him, so I thought it was important to have it properly vetted. |
| Question: | So he knew the board members too? |
| Answer: | Mhmm-hmm. |
| Question: | And then a third person you mentioned… |
| Answer: | Darren Blanton. |

| Source | Citation | Text | |
|---|---|---|---|
| | | Question: | Did you have an understanding of how Martin knew him? |
| | | Answer: | I don't have an understanding. I know they have a complicated history. I know that I previously stripped him of his shares. That he was offered so—he was apparently the person who had been involved in the formation of Retrophin. He had been allocated stock based on the records that I was given. He never signed the documentation to accept the stock. So I sent him a letter stripping him of those shares which to me meant that he might have had some valid claim against the company. So when the company was bringing him as a consultant, that was not uncommon—not uncommon or unwise—but I also thought it required board consent, which I told Martin repeatedly. He did not get it. He didn't need it, because he had the plenary authority. But I recommended on multiple occasions to get board consent. And he was slated at the board meeting, his agreement had been circulated to the board so it was slated at the board meeting to be discussed. |
| Greebel Post-Arrest Interview, December 17, 2015 | Excerpt begins at approximately 9:13:20 | Question: | Um, what about Marek Biestek? |
| | | Answer: | I had nominal interactions with him. He was an employee of the company. He was the co-founder of the MSMB Capital. I never really had any direct interaction with him. |

17