**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Winston Y. Chan
Direct: +1 415.393.8362
Fax: +1 415.374.8460
WChan@gibsondunn.com

October 26, 2017

VIA ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter in response to the government's letter brief (Dkt. No. 422), dated October 23, 2017, in further support of the government's motion (Dkt. No. 383) for a *Daubert* hearing on the admissibility of expert testimony from Alan Johnson.

On August 11, 2017, we disclosed to the government Mr. Johnson's *curriculum vitae* ("CV") and a summary of his expected testimony "that the consulting agreements at issue in Count 7 of the indictment have multiple similarities to consulting agreements entered into by a variety of companies," based on his "identification and analysis of consulting agreements disclosed publicly through SEC filings."  Dkt. No. 312-2 at 3–4, 45–46.

On September 19, 2017, we described in further detail Mr. Johnson's background and qualifications, including his "career advising private and public companies about, among other things, consulting agreements" and his "expertise in consulting agreements containing broad general releases."  Dkt. No. 383-1 at 11.  We also described Mr. Johnson's opinions in further detail, as well as the specific bases and reasons for them.  *Id.* at 11–13.

On October 13, 2017, we provided additional information regarding Mr. Johnson's analysis, including the results of an EDGAR search based on identified search terms, specific criteria for identifying comparable consulting agreements, and a list of 50 comparable agreements.  *See* Dkt. Nos. 405 at 4–6, 405-1, 405-2.  We also provided detailed responses to each of the government's requests for information regarding Mr. Johnson's opinions, as well as the bases and reasons for them.  Dkt. No. 405 at 7–9.

The government now misconstrues our proffer and requests an unnecessary and improper *Daubert* hearing that would give it an unfair preview of Mr. Greebel's defenses.  For the following reasons, the Court should deny the government's request.  At a minimum, the

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 26, 2017
Page 2

Court should not hold any *Daubert* hearing before the close of the government's case-in-chief, since we will not know until then whether we intend to put on a case at all, and even if we do ultimately call Mr. Johnson, his anticipated testimony necessarily will be subject to change based on how the government's case-in-chief actually unfolds.

> **1.     Mr. Johnson's Proffered Testimony Satisfies the Second Circuit's Liberal Standard for Admissibility under Rule 702**

As discussed in our principal response to the instant motion, the Second Circuit's standard for admitting expert testimony under Federal Rule of Evidence ("Rule") 702 is a liberal one, with a "presumption of admissibility" that reflects a "bias" toward admission into the adversary system.  Dkt. No. 389 at 22–23 (quoting *United States v. Barone*, No. S1 09 Cr. 91 (NRB), 2010 WL 2976502, at *1 (S.D.N.Y. July 14, 2010)).  District courts enjoy "broad latitude" both in determining reliability pursuant to Rule 702 and in deciding which factors to consider in making that determination.  *Id.* at 23–24 (quoting *United States v. Brooks*, No. 06-CR-550 (JS), 2010 WL 291769, at *2 (E.D.N.Y. Jan. 11, 2010)).

The Second Circuit recently underscored the flexibility of a district court's *Daubert* analysis, noting that "expert testimony does not [have to] rest on traditional scientific methods" and "the *Daubert* factors do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert."  *United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015) (citations omitted).

> **a.     Mr. Johnson Is Qualified**

The government contends that Mr. Johnson "does not appear to be qualified to testify about" "consulting agreements in general" or about his analysis of the consulting agreements at issue in this case and comparable agreements he has identified.  *See* Dkt. No. 422 at 2.  The government insists that Mr. Johnson's "expertise is 'executive compensation' and 'executive compensation' plays no role in this case, because none of the consulting agreements involve Retrophin executives," so he is not "qualified to offer opinions about consulting agreements outside the field of executive compensation."  *See id.* at 3.  Finally, the government suggests that Mr. Johnson's never having provided this exact type of testimony in a prior proceeding disqualifies him.  *See id.*

As an initial matter, neither Mr. Johnson's qualifications nor the nature of his expected testimony has changed since our initial disclosure in August 2017.  At that time, we provided Mr. Johnson's CV and explained that Mr. Johnson would "testify that it is his opinion that the *consulting agreements* at issue in Count 7 of the indictment have multiple similarities to

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 26, 2017
Page 3

*consulting agreements* entered into by various companies." Dkt. No. 312-2 at 4 (emphasis added). The government did not challenge Mr. Johnson's qualifications in its motion to preclude his testimony (Dkt. No. 329), its *Daubert* motion (Dkt. No. 383), or its reply (Dkt. No. 390). The Court should not allow the government to now raise this threshold issue at the eleventh hour.

In any event, Mr. Johnson is clearly qualified to offer his proffered testimony. As we have explained, Mr. Johnson has "advis[ed] on approximately 100 executive separation agreements that were structured as consulting agreements with broad general releases and little expectation of consulting services" and thereby "has developed an expertise in consulting agreements containing broad general releases." Dkt. No. 405 at 8–9.

The government's analogy to a doctor's hypothetical testimony regarding "all of 'medicine'" is inapposite, because Mr. Johnson's proffered testimony does not comprise an entire discipline of which his expertise comprises just a single field. That might be true if Mr. Johnson were offering to testify as to "all of business." Here, by contrast, Mr. Johnson would testify as to consulting agreements *based on his extensive experience reviewing consulting agreements*. That he did so in the context of his work as an executive compensation consultant is immaterial, and at best an area for the government to explore on cross examination.

A more appropriate analogy is found in *Brooks*, where the district court admitted a law professor's expert testimony as to various aspects of corporate governance, including not only legal and regulatory obligations but also management structure and accounting terms. 2010 WL 291769, at *1, *4; *see also id.* at *2 ("Courts within the Second Circuit have liberally construed expert qualification requirements."). As with the qualified expert in *Brooks*, Mr. Johnson's expertise is not circumscribed by his professional title, and Mr. Johnson has sufficient experience with consulting agreements to assist the jury in understanding them.

Mr. Johnson's comparison of the terms of the consulting agreements at issue in this case with those found in various publicly available consulting agreements does not depend on the professional classification of the consultant at issue. It is immaterial to Mr. Johnson's analysis whether the consultants whose agreements he analyzed were "departing executive[s]," "scientists, engineers, human resource executives, former investors, or . . . any other . . . consultants." *Cf.* Dkt. No. 422 at 3. The government's apparent disagreement with the nature of the agreements Mr. Johnson found comparable to the agreements at issue in this case simply has no bearing on Mr. Johnson's qualification to testify about them. We further note that this argument is merely a dressed up rehashing of the government's failed relevance

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 26, 2017
Page 4

objection and for that reason alone should be denied.  *See* Dkt. No. 329 at 47–48 ("[Mr. Johnson's] testimony should be excluded because it is irrelevant.").

> **b.     Mr. Johnson's Methodology Is Sound**

The government makes three arguments challenging Mr. Johnson's methodology.  First, the government argues that the set of 50 comparable consulting agreements Mr. Johnson identified are not "likely to provide relevant information," because they pertain to "departing executive[s]" from "Fortune 500 companies."  Dkt. No. 422 at 3.  Second, the government suggests that Mr. Johnson's methodology is unreliable because we have not explained "how or why" he identified four key provisions in the consulting agreements at issue in this case. *Id.* at 4.  Third, the government asserts that Mr. Johnson's methodology "appears based on nothing more than his own say-so," given that Mr. Johnson observed that consulting fees in the agreements at issue were "varying in amounts" and that Mr. Johnson's conclusions seem to go beyond the "four corners of each contract."  *Id.*

The government's objections are classic cross-examination questions that go to weight, not admissibility.[1]  *See Barone*, 2010 WL 2976502, at *1 (admitting handwriting expert over objections "best raised through cross-examination").  Moreover, Mr. Johnson's methodology is described in detail in our letter dated October 13, 2017, Dkt. No. 405 at 4–6.  Mr. Johnson's search of public SEC filings and media reports through Google naturally yielded a large number of consulting agreements with departing executives, because such agreements are common in the industry and more likely to be publicly available than other types of consulting agreements.

Contrary to the government's assertion in footnote 7, Mr. Johnson is entirely qualified, as explained above, to apply his decades of knowledge and experience reviewing dozens of consulting agreements to the task of analyzing the agreements at issue here for their key provisions.  As the *Litvak* court highlighted, courts in the Second Circuit "regularly permit" experts to testify based solely on personal knowledge and experience.  *Litvak*, 808 F.3d at 180 n.25 (collecting cases).

Mr. Johnson then determined that these particular consulting agreements were

---

[1]     This also applies to the government's concern that Mr. Johnson "does not identify how many agreements were <u>not</u> comparable."  Dkt. No. 422 at 3 n.5.  The extent to which the consulting agreements at issue are "outliers" goes to the persuasiveness of Mr. Johnson's conclusions, but it does not implicate the reliability of Mr. Johnson's methodology.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 26, 2017
Page 5

> comparable to many publicly filed consulting agreements with departing
> executives.  These publicly filed consulting agreements are comparable
> because (1) there was little expectation of work *based on the description of*
> *the work and the circumstances* and (2) the company benefitted from the
> restrictive covenants and releases.

Dkt. No. 405 at 5 (emphasis added).  Thus, Mr. Johnson expressly based his analysis not on
his own mere "say-so" but rather on the "four corners" of the agreements themselves, and he
determined that consulting agreements with departing executives would provide "relevant
information" for comparison with the agreements at issue.  *Contra* Dkt. No. 422 at 3.

Even in cases where courts have excluded expert opinions pursuant to Rule 702, they have
done so to protect the jury from dangers that do not exist here.  *See, e.g.*, *DiBella v. Hopkins*,
403 F.3d 102, 121 (2d Cir. 2005) (affirming exclusion of business-ethics expert who
proposed to testify as to his "personal view of the veracity of a lay witness's testimony," and
where issue of whether the plaintiff had acted ethically was not material so would confuse
the jury); *United States v. Cruz*, 981 F.2d 659, 662–63 (2d Cir. 1992) (government's use of a
police-officer expert to bolster the testimony of a fact witness "strongly suggests to the jury
that a law enforcement specialist—here an arresting officer—believes the government's
witness to be credible and the defendant to be guilty, suggestions we have previously
condemned").

By contrast, here, Mr. Johnson's expected testimony regarding the similarities between the
consulting agreements at issue in Count Seven and other consulting agreements is clearly
relevant to the government's express charge that the consulting agreements were "sham[s]."
*See* Superseding Indictment, Dkt. No. 60 at 19 ¶ 35.  Mr. Johnson's testimony would be
helpful to the jury because we intend to focus on the existence of potential legal claims
against Retrophin, which—pursuant to common corporate practices by publicly companies—
could have been resolved with consulting agreements containing releases and little to no
expectation of work to be performed.  Whether the putative-plaintiffs-turned-consultants
were employees or shareholders is not an important enough difference to preclude us from
making this argument on relevance grounds, and has nothing to do with Mr. Johnson's
qualifications or methodology.  Indeed, the government's own theory is that the consulting
agreements at issue were really disguised settlement agreements, because they contained no
work requirements and were not tied to the consultants' work relationships with Retrophin.[2]

---

[2]    *See* Trial Tr. 1080:21–1081:6 ("But there were still more investors to pay off.  With
the auditors watching for suspicious settlement agreements, the Defendant changed tactics.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
October 26, 2017
Page 6

Accordingly, given the Court's "broad latitude" to decide which factors to weigh in determining reliability, especially in the context of non-scientific evidence, *see Brooks*, 2010 WL 291769, at *2, and the Second Circuit's "bias" toward admissibility, *Barone*, 2010 WL 2976502, at *1, the Court should find Mr. Johnson's proffered methodology to be reliable.

### 2.    A *Daubert* Hearing is Not Necessary for the Court to Determine Admissibility Here

A *Daubert* hearing is not necessary to determine the qualifications of an expert or the reliability of his proffered testimony, especially where an expert's "reliability and qualifications . . . can be answered through the foundation that the [examining party] will establish before turning to each expert's conclusion," and the opposing party "may conduct additional questioning of the witness at trial."  Dkt. No. 389 at 31–32 (citing *United States v. Diakhoumpa*, 171 F. Supp. 3d 148, 152–53 (S.D.N.Y. 2016); *United States v. Ashburn*, 88 F. Supp. 3d 239, 244 (E.D.N.Y. 2015)).

There is no need for a *Daubert* hearing here.  Mr. Johnson's qualifications and methodology are thoroughly presented in his CV and our disclosures.  *See* Dkt. Nos. 312-2 45–46 (CV); 383-1 at 11; 405 at 4–5.  A hearing would not offer additional information, and instead would only offer the government the opportunity effectively to conduct a deposition as if this were a civil proceeding, which it is not.

Mr. Johnson's proffered testimony directly challenges one of the government's three core theories of fraud – the so-called "sham" consulting agreements.  The government's argument is that no consulting argument can properly contain liability releases, and that all consulting agreements that do not contemplate actual work constitute "shams".  Mr. Johnson's extensive experience to the contrary, as well as his analysis demonstrating that he has identified a set of approximately 50 other consulting agreements used by other public companies and comparable to those labeled as "shams" here undercuts that central notion.  That the government's prosecution theory is undercut does not mean that there is a flaw, for purposes of *Daubert*, as to Mr. Johnson's qualifications or methodology.

---

He arranged for some of the remaining investors to receive not settlement agreements but something he now called consulting agreements.  These consulting agreements made it look like the investors were doing work for Retrophin.  That way, the payments looked legitimate. But the investors hadn't asked to be Retrophin consultants and they were never asked to do any work for Retrophin. They just wanted the money that Shkreli had told them he owed them back.").

GIBSON DUNN

The Honorable Kiyo A. Matsumoto
October 26, 2017
Page 7


Mr. Johnson's testimony would be key to Mr. Greebel's defense case, to the extent we seek
to put on such a case.  And to the extent the government wants to question whether Mr.
Johnson's 50 examples are not really that comparable, they are free to do so on cross-
examination.  For all these reasons discussed, the government has failed to show any need
for a *Daubert* hearing as to Mr. Johnson's methodology or qualifications.

> **3.    If the Court Determines to Hold a *Daubert* Hearing, It Should Not Take
> Place Until After the Close of the Government's Case-in-Chief**

If the Court does decide to hold a *Daubert* hearing regarding Mr. Johnson's qualifications or
methodology, it should not schedule it before the close of the government's case-in-chief.
To do so would be to give the government the unfair advantage of confronting Mr. Johnson
early and previewing Mr. Greebel's defense strategy, before he has even decided to put on a
defense case or determined the exact contours of it.  It would also improperly freeze Mr.
Johnson's testimony before he has a chance to review and account for the government's
case-in-chief—which is of course the very purpose of a defense expert in a criminal case.
*See United States v. St. Pierre*, No. CRIM. 09-374, 2011 WL 2199375, at *2 (E.D. La. June
6, 2011).  The Court should not assist the government in laying such an "impeachment trap."
*See United States v. Mehta*, 236 F. Supp. 2d 150, 157 (D. Mass. 2002).

*          *          *

For all these reasons, the Court should deny the government's motion for a *Daubert* hearing
on the admissibility of Mr. Johnson's expert testimony.

Respectfully,


*/s/ Winston Y. Chan*
Winston Y. Chan

cc:    Alixandra E. Smith, Esq.
       David C. Pitluck, Esq.
       David K. Kessler, Esq.