**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

November 2, 2017

VIA ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Evan Greebel*, S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter in connection with the Court's evidentiary ruling on October 31, 2017, regarding potential testimony from Richard Kocher about whether he ever returned settlement payments he received from Retrophin.

1.     **Background**

During cross-examination of Mr. Kocher, Mr. Dubin began to ask him the same question the Court had expressly allowed Mr. Dubin to ask Sarah Hassan—namely, whether Mr. Kocher was "aware that the allegation in this case against Mr. Greebel is that a settlement agreement that entered into is alleged to have been fraudulent." Tr. 2760:16–2761:5; *cf. id.* at 1673:11–17 (Hassan) ("Q. [A]re you aware that the prosecution in this case has claimed that Retrophin was defrauded as a result of the settlement agreement that you entered into?  MS. SMITH: Objection, Your Honor, asked and answered.  THE COURT: Overruled. You can answer the question.").

This time, the Court sustained the government's objection, and the parties proceeded to discuss the issue at sidebar. *Id.* at 2761–2796. The Court precluded Mr. Dubin from asking Mr. Kocher—and, presumably, any investor witness—"if he's given any money back [to Retrophin] or [if] he's kept it." *Id.* at 2794:22–23. For the following reasons, we respectfully believe the Court's ruling to be in error.[1]

---

[1]    We did not raise this issue before because, as discussed below, it was not contested during Mr. Shkreli's trial. Moreover, it was not briefed in that trial, and we had no reason to believe it would be a controversial line of questioning.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 2, 2017
Page 2

2. **Argument**

   A. **The Evidentiary Standard for Relevance Is Very Low**

All relevant evidence is generally admissible at trial, and the standard for relevance under Federal Rule of Evidence ("Rule") 401 is "very low." *United States v. Litvak*, 808 F.3d 160, 179–80 (2d Cir. 2015) (citation omitted). Rule 403 allows the court to exclude relevant evidence only if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

   B. **Whether or Not an Alleged Victim Received the Benefit of the Bargain Is Relevant to an Essential Element of Wire Fraud: a Scheme to Defraud**

"The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 92d Cir. 2007) (citation omitted). The federal mail and wire statutes use the same relevant language, so courts interpret them the same way. *Id.* To prove the first element, a "scheme to defraud," the government must prove, beyond a reasonable doubt, that the defendant "*contemplated* some actual harm or injury to the victims." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (quoting *Unites States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (emphasis in original)).

Although it is not required that the alleged victims in fact suffered harm, the Second Circuit has "repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." *United States v. Davis*, No. 13-cr-923, 2017 WL 3328240, at *8–9 (S.D.N.Y. Aug. 3, 2017) (Preska, J.). In such circumstances, "an essential element of the bargain is not implicated, and thus the wire fraud statute does not apply." *Id.*at *9. This is true even if the defendant "practiced a deceit" on a third party, *United States v. Starr*, 816 F.2d 94, 99 (2d Cir. 1987); *Davis*, 2017 WL 3328240, at *14, or even engaged in "blatant dishonesty . . . repugnant to standards of business morality," *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970).

   C. **Under Binding Second Circuit Authority, a Conviction for Wire Fraud Does Not Lie Where the Alleged Victim Received the Economic Benefit of the Bargain in the Transaction at Issue**

In *Regent*, the defendant corporations stipulated to facts establishing that their salesmen made "false representations" to potential customers in order to solicit purchases of defendants' stationary. 421 F.2d at 1176. The Second Circuit reversed the defendants' mail-fraud convictions, because the admitted misrepresentations neither regarded the "quality or

The Honorable Kiyo A. Matsumoto
November 2, 2017
Page 3

price" of the goods nor made "any suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered." *Id.* at 1180.  The court explained, "If there is no proof that the defendants expected to get something for nothing, or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods." *Id.* at 1181.

In *Starr*, the government charged the defendants with mail fraud and wire fraud in connection with their operation of a bulk-mail business.  816 F.2d at 95.  Specifically, the indictment alleged that the defendants had charged customers full price for high-postage parcels, concealed them inside lower-postage mailing sacks, submitted fraudulent postal service receipt forms, and pocketed the difference.  *Id.* at 96.  Despite evidence in the record that the defendants "practiced a deceit on their customers," the Second Circuit reversed their conviction because their "customers received exactly what they paid for." *Id.* at 99.  The court explained, "The misappropriation of funds simply has no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." *Id.* at 100.  Moreover, the court noted that a similar analysis applies to contracts for both services and sales of goods: "Although this case involves a contract for services rather than a contract for the sale of goods as in Regent, the evidence produced here calls for the same result.  As in *Regent*, no evidence of tangible injury was shown from which the jury could infer an intent to defraud." *Id.* at 101.

In *Novak*, a district court in the Eastern District of New York convicted the defendant union leader of various crimes, including mail fraud, arising out of an alleged scheme to collect payments from elevator-construction contractors for fraudulent time sheets submitted by union members.  443 F.3d at 153.  The arrangement involved contractors who, in a form of settlement for violating their collective-bargaining agreement with the union by using non-union labor, would pay union members for hours they had not actually worked ("no-show hours").  *Id.* at 153–54.  The defendant, as a union leader, received a kickback from each payment for no-show hours.  *Id.* at 154.  "In order to gain the cooperation of the Union members in his corrupt arrangement, Novak used his power to assign jobs." *Id.*  The government alleged that the defendant "us[ed] the mail to defraud and obtain the property of the contractors." *Id.* at 156.  The Second Circuit reversed his mail-fraud conviction, because "as in *Starr*, the contractors received all they bargained for, and Novak's conduct did not affect an essential element of those bargains." *Novak*, 443 F.3d at 159.  The court reasoned that "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed." *Id.*

In *Shellef*, a grand jury in this District returned an indictment that charged the defendants with multiple counts of wire fraud in connection with a contract to purchase quantities of a highly regulated chemical.  507 F.3d at 95.  The government alleged that the defendants had

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 2, 2017
Page 4

defrauded the manufacturer by representing that they would only export the chemical, thus avoiding an excise tax the manufacturer would have charged them for the domestic distribution the defendants actually contemplated. *Id.* Although there was evidence at trial that the manufacturer would not have contracted with the defendants if it had known of the defendants' intent to distribute the chemicals domestically, the Second Circuit nonetheless reversed their conviction, because the indictment did not allege "that there was a discrepancy between benefits reasonably anticipated and actual benefits received." *Id.* at 109 (citation omitted). The court noted,

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain— which do violate the mail and wire fraud statutes.

*Id.* at 108.

In *Davis*, the government alleged that the defendants engaged in wire fraud and conspiracy to commit wire fraud in connection with the construction of Tower 1 of the World Trade Center by depriving the Port Authority of the right to control its assets. 2017 WL 3328240, at *5. Specifically, the government alleged that defendants—a steel company and its owner— misrepresented the extent to which it subcontracted with minority-owned and woman-owned businesses. *Id.* Judge Preska vacated the convictions of both defendants after a jury trial, finding that "the evidence was not sufficient for a rational jury to find that the alleged misrepresentations went to an essential element of the contract or that they exposed the Port Authority to potential or actual economic harm." *Id.* at *15.

Even where the Second Circuit has upheld wire-fraud convictions, the court has done so "where the deceit created the potential to cause economic harm to the victim," *id.* at *9–10 (collecting cases), or where "the defendants' compliance with the law in carrying out their contractual obligations was a fundamental part of the bargain between the parties," *Novak*, 443 F.3d at 159 (citing *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999); *United States v. Frank*, 156 F.3d 332 (2d Cir. 1998); *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991)).

> **D.    Retrophin's and the Settling Investors' Receipt of the Benefit of the Bargain in the Settlement Agreements is Relevant to an Essential Element of Count Seven**

Here, an essential element of the government's case against Mr. Greebel in Count Seven is that Mr. Greebel had a fraudulent intent to engage in a scheme to defraud Retrophin through, among other means, "fraudulent settlement agreements." *See* Superseding Indictment, Dkt.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 2, 2017
Page 5

No. 60 ¶¶ 26–30; *see also* Tr. 1079:17–22 ("But the investors weren't angry at Retrophin. Retrophin didn't owe them any money. There was nothing for Retrophin to settle. These settlement agreements were just long legal documents full of fancy legal terms designed to hide the fact that the Defendant and Shkreli were stealing money from Retrophin to pay the investors.").

Testimony from settling investors that they accepted settlement terms from Retrophin, that they agreed to mutual releases from liability, that they received and retained payment from Retrophin, and that they did not return such money to Retrophin is relevant to undermining the government's characterization of the settlement agreements as "fraudulent." *See id.* ¶ 26. Moreover, such testimony is relevant to and highly probative of each party's potential benefit in the bargain, including mutual releases from liability. *See* Tr. 2779:12–17 ("Despite other things going on, the fact that [Mr. Kocher] still has the money and he's kept the profits is relevant. For our perspective to says it's a valid agreement, and Retrophin has gotten the benefit of the bargain. It's one of our defenses that we put in our motion. It's one of classic defenses to wire fraud.").

The facts of this case are most similar to *Novak*, in that the alleged underlying fraud was allegedly perpetrated through transactions to which Mr. Greebel was not a party. *See* 443 F.3d at 153–54. And as in both *Novak* and *Starr*, the issue of whether or not the settling investors and Retrophin, the alleged victim of the alleged wire fraud, "received all they bargained for" in the settlement and consulting agreements—*i.e.*, releases from liability, monetary payments, and/or Retrophin stock—is relevant to an essential element of Count Seven: a scheme to defraud. *See Novak*, 443 F.3d at 159; *Starr*, 816 F.2d at 99. Establishing that the investors kept the settlement money will tend to make a scheme to defraud less likely, because it will demonstrate that neither the settling investors nor Retrophin were attempting to "get something for nothing." *See Regent*, 421 F.2d at 1181.

Even if the government wished to argue that the alleged misrepresentations to Retrophin transgressed the Second Circuit's "fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes," *Shellef*, 507 F.3d at 108, such testimony would be relevant to identifying on which side of the line the alleged conduct falls. Indeed, whether "the alleged misrepresentations went to an essential element of the contract or . . . exposed [the alleged victim] to potential or actual economic harm" is a central consideration in indentifying the existence of a scheme to defraud. *See Davis*, 2017 WL 3328240, at *15.

The government is wrong to insist that "the benefit of the bargain is [only] relevant in a right to control theory, which was litigated extensively in a motion *in limine* and motion to dismiss

context.  That's not the theory we're advancing here.  The benefit of the bargain is not a defense to [an alleged] straight up fraud." Tr. 2780:7–12.  The relevant language of Count Seven—"MARTIN SHKRELI and EVAN GREEBEL, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Retrophin, and *to obtain money and property* from Retrophin by means of materially false and fraudulent pretenses, representations and promises," Dkt. No. 60 ¶ 56 (emphasis added)—closely resembles that of the indictment in *Novak*—"the indictment charged Novak with using the mail to defraud and *obtain the property* of the contractors," 443 F.3d at 156 (emphasis added)—where the Second Circuit expressly applied a benefit-of-the-bargain analysis in reversing a mail-fraud conviction.  *Id.* at 159.  That is because, as Judge Preska explained in *Davis,* "where the purported victim received the full economic benefit of its bargain, an essential element of the bargain is not implicated, and thus the wire fraud statute does not apply." 2017 WL 3228240, at *9.

### E.  Allowing This Testimony Will Not Open the Door to Evidence of Retrophin's Subsequent Conduct After the Charged Period

Allowing us to ask settling investors whether they returned their settlement money to Retrophin would not, as the Court suggested, "open[] a lot of doors that [we] don't want opened," such as to "questions about the civil lawsuit, the forfeiture, and other matters where people are trying to get money back." Tr. 2764:16–25; *see also* Tr. 2783:15–19 ("I think it's a huge stretch, and it's leaping over many points of logic, and it risks opening the door to exploring Mr. Kocher's knowledge about attempts by Retrophin to get its money back, regulators looking at what happened to Retrophin.").

First, we intend only to ask a discrete set of questions from the government's investor witnesses about how they interpreted the settlement agreements at the center of the government's own case, as well as what they did with the proceeds of those agreements.  Further questions about civil litigation and regulatory actions would be beyond the scope of such questioning.

Second,  assuming the government's allegations are true, and based on the government's evidence received during Mr. Shkreli's trial, the Retrophin Board came to learn about the agreements at issue by no later than September 2013.  It did not take any action at the time to recover the allegedly misappropriated money.  Moreover, the charged period in Counts Seven and Eight extends no later than September 2014.  Any action the Retrophin Board or the SEC may have taken after September 2014 is not only beyond the scope of our proposed line of questioning but also beyond the scope of the indictment itself.  Thus, our questioning should not open the door to allow the government to improperly elicit testimony about either action.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 2, 2017
Page 7

### F. The Testimony Would Not Prejudice the Government

The Court allowed counsel for Mr. Shkreli to elicit similar testimony regarding whether settling investors returned money to Retrophin, and the government never objected to relevance. Shkreli Trial Tr. 1699:23–1700:1 (Blanton) ("Q. Now, has anyone ever asked you to give back the money to Retrophin because you signed a fraudulent consulting agreement? A. Not to my knowledge."); *id.* at 3512:1–3 (Aselage) ("Q. Did you on behalf of Retrophin ever attempt to recover the money that they received? A. No."); *id.* at 4409:2–10 (Yaffe)[2] ("Q. And in addition to agreeing to provide truthful information, did you also agree to do anything with the money or shares that you had received from Retrophin? A. Yes. Q. What did you agree to do with those -- that money or shares? A. To pay back all the money I received as consulting income and to pay back all the gains that I received on the stock sale."). The government made no mention in the Shkreli trial about these questions' opening any doors on redirect examination.

Nor did the government object when Mr. Shkreli's counsel argued in summation that the settling investors failed to return any money. *See id.* at 5354:22–23 ("Did [Hassan] tell you she had to give back her money? Why not?"); *id.* at 5364:21–25 ("And [Kocher] gets a settlement agreement and he has his own lawyer, his own lawyer helped draft it with Evan Greebel, and no one is asking him to give back any money. And Retrophin is not suggesting that he got an illegal, fraudulent settlement agreement.").

Finally, admitting this testimony would not unfairly prejudice the government, confuse the issues, or mislead the jury. As explained above, evidence that the settling investors did not return their settlement money to Retrophin is relevant to the charges against Mr. Greebel and probative of the settling parties' respective benefits of the bargains. Thus, the evidence would actually help clarify the issues and focus the jury's attention on important facts. Given the admission of similar testimony without objection in the Shkreli trial, the government could not seriously claim unfair prejudice hear.

\*   \*   \*

---

[2] The government argued that Mr. Yaffe's testimony in the Shkreli trial should be treated differently because "Mr. Yaffe was a coconspirator. So that's why he gave the money back. Unlike Mr. Kocher, Ms. Hassan and the other investors here." Tr. 2786:13–15, but that is a distinction without a difference for purposes of the Rules of Evidence. The Court should not allow the government to unilaterally keep from the jury relevant evidence based on its own determination that some witnesses are co-conspirators while others are not. If the fact of Mr. Yaffe's returning settlement payments to Retrophin was relevant to whether or not Mr. Yaffe's settlement agreement was allegedly fraudulent, then the fact of other investors' failure to return the money has to be relevant to the same issue.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 2, 2017
Page 8


For these reasons, the Court should allow us to ask settling investor witnesses whether they are aware of the government's contention that the settlement agreements are fraudulent and whether they returned any settlement payments to Retrophin.

Respectfully,

*/s/ Reed Brodsky*
Reed Brodsky


cc:    Alixandra E. Smith, Esq.
       David C. Pitluck, Esq.
       David K. Kessler, Esq.