Joshua E. Dubin, Esq., P.A.

November 8, 2017

VIA ECF

The Honorable Kiyo A. Matsumoto
United States District Court Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter to raise our objections and concerns about the constitutional dangers that flow from the government's attempts to limit Evan Greebel's constitutional right under the Sixth Amendment's Confrontation Clause to have his counsel thoroughly and vigorously cross-examine the government's witnesses. This concern is particularly salient where such cross-examination will inform the jury of "relevant and important facts bearing on the trustworthiness" of several government witnesses. *United States v. Pedroza*, 750 F.2d 187, 196 (2d. Cir. 1984).

As we said at sidebar today, we do not seek to re-call any witnesses who have testified to date at trial. Rather, we write to bring to the Court's attention what we believe has been a pattern in which the prosecution has tried—throughout the trial and with numerous different witnesses—to shut down and "cabin[]" what ought to have been fair and appropriate lines of cross-examination. *See* Tr. 3386:15–3387:2.

Accordingly, we respectfully request that moving forward for the duration of trial, we be afforded greater latitude on cross-examination of the government's witnesses since, as the Supreme Court has stated, cross-examination is "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 J. Wigmore, Evidence § 1395 (3d ed. 1940)).

I.    **Applicable Law**

The Sixth Amendment's Confrontation Clause provides anyone accused of a crime the "bedrock procedural guarantee" "'to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (quoting U.S. Const. amend. XI). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (quoting Wigmore); *accord Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1973). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316. The Sixth Amendment "commands . . . that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61.

7413 Fairfax Dr., Bldg. F / Tamarac, Florida / 33321

Thorough cross-examination is absolutely necessary to expose the jury to questions regarding a witness's credibility. "In criminal cases especially, defense counsel should be given great latitude in adducing ***proof which might bear on credibility***." *United States v. Wolfson*, 437 F.2d 862, 874 (2d Cir. 1970) (emphasis added). Such cross-examination cannot be curtailed if it "keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *Pedroza*, 750 F.2d at 195–96.

Improperly curtailing the right to fully cross-examine government witnesses is reversible error. A particularly noteworthy case is the Second Circuit's opinion in *Wolfson*, in which the indictment charged the co-defendants with conspiracy to violate federal securities laws, among other crimes. 437 F.2d at 863. At trial, during cross-examination of a key government witness on the count of conspiracy to violate securities laws, defense counsel sought to offer impeachment evidence regarding the witness's apparent "reward" of an SEC no-action letter in exchange for his testimony against the defendants. *Id.* at 874. The district court sustained the government's objection to this line of questioning, as well as to the introduction of the witness's correspondence with the SEC, concluding that the evidence "would show a relatively minor, esoteric manifestation of prejudice, that it would unduly prolong [the] trial . . . , and that it would complicate the already complicated issues of [the] trial with a peripheral and complex question, all for the purpose of showing a possible lack of credibility." *Id.* (quotation marks omitted).

The Second Circuit reversed the convictions. *Id.* at 875–76. The court reasoned that the district judge had improperly curtailed the defendant's "great latitude in adducing proof which might bear on credibility." *Id.* at 874–75. The Court of Appeals rejected the government's argument that admitting the evidence would have opened a "Pandora's box of collateral matters," noting that trial judges have ample means to control the scope of questioning: "Rather than cut off the line of inquiry completely, in a criminal case greater liberality would have been warranted." *Id.* at 875.

In light of the following examples of our lines of inquiry being cut off completely, we respectfully request greater latitude in our cross-examinations.

## II.     The Government's Improper Objections Fall Into Three General Categories

On numerous occasions, our cross-examination of government witnesses has been curtailed, including multiple instances where we endeavored to test the witness's credibility.

Even a cursory review of the trial record in this case demonstrates that the government is improperly raising objections to witness after witness. Making matters worse, the prosecutors very rarely provide the basis for their objections, which puts the Court (and Mr. Greebel's counsel) in a difficult position. That means, for example, that on many occasions, we do not know if the objection is to form, and so we can rephrase the question, or if the objection is more substantive, to a particular line of questioning.

The examples set forth below constitute only a selection of the types of improper objections that we are concerned are impeding our client's right to have his counsel fully and vigorously cross-examine the witnesses the government calls against him. The Supreme Court has made eminently clear that cross-examination "is the principal means by which the believability of a

witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316.  The Sixth Amendment "commands . . . that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61.

### A.     Witness Demeanor, Bias, and Credibility

We should be allowed to question government witnesses regarding their demeanor, bias, and credibility.  During the cross-examination of Darren Blanton, the Court admonished Mr. Blanton, "No assuming," Tr. 3641:19.  Later in his cross-examination, Mr. Blanton apparently used this admonition as an excuse to avoid answering questions, as he testified—while smirking at the government—as follows:

> Q:     Do you know, sir, who put the strings and releases into the option agreement that was drafted and sent to you?
> A:     He says it was him.
> Q:     Him being Evan Greebel, correct?
> A:     I don't want to get assumptive. *[laughing]*
> Q:     Sir, this is -- strike that.  Do you find it funny who the him is in that e-mail?
>
>        MS. SMITH: Objection, your Honor.
>        THE COURT: Sustained.

Tr. 3775:15–23 (Blanton) (emphasis and comment added).  We believe—and we know the Court agrees—that Mr. Greebel's circumstances should not be taken lightly.  We should thus be allowed to explore a witness's apparent lack of respect for the gravity of these proceedings.  Had we been allowed to inquire more extensively into what seemed to be gamesmanship on the part of Mr. Blanton, the jury would be able to more fully assess his credibility, trustworthiness, and possible bias.

Later, in response to Mr. Mastro's questions, Mr. Blanton pointed to a question mark in communications with Mr. Shkreli, wherein Mr. Blanton referred to himself as a "consultant."  DX 115-14.  ("I hope I can help you make [Retrophin] an even bigger success as a consultant?").  The clear implication of Mr. Blanton's response was that he was merely asking about the details of his role as a consultant.  Tr. 3675:1-4 ("Q: And the question mark was because of the 400,000 shares of Retrophin and whether or not you get to keep all 400, correct?  A:  No. It was a *question of what that might entail*.") (emphasis added).  Despite this exchange, Mr. Mastro was prohibited from testing Mr. Blanton's consistency—and thus his credibility—with respect to his use of question marks on other communications with Mr. Shkreli.

> Q:     And then you write, let's get RTRX to 75 and buy one together, double question mark. Do you see that?
> A:     Yes.
> Q:     RTRX is Retrophin; correct?
> A:     Correct.
> Q:     And that was not actually a question that you put the double question marks after; right?
>
>        MS. SMITH: Objection, Your Honor.

> MR. MASTRO: All right.
> THE COURT: Sustained.

Tr. 3887:8–17 (Blanton).  Mr. Brodsky was similarly prevented from testing Mr. Massella's credibility by determining whether he placed "his own interests above" his employer's and his client's, and whether he had given prior inconsistent testimony.

> Q:  Were you not the engagement the [sic] partner assigned the responsibility of overseeing the relationship with this client to whom you loaned money?
>
> MS. SMITH: Objection, Your Honor.
> THE COURT: Overruled.
>
> A:  They were no longer a client.
> Q:  At the time you loaned the money, sir, were you not the engagement partner in that matter?
> A:  It was a non-attest client.
> Q:  Sir, I'm going to ask you for a yes or no. Were you not the engagement partner for this client at the time you loaned this money to the client?
> A:  Yes.
> Q:  And is it not true that as the engagement partner, you put your own personal interests above the firm and above the client loaning that client the money without disclosing it to the Citrin Cooperman?
>
> MS. SMITH: Objection, Your Honor.
> THE COURT: Sustained.

Tr. 3405:14–3406:7 (Massella).  These examples are the *precise type of cross-examination* properly aimed at "proof which might bear on credibility" and should clearly be allowed during cross-examination of future witnesses.  *See Wolfson*, 437 F.2d at 874.

### B.  "Assuming Facts Not in Evidence"

There was no fair basis for the government to seek to prevent our questioning of Mr. Richardson and Ms. Hassan about issues at the heart of this case.  The government failed to state a basis for the objections set forth below.  Thus, we are forced to speculate as to the basis.  If the basis is that they believed the questions assumed facts not in evidence, then such an objection would still be an improper applications of the applicable evidentiary principle.  For example, the government improperly objected to our questioning Mr. Richardson about the fact that Mr. Greebel sent meeting minutes to Marc Panoff, Retrophin's Chief Financial Officer:

> Q:  And I take it Mr. Panoff had a presence at Board meetings at Retrophin, correct?
> A:  Yes, he did.
> Q:  After he joined in May 2013, Mr. Panoff, the chief financial officer, attended to the best of your recollection, sir, each and every Board meeting in 2013?
> A:  Yes; to the best of my recollection, yes.

*Joshua E. Dubin, Esq., P.A.*
_____

> Q: And, sir, did you know that Mr. Greebel sent an e-mail to Mr. Panoff in December 2013 attaching all the Board minutes, drafts of all the Board minutes for that year?
>
> MS. SMITH: Objection, Your Honor.
> THE COURT: Sustained.
>
> . . . .
>
> Q: And, sir, did you know that Mr. Greebel sent an e-mail to Mr. Panoff in December 2013 attaching all the Board minutes, drafts of all the Board minutes for that year?
>
> MS. SMITH: Objection, Your Honor.
> THE COURT: Sustained.

Tr. 2038:25–2039:11; 2039:7–11 (Richardson).  The government also improperly cabined our cross-examination of Sarah Hassan regarding her awareness of investor threats to sue Retrophin.

> Q: You have no idea that prior to having e-mail communications with you and being copied and e-mails with you, that another investor in MSMB named Lindsay Rosenwald made a direct threat to sue Retrophin?  Did you know that?
>
> MS. SMITH: Objection, your Honor.
> THE COURT: Sustained.

Tr. 1519:24–1520:4 (Hassan).

    **C.**    **"Misstating the Testimony"**

The government has also repeatedly objected to our questions on the apparent basis that they misstate witnesses' testimony, notwithstanding the fact that the government's witnesses are fully capable of explaining what they mean.  For example, the government successfully objected to Mr. Brodsky's question regarding whether Mr. Richardson had said he relied on outside counsel:

> Q: Did you know there is specific accounting literature regarding related party transactions disclosures in public filings?
> A: No, I wouldn't, but I would rely on my CFO and my counsel to make sure they knew that.
> Q: Well, do you think -- withdrawn.  You would rely, you said, on counsel, outside counsel for the meaning of related party transactions? That's what you're saying?
>
> MS. SMITH: Objection, Your Honor.
> THE COURT: Sustained.

Tr. 2072:3–13 (Richardson).  The government also cabined Mr. Brodsky's question as to why Mr. Massella used certain language in an email:

5

*7413 Fairfax Dr., Bldg. F / Tamarac, Florida / 33321*

> Q: Mr. Massella, you remember you testified just a few minutes ago about what that meant "WTF"?
> A: Yes, sir.
> Q: Isn't that the case, sir, that your testimony as to the reason you wrote WTF contradicts what you said in the prior proceeding?
> A: No.
> Q: Is it not the case, sir, that you said today that the reason why you said WTF was because were concerned about a transaction between an employee and a CEO, right? Correct?
> A: It was one piece of it, yes.
> Q: Sir, your testimony today was about what you -- did you not testify -- we can get the record out. Did you not testify to this jury minutes ago that the reason you wrote WTF after receiving Marek Biestek transfer agreement of 4,167 shares to Martin Shkreli on November 29th, 2012 was because you thought there was something concerning about a CEO and employee engaged in a stock transfer?
>
> MS. SMITH: Objection, Your Honor. Misstates the testimony.
> THE COURT: Sustained.

Tr. 3407:21–3408:16 (Massella). Similarly, Mr. Mastro was curtailed from asking Mr. Blanton a simple "yes-or-no" question regarding the very language used by Mr. Blanton in communications with Mr. Shkreli.

> Q: And you said you didn't want to join the Retrophin board because Martin Shkreli was, quote, not as trustworthy as someone I would want to be representing.
> A: Right.
> Q: Do you recall that testimony, sir; yes or no?
> A: Yes.
> Q: And you felt that way about Martin Shkreli in 2012; correct?
> A: Correct.
> Q: In 2013; correct?
> A: Possibly.
> Q: And in 2014; correct?
> A: Possibly.
> Q: Yet, in 2014, you signed on to a consulting agreement and release with Retrophin; correct?
> A: With Retrophin.
> Q: And in that connection, you represented Mr. Shkreli to investors as someone doing great things, didn't you, sir?
>
> MS. SMITH: Objection, Your Honor.
> THE COURT: Sustained.

Tr. 3813:21–3814:15 (Blanton). The government is well aware that documents contemporaneous with Mr. Blanton's consulting agreement show his endorsement of Mr. Shkreli—Retrophin's then-CEO—and his praise for the "great thing" Mr. Shkreli was doing for the company. DX 115-15. *This evidence strikes at the heart of the government's allegations*

regarding one of the three theories charged in Count Seven, *i.e.*, that the consulting agreements were "shams." Accordingly, the government's objections to these lines of questions were particularly ill-founded and improper. Mr. Blanton's answers to Mr. Mastro's questions would have allowed the jury to evaluate Mr. Blanton's credibility with respect to a crucial issue on this case.

The government has alleged that Retrophin was defrauded by the settlement and consulting agreements at issue in Count Seven. Nonetheless, Mr. Mastro was cut short in his efforts to inquire about Retrophin's disclosure of Mr. Blanton's consulting agreement in SEC filings.

> Q: Am I correct, that in its fiscal year 2013, 10K filing, that Retrophin disclosed your consulting agreement?
> A: If you say they did, and if it is in the filings, I assume it is.
> Q: They disclosed exactly how many shares you were going to receive as a consultant, the term expired on December 31, 2014. Correct?
>
> MS. SMITH: Objection.
> THE COURT: Sustained.

Tr. 3825:8–16 (Blanton).

\*   \*   \*

For the reasons set forth above, we respectfully request that going forward at trial, the defense be allowed greater latitude to cross-examine the government's witnesses, and especially as it relates to questions pertaining to a witness's credibility or bias and to issues that are central to the allegations in the Superseding Indictment.


Respectfully,


*/s/ Joshua E. Dubin*
Joshua E. Dubin


cc:   Alixandra E. Smith, Esq.
      David C. Pitluck, Esq.
      David K. Kessler, Esq.