**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Winston Y. Chan
Direct: +1 415.393.8362
Fax: +1 415.374.8460
WChan@gibsondunn.com

November 9, 2017

VIA ECF

The Honorable Kiyo Matsumoto
United States District Court Judge
United States DIstrict Court for the Eastern DIstrict of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *United States v. Greebel*, S1 15 Cr. 637 (KAM)

We respectfully write regarding the government's intention to elicit testimony from Stephen Aselage as to his understanding—based solely on multiple layers of hearsay emanating from a privileged internal investigation—that the settlement and consulting agreements at issue in Count Seven were fraudulent, and as to Retrophin's remedial actions following that investigation. There is absolutely no basis for the proffered testimony, the admission of which we submit would give rise to immediate grounds for a mistrial.

As an initial matter, we have not in any way "opened the door" to the proffered testimony. As Your Honor is aware, the parties have briefed this issue over the past few weeks, but for the first time yesterday the government reversed itself. Indeed, having first taken the position that it would not delve into the details of Retrophin's post-September 2014 conduct unless we "opened the door," the government now intends to affirmatively introduce that very conduct through Mr. Aselage. This, despite the government having obtained rulings from the Court premised on the government's prior position and despite our having altered our approach on cross-examination in order to conform to those rulings.

Early in the trial, the government objected to our cross-examination of former MSMB investors with respect to those investors' settlement agreements with Retrophin. Specifically, this issue first arose on cross-examination of Richard Kocher. At sidebar, Mr. Dubin clarified for the court that his next question for Mr. Kocher would be "if he's given the money back." Tr. 2761:19-20. Mr. Dubin further explained, "What I intend to ask him is that if the government's claim in this case that the money that he was given rightfully belonged to Retrophin, and then I'm going to ask him how much he's given back." Tr. 2762:18-21. Your Honor sustained the government's objection, in part reasoning that these questions "risk[ed] opening the door to exploring Mr. Kocher's knowledge about attempts by Retrophin to get its money back, regulators looking at what happened to Retrophin." Tr. 2783:16-19. Your Honor further explained, "I really don't think that this question about

GIBSON DUNN

The Honorable Kiyo Matsumoto
November 9, 2017
Page 2

giving money back . . . and that somehow the fact that he has the money negates the government's . . . ability to prove its case against Mr. Greebel, I think it's too far of a leap." Tr. 2793:13-18.

The parties then briefed the issue, wherein the government again argued that our inquiry into whether settling parties returned their funds to Retrophin would open the door to questions regarding Retrophin's post-September 2014 handling of the settlement agreements. Specifically, the government argued:

> <u>Third</u>, if the defendant is permitted to argue that Retrophin received the "benefit of a "bargain" and to elicit that Retrophin has not requested the money back, then the government must be permitted to offer evidence that Retrophin did not received the "benefit of the bargain" and that it has sought the return of the funds from the settlement agreements. . . . That evidence would include, but would not be limited to:  (1) testimony from board members about whether Retrophin received the benefit of the bargain; (2) evidence related to Retrophin's subsequent internal investigation that revealed for the first time the true nature and purpose of the settlement agreements; (3) the fact that Retrophin filed a civil lawsuit against Mr. Shkreli accusing him of fraud and seeking the return of the stolen funds; and (4) the fact that the criminal charges against the defendant include a forfeiture allegation.

Dkt. 437, at 3. Similarly, at oral argument on this issue, the government stated that "[t]here's certainly additional Retrophin board members on our witness list, including Mr. Aselage, to the extent a cross-examination of him might ask questions that suggest Retrophin believed it got the benefit of the bargain, . . . those sorts of questions would open the door" because it is "not Retrophin's belief" that it got the benefit of the bargain. Tr. 3435:24-3436:9. Relying in part on the government's representations, the Court denied our request and precluded us from inquiring, on subsequent cross-examinations, whether investors returned their money to Retrophin. Tr. 3435 ("[I]f the jurors hear testimony from an investor, 'Yes. I've kept the money. I've never given it back,' then they would be misled into believing that Retrophin didn't do anything to get their money back. . . . The question then the government would want to seek to explore [is] 'did Retrophin ever do anything to get the money back?' The answer to that question is yes.").

Taking heed of Your Honor's ruling and relying on the government's representations, we have since altered our approach on cross-examination. Indeed, since the Court's ruling we have not asked any investor-witnesses whether they have returned their settlement payment to Retrophin. While we have inquired into the investor-

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
November 9, 2017
Page 3

witnesses' own views of their settlement agreements, the testimony elicited—without government objection—has been focused on the monetary value of these witnesses' recoveries, relative to their initial investment. D. Geller Cross, Tr. 2965:18-21 ("Q: . . . You thought that settlement was fair to all parties, correct, 300,000, and you got to keep your 30,514. A: Yes, I thought it was fair to all the parties at the time."); S. Marshall Cross, Tr. 3157:12-17 (Q: So 480,000, plus 300,000 in cash adds up to $780,000? A: Yes. Q: From your original investment of 200,000? A: That's right. Q: That's a pretty good deal, right? A: It turned out that way."); L. Rosenwald Cross, Tr. 3515:24-3516:1 ("Q: Did you consider the settlement agreement that you ultimately reached to have made you whole? A: To have made me whole? Yes.").

It is fundamentally and breathtakingly unfair for the government to have obtained rulings from the Court based explicitly on the desire to avoid "opening the door" to Retrophin's post-September 2014 conduct, and for the defense to have changed course on cross-examination based on those rulings, and for the government now to seek to admit such testimony affirmatively.

What is additionally troubling is the government's intention to elicit testimony from Mr. Aselage based exclusively on what he learned from Retrophin's privileged internal investigation—or worse, what he learned from other board members about what those board members learned from that investigation. Such testimony is irrelevant, inadmissible, and highly prejudicial; it also would violate Mr. Greebel's constitutional rights under *Crawford v. Washington*, 541 U.S. 36 (2004), *Melendez-Diaz Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).

***First***, the results of internal investigations are irrelevant and improperly invade the province of the jury. Indeed, "an attorney's formal opinion about whether any crimes were committed would not be relevant evidence," as "that determination is for a jury" to make, not an outside law firm. *United States v. Reyes*, 239 F.R.D. 591, 599-600 (N.D. Cal. 2006) (Breyer, J.). Here, as the government itself concedes, the proffered testimony of Mr. Aselage is derived solely from the results of the internal investigation conducted by Retrophin's counsel, testimony of which if admitted would improperly usurp both the role of the Court in instructing the jury as to the applicable law and the role of the jury in applying that law to the facts before it. *Accord United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988). The government permissibly has offered, and will undoubtedly continue to offer, direct evidence through witnesses with first-hand knowledge in support of its proposition that the settlement and consulting agreements provided Retrophin with no value, for example because the investors did not seek to sue Retrophin or the consultants performed no work. But to instead simply put the law firm's investigative findings before

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
November 9, 2017
Page 4

the jury improperly does nothing more than "*merely tell[ing] the jury what result to reach.*" *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

**Second**, Mr. Aselage's proffered testimony as to the settlement and consulting agreements constitutes inadmissible hearsay within multiple layers of hearsay.  Indeed, the court in *Reyes* held that that a law firm's statements in an investigative report constituted "hearsay-upon-hearsay," and that "the second-hand reflections, findings, and conclusions of investigating attorneys would not themselves become evidence at trial to prove the truth of the matters they assert." *Reyes*, 239 F.R.D. at 600.  Similarly, in *In re Homestore.com, Inc.*, 2011 WL 291176, at *6-7 (C.D. Cal. 2011), the court addressed a motion *in limine* to exclude an investigative report created by a law firm hired by a company's board.  The court found the report inadmissible on a number of grounds.  First, the report contained "documents and statements that constitute[d] hearsay," as it contained "many statements and interviews with unknown individuals," which the plaintiff sought to offer for the truth of the matters asserted therein.  *Id.* at *6.  Like the internal investigations at issue in *Reyes* and *Homestore*, Retrophin's internal investigation should be precluded as inadmissible hearsay.  Nor does it matter that the government does not seek to admit the report itself, since Mr. Aselage's testimony would serve only as a conduit of the report's findings and conclusions regarding the settlement and consulting agreements, which the government is seeking to offer for the truth of the matter asserted—that the agreements were in fact fraudulent.

**Third**, Mr. Aselage's proffered testimony should be precluded under Rule 403.  In *Thomas v. Metro. Dist. Comm'n*, 2004 WL 2549728, at *1 (D. Conn. Nov. 5, 2004), the court ruled that a report prepared by a law firm pursuant to an independent investigation of a company's employment practices was inadmissible at a trial on the plaintiff's employment discrimination claims.  Crucially, the court held that "even if the Report were otherwise admissible, the Court would exercise its authority under Rule 403" to exclude it, because "whatever slight probative value" the report had was "far outweighed by the danger of prejudice, confusion, waste of time and undue delay" given the concern that introduction of the report "would spin off into mini-trials on all of the findings and opinions set forth" in the report.  *Id.* at *3; *see also Chavez v. Metro. Dist. Comm'n*, 198 F. App'x 74, 75 (2d Cir. 2006) (unpublished) (agreeing with the district court's exclusion of the report "on grounds that the report was inadmissible hearsay, was irrelevant, and that the prejudice associated with admitting the report far outweighed its probative value").  Indeed, Mr. Aselage's testimony, rooted solely in Cooley's findings, poses a significant risk that the jury will make decisions regarding Mr. Greebel's innocence or guilt based *not* on the evidence on trial but on the conclusions of Retrophin' s outside counsel.

This testimony will also cause significant delay, since we will be forced to seek to compel discovery, having been denied any discovery whatsoever relating to the internal investigation

The Honorable Kiyo Matsumoto
November 9, 2017
Page 5

on grounds of Retrophin's privilege. During trial, we will be left with no choice but to explore the deficiencies of the internal investigation and the inadequacy of its conclusions, thereby conducting a "trial within a trial." We will also be forced to recall the investor-witnesses in order to more fully cross-examine these witnesses regarding their settlement agreements, having unfairly altered our approach in response to a ruling the Court made in reliance on the government's representation that it was seeking to avoid evidence of Retrophin's post-September 2014 conduct.

**_Fourth_**, Supreme Court precedent makes clear that the government may not introduce an external report without providing an opportunity for Mr. Greebel to cross-examine its authors at trial. In *Melendez-Diaz*, the Supreme Court ruled that a defendant's Sixth Amendment right of confrontation was violated when the prosecution submitted into evidence "certificates of analysis" reporting that a forensic analysis of seized substances revealed them to contain narcotics. 557 U.S. at 308 (2009). The Court held that such documents fell within the "core class of testimonial statements" which are inadmissible against a defendant unless a defendant is confronted with the declarant at trial, or the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine them. *Id*. at 309-11 (quoting *Crawford*, 541 U.S. at 51-52). The report of Retrophin's internal investigation, which clearly qualifies as a "pretrial statement[] that declarants would reasonably expect to be used prosecutorily," falls squarely within this analysis, and its admission into evidence without an opportunity to confront its authors at trial would violate Mr. Greebel's Sixth Amendment rights. *Crawford*, 541 U.S. at 51.

Moreover, as the Supreme Court held in *Bullcoming*, the government cannot introduce a report containing testimonial statements through the in-court testimony of an individual who did not themselves make the testimonial statement. 564 U.S. at 652. Indeed, the Court emphasized that the Confrontation Clause "does not tolerate dispensing with confrontation [even if] the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id*. at 662. Under *Bullcoming*, testimony by Aselage regarding the substance or conclusion of the report (and the hearsay statements therein) plainly violates Mr. Greebel's Sixth Amendment right to confront the declarants of the testimonial statements therein.

GIBSON DUNN

The Honorable Kiyo Matsumoto
November 9, 2017
Page 6

For all of these reasons, the Court should preclude the government from eliciting Mr. Aselage from testifying about matters derived from Retrophin's internal investigation or the actions taken by Retrophin as a result of that investigation.

Sincerely,

*/s/ Winston Y. Chan*

Winston Y. Chan