

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMK:AES/DCP/DKK                                    *271 Cadman Plaza East*
F.#2014R00501                                      *Brooklyn, New York 11201*

November 18, 2017

By Hand and ECF

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:   United States v. Evan Greebel
             Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

       The government respectfully submits this letter in further support of its motion to preclude defense expert witness Alan Johnson from testifying at trial. (See, e.g., Dkt. Nos. 329, 383.) Based on the Daubert hearing on November 14, 2017, it is clear that Johnson's proposed testimony should be precluded for multiple independent reasons.

       First, as Johnson concedes, he is not qualified to offer any of the opinions disclosed by the defendant in this case, which relate to "consulting agreements" in general. Second, to the extent Johnson is qualified to opine about a narrow subset of consulting agreements—agreements "used for departing senior executives usually that require little or no work and where the significant substance of the agreement is in the covenants" (Nov. 14, 2017 Daubert Hearing Tr. ("Tr.") 41:23-42:2)—those narrow opinions are irrelevant because they do not relate to any fact at issue in this case. Third, Johnson's opinions are based on an unreliable methodology. Fourth, Johnson is not qualified to offer his new opinion about "with cause" termination provisions in employment agreements, and that opinion is similarly both irrelevant and based on an unreliable methodology.

I.      Background

      A.     The Defendant's Expert Disclosures

       On August 11, 2017, the defendant noticed Johnson to testify about "consulting agreements" and, more specifically, his "scientific identification and analysis of consulting agreements disclosed publicly through SEC filings." Dkt. No. 312-2 at 3-4 (emphasis added). On August 25, the defendant described Johnson as "one of the foremost and leading experts

about the use of consulting agreements by private and public corporations."  Dkt. No. 347 at 53 (Aug. 25, 2017 Def.'s Opp'n to Gov.'s Motions in Limine).  On September 19, the defendant disclosed that Johnson's "ongoing" analysis involved: "analyzing the consulting agreements at issue in this case, including the specific terms included"; "using keyword searches in the SEC's EDGAR database . . . to identify the disclosure of consulting agreements that are potentially comparable"; and "analyzing the universe of potentially comparable consulting agreements to identify agreements that have similar key terms."  Dkt. No. 383-1 at 11.  On October 13, the defendant disclosed a detailed methodology related to Johnson's EDGAR searches, as well as an additional search Johnson apparently did using Google.  See Dkt. No. 405.  On November 13—the day before the Daubert hearing—the defendant made a further disclosure, which stated that (1) Johnson was no longer relying on his EDGAR searches for his opinions related to consulting agreements, and (2) Johnson would offer a new opinion related to the termination-for-cause provision in Martin Shkreli's employment agreement, which was based in part on an additional Google search.  See Dkt. No. 448.

      B.      The Daubert Hearing

      Johnson's testimony at the Daubert hearing about his qualifications, methodology, and opinions bore little resemblance to the expert disclosures described above.

      First, Johnson described himself as an expert in a different field than that which the defendant had identified.  Rather than agreeing that he was "one of the foremost and leading experts about the use of consulting agreements by private and public corporations" or even an expert in all "consulting agreements" or all agreements with broad general releases, Johnson testified that, in addition to being an executive compensation expert—which is Johnson's actual area of expertise—he has expertise with consulting agreements "used for departing senior executives usually that require little or no work and where the significant substance of the agreement is in the covenants."  Tr. 41:23-42:2; see Tr. 38:3-4 ("Q. Are you an expert in all consulting agreements?  A. No.").

      Second, Johnson testified to a substantially different methodology than that which was described in the expert disclosures.  The defendant disclosed that the Google search Johnson directed was used to identify agreements that were "comparable to the agreements at issue in this case based on the key provisions [he] identified" (Dkt. No. 405 at 6), whereas Johnson testified that he "went out to look for examples of the kind of consulting agreement in which [he] told us [he] had specific expertise in" (Tr. 68:19-22) (emphasis added).  In other words, Johnson did not look for agreements similar to the ones in this case; he looked for agreements similar to those he already knew.[1]

---

[1] Johnson's testimony revealed many other differences with regard to methodology.  For example, the disclosures stated that one of the "key provisions" Johnson identified was the "title" (Dkt. No. 405 at 4-5), but Johnson denied that.  Tr. 63:19-21 ("I don't think the title is -- it can be helpful, but I don't think the title . . . .").  And Johnson testified that he relied on a "half dozen or so substantive similarities," not the four "key provisions" in the disclosures.  Tr. 63:12-17.  There were also inconsistencies as to the bases for Johnson's opinions.  For example, the

Third, Johnson testified to different opinions than those described in the disclosures. The disclosures described eight opinions Johnson intended to offer related to "consulting agreements" without limitation. But Johnson testified that all of the references to "consulting agreements" in the disclosures should be limited to the narrow subset of consulting agreements with which Johnson has experience. Tr. 42:3-18.

Johnson also made clear that, other than the four consulting agreements identified in the Superseding Indictment, he has not reviewed any documents related to this case and is not basing his opinions on any facts in this case. Tr. 44:24-45:9. Johnson has no knowledge of the parties to the consulting agreements he reviewed or the context in which those agreements were entered. Tr. 45:10-46:8.

II.     Applicable Law

A district court, in executing its gatekeeping function, should ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The proponent of the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10.

With respect to the admission of expert testimony, Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has explained that Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 590. "[W]hether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999) (internal citation omitted). Therefore, an expert's testimony must be relevant, reliable, and of such a foreign subject matter that the testimony would assist the trier of fact.

When an expert witness conducts a study or employs a methodology, Daubert requires that the Court evaluate the study and methodology in order to determine whether they are reliable:

---

disclosures state that Johnson based his opinions in part on "academic research and literature" (Dkt. No. 383-11 at 11), but Johnson denied using any such material, Tr. 43:22-44:3.

> [I]t is critical that an expert's analysis be reliable at every step . . . .
> [T]he <u>Daubert</u> requirement that the expert testify to scientific
> knowledge—conclusions supported by good grounds for each step
> in the analysis means that any step that renders the analysis
> unreliable under the <u>Daubert</u> factors renders the expert's testimony
> inadmissible. . . . In deciding whether a step in an expert's analysis
> is unreliable, the district court should undertake a rigorous
> examination of the facts on which the expert relies, the method by
> which the expert draws an opinion from those facts, and how the
> expert applies the facts and methods to the case at hand.

<u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002) (internal quotation marks omitted) (citing <u>In re Paoli R.R. Yard PCB Litig</u>, 35 F.3d 717, 745 (3d Cir. 1994)).  The methodology must "rise to the level of intellectual rigor employed" in a given field, and cannot simply consist of "reverse-engineering a theory to fit the desired outcome."  <u>In re Mirena IUD Prod. Liab. Litig.</u>, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016); <u>see also</u> <u>Kumho Tire Co.</u>, 526 U.S. at 152; <u>Faulkner v. Arista Records LLC</u>, 46 F.Supp.3d 365, 381 (S.D.N.Y. 2014) ("[M]ethodology . . . aimed at achieving one result . . . is unreliable, and . . . must be excluded.").

With regard to expert testimony that is based upon experience, "the witness must explain how that experience leads to the conclusion reached . . . reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" <u>Thomas v. City of Chattanooga</u>, 398 F.3d 426, 432 (6th Cir. 2005) (quoting Fed. R. Evid. 702, Advisory Committee Note).  In other words, expert opinions are inadmissible if based on speculative assumptions.  <u>See</u> <u>Daubert</u>, 509 U.S. at 589-590 (noting that "knowledge" within the meaning of Rule 702 means more than subjective belief and unsupported speculation); <u>see</u> <u>also</u> <u>Kumho Tire</u>, 526 U.S. at 157 (1999) (noting that "[o]pinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be admitted).

III.   <u>Argument</u>

    A.   <u>Johnson Is Not Qualified To Offer the Opinions Disclosed by the Defendant</u>

The defendant disclosed that Johnson would offer eight opinions related to "consulting agreements" or consulting agreements with "broad general releases."  Dkt. No. 383-10-11.  But Johnson conceded that he is not an expert in the general field of consulting agreements. Tr. 38:3-4 ("Q. Are you an expert in all consulting agreements.  A. No.").  Nor did Johnson claim to be an expert in all consulting agreements with "broad general releases."  To the extent Johnson has any expertise in a particular subset of consulting agreements, his expertise is limited to agreements "that are used for departing senior executives usually that require little or no work and where the significant substance of the agreement is in the covenants." Tr. at 41:23-42.  Moreover, Johnson's expertise does not extend to any consulting agreements where the individual party to the contract did not have an employment relationship with the company:

> Q.  So have you ever seen one of the specific type of settlement consulting agreements on which you're offering an expert opinion in which the person getting the consulting agreement had never been an officer or a director of the company?
>
> A.  Yes. My expertise -- I have not. Again, the work that I do, I have not seen it used for people that never had an employment arrangement at some time with the company.

Tr. 48:13-22.[2]

        As a result, Johnson is plainly unqualified to offer any of the broad opinions about "consulting agreements" identified in the defendant's disclosures.  See, e.g., Nimley v. City of New York, 414 F.3d 381, 399 n.13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."); United States v. Diallo, 40 F.3d 32, 34 (2d Cir. 1994) ("[W]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.") (internal quotation marks and citation omitted); LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 2d 612, 638-39 (S.D.N.Y. 2016).  Indeed, when confronted with the defense's disclosures describing his broad opinions, Johnson stated that he would not offer such opinions.  Tr. 42:3-42:8.

      B.    **Johnson's Opinions About Certain Consulting Agreements Used with "Departing Executives" Are Irrelevant**

        Johnson's opinions about the narrow set of consulting agreements in which he believes he has expertise are irrelevant.  Daubert, 509 U.S. at 597 (emphasis added) (district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").[3]

---

    [2] Although Johnson initially suggested that the kinds of consulting agreements with which he supposedly has expertise are sometimes used with a departing "founder" of the company—information not listed in the defendant's many expert disclosures—Johnson later clarified that the "founders" to which he referred also either had an employment relationship at the time they left or had previously had an employment relationship as an officer or director but had then transitioned to an "emeritus" position.  Tr. 47:8-48:25.

    [3] See also, e.g., Donnelly v. Ford Motor Co., 80 F.Supp.2d 45, 49 (E.D.N.Y. 1999) ("In order to determine whether the expert's testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' . . . the testimony must not only be reliable but must be relevant in that it 'fits' the facts of the case.") (quoting Federal Rule of Evidence 702 and Daubert, 509 U.S. at 591-92)).

None of the consulting agreements at issue in this case involved a Retrophin employee, let alone a "departing senior executive." Yet those are the only kinds of consulting agreements with which Johnson has experience or expertise and the only kinds of consulting agreements his opinions address. Johnson's opinions therefore are irrelevant because they relate to facts that will not be established in this case, including that any consulting agreement at issue was given to a departing executive. Daubert, 509 U.S. at 591; Donnelly, 80 F.Supp.2d at 52 (excluding expert opinion under Daubert because the opinion "does not fit the facts of this case").

Moreover, the reasons Johnson provided for the use of the "departing executive consulting agreements" about which he claims to have expertise underscore the irrelevance of his proposed testimony to this case. For example, Johnson explained that such "departing executive" agreements may be used to address litigation concerns, but also explained that the applicable litigation concerns were those that related to the departing executive's employment. Tr. 50:33-5 ("Q. [Those claims] had some relationship to the employment status of the consultant at some point? A. Yes, I believe that's true."). Johnson also testified that these "departing executive consulting agreements" are often used when a company is seeking to dismiss an executive—which Johnson described as "usually a very emotional chaotic period"— but wants "to get the [departing executive] to leave in a reasonable state" or "may be concerned about trade secrets or business secrets. You don't want to be sued." Tr. 8:6-22. It is not surprising that Johnson intends to opine on the factors that contribute to departing senior executive agreements—that is what he knows. But none of those circumstances apply in this case.

Even if the bar for "relevance" is low, Johnson's testimony does not clear it. Johnson's opinions about consulting agreements given to departing executives to resolve potential claims arising out of those executives' employment do not make it any more or less likely that the defendant conspired to defraud Retrophin. See Fed. R. Evid. 401. Again, none of the recipients of the consulting agreements at issue was a departing Retrophin executive, and, as a result, no alleged claims that any of the recipients may have made against Retrophin (to the extent that any such claims were made at all) could have related to the recipients' employment with Retrophin.

Nor does Johnson's view that the text of the consulting agreements at issue in this case is similar to the text of various "departing executive" agreements make it less likely that those agreements were used to conceal that the defendant, Shkreli, and others agreed to misappropriate Retrophin assets to pay defrauded MSMB Capital and Healthcare investors. The government has not argued that the consulting agreements themselves are not contracts that appear to be valid; rather, the government has argued that the agreements were the mechanism that made it possible for the defendant and Shkreli to steal money from Retrophin to buy off Shkreli's disgruntled hedge fund investors. Johnson has nothing to say about what actually happened in this case, and the jury should decide this case based on what happened, not an executive compensation expert's opinions about common practices in the entirely irrelevant field of executive separation agreements.

C.      To the Extent Johnson Applied a Methodology, It Is Unreliable

As the testimony at the Daubert hearing made clear, Johnson's general opinions about "departing executive consulting agreements" are not based on anything other than his purported expertise.  Although the defendant's disclosures described a "scientific analysis" and suggested that Johnson's opinions were based in part on his Google and EDGAR searches, Johnson made it clear that he is not relying on EDGAR searches at all and that the Google searches provided only examples of "departing executive consulting agreements," not information upon which he relied to reach his opinions.  See Tr. 61:18-20 ("I didn't say I was relying on any of [the example agreements].") ; Tr. 62:7-9 ("Q. But whether you have zero examples or 100 examples, Opinion G [about comparing agreements] would not change? A. Exactly.") ; Tr. 68:19-68:22 ("Q. So basically you went out to look for examples of the kind of consulting agreement in which you told us you had specific expertise in?  A. That's exactly what I have said several times, yes.").

But even if Johnson's opinions about "departing executive consulting agreements" in general were reliably based on his training and experience, his opinions about the consulting agreements in this case are not.  Those opinions, including an opinion about the expectations of the various parties, are not based on the facts of this case, which Johnson does not know.  Nor is Johnson an expert in interpreting contracts, including consulting agreements. See, e.g., Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505, (2d Cir. 1977) (expert's opinion on meaning contract terms was outside scope of expertise and invaded court's authority to instruct on the law); Levinson v. Westport Nat'l Bank, No. 2013 WL 3280013, at *4 (D. Conn. Jun. 27, 2013) ("[A]n expert may not interpret a contract for the jury, nor may an expert testify about the meaning of legal terms.") (citations omitted); Breezy Point Co-Op., Inc. v. Cigna Prop. and Cas. Co., 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (noting that an expert is barred from proffering an opinion with respect to the parties' legal obligations pursuant to a contract).

Moreover, Johnson's comparison of the agreements in this case to agreements he found using Google is patently unreliable.  Johnson could not explain the Google search he used to select exemplar "departing executive consulting agreements."  Johnson testified that he did not conduct the searches himself, did not know what keywords were used for the searches, and did not know how the agreements about which he testified were selected from the initial set of hits generated by Google.  See Tr. 67:24-68:18; 69:18-25.  More importantly, Johnson's comparison of his example consulting agreements to the agreements at issue in this case is not based on a reliable methodology.

To conduct that comparison, Johnson simply applied a "you know it when you see it" test based on the texts of the documents:

> Q. So you can tell just from looking at the four consulting agreements at issue in this case that they fall in one category or another?
>
> A. I would, again, just looking at them and putting them into the typical categories, yes.

7

Tr. 52:17-21; see Tr. 51:18-23 ("Q.  Tell me if this is not fair: You know it when you see it, right? . . . A. I guess like Potter Stewart said, when you see it.").  Johnson conducted this word comparison without knowing the actual relationship between any of the recipients of the consulting agreements and Retrophin; indeed, he claimed his opinion would be the same regardless of the actual relationship between those parties.  Tr. 46:5-7 ("Q. Do any of your opinions depend on the relationship between any of those four people and Retrophin?  A No.").  There is nothing rigorous, replicable, or reliable about Johnson's comparison of the text of two documents using a "you know it when you see it" test.[4]  Fed. R. Evid. 702, Advisory Cmte. Note ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").  If there could be an expert in the field of comparing consulting agreements with departing executive separation agreements, the "level of intellectual rigor that characterizes the practice of an expert in the field" would surely require more than the test Johnson used.  Kumho Tire Co., 526 U.S. at 152.

Finally, as Johnson himself explained, the jury could conduct the word comparison just as easily as he did:  "[T]he judge, certainly a jury or certainly lawyers in this room would generally know it when they see it."  Tr. 53:10-13.  Therefore, even if this word comparison were relevant and reliable, it is not the proper purview of expert testimony.  See United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991) (If the testimony is instead directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help, the testimony is properly excludable." (internal quotation marks and citation omitted); United States v. Mohamed, 157 F. Supp. 3d 268, 271–72 (E.D.N.Y. 2016) ("[E]xpert witnesses are unnecessary when the factfinder is "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962)).

D.     Johnson's Last-Minute, Narrow Opinion about the Termination-for-Cause
       Provision Is Irrelevant and His Google-Based Comparison Is Unreliable

At the Daubert hearing, Johnson offered a new and extremely narrow opinion: he has seen "termination for cause" provisions substantially similar to the one in Shkreli's employment agreement.  Tr. 79:2-10.  Johnson offered this opinion without knowing whose employment agreement contained that provision, without knowing whether that agreement was for the CEO of a company, and without reading any other part of the agreement, including any of the other termination provisions.  See Tr. 73:18-21 ("Q. When did you first review Mr. Shkreli's employment agreement?  A. I don't think I've ever reviewed his employment agreement."); Tr. 74:5-6 ("I haven't read the agreement"); Tr. 75:9 ("A. I assumed it's for an executive.").

---

[4] At times Johnson suggested that he relied on "half dozen multiple similarities generally between the different agreements" in conducting a comparison.  Tr. 63:3-5.  But Johnson did not explain how he identified the factors he considered, why he considered them, or how much weight he placed on each of them.  In other words, even if Johnson did conduct a comparison of "half a dozen" similarities, that comparison relied on the same eye-ball test described here.

Johnson's opinion about the "termination for cause" provision is irrelevant because, among other reasons, he did not review any other provision of the employment agreement.  As a result, Johnson is not and cannot offer opinions about the reasonableness of Shkreli's employment agreement or termination clause as a whole, assuming such an opinion could be relevant.

Moreover, Johnson's comparison of the Shkreli "termination for cause" provision to the "termination for cause" provision in four other employment agreements he identified using Google is unreliable because Johnson could not explain what search terms were used to run those Google searches or how the hits from those searches were reviewed.  Instead, Johnson suggested that his staff simply cherry-picked four agreements in which the text of the "for cause" provision was similar. Tr. 80:2-81:2.  As a result, even if his narrow general opinion was permitted, his examples should not be.

IV.   Conclusion

For the reasons set forth above, the Court should exercise its gatekeeping function and preclude Johnson from testifying at trial.[5]

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:   /s/_____
      Alixandra E. Smith
      David C. Pitluck
      David K. Kessler
      Assistant U.S. Attorneys
      (718) 254-7000

---

[5] In the event that the Court permits Johnson to testify, his testimony should be limited to the opinions and bases about which he testified at the Daubert hearing.  Furthermore, to the extent the defense offers other experts in his case-in-chief, their testimony should be limited to the opinions and subject matters described in the defendant's expert disclosures.  This limitation is particularly important in light of the substantial divergence between the expert disclosures for Johnson and Johnson's testimony at the Daubert hearing.