## GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Winston Y. Chan
Direct: +1 415.393.8362
Fax: +1 415.374.8460
WChan@gibsondunn.com

November 21, 2017

VIA ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter in response to the government's letter brief dated October 23, 2017 (Dkt. No. 451) in further support of its motion to preclude the expert testimony of Alan Johnson (Dkt. Nos. 329, 383).

Our letter to the Court dated October 26, 2017 (Dkt. No. 429) describes our prior disclosures to the government of Mr. Johnson's qualifications, opinions, bases, and analysis (Dkt. Nos. 312-2, 383-1, 405), so we do not reiterate that history here. We further supplemented our disclosures to the government by letter dated November 13 (Dkt. No. 448). Specifically, we disclosed one additional opinion regarding termination-for-cause provisions in executive employment agreements, in response to trial testimony the government elicited on that topic. *See* Trial Tr. 2602:3–12 (Richardson), 4449:8–4450:5 (Aselage). We also disclosed that the defense would not seek to offer evidence of Mr. Johnson's searches for exemplar consulting-and-settlement agreements on the Securities and Exchange Commission's EDGAR database.

### A.      Mr. Johnson's Testimony at the *Daubert* Hearing

The Court held a *Daubert* hearing for Mr. Johnson on November 14, 2017. Mr. Johnson testified that he has "advise[d] corporations on their compensation programs" for his "entire professional career, 37 years." Hr'g Tr. ("Tr.") 3:21–25. He has testified as an expert in "about 30" prior proceedings in federal and state courts and arbitrations. Tr. 18:4–10.

At Johnson Associates, the firm he founded "25 years ago," Mr. Johnson annually "advise[s] about 100 to 125" clients from "across the United States," as well as internationally. Tr. 4:7–23. His work includes advising companies on both the compensation amount and the design of "elements" of agreements for both incoming and departing executives. Tr. 5:18–6:3, 7:9–13. Over the course of his career, he has reviewed "tens of thousands" of employment

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 2

agreements and advised on up to 1,000 of them, as well as personally advising on "hundreds" of termination agreements. Tr. 6:24–7:8, 7:25–8:3. He spends more time advising his corporate clients on contract design than on pure compensation amounts:

> Q. And going back to executive compensation consulting, what would you say are sort of the main areas of your work?
>
> A. We spend a lot of time on the amounts of compensation, that's probably, if I were to guess, 40 percent of our work and the other 60 percent is around designs. It would be annual and long-term incentive plans, looking at different kinds of agreements, employment agreements, but all kinds of structures and programs. So it is probably 40 percent data and roughly 60 percent kind of the design of different programs.

Tr. 5:8–17.

Mr. Johnson testified that he "[a]lmost always" works with counsel for both his corporate clients and the individual executives in advising on both employment and termination agreements. Tr. 6:16–23. He described the termination context as a "fraught," "very emotional [and] chaotic period" during which a company may be concerned about "threats or implicit threats of litigation or badmouthing the company." Tr. 7:15–24, 8:9–9:3. He explained that such litigation risks may arise out of provisions of the agreement to be terminated: "Depending on how well the document is written, it may not provide a basis for that type of termination . . . ." Tr. 9:15–18.

### 1. Consulting and Settlement Agreements

Companies "[a]lmost always" mitigate risk by entering into "some type of agreement" with an involuntarily departing executive, board member, or founder. Tr. 10:11–12, 16:24–17:15. Although the most common form is a "simple release," a company "may decide that a settlement agreement is not enough." Tr. 10:13–11:15. He explained:

> The individual may negotiate something that they're not comfortable providing just for a settlement agreement. They may go down the road of a consulting agreement or other feature they believe can justify either the board or shareholders that they're willing to go beyond what would be a more straightforward settlement agreement to something else, which is a consulting agreement.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 3

Tr. 11:15–21.  Mr. Johnson has personally advised clients on between 100 and 200 such consulting-and-settlement agreements.  Tr. 14:2–6.

These types of consulting-and-settlement agreements generally contain "vague" consulting terms and broad releases of liability, because in "almost all cases, really what you're trying to get is the covenants rather than, for example, the consulting aspects."  Tr. 12:22–24.  Mr. Johnson explained:

> In most cases, the consulting agreement in the context we're talking about, the consulting element is vague.  It says you must be available, it says that you must use your expertise.  There is usually very little standards for the accomplishments that you have to do.  There is almost never a statement of how much work is really required of you.  It's usually stated as a maximum, that you can't work more than—that you shouldn't work more than 20 percent of your time or be available or some other provisions.  So the consulting element of it is usually quite modest.  It provides the company some optionality for using this executive as they see fit.  But really what you're trying to get is get the release, what the settlement agreement would provide, perhaps some enhanced covenants, non-disparagement, non-solicit, non-compete, confidentiality, of course.  You are really pushing for the covenants.

Tr. 11:24–14.  Mr. Johnson testified that the "working assumption" on "both sides" of such agreements "is that little or no work will need to be performed," and that it would be "unusual" for the company to actually invoke the consulting provisions.  Tr. 16:3–15.  Indeed, Mr. Johnson testified that it would be "unusual" for either party to bring up consulting at all during settlement negotiations; instead, "[i]t's one of the two lawyers who bring it up."  Tr. 15:5–16:2.

To illustrate these types of consulting-and-settlement agreements, Mr. Johnson directed his staff to find publicly available examples through a "simple Google search."  Tr. 18:18–19:16 ("Q. And you reviewed sort of everything that the staff member did as to the public record search?  A. Yes."); *see also* DX-119-11.  The search was not intended to be an "exhaustive search," but rather an effort to find "some real world examples" of similar consulting agreements with broad settlement provisions.  Tr. 19:17–20:1.  The nine agreements identified through this search shared "common characteristics," including "generally vague" consulting provisions with "no real parameters about the work to be performed" juxtaposed with "very long and detailed" release provisions "from all potential claims," indicating a "focus . . . on the covenants rather than the consulting part of the agreement."  Tr. 20:21–22:1.  He also identified "pretty significant" amounts of compensation associated with the

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 4

consulting provisions, which are not "conditioned upon the completion of any amount of consulting work," indicating the company was "paying much more for the different releases and other covenants" than the consulting services themselves. Tr. 22:2–24.

Mr. Johnson walked through one of the nine illustrative agreements, DX-119-15, for the CEO of Tyson Foods, a "food company based in Arkansas." Tr. 23:6–13. Mr. Johnson testified that this agreement, like those Mr. Johnson has reviewed in his professional experience, contains "very general and broad consulting duties" and does not "condition[] the payment of any of that money [$6.9 million] on the actual performance of consulting work." Tr. 26:20–27:12. It also contains "very general and open release" provisions that cover a variety of potential claims. Tr. 29:19–8.

Finally on this topic, Mr. Johnson testified that DX-119-15, as well as the other publicly available agreements Mr. Johnson reviewed, are "similar" to the consulting agreements at issue in this case. Tr. 31:17–33:5. Referring as an example to the Blanton Consulting and Release Agreement, DX-119-6, Mr. Johnson explained:

> I think the substance of this is similar to what we were talking about before. It's not as long an agreement, but the work, the description of services is very general and vague, likely not to actually, in my experience, to be enforced. There's certainly compensation for this agreement and then it goes through the release and all the different covenants that you would expect to see.

Tr. 32:12–18.

### 2. For-Cause Termination Clauses

Mr. Johnson also testified as to the definition of "cause" in for-cause termination provisions of executive employment agreements, a type of provision he has experience reviewing and advising clients on. Tr. 33:6–22. Mr. Johnson reviewed the termination-for-cause provision of Mr. Shkreli's employment agreement, GX-251 at Bates R168759, which he agreed was "similarly narrow" to similar provisions he has reviewed in his career. Tr. 34:3–17.

He testified that the practice of limiting the definition of "cause" to felony convictions was "more common before the financial crisis," but "you do see" them today. Tr. 34:18–35:9. Although he himself is "a stickler" for a relatively broad definition of "cause," he testified that he "understand[s] why clients get" to a narrow definition as part of a broader negotiation over an entire agreement. Tr. 35:10–24 ("They can only push on so many aspects of an agreement and this may not be one that they feel is worth it . . . .").

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 5

Similar to his process above, Mr. Johnson supervised a Google search of publicly available termination clauses to compare with the clause in Mr. Shkreli's employment agreement.  Tr. 36:2–7.  Of the four agreements he identified through that search, Mr. Johnson focused in his testimony on DX-119-21, an employment agreement relating to Volition RX.  Tr. 36:8–14.  That provision

> talks about your conviction of a felony, of theft, embezzlement or some other major felony involving moral turpitude and then I guess it also narrows it, if you are convicted that reflects adversely upon the standing of the company in the community.  So you have to have committed of a major felony involving moral turpitude and it has to impact the reputation of the company.
>
> So I would consider this quite narrow.

Tr. 36:18–25.  The other three agreements have "similarly narrow termination for cause provisions," which are similar to those Mr. Johnson has experience with.  Tr. 37:7–13.

**B.      Legal Standard**

The Second Circuit's "liberal" legal standard for admitting expert testimony pursuant to Federal Rule of Evidence 702—applying a "presumption of admissibility" that reflects a "bias" toward admission into the adversary system—is set forth in our prior responses to the instant motion, so we do not repeat it here.  *See* Dkt. Nos. 389 at 22–25, 429 at 2 (citing *United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015); *United States v. Barone*, No. S1 09 Cr. 91 (NRB), 2010 WL 2976502, at *1 (S.D.N.Y. July 14, 2010); *United States v. Brooks*, No. 06-CR-550 (JS), 2010 WL 291769, at *2 (E.D.N.Y. Jan. 11, 2010)).

**C.      Argument**

**1.      Mr. Johnson's Expert Opinions as to Consulting-and-Settlement Agreements Are Relevant and Helpful to the Jury**

As we have repeatedly emphasized (Dkt. Nos. 383-1 at 1, 347 at 62–63, 405 at 7, 429 at 5–6), if we choose to put on a defense case and call him to testify, Mr. Johnson's testimony will respond to the specific testimony elicited by the government and the government's own arguments regarding the consulting agreements at issue.  Here, the government argues that the consulting agreements in this case "were the mechanism that made it possible for [Mr. Greebel] and Shkreli to steal money from Retrophin to buy off Shkreli's disgruntled hedge fund investors."  Dkt. No. 451 at 6.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 6

In its opening statement, the government set this stage of "sham" consulting agreements for the jury:

> But there were still more investors to pay off. With the auditors watching for suspicious settlement agreements, the Defendant changed tactics. He arranged for some of the remaining investors to receive not settlement agreements but something he now called consulting agreements.
>
> These consulting agreements made it look like the investors were doing work for Retrophin. That way, the payments looked legitimate. But the investors hadn't asked to be Retrophin consultants and they were never asked to do any work for Retrophin. They just wanted the money that Shkreli had told them he owed them back.

Trial Tr. 1080:21–1081:6. The government then elicited witness testimony in support of this theory from one of the recipients of a consulting agreement in this case, Darren Blanton:

> Q. We are going to start by looking at Government Exhibit 103-62, which is tab 48A in your binder. This is an e-mail Mr. Shkreli to Mr. Greebel on September 4, 2013. What is the subject line?
>
> A. Blanton consulting agreement.
>
> Q. Can you read what Mr. Shkreli wrote in the e-mail?
>
> A. "Can you send Darren a consulting agreement for Retrophin? Thanks, Mr. Shkreli, executive officer, Retrophin.
>
> Q. Had you had a discussion with Mr. Shkreli about serving as a consultant to Retrophin?
>
> A. No.
>
> Q. Had you had a discussion with Mr. Greebel about serving as a consultant to Retrophin?
>
> A No.
>
> . . . .

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 7

> Q. After you received this agreement, did you ever discuss serving as a consultant to Retrophin?
>
> A. No.
>
> Q. Did you ask Mr. Shkreli why you got this document as a consulting agreement?
>
> A. I don't recall.
>
> . . . .
>
> Q. If we can look up at the top section here.  There is a description of services.  Can you read that first sentence?
>
> A. "Consultant will serve as an advisor to the company and provide consulting services on strategic and corporate governance matters to the management of the company.
>
> Q. Do you know what it meant strategic and corporate governance matters?
>
> A. No.
>
> Q. Again, had you ever discussed with Mr. Shkreli serving as a consultant to Retrophin?
>
> A. Not to my knowledge.

Trial Tr. 3647:5–18, 3649:11–16, 3651:2–12.  And the government did so again with Stephen Aselage, a Retrophin director:

> Q. Did the Retrophin board ever discuss the use of consulting agreements to repay MSMB investors with money or shares from Retrophin?
>
> A. No.
>
> Q. And did the Retrophin board ever approve the use of consulting agreements to repay MSMB investors with money or shares from Retrophin?
>
> . . . .

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 8

> A. No.
>
> Q. Did Mr. Panoff ever bring to your attention that consulting agreements were being used to repay MSMB investors?
>
> . . . .
>
> A. No.
>
> Q. Did Mr. Shkreli ever bring to your attention that consulting agreements were being used to pay MSMB investors?
>
> A. No.
>
> Q. Did Mr. Greebel ever bring to your attention that consulting agreements were being used do repay MSMB investors?
>
> A No.

Trial Tr. 4433:3–23.  We fully expect the government to elicit similar testimony from some of its remaining witnesses, and to repeat its "sham" consulting agreement theory during closing arguments.

Mr. Johnson's testimony is thus relevant to rebutting a core aspect of the government's theory of Count Seven in that his testimony advances Mr. Greebel's argument to the jury that consulting agreements similar to those at issue here were not "shams" but rather an appropriate "mechanism" to settle potential claims against the company.  Specifically, as Mr. Johnson testified, Tr.7:25–8:3, 14:2–6, he will offer the following opinions, based on his extensive professional experience:

1) Companies often settle litigation risk through the use of consulting agreements with broad release provisions.  Tr. 11:9–12:24.

2) Such consulting-and-settlement agreements are motivated primarily by the need to settle potential claims rather than to receive consulting services.  Tr. 16:3–15.  Thus, they are characterized by vague descriptions of consulting services, relatively little (if any) time requirements, payment terms unconnected to work performed, and relatively detailed descriptions of covenants releasing legal claims.  Tr. 20:21–22:24.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 9

      3) Consulting-and-settlement agreements usually are not the product of either side's previously wanting or requesting consulting services, but are rather the product of lawyers negotiating a settlement solution.  Tr. 15:5–16:2.

      4) Consulting-and-settlement agreements that are publicly available via Google searches demonstrate the use of terms described in opinion 2, above.  *See* Tr. 18:18–20:20, 23–; DX-119-11 (list of nine example agreements); DX-119-12 (Mattel); DX-119-13 (McDonald's); DX-119-14 (Williams-Sonoma); DX-119-15 (Tyson Foods); DX-119-16 (Mylan, Inc.); DX 119-17 (RenaissanceRe Holdings Ltd.); DX-119-18 (Kimberly-Clark Corp.); DX-119-19 (Great Lakes Dredge & Dock Corp.); DX-119-20 (Furmanite Corp.).

      5) The example agreements in opinion 4, above, resemble the consulting agreements at issue in this case.[1]  *See* Tr. 31:13–33:13; DX-119-02 (A. Geller); DX-119-05 (Rosenfeld); DX-119-06 (Blanton).

Thus, Mr. Johnson will not testify about all consulting agreements in the world.  *Cf.* Tr. 38:3–4 ("Q. Are you an expert in all consulting agreements.  A. No.").  Mr. Johnson will testify about a "part of the mainstream corporate toolkit that corporations consider when they want to settle something," Tr. 72:10–14—no matter with whom the settlement is reached or the type of claim settled.  Having "reviewed personally" between 100 and 200 consulting-and-settlement agreements, Tr. 14:2–6, Mr. Johnson is eminently qualified to offer such opinions.  It does not matter whether the "tool" is used in the context of departing executives versus third parties, or to settle potential employment claims versus non-employment claims.  *See* Tr. 16:24–17:15 (same principles would apply to departing board members or founders); Tr. 46:9–15 ("Q. So whether Mr. Blanton is departing CEO of Retrophin or a janitor of Retrophin your opinion is no different?  A. Well, I think the -- yes. I think that will be true.  Q. And whether Mr. Geller was the CEO of Retrophin or an investor in a hedge fund that invested in Retrophin, none of your opinions are any different?  A. I think that's going to be true, yes.").

To accept the government's cabined logic is to wrongly conclude that consulting agreements may only be used to settle litigation disputes if the dispute is an employment dispute with a departing executive.  The government is free to make this argument in its cross examination

---

    [1] Mr. Johnson will limit his analysis of Retrophin consulting-and-settlement agreements to those put into issue by the government (to date, the Blanton and Geller agreements), and potentially the Rosenfeld agreement.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 10

of Mr. Johnson and to the jury, but it certainly should not be the basis for the wholesale preclusion of Mr. Johnson's testimony on relevance grounds.

In addition, the government's argument that because Mr. Johnson "has nothing to say about what actually happened in this case," Dkt. No. 451 at 6, he should be precluded from offering his testimony, Tr. 72:21–24, is misplaced. Mr. Johnson will simply testify as to what he knows about consulting-and-settlement agreements, provide examples of such agreements, and compare those agreements to the agreements at issue here. He will not testify as to any other facts related to this case, and there is no requirement that he do so. *See* Tr. 45:5–9. If the government believes that Mr. Johnson should have considered the specific factual context of the consulting agreements in this case, the government can make that point during cross-examination.

Finally, the government is wrong to argue that "the jury could conduct the word comparison just as easily as [Mr. Johnson] did." Dkt. No. 451 at 8. Indeed, the government misrepresents Mr. Johnson's testimony by cherry-picking one response out of a longer discussion in which Mr. Johnson explained that he was paraphrasing Justice Potter Stewart's well-known use of the phrase, applied in a different context, "I know it when I see it."[2] Tr. 51:18–52:10; *see also* Tr. 53:8–11 ("Q. Can I or the defense counsel or Judge Matsumoto apply the significant flavor test to an agreement? A. Okay. You can have some fun with me. I was trying to use the Potter Stewart example."). Even if Mr. Johnson were acknowledging that the jury could, on its own, compare the specific words and relative lengths of various provisions in the consulting agreements at issue in this case, that would only be as a result of being educated by Mr. Johnson on how to conduct such a comparison and what similarities to look for between agreements—which expertise Mr. Johnson obtained through his 37 years of experience reviewing and advising on hundreds of corporate agreements.

### 2. We Are Entitled to Supplement Mr. Johnson's Proposed Testimony in Response to the Government's Actual Case-in Chief

The government offers no legal authority in support of its apparent position that Mr. Johnson's testimony is inadmissible just because his testimony at the *Daubert* hearing was not identical to our initial disclosures. *See* Dkt. No. 451 at 2–3. It was for this very reason that we objected to providing such detailed disclosures to the government, wary that they would give the government an unfair opportunity to preview and freeze our experts' testimony before they had a chance to respond to the government's actual case-in-chief, which is precisely the role of defense experts in a criminal case. *See* Dkt. No. 389 at 33. It is

---

[2] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

GIBSON DUNN

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 11

clear now that our concerns were warranted.  In any event, we repeatedly reserved the right to supplement our expert disclosures in response to the government's case-in-chief, which we are entitled to do.  *See* Dkt. Nos. 312-2 at 5, 383-1 at 2, 401 at 1, 405 at 1.  Nor is there anything that prevents a defendant from choosing to streamline the testimony it seeks to offer from any particular witness in an effort to focus on the specific issues that have arisen at trial.

### 3. Mr. Johnson Bases His Opinions on Reliable Principles

Contrary to the government's assertions, Dkt. No. 451 at 7, Mr. Johnson's opinions are the product of "reliable principles . . . reliably applied."  *See* Fed. R. Evid. 702; *see also United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015) ("[I]n many cases, the reliability inquiry may . . . focus upon personal knowledge and experience of the expert.").  It is false to state, as the government does, that Mr. Johnson "did not know what keywords were used for the [Google] searches . . . . [or] how the agreements about which he testified were selected from the initial set of hits generated by Google."  Dkt. No. 451 at 7.  Mr. Johnson clearly testified that while he could not "remember" the exact search terms, he knew them at the time of the search, approved them, and supervised his associate in the process.  *See* Tr. 19:1–16, 58:10–13, 67:24–68:9.

In any event, the government misses the point.  Mr. Johnson testified repeatedly that these simple searches were designed to identify a few examples of publicly available consulting agreements with broad settlement terms, which in his professional experience are commonly used.  *See* Tr. 19:20–20:1, 59:20–60:3, 61:21–62:2.  He did not conduct an "exhaustive search" to identify all possible consulting agreements of this type.  Tr. 19:17–29.  Moreover, there can be no basis to argue a deficiency in Mr. Johnson's methodology simply as a result of our decision, in an effort to streamline and narrow the issues for trial, to voluntarily not seek to elicit testimony concerning the over 40 other comparable consulting-and-settlement agreements identified by Mr. Johnson through a separate search process of the EDGAR database.  Precluding Mr. Johnson's testimony on this basis would be tantamount to punishing Mr. Greebel for our fulsome early expert disclosures.

All of the government's objections here, and as to relevance, go to weight, not admissibility, and should be reserved for cross-examination.  *See Barone*, 2010 WL 2976502, at *1 (admitting handwriting expert over objections "best raised through cross-examination").

### 4. Mr. Johnson's Opinion Regarding For-Cause Termination Clauses Is a Proper Response to Issues the Government Itself Has Raised at Trial

Finally, Mr. Johnson's opinion regarding for-cause termination clauses in executive agreements is relevant to issues the government itself has raised at trial about that very

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 12

provision—and only that provision to the exclusion of any other provision of Mr. Shkreli's employment agreement.  For example, the government elicited the following testimony from Steve Richardson:

> Q. And the termination provision that we have discussed, did Mr. Greebel ever highlight for you or the other board members that that provision stated that Mr. Shkreli could only be terminated if he was convicted of a felony?
>
> A. No, he did not draw attention to it.
>
> Q. In all of your years of experience in human resources, have you ever seen or heard of such a provision?
>
> MR. BRODSKY: Objection.
>
> THE COURT: Overruled.
>
> A No, I have not.

Trial Tr. 2602:3–12.  The government elicited similar testimony from Stephen Aselage: "Q. In all of your experience in the industry, have you ever seen a termination clause like this one?  A. No, ma'am."  Trial Tr. 4449:22–24.  Having itself raised the issue of the propriety of the termination clause in Mr. Shkreli's employment agreement, the government should not now be allowed the unfair advantage of precluding Mr. Johnson's testimony about the use of such clauses in general.  As with the consulting agreements, Mr. Johnson's lack of familiarity with the rest of Mr. Shkreli's employment agreement or the circumstances of its execution has no bearing on the relevance and helpfulness of his testimony.  And the government cannot fairly object to the timing of our disclosure of this opinion, as it comes in direct response to the government's own developing case.

Mr. Johnson explained that although such narrow definitions of cause were "more common before the financial crisis," they are sometimes still used, and he identified some publicly available examples to illustrate the point.  Tr. 33:23–34:21, 36:2–9.  He further explained that such provisions are "part of the negotiating process" along with other provisions in an agreement.  Tr. 35:10–24.  The government is free to cross-examine Mr. Johnson as to the strength of his comparison, or on the import of other terms in the agreement, but it should not be allowed to preclude Mr. Johnson's relevant, helpful testimony altogether.

*   *   *

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 21, 2017
Page 13

For all these reasons, the Court should deny the government's motion to preclude Mr. Johnson's expert testimony.[3]

Respectfully,

*/s/ Winston Y. Chan*
Winston Y. Chan

cc: Alixandra E. Smith, Esq.
David C. Pitluck, Esq.
David K. Kessler, Esq.

---

[3] We also request, respectfully, that the Court set a deadline of November 28, 2017 for the government's disclosure of its rebuttal experts, if any, including summaries of any such expert's qualifications and opinions, as well as the bases and methodologies thereof.

In *United States v. Tin Yat Chan*, the Second Circuit denounced as "sharp practice" the government's failure to disclose rebuttal experts until the last minute. 476 F.3d 144, 146 (2d Cir. 2007). There, the defendant had timely disclosed both its intent to call a handwriting expert and his opinions, but the government "chose to remain entirely silent, until one day before the end of the defense case, both as to the fact that it had retained a handwriting expert and as to the testimony he was expected to give." *Id*. The Second Circuit described this conduct as "unworthy of a representative of the United States." *Id*. The only reason the court did not find a constitutional violation was because the trial judge had granted the defendant a continuance to prepare for cross-examination, which the defendant was able to do given the closeness in expertise between the defendant's own expert and the government's. *Id*. The court nonetheless noted that, "[i]n an appropriate case, such an ambush might well violate due process." *Id*. (citing *Wardius v. Oregon*, 412 U.S. 470, 476, (1973) ("It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.")).

So too here it would be unfair for the government not to be required to provide Mr. Greebel with advance notice of the government's potential rebuttal experts, so that Mr. Greebel can be afforded a sufficient opportunity to review, and if necessary challenge, the admissibility of any such rebuttal expert—particularly in light of the requirement that Mr. Greebel disclose his own potential experts more than nine weeks in advance of even the start of this trial. *See* July 14, 2017 Am. Criminal Pretrial Scheduling Order, Dkt. No. 266 at 1 ¶ 4 & n.2 (setting August 11 deadline).