**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

November 26, 2017

<u>VIA ECF</u>

The Honorable Kiyo A. Matsumoto
United States District Court Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   <u>United States v. Greebel,</u>  S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully request that the Court preclude the government from admitting any out-of-court statements made by Marc Panoff and certain other individuals through its case agent as alleged statements of a "coconspirator during and in furtherance of the conspiracy" pursuant to Federal Rule of Evidence ("Rule") 801(d)(2)(E).  The government cannot point to any independent, non-hearsay evidence in the record demonstrating that Mr. Panoff and others were alleged coconspirators in the charged conspiracies of Count Seven and/or Count Eight of the Superseding Indictment.  Accordingly, the government cannot offer the hearsay statements of Mr. Panoff and others in email exchanges without Mr. Greebel at all, and any hearsay statements of Mr. Panoff and others during email exchanges with Mr. Greebel cannot be offered for the truth of the matters asserted therein.  *See* Fed. R. Evid. 801, 802.

In order to admit a statement pursuant to Rule 801(d)(2)(E), this Court must find the following:  (1) there was a conspiracy as charged in Count Seven or Count Eight; (2) that the members of the charged conspiracy included the declarant and the party against whom the statement is offered; and (3) the alleged hearsay statement was made both during the course of and in furtherance of the conspiracy.  *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  As a threshold matter, before being able to admit hearsay evidence of an alleged co-conspirator, the government must prove by a preponderance of the evidence that the declarant had agreed to participate in the charged conspiracy.  *Id*.  Moreover, the government must show that the declarant and defendant had a "unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E)." *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) (finding that defendant's membership in a general process and network of criminal conspiracy and activity, such as organized crime, does not constitute a conspiracy for the purpose of Rule 801(d)(2)(E)).  These preliminary questions of fact "must

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 2

be resolved by the district court before a challenged statement may be admitted under Rule 801(d)(2)(E)." 5 Weinstein's Federal Evidence § 801.34[6][c][i].

In short, the Court must find that there is non-hearsay independent, "corroborating evidence" that the declarant participated in the charged conspiracy. *Id.* (reversing convictions because the court improperly admitted a hearsay statement under Rule 801(d)(2)(E) without independent corroborating proof); *United States v. Clark*, 18 F.3d 1337, 1341-42 (6th Cir. 1994) (same).

*United States v. Al-Moayad*, 545 F.3d 139, 174 (2d Cir. 2008), is a good example where the government improperly sought to offer hearsay evidence of a declarant pursuant to Rule 801(d)(2)(E) without meeting its burden of proving by a preponderance of the evidence that this declarant had agreed to join the alleged conspiracy. In *Al Moayad*, the Second Circuit reversed the district court's decision at the government's request that a form filled out by a declarant was admissible hearsay. The Second Circuit held that the mere fact that the declarant had written on this form that the defendant was a reference did not satisfy the government's burden of proving that the declarant was a member of the charged conspiracy. *Id.* at 174. Similarly, the Second Circuit held that a declarant's videotaped speech at a wedding was inadmissible hearsay because the government had not demonstrated by a preponderance of the evidence that the declarant had joined the charged conspiracy. *Id.* at 175.

Moreover, where there is evidence that the declarant or defendant refused to join the conspiracy, the court cannot admit the declarant's out-of-court statements under Rule 801(d)(2)(E). In *Gigante*, 166 F.3d at 83, the Second Circuit held that the district court had erred in admitting statements under Rule 801(d)(2)(E) where there was evidence that the defendant refused to join the conspiracy. The district court had admitted a tape recording of three declarants discussing a conspiracy to murder an individual, and stating that they needed to secure the defendant's permission to utilize a particular person to kill the individual. Because there was evidence indicating that the defendant "refused this permission" and there was no evidence that the defendant ever joined the conspiracy, the tape recordings should have been excluded. *Id.*

### Count Seven:  Marc Panoff

Here, as in *Gigante*, the government will not be able to identify any non-hearsay, independent evidence that Mr. Panoff knowingly, willfully, and intentionally joined the alleged conspiracy in Count Seven of the Superseding Indictment. Indeed, the record shows Mr. Panoff was often at odds with Mr. Shkreli, going over Mr. Shkreli's head to complain to Retrophin's Board of Directors about Mr. Shkreli's conduct. If anything, the evidence shows a divergence of interests between Mr. Shkreli and Mr. Panoff, rather than their joint

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 3

participation in a criminal partnership. Thus, the government will not be able to admit Mr. Panoff's out-of-court statements into evidence.

Mr. Panoff became Chief Financial Officer of Retrophin in May 2013. GX 972 at 28 (Retrophin Form 10-Q for the quarterly period ended Sept. 30, 2013). Thus, Mr. Panoff did not even enter the picture until more than two years after the alleged conspiracy charged in Count Seven supposedly began in February 2011.

Mr. Panoff had "extensive experience in accounting and finance, and provide[d] additional depth in each area." *Id.* at 46; *see also* Trial Tr. 2038:19–21 ("Q. In your interviews of Mr. Panoff you found him to be a capable chief financial officer? [Mr. Richardson:] Yes."). When Mr. Panoff joined Retrophin in May 2013, many of the settlements at issue were already executed. During the audit of Retrophin's financial statements from in or about May 2013 through early September 2013, Mr. Panoff provided complete financial information to Marcum, and did not conceal any information from Marcum. As Sunil Jain testified, Mr. Panoff disclosed "everything he could" about settlement agreements to Retrophin's outside auditor, Marcum:

> A. Mr. Panoff said that they are -- this swing or this change in the numbers is because of certain settlement agreements and I asked him about the details of those settlement agreements and he said that he's not fully aware of it but then he can provide me the copy of those agreements and that we requested that.
>
> Q. [And] he did, right?
>
> A. He arranged that, yes.
>
> Q. He didn't say I'm not going tell you, right?
>
> A. No, he didn't say that.
>
> Q. He didn't say I can't tell you about those settlement agreements because I don't want to?
>
> A. My understanding was that like Mr. Panoff was not fully aware of these settlement agreements.
>
> Q. He may not have been fully aware. He was not reluctant to tell you as much as he could?
>
> A. He told me everything he could.

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 4

Trial Tr. 5436:1–17 (Nov. 16, 2017); *see also* GX 114-29-A (Aug. 20, 2013 email from M. Panoff to S. Jain *et al*. Re: Settlement Agreement memo).  Mr. Jain further testified that he did not "believe[] the settlement agreements were improper agreements in and of themselves."  Trial Tr. 5442:4–7 (Nov. 16, 2017).

On or about September 9, 2013, Mr. Panoff provided extensive disclosures to the Board of Directors of Retrophin relating to the settlement agreements and Alan Geller's consulting agreement.  *See* GX 247 at R019334 (Form 10-K/A for the year ended December 31, 2012), R019369 (Form 10-Q/A for the quarterly period ended March 31, 2013), R019397 (Marcum's SAS 61 letter), R019406 (Form 10-Q for the quarterly period ended June 30, 2013); GX 245 at R116063 (draft A. Geller agreement); GX 246 (Sept. 9, 2013 board meeting agenda); DX-8281 (Richardson notes from Sept. 9, 2013 board meeting).

As Steven Richardson testified, Mr. Panoff did not hesitate to complain to the Board over Mr. Shkreli's head when he felt there was inappropriate conduct at Retrophin:

> Q. Mr. Panoff stood up against Mr. Shkreli with respect to the business development group?
>
> A. Oh, yes. Yes, the trading activity, yes.
>
> Q. He went over Mr. Shkreli [*sic*] head to report to the board, to you?
>
> A. Yes.
>
> Q. That Mr. Shkreli was violating the understanding with the board about the limits on the trading activities that Mr. Shkreli's business development group had engaged in?
>
> A. Yes, Mr. Panoff did that.
>
> Q. And Mr. Panoff also went over Mr. Shkreli's head in 2014 and reported to you that he didn't like how the expenses -- that the lack of control over operating expenses?
>
> A. Yes, that was another discussion.

Trial Tr. 2434:7–20 (Oct. 30, 2017); *see also* DX-11098 (June 21, 2014 email from Marc Panoff to Martin Shkreli Re: Controls).

There is no non-hearsay testimony in the record that Mr. Panoff did anything improper regarding settlement or consulting agreements.  Stephen Aselage's testimony that "Mr.

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 5

Panoff came across as subservient and sometimes just outright afraid of Mr. Shkreli," Trial Tr. 4460:19–20 (Nov. 9, 2017), was shown on cross-examination to relate to the fractured and hostile relationship between the two men in the summer 2014—after Mr. Panoff had complained to the Board of Directors about Mr. Shkreli's lack of control over costs and Mr. Shkreli's trading activities:

> Q. Mr. Panoff said something to you about being scared.
>
> A. Yes, he said that.
>
> Q. That was during the period between January 2014 and September 2014, correct?
>
> A. It was during the summer of 2014.

Trial Tr. 6463: 5–9 (Nov. 21, 2017). These interactions are hardly indicative of a criminal partnership. In contrast, the evidence shows that Mr. Panoff was scared of Mr. Shkreli by the summer of 2014 because Mr. Shkreli and Mr. Panoff were at war with one another by then. Before the summer of 2014, Mr. Panoff stood up to Mr. Shkreli regarding Mr. Shkreli's management of Retrophin. *See*, *e.g.*, DX-11098 (June 21, 2014 email from Marc Panoff to Martin Shkreli Re: Controls).

Further, even assuming *arguendo* that Mr. Panoff was "subservient and sometimes just outright afraid of Mr. Shkreli," Trial Tr. 4460:19–20 (Nov. 9, 2017), such evidence does not prove that Mr. Panoff did anything wrong, and it certainly does not prove by a preponderance of the evidence that Mr. Panoff agreed to join a conspiracy to defraud Retrophin and intended to defraud Retrophin. Indeed, the government's own witnesses testified that Mr. Shkreli was dominant and rude to everyone, including persons the government has not alleged to be coconspirators. For example, Mr. Aselage testified that Mr. Shkreli was "dominant" with "most people":

> Q. Sir, it is your view that Mr. Shkreli was dominant with everybody; right?
>
> A. With most people.
>
> Q. And he was certainly dominant with you when you were CEO for a short period of time in late 2012?
>
> A. I think that's correct.

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 6

Trial Tr. 4511:6–11 (Nov. 9, 2017).  Mr. Aselage also testified that Mr. Shkreli had so unprofessionally dressed down Dr. Harold Plotkin at a February 2014 board meeting that Mr. Aselage felt compelled to apologize to Dr. Plotkin:

> Q. And during the discussion about the pipeline update, is there anything in particular you remember about that discussion?
>
> A. Well, there was a fairly contentious exchange between Mr. Shkreli and Dr. Plotkin.
>
> Q. What did you do after that exchange?
>
> A. When the board broke, you know, I found Dr. Plotkin and apologized to him for the way he was treated.
>
> Q. Did you have a conversation with Mr. Shkreli about the --
>
> A. I did. I told Mr. Shkreli that what he did was unprofessional and it was absolutely no way to interact with an employee at a board meeting.
>
> Q. What did Mr. Shkreli say in return?
>
> A. He said he needed to make it clear to the board that he felt that Dr. Plotkin was not doing an adequate job and he needed to be called to task for that.

Trial Tr. 4453:8–23 (Nov. 9, 2017).  Darren Blanton testified that Mr. Shkreli denigrated his own lawyers in a correspondence with Mr. Blanton:

> Q. That's what Mr. Shkreli told you about his own outside lawyers, they're lazy, stupid and paid too much; right?
>
> A. Right.

Trial Tr. 3800:13–15 (Nov. 7, 2017) (quoting DX-115-42 (Aug. 15, 2013 email from Martin Shkreli to Darren Blanton Re: Transfer to Darren Blanton)).

Based on the trial record, we respectfully submit that the government will be unable to establish by a preponderance of the evidence that Mr. Panoff knowingly, willfully, and

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 7

intentionally became a member of the charged conspiracy in Count Seven.[1]  Thus the government cannot admit Mr. Panoff's out-of-court statements pursuant to Rule 801(d)(2)(E).  *See Bourjaily*, 483 U.S. at 175; *Tellier*, 83 F.3d at 580; *Clark*, 18 F.3d 1341-42.

### Count Seven:  Thomas Fernandez, Kevin Mulleady, and Marek Biestek

The government will be unable to meet its burden of demonstrating by a preponderance of the evidence that Tom Fernandez, Kevin Mulleady, and Marek Biestek all knowingly, willfully, and intentionally joined the charged conspiracy in Count Seven.  Before admitting any hearsay statements of Messrs. Fernandez, Mulleady, and Biestek in connection with Count Seven, the government will have to identify independent, non-hearsay, corroborating proof that each of these individuals became knowing members of a conspiracy to defraud Retrophin.

It appears that the government's sole independent, non-hearsay evidence relating to Messrs. Fernandez, Mulleady, and Biestek in the trial record with respect to Count Seven arises out of the November 29, 2012 transfer of 4,167 shares of stock from Mr. Biestek to Mr. Shkreli, and the December 3, 2012 transfers of stock from Messrs. Fernandez and Mulleady to Mr. Shkreli.  However, for the reasons explained in our pretrial motion to dismiss the government's backdating theory relating to Mr. Shkreli's transfer of 75,000 shares of Class B

---

[1]  Concurrently with this publicly filed letter, we are submitting for the Court's *in camera* review two reports of Mr. Panoff's statements to agents of the Federal Bureau of Investigation ("FBI").  If the Court wishes, we will also file these documents publicly.  Mr. Panoff's statements to the FBI further demonstrate that the government has failed to meet its burden of demonstrating through non-hearsay evidence that Mr. Panoff is a co-conspirator.  Mr. Panoff's statements to the government reflect that Mr. Panoff complained to the Board of Directors about Mr. Shkreli's conduct relating to Mr. Shkreli's failure to control costs, Mr. Shkreli's and the Business Development Group's trading in securities, and Mr. Shkreli's use of a twitter account; that Mr. Panoff's hostile relationship with Mr. Shkreli and complaints to Retrophin's Board about Mr. Shkreli reflect that Mr. Panoff was not a co-conspirator with Mr. Shkreli in any way, shape, or form; that Mr. Panoff knew about the settlement and consulting agreements, that Mr. Panoff suggested that MSMB issue promissory notes to Retrophin to pay the company back for the settlement amounts, and that Mr. Panoff's concern was focused on disclosing these agreements but not on any actual concerns about the agreements themselves; that Mr. Panoff recalled that Al Geller's consulting agreement was discussed with the Board of Directors during the September 9, 2013, telephonic board meeting; and that Mr. Panoff did not believe that there was anything unlawful or illegal about the settlement and consulting agreements.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 8

common units on or about December 3, 2012, to MSMB Capital, *see* Mr. Greebel's Mem. Law Supp. Mot. Dismiss Count Seven Superseding Indictment, Dkt. No. 327 at 18–25 (Aug. 18, 2017), the government's theory is fundamentally flawed and the stock transfers at issue did not and could not have defrauded Retrophin.  Moreover, the trial evidence to date has demonstrated the following fundamental flaws in the government's backdating theory: (1) all of the November 29 and December 3 stock transfers to Mr. Shkreli were transfers of stock between private individuals and thus could not have defrauded Retrophin LLC; (2) all of the November 29 and December 3 stock transfers to Mr. Shkreli were prior to Retrophin becoming a public company and thus Mr. Shkreli had the authority and power to cause these transfers to be made; (3) Mr. Shkreli's stock transfer of 75,000 Class B common units to MSMB Capital were from Mr. Shkreli's personal stock holdings, just as Mr. Shkreli's stock transfer of 50,000 Class B common units to Mr. Aselage were from Mr. Shkreli's personal stock holdings; (4) Mr. Biestek's transfer of 4,167 shares of common stock to Mr. Shkreli was reversed by the time of the reverse merger on or about December 12, 2012; (5) Mr. Mulleady's stock transfer emailed on December 3 could not have taken place until the time of the reverse merger because half of the 10,000 shares did not vest until the reverse merger took place.  For these reasons, the government will not be able to point to independent, non-hearsay proof that Messrs. Fernandez, Mulleady, and Biestek knowingly and willfully joined the charged conspiracy in Count Seven.

**Count Eight:  Edmund Sullivan, Andrew Vaino, and Ronald Tilles**

The government will not be able to meet its burden of demonstrating that Edmund Sullivan, Andrew Vaino, and Ronald Tilles all knowingly, willfully, and intentionally joined the charged conspiracy in Count Eight.  The government will not be able to point to independent, non-hearsay, corroborating evidence in the trial record that Messrs. Sullivan, Vaino, and Tilles agreed to manipulate and/or control the price of Retrophin securities in furtherance of the objective in Count Eight.  Mere purchase of Fearnow shares at a deeply discounted price is insufficient evidence of having joined the charged conspiracy.  Indeed, the government has not identified Mr. Pierotti as an alleged co-conspirator in Count Eight even though Mr. Pierotti purchased the Fearnow shares at a deeply discounted price.

The evidence in the trial record shows that Mr. Sullivan was on the board of managers of Retrophin LLC through in or about early October 2012.  At the time that Mr. Sullivan resigned from the board, there is absolutely no evidence that anyone anticipated that Mr. Sullivan would have the opportunity to purchase Fearnow shares.  This is true for two fundamental reasons.  First, there was still uncertainty at this time whether the reverse merger with Desert Gateway was going to get done.  Second, as reflected in the December 3, 2012 capitalization table, Mr. Sullivan was not one of the original four individuals who were expected to purchase the Fearnow shares.  *See* GX 111-28.

# GIBSON DUNN

The Honorable Kiyo A. Matsumoto
November 26, 2017
Page 9

The evidence in the trial record shows that Mr. Vaino was a chemist for Retrophin in 2012 and later in 2013 through 2014.  The government cannot point to any independent, non-hearsay evidence that Mr. Vaino knowingly and willfully became a member of a conspiracy to control and/or manipulate the securities of Retrophin.  Indeed, the evidence in the record reflects that Mr. Vaino sold the Fearnow shares that he had purchased starting in December 2012 and through 2013.  Mr. Vaino's consistent and repeated sales of Fearnow shares were exactly like Mr. Pierotti's sales of Fearnow shares.  As a result, Mr. Vaino's actions demonstrate that he never joined any conspiracy to control and/or manipulate the securities of Retrophin.

The evidence in the trial record shows that Mr. Tilles was a consultant to Retrophin and focused his efforts on raising money from potential investors.  The government cannot point to any independent, non-hearsay evidence that Mr. Tilles knowingly and willfully became a member of a conspiracy to control and/or manipulate the securities of Retrophin.

**Count Eight:  Kevin Mulleady, Marek Biestek, and Tom Fernandez**

This Court has already made a preliminary determination that there is sufficient independent, non-hearsay evidence in the record that Messrs. Mulleady and Biestek joined the conspiracy in Count Eight.  We hope that the Court will determine that the government has been unable to connect up its proffers of anticipated evidence during the trial to demonstrate through non-hearsay evidence that Messrs. Mulleady and Biestek joined the conspiracy to control and/or manipulate Retrophin securities.  We respectfully submit that the government has not and will not be able to point to evidence that Mr. Fernandez joined the same charged conspiracy through independent, non-hearsay proof.

Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky

cc:     All counsel (via ECF)