

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES/DCP/DKK
F.#2014R00501

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 27, 2017

By Hand and ECF

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:  United States v. Evan Greebel
           Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in response to the defendant's November 26, 2017 motion seeking to preclude the government from introducing co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). This untimely motion—filed on Sunday, approximately 24 hours before the case agent was set to testify, with no explanation—seeks to reargue motions that were litigated prior to trial and to advance arguments that, if they should be made at all, are properly raised in the context of a Rule 29 motion. The motion is particularly improper given the established law that a determination of whether an individual is in fact a co-conspirator for purposes of Rule 801(d)(2)(E) is routinely reserved for the close of the government's case, with statements admitted conditionally until that determination has been made.

      Even taken on its own terms, the defendant's motion misconstrues the standard and procedure for determining and the admissibility of co-conspirator statements and provides a selective representation of the trial record to date. For these reasons, and those set forth below, the defendant's motion should be denied.[1]

---

[1] Given the timing of this motion—both its late filing and the fact that it should be considered at the end of the government's case—the government includes here a summary of evidence and select citations to the record, including, in some cases, citations to exhibits that have not yet been admitted because the case agent's testimony is not complete.

I.  Background

On November 26, 2017, the defendant filed a letter seeking to preclude the government from introducing any statements made by a number of co-conspirators under Rule 801(d)(2)(E). Without regard to any specific document or statement the government may seek to introduce, the defendant argued that all such co-conspirator statements should be precluded because, according the defendant, the government has not established that the certain co-conspirators were members of the charged conspiracies.

II. Applicable Law

"The law is well settled within this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances." United States of America v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979). "To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of the conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." Id. "[W]hile the hearsay statement itself may be considered in establishing the existence of the conspiracy, 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" Id. (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)). Moreover, statements that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible. Id. However, the "Government need not show that the listener, or the person who heard the declarant's statement, was also a member of the conspiracy." United States v. Paredes, 176 F. Supp. 2d 183, 187 (S.D.N.Y. 2001). Indeed, a communication "with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the plan's goals" is admissible. Id.

Crucially, the independent evidence must corroborate the hearsay statements to show that they are reliable. The requirement is not that the government must establish fully that an individual is a co-conspirator before admitting hearsay statements of such co-conspirator. That requirement would swallow the hearsay exception because it is often the communications among individuals that fully establish the scope, nature and duration of the conspiracy. Indeed, conspiracy depends on a verbal or non-verbal communicative act—an agreement. Rather, as Cambindo Valencia, Paredes and Gigante demonstrate, there must be "some independent corroborating evidence of the defendant's participation in the conspiracy" and the totality of the evidence—both the independent corroborative evidence and the hearsay statements themselves—must be considered when the Court determines whether a particular individual is a co-conspirator. Gigante, 166 F.3d at 82 (emphasis added).

2

Moreover, a disagreement along the way towards communications and actions in furtherance of the conspiracy is not a bar to admission and does not disprove the existence of a conspiracy. See, e.g., United States v. James, 712 F.3d 79, 106 (2d Cir. 2013) ("That members of a conspiracy have had a disagreement or a falling out is not, however, sufficient to establish withdrawal from the conspiracy."); United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994) ("An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it.").

Finally, there is no question that a court may conditionally admit a statement pursuant to 801(d)(2)(E) and then evaluate whether the government has met its burden of proving by a preponderance that the rule applies at the close of the government's case. See, e.g., United States v. Watts, 934 F. Supp. 2d 451, 477 (E.D.N.Y. 2013).

III. Argument

The defendant's motion is simply an attempt to argue its Rule 29 motion before the close of the government's case. As discussed, a court has discretion to admit statements pursuant to 801(d)(2)(E) conditionally and then evaluate whether the totality of the evidence is sufficient to establish the exception applies. See, e.g., Watts, 934 F. Supp. 2d at 477. The defendant has provided no reason for a different approach in this case. Nevertheless, it is clear that, when the appropriate legal standard is applied, the government has satisfied its burden of establishing that each of the individuals in the defendant's motion is a co-conspirator for purposes of 801(d)(2)(E).

A. The Defendant Misconstrues the Standard for Admissibility of Co-Conspirator Statements.

The defendant's letter improperly conflates the standard for admissibility of co-conspirator statements under Rule 801(d)(2)(E) with the standard for determining whether an individual is in fact a co-conspirator. As Supreme Court and Second Circuit case law makes clear, "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." Bourjaily v. United States, 483 U.S. 171 181 (1987); Gigante, 166 F.3d at 82 (when determining whether to admit a co-conspirator's statement under Rule 801(d)(2)(E), "the hearsay statement itself may be considered in establishing the existence of the conspiracy."); United States v. Abouhalima, 201 F.3d 432, at *2 (2d Cir. 1999) (unpublished) ("The district court may rely on the hearsay statements themselves to establish the existence of a conspiracy, so long as there is some independent corroborating evidence of the defendant's participation in the conspiracy.").

The defendant's motion ignores (i) the requirement that, in determining admissibility of co-conspirator statements, the Court consider the totality of the evidence – including the hearsay statements themselves; (ii) the case law stating that the court can rely on the hearsay statements themselves to establish the existence of a conspiracy; and (iii) that the requirement of "some independent corroborating evidence" applies to the defendant's

3

participation in the conspiracy. Gigante, 166 F.3d at 82.[2] Instead, based on the (incorrect) view that the government has not established that certain co-conspirators were members of the conspiracy, the defendant asks the Court to preclude the government from introducing co-conspirator statements, without considering any of the statements themselves. Under Second Circuit law, that is neither the proper procedure nor standard for determining the admissibility of co-conspirator statements. Rather, the admissibility determination should be made with consideration of the statements themselves.

The motion should be denied for this reason alone.

    B.    <u>The Government Has Already Established the Members of the Conspiracies: Count Seven</u>.

Even if the Court were to consider whether the government has established the co-conspirators' participation in the charged conspiracies, the record is clear that it has. Below, we address each of the co-conspirators identified by the defendant in his letter.

    1.    <u>Background on Count Seven and the Defendant's Improper Arguments</u>

The defendant's motion once again tries to improperly re-litigate the admissibility of evidence related to the backdating of Retrophin share transfers between Shkreli and Biestek, Fernandez and Mulleady, as well as a backdated share transfer between Shkreli and MSMB Capital Management LP, arguing that "the government's theory is fundamentally flawed and the stock transfers at issue did not and could not have defrauded Retrophin." (Def. Letter at 8.) The defendant raised and the parties subsequently debated many of the same arguments regarding the backdating evidence in connection with the defendant's motion to dismiss. See Dkt. Nos. 327, 345, 349. Prior to trial, the Court ruled both that it would not dismiss any part of Count Seven based on the defendant's arguments that the backdated transfers could not in fact have defrauded Retrophin, and that there were independent bases for the introduction of evidence of the backdated transfers with respect to the conspiracies charged in Counts Seven and Eight, including that such evidence was admissible with respect to Count Seven because such transfers "created the appearance of an investment relationship between MSMB Capital and Retrophin," and with respect to Count Eight because certain of the transferees—specifically, Mulleady and Fernandez—were promised by Shkreli that they would receive the opportunity to purchase Fearnow shares in return for the backdated transfers. See Dkt. No. 402 at 9-13.

Moreover, the defendant should not be allowed to argue now, prior to the close of the government's evidence, that the Court should make a determination on the viability of the backdating as a means by which the conspiracy in Count Seven could be accomplished, based solely on the defendant's own interpretation of select evidence elicited to date. And if this issue were properly before the Court on a Rule 29 motion, all inferences with respect to the backdating

---

[2] Moreover, where "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." United States v. Padilla, 203 F.3d 156, 162 (2d Cir. 2000).

evidence would need to be drawn in favor of the government. See United States v. Thorn, 317 F.3d 107, 132 (2d Cir. 2003) (In a Rule 29 motion for acquittal, "all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense.") (internal quotation marks omitted). It is similarly improper for the defendant to ask the Court to conclude at this stage that, because the defendant anticipates that he will prevail on a Rule 29 motion, the evidence that has already been introduced of the involvement of Mulleady, Fernandez and Biestek in the backdated shares transfers is insufficient to establish that those three individuals were co-conspirators on Count Seven, and therefore any additional statements that are introduced by those individuals as statements furtherance of Count Seven must be precluded.

Moreover, the defendant's arguments regarding the backdated share transfers ignore evidence in the case that does not support the defendant's version of events and, more significantly, do not address the overarching purpose of the backdating to the conspiracy. As detailed at length in the pretrial briefing, the purpose of the transfers was to make it appear as if MSMB Capital had invested in Retrophin in the summer of 2012, even though MSMB Capital never invested in Retrophin and only received shares—for no investment—in December 2012. The transfers made it possible to add MSMB Capital to the capitalization table and, post-merger, distribute stock in Retrophin to MSMB Capital investors; in combination with the false 13D filing made by the defendant and Shkreli, which stated that MSMB Capital purchased its stake in Retrophin with working capital, the transfers also made it appear to MSMB Capital investors as if the fund had in fact invested in Retrophin, which the defendant and Shkreli used to try and explain to the defrauded investors why money and shares from Retrophin were being used to repay them via the consulting and settlement agreements. None of the defendant's arguments about the ultimate success of certain of those transfers—for example, the fact that Mulleady's transfer of 10,000 shares to Shkreli allegedly could not be completed because not all of the shares had vested—changes the fact that the conspiracy existed.

Finally, as the government anticipates arguing at greater length in connection with the defendant's Rule 29 motion, the government strongly disagrees with the defendant's interpretation of certain of the already-admitted evidence related to the backdated transfers. For example, the defendant contends that the transfers were simply "between private individuals" and thus could not have defrauded "Retrophin LLC." Def. Letter at 8. However, the transfers in fact took place after Retrophin LLC was converted into Retrophin Inc.; many of the shares implicated by the transfers were shares that were subject to vesting (as the defendant himself acknowledges with respect to Mulleady's shares), a process that was not controlled solely by Shkreli (as evidenced by Board resolutions regarding vesting) and that was affected by the backdated nature of the transfers; and the transfers were specifically classified by Shkreli and the defendant as "gifts," despite the fact that the transfers state that they are for "value" and were between Retrophin employees.

2. Marc Panoff

The majority of the defendant's letter argues that there is insufficient evidence to establish Mr. Panoff's participation in the wire fraud conspiracy charged in Count Seven. The defendant is incorrect. Most of the defendant's argument relies on selective citations to the trial

5

record reflecting instances where Panoff and Shkreli are alleged to have had a disagreement.[3] But disagreement or discord between co-conspirators does not nullify a conspiracy. To the contrary, "[a]n internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it." United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); United States v. Kassir, 2009 WL 2913651, at *6 (S.D.N.Y. Sep. 11, 2009) ("Although [the co-conspirators] had a number of disagreements during the course of the conspiracy, it was within the jury's discretion to conclude that these did not rise to the level of nullifying the conspiracy itself."). In any event, the evidence from the trial record already demonstrates, by a preponderance of the evidence, that Panoff was a co-conspirator in Count Seven.

First, Panoff was specifically advised when he started as Retrophin's CFO of issues with respect to payments on behalf of Mr. Shkreli and the MSMB entities:

> Q. What, if anything, did you convey to Mr. Panoff during that meeting?
>
> A. We conveyed that he had to be -- he had to be cognitive of focusing in on the related-party transactions, the personal transactions of Martin, and that we hadn't resolved the legal bill issue.

Tr. 3377-78 (Corey Massella). Despite this warning, Panoff did not raise any alarm when he learned of the settlement agreements with MSMB investors, even though such agreements were the cause of significant cash payments far in excess of the expenses Retrophin had incurred in prior quarters. In fact, Panoff provided the settlement agreements to Retrophin's auditors only after they themselves discovered the drastic change in cash flow, and even then with a delay:

> Q. So, what happened after that got brought to your attention?
>
> A. So, he brought to my attention, and from the inquiry point of view we called the company's then controller Mike Harrison that we need to know why these significant variances are there. He said he's not aware of this, you need to speak to Marc Panoff, then CFO of the company. We inquired with Marc Panoff about it, and he mentioned, This has something to do with certain settlement

---

[3] In addition to selective citations to the trial record, the defendant attached various documents reflecting statements that co-conspirator Marc Panoff gave to the FBI and which the defendant appears to assume are true. These documents have not been discussed at the trial, are not in the trial record, and would not even be admissible at trial. See, e.g., United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) ("The burden of proving that notes reflect the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes."). The defendant provides no explanation for his impermissible reliance on documents that could not possibly be relevant to an analysis of the evidence presented by the government at trial.

6

>agreements and I don't know much details about it. But then I said, Send me those though settlement agreement. I can look into those settlement agreements and then we can discuss further about it.
>
>Q. Did Mr. Panoff send you settlement agreements?
>
>A. It took him maybe a couple of days to send it back to me, the settlement agreements, but he did, yes.

Tr. 5383-83 (Sunil Jain).

Second, when Panoff was directly asked about the state of Retrophin's finances by Board member Steven Richardson, Panoff provided Richardson with false information. Panoff told Richardson that he was working to determine which entity was responsible for paying any remaining expenses (e.g., which entity would pay for rent for a period where the entities shared the same physical space), but failed to disclose that Retrophin was in fact paying for expenses incurred by MSMB, including with respect to the settlement agreements and Katten legal bills:

>Q. So, Mr. Richardson, I was asking you whether you had a discussion with Mr. Panoff about Retrophin's finances after the July meeting and before the September meeting regarding the accounting for finances as allocated between MSMB Capital and Retrophin.
>
>A. [Richardson] Yes, I did. Just for completeness, Ms. Smith, I did meet with Mr. Panoff in June as well. I think when the dialup started before this meeting as well, as well after this meeting. He was the new CFO and I wanted to be sure he was well supported. Yes, I did meet him and he had explained to me that one of the things he was finding as new CFO is that during the fairly lengthy period where MSMB and Retrophin were operating in parallel but using some shared resources and shared facilities, there was -- a lot of the expenses had to be corrected and rationalized; you know, which expenses should have gone to the MSMB entity, which expenses should have gone to the Retrophin entity. That was something that he was explaining to me. He talked about it was the overlap period and understanding he had to get behind the expenses for both entities.
>
>Q. And during that conversation with Mr. Panoff was there any discussion of Retrophin paying for expenses for MSMB Capital?
>
>A. No. The exercise was to rationalize and understand which entities should pick up which charge relative to their business.

7

Tr. at 1874-75 (Steve Richardson).

Third, Panoff took steps to hide the true nature of the settlement agreements from Retrophin's Board.  For example, when Panoff circulated the draft November 2013 Retrophin S-1 filing (GX 250) to the Board, he specifically did not include as attachments to that draft the form Indemnification Note and/or form Settlement Agreement.  Those forms were, however, attached to the final version of the S-1 filed with the SEC.  (See GX 978.)  As Richardson testified, the Board expected Panoff to have sent for its review the complete version of whatever document would be filed with the SEC:

> Q. When you were sent the draft to review, was it your understanding that it was the complete draft of what would be filed with the SEC?
> . . .
> A. Yes, it was, because Mr. Panoff is asking us to sign and he would only ask us to sign if he viewed it as the final document that we were signing.
> Q. If there were additional documents or Exhibits attached to the S-1, would you have expected them to be provided for your review?
> A. Yes.
> Q. And just for the record, this is a document that starts at page with Bates Stamp R-168856 and goes to R-169004. So, let's look at Government's Exhibit 978. (Exhibit published to jury.)
> Q. So, as discussed before, is this the final S-1 as filed with the Securities and Exchange Commission?
> A. Yes, as it notes at the top of the page.
> * * * *
> Q. Okay, so looking back at page 162 of the document, what is the title of this page?
> A. Settlement and Release Agreement.
> Q. And if you look in the first paragraph, is there kind of a bracket for a date?
> A. Yes, there is.
> Q. And also a bracket for what says releasor?
> A. Yes.
> Q. Was this form of settlement agreement attached to the version of the S-1 that was sent to the Board for review, which was Government Exhibit 250?
> A. No.
> Q. Was this form of settlement agreement provided to you for review at any time in 2013 or 2014?
> A. No, I haven't -- haven't seen this page before.

Tr. at 1946-49.

8

Fourth, Panoff allegedly certified the accuracy of Board minutes drafted and signed by the defendant—which were never approved by the Board—without checking with the Board, including for minutes of meetings that took place prior to his tenure at Retrophin. (See Tr. 2588 ("Q Mr. Brodsky also asked you about whether you were aware of a declaration that Mr. Panoff had made in January of 2014 about some Board minutes, do you remember those questions? A. [Richardson] I remember the questions. Q Did Mr. Panoff check with the Board before certifying any minutes? Did Mr. Panoff ever check with the Board to certify whether any minutes were accurate? A. [Richardson] No, he did not.").)

Fifth, Panoff failed to advise the Board members of any concerns he may have had about the settlement and consulting agreements. (See, e.g., Tr. 2599-600 (Q. Did Mr. Panoff ever express any concerns to you about the settlement agreement? A [Richardson]. No, he did not . . . Q. What, if anything, did you believe were Mr. Panoff's responsibilities as the chief financial officer at board meetings? A. [Richardson] Certainly one of them was to be an independent voice and to speak out if there were any concerns.); Tr. 4433 (Q. Did Mr. Panoff ever bring to your attention that consulting agreements were being used to repay MSMB investors? . . . A. [Asselage] No.").) Panoff also generally failed to raise issues of concern to the Board. (See Tr. 4459-60 ("Q By early to mid 2014, at the time that you stepped into the role as chief operating officer, what was your impression of Mr. Panoff's abilities as a CFO? A. [Asselage] Mr. Panoff, you know, seemed weak. Over the period of time, you know, I lost significant faith in Mr. Panoff to be able to function in his capacity. Q Why do you say that? A. [Asselage] He was not forthcoming when asked for information. I had discussions with Mr. Panoff in which he would convey that he was really concerned, he was worried. I remember one discussion in which he said he's scared bad things are happening, but then, at the same time would not share any details on what bad things he was referencing.").)

The government also anticipates that it will introduce additional evidence of Panoff's role in the conspiracy charged in Count Seven—much of which is admissible on bases other than as a co-conspirator statement pursuant to 801(d)(2)(E)—through Special Agent Delzotto. For example, in GX 627, Panoff informs the defendant that the auditors are asking for "evidence of MSMB's ability to repay the remaining settlements and/or indemnify" Retrophin, and the defendant then drafts a response for Panoff to provide to the auditors that makes a representation about documentation that Shkreli had allegedly provided in order to satisfy the auditors that MSMB and/or Shkreli could repay the notes, when in fact Shkreli and the MSMB entities had no intention of doing so.

In sum, there is ample evidence from which to conclude that the Panoff conspired with the defendant, Shkreli, and others to misappropriate Retrophin's assets, as alleged in Count Seven.

### 3. Kevin Mulleady, Marek Biestek, and Thomas Fernandez

The evidence of Kevin Mulleady's agreement to participate in the conspiracy charged in Count Seven as it relates to the backdating of the MSMB Capital LP interest in Retrophin has been briefed elsewhere. In short, Mulleady agreed in December 2012 to sign a transfer agreement of shares to Shkreli dated July 1, 2012, despite being well aware that the

9

transaction had not in fact taken place then. (See GX 111-26-A at R020396.) Indeed, the consideration for Mulleady's agreement to transfer shares was the opportunity to purchase Fearnow shares, an opportunity that did not exist in July 2012. (See GX 447.)

But the trial record includes additional evidence that Mulleady was part of the conspiracy. For example, Al Geller testified that when he spoke with Mulleady about his consulting agreement, Mulleady told Geller that "[i]t was common. It was, you know, just normal. It was not a big deal." (Tr. 6744.) Mulleady also tried to talk David Geller out of alerting law enforcement about his concerns related to his settlement agreement. (Tr. 2944 ("Q. So Mr. Geller, what did you discuss with Kevin Mulleady after you sent that e-mail in the time period after you sent that e-mail to Mr. Greebel on July 11, 2013? A. We discussed, he was giving me his reasons why I should not try to sue or alert any enforcement agencies. Q. Did he tell you why he didn't want you to alert any enforcement agencies? A. Pretty much. A natural reason that if I bring attention to anything going on we're not going to, me and my brother, maybe him, we're not going to get the funds, get our money back.").) And both David Geller Richard Kocher testified that Mulleady deceived them about the state of the MSMB funds, thereby delaying redemption requests (and the revelation of Shkreli's underlying fraud).[4]

As with Mulleady, the evidence at trial shows that Biestek and Fernandez agreed to sign back-dated documents to create the impression that a transfer had occurred in the summer of 2012 when in fact it occurred in December 2012. (See, e.g., 111-26-A, GX 462 (discussing Fernandez being compensated for the back-dated transfer with Fearnow shares).) The evidence also shows, as discussed below with respect to Count Eight, that Biestek and Fernandez were each willing to allow Shkreli to use Fearnow stock held in Biestek's and Fernandez's names in order to fund settlement agreements, thereby avoiding the need to disclose the agreements and ask the Board of Directors to issue shares as part of the settlements.

    C.    <u>The Government Has Established the Members of the Conspiracies: Count Eight</u>

As charged in the indictment, Count Eight alleges a conspiracy to commit securities fraud related to the control of the volume and/or price of Retrophin shares. The evidence at trial has shown that, among other things, the recipients of the Fearnow shares—co-conspirators for Count Eight—generally did not trade those shares during the period between the reverse merger and the PIPE in February 2013, which had the effect of preventing Retrophin's price from dropping. The evidence has also shown that, although those individuals held Fearnow

---

[4] See Tr. 2871 ("Q And what, if anything, did Martin Shkreli and Kevin Mulleady tell you about MSMB Healthcare shutting down? A. [D. Geller] They said that they were shutting down and they were going to give investors the option of, um, taking – cashing out. They could either take money, the cash, or they can get Retrophin, whatever Retrophin was at that time, or they can do a combination of both."); Tr. 2684 ("Q. So when you wrote that your position at MSMB was supposed to be transitioned into shares of Retrophin, where did that understanding come from? A. [Kocher] Well, the understanding came from, I don't remember exactly, but in speaking with Kevin Mulleady and it was my understanding that the easiest way to get my money out was through stock in Retrophin. But what I originally wanted was cash. But it sounded like I wasn't going to be able to get cash at this point.").

shares in their own names and acquired those shares through "purchase" agreements, the shares were in reality controlled by Shkreli and the defendant.

1. Edmund Sullivan, Andrew Vaino, Ron Tilles, Thomas Fernandez

The evidence in the record establishes by a preponderance that Edmund Sullivan, Andrew Vaino, Ron Tilles, and Thomas Fernandez agreed to join the conspiracy alleged in Count Eight.

There is no dispute that each of those three individuals received hundreds of thousands of Fearnow shares as orchestrated by the defendant and Shkreli. There is no evidence to support the idea that these acquisitions of shares constituted some sort of "incentive payment" to get the individuals to do work for Retrophin, as argued by the defendant in his opening statement. (Tr. 1166-67.) As discussed by Jackson Su, Tim Pierotti, and Sunil Jain, it would make no sense to provide hundreds of thousands of dollars in freely tradeable stock as incentive compensation, and any such incentive payments would have been (but were not) reported in Retrophin's financial statements. (See Tr. 4609-4701 (Su), 5403:14-20 (Jain), 6378-79 (Pierotti).) Nor would it make sense for individuals who received hundreds of thousands of dollars in freely tradeable stock not to sell even small amounts of that stock to realize a quick profit. Instead, these individuals clearly "purchased" these shares only to hold them on behalf of Martin Shkreli and not to trade them excessively during the most vulnerable period of Retrophin's nascent existence as a public company. (See Tr. 5760, 5770-72, 5837-38 (Oremland).)

Setting aside these most significant facts, the evidence further shows that each of these individuals knew the real reason he was being given shares was to hold them at Shkreli's direction. For example, Vaino, Sullivan, Tilles, and Fernandez each received the December 11, 2012, email from Michael Smith directing them to provide daily updates about the contents of their brokerage accounts. (GX 112-12.) Vaino and Tilles each received Shkreli's email stating that he was no longer an employee or consultant of Retrophin, yet continued doing work for Retrophin, indicating an awareness that the severing of any visible employment relationship was a pretext to hide continued affiliation with Shkreli. (See Tr. 4794-4796 (Su direct); Tr. 6267-68 (Pierotti).) And, notwithstanding that he received the "over the wall" email from Shkreli designed to prevent trading in Retrophin stock on December 30, 2012, Vaino sold limited amounts of Retrophin stock soon thereafter, indicating he knew that the "over the wall" email was not a legitimate way to stop trading. (See GX 112-24.) Vaino also seemed "nervous" about holding free-trading shares but ultimately held them. (Tr. 5945 (Pierotti).)

The willingness of these co-conspirators to allow the Fearnow shares held in their names to be controlled by Shkreli is also evidenced by the way in which the co-conspirators gave up hundreds of thousands of dollars' worth of stock for nothing, simply at the request of Shkreli and Greebel. In March 2013, Shkreli told the defendant to use Fearnow shares "purchased" by Fernandez, Vaino, and Tilles "to satisfy folks who need it" and to wait on using shares from Sullivan or Biestek because "they will do as directed at some point down the road." (See GX 544.) In April 2013, Shkreli and the defendant decided that 50,000 shares of Fearnow stock "purchased" by Sullivan would instead be used to pay some of the Rosenwald settlement

11

agreement.  (See GX 558.)  Similarly, Shkreli and the defendant discussed moving 50,000 shares "purchased" by Vaino to Sarah Hassan or MSMB Healthcare, and 50,000 shares "purchased" by Tilles to MSMB Healthcare.  (See GX 546.)  These communications reflect a willingness by Vaino, Sullivan, and Tilles to allow massively valuable shares, purportedly held in their own name, to be disposed of however Shkreli and the defendant wanted.

Finally, the defense argues that Vaino's decision to sell shares during and after December 2012 shows he is not part of the conspiracy.  Vaino sold a small amount of shares in December 2012 and January 2013, consistent with Shkreli's stated goal of generating liquidity without depressing price.  At most, that evidence shows that Vaino did not follow through on his role in the conspiracy after joining it.  And even if that is one possible inference to be drawn from the evidence, the evidence should not be drawn in the defendant's favor at this point.  In any event, other evidence discussed above shows that Vaino agreed to participate in the conspiracy.

### 2. Mulleady and Biestek

As the defendant acknowledges, the Court has already ruled that there is sufficient evidence in the record that Biestek and Mulleady are co-conspirators on Count Eight.  There is no reason to revisit that determination, and the additional evidence that the government will introduce through its case-agent will provide further support.

### IV. Conclusion

For the reasons set forth above, the defendant's motion should be denied.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:   /s/                             
Alixandra E. Smith
David C. Pitluck
David K. Kessler
Assistant U.S. Attorneys
(718) 254-7000