# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Winston Y. Chan
Direct: +1 415.393.8362
Fax: +1 415.374.8460
WChan@gibsondunn.com

December 2, 2017

VIA ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

We respectfully write in response to that part of the Court's December 1, 2017 docket-entry order regarding expert witnesses.

Our final anticipated expert witness list in the event of a defense case is as follows, in alphabetical order: Stephen Ferruolo, Stephen Gillers, Alan Johnson, Gayle Klein, Craig Lewis, and Ronald Minkoff.

For Professor Gillers, Ms. Klein, and Mr. Minkoff, there is no update to their disclosures set forth in our letters dated September 19 (Dkt. No. 383-1) (Klein; Minkoff) and October 11 (Dkt. No. 401) (Gillers; Klein; Minkoff).  Additionally, Mr. Johnson's anticipated testimony will be consistent with his testimony at the November 14, 2017 *Daubert* hearing.

For Mr. Lewis, there is no update to the summaries of his opinions and their bases set forth in our letters dated September 19 (Dkt. No. 383-1) and October 13, 2017 (Dkt. No. 405).  The attached charts replace Exhibit C of our October 13 letter (Dkt. No. 405-3).

We set forth updated disclosures as to Mr. Ferruolo below.

Summary of Opinions Narrowed From Prior Disclosures[1]

1.    Mr. Ferruolo would testify as to the role of an outside corporate lawyer representing small and early-stage private and public companies, including but not limited to the following opinions:

---

[1]   For the sake of clarity, to more directly address the government's actual case-in-chief and streamline the issues, we will not elicit during any defense case those expert opinions previously set forth in our prior disclosures but excluded here.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
December 2, 2017
Page 2

    a.    As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel "engaged in a scheme to fabricate an investment by MSMB Capital in Retrophin LLC and engineered a series of fraudulent transactions that were backdated to the summer of 2012 to create the appearance of an investment by MSMB Capital," Superseding Ind. ¶¶ 22-25, Dean Ferruolo would testify that:

        (i)    Early-stage companies are commonly disorganized in their record-keeping, often engaging in clean-up immediately prior to a financing event.

        (ii)    This disorganization extends to the issuance and transfer of shares.

        (iii)    Founders commonly provide employees and consultants with shares in the company as compensation, and often pursuant to oral understandings that do not get memorialized until later. If subsequently memorialized, the documents typically reflect the date the agreement was made or understanding was reached.

        (iv)    It is common for the composition and allocation of shareholders of an early-stage private company to change frequently.

    b.    As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli allowed "seven of his employees and contractors . . . to each purchase, for a nominal amount, a portion of Retrophin's 2.5 million unrestricted or free trading shares from John Doe 1," Superseding Ind. ¶ 36, Dean Ferruolo would testify that:

        (i)    Early-stage companies regularly use stock as a means to incentivize employees and consultants, with the hope and expectation that those recipients will work hard and stay with company.

        (ii)    It is usual for early-stage companies to distribute shares to individuals who are friendly and loyal to the company and who are committed to remain long-term shareholders.

        (iii)    Brokering a transaction allocating stock, whether restricted or unrestricted, among employees and other parties, is not prohibited and may be in the interest of both the company and those parties.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
December 2, 2017
Page 3

      (iv)    Management commonly brokers private agreements transferring unrestricted shares between holders for a variety of legitimate reasons, including for the mutual benefit of the shareholders and company.

      (v)    A transfer of unrestricted stock to an employee, who is not an "affiliate"—an executive officer, director, or large shareholder—would not make the stock restricted.

c.    As a potential response in the event the government's case-in-chief includes the allegation in the Superseding Indictment that Mr. Shkreli and Mr. Greebel "concealed and failed to disclose Shkreli's beneficial ownership and control over any of the unrestricted or free trading shares in Schedule 13Ds," Superseding Ind. ¶ 40, Dean Ferruolo would testify that:

      (i)    The purpose of a Schedule 13D filing is to provide an early warning signal of a potential change in control (e.g., hostile takeover).

      (ii)    A lawyer preparing a Schedule 13D filing for a client is similar to an accountant preparing a tax filing, in that the lawyer would rely on the information provided by the client. The filings themselves are commonly prepared and filed by paralegals or junior associates.

      (iii)    Merely brokering a private share transaction between third parties does not give rise to control over those shares.

2.    Dean Ferruolo would explain (a) certain complex and esoteric terms, and (b) certain complex concepts relating to the practice of outside corporate counsel, including but not limited to the following:

    a.    the distinction between outside corporate counsel and internal general counsel;

    b.    the mechanics of reverse mergers;

    c.    Over-the-Counter ("OTC") markets, including the types of investors that trade and the types of securities traded in these markets; and

    d.    types of financing for companies, including Private Investment in Public Entity ("PIPE") investments.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
December 2, 2017
Page 4

Summary of Supplemental Opinion

1.  As a potential response to the government's opening argument to the jury and to testimony already elicited by the government in its case-in-chief regarding Martin Shkreli's desire to limit the sale of Fearnow shares in the market (Trial Tr. 1081:22–1082:13 (Opening), 4777–78 (Su Testimony)), as well as the effect on the market of limiting the amount of shares available for sale (Trial Tr. 5760:6–20 (Oremland Testimony)), Dean Ferruolo would testify that one of a company's goals after a "going public" transaction, such as a reverse merger, is to create an orderly and stable market. To achieve this goal, companies and underwriters frequently enter into lockup agreements with as many shareholders as possible to prevent holders of freely-trading shares from selling their stock for a certain period of time, and that such lockup agreements are recognized and permitted by the SEC. To the extent there are freely-trading shares that are not subject to sale restrictions under SEC rules, such as Rule 144, or held by an individual subject to a restrictive sales agreement, companies may reasonably allocate those shares to individuals who are friendly to the company and share the same goal of creating an orderly and stable market.

Bases and Reasons

Dean Ferruolo's potential testimony will be based on his extensive professional experience, his understanding and interpretation of Sections 13(d) and 16 of the Securities Act of 1934 and Rule 144 of the Securities Act of 1933, and his review of materials from the SEC website.

Respectfully,

*/s/ Winston Y. Chan*
Winston Y. Chan

Attachment

cc:     Alixandra E. Smith, Esq.
        David C. Pitluck, Esq.
        David K. Kessler, Esq.