JAMS

Park Avenue Discoveries, LLC and
Dr. Steven Rosenfeld,

Claimants, Ref. No. 1425018539

-v-

Retrophin, Inc.,

Respondent.

# DECISION AND FINAL AWARD

## I. Procedural Background

This matter was initiated by a Notice of Arbitration dated April 29, 2015, submitted to JAMS by the Claimants, Dr. Steven Rosenfeld and Park Avenue Discoveries, LLC. On June 5, 2015, Respondent Retrophin, Inc. filed its Answer, Affirmative Defenses, and Counterclaims. Claimants filed a First Amended Demand for Arbitration on September 18, 2015; on October 2, 2015, Respondent denied the allegations in the Amended Demand and relied on its original Answer. The Arbitration is brought pursuant to Section 11 of the agreement captioned "Consulting Agreement and Release" dated as of February 14, 2014 (the "Agreement"). The matter was subject to the JAMS Streamlined Rules.

Throughout these proceedings, Claimants were represented by attorneys Jenice L Malecki and Adam M. Nicolazzo, of Malecki Law, 11 Broadway, New York, New York. Respondent was represented by attorneys Celia Goldwag Barenholtz, Ian Shapiro, and Nicholas Flath, of Cooley LLP, 1114 Avenue of the Americas, New York, New York.

The matter was heard on September 20, 21, 22, 23, 29, and 30, 2016 at the office of JAMS, 620 Eighth Avenue, 34th Floor, New York, New York. Testimony under oath was heard from Steven Rosenfeld, David Carter, Mark Ehrlich, Mark Fawer, David Filer, and Daniel Teper, on behalf of Claimants, and from Stephen J. Aselage on behalf of Respondent. The hearing was transcribed. At the conclusion of the hearing, the parties developed an agreed schedule for post-hearing briefs. The parties submitted their final post-hearing brief on November 30, 2016 and graciously agreed to extend the due date of this Award.

## II. Factual Background

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award.[1] In finding the facts and reaching the conclusions set forth below, the Arbitrator has given full and careful consideration to all evidence of record and all arguments advanced by the parties at the hearing and in their post-hearing submissions. To the extent that this recitation differs from any party's position, that is the result of the Arbitrator's determinations as to credibility, relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

**Claimants Invest in Shkreli Entities**

This matter relates to, and arises from, investments made by Claimants in entities originated by or related to Martin Shkreli.

Steven Rosenfeld is a self-employed investor with interest and experience in the biotechnology field. Rosenfeld attended medical school but has not practiced as a physician. Park Avenue Discoveries, LLC, is the name of Rosenfeld's wholly owned investment firm vehicle. On June 20, 2012, Rosenfeld invested $200,000 in an entity known as MSMB Healthcare LP, a hedge fund run by Martin Shkreli. Rosenfeld had been introduced to Shkreli and his hedge fund by Ron Tilles, Rosenfeld's friend and occasional business associate, who was involved in identifying investors for Shkreli's entities. Tilles also set up a meeting on June 26, 2012, for Rosenfeld to meet with Shkreli. Shkreli had founded and was the CEO of a pharmaceutical company, Retrophin LLC, and Rosenfeld spoke with Shkreli and Retrophin's outside counsel, Evan Greebel, about their plans to take Retrophin public. In November 2012, Rosenfeld, through Park Avenue, invested $100,000 in Retrophin.

**MSMB Healthcare is Liquidated**

In the latter part of 2012, Rosenfeld learned that Shkreli had decided to liquidate the MSMB hedge fund and focus his activities on Retrophin. Although Shkreli assured investors that the hedge fund had been profitable, Rosenfeld became concerned about recovering his money and began to press Shkreli and Tilles for the $200,000 he had invested in MSMB as well as the return on his principal. By February of 2013, Rosenfeld knew that MSMB would not be able to redeem his investment in cash. The MSMB liquidation took place in March. Since the hedge fund had invested in Retrophin, it carried out the liquidation by distributing its Retrophin stock to investors on a pro rata basis. In the distribution, Rosenfeld received shares that were worth less that 50 per cent of his investment. Dissatisfied, he sent many communications to Shkreli and threatened to bring suit. Eventually, Shkreli responded by telling Rosenfeld to direct further communications to Greebel.

---

[1] Specific transcript and exhibit citations are included only for direct quotations. References to the record are identified as follows: "Tr." for Transcript, "C- "for Claimant's Exhibits, and "R- "for Respondent's Exhibits.

**Rosenfeld Pursues Recovery**

Rosenfeld was vigorous in seeking the return of his funds and pursued negotiations with Shkreli's representatives, including attorney Greebel. In April 2013, Greebel advised Shkreli to obtain approval from Retrophin's Board of Directors "to retain consultants who may be paid in cash or stock..." (C-25). On April 22, 2013, the Board held a telephonic meeting. According to the minutes of the meeting, the Board passed a resolution that Shkreli, as CEO, was "authorized, empowered and directed, in the name and on behalf of [Retrophin, Inc.], to execute and deliver any and all employment and consultant agreements for employees and consultants to the company ..." (C-26).

In May 2013, Greebel, using Tilles as a conduit, communicated a draft consulting agreement and release to Rosenfeld. The proposed agreement envisioned the issuance of 60,000 Retrophin shares to Rosenfeld. Rosenfeld rejected the offer and protracted negotiations ensued. In addition to Rosenfeld, the discussions included Shkreli, Greebel, Tilles, Mark Panoff, who was Retrophin's CFO, and Ken Banta, a Retrophin advisor.

**Agreement is Reached**

Ultimately, the parties reached agreement in February 2014. The Consulting Agreement, which was finalized on February 14, 2014 and included Park Avenue as well as Rosenfeld, called for Rosenfeld to receive a cash payment of $200,000 plus 66,000 shares of Retrophin stock, payable by the end of 2014 in four installments of 16,500 shares. The Agreement states that the cash and stock were being issued to Claimants "in exchange for the services" (R-77 §2), a defined term that refers to "consulting services ... on strategic and corporate governance matters." (*Id.* §1). Apart from the definition, there is no other discussion of the consulting services.

Retrophin's 2013 Form 10-K filing described the material terms of the Consulting Agreement, as well as those of two other consulting agreements that the company had entered into in 2014. In a section titled "Subsequent Events," the filing stated, in relevant part:

> On February 14, 2014, we entered into an agreement with a consultant to serve as an advisor to us. We granted 66,000 shares of common stock to such consultant, payable as follows: (i) 16,500 shares of common stock to be issued on March 31, 2014, (ii) 16,500 shares of common stock to be issued on June 30, 2014, (iii) 16,500 shares of common stock to be issued on September 30, 2014, (iv) 16,500 shares of common stock to be issued on December 31, 2014. In addition, such consultant shall receive $200,000 upon execution of the agreement. The agreement expires on December 31, 2014. (C-122, p. 69).

The other agreements also included grants of common stock. The filing, which was dated March 28, 2014, stated that management had reviewed all material events through the date of filing (C-122, p 119) and was signed by the firm's Directors (C-122, p. 81).

**Rosenfeld's Activities: February - October 2014**

Rosenfeld testified that between February and October 2014, he engaged in multiple activities related to or on behalf of Retrophin. These activities included investing in and researching two databases, *i.e.*, Sagient's BioMed Tracker and Axial; forwarding information to Tilles; and contacting persons he knew, including Zvi Loewy, who had connections to pharmaceutical companies. He testified that he worked extensively on the potential acquisition of a drug, Amiket, from Immune Pharmaceuticals, which he believed had potential for Retrophin, and that he asked colleagues, including David Carter, Jeffrey Benison, Marc Ehrlich, and Zvi Loewy, to look for drug acquisition possibilities. In May, he introduced Carter to Ron Tilles to present an investment opportunity, and he also arranged for Tilles to meet David Filer, a molcular biologist and experienced biotech professional, to see if there was synergy with Retrophin.

**Aselage Replaces Shkreli;**
**Shares are Withheld**

In late September 2014, Stephen Aselage replaced Shkreli as Retrophin's CEO. Aselage had been a Retrophin Board member since September 2012 and had served as its Chief Operating Officer since May 2014. As a board member, he knew little about Retrophin's consultants[2] and was unaware of Rosenfeld or the Consulting Agreement until he took over as CEO. Aselage testified that the minutes of the April 2013 meeting of the Board of Directors were inaccurate: specifically, that they failed to reflect what transpired at the meeting or the limitations that were placed on Shkreli's authority to enter into consulting agreements on behalf of Retrophin.

On October 14, 2014, after becoming Retrophin's CEO and reviewing company records, Aselage sent an email to Rosenfeld inquiring about the latter's activities. Aselage said: "I was head of the Governance committee last year and I don't recall any interaction with you. Can you tell me what exactly has been the consulting you have done for the company." (R-097 at RTRX-Rosenfeld166). Rosenfeld waited until November 20 to respond. Ascribing the delay to having "missed" Aselage's email, Rosenfeld said that he had provided "substantive services" but did not describe them. (R-97). Aselage replied that the final installment of shares would not be issued without "documentation of your consulting activites." (*Id.*) On January 2, 2015, Rosenfeld threatened to bring legal action if the shares were not issued. Aselage answered: "... if you want [to be] compensated for your consulting, you need to show you actually consulted." (R-98). Neither Rosenfeld nor his attorney, Stuart Meissner, responded to that demand, and Retrophin did not issue the remaining 16,500 shares. Rosenfeld filed his Notice of Arbitration on April 29, 2015, and this proceeding followed.

[2] "As a board member," he testified, "I was not reviewing consulting time sheets or consulting output." (Tr. 236).

## III. The Parties' Claims

### The Rosenfeld/Park Avenue Claims

Claimants assert five causes of action against Respondent. Their principal claim is that Respondent breached the Consulting Agreement by refusing to distribute the fourth tranche of stock, as required by that Agreement. Respondent is liable, they allege, because (i) a valid contract exists, (ii) Claimants met their contractual obligations, (iii) Respondent refused to make a promised payment, and (iv) Claimants were damaged.

Alternatively, if the Consulting Agreement were found to be invalid, Claimants assert that Retrophin is liable on equitable theories of quantum meruit and unjust enrichment. According to Claimants, a quantum meruit recovery is warranted because (a) Rosenfeld performed services that Retrophin accepted, (b) he expected compensation on the terms negotiated by the parties, and (c) Retrophin failed to pay pursuant to those terms. Similarly, they assert that Retrophin was unjustly enriched by retaining the services Rosenfeld provided while failing to compensate him fully, as agreed.

Claimants also assert a claim for fraudulent inducement. They contend that if Shkreli did not possess actual or apparent authority to bind Retrophin to the Consulting Agreement, Retrophin is liable because Rosenfeld justifiably relied on Shkreli's misrepresentations to induce him to perform consulting services and has suffered damages in the amount of 16,500 shares. Finally, Claimants assert a claim of conversion. They argue that Rosenfeld's performance of the Consulting Agreement rendered him the rightful owner of the final tranche of 16,500 shares of Retrophin stock, and that Respondent has intentionally and wrongly failed to distribute those shares to him.

### Retrophin's Defenses and Counterclaims

Respondent counters that Claimants' breach of contract claim fails for three separate reasons. It asserts, first, that the Consulting Agreement is a "sham" agreement and is unenforceable under New York's illegality doctrine. Second, it contends that the Agreement is unenforceable because it contains a stock grant that was not approved in writing by the Board, as required by the Delaware General Corporation Law. Third, it asserts that the Agreement contains a self-dealing component and that Shkreli lacked actual or apparent authority to enter into such a contract.

Retrophin claims that the quantum meruit and unjust enrichment claims fail because Claimants did not establish that services were provided or that Retrophin received anything of value, and did not prove the value of any alleged services or time expended. Respondent further argues that Claimants are not entitled to recover under theories of fraudulent inducement or conversion.

In addition to its defenses, Respondent interposes two counterclaims. Retrophin asserts that Claimants aided and abetted Shkreli's breach of ficudiary duty to Retrophin, and that Claimants were unjustly enriched. As to the aiding and abetting claim, Retrophin contends that Shkreli breached his fiduciary duties to Retrophin by causing the company to pay cash and issue shares to Claimants in order to obtain a release of their MSMB Healthcare claims, and by disguising that transaction as a consulting agreement. They allege that Rosenfeld provided substantial assistance and knowingly participated in that breach by negotiating and executing a deceptive instrument. As to unjust enrichment: Retrophin contends that Claimants provided nothing of value and should be required to disgorge what they received, *i.e.*, the cash and stock, that they wrongfully obtained from Retrophin and its shareholders.

## IV. Analysis and Findings

Upon careful consideration and review of the evidence and arguments, the Arbitrator finds and declares that Claimants have established their claim for breach of the Consulting Agreement and are entitled to recover damages for that breach. All of the other claims and counterclaims are dismissed.

The Arbitrator addresses the specific issues raised by the parties. Not all arguments made by the parties will be addressed, only those that the Arbitrator finds are determinative of the issues. To the extent any claim, counterclaim, or argument is not specifically mentioned here, it is denied.

### Claims by Rosenfeld and Park Avenue Discoveries

### A. Breach of Contract

Under the terms of the Consulting Agreement, Retrophin agreed to compensate Claimants with cash and stock in exchange for consulting services on "strategic and corporate governance" matters. The stock was to be provided in four installments, with the last delivered by December 31, 2014. The Agreement did not specify the "services" to be provided and did not obligate Rosenfeld to give reports to Retrophin or maintain records of his time or work. During the period covered by the Agreement, Rosenfeld reviewed databases and spoke with contacts about potential biotechnology opportunities, some for his own investment and some that might be a fit for Retrophin, and he introduced an established scientist to a Retrophin consultant. Based on these activities, Rosenfeld asserts that he fulfilled his contractual obligation to provide consulting services whereas Retrophin reneged on its promise by failing to provide the final tranche of 16,500 shares.

The Arbitrator finds that the Consulting Agreement is an express and enforceable agreement between the parties that was breached by Retrophin. Although the Agreement's demands on Rosenfeld were minimal, those demands were met; there was no requirement that

the services be of proven value. Retrophin failed to pay what was owed. In addition, as discussed more fully below, none of Retrophin's defenses has merit. Accordingly, Claimants have established their claim for breach of contract and are entitled to damages for that breach.

1. The Consulting Agreement is Not Void for Illegality.

Under New York law, a contract that would enable a party to "profit by his own fraud" is illegal and unenforceable. *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 469 (1960). The illegality doctrine applies when there is a "direct connection between the illegal transaction and the obligation sued upon." *Id.* at 471. Retrophin contends that the Consulting Agreement is such an illegal and unenforecable contract because:

- the "predominant purpose" of the Agreement was to resolve Claimants' dissatisfaction with the MSMB Healthcare investment (R. Reply at 4)[3];
- the consulting term of the Agreement was never intended to produce meaningful consulting services for Retrophin;
- the consulting efforts were "window dressing" or activities taken for Rosenfeld's own benefit and conferred no benefit on Retrophin (R. Reply at 2);
- the Agreement lacks the typical terms included in a bona fide consulting agreement such as the obligations to log hours and provide reports, the identification of specific tasks, and the representation that the consultant would perform services in a "diligent and professional" manner (R. Post at 20).

Respondent's argument overreaches. Even if the points above were true, they would not suffice to establish that the Consulting Agreement is void for illegality or that the breach of contract claim, if allowed, would enable Claimants to recover "the fruit of a crime." As Retrophin's cited cases show, the conduct alleged does not approach the kind of wrongdoing that triggers the illegality doctrine.

The caselaw makes clear that in order for a contract to be void for illegality, the conduct at issue must be egregious. In two of Retrophin's cases, for example, the party seeking to enforce the contract had been convicted of a crime related to that contract. One such case is *BD Estate Planning Corp. v. Trachtenberg*, 134 A.D.3d 650 (1st Dep't 2015), where the plaintiff sought to enforce a promissory note providing for the payment of death benefits under an insurance policy on the life of defendant's late spouse. The defendant refused to pay, on the ground that plaintiff's owner had been convicted of mail and wire fraud in a scheme to defraud insurance companies. The court upheld the defense of illegality because of the direct connection between the promissory note and the scheme to defraud. Similarly, in *Villacorta v. Saks, Inc.*, 32 Misc. 3d 1203(A) (Sup. Ct. N.Y. Cnty, May 6, 2011), the court's refusal to enforce a contract was also based on a criminal conviction. In that case, a plaintiff who had been convicted of falsifying sales records sued her former employer for breach of contract, alleging that she was entitled to bonuses and

[3] References to the parties' Pre-Hearing, Post-Hearing, and Reply Memoranda are as follows: "C. Pre" and "R. Pre"; "C. Post," and "R. Post;" and "C. Reply" and "R. Reply."

commissions based on her sales performance. The very records for which she had been convicted were basis of her contract claim. Citing plaintiff's conviction, the Court dismissed the breach of contract claim "in the interest of justice and on public policy grounds "(*id*. at *12), explaining:

> This is not a simple breach of contract claim, as plaintiff seeks, in legal effect, the aid of the court for payment of the compensation, which, as demonstrated by her criminal conviction, was based on the falsely inflated 'net sales' numbers.

(*Id*. at *11). No convictions are present here.

In other cases cited by Retrophin in which contracts were not enforceable due to illegality, there was direct evidence (or an admission) of a party's involvement in illegal activity. In *Goldberger v. Magid*, 133 A.D.3d 546 (N.Y. 1st Dep't 2015), where plaintiff moved for summary judgment for payment of a promissory note, the maker of the note admitted to forging the signature on a guarantee. That admission, the Court found, created an issue of fact that the amount sought by plaintiff was "the fruit of a crime." Likewise, in *CMF Investments, Inc. v. Palmer*, 2014 WL 6604499 (S.D.N.Y. Nov. 21, 2014), the Court concluded that plaintiff had engaged in a pump and dump scheme to increase the value of stock before selling out at a profit, and refused to enforce a contractof sale that was intended to facilitate illegal trading activity: "Although the [contract] is lawful on its face ... to give [Plaintiff] the relief it seeks would permit [Plaintiff's sole shareholder] to profit from her own illegality." (*Id*. at *10). In the matter at hand, there is nothing remotely akin to the forgery in *Goldberger* or evidence of fraud that was present in *CMF*.

Finally, despite its colorful language that Retrophin quotes, *McConnell v. Commonweath Pictures Corp*. is inapposite and does not support Respondent's position. In *McConnell*, the plaintiff sued to enforce a contract involving payment for distribution rights. Defendant asserted an affirmative defense: that he stopped paying when he learned that plaintiff had procured the distribution rights through bribery. The Court of Appeals resinstated the affirmative defense, ruling that, if the defense were established, the contract could not be enforced: "(... assuming that the defenses speak the truth) the disclosed situation would be within the rule of our precedents forbidding court assistance to bribers." (7 N.Y.2d. at 471). The Court went on to explain that:

> ... It is not every minor wrongdoing in the course of contract performance that will insulate the other party from liability for work done or goods furnished ...
> All we are doing here is labeling the conduct described in these defenses as gross corruption depriving plaintiff of all right of access to the courts of New York State... we hold that a party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance. *Id*.

Respondent attempts to analogize the present case to the facts in *McConnell* and *B.D. Estate Planning*, claiming:

> Like the plaintiffs in *McConnell* and *B. D. Estate Planning*, Claimants are suing 'to collect the rewards of corruption.' Claimant entered into a sham consulting agreement in order to aid and abet Shkreli in his scheme to use Retrophin assets to pay his personal obligations and those of the MSMB Funds. There was no intent that Rosenfeld would be a *bona fide* Retrophin consultant. (R. Pre at 13-14).

Key differences render the analogy false. In *B. D. Estate Planning*, there was a fraud conviction that made the contract illegal and unenforceable. In *McConnell*, the court stressed that the contract would be unenforceable if there was proof of illegality, that is, if "the [bribery] defenses speak the truth." 7 N.Y.2d.at 471. Convictions and proof of illegality are missing here; there has been no conviction of an underlying "scheme" nor any proof that Rosenfeld induced or participated in such a scheme.

In sum, Retrophin has not established that the Consulting Agreement is void for illegality. The key characteristic of Retrophin's cases – indeed, the basis of the illegality rulings – is evidence of "gross corruption" related to the contracts at issue: *i.e.*, convictions for fraud and falsification of records, a determination of securities fraud, and an admission of forgery. Because nothing comparable is present here, the Consulting Agreement is not void under the illegality doctrine.

2. The Consulting Agreement is Not Void for Containing a Stock Grant.

Retrophin contends that the Consulting Agreement is not enforceable because it contains a stock grant that was not approved in the manner required by the Delaware General Corporation Law.[4] It claims that, pursuant to 8 Del. C. § 157, an agreement that creates a right to stock must be approved by the Board of Directors in writing, and that Retrophin's Board did not do so here.

Claimants respond that both of the statutory requirements are met. They assert that the Board did approve the grant of stock and that the approval is confirmed in two separate documents: the minutes of the April 2013 meeting of Retrophin Board's and the company's 2013 Form 10-K filing. Claimants challenge Aselage's testimony that the minutes do not accurately reflect what transpired at the Board meeting.

The evidence refutes Retrophin's argument and supports the Claimants' position. With respect to the grant of stock at issue, the Delaware statute, 8 Del. C. § 157, "requires board approval and that there be a written instrument that evidences those arrangements." *Grimes v. Alteon, Inc.*, 804 A.2d 256, 259 (Del. 2002). Notably, the statute does not state that a particular form of documentation is required; indeed, case law makes clear that the statute does not require "airtight written documentation of a resolution" or "that the resolution be included in the minutes of the board meeting at which it was adopted." *Feldman v. Cutaia*, 956 A.2d 644, n. 67 (Del. Ch. 2007). Here, Board approval is evidenced in two documents: Board minutes and the Form 10-K. But even if the Board's approval of the Consulting Agreement were not reflected in

[4] Under New York law, which governs the Agreement, Delaware law applies to questions concerning the validity of Retrophin stock.

the April 2013 Board minutes, which it was,[5] it is documented in Retrophin's 2013 Form 10-K, which was signed and authorized by the Directors. That documentation distinguishes this matter from Retrophin's cases,[6] which had no written evidence of any kind of Board authority or approval. Accordingly, the stock grant in the Consulting Agreement complies with the requirements of Delaware law and is enforceable.

3. The Consulting Agreement is Not Void for Lack of Actual or Apparent Authority

Retrophin's final contention, that the Consulting Agreement is void because Shkreli lacked actual or apparent authority to enter into it, does not require extended discussion. The argument as to lack of actual authority rests on claims that the Agreement was illegal or not approved by the Board. Those claims were addressed and rejected above. In its other argument, Retrophin contends that Rosenfeld failed to establish that Shkreli had apparent authority to enter into the Agreement or that Rosenfeld had a reasonable belief that entering into the Agreement was within the scope of Shkreli's authority as Retrophin's CEO. According to Retrophin, Rosenfeld should have been aware that Shkreli was overstepping his authority or was obligated to inquire about his authority, because Rosenfeld knew that the Agreement conferred a benefit on Shkreli (the Release) and because the terms of the Agreement were "extraordinary." (R. Post at 25).

Respondent's "apparent authority" argument strains credulity. It is undisputed that Shkreli was the CEO of Retrophin and its public face throughout the months of negotiation. It is undisputed that, for a protracted period, Rosenfeld negotiated with and through through Shkreli and a host of others with Retrophin titles, including its CFO, Panoff, and its corporate counsel, Greebel. To any reasonable observer, their participation and titles stamped the Agreement with Retrophin's imprimatur. Respondent points to nothing in the negotiations to dispel the appearance that Shkreli had authority to enter into the Agreement. Nor was there anything in the Agreement itself that should or could have alerted Rosenfeld that Shkreli might be overreaching. Retrophin says that Shkreli's self-dealing was, or should have been, apparent to Rosenfeld but gives no proof. The Agreement did not single out Shkreli; it called for services to be provided to Retrophin, not Shkreli, and the release provision applied broadly to Retrophin's officers and directors, not Shkreli alone. Shkreli was "clothed with a broad apparent authority" to enter into the agreement, and Rosenfeld's reliance on that authority was reasonable.[7]

***

[5] The testimony concerning the inaccuracy of the minutes is unpersuasive.

[6] In the cases cited by Retrophin, grants of stock or options were held to be unenforceable where there was no evidence of Board authority or approval: *Niehenke v. Right O Way Transp*, 1995 Del. Ch. Lexis 159(Del. Ch. Dec. 28, 1995) (no documentation of authority); *Scarpinato v. National Patent Devel. Corp.*, 75 Misc. 2d 94 (Sup. Ct. Nassau Cty 1973 (no allegation or proof of board approval); *Patriot Sci. Corp. v. Korodi*, 504 F.Supp. 2d 952, 958(S.D.Cal.2007) (oral promise unenforceable).

[7] *See Ullman-Briggs v. Salton, Inc.*, 754 F. Supp. 1003,1007( S.D.N.Y. 1991).

For the reasons stated above, the Consulting Agreement is an express and enforceable agreement between the parties and is not void for illegality. Claimants have established that Retrophin breached the Agreement when it failed to deliver the final installment of 16,500 shares of Retrophin stock that were due to be paid by December 31, 2014.

**B. Claimants' Other Causes of Action**

For the reasons set forth below, Claimants are not entitled to prevail on their remaining claims against Retrophin.

1. Quantum Meruit and Unjust Enrichment

Unjust enrichment is "an obligation imposed by equity ... in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 19 N.Y. 3d 511,516 (2012)(internal citations omitted). The same is true of quantum meruit claims, which apply only "in the absence of an express agreement." *Martin H. Bauman Assocs. V. H&M Int'l Transp. Inc.*, 171 A.D.2d 479,484 (1st Dep't 1991). Having determined that the Consulting Agreement is an express and enforceable contract between the parties, the quasi-contractual claims cannot lie. Claimants' claims for unjust enrichment and quantum meruit are denied and dismissed.

2. Fraudulent Inducement

The claim for fraudulent inducement is dismissed. There was no evidence of a misrepresentation by Retrophin or Shkreli concerning intent to perform the Consulting Agreement, which, in fact, was substantially performed. Under New York law, "A cause of action alleging fraud does not lie where the only fraud claim relates to a breach of contract. ... a mere misrepresentation of an intention to perform under the contract is insufficient to allege fraud." *Jeffers v. Am. Univ. of Antigua*, 125 A.D. 3d 440,442 (1st Dep't 2015) (internal citation omitted).

3. Conversion

Claimants contend that they proved their conversion claim by establishing that Rosenfeld performed consulting services for Retrophin, that they were entitled to the shares at issue pursuant to the Agreement, and that Retrophin refused to issue the shares. As Retrophin correctly argues, however, conversion requires more than an alleged or actual breach of contract. *See Jeffers*, 125 A.D. 3d at 443. In order to prove a conversion claim, Claimants would need to show that Retrophin interfered with their "possessory right or interest" in property. *Pappas v. Tzolis*, 20 N.Y. 3d 228, 234 (2012)(internal citation omitted). Significantly, the failure to deliver property promised under a contract does not establish the requisite possessory right or interest in property. *See, e.g., Strategic Growth Intern., Inc. v. RemoteMDx, Inc.*, 2008 WL 4179235, at *3 (S.D.N.Y. Sept. 10, 2008)(dismissing conversion claim premised on defendant's "failure to deliver the options and shares provided for in the Agreement"). Here, Claimants' conversion claim is based on no facts independent of the facts supporting the breach of contract claim. Accordingly, the claim for conversion is denied and dismissed.

C. Damages

Claimants are entitled to recover damages for the 16,500 shares of Retrophin stock that were owed, but not delivered, pursuant to the Consulting Agreement. December 31, 2014 was the date by which the shares were due.

The parties are in sharp disagreement about the value of the shares. Claimants contend that because the value of the shares has both increased and decreased over time, they are entitled to "a conversion measure of damages known as the highest intermediate price rule" (C. Post at 30), as articulated by the Second Circuit in *Shultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir. 1983). In transactions for which that methodology applies, the measure of damages is "the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter..." *Schultz*, 716 F.2d at 139-140. According to Claimants, August 5, 2015 is "a reasonable time from Retrophin's breach in December 2014" (C. Post at 30), and they assert that on that date, the value of the stock was $611,160. Claimants also seek interest on that amount at the statutory rate.

By contrast, Respondent insists that, under the law of this Circuit, the "highest intermediate price" rule does not apply to breach of contract claims. Retrophin relies on the Second Circuit's decision in *Lucente v. IBM*, 310 F.3d 243 (2d Cir. 2002), for the proposition that "breach of contract damages are to be measured from the date of breach." *Id.* at 263. Retrophin also points out that, under *Lucente*, the date-of-breach valuation date applies even where, as here, the Agreement calls for the issuance of restricted stock. *Id.* at 262. Retrophin argues that the date of breach is November 20, 2014, the date on which Aselage told Rosenfeld that the Rosenfeld would need to document his services in order for Retrophin to complete its performance. Retrophin states that although the value of the 16,500 shares on that day was $144,210, Claimants' damages were less than that amount because the stock consisted of restricted shares. Based on Rosenfeld's testimony that restricted shares were worth 30 to 40 per cent less than market (Tr. 742-743), Retrophin asserts that the actual damages are 30 to 40 per cent less than $144,210, and are between $86,526 and $100,974.

In their reply to Retrophin's damage analysis, Claimants do not address Retrophin's claim that November 20, 2014 should be used as the date of breach and do not respond to the argument that the valuation should be discounted because of the restricted shares. They insist, however, that the "highest intermediate price rule" should apply because Respondent "is liable on a theory of conversion." (C. Reply at 11).

Under well-settled law in this Circuit, the damages in this breach of contract claim are to be assessed as of the date of breach. The "highest intermediate price" rule does not apply to breach of contract claims (*see Lucente*, 310 F.3d at 262-63), and Claimants' claim for conversion has been dismissed. Apart from arguing for the "highest intermediate price" rule, Claimants proffer no basis for calculating the damages as of August 5, 2015. There is no evidence that Rosenfeld would have held the shares for eight months. To the contrary, he testified that he sold

his Retrophin shares at a discount as quickly as possible (*see, e.g.*, Tr. 517, 540-541, 741, 747). In addition, Claimants did not counter Retrophin's claims that November 20, 2014 is the date of breach, that the share price on that date was $8.74, or that a discount is appropriate for restricted shares. Accordingly, Claimants' damages are calculated as follows: (16,500 shares x $8.74 share price) = $144,210; applying a discount of 20 per cent ($28,842) for the restricted shares, the total damages are $115,368. Claimants are entitled to interest at the statutory rate of nine per cent.

## Retrophin's Counterclaims

### A. Aiding and Abetting

Retrophin alleges that the Claimants aided and abetted Shkreli's breach of his fiduciary duty to Retrophin. In order to prevail on that claim, Retrophin had to establish (i) that Shkreli breached his fiduciary duty to Retrophin, (ii) that Claimants "knowingly induced or participated in the breach;" and (iii) that Retrophin suffered damage as a result. *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003). In fact, Retrophin established none of those elements.

Shkreli was not a party or witness in these proceedings and was not represented by a surrogate. The legality or illegality of his and Greebel's conduct is being assessed in a proceeding in a different forum. Neither Shkreli's indictment nor the Consulting Agreement constitutes *prima facie* evidence of wrongdoing. At least at this juncture, Shkreli is entitled to a presumption of innocence, and the Consulting Agreement alone, with its unexceptional terms, is inadequate to establish a breach of duty. Absent an underlying breach of duty, the aiding and abetting claim fails, and is hereby dismissed.

### B. Unjust Enrichment

In its unjust enrichment claim, Retrophin seeks to recover the value of the 49,500 shares of stock and the $200,000 in cash that it paid to Claimants. It asserts that the aggregate value of that consideration is $906,200 and that, in return, it received no consulting services of value.

As Retrophin has recognized, "A claim for unjust enrichment cannot proceed when a 'valid and enforceable written contract' governs the subject matter of the claim." (R. Post at 34, n. 30, quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y. 2d 382, 388 (1987). Here, the subject matter of Retrophin's unjust enrichment claim is covered by the Consulting Agreement, which has been determined to be a valid and enforceable contract. Accordingly, the claim for unjust enrichment is dismissed. *See Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 109 (1st Dep't 2005) ("the existence of a contract governing a particular subject matter precludes recovery in quasi contract for events arising out of the same subject matter").

## V. Legal Fees and Costs

Claimants seek to recover legal fees and costs incurred in this matter. However, the Consulting Agreement provides that each party must pay "an equal share" of the arbitration costs and "bear its own attorneys' fees and expenses." (R-77 §11). Accordingly, Claimants' request is denied; each party shall bear its own fees and costs.

## RELIEF AWARDED

The undersigned Arbitrator, having been duly sworn, having heard the proof, and having given full and fair consideration to the evidence submitted and all factual and legal arguments presented, does hereby issue the following relief:

1. Claimants have established their claim for breach of the Consulting Agreement and are awarded damages of $115,368.
2. Pursuant to New York CPLR §§5501 *et seq*, Claimants are entitled to interest on the amount of $115,368 at the rate of 9 per cent per annum, from November 20, 2014.
3. Claimants' claim for quantum meruit is dismissed in its entirety.
4. Claimants' claim for unjust enrichment is dismissed in its entirety.
5. Claimants' claim for fraudulent inducement is dismissed in its entirety.
6. Claimants' claim for conversion is dismissed in its entirety.
7. Respondent's counterclaim for aiding and abetting is dismissed in its entirety.
8. Respondent's counterclaim for unjust enrichment is dismissed in its entirety.
9. Each party shall bear its own costs and attorneys' fees.

This Final Award resolves, and is in full settlement of, all claims and counterclaims submitted in this Arbitration. All claims and counterclaims not expressly granted herein are denied and dismissed.

Vivien B. Shelanski
Arbitrator

Jan. 30, 2017
Date

I, Vivien B. Shelanski, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Vivien B. Shelanski — Jan. 30, 2017

Vivien B. Shelanski
Arbitrator

Date

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Park Avenue Discoveries LLC vs. Retrophin Inc.
Reference No. 1425018539

I, Garrett Feldman, not a party to the within action, hereby declare that on January 30, 2017, I served the attached Decision and Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Mr. Steven Rosenfeld
Park Avenue Discoveries LLC
375 Park Avenue
Suite 2607
New York, NY 10152
Phone: 917-882-4145
stevenrosenfeldmd@gmail.com
Parties Represented:
Park Avenue Discoveries LLC

Ian Shapiro Esq.
Nicholas Flath Esq.
Celia G. Barenholtz Esq.
Cooley LLP
The Grace Building
1114 Avenue of the Americas
New York, NY 10036-7798
Phone: 212-479-6000
ishapiro@cooley.com
nflath@cooley.com
cbarenholtz@cooley.com
Parties Represented:
Retrophin, Inc.

Adam M. Nicolazzo Esq.
Jenice L. Malecki Esq.
Malecki Law
11 Broadway
Suite 715
New York, NY 10004
Phone: 212-943-1233
adam@maleckilaw.com
jenice@maleckilaw.com
Parties Represented:
Park Avenue Discoveries LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on January 30, 2017.

Garrett Feldman
gfeldman@jamsadr.com