### 49) PROPOSED INSTRUCTION 49:  Defense Theory of the Case

Mr. Greebel did not conspire with Mr. Shkreli or anyone else to commit wire fraud.  Mr. Greebel did not conspire with Mr. Shkreli or anyone else to commit securities fraud.[85]  Mr. Greebel provided legal advice in good faith, and relied on Mr. Shkreli's representations, which included lies and misleading statements.

Mr. Greebel had no motive to commit the alleged crimes.  It makes no sense that Mr. Greebel would throw away his legal career in 2012 for a man he just met, for a man who failed to pay his bills on time, and for a company on the brink of bankruptcy.  Mr. Shkreli did not give any money, stock, gifts, or property to Mr. Greebel.  By 2012, Mr. Greebel was a successful partner at Katten Muchin with many existing and prospective clients.  Mr. Jacobs, a senior partner at Katten, was transitioning his large book of business to Mr. Greebel.  And Mr. Greebel's compensation was already significant without Retrophin.  Although Mr. Greebel, like any other partner at Katten Muchin, wanted a higher base salary and bonus, Katten Muchin's compensation system was not driven by a formula.  Just because a partner brought in more business didn't mean that the partner would be paid more money.  The idea that Mr. Greebel would help Mr. Shkreli commit a crime in exchange for no money from Mr. Shkreli and no way of knowing whether his compensation would increase at Katten Muchin makes no sense.

Mr. Greebel and Mr. Shkreli were opposites.  They were not friends.  They were not social acquaintances.  They did not grow up together.  While Mr. Greebel was married with a family, Mr. Shkreli was younger and single.  While Mr. Greebel was focused on a legal career

---

[85]  *See United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir. 1991) ("This Court has repeatedly recognized a criminal defendant's right to a jury charge which reflects the defense theory.").

that was well underway, Mr. Shkreli was still experimenting with his career, changing from a hedge fund manager to the founder and chief executive officer of a public company.

Mr. Greebel was not an officer, director, or employee of Retrophin. Mr. Greebel worked at a law firm that served as outside counsel to Retrophin. Mr. Greebel provided legal advice in good faith, along with other attorneys at Katten Muchin. Mr. Greebel did not work in a silo, alone and without seeking counsel from other attorneys. For example, Mr. Greebel sought the advice and counsel of Mr. Jacobs from time to time. Also, Mr. Rosensaft, a former federal prosecutor, handled the SEC investigation into MSMB. And Mr. Cotton, a senior equity partner, handled Retrophin's lawsuits against Timothy Pierotti, Jackson Su, George Huang, and others.

By contract and practice, Mr. Greebel and Katten attorneys relied on Mr. Shkreli's representations. But like the sophisticated, wealthy investors in the MSMB funds, Mr. Greebel and the other Katten attorneys were deceived by Mr. Shkreli.

Each of the prosecution's three theories in Count One makes no sense. The prosecution's MSMB Capital stock backdating theory makes no sense for many reasons: (1) The stock transfers between Mr. Shkreli and other individuals did not take any stock away from the company of Retrophin—these were private share transfers from one individual to another; (2) Capitalization tables of startup companies change frequently, and Mr. Greebel had learned from working on matters with Mr. Jacobs that capitalization tables change, and that there were often oral agreements that had to be put into writing; (3) Mr. Greebel relied on the representations of Mr. Shkreli, Jackson Su, and these individuals with respect to the accuracy of the stock transfers; and (4) Mr. Greebel knew from the capitalization tables that Mr. Shkreli was the largest stockholder and easily had the ability to give 75,000 units to MSMB Capital in the same way that Mr. Shkreli gifted 50,000 units to Mr. Aselage in late 2012.

The prosecution's theory that Mr. Greebel knowingly and willfully joined a conspiracy to steal Retrophin assets by settling lawsuits with parties who threatened to sue Retrophin makes no sense. From the time of the first threatened lawsuit against Retrophin by Lindsay Rosenwald's attorney in February 2013, Mr. Greebel knew that Retrophin would be substantially harmed if these investors had filed their lawsuits against the company. The threats to file suit were real. Each of these investors were sophisticated, wealthy, and represented by lawyers. Each of them made clear that they would bring a lawsuit if the value of their Retrophin shares were not increased. Retrophin had barely gotten off the ground as a new public company and had little money to defend against expensive litigation in court. Mr. Greebel, as counsel, papered the settlements under the terms dictated by Mr. Shkreli and included releases to ensure that the settlements would end any and all possibility of a lawsuit against Retrophin, its affiliates, its directors, its officers, and anyone else. Pursuant to a resolution of Retrophin's board of directors on or about April 22, 2013, the Board gave Mr. Shkreli the authority to enter into nonmaterial agreements. Thereafter, Mr. Richardson and Mr. Aselage repeatedly received information about the settlement agreements, but either did not read the materials they received or did not ask any questions about it. Retrophin's outside auditor, Marcum, did not think there was anything improper with the settlements. Retrophin's outside accountants at Citrin Cooperman did not question the settlements. Marcum discussed them with Mr. Richardson and Mr. Aselage at the September 2013 board meeting. Marcum also insisted that Retrophin restate its prior public filings to account for the settlements and Retrophin did so. The substance, the purpose, and the amounts of the agreements were disclosed in SEC public filings signed by the members of the Board and for all the world to see and read.

The prosecution's theory that Mr. Greebel knowingly participated in a conspiracy to defraud Retrophin through sham consulting agreements makes no sense. Mr. Greebel relied on Mr. Shkreli's representations regarding the work to be done by Mr. Geller and Mr. Blanton. Mr. Greebel had every reason to believe that these individuals were people whom Mr. Shkreli had relied on to create Retrophin and whose counsel Mr. Shkreli might seek in the future. And both Mr. Geller and Mr. Blanton provided consulting services. Mr. Greebel also recommended that Mr. Shkreli obtain board approval for these agreements on multiple occasions. In September 2013, the documentary evidence proves that the Board received a copy of and approved Mr. Geller's consulting agreement.

Finally, Mr. Greebel did not conspire with Mr. Shkreli or anyone else to give Mr. Shkreli control over Retrophin's freely-trading shares and/or conceal that control from potential investors. Because the company had almost no money, Mr. Greebel understood that Mr. Shkreli arranged for these individuals to buy freely-trading shares at a deeply discounted price in exchange for helping to make Retrophin a success without receiving any salary or benefits. Prior to purchasing the shares, pursuant to the legal opinion letter of Fearnow's counsel, Mr. Greebel properly required each individual to affirm that each one was not an affiliate. Each of these individuals signed purchase agreements where they bought the shares from Troy Fearnow, not from the company. Each of these individuals had the contractual and legal authority to do what they wanted with those shares. Mr. Greebel relied on Mr. Shkreli's representations and signed amended agreements that authorized the use of some of their shares to settle potential lawsuits that threatened to destroy Retrophin and, in turn, destroy the value of their freely trading shares.

There is absolutely no evidence that any of these individuals who purchased freely-trading shares from Troy Fearnow traded in a joint way—some bought more Retrophin shares;

some sold their Retrophin shares; and some held their Retrophin shares.  The actual trading by each of these individuals proves that they did not do anything to control the price of the securities of Retrophin stock.