1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    -------------------------------x
                                        15-CR-00637(KAM)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5         -against-                     December 04, 2017
                                        9:00 a.m.
6    EVAN GREEBEL,

7              Defendant.

8    -------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
             BEFORE THE HONORABLE KIYO A. MATSUMOTO
10               UNITED STATES DISTRICT JUDGE
                      BEFORE A JURY

11   APPEARANCES

12
     For the Government:       BRIDGET M. ROHDE, ESQ.
13                             Acting United States Attorney
                               Eastern District of New York
14                             271 Cadman Plaza East
                               Brooklyn, New York 11201
15                             BY:  DAVID PITLUCK, ESQ.
                               BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                             BY:  DAVID KESSLER, ESQ.
                               Assistant United States Attorneys
17
     For the Defendant:        GIBSON DUNN & CRUTCHER
18                             200 Park Avenue, 48th Floor
                               New York, New York 10166
19                             BY:  REED BRODSKY, ESQ.
                               BY:  RANDY MASTRO, ESQ.
20                             BY:  MYLAN LEE DENERSTEIN, ESQ.
                               BY:  JOSHUA DUBIN, ESQ.
21                             BY:  GRACE TSOU, ESQ.
                               BY:  LISA RUBIN, ESQ.
22
     Court Reporter:           Rivka Teich, CSR, RPR, RMR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.

PROCEEDINGS

1          (In open court.)

2          THE COURT:  I would like to note that the Government

3   and defense are here, Mr. Greebel is here.

4          I want to just make sure we have everything left,

5   everything that's left has to be identified.  And so what

6   you're waiting on are decisions regarding specific experts.  I

7   want to confirm that those experts are, that will be called

8   are, Gillers, Ferruolo, Johnson, Klein, Minkoff and Lewis.

9   And the issues based on relevancy raised in the Government's

10  motions in limine are still alive.  And the Government still

11  contests the relevancy of testimony by Ferruolo, Johnson,

12  Klein, Minkoff, and Lewis.  And that Johnson is the subject of

13  the outstanding Daubert motion; is that accurate?

14         MR. KESSLER:  We had some modifications that should

15  narrow --

16         THE COURT:  I want to issue a decision.  I would

17  suggest I could do it either later today after 5:30 or during

18  the mid-morning break tomorrow.

19         MR. KESSLER:  Being it's not something we have to

20  brief for ten pages, we can convey it to the Court.

21         THE COURT:  I probably should be aware of those

22  before I make a decision.

23         MR. KESSLER:  Absolutely.

24         THE COURT:  When do you want to be heard on that?

25  I don't want to hold up the jury.

7350

PROCEEDINGS

1    MR. KESSLER:  At a break today that is fine.

2    THE COURT:  Then we also have an issue on the

3 Rosenfeld decision.  My problem is, I don't have a color

4 copier.  I asked my office to give me one --

5    MR. BRODSKY:  We have copies, your Honor.

6    THE COURT:  It seems to me you're all pretty much in

7 agreement.  There are a few outstanding disputes as to what

8 words get redacted.  I do think that it's better to have fewer

9 facts before the jury because they are ultimately the fact

10 finders in this case.  I don't think that putting in a lot of

11 additional facts that the arbitrators might have found would

12 be helpful to the jury, and would rather usurp their function

13 or confuse them.

14    I think when I envision the issue of the Rosenfeld

15 arbitration decision, I had hoped there could be a stipulation

16 along the lines that, you know, there was this arbitration;

17 that the arbitrator found in favor of Dr. Rosenfeld; and that

18 he had performed under the arbitration agreement.  I think the

19 more facts that are in this, left in this decision, the more

20 likely it is that the jury could be confused and perhaps cede

21 some of their responsibilities.

22    I'd like to understand the marks, though.  I think

23 Mr. Brodsky tried to explain it, I appreciate it, but there

24 are portions that I can see on the screen and now I see in

25 this hard copy where it looks like there is yet a third color

PROCEEDINGS

1    that's been injected on page three.

2              MR. KESSLER:  The yellow is the defense original

3    proposal.

4              THE COURT:  You have no objections to those, am I

5    correct?

6              MR. KESSLER:  There is -- we have a general

7    objection to anything coming in other than the fact that the

8    arbitrator you know awarded X, Y, Z.  Because we think

9    everything else is hearsay, not admissible in under the

10   statements and documents.  Assuming we're going to move, the

11   Court is not going to entertain that specific objection, we

12   have no objection to any of the defense redactions, except for

13   one.  The defense redacted -- I'll find the page.

14             THE COURT:  That would be great.

15             MR. KESSLER:  The defense has redacted on page 13.

16   The Court sees there are now two sentences that are not

17   redacted on page 13.

18             THE COURT:  Three sentences, actually.

19             MR. KESSLER:  Shkreli was not a party, the defense

20   had redacted those.  What the Court has is the proposal we

21   sent to the defense.  We didn't hear back from them.  We had

22   unredacted those sentences based on the pretrial discussion,

23   to make the point that the arbitrator is not deciding whether

24   Shkreli committed fraud, whether the defendant in this case

25   committed fraud, but was limiting the arbitrator to a contract

PROCEEDINGS

1    interpretation.

2            Other than those sentences we didn't object to

3    anything the defense had redacted.  We just added redactions

4    because, as the Court said, our view is -- let's put it this

5    way, the defense couldn't introduce the transcript of the

6    Rosenfeld arbitration absolutely, clearly invisible.  So what

7    is going on now, the defense is trying to introduce someone

8    else's interpretation of things that were said in the

9    transcript of the Rosenfeld arbitration, so it's even more

10   hearsay.  We were trying to take out that hearsay, but to

11   leave in enough information that frankly we think is still

12   hearsay but just so the jury has the most basic understanding

13   what the award means.

14           In addition, we should note, Dr. Rosenfeld is on

15   their witness list, that they say they are likely to call

16   them.  And the exhibits they disclosed last night, we haven't

17   really reviewed it, we got them at 10:00 p.m.  But there are

18   50 e-mails from Dr. Rosenfeld, so it makes even less sense to

19   include facts about the arbitration when they plan to call

20   Dr. Rosenfeld and introduce the e-mails.

21           MR. BRODSKY:  Your Honor, with all do respect to the

22   Government, we cite your Honor's pretrial ruling.  Your Honor

23   had extensive briefing on this, and your Honor had, and we

24   cited your Honor's ruling at the pretrial conference, where

25   your Honor said, laid out at least the scope of what would be

PROCEEDINGS

1    admissible after the oral argument and after reading all the

2    papers.  And I think that your Honor should govern, at a

3    minimum, of what is admissible in evidence.  Your Honor had

4    said that the rights of the parties would be admissible; that

5    there was an arbitration; that Dr. Rosenfeld wanted to enforce

6    the agreement; that the arbitrator found that he had given

7    minimal services in exchange for the consideration that he

8    received, and rejecting the sham argument of Retrophin and

9    ruling that Retrophin owed him money.

10        Your Honor also said that the fact that she held a

11   hearing on a number of days and listened to X number of

12   witnesses would be admissible.

13        We proposed redactions that on, if you go through

14   it, we did not put in testimonial information, we put in on

15   the first page, just the Government has orange highlighting on

16   the first page, but that is just where the proceedings were

17   held, how many witnesses were called, what the days were.  On

18   the top of the first page, on factual background, we just, we

19   didn't redact in orange because that's just basic setting

20   forth the Court's, what the Court looked at.  And we have no

21   objection to redacting testimonial information.  That's not

22   what we were trying to put into the record.  And we tried to

23   redact that.

24        THE COURT:  Do you have objections to the

25   Government's redactions; if so, where are they?  Because it

PROCEEDINGS

1   just seems to me that I did envision something very

2   bare-bones, with just the fact of the arbitration.  And

3   minimal information about the fact that it was favorable, that

4   the arbitration lasted X number of days, and included X number

5   of witnesses.  I don't think we need to explain who they are

6   necessarily, because then the jury will wonder, well, who are

7   these other people and how come we're not hearing from them.

8            I had hoped, actually, that there would be a

9   stipulation on this.  You could stipulate there was a

10  favorable arbitration decision in favor of Dr. Rosenfeld and

11  against Retrophin.  And that they made findings that he had

12  performed under this agreement.

13           It does seem to me that less is always more in these

14  situations, when we have finders of fact in the form of our

15  jurors who will be deciding some of these overlapping facts

16  and I don't want them to be distracted.  Because ultimately

17  whatever this arbitrator found regarding the relationship

18  between Dr. Rosenfeld and Retrophin, is related to but not

19  directly relevant, to the issue as to whether or not

20  Mr. Greebel and Mr. Shkreli conspired as charged in Count

21  Seven.  So that is the concern.

22           Less is always more in these situations because we

23  do have, I agree, this is a hearsay document.  So for example,

24  I'm not even sure why we would need information about legal

25  fees and costs or the damages.  I think it would be fine to

7355
PROCEEDINGS

1    just say that he got favorable decision.  I think that I will

2    definitely look at this with care now that I've gotten a

3    better idea about where the parties stand.

4            I do think we need to be pretty minimal in what the

5    jury is told, because we do run the risk of you usurping their

6    function or confusing them thinking that there had been

7    findings, extensive hearings, and now how does that effect our

8    findings.

9            MR. BRODSKY:  Understood, your Honor.  Under the

10   legal rights ands responsibilities of the hearsay exception,

11   which is very well-developed in the law and two other circuits

12   and through some case law in the Second Circuit, I believe

13   it's required to put in the amount of the awarded damages.  I

14   believe it's required, that goes to the rights of the parties.

15   I believe it's also required to put in that the Court had

16   rejected the claimant's counter-claims that it was a sham

17   agreement.  And so that is what governs, the legal rights and

18   responsibilities.  And again, we did have pretrial rulings on

19   this, your Honor.  Did we quote your Honor from the pretrial

20   conference.

21           The Government's position, of course, was that none

22   of this should come in, and I understand that.  But the law is

23   very clear.  And we would ask your Honor to consider that when

24   you look at the redactions.  While, yes, we did attempt to

25   redact the testimonial evidence, that's not what we're trying

PROCEEDINGS

1    to accomplish.  In order to determine the legal rights and

2    responsibilities, as your Honor had said, it's important that

3    they know that there was a hearing, that it occurred on a

4    number of days, what days they occurred, that there was

5    testimony heard, and --

6              THE COURT:  I think the testimony.  I don't think

7    it's necessary to identify all the witnesses.

8              MR. BRODSKY:  That's fine.

9              THE COURT:  It's going to be confusing.  I think

10   it's all right to say the number of days perhaps and the fact

11   that both parties were represented by counsel.  I don't think

12   you need the name of counsel.  It does seem to be that the two

13   of you are close.  I'm not hearing that the defense

14   necessarily objects to the Government's additional redactions.

15             MR. BRODSKY:  We have some objections, I can point

16   them out to your Honor.

17             THE COURT:  What would those be?

18             MR. BRODSKY:  On the first page they redacted all

19   the -- we're fine with the redactions of who was representing

20   who.  That seems fine.

21             But I think on the third paragraph, the matter was

22   heard on the following days, we can redact the names of the

23   parties, but I think that should be unredacted.

24             On page two in the first paragraph, I think it sets

25   forth a no --

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1        THE COURT:  You're saying that on page one you don't

2   object to redacting the names of the witnesses.

3        MR. BRODSKY:  Correct, your Honor.  But the other,

4   we don't object to the redactions on the second paragraph --

5   if it's easier, your Honor, we can mark it up in light of your

6   Honor's comments this morning and give it to you at lunch time

7   instead of taking your time now.

8        THE COURT:  All right, okay.  I appreciate that.

9        I think, I mean, what I'm trying to do is look at

10   the parties' two redactions, which I think -- and look at what

11   is left, and I think that perhaps there may be material even

12   beyond what is left that should be redacted, I'm going to look

13   at that.  Some of this I think is just unnecessary, and again,

14   runs the risk of confusion, confusing and distracting the jury

15   and usurping their function, but I'll look at this.

16        I guess the question is whether I can get another

17   color-coded copy; if not, we can try to figure it out, maybe

18   manually mark it up and maybe you two can talk.  Why not a

19   stipulation?

20        MR. KESSLER:  Frankly, the defendant's letter last

21   night said the negotiations was at an impasse.  That was news

22   to us.  The last communication we had was sending them our

23   version and we said let us know if you want to talk about it;

24   we didn't hear about it.  We're happy to talk about a

25   stipulation and work it out.  It doesn't look like the

PROCEEDINGS

1  defense's case is going to start today.  We're happy to

2  proceed in that way too.

3          THE COURT:  May I get confirmation, Mr. Brodsky, did

4  I name the six experts that you intend to call at this point:

5  Gillers, Ferruolo, Johnson, Klein, Minkoff and Lewis; is that

6  it?

7          MR. BRODSKY:  Yes, your Honor.

8          THE COURT:  And have you narrowed any of your

9  disagreements about these folks on relevance counts?

10         MR. KESSLER:  We have a narrow view of Mr. Ferruolo,

11  which we can talk about now or later.  We have no change to

12  our view about Mr. Minkoff and Mr. Gillers or Mr. Lewis.  And

13  we have, I don't want to say narrowed, but easier to address

14  objections to Johnson and Klein.

15         THE COURT:  They seem to be overlapping somewhat.

16  We have Johnson who is talking about the industry practice and

17  Klein who is talking about the legal issue as to what an

18  attorney might do on a settlement like this.  There did seem

19  to be some overlap.  I'm not interested in having witness

20  after witness duplicate testimony.  But it may be that there

21  is a way to segregate the areas that each witness would

22  testify, assuming that I am going to allow some of Johnson's

23  testimony; some of it, not all of it.

24         MR. KESSLER:  I think Johnson and Klein may not

25  actually overlap.  I think possibly that Minkoff and Ferruolo

PROCEEDINGS

1  would overlap on certain things, possible Gillers and Minkoff

2  would overlap.  I think that is probably not something we're

3  going -- that's going to be clear.

4          MR. BRODSKY:  The only potential overlap would be

5  probably Minkoff and Gillers.  And we would not, we would not

6  try to elicit overlap, your Honor, we understand that.  I

7  don't believe there will be overlap between Mr. Ferruolo,

8  Ms. Klein, or Mr. Johnson.

9          THE COURT:  All right.

10         MR. KESSLER:  We're happy to at a break, at lunch,

11 convey our updates.  And we also provided the Court with a

12 binder of the 26.2 material related to the defense experts

13 that they gave us -- rather, I provided your clerk with that

14 binder a few minutes ago.

15         THE COURT:  Thank you.

16         MR. KESSLER:  We do have a few other issues that

17 have percolated up over the weekend, which we're happy to

18 address now or we can address later.

19         THE COURT:  Is it something that is worth keeping

20 the jury waiting for, assuming they're all here?

21         MS. SMITH:  Not if they are all here, we can do it

22 at a break.  If not, we can do it now.

23         THE COURT:  They may not all be here.  We'll check.

24 If they are all here, we'll bring them in; if not, I'll hear

25 from you.

PROCEEDINGS

1          MS. SMITH:  One housekeeping piece.  Your Honor

2     ordered defendant to issue their updated expert disclosures by

3     5:00 p.m. on Saturday.  Then said our rebuttal expert

4     disclosure was due 48 hours later, which is 5:00 p.m. today

5     while still in court.  We ask that we can make those

6     disclosures by 6:30 tonight to have a little bit of time after

7     court to just discuss them.

8          THE COURT:  Okay.

9          MS. SMITH:  Thank you.

10         THE COURT:  I think the motion to preclude the

11    Government made regarding the subpoenaed information is pretty

12    much moot.  There is nothing for me to deal with right now

13    given they've gotten their documents.

14         MR. KESSLER:  Nothing to deal with because nothing

15    has been produced.  I wouldn't say absolutely moot, it's

16    possible.

17         THE COURT:  It's dormant.

18         The jurors aren't all here, if you want to raise

19    other issues that's fine.

20         MS. SMITH:  So just for the record, your Honor, the

21    26.2 material that we received and we provided the binder to

22    your clerk, we received it for only a few experts.  We

23    received no 26.2 material for any the 20 fact witnesses in the

24    case, except for Cooley, I guess who is now a fact witness.

25         And so we are requesting two things.  First of all,

7361

PROCEEDINGS

1   the 26.2 that we received, as you can see from the binder

2   itself, is heavily redacted.  We did ask defense counsel and

3   did not hear back.  There are redacted questions for which we

4   just have the answers.  It it is hard to understand the

5   answers without the redacted questions.  We asked defense

6   counsel for the questions, we heard nothing back.  Some of the

7   26.2 refers to documents.  We asked defense counsel to give us

8   the documents that it refers to so we can understand when in

9   the 26.2 it's talking about the document what document they

10  are talking about.  We did the same for the 3500 material, we

11  did not hear back on that.

12          To the extent that defense is not providing the

13  questions or any other information that's been redacted from

14  the 26.2 material, because of privilege or work product, we're

15  asking the Court under 26.2(c) to review those redactions in

16  camera and make a determination about whether any of them are

17  work product or privilege.

18          For the 20 fact witnesses for which we received

19  absolutely no 26.2 material, to the extent the defense has

20  interview memos that they are withholding pursuant to work

21  product or privilege, we ask them to be provided to the Court

22  and reviewed in camera 26.2(c).  And any fact information in

23  those memorandum be provided to the Government as 26.2

24  material.

25          MR. BRODSKY:  Your Honor, the Government's request

PROCEEDINGS

1    is extraordinary with respect to their -- we've complied with

2    our 26.2 obligations.

3            We did not take notes when interviewing our

4    witnesses.  We have a practice of not taking note when

5    interviewing our fact witnesses.  These aren't complicated

6    matters that require taking notes.  The FBI is under an

7    obligation to take notes when they interview fact witnesses;

8    by contrast, a defense attorney is not obligated to take any

9    notes when interviewing witnesses.  So we didn't turnover 26.2

10   material for interviews of fact witnesses because we do not

11   have 26.2 material for fact witnesses.

12           And the Government is not entitled to sort of

13   summaries or our views of various witnesses in anyway.

14           Second, we'll go back and look at the 26.2 material

15   that we turned over, but we redacted what we believe were not

16   the statements of the witness but rather our work product.

17   We'll go back to make sure we didn't redact anything that was

18   a question.  When we interview or comment on an expert or talk

19   to an expert, we did take, some of our members of our team

20   took some notes, but they also had their own commentary,

21   thoughts, impressions, which are work product or privileged

22   communications with our client relating to them.  And so we'll

23   go back and look at it.

24           But, your Honor, what they asked for last night was

25   to give them the questions that we asked the expert that

PROCEEDINGS

1    prompted some of these answers.  And when we get 3500 material

2    from the Government, which are FBI statements of what a

3    witness purportedly says, it doesn't come in question and

4    answer format.  We never get from the Government what

5    statements did you ask Mr. Su or Mr. Massella that prompted an

6    answer.  We just get a scribbled note.  And we provided

7    actually typewritten 26.2 material for the most part.

8            The Government for the last six or seven weeks has

9    provided handwritten, hard to read, very difficult parsed

10   statements of witnesses that are out of context.  And for the

11   Government to stand up and say they want more material when it

12   doesn't exist, is extraordinary.

13           THE COURT:  Well, I think what she wanted was

14   representation to you that it, that it doesn't exist and

15   that's not why you didn't produce it.

16           MR. BRODSKY:  We didn't produce, when we talked to

17   fact witnesses --

18           THE COURT:  If she thought it existed, she wouldn't

19   ask me to review it in camera, would she?

20           MR. BRODSKY:  I don't know, your Honor.  They did

21   not ask whether we took notes when meeting with fact

22   witnesses.  It is our practice not to take notes when meeting

23   with fact witnesses.  It's our practice to interview the

24   witnesses.

25           There are lots of reasons why, your Honor, on the

PROCEEDINGS

1  defense side and meeting with witnesses.  One reason, for

2  example, witnesses are often reticent to talk to you, if they

3  talk to you and you're taking notes or you have your computer

4  open and typing what they say.  It's intimidating to witnesses

5  and it often causes them to clam up and not talk to you at

6  all.  And it's a good think to encourage communication.  And

7  these are very simple matters.  We don't need to take notes

8  when we talk to particular witnesses.

9       THE COURT:  All jurors are here.  FYI, jury number

10  16 has to leave tonight by five.  Jury number, the person in

11  the 12th juror seat, has a funeral on Friday and will give us

12  more information about the time on Friday.

13       MS. SMITH:  Your Honor, for the record we requested

14  this information on Saturday.  They in fact produced redacted

15  statements.  As you can see from the 26.2, when you in fact

16  produce redacted 26.2, under 26.2(c) the Court should review

17  it under work product.  That is not controversial or unusual.

18  We're trying to determine if anything with held was work

19  product.

20       There is questions and answers, but only the answers

21  are provided.  You can't understand the answer without the

22  context of the question.  The same thing with the documents.

23       So like I said 26.2(c), since they chose to provide

24  redacted 26.2 material, they need to provide the unredacted

25  statement to the Court for in camera.

PROCEEDINGS

1          MR. BRODSKY:  I should bring up, because the issue

2     has come up.  Every one of our witnesses that we put on our

3     fact witnesses got calls from the FBI.  One individual --

4     almost everyone has reported to us they got calls from the

5     FBI.

6          One individual reported the following to us.  They

7     reported to us that on Friday the FBI left a voicemail for

8     this individual to return this individual's call.  The

9     individual decided, because this individual consulted another

10    lawyer, not to return the call.

11         On Sunday after we provided our order of five likely

12    witnesses in order, that witness was visited by two FBI agents

13    who were in his hallway.  It's a doorman building.  They

14    weren't called up.  They got through the doorman, passed up

15    into the hall, and got knocked on the door.  This was quite

16    intimidating for this witness.  It was our first witness to be

17    called in the likely order of witnesses, should we put on a

18    case.

19         And your Honor, I think that kind of tactic is

20    unacceptable.  If you leave a message for somebody and they

21    don't call you back, it doesn't entitle you as the FBI to show

22    up to their door step.  And so, if they are going to do that

23    we're never going to call any witnesses because every witness

24    is going to say, I don't want the FBI knocking on my door.  If

25    I don't return a phone call, that's one thing.  Then they show

PROCEEDINGS

1    up and show up right in front of their door with their family

2    it.  Is a quite an extraordinary thing.

3         I understand the FBI is very nice when they do it.

4    I'm not say they are shouting or angry or weren't personable.

5    They're quite personable and nice.  But just having badges and

6    not having received a return phone call, the FBI should not be

7    showing up and knocking on someone's door if they chose not to

8    return their call.  It's really not good practice.

9         THE COURT:  Was the witness represented by an

10   attorney?

11        MS. SMITH:  Your Honor, it's not our understanding

12   that they were represented by an attorney.  It is my

13   understanding that -- again, we weren't even sure we had the

14   right number.  When they showed up, the individual said that

15   they've been advised by defense counsel not to speak to the

16   FBI, which was very surprising to us.  They were very polite.

17   And they confirmed it was the right person and did not want to

18   talk.  And they said, he said, I'll see you in court and the

19   defense counsel told me not to talk to you.  So they left.  So

20   counsel told him not to talk.

21        MR. BRODSKY:  I want that corrected on the record.

22   Because that is a huge difference.  We know we can't tell

23   witnesses that they can't talk to the Government.  I made it

24   very clear to every witness that they had the right to talk to

25   the FBI or not to talk to the FBI.  And Ms. Smith's

PROCEEDINGS

1    misstatement, which is a serious one, the witness did say

2    counsel advised me now to talk, not defense counsel, counsel

3    advised me not to talk.  And we never advised this witness not

4    to talk to the Government.  We said you have the right to or

5    not to, but we don't represent you.  That person consulted

6    another lawyer.

7            So I really want that on the record.

8            THE COURT:  It's on the record.  Let's calm down.

9            MS. SMITH:  That was the entirety of the

10   interaction.  He didn't want to speak, the FBI left.  It is,

11   like you know, our practice to reach out to witnesses,

12   especially when we have absolutely no idea what the witness is

13   going to say.  This is an individual who billed ten hours

14   total over three years to Retrophin.

15           We weren't sure we had the right individual,

16   frankly, because it's kind of a common name.  They went out to

17   see if he was willing to speak.  He wasn't.  There will be no

18   further contact.  It was standard procedure.  We were

19   surprised by the response.  The client clarified his counsel

20   told him that.  He didn't say he had individual counsel.  So

21   that was the entire interaction.

22           MR. BRODSKY:  The interaction is unacceptable.  They

23   know which call number they left a number at.  They knew they

24   had the right number because it's a listed number, which they

25   went to the exact address where the number goes to, and then

DELZOTTO – DIRECT – MR. PITLUCK

1    they showed up.

2              THE COURT:  All right, Mr. Brodsky, they are not

3    going to have further contact.  She explained it is the

4    regular practice.  I'm sure when you were a prosecutor agents

5    went out to speak to witnesses, and not all witnesses are

6    happy to see the FBI knocking on their door.  Witnesses

7    sometimes are willing to speak to the FBI, and other times

8    they are not.  If this witness was told by his own retained

9    attorney not to speak to the FBI or was advised that he need

10   not speak to the FBI and exercised that right and the agents

11   disappeared, that's the end of it.  I think now that we have

12   all the jurors here we ought to start the trial.

13              (Jury enters the courtroom. Time 9:37 a.m.)

14              THE COURT:  We have all jurors present.  Have a

15   seat.

16              Mr. Pitluck, you may resume your direct on Special

17   Agent Delzotto.

18              Sir, you're still under oath.

19              THE WITNESS:  Yes, ma'am.

20   DIRECT EXAMINATION

21   BY MR. PITLUCK:

22   Q    Good morning, Special Agent Delzotto.

23   A    Good morning.

24   Q    When we broke last Tuesday, you will recall we were

25   looking at documents from August 2013 regarding discussions

DELZOTTO – DIRECT – MR. PITLUCK

1  related to Marcum's request for more information on the

2  settlement agreements.  Do you recall that?

3  A    I do.

4  Q    I'd like to show you at this point what is marked

5  Government's Exhibit 609A for identification.  Is that an

6  e-mail from the defendant to Marc Panoff August 19, 2013?

7  A    Yes.

8            MR. PITLUCK:  We offer 609A.

9            THE COURT:  Any objection, Mr. Brodsky?

10           MR. BRODSKY:  One moment, your Honor.

11           No objection, your Honor.

12           THE COURT:  We receive in evidence Government's

13  Exhibit 609A.

14           (Government Exhibit 609A, was received in evidence.)

15  BY MR. PITLUCK:

16  Q    So I'll publish that to the jury and ask you a couple of

17  questions before we cover e-mail.

18           What is the subject of this e-mail from the

19  defendant to Marc Panoff?

20  A    Draft control memo.

21  Q    Is there an attachment, controlmemo.doc?

22  A    There is.

23  Q    Go to the second page of this.  Is this the document that

24  was attached to that e-mail by the defendant?

25  A    Yes.

DELZOTTO - DIRECT - MR. PITLUCK

1    Q    You see on top it says Retrophin letterhead, what does it

2    say on the right?

3    A    Draft.

4    Q    To the files from Retrophin Inc. dated August 19, 2013

5    what is the subject of that?

6    A    Certain payments by Retrophin.

7    Q    This version of this is already in evidence, we're not

8    going to read the whole thing.  Can you go down to the last

9    paragraph, just read from where it says the sentence

10   "following"?

11   A    Following the company's determination that the payments

12   and obligations should not have been assumed by the company

13   the company determined that any future agreement that includes

14   the company and MSMB or any of its related funds will require

15   the signature of the Chief Financial Officer of the company.

16   In order to reflect the repayment obligation, MSMB and its

17   related funds delivered promissory notes to the company and

18   entered into indemnification agreements with the company

19   pursuant to which MSMB and its related funds have agreed to

20   indemnify and hold harmless the company for any costs, charges

21   or damages incurred by the company in connection with the

22   settlement and release agreements.

23   Q    So that was an e-mail from the defendant which was dated

24   August 19 at 8:12 p.m. I'd like to show you Government's

25   Exhibit 609 for identification.  Is this a continuation that

DELZOTTO – DIRECT – MR. PITLUCK

1    of the email we saw in 609A from Marc Panoff to Mr. Shkreli

2    copying the defendant?

3    A    Yes.

4              MR. PITLUCK:  We offer Government's Exhibit 609.

5              MR. BRODSKY:  No objection.

6              THE COURT:  We will receive in evidence Government's

7    Exhibit 609.

8              (Government Exhibit 609, was received in evidence.)

9    BY MR. PITLUCK:

10   Q    So in this email it appears that Mr. Panoff is forwarding

11   the document that the defendant sent to him to Martin Shkreli,

12   correct?

13   A    And copying the defendant.

14   Q    What time is that sent?

15   A    At 8:21 p.m. on August 19, 2013.

16   Q    What did Mr. Panoff write?

17   A    Mr. Panoff wrote, Martin draft of the memo we will need

18   to provide Marcum.  Let me know if you have any

19   issues/comments.  Mark.

20   Q    Is a draft of that control memo attached to this e-mail?

21   A    Yes.

22   Q    I'd like to show you what is marked for identification

23   691?

24   A    Okay.

25   Q    Is this a another e-mail on that same chain, this one

DELZOTTO – DIRECT – MR. PITLUCK

1    from Martin Shkreli to Marc Panoff copying the defendant on

2    the same day August 20 -- the next day, August 20, 2013?

3    A    Yes.

4              MR. PITLUCK:  Your Honor, we offer Government's

5    Exhibit 691?

6              MR. BRODSKY:  No objection, your Honor.

7              THE COURT:  We receive in evidence Government's

8    Exhibit 691.

9              (Government Exhibit 691, was received in evidence.)

10             MR. PITLUCK:  If we post it for the jury.

11   Q    The bottom two e-mails is what we saw in Government's

12   Exhibit 609?

13   A    Correct.

14   Q    What was Mr. Shkreli's response to Marc Panoff and the

15   defendant the next day after receiving the e-mail from

16   Mr. Panoff?

17   A    Mr. Shkreli wrote, Also this isn't exactly true.  Some of

18   the objections are related to the exchange ratio of the Desert

19   Gateway merger, which was very dilutive to them.

20   Q    If you go to the next tab I'd like to show you,

21   Government's Exhibit 692.  Is this yet another different chain

22   of the same e-mail that we saw in 609 and 691?

23   A    Yes.

24             MR. PITLUCK:  We offer 692 into evidence.

25             MR. BRODSKY:  No objection.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

DELZOTTO - DIRECT - MR. PITLUCK

1      THE COURT:  We receive Government's Exhibit 692.

2          (Government Exhibit 692, was received in evidence.)

3   BY MR. PITLUCK:

4   Q    Again here, Special Agent Delzotto, the bottom two

5   e-mails is what we saw in Government's Exhibit 609.  Can you

6   read Martin Shkreli's response to Mr. Panoff and the defendant

7   at 9:26 a.m. the following day, Tuesday, August 20?

8   A    I have not reviewed those.

9   Q    Two more down, the third e-mail down in the e-mail,

10  9:26 a.m.?

11  A    He states, If you think this will fix the problem, then

12  great.

13  Q    What was Mr. Panoff's response to that e-mail?

14  A    And are you okay with the note and the indemnification

15  agreement?

16  Q    And did Mr. Shkreli respond to that?

17  A    He did, copying the defendant.

18  Q    What did he write?

19  A    I have not reviewed those.

20  Q    I'd like you to open the smaller binder, go to

21  Government's Exhibit 114-29A, which is in evidence, very last

22  tab I believe.

23  A    I'm there.

24  Q    What is the date of this e-mail?

25  A    The date of the e-mail is August 20, 2013.

DELZOTTO - DIRECT - MR. PITLUCK

1   Q    From Marc Panoff, who is it to?

2   A    To Sunil Jain and Ed Hackert copying the defendant.

3   Q    What is the subject of that?

4   A    Settlement agreement memo.

5   Q    The attachment?

6   A    Control memo.

7   Q    Flipping to the next page, is that the control memo that

8   we saw that the defendant send to Marc Panoff the day earlier?

9   A    Yes.

10  Q    That was sent to Marcum on August 20, 2013 at 7:08 p.m.?

11  A    Sunil Jain and Ed Hackert work for Marcum, yes.

12  Q    I'd like to have you go back to the big binder,

13  Government's Exhibit 610-23 -- sorry, just Government's

14  Exhibit 610.

15  A    Okay.

16  Q    Is this an e-mail exchange, the top between from the

17  defendant to Martin Shkreli, the bottom e-mail between Martin

18  Shkreli the defendant and Marc Panoff?

19  A    Yes.

20       MR. PITLUCK:  Your Honor, we offer Government's

21  Exhibit 610 in evidence.

22       MR. BRODSKY:  No objection, your Honor.

23       THE COURT:  We receive Government's Exhibit

24  610-23 -- sorry.

25       MR. PITLUCK:  Just 610.

DELZOTTO – DIRECT – MR. PITLUCK

1          THE COURT:  Government's Exhibit 610 is admitted.

2          (Government Exhibit 610, was received in evidence.)

3    BY MR. PITLUCK:

4    Q    Let's start with the bottom e-mail from Marc Panoff dated

5    August 19, 2013.  What did Mr. Panoff write on that e-mail?

6    A    The first e-mail in this the chain is from the defendant

7    to Marc Panoff.

8    Q    I'm sorry.  Yes, thank you.  Going to the second page,

9    first e-mail is from the defendant, what time and date?

10   A    August 19, 2013, at 1:14 p.m.

11   Q    What did the defendant write in that e-mail?

12   A    Attached are the drafts of the form of note and

13   indemnification agreement.

14   Q    Can we put that up next to Government's Exhibit 609 --

15   withdrawn.

16          What did Mr. Panoff do with that e-mail?

17   A    Looks like on this chain that Mr. Panoff forwarded it to

18   Martin Shkreli.

19   Q    What did Mr. Panoff write to Martin Shkreli?

20   A    He states, Martin attached are drafts of the

21   indemnification agreement for all settlement agreements

22   entered into as well as a note for the amounts and shares

23   already paid.  Let me know if you have any questions.  Marc.

24   Q    Did Mr. Shkreli respond to that e-mail?

25   A    He did.

DELZOTTO – DIRECT – MR. PITLUCK

1   Q    Was the defendant copied?

2   A    Yes.

3   Q    What did Mr. Shkreli write?

4   A    Retrophin is a claimant, investors are not happy at how

5   dilutive the Desert merger was, so I would rethink indemnity.

6   Q    Did the defendant respond to that e-mail?

7   A    Yes, he responds just to Martin Shkreli.

8   Q    What did Mr. Greebel write in that e-mail?

9   A    Mr. Greebel wrote, If the issue is tied to the merger,

10  Marcum will require a restatement under applicable accounting

11  rules.  My understanding is that there was never a link

12  expressed.  And since they all had invested through MSMB this

13  is the appropriate result.

14  Q    That is August 20, 2013 at 2:01 p.m.?

15  A    Correct.

16  Q    I'd like to show you what is marked for identification as

17  Government's Exhibit 612.  Is this an e-mail from the

18  defendant to Marc Panoff on August 22, 2013?

19  A    Yes.

20         MR. PITLUCK:  Your Honor we offer Government's

21  Exhibit 612.

22         MR. BRODSKY:  No objection.

23         THE COURT:  We receive Government's Exhibit 612.

24         (Government Exhibit 612, was received in evidence.)

25  BY MR. PITLUCK:

DELZOTTO – DIRECT – MR. PITLUCK

1   Q    What is the subject of this e-mail from the defendant to

2   Marc Panoff?

3   A    The subject is, Notes and indemnification agreements.

4   Q    Can you read for the jury what attachments are included

5   on this e-mail?

6   A    Sure.  MSMB note for Spielberg payment; MSMB note for

7   Kocher payment; MSMB note for Hassan payment; Hassan

8   MSMB_Retrophin indemnification letter agreement; Lavelle

9   MSMB_Retrophin indemnification letter agreement; DGeller

10  MSMB_Retrophin indemnification letter agreement; Kocher

11  MSMB_Retrophin indemnification letter agreement; Spielberg

12  MSMB_Retrophin indemnification letter agreement.

13  Q    Were those, are each of those agreements attached to this

14  Exhibit 612?

15  A    Yes.

16  Q    So that's August 22, 2013, correct?

17  A    That's correct.

18  Q    I'd like to show you what is marked for identification as

19  Government's Exhibit 627, an e-mail chain between the

20  defendant and Marc Panoff, with e-mails in the chain between

21  Marc Panoff and Ed Hackert and Sunil Jain?

22  A    Yes.

23        MR. PITLUCK:  We offer Government's Exhibit 627.

24        MR. BRODSKY:  Objection to the hearsay statements,

25  the bottom of page one, the witness is unavailable.

DELZOTTO - DIRECT - MR. PITLUCK

1           MR. PITLUCK:  I'm happy to be heard if you want.

2    Availability has no issue here.

3           THE COURT:  Right.  I'm going to overrule the

4    objection and note this e-mail, I believe it's the Hackert

5    e-mail, right?

6           MR. BRODSKY:  Yes, your Honor.

7           THE COURT:  Gives context, background and

8    explanation to the parties, the other parties' understandings

9    and responses.  And explains the effect of this e-mail on the

10   other recipients who either got it directly or through a

11   forwarded e-mail.

12   BY MR. PITLUCK:

13   Q    Starting Special Agent Delzotto, with the first e-mail on

14   this chain, which is on the second page of the document, an

15   e-mail from Marc Panoff to Sunil Jain and Ed Hackert?

16   A    It is.

17   Q    September 4, 2013?

18   A    Correct.

19   Q    What did Mr. Panoff write here?

20   A    Guys, we would like to file the amended 10K and Q and in

21   the second quarter 10Q by Friday.  I plan on having a Board

22   call on Friday at 4:30 p.m. to approve.  We also need to file

23   our S1 mid-week next week, which we would like your consent

24   on.  Please push to get your review completed as quickly as

25   possible.  We need to get the docs sent of XBRL today in order

DELZOTTO - DIRECT - MR. PITLUCK

1    to file on Friday afternoon.   Thanks, Marc.

2    Q    Going to the first page, what was Mr. Hackert's response

3    to that e-mail?

4    A    Mark, we are working on the review as we speak.   I need

5    to get everything through our review our department.   Critical

6    item to evaluate is the evidence of MSMB's ability to repay

7    the remaining settlements and/or indemnify the company for the

8    payment exposure.   Please also advise as to when the

9    liabilities will be paid by MSMB.   I know that at a minimum

10   the Lavelle agreement is overdue.   This is a requirement of

11   joint and several liability accounting which requires the

12   recognition of liabilities at a greater of the contractual or

13   likely payment amounts.

14   Q    What did Mr. Panoff do with that e-mail after he received

15   it?

16   A    He forwards it to the defendant.

17   Q    What did he write?

18   A    Let's discuss.

19   Q    Did the defendant respond to that e-mail?

20   A    The defendant did respond to the e-mail, yes.

21   Q    What did he -- who did he respond to?

22   A    He responded to Marc Panoff, the CFO.

23   Q    What was the defendant's response?

24   A    He responded, Proposed response.   Hi, Ed.   As discussed

25   on our prior call, MSMB has advised us that it has received

DELZOTTO - DIRECT - MR. PITLUCK

1  assurances from its managing member that it will have the

2  resources to pay the obligations set forth in the notes and

3  the indemnification agreements.  MSMB advised us that the

4  managing member provided documentation demonstrating that it

5  owns securities with an estimated value in excess of

6  $8 million.

7  Q    I'd like to direct your attention to Government's Exhibit

8  694, the back of your binder.  Is this a different

9  continuation of the chain that we saw in Government's Exhibit

10  627, including e-mails at the top between Marc Panoff and the

11  defendant?

12  A    Marc Panoff, the defendant, and Ed Hackert, yes.

13          MR. PITLUCK:  We offer Government's Exhibit 694.

14          MR. BRODSKY:  We're having trouble locating a copy.

15          No objection, your Honor.

16          THE COURT:  We will receive Government's Exhibit 694

17  in evidence.

18          (Government Exhibit 694, was received in evidence.)

19  BY MR. PITLUCK:

20  Q    Can we go to the third page of the document, that's an

21  e-mail from Ed Hackert to Marc Panoff we saw in the previous

22  exhibit Government's Exhibit 627, correct?

23  A    Yes.  We also saw the e-mail on page two at the bottom.

24  Q    Okay.  So let's look at that e-mail, an e-mail from Marc

25  Panoff to Ed Hackert?

DELZOTTO - DIRECT - MR. PITLUCK

1    A    Correct.

2    Q    The language that he wrote there, you've mentioned we've

3    seen before?

4    A    Yes.

5    Q    Can we put that next to Government's Exhibit 627?  It's

6    the same language?

7    A    The defendant supplied the language, and Marc Panoff used

8    the language.

9    Q    Okay.  So let's go back to Government's Exhibit 694

10   please, what was Mr. Hackert's response to Mr. Panoff's

11   e-mail?

12   A    Hi Marc, I'm aware that MSMB was advised as such and that

13   MSMB advised Retrophin that it and/or Martin have sufficient

14   financial resources.  Having said that, we need to confirm

15   that ability with audit documentation.  Please provide the

16   applicable documentation at your earliest convenience.  Thank

17   you, Ed.

18   Q    What was Mr. Panoff's response to that e-mail from Ed

19   Hackert?

20   A    He responds, Mr. Panoff responds to Mr. Hackert, states,

21   There are Form fours that have been filed that show the

22   ability.  Is there something specific you're looking for?

23   Q    What did Mr. Hackert respond to Mr. Panoff?

24   A    Give me a call when you can, Ed.

25   Q    What did Mr. Panoff do with that e-mail?

DELZOTTO - DIRECT - MR. PITLUCK

1    A    He forwarded it to the defendant.

2    Q    What did he write?

3    A    Please give me a call.

4    Q    I'd like to show what you is marked for identification as

5    Government's Exhibit 641.  This is an October 7 e-mail from

6    the defendant to Marc Panoff, the subject MSMB notes?

7    A    Yes.

8         MR. PITLUCK:  Your Honor, we offer Government's

9    Exhibit 641.

10        MR. BRODSKY:  No objection.

11        THE COURT:  We receive Government's Exhibit 641.

12        (Government Exhibit 641, was received in evidence.)

13   BY MR. PITLUCK:

14   Q    Posting this e-mail.  What did Mr. Greebel write in this

15   e-mail?

16   A    Mr. Greebel wrote to Mr. Panoff, As requested attached

17   are the notes for Lavelle and Geller.

18   Q    Are there attachments to this e-mail?

19   A    There are.

20   Q    What are the two attachments?

21   A    The attachments are entitled MSMB note for Lavelle

22   payment; MSMB note for Geller payment.

23   Q    Both of those documents attached to this e-mail?

24   A    Yes.

25        (Continued following page.)

DELZOTTO - DIRECT - MR. PITLUCK

1   MR. PITLUCK:
    (Continuing.)

2   Q   Skyler Marshall?

3   A   Yes.

4   Q   I would like to have you look at the smaller binder and

5   go to going 102-7.

6   What's the subject of that e-mail?

7   A   Draft settlement agreement.

8   Q   What did the defendant write in this e-mail?

9   A   The defendant wrote: "Skyler, as discussed, attached is

10  a draft settlement agreement.  I am simultaneously sending it

11  to my client, and it is the subject to their review and

12  comment.

13          If you have any questions or comments, please call

14  me at (212) 940-6383.

15          Best regards, Evan."

16  Q   And this is an, excuse me, an e-mail that was sent at

17  June 18, 2013, at 12:37 a.m.?

18  A   Yes, it was.

19  Q   Can we go to the first page which is the -- of the

20  attachment, I'm sorry, the second page, which is the first

21  page of the attachment.

22  A   Okay.

23

24  Q   This is settlement, a draft settlement and release

25  agreement.  It was attached to that e-mail.

DELZOTTO - DIRECT - MR. PITLUCK

1   A    Yes.

2   Q    Could we go to the bottom where it says, "Payment terms."

3   A    Okay.

4   Q    (What are the payment terms?  Can you just read the first

5   full sentence of that payment terms subject?

6   A    Sure.  "The MSMB entities (or Retrophin) individually or

7   collectively the "payor" agree to deliver or cause to be

8   delivered to the releasor the total amount of $300,000 in

9   parenthesis," I think it's supposed to be $300,000 there.  And

10  then in another parenthesis, the cash payment, and Shkreli

11  agrees to deliver or cause to be delivered to the releasor the

12  total amount of six thousand three hundred (6,300) shares of

13  common stock (the shares) and collectively with the cash

14  payment the liquidation amount.

15  Q    I'll stop you there.

16       Can we go up a little on that page to the fifth

17  "Whereas" paragraph that starts with "releasor previously."

18  A    Yes.

19  Q    Can you just read that.

20  A    "Whereas releasor previously" -- I'm sorry -- "releasor

21  previously received 37,809 shares, the initial distribution,

22  in quotes, of common stock par value, whatever that is, per

23  share the common stock of Retrophin.'

24  Q    Okay.  So I would like to show you now what's been marked

25  for identification as Government Exhibit 595.  It's going to

DELZOTTO - DIRECT - MR. PITLUCK

1    be in the larger binder.

2              Is this an e-mail chain between the defendant and

3    Martin Shkreli the same date as Government Exhibit 1027 which

4    is dated June 18, 2013?

5    A    Yes, it is.

6              MR. PITLUCK:  Your Honor, we offer

7    Government Exhibit 595.

8              MR. BRODSKY:  No objection, your Honor.

9              THE COURT:  We receive Government's Exhibit 595.

10             (Government Exhibit 595, was received in evidence.)

11   EXAMINATION BY

12   MR. PITLUCK:
     (Continuing.)

13   Q    Starting with the bottom e-mail from the defendant to

14   Martin Shkreli, 7:55 a.m. on June 18, 201e.

15             What's the subject of that e-mail?

16   A    The subject is Skyler Marshall.

17   Q    What did the defendant write?

18   A    The defendant wrote:  "Skyler said that you agreed that

19   you would get freely tradeable stock, both the new shares and

20   the stock that he previously got.  How do you want to handle

21   it?"

22   Q    And what was Mr. Shkreli's response to that e-mail?

23   A    "Eh, I think I said I'd do my best."

24   Q    And did the defendant respond to Mr. Shkreli's e-mail?

25   A    Yes.

DELZOTTO – DIRECT – MR. PITLUCK

1    Q    What did he write?

2    A    Mr. Greebel wrote:  "He said he's willing to sign the

3    form I sent him, but wants a letter from you that you will

4    have it registered as soon as practicable.  I think providing

5    a letter like that would be very difficult for you.  He also

6    asked if he would get his money by Friday.

7    Q    So this was June 18, 2013.  I would like to have you flip

8    over to Government Exhibit 600 for identification.

9    A    (Complying).

10   Q    Is this an e-mail chain at the top between the defendant,

11   Martin Shkreli, and earlier in the chain, e-mails between the

12   defendant, Martin Shkreli, and Skyler Marshall?

13   A    Yes.

14            MR. PITLUCK:  Your Honor, we offer

15   Government Exhibit 600.

16            MR. BRODSKY:  No objection.

17            THE COURT:  We receive government's 600 in evidence.

18            (Government Exhibit 600, was received in evidence.)

19   Q    Let's start on the third page which has the first e-mail.

20            What's the date of this e-mail from Skyler Marshall

21   to the defendant?

22   A    June 24, 2013.

23   Q    And this e-mail is already in evidence, we're not going

24   to read the whole thing in the record.

25            But this is an e-mail from Skyler Marshall to Evan

DELZOTTO - DIRECT - MR. PITLUCK

1   Greebel regarding his investment in MSMB?

2   A    Yes.

3   Q    Did Mr. Greebel respond to that e-mail?

4   A    He did.

5   Q    What did he write?

6   A    He states:  "Skyler, I have been out of the country and

7   just returned.  We will revert regarding our conversation from

8   last week."

9   Q    And what was -- that's June 24, 2013; correct?

10  A    Correct.

11  Q    Did Mr. Marshall respond to that e-mail?

12  A    He respond --

13  Q    From the defendant?

14  A    He responds to the defendant and copies Martin Shkreli.

15  Q    What's the date of that e-mail?

16  A    July 9, 2013.

17  Q    What did Mr. Marshall write?

18  A    Mr. Marshall wrote:  "Evan, how shall I interpret your

19  silence as to the request below, and the effort to complete

20  the agreement Martin and I made which was memorialized in the

21  release you sent.  Skyler."

22  Q    And going to the previous page.  What did defendant write

23  back to Mr. Marshall?

24  A    Defendant responded to Mr. Marshall and copied Martin

25  Shkreli and stated, "I am I'm sorry for the confusion, Skyler.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1    I understood that you were traveling and not accessible.  Let

2    me catch up with Martin and revert.  Evan."

3    Q    Did Mr. Marshall respond to that e-mail on July 10th?

4    A    Yes.  He responded only to the defendant.

5    Q    And what did Mr. Marshall wrote?

6    A    He wrote, "Evan you said you had sent the settlement

7    agreement to your client on 6/17 for comment, and your e-mail

8    suggests you still need to catch up with Martin.  It's not

9    that complicated.  Does he intend to perform the agreement he

10   made or not?  I like Martin and was glad we could resolve this

11   by agreement, but the long delay is beginning to feel like a

12   stall.

13        Please confirm promptly whether he plans to honor

14   the agreement he made with me and assuming so, when and how we

15   will conclude to.

16        As I'm sure you are aware, his legal position is not

17   a pretty one.  Other LPs, limited partners, have confirmed

18   their lack of awareness or consent to the conversion of a

19   long-short hedge fund with multiple holdings to a single

20   investment in a microcap startup as well as how Martin

21   acquired his 25-million share position."

22   Q    Okay.  I'm going to stop you there.  Does the e-mail

23   continue on?

24   A    It does.

25   Q    And did the defendant respond to this e-mail from

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1    Mr. Marshall?

2    A    Yes.

3    Q    What was his respond?

4    A    He responds to Mr. Marshall as well as copies Martin

5    Shkreli and states, "Hi, Skyler.  I spoke to Martin and he

6    confirmed everything should proceed.  He will reach out to you

7    to discuss timing and related topics.  Best, Evan."

8    Q    That's July 10, 2013?

9    A    Yes.

10   Q    What was Mr. Marshall's response to that e-mail on the

11   first page?

12   A    His response was to the defendant and copied Mr. Shkreli

13   and states, "Thanks for the prompt response, Evan.  This can

14   and should be simple.  Given how busy everyone is, I propose

15   that I sign and send the release to you on the condition that

16   it is not effective and not to be delivered to your client

17   until the cash is wired to my IRA account which should occur

18   the day you receive the signed document.

19        I will accept a letter from you or Martin confirm

20   that is the additional shares agreed upon will be issued and

21   existing shares legend removed as soon as practical.  But in

22   no event later than September 30th of this year.

23        Please confirm this approach is acceptable, and upon

24   your doing so I will send wire transfer instructions and FedEx

25   a release.  Best, Skyler."

DELZOTTO - DIRECT - MR. PITLUCK

1    Q    And what did the defendant do after receiving this e-mail

2    from Mr. Marshall?

3    A    He forwards it to Mr. Shkreli.

4    Q    What did he write?  What did the defendant write?

5    A    "What do you want me to tell him about payment?  As for

6    the stock, Ron, Ron Tilles and Tom, Tom Fernandez, both have

7    free trading shares."

8    Q    What did Mr. Shkreli respond to the defendant?

9    A    Mr. Shkreli responds and states tell him to expect

10   payment around August 1st.  We can get him free trading

11   shares.

12   Q    What was the defendant's respond to that e-mail?

13   A    Okay.

14   Q    That's July 11, 2013; correct?

15   A    Correct.

16   Q    If you could flip over really quick.

17        I'd like to direct you back to

18   Government Exhibit 609-A which I just put in this morning.

19   This is the draft control memo that defendant sent to Mark

20   Panoff.

21        Just going to the second page, can you just read the

22   sentence again that says, "Following," just that one sentence?

23   A    "Following the company's determination that the payments

24   and obligations should not have been assumed by the company,

25   the company determined that any future agreement that includes

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO - DIRECT - MR. PITLUCK

1    the company and MSMB, or any of its related funds will require

2    the signature of the chief financial Officer Of the company.

3    Q    That's dated August 19, 2013?

4    A    Yes.

5    Q    I would like to show you what's been marked for

6    identification as Government Exhibit 611.

7             Is this an e-mail from the defendant to Martin

8    Shkreli?  2-E-mails below that are between defendant, Martin

9    Shkreli and, Skyler Marshall?

10   A    Yes.

11            MR. PITLUCK:  Your Honor, we offer

12   Government Exhibit 611.

13            MR. BRODSKY:  No objection.

14            THE COURT:  All right.  We receive in evidence

15   government's 611.

16            (Government Exhibit 611, was received in evidence.)

17   EXAMINATION BY

18   MR. PITLUCK:
     (Continuing.)

19   Q    Let's start with the bottom e-mail from Mr. Marshall to

20   the defendant and Martin Shkreli.

21            What's the date on that e-mail?

22   A    The date is August 12, 2013.

23   Q    And what did Mr. Marshall write in that e-mail?

24   A    Mr. Marshall wrote to the defendant and Mr. Shkreli, "Are

25   we now in a position to finalize the agreement we made

DELZOTTO - DIRECT - MR. PITLUCK

1   regarding my IRA's MSMB investment.  Skyler."

2   Q    And the next e-mail up.  Is that also an e-mail from

3   Mr. Marshall to the defendant and Martin Shkreli?

4   A    Yes.

5   Q    What did Mr. Marshall write in that e-mail?

6   A    "In light of your successful pipe placement on

7   August 16th of $25 million, may we now consummate our

8   settlement agreement.  Skyler."

9   Q    What did the defendant do after he received that e-mail

10  from Mr. Marshall?

11  A    He forwards it to Martin Shkreli.

12  Q    What did he write?

13  A    "How do you want me to handle given the new approach?"

14  Q    I would like to show you what's been marked for

15  identification as Government Exhibit 616.

16          I'm sorry, just going back to

17  Government Exhibit 611, the top 2-E-mails are from August 21,

18  2013 correct?

19  A    Yes.

20  Q    Is that after the date that Mr. Greebel sent the control

21  memo to Mark Panoff?

22  A    Yes.

23  Q    So now I would like to show you Government Exhibit 616

24  for identification.

25          The 2-E-mails at the top between the defendant and

DELZOTTO – DIRECT – MR. PITLUCK

1   Martin Shkreli, and the e-mails lower down the chain between

2   the defendant, Martin Shkreli, and Skyler Marshall?

3   A    Yes.

4          MR. PITLUCK:  Your Honor, I offer

5   Government Exhibit 616.

6          MR. BRODSKY:  No objection.

7          THE COURT:  We receive Government Exhibit 616.

8          (Government Exhibit 616, was received in evidence.)

9   Q    The second page.

10         The bottom 2-E-mails here are the same as we saw in

11  the bottom 2-E-mails in Government's Exhibit 611; correct?

12  A    Yes.

13  Q    And going to the third e-mail up, what did Mr. Shkreli

14  respond to Skyler Marshall and the defendant on August 21,

15  2013?

16  A    He responds, "Yes, let us discuss.  Are you around on

17  Friday?"

18  Q    Going to the first page, what was Mr. Marshall's response

19  to that?

20  A    I'm here all day tomorrow.  Also this afternoon if you

21  wish to call.  Skyler.

22  Q    Can you read Mr. Shkreli's response to Mr. Marshall at

23  12:02 p.m. on the 23rd?

24  A    In good old North Carolina meeting with GSK and some

25  psychiatrists (for the company, not my disturbed psyche).

DELZOTTO - DIRECT - MR. PITLUCK

1    Friday would be ideal if you could spare."

2    Q    Is the defendant on that e-mail?

3    A    He is not.

4    Q    What did Mr. Marshall respond to Martin Shkreli on

5    Friday, August 23rd?

6    A    "I'm here looking forward to your call, (214) 819-9141.

7    There should not be much to discuss, though, I'm interested in

8    Retrophin's progress.  We settled, per your e-mail of 5/31,

9    and as documented by Evan in the release dated 6/17.

10        You also said you would remove the legend from the

11   stock.  If you wire the $300,000 to my account at Morgan

12   Stanley, I will FedEx you the signed release and trust you to

13   issue the additional 6,300 shares and remove the legend from

14   both certificates as soon as practicable.  Does this work for

15   you, Skyler?

16   Q    And what did Mr. Shkreli do with that e-mail from

17   Mr. Marshall?

18   A    He forwards it to Mr. Greebel.

19   Q    What did he write?

20   A    "Let's work out a resolution ASAP.  I have been doing

21   financial statement analysis for 15 years and I really don't

22   think the Marcum view makes any sense.  Please get this

23   settled ASAP.  I am promising these guys we will have a

24   definitive solution by Monday.  Be creative."

25   Q    What was Mr. Greebel's response to that?

DELZOTTO - DIRECT - MR. PITLUCK

```
1    A    "We may have a solution using notes which we are

2    exploring."

3    Q    That e-mail is Friday, August 23, 2013?

4    A    It is.

5    Q    I would like to briefly direct your attention back to

6    Government Exhibit 612 which is in evidence.

7         What's the date of this e-mail?

8    A    It's August 22, 2013, so the day before.

9    Q    This is the e-mail from the defendant to Mr. Panoff

10   attaching a series of notes and indemnification agreement?

11   A    That's correct.

12   Q    Now, I'd like to show you what's been marked as

13   Government Exhibit 617 for identification.

14        Is this, Special Agent Delzotto, a continuation of

15   the e-mail exchange that we saw in a previous exhibit,

16   Government Exhibit 616, consisting of further e-mails between

17   the defendant and Martin Shkreli?

18   A    Yes.

19        MR. PITLUCK:  Your Honor, we offer

20   Government Exhibit 617.

21        MR. BRODSKY:  No objection.

22        THE COURT:  We will admit Government Exhibit 617.

23        (Government Exhibit 617, was received in evidence.)

24   Q    Special Agent Delzotto, if you go to the third page, the

25   top e-mail, the one that ends in "Be creative."
```

DELZOTTO – DIRECT – MR. PITLUCK

1          Is this the one that we just reviewed in

2   Government Exhibit 616?

3   A     Yes, it is.

4   Q     And the e-mail's from there on up are new; correct?

5   A     Correct.

6   Q     Can you read Mr. Greebel's response to Mr. Shkreli

7   starting on Page 2?

8   A     Sure.  "We talked to another accountant that is a GAAP

9   expert and confirms the subsequent event restatement issue

10  that Marcum identified.  We are trying to speak to BBO.  This

11  is a pure GAAP issue and legal analysis is not determinative."

12  Q     What was Mr. Shkreli's response to that e-mail?

13  A     "Can you show me an example of a public company that has

14  settled a lawsuit and restated all their prior financials?  If

15  you're right, this should be very, very easy to pull up but

16  I've never seen despite having meticulously followed SEC

17  filings for over a decade for thousands of companies."

18  Q     What was the defendant's response to that e-mail?

19  A     The defendant states, "The issue is the aggregate amount

20  is material against your cash and balance sheet.  We just

21  spoke to a partner at BBO and they confirm that Marcum is

22  correct (we described the facts and had the same

23  analysis/outcome).  The note struck may work and Mark is

24  thinking about it."

25  Q     What did Mr. Shkreli respond?

DELZOTTO - DIRECT - MR. PITLUCK

1   A    "So how much exactly is material?  I didn't see anything

2   on how to make that determination."

3   Q    And going to the first page, what was Mr. Greebel's

4   response to that e-mail?

5   A    "Marcum and BBO both said ten percent of your cash

6   balance sheet at the time of your agreement is deemed

7   material.  I argued it should be qualitative (i.e. value of

8   assets in total not just cash) and they said no.

9   Q    What did Mr. Shkreli on respond on August 23rd?

10  A    "Well, this is less than ten percent of the cash.  The

11  agreement would be as of today, and as of today we have

12  20-million plus."

13  Q    What did Mr. Greebel respond to that e-mail?

14  A    "Only Skyler can be as of today.  Does not solve

15  D. Geller or Lavelle."

16  Q    Mr. Shkreli's response?

17  A    "Yeah, but Geller and Lavelle will cancel old settlement

18  and enter into a new one."

19  Q    Finally, what did the defendant write in the top e-mail

20  on August 23rd?

21  A    The defendant wrote, "Marcum will have a big problem with

22  that.  My suggestion is we do not rebate/annul the agreement

23  with Geller and Lavelle.  We can have the fund sign a note to

24  Retrophin for the amount paid to Geller and Lavelle.  This

25  complies with the reps and covenants in the SPA."

DELZOTTO – DIRECT – MR. PITLUCK

1    Q    That's August 23, 2013?

2    A    Correct.

3    Q    I would like to show you what's marked in the next tab as

4    Government's Exhibit 618 for identification.

5            Is this a further e-mail chain of the one we just

6    saw in Government Exhibit 617 also consisting of e-mails

7    between Martin Shkreli and the defendant.

8    A    Yes, it is.

9            MR. PITLUCK:  Your Honor, we offer

10   Government Exhibit 618.

11           MR. BRODSKY:  No objection, your Honor.

12           THE COURT:  We admit government's 618.

13           (Government Exhibit 618, was received in evidence.)

14   EXAMINATION BY

15   MR. PITLUCK:
     (Continuing.)
16   Q    I would like to direct your attention to the third page,

17   the bottom e-mail that starts, "The issue is the aggregate."

18           We saw that e-mail in Government Exhibit 617;

19   correct, the previous exhibit?

20   A    Yes.

21   Q    But the e-mails from there are new; correct?

22   A    Correct.

23   Q    So, in response to the bottom e-mail from the defendant,

24   what did Mr. Shkreli write in this chain?

25   A    "Even at this stage, where we have $25 million?  Surely,

DELZOTTO – DIRECT – MR. PITLUCK

1  it's not material now."

2  Q    What did the defendant write in response to that?

3  A    "The test was at the time you signed, not now.  I made

4  that argument, also."

5  Q    What did Mr. Shkreli respond?

6  A    "We can annul the old agreements then and replace."

7  Q    And defendant's response to that?

8  A    "No.  They were already paid, and Marcum had a problem

9  with that.  The indemnification agreements and notes cover

10  that."

11  Q    And what was Mr. Shkreli's response to that e-mail?

12  A    "I'm talking about things like Geller who can be annulled

13  and the settlement can be deemed to take place today, 8/23/13,

14  with Geller."

15  Q    And going to the first page.

16        What was the defendant's response to that e-mail?

17  A    "Marcum didn't like that idea."

18  Q    What did Mr. Shkreli write back to defendant?

19  A    Mr. Shkreli wrote to the defendant, "There were serious

20  faults with the agreements including lack of board approval,

21  so perhaps a second go isn't the worst idea."

22  Q    And what was the defendant's response to that?

23  A    Mr. Greebel responds to Mr. Shkreli, "That will open up

24  some very big issues.  The current thinking is let Retrophin

25  pay.  Get a note from the fund, and if the fund can't fulfill

SIDEBAR CONFERENCE

1    the note, Retrophin will write it off as bad debt.  It would

2    be easier than the road you are referring to.  Also, Marcum

3    would get very spooked with what you're talking about in

4    parenthesis which could spook your investors and

5    counterparties."

6    Q    Finally, what did Mr. Shkreli respond to that?

7    A    "On current thinking, that works for me."

8    Q    I'd like to have you go down to the next tab, which is

9    Government Exhibit 619 for identification.

10             Special Agent Delzotto, is this a continuation of

11   the e-mails we saw in Government's Exhibit 616 with new

12   e-mails between Mark Panoff and the defendant as well as

13   between Martin Shkreli, Skyler Marshall, and Babs Millward?

14             MR. BRODSKY:  Your Honor can we have a brief second

15   at the sidebar.

16             THE COURT:  Yes.

17             (Continued on the next page.)

18             (Sidebar conference.)

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          MR. BRODSKY:  Your Honor, my objection, and I know

5    we had a little discussion about this before is that they're

6    getting into evidence, Mr. Panoff's statements, and they're

7    going to try to do it for a few other documents.  And my

8    concern is we can't unring the bell once the statements come

9    in.

10         This is their final witness, they have no other

11   witnesses.  They're not calling Mr. Panoff who is totally

12   available to them.  Mr. Panoff they've spoken to, he disagrees

13   with how they're going to be interpreting these documents.

14   But Mr. Panoff is saying here, "Waiting to hear back from

15   Marcum this morning.  The fact that we keep changing our story

16   to them doesn't help."

17         They're going to be getting into matters where

18   Mr. Panoff says, "We keep changing our story."  We're going to

19   be arguing going from that, that has some significant meaning

20   with respect to deceiving the auditors.  And the problem is,

21   your Honor, we have a zero opportunity to cross-examine

22   Mr. Panoff.  It is a complete hearsay that they're going to

23   bring in coming in for the truth of the matter.  It's the kind

24   of statement that you can't unring the bell once it's

25   disclosed to the jury.  It is something that the Government is

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    going to harp on in their summation.  And we think it's deeply

2    prejudicial to but it before the jury.  We think it's an

3    example Mr. Panoff not acting as a co-conspirator.

4              There's not a single piece of evidence the

5    Government has pointed to or proffered to your Honor

6    Mr. Panoff acted as a co-conspirator.  All the evidence points

7    towards Mr. Panoff comes in May of 2013, is acting as a good

8    new to CFO trying to identify problems, trying to raise

9    concerns, trying to get comfortable with issues that he's not

10   familiar.  And it's really problematic that the Government

11   labels him as an co-conspirator.

12             They don't have the evidence, and they're putting in

13   this statement which is in and of itself is further suggestion

14   that Mr. Panoff is not a co-conspirator because he's concerned

15   that there's a change in the story, whatever that story may

16   be.

17             And so, I just think we have a real problem, your

18   Honor, with unringing the bell if your Honor allows the jury

19   to see this when the Government is not able to tell you

20   because they are not going to call any other witnesses on

21   Mr. Panoff's is going to come into the courtroom or some other

22   testimonial evidence is going to come in non-hearsay evidence

23   that Mr. Panoff was involved in some conspiracy.

24             MR. PITLUCK:  Your Honor, we've had, obviously,

25   extensive briefing on Mr. Panoff as a co-conspirator.  Now,

7403

SIDEBAR CONFERENCE

1    objections are coming in showing him as a co-conspirator.

2              This is an e-mail where they're trying to create a

3    solution.  There were e-mails that the Court you just saw in

4    which they're writing draft control memos, they're changing

5    their story vis--vis Mr. Marshall.  He can shake his head all

6    he wants, Judge, but this is Mr. Panoff saying, I don't know

7    what the solution is working.  It doesn't help with Marcum in

8    changing their story.  There are other e-mails that follow

9    where he said, I have a real problem with this.  It's causing

10   me sleepless notes and then he goes along with this anyway.

11             And it's exactly what happens is the settlements are

12   done and split in this way.  The Court has obviously heard

13   testimonial evidence about Mr. Panoff.  This is the evidence

14   that corroborates that.  We are entitled to put this in.  More

15   than people the minimum January at the time forth.

16             And I don't want to waste the jury's time, but we've

17   already heard this.  We've seen a number of e-mails exchanged

18   in this time period between Mr. Panoff and Mr. Greebel where

19   they're trying to find solutions to get around the Marcum

20   disclosure problem.

21             MR. BRODSKY:  Your Honor, here's the fundamental

22   problem -- excuse me, Mr. Kessler -- the fundamental problem

23   is we don't know what he means by that.  We don't know whether

24   it relates to the Skyler Marshall agreement, or whether it

25   relates to the disclosure, or whether it relate to the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    subsequent event footnote.

2                We don't have any evidence of what this means and

3    there will be a few other ambiguous e-mails about changing

4    stories.  And we will debate what it means, and we will argue

5    what it means, and we will all pull strings to try to figure

6    out what it means.

7                But the problem here, your Honor, is e-mail-type

8    case, and that's what this is, is finally we have e-mails into

9    evidence up until this point in the case we've had a very few

10   witnesses who had any testimonial evidence relating to

11   Mr. Greebel.

12               And now we have an agent who has no personal

13   knowledge, who is going to be put in these e-mails which are

14   completely ambiguous, and the Government is going to argue

15   about what the meaning is when they're hearsay, but there's no

16   exception because the co-conspirator exception doesn't apply

17   because they can't even meet the low level of preponderance

18   that Mr. Panoff is doing something doing something criminal

19   because he's joined a conspiracy a few months into joining the

20   company and he wants to do something criminal with respect to

21   settlements that already occurred.

22               We're really troubled by this, your Honor.  If you

23   allow this evidence in, we're all going to spend half the

24   summation arguing about what Mr. Panoff meant.  And the --

25   problem is Mr. Panoff is unavailable to us because they've

SIDEBAR CONFERENCE

1    labeled him a co-conspirator.  He will never testify for us.

2    He will never -- he will take the Fifth Amendment.

3         And the problem -- and the Government spoke to him.

4    Your Honor has his proffer statements.  He did nothing wrong,

5    Mr. Panoff.  And now we're going to put in testimony and it's

6    completely ambiguous.

7         And our problem is, your Honor, this is a backdoor

8    way of getting in hearsay.  And if this were an overwhelming

9    evidence case where there was overwhelming evidence that would

10   be one thing.  This is a case where there's very little

11   evidence about what's in Mr. Greebel's head or mind or

12   understanding of this or his knowledge or his intent.  And we

13   have few evidence to testify about Mr. Greebel, the whole

14   trial has been about Mr. Shkreli with very few exceptions.

15        To put this in, your Honor, I have to tell you it is

16   beyond prejudicial, it's extraordinarily prejudicial.  We ask

17   your Honor to strike it.  If they want to put in the e-mail,

18   put in the e-mail without the fact that we keep changing our

19   story to them doesn't help because that's testimonial

20   evidence, it doesn't come within the exception.

21        THE COURT:  Okay.

22        MR. PITLUCK:  Judge, I'm reluctant to go back into

23   this.  That was all Mr. Brodsky's interpretation of the

24   evidence.  This is not an ambiguous e-mail.  This is the

25   e-mail exchange that's already in evidence to Skyler Marshall

SIDEBAR CONFERENCE

1   where he's asking to get paid.  And Martin Shkreli keeps

2   getting pressure, do we have a solution.  Mr. Brodsky made a

3   dispute what that means, but it's --

4           THE COURT:  No, he's just disputing what Mr. Panoff

5   means.

6           MR. PITLUCK:  That's a goes to weight, not

7   admissibility.

8           MR. KESSLER:  As to the unringing bell issue.  First

9   of all, the law says the hearsay statement can come in and be

10  considered.  Mr. Brodsky has hasn't cited any law that says

11  you can't do that.

12          Second of all, the fact that Mark Panoff is telling

13  Evan Greebel we keep changing our story has relevance even

14  whether or not it's true.  Mr. Brodsky just talked about how

15  there isn't a lot of evidence to what in Mr. Greebel's head

16  this is information being put in Mr. Greebel's head.  He might

17  have believed it, he might not, but that's all an argument.

18          So, you know, it's a relevant statement.  It's a

19  co-conspirator statement as we said.  Even if it's not a

20  co-conspirator statement, it's still relevant to show the

21  information that was told to Mr. Greebel.  And the things that

22  were being told to Mr. Greebel by Mr. Panoff.

23          No actual hearsay, case, or anything has been cited

24  by Brodsky, he just says.  It's prejudicial because it shows

25  the conspiracy.  It's not a reason not to include it.

Case 1:15-cr-00637-KAM   Document 510   Filed 01/10/18   Page 60 of 322 PageID #: 13615

SIDEBAR CONFERENCE

1        MR. BRODSKY:  Your Honor, it's an e-mail that comes

2   hours after Mr. Shkreli's e-mail.  There's thousands of

3   e-mails flying around.  We do not know what Mr. Panoff meant

4   by that.  They should call Mr. Panoff to explain it.

5        They won't call Mr. Panoff because Mr. Panoff has

6   proffered to the Government.  And the story that Mr. Panoff

7   tells is not consistent with what the Government wants to tell

8   the jury and that's really problem for us.  They're able to

9   get in this evidence of complete hearsay for the truth and

10   it's completely prejudicial.

11        Even if your Honor was going to offer it for the

12   effect on the listener, I would move to redact it as

13   ambiguous, completely unclear, hearsay statement coming from

14   Mr. Panoff that's extraordinarily prejudicial.

15        MR. KESSLER:  And an ambiguously unclear prejudicial

16   statement is admissible.  That's for the jury.

17        MR. PITLUCK:  It's not relevant that Mr. Panoff is

18   not going to come in and testify.  As the Court knows,

19   co-conspirators don't come in and testify all the time.

20   Co-conspirators also don't tell the truth.

21        Mr. Brodsky's interpretation of FBI-302 is totally

22   irrelevant to this issue.  It doesn't matter.  What matters

23   is, that this e-mail is up to the jury to conclude.  They can

24   interpret the meaning.  They can go to Mr. Brodsky's meaning.

25   He's talking about something totally unrelated to context of

SIDEBAR CONFERENCE

1    the previous seven e-mails.  This is a factual interpretation,

2    Judge.

3              MR. BRODSKY:  Doesn't the truth matter anymore?

4              MR. PITLUCK:  Absolutely.

5              THE COURT:  What Mr. Panoff is saying is that Marcum

6    is, you know, obviously concerned that the story keeps

7    changing.  And it seems to me that it's not ambiguous, I don't

8    think.

9    Mr. Panoff has been identified as a co-conspirator.  There has
     been evidence thus far as least to establish by a
10   preponderance that Mr. Panoff was a co-conspirator and the
     statement goes, the statement that Mr. Panoff makes it
11   Mr. Greebel about the Marcum folks and how he, Mr. Panoff, as
     the point person is perceiving that Marcum is concerned about
12   the different iterations and explanations regarding his
     settlement.
13   So I do think it's, A, relevant, B, not unduly prejudicial to
     either side under the balancing and it is admissible.

14             MR. PITLUCK:  Thank you.

15             MR. KESSLER:  Thank you.

16             MR. BRODSKY:  I'm not going to object.  I don't need

17   to object.  I've objected here.

18             THE COURT:  It's noted here.

19   I will admit it and I will note you have objected if you'd
     like.  Okay.
20             MR. BRODSKY:  You don't need to.

21             (Sidebar discussion concludes.)

22             (Continued on the next page.)

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1          (In open court.)

2          THE COURT:   The Court overrules the defense

3   objection and admits Government's Exhibit 619.

4          (Government Exhibit 619, was received in evidence.)

5   MR. PITLUCK:
    (Continuing.)

6   Q     So Special Agent Delzotto is this e-mail the

7   continuation, the bottom e-mail on Government's Exhibit 619

8   that says, "Am looking forward to your call."

9          Is that also an e-mail that we saw in

10  Government's Exhibit 616 a few minutes ago?

11  A     Yes.

12  Q     And what's the response from Mr. Shkreli to

13  Mr. Marshall's e-mail on August 23, 2012?

14  A     I'll call you in a moment.

15  Q     And the next e-mail up on August 26, 2013.  Can you just

16  read who that's from and on behalf of?

17  A     Sure.  It's from Babs Millward, who is Skyler Marshall's

18  secretary, on behalf of Skyler Marshall to Martin Shkreli.

19  Q     What's the subject of that e-mail?

20  A     Wire instructions.

21  Q     Are there wiring instructions for an account in Skyler

22  Marshall's IRA?

23  A     There's wire instructions, yes, for the benefit of

24  Skyler B. Marshall IRA.

25  Q     Going up.  What did Mr. Shkreli write after receiving

DELZOTTO – DIRECT – MR. PITLUCK

1   that e-mail?

2   A   "Getting pressure.  Do we have a solution?"

3   Q   And going to the top e-mail, is that an e-mail from Mark

4   Panoff to the defendant also dated August 26, 2013?

5   A   Yes, it is.

6   Q   What did Mr. Panoff write in that e-mail to the

7   defendant?

8   A   Mr. Panoff writes, "Waiting to hear back from Marcum this

9   morning.  The fact that we keep changing our story to them

10  doesn't help."

11  Q   So that's August 26, 2013; correct?

12  A   Correct.

13  Q   I would like to show what's marked for identification

14  Government Exhibit 621.

15          Is this a further e-mail exchanging with the one we

16  previously just saw in Government's Exhibit 619.  This one

17  between these between Martin Shkreli, Mark Panoff, and Evan

18  Greebel?

19  A   Yes, it is.

20          MR. PITLUCK:  Your Honor, we offer

21  Government Exhibit 621.

22          MR. BRODSKY:  Same objection.  But I understand your

23  Honor pursuant to sidebar.

24          THE COURT:  Thank you.  We will admit

25  Government Exhibit 621.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1          (Government Exhibit 621, was received in evidence.)

2    EXAMINATION BY

3    MR. PITLUCK:
     (Continuing.)
4    Q    Let's go to the second page.  We see the e-mail from

5    Mr. Shkreli where he wrote, "Getting pressure.  Do we have a

6    solution?"

7    A    Yes, I see it.

8    Q    Who did he send that e-mail to on August 26th?

9    A    He sends the e-mail to Mr. Greebel and Mark Panoff.

10   Q    The next e-mail up, is that also from Mr. Shkreli?

11   A    Yes, it is.

12   Q    What did he write?

13   A    "I expect responses to my e-mails."

14   Q    Let's go to the first page, the next e-mail in the chain.

15          Is that an e-mail from Mr. Panoff to Mr. Shkreli

16   copying Evan Greebel?

17   A    It is.

18   Q    What did Mr. Panoff write in that e-mail?

19   A    "Guys I think this is a little too much for my risk

20   tolerance.  I was told that MSMB was going to handle these

21   outstanding settlements prior to the financing and we are

22   changing our story.

23          If you're going to force me to pay for Retrophin,

24   I'm going to have to ask the board for guidance or resign.

25   This is not something I'm comfortable deciding on an island.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

7412

DELZOTTO – DIRECT – MR. PITLUCK

1        This issue has caused me a tremendous amount of

2   stress and sleepless nights.  It is affecting my personal life

3   and it is not worth it for me to continue to operate that way.

4        You may think I'm overreacting but it is how I

5   genuinely feel.  If you think it is worth further discussion,

6   I will make myself available to speak.  Mark."

7   Q    What did Mr. Shkreli write in response to that e-mail?

8   A    "On a separate topic, the 10Q is still on track for 9/6

9   timeframe."

10  Q    What did Mr. Panoff respond to Mr. Shkreli and the

11  defendant?

12  A    "This issue ties into all of this.  We keep changing our

13  story with Marcum.  First, MSMB was going to pay Geller

14  directly and now we are saying something different."

15  Q    What did Mr. Shkreli to Mr. Panoff and the defendant in

16  the top e-mail?

17  A    "The facts are so simple.  Investors are ready to sue

18  Retrophin for reasonable claims they have against Retrophin.

19  To circumvent that, we will settle with them.  This is so

20  simple and standard fare, it shouldn't give anyone any stress.

21  I would like to wrap this up ASAP.  I don't care if the board

22  has to approve or not.  I don't care if you end up resigning

23  or not.  But I do need this settled soon or threats will

24  become filed claims and that doesn't help anyone."

25  Q    That's August 26, 2013?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1    A    It is.

2    Q    I would like to show you what's been marked for

3    identification as Government Exhibit 623.

4          Is this a further exchange of the e-mails we saw in

5    Government Exhibit 619 and Government Exhibit 621?

6    A    You're on 623 you said?

7    Q    Yes.  The bottom e-mail on the second page with the

8    wiring instructions.

9          Do you see that?

10   A    What's the Bates Stamp you're on.

11   Q    I'm R023367.

12   A    Okay.  I'm there.

13   Q    The bottom e-mail here from Babs Millward is that part of

14   the same chain?

15   A    It is part of the same chain.

16        MR. PITLUCK:  Your Honor, the e-mails above that are

17   between Martin Shkreli, the defendant, Mark Panoff, and Skyler

18   Marshall.

19        THE WITNESS:    Yes.

20        MR. PITLUCK:  We offer Government Exhibit 623.

21        MR. BRODSKY:  No objection, your Honor.

22        THE COURT:  We receive Government Exhibit 623.

23        (Government's Exhibit 623 was received in evidence

24   as of this date.)

25   EXAMINATION BY

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1  MR. PITLUCK:
   (Continuing.)
2  Q    Going to the second page the bottom, that's the e-mail
3  from Babs Millward that we saw.
4           What did Mr. Shkreli respond to him?
5  A    "I will have news tomorrow on this outcome.  I expect it
6  to be positive."
7  Q    What did Mr. Marshall respond the next day?
8  A    "Where do we stand, Martin?  Is there any issue other
9  than recasting the form of release as you describe on Friday?"
10  Q    What was Mr. Shkreli's response to that?
11  A    "My understanding is we will not even be recasting it.
12  We'll be wiring the funds shortly."
13  Q    What did Mr. Marshall write there?
14  A    "Let me know wire is sent and whether you want the
15  release FedExed today."
16  Q    And did Mr. Shkreli forward that e-mail to the defendant
17  on August 28th?
18  A    Yes.
19  Q    What did he write?
20  A    "Can you give me a copy of the Marshall agreement?"
21  Q    And what did the defendant write in response to that?
22  A    "Attached.  This is a version that should be used.  Do
23  you want us to do anything about the FTC?"
24           (Continued on the next page.)
25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO − DIRECT − PITLUCK

1    DIRECT EXAMINATION (Continued)

2    BY MR. PITLUCK:

3    Q    And starting on the first page and going in and staying

4    on this page, what did Mr. Shkreli respond to the defendant

5    copying Marc Panoff?

6    A    Is there a reason why we can't pay the settlement today

7    or rewrite it so it avoids the issues in the past?

8    Q    What's the defendant's obligation?

9         THE COURT:  I'm sorry, what did you say?

10   Q    What's the defendant's response to Mr. Shkreli at

11   2:28 p.m. copying Mr. Panoff?

12   A    Mr. Greebel responds:  This agreement clarifies that it

13   is a Retrophin obligation and the deal is solely between

14   Retrophin and Schuyler.  Other parties are getting release as

15   a prudent measure.  It will be signed and paid in the third

16   quarter given the amount.  I believe it is an immaterial

17   number for the Retrophin.

18   Q    And what did Mr. Shkreli respond just to Mr. Greebel?

19   A    Can you even separate the other parties release into

20   separate document?

21   Q    And what was the defendant's response?

22   A    Sure, but I can't do it now because I don't have Wifi.  I

23   could send you a broken version in a couple of hours.

24   Q    And, finally, what was Mr. Shkreli's response to

25   defendant?

DELZOTTO – DIRECT – PITLUCK

1   A    Seriously.

2   Q    So that's August 28th, 2013.  I'd like to show you what's

3   in evidence as Government Exhibit 102-12, which is another

4   continuation of this email.

5        And the first email is on the first page from

6   Schuyler Marshall to Martin Shkreli at 1:17 p.m. dated

7   August 28th, 2017 –– I'm sorry, August 28th, 2013 at 1:17 p.m.

8   What did Mr. Marshall write in this email?

9   A    He writes:  Martin, where do we stand on this?  Schuyler.

10  Q    What was Mr. Shkreli's response to that on the previous

11  page?

12  A    Hi, Schuyler, still waiting on approval from my auditors

13  and CFO, as you can imagine there is some complexity.

14  Q    Mr. Marshall's response?

15  A    Friday it was Monday.  Yesterday today.  Now, I really

16  don't understand these delays if release form is okay.  I

17  don't want to get close to a year from all of the activity in

18  question and will further delay –– and will further delay may

19  force me into different direction.

20  Q    What was Mr. Shkreli's response to that?

21  A    I understand.  I'm cc'g my attorney again and pressing on

22  the urgency of this.  We're in the midst of acquiring a

23  company and our CFO is on vacation.  I'm doing my very best.

24  I think my team understands what is at stake.

25  Q    And going up, what was Mr. Marshall's response to that

DELZOTTO - DIRECT - PITLUCK

1    email?

2    A    I approved the form of release sent on 617 have

3    reiterated I will sign upon receipt of the $300,000 and trust

4    you to send the 6300 and remove legend later.  Given there is

5    no need to redo the release and all someone needs to do is

6    send the wire per the instructions I have sent, it would seem

7    neither attorney or CFO involvement is needed.  Am I missing

8    something here?

9    Q    Defendant copied on that email?

10   A    Yes.

11   Q    Finally, what did Mr. Shkreli respond to Mr. Marshall on

12   the defendant?

13   A    We're wiring it today.  The agreement has to be

14   compliant.  You'd be surprised how intricate this is.  I thank

15   you for your patience.

16   Q    And I'd like to direct your attention to the next tab,

17   Government Exhibit 102-13, which is also in evidence.  Is this

18   an email from defendant to Martin Shkreli and Schuyler

19   Marshall dated August 29th, 2013?

20   A    Yes.

21   Q    Does it attach two agreements -- have two attachments

22   there?

23   A    The top email has two attachments, yes.

24   Q    Can you read the first two paragraphs of defendant's

25   email.

DELZOTTO – DIRECT – PITLUCK

1    A    The top email?

2    Q    Yes.

3    A    Hi, Schuyler, I apologize for the delay but I had some

4    connectivity issues.  As discussed, attached are two

5    settlement/release agreements, one between you and Retrophin

6    contemplating the payment of the money and a second between

7    you and Martin and MSMB relating to the delivery of the

8    shares.  In the interest of time, I am simultaneously sending

9    it to Martin.

10             The difference between these two agreements and the

11   prior version is that we divided the prior version to separate

12   Retrophin's payment obligation and release from the delivery

13   obligation and release of Martin and MSMB, otherwise the

14   agreements are the same.

15   Q    Going down in the email that was sent earlier, is that

16   email from Mr. Shkreli to Mr. Marshall copying the defendant?

17   A    Yes, it is.

18   Q    What does Mr. Shkreli write there?

19   A    He writes:  After exhaustive talks with our attorneys,

20   there will be a revision to the agreement, you will get this

21   at about 7:00 p.m. eastern standard time.  The revision is

22   simple it merely removes MSMB as an obligor and references

23   Retrophin alone.  This is crucial for a number of reasons that

24   are beyond my ability to explain.  Evan is cc'd if you have

25   any questions.

DELZOTTO - DIRECT - PITLUCK

1   Q    That's August 29th, 2013?

2   A    That's correct.

3   Q    I'd like to direct your attention to what's been marked

4   for identification as Government Exhibit 624.

5          This is an email exchange between defendant, Marc

6   Panoff -- a series of emails between the defendant, Marc

7   Panoff and Martin Shkreli between September 2nd, and September

8   3rd, 2013?

9   A    As well as the defendant, yes.

10         MR. PITLUCK:  Your Honor, we offer Government

11  Exhibit 624.

12         MR. BRODSKY:  No objection, Your Honor.

13         THE COURT:  We will receive Government 624 in

14  evidence.

15         (Government Exhibit 624, was received in evidence.)

16  BY MR. PITLUCK:

17  Q    Going to the very bottom email here, September 2nd, 2013,

18  it's from Marc Panoff at a Gmail address to

19  Marc@retrophin.com.  What's is the subject?

20  A    The subject is entitled:  Footnote disclosure.

21  Q    What did Mr. Panoff write?

22  A    Martin, please take a look at the attached draft footnote

23  disclosure and let me know if you have any comments.  I'd like

24  to get this and the draft AK over to Marcum for their review.

25  Thanks, Marc.

Georgette K. Betts, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1  Q    What did Mr. Panoff do with that email that he wrote to

2  himself?

3  A    He forwards that email to Martin Shkreli and Evan

4  Greebel.

5  Q    What did he write?

6  A    Martin, I drafted attached language for the subsequent

7  event footnote for the amended 10-K, Q1, 10-Q and the Q2

8  related-party footnote.  Let me know if you have any comment

9  and I will forward over to Marcum with the draft 8K for their

10  review.  Thanks, Marc.

11  Q    What did the defendant respond to that email?

12  A    I assume this deletes the reference to the payment to

13  Schuyler that we discussed.

14  Q    What was Mr. Panoff's response to that email?

15  A    Yeah.

16  Q    That's just to the defendant?

17  A    Yes.

18  Q    I'd like to direct your attention to Government Exhibit

19  639 for identification.  Is this is an email exchange between

20  the defendant, Martin Shkreli, and towards the bottom between

21  Martin Shkreli, Schuyler Marshall and the defendant?

22  A    Yes.

23       MR. PITLUCK:  Your Honor, we offer Government

24  Exhibit 639.

25       MR. BRODSKY:  No objection, Your Honor.

Georgette K. Betts, RPR, CSR
Official Court Reporter

DELZOTTO – DIRECT – PITLUCK

1        THE COURT:  We receive Government 639 in evidence.

2            (Government Exhibit 639, was received in evidence.)

3   BY MR. PITLUCK:

4   Q    Starting with first email in the chain, what's the date

5   of that email?

6   A    September 20th, 2013.

7   Q    And what did Mr. Marshall write to Martin Shkreli copying

8   the defendant?

9   A    Hi Guys, understand you're busy in pursuit of TSPT, but

10  don't forget the other part of our agreement the additional

11  shares and removal of the restricted legend.  Could these

12  points be delegated assuming you're too busy to handle?  Best,

13  Schuyler.

14  Q    That's September 20th, 2013?

15  A    Yes.

16  Q    What did Mr. Shkreli respond to that?

17  A    Will do.

18  Q    And Mr. Marshall's response?

19  A    When?

20  Q    What did Mr. Shkreli do with that response from

21  Mr. Marshall?

22  A    He forwards it to the defendant.

23  Q    That's October 3rd, 2013?

24  A    Yes.

25  Q    What was -- starting on the first page, what was the

Georgette K. Betts, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1   defendant's response to Mr. Shkreli?

2   A    The defendant responds to Mr. Shkreli states, the stock

3   would have to come from the Fearnow stock that remains.  I'll

4   have to see how much is left, how many shares does he want?

5   Q    What did Mr. Shkreli respond to that?

6   A    I don't know, you ask him, I'm busy being the CEO of a

7   company.

8   Q    And the defendant's response?

9   A    Okay, I wasn't sure if you had a deal with him.

10   Q    And what did Mr. Shkreli respond?

11   A    I don't even know.

12   Q    And, finally, what did the defendant write back to

13   Mr. Shkreli on October 3rd, 2013?

14   A    Mr. Greebel states, I'll handle.

15   Q    I'd like to show you what's been marked for

16   identification as Government Exhibit 655.  Are these emails

17   between the defendant and Martin Shkreli between December 30

18   and December 31st, 2013?

19   A    They are.

20          MR. PITLUCK:  Your Honor, we offer Government

21   Exhibit 655.

22          MR. BRODSKY:  No objection.

23          THE COURT:  We receive Government's Exhibit 655.

24          (Government Exhibit 655, was received in evidence.)

25   Q    What did defendant write in the bottom email to

DELZOTTO - DIRECT - PITLUCK

1    Martin Shkreli -- withdrawn.  What's the subject line of this

2    email from the defendant to Martin Shkreli on December 30th,

3    2013?

4    A    The subject is titled Schuyler Marshall.

5    Q    What did the defendant write here?

6    A    The defendant wrote:  We just spoke to Schuyler and

7    revolved his de-legending issue.  He mentioned that you and he

8    discussed that he would receive 15,000 additional shares.  Was

9    that meant to come from you or should we do a consulting

10   agreement for him?

11   Q    What did Mr. Shkreli respond?

12   A    Ask him if he will tolerate a consulting agreement.

13   Q    And what did Mr. -- the defendant respond to that?

14   A    Okay.

15   Q    I'd like to direct your attention to Government

16   Exhibit 613 for identification.  This is a series of emails at

17   the top between the defendant and Martin Shkreli, and in the

18   second and third page related to Steve Cavelli and Tom

19   Koestler, TKoestler@gmail.com?

20          MR. BRODSKY:  Your Honor, I apologize we haven't

21   opened on this one, it looks likes it relates to something --

22          THE COURT:  Let me give the jury a mid morning break

23   at this time.  Please don't talk about the case, keep an open

24   mind, we will get back to you soon.

25          If you like to step off yourself.

Georgette K. Betts, RPR, CSR
Official Court Reporter

7424

DELZOTTO - DIRECT - PITLUCK

1          THE WITNESS:  Thank you.

2          (Jury exits courtroom.)

3          THE COURT:  Have a seat.  Mr. Brodsky, go ahead.

4          MR. BRODSKY:  If you have a copy, Your Honor, in

5     front of you of Government Exhibit 613 for identification.

6          THE COURT:  Yes, I do.

7          MR. BRODSKY:  This appears to be an email about

8     Thomas Koestler and there's communications, it starts with the

9     communication from Mr. Shkreli, it proceeds with an email from

10    Mr. Koestler to Mr. Shkreli regarding his subscription

11    agreement back in April of 2012, that's on page RO2334.  It

12    continues with an email from Steve Cavelli from Capital

13    Enhancement about a transfer agreement with Tom Koestler.

14    Then there is an email above it by Steve Cavelli again

15    relating to a transfer agreement.

16          There is another email from Mr. Shkreli about

17    Mr. Koestler and his shares.

18          There's another email above that from Mr. Cavelli

19    about an agreement and understanding with Mr. Koestler.

20          There's another email above that which is

21    Mr. Cavelli congratulating Mr. Shkreli on a round of financing

22    and talking about Tom Koestler receiving 20,000 of 175,000 due

23    to him.

24          There's an email from Mr. Greebel above that that

25    says, do you want the remaining 50,000 shares coming from the

DELZOTTO - DIRECT - PITLUCK

1    freely traded group, if so, would the remaining 140,000 shares

2    be subject to the forward option ala Geller and Blanton?  That

3    seems to be only reference there to anyone other than

4    Koestler.

5          Then Mr. Shkreli responds.  Mr. Greebel responds, so

6    consulting agreement, question mark.  I spoke to Marc about it

7    today and TK's at 120.  And so there is additional information

8    about Tom Koestler and they're talking about what he's owed.

9          In a pretrial proceeding, Mr. Koestler came up and

10   at page 106 of the transcript the government said we do not --

11   let's see, no, the Court said with regard -- this is lines

12   eight to nine, with regard to Mr. Koestler I do not think his

13   agreement is at issue or noted or part of the indictment.

14         Mr. Kessler says, in response on line 10, it is not.

15   The Court responded, and the government is not alleging this

16   is fraudulent.

17         So there were -- in pretrial proceedings there was

18   an understanding that Mr. Koestler was not going to be part of

19   the government's case.  Thus far Mr. Koestler has not been

20   part of the government's case in chief, they are not calling

21   Mr. Koestler.  There is a lot of hearsay statements between

22   Mr. Cavelli.

23         This will be a completely confusing and irrelevant

24   email communication.  The prejudice is high because they're

25   introducing now another individual, Mr. Koestler, at the end

DELZOTTO - DIRECT - PITLUCK

1    of their case through an email and we would ask Your Honor to

2    preclude this email from being admitted.

3            MR. PITLUCK:  Your Honor, a few points on this.

4    First, it is not accurate that Mr. Koestler has not come up in

5    this case.  I have to say "Koestler" otherwise it sometimes

6    confuses my colleague, but there were multiple emails through

7    documents through Amy Merrill and through the case agent in

8    which Mr. Koestler was paid with Fearnow shares, which is what

9    this is also a reference to.

10           We're not now coming out and saying the Koestler

11   consulting agreement was fraudulent and trying to prove that.

12   Quite -- that's just not the case here.  What we are doing is

13   showing that on August 23rd, 2013 at precisely the same time

14   that the defendant, Martin Shkreli and Marc Panoff are

15   discussing how to deal with Schuyler Marshall, the defendant

16   is emailing with Martin Shkreli in terms of how to resolve an

17   obligation and it's the option, the forward option agreement,

18   which we've seen already through Alan Geller and Darren

19   Blanton is offered as one possible option.  And then when

20   Mr. Shkreli said I rather the shares come from the company,

21   Mr. Greebel's response, which is certainly relevant to this

22   case is, so a consulting agreement.

23           So we're happy to redact out the name of

24   Mr. Koestler.  We're happy to not go into the emails from

25   Steve Cavelli, which we don't think are prejudicial at all,

7427

DELZOTTO - DIRECT - PITLUCK

1    it's just showing that shares are owed to somebody, but it is

2    certainly relevant to Mr. Greebel's intent.  And it's

3    certainly relevant to the discussions that he's having with

4    Martin Shkreli at this time, which is a very critical time in

5    the period in which Marcum is aware of these agreements and is

6    becoming, as we just saw in the previous 15 emails exhibits

7    entered into evidence, that this is a very relevant factor in

8    Mr. Greebel's state of mind, which is -- and Your Honor this

9    evidence is only prejudicial to the extent that it shows a

10   state of mind.  It's certainly probative, it's certainly

11   admissible and we're not arguing that Mr. Koestler's agreement

12   is fraudulent.

13           MR. BRODSKY:  And in pretrial proceedings the

14   government said -- Your Honor put them right to it and they

15   said, they represented to the Court there will not be evidence

16   regarding Mr. Koestler and his agreement.  And we relied on

17   that pretrial proceeding.  This is on page 109 lines one to

18   two.  The Court said to the government, you have represented

19   there will not be evidence regarding the agreement.  And

20   Mr. Kessler said for Rosenfeld and the Koestler consulting.

21   The Court said, the Koestler agreement.

22           So and the problem we have, Your Honor, is had we

23   known they were going to introduce all sorts of evidence

24   related to Mr. Koestler it would have changed our cross

25   examinations.  We certainly relied on their representation to

DELZOTTO - DIRECT - PITLUCK

1    the Court and, Your Honor, Mr. Koestler never gets freely

2    traded shares.

3              THE COURT:  Cross-examination of whom?

4              MR. BRODSKY:  Of the witnesses of -- we would have

5    talked with Mr. Aselage and Mr. Richardson we crossed that --

6    Mr. Koestler is one of the foremost leading experts in a

7    particular field.  We would have cross examined about his --

8    he's a leading expert in a particular field, we would have a

9    cross examined those witnesses about him.

10             We would have a demonstrated that Mr. Koestler is a

11   real -- we would have demonstrated Mr. Greebel's knowledge and

12   mental -- and state of mind knowing Mr. Koestler was such a

13   prominent figure entering into a consulting agreement would

14   have helped our argument that -- would have helped our

15   argument that Mr. Greebel only knew what he was being told

16   about these various experts and consultants.

17             And Mr. Kessler also said, this is on line --

18   page 108 of the transcript lines 21 to 25, well, so I'm not

19   representing that our opening will include the Koestler

20   arbitration, I'm just saying we don't want to take the

21   position today that there will be no evidence related to Mr.

22   Koestler at any point in the government's case, and then they

23   had no evidence relating to Mr. Koestler at any point in the

24   case, and then here we are they're introducing evidence which

25   we think the jury will hear for the first time about

DELZOTTO – DIRECT – PITLUCK

1    Mr. Koestler's agreement.  He does not get any Fearnow shares.

2    I don't see how any of this is anything other than confusing

3    and if they redact things from this email it will be even more

4    confusing.

5         THE COURT:  All right, look, I'm going to sustain

6    the objection.  I think this is just going to lead to the

7    jurors' confusion and I also think that given the government's

8    representations it would be unfair to admit it at this point

9    given that Mr. Brodsky has indicated that his cross

10   examination approach may have been different with certain

11   witnesses, so I'm going to sustain the objection for the

12   admission of Government Exhibit 613.

13        MR. PITLUCK:  Your Honor, just to be clear, we

14   understand the Court's ruling, but I just went back through

15   the exhibits, there are a number of emails, dozens of

16   emails -- not dozens but at least four that I just looked at

17   in which Thomas Koestler or TK was somebody who was put before

18   the jury as somebody who is in discussion with -- part of

19   discussions between Martin Shkreli and the defendant as to

20   being the recipient of free trading shares.

21        And I would again just point out that we are not

22   alleging and would not be able to allege, based on the

23   evidence, certainly based on this one email, that the Koestler

24   consulting agreement is fraudulent.  So Mr. Brodsky's

25   assertion -- we would just not say that.  This is all relevant

DELZOTTO – DIRECT – PITLUCK

1    to Mr. Greebel's state of mind particularly in the options

2    agreements and Mr. Shkreli trying to get shares from the

3    company rather than from himself because that's what a forward

4    option is, as the Court is aware.  Mr. Geller and Mr. Blanton

5    got shares directly from Mr. Shkreli.  This is relevant to

6    Mr. Greebel's understanding and his agreement to structure

7    things in such a way that Mr. Shkreli doesn't have to have the

8    shares come from him.  So we're not going to be able to stand

9    here based on this simple email and say Mr. Koestler's

10   agreement was fraudulent.

11           So the notion that would somehow affect his

12   cross-examination is just a back door attempt to get an email

13   precluded that doesn't make the argument that he implies we're

14   trying to make.  So, I mean, I don't think it's confusing,

15   they certainly heard Mr. Koestler's name and the fact that he

16   got shares from the free trading group a number of times over

17   the last three days.

18           THE COURT:  That may be the case but to the extent

19   this particular email is being used to make an argument about

20   Mr. Greebel's state of mind I think it's best that we not

21   present this to the jury and the government can rely on other

22   evidence in the record.  I think that it is just going to

23   cause confusion especially –– and the likelihood of some

24   prejudice if the jury suddenly is considering discussions

25   between Mr. Greebel and Mr. Shkreli regarding shares to

DELZOTTO - DIRECT - PITLUCK

1    resolve or to provide to Mr. Thomas Koestler.  So let's just

2    leave that out of this --

3              MR. PITLUCK:  Understood, Your Honor.

4              THE COURT:  -- this particular exhibit.

5              Do you all want to take five minutes?

6              By the way, before you all disappear, I am going to

7    order that the government -- I'm sorry, that the defense

8    provide for in camera review the disputed statements, notes,

9    et cetera, pursuant to Rule 26.2.  I think the rules clearly

10   provide that that would be the proper procedure.  And I would

11   also just say that I've noticed the defense from time to time

12   raises the specter of a constitutional violation when I'm

13   trying to adhere to the federal criminal rules, as you did in

14   your weekend submissions regarding disclosing to the

15   government exhibits that you had subpoenaed and just giving

16   them some ideas as to how and whether you're going to present

17   a defense case and present certain witnesses.  That may be

18   your view, I'm trying very hard to adhere to the federal rules

19   and case law.

20              I would never, obviously, want to violate anyone's

21   constitutional rights, I believe my rulings are consistent

22   with the constitution and I believe there is a legal basis for

23   those rulings.  So, obviously, you're free if the need arises

24   and if Mr. Greebel is convicted to raise these issues on

25   appeal, but at the present time given what I believe the rules

DELZOTTO - DIRECT - PITLUCK

1  to clearly mandate or provide, that I'm going to order

2  disclosure.

3          I'd like to have those documents, if you don't mind,

4  this evening so we don't have any delays.  I'd like to see

5  them no later than 6:00 p.m. tonight and we will move forward.

6  All right.  Thank you.  Let's take five minutes

7          MR. BRODSKY:  Your Honor, may we email them to your

8  law clerk?  It's probably the easiest way to get to you by

9  6:00 p.m.

10          THE COURT:  Yes, I mean, I just want to make sure

11  they're legible.  Sometimes with notes, handwritten notes they

12  tend to be a little less legible.  I'm happy to look at -- I

13  just want legible copies, all right.

14          MR. BRODSKY:  Okay.

15          MS. RUBIN:  The Rule 26.2 materials produced to the

16  government are not handwritten notes, they are computerized so

17  I don't believe that will be a problem.

18          THE COURT:  I'm ordering the notes, if any, that

19  were taken by some of the defense team and I'm to make a

20  determination under 26.2(c) whether or not the defense claims

21  of privilege or work product doctrine protection should be

22  upheld.  All right.

23          MR. BRODSKY:  Right, so for the 26.2 we gave that's

24  redacted we will unredact it, give it to Your Honor, we'll

25  email it to your law clerk and we'll be standing by to

DELZOTTO - DIRECT - PITLUCK

1    messenger an unredacted, if any of it's illegible.

2              THE COURT:  All right.  If there are notes we will

3    need those too.  Thank you.

4              (Recess.)

5              THE COURT:  Are we ready to bring the jury back?

6              MR. PITLUCK:  Yes, Your Honor.

7              (Jury enters courtroom.)

8              THE COURT:  All our jurors are present.  Please have

9    a seat.

10             You may proceed Mr. Pitluck.

11             MR. PITLUCK:  Thank you, Your Honor.

12   DIRECT EXAMINATION(Continued)

13   BY MR. PITLUCK:

14   Q    Special Agent Delzotto, did you look at emails and

15   documents in connection with an MSMB investor named Darren

16   Blanton?

17   A    Yes.

18   Q    I'd like to direct your attention in the smaller binder

19   to Government Exhibit 103-31 for identification.

20   A    Okay.

21   Q    This is an email exchange between JD McCullough

22   Martin Shkreli, Darren Blanton and the top email which is sent

23   to Evan Greebel?

24   A    Yes.

25             MR. PITLUCK:  Your Honor, we offer Government

7434

DELZOTTO - DIRECT - PITLUCK

1    Exhibit 103-31 in evidence.

2            MR. BRODSKY:  Your Honor, my only objection is to

3    the hearsay by Mr. McCullough.

4            MR. PITLUCK:  Your Honor, it's not being offered for

5    the truth, Your Honor.

6            THE COURT:  All right.  We will admit it subject to

7    that instruction to the jury that, again, this is background

8    not offered for the truth.  This is regarding Mr. McCullough's

9    email only and I think it helps give an explanation as to

10   context in fact on the listener or recipient and I will

11   therefore admit Government Exhibit 103-31 in evidence.

12           (Government Exhibit 103-31, was received in

13   evidence.)

14           MR. PITLUCK:  Thank you, Judge.

15   Q    Special Agent Delzotto, so the bottom email here from

16   Martin Shkreli and Darren Blanton and JD McCullough dated

17   January 30th, 2013, what's the subject of that email?

18   A    Retrophin certificate being FedExed.

19   Q    What did Martin Shkreli write briefly on the next page?

20   A    Here is the certificate.

21   Q    Did Mr. McCullough respond to that email to

22   Martin Shkreli copying Darren Blanton?

23   A    Yes.

24   Q    What did he write?

25   A    Can you have this transferred into Darren's name as

DELZOTTO - DIRECT - PITLUCK

1    holder instead of MSMB, thanks.

2    Q    What did Mr. Shkreli write in response?

3    A    Yes.  The way that works is through stock power, I will

4    have that form sent as well.  I don't really know how it works

5    but my lawyer will do it.  You will have the rights to the

6    stock in 48 hours.  It is restricted stock, in parenthesis,

7    obviously.  We will register it soon.

8    Q    What was Mr. McCullough's response to that email?

9    A    Thanks, happy to work with your lawyer to do the stock

10   power and you can hold onto the current cert as you need to

11   turn it in along with the resolution.  So don't bother mailing

12   the physical cert to us with MSMB as owner as we would have to

13   send it right back to you to do the owner of a record

14   transfer.  Do you want me to get in touch with your lawyer?

15   Thanks.

16   Q    What was Mr. Shkreli's response to Mr. McCullough?

17   A    He responds to Mr. McCullough and copies Mr. Evan Greebel

18   and states Evan Greebel (212)940-6383.

19   Q    That's January 2013, correct?

20   A    Correct.

21   Q    I'd like to direct your attention to Government

22   Exhibit 606.

23        This is an email exchange involving defendant,

24   Martin Shkreli and on some of the emails Michael Rosensaft and

25   Darren Blanton.

DELZOTTO - DIRECT - PITLUCK

1    A    Yes.

2           MR. PITLUCK:  Your Honor, we offer Government

3    Exhibit 606.

4           MR. BRODSKY:  I think this might be in evidence as a

5    defense exhibit, is that true?

6           MR. PITLUCK:  Certainly not with the top email,

7    Judge.

8           THE COURT:  Do you have an objection to Government

9    Exhibit 606, Mr. Brodsky?

10          MR. BRODSKY:  No, Your Honor.

11          THE COURT:  We will admit Government Exhibit 606.

12          (Government Exhibit 606, was received in evidence.)

13   BY MR. PITLUCK:

14   Q    Let's start with the bottom email on the first page from

15   Martin Shkreli -- I'm sorry on the second page.

16   Martin Shkreli to Darren Blanton copying Michael Rosensaft and

17   the defendant.  What's the subject of that?

18   A    Transfer to Darren Blanton.

19   Q    What did Mr. Shkreli write there?

20   A    Hi Guys, Darren and I have agreed that I will give him a

21   hundred thousand shares of my stock.  Please effect this

22   transaction and send him documents ASAP.  Darren, as you know,

23   has been waiting extremely patiently to resolve this matter

24   and we are letting him down.  There will be further discussion

25   on resolution but this immediate transfer should begin this

DELZOTTO - DIRECT - PITLUCK

1  process.  Thanks, Martin.

2  Q    That's on August 10th, 2013?

3  A    Yes.

4  Q    And what was Mr. Blanton's response to Mr. Shkreli,

5  Mr. Rosenfeld -- sorry, Mr. Rosensaft and the defendant on

6  August 15th, 2013?

7  A    Is there anything we need to be doing?  Are we still

8  moving forward with this?  Thanks, Darren.

9  Q    What was Mr. Shkreli's response to the same individuals?

10  A    Yes.  My lawyers are lazy and stupid and paid too much.

11  I send them important emails and they don't respond.  Guys,

12  please use the same agreement we used with AG, Alan Geller.

13  Q    What did the defendant respond to that email?

14  A    AG, Alan Geller, had a forward option.  Is DB getting the

15  same thing, Darren Blanton.  Also, I assume we want a release

16  from him.

17  Q    What was Mr. -- was Mr. Rosensaft copied on that email?

18  A    The one I just read, no.

19  Q    What was Mr. Shkreli's response to that?

20  A    He responds and copies this time Mr. Rosensaft and says,

21  yes.  Also we want him to talk to SEC.

22  Q    And what was Mr. Greebel's response on August 15th, 2013?

23  A    Attached is a draft of the DB agreement.  Please confirm

24  that it is acceptable to be sent to him.

25  Q    And just going to the third page of this, is this the

DELZOTTO - DIRECT - PITLUCK

1  option agreement that's attached to the -- the draft option

2  agreement that's attached to this email?

3  A    Yes.  For Darren Blanton.

4  Q    And the first paragraph reads it's an option agreement,

5  made by and between Martin Shkreli, if you skip down, and

6  Darren Blanton, the optionee.

7          Can you read the first two whereas paragraphs,

8  please.

9  A    Sure.  Whereas, Shkreli is the record and beneficial

10 owner of 100,000 shares, in parentheses, the shares, in

11 quotes, of common stock par value .0001 per share, in

12 parentheses in quotes, common stock of Retrophin, Inc., a

13 Delaware corporation, the company, and whereas, Shkreli has

14 agreed to grant the optionee the option to purchase some or

15 all of the shares, all on the terms and conditions set forth

16 herein.

17 Q    And going to Section 1.2 at the bottom you see it says,

18 exercise of option exercise credits?

19 A    Yes.

20 Q    Can you read the sentence that says what the purchase

21 price is towards the bottom.

22 A    The purchase price for the shares, in quotes, the option

23 consideration shall be .01 cents per share.  The term business

24 day as used in the agreement shall mean a day, other than a

25 Saturday or Sunday on which commercial banks in New York are

DELZOTTO – DIRECT – PITLUCK

1    open for the general transaction of business.

2    Q    I'd like to show you what's been –– in evidence as

3    Government Exhibit 103-42.  It's in the smaller binder.  Is

4    this an email from the defendant to Darren Blanton,

5    Martin Shkreli, copying Michael Rosensaft, the top email?

6    A    Yes.

7    Q    What did the defendant write in the top email?

8    A    Top email Mr. Greebel wrote:  Hi, Darren, as requested,

9    attached is a draft of the escrow agreement.  I am

10   simultaneously sending it to our client and it is subject to

11   their review and comment.

12   Q    And the two emails below are what we just saw in

13   Government Exhibit 606?

14   A    Yes.

15   Q    That was August 15th, 2013 the same date as in Government

16   Exhibit 606?

17   A    Yes.

18   Q    I'd like to show you now what's been marked for

19   identification as Government Exhibit 626.

20        Is this an email from the defendant to

21   Martin Shkreli dated September 4th, 2013?

22   A    Yes.

23        MR. PITLUCK:  Your Honor, we offer Government

24   Exhibit 626.

25        MR. BRODSKY:  No objection, Your Honor.

DELZOTTO - DIRECT - PITLUCK

1    THE COURT:  We admit then Government's Exhibit 626.

2    (Government Exhibit 626, was received in evidence.)

3  Q    What's the date of this email?

4  A    September 4th, 2013.

5  Q    And the subject?

6  A    Draft Blanton consulting agreement.

7  Q    What did -- is there an attachment to this?

8  A    Yes.

9  Q    What did the defendant write in this email?

10 A    Attached is a draft of a consulting agreement based on

11 the Geller document.  It provides for him to receive in

12 50,000-dollar intervals -- I'm sorry, 50,000 intervals 300,000

13 shares over the next 12 months.  It also grants him a signing

14 bonus of 31,500 shares.  Similar to Geller it includes a

15 non-disparagement provision and a full release of Retrophin,

16 you and the MSMB entities.  Please advise if I should change

17 anything.  Similar to Geller and Banta this will need to be

18 approved by the board.

19 Q    And going to the actual agreement, which is on the second

20 page, is that consulting agreement and release?  What does it

21 say up at the top there?

22 A    It says, this agreement --

23 Q    I'm sorry, the top right corner.

24 A    Oh, I'm sorry.  It says, Katten draft September 4th,

25 2013.

7441

DELZOTTO - DIRECT - PITLUCK

1    Q    Can you read the description of services in this

2    agreement.

3    A    Sure.  Description of services:  Consultant will serve as

4    an advisor to the company and provide consulting services on

5    strategic and corporate governance matters to the management

6    of the company.  Consultant shall be permitted to undertake

7    other employment or activities provided that such employment

8    and activities are not in violation of the terms of this

9    agreement or compete with the business or activities of the

10   company.

11   Q    You see it on there in compensation in paragraph B there

12   is -- is that a reference to bonus shares?

13   A    Yes.

14   Q    Is that -- withdrawn.  I'd like to show you what's been

15   marked -- what's in evidence as Government Exhibit 103-44.

16          Is this a September 12th email from the defendant to

17   Darren Blanton copying Martin Shkreli?

18   A    Yes.

19   Q    And what did the defendant write in the top paragraph?

20   A    The defendant wrote:  Hi, Darren, as per your

21   conversation with Martin, attached is a draft consulting

22   agreement.  The agreement has a three year term, during which

23   you will receive 300,000 shares of Retrophin common stock each

24   year and $300,000 each year as compensation for your

25   consulting services.  The agreement also contains standard

7442

DELZOTTO - DIRECT - PITLUCK

1    boilerplate provisions which are in all of Retrophin's

2    consultant agreements.  I am simultaneously sending this to

3    our client and is it is subject to their review and comment.

4         As discussed in our prior email, you already have

5    the option agreement so I did not send you another version.

6    Q    So going to the actual document which is at the second

7    page, consulting agreement and release, you see where it says

8    Katten draft 9/12/13 at the top?

9    A    Yes.

10   Q    And going down to the compensation paragraph B, is that

11   still the bonus shares provision?

12   A    I'm sorry, 2B?

13   Q    Yes, 2B.

14   A    I don't see anything about bonus.

15   Q    What does 2B read now?

16   A    It states:  In addition to the shares to be paid to

17   consultant pursuant to Section 2a, consultant shall receive a

18   fee at a rate of $300,000 per year, which shall be paid in

19   accordance with the customary payroll practices of the

20   company.

21   Q    I'd like to show you now what's been marked as Government

22   Exhibit 643 for identification.  It's a series of emails

23   between the defendant and Martin Shkreli dated October 16th,

24   2013.

25   A    Yes.

DELZOTTO – DIRECT – PITLUCK

1      MR. PITLUCK:  Your Honor, we offer Government

2  Exhibit 643 in evidence.

3      MR. BRODSKY:  No objection.

4      THE COURT:  We receive government 643 in evidence.

5      (Government Exhibit 643, was received in evidence.)

6  Q    Let's start with the very bottom email on the second

7  page.  What did -- it's at 4:29 p.m.  What did the defendant

8  write in that email?

9  A    One of Blanton's guys just called me and said that they

10  do not want an option from you.  Rather, he wants 100,000

11  shares of stock.  While he would prefer registered stock, he

12  will accept unregistered stock.  He also does not want to

13  enter into a consulting agreement.

14  Q    What did Mr. Shkreli respond to that email from the

15  defendant?

16  A    Fine with me.  We can't give him registered stock

17  obviously.

18  Q    And what was the defendant's response to that email?

19  A    Where will the hundred thousand come from?  If it's from

20  the company it would need to be in a consulting agreement.

21  Q    What did Mr. Shkreli respond to that email on the first

22  page?

23  A    Why would it need to be in a consulting agreement?  Have

24  you heard of the term settlement?  More business to other

25  firms.

DELZOTTO – DIRECT – PITLUCK

1   Q    What was the defendant's response to that email from

2   Mr. Shkreli?

3   A    Mr. Greebel states:  We can call it a settlement

4   agreement but given Marcum's recent behavior they may require

5   it to be disclosed in the financials.  I was trying to prevent

6   that issue.

7   Q    That was at 4:39 p.m.?

8   A    Correct.

9   Q    What did Mr. Shkreli respond to Mr. Greebel's email?

10  A    Maybe we won't have Marcum.  Doesn't matter even if it is

11  disclosed.  It is preferable that it is not but the way you

12  idiotically characterized it as it has to be, in quotes, is

13  erroneous.

14  Q    What was defendant's response to that email at the top?

15  A    Okay, if you are comfortable disclosing it we can do it

16  as a settlement agreement.  I'll prepare the document.  Do you

17  want me to ask for a release?

18  Q    I'd like to show you now what's been marked -- what's in

19  evidence as Government Exhibit -- I'm sorry, withdrawn.

20       That Government Exhibit 643, the last email was

21  October 16th, 2013?

22  A    Yes, it was.

23  Q    I'd now like to show you what's been marked as Government

24  Exhibit 103-46 in evidence.

25       Is this an October 24th, 2013 email from defendant

DELZOTTO – DIRECT – PITLUCK

1   to Darren Blanton copying Martin Shkreli?

2   A    Yes.

3   Q    What's the subject of the email?

4   A    Subject line reads:  Draft settlement agreement.

5   Q    Is there a Blanton settlement agreement attached here?

6   A    Yes.

7   Q    What did the defendant write in this email?

8   A    Hi, Darren, as per my conversation with your colleague,

9   attached is a draft settlement agreement.  I am simultaneously

10  sending it to our client and it is subject to their review and

11  comment.

12  Q    And the settlement agreement is actually attached to

13  that --

14  A    It is.

15  Q    -- document?

16       I'd like to show you what's been marked for

17  identification as Government Exhibit 653.  Is that an email

18  exchange between Martin Shkreli, the defendant, and Michael

19  Rosensaft?

20  A    Yes.

21       MR. PITLUCK:  Your Honor, we offer Government

22  Exhibit 653.

23       MR. BRODSKY:  No objection, Your Honor.

24       THE COURT:  We receive Government's Exhibit 653 in

25  evidence.

DELZOTTO - DIRECT - PITLUCK

1          (Government Exhibit 653, was received in evidence.).

2    Q    Let's start with the bottom email.  What's the date of

3    that email?

4    A    The date is December 26th, 2013.

5    Q    And who is it from and who is it to?

6    A    It's from Martin Shkreli to Michael Rosensaft.

7    Q    What did Mr. Shkreli write -- sorry, what's the subject?

8    A    Subject:  Hey.

9    Q    What did Mr. Shkreli write?

10   A    Let's catch up on phone today if you can.

11   Q    What was Mr. Rosensaft's response to that email?

12   A    I'm in my office whenever is good for you.

13   Q    And going up, what did Mr. Shkreli write in response to

14   Mr. Rosensaft's email?

15   A    Mr. Shkreli writes:  I basically want to discuss having

16   the main complainer, Darren Blanton, recant his complaint.  I

17   have to give him some stock ASAP.

18   Q    What was Mr. Rosensaft's response to that email?

19   A    I'll give you a call Monday.  We need to talk about MSMB

20   Healthcare as well.

21   Q    Is the defendant copied on that email?

22   A    He is.

23   Q    Finally, what's Mr. Shkreli's response?

24   A    You can call me now if you'd like (646)217-2783.

25   Q    If you could turn to Government Exhibit 660 for

DELZOTTO - DIRECT - PITLUCK

1   identification.  That's an email, a series of emails between

2   the defendant and Martin Shkreli on January 15th, 2014?

3   A    What was the date you just said?

4   Q    January 15th, 2014?

5   A    Yes.

6            MR. PITLUCK:  Your Honor, we offer Government

7   Exhibit 660 --

8            MR. BRODSKY:  No objection, Your Honor.

9            MR. PITLUCK:  -- in evidence.

10           THE COURT:  We receive defense -- I'm sorry,

11  Government Exhibit 660.

12           (Government Exhibit 660, was received in evidence.)

13  Q    Starting with the bottom email, January 15th, 2014 at

14  1:22 p.m., what did Mr. Greebel write to -- write in that

15  email?

16  A    I spoke with JD McCullough today.  He said Blanton would

17  accept 100,000 shares of restricted Retrophin stock and 100

18  shares of freely tradeable Retrophin stock.  Retrophin could

19  issue the restricted stock to him under a consulting

20  agreement.  As you may recall, we discussed that Marek could

21  transfer, Marek Biestek, could transfer 100,000 shares of

22  stock to Blanton and we could have the board approve

23  100,000-dollar grant of new Retrophin stock to Marek.  Do you

24  want to discuss the concept with Marek?

25  Q    What was Mr. Shkreli's response to the defendant?

DELZOTTO – DIRECT – PITLUCK

1   A    Those guys should just take restricted stock.  It doesn't

2   make a difference.  Making Marek jump through hoops is silly.

3   Q    What was the defendant's response to that email?

4   A    Okay, I will discuss with him.  Would you be willing to

5   increase the number of shares of restricted stock?

6   Q    What was Mr. Shkreli's response to that email?

7   A    No, we have a deal.  Smarter thing to do is give him

8   200,000 restricted stock and have him swap any and all he

9   wants for free trading from our employees.

10  Q    What was the defendant's response to that email?

11  A    Okay, I will propose that concept to him.

12  Q    That was January 15th, 2014, correct?

13  A    Correct.

14  Q    I'd like to show you what's been marked for

15  identification, small binder, as Government Exhibit 103-50.

16          Is this an email from the defendant to JD

17  McCullough?

18  A    It is.

19          MR. PITLUCK:  Your Honor, we offer Government

20  Exhibit 103-50.

21          MR. BRODSKY:  No objection, Your Honor.

22          THE COURT:  We receive in evidence Government

23  Exhibit 103-50.

24          (Government Exhibit 103-50, was received in

25  evidence.)

DELZOTTO - DIRECT - PITLUCK

1 Q    What's the subject of this email?

2 A    Subject reads:  Call.

3 Q    And what's the date and time of this email?

4 A    February 17th, 2014 at 12:57 p.m.

5 Q    What did the defendant write in this email?

6 A    Hi, JD, are you available to speak at 3:30, in

7 parenthesis, New York time today.  Thanks, Evan.

8 Q    So that was February 17th, 2014 at 12:47 p.m.?

9 A    Yes.

10 Q    If you could flip to that bigger binder, Government

11 Exhibit 663 for identification.  This is a series of emails

12 between, at the top, the defendant Martin Shkreli and earlier

13 on in the chain also emails that include Darren Blanton?

14 A    Yes.

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

DELZOTTO – DIRECT – PITLUCK

1          MR. PITLUCK:  Your Honor, we offer Government's

2     Exhibit 663.

3          MR. BRODSKY:  No objection.

4          THE COURT:  We receive Government's Exhibit 663 in

5     evidence.

6          (Government Exhibit 663, was received in evidence.)

7     BY MR. PITLUCK:

8     Q    Let's go to the first e-mail in the chain on the second

9     page, February 17, 2014 at 5:12 p.m., correct?

10    A    Yes.

11    Q    Same day that we just saw in Government's Exhibit 103-50?

12    A    Same date, yes.

13    Q    What did the defendant write in this e-mail?

14    A    Hi, Darren.  Following up on our conversation Retrophin

15    could give you restricted stock, which you could sell under

16    Rule 144 six months after you received it.  As we discussed,

17    Retrophin does not have any freely tradeable stock that it

18    could give you.  And since Retrophin is a NASDAQ listed

19    publically reporting company, you would be able to sell any

20    restricted stock after six months following receipt.  Please

21    advise if this structure is acceptable.  Best regards, Evan.

22    Q    What was Mr. Blanton's response?

23    A    Evan, I think this structure is acceptable.  Let's move

24    forward with it.  Send me the applicable documentation.

25    Thanks, Darren.

DELZOTTO – DIRECT – PITLUCK

1    Q    Is Mr. Shkreli copied on this e-mail?

2    A    Yes, he is.

3    Q    What does Mr. Greebel do with that e-mail from

4    Mr. Blanton?

5    A    Forwards it to Mr. Shkreli.

6    Q    6:41 p.m.?

7    A    Yes.

8    Q    What did he write?

9    A    Can I do this via a consulting agreement.

10   Q    Going to the first page, what was Mr. Shkreli's response?

11   A    Sure.

12   Q    What did Mr. Greebel respond to that?

13   A    200,000 shares, question mark.

14   Q    And what did Martin Shkreli respond to the defendant at

15   7:05 p.m.?

16   A    That was the deal I thought you guys made.

17   Q    Finally, what was defendant's response to Mr. Shkreli?

18   A    Wanted to make sure you did not have a different

19   conversation, the proposed deal was payable up front.

20   Q    Can you flip to Government's Exhibit 103-52, which is in

21   evidence, an e-mail from the defendant to Darren Blanton and

22   Martin Shkreli on February 17, 2014?

23   A    Yes.

24   Q    7:26 p.m.?

25   A    Yes.

DELZOTTO – DIRECT – PITLUCK

1    Q    About 20 minutes after the last e-mail we saw on

2    Government's Exhibit 663?

3    A    Yes.

4    Q    What is the subject line here?

5    A    Subject reads draft consulting agreement.

6    Q    What is the attachment?

7    A    Attachment is entitled Blanton consulting agreement.

8    Q    What did the defendant write here?

9    A    Hi, Darren.  As per our conversation attached is a draft

10   consulting agreement.  I am simultaneously sending to our

11   client and subject to their review and comment.

12   Q    So if you could flip to the front of this binder,

13   Government's Exhibit 61, which is in evidence, last page, was

14   this a consulting agreement that relates between Retrophin

15   Incorporated and Darren Blanton, signed on the last page?

16   A    Yes.

17   Q    Going back to the first page of this, what is date is

18   this agreement made as of?

19   A    The consulting agreement is dated March 6, 2014.

20   Q    I'd like to direct your attention to the bigger binder

21   Government's Exhibit 664, series of e-mails between the

22   defendant and Martin Shkreli on Monday March 17, 2014?

23   A    Yes.

24        MR. PITLUCK:  Your Honor we offer Government's

25   Exhibit 664.

                        DELZOTTO – DIRECT – PITLUCK

1           MR. BRODSKY:  No objection.

2           THE COURT:  We will admit Government's Exhibit 664

3    into evidence.

4           (Government Exhibit 644, was received in evidence.)

5    BY MR. PITLUCK:

6    Q    Start with the bottom e-mail from the defendant to Martin

7    Shkreli, dated March 17, 2014, correct?

8    A    Correct.

9    Q    About 11 days after the consulting agreement and release

10   was signed?

11   A    Yes, 11 days.

12   Q    What is the subject of the e-mail?

13   A    Blanton.

14   Q    What did the defendant write here?

15   A    Do you want to raise the consulting agreement during your

16   business update?  It would be good to get Board sign off on

17   it.

18   Q    What was Mr. Shkreli's response to that?

19   A    No, another time.  This Board meeting is going too long.

20   Q    What did the defendant write?

21   A    Okay, that was why I asked.  Should we delay Perlstein,

22   Maccabim and Pierotti also?  There is a Board meeting on

23   Thursday to go over.

24   Q    What was Mr. Shkreli's respond?

25   A    Yes.  Let's delay.  I don't want to pollute their

DELZOTTO – DIRECT – PITLUCK

1   thinking on this very big subject.

2   Q     What was defendant's response?

3   A     I agree.

4   Q     Switching subjects.  I'd like to direct your attention to

5   Government's Exhibit 647, a series of e-mails between

6   defendant and Martin Shkreli, between December 8 and

7   December 9, 2013, with the subject escrow shares?

8   A     Yes, it is.

9           MR. PITLUCK:  Your Honor, we offer Government's

10   Exhibit 647.

11           MR. BRODSKY:  No objection.

12           THE COURT:  We admit Government's Exhibit 647.

13           (Government Exhibit 647, was received in evidence.)

14   BY MR. PITLUCK:

15   Q     Starting at the bottom on the second page, the first

16   e-mail in this chain from Martin Shkreli to the defendant

17   dated December 8, 2013?

18   A     Yes.

19   Q     What is the subject?

20   A     Escrow shares.

21   Q     What did Mr. Shkreli write?

22   A     Any idea how many left?  Rosenwald got 80,000, Kessler

23   got 20,000, right?

24   Q     Starting on the first page and continuing back to the

25   second, what did the defendant respond to Mr. Shkreli?

DELZOTTO - DIRECT - PITLUCK

1    A      Kocher got 47,128 (from Andy), you got 2,872 (from Andy)

2    Rosenwald got 80,000, (50,000 came from Ed and 30,000 came

3    from Marek), Koestler got 20,000 (which came from Marek,

4    Mulleady took his 50,000), Pierotti is theoretically entitled

5    to 50,000.  We will not be able to assign it to you or prevent

6    him from getting it, without a court order or him agreeing in

7    a settlement agreement.  I do not believe that Fernandez got

8    his 100,000 or Claridge Capital.  Ron, got his 50,000.

9    However, I cannot confirm that from home as I cannot access

10   all of my files at office.  At one point we discussed Koestler

11   getting some of remaining shares.  Do you want to do that?  In

12   terms of Fernandez and Claridge's stock, I can prepare the

13   amendment to have the stock transferred to you.

14   Q      What was Mr. Shkreli's response to that e-mail from the

15   defendant?

16   A      Okay.  I will take the 150,000 left.  But I, Pierotti is

17   obviously not theoretically entitled to it.  I expect to be

18   able to get those shares as well.  What can you do?  Claim he

19   violated agreement, et cetera, shares go back to me.

20   Q      What was the defendant's response to that e-mail?

21   A      Okay.  On the 150, I'll draft the paperwork for Tom and

22   Claridge to assign delivery to you.  As for Pierotti 50,000

23   I'll discuss it with Cotton tomorrow and figure out how to get

24   it to you.

25   Q      What did Martin Shkreli respond to the defendant at

DELZOTTO – DIRECT – PITLUCK

1    9:17 p.m.?

2    A    Yeah, I'm not sure why I need Tom or Claridge to assign.

3    The escrow agreement was violated, rights revert back to me.

4    Q    Finally, what was the defendant's response?

5    A    Fearnow referred to the shares as being held in escrow as

6    colloquialism.  Tom and Claridge's shares are not actually in

7    escrow.  Rather, since they have a contractual right to

8    receive Troy Fearnow and vote or transfer them.  So they are

9    essentially suspended pending the direction to deliver.  I

10   will talk to John tomorrow about getting them sent to you.

11   Q    That was December 9, 2013, right?

12   A    Correct.

13   Q    I'd like to show you what is marked for identification as

14   Government's Exhibit 650.  These are a series of e-mails

15   between defendant and Martin Shkreli between December 10 and

16   December 17, 2013?

17   A    Yes.

18          MR. PITLUCK:  Your Honor, we offer Government's

19   Exhibit 650 into evidence.

20          MR. BRODSKY:  No objection.

21          THE COURT:  We receive Government's Exhibit 650.

22          (Government Exhibit 650, was received in evidence.)

23   BY MR. PITLUCK:

24   Q    Let's start with the bottom e-mail, on the third page.

25   This is an e-mail from the defendant to Martin Shkreli dated

DELZOTTO - DIRECT - PITLUCK

1    December 10, 2013?

2    A    Yes.

3    Q    What is the subject line?

4    A    Fearnow stock.

5    Q    What did the defendant write here?

6    A    I prepared the amendments to have Tom F. and Ron assign

7    the stock to you.  As you may recall, Tom is entitled to

8    receive 100,000 shares from Fearnow.  And when we previously

9    discussed, you said Tom may get 50,000.  Also you previously

10   mentioned that Tom Koestler may get some of the shares from

11   Ron and Tom F.  Attached is a consulting agreement that you

12   asked me to prepare for Tom Koestler.  I was not instructed to

13   send it to him and do not know if you or Mark sent it.  Please

14   confirm that I should have Tom F. and Ron sign the amendments

15   to have all the stock assigned to you, or whether you want Tom

16   F. to get 50,000 shares and/or Tom Kessler to get some stock.

17   Q    What was Martin Shkreli's response to the defendant at

18   4:45 p.m. on the tenth of December?

19   A    Why does this have a Koestler consulting agreement?  What

20   does this have to do with that?  Just leave it alone.

21   Regarding Tom and Ron, they will not exactly assign the stock

22   to me.  Before I get into that, can you give me the original

23   break down of who put how much into escrow.  Tim, 50,000; Tom

24   100,000; Ron 50,000; Marek 50,000; Kevin 50,000.  Who else?

25   400,000 total, right?

DELZOTTO - DIRECT - PITLUCK

1  Q    What was the defendant's response to that e-mail at

2  4:49 p.m.?

3  A    Yes.  400.  Tom 100,000; Ron 50,000; Marek 50,000; Ed

4  50,000; Andy 50,000; Kevin 50,000; Tim 50,000.

5  Q    Going back to the second page, what did Mr. Shkreli write

6  in response to that e-mail from the defendant?

7  A    Next step on this, can you outline all the settlements

8  that have been paid out of this pool?

9  Q    What was defendant's response to that?

10  A    Richard Kocher received 37,128 shares (from Andy's

11  portion).  You got 2,872 shares (from Andy's portion).

12  Lindsay Rosenwald got 80,000 shares, (50,000 shares came from

13  Ed's portion and 30,000 shares came from Marek's portion).

14  Tom Koestler got 20,000 shares (which came from Marek's

15  portion, Mulleady took his 50,000 shares).  As a result Andy,

16  Ed, Marek, and Kevin are not entitled to anymore stock.

17  Q    Going to the first page, what did Mr. Shkreli write in

18  response?

19  A    Okay.  Did I file Form four on the 2,872 shares from

20  Andy?  If not, please prepare.

21       What I'd like to do with the rest is the following.

22  There are 150,000 assignable shares left.  The rest, 50,000 to

23  Tim we don't really control, looked like we've given away

24  150,000, 200,000 if you count Kevin.  So I'd like to split

25  those 150,000 shares this way.  Tom 75,000; Marek 37,500; Ron

DELZOTTO - DIRECT - PITLUCK

1    37,500.  This would be a bit more equitable whoever has shares

2    in their name, I suppose that would be Tom and Ron, would

3    equally given to Marek to true him up to 37,500.  Then, and

4    this is a complicated step, I would buy all 150,000 shares in

5    three separate purchase agreements.  This would be on a

6    forward concept.  I take possession today, pay them at a close

7    or at a later date, as per the purchase agreement details, the

8    only detail is I have three years to pay them.  If I don't pay

9    them after three years, I have to either return the shares or

10   give them cash or they have remedy.  The sooner you could do

11   this the better.  Ideally would like to file an updated Form

12   four on this acquisition of 150,000 shares this week, if

13   possible.  Next week would be okay too.  What is going on with

14   Jackson and George?  I want that stock too.  Make sure they

15   can't take it out of the transfer agent.

16   Q    First page, what did the defendant respond to that e-mail

17   from Mr. Shkreli at 9:34 p.m.?

18   A    I could set up the agreements to be executed this week

19   but I do not know how quickly Troy will get the stock up here.

20   Does Tom, Marek, and Ron know about the concept of your

21   "forward" or should I walk them through it?  Also, what

22   purchase price do you want to use?

23   Q    What was Mr. Shkreli's response?

24   A    They know.  Purchase price of the last closing price of

25   the date we do the deal.

DELZOTTO - DIRECT - PITLUCK

1    Q    What is the defendant's response?

2    A    Okay.  Will prep tomorrow.

3         MR. PITLUCK:  Your Honor, can I approach?

4         THE COURT:  Yes.

5         MR. PITLUCK:  Handing the defense and the witness

6    copies of Government's Exhibits 969, and 970 for

7    identification, I have a copy for your Honor as well.

8         THE COURT:  I have it, 969, and 970.

9    BY MR. PITLUCK:

10   Q    Special Agent Delzotto, is 969 a form 10Q for Retrophin

11   Incorporated for the quarterly period ending June 30, 2013?

12   A    Yes.

13   Q    Is 970 a form 10Q-A, or amended form 10Q for Retrophin

14   ending for quarter period March 31, 2013?

15   A    Yes.

16        MR. PITLUCK:  Your Honor, we offer Government's

17   Exhibit 969 and --

18        MR. BRODSKY:  Are you sure you didn't put this in

19   already?  No objection, but I think it might be a defense

20   exhibit, but no objection.  I believe I questioned the witness

21   about this document.

22        THE COURT:  Unless you have a number for me, to keep

23   this moving we'll admit 969 and 970, even if they are

24   duplicates of defense exhibits, we can let the record reflect

25   that.

DELZOTTO – DIRECT – PITLUCK

1          (Government Exhibit 969, 970, were received in

2     evidence.)

3          MR. PITLUCK:  Thank you, Judge.

4     BY MR. PITLUCK:

5     Q    Moving on to back to your big binder, take a look at

6     Government's Exhibit 448 for identification?

7     A    Yes.

8     Q    This is an e-mail from Martin Shkreli at MSMBCapital.com

9     to Eric M. Schmidt dated October 1st, 2012?

10    A    Yes.

11         MR. PITLUCK:  Your Honor, we offer document

12    Government Exhibit 448.

13         MR. BRODSKY:  Objection to this.  This is a document

14    that doesn't have Mr. Greebel on it, never received, or known

15    by Mr. Greebel at the time.

16         MR. PITLUCK:  Your Honor --

17         THE COURT:  We'll do a sidebar.  No more speaking

18    objections, please.

19         (Continued on the next page.)

20         (Sidebar conference.)

21

22

23

24

25

SIDEBAR CONFERENCE.

1          MR. BRODSKY:  Your Honor, in October 1, 2012, Eric

2     Schmidt of the SEC, who is not a witness being called by the

3     Government, sent an e-mail to Martin Shkreli asking for

4     request for information, a voluntary request for information.

5     As your Honor probably knows from Mr. Shkreli's trial,

6     Mr. Shkreli responded by himself in or about of early

7     November 2012.  Mr. Greebel is not aware of this request nor

8     the response.  This is complete hearsay and inadmissible in

9     evidence.

10          MS. SMITH:  Your Honor, we briefed this in the

11     pretrial motions.  Mr. Pitluck is going to get the next

12     exhibit, which is Mr. Shkreli's response on November 4, 2012.

13     So this document is just being offered as background context

14     for what Mr. Shkreli was responding to.  The response from

15     Mr. Shkreli is Government's Exhibit 451.  And it is in fact a

16     response where he then includes the schedule of assets, says

17     that MSMB Capital has 2.6 million assets under management.

18     It's part of the Indictment.  This conduct is in furtherance

19     of the conspiracy that's charged in the Indictment.

20          Obviously, Mr. Brodsky can make whatever argument he

21     would like to make about what Mr. Greebel did or did not know.

22     There is no evidence in the record one way or the other right

23     now.

24          This document is necessary to provide the context

25     for the response.  If you want to say it's not offer for the

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE.

1    truth, it's being offered for context to response, which is in

2    furtherance of the --

3              THE COURT:  Mr. Shkreli, there is no indication that

4    Mr. Shkreli informed or copied Mr. Greebel of any of this and

5    that he has no knowledge of it.  Do you have proof that he had

6    knowledge?

7              MS. SMITH:  He had knowledge in 2013 of this

8    response in connection with the SEC investigation.  There are

9    also references of Jackson Su references in response to the

10   SEC in one the e-mails that was sent to Mr. Greebel.  Whether

11   or not Mr. Greebel is going to a stand that he knew or didn't

12   know, as we know with conspiracies acts taken in furtherance

13   don't need to be known by all conspirators all the time.  This

14   is an act inform furtherance.  This is the context.  The

15   defense is able to make any argument that they want about what

16   Mr. Greebel knew or didn't know.  We believe the evidence will

17   show that he did in fact learn of this at a later time.  It's

18   actually a key aspect of the SEC investigation.  It's

19   necessary to explain Mr. Shkreli's actions.  Mr. Greebel is

20   involved in defending Mr. Shkreli in connection with the SEC

21   inquiry.

22             THE COURT:  How so?

23             MS. SMITH:  So Mr. Rosensaft was the lead partner,

24   Mr. Greebel is the person who brings him in to take on, he

25   sits in on prep sessions and meetings, he's copied in e-mails,

SIDEBAR CONFERENCE.

1    involved in document collection, both for the MSMB entities

2    and for Retrophin.  There are a number of subpoenas that they

3    respond to.

4            THE COURT:  For the SEC.

5            MS. SMITH:  For the SEC.  The billing records that

6    are already in evidence show that Mr. Greebel was involved in

7    the collection of documents from MSMB as well as from

8    Retrophin, e-mails that show that.

9            They have on their witness list Mr. Rosensaft, who

10   they are calling later this week, who has said in statements

11   to the Government, that had been provided to the defense, that

12   Mr. Greebel was aware of all of the back and forth that was

13   going on with the SEC investigation and certainly understood

14   at some point the contents of this e-mail.

15           Obviously, timing-wise defense is able to make any

16   arguments they want to make about whether he's copied on it,

17   whether he knew about it.  But the SEC investigation is at

18   issue in this case.  The defense is squarely at issue in a

19   number of requests, asking questions about when people learned

20   about it, the bills are in evidence, the SEC indemnification

21   bill.

22           So we have a right to show what Mr. Shkreli was

23   telling SEC in furtherance of the conspiracy.  And like I

24   said, the actual subpoena that he received is what he is

25   responding to here.

SIDEBAR CONFERENCE.

1          MR. BRODSKY:  Your Honor, there are were a lot of

2    things said there.  First, this is the Government's last

3    witness and they don't have a single shred of evidence that

4    Mr. Greebel ever learned about this.  The Government's

5    assumption that we may have a case in chief is just not

6    applicable.  They can call Mr. Rosensaft as a witness.  They

7    met with him twice.  He's extra ordinarily helpful to the

8    defense, that's true.  He has great statements to say about

9    Mr. Greebel, but the Government is not calling him as a

10   witness.  We must make the determination based on what the

11   evidence is in the Government's case in chief.  There is zero

12   evidence the Government can point to in their case in chief

13   that Mr. Greebel was aware of this at the time or ever became

14   aware of it at the time.

15          If we put on a case in chief and Mr. Rosensaft is

16   called as a witness, that's very different.  But right now,

17   based on the record there is zero evidence Mr. Greebel knew at

18   the time, and the Government knows that he never knew it at

19   the time.  There is zero evidence, zero on the record, they

20   can't point to you anything, that Mr. Greebel became aware of

21   these specific communications with the SEC.  To the extent.

22          Ms. Smith is saying we've raised an issue with the

23   SEC investigation, we moved to preclude it, as a your Honor

24   will remember.  We lost the motion with regard to moving to

25   preclude any evidence relating to the SEC investigation,

SIDEBAR CONFERENCE.

1    except for the part relating to Manchester and insider

2    trading, which was not with the United States Attorney's

3    Office.

4              In response to losing that motion, of course we

5    questioned witnesses about the SEC investigation and what

6    Mr. Richardson knew about it and when the Government had made

7    it an issue.  So these documents should not be becoming into

8    evidence at all.

9              MS. SMITH:  Your Honor, the next e-mail we will put

10   in after these two is an e-mail from Jackson Su in March 2013

11   that explicitly describes this communication and the contents

12   of it.  It's already in.

13             MR. PITLUCK:  He testified about.

14             MS. SMITH:  It's the next document we were going to

15   show the witness.  It says an e-mail with Eric Schmidt.  It

16   says he made representations about the MSMB Capital fund.  So

17   certainly there is already evidence in the record that

18   Mr. Greebel was made aware of these communications.

19             MR. BRODSKY:  Your Honor, that is a very -- you may

20   remember, Mr. Jackson Su's claims, there are were a lot of

21   claims he made there.  Very oblique, very ambiguous what he's

22   referring to there.  He certainly doesn't say on October 1st,

23   2012, Mr. Shkreli sent an e-mail to Eric Schmidt.  Even if he

24   did, your Honor, it doesn't allow to you back door into

25   hearsay.  Mr. Su's stolen information or whatever he stole or

SIDEBAR CONFERENCE.

1    he took is not allowed to be used as a back door to get

2    documents that are hearsay.  There is no evidence that Mr.

3    Greebel is aware of this communication or the communication

4    back from the Mr. Shkreli.

5              MS. SMITH:  Mr. Shkreli response is not hearsay, in

6    furtherance of the conspiracy.  It's pled that way.  We argued

7    that there is more than ample evidence of it.  The fact that

8    the one co-conspirator doesn't know all of the actions of

9    another does not make it not a statement in furtherance of the

10   conspiracy, so that's Government's Exhibit 451.  And 448 would

11   be the context for that.

12             Mr. Pitluck is getting the next Jackson Su e-mail

13   that refers to the exact date of the e-mail in Mr. Su's e-mail

14   that's already in evidence.  It says that communication from

15   Mr. Shkreli to Mr. Schmidt on November 4, 2012 and I

16   believe --

17             THE COURT:  This is Government's Exhibit?

18             MS. SMITH:  111-45.

19             THE COURT:  Already in evidence?

20             MS. SMITH:  Yes.

21             It says, Martin claims assets verbally and e-mailed

22   documents to other individuals as well, when in fact Martin

23   did not manage that amount at the time, nor at any time in the

24   past, according to the correspondence with Eric M. Schmidt,

25   Securities & Exchange Commission on November 4, 2012.

SIDEBAR CONFERENCE.

1          THE COURT:  On November 4, that's a different --

2          MS. SMITH:  That's the actual date of Exhibit 451,

3     which is Mr. Shkreli's e-mail.  This e-mail is obviously

4     admissible.

5          THE COURT:  Let's leave 448 out.  And 451 gives

6     background to the Government's Exhibit, already in evidence,

7     which is 111-45, Mr. Su specifically e-mailing Mr. Greebel

8     about that information.

9          MS. SMITH:  451 is a statement in furtherance of

10    448.  It's a response.  But we're happy to say that 448 is not

11    being offered for the truth.

12         THE COURT:  This is basically like a request for

13    documents?

14         MS. SMITH:  Yes.

15         MR. PITLUCK:  Your Honor, how do we explain 451

16    without actually offering the subpoena that is in response.

17         THE COURT:  Is Mr. Su e-mailing Mr. Greebel with

18    copies of any of these documents?

19         MS. SMITH:  Not this particular e-mail, no.

20         MR. BRODSKY:  Not any e-mail.

21         MS. SMITH:  Well, he does e-mail, for example, a

22    copy of the Merrill Lynch settlement.  There is a whole of

23    documents that he does.  This one is not in there.

24         THE COURT:  451.

25         MS. SMITH:  But 451 is a statement in furtherance.

SIDEBAR CONFERENCE.

1    The question is, does 448 come in to provide context?

2            MR. BRODSKY:  Neither of these documents are

3    attached.  The e-mail from Mr. Su was in the context of Mr. Su

4    having, as you remember, in December 2012 picked up and left,

5    completely.  Then sending e-mails basically to extort

6    Mr. Shkreli for money.  And in that context he's thrown around

7    all sorts of allegations.

8            What the Government would like suggest and argue to

9    the jury is that somehow Mr. Su's statement should have caused

10   Mr. Greebel to have some duty to investigate, which he does

11   not.  They are creating this perception that Mr. Greebel had

12   some obligation upon receiving this e-mail to dig out and find

13   these documents.  They are creating the perception to the

14   jury, it's very misleading, that because Mr. Su referenced

15   this e-mail that Mr. Greebel had possession of it.  There is

16   no way that you'll be able to get these documents in because

17   Mr. Su referenced it, because it creates a misimpression to

18   the jury, which they will argue in summation or create a

19   misimpression in summation that Mr. Greebel somehow became

20   aware of Mr. Shkreli's statements.  Mr. Su's statements stand

21   alone as what they said.  Had it touched Mr. Shkreli's

22   response, that is one thing.  Having spoken to Rosensaft as

23   well, they know Mr. Rosensaft does not remember seeing

24   Government's Exhibit 451.

25            MS. SMITH:  I will say that Government's Exhibit 451

SIDEBAR CONFERENCE.

1   was produced by Katten.  It came from the Katten system.  It

2   was provided to Katten.

3          MR. BRODSKY:  Mr. Rosensaft has proffered with the

4   Government and to us that he does not remember seeing these

5   voluntarily e-mails between Mr. Shkreli and the SEC.  Hearing

6   no objection from the Government, we know that to be true.

7   It's not in the 3500 material.

8          MS. SMITH:  Right, exactly.  We do object.

9          MR. BRODSKY:  We have no reason to believe that

10  Mr. Rosensaft, and I don't think the Government is saying

11  Mr. Rosensaft knew these documents or saw them.  If

12  Mr. Rosensaft who was in charge of the SEC investigation did

13  not see them, then there is very good reasonable inference to

14  be drawn that Mr. Greebel didn't.

15          What they are trying to do, your Honor, if the case

16  ends today with the case agent, and we do not put on a case,

17  creating a misimpression to the jury that Mr. Su points out

18  that e-mail, then in summation point to this document and say

19  it's a lie by Mr. Shkreli, that's very deceptive and very

20  misleading.

21          MS. SMITH:  Your Honor, again --

22          MR. PITLUCK:  That goes to weight not admissibility.

23  Mr. Brodsky is trying to preclude documents, based on what he

24  thinks should be argued.  There is a specific reference in

25  that e-mail to this document that the jury can infer.

SIDEBAR CONFERENCE.

1    Everybody can look at it.  Throw things up in the air all he

2    wants to, but the fact is there has nothing to do with

3    admissibility, it has to do with the weight.  This is charged

4    as an overt act in the conspiracy in the Indictment,

5    referenced in the notice March 2013.  If the jury doesn't

6    believe that Mr. Greebel should have noticed that based on

7    Jackson Su's e-mail based on whatever, they don't trust

8    Jackson, too oblique, that's an argument that can be made.

9    This is directly related to that.  He's on notice of it in

10   March.  And that is evidence regardless of what Mr. Rosensaft,

11   whether he testified.

12          MS. SMITH:  Exactly.  451 is a statement in

13   furtherance of an overt act.  There is no question that

14   Government's Exhibit 451 is admissible, the only question is

15   whether 448 provides context.  Because of --

16          THE COURT:  May I see 451?

17          MS. SMITH:  Sure, this is Government's Exhibit 451.

18          MR. BRODSKY:  One more thing, your Honor.

19          MS. SMITH:  Again, a statement from Mr. Shkreli in

20   furtherance of the conspiracy.

21          MR. BRODSKY:  Your Honor, nobody knows about it.

22   Nobody knows about this except for Mr. Shkreli.

23          MS. SMITH:  Make that argument.

24          MR. BRODSKY:  But your Honor, they are creating a

25   misimpression by putting in Mr. Su's document.

SIDEBAR CONFERENCE.

1          MS. SMITH:  Mr. Su's document is in evidence.

2          MR. BRODSKY:  They are creating a misimpression now

3   that it's in evidence that somehow Mr. Greebel should have

4   known about it.  That is a very dangerous, unduly prejudicial

5   under 403.

6          I don't believe even relevant to Mr. Greebel.  It

7   doesn't have a fact.  Mr. Greebel is not aware of it.  They

8   cannot proffer to your Honor his awareness of it other than

9   Mr. Su's reference to it.

10          But Mr. Rosensaft, who is actually part of the, in

11   charge of the defending MSMB and in connection with the

12   investigation, has no memory of these communications by

13   Mr. Shkreli.  And on his own in October and November 2012.

14          And prior to trial, your Honor, you may remember one

15   of the pretrial proceedings Mr. Payne stood up and said he had

16   no evidence, no knowledge, during the Bill of Particulars

17   argument, that Mr. Greebel had any awareness of the SEC

18   investigation.  You may also remember that the Deputy General

19   counsel, Michael Verde of Katten came in and said Mr. Greebel

20   had no awareness or knowledge of this SEC investigation.

21          MS. SMITH:  At the time, is what you're saying.  So

22   please modify it to be at the time.

23          MR. BRODSKY:  No knowledge of these particular

24   documents 451, and the other one --

25          MS. SMITH:  At the time they were sent.

SIDEBAR CONFERENCE.

1          MR. BRODSKY:  -- 458, for example.  Zero evidence in

2     the record, nor will there be, that Mr. Greebel ever became

3     aware of 451 for identification or 458.

4          If there was an e-mail to Mr. Greebel containing

5     these documents, they would have produced it.  There is no

6     evidence in the record he ever become aware of it.

7          MS. SMITH:  What we're hearing is Mr. Brodsky's

8     closing argument.  Not all co-conspirators have to be aware of

9     all acts in furtherance of the conspiracy.  This is clearly in

10    furtherance of the conspiracy.

11         THE COURT:  I think that to the extent that

12    Mr. Shkreli's own statement has given that he's charged

13    co-conspirator to the SEC is admissible.  I think 451 may come

14    in.

15         I think that 448, the SEC's request for information,

16    I'm trying to see how it squares with what is provided in 451.

17         MR. PITLUCK:  Documents response NY8799, which is

18    the e-mail on the references number on the front in 448.

19         THE COURT:  But he doesn't actually reference the

20    specific, he just provides a lot of information.

21         MS. SMITH:  These are the two.

22         MR. PITLUCK:  Documents respond NY8799, it's subject

23    in the e-mail production.

24         MS. SMITH:  This is the case number on that.

25    Obviously asking documents related to MSMB.

SIDEBAR CONFERENCE.

1      THE COURT:  It's not like he's correlating his

2  responses to particular document requests.

3      MS. SMITH:  No.

4      THE COURT:  Let's leave out 448, which is the SEC's

5  request.

6      MR. PITLUCK:  I'm fine to do that.  It's just a

7  matter of if I give this to the case agent and just say can

8  you please find response NY8799, it's out of context.

9      THE COURT:  You can have this to refresh his

10  recollection.  The SEC letter won't come in.

11     MR. PITLUCK:  Are you aware that SEC sent Martin

12  Shkreli a subpoena.

13     MR. BRODSKY:  That's hearsay.  He doesn't have any

14  personal knowledge of the document.

15     MR. PITLUCK:  We're trying to provide context of why

16  he's filing a response.

17     THE COURT:  You can show him 451 ask him if he

18  recognizes it as case agent.  If he doesn't remember what this

19  is responding to, you can show him 448 to refresh his

20  recollection.  Mr. Shkreli himself says it's in response to

21  the New York 8799.  You can ask the witness if he knows what

22  that is a reference to.  You can say --

23     MR. PITLUCK:  Can we say, this is a subject NY8799

24  production.  The problem is, if I don't lead him a little bit

25  he's going to say this is a request from the SEC.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE.

1          THE COURT:  I think he has to lead him so he can

2   confine him to.

3          MR. BRODSKY:  May we have a moment, your Honor?

4          THE COURT:  Yes.

5          MR. BRODSKY:  Your Honor, the other trouble with the

6   document is given that there is no evidence, that Mr. Greebel

7   is wasn't aware of it, given there is no evidence anyone was

8   aware of it, we're having trouble how it can be an overt act

9   in furtherance of a conspiracy, when the only one who knew

10  about it was Mr. Shkreli.  What conspiracy do they think it

11  was overt act in furtherance of in Count Seven?

12         Count Seven is charged in three theories.  One

13  theory is the MSMB Capital theory which relates to the 75,000

14  shares that they say Mr. Shkreli gifted to arranged to get to

15  MSMB Capital in anticipation of something, or that he wanted

16  assets in MSMB Capital.  This certainly isn't in furtherance

17  of that conspiracy.

18         The second theory they have on Count Seven is the

19  theory that there were settlement agreements.  This isn't in

20  furtherance of the Government's settlement agreement theory.

21         The third is consulting agreements, that's not in

22  furtherance.  While it may be in furtherance of counts One

23  through Six, that's not been admitted in evidence.

24  Mr. Greebel is not allegedly a co-conspirator in that.  So now

25  they are using a separate conspiracy, that has nothing to do

SIDEBAR CONFERENCE.

1   with Mr. Greebel, to get in these documents.  That is really

2   impermissible, your Honor.

3           MS. SMITH:  I'm not sure why these Rule 29 motions

4   are now or why this wasn't brought up in the pretrial motions,

5   which address these specific documents.  So I don't know if --

6   I believe the Court is pretty aware of the role that this

7   plays Count Seven, which is he told the SEC, in part, one of

8   the reasons why he needed to create the backdated interests

9   entries, he told the SEC that MSMB Capital had asset when it

10  did not.  He sends this e-mail on November 4.  The backdated

11  interests come into play November 29.  And December 3rd that

12  is backdated to June or July prior to the date of this of

13  subpoena to the SEC.

14          MR. BRODSKY:  Your Honor, that's --

15          MS. SMITH:  That is how it is alleged in the

16  Indictment.  It's very clearly laid out.  That is one of the

17  purposes of the backdated interest, which is a method and

18  means in Count Seven theory.  Again, I'm not sure why we're

19  relitigating this now.

20          THE COURT:  I do think that the case law provides

21  that not all members of the conspiracy have to be aware of

22  what everyone else is doing at any given time in furtherance.

23  People come and go within conspiracies and conspirators may

24  take actions that are in furtherance of, but not necessarily

25  known to or participated in by other co-conspirators.  So I

SIDEBAR CONFERENCE.

1  think that's what they are offering here on 448.

2        MR. BRODSKY:  What we're saying is 448 may be in

3  furtherance of the conspiracy One through Six, but nothing in

4  the conspiracy charged in Count Seven.

5        Count Seven has three facets.  The first facet

6  relates to putting 75,000 units into MSMB Capital.  And that

7  has nothing to do with lying to the SEC about how many assets

8  you have under management MSMB Capital.  That theory, relating

9  to Count Seven, has to do with the settlement agreements and

10  consulting agreements.  It doesn't have to do with saying how

11  many assets you have under management.  This is an overt act

12  in furtherance of the conspiracy to hide and deceive how many

13  assets are under management in MSMB Capital.  That's not an

14  act in furtherance of the conspiracy charged in Count Seven.

15        MS. SMITH:  We're going to get the charge.  It's

16  charged in furtherance.

17        THE COURT:  If I understand correctly, though, the

18  agreements were necessary to pull Retrophin in, because MSMB

19  did not have sufficient assets to cover or to pay for the

20  exposure that was generated as a result of the investors'

21  losses.  So Count Seven charges that, I mean, I guess my view

22  of Government's Exhibit 448 is that it's showing Mr. Shkreli

23  making untruthful statements to the SEC about the amount of

24  assets under management.  And in fact, as Count Seven shows,

25  the evidence in support of Count Seven shows because MSMB's

SIDEBAR CONFERENCE.

1    entities were insufficiently funded, they had no assets, they

2    pulled Retrophin in.  And some share transfers, allegedly,

3    were being done to cover, to create the impression that these

4    were assets, or at least an interest in Retrophin, which would

5    justify why Retrophin's assets were being used to fund

6    settlements.

7              MS. SMITH:  For the record, Mr. Brodsky, subsection

8    C of the Indictment, which is the section describing the

9    conduct in connection with Count Seven, the Retrophin

10   misappropriation scheme.  In connection with the discussions

11   fabricated MSMB Capital interest that Mr. Greebel was involved

12   in, in fact discusses this very response from the defendant

13   regarding --

14             MR. BRODSKY:  Not the defendant.

15             MS. SMITH:  Sorry, I'm reading the defendant -- from

16   Mr. Shkreli in connection with the SEC inquiry.  So it is in

17   fact pled.

18             THE COURT:  Paragraph 24?

19             MS. SMITH:  Paragraph 24, part of Count Seven.  I'm

20   not sure that Mr. Brodsky is talking about in furtherance of

21   Counts One to Six.

22             MR. BRODSKY:  Because, your Honor, as a matter of

23   fact, it's not an overt act in furtherance of the conspiracy

24   in seven.  You can put in the Indictment, you can put anything

25   you want in the Indictment.  But Mr. Shkreli's lie in

SIDEBAR CONFERENCE.

1    November 2012 to the SEC about his asset the under management,

2    where there is no proof Mr. Greebel knew about it, where there

3    is no proof anybody else knew about it, and no proof

4    Mr. Greebel subsequently became aware of it other than Mr.

5    Su's general reference to a response.  Even if it were

6    relevant under 401, it should be precluded under 401.

7              MR. PITLUCK:  It's not a specific --

8              THE COURT:  Why don't the jurors take their lunch

9    break right now, one hour.  Don't discuss the case.  Keep an

10   open mind.  Thank you.

11             (Jury exits the courtroom. Time 12:35 p.m.)

12             MS. SMITH:  Your Honor, I note for the record

13   because it's been a while, but in the defendant's motion of

14   August 19, 2017, it's one of many pretrial motions, but it was

15   a motion to preclude testimony, I believe it's docket 340.

16   The defense only moved to preclude the letter, which is

17   Government's Exhibit 448, and not Mr. Shkreli's statement in

18   furtherance, which is Government's Exhibit 451.  So I find it

19   incredibly curious that we're now hearing this entire argument

20   that it's only relevant to Counts One to Six now.  We

21   obviously didn't anticipate that, given that it wasn't raised.

22             THE COURT:  They are making an objection now.  The

23   question is how Mr. Shkreli's response to the SEC is outlined

24   in Government's Exhibit 451 is in furtherance of Count Seven,

25   the conspiracy in Count Seven.  I understand that a lot of

SIDEBAR CONFERENCE.

1    this is sort of an evolutionary process, right. So we have no

2    dispute that 451 is in furtherance of Counts One through Six.

3    But in terms of Count Seven, how does that further the

4    conspiracy to use Retrophin stock and assets via share

5    transfers and settlement and consulting agreements?

6            MS. SMITH: Sure.

7            THE COURT: Despite the fact I know that it's

8    charged.

9            MS. SMITH: Because it is charged I want to lay it

10   out the way it is charge, which is that, as you know MSMB

11   Capital is not on the cap table until the back dated interest

12   is created. MSMB Capital has no assets because Mr. Shkreli

13   has blown up the fund. It's clear that MSMB and Merrill Lynch

14   settlement Mr. Shkreli says that MSMB Capital has no assets.

15   So when Mr. Shkreli responds to the SEC on November 4, which

16   is again described in paragraph 24, he says that MSMB Capital

17   has 2.6 million in assets under management. So again, there

18   are were multiple reasons for the backdated MSMB Capital

19   interest. One is obviously to create shares to distribute to

20   people who are now asking for money back. The other one is to

21   basically provide justification for the answer that was given

22   to the SEC.

23           THE COURT: But you're saying the answer itself is

24   in furtherance of the conspiracy, this the false response.

25           MS. SMITH: The false response, and then the

SIDEBAR CONFERENCE.

1   backdated interest is created in order to justify.  You could

2   look at it either way, even if the backdated interest isn't

3   explained by the November 4 e-mail, then it is important

4   context to understand why you need to backdate the interest.

5   Because if you -- if there was no communication to the SEC

6   there may not have been a need to backdate it to June or July

7   prior to when the e-mail to the SEC was sent.  There are other

8   reasons why it may have been backdated, in part, they didn't

9   want it to look like it was effecting the current company,

10  some of the investing issues related to shares.  The other

11  reason is to provide explanation for why a prior e-mail to the

12  SEC had been sent.

13         So even if you don't take it as a statement in

14  furtherance of the Count Seven, it is certainly important

15  context to explain Count Seven because it explains the reason

16  why Mr. Shkreli is, in part, needs to backdate the interest to

17  prior to when he told the SEC that the fund actually had

18  something in the fund.

19         MR. BRODSKY:  Respectfully, your Honor, the

20  Government's statement has proved us correct, which is if

21  Mr. Shkreli, as proffered by the Government, was lying to the

22  SEC because he had backdated, right, he backdated because he

23  needed to lie to the SEC about the assets under management --

24  step back.  The SEC investigated his lies to investors about

25  how many assets he has under management in the MSMB entities.

SIDEBAR CONFERENCE.

1   They know from seeing the documents, talking to investors, he

2   lied to them.  What does he do?  He backdates for the purpose

3   of falsely getting assets into MSMB Capital, according to the

4   Government, then he lies to the SEC.  But that's all in

5   connection in furtherance of making sure the SEC doesn't

6   uncover he's lied to investors about the assets under

7   management at MSMB Capital.

8          It is not in furtherance of the charged conspiracy

9   that we're involved in, allegedly, in Count Seven, which is

10  the settlement agreements and the consulting agreements.

11  That's what we're overlooking here.  The charge in Count Seven

12  relates to the settlement agreements and the consulting

13  agreements, that's the conspiracy.  And they are trying to

14  loop in the conspiracies in One through Six into them.  They

15  can't do it.

16         MS. SMITH:  There is a lot of evidence that has come

17  in for conspiracies One to Six, because they are necessary

18  background to this trial --

19         MR. BRODSKY:  This isn't necessary background.

20         MS. SMITH:  -- excuse me.  Even if you loop it in

21  with Counts One through Six, this is necessary background.

22  One of the reasons why the interest needed to be backdated was

23  to get that on the cap table, make it look like it was on the

24  cap table prior to November 4.  Even taking Mr. Brodsky's

25  argument and saying it's not a statement specifically in

SIDEBAR CONFERENCE.

1  furtherance of Count Seven, it should come in, possibly not

2  for the truth.

3          THE COURT:  Everyone is saying it's a lie.  It's not

4  hearsay.

5          MS. SMITH:  We don't need it as a co-conspirator

6  statement.  It can just come in as context for the same way

7  that everything else related to Count One to Six have.  If

8  that's Mr. Brodsky's argument, obviously were strongly

9  disagree.  I don't know why, since it isn't offered for the

10  truth.  We all agree the information in that statement is not

11  in fact true.  It comes in as a necessary context, the same

12  way the performance statements did and other statements by

13  Mr. Shkreli, multiple, that have nothing to do with

14  Mr. Greebel.  The performance statements there is no

15  allegation that Mr. Greebel --

16          MR. BRODSKY:  It is very different in kind between

17  investor statements and lies he made to investors assets under

18  management and these documents and communications with SEC and

19  Mr. Su's e-mail.  Under 403 this is much different in kind and

20  unduly prejudicial.  This is not just any background.

21          They are going to sum up and they are going to

22  allege when Mr. Greebel received Mr. Su's e-mail he had to

23  somehow investigate and he had to find out that Mr. Shkreli

24  had lied to the SEC about assets under management.  They are

25  going to create some obligation on his part as outside counsel

SIDEBAR CONFERENCE.

1   that he should have raised the flag, blew the whistle, called

2   the Board, and told the Board about this.  That is part of

3   their argument.  So it's incredibly prejudicial in that they

4   are trying to get in an overt act in furtherance of One

5   through Six, but not in furtherance of Seven.

6            If the Government's theory is that he lied to the

7   SEC, he backdated to lie to the SEC about his assets under

8   management, the entire theory should be thrown out.  None of

9   that is in furtherance of Count Seven.

10           I thought their theory, which they told your Honor

11  prior to trial on the MSMB Capital backdating, was that

12  Mr. Shkreli was putting shares into MSMB Capital because he

13  foresaw that he would have to pay out money.

14           THE COURT:  If you look at the dates of this whole

15  transaction with the SEC, Mr. Shkreli is interested in doing

16  reverse merger, he's gotten a lot of rumblings and grumblings

17  from numerous MSMB Capital investors who are threatening to

18  sue.

19           MR. BRODSKY:  Not at this time, your Honor.  Sorry.

20           THE COURT:  MSMB Healthcare investors they are

21  starting to -- the wind down e-mail has happened in November,

22  right, as of this time?  And investors have asked for their

23  money back.  They are being stalled.  They are being

24  frustrated.  There are e-mails that are being sent.

25           MR. BRODSKY:  I think the wind down happens after.

SIDEBAR CONFERENCE.

1    THE COURT:  September 2012.

2    MS. SMITH:  September 9, 2012.  And people like

3 Sarah Hassan start in September 2012 asking for money back.

4    THE COURT:  Demanding liquidation.  Mr. Shkreli is

5 realizing I don't have money to pay these people, we have no

6 money.  It's gone.  So in terms of structuring settlements and

7 consulting agreements to use Retrophin to satisfy these people

8 who threatened, or right around this time, the reverse merger,

9 and attempt to take Retrophin public is in jeopardy.  This is

10 right in the late fall, early December period.  Let's not

11 forget the reverse happened December 12, 2012.  This is within

12 just a very short time.

13    And I think the context and background of what is

14 going on with regard to Count Seven, the statements themselves

15 are not offered for the truth because they are lies.  It is to

16 show that Mr. Shkreli's interested in pushing off the SEC, not

17 having them dig too deeply or to inquire because this is a

18 very critical time.

19    MR. BRODSKY:  I understand, your Honor.  It's in

20 furtherance of One through Six.  I still don't see the

21 connection of being in furtherance of Count Seven, which is

22 the theory of settlements and consulting agreements.  The

23 theory of the settlement doesn't come to life until

24 February 2013.

25    THE COURT:  The lies is then consistent with what he

SIDEBAR CONFERENCE.

1   then tries to manipulate in terms of getting shares Retrophin,

2   MSMB's interest in Retrophin to create that interest.  Part of

3   what he is telling the investors is we've rolled your

4   investment into Retrophin.  Some of you have agreed not to

5   cash out, but to put your very valuable investments into

6   Retrophin.

7            MR. BRODSKY:  I understand.

8            THE COURT:  And so that gives --

9            MR. BRODSKY:  Here is how I'm troubled, your Honor,

10  under 403, even if they pass 401.  They are going to point to

11  Mr. Su's email and create an impression for the jury and the

12  jury will take it because it sounds so easy.

13           THE COURT:  That is in evidence.  We shouldn't talk

14  about it.

15           MR. BRODSKY:  That's how they connect the relevance.

16  That's prejudicial for us.  That's how they started their

17  argument.  The document that Mr. Pitluck is about to show the

18  agent after he puts these in, he's going to show, he said, Mr.

19  Su's e-mail.  He's going to reference Mr. Su's comment about

20  Mr. Schmidt's letter.  Then they are going to say, well,

21  Mr. Greebel received that, he had some obligation, some duty,

22  which doesn't exist in the law, but he had some obligation or

23  duty to go do something or inform the Board.

24           Your Honor, that's the unduly prejudicial part.  It

25  is connecting, it is creating an impression Mr. Greebel had

SIDEBAR CONFERENCE.

1   this document or access to the document, which is not true.

2   The Government can't point to a single piece of evidence that

3   he did.

4              THE COURT:  Okay.

5              MS. SMITH:  So it sounds like it's coming in.  For

6   the record, the reference to the Jackson Su e-mail was because

7   Mr. Brodsky said that Mr. Greebel never heard, there was no

8   evidence that Mr. Greebel --

9              MR. BRODSKY:  Received.

10             MS. SMITH:  No, you said aware.  I don't have the

11  transcript, but what I heard was aware.  So that was my

12  response to that argument.  But you don't get to argue that

13  because two pieces of evidence don't look good next to other

14  that's prejudicial for the defendant.

15             Taking Mr. Brodsky's argument that it's not in

16  furtherance of Count Seven, it's very clearly relevant

17  background information for the charges in Count Seven.  And

18  it's not offered for the truth, so it can come in as long as

19  it's relevant, and it is.

20             MR. BRODSKY:  Your Honor, our objection on 403.

21             THE COURT:  I think that the rulings that I made

22  earlier still stand.  We won't ask, we won't have the agent

23  testify about 448.  And he can use it to refresh his

24  recollection but not --

25             MR. PITLUCK:  Judge, he knows about it, quite

SIDEBAR CONFERENCE.

1   obviously.  I want to elicit, if I ask him an open-ended

2   question, I want to be able to say this is Government's

3   Exhibit 451, is this in response to a request from the SEC.

4            MR. BRODSKY:  Your Honor, they can talk to him now.

5            THE COURT:  Is that all right with you?

6            MS. SMITH:  He's still on direct.  We'll make sure.

7            THE COURT:  All right.

8            MR. PITLUCK:  I just want to be able to establish

9   here is 451, this is a document with SEC, that's fine.  If

10  there is a predicate one-word, sentence, I can say, based on

11  your review of the documents this in response from the request

12  from the SEC, yes, then put in the document, then 448 doesn't

13  need to come in.

14           THE COURT:  Okay.

15           MS. SMITH:  Thank you.

16           THE COURT:  So come back by 1:25 p.m.

17           MR. KESSLER:  We had offered to update the Court.

18  It will take three minutes, but frankly, I think we can do it

19  at the end of the day at 5:00 o'clock, whatever the Court

20  wants.

21           THE COURT:  That is fine.  I want to make sure

22  because I wasn't sure if you wanted a decision on all the

23  experts tonight.

24           MR. BRODSKY:  We were hoping for one because we have

25  to prepare the experts if we put on a case.

SIDEBAR CONFERENCE.

1          MS. SMITH:  We can do it now.

2          THE COURT:  This juror is leaving at five.  We

3     should have time between five and 5:30.  But I'm not promising

4     a decision because I'm hearing from you at five.

5          MR. DUBIN:  The other thing I wanted to raise, there

6     was a substantial amount of press on Friday and over the

7     weekend about Mr. Shkreli.  Many of the articles contained,

8     what we thought, is highly prejudicial, inadmissible

9     evidence --

10          THE COURT:  I missed it all.

11          MS. SMITH:  Related to the forfeiture filing for

12     Shkreli.

13          MR. DUBIN:  -- related to the forfeiture filing.

14     But it was about his confinement, seizures that the Government

15     might make, attempting to make, about albums and so forth.

16          Our concern is that it wasn't just, it didn't just

17     get published in some -- a lot of the articles so far have

18     been in Law 360, unless you have a subscription, you can't get

19     access to it.  But this was in Bloomberg, New York Post, I

20     think it was the Daily News.  What we would ask for your Honor

21     to poll the jury to see if anybody came across any of these

22     articles at any point in time.  I think it was frankly

23     unavoidable.  It was everywhere.  We would ask that if the

24     jurors could be asked if anybody came across any of the press,

25     even incidentally, over the weekended.

7490

SIDEBAR CONFERENCE.

1          THE COURT:  I get live feeds that pop up and there

2     was nothing about Shkreli over the weekended, in fact, that I

3     saw.

4          MR. DUBIN:  I could submit it for your Honor; it was

5     every where.

6          THE COURT:  I can go looking for it and see.  We

7     presume, as the Second Circuit has acknowledged, that jurors

8     follow instructions.  I've told them repeatedly to avoid any

9     press coverage, not to talk about the case.  I think at the

10    end of the case day on Tuesday I said put it out of your mind,

11    don't talk about it.  When you say unavoidable, I mean there

12    was much bigger news that was going on during the weekend.

13         MR. DUBIN:  Unfortunately, they don't always follow

14    instructions.  We know from -- we hope they do, we want them

15    to, but a lot of the juror misconduct cases that we're aware

16    of are from jurors reading about the case during the trial.

17    It's just an unfortunate reality that we have to face as

18    criminal defense lawyers.  They often times, either purposely

19    or inadvertently, and we're not accusing anyone of doing it

20    purposely.  We have a concern I want to raise if your Honor

21    can take a look.

22         We can submit the coverage.  I don't think there is

23    any harm in asking did anyone come across articles over Friday

24    or the weekend.

25         MS. SMITH:  I don't know why we would inject that

SIDEBAR CONFERENCE.

1  idea or suggest that there had been.  I don't know what

2  phrasing Mr. Dubin wants to use.  I will say from the articles

3  I saw, none of them mentioned Mr. Greebel or this case in any

4  respect.  I don't know what Mr. Dubin found.

5          THE COURT:  Did you find any that he mentioned

6  Mr. Greebel?

7          MR. DUBIN:  No.  But they mentioned Mr. Shkreli.

8          MR. BRODSKY:  They mentioned he was found guilty.

9          MR. DUBIN:  That he's in jail.  That the Government

10  is looking to seize this his assets, not just the assets.

11  It's the Wu Tang album; it's the Sean Carter album; it's the

12  Picasso, it creates the impression that he either looted the

13  company or has ill-gotten gains that he is not giving up.

14          And our biggest concern is that they are hearing

15  about an alleged co-conspirator.  And none of them during -- I

16  went back and looked at transcript during jury selection, even

17  the ones that had relative awareness of the case, certainly

18  didn't know that Mr. Shkreli was incarcerated.  That's our big

19  concern, is that they came across something and now have the

20  knowledge that he is incarcerated and draw a negative

21  inference about our client.

22          I don't think there is any harm of asking the vague

23  question, did anyone come across any news coverage, has anyone

24  seen any news coverage about Mr. Shkreli or Mr. Greebel, you

25  could say over the last week.

SIDEBAR CONFERENCE.

1          THE COURT:  Well, I thought the idea was to try to

2     keep in the juror's mind a separation between the two.

3          MR. DUBIN:  I was trying to.

4          THE COURT:  I know, but sometimes I think the

5     concern is that you end up maybe having the unintended effect

6     of planting in the juror's mind some greater connection than

7     you may want to argue at the end of the day.

8          MR. DUBIN:  How about if we ask of any parties in

9     this case or names mentioned in this case.  I wouldn't raise

10    it if -- there has been some coverage, and I wouldn't raise it

11    if wasn't a concern to Mr. Greebel.

12          It's just the first article that was that made

13    mention during the trial that made sort of the rounds in all

14    of the main-stream media, especially the New York papers about

15    Mr. Shkreli being in jail right now.  That's the big concern.

16    So if your Honor would consider it.

17          THE COURT:  I think I remanded him before the start

18    of the jury selection.

19          MR. DUBIN:  I mean, it was the first one during --

20          THE COURT:  That was the biggest waive the media

21    coverage post-conviction regarding Mr. Shkreli, I think.

22          MR. DUBIN:  I just meant --

23          THE COURT:  I'm just saying, we didn't get into

24    that, as you point out, with the jury.  We want to maintain --

25    I severed the trials for a reason.  Each defendant gets their

SIDEBAR CONFERENCE.

1   own day in court here.

2           MR. DUBIN:  Your Honor, unfortunately that is not

3   the concern.  I want to be clear about what the concern is.

4   This is first article that came out during the trial about

5   Mr. Shkreli being in jail.  If I didn't have first-hand

6   experience with it, I wouldn't raise it.  I have a case on

7   appeal now where a juror, we wished had followed the rules,

8   and it was a state court case, where the juror was reading

9   about the case the whole trial.  There was an admonition

10  everyday, just as your Honor has done, not to do research.  It

11  is an unfortunate reality.  I wouldn't raise it if there were

12  no articles out there.

13          I can provide copies for the Court where they

14  appeared so you can get a flavor of the coverage.

15          MR. KESSLER:  I believe the articles that covered

16  the opening, the Daily News, New York Post, Reuters.  I

17  believe some those may have mentioned that Mr. Shkreli is

18  incarcerated.  I haven't gone back to look.

19          MR. DUBIN:  I don't want to take up too much of your

20  Honor's lunch.  That's our request.  I don't think there is

21  any harm.  I don't think it's drawing attention to it.

22  Whatever the Court desires.  It's something that we're

23  concerned about.

24          At this late stage of the trial, for there to be --

25  it wasn't just that he was incarcerated, it was, had a lot of

SIDEBAR CONFERENCE.

1   awful information about the allegations about assets that he

2   has, that if they can't get the Wu Tang album, they'll swap

3   out the Picasso for it.

4           MS. SMITH:  It was just the substitute assets

5   declaration.  It's amazing what people find interesting.

6           MR. DUBIN:  It was actually pretty shocking to us

7   that that was what they latched on to.  If it was just on

8   Bloomberg or just financial sites, but it made it's way into

9   the Post and Daily News as well, I'll check.  Let me try to

10  pull --

11          THE COURT:  I'm just trying to think how I would

12  formulate the question.  Has any juror had any exposure to any

13  media coverage regarding any names that you've heard in this

14  trial.

15          MR. DUBIN:  That's all I would ask.  I would

16  appreciate it.

17          THE COURT:  If we get a yes, then we'll probably

18  have to speak to them separately.

19          MS. SMITH:  Maybe just clarify, I want to try avoid

20  situation like we had during jury selection like Bank of

21  America, names of individuals.

22          MR. DUBIN:  I'll e-mail with the Government during

23  lunch break and come up with something.

24          THE COURT:  All right.

25          (Lunch recess.)

PROCEEDINGS

1          (In open court.)

2          (Parties present.)

3          THE COURT:  Did you come up with a joint question

4     for the jurors?

5          MS. SMITH:  Mr. Dubin didn't come back yet so maybe

6     we can do it at the next break.

7          THE COURT:  Okay.

8          (Witness takes the witness stand.)

9          COURTROOM DEPUTY:  Jury entering.

10         (Jury enters courtroom.)

11         THE COURT:  We have all our jurors back, so you may

12    continue your direct.

13         MR. BRODSKY:  Your Honor, before Mr. Pitluck

14    started, I wanted you to note for the record

15    Government Exhibit 970, which is the quarterly filing, was

16    admitted in evidence as Defendant's Exhibit 116-80.

17         THE COURT:  116-80.

18         MR. BRODSKY:  Yes.

19         THE COURT:  Exhibit 670.

20         MR. BRODSKY:  970.  I don't know since there were no

21    questions about 970 maybe we can have it marked as 116-80

22    instead of having two exhibits.

23         THE COURT:  So Defendant's Exhibit 116-80.

24         MR. BRODSKY:  81.

25         THE COURT:  81 is in evidence.  And we will refer --

DELZOTTO – DIRECT – MR. PITLUCK

1          MR. BRODSKY:  I'm sorry, your Honor, 80.  I

2     apologize.

3          MR. PITLUCK:  Just leave it as a Government Exhibit,

4     Judge.

5          THE COURT:  All right.

6          MR. PITLUCK:  Can I proceed, your Honor.

7          THE COURT:  Okay.

8     DIRECT EXAMINATION

9     MR. PITLUCK:
       (Continuing.)
10    Q     Special Agent Delzotto, I direct your attention to

11    Government Exhibit 451 for identification, please.

12          Is this an e-mail from Martin Shkreli to an

13    enf-cpu@sec.gov?

14    A     Yes.

15    Q     Are there attachments to that document?

16    A     Yes.

17          MR. PITLUCK:  Your Honor we offer

18    Government Exhibit 451.

19          THE COURT:  I will admit the exhibit and note the

20    sidebar on this.

21          (Government Exhibit 451, was received in evidence.)

22          MR. PITLUCK:  Thank you.

23    Q     Special Agent Delzotto, what's the subject of this

24    e-mail?

25    A     Subject is "NY8799 Production."

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO - DIRECT - MR. PITLUCK

1    Q     And Special Agent Delzotto, do you know if this was a

2    production that Martin Shkreli made to the SEC in response to

3    a request for documents?

4    A     Yes, it was.

5    Q     What did Mr. Shkreli write, and sorry, who was this

6    e-mail was went to enf-cpu@sec.gov who is copied on the

7    e-mail?

8    A     Mr. Shkreli and Eric Schmidt, an attorney with the SEC.

9    Q     And what did Mr. Shkreli write in the body of this

10   e-mail?

11   A     He states.  "All:  Please find attached documents

12   responsive to NY8799.  The password for the protected file is

13   CQPA7391."

14   Q     "Thank you, Martin Shkreli MSMB Capital," with a phone

15   number?

16   A     Yes.

17   Q     Let's go to the first page of the attachment which has

18   two Bates stamps, but the one in the middle is BA0112378.

19            What's does it say up at the top there?

20   A     "Schedule of funds managed by MSMB."

21   Q     And what's listed under MSMB Healthcare?

22   A     MSMB Healthcare, LP.  It's the third-party administrator,

23   files provided.

24   Q     What about MSMB Capital Management, LP?  What's listed

25   there?

DELZOTTO – DIRECT – MR. PITLUCK

1   A    "$2.6 million AUM," assets under management, "fund being

2   liquidated."

3   Q    And going to the next page.  Is that a cover letter, a

4   letter that Mr. Shkreli wrote to Mr. Schmidt?

5   A    Yes.

6   Q    BA0102379.  Next page, please.  Thank you.

7   A    Yes.

8   Q    And then there's two blank pages and then there is a

9   finally a page Bates-stamped 2382, the last four digits, and

10  that's an investment summary, MSMB Healthcare?

11  A    Yes.

12  Q    Those were all documents that were produced by Martin

13  Shkreli to the SEC on November 4, 2012?

14  A    Yes.

15  Q    I would like to show you what's been marked for

16  identification as Government Exhibit 532.

17             Is this an e-mail exchange between Martin Shkreli

18  and the defendant and forwarding from Jackson Su to Martin

19  Shkreli all between February 1, 2201, and March 5, 2013?

20  A    Yes.

21             MR. PITLUCK:  Your Honor, we offer

22  Government Exhibit 532.

23             MR. BRODSKY:  No objection, your Honor.

24             THE COURT:  We will receive in evidence

25  Government Exhibit 532.

DELZOTTO – DIRECT – MR. PITLUCK

1          (Government's Exhibit 532 was received in evidence

2     as of this date.)

3     EXAMINATION BY
      MR. PITLUCK:
4     (Continuing.)

5     Q     Let's go to the second page of this document and start

6     with the bottom e-mail.

7              Who is that e-mail from, who is it to, and what's

8     the date?

9     A     It's from Jackson Su to Martin Shkreli the date is

10    February 12, 2013.

11    Q     And in the large paragraph it begins, "I'd like."

12             Can you read that, "I'd like to discuss," paragraph

13    please?

14    A     "I'd like to discuss the bonus from the funds last year

15    during my employment with MSMB And Retrophin.  Attached is the

16    contract we signed in January 2012.  Calls for

17    performance-related bonus paid to me every year for the next

18    five years.  MSMB Healthcare, LP, fund enjoyed over a 34

19    percent return since July 31, 2012, according to an investor

20    letter.  With 100 million in assets, that's a great return for

21    you and the firm, congrats."

22    Q     Now, there's an e-mail above that one.  Who is that one

23    from, one who is it to, and what's the date?

24    A     Also from Jackson Su to Martin Shkreli.

25    Q     What's the date on that one?

DELZOTTO - DIRECT - MR. PITLUCK

1    A    The date is March 5, 2013.

2    Q    Mr. Su writes, "Disappointed not hearing back from you."

3         Can you continue and read the second paragraph that

4    begins, "Only thing"?

5    A    "Only thing I'm requesting is the fulfillment of the

6    contractual requirement.  I don't want to escalate the

7    situation to lawyers which would trigger a number of things

8    outside of my control including reaching out to investors for

9    final numbers for MSMB i.e., Spencer Spielberg, Sarah Hassan,

10   Lindsay Rosenwald, Rob Johnson, Steve Rosenfeld and the like.

11   SEC and other enforcement notification media exposure, asking

12   the company to spend unnecessary money on full audits on each

13   and every entity.  Tracking funds that may have come in and

14   out of different accounts, shared transfers and other measures

15   an attorney would demand.  I don't want to burn a bridge."

16   Q    I can stop you there.

17        And what did Mr. Shkreli do with this e-mail that

18   was sent to him on March 5, 2013?

19   A    He forwards it to Mr. Greebel.

20   Q    And what did he write in that forward?

21   A    He writes, "Please organize response."

22   Q    And what was Mr. Greebel's response to that e-mail from

23   Martin Shkreli?

24   A    "Did he ever give you notice of resignation, or did you

25   ever terminate him?"

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO – DIRECT – MR. PITLUCK

1   Q    Did Mr. Shkreli write back at 4:22 p.m. on March 5, 2013?

2   A    Mr. Shkreli did write back.  He stated, "Neither has

3   occurred."

4   Q    And what was Mr. Greebel's response to that going up on

5   that.

6   A    Mr. Greebel, wrote, "No, my point was I need to discuss

7   with you not prepare a response.  If neither has occurred, we

8   can terminate him now for cause and mostly avoid all

9   payments."

10  Q    What was Mr. Shkreli's response to that?

11  A    "Feel free to terminate for cause, and also feel free to

12  describe there is no incentive bonus."

13  Q    That was March 5, 2013, at 7:57 p.m.?

14  A    Yes.

15  Q    I would like to show you what's been marked for

16  identification as Government Exhibit 685.  It's the back.

17          Is this a series of e-mails between the defendant,

18  Martin Shkreli, that's a continuation of the same chain of

19  e-mails that we saw in the last exhibit,

20  Government Exhibit 532?

21  A    Yes.

22          MR. PITLUCK:  Your Honor, we offer

23  Government Exhibit 685 into evidence.

24          MR. BRODSKY:  No objection, your Honor.

25          THE COURT:  We she have Government Exhibit 685.

DELZOTTO – DIRECT – MR. PITLUCK

1    (Government Exhibit 685, was received in evidence.)

2  Q    So going to the second page, the middle e-mail there from

3  Mr. Su to Mr. Shkreli, that was the same e-mail we saw in the

4  previous exhibit; correct?

5  A    Yes.

6  Q    What was Mr. Shkreli's response in this chain to the

7  defendant?

8  A    "Make sure he understands threatening us would not be

9  fruitful as he did 'in reaching out to SEC?'"

10 Q    What was Mr. Mr. Greebel's response to that e-mail going

11 to the first page.

12 A    "Or the media."

13 Q    What did Mr. Shkreli respond at 8:04 p.m. to that e-mail

14 from the defendant?

15 A    "I would just write a long nastygram back indicating that

16 we think he was terminated without cause.  His deletion of

17 e-mail boxes was illegal and we could sue, et cetera, et

18 cetera, et cetera, false pretense to defraud me out of the

19 stock welfare he skipped town et cetera, et cetera."

20 Q    What was the defendant's response to Mr. Shkreli's

21 e-mail?

22 A    "Alternative would be saying that we are hereby

23 terminating him with cause.  He gets nothing," in capital

24 letters, "and we are considering suing him for willful

25 destruction of property, et cetera."

DELZOTTO – DIRECT – MR. PITLUCK

1    Q    What was Mr. Shkreli's response to that e-mail?

2    A    "Yeah, all that stuff.  Draft it out and I'll provide and

3    will be fun."

4    Q    I think you may have misread after draft.  Can you read

5    that again so the record is clear?

6    A    Sure.  It states, "Yeah, all that stuff.  Draft it out

7    and I will proofread/add.  Will be fun."

8    Q    What was the defendant's response to that e-mail?

9    A    Mr. Greebel states, "Fun is relative."

10   Q    At this point, I'd like to show you what's in evidence as

11   Government Exhibit 111-45 in your second binder there towards

12   the back.

13         It's an e-mail.  I'll give you a chance to look it

14   up.

15   A    111?

16   Q    Dash 45.

17   A    Okay.

18   Q    Is this an e-mail, this is already in evidence from

19   Jackson Su to Mr. Greebel copying Martin Shkreli?

20   A    Yes.

21   Q    And going to the second page, there's an e-mail from

22   Mr. Greebel to Jackson Su copying Shkreli, Martin Shkreli,

23   that says "Subject, Letter.  Mr. Su, please see the attached."

24   Correct?

25   A    Correct.

DELZOTTO – DIRECT – MR. PITLUCK

1    Q    What date was that e-mail written, or was that e-mail

2    written enclosing the letter?

3    A    The e-mail on the second page is dated March 8, 2013.

4    Q    So, approximately, two days after the -- or three days

5    after the e-mail we just saw on Government Exhibit 685?

6    A    Yes.

7    Q    Now, going to the first page of this document.  This is

8    already in evidence, so I don't want you to have to read all

9    of it.  But can you read the fourth paragraph here, please,

10   the one that starts, "However"?

11   A    "However, fraudulently inducement was on Martin's point

12   where he enticed me to join his companies as chief operating

13   officer claiming to manage in excess of $100 million in hedge

14   fund assets.

15         Martin claimed that these alleged assets verbally

16   and in e-mail documents to other individuals as well.  When,

17   in fact, Martin did not manage that amount at the time, nor

18   any time in the past according to his correspondence with Eric

19   M. Schmidt with the Securities and Exchange Commission on

20   November 4, 2012.  The mere sum of less than $5 million, which

21   he did manage, is a far cry from collecting performance and

22   manage fees on a hundred million dollars in which he conveyed.

23         Martin holds himself out to be this wildly

24   successful hedge fund manager and a "Forbes 30 under 30

25   Brilliant" when the truth is highly disputable given the facts

DELZOTTO - DIRECT - MR. PITLUCK

1   as hand."

2   Q    If we could just go up to the second paragraph that

3   starts, "My contract."

4          Can you read from the sentence in the middle that

5   reads, "Having to chase," to the end of that paragraph.

6   A    "Having to chase your employer down for salary every

7   period should not be the norm, especially in light of

8   observing your employer maneuver funds from company accounts

9   to personal ones to satisfy personal and unrelated company

10  debts (Merrill communication complete discovery/coface Merrill

11  Lynch settlement, et cetera, just to name a future at the

12  moment) before paying company salaries.

13         The situations are well documented along with

14  500-plus other pages of documents and e-mails.  Your

15  determination of unexcused absence is inaccurate and invalid."

16  Q    So that was March 12, 2013; correct?

17  A    Yes.

18  Q    I'd like to direct your attention to

19  Government Exhibit 684 for identification.

20         Is this a continuation of the e-mail that we just

21  saw in 111-45 between the defendant, Martin Shkreli, Howard E.

22  Cotton, and an e-mail from Jackson Su?

23  A    Yes.

24         MR. PITLUCK:  Your Honor, we offer

25  Government Exhibit 684 into evidence.

DELZOTTO – DIRECT – MR. PITLUCK

1        MR. BRODSKY:  Your Honor, I apologize.  May we talk

2    about this one?

3        THE COURT:  Excuse us, members of the jury.  We're

4    going to have a little sidebar.

5        (Continued on the next page.)

6        (Sidebar conference.)

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4          MR. BRODSKY:  Your Honor, 684 for identification

5   contains attachments that apparently Mr. Su sent.

6          THE COURT:  Okay.

7          MR. BRODSKY:  And those attachments contain numerous

8   hearsay e-mails, and there's a lot of different folks who are

9   communicating in this document including, for example.

10          THE COURT:  That's at Page KATS355872.  There are

11  individuals whose names are not familiar to this jury or

12  related familiar to me either, so how do you want to deal with

13  this.

14          MR. PITLUCK:  Well, Judge, they're not boning

15  offered for the truth certainly there are documents in here

16  that we are going to enter pursuant to a stipulation in a

17  moment.  It is the mere fact that these were provided by

18  Jackson Su to Evan Greebel as of this date.  The fact that the

19  documents exist and he was on notice of their existence as of

20  this date.

21          MR. BRODSKY:  The stipulation I think you want to

22  make clear to the judge which documents within here are being

23  stipulated to because it's not all the attachments.

24          MR. PITLUCK:  It's not all of the attachments, it's

25  the.

SIDEBAR CONFERENCE

1          MR. KESSLER:  The middle.

2          MR. PITLUCK:  It's the documents related to the

3    actual settlement agreement and the amendment, number one.

4    And number two, to the settlement agreement.

5          MS. RUBIN:  Just the settlement agreement and the

6    two amendments; is that correct?

7          MR. PITLUCK:  Well, there's also other contents of

8    the letter marked as Government's 3, the settlement agreement,

9    the amendment is number one and number two.

10         THE COURT:  Settlement agreement of who?

11         MR. PITLUCK:  Merrill Lynch.

12         THE COURT:  Okay.

13         MS. SMITH:  There's also --

14         MR. PITLUCK:  There's also documents in here that

15   have come into evidence in unrelated forms but the point of

16   the document, your Honor, is that they were provided to

17   Mr. Greebel as of March 20, 2013.

18         MR. BRODSKY:  My only question, your Honor, that we

19   have Liam O'Brian who is making a lot of different statements

20   of different types.

21         MR. PITLUCK:  I don't know how many times I have to

22   say it.  It's not being offered for the truth that these

23   documents are here existing.  I agree we can't go in Liam

24   O'Brian wrote this on this date it's the fact that the

25   documents from those people were sent to Mr. Greebel and that

SIDEBAR CONFERENCE

1  he was aware of their existence on March 20, 2013.

2            MR. KESSLER:  The last few pages, I believe,

3  contain e-mails from someone named Robert Johnson who is on

4  the defendant's witness list.

5            THE COURT:  It doesn't mean you get to bring them

6  in.

7            MR. KESSLER:  I'm just flagging these are not all

8  unknown parties.

9            THE COURT:  They're unknown to me I am trying to

10 wife.

11           MR. BRODSKY:  Unknown to the jury.

12           THE COURT:  Unknown to the jury as well.

13           MR. BRODSKY:  They shouldn't be able to get in the

14 Robert Johnson e-mail communications if we put on a defense's

15 case-in-chief.  If we call Robert Johnson, questions will be

16 able raised related to him introduced a series of e-mails

17 relating to Robert Johnson is a series of e-mails about a

18 lawyer for Liam O'Brian from McCormick & O'Brien related to

19 the stipulated and agreed-upon settlement agreement.

20           THE COURT:  I think that did come in already, didn't

21 it Liam O'Brien.

22           MR. KESSLER:  They're lawyers related to the Merrill

23 Lynch settlement.

24           MR. PITLUCK:  The point of the exhibits is he has

25 documents.  Jackson Su represents two of the defendants that

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1  he and then he attaches excerpt was his communications with

2  Evan Greebel in the context of him being sent a termination

3  letter.

4          The defendant then takes them and forwards them to

5  Martin Shkreli and Howard Cotton.  So there may be documents

6  in there that involve people unknown to the jury, but this is

7  what Jack is Su attaches in the time period of March 2013.

8          So he would go back and say Rob Johnson had a

9  dispute with Martin Shkreli on October 30, 2013, and the Court

10 can clearly instruct the jury that these particular documents

11 aren't being offered for the truth but they're all attached to

12 that.  They're provided to the defendant and they're on notice

13 at this point in time.

14         MR. BRODSKY:  If Mr. Jackson sent them pictures of

15 children or pictures of his kids or pictures of relatives

16 offer things about sports, we would not be saying they're

17 admissible in evidence as an attachment.  The judge has

18 the -- your Honor, you have the discretion to look at the

19 attachments and decide for each attachment whether or not it's

20 relevant under 401 and whether or not under 403.  The

21 prejudice is outweighed by it's unduly prejudicial because

22 there's no evidence relating to e-mails in this trial.

23         THE COURT:  I don't think right now is the time it

24 go document by document we can do this maybe before the

25 Government fishes its direct with the saying maybe that will

SIDEBAR CONFERENCE

1    be at 5:00 o'clock today can we put these to the side.

2                MR. PITLUCK:  I mean to finish today.  I mean finish

3    in not before the next break soon thereafter.

4                MR. KESSLER:  I think easiest because the span only

5    to show this witness and the jury the Merrill Lynch settlement

6    documents in this stack right now, we can.

7                THE COURT:  Redact.

8                MR. KESSLER:  Well, just because redacting would

9    take ten minutes now and we can submit it to our working on

10   what gets redacted later.  The only thing that's going to get

11   shown to the jury is the actual settlement documents related

12   to Merrill Lynch which is really the subject of the defense

13   objection.  And we understand that anything else may or play

14   not be redacted subject to it being worked out among the

15   parties.

16               MR. PITLUCK:  That's fine.

17               MR. KESSLER:  That way we don't have to stop

18   examination and we don't show any documents that the defense

19   has suggested might be subject to some redaction.

20               THE COURT:  Seems like a way forward.  Do you have

21   any objection to that.  We'll focus only on the --

22               MS. SMITH:  Can I grab a piece of paper?  I can tell

23   the court and the parties which specific payments of this

24   document might prevent everything and we can redact it.

25               THE COURT:  Okay.

SIDEBAR CONFERENCE

1     (Pause.)

2          THE COURT:   The McCormick e-mails then regarding

3    the Merrill Lynch settlement.

4          MR. PITLUCK:  Yes.

5          THE COURT:  I can get the McCormick e-mails

6    regarding the settlement.

7          MR. PITLUCK:  Judge, for the record, I'm planning on

8    showing the witness three pages.  55884 which is the front

9    part of the settlement agreement.

10          THE COURT:  Okay.

11          MR. PITLUCK:  55892 which is the signature block of

12    the settlement agreement.  And 55895 which is the exhibit to

13    the settlement agreement.

14          MR. KESSLER:  Previous page?

15          MR. PITLUCK:  55894 which.

16          THE COURT:  Number of exhibits an affidavit on two

17    as Exhibit B.  So is that all the exhibits.

18          MR. PITLUCK:  It's all part of the settlement.

19    These are exhibits to the settlement agreement, Judge, not

20    exhibits to the e-mail.

21          THE COURT:  Okay.

22          MR. PITLUCK:  If that's clear.

23          THE COURT:  Okay.

24          MR. PITLUCK:  So it's all part of the settlement

25    agreement which is pursuant to stipulation going to come in.

SIDEBAR CONFERENCE

1    I'm not showing them anything else.  We can talk to the

2    defense about redacting out other e-mails if it's necessary.

3             MR. BRODSKY:  Okay.

4             THE COURT:  All right.  So when you gave me page

5    numbers were Katten page number.

6             MS. SMITH:  KAT0055884.

7             THE COURT:  Okay.

8             MS. SMITH:  Two zeros, Judge.

9             THE COURT:  Great got.  It.

10            (Sidebar discussion concludes.)

11            (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO – DIRECT – MR. PITLUCK

1          (In open court.)

2          THE COURT:   Pursuant to our discussion at sidebar,

3    the Court will admit Government Exhibit 684 as to certain

4    documents and will allow the jury to see those documents and

5    the rest will be subject to a stipulation or agreement by the

6    parties at some later time.

7          (Government Exhibit 684, was received in evidence.)

8          MR. PITLUCK:   Thank you, your Honor.

9    MR. PITLUCK:

10   Q    So Special Agent Delzotto, the bottom e-mail here on

11   March 12, 2013, that's the same e-mail we just or, I guess, a

12   moment ago saw in Government Exhibit 111-45; correct?

13   A    Yes.

14   Q    And what did Mr. -- what's the next e-mail up in that

15   chain from Mr. Su to the defendant on March 20, 2013?

16   A    Would you like me to read?

17   Q    Can you read it?

18   A    "I have a 2:00 p.m. appointment with my attorneys which I

19   will keep today.  A prompt response would be beneficial, but

20   we won't stop our timeline until Martin accepts the settlement

21   offer.  A few excerpts attached."

22   Q    What did the defendant do on that e-mail?

23   A    The defendants forwards it to Martin Shkreli and copies

24   Howard Cotton.

25   Q    That's also on March 20, 2013?

DELZOTTO – DIRECT – MR. PITLUCK

1    A      Yes.

2    Q      What did the defendant write?

3    A      "Martin, I spoke with Jackson yesterday for about an hour

4    and as a follow-up, he sent the attached documents.  Please

5    advise if you are available to discuss.  Evan."

6    Q      So going to the attached documents.

7           Can we go to

8    Page No. KAT0055884.  That's the 20th page of the document?

9    A      Entitled, "Settlement Agreement"?

10   Q      That's right.  Yes, I'm waiting for it to come up on the

11   screen.

12          Can you just read the first paragraph, please?

13   A      Sure.  It's titled, "Settlement agreement."  The

14   settlement agreement is dated as of September 5, 2012, and is

15   entered into by Merrill, Lynch, Pierce, Fenner & Smith, Inc.,

16   (Merrill Lynch) and MSMB Capital Management, LP, Martin

17   Shkreli and Marek Biestek.  The latter three parties are

18   referred to collectively here MSMB Partners as follows.

19   Q      What's the next "Whereas" paragraph?

20   A      "Whereas, Merrill Lynch claims MSMB incurred a debt of

21   $7,037,905 in connection with orders for the purchase, sale,

22   and short sale of securities through Merrill Lynch in

23   February 2011."

24   Q      Can you go to the next "Whereas" paragraph?

25   A      "Whereas, MSMB has failed to pay Merrill Lynch any

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DELZOTTO - DIRECT - MR. PITLUCK

1   portion of the debit."

2   Q    And can you read the bottom paragraph for number one

3   which reads, "Financial Representations and Warranties."

4   A    "Each of the MSMB parties has set forth in Exhibit A

5   hereto an accurate list setting forth the approximate value of

6   each of his/its material assets and liabilities as they

7   currently exist.  And each represents and warrants that, A,

8   he/it does not have, and since January 1, 2011, has not had

9   assets in his/its custody or control sufficient to pay the

10  debit in full.

11           And that, B, he/it has a reasonable basis to believe

12  the MSMB Parties have the ability to obtain sufficient funds

13  in the form of loans or investments from bona fide and

14  legitimate sources to meet the financial obligations to

15  Merrill Lynch that are undertaken by the MSMB parties in this

16  agreement, specifically, with regard to those set forth in

17  Paragraph 2 below."

18  Q    Okay.  So can we go to Page KAT0055892.

19           This is a signature page for the same settlement

20  agreement?

21  A    It is.

22  Q    Who is it signed by?

23  A    Martin Shkreli and Marek Biestek.

24  Q    As of what date?

25  A    Looks like as of September 5, 2012.

STIPULATION - MR. PITLUCK

1    Q    Finally, can we go to 0055894.

2    A    (Complying).

3    Q    It's Exhibit A.  And then the next page which is Exhibit

4    A.

5         What does that read at the top?

6    A    The top of this document is titled "Exhibit A, Assets,

7    Liabilities for MSMB Partners as of September 4, 2012."

8    Q    What are the total assets listed for Martin Shkreli?

9    A    $1,415.

10   Q    Total liabilities?

11   A    $2,362,350.

12   Q    What about for MSMB Capital Management, LP, how much cash

13   and equivalent do they have?

14   A    Zero.

15        MR. PITLUCK:  At this point, your Honor, I would

16   like to read a stipulation between the parties for the record

17   and enter the Government Exhibits pursuant to that

18   stipulation.

19        THE COURT:  All right.

20        (A brief pause in the proceedings was held.)

21        MR. PITLUCK:  This is a stipulation marked as

22   Government Exhibit 1003.  It reads:

23        It is hereby stipulated and agreed by and between

24   the undersigned parties that if called to testify at trial in

25   the above-captioned matter, Lloyd Clareman would testify to

STIPULATION - MR. PITLUCK

1     the following information in sum and substance.

2              Government Exhibits 101, sorry, 110-1 which includes

3     Exhibits A and B thereto is a true and accurate copy of a

4     settlement agreement between Merrill, Lynch, Pierce, Fenner &

5     Smith, Inc., (Merrill Lynch) and Martin Shkreli, Marek Biestek

6     and MSMB Capital Management, LP dated September 5, 2012.

7              Government Exhibit 110-2 is a true and accurate copy

8     of an amendment to Government Exhibit 110-1 dated December 13,

9     2012.

10             Government Exhibit 110-3 is a true and accurate copy

11    of an amendment to Government Exhibit 110-3 which should read

12    110-1 dated January 8, 2013.

13             Commencing in 2011 and continuing thereafter,

14    Mr. Clareman represented Merrill Lynch in bringing legal

15    claims against Martin Shkreli, Marek Biestek, and MSMB Capital

16    Management in a private FINRA arbitration proceeding.

17             In the arbitration, Merrill Lynch sought to recover

18    the approximate $7 million in losses Merrill Lynch had as a

19    result of trades that Mr. Shkreli executed with Merrill Lynch

20    for the stock of a company called Orexigen, OREX, on

21    February 1, 2011.

22             Mr. Clareman, also represented Merrill Lynch in the

23    drafting, negotiation, and execution of the documents marked

24    as Government Exhibits 110-1, 110-2, and 110-3.

25             The law firms of Gusrake, Kaplan & Nussbaum PLLC and

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

STIPULATION – MR. PITLUCK

1    McCormick & O'Brien LLP represented Mr. Shkreli, Mr. Biestek

2    and MSMB Capital in the arbitration.  No one at Katten Muchin

3    Rosenman, LLP including Evan Greebel represented Mr. Shkreli

4    Mr. Biestek, or MSMB Capital in the arbitration proceeding or

5    in the negotiation or drafting of the documents marked as

6    Government Exhibits 110-1, 110-2, and 110-3 are the exhibits

7    or attachments thereto.

8           Multiple payments totaling $1,542,500 were made to

9    Merrill Lynch in satisfaction of the settlement agreement and

10   amendments that are Government Exhibits 110-1, 110-2, and

11   110-3.

12          These payments were made to entities related to

13   Merrill Lynch known as MLPFS and/or MLPFS Global Markets in

14   the following amounts and on the following days:

15          $25,000 on December 17, 2012.  $14,000 on

16   December 17, 2012.  $16,000 on December 17, 2012.  $11,000 on

17   December 17, 2012.  $1,500 on December 17, 2012.  $125,000 on

18   January 18, 2013.  $775,000 on March 4, 2013.  $575,000 on

19   March 4, 2013.

20          Government Exhibits 110-1, 110-2, and 110-3 are

21   non-hearsay verbal acts that affect the legal rights of the

22   periods thereto and are admissible at trial.

23          This stipulation marked Government Exhibit 1003 is

24   admissible in evidence as trial and is dated November 27,

25   2017, and it's signed by both the parties.

STIPULATION – MR. PITLUCK

1          (Government's Exhibit 1003 was received in evidence

2     as of this date.)

3          (Government Exhibit 1003, was received in evidence.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO - DIRECT - PITLUCK

1    MR. PITLUCK:  So, Your Honor, I would ask that

2    Government Exhibit 1003 and the corresponding Government

3    Exhibits 110-1, 110-2 and 110-3 be admitted in evidence.

4    THE COURT:  Your request for admission is granted,

5    the Government's Exhibit Exhibits 1003 and 110-1, -2 and -3

6    are admitted.

7    (Government Exhibit 1003, was received in evidence.)

8    (Government Exhibit 110-1, 110-2, 110-3, were

9    received in evidence.)

10    MR. PITLUCK:  Thank you.

11    Can we go back to the prosecution laptop, please.

12   Q    So briefly, Special Agent Delzotto, showing you

13   Government Exhibit 110-1 which is in evidence, is this is the

14   settlement agreement dated as of September 5th, 2012?

15   A    Yes.

16   Q    Is that -- with the Exhibit A and Exhibit B as attached

17   at R012705 and thereafter?

18   A    I'm sorry, can you repeat.

19   Q    R012705, is that the start of Exhibit A in 110-1?

20   A    Yeah -- yes, I'm sorry.

21   Q    Is that the same document that we just saw attached to

22   Government Exhibit 684?

23   A    Yes.

24   Q    And then turning briefly to 110-2, is that amendment

25   number one to settlement agreement?

DELZOTTO - DIRECT - PITLUCK

1    A    Yes.

2    Q    What is that document dated as of?

3    A    It's as of December 13th, 2012.

4    Q    And, finally, Government Exhibit 110-3, is that amendment

5    number two to the settlement agreement?

6    A    It is.

7    Q    What's the date of that document?

8    A    January 8th, 2013.

9    Q    So at this point I'd like to show you for identification

10   what's been marked as Government Exhibit 687.  Is this an

11   email from Martin Shkreli to the defendant on January 4th,

12   2013?

13   A    Yes.

14           MR. PITLUCK:  Your Honor, we'd offer Government

15   Exhibit 687.

16           MR. BRODSKY:  No objection, Your Honor.

17           THE COURT:  All right, we will receive Government

18   Exhibit 687.

19           (Government Exhibit 687, was received in evidence.)

20   Q    So what's the date of this email from Martin Shkreli to

21   the defendant?

22   A    January 4, 2013.

23   Q    What's the subject?

24   A    Subject is, in quotes, other thing.

25   Q    And what did Mr. Shkreli write in this email?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO – DIRECT – PITLUCK

1    A    Mr. Shkreli writes Mr. Greebel:  I got them down to

2    $125,000 by January 15th and the big check by March 1st.

3    Q    I'd like to go back to Government Exhibit 110-3, which we

4    just looked at, can you read, going to the second page, of

5    110 -- this is amendment number two to the settlement

6    agreement, correct?

7    A    It's 110-3.

8    Q    And can you read the first sentence of Additional

9    Payment?

10   A    In order to induce Merrill Lynch to further extend the

11   due date of the repayment obligation to March 1st, 2013, the

12   MSMB parties will pay to Merrill Lynch the separate and

13   additional sum of $125,000.

14   Q    And then going down to paragraph number 2 there that

15   reads, Extension of Time, can you read the first sentence of

16   that one?

17   A    Upon timely payment of the second additional payment as

18   set forth above, paragraph 2 of the settlement agreement will

19   be deemed amended to substitute the date of March 1st, 2013,

20   where the date of December 15th, 2012 originally appeared as

21   subsequently extended to December 31st, 2012 by amendment one.

22   Q    If I can just have the Elmo very briefly.  Going back to

23   stipulation 1003 in paragraph 8, how much is paid on -- in

24   Subsection F and on what date?

25   A    $125,000 on January 18th, 2013.

DELZOTTO - DIRECT - PITLUCK

1   Q    And how much is paid in Subsection G and H on March 4th,

2   2013?

3   A    Two payments on March 4th, 2013:  The first is for

4   $775,000, and the second is for $575,000.

5   Q    I'd like to go back to the prosecution laptop, if I

6   could, and show you Government Exhibit 510 which is in

7   evidence.  This is an email exchange that we looked at last

8   week at some point, the email chain between the defendant and

9   Martin Shkreli, correct?

10  A    Yes.

11  Q    I'd like to direct your attention to the page that's

12  49754, the fifth page of the document.  Do you see the -- can

13  you read the email from Mr. Greebel to Martin Shkreli

14  December 28th, 2012 at 8:40 p.m.?

15  A    Sure.  It says:  If it is what it is, hopefully you can

16  get me the promised money by Wednesday because at this point I

17  need to be the top of the list and -- I need to be at the top

18  of the list and not waiting behind others anymore.  Regarding

19  name change, Bloomberg, Yahoo and FINRA will not be able to

20  update their various sites until the necessary paperwork is

21  filed with Delaware, et cetera.

22  Q    What did Mr. Shkreli respond to that email?

23  A    Any way to get the docs filed?

24  Q    What was Mr. Greebel's response to that?

25  A    Sorry, didn't realize you changed topics; we can file

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1   once the other thing is addressed or partially addressed.

2   Q     Is that reference to the other thing?

3   A     Yes, the other thing.

4   Q     I'd like to -- and that's December 30th, 2012?

5   A     Correct.

6   Q     I'd like to show you what's in evidence as Government

7   Exhibit 513.  If you go to the second page of this R049789

8   this is another email chain we looked at but I'd like to

9   direct you to Mr. Shkreli's 7:24 p.m. on January 17th, 2013

10  email to the defendant.

11          Do you see that?

12  A     Yes.

13  Q     Can you read what Mr. Shkreli wrote there.

14  A     100-200.  I have to take care of some other stuff we'll

15  see what is left over should be enough for $200,000.

16          475,000 in.

17          175,000 out for that thing.

18          25,000 rent, 25,000 rent again --

19  Q     I'll stop you there and ask you to go to the next email

20  up in the chain which is 49788, is that an email from the

21  defendant to Martin Shkreli?

22  A     Yes.

23  Q     7:35 p.m. on January 17th, 2013?

24  A     Yes.

25  Q     And what did the defendant write there?

DELZOTTO – DIRECT – PITLUCK

1   A    The defendant wrote:  We had multiple conversations in

2   December and beginning of January that you would get me 200

3   from this money assuming that Pedro gave you have at least

4   400.  Pedro is giving you 450 so I need to get the 200.  You

5   said that the other thing had to be done first, rent and back

6   salary and that I would get the remainder.  I'm not asking for

7   the full remainder but I do need to get the 200 we discussed.

8   Q    So I'd like to direct your attention to Government

9   Exhibit 514 for identification.  This is a series of emails

10  between the defendant and Martin Shkreli and earlier emails to

11  somebody named Blair Fensterstock taking place between

12  January 12th, 2013 and January 18th, 2013?

13  A    Yes.

14          MR. PITLUCK:  Your Honor, we'd offer Government

15  Exhibit 514 into evidence.

16          MR. BRODSKY:  Your Honor, there's a series of emails

17  in here with respect to Blair Fensterstock, can we be heard on

18  that?

19          THE COURT:  All right, let's get a sidebar.

20          MR. BRODSKY:  Sorry, Your Honor.

21          (Sidebar conference.)

22          (Continued on the next page.)

23

24

25

SIDEBAR CONFERENCE

1          MR. BRODSKY:  My understanding, Your Honor, is that

2     there was money owed to this other law firm, Fensterstock and

3     there may have even been a settlement agreement with

4     Fensterstock, my only concern is it's beyond the scope of the

5     bill of particulars, it's beyond the scope of the indictment

6     and it, under 403, creates incredible confusion for the jury

7     and it is unduly prejudicial to introduce another series of

8     emails by somebody who is not a witness about a whole separate

9     issue.

10          And then there's also a statement about Merrill

11     datasite people who sued me.  Merrill did reach a settlement

12     with Retrophin over bills owed to Merrill.  Retrophin, as I

13     understand it, has never disputed any of these settlements

14     with Merrill -- not that that's relevant at all, but once

15     again, that's beyond the scope of the indictment, it's beyond

16     the scope of the bill of particulars.  We were never told it

17     was going to be evidence about Merrill or this law firm and

18     it's doesn't pass 401 and it doesn't pass 403.

19          THE COURT:  I'll hear from the government.

20          MR. PITLUCK:  Judge, I would note that this is --

21     the defendant is on --

22          THE COURT:  Watch your papers.

23          MR. PITLUCK:  I'm sorry.  The defendant is on every

24     email but the bottom one after Mr. Shkreli copies him.  Now,

25     he owes money to a law firm, he being Martin Shkreli and he

SIDEBAR CONFERENCE

1    loops in the defendant.  There are then negotiations about

2    that and then the document goes into discussion between the

3    defendant and Mr. Shkreli about the amount of money that is

4    owed to the defendant and his financial state.  That's

5    directly relevant to this case, how much money Mr. Shkreli has

6    to pay him, the payment of Katten bills, the lack of payment

7    of Katten bills, the Merrill datasite issue.  We just saw an

8    email about the Merrill datasite.  We're not alleging that

9    there is some sort of fraud related to that.  There's no

10   prejudice here, Judge, it's not confusing.

11          They just saw the email.  This is communications

12   between the defendant and Martin Shkreli about

13   Martin Shkreli's financial condition as of January 2013 and

14   the money that he owes to Katten Muchin Rosenman.

15          MR. BRODSKY:  Your Honor, it's already cumulative of

16   other emails where they just showed the witness that

17   Mr. Greebel is chasing payments to be made to Katten.  There

18   is already a substantial amount of evidence, and we're going

19   to argue and we can stipulate to this, by the end of 2012 and

20   early 2013, Katten was owed a lot of money.  We've heard

21   evidence from Mr. Silverman and Davida, Ms. Davida that

22   partners were obligated to go get that money that was owed to

23   the firm.  And this is just another email in a series that

24   money is owed to Katten, the amounts are in evidence, and

25   Mr. Greebel is asking for the money to be paid for the law

SIDEBAR CONFERENCE

1    firm, that's in evidence.  But what is damaging and what is

2    beyond the scope of the indictment and unduly prejudicial here

3    and not relevant is this back and forth about a law firm

4    that's owed money.  That is unduly prejudicial and that there

5    is a settlement that's being reached.  And the difference here

6    between Merrill, the last email, and this one this talks about

7    Merrill datasite people who sued, so it invokes a whole other

8    lawsuit by Merrill.

9           I just don't see why the government -- the probative

10   value here, which is so small and cumulative to all the other

11   evidence is substantially outweighed by the unfair and undue

12   prejudice of introducing a whole other set of alleged

13   settlements or alleged people seeking money from Mr. Shkreli

14   and Retrophin.

15          MR. PITLUCK:  Judge, first, I heard they don't need

16   it because there is so much else.  I would just say the

17   obligatory government cite to the whole chief we're allowed to

18   present the case we need.  The material dispute in this case

19   is what Mr. Greebel knew about Martin Shkreli's financial

20   state, particularly vis-a-vis how the agreements were paid.

21   There is an email from Mr.Shkreli to Mr. Greebel, I have very

22   little run my actual business with if I give you another

23   hundred thousand dollars.  That's on page 027308.  There is

24   nothing --

25          MR. BRODSKY:  Judge --

SIDEBAR CONFERENCE

1          MR. PITLUCK:  Can I finish?  There is nothing

2     prejudicial.  There have been multiple emails about the people

3     that Mr. Shkreli owes money to.  We just read one where he

4     went through every single dollar amount that was shown to him.

5     There is nothing prejudicial about it.  What is probative is

6     this is a discussion in January of 2013 after the reverse

7     merger before the agreements are entered into, there is a line

8     by line delineation of how Martin Shkreli has no money and how

9     it is being informed to the defendant.  If that's precluded

10    based on this notion that he owes -- Martin Shkreli owes the

11    law firm $16,000, which he does which he loops the defendant

12    in to settle, then the probative value far outweighs any

13    prejudice.  There have been email after email about how

14    Martin Shkreli owes money to.

15         MR. BRODSKY:  If they want that email they should

16    redact everything else which is totally irrelevant, unduly

17    prejudicial.  The only thing that should come in is

18    Mr. Shkreli statement, I have very little run my actual

19    business with.  The government has interpreted that as

20    Mr. Shkreli personally has very little money.  I think what

21    he's saying there is that Retrophin has very little money.  I

22    think we all know that Retrophin didn't raise money in the

23    pipe until it was announced on February 12th, 2013.  In late

24    December, the government exhibit that's already introduced

25    into evidence, Mr. Shkreli was sending Mr. Greebel a possible

SIDEBAR CONFERENCE

1    bankruptcy press release for Retrophin going out of business.

2    So this is unduly prejudicial to be introducing hearsay

3    statements about another potential settlement and other

4    potential lawsuits when it's beyond the scope of the

5    indictment, it's beyond the scope of the bill of particulars.

6              MR. PITLUCK:  Judge --

7              THE COURT:  Please step away from her face with the

8    papers.  You're getting very close to her eyes.

9              MR. PITLUCK:  I'm sorry.  Judge, there are multiple

10   emails where he says if they destroy our inventory good-bye

11   company.  It's not just money, this is a whole delineation of

12   the financial state of Retrophin, Martin Shkreli and his

13   financial state.  This can't be more relevant.

14             MR. BRODSKY:  That's what I mean, Your Honor, they

15   are trying to get in this evidence about if they destroy our

16   inventory.  Nobody knows what that means because there's been

17   no evidence about Blair, there's been no evidence about these

18   other vendors.  There's been no evidence about all this other

19   stuff in this email exchange, and so they're introducing

20   concepts that are completely confusing for the first time.

21   And again, we got no notice from the defense about this bill

22   of particulars, we got no notice in the indictment and they

23   didn't put any 404(b) notice in for us and these are potential

24   alleged other bad acts that the jury can interpret.

25             MR. PITLUCK:  Judge --

SIDEBAR CONFERENCE

1     MR. BRODSKY:  So this is, under 403 it should be

2  out, under 401 it should be out.  It's also should be out on

3  under 404(b).

4     MR. PITLUCK:  Judge, 404(b), it's crazy.  This is

5  not bad act, this is money that Martin Shkreli owes.

6     THE COURT:  All right, but let's do this.  Can we

7  consider on page R027309 redacting the email that -- maybe

8  there's nothing on here that's really needs to come in.  Just

9  taking that page and everything that follows out of this

10  exhibit and introducing the first three pages.  You can mark

11  them redacted but just the first three pages that start at

12  27306 through 27308.

13     I think that putting Fensterstock in the middle of

14  this sort of -- could be confusing.  I understand that subject

15  line re legal bills refers to Fensterstock's firm, but it

16  also -- I mean, it relates in some ways Mr. Greebel's law firm

17  and what's owed, but it seems to me that we're talking about a

18  dispute and granted Mr. Shkreli is offering to have

19  Mr. Greebel get involved and drafting up a settlement

20  agreement and he's looping him in, but it just seems to me

21  that it is --

22     MR. PITLUCK:  Judge, if I may -- I'm sorry.

23     THE COURT:  -- confusing.

24     Step away from her face.

25     MR. PITLUCK:  I'm sorry.  The email from

SIDEBAR CONFERENCE

1    Martin Shkreli to Blair Fensterstock a copy to the defendant.

2    It says, we have returned our investors' capital and MSMB

3    would have no ability to pay you whatsoever.  That's directly

4    on point to --

5            MR. BRODSKY:  But that goes to Blair Fensterstock,

6    Your Honor.  Yeah, but they're email exchanges related to

7    legal bills that Martin Shkreli is making statements to Blair

8    Fensterstock.  They never called him as a witness.  We have no

9    idea what this means.  It is completely inappropriate and it

10   should be out.

11           MR. PITLUCK:  Judge, as I recall, when they showed

12   the cash flow statements that were on the board, Mr. Brodsky

13   went through every single legal bill that was paid to other

14   firms.

15           MR. BRODSKY:  That was a document in evidence that

16   the government put in.

17           MR. PITLUCK:  This is now the government is going to

18   put in.

19           THE COURT:  Where is that email, what page is that

20   on?

21           MR. PITLUCK:  I'm sorry, Judge.

22           MR. BRODSKY:  It's on the second to last page.

23           THE COURT:  310.

24           MR. PITLUCK:  310.

25           THE COURT:  Let me take a look, please.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

7534

SIDEBAR CONFERENCE

1    Is it page 310, is that what you said?

2    MR. PITLUCK:  Yes, Judge.

3    MR. KESSLER:  It's hard to see, I'm sorry.

4    THE COURT:  Okay.  I thought there was something

5  else quoted.

6    MR. KESSLER:  Your Honor, what may be part of the --

7    THE COURT:  That's not what you quoted though.

8    MR. KESSLER:  What may be part of the confusion is

9  the email Mr. Pitluck pointed you to --

10    THE COURT:  Yes.

11    MR. KESSLER:  -- on page ending 310 --

12    MR. PITLUCK:  We have returned our --

13    MR. KESSLER:  That is a statement that Evan Greebel

14  receives in January 2013 that says MSMB Capital has returned

15  all its investors' money and has no money.  So that's relevant

16  to Mr. Greebel's knowledge about MSMB Capital's resources.

17    THE COURT:  This email does not say any of that.

18    MR. PITLUCK:  Right there, Judge, the second line.

19  We have returned our investors' capital and MSMB would have no

20  ability to pay you whatsoever.

21    THE COURT:  Okay, sorry.

22    MR. KESSLER:  So that email is related to

23  Mr. Greebel's knowledge of MSMB Capital's ability to pay and

24  its financial status.  Then the emails towards the beginning,

25  which is what Mr. Pitluck talked about at the beginning, are

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    about Retrophin's ability to pay.  They're both relevant.

2              MR. BRODSKY:  Your Honor, Blair Fensterstock, we do

3    not know what bills were owed or outstanding.  We do not know

4    what the issues were with Mr. Fensterstock.  That is the

5    context that is necessary to understand we have returned our

6    investors' capital.  Is it talking about MSMB Healthcare or

7    MSMB Capital?  They are very, very different.  He just says in

8    MSMB would have no ability to pay you whatsoever.  I don't

9    know whether that means the bills were owed to MSMB Healthcare

10   or MSMB Capital.  Because if it was owed to MSMB Healthcare,

11   respectfully, there is money in MSMB Healthcare.  The capital

12   was returned but they have an immense amount of Retrophin

13   stock that's worth a lot of money and so it is completely

14   confusing and misleading and we're unable to question anybody

15   about the meaning of that because Ms. Izerne they didn't call,

16   Mr. Fensterstock they didn't call and it's confusing, beyond

17   the scope and they should not be able to admit this, Your

18   Honor, one line that they're interpreting within a context of

19   another law firm's bills.

20             MR. PITLUCK:  There is no confusion here, it's

21   argument.  MSMB Capital or Healthcare that's what Mr. Shkreli

22   wrote.  That line could not be clearer.  They are just trying

23   to keep this out.

24             MR. KESSLER:  And if they want to redact

25   Mr. Fensterstock's name or some specific detail about the

SIDEBAR CONFERENCE

1  specific settlement, that's fine.

2           MR. PITLUCK:  There have been email after email and

3  document after document about fees owed to law firms and the

4  defense has seized on it and the updates to the board.  I

5  don't see how this one's prejudicial.

6           MR. BRODSKY:  It is incredibly prejudicial.  We

7  don't know any details about Fensterstock whether they did

8  work for MSMB Healthcare or whether they did work for MSMB

9  Capital.  That would matter to this, the interpretation of

10  this --

11           MR. KESSLER:  Your Honor, I'm sorry.

12           MR. BRODSKY:  And then again had we received the

13  bill of particulars and this was on it, had they told us about

14  it before trial, we might have been able to question witnesses

15  about it.  We might have been able to cross examine people

16  about it, instead we get this at the last minute embedded in

17  an email exchange that they say they are for one purpose which

18  is to say that Mr. Greebel was chasing Mr. Shkreli for money.

19  This should not be admitted, Your Honor.

20           MR. PITLUCK:  Your Honor, respectfully, this

21  document has been produced as an exhibit for months.  It's

22  been produced in discovery for over a year.  This is not

23  blindsiding anybody or there is no need to put it on a bill of

24  particulars that Martin Shkreli owed money to a law firm and

25  Mr. Greebel knew it.  This is directly to his knowledge.

SIDEBAR CONFERENCE

1    THE COURT:  Why don't we try to do some redactions

2   then.  If you take out references to the other law firm, so

3   Mr. Fensterstock, right.  I think you should -- if what you

4   want from this email dated January 18th from Mr. Shkreli to

5   Mr. Fensterstock copying Mr. Greebel is the fact that he will

6   personally -- well, I don't even know it's about the bill, but

7   maybe, we have returned our investors' capital and MSMB would

8   have no ability to pay you whatsoever, is that what you want?

9    MR. PITLUCK:  Respectfully, Judge, without

10  knowing -- it's not that they owe money and he writes that we

11  have returned our investors' capital in MSMB.  It's the

12  context, Judge.  I'm failing to see the prejudice because

13  Mr. Shkreli gets an email from firm that says you owe me

14  $16,000.  I don't understand, this has been coming -- we just

15  literally went through a document where he went through five

16  different places that he owes money to Mr. Greebel.  This is

17  less prejudicial than that and that's in evidence.

18    MR. BRODSKY:  No, that communication was strictly

19  between Mr. Shkreli and Mr. Greebel and there was no basis to

20  object to their discussion.  Here it is a communication

21  between Mr. Shkreli and Mr. Fensterstock copying Mr. Greebel,

22  and that is a completely different character.

23    THE COURT:  Well, he says, Evan can draw up a

24  settlement agreement if you do not accept my billing analysis

25  Leonora, blah, blah, blah.  And he's offering Mr. Greebel

SIDEBAR CONFERENCE

1  services to resolve this outstanding billing dispute with

2  Mr. Fensterstock.

3          MR. PITLUCK:  I don't see --

4          THE COURT:  Pardon me?

5          MR. PITLUCK:  I'm sorry, Judge.  I don't see how any

6  of this needs to be redacted.  It's involving him from the

7  beginning, it's relevant to so many issues that he's copied on

8  the email.  Respectfully, Judge, I don't understand the

9  difference between a communication between Mr. Shkreli and

10 Mr. Greebel where somebody else is included.  He's making it

11 plain that this issue is being copied to him.

12         MR. KESSLER:  No one is alleging this settlement

13 agreement is fraudulent or that this payment is a debt of some

14 sort which might be the thing that implicates a bill of

15 particulars.  This is just fact.

16         MR. BRODSKY:  We do not know what the facts are.

17         THE COURT:  The statement by Mr. Shkreli about the

18 financial status of MSMB and its ability to pay even on a

19 modest legal bill and then the rest of the email seems to

20 focus on Mr. Greebel's outstanding bills and his request that

21 he get paid a hundred thousand dollars in outstanding bills,

22 right?  That's what rest of this is.

23         MR. PITLUCK:  Yes.

24         MR. BRODSKY:  I don't have an objection to the rest

25 of it where he's asking to chase for money.  I have a serious

SIDEBAR CONFERENCE

1   objection to all the email exchanges to Blair, who is a person

2   who is not a witness at the trial, who is a managing partner

3   in a law firm.  We don't know what the legal bills were for,

4   we don't know anything about the nature of the amount, we

5   don't know whether it even continues through to Retrophin

6   because it says, we now have bills outstanding to your firm

7   going back to July of 2011.  There's a lot confusion about

8   what that means and the government is going to draw an

9   inference about what that means but without any context.  They

10  shouldn't be allowed to admit this into evidence.

11        MR. PITLUCK:  They can argue what the inference is

12  too.  I'm not familiar with the concept that every single

13  person on every email has to testify.  This is a very clear

14  invoice for a number of bills.

15        We just went through a number of legal firms that

16  were getting paid, nobody knew what they were.  They can call

17  Blair Fensterstock if they wanted to for an explanation of it,

18  we don't have to.

19        MR. BRODSKY:  Again, Your Honor, the government is

20  shifting a burden.  We don't have to put on a case or we don't

21  have to call a witness.  This dates back to 2011, a legal bill

22  from 2011 and now we're offering it into evidence in the

23  context of a settlement agreement when the whole trial in

24  Count Seven is about settlement agreements.

25        THE COURT:  You said 2011, you mean 2013?

SIDEBAR CONFERENCE

1      MR. BRODSKY:  It goes back, the bills goes back to

2  July 2011 --

3      THE COURT:  Right.

4      MR. BRODSKY:  -- so when they're talking about a

5  settlement agreement it is unduly prejudicial.

6      MR. PITLUCK:  It's in 2013, they are chasing in

7  2013.  There is nothing prejudicial settling with a law firm.

8  He negotiated a half off, that's it.

9      THE COURT:  So you would suggest the government

10  would want -- I don't want to admit the whole thing but it

11  would be starting with the January 18th, 2013 email from

12  Shkreli to Fensterstock copying Mr. Greebel making an offer --

13  making a statement about status or the effect on MSMB and

14  offering Mr. Greebel's services to do the settlement.

15      MR. PITLUCK:  You want me to redact out the bottom

16  email?

17      MR. BRODSKY:  Your Honor, the bottom email,

18  respectfully, we object and disagree.  You have to put in the

19  bottom email if you're going to put in Mr. Shkreli's email.

20  Again, I object.  I don't like the document, I think it's a

21  bunch of hearsay, I think it's inadmissible, I think it's

22  prejudicial, I think it should be out for hearsay alone, but

23  it's not in furtherance of any conspiracy and it is confusing

24  unduly prejudicial, but if Your Honor is going to overrule

25  that objection I think starting to parse it you start losing

SIDEBAR CONFERENCE

1   the nature of the dispute.

2           THE COURT:  These are direct statements by

3   Mr. Shkreli, you know, again Mr. Greebel's copied and he's

4   offering Mr. Greebel's services to straighten out this dispute

5   and then obviously what follows is Mr. Greebel's own firm

6   bills, a request for payment and stating that he needs to get

7   the money.

8           MR. BRODSKY:  But these statements to Blair

9   Fensterstock are not in furtherance of any conspiracy, they

10  are hearsay statements.

11          MR. KESSLER:  They are not being offered for the

12  truth.

13          MR. BRODSKY:  If they are not being offered for the

14  truth --

15          MR. KESSLER:  They are being offered to show that

16  Mr. Greebel is on notice that in January 2013 Martin Shkreli's

17  view is that MSMB Capital had no money.  Mr. Greebel then goes

18  on to obligate MSMB Capital to repay Retrophin.  His knowledge

19  and his understanding of MSMB Capital's finances are relevant

20  and it doesn't matter if Mr. Shkreli's statement is true or

21  not.  It is the information that was conveyed to him.

22          MR. BRODSKY:  No, Your Honor, Mr. Kessler cut me off

23  when I was in the middle of talking and, that is, they are

24  offering this for the truth.  They want the jury to believe

25  this is the truth that we have returned investors' capital and

SIDEBAR CONFERENCE

1   MSMB would have no ability to pay you whatsoever.

2          We tried to offer in documents, if you remember, it

3   was a bill that was sent from Mr. Greebel to Mr. Shkreli and

4   we had a sidebar out in the hallway before Your Honor's

5   chambers and that was all about redacting a statement that

6   Mr. Shkreli made about indemnification because we said we

7   weren't offering it for the truth, they said absolutely it is

8   truth.

9          They are offering this for the truth.  It is not in

10  furtherance of any conspiracy.  It cannot be in furtherance of

11  a conspiracy.

12         THE COURT:  You are offering it to show that

13  Mr. Shkreli got no money, MSMB is unable to --

14         MR. KESSLER:  We're offering to show that

15  Mr. Greebel was told that.

16         MR. BRODSKY:  For the truth.

17         MR. KESSLER:  No, Mr. Greebel's actions are premised

18  on whatever was in his head.  Mr. Shkreli telling him MSMB

19  Capital has no money, that's important whether or not MSMB

20  Capital in fact has no money because he then goes on to take

21  actions that are inconsistent with that.

22         MR. BRODSKY:  Your Honor, he's not telling

23  Mr. Greebel, he's telling somebody he's in negotiations with

24  to reduce a bill.  If you're in negotiations with someone to

25  reduce a bill, you do make statements to reduce the bill.

7543

SIDEBAR CONFERENCE

1      THE COURT:  I'm going to exclude it.  I'm just going

2  to allow the emails.  I think we've been at sidebar long

3  enough.  I'll allow the emails that start -- looks like we

4  don't have anything on page R027309.  So let's just start with

5  Government Exhibit 514 up to page R027308.

6      MR. BRODSKY:  Thank you.

7      MR. PITLUCK:  I have to, respectfully, object.  It's

8  clear notice that he has no money, it's up to them to argue.

9      THE COURT:  Well, there's other inferences to be

10  drawn from other statements in this document.  All right.

11      MR. PITLUCK:  Thank you, Judge.

12      THE COURT:  So the way I'm going resolve it is that

13  it can be admitted but it will be redacted from page --

14      MR. PITLUCK:  I'll just show --

15      MR. KESSLER:  We just want to show it, we'll redact

16  it before it goes into evidence.

17      THE COURT:  So what we're going to do is we will

18  admit this, we will redact the pages after R027308, so these

19  pages will be redacted and we will admit just the first three

20  pages of this exhibit.

21      MR. BRODSKY:  Thank you.

22      THE COURT:  I will admit it now and you can redact

23  it later and show only those three pages.

24      MR. PITLUCK:  We'll show only those three pages.

25      (End of sidebar conference.)

DELZOTTO - DIRECT - PITLUCK

1          (In open court.)

2          THE COURT:  Government Exhibit 514 will be admitted

3    with redactions, the redactions will start at page R027309 to

4    the end of the exhibit.

5          (Government Exhibit 514, was received in evidence.)

6    BY MR. PITLUCK:

7    Q    So can we go to R027308, please, and publish to the jury.

8          The bottom email from the defendant to Mr. Shkreli

9    dated January 18th, 2013, the subject line, re legal bills

10   outstanding, what did the defendant write there?

11   A    Will be ready to do it once the other wire is sent.

12   Q    What was Mr. Shkreli's response there?

13   A    Maybe it's time for me to find a new law firm.

14   Q    And going up to the 6:26 p.m. email, what did the

15   defendant write?

16   A    You are funny.  The documents are done.  You said you

17   would send me $200,000.  I'm not looking for the whole thing.

18   Q    And what was Mr. Shkreli's response to that?

19   A    I have very little run my actual business with if I give

20   you another $100,000.

21   Q    And going back to R027307, what was the defendant's

22   response?

23   A    You told me in December, in parenthesis, after everything

24   happened you would be giving me $200,000.  I have already

25   given you a significant discount and agreed to wait for

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1  payment in the remainder until the Roth thing is resolved.

2  You had money during the year on a variety of occasions and

3  asked me to wait while you paid others.  You told me last

4  night and this morning that you would be sending me the

5  remaining money today or Tuesday.

6  Q    What was Mr. Shkreli's response to the defendant's email

7  on January 18th, at 6:36 p.m.?

8  A    I will be able to -- I'm sorry.  I might be able to do

9  $50,000 but I have a lot of people sweating me even after this

10 $450,000.

11 Q    And what did Mr. Greebel write above?

12 A    Not sure who is sweating you.  We discussed the bills as

13 we discussed in December, the patience I have shown you is

14 putting me at grave risk.  I need to get that second $100,000.

15 I won't hock you again.  In parenthesis, and you know from the

16 past statements that I do not once I tell you that.

17 Q    What was Mr. Shkreli's response to that email?

18 A    You're not my only bill, vendors, other lawyers, in

19 parenthesis, you saw Blair's email.

20 Q    What was the defendant's response to that email?

21 A    Blair is less than $10,000, he'll wait.  The other

22 vendors should not be a problem and can be put off 'til after

23 Roth.

24 Q    And going to the first page what was Mr. Shkreli's

25 response to the defendant at 6:46 p.m.?

7546

DELZOTTO - DIRECT - PITLUCK

1   A    No.  One of our doctors was pissed we hadn't paid him yet

2   and that was $13,000.  Our drug supply company is due for nine

3   months now, if they destroy our inventory good-bye company, et

4   cetera, et cetera.

5   Q    What did the defendant write after receiving that email?

6   A    Understood.  Blair can still wait.  I just need the

7   hundred and I can be patient again.  I've gotten you out of

8   paying a lot of people, I can't be left stuck at this point on

9   this.

10  Q    And Mr. Shkreli's response at 6:48 p.m.?

11  A    Blair is my smallest bill, don't forget the Merrill

12  datasite people who sued me.

13  Q    And, finally, what was the defendant's response at the

14  top of the page?

15  A    I factored them in.  I worked on this stuff during

16  vacation and you clearly said if he pays at least 400 I would

17  get 200.  I've repeatedly done all you asked and very rarely

18  chase you for money.

19  Q    At this point I'd like to direct your attention to

20  Government's Exhibit 113-12, which is in evidence.  It's an

21  email exchange between the defendant and Corey Massella.  Are

22  you there?

23  A    Yes.

24  Q    What's the bottom email from the defendant -- sorry,

25  withdrawn.  Can you go to the first page.  It's an email from

DELZOTTO - DIRECT - PITLUCK

1    Corey Massella to the defendant dated March 8th, 2013,

2    correct?

3    A    Correct.

4    Q    What's the subject line?

5    A    Martin's employment agreement for $200,000, see attached.

6    Q    What did Mr. Massella write in that email?

7    A    Mr. Massella wrote:  Evan, this is the only employment

8    agreement I have for Martin.

9    Q    And going to the first page, what was the defendant's

10   response to this email?

11   A    Martin has advised that there was a misprint/typo in the

12   agreement and his compensation is $350,000 per annum.

13   Q    What did Mr. Massella respond on the same day at

14   12:15 p.m.?

15   A    After two sets of financial statements were issued with

16   the same disclosure, that he signed off with rep letters.  So

17   we used $250,000 based on the facts presented previously.  You

18   want to restate both sets of financial statements?

19   Q    So just going back down to Mr. Greebel's email to

20   Mr. Massella at the bottom of the page that's at 12:13 p.m.?

21   A    Yes.

22   Q    I'd like to show you what's been marked for

23   identification as Government Exhibit 535.

24   A    Okay.

25   Q    Is this a series of communications between the defendant

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1  and Martin Shkreli with a bottom email from Mr. Massella to

2  the defendant that we previously saw in Government

3  Exhibit 113-12?

4  A    Yes.

5           MR. PITLUCK:  Your Honor, we offer Government

6  Exhibit 535.

7           MR. BRODSKY:  No objection, Your Honor.

8           THE COURT:  All right.  We admit Government

9  Exhibit 535.

10           (Government Exhibit 535, was received in evidence.)

11  Q    Let's start with the bottom email, the email from

12  Mr. Massella to the defendant.  Evan, this is the only

13  employment agreement I have for Martin.

14           Is that the same email we saw on the bottom of the

15  previous exhibit?

16  A    Yes.

17  Q    What did Mr. Greebel do with that email?

18  A    Mr. Greebel forwarded it to Martin Shkreli.

19  Q    What did he write?

20  A    He wrote tell him it's a misprint or something else.

21  Q    What was Mr. Shkreli's response?

22  A    It is a misprint.

23  Q    And what did the defendant respond to that?

24  A    Okay.

25  Q    What time was that email sent?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1    A    That was sent at 12:12 p.m. on March 8th, 2013.

2    Q    I'd like to show you what's been marked for

3    identification as Government Exhibit 537.

4         Is this a series of emails between the defendant and

5    Martin Shkreli dated March 8th, 2013 that's another

6    continuation of the chain we saw in Government Exhibit 113-12?

7    A    Yes.

8         MR. PITLUCK:  Your Honor, we offer Government

9    Exhibit 537 in evidence.

10        MR. BRODSKY:  No objection.

11        THE COURT:  We receive Government Exhibit 537.

12        (Government Exhibit 537, was received in evidence.)

13    Q    Going to the third page, you see the email in the middle

14    we looked at in 113-12.  It says, Martin has advised there was

15    a misprint/typo in the agreement and his compensation is 350

16    per annum, do you see that?

17    A    I do see it.

18    Q    The email above is also one that we saw at 113-12 from

19    Mr. Massella about restating, correct?

20    A    Correct.

21    Q    What did Mr. Greebel do with Mr. Massella's email of

22    12:17 p.m.?

23    A    He forwards it to Martin Shkreli.

24    Q    What did he write?

25    A    He writes:  Corey is saying 250 to 350 will cause a

DELZOTTO - DIRECT - PITLUCK

1    restatement for both financials.

2    Q    What was Martin Shkreli's response to the defendant's

3    email?

4    A    I guess that's what it will have to be.

5    Q    And what did the defendant write back at 12:21 p.m.?

6    A    We can do a new one now for you if you want.

7    Q    What was Mr. Shkreli's response to that email?

8    A    What good will that do.

9    Q    Going to the first page, what did defendant respond to

10   Mr. Shkreli's email?

11   A    Mr. Greebel states:  Retroactive to January 1st, 2013 and

12   new grant.

13   Q    What did Mr. Shkreli respond after that?

14   A    Need it retroactive to January 1st, 2011 or somehow

15   reimbursed for that period the extra $100,000 for 2011, 2012.

16   Find a way without restatement.

17   Q    What was the defendant's response at 1:01 p.m.?

18   A    One time bonus for financing?

19   Q    Mr. Shkreli's response to that?

20   A    Good idea.

21   Q    Finally, what did Mr. Greebel write at 1:06 p.m.?

22   A    Please review your EA, employment agreement, and advise

23   if there is anything else you want to change.

24   Q    That's all on March 8th, 2013?

25   A    Correct.

PROCEEDINGS

1    BY MR. PITLUCK:

2    Q    At this point I'd like to show you Government's Exhibit

3    674 for identification.  Top e-mail from defendant to Martin

4    Shkreli with e-mails at the bottom from Steven Aselage to

5    Martin Shkreli and Megan Valeur-Jensen all dated September 24,

6    2014?

7    A    Yes.

8              MR. PITLUCK:  Your Honor, we offer 674 --

9              MR. BRODSKY:  Your Honor, we had a ruling on this

10   earlier in the trial.  I'm happy to go to sidebar and explain

11   what your Honor's ruling was with respect to the bottom

12   e-mail.

13             THE COURT:  All right, excuse us.  Should we give

14   you the mid-afternoon break at this time?  This hopefully

15   won't take a long time.  Can you indulge us for five minutes

16   at sidebar, or would you like a break.  Break?  All right.

17             Please don't talk about the case.

18             (Jury exits the courtroom.)

19             (Whereupon, the witness steps down.)

20             THE COURT:  What I recall there was a double hearsay

21   objection to this.

22             MR. BRODSKY:  Yes, your Honor.  I'm anticipating

23   that my worthy adversary is going to say that this is for its

24   effect on Mr. Greebel.  The problem is, your Honor, that I

25   went back and looked at all communications between Meg

PROCEEDINGS

1  Valeur-Jensen in this time period, within the last week before

2  this e-mail on September 24, 2014, and this is the danger of

3  hearsay.  Mr. Aselage is saying what Meg Valeur-Jensen had

4  requested.  And then is saying somebody at Katten, it's

5  unclear who, is telling Meg Valeur-Jensen that they are

6  working on pulling them together.  So it's multiple level of

7  hearsay.  Actually, Ms. Valeur-Jensen had requested very

8  specific ordinance within a week before this, roughly.  They

9  were audit committee minutes.

10         They have Ms. Valeur-Jensen available to them.  They

11  can call her.  The problem is, we believe this statement is

12  misleading, what she had requested regarding the books from a

13  prior meeting, misleading with respect to Katten continues to

14  say, we don't know what means.

15         And the reality is, Mr. Greebel had given all the

16  minutes to Mr. Panoff in December of 2013.  And then he

17  updated him continuously throughout 2014 with Board minutes.

18  And they are trying to put this in with double hearsay as a

19  suggestion that Mr. Aselage is somehow -- that Meg

20  Valeur-Jensen had requested all of the minutes.  And that she

21  had done it months or weeks, it's unclear from this what a

22  substantial period of time is.  And then that somebody at

23  Katten continues to say they are working on pulling them

24  together.  This is unfair.  It's unduly prejudicial.  It's

25  double, triple-level hearsay.  Your Honor ruled on it.  We

7553

PROCEEDINGS

1    believe it should be inadmissible.

2            MR. PITLUCK:  Your Honor, the version of the e-mail

3    that was shown to Mr. Aselage did not have the defendant being

4    forwarded the e-mail and then responding to it.  We would note

5    that the next exhibit is Government's Exhibit 286, in which

6    approximately six hours later, defendant sends Meg

7    Valeur-Jensen all Board minutes through May of 2014.

8            So I've never actually heard of triple hearsay, I

9    don't know if that entails here.  This is a request from

10   Mr. Aselage to Martin Shkreli forwarding on a request saying

11   Meg is requesting the books from prior meetings.  Mr. Shkreli

12   forwards it to Mr. Greebel.  Mr. Greebel is now on notice

13   there is a request, there is a statement there has been a

14   request pending.  He doesn't respond, what are you talking

15   about, I don't know what this means.  He responds, I'm in the

16   process of sending it, will have to today.  Which is indicia

17   that he knew about beforehand.

18           Regardless, the bottom e-mail is not coming in for

19   the truth of the matter that Meg Valeur-Jensen requested

20   e-mails, it's regarded for the e-mail at the top that says as

21   of September 24, 2014, he is pulling e-mails, he's pulling

22   Board minutes, and knew he was supposed to pull Board minutes.

23   He says, he's in the process of sending it to her.  Then six

24   hours later sends her four months' of Board minutes.

25           MR. BRODSKY:  It's deeply prejudicial.  They are

PROCEEDINGS

1   going to argue September 24 that Mr. Greebel intentionally

2   tried to delay the sending of Board minutes.  That's their

3   whole purpose for doing.  The reality is that if you look at

4   the e-mails, he had to go to storage to get them, the files.

5   And it's not Mr. Greebel that is causing this delay.  He had

6   requested them, it took Katten a while to put the files --

7   these are not files sitting around in his office.

8           And so it's a little unfair for them to create this

9   prejudice.  Because what Mr. Aselage is saying, and he doesn't

10  have any first-hand knowledge, this is coming in for it's

11  truth, even though they say it's just for the effect.  Meg has

12  been requesting the books from prior meeting for a substantial

13  period of time.  We don't know when that prior meeting was,

14  what specific books are being requested.

15          My understanding, from looking at e-mail

16  communications, she had specific requests about two audit

17  committee minutes.  Then it says, Katten continues to say they

18  are working on pulling them together.

19          Ms. Valeur-Jensen was not just in touch with

20  Mr. Greebel at this time, she was in touch with other lawyers

21  at Katten.

22          THE COURT:  Like who?

23          MR. BRODSKY:  Jim Calder was doing anti-trust

24  litigation for Jim Calder's partner at Katten, was doing an

25  anti-trust litigation matter for Katten.  There were

PROCEEDINGS

1    communications in September of 2014.

2              THE COURT:  These are about meeting minutes.

3              MR. BRODSKY:  I understand, your Honor.  We don't

4    know, without having Meg Valeur-Jensen testify, we don't know

5    what Meg Valeur-Jensen told Mr. Aselage, and what Mr. Aselage

6    told to Meg Valeur-Jensen.

7              And Katten continues to say they are working on

8    pulling them together, which what this is going to require us

9    to do, your Honor.  It says, it shouldn't take weeks, as if

10   this is somehow an intentional act.

11             THE COURT:  No, I don't think you can make that

12   inference.  I think just that it's taking time, that

13   Mr. Aselage wants the information, so he's asking Mr. Shkreli

14   to reach out and get it done.

15             MR. BRODSKY:  I know, your Honor, but they are

16   putting this in, they can put in the notice that Mr. Aselage

17   has already testified that he requested the minutes, he's

18   already testified to that.  Now they can put in the e-mail

19   showing Mr. Greebel giving the minutes.

20             THE COURT:  There is a lot of cross-examination

21   about not having any paper to back up the testimony.  I think

22   this is just a document for Mr. Aselage documenting his

23   efforts to try to get the information, the Board minutes.

24             MR. BRODSKY:  I agree, your Honor.  He testified to

25   that.  Nobody objected to it.

PROCEEDINGS

1           But this is, as your Honor ruled already,

2    Mr. Aselage's statement about what Meg Jensen said to him and

3    then that's one level of hearsay.  And then it's what Meg

4    Valeur-Jensen said, and then it's another level of hearsay of

5    somebody at Katten responding to Meg Valeur-Jensen about what

6    they are doing, and that's double hearsay.

7           And they can say they are only using it for the

8    effect on the listener, but the reality is it's impossible to

9    distinguish this between the truth.

10          Mr. Aselage is complaining it shouldn't take weeks,

11   would you mind pushing them to send the books over.  The only

12   purpose they have in this is to argue to the jury at summation

13   that Mr. Greebel was intentionally holding back the Board

14   meeting minutes.  And that is -- we are unable to

15   cross-examine Ms. Valeur-Jensen and prove that that is false.

16          MR. PITLUCK:  Your Honor, they did cross examine

17   Steven Aselage, as the Court pointed out, the most consistent

18   line of crosses, there is no single document to back you up.

19   I'm also getting a little tired of being told what we're going

20   to argue and what evidence we are allowed to introduce.  This

21   is the redacted e-mail that was shown to Mr. Aselage.  We

22   disagreed with respect to the Court's ruling on it.  Now it's

23   being forwarded by Mr. Shkreli to Evan Greebel, not any other

24   lawyers that Mr. Brodsky is hypothesizing had a conversation,

25   forwarded to Evan Greebel who responds and shows he's on

PROCEEDINGS

1    notice that they had this request.

2              So there are a number of reasons why this document

3    is admissible.  It's not being offered for the truth of what

4    Mr. Aselage said to Martin Shkreli.  It's being offered for

5    what notice was given to Mr. Greebel and the action that he

6    took six hours later when he produced exactly the same minutes

7    that the Board didn't, have he gave them to them.  So this is

8    relevant.

9              The Board has been attacked and said that they don't

10   have anything to back them up, that they didn't get this, and

11   didn't get that.  Here they are asking.  So we're kind of, we

12   have a Catch-22.

13             MR. BRODSKY:  They are not in a Catch-22.  That's

14   not an exception to the double hearsay rule.  They can redact

15   the entire thing under Mr. Aselage.  They can leave the

16   subject line that said Board books from previous meetings.

17   They can get in Mr. Greebel's statement, I'm in the process of

18   sending it to her and have it completed.

19             They can't get in -- Mr. Aselage's statement about

20   what Meg Valeur-Jensen said and the what Meg Valeur-Jensen

21   said somebody at Katten said to her.  It is double hearsay.

22             It doesn't say Evan Greebel continued to say they

23   are working on pulling them together.  And even if it did, it

24   still wouldn't cure double hearsay.  It is impossible for us

25   to cross-examine this document.  It's just impossible without

PROCEEDINGS

1   having Meg Valeur-Jensen testify.

2            We know from e-mail communications we proffered to

3   your Honor, it was only within two weeks or so that he was

4   asked about it.  So it's unduly prejudicial if they get this

5   in for the proposition that Mr. Aselage is saying that there

6   is something wrong here, it shouldn't take weeks to pull the

7   minutes.

8            We don't have a burden to put on a case, but if we

9   had to put on a defense case we would have to explain all the

10  e-mails prior to this.  We would have to find a way to explain

11  all the e-mails prior to this being sent out.  We'd be able to

12  admit all the e-mails of Mr. Greebel sending Board minutes at

13  any time.  And the issue about the Board being asleep at the

14  switch relates to 2013.  It related to their notice repeatedly

15  about settlements.  It doesn't relate to what happens in

16  September of 2014 at all.

17           MR. PITLUCK:  So, Judge, there is no hearsay problem

18  because the statement is not being offered for the truth.

19  Mr. Brodsky can try to conflate it, he can try, he's being

20  doing it with literally every document and says we don't have

21  the right to cross examine this person.  If he wanted to, he

22  could have cross-examined Steven Aselage about why he wrote

23  that e-mail.  Because that -- why did you write that e-mail.

24  If there was a none hearsay portion of it, he could have

25  cross-examined.  He was on the stand almost three days.

PROCEEDINGS

1          This is an e-mail forwarded to the defendant where

2    he takes an action.  So we can't argue that the truth of the

3    statements in there, and we have no intention of doing so;

4    respectfully, we know the difference.  But this is being put

5    on notice that the Board is asking for the minutes that he

6    provides them the same day, it's that simple.

7          MR. BRODSKY:  If he provides them the same day, your

8    Honor, why do they the need the statements by Mr. Aselage,

9    that are double hearsay about Meg Valeur-Jensen, what she said

10   and what she said Katten said?  Why do they need that?  What

11   is the relevance of those double hearsay statements?

12         MR. PITLUCK:  It's absolutely relevant, Judge.  It's

13   the Chairman, it's the Chairman of the Board of the company,

14   Board member of the company, the General Counsel who are the

15   ones putting Mr. Shkreli on notice that the Board books have

16   been requested.  Mr. Shkreli sends it to Evan Greebel.  He

17   responds.

18         THE COURT:  The CEO makes a specific request to

19   Mr. Shkreli to get the books of Board meetings over to the

20   corporation to Ms. Valeur-Jensen.

21         MR. BRODSKY:  Sorry to interrupt, Mr. Aselage at

22   that time was a member of the Board.  He was Chief Operating

23   Officer.

24         THE COURT:  Whatever he was.

25         MR. BRODSKY:  Mr. Shkreli was at CEO at the time.

PROCEEDINGS

1          THE COURT:  All right.  Mr. Aselage as the Chief

2    Operating Officer is asking the CEO, Mr. Shkreli, to make the

3    request to get these Board minutes, which the Board, there is,

4    evidence did not have and would be interested in having.

5          MR. BRODSKY:  Your Honor, you had asked at sidebar,

6    these are pages 4470 to 4471, whether they were going to call

7    Ms. Valeur-Jensen.  They made a determination they are not.

8    Your Honor said, I think in terms of her statements of what

9    she reported back to Mr. Aselage, and your Honor went on to

10   say, but we are concerned -- this is your Honor making the

11   statement -- line 15, about that means swallowing the rule

12   before hearsay.  Anything can become to the effect of the

13   listener.  We have to be a little mindful of that.  If might

14   be important at some point to have an effect on the listener,

15   but here I think it is hearsay.

16         THE COURT:  That was just a statement devoid of any

17   forwarding or response from Mr. Greebel.  That was just

18   Mr. Aselage's statement to Mr. Shkreli saying, look, get these

19   documents, we've been waiting a long time.  That, in and of

20   itself, was the problem at that stage.  We didn't have the

21   other document the Government is intending to proffer to give

22   context, again, not for the truth but to explain that here

23   Mr. Greebel is responding to a forwarded e-mail from the CEO,

24   Mr. Shkreli, that these Board minutes be turned over.

25         MR. BRODSKY:  Your Honor, we'll stipulate that a

PROCEEDINGS

1    request was made for the Board minutes.  We'll stipulate to

2    that.  We're happy to stipulate to that.

3           What we don't want is the double hearsay that we

4    can't cross-examine Meg Valeur-Jensen on.  Mr. Aselage was on

5    the stand, but representations were made to her, apparently,

6    by Ms. Valeur-Jensen, who is not a witness at the trial.

7           THE COURT:  Representations were made to her by

8    Ms. Jensen, who is her?

9           MR. BRODSKY:  Somebody made representations to

10   Ms. Jensen.  Then Ms. Jensen made representations to

11   Mr. Aselage.  We cannot cross-examine Ms. Jensen, who made

12   representations to her, and then what representations she made

13   to Mr. Aselage.

14          And it is impossible for anybody to divorce the

15   truth of the matter of what they are trying to get in the

16   bottom e-mail by Mr. Aselage, from the effect on the listener.

17   So if they want to get it in for the purpose that a request

18   was made for the Board minutes, then we will stipulate, your

19   Honor.  Your Honor can instruct the jury the parties have

20   stipulated that prior to September 24, 2014, a request was

21   made for the Board books.  And we can get the exact date,

22   which I think was a week or two prior.  Then the document can

23   come in with this double hearsay redacted.

24          MR. PITLUCK:  Judge, respectfully, we don't have to

25   stipulate.  This is admissible under the rules of evidence as

PROCEEDINGS

1  none hearsay.  The fact it was sent by Mr. Aselage to

2  Mr. Shkreli, an e-mail, which was then forwarded to Evan

3  Greebel, then Evan Greebel's response, and the chain of how it

4  comes to him is the relevant part.  We don't have to

5  stipulate.  This is old chief.  This is relevant.

6         We've admitted a lot of things that have not been

7  for the truth, a lot of things.

8         THE COURT:  What about a specific instruction then

9  in this case that the Aselage e-mail is not being admitted for

10  the truth, but rather to show the effect on the recipient, the

11  defendants, the recipient of a forwarded e-mail containing

12  this information.

13         MR. BRODSKY:  If your Honor allows it in for that

14  condition, we would your Honor ask for the latitude to put in,

15  if we have a defense case or if we cross-examine Special Agent

16  Delzotto, the specific e-mails by Meg Valeur-Jensen requesting

17  which minutes.  And we would ask your Honor the latitude to

18  put in, through Special Agent Delzotto, any e-mail Mr. Greebel

19  sent to Marc Panoff or anybody at management or the Board in

20  2014, Board minutes.

21         Because the suggestion they want to make is that

22  somehow these minutes were not coming very quickly.  And if we

23  can, to offset that, to mitigate that, we have to be allowed

24  to put in the evidence not for the truth, but for the fact

25  that Mr. Greebel did send repeatedly the Board minutes, not

PROCEEDINGS

1    just in December 2013, but continuously in 2014.  And so if

2    they are going to do this through double hearsay and they are

3    going to admit this, your Honor, we respectfully request the

4    ability on cross-examination of Special Agent Delzotto to

5    admit the e-mails from Mr. Greebel to management sending the

6    Board minutes in 2014.

7              THE COURT:  And Ms. Valeur-Jensen's e-mails

8    requesting Board minutes?

9              MR. BRODSKY:  And Ms. Jensen's e-mails requesting

10   any Board minutes.

11             MR. PITLUCK:  Your Honor, I'm not familiar with --

12   first of all, it's all premised on what Mr. Brodsky believes

13   or summarily asserts, we're going to argue.  Obviously, we're

14   only allowed to argue things which are consistent with how a

15   document comes on the rule of evidence.  I'm not familiar with

16   a rule of evidence that allows inadmissible hearsay documents,

17   that -- because the top e-mail comes in as a statement of the

18   defendant.  The other e-mail comes in as part of the chain

19   forwarding it up, background, there is no contest that.  I'm

20   not of familiar with the tit-for-tat rule of evidence that

21   says if they put in a document that we might have to argue

22   against, we now have free reign to argue whatever we want.  We

23   don't agree to that.  We object to that.  We'll have to take

24   it on an e-mail by e-mail basis.

25             MR. BRODSKY:  There is a rule of completeness.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

7564

PROCEEDINGS

1    There is a rule you should not be misleading the jury.  This

2    e-mail is suggestive that Mr. Greebel was somehow not sending

3    the minutes.

4              If we have evidence in 2014 that Mr. Greebel

5    repeatedly sent Board minutes to Board members or to Marc

6    Panoff, then that offsets that and that tells a more complete

7    story.  And there is nothing inadmissible about it.

8              We are not offering it for the truth.  We're

9    offering for just the mere fact that Mr. Greebel sent the

10   minutes.  That is isn't being offered for the truth, that's

11   being offered for the fact that it was sent.  And that is an

12   action.  It's not the content.  And if there were any content

13   to the e-mail, we'd be happy to redact it.

14             But if it's offered for any hearsay purpose, we have

15   to be allowed, your Honor, if the defense is going to be

16   offering this exhibit, we have to be allowed to be offered

17   evidence through Special Agent Delzotto that completes the

18   story.

19             MR. PITLUCK:  Judge, I'm not familiar with the rule

20   of completeness that allows other e-mails from other chains

21   that happens to be related to similar subject matter of Board

22   materials beings transmitted under 106.  That's not an

23   appropriate line of cross.  If they want to call a witness and

24   try to put them through and they can find a hearsay objection

25   or hearsay exception, then we can do it, or they can call Meg

PROCEEDINGS

1  Valeur-Jensen.

2         MR. BRODSKY:  Your Honor, it's not hearsay --

3         MR. PITLUCK:  And it's not burden shifting.

4         MR. BRODSKY:  -- it's not hearsay, your Honor.  We

5  have the case agent on the stand.  It's not hearsay at all.

6  If we offer it in through the case agent, a document the case

7  agent in the discovery, that the case agent who is the lead

8  investigator, I think he testified yesterday or last week that

9  he was the lead investigator.  There is nothing wrong with

10  offering non-hearsay purpose e-mails from Mr. Greebel to the

11  company sending Board minutes.  This is a topic they are

12  getting into.  We're allowed to cross on it and offer those

13  documents.  You can object, but I believe it's perfectly

14  admissible through the case agent.

15         MR. PITLUCK:  I don't think that's appropriate.

16         THE COURT:  You have to find some other way to admit

17  Rule 106.  As you know, the rule of completeness applies to

18  the document when portions of a document are offered.  It

19  doesn't apply to offering completely different distinct

20  documents.

21         MR. BRODSKY:  I understand, your Honor.  When we

22  have a case agent on the stand, and I have a non-hearsay

23  document to be offered into evidence during the scope of the

24  Government's investigation, I believe I'm allowed to offer

25  that into evidence through the case agent.  We'll do it on a

PROCEEDINGS

1    document by document basis.  It can't be that we have a case

2    agent on, who has got the entire scope of the investigation

3    and responsibility for it, and it can't be that the Government

4    says you're shut down from offering in admissible evidence

5    that complies with all the rules, evidentiary rules.  If it

6    relates to -- if it's relevant and it relates to a topic he

7    testified to, if we're cross-examining a witness and it goes

8    to their credibility, and it goes to the completeness of their

9    testimony, and they testify about certain minutes that are

10   being requested by the Board and are being obtained by

11   Mr. Greebel, well, then I'm allowed to cross-examine about the

12   topic of minutes.  I believe I'm allowed to cross-examine him

13   about whether he was aware minutes were spent by Mr. Greebel

14   to the company and what dates and times.  I can show him

15   documents I believe that are authenticated and that are

16   admissible under the hearsay rules.

17            MR. PITLUCK:  Judge, first of all Special Agent

18   Delzotto has studiously avoided offering any kind of

19   interpretation of these e-mails.  He's been reading them in.

20   What I'm hearing now, Mr. Brodsky can offer any documents he

21   wants through the case agent that are are related to the broad

22   scope of his testimony because he's the case agent, then we

23   strenuously object.  That's not the purpose of

24   cross-examination.

25            We've gone through this before.  There are very

PROCEEDINGS

1   cabin areas of cross, there are very cabin areas of the rule

2   of completeness.  We talked about this with a number of

3   witnesses.  If they want to put in unrelated documents or

4   documents that are broad, they can do that, but not with a

5   witness who has not interpreted e-mails.  He's been shown them

6   and he's read them.  There is no credibility issue to Special

7   Agent Delzotto reading e-mails.

8          THE COURT:  All that he wants to admit are emails

9   showing Mr. Greebel transmitted draft Board minutes to

10  Mr. Panoff, I think.

11         MR. BRODSKY:  That's the substance.

12         THE COURT:  There is one in my mind, are there more

13  than that?

14         MR. BRODSKY:  There are.  In 2014, respectfully,

15  directly related to the document Mr. Pitluck is about to put

16  in.  We have e-mails that directly relate to those minutes.

17         THE COURT:  Showing that Mr. Greebel submitted those

18  Board minutes before the request from Mr. Aselage in

19  September 2014?

20         MR. BRODSKY:  Board minutes, I have to verify for

21  you which ones, your Honor.  I haven't seen the e-mail that

22  he's about to offer into evidence.  As soon as I see that

23  e-mail I can offer --

24         THE COURT:  What Board minutes did Mr. Greebel send

25  to Mr. Panoff in this time period?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

7568

PROCEEDINGS

1          MR. PITLUCK:  That's a very different issue from

2     sending them to Mr. Panoff and sending them to the Board.

3     We're not saying anything about what was or was not sent to

4     Mr. Panoff.  This is an e-mail where he gets a request from

5     the company, forwarded to him, and he sends the records six

6     hours later.

7          I'm also a little concerned that it's not going to

8     be limited to the Board minutes.  It's going to be everything.

9     That's not -- this is not their case, this is not their case

10    agent.

11         The case agent is being put up there because he has

12    familiarity with the case before he was transferred to

13    Washington.  He's situated to answer any questions the Judge

14    determines to be appropriate.  He's not called to be their

15    witnesses, to put in their documents.

16         This is a request from a member of the Board.  Those

17    are e-mails that Mr. Panoff -- there is already a

18    differentiation of that in 2013.  I don't see how they are

19    related.

20         MR. BRODSKY:  To answer your Honor's question, on

21    December 13, 2013, Mr. Greebel sent Mr. Panoff draft minutes.

22    They came in.  Your Honor also may remember signed minutes

23    came in.  This is DX, I believe, 118-26A, where the minutes

24    were signed and sent to Mr. Sunil Jain and Edward Hackert on

25    December 12, 2013.  Those were minutes that related to 2013.

PROCEEDINGS

1          Then of course, on May 6, 2014, Mr. Greebel sent

2    additional minutes to, draft minutes, of an audit committee

3    meeting to Marc Panoff.  On May 9, 2014 minutes were sent by

4    David Kravitz copying Evan Greebel to Marc Panoff, with draft

5    Board of Directors and committee meeting minutes for 2014 on

6    multiple dates.  Then on August 4, 2014, Mr. Greebel sent to

7    Mr. Panoff audit committee meeting minutes on multiple dates.

8          So there is perfect evidence in the record of

9    Mr. Greebel repeatedly sending minutes to Mr. Panoff.

10          Again, your Honor, that is under the bylaws

11   perfectly permissible for Mr. Greebel to do.

12          If the Government is going to do this and get in

13   this evidence, we believe we have every right to cross-examine

14   Special Agent Delzotto.

15          Now they say he's just reading e-mails, your Honor.

16   But if you may remember, they opened with the fact that he was

17   the case agent, he was the lead case agent that he interviewed

18   45 to 50 witnesses.  They discussed the process of him taking

19   notes and interviewing witnesses.  So if they wanted to narrow

20   his testimony to just reading testimony they would not have

21   introduced all that testimony about his involvement in the

22   case.  So I do think it's important, your Honor, that we're

23   given the latitude to cross-examine the case agent regarding

24   his testimony.

25          He may be reading documents, but he's also saying

PROCEEDINGS

1    who TF is, Tom Fernandez.  He's saying other things that are

2    beyond the four corners of a document.  And he, through his

3    examination, is piecing together evidence for the jury that he

4    thinks ties documents together.

5            THE COURT:  He's not giving any opinions of that

6    nature.  He's --

7            MR. BRODSKY:  I understand.

8            THE COURT:  -- providing translations for initials,

9    which are not in dispute.  Certainly, if you thought he had

10   incorrectly designated or defined or identified Tom Fernandez

11   via TF or --

12           MR. BRODSKY:  Of course.

13           THE COURT:  -- the other folks who received Fearnow

14   shares you could have objected to that.  I don't think the

15   agent has stepped beyond merely reading documents that have

16   been admitted.

17           I am concerned about any effort to introduce

18   otherwise inadmissible documents through the case agent on

19   cross.  It's not within the rules of evidence to permit you to

20   do that, so be mindful of that.

21           MR. BRODSKY:  Your Honor, if they are admissible --

22           THE COURT:  If they are admissible.  But they are

23   not admissible.  Simply because he might have testified to

24   some subject matter that touches on the subject matter of the

25   document, that's not how admissibility is determined.

PROCEEDINGS

1          MR. BRODSKY:  If it's directly related to the

2   document, I think I should be able to cross examine.

3          THE COURT:  Rule 106 it doesn't apply to settlement

4   documents.  It's about providing additional information within

5   a document if parts of it are admitted, that's what Rule 106

6   is about.  If you read it, it's clear on it's face.

7          MR. BRODSKY:  I believe, your Honor.

8          THE COURT:  So perhaps you have another basis for

9   admission, but I don't want to decide them and argue and take

10  more time.  I'm just telling you now that they will have to be

11  evidentiary basis on which to admit a document if you wish to

12  do that.

13         MR. BRODSKY:  Yes, your Honor.

14         I would like your Honor to consider the fact that he

15  is the case agent.  He's not just anybody.  And he testified

16  to being the lead investigator in this case.  I do think when

17  the Government puts the lead investigator on the case --

18         THE COURT:  They do that in every case, Mr. Brodsky.

19         MR. BRODSKY:  Yes, your Honor.

20         THE COURT:  You've done that, I'm sure, in your

21  years as a prosecutor.  The case agent is not a free-for-all

22  bucket through which all documents, whether or not otherwise

23  admissible, may flow.  The case agent can be the conduit, but

24  if it's not otherwise admissible when offered by a party, it's

25  not going to come in.

PROCEEDINGS

1        MR. BRODSKY:  Understood, your Honor.  I expect to

2   be offering admissible evidence.

3        MR. PITLUCK:  Your Honor, just for the record, when

4   we introduced the document through the case agent it was

5   either statement of the defendant, co-conspirator statement,

6   or a business record somehow other admissible on that basis.

7   We are very concerned that they the defense is going to say,

8   well, you testified about Darren Blanton's consulting

9   agreement.  Here is another document from Darren Blanton, an

10  e-mail from the defendant to Martin Shkreli, and there is no

11  hearsay.  They don't have the statement of the defendant

12  route.  They don't have the co-conspirator route.

13        They are saying it's being offered for the truth,

14  then try to shove the whole thing in.  Obviously, if there is

15  an e-mail from a chain that has been left out under 106, rule

16  of completeness, then we have a different consideration.

17        As the Court noted, this isn't a free-for-all where

18  everything comes in just because the case agent happened to

19  testify or read documents about a lot of different subjects.

20        MR. BRODSKY:  I would also note, it's not an ability

21  for Government to cherrypick e-mails, to exclude ones that are

22  directly on point that are relevant that would complete the

23  chain, they don't have the ability to do that, your Honor.  I

24  think your Honor will see that there are going to be examples

25  where they cherrypicked and they decided they are cutting out

PROCEEDINGS

1    certain ones because they believe it doesn't help them.  And I

2    think, your Honor, I should have the latitude to cross-examine

3    the case agent about them.  That's the whole-purpose of

4    cross-examination.  They are presenting email after e-mail as

5    if they are tied together.

6              THE COURT:  We'll see what happens.  We'll see what

7    basis can you offer for admissible.  It's impossible to

8    really, not very reasonable to waste a lot of time talking

9    about issues that aren't ripe for my decision.

10             I would be willing to give the jurors a limiting

11   instruction on Government's Exhibit 674, that the Aselage

12   e-mail is not being offered for its truth, but rather to

13   provide background for the response, this is forwarded to

14   Mr. Greebel by Mr. Shkreli, and Mr. Greebel then responds to

15   it.  And you said you have other exhibits that have his actual

16   substantive response on the minutes issue?

17             MR. PITLUCK:  Yes, your Honor, the same day.

18             THE COURT:  All right.  Should we bring the jury

19   back?

20             I'm going to correct one thing.  I said Rule 106

21   does permit the admission of any other writing or reported

22   statement, that is not necessarily the same document portions

23   of which have been offered, but it will still have to be

24   admissible.  So I want to make that correction.  I might have

25   misstated the Rule, that it had to be part of the same

DELZOTTO - DIRECT - MR. PITLUCK

1   document, which is not the case.

2           MR. PITLUCK:  That's fine, your Honor.  If there are

3   106 issues we'll take them up.  We're trying to finish the

4   case.

5           (Whereupon, the witness resumes the stand.)

6           (Jury enters the courtroom.)

7           THE COURT:  We have all our jurors back.  Have a

8   seat.  You may continue your examination.

9           Let me just say for the record, with regard to the

10  Government's application to admit Government's Exhibit 674,

11  the jury is instructed that the bottom e-mail on this exhibit

12  from Mr. Aselage is not being offered for the truth, but

13  rather to understand the chain of forwarding that occurred

14  with this e-mail and the response or effect on the recipients

15  of the e-mail.

16          MR. PITLUCK:  Thank you, your Honor.

17  BY MR. PITLUCK:

18  Q    So Special Agent Delzotto, looking at Government's

19  Exhibit 674, bottom e-mail is an e-mail from Steve Aselage to

20  Martin Shkreli copying Meg Valeur-Jensen, what is the date of

21  that e-mail?

22  A    September 24, 2014.

23  Q    What is the subject of that e-mail?

24  A    It reads, Board books from previous meetings.

25  Q    What did Mr. Aselage write in that e-mail?

DELZOTTO – DIRECT – MR. PITLUCK

1    A    Meg has been requesting the books from prior meeting for

2    a substantial period of time.  Katten continues to say they

3    are working on pulling them together.  It shouldn't take

4    weeks.  Would you mind pushing them to send the books over.

5    They seem to respond to you.  Thanks in advance, Steve.

6    Q    What did Mr. Shkreli do with that e-mail?

7    A    He forwarded to Mr. Greebel.

8    Q    Also on September 24, 2014?

9    A    Yes.

10   Q    What was Mr. Greebel's response to Mr. Shkreli's e-mail?

11   A    I am in the process of sending it to her and will have it

12   completed today.

13   Q    That's September 24, 2014, as well?

14   A    Yes.

15   Q    I'd like to show you now Government's Exhibit 286 for

16   identification.  Are you with me, Special Agent Delzotto?

17   A    Yes, I am.

18   Q    Is this an e-mail from the defendant to Meg Valeur-Jensen

19   also dated September 24, 2014?

20   A    It is.

21   Q    What is the subject of the e-mail?

22   A    The subject line reads 2014 minutes (through May).

23        MR. PITLUCK:  Your Honor, we would move to make

24   Government's Exhibit 286, consistent with the Court's prior

25   ruling, the attachments thereto are not for the truth.

DELZOTTO – DIRECT – MR. PITLUCK

1          MR. BRODSKY:  No objection at all.

2          THE COURT:  We will receive Government's Exhibit 286

3   and the attachments not for the truth, the attachments are not

4   for the truth.

5              (Government Exhibit 286, was received in evidence.)

6              (Continue following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO – DIRECT – PITLUCK

1   BY MR. PITLUCK:

2   Q    What did Mr. Greebel write in this email?

3   A    Hi, Meg, here are the 2014 minutes from January through

4   April.  I have not received the minutes from May through the

5   summer yet from my files department and will send next week

6   when I return.  In parentheses, I assume they will arrive

7   before I am back in the office.  Thanks, Evan.

8   Q    Then there are a series of minutes attached to this

9   email?

10  A    Yes.

11  Q    At this point, Special Agent Delzotto, I'd like to show

12  you what's been marked for identification as Government

13  Exhibit 676.  Is this an email from the defendant to

14  Martin Shkreli dated September 29th, 2014?

15  A    Yes.

16  Q    Does it have an attachment to it?

17  A    It does.

18       MR. PITLUCK:  Your Honor, we offer Government

19  Exhibit 676 in evidence.

20       MR. BRODSKY:  No objection.

21       THE COURT:  We receive Government Exhibit 676.

22       (Government Exhibit 676, was received in evidence.)

23  Q    It's an email from Evan Greebel to Martin Shkreli?

24  A    It is.

25  Q    What email address is being used by Martin Shkreli?

Georgette K. Betts, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1    A    Martin Shkreli@AOL.com.

2    Q    What's the date and time of this email?

3    A    September 29, 2014.

4    Q    And the subject?

5    A    Subject reads:  Draft majority stockholder consent.

6    Q    What's the attachment called in the cover of the email?

7    A    The attachment is entitled, majority stockholder consent.

8    Q    What did Mr. Greebel write in this email?

9    A    As requested, attached is a draft of the written consent

10   for a majority of stockholders to remove directors.  I am

11   available to discuss tonight at your convenience.  I am also

12   reviewing your EA, employment agreement, tonight.  One item to

13   note under Delaware law the stockholders have to be record

14   holders.  As you may recall, it is easy to convert from street

15   to record.

16   Q    So let's look at the attachment the, first page of the

17   attachment.  What's up there in the top right-hand corner?

18   A    It says, draft.

19   Q    And it says, written consent of the holders of common

20   stock of Retrophin, Inc. dated as of September, with a blank,

21   2014, correct?

22   A    Correct.

23   Q    Can you read the first paragraph.

24   A    The undersigned the holders of record of blank shares of

25   common stock, par value .001 per share the common stock of the

DELZOTTO – DIRECT – PITLUCK

1   Retrophin, Inc. a Delaware corporation, the company,

2   representing at least a majority of the issued and outstanding

3   shares of common stock, hereby consent to the adoption of the

4   following resolutions without a meeting pursuant to

5   Section 228a of the Delaware general corporation law and

6   Section 2.11 of the amended and restated bylaws, the bylaws of

7   the company, with the intent that said resolutions shall be as

8   valid and effectual as if they had been adopted and ratified

9   at a formal meeting of stockholders duly convened which

10  consent will be effective when the minimum number of shares

11  required to approve the action are obtained.

12  Q    Can you just read the first two whereas clauses, please.

13  A    Whereas, that the undersigned holders of the majority of

14  outstanding shares of common stock seek to ensure that the

15  board of directors of the company, the board, do not change,

16  alter or amend the bylaws filed with the Securities and

17  Exchange Commission, the SEC.

18        Whereas, that the undersigned holders of a majority

19  of the outstanding shareholders of common stock seek to remove

20  Steve Richardson, Steve Aselage, Cornelius E. Golding as

21  directors of the company.

22  Q    And just going back to the first page, this is sent from

23  the defendant's -- with the defendant's Katten Muchin Rosenman

24  email signature on the bottom, correct?

25  A    Yes.

DELZOTTO – DIRECT – PITLUCK

1    Q    I'd like to -- it's September 29th, 2014 at 7:18 p.m.?

2    A    Yes.

3    Q    I'd like to direct your attention to Government

4    Exhibit 686 for identification.  Is this a series of emails

5    between the defendant and Martin Shkreli all dated

6    September 30th, 2014?

7    A    Yes.

8         MR. PITLUCK:  Your Honor, I would offer Government

9    Exhibit 686.

10        MR. BRODSKY:  No objection, Your Honor.

11        THE COURT:  We receive in evidence Government's

12   Exhibit 686.

13        (Government Exhibit 686, was received in evidence.)

14   Q    Let's go to the first email in the chain, which is on the

15   second page.  The bottom email from the defendant to

16   Martin Shkreli, correct?

17   A    Correct.

18   Q    What's the date and time of that email?

19   A    September 30th, 2014, 8:33 a.m.

20   Q    What's the subject line of that email?

21   A    Ayur Pharma formed.

22   Q    What did the defendant write in that email?

23   A    As requested, attached is the formation cert for Ayur

24   Pharma LLC.

25   Q    Going up, what did Mr. Shkreli respond at 11:49 a.m.?

DELZOTTO – DIRECT – PITLUCK

1   A    He responded can you register Raro Pharmaceuticals LLC.

2   Q    What was the defendant's response?

3   A    Sure.

4   Q    And the defendant sent another email at 12:58 p.m. to

5   Mr. Shkreli?

6   A    Yes.

7   Q    What did he write?

8   A    I will send confirmation of Raro once it is formed.  Do

9   you have a couple of minutes to talk about the document I sent

10  you last night?

11  Q    That was at 12:58 p.m.?

12  A    Yes.

13  Q    What did Mr. Shkreli respond at 3:34 p.m.?

14  A    Please send me my EA, employment agreement.

15  Q    Going to the first email in the chain, at the top what

16  did the defendant write to Mr. Shkreli at 3:45 p.m. at the top

17  there?

18  A    This is what I wanted to talk to you about.  I am not

19  convinced they can terminate you.  Section 4b is the operative

20  section and only allows termination as follows.

21  Q    What are the four areas of termination, you know, the

22  topic headers where termination is permitted in this instance?

23  A    The four are, death, incapacity, termination for cause,

24  resignation for good reason.

25  Q    Can you read the termination for cause provision.

DELZOTTO - DIRECT - PITLUCK

1   A     The company may terminate the executive's employment for

2   cause.  For the purposes of this agreement, cause shall mean

3   the executive's final conviction under United States federal

4   or state laws for a felony or crime involving moral turpitude.

5   Q     So going down to the bottom of the email right above the

6   defendant's email signature, what's written beginning with

7   "attached?"

8   A     Attached is the employment agreement and below is a link.

9   Q     There is a link that begins with SEC.gov?

10  A     Yes.

11  Q     I'd like to show you now Government's Exhibit 678 --

12  actually can we go back to the second page of Government

13  Exhibit 686.  You see the top email there from -- the whole

14  email from defendant to Martin Shkreli?  What email address is

15  being used there for Martin Shkreli?

16  A     Martin Shkreli@AOL.com.

17  Q     I'd like to show you what's been marked as Government's

18  Exhibit 678 for identification.  The top email is an email

19  from Martin Shkreli to defendant forwarding a series of

20  communications between a number of individuals at Retrophin.

21  A     Yes.

22          MR. PITLUCK:  Your Honor, we offer government 678.

23          MR. BRODSKY:  No objection.

24          THE COURT:  We receive Government's Exhibit 678.

25          (Government Exhibit 678, was received in evidence.)

DELZOTTO – DIRECT – PITLUCK

1   Q    So going to the bottom email from -- appears to be from

2   Christopher Cline, Chris.Cline@Retrophin.com to Marc Panoff.

3   What's the subject there?

4   A    Final release.

5   Q    What does Mr. Panoff do with that email?

6   A    He forwards it to Stephen Aselage, Steve Richardson, Neal

7   Golding, Meg Valeur-Jensen, Tom Fernandez copies to

8   Christopher Cline.

9   Q    What time was that email sent on September 30th, 2014?

10  A    3:27 p.m.

11  Q    What's the next email up in the chain?

12  A    The next email, what does it read?

13  Q    Who is it from?

14  A    It's from Christopher Cline.

15  Q    Who is it to?

16  A    Marc Panoff, Stephen Aselage, Steve Richardson, Neal

17  Golding, Meg Valeur Jensen and Tom Fernandez.

18  Q    What did Mr. Cline write there?

19  A    Small grammar edit, final to go at 5:00 p.m.

20  Q    Did Ms. Valeur-Jensen forward that email to

21  Martin Shkreli?

22  A    She did.

23  Q    What date and time?

24  A    September 30th, 2014, 4:02 p.m.

25  Q    What did Ms. Valeur-Jensen write in that email?

DELZOTTO - DIRECT - PITLUCK

1    A    The board met this morning and resolved put you on leave

2    effective immediately.  Enclosed is the press release

3    announcing Steve Aselage's appointment as interim CEO,

4    regards.

5    Q    What did Mr. Shkreli do with that email?

6    A    He forwarded it to Mr. Greebel.

7    Q    What email address was Mr. Shkreli using when he

8    forwarded that document to Mr. Greebel?

9    A    Martin@Retrophin.com.

10   Q    Going to the second page or third page of the document,

11   is that the draft press release that was attached?

12   A    Yes.

13   Q    What's the title of the press release?

14   A    The title is Retrophin Announces Leadership

15   Reorganization.

16   Q    What does it read under that?

17   A    Stephen Aselage named interim CEO.

18   Q    Can you read the first paragraph?

19   A    New York, New York, September 30th, 2014.  Retrophin,

20   Inc., NASDAQ, RTRX today announced a leadership reorganization

21   under the board of directors has appointed Stephen Aselage as

22   interim chief executive officer, CEO effective immediately to

23   replace Martin Shkreli founder and CEO.

24   Q    Can you read the last paragraph before about Retrophin.

25   A    The company intends to appoint additional independent

DELZOTTO – DIRECT – PITLUCK

1   directors with robust industry experience in the near term and

2   discussions with candidates are ongoing.  The board will soon

3   commence a search for a permanent CEO.

4   Q   So at this point Special Agent Delzotto I'd like to show

5   you Government Exhibit 290 in evidence.

6           Is this an email from Martin Shkreli dated

7   September 30th, 2014 at 7:49 p.m.?

8   A   Yes.

9   Q   Who did he send it to?

10  A   Steve Richardson, Neal Golding, Stephen Aselage copied

11  Meg Valeur-Jensen.

12  Q   What's the subject of that email?

13  A   Termination.

14  Q   And what did Mr. Shkreli write in email?

15  A   You cannot terminate my employment according to my EA,

16  employment agreement.  Please read it carefully.  And there's

17  a link.

18  Q   Can we put Government's Exhibit 686 next to this one.  Is

19  that the same link at the bottom?

20  A   Yes.

21  Q   I'd like to show you what's been marked as –– what's in

22  evidence as Government's Exhibit 291.  Is that another email

23  from Martin Shkreli dated September 30th, 2014 at 8:38 p.m.?

24  A   It is.

25  Q   Who is it to?

DELZOTTO - DIRECT - PITLUCK

1    A    Stephen Aselage, Steve Richardson, Neal Golding, Meg

2    Valeur-Jensen.

3    Q    What's the subject?

4    A    EA.

5    Q    What did Mr. Shkreli write in this email?

6    A    I have reviewed my employment agreement and you do not

7    have the ability to terminate me, place me on leave, or

8    suspend me.  I will hold all of you and the company personally

9    responsible for any damage caused to my share value.  As you

10   know, I am a vigorous litigant.

11        Further, I don't recognize the impermissible actions

12   taken by the board including this placement on, in quotation,

13   leave.  I plan on continuing to perform my duties to best of

14   my ability as I always have.  I am the largest stockholder of

15   the company and will protect myself and the value of my shares

16   by any means necessary.

17   Q    I'd like to show you what's been marked for

18   identification as Government Exhibit 298 for identification.

19   This is a series of emails between Martin Shkreli, Stephen

20   Aselage, the defendant and others dated October 4th, 2014.

21   A    Yes.

22        MR. PITLUCK:  Your Honor, we offer Government

23   Exhibit 298.

24        MR. BRODSKY:  Your Honor, can we have a brief

25   sidebar on this?  I'm sorry.

DELZOTTO - DIRECT - PITLUCK

1          THE COURT:  All right.

2          (Sidebar conference.)

3          (Continued on the next page.)

SIDEBAR CONFERENCE

1          THE COURT:  I don't think I have a copy of it, do

2     you have an extra copy?  I'll share with you.

3          MR. BRODSKY:  Your Honor, this is an email in which

4     Mr. Aselage says -- 298 for identification, October 4th, 2014

5     at 5:45 p.m. -- that the only thing said that I believe will

6     come to pass is that law enforcement will eventually be

7     involved and that both you and the lawyer who is functioning

8     in the inherent conflict of interest situation of representing

9     you personally and supposedly the company simultaneously will

10    not be happy with the way it turns out.  And then there's an

11    email from Mr. Shkreli that responds in part and talks about

12    law enforcement and that he alleges defrauding by the company.

13         For obvious reasons, Your Honor, well I won't state

14    the obvious -- I'll just state the obvious, Mr. Aselage's

15    opinion to Mr. Shkreli in this war of words between them

16    should be inadmissible.  I believe it is hearsay opinion

17    testimony.  I believe that even if it came within the

18    exception to the hearsay rule it is extraordinarily

19    prejudicial and unduly prejudicial it outweighs any probative

20    value.  For Mr. Aselage to be offering his opinion that in

21    October 4th of 2014 law enforcement is going to be coming for

22    Mr. Shkreli and the lawyer, which is purportedly is going --

23    the government would say Mr. Greebel, I think that's

24    extraordinarily prejudicial.

25         If Mr. Aselage took the witness stand would not be

Georgette K. Betts, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    able to testify to that and it's an opinion and as we saw from

2    2013 what his role was on the board and where he was and what

3    he remembers and doesn't remember, his opinion should not be

4    offered in any way to influence the jury.  So I think it's

5    just a dangerous thing to put before the jury.

6              MR. KESSLER:  I didn't know if there was anything

7    else.

8              THE COURT:  Are you finished?

9              MR. BRODSKY:  I'm finished with that part, yes, Your

10   Honor.

11             THE COURT:  Okay.

12             MR. KESSLER:  First of all, it's not hearsay, right.

13   Truth or not truth, Mr. Aselage's believes.  Second of all it

14   is a war of words.  It explains how this relationship ends

15   and, frankly, there's been a lot of argument that Retrophin

16   got a lot of benefit out of the relationship with what

17   Mr. Greebel did and what Mr. Shkreli did and how they looked

18   out for the company and, you know, the fact that that is

19   clearly not the view of the Retrophin CEO is certainly

20   relevant.  It is relevant that Mr. Greebel is copied on these

21   emails, right?  Yes, he's copied on this chain, he receives

22   all of this information and then he goes on to have this Yom

23   Kippur email which where he sort of very technically denies

24   advising Mr. Shkreli after receiving this, so --

25             MR. PITLUCK:  The first two emails I would note,

7590

SIDEBAR CONFERENCE

1    Your Honor, the first two emails on this exchange are already

2    admitted into evidence pursuant to Government Exhibit 300.

3            THE COURT:  The first two emails on the chain in

4    Government Exhibit 298?

5            MR. PITLUCK:  In 298 are already in evidence.

6            THE COURT:  I'm sorry.

7            MR. PITLUCK:  I'm sorry, Judge.

8            THE COURT:  You have the back.

9            MR. BRODSKY:  These emails, we don't have an

10   objection to those, but we object to, Your Honor, if

11   Mr. Aselage took the witness stand, as he did, was not able to

12   testify to his opinion and we actually had jury trial motion

13   practice as to the extent to which Mr. Aselage could take the

14   witness stand and testify about his opinion about whether or

15   not Retrophin was defrauded or whether or not Retrophin, the

16   settlement agreements were proper or not proper.

17           And what we are now getting in through the back door

18   is an extraordinarily prejudicial hearsay statement that

19   Mr. Aselage would not be able to state on the stand and that

20   it's his opinion that law enforcement is going to be coming

21   and arresting Mr. Shkreli and Mr. Greebel.  And here we are,

22   Your Honor, Mr. Shkreli was arrested and Mr. Greebel was

23   arrested.  So for a jury to be able to parse this opinion

24   testimony that we can't cross examine Mr. Aselage about, and

25   even if we could cross examine him about it would be

SIDEBAR CONFERENCE

1   inadmissible, he couldn't get on the stand and say that.  Your

2   Honor should strike it.

3           It's extraordinarily prejudicial.  It's hard for, I

4   think, anybody to argue that in front of this jury a statement

5   by Mr. Aselage that the two people should be arrested

6   including Mr. Greebel and he offers the opinion that it's

7   because of a conflict of interest, when Mr. Greebel is not

8   charged with a conflict of interest.  There's no ethical

9   violation that Mr. Greebel is charged with, and Mr. Aselage's

10  opinion he's not a law enforcement officer.

11          He doesn't even, at this time, have any of the facts

12  relating to the settlement agreements, he has no facts

13  relating to the consulting agreements and so he's offering

14  this opinion because he believes at that time that Mr. Greebel

15  has acted in misimpression.

16          So what happens is on Yom Kippur, as Your Honor

17  knows, Mr. Shkreli copies includes Mr. Greebel.  Mr. Greebel

18  is in temple that day and what the government has failed to

19  tell, Your Honor, is that if you saw those two emails -- there

20  was an email that came into evidence that said, here's your

21  employment agreement on September 30th.  If you notice the

22  time, Your Honor, it's about 3:45 p.m., shortly after that,

23  minutes, Ms. Valeur-Jensen sends Mr. Greebel, who doesn't know

24  about the board attempt to take Mr. Shkreli, all he knows is

25  Mr. Shkreli and the board they were in a fight and Mr. Shkreli

SIDEBAR CONFERENCE

1    says how do I remove the board members.  Mr. Greebel is told

2    by Ms. Valeur-Jensen stand down, then he's out.

3              And just -- I proffered to Your Honor that the

4    deputy general counsel Mike Fertolay has a meeting shortly

5    after the September 30 public announcement that Mr. Greebel --

6    that Mr. Shkreli is out as CEO and they discuss what do we do

7    given the fact that we have a problem here, we've been

8    representing the board -- the company through Mr. Shkreli,

9    what do we do.  And they decided they're not doing anything.

10   And so you don't see Mr. Greebel involved in any of this and

11   when Mr. Greebel says, I'm in services, Yom Kippur, he is in

12   services for Yom Kippur and he's not involved in Mr. Shkreli's

13   one-off emails trying to enter into a war of words with --

14   after September 30th with Mr. Aselage.

15             So for that reason too, Your Honor, I believe that

16   Mr. Aselage's opinion is partially based on the fact that he

17   had received an email from Martin Shkreli and he had copied

18   Evan Greebel and he had believed that Evan Greebel was

19   involved in this email saying you're terminated when, in fact,

20   Mr. Greebel is not.  Mr. Greebel had been told by his law firm

21   to stand down and he stood down on September 30th.

22             So, Your Honor, I proffer that only as background to

23   Your Honor to know that it's not only inadmissible, deeply

24   prejudicial, unduly prejudicial, hearsay it's based on an

25   inaccurate statement.

SIDEBAR CONFERENCE

1          THE COURT:  Just so I understand your objection it's

2    to the second paragraph of the Aselage email dated

3    October 4th, 2014 at 5:45 p.m. --

4          MR. BRODSKY:  Yes, Your Honor.

5          THE COURT:  -- is that right?

6          MR. BRODSKY:  I just want to make sure there's no --

7    I think we have to redact because this paragraph is in

8    response to this and it talks about law enforcement in quotes.

9    I've worked very hard to get the lawyer who drafted my EA is

10   relevant.  I think we have to redact that part because it

11   implies -- it follows this portion.  This is really the

12   portion I have problem with but I believe part of this is in

13   response to this.

14          For the record, I mean in 298, we're principally

15   asking Your Honor to strike Mr. Aselage's second paragraph in

16   the October 4, 2014, 5:45 p.m. email and we believe that

17   Mr. Shkreli's subsequent email at 9:49 p.m., third paragraph

18   responds to that paragraph.

19          MR. KESSLER:  Your Honor, even before we get to the

20   email, Mr. Brodsky has again introduced a number of facts that

21   are at least one sided and are not in the record.

22          So, first of all, the idea that Evan Greebel didn't

23   know the status of Martin Shkreli's termination or

24   nontermination on the board at a specific time is not in the

25   record.

SIDEBAR CONFERENCE

1        THE COURT:  But it's your burden to prove --

2        MR. KESSLER:  Absolutely.

3        MR. PITLUCK:  Absolutely.

4        MR. KESSLER:  The record needs to be clear of the

5   background facts before we get to that.

6        THE COURT:  There is no evidence of what was going

7   on here.

8        MR. PITLUCK:  That's a matter for the jury to

9   interpret.  Certainly what is going on and what's being sent

10  to Mr. Shkreli by Mr. Greebel at what specific time, that's a

11  matter for argument.

12       THE COURT:  Right, but you haven't provided evidence

13  that Mr. Greebel knew what was going on at this time with

14  regard to this ongoing battle --

15       MR. KESSLER:  This specific email --

16       THE COURT:  -- between the board and Mr. Shkreli.

17       MR. KESSLER:  He's actively helping Mr. Shkreli

18  fight it against the board, that's exactly what he's doing.

19       MR. PITLUCK:  He's interpreting his employment

20  agreement telling him that he can't fire him, drafting a

21  consent to remove the board of directors.

22       THE COURT:  But that was the 29th of September.

23       MR. PITLUCK:  Right, and then he's copied on an

24  email to the company on October 4th which relates to the same

25  thing.  It's a matter for the jury to interpret whether or not

SIDEBAR CONFERENCE

1   Mr. Greebel was involved in any email or --

2              THE COURT:  Let's cut to what the issue is, which is

3   Mr. Aselage's paragraph two of his October 4th, 2014 email at

4   545.  I do think that that is just opinion and, you know,

5   posturing, kind of tough talk, right, by the acting CEO

6   against the former CEO and so I think that it would not

7   otherwise be admissible.

8              I mean, he doesn't -- he's expressing his opinion

9   but I don't think it's really appropriate and I think could be

10  very prejudicial to Mr. Greebel.  If you're hearing threats

11  from the CEO that the law enforcement is going to get

12  involved, so I would strike the last paragraph of that email.

13             Now, Mr. Shkreli's is a little bit different because

14  it is his statement.  I'm trying to see if there's a way to

15  sanitize that last paragraph of the October 4th Shkreli email

16  at 9:49 p.m.  I think if I understand Mr. Brodsky's request he

17  wants that last paragraph stricken out as well.

18             MR. BRODSKY:  Maybe you can strike the first

19  sentence of it and then, the lawyer who drafted my EA is

20  irrelevant.  Just those two phrases.  Those are the two

21  phrases that respond to that paragraph.  Everything else is --

22             THE COURT:  Well, he says there is no CIO, which I'm

23  assuming is conflict of interest.

24             MR. BRODSKY:  Right.

25             THE COURT:  Only an imaginary one you devised to

SIDEBAR CONFERENCE

1   further your illegal behavior.  That last sentence maybe ought

2   to come out.  The first sentence ought to come out.

3          MR. PITLUCK:  Judge, I think contextually we should

4   just take out the whole last paragraph and the whole first

5   paragraph otherwise it's confusing.

6          THE COURT:  All right.  The last paragraphs of both

7   of these emails dated October 4th will be stricken and

8   otherwise Government Exhibit 298 will be admitted.

9          So do you have a way to just redact that?

10          MR. PITLUCK:  We'll get it redacted on the computer.

11          MR. KESSLER:  Yes.

12          THE COURT:  All right.  Give her that clue and maybe

13   she can take care of it.  All right?

14          MR. PITLUCK:  Yes.

15          MR. BRODSKY:  Thank you.

16          (End of sidebar conference.)

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

DELZOTTO – DIRECT – PITLUCK

1              (In open court.)

2              THE COURT:  Does someone have an extra copy of that

3    exhibit for me?  By the way, it doesn't seem to be in my

4    notebook.  Ms. Balbin, you can focus on the redactions right

5    now.

6              MR. PITLUCK:  It's redacted, Judge.

7              THE COURT:  So Government's Exhibit 298 will be

8    admitted with redactions discussed at sidebar.

9              (Government Exhibit 298, was received in evidence.)

10   you may publish.

11   BY MR. PITLUCK:

12   Q    So, Special Agent Delzotto, I'm going to ask you to use

13   the one on the computer screen, please.

14              Let's go to the first email in the chain from

15   Martin Shkreli on Sunday, October 4th, 2014 at 1:38 p.m.  It's

16   the very bottom.

17              What did Mr. Shkreli write here?

18   A    What was the date you said before?

19   Q    October 4th, 2014 at 1:38 p.m.

20   A    Okay.

21   Q    What did Mr. Shkreli write in this email?

22   A    He writes:  Steve, pursuant to your employment agreement,

23   EA, I have elected to terminate your employment from

24   Retrophin.  Please cease and desist from using any of

25   Retrophin's electronic equipment or appearing at any of the

DELZOTTO – DIRECT – PITLUCK

1    Retrophin's office.  I am sorry it has come to this but your

2    unauthorized and illegal actions of attempting to usurp my

3    authority using an unrecognized tool of, in quotes, suspension

4    or, in quotes, leave is unacceptable.

5              Fazela, please take the appropriate actions,

6    Martin Shkreli.

7    Q    That was an email from Martin Shkreli to Stephen Aselage,

8    Fazela Mohamed and the defendant?

9    A    Yes.

10   Q    What was Mr. Aselage's response?

11   A    He states:  Martin, as you are aware you've been placed

12   on leave and have no authority to direct anything or anyone.

13   Mr. Greebel, you are on very dangerous ground if you hope to

14   continue to practice law.  Suggest you take a deep breath and

15   think about where you are going with Martin.

16             Fazela, apologies for being put in this position,

17   Steve.

18   Q    And who did Mr. Aselage send that email to?

19   A    He sends it to Martin Shkreli and he copies a host of

20   people.

21   Q    Fazela Mohamed, the defendant, Meg Valeur-Jensen, Neal

22   Golding, Steve Richardson and Andrew Savage?

23   A    Yes.

24   Q    What was Mr. Shkreli's response to that email?

25   A    This is a matter for -- can I see the top of the email?

Georgette K. Betts, RPR, CSR
Official Court Reporter

DELZOTTO - DIRECT - PITLUCK

1    Q    It's on a previous page.

2    A    Okay.

3    Q    What did Mr. Shkreli write at 2:39 p.m. on October 4th?

4    A    I'm sorry, I can't see it.  Okay.

5         This is a matter for the Court.  You and the rest of

6    the board of directors, BO, have interpreted a contract one

7    way.  I have interpreted it another.  We will find out who

8    prevails soon but don't be so arrogant to assume you are

9    correct.  I, for one, would be extremely careful about going

10   out on limb for something you don't have much of a stake in,

11   Martin.

12   Q    Going up to Mr. Aselage's response on the next page at

13   5:45 p.m., what did Mr. Aselage write?

14   A    I have a job to do and I will do it to the best of my

15   ability.  You seem confused to be dealing with people who are

16   honest and you who can't buy.  Suggest you step back, Steve.

17   Q    Finally, what did Mr. Shkreli respond to this email?

18   A    Sorry, Steve, it is the height of dishonesty to

19   acknowledge how poorly you planned this coup, in quotes.  You

20   admitted that you would not consult with shareholders.  You

21   didn't notice that you can't legally terminate my employment

22   and made up a nonsensical charade concept of a leave, in

23   quotes, to advance your pitiful agenda.  In quotes, I suggest

24   you step back.  I've tried to do that with extremely

25   reasonable settlement of buying a drug that you don't want to

DELZOTTO - DIRECT - PITLUCK

1   be rebuffed.  Take the offer and I will take the step back

2   you're asking me to.  You no longer have a job at Retrophin.

3   I am the CEO, you are fired.  Good-bye.

4   Q    I'd like to show you the next Government's Exhibit 300

5   that's in evidence.  The email in the middle of the page

6   reads:  Martin, as you are aware you've been placed on leave.

7   We saw that in previous exhibit, Government Exhibit 298,

8   correct?

9   A    Yes.

10  Q    What was Mr. Greebel's response to the email from

11  Mr. Aselage?

12  A    He responds -- Mr. Greebel's responds to Mr. Aselage and

13  states:  Steve, I have not advised Martin of anything.  Today

14  is Yom Kippur and I have been in temple all day.  I just

15  received this correspondence and I want to be clear that I had

16  nothing to do with it and no knowledge of it.  I take my

17  ethical obligations very seriously.  I am available to discuss

18  if you, Steve or Neal have any questions.  Thanks, Evan.

19  Q    And who is copied on that email?

20  A    Steve Richardson and Neal Golding.

21  Q    Is martin Shkreli on that email?

22  A    He is not.

23  Q    And what was Mr. Aselage's response?

24  A    Thank you.

25  Q    I'd like to show you what's in evidence as Defense

7601

DELZOTTO - DIRECT - PITLUCK

1    Exhibit 106-41, it's behind Tab 677 in your binder.

2              Is this email from Evan Greebel for Martin Shkreli

3    on September 30th, 2014 at 10:38 a.m.?

4    A    Yes.

5    Q    And what email address is being used for Martin Shkreli?

6    A    Martin Shkreli@AOL.com.

7    Q    The subject?

8    A    The subject is inquiry invoice.

9    Q    What is the -- is there an attachment?

10   A    Yes, there is a scanned attachment with a date,

11   September 30th, 2014.

12   Q    What did Mr. Greebel write in this?

13   A    Please let me know if you have any questions or comments.

14   Q    Can we go to the first page of this.  What's the date of

15   this email or of this letter?

16   A    The letter is dated September 30th, 2014.

17   Q    And it's from the defendant?

18   A    Yes.

19   Q    Signed by the defendant?

20   A    Yes.

21   Q    Who is it to?

22   A    Martin Shkreli.

23   Q    What did the defendant write in this email?

24   A    Dear Martin, enclosed is our invoice for services

25   rendered through August 31st, 2014 in connection with the SEC

DELZOTTO – DIRECT – PITLUCK

1    inquiry.

2            MR. PITLUCK:  I'm sorry, this is in evidence.  I

3    apologize.

4    Q    We'll go back to the front page.  This is an email from

5    Evan Greebel to Martin Shkreli@AOL.com.

6    A    It is.

7    Q    September 30th, 2014?

8    A    Correct.

9    Q    Go back to the second page, please.  What did the

10   defendant write here?

11   A    Dear Martin, enclosed is our invoice for services

12   rendered through August 31st, 2014 in connection with the SEC

13   inquiry.  For our work on the inquiry, there is a current

14   charge of $224,324.67.  For your convenience, wiring

15   instructions are enclosed.  If you have any questions, please

16   contact me.

17   Q    Go to the second page of this document, you see where it

18   says "re," what is the re line on this?

19   A    Indemnification.

20   Q    Finally, Special Agent Delzotto, I'd like to show you

21   what's been marked for identification as Government

22   Exhibit 301.

23            Is this an October 6th, 2014 email from

24   Ms. Valeur-Jensen to the defendant?

25   A    Yes.

DELZOTTO – DIRECT – PITLUCK

1          MR. PITLUCK:  Your Honor, I offer Government

2     Exhibit 301.

3          MR. BRODSKY:  Objection, Your Honor.  Can we discuss

4     this one as well?

5          THE COURT:  You would like to discuss this?

6          MR. BRODSKY:  I'm sorry, Your Honor.

7          THE COURT:  Okay.  Excuse us.

8          MR. BRODSKY:  Another one of them.

9          THE COURT:  All right.

10          (Sidebar conference.)

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          MR. BRODSKY:  Your Honor, this was another example

2     of an email from Ms. Valeur-Jensen, who is not a witness at

3     the trial, available to government.  They're trying to offer

4     it and it's incredibly prejudicial, unduly prejudicial.  It's

5     post charge period.

6          It is an email from Ms. Jensen that says, you're

7     immediately to suspend to Evan all activities of Retrophin.

8     Suggesting somehow Evan has done something wrong and asking

9     him to preserve documents as if there is a litigation notice

10    and hold to him personally, it's not Katten, it's Evan

11    personally.  It says, please send me all documents relating to

12    Mulleady.  Mulleady is not in evidence in this record, it was

13    a whole settlement negotiation between Mulleady, Koestler who

14    we already talked about is out, and Johnson.  Johnson is a

15    person who reached the consulting agreement with Mr. Shkreli

16    and Ms. Jensen decided that Mr. Johnson should actually -- she

17    actually actively cleared his shares.  He had been an investor

18    in MSMB Healthcare, Mr. Shkreli gave him about 17,000 shares

19    of Retrophin, post September 30, 2014.  Mr. Johnson has told

20    the government, he's told us that Ms. Jensen cleared his

21    shares and understood he had an investment in MSMB Healthcare

22    and said, no problem, I'll clear your shares.

23         Mr. Johnson is an associate of Mr. Soros, Mr. George

24    Soros and a very close friend with George Heywood, who is a

25    very well know money manager.

SIDEBAR CONFERENCE

1          So Johnson is not in, Koestler is not in, Mulleady

2   is not in and this actually, Your Honor, suggests that there

3   is something wrong with what Mr. Greebel has done.

4          So we see no probative value in the suspension of

5   the activities, a message to Mr. Greebel.

6          Second it is hearsay by Ms. Valeur-Jensen and,

7   third, Your Honor, it is unduly prejudicial under 403 for

8   numerous reasons.

9          THE COURT:  Go ahead.

10          MR. PITLUCK:  So, Your Honor, this is an email that

11   completes the narrative.  This is an email putting Mr. Greebel

12   on notice that he is no longer to work on matters for

13   Retrophin anymore.  It is two days after the last email we

14   just saw.  It doesn't say anything, it just says suspend all

15   activities including litigation matters until further notice.

16   It asks to preserve all documents, that's not a document

17   preservation notice.  She's asking a lawyer to save the

18   documents.  It says all documents related to three matters.

19   It doesn't describe them, it doesn't say litigations, it

20   doesn't say there's any issues with them.

21          None of it is being offered for the truth.  It's

22   being offered for the fact that Ms. Valeur-Jensen notified the

23   defendant on October 6th, 2014 that the suspending

24   Retrophin -- that suspending representation of Retrophin.

25          THE COURT:  So why wouldn't you just want to -- what

SIDEBAR CONFERENCE

1    would your objection be to just offering the first sentence?

2              MR. BRODSKY:  Your Honor, even the first sentence,

3    if I can say, Mr. Aselage has already testified that they

4    fired Katten.  Mr. Aselage testified to that.  And so it is in

5    the record, we don't dispute it.  We're happy to stipulate

6    that on or about October 6th, 2014 Katten was told to suspend.

7    But the problem with this email, again, Your Honor, is

8    Ms. Valeur-Jensen making the statement, it's testimonial, and

9    it's hearsay it is supposed to be the entire firm and this is

10   suggesting that it is just to Evan.  They happen to send it to

11   Evan, but you will note, Your Honor, it is entirely all Katten

12   matters, everything.  The last sentence says, I will follow up

13   with James Calder to discuss the status of the Questcor

14   litigation.  That's the antitrust litigation that I was

15   referencing.

16             THE COURT:  Who is James Calder, a lawyer?

17             MR. BRODSKY:  A partner at Katten.

18             MR. KESSLER:  This is not testimonial, I mean that

19   has a very special meaning --

20             THE COURT:  Right.

21             MR. KESSLER:  -- which obviously -- it's not hearsay

22   because an instruction is not hearsay by definition, it cannot

23   be offered for it's truth.  There is no truth in the

24   instruction, please immediately suspend, whatever.  It's not

25   hearsay.  It is simply being offered to show it was

SIDEBAR CONFERENCE

1    communicated to Mr. Greebel and to finish the story.

2              I mean, we can take out the names of Mulleady and

3    Koestler and Johnson.

4              MR. PITLUCK:  Not that there is anything wrong with

5    them.

6              MR. KESSLER:  But we can redact out the names with

7    the white out tape, that's fine.

8              MR. BRODSKY:  Your Honor, there is no narrative to

9    complete.  It is post charge period, it is a decision by

10   Retrophin to suspend Katten.  It is suggestive that Katten did

11   something wrong.  It is incredibly prejudicial.  They've

12   already testified that Katten was fired.  To add to it now as

13   suspension notice on October 6th is to tie it directly to the

14   October 4 temple email and it creates a strong impression to

15   the jury that Retrophin made a determination that Evan Greebel

16   did something wrong and, clearly, Evan Greebel --

17   Ms. Valeur-Jensen is taking instruction from Mr. Aselage and

18   Mr. Aselage is very upset with Mr. Greebel.  You saw the

19   emails, Judge.  And so it's creating an impression that

20   Mr. Greebel did something wrong.  I.

21             Just think it has no evidentiary value, it's not

22   probative.  It doesn't make a fact of consequence more or less

23   likely.  Does this email suggest that Mr. Greebel did

24   something -- does it suggest --

25             THE COURT:  No, it doesn't suggest wrongdoing, it's

SIDEBAR CONFERENCE

1   relevant to the testimony and it's corroborative of the

2   testimony that Katten services were terminated.

3           MR. BRODSKY:  It's irrelevant.

4           THE COURT:  To the extent you have argued repeatedly

5   that many witnesses lack of email or document, in fact you did

6   this with Mr. Aselage, is there a document if which you

7   memorialized this or that and I think this is just

8   corroborative of the termination of services.

9           Would you agree to just a stipulation --

10          MR. PITLUCK:  No.

11          THE COURT:  -- on X date.

12          MR. PITLUCK:  No.

13          MR. BRODSKY:  We stipulated, Your Honor.

14          MR. PITLUCK:  They don't get to stipulate.  This is

15  all chief.  As Your Honor pointed out, relevant, admissible

16  corroborative.  They don't get to stipulate because they don't

17  like the fact that an email, particularly they've been arguing

18  that email exists.  It's exists.  It is all chief.  We get to

19  put on our case.  They don't get to stipulate out what they

20  don't like.

21          MR. BRODSKY:  Unless they call Ms. Valeur-Jensen,

22  Your Honor, any probative value is extraordinarily outweighed

23  by the dangerous unfair prejudice and there is unfair

24  prejudice which they are putting in suspension of

25  representation, Dear Evan.  The suggestion is Mr. Evan

SIDEBAR CONFERENCE

1  Greebel, you've done something wrong, you've been in cahoots

2  with Mr. Shkreli.

3           THE COURT:  This is actually the less -- you know,

4  Mr. Aselage used term terminate or fired.  This is just saying

5  we're suspending, people get suspended all the time for

6  reasons that may not have anything to do with wrongdoings.

7  It's a temporary hold.  She's not making any judgments or

8  findings or implications, she's just saying save the

9  documents, don't do any more work, and provide certain

10 documents to me.

11          They've agreed to redact the documents concerning

12 Mulleady, Koestler and Johnson to avoid any confusion.

13          MR. BRODSKY:  It has no probative value.  As Your

14 Honor says, it could mean anything.  It could be a suspension

15 for a variety of reasons.  It doesn't have probative value

16 unless Ms. Jensen testifies about the purpose for her sending

17 it.  That's the danger here.

18          They are putting in an email when Ms. Jensen, I

19 don't believe would say, that they are suspending Mr. Greebel

20 because of something they thought Mr. Greebel did wrong.  I

21 truly believe that, Your Honor.  And they can call Ms. Jensen,

22 they had the ability to.  We have the 3500 material of

23 Ms. Jensen.  She doesn't accuse Mr. Greebel of doing anything

24 wrong in the 3500.

25          THE COURT:  I don't think she does in this email

SIDEBAR CONFERENCE

1   either.

2           MR. BRODSKY:  I think it could be suggesting it,

3   Your Honor.

4           MR. PITLUCK:  That's the point.

5           MR. BRODSKY:  Judge it's already on the record,

6   we'll stipulate that the issue is there is no email or

7   document we're willing to stipulate, Your Honor, so we don't

8   say there is no email or document, we're willing to stipulate

9   on or about October 6th Retrophin told Katten, told

10  Mr. Greebel --

11          THE COURT:  Via email.

12          MR. BRODSKY:  -- told via email that they were not

13  to do any further work on Retrophin matters.

14          MR. PITLUCK:  Especially, Judge, we shouldn't have

15  to stipulate to this.  You've held -- I don't think you held

16  that this wasn't relevant, I think that was.

17          THE COURT:  No.  No, I think it's relevant.

18          MR. PITLUCK:  We're happy to redact the words

19  Mulleady Koestler and Johnson.  Mr. Brodsky is reading into it

20  what he thinks it says, that's not for Mr. Brodsky to decide.

21  It's not for Mr. Brodsky to proffer extraneous evidence to try

22  to explain everything he wants excluded from the government's

23  case, that's the jury province.

24          This is an email that corroborates all the

25  statements on the record and notifies Evan Greebel that the

SIDEBAR CONFERENCE

1   suspension of services for Retrophin effective as of this

2   date.  I think we're entitled to put that in.  Judge, we've

3   been at sidebar most of the day, I really just want -- this is

4   my last document, this is the last question.

5           MR. BRODSKY:  Your Honor, I believe if they are

6   going to put it in it should be just the first sentence.

7   Because please preserve all documents does suggest, without

8   cross examining Ms. Jensen, it suggests a litigation against

9   Katten.

10          And you should know, Your Honor, there were threats

11  of litigation between Katten and Retrophin and all parties

12  released each other completely in settlement.

13          THE COURT:  I think it's common that when lawyers

14  are substituted for a client, the lawyers are told or the

15  incoming tells the outgoing, look, save documents, send your

16  file over, right.

17          MR. BRODSKY:  The jury doesn't know that, right.

18          THE COURT:  But aren't you going to have an expert

19  that's going to talk about what lawyers do.

20          MR. BRODSKY:  Not this, we're not going to have an

21  expert talking about that it is --

22          THE COURT:  Preserving and sending over the files.

23          MR. BRODSKY:  No.

24          MR. PITLUCK:  Judge, there is nothing again about

25  preserve all the documents.

SIDEBAR CONFERENCE

1    MR. BRODSKY:  We don't have to put in a case in

2    chief, Your Honor.

3        THE COURT:  All right.

4    MR. BRODSKY:  All they need is the first sentence if

5    that's their purpose.  The rest of it looks like it's

6    litigation and it is incredibly prejudicial.

7        MR. PITLUCK:  Respectfully, Judge, I don't think

8    Mr. Brodsky gets to determine what we think we need.  I think

9    we do.  I don't think there's anything improper with the

10   instruction from the company's lawyer to preserve all

11   documents and forward anything you may receive going forward

12   that relates to Retrophin.

13       MR. BRODSKY:  Will they stipulate to that?  Will

14   they tell the jury there's nothing wrong, it's common practice

15   for a lawyer to preserve all emails, to say preserve all

16   documents.  Are we going --

17       THE COURT:  They can't.  They don't have a

18   witness -- this agent can't testify to that.

19       MR. BRODSKY:  Exactly, Your Honor, we can't cross

20   examine the documents, that's problem.  Ms. Jensen we could

21   have cross examined her, why, it's standard practice.

22       THE COURT:  It's an interaction from a client to a

23   lawyer saying, stop work, save the documents and forward them

24   to me.  That's all it is.  There is no judgment here.

25       MR. BRODSKY:  But the jury will take incredible

Georgette K. Betts, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    prejudice for that because Schuyler Marshall said the same

2    thing to Mr. Shkreli and we made a big deal about it, it was a

3    document, it was a litigation threat.  Those emails were in

4    the record.  Mr. Marshall testified that, yes, it was a

5    document hold.

6              THE COURT:  But he used the term --

7              MR. BRODSKY:  He didn't use the term.

8              THE COURT:  -- litigation hold.

9              MR. BRODSKY:  No, he didn't unfortunately.

10             MR. PITLUCK:  These emails are markedly different

11   this email.

12             MR. KESSLER:  Mr. Marshall accuses people --

13             THE COURT:  He put it in the context.

14             MR. KESSLER:  Fraud.

15             THE COURT:  You know he explained to the jury what a

16   litigation hold is and why he was giving them notice and a

17   hint that, look, I'm coming after you, my lawyers are coming

18   after you with a lawsuit if you don't, you know, make me whole

19   or whatever it was he was demanding.

20             This is merely an in-house lawyer to the outside

21   counsel saying, you know, you're not working for our company

22   anymore and just bring us the documents or send us the

23   documents, forward -- preserve and forward.  It's a very

24   neutral statement.

25             MR. BRODSKY:  There is no probative value and it is

SIDEBAR CONFERENCE

1   unduly prejudicial, Your Honor.  It creates confusion about

2   the meaning of this.  We're going to have to sum up on this,

3   we're going to have to talk about this in summation.  I mean,

4   that's the -- we have limited time in summation, now we have

5   to address this document.

6            THE COURT:  You don't have limited time on

7   summation, I didn't tell you that, did I?  I haven't limited

8   you at all in this trial that's why we're here for seven

9   weeks.

10           MR. PITLUCK:  The eighth week of trial.  It's

11  perfectly plainly.

12           MR. BRODSKY:  I apologize for making a statement

13  about limiting.

14           MR. PITLUCK:  We're happy to redact Johnson,

15  Mulleady and Johnson, those three names.

16           MR. KESSLER:  And Questcor.

17           MR. PITLUCK:  And Questcor.

18           MR. BRODSKY:  No, I think if we're going to -- no, I

19  would leave in Questcor.  I would redact, please send me to

20  all documents relating to the Mulleady, Koestler and Johnson

21  matters at your earliest convenience.  I would redact --

22           THE COURT:  I think the third sentence is redundant

23  of the second.  I think the second sentence she generally asks

24  to preserve and forward all documents.  You don't really need

25  the third statement.

SIDEBAR CONFERENCE

1          MR. KESSLER:  We'll redact the third sentence.

2          MR. PITLUCK:  We'll redact the third sentence.

3          THE COURT:  What about the fourth?

4          MR. BRODSKY:  I have no objection to the fourth.

5     There are invoices in the record about James Calder on

6     antitrust.

7          THE COURT:  So we will redact the third sentence of

8     this document.  All right.

9          MR. BRODSKY:  Thank you.

10          MR. KESSLER:  Thank you.

11          (End of sidebar conference.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO – DIRECT – MR. PITLUCK

1          THE COURT:  The Court will admit Government's

2    Exhibits 301 with the redactions discussed at sidebar.

3          (Government Exhibit 301, was received in evidence.)

4          MR. PITLUCK:  The redactions are made on the version

5    on the screen.

6    BY MR. PITLUCK:

7    Q    This is an e-mail, Special Agent Delzotto, from Meg

8    Valeur-Jensen to the defendant, what is the date of this

9    e-mail?

10   A    October 6, 2014.

11   Q    What is the subject of the e-mail?

12   A    Subject reads suspension of representation.

13   Q    What does Ms. Valeur-Jensen write here?

14   A    Important.  Dear Evan, please immediately suspend all

15   activities on behalf of Retrophin Inc. including all

16   litigation matters until further notice.  Please preserve all

17   documents and forward to me all documents you may receive

18   going forward that relate to Retrophin Inc. matters.  I will

19   follow up with James Calder to discuss status of the Questcor

20   litigation.  With best records, Meg Valeur-Jensen.

21         MR. PITLUCK:  Your Honor, at this time the

22   Government has nothing further -- I'm sorry, one second.

23         Your Honor, just a bit of housekeeping.  Last week I

24   introduced Government's Exhibit 106-18 mistakenly said to was

25   in evidence.  It was actually a chain of, subset of a chain.

DELZOTTO - CROSS - MR. BRODSKY

1   So at this point we would move to admit Government's Exhibit

2   106-18in evidence.  It's up on the screen.

3          MR. BRODSKY:  No objection.

4          THE COURT:  We will admit Government's Exhibit

5   106-18.

6          (Government Exhibit 106-18, was received in

7   evidence.)

8          Were there any other exhibits that we have to

9   discuss?

10          MR. PITLUCK:  Probably, Judge, I haven't figured it

11   out yet.

12          THE COURT:  We'll admit Government's Exhibit 106-18.

13   Anything else?

14          MR. PITLUCK:  Nothing further.

15          THE COURT:  Mr. Brodsky, would you like to start

16   your cross?  I did promise the juror that we would conclude by

17   five tonight because of an appointment that juror has.  So we

18   will keep an eye on the clock.

19   CROSS-EXAMINATION

20   Q    Good afternoon, Agent Delzotto.

21   A    Good afternoon.

22   Q    You testified, you were asked this question, Special

23   Agent Delzotto, approximately how many witnesses did you

24   interview or take part in interviews of.  And at 6977 of the

25   transcript, line three to six, you said, "Approximately, I

DELZOTTO - CROSS - MR. BRODSKY

1   would say between 45, 50, somewhere in there, maybe more," end

2   quote.

3          Do you remember that testimony from last week.

4   A    Yes, I do.

5   Q    Is it fair to say that actually prior to the Indictment

6   in this case in December of 2015 that you had interviewed or

7   participated in interviews of 21 people?

8   A    I have no idea.

9   Q    Is it fair to say that in total that in fact the number

10  of witnesses interviewed that you took, either participated in

11  or did yourself, was not 45 to 50, but rather a total of 35

12  individuals?

13  A    As I said, I have no idea.  I said approximately.

14  Q    Let me show you a document.  Let me see if I can refresh

15  your recollection, Special Agent Delzotto, on the number of

16  interviews you participated in.

17          MR. BRODSKY:  May I approach, your Honor?

18          THE COURT:  Yes.

19  Q    Showing you for identification DX124-106, Special Agent

20  Delzotto, I would ask you to look at it to see if it refreshes

21  your recollection that the number of interviews of, that you

22  either interviewed people or took part in would be

23  approximately 21 individuals prior to the Indictment in

24  December of 2015?

25  A    I'm not familiar with this document.

DELZOTTO – CROSS – MR. BRODSKY

1  Q    Are you familiar with the names on the document with the

2  3500 material references?

3  A    I'm familiar with the names on the document, yes, on this

4  document, yes.

5  Q    Looking at the document, although you're not familiar

6  with it, if you look at the first 31 entries on the left-hand

7  side with the dates, does it refresh your recollection if you

8  add up the number that there were 21 interviews that you

9  participated in prior to Indictment?

10 A    I don't know if this is accurate or not.  I did not

11 produce this.  I'm not aware of this document.

12 Q    Looking at the names, you do know who you interviewed

13 prior to Indictment, correct?

14 A    Yes.

15 Q    You do remember the names of the people you interviewed

16 prior to Indictment, right?

17 A    I don't recall every person and order and whether it was

18 before Indictment or after Indictment.

19 Q    All right.  In the interest of time maybe, we'll do it

20 tomorrow morning Special Agent Delzotto, but for your purposes

21 to refresh your memory, you're going to need then, am I

22 correct, the actual 3500 material; is that right?  If I showed

23 you a binder?

24 A    If you want to show me all the 3500 material I'll gladly

25 look at it.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    Thank you, sir.

2              Is it fair to say that you would agree with me, sir,

3    that it's important for you, as the lead investigative agent

4    to obtain all relevant e-mails and not just a portion of the

5    relevant ones?

6              MR. PITLUCK:  Objection, your Honor.

7              THE COURT:  I'll overrule the objection.

8    A    Can you repeat that?

9              MR. BRODSKY:  Would you mind reading that back.

10             (Whereupon, the record was read.)

11   A    It's not really a yes or no.  Can I expand on that?

12             THE COURT:  Only if Mr. Brodsky let's you do it.

13   Q    Yes or no question, Special Agent Delzotto, yes or no.

14   A    If possible.

15   Q    Is it important, sir, to with respect to e-mails if

16   you're trying to -- yes or no -- tie one e-mail to another

17   e-mail and they are separated by a few dates, by a few days,

18   is it important to look at the e-mails in between the first

19   date and the second date in order to understand the e-mail

20   chain?

21             MR. PITLUCK:  Objection to the form of that.

22             THE COURT:  Sustained.

23   Q    If you have an e-mail on one date, let's say three days

24   ago, you had an e-mail today, there were e-mails in between,

25   between the same two people on the three days ago and the same

DELZOTTO - CROSS - MR. BRODSKY

1    two people today, is it fair to say that it's important to get

2    the e-mails between those same two people about the same topic

3    between those dates to understand those e-mails?

4    A    If it's possible.

5    Q    If it's possible to obtain them, you would obtain them,

6    correct?

7    A    If it's possible to obtain them.

8    Q    Now you would agree with me that sometimes e-mails can

9    have one more than one interpretation, right, more than one

10   reasonable interpretation -- withdrawn.

11          Special Agent Delzotto, as the lead investigative

12   agent and somebody with some experience, is it fair to say,

13   would you agree with me -- yes or no -- that sometimes there

14   are more than one reasonable interpretations of an e-mail?

15          MR. PITLUCK:  Object to the form of that, your

16   Honor.

17          THE COURT:  I'll sustain.  If you can rephrase it,

18   Mr. Brodsky.

19   Q    Special Agent Delzotto, do you recognize that sometimes

20   e-mails can have more than one meaning?

21   A    Sometimes they cannot, and sometimes they can.

22   Q    And you agree that sometimes words in e-mails can have

23   more than one interpretation, correct?

24   A    Sometimes they can, sometimes they can't.

25   Q    And you've, in your experience, have seen an e-mail,

DELZOTTO - CROSS - MR. BRODSKY

1   obtained the e-mail, interrupted it one way, and then actually

2   spoke to the participants on the e-mail and found out it meant

3   something else, right, that's happened to you, correct?

4   A    Are you talking about specific instance?

5   Q    In general, Special Agent Delzotto.  In your experience

6   doing cases, has there been an instance -- yes or no -- ever,

7   where you've obtained an e-mail in the course of discovery or

8   obtaining documents and you interpreted the plain face of the

9   e-mail one way, but when you talked to people about it you

10  learned it meant something else, yes or no?

11  A    Yes, that's possible.

12  Q    You don't have any personal knowledge about the meaning

13  of any of the e-mail communications and documents that were

14  introduced through your direct examination, correct?

15  A    I don't know what you mean personal knowledge.

16  Q    You didn't observe any of events that took place between

17  2011 through 2014, correct, you weren't present?

18  A    In any investigation I'm not there in person observing

19  what is going on.

20  Q    So the answer is yes.  Is the answer is yes, that in

21  connection with all the e-mails that were introduced through

22  you, you don't have any personal knowledge about what actually

23  took place in those e-mails because you weren't there.  You

24  didn't -- you weren't present in connection with any of those

25  events, correct?

DELZOTTO - CROSS - MR. BRODSKY

1          MR. PITLUCK:  Objection to the form, your Honor.

2          THE COURT:  Try to rephrase it.  It becomes a very

3     compound question, I think Mr. Brodsky, as phrased.

4     Q    I'll break it down, Special Agent Delzotto.  Between 2011

5     and 2014 you had no connection, personal connection, with MSMB

6     entities, correct?

7     A    Personal connection, other than investigating them?

8     Q    Yes.  Between that date -- so take me back to your life

9     in 2011 through 2014, you didn't visit the offices during that

10    time period of MSMB, right?

11    A    No.

12    Q    And you weren't present at any of the Retrophin Board

13    meetings in 2013, right?

14    A    I was not physically present at any Board meeting, no.

15    Q    You weren't around in 2012 when Mr. Shkreli was making

16    statements to all sorts of people, correct?

17    A    What do you mean?

18    Q    You weren't there?

19    A    Was I there in person?  Where, where are you talking

20    about?

21    Q    At any time, 2011 through 2014, were you ever present,

22    ever, when Mr. Shkreli was making statements to people?

23    A    No.

24    Q    Let's put up for example DX111-2 in evidence.

25          MR. BRODSKY:  May I approach?

DELZOTTO - CROSS - MR. BRODSKY

1        THE COURT:  Yes.

2    Q    Directing your attention, to the top of the e-mail.  You

3    see where it says from Jackson Su sent December 12, 2012 to

4    George Wang, subject forward executed merger agreement, FYI

5    glad we were able to help everyone else?

6    A    Yes, I see it.

7    Q    Now, is it fair to say that you don't know the meaning of

8    the words "glad we were able to help everyone else" --

9    withdrawn.

10        You don't know sitting here right now, Special Agent

11   Delzotto, whether Jackson Su was actually glad we were able to

12   help everyone else or not so glad that he was able to help,

13   they were able to help everyone else?

14        MR. PITLUCK:  Objection, your Honor.

15        THE COURT:  I'll overrule the objection.  If he can

16   answer it.

17   A    I can't answer it.  I don't know if he was glad, not

18   glad.  I don't understand your question really.

19   Q    And that's because these words "glad we were able to help

20   everyone else," do you see those words Special Agent Delzotto?

21   A    Yes, I see them.

22   Q    You understand, sir, just in general, that there might be

23   more than one reasonable interpretation of those words?

24   A    You don't -- you're talking about that specific e-mail on

25   December 12, at 10:43 p.m.?

DELZOTTO - CROSS - MR. BRODSKY

1    Q    Those words, "glad we were able to help everyone else"?

2    A    It does mean something actually, because if you look at

3    the preceding e-mails, you look at them together, we know this

4    is about the Fearnow shares.

5    Q    Well, let me ask you this Special Agent Delzotto, let me

6    show you this one, Government's Exhibit 106-13, can we put

7    that up?  If you blow up the bottom e-mail, you see where

8    there is a message from David Geller it says, "it's really not

9    fair to leave me on a cliff."  You would agree with me, sir,

10   that sometimes in e-mails when people communicate they don't

11   actually mean the very words that they say?

12   A    Yes, he wasn't on a physical cliff, correct.

13   Q    So sometimes e-mails can be interpreted as if they're

14   symbolic or they are trying to get across a message?

15   A    In some cases, yes.

16   Q    You would agree with me, sir, that sometimes people in

17   e-mail communications make representations about what other

18   people said to them, or proved, or disproved, correct, just in

19   general?

20   A    In general, sometimes.

21   Q    And you saw e-mail communications with Mr. Shkreli,

22   right, during your direct examination, a lot of them, right?

23   A    Yes, I think a couple.

24   Q    And Mr. Shkreli was making a lot of representations,

25   correct?

DELZOTTO - CROSS - MR. BRODSKY

1    A    He was making some representations, yes.

2    Q    He was sometimes making representations about Mr. Greebel

3    when Mr. Greebel wasn't on the exchange, correct?

4    A    In some cases, yes.

5    Q    And let me ask you this, the Government showed you

6    Government's Exhibit 459 in evidence.  Can we put up

7    Government's Exhibit 459?  Let's do this example, it's just

8    three e-mails then that's it.

9            Government's Exhibit 459 in evidence, the Government

10   showed you this e-mail chain and it starts at the bottom on

11   November 25, 2012, correct?

12   A    Correct.

13   Q    And it goes up to November 26, 2012, correct?

14   A    Correct.

15   Q    And then the Government directed your attention to this

16   e-mail, 111, if we could put it up, side by side, Government's

17   Exhibit 111-15, and that Exhibit 111-15 was November 29, 2012,

18   correct?

19   A    The date of that e-mail is November 29, 2012.

20   Q    So four days after the November 25 e-mail in Government's

21   Exhibit 459, right?

22   A    There are four days, yes, between the 25 and the 29.

23   Q    Do you know one way or the other whether or not on

24   November 25, 2012 -- can we blowup Government's Exhibit 459

25   please -- and go down to November 25 at 10:36 p.m., do you see

DELZOTTO - CROSS - MR. BRODSKY

1   two e-mails between Mr. Greebel and Mr. Shkreli on

2   November 25, 2012 at 10:36 p.m.?

3   A    There are two e-mails between Martin Shkreli and

4   Mr. Greebel on November 25, 2012 at 10:36 p.m., yes.

5   Q    So, sir, did you know on November 25, 2012, at 10:36:29,

6   Mr. Shkreli forwarded an e-mail to Mr. Greebel about the

7   cancelation of common stock to investors?

8            MR. PITLUCK:  Objection, your Honor.

9            THE COURT:  I'm going to sustain the objection and

10   ask you to try to rephrase.

11  Q    Did you look at an e-mail on November 25, 2012, at

12  10:36:29 that related to Mr. Shkreli giving up common stock

13  that he had given to other investors?

14  A    If you're looking at something specific maybe you can

15  show it to me.

16           MR. BRODSKY:  Will do.  May I approach, your Honor?

17           THE COURT:  Yes.

18           MR. BRODSKY:  Showing you DX124-61 for

19  identification.

20  Q    You recognize this as an e-mail from Mr. Shkreli on

21  November 25, 2012, at 10:36:29 p.m. to Evan Greebel, correct?

22  A    I don't recognize this e-mail.

23  Q    You've never seen it before?

24  A    Have I seen it before?

25  Q    Yes.  Have you seen it before?

DELZOTTO - CROSS - MR. BRODSKY

1    A    Perhaps, but I don't recall it as I sit here right now.

2    Q    You recognize the names of Mr. Shkreli and Evan Greebel?

3         MR. PITLUCK:  Objection, your Honor.  Not in

4    evidence.

5         MR. BRODSKY:  I'm asking if he recognizes the names,

6    trying to lay a foundation for admissibility.

7         THE COURT:  To the extent he's asking you if

8    recognize certain names, you may answer yes or no.

9    Q    Special Agent Delzotto, you recognize Martin Shkreli's

10   e-mail address on the e-mail?

11   A    Yes.

12   Q    You recognize Evan Greebel's name on the e-mail?

13   A    Yes.

14   Q    If you go down to the e-mail that is being forwarded, you

15   recognize the names of the people that Mr. Shkreli is sending

16   an e-mail to earlier that day, correct?

17   A    Yes.

18   Q    And you recognize that it relates to Mr. Shkreli

19   asking --

20         MR. PITLUCK:  Objection, your Honor.

21         THE COURT:  Sustained.

22         MR. BRODSKY:  Your Honor, we offer DX124-61 as it's

23   directly in connection in our view with Government's Exhibit

24   459 given the time at which it's sent during the e-mail

25   communications and the topic.

PROCEEDINGS

1         MR. PITLUCK:  Objection, your Honor.  Hearsay.

2         MR. BRODSKY:  We're not offering for the truth, your

3  Honor, just offering it for information, for its effect on

4  Mr. Greebel and what Mr. Greebel sent in response on

5  November 25, 2012 at 10:37 p.m.

6         MR. PITLUCK:  Speaking objection.

7         THE COURT:  Mr. Brodsky, you know discussion should

8  be had at sidebar rather than speaking arguments why documents

9  ought to be admitted.

10        We're now at 5:00 o'clock.  I think it's time to

11 excuse the jurors for the day in any event.

12        Before you go, I have a question please, I just

13 wondered whether any of you were exposed to any media reports

14 about any individuals who's names you may have heard during

15 this trial over the last few days.  If so, please raise your

16 hand.  If not, that's fine too.

17        Did anyone hear or read anything?

18        THE COURT:  Juror number one and three.  Did you

19 read or did you read anything that you were exposed to or did

20 you consciously avoid --

21        JUROR NO. 1:  I saw something on the news.

22        THE COURT:  We may have to talk to jurors in seats

23 one, three, and six.

24        Do any of you have to leave right this moment,

25 jurors one, three, six?

PROCEEDINGS

1          THE JURORS:  No.

2          THE COURT:  Let me dismiss the rest of you.  I'll

3    ask you please not to discuss the case.  If you happen to hear

4    or notice anything regarding anyone else who's names you may

5    have heard in this case, please consciously avoid it.  Don't

6    listen, read or expose yourself to it.  Keep an open mind.

7    I'll see you tomorrow at 9:00 a.m.  Have a safe trip home.

8               Jurors one, three, six could just remain in the jury

9    room, we'll probably speak to you individually.

10              (Jury exits the courtroom.)

11              (Whereupon, the witness steps down.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          (In open court.)

2          THE COURT:  Sir, you can step down.  Thank you.

3          (Witness takes the witness stand.)

4          THE COURT:  All right.  Have a seat.  Mr. Dubin is

5   not here.

6          MR. BRODSKY:  No, he's not, your Honor.

7          THE COURT:  One of you can speak to this because I'm

8   asking them to stay.  How do you want to deal with this?  Do

9   you want to find out from each juror who has raised his hand

10  what he's heard and ask whether or not I'm proposing whether

11  or not that would affect his or her ability to remain

12  open-minded and fair minded toward both parties in this case.

13         MR. BRODSKY:  I think so, your Honor.  I think if

14  they heard something on the news it's probably less likely,

15  I'm just giving you my gut instinct that it's probably less

16  likely they heard something they were influenced, but I don't

17  know what was on the news.  If they read something, obviously,

18  we'd want to know that, too, and if your Honor could ask if

19  they could still be fairly.

20         THE COURT:  Let's bring in Juror No. 1, if you don't

21  mind, Ms. Jackson and tell them not to discuss anything with

22  the fellow jurors.

23         MR. KESSLER:   For the record it's the juror in seat

24  No. 1.

25         THE COURT:  Yes.  I don't even remember what his

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1  former number was, but I think it might have been three or

2  four.

3          MR. KESSLER:  That's why I ask about the seat

4  number.

5          THE COURT:  I try to say "seat number," "now

6  currently in seat number."

7          MR. BRODSKY:  Would you mind --

8          MR. DUBIN:  Your Honor, I guess you can do it at the

9  end if they heard something to reinforce the presumption of

10  innocence I nope you do that all the time but that's all.

11          THE COURT:  All right.

12          (Juror enters courtroom.)

13          THE COURT:  Hello, sir.  Let's see one moment have a

14  seat on the witness stand I'm we're going to ask you a few

15  questions.  Just so we can hear you because the microphone,

16  just make yourself comfortable.  All right, sir, you're now

17  seated in seat No. 1 and you raised your hand in response to

18  my question as to whether or not you might have been exposed

19  to any media coverage about any individuals whose names may

20  have popped up in this trial.  Can you tell us specifically

21  what your exposure was to any media?

22          THE JUROR:  I was watching the news and I saw a

23  small clip about Martin Shkreli that he had purchased a

24  collector's item, an album of a group, and that they wanted to

25  confiscate it from him.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

7633

PROCEEDINGS

1        THE COURT:  They being?

2        THE JUROR:  I think the Government was.

3        THE COURT:  Do you recall anything else about what

4   you heard?

5        THE JUROR:  I think they also said that he owed

6   $7 million.

7        THE COURT:  Okay.  Is there anything else that you

8   recall?

9        THE JUROR:  That's it.

10        THE COURT:  All right, sir.

11        So my question is whether hearing what you did,

12   whether you are committed to maintaining a fair and open mind

13   toward both sides in this case?

14        THE JUROR:  Yes.

15        THE COURT:  And could you be fair and impartial to

16   both sides in this case?

17        THE JUROR:  Yes, your Honor.

18        THE COURT:  And could you maintain the fundamental

19   principle that anyone charged with an offense is presumed

20   innocent until unless and until the jury finds beyond a

21   reasonable doubt that the Government has proven each element

22   required for a finding of guilt.

23        THE JUROR:  Yes, your Honor.

24        THE COURT:   Do you have any doubt as to whether or

25   not you could be fair and impartial to both sides.

PROCEEDINGS

1          THE JUROR:  No, ma'am.

2          THE COURT:    I would ask you, sir, we don't have

3   control over the media but if you hear anything else that

4   might touch on any name you've heard in this trial, just

5   please walk away or turn to down or turn it off.

6          THE JUROR:  Okay.  I will.

7          THE COURT:   And please don't discuss this with your

8   fellow jurors.

9          THE JUROR:  I will not.

10          THE COURT:  All right.  Thank you very much, sir.

11          THE JUROR:  You're look.

12          THE COURT:  Have a good trip home.

13          THE JUROR:  Thanks see you tomorrow.

14          (Juror exits courtroom.)

15          THE COURT:   I think does anybody have any issues

16   regarding Juror No. 1?

17          MR. KESSLER:  No.

18          MS. SMITH:  No, your Honor.

19          MR. BRODSKY:  If you would allow me to consult with

20   my colleagues and client.

21          THE COURT:  I'd rather just get jurors in so we can

22   get the information and send them on their way.

23          Juror in seat No. 3, please.  If it's all right with

24   you, I'm going to refer to them by number unless somebody

25   needs me to have name in the record.  I think we all know who

PROCEEDINGS

1    they are.

2              (Juror enters courtroom.)

3              THE COURT:  Hello, sir, please have a seat.  Make

4    yourself comfortable.

5              This is the juror who is now sitting in seat No. 3.

6              Sir, you raised your hand in response to my question

7    whether I asked anyone had seen or heard any media coverage

8    about any individual whose names may have been mentioned

9    during this trial.  And we'd like to find out who you heard

10   about and how you heard about it or read about.

11             THE JUROR:  On my Kindle Fire, I have little

12   newsfeeds come across.  I saw a headline that I saw about the

13   Wu Tang Clan, I don't know what that is, but that the Feds

14   were looking to, I guess, seize Shkreli's album that's worth a

15   lot of money.

16             THE COURT:  Is there anything else that you recall?

17   Did you read it when it popped up?

18             THE JUROR:  No.  But, again, the way the Kindle,

19   works like a lot of headlines.  So I saw the headline, but I

20   saw oh, my God there he is, that's the name I've been hearing

21   about.

22             THE COURT:  You didn't read it?

23             THE JUROR:  I didn't think much about it.  I don't

24   know what the Wu Tang Clan is.

25             THE COURT:  That's all right.  You're not required

PROCEEDINGS

1    to know this for this trial.  Whatever, as we talked about,

2    before anything that is relevant to the jury's decision is

3    going to be before you in this trial, and everything else

4    outside this courtroom cannot be considered in the jury's

5    decision.

6                So my question for you, sir, is whether despite

7    having seen that pop up headline whether you could remain

8    open-minded and fair minded toward both parties in this case.

9                THE JUROR:  Yes.  I've already told you during jury

10   selection that.

11               THE COURT:  All right.

12               THE JUROR:  I didn't think much of him to begin

13   with.

14               THE COURT:   Well we want to ensure there hasn't

15   been anything that a juror has heard or listened to outside of

16   the courtroom that could have any affect on his or her ability

17   and commitment to be fair minded and open-minded toward both

18   sides and I wanted to just see whether or not seeing that

19   headline had any affect on your ability to be fair minded and

20   open-minded toward both sides.

21               THE JUROR:  All right.  Your Honor.

22               THE COURT:  And would you also maintain in your mind

23   throughout this trial the fundamental Constitutional principle

24   that somebody charged with an offense is presumed innocent

25   unless and until the Government proves beyond a reasonable

PROCEEDINGS

1    doubt each and every element of the charged offense.

2              THE JUROR:  Of course.  I teach AP Government and

3    Politics.

4              THE COURT:  Do you have any concerns about what you

5    might have read in the pop-up that would you would like to

6    bring to our attention?

7              THE JUROR:  No.

8              THE COURT:  All right.  Thank you.  Were there any

9    questions that anyone would like me to ask this witness, this

10   juror, excuse me.  All right, sir, have a good trip home.  See

11   you tomorrow morning.

12             (Juror exits courtroom.)

13             (A brief pause in the proceedings was held.)

14             (Juror enters courtroom.)

15             THE COURT:  Hello, sir, have a seat here.  Make

16   yourself comfortable.

17             This is the juror who is seated now in seat No. 6 of

18   the jury.

19             Sir, you raised your hand in response to my question

20   as to whether or not any juror has heard or gotten a pop-up

21   headline or something of that nature involving any individual

22   whose name may have been raised or discussed during this

23   trial.

24             THE JUROR:  No.

25             THE COURT:  Okay.  You raised your hand in response

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1    to my question, so could you tell me what you why you raised

2    your hand.

3              THE JUROR:  Oh, because Saturday morning my mom is

4    putting on the television and the news pop-up just a few

5    minutes and Mr. Martin was charged with some, but I didn't

6    expect to neither about the case or anything.

7              THE COURT:  You didn't what.

8              THE JUROR:  My mom just put on the television, ABC

9    News, and Mr. Martin showed up that he was charged and drop

10   something like that and that's it.

11             THE COURT:  Is there anything else that you

12   remember -- did you walk away or did you stay and listen to

13   the report?

14             THE JUROR:  No, I just move away because it was just

15   like a two seconds or something.  Just pop up on the news.

16             THE COURT:  Okay.  Now, as we discussed at the

17   beginning of the trial, we wanted jurors to always maintain a

18   fair and open mind toward both sides.

19             Would anything about what you heard for two seconds

20   on the news on Saturday morning affect your ability to be fair

21   minded and open-minded toward both sides?

22             THE JUROR:  No.

23             THE COURT:  And could you also remain committed to

24   the Constitutional principle that anyone charged with an

25   offense is presumed innocent unless and until the Government

PROCEEDINGS

1    proves beyond a reasonable doubt each and every element of the

2    offense charged?

3               THE JUROR:  Yes.

4               THE COURT:  And would you also commit to avoiding

5    any, as you did on Saturday, avoid any exposure to any media

6    about anyone whose name may be mentioned in this case?

7               THE JUROR:  Yes.

8               THE COURT:   Is there anything, and what you heard

9    for those two seconds on Saturday morning that would cause you

10   to doubt your ability to be fair and impartial to both sides?

11              THE JUROR:  No.

12              THE COURT:  All right.  Thank you, sir.

13              THE JUROR:  Thank you.

14              THE COURT:  I will ask you also not to discuss this

15   with any of your fellow jurors.

16              THE JUROR:  Okay.

17              THE COURT:  You're excused for the evening and thank

18   you for your attention.  I'll see you tomorrow morning.

19              THE JUROR:  Thank you, ma'am, have a good night.

20              (Juror exits courtroom )

21              THE COURT:  All right.  Have a seat.  Did the

22   defense want to -- what was your application, if any.

23              MR. BRODSKY:  I don't think we have one at this

24   time, your Honor.  I did want to confer with my more

25   experienced colleague about this, Josh Dubin, which I will do

PROCEEDINGS

1   this evening.  If we had any application to make, I will let

2   your Honor know, but I didn't see, from my perspective, any

3   issue I just wanted to check with Mr. Dubin.

4           THE COURT:  That's fine.  Is there anything else?  I

5   think, Mr. Kessler, you wanted to discuss one of the experts.

6           MR. KESSLER:  Yes, three.

7           THE COURT:  Okay.

8           MR. KESSLER:  But this will be very brief.

9           THE COURT:  Just so you November give than we got

10  three issues I will not be issuing a decision on your experts

11  because I do want to listen to and consider your arguments on

12  these experts, so go ahead.

13          MR. KESSLER:  So the first update is on Mr. Johnson

14  who is the subject of a Daubert hearing.  The defense

15  supplemental disclosure or final disclosure, I guess, which is

16  Docket 466 which was filed Saturday at about 5:00 o'clock says

17  this Mr. Johnson his happened testimony will be consistent

18  with his testimony at the Daubert hearing.  So, in other

19  words, we don't actually know what opinions he's offering and

20  not offering because, as the Court will remember, he

21  originally -- there were eight opinions disclosed related to

22  his testimony, you know, that referred to all consulting

23  agreements or I guess consulting agreements in general.  He

24  then walked that back to a very specific subset of the party

25  executive consulting agreements that were also for the purpose

PROCEEDINGS

1    of the settlement or something like that.  And then there was

2    a new opinion added about employment agreements or the one

3    specific four cause clause in a termination agreement.

4         And so, our objections from the Daubert hearing,

5    we're not trying to change those.  Our only objection to

6    Mr. Johnson we don't actually know which of the opinions he's

7    being proffered to offer.

8         It's sort of hard too say, well, his opinions are

9    going to be what he said at the hearing.  As the Court

10   remembered he referred to as significant flavor at one point,

11   a significant flavor, that a contract, I assume, that's not an

12   opinion he's offering.  But it's very hard for us to really be

13   sure which of the noticed opinions that were previously

14   disclosed before the Daubert hearing he's still offering and

15   what they are.

16        THE COURT:  Well, I have to assume based on the

17   latter that the defense submitted on Saturday that the most

18   recent iteration of the opinions is as stated in that letter

19   the Saturday letter that it will be confined to the Daubert

20   hearing unless I'm misunderstanding the defense letter.  Does

21   somebody on the defense attorney team want offer

22   clarification?

23        MR. BRODSKY:  I didn't use those words, your Honor,

24   but I think that is right if we were going to supplement his

25   testimony with something else, we would have specified it in

PROCEEDINGS

1     the letter.

2              THE COURT:  So you're confining Mr. Johnson's

3     proposed testimony to the opinions that he offered only at the

4     Daubert hearing and that supercedes any opinions that he may

5     have offered in prior disclosures or reports, am I correct

6     about that the.

7              MR. BRODSKY:  May I check, your Honor?

8              THE COURT:  Yes.

9              MR. KESSLER:  And your Honor, it might be helpful to

10    be clear.  I don't think the defense is saying he's offering

11    opinions outside of what he said at the Daubert hearing.  My

12    point is just, you know, with respect to Professor Giller,

13    there is nine or five opinions.  They're specific when he

14    testifies we'll know whether or not, you know, his opinion is

15    within the scope of the disclosure and we can object or not

16    object.  My concern is saying that Mr. Johnson will testify

17    consistent with his testimony at the Daubert hearing.

18             Certainly, not everything at the Daubert hearing is

19    a permissible opinion, so my point is we really don't know

20    what the opinions are.  You know, we can't just say that

21    everything he said at the Daubert hearing is his opinion.

22             THE COURT:  I think, as I recall correctly, he

23    articulated certain factors or indicia they found common to

24    the agreement that is located on the Internet and it

25    the -- and looked at those in comparison with the factors that

PROCEEDINGS

1    he found in the disputed agreements.

2              MR. KESSLER:  He said that he didn't say what all

3    the factors were.  And he said he's, you know, the examples he

4    found were not examples he was relying on for his opinions.

5    That they were just -- so my point is, I don't want to put

6    words in the defense mouth, but I think if you read the

7    Johnson transcript, and I'm sure the Court has, and I think as

8    we all, I don't think someone can say well, his opinions are

9    A, B, C, D, and so.

10             THE COURT:  Are you asking me for a further

11   iteration of his opinions based on the Daubert hearing, or are

12   you asking or just maintaining your view that his entire

13   opinion and the methodology are precludable under Daubert?

14             MR. KESSLER:  We are absolutely maintaining that

15   position.

16             THE COURT:  Yes.

17             MR. KESSLER:  I don't think what I'm saying --

18             THE COURT:  But assuming I deny that conclusion

19   outright, are you asking for a more concise statement of his

20   opinions?

21             MR. KESSLER:  Well, I suppose if the Court ruled

22   that professor Mr. Johnson could certain about A, B, C, but

23   not D, E, F then we have that.

24             THE COURT:  All right.

25             MR. KESSLER:  I think --

PROCEEDINGS

1          THE COURT:  That's what I intend to do -- to make

2    specific rulings about what an expert may say.

3          MR. KESSLER:  So then I think that will address

4    remember question about Mr. Johnson.

5          THE COURT:  Okay.

6          MR. KESSLER:  Because the objections are the same

7    that are in the Daubert brief.

8          So then the next issue is Mr. Ferruolo.  We have two

9    different issues.  The first is something that we're just

10   raising now that we've actually seen his 26.2 material.  As

11   the Court knows this wasn't the 26.2 material wasn't disclosed

12   to us until bay day ago, two days ago it's not something we

13   could have used for purposes of Daubert hearing or relevance

14   briefing but in 26.2-SF-1, there's a list some numbered

15   entries some of them are redacted and in item No. 7, if

16   appears that when Mr. Ferruolo said that with respect to 13(d)

17   filings, 13(d) being the SEC Form 13(d), I was generally

18   familiar and, at one point, I did a little bit of that, but

19   that was more of a specialist issue.  So that's the only 26.2

20   material we have related to 13(d)'s.

21         Mr. Ferruolo offers a host of opinions about SEC

22   form 13(d)'s in his modified disclosure that came on Saturday.

23   So it's now not clear to us what the basis of those particular

24   13(d) opinions are of the scope of Mr. Ferruolo's knowledge

25   about 13(d)'s is that he was generally familiar with them at

PROCEEDINGS

1    one point, but it was mostly something that specialists did.

2              There's another set of 26.2 material that refers to

3    the 13(g) form which is a different disclosure form.  And if

4    you read the 26.2 material about the 13(g) form, it looks like

5    the opinions that are being offered in the disclosure with

6    respect to the 13(d) form.  So I'm not trying to be overly

7    technical the forms happen to have very similar sounding

8    names.

9              The point is, we had these disclosures in advance of

10   the Daubert practice.  We would have sought much more detailed

11   explanation of the basis for Mr. Ferruolo's understanding or

12   opinions about 13(d) forms given what he seems to have told

13   the defense.

14             So that's the first of two objections we have with

15   respect to Mr. Ferruolo.  We don't have relevance objections,

16   you know, as the disclosures are drafted it anything other

17   than those 13(d) opinions and then the topic I'm about to

18   bring up.  So we're narrowing the issues but supplementing

19   them with this new information.

20             THE COURT:  Okay.  What's the next topic?  So the

21   next issue is the defense has disclosed a supplemental opinion

22   on the last page of Docket No. 466 which is styled as a

23   potential response to the Government's opening arguments and

24   various testimony about limiting or restricting or controlling

25   Fearnow shares and the supplemental disclosure is maybe seven

PROCEEDINGS

1    or eight lines long, but it appears to be about lock-up

2    agreements.  And as the Court may have seen, the defense also

3    submitted an entire jury charge about lock-up agreements.

4            A lock-up agreement is an agreement at the time of

5    an IPO between a company, and underwriters and shareholders

6    where shareholders get some shares, they sign a lock-up

7    agreement not to trade for a certain period of time, not to

8    sell for a period of time, and those agreements get disclosed.

9            And, obviously, sort of characterizing this but the

10   point is a lock-up agreement is an agreement that relates,

11   according to Dean Ferruolo's opinion and the disclosures we

12   get, relates to companies and underwriters often in the

13   context of an IPO.

14           The objection simply that lock-up agreements aren't

15   at issue here.  There are no lock-up agreement, no one has

16   seen an it be lock-up agreement related to fear now shares no

17   lock-up agreement has been disclosed.  And so, we have a

18   religious objection to this entire opinion which appears to

19   address lock-up agreements.

20           Now, it's possible we're misconstruing this opinion

21   we just got but it certain certainly looks like it's all about

22   lock-up agreements.

23           MR. BRODSKY:  Your Honor, I would direct Mr. Kessler

24   to page four of the letter.

25           MR. KESSLER:  Yes.

PROCEEDINGS

1          MR. BRODSKY:  The last sentence, "to the extent

2    there are freely traded shares that are not subject to sale

3    restriction under SEC rules, such as Rule 144 held by

4    individuals subject to a restrictive sales agreement a company

5    allocates shares to individuals who are friendly to the

6    company and share the same goal of creating an orderly and

7    stable market.

8          That's an industry practice.  It's been endorsed by

9    the SEC.  There's a lot of SEC opinions that have this

10   language in it and Dean Ferruolo has experience in that and

11   would testify to that.

12         It's not about the lock-up agreement, but rather the

13   lock-up agreement is the background to that opinion which is

14   that to the extent there are freely traded shares that aren't

15   subject to sales restrictions, companies can reasonably

16   allocate them to individuals who are friendly to the company.

17         MR. KESSLER:  So, your Honor, if Dean Ferruolo's

18   eight opinion is the lock-up agreement takes up the bulk of

19   the disclosure, but if they are offering him to get on the

20   stand and say absent, you know, any restriction a company is

21   free to allocate shares to anyone to wants or friendly to the

22   company and share the same goal then I think we need to be

23   know a lot more detail about what that opinion is and the

24   specific bases because right now bases are several sections of

25   the Securities Act and a review of materials on the SEC

PROCEEDINGS

1    website.

2            And so if an expert is going to be proffered to come

3    in here and safe companies can allocate shares to people they

4    like we need really to know the contours of that opinion, the

5    specific bases, because it sounds an awful like an opinion on

6    the ultimate issue and an awful lot like, I'll give you an

7    example, the defense draft jury instructions on lock-up

8    agreements the last sentence says I instruct you that it is

9    lawful to impose restrictions on the sale of stock of new

10   companies and you must not draw any negative conclusions from

11   the existence of, if any, of lock-up agreements.

12           So, again, it sort of seems like that instruction

13   relates to lock-up agreements, but it sort of seems like the

14   defense is seeking a legal instruction that it's fine for a

15   company to impose restriction option the sale of its stock

16   unrelated to a publicly disclosed lock-up agreement.

17           I'm not saying that that opinion is necessarily

18   improper, but as drafted and given the disclosure, we have

19   serious concerns about it and I think we need a lot more

20   information about what's being said and what the bases are if,

21   in fact, Dean Ferruolo is not going to come in and say there

22   are publicly disclosed lock-up agreements you can lock-up the

23   shares which is uncontroversial and irrelevant.

24           But if he's really opining on a more general idea

25   that companies can just give shares to whoever they want and

PROCEEDINGS

1   then impose restrictions on the sale of those shares, which is

2   what it sounds like.

3          Again, it's impossible we are misinterpreting the

4   opinion based on a can couple of sentences we've been provided

5   with, many of which address lock-up agreements it is not clear

6   to us and we are concerned about both the disclosure, the

7   specific opinion.

8          THE COURT:  Well, I guess my question is whether the

9   defense is arguing that somehow lock-up agreements in the

10  context of an IPO are applicable here.  There's just a misuse

11  of a term of art that may have a limited meaning and context

12  and definition, which is it?  Because I'm not going to have

13  any sort of surprises or interruptions to straighten this out

14  we're going to straighten this out before he testifies.  If

15  you can't straighten this out, they're not going to testify.

16  We'll have to define parameters some we're just going --

17         MR. BRODSKY:  I think Mr. Kessler mentioned IPO, but

18  that's not summary of the supplemental opinion of Dean

19  Ferruolo.  He mentions, Dean Ferruolo, would testify that one

20  of a company's goals after going public transaction such as a

21  reverse merger is to create an orderly and stable market.  So

22  I think he was talking about it in the context of any going

23  public transaction including a reverse merger.

24         If your Honor would like us to supplement this, I

25  personally did not speak to Dean Ferruolo about this opinion,

PROCEEDINGS

1    Mr. Chan did and we can supplement it if your Honor wants.

2    And given Mr. Kessler's objection and provide further

3    information to the Court.

4              THE COURT:  Well, to me, and to the Government.

5              MR. BRODSKY:  Yes, of course.

6              THE COURT:  This instruction about lock-up

7    agreements we are in agreement that's not applicable; correct

8    in this context.

9              MR. BRODSKY:  May I reserve on that for the purpose

10   of?

11             THE COURT:  We're trying to get the I mean I'm

12   assuming we're going to have a charging conference some time

13   this week we're trying to get it finalized.  We really can't

14   afford you more time we need to get these done.  We've given

15   you a year.  We've given you extensions and we want to get it

16   done.  So I would like to just clarify that lock-up

17   agreements, instructions, are not going to be necessary given

18   that that is not what Mr. Ferruolo is going to be testifying

19   about.

20             MR. BRODSKY:  May I confer with colleague, Mr. Chan,

21   before I answer, your Honor?  I don't want to prematurely

22   answer without the knowledge about Dean Ferruolo and his

23   expert testimony.

24             THE COURT:  You're going to supplement your

25   disclosures by this evening.  It's now 5:30.  Can you do it by

PROCEEDINGS

1    8:00 p.m.

2              MR. BRODSKY:  Yes, your Honor.

3              THE COURT:  And I would like also an answer about

4    the instruction.  If it's not relevant, I don't want to give

5    it -- I don't want to confuse the jury in this very complex

6    case.

7              MR. BRODSKY:  With respect to 13(d), I think, your

8    Honor, just to give your Honor the full scope of it.  I know

9    Mr. Kessler was taking something from a 26.2 note, Mr. Dean

10   Ferruolo would testify from the perspective an outside counsel

11   whose filled out 13(d)'s on behalf of clients.  He's outside

12   counsel for decades at, I believe at least two different law

13   firms to small public companies, private companies going

14   public.  And I believe that his experience is extensive in

15   terms of an external counsel preparing 13(d)'s.

16             THE COURT:  Give me the letter.

17             MR. BRODSKY:  The letter.

18             THE COURT:  13(d)?

19             MR. BRODSKY:  13(d).

20             THE COURT:  Or G?

21             MR. BRODSKY:  13(d).  We're happen to supplement it,

22   your Honor, if your Honor would like to know his experience

23   with respect to schedule 13(d).  13(g) and 13(d) are vastly

24   different quite similar in terms of the practices with respect

25   to filling out 13(g)'s and 13(d)'s.  They certainly are --

PROCEEDINGS

1   there's not a wide gulf there.

2          But we're certainly happy, your Honor, if you wanted

3   to know a little bit more about his experience in light of the

4   26.2 disclosure and the statement there we can supplement that

5   also by tonight.

6          THE COURT:   By 8:00 o'clock.

7          MR. BRODSKY:   8:00 o'clock, your Honor.

8          MR. KESSLER:   And then the last issue which I this I

9   is not going to require a supplemental disclosure.

10          With respect to Ms. Klein who is the plaintiff's

11   lawyer.  As the Court will recall it and, again, her opinion

12   is that either a reasonable attorney for she, herself, both

13   file claims against Retrophin in light of the facts that in

14   the record in this case more or less would, could, one of

15   those two.  We've already objected to that as irrelevant.

16          We think, frankly, whether or not an experienced

17   plaintiff's attorney would have brought a claim on this entire

18   record doesn't tell you anything about what the defendant was

19   thinking or intended.

20          But the 26.2 disclosures in addition, I think,

21   further strengthen our objection which is why I want to raise

22   it.

23          Ms. Klein told the defendant, Shkreli is holding

24   himself out to investors as the center of this universe.  It's

25   all about him.  Greebel would not know how Shkreli is holding

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

7653

PROCEEDINGS

1   himself out to investors.  She also apparently is relying on

2   the fact that all communications about Retrophin went to

3   Shkreli.  And she's relying specifically on a May 13, 2012,

4   e-mail, I believe, it's from Mr. Shkreli to Dr. Rosenwald

5   where Dr. Rosenwald says hedge fund gets shares as no cost,

6   but I might be wrong about Dr. Rosenwald or something like.

7           My point is, Ms. Klein is saying that she or another

8   reasonable plaintiff's attorney, based on facts that she

9   believes Mr. Greebel did not have, and could not have known,

10  would not know would have brought claims against Retrophin or

11  engaged in some sort of veil piercing or alter ego litigation

12  to bring Retrophin into a lawsuit against MSMB.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          MR. KESSLER:  So our relevance objection, assuming

2   those are -- this is the information Ms. Klein is actually

3   relying on, is just further enhanced by the fact she seems to

4   be saying a plaintiff's attorney who knew things that

5   Mr. Greebel didn't or couldn't have known would have taken

6   certain actions, and that that is somehow relevant to

7   something Mr. Greebel thought.  That just seems to be

8   extremely far afield.

9          This isn't a motion to preclude evidence about

10   whether Dr. Rosenwald threatened to sue or what his threat

11   means, that's not at all what we're talking about.  We're

12   talking about an expert to say that there could be or a

13   reasonable plaintiff's lawyer would bring a specific claim.

14   And she's clearly relying on, among other things, documents

15   that even -- and information that she believes Mr. Greebel

16   wouldn't have known.  So it's hard to see how that could be

17   relevant to what he was thinking or doing.

18          THE COURT:  I mean, I'm curious about the basis for

19   her opinion about what Mr. Greebel knew or didn't know and

20   whether her statements about the ultimate issues that the jury

21   has to determine should be precluded because they do run the

22   risk of forcing the jury to make findings that this expert

23   purportedly is asserting that Mr. Greebel did not know this or

24   could not have known it.

25          MR. KESSLER:  To be fair, I don't think she's

PROCEEDINGS

1    offering the opinion he wouldn't have known.

2              THE COURT:  She's assuming that he wouldn't have

3    known it.

4              MR. KESSLER:  Or she believes that and it's

5    information she conveys to the defense.

6              THE COURT:  I'm questioning, Ms. Klein's usefulness

7    as an expert in any of that.  Because I think there is a lot

8    of evidence in this record that Mr. Greebel was aware that

9    some of these disgruntled investors were threatening to sue

10   and they came here and testified in front of the jury, that

11   Schuyler Marshall, Mr. Koestler -- Kocher, I'm sorry, Kocher

12   Mr. Blanton, you know, they all dropped pretty heavy hints

13   wanting to sue Retrophin, and MSMB and Mr. Shkreli.

14             So I'm just not sure that Ms. Klein's testimony on

15   this issue really is going to be helpful for the jury and, in

16   fact, may well confuse them, especially if she's going to

17   start laying out theories under New York and Delaware law for

18   how someone might sue.

19             The bottom line is these investors said, I'm

20   lawyering up, I'm going to sue, I don't want to sue but I'm

21   willing to sue.  And by the way, you know, preserve documents

22   for litigation purposes.  And I'm just not sure that Ms. Klein

23   is going to be all that helpful.  And, in fact, she may well

24   confuse because she's actually stepping somewhat into my

25   province to the extent that I find New York and Delaware law

PROCEEDINGS

1    have to be instructed or explained to the jury.  She's giving

2    litigation theories under both of those state laws and I don't

3    really think it's all that relevant, honestly, when we have so

4    much evidence that Mr. Greebel reasonably could have been

5    concerned that MSMB and Martin Shkreli and Retrophin were at

6    risk for litigation.

7            MR. BRODSKY:  That was a lot, Your Honor.

8            THE COURT:  Well, why do we need her?  What is she

9    adding other than confusion and perhaps a concern that the

10   jurors maybe told what facts to find?

11           MR. BRODSKY:  Well, her opinion is consistent with

12   some of the opinions of the threatened litigation of some of

13   the investors if it is helpful to hear from an expert that --

14   of what theories that expert would -- that litigator would

15   bring against Retrophin.  I'm not disagreeing with Your

16   Honor's view of the investors, we have that view, we did try

17   to bring that out on some of the investors and --

18           THE COURT:  But I think what's really relevant, I

19   mean whether or not she can conjure up a theory under state

20   law, New York or Delaware law really it's immaterial to

21   whether or not Mr. Greebel reasonably believed that these

22   folks were ready to sue Retrophin and embroil it in

23   litigation.  The theory for that is really not relevant.

24           I think what we have, as I said, is evidence from

25   disgruntled investors that they were ready to sue if they did

PROCEEDINGS

1   not receive their investments back when they were given the

2   opportunity to liquidate and receive their investments or roll

3   their investments into Retrophin and receive shares.  So I'm

4   just not sure whether she's going to be helpful or necessary

5   to anything in this case.

6            MR. BRODSKY:  I understand, Your Honor.

7            THE COURT:  Given the striking of the evidence on

8   this point.

9            MR. BRODSKY:  I understand.  We put our best

10  arguments on paper for Your Honor.  I wish I could articulate

11  better ones, but I think we set forth in our papers our best

12  reasons or reasons why we hope her testimony is admissible.

13           MR. KESSLER:  That's it.

14           THE COURT:  It's difficult, I mean listening to

15  Mr. Kessler has argued that she's going to testify that

16  assuming Mr. Greebel didn't know fact A, fact B and fact C.

17           MR. KESSLER:  I don't think she's -- I don't think

18  those are her opinions.  I think she's going to say based on

19  X, Y, Z, lawsuit and it seems like she has told defense she

20  doesn't think Mr. Greebel would have known all of those things

21  and she's relying on documents.  I don't think anyone is

22  certain, Mr. Greebel has seen certainly the record unclear

23  whether he considered them.  So the point is even she, the

24  expert, doesn't think Mr. Greebel would have known the things

25  that she says are necessary to reach her opinion.  And, you

PROCEEDINGS

1    know, whether or not Dr. Rosenwald could have a claim under

2    the Martin Act is beside the point.  He said he was thinking

3    about one.  We can argue about what it means and how that

4    factors into the legal elements of the charges, but --

5            THE COURT:  The government is not going to argue

6    that these investors didn't really mean it or weren't going to

7    be actually suing or that Mr. Greebel didn't reasonably move

8    as counsel for Retrophin and MSMB to protect those clients

9    from the threat of litigation, are you?

10           MR. KESSLER:  Not all of those things.  I mean we're

11   not going to dispute that the investors said whatever they

12   said and Mr. Greebel was told whatever he was told and we're

13   not going to dispute that there are clauses in the settlement

14   agreements that get releases on behalf of Retrophin.  I

15   think --

16           THE COURT:  I mean, even if these were baseless

17   lawsuits somebody has to come in and defend it.  I cannot tell

18   you the number of baseless lawsuits that we get in this court

19   among my 300 some odd civil cases.  We still have to deal with

20   them.  The defendant still has to come in and make an

21   appearance and defend it.

22           MR. KESSLER:  I understand that.

23           THE COURT:  There's a cost factor involved.

24           MR. KESSLER:  I think what I'm saying is whether or

25   not the lawsuit is baseless, the thing that I think Ms. Klein

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    would address, you know, because her opinion would be -- she's

2    saying she'd bring a lawsuit, she's not saying it would be

3    successful, that's what she's addressing.  I don't think that

4    is the issue in this case.

5            What the defendant's action mean, what he believed,

6    what he thought those are all things I think we're going to

7    argue about, but the facts of what the investors are in

8    the record and, you know, to have an expert come in and say,

9    you know, Dr. Rosenwald could have brought a claim under X

10   when the record is clear about what he said and didn't say,

11   just doesn't add anything.  Certainly not with respect to what

12   Mr. Greebel's intent was.  He's not a plaintiff's lawyer.  He

13   wasn't conducting an analysis of the veil piercing under the

14   Martin Act.  So that's why I think she's not relevant.

15           In any event, we we're not asking the Court to rule

16   right now, I wanted to raise these additional points from the

17   26.2 material.

18           THE COURT:  I know but you all dropped little

19   nuggets here and there asked me to withhold on ruling, but

20   nobody gets any further in their efforts to negotiate with

21   their adversaries and resolve some of these issues.  So it

22   seems to me that everybody needs to take a stand at this point

23   because we are very much up against the wall.

24           MR. KESSLER:  Our stand is she's irrelevant.

25           THE COURT:  She's irrelevant.

PROCEEDINGS

1      MR. KESSLER:  She's irrelevant and she should be

2  precluded.  We've been clear on that.  I'm sorry.

3      THE COURT:  And the defense argues that her

4  testimony is relevant to establish -- the reasons are that you

5  want to give support for Mr. Greebel's reasonable apprehension

6  based on all of these investor threats that the clients could

7  have been embroiled in a expensive litigation?

8      MR. BRODSKY:  Yes, Your Honor.

9      THE COURT:  All right.  Well, I will take this under

10  advisement.

11      Did you have any other issues with any other experts

12  at this point?

13      MR. KESSLER:  No, Your Honor, we're going to go back

14  and file our rebuttal expert disclosure at 6:30.  The only

15  thing with respect to Dean --

16      THE COURT:  I'll give you a reasonable hour.

17      MR. KESSLER:  With respect to the Dean Farrulo's new

18  opinion that the defense is going to supplement, I think we

19  won't address that in this filing and we'll file later tonight

20  or tomorrow just on that point.

21      THE COURT:  Okay.  So except for --

22      MR. KESSLER:  The lock-up related opinion.

23      THE COURT:  Do you want to talk about then the next

24  issue which was this redaction of the arbitration agreement

25  involving Steven Rosenfeld.  Did you get any further -- I

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    finally got a color copy and the government you don't get your

2    own color copy, I did get someone to print it for me in color

3    and it's document number 468-1.  That's the one with both

4    parties' proposed redactions.

5         Were you going to make some more proposed redactions

6    or comments or let me know what's at issue.  I think, again, I

7    believe less is more with this as I stated previously in the

8    transcript portions that you cited.  I don't want too much

9    substance or fact, fact findings slipping into this.

10        MR. BRODSKY:  Your Honor, we have gone through it,

11   we're happy to give it to the government and we've agreed

12   to -- we can agree, based in light of Your Honor's comments to

13   do some more redactions.  If you want us to give it to the

14   government what we're proposing and --

15        THE COURT:  If you could work things out it would

16   make me very happy.  It hasn't happened yet, but I'm still

17   hopeful.  The case isn't over.

18        MR. KESSLER:  We'll keep trying.

19        THE COURT:  So could you keep trying.

20        MR. KESSLER:  Absolutely.

21        THE COURT:  I'm willing to take a look at this.  If

22   you don't have some sort of agreement by lunchtime tomorrow

23   I'll issue a decision on this.

24        MR. BRODSKY:  Okay.

25        MR. KESSLER:  I think it is unlikely a defense case

PROCEEDINGS

1    would start tomorrow, certainly the award would not have to be

2    put in or not put in tomorrow, I think that's fine timewise.

3              THE COURT:  All right.  It doesn't mean you

4    shouldn't try to work everything out that you have in the way

5    of remaining disputes.

6              I will probably make additional redactions on this.

7              MS. RUBIN:  Your Honor, can we come back tomorrow --

8              THE COURT:  The two of you.

9              MS. RUBIN:  -- on the proposal.

10             THE COURT:  Yes, of course.

11             Anything else.

12             MR. KESSLER:  I don't think so.  The defense

13   informed us of their first five witnesses so we're planning on

14   those five witnesses in that order.  If they -- obviously, no

15   one is required to put on a case but assuming there is going

16   to be a case just for planning purposes, they've told us the

17   first five witnesses.  We'll be ready for those five

18   witnesses.  It's not clear that those witnesses will take the

19   rest of the week so if we get to Wednesday and things are

20   moving we might want to know who is next in the queue for this

21   week.

22             THE COURT:  You're not planning to rest tomorrow

23   because you think there will be quite a bit of cross and

24   redirect of the case agent.  And then Mr. Mastro is wanting to

25   make his Rule 29 motion.  He's not going to be here tomorrow.

PROCEEDINGS

1    But don't keep it going --

2              MR. PITLUCK:  I'm going intercede we're all hopeful

3    on this side of the table that we can finish cross and

4    redirect tomorrow, I'm looking at Mr. Brodsky in a pleasantly

5    menacing manner and hoping we can finish tomorrow and any

6    redirect will -- I'm hoping mostly our agents been up here for

7    two weeks we can rest and hopefully move this towards a

8    December 15th date that we promised to the jury so many weeks

9    ago.

10             THE COURT:  If we're going to lose any jurors we

11   need to know by tomorrow whether that's going to happen.

12             MR. BRODSKY:  Understood.

13             THE COURT:  Right.  So you let me know if you're

14   going to make an application.

15             Can you make that application tonight please?

16             MR. BRODSKY:  Yes, Your Honor.

17             MR. PITLUCK:  Sorry, Judge, you're referring to the

18   three jurors --

19             THE COURT:  The three jurors who heard -- yes,

20   because I think we have a lot of balls in the air now with

21   regard to jurors.  We have those who will probably not be able

22   to serve after the 15th of December, we've kind of pulled them

23   along.  Then we have three potentially the defense would want

24   to move against.

25             MR. BRODSKY:  I won't say what position we'll take

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    on it, we will confer as soon as we get back to the office and

2    let Your Honor know.

3            THE COURT:  I will say for the record, I didn't hear

4    anything of concern from any of the three jurors that we did

5    interview.  They seemed just as committed to fairness,

6    openmindedness and the presumption of innocence as they did

7    when we started.  So that's my view of our interview of those

8    witnesses.  If the defense is going to move to excuse any of

9    these jurors I would want to know by tonight.

10           MR. BRODSKY:  Yes, Your Honor.

11           THE COURT:  8:00 o'clock.

12           MR. BRODSKY:  Yes, yes, Your Honor.

13           THE COURT:  Thank you.

14           MS. RUBIN:  With respect the 26.2 materials that

15   Your Honor asked we provide in unredacted form for our

16   application.  May we have until 6:30 to provide that to Your

17   Honor?

18           THE COURT:  Yes.  You were going to give it to me

19   unredacted, were you not?

20           MS. RUBIN:  That's correct.

21           THE COURT:  As the rule provides I see it without

22   redactions.  You can maybe highlight what you think is

23   privileged or subject to the work product doctrine.

24           MS. RUBIN:  We will do that.

25           THE COURT:  Okay.  Just highlight it, but don't

7665

PROCEEDINGS

1    redact anything.  I'd like to see the notes and the typed

2    version just to be clear.  6:30 is fine.

3         MS. RUBIN:  Your Honor is it clear we email to

4    Mr. Tata.

5         THE COURT:  Yes.

6         MS. RUBIN:  Okay.  It's not a filing, we wanted to

7    make sure.

8         THE COURT:  Yes.  All of this somehow has to be made

9    part of the record so I do want to put a little bit of a break

10   on all of this emailing directly to my law clerk, everything

11   needs to be part of this record.  Because if there is going to

12   be an appeal we need to have a complete record of what I've

13   considered and so you all know how to file documents under

14   seal and you should do that.

15        MS. RUBIN:  Yes.

16        THE COURT:  There were some additional emails that

17   came in last night and over the weekend as I recall.  Some of

18   them were filed, and maybe some of them weren't.

19        MS. SMITH:  Your Honor, some of the -- I believe the

20   initial email about requesting additional time was not filed,

21   then I think there were at least one or two emails on Sunday

22   that were not filed by defense counsel, so.

23        THE COURT:  So Mr. Brodsky make sure they get filed.

24        MR. BRODSKY:  Will do.

25        THE COURT:  Everything is part of this record, we

7666

PROCEEDINGS

1   don't do anything off record, okay.

2            MR. BRODSKY:  Very good.  And just so I'm clear, I

3   want to make sure I understand Your Honor's order, if we sent

4   an email you're not -- are you talking about the likely order

5   of the witnesses' email where we sent a likely order of

6   witnesses, or --

7            THE COURT:  Well, look, you know, I've made orders,

8   I'd like to have the record reflect that the defense has

9   complied with my orders and so it seems to me that you can

10  still submit a letter saying although we're not a

11  hundred percent committed to putting on a case and we're not

12  sure that we will until after the government rests and we have

13  an opportunity to really assess where we stand, if we were to

14  present a case these would be our first witnesses.  You can do

15  that under seal, all right, but I'm just saying that I want

16  the record to be complete.

17           MR. BRODSKY:  Okay.

18           THE COURT:  I don't want orders being unresponded to

19  when in fact they were responded to.  So please file

20  everything.

21           MR. BRODSKY:  Okay.

22           MS. SMITH:  Thank you.

23           THE COURT:  Have a good night everybody.

24           (Whereupon, the trial adjourned at 5:55 p.m. to

25  resume Tuesday, December 5, 2017 at 9:00 a.m.)

1                          I N D E X

2    WITNESS                              PAGE

3
     DIRECT EXAMINATION     BY MR. PITLUCK     7371

4
     CROSS-EXAMINATION      BY MR. BRODSKY     7620

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR
Official Court Reporter

1                            I N D E X

2                            EXHIBITS

3     GOVERNMENT                    PAGE
      609A                          7372
4     609                           7374
      691                           7375
5     692                           7376
      610                           7378
6     612                           7379
      694                           7383
7     641                           7385
      595                           7388
8     600                           7389
      611                           7394
9     616                           7396
      617                           7398
10    618                           7401
      619                           7412
11    621                           7414
      663                           7453
12    644                           7456
      647                           7457
13    650                           7459
      969 & 970                     7461
14    451                           7499
      685                           7505
15    684                           7517
      1003                          7523
16    1003                          7524
      286                           7579
17    301                           7619
      106-18                        7620

18

19

20

21

22

23

24

25

```
1                          I N D E X

2                           EXHIBITS

3    DEFENDANT                    PAGE
     624                          7422
4    639                          7424
     655                          7425
5    103-31                       7437
     606                          7439
6    626                          7443
     643                          7446
7    653                          7449
     660                          7450
8    103-50                       7451
     110-1, 110-2, 110-3          7524
9    687                          7525
     514                          7547
10   535                          7551
     537                          7552
11   676                          7580
     686                          7583
12   678                          7585
     298                          7600
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rivka Teich CSR, RPR, RMR
Official Court Reporter