```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                        15-CR-00637(KAM)
 3    UNITED STATES OF AMERICA,
                                        United States Courthouse
 4                                      Brooklyn, New York

 5           -against-                  December 05, 2017
                                        9:00 a.m.
 6    EVAN GREEBEL,

 7              Defendant.

 8    ------------------------------x

 9             TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
                 BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                   UNITED STATES DISTRICT JUDGE
                           BEFORE A JURY
11
      APPEARANCES
12
      For the Government:        BRIDGET M. ROHDE, ESQ.
13                               Acting United States Attorney
                                 Eastern District of New York
14                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
15                               BY:  DAVID PITLUCK, ESQ.
                                 BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                               BY:  DAVID KESSLER, ESQ.
                                 Assistant United States Attorneys
17
      For the Defendant:         GIBSON DUNN & CRUTCHER
18                               200 Park Avenue, 48th Floor
                                 New York, New York 10166
19                               BY:  REED BRODSKY, ESQ.
                                 BY:  WINSTON CHAN, ESQ.
20                               BY:  MYLAN LEE DENERSTEIN, ESQ.
                                 BY:  JOSHUA DUBIN, ESQ.
21                               BY:  LISA RUBIN, ESQ.

22    Court Reporter:            Rivka Teich, CSR, RPR, RMR
                                 Phone:  718-613-2268
23                               Email:  RivkaTeich@gmail.com

24    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
25
```

PROCEEDINGS

1          (In open court.)

2          THE COURT:  As soon as all the jurors are here we'll

3     bring them in.  Have a seat, please.

4          MR. BRODSKY:  Your Honor, would we be able to talk

5     about the document I have before Special Agent Delzotto --

6          THE COURT:  Sure.

7          MR. BRODSKY:  -- which is Defense Exhibit 124-61.  I

8     was tying that together, Your Honor, with Government

9     Exhibit 459 in evidence.

10          THE COURT:  All right, what is it you wanted to talk

11     about?

12          MR. BRODSKY:  Your Honor, in Government Exhibit 459

13     on November 25th, 2012 between at 10:35 p.m. Mr. Shkreli asked

14     Mr. Greebel, Can you prepare a surrender agreement for the

15     Retrophin shares I've given out.  And Mr. Greebel asks, one

16     minute later, what is a surrender agreement, what do you want

17     to do?  And Mr. Shkreli says cancel a specific transfer I

18     made.  Then 29 seconds later in DX124-61 for identification,

19     Mr. Shkreli forwards to Mr. Greebel an email that he had sent

20     at 10:28 p.m., which was seven minutes before -- seven minutes

21     before Mr. Shkreli had sent the email to Evan Greebel on

22     Government Exhibit 459 in evidence asking, can you prepare a

23     surrender agreement for the Retrophin shares I've given out.

24     So seven minutes before he asks that surrender question to

25     Mr. Shkreli in Government Exhibit 459, he had emailed a number

7672

PROCEEDINGS

1    of investors in Retrophin and says in the first paragraph,

2    where -- in sum and substance, we're executing -- he's trying

3    to execute a deal with Valeant and new investors, the new

4    investors are putting money into the company and they want the

5    current preferred investors, and he says the people on this

6    email, to be lumped in.  He explains why they want that,

7    according to him, and then he says in the second paragraph,

8    quote, I am asking you to, quote, give up, end quote, your

9    common stock which was previously inducement to invest in the

10   Series A preferred stock, end quote.

11         The plain meaning of give up your common stock is to

12   surrender your common stock.  So seven minutes after sending

13   that email to those investors he then asks Mr. Greebel, in

14   Government Exhibit 459, can you prepare a surrender agreement

15   for the Retrophin shares I've given out.  And Mr. Greebel asks

16   him, as I said, in Government Exhibit 459, what's a surrender

17   agreement, what do you want to do, and Mr. Shkreli responds at

18   10:36 p.m., cancel the specific transfer I made.  And then 29

19   seconds minutes later forwards this.

20         I think, Your Honor, there can be no -- in my view

21   certainly, very strong evidence that this November 25th, 2012

22   email DX124-61 for identification ties directly into the

23   advice he's seeking from Mr. Shkreli -- from Mr. Greebel in

24   Government Exhibit 459 in evidence.  And, Your Honor, I would

25   offer DX124-61.  It's admissible not for the truth whether

7673

PROCEEDINGS

1    it's true or not I don't care and I'm not offering it for its

2    truth, and I'm happy to have an instruction to that effect,

3    I'm offering it for the state of mind of Mr. Greebel in giving

4    the advice he gave in Government Exhibit 459 in evidence.  And

5    it is extraordinarily exculpatory, in our view, it's a

6    powerful piece of exculpatory evidence, because the government

7    is tying, as they did through Special Agent Delzotto's

8    testimony, they tied Government Exhibit 459 to an email that

9    Mr. Greebel received on or about November 29, 4 to 5 days

10   later, depending on which email you go from, and that is with

11   respect to the transfer to Mr. Biestek -- from Mr. Biestek to

12   Mr. Shkreli.

13          So given that that transfer on November 29th that

14   email is at the heart of one of the government's three

15   theories with respect to Count Seven and given that this is

16   a -- DX124-61 is a highly exculpatory document that goes to

17   Mr. Greebel's state of mind completely ties, in our view, to

18   Government Exhibit 459, we believe it's admissible in evidence

19   and admissible on cross-examination with Special Agent

20   Delzotto.

21          THE COURT:  Mr. Pitluck.

22          MR. PITLUCK:  Well, obviously, Judge, there is a

23   great number of things unpacked there, I'm not even going to

24   address the argument to hear about anything that's highly

25   exculpatory because we certainly don't agree with that.

7674

PROCEEDINGS

1          The bigger issue, Judge, is this is an email chain

2     that is unrelated to the chains that the government offered in

3     direct evidence through Special Agent Delzotto.  It requires,

4     as Mr. Brodsky just took five minutes to explain to you a

5     number of leaps of interpretation as to why it's related to

6     this, and I could dispute what is written in the other email

7     on 124-61 and how it relates to this, but the point is that

8     I'm not aware of a hearsay exception that allows something to

9     come in because they think it might be juxtaposed against

10    their case and requires interpretation.

11         Now, if we are going to take the position that every

12    email Mr. Greebel receives is admitted not for the truth but

13    for the effect on the listener, then it just literally means

14    that every email that Mr. Greebel receives in this case is

15    going to be admitted with the instruction of it's not being

16    offered for the truth, but for the effect on the listener,

17    which is, in my view, just totally improper.  I should say in

18    our view totally improper and certainly not a proper basis for

19    cross-examination.

20         Special Agent Delzotto did not reference what this

21    email meant or how it was interpreted or at all how it related

22    to the following documents, and what defense counsel is now

23    trying to do is put in their case on cross-examination through

24    Special Agent Delzotto through an inadmissible, hearsay

25    document that is clearly being offered for the truth of what

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1   Martin Shkreli said to the investors, because there is no way

2   to argue that what Mr. Greebel thought and what effect it had

3   is unrelated to the contents of the email, which is how do you

4   know that the surrender agreement email that the government

5   showed you is related to it, look at Mr. Shkreli's email in

6   which he says he's trying to get people to give up common

7   stock.  That's just -- that's plainly being offered for the

8   truth not just for the effect it had on Mr. Greebel and it's

9   also not the basis for cross-examination.

10          THE COURT:  I guess the question I have, and I think

11  it's an issue that is not clear from either email -- well,

12  it's not clear from Government Exhibit 459 whether the

13  discussion that Mr. Shkreli is having with Mr. Greebel about

14  surrender agreements and getting back stocks that he has given

15  out, whether that refers to the Fearnow shareholders, or

16  whether it refers to the investors with whom he settled.

17  Because 124-61 is directed to investors.  He's asking them to

18  give up their common stock.

19          MR. BRODSKY:  Your Honor, if I may.  First, I'm

20  happy to interpret the email and address it and connect it to.

21  I just think, Your Honor, that I need to say this, if we're

22  unable to put in emails that go to Mr. Greebel's state of mind

23  we will have no defense.

24          THE COURT:  Well, it's not a matter -- I'm just

25  saying --

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1          MR. BRODSKY:  I understand, Your Honor.

2          THE COURT:  -- you need a evidentiary basis for

3     admission.  That's all.  I don't --

4          MR. BRODSKY:  I agree completely.

5          THE COURT:  The rules apply to him as much as anyone

6     else in any other case, right?  Rule 16 applies, Rule 27

7     applies --

8          MR. BRODSKY:  I understand.

9          THE COURT:  Rule 22.2 applies --

10          MR. BRODSKY:  A hundred percent.

11          THE COURT:  -- and it's not a Constitutional issue

12     regarding this defendant or any other defendant.  The federal

13     rules apply --

14          MR. BRODSKY:  Agreed.

15          THE COURT:  -- evenly to every defendant and

16     government any party in any criminal case.

17          MR. BRODSKY:  Agreed, Your Honor.  But my point is

18     this, Your Honor, the government is putting in a select number

19     of emails about what was in Mr. Greebel's head, that is their

20     case.  They are going to point to the emails about -- and they

21     said it on sidebar multiple times when I made objections, that

22     it was information that Mr. Greebel received and impacted what

23     he did and what he knew.  And they selected them which they

24     have every right to do.  We need to make sure that we put in

25     the emails that tie to those same emails that show the

7677

PROCEEDINGS

1    information in Mr. Greebel's head that impacted him and that

2    affect what advice he gave.

3            And so I'll connect these up, Your Honor, but on

4    time alone, just on the time in which the email is sent, they

5    are connected and I say that because, Your Honor, he sends the

6    email -- he being Mr. Shkreli, sends the email in DX124-61 --

7            THE COURT:  I know, seven minutes before --

8            MR. BRODSKY:  Thirty-nine seconds after.

9            THE COURT:  -- don't repeat --

10           MR. BRODSKY:  I won't repeat.

11           THE COURT:  -- what you've already said.

12           MR. BRODSKY:  Here's how they connect, Your Honor.

13   On November -- the date we're talking about in DX124-61 is

14   November 25th, 2012, Your Honor.  There is no discussion at

15   this time of Fearnow shares.  What this is about is he's

16   sending an email to Robert Bertolini, who is a direct investor

17   in Retrophin, he's sending an email to Tom Koestler --

18           THE COURT:  Koestler.

19           MR. BRODSKY:  -- who is a direct investor in

20   Retrophin; Brent Saunders who is a big direct investor in

21   Retrophin; and Sarah Hassan who made an investment in

22   Retrophin.  He's sending the email -- and again it doesn't

23   matter to me the interpretation of the email for purposes of

24   getting the evidence in the record, but he's in negotiations

25   at this time, as you heard from Mr. Aselage with respect to

PROCEEDINGS

1    Valeant, he's trying to do the Valeant deal and you saw some

2    emails about that during the case in chief of the government.

3    And the Valeant deal falls apart and it doesn't come through.

4    But he's saying to them that the new investors who are putting

5    money into want you, you people on this email, Mr. Bertolini,

6    Mr. Koestler, Mr. Saunders and Ms. Hassan to have the same

7    class -- be lumped into the same class of shares.  In the

8    second paragraph he says, to do that I'm asking you to give up

9    your common stock, which was previously inducement to invest

10   in the Series A preferred stock.  And he's saying, I'm asking

11   you to give that up so that you can now be in the same class

12   of preferred A shares -- preferred B shares, I guess he's

13   calling it, as everybody else, as all the new investors and

14   you.  And then he sends the email -- and then he asks the

15   question to Mr. Shkreli -- to Mr. Greebel in Government's

16   Exhibit 459, can you prepare a surrender agreement for the

17   Retrophin shares I have given out.  So Mr. Shkreli, in our

18   view, has given out these shares to Mr. Bertolini,

19   Mr. Koestler --

20            THE COURT:  But I thought you said they invested.

21   They bought those shares, they weren't given to them.

22            MR. BRODSKY:  Well, okay, fine.

23            THE COURT:  Some of these investors were given

24   shares as part of their settlement and I think what you just

25   said when you started your explanation is that these folks,

PROCEEDINGS

1    Bertolini, Koestler, Saunders and Hassan invested, so they

2    bought their shares, they weren't given to them by

3    Mr. Shkreli.

4              MR. BRODSKY:  Your Honor, what happened was they

5    were given common stock as a sweetener if they invested and

6    got preferred.  So they were preferred investors.  And in

7    order to induce them to get -- in the second sentence of the

8    first paragraph he calls -- he says the current preferred

9    investors, the people on this email.  They were preferred

10   investors.  As a sweetener, he gave them common stock, he gave

11   them, and he says I'm asking you to give up your common stock

12   which was a previous inducement for you to invest.  In order

13   for you to invest in the Series A preferred stock I'm asking

14   you to give up the common stock I gave to you.

15             And so when he asks the question on November 25th,

16   seven minutes later to Mr. Greebel and says, surrender

17   agreement, can you prepare a surrender agreement for the

18   Retrophin shares I have given out, our argument, Your Honor,

19   is that -- and given the timing is that it relates to this

20   email.  We believe that's a stronger argument than the

21   government's argument which is that this email chain in

22   Government Exhibit 459 relates to Marek Biestek's transfer of

23   stock to Mr. Shkreli on November 29th, 2012 for 4,167 shares.

24   I think that's the much stronger argument giving the tie and

25   the time and the content of the email exchanges.

PROCEEDINGS

1          So that is our good faith basis to tie the two

2     together.  Timing alone and the contents.  And we believe,

3     Your Honor, that it goes directly to Mr. Greebel's state of

4     mind and that is the hearsay exception.  There is no question

5     this document is authentic, there's no question it's relevant

6     under 401.  Under 403 it is not unduly prejudicial, it doesn't

7     cause confusion of the issues.  We can tie the two together

8     and under -- it's not hearsay because we're not offering it

9     for the truth.  We're offering it for the state of mind of

10    Mr. Greebel and connecting it directly to this email in which

11    he sends and he answers the question.

12          And so with all respect, Your Honor, the reason why

13    I reacted the way I did is because the government has put in

14    459 then they tied it to 111-15 in evidence which is the

15    November 29th email and that's their argument connecting the

16    two together, in my view is that's what they're going to

17    argue.  And if we don't have in DX124-61 we are severely

18    harmed because we truly believe that those two emails are

19    connected and not the November 29th email and it's highly

20    exculpatory to us if we can connect it up to Defense

21    Exhibit 124-61.

22          MR. PITLUCK:  Your Honor, can I be heard?

23          THE COURT:  Yes, go ahead.

24          MR. PITLUCK:  Sorry, there's a few points I'd like

25    to make.  First of all, the primary point here is this is not

7681

PROCEEDINGS

1    the proper basis of cross-examination.  There is no 106 issue

2    here not even raising one.  This is attempting to put in their

3    case through our case agent which requires to Your Honor an

4    elaborate explanation of Mr. Brodsky's view using facts that

5    are not in evidence.  And we can -- I don't even want to get

6    into it and proffer why the statements in this email that

7    Mr. Brodsky interpreted are not accurate, but the fact of the

8    matter is that it's not the proper basis of cross-examination.

9    They don't get to put on their case through our case agent,

10   we've said that a number of times.

11            However, if it's related to the admissibility of

12   this document I make two points:  One is that Mr. Brodsky has

13   repeatedly argued throughout this case and it has been borne

14   out by the emails, timestamps are not always accurate, some

15   are in GMT, some are not.  So the notion on its face that it

16   says 10:36 p.m. it could mean that it is later or earlier,

17   they are both later or earlier but even putting that aside,

18   the contents of this email, as Mr. Brodsky just argued, are

19   being offered for their truth.  They are being offered for the

20   fact that Mr. Shkreli wrote this related to the investors and

21   that these investors were being induced to give up their

22   common stock in order for preferred which is totally different

23   practically than surrendering and canceling a specific

24   transaction, which we also know never happened.  But they are

25   now trying --

PROCEEDINGS

1          THE COURT:  What never happened?

2          MR. PITLUCK:  The surrender.

3          THE COURT:  The surrender by these investors?

4          MR. PITLUCK:  Exactly.  What we will chose to argue

5    relating to the back-dating evidence is a matter for the jury

6    at closing.  But they don't get to try to -- because this is

7    going to happen for the next 48 hours, where they're trying to

8    take a document and say this relates to this broad subject

9    matter, it's around the same time, around the same date but it

10   is a different email chain, so based on our 20 minute proffer

11   to you, Judge, on the evidence we think they're related and

12   therefore we should be able to put it in is the more

13   fundamental problem we have.  This is not the proper basis for

14   cross.

15          As the Court has said a number of times yesterday

16   and today, there has to be an admissible basis for this.  And

17   the admissible for everything is not it has an effect on the

18   listener because it is related to other documents we really

19   thinks it's unfair.  We used all the hearsay, the proper

20   hearsay exceptions or exclusions to put in documents.  And we

21   have different hearsay exclusions, they don't get to put

22   things in simply offered for their truth if there is no

23   exception.

24          MR. BRODSKY:  Your Honor --

25          MR. PITLUCK:  And we're going to be doing this all

PROCEEDINGS

1    day and I'd like to be able to obviously get our jury in and

2    advance the case but...

3              MR. BRODSKY:  Your Honor --

4              THE COURT:  It seems to me this document could have

5    been shown to Mr. Koestler.

6              MR. BRODSKY:  Mr. Koestler was never testifying,

7    Your Honor.

8              THE COURT:  I'm sorry, Ms. Hassan then who did

9    testify --

10             MR. BRODSKY:  But not the top email.

11             THE COURT:  -- and any of these witnesses obviously

12   are available to both sides should they be called in either

13   the government or defense case.

14             MR. BRODSKY:  But not --

15             THE COURT:  I'm not saying a specific basis for

16   admissibility, that's really -- I mean the rules apply, right?

17             MR. BRODSKY:  Your Honor, the rules totally apply.

18   May I react first to the timestamp issue.  We could connect it

19   up to the metadata it's the actual time.  The reason why you

20   know it's the actual time because the only timestamps that are

21   ever off in emails are the last email in the chain.  And

22   that's the only timestamp that's ever off.  And in this one it

23   is impossible for it to be off given that Mr. Shkreli's email

24   is at 10 -- I think it was 10:25.

25             THE COURT:  10:28.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

7684

PROCEEDINGS

1      MR. BRODSKY:  10:28.  Then the next one is at 10 --

2      THE COURT:  Thirty-six.

3      MR. BRODSKY:  10:36.  So it's impossible for it to

4  have been earlier in time.  The earlier embedded emails have

5  never been accurate.

6      Second, Your Honor, there is an admissible basis,

7  Your Honor.  I've laid out the admissible basis which is it

8  also relates directly to the email that the government put

9  into evidence.

10     If the objection, Your Honor, is that I shouldn't

11 get it in on cross-examination of their witness, that I should

12 call my own witness, I believe that I could call a paralegal,

13 for example, and get it in on the case in chief because it

14 meets the state of mind exception of Mr. Greebel, what

15 information is in his head directly related to this exhibit.

16     I just want to know from Your Honor with guidance

17 that I can do that.  Because if I can't do that, Your Honor,

18 then we are going to be prevented from, first, I believe that

19 it is -- I should be able to get it in on the cross of the

20 agent, I do believe it completes -- it directly ties to this

21 email, Your Honor, respectfully.  I don't think I need -- I

22 don't need the agent to interpret the document.  I don't need

23 the agent to describe it, I don't need the agent for that.  I

24 think the timing and Your Honor review of the document alone

25 is enough.  It doesn't matter about the truth of the document.

PROCEEDINGS

1   In other words, it doesn't matter if those transfers occur or

2   not.  The reason we're putting it in is to explain what

3   Mr. Greebel -- information he received at the time that he

4   gave his legal advice in that Government Exhibit and given the

5   timing, that is the information he received and that is what

6   he was responding to.  He was not receiving the November 29th

7   email four or five days later and giving that advice on

8   November 26th and -- November 25th and November 26th directly

9   relates to that email.

10          So, Your Honor, it's relevant, it passes 403.  It's

11  not hearsay because we're absolutely not offering

12  Mr. Shkreli's email for the truth of what he said and we could

13  not offer it through Ms. Hassan or Mr. Bertolini or

14  Mr. Saunders because it is forwarded.  He sends that email to

15  them and then he forwards it to Mr. Shkreli and Mr. Shkreli is

16  totally unavailable to us, obviously.  We've conferred with

17  Mr. Brafman and Mr. Brafman had told us prior to trial that

18  Mr. Shkreli would not take the stand and he would take the

19  Fifth Amendment, so he's unavailable to us.  And the only way

20  to get this document into evidence is to authenticate it and

21  to fit -- make sure it's relevant under 403, argue about

22  whether it's 403 unduly prejudicial and then look at the

23  hearsay rule.  And the hearsay rules, Your Honor, there is an

24  exception to the hearsay rule that if it goes to a state of

25  mind then it is admissible.  And this is admissible because it

7686

PROCEEDINGS

1    does go to Mr. Greebel's state of mind.

2              We're just looking for guidance, Your Honor, that

3    you will allow us, if we put on a case in chief, to put

4    evidence in the record going to Mr. Greebel's state of mind.

5    Because if not, Your Honor, with all respect -- with all

6    respect, Your Honor, there are numerous emails where

7    information is being received by Mr. Greebel, information just

8    being received by him that's relevant to the advice he gives

9    and if the jury can't see that but all they see is what the

10   government selected, well, then they don't have a complete

11   story.  They have a misleading story.  And I believe they have

12   a misleading story with respect to the two exhibits that I

13   pointed out to Your Honor that are in evidence and I think

14   without that document, that missing document the government is

15   being told -- the government is telling a misleading story

16   and, respectfully, Your Honor, I think it's for that reason

17   it's exculpatory.

18             MR. PITLUCK:  Your Honor, I'm not even going to

19   address another exculpatory comment.  The point is, Your Honor

20   is correct, they could have shown this document to Ms. Hassan

21   and then we would have had a 106 on argument on Mr. Greebel's

22   complete intentions; they chose not.  The unavailability of

23   Mr. Shkreli is utterly irrelevant.

24             The point is, Judge, is that they are trying, as

25   we've said before, to put in their case.  Mr. Brodsky just

PROCEEDINGS

1  said, if we call a paralegal, fine, call a paralegal we'll

2  have the argument then, but it's our position that this is not

3  the basis for -- proper basis for cross-examination of Special

4  Agent Delzotto, which they're clearly trying to do to advance

5  their case to try to show the government's weak somehow and

6  that's not the proper basis of cross-examination.  It's got to

7  be relevant to the scope of direct or on credibility and this

8  is neither.  And, Your Honor, the state of mind exception,

9  which we can get to later, what I'm hearing is that everything

10  email that Mr. Greebel receives is relevant to his state of

11  mind.  And I looked through the case law, I did not see

12  anything that comes remotely close to that point, that would

13  totally eviscerate the hearsay exception.  It's not a fight to

14  have now because we obviously want to start with the jury, but

15  we're looking for some guidance as to how Special Agent

16  Delzotto's cross-examination should be appropriately

17  completed.

18          THE COURT:  Well, you all know that the scope of the

19  cross is defined somewhat by the scope of the direct and the

20  idea of cross is to call into question the witness'

21  credibility, reliability as a reporter or witness, whether the

22  witness has bias or can be impeached, these are the kinds of

23  bases that one would be able to confront a witness on

24  cross-examination.  But my concern is that you have asked me

25  to open a conduit to put in evidence through your cross of

PROCEEDINGS

1  this witness without really establishing an evidentiary ground

2  for admissibility.  Yes, it may be relevant, that doesn't make

3  it admissible, right?  It has to be relevant to be admissible.

4  Simply because it's relevant doesn't mean it is admissible.

5          MR. BRODSKY:  I agree, Your Honor.  If this document

6  was dated in 2013, if it was dated in 2014 I wouldn't be

7  asking Your Honor to put it into evidence through Special

8  Agent Delzotto.

9          The scope of a cross-examination is not limited to

10  credibility and it's not limited to bias.  It is limited to

11  the scope of his direct, and bias and so forth.  His direct

12  tied the two emails together which I pointed out this morning,

13  they did.  They showed one email on the questions of cancel or

14  surrender Mr. Greebel's advice and then on November 29th, and

15  they had the special agent read it.  It was unquestionable

16  that they were tying the two together.  And if memory serves

17  me correctly they put them on the board.  And, Your Honor --

18          MR. PITLUCK:  That's not accurate.

19          THE COURT:  Well, even if they did, it's their

20  case --

21          MR. BRODSKY:  I agree.

22          THE COURT:  -- they are entitled to present their

23  evidence in the way that they want --

24          MR. BRODSKY:  Agreed.

25          THE COURT:  -- provided it's admissible --

PROCEEDINGS

1          MR. BRODSKY:  Agreed.

2          THE COURT:  -- and make whatever arguments.

3          MR. BRODSKY:  Your Honor, part of our

4     cross-examination of the special agent that has to be

5     permitted, in my view, is that they are painting a picture

6     through the special agent of a complete story.  That these

7     emails tell a complete story and if I have an email that is

8     directly on point, directly on point -- I'm not asking for an

9     email that's on different day at a different time, this is an

10    email that's directly on point at the same time relating to

11    the same piece of advice, it is for completeness.  It directly

12    goes to his statements about the email which he read into

13    evidence.  I'm not going to ask him to interpret it.  I'm

14    asking to offer it.

15          So it's state of mind, it goes to the government

16    multiple times yesterday said it goes to the effect on the

17    listener, they used that exception.  This is the effect on

18    Mr. Greebel as he's giving the advice in the same government

19    exhibit and that's why I offer it, Your Honor, through this

20    witness.  I'm not going to be here for hours, Your Honor, I'm

21    not.  I had two binders, I cut it down to one last night.  I

22    don't have -- I'm not going to try to put in dozens and dozens

23    of exhibits through -- given Your Honor's guidance yesterday

24    with respect to the scope of the cross-examination, I severely

25    reduced it.  I expect to try to finish with him by lunch and

PROCEEDINGS

1    tender him to back to the government, and that's what I'm

2    going to try to do.  I always -- I know I've made some

3    predictions before, Your Honor, I have been wrong on my time

4    but that's my goal and I've cut down my materials for that

5    purpose.

6            And the reality is, Your Honor, we're not going to

7    say to you, Your Honor, in our case in chief, if we put one

8    on, that every document that Mr. Greebel receives is relevant

9    to his state of mind.  We'd be putting in thousands.  What

10   we're going to do is show you, Your Honor -- and we'll do it

11   before we ever put on a witness, a paralegal, or our case

12   agent to -- before we ever do that we would show Your Honor

13   the emails to get rulings on it to tie the emails --

14           THE COURT:  When do you propose to do this at

15   sidebar after sidebar?

16           MR. BRODSKY:  No, what we would do is, Your Honor --

17           THE COURT:  You want me to just stay up all night

18   making rulings on the documents.

19           MR. BRODSKY:  No, absolutely not.

20           THE COURT:  When do you propose to do this?

21           MR. BRODSKY:  We have to make a decision which we

22   will make immediately after we're done with the case agent

23   with our client as to whether we're putting on a case in

24   chief.  And then once we decide --

25           THE COURT:  How many documents are you expecting me

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    to review between the time the government rests and the time

2    you decide whether or not to put on a case?

3              MR. BRODSKY:  I don't think there will be many that

4    will be at issue, Your Honor, I don't.  But I would like Your

5    Honor's -- a little guidance from Your Honor.

6              THE COURT:  I would say generally don't expect to

7    put in documents simply because you think they are relevant to

8    Mr. Greebel's state of mind.  You need to have a clear

9    evidentiary basis to offer a document.

10             This one that you offer, Defense Exhibit 124-61, I

11   think is -- I guess given the timing and the way that the

12   emails in Government Exhibit 459 are intersecting with the

13   transmission by Mr. Shkreli to Mr. Greebel of Defense

14   Exhibit 124-61 I would say that a stronger case could be made

15   for admitting this one because I think that they're talking

16   about undoing share transfers and Mr. Shkreli is forwarding

17   his email requests to a number of investors to surrender or

18   give up their shares.  So I may make an exception to this one,

19   but you should not expect me to generally randomly allow you

20   to put in any exhibit that you think reflects Mr. Greebel's

21   state of mind.

22             MR. BRODSKY:  We understand, Your Honor.  We

23   understand.

24             THE COURT:  So I understand the government's

25   objections to trying to put this in on cross.  I do think that

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    to the extent it intersects just by minutes with Government

2    Exhibit 459 and touches on the same subject matter of either

3    surrendering or giving up shares, that it is properly

4    admissible in this one instance.

5            The emails in 459 is subject to interpretation.

6    Mr. Shkreli talks about a surrender agreement for the

7    Retrophin shares I have given out.  Whether that means in the

8    context of the sweetener that you allege happened with regard

9    to investors or whether it relates to the Fearnow shares that

10   he -- and other shares that he gave out to certain people like

11   Marek Biestek is an open question.  And then when Mr. Greebel

12   asks what is a surrender agreement, what do you want to do, he

13   says in the singular, cancel a specific transfer.  A specific

14   transfer I made.  Not multiple transfers that I made to

15   investors or multiple transfers I made to others.  He says a

16   specific transfer, singular, I made.  And then Mr. Greebel

17   uses the plural, hard to unwind stuff easier if they transfer

18   it back.  I don't know why Mr. Greebel uses the plural form

19   when Mr. Shkreli is speaking about a specific transfer.

20           MR. BRODSKY:  I would say, Your Honor -- I would say

21   the specific transfer would the same -- the same idea would

22   apply.  The government is saying there were multiple transfers

23   made on November 29th and December 3rd, so the use of the

24   specific transfer would be the same problem for both sides.

25   My view is when Mr. Greebel responds "they" he had received

PROCEEDINGS

1    already the email forwarded by Mr. Shkreli of the multiple

2    investors.

3              Your Honor, one other thing -- I know you want to

4    move on, Your Honor -- is that Mr. Dubin -- we have no

5    application with respect to the three jurors, Mr. Dubin wanted

6    to comment on it to Your Honor on the situation and then we

7    can begin.

8              MR. DUBIN:  It can wait, Your Honor.  We can get

9    started, we can do it at a break.

10             MR. BRODSKY:  So we can get started.  Sorry.

11             THE COURT:  So there are no applications regarding

12   excusing any jurors; is that correct?

13             MR. DUBIN:  Correct.

14             THE COURT:  All right.  Then we will bring them in.

15   Thank you.

16             MR. DUBIN:  I can even leave it to the charge

17   conference.

18             THE COURT:  I beg your pardon?

19             MR. DUBIN:  I'm sorry, I can even leave it to the

20   charge conference.

21             THE COURT:  Well, I don't like last minute

22   surprises, you guys are full of them.  So whatever you have to

23   tell me, tell me now.  I'm not criticizing you, Mr. Dubin.

24   I'm just saying you all continue to file --

25             MR. DUBIN:  I'll tell you at the break, I don't want

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

7694

PROCEEDINGS

1    to leave the jury waiting.

2              THE COURT:  Fine.

3              MR. PITLUCK:  Your Honor, obviously we respect the

4    Court's ruling but our continued objection --

5              THE COURT:  I'm going to be very mindful and you're

6    going to continue to object --

7              MR. PITLUCK:  Yes.

8              THE COURT:  -- I respect your objections, I think

9    you are correct for most part, Mr. Pitluck, in your objection,

10   I do think that given the timing, the way these two emails

11   intersect it would be appropriate for me to admit Defense

12   Exhibit 124-61.

13             MR. PITLUCK:  Absolutely, Judge, we understand.  We

14   wanted to preserve our objection generally.

15             THE COURT:  Keep preserving it.

16             MR. PITLUCK:  Okay.  We will.

17             THE COURT:  Mr. Brodsky, are you going to be using

18   969 or 970, the SEC 10-Qs on cross?  I just want to know if I

19   can put them away.

20             MR. BRODSKY:  Let me take a look at them, I don't

21   know them by memory.  No, Your Honor.

22             THE COURT:  Okay.

23             (Jury enters courtroom.)

24             THE COURT:  Good morning, members of the jury.  All

25   jurors are present.  Please have a seat.

DELZOTTO - CROSS - BRODSKY

1          Agent Delzotto, you're still under oath and

2     Mr. Brodsky may continue his cross-examination.

3          MR. BRODSKY:  Thank you.

4     CROSS-EXAMINATION

5     BY MR. BRODSKY::

6     Q    Good morning.

7     A    Good morning, sir.

8     Q    We left off with Government Exhibit 459.  Can we put that

9     up on the screen, Mr. Carter.  And, Mr. Carter, will you blow

10    up the bottom of the email, please.

11         Special Agent, you remember being shown this

12    document, correct?

13    A    Yes, I do recall.

14    Q    This is -- on the bottom of 459, Government Exhibit 459

15    in evidence, Mr. Shkreli sending an email on November 25th,

16    2012 at 10:35 p.m. to Mr. Greebel, subject, surrender

17    agreement, right?

18    A    I do recall it, yes.

19    Q    And in that email Mr. Shkreli states, quote, can you

20    prepare a surrender agreement for the Retrophin shares I have

21    given out.  Correct?

22    A    Yes, I see it.

23    Q    And then -- we'll go through to the rest of the email but

24    you were also then shown after reading the email exchange --

25    and can we put this up, Mr. Carter, Government Exhibit 111-15

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO - CROSS - BRODSKY

1  in evidence, and blow up the top, Mr. Carter.

2         This is an email Government Exhibit 111-15 in

3  evidence of Mr. Su, November 29th, 2012, 8:20 p.m., sending it

4  to Mr. Greebel, Corey Massella and Ms. Chew, correct?

5  A    What I recall about this email is this is related to the

6  back-dated documents that were used to transfer shares.

7         MR. BRODSKY:  Your Honor, move to strike.  My

8  question was a yes or no whether or not this is an email dated

9  November 29th from Mr. Su to Mr. Greebel, Mr. Massella and

10 Ms. Chew.

11        THE COURT:  The application is granted.  The

12 response of the witness will be stricken from the record, and

13 if you can answer the question yes or no, please do so.

14        MR. PITLUCK:  Your Honor, we object.  It was not a

15 yes or no question, it was answer of --

16        THE COURT:  I think he asked whether this email was

17 addressed to three people.

18        MR. PITLUCK:  And then he said "correct."  I mean,

19 just clearly it wasn't a yes or no question.  We just wanted

20 to note that for the record.

21        THE COURT:  All right.  I think to the extent

22 Mr. Brodsky has clarified that he's seeking a yes or no

23 answer, if you can answer the question that he posed yes or no

24 please do so.

25 A    I'm sorry, can you rephrase it or repeat it.  I'm sorry.

7697

DELZOTTO - CROSS - BRODSKY

1   Q    Sure.

2          Special Agent Delzotto, yes or no, is this an email

3   dated November 29th, 2012 at 8:20 p.m. from Mr. Su to

4   Mr. Greebel, Mr. Massella and Ms. Chew?

5   A    Yes, it is.

6   Q    And keeping in mind that November -- the November 29th

7   date, if we can go back to Government Exhibit 459 at the

8   bottom that email, the one I just showed you from Mr. Jackson

9   Su, is four days after this November 25th email, correct?

10  A    Correct.

11  Q    Now do you have in front of you Defense Exhibit 124-61 or

12  do we have it put up the screen?  Can we put it up on the

13  screen, Mr. Carter, not to be published to the jury just on

14  the witness screen.

15          MR. PITLUCK:  Your Honor, I would ask -- it's a

16  multiple page document --

17          MR. BRODSKY:  Sure.

18          MR. PITLUCK:  -- I ask the witness be given a copy.

19          THE COURT:  Can you give him a hard copy, please.

20          MR. BRODSKY:  Yes.

21          May I approach, Your Honor?

22          THE COURT:  Showing the witness Defense Exhibit

23  124-61.

24          MR. BRODSKY:  For identification, yes, Your Honor.

25          THE COURT:  All right.

DELZOTTO - CROSS - BRODSKY

1          THE WITNESS:  Thank you.

2          MR. BRODSKY:  Your Honor, pursuant to the prior

3     discussion, we offer it into evidence.

4          THE COURT:  All right.  I will admit Defense

5     Exhibit 124-61.

6          (Defendant Exhibit 124-61, was received in

7     evidence.)

8          MR. PITLUCK:  Your Honor, with the instructions.

9          THE COURT:  Pardon me?

10         MR. PITLUCK:  With the instruction we discussed.

11         THE COURT:  All right.  This document is admitted,

12    but the jury is instructed that the email that appears on

13    Defense Exhibit 124-61 from Martin Shkreli dated

14    November 25th, 2012 is not being offered for its truth.

15    BY MR. BRODSKY::

16    Q    Special Agent Delzotto, if you look at the bottom

17    email -- can we blow up that bottom email just from, send, to,

18    and can we put that next to Government Exhibit 459 in

19    evidence.  And blow up the bottom of Government Exhibit 459 in

20    evidence, the last email in the chain.  Can we scroll that

21    over a little bit, Mr. Carter, so we can see the full -- on

22    both of them the full email.  Yes, that's perfect.  Thank you.

23         So looking at the screen, you see, sir, that

24    Government Exhibit 459 is at the bottom, correct?

25    A    Correct.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO - CROSS - BRODSKY

1   Q    And is that email from Mr. Shkreli, yes or no,

2   November 25th, 2012 at 10:35 p.m. to Mr. Greebel, correct?

3   A    It is, yes, that's correct.

4   Q    And the email above it from Defense Exhibit 11 -- I'm

5   sorry, Defense Exhibit 124-61 in evidence was sent by

6   Mr. Shkreli to Robert Bertolini, correct?

7   A    Yes, he's an associate of Mr. Saunders.

8   Q    I'll ask you --

9        THE COURT:  It's a response, I'm not going to strike

10  that.

11       MR. BRODSKY:  I understand, I'm fine with that

12  response.

13       THE COURT:  All right.

14  BY MR. BRODSKY::

15  Q    And yes or no --

16       THE COURT:  Do you want --

17  Q    And, sir, Mr. Shkreli sent the email at the top

18  November 25th, 2012 to the following people, yes or no.

19  Robert Bertolini?

20  A    Yes.

21  Q    Tom Koestler?

22  A    Yes, sir.

23  Q    Brent Saunders?

24  A    Yes, sir.

25  Q    And Sarah Hassan?

DELZOTTO - CROSS - BRODSKY

1    A    Yes, sir.

2    Q    And that email that's sent by Mr. Shkreli in DX 124-61 is

3    sent seven minutes before Mr. Shkreli's email to Mr. Greebel

4    in Government Exhibit 459, right?

5    A    It is, but I don't know if they're related or not.  It

6    is, yes.

7    Q    It is, right?

8    A    But I don't know if they're related.  The subject titles

9    are different, it's to different people.

10   Q    Okay.  And, Mr. Delzotto, Defense Exhibit -- can we blow

11   up Defense Exhibit 124-61.  And blow up the whole thing.

12            Sir, prior to the indictment did you have this

13   email?

14            MR. PITLUCK:  Objection, Your Honor.

15            THE COURT:  Sustained.

16   Q    Prior to coming into the courtroom today, had you seen

17   this email?

18            MR. PITLUCK:  Objection, Your Honor.

19            THE COURT:  Sustained.

20   Q    Prior to your testimony last week, had you seen the

21   email?

22            MR. PITLUCK:  Objection, Your Honor.

23            THE COURT:  I'll allow it.

24   A    Can I see the whole email?

25   Q    Sure, it's right before you in the physical copy.

7701

DELZOTTO - CROSS - BRODSKY

1    A    Oh, I'm sorry.

2    Q    Yes or know, sir?

3    A    It's not a yes or no answer.

4    Q    It's not a yes or no?

5    A    No, it's not a yes or no.

6    Q    All right.  You agree though, sir, a yes or no, that that

7    e-mail from Mr. Shkreli to Mr. Bertolini, Mr. Koestler, Mr.

8    Saunders, Ms. Hassan is seven minutes before Mr. Shkreli sends

9    that e-mail to Mr. Greebel in Government's Exhibit 459 in

10   evidence, yes or no, sir?

11   A    Is it seven minutes?  It's seven minutes, yes.

12   Q    And then if you stay with me, on Government's Exhibit

13   459, one minute later, Mr. Greebel says to Mr. Shkreli, yes or

14   no, sir, November 25, 2012, 10:36 p.m., quote, from

15   Mr. Greebel, "What is a surrender agreement?  What do you want

16   to do?"  That's what it says, right?

17   A    That's what it says.

18   Q    And then the next e-mail in the chain, Mr. Shkreli

19   responds one minute later, what time is that, sir, what is the

20   time stamp there?

21   A    It says November 25, 2012, 10:36 p.m.

22   Q    And Mr. Shkreli says to Mr. Greebel in that e-mail quote,

23   "cancel a specific transfer I made," end quote, correct, yes

24   or no?

25   A    Yes, that's what it says.

DELZOTTO - CROSS - BRODSKY

1    Q    And then if we can put up side by side Defendant's

2    Exhibit 124-61, and tell me, yes or no, whether after

3    Mr. Shkreli said on November 25, 2012, at 10:36 p.m. "cancel a

4    specific trade I made."

5            THE COURT:  Transfer.

6    Q    "Transfer I made."  Mr. Shkreli sent, forwarded to

7    Mr. Greebel on November 25, 2012, 29 seconds later this e-mail

8    in Defendant's Exhibit 124-61, yes or no?

9    A    I could answer it yes or no, but I'd like to add.

10   Q    It's just a yes or no, sir.

11   A    But it's not because I don't know if they are related or

12   not.

13   Q    I'm not asking --

14           MR. BRODSKY:  Move to strike.

15           THE COURT:  He's just asking about the timing.

16   A    The timing is November 25, 2012, 10:36:29, which the

17   e-mail below doesn't have the millisecond, so I don't know if

18   the top one came before or after the one below.

19   Q    Okay.  So, sir, you would agree, putting aside the

20   milliseconds, right, according to these two documents

21   Government's Exhibit 459, Mr. Shkreli sent an e-mail at

22   10:36 p.m. stating cancel a specific trade I made; and in

23   Defendant's Exhibit 124-61, at 10:36 p.m. sent, forwarded, to

24   Mr. Greebel the e-mail we were looking at, Defendant's Exhibit

25   124-61, yes or no?

DELZOTTO - CROSS - BRODSKY

1          MR. PITLUCK:  Objection, your Honor.

2          THE COURT:  Overruled.

3          MR. PITLUCK:  He said trade not transaction.

4     Q    I said transfer.  I apologize.  You want me to restate

5     the question?

6     A    If you could.

7     Q    Okay.  Sir, the e-mail -- do Government's Exhibit 459,

8     which Mr. Shkreli said sent at 10/25 at 10:36 p.m. the same

9     time, correct, the same minute, 10:36, according to the time

10    stamp on DX124-61 he forwarded that e-mail to Mr. Greebel, yes

11    or no?

12    A    Was it at the same time?  No, it wasn't.  Because one has

13    10:36 and one is 10:36:29 milliseconds.

14    Q    And one was 29 milliseconds later, correct?

15    A    No, I can't say that, because the one on the bottom

16    doesn't have the millisecond.

17    Q    But they were both sent at 10:36.  One was sent before

18    the other you, would agree with that they weren't sent

19    simultaneously?

20    A    They weren't sent simultaneously.  I don't know which one

21    came first.

22    Q    Without knowing which one came first, you know they were

23    both sent by Mr. Shkreli to Mr. Greebel at 10:36, right?

24    A    One was at 10:36 and one was at 10:36:29.

25    Q    And would you read for us -- could we put up Defendant's

DELZOTTO - CROSS - BRODSKY

1    Exhibit 124-61 -- would you read the e-mail Mr. Shkreli

2    forwarded to Mr. Greebel at 10:36:29 milliseconds at the

3    bottom where Mr. Shkreli sent the e-mail, would you start with

4    "hi" and read it into the record?

5    A    Okay, but it's 10:28, not 10:36.

6         THE COURT:  I think he just wants you to read it.

7    A    "Hi.  Retrophin is executing it's deal with Valeant and

8    new investors.  The new investors putting money into the

9    company want the current preferred investors, the people on

10   this e-mail, to be lumped into their class.  I think it makes

11   sense, the new preferred stock has very, very generous terms.

12   Cash investors will receive 3.3 times their initial investment

13   in a preferred A share.  They will also receive a preferred B

14   share, which will convert into a $35 million premoney

15   valuation."

16   Q    Let me ask you to stop right there.  Am I reading the

17   next paragraph correctly, sir?  "I am asking you to give up

18   your common stock, which was previously inducement to invest

19   in the series A preferred stock.  The new preferred stock is a

20   much more, quote, "institutional quality," replacement for the

21   bandaid common stock I gave out.  I hope you all agree to do

22   this.  I believe it is in all of our respective best

23   interests," end quote.  Is that how the second paragraph

24   reads?

25   A    That's how it reads, yes.

DELZOTTO - CROSS - BRODSKY

1  Q    And then it goes to say, quote, "I have attached the

2  latest term sheet.  We are proceeding with the Valeant deal

3  but paying them a lot less up front than we had envisioned.

4  Instead of $28 million up front, we are going with ten to

5  $16 million up front.  This should end the uncertainty and

6  difficulty with Valeant.  I hope this situation has not put

7  anyone in an uncomfortable position," period, end quote.

8  That's the third paragraph how it reads, correct?

9  A    Correct.

10  Q    And then turning to Government's Exhibit 459 in evidence.

11  Am I reading Mr. Greebel's response on November 25, 2012, at

12  10:37 p.m. correctly, to Mr. Shkreli, quote, "hard to unwind

13  stuff, easier if they transfer back," end quote, did I read

14  that correctly?

15  A    Did you read it correctly?  Yes.  But it's not related to

16  the former e-mail.

17            MR. BRODSKY:  Move to strike, your Honor.

18            THE COURT:  Sir, just answer yes or no.

19            MR. BRODSKY:  I'd like the answer stricken, his last

20  statement, your Honor.

21            THE COURT:  Sir, I'm going to strike the additional

22  statement you made about whether or not it's related.  Just

23  answer yes or no when he asks you on cross-examination to do

24  so.

25            THE WITNESS:  Okay.

DELZOTTO - CROSS - BRODSKY

1          THE COURT:  Thank you.

2    BY MR. BRODSKY::

3    Q    Mr. Shkreli, am I reading his response correctly on

4    November 26, 2012, quote, "okay, that works," end quote?

5    A    That is what he writes in this e-mail, yes.

6    Q    Now, you were shown, sir, Government's Exhibit 674 in

7    evidence.  Can we put that up, please?

8          At the top of the e-mail does it read, September 24,

9    2014, from Mr. Greebel to Mr. Shkreli subject Re: Board books

10   from previous meetings.  I am in the process of sending it to

11   her and will have it completed today," end quote.  Is that

12   what it reads, sir, yes or no?

13   A    That is what it reads, yes.

14   Q    And then -- by the way, sir, during the two days roughly

15   of your testimony on direct examination, you read emails and

16   documents into the record, correct?

17   A    I did.

18   Q    And not a single time, not once ever, during your direct

19   examination did you ever interpret an e-mail, correct?

20   A    Interpret an e-mail?  What do you mean?

21   Q    Not once did you say this document relates to this

22   document, or this document is unrelated to this document, or

23   this document has nothing to do with this document, not a

24   single time, sir, yes or no?

25   A    I --

DELZOTTO - CROSS - BRODSKY

1    Q    The jury heard your testimony.  Yes or no?

2    A    I don't recall.  I may have; I may not have.

3    Q    You don't remember your testimony from last week and

4    yesterday?

5    A    We went through hundreds of documents.  I don't remember

6    everything that I said, no.

7    Q    Was there a single instance in response to a question

8    from the Government, a single time, you ever volunteered

9    information that wasn't asked of you?

10             MR. PITLUCK:  Objection, your Honor.

11             THE COURT:  Sustained.

12   Q    Let me ask you, sir, you were shown Government's Exhibit

13   286 in evidence, and this was on the same date, correct, as

14   the last e-mail, Government's Exhibit 674 in evidence?

15   A    Can I see the previous e-mail again?

16   Q    Sure.

17   A    Yes, sir, it was the same day.

18   Q    And Mr. Greebel, am I reading this correctly, sends to

19   Ms. Valeur-Jensen "subject 2014 minutes (through May),"

20   correct?

21   A    Correct.

22   Q    And says, quote, "Hi Meg, here are the 2014 minutes from

23   January through April.  I have not received the minutes from

24   May through the summer yet from my files department and will

25   send next week when I return.  As I assume they will arrive

DELZOTTO – CROSS – BRODSKY

1   before I'm back in the office," end quote, do you see that?

2   A     Do I see it?  Yes, I see it.

3   Q     It attaches, if you turn to the first page of the

4   attachment, it attaches minutes of a special meeting of the

5   Board of Directors of Retrophin Inc. January 6, 2014, yes or

6   no?

7   A     Can I see all of it?

8   Q     Yes.  Let me show you a hard copy?

9          MR. BRODSKY:  May I approach, your Honor?

10         THE COURT:  Yes.

11  Q     If you turn to Bates RO2379, do you see minutes of the

12  special meeting of the Board of Directors of Retrophin Inc.

13  dated January 6, 2014?

14  A     I see minutes for this one month, yes.

15  Q     And you see the redactions there were on there before --

16  withdrawn.  Retrophin produced the document with redactions,

17  correct?

18         MR. PITLUCK:  Objection, your Honor.

19         THE COURT:  Overruled.

20  A     I'm sorry?

21  Q     You didn't redact this document, correct?

22  A     Did I redact it?  No, I did not.

23         MR. PITLUCK:  Objection.  Your Honor, we need a

24  sidebar.  We object.  We need a sidebar.

25         (Continued on the next page.)

Rivka Teich CSR, RPR, RMR
Official Court Reporter

DELZOTTO - CROSS - BRODSKY

1          (Sidebar conference.)

SIDEBAR CONFERENCE

1    MS. SMITH:  Your Honor, this is has come up more

2    than once in this trial.  It came up I believe in connection

3    with Mr. Jain at one point where the witness was shown a

4    redacted document and asked when the redactions were made, who

5    made them.  As we submitted in our jury instructions,

6    redactions are made depending on various evidentiary issues in

7    this case.  There may be Retrophin asserted privilege.  And

8    we're not supposed to ask the jury to speculate why the

9    redactions are there or what is underneath the redactions.

10        If we start to distinguish these redactions were

11   made because the company wanted them for some reason or these

12   redactions were made because defense didn't like what was

13   underneath the redactions, this focus on why the redactions

14   are there and what the jury should infer from them I think is

15   highly inappropriate.

16        MR. BRODSKY:  Your Honor, what I'm trying to do is

17   I'm very concerned that there are minutes that have

18   redactions.  The minutes are very important to us.  And we are

19   going to be pointing to the minutes as part of our proof.  I

20   want to make it very clear that we didn't redact this.  I want

21   to make it clear that he didn't redact it.  It is important to

22   us when it comes to the minutes, other documents I don't care,

23   but it's important to us to be able to argue to the jury for

24   not the jury to get the impression that we are concerned by

25   something in the minutes because we don't want --

SIDEBAR CONFERENCE

1          THE COURT:  What if I give the instruction to the

2     jury that these documents were redacted by Retrophin and they

3     should not speculate as to why.

4          MS. SMITH:  I think --

5          MR. BRODSKY:  Fine.

6          MS. SMITH:  They were redacted.  You shouldn't

7     speculate why or who redacted isn't important.  Unless we

8     explain the attorney-client privilege.  The impression is

9     Retrophin did something inappropriate.  It's inappropriate

10    through the witness, that is why we have jury instructions on

11    redactions.  And so it's, just again, we objected the last

12    time.  This is the second time defense has tried to suggest

13    that Retrophin is doing something improper.  If we suggest

14    that the Retrophin made the redactions, we can say because

15    it's privilege or unrelated.

16         THE COURT:  It might be a trade secret, a lot of

17    different things.

18         MS. SMITH:  Defense counsel had the opportunity to

19    challenge redactions where they wanted to.  I don't know if

20    they challenged redactions in a particular case.  The

21    Government, as long as the redactions don't have to do with

22    information relevant to the case, I agree, trade secrets,

23    other transactions that are still privileged.

24         THE COURT:  It could be personal issues.  It could

25    be a lot of personnel issues.

SIDEBAR CONFERENCE

1          MS. SMITH:  If you want to give a fulsome discussion

2   to all of the reasons why Retrophin might have redacted it,

3   that's fine.  More appropriate would be to say this document,

4   like other documents you will see in the case, has redactions.

5   You shouldn't speculate as to why, one way or the other.

6          THE COURT:  Who did them.

7          MS. SMITH:  Sometimes it's the defense, sometimes

8   the Government, sometimes the Court.

9          THE COURT:  We did redact a number of documents

10   yesterday.  We took things out, we took out sentences or parts

11   of paragraphs or whatever.  So I don't think we need to get

12   into that, we shouldn't.  We should treat all of redactions

13   equal.  Just say they were redacted, they shouldn't speculate

14   why.

15          MR. BRODSKY:  I respectfully ask your Honor to

16   reconsider.  I'll explain why.  It's perfectly fine if you say

17   something is redacted over our objection.  I think it's

18   obvious to jury with the objection, something gets redacted.

19   I think the jury is a smart jury they know something is

20   redacted because defense objected.

21          Excuse me, Ms. Smith.  Let me finish.  Thank you.

22          I think it's perfectly appropriate.  I think it's

23   perfectly appropriate.  What concerns us in the Board minutes,

24   we want the jury -- we'll call somebody if we have to, if we

25   put on a case in chief -- we want the jury to know Retrophin

SIDEBAR CONFERENCE

1    redacted it.  It wasn't the Government because they had

2    concerns about something in the document.  And it wasn't the

3    defense because we had concerns about something in the

4    document.  It was Retrophin.  And they did it for their own

5    reasons.

6              I'm fine with your Honor instructing them that

7    Retrophin redacted for its own reasons, which no party is

8    disputing.  That's fine with us.  If you want to add to it

9    it's privileged or trade secret.

10             THE COURT:  No.  I don't know why they redacted, I

11   couldn't say it.  I'm saying to all of you there are a number

12   of reasons why Retrophin made the redactions.

13             MS. SMITH:  My concern what is Mr. Brodsky is going

14   to argue from that in closing if, what he's going to argue is

15   they should think about why Retrophin redacted what is

16   underneath or what might be there.  That's entirely

17   inappropriate.  That's the whole purpose of the jury

18   instruction.

19             I was not suggesting that we should ever say X party

20   redacted this, that is suggesting to the jury what is

21   underneath that, why does this party want it and not this

22   party.  All redactions should be treated the same.

23             I would like to hear why Mr. Brodsky thinks it's

24   important for his summation to say that Retrophin redacted the

25   document.  Because you have to, there has to be some relevant

SIDEBAR CONFERENCE

1   reason that that would be important.  I agree, if that's the

2   case, then he should call someone from Retrophin and that

3   person can talk about all the reasons why redactions were

4   made.  I think it's a side show, but I haven't heard a

5   relevant argument.

6           MR. BRODSKY:  Putting aside summation.  I know both

7   sides have said we don't know what we're going to be saying at

8   summation at this point.

9           MS. SMITH:  That's the point.

10          MR. BRODSKY:  I think the point for us is

11  Mr. Greebel signed these minutes.  He's the signature on them.

12  And it is important for us to get a cross to the jury, since

13  he signed them, and the jury sees that, that he did not redact

14  those and we did not ask for redactions in them.

15          THE COURT:  The agent can't testify as to whether

16  Mr. Greebel redacted, I think.

17          MR. BRODSKY:  He knows he received them in discovery

18  redacted.  He knows this because he recognized the document.

19  It was admitted into evidence through him.  He knows it's the

20  Bates stamp.  And the foundation for it is that he was

21  familiar with the documents.  He knows it came from Retrophin;

22  therefore, he knows when he got the document from Retrophin it

23  was redacted.

24          But I'm fine -- your Honor, I think it's perfectly

25  permissible to question a witness about redactions in a

Case 1:15-cr-00637-KAM   Document 511   Filed 01/10/18   Page 46 of 333 PageID #: 13923

SIDEBAR CONFERENCE

1    document that he offered into evidence.  But your Honor, I'm

2    fine with you instructing the jury.  But it is important to us

3    that Retrophin did it.  And it is important to us because it

4    wasn't Mr. Greebel's decision to redact things.  And that is

5    important to us because he signed them.

6              The inference we're worried about is that a juror

7    might draw an inference back in the jury room, you know what,

8    why did Mr. Greebel sign those?  Did he send them all blacked

9    out?

10             MS. SMITH:  There is an instruction.

11             THE COURT:  I will say they are not to speculate as

12   to who or why redactions were made.  They shouldn't speculate

13   about what was redacted.  Those are the three things:  The

14   who, why and what.

15             MS. SMITH:  I would also say the minutes were not

16   offered for the truth.  So to the extent that Mr. Brodsky will

17   argue certain things in there, obviously statements of the

18   defendant, but that somehow -- it's very strange.  There are

19   e-mails that Mr. Greebel is on.  I don't think anyone is

20   suggesting that the e-mails are redacted.

21             MR. BRODSKY:  Your Honor, it is important to us.

22   We're requesting it.

23             THE COURT:  Why is it important?  Why don't you tell

24   me why it's important.  Then I have to go through each

25   document where there's a redaction and explain.  I'm not going

SIDEBAR CONFERENCE

1   to treat the Retrophin documents any differently than I will

2   any other documents.  Tell me why it's important.  And now, if

3   I do agree with the request, I'm going to do it with all

4   documents.  Tell me why.

5           MR. BRODSKY:  The Board minutes, your Honor, given

6   that Mr. Greebel signed them, we are concerned.  I understand

7   you're going to instruct the jury not to speculate.  I

8   understand that, your Honor, but we know the jurors are

9   allowed to draw their own inferences from the evidence.  They

10  are instructed about that.  Knowing human behavior, we are

11  concerned, really concerned, that because he signed them.

12          If you don't instruct the jury that Retrophin

13  redacted them, then somebody on the jury will think, even for

14  a moment, oh, Mr. Greebel was hiding something when he sent

15  them the minutes to Meg Valeur-Jensen.  They were not redacted

16  when he sent them to Meg Valeur-Jensen.  They were unredacted.

17  And I don't want the jury to think on September 24 when he

18  sent those Board minutes to Ms. Jensen, he hid stuff.  While

19  case is about concealment, hiding things, and constantly

20  saying that; here it is, Mr. Greebel's e-mail he's attaching

21  the minutes that they redacted.

22          I am deeply worried that somebody in the jury will

23  think, oh, Mr. Greebel hid stuff.  That is my, that's why it's

24  important to me that you tell them that Retrophin did it.  If

25  you say you're not to draw an inference from it, the jury will

SIDEBAR CONFERENCE

1   not know that it was Retrophin who did it and the wasn't

2   redacted on September 246.

3          MS. SMITH:  Your Honor, the instruction that we ask

4   for is very simple.  It says, among the exhibits you receive

5   in evidence there are some documents that are redacted.

6   Redacted means that part of document was taken out.  You're to

7   concern yourself only with the part of the document that is

8   admitted into evidence.  You should not consider any possible

9   reason why the other part of it had been redacted.  It's an

10  instruction that Judge Wood gave in the Southern District

11  recently.  I believe it's a Sand instruction as well.

12         Mr. Brodsky is suggesting that for some reason the

13  jurors are not going to follow this instruction but they will

14  follow all the other ones.  This is very straightforward.

15         I don't know why we've drawn undue attention to

16  these redactions, suggesting that these are different than

17  other redactions.  In this case you have information about who

18  redacted, but you shouldn't speculate why it was redacted.  As

19  in other cases you're not given information about who is

20  redacted.

21         Asking this witness about the redactions suggests

22  that these redactions should be treated differently.  I don't

23  understand.  Again, the suggestion is that the jurors cannot

24  follow instructions and would draw some inference from this

25  particular document.

Case 1:15-cr-00637-KAM   Document 511   Filed 01/10/18   Page 49 of 333 PageID #: 13026

SIDEBAR CONFERENCE

1    There are e-mails from Mr. Shkreli and Mr. Greebel

2  where there are redactions for privilege, where Retrophin has

3  not waived on certain transactions.  I don't hear Mr. Brodsky

4  wanting those to be singled out like Mr. Shkreli and

5  Mr. Greebel are trying to hide something.

6    I think this particular focus is inappropriate.  I

7  think this instruction will cover all redactions, and we can

8  give it now.

9    But I don't think he should be able to question this

10 witness about it.  I don't think it's appropriate.  It is

11 asking them to speculate.

12    MR. BRODSKY:  Your Honor, I don't want any

13 speculation about why they did it.  But this is different than

14 all other documents.

15    THE COURT:  It's not different.

16    MR. BRODSKY:  May I at least, your Honor, or can you

17 instruct them that with the Board minutes that on September 24

18 when Mr. Greebel sent it they weren't redacted.  Again, my

19 concern, your Honor, unlike e-mails coming into evidence, it's

20 obvious something was written they are redacted over it.  Here

21 you have a cover e-mail that then attaches Board minutes.  And

22 Mr. Greebel, they are arguing, is delaying in sending them.

23 So think about that.  They argue that delay.  Then on

24 September 24 he attaches Board minutes, which are redacted.

25 Then they argue, and then somebody draws an inference, oh, he

SIDEBAR CONFERENCE

1    hid stuff.  That's my concern.

2              THE COURT:  Can I instruct them that Mr. Greebel did

3    not make these redactions and leave it at that?

4              MS. SMITH:  That's fine.  But there are other

5    documents.  For example, the bills when Mr. Greebel sent the

6    bills, the cover e-mail has no redactions and the bills are

7    redacted.

8              MR. KESSLER:  The defense request --

9              MR. PITLUCK:  Any specific direction on who did or

10   didn't make the redactions is totally inappropriate.  It runs

11   contrary to the instruction you're giving them, which is to

12   say, you're not consider the redaction.

13             THE COURT:  Who or why.

14             MS. SMITH:  You can say neither party requested the

15   redactions.

16             THE COURT:  Neither party.

17             MR. BRODSKY:  Can you just say it wasn't redacted at

18   the time it was sent?

19             THE COURT:  I don't know that I'm not going to say

20   that.  I'm going to say -- I don't know that.

21             MR. BRODSKY:  We're going to have to call a witness.

22             THE COURT:  I don't know what Katten did, and what

23   it looked like when it was sent.  I don't know.  I don't know

24   whether at what point the redactions were made -- I'm going to

25   say that these, they should not speculate about what was

SIDEBAR CONFERENCE

1  redacted or why, neither party made the redactions.  That's

2  all I am going to say.

3               (End of sidebar conference.)

4               (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO - CROSS - MR. BRODSKY

1          (In open court.)

2          THE COURT:  I'm instructing the jury that you may

3   see documents in this trial that have redactions, i.e.,

4   portions are blacked out.  You should not speculate as to why

5   those redactions were made or speculate about what was

6   underneath those redactions.  In this case with regard to

7   Government's Exhibit 286, the redactions were not made by

8   either party in this case.

9          You may continue.

10          MR. BRODSKY:  Thank you, your Honor.

11   BY MR. BRODSKY::

12   Q    Just reorienting ourselves.  The top is the minutes for a

13   special meeting of the Board of Directors of Retrophin Inc.

14   January 6, 2014, correct?

15   A    Correct, sir.

16   Q    Then if you scroll over on RO24386 you see a signature

17   above Evan Greebel, Acting Secretary, correct?

18   A    I see a signature, yes.

19   Q    And then if I can ask you to scroll a few more pages to

20   RO24393, this is entitled minutes of a special meeting of the

21   Board of Directors of Retrophin Inc. March 17, 2014, correct?

22   A    Yes, correct.

23   Q    And then a few pages later, RO24395, there is a name Evan

24   Greebel, Acting Secretary, and above that a signature,

25   correct?

DELZOTTO - CROSS - MR. BRODSKY

1   A    Correct, sir.

2   Q    And then on the next page, RO24396, it's entitled minutes

3   of a special meeting of the Board of Directors of Retrophin

4   Inc. March 20, 2014, correct?

5   A    Yes.

6   Q    Then if you scroll a few more pages you see on RO24402,

7   above the name Evan Greebel, Acting Secretary, a signature,

8   correct?

9   A    Yes, I see it.

10  Q    Then the next page it says minutes of a special meeting

11  of the Board of Directors of Retrophin Inc. April 7, 2014, and

12  that's on RO24403, correct?

13  A    Yes, I see it.

14  Q    Then if you scroll over a few more pages on RO2447 you

15  see a signature above Evan Greebel, Acting Secretary, right?

16  A    Yes, I see it.

17  Q    Then the next page you see minutes of a special meeting

18  of the Nominating and Corporate Governance Committee of the

19  Board of Directors of Retrophin Inc. March 20, 2014, right?

20  A    I do see it, yes.

21  Q    RO24408?

22  A    Correct.

23  Q    Then the next page, on RO2449, there is a signature above

24  Evan Greebel, Acting Secretary, correct?

25  A    Correct.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    And then the next page is RO24410, it says minutes of a

2    special meeting of the Audit Committee of the Board of

3    Directors of Retrophin Inc. March 20, 2014, correct?

4    A    Yes, I see that.

5    Q    Let me show you a particular document.

6              MR. BRODSKY:  May I approach, your Honor?

7              THE COURT:  Yes.

8    Q    I'm showing you Defendant's Exhibit 10868A for

9    identification.  Sir, this document is dated May 9, 2014,

10   correct?

11   A    Correct, this e-mail is dated May 9, 2014.

12   Q    And if I can ask you to, without, you don't have to

13   publish, Mr. Carter, but you have a physical copy of both

14   documents in front of you, sir?

15   A    I have a physical copy of both documents you're showing

16   me, yes.

17   Q    If you turn to Government's Exhibit 286 in evidence, and

18   you turn to RO24393, the one that has the minutes of the

19   special of the Board of Directors of Retrophin on March 17,

20   2014, do you see that?

21   A    Yes, I see it.

22   Q    And if you turn to the third page, first attachment of

23   the May 9, 2014 e-mail?

24             THE COURT:  I'm sorry.

25             MR. PITLUCK:  We're objecting to having him compare

DELZOTTO - CROSS - MR. BRODSKY

1    a document that's not in evidence to a document that is in

2    evidence.

3              MR. BRODSKY:  I'm trying to lay a foundation, your

4    Honor.

5              THE COURT:  You're having him look at so far

6    Government's Exhibit 286 in evidence; is that right?

7              MR. BRODSKY:  Yes, 286 in evidence.  And to lay the

8    foundation compare it to DX-10868A, May 9, 2014.

9              THE COURT:  Are you going to move this exhibit into

10   evidence?

11             MR. BRODSKY:  If can I lay a proper foundation.

12             MR. PITLUCK:  Your Honor, we object.

13             THE COURT:  All right.  Why don't you first see if

14   it you can establish admissibility.  You're going to try to

15   lay a foundation for DX-10868A, correct?

16             MR. BRODSKY:  Yes, your Honor.  I'm trying to do

17   that with this.

18   BY MR. BRODSKY::

19   Q    Sir, the first attachment on DX-10868A which is Bates

20   numbered on the bottom RO24317, are you with me?

21   A    Yes.

22   Q    If you look at that, those three pages from RO24317 to

23   RO24319, and you compare them to Government's Exhibit 286 in

24   evidence RO24393 through RO4395, isn't it true that they

25   relate to the same meeting, one is signed and one is not

Rivka Teich CSR, RPR, RMR
Official Court Reporter

DELZOTTO – CROSS – MR. BRODSKY

1    signed, correct?

2            MR. PITLUCK:  Your Honor, we object.  Can we have a

3    sidebar?

4            THE COURT:  Yes.

5            (Continued on the next page.)

6            (Sidebar conference.)

SIDEBAR CONFERENCE.

1          MR. PITLUCK:  Your Honor, apologize for the other

2     sidebar so soon.  It's clear what is going on and I want to

3     prevent this before it's in the record.  Defense counsel is

4     reading all of the Board minutes, having the agent compare the

5     same minutes, which were sent in draft form to Mr. Panoff on

6     May 9, 2014.  We had a lengthy sidebar yesterday regarding

7     Ms. Jensen.  They are trying to put in a case of an unrelated

8     issue that Mr. Kravitz at Katten sent draft Board minutes to

9     Panoff, the CFO, to establish a point that because we just

10    established that he sent them to the Board in September that

11    he's now saying he sent it in May.  It's totally unrelated.

12    This is not proper cross-examination.  There is no connection.

13         Your Honor ruled on the previous document, and that

14    it was in seconds.  This is six months in advance.  There is

15    no indication that this was ever sent to the Board.  It's an

16    unrelated point.  And assuming they can get this in for the

17    truth of the matter, it was sent to Mr. Panoff.  It's

18    unrelated to the fact that it was sent to the Board.

19         We don't want him to read every document and say

20    these are the same.  It's leaving the jury with the impression

21    that the case agent -- that the documents are related when

22    they are not.  This is four-and-a-half months before.

23         MR. KESSLER:  It's not cross.  It's their case on

24    our agent.

25         MR. PITLUCK:  He didn't say they weren't sent to

SIDEBAR CONFERENCE.

1    somebody else.

2              THE COURT:  Well, the set that is in evidence that

3    was sent by Mr. Greebel to Ms. Valeur-Jensen, these are sent

4    by Mr. Kravitz unassigned to Mr. Panoff.

5              MR. PITLUCK:  Yes.

6              THE COURT:  Mr. Greebel sent those minutes in

7    response to Ms. Valeur-Jensen's request.

8              MR. PITLUCK:  Right.

9              THE COURT:  These were sent, I don't know whether

10   there was an outstanding request, or whether this was just

11   done in the normal course.

12             MR. PITLUCK:  Your Honor, our point is not -- it's

13   simply.  This is totally unrelated to the scope of the

14   testimony.  We didn't argue that they were sent to anybody

15   else.

16             THE COURT:  I think the appropriate point, if I

17   recall reading the defendant's proposed experts, if they do

18   put on a case one of those experts will testify that it is not

19   uncommon for Board minutes to be sent to an officer, CFO I

20   think.

21             MR. KESSLER:  I think they withdrew that opinion.

22   Mr. Ferruolo's revised opinion, I believe, they are not longer

23   offering those governance points.

24             MR. BRODSKY:  May I respond to Mr. Pitluck, briefly?

25   In terms of the relationship between the two documents, they

SIDEBAR CONFERENCE.

1    are directly related.  Because I will establish through this

2    witness by the way the DX-10868A, which is a May 19 e-mail

3    from Mr. Kravitz to Marc Panoff copying Mr. Greebel in the

4    record already, is that Mr. Kravitz is an associate and

5    working for Mr. Greebel on Retrophin matters.  And he is

6    sending the Board minutes of four dates.  They are drafts.  He

7    says they are draft minutes.  And they match the minutes that

8    are attached to Government's Exhibit 286 in all of these four

9    dates.

10             Prior to putting in Evan Greebel's e-mail to Meg

11   Valeur-Jensen, who was acting outside counsel to or acting

12   counsel to in some capacity in-house to Retrophin, the

13   Government put in Government's Exhibit 674 directly before.

14   We had objected on the double hearsay grounds.  But the idea

15   was that Mr. Aselage, who was Chief Operating Officer, it was

16   not coming from the Board, it was coming from the Chief

17   Operating Officer.

18             THE COURT:  To the CEO.

19             MR. BRODSKY:  To the CEO saying Meg has been

20   requesting, it doesn't say the Board, it says Meg

21   Valeur-Jensen, the general counsel, has been requesting the

22   books.  And Katten continues to be working on them, it

23   shouldn't take weeks.

24             The impression this created that these minutes

25   hadn't existed before happened.  We need to put in, and it's

7729

SIDEBAR CONFERENCE.

1    directly on point, because these are minutes that match the

2    ones that are sent in Government's Exhibit 286.  They

3    completely match.  And they were sent months earlier, that is

4    the point, that they were sent months earlier to out the CFO

5    of the company.  And they are business records, your Honor,

6    generally minutes are the considered to be --

7               THE COURT:  They are drafts.

8               MR. BRODSKY:  They are drafts.  I'm not offering it

9    for the truth.  I don't need it for the truth.

10              MR. PITLUCK:  Our point is we are far afield from

11   cross.  The point is he's trying to get it in through our

12   agent.  It's not involving the same people.

13              MR. BRODSKY:  Your Honor, this is directly on point

14   because it's not far afield from cross.  I only have a few

15   documents like this for cross-examination.  This one is --

16   they created the impression in 674 and 286 that it took him a

17   while.

18              THE COURT:  Is Mr. Panoff no longer employee?

19              MR. BRODSKY:  An associate.

20              THE COURT:  If he had them --

21              MR. KESSLER:  The question is, whether they were

22   sent to the Board.  Mr. Brodsky repeatedly proffered they were

23   sent to the Board.  There are no documents that they were sent

24   to the Board.  He offered e-mails sent to Mr. Panoff three

25   months earlier, it's not related.

SIDEBAR CONFERENCE.

1        MR. PITLUCK:  It's unrelated to the cross.  The last

2   document, over our objection, you admitted, we respect that.

3   But this is now five months earlier sent to different people.

4   It's not contemporaneously.  They are trying to introduce

5   evidence through our case agent, that's inappropriate.

6        MR. BRODSKY:  Exact same minutes that are sent a few

7   months before, which is exactly the point.  They directly

8   respond to the claim that's being made from the company that

9   he's taken a while to send the minutes, directly responsive to

10  their testimony through this agent.

11       THE COURT:  But they are not the same.  Because one

12  is characterized as a draft and unsigned, the others are the

13  final signed work minutes.  So they are not the same.  I mean,

14  I don't know if you want this agent to go through word by word

15  on each document to ascertain whether it's exactly the same, I

16  don't know what utility.  Why wouldn't you -- why would you be

17  able to put these documents in through the case agent when

18  presumably Mr. Kravitz who sent these over would be able to

19  state what these were, what the circumstances were?  Are the

20  redactions the same?

21       MR. PITLUCK:  I don't have a copy, your Honor.  I

22  don't believe so.  I believe there were heavier redactions in

23  the other one.  I don't know what Retrophin's position was on

24  asserting privilege in the draft.

25       MR. BRODSKY:  I think the redactions are the same.

SIDEBAR CONFERENCE.

1    THE COURT:  Why don't we table these and Defendant's

2    Exhibit –– maybe let the jury a mid-morning break too.

3    (In open court.)

4    THE COURT:  Ladies and gentlemen of the jury, we'll

5    give you a mid morning break as well.  Please don't talk about

6    the case.  Remain open minded.  Thank you.

7    (Jury exits the courtroom.)

8    (Sidebar continues.)

9    THE COURT:  Back on the record.

10   MR. KESSLER:  To be clear, Government's Exhibit 286

11   contains a January set of Board minutes, which are not

12   contained in the Defendant's Exhibit.  Obviously, that's not

13   the basis of our objection, but that's an additional issue

14   saying they are the same.

15   THE COURT:  I understand the main basis of your

16   objection seems to be he's the case agent and it's not

17   appropriate to for the defense to admit other documents

18   through the case agent.  But he is the case agent, right, so

19   he would have seen or had access to or been provided the

20   Kravitz e-mail of May 9, 2014, correct?

21   MR. PITLUCK:  I have no idea.

22   MR. KESSLER:  We don't know.

23   THE COURT:  He's the case agent who is the main

24   person who is presented a number of exhibits, including the

25   Valeur-Jensen/Aselage e-mails regarding the Board minutes and

SIDEBAR CONFERENCE.

1    Mr. Greebel's transmission of signed final Board minutes that

2    overlap in someways with the drafts that were sent in

3    DX-10868A.  I think that --

4              MR. PITLUCK:  Judge, these are --

5              THE COURT:  -- I don't think that you're arguing

6    that Mr. Kravitz was somehow part of the conspiracy or an

7    unwitting participant in being asked to send drafts.  And I

8    don't think you're arguing that Mr. Kravitz would have sent

9    these draft Board minutes without authority or some greenlight

10   from somebody, right?  He didn't just do this on his own.

11             MR. PITLUCK:  We have no idea, but I assume not.

12             THE COURT:  I think as the case agent who would have

13   had access to and may possibly have familiarity with

14   DX-10868A, that it would be appropriate to ask him, to have

15   him questioned once this exhibit is admitted as to his

16   familiarity or --

17             MR. PITLUCK:  Judge, that would mean that every

18   document that's been produced is, by that rationale, as the

19   case agent he could have had access to.

20             Our point is much simpler, which is, your Honor has

21   held with multiple witnesses in the case the fact that this is

22   cross-examination does not mean that anything comes in through

23   him.  These are Board meetings sent four months earlier.  They

24   are different sent to a different person than is copied on any

25   of the e-mails that we introduced.  They may want to proffer

SIDEBAR CONFERENCE.

1    it as related, and that's the whole point, they don't get to

2    introduce their evidence in our case, regardless of whether or

3    not he may have seen the document.

4              THE COURT:  Why isn't it fair ground for cross if

5    the case agent is saying that way back in September

6    Mr. Aselage had to prompt Mr. Shkreli after complaints by Meg

7    Valeur-Jensen, which were not admitted for the truth, urging

8    Mr. Greebel to get those minutes.  And then he responds, I'm

9    working on it and then sends them within a matter of days.

10   Why is this not directly addressing or relevant to that?

11             MR. PITLUCK:  The case agent -- he put in an e-mail

12   and said this is a request to Evan Greebel for the Board

13   minutes, he responded with the Board minutes, that's it.  The

14   Board requested them as of September 24.  He didn't testify

15   there was a delay.  He never would have interpreted that.

16             THE COURT:  These are not admitted for the truth

17   either, just admitted for the fact that they are being

18   transmitted, right?

19             MR. PITLUCK:  What difference?  How is it related at

20   all to his testimony that the Board asked Mr. Greebel and

21   received the statements in September?

22             THE COURT:  Because the impression --

23             MR. PITLUCK:  An entire different person got them in

24   May.

25             THE COURT:  -- an impression made to the jury by

SIDEBAR CONFERENCE.

1    virtue of the exhibits you put in through the case agent that

2    Mr. Greebel was stalling and not responding to Meg

3    Valeur-Jensen's request to provide Board minutes.  And it took

4    the intervention of Mr. Aselage to Mr. Shkreli to prompt him

5    to get those Board minutes in September.  So appears the

6    impression is, I believe, that Mr. Greebel was somehow

7    stalling or not providing minutes.  And this exhibit,

8    DX-10868A, provides a fuller more complete picture that

9    Mr. Greebel's associate was sending draft Board minutes to

10   Mr. Panoff, who at that time was CFO.  Is that correct, CFO?

11           And he, whether or not he passed it on to the Board,

12   there is maybe a missing piece there, whether or not he's, as

13   you allege a co-conspirator and would have some reason to

14   withhold Board minutes from the Board, is something that you

15   all are going to be arguing about, I suppose, in summation.

16           But it does seem to me that this exhibit is

17   certainly relevant to the, and directly addresses, and on

18   cross may in fact be ground for confronting the witness about

19   a document that was admitted through him.

20           MR. KESSLER:  Your Honor, the document that was

21   admitted through him is about whether or not Mr. Greebel

22   provided the Board minutes in September 2014.  If they have a

23   document, which they don't, showing that Mr. Greebel provided

24   the Board the minutes the Board was asking for, you know, two

25   weeks before the e-mail, that would address that.

SIDEBAR CONFERENCE.

1          THE COURT:  But this is a document that shows that

2    Mr. Greebel's associate provided draft minutes, albeit draft

3    and unsigned minutes, in May.

4          MR. KESSLER:  That's a jury argument they can make

5    if they put on a case to introduce evidence.  It's not

6    cross-examination of someone else.  The difference between an

7    argument that might be permissible in a trial and

8    cross-examination of a specific witness is what we're talking

9    about.

10         THE COURT:  But this would be admissible through the

11   case agent.  There is no reason not to admit it through him.

12         MR. KESSLER:  Except then the Court said yesterday

13   the case agent is not a vessel to admit whatever document --

14         THE COURT:  I said that this morning, too, I agree

15   with that.

16         MR. KESSLER:  That's what they are doing.

17         MR. PITLUCK:  Judge, this is an unrelated issue.

18   The issue that these two documents create is whether or not

19   these were communicated to the Board, not whether the case

20   agent was testifying --

21         THE COURT:  But Mr. Greebel doesn't have

22   responsibility of communicating that to the Board necessarily.

23   What he's doing is asking his associate in May to provide

24   these to the CFO, which he does, and then later in September.

25         MR. PITLUCK:  Mr. Kravitz provided them to the CFO.

SIDEBAR CONFERENCE.

1    THE COURT:  Mr. Kravitz is Mr. Greebel's associate

2    and appears on numerous e-mails and doing things at

3    Mr. Greebel's request.  And Mr. Greebel is CCed.  I think the

4    defense is entitled to provide this document to complete.  And

5    to have the agent, as the case agent, acknowledge whether or

6    not this is a document that indicates that draft Board minutes

7    were transmitted in May.

8    MR. KESSLER:  The fact that he's the case agent, if

9    we had called a paralegal or an agent who knows nothing about

10   the case, it would be just as improper.

11   THE COURT:  I know, but --

12   MR. PITLUCK:  Our --

13   THE COURT:  It seems to me the basis for your

14   objection is you want them to call Mr. Kravitz to say I sent

15   this e-mail if they are going to admit this document, but they

16   can't admit it through the agent.

17   MR. PITLUCK:  I don't care who they call,

18   Mr. Kravitz, their paralegal, or Mr. Cooley.  They can't make

19   their case or admit documents through our agent.  Courts have

20   held and precedent dictates.

21   This is too far afield from his testimony at trial,

22   which was entirely related to the September 2014 provision of

23   the minutes.  What we argue on in summation is irrelevant.

24   Because the case agent didn't say anything about that.  He

25   didn't say this is the first time that they were provided to

SIDEBAR CONFERENCE.

1   anyone at the company, this is the first time that nobody at

2   Katten provided Board meeting.

3            THE COURT:  The document itself, which the wasn't

4   admitted for the truth, suggested through Mr. Aselage's e-mail

5   to Mr. Shkreli, that there had been repeated requests,

6   repeated non-responses, this is taking too long, please reach

7   out.

8            MR. KESSLER:  There is other evidence.

9   Mr. Richardson testified he does have personal knowledge.  He

10  asked for minutes, Mr. Greebel didn't send it to him.

11           THE COURT:  That's fine.  But this is directly

12  related to the provision of Board minutes, draft Board

13  minutes, to an officer of Retrophin in May of 2014.  To say

14  its unrelated, I think, is not accurate.  It's an e-mail.  And

15  the Board minutes are different in that they are not signed.

16  They are characterized as being drafts.  It does show that

17  minutes are being transmitted to an officer of Retrophin in

18  May of 2014.

19           MR. KESSLER:  But not to the Board.

20           MR. PITLUCK:  Judge, I think our point is a more

21  simple one.  These are all --

22           THE COURT:  You can still argue that there is no

23  evidence that any of this is transmitted to the Board by

24  Mr. Panoff or Ms. Valeur-Jensen or Mr. Greebel or whomever if

25  there is no evidence to that.  But --

SIDEBAR CONFERENCE.

1          MR. PITLUCK:  Judge, we're creating an exception

2     that they can drive a truck through, and they will drive a

3     truck through, which is the notion that when the case agent

4     testifies on the limited documents, same day in September, the

5     e-mail from Aselage didn't say we've been asking for months

6     and nobody from the company has ever gotten a document, any

7     Board minutes.  Even if it's not admitted for the truth --

8          THE COURT:  Repeated request.

9          MR. PITLUCK:  Meg has been requesting the Board

10    minutes from --

11         THE COURT:  For a substantial period of time.

12         MR. PITLUCK:  That could refer to the Board minutes.

13         THE COURT:  Katten continues to say they are working

14    on putting them together it shouldn't take weeks.

15         So weeks or months, whatever substantial period of

16    time, the impression that this suggests is that there is some

17    stonewalling or blockading going on.

18         MR. PITLUCK:  That e-mail say weeks, this is five

19    months.

20         Mr. Brodsky can roll his eyes all he wants.  This is

21    their attempt to put in their case by introducing unrelated

22    documents through a case agent who hasn't testified about the

23    substance of anything that so they can argue that the case

24    agent didn't tell you that the Mr. Panoff, the CFO of the

25    corporation, received Board minutes from Katten, they hid that

SIDEBAR CONFERENCE.

1    from you.

2            We didn't hide it from anybody.  We didn't make any

3    arguments about it.  We said that they sent it in September.

4    And that the statement that your Honor instructed them is not

5    for the truth, said that they are requesting it for weeks then

6    it was sent the same day.  That's it.  There are a number of

7    reasons that we can argue why that's important, including when

8    the Board got the minutes.

9            Just because these are related to Board minutes,

10   just because they were provided to somebody else in the

11   company does not mean that his testimony was incomplete,

12   misleading or inaccurate.

13           THE COURT:  But the fact that Mr. Greebel ultimately

14   sent these minutes, signed, complete to Ms. Valeur-Jensen

15   doesn't establish when and if the minutes were presented to

16   the Board.

17           MR. PITLUCK:  No, just that they were sent to

18   Ms. Valeur-Jensen.

19           THE COURT:  And this establishes it was sent four

20   months earlier to the CFO.

21           MR. PITLUCK:  The request is being made on behalf of

22   Mr. Aselage.  I think the point is, just because they relate

23   to Board meetings doesn't mean every document comes in through

24   the agent.

25           THE COURT:  Well, they are the same, they are the

SIDEBAR CONFERENCE.

1   virtually the same month and year of Board minutes.

2           What I don't want, what I wouldn't want for you to

3   do is have the agent go through one by one and compare.

4           MR. BRODSKY:  I won't, your Honor.

5           THE COURT:  I mean, these are being admitted not for

6   the truth but really for the fact that they were sent.

7           MR. BRODSKY:  I promise you, your Honor.  I got your

8   instruction yesterday, I'm not going to be putting in -- I had

9   two binders, very large, I was going to try to put it in, I

10  admit, 40 or 50 documents.  I got your instruction yesterday

11  and I spent last night completely combing it down to a handful

12  of documents that I think can show are directly related.  I

13  got your message loud and clear, your Honor.

14          MR. PITLUCK:  Judge, I don't know what a handful

15  means.

16          THE COURT:  I think we're going to have to do it

17  document by document.

18          So far, based on this and based on the prior

19  document that was intersected by seconds with an e-mail chain

20  that Mr. Shkreli was having with Mr. Greebel, I thought it was

21  appropriate to admit.

22          MR. PITLUCK:  That was seconds, this is months;

23  different documents to different people.

24          THE COURT:  It's at same month and year and day of

25  the Board.

7741

SIDEBAR CONFERENCE.

1        MR. PITLUCK:  This has January as well.

2        THE COURT:  Exactly.

3        MR. PITLUCK:  They are sent to a different person.

4   They are different context, different time periods, different

5   people requesting.  They are different.

6        THE COURT:  But neither of them is the Board.  One

7   is the CFO, one is a lawyer in-house for Retrophin.

8        MR. PITLUCK:  That's the whole point, Judge.  The

9   whole point is it's requested by different people at different

10  times.  If it had been the Board has requested from

11  Mr. Panoff, and the Board had requested from Ms. Jensen, we

12  can argue that they are all intended for the Board.

13       THE COURT:  I guess this is the thing, if Mr. Panoff

14  is attending the Board meetings and he's hearing that Mr.

15  Richardson is asking for Board minutes and where they are or

16  making requests to Mr. Greebel to get the Board minutes, he's

17  sitting on them as of May.

18       MR. KESSLER:  That's a different question.

19       THE COURT:  One wonders what is going on.  I'm

20  saying, it doesn't necessarily show that Mr. Greebel is part

21  of some grand conspiracy to withhold Board minutes.

22       MR. PITLUCK:  We're so far afield.  If that's the

23  Court ruling -- but it was seconds and now it's months.  Just

24  because they are Board minutes doesn't mean they are related.

25       MR. KESSLER:  We are going to do this for each

SIDEBAR CONFERENCE.

1   document.

2           MR. PITLUCK:  They are pushing the envelope.  Just

3   because it's the case agent doesn't mean it's a conduit.  You

4   would never let this in with a paralegal.  He may have no

5   personal knowledge of this.

6           THE COURT:  Maybe he'll say of that, and that will

7   be the end of the inquiry, right?

8           MR. KESSLER:  They just want the document in it.

9   They don't want to ask him questions.

10          MR. BRODSKY:  Your Honor, I think your Honor has

11  ruled.  We respect your Honor's ruling.  I'm not putting in

12  dozens of documents, I promise you, your Honor.  I've narrowed

13  them to the ones that go to the point.  May I?

14          MR. PITLUCK:  This is not the first time that we

15  asked to reargue your ruling on both sides.  I guess we

16  respectfully disagree.

17          THE COURT:  Thank you, I understand.

18          (Continue following page.)

19

20

21

22

23

24

25

DELZOTTO - CROSS - MR. BRODSKY

1          (WHEREUPON, at 11:11 a.m., the jury re-entered the

2     courtroom.)

3          THE COURT:  All jurors present.  You may resume your

4     cross.

5          MR. BRODSKY:  Thank you, Your Honor.

6     BY MR. BRODSKY:

7     Q    Sir, do you have before you, DX-10868A for

8     identification?

9     A    I do, sir.

10          MR. BRODSKY:  Your Honor, we offer it, pursuant to

11     our discussion.

12          MR. PITLUCK:  Your Honor, pursuant to our

13     discussion, there were foundational issues as well.

14          THE COURT:  I am going to admit Defense Exhibit

15     10868A, pursuant to our discussion at sidebar.

16          (Defendant Exhibit 10868A, was received in

17     evidence.)

18          MR. PITLUCK:  Your Honor, can we have the

19     instruction then?

20          THE COURT:  All right.  Members of the jury, you are

21     instructed once again that Defense Exhibit 10868A is being

22     admitted not for the truth, but, rather, to give you an idea

23     as to what was transmitted on a given date and what e-mails

24     were provided, and the effect of the e-mail on the recipients.

25          MR. BRODSKY:  Thank you, Your Honor.

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  All right.

2    BY MR. BRODSKY:

3    Q     Can we blow up the top of this e-mail, to include the

4    "Best, David."

5          Sir, do you see in DX-10868A, that this is an e-mail

6    dated Friday, May 9, 2014?

7    A     I see the date, yes.

8    Q     And the date is May 9, 2014, correct?

9    A     That is the date, yes.

10   Q     And that is this e-mail, DX-10868A in evidence, is an

11   e-mail from David Kravitz to Marc@Retrophin.com.  Do you see

12   that?

13   A     I see the from and to, and that's what it says.

14   Q     And it copies Mr. Greebel, correct?

15   A     Correct.

16   Q     The subject states:  Retrophin draft board of directors

17   and committee minutes?

18   A     That's what it states.

19   Q     The attachments read:  Retrophin March 17, 2014,

20   minutes.doc, Retrophin April 7, 2014, minutes.doc, Retrophin

21   March 20, 2014, minutes.doc, Retrophin March 20, 2014,

22   nominating and corporate governance committee meetings,

23   parenthetical, 2.doc, correct?

24   A     That's what it reads.

25   Q     And the e-mail reads by Mr. Kravitz:  Marc, attached for

DELZOTTO - CROSS - MR. BRODSKY

1  your review, are draft minutes to the following meetings, and

2  it lists them there, correct?

3  A    You know, I don't want to comment on the e-mail because I

4  really don't recognize the e-mail.

5  Q    So let me ask you about the recognition of the e-mail.

6  Do you see the Bates number on the bottom right?

7  A    Yes.

8  Q    Do you see it is RO24315?

9  A    I do see that, yes.

10  Q    Now, that's a Bates number that, obviously, you didn't

11  put on there, correct?

12  A    I did not put it on there, no.

13  Q    And that's a Bates number that's comes on a document when

14  someone produces that, it is a party produces the document,

15  right?

16  A    I assume so.

17        MR. PITLUCK:  Objection, Your Honor.

18        THE COURT:  We are not assuming.  Either you know or

19  don't know.  Don't assume anything.

20        THE WITNESS:  I don't know then.

21  BY MR. BRODSKY:

22  Q    So you were participating in sending out requests as the

23  case agent for documents, right?

24  A    I did, yes.

25  Q    And the document in evidence that you put on direct

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1  examination, Government Exhibit 286, has Bates numbers on it,

2  right?

3  A    They do, but I didn't put them on there.

4  Q    But you recognize that when you made document requests

5  and received documents, they had Bates numbers on them, right?

6  A    Did I see Bates numbers, yes.

7  Q    And you understand that Bates numbers are consecutive, in

8  order?  In other words, if you look at Government Exhibit

9  286 -- can you pull up 286 in evidence?  It starts with

10  R024378, right?

11  A    Yes, that's what it starts with.

12  Q    And then it is consecutive, is it not?  It goes 7, it

13  ends in 79, 80, all the way --

14  A    Yes.

15  Q    -- through R024413?

16  A    Yes.

17  Q    Right?

18        MR. BRODSKY:  So can we put that up?  Mr. Carter,

19  can you highlight RO24412, the last page.

20  BY MR. BRODSKY:

21  Q    This is Government Exhibit 286 in evidence.  And let's

22  talk about the defense exhibit that we just put up, if you can

23  put it side by side.

24        The last page of Defense Exhibit 10868A.

25        MR. BRODSKY:  And the last page of that exhibit,

DELZOTTO - CROSS - MR. BRODSKY

1   Mr. Carter.  Just blow up that Bates number.  And put them

2   side by side.  In fact, in 286, put the first -- put the first

3   number, RO24378.  Sorry, Mr. Carter.

4   BY MR. BRODSKY:

5   Q    Would you not agree with me, sir, if you subtract from

6   Defense Exhibit 10868A, RO24378, from the number RO24333, you

7   get 45 pages of difference?

8   A    Yes.  That looks right.  45 pages.

9   Q    So, sir, since you had seen Government Exhibit 286, and

10  you know who produced it, right?

11  A    Yes.

12  Q    And then, sir, you certainly saw, 45 pages later, Defense

13  Exhibit 10868A?

14          MR. PITLUCK:  Objection, Your Honor.

15          THE COURT:  Sustained.

16  BY MR. BRODSKY:

17  Q    Does it refresh your recollection, sir, having seen now

18  Government Exhibit 286, end in RO2433, on the left, and now

19  seeing Defense Exhibit -- withdrawn.

20          Having seen --

21          THE COURT:  I think you have it flipped.

22          MR. BRODSKY:  I have it reversed.

23          Would you mind putting them both up again.  Thank

24  you.

25  BY MR. BRODSKY:

DELZOTTO - CROSS - MR. BRODSKY

1    Q    On the right-hand side, having seen RO24378 in Government

2    Exhibit 286, and the left-hand side, seeing that Defense

3    Exhibit 10868A, ends in RO24333, does it refresh your

4    recollection that you did see Defense Exhibit 10868A?

5    A    As I said, I don't recognize your exhibit here.

6    Q    Okay.  And if we can go back to the exhibit and put it

7    up, DX-10868A, and the first page, if you go to the --

8         MR. BRODSKY:  Let's do it this way, Mr. Carter.

9    Would you go to Government Exhibit 286, and would you just go

10   to RO24393.  Would you just blow up the top, please, from that

11   all the way down to the first couple of paragraphs.  Yes,

12   please.  Would you put that side by side with Defense Exhibit

13   10868A and RO24317.  And blow up the same section.

14   BY MR. BRODSKY:

15   Q    And do you see, sir, that the March 17, 2014 board of

16   directors meeting draft minutes sent by Mr. Kravitz on May 9,

17   2014, at least with respect to these first paragraphs at

18   RO24393, match the paragraphs in Government Exhibit -- sorry.

19   I have got the pages mixed up.  Let me just withdraw that.

20        That the pages in Government Exhibit 286, RO24393,

21   match the DX-10868A at RO24317, the minutes of the special

22   meeting of the board of directors of Retrophin, Inc., March

23   17, 2014, correct?

24   A    Sir, they appear the same, but what I said was that the

25   e-mail cover I don't recognize.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    Okay.  And you see that if you go to the defense exhibit,

2    March 17, 2014, if you scroll two more pages to RO24319, you

3    see that it is unsigned, correct?

4    A    I see it is unsigned, yes.

5    Q    And if we do that again, same exercise, and I ask you to

6    turn to in Government Exhibit 286, the minutes of the special

7    meeting of the board of directors of Retrophin on March 20,

8    2014, at RO24396, would you do that for me?

9    A    Yes, I'm there.

10   Q    Okay.

11        MR. BRODSKY:  And are you there, Mr. Carter?  Can

12   you blow up the same, just the top or first couple paragraphs.

13   BY MR. BRODSKY:

14   Q    And would you then go to Defense Exhibit 10868A at

15   RO24325, do you see that they match up there, correct?

16   A    One's a draft, one is not.  Otherwise, it looks similar.

17   Q    And the draft is on Defense Exhibit 10868A, the

18   Mr. Kravitz, May 9, 2014 e-mail, right?

19   A    It appears to be an attachment to that e-mail.

20   Q    And if you scroll through a few pages, you see that at

21   the ends of those draft minutes for March 20, 2014, the

22   special meeting, is again unsigned, with a signature block for

23   Evan Greebel, acting secretary?

24   A    It is unsigned, yes.

25   Q    And if you scroll with me to Government Exhibit 286, to

DELZOTTO - CROSS - MR. BRODSKY

1   RO24403, and you see the minutes of the special meeting of the

2   board of directors of Retrophin, Inc., dated April 7, 2014,

3   correct?

4   A    Yes, sir.

5   Q    And then if you go to DX-10868A, at RO24320?

6   A    Okay.

7   Q    You see what appeared to be the signed minutes of April

8   7, 2014, in Government Exhibit 286, and the unsigned draft in

9   Defense Exhibit 10868A, dated May 9, 2014, correct?

10  A    I don't see any signature on either document.  Which --

11  Q    You don't see a signature on the draft, correct?

12  A    No.  I thought you were on RO24320 in your exhibit.

13  Q    Right.  So if you go to the end of that.

14  A    Correct.

15  Q    If you go to RO24324, in the Defense Exhibit 10868A, it

16  is unsigned, correct?

17  A    It is unsigned, correct.

18  Q    And let me do one more.  If you go to Government Exhibit,

19  again -- so does that -- that covers the four minutes -- well,

20  withdrawn.

21          That covers three out of the four board of

22  directors -- withdrawn.

23          We just went through and I showed you, four sets of

24  minutes, correct?  That are attached to May 9, 2014.  Are

25  there four sets of minutes attached.

DELZOTTO - CROSS - MR. BRODSKY

1   A    They are attached to the e-mail I said I don't recognize,

2   yes.

3   Q    Right.

4         Now, you don't recognize the e-mail, you are not

5   disputing its authenticity, are you, on the stand today?

6         MR. PITLUCK:  Objection, Your Honor.

7         THE COURT:  Sustained.

8   BY MR. BRODSKY:

9   Q    Let me ask you to turn to Government Exhibit, again, 286,

10  and if you go to RO24408, and you see the minutes of the

11  special meeting of the nominating and corporate governance

12  committee of the board of directors of Retrophin, dated March

13  20, 2014?

14  A    I see it, yes.

15  Q    And then let me ask you to go to RO, in Defense Exhibit

16  10868A, RO24332.

17  A    Okay.

18  Q    Do those appear to you to be similar, one signed in

19  Government Exhibit 286, and one unsigned in Defense Exhibit

20  10868A, from Mr. Kravitz on May 9, 2014, to

21  Marc@Retrophin.com, copying Mr. Greebel?

22        MR. PITLUCK:  Your Honor, objection, and let the

23  record show that the witness is only being shown a portion of

24  these exhibits.

25        THE COURT:  Right.

DELZOTTO - CROSS - MR. BRODSKY

1          You are asking just with regard to the first few

2    paragraphs, correct?

3          MR. BRODSKY:  I would ask all -- you know, for all,

4    but I understand, I appreciate the time, Your Honor.  So I

5    don't do that if -- given the time.  We'll be able to do that

6    in a different way.  So I won't spend the time doing that.

7    BY MR. BRODSKY:

8    Q    Let me ask you, if they appear the same without telling

9    us if every word is the same?

10         MR. PITLUCK:  Objection, Your Honor.

11         THE COURT:  Well, all right.  I don't think we care

12   to have this witness go through each and every word of the two

13   exhibits.  I think to the extent Mr. Brodsky you are going to

14   ask him to look at certain pages, certain paragraphs, do a

15   quick review and ask if it appears to be similar or the same,

16   you may do so.  But I don't think we can have the time to have

17   this agent read every single board minute entry.

18         MR. BRODSKY:  Understood, Your Honor.

19   BY MR. BRODSKY:

20   Q    This one I'm showing you for the minutes of the special

21   meeting of the nominating and corporate governance committee

22   of the board of directors is two pages, right?  The March 20,

23   2014?

24   A    Are you looking at your exhibit or Government Exhibit?

25   Q    If you look at either exhibit.

DELZOTTO - CROSS - MR. BRODSKY

1   A    Is it two pages, you said?

2   Q    Yes.

3   A    It looks like it is two pages, yes.

4   Q    And without reading every word, does it appear on, let's

5   say the second page, in bold, there are four bold portions,

6   right, in bold, words in bold?

7   A    There's five.

8   Q    Five.  Thank you.

9        Are there five on both pages --

10  A    Yes.

11  Q    -- and do they match?

12  A    Yes, five.

13  Q    And they match, correct?

14  A    Yes.  Although, I will just note that one's a draft again

15  and unsigned, and the other one is not a draft, and it is

16  executed with a signature.

17  Q    Thank you.

18        Let me ask you to turn to Government Exhibit 286.

19  If you go to the minutes of the special meeting of the audit

20  committee of the board of directors of Retrophin, Inc., it is

21  on RO24410, and it is dated March 20, 2014.  Do you see that

22  one?

23  A    Hold on.  Okay.  Yes, I see it.

24  Q    Do you see it?

25  A    Yes.

DELZOTTO – CROSS – MR. BRODSKY

1              MR. BRODSKY:  May I approach, Your Honor?

2              THE COURT:  Yes.

3   BY MR. BRODSKY:

4   Q    I am showing you Defense Exhibit 10830A, and is this an

5   e-mail from Mr. Greebel to Mr. Panoff dated May 6, 2014?

6   A    Yes.  Appears that way.

7   Q    And if you look at the attachment to that e-mail, does

8   the attachment appear to be, again, without looking at every

9   word, the same --

10             MR. PITLUCK:  Your Honor --

11  BY MR. BRODSKY:

12  Q    -- other than being unsigned --

13             MR. PITLUCK:  Objection.  Is this in evidence?

14             THE COURT:  No, it's not.

15             MR. BRODSKY:  Right.  I am not going to have him

16  read from it.  I am just going to ask him if it appears to be

17  the same.

18             THE COURT:  But if it is not in evidence, what value

19  does it have to anybody?

20             MR. BRODSKY:  Laying the foundation, Your Honor, for

21  the admissibility, comparing the government exhibit to this

22  one.

23             THE COURT:  All right.

24  BY MR. BRODSKY:

25  Q    If you look at Government Exhibit 286 in evidence, and

DELZOTTO - CROSS - MR. BRODSKY

1    you go to RO24410, the March 20, 2014 audit committee minutes;

2    are you there with me?

3    A    Yes, I am.

4    Q    And then if you compare that generally, I am not asking

5    you to read every word, to what's attached to Defense Exhibit

6    10830A, am I not correct that the government exhibit, audit

7    committee minutes dated March 20, 2014, are signed, but the

8    ones attached to the May 6, 2014 e-mail, are unsigned?

9              MR. PITLUCK:  Your Honor, we have an objection to

10   the document at all being shown.

11             THE COURT:  Being shown?

12             MR. PITLUCK:  Yes.

13             THE COURT:  It is not being shown yet, is it?

14             MR. PITLUCK:  No.  To the witness.

15             MR. BRODSKY:  I showed the witness.

16             THE COURT:  I am overruling -- it is being shown to

17   the witness.

18             Are you not seeing it, sir?

19             THE WITNESS:  I have it in front of me.

20             THE COURT:  He has it in front of him.  It is not in

21   evidence, so it is not being shown to the jury.

22             MR. PITLUCK:  I will save my objection.

23             THE COURT:  Okay.  I think there wasn't a response

24   to the question.

25             THE WITNESS:  I'm sorry, could you read that?

DELZOTTO - CROSS - MR. BRODSKY

1          MR. BRODSKY:  I will save the court reporter from

2     reading it.

3     BY MR. BRODSKY:

4     Q    Would you compare Government Exhibit 286 in evidence and

5     RO24410, the audit committee signed minutes, dated March 20,

6     2014, with the minutes of the special meeting of the audit

7     committee on March 20, 2014, unsigned, in DX-10830A for

8     identification, generally, without reading everything.

9     A    Generally, they appear the same, with the difference

10    being one's a draft and unsigned, but I, again, I am not sure

11    if I've ever seen this e-mail that this document's attached

12    to.

13          MR. BRODSKY:  Your Honor, we offer, for the same

14    reasons as Defense Exhibit 10868A, in evidence, we offer

15    DX-10830A.

16          MR. PITLUCK:  Your Honor, we object for the same

17    reasons, and we note these aren't identical.

18          MR. BRODSKY:  We're not offering them for the truth,

19    we are offering them for transmission.

20          THE COURT:  All right.  I will admit Defense Exhibit

21    10830A, noting the prior objections, and advise the jury again

22    that these documents are not being -- this exhibit is not

23    being offered for the truth, but rather for the information

24    regarding the date, the sender, and the recipient.

25          (Defendant Exhibit 10830A, was received in

DELZOTTO – CROSS – MR. BRODSKY

1    evidence.)

2    BY MR. BRODSKY:

3    Q    Sir, if we go to the first page of RO –– DX–10830A ––

4             MR. BRODSKY:  Mr. Carter, would you go to the first

5    page of that document in evidence and just blow up the entire

6    e-mail chain, the from through Mr. Greebel.

7    BY MR. BRODSKY:

8    Q    This is an e-mail in DX–10830A in evidence, that

9    Mr. Greebel sent on May 6, 2014, to Marc Panoff, correct; yes

10   or no?

11   A    Yes.

12   Q    And the subject is, Retrophin March 20, 2014 audit

13   committee minutes, correct?

14   A    That's what it states there, yes.

15   Q    And Mr. Greebel states in the e-mail, quote, attached is

16   a draft of the 3/20 audit committee minutes, correct, end

17   quote?

18   A    That's what it states.

19   Q    And as the case agent, you –– have you seen –– let's put

20   up Defense Exhibit, on the screen, 118-26A.  And if you blow

21   up the –– it is in evidence.  And, sir ––

22            MR. BRODSKY:  May I approach, Your Honor?

23            THE COURT:  Yes.

24   BY MR. BRODSKY:

25   Q    I will just show you a hard copy in case you ask for a

DELZOTTO - CROSS - MR. BRODSKY

1    hard copy.

2    A    Thank you.

3    Q    Sure.

4         Have you seen this document before, Defense Exhibit

5    118-26A in evidence, an e-mail from Evan Greebel, dated

6    December 12, 2013, to Sunil Jain and Edward Hackert, copying

7    Marc@Retrophin.com?

8    A    It does not look familiar to me.

9    Q    In the bottom e-mail from Mr. Jain to Mr. Greebel and

10   Mr. Hackert, copying Marc@Retrophin.com, where it says,

11   Even -- that's what it says -- prior to December 6, 2013, we

12   have following minutes or agenda of meeting of BOD held in

13   year 2013.  And then it lists out, one, two, three, four,

14   five, six meetings.  Do you see that?

15   A    I see it, yes.

16   Q    And with respect to one and two, where it says unanimous

17   consent to the board, January 28, 2013, we have signed

18   document; do you see it says that?

19   A    I see it is written there.  I don't know if it's true.

20   Q    Now, it then says, special meeting of board, 2-7-13, we

21   have signed minutes, right?  That's what it says?

22   A    That's what it states in this e-mail.

23   Q    Right.

24        Now, when you were on direct examination, was there

25   a single time where you voluntarily said, to any question, "I

DELZOTTO - CROSS - MR. BRODSKY

1    don't know if that's true"?

2    A    I volunteered information.  I don't know if I used those

3    specific words or not.

4    Q    You don't remember when you used those words, correct?

5    A    Those specific words, I don't remember, but I did, I

6    think, volunteer information.  For example --

7    Q    Did you ever say at any time during your direct

8    examination, something was untrue?

9              MR. PITLUCK:  Objection, Your Honor.

10   BY MR. BRODSKY:

11   Q    On your direct examination.

12             THE COURT:  Overruled.

13             THE WITNESS:  I believe when it came to the investor

14   statements, there was a characterization that all of them

15   involved a MSMB Healthcare investor by the name of Michael

16   Lavelle, and they didn't, one of them was related to David

17   Geller.  So I guess that would be my -- the one instance that

18   I remember.

19   BY MR. BRODSKY:

20   Q    Understood.

21             Now, sir, are you familiar with, as the case agent,

22   other e-mails sent to -- by Mr. Greebel, or Mr. Panoff,

23   forwarding other minutes to people at Retrophin?

24   A    Am I familiar with that?

25   Q    Yes.  Have you ever seen them?

DELZOTTO - CROSS - MR. BRODSKY

1   A     I've seen hundreds of thousands of documents probably in

2   this case so I would have to look at what you're referencing.

3   Q     And you mentioned hundreds of thousands of documents, and

4   that's because hundreds of thousands of documents were

5   provided to the government, correct, in one way, shape, or

6   form?

7   A     I don't know the exact amount, but it is easily a couple

8   hundred thousand, probably in the millions.

9   Q     And on your direct examination, you read into the record,

10  a very small portion of the hundreds of thousands of documents

11  that you received during the investigation, correct; yes or

12  no?

13  A     We read some, yes.

14  Q     And you characterize it, given the hundreds of thousands

15  of documents, you -- isn't it fair, yes or no, to characterize

16  it as a very small portion of the number of e-mails that you

17  received --

18            MR. PITLUCK:  Objection.

19  BY MR. BRODSKY:

20  Q     -- in your investigation?

21            MR. PITLUCK:  Objection.

22            THE COURT:  Sustained.

23  BY MR. BRODSKY:

24  Q     Sir, fair to say, that there are thousands of other

25  e-mails that you received that you did not present to the jury

DELZOTTO - CROSS - MR. BRODSKY

1    on your direct examination?

2            MR. PITLUCK:  Objection, Your Honor.

3    BY MR. BRODSKY:

4    Q    Correct?

5            THE COURT:  Sustained.

6    BY MR. BRODSKY:

7    Q    You didn't select the e-mails that you read into the

8    record during your two days of your direct examination,

9    correct; yes or no?

10   A    It is not a yes or no.

11   Q    Let me ask you, then, the following.  You were shown

12   Government Exhibit 487 in evidence.  If we can blow up the

13   top.  And does it not state in 487 in evidence, Mr. Greebel,

14   December 13, 2012, to Mr. Shkreli, subject, forward,

15   underneath, quote, FYI, to deal with this latest request.  Do

16   you see that?

17   A    Can I see the e-mail underneath it, first?

18   Q    Sure.

19   A    Okay.  Could you scroll up to the top?

20           Okay.  What is your question?  Sorry.

21   Q    Do you see Mr. Greebel's e-mail, December 13, 2012, to

22   Mr. Shkreli, in Government Exhibit 487, FYI, to deal with this

23   latest request?

24   A    I see the e-mail, yes.

25           MR. BRODSKY:  May I approach, Your Honor?

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  Yes.

2   BY MR. BRODSKY:

3   Q    Now, and the time of that e-mail, sir, is it not, 10:58

4   p.m.?

5   A    Yes.

6   Q    Now, you don't know whether that's in GMT time or whether

7   that's in Eastern Standard Time, correct?

8   A    I don't know exactly, no.  I mean, you could --

9   Q    But the e-mail below from Mr. Greebel says 5:57 p.m.,

10  correct?

11  A    Right.  And there was some time stamp -- some was in GMT,

12  some was in Eastern Standard Time.  So based on the previous

13  e-mail, it looks like it came a minute later, the top e-mail.

14  Q    So -- and that would be 5:58 p.m., correct?

15  A    Right.

16  Q    Now let me show you an e-mail that is at December 13,

17  2012, at 10:43 p.m., or 5:43 p.m.

18          MR. BRODSKY:  May I approach, Your Honor?

19          THE COURT:  Yes.

20  BY MR. BRODSKY:

21  Q    Am I correct, sir, this is an e-mail from Gregg Jaclin,

22  December 13, 2012, 10:43 p.m., to Evan Greebel, copied

23  mike@gopublic.com, martin@msmbcapital.com, and Jennifer

24  Zammit.

25  A    That's what this e-mail says, yes.

DELZOTTO - CROSS - MR. BRODSKY

1   Q    And since it's not in evidence, 124-8 for identification,

2   I'd like you to read silently what is stated in the below

3   e-mail.  And tell me when you're done.

4   A    I'm done.

5   Q    Okay.  And the last sentence, again, without reading it

6   into the record, do you see the last sentence there, the words

7   of the last sentence, particularly the first three words?  Do

8   you see that?

9   A    Yes, I see it.

10  Q    All right.  And keeping those first three words in mind,

11  I would like you to turn to page RO19684, and direct your

12  attention to the three word description?

13  A    I'm sorry, what Bates stamp are you on?

14  Q    I'm RO19684.

15  A    Okay.

16  Q    And if you would read what's in that paragraph silently

17  to yourself, and let me know when you're done.

18  A    Okay.

19  Q    And you see how the language of that paragraph in RO19684

20  of DX-124-8 for identification, matches many of the words, not

21  all, but many of the words, yes or no, sir, of Government

22  Exhibit 487 in evidence, where Mr. Greebel sends to

23  Mr. Biestek and Mr. Sullivan, please send me an e-mail

24  confirming the following.  It's up on the screen for the

25  comparison between the two.

DELZOTTO - CROSS - MR. BRODSKY

1        MR. PITLUCK:  Judge, objecting to using a document

2   that's not in evidence.  It is being used to refresh, it is

3   being used to compare.

4        MR. BRODSKY:  I'm trying to lay the foundation,

5   Your Honor.  That's all.

6        THE COURT:  I think you should --

7        MR. BRODSKY:  I am not saying what's in it.

8        THE COURT:  Lay the foundation.  Doing a comparison

9   and asking him questions about the substance is not laying a

10  foundation.

11       MR. BRODSKY:  Okay, Your Honor.

12  BY MR. BRODSKY:

13  Q    And, sir --

14       MR. BRODSKY:  Your Honor, with that foundation, I

15  offer DX-124-8 for identification.

16       THE COURT:  For admission?

17       MR. BRODSKY:  For admission.

18       MR. PITLUCK:  Your Honor, what -- objection.

19       MR. BRODSKY:  Not for the truth, Your Honor.  I'm

20  not offering it for the truth.

21       MR. PITLUCK:  What foundation is proffered?

22       THE COURT:  Well, I'm just not quite sure I am

23  understanding the foundation that you laid, or tried to lay.

24       MR. BRODSKY:  I will try to tie it up a little

25  better without discussing the contents of the document.

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  Okay.

2   BY MR. BRODSKY:

3   Q     Government Exhibit 487, going back to that, if we can put

4   that up on the screen, Mr. Carter.

5          Sir, you see Mr. Greebel's e-mail to Mr. Biestek and

6   Mr. Sullivan, December 13, 2012, at 5:57 p.m., right?

7   A     I do see that e-mail, yes.

8   Q     And you see the language, which says, please send me an

9   e-mail confirming the following.  And below it is language

10  that says, quote, I represent that I am not an officer,

11  director, or holder of ten percent or more of the outstanding

12  equity securities of Desert Gateway, and do not alone or

13  together with any other person exercise control over Desert

14  Gateway, and not an affiliate, as such term is defined in the

15  Securities Act of 1933 of Desert Gateway, and in no position

16  to issue or propose to issue any security relating to the

17  Desert Gateway.

18         And then it says, Marek, please ask each of the

19  other investors to send the same e-mail to me.  If it is

20  easier, please print it out and have them sign it, end quote.

21  Do you see that?

22  A     I see it.

23  Q     Now, then you see, on DX-124-8, for identification, an

24  e-mail at the top from Mr. Jaclin, dated December 13, 2012 at

25  10:43 p.m.  That's the time stamp.  Whether it's GMT or

DELZOTTO - CROSS - MR. BRODSKY

1    Eastern, put that aside.  That's the time stamp, correct?

2    A     That is the time stamp.

3    Q     And that goes from Mr. Jaclin, in DX-124-8 for

4    identification, to Mr. Greebel, correct?

5    A     Yes.  And it also copies --

6    Q     It copies three people?

7    A     Right.

8    Q     And then if you go -- it has an RO Bates stamp number,

9    correct?

10   A     It does.

11   Q     And then if you go to Government Exhibit 487, at the top,

12   15 minutes, that e-mail in DX-124-8 for identification, has a

13   request, without saying what the request is, has a request in

14   the third sentence, correct, in DX-124-8 for identification?

15   A     What's the question?

16   Q     The third sentence, without saying what the content is,

17   the third sentence in DX-124-8 for identification, yes or no,

18   requests information?

19              MR. PITLUCK:  Objection, Your Honor.

20              THE COURT:  Try to rephrase your question,

21   Mr. Brodsky.

22   BY MR. BRODSKY:

23   Q     Reflects what Mr. Jaclin needs; yes or no?

24   A     It appears that way.

25   Q     And then if you go to Government Exhibit 487 in evidence,

DELZOTTO - CROSS - MR. BRODSKY

1   which has a time stamp of 15 minutes later, correct?

2   A    Yes.

3   Q    Mr. Greebel says, quote, FYI to deal with his latest

4   request, end quote.  Is that what it says?

5   A    It is what it says, but I don't know who "his" refers to.

6        MR. BRODSKY:  Your Honor, I am happy to explain

7   further, but I believe the foundation has been laid for

8   admission of DX-124-8.

9        THE COURT:  All right.  I will admit DX-124-8.

10       (Defendant Exhibit 124-8, was received in evidence.)

11       MR. BRODSKY:  All right.  So if we can go to

12   DX-124-8, Mr. Carter.

13   BY MR. BRODSKY:

14   Q    And you see at the bottom -- and, sir, for DX-124-8, do

15   you remember prior to your testimony seeing DX-124-8 in

16   evidence?  Yes or no?

17   A    My answer is similar to the one before.  I mean, perhaps,

18   I don't recognize it sitting here today, but there's a lot of

19   documents, so maybe I saw it.

20   Q    And the bottom e-mail, on DX-124-8, in evidence, is from

21   Mr. Greebel, December 13, 2012, at 5:06 p.m., to Gregg Jaclin,

22   correct?

23   A    Yes.

24   Q    Copied to Mike Fearnow, Martin Shkreli, right?

25   A    Yes, that's what it states.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    It states:  Gregg, what is the status of the opinion and

2    the letter, question mark.  Evan.  Correct?

3    A    That's what it says.

4    Q    And in response Mr. Jaclin says, December 13, 2012 -- is

5    the time stamp 10:43 p.m.?

6    A    Yes.

7    Q    And the bottom e-mail's at 5:06 p.m., right?

8    A    Correct.

9    Q    And you don't know sitting here today whether that's

10   10:43 p.m. or 5:43 p.m.?

11   A    No.  I don't know.

12   Q    And it states, from Mr. Jaclin to Mr. Greebel, copying

13   three people.  Am I correct in how I am reading this, sir?

14   A    Yes.  It copies three people.  Correct.

15   Q    And does it read:  Evan, attached is an initial draft of

16   the opinion for your review.  I am still reviewing, but I felt

17   this was close enough for your review.  The highlighted area

18   reflects what I need from the shareholders to issue the

19   opinion, end quote.  Right?

20   A    Is that what it says?  Yes, that's what it says.

21   Q    And if you turn to the opinion, go to RO19682, the draft

22   opinion, that's the first page of the draft opinion, correct?

23   A    Appears to be.

24   Q    And then if you scroll to the highlighted portion on

25   RO9684, three pages into the opinion, and you blow that up,

DELZOTTO - CROSS - MR. BRODSKY

1    and you put it side by side, would you, Mr. Carter, with that

2    portion, with Government Exhibit 487 in evidence, and

3    Mr. Greebel's e-mail of 5:57 p.m. to Mr. Biestek and

4    Mr. Sullivan.  That portion, please, with the highlighted

5    portion.

6           Do you see how the highlighted portion says:  In the

7    present case the company is the issuer of the shares.  Is that

8    how the first sentence reads, sir?

9    A    That's how the first sentence reads.

10   Q    And the second sentence reads:  The above-named

11   shareholders represent that they are not an officer, not a

12   director, and not a holder of 10 percent or more of the

13   outstanding equities securities of the issuer, and does not

14   alone or together with any other person exercise control over

15   the issuer, right?  That's what it says?

16   A    That's what it says, yes.

17   Q    And if you go to Government Exhibit 487, Mr. Greebel's

18   e-mail at 5:57 p.m., is the wording of the e-mail, Mr. Greebel

19   is requesting confirmation on state, quote, I represent that I

20   am not an officer, a director, or holder of 10 percent or more

21   of the outstanding equity securities of Desert Gateway, and do

22   not alone or together with any other person exercise control

23   over Desert Gateway.  That's what it says, correct?

24   A    That's what it says, but it is different than the one

25   below it.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    And the statement where it says, if you scroll to the

2    highlighted statement, it says, based on my review and

3    investigation, the shareholders have no affiliation with the

4    issuer other than as an investor, period.  Do you see that?

5    A    I do see that.

6    Q    And then it says, the shareholders are in no position to

7    issue or propose to issue any securities relating to the

8    company.  Correct?  That's what it says, correct, the next

9    sentence?

10   A    That's what it states, but it is not accurate.

11             MR. BRODSKY:  And move to strike, Your Honor.

12             THE COURT:  Yes.  Just answer the question yes or

13   no.

14             MR. PITLUCK:  Your Honor, we object.  The question

15   misstates evidence.  He said "the next sentence," but there's

16   no sentence before that.

17             THE COURT:  All right.  Well, Mr. Brodsky, try to

18   rephrase the question.

19             MR. BRODSKY:  Yes.  Would you strike the portion,

20   though, of the --

21             THE COURT:  Yes.  I will strike it.

22             MR. BRODSKY:  Thank you, Your Honor.

23   BY MR. BRODSKY:

24   Q    Did I read, sir, yes or no, the last two sentences

25   correctly of the highlighted portion of DX-124-8?

DELZOTTO - CROSS - MR. BRODSKY

1    A    You did.

2    Q    And if I ask you am I reading it correctly in Government

3    Exhibit 487, the last two sentences, "I am not" -- of the

4    portion that Mr. Greebel is asking for e-mail confirmation on,

5    quote, I am not an affiliate as such term is defined in the

6    Securities Act of 1933 of Desert Gateway.  I am in no position

7    to issue or propose to issue any security relating to the

8    Desert Gateway.

9             Did I read that accurately, sir?

10   A    You read it accurately.

11   Q    Let me show you, you were asked some questions about this

12   document, Government Exhibit 108-10 in evidence.  Would you

13   like me to give you a hard copy?

14   A    Please.

15             MR. BRODSKY:  May I approach, Your Honor?

16             THE COURT:  Yes.

17   BY MR. BRODSKY:

18   Q    Here's 108-10 in evidence, Government Exhibit.  And

19   that's an exchange on March 31, 2013, correct, sir?

20   A    It's an exchange between March 27, 2013 and March 31,

21   2013.

22   Q    And the first page of it, on March 31, 2013, at 4:31,

23   has, among other things, a list of questions, correct?

24   A    Has a list of questions, yes.

25   Q    And it ends on -- and that e-mail is March 31, 2013, at

DELZOTTO - CROSS - MR. BRODSKY

1    4:31 p.m., from Mr. Lavelle, correct?

2    A    From Mr. Lavelle, yes.

3         MR. BRODSKY:  May I approach, Your Honor?

4         THE COURT:  Yes.

5    BY MR. BRODSKY:

6    Q    I am showing you DX-124-119 for identification.

7         Let me ask you, sir, that e-mail that I have just

8    shown you, Mr. Lavelle on March 31, 2013, at 4:31 p.m., does

9    that appear on DX-124-119, at the bottom of the page, and, of

10   course, in the successive pages?

11   A    Yes, it does appear.

12   Q    And if you see how the -- there's an e-mail chain before

13   those questions, in Government Exhibit 108-10, right, there's

14   a number of e-mails before that?

15   A    Yes.

16   Q    And those same e-mails appear in DX-124-119 for

17   identification, correct?

18   A    It appears they're the same, yes.

19   Q    And then in DX-124-119, having the same e-mail exchange

20   from Mr. Lavelle's March 31, 2013 e-mail, at 4:31 p.m.,

21   there's then an e-mail exchange above that, correct?

22   A    There is an e-mail exchange above that, yes.

23   Q    And that e-mail exchange is between Mr. Shkreli and

24   Mr. Greebel, correct?

25   A    Correct.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    And it's dated April 8, 2013, correct?

2    A    Yes.

3         MR. BRODSKY:  Your Honor, we offer DX-124-119, not

4    for the truth of the matters asserted, but for the statements

5    that are made, 803(3) and completeness.

6         MR. PITLUCK:  Judge, we have no objection to the

7    document being admitted into evidence.

8         THE COURT:  All right.  I will admit Defense Exhibit

9    124-119.

10        (Defendant Exhibit 124-119, was received in

11   evidence.)

12        MR. BRODSKY:  Thank you, Your Honor.

13   BY MR. BRODSKY:

14   Q    Do you see where Mr. Shkreli says to Mr. Greebel -- well,

15   let's go to the bottom.  The bottom e-mail is Mr. Lavelle,

16   March 31, with a series of questions, correct?

17   A    Yes.

18   Q    Some of those questions say, "How big was the fund?"  Do

19   you see where it says, "I do not understand what exactly was

20   in MSMB," by Mr. Lavelle?

21   A    I see it, yes.

22   Q    It says, "How big with the fund," question mark.  Do you

23   see that?

24   A    Yes.

25   Q    "What was it actually invested in, including Retrophin,"

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1   question mark.  Do you see that?

2   A    I do see that.

3   Q    "Who audited that fund," question mark.

4   A    I see that as well.

5   Q    "Retrophin was always pitched to me as additive to MSMB,

6   not as an alternative to it."  You see, it continues to go on

7   and say:  I was told by both of you and Kevin that Retrophin

8   was an MSMB option.  I was not given an option to debate

9   transfer from MSMB and want to understand it.  On what basis

10  was the reverse of MSMB and Retrophin agreed.  On what

11  valuation basis.  Who approved it.  Did Retrophin raise

12  private equity.  What are the details of that PIPE, and was it

13  offered to all shareholders.  Who independently audited it.

14          Mr. Shkreli says in response, forwarding it on April

15  8, 2013:  We should answer these.

16          You see that?

17  A    Yes, I see that it is from Martin Shkreli to your client,

18  yes.

19  Q    And Mr. Greebel says, April 8, 2013, to Mr. Shkreli:  I'm

20  not sure how.  Correct?

21  A    That's what it states here.

22  Q    And Mr. Shkreli says in response, quote:  And perhaps we

23  can do a call.  Don't let stuff fester for a week, and then I

24  get sued, end quote.

25          Do you see that?

DELZOTTO – CROSS – MR. BRODSKY

1    A    I see it.

2    Q    And then Mr. Greebel says:  Can you speak at noon.

3    Right?

4    A    I see that, too.

5    Q    And Mr. Shkreli says:  I don't know.

6              Do you see that?

7    A    I do.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO - CROSS - MR. BRODSKY

1   Q    DX124-118 for identification, am I correct, sir, that

2   it's on April 8 of 2013 an e-mail exchange between Mr. Greebel

3   and Mr. Shkreli?

4   A    I see it, but I don't recognize this e-mail.

5   Q    You don't recognize it, okay.  And do you see how the

6   bottom e-mail there is dated April 8, 2013 at 1:07 p.m.?

7   A    I see that, yes.

8   Q    And the next e-mail is dated, next e-mail is on April 8

9   at 2:29 p.m., right?

10  A    Yes.

11  Q    And you know from the e-mail, the bottom e-mail on

12  April 8, 2013, again without discussing the content, that it

13  relates to Mr. Lavelle's questions, correct?

14          MR. PITLUCK:  Your Honor, object to the form.

15          THE COURT:  Try to rephrase, Mr. Brodsky.

16  Q    You know from the DX-124-118 from April 8, 2013,

17  1:07 p.m. e-mail that it is a continuation of the e-mail

18  discussion in DX124-119?

19          THE COURT:  You're asking whether he knows?

20          MR. BRODSKY:  I'll withdraw it, your Honor.

21  Q    The e-mail on April 8, 2013, 1:07, mentioned an

22  individual there, correct?

23  A    Yes.

24  Q    And mentions in the first four sentences, do you see

25  that, what is stated there by Mr. Greebel?

DELZOTTO - CROSS - MR. BRODSKY

1    A    The first four sentences?

2    Q    The first four words of the first sentence.

3    A    Do I see them, yes.

4    Q    And that subject matter is the same subject matter in

5    DX-124-119; in other words, in DX-124-119 in evidence, you

6    have Mr. Lavelle's questions.  Mr. Shkreli is saying we should

7    answer these.  And Mr. Greebel saying, I'm not sure how?

8    A    I'm not sure if they are related to exactly to those

9    questions.  No, I can't comment on that.

10   Q    Well, you know it's on the same -- let me take it step by

11   step.

12            On 124-119 in evidence -- can we put that up,

13   Mr. Carter, and blow up the bottom, please -- Mr. Lavelle

14   sends question March 31, 2013, correct, we went over this,

15   right?

16   A    We did go over it, right.  He sent questions to

17   Mr. Shkreli on March 31, 2013 at 4:31.

18   Q    On April 8, 2013 at 8:35 a.m. Eastern Standard Time, see

19   where it says actually Eastern Standard Time there?

20   A    Yes.

21   Q    It says, we should answer these, right?

22   A    That's what it says.

23   Q    Mr. Greebel responds, I'm not sure how, right?

24   A    I do see that, yes.

25   Q    Then if you go to Mr. Greebel's e-mail at 8:59 a.m. it

DELZOTTO - CROSS - MR. BRODSKY

1    says, can you speak at noon, right?

2    A    I do see that, yes.

3    Q    Then the e-mail that I'm showing you in DX124-118, at

4    1:07 p.m. is an e-mail from Mr. Greebel to Mr. Shkreli about

5    Mr. Lavelle's questions, yes or no?

6              MR. PITLUCK:  Objection, your Honor.

7              THE COURT:  I'll overrule the objection.

8    A    My answer is the same, I don't know if he's talking about

9    these specific questions or other questions.  He was an

10   investor, he could have been speaking being something else.

11   The subject lines are different.  So I don't know.

12   Q    What is the subject line -- withdrawn.

13             In DX124-118 there is no subject line, right?

14   A    DX124-119?

15   Q    118, for identification.

16   A    There is a subject line saying --

17   Q    Nothing.

18   A    Nothing.  And then there is a subject line that says, RE

19   regarding, in the next chain up.

20   Q    But regardless of whether -- you have no personal

21   knowledge of the content in DX124-119, right, you don't have

22   any personal knowledge, 119 in evidence.  This e-mail

23   exchange, you don't have any personal knowledge, you weren't

24   involved in these communications at the time?

25   A    I was not involved in these communications, no.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    You agree with me, sir, that in DX124-118 for

2    identification, the Bates number on the document is RO50168?

3    A    That's what the Bates stamp says, yes.

4    Q    Bates number DX124-119 ends RO50167, the prior page?

5    A    That's what it says, yes.

6    Q    In DX124-118 for identification the April 8, 2013 e-mail,

7    at 1:07 says, without describing the content, the subject is

8    Mr. Lavelle's questions?

9              MR. PITLUCK:  Objection, your Honor.

10             THE COURT:  I think that the question as framed is

11   improper.  It should be rephrased.  The subject is blank.

12   He's testified that the subject is blank.

13             MR. BRODSKY:  I'm sorry.  I got you.

14   BY MR. BRODSKY::

15   Q    Does the message under subject relate to Mr. Lavelle's

16   questions, just generally, not specific questions, does it

17   relate to questions from Mr. Lavelle?

18   A    I'm not sure which questions, though.

19   Q    Without knowing which questions, yes or no, does it

20   relate to questions from Mr. Lavelle?

21   A    Yes, it does.

22             MR. PITLUCK:  Your Honor --

23             MR. BRODSKY:  Your Honor, we offer DX124-118.

24             THE COURT:  I'm going --

25             MR. PITLUCK:  Your Honor, it's -- we have an

DELZOTTO - CROSS - MR. BRODSKY

1    objection.  It's hearsay, but with an instruction.

2              MR. BRODSKY:  Not for the truth.

3              THE COURT:  I'm going to admit Defendant's Exhibit

4    124-118 and instruct the jury that this document is not being

5    admitted for its truth.

6              (Defendant Exhibit 124-118, was received in

7    evidence.)

8    BY MR. BRODSKY::

9    Q    124-118, sir, when you say you didn't know what this was

10   about.  Can you --

11   A    I didn't say that.  I didn't say that.  I said --

12   Q    Withdrawn.  Withdrawn, sir.

13             Does this e-mail, April 8, 2013, from Mr. Greebel to

14   Mr. Shkreli say, I cannot answer Lavelle's questions as I do

15   not know a lot of the information, did I read that correctly?

16   A    Yes, you read that correctly.

17   Q    Does he go on to say, we need to speak to discuss the

18   answers so I will prep a response for you based on the tenor

19   of my conversations with I him I think he is very serious

20   about pursuing this.  Did I read that correctly?

21   A    You read that nicely.

22   Q    Did Mr. Shkreli say in response, when did you speak with

23   him?

24   A    Yes, that's what he states.

25   Q    Then in response do you see Mr. Greebel saying on

Rivka Teich CSR, RPR, RMR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1   April 8, 2013, I got a call from your office at 12:45 and when

2   I answered it he was on the line?

3   A     Yes, that's what it states there.

4   Q     And that is a document you had not seen before, correct?

5   A     I don't recall seeing this.  I could have.  Again, I've

6   seen a lot of documents in this case.  I could have seen it,

7   maybe I didn't see it.  I don't recall sitting here today.  I

8   don't have them all memorized.

9   Q     If we could go to Government's Exhibit 114-29A.  You

10  remember being shown a draft of this memo from Retrophin Inc.

11  to files?  Do you need a hard copy, sir?

12  A     If you have one that would be great.

13  Q     Yes.

14              THE COURT:  Tell me again, what exhibit this is?

15              MR. BRODSKY:  114-29A.

16              THE COURT:  Thank you.

17  Q     You remember being shown on direct examination a memo

18  with the subject, certain payments by Retrophin, a draft from

19  Retrophin Inc. to files?

20  A     I do recall this, yes.

21  Q     And this one in evidence is from Mr. Panoff on August 20,

22  2013, right?

23  A     From Mr. Panoff, yes, on that date August 20, 2013.

24  Q     To Mr. Jain and Mr. Hackert, right?

25  A     Correct.

DELZOTTO - CROSS - MR. BRODSKY

1  Q     The subject is, settlement agreement memo, right?

2  A     Yes, it copies Mr. Greebel too.

3  Q     The attachments are controlmemo.doc?

4  A     Yes.

5  Q     The page over, if you go to the second page of the

6  document, the memorandum, it says in the first portion of the

7  document, after extensive conversations with Martin Shkreli

8  the founder of and Chief Executive Officer of Retrophin Inc.

9  the company and the managing member of MSMB Capital Management

10  LLC, MSMB, a Delaware limited liability company, an entity

11  related to the company and in connection with our preparation

12  of our financial statements for the quarter ended June 30,

13  2013, Retrophin determined that (i) certain payments made by

14  the company to three individuals pursuant to certain

15  settlement and release agreements, and (ii) certain

16  obligations accepted by the company to make payments to two

17  additional individuals pursuant to certain settlement and

18  release agreements should be reclassified as obligations that

19  should have been borne solely by MSMB and its related funds.

20  You see that?

21  A     Do I see it?  Yes.

22  Q     And then the next sentence says -- you read a portion of

23  it during your direct, which was at the bottom of the document

24  right a draft that was at the bottom; is that correct?  Do you

25  remember that from your direct?

DELZOTTO - CROSS - MR. BRODSKY

1    A    Yes.

2    Q    Let me read the second paragraph.  In April and May 2013

3    certain investors in funds affiliated with MSMB advised MSMB

4    that they objected to the number and/or value of the shares of

5    common stock in the company that they received as a

6    distribution from such funds.  The company was advised of such

7    investors' objections and the company, MSMB, and its related

8    funds, and such investors entered into settlement and release

9    agreements in which the company and MSMB and its related funds

10   agreed to make certain payments to such investors in

11   consideration for a full release from such investors to MSMB,

12   its related funds and the company for any claims that such

13   investor had or may have against the company, MSMB or its

14   related funds.  You see that, right?

15   A    I see it.  But it's not accurate.

16            MR. BRODSKY:  Your Honor, could I move to strike the

17   last part?

18            THE COURT:  Are you saying the reading was not

19   accurate?

20            THE WITNESS:  I'm saying the content there is not

21   accurate.

22            THE COURT:  Well --

23            MR. BRODSKY:  Can I move that to strike that, your

24   Honor?

25            THE COURT:  I think the question was whether he read

Rivka Teich CSR, RPR, RMR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1    it.

2    Q    Did I read it accurately, sir?

3    A    Did you read the words on the page accurately?  Yes.

4    Q    There wasn't a single time during direct examination,

5    other the time that Mr. Lavelle's statements one of them said

6    Mr. Geller, that you told the Government during their direct

7    examination that some fact of which you have no personal

8    knowledge was not accurate, right?

9    A    I gave you that example.  I can't think of other

10   examples.

11   Q    Let's turn to Government's Exhibit 560 in evidence.  You

12   were shown this e-mail, sir, since it's short I'll just put it

13   up on the screen for you.  This is from Evan Greebel April 10,

14   2013, to Martin Shkreli, e-mail to Al?

15   A    Yes.

16   Q    This is dated April 10, 2013, right?

17   A    Correct.

18   Q    And this says, Hi, Al would be willing to sign a

19   consulting agreement.  Correct, that's what the first few

20   words say?

21   A    I certainly remember this, yes.

22   Q    And that April 10, 2013, would you agree with me, is four

23   months, approximately four months and ten days before

24   Government's Exhibit 1129A, Mr. Panoff's e-mail on August 20,

25   to Mr. Jain and Mr. Hackert.  Am I correct about that, sir?

DELZOTTO - CROSS - MR. BRODSKY

1    A    You're comparing it to which Government's Exhibit?

2    Q    The one I just showed you.

3    A    114-29A?

4    Q    Yes.  So Mr. Greebel's e-mail to Mr. Shkreli on April 10,

5    2013, is approximately four months and ten days before

6    Mr. Panoff's August 20, 2013 e-mail to Mr. Jain and

7    Mr. Hackert, correct?

8    A    Yes, that's correct.

9    Q    Let me show you Government's Exhibit 560 in evidence on

10   the screen.  Let me show you Defendant's Exhibit 6650 for

11   identification.  I'm showing you Defendant's Exhibit 6650 for

12   identification.  Do you recognize it as an e-mail from

13   Mr. Shkreli April 10, 2013, at 2:45 p.m. to Mr. Alan Geller

14   copied to Mr. Evan Greebel subject -- I won't read the

15   subject.

16   A    I don't know if I recognize this e-mail.

17   Q    Putting aside whether you recognize it, you see how it's

18   an e-mail from Mr. Shkreli to Mr. Geller copying Mr. Greebel?

19   A    Yes, I see that.

20   Q    It relates to the same person as in Government's Exhibit

21   560, correct?

22   A    Yes.

23   Q    And it's the same date, correct?

24   A    Yes.

25   Q    And Government's Exhibit -- Defendant's Exhibit 6650 for

                  DELZOTTO - CROSS - MR. BRODSKY

1    identification is approximately an hour-and-a-half before

2    Government's Exhibit 560 in evidence when Mr. Greebel sends it

3    to Mr. Shkreli.  Below is the e-mail, you can send to Al,

4    right?

5    A    Two hours difference, but yes.

6    Q    One is at 2:45 p.m. and one is at 4:44 p.m.?

7    A    Yes.

8    Q    Approximately two hours?

9    A    Yes.

10   Q    I was never good at math.

11             Mr. Shkreli -- my apologies.  I do not mean to

12   suggest that, sir.  Withdraw that.

13             MR. BRODSKY:  The Defendant's Exhibit 6650 for

14   identification, your Honor, we offer.

15             MR. PITLUCK:  Your Honor, we don't object because

16   this e-mail is already in evidence in Government's Exhibit

17   105-8, 105-10.

18             THE COURT:  105-8.

19             MR. PITLUCK:  And ten.  Two different chains that's

20   the reason why we don't object.

21             MR. BRODSKY:  Fabulous.

22             THE COURT:  We will just note that this Defendant's

23   Exhibit 6650 is already in evidence as part of an e-mail chain

24   found in the exhibits that the Government had already

25   admitted.

DELZOTTO - CROSS - MR. BRODSKY

1          MR. BRODSKY:  Saves me from work.

2     BY MR. BRODSKY::

3     Q     Sir, you see how approximately two hours before this

4     e-mail from Mr. Greebel to Mr. Shkreli in Government's Exhibit

5     560, Mr. Shkreli sends an e-mail to Mr. Geller copying

6     Mr. Greebel with the subject, Geller shares, right, that's

7     what it says?

8     A     That's what it says.

9     Q     It says, Hi Evan, there was no specific written agreement

10    with Mr. Geller regarding the shares.  However, we did reach

11    an oral agreement in my office that we would receive adjusted

12    for all transactions an additional 31,500 shares.  Can you

13    have the transfer agent issue them?  Also, perhaps add a

14    specific release on shares associated with his direct

15    investments into Retrophin.  That's what it reads correct,

16    sir?

17    A     Those are the words in the e-mail, yes.

18    Q     And then in Government's Exhibit 565 in evidence, this

19    was Mr. Greebel at the top on April 19, approximately nine

20    days later, sends an e-mail to Mr. Shkreli, part of an e-mail

21    chain, actually the beginning of the e-mail is on April 10,

22    2013, do you see that?

23    A     Can I see the whole document?

24    Q     Sure.

25          MR. BRODSKY:  May I approach, your Honor?

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  Yes.

2     Q     The last e-mail in the chain, there is on the same date

3     that we've been talking about in the defense exhibit, the last

4     defendant's exhibit on April 10, 2013, right?

5     A     Yes, sir.

6     Q     And then it's April 18 where Mr. Greebel says at

7     9:00 p.m. consulting agreement is done, right?

8     A     He also says, I need the transfer numbers for me to tie

9     up that piece, yes.

10    Q     Then Mr. Shkreli says, send me the draft, correct?

11    A     Yes.

12    Q     And then Mr. Greebel says, attached is a draft of the

13    form.  I think you should get blanket approval from the Board

14    for you to retain consultants who may be paid in cash or stock

15    up to an aggregate amount of money blank, right?

16    A     Are these, are we talking about legitimate consultants

17    or?

18          MR. BRODSKY:  Your Honor, move to strike.  I just

19    asked him whether or not --

20          THE COURT:  Just answer the question.

21          MR. BRODSKY:  -- it said it.

22          THE COURT:  If you can.

23    A     That's what it says.

24    Q     And then if we can put up Government's Exhibit 245 in

25    evidence.  Is this a document, sir, that you saw before you

DELZOTTO - CROSS - MR. BRODSKY

1   testified, Mr. Panoff's September 9, 2013, e-mail to Steve

2   Richardson, Steven Aselage, Martin Shkreli, copied to Evan

3   Greebel, subject, Board agenda with a number of attachments?

4   A    Can you zoom out?  I think so, yes.

5   Q    Having seen it before, you recognize that it attached a

6   draft consulting agreement for Al Geller?

7   A    Doesn't necessarily mean that these people --

8         MR. BRODSKY:  Objection, your Honor.  Move to

9   strike.

10        THE COURT:  Yes.  Please answer the question as

11   asked.  Yes or no, please.

12   A    Is this attached?  Yes.

13   Q    That's an attachment, sir, yes or no, that you've seen

14   before?

15   A    I have seen it before.

16   Q    And if you go to page R116063, Mr. Carter, and just blow

17   up Government's Exhibit 245 in evidence, thank you.  Do you

18   see the language there, sir?

19   A    Which language are you talking about?

20   Q    I apologize.  Under consulting agreement and release do

21   you see how it says, the agreement is made as of, with a

22   blank, 2013, do you see that?

23   A    I see it.

24   Q    Then the paragraph below that paragraph one, you see that

25   one, correct?

DELZOTTO - CROSS - MR. BRODSKY

1    A    I see it, yes.

2    Q    Then if you could put up, Mr. Carter, Government's

3    Exhibit 565, the attachment of the form consulting and

4    agreement and release and put them side by side to each other.

5    On the right-hand side is 565, on the left hand side --

6           On the left-hand side, Mr. Carter, you're putting up

7    Government's Exhibit 565 in evidence.  The attachment there,

8    if you blow up the first two paragraphs consulting agreement

9    and release through paragraph one.

10          THE COURT:  You're comparing 565 with what?

11          MR. BRODSKY:  The attachment there with Government's

12   Exhibit 245 in evidence at R116063 draft consulting agreement

13   and release with Al Geller.

14          THE COURT:  Thank you.

15   Q    Sir, would you agree with me that the draft in 265

16   contains two sentences in the first paragraph, correct?

17   A    That's the one on the bottom?

18   Q    The one on the top.

19   A    There is two sentences, yes.

20   Q    And you see how on the upper top it says draft 4/19/13.

21   Government's Exhibit 245 -- Government's Exhibit 565 is the

22   draft April 19, 2013.  And Government's Exhibit 245 is the

23   draft on August 20, 2013.  Is that an easy way for us to talk

24   about them?

25   A    Yes.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    The April 19, 2013 draft at the top, says consultant will

2    serve as an adviser to the company and provide consulting

3    services on strategic and corporate governance matters to the

4    management of the company.  Right?

5    A    It says it, but.

6    Q    And all I'm asking is yes or no, does it say it?

7    A    Those are the words on the paper.

8    Q    Thank you.  And the words on the paper in the August 20,

9    2013, draft consulting agreement that went to the Board of

10   Directors on September 9, 2013 has the same first sentence,

11   correct?

12   A    I don't think --

13   Q    Yes or no, sir?  Same first sentence?

14   A    Give me a second to explain.

15   Q    Sir, yes or no?

16   A    You said that --

17           THE COURT:  He just wants yes or no.

18           THE WITNESS:  But he's saying that it went to the

19   Board of Directors when --

20           THE COURT:  If you can't answer it yes or no.

21           THE WITNESS:  I don't know that it went to the Board

22   of Directors.  I can't answer.

23   Q    We'll get right back to that, Mr. Delzotto.

24           The description here that we're comparing,

25   August 20, 2013, the second sentence in the August 20, 2013,

DELZOTTO - CROSS - MR. BRODSKY

1    draft is different from the one on April 19, 2013, correct?

2    The second sentence on August 20, 2013 says, consultant shall

3    be permitted to undertake other employment or activities

4    provided that such employment and activities are not

5    violations of the terms of this agreement or compete with the

6    business or activities of the company.  Right?

7    A    Yes, they are certainly different.

8    Q    Okay.  And can we blow up Government's Exhibit 245, the

9    e-mail, just the first page.  So, sir, your testimony, I want

10   to be clear about this, your testimony is you don't know,

11   sitting here today, you have no personal knowledge as to

12   whether on September 9, 2013, Mr. Panoff e-mailed to

13   Mr. Richardson, Mr. Aselage, Mr. Shkreli, copied to

14   Mr. Greebel a draft of the Geller consulting agreement,

15   correct, yes or no?

16   A    I see the e-mail here.  Whether or not those directors

17   were reviewed it or not, I've interviewed them, I can tell you

18   what they said.

19              THE COURT:  No, sir, you can't do that.

20              MR. BRODSKY:  Move to strike, your Honor.

21              THE COURT:  Yes.  You have to answer the question

22   asked.  The Government is going to have an opportunity to

23   redirect and if there is something more you have to say you

24   can have an opportunity.  But right now you're being asked

25   fairly straight-forward questions about whether something says

DELZOTTO - CROSS - MR. BRODSKY

1    something.  If you can answer that yes or no can, you should

2    do so.  If not, tell them you can't do so.

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  Thank you.

5    BY MR. BRODSKY::

6    Q    If we can put up Defendant's Exhibit 8281 in evidence, if

7    we can it blow up.  Does this state, sir, Defendant's Exhibit

8    8281 in evidence, September 9, 2013, Retrophin Inc. telephonic

9    meetings of the Board of Directors agenda Monday, September 9,

10   2013, 5:30 p.m. New York time.  Is that what the top says?

11   A    That's what the top says.

12   Q    If you go down to number nine and blow it up.

13             Sir, have you seen this document before prior to

14   your testimony?

15   A    Can I see the document?

16             MR. BRODSKY:  Yes.  Can I approach?

17             THE COURT:  Yes.  It may save time to give him the

18   paper copies that you're going to show him so you don't have

19   to walk back and forth.  He wants hard copies, if you have

20   them, please give it to him.

21             MR. BRODSKY:  Understood, your Honor.

22   Q    So prior to your testimony, sir, did you see, yes or no

23   question, have you seen this document before, prior to your

24   testimony?

25   A    I do not recall seeing this document.

DELZOTTO - CROSS - MR. BRODSKY

1  Q    And sitting here right now you don't recognize obviously

2  the handwriting on the document, right?

3  A    I do not recognize the handwriting on the document.

4  Q    And where it says in paragraph nine in handwriting --

5  well, does paragraph nine read, quote, "approve retaining Al

6  Geller Ken Banta as consultants"?

7            MR. PITLUCK:  Your Honor, objecting to this

8  testimony.  Beyond the scope.  No personal knowledge.  This is

9  not related to the Special Agent's -- he testified he had

10 never seen this.

11           THE COURT:  It is beyond the scope.  So I will

12 sustain.

13           MR. BRODSKY:  I was going to connect it up, your

14 Honor, with the document I believe that they did discuss.

15           THE COURT:  We established the agent doesn't have

16 personal knowledge.  And it's beyond the scope.  And he hasn't

17 seen it before he testified.

18           MR. BRODSKY:  Understood, your Honor.  No problem.

19 BY MR. BRODSKY::

20 Q    Can we put up Defendant's Exhibit 116-102, that's in

21 evidence.  I'm sorry, it's a different one.  I'm sorry.

22           THE COURT:  To correct the record, you're showing

23 the witness now...

24           MR. BRODSKY:  Sorry, your Honor.

25           THE COURT:  Maybe it's easier --

DELZOTTO - CROSS - MR. BRODSKY

1          MR. BRODSKY:  Sorry, sorry.  I do believe I know

2     which page I'm going to.

3          THE COURT:  Which exhibit, sir?

4          MR. BRODSKY:  He has it before him.  I want to get

5     to the right page.

6          THE COURT:  DX116-102, correct, Mr. Brodsky?

7          MR. BRODSKY:  Yes, your Honor.  I'm just trying to

8     verify.  I apologize.  Yes, your Honor DX116-102 in evidence.

9     Q     And if I could ask you to turn, is this a document the

10    form 10K of Retrophin Inc. for the period that ends

11    December 31, 2013, that you had reviewed prior to your

12    testimony?

13    A     I reviewed a lot of SEC form 10Ks.  I'm not sure.  I

14    didn't memorize the dates.  I may have seen this, I may not

15    have.

16    Q     Let me ask you to turn to page 109 of 121 on the bottom

17    right, it has page numbers.

18         MR. PITLUCK:  Your Honor, we object to scope again.

19         THE COURT:  I'm going to sustain the objection.

20         MR. BRODSKY:  I was going to direct him to a portion

21    of it, your Honor.

22         MR. PITLUCK:  Your Honor, it doesn't matter.  We

23    maintain our objection.

24         THE COURT:  I'm not sure given what the agent has

25    said so far that this would be an appropriate document for him

Rivka Teich CSR, RPR, RMR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1    to testify about at this time.

2             MR. BRODSKY:  Understood, your Honor.  All right.

3    BY MR. BRODSKY::

4    Q    So Special Agent Delzotto, based on your recollection

5    sitting here today, prior to today, can you pinpoint a

6    specific SEC filing of Retrophin that you did review that you

7    have in your mind?

8    A    I reviewed 10Ks and 10Qs, and I think the S1, possibly

9    some Form Fours, some Form 13Ds.  I mean, I've seen a lot.  I

10   don't remember the dates.  They all look very similar to one

11   another.

12   Q    Let me ask you this, sir, if you go to this exhibit,

13   which you were shown during your direct examination,

14   Government's Exhibit 664 in evidence, do you remember this

15   e-mail exchange on March 17, 2014, in connection with a Board

16   meeting?

17   A    I'm sorry, can I get the full document?

18   Q    Sure, we'll find a copy for you.  While we find a copy

19   for you, sir, you remember you have Government's Exhibit 286

20   there?

21             THE COURT:  I'm going to give him a copy of my

22   document 664.

23             MR. BRODSKY:  That would be great, your Honor.

24             THE WITNESS:  Thank you.

25   Q    Sir, that's Government's Exhibit 664, an e-mail exchange

DELZOTTO - CROSS - MR. BRODSKY

1    where there is a discussion between Mr. Shkreli, Mr. Greebel

2    during a Board meeting, correct, yes or no?

3            THE COURT:  During a Board meeting?

4            MR. BRODSKY:  Let me direct his attention then.

5    Q    You see 664 in Government's Exhibit 664 in evidence

6    Martin Shkreli, March 17, 2014, e-mail 5:42 p.m. Evan Greebel,

7    do you see that?

8    A    I do see that.

9    Q    You see that it says, Blanton, no another time, this

10   Board meeting going too long?

11   A    I see it.

12   Q    In response to Mr. Greebel's earlier e-mail, do you want

13   to raise the consulting agreement during your business update?

14   It would be good to get Board sign off on it.  Right?

15   A    Where do you see that?

16   Q    The second page of Government's Exhibit 664.

17   A    I see those words, yes.

18   Q    And can you turn with me to Government's Exhibit that we

19   just distributed, 286, in evidence, the one dated

20   September 24, 2014.

21   A    286?

22   Q    Yes.

23   A    I have it here.

24   Q    If you go to the page RO24393.

25   A    Okay.

DELZOTTO – CROSS – MR. BRODSKY

1    Q    And do you see where it says in the third paragraph, the

2    paragraph that begins, Mr. Shkreli began the meeting by

3    updating the Board on the company's conversations with

4    Novartis about the potential acquisition of the right to sell

5    Clozaril and Fanapt in the United States and Canada.  Do you

6    see that?

7    A    I do see it, yes.

8    Q    Do you see towards the bottom of that Mr. Shkreli said,

9    that based on such conversations with Novartis he anticipated

10   that the company could acquire the rights to sell such drugs

11   for $180 million.  Mr. Shkreli explained that the acquisition

12   would be immediately accretive to the company and he reviewed

13   the model that was previously provided to the Board.  Do you

14   see that?

15   A    I do see that.

16   Q    Let me put up Government's Exhibit 653.  Do you remember

17   being shown this e-mail exchange?  I'm not going to ask you

18   about the content, just going to ask you about one particular

19   person on it.  Directing your attention to December 29, 2013?

20   A    I'd like to see the whole chain.

21   Q    Directing your attention to the top e-mail where it says

22   Mr. Shkreli, December 29, 2013, to Michael Rosensaft copied to

23   Evan Greebel.  Do you see that?

24   A    No, I don't see that.

25   Q    You don't see where it says Mr. Shkreli to Michael

DELZOTTO – CROSS – MR. BRODSKY

1    Rosensaft, top e-mail?

2    A    I have an e-mail dated February 17.

3         MR. BRODSKY:  We'll give you 653.  You can take my

4    copy even though that has notes on it.

5    Q    You see an e-mail from Mr. Shkreli to Mr. Rosensaft

6    copied to Mr. Greebel?

7    A    The top e-mail, I see that.

8    Q    Sir, prior to December 2015, the Indictment, you never

9    spoke to Mr. Rosensaft, correct?

10   A    No, I would not.

11        MR. PITLUCK:  Objection, your Honor.

12        THE COURT:  Sustained.

13   Q    Sir, at no time did you ever speak to Mr. Rosensaft?

14        MR. PITLUCK:  Objection, your Honor.

15        THE COURT:  Sustained.

16   Q    You testified about taking notes during witness

17   interviews, right?

18   A    Yes.

19   Q    And you were asked, "What do you take down in those

20   notes," transcript page 6978:3.  You testified, quote, "Me,

21   personally, I try to take down as much as I can," end quote.

22   Do you remember that testimony?

23   A    Yes.  I try to take down as much as I can to the best of

24   my ability.

25        MR. BRODSKY:  Yes.  It was yes or no question.  I

DELZOTTO - CROSS - MR. BRODSKY

1    move to strike.

2            THE COURT:  I will strike the answer after yes.

3    Q    You testified, sir, yes or no, you are, it's your

4    testimony you don't show the witness your notes after you take

5    notes about what they said, yes or no?

6    A    Yes.

7    Q    And you have an obligation when you take notes as an FBI

8    agent to take them down accurately, correct, yes or no?

9    A    Absolutely.

10   Q    You would agree with me, sir, that when you take notes

11   about something important you take extra care to be

12   particularly accurate, yes or no?

13           MR. PITLUCK:  Objection.

14           THE COURT:  Sustained.  I think you can try to

15   rephrase the question.

16           MR. BRODSKY:  Yes, your Honor.

17   Q    When you take notes you try to be careful to take down

18   what people say accurately, yes or no, sir?

19   A    I take notes to the best of my ability at a given time.

20   I write them down as accurately as I can to my best ability.

21   Q    And if someone admits, for example, to a crime like

22   insider trading, you take notes accurately about that?

23           MR. PITLUCK:  Objection, your Honor.

24           THE COURT:  I will overrule that objection.

25   Q    Sir?

DELZOTTO - CROSS - MR. BRODSKY

1    A    I'm sorry, could you restate again?

2              MR. BRODSKY:  Do you mind reading that back?

3              (Whereupon, the record was read.)

4    A    The phrase, "accurately," I take the notes to the best of

5    my ability.  So if somebody said something about insider

6    trading, I would do my best to capture that within the 302.

7    Q    In this case you testified you had spoken to 45, 40 to 45

8    people.  Do you remember that testimony?

9    A    I said approximately.

10   Q    And you agree with me, sir, that you may be inaccurate

11   about that number, about the people you interviewed?

12   A    No, I do not agree with that.

13   Q    You agree with me, sir, that prior to December of 2015,

14   one of the people that you interviewed was Jackson Su?

15   A    I don't remember the exact dates, but I did interview

16   Jackson Su, yes.

17   Q    And in fact, prior to December of 2015, yes or no, sir,

18   you interviewed him three times?

19   A    I don't know the exact number.

20   Q    And is it not true that when you interviewed Mr. Su, in

21   July of 2015, Mr. Su told you he never backdated any documents

22   while employed at Retrophin?

23   A    You would have to show me the 302.  I don't recall off

24   the top of my head.

25   Q    Let me show you --

DELZOTTO - CROSS - MR. BRODSKY

1    MR. PITLUCK:  Your Honor, I think we need to raise

2    this at sidebar.

3    THE COURT:  All right.  Maybe this is a good time

4    for the jurors to have their lunch break.  Don't talk about

5    the case.  Keep an open mind.  We'll come get you as soon as

6    we can.

7    Sir, you can step down too.

8    (Jury exits the courtroom.)

9    (Whereupon, the witness steps down.)

10   THE COURT:  Yes, Mr. Pitluck.

11   MR. PITLUCK:  Your Honor, this is related to Jackson

12   Su's testimony and defense's interpretation of the document,

13   which they argued a number of times and I expect they will do

14   it again, where, related to Mr. Su putting a date on a

15   document.  I think it was related to Mr. Aselage and saying

16   his testimony, your Honor, is that I wrote the date on that

17   because that was the date I received it.  And I understand

18   we're under reliability.  And now they are going to attempt to

19   show the 302, which was never shown to Jackson Su to Special

20   Agent Delzotto and try to complete an impeachment that doesn't

21   exist.

22   We don't agree with defense's assertion, which is

23   not established by testimony that this specific document was,

24   that a specific document was backdated.  So they are setting

25   up an impeachment that doesn't exist in our view.

DELZOTTO - CROSS - MR. BRODSKY

1          And to have the jury say, to have the jury be shown

2     a 302 that was never shown to the witness, and hadn't been

3     given the opportunity to deny it, as far as I recall, that

4     there is some sort of impeachment that goes on.  That's, in my

5     experience, and the Court is well aware of it, you give the

6     witness an opportunity to deny the statement, then you show

7     the statement of the 302, then you show the agent and ask did

8     he in fact say that, the agent says whatever the agent is

9     going to say.

10          So now it's being put up as sort of affirmative

11     attack on Mr. Su's credibility without the predicate act.

12          MR. BRODSKY:  You may remember that Mr. Su stood up

13     and testified -- I wouldn't point out that example that

14     Mr. Pitluck pointed to.  I would point to the example where it

15     was in December of 2012 where through a series of three

16     e-mails we demonstrated to Mr. Su.  And Mr. Su in sum and

17     substance admitted it, that he had been, he was requested from

18     the outside accountants to provide documentation for a

19     transfer of an investment by MSMB into Retrophin.  He then

20     sent to Mr. Shkreli a blank form of the transfer agreement

21     with the information to be filled out.  Mr. Shkreli then

22     filled it out.  It was dated in I believe February 2012.  Mr.

23     Su then sent that document on to Citrin Cooperman and did not

24     tell them in any way, shape or form that it was dated other

25     than February of 2012.  He admitted on the stand in sum and

DELZOTTO - CROSS - MR. BRODSKY

1    substance that that was fine because if the event actually

2    occurred, and although he backdated the document, you remember

3    a series of questions I asked him.  He said he had told the

4    Government he had backdated this.  He said he couldn't

5    remember which document.  He had told the Government about it.

6    He said he backdated a number of documents.

7         And when I asked him if he ever told the FBI that he

8    never personally backdated documents, I believe to the best of

9    my recollection, is that wasn't true.  He said that wasn't

10   true.

11        What I plan on doing is showing him directly an

12   inconsistent statement that he made to Special Agent Delzotto

13   on July 13, 2015, in which he, Mr. Delzotto, said Su never

14   backdated any documents while employed at Retrophin.

15        That is diametrically opposite of what his actual

16   testimony was.  And it's proper for me to ask.

17        MR. KESSLER:  It's not impeachment.  What

18   Mr. Brodsky brought up was a transaction, there was a

19   transaction in the past, in February of 2012.  It was document

20   dated different ways and Mr. Su and Mr. Shkreli memorialized

21   it later, that's what he said was fine.

22        Now there is this bait and switch where he's going

23   to ask him about a statement in a 302.  Mr. Su is shown one of

24   the Marek Biestek backdated documents when the transaction

25   never happened in the past and no evidence that it occurred in

DELZOTTO - CROSS - MR. BRODSKY

1    the past.  There was this document created to pretend that it

2    happened in the past.  And then Special Agent Delzotto wrote

3    that Mr. Su said it was common practice, and Su himself did

4    not backdate this document.

5            MR. BRODSKY:  You skipped the --

6            MR. KESSLER:  That Su never backdated the document.

7            THE COURT:  Never backdated any or that?

8            MR. KESSLER:  He said that, and then he said any.

9    Now we're getting into this word war, where Mr. Brodsky is

10   going to say backdated means memorializing something that

11   happened in the past.  And where Mr. Su means creating

12   something that never happened, pretending it did happen.  So

13   now he's going to say that Mr. Su confessed or lied to the FBI

14   and said he never backdated any document under one

15   interpretation of backdating, which was not what was being

16   discussed.  And use a different idea of backdating a document

17   that was discussed on the stand.  And so we're going to end up

18   with confusion where there is no inconsistency.

19            So the point is, we can use backdating loosely to

20   refer to lots of things, right, but the testimony Mr. Brodsky

21   is referring to when Mr. Su was on the stand was a transaction

22   occurring in February, they lost or never had a subscription

23   agreement, so they filled out a subscription agreement.  I

24   thought it was March, but it might have been December, many

25   months later.  Mr. Su said that was fine.  We can discuss what

DELZOTTO - CROSS - MR. BRODSKY

1    we think about that.  So that's the backdating.

2                    (Continued following page.)

PROCEEDINGS

1      THE COURT:  That was the instance where he testified

2  that he had verification through the bank records of the

3  deposit and he could confirm that there was, in fact, this

4  investment, so...

5      MR. KESSLER:  And the cap table shows it repeatedly,

6  it's in the bank statement, there is no question the

7  investment happened, they're just memorializing the

8  subscription agreement.  The fact either there wasn't one or

9  they couldn't find one.  So that's the backdating Mr. Su

10  testified about on the stand to which Mr. Brodsky is referring

11  to.

12      Then the 302 there's questioning in the context of

13  Marek Biestek, you know, whiteout tape series of documents

14  where there was no transfer in June or July and there are

15  these documents created to say there was.  So we can call all

16  of these things backdating, but they're really two very

17  different things.  And so to take Mr. Su's testimony where he

18  said, I did the backdating where I memorialized something that

19  actually did happen and to say, aha, you're lying because you

20  told the FBI you never backdated, when that backdating is in

21  reference to creating things that never happened in the past

22  is just improper.

23      THE COURT:  Does the 302 use the language backdate?

24      MR. BRODSKY:  Your Honor -- I'm sorry.

25      MR. KESSLER:  It says backdating.

PROCEEDINGS

1          THE COURT:  Okay.  I think that that term --

2          MR. BRODSKY:  I will check the transcript, Your

3    Honor, and then point to Your Honor what the transcript pages

4    are.  I'm happy to.  I will do that.  I don't have it at my

5    fingertips, I will do that in the next 20 minutes and send

6    it -- provide it to your law clerk.

7          MR. KESSLER:  Obviously, the 302 is not Mr. Su's

8    statement and I don't believe -- although perhaps the

9    transcript will correct us, that Mr. Su was actually shown

10   this 302 and asked about it.  And so that would also be

11   important.

12         MR. BRODSKY:  There is, of course, Mr. Aselage, the

13   evidence regarding the backdating with respect to Mr. Aselage.

14         MR. KESSLER:  Where, again, there is not question

15   that Mr. Aselage invested money in Retrophin and got Retrophin

16   shares, it's just a matter of when the document was signed.

17   So, again --

18         MR. BRODSKY:  It was actually a gift of shares,

19   according to the testimony of both Mr. Aselage --

20         MR. KESSLER:  The 50,000 is a gift and then 40,000,

21   yes.  But there was no question those occurred, you know,

22   contemporaneously with --

23         THE COURT:  With the day it was placed on the

24   document.

25         MR. KESSLER:  Right.

Georgette K. Betts, RPR, CSR
Official Court Reporter

7809

PROCEEDINGS

1      MR. BRODSKY:  No, I think with Mr. Aselage that's

2  not true.  I think as the testimony is with respect to

3  Mr. Aselage --

4      THE COURT:  There was a date placed on the document

5  that was in his handwriting.

6      MR. BRODSKY:  And he did not put that date there,

7  didn't know who did and the date was put on there by -- we

8  demonstrated through email exchanges, long after.

9      THE COURT:  Did Mr. Aselage dispute the date of the

10  transaction reflected in the document?

11      MR. BRODSKY:  I'd have to look back.

12      MR. KESSLER:  If you look at the cap table it's

13  there.

14      MS. SMITH:  Right.  Also for Mr. Aselage, the date

15  that was put on -- the date that was put on the gift was the

16  same date as the date on the subscription agreement, they

17  happened at the same time and that date was actually written

18  into the subscription agreement and he signed it with the date

19  on it.  It's filled out and those two documents were sent

20  together in an email.  So there's obviously evidence that they

21  were done at the same time and that the date on the

22  subscription agreement was the same on the date as the gift.

23  And that email is from March, but that's because Citrin was

24  going back and attaching documents, not because at some point

25  in March a date was added, 2013.

PROCEEDINGS

1          MR. BRODSKY:  Your Honor, it was shown through other

2     emails, you may recall, Ms. Smith, we showed through other

3     emails during, I believe it was October or November, Mr. Su

4     was communicating with Citrin Cooperman and that's when he

5     provided -- we showed a contemporaneous document then and

6     that's when he backdated the document September 20th.

7          MR. KESSLER:  But Ms. Smith's point is that --

8          MR. BRODSKY:  Mr. Aselage did testify that he

9     believes he received the shares in October, November.  So I

10    think we established through Mr. Aselage's testimony it was

11    backdated.  But we are at a point in the record, Your Honor,

12    we thought it was overwhelming evidence through Mr. Su that he

13    participated in backdating and he actually said he told the

14    government that.

15         MR. KESSLER:  But the word backdating is

16    different --

17         THE COURT:  I think the problem is that Mr. Su's

18    definition or understanding of the word backdating maybe used

19    in a different context or may have a different understanding

20    than what you may be proffering or what you may want to argue

21    to the jury.  I think the bottom line is the indictment, the

22    evidence about anyone doing anything regarding putting dates

23    on a document different from the date the document is actually

24    executed and whether the reason for that different -- date

25    differential is due to an alleged fabrication or due to a

PROCEEDINGS

1   transaction that actually occurred and there was no

2   documentation previously, those are issues for the jury to

3   sort out.

4           I think that using the agent's statements reflecting

5   the interview that he had with Mr. Su who may or may not have

6   been shown the specific documents that you confronted Mr. Su

7   with during cross, would perhaps create confusion and an

8   unfair impression because Mr. Su's 302 -- statements reflected

9   in his 302 may have been discussing apples, whereas on cross

10  he may have been discussing oranges.  So I think it could be

11  confusing.  The term backdating used by this agent, I don't

12  know what he's defining this word to mean.  I don't know what

13  Mr. Su's definition is.  The government also used the term

14  backdate and so it seems a little convoluted in my mind to

15  take the agent's 302, and granted he said he tries to be

16  accurate and reflect what a witness says during the interview,

17  but whether or not Mr. Su was ever asked about the Aselage

18  documents or about other documents during this interview is

19  unknown, right?  So I'm not sure that confronting or trying to

20  impeach a witness who A, hasn't seen the statement of the FBI

21  agent, and B, may not have been shown the very document that

22  you think shows that he was inaccurate, would be a fair

23  reflection of anything.

24          I mean, I think 302s generally, as you know, don't

25  come in and to the extent the agent may be probed and you may

7812

<div align="center">PROCEEDINGS</div>

1  probe him about his interview with Mr. Su and whether they

2  talked about X, Y or Z, I think that's fine, but I'm not sure

3  trying to impeach Mr. Su through the 302, which again is the

4  agent's statement not his own and he's never seen what the

5  agent wrote and doesn't have an opportunity to explain whether

6  that's an accurate reflection or a complete discussion of all

7  of the issues that he's confronted with on cross would be

8  unfair.

9           MR. BRODSKY:  I understand, Your Honor.  I'll try to

10  go back to the testimony of Mr. Su and try to identify how he

11  defined backdating, if he did define it, and see if that

12  changes your determination.  Thank you, Your Honor.

13           THE COURT:  That's fine.

14           MR. BRODSKY:  What time do you want us back?

15           THE COURT:  We dismissed them around five of or 10

16  of, is that right.

17           MS. SMITH:  About five of.

18           THE COURT:  Five of.

19           Mr. Dubin wanted to say something, did he disappear

20  again?

21           MR. BRODSKY:  I think he did, Your Honor.

22           THE COURT:  Oh my Lord.  Can you just tell me what

23  he was going to say so we can deal with it.

24           MR. BRODSKY:  I think --

25           MR. CHAN:  He was going to ask for some sort of

<div align="center">
Georgette K. Betts, RPR, CSR<br/>
Official Court Reporter
</div>

PROCEEDINGS

1    curative instruction.

2              THE COURT:  To cure what?

3              MR. BRODSKY:  I think he was worried, Your Honor.  I

4    think he read the transcript, my understanding was he was

5    worried that inferences could be drawn by the -- reasonable

6    inferences could be drawn from the fact that the government

7    was seizing property from Mr. Shkreli, that he had been found

8    guilty and we have talked about a prior proceeding before the

9    jury and so I think Mr. Dubin was concerned about jurors

10   drawing that inference.  We weren't moving to strike any

11   jurors, Your Honor.  We were just -- I think he wanted to ask

12   Your Honor if there was a possible way to handle that.  And I

13   would leave it to him to --

14             THE COURT:  Well, he wasn't there, unfortunately,

15   but I did probe and ask the jurors again and again what did

16   you hear, what did you hear.

17             MR. BRODSKY:  Yes, you did.

18             THE COURT:  I didn't even utter the word

19   "conviction."  None of the jurors said they heard that

20   Mr. Shkreli had been convicted, they just heard the government

21   was seeking to seize the Wu Tang Clan album --

22             MR. BRODSKY:  And other property.

23             THE COURT:  -- and other property --

24             MR. BRODSKY:  Right.

25             THE COURT:  -- but it wasn't in relation to a

PROCEEDINGS

1  conviction as I recall.

2          MR. BRODSKY:  No, nobody said conviction.

3          THE COURT:  I don't think so, right.

4          MR. BRODSKY:  Nobody did.

5          THE COURT:  Or a guilty verdict or anything like

6  that.

7          MR. BRODSKY:  Nobody said guilty verdict or our

8  conviction, Your Honor.  Our concern --

9          THE COURT:  So to now tell the jurors they shouldn't

10 infer anything from --

11         MR. BRODSKY:  No, I don't know what he proposed --

12 I'm sorry.

13         THE COURT:  I think it would be nice if Mr. Dubin

14 was here to talk about what he wants, but I don't think given

15 what has been described thus far -- oh, here he is.

16         Mr. Dubin, come on in, we're trying to deal with

17 your issue.

18         MR. DUBIN:  I went to the restroom, I apologize.

19         MR. BRODSKY:  I apprised the Court I thought your

20 issue was you said to us the reasonable inference could be

21 drawn from what the jurors said because the forfeiture -- I

22 was characterizing your words, you'll have to correct me if

23 I'm wrong, that you were concerned that they would infer from

24 that, not because the juror said it, but Mr. Shkreli was found

25 guilty.  That's where we were.

PROCEEDINGS

1      MR. DUBIN:  That is my concern, Your Honor.

2      THE COURT:  So how do you want to deal with it?

3      MR. DUBIN:  Well, we would renew our application to

4  have the jury instructed that he was acquitted of Count Seven.

5      THE COURT:  I'm not going to --

6      MR. DUBIN:  Okay.

7      THE COURT:  It's no more appropriate for me to tell

8  the jury that he was convicted of Count Eight than it would be

9  for me to instruct the jury he was convicted of Count Seven.

10     MR. DUBIN:  Okay, no problem.  I figured I'd make

11  the record.  I think one of things --

12     THE COURT:  You made the record, we ruled, we had

13  extensive briefing and --

14     MR. DUBIN:  I know I was renewing it, Your Honor --

15  sorry.  I was renewing it, Your Honor, in light of the fact

16  that I was just laughed at again quite audibly for no reason.

17  I was laughed at when I raised it yesterday that it would be

18  beyond reason that jurors would read this and, in fact, they

19  did.  And, in fact, they did.

20     THE COURT:  No juror heard or read that Mr. Shkreli

21  had been convicted, no juror said that.

22     MR. DUBIN:  That's what they said.

23     THE COURT:  I probed them, what did you hear, what

24  did you hear --

25     MR. DUBIN:  I read the record.

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1          THE COURT:  -- unfortunately you weren't here but I

2     did exactly what you asked.  No juror said they had heard that

3     he had been convicted.  All they talked about -- most of them

4     focused on the album and the property that the government

5     sought to seize.  They didn't express any understanding as to

6     why or the basis or that it was arising from a criminal as

7     opposed to a civil forfeiture.

8          MR. DUBIN:  Understood.

9          THE COURT:  There are two different standards, as

10    you know.

11         MR. DUBIN:  Understood.

12         THE COURT:  I just don't think that the jurors had

13    reflected any knowledge about a conviction.

14         MR. DUBIN:  Here's my concern, Your Honor, and just

15    so the record is clear, I was back at the office trying to

16    help prepare in the event we do put on a defense case, so I

17    wasn't off running around.

18         THE COURT:  I'm not accusing of you being off

19    galavanting, I'm just saying I did exactly what you asked --

20         MR. DUBIN:  I understand --

21         THE COURT:  -- even though you weren't here.

22         MR. DUBIN:  -- and I appreciate it, Your Honor.

23         THE COURT:  I did ask each party whether there were

24    other the questions they would like me to ask of any of the

25    jurors, they said, no.  I didn't want to plant the word

PROCEEDINGS

1    "conviction" in anyone's head.

2              MR. DUBIN:  Understood, Your Honor.  I read the

3    record with interest and I appreciate Your Honor's

4    thoroughness.  And I understand that the jurors reiterated

5    their willingness to abide by the Court's instructions and

6    appreciate the presumption of innocence.  I do remain

7    concerned for two reasons:  One, is that none of them brought

8    it to the Court's attention -- I'm not making an application

9    to have them excused, but it is concerning to us that -- and I

10   think Your Honor, if I'm not mistaken has asked the jury if

11   they see or come across anything not in the daily admonition,

12   but at some point, they should bring it the Court's attention.

13   And the fact that they read this, what we think is highly

14   prejudicial --

15             THE COURT:  They didn't read anything --

16             MR. DUBIN:  They heard something that is highly

17   prejudicial.

18             THE COURT:  They heard it and they walked away.  One

19   juror said he walked away after his mother turned on the

20   television; he walked away.  Another juror got a pop up, he

21   didn't read it, and another juror I think said that --

22   whatever it was, nobody read anything.

23             MR. DUBIN:  But here's the point, the point is --

24             THE COURT:  Actually I didn't admonish them to tell

25   me if they heard or read any media reports.  What I said is if

PROCEEDINGS

1    anyone approaches you or tries to talk to you or anything of

2    that nature occurs.

3           Do you want me to now tell them they should tell me

4    if they have heard anything, I can do that.  I don't believe I

5    ever instructed them on --

6           MR. DUBIN:  I stand corrected.

7           THE COURT:  Yes, but if you want me to do it, I'll

8    do it.

9           MR. DUBIN:  I would like to think about it and talk

10   to my client about it but the problem is, is that they cannot

11   unhear what they've heard.  And what they've heard is that

12   Mr. Shkreli owes many millions of dollars and the government

13   is going after it.

14          I don't think that it's an unreasonable concern that

15   we would feel that these jurors don't know the different

16   standards as it relates to civil versus criminal forfeiture.

17          THE COURT:  No, they don't, they don't even know

18   that it's a forfeiture necessarily.

19          MR. DUBIN:  I just think that it's --

20          THE COURT:  Nobody said the word "forfeiture"

21   either.  I'm just saying that the extent of their knowledge

22   was vague.  It was -- I think they deliberately and

23   consciously tried to avoid it.  It was a sense that one juror,

24   as I said, walked away from the news that his mother had

25   turned on, another juror didn't read the pop up, and I

7819

PROCEEDINGS

1 forgot -- does anyone remember what the third juror said?

2                MS. SMITH:  I think he said it was a very short

3 segment.

4                MR. DUBIN:  He said he heard it and that he walked

5 out.  One of them was on a Kindle and the other one -- look, I

6 don't quarrel with the way Your Honor covered it.  I could be

7 laughed at, that's fine, I renewed our application to ask

8 that --

9                THE COURT:  To tell them Mr. Shkreli was

10 acquitted --

11                MR. DUBIN:  Acquitted of Count Seven.

12                THE COURT:  What about Count Eight?

13                MR. DUBIN:  I think that I would have to speak to my

14 client about whether or not he'd be willing to live with an

15 instruction that included that while Mr. Shkreli was --

16                THE COURT:  I believe I could commit an error if I

17 were to give that instruction --

18                MR. DUBIN:  Understood.  Understood.  That's why I

19 said I would like to --

20                THE COURT:  -- because I don't think that the jurors

21 should make any decision based on what a co-defendant, whose

22 trial was severed with great consideration by the Court to the

23 arguments that you made, Mr. Greebel's counsel, Mr. Brodsky

24 made on his behalf to severe.

25                It's been an obvious hardship --

PROCEEDINGS

1          MR. DUBIN:  -- understood.

2          THE COURT:  -- to do it this way, but why on earth

3    would I then want to tell the jury that Mr. Shkreli had been

4    convicted of Count Seven?

5          MR. DUBIN:  Acquitted of Count Seven.

6          THE COURT:  Acquitted of Count Seven and convicted

7    of Count Eight.

8          MR. DUBIN:  The problem we're faced with, Your

9    Honor, and I'm not so sure there is anything curative that the

10   Court can do, is at the beginning of the case, like, for

11   instance, with respect to juror number three, he comes in says

12   I already had a low opinion of him, I think he said words to

13   that effect during jury selection and again yesterday.  But

14   what he read prior to the trial wasn't what he heard.  Whether

15   it was in a snippet or not, he now has in his mind that the

16   government is going after Mr. Shkreli for a lot of money and

17   in his mind there has to be a reason for it, right?  So we're

18   just faced with a very unfortunate situation where I'm not

19   suggesting that the Court can control the media coverage, but

20   it was a concern that I had and, unfortunately, it came to

21   fruition.  I guess we're just going to have to take them at

22   their word that they're able to block it out somehow.  I think

23   it's difficult for jurors to do that after they have, you

24   know, gone for two months and, you know, heard all of this

25   evidence much of it about Mr. Shkreli not very positive.  And

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    that was why I thought long and hard about putting in a letter

2    or whether we move to excuse them.  Frankly, it's a very

3    difficult decision.

4              THE COURT:  You could have excused juror number

5    peremptorily or for cause if you thought he was a problem.

6              MR. DUBIN:  Well, I didn't that's why we didn't, but

7    now he has -- now someone that already had an unfavorable

8    opinion --

9              THE COURT:  Well, you're citing things he said

10   during voir dire.

11             MR. DUBIN:  But now to add to that he's heard his

12   information.  Look, Your Honor, I don't want to waste the

13   Court's time, I'm going to let you have lunch, now I feel I'm

14   just venting so there is no need for it.

15             It is a concern that they have been exposed to what

16   we feel is damaging, prejudicial information that is not

17   making it into evidence and now they have said the right

18   things to Your Honor and we have to take them at their word.

19   So I made the application, I respect the Court's decision.

20   And I understand the quandary that the Court would be in to

21   instruct them that he had been acquitted of Count Seven and

22   then what do you with Count Eight, I understand and I

23   appreciate that.  It's not --

24             THE COURT:  He was convicted of other counts as

25   well.

PROCEEDINGS

1          MR. DUBIN:  Yes, none of which Mr. Greebel is

2     charged with.

3          THE COURT:  With which Mr. Greebel was not charged.

4          MR. DUBIN:  Right.

5          THE COURT:  As I said, the application to severe the

6     trial was opposed by the government quite vigorously.  I

7     granted the application, but one cannot now complain that

8     because the media coverage of the first trial so long as the

9     jurors in this trial confirm under oath to me that they can

10    still be impartial and fair and open minded and respect the

11    presumption of innocence, that is what I'm left with.

12         MR. DUBIN:  I agree.

13         THE COURT:  I'm sure not going to make a bigger

14    problem by instructing the jury that Mr. Shkreli has been

15    acquitted of Count Seven but convicted of Count Eight.

16         MR. DUBIN:  Understood, Your Honor.  Thanks for

17    hearing me out.

18         THE COURT:  You're welcome.

19         MR. BRODSKY:  Your Honor, I'm handing up to you, and

20    it's not for discussion now, transcript page 5054, lines 1

21    through 5 with respect to Mr. Su's testimony.  I would ask

22    Your Honor to look at that with respect to his statement in

23    the...

24         THE COURT:  Let's return by five, please.

25         MR. KESSLER:  Thank you.

PROCEEDINGS

1          (Open court; no jury present.)

2          THE COURT:  Yes.  Are you ready?

3          MR. PITLUCK:  Yes, we are.  The government is.

4          MR. BRODSKY:  I was just going ask, Your Honor, if

5    you had looked at that transcript cite and had reconsidered it

6    at all, or if you thought still that there was not an

7    inconsistency, as I thought he had testified that -- he used

8    the word "backdating," because I did, and he had testified

9    that he did backdate documents, but he thought it was

10   justified because he -- the backdating he did that was

11   permissible, using the word "backdating," was where you had

12   support for the backdating.

13         MR. KESSLER:  Where is the actual cite he says he

14   used the word "backdated"?

15         MR. BRODSKY:  That's the same -- is what I pointed

16   out to Your Honor --

17         THE COURT:  Page 5054 of the transcript.  Do you

18   have it?

19         MR. BRODSKY:  Lines 1 through 7.

20         MR. KESSLER:  I do, but --

21         MR. BRODSKY:  I used the word "backdating" in my

22   question, and he accepted it.  So -- I believe that is

23   directly inconsistent with the testimony that -- with his --

24   with Mr. Delzotto's interview of Mr. Su, where he says, Su

25   said he never backdated any documents.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

PROCEEDINGS

1    THE COURT:  I guess my concern or my discomfort with

2 this is you're using a hearsay statement, a double hearsay

3 statement, to try to impeach somebody who never looked at,

4 confirmed, proofread, or, you know, adopted the hearsay

5 statement of the agent as his own, and, furthermore, that he's

6 been -- what he was asked at the interview, it seemed to be

7 focused on a specific document, and the dialogue or the

8 conversation seemed to be focusing on other instances that

9 were described in -- during his examination at trial.  So, for

10 example, the Aselage documents and other documents, I just

11 don't know that it is appropriate to impeach someone with

12 intrinsic evidence that is double hearsay.

13    MR. BRODSKY:  All right, Your Honor.

14    THE COURT:  Do you agree?

15    MR. BRODSKY:  I respectfully disagree.  I believe I

16 have seen it done before where the witness testifies, having

17 been interviewed by the FBI, and then the FBI agent takes the

18 witness stand, and if there's an inconsistency between what a

19 witness told the jury and what a witness told the FBI

20 previously, I believe that is admissible impeachment

21 testimony.  It's a statement that a witness has made that's

22 inconsistent and impeaches their testimony, under an

23 obligation to tell the FBI the truth.

24    MR. KESSLER:  Your Honor, there's two problems

25 there.  First of all, Mr. Su was not confronted with the 302,

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

PROCEEDINGS

1   which I believe is the standard practice, given an opportunity

2   to say whether it refreshes recollection or ask those kinds of

3   questions.  Second of all, this is a situation where the word

4   "backdating" just means different things.  And it can have

5   different import.  As the two pages of transcript that

6   Mr. Brodsky cited, or three pages of transcript, make clear,

7   they're talking about this kind of backdating and that kind of

8   backdating, what's okay, what's not okay.  So even if you

9   could introduce the statement where Mr. Su said "I never

10   backdated a document," it doesn't mean that what he said is

11   inconsistent.  It is not like, "Did you ever tell the FBI you

12   your shirt is red?"  "No."  And then the 302 says Mr. Su said

13   his shirt is red.  That might be closer -- blue.  Sorry.

14   Blue.

15        THE COURT:  Interesting you've raised that.  I was

16   discussing with my clerk, we used a car example, the color of

17   a car, you know, but it is the same thing.  It is not --

18   agreed, it is the same thing.  And I just don't think it is

19   appropriate when Mr. Su was not given an opportunity to see

20   this, adopt it, say that it is accurate, explain the context.

21        MR. BRODSKY:  Understood, Your Honor.  We are ready

22   to proceed.

23        THE COURT:  Okay.  Are they all back?

24        MR. KESSLER:  And, Your Honor, just to follow up

25   from yesterday, two things that do not need to be addressed

PROCEEDINGS

1   now or shouldn't, if the jury's here, but just that are

2   hanging out there.  Mr. Chan and I have talked.

3          We have narrowed the dispute about the Rosenfeld

4   arbitration award --

5          THE COURT:  Okay.

6          MR. KESSLER:  -- substantially, so we can talk about

7   that when Special Agent Delzotto's done.

8          THE COURT:  What about the experts?

9          MR. KESSLER:  So I am happy to get into it when the

10  jury is not coming, but we still have a problem with the

11  disclosure.

12         THE COURT:  For Mr. Ferruolo.

13         MR. KESSLER:  For Mr. Ferruolo.  It is the same

14  disclosure as yesterday, it doesn't add anything, change the

15  bases, elaborate, and it actually confuses the issue about the

16  relevance of a lock up agreement instruction and testimony

17  about lock up agreements, but that's something we can address

18  when the witness' testimony is done.

19         THE COURT:  Okay.

20

21

22

23

24

25

DELZOTTO - CROSS - MR. BRODSKY

1

2          (Continued on the next page.)(WHEREUPON, at 2:13

3    p.m., the jury re-entered the courtroom.)

4          THE COURT:  All our jurors are back.  Please have a

5    seat, everybody.

6          Agent Delzotto, you are still under oath.

7          Mr. Brodsky, you may resume your cross.

8          MR. BRODSKY:  Thank you, Your Honor.

9    CROSS-EXAMINATION (Resumed)

10   BY MR. BRODSKY:

11   Q    Yes or no, Special Agent Delzotto, prior to December

12   2015, the FBI did not attempt to speak with Mr. Greebel before

13   arresting him to get his side of the story?

14         MR. PITLUCK:  Objection, Your Honor.

15         THE COURT:  I am going to overrule the objection.

16         MR. PITLUCK:  Your Honor, I think we need a sidebar.

17         THE COURT:  All right.

18         (Sidebar conference.)

19         (Continued on the next page.)

20

21

22

23

24

25

SIDEBAR

1          (WHEREUPON, the following proceedings were had at

2     sidebar, out of the hearing of the open courtroom, to wit:)

3          THE COURT:  We are going to give the instruction

4     that the FBI investigation is not on trial and they are not to

5     make any inferences about what they did or didn't do.

6          MR. PITLUCK:  Your Honor, we understand that and

7     apologize for doing this on the first question.  Didn't know

8     it was coming.  Obviously, the issue here is, the crime fraud

9     exception determination and privilege issues, there's lot of

10    reasons why Mr. Greebel was not interviewed prior to his

11    indictment, including -- I am sure Special Agent Delzotto

12    would be happy to get into, but the timing of the interview,

13    and the fulsome answer of that question invokes a lot of

14    issues that I am sure defense would like to keep away from the

15    issue, like an independent judge's determination that the

16    crime fraud exception applied, and there's no privilege

17    attached to those communications between Mr. Greebel and

18    Mr. Shkreli.  So it is misleading if he's allowed to answer

19    that question and not allowed to explain why.

20         MR. BRODSKY:  Your Honor, respectfully, the case law

21    is clear, as Your Honor has just ruled, that a rush to

22    judgment defense is permissible so long as Your Honor gives

23    the instruction that a particular investigative technique is

24    necessary, but the government -- that does not open the door

25    for the government to get into the crime fraud exception,

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

SIDEBAR

1 because if you look at the judge's actual ruling, the judge
2 did not find that Mr. Greebel's communications or anything he
3 said was in furtherance of any crime. The judge made multiple
4 rulings on multiple grounds, and he was very clear to say he
5 didn't have all information, and he was also very clear in
6 making it very apparent he was not deciding whether or not
7 Mr. Greebel played an active -- or a role in it.

8 So there is no -- the crime fraud exception, in
9 going to Judge Weinstein, A, is not an explanation for why
10 they didn't talk to Mr. Greebel. B --

11 THE COURT: Well, it might be in the agent's mind.
12 We can't say that with any certainty. He might have
13 legitimately believed that there were reasons, I mean, further
14 reasons why he could not appropriately interview Mr. Greebel,
15 which he will be allowed to explain on redirect, if we go down
16 this road. I think it is only fair.

17 MR. BRODSKY: All right. We are going to bring out
18 the order by Judge Weinstein that he did not make a finding of
19 crime fraud. I think inadmissible hearsay statements from
20 Judge Weinstein, I don't think he can comment at all on Judge
21 Weinstein or the proceeding. He can make a comment that he
22 thought he had to go to a judge to get a crime fraud, but he
23 cannot comment on Judge Weinstein's ruling, just as we weren't
24 allowed to get into Judge Ramos' ruling and Judge Ramos'
25 ruling with respect Jackson Su, and precluding any elicitation

SIDEBAR

1   of Judge Ramos cited or the issues he was raising or the

2   application that was made.  All that was hearsay.  The same

3   would hold true here.

4              THE COURT:  You did cross-examine Mr. Su extensively

5   about Judge Ramos' ruling.  My point is to the extent that the

6   agent's actions in deciding whether or not to interview

7   Mr. Greebel would be informed by certain facts and events that

8   he might wish to explain, and I think that it might not be

9   appropriate -- I mean, I can't -- I would not want to limit

10  his explanation.  Now, Judge Weinstein's actual ruling, the

11  substance of it would not necessarily come into evidence, but,

12  certainly, the agent could say that, you know, a judge did

13  issue an order, and it was my understanding, or whatever it

14  may be, I don't know what he is going to say on that point on

15  whether the factors would have influenced his decision not to

16  interview Mr. --

17             MR. BRODSKY:  Your Honor, he can't testify about

18  Judge Weinstein's order.

19             THE COURT:  He can testify as to the effect it had

20  on him and what he thought he could or could not do, and --

21             MR. BRODSKY:  But as Your Honor knows, Judge

22  Weinstein's order didn't preclude him from doing anything.

23  Once Judge Weinstein accepted the crime fraud, and they got

24  the e-mails, there was nothing to prevent them from going to

25  ask Mr. Greebel questions about it.

SIDEBAR

1          THE COURT:  My point is, if he's mistaken, but has a

2    good faith belief that there are certain things he can and

3    cannot do, he's going to explain Judge Weinstein's order, I

4    don't know about what he would say, but I am just trying to

5    make the point that his explanation for why he didn't

6    interview Mr. Greebel would be appropriate to bring out on

7    redirect.  And if that includes Judge Weinstein's order or his

8    misunderstanding or misapplication of it, that may be the

9    case.  But I -- you know, I don't know --

10          MR. BRODSKY:  Okay.

11          THE COURT:  -- what he would say on that.

12          MR. BRODSKY:  Maybe the government can proffer what

13   he would say.

14          MS. SMITH:  Well, I think part of the rush to

15   judgment is complicated in this case.  Obviously, there were

16   steps that were taken to obtain certain evidence, for example,

17   going to Judge Weinstein and getting, prior to indictment,

18   certain e-mails deemed not privileged pursuant to the crime

19   fraud exception.

20          There were also steps taken afterwards that are

21   complicated, how the Department of Justice subpoenas, since

22   the subpoena went to Katten, which is a law firm, there's an

23   entire process that's goes on down to DC and getting special

24   approvals.

25          The fact that Mr. Shkreli chose to waive privilege

SIDEBAR

1    at certain points, so there were certain documents that only

2    became available after some of those steps were taken, not to

3    mention the fact that Mr. Greebel has access to the documents

4    that the government does not.

5         So I just -- the more you open the door to the kind

6    of -- I think we just want to be straightforward about what we

7    think this is opening the door to, all these various different

8    steps.  We think that some of this sort of rush to judgment is

9    inappropriate because the government is not on trial, and we

10   will obviously object to that, as appropriate.

11        Any suggestions about the post arrest interview that

12   did not come into evidence, I do not know what Mr. Brodsky is

13   planning to do with those, so I will be interested in the

14   proffer on that.  Because, obviously, commenting on any

15   decisions that were made by the defendant, when the defendant

16   does not himself testify, would be inappropriate.  So we are

17   just very concerned about the scope of this, particularly

18   since it is our position that the defense is really pushing

19   this for rush to judgment past where it is appropriate in

20   terms of putting the government's investigation on trial.

21        MR. PITLUCK:  Judge Chen just made a similar finding

22   in the FIFA case, where a similar issue has come up by some of

23   the defendants in that issue on putting the government's

24   investigation on trial through questions related to the case

25   agent.

SIDEBAR

```
1            THE COURT:  I mean, I guess my question is whether

2     the question about interviewing Mr. Greebel prior to arrest is

3     something that is going to trigger, you know, in fairness to

4     the government, an ability to have the agent explain what he

5     did and why he did it.

6            It seems to me that while you have the right to

7     assert the defense, there would have to be a balanced

8     consideration of what's deemed appropriate on redirect.  And I

9     do think that certainly the agent's view of what was

10    appropriate vis-a-vis interviewing Mr. Greebel to certain

11    steps would be fair ground.  My concern, my concern --

12            MR. BRODSKY:  Yes, Your Honor.

13            THE COURT:   -- has been that I will give this

14    instruction that the government's investigation and

15    prosecution is not on trial, and that they are not to

16    second-guess or speculate about techniques that the government

17    used or didn't use, or evidence that the government presented

18    or didn't present, all of that is in the instructions.

19            I am thinking about whether if we open that

20    Pandora's box a crack, whether we are all going to be sorry

21    that we have, you know, a whole other sideshow that's going to

22    be --

23            MR. BRODSKY:  I know.

24            THE COURT:   -- not great for either side.  It might

25    be better not to.
```

SIDEBAR

1          MR. BRODSKY:  I will confer --

2          THE COURT:  I am thinking that it may be better not

3   to go down this road.

4          MR. BRODSKY:  Your Honor, may I take a few minutes

5   to confer with my client and I --

6          THE COURT:   Of course.

7          MR. BRODSKY:   -- would like to --

8          THE COURT:   I think the government has one other

9   point.

10         MR. BRODSKY:  Okay.

11         MS. SMITH:  Just to put on the record, also, there's

12  a suggestion here that things would have been different, had

13  the government had different pieces of evidence at different

14  points in time.  For example, an indictment would or would not

15  have come down, or the government would or would not have

16  proceeded to trial, where the jury is really just being asked

17  to look at the universe of what is in front of them, not to

18  speculate about when the government obtained it, or, you know,

19  we don't have kind of any arguments about searches or any

20  issues along those lines.  And so to suggest to the jury that

21  they shouldn't just consider what's in front of them, but the

22  manner in which what's in front of them, at what time what's

23  in front of them came into the government's possession, as if

24  that changes their analysis of the evidence is inappropriate.

25         MR. BRODSKY:  I think the case law is clear, and I

SIDEBAR

1   think the government agreed in the pretrial motions that to

2   the extent the failure to use an investigative technique gives

3   rise to reasonable doubt about the quality of the evidence to

4   find somebody guilty beyond a reasonable doubt, then that

5   argument is permissible for a person who's accused of a crime,

6   and that's the context in which somebody can make it.  That's

7   the context in which we would make it.

8               MS. SMITH:  We disagree.  The other issue with the

9   question in part was that Mr. Brodsky said for Mr. Greebel to

10  tell his side of the story.  So if the questions themselves

11  are suggesting what Mr. Greebel --

12              THE COURT:  You are Mr. Greebel's --

13              MS. SMITH:   -- would have said or would not have

14  said is highly inappropriate.

15              THE COURT:   It kind of suggests he has a story to

16  tell.  I --

17              MR. BRODSKY:  It's cross.

18              THE COURT:  I know it may be for cross, because you

19  are his representative, but my concern is when you say

20  Mr. Greebel has a story to tell, it is going to create in the

21  jurors' minds, despite my instructions, that he has a story to

22  tell it, lets it.  You don't want to shift the burden.  I

23  think you need to be very careful, because you just put that

24  out there, and we have been telling them he doesn't have to

25  tell any story.  The burden is on the government.

SIDEBAR

1          MS. SMITH:  We are concerned about that.

2          MR. BRODSKY:  Can I confer?

3          THE COURT:  Yes.

4          MR. BRODSKY:  Thank you.

5          (Short pause while all lawyers conferred.)

6          MR. BRODSKY:  Okay.  We're ready to proceed.

7          THE COURT:  Let's put something on the record.

8          MR. BRODSKY:  Yes, Your Honor.

9          I am going to proceed with the cross-examination,

10   question by question, I think.

11          THE COURT:  Withdraw the last question?  Or --

12          MR. BRODSKY:  I am going to proceed with this

13   question.  We have client consent to proceed with the current

14   question.

15          MR. KESSLER:   The current question suggests what

16   Mr. Greebel would have said and suggests that he has some kind

17   of story to tell.  I mean, that is --

18          MS. SMITH:  Forget what he consents to.

19          MR. KESSLER:   -- telling the jury he would have

20   suggested something different than what the government has.

21   That's completely improper unless he's going to testify.

22   There's no way to cross-examine that statement.

23          MR. DUBIN:  Your Honor --

24          MR. KESSLER:  There's no way for us to address the

25   idea that Mr. Greebel has a story to tell, you know,

SIDEBAR

1  question -- there's no way for us to address that unless he

2  testifies.

3  THE COURT:  Well, on the -- I think the jury --

4  MS. SMITH:  "Did you speak to him," is a fair

5  question.  If we are going to go down this road, "is your

6  intent to interview him," is one thing.  "To hear his story,"

7  is a completely inappropriate statement.

8  MR. BRODSKY:  Your Honor, may I return -- I know on

9  a question by question Your Honor will take the objections of

10  the government.

11  MS. SMITH:  There's a question outstanding.  The

12  question is what's the ruling on the question outstanding.

13  MR. BRODSKY:  The question was overruled by the

14  Court.

15  MS. SMITH:  Before --

16  THE COURT:  It was before the sidebar.

17  I mean, look.  I am concerned that the admonishment

18  to the jury that they should not be thinking about what

19  investigations could have been conducted, but weren't, or what

20  documents or evidence should have been obtained, but wasn't,

21  or second-guessing the agent's actions, or wondering what

22  story Mr. Greebel has, but maybe won't tell this jury, okay,

23  is just opening some very dangerous territory, and I do think

24  that you would still be able to ask questions of this agent

25  that would be consistent with a defense that you want without,

SIDEBAR

1    again, I think opening a Pandora's box of very difficult and

2    troubling testimony that may require repeated sidebars to try

3    to sort out.  Because I don't know what this agent will say.

4    I mean, I don't -- you probably know better than I do, but --

5              MR. BRODSKY:  I think the government can proffer at

6    sidebar here what the agent would say.

7              MS. SMITH:  We don't know what the agent is going to

8    say to this question.

9              MR. KESSLER:  I don't think -- I don't know -- I

10   don't think you want to know the answer, frankly.

11             MR. PITLUCK:  We don't know.

12             MR. BRODSKY:  They have spoken to the agent.  They

13   knew this was coming.

14             MR. KESSLER:  Not to tell his story?

15             MR. DUBIN:  I think that the way the question was

16   asked was -- it is a common phrase to say, "What's your side

17   of the story."  It wasn't that he was going to get up and tell

18   the story, and if it is colloquial use, "did you speak to him

19   to get his side of the story, his explanation, "which is how

20   Mr. Brodsky meant it, we can take that part of it out and just

21   ask prior to arresting him, did you ever speak to him?

22             MS. SMITH:  That's fine.  That's was our objection.

23             THE COURT:  Why don't we just strike the question

24   and start over.  We will strike the question.

25             MR. DUBIN:  Withdraw it.

                           SIDEBAR

1              MR. BRODSKY:  Can I withdraw it?

2              THE COURT:  Sure.  You can withdraw it.  That's

3    better.  And then you will ask the question about with respect

4    to Mr. Greebel.  I am very troubled a seed we have tried so

5    hard to keep out --

6              MR. DUBIN:  I think we solved it with a new

7    formulation.

8              MR. PITLUCK:  Judge, on redirect, why didn't you

9    speak --

10             THE COURT:  Sure.

11             MR. PITLUCK:  That's --

12             THE COURT:  Okay.

13             (Sidebar conference ends.)

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO - CROSS - MR. BRODSKY

1            (Continued on the next page.)

2            (Open court; jury present.)

3            MR. BRODSKY:  Your Honor, I will withdraw the

4    question and rephrase as follows.

5    BY MR. BRODSKY:

6    Q    Yes or no, Special Agent Delzotto, the FBI did not

7    attempt to speak to Mr. Greebel prior to arresting him in

8    December of 2015; yes or no?

9    A    No.

10   Q    And, yes or no, Special Agent Delzotto, the FBI did not

11   attempt to speak with any single partner at Katten Muchin

12   prior to arresting Mr. Greebel; yes or no?

13           MR. PITLUCK:  Objection.

14           THE COURT:  I will sustain that objection.

15   BY MR. BRODSKY:

16   Q    Yes or no --

17           THE COURT:  I sustained the objection.

18           MR. BRODSKY:  Yes, Your Honor.  I was asking the

19   next question.

20           THE COURT:  Oh, I'm sorry.  I thought you were -- I

21   thought you were prompting him to answer.

22           MR. BRODSKY:  No.  Sorry.

23           THE COURT:  Okay.

24           MR. BRODSKY:  That's how I was starting my question.

25   BY MR. BRODSKY:

DELZOTTO - CROSS - MR. BRODSKY

1    Q     Yes or no, Special Agent Delzotto, the FBI did not

2    attempt to speak to anyone at the law firm of Katten Muchin

3    prior to arresting Mr. Greebel?

4                 MR. PITLUCK:  Objection, Your Honor.

5                 THE COURT:  Sustained.

6    BY MR. BRODSKY:

7    Q     Yes or no, Special Agent Delzotto, you never spoke to

8    anyone at Katten Muchin prior to arresting Mr. Greebel in

9    December 2015?

10   A     That wouldn't have made sense, no.

11                MR. BRODSKY:  Your Honor move to strike "it would

12   not have made sense."

13                THE COURT:  All right.  Sir, he wants a yes or no

14   answer.  So, once again, just yes or no.

15                THE WITNESS:  No.

16   BY MR. BRODSKY:

17   Q     And, yes or no, Special Agent Delzotto, you did not

18   attempt to speak to any partners at Katten Muchin, but prior

19   to arresting Mr. Greebel in December of 2015?

20                MR. PITLUCK:  Objection, Your Honor.  Asked and

21   answered.

22                THE COURT:  Well, I think the first time it was

23   asked as whether the FBI.  This is directed to whether he --

24                MR. PITLUCK:  Yes.  Second one was he.

25                THE COURT:  He, yes, and the two questions for both

DELZOTTO - CROSS - MR. BRODSKY

1   partners and whether Agent Delzotto did, was directed at first

2   partners at Katten and then anyone at Katten.  So I think it

3   is a separate question.  If you want to object to it, that's

4   fine.  If you don't --

5           MR. PITLUCK:  Objection.

6           THE COURT:  You are objecting to this question as

7   well?

8           MR. PITLUCK:  Yes.

9           THE COURT:  All right.  I will sustain this

10  question -- the objection.

11  BY MR. BRODSKY:

12  Q    Yes or no, Special Agent Delzotto, you did not attempt to

13  speak to any of Mr. Greebel's former partners at Katten Muchin

14  prior to arresting Mr. Greebel in December of 2015?

15          MR. PITLUCK:  Objection, Your Honor.

16          THE COURT:  Sustained.

17          MR. BRODSKY:  Is that to the form, Your Honor?  Is

18  there --

19          THE COURT:  Well, based on our sidebar and

20  discussions that we had, I am a little bit, also, confused by

21  the term "former partners."  Do you mean at the time or now

22  or --

23          MR. BRODSKY:  Okay.

24  BY MR. BRODSKY:

25  Q    Yes or no, Special Agent Delzotto, prior to arresting

DELZOTTO - CROSS - MR. BRODSKY

1    Mr. Greebel, you did not attempt to speak to any person who

2    was a partner of Mr. Greebel and left the firm of Katten prior

3    to your arrest of Mr. Greebel?

4                MR. PITLUCK:  Objection, Your Honor.

5                MR. BRODSKY:  I will rephrase, Your Honor.  I will

6    try --

7                THE COURT:  I am trying to follow the question.

8                MR. BRODSKY:  I will try a better question.

9    BY MR. BRODSKY:

10   Q    Yes or no, Special Agent Delzotto, prior to arresting

11   Mr. Greebel, you did not attempt to speak to any person who

12   worked as a partner at Katten Muchin, but left the firm before

13   you arrested Mr. Greebel?

14               MR. PITLUCK:  Objection, Your Honor.

15               THE COURT:  I think you need to make a more specific

16   question.  I'm just going to sustain on the basis of form.

17               MR. BRODSKY:  My apologies.

18               (Short pause.)

19   BY MR. BRODSKY:

20   Q    Prior to -- yes or no, Special Agent Delzotto, prior to

21   arresting Mr. Greebel in December of 2015, you did not attempt

22   to speak to any current, then current, or then former employee

23   at Katten Muchin?

24               MR. PITLUCK:  Objection.

25               THE COURT:  I will overrule that objection.  You may

DELZOTTO - CROSS - MR. BRODSKY

1    answer the question.

2                    THE WITNESS:  No.

3    BY MR. BRODSKY:

4    Q    And prior to arresting Mr. Greebel, yes or no, Special

5    Agent Delzotto, in December of 2015, you did not obtain a

6    single piece of paper from the law firm of Katten Muchin?

7                    MR. PITLUCK:  Objection, Your Honor.

8    BY MR. BRODSKY:

9    Q    Yes or no?

10                   THE COURT:  I will overrule that objection.

11                   THE WITNESS:  Anything dealing with Katten Muchin --

12                   MR. BRODSKY:  Your Honor, this is a yes or no

13   question.  It didn't call for explanation.  I would ask to

14   move to strike that and ask yes or no.

15                   THE COURT:   Well, are you asking whether he

16   personally received or obtained papers from Katten?

17                   MR. BRODSKY:  My question was you.

18                   THE COURT:  Whether he personally?

19                   MR. BRODSKY:  "You" is Special Agent Delzotto.

20                   THE WITNESS:  I am trying to answer.

21                   THE COURT:  Well --

22                   MR. BRODSKY:  I can take it step by step,

23   Your Honor.  My question didn't call for an explanation.  It

24   was a yes or no question.

25                   THE COURT:  If you can answer it yes or no, please

DELZOTTO - CROSS - MR. BRODSKY

1   do so.

2            THE WITNESS:  It really requires me to explain a

3   little bit more.

4   BY MR. BRODSKY:

5   Q    Prior to arresting -- Special Agent Delzotto, prior to

6   arresting Mr. Greebel, isn't it a fact, sir, that you, you

7   personally, never obtained a single piece of paper from the

8   law firm of Katten Muchin; yes or no?

9   A    Me personally, no.

10  Q    Prior to arresting Mr. Greebel in December of 2015, you

11  never observed any FBI agent attempt to obtain a single piece

12  of paper from the law firm of Katten Muchin --

13           MR. PITLUCK:  Objection, Your Honor.

14  BY MR. BRODSKY:

15  Q    -- yes or no?

16           THE COURT:  I will overrule that objection.  It is

17  what he personally observed.

18           Did you observe?

19           THE WITNESS:  Observe?  When you say "observe," what

20  do you mean?

21  BY MR. BRODSKY:

22  Q    You testified, sir, on direct examination, I think,

23  within minutes of starting your testimony, your sworn

24  testimony under oath, that you were the lead investigative

25  agent in this case; yes or no?

DELZOTTO - CROSS - MR. BRODSKY

1    A    One of two leads.

2    Q    One of two lead investigators?

3    A    Correct.

4    Q    And I take it, sir, as one of the two lead investigative

5    agents, before a request is made by any members of the FBI

6    team, to Katten Muchin, you would know about it; yes or no?

7            MR. PITLUCK:  Objection, Your Honor.

8            THE COURT:  Sustained.

9    BY MR. BRODSKY:

10   Q    When I ask you about your observations, Special Agent

11   Delzotto, I am asking you what you personally saw, with your

12   own eyes, or you observed another agent doing, writing some

13   subpoena out or writing out a document request.  So --

14           MR. PITLUCK:  Objection, Your Honor.

15           THE COURT:  Well, let him finish.

16           MR. PITLUCK:  I thought --

17   BY MR. BRODSKY:

18   Q    With that definition in mind, prior to arresting

19   Mr. Greebel in December of 2015, isn't it a fact that you

20   never observed any FBI agent, as one of the two lead

21   investigative agents on the team, requesting documents from

22   the law firm of Katten Muchin?

23           MR. PITLUCK:  Objection, Your Honor.

24           THE COURT:  I will overrule that objection, to the

25   extent he is asking for the agent's personal observations.

DELZOTTO - CROSS - MR. BRODSKY

1      THE WITNESS:  Everything that had to do with Katten

2  Muchin went through Eastern District of New York because it

3  was a law firm.

4  BY MR. BRODSKY:

5  Q      So is the answer, sir, you, your personal observations,

6  you never observed any request being made by the FBI team to

7  the law firm of Katten Muchin, yes or no, prior to arresting

8  Mr. Greebel in December of 2015?

9  A      Me, personally, I don't recall that because Eastern

10  District was handling that.

11  Q      And at the time that Mr. Greebel was arrested, you

12  understood, sir, yes or no, that some of the associates at

13  Katten Muchin who worked on Retrophin matters had left the law

14  firm; yes or no?

15  A      I don't recall at that time what I knew about who left

16  and when they left, and I'm sure some people left.  I don't

17  know that for a fact.

18  Q      Isn't it fair to say, sir, that when Mr. Greebel was

19  actually arrested he waived his rights and spoke to --

20      MR. PITLUCK:  Objection, Your Honor.

21  BY MR. BRODSKY:

22  Q      -- the FBI?

23      MR. PITLUCK:  Objection, Your Honor.  Move to

24  strike.

25      THE COURT:  I think I'm going to ask for a sidebar

DELZOTTO – CROSS – MR. BRODSKY

1    at this point, please.  Excuse me.

2                    (Sidebar conference.)

3                    (Continued on the next page.)

SIDEBAR

1

2          (WHEREUPON, the following proceedings were had at

3     sidebar, out of the hearing of the open courtroom, to wit:)

4          MR. KESSLER:  The record should reflect the smiling

5     of the defense bar as they walked over here, knowing that

6     question was improper.

7          MR. DUBIN:  Absolutely not, Your Honor.

8          MR. BRODSKY:  It was not --

9          MR. CHAN:  Jesus Christ.

10         THE COURT:  Don't do that.

11         Mr. Dubin complained about the government laughing

12    at some comment he made.  He's putting things on the record.

13    It is unfortunate you guys have devolved to this level of

14    advocacy on behalf of your clients.  It doesn't serve anyone

15    well.

16         MR. BRODSKY:  Your Honor, just --

17         THE COURT:  I don't appreciate cursing in my

18    courtroom.  I am not a religious person, but I don't think

19    yelling "Jesus Christ" at sidebar is a good thing, Mr. Chan.

20    And I really think everyone needs to grow up and become more

21    professional because this is getting intolerable.

22         MR. BRODSKY:  I will move on then to the substance,

23    Your Honor.

24         The agent with his answer, his speaking answers, has

25    suggested that a decision to go subpoena documents or obtain

SIDEBAR

1   documents or go talk to anybody at the law firm of Katten

2   Muchin who no longer worked there is not something the FBI

3   decided to do.  And I believe that created the impression, an

4   impression was being created that there's a view -- well, when

5   Mr. Greebel spoke to the FBI, and he waived his rights twice,

6   once signing it -- once in verbally, and once signing it.

7          They told him that Retrophin had waived the

8   privilege.  And they proceeded to ask -- he asked about it.

9   As Your Honor may recall from the post arrest statements, he

10  asked them on multiple occasions, "Can I talk about the

11  subject?  Is the privilege waived?"  And they said yes.

12         And then he proceeded to be asked about MSMB, his

13  work for MSMB, his work on the consulting agreements, his work

14  on the settlement agreements.  And Your Honor saw multiple

15  settlement -- statements that the government wanted to admit

16  into evidence.

17         So my view is, that knowing that the government is

18  going to elicit, "Hey, we couldn't go talk to him because of

19  some procedural issue with Judge Weinstein or some order," and

20  he's already -- I didn't point it out, Your Honor, but when he

21  answered those questions, he was directly looking at the three

22  prosecutors sitting at the prosecution table.

23         THE COURT:  But witnesses do that all the time.

24         MR. BRODSKY:  I understand.  I understand.

25         THE COURT:  You know.

SIDEBAR

1          MR. BRODSKY:  But my view is, Your Honor, that

2    knowing that the government is going to elicit that he --

3    there was some preclusion or bar because of crime fraud or

4    attorney-client privilege that prevented them from speaking to

5    people at Katten, and knowing that that is undercut and

6    undermined completely by the fact that when they arrested him,

7    they expressly told him, Special Agent Braconi, the privilege

8    is waived, and you can talk about all these subjects.

9          So my view is, when they -- on the day they arrested

10   Mr. Shkreli, or the day before or two days before or the very

11   same day, they could have gone to him.  And instead of, what

12   they did, Your Honor, was knocking on his -- not -- they

13   knocked on his door, nine agents.  They arrested him in front

14   of his three children who are sleeping, and one woke up.  His

15   wife was there.

16         And instead of all that taking place, they brought

17   him down in handcuffs, they told him the privilege was waived,

18   and they asked him all sorts of questions.  Nothing prevented

19   him on the day of arrest from saying, "Would you speak with

20   us," and going through the whole thing and saying Retrophin

21   waived and then eliciting all the same statements.

22         And so our view is there is no -- there is no basis

23   to argue that they could not have done that.  My question,

24   the -- my foundation for my question is based on the fact that

25   the government has proffered that they are going to elicit

SIDEBAR

1    from this witness that there was a block, because of

2    privilege, because of crime fraud, because of other reasons,

3    to getting statements from Mr. Greebel.

4           And in light of the fact on the day of his arrest

5    they had no block or nothing preventing them from eliciting

6    those statements, I believe I am allowed to elicit that they

7    spoke to him, he waived his rights, and they told him

8    Retrophin waived the privilege, and he spoke about all the

9    subjects.

10          And, in addition, I believe evidence of waiving your

11   rights -- I am not getting into the content of what he said.

12   Of course I can't do that.  That's all hearsay.  But waiving

13   your right, agreeing to speak, is consciousness of innocence.

14   And I believe there's case law supporting me that I can elicit

15   that if there was some objection on that basis.

16          So for those reasons, Your Honor, I think my

17   question is permissible, and I am allowed to cross-examine the

18   agent about this.

19          MS. SMITH:  So, I have a number of things to say.

20   One, I have no idea why this wasn't brought up prior to asking

21   this question.  And we need to actually speak to our appeals

22   division because I am very concerned about what we are allowed

23   to do on redirect, and as a result, what objections we can be

24   making now with respect to what Mr. Greebel did or didn't do

25   or say or didn't say.

SIDEBAR

1        And so I am shocked, frankly, that this is coming up

2   here.  Defense counsel knows that this witness was not, in

3   fact, at the arrest of Mr. Greebel, and so he's not, in fact,

4   an appropriate -- or the interview.  So he's not, in fact, an

5   appropriate person to be testifying to what Mr. Greebel was

6   told or not told on the day of the interview.

7        He also knows that Retrophin, in fact, waived with

8   respect to certain subjects, and that we sought the crime

9   fraud ruling to make sure, because Mr. Shkreli had a separate

10  privilege, that's part of the intricacy, and I do think the

11  agent, not being a lawyer, it's difficult for him to say that

12  necessarily, maybe as nuanced a form as a lawyer would, but

13  there were multiple steps that were taken with respect to what

14  was said to Mr. Greebel when he was arrested.  Again, this is

15  the wrong individual.  This suggestion is that he was told

16  things with respect to certain topics, which gets into the

17  contents of the interview.

18       And I have not seen the case law that Mr. Brodsky is

19  proffering for the first time at sidebar that suggests that he

20  can ask whether or not the defendant waived his rights and

21  spoke to the government, and, then, frankly, what is the scope

22  of our redirect on that.  Because, again, I'm worried that's

23  what's happening is the same thing with the story, we are

24  opening the door with Mr. Greebel had this story to tell, and

25  he spoke on these subjects and took this long, and we can't

SIDEBAR

1    cross because we can't -- you know, we're unable to -- we have

2    a right to put in his statements or not put them in, and we

3    have to be able to talk about what Mr. Greebel did or didn't

4    do.  For example, there were points at which Mr. Greebel said

5    that he was considering an innocence proffer, and then he

6    didn't come in.  I don't know -- I want to be very careful

7    about what we suggest happened afterwards.  If we want to talk

8    about timing, there were proffers that were being made at

9    different points by agents of his.  And so, you know, if we're

10   going to get into this, first of all, again, I think it is

11   completely inappropriate the way it was asked.  It is the

12   wrong witness, even if it was appropriate.  I am worried about

13   the Pandora's box we talked about, and I also, since I have

14   never heard this argument before, I don't know what case law

15   Mr. Brodsky is referring to with respect to being able to ask

16   this question.  We need to look into it so we have a sense of

17   what we -- what our objections can be, or not be.  I am not

18   sure that what the circumstances are, or other people are able

19   to say, you know, was Mr. Greebel, did he waive his rights

20   when interviewed.  If he has the case law, we can take a break

21   and look at it and speak to appeals division.  But this is a

22   unique argument, they briefed putting the investigation under,

23   you know, under a microscope, but not with any of the

24   specificity.  This is all stuff that could have been hashed

25   out ahead of time.

SIDEBAR

1          MR. BRODSKY:  Your Honor, his answers to the

2     questions, and government's proffer at sidebar, about what he

3     would say in response to an explanation is what prompted me to

4     ask that question.  It was not a planned event or planned

5     question.  And that's what often happens on cross-examination.

6          I listened to the agent's testimony, I listened to

7     the government's proffer, I put two and two together and I

8     thought to myself, they are going to get up and say, there's a

9     block that prevented him from going to talk to Mr. Greebel

10    prior to arrest, and they are going to suggest it was a

11    privilege issue, whether it was Mr. Shkreli or somebody else.

12    And the reality is there's zero block because when Shkreli was

13    arrested, Retrophin had waived the privilege --

14          THE COURT:  Have you already said this?

15          MR. BRODSKY:  Yes.

16          THE COURT:  Don't repeat.

17          MR. BRODSKY:  I don't think you have to confer with

18    appeals.  There's time --

19          THE COURT:   Okay.

20          MR. BRODSKY:  Take it question by question.  I think

21    we should proceed with cross-examination, not take a break

22    now, Your Honor, and interrupt the flow of the

23    cross-examination.

24          MS. SMITH:  It is the wrong witness, first of all.

25    He knows that.

SIDEBAR

1          THE COURT:  This witness did not interview him after

2     his arrest, did not administer rights; is that right?

3          MR. BRODSKY:  Yes, Your Honor.

4          MS. SMITH:  He was not there at the house.  So if we

5     are going into what was happening at the house, all the stuff

6     he's talking about, it's the wrong witness, as a first step.

7          MR. BRODSKY:  He's the colead investigative agent,

8     and so he knows firsthand Mr. Greebel was arrested that day

9     because he was in court that day.  He knows firsthand

10    Mr. Greebel had waived his rights.  He's the lead

11    investigative agent who knows that statements were made.  It

12    is beyond question that as a lead investigative agent, he just

13    put in a series of e-mails that the government presented to

14    him, that he didn't personally obtain, but he was allowed to

15    put them in and read them, and talk about them, because he's

16    the colead investigative agent.

17         THE COURT:  Because they were admissible.

18         MR. BRODSKY:  He was allowed to testify as to

19    certain things because he's a colead investigator, and the

20    number of people he interviewed, he testified about other

21    things, Your Honor, because he's colead investigative agent.

22    And that is when you put on the colead investigative agent,

23    that is permissible for cross-examination.

24         He knows.  It is not -- let's not pretend.  I am not

25    asking bad faith questions.  I am asking a valid good faith

question we all know about. I am not going to the content of what Mr. Greebel said post arrest. I know that's hearsay.

THE COURT: Let the government finish.

MR. PITLUCK: Your Honor, I'm trying to just take this back a step. We didn't proffer anything about what he was going to say. We said it opened doors, and we don't know exactly what he's going to say. Mr. Brodsky has now used this to ask a legally impermissible question about the fact that -- did he waive his rights and did he speak to the agent.

First of all, he wasn't there. Second of all, he's anticipating what he thinks a witness might say on redirect to open the door to ask this question about the post arrest interview where no statements came in, to then use it to argue that you didn't hear any statements from the government, but you know there was a post arrest interview, and you know he answered questions. The implication is he exonerated himself and he's innocent.

We have looked at this. This has been addressed numerous times in our statements we put in. We chose not to do it. So you can't open the door and say, in your post arrest interview he said things, and you didn't hear any of them. This is -- first of all, improper basis to ask an improper question. Second of all, it's the improper witness to ask it in front of. Third of all, we think it is legally impermissible to raise the issue of a post arrest interview,

SIDEBAR

1    when the government has not put any -- any evidence that such

2    a post arrest interview existed or any statements thereof.

3    They don't get to bootstrap this evidence in.

4                MS. SMITH:  What's the cases?

5                MR. BRODSKY:  There is a well known defense of

6    consciousness of innocence.  And when they -- we have a

7    perfectly valid basis, Your Honor, that, of course, the

8    government can argue otherwise, but a lawyer, who very well

9    knows his rights, who is verbally asked, will you waive your

10   rights.

11               THE COURT:  Give us the case that you are relying

12   on.

13               MR. BRODSKY:  I would like to see it.

14               MR. PITLUCK:  I would like to see it --

15               MR. KESSLER:  I'd love to read it.

16               MR. PITLUCK:   -- consciousness of innocence allows

17   you to circumvent --

18               THE COURT:  I don't want to make legal error that's

19   going to cause anything to have to be redone.

20               MR. BRODSKY:  Yes, Your Honor.

21               THE COURT:  I would like to --

22               MR. BRODSKY:  I never saw this case.  Ms. Rubin has

23   a case back there.

24               MR. KESSLER:  Specifically, it is not a case that

25   says consciousness of innocence, it's a case that says a

SIDEBAR

1  defendant can introduce the fact that he waived his rights and

2  agreed to speak to the government as evidence of --

3          MR. PITLUCK:  Based on consciousness of innocence.

4          MS. SMITH:  That's number one.  And, number two, he

5  would need to have individuals actually present at the

6  interview who can say what Mr. Greebel was or was not told,

7  assuming hearsay statements are appropriate in the first

8  place.  We do need to take a break, we need to see what the

9  case is.

10          THE COURT:  We can take a break.  I am not

11  interested in having, you know, walking into a buzz saw here,

12  you or defense or the government, or the Court in making

13  rulings that might need more careful consideration.

14          MR. KESSLER:  I'm happy to read whatever Second

15  Circuit cases --

16          THE COURT:  There are cases we can look at.

17          MR. BRODSKY:  I didn't know I was going to do this.

18          THE COURT:  You said there are a lot of cases.

19          MR. BRODSKY:  I know that generally.

20          THE COURT:  Okay.  Maybe one of your colleagues.

21          MR. BRODSKY:  We will look it up now.

22          THE COURT:  All right.

23          MS. SMITH:  And we will call our appeals division

24  and speak to them again.  This would not be the right witness

25  to do this anyway, and Mr. Brodsky is well aware of that.

SIDEBAR

1          THE COURT:  Maybe you want to call some other agent

2     who is present.

3          MR. PITLUCK:  It is not appropriate to talk about

4     the post arrest interview.  There's no evidence of that in the

5     record.  It is irrelevant.

6          MS. SMITH:  I was making the point, Mr. Brodsky

7     knows that this witness was not present when Mr. Greebel was

8     arrested, so all this discussion about what happened at the

9     house and everything else, which is completely inappropriate

10    anyway, and we briefed that ahead of time, you know, this

11    would be the wrong witness.  So that is our concern with the

12    way the question is asked, as if this witness was present,

13    which leaves the impression with the jury anyway.  But the

14    second level is that the concern about being able to ask the

15    question at all.  So we will take a look at the cases that

16    Mr. Brodsky has cited, Second Circuit cases, when he gives

17    them to us, and we can address any of the other issues after

18    the break as well.

19         THE COURT:  All right.

20         MR. KESSLER:  Give the jury a break.

21         THE COURT:  The jury today is able to sit until

22    5:30.  It would be a shame not to use all the time that they

23    are able to sit.  So I think I will give them a mid-afternoon

24    break.

25         MR. KESSLER:  It sounded like they had some cases

SIDEBAR

1    ready.  We will call our appeals now.

2                MS. SMITH:  Once we have the case.

3                THE COURT:  Good.

4                (Sidebar conference ends.)

5                (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1              THE COURT:  Members of the jury, I'm going to give

2        you a mid-afternoon break at this point.  Please don't discuss

3        the case.  And we'll come and retrieve you when the time is

4        appropriate.  There are some issues we need to resolve.

5              (Jury exits the courtroom.)

6              (Whereupon, the witness steps down.)

7              THE COURT:  Let's take a 15-minute break.

8              (Recess.)

9              (In open court outside the presence of the jury.)

10             THE COURT:  Will the parties get me up-to-date where

11       you stand.  You've spoken to your appellate folks and the

12       defense has provided the case United States Versus Mario

13       Biaggi, 909 F.2d 662.

14             MR. PITLUCK:  We proffer Biaggi for our position.

15       But there is other case law, United States Versus Demosthene,

16       United States Versus Marin, that say defendant introducing his

17       post-arrest statement simply for the fact that it was made,

18       shows that it must be, there must some be relevance in the

19       fact that it was made to an issue.

20             The example given in Demosthene, the fact that a

21       post-arrest statement was made, if the issue is, if the person

22       who made it was asleep, basically saying the mere fact that

23       something was said is relevant to an issue, the relevant issue

24       in the case.  Biaggi has not been extended to much of

25       anything, certainly not to somebody making statements to law

PROCEEDINGS

1   enforcement.  That was, as the Court is aware, a very narrow

2   case related to an offer of immunity.

3          THE COURT:  Right.

4          MR. PITLUCK:  And Demosthene itself says even plea,

5   rejection of a plea, not ruling on it, subsequent cases in the

6   Second Circuit said plea negotiations are not consciousness of

7   innocence.  This is a narrow opinion that certainly does not,

8   in our view apply to a stand where somebody waives Miranda and

9   makes a statement.

10          The number one overarching point that we asserted

11   from the beginning is Special Agent Delzotto is not present at

12   the interview.  He was not present at the arrest.  Anything

13   that he has to say about that was learned elsewhere, it's

14   hearsay.

15          But even going beyond that, the defense does not get

16   to put in the fact that he was interviewed and that he

17   answered questions and he waived Miranda, because it's not

18   relevant.  The statements -- and statements aren't coming in.

19   There is no relevance.

20          People waive Miranda all the time and make

21   statements.  There is nothing probative about that.  Your

22   Honor, we obviously we object to Special Agent Delzotto being

23   asked the question primarily for the hearsay reason and for

24   the impropriety there is not a shred of case law that says

25   that this is appropriate through any witness.  There is no 106

7864

PROCEEDINGS

1    issue, no rule of completeness.

2           Like most of the cases, as your Honor is aware, they

3    are seeking, defendant is seeking to admit parts that the

4    Government did not.  This is simply trying to raise the

5    specter that the defendant was interviewed and answered

6    questions and waived Miranda without putting in the

7    statements.  And that we believe that's improper.

8           Because there is only one inference to be taking

9    away from that, if you didn't hear he made statements, you

10   didn't hear anything, is only one inference, which is not the

11   correct inference in our view, but it's the Government's

12   decision whether to introduce the statements.

13          THE COURT:  Mr. Brodsky.

14          MR. BRODSKY:  Yes, your Honor, we believe that

15   United States Versus Biaggi 909 F.2d 662-1990 in the Second

16   Circuit is squarely on point in the lead case in the Second

17   Circuit for deciding whether an individual accused of a crime

18   takes certain actions, whether there is evidence of

19   consciousness of guilt.  It is squarely on all points, because

20   what the Court says is, quote, "In that case Mr. Mariotta had

21   a defense that he didn't have any, that the Government had

22   failed to prove his state of mind, his knowledge about the

23   alleged bribes that he placed.  The Second Circuit points out

24   that was squarely at issue and that the evidence about those

25   alleged it bribes, what Mr. Mariotta knew about the bribes was

PROCEEDINGS

1   in conflict.  That there was cooperating witnesses who claimed

2   Mr. Mariotta knew that the credibility of those cooperating

3   witness were in question."

4          Here the evidence is better for us and, the defense,

5   than Mr. Mariotta's defense.  There were cooperating witnesses

6   in that case who testified Mr. Mariotta had knowledge of

7   bribes.  Here the Government is principally relying, in fact I

8   would say entirely relying, on a set of inferences through

9   e-mails and testimony as undercut they can argue.

10          But state of mind of Mr. Greebel and what he knew

11   and didn't know, and whether Mr. Shkreli lied to him or didn't

12   lie to him, used him like a pawn or instrument, is squarely at

13   issue in the case, in that effected the court deeply in US V.

14   Biaggi.

15          What the Court said in Biaggi, they were faced with

16   a situation where Mr. Mariotta was offered immunity if he told

17   the Government what the Government would regard as truthful

18   information.  He did not have information that the Government

19   wanted because and he disagreed with the Government's

20   characterization s of facts.  And the Court went on to say

21   that even there was a dispute over whether or not

22   Mr.Mariotta's decision to reject immunity was how he was

23   incentivized or whether or not he -- the evidence relating to

24   it, what the jury, what the inferences should be drawn from

25   it.  The Court went on to say, there is a consciousness of

PROCEEDINGS

1   innocence defense, particularly when state of mind is at play.

2          It stated the following, your Honor.  It said,

3   quote, "The probative force of a" --

4          THE COURT:  What page are you on, please?

5          MR. BRODSKY:  On page 691, first full paragraph,

6   "The probative force of a rejected immunity offer is clearly

7   strong enough for rendering it relevant.  As Dean Wigmore has

8   written, this is the quote, "Let the excused whole conduct

9   come in; and whether it tells the for conscientiousness of

10  guilt or for conscientiousness of innocence, let us take it

11  for what it is worth, remembering that in either case it is

12  open to varying explanations and is not to be emphasized.  Let

13  us not deprive an innocent person, falsely accused, of the

14  inference which common sense draws from a consciousness of

15  innocence and it's natural manifestations," end quote.  That

16  is cited to Wigmore on Evidence, Section 293.

17         The Court went on to say that they reversed the

18  convictions.  They had to determine whether or not this error

19  that the Government had precluded based on the Government's

20  request to this Court, and that the Court granted the

21  Government's request of preclusion, the Court went on to say

22  they had to determine whether this error was enough to reverse

23  the convictions.  And the Court decided with that heavy weight

24  of getting a reversal of convictions, that it certainly was.

25         And so your Honor, in this case what we have, if you

PROCEEDINGS

1    compare Mr. Mariotta's decision to reject immunity, he was

2    incentivized to give the Government information in exchange to

3    get immunity.  And here we have a situation where Mr. Greebel

4    is arrested, a lawyer which is particularly important that

5    he's a lawyer who knows his rights.  He waives his rights.

6    And he decides that despite knowing my rights, I'm going to

7    written waiver, I'm going to orally waive, and I'm going to

8    speak to the FBI as long as they want, as long as they want.

9            They kept saying, he kept saying, well, I should

10   call a lawyer.  At one point he said I should call a lawyer.

11   They said to him during the interview, do you want to waive

12   your rights, he left a message with a lawyer.  He didn't know

13   he was under investigation.  He left with a message with this

14   lawyer colleagues he said, I need a lawyer.  And they said,

15   you want to stop?  He said, no, I'll continue to answer

16   questions.

17           And Dean Wigmore's words of wisdom, which the Second

18   Circuit adopted, are squarely on all points.  Could there be

19   anything more important than having evidence of a

20   consciousness of innocence of a person falsely accused, there

21   is a presumption of innocence, not guilt, a person who is

22   falsely accused of a crime, waives their rights to a lawyer,

23   and agrees to speak to the FBI.  What is wrong with us arguing

24   to a jury the power and probative value of that?

25           The Government may argue equally, as they did in

PROCEEDINGS

1    Mariotta, that you can't draw any conclusion from it

2    whatsoever.  And that it's evidence that he was just doing

3    other things, other motives.

4         But just because the Government is skeptical about

5    it, or have their own views about it, or is presuming or

6    believing in their case, let's not deny a person accused, we

7    believe falsely, of a crime the opportunity to demonstrate

8    consciousness of innocence by speaking when questioned by the

9    FBI after arrest.

10        Remember, the conditions of the arrest are relevant.

11   You're dragged out of your home.  There are multiple FBI

12   agents who stop in the street.  They come into your home six,

13   6:30 in the morning, your kids are sleeping.  They put guards

14   outside your kids doors.  All of that is relevant, because in

15   that state of mind most people would be frenzied.  They

16   wouldn't be speaking to the FBI.

17        But he gets arrested in front of his wife.  And he

18   gets taken to the FBI headquarters.  The only thing he's

19   thinking is I will waive my rights, I will speak to them, I am

20   innocent, I did nothing wrong.  There is nothing more powerful

21   than that.  That should be admitted into evidence.

22        There was another citing in Biaggi.  Judge Buchwald,

23   in the Southern District was confronted with a different

24   situation, but similar evidence of consciousness of innocence,

25   that the Government refused and argued against the admission

7869

PROCEEDINGS

1    of.  In that case, Rengan Rajaratnam -- I was not involved in

2    the prosecution of this case, I did not participate in the

3    trial.  So I'm not giving you other information related to the

4    trial that I have personal knowledge of.  Rengan Rajaratnam at

5    trial, I was outside of the office when this trial took place.

6              Rengan Rajaratnam was in Brazil at the time of the

7    charges.  And said I'm coming back.  I'm coming back to face

8    the charges.  The Government made all sorts of allegations and

9    suggestions that he was coming back for other motives, he was

10   trying to plead, he was never going to truly come back.

11             Judge Buchwald rejected all of that, relying on

12   Biaggi saying this is evidence of innocence.  And yes, the

13   Government has counter evidence that he had other motives to

14   come back or to do other things.  But that doesn't take away

15   from the fact that he had had evidence of innocence that he

16   was returning.  Now the Government cites --

17             THE COURT:  I'll tell you what my concern is, I

18   think the discussion that I'm seeing that could be problematic

19   between this case and the Rengan Rajaratnam case and Biaggi,

20   Biaggi involved an immunity.  The other case that you were

21   involved in, involved someone returning voluntarily from

22   abroad.  This is a question that was posed about waiving one's

23   Fifth Amendment right.  So he has a Fifth Amendment right as

24   of the time he's arrested, that he waives.  He has a Fifth

25   Amendment right at trial not to testify.

PROCEEDINGS

1          MR. BRODSKY:  Yes, your Honor.

2          THE COURT:  I'm concerned that there is some

3     undermining of the Fifth Amendment privilege against

4     self-incrimination that we've hammered into the jury at jury

5     selection and we'll do that again with the instructions.  I

6     don't know, I mean, if, I'm saying if Mr. Greebel is

7     convicted, whether we'll get post-trial motions for infective

8     assistance because this was put up before the jury.

9          The Government is the one usually who makes the

10    mistake of inadvertently or deliberately expecting that

11    somehow a defendant should have some burden to speak or

12    explain himself.

13         And the Courts have been very swift about condemning

14    that.  Here we have a defendant, through his counsel, who is

15    making an argument that the waiver of the Fifth Amendment

16    right is indicative of innocence.

17         I don't know what Mr. Greebel is going to do here at

18    this trial, but if he decides not to testify, whether or

19    not -- I know the Government would not argue this, but by

20    couching this in terms of a waiver of Fifth Amendment

21    privilege, post-arrest, will the jury be tempted to find or to

22    wonder whether or not the adverse or the converse conclusion

23    or inference should be drawn if Mr. Greebel doesn't testify.

24    That's my concern, maybe that's not anybody else's concern.

25         MR. BRODSKY:  Our view on it is that in this

PROCEEDINGS

1    particular circumstances with Mr. Greebel and being a lawyer,

2    his waiver is consciousness of innocence and fits within

3    Biaggi and its progeny.

4         The fact that he does not -- let's assume we put on

5    a case, and let's assume Mr. Greebel makes the decision and

6    decides not to testify, the decision not to waive your rights

7    is not consciousness of guilt.  I'm not suggesting that

8    anybody who will argue or imply to the jury or suggest to the

9    jury, and we're relying very heavily, and if Mr. Greebel

10   decides not to testify that the decision made not to testify,

11   there will be a very strong instruction that, and there is a

12   long tradition of it, that if you decide not to testify then

13   not implication cannot be drawn.

14        There are many criminal cases in which defendants

15   waive their rights and they testify or waive their rights

16   post-arrest and they give statements and the statements are

17   given.  And in those cases there is no suggestion if the

18   defendant doesn't testify that there was somehow an

19   implication that Fifth Amendment, undermining Fifth Amendment

20   privilege.

21        We believe strongly that the jury, given how clear

22   your Honor's instruction will be on how a person's decision

23   not to testify cannot be, nothing can be drawn from it.  If

24   Mr. Greebel decides not to testify, if we put on a defense

25   case, then we are, we have no issue with it.  We don't think

PROCEEDINGS

1    the jury will draw a problem from it.  We don't think the jury

2    will draw an adverse inference against Mr. Greebel.

3            On the contrary, one could argue that having been

4    arrested and having waived his rights that was consciousness

5    of innocence and that will enable us to tell the jury that in

6    a moment when a lawyer knows his rights and he spoke and

7    agreed to speak to the FBI, then that should be evidence of

8    innocence.

9            Now U.S. V. Demosthene, that the Government cites,

10   334 F. Supp. 2d 378, the District Court case in the Southern

11   District 2004, is simply not on point in that case as I read

12   the case.  The defendant was trying to, a person accused of a

13   crime is trying to admit his post-arrest statements, he was

14   trying to admit the content of them.  He said he fell under an

15   exception to the hearsay rules that he was arguing under the

16   rules of evidence of 801.

17           We're not trying to admit the content at all.  We

18   understand the content of Mr. Greebel's statements is hearsay

19   and inadmissible by us.  The cite to Demosthene is not

20   relevant.  I haven't completed my reading of the Marin case,

21   I'm happy to do so.

22           THE COURT:  No, unless you want to do it.  I think

23   we've kept the jury out for an hour.

24           Mr. Pitluck, did you want to be heard?

25           Let's first address the fact that this is not the

PROCEEDINGS

1  appropriate witness who will be able to establish that

2  Mr. Greebel did in fact make an oral and written Miranda

3  waiver and he nonetheless spoke to the FBI.  He's not the

4  right witness.  He was not there.  He did not take the

5  statement.  He did not obtain waivers and did not administer

6  the Miranda warning.  I really doubt that this is the right

7  witness for that purpose and he doesn't have any knowledge of

8  it.

9           (Continued following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

PM4 GB*

1

2          MR. BRODSKY:  Your Honor, respectfully as the

3    co-lead investigative agent on the case, he has direct

4    knowledge that Mr. Greebel waived his rights and made

5    statements and the fact -- the most important thing, as we all

6    know when the government goes out and arrests somebody and

7    they try to get statements, the one thing they all plan to do

8    is, particularly with somebody who is unrepresented, is they

9    make a plan, a joint plan and they try to figure out, are you

10   represented by counsel.  If they're not represented by

11   counsel, which means they had knowledge -- they had no

12   knowledge Mr. Greebel was represented by counsel in this

13   matter because he did have counsel, didn't know he was under

14   investigation, when they made a plan, because that is standard

15   operating procedure at the FBI and the U.S. Attorney's Office,

16   not knowing that he has counsel, they laid out a plan to ask

17   him to waive his rights, had the paper prepared to get his

18   statements.  And that is the plan that the co-lead case agents

19   would have been aware of.  And once there is a waiver of

20   rights and somebody speaks, unquestionably, Mr. Delzotto was

21   there during the arrest proceedings of Mr. Shkreli and he was

22   present, we believe, in Court when Mr. Shkreli was arrested --

23   when Mr. Shkreli was presented for arraignment,

24   unquestionably, as a co-lead case agent his personal knowledge

25   that Mr. Greebel waived his rights and Mr. Greebel made

PROCEEDINGS

1    statements and I don't think the government can deny that.

2         He doesn't have to be present in the room to have

3    personal knowledge that Mr. Greebel waived his rights and gave

4    statements.  There is an arrest form that's a business record

5    of the FBI, there's a form that they use that's standard

6    operating procedure and, undoubtedly, Mr. Delzotto -- Special

7    Agent Delzotto has known of this fact since the day of

8    Mr. Greebel's arrest.

9         MR. PITLUCK:  Judge, I'm not aware of a hearsay

10   exception for co-lead case agent.  Miranda forms come in as

11   statements of the defendant, not business records.  They are

12   prepared in anticipation of litigation.  The hearsay issue --

13   this is not the right witness, the Court is correct.  What

14   Mr. Brodsky's beliefs and ideas and insinuations based on the

15   fact that he was involved in the arrest.  Special Agent

16   Delzotto was not there for the interview, he was not there for

17   the defendant's arrest.  He is not the appropriate witness to

18   talk about those issues should they be appropriate, which we

19   strongly believe they are not.

20        *Biaggi* does not apply here.  That was a fact of an

21   offer of immunity based on knowledge.  The Miranda -- the fact

22   that a defendant waived Miranda and speaks, regardless of

23   whether or not they're a lawyer, would be literally applicable

24   to every criminal case in which somebody made a statement, and

25   the government chose not to introduce it.

PROCEEDINGS

1          THE COURT:  You would think that if that were the

2    case, and I'm not doubting that defendants often waive Miranda

3    warnings and speak to agents after they are arrested, we have

4    not found a case squarely on point with this particular

5    situation, despite its common occurrence where the government

6    has objected to the admission of a Miranda waiver and a

7    statement, a post-arrest statement to law enforcement --

8          MR. PITLUCK:  Neither have we, Judge.

9          THE COURT:  -- in support of this consciousness of

10   innocence.

11         I'm not firmly convinced that it cannot be admitted.

12   There's no case that we've found, we've looked, that would

13   forbid the defense from presenting the evidence.  I'm just

14   trying to make a point that this particular agent may not be

15   the correct person to do it.

16         MR. PITLUCK:  Judge, I think there is a reason why

17   *Biaggi* has not been extended.  We Shepardized *Biaggi*, if you

18   look down it is all declined to follow even in instances where

19   the defendant's have rejected pleas.  We think there's no case

20   because it is self-evident that just because you refuse to

21   speak to -- there is a lot of hearsay and relevance issues.

22   There's tons of cases about defendants introducing the content

23   of their own statement.

24         If you read Demosthene it says the mere fact that a

25   statement is made it must be relevant to the issue.  So I

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    disagree with Mr. Brodsky's reading.  *Marin* and *Demosthene*

2    differentiate between affirmatively admitting statements and

3    admitting a fact that a statement was made.  And those cases

4    say it has to be relevant to something about the making of the

5    statement.  And the example that I gave was the one from

6    *Demosthene* not simply that it is consciousness of something.

7              It cannot be the case that the consciousness of

8    innocence that is cited 28 years ago in *Biaggi* not extended

9    since then applies to anybody who agrees to speak to law

10   enforcement after waiving Miranda.  People do that all the

11   time.

12             MR. BRODSKY:  Your Honor, I do note in the

13   *Demosthene* case that the government cited, I point Your Honor

14   to a particular portion of it, we believe it supports us.

15   It's on 334 F. Supp. 2d 10 point site of 381.  Quote, however,

16   to the extent -- he first tried to evict the post-arrest

17   statements, and these were actual statements for the truth and

18   for other arguments.  And the Court then said, quote, however,

19   to the extent that *Demosthene* seeks to use his post-arrest

20   statements for any purpose other than the truth of the matter

21   asserted, for example, under Federal Rule 613(b) to impeach a

22   government witness who has personal knowledge of the

23   statements may be admissible solely for this limited purpose.

24             Now he was trying to admit the actual statements,

25   we're not.  And so the difference here is what the Court there

PROCEEDINGS

1   was saying was if you are trying to get it for the truth of

2   the matter asserted, the actual statements, well that's not

3   coming in, but if there is some other proper purpose, then

4   they would be admissible.

5        Here we're just asking for not the content for the

6   waiver, the act of the waiver and the act of speaking and

7   answering questions and saying I'll speak as long as you want

8   and answer your questions, is probative, strong probative

9   evidence for a lawyer of innocence.

10        MR. PITLUCK:  Judge, the difference is -- and

11   *Demosthene* that says nothing about this situation here.

12        What *Biaggi* said is that there is no other inference

13   that can be drawn from somebody who refused a request for

14   immunity for not being prosecuted other than a lack of

15   knowledge.  You cannot draw the same inference from somebody

16   who waived Miranda and speaks to law enforcement.  That's the

17   reason why the courts have refused to extend it to guilty

18   pleas, there would be a number of other reasons why people --

19        THE COURT:  Did you find a case where the Court

20   specifically addressed whether or not a defendant could argue

21   consciousness of innocence based on the fact that he had or

22   she had waived Miranda rights including the Fifth Amendment

23   right and made a post-arrest statement?  There is no case --

24        MR. PITLUCK:  No.

25        THE COURT:  -- that says you can't do that or that

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    you can do it.  I think that it is -- you know, this is part

2    of the defense's theory that Mr. Greebel's innocence is

3    supplanted by the fact that he agreed to waive his Miranda

4    rights and speak to the FBI.  They want to make that argument.

5    All they want in evidence at this point is the fact that he

6    waived and he spoke.

7              MR. KESSLER:  Your Honor, but the difference is it's

8    sort of a like the acquittal point, the people waived their

9    Miranda and tell false statements to law enforcement all the

10   time.  Special Agent Delzotto, you know, certainly has

11   personal knowledge of that fact.  That's why there aren't

12   cases where there are inferences drawn.  The point of *Biaggi*,

13   the reason it is so rare, it's never been extended is the idea

14   that someone would turn down an immunity offer by saying I

15   don't know a fact.  No one would do that unless they knew the

16   fact.  But people waive their Miranda rights and say false

17   statements all the time.  That's why these inferences don't

18   come in.

19             We have courier case after courier case where nobody

20   is allowed to put the fact in that the courier was interviewed

21   and waived their Miranda rights and agreed to talk.  So that's

22   the difference.  That's why there aren't these cases.

23   Obviously this is an argument we can have with a different

24   witness, but that's why this isn't allowed.  Because the only

25   inference the defense is trying to draw from the fact that

PROCEEDINGS

1  someone waived a Miranda right is he must have been telling

2  the truth.  He must have wanted to say the truth, he must be

3  innocent, but that happens all the time with people who are

4  not innocent.

5          THE COURT:  But in those cases the government will

6  usually be able to admit, as you can here, the defendant's

7  statements as admissions and you can show, if you believe it

8  to be the case, that the statements are false.

9          MR. KESSLER:  Right, but the converse they're trying

10  to put in what they believe is their version of the

11  statements, which is he must have been innocent and he must

12  have been saying things that show he's innocent, but they

13  can't.

14          THE COURT:  We spent a lot of time reviewing those

15  statements --

16          MR. KESSLER:  Exactly.

17          THE COURT:  -- because both sides wanted to proffer.

18  We also spent time discussing the videotapes --

19          MR. KESSLER:  Exactly.

20          THE COURT:  -- and what was going to be an

21  appropriate video to show the jury and the government had the

22  ability to put in any statements that the defendant made

23  post-arrest and/or prove that those statements were false,

24  which is what I thought you were going to do.  So in those

25  cases I think there is some distinction because the government

7881

PROCEEDINGS

1  did, in fact, use those post-arrest statements.

2          MR. KESSLER:  Sometimes the government does,

3  sometimes the government doesn't.  Sometimes the post-arrest

4  statement is neither here nor there.  You don't get to argue

5  because a statement is made.  The only -- let's put it this

6  way, the inference is that the only person who would waive his

7  Miranda rights is innocent.  That's the inference.

8          THE COURT:  All right.  I think the best way forward

9  is this:  The defense will not be making arguments until

10 summation, right?  Right now we have a witness who is not the

11 appropriate witness through whom to admit evidence that

12 Mr. Greebel did receive written and oral Miranda warnings and

13 waived both, and that Mr. Greebel thereafter made statements.

14 That's for another witness who has knowledge of the

15 circumstances of the statements and the waivers.

16         But I will look into the views, the conflicting

17 views before summations as to whether or not the defendant may

18 then argue, based on the Miranda waiver and the making of

19 statements, that is evidence of innocence.

20         It seems to me that given the quotation of *Wigmore*

21 and *Biaggi* that they are interpreting fairly broadly a

22 defendant's right to submit or to argue that certain evidence

23 is evidence of innocence.  But if you are continuing to object

24 to that argument on behalf of the defendant, then I'll look at

25 it before the time comes for summation.

PROCEEDINGS

1          And I think that at this point this statement is not

2   properly admissible through this agent, so in any event I

3   think we can move forward.

4          MR. KESSLER:  We can strike the question, we can

5   think about whether to provide the Court with additional

6   material about this question.

7          THE COURT:  Right.  I don't think it's appropriate

8   to allow -- despite the fact he's a case agent he does not

9   have the ability to personally testify about the Miranda

10  warnings, how they were administered and whether Mr. Greebel

11  actually waived.

12         MR. BRODSKY:  Your Honor --

13         THE COURT:  Yes, there might be a document that he

14  signed waiving it in terms of the oral warnings and whether he

15  made statements, this agent was not there.

16         MR. BRODSKY:  Your Honor, we should be permitted to

17  try to lay a foundation before this witness.  It is perfectly

18  permissible for us to cross examine a witness and try to lay a

19  foundation.  We believe he has personal knowledge and we'll be

20  able to lay a foundation.

21         THE COURT:  Well, he wasn't there and as you

22  question this agent about whether he was there when emails

23  were sent or whether he was there when statements were made,

24  when some of the individuals whose names have been mentioned

25  during this trial, the point is that this agent does not have

PROCEEDINGS

1   personal knowledge, i.e. he did not observe, hear, or

2   administer the warnings or obtain the waivers.

3          MR. BRODSKY:  Your Honor, there was a videotape

4   taken of Mr. Greebel's statements and his waiver.  I don't

5   know whether or not Mr. Delzotto was present when that

6   videotape statement was being given.  I don't know whether or

7   not Mr. Delzotto had personal knowledge.

8          THE COURT:  You just want to ask him preliminarily

9   whether he was present in the room with Mr. Greebel when

10  Miranda warnings –– whether he observed Miranda warnings being

11  given orally or in writing?  If he says yes, we don't have an

12  issue, if he says no ––

13         MR. BRODSKY:  I want to ask him if he has personal

14  knowledge about it.  And, Your Honor, I would characterize our

15  view of *U.S.* v. *Biaggi* is not a broad view of consciousness of

16  innocence.

17         This is a unique case where state of mind is

18  squarely at issue.  Where we have somebody who waived rights,

19  gave statements and the government's not offering any

20  statements.  The government can't even cite a case and we

21  didn't find any, and Your Honor hasn't found any, as I

22  understand it, where the government –– where this was argued

23  where somebody tried to admit, tried to get into evidence the

24  fact that they waived their rights and made statements.  So I

25  don't think we're asking for a broad reading or a reading that

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1   will apply to many cases.

2          I feel like this is a very unique situation.  Same

3   with *Rengan Rajaratnam*.  There is no case that could be cited

4   by Judge Buchwald with respect to the fact of *Rengan*

5   *Rajaratnam*.  In *Biaggi*, it was hard for *Biaggi* to cite case

6   with a similar set of facts.  These are very unique

7   circumstances where state of mind is at issue, and so,

8   respectfully, I think we have -- we are not applying the broad

9   reading of *Biaggi*, but squarely on all fours of *Biaggi*.

10          MR. KESSLER:  Your Honor, in 28 years no case has

11   ever approved of this that the defense has.  But hearsay

12   exception is not a personal knowledge exception, it is a

13   hearsay exception.

14          Special Agent Delzotto was not in the room.  We have

15   a video, we know he wasn't.  Anything he knows will have come

16   from some other source, so it will be an out of court

17   statement offered to prove the matter asserted.  That's the

18   end of it.  He wasn't there, we know he wasn't there.

19   Mr. Brodsky knows he wasn't there.

20          THE COURT:  I don't know that.

21          MR. KESSLER:  He's not in the video, he's not there.

22          MR. BRODSKY:  He may have seen the video while it

23   was being played, he may have seen the video while it was

24   being recorded.

25          MR. KESSLER:  The point is to ask him in front of

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1   the jury is just to get the information in, that's what they

2   want to do.  He doesn't have the knowledge.  He wasn't there.

3           THE COURT:  Well, as an Officer of the Court, can

4   you represent to me that he was not in the room or within

5   earshot or was not able to visualize or observe the

6   administration of Miranda warnings both orally and in writing

7   and that he wasn't able to observe and did not observe, hear

8   or see or be within earshot of any statements that Mr. Greebel

9   made?

10          MR. PITLUCK:  Your Honor, I can certainly make that

11  representation in regard to the interview -- sorry, the

12  Miranda warnings, the administration of the Miranda warnings,

13  the whole period of arrest and the waiver of Miranda warnings,

14  he was not present for any of that.  There were two arrests

15  going on, he was on the other arrest.  I can say that, Judge,

16  he does not have personal knowledge of this.

17          And to put the issue in front of the jury that's all

18  they want to do is ask the question.  That's why we objected

19  to the question as soon as it came out.  He was not there.  I

20  haven't said this through the whole trial, as an Officer the

21  Court I can tell you he was not present for the waiver of the

22  Miranda warning, the arrest of the defendant, or the beginning

23  of the interview.  I don't know if he, at any point, walked by

24  the room while the interview was going on, but I don't believe

25  that's the case.  And I don't think that's relevant because he

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1  wasn't there for the key issue which is the waiver of Miranda.

2           MR. BRODSKY:  Your Honor, in other cases what courts

3  have done is put the witness on the stand outside the presence

4  of the jury so questions can be asked to see if we can lay the

5  proper foundation.  I accept Mr. Pitluck's representation, but

6  the reality is we don't know because he's not on the witness

7  stand, whether or not he observed the recording being made,

8  whether --

9           THE COURT:  Well, all right.  Why don't we have him

10  come in and ask him those questions, all right.  I think

11  that's appropriate.

12           I'm not saying I disbelieve you, Mr. Pitluck, I take

13  your word as an officer of the Court, but since Mr. Brodsky

14  wants to just make preliminary inquiry outside the presence of

15  the jury, I think we can allow these short questions to be

16  asked and then we'll move forward.  If he doesn't have

17  knowledge, didn't observe it, didn't hear it, didn't see it,

18  then my ruling that I have made preliminarily based on your

19  representation is going to be enforced.

20           MR. PITLUCK:  That's fine, Judge.

21           THE COURT:  Please bring him in and we will get him

22  in here and, Mr. Brodsky, I trust this is not going to take

23  more than five minutes.

24           MR. BRODSKY:  That's what I expect, Your Honor.

25           THE COURT:  It should be like four questions.

PROCEEDINGS

1        MR. BRODSKY:  I haven't thought of them, but I'm

2   going to do that right now.

3        THE COURT:  Well --

4        MR. PITLUCK:  I'm happy to do it, Judge.

5        MS. SMITH:  Yes.

6        THE COURT:  You want the government to do it for

7   you?

8        MR. BRODSKY:  I think we'll --

9        THE COURT:  You've got him on cross that's why I

10   preferred to defer to Mr. Brodsky.  The government should get

11   this done in three minutes, you shouldn't have to take five,

12   I'll give you five.

13        MR. BRODSKY:  I think the government has an interest

14   of not having him testify with personal knowledge.

15        THE COURT:  You can phrase the question as you want.

16        Hello, Agent, sorry to keep you waiting.  Come on up

17   here, please.  We have some questions to ask you.  Mr. Brodsky

18   would like to ask you some questions.

19        You're still under oath.

20        THE WITNESS:  Sure.

21        (The following took place outside the presence of

22   the jury.)

23   BY MR. BRODSKY::

24   Q    Special Agent Delzotto, on the day of Mr. Greebel's

25   arrest and Mr. Shkreli's arrest you were assigned to the team

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    for Mr. Shkreli's arrest, correct?

2    A    Correct.

3    Q    And there came a time when Mr. Greebel waived his rights,

4    correct?

5    A    Yes.  He waived his rights, which is not unusual.

6    Q    And you understand that he waived his rights because --

7    and I would ask you to look towards me not the prosecutors,

8    but you understand that when he waived his right -- you

9    understand he waived his rights.  Were you in -- you were in

10   the same building when Mr. Greebel was waiving his rights?

11   A    I was a couple of rooms down.

12   Q    And you learned very, very quickly that Mr. Greebel had

13   waived his rights that day?

14              MR. KESSLER:  Objection, Your Honor.

15              THE COURT:  How did you learn that Mr. Greebel

16   waived his rights.

17              THE WITNESS:  How did I learn?  I had a co-case

18   agent, you know, had told me at some point.

19              THE COURT:  Did you observe Mr. Greebel being

20   administered any Miranda warnings, either orally or in

21   writing?

22              THE WITNESS:  Did I observe it, like, live as it was

23   happening, no?

24              THE COURT:  Did you witness Mr. Greebel waiving any

25   Miranda rights that he was advised of?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1        THE WITNESS:  In person, no.

2        THE COURT:  Were you present for any part of his

3   interview?

4        THE WITNESS:  On the day of Mr. Greebel's arrest I

5   recall the door might have been open to the room that he was

6   in, I might have walked past him, maybe ducked in, but I

7   didn't -- I don't recall speaking to him or anybody in the

8   room.  It was just as we were putting him in the room and my

9   co-case agent was about to speak to him and then I left

10  quickly so I didn't say anything to him.  I didn't interview

11  him, I didn't do anything.  I went down to the room where

12  Mr. Shkreli was and I began speaking with him.

13  BY MR. BRODSKY::

14  Q    And you observed Special Agent Delzotto, was what you

15  observed with respect to the door open and Mr. Braconi sitting

16  in with him you -- Special Agent Braconi you understood he was

17  going to begin a period of questions for Mr. Greebel, correct?

18  A    All I know is he was sitting in the room.  I didn't even

19  know when he was going to do the questioning.  Obviously he's

20  in the room so we could speak to him.

21  Q    You understood that was the purpose of putting him in the

22  room to speak to him?

23  A    That was my understanding, yeah.

24        THE COURT:  Did you know when you observed him

25  whether or not he had been given Miranda warnings and waived

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    them?

2            THE WITNESS:  At that time, no, I didn't know.

3    BY MR. BRODSKY::

4    Q    And during that day when Mr. Greebel was making

5    statements, did you observe at any point the statements he was

6    being made -- from the outside, from the recording?

7    A    No.

8    Q    At any point?

9    A    Not at that time, no.

10   Q    And the first time -- you do learn about the videotape

11   and watched the videotape, correct?

12   A    Not that day, no.

13   Q    A subsequent day?

14   A    A subsequent day, yes.

15   Q    And you go down to court where Mr. Greebel is arraigned?

16           MR. PITLUCK:  Your Honor, what more do we need?

17           THE COURT:  All right.

18           MR. BRODSKY:  I'd like a little latitude to lay the

19   foundation.  I think I can lay some foundation.  I know that

20   Mr. Pitluck disagrees -- well, if you ask three more

21   questions, Your Honor, if I may.

22           MR. PITLUCK:  Your Honor, he just testified he

23   wasn't present for any of this.

24           MR. BRODSKY:  I should be allowed three more

25   questions.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1          THE COURT:  Well, I don't think that answer is going

2   to change if you start getting into what went on at the

3   arraignment, right?

4          MR. BRODSKY:  Unless he has personal knowledge at

5   the arraignment post-arrest statements were made.

6          MR. PITLUCK:  That doesn't change anything, Judge,

7   he was told of it after it happened.

8          MR. BRODSKY:  And if he watched the videotape

9   afterwards I do think that's personal knowledge from watching

10   the videotape.

11          THE COURT:  Well, I think that the agent's testimony

12   establishes that he was not in the room and did not observe

13   Miranda warnings being given, did not observe Mr. Greebel --

14          MR. DUBIN:  Your Honor, can we go sidebar?

15          THE COURT:  I'm just trying to recap what he said.

16   We've done enough of the inquiry.

17          MR. DUBIN:  I don't want to disagree in front of the

18   witness.

19          THE COURT:  All right.

20          He's going to step out.

21          (Witness excused.)

22          MR. DUBIN:  I think the reason why I don't want to

23   do it in front of Mr. Delzotto is that his personal knowledge

24   doesn't only have to come from him actually observing

25   something happen.  He's the co-case agent.  If his fellow case

PROCEEDINGS

1    agent informs him of it or he watches the video, whether it's

2    that day or a week later and that's how he gains the personal

3    knowledge, he doesn't have any less personal knowledge than if

4    he sat there and watched it live.  So the fact that he has the

5    personal knowledge doesn't have to come contemporaneous to

6    when it's happening or else people -- that's the problem.

7              MR. KESSLER:  There is no personal knowledge in a

8    hearsay context the question --

9              MR. DUBIN:  It's in the hearsay context.

10             MR. KESSLER:  He's going to testify -- if he

11    testifies Mr. Greebel waived his Miranda rights during the

12    interview, it will be based on information that he didn't

13    observe firsthand.  He will be offering some out of court fact

14    statement he received from the video, from Agent Braconi, from

15    someone else that that happened and he will be offering it for

16    the truth.  That's the end of the story.

17             MR. DUBIN:  I disagree.

18             MR. KESSLER:  He was not there.  The Miranda waiver

19    is even more hearsay.

20             MR. DUBIN:  If he watched the video and he got

21    knowledge that way, he clearly has the knowledge that he

22    waived his rights.

23             MR. KESSLER:  You can't call someone who watched a

24    video to say what happened.  You know, there's a robbery, you

25    put in the -- there's a security video.  You don't call

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

7893

PROCEEDINGS

1   someone say I watched a video and therefore I know what

2   happened or this happened.

3   MR. DUBIN:  Your Honor, that's simply not the case.

4   That would mean that any police officer, any law enforcement

5   officer that ever testifies in court has to observe everything

6   firsthand or else they can't testify to it.

7   THE COURT:  Well, typically when there is a

8   suppression hearing and there is an issue about the Miranda

9   warnings the agent who administered the Miranda warnings is

10  the one who comes in to testify that they were given.  I don't

11  think I've ever had a situation where an agent has relied on

12  hearsay to establish that the Miranda warnings were given.

13  MR. DUBIN:  Well one of the things I was hoping we

14  could to do and what Mr. Brodsky intended to do when he wanted

15  to ask a few more questions is, let's just find out, he's here

16  now let's find out how he got the knowledge.  If it was

17  because his co-lead agent told him or it's because something

18  that he heard that would be different.  What we didn't get he

19  said he watched the video at some point, can we find out when?

20  He has knowledge of it, he said that.  Can we find out the

21  basis of his knowledge and then if Your Honor isn't satisfied,

22  I assume we're going to have to call the agent that

23  administered the rights it seems like.

24  THE COURT:  It's a relatively simple thing just call

25  the agent who was there.  What is the big problem with having

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    the agent come in and testify that I gave him the warnings

2    orally, he waived, I gave him the warnings in writing, he

3    waived, he spoke to us.  I don't understand.

4              MR. DUBIN:  Well, because we're being mindful of the

5    schedule and how long the trial has lasted.

6              THE COURT:  It's a five minute inquiry.

7              MR. DUBIN:  And also -- and also the fact that we do

8    think that this witness appropriate.  We think he has

9    firsthand knowledge.  We don't think that it was garnered from

10   hearsay, but we can't figure that out unless we're allowed to

11   ask a few more questions.  What's the harm?

12             MS. SMITH:  Your Honor, it's already been

13   established he wasn't there at the time of the waiver, when it

14   was administered orally or in writing.  He wasn't there for

15   the interview.  So to the extent he learned about it

16   afterwards, I'm not sure if temporally if he learned about it

17   a day later or 10 days later it doesn't make him anymore of a

18   witness of the events.

19             Our office has trials all the time, and in front of

20   Your Honor 11 weeks we had to call six different agents to do

21   different seizures over all three dates because you personally

22   have to get the person who was there actually heard from the

23   defendant what they said.  This happens all the time.

24             This idea that someone has their the case agent so

25   anything that happened in the case that they have personal

PROCEEDINGS

1    knowledge about that they can somehow testify to.  It's

2    completely improper.  That's why we have the rules of

3    evidence.

4            As Your Honor pointed out, Mr. Brodsky made a huge

5    point of establishing that with respect to certain aspects of

6    the emails the agent doesn't have personal knowledge so he

7    can't possibly interpret what was in the emails, yet they want

8    him to talk about events for which he was not present and

9    testify to them for the truth of the matter, for what was

10   said, for what Mr. Greebel did.  It is just -- it is

11   completely improper.  And once -- I mean, separate and apart

12   from the issue of whether or not this is consciousness of

13   innocence, it is the wrong witness.  They have a witness on

14   their witness list who was present for at least one of the

15   waivers.  So there's nothing to prevent them from calling that

16   person if Your Honor rules that that's the appropriate -- that

17   evidence can come in.

18            (Continued on the next page.)

19

20

21

22

23

24

25

PROCEEDINGS

1              (Open court; no jury present.)

2              MR. DUBIN:  The only thing that I will say, and then

3      I will sit down, it is very different, what he was doing with

4      regard to personal knowledge when Mr. Brodsky was

5      cross-examining him, is he was purposely injecting his view

6      about documents being either connected or disconnected to try

7      to paint it in the most -- in the least favorable light to

8      Mr. Greebel.  That is what he was doing, as opposed to just

9      reading in the documents.  And he clearly had no personal

10     knowledge about the documents when he read them in on direct

11     or on cross.

12              Now, he might have his own personal subjective

13     belief about what documents mean, and that's what we were

14     dealing with with that situation.  Here, he's getting the

15     personal knowledge, either by watching the video or learning

16     it some other way, which we don't know yet because we didn't

17     finish the examination of him.

18              But, you know, I understand Your Honor's ruling, I

19     am respectful of it, but I think it is very different than

20     what he was attempting to do with the documents.

21              THE COURT:  If he learns about it because someone

22     told him so, or he read something, that's hearsay.  Right?

23     And there is an agent available to you to call to establish

24     everything that you want, who has personal knowledge, and

25     would be an appropriate witness.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

PROCEEDINGS

1        MR. DUBIN:  Okay.

2        THE COURT:  I mean, that's --

3        MR. DUBIN:  All right.  I was --

4        THE COURT:  That's how it works.

5        MR. DUBIN:  Yeah, I understand.  The only thing is

6   we were trying to establish is that the waiver happens when

7   he's watching the video, and the government's position is

8   that's hearsay?  Where an official recording is created of

9   Mr. Greebel by his co-case agent, and it is not from him

10  reading anything and not from the case agent saying anything

11  to him, it is really their position?  I don't know.  If that's

12  their position that when he watches the video, that that was

13  hearsay?

14       MS. SMITH:  You can put anybody on the stand.

15  Anybody who has ever watched the video could get on the stand

16  and say that Mr. Greebel waived his rights.  I mean, I don't

17  understand, just because he's the case agent, it doesn't make

18  it -- defense has argued multiple times about double and

19  triple hearsay.  You literally can't just put anyone on the

20  stand and say, "I watched that video, and so I know that

21  Mr. Greebel waived his rights."  That's not the way it works.

22       MR. DUBIN:  He's not just anybody.  He just

23  testified he was three doors down, and he was walking by and

24  popped his head in, and he's the guy that was coordinating the

25  arrest for the FBI.  I just don't get it, but I understand

PROCEEDINGS

1    Your Honor's ruling, and we have to be respectful of it, so.

2            THE COURT:  Well, look.  Let me just say something.

3    I appreciate your respect.  I have noticed from time to time

4    that heads on both sides of the table are sometimes wagging or

5    shaking or nodding up and down, smirks are being exchanged.

6    Whispering.  I think, you know, you're both visible to the

7    jury, you both need to just -- both sides need to just rein it

8    in --

9            MR. DUBIN:  We agree.

10           THE COURT:   -- and not engage in any sort of

11   gesturing, expressions.  You should just be a mask.

12           MR. DUBIN:  We agree.

13           THE COURT:  We all have to do that because I think

14   the jury should be focused on the witness and the evidence,

15   and should not be distracted by facial gestures or, you know,

16   chats at counsel table.

17           The agent and other witnesses have been called out I

18   think in front of the jury for looking over at the government

19   table.  I am a little concerned about that, because when a

20   witness testifies, as you know, they really are supposed to

21   listen for any objection, right, and simply imputing some

22   ill-motive to a witness looking over toward the counsel table

23   to see whether they're going to object or stand up, and

24   suggesting that somehow there's something improper going on I

25   think is not appropriate.  If I thought that was going on, I

7899

PROCEEDINGS

1    would say something --

2                MR. DUBIN:  Yes, Your Honor.

3                THE COURT:  -- but my sense is that, you know,

4    sometimes the government has started to get up, and that does

5    attract attention.  I, sometimes, am not going to see that, I

6    am trying to be aware of it, but to the extent a witness is

7    looking over at the counsel table to see if there's going to

8    be an objection or whatever is perfectly okay.  I don't think

9    that one should infer that there's something untoward

10   happening.

11               MR. DUBIN:  Okay.  Thank you, Your Honor.

12               THE COURT:  Okay.  So can we just get the jury back

13   in?  I know we have to adjourn in 40 minutes, but let's just

14   try to salvage what's left of the day.

15               I just want to talk, also, what do we do about what

16   happened before the break?  I am --

17               MR. BRODSKY:  I'm happy to withdraw the question and

18   move on.

19               THE COURT:  I am thinking that might be the best

20   way.

21               MR. BRODSKY:  In light of Your Honor's ruling.

22               THE COURT:  Okay.  And I am sure the government will

23   help you obtain witnesses' presence, if you choose to do that.

24               MR. BRODSKY:  Yes, Your Honor.

25               MR. PITLUCK:  Your Honor, I think we would like to

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

PROCEEDINGS

1  submit something, if -- and Your Honor said the Court was

2  going to look at the law related to that issue, since I do

3  think that there's something to be done there.

4              THE COURT:  All right.

5              (Short pause.)

6              THE COURT:  Juror number 12 would like to be

7  dismissed by -- I believe it was by 2:00 on Friday to attend

8  the wake.

9              MS. SMITH:  Yes, Your Honor.  We would suggest,

10  depending on whether, obviously, the defense decides to put on

11  a case, but if they decide not to, that perhaps that would be

12  a time to do the charge conference.  Even if the defense's

13  case isn't complete, I think we can get through most -- to the

14  extent that there are a couple of things that need to be

15  outstanding until the entire case is closed, but that was our

16  suggestion so that we can kind of utilize the rest of the day.

17              THE COURT:  Sure.  The only time constraint, we

18  would have to adjourn at 4:45.

19              MS. SMITH:  Right.  I understand for the Friday.

20  But at least we can -- that was just a suggestion.  Obviously,

21  whatever the Court wants to.

22              THE COURT:   No, I would like to get it done.  I

23  don't want big gaps in the trial.

24              MS. SMITH:  To at least get started.

25              THE COURT:  Okay.

DELZOTTO - CROSS - MR. BRODSKY

1      (WHEREUPON, at 4:55 p.m., the jury re-entered the

2 courtroom.)

3      THE COURT:  All jurors are present.

4      Members of the jury, I'd like to thank you again for

5 your patience and understanding.  We do from time to time have

6 issues we need to resolve.

7      Mr. Brodsky, you may continue your cross.

8      MR. BRODSKY:  Yes, Your Honor.  Thank you.

9 CROSS-EXAMINATION (Resumed)

10 BY MR. BRODSKY:

11 Q    Let me switch to a different question for you, Special

12 Agent Delzotto.  And I will come back to this issue, but I did

13 want to ask you briefly about the following.  And let me turn

14 to it.  So you were -- and then I will come back to it very

15 briefly, where we left off, Special Agent.

16      But you were shown Government Exhibit 589 in

17 evidence, which is -- do you need a physical copy, Special

18 Agent Delzotto, or could you --

19 A    If you don't mind, I like a physical copy for everything.

20 Q    Okay.  While we're getting you a physical copy of 589 in

21 evidence, do you -- we are going to pull it out from our

22 collection.

23      THE COURT:  I have it here.  May I share my copy

24 with him, Mr. Brodsky?

25      MR. BRODSKY:  Yes, Your Honor, please.  Thank you.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1   BY MR. BRODSKY:

2   Q     And, Special Agent Delzotto, you were asked some

3   questions about this document, correct, which related to

4   Mr. Lavelle's settlement agreement, correct?

5   A     Yes, I believe so.

6   Q     And the last e-mail in that chain, you can go to it, from

7   Mr. Greebel, May 3, 2013, to Michael Lavelle, right?

8   A     And copying Martin Shkreli, yes.

9   Q     Subject, draft settlement agreement, correct?

10  A     Correct.

11  Q     Hi, Michael.  As discussed, attached is a draft of the

12  settlement agreement.

13              That's what it says, correct?

14  A     It says that, yes.

15  Q     And then in response, Mr. Lavelle says, on May 9, six

16  days later, in the second line, quote, the amounts, however,

17  are not what I expected, end quote.  Do you see that?

18  A     I see that statement, yes.

19  Q     And then above that Mr. Shkreli says in part, May 22,

20  2013, well -- do you see Mr. Greebel forwards that to

21  Mr. Shkreli, and says:  Please see below, from Lavelle, May 9,

22  2013?

23  A     I do see that, yes.

24  Q     And then Mr. Shkreli says in response to Mr. Greebel,

25  copying Mr. Lavelle -- that's what he does, right, he copies

DELZOTTO - CROSS - MR. BRODSKY

1   Mr. Lavelle?

2   A      Yes.

3   Q      I didn't hear you.  Sorry.

4   A      I said yes.

5   Q      And it says:  I agree.  It should be a total of two times

6   your initial investment.  Please fix.  Evan.  I was very, very

7   clear on the call with Lavelle.  I am therefore disappointed

8   that you sent him an underwhelming nonagreed upon deal.  The

9   300K savings doesn't help me, and only frustrates a key

10  partner of ours and myself.  Embody the deal we agreed upon,

11  please, end quote.

12            Do you see that stated there?

13  A      I see it stated there, yes.

14  Q      Do you remember, one way or the other, if we can scroll

15  down to the original e-mail at the bottom, before Mr. Shkreli

16  sent that, do you remember one way or the other seeing an

17  e-mail where prior to May 3, 2013 Mr. Greebel sent the draft

18  settlement agreement containing one million dollars as a

19  settlement number to Mr. Shkreli?

20  A      There's no way I can answer that.  There's a lot of

21  documents.  I don't have them in my mind what's in

22  chronological order before May 22 or after it.  I don't know.

23  Q      Well, let me show you -- do we have 561 in evidence?  Let

24  me show you very quickly, 561 in evidence, Government Exhibit,

25  an e-mail from Mr. Greebel to Martin Shkreli, entitled Lavelle

DELZOTTO - CROSS - MR. BRODSKY

1    settlement and release agreement.  Do you see that?

2    A    I see it, yes.

3    Q    And you see it is April 10, 2013, right?

4    A    I don't know if you are talking about the same settlement

5    and release agreement, though.

6    Q    Understood.  But you see it is dated April 10, 2013,

7    correct?

8    A    I see that date on this document, yes.

9    Q    And you would agree with me, sir, that April 10, 2013,

10   comes before, weeks before May 3, 2013, correct?

11   A    May 22, right.

12   Q    Well --

13   A    2013.

14   Q    -- do you see on the bottom of Government Exhibit 589,

15   the e-mail exchange we were just looking at, the e-mail

16   Mr. Greebel sends to Mr. Lavelle, copying Mr. Shkreli, draft

17   settlement agreement, is dated May 3, 2013?

18   A    The first e-mail in that chain is dated, correct, May 3,

19   2013.

20   Q    So April 10, 2013, is weeks before the exhibit we're

21   looking at, from Mr. Greebel to Mr. Shkreli, attaching Lavelle

22   settlement release agreement, is dated weeks before, correct?

23   A    It is dated weeks before, yes.

24   Q    And if you turn to the attachment, and you go to the

25   bottom, and it says, payment terms, you agree it states, the

DELZOTTO - CROSS - MR. BRODSKY

1    MSMB entities, or Retrophin, individually or collectively the

2    payor, agreed to deliver or cause to be delivered to releasor

3    total amount of one million dollars.  And then in

4    parenthetical, one million dollars, the cash payment, and,

5    blank, shares of common stock, par value of dollar point 0001,

6    per share.  And it goes on.

7           Do you see that?  Did I read that correctly, that

8    portion?

9    A    I see it on here.

10   Q    Okay.  And you can't point me to an e-mail or a document,

11   can you, between April 10, 2013 and May 3, 2013, in which

12   Mr. Shkreli said to Mr. Greebel, in an e-mail, a million

13   dollars is not what we worked out with Mr. Lavelle, correct?

14   A    Can I show you one?

15   Q    Yes.  Can you point to me one or show me one?

16   A    Like I said before, there's a lot of documents.  I don't

17   have them memorized.  There could be one there.  I don't know

18   for sure.

19   Q    All right.  Now, fair to say you did introduce into

20   evidence some documents where Mr. Shkreli sent something to

21   Mr. Greebel, and Mr. Greebel asked what is this, asked

22   questions about it?  Do you remember that on your direct

23   examination?

24   A    I do remember some e-mails where he asked questions, yes.

25   Q    And, for example, Government Exhibit 506A, in evidence,

DELZOTTO - CROSS - MR. BRODSKY

1   if we put it up on the screen, I think this is a short one --

2            MR. BRODSKY:  Can Ms. Rubin approach?  And can we

3   put it on the -- oh, no.  We're out of power.

4            MR. CARTER:  No, I don't have it.

5            MR. BRODSKY:  Oh, you don't have it.  Okay.  That's

6   all right.

7            THE COURT:  Use the ELMO.  The jury needs to see it.

8   Do you want my copy, Mr. Brodsky?  I have an extra copy here.

9   506, is that the one?

10           MS. RUBIN:  506A.

11           MR. BRODSKY:  It is all right.

12           THE COURT:  I have it, if you want it.  Let's go.

13   Come on, Mr. Brodsky.

14           MR. BRODSKY:  Thank you.

15           THE COURT:  Thank you.

16   BY MR. BRODSKY:

17   Q    You see where Mr. Greebel is sent by Mr. Shkreli,

18   December 28, 2012, Retrophin liquidation press release, and

19   Mr. Greebel responds, question, question, question, question,

20   did I miss something?

21   A    Do I see it?  Yes, I see it.

22   Q    Okay.  And then if we put up Government Exhibit 520 in

23   evidence, you see where it says, February 19, 2013,

24   Mr. Greebel saying to Mr. Shkreli, 5:29 p.m., what is this

25   about?

DELZOTTO – CROSS – MR. BRODSKY

1    Do you see that in that e-mail?

2    A    Hold on.  I see the e-mail.

3    Q    Okay.  And there were other e-mails, would you agree,

4    where Mr. Greebel received information from Mr. Shkreli, and

5    asked, essentially, what is this about?

6    A    Are there other e-mails?

7    Q    Yes.

8    A    I don't know what other e-mails you are referring to.

9    Q    In general.  As the lead case agent, you know there are

10   other e-mails which Mr. Shkreli -- Mr. Greebel responded to

11   Mr. Shkreli, providing information which -- informing him of

12   something, he responded, what is this about?

13        MR. PITLUCK:  Objection to the form, Your Honor.

14        THE COURT:  I will allow the question.

15        You can answer it.  Are you aware of any other

16   e-mails?

17        THE WITNESS:  Specifically, that I could cite, no,

18   but if you want to show me one, I will -- I can confirm.

19   BY MR. BRODSKY:

20   Q    What about generally?  You generally know this from the

21   documents you reviewed, correct?

22   A    Do I generally know that there was questions asked?

23   Generally there's questions asked in conversations.

24   Q    And multiple e-mails, correct, where Mr. Greebel

25   responded to something Mr. Shkreli sent and said, what is this

DELZOTTO - CROSS - MR. BRODSKY

1    about --

2              MR. PITLUCK:  Objection.  Form.

3    BY MR. BRODSKY:

4    Q    -- in sum and substance?

5              THE COURT:  I am going to sustain that objection.

6              MR. BRODSKY:  All right.

7    BY MR. BRODSKY:

8    Q    Let me return back to where we left off, Special Agent

9    Delzotto.

10             THE COURT:  Does he need the exhibits any more?

11             MR. BRODSKY:  He doesn't need the exhibit.  Thank

12   you, Your Honor.

13   BY MR. BRODSKY:

14   Q    Yes or no, Special Agent Delzotto, you agree that it

15   would be important before arresting Mr. Greebel in December

16   2015, to find out what Mr. Greebel's partners at Katten Muchin

17   working on Retrophin matters knew; correct or incorrect?

18   A    Incorrect.

19   Q    And you agree that it would be important, for example,

20   prior to arresting Mr. Greebel, to speak to Michael Rosensaft,

21   a partner at Katten Muchin, regarding e-mail communications

22   that were introduced during your direct examination, prior to

23   arresting Mr. Greebel?

24   A    Would I speak to Mr. Rosensaft?

25   Q    You would agree it would be important, prior to arresting

DELZOTTO - CROSS - MR. BRODSKY

1    Mr. Greebel, to go speak to Mr. Rosensaft, a partner at Katten

2    Muchin, about the e-mails that you introduced during your

3    direct examination; yes or no?

4    A    I would not have spoken to Mr. Rosensaft during the

5    investigation.

6    Q    And you agree, sir, that it would be important, prior to

7    arresting Mr. Greebel, to talk to Howard Cotton, a partner who

8    worked on the litigation relating to Timothy Pierotti, before

9    arresting Mr. Greebel; yes or no?

10   A    I would not have spoken to lawyers at Katten Muchin, no.

11   Q    And you suggested in your -- well, withdrawn.

12         Your position, sir, is that you could not speak to

13   lawyers at Katten Muchin prior to arresting Mr. Greebel?

14   That's your position, correct?

15   A    My position is that it didn't make sense, given that

16   Mr. Greebel was the main subject of the investigation or one

17   of the two main subjects to speak to people that he works with

18   on a daily basis because he could get wind of it, he could

19   destroy evidence.  I mean, there's a litany of things.  He

20   was -- as you know, as a formal -- former prosecutor --

21         MR. PITLUCK:  Objection, Your Honor.

22         THE COURT:  Excuse me.  We'll strike that last

23   statement by the witness.

24         THE WITNESS:  Sorry.

25         THE COURT:  Hit the erase button, members of the

DELZOTTO - CROSS - MR. BRODSKY

1    jury, please, about Mr. Brodsky.

2              Go ahead.

3    BY MR. BRODSKY:

4    Q    Special Agent Delzotto, you knew at the time that

5    Mr. Greebel was arrested he was no longer working at Katten

6    Muchin, but at a firm called Kaye Scholer, correct?

7    A    Correct.

8    Q    And Kaye Scholer is a multi national firm, correct, a

9    multi-national international firm, correct?

10   A    I don't know anything about Kaye Scholer.

11   Q    And you knew that e-mails at Katten were at Katten,

12   correct?

13   A    Did I know e-mails --

14   Q    Yes.

15   A    -- were at Katten?

16   Q    Yes.

17   A    Yes, I knew e-mails were at Katten.

18   Q    And you knew that Mr. Greebel, there was zero risk that

19   Mr. Greebel would flee, correct?

20   A    There was a lot of risk in talking to him.  Fleeing, no,

21   that wasn't necessarily a risk here, but there was other

22   risks.

23   Q    So your position, sir, is that the risk in talking to

24   somebody, Mr. Greebel, there was a risk to speak to

25   Mr. Greebel, your view is there was a risk to speak to

DELZOTTO - CROSS - MR. BRODSKY

1  Mr. Greebel himself prior to arresting him; that's your view,

2  correct?

3  A    That's my view, yes.

4  Q    And there was a risk to speaking to anybody at Katten

5  prior to arresting him, correct, that's your view?

6  A    That was my view, yes.

7  Q    And, therefore, your decision, and the reason you think

8  there was a risk was because you believed -- am I correct, you

9  believed that there was a possibility that Mr. Greebel

10  might -- what did you say, destroy evidence, prior to the

11  arrest?

12  A    There's a litany of things.  When you're talking about a

13  main subject -- I wouldn't approach him, one, he was an

14  attorney, he's well aware of his rights, so the odds of him

15  speaking to me are nil.  Two is he could destroy evidence.  If

16  I spoke to people that he worked with, either former employees

17  or current employees, however you want to describe, they could

18  have let him known of the investigation, and he could have

19  gotten rid of evidence or destroyed evidence.  Plus, it's --

20  in investigations, you do not -- you typically don't approach

21  the main subject of a case because, you know, he's -- you

22  approach lower level people to have -- to see if they will

23  cooperate and give you information on the higher level person.

24  He was the apex, right, him and the other person involved in

25  the case.

DELZOTTO - CROSS - MR. BRODSKY

1            So who is he going to give me?  He's the main

2    target.  So I wouldn't have -- it wouldn't -- didn't make

3    sense to me, as an investigative step, to go and speak to

4    Mr. Greebel.

5    Q    You know, sir, that there's practices at the FBI and at

6    US Attorney's offices throughout this country, you know from

7    your own personal experience, that if somebody is to be

8    charged in a nonviolent case, where there's no risk of flight,

9    the best practice is to actually approach them and speak to

10   them to get an explanation before you put handcuffs on a

11   person --

12            MR. PITLUCK:  Objection, Your Honor.

13   BY MR. BRODSKY:

14   Q    -- and charge them with a crime?  You know that to be the

15   case, don't you, sir?

16            MR. PITLUCK:  Objection, Your Honor.

17            THE COURT:  All right.  I am going to sustain the

18   objection.

19   BY MR. BRODSKY:

20   Q    Special Agent Delzotto, you have been part of many cases

21   in which before arresting somebody for a nonviolent offense

22   where they are not a risk of flight, you've gone to talk to

23   them, have you not?

24   A    Most of the cases where I was a lead case agent, I did

25   not take that approach, no, and that is not --

DELZOTTO - CROSS - MR. BRODSKY

1    Q    That's not your approach, but you know --

2    A    No, that's not the FBI's approach, that's something that

3    the US Attorney's office in some cases does, but that's not

4    the FBI's approach.

5    Q    So you know there are US Attorney's offices, federal

6    prosecutors, who prefer, before they arrest somebody for a

7    nonviolent offense, where there's no risk of the destruction

8    of evidence, there's no risk that they're a flight risk, that

9    you go talk to them and ask them some questions, correct?

10   A    That's not true.

11             MR. PITLUCK:  Objection, Your Honor.

12             THE WITNESS:  That's not true.

13   BY MR. BRODSKY:

14   Q    Now, Special Agent Delzotto --

15             THE COURT:  Overruled.

16   BY MR. BRODSKY:

17   Q    -- isn't it a fact that not only -- withdrawn.

18             Isn't it a fact that by not going to talk to people

19   who worked at Katten with Mr. Greebel on Retrophin matters,

20   you, when you arrested Mr. Greebel, did not have all relevant

21   information; yes or no?

22             MR. PITLUCK:  Objection, Your Honor.

23             THE COURT:  Sustained.

24             MR. BRODSKY:  Is that a form objection, Your Honor?

25             THE COURT:  I think that the objection was based on

DELZOTTO - CROSS - MR. BRODSKY

1    what we've talked about in prior rulings and motions, which

2    were extensive.

3    BY MR. BRODSKY:

4    Q    Now, you knew, did you not, that Mr. Greebel was an

5    attorney, I think you said, especially because he was an

6    attorney, right?  You did not --

7    A    Those are your words.  I didn't say "especially."  Did I

8    know he is an attorney?  Yes.  "Especially attorney," I don't

9    recall saying that.

10   Q    Let me see what the transcript says.

11        I think you said that, quote:  I won't approach him,

12   one, he is an attorney, well aware of his rights, so the odds

13   of speaking to me were nil, end quote.

14        You testified that way, correct?

15   A    Which is different than what you just said.

16   Q    And you understood that other people at Katten Muchin,

17   the odds of them speaking to you were very strong, correct?

18        MR. PITLUCK:  Objection, Your Honor.

19        THE COURT:  Sustained.

20   BY MR. BRODSKY:

21   Q    You understood, sir, prior to arresting Mr. Greebel, that

22   Retrophin had waived its privileges in the areas you were

23   interested in inquiring about; yes or no?

24   A    I don't think I can answer that with yes or no.

25   Q    You agree, sir, that, generally, putting ourselves

DELZOTTO - CROSS - MR. BRODSKY

1   outside this case, when you investigate a case, a nonviolent

2   case, it is important for you to obtain as many relevant

3   documents as possible, correct, prior to charging him?

4   A    I would say, generally, that's true, unless -- well, I

5   would say generally that's true.

6   Q    And in order to obtain as many relevant documents as

7   possible, you have to go to multiple sources, correct?

8   A    Yes, that's correct.

9   Q    And often for a nonviolent case, you have to speak to a

10  lot of different people, correct?  Yes or no?

11  A    Yes, that's true.

12  Q    And it is fair to say, again, taking ourselves out of

13  this case, that to get it right, before you arrest somebody,

14  to get it right, it is important to talk to the people who

15  worked on the very specific documents or the very specific

16  transactions you're investigating before you arrest someone?

17          MR. PITLUCK:  Objection, Your Honor.

18          THE COURT:  Sustained.

19  BY MR. BRODSKY:

20  Q    Isn't it true, Special Agent Delzotto, that you rushed

21  your investigation and arrested Mr. Greebel prematurely?

22  A    That's ridiculous.

23          (Continued on the next page.)

24

25

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

DELZOTTO - CROSS - MR. BRODSKY

1   Q    And isn't it true, sir, that following the arrest of

2   Mr. Greebel you've seen new documents that you never saw

3   before, yes or no?

4   A    After his arrest?

5   Q    Yes or no, sir.  That's a yes or no question.  Have you

6   seen new documents following his arrest that you never saw

7   before?

8   A    I did see new documents, yes.

9   Q    And isn't it the case that I showed you on

10  cross-examination a few documents that you had never seen

11  before prior to arresting Mr. Greebel?

12  A    Did I see new documents?  Yes, I saw new documents.

13  Q    Wouldn't it have been important for you to find out what

14  people at Katten Muchin had to say about Mr. Greebel and his

15  work before you arrested him, yes or no?

16          MR. PITLUCK:  Objection, your Honor.

17          THE COURT:  Sustained.

18  Q    Special Agent Delzotto, although you didn't have to do,

19  you didn't have to go to Mr. Greebel and talk to him before

20  you arrested him, you knew that was an option you had, yes or

21  no?

22  A    It was not an option, no.

23  Q    You knew it was an option that you had, to talk to other

24  people who work at Katten Muchin, yes or no, before you

25  arrested Mr. Greebel?

DELZOTTO - CROSS - MR. BRODSKY

1    A    No, for the reasons I gave you before.

2              MR. BRODSKY:  Your Honor, I see the hour is near and

3    what I would ask your Honor to do is allow me to just see

4    whether I can narrow whatever else I have to less than 30

5    minutes, which I'm committing to in front of the jury to do.

6    And I did honor my commitment last time with less than 30

7    minutes on cross-examination.

8              THE COURT:  That's for tomorrow.

9              MR. BRODSKY:  For tomorrow.

10             THE COURT:  He's not asking you to stay.

11             MR. BRODSKY:  For tomorrow.  I committed last time

12   when we were about this point to 30 minutes the next morning.

13   I'm committing in front of the jury to less than 30 minutes

14   tomorrow morning.

15             THE COURT:  All right.  At this time then we will

16   excuse the jurors.

17             I thank you again for your service.  And for your

18   indulgence and attention.  Please don't talk about the case.

19   Please avoid all media coverage of anything touching on,

20   anything relating to any names you may have heard in this

21   trial.  And have a safe trip home.  I'll see you tomorrow

22   morning at 9:00.  Thank you.

23             (Jury exits the courtroom. Time 5:27 p.m.)

24             THE COURT:  Sir, you may step down.

25             (Whereupon, the witness steps down.)

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  The agent has asked whether he could

2    speak to the prosecutors about his hotel arrangements.

3          MR. PITLUCK:  I was just going to make that request,

4    purely logistical.  We weren't anticipating this, I need to

5    talk to him about this.

6          THE COURT:  I think that's fine.

7          MR. BRODSKY:  Our apologies that he has to spend

8    another night in New York again.

9          THE COURT:  He's been here a while.

10         Thank you.

11         MR. PITLUCK:  I'm going to step out.

12         THE COURT:  Yes, of course.

13         Is there anything I should address at this time?

14         MR. DUBIN:  Yes, your Honor, just briefly.

15         Your Honor, Special Agent Delzotto has now kicked

16   the door wide open on the issue that we were dealing with

17   earlier.  He said in his testimony that the reason that he

18   didn't, one of the of the reasons, that he didn't approach and

19   speak to Mr. Greebel is because the chances of him speaking to

20   him were nil.  Now, the jury is left with the impression that

21   that is in fact the case, when it is not the case.

22         We should be permitted tomorrow to cross-examine him

23   and to ask him, sir, that's not the case, while you thought

24   the chances were nil, in fact what happened was he waived his

25   rights and he spoke to your colleague.  He set it up.  The

DELZOTTO - CROSS - MR. BRODSKY

1   question didn't ask for it.  He blurted it out and he

2   reaffirmed it twice.  There can be no better evidence of

3   consciousness of innocence.  And if we don't get to address it

4   and get deprived of it, we should be able to come back that he

5   told the jury that 'the chances of him talking to me were nil'

6   he was talking about in a pre-arrest scenario.

7           Now he has been arrested, pulled out of his house at

8   5:30 in the morning, dragged downtown here, and he not only

9   speaks to them, but waives his rights.  We should be

10  permitted, your Honor, most respectfully, to now confront him.

11  Because he's told the jury something that we can impeach him

12  with.  We have something directly on point.

13          Because not only did Mr. Greebel speak to his

14  colleague, but spoke to him with handcuffs on, we won't bring

15  that part out.  But he offered up the testimony so there

16  should be nothing that prevents us.  We wanted to make sure

17  that we fronted it with your Honor, because now he has opened

18  the door to it.

19          THE COURT:  The question was framed in terms of

20  prior to arresting him.  That was the antecedent condition

21  that Mr. Brodsky posed in every single question.  Prior to

22  arresting Mr. Greebel did you do X,Y, and Z.  It was a litany

23  of questions about prior to the arrest.

24          MR. DUBIN:  Okay, but the implication --

25          THE COURT:  I want to make a clear distinction about

DELZOTTO - CROSS - MR. BRODSKY

1    the issue before me at sidebar, which was after his arrest,

2    and the issue that Mr. Brodsky posed that prompted the agent's

3    response.

4              MR. DUBIN:  I understand, your Honor.  But the

5    implication was clear from Special Agent Delzotto's testimony,

6    which was that the reason that he wouldn't go speak to someone

7    that was being investigated is because they wouldn't speak.  I

8    think he said, I think it's in the record we'll check tonight

9    in the transcript, is because he knows his rights.  In fact,

10   yes, he does know his rights.  And prior to arrest, if that

11   was the reason why he would be reluctant to speak to him

12   because the chances were, his words not mine, nil, then

13   post-arrest, certainly the specter is higher.  He knows his

14   rights, certainly would never under those circumstances talk.

15   We should simply be allowed the latitude to confront him.

16             THE COURT:  Just to be clear, Mr. Dubin, I don't

17   remember whether you were in the room, maybe you were, but I

18   did not exclude the testimony.  I was just making the point

19   that this is the not the right witness from whom to elicit

20   that testimony.  All right.  So I'm not, I haven't precluded

21   you from inquiry of the appropriate agent about the

22   administration of Miranda warnings, the waiver by Mr. Greebel,

23   and the fact that he made statements.

24             MR. DUBIN:  Understood, your Honor.  We can frame

25   the question in a way that we don't talk about invoking

DELZOTTO - CROSS - MR. BRODSKY

1    rights, not invoking rights.  We can just say -- I don't want

2    to give away the question, I need to formulate it tonight, but

3    we don't have to talk about it within the context of his

4    rights being read or waived, but simply that what happened was

5    after he was arrested he did exactly what you told the jury

6    yesterday you said there was nil chance he would do.  Nothing

7    could be more relevant to our client's state of mind,

8    especially given how Special Agent Delzotto was testifying,

9    than being able to confront him with that.

10              MS. SMITH:  Your Honor, I'm not sure why the agent's

11   subjective understanding of why someone might or might not

12   talk to them prior to arrest is reflective on the defendant's

13   state of mind as to what was going on.  What the agent said

14   was, in part, it wasn't the only reason that he didn't

15   approach the defendant, was because he was a lawyer, and he

16   didn't expect him to waive his rights, in that context.  Not

17   to mention, as we know in a pre-arrest context, if you do

18   approach and they are not under arrest, there is a different

19   dynamics.  Not to mention, we could get into this down this

20   road, they cannot approach a lawyer even with the waiver.

21   There is a whole process.  There are multiple other reasons in

22   addition to the fact that he said the chances of him talking

23   to him were nil, that he would have that subjective belief

24   before arrest.  Including the fact that he works at the law

25   firm.  He might lawyer up immediately.  All sorts of other

DELZOTTO - CROSS - MR. BRODSKY

1    issues.

2            This is where the 403 issue comes in.  We're going

3    to have a mini trial about how often people waive their

4    rights, I think, if we go down this road.  We can include this

5    in our briefing.  Plenty of people waive their rights and lie.

6    And plenty of people waive their rights and end up being

7    convicted.  Just because you waived your rights doesn't mean

8    you're in fact innocent.

9            If the question is what is the inference to be drawn

10   from somebody deciding to waive their rights, if the defense

11   is going to try to argue that's evidence of innocence, we

12   would put in evidence that is not always the case.

13           THE COURT:  It's subjective consciousness personal

14   to the person who decides to waive rights, what he or she

15   consciously may believe about their criminal exposure.  And

16   it's evidence from which inferences may be drawn, but it's

17   totally subjective and individual to the defendant under

18   arrest really.

19           MR. DUBIN:  Agreed, your Honor.

20           THE COURT:  It's not empirically correlated that

21   people who waive Miranda warnings and talk to law enforcement

22   after an arrest have been demonstrated with any statistic

23   clarity that they are innocent or guilty.  I think it's a

24   consciousness.  The conscientiousness goes to the arrestee,

25   not to anyone else.  Right?

DELZOTTO - CROSS - MR. BRODSKY

1          MR. DUBIN:  Agreed, your Honor.  And --

2          THE COURT:  So I think it's fine if you are arguing

3  that Mr. Greebel's consciousness of innocence that he believed

4  was innocent; and therefore, willing to talk to law

5  enforcement.  I think that that, as I said, I'm inclined to

6  allow that evidence.  The Government has asked me to just put

7  it on ice for a little bit so you all can give me further

8  briefing since the only case that anyone seems to come back to

9  is Biaggi which the Government points out, has not been

10  followed by any Court since then.

11          MR. DUBIN:  Understood, your Honor.

12          THE COURT:  I'm done.

13          MR. DUBIN:  Are you sure?

14          THE COURT:  Yes.

15          MR. DUBIN:  That was the case.  Prior to

16  Mr. Delzotto resuming the stand and he testified about his

17  subjective belief, he said he thought that the chances of

18  Mr. Greebel speaking were nil.  So the fact of the matter is,

19  all of these arguments that Ms. Smith are making go to weight,

20  not admissibility.  We still can confront something he now

21  said, something that is clearly impeachable in our view.

22  Whether or not it's effective impeachment is for the jury to

23  decide.  He said the chances of Mr. Greebel speaking would

24  have been nil.  We can certainly point out, and feel that

25  respectfully we should be permitted to point out, but what

DELZOTTO - CROSS - MR. BRODSKY

1    happened was after he was arrested he did just that, he spoke

2    right away.  And whether or not, we're certainly not

3    suggesting that there is empirical data that says that because

4    he spoke, that's consciousness of guilt and that all of those

5    people or 80 percent of them are acquitted.

6              If the Government believes that, yes, he spoke, then

7    he lied, it's still their case.  They have the right to put in

8    his post-arrest statements.  They can put them in and point

9    out where they think that he mislead the FBI.  And we have our

10   counter designations and we can do that.

11             This issue was just recreated, I suggest.  And it's

12   not the issue of him sitting there and having personal

13   knowledge about whether or not he waived his rights in that

14   instance.  But the very knowledge of the fact that Mr. Greebel

15   did exactly what he is saying there was nil chance could

16   happen, we certainly should be permitted to point that out.

17   And then Ms. Smith or Mr. Pitluck on redirect can do whatever,

18   ask whatever questions he wants.  They can argue to the jury

19   that a lot of people go in and lie and waive their rights and

20   lie, that's a different issue.  That goes again to weight, not

21   admissibility.

22             We shouldn't be -- I wasn't meaning to suggest

23   earlier, your Honor, that you had precluded a certain line of

24   defense questioning.  We understand the Court's ruling that

25   whether or not he's aware that Mr. Greebel sat in the room and

DELZOTTO - CROSS - MR. BRODSKY

1    waived his right is for the agent that was sitting in the

2    room.  But now that he's given this testimony we certainly

3    should be able to just point out the fact that what

4    Mr. Greebel did, if you want us to leave out the fact that he

5    said, I waive my rights and I'm going to speak.  What he did

6    was is he sat in the room with him and the agent and he spoke.

7    He did exactly what you told the jury there was nil chance of.

8    We can point out to the jury, and certainly the Government can

9    point out to the jury, we were talking about two different

10   situations and pre-arrest versus post-arrest, they can point

11   that out and make the argument.

12            MS. SMITH:  That was the point I was going to make.

13   There is a difference between an individual who is approached

14   cold prior to arrest and the circumstances after arrest.  So

15   this idea that impeachment, the agent is testifying honestly.

16   Among other reasons, he thought that there was a nil chance

17   that he would talk to him.  Set aside all the other reasons

18   why he wouldn't necessarily want to approach Mr. Greebel prior

19   to arrest.  But I do think that's a completely different set

20   of circumstances than after arrest.  It's not impeachment.  It

21   is in fact what he thought at the time.

22            MR. DUBIN:  We think it is impeachment.  I

23   understand Ms. Smith's arguments, those are certainly

24   arguments that they can make.  And we should be entitled to

25   confront the witness with this.

DELZOTTO - CROSS - MR. BRODSKY

1          We didn't elicit it.  We went back and checked the

2    transcript a few times to make sure that it was something that

3    he was responding to why he didn't go speak to anyone at

4    Katten Muchin.  Why he didn't speak to Mr. Greebel.  We

5    frankly vehemently disagree with those reasons, because it

6    happens all the time in white collar cases.  They get a target

7    letter.  They get an attorney.  And before they go testify in

8    the Grand Jury, decide whether they're going to testify in the

9    Grand Jury.

10         That wasn't this case.  He stated his reasons why.

11   If I'm a betting man, a safe bet is we'll go into a little

12   more on redirect.  The fact of the matter is, is that they

13   didn't.  They didn't speak to Mr. Greebel before.

14         THE COURT:  He admits he didn't speak to him.  He

15   set forth his reasons why.  He, as the case agent, didn't do

16   it.  He also testified that he rarely does it in his cases.

17   He's on a white collar squad and different agents investigate

18   cases different ways.  I think what he was trying to say is

19   there no set FBI policy.  This is the way he operates.  And

20   he's not in violation of any protocols or AG memos or director

21   memos.  This is what his view was of the landscape based on

22   his investigation, which I don't know how long he was

23   investigating this case, but it sounds like it was quite a

24   while.

25         MR. DUBIN:  A lot of documents.

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  A lot of documents, a lot of witnesses,

2    and a lot of months went by.  His assessment that it would not

3    fruitful to approach the target, who was a lawyer, in a law

4    firm, or any of his colleagues where he had been employed for

5    a number of years, many of whom I'm sure are friends or

6    friendly colleagues, was a judgment call that this agent made.

7    And he was asked and articulated reasons why he didn't

8    approach Mr. Greebel prior to arrest.

9          You can make an argument that after arrest

10   Mr. Greebel, in fact, did waive Miranda and speak to an agent,

11   not this agent but another agent, and argue to the jury that

12   Special Agent Delzotto's hunch that he wouldn't be likely to

13   talk to him was --

14         MR. DUBIN:  I understand, your Honor.  Look, I think

15   we'll be very careful to look at the record tonight, be

16   mindful of the conversation we had at sidebar of your Honor's

17   ruling with respect to that issue regarding waiving the rights

18   and formulate a question.  If the Government finds it

19   objectionable, I'm sure they'll raise an objection.

20         MS. SMITH:  We just ask to preview the question,

21   which is something that we've done in questions when we were

22   talking about some of issues with the benefit of Retrophin

23   with Mr. Aselage, we hashed out the question ahead of time.  I

24   have a feeling we're going to object one way or the other, but

25   we want to hear it in advance.

DELZOTTO - CROSS - MR. BRODSKY

1          MR. DUBIN:  I'll try to confer with the Government,

2     maybe even tonight, so we don't waste time in the morning.

3          MS. SMITH:  I was going to raise for scheduling

4     tomorrow if Mr. Brodsky only has a half hour left, let's

5     assume the morning.  We would, obviously it's hard to do the

6     Rule 29 motion then potentially start the defense case.  We

7     wanted to make sure that the defense's first two witnesses

8     were still Howard Jacob then I believe Steven Ferruolo.

9          MR. CHAN:  We'll get back to you tonight

10         MS. SMITH:  We need to know now.

11         THE COURT:  They have to prepare cross.  Is there

12    any reason you can't tell them now?

13         MR. CHAN:  We don't know who the first witness will

14    be, but it will come from the first five.  We should be able,

15    as a team, to collect our thoughts who we are going to call

16    rather than be put on the spot.

17         MS. SMITH:  At the end of every trial day we let the

18    defense know.

19         MR. CHAN:  You told us at night

20         MS. SMITH:  We turned around and told.  We

21    understood it was an order, not the first five witness in any

22    order.  We just need to know.

23         MR. CHAN:  I understand.  We can't answer the

24    question without knowing who is available.

25         THE COURT:  Tell them by 6:30.

DELZOTTO – CROSS – MR. BRODSKY

1           MR. CHAN:  That's fine

2           THE COURT:  I have a question about Ms. Rubin, her

3    in camera submission.  I'm having trouble understanding some

4    of the marks and what it is that I'm looking at.

5           MS. RUBIN:  I had don't have an independent copy in

6    front of me.

7           THE COURT:  I could pull it up on the docket.

8           MR. KESSLER:  That's probably we --

9           THE COURT:  We'll do it privately

10          MS. RUBIN:  Mr. Chan can speak to those things as

11   well.

12          THE COURT:  All right.

13          MR. CHAN:  When Mr. Kessler previewed our

14   disagreement about the remaining disagreement as to which

15   portion of the Rosenfeld arbitration award to redact or not

16   redact.  And I think we should discuss it today, it might too

17   close tomorrow.

18          THE COURT:  Who is going to put this in, the

19   defense?

20          MR. CHAN:  Yes, the defense through Mr. Rosenfeld.

21          MR. KESSLER:  I don't think any of the witnesses the

22   defense has in their first five witnesses, certainly not Mr.

23   Rosenfeld.

24          THE COURT:  I'd love it if you can work it out.

25   Have you made any progress?

DELZOTTO - CROSS - MR. BRODSKY

1          MR. KESSLER:  We're down to two things.

2          MR. CHAN:  Down to two things we cannot agree.

3          THE COURT:  Do you want me to resolve them now or

4    will there be movement or agreement if you keep talking?

5          MR. KESSLER:  No.

6          THE COURT:  Let me see if I can find, unless someone

7    has the copy of the Rosenfeld agreement.  I'm looking at

8    document number 468-1 in our docket.

9          MR. KESSLER:  There is orange and yellow.

10          THE COURT:  Yes.

11          MR. KESSLER:  On the first page.

12          THE COURT:  Yes.

13          MR. KESSLER:  The first paragraph in orange everyone

14    agrees to redact.

15          THE COURT:  All right.  Paragraph two, first orange

16    is agreed to by the parties.

17          MR. KESSLER:  Every agrees.  The second paragraph

18    we'll agree not to redact except for the names of the

19    witnesses, which we won't redact.

20          THE COURT:  What I'm thinking is you can put a

21    bracket in with ellipses just saying testimony under oath was

22    heard from and give the number of witnesses.  Is that

23    acceptable?

24          MR. KESSLER:  Yes.

25          MR. CHAN:  Yes.

DELZOTTO - CROSS - MR. BRODSKY

1          MR. KESSLER:  On the next page, it might make, the

2     top paragraph is one of the two we don't agree on, but it

3     might make sense to come back to that at the end when the

4     Court has a better sense of what is in and what is out.

5          THE COURT:  I think I would, reading it --

6          MR. KESSLER:  We want it out.

7          THE COURT:  -- this was a paragraph that I thought

8     should come out.  It's basically saying that these are facts

9     that have been found to be true and necessary.  It's

10    characterizing the fact finding, almost vouching for the

11    arbitrator's findings.  And vouching for the care and full

12    consideration of the arbitrator, which may, you know, mislead

13    the jury into thinking that an arbitrator has made this

14    careful finding and that they, therefore, should defer and not

15    make their own independent findings.  I think that that's not

16    an appropriate statement.  It should come out.

17         MR. CHAN:  Just to that, to make the record, I think

18    that our position is that it just sets forth what it was that

19    the arbitrator did is to find facts.  We're not disputing that

20    that happened.  We're keeping in some facts found by the

21    arbitrator.

22         MR. KESSLER:  The entire conceit here, the

23    background of this, none of this should come in.  It's all

24    hearsay, except if it has some relevance to operative portion.

25    The fact that the arbitrator found facts doesn't effect this.

DELZOTTO - CROSS - MR. BRODSKY

1    Certainly the fact that the arbitrator made determinations as

2    to credibility, that arbitrator found facts to be true, there

3    are conclusions the arbitrator has given full careful

4    consideration of the record.

5            THE COURT:  It's inappropriate to have this before

6    the jury and I'm going to rule that page two the first full

7    paragraph in orange should come out.  What about the heading

8    that follows?

9            MR. KESSLER:  I don't think we talked about that.  I

10   think the headings can come out.  Ultimately there will be

11   only about two paragraphs effects by agreement.

12           MR. CHAN:  I think the heading, because there is

13   text, that we agreed to keep in.  It makes sense to keep the

14   heading.

15           THE COURT:  Well, okay, I just, let me make sure

16   we're consistent.  Because, so, for example, on page three

17   we're deleting the heading but put in the substance.  I just

18   think --

19           MR. KESSLER:  Both parties have redacted the heading

20   in the proposal we're fine with keeping the heading out.

21           THE COURT:  Out.

22           MR. CHAN:  I'm saying to the extent we agreed to

23   keep out headings because the entire portion under the heading

24   is out.  And so to the extent there is language in, we should

25   keep the heading in, so it preserves the organization if we're

DELZOTTO - CROSS - MR. BRODSKY

1  already going to have the language in.

2          THE COURT:  I'm pointing out on page three you have,

3  there is a heading that is coming out, I believe that is --

4          MR. CHAN:  We met with the Government last night to

5  keep that in, agreement is reached.

6          THE COURT:  Yes, you're keeping it in?

7          MR. CHAN:  That's what we agreed last night.

8          MR. KESSLER:  That's fine.

9          THE COURT:  Back to page two, heading claimants

10 invest in Shkreli entities is staying in.

11          MR. KESSLER:  That's fine.  Then we all agree with

12 the orange redaction in the next paragraph, starting at

13 Rosenfeld and going several lines down to public.

14          THE COURT:  Okay.

15          MR. KESSLER:  We agree that the footnote which talks

16 about citations is fine not to redact.

17          THE COURT:  Not to redact.

18          MR. KESSLER:  Yes.

19          THE COURT:  So that stays.

20          MR. KESSLER:  We agree with the orange, sorry, the

21 heading and the two paragraphs at the top of page three should

22 come out.

23          THE COURT:  Wait a minute, we've got on page two in

24 yellow.

25          MR. KESSLER:  Also, we agree on that to take it out.

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  All right, page three.

2          MR. KESSLER:  We agree the first heading, first two

3   paragraphs, should come out based on the discussion we just

4   had.  The second heading agreement is reached.  Then the first

5   paragraph should come in.  Then the rest of the page should

6   come out.

7          THE COURT:  Okay.

8          MR. KESSLER:  Page four we all agree everything

9   comes out.  Page five I think we've agreed that the top

10  paragraph in orange can come in.

11         THE COURT:  So does that include the heading as

12  well?

13         MR. KESSLER:  Sure.

14         THE COURT:  The parties claim the Rosenfeld Park

15  Avenue claims, that stays in.

16         MR. KESSLER:  Yes, then everything else out.

17         THE COURT:  The heading plus the first full

18  paragraph stays in.

19         MR. KESSLER:  Right.

20         THE COURT:  Then everything that follows in on the

21  page comes out.

22         MR. KESSLER:  Page six, the top paragraph in yellow

23  comes out.  The first paragraph under analysis and findings in

24  orange comes out.

25         THE COURT:  Wait a minute.  I just think, I think

DELZOTTO - CROSS - MR. BRODSKY

1    again, the antecedent clause, "upon careful consideration and

2    review of the evidence and arguments," I think is a little

3    self-serving on the part of the arbitrator.  We can start with

4    arbitrator finds and declares, and leave in the heading that's

5    with Roman numeral IV.

6            MR. CHAN:  I have the same objection as to the

7    prior, as to the other paragraph you struck for the same

8    reason for the record.

9            THE COURT:  I'm sorry?

10           MR. CHAN:  The same objection to striking that

11   clause for the same reasons I objected to the prior paragraph

12   that the Court previously ruled.

13           THE COURT:  Next we have --

14           MR. KESSLER:  We all agree.

15           THE COURT:  The rest of the page.

16           MR. KESSLER:  The short paragraph.

17           THE COURT:  Under heading four.

18           MR. KESSLER:  That begins the arbitrator addresses,

19   that comes out.  Then we disagree about the next two

20   paragraphs, then we agreed on everything else in the document.

21           MR. CHAN:  Well, so --

22           MR. KESSLER:  There is one more that we agree on,

23   but we need to change.

24           THE COURT:  There is a disagreement under subheading

25   A, breach of contract.

DELZOTTO - CROSS - MR. BRODSKY

1              MR. KESSLER:  Right.

2              THE COURT:  Then two paragraphs.  Let me read that

3    please.

4              MR. KESSLER:  I'm happy to --

5              THE COURT:  Yes, I'll hear from you.  Honestly, I

6    would be inclined to take out the first paragraph under

7    subheading A.

8              MR. KESSLER:  Our view is both paragraphs should

9    come out.  The issue is we already know the arbitrator's

10   conclusion that there is a breach of contract claim that is

11   coming in.  All of this information is just the arbitrator's

12   view of the facts.  And frankly, the application of the facts

13   to the law.  As I said yesterday, no one could introduce the

14   transcript of this arbitration to get these facts in, they'd

15   be hearsay.  We couldn't call, there was an objection to

16   Mr. Geller's consulting agreement coming into the record until

17   Mr. Geller testified under the grounds that I think everyone

18   agreed on that you can't prove whether or not services were

19   provided and whether or not a consultant engaged in a sham or

20   not without the consultant testifying.  That was different

21   than the settlement agreement.  This is two extra layers of

22   hearsay on top of that.  It is not necessarily to understand

23   the legally operative value of this document, which is in the

24   last page, which is there was a breach of contract claim, the

25   claim was found a certain way and certain damages were

DELZOTTO – CROSS – MR. BRODSKY

1   awarded.  Especially since Dr. Rosenfeld, if there is a case,

2   right, if there is a defense case, then presumably the

3   defendant would offer this and it sounds like they are going

4   to call Dr. Rosenfeld.  So it's particularly improper to have

5   an arbitrator's view of the impact of testimony from

6   Dr. Rosenfeld, that she heard in a different proceeding

7   embodied in this document, when it certainly is hearsay.  It's

8   not operative.  It's not the thing that determined the rights

9   of the parties, that's the last make, and so it should come

10  out.

11          THE COURT:  Mr. Chan.

12          MR. CHAN:  I disagree.  The Government is rearguing

13  the motion that it already lost on this of what the Court

14  entertained briefing on and ruled, was that we could get in

15  parts of the arbitration decision that explain the ruling

16  about the consulting agreement being a legitimate agreement

17  and there were services provided.  Absent these paragraphs

18  there is no such language in the entire thing.  We have gone

19  through this with the Government and given up on everything.

20  You look after this it's all agreed to be redacted.  This is

21  the last portion remaining that talks about the consulting

22  agreement being enforcement and why other than that there is

23  no language in this.  And to strike it would be basically to

24  subvert the Court's prior ruling.

25          THE COURT:  No, not actually.  The first paragraph

DELZOTTO - CROSS - MR. BRODSKY

1    has specific findings that I did not rule should be

2    admissible.  First of all, this arbitrator had evidence before

3    her that is not in this case.  Second of all, I think having

4    the arbitrator make the arbitrator's detailed findings would

5    again interfere with the jury's consideration of the evidence

6    presented in this trial.  And the question that it has to

7    resolve is whether the Government has proven beyond a

8    reasonable doubt that one of the means to defraud Retrophin,

9    as charged in Count Seven, was executed through sham

10   consulting agreements.  So the facts in paragraph one I think

11   should come out.

12        What I did rule would be appropriate would be the

13   ultimately finding.  The second paragraph of that starts with

14   the arbitrator finds that the consulting agreement is an

15   express and enforcement agreement between the parties that was

16   breached by Retrophin.  I think the second sentence is a very

17   minimal sentence explaining the bases that the agreements

18   demands were minimal but they were met.

19        MR. KESSLER:  My only concern with that sentence is

20   the arbitrator's interpretation of the contract, which is one

21   thing.  Then the fact that they were met is the arbitrator's

22   interpretation of all the testimony at the trial that

23   Dr. Rosenfeld did in fact perform services, something that may

24   not be uncontested if Dr. Rosenfeld decides to testify.  And

25   so again, there is the arbitrator vouching for the truth of

                    DELZOTTO - CROSS - MR. BRODSKY

1    certain statements.

2             I agree with the Court that the first sentence I

3    think does fairly layout the arbitrator's determination.  The

4    point is on the less is more idea.  It's the reasoning that's

5    the problem, because call it whatever we want, in closing this

6    will be used to prove that Dr. Rosenfeld performed services.

7             (Continued following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7940

PROCEEDINGS

1   GB PM7*

2           THE COURT:  What I wanted to avoid are statements

3   that touch upon issues that are before the jury to decide.

4   And we are going to have if, I expect the defense puts on a

5   case, we're going to have experts talking about what is

6   typical in a consulting agreement and whether or not those who

7   are being compensated for consulting services have to perform

8   at some minimal level or not.  I think that the second

9   sentence does touch on facts that were before the arbitrator

10  and that would also have to be decided by the jury --

11          MR. CHAN:  Well, I think --

12          THE COURT:  -- so --

13          MR. CHAN:  But just to --

14          THE COURT:  I'm listening.

15          MR. CHAN:  On the flip side of Mr. Kessler's

16  argument too little is not enough.  And so the arbitrator's

17  award in this case was both that there was a valid agreement

18  and that it was breached.  The second sentence, in one

19  sentence, as the Court pointed out in a brief sentence,

20  articulates the basis of the breach award.  I mean, we're

21  keeping in the fact that there was monetary damages awarded as

22  part of this, you can only get monetary damages --

23          THE COURT:  I am not sure I am going to agree to

24  that.

25          MR. CHAN:  That's what the parties agreed to.

7941

PROCEEDINGS

1          THE COURT:  Yes.  But it seems to me that the

2     monetary award is somewhat of a distraction and it's not at

3     issue here.  It's irrelevant to any issues.

4          MR. KESSLER:  The question is what is the relevance

5     of this document.  The reason we objected to it originally is

6     the document itself is not relevant at all.  If this were a

7     dispute about whether there were an enforceable agreement

8     against Dr. Rosenfeld it would be a relevant consideration,

9     it's not.

10          THE COURT:  It goes to the defense that these were

11     not sham consulting agreements and at least one neutral party

12     has found that it was a valid agreement and I think that's

13     what they want to proffer.

14          MR. KESSLER:  That's importing another decider --

15          THE COURT:  I know.

16          MR. KESSLER:  -- to vote about the actual -- or it's

17     not actually the ultimate issue, but it is a hotly contested

18     issue in this case.

19          If Dr. Rosenfeld testifies, presumably, he will say

20     I performed services.  So we will be now in a situation where

21     the jury has not just Dr. Rosenfeld's testimony but some

22     arbitrator's view that this testimony is, in fact, accurate.

23     This is bootstrapping argument --

24          MR. CHAN:  Except for -- sorry.

25          MR. KESSLER:  That's my fault I apologize.

PROCEEDINGS

1          I have one more.  It's a bootstrapping argument.

2    The defense is asserting the document is relevant and then

3    saying they have to have all these things in here to explain

4    it.  But the relevance under the 803.15 exception is just to

5    the operative part.  It is to show that if Retrophin refused

6    to pay this award, there is an enforceable award.  Or someone

7    was on notice that the arbitrator ruled for Dr. Rosenfeld.

8    It's not this bootstrapping situation where the award is

9    irrelevant but it's sort of coming in a little bit, and then

10   you argue that a lot more come in to explain the other side.

11          THE COURT:  I am concerned about the arbitrator's

12   factual determination that's reflected in the second sentence.

13   She's making findings based on her record, which is different

14   from the record here.  And the other thing I think the parties

15   haven't really addressed is there is certainly a different

16   standard of proof.  I think that the less, as I said, less is

17   more.  The less we have that touches on findings that are

18   similar to the findings that a jury in this case have to make,

19   the better off we would be to avoid confusion.  The jury

20   should be making its own findings putting the government to

21   its proof based on the record before this Court and not

22   abdicating its fact-finding mission to determine the bona

23   fides of the consulting agreement based on what an arbitrator

24   may have found in the way of facts.

25          MR. CHAN:  I agree on less is more, Your Honor,

PROCEEDINGS

1   which is why we agreed to redact 99.9 percent of this award.

2   What we're leaving in is the one sentence of that paragraph

3   right now and I want to give the Court its own ruling on this

4   issue already.

5           At page 104 of the pretrial conference where the

6   Court said, and I'm quoting, what I am looking at is the terms

7   of this agreement and I think that this is decision can come

8   in but it has to be a balanced submission.  So as much as the

9   rights and the rights of the parties would be admissible in

10  terms of what you have just articulated that there was an

11  arbitration, that Dr. Rosenfeld wanted to enforce the

12  agreement, that the arbitrator found that he had given minimal

13  services in exchange for the consideration that he received

14  and it is rejecting the sham argument of Retrophin and ruling

15  that Retrophin owed him money.  I think that the

16  qualifications that she made also would have to, in fairness,

17  be admissible as to what she did not find.

18          So I think we understood the Court's clear ruling

19  that those were the specific enumerated items from the award

20  that we could get in, we adhered to that admonition to be as

21  minimalist as possible and it goes to that.  And so what the

22  Court is now articulating and the government is arguing, is

23  contra -- contrary to what the Court's express ruling was on

24  the record at that pretrial conference.

25          MR. KESSLER:  Your Honor, I understood the pretrial

7944

PROCEEDINGS

1   conference to be the Court's view at that time, not a

2   preclusive ruling that, you know, the parties could not view

3   once the record was in.  We actually had the proposed

4   redactions.  We understand the scope of the case, we

5   understand the evidence.  I mean, that was my view rather than

6   the Court saying under no circumstances can the award have any

7   more or less than what the Court was saying at the pretrial

8   conference.

9           But in any -- even if that was the view at the time

10  and it was a firm view, I think it's clear now what the issues

11  are.  And if Dr. Rosenfeld testifies, as defense says he is,

12  the jury may well have to decide if he, in fact, provided

13  service and if the demands of the contract were met.  It would

14  be -- I don't understand how he could testify and have

15  anything of conceivable relevance to say unless it's exactly

16  these issues.  I mean, frankly, if he testifies it's not even

17  clear this award should come in at all.

18          THE COURT:  I agree.

19          MR. KESSLER:  But that's something we can revisit at

20  the time of his testimony.

21          MR. CHAN:  Your Honor, I think we would agree, in

22  the spirit of compromise, we will agree that paragraph 1,

23  right, we can keep out, because it doesn't go to that, but the

24  next six lines -- and these are the only six lines we're

25  asking for to be left into this award that go to the specific

PROCEEDINGS

1    items enumerated in the Court's ruling.  So these are only six

2    lines and we've agreed to redact, you know -- this is over 15

3    pages of rulings.

4              MR. KESSLER:  With respect, Your Honor, we're trying

5    to compromise, we compromised on a bunch of things already,

6    but if it's inadmissible, it's inadmissible.  We are going to

7    have situation where Dr. Rosenfeld testifies and there is

8    another person who has already -- the jury will have someone

9    else's view of his testimony.

10             THE COURT:  I do think that we can revisit the

11   admissibility of this award if Dr. Rosenfeld testifies because

12   that's really what the jury should be paying attention to.

13             MR. KESSLER:  I agree.

14             THE COURT:  So if he does testify, which the defense

15   is still trying to sort out, this award is really superfluous

16   and doesn't really need to be in the record.

17             MR. KESSLER:  I agree with that.  My point is just,

18   in any event, this sentence shouldn't come in because it is --

19   for all the reasons we said, it is the arbitrator's

20   interpretation of evidence at the trial.

21             THE COURT:  I mean, look, I think sometimes there's

22   a danger in thinking out loud, which is what I'm doing here at

23   page 104 of the transcript.  I think sometimes parties

24   appreciate the Court's preliminary view before full briefing

25   just to get a sense of what issues they might want to address

PROCEEDINGS

1   or emphasize if they are going to be making more fulsome

2   arguments or submissions on a given topic.  I know that in

3   fact in the Northern District of California it's quite common

4   for judges to give sort of a preliminary preview of which way

5   they are leaning on a given issue and asking the parties to

6   prepare to come in and address those issues in oral argument.

7          My view, and it continues to be my view that we need

8   to be very careful, very mindful not to insert the jury's

9   function here, which is to look at the record as it is in this

10  case and decide the issues in dispute.  And my concern is that

11  while the ultimate decision regarding the consulting agreement

12  being an enforceable one and breach by Retrophin is

13  appropriate because it determines the rights of Retrophin and

14  Dr. Rosenfeld, the findings are based on an entirely different

15  constellation of evidence that is not before this Court or

16  this jury.  And my concern is that they will be giving undue

17  weight to the findings of the arbitrator, which really isn't

18  appropriate no more than it would be for them to consider

19  anything else that wasn't presented here in this courtroom.

20         I recognize and appreciate, Mr. Chan, you pointing

21  out what I said on the date of this pretrial conference which

22  seems like decades ago at this point.  When this was this?

23         MS. RUBIN:  October 6th, Your Honor.

24         MR. KESSLER:  October 6th.

25         THE COURT:  Well, a lot of submissions have come

PROCEEDINGS

1    through and including other sort of efforts regarding, one,

2    whether the defense was going to have a case, two, whether

3    Dr. Rosenfeld would be called, three, whether documents have

4    been provided to the government if the defense intends to use

5    in its case in chief.  We've had so many submissions.

6         I do think that adding the second sentence of the

7    second paragraph on page 6 under the heading Claims by

8    Rosenfeld would again touch on too many of the issues in

9    dispute, or the issues in dispute and it probably would be

10   better to redact the second sentence.  Not probably, I'd like

11   to say it should be.  Because you're going to have experts who

12   are going to talk about these types of agreements with

13   Dr. Rosenfeld or other recipients of these types of agreements

14   could or do given the language of the agreements, and so it

15   does seem to be really inappropriate to provide those

16   statements to the jury, left it leading to findings that are

17   not based on the trial of evidence.

18        MR. CHAN:  I understand.

19        THE COURT:  So we will delete the second sentence of

20   this paragraph starting with "Although the agreements demand"

21   and the rest I think the parties have agreed that the

22   remainder of page 7 should come out.

23        MR. CHAN:  But those last two lines of that

24   paragraph in?

25        MR. KESSLER:  "In addition as discussed more fully"

PROCEEDINGS

1   and then the last sentence I guess so it makes sense, "in

2   determining the claims."

3           THE COURT:  We will agree -- the parties have agreed

4   to leave in the last two sentences of that paragraph, right?

5   So what we are talking taking out is just one sentence in that

6   paragraph.

7           MR. CHAN:  Correct.

8           MR. KESSLER:  I think it's two, although it's

9   actually hard for me to tell if there is a semicolon after

10  proven value or a period on the top of page 7.

11          MR. CHAN:  You're right, it's two sentences.

12          MR. KESSLER:  I started scribbling, so I can't tell.

13          MR. CHAN:  Proven value period Retrophin.

14          THE COURT:  The parties are all right with leaving

15  in, "in addition as discussed" in the following sentence, is

16  that right?  Or did you want to leave in --

17          MR. KESSLER:  Given that we're taking out the other

18  discussion in the counterclaims I guess our view would be to

19  take it out, but I understand if the Court has a different

20  view.

21          MR. CHAN:  I think that's just a conclusory ruling

22  which we're also keeping at the end for the traditional part

23  of the judgment which is wherefore the following --

24          THE COURT:  Be clear, what are we doing, folks?

25          MR. CHAN:  I vote to keep it in.

PROCEEDINGS

1          THE COURT:  We're taking out the second sentence of

2    this paragraph.  It is third sentence that starts, "Retrophin

3    failed to pay what I was owed."

4          MR. KESSLER:  So we're taking that out and we'll

5    leave the last two.

6          MR. CHAN:  Correct.

7          THE COURT:  All right.

8          MR. KESSLER:  Then everything in yellow on page 7

9    comes out.

10          THE COURT:  Right.

11          MR. KESSLER:  Everything in yellow on page 8 comes

12    out.

13          Everything in yellow on page 9 comes out.

14          THE COURT:  Yes.

15          MR. KESSLER:  Everything in yellow on page 10 comes

16    out.

17          We had agree to leave the paragraph in orange in,

18    although I understand if the Court has a view -- I guess this

19    one doesn't have the damages.  So we had agreed that the

20    paragraph in orange stays in.

21          THE COURT:  All right.

22          MR. KESSLER:  Then everything else in yellow comes

23    out.

24          On page 12 we agreed that everything in yellow comes

25    out.  The one paragraph that's not highlighted is essentially

PROCEEDINGS

1   just the same thing as the paragraph we saw on the previous

2   page.

3          THE COURT:  You want to leave it in or just strike

4   it as duplicative.

5          MR. KESSLER:  It's fine.

6          THE COURT:  Leave it in?

7          MR. CHAN:  Yes, please.

8          MR. KESSLER:  On page 13, we had agreed that

9   everything in yellow and orange comes out.

10          THE COURT:  Okay.

11          MR. KESSLER:  Then in addition, if the Court sees

12   there's three sentences that are not highlighted in the middle

13   that start "Shkreli," the third of those sentences which

14   begins "Neither Shkreli's indictment nor the consulting

15   agreement constitutes prima facie evidence of wrongdoing,"

16   given the recent concerns about Shkreli's case we thought we

17   might just take that sentence out too.

18          THE COURT:  I think so too.  Don't you agree,

19   Mr. Chan?

20          MR. CHAN:  Yes, sure.

21          THE COURT:  So in the non-highlighted portion of

22   this paragraph we will just include the first two sentences

23   and that's it.

24          MR. CHAN:  Correct.

25          MR. KESSLER:  Correct.

PROCEEDINGS

1          Then on page 14 we agreed that all --

2          MR. CHAN:  All unredacted.

3          MR. KESSLER:  All the highlighting would come out so

4    the sentences -- or the provisions would stay in.  And then

5    this is I think the place where the damages are if the Court

6    wanted to address that.

7          THE COURT:  I'm wondering why they're relevant to

8    anything in this case.

9          MR. KESSLER:  We're for taking everything out.

10         THE COURT:  Mr. Chan, you want to make a pitch?

11         MR. CHAN:  I think that it would be permissible to

12   take out the amount but leave -- it's sort of like is it worth

13   the hassle of taking out one word in the sentence.  So it

14   would be claimants have established their claim for breach of

15   the consulting agreement and awarded damages, period.  Versus

16   leaving the amount in.  I'm happy to do it either way.  It's

17   the only instance in which we redact one part of a sentence

18   from this entire thing, so either way is fine.

19         MR. KESSLER:  We are going to redact the witnesses.

20   But we're happy to defer to the Court.

21         THE COURT:  How about paragraph 1, we just use let's

22   see --

23         MR. CHAN:  That's fine.

24         THE COURT:  So award of damages and that's it.

25         MR. CHAN:  Okay, and the same for two.

PROCEEDINGS

1          THE COURT:  Do we need interest?

2          MR. CHAN:  Well, what if we just said claimants are

3     entitled to interest, that's it.

4          THE COURT:  Okay, period.

5          MR. CHAN:  Yes.

6          THE COURT:  Okay.  Do you want number nine?

7          MR. CHAN:  We had agreed to leave it in, it's fine.

8          THE COURT:  All right.

9          MR. KESSLER:  Then the page 15 we didn't have an

10    objection to leaving that in but I don't have a view one way

11    or another.

12         MR. CHAN:  It's just the arbitrator's signature on

13    the award.

14         THE COURT:  That's fine.

15         MR. KESSLER:  Then we all agreed the last two pages

16    come out.

17         MR. CHAN:  Agreed.

18         THE COURT:  Okay.

19         Now my clerk was just raising an issue back on

20    page 13 where the paragraph that was unredacted starts,

21    "Shkreli was not a party or witness in these proceedings and

22    was not represented by a surrogate.  The legality or

23    illegality of his and Greebel's conduct is being assessed in a

24    proceeding in a different forum."

25         Are the parties sure they don't mind leaving that

PROCEEDINGS

1   in, or they don't have any concerns about Mr. Shkreli's --

2            MR. CHAN:  I think that given -- I think we had

3   originally felt that those gave context to the third sentence,

4   so if we're taking out the third sentence I'd say for the sake

5   of completeness take it all out.

6            MR. KESSLER:  I don't have an objection to taking

7   the Shkreli part of his and.

8            THE COURT:  So it would say, the legality or

9   illegality of -- it would read, and Greebel's.

10           MR. KESSLER:  Well, Greebel's, take out the "and."

11           MR. CHAN:  This clearly refers to this case, Your

12  Honor, now that I look more carefully at it.

13           MR. KESSLER:  But that's exactly the point.

14           MR. CHAN:  But if we can't get in the fact -- if the

15  government is asking us to take out parts where we can make --

16  where there are references to something that the fact finder

17  can improperly rely on and we're not allowed to make that

18  argument based on that language, why do they need the

19  clarification in here to make sure that it is expressed that

20  this has nothing to do with this case?

21           MR. KESSLER:  Because there will be an argument that

22  these facts establish innocence not guilt.

23           MR. CHAN:  That can be established by the

24  establishment of the part of the sentence that says they were

25  not parties to the arbitration.

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1          MR. KESSLER:  It says Shkreli.

2          THE COURT:  It's a bit of a disclaimer I think just

3    saying, look, whatever is going on with these two, Mr. Shkreli

4    and Mr. Greebel is not being assessed, acknowledging that

5    there is a separate proceeding and --

6          MR. KESSLER:  It's neutral.

7          MR. CHAN:  The problem is by only leaving

8    Mr. Greebel in that sentence it implies the arbitrator was

9    only concerned with one other proceeding.

10          THE COURT:  Right.

11          MR. CHAN:  I don't think the government is harmed by

12    the removal of these sentences.

13          MR. KESSLER:  Well --

14          THE COURT:  The first -- these three sentences.

15          MR. KESSLER:  Well, I think the first sentence there

16    is no dispute about that, that sort of doesn't implicate what

17    we're talking about.  I understand Mr. Chan's argument.  I,

18    frankly, just haven't thought it through.  Perhaps if possible

19    we can just think about it and get back to Mr. Chan tonight if

20    we have a problem with taking it out.

21          THE COURT:  All right.  So the first sentence of

22    paragraph 2 under the heading "A, aiding and abetting," will

23    be deleted and the parties are going to talk about whether or

24    not the second sentence will remain or not; is that right?

25          MR. KESSLER:  I think the first sentence stays and

PROCEEDINGS

1    we'll talk about the second sentence.

2              THE COURT:  Oh, I'm sorry.

3              MR. KESSLER:  The first sentence doesn't -- it just

4    establishes that Shkreli was not a party.  That doesn't say

5    anything about proceedings, about legality or illegality.

6              This may also be the sort of thing we can resolve

7    with a stipulation about...

8              THE COURT:  Right, the third sentence you both agree

9    should come out?

10             MR. KESSLER:  Agreed.

11             THE COURT:  Right?

12             MR. CHAN:  Yes.

13             THE COURT:  So the question is whether or not the

14   second sentence stays in --

15             MR. KESSLER:  Yes.

16             THE COURT:  -- right?

17             MR. CHAN:  Yes.

18             MR. KESSLER:  Yes.

19             THE COURT:  All right.  So you let me know tomorrow.

20             MR. KESSLER:  Yes.  Almost resolved one for you.

21             MR. CHAN:  Do you have experts?

22             MR. KESSLER:  So if Dean Ferruolo is testifying

23   tomorrow, then we still do have -- we have an issue with his

24   disclosure.  If he's not testifying tomorrow, we can raise it

25   tomorrow.

PROCEEDINGS

1    THE COURT:  Well, we don't have that straightened

2    out, he can't testify tomorrow, so...

3    MR. CHAN:  I don't understand what -- the only thing

4    to straighten out is for the Court to rule, right, on whatever

5    their objections are.

6    MR. KESSLER:  Right.

7    MR. CHAN:  I don't think there's anything more for

8    me to --

9    THE COURT:  Yesterday weren't you going to be

10   further --

11   MR. KESSLER:  Right.

12   THE COURT:  Further --

13   MR. KESSLER:  So we had objected yesterday to the

14   new opinion related to lockup agreements, although it seemed

15   like part of it might not have been related to lockup

16   agreements and we'd asked for supplemental disclosures about

17   in particular the last sentence of the opinion, which said,

18   companies --

19   THE COURT:  Which document are you referring to?

20   MR. KESSLER:  466.

21   THE COURT:  Document number 466.

22   MR. KESSLER:  December 2nd letter.  So on the fourth

23   page much of the supplemental opinion related or discussed

24   lockup agreements.  Then the last sentence after preamble

25   said, the opinion would be companies may reasonably allocate

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    those shares, meaning free trading shares, to individuals who

2    are friendly to the company and share the same goal of

3    creating an orderly and stable market.

4              And we had sought a supplemental explanation of

5    whether that related to lockup agreements or not or what the

6    basis of that opinion actually was.

7              THE COURT:  We don't have a lockup agreement here,

8    do we?

9              MR. KESSLER:  No.

10             MR. CHAN:  Well, so this is what our expert would

11   say --

12             THE COURT:  It's not even in the case.

13             MR. CHAN:  It is in the case and this is why I would

14   explain why it is in the case.  The government --

15             THE COURT:  I'm missing something, I'm sorry.

16             MR. CHAN:  What's that?

17             THE COURT:  I'm obviously missing something.

18             MR. CHAN:  The government has argued from its

19   opening statement that a conspiracy to not sell shares is

20   unlawful.  And so our expert would testify that, in fact,

21   there are some cases where an agreement not to sell is

22   perfectly lawful and encouraged in fact by the SEC and that

23   the Second Circuit has ruled is proper and actually not the

24   basis of 13D filing.  That 13D definition of control does not

25   apply to a lockup agreement.

PROCEEDINGS

1      So our argument, based on the opinion of the expert

2 and to educate the jury, is in fact there are some instances

3 when a bunch of people can get together and say we all promise

4 not to sell for the express purpose of not collapsing the

5 price of a company stock immediately after going public event.

6      So in order to respond to the government's argument

7 to the jury that merely agreeing not to sell stock is

8 unlawful, we should be entitled to put evidence in front of

9 the jury that, in fact, merely agreeing not to sell stock can

10 be okay and the government okays it.

11      So what our expert will testify is, there are lockup

12 agreements in the IPO context, that is established.

13 Similarly, those kinds of agreements or discussions about not

14 selling stock in order not to collapse the price of stock, can

15 also apply to a post reverse merger context which is similarly

16 a going public event.  So that sort of the testimony of the

17 expert analogizing from a lockup agreement context in an IPO

18 context to a reverse merger context.

19      If the government is saying it won't argue that an

20 agreement not to sell is unlawful, then I would agree it might

21 be different, but from their opening statement they sought to

22 argue to the jury that Count Eight was an unlawful conspiracy

23 amongst the Fearnow share recipients and Mr. Shkreli and

24 Mr. Greebel to not sell the stock, because in Mr. Kessler's

25 own words, if the free trading shares had been sold quickly,

7959
PROCEEDINGS

1    the price of Retrophin might have collapsed and the company

2    could have gone under.  If there was no company, there would

3    be no money nor source of funds to pay back the defrauded

4    investors and no one to pay the bills of the defendant.

5              So the government is make the argument and

6    impression to the jury that you can't agree not to sell stock.

7    What we're trying to say, through this expert and other

8    evidence, is that you can agree not to sell stock in certain

9    circumstances and this is one of them.

10             THE COURT:  But an IPO is a different kind of

11   vehicle than a reverse merger and I am not sure that you can

12   just say they're analogous.  I am not an expert in securities,

13   but an IPO I think, from what I understand, is when you offer

14   shares publicly and some insiders, employees are allowed to

15   get a certain number of shares or certain pricing and they are

16   committed formally in exchange for those shares not to sell

17   them for a set period of time.

18             The reverse merger situation here I don't know that

19   there was anything formalized with regard to the shares that

20   Mr. Shkreli's close associates received and I am just not sure

21   that a lockup agreement is going to be more confusing to the

22   jury than whatever else Mr. Ferruolo may want to talk about.

23             (Continued on the next page.)

24

25

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1           (Open court; no jury present.)

2           MR. KESSLER:  Your Honor, I still -- frankly, this

3    is my issue with the disclosure, it sounds like Dean

4    Ferruolo's opinion is that in one context that is not this

5    case, if you have a written lockup agreement, which the SEC

6    web site which he relies on, requires to be disclosed to the

7    market, and I am not securities lawyer, but my understanding

8    there's a lot involved in a lockup agreement, because you can

9    do that, the jury should understand that not all agreements

10   not to sell are -- no one's arguing that all agreements not to

11   sell in any context are a problem.  You can do things legally,

12   you can do things unlegally.  I'm pretty certain if you had a

13   lockup agreement and you didn't disclose it, that would be a

14   big problem, too.

15           So, you know, regardless of the intricacies of the

16   securities laws, one way or another, if Dean Ferruolo is going

17   to come in here and his testimony is that individuals can get

18   together, not tell anyone, and agree amongst themselves to

19   have a compact, a private secret compact not to sell shares --

20           THE COURT:  I don't know that it was even not to

21   sell.  It was don't, you know, on the one hand, they were

22   being told trade and pump up the volume, and on the other hand

23   they were told don't share without my approval.  I mean, the

24   idea was the control.

25           MR. KESSLER:  Whatever they were being told.  The

PROCEEDINGS

1    point is, if individual -- if he's going to come in and say

2    individuals can get together and have a secret agreement

3    about, you know, shares that they don't disclose in a public

4    market, I would be curious to hear that opinion.  But it

5    doesn't actually sound like that's his opinion.

6            MR. CHAN:  That would be the opinion, because it is

7    absolutely not securities law of fact that all lockup

8    agreements must be disclosed.  Lockup agreements occur in

9    other private transactions involving companies, including M&A

10   transactions and other transactions involving the issuance of

11   stock or private offerings by companies.  And in those cases

12   the SEC rules don't require their disclosure.  So the

13   disclosure argument is a red herring.

14           What really makes this case -- what makes lockups,

15   and the concept of lockups at issue here, is the government's

16   argument that there cannot be a legitimate reason for these

17   people to get together and say "let's not sell the stock," for

18   Mr. Shkreli to say, "hey, guys, please don't sell the stock

19   because if you do, the company's going to tank."  The fact of

20   the matter is, that request, "don't sell the stock after a

21   public -- a company goes public," which is true equally in

22   reverse merger context or an IPO context, because on day zero,

23   they're not public, on day one they are public, and all the

24   sudden there's shares on the market, and people have an

25   interest in trying to prevent in those first few months after

PROCEEDINGS

1    the day one of going public, of the stock going -- tanking.

2            And so to have a group of people have that

3    conversation and share desire to not have stock go down

4    immediately after a company goes public, should not -- the

5    logic of it is not limited to an IPO.  Because the logic of

6    the rule in the IPO context is about preserving, this is the

7    SEC's own words, in an amicus brief they filed in the In Re

8    Facebook case in the Southern District of New York, which is

9    affirmed on the Second Circuit, which found in that case that

10   lockups are permissible, and that they do not violate 13D, and

11   they do not constitute control for purposes of 13D.

12           So, our expert will give the jury the context of the

13   corporate world, where lockups can be done, and the people

14   agreeing not to sell stock are operating in that world.

15           MR. KESSLER:  Your Honor, none of that is in the

16   supplemental disclosure.  There's no reference to a 13D as the

17   basis for his opinion, there's no reference to a Second

18   Circuit case.  There's nothing about this other stuff.  And,

19   frankly, there's no lockup agreement in this case.  You know,

20   if Dean Ferruolo is going to come in and say a bunch of people

21   can get together and that's a lockup agreement, I'd like to

22   know in advance that that's his testimony, because we are

23   certainly going to want to question him about that.

24           THE COURT:  Look.  It seems to me that every time we

25   have one of these discussions about what the experts will say,

PROCEEDINGS

1   little nuggets come tumbling out of the defense counsel's

2   mouth about additional things that this expert may or may not

3   say, and I think it is somewhat difficult -- it is like the

4   shifting landscape, and I don't know how that type of

5   disclosure is consistent with what the rules require, and

6   whether it creates a very difficult situation for anyone who's

7   trying to prepare for cross-examination of an expert.

8        You know, if you haven't disclosed it by now, maybe

9   he doesn't testify about it.  Because at some point we have to

10  draw a bright line and say whatever's not disclosed is

11  precluded.  And if it is not in his disclosures, he's not

12  going to be able to say it.

13       MR. CHAN:  I disagree.  I think it's in disclosure.

14  I think that what's not in the disclosure are verbatim answers

15  that Mr. Kessler posing right now that I'm trying to answer

16  and put words in his mouth.  A summary of his testimony is not

17  supposed to be his 3500 material.  A summary of his testimony

18  is not supposed to be a roadmap of every word he's going to

19  say.  The topics are summarized in here.  We are no less

20  detailed than the government is in their own rebuttal expert

21  disclosures.

22       THE COURT:  You all agreed they shouldn't have to do

23  much of that until they hear from your experts because they

24  are on rebuttal.

25       MR. CHAN:  I don't agree with that, but --

PROCEEDINGS

1      THE COURT:  Well, Mr. Brodsky made that statement,

2  I think, quite some time ago, but it would be nonsensical in

3  some ways to expect the government to reveal rebuttal experts

4  when they haven't even, A, don't know whether you're going to

5  call rebuttal experts, B, the defense experts were in the

6  process of formulating their opinions and still conducting

7  their methodologies, whatever they may be, to try to come to

8  an opinion.  And so to require the government to try to

9  respond to something in that confused uncertain landscape

10  would be grossly unfair and in violation, I think, of what the

11  rules would require.

12      MR. CHAN:  I think it depends.  I mean, if the

13  expert's opinion is going to be the opinion of 13D, that's not

14  an unfair expectation for them to tell us what that expert is

15  going to say.  If the expert can't -- I agree, if the expert

16  can't say, Dean Ferruolo is wrong about "X," because he

17  doesn't know what Dean Ferruolo is going to say.  If they

18  already know that the topic in this case is going to be the

19  function of a rule or the function of the form -- but I am not

20  here to argue the rebuttal.

21      THE COURT:  They are trying to understand this whole

22  lockup business, which I think I am hearing them say hasn't

23  been explained, at least in Dean Ferruolo's disclosures.  You

24  may have done a more artful detailed job of that.

25      MR. CHAN:  Okay.  I understand.  I mean, I

PROCEEDINGS

1    understand that we -- if we don't supplement this disclosure,

2    there might be an adverse result from that, and we will take

3    that into consideration.

4           THE COURT:  Well, I think that's what the cases

5    require me to do.  I don't like precluding people, especially

6    defense lawyers, but, you know, the rules are the rules and

7    fair is fair.

8           MR. CHAN:  Okay.

9           THE COURT:  All right.  So is Dean Ferruolo

10   testifying tomorrow?

11          MR. CHAN:  He is our second potential witness.

12          THE COURT:  All right.

13          MR. PITLUCK:  Judge, on that point, if I may, we

14   just heard from Mr. Brodsky that said, they still haven't made

15   a decision about -- a final decision to put on their case.

16   They haven't been able to speak to their first five witnesses,

17   in light of the unexpected length today, which -- and he said

18   we will tell you as soon as we know and we will press to find

19   quickly.

20          So we still don't know who amongst the five is going

21   to testify, we don't know if it is going -- we don't know

22   anything, Judge, other than these are the people who are the

23   first five witnesses, two of them are exerts, which are still

24   pending rulings from the Court so.  We may need to --

25   depending what we find out, we may have to ask for a

PROCEEDINGS

1   continuance, which is something we are horribly loath to do at

2   this point.  We are staring next Friday dead in the eyes at

3   this point, and it seems like there's going to a lengthy case

4   regarding -- they don't have to do it, but we've only got the

5   first five witnesses, and we are still arguing over experts

6   that aren't even in that five.

7            So I just wanted to put the Court on notice of that,

8   and to respectfully ask the Court when we might be able to

9   expect a decision on the experts, so we can kind of determine

10  going forward which ones might be called in the next couple

11  days, or which ones might not be able to.

12           MR. CHAN:  Just to add to that, of the five

13  witnesses, there's a second expert.

14           THE COURT:  Are you awaiting my decision in order to

15  decide which expert you want to call?  Or are you -- I mean,

16  my understanding was that the government is trying -- there's

17  parts of the experts disclosures that they are still having

18  issues with, where there's parts of the experts' opinions that

19  they are objecting to.  They are not asking for a flat out

20  preclusion of anyone except Mr. Johnson?

21           MR. KESSLER:  Ms. Klein, Mr. Johnson, and

22  Mr. Minkoff, we are.  But none -- the two experts who the

23  defense has noted in their first five are not experts we are

24  seeking to preclude entirely.

25           MS. RUBIN:  Your Honor, I would be remiss, Your

PROCEEDINGS

1    Honor, if I didn't say my client is urging me to remind the

2    Court that my client will not make a final decision about

3    whether to offer a case in chief until the government rests.

4    And I just wanted to reiterate that on the record for the

5    benefit of our client.

6            MR. KESSLER:  And to be clear, no one is going to

7    force that decision until the decision is appropriate, but we

8    need to note that, if there is a case, who's first.

9            MS. RUBIN:  Your Honor, we understand we have

10   disclosure obligations with respect to our case.  To the

11   extent we are going to offer one, we intend to comply with

12   that.

13           THE COURT:  Well, can you give a time by which you

14   must disclose it?

15           MR. PITLUCK:  You did, Judge.  By 6:30.

16           THE COURT:  Right.

17           MR. KESSLER:  To be fair, Mr. Greebel is --

18           THE COURT:  Mr. Greebel is still here.

19           MR. PITLUCK:  But that's not predicated on the

20   decision.  We are saying if a decision is made, and I think it

21   is on the record a number of times, the Court ordered it this

22   weekend, if a decision is made, we now have a very good sense

23   of timing.  Mr. Brodsky said 30 more minutes.  Redirect is

24   going to be brief.  There is going to be a Rule 29 argument.

25   Then the decision will be made.  We can start as soon as

PROCEEDINGS

1    tomorrow.  We are saying if a case goes on --

2                THE COURT:  You need to know --

3                MR. PITLUCK:   -- we need to know who it is.

4                THE COURT:   -- who the first witness is.

5                So, you know, is Mr. Greebel going to go back and

6    speak in person, or can this be done by phone?  I mean, I just

7    want to know what's a reasonable time --

8                MS. RUBIN:  I believe this can be done by telephone,

9    but I do know that Mr. Greebel would like to consult with

10   counsel this evening before making a decision.

11               THE COURT:  All right.  Well, you have until 7:30.

12               MS. RUBIN:  Thank you, Your Honor.

13               MR. PITLUCK:  Thank you, Your Honor.

14               THE COURT:  Otherwise, you know, I don't want to

15   continue this either.  We need to get this finished.

16               MR. CHAN:  Understand.

17               There's just two quick things.  On scheduling, for

18   purposes of planning for witnesses tomorrow, would the Court

19   want the Rule 29 argument to happen after the government's

20   case no matter what, or would the Court entertain the

21   possibility of just pushing that off until after court so we

22   can get -- use the jury time while we have the jury time

23   tomorrow during the day.  In other words, we can sort of say

24   we are making the motion and argue it at the end of the day of

25   tomorrow, or do you want it just to be done, get it all done

PROCEEDINGS

1    and taken care of after the government rests?

2             THE COURT:  You mean you would start your case, if

3    you were going to put one on, without a ruling?

4             MR. CHAN:  Correct.  If you wanted us to save jury

5    day time.

6             THE COURT:  Well, I'd like to save day time.  I

7    don't know what --

8             MR. KESSLER:  I mean, there are certainly cases

9    where the defendant sort of makes a pro forma motion to -- and

10   then to be supplemented.  But, frankly, I don't feel confident

11   or competent to actually advise on what the state of the law

12   is about what is waived or not waived about when a Rule 29

13   motion is made.

14            THE COURT:  I don't want to be wrong either and

15   agree to something that might --

16            MR. CHAN:  Okay, that's fine.  I just didn't know if

17   you wanted a particular --

18            THE COURT:  Obviously, my desire is to move the case

19   forward, but if it means that you may inadvertently waive,

20   despite a ruling on my part --

21            MR. CHAN:  Okay.

22            MR. KESSLER:  And I think the defense would have to

23   make a motion.  The question is --

24            MR. CHAN:  Save the argument.

25            MR. KESSLER:   -- the argument.

PROCEEDINGS

1          MR. CHAN:  No, we'll just do the whole thing.  We'll

2   just do the whole thing after the government rests.  And then

3   the only --

4          THE COURT:  How long will that take?

5          MR. CHAN:  Well, I was going to argue it, if it was

6   today.  But Mr. Mastro is back tomorrow so he's going to argue

7   it.

8          MR. KESSLER:  He promised an hour.  No more.

9          MR. PITLUCK:  That was a careful nonanswer, Judge.

10          MR. CHAN:  That's all I can say on that topic.

11          MR. KESSLER:  So no one has a position on it.

12          MR. CHAN:  But I think definitely not more than an

13   hour.  I think an uninterrupted 30 minutes sounds about right.

14          THE COURT:  All right.

15          MR. CHAN:  And the last thing that I wanted to say

16   on the record was I want to apologize to Mr. Kessler for the

17   outburst I had at sidebar.

18          THE COURT:  We don't have to put this on the record.

19   Please.

20          (WHEREUPON, discussion was had off the record.)

21          MS. RUBIN:  Your Honor, to the extent that you

22   wanted to talk about the ex parte submission we made last

23   night at Your Honor's request, if Your Honor would like to do

24   that in the morning instead so that Mr. Greebel can consult

25   with counsel, I would be happy to do that, or at another time,

PROCEEDINGS

1    and I would be happy to stay and have that conversation with

2    Your Honor and your clerk.

3              THE COURT:  I was just trying to understand, because

4    I -- you are welcome to come up here and see what I've got.

5              MR. PITLUCK:  Judge, we'll leave.  I would just put

6    on the record that one of them, as you're aware, I'm sure, one

7    of the disclosures we're concerned about is for Professor

8    Lewis, who is in their first five witnesses, who has also got

9    some --

10             MS. RUBIN:  You're elevating her professor status.

11   I'm sure she'll take that?

12             MR. KESSLER:  No, Professor Lewis is a professor.

13             MS. RUBIN:  Oh, I'm sorry.  Professor Lewis.  I

14   thought you meant Ms. Klein.

15             THE COURT:  What do you want about Professor Lewis?

16   You want more disclosure?

17             MR. PITLUCK:  It is not necessarily -- we asked for

18   the disclosure, so in the event the Court deems that it is

19   not -- that it is 26.2 material, we'd obviously like it

20   before, but we are now butting up to, you know, the day in

21   which Professor Lewis would testify.  So we do have relevance

22   objections of certain opinions for Professor Lewis, and,

23   obviously, if we are going to cross-examine him and the Court

24   determines that that material should be disclosed to us, we

25   would like to have it sooner rather than later, and I

PROCEEDINGS

1   appreciate everything the Court is dealing with.  I just

2   wanted to --

3           THE COURT:  All right.  I will tell you what.  This

4   is just not even what you have given me in the last week on

5   experts.  And, you know, I was talking to my clerk about this

6   last evening.  I have read everything now three times because

7   this has gone on for so long, the expert submission and the

8   little dribbles of additional information, it is just taking

9   me more time than I would like.  We have got so many experts

10  and so many problems.

11          MR. PITLUCK:  I completely understand, Judge, and I

12  didn't mean to imply that.

13          THE COURT:  Mr. Greebel is not here, so I didn't

14  want to get too far into the weeds.  But I am just trying to

15  explain why.  It seems like I am taking a long time, but,

16  honestly, you guys just made additional submissions over the

17  weekend.

18          MR. PITLUCK:  Judge, obviously, you and your clerk

19  are doing a ton of work.  I was just putting you on notice of

20  where we are vis-a-vis timing.

21          THE COURT:  Understood.

22          MR. PITLUCK:  Thank you.

23          THE COURT:  All right.

24          (WHEREUPON, at 6:40 p.m., the proceedings were

25  adjourned until 9:00 a.m., December 6, 2017.)

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

```
1                    I N D E X

2   WITNESS                          PAGE

3   CROSS-EXAMINATION    BY MR. BRODSKY   7697

4
                     I N D E X
5

6                    EXHIBITS

7   DEFENDANT             PAGE
    124-61                7700
8   10868A                7745
    10830A                7758
9   124-8                 7769
    124-119               7775
10  124-118               7782
```

**BY MR. BRODSKY::** [15]  7695/4 7698/14
7699/13 7706/1 7721/10 7724/17 7779/13
7780/7 7787/1 7793/4 7794/18 7796/2 7887/22
7889/12 7890/2

**MR. BRODSKY:** [269]  7671/3 7671/6 7671/11
7675/18 7675/25 7676/3 7676/7 7676/9
7676/13 7676/16 7677/7 7677/9 7677/11
7677/18 7678/21 7679/3 7682/23 7683/2
7683/5 7683/9 7683/13 7683/16 7683/25
7684/2 7688/4 7688/20 7688/23 7688/25
7689/2 7690/15 7690/18 7690/20 7691/2
7691/21 7692/19 7693/9 7694/19 7695/2
7696/6 7697/16 7697/19 7697/23 7698/1
7699/10 7702/13 7705/16 7705/18 7708/8
7710/15 7711/4 7712/14 7714/5 7714/9
7714/16 7715/20 7716/4 7718/11 7718/15
7719/16 7719/20 7721/9 7723/5 7724/2 7724/6
7724/10 7724/15 7727/23 7728/18 7729/7
7729/12 7729/18 7730/5 7730/24 7740/3
7740/6 7742/9 7743/4 7743/9 7743/24 7746/17
7746/24 7747/21 7748/7 7749/10 7752/2
7752/17 7753/25 7754/14 7754/19 7755/14
7755/25 7756/12 7756/17 7757/3 7757/21
7761/24 7762/17 7764/3 7764/6 7764/10
7764/13 7764/16 7764/18 7764/23 7767/5
7770/10 7770/18 7770/21 7771/14 7772/2
7773/2 7773/11 7776/19 7779/12 7779/22
7780/1 7781/14 7783/15 7783/22 7786/12
7786/20 7786/25 7787/24 7788/17 7788/20
7789/7 7790/10 7792/19 7793/15 7793/20
7794/12 7794/17 7794/23 7794/25 7795/3
7795/6 7795/19 7796/1 7796/22 7797/3 7799/2
7799/24 7800/15 7801/1 7803/11 7805/4
7807/23 7808/1 7808/11 7808/17 7808/25
7809/5 7809/10 7809/25 7810/7 7812/8
7812/13 7812/20 7812/23 7813/2 7813/16
7813/21 7813/23 7814/1 7814/3 7814/10
7814/10 7814/18 7822/18 7823/3 7823/14
7823/18 7823/20 7824/12 7824/14 7825/20
7827/7 7828/19 7829/16 7830/16 7830/20
7831/9 7831/11 7833/11 7833/22 7833/25
7834/3 7834/6 7834/9 7834/24 7835/16 7836/1
7836/3 7836/5 7836/7 7836/11 7837/7 7837/12
7838/4 7838/11 7838/25 7840/2 7840/17
7840/21 7840/23 7841/10 7842/16 7842/22
7843/4 7843/7 7843/16 7844/11 7844/16
7844/18 7844/21 7849/7 7849/15 7849/21
7850/23 7850/25 7854/25 7855/14 7855/16
7855/19 7856/2 7856/6 7856/17 7858/4
7858/12 7858/19 7858/21 7859/16 7859/18
7859/20 7864/13 7866/4 7869/25 7870/24
7874/1 7877/11 7882/11 7882/15 7883/2
7883/12 7884/21 7886/1 7886/23 7886/25
7887/7 7887/12 7890/17 7890/23 7891/3
7891/7 7899/16 7899/20 7899/23 7901/7
7901/24 7906/1 7906/4 7906/10 7906/13
7908/5 7908/10 7917/1 7917/8 7917/10 7918/6

**MR. CARTER:** [1]  7906/3

**MR. CHAN:** [79]  7812/24 7849/8 7928/8
7928/12 7928/18 7928/22 7928/25 7929/12
7929/19 7930/1 7930/24 7931/16 7932/11
7932/21 7933/3 7933/6 7935/5 7935/9 7935/20
7937/11 7940/10 7940/12 7940/14 7940/24
7941/23 7942/24 7944/20 7947/17 7947/22
7948/6 7948/10 7948/12 7948/20 7948/24
7949/5 7950/6 7950/19 7950/23 7951/1
7951/10 7951/22 7951/24 7952/1 7952/4
7952/6 7952/11 7952/16 7953/1 7953/10
7953/13 7953/22 7954/6 7954/10 7955/11
7955/16 7955/20 7956/2 7956/6 7957/9
7957/12 7957/15 7957/17 7961/5 7963/12
7963/24 7964/11 7964/24 7965/7 7965/10
7966/11 7968/15 7969/3 7969/15 7969/20
7969/23 7970/4 7970/9 7970/11 7970/14

**MR. DUBIN:** [74]  7693/7 7693/12 7693/15
7693/18 7693/24 7814/17 7814/25 7815/2
7815/5 7815/9 7815/13 7815/21 7815/24

7816/7 7816/10 7816/13 7816/19 7816/21
7817/14 7817/17 7817/20 7817/22 7818/8
7818/18 7819/3 7819/10 7819/12 7819/17
7819/25 7820/4 7820/7 7821/5 7821/10
7821/25 7822/3 7822/11 7822/15 7836/22
7838/14 7838/24 7839/5 7849/6 7891/13
7891/16 7891/21 7892/8 7892/16 7892/19
7893/2 7893/12 7894/3 7894/6 7896/1 7896/25
7897/2 7897/4 7897/21 7898/8 7898/11 7899/1
7899/10 7918/13 7919/23 7920/3 7920/23
7922/18 7922/25 7923/10 7923/12 7923/14
7925/21 7926/24 7927/13 7927/25

**MR. KESSLER:** [155]  7719/7 7726/22 7727/20
7729/20 7731/9 7731/21 7734/19 7735/3
7735/11 7735/15 7736/7 7737/7 7737/18
7741/17 7741/24 7742/7 7804/16 7805/5
7805/7 7807/4 7807/24 7808/6 7808/13
7808/19 7808/24 7809/11 7810/6 7810/14
7822/24 7823/12 7823/19 7824/23 7825/23
7826/5 7826/8 7826/12 7836/14 7836/18
7836/23 7838/8 7838/13 7849/3 7858/14
7858/23 7859/13 7860/19 7860/24 7879/6
7880/8 7880/15 7880/18 7881/1 7882/3 7884/9
7884/20 7884/24 7888/13 7892/6 7892/9
7892/17 7892/22 7929/7 7929/20 7929/25
7930/4 7930/8 7930/10 7930/12 7930/16
7930/23 7930/25 7931/5 7931/21 7932/8
7932/18 7933/7 7933/10 7933/14 7933/17
7933/19 7933/24 7934/1 7934/7 7934/12
7934/15 7934/18 7934/21 7935/13 7935/15
7935/17 7935/21 7935/25 7936/3 7936/7
7938/18 7941/3 7941/13 7941/15 7941/24
7943/24 7944/18 7945/3 7945/12 7945/16
7946/23 7947/24 7948/7 7948/11 7948/16
7949/3 7949/7 7949/10 7949/14 7949/21
7950/4 7950/7 7950/10 7950/24 7951/2 7951/8
7951/18 7952/8 7952/14 7953/5 7953/9
7953/12 7953/20 7953/25 7954/5 7954/17
7954/14 7954/24 7955/2 7955/9 7955/14
7955/17 7955/19 7955/21 7956/5 7956/10
7956/12 7956/19 7956/21 7957/8 7960/24
7962/14 7966/20 7967/5 7967/16 7969/7
7969/21 7969/24 7970/7 7970/10 7971/11

**MR. PITLUCK:** [171]  7673/21 7680/21
7680/23 7682/1 7682/3 7682/24 7686/17
7688/17 7692/4 7694/6 7694/12 7694/15
7696/13 7696/17 7697/14 7697/17 7698/7
7698/9 7700/13 7700/17 7700/21 7702/25
7703/2 7707/9 7708/17 7708/22 7719/8
7723/24 7724/11 7725/1 7725/6 7726/24
7727/4 7727/7 7727/11 7729/9 7729/25
7730/20 7731/20 7732/3 7732/10 7732/16
7733/10 7733/18 7733/22 7735/16 7735/24
7736/11 7736/16 7737/19 7737/25 7738/8
7738/11 7738/17 7739/16 7739/20 7740/13
7740/21 7740/25 7741/2 7741/7 7741/21
7742/1 7742/13 7743/11 7743/17 7745/16
7747/13 7751/5 7751/21 7752/9 7754/9
7754/12 7755/8 7755/11 7755/13 7755/21
7756/15 7759/8 7760/17 7760/20 7761/1
7763/25 7764/17 7764/20 7766/18 7770/13
7773/5 7776/13 7778/5 7779/8 7779/21
7779/24 7786/14 7786/18 7794/6 7795/17
7795/21 7799/10 7799/13 7800/12 7800/22
7801/25 7802/10 7823/2 7827/13 7827/15
7828/5 7832/20 7838/10 7839/7 7839/10
7840/12 7841/3 7841/19 7841/23 7842/4
7842/7 7842/14 7843/3 7843/13 7843/23
7844/6 7845/11 7846/18 7846/13 7846/15
7847/19 7847/22 7857/3 7858/13 7858/15
7859/2 7860/2 7862/13 7863/3 7875/8 7876/7
7876/15 7878/9 7878/23 7885/9 7886/19
7887/3 7890/15 7890/21 7891/5 7899/24
7907/12 7908/1 7909/20 7912/11 7912/15
7913/10 7913/21 7914/17 7915/16 7916/15
7918/2 7918/10 7965/12 7967/14 7967/18
7968/2 7968/12 7970/8 7971/4 7971/16
7972/10 7972/17 7972/21

**MS. RUBIN:** [11]  7906/9 7929/4 7929/9
7945/12 7966/24 7967/9 7967/17 7969/7
7970/20 7971/9 7971/12

**MS. SMITH:** [48]  7709/1 7711/3 7711/5
7711/17 7711/25 7712/6 7713/12 7714/8
7715/9 7715/14 7717/2 7719/3 7719/13
7809/13 7812/16 7819/1 7831/13 7834/10
7835/7 7835/12 7835/25 7836/17 7837/3
7837/10 7837/14 7838/6 7838/21 7852/18
7855/23 7856/3 7858/3 7859/3 7859/22 7860/5
7861/1 7887/4 7894/11 7897/13 7900/8
7900/18 7900/23 7921/9 7925/11 7927/19
7928/2 7928/9 7928/16 7928/19

**THE COURT:** [579]
**THE WITNESS:** [26]  7697/25 7705/24 7745/19
7755/18 7755/24 7759/12 7783/19 7791/17
7791/20 7793/2 7796/23 7841/14 7844/1
7844/10 7844/19 7845/1 7845/18 7846/25
7887/19 7888/16 7888/21 7888/25 7889/3
7890/1 7907/16 7913/11

**$**

**$16** [1]  7705/5
**$16 million** [1]  7705/5
**$180** [1]  7798/11
**$180 million** [1]  7798/11
**$28** [1]  7705/4
**$28 million** [1]  7705/4
**$35** [1]  7704/14
**$35 million** [1]  7704/14

**,**

**'the** [1]  7919/5

**-**

**-- and** [2]  7753/11 7912/14
**-- but** [1]  7899/3
**-- consciousness** [1]  7858/16
**-- in** [2]  7760/20 7908/4
**-- substantially** [1]  7826/6
**-- through** [1]  7746/15
**-- what** [1]  7831/11
**-- who** [1]  7968/4
**-- yes** [1]  7845/15
**------------------------------x** [2]  7670/2 7670/8
**-against** [1]  7670/5

**0**

**0001** [1]  7905/5
**00637** [1]  7670/2
**05** [1]  7670/5

**1**

**10** [24]  7683/24 7684/1 7769/12 7769/20
7771/12 7771/18 7772/13 7784/13 7784/16
7784/22 7785/4 7785/13 7786/17 7787/21
7788/4 7812/15 7877/15 7894/17 7904/3
7904/6 7904/9 7904/20 7905/11 7949/15
**10-Qs** [1]  7694/18
**10/25** [1]  7703/8
**10166** [1]  7670/18
**102** [3]  7794/20 7795/6 7795/8
**104** [2]  7943/5 7945/23
**105-10** [1]  7786/17
**105-8** [2]  7786/17 7786/18
**106** [3]  7681/1 7686/21 7863/25
**108-10** [3]  7771/12 7771/18 7772/13
**10830A** [8]  7754/4 7755/6 7756/7 7756/15
7756/21 7756/25 7757/3 7757/8
**10868A** [30]  7723/8 7724/8 7724/15 7724/19
7728/2 7732/3 7732/14 7734/8 7743/7 7743/15
7743/16 7743/21 7744/5 7744/10 7746/24
7747/6 7747/13 7748/3 7748/4 7748/7 7748/13
7748/21 7749/14 7749/17 7750/5 7750/9
7750/16 7751/16 7751/20 7756/14
**109** [1]  7795/16
**10:25** [1]  7683/24
**10:28** [3]  7683/25 7684/1 7704/5

**1**

**10:28 p.m [1]** 7671/20
**10:35 [1]** 7695/16
**10:35 p.m [2]** 7671/13 7699/2
**10:36 [8]** 7672/18 7684/3 7703/9 7703/13 7703/17 7703/23 7703/24 7704/5
**10:36 p.m [7]** 7681/16 7701/14 7701/21 7702/3 7702/22 7702/23 7703/8
**10:36:29 [4]** 7702/16 7703/13 7703/24 7704/2
**10:37 p.m [1]** 7705/12
**10:43 [5]** 7762/17 7762/22 7765/25 7768/5 7768/10
**10:58 [1]** 7762/3
**10K [1]** 7795/10
**10Ks [2]** 7795/13 7796/8
**10Qs [1]** 7796/8
**11 [2]** 7699/4 7894/20
**111-15 [1]** 7680/14
**11201 [1]** 7670/14
**1129A [1]** 7784/24
**114-29A [3]** 7781/9 7781/15 7785/3
**116-102 [1]** 7794/20
**118 [11]** 7776/1 7776/16 7778/3 7778/13 7778/15 7779/1 7779/6 7779/23 7780/4 7780/6 7780/9
**118-26A [2]** 7757/20 7758/5
**119 [15]** 7772/6 7772/9 7772/16 7772/19 7773/3 7773/9 7773/10 7776/18 7777/5 7777/5 7777/12 7778/14 7778/21 7778/22 7779/4
**11:11 [1]** 7743/1
**12 [3]** 7758/6 7900/6 7949/24
**121 [1]** 7795/16
**124-118 [3]** 7780/4 7780/6 7780/9
**124-119 [3]** 7773/9 7773/10 7777/12
**124-61 [9]** 7674/7 7675/17 7697/23 7698/6 7702/2 7702/8 7702/23 7702/25 7704/1
**124-8 [2]** 7763/1 7767/10
**12:45 [1]** 7781/1
**13 [13]** 7758/20 7761/14 7761/21 7762/16 7762/22 7765/6 7765/24 7767/21 7768/4 7790/20 7804/13 7950/8 7952/20
**13D [6]** 7957/24 7957/24 7962/10 7962/11 7962/16 7964/13
**13Ds [1]** 7796/9
**14 [1]** 7951/1
**15 [7]** 7680/14 7695/25 7696/2 7766/12 7767/1 7945/2 7952/9
**15-CR-00637 [1]** 7670/2
**15-minute [1]** 7862/7
**16 [1]** 7676/6
**17 [9]** 7721/21 7723/19 7744/19 7748/15 7748/23 7749/2 7796/15 7797/6 7799/2
**18 [1]** 7788/6
**19 [6]** 7728/2 7787/19 7790/22 7791/1 7792/1 7906/23
**1933 [2]** 7765/15 7771/6
**1990 [1]** 7864/15
**1:07 [2]** 7776/21 7779/7
**1:07 p.m [3]** 7776/6 7776/17 7778/4

**2**

**2-7-13 [1]** 7758/20
**2.doc [1]** 7744/23
**20 [27]** 7682/10 7722/4 7722/19 7723/3 7744/21 7744/21 7749/7 7749/21 7751/13 7752/22 7753/21 7755/1 7755/7 7756/5 7756/7 7757/12 7757/16 7781/21 7781/23 7784/24 7785/6 7790/23 7791/8 7791/25 7791/25 7792/2 7808/5
**200 [1]** 7670/18
**2004 [1]** 7872/11
**2012 [30]** 7671/13 7672/21 7677/14 7679/23 7695/16 7696/3 7697/3 7698/14 7699/2 7699/18 7701/14 7701/21 7702/3 7702/7 7702/16 7705/11 7706/4 7761/14 7761/21 7762/17 7762/22 7765/6 7765/24 7767/21 7768/4 7803/15 7803/22 7803/25 7804/19 7906/18

**2013 [71]** 7688/6 7758/6 7758/11 7758/13 7758/17 7771/15 7771/16 7771/22 7771/22 7771/25 7771/25 7772/8 7772/20 7773/1 7774/15 7774/19 7776/2 7776/6 7776/12 7776/16 7776/21 7777/14 7777/17 7777/18 7779/6 7780/13 7781/1 7781/22 7781/23 7782/13 7783/2 7784/14 7784/16 7784/22 7785/5 7785/6 7785/13 7787/22 7788/4 7789/1 7789/22 7790/22 7790/23 7791/1 7791/9 7791/10 7791/25 7791/25 7792/1 7792/2 7792/12 7793/8 7793/10 7795/11 7798/19 7798/22 7809/25 7902/7 7902/20 7902/22 7903/17 7904/3 7904/6 7904/9 7904/10 7904/13 7904/17 7904/19 7904/20 7905/11 7904/17 7904/17 7904/19 7904/20 7905/11 7905/11 7906/23

**2014 [55]** 7688/6 7706/9 7707/19 7707/22 7708/5 7708/13 7721/14 7721/21 7722/4 7722/11 7722/19 7723/3 7723/9 7723/11 7723/20 7723/23 7724/8 7726/6 7731/20 7734/22 7736/22 7737/13 7737/18 7744/6 7744/8 7744/19 7744/20 7744/21 7744/21 7748/15 7748/17 7748/23 7749/2 7749/8 7749/18 7749/21 7750/2 7750/8 7750/9 7750/24 7751/13 7751/20 7752/23 7753/21 7754/5 7755/1 7755/7 7755/8 7756/6 7756/7 7757/9 7757/12 7796/15 7797/6 7797/20

**2015 [16]** 7799/8 7801/13 7801/17 7801/21 7804/13 7827/12 7840/8 7841/9 7841/19 7842/14 7843/21 7844/5 7845/10 7846/19 7847/8 7908/16
**2017 [2]** 7670/5 7972/25
**20th [1]** 7810/6
**22 [3]** 7902/19 7903/22 7904/11
**22.2 [1]** 7676/9
**2268 [1]** 7670/22
**24 [6]** 7706/8 7716/17 7718/17 7718/24 7733/14 7797/20
**245 [6]** 7788/24 7789/17 7790/12 7790/21 7790/22 7792/8
**246 [1]** 7717/2
**25 [7]** 7701/14 7701/21 7702/3 7702/7 7702/16 7703/8 7705/11
**25th [10]** 7671/13 7672/21 7677/14 7679/15 7685/8 7695/15 7697/9 7698/14 7699/2 7699/18
**26 [1]** 7706/4
**26.2 [1]** 7971/19
**265 [1]** 7790/15
**26A [2]** 7757/20 7758/5
**26th [2]** 7685/8 7685/8
**27 [2]** 7676/6 7771/20
**271 [1]** 7670/14
**28 [4]** 7758/17 7877/8 7884/10 7906/18
**286 [31]** 7707/13 7721/7 7723/17 7724/6 7724/7 7724/23 7728/8 7729/2 7729/16 7731/10 7746/1 7746/9 7746/9 7746/21 7747/2 7747/9 7747/18 7748/2 7748/9 7748/20 7749/6 7749/25 7750/8 7751/9 7751/19 7753/18 7754/25 7756/4 7796/19 7797/19 7797/21
**29 [11]** 7671/18 7672/18 7673/9 7702/7 7703/14 7798/19 7798/22 7928/6 7967/24 7968/19 7969/12
**293 [1]** 7866/16
**29A [3]** 7781/9 7781/15 7785/3
**29th [11]** 7673/13 7679/23 7680/15 7680/19 7685/6 7688/14 7692/23 7696/3 7696/9 7697/3 7697/6
**2:00 [1]** 7900/7
**2:13 [1]** 7827/2
**2:29 p.m [1]** 7776/9
**2:45 p.m [2]** 7785/13 7786/6
**2d [2]** 7872/10 7877/15
**2nd [1]** 7956/22

**3**

**3.3 [1]** 7704/12
**3/20 [1]** 7757/16
**30 [7]** 7782/12 7917/4 7917/6 7917/12 7917/13

7967/23 7970/13
**300 [1]** 7906/6
**302 [16]** 7801/6 7801/23 7802/19 7803/2 7803/7 7804/23 7807/12 7807/23 7808/7 7808/10 7811/8 7811/9 7811/15 7812/3 7824/25 7825/12
**302s [1]** 7811/24
**31 [10]** 7771/19 7771/20 7771/22 7771/25 7772/8 7772/20 7773/16 7777/14 7777/17 7795/11
**31,500 [1]** 7787/12
**334 [2]** 7872/10 7877/15
**3500 [1]** 7963/17
**378 [1]** 7872/10
**381 [1]** 7877/15
**3rd [1]** 7692/23

**4**

**4,167 [1]** 7679/23
**4/19/13 [1]** 7790/20
**40 [3]** 7740/10 7801/7 7899/13
**40,000 [1]** 7808/20
**401 [1]** 7680/6
**403 [5]** 7680/6 7685/10 7685/21 7685/22 7922/2
**45 [5]** 7747/7 7747/8 7747/12 7801/7 7801/7
**459 [30]** 7671/9 7671/12 7671/22 7671/25 7672/14 7672/16 7672/24 7673/4 7673/8 7673/18 7675/12 7678/16 7679/22 7680/14 7691/12 7692/2 7692/5 7695/8 7695/14 7695/14 7697/7 7698/18 7698/19 7698/24 7700/4 7701/9 7701/13 7702/21 7703/7 7705/10
**466 [2]** 7956/20 7956/21
**468-1 [1]** 7930/8
**48 [1]** 7682/7
**487 [10]** 7761/12 7761/13 7761/22 7763/22 7765/3 7766/11 7766/25 7769/2 7769/17 7771/3
**48th [1]** 7670/18
**4:31 [5]** 7771/22 7772/1 7772/8 7772/20 7777/17
**4:44 p.m [1]** 7786/6
**4:45 [1]** 7900/18
**4:55 [1]** 7901/1

**5**

**50 [1]** 7740/10
**50,000 [1]** 7808/20
**5054 [2]** 7822/20 7823/17
**506 [1]** 7906/9
**506A [2]** 7905/25 7906/10
**520 [1]** 7906/22
**560 [5]** 7784/11 7785/9 7785/21 7786/2 7787/5
**561 [2]** 7903/23 7903/24
**565 [6]** 7787/18 7790/3 7790/5 7790/7 7790/10 7790/21
**589 [3]** 7901/16 7901/20 7904/14
**5:06 [2]** 7767/21 7768/7
**5:27 [1]** 7917/23
**5:29 [1]** 7906/24
**5:30 [2]** 7860/22 7919/8
**5:30 p.m [1]** 7793/10
**5:42 p.m [1]** 7797/6
**5:43 [2]** 7762/17 7768/10
**5:57 [4]** 7762/9 7765/6 7769/3 7769/18
**5:58 [1]** 7762/14

**6**

**61 [28]** 7671/7 7671/18 7672/22 7672/25 7673/16 7674/7 7675/17 7677/6 7677/13 7680/17 7680/21 7691/10 7691/14 7694/12 7697/11 7697/23 7698/6 7698/13 7699/5 7700/2 7700/11 7702/2 7702/8 7702/23 7702/25 7703/10 7704/1
**613 [1]** 7877/21
**653 [2]** 7798/16 7799/3
**662 [1]** 7862/13

**6**

**662-1990** [1] 7864/15
**664** [6] 7796/14 7796/22 7796/25 7797/5
7797/5 7797/16
**6650** [5] 7785/10 7785/11 7785/25 7786/13
7786/23
**674** [4] 7706/6 7707/14 7728/13 7729/16
**691** [1] 7866/5
**6978:3** [1] 7799/20
**6:30** [3] 7868/13 7928/25 7967/15
**6:40** [1] 7972/24
**6th** [2] 7946/23 7946/24

**7**

**718-613-2268** [1] 7670/22
**79** [1] 7746/13
**7:30** [1] 7968/11

**8**

**80** [1] 7746/13
**80 percent** [1] 7924/5
**801** [1] 7872/16
**803** [1] 7773/5
**803.15** [1] 7942/4
**8281** [2] 7793/6 7793/8
**8:20 p.m** [2] 7696/3 7697/3
**8:35 a.m** [1] 7777/18
**8:59 a.m** [1] 7777/25

**9**

**909** [2] 7862/13 7864/15
**969** [1] 7694/18
**970** [1] 7694/18
**99.9** [1] 7943/1
**9:00** [3] 7670/5 7917/22 7972/25
**9:00 p.m** [1] 7788/7

**A**

**a.m** [5] 7670/5 7743/1 7777/18 7777/25
7972/25
**abdicating** [1] 7942/22
**abetting** [1] 7954/22
**abide** [1] 7817/5
**ability** [7] 7799/24 7800/19 7800/20 7801/5
7833/4 7880/22 7882/9
**able** [31] 7671/4 7682/12 7683/1 7684/19
7687/23 7710/23 7718/9 7730/17 7730/18
7752/5 7820/22 7837/24 7854/3 7854/15
7854/18 7860/14 7860/21 7860/23 7873/1
7880/6 7882/20 7885/5 7885/7 7919/4 7921/9
7925/3 7928/14 7963/12 7965/16 7966/8
7966/11
**above-named** [1] 7769/10
**abroad** [1] 7869/22
**Absent** [1] 7937/17
**absolutely** [6] 7685/11 7690/19 7694/13
7800/9 7849/7 7961/7
**accept** [1] 7886/5
**acceptable** [1] 7930/23
**accepted** [3] 7782/16 7823/22 7830/23
**access** [4] 7731/19 7732/13 7732/19 7832/3
**according** [4] 7672/7 7702/20 7703/9 7808/19
**accountants** [1] 7803/18
**accretive** [1] 7798/12
**accurate** [15] 7681/7 7681/14 7684/5 7688/18
7737/14 7770/10 7783/15 7783/19 7783/21
7784/8 7800/12 7811/16 7812/6 7825/20
7941/22
**accurately** [4] 7771/9 7771/10 7784/2 7784/3
7800/8 7800/18 7800/20 7800/22 7801/4
**accused** [7] 7835/5 7864/17 7866/13 7867/20
7867/22 7868/6 7872/12
**accusing** [1] 7816/18
**acknowledge** [1] 7736/5
**acknowledging** [1] 7954/4
**acquire** [1] 7798/10
**acquisition** [2] 7798/4 7798/11
**acquittal** [1] 7879/8

**acquitted** [8] 7815/4 7819/10 7819/11 7820/5
7820/6 7821/21 7822/15 7824/6
**act** [5] 7765/15 7771/6 7803/11 7878/6 7878/6
**acting** [9] 7670/13 7721/17 7721/24 7722/7
7722/15 7722/24 7728/11 7728/11 7749/23
**actions** [3] 7830/6 7837/21 7864/18
**active** [1] 7829/7
**activities** [3] 7792/3 7792/4 7792/6
**actual** [10] 7683/19 7683/20 7804/15 7823/13
7829/1 7830/10 7877/17 7877/24 7878/2
7941/16
**add** [6] 7702/9 7713/8 7787/13 7821/11
7826/14 7966/12
**added** [1] 7809/25
**adding** [1] 7947/6
**addition** [5] 7852/10 7921/22 7947/25 7948/15
7950/11
**additional** [8] 7705/21 7731/13 7782/17
7787/12 7882/5 7963/2 7972/8 7972/16
**additive** [1] 7774/5
**address** [14] 7673/24 7675/20 7686/19
7734/25 7826/17 7836/24 7837/1 7860/17
7872/25 7918/13 7919/3 7945/25 7946/6
7951/6
**addressed** [5] 7696/17 7825/25 7857/18
7878/20 7942/15
**addresses** [2] 7734/17 7935/18
**addressing** [1] 7733/10
**adhered** [1] 7943/20
**adjourn** [1] 7899/13 7900/18
**adjourned** [1] 7972/2
**adjusted** [1] 7787/11
**administer** [3] 7856/2 7873/5 7883/2
**administered** [5] 7882/10 7888/20 7893/9
7893/23 7894/14
**administration** [3] 7885/6 7885/12 7920/22
**admissibility** [8] 7681/11 7683/16 7688/2
7724/14 7754/21 7923/20 7924/21 7945/11
**admissible** [23] 7672/25 7673/18 7673/19
7682/16 7682/17 7684/6 7684/7 7685/25
7685/25 7688/3 7688/3 7688/4 7688/25 7692/4
7735/10 7824/20 7856/17 7877/23 7878/4
7882/2 7938/2 7943/9 7943/17
**admission** [6] 7676/3 7764/16 7764/17 7767/8
7868/25 7876/6
**admissions** [1] 7880/7
**admit** [24] 7694/11 7698/4 7731/17 7735/11
7735/13 7736/16 7736/16 7736/16 7740/10
7740/21 7743/14 7756/20 7767/9 7773/8
7780/3 7850/15 7864/3 7872/13 7872/14
7872/17 7877/24 7880/6 7881/11 7883/23
**admits** [2] 7800/21 7926/14
**admitted** [23] 7674/12 7674/15 7698/11
7714/19 7717/8 7730/2 7732/15 7733/7
7733/16 7737/13 7734/19 7734/21 7737/4
7738/7 7740/5 7743/22 7773/7 7780/5 7786/25
7803/17 7803/25 7868/21 7876/11
**admitting** [5] 7961/15 7877/2 7877/3
**admonish** [1] 7817/24
**admonishment** [1] 7837/17
**admonition** [2] 7817/11 7943/20
**adopt** [1] 7825/20
**adopted** [2] 7824/4 7867/18
**advance** [5] 7683/2 7687/4 7726/14 7927/25
7962/22
**adverse** [3] 7870/22 7872/2 7965/2
**advice** [9] 7672/23 7673/4 7677/2 7685/4
7685/7 7686/8 7688/14 7689/11 7689/18
**advise** [2] 7756/21 7969/11
**advised** [3] 7783/3 7783/6 7888/25
**adviser** [1] 7791/2
**advocacy** [1] 7849/14
**affect** [1] 7677/2
**affiliate** [2] 7765/14 7771/5
**affiliated** [1] 7783/3
**affiliation** [1] 7770/3
**affirmatively** [1] 7877/2
**affirmed** [1] 7962/9

**afield** [4] 7729/10 7729/14 7736/21 7741/22
**afternoon** [2] 7867/20 7962/2
**afterwards** [4] 7831/20 7854/7 7891/9 7894/16
**AG** [1] 7926/20
**agenda** [3] 7758/12 7789/3 7793/9
**agent** [186] 7671/5 7673/7 7673/19 7674/3
7674/20 7674/24 7681/3 7681/9 7684/20
7684/22 7684/23 7684/23 7687/4 7687/15
7688/8 7688/15 7689/4 7689/6 7690/12
7690/22 7695/1 7695/11 7697/2 7698/16
7714/15 7726/4 7726/21 7726/24 7729/12
7730/5 7730/10 7730/14 7730/17 7731/16
7731/18 7731/18 7731/23 7732/12 7732/19
7733/5 7733/11 7734/1 7735/11 7735/13
7735/20 7736/5 7736/5 7736/8 7736/9 7736/16
7736/19 7736/24 7738/3 7738/22 7738/24
7739/24 7740/3 7742/3 7745/23 7752/17
7757/19 7759/21 7787/13 7794/15 7795/24
7796/4 7800/8 7802/20 7803/7 7803/8 7803/8
7804/12 7805/2 7811/11 7811/21 7811/25
7812/5 7824/5 7824/17 7826/7 7827/6 7827/11
7828/11 7830/12 7832/25 7833/4 7837/24
7838/3 7838/6 7838/7 7838/12 7840/6 7840/10
7841/1 7841/7 7841/17 7842/1 7842/12
7842/25 7843/10 7843/20 7844/5 7844/19
7845/5 7845/11 7845/25 7846/10 7846/12
7846/20 7849/24 7851/7 7852/18 7853/11
7856/7 7856/11 7856/12 7856/16 7856/21
7856/22 7857/9 7860/1 7863/11 7863/22
7874/3 7874/24 7875/7 7875/10 7875/15
7876/14 7879/10 7882/2 7882/8 7882/15
7882/22 7882/25 7884/14 7887/16 7887/24
7888/18 7889/9 7889/14 7889/16 7891/25
7892/1 7892/14 7893/9 7893/11 7893/17
7893/22 7893/25 7894/1 7894/24 7895/6
7896/23 7897/9 7897/10 7897/17 7898/17
7901/12 7901/15 7901/18 7902/2 7907/9
7908/8 7908/14 7910/4 7912/20 7912/24
7913/14 7915/20 7916/18 7918/1 7918/15
7920/5 7920/21 7921/8 7921/13 7925/1 7925/6
7925/15 7926/15 7927/6 7927/10 7927/11
7927/11 7927/12
**agent's** [13] 7794/9 7811/4 7811/15 7812/4
7829/11 7830/6 7833/9 7837/21 7846/25
7855/6 7891/11 7920/2 7921/10
**agents** [9] 7846/5 7846/21 7851/13 7854/9
7868/12 7874/18 7876/3 7894/20 7926/17
**aggregate** [1] 7788/15
**ago** [3] 7877/8 7946/22 7964/2
**agree** [64] 7673/25 7676/4 7688/5 7688/21
7701/6 7702/19 7703/18 7704/21 7711/22
7714/1 7716/3 7735/14 7747/5 7779/1 7784/22
7790/15 7800/10 7801/10 7801/12 7801/13
7802/22 7822/12 7824/14 7898/9 7898/12
7903/5 7904/9 7904/25 7907/3 7908/14
7908/19 7908/25 7909/6 7914/25 7930/2
7930/18 7931/2 7933/11 7933/15 7933/20
7933/25 7934/2 7934/8 7935/14 7935/22
7939/2 7940/23 7942/25 7944/18 7944/21
7944/22 7945/13 7945/17 7948/3 7949/17
7950/18 7955/8 7958/20 7959/6 7959/8
7960/18 7963/25 7964/15 7969/15
**agreed** [38] 7676/14 7676/17 7688/24 7689/1
7774/10 7783/10 7825/18 7835/1 7859/2
7872/7 7879/3 7879/21 7903/10 7905/2
7922/19 7923/1 7930/16 7932/13 7932/22
7933/7 7934/9 7935/20 7936/18 7937/20
7940/25 7943/1 7945/2 7947/21 7948/3
7949/19 7949/24 7950/8 7951/1 7952/7
7952/15 7952/17 7955/10 7963/22
**agreeing** [4] 7852/13 7958/7 7958/9 7962/14
**agreement** [79] 7671/14 7671/16 7671/23
7672/14 7672/17 7675/4 7678/16 7679/17
7679/17 7692/6 7692/12 7695/17 7695/20
7701/15 7782/1 7784/14 7787/10 7787/14
7788/7 7789/6 7789/20 7789/21 7790/4 7790/8
7790/12 7791/9 7792/5 7792/14 7797/13
7803/20 7805/23 7805/23 7807/8 7809/16

**A**

**agreement... [45]** 7809/18 7809/22 7826/16
7902/4 7902/9 7902/12 7903/18 7904/1 7904/5
7904/17 7904/22 7930/4 7930/7 7932/11
7933/5 7934/4 7936/16 7936/21 7937/16
7937/16 7937/22 7938/14 7938/15 7940/6
7940/17 7941/17 7941/12 7942/23 7943/7
7943/12 7946/11 7950/15 7951/15 7957/7
7957/21 7957/25 7958/17 7958/20 7959/21
7960/5 7960/8 7960/13 7961/2 7962/19
7962/21

**agreements [24]** 7675/14 7782/15 7782/18
7783/9 7826/17 7850/13 7850/14 7938/10
7938/17 7941/11 7947/12 7947/13 7947/14
7947/20 7956/14 7956/16 7956/24 7957/5
7958/12 7958/13 7960/9 7960/10 7961/8
7961/8

**agrees [4]** 7867/23 7877/9 7930/14 7930/17

**aha [1]** 7807/19

**ahead [5]** 7680/23 7854/25 7860/10 7910/2
7927/23

**aided [1]** 7670/24

**aiding [1]** 7954/22

**AI [6]** 7784/14 7784/18 7786/3 7789/6 7790/13
7794/5

**Alan [1]** 7785/13

**albeit [1]** 7735/2

**album [2]** 7813/21 7816/4

**ALIXANDRA [1]** 7670/15

**allegations [1]** 7869/8

**allege [2]** 7692/8 7734/13

**alleged [3]** 7810/25 7864/23 7864/25

**allocate [1]** 7956/25

**allow [8]** 7686/3 7691/19 7700/23 7882/8
7886/15 7907/14 7917/3 7923/6

**allowed [17]** 7716/9 7828/18 7828/19 7829/15
7829/24 7852/6 7852/17 7852/22 7856/14
7856/18 7879/20 7879/24 7890/24 7894/10
7920/15 7953/17 7959/14

**allows [2]** 7674/8 7858/16

**almost [2]** 7931/10 7955/20

**alone [6]** 7677/4 7680/2 7684/24 7765/12
7769/14 7769/22

**alternative [1]** 7774/6

**Amendment [10]** 7685/19 7869/23 7869/23
7869/25 7870/3 7870/15 7870/20 7871/19
7871/19 7878/22

**AMERICA [1]** 7670/3

**amicus [1]** 7962/7

**amount [5]** 7760/7 7788/15 7905/3 7951/12
7951/16

**amounts [1]** 7902/16

**analogizing [1]** 7958/17

**analogous [1]** 7959/12

**analysis [2]** 7834/24 7934/23

**answer [41]** 7696/13 7696/15 7696/23 7696/23
7701/3 7702/9 7705/18 7705/19 7705/23
7767/17 7770/12 7774/15 7777/7 7777/21
7778/8 7780/14 7788/20 7789/10 7791/20
7791/22 7792/21 7793/1 7800/2 7828/13
7828/18 7838/10 7840/21 7841/14 7844/1
7844/20 7844/25 7847/5 7849/24 7867/15
7878/8 7891/1 7903/20 7907/15 7914/24
7928/23 7963/15

**answered [6]** 7781/2 7841/21 7850/21 7857/16
7863/17 7864/5

**answering [1]** 7878/7

**answers [5]** 7680/11 7780/18 7849/24 7855/1
7963/14

**antecedent [2]** 7919/20 7935/1

**anticipated [1]** 7798/9

**anticipating [2]** 7857/11 7918/4

**anticipation [1]** 7875/12

**anyway [3]** 7859/25 7860/10 7860/13

**apart [2]** 7678/3 7895/11

**apex [1]** 7911/24

**apologies [3]** 7786/11 7843/17 7918/7

**apologize [8]** 7703/4 7726/1 7789/20 7795/8

7814/18 7828/7 7941/25 7970/16

**apparent [1]** 7829/6

**appeals [5]** 7852/21 7854/21 7855/18 7859/23
7861/1

**appear [9]** 7748/24 7751/18 7752/8 7753/4
7754/8 7756/9 7772/9 7772/11 7772/16

**APPEARANCES [1]** 7670/11

**appeared [1]** 7750/7

**appellate [1]** 7862/11

**apples [1]** 7811/9

**applicable [1]** 7875/23

**application [10]** 7693/5 7696/11 7815/3
7817/8 7819/7 7821/19 7822/5 7822/7 7830/2
7936/12

**applications [1]** 7693/11

**applied [1]** 7828/16

**applies [4]** 7676/6 7676/7 7676/9 7877/9

**apply [10]** 7676/5 7676/13 7683/16 7683/17
7692/22 7863/8 7875/20 7884/1 7957/25
7958/15

**applying [1]** 7884/8

**appreciate [10]** 7752/4 7816/22 7817/3 7817/6
7821/23 7849/17 7898/3 7945/24 7946/20
7972/1

**apprised [1]** 7814/19

**approach [28]** 7697/21 7708/9 7723/6 7754/1
7757/22 7761/25 7762/18 7771/15 7772/3
7787/25 7793/16 7906/2 7911/13 7911/20
7911/22 7912/9 7912/25 7913/1 7913/2 7913/4
7914/11 7918/18 7921/15 7921/18 7921/20
7925/18 7927/3 7927/8

**approached [1]** 7925/13

**approaches [1]** 7818/1

**appropriate [43]** 7694/11 7712/3 7712/22
7712/23 7718/10 7727/16 7731/17 7732/14
7740/21 7795/25 7815/7 7824/11 7825/19
7830/9 7831/6 7832/10 7832/19 7833/8
7833/10 7853/4 7853/5 7854/12 7859/7 7860/3
7862/4 7863/25 7873/1 7875/17 7875/18
7880/21 7881/11 7882/7 7886/11 7894/8
7895/16 7896/25 7898/25 7920/21 7931/16
7938/12 7946/13 7946/18 7967/7

**appropriately [2]** 7687/16 7829/14

**approval [3]** 7778/13 7960/23

**approvals [1]** 7831/24

**approve [1]** 7794/5

**approved [2]** 7774/11 7884/11

**April [36]** 7707/23 7722/11 7744/20 7750/2
7750/7 7773/1 7774/14 7774/19 7776/2 7776/6
7776/8 7776/12 7776/16 7776/21 7777/18
7779/6 7780/13 7781/1 7783/2 7784/13
7784/16 7784/22 7785/4 7785/13 7787/19
7787/21 7788/4 7788/6 7790/22 7791/1 7792/1
7904/3 7904/6 7904/9 7904/20 7905/11

**April 10 [7]** 7784/13 7784/16 7784/22 7785/4
7785/13 7787/21 7788/4

**April 18 [1]** 7788/6

**April 19 [4]** 7787/19 7790/22 7791/1 7792/1

**April 7 [1]** 7722/11

**April 8 [10]** 7776/2 7776/6 7776/8 7776/12
7776/16 7776/21 7777/18 7779/6 7780/13
7781/1

**arbitration [6]** 7826/4 7929/15 7936/14
7937/15 7943/11 7953/25

**arbitrator [21]** 7931/12 7931/13 7931/19
7931/21 7931/25 7932/7 7932/2 7932/3 7935/3
7935/4 7935/18 7938/2 7938/4 7938/14
7938/25 7940/9 7942/7 7942/23 7943/12
7946/17 7954/8

**arbitrator's [13]** 7931/11 7936/9 7936/11
7937/5 7938/4 7938/20 7938/21 7939/3
7940/16 7941/22 7942/11 7945/19 7952/12

**area [1]** 7768/17

**areas [1]** 7914/22

**argue [39]** 7678/2 7680/17 7682/4 7685/21
7710/23 7713/14 7713/14 7715/17 7718/23
7718/25 7727/14 7736/23 7737/22 7738/23
7739/7 7741/12 7810/20 7851/23 7857/13

7858/8 7865/9 7867/25 7870/19 7871/8 7872/3
7879/20 7887/7 7899/2 7907/18 7912/21
7924/18 7927/11 7942/10 7958/19 7958/22
7964/20 7968/24 7970/5 7970/6

**argued [7]** 7681/13 7681/18 7802/13 7868/25
7883/22 7897/18 7957/18

**arguing [10]** 7718/22 7732/5 7732/8 7734/15
7867/23 7872/15 7923/2 7943/22 7960/10
7966/5

**argument [37]** 7673/24 7679/18 7679/20
7679/21 7679/24 7680/15 7686/21 7687/2
7714/5 7735/4 7735/7 7835/5 7854/14 7854/22
7870/15 7879/4 7879/23 7881/24 7925/11
7927/9 7940/16 7941/23 7942/1 7943/14
7946/6 7953/18 7953/21 7954/17 7958/1
7958/6 7959/5 7961/13 7961/16 7967/24
7968/19 7969/24 7969/25

**arguments [11]** 7689/2 7739/3 7819/23
7834/19 7877/18 7881/9 7923/19 7925/23
7925/24 7935/2 7946/2

**arising [1]** 7816/6

**arraigned [1]** 7890/15

**arraignment [3]** 7874/23 7891/3 7891/5

**arrangements [1]** 7918/2

**arrest [72]** 7832/11 7833/2 7843/3 7850/9
7851/19 7852/4 7853/3 7855/10 7856/2 7857/2
7857/12 7857/15 7857/21 7857/25 7858/2
7860/4 7862/17 7862/21 7863/12 7868/9
7868/10 7870/21 7871/16 7872/13 7874/21
7875/4 7875/8 7875/15 7875/17 7876/7
7877/16 7877/19 7878/23 7880/23 7881/1
7881/3 7885/13 7885/15 7885/22 7887/25
7887/25 7888/1 7889/4 7891/5 7897/25
7911/11 7913/6 7915/13 7915/16 7916/1
7916/4 7916/6 7916/9 7919/23 7920/1 7920/10
7920/13 7921/12 7921/17 7921/18 7921/24
7922/18 7922/22 7924/8 7925/10 7925/10
7925/14 7925/14 7925/19 7925/20 7927/8
7927/9

**arrested [25]** 7843/13 7847/11 7847/19 7851/6
7851/9 7851/13 7853/14 7855/13 7856/8
7860/8 7867/4 7868/17 7869/24 7872/4
7874/22 7876/3 7910/5 7913/20 7915/21
7916/15 7916/20 7916/25 7919/7 7921/5
7924/1

**arrestee [1]** 7922/24

**arresting [31]** 7827/13 7838/21 7840/7
7840/12 7841/3 7841/8 7841/19 7842/14
7842/25 7843/10 7843/21 7844/4 7845/5
7845/6 7845/10 7846/18 7847/7 7908/15
7908/20 7908/23 7908/25 7909/7 7909/9
7909/13 7911/1 7911/5 7912/21 7914/21
7916/11 7919/20 7919/22

**arrests [2]** 7874/6 7885/14

**arrive [1]** 7707/25

**artful [1]** 7964/24

**articulated [2]** 7927/7 7943/10

**articulates [1]** 7940/20

**articulating [1]** 7943/22

**ascertain [1]** 7730/15

**Aselage [22]** 7677/25 7728/15 7731/25 7733/6
7734/4 7738/5 7739/22 7789/2 7792/13
7802/15 7808/12 7808/13 7808/15 7808/19
7809/1 7809/3 7809/9 7809/14 7810/8 7811/17
7824/10 7927/23

**Aselage's [2]** 7737/4 7810/10

**aside [6]** 7681/17 7702/19 7714/6 7766/1
7785/17 7925/17

**asleep [1]** 7862/22

**aspects [1]** 7895/5

**assert [1]** 7833/7

**asserted [6]** 7710/7 7773/4 7863/10 7877/21
7878/2 7884/17

**asserting [2]** 7730/24 7942/2

**assertion [1]** 7802/22

**assessed [2]** 7952/23 7954/4

**assessment [1]** 7927/2

**assigned [1]** 7887/25

## A

assistance [1] 7870/8
Assistant [1] 7670/16
associate [7] 7699/7 7728/4 7729/19 7734/9 7735/2 7735/23 7736/1
associated [1] 7787/14
associates [2] 7847/12 7959/20
assume [8] 7707/25 7732/11 7745/16 7745/19 7871/4 7871/5 7893/22 7928/5
assuming [3] 7726/16 7745/18 7859/7
attached [16] 7705/1 7728/8 7744/25 7750/24 7750/25 7751/1 7755/5 7755/8 7756/11 7757/15 7768/15 7788/12 7789/5 7789/12 7828/17 7902/11
attaches [4] 7708/3 7708/4 7718/21 7718/24
attaching [1] 7716/20 7809/24 7904/21
attachment [11] 7708/4 7723/22 7724/19 7749/19 7754/7 7754/8 7789/13 7790/3 7790/7 7790/11 7904/24
attachments [3] 7744/19 7782/3 7789/3
attack [1] 7803/11
attempt [12] 7738/21 7802/18 7827/12 7840/7 7840/11 7841/2 7841/18 7842/12 7843/1 7843/11 7843/21 7845/11
attempting [2] 7681/2 7896/20
attend [1] 7900/7
attending [1] 7741/14
attention [10] 7717/15 7763/12 7797/4 7798/19 7798/21 7817/8 7817/12 7899/5 7917/18 7945/12
attorney [10] 7670/13 7711/8 7851/4 7911/14 7914/5 7914/6 7914/8 7914/12 7926/7
Attorney's [4] 7874/15 7912/6 7913/3 7913/5
attorney-client [2] 7711/8 7851/4
Attorneys [1] 7670/16
attract [1] 7899/5
audibly [1] 7815/16
audit [8] 7723/2 7753/19 7755/1 7755/6 7756/5 7756/6 7757/12 7757/16
audited [2] 7774/3 7774/13
August [9] 7781/21 7781/23 7784/24 7785/6 7790/23 7791/8 7791/25 7791/25 7792/2
August 20 [9] 7781/21 7781/23 7784/24 7785/6 7790/23 7791/8 7791/25 7791/25 7792/2
authentic [1] 7680/5
authenticate [1] 7685/20
authenticity [1] 7751/5
authority [1] 7732/9
available [4] 7683/12 7832/2 7896/23 7928/24
Avenue [2] 7670/18 7934/15
avoid [4] 7818/23 7917/19 7940/2 7942/19
awaiting [1] 7966/14
award [17] 7826/4 7929/15 7940/17 7940/20 7941/2 7942/6 7942/6 7942/8 7943/1 7943/19 7944/6 7944/17 7944/25 7945/11 7945/15 7951/24 7952/13
awarded [3] 7937/1 7940/21 7951/15
aware [13] 7674/8 7803/5 7859/25 7863/1 7864/2 7874/19 7875/9 7899/6 7907/15 7911/14 7914/12 7924/25 7971/6

## B

back-dated [1] 7696/6
back-dating [1] 7682/5
backdate [4] 7805/4 7807/23 7811/14 7823/9
backdated [18] 7801/21 7802/24 7804/2 7804/4 7804/6 7804/8 7804/14 7804/24 7805/6 7805/7 7805/10 7805/14 7807/20 7810/6 7810/11 7823/14 7823/23 7825/10
backdating [23] 7805/15 7805/16 7805/19 7806/1 7807/9 7807/16 7807/18 7807/20 7807/25 7808/13 7810/13 7810/15 7810/18 7811/11 7812/11 7823/8 7823/10 7823/11 7823/12 7823/23 7824/5 7825/7 7825/8
background [1] 7931/23
bad [1] 7856/25
bait [1] 7804/22

balanced [2] 7833/7 7943/8
bandaid [1] 7704/26
bank [2] 7807/2 7807/6
Banta [1] 7794/6
bar [2] 7849/5 7851/3
based [29] 7682/10 7740/18 7740/18 7762/12 7770/2 7780/18 7796/4 7798/9 7819/21 7842/19 7851/24 7859/3 7866/19 7875/14 7875/21 7878/21 7881/18 7886/18 7892/12 7913/25 7926/21 7934/3 7942/13 7942/21 7942/23 7946/14 7947/17 7953/18 7958/1
bases [3] 7687/23 7826/15 7938/17
basis [32] 7674/18 7675/9 7676/2 7680/1 7681/1 7681/8 7682/13 7682/16 7683/15 7684/6 7684/7 7687/3 7687/3 7687/6 7691/9 7731/13 7731/15 7736/13 7774/9 7774/11 7816/6 7843/16 7851/22 7852/15 7857/22 7858/7 7893/21 7909/18 7940/20 7957/6 7957/24 7962/17
Bates [16] 7708/11 7714/20 7724/19 7745/6 7745/10 7745/13 7746/1 7746/5 7746/6 7746/7 7747/1 7763/13 7766/8 7779/2 7779/3 7779/4
became [1] 7832/2
become [1] 7849/20
beg [1] 7693/18
began [2] 7798/2 7889/12
begin [2] 7693/7 7889/17
beginning [4] 7787/21 7820/10 7863/11 7885/22
begins [3] 7798/2 7935/18 7950/14
behalf [4] 7739/21 7819/24 7849/14 7881/24
behavior [1] 7716/10
belief [4] 7831/2 7896/13 7921/23 7923/17
beliefs [1] 7875/14
believes [2] 7810/9 7924/6
below [9] 7702/17 7702/18 7762/9 7763/2 7765/9 7769/25 7786/3 7789/24 7902/21
benefit [2] 7927/22 7967/5
Bertolini [8] 7677/16 7678/5 7678/18 7679/1 7685/13 7699/6 7699/19 7701/7
best [11] 7704/22 7744/4 7799/23 7800/19 7800/20 7801/4 7801/6 7804/8 7881/8 7899/19 7912/9
bet [1] 7926/11
better [11] 7764/25 7833/25 7834/2 7838/4 7839/3 7843/8 7865/4 7919/2 7931/4 7942/19 7947/10
betting [1] 7926/11
between [16] 7671/13 7691/1 7727/25 7735/6 7763/25 7771/20 7772/23 7776/2 7797/1 7824/18 7828/17 7869/19 7877/2 7905/11 7925/13 7938/15
beyond [8] 7794/8 7794/11 7794/16 7815/18 7835/4 7856/12 7863/15 7938/7
Biaggi [22] 7862/13 7862/14 7862/24 7864/15 7865/14 7865/15 7868/22 7869/12 7869/19 7869/20 7871/3 7875/20 7876/17 7876/17 7877/7 7877/8 7878/12 7879/12 7881/21 7883/15 7884/5 7884/5 7884/9 7884/9 7923/9
bias [3] 7687/22 7688/10 7688/11
Biestek [3] 7673/11 7673/11 7692/11 7763/23 7765/5 7769/3 7804/24 7807/13
Biestek's [1] 7679/22
big [6] 7677/20 7773/18 7773/22 7893/25 7900/23 7960/14
bigger [1] 7764/1 7822/13
bills [4] 7719/5 7719/6 7719/6 7959/4
binders [2] 7689/21 7740/9
bit [6] 7698/21 7842/20 7845/3 7923/7 7942/9 7954/2
blacked [2] 7715/8 7721/4
blank [6] 7779/11 7779/12 7788/15 7789/22 7803/20 7905/5
blanket [1] 7788/13
Blanton [1] 7797/9
block [6] 7749/22 7820/22 7852/1 7852/5 7855/9 7855/12
blockading [1] 7738/17

blow [21] 7695/9 7696/1 7698/17 7698/19 7700/10 7700/17 7700/24 7747/1 7748/10 7748/13 7749/12 7757/5 7757/20 7761/12 7768/25 7777/13 7789/16 7790/8 7792/8 7793/7 7793/12
blue [2] 7825/13 7825/14
blurted [1] 7919/1
board [100] 7688/17 7706/9 7708/5 7708/12 7712/23 7716/5 7716/18 7718/17 7718/21 7718/24 7721/13 7721/21 7722/2 7722/11 7722/19 7723/2 7723/19 7726/4 7726/8 7726/10 7726/15 7726/18 7727/19 7728/6 7728/16 7728/20 7729/22 7729/23 7729/24 7731/11 7731/25 7732/1 7732/9 7732/23 7733/12 7733/13 7733/14 7733/20 7734/3 7734/5 7734/9 7734/11 7734/14 7734/14 7734/22 7734/24 7734/24 7735/19 7735/22 7736/6 7737/2 7737/12 7737/12 7737/15 7737/19 7737/23 7738/7 7738/9 7738/12 7738/25 7739/8 7739/16 7739/23 7740/1 7740/25 7741/6 7741/10 7741/11 7741/12 7741/14 7741/15 7741/16 7741/21 7741/24 7744/16 7748/15 7748/22 7749/7 7750/2 7750/21 7751/12 7752/17 7752/22 7753/20 7758/17 7758/20 7758/13 7789/3 7791/9 7791/19 7791/21 7793/9 7796/15 7797/2 7797/3 7797/10 7797/14 7798/3 7798/13
BOD [1] 7758/12
bold [1] 7753/5 7753/5 7753/6 7753/6
bona [1] 7942/22
books [2] 7706/9 7728/22
bootstrap [1] 7858/3
bootstrapping [3] 7941/23 7942/1 7942/8
borne [2] 7681/13 7782/19
bottom [30] 7695/10 7695/14 7697/8 7698/16 7698/17 7698/19 7698/24 7703/15 7704/3 7724/20 7745/6 7758/9 7767/14 7767/20 7768/7 7772/9 7773/15 7773/15 7776/6 7776/11 7777/13 7782/23 7782/24 7790/17 7795/16 7798/8 7810/21 7903/15 7904/14 7904/25
bought [2] 7678/21 7679/2
box [3] 7833/20 7838/1 7854/13
bracket [1] 7930/21
Braconi [4] 7851/7 7889/15 7889/16 7892/14
Brafman [2] 7685/17 7685/17
Brazil [1] 7869/6
breach [6] 7935/25 7936/10 7936/24 7940/20 7946/12 7951/14
breached [2] 7938/16 7940/18
break [15] 7693/9 7693/25 7731/2 7731/5 7802/4 7854/20 7855/21 7859/8 7859/10 7860/18 7860/20 7860/24 7862/2 7862/7 7899/16
Brent [2] 7677/20 7699/23
bribes [4] 7864/23 7864/25 7864/25 7865/7
BRIDGET [1] 7670/12
brief [3] 7940/19 7962/7 7967/24
briefed [2] 7854/22 7860/10
briefing [5] 7815/13 7922/5 7923/8 7937/14 7945/24
briefly [4] 7727/24 7901/13 7901/15 7918/14
bright [1] 7963/10
bring [7] 7671/3 7693/14 7817/12 7829/17 7831/6 7886/21 7924/17
broad [4] 7682/8 7883/15 7883/25 7884/8
broadly [1] 7881/21
BRODSKY [129] 7670/19 7674/4 7681/7 7681/12 7681/18 7686/25 7694/17 7695/2 7696/22 7713/13 7713/23 7715/16 7717/12 7718/3 7729/22 7738/20 7743/6 7744/2 7745/21 7746/20 7747/4 7747/16 7747/25 7748/14 7749/13 7751/8 7752/7 7752/13 7759/14 7754/3 7754/11 7754/24 7756/3 7757/2 7757/7 7757/24 7759/10 7759/19 7760/19 7760/23 7761/3 7761/6 7762/2 7762/20 7764/12 7765/2 7766/21 7766/22

85c8e39988c12477 · 7741/25

**B**

**BRODSKY... [81]** 7767/11 7767/13 7770/17
7770/23 7771/17 7772/5 7773/13 7776/15
7795/6 7804/18 7805/9 7805/20 7807/10
7819/23 7825/6 7827/7 7827/10 7832/12
7835/9 7838/20 7840/5 7840/15 7840/25
7841/6 7841/16 7842/11 7842/24 7843/9
7843/19 7844/3 7844/8 7845/4 7845/14
7845/21 7846/9 7846/17 7847/4 7847/21
7853/18 7854/15 7857/7 7859/25 7860/6
7860/16 7864/13 7884/19 7886/13 7886/22
7887/10 7887/17 7893/14 7895/4 7896/4
7901/7 7901/10 7901/24 7902/1 7906/8
7906/13 7906/16 7907/19 7908/3 7908/7
7908/13 7910/7 7910/3 7912/13 7912/19
7913/13 7913/16 7913/24 7914/3 7914/20
7915/19 7919/21 7920/2 7928/4 7964/1
7965/14 7967/23 7973/3
**Brodsky's [1]** 7681/4 7765/14 7877/1
**Brooklyn [2]** 7670/4 7670/14
**brought [4]** 7804/18 7817/7 7851/16 7852/20
**Buchwald [3]** 7868/22 7869/11 7884/4
**building [1]** 7888/10
**bunch [3]** 7945/5 7958/3 7962/20
**burden [3]** 7835/22 7835/25 7870/11
**business [6]** 7729/5 7792/6 7797/13 7875/4
7875/11 7964/22
**butting [1]** 7971/20
**button [1]** 7909/25
**buzz [1]** 7859/11

**C**

**Cadman [1]** 7670/14
**California [1]** 7946/3
**camera [1]** 7929/3
**Canada [1]** 7798/5
**cancel [7]** 7671/17 7672/18 7688/13 7692/13
7701/23 7702/3 7702/22
**canceling [1]** 7681/23
**cannot [14]** 7717/23 7780/14 7818/10 7822/7
7829/23 7831/3 7871/13 7871/23 7876/11
7877/7 7878/15 7921/20 7930/2 7961/16
**cap [2]** 7807/5 7809/12
**capacity [1]** 7728/12
**Capital [1]** 7782/9
**capture [1]** 7801/6
**car [2]** 7825/16 7825/17
**care [7]** 7673/1 7710/22 7736/17 7752/11
7800/11 7931/11 7969/1
**careful [10]** 7800/17 7835/23 7854/6 7859/13
7927/15 7931/14 7932/3 7935/1 7946/8 7970/9
**carefully [1]** 7953/12
**Carter [20]** 7695/9 7695/9 7695/25 7696/1
7697/13 7698/21 7723/13 7746/18 7747/1
7747/3 7748/8 7749/11 7757/4 7765/4 7767/12
7769/1 7777/13 7789/16 7790/2 7790/6
**case [215]** 7674/10 7674/14 7676/24 7676/6
7676/16 7676/20 7678/2 7681/3 7681/3 7681/9
7681/9 7681/13 7683/2 7683/13 7684/13
7686/3 7686/25 7687/5 7687/11 7688/20
7690/7 7690/11 7690/22 7690/23 7691/2
7691/14 7710/7 7711/20 7711/22 7712/4
7712/25 7714/2 7716/19 7717/17 7721/6
7721/8 7726/7 7726/21 7726/23 7727/18
7730/5 7730/17 7731/6 7731/16 7731/18
7731/18 7731/23 7732/12 7732/19 7732/21
7733/2 7733/5 7733/11 7734/1 7735/5 7735/11
7735/13 7735/19 7736/5 7736/8 7736/10
7736/19 7736/24 7738/3 7738/21 7738/22
7738/23 7742/3 7745/23 7757/19 7757/25
7759/21 7762/2 7769/7 7781/6 7801/7 7802/5
7816/16 7820/10 7828/20 7831/9 7831/15
7832/22 7832/24 7834/25 7845/25 7852/14
7853/18 7854/14 7854/20 7858/11 7858/22
7858/23 7858/24 7858/25 7859/9 7861/2
7862/3 7862/12 7862/15 7862/24 7863/2
7863/24 7864/16 7864/20 7865/6 7865/13
7866/11 7866/25 7868/6 7869/1 7869/2

**B**

7869/19 7869/19 7869/20 7871/5 7871/25
7872/1 7872/12 7873/20 7874/2 7874/9 7874/24
7874/18 7874/24 7875/10 7875/24 7876/2
7876/4 7876/12 7876/19 7877/7 7877/13
7878/19 7878/23 7879/19 7879/19 7880/8
7882/8 7883/17 7883/20 7884/3 7884/5
7884/10 7885/25 7888/17 7889/9 7891/25
7891/25 7893/3 7894/24 7894/25 7897/9
7897/10 7897/17 7900/11 7900/13 7900/15
7907/9 7911/21 7911/25 7912/8 7912/15
7912/24 7915/11 7915/1 7915/2 7915/9 7915/13
7916/9 7917/18 7918/21 7918/21 7918/23
7922/12 7923/8 7923/15 7924/7 7926/10
7926/15 7926/23 7928/6 7937/1 7937/2 7938/3
7940/5 7940/17 7941/18 7942/18 7944/4
7946/10 7947/2 7947/5 7950/16 7951/8
7953/11 7953/20 7957/12 7957/13 7957/14
7960/5 7961/14 7962/8 7962/9 7962/18
7962/19 7964/18 7965/15 7966/3 7967/3
7967/8 7967/10 7968/1 7968/20 7969/2
7969/18
**cases [30]** 7717/19 7858/4 7859/15 7859/16
7859/18 7860/15 7860/16 7860/25 7863/5
7864/2 7871/14 7871/17 7876/22 7877/3
7879/12 7879/22 7880/5 7880/25 7884/1
7886/2 7912/20 7912/24 7913/3 7926/6
7926/16 7926/18 7957/21 7961/11 7965/4
7969/8
**cash [3]** 7704/12 7788/14 7905/4
**CCed [1]** 7736/3
**CEO [2]** 7728/18 7728/19
**certain [34]** 7692/10 7715/17 7718/3 7752/14
7752/14 7781/18 7782/13 7782/14 7782/15
7782/17 7783/3 7783/10 7830/7 7831/2
7831/16 7831/18 7832/1 7832/1 7833/10
7853/8 7853/16 7856/19 7864/18 7881/22
7895/5 7924/23 7936/25 7936/25 7939/1
7959/8 7959/15 7959/15 7960/12 7971/22
**certainly [28]** 7672/21 7673/25 7674/18
7734/17 7747/12 7784/21 7792/7 7830/12
7833/9 7862/25 7863/7 7866/24 7879/10
7885/10 7920/13 7920/14 7923/24 7924/2
7924/16 7925/2 7925/8 7925/23 7929/22
7932/1 7937/7 7942/15 7962/23 7969/8
**certainty [1]** 7829/12
**CFO [10]** 7726/9 7727/19 7729/4 7734/10
7734/10 7735/24 7735/25 7738/24 7739/20
7741/7
**chain [16]** 7674/1 7679/21 7682/10 7683/21
7698/20 7701/18 7740/19 7757/6 7772/12
7778/19 7786/23 7787/21 7788/2 7798/20
7902/6 7904/18
**chains [2]** 7674/2 7786/19
**challenge [1]** 7711/19
**challenged [1]** 7711/20
**CHAN [10]** 7670/19 7826/2 7849/19 7929/10
7937/11 7946/20 7950/19 7951/10 7954/19
7970/1
**Chan's [1]** 7954/17
**chance [4]** 7921/6 7924/15 7925/7 7925/16
**chances [7]** 7918/19 7918/24 7919/5 7920/12
7921/22 7923/17 7923/23
**change [4]** 7826/14 7891/2 7891/6 7935/23
**changes [2]** 7812/12 7834/24
**characterization [1]** 7759/14 7865/20
**characterize [3]** 7760/14 7760/15 7883/14
**characterized [2]** 7730/12 7737/16
**characterizing [2]** 7814/22 7931/10
**charge [4]** 7693/16 7693/20 7900/12 7912/14
**charged [4]** 7822/2 7822/3 7912/8 7938/9
**charges [2]** 7869/7 7869/8
**charging [1]** 7915/3
**chats [1]** 7898/16
**check [2]** 7808/2 7920/8
**checked [1]** 7926/1
**Chen [1]** 7832/21
**Chew [3]** 7696/4 7696/10 7697/4
**chief [11]** 7678/2 7684/13 7686/3 7690/7

**B**

7690/24 7712/25 7728/15 7728/16 7782/8
7947/5 7965/23
**children [1]** 7851/14
**choose [1]** 7899/23
**chose [5]** 7682/4 7686/22 7831/25 7857/19
7875/25
**Christ [2]** 7849/9 7849/19
**chronological [1]** 7903/22
**Circuit [10]** 7859/15 7860/16 7863/6 7864/16
7864/17 7864/23 7867/18 7957/23 7962/9
7962/18
**circumstances [10]** 7730/19 7854/18 7871/1
7881/15 7884/7 7920/14 7925/14 7925/20
7944/6 7959/9
**circumvent [1]** 7858/17
**citations [1]** 7933/16
**cite [6]** 7823/5 7823/13 7872/19 7883/20
7884/5 7907/17
**cited [7]** 7825/6 7830/1 7860/16 7866/16
7877/8 7877/13 7884/3
**cites [2]** 7869/16 7872/9
**citing [2]** 7821/9 7868/22
**Citrin [3]** 7803/23 7809/23 7810/4
**civil [2]** 7816/7 7818/16
**claim [6]** 7730/8 7934/14 7936/10 7936/24
7936/25 7951/14
**claimants [3]** 7933/9 7951/14 7952/2
**claimed [1]** 7865/1
**claims [2]** 7712/23 7934/15 7947/7 7948/2
**Clan [1]** 7813/21
**clarification [1]** 7953/19
**clarified [1]** 7696/22
**clarity [1]** 7922/23
**class [4]** 7678/7 7678/7 7678/11 7704/10
**clause [2]** 7935/1 7935/11
**clear [25]** 7675/11 7675/12 7691/8 7710/20
7710/21 7726/2 7731/10 7740/13 7792/10
7816/15 7825/6 7828/21 7829/4 7829/5
7834/25 7871/21 7903/7 7919/25 7920/5
7920/16 7943/18 7944/10 7944/17 7948/24
7967/6
**clearly [8]** 7674/25 7687/4 7696/19 7866/6
7892/21 7896/9 7923/21 7953/11
**clerk [6]** 7808/6 7825/16 7952/19 7971/2
7972/5 7972/18
**client [11]** 7690/23 7711/8 7774/17 7818/10
7819/14 7834/5 7836/13 7851/4 7967/1 7967/2
7967/5
**client's [1]** 7921/7
**clients [1]** 7849/14
**close [4]** 7687/12 7768/17 7929/17 7959/20
**closed [1]** 7900/15
**closer [1]** 7825/13
**closing [3]** 7682/6 7713/14 7939/5
**Clozaril [1]** 7798/5
**co [11]** 7734/13 7819/21 7874/3 7874/18
7874/24 7875/10 7888/17 7889/9 7891/25
7893/17 7897/9
**co-case [4]** 7888/17 7889/9 7891/25 7897/9
**co-conspirator [1]** 7734/13
**co-defendant [1]** 7819/21
**co-lead [5]** 7874/3 7874/18 7874/24 7875/10
7893/17
**cold [1]** 7925/14
**coled [5]** 7856/7 7856/16 7856/19 7856/21
7856/22
**collapse [1]** 7958/14
**collapsed [1]** 7959/1
**collapsing [1]** 7958/4
**collar [2]** 7926/6 7926/17
**colleague [2]** 7918/25 7919/14
**colleagues [4]** 7859/20 7867/14 7927/4 7927/6
**collect [1]** 7928/15
**collection [1]** 7901/22
**collectively [1]** 7905/1
**colloquial [1]** 7838/18
**color [1]** 7825/16
**combing [1]** 7740/11

**coming [17]** 7700/16 7718/19 7728/16 7728/16
7826/10 7828/8 7838/13 7853/1 7863/18
7869/7 7869/7 7869/9 7878/3 7933/3 7936/11
7936/16 7942/9

**comment [8]** 7686/19 7693/6 7745/3 7777/9
7829/20 7829/21 7829/23 7849/12

**commenting [1]** 7832/14

**commit [1]** 7819/16

**commitment [1]** 7917/6

**committed [2]** 7917/11 7959/16

**committee [13]** 7722/18 7723/2 7744/17
7744/22 7751/12 7752/21 7753/20 7755/1
7755/7 7756/5 7756/7 7757/13 7757/16

**committing [2]** 7917/5 7917/13

**common [20]** 7672/9 7672/11 7672/12 7675/6
7675/18 7678/9 7679/5 7679/10 7679/11
7679/14 7681/22 7704/18 7704/21 7783/5
7805/3 7838/16 7866/14 7876/5 7905/5 7946/3

**communicated [1]** 7735/19

**communicating [2]** 7763/22 7810/4

**communications [5]** 7778/24 7778/25 7828/17
7829/2 7908/21

**compact [2]** 7960/19 7960/19

**companies [2]** 7956/18 7956/25 7961/9
7961/11

**company [32]** 7672/4 7704/9 7710/11 7729/5
7730/8 7737/1 7738/6 7739/11 7769/7 7770/8
7782/9 7782/10 7782/11 7782/14 7782/16
7783/5 7783/6 7783/7 7783/9 7783/12 7783/13
7791/2 7791/4 7792/6 7798/10 7798/12 7957/2
7958/5 7959/1 7959/2 7961/21 7962/4

**company's [2]** 7798/3 7961/19

**compare [9]** 7723/25 7724/8 7724/23 7726/4
7740/3 7755/4 7756/4 7764/3 7867/1

**comparing [4]** 7754/21 7785/1 7790/10
7791/24

**comparison [2]** 7763/25 7764/8

**compensated [1]** 7940/7

**compete [1]** 7792/5

**competent [1]** 7969/11

**complain [1]** 7822/7

**complained [1]** 7849/11

**complaints [1]** 7733/6

**complete [10]** 7686/10 7686/22 7689/6 7689/7
7734/8 7736/4 7739/14 7802/20 7812/6
7900/13

**completed [3]** 7687/17 7706/11 7872/20

**completely [13]** 7673/17 7676/4 7729/3
7740/11 7836/21 7837/7 7851/6 7854/11
7860/9 7895/2 7895/11 7925/19 7972/11

**completeness [4]** 7689/11 7773/5 7864/1
7953/5

**completes [1]** 7684/20

**complicated [2]** 7831/15 7831/21

**comply [1]** 7967/11

**compromise [2]** 7944/22 7945/5

**compromised [1]** 7945/5

**computer [1]** 7670/24

**computer-aided [1]** 7670/24

**concealment [1]** 7716/19

**conceit [1]** 7931/22

**conceivable [1]** 7944/15

**concept [1]** 7961/15

**concern [23]** 7687/24 7713/13 7717/7 7718/19
7719/1 7814/8 7815/1 7816/14 7818/14
7820/20 7821/15 7824/1 7833/11 7833/11
7835/19 7860/11 7860/14 7869/17 7870/24
7870/24 7938/19 7946/10 7946/16

**concerned [17]** 7710/7 7710/24 7716/6
7716/11 7716/11 7813/9 7814/23 7817/7
7832/17 7836/1 7837/17 7852/22 7870/2
7898/19 7942/11 7954/9 7971/7

**concerning [1]** 7817/9

**concerns [5]** 7712/23 7713/2 7713/3 7950/16
7953/1

**conclusion [3]** 7868/1 7870/22 7936/10

**conclusions [1]** 7932/3

**conclusory [1]** 7948/21

**condemning [1]** 7860/19

**condition [1]** 7919/20

**conditions [1]** 7868/10

**conduct [2]** 7866/8 7952/23

**conducted [1]** 7837/19

**conducting [1]** 7964/6

**conduit [2]** 7687/25 7742/3

**confer [5]** 7834/1 7834/5 7836/2 7855/17
7928/1

**conference [15]** 7693/17 7693/20 7709/1
7720/3 7725/6 7827/18 7839/13 7848/2 7861/4
7900/12 7943/5 7943/24 7944/1 7944/8
7946/21

**conferred [2]** 7685/16 7836/5

**confessed [1]** 7805/13

**confident [1]** 7969/10

**confirm [3]** 7807/3 7822/9 7907/18

**confirmation [2]** 7769/19 7771/4

**confirmed [1]** 7824/4

**confirming [2]** 7763/24 7765/9

**conflict [1]** 7865/1

**conflicting [1]** 7881/16

**confront [6]** 7687/23 7919/10 7920/15 7921/9
7923/20 7925/25

**confronted [4]** 7811/6 7812/7 7824/25 7868/23

**confronting [2]** 7734/18 7811/19

**confused [2]** 7842/20 7964/9

**confuses [1]** 7826/15

**confusing [2]** 7811/11 7959/21

**confusion [4]** 7680/7 7805/18 7811/7 7942/19

**connect [6]** 7675/20 7677/3 7677/12 7680/20
7683/18 7794/13

**connected [3]** 7677/5 7680/19 7896/6

**connecting [2]** 7680/10 7680/15

**connection [4]** 7710/2 7726/12 7782/11
7796/15

**conscientiousness [3]** 7866/9 7866/10
7922/24

**consciously [2]** 7818/23 7922/15

**consciousness [26]** 7852/13 7858/6 7858/16
7858/25 7859/3 7863/6 7864/19 7865/25
7866/14 7867/20 7868/8 7868/24 7871/2
7871/7 7872/4 7876/9 7877/6 7877/7 7878/21
7883/15 7895/12 7919/3 7922/13 7922/24
7923/3 7924/4

**consecutive [2]** 7746/7 7746/12

**consent [2]** 7758/17 7836/13

**consents [1]** 7836/18

**consider [4]** 7717/8 7719/12 7834/21 7946/18

**consideration [11]** 7783/11 7819/22 7833/8
7859/13 7931/12 7932/4 7935/1 7938/5 7941/8
7943/13 7965/3

**considered [1]** 7729/6

**considering [1]** 7854/5

**consistent [3]** 7837/25 7932/16 7963/5

**conspiracy [4]** 7732/6 7741/21 7957/19
7958/22

**conspirator [1]** 7734/13

**constantly [1]** 7716/19

**constellation [1]** 7946/15

**constitute [1]** 7962/11

**constitutes [1]** 7950/15

**Constitutional [1]** 7676/11

**constraint [1]** 7900/17

**consult [2]** 7968/9 7970/24

**consultant [4]** 7791/1 7792/2 7936/19 7936/20

**consultants [3]** 7788/14 7788/16 7794/6

**consulting [24]** 7788/19 7788/7 7789/6
7789/20 7790/3 7790/8 7790/12 7791/2 7791/9
7792/14 7797/13 7803/10 7934/6 7940/7
7937/21 7938/10 7938/14 7940/6 7940/7
7941/11 7942/23 7946/11 7950/14 7951/15

**contained [1]** 7731/12

**containing [1]** 7903/18

**contains [2]** 7731/11 7790/16

**contemporaneous [2]** 7810/5 7892/5

**contemporaneously [2]** 7730/4 7808/22

**content [14]** 7679/25 7766/16 7776/12
7778/21 7778/22 7780/8 7856/5 7856/18 7857/2
7857/1 7872/14 7872/17 7872/18 7876/22
7878/5

**contents [5]** 7675/3 7680/2 7681/18 7764/25
7853/17

**contested [1]** 7941/17

**context [24]** 7692/8 7741/4 7807/12 7810/19
7825/20 7835/6 7835/7 7892/8 7892/9 7921/3
7921/16 7921/17 7953/3 7958/12 7958/15
7958/17 7958/18 7958/18 7960/4 7960/11
7961/22 7961/22 7962/6 7962/12

**continuance [1]** 7966/1

**continuation [1]** 7776/17

**continue [8]** 7693/24 7694/6 7695/2 7721/9
7742/18 7867/15 7901/7 7968/15

**continued [16]** 7694/4 7708/25 7720/4 7725/5
7775/8 7806/2 7827/2 7827/19 7840/1 7848/3
7861/5 7873/9 7895/18 7915/23 7939/7
7959/23

**continues [5]** 7728/22 7731/8 7738/13 7774/6
7946/7

**continuing [1]** 7881/23

**contra [1]** 7943/23

**contract [5]** 7935/25 7936/10 7936/24 7938/20
7944/13

**contrary [3]** 7719/11 7872/3 7943/23

**control [7]** 7765/13 7769/14 7769/22 7820/19
7957/24 7960/24 7962/11

**controlmemo.doc [1]** 7782/3

**conversation [4]** 7824/8 7927/16 7962/3
7971/1

**conversations [5]** 7780/19 7782/7 7798/3
7798/9 7907/23

**converse [2]** 7870/22 7880/9

**convert [1]** 7704/14

**convicted [11]** 7813/20 7815/8 7815/9 7815/21
7816/3 7820/4 7820/6 7821/24 7822/15 7870/7
7922/7

**conviction [6]** 7813/19 7814/1 7814/2 7814/8
7816/13 7817/1

**convictions [3]** 7866/18 7866/23 7866/24

**convinced [1]** 7876/11

**convinced [1]** 7811/14

**convoluted [1]** 7811/14

**Cooley [1]** 7736/18

**cooperate [1]** 7911/23

**cooperating [3]** 7865/5 7865/2 7865/5

**Cooperman [2]** 7803/23 7810/4

**coordinating [1]** 7897/24

**copied [8]** 7732/24 7762/22 7767/24 7785/14
7789/2 7792/13 7798/22 7799/6

**copies [8]** 7744/14 7766/5 7766/6 7768/14
7782/2 7793/18 7793/19 7902/25

**copy [23]** 7697/18 7697/19 7700/25 7708/8
7723/13 7723/15 7730/21 7757/25 7758/1
7771/13 7781/11 7796/18 7796/18 7796/21
7799/4 7901/17 7901/19 7901/20 7901/23
7906/8 7906/8 7929/5 7930/7

**copying [10]** 7728/3 7751/21 7758/6 7758/10
7768/12 7785/18 7787/5 7902/8 7902/25
7904/16

**Corey [1]** 7696/4

**corporate [6]** 7722/18 7744/22 7751/11
7752/21 7791/3 7962/13

**corporation [1]** 7738/25

**correct [174]** 7686/20 7693/12 7693/13 7694/9
7695/12 7695/21 7696/4 7696/18 7697/9
7697/10 7698/24 7698/25 7699/2 7699/3
7699/6 7701/23 7703/9 7703/14 7705/8 7705/9
7706/16 7706/19 7707/13 7707/20 7707/21
7708/17 7708/21 7721/14 7721/15 7721/17
7721/21 7721/22 7721/25 7722/1 7722/4
7722/8 7722/12 7722/22 7722/24 7722/25
7723/3 7723/10 7723/11 7724/15 7725/1
7731/20 7734/10 7744/8 7744/14 7744/15
7744/23 7745/2 7745/11 7748/23 7749/3
7749/15 7750/3 7750/9 7750/11 7750/14
7750/16 7750/17 7750/24 7752/2 7753/13

## C

correct... **[109]**  7755/6 7757/9 7757/13
7757/16 7759/4 7760/5 7760/11 7761/4 7761/9
7762/7 7762/10 7762/14 7762/21 7766/1
7766/4 7766/9 7766/14 7767/1 7767/22 7768/2
7768/8 7768/13 7768/14 7768/22 7769/23
7770/8 7770/8 7771/19 7771/23 7772/1
7772/17 7772/21 7772/24 7772/25 7773/1
7773/16 7774/20 7776/1 7776/13 7776/22
7777/14 7781/4 7781/25 7782/24 7784/17
7784/19 7784/25 7785/7 7785/8 7785/21
7785/23 7787/15 7788/10 7789/25 7790/16
7791/11 7792/1 7792/15 7794/22 7795/6
7797/2 7799/9 7800/8 7808/9 7814/22 7846/3
7864/11 7875/13 7876/15 7888/1 7888/2
7888/4 7889/17 7890/11 7902/3 7902/4 7902/9
7902/10 7902/13 7904/7 7904/10 7904/18
7904/22 7905/13 7907/21 7907/24 7908/17
7909/14 7910/6 7910/7 7910/8 7910/9 7910/12
7910/19 7911/2 7911/5 7911/8 7913/9 7914/14
7914/17 7915/3 7915/7 7915/8 7915/10 7948/7
7949/6 7950/24 7950/25 7969/4
**corrected** [1]  7818/6
**correctly** [13]  7688/17 7704/17 7705/12
7705/14 7705/15 7706/3 7707/18 7770/25
7771/2 7780/15 7780/16 7780/20 7905/7
**correlated** [1]  7922/20
**Cotton** [1]  7909/7
**couching** [1]  7870/20
**counsel** [19]  7674/22 7711/18 7726/3 7728/11
7728/12 7728/21 7819/23 7853/2 7870/14
7874/10 7874/11 7874/12 7874/13 7874/16
7898/16 7898/22 7899/7 7968/10 7970/25
**counsel's** [1]  7963/1
**Count** [16]  7673/15 7815/4 7815/8 7815/9
7819/11 7819/12 7820/4 7820/5 7820/6 7820/7
7821/21 7821/22 7822/15 7822/15 7938/9
7958/22
**counter** [2]  7869/13 7924/10
**counterclaims** [1]  7948/18
**country** [1]  7912/6
**counts** [1]  7821/24
**couple** [6]  7748/11 7749/12 7760/7 7888/11
7900/14 7966/10
**courier** [1]  7879/19 7879/19 7879/20
**course** [7]  7727/11 7772/10 7808/12 7834/6
7852/12 7858/7 7918/12
**Court's** [11]  7694/4 7817/5 7817/8 7817/12
7821/13 7821/19 7924/24 7937/24 7943/18
7943/23 7944/1 7945/1 7945/24
**Courthouse** [1]  7670/3
**courtroom** [13]  7694/23 7700/16 7731/7
7743/2 7802/8 7827/3 7828/2 7849/3 7849/18
7862/5 7901/2 7917/23 7946/19
**courts** [4]  7736/19 7870/13 7878/17 7886/2
**cover** [4]  7718/7 7718/21 7719/6 7748/25
**coverage** [3]  7820/19 7822/8 7917/19
**covered** [1]  7819/6
**covers** [2]  7750/19 7750/21
**CR** [1]  7670/2
**crack** [1]  7833/20
**create** [3]  7735/18 7811/7 7835/20
**created** [7]  7728/24 7729/16 7805/1 7807/15
7850/3 7850/4 7897/8
**creates** [1]  7963/6
**creating** [4]  7738/1 7805/11 7807/21 7957/3
**credibility** [6]  7687/7 7687/21 7688/10 7803/11
7865/2 7932/2
**crime** [19]  7800/21 7828/8 7828/16 7828/25
7829/3 7829/8 7829/19 7829/22 7830/23
7831/18 7835/5 7851/3 7852/2 7853/8 7864/17
7867/22 7868/7 7872/13 7912/14
**criminal** [7]  7670/9 7670/16 7816/6 7818/16
7871/14 7875/24 7922/15
**criticizing** [1]  7693/23
**cross** [65]  7673/19 7674/19 7674/23 7675/9
7681/1 7681/8 7682/14 7684/11 7684/19
7687/3 7687/6 7687/16 7687/19 7687/20

7687/24 7687/25 7688/9 7689/4 7689/24
7690/25 7694/19 7694/20 7694/23 7705/23
7714/12 7726/12 7726/23 7729/11 7729/14
7729/15 7730/1 7732/22 7733/4 7734/18
7735/6 7735/8 7743/4 7811/7 7811/9 7812/7
7827/7 7827/9 7830/4 7835/17 7835/18 7836/9
7836/22 7852/17 7854/1 7855/5 7855/21
7855/23 7856/23 7882/18 7887/9 7896/5
7896/11 7901/7 7901/9 7916/10 7917/7
7918/22 7928/11 7963/7 7971/23
**cross-examination** [32]  7673/19 7674/19
7674/23 7675/9 7681/1 7681/8 7684/11 7687/3
7687/6 7687/16 7687/24 7688/9 7689/4
7689/24 7695/2 7695/4 7705/23 7726/12
7729/15 7732/22 7735/6 7735/8 7827/9 7836/9
7855/5 7855/21 7855/23 7856/23 7901/9
7916/10 7917/7 7963/7
**cross-examine** [5]  7830/4 7836/22 7852/17
7918/22 7971/23
**cross-examining** [1]  7896/5
**CRUTCHER** [1]  7670/17
**CSR** [1]  7670/22
**curative** [2]  7813/1 7820/9
**cure** [1]  7813/2
**curious** [1]  7961/4
**current** [8]  7672/5 7679/8 7704/9 7836/13
7836/15 7843/22 7843/22 7911/17
**cursing** [1]  7849/17
**cut** [2]  7689/21 7690/4

## D

**daily** [2]  7817/11 7909/18
**damages** [7]  7936/25 7940/21 7940/22
7949/19 7951/5 7951/15 7951/24
**damaging** [1]  7821/16
**danger** [1]  7945/22
**dangerous** [1]  7837/23
**data** [1]  7924/3
**date** [33]  7677/13 7682/9 7697/7 7707/13
7743/23 7744/7 7744/8 7744/9 7756/24
7781/23 7785/23 7788/2 7802/14 7802/16
7802/17 7809/4 7809/6 7809/7 7809/9 7809/14
7809/15 7809/16 7809/16 7809/17 7809/18
7809/21 7809/22 7809/25 7810/23 7810/24
7862/10 7904/8 7946/21
**dated** [33]  7688/6 7688/6 7696/6 7696/8
7697/3 7698/13 7708/13 7723/9 7723/11
7744/6 7750/2 7750/9 7751/12 7753/21 7754/5
7755/7 7756/5 7758/5 7765/24 7773/1 7776/6
7776/8 7784/16 7797/19 7799/2 7803/22
7803/24 7804/20 7904/6 7904/17 7904/18
7904/22 7904/23
**dates** [7]  7728/6 7728/9 7795/14 7796/10
7801/15 7810/22 7894/21
**dating** [1]  7682/5
**DAVID** [5]  7670/15 7670/16 7744/4 7744/11
7759/16
**days** [13]  7673/9 7685/7 7697/9 7706/14
7733/9 7761/8 7784/23 7785/5 7787/20
7821/10 7893/17 7902/16 7966/11
**DC** [1]  7831/23
**dead** [1]  7966/2
**deal** [13]  7672/3 7678/1 7678/3 7704/7 7705/2
7761/15 7761/22 7767/3 7812/23 7814/16
7815/2 7903/8 7903/10
**dealing** [4]  7844/11 7896/14 7918/16 7972/1
**Dean** [10]  7866/7 7867/17 7955/22 7960/3
7960/16 7962/20 7964/16 7964/17 7964/23
7965/9
**debate** [1]  7774/8
**decades** [1]  7946/22
**December** [34]  7670/5 7692/23 7758/6
7758/11 7761/14 7761/21 7762/16 7762/22
7765/6 7765/24 7767/21 7768/4 7795/11
7798/19 7798/22 7799/8 7801/13 7801/17
7803/15 7805/24 7827/11 7840/8 7841/9
7841/19 7842/14 7843/21 7844/5 7845/10
7846/19 7847/8 7906/18 7908/15 7956/2

7972/25
**December 29** [2]  7798/19 7798/22
**December 2nd** [1]  7956/22
**December 31** [1]  7795/11
**December 3rd** [1]  7692/23
**decide** [10]  7690/24 7691/2 7817/12 7900/11
7923/23 7926/8 7940/3 7944/12 7946/10
7966/15
**decided** [3]  7850/3 7866/23 7940/10
**decider** [1]  7941/14
**decides** [8]  7867/6 7870/18 7871/6 7871/10
7871/24 7900/10 7922/14 7938/24
**deciding** [4]  7829/6 7830/6 7864/17 7922/10
**decision** [30]  7690/21 7715/4 7819/21 7821/3
7821/19 7830/15 7849/25 7864/12 7865/22
7867/1 7871/5 7871/6 7871/10 7871/22 7911/7
7937/15 7943/7 7946/11 7965/15 7965/15
7966/9 7966/14 7967/2 7967/7 7967/7 7967/20
7967/20 7967/22 7967/25 7968/10
**decisions** [1]  7832/15
**declares** [1]  7935/4
**declined** [1]  7876/18
**deemed** [2]  7831/18 7833/8
**deems** [1]  7971/18
**deeply** [2]  7716/22 7865/13
**defendant** [38]  7670/7 7670/17 7676/12
7676/12 7676/15 7698/6 7715/18 7743/16
7756/25 7767/10 7773/10 7780/6 7819/21
7832/15 7832/15 7853/20 7859/1 7862/16
7864/3 7864/5 7870/11 7870/14 7871/18
7872/12 7875/11 7875/22 7878/20 7880/22
7881/17 7881/24 7885/22 7894/23 7921/15
7922/17 7937/3 7959/4 7969/9 7973/7
**defendant's** [24]  7702/1 7702/8 7702/23
7702/24 7703/25 7723/8 7727/17 7731/1
7731/12 7780/3 7785/10 7785/11 7785/25
7786/13 7786/22 7788/4 7793/6 7793/7
7794/20 7875/17 7876/19 7880/6 7881/22
7921/12
**defendants** [4]  7832/23 7871/14 7876/2
7876/22
**defense** [94]  7671/7 7674/22 7675/23 7680/20
7683/13 7691/10 7691/13 7694/11 7697/11
7697/22 7698/4 7698/13 7699/4 7699/5
7700/10 7700/11 7702/12 7711/12 7711/18
7712/7 7712/20 7713/3 7719/8 7726/3 7731/17
7736/4 7743/14 7743/21 7746/22 7746/24
7747/6 7747/12 7747/19 7748/2 7748/4
7748/12 7749/1 7749/14 7749/17 7750/9
7750/15 7751/15 7751/19 7754/4 7755/5
7756/14 7756/20 7757/20 7758/4 7773/8
7788/3 7816/16 7828/14 7828/22 7832/18
7833/7 7837/25 7849/5 7853/2 7858/5 7859/12
7862/12 7863/15 7864/21 7865/4 7865/5
7866/1 7871/24 7876/13 7879/25 7881/9
7884/11 7897/18 7900/10 7922/10 7924/24
7928/6 7928/18 7929/19 7929/20 7929/22
7937/2 7940/4 7941/10 7942/2 7944/11
7945/14 7947/2 7947/4 7963/1 7964/5 7965/6
7966/23 7969/22
**defense's** [6]  7802/12 7802/22 7879/2 7900/12
7928/7
**defer** [3]  7887/10 7931/14 7951/20
**define** [1]  7812/11
**defined** [4]  7697/19 7765/14 7771/5 7812/11
**defining** [1]  7811/12
**definitely** [1]  7970/12
**definition** [4]  7810/18 7811/13 7846/18
7957/24
**defraud** [1]  7938/8
**defrauded** [1]  7959/3
**Delaware** [1]  7782/10
**delay** [2]  7718/23 7733/15
**delaying** [1]  7718/22
**delete** [1]  7947/19
**deleted** [1]  7954/23
**deleting** [1]  7932/17

**D**

deliberately [2] 7818/22 7870/10
deliver [1] 7905/2
delivered [1] 7905/2
Delzotto [60] 7671/5 7673/20 7674/3 7674/20
7674/24 7687/4 7688/8 7695/1 7697/2 7698/16
7700/10 7791/23 7796/4 7802/20 7804/12
7804/13 7805/2 7827/6 7827/11 7828/11
7840/6 7840/10 7841/1 7841/7 7841/17 7842/1
7842/12 7842/25 7843/10 7843/20 7844/5
7844/19 7845/5 7846/11 7863/11 7863/22
7874/20 7875/6 7875/7 7875/16 7879/10
7883/5 7883/7 7884/14 7887/24 7889/14
7891/23 7901/12 7901/18 7902/2 7908/9
7908/14 7910/4 7912/20 7913/14 7915/20
7916/18 7918/15 7921/8 7923/16
Delzotto's [6] 7673/7 7687/16 7823/24 7826/7
7920/5 7927/12
demand [1] 7947/20
demands [2] 7938/18 7944/13
demonstrate [1] 7868/7
demonstrated [3] 7803/16 7809/8 7922/22
Demosthene [11] 7862/15 7862/20 7863/4
7872/9 7872/19 7876/24 7877/1 7877/6
7877/13 7877/19 7878/11
DENERSTEIN [1] 7670/20
deny [4] 7803/3 7803/6 7868/6 7875/1
department [2] 7707/24 7831/21
deposit [1] 7807/3
deprive [1] 7866/13
deprived [1] 7919/4
describe [2] 7684/23 7911/17
described [2] 7814/15 7824/9
describing [1] 7779/7
description [2] 7763/12 7791/24
Desert [8] 7765/12 7765/13 7765/15 7765/17
7769/21 7769/23 7771/6 7771/8
designations [1] 7924/10
desire [2] 7962/3 7969/18
despite [5] 7835/21 7867/6 7876/5 7882/8
7969/20
destroy [3] 7909/19 7911/10 7911/15
destroyed [1] 7911/19
destruction [1] 7913/7
detailed [3] 7938/4 7963/20 7964/24
details [1] 7774/12
determination [5] 7812/12 7828/9 7828/15
7939/3 7942/12
determinations [1] 7932/1
determine [4] 7866/18 7866/22 7942/22
7966/9
determined [2] 7782/13 7937/8
determines [2] 7946/13 7971/24
determining [1] 7948/2
devolved [1] 7849/13
dialogue [1] 7824/7
diametrically [1] 7804/15
dictates [1] 7736/20
difference [10] 7733/19 7735/6 7747/7 7756/9
7786/5 7877/25 7878/10 7879/7 7879/22
7925/13
different [76] 7681/22 7682/10 7682/21 7689/9
7689/9 7700/9 7700/9 7711/17 7717/16
7718/13 7718/15 7730/3 7732/24 7732/24
7733/23 7737/15 7740/23 7740/23 7741/3
7741/4 7741/4 7741/4 7741/5 7741/9 7741/9
7741/18 7752/6 7769/24 7778/11 7786/19
7792/1 7792/7 7794/21 7804/20 7805/16
7807/17 7810/16 7810/19 7810/19 7810/23
7810/24 7816/9 7818/15 7825/4 7825/5 7832/7
7834/12 7834/13 7834/13 7836/20 7854/9
7868/23 7879/23 7893/18 7894/20 7894/21
7896/3 7896/19 7901/11 7914/15 7915/10
7921/18 7924/20 7925/9 7925/19 7926/17
7926/18 7936/20 7937/6 7942/13 7942/15
7946/14 7948/19 7952/24 7958/21 7959/10
differential [1] 7810/25
differentiate [1] 7877/2

differently [2] 7716/1 7717/22
difficult [6] 7820/25 7821/3 7836/4 7853/1
7963/3 7963/6
difficulty [1] 7705/6
dire [1] 7821/10
direct [33] 7674/3 7677/16 7677/19 7677/20
7687/7 7687/19 7688/11 7688/11 7706/15
7706/18 7745/25 7758/24 7759/7 7759/11
7760/9 7761/1 7761/8 7763/11 7781/17
7782/23 7782/25 7784/4 7784/6 7787/14
7795/20 7796/13 7797/4 7845/22 7874/3
7896/10 7905/22 7908/22 7909/3
directed [3] 7675/17 7841/23 7842/1
Directing [2] 7792/19 7798/21
direction [1] 7719/9
directly [25] 7672/22 7680/3 7680/10 7684/8
7684/15 7684/20 7685/8 7689/8 7689/8
7689/10 7689/11 7728/1 7728/13 7729/1
7729/13 7730/7 7730/9 7733/10 7734/17
7737/11 7740/12 7804/11 7823/23 7850/21
7919/12
director [4] 7765/11 7769/12 7769/20 7926/20
directors [23] 7708/5 7708/12 7721/13
7721/21 7722/3 7722/17 7722/19 7723/3
7723/19 7744/16 7748/16 7748/22 7749/7
7750/2 7750/22 7751/12 7752/22 7753/20
7791/10 7791/19 7791/22 7792/16 7793/9
disagree [10] 7742/16 7824/15 7835/8 7877/1
7891/17 7892/17 7926/5 7935/19 7937/12
7963/13
disagreed [1] 7865/19
disagreement [3] 7929/14 7929/14 7935/24
disagrees [1] 7890/20
disappear [1] 7812/19
disappointed [1] 7903/7
disbelieve [1] 7886/12
disclaimer [1] 7954/2
disclose [3] 7960/13 7961/3 7967/14
disclosed [5] 7960/6 7961/8 7963/8 7963/10
7971/24
disclosure [14] 7826/11 7826/14 7955/24
7960/3 7961/12 7961/13 7962/16 7963/5
7963/13 7963/14 7965/1 7967/10 7971/16
7971/18
disclosures [6] 7956/16 7963/11 7963/21
7964/23 7966/17 7971/7
discomfort [1] 7824/1
disconnected [1] 7896/6
discovery [1] 7714/17
discuss [5] 7780/17 7794/14 7805/25 7862/2
7929/16
discussed [7] 7698/10 7805/16 7805/17
7902/11 7947/25 7948/15 7956/23
discussing [6] 7764/25 7776/12 7811/9
7811/10 7825/16 7880/18
discussion [16] 7675/13 7677/14 7698/3
7712/1 7743/11 7743/13 7743/15 7776/18
7797/1 7812/6 7822/20 7860/8 7869/18 7934/3
7948/18 7970/20
discussions [3] 7842/20 7958/13 7962/25
dismissed [2] 7812/15 7900/7
dispute [9] 7674/6 7809/9 7826/3 7865/21
7941/7 7946/10 7947/9 7947/9 7954/16
disputing [3] 7713/8 7751/5 7931/19
distinction [2] 7880/25 7919/25
distinguish [1] 7710/10
distracted [1] 7898/15
distraction [1] 7941/2
distributed [1] 7797/19
distribution [1] 7783/6
DISTRICT [12] 7670/1 7670/1 7670/10 7670/13
7717/10 7847/2 7847/10 7868/23 7872/10
7872/11 7946/3 7962/8
division [3] 7852/22 7854/21 7859/23
docket [2] 7929/7 7930/8
document [136] 7671/5 7673/16 7674/25
7680/5 7681/12 7682/8 7683/4 7684/22
7684/24 7684/25 7685/20 7686/14 7686/14

7686/20 7688/5 7690/8 7691/9 7695/12
7697/10 7698/1 7700/21 7705/16 7705/24
7706/21 7706/23 7706/23 7708/16 7708/21
7710/4 7712/3 7713/2 7713/4 7713/25 7714/18
7714/22 7715/1 7715/25 7717/6 7717/7
7717/25 7723/5 7723/9 7724/1 7724/1 7726/13
7726/19 7730/2 7730/15 7732/18 7733/3
7734/19 7734/20 7734/23 7735/1 7735/13
7736/4 7736/6 7736/15 7737/3 7738/6 7739/23
7740/17 7740/17 7740/19 7742/1 7742/8
7745/13 7745/14 7745/25 7746/4 7750/10
7755/10 7757/5 7758/4 7758/18 7764/1
7764/25 7771/12 7773/7 7779/2 7780/4 7781/4
7782/6 7782/7 7782/23 7787/23 7788/25
7793/13 7793/15 7793/23 7793/25 7794/2
7794/3 7794/14 7795/9 7795/25 7796/17
7796/22 7802/12 7802/15 7802/23 7802/24
7803/23 7804/2 7804/5 7804/19 7805/1 7805/4
7805/6 7805/14 7805/16 7808/16 7808/24
7809/4 7809/10 7810/5 7810/6 7810/23
7810/23 7811/21 7824/7 7825/17 7846/13
7882/13 7902/3 7904/8 7905/10 7930/8
7935/20 7936/23 7937/7 7941/5 7941/6 7942/2
7956/19 7956/21
document's [1] 7756/11
documentation [2] 7803/18 7811/2
documents [91] 7674/22 7682/18 7682/20
7690/18 7690/25 7691/7 7696/6 7702/20
7706/16 7707/5 7710/22 7711/2 7712/4 7712/9
7714/21 7716/1 7716/2 7716/4 7717/5 7718/14
7719/5 7721/3 7723/14 7723/15 7726/21
7727/25 7729/15 7729/23 7730/17 7731/17
7735/18 7736/19 7738/4 7738/22 7740/10
7740/12 7740/23 7742/12 7745/23 7746/5
7756/22 7760/1 7760/3 7760/4 7760/10
7760/15 7767/19 7781/6 7801/21 7804/6
7804/8 7804/14 7804/24 7807/13 7807/15
7809/19 7809/24 7811/6 7811/18 7811/18
7823/9 7823/25 7824/10 7824/10 7832/1
7832/3 7837/20 7846/21 7849/25 7850/1
7896/6 7896/9 7896/10 7896/13 7896/20
7903/21 7905/16 7905/20 7907/21 7915/3
7915/6 7915/15 7916/2 7916/6 7916/8 7916/10
7916/12 7916/12 7926/5 7926/25 7927/1 7947/3
dollar [1] 7905/5
dollars [5] 7818/12 7903/18 7905/3 7905/4
7905/13
done [24] 7690/22 7727/11 7763/3 7763/4
7763/17 7788/7 7809/21 7824/16 7826/7
7826/18 7851/23 7886/3 7887/11 7891/16
7900/3 7900/22 7923/12 7927/21 7962/13
7964/24 7968/6 7968/8 7968/25 7968/25
door [11] 7828/24 7832/5 7832/7 7851/13
7853/24 7857/12 7857/20 7889/5 7889/15
7918/16 7919/18
doors [3] 7857/6 7868/14 7897/23
double [4] 7728/14 7824/2 7824/12 7897/18
doubt [4] 7835/3 7835/4 7873/6 7938/8
doubting [1] 7876/2
down [37] 7689/21 7690/4 7740/11 7748/11
7793/12 7799/19 7799/21 7799/23 7800/8
7800/17 7800/20 7802/7 7802/9 7829/15
7831/23 7834/3 7834/15 7837/5 7851/17
7862/6 7876/18 7879/14 7888/11 7889/11
7890/15 7896/3 7897/23 7898/5 7903/15
7917/24 7917/25 7921/19 7922/4 7930/1
7930/2 7933/13 7962/3
downtown [1] 7919/8
dozens [3] 7689/22 7689/22 7742/12
Dr [2] 7937/1 7938/24
Dr. [15] 7937/4 7937/6 7938/23 7939/6 7941/8
7941/19 7941/21 7942/7 7943/11 7944/11
7945/7 7945/11 7946/14 7947/3 7947/13
Dr. Rosenfeld [14] 7937/4 7937/6 7938/23
7939/6 7941/8 7941/19 7942/7 7943/11
7944/11 7945/7 7945/11 7946/14 7947/3
7947/13
Dr. Rosenfeld's [1] 7941/21

## D

**draft [45]** 7726/5 7726/8 7728/7 7730/12
7730/24 7732/9 7734/9 7735/2 7735/2 7736/6
7737/12 7744/16 7745/1 7748/16 7749/16
7749/17 7749/21 7750/8 7750/11 7753/14
7753/15 7756/10 7757/16 7768/15 7768/21
7768/22 7781/10 7781/18 7782/24 7788/10
7788/12 7789/6 7790/12 7790/15 7790/20
7790/22 7790/23 7791/1 7791/9 7792/1
7792/14 7902/9 7902/11 7903/17 7904/16

**drafts [6]** 7728/6 7729/7 7729/8 7732/2 7732/7
7737/16

**dragged [2]** 7868/11 7919/8

**draw [10]** 7715/7 7716/9 7716/25 7717/24
7868/1 7872/1 7872/2 7878/15 7879/25
7963/10

**drawing [1]** 7813/10

**drawn [12]** 7717/15 7813/5 7813/6 7814/21
7865/24 7870/23 7871/13 7871/24 7878/13
7879/12 7922/9 7922/16

**draws [2]** 7718/25 7866/14

**dribbles [1]** 7972/8

**drive [2]** 7738/2 7738/2

**drugs [1]** 7798/10

**DUBIN [10]** 7670/20 7693/4 7693/5 7693/23
7812/19 7813/9 7814/13 7814/16 7849/11
7920/16

**ducked [1]** 7889/6

**due [2]** 7810/25 7810/25

**DUNN [1]** 7670/17

**duplicative [1]** 7950/4

**during [30]** 7678/2 7706/14 7706/18 7759/7
7760/11 7761/8 7782/23 7784/4 7784/6
7796/13 7797/2 7797/3 7797/13 7797/16
7810/3 7811/7 7811/16 7811/18 7820/13
7821/10 7824/9 7867/11 7874/21 7882/25
7890/4 7892/11 7908/22 7909/2 7909/4
7968/23

**DX [40]** 7700/2 7724/8 7724/15 7724/19
7728/2 7732/3 7732/14 7734/8 7743/7 7744/5
7744/10 7748/7 7748/21 7750/5 7756/7
7756/15 7757/3 7757/8 7763/20 7764/15
7765/23 7766/3 7766/12 7766/14 7766/17
7767/8 7767/9 7767/12 7767/14 7767/15
7767/20 7770/25 7772/6 7772/9 7772/16
7772/19 7773/3 7776/17 7777/5 7777/5

**DX 124-61 [1]** 7700/2

**DX-10830A [4]** 7756/7 7756/15 7757/3 7757/8

**DX-10868A [13]** 7724/8 7724/15 7724/19
7728/2 7732/3 7732/14 7734/8 7743/7 7744/5
7744/10 7748/7 7748/21 7750/5

**DX-124-118 [1]** 7776/16

**DX-124-119 [7]** 7772/6 7772/9 7772/16
7772/19 7773/3 7777/5 7777/5

**DX-124-8 [14]** 7763/20 7764/15 7765/23
7766/3 7766/12 7766/14 7766/17 7767/8
7767/9 7767/12 7767/14 7767/15 7767/20
7770/25

**DX116 [2]** 7795/6 7795/8

**DX116-102 [2]** 7795/6 7795/8

**DX124 [18]** 7671/18 7672/22 7672/25 7673/16
7677/6 7677/13 7680/17 7703/10 7776/1
7776/18 7778/3 7778/13 7778/14 7778/21
7779/1 7779/4 7779/6 7779/23

**DX124-118 [6]** 7776/1 7778/3 7778/13 7779/1
7779/6 7779/23

**DX124-119 [4]** 7776/18 7778/14 7778/21
7779/4

**DX124-61 [8]** 7671/18 7672/22 7672/25
7673/16 7677/6 7677/13 7680/17 7703/10

**dynamics [1]** 7921/19

## E

**e-mail [151]** 7701/7 7701/9 7701/18 7701/22
7702/7 7702/17 7702/21 7702/24 7703/7
7703/10 7704/1 7704/3 7704/10 7705/16
7706/5 7706/8 7706/19 7706/20 7707/14
7707/15 7716/20 7718/21 7719/6 7723/11

**e-mail's [1]** 7768/7

**e-mailed [1]** 7792/12

**e-mails [31]** 7715/19 7715/20 7718/1 7718/19
7729/24 7731/25 7732/25 7736/2 7743/23
7759/22 7760/16 7760/25 7761/7 7772/14
7772/16 7803/16 7830/24 7831/18 7856/13
7865/9 7905/24 7907/3 7907/6 7907/8 7907/10
7907/16 7907/24 7909/2 7910/11 7910/13
7910/17

**earshot [2]** 7885/5 7885/8

**earth [1]** 7820/2

**easier [4]** 7692/17 7705/13 7765/20 7794/25

**easily [1]** 7760/7

**East [1]** 7670/14

**EASTERN [9]** 7670/1 7670/13 7762/7 7762/12
7766/1 7777/18 7777/19 7847/2 7847/9

**easy [1]** 7790/23

**educate [1]** 7958/2

**Edward [1]** 7758/6

**effect [12]** 7673/2 7674/13 7674/16 7675/2
7675/8 7682/17 7689/16 7689/17 7743/24
7820/13 7830/19 7931/25

**effected [1]** 7865/13

**effective [1]** 7923/22

**effects [1]** 7932/11

**efforts [1]** 7947/1

**Eight [6]** 7815/8 7819/12 7820/7 7821/22
7822/15 7958/22

**either [20]** 7675/11 7683/12 7692/2 7721/8
7733/17 7745/18 7750/10 7752/25 7807/8
7818/21 7833/24 7866/11 7888/20 7896/6
7896/15 7911/16 7951/16 7951/18 7968/15
7969/14

**elaborate [2]** 7681/4 7826/15

**ELEIS [1]** 7670/15

**elevating [1]** 7971/10

**elicit [7]** 7850/18 7851/2 7851/25 7852/6
7852/14 7920/19 7926/1

**elicitation [1]** 7829/25

**eliciting [2]** 7851/21 7852/5

**ellipses [1]** 7930/21

**ELMO [1]** 7906/7

**elsewhere [1]** 7863/13

**email [84]** 7670/23 7671/19 7671/21 7672/6
7672/13 7672/22 7673/8 7673/10 7673/14
7674/1 7674/6 7674/12 7674/14 7674/21
7675/3 7675/4 7675/5 7675/11 7675/20 7677/4
7677/6 7677/6 7677/17 7677/17 7677/22
7677/23 7678/5 7678/14 7679/9 7679/20
7679/21 7679/25 7680/10 7680/15 7680/19
7681/6 7681/18 7682/10 7683/10 7683/21
7683/23 7684/8 7684/21 7685/7 7685/9
7685/12 7685/14 7687/10 7688/13 7689/7

**emailed [1]** 7671/25

**emails [24]** 7675/22 7676/19 7676/20 7676/25
7676/25 7678/2 7680/18 7681/14 7683/21
7684/4 7686/6 7688/12 7689/7 7690/13
7690/13 7691/12 7692/5 7694/10 7706/15
7810/2 7810/3 7882/22 7895/6 7895/7

**embedded [1]** 7684/4

**embodied [1]** 7937/7

**Embody [1]** 7903/10

**emphasize [1]** 7946/1

**emphasized [1]** 7866/12

**empirical [1]** 7924/3

**empirically [1]** 7922/20

**employed [3]** 7801/22 7804/14 7927/4

**employee [2]** 7729/18 7843/22

**employees [3]** 7911/16 7911/17 7959/14

**employment [2]** 7792/3 7792/4

**enable [1]** 7872/5

**encouraged [1]** 7957/22

**end [32]** 7672/8 7672/10 7701/23 7704/23
7705/5 7705/7 7705/13 7706/4 7706/11 7708/1
7720/3 7742/7 7747/18 7750/13 7757/16
7765/20 7767/4 7768/19 7774/24 7799/21
7805/17 7866/15 7884/18 7892/16 7902/17
7903/11 7914/13 7922/6 7928/17 7931/3
7948/22 7968/24

**ended [1]** 7782/12

**ends [8]** 7746/13 7748/3 7749/21 7771/25
7779/4 7795/10 7839/13 7861/4

**enforce [1]** 7943/11

**enforceable [3]** 7941/7 7942/6 7946/12

**enforced [1]** 7886/19

**enforcement [10]** 7863/1 7876/7 7877/10
7878/16 7879/9 7893/4 7922/21 7923/5
7937/22 7938/15

**engage [1]** 7898/10

**engaged [1]** 7936/19

**entered [4]** 7743/1 7783/8 7827/3 7901/1

**enters [1]** 7694/23

**entertain [1]** 7968/20

**entertained [1]** 7937/14

**entire [8]** 7733/23 7757/5 7831/23 7900/15
7931/22 7932/23 7937/18 7951/18

**entirely [5]** 7713/16 7736/22 7865/8 7946/14
7966/24

**entities [2]** 7905/1 7933/10

**entitled [8]** 7688/22 7721/20 7722/2 7736/4
7903/25 7925/24 7952/3 7958/8

**entity [1]** 7782/10

**entry [1]** 7752/17

**enumerated [2]** 7943/19 7945/1

**envelope [1]** 7742/2

**envisioned [1]** 7705/3

**equal [1]** 7712/13

**equally [2]** 7867/25 7961/21

**equities [1]** 7769/13

**equity [3]** 7765/12 7769/21 7774/12

**erase [1]** 7909/25

**error [4]** 7819/16 7858/18 7866/18 7866/22
7937/1 7965/5

**especially [6]** 7914/5 7914/7 7914/8 7921/8
7937/1 7965/5

**ESQ [9]** 7670/12 7670/15 7670/15 7670/16
7670/19 7670/19 7670/20 7670/20 7670/21

**essentially [2]** 7907/5 7949/25

**establish [9]** 7724/14 7726/9 7728/1 7739/15
7873/1 7893/12 7896/23 7897/6 7953/22

**established [8]** 7726/10 7794/15 7802/23
7810/10 7894/13 7951/14 7953/23 7968/12

**establishes [3]** 7739/19 7891/12 7955/4

**establishing [2]** 7688/1 7895/5

**establishment [1]** 7953/24

**E**

**EVAN [21]** 7670/6 7671/21 7721/17 7721/23 7722/7 7722/15 7722/24 7728/10 7733/12 7749/23 7758/5 7762/22 7768/2 7768/15 7784/13 7785/14 7787/9 7789/2 7797/6 7798/23 7903/6

**evening [2]** 7968/10 7972/6

**evenly [1]** 7676/15

**event [8]** 7804/1 7816/16 7855/4 7882/2 7945/18 7958/5 7958/16 7971/18

**events [3]** 7830/7 7894/18 7895/8

**evict [1]** 7877/16

**evidence [182]** 7671/9 7671/22 7672/21 7672/24 7673/4 7673/6 7673/18 7674/3 7677/24 7680/14 7681/5 7682/5 7682/11 7684/9 7685/20 7686/4 7686/13 7687/25 7688/7 7688/23 7689/13 7695/15 7696/1 7696/3 7698/3 7698/7 7698/19 7698/20 7699/5 7701/10 7705/10 7706/7 7707/13 7707/14 7714/19 7715/1 7716/9 7717/5 7717/8 7718/19 7723/17 7724/1 7724/2 7724/6 7724/7 7724/10 7724/24 7727/2 7730/5 7733/2 7735/5 7737/8 7737/23 7737/25 7743/17 7744/10 7745/25 7746/9 7746/21 7754/13 7754/18 7754/25 7755/21 7756/4 7756/14 7757/1 7757/5 7757/8 7757/21 7758/5 7761/12 7761/13 7763/1 7763/22 7764/2 7766/25 7767/10 7767/16 7767/20 7769/2 7770/15 7771/12 7771/18 7773/7 7773/11 7777/5 7777/12 7778/22 7780/7 7781/21 7784/11 7785/9 7786/2 7786/16 7786/23 7787/18 7788/25 7789/17 7790/7 7790/12 7793/6 7793/8 7794/21 7795/8 7796/14 7797/5 7797/19 7804/25 7808/13 7809/20 7810/12 7810/22 7820/25 7821/17 7824/12 7830/11 7831/16 7832/12 7833/17 7834/13 7834/24 7835/3 7837/20 7850/16 7852/10 7858/1 7858/3 7859/2 7860/4 7864/18 7864/24 7865/4 7865/23 7866/16 7867/19 7868/2 7868/21 7868/24 7869/12 7869/13 7869/15 7872/7 7872/16 7876/13 7878/9 7879/5 7881/11 7881/19 7881/22 7881/23 7883/23 7895/3 7895/17 7898/14 7901/17 7901/21 7903/23 7903/24 7905/20 7905/25 7906/23 7909/19 7911/10 7911/15 7911/19 7911/19 7913/8 7919/2 7922/11 7922/12 7922/16 7923/6 7923/25 7938/2 7938/5 7944/5 7945/20 7946/15 7947/17 7950/15 7958/8 7959/8

**evident [1]** 7876/20

**evidentiary [4]** 7676/2 7688/1 7691/9 7710/6

**eviscerate [1]** 7687/13

**ex [1]** 7970/22

**exact [4]** 7730/6 7760/7 7801/15 7801/19

**exactly [17]** 7682/4 7730/7 7730/15 7741/2 7762/8 7773/19 7777/8 7816/2 7816/19 7857/7 7880/16 7880/19 7921/5 7924/15 7925/7 7944/15 7953/13

**examination [51]** 7673/19 7674/19 7674/23 7675/9 7681/1 7681/8 7684/11 7687/3 7687/6 7687/16 7687/24 7688/9 7689/4 7689/24 7695/2 7695/4 7705/23 7706/15 7706/19 7726/12 7729/15 7732/22 7735/6 7735/8 7746/1 7758/24 7759/8 7759/11 7760/9 7761/1 7761/8 7781/17 7784/4 7784/7 7796/13 7824/9 7827/9 7836/9 7845/22 7855/5 7855/21 7855/23 7856/23 7896/17 7901/9 7905/23 7908/22 7909/3 7916/10 7917/7 7963/7

**examine [6]** 7830/4 7836/22 7852/17 7882/18 7918/22 7971/23

**examining [1]** 7896/5

**example [9]** 7684/13 7719/5 7759/6 7784/9 7800/21 7803/13 7803/14 7824/10 7825/16 7831/16 7834/14 7854/4 7862/20 7877/5 7877/21 7905/25 7908/19 7932/16

**examples [1]** 7784/10

**except [5]** 7735/12 7930/18 7931/24 7941/24 7966/20

**exception [21]** 7674/8 7680/4 7682/23 7684/14

7685/24 7687/8 7687/13 7689/17 7691/18 7691/18 7828/9 7828/16 7828/20 7829/8 7831/19 7872/15 7875/10 7884/12 7884/12 7884/13 7942/4

**exceptions [1]** 7682/20

**exchange [16]** 7695/24 7771/19 7771/20 7772/19 7772/21 7772/22 7772/23 7776/2 7778/23 7796/15 7796/25 7798/17 7867/22 7904/15 7943/13 7959/16

**exchanged [1]** 7898/5

**exchanges [2]** 7679/25 7809/8

**exclude [1]** 7920/18

**exclusions [2]** 7682/20 7682/21

**exculpatory [7]** 7673/5 7673/6 7673/16 7673/25 7680/20 7686/17 7686/19

**excuse [5]** 7712/21 7821/2 7848/1 7909/22 7917/16

**excused [4]** 7817/9 7821/4 7866/8 7891/21

**excusing [1]** 7693/12

**execute [1]** 7672/3

**executed [3]** 7753/16 7810/24 7938/9

**executing [2]** 7672/2 7704/7

**Executive [1]** 7782/8

**exercise [4]** 7749/5 7765/13 7769/14 7769/22

**exerts [1]** 7965/23

**exhibit [187]** 7671/7 7671/9 7671/12 7671/21 7671/25 7672/14 7672/16 7672/24 7673/4 7673/8 7673/18 7675/12 7678/16 7679/22 7680/21 7684/15 7685/4 7689/19 7691/10 7691/12 7691/14 7691/20 7692/2 7694/12 7695/8 7695/14 7695/25 7696/2 7697/7 7697/11 7697/22 7698/5 7698/6 7698/13 7698/18 7698/19 7698/24 7699/4 7699/5 7700/4 7700/10 7700/11 7701/9 7701/12 7702/2 7702/8 7702/21 7702/23 7702/24 7703/7 7704/1 7705/10 7706/6 7707/12 7707/14 7721/7 7723/8 7723/17 7724/6 7724/9 7724/23 7728/8 7728/13 7729/2 7731/2 7731/10 7731/12 7732/15 7734/7 7734/16 7743/14 7743/16 7743/21 7746/1 7746/8 7746/22 7746/24 7746/25 7747/6 7747/9 7747/13 7747/18 7747/19 7748/2 7748/3 7748/4 7748/5 7748/6 7748/9 7748/12 7748/18 7748/20 7749/1 7749/6 7749/14 7749/17 7749/25 7750/8 7750/9 7750/12 7750/15 7750/18 7751/9 7751/15 7751/19 7751/19 7752/24 7752/24 7752/25 7753/18 7754/4 7754/21 7754/25 7755/5 7755/6 7756/4 7756/14 7756/20 7756/22 7756/25 7757/20 7758/4 7761/12 7761/22 7763/22 7765/3 7766/11 7766/25 7767/10 7769/2 7769/17 7771/3 7771/12 7771/18 7772/13 7773/8 7773/10 7780/3 7780/6 7781/9 7781/14 7784/11 7784/24 7785/1 7785/9 7785/10 7785/25 7786/2 7786/13 7786/16 7786/23 7787/4 7787/18 7788/3 7788/4 7788/24 7789/17 7790/3 7790/7 7790/12 7790/21 7790/21 7790/22 7792/8 7793/6 7793/7 7794/20 7795/3 7796/12 7796/16 7796/19 7796/25 7797/16 7797/18 7798/16 7901/16 7903/24 7904/14 7904/20 7905/25 7906/22 7908/11

**Exhibit 11 [1]** 7699/4

**Exhibit 111-15 [2]** 7695/25 7696/2

**Exhibit 124-61 [10]** 7671/7 7680/21 7691/10 7691/14 7694/12 7697/11 7698/5 7698/13 7699/5 7700/11

**Exhibit 459 [22]** 7671/9 7671/12 7671/22 7671/25 7672/14 7672/16 7672/24 7673/4 7673/8 7673/18 7675/12 7678/16 7679/22 7691/12 7692/2 7695/8 7695/14 7697/7 7698/18 7698/19 7698/24 7700/4

**exhibits [10]** 7686/12 7689/23 7717/4 7731/24 7734/1 7751/24 7752/13 7786/24 7908/10 7973/6

**exist [2]** 7802/21 7802/25

**existed [2]** 7728/25 7858/2

**exits [2]** 7731/7 7802/8 7862/5 7917/23

**exonerated [1]** 7857/16

**expect [9]** 7688/25 7689/6 7691/14 7802/13 7886/24 7921/16 7940/4 7964/3 7966/9

**expectation [1]** 7964/14

**expected [1]** 7902/17

**expecting [2]** 7690/25 7870/10

**experience [1]** 7803/5 7912/7

**expert [17]** 7957/10 7957/20 7958/1 7958/11 7958/17 7959/7 7959/19 7962/12 7963/2 7963/7 7963/20 7964/14 7964/15 7964/15 7966/13 7966/15 7972/7

**expert's [1]** 7964/13

**experts [18]** 7727/17 7727/18 7826/8 7940/5 7947/11 7955/21 7962/25 7963/23 7964/3 7964/5 7964/5 7966/5 7966/9 7966/11 7966/22 7966/23 7972/5 7972/9

**experts' [1]** 7966/18

**explain [21]** 7674/4 7685/2 7711/8 7712/16 7715/25 7767/6 7791/14 7812/5 7825/20 7828/19 7829/15 7830/8 7831/3 7833/4 7845/2 7870/12 7937/15 7942/3 7942/10 7957/14 7972/15

**explained [2]** 7798/11 7964/23

**explaining [1]** 7938/17

**explains [1]** 7672/6

**explanation [11]** 7678/25 7681/4 7829/9 7830/10 7831/5 7838/19 7844/13 7844/23 7855/3 7912/10 7957/4

**explanations [1]** 7866/12

**exposed [1]** 7821/15

**exposure [1]** 7922/15

**express [4]** 7816/5 7938/15 7943/23 7958/4

**expressed [1]** 7953/19

**expressions [1]** 7898/11

**expressly [1]** 7851/7

**extend [1]** 7878/17

**extended [3]** 7862/24 7876/17 7877/8 7879/13

**extensive [3]** 7782/7 7815/13 7914/2

**extensively [1]** 7830/4

**extent [18]** 7692/1 7696/21 7715/16 7752/13 7811/25 7818/21 7830/5 7835/2 7846/25 7877/16 7877/19 7894/15 7899/6 7900/14 7932/22 7932/24 7967/11 7970/21

**extra [3]** 7800/11 7906/8 7936/21

**extraordinarily [1]** 7673/5

**eyes [2]** 7738/20 7846/12 7966/2

**F**

**F.2d [2]** 7862/13 7864/15

**fabrication [1]** 7810/25

**Fabulous [1]** 7786/21

**face [2]** 7681/15 7869/7

**Facebook [1]** 7962/8

**faced [3]** 7820/8 7820/18 7865/15

**facial [1]** 7898/15

**facie [1]** 7950/15

**fact [100]** 7681/7 7681/20 7726/18 7732/21 7733/17 7734/18 7736/8 7739/13 7740/6 7747/2 7784/7 7801/17 7803/8 7807/3 7807/8 7813/6 7815/15 7815/18 7815/19 7817/13 7831/25 7832/3 7845/6 7846/19 7847/17 7851/6 7851/24 7852/4 7853/3 7853/3 7853/4 7853/7 7857/8 7859/1 7862/17 7862/19 7862/20 7862/22 7863/16 7865/7 7869/15 7871/4 7872/25 7873/2 7874/5 7875/7 7875/15 7875/20 7875/21 7876/24 7877/3 7878/21 7879/3 7879/5 7879/11 7879/15 7879/16 7879/20 7879/25 7881/1 7882/8 7883/24 7884/4 7892/4 7892/13 7894/7 7913/17 7913/18 7918/21 7918/24 7920/9 7920/23 7921/22 7921/24 7922/8 7923/18 7924/14 7925/3 7925/4 7925/21 7926/12 7927/10 7931/10 7931/25 7932/1 7938/21 7938/23 7940/21 7941/22 7942/22 7944/12 7946/3 7953/14 7953/16 7957/20 7957/22 7958/2 7958/9 7961/7 7961/19

**fact-finding [1]** 7942/22

**factors [1]** 7830/15

**F**

facts [16] 7681/4 7830/7 7865/20 7884/6
7931/8 7931/19 7931/20 7931/25 7932/2
7936/12 7936/12 7936/14 7938/10 7940/9
7942/24 7953/22

factual [1] 7942/12
failed [2] 7864/22 7949/3
failure [1] 7835/2
fair [14] 7733/4 7760/15 7760/24 7811/22
7822/10 7829/16 7833/11 7837/4 7847/18
7905/19 7915/12 7965/7 7965/7 7967/17
fairly [3] 7792/25 7881/21 7939/3
fairness [2] 7833/3 7943/16
faith [4] 7680/1 7831/2 7856/25 7856/25
falls [1] 7678/3
false [4] 7879/9 7879/16 7880/8 7880/23
falsely [4] 7866/13 7867/20 7867/22 7868/7
familiar [4] 7714/21 7758/8 7759/21 7759/24
familiarity [2] 7732/13 7732/16
Fanapt [1] 7798/5
far [10] 7724/5 7729/10 7729/14 7736/21
7740/18 7741/22 7795/25 7803/3 7814/15
7972/14
fault [1] 7941/25
favorable [1] 7896/7
FBI [38] 7800/7 7804/7 7805/13 7807/20
7811/20 7824/17 7824/17 7824/19 7824/23
7825/11 7827/12 7828/4 7840/6 7840/10
7841/1 7841/23 7845/11 7846/5 7846/20
7847/6 7847/22 7850/2 7850/5 7867/8 7867/23
7868/9 7868/11 7868/16 7868/18 7872/7
7873/3 7874/15 7875/5 7879/4 7897/25 7912/5
7924/9 7926/19
FBI's [2] 7913/2 7913/4
Fearnow [5] 7675/15 7677/15 7692/9 7767/24
7958/23
February [6] 7799/2 7803/22 7803/25 7804/19
7805/22 7906/23
February 17 [1] 7799/2
February 2012 [1] 7803/22
federal [3] 7676/12 7877/21 7913/5
fell [1] 7872/14
fellow [1] 7891/25
felt [2] 7768/16 7953/3
Ferruolo [10] 7826/12 7826/13 7928/8 7955/22
7959/22 7960/16 7962/20 7964/16 7964/17
7965/9
Ferruolo's [3] 7727/22 7960/4 7964/23
fester [1] 7774/23
few [16] 7680/24 7721/19 7721/23 7722/6
7722/14 7729/14 7730/6 7749/20 7752/1
7784/19 7834/4 7893/15 7894/11 7916/10
7926/2 7961/25
fides [1] 7942/23
FIFA [1] 7832/22
Fifth [10] 7685/19 7869/23 7869/23 7869/24
7870/3 7870/15 7870/20 7871/19 7871/19
7878/22
fight [1] 7687/13
figure [2] 7874/9 7894/10
figured [1] 7815/10
file [1] 7693/24
filed [1] 7962/7
files [3] 7707/24 7781/11 7781/19
filing [2] 7796/6 7957/24
filled [4] 7803/21 7803/22 7805/23 7809/19
final [4] 7730/13 7732/1 7965/15 7967/22
financial [1] 7782/12
finder [1] 7953/16
findings [12] 7931/11 7931/15 7934/23 7938/1
7938/4 7942/13 7942/17 7942/18 7942/20
7946/14 7946/17 7947/16
fine [35] 7678/22 7687/1 7694/2 7699/11
7711/5 7712/3 7712/16 7713/6 7713/8 7714/24
7715/2 7719/4 7737/11 7804/1 7804/21
7805/25 7812/2 7812/13 7819/7 7838/22
7842/4 7886/20 7918/6 7923/2 7929/1 7932/20
7933/8 7933/11 7933/16 7950/5 7951/18

7951/23 7952/7 7952/14 7969/16
7972/1 7973/2
fingertips [1] 7806/8
finish [5] 7689/25 7712/21 7846/15 7857/3
7896/17
finished [1] 7968/15
firm [18] 7831/22 7841/2 7843/2 7843/12
7844/6 7845/8 7845/12 7846/22 7847/3 7847/7
7847/14 7850/1 7910/6 7910/8 7910/9 7921/25
7927/4 7944/10
firmly [1] 7876/11
first [91] 7672/1 7675/19 7679/8 7680/25
7683/18 7684/18 7703/21 7703/22 7708/3
7723/22 7724/13 7724/19 7736/25 7737/1
7742/14 7747/2 7747/2 7748/7 7748/11
7748/17 7749/12 7752/1 7757/3 7757/4
7761/17 7763/7 7763/10 7768/22 7769/8
7769/9 7771/22 7776/24 7777/1 7777/2 7777/2
7782/6 7784/19 7790/8 7790/16 7791/10
7791/13 7792/9 7822/8 7824/25 7828/7
7841/22 7842/1 7853/19 7854/10 7855/24
7856/6 7857/10 7857/22 7859/7 7866/5
7872/25 7877/16 7890/10 7904/18 7928/7
7928/13 7928/14 7928/21 7929/22 7930/11
7930/13 7930/15 7932/6 7934/2 7934/2 7934/4
7934/17 7934/23 7936/6 7937/25 7938/2
7939/2 7950/22 7954/14 7954/15 7954/21
7954/25 7955/3 7961/25 7965/16 7965/23
7966/5 7966/23 7967/8 7968/4 7971/8
firsthand [5] 7856/8 7856/9 7892/13 7893/6
7894/9
fit [1] 7685/21
fits [1] 7871/2
five [29] 7674/4 7685/7 7730/3 7738/18 7753/7
7753/8 7753/9 7753/12 7758/14 7812/15
7812/17 7812/18 7822/24 7886/23 7887/11
7887/12 7894/6 7928/14 7928/21 7929/22
7934/9 7965/16 7965/20 7965/23 7966/5
7966/6 7966/12 7966/23 7971/8
fix [1] 7903/6
flat [1] 7966/19
flee [1] 7910/19
Fleeing [1] 7910/20
flight [3] 7912/8 7912/22 7913/8
flip [1] 7940/15
flipped [1] 7747/21
Floor [1] 7670/18
flow [1] 7855/22
focus [2] 7710/13 7718/6
focused [3] 7816/4 7824/7 7898/14
focusing [1] 7824/8
folks [3] 7678/25 7862/11 7948/24
follow [6] 7717/13 7717/14 7717/24 7825/24
7843/7 7876/18
followed [1] 7923/10
following [20] 7674/22 7699/18 7742/18
7745/1 7758/12 7761/11 7763/24 7765/9
7806/2 7828/1 7849/2 7866/2 7873/9 7887/21
7901/13 7916/1 7916/6 7939/7 7948/15
7948/23
follows [3] 7840/4 7932/8 7934/20
footnote [1] 7933/15
forbid [1] 7778/9
force [3] 7866/3 7866/6 7967/7
forfeiture [5] 7814/21 7816/7 7818/16 7818/18
7818/20
Forget [1] 7836/18
forgot [1] 7819/1
form [21] 7692/18 7726/5 7760/6 7776/14
7788/13 7790/3 7795/10 7795/13 7796/9
7796/9 7803/20 7803/24 7842/17 7843/16
7853/12 7875/4 7875/5 7907/13 7908/2
7913/24 7964/19
forma [1] 7969/9
formal [1] 7909/20
formalized [1] 7952/19
formally [1] 7959/16
former [6] 7705/16 7842/13 7842/21 7843/22
7909/20 7911/16

forms [1] 7875/10
formulate [2] 7921/2 7921/4
formulating [1] 7964/6
formulation [1] 7839/7
forth [4] 7688/11 7793/19 7926/15 7931/18
forum [1] 7952/24
forward [7] 7761/14 7792/25 7881/8 7882/3
7886/16 7966/10 7969/19
forwarded [6] 7685/14 7693/1 7702/6 7702/23
7703/10 7704/2
forwarding [3] 7691/16 7759/23 7774/14
forwards [4] 7671/19 7672/19 7685/15
7902/20
foundation [20] 7714/20 7724/3 7724/8
7724/11 7724/15 7754/20 7764/4 7764/8
7764/10 7764/14 7764/21 7764/23 7767/7
7851/24 7882/17 7882/19 7882/20 7886/5
7890/19 7890/19
foundational [1] 7743/13
founder [1] 7782/8
four [22] 7685/7 7697/9 7726/22 7728/6
7728/8 7732/23 7739/19 7750/19 7750/21
7750/23 7750/25 7753/5 7758/13 7776/24
7777/1 7777/2 7784/22 7784/23 7785/5
7886/25 7934/8 7935/17
four-and-a-half [1] 7726/22
fours [2] 7796/9 7884/9
fourth [1] 7956/22
frame [1] 7920/24
framed [2] 7779/10 7919/19
frankly [11] 7821/2 7838/10 7853/1 7853/21
7926/5 7936/12 7944/16 7954/18 7960/2
7962/19 7969/10
fraud [11] 7828/8 7828/16 7828/25 7829/8
7829/19 7829/22 7830/23 7831/19 7851/3
7852/2 7853/9
free [2] 7957/1 7958/25
frenzied [1] 7868/15
Friday [4] 7744/6 7900/7 7900/19 7966/2
friendly [2] 7927/6 7957/2
friends [1] 7927/5
front [24] 7697/11 7705/3 7705/4 7705/5
7723/14 7755/19 7755/20 7834/17 7834/21
7834/22 7834/23 7851/13 7857/24 7868/17
7884/25 7885/17 7891/17 7891/23 7894/19
7898/18 7917/5 7917/13 7929/6 7958/8
fronted [1] 7919/17
fruitful [1] 7927/3
fruition [1] 7820/21
frustrates [1] 7903/9
full [11] 7693/22 7698/21 7698/22 7783/11
7796/17 7866/5 7931/11 7932/3 7932/6
7934/17 7945/24
fuller [1] 7734/8
fully [1] 7947/25
fulsome [3] 7712/1 7828/13 7946/1
function [2] 7946/9 7964/19 7964/19
fund [3] 7773/18 7773/22 7774/3
fundamental [1] 7682/13
funds [8] 7782/19 7783/3 7783/6 7783/8
7783/9 7783/12 7783/14 7959/3
furtherance [1] 7829/3
furthermore [1] 7824/5
FYI [3] 7761/15 7761/22 7767/3

**G**

gains [1] 7892/2
galavanting [1] 7816/19
gaps [1] 7900/23
garnered [1] 7894/9
Gateway [8] 7765/12 7765/14 7765/15 7765/17
7769/21 7769/23 7771/6 7771/8
GB [2] 7874/1 7940/1
Geller [12] 7759/17 7784/6 7785/13 7785/18
7787/5 7787/6 7787/10 7789/6 7790/13
7792/14 7794/6 7936/17
Geller's [1] 7936/16
general [2] 7728/21 7907/9

**G**

**generally [17]** 7691/6 7691/19 7694/14 7729/6 7755/4 7756/8 7756/9 7779/16 7811/24 7859/19 7907/20 7907/20 7907/22 7907/23 7914/25 7915/4 7915/5

**generous [1]** 7704/11

**gentlemen [1]** 7731/4

**gestures [1]** 7898/15

**gesturing [1]** 7898/11

**GIBSON [1]** 7670/17

**gift [4]** 7808/18 7808/20 7809/15 7809/22

**given [57]** 7671/15 7671/23 7672/15 7673/13 7673/15 7675/14 7678/17 7678/18 7678/21 7678/23 7679/2 7679/5 7679/18 7679/19 7683/23 7685/4 7689/23 7691/11 7692/7 7694/10 7695/21 7697/18 7716/5 7717/19 7743/23 7752/5 7760/14 7774/8 7795/24 7800/19 7803/3 7814/14 7825/1 7825/19 7862/20 7871/17 7871/21 7881/20 7883/6 7883/11 7889/25 7891/13 7893/10 7893/12 7909/15 7921/8 7925/2 7932/3 7937/19 7943/12 7946/2 7946/5 7947/14 7948/17 7950/16 7953/2 7972/4

**gmail.com [1]** 7670/23

**GMT [4]** 7681/15 7762/6 7762/11 7765/25

**goal [2]** 7690/4 7957/2

**gopublic.com [1]** 7762/23

**governance [6]** 7722/18 7727/23 7744/22 7751/11 7752/21 7791/3

**government [193]** 7670/12 7671/8 7671/12 7671/22 7671/25 7672/14 7672/16 7672/24 7673/4 7673/6 7673/8 7673/18 7674/2 7675/4 7675/12 7676/16 7676/18 7678/2 7679/22 7680/13 7683/13 7684/8 7685/4 7686/10 7686/14 7686/15 7689/15 7689/18 7690/1 7691/1 7691/12 7692/1 7692/22 7695/8 7695/14 7695/25 7696/2 7697/7 7698/18 7698/19 7698/24 7700/4 7707/8 7711/21 7712/8 7713/1 7728/13 7746/1 7746/8 7746/21 7747/9 7747/18 7748/1 7748/9 7748/18 7748/20 7749/6 7749/25 7750/8 7750/18 7751/9 7751/19 7752/24 7753/18 7754/21 7754/25 7755/6 7756/4 7760/5 7761/12 7761/22 7763/21 7765/3 7766/1 7766/25 7769/2 7769/17 7771/2 7771/12 7771/18 7772/13 7784/6 7786/24 7792/22 7804/4 7804/5 7810/14 7811/13 7813/6 7813/20 7816/4 7818/12 7820/16 7822/6 7823/3 7828/24 7828/25 7831/12 7832/4 7832/9 7833/4 7833/16 7833/17 7834/8 7834/11 7834/15 7834/18 7835/17 7835/25 7836/20 7837/10 7838/5 7849/11 7850/15 7850/17 7851/2 7851/25 7853/21 7856/13 7857/3 7857/14 7858/1 7858/8 7859/2 7859/12 7864/4 7864/21 7865/17 7865/17 7865/18 7866/19 7867/2 7867/25 7868/4 7868/25 7869/8 7869/13 7869/16 7870/9 7870/19 7872/9 7874/6 7875/1 7875/25 7876/5 7877/13 7877/22 7880/5 7880/21 7880/25 7881/2 7881/3 7883/20 7883/22 7887/6 7887/10 7887/13 7898/18 7899/4 7899/22 7901/16 7903/24 7904/14 7905/25 7906/22 7923/6 7923/9 7924/6 7925/8 7927/18 7928/1 7933/4 7937/12 7937/19 7938/7 7942/20 7943/22 7947/4 7953/15 7954/11 7957/14 7957/18 7958/10 7958/19 7959/5 7963/20 7964/3 7964/8 7966/16 7967/3 7969/1 7970/2

**government's [63]** 7673/14 7678/15 7679/21 7687/5 7691/24 7701/9 7701/12 7702/21 7703/7 7705/10 7706/6 7707/12 7707/14 7721/7 7723/17 7724/6 7724/23 7728/8 7728/13 7729/2 7731/10 7781/9 7784/11 7784/24 7785/1 7785/20 7785/25 7786/2 7786/16 7787/4 7787/18 7788/24 7789/17 7790/2 7790/7 7790/11 7790/21 7790/22 7792/8 7796/14 7796/19 7796/25 7797/5 7797/16 7797/18 7798/16 7820/9 7832/23 7833/14 7834/23 7855/2

**grand [3]** 7741/21 7926/8 7926/9

**granted [4]** 7696/11 7811/15 7822/7 7866/20

**great [5]** 7673/23 7781/12 7796/23 7819/22 7833/24

**GREEBEL [289]** 7670/6 7671/14 7671/15 7671/19 7671/21 7672/13 7672/15 7672/23 7673/3 7673/9 7674/12 7674/14 7675/2 7675/8 7675/13 7676/22 7678/15 7679/16 7680/10 7684/14 7685/3 7686/7 7687/10 7689/18 7690/8 7691/13 7692/11 7692/16 7692/18 7692/25 7695/16 7696/4 7696/9 7697/4 7699/2 7700/3 7701/9 7701/13 7701/15 7701/22 7702/7 7702/24 7703/10 7703/23 7704/2 7706/9 7707/18 7714/11 7714/16 7715/6 7715/19 7716/19 7716/14 7716/23 7718/1 7718/5 7718/18 7718/22 7719/2 7719/5 7721/17 7721/24 7722/7 7722/15 7722/24 7727/3 7727/6 7728/3 7728/5 7733/8 7733/12 7733/20 7734/2 7734/6 7734/21 7734/23 7735/21 7736/3 7737/10 7737/24 7739/13 7740/20 7741/16 7741/20 7744/14 7749/23 7751/21 7757/4 7757/6 7757/9 7757/15 7758/5 7758/9 7759/22 7761/13 7762/9 7762/22 7763/22 7766/4 7767/3 7767/21 7768/12 7769/18 7771/4 7772/24 7773/14 7774/19 7775/2 7776/2 7776/25 7777/7 7777/23 7778/4 7780/13 7780/25 7782/2 7784/13 7785/14 7785/18 7786/2 7787/4 7787/6 7787/19 7788/6 7788/12 7789/3 7792/14 7797/1 7797/6 7798/23 7799/6 7822/1 7822/3 7827/12 7828/10 7828/17 7829/7 7829/10 7829/14 7830/7 7830/25 7831/6 7832/3 7833/2 7833/10 7835/9 7835/11 7835/20 7836/16 7836/25 7837/22 7839/4 7840/7 7840/12 7841/3 7841/8 7841/19 7842/14 7843/1 7843/2 7843/8 7843/11 7843/13 7843/21 7844/4 7845/6 7845/10 7846/19 7847/8 7847/11 7847/18 7850/5 7852/3 7852/24 7853/3 7853/5 7853/14 7853/24 7854/4 7854/14 7854/19 7855/9 7856/8 7856/10 7857/2 7859/6 7860/7 7865/10 7867/3 7870/6 7870/17 7870/23 7871/1 7871/5 7871/9 7871/24 7872/2 7873/2 7874/4 7874/12 7874/25 7875/3 7881/12 7881/13 7882/10 7883/9 7885/8 7888/3 7888/10 7888/12 7888/15 7888/19 7888/24 7889/17 7890/4 7890/15 7891/13 7892/11 7895/10 7896/8 7897/9 7897/16 7897/21 7902/7 7902/20 7902/24 7903/17 7903/25 7904/16 7904/21 7905/12 7905/21 7906/17 7906/19 7906/24 7907/10 7907/24 7908/15 7908/20 7908/23 7909/1 7909/7 7909/9 7909/13 7909/16 7910/5 7910/18 7910/19 7910/24 7910/25 7911/1 7911/9 7912/4 7913/19 7913/20 7914/4 7914/21 7915/21 7916/2 7916/11 7916/14 7916/19 7916/25 7918/19 7919/13 7919/22 7920/22 7923/18 7923/23 7924/14 7924/25 7925/4 7925/18 7926/4 7926/13 7927/8 7927/10 7954/4 7954/8 7958/24 7967/17 7967/18 7968/5 7968/9 7970/17 7972/13

**Greebel's [42]** 7673/17 7675/22 7676/19 7677/1 7680/3 7686/1 7686/4 7686/21 7688/14 7691/8 7691/20 7705/11 7715/4 7716/20 7728/10 7732/1 7734/9 7735/2 7736/1 7736/3 7761/21 7765/5 7769/3 7769/17 7777/25 7785/4 7797/12 7819/23 7829/2 7835/12 7842/13 7872/18 7875/8 7879/2 7883/4 7887/24 7889/4 7908/16 7923/3 7952/23 7953/9 7953/10

**greenlight [1]** 7732/9

**Gregg [3]** 7762/21 7767/21 7768/1

**grossly [1]** 7964/10

**ground [4]** 7688/1 7733/4 7734/18 7833/11

**grounds [3]** 7728/14 7829/4 7936/17

**group [1]** 7962/2

**grow [1]** 7849/20

**guards [1]** 7868/13

**guess [16]** 7715/24 7742/8 7761/3 7761/11 7741/13 7742/15 7759/17 7820/21 7824/1 7833/1 7833/16 7948/1 7948/18 7949/18

**guessing [1]** 7837/21

**guidance [5]** 7684/16 7686/2 7687/15 7689/23 7691/5

**guilt [6]** 7864/19 7866/10 7867/21 7871/7 7924/4 7953/22

**guilty [7]** 7813/8 7814/5 7814/7 7814/25 7835/4 7878/17 7922/23

**guy [1]** 7897/24

**guys [4]** 7693/22 7849/13 7961/18 7972/16

**H**

**Hackert [5]** 7758/6 7758/10 7781/24 7784/25 7785/7

**half [3]** 7726/22 7786/1 7928/4

**hammered [1]** 7870/4

**hand [7]** 7748/1 7748/2 7790/5 7790/5 7790/6 7960/21 7960/22

**handcuffs [3]** 7851/17 7912/10 7919/14

**handful [2]** 7740/11 7740/14

**handing [1]** 7822/19

**handle [1]** 7813/12

**handling [1]** 7847/10

**handwriting [4]** 7794/2 7794/3 7794/4 7809/5

**hanging [1]** 7826/2

**happy [15]** 7673/2 7675/20 7767/6 7808/4 7826/9 7828/12 7859/14 7872/21 7887/4 7899/17 7936/4 7951/16 7951/20 7970/25 7971/1

**hard [14]** 7692/17 7697/19 7705/12 7708/8 7757/25 7758/1 7771/13 7781/11 7793/19 7821/1 7839/5 7884/5 7928/5 7948/9

**hardship [1]** 7819/25

**harm [1]** 7894/11

**harmed [2]** 7680/18 7954/11

**hashed [2]** 7854/24 7927/23

**Hassan [8]** 7677/21 7678/6 7679/1 7683/8 7685/13 7686/20 7699/25 7701/8

**hassle [1]** 7951/13

**head [6]** 7676/19 7677/1 7684/15 7801/24 7817/1 7897/24

**heading [19]** 7932/7 7932/12 7932/14 7932/17 7932/19 7932/20 7932/23 7932/25 7933/3 7933/9 7933/21 7934/2 7934/4 7934/11 7934/17 7935/4 7935/17 7947/7 7954/22

**headings [2]** 7932/10 7932/23

**headquarters [1]** 7868/18

**heads [1]** 7898/4

**Healthcare [1]** 7759/15

**hear [20]** 7673/24 7713/23 7718/3 7813/16 7813/16 7815/23 7815/24 7837/6 7857/14 7857/21 7864/9 7864/10 7883/1 7885/7 7886/17 7903/3 7927/25 7936/5 7961/4 7963/23

**heard [26]** 7677/25 7680/22 7707/1 7714/4 7813/19 7813/20 7815/20 7816/2 7817/16 7817/18 7817/25 7818/4 7818/11 7818/11 7819/4 7820/14 7820/24 7821/11 7854/14 7872/24 7893/18 7894/22 7917/20 7930/22 7937/6 7965/14

**hearing [7]** 7687/9 7741/14 7822/17 7828/2 7849/3 7893/8 7964/22

**hearsay [45]** 7674/8 7674/24 7680/4 7680/8 7682/19 7682/20 7682/21 7685/11 7685/23 7685/23 7685/24 7687/13 7728/14 7780/1 7824/2 7824/2 7824/4 7824/4 7824/12 7829/19 7830/2 7852/12 7857/2 7859/7 7863/14 7863/23 7872/15 7872/5 7875/12 7876/21 7893/12 7894/11 7898/22 7917/20 7930/22 7897/19 7931/24 7936/15 7936/22 7937/7

**heart [1]** 7673/14

**heavier [1]** 7730/22

**heavily [1]** 7871/9

**heavy [1]** 7866/23

**H**

**held [3]** 7732/21 7736/20 7758/12
**Hello [1]** 7887/16
**help [3]** 7816/16 7899/23 7903/9
**herring [1]** 7961/13
**hi [6]** 7704/4 7704/7 7707/22 7784/18 7787/9 7902/11
**hid [4]** 7716/18 7716/23 7719/1 7738/25
**hide [2]** 7718/5 7739/2
**hiding [2]** 7716/14 7716/19
**higher [2]** 7911/23 7920/13
**highlight [1]** 7746/19
**highlighted [9]** 7768/17 7768/24 7769/4 7769/6 7770/2 7770/25 7949/25 7950/12 7950/21
**highlighting [1]** 7951/3
**highly [7]** 7673/16 7673/24 7680/19 7710/15 7817/13 7817/16 7835/14
**himself [5]** 7805/3 7832/16 7857/16 7870/12 7911/1
**Hit [1]** 7909/25
**hold [3]** 7753/23 7830/3 7907/2
**holder [3]** 7765/11 7769/12 7769/20
**home [3]** 7868/11 7868/12 7917/21
**honestly [3]** 7925/15 7936/5 7972/16
**honor [347]**
**Honor's [10]** 7689/23 7691/5 7742/11 7817/3 7871/22 7896/18 7898/1 7899/21 7927/16 7970/23
**HONORABLE [1]** 7670/9
**hope [2]** 7704/21 7705/6
**hoping [1]** 7893/13
**horribly [1]** 7966/1
**hotel [1]** 7918/2
**hotly [1]** 7941/17
**hour [6]** 7786/1 7872/23 7917/2 7928/4 7970/8 7970/13
**hour-and-a-half [1]** 7786/1
**hours [5]** 7682/7 7689/20 7786/5 7786/8 7787/3
**house [6]** 7728/12 7741/7 7856/4 7856/5 7860/9 7919/7
**Howard [2]** 7909/7 7928/8
**huge [1]** 7895/4
**human [1]** 7716/10
**hunch [1]** 7927/12
**hundred [2]** 7676/10 7760/8
**hundreds [6]** 7707/5 7760/1 7760/3 7760/4 7760/10 7760/14

**I**

**I N D E X [1]** 7973/4
**i.e [2]** 7721/3 7883/1
**ice [1]** 7923/7
**idea [14]** 7687/20 7692/21 7728/14 7731/21 7732/11 7743/22 7805/16 7836/25 7852/20 7879/13 7894/24 7925/15 7939/4 7960/24
**ideas [1]** 7875/14
**identical [1]** 7756/17
**identification [24]** 7671/18 7672/22 7697/24 7723/9 7743/8 7756/8 7763/1 7763/20 7764/15 7765/23 7766/4 7766/12 7766/14 7766/17 7772/6 7772/17 7776/1 7778/15 7779/2 7779/6 7785/11 7785/12 7786/1 7786/14
**identify [1]** 7812/10
**ii [1]** 7782/15
**ill [1]** 7898/22
**ill-motive [1]** 7898/22
**illegality [3]** 7952/23 7953/9 7955/5
**immediately [5]** 7690/22 7798/12 7921/25 7958/5 7962/4
**immunity [10]** 7863/2 7865/16 7865/22 7866/6 7867/1 7867/3 7869/20 7875/21 7878/14 7879/14
**impact [1]** 7937/5
**impacted [2]** 7676/22 7677/1
**impartial [1]** 7822/10
**impeach [6]** 7811/20 7812/3 7824/3 7824/11

7877/21 7919/11
**impeachable [1]** 7920/21
**impeached [1]** 7687/22
**impeaches [1]** 7824/22
**impeachment [9]** 7802/20 7802/25 7803/4 7804/17 7824/20 7923/22 7925/15 7925/20 7925/22
**impermissible [2]** 7857/8 7857/25
**implicate [1]** 7954/16
**implication [5]** 7857/16 7871/13 7871/19 7919/24 7920/5
**implies [1]** 7954/8
**imply [2]** 7871/8 7972/12
**import [1]** 7825/5
**important [28]** 7710/18 7710/21 7710/23 7711/7 7713/24 7714/1 7714/12 7715/2 7715/3 7715/5 7715/21 7715/23 7715/24 7716/2 7716/24 7739/7 7800/11 7808/11 7867/4 7867/19 7874/5 7908/15 7908/19 7908/25 7909/6 7915/2 7915/14 7916/13
**importing [1]** 7941/14
**impossible [2]** 7683/23 7684/3
**impression [15]** 7710/24 7711/8 7726/20 7728/24 7729/16 7733/22 7733/25 7734/6 7738/16 7811/8 7850/3 7850/4 7860/13 7918/20 7959/6
**improper [7]** 7674/17 7674/18 7711/13 7736/10 7779/11 7807/22 7836/21 7849/6 7857/22 7857/23 7857/23 7864/7 7895/2 7895/11 7898/24 7937/4
**improperly [1]** 7953/17
**impropriety [1]** 7863/24
**imputing [1]** 7898/21
**in-house [2]** 7728/12 7741/7
**inaccurate [3]** 7739/12 7801/10 7811/22
**inadmissible [5]** 7674/24 7829/19 7872/19 7945/6 7945/6
**inadvertently [2]** 7870/10 7969/19
**inappropriate [16]** 7710/15 7711/9 7711/9 7713/17 7718/6 7719/10 7730/5 7832/9 7832/16 7834/24 7835/14 7837/7 7854/11 7860/9 7932/5 7947/15
**Inc [16]** 7708/5 7708/12 7721/13 7721/21 7722/4 7722/11 7722/19 7723/3 7748/22 7750/2 7753/20 7781/10 7781/19 7782/8 7793/8 7795/10
**incentivized [2]** 7865/23 7867/2
**inclined [2]** 7923/5 7936/6
**include [4]** 7744/3 7922/4 7934/11 7950/22
**included [1]** 7819/15
**includes [1]** 7831/7
**including [8]** 7731/24 7739/7 7773/25 7828/11 7878/22 7921/24 7947/1 7961/9
**incomplete [1]** 7739/11
**inconsistency [3]** 7805/18 7823/7 7824/18
**inconsistent [4]** 7804/12 7823/23 7824/22 7825/11
**incorrect [2]** 7908/17 7908/18
**incrimination [1]** 7870/4
**independent [3]** 7828/15 7929/5 7931/15
**independently [1]** 7774/13
**indicates [1]** 7736/6
**indication [1]** 7726/15
**indictment [7]** 7700/12 7799/8 7810/21 7828/11 7831/17 7834/14 7950/14
**individual [6]** 7776/22 7853/15 7864/17 7922/17 7925/13 7961/1
**individually [1]** 7905/1
**individuals [7]** 7782/14 7782/17 7859/5 7882/24 7957/1 7960/17 7961/2
**induce [1]** 7679/7
**induced [1]** 7681/21
**inducement [4]** 7672/9 7678/9 7679/12 7704/18
**indulgence [1]** 7917/18
**infective [1]** 7870/7
**infer [4]** 7710/14 7814/10 7814/23 7899/9

**inference [19]** 7715/6 7715/7 7716/25 7717/24 7748/25 7743/10 7749/20 7864/8 7864/15 7864/11 7866/14 7870/23 7872/2 7878/12 7878/15 7879/25 7884/6 7881/7 7922/9
**inferences [9]** 7716/9 7813/5 7813/6 7828/5 7865/8 7865/24 7879/12 7879/17 7922/16
**influenced [1]** 7830/15
**information [32]** 7676/22 7677/1 7684/15 7685/3 7685/5 7686/7 7686/7 7707/9 7711/22 7717/17 7717/19 7756/23 7759/2 7759/6 7766/18 7780/15 7803/21 7821/12 7821/16 7829/5 7865/18 7867/2 7869/3 7885/1 7892/12 7907/4 7907/11 7911/23 7913/21 7936/11 7972/8
**informed [1]** 7830/7
**informing [1]** 7907/11
**informs [1]** 7892/1
**initial [3]** 7704/12 7768/15 7903/6
**injecting [1]** 7896/5
**innocence [35]** 7817/6 7822/11 7852/13 7854/5 7858/6 7858/16 7858/25 7859/3 7863/7 7866/1 7866/10 7866/15 7867/20 7867/21 7868/8 7868/24 7869/12 7869/15 7870/16 7871/2 7872/5 7872/8 7876/10 7877/8 7878/9 7878/21 7879/2 7881/19 7881/23 7883/16 7895/13 7919/3 7922/11 7923/3 7953/22
**innocent [1]** 7857/17 7866/13 7868/20 7880/3 7880/4 7880/1 7880/12 7881/7 7922/8 7922/23 7923/4
**inquiring [1]** 7914/23
**inquiry [5]** 7742/7 7886/14 7891/16 7894/6 7920/21
**insert [1]** 7946/8
**insider [2]** 7800/22 7801/5
**insiders [1]** 7959/14
**insinuations [1]** 7875/14
**instance [7]** 7692/4 7707/7 7759/17 7807/1 7820/11 7924/14 7951/17
**instances [3]** 7824/8 7876/18 7958/2
**instead [4]** 7705/4 7851/11 7851/16 7970/24
**institutional [1]** 7704/20
**instruct [7]** 7716/7 7716/12 7718/17 7719/2 7780/4 7815/9 7821/21
**instructed [6]** 7698/12 7716/10 7739/4 7743/21 7815/4 7818/5
**instructing [4]** 7713/6 7715/2 7721/2 7822/14
**instruction [25]** 7673/2 7674/15 7698/10 7711/1 7713/18 7715/10 7717/3 7717/10 7717/11 7717/13 7718/7 7719/11 7740/8 7740/10 7743/19 7780/1 7813/1 7819/15 7819/17 7826/16 7828/3 7828/23 7833/14 7871/11 7871/22
**instructions [8]** 7698/8 7710/5 7711/10 7717/24 7817/5 7833/18 7835/21 7870/5
**instrument [1]** 7865/12
**intend [1]** 7967/11
**intended [2]** 7741/12 7893/14
**intends [1]** 7947/4
**intent [1]** 7837/6
**intentions [1]** 7686/22
**interest [5]** 7817/3 7887/13 7952/1 7952/3 7961/25
**interested [3]** 7832/13 7859/11 7914/23
**Interesting [1]** 7825/15
**interests [1]** 7704/23
**interfere [1]** 7938/5
**international [1]** 7910/9
**interpret [6]** 7675/20 7684/22 7689/13 7706/19 7706/20 7895/7
**interpretation [9]** 7674/5 7674/10 7677/23 7692/5 7802/12 7805/15 7938/20 7938/22 7945/20
**interpreted [3]** 7674/21 7681/7 7733/15
**interpreting [1]** 7881/21
**interrupt [1]** 7855/22
**intersect [1]** 7694/11
**intersected [1]** 7740/19
**intersecting [1]** 7691/12

**I**

intersects [1] 7692/1
intervention [1] 7734/4
interview [35] 7801/15 7811/5 7811/16
7811/18 7812/1 7823/24 7824/6 7828/12
7829/14 7830/6 7830/16 7831/6 7832/11
7837/6 7853/4 7853/6 7853/17 7856/1 7857/13
7857/15 7857/21 7857/25 7858/2 7859/6
7860/4 7863/12 7867/11 7875/16 7885/11
7885/23 7885/24 7889/3 7889/10 7892/12
7894/15
interviewed [12] 7792/17 7801/11 7801/14
7801/18 7801/20 7824/17 7828/10 7854/20
7856/20 7863/16 7864/5 7879/20
interviewing [2] 7833/2 7833/10
interviews [1] 7799/17
intolerable [1] 7849/21
intricacies [1] 7960/15
intricacy [1] 7853/10
intrinsic [1] 7824/12
introduce [9] 7730/4 7733/2 7735/5 7825/9
7859/1 7864/12 7875/25 7905/19 7936/13
introduced [3] 7732/25 7908/22 7909/2
introducing [3] 7738/21 7862/16 7876/22
invest [6] 7672/9 7678/9 7679/12 7679/13
7704/18 7933/10
invested [5] 7678/20 7679/1 7679/5 7773/25
7808/15
investigate [2] 7915/1 7926/17
investigated [1] 7920/7
investigating [2] 7915/16 7926/23
investigation [15] 7760/11 7760/20 7770/3
7828/4 7832/20 7832/24 7833/14 7854/22
7867/13 7874/14 7909/5 7909/16 7911/18
7915/21 7926/22
investigations [2] 7837/19 7911/20
investigative [13] 7828/23 7835/2 7845/24
7846/4 7846/21 7856/7 7856/11 7856/12
7856/16 7856/21 7856/22 7874/3 7912/3
investigator [1] 7846/2
investigators [1] 7846/2
investment [6] 7677/21 7704/12 7803/19
7807/4 7807/7 7903/6
investments [1] 7787/15
investor [8] 7677/16 7677/19 7677/20 7759/13
7759/15 7770/4 7778/10 7783/13
investors [31] 7672/1 7672/3 7672/4 7672/5
7672/13 7675/1 7675/16 7675/17 7678/4
7678/13 7678/23 7679/6 7679/9 7679/10
7681/20 7681/21 7682/3 7691/17 7692/9
7692/15 7693/2 7704/8 7704/8 7704/9 7704/12
7765/19 7783/3 7783/8 7783/10 7783/11
7959/4
investors' [1] 7783/7
invokes [1] 7828/13
invoking [2] 7920/25 7921/1
involved [10] 7759/15 7778/24 7778/25 7869/1
7869/20 7869/21 7869/21 7875/15 7911/24
7960/8
involving [3] 7729/12 7961/9 7961/10
IPO [7] 7958/12 7958/17 7959/10 7959/13
7961/22 7962/5 7962/6
irrelevant [5] 7686/23 7736/23 7860/5 7941/3
7942/9
issuance [1] 7961/10
issue [67] 7674/1 7675/11 7676/11 7681/1
7683/18 7691/4 7726/8 7731/13 7735/17
7735/18 7765/16 7765/16 7768/18 7770/7
7770/7 7771/7 7771/7 7787/13 7814/17
7814/20 7815/15 7828/8 7828/15 7830/13
7832/22 7832/23 7835/8 7850/19 7855/11
7857/25 7862/19 7862/21 7862/23 7862/23
7864/1 7864/24 7865/13 7871/25 7875/12
7876/25 7883/12 7883/18 7884/7 7885/17
7886/1 7893/8 7895/12 7900/2 7901/12
7918/16 7920/1 7920/2 7922/2 7924/11
7924/12 7924/20 7927/17 7936/9 7941/3
7941/17 7941/19 7943/4 7946/5 7952/19

7955/23 7960/3 7961/15
issued [17] 7697/17 7759/17 7759/15 7774/5
7790/6 7770/3
issues [28] 7680/7 7710/6 7711/24 7711/25
7743/13 7811/2 7812/7 7828/9 7828/14 7830/1
7834/20 7860/17 7862/4 7875/18 7876/21
7901/6 7922/1 7927/22 7940/3 7941/3 7944/10
7944/16 7945/25 7946/6 7946/10 7947/8
7947/9 7966/18
items [2] 7943/19 7945/1
itself [2] 7737/3 7863/4 7941/6
IV [1] 7935/5

**J**

Jackson [6] 7697/8 7801/14 7801/16 7802/11
7802/19 7829/25
Jaclin [7] 7762/21 7765/24 7766/3 7766/23
7767/21 7768/4 7768/12
Jacob [1] 7928/8
Jain [6] 7707/19 7716/15 7716/16 7716/18
7726/7 7727/3 7728/11 7728/21 7731/25
7733/7 7737/24 7739/14 7739/18 7741/11
Jensen's [2] 7727/7 7734/3
Jesus [2] 7849/9 7849/19
job [1] 7964/24
Johnson [2] 7966/20 7966/21
joint [1] 7874/9
JOSHUA [1] 7670/20
judge [57] 7670/10 7673/22 7674/1 7682/11
7686/24 7694/13 7717/10 7732/4 7732/17
7735/17 7737/20 7738/1 7740/14 7741/8
7764/1 7773/6 7829/1 7829/3 7829/9 7829/11
7829/20 7829/20 7829/22 7829/23 7829/24
7829/24 7830/1 7830/5 7830/10 7830/12
7830/18 7830/21 7830/23 7831/3 7831/7
7831/17 7832/21 7839/8 7850/19 7868/22
7869/11 7875/9 7876/8 7876/16 7878/10
7884/4 7885/15 7886/20 7887/4 7891/6
7965/13 7965/22 7967/2 7970/9 7971/5
7972/11 7972/18
judge's [2] 7828/15 7829/1
judges [1] 7946/4
judgment [6] 7828/22 7831/15 7832/8 7832/19
7927/6 7948/23
July [3] 7801/21 7804/13 7807/14
July 13 [1] 7804/13
June [2] 7782/12 7807/14
June 30 [1] 7782/12
juror [14] 7715/6 7814/24 7815/20 7815/21
7816/2 7817/19 7817/20 7817/21 7818/23
7818/25 7819/1 7820/11 7821/4 7900/6
jurors [26] 7671/2 7693/5 7693/12 7694/25
7716/8 7717/13 7717/23 7743/3 7802/4 7813/9
7813/11 7813/15 7813/19 7814/9 7814/21
7815/18 7816/12 7816/25 7817/4 7818/15
7819/20 7820/23 7822/9 7827/4 7901/3
7917/16
jurors' [1] 7835/21
jury [146] 7670/9 7670/10 7682/5 7683/1
7686/9 7687/14 7694/1 7694/23 7694/24
7697/13 7698/12 7707/1 7710/5 7710/8
7710/14 7710/23 7710/24 7711/2 7711/10
7712/18 7712/19 7712/19 7712/24 7712/25
7713/17 7713/20 7714/12 7714/13 7715/2
7715/7 7716/7 7716/12 7716/13 7716/17
7716/22 7716/25 7722/7 7726/20 7731/2
7731/4 7731/7 7733/25 7735/4 7743/1 7743/20
7755/21 7756/21 7760/25 7780/4 7802/8
7803/1 7803/1 7810/21 7811/2 7813/9 7815/4
7815/8 7815/9 7817/10 7820/3 7820/13
7822/14 7823/1 7824/19 7826/10 7827/3
7834/16 7834/20 7836/19 7837/3 7837/18
7837/22 7840/2 7860/13 7860/20 7860/21

7862/1 7862/5 7862/9 7865/24 7867/24 7870/4
7870/4 7870/5 7870/9 7870/13 7871/7 7871/21
7872/1 7872/1 7872/5 7872/23 7880/21 7885/1
7885/17 7886/4 7886/15 7887/22 7896/1
7898/7 7898/14 7898/18 7899/12 7901/1
7901/4 7906/7 7910/1 7917/5 7917/13 7917/23
7918/20 7919/5 7919/11 7921/5 7923/22
7924/18 7925/7 7925/8 7925/9 7926/8 7926/9
7927/11 7931/13 7932/6 7940/3 7940/10
7941/21 7942/18 7942/19 7944/12 7945/8
7945/12 7946/16 7947/16 7958/2 7958/7
7958/9 7958/22 7959/6 7959/22 7960/1 7960/9
7962/12 7968/22 7968/22 7969/4
jury's [3] 7826/1 7938/5 7946/8
Justice [1] 7831/21
justified [1] 7823/10
juxtaposed [1] 7674/9

**K**

KAM [1] 7670/2
Katten [45] 7719/22 7726/8 7728/22 7737/2
7738/13 7738/25 7831/22 7840/11 7841/2
7841/8 7841/18 7842/2 7842/2 7842/13 7843/2
7843/12 7843/23 7844/6 7844/11 7844/16
7845/8 7845/12 7846/6 7846/22 7847/1 7847/7
7847/13 7850/1 7851/5 7908/16 7908/21
7909/1 7909/10 7909/13 7910/5 7910/11
7910/11 7910/15 7910/17 7911/4 7913/19
7914/16 7916/14 7916/24 7926/4
Kaye [3] 7910/6 7910/8 7910/10
keep [13] 7694/15 7802/5 7828/14 7839/5
7887/16 7930/4 7932/13 7932/13 7932/23
7932/25 7933/5 7944/23 7948/25
keeping [7] 7697/6 7763/10 7931/20 7932/20
7933/6 7940/21 7948/22
Ken [1] 7794/6
kept [3] 7867/9 7867/9 7872/23
KESSLER [5] 7670/16 7929/13 7960/2
7963/15 7970/16
Kessler's [2] 7940/15 7958/24
Kevin [1] 7774/7
key [2] 7886/1 7903/9
kicked [1] 7918/15
kids [2] 7868/13 7868/14
kind [9] 7825/7 7825/7 7832/5 7834/19
7835/15 7836/16 7900/16 7959/10 7966/9
Kindle [1] 7819/5
kinds [3] 7687/22 7825/2 7958/13
KIYO [1] 7670/9
Klein [2] 7966/21 7971/14
knocked [1] 7851/13
knocking [1] 7851/12
knowing [10] 7703/22 7716/10 7779/19 7849/5
7850/17 7851/2 7851/5 7867/6 7874/16
7928/24
knowledge [55] 7737/9 7742/5 7778/21
7778/22 7778/23 7784/8 7792/11 7794/8
7794/16 7816/13 7818/21 7864/22 7865/6
7869/4 7873/7 7874/4 7874/11 7874/12
7874/24 7875/3 7875/21 7877/22 7878/15
7879/11 7881/14 7882/19 7883/1 7883/7
7883/14 7884/12 7885/2 7885/16 7886/17
7887/14 7891/4 7891/9 7891/23 7892/3 7892/3
7892/5 7892/7 7892/21 7892/21 7893/16
7893/20 7893/21 7894/9 7895/1 7895/6 7896/4
7896/10 7896/15 7896/24 7924/14 7924/19
known [3] 7858/5 7875/7 7911/18
knows [23] 7714/17 7714/18 7714/19 7714/21
7714/22 7736/9 7776/19 7830/21 7853/2
7853/7 7855/25 7856/8 7856/9 7856/11
7856/24 7858/9 7860/7 7867/5 7872/6 7884/15
7884/19 7920/9 7920/13
Koestler [9] 7677/17 7677/19 7678/6 7678/19
7679/1 7683/5 7683/6 7699/21 7701/7
Kravitz [17] 7726/8 7727/4 7728/3 7728/4
7730/18 7731/20 7732/6 7732/8 7735/25
7736/1 7736/14 7736/18 7744/11 7744/25
7746/18 7749/18 7751/20

**lack** [1] 7878/14
**Ladies** [1] 7731/4
**laid** [4] 7684/7 7764/23 7767/7 7874/16
**landscape** [3] 7926/21 7963/4 7964/9
**language** [12] 7763/19 7765/8 7765/9 7789/18
7789/19 7807/23 7932/24 7933/1 7937/18
7937/23 7947/14 7953/18
**large** [1] 7740/9
**last** [43] 7683/21 7689/21 7693/21 7698/20
7700/20 7705/19 7707/3 7707/14 7711/11
7730/1 7740/11 7746/19 7746/24 7746/25
7763/5 7763/6 7763/7 7770/24 7771/3 7783/17
7788/2 7788/3 7836/11 7902/6 7909/22 7917/6
7917/11 7933/4 7933/7 7936/24 7937/9
7937/21 7947/23 7948/1 7948/4 7949/5
7952/15 7956/17 7956/24 7970/15 7970/22
7972/4 7972/6
**lasted** [1] 7894/5
**latest** [4] 7705/2 7761/15 7761/23 7767/3
**latitude** [2] 7890/18 7920/15
**laughed** [3] 7815/16 7815/17 7819/7
**laughing** [1] 7849/11
**Lavelle** [19] 7759/16 7772/1 7772/2 7772/8
7773/15 7773/20 7777/13 7779/17 7779/20
7902/7 7902/15 7902/21 7902/25 7903/1
7903/7 7903/25 7904/16 7904/21 7905/13
**Lavelle's** [9] 7772/20 7776/13 7777/6 7778/5
7779/8 7779/15 7780/14 7784/5 7902/4
**law** [34] 7687/11 7808/6 7828/20 7831/22
7834/25 7841/2 7844/6 7845/8 7845/12
7846/22 7847/3 7847/7 7847/13 7850/1
7852/14 7853/18 7854/14 7854/20 7862/15
7862/25 7863/24 7876/7 7877/9 7878/16
7879/9 7893/4 7900/2 7921/24 7922/21 7923/4
7927/3 7936/13 7961/7 7969/11
**lawful** [1] 7957/22
**laws** [1] 7960/16
**lawyer** [21] 7741/7 7853/11 7853/12 7858/8
7867/4 7867/5 7867/10 7867/10 7867/12
7867/14 7867/14 7867/22 7871/1 7872/6
7875/23 7878/9 7921/15 7921/20 7921/25
7927/3 7960/7
**lawyers** [4] 7836/5 7909/10 7909/13 7965/6
**lay** [13] 7724/3 7724/7 7724/11 7724/15
7764/4 7764/8 7764/23 7882/17 7882/18
7882/20 7886/4 7890/18 7890/19
**layers** [1] 7936/21
**laying** [2] 7754/20 7764/9
**layout** [1] 7939/3
**lead** [14] 7845/24 7846/2 7846/4 7846/20
7856/10 7856/12 7864/16 7874/3 7874/14
7874/24 7875/10 7893/17 7907/9 7912/24
**leading** [1] 7947/16
**leads** [1] 7846/1
**leaning** [1] 7946/5
**leaps** [1] 7674/5
**learn** [3] 7888/15 7888/17 7890/10
**learned** [4] 7863/13 7888/12 7894/15 7894/16
**learning** [1] 7896/15
**learns** [1] 7896/21
**least** [8] 7718/16 7748/17 7895/14 7896/7
7900/20 7900/24 7941/11 7964/23
**leave** [16] 7693/16 7693/19 7694/1 7719/3
7813/13 7925/4 7935/4 7948/4 7948/16 7949/5
7949/17 7950/3 7950/6 7951/12 7952/7 7971/5
**leaves** [1] 7860/13
**leaving** [7] 7726/20 7943/2 7948/14 7951/16
7952/10 7952/25 7954/7
**LEE** [1] 7670/20
**left** [22] 7695/8 7747/18 7748/2 7790/5 7790/6
7822/11 7843/2 7843/12 7847/13 7847/15
7847/16 7847/24 7867/12 7867/13 7889/9
7899/14 7901/15 7908/8 7918/20 7928/4
7944/25 7947/16
**left-hand** [2] 7748/2 7790/6
**legal** [2] 7685/4 7858/18
**legality** [3] 7952/22 7953/8 7955/5

**legally** [4] 7857/8 7857/24 7936/23 7960/11
**legitimate** [3] 7788/9 7937/16 7961/16
**legitimately** [1] 7829/13
**length** [1] 7965/17
**lengthy** [2] 7726/6 7966/3
**less** [12] 7705/3 7892/3 7917/4 7917/6
7917/13 7939/4 7942/16 7942/16 7942/17
7942/25 7944/7 7963/19
**letter** [4] 7768/2 7821/1 7926/7 7956/22
**level** [7] 7849/13 7860/14 7911/22 7911/23
7940/8
**Lewis** [6] 7971/8 7971/12 7971/13 7971/15
7971/21 7971/22
**liability** [1] 7782/10
**lie** [4] 7865/12 7922/5 7924/19 7924/20
**lied** [3] 7805/13 7865/11 7924/7
**light** [5] 7815/15 7852/4 7896/7 7899/21
7965/17
**likely** [1] 7927/12
**limit** [1] 7830/9
**limited** [7] 7688/9 7688/10 7688/10 7738/4
7782/10 7877/23 7962/5
**line** [9] 7778/12 7778/13 7778/16 7778/18
7781/2 7810/21 7902/16 7924/23 7963/10
**lines** [5] 7778/11 7822/20 7823/19 7834/20
7933/13 7944/24 7944/24 7945/2 7947/23
**liquidation** [1] 7906/18
**LISA** [1] 7670/21
**list** [3] 7771/23 7771/24 7895/14
**listen** [1] 7898/21
**listened** [2] 7855/6 7855/6
**listener** [4] 7674/13 7674/16 7682/18 7689/17
**listening** [1] 7940/14
**lists** [2] 7745/2 7758/13
**litany** [3] 7909/19 7911/12 7919/22
**literally** [3] 7674/13 7875/23 7897/19
**litigation** [2] 7875/12 7909/8
**live** [3] 7819/14 7888/22 7892/4
**LLC** [1] 7782/10
**loath** [1] 7966/1
**lock** [2] 7826/16 7826/17
**lockup** [17] 7956/14 7956/15 7956/24 7957/5
7957/7 7957/25 7958/11 7958/17 7959/21
7960/5 7960/8 7960/13 7961/7 7961/8 7962/19
7962/21 7964/22
**lockups** [4] 7961/14 7961/15 7962/10 7962/13
**logic** [2] 7962/5 7962/5
**logistical** [1] 7918/4
**look** [41] 7675/5 7685/22 7694/20 7698/16
7724/5 7724/22 7748/6 7752/14 7752/25
7754/7 7754/25 7758/8 7760/2 7796/10
7809/11 7809/12 7819/5 7821/12 7822/22
7829/1 7834/17 7837/17 7854/16 7854/21
7859/16 7859/21 7860/15 7876/18 7881/16
7881/24 7888/7 7898/2 7900/2 7927/14
7927/15 7937/20 7945/21 7946/9 7953/12
7954/3 7962/24
**looked** [6] 7687/11 7719/23 7823/5 7824/3
7857/18 7876/12
**looking** [15] 7686/2 7687/15 7698/23 7702/24
7752/24 7754/8 7850/21 7898/18 7898/22
7899/7 7904/15 7904/21 7929/4 7930/7 7943/6
**looks** [4] 7747/8 7749/16 7753/3 7762/13
**loosely** [1] 7805/19
**Lord** [1] 7812/22
**lost** [2] 7805/22 7937/13
**loud** [2] 7740/13 7945/22
**love** [3] 7858/15 7929/24
**low** [1] 7820/12
**lower** [1] 7911/22
**lumped** [3] 7672/6 7678/7 7704/10
**lunch** [3] 7689/25 7802/4 7821/13
**lying** [1] 7807/19

**M**

**ma'am** [1] 7793/3
**mail** [151] 7701/7 7701/9 7701/18 7701/22
7702/7 7702/17 7702/21 7702/24 7703/7

7703/10 7704/1 7704/3 7704/10 7705/16
7706/5 7706/8 7706/9 7706/20 7707/17
7707/15 7716/20 7718/21 7719/6 7723/11
7723/23 7728/2 7728/10 7731/20 7733/11
7734/25 7736/15 7737/4 7737/14 7738/5
7738/18 7740/19 7743/24 7744/3 7744/5
7744/10 7744/11 7744/25 7745/3 7745/4
7745/5 7748/25 7749/18 7749/19 7751/1
7751/4 7754/5 7754/7 7755/8 7756/11 7757/6
7757/8 7757/15 7758/5 7758/9 7758/22
7761/17 7761/21 7761/24 7762/3 7762/9
7762/13 7762/13 7762/16 7762/21 7762/25
7763/3 7763/23 7765/5 7765/7 7765/9 7765/19
7765/24 7766/12 7767/20 7769/3 7769/18
7769/18 7771/4 7771/25 7772/7 7772/12
7772/19 7772/20 7772/22 7772/22 7772/23
7773/15 7776/2 7776/4 7776/6 7776/8 7776/8
7776/11 7776/11 7776/17 7776/17 7776/21
7777/25 7778/3 7778/4 7778/22 7779/6
7780/13 7784/12 7784/14 7784/24 7785/4
7785/6 7785/12 7785/16 7785/18 7786/3
7786/16 7786/23 7787/4 7787/5 7787/17
7787/20 7787/20 7787/21 7788/2 7789/1
7792/9 7792/16 7796/15 7796/25 7797/6
7797/12 7798/17 7798/21 7799/1 7799/2
7799/5 7799/7 7902/6 7903/15 7903/17
7903/25 7904/15 7904/15 7904/18 7905/10
7905/12 7907/1 7907/2 7908/21
**mail's** [1] 7768/7
**mailed** [1] 7792/12
**mails** [31] 7715/19 7715/20 7718/1 7718/19
7729/24 7731/25 7732/25 7736/2 7743/23
7759/22 7760/16 7760/25 7761/7 7772/14
7772/16 7803/16 7830/24 7831/18 7856/13
7865/9 7905/24 7907/3 7907/6 7907/8 7907/10
7907/16 7907/24 7909/2 7910/11 7910/13
7910/17
**main** [7] 7731/15 7731/23 7909/16 7909/17
7911/13 7911/21 7912/1
**maintain** [1] 7795/23
**man** [1] 7926/11
**management** [2] 7782/9 7791/4
**managing** [1] 7782/9
**manifestations** [1] 7866/15
**manner** [1] 7834/22
**Marc** [7] 7728/3 7744/11 7744/25 7751/21
7757/9 7758/7 7758/10
**March** [36] 7721/21 7722/4 7722/19 7723/3
7723/19 7744/19 7744/21 7744/21 7748/15
7748/22 7749/2 7749/7 7749/21 7751/12
7752/22 7753/21 7755/1 7755/7 7756/5 7756/7
7757/12 7771/19 7771/20 7771/20 7771/22
7771/25 7772/8 7772/20 7773/16 7777/14
7777/17 7796/15 7797/6 7805/24 7809/23
7809/25
**March 17** [4] 7721/21 7723/19 7796/15 7797/6
**March 20** [3] 7722/4 7722/19 7723/3
**March 31** [2] 7777/14 7777/17
**Marek** [5] 7679/22 7692/11 7765/18 7804/24
7807/13
**Marin** [3] 7862/16 7872/20 7877/1
**Mario** [1] 7862/12
**Mariotta** [6] 7864/20 7864/25 7865/2 7865/6
7865/16 7868/1
**Mariotta's** [2] 7865/5 7867/1
**mark** [4] 7802/8 7773/22 7774/1 7774/3
**market** [4] 7957/3 7960/7 7961/4 7961/24
**marks** [1] 7929/4
**martin** [11] 7675/1 7698/13 7762/23 7767/24
7774/17 7782/7 7784/14 7789/2 7797/6 7902/8
7903/25
**Martin Shkreli** [2] 7675/1 7698/13
**mask** [1] 7898/11
**Massella** [3] 7696/4 7696/9 7697/4
**Mastro** [1] 7970/6
**match** [8] 7728/7 7729/1 7729/3 7748/18
7748/21 7749/15 7753/11 7753/13
**matches** [1] 7763/20

**material [4]** 7882/6 7963/17 7971/19 7971/24
**materials [1]** 7690/4
**math [1]** 7786/10
**MATSUMOTO [1]** 7670/9
**matter [23]** 7675/24 7677/23 7681/8 7682/5 7682/9 7684/25 7685/1 7692/2 7726/17 7733/9 7777/4 7777/4 7795/22 7808/16 7874/13 7877/20 7878/2 7884/17 7895/9 7923/18 7926/12 7961/20 7968/20
**matters [6]** 7728/5 7773/4 7791/3 7847/13 7908/17 7913/19
**May 19 [1]** 7728/2
**May 2013 [1]** 7783/2
**May 9 [6]** 7723/9 7723/11 7723/23 7724/8 7726/6 7731/20
**mean [49]** 7681/16 7683/16 7688/4 7696/18 7706/20 7730/13 7732/17 7732/22 7739/11 7739/23 7740/5 7741/24 7742/3 7762/8 7767/17 7786/11 7789/7 7796/9 7811/12 7811/24 7825/10 7829/13 7830/9 7833/1 7836/17 7837/17 7838/4 7842/21 7845/20 7870/6 7893/4 7895/11 7896/13 7897/2 7897/16 7909/19 7922/7 7940/20 7944/5 7944/16 7945/21 7960/23 7964/12 7964/25 7966/15 7968/6 7969/2 7969/8 7972/12
**meaning [3]** 7672/11 7924/22 7957/1
**means [10]** 7674/13 7692/7 7717/6 7740/15 7805/10 7805/11 7825/4 7874/11 7938/8 7969/19
**meant [3]** 7674/21 7838/20 7971/14
**mechanical [1]** 7670/24
**media [4]** 7817/25 7820/19 7822/8 7917/19
**meeting [26]** 7708/4 7708/12 7721/13 7721/20 7722/3 7722/10 7722/17 7723/2 7724/25 7737/2 7748/16 7748/22 7749/7 7749/22 7750/1 7751/11 7752/21 7753/19 7756/6 7758/12 7758/20 7796/16 7797/2 7797/3 7797/10 7798/2
**meetings [8]** 7706/10 7732/23 7739/23 7741/14 7744/22 7745/1 7758/14 7793/9
**meets [1]** 7684/14
**Meg [9]** 7707/22 7716/15 7716/16 7728/10 7728/19 7728/20 7733/6 7734/2 7738/9
**member [1]** 7782/9
**members [6]** 7694/24 7743/20 7846/5 7862/1 7901/4 7909/25
**memo [3]** 7781/10 7781/17 7782/1
**memorandum [1]** 7782/6
**memorialized [2]** 7804/20 7807/18
**memorializing [2]** 7805/10 7807/7
**memorize [1]** 7795/14
**memorized [2]** 7781/8 7905/17
**memory [2]** 7688/16 7694/21
**memos [2]** 7926/20 7926/21
**mention [3]** 7832/3 7921/17 7921/19
**mentioned [3]** 7760/3 7776/21 7882/24
**mentions [1]** 7776/24
**mere [2]** 7862/22 7876/24
**merely [2]** 7958/7 7958/9
**merger [5]** 7958/15 7958/18 7959/11 7959/18 7961/22
**message [4]** 7740/13 7779/15 7867/12 7867/13
**met [4]** 7933/4 7938/18 7938/21 7944/19
**metadata [1]** 7683/19
**methodologies [1]** 7964/7
**Michael [6]** 7759/15 7798/22 7798/25 7902/7 7902/11 7908/20
**microscope [1]** 7854/23
**mid [4]** 7731/2 7731/5 7860/23 7862/2
**mid-afternoon [2]** 7860/23 7862/2
**mid-morning [1]** 7731/2
**middle [1]** 7950/12
**might [37]** 7674/9 7711/16 7712/2 7713/16 7715/7 7735/7 7805/24 7825/1 7829/11 7829/12 7830/8 7830/8 7833/24 7857/11 7859/13 7882/13 7889/5 7889/6 7896/12

**7899/19** 7911/10 7921/11 7921/11 7921/25 7922/1 7931/1 7946/20 7950/17
**Mike [1]** 7786/13
**7956/15** 7958/20 7959/1 7965/2 7966/8 7966/10 7966/11 7969/15
**mike [2]** 7762/23 7767/24
**million [8]** 7704/14 7705/4 7705/5 7798/11 7903/18 7905/3 7905/4 7905/12
**millions [2]** 7760/8 7818/12
**millisecond [2]** 7702/17 7703/16
**milliseconds [4]** 7702/20 7703/13 7703/14 7704/2
**mind [37]** 7673/3 7673/17 7675/22 7680/4 7680/9 7684/14 7685/25 7686/1 7686/4 7687/8 7687/11 7689/15 7690/9 7691/8 7691/21 7697/6 7747/23 7761/10 7796/7 7801/2 7802/5 7811/14 7820/15 7820/17 7829/11 7846/18 7864/22 7865/10 7866/1 7868/15 7883/17 7884/7 7901/19 7903/21 7921/7 7921/13 7952/25
**minded [2]** 7731/6 7822/10
**mindful [4]** 7694/5 7894/4 7927/16 7946/8
**minds [1]** 7835/21
**mine [1]** 7920/12
**mini [1]** 7922/3
**minimal [4]** 7938/17 7938/18 7940/8 7943/12
**minimalist [1]** 7943/21
**Minkoff [1]** 7966/22
**minute [12]** 7671/16 7682/10 7693/21 7701/13 7701/19 7703/9 7752/17 7762/13 7862/7 7894/6 7933/23 7934/25
**minutes [128]** 7671/20 7671/20 7671/24 7672/12 7672/19 7674/4 7677/7 7679/16 7692/1 7700/3 7701/8 7701/11 7701/11 7707/19 7707/22 7707/23 7708/4 7708/11 7708/14 7710/17 7710/18 7710/19 7710/22 7710/25 7712/23 7714/11 7715/15 7716/5 7716/15 7716/18 7716/21 7718/17 7718/21 7718/24 7721/12 7721/20 7722/2 7722/10 7722/17 7723/1 7723/18 7726/4 7726/5 7726/8 7727/6 7727/19 7728/6 7728/7 7728/7 7728/24 7729/1 7729/6 7730/6 7730/9 7730/13 7731/11 7731/15 7732/1 7732/9 7733/8 7733/13 7733/13 7734/3 7734/5 7734/7 7734/9 7734/14 7734/22 7734/24 7735/2 7735/3 7736/6 7736/23 7737/10 7737/12 7737/13 7737/15 7737/17 7738/7 7738/10 7738/12 7738/25 7739/8 7739/9 7739/14 7739/15 7740/1 7741/15 7741/16 7741/21 7741/24 7744/17 7745/1 7748/16 7748/21 7749/6 7749/21 7750/1 7750/7 7750/19 7750/24 7750/25 7751/10 7752/20 7753/19 7755/1 7755/7 7756/5 7756/6 7757/13 7757/16 7758/12 7758/21 7759/23 7766/12 7767/1 7808/5 7834/4 7845/23 7886/23 7887/11 7889/15 7917/5 7917/7 7917/12 7917/13 7967/23 7970/13
**minutes.doc [3]** 7744/20 7744/20 7744/21
**Miranda [43]** 7863/8 7863/17 7863/20 7864/6 7873/2 7873/6 7875/10 7875/21 7875/22 7876/2 7876/6 7877/10 7878/16 7878/22 7879/3 7879/9 7879/16 7879/21 7880/1 7881/7 7881/12 7881/18 7882/9 7883/10 7883/10 7885/6 7885/12 7885/15 7885/13 7885/22 7886/1 7888/20 7888/25 7889/25 7891/13 7892/11 7892/18 7893/8 7893/9 7893/12 7920/22 7922/7 7921/11 7923/1
**misapplication [1]** 7831/8
**mislead [1]** 7924/9 7931/12
**misleading [5]** 7686/11 7686/12 7686/15 7739/12 7828/18
**miss [1]** 7906/20
**missing [4]** 7686/14 7734/12 7957/15 7957/17 7922/14
**mission [1]** 7942/22
**misstates [1]** 7770/15
**mistake [1]** 7870/10
**mistaken [2]** 7817/10 7831/1
**misunderstanding [1]** 7831/8
**mixed [1]** 7748/19

**model [1]** 7798/13
**moment [2]** 7716/7 7874/2
**Monday [1]** 7793/9
**monetary [3]** 7940/21 7940/22 7941/2
**money [8]** 7672/4 7678/5 7704/8 7788/15 7808/15 7820/16 7943/15 7959/3
**month [3]** 7708/14 7740/1 7740/24
**months [21]** 7726/14 7726/22 7729/3 7729/4 7729/25 7730/3 7730/7 7732/23 7738/5 7738/15 7738/19 7739/20 7740/22 7741/23 7784/23 7784/23 7785/5 7805/20 7820/24 7927/2 7961/25
**morning [15]** 7688/12 7694/24 7695/6 7695/7 7731/2 7731/5 7735/14 7868/13 7917/12 7917/14 7917/22 7919/8 7928/2 7928/5 7970/24
**most [9]** 7694/9 7816/3 7864/2 7868/15 7874/5 7896/7 7900/13 7912/24 7919/10
**mother [2]** 7817/19 7818/24
**motion [6]** 7928/6 7937/13 7968/24 7969/9 7969/13 7969/23
**motions [3]** 7835/1 7870/7 7914/1
**motive [1]** 7898/22
**motives [3]** 7868/3 7869/9 7869/13
**mouth [2]** 7963/2 7963/16
**move [21]** 7693/4 7696/7 7702/14 7705/17 7724/9 7770/11 7783/16 7783/23 7788/18 7789/8 7792/20 7800/1 7821/2 7841/11 7844/14 7847/23 7849/22 7882/3 7886/16 7899/18 7969/18
**movement [1]** 7930/4
**moving [1]** 7813/10
**Mr. [725]**
**Mr. Alan [1]** 7785/13
**Mr. Aselage [16]** 7677/25 7728/15 7733/6 7791/23 7792/13 7802/15 7808/12 7808/15 7808/19 7809/1 7809/3 7809/9 7809/14 7810/8 7927/23
**Mr. Aselage's [2]** 7737/4 7810/10
**Mr. Bertolini [4]** 7678/5 7678/18 7685/13 7701/7
**Mr. Biestek [5]** 7673/11 7673/11 7763/23 7765/5 7769/3
**Mr. Braconi [1]** 7889/15
**Mr. Brafman [2]** 7685/17 7685/17
**Mr. Brodsky [56]** 7674/4 7681/7 7681/12 7681/18 7686/25 7694/17 7695/2 7696/22 7713/13 7713/23 7715/16 7717/12 7718/3 7729/22 7738/20 7752/13 7766/21 7770/17 7776/15 7795/6 7804/18 7805/9 7805/20 7807/10 7819/23 7825/6 7827/7 7832/12 7835/9 7838/20 7853/18 7854/15 7857/7 7859/25 7860/6 7860/16 7864/13 7884/19 7886/13 7886/22 7887/10 7887/17 7893/14 7895/4 7896/4 7901/7 7901/24 7906/8 7906/13 7910/1 7919/21 7920/2 7928/4 7964/1 7965/14 7967/23
**Mr. Brodsky's [3]** 7681/4 7875/14 7877/1
**Mr. Carter [19]** 7695/9 7695/9 7695/25 7696/1 7697/13 7698/21 7723/13 7746/18 7747/1 7748/8 7749/11 7757/4 7765/4 7767/12 7769/1 7777/13 7789/16 7790/2 7790/6
**Mr. Chan [8]** 7826/2 7849/19 7929/10 7937/11 7946/20 7950/19 7951/10 7954/19
**Mr. Chan's [1]** 7954/17
**Mr. Cooley [1]** 7736/18
**Mr. Delzotto [9]** 7700/10 7791/23 7804/13 7874/20 7875/6 7883/5 7883/7 7891/23 7923/16
**Mr. Delzotto's [1]** 7823/24
**Mr. Dubin [9]** 7693/4 7693/5 7693/23 7812/19 7813/9 7814/13 7814/16 7849/11 7920/16
**Mr. Evan [1]** 7785/14
**Mr. Ferruolo [1]** 7826/12 7826/13 7959/22
**Mr. Ferruolo's [1]** 7727/22
**Mr. Geller [5]** 7784/6 7785/18 7787/5 7787/10 7936/17
**Mr. Geller's [1]** 7936/16

## M

Mr. Greebel [271] 7671/14 7671/15 7671/19
7672/13 7672/15 7672/23 7673/3 7673/9
7674/12 7674/14 7675/2 7675/8 7675/13
7676/22 7678/15 7679/16 7680/10 7684/14
7685/3 7686/7 7687/10 7689/18 7690/8
7691/13 7692/11 7692/16 7692/18 7692/25
7695/16 7696/4 7696/9 7697/4 7699/2 7700/3
7701/9 7701/13 7701/15 7701/22 7702/7
7702/24 7703/10 7703/23 7704/2 7706/9
7707/18 7714/11 7714/16 7715/8 7715/19
7716/6 7716/14 7716/23 7718/1 7718/5
7718/18 7718/22 7719/2 7719/5 7727/3 7727/6
7728/3 7728/5 7733/8 7733/20 7734/2 7734/6
7734/21 7734/23 7735/21 7736/3 7737/10
7739/13 7740/20 7741/16 7741/20 7744/14
7751/21 7754/5 7757/6 7757/9 7757/15 7758/9
7759/22 7761/13 7762/9 7763/22 7766/4
7767/3 7767/21 7768/12 7769/18 7771/4
7772/24 7773/14 7774/19 7775/2 7776/2
7776/25 7777/7 7777/23 7778/4 7780/13
7780/25 7782/2 7785/18 7786/2 7787/4 7787/6
7787/19 7788/6 7788/12 7792/14 7797/1
7799/6 7822/1 7822/3 7827/12 7828/10
7828/17 7829/7 7829/10 7829/14 7830/7
7830/25 7831/6 7832/3 7833/2 7833/10 7835/9
7835/20 7836/16 7836/25 7837/22 7839/4
7840/7 7840/12 7841/3 7841/8 7841/19
7842/14 7843/1 7843/2 7843/3 7843/11
7843/13 7843/21 7844/4 7845/6 7845/10
7846/19 7847/8 7847/11 7847/18 7850/5
7852/3 7852/24 7853/3 7853/5 7853/14
7853/24 7854/3 7854/4 7854/19 7855/9 7856/8
7856/10 7857/2 7859/6 7860/7 7865/10 7867/3
7870/6 7870/17 7870/23 7871/1 7871/5 7871/9
7871/24 7872/2 7873/2 7874/4 7874/12
7874/25 7874/25 7875/3 7881/12 7881/13
7882/10 7883/9 7885/8 7888/3 7888/10
7888/12 7888/15 7888/19 7888/24 7889/17
7890/4 7890/15 7891/13 7892/11 7895/10
7896/8 7897/9 7897/16 7897/21 7902/7
7902/20 7902/24 7903/17 7903/25 7904/16
7904/21 7905/12 7905/21 7905/21 7906/17
7906/19 7906/24 7907/4 7907/10 7907/24
7908/15 7908/20 7908/23 7909/1 7909/7
7909/9 7909/13 7909/16 7910/5 7910/18
7910/19 7910/24 7910/25 7911/1 7911/9
7912/4 7913/19 7913/20 7914/4 7914/21
7915/21 7916/2 7916/11 7916/14 7916/19
7916/25 7918/19 7919/13 7919/22 7920/22
7923/18 7923/23 7924/14 7924/25 7925/4
7925/18 7926/4 7926/13 7927/8 7927/10
7954/4 7954/8 7958/24 7967/17 7967/18
7968/5 7968/9 7970/24 7972/13

Mr. Greebel's [38] 7673/17 7675/22 7676/19
7677/1 7680/3 7686/1 7686/4 7686/21 7688/14
7691/8 7691/20 7705/11 7715/4 7716/20
7732/1 7734/9 7735/2 7736/1 7736/3 7761/21
7765/5 7769/3 7769/17 7777/25 7785/4
7797/12 7819/23 7829/2 7835/12 7842/13
7872/18 7875/8 7879/2 7883/4 7887/24 7889/4
7908/16 7923/3

Mr. Hackert [4] 7758/10 7781/24 7784/25
7785/7

Mr. Jackson [1] 7697/8

Mr. Jaclin [5] 7765/24 7766/3 7766/23 7768/4
7768/12

Mr. Jain [5] 7710/3 7758/9 7781/24 7784/25
7785/6

Mr. Johnson [2] 7966/20 7966/21

Mr. Kessler [3] 7929/13 7963/15 7970/16

Mr. Kessler's [2] 7940/15 7958/24

Mr. Koestler [5] 7678/6 7678/19 7683/5 7683/6
7701/7

Mr. Kravitz [14] 7726/8 7727/4 7728/4 7730/18
7732/6 7732/8 7735/25 7736/1 7736/14
7736/18 7744/25 7748/16 7749/18 7751/20

Mr. Lavelle [13] 7772/1 7772/2 7772/8 7773/15

7773/20 7777/13 7779/17 7779/20 7902/15
7902/25 7903/1 7904/6 7905/8

Mr. Lavelle's [8] 7772/20 7776/13 7777/6
7778/5 7779/8 7779/15 7784/5 7902/4

Mr. Mariotta [2] 7864/25 7865/2 7865/6

Mr. Massella [2] 7696/9 7697/4

Mr. Mastro [1] 7970/6

Mr. Minkoff [1] 7966/22

Mr. Panoff [13] 7726/5 7727/4 7729/18
7729/24 7734/10 7737/24 7741/11 7741/13
7754/5 7759/22 7781/21 7781/23 7792/12

Mr. Panoff's [3] 7734/24 7785/6 7789/1

Mr. Pitluck [9] 7673/21 7694/9 7727/24
7802/10 7803/14 7872/24 7886/12 7890/20
7924/17

Mr. Pitluck's [1] 7886/5

Mr. Richardson [2] 7737/9 7792/13

Mr. Rosenfeld [1] 7929/20

Mr. Rosensaft [6] 7799/5 7799/9 7799/13
7908/24 7909/1 7909/4

Mr. Saunders [3] 7678/6 7685/14 7699/7

Mr. Shkreli [123] 7671/13 7671/17 7671/19
7671/21 7671/25 7672/17 7672/23 7673/12
7675/13 7677/6 7678/15 7678/17 7679/3
7679/23 7681/20 7685/15 7685/15 7685/18
7691/13 7691/16 7692/6 7692/19 7693/1
7695/15 7695/19 7699/1 7699/6 7699/17
7700/2 7701/7 7701/8 7701/13 7701/18
7701/22 7702/3 7702/6 7702/21 7703/8
7703/23 7704/1 7704/3 7705/12 7706/3 7706/9
7718/1 7718/4 7733/6 7734/4 7737/5 7740/20
7761/14 7761/22 7772/23 7773/14 7774/14
7774/19 7774/22 7775/5 7776/3 7777/6
7777/17 7778/4 7780/14 7780/22 7785/4
7785/13 7785/18 7786/3 7786/11 7787/4
7787/5 7787/20 7788/10 7792/13 7797/1
7798/2 7798/8 7798/11 7798/22 7798/25
7799/5 7803/20 7803/21 7804/20 7813/7
7813/20 7814/24 7815/20 7818/12 7819/9
7819/15 7820/3 7820/16 7820/25 7822/14
7828/18 7831/25 7851/10 7853/9 7855/11
7865/11 7874/21 7874/22 7874/23 7889/12
7902/19 7902/21 7902/24 7903/15 7903/19
7904/16 7904/21 7905/12 7905/20 7906/17
7906/24 7907/4 7907/10 7907/11 7907/25
7954/3 7958/23 7961/18

Mr. Shkreli's [8] 7675/5 7683/23 7685/12
7700/3 7887/25 7888/1 7953/1 7959/20

Mr. Su [20] 7696/3 7696/9 7697/3 7804/20
7807/9 7808/9 7810/3 7810/12 7811/5 7811/6
7811/17 7812/1 7812/3 7812/10 7823/24
7824/25 7825/9 7826/12 7825/19 7830/4

Mr. Su's [6] 7807/17 7808/7 7810/17 7811/8
7811/13 7822/21

Mr. Sullivan [1] 7763/23 7765/6 7769/4

Mr.Mariotta's [1] 7865/22

Ms. [28] 7678/6 7683/8 7685/13 7686/20
7696/4 7696/10 7697/4 7701/8 7707/19
7712/21 7716/18 7726/7 7727/3 7727/7
7737/24 7739/14 7739/18 7741/11 7810/2
7810/7 7858/22 7906/2 7923/19 7924/17
7925/23 7929/2 7966/21 7971/14

Ms. Chew [3] 7696/4 7696/10 7697/4

Ms. Hassan [5] 7678/6 7683/8 7685/13
7686/20 7701/8

Ms. Jensen [3] 7716/18 7726/7 7741/11

Ms. Klein [2] 7966/21 7971/14

Ms. Rubin [3] 7858/22 7906/2 7929/2

Ms. Smith [4] 7712/21 7810/2 7923/19
7924/17

Ms. Smith's [2] 7810/7 7925/23

Ms. Valeur-Jensen [5] 7707/19 7727/3
7737/24 7739/14 7739/18

Ms. Valeur-Jensen's [1] 7727/7

MSMB [19] 7759/15 7773/20 7774/5 7774/8
7774/9 7774/10 7782/9 7782/10 7782/19
7783/3 7783/3 7783/7 7783/9 7783/11 7783/13
7803/19 7850/12 7850/13 7905/1

msmbcapital.com [1] 7762/23

Muchin [27] 7840/9 7841/3 7841/18 7841/19
7842/13 7843/12 7843/23 7844/6 7844/11
7845/8 7845/12 7846/6 7846/22 7847/2 7847/7
7847/13 7850/2 7908/16 7908/21 7909/2
7909/10 7909/13 7910/6 7914/16 7916/14
7916/24 7926/4

multi [2] 7910/8 7910/9

multi-national [1] 7910/9

multiple [18] 7676/21 7689/16 7692/14
7692/15 7692/22 7693/1 7697/16 7732/21
7829/3 7829/4 7850/10 7850/14 7853/13
7868/11 7897/18 7907/24 7915/7 7921/21

must [10] 7862/18 7862/18 7876/25 7880/1
7880/2 7880/2 7880/11 7880/11 7961/8
7967/14

MYLAN [1] 7670/20

## N

name [3] 7721/23 7722/7 7759/15

named [1] 7769/10

names [3] 7882/24 7917/20 7930/18

narrow [3] 7863/1 7863/7 7917/4

narrowed [2] 7742/12 7826/3

national [1] 7910/8 7910/9

natural [1] 7866/15

nature [1] 7818/2

near [1] 7917/2

necessarily [10] 7735/22 7741/20 7789/7
7818/18 7830/11 7853/12 7910/21 7925/18
7936/22 7971/17

necessary [2] 7828/24 7931/9

need [53] 7675/21 7676/2 7676/24 7684/21
7684/22 7684/22 7684/23 7691/8 7708/23
7708/24 7712/11 7728/25 7729/9 7768/18
7780/17 7781/11 7788/8 7802/1 7821/14
7825/25 7827/16 7835/23 7843/15 7852/21
7854/16 7859/5 7859/8 7859/8 7859/13 7862/4
7867/14 7890/16 7896/7 7898/7 7900/14
7901/6 7901/17 7908/10 7908/11 7918/4
7921/2 7928/10 7928/22 7935/23 7945/16
7946/7 7952/1 7953/18 7965/24 7967/8 7968/2
7968/3 7968/15

needs [20] 7766/23 7849/20 7906/7

negotiations [2] 7677/24 7863/6

neutral [2] 7941/11 7954/6

never [39] 7681/24 7682/1 7683/6 7684/5
7733/15 7742/4 7786/10 7794/10 7799/8
7801/21 7802/19 7803/2 7804/8 7804/13
7804/25 7805/6 7805/7 7805/12 7805/14
7805/22 7807/20 7807/21 7812/4 7823/25
7824/3 7825/9 7841/7 7845/7 7845/11 7846/20
7847/6 7854/14 7858/22 7869/10 7879/13
7916/2 7916/6 7916/10 7920/14

new [25] 7670/1 7670/4 7670/13 7670/14
7670/18 7670/18 7672/3 7672/3 7678/4
7678/13 7704/8 7704/8 7704/11 7704/19
7793/10 7839/6 7847/2 7916/2 7916/6 7916/8
7916/12 7916/12 7918/8 7956/14 7962/8

news [1] 7818/24

next [39] 7682/7 7684/1 7698/18 7701/18
7704/17 7707/25 7708/25 7720/4 7722/2
7722/10 7722/17 7722/23 7723/1 7725/5
7770/8 7770/15 7775/8 7776/8 7776/8 7778/19
7782/22 7808/5 7827/2 7827/19 7840/1
7840/19 7848/3 7861/5 7895/18 7915/23
7917/12 7931/1 7933/12 7935/13 7935/19
7944/24 7959/23 7966/2 7966/10

nice [1] 7814/13

nicely [1] 7780/21

night [8] 7689/21 7690/17 7740/11 7918/8
7928/19 7933/4 7933/7 7970/23

nil [12] 7911/15 7914/13 7918/20 7918/24
7920/12 7921/6 7921/23 7923/18 7923/24
7924/15 7925/7 7925/16

nil' [1] 7919/5

nine [7] 7677/8 7787/19 7793/12 7794/4
7794/5 7851/13 7952/6

**N**

**nobody [8]** 7737/1 7738/6 7814/2 7814/4
7814/7 7817/22 7818/20 7879/19
**nominating [4]** 7722/18 7744/22 7751/11
7752/21
**non [2]** 7737/6 7950/21
**non-highlighted [1]** 7950/21
**non-responses [1]** 7737/6
**nonagreed [1]** 7903/8
**nonanswer [1]** 7970/9
**none [6]** 7813/19 7817/7 7822/1 7931/23
7962/15 7966/22
**nonetheless [1]** 7873/3
**nonsensical [1]** 7964/2
**nonviolent [5]** 7912/8 7912/21 7913/7 7915/1
7915/9
**noon [2]** 7775/2 7778/1
**normal [1]** 7727/11
**Northern [1]** 7946/3
**note [6]** 7696/20 7753/14 7756/17 7786/22
7877/12 7967/8
**noted [1]** 7966/23
**notes [11]** 7799/4 7799/16 7799/20 7800/4
7800/5 7800/7 7800/10 7800/17 7800/19
7800/22 7801/4
**nothing [17]** 7706/23 7736/9 7778/17 7778/18
7830/24 7851/18 7852/5 7863/21 7868/20
7868/20 7871/23 7878/11 7895/15 7919/16
7921/6 7953/20 7962/18
**notice [3]** 7942/7 7966/7 7972/19
**noticed [1]** 7898/3
**noting [1]** 7756/21
**notion [2]** 7681/15 7738/3
**Novartis [2]** 7798/4 7798/9
**November [35]** 7671/13 7672/21 7673/9
7673/13 7677/13 7677/14 7679/15 7679/23
7680/15 7680/19 7685/6 7685/8 7685/8 7685/8
7688/14 7692/23 7695/15 7696/3 7696/9
7697/3 7697/6 7697/6 7697/9 7698/14 7699/2
7699/18 7701/14 7701/21 7702/3 7702/7
7702/16 7705/11 7706/4 7810/3 7810/9
**November 25 [6]** 7701/14 7701/21 7702/3
7702/7 7702/16 7705/11
**November 25th [10]** 7671/13 7672/21 7677/14
7679/15 7685/8 7695/15 7697/9 7698/14
7699/2 7699/18
**November 26 [1]** 7706/4
**November 26th [2]** 7685/8 7685/8
**November 29 [1]** 7673/9
**November 29th [11]** 7673/13 7679/23 7680/15
7680/19 7685/6 7688/14 7692/23 7696/3
7696/9 7697/3 7697/6
**nuanced [1]** 7853/12
**nuggets [1]** 7779/5
**number [46]** 7671/25 7673/23 7674/5 7676/18
7681/10 7682/15 7691/17 7712/9 7713/11
7731/24 7739/6 7745/6 7745/10 7745/13
7747/1 7747/3 7747/6 7760/16 7766/8 7772/14
7779/2 7779/4 7783/4 7789/3 7793/12 7801/11
7801/19 7802/13 7804/6 7820/11 7821/4
7852/19 7856/20 7859/4 7859/4 7863/10
7878/18 7900/6 7903/19 7927/5 7930/8
7930/22 7952/6 7956/21 7959/15 7967/21
**numbered [1]** 7724/20
**numbers [6]** 7746/1 7746/5 7746/6 7746/7
7788/8 7795/17
**numeral [1]** 7935/5
**numerous [3]** 7686/6 7736/2 7857/19

**O**

**oath [6]** 7695/1 7822/9 7827/6 7845/24
7887/19 7930/21
**object [17]** 7694/6 7696/14 7708/24 7724/12
7725/2 7756/16 7770/14 7776/14 7786/15
7786/20 7795/18 7832/10 7842/3 7863/22
7881/23 7898/23 7927/24
**objected [9]** 7711/11 7712/20 7728/14 7783/4
7876/6 7885/18 7935/11 7941/5 7956/13

**objecting [5]** 7723/25 7764/1 7794/7 7842/6
7961/15
**objection [93]** 7684/10 7694/4 7694/9 7694/14
7700/14 7700/18 7700/22 7703/1 7707/10
7708/18 7708/23 7712/17 7712/18 7730/2
7731/13 7731/16 7736/14 7745/17 7747/14
7751/6 7751/22 7752/10 7754/13 7755/9
7755/22 7759/9 7760/18 7760/21 7761/2
7764/18 7766/19 7773/6 7778/6 7778/7 7779/9
7780/1 7789/8 7795/19 7795/23 7799/11
7799/14 7800/13 7800/23 7800/24 7827/14
7827/15 7838/22 7840/7 7840/14 7840/17
7841/4 7841/20 7842/5 7842/10 7842/15
7843/4 7843/14 7843/24 7843/25 7844/7
7844/10 7845/13 7845/16 7846/7 7846/14
7846/23 7846/24 7847/20 7847/23 7852/15
7888/14 7898/21 7899/8 7907/13 7908/2
7908/5 7909/21 7912/12 7912/16 7912/18
7913/11 7913/22 7913/24 7913/25 7914/18
7915/17 7916/16 7927/19 7935/6 7935/10
7936/15 7952/10 7953/6
**objectionable [1]** 7927/19
**objections [10]** 7676/21 7691/25 7694/8
7756/21 7737/1 7837/9 7852/23 7854/17
7956/5 7971/22
**obligation [2]** 7800/7 7824/23
**obligations [3]** 7782/16 7782/18 7967/10
**observations [3]** 7846/10 7846/25 7847/5
**observe [15]** 7845/18 7845/19 7845/19 7883/1
7885/5 7885/7 7885/7 7886/17 7888/19
7888/22 7890/5 7891/12 7891/13 7892/13
7893/5
**observed [10]** 7845/11 7845/17 7846/12
7846/20 7847/6 7883/10 7886/7 7889/14
7889/15 7889/24
**observing [1]** 7891/24
**obtain [10]** 7831/16 7844/5 7845/11 7849/25
7856/14 7873/5 7883/2 7899/23 7915/2 7915/6
**obtained [4]** 7834/18 7837/20 7844/16 7845/7
**obvious [3]** 7712/18 7718/20 7819/25
**obviously [27]** 7673/22 7683/1 7683/11
7685/16 7687/14 7694/3 7715/17 7731/12
7745/10 7794/1 7808/7 7809/20 7828/8
7831/15 7832/10 7832/14 7863/22 7879/23
7889/19 7900/10 7900/20 7928/5 7957/17
7969/18 7971/19 7971/23 7972/18
**occasions [1]** 7850/10
**occur [2]** 7691/1 7961/8
**occurred [4]** 7804/2 7804/25 7808/21 7811/1
**occurrence [1]** 7876/5
**occurring [1]** 7805/22
**occurs [1]** 7818/2
**October [4]** 7810/3 7810/9 7946/23 7946/24
**October 6th [2]** 7946/23 7946/24
**odds [3]** 7911/14 7914/12 7914/17
**offense [2]** 7912/21 7913/7
**offer [22]** 7672/25 7685/13 7689/14 7689/19
7691/9 7691/10 7698/3 7743/10 7756/13
7756/14 7764/15 7773/3 7779/23 7786/14
7863/2 7866/6 7875/21 7879/14 7937/3
7959/13 7967/3 7967/11
**offered [16]** 7674/2 7674/16 7674/25 7675/7
7681/19 7681/19 7682/22 7698/14 7715/1
7715/16 7729/24 7756/23 7774/13 7865/16
7884/17 7919/15
**offering [13]** 7673/1 7673/3 7680/8 7680/9
7685/11 7727/23 7729/8 7756/18 7756/19
7764/20 7883/19 7892/13 7892/15
**offerings [1]** 7961/11
**office [8]** 7708/1 7781/1 7787/11 7816/15
7869/5 7874/15 7894/19 7913/3
**officer [14]** 7727/19 7728/15 7728/17 7737/13
7737/17 7765/10 7769/11 7769/20 7782/8
7885/3 7885/20 7886/13 7893/4 7893/5
**offices [2]** 7912/6 7913/5
**official [1]** 7897/8
**often [4]** 7855/5 7876/2 7915/9 7922/3
**okays [1]** 7958/10

**once [15]** 7690/24 7706/18 7706/21 7710/2
7732/16 7743/21 7850/21 7841/14 7850/6
7850/6 7850/6 7861/2 7874/19 7895/11 7944/3
**one [163]** 7671/15 7673/14 7681/2 7681/12
7683/22 7684/1 7687/23 7688/13 7689/21
7690/7 7691/10 7691/15 7691/18 7692/4
7693/3 7697/8 7701/13 7701/19 7702/18
7702/18 7703/12 7703/13 7703/14 7703/15
7703/17 7703/20 7703/22 7703/24 7703/24
7708/14 7710/3 7712/5 7723/18 7724/25
7724/25 7727/18 7729/15 7730/11 7730/23
7737/21 7740/3 7740/3 7741/6 7741/7 7741/19
7749/16 7750/18 7751/18 7751/19 7752/20
7753/15 7753/22 7754/22 7758/13 7758/16
7759/16 7759/17 7760/5 7767/17 7769/24
7781/12 7781/21 7784/5 7785/2 7786/6 7786/6
7789/24 7789/25 7790/9 7790/17 7790/18
7792/1 7794/21 7796/10 7797/19 7798/18
7801/14 7804/23 7805/14 7807/8 7807/9
7815/11 7817/7 7817/18 7818/23 7819/5
7819/5 7822/7 7834/8 7837/6 7841/24 7846/1
7846/2 7846/4 7846/20 7851/14 7852/20
7859/4 7859/20 7863/10 7864/8 7864/10
7867/10 7870/9 7872/3 7874/7 7877/5 7879/15
7893/10 7893/13 7895/14 7899/9 7903/14
7903/16 7903/18 7905/3 7905/4 7905/14
7905/15 7905/15 7905/17 7906/1 7906/9
7907/18 7909/16 7911/13 7914/12 7918/18
7927/24 7931/2 7935/22 7936/13 7938/8
7938/10 7938/20 7940/18 7941/11 7942/1
7943/2 7946/12 7947/1 7948/5 7949/19
7949/25 7951/13 7951/17 7952/10 7954/9
7955/20 7959/4 7959/9 7960/4 7960/16
7960/21 7961/23 7962/1 7962/25 7967/6
7967/1 7969/3 7970/11 7971/6 7971/6
**one's [5]** 7749/16 7753/14 7756/10 7869/22
7960/10
**ones [6]** 7717/14 7729/2 7742/13 7755/8
7966/10 7966/11
**open [24]** 7671/1 7687/25 7692/11 7721/1
7731/3 7731/6 7802/5 7822/10 7823/1 7828/2
7828/24 7832/5 7833/19 7840/2 7849/3
7857/12 7857/20 7862/9 7866/12 7889/5
7889/15 7896/1 7918/16 7960/1
**opened [2]** 7857/6 7919/17
**opening [6]** 7832/7 7837/23 7838/1 7853/24
7957/19 7958/21
**operates [1]** 7926/19
**operating [5]** 7728/15 7728/17 7874/15 7875/6
7962/14
**operative [4]** 7931/24 7936/23 7937/8 7942/5
**opinion [26]** 7727/21 7727/22 7768/1 7768/16
7768/19 7768/21 7768/22 7768/22 7768/25
7820/12 7821/8 7863/7 7956/14 7956/17
7956/23 7956/25 7957/6 7958/1 7960/4 7961/4
7961/5 7961/6 7962/17 7964/8 7964/13
7964/13
**opinions [3]** 7964/6 7966/18 7971/22
**opportunity [9]** 7711/18 7792/22 7792/24
7803/3 7803/6 7812/5 7825/1 7825/19 7868/7
**opposed [7]** 7816/7 7822/6 7896/8
**opposite [1]** 7804/15
**option [5]** 7774/8 7774/8 7916/20 7916/22
7916/23
**oral [5]** 7787/11 7873/2 7881/12 7882/14
7946/6
**orally [6]** 7867/7 7883/11 7885/6 7888/20
7894/2 7894/14
**orange [11]** 7930/9 7930/13 7930/15 7932/7
7933/12 7933/20 7934/10 7934/24 7949/17
7949/20 7950/9
**oranges [1]** 7811/10
**order [18]** 7679/7 7679/12 7681/22 7746/8
7829/18 7830/13 7830/18 7830/22 7831/3
7831/7 7850/19 7903/22 7915/6 7928/21
7928/22 7958/6 7958/14 7966/14
**ordered [1]** 7967/21
**orderly [1]** 7957/3

**O**

**organization** [1] 7932/25

**original** [1] 7903/15
**originally** [2] 7941/5 7953/3
**otherwise** [3] 7749/16 7858/8 7968/14
**ourselves** [3] 7721/12 7914/25 7915/12
**outburst** [1] 7970/17
**outside** [10] 7728/11 7803/18 7862/9 7868/14
7869/5 7886/3 7886/14 7887/21 7890/6 7915/1
**outstanding** [7] 7727/10 7765/11 7769/13
7769/21 7837/11 7837/12 7900/15
**overarching** [1] 7863/10
**overlap** [1] 7732/2
**overrule** [7] 7778/7 7800/24 7827/15 7843/25
7844/10 7845/16 7846/24
**overruled** [5] 7703/2 7708/19 7759/12 7837/13
7913/15
**overruling** [1] 7755/16
**overwhelming** [1] 7810/12
**owed** [2] 7943/15 7949/3
**owes** [1] 7818/12
**own** [18] 7684/12 7713/4 7713/7 7716/9
7732/10 7812/4 7824/5 7846/12 7868/5
7876/23 7896/12 7912/7 7931/15 7942/20
7943/3 7958/25 7962/7 7963/20

**P**

**p.m** [48] 7671/13 7671/20 7672/18 7681/16
7695/16 7696/3 7697/3 7699/2 7701/14
7701/21 7702/3 7702/22 7702/23 7703/8
7705/12 7762/4 7762/9 7762/14 7762/17
7762/17 7762/22 7765/6 7765/25 7767/21
7768/5 7768/7 7768/10 7768/10 7769/3
7769/18 7772/1 7772/8 7772/20 7776/6 7776/9
7776/17 7778/4 7785/13 7786/6 7786/6 7788/7
7793/10 7797/6 7827/3 7901/1 7906/24
7917/23 7972/24
**page** [86] 7697/16 7708/3 7708/25 7720/4
7722/2 7722/10 7722/17 7722/23 7723/1
7723/22 7725/5 7742/18 7746/19 7746/24
7746/25 7748/7 7753/5 7757/3 7757/5 7763/11
7768/22 7771/22 7772/9 7775/8 7779/4 7782/5
7782/5 7784/3 7789/16 7792/9 7795/2 7795/5
7795/16 7795/17 7797/16 7797/24 7799/20
7806/2 7822/20 7823/17 7827/2 7827/19
7840/1 7848/3 7861/5 7866/4 7866/5 7873/9
7895/18 7915/23 7930/11 7931/1 7932/6
7932/16 7933/2 7933/9 7933/21 7933/23
7934/1 7934/5 7934/8 7934/9 7934/21 7934/22
7935/15 7936/24 7939/7 7943/5 7945/23
7947/7 7947/22 7948/10 7949/8 7949/11
7949/13 7949/15 7949/24 7950/2 7950/8
7951/1 7952/9 7952/20 7956/23 7959/23
7973/2 7973/7
**page 10** [1] 7949/15
**page 104** [2] 7943/5 7945/23
**page 12** [1] 7949/24
**page 13** [2] 7950/8 7952/20
**page 14** [1] 7951/1
**page 15** [1] 7952/9
**page 5054** [1] 7822/20
**page 6** [1] 7947/7
**page 7** [3] 7947/22 7948/10 7949/8
**page 8** [1] 7949/11
**page 9** [1] 7949/13
**pages** [24] 7721/19 7721/23 7722/6 7722/14
7724/22 7747/7 7747/8 7747/12 7748/19
7748/20 7749/2 7749/20 7752/14 7752/22
7753/1 7753/3 7753/9 7768/25 7772/10 7808/3
7825/5 7825/6 7945/3 7952/15
**paid** [1] 7788/14
**paint** [1] 7896/7
**painting** [1] 7689/5
**Pandora's** [1] 7833/20 7838/1 7854/13
**Panoff** [18] 7726/5 7726/9 7726/17 7727/4
7728/3 7729/18 7729/24 7734/10 7737/24
7738/24 7741/11 7741/13 7754/5 7757/9
7922/7 7781/21 7781/23 7792/12

**Panoff's** [3] 7784/24 7785/6 7789/1
**paper** [2] 7791/7 7793/8 7793/18 7844/6
7845/7 7845/12 7874/17
**papers** [1] 7844/16
**par** [1] 7905/5
**paragraph** [54] 7672/1 7672/7 7678/8 7679/8
7704/17 7704/23 7705/8 7763/16 7763/19
7783/2 7789/24 7789/24 7790/9 7790/16
7794/4 7794/5 7798/1 7798/2 7866/5 7930/13
7930/15 7930/17 7931/2 7931/7 7932/7
7933/12 7934/5 7934/10 7934/18 7934/22
7934/23 7935/7 7935/11 7935/16 7936/6
7937/25 7938/10 7938/13 7943/2 7944/22
7947/7 7947/20 7947/24 7948/4 7948/6 7949/2
7949/17 7949/20 7949/25 7950/1 7950/22
7952/20 7952/20 7954/22
**paragraph 1** [2] 7944/22 7951/21
**paragraph 2** [1] 7954/22
**paragraphs** [15] 7712/11 7748/11 7748/17
7748/18 7749/12 7752/2 7752/14 7790/8
7932/11 7933/21 7934/3 7935/20 7936/2
7936/8 7937/17
**paralegal** [2] 7684/12 7687/1 7687/1 7690/11
7736/9 7736/18 7742/4
**pardon** [2] 7693/18 7698/9
**parenthetical** [2] 7744/23 7905/4
**Park** [2] 7670/18 7934/14
**part** [31] 7678/24 7689/3 7694/9 7710/19
7717/6 7717/7 7717/9 7732/6 7741/20 7783/17
7786/23 7787/20 7831/14 7835/9 7838/20
7853/10 7879/1 7889/2 7902/19 7912/20
7919/15 7921/14 7935/3 7940/22 7942/5
7948/22 7951/17 7953/7 7953/24 7956/15
7969/20
**participant** [1] 7732/7
**participate** [1] 7869/2
**participated** [1] 7810/13
**participating** [1] 7745/22
**particular** [12] 7711/20 7717/25 7718/6 7723/5
7798/18 7828/23 7871/1 7876/4 7876/14
7877/14 7956/17 7969/17
**particularly** [7] 7763/7 7800/12 7832/17
7866/1 7867/4 7874/8 7937/4
**parties** [18] 7862/10 7930/16 7932/19 7934/14
7937/9 7938/15 7940/25 7942/14 7943/9
7944/2 7945/23 7946/5 7947/21 7948/3
7948/14 7952/25 7953/25 7954/23
**partner** [7] 7840/11 7843/2 7843/12 7903/10
7908/21 7909/1 7909/7
**partners** [7] 7841/18 7842/1 7842/2 7842/13
7842/21 7908/16
**parts** [6] 7712/10 7864/3 7937/15 7953/15
7966/17 7966/18
**party** [14] 7676/16 7713/7 7713/19 7713/21
7713/22 7719/14 7719/16 7720/1 7721/2
7745/14 7816/23 7941/11 7952/21 7955/4
**passed** [1] 7734/11
**passes** [1] 7685/10
**past** [8] 7804/19 7804/25 7805/1 7805/2
7805/11 7807/21 7832/19 7889/6
**patience** [1] 7901/5
**pause** [3] 7836/5 7843/18 7900/5
**pawn** [1] 7865/12
**pay** [4] 7942/6 7949/3 7959/3 7959/4
**paying** [2] 7705/3 7945/12
**payment** [2] 7904/25 7905/4
**payments** [4] 7781/18 7782/13 7782/16
7783/10
**payor** [1] 7905/2
**pending** [1] 7965/24
**people** [58] 7672/5 7675/6 7678/5 7679/9
7692/10 7696/17 7699/18 7700/9 7704/9
7729/12 7730/3 7740/23 7741/5 7741/9
7759/23 7766/6 7768/13 7768/14 7789/7
7800/18 7801/8 7801/11 7801/14 7847/16
7851/5 7854/18 7856/20 7863/20 7868/15
7877/10 7878/18 7879/8 7879/16 7879/20

7892/6 7909/17 7911/16 7911/22 7913/18
7914/16 7915/10 7915/16 7916/14 7916/24
7922/3 7922/5 7922/6 7922/21 7924/5 7924/19
7958/3 7961/17 7961/24 7962/2 7962/13
7962/20 7965/5 7965/22
**per** [1] 7905/6
**percent** [6] 7676/10 7765/11 7769/12 7769/20
7924/5 7943/1
**peremptorily** [1] 7821/5
**perfect** [1] 7698/22
**perfectly** [8] 7712/16 7712/22 7712/23
7714/24 7858/7 7882/17 7899/8 7957/22
**perform** [2] 7938/23 7940/7
**performed** [2] 7939/6 7941/20
**perhaps** [7] 7767/17 7774/22 7787/13 7808/8
7811/7 7900/11 7954/18
**period** [12] 7705/7 7738/11 7738/15 7770/4
7795/10 7885/13 7889/17 7948/10 7948/13
7951/15 7952/4 7959/17
**periods** [1] 7741/4
**permissible** [10] 7714/25 7735/7 7823/11
7828/22 7835/5 7852/17 7856/23 7882/18
7951/11 7962/10
**permitted** [7] 7689/5 7792/3 7882/16 7918/22
7919/10 7923/25 7924/16
**person** [32] 7714/3 7731/24 7732/24 7733/23
7741/3 7765/13 7769/14 7769/22 7785/20
7798/19 7835/5 7843/1 7843/11 7849/18
7853/5 7862/21 7866/13 7867/20 7867/21
7868/6 7872/12 7876/15 7881/6 7889/1
7894/22 7895/16 7911/23 7911/24 7912/11
7922/14 7945/8 7968/6
**person's** [1] 7871/22
**personal** [41] 7711/24 7737/9 7742/5 7778/20
7778/22 7778/23 7784/7 7792/11 7794/8
7794/16 7846/25 7847/5 7869/4 7874/24
7875/3 7877/22 7879/11 7882/19 7883/1
7883/7 7883/13 7884/12 7885/16 7887/14
7891/4 7891/9 7891/23 7892/2 7892/3 7892/5
7892/7 7894/25 7895/6 7896/4 7896/9 7896/12
7896/15 7896/24 7912/7 7922/13 7924/12
**personally** [12] 7799/21 7804/8 7844/16
7844/18 7845/7 7845/9 7845/17 7846/11
7847/9 7856/14 7882/9 7894/21
**personnel** [1] 7711/25
**phone** [2] 7670/22 7968/6
**phrase** [3] 7801/4 7838/16 7887/15
**physical** [6] 7700/25 7723/13 7723/15 7901/17
7901/19 7901/20
**picture** [2] 7689/5 7734/8
**piece** [7] 7673/6 7689/11 7734/12 7788/9
7844/6 7845/7 7845/11
**pieces** [1] 7834/13
**Pierotti** [1] 7909/8
**pinpoint** [1] 7796/5
**PIPE** [1] 7774/12
**pitch** [1] 7951/10
**pitched** [1] 7774/5
**PITLUCK** [11] 7670/15 7673/21 7694/9
7727/24 7802/10 7803/14 7846/23 7872/24
7886/12 7890/20 7924/17
**Pitluck's** [1] 7886/5
**place** [5] 7851/16 7859/8 7869/5 7887/21
7951/5
**placed** [3] 7808/23 7809/4 7864/23
**plain** [1] 7672/11
**plainly** [1] 7675/7
**plan** [7] 7804/11 7874/7 7874/9 7874/9
7874/14 7874/16 7874/18
**planned** [2] 7855/4 7855/4
**planning** [2] 7832/13 7968/18
**plant** [1] 7816/25
**play** [1] 7866/1
**played** [2] 7829/7 7884/23
**Plaza** [1] 7774/6
**plea** [3] 7863/4 7863/5 7863/6
**plead** [1] 7869/10
**pleas** [2] 7876/19 7878/18

**plenty** [1]  7922/5 7922/6
**plural** [2]  7692/17 7692/18
**plus** [2]  7911/19 7934/17
**PM4** [1]  7874/1
**PM7** [1]  7940/1
**point** [95]  7674/7 7676/17 7676/20 7680/25
7686/19 7686/24 7687/12 7689/8 7689/8
7689/10 7710/3 7714/8 7714/9 7714/10
7719/24 7726/9 7726/16 7727/12 7727/16
7729/1 7729/4 7729/10 7729/11 7729/13
7730/7 7732/20 7733/1 7737/20 7739/22
7741/8 7741/9 7742/13 7803/13 7803/14
7805/19 7808/3 7809/24 7810/7 7810/11
7817/12 7817/23 7817/23 7830/5 7830/14
7831/1 7831/5 7834/9 7848/1 7850/20 7860/6
7862/2 7863/10 7864/16 7867/10 7872/11
7876/4 7876/14 7877/13 7877/15 7879/5
7879/8 7879/12 7882/1 7882/25 7884/25
7885/23 7888/18 7890/5 7890/8 7893/19
7895/5 7905/5 7905/10 7905/15 7917/12
7919/12 7920/18 7923/24 7923/25 7924/8
7924/16 7925/3 7925/8 7925/9 7925/10
7925/12 7939/4 7945/17 7946/22 7953/13
7961/1 7963/9 7965/16 7966/2 7966/3
**pointed** [6]  7686/13 7688/12 7803/14 7823/15
7895/4 7940/19
**pointing** [3]  7710/19 7933/2 7946/20
**points** [11]  7680/24 7681/12 7727/23 7832/1
7834/14 7854/4 7854/9 7864/19 7864/23
7867/18 7923/9
**police** [1]  7893/4
**policy** [1]  7926/19
**pop** [2]  7817/20 7818/25
**popped** [1]  7897/24
**portion** [21]  7751/23 7760/10 7760/16 7768/24
7769/2 7769/4 7769/5 7769/6 7770/19 7770/25
7771/4 7782/6 7782/22 7795/20 7877/14
7905/8 7929/15 7931/24 7932/23 7937/21
7950/21
**portions** [2]  7721/4 7753/5
**posed** [4]  7696/23 7869/22 7919/21 7920/2
**posing** [1]  7963/15
**position** [18]  7674/11 7687/2 7705/7 7730/23
7765/15 7770/6 7771/6 7832/18 7862/14
7897/7 7897/11 7897/12 7909/12 7909/14
7909/15 7910/23 7931/18 7970/11
**positive** [1]  7820/25
**possession** [1]  7834/23
**possibility** [1]  7911/9 7968/21
**possible** [6]  7717/8 7813/12 7915/3 7915/7
7943/21 7954/18
**possibly** [3]  7732/13 7796/8 7895/7
**post** [27]  7832/11 7850/9 7857/2 7857/12
7857/15 7857/20 7857/25 7858/2 7860/4
7862/17 7862/21 7870/7 7870/21 7871/16
7872/13 7876/7 7877/16 7877/19 7878/23
7880/23 7881/1 7881/3 7891/5 7920/13 7924/8
7925/10 7958/15
**post-arrest** [16]  7862/17 7862/21 7870/21
7871/16 7872/13 7876/7 7877/16 7877/19
7878/23 7880/23 7881/1 7881/3 7891/5
7920/13 7924/8 7925/10
**post-trial** [1]  7870/7
**potential** [2]  7798/4 7965/11
**potentially** [1]  7928/6
**power** [2]  7867/24 7906/3
**powerful** [2]  7673/6 7868/20
**practically** [1]  7681/23
**practice** [3]  7805/3 7825/1 7912/9
**practices** [1]  7912/5
**pre** [3]  7919/6 7921/17 7925/10
**pre-arrest** [3]  7919/6 7921/17 7925/10
**preamble** [1]  7956/24
**precedent** [1]  7736/20
**preclude** [2]  7830/22 7966/24
**precluded** [4]  7866/19 7920/20 7924/23
7963/11

**precluding** [2]  7829/25 7965/5
**preclusion** [3]  7865/7 7866/21 7966/20
**preclusive** [1]  7944/2
**predicate** [1]  7803/11
**predicated** [1]  7967/19
**predictions** [1]  7690/3
**prefer** [1]  7913/6
**preferred** [18]  7672/5 7672/10 7678/10
7678/12 7678/12 7679/6 7679/6 7679/8 7679/9
7679/13 7681/22 7704/9 7704/11 7704/13
7704/13 7704/19 7704/19 7887/10
**prejudicial** [5]  7680/6 7685/22 7817/14
7817/17 7821/16
**preliminarily** [2]  7883/8 7886/18
**preliminary** [3]  7886/14 7945/24 7946/4
**prematurely** [1]  7915/21
**premoney** [1]  7704/14
**prep** [1]  7780/18
**preparation** [1]  7782/11
**prepare** [10]  7671/14 7671/22 7672/14
7678/16 7679/17 7695/20 7816/16 7928/11
7946/6 7963/7
**prepared** [2]  7874/17 7875/12
**presence** [5]  7862/9 7886/3 7886/14 7887/21
7899/23
**present** [27]  7688/22 7694/25 7743/3 7760/25
7769/7 7823/1 7833/18 7840/2 7859/5 7860/2
7860/7 7860/12 7863/11 7863/12 7874/22
7875/2 7883/5 7883/9 7885/14 7885/21 7889/2
7890/23 7895/8 7895/14 7896/1 7901/3 7960/1
**presented** [7]  7731/24 7739/15 7833/17
7856/13 7874/23 7938/6 7946/19
**presenting** [1]  7876/13
**preserve** [1]  7694/14
**preserves** [1]  7932/25
**preserving** [2]  7694/15 7962/6
**press** [2]  7906/18 7965/18
**presumably** [3]  7730/18 7937/2 7941/19
**presuming** [1]  7868/5
**presumption** [3]  7817/6 7822/11 7867/21
**pretend** [2]  7805/1 7856/24
**pretending** [1]  7805/12
**pretrial** [6]  7835/1 7943/5 7943/24 7943/25
7944/7 7946/21
**pretty** [1]  7960/12
**prevent** [4]  7726/3 7830/24 7895/15 7961/25
**prevented** [2]  7684/18 7851/4 7851/18 7855/9
**preventing** [1]  7852/5
**prevents** [1]  7919/16
**preview** [2]  7927/20 7946/4
**previewed** [1]  7929/13
**previous** [6]  7679/12 7706/10 7707/15
7726/13 7762/12 7950/1
**previously** [7]  7672/9 7678/9 7704/18 7798/13
7811/2 7824/20 7935/12
**price** [3]  7958/5 7958/14 7959/1
**pricing** [1]  7959/15
**prima** [1]  7950/15
**primarily** [1]  7863/23
**primary** [1]  7680/25
**principally** [1]  7865/7
**print** [1]  7765/20
**private** [4]  7774/12 7960/19 7961/9 7961/11
**privately** [1]  7929/9
**privilege** [21]  7710/7 7711/8 7711/15 7718/2
7730/24 7828/9 7828/16 7831/25 7850/8
7850/11 7851/4 7851/7 7851/17 7852/2 7852/8
7853/10 7855/11 7855/13 7870/3 7870/21
7871/20
**privileged** [3]  7711/23 7713/9 7831/18
**privileges** [1]  7914/22
**pro** [1]  7969/9
**probative** [6]  7863/21 7866/3 7866/6 7867/24
7878/8 7878/8
**probe** [2]  7812/1 7813/15
**probed** [2]  7811/25 7815/23
**problem** [18]  7682/13 7692/24 7794/18
7810/17 7815/10 7818/10 7820/8 7821/5

**problematic** [1]  7869/18
**problems** [2]  7824/24 7972/10
**procedural** [1]  7850/19
**procedure** [2]  7874/15 7875/6
**proceed** [6]  7825/22 7836/6 7836/9 7836/12
7836/13 7855/21
**proceeded** [3]  7834/16 7850/8 7850/12
**proceeding** [7]  7705/2 7813/8 7829/21 7937/6
7952/24 7954/5 7954/9
**proceedings** [7]  7670/24 7828/1 7849/2
7874/21 7952/21 7955/5 7972/24
**process** [4]  7706/10 7831/23 7921/21 7964/6
**produced** [2]  7670/24 7708/16 7732/18
7747/10
**produces** [2]  7745/14 7745/14
**professional** [1]  7849/21
**professor** [8]  7971/7 7971/10 7971/12 7971/12
7971/13 7971/15 7971/21 7971/22
**proffer** [13]  7681/6 7682/10 7732/25 7831/12
7832/14 7838/5 7854/5 7855/2 7855/7 7857/5
7862/14 7880/17 7941/13
**proffered** [3]  7729/22 7764/21 7851/25
**proffering** [2]  7810/20 7853/19
**proffers** [1]  7854/8
**progeny** [1]  7871/3
**progress** [1]  7929/25
**promise** [3]  7740/7 7742/12 7958/3
**promised** [1]  7970/8
**prompt** [2]  7733/6 7734/4
**prompted** [2]  7855/3 7920/2
**prompting** [1]  7840/21
**proof** [3]  7710/19 7942/16 7942/21
**proofread** [1]  7824/4
**proper** [13]  7674/18 7681/7 7681/8 7682/13
7682/19 7687/3 7687/6 7724/11 7726/12
7804/16 7878/3 7886/5 7957/23
**properly** [2]  7692/3 7882/2
**property** [4]  7813/7 7813/22 7813/23 7816/4
**proposal** [1]  7932/20
**propose** [5]  7690/14 7690/20 7765/16 7770/7
7771/7
**proposed** [3]  7727/17 7814/11 7944/3
**prosecuted** [1]  7878/14
**prosecution** [3]  7833/15 7850/22 7869/2
**prosecutor** [1]  7909/20
**prosecutors** [4]  7850/22 7888/7 7913/6 7918/2
**protocols** [1]  7926/20
**prove** [5]  7864/22 7880/23 7884/17 7936/18
7939/6
**proven** [3]  7938/7 7948/10 7948/13
**provide** [8]  7734/3 7735/23 7736/4 7791/2
7803/18 7808/6 7882/5 7947/15
**provided** [19]  7688/25 7731/19 7734/22
7734/23 7735/2 7735/25 7736/25 7737/2
7739/10 7743/24 7760/5 7792/4 7798/13
7810/5 7862/12 7936/19 7937/17 7944/12
7947/4
**provides** [1]  7734/8
**providing** [2]  7734/7 7907/11
**provision** [2]  7736/22 7737/12
**provisions** [1]  7951/4
**public** [10]  7933/13 7958/5 7958/16 7961/3
7961/21 7961/21 7961/23 7961/23 7962/1
7962/4
**publicly** [1]  7959/14
**publish** [1]  7723/13
**published** [1]  7697/13
**pull** [3]  7746/9 7901/21 7929/7
**pulled** [1]  7919/7
**pump** [1]  7960/22
**purely** [1]  7918/4
**purpose** [8]  7690/5 7713/17 7873/7 7877/20
7877/23 7878/3 7889/21 7958/4
**purposely** [1]  7896/5
**purposes** [5]  7677/23 7962/1 7968/18
**pursuant** [7]  7698/2 7743/10 7743/12 7743/15

**pleading** [3]  7865/7 7866/21 7966/20
7822/14 7826/10 7872/1 7892/6 7893/25
7939/5 7947/25 7948/3 7960/11 7962/12

**P**

pursuant... [3] 7782/14 7782/17 7831/18

pursuing [1] 7780/20

pushing [3] 7742/2 7832/18 7968/21

put [119] 7674/23 7675/22 7676/24 7680/13 7681/2 7681/9 7682/12 7682/20 7682/21 7684/8 7686/3 7686/3 7686/25 7687/25 7688/7 7688/17 7689/22 7690/7 7690/11 7691/2 7691/7 7691/20 7691/25 7694/19 7695/8 7695/25 7697/12 7697/12 7698/18 7702/1 7703/25 7705/6 7706/7 7712/25 7726/7 7727/18 7728/13 7728/25 7730/17 7733/11 7734/1 7735/5 7738/21 7740/9 7745/11 7745/12 7745/25 7746/3 7746/18 7746/22 7746/23 7747/1 7747/2 7747/2 7748/6 7748/12 7757/19 7753/3 7766/1 7769/1 7777/12 7784/12 7788/24 7790/2 7790/4 7793/6 7794/20 7798/16 7803/10 7809/6 7809/7 7809/15 7809/15 7816/16 7834/11 7835/23 7836/7 7854/2 7854/2 7855/7 7856/13 7856/15 7856/22 7857/19 7858/1 7863/16 7868/13 7870/8 7871/4 7871/24 7879/20 7880/10 7880/22 7881/5 7885/17 7886/3 7892/25 7897/14 7897/19 7900/10 7906/1 7906/3 7906/22 7912/10 7922/12 7923/6 7924/7 7924/8 7928/16 7929/18 7930/20 7932/17 7958/8 7963/16 7965/15 7966/7 7969/3 7970/18 7971/5

puts [1] 7940/4

putting [30] 7672/4 7676/18 7678/4 7681/17 7685/2 7690/9 7690/23 7702/19 7704/8 7714/6 7728/10 7738/14 7740/8 7742/11 7747/23 7785/17 7790/6 7802/14 7810/22 7821/1 7832/20 7832/23 7849/12 7854/22 7864/6 7889/8 7889/21 7914/25 7942/20 7972/19

**Q**

Qs [1] 7694/18

qualifications [1] 7943/16

quality [2] 7704/20 7835/3

quandary [1] 7821/20

quarrel [1] 7819/6

quarter [1] 7782/12

questioned [2] 7732/15 7868/8

questioning [3] 7807/12 7889/19 7924/24

questions [63] 7688/13 7742/9 7764/9 7771/11 7771/23 7771/24 7772/13 7773/16 7773/18 7776/13 7777/6 7777/9 7777/16 7778/5 7778/9 7778/9 7779/9 7779/16 7779/16 7779/17 7779/18 7779/19 7779/20 7780/14 7792/25 7804/3 7816/24 7825/3 7830/25 7832/24 7835/10 7837/24 7841/25 7850/21 7851/18 7855/2 7856/25 7857/16 7863/17 7864/6 7867/16 7878/7 7878/8 7886/4 7886/10 7886/15 7886/25 7887/17 7887/18 7889/17 7890/21 7890/25 7893/15 7894/11 7902/3 7905/22 7905/24 7907/22 7907/23 7913/9 7919/23 7924/18 7927/21

quick [2] 7752/15 7968/17

quickly [5] 7888/12 7889/10 7903/24 7958/25 7965/19

quite [6] 7764/22 7815/16 7822/6 7926/23 7946/3 7964/2

quotation [1] 7881/20

quote [45] 7672/8 7672/8 7672/8 7672/10 7695/19 7701/14 7701/22 7701/23 7704/20 7704/23 7705/1 7705/7 7705/12 7705/13 7706/4 7706/4 7706/11 7707/22 7708/1 7757/15 7757/17 7761/15 7765/10 7765/20 7767/3 7767/4 7768/19 7769/19 7771/5 7774/22 7774/24 7794/5 7799/20 7799/21 7864/20 7866/3 7866/8 7866/15 7877/15 7877/18 7902/16 7902/17 7903/11 7914/11 7914/13

quoting [1] 7943/6

**R**

R024378 [1] 7746/10

R024413 [1] 7746/15

R024662 [2] 7789/10 7700/24

raise [8] 7774/11 7797/13 7802/1 7857/25 7864/4 7927/19 7928/3 7955/24

raised [2] 7815/17 7825/15

raising [5] 7681/2 7830/1 7952/19

Rajaratnam [6] 7869/1 7869/4 7869/6 7869/19 7884/3 7884/5

Ramos [1] 7830/1

Ramos' [3] 7829/24 7829/24 7830/5

randomly [1] 7691/19

rare [1] 7879/13

rarely [1] 7926/16

rather [5] 7743/22 7756/23 7928/16 7944/5 7971/25

rationale [1] 7732/18

re [6] 7706/9 7743/1 7778/18 7827/3 7901/1 7962/7

re-entered [3] 7743/1 7827/3 7901/1

reach [2] 7737/6 7787/10

reached [2] 7933/5 7934/4

react [1] 7683/18

reacted [1] 7680/13

read [61] 7688/15 7689/12 7703/25 7704/1 7704/4 7704/6 7705/13 7705/15 7706/8 7706/15 7726/19 7744/19 7752/17 7754/16 7755/5 7755/25 7760/9 7760/13 7761/7 7763/2 7763/16 7768/15 7770/24 7771/9 7771/10 7780/15 7780/16 7780/20 7780/21 7782/22 7783/2 7783/25 7784/2 7784/3 7785/14 7794/5 7801/3 7813/4 7815/18 7815/20 7815/25 7817/2 7817/13 7817/15 7817/21 7817/22 7817/25 7818/25 7820/14 7856/15 7858/15 7859/14 7872/11 7876/24 7896/10 7896/22 7905/7 7921/4 7936/2 7953/9 7972/6

reading [23] 7695/24 7704/16 7705/11 7706/3 7707/18 7726/4 7727/3 7754/3 7756/2 7756/8 7763/5 7768/13 7771/2 7783/18 7801/2 7872/20 7877/1 7883/25 7883/25 7884/9 7896/9 7897/10 7931/5

reads [11] 7704/24 7704/25 7705/8 7706/12 7706/13 7744/24 7744/25 7769/8 7769/9 7769/10 7787/15

ready [4] 7823/2 7825/21 7836/6 7861/1

reaffirmed [1] 7919/2

reality [3] 7690/6 7855/12 7886/6

really [22] 7682/18 7683/16 7688/1 7716/11 7740/6 7745/4 7807/16 7832/18 7834/16 7845/2 7849/20 7873/6 7897/11 7898/20 7922/18 7942/15 7945/12 7945/15 7945/16 7946/17 7947/15 7961/14

reargue [1] 7742/15

rearguing [1] 7937/12

reason [29] 7680/12 7683/19 7685/2 7686/16 7710/11 7714/1 7717/9 7717/12 7734/13 7735/11 7786/20 7810/24 7815/16 7815/18 7820/17 7863/23 7876/16 7878/17 7879/13 7891/22 7911/7 7918/17 7920/6 7920/11 7921/14 7928/12 7935/8 7941/5 7961/16

reasonable [6] 7813/5 7814/20 7835/3 7835/4 7938/8 7968/7

reasonably [1] 7956/25

reasoning [1] 7939/4

reasons [26] 7712/2 7713/5 7713/7 7713/12 7714/3 7739/7 7756/14 7756/17 7817/7 7828/10 7829/13 7829/14 7852/2 7852/16 7878/18 7917/1 7918/18 7921/21 7925/16 7925/17 7926/5 7926/10 7926/15 7927/7 7935/11 7945/19

rebuttal [5] 7963/20 7963/24 7964/3 7964/5 7964/20

recap [1] 7891/15

receive [5] 7704/12 7704/13 7717/4 7787/11 7881/12

received [15] 7673/9 7676/22 7685/3 7685/5 7686/7 7686/8 7692/25 7698/6 7707/23 7714/17 7733/21 7738/25 7743/16 7746/5 7756/25 7760/11 7760/17 7760/25 7767/10

7773/10 7780/6 7783/5 7802/17 7810/9 7840/16 7852/14 7905/13 7943/13 7959/20

receives [4] 7674/12 7674/14 7687/10 7690/8

receiving [1] 7685/6

recent [1] 7950/16

recently [1] 7717/11

Recess [1] 7862/8

recipient [1] 7756/24

recipients [3] 7743/24 7947/13 7958/23

reclassified [1] 7782/18

recognition [1] 7745/5

recognize [16] 7745/4 7746/4 7748/5 7748/25 7751/1 7751/4 7767/18 7776/4 7776/5 7785/12 7785/16 7785/17 7789/5 7794/1 7794/3 7946/20

recognized [1] 7714/18

recollection [5] 7747/17 7748/4 7796/4 7804/9 7825/2

reconsider [1] 7712/16

reconsidered [1] 7823/5

record [46] 7677/24 7686/4 7696/12 7696/20 7704/4 7706/16 7726/3 7728/4 7731/9 7751/23 7760/9 7761/8 7763/6 7794/22 7801/3 7810/11 7815/11 7815/12 7815/25 7816/15 7817/3 7834/11 7836/7 7849/4 7849/12 7860/5 7875/4 7920/8 7927/15 7931/17 7932/4 7935/8 7936/16 7942/13 7942/14 7942/21 7943/24 7944/3 7945/16 7946/9 7967/4 7967/21 7970/16 7970/18 7970/20 7971/6

recorded [2] 7670/24 7884/24

recording [3] 7886/7 7890/6 7897/8

records [3] 7729/5 7807/2 7875/11

recreated [1] 7924/11

red [3] 7825/12 7825/13 7961/13

redact [19] 7708/21 7708/22 7710/20 7710/21 7712/9 7714/13 7715/4 7929/15 7929/16 7930/14 7930/18 7930/19 7933/16 7933/17 7943/1 7945/2 7947/10 7951/17 7951/19

redacted [38] 7710/4 7711/2 7711/6 7711/7 7712/2 7712/13 7712/17 7712/18 7712/20 7713/1 7713/7 7713/10 7713/15 7713/20 7713/24 7714/16 7714/18 7714/23 7715/13 7715/20 7716/13 7716/15 7716/21 7717/2 7717/5 7717/6 7717/9 7717/18 7717/18 7717/20 7718/18 7718/20 7718/24 7719/7 7719/17 7720/1 7932/19 7937/20

redaction [3] 7715/25 7719/12 7933/12

redactions [44] 7708/15 7708/16 7710/4 7710/6 7710/9 7710/9 7710/10 7710/12 7710/13 7710/13 7710/18 7711/11 7711/14 7711/19 7711/20 7711/21 7712/4 7712/12 7713/12 7713/22 7714/3 7714/14 7714/25 7715/12 7717/16 7717/17 7717/21 7717/22 7718/2 7718/7 7719/3 7719/6 7719/10 7719/10 7719/15 7719/24 7720/1 7721/3 7721/5 7721/6 7721/7 7730/20 7730/22 7730/25 7944/4

redirect [11] 7792/23 7829/15 7831/7 7833/8 7839/8 7852/23 7853/22 7857/11 7924/17 7926/12 7967/23

redone [1] 7858/19

reduced [1] 7689/25

REED [1] 7670/19

refer [2] 7738/12 7805/20

reference [4] 7674/20 7807/21 7962/16 7962/17

references [1] 7953/16

referencing [1] 7760/2

referring [5] 7805/21 7807/10 7854/15 7907/8 7956/19

refers [4] 7675/15 7675/16 7767/5 7953/11

reflect [2] 7811/16 7849/4

reflected [4] 7809/10 7811/8 7816/13 7942/12

reflecting [1] 7811/4

reflection [2] 7811/23 7812/6

reflective [1] 7921/12

reflects [3] 7691/20 7766/23 7768/18

refresh [3] 7747/17 7748/3 7764/2

refreshes [1] 7825/2

**refuse [1]** 7876/20
**refused [4]** 7868/25 7878/13 7878/17 7942/5
**regard [5]** 7692/8 7721/6 7752/1 7865/17 7885/11 7896/4 7959/19
**regarding [14]** 7676/12 7693/11 7726/6 7731/25 7756/24 7778/19 7787/10 7808/13 7810/22 7908/21 7927/17 7946/11 7947/1 7966/4
**regardless [4]** 7733/2 7778/20 7875/22 7960/15
**rein [1]** 7898/7
**reiterate [1]** 7697/4
**reiterated [1]** 7817/4
**reject [2]** 7865/22 7867/1
**rejected [3]** 7866/6 7869/11 7876/19
**rejecting [1]** 7943/14
**rejection [1]** 7863/5
**relate [5]** 7724/25 7739/22 7779/15 7779/17 7779/20
**related [45]** 7674/5 7674/21 7675/5 7681/11 7681/20 7682/11 7682/18 7684/15 7696/5 7700/5 7700/8 7702/11 7705/15 7705/22 7726/21 7728/1 7729/25 7733/1 7733/19 7736/22 7737/12 7739/9 7740/12 7741/24 7759/16 7777/8 7782/11 7782/19 7783/7 7783/9 7783/12 7783/14 7794/9 7802/11 7802/14 7802/15 7832/24 7863/2 7869/3 7900/2 7902/3 7956/14 7956/15 7956/23 7957/5
**relates [11]** 7674/7 7679/19 7679/22 7682/8 7684/8 7685/9 7692/9 7706/21 7776/13 7785/20 7818/16
**relating [8]** 7682/5 7689/10 7765/16 7770/7 7771/7 7865/23 7909/8 7917/20
**relation [1]** 7813/25
**relationship [1]** 7727/25
**relatively [1]** 7893/24
**release [13]** 7782/15 7782/18 7783/8 7783/11 7787/14 7789/20 7790/4 7790/9 7790/13 7904/1 7904/5 7904/22 7906/18
**releasor [1]** 7905/2
**relevance [9]** 7826/16 7862/18 7863/19 7876/21 7931/24 7941/4 7942/4 7944/15 7971/21
**relevant [34]** 7680/5 7685/10 7685/21 7686/8 7687/7 7687/10 7688/2 7688/3 7688/4 7690/8 7691/7 7711/22 7713/25 7714/5 7733/10 7734/17 7862/23 7862/23 7863/18 7866/7 7868/10 7868/14 7872/20 7876/25 7877/4 7885/25 7913/20 7915/2 7915/6 7921/7 7941/6 7941/8 7942/2 7951/7
**reliability [2]** 7687/21 7802/18
**relied [1]** 7893/11
**relies [1]** 7960/6
**religious [1]** 7849/18
**reluctant [1]** 7920/11
**rely [1]** 7953/17
**relying [5]** 7858/11 7865/7 7865/8 7869/11 7871/9
**remain [3]** 7731/6 7817/6 7954/24
**remainder [1]** 7947/22
**remaining [2]** 7929/14 7937/21
**remember [28]** 7695/11 7707/3 7707/5 7759/4 7759/5 7759/18 7767/15 7781/10 7781/17 7782/25 7784/21 7796/10 7796/14 7796/19 7798/16 7799/22 7801/8 7801/15 7803/12 7804/2 7804/5 7819/1 7868/10 7903/14 7903/16 7905/22 7905/24 7920/17
**remembering [1]** 7866/11
**remind [1]** 7967/1
**remiss [1]** 7966/25
**remotely [1]** 7687/12
**removal [1]** 7954/12
**rendering [1]** 7866/7
**renew [1]** 7815/3
**renewed [1]** 7819/7
**renewing [2]** 7815/14 7815/15

**Rengan [6]** 7869/1 7869/4 7869/6 7869/19 7884/3 7884/4
**reorienting [1]** 7721/12
**repeat [4]** 7677/9 7677/10 7696/25 7855/16
**repeated [4]** 7737/5 7737/6 7738/8 7838/2
**repeatedly [3]** 7681/13 7729/22 7807/5
**rephrase [7]** 7696/25 7766/20 7770/18 7776/15 7800/15 7840/4 7843/5
**rephrased [1]** 7779/11
**replacement [1]** 7704/20
**reporter [3]** 7670/22 7687/21 7756/1
**reports [1]** 7817/25
**represent [4]** 7765/10 7769/11 7769/19 7885/4
**representation [3]** 7885/11 7886/5 7886/19
**representative [1]** 7835/19
**represented [4]** 7874/10 7874/10 7874/12 7952/22
**request [24]** 7716/3 7719/8 7727/7 7727/10 7733/12 7734/3 7736/3 7738/8 7739/21 7761/15 7761/23 7766/13 7766/13 7766/13 7767/4 7846/5 7846/6 7847/6 7866/20 7866/21 7878/13 7918/3 7961/20 7970/23
**requested [6]** 7719/14 7733/14 7741/9 7741/10 7741/11 7803/17
**requesting [8]** 7715/22 7728/20 7728/21 7738/9 7739/5 7741/5 7769/19 7846/21
**requests [6]** 7691/17 7737/5 7741/16 7745/22 7746/4 7766/18
**require [6]** 7838/2 7961/12 7963/5 7964/8 7964/11 7965/5
**requires [5]** 7674/3 7674/10 7681/3 7845/2 7960/6
**resolve [5]** 7862/4 7901/6 7930/3 7938/7 7955/6
**resolved [1]** 7955/20
**respect [36]** 7673/11 7673/15 7677/25 7680/12 7686/5 7686/6 7686/12 7689/24 7693/5 7694/3 7694/8 7730/2 7742/11 7748/17 7758/16 7808/13 7809/2 7820/11 7821/19 7822/10 7822/21 7822/22 7829/25 7839/3 7852/24 7853/8 7853/13 7853/16 7854/15 7884/4 7889/15 7895/5 7898/3 7927/17 7945/4 7967/10
**respectful [2]** 7896/19 7898/1
**respectfully [15]** 7684/21 7686/16 7712/15 7742/16 7824/15 7828/20 7874/2 7884/8 7919/10 7923/25 7966/8
**respective [1]** 7704/12
**respond [4]** 7727/24 7730/8 7958/6 7964/9
**responded [4]** 7733/13 7907/10 7907/12 7907/25
**responding [3]** 7685/6 7734/2 7926/3
**responds [6]** 7672/17 7692/25 7701/19 7733/8 7777/23 7906/19
**response [19]** 7696/12 7699/9 7699/12 7705/11 7706/3 7707/7 7727/7 7755/23 7768/4 7774/14 7774/22 7780/18 7780/22 7780/25 7797/12 7855/3 7902/15 7902/24 7920/3
**responses [2]** 7737/6
**responsibility [1]** 7735/22
**responsive [1]** 7730/9
**rest [5]** 7695/23 7900/16 7934/5 7935/15 7947/21
**restate [2]** 7703/4 7801/1
**restroom [1]** 7814/18
**rests [4]** 7691/1 7967/3 7969/1 7970/2
**result [2]** 7852/23 7965/2
**resume [2]** 7743/3 7827/7
**Resumed [2]** 7827/9 7901/9
**resuming [1]** 7923/16
**retain [1]** 7787/14
**retaining [1]** 7794/5
**retrieve [1]** 7862/13
**Retrophin [102]** 7671/15 7671/23 7672/1 7672/15 7677/17 7677/20 7677/21 7677/22 7678/17 7679/18 7692/7 7695/20 7704/7 7708/5 7708/12 7708/16 7710/7 7711/2 7711/9 7711/13 7711/14 7712/2 7712/25 7713/4

**Retrophin's [1]** 7730/23
**Retrophin.com [4]** 7744/11 7751/21 7758/7 7758/10
**return [4]** 7707/25 7822/24 7837/8 7908/8
**returning [2]** 7869/16 7869/21
**reveal [1]** 7964/3
**reversal [1]** 7866/24
**reverse [7]** 7774/10 7866/22 7958/15 7958/18 7959/11 7959/18 7961/22
**reversed [2]** 7747/22 7866/17
**review [9]** 7684/24 7691/1 7745/1 7752/15 7768/16 7768/17 7770/2 7796/6 7935/2
**reviewed [6]** 7792/17 7795/11 7795/13 7796/8 7798/12 7907/21
**reviewing [2]** 7768/16 7880/14
**revised [1]** 7727/22
**revisit [2]** 7944/19 7945/10
**Richardson [4]** 7737/9 7741/15 7789/2 7792/13
**rid [1]** 7911/19
**ridiculous [1]** 7915/22
**right-hand [2]** 7748/1 7790/5
**rights [74]** 7798/10 7847/19 7850/5 7852/7 7852/11 7853/20 7854/19 7856/2 7856/10 7857/9 7858/9 7858/10 7859/1 7867/5 7867/5 7867/6 7867/12 7867/22 7868/19 7871/6 7871/15 7871/15 7872/4 7872/6 7874/4 7874/17 7874/20 7874/25 7875/3 7878/22 7879/4 7879/16 7879/21 7881/7 7883/18 7883/24 7888/3 7888/5 7888/6 7888/9 7888/10 7888/13 7888/16 7888/25 7892/11 7892/22 7893/23 7897/16 7897/21 7911/14 7914/12 7918/25 7919/9 7920/9 7920/10 7920/14 7921/1 7921/1 7921/4 7921/16 7922/4 7922/5 7922/6 7922/7 7922/10 7922/14 7924/13 7924/19 7925/5 7927/17 7937/8 7943/9 7943/9 7946/13
**rise [1]** 7835/3
**risk [13]** 7910/18 7910/20 7910/21 7910/23 7910/24 7910/25 7911/4 7911/8 7912/8 7912/22 7913/7 7913/8 7913/8
**risks [1]** 7910/22
**Rivka [1]** 7670/22
**RivkaTeich [1]** 7670/23
**RMR [1]** 7670/22
**RO [3]** 7751/15 7757/3 7766/8
**RO19682 [1]** 7768/21
**RO19684 [3]** 7763/11 7763/14 7763/19
**RO2379 [1]** 7708/11
**RO24315 [1]** 7745/8
**RO24317 [4]** 7724/20 7724/22 7748/13 7748/21
**RO24319 [2]** 7724/23 7749/2
**RO24320 [2]** 7750/5 7750/12
**RO24324 [1]** 7750/15
**RO24325 [1]** 7749/15
**RO2433 [1]** 7747/18
**RO24332 [1]** 7751/16
**RO24333 [2]** 7747/6 7748/3
**RO24378 [3]** 7747/3 7747/6 7748/1
**RO24386 [1]** 7721/16
**RO24393 [7]** 7721/20 7723/18 7724/24

**R**

RO24393... [4] 7748/10 7748/18 7748/20 7797/24

RO24395 [1] 7721/23

RO24396 [2] 7722/2 7749/8

RO24402 [1] 7722/6

RO24403 [2] 7722/12 7750/1

RO24408 [2] 7722/21 7751/10

RO24410 [4] 7723/1 7753/21 7755/1 7756/5

RO24412 [1] 7746/19

RO2447 [1] 7722/14

RO2449 [1] 7722/23

RO4395 [1] 7724/24

RO50167 [1] 7779/4

RO50168 [1] 7779/2

RO9684 [1] 7768/25

road [5] 7829/16 7834/3 7837/5 7921/20 7922/4

roadmap [1] 7779/25

robbery [1] 7892/24

Robert [3] 7677/16 7699/6 7699/19

ROHDE [1] 7670/12

role [1] 7829/7

roll [1] 7738/20

Roman [1] 7935/5

room [18] 7715/7 7875/2 7883/9 7884/14 7885/4 7885/24 7889/5 7889/8 7889/8 7889/11 7889/18 7889/20 7889/22 7891/12 7920/17 7924/25 7925/2 7925/6

rooms [1] 7888/11

Rosenfeld [24] 7826/3 7929/15 7929/20 7929/23 7930/7 7933/13 7934/14 7937/1 7937/4 7937/6 7938/23 7938/24 7939/6 7941/8 7941/19 7942/7 7943/11 7944/11 7945/7 7945/11 7946/14 7947/3 7947/8 7947/13

Rosenfeld's [1] 7941/21

Rosensaft [5] 7798/22 7799/1 7799/5 7799/9 7799/13 7908/20 7940/24 7909/1 7909/4

roughly [1] 7706/14

RPR [1] 7670/22

RUBIN [4] 7670/21 7858/22 7906/2 7929/2

rule [17] 7676/6 7676/6 7676/9 7685/23 7685/24 7864/1 7877/21 7928/6 7932/6 7938/1 7938/12 7956/4 7962/6 7964/19 7967/24 7968/19 7969/12

Rule 613 [1] 7877/21

ruled [8] 7726/13 7742/11 7815/12 7828/21 7935/12 7937/14 7942/7 7957/23

rules [14] 7676/5 7676/13 7683/16 7683/17 7685/23 7872/15 7872/16 7895/2 7895/16 7961/12 7963/5 7964/11 7965/6 7965/6

ruling [30] 7694/4 7741/23 7742/11 7742/15 7829/1 7829/23 7829/24 7829/25 7830/5 7830/10 7837/12 7853/9 7863/5 7886/18 7896/18 7898/1 7899/21 7924/24 7927/17 7943/23 7944/2 7945/1 7948/21 7969/3 7969/20

rulings [17] 7690/13 7690/18 7829/4 7859/13 7914/1 7945/3 7965/24

running [1] 7816/17

runs [1] 7719/10

rush [4] 7828/21 7831/14 7832/8 7832/19

rushed [1] 7915/20

**S**

S1 [1] 7796/8

safe [2] 7917/21 7926/11

sake [1] 7953/4

salvage [1] 7899/14

Sand [1] 7717/11

Sarah [2] 7677/21 7699/25

sat [3] 7892/4 7922/4 7925/6

satisfied [1] 7893/21

Saunders [7] 7677/20 7678/6 7679/1 7685/14 7699/7 7699/23 7701/8

save [6] 7755/22 7756/1 7793/17 7969/4 7969/6 7969/24

Saves [1] 7787/1

savings [1] 7903/6

saw [12] 7678/1 7747/12 7767/19 7788/25 7846/11 7850/14 7858/22 7859/11 7916/2 7916/6 7916/12 7950/1

scenario [1] 7919/6

schedule [1] 7894/5

scheduling [2] 7928/3 7968/17

Scholer [3] 7910/6 7910/8 7910/10

scope [14] 7687/7 7687/18 7687/19 7688/9 7688/11 7689/24 7727/13 7794/8 7794/11 7794/16 7795/18 7832/17 7853/21 7944/4

screen [11] 7695/9 7697/12 7697/13 7697/14 7698/23 7757/20 7763/24 7765/4 7784/13 7785/10 7906/1

scribbling [1] 7948/12

scroll [12] 7698/20 7721/16 7721/19 7722/6 7722/14 7749/2 7749/20 7749/25 7761/19 7768/24 7770/1 7903/14

searches [1] 7834/19

seat [3] 7671/3 7694/25 7827/5

SEC [6] 7694/18 7795/13 7796/6 7957/22 7960/5 7961/12

SEC's [1] 7962/7

second [50] 7672/7 7678/8 7679/7 7684/6 7704/23 7711/12 7753/5 7769/10 7782/5 7783/2 7791/14 7791/25 7792/2 7797/16 7825/3 7833/16 7837/21 7841/24 7857/10 7857/23 7859/14 7860/14 7860/16 7863/6 7864/15 7864/16 7864/23 7867/17 7902/16 7930/17 7934/4 7938/3 7938/13 7938/16 7940/8 7940/18 7942/12 7947/6 7947/7 7947/10 7947/19 7949/1 7954/24 7955/1 7955/14 7957/23 7962/9 7962/17 7965/11 7966/13

second-guess [1] 7833/16

second-guessing [1] 7837/21

seconds [8] 7671/18 7672/19 7677/8 7702/7 7726/14 7740/4 7740/22 7741/23

secret [4] 7711/16 7713/9 7960/19 7961/2

secretary [6] 7721/17 7721/24 7722/7 7722/15 7722/24 7749/23

secrets [1] 7711/22

section [2] 7748/13 7866/16

securities [10] 7765/12 7765/15 7769/13 7769/21 7770/7 7771/6 7959/12 7960/7 7960/16 7961/7

security [3] 7765/16 7771/7 7892/25

see [183] 7686/9 7686/9 7687/11 7695/22 7698/21 7698/23 7700/24 7707/15 7708/1 7708/2 7708/2 7708/7 7708/11 7708/14 7708/15 7712/4 7721/3 7721/16 7721/18 7722/6 7722/9 7722/13 7722/15 7722/16 7722/17 7722/20 7723/4 7723/20 7723/21 7724/13 7744/5 7744/7 7744/11 7744/13 7745/6 7745/8 7745/9 7746/6 7748/4 7748/15 7749/1 7749/3 7749/4 7749/15 7749/20 7750/1 7750/7 7750/10 7750/11 7751/10 7751/14 7753/21 7753/23 7753/24 7758/14 7758/15 7758/18 7758/19 7761/16 7761/17 7761/21 7761/24 7763/6 7763/8 7763/9 7763/19 7765/5 7765/7 7765/8 7765/22 7765/23 7767/14 7769/6 7770/4 7770/5 7772/12 7773/14 7773/19 7773/21 7773/23 7774/1 7774/2 7774/4 7774/6 7774/16 7774/17 7774/25 7775/1 7775/4 7775/6 7776/4 7776/5 7776/7 7776/24 7777/3 7777/18 7777/24 7778/2 7780/25 7781/7 7782/20 7782/21 7783/14 7783/15 7785/17 7785/19 7787/3 7787/22 7787/23 7789/18 7789/21 7789/22 7789/23 7789/24 7790/1 7790/20 7792/16 7793/15 7793/22 7797/5 7797/7 7797/8 7797/9 7797/11 7797/15 7797/17 7798/1 7798/6 7798/7 7798/8 7798/14 7798/15 7798/20 7798/23 7798/24 7798/25 7799/7 7812/11 7817/11 7825/19 7858/13 7858/14 7859/8 7885/8 7886/4 7886/17 7898/23 7899/5 7899/7 7902/17 7902/18 7902/20 7902/21

savings [1] 7903/6

7902/23 7903/12 7903/13 7904/1 7904/2 7904/3 7904/5 7904/6 7904/14 7905/2 7905/9 7906/7 7906/17 7906/21 7906/21 7906/23 7907/1 7907/2 7911/22 7914/10 7916/8 7916/12 7917/2 7917/3 7917/21 7930/6 7951/22 7971/4

seed [1] 7839/4

seeing [8] 7747/19 7748/2 7755/18 7767/15 7781/5 7793/25 7869/18 7903/16

seeking [6] 7672/23 7696/22 7813/21 7864/3 7864/3 7966/24

seeks [1] 7877/19

seem [2] 7734/16 7947/15

sees [2] 7714/13 7950/11

segment [1] 7819/3

seize [2] 7813/21 7816/5

seizing [1] 7813/7

seizures [1] 7894/21

select [2] 7676/18 7761/7

selected [2] 7820/13 7870/5

selection [2] 7820/13 7870/5

self [3] 7870/4 7876/20 7935/3

self-evident [1] 7876/20

self-incrimination [1] 7870/4

self-serving [1] 7935/3

sell [20] 7798/4 7798/10 7957/19 7957/21 7958/4 7958/7 7958/9 7958/20 7958/24 7959/6 7959/8 7959/16 7960/10 7960/11 7960/19 7960/21 7961/17 7961/18 7961/20 7962/14

selling [1] 7958/14

semicolon [1] 7948/9

send [12] 7698/17 7707/25 7715/8 7730/9 7732/7 7737/10 7763/23 7765/8 7765/19 7786/3 7788/10 7808/5

sender [1] 7756/24

sending [11] 7672/12 7677/16 7677/17 7677/22 7695/15 7696/3 7706/10 7718/22 7728/6 7734/9 7745/22

sends [14] 7675/7 7677/6 7678/14 7680/11 7685/14 7701/8 7707/18 7733/9 7763/22 7777/14 7786/2 7787/5 7787/20 7904/16

sense [15] 7704/11 7818/23 7841/10 7841/12 7854/16 7866/14 7899/3 7909/15 7912/3 7931/3 7931/4 7932/13 7945/25 7948/1 7967/22

sent [74] 7671/19 7671/21 7677/4 7699/5 7699/17 7700/2 7700/3 7702/6 7702/21 7702/23 7703/8 7703/17 7703/17 7703/18 7703/20 7703/23 7704/3 7716/14 7716/16 7716/18 7716/18 7719/5 7719/18 7719/23 7726/5 7726/8 7726/10 7726/11 7726/15 7726/17 7726/18 7726/25 7727/3 7727/3 7727/6 7727/9 7727/14 7727/17 7729/2 7729/3 7729/4 7729/22 7729/23 7729/23 7729/24 7730/3 7730/6 7730/18 7732/2 7732/8 7732/23 7732/24 7736/14 7739/3 7739/6 7739/14 7739/17 7739/19 7740/6 7741/3 7748/16 7757/9 7759/22 7777/16 7803/20 7803/23 7809/19 7882/23 7903/8 7903/16 7903/17 7905/20 7906/17 7907/25

sentence [55] 7679/7 7763/5 7763/6 7763/7 7766/14 7766/16 7766/17 7769/8 7769/9 7769/10 7770/9 7770/15 7770/16 7777/2 7782/22 7791/10 7791/13 7791/25 7792/2 7938/16 7938/17 7938/19 7939/2 7940/9 7940/18 7940/19 7940/22 7942/12 7943/2 7945/18 7947/6 7947/10 7947/19 7948/1 7948/5 7948/15 7949/1 7949/2 7950/17 7951/13 7951/17 7953/3 7953/4 7953/24 7954/8 7954/15 7954/21 7954/24 7954/25 7955/1 7955/3 7955/8 7955/14 7956/17 7956/24

sentences [15] 7712/10 7770/24 7771/3 7776/24 7777/1 7790/16 7790/19 7948/4 7948/11 7950/12 7950/13 7950/22 7951/4 7954/12 7954/14

separate [4] 7842/3 7853/9 7895/11 7954/5

September [22] 7706/8 7716/17 7717/2

S

**September...** [19] 7718/17 7718/24 7726/10 7733/5 7733/14 7733/21 7734/5 7734/22 7735/24 7736/22 7738/4 7739/3 7789/1 7791/10 7792/12 7793/8 7793/9 7797/20 7810/6

**September 2014** [2] 7734/22 7736/22
**September 20th** [1] 7810/6
**September 24** [6] 7706/8 7716/17 7718/17 7718/24 7733/14 7797/20
**September 246** [1] 7717/2
**September 9** [4] 7791/10 7792/12 7793/8 7793/9

**series** [7] 7672/10 7678/10 7679/13 7704/19 7773/16 7803/15 7804/3 7807/13 7856/13
**serious** [1] 7780/19
**serve** [2] 7791/2 7849/14
**serves** [1] 7688/16
**service** [2] 7917/17 7944/13
**services** [8] 7791/3 7936/18 7937/17 7938/23 7939/6 7940/7 7941/20 7943/13
**serving** [1] 7935/3
**set** [10] 7727/2 7731/11 7865/8 7884/6 7918/25 7925/17 7925/19 7926/15 7926/19 7959/17
**sets** [3] 7750/23 7750/25 7931/18
**setting** [1] 7802/24
**settled** [1] 7675/16
**settlement** [17] 7678/24 7782/1 7782/15 7782/17 7783/8 7850/14 7850/15 7902/4 7902/9 7902/12 7903/18 7903/19 7904/1 7904/4 7904/17 7904/22 7936/21
**seven** [20] 7671/20 7671/20 7671/24 7672/12 7673/15 7677/7 7679/16 7700/3 7701/8 7701/11 7701/11 7815/4 7815/9 7819/11 7820/4 7820/5 7820/6 7821/21 7822/15 7938/9
**several** [1] 7933/13
**severe** [2] 7819/24 7822/5
**severed** [1] 7819/22
**severely** [2] 7680/17 7689/24
**shaking** [1] 7898/5
**shall** [1] 7792/2
**sham** [4] 7936/19 7938/9 7941/11 7943/14
**shame** [1] 7860/22
**shape** [2] 7760/5 7803/24
**share** [9] 7691/16 7704/13 7704/14 7901/23 7905/6 7957/2 7958/23 7960/23 7962/3
**shareholders** [6] 7675/15 7768/18 7769/11 7770/3 7770/6 7774/13
**shares** [42] 7671/15 7671/23 7672/15 7677/15 7678/7 7678/12 7678/12 7678/17 7678/18 7678/21 7678/24 7679/2 7679/18 7679/23 7691/18 7692/3 7692/7 7692/9 7692/10 7695/20 7696/6 7769/7 7783/4 7787/6 7787/10 7787/12 7787/14 7808/16 7808/18 7810/9 7905/5 7957/1 7957/1 7957/19 7958/25 7959/14 7959/15 7959/16 7959/19 7960/19 7961/3 7961/24
**sheet** [1] 7705/2
**Shepardized** [1] 7876/17
**shift** [1] 7835/22
**shifting** [1] 7963/4
**shirt** [2] 7825/12 7825/13
**Shkreli** [141] 7671/13 7671/17 7671/19 7671/21 7671/25 7672/17 7672/23 7673/12 7675/1 7675/13 7677/6 7678/15 7678/17 7679/3 7679/23 7681/20 7685/15 7685/15 7685/18 7686/23 7691/13 7691/16 7692/6 7692/19 7693/1 7695/15 7695/19 7698/13 7699/1 7699/6 7699/17 7700/2 7701/7 7701/8 7701/13 7701/14 7702/12 7702/13 7702/6 7702/21 7703/8 7703/23 7704/1 7704/3 7705/12 7706/3 7706/19 7718/1 7718/4 7733/6 7734/4 7737/5 7740/20 7761/14 7761/22 7767/24 7773/23 7773/14 7774/14 7774/17 7774/19 7774/22 7775/5 7776/3 7777/6 7777/17 7778/4 7780/14 7780/22 7782/7 7784/14 7785/4 7785/13 7785/18 7786/3

7786/11 7787/4 7787/5 7787/20 7788/10 7793/13 7796/14 7797/10 7797/13 7798/10 7798/11 7798/22 7798/25 7799/5 7803/20 7803/21 7804/20 7813/7 7813/20 7814/24 7815/20 7818/12 7819/9 7819/15 7820/3 7820/16 7820/25 7822/14 7828/18 7831/25 7851/10 7853/9 7855/11 7855/12 7865/11 7874/21 7874/22 7874/23 7889/12 7902/8 7902/19 7902/21 7902/24 7903/15 7903/19 7903/25 7904/16 7904/21 7905/12 7905/20 7906/17 7906/24 7907/4 7907/10 7907/11 7907/25 7933/10 7950/13 7952/21 7953/7 7954/1 7954/3 7955/4 7958/23 7961/18
**Shkreli's** [10] 7675/5 7683/23 7685/12 7700/3 7887/25 7888/1 7950/14 7950/16 7953/1 7959/20
**shocked** [1] 7853/1
**short** [8] 7784/12 7819/2 7836/5 7843/18 7886/15 7900/5 7906/1 7935/16
**show** [32] 7676/25 7687/5 7690/10 7690/12 7708/8 7714/4 7723/5 7737/16 7740/12 7741/20 7751/23 7757/25 7762/16 7771/11 7785/9 7785/10 7793/18 7800/4 7801/23 7801/25 7802/19 7803/6 7803/7 7880/7 7880/12 7880/21 7903/23 7903/24 7905/14 7905/15 7907/18 7942/5
**showed** [9] 7675/5 7688/13 7697/8 7750/23 7755/15 7785/2 7810/2 7810/5 7916/9
**showing** [11] 7697/22 7723/8 7723/15 7734/23 7752/20 7754/4 7772/6 7778/3 7785/11 7794/22 7804/11
**shown** [29] 7683/5 7686/20 7695/11 7695/24 7706/6 7707/12 7710/3 7751/23 7755/10 7755/11 7755/13 7755/16 7755/21 7761/11 7772/8 7781/10 7781/17 7784/12 7796/13 7798/17 7802/19 7803/1 7803/2 7804/23 7808/9 7810/1 7811/6 7811/21 7901/16
**shows** [4] 7735/1 7807/5 7811/22 7862/18
**shred** [1] 7863/24
**side** [25] 7702/1 7702/1 7714/4 7746/23 7746/23 7747/2 7747/2 7748/1 7748/2 7748/12 7748/12 7769/1 7769/1 7790/4 7790/4 7790/5 7790/5 7790/6 7827/13 7833/24 7835/10 7838/16 7838/19 7940/15 7942/10
**sidebar** [32] 7676/21 7690/15 7690/15 7708/24 7708/24 7709/1 7720/3 7725/3 7725/6 7726/2 7726/6 7731/8 7743/15 7802/2 7827/16 7827/18 7828/2 7837/16 7838/6 7839/13 7842/19 7847/25 7848/2 7849/3 7849/19 7853/19 7855/2 7861/4 7891/14 7920/1 7927/16 7970/17
**sidebars** [1] 7838/2
**sides** [7] 7683/12 7692/24 7714/7 7742/15 7880/17 7898/4 7898/7
**sideshow** [1] 7833/21
**sign** [4] 7715/8 7765/20 7784/18 7797/14
**signature** [12] 7714/11 7721/16 7721/18 7721/24 7722/7 7722/15 7722/23 7749/22 7750/10 7750/11 7753/16 7952/12
**signed** [20] 7714/11 7714/13 7715/5 7716/6 7716/11 7724/25 7725/1 7730/13 7732/1 7737/15 7739/14 7750/7 7751/18 7755/7 7756/5 7758/17 7758/21 7808/16 7809/18 7882/14
**signing** [2] 7850/6 7850/6
**silently** [2] 7763/2 7763/16
**similar** [10] 7749/16 7751/18 7752/15 7767/17 7796/10 7832/21 7832/22 7868/24 7884/6 7942/18
**similarly** [2] 7958/13 7958/15
**simple** [3] 7717/4 7737/21 7893/24
**simpler** [1] 7732/20
**simply** [12] 7682/22 7688/4 7691/7 7727/13 7862/17 7864/4 7872/11 7877/6 7893/3 7898/21 7902/15 7921/4
**simultaneously** [2] 7703/19 7703/20
**single** [12] 7706/18 7706/24 7707/7 7707/8 7752/17 7758/25 7784/4 7840/11 7844/6

7845/7 7845/11 7919/21
**singled** [1] 7773/24
**singular** [2] 7692/13 7692/16
**sit** [3] 7860/21 7860/23 7896/3
**site** [2] 7877/15 7960/6
**sitting** [12] 7741/17 7767/18 7768/9 7781/7 7792/11 7794/1 7796/5 7850/22 7889/15 7889/18 7924/12 7925/1
**situation** [17] 7693/6 7705/6 7820/18 7825/3 7865/16 7867/3 7868/24 7876/5 7878/11 7884/2 7893/11 7896/14 7941/20 7942/8 7945/7 7959/18 7963/6
**situations** [1] 7925/10
**six** [10] 7684/2 7726/14 7758/14 7868/12 7894/20 7902/15 7934/22 7944/24 7944/24 7945/1
**skeptical** [1] 7868/4
**skipped** [1] 7805/5
**sleeping** [2] 7851/14 7868/13
**small** [2] 7760/10 7760/16
**smart** [1] 7712/19
**smiling** [1] 7849/4
**smirks** [1] 7898/5
**SMITH** [5] 7670/15 7712/21 7810/2 7923/19 7924/17
**Smith's** [2] 7810/7 7925/23
**snippet** [1] 7820/15
**sold** [1] 7958/25
**solely** [2] 7782/19 7877/23
**solved** [1] 7839/6
**someone** [20] 7714/2 7735/6 7745/14 7800/21 7821/7 7824/11 7869/21 7879/14 7880/1 7892/15 7892/23 7893/1 7894/24 7896/21 7915/16 7920/6 7921/11 7930/6 7942/6 7945/8
**sometimes** [11] 7712/7 7712/7 7712/8 7881/2 7881/3 7881/3 7898/4 7899/4 7899/5 7945/21 7945/23
**someways** [1] 7732/2
**somewhat** [3] 7687/19 7941/2 7963/3
**soon** [6] 7671/2 7726/2 7802/5 7885/19 7965/18 7967/25
**sooner** [1] 7971/25
**sorry** [40] 7680/24 7683/8 7693/10 7693/19 7696/25 7696/25 7699/5 7701/1 7708/20 7723/24 7747/3 7748/18 7755/25 7761/20 7763/13 7779/13 7794/21 7794/21 7794/24 7795/1 7795/1 7796/17 7801/1 7807/24 7814/12 7815/15 7825/13 7833/20 7840/20 7840/22 7885/11 7887/16 7903/3 7909/24 7933/20 7935/9 7941/24 7955/2 7957/15 7971/13
**sort** [18] 7803/4 7803/10 7811/3 7812/25 7832/8 7838/3 7879/8 7898/10 7942/9 7945/15 7946/4 7947/1 7951/12 7954/16 7955/6 7958/16 7968/23 7969/9
**sorts** [3] 7851/18 7869/8 7921/25
**sought** [4] 7816/5 7853/8 7957/4 7958/21
**sound** [1] 7961/5
**sounded** [1] 7860/25
**sounds** [4] 7926/23 7937/3 7960/3 7970/13
**source** [2] 7884/16 7959/3
**sources** [1] 7915/7
**Southern** [4] 7717/10 7868/23 7872/10 7962/8
**speaking** [16] 7692/19 7778/10 7849/24 7851/4 7868/8 7868/16 7878/6 7889/7 7889/12 7911/4 7911/15 7914/13 7914/17 7918/19 7923/18 7923/23
**speaks** [4] 7874/20 7875/22 7878/16 7919/9
**special** [80] 7671/5 7673/7 7673/19 7674/3 7674/20 7674/24 7687/3 7687/15 7688/7 7688/15 7689/4 7689/6 7695/11 7697/2 7698/16 7708/4 7708/12 7721/13 7721/20 7722/3 7722/10 7722/17 7723/2 7723/19 7748/21 7749/6 7749/22 7750/1 7751/11 7752/20 7753/19 7756/6 7758/20 7794/9 7796/4 7802/19 7804/12 7805/2 7826/7 7827/11 7828/11 7831/23 7840/6 7840/10 7841/1 7841/7 7841/11 7842/12 7842/25

**S**

**special... [31]** 7843/10 7843/20 7844/4
7844/19 7845/5 7846/10 7851/7 7863/11
7863/22 7875/6 7875/15 7879/10 7884/14
7887/24 7889/14 7889/16 7901/11 7901/15
7901/17 7902/2 7908/8 7908/14 7910/4
7912/20 7913/14 7915/20 7916/18 7918/15
7920/5 7921/8 7927/12

**specific [32]** 7671/17 7672/18 7681/23
7683/15 7692/13 7692/13 7692/16 7692/19
7692/21 7692/24 7701/23 7702/4 7702/22
7719/9 7735/8 7759/3 7759/5 7778/9 7779/16
7787/9 7787/14 7796/6 7802/23 7802/24
7811/6 7824/7 7843/15 7915/15 7915/15
7938/1 7943/19 7944/25

**specifically [3]** 7858/24 7878/20 7907/17

**specificity [1]** 7854/24

**specter [2]** 7864/5 7920/13

**speculate [15]** 7710/8 7711/3 7711/7 7712/5
7712/13 7715/11 7715/12 7716/7 7717/18
7718/11 7719/25 7721/4 7721/5 7833/16
7834/18

**speculation [1]** 7718/13

**spend [2]** 7752/6 7918/7

**spent [3]** 7740/11 7880/14 7880/18

**spirit [1]** 7944/22

**spoken [5]** 7801/7 7838/12 7862/11 7909/4
7909/10

**spot [1]** 7928/16

**squad [1]** 7926/17

**squarely [8]** 7864/16 7864/19 7864/24 7865/12
7867/18 7876/4 7883/18 7884/9

**stable [1]** 7957/3

**stalling [2]** 7734/2 7734/7

**stamp [12]** 7701/20 7703/10 7714/20 7762/11
7763/13 7765/25 7766/1 7766/2 7766/8 7767/1
7768/5 7779/3

**stand [17]** 7685/18 7751/5 7803/25 7805/17
7805/21 7807/10 7818/6 7824/18 7862/11
7863/8 7886/3 7886/7 7897/14 7897/15
7897/20 7898/23 7923/16

**standard [3]** 7762/7 7762/12 7777/18 7777/19
7825/1 7874/14 7875/5 7942/16

**standards [2]** 7816/9 7818/16

**staring [1]** 7966/2

**start [10]** 7687/14 7704/3 7710/10 7838/24
7891/2 7928/6 7935/3 7950/13 7967/25 7969/2

**started [6]** 7678/25 7693/9 7693/10 7899/4
7900/24 7948/12

**starting [4]** 7840/24 7845/23 7933/12 7947/20

**starts [5]** 7746/9 7746/11 7938/13 7949/2
7952/20

**state [28]** 7673/3 7673/17 7675/22 7680/3
7680/9 7684/14 7685/24 7686/1 7686/4 7687/8
7687/10 7689/15 7690/9 7691/8 7691/21
7730/19 7761/13 7769/19 7793/7 7864/22
7865/10 7866/1 7868/15 7883/17 7884/7
7921/7 7921/13 7969/11

**statement [45]** 7705/20 7705/22 7739/4
7770/1 7770/2 7803/6 7803/7 7804/12 7804/23
7807/6 7808/8 7811/20 7814/2 7822/22 7824/2
7824/3 7824/5 7824/21 7825/9 7836/22 7837/7
7862/17 7862/21 7863/9 7873/5 7875/24
7876/7 7876/7 7876/23 7876/25 7877/3 7877/5
7878/23 7881/4 7881/5 7882/1 7883/6 7884/17
7892/14 7902/18 7909/23 7931/16 7957/19
7958/21 7964/1

**statements [74]** 7681/6 7689/12 7715/17
7733/21 7759/14 7773/4 7782/12 7784/5
7811/4 7811/8 7829/19 7850/9 7850/15
7851/21 7852/3 7852/6 7854/2 7856/11
7857/13 7857/14 7857/19 7858/2 7859/7
7862/25 7863/18 7863/18 7863/21 7864/7
7864/9 7864/12 7871/16 7871/16 7872/13
7872/18 7874/5 7874/7 7874/18 7875/1 7875/4
7875/11 7877/2 7877/17 7877/17 7877/20
7877/23 7877/24 7878/2 7879/9 7879/17
7879/22 7880/8 7880/11 7880/15 7880/22

7880/23 7881/1 7881/13 7881/15 7881/19
7881/21 7882/22 7882/24 7883/4 7883/7
7883/24 7885/8 7890/5 7890/5 7891/5 7920/23
7924/8 7939/1 7940/2 7947/16

**states [26]** 7670/1 7670/3 7670/3 7670/10
7670/13 7670/16 7695/19 7744/16 7744/18
7757/14 7757/15 7757/18 7758/22 7767/25
7768/1 7768/12 7770/10 7774/21 7780/24
7781/3 7798/5 7862/12 7862/15 7862/16
7864/15 7904/25

**stating [1]** 7702/22

**statistic [1]** 7922/22

**status [7]** 7768/1 7971/10

**stay [5]** 7690/17 7701/12 7917/10 7951/4
7971/1

**staying [1]** 7933/10

**stays [6]** 7933/19 7934/15 7934/18 7949/20
7954/25 7955/14

**stenography [1]** 7670/24

**step [11]** 7777/10 7777/11 7802/7 7844/22
7844/22 7856/6 7857/5 7891/20 7912/3
7917/24 7918/11

**steps [9]** 7802/9 7831/16 7831/20 7832/2
7832/8 7833/11 7853/13 7862/6 7917/25

**Steve [1]** 7740/1

**Steven [2]** 7789/2 7928/8

**still [23]** 7695/1 7711/23 7737/22 7768/16
7822/10 7823/6 7826/10 7827/6 7837/24
7887/19 7923/20 7924/7 7928/8 7945/15
7955/23 7960/2 7964/6 7965/14 7965/20
7965/23 7966/5 7966/17 7967/18

**stipulation [1]** 7955/7

**stock [38]** 7672/9 7672/10 7672/11 7672/12
7675/7 7675/18 7678/9 7678/10 7679/5
7679/10 7679/11 7679/13 7679/14 7679/23
7681/22 7704/11 7704/18 7704/19 7704/19
7704/21 7783/5 7788/14 7905/5 7958/5 7958/7
7958/9 7958/14 7958/14 7958/24 7959/6
7959/8 7961/11 7961/17 7961/18 7961/20
7962/1 7962/3 7962/14

**stocks [1]** 7675/14

**stonewalling [1]** 7738/17

**stood [1]** 7803/12

**stop [3]** 7704/16 7867/15 7868/12

**story [23]** 7686/11 7686/11 7686/12 7686/15
7689/6 7689/7 7827/13 7835/10 7835/15
7835/20 7835/21 7835/25 7836/17 7836/25
7837/6 7837/22 7838/14 7892/17 7838/18
7838/19 7853/23 7853/24 7892/16

**straight [1]** 7792/25

**straight-forward [1]** 7792/25

**straighten [1]** 7956/4

**straightened [1]** 7956/1

**straightforward [2]** 7717/14 7832/6

**strange [1]** 7715/18

**strategic [1]** 7791/3

**street [1]** 7868/12

**stricken [2]** 7696/12 7705/19

**strike [25]** 7696/7 7699/9 7702/14 7705/17
7705/21 7770/11 7770/19 7770/21 7783/16
7783/23 7788/18 7789/9 7792/20 7800/1
7800/2 7813/10 7838/23 7838/24 7841/11
7844/14 7847/24 7882/4 7909/22 7937/23
7950/3

**striking [1]** 7935/10

**strong [5]** 7672/21 7866/7 7871/11 7878/8
7914/17

**stronger [3]** 7679/20 7679/24 7691/14

**strongly [2]** 7871/21 7875/19

**struck [1]** 7935/7

**stuff [9]** 7692/17 7705/13 7716/18 7716/23
7719/1 7774/23 7854/24 7856/5 7962/18

**Su [42]** 7696/3 7696/9 7697/3 7697/9 7801/14
7801/16 7801/20 7801/21 7802/14 7802/19
7803/12 7803/16 7803/16 7803/23 7804/13
7804/20 7804/23 7805/3 7805/3 7805/6
7805/11 7805/13 7805/21 7805/25 7807/9
7808/9 7810/3 7810/12 7811/5 7811/6 7811/17

7812/1 7812/3 7812/10 7823/24 7823/24
7824/2 7826/20 7826/22 7826/25 7829/2
7830/4

**Su's [8]** 7802/12 7803/11 7807/17 7808/7
7810/17 7811/8 7811/13 7822/21

**subheading [2]** 7935/24 7936/7

**subject [32]** 7682/8 7692/2 7692/5 7695/16
7700/8 7706/9 7707/19 7744/16 7757/12
7761/14 7777/4 7777/4 7778/11 7778/12
7778/13 7778/16 7778/18 7779/7 7779/11
7779/12 7779/15 7781/18 7782/1 7785/14
7785/15 7787/6 7789/3 7850/11 7902/9
7909/16 7911/13 7911/21

**subjective [6]** 7896/12 7921/11 7921/23
7922/13 7922/17 7923/17

**subjects [5]** 7851/8 7852/9 7853/8 7853/25
7909/17

**submission [4]** 7929/3 7943/8 7970/22 7972/7

**submissions [4]** 7946/2 7946/25 7947/5
7972/16

**submit [2]** 7881/22 7900/1

**submitted [1]** 7710/5

**subpoena [3]** 7831/22 7846/13 7849/25

**subpoenas [1]** 7831/21

**subscription [6]** 7805/22 7805/23 7807/8
7809/16 7809/18 7809/22

**subsequent [3]** 7863/5 7890/13 7890/14

**substance [9]** 7672/2 7738/23 7764/9 7803/17
7804/1 7830/11 7849/22 7908/4 7932/17

**substantial [2]** 7738/11 7738/15

**substantially [1]** 7826/6

**subtract [1]** 7747/5

**subvert [1]** 7937/24

**successive [1]** 7772/10

**sudden [1]** 7961/24

**sued [1]** 7774/24

**suggest [10]** 7711/12 7711/13 7786/12
7834/20 7854/7 7855/10 7871/8 7900/9
7924/11 7924/22

**suggested [4]** 7737/4 7836/20 7849/25
7909/11

**suggesting [10]** 7713/19 7713/20 7715/20
7717/12 7717/16 7820/19 7835/11 7871/7
7898/24 7924/3

**suggestion [6]** 7717/23 7834/12 7853/15
7871/17 7900/16 7900/20

**suggestions [2]** 7832/11 7869/9

**suggests [6]** 7717/21 7738/16 7835/15
7836/15 7836/16 7853/19

**Sullivan [3]** 7763/23 7765/6 7769/4

**sum [4]** 7672/2 7803/16 7803/25 7908/4

**summarized [1]** 7963/19

**summary [2]** 7963/16 7963/17

**summation [7]** 7713/24 7714/6 7714/8
7734/15 7736/23 7881/10 7881/25

**summations [1]** 7881/17

**summer [1]** 7707/24

**Sunil [1]** 7758/6

**superfluous [1]** 7945/15

**Supp [2]** 7872/10 7877/15

**supplanted [1]** 7879/3

**supplement [1]** 7965/1

**supplemental [4]** 7956/16 7956/23 7957/4
7962/16

**supplemented [1]** 7969/10

**support [2]** 7823/12 7876/9

**supporting [1]** 7852/14

**supports [1]** 7877/14

**suppose [1]** 7734/15

**supposed [4]** 7710/8 7898/20 7963/17
7963/18

**suppression [1]** 7893/8

**surprises [1]** 7693/22

**surrender [21]** 7671/14 7671/16 7671/23
7671/24 7672/12 7672/14 7672/16 7674/5
7675/14 7678/16 7679/16 7679/17 7682/2
7682/3 7688/14 7691/17 7692/6 7692/12
7695/16 7695/20 7701/15

**S**

surrendering [2] 7681/23 7692/3
surrogate [1] 7952/22
sustain [7] 7794/12 7795/19 7840/14 7842/9 7843/16 7908/5 7912/17
sustained [18] 7700/15 7700/19 7707/11 7747/15 7751/7 7760/22 7761/5 7799/12 7799/15 7800/14 7840/17 7841/5 7842/16 7846/8 7913/23 7914/19 7915/18 7916/17
sweetener [3] 7679/5 7679/10 7692/8
swift [1] 7870/13
switch [2] 7804/22 7901/11
sworn [1] 7845/23

**T**

table [9] 7731/1 7807/5 7809/12 7850/22 7898/4 7898/16 7898/19 7898/22 7899/7
talks [3] 7692/6 7933/15 7937/21
Tang [1] 7813/21
tank [1] 7961/19
tanking [1] 7962/1
tape [1] 7807/13
target [3] 7912/2 7926/6 7927/3
team [5] 7846/6 7846/21 7847/6 7887/25 7928/15
technique [2] 7828/23 7835/2
techniques [1] 7833/16
Teich [1] 7670/22
telephone [1] 7968/8
telephonic [1] 7793/8
television [1] 7817/20
temporally [1] 7894/16
tempted [1] 7870/21
ten [5] 7705/4 7765/11 7784/23 7785/5 7786/19
tender [1] 7690/1
tenor [1] 7780/18
term [7] 7705/2 7765/14 7771/5 7808/1 7811/11 7811/13 7842/21
terms [10] 7704/11 7727/25 7792/5 7832/20 7870/20 7882/14 7904/25 7919/19 7943/6 7943/10
territory [1] 7837/23
testified [24] 7737/9 7738/22 7779/12 7789/1 7794/9 7794/17 7799/16 7799/20 7800/3 7801/7 7803/13 7807/1 7807/10 7823/7 7823/8 7845/22 7856/20 7865/6 7890/22 7897/23 7914/14 7923/16 7926/16 7936/17
testifies [11] 7738/4 7824/16 7837/2 7892/11 7893/5 7898/20 7941/19 7944/11 7944/16 7945/7 7945/11
testify [41] 7683/9 7714/15 7727/18 7733/14 7796/1 7810/8 7830/17 7830/19 7832/16 7836/21 7856/18 7869/25 7870/18 7870/23 7871/6 7871/10 7871/10 7871/12 7871/15 7871/18 7871/23 7871/24 7882/9 7887/14 7892/10 7893/6 7893/10 7894/1 7895/1 7895/9 7926/7 7926/8 7938/24 7944/14 7945/14 7956/2 7957/20 7958/11 7963/9 7965/21 7971/21
testifying [9] 7683/6 7735/20 7853/5 7921/8 7925/15 7936/20 7955/22 7955/24 7965/10
testimony [61] 7673/8 7700/20 7706/15 7707/1 7707/3 7727/14 7730/10 7733/20 7736/21 7739/11 7767/15 7792/9 7792/10 7793/14 7793/22 7793/24 7794/8 7795/12 7799/22 7800/4 7801/8 7802/12 7802/16 7802/23 7804/16 7805/20 7807/17 7808/19 7809/2 7810/10 7812/10 7822/21 7823/23 7824/21 7824/22 7826/16 7826/18 7838/2 7845/23 7845/24 7855/6 7865/9 7891/11 7918/17 7919/15 7920/5 7920/18 7920/20 7925/2 7930/21 7937/5 7938/22 7941/21 7941/22 7944/20 7945/9 7958/16 7960/17 7962/22 7963/16 7963/17
text [1] 7932/13
themselves [2] 7835/10 7960/18
theories [1] 7673/15

theory [1] 7879/2
thereafter [1] 7819/6
therefore [7] 7682/12 7714/22 7893/1 7903/7 7911/7 7923/4 7931/14
thereof [1] 7858/2
they've [1] 7818/11 7818/11
thinking [8] 7833/19 7834/2 7837/18 7868/19 7899/19 7930/20 7931/13 7945/24
thinks [3] 7682/19 7713/23 7857/11
third [13] 7705/8 7723/22 7766/14 7766/16 7766/17 7798/1 7819/1 7857/24 7949/2 7950/13 7953/3 7953/4 7955/8
Thirty [2] 7677/8 7684/2
Thirty-nine [1] 7677/8
Thirty-six [1] 7684/2
thoroughness [1] 7817/4
thoughts [1] 7928/15
thousand [1] 7760/8
thousands [7] 7690/9 7760/1 7760/3 7760/4 7760/10 7760/14 7760/24
three [35] 7673/14 7693/5 7696/17 7715/13 7724/22 7729/24 7750/21 7758/13 7763/7 7763/10 7763/12 7766/6 7768/13 7768/14 7768/25 7782/14 7801/18 7803/15 7820/11 7825/6 7850/21 7851/14 7887/11 7890/20 7890/24 7894/21 7897/23 7932/16 7933/2 7933/21 7934/1 7947/3 7950/12 7954/14 7972/6
throughout [2] 7681/13 7912/6
tie [7] 7676/25 7679/24 7680/1 7680/7 7690/13 7764/24 7788/8
tied [3] 7673/8 7680/14 7688/12
ties [3] 7672/22 7673/17 7684/20
timestamp [2] 7683/18 7683/22
timestamps [2] 7681/14 7683/20
timing [12] 7679/19 7680/2 7684/24 7685/5 7691/11 7694/10 7715/10 7702/16 7828/12 7854/8 7967/23 7972/20
Timothy [1] 7909/8
titles [1] 7700/8
today [14] 7682/16 7700/16 7706/11 7751/5 7767/18 7768/9 7781/7 7792/11 7796/5 7796/5 7860/21 7929/16 7965/17 7970/6
together [17] 7671/8 7680/2 7680/7 7680/16 7688/12 7688/16 7738/14 7765/13 7769/14 7769/22 7800/20 7855/7 7958/3 7960/18 7961/2 7961/17 7962/21
Tom [2] 7677/17 7699/21
tomorrow [19] 7917/8 7917/9 7917/11 7917/14 7917/21 7918/22 7928/4 7929/17 7955/19 7955/23 7955/24 7955/25 7956/2 7965/10 7968/1 7968/18 7968/23 7968/25 7970/6
ton [1] 7972/19
tonight [6] 7920/8 7921/2 7927/15 7928/2 7928/9 7954/19
tons [1] 7876/22
took [8] 7674/4 7712/10 7712/10 7729/16 7734/3 7853/25 7869/5 7887/21
top [30] 7683/10 7696/1 7699/17 7702/18 7706/8 7721/12 7744/3 7748/10 7749/12 7761/13 7761/19 7762/13 7765/24 7766/11 7787/19 7790/18 7790/20 7791/1 7793/10 7793/11 7798/21 7799/1 7799/7 7801/24 7832/7 7933/21 7934/9 7934/22 7936/22 7948/10
topic [3] 7946/2 7964/18 7970/10
topics [2] 7853/16 7963/19
total [2] 7903/5 7905/3
totally [10] 7674/17 7674/18 7681/22 7683/17 7685/16 7687/13 7719/10 7726/11 7727/13 7922/17
touch [3] 7940/3 7940/9 7947/8
touches [2] 7692/2 7942/17
touching [1] 7917/19
toward [1] 7898/22
towards [2] 7798/8 7888/7
trade [7] 7702/4 7702/22 7703/3 7711/16 7711/22 7713/9 7960/22

trading [4] 7800/22 7801/6 7957/1 7958/25
tradition [1] 7877/22
traditional [1] 7948/22
transaction [8] 7681/24 7703/3 7804/18 7804/19 7804/24 7805/21 7809/10 7811/1
transactions [7] 7711/23 7718/3 7787/12 7915/16 7961/9 7961/10 7961/10
transcript [17] 7670/9 7670/24 7799/20 7808/2 7808/3 7808/9 7813/4 7822/20 7823/5 7823/17 7825/5 7825/6 7914/10 7920/9 7926/2 7936/14 7945/23
transcription [1] 7670/24
transfer [24] 7671/17 7672/18 7673/11 7673/13 7679/22 7692/13 7692/14 7692/16 7692/17 7692/19 7692/21 7692/24 7696/6 7701/23 7702/5 7702/6 7703/4 7705/13 7774/9 7787/13 7788/8 7803/19 7803/20 7807/14 transfers [5] 7685/1 7691/16 7692/14 7692/15 7692/22
transmission [3] 7691/13 7732/1 7756/19
transmitted [5] 7733/18 7736/7 7737/17 7737/23 7743/23
treat [2] 7712/12 7716/1
treated [2] 7713/22 7717/22
trial [36] 7670/9 7685/17 7710/2 7721/3 7735/7 7736/21 7819/22 7820/14 7822/6 7822/8 7822/9 7824/9 7828/4 7832/9 7832/20 7832/24 7833/15 7834/16 7869/3 7869/4 7869/5 7869/5 7869/25 7870/7 7870/18 7882/25 7885/20 7894/5 7900/23 7917/21 7922/3 7928/17 7938/6 7938/22 7945/20 7947/17
trials [1] 7894/19
tried [7] 7711/12 7764/23 7818/23 7839/4 7877/16 7883/23 7883/23
tries [2] 7811/15 7818/1
trigger [1] 7833/3
trip [1] 7917/21
triple [1] 7897/19
trouble [1] 7929/3
troubled [1] 7839/4
troubling [1] 7838/2
truck [2] 7738/2 7738/3
true [19] 7673/1 7724/24 7758/19 7759/1 7801/20 7804/9 7804/10 7809/2 7830/3 7913/10 7913/12 7915/4 7915/5 7915/11 7915/20 7916/1 7931/9 7932/2 7961/21
truly [2] 7680/18 7869/10
trust [1] 7886/22
truth [39] 7672/25 7673/2 7674/12 7674/16 7674/25 7675/8 7680/9 7681/19 7682/22 7684/25 7685/12 7698/14 7715/16 7726/17 7729/9 7729/9 7733/7 7733/16 7737/4 7738/7 7739/5 7740/6 7743/22 7756/18 7756/23 7764/19 7764/20 7773/4 7780/2 7780/5 7824/23 7877/17 7877/20 7878/1 7880/2 7880/2 7892/16 7895/9 7938/25
truthful [1] 7865/17
try [32] 7682/6 7687/5 7689/22 7689/25 7690/2 7724/14 7740/9 7764/24 7766/20 7770/17 7776/15 7799/21 7799/23 7800/14 7800/17 7802/20 7812/9 7812/10 7824/3 7838/2 7843/6 7843/8 7874/7 7874/9 7882/17 7882/18 7896/6 7899/14 7922/11 7928/1 7964/7 7964/8
trying [51] 7672/2 7674/23 7675/6 7678/1 7681/25 7682/7 7686/24 7687/4 7691/25 7710/16 7718/5 7724/3 7724/16 7726/7 7729/11 7730/4 7764/4 7795/7 7811/19 7812/3 7814/16 7816/15 7831/4 7843/7 7844/20 7857/4 7864/4 7869/10 7872/12 7872/13 7872/14 7872/17 7876/14 7877/24 7878/1 7879/25 7880/9 7891/15 7897/6 7899/6 7926/18 7945/4 7945/15 7959/7 7961/25 7963/7 7963/15 7964/21 7966/16 7971/3 7972/14
tumbling [1] 7963/1
turn [17] 7708/3 7708/11 7723/17 7723/18 7723/22 7749/6 7751/9 7753/18 7763/11 7763/11 7763/11 7795/9 7795/16 7797/18

**T**

turn... [3] 7879/14 7901/13 7904/24
turned [3] 7817/19 7818/25 7928/20
turning [1] 7705/10
twice [2] 7850/5 7919/2
two [84] 7680/1 7680/7 7680/16 7680/18
7681/12 7686/12 7688/12 7688/16 7689/21
7694/10 7702/20 7706/14 7727/25 7734/24
7735/18 7740/9 7749/2 7752/12 7752/22
7753/1 7753/3 7758/13 7758/16 7761/8
7763/25 7770/24 7771/3 7782/16 7786/5
7786/8 7786/19 7787/3 7790/8 7790/16
7790/19 7807/16 7809/19 7816/9 7817/7
7820/24 7824/24 7825/5 7825/25 7841/25
7846/1 7846/2 7846/4 7846/20 7851/10 7855/7
7855/7 7859/4 7885/14 7903/5 7909/17
7911/15 7925/9 7928/7 7930/1 7930/2 7930/15
7931/2 7932/6 7932/11 7933/9 7933/21
7933/23 7934/2 7935/19 7936/2 7936/21
7947/2 7947/23 7948/4 7948/8 7948/11 7949/5
7950/22 7951/25 7952/15 7954/3 7965/23
7966/22 7968/17
tying [3] 7671/8 7673/7 7688/16
type [1] 7963/4
types [2] 7947/12 7947/13
typical [1] 7940/6
typically [2] 7893/7 7911/20

**U**

U.S [3] 7872/9 7874/15 7883/15
ultimate [2] 7941/17 7946/11
ultimately [3] 7739/13 7932/10 7938/13
unable [2] 7675/22 7854/1
unanimous [1] 7758/16
unassigned [1] 7727/4
unavailability [1] 7686/22
unavailable [2] 7685/16 7685/19
uncertain [1] 7964/9
uncertainty [1] 7705/5
uncomfortable [1] 7705/7
uncommon [1] 7727/19
uncontested [1] 7938/24
under [36] 7680/6 7680/6 7680/8 7685/21
7695/1 7779/15 7789/20 7802/18 7805/14
7822/9 7824/22 7827/6 7845/24 7854/22
7854/23 7867/13 7872/14 7872/15 7874/13
7877/21 7887/19 7920/14 7921/18 7922/17
7930/21 7932/23 7934/23 7935/17 7935/24
7936/6 7936/17 7942/4 7944/6 7947/7 7954/22
7959/2
undercut [2] 7851/5 7865/9
undermined [1] 7851/6
undermining [1] 7870/3 7871/19
underneath [1] 7710/9 7710/13 7713/16
7713/21 7721/6 7761/15 7761/17
understood [25] 7752/18 7759/20 7793/21
7794/18 7796/2 7816/8 7816/11 7817/2
7819/18 7819/18 7820/1 7822/16 7825/21
7847/12 7889/16 7889/21 7904/6 7914/16
7914/21 7920/24 7923/11 7928/21 7943/18
7943/25 7972/21
undertake [1] 7792/3
underwhelming [1] 7903/8
undoing [1] 7691/16
undoubtedly [1] 7875/6
undue [2] 7717/15 7946/16
unduly [2] 7680/6 7685/22
unexpected [1] 7965/17
unfair [5] 7682/19 7811/8 7812/8 7964/10
7964/14
unfavorable [1] 7821/7
unfortunate [2] 7820/18 7849/13
unfortunately [1] 7813/14 7816/1 7820/20
unhear [1] 7818/11
uninterrupted [1] 7970/13
unique [4] 7854/22 7883/17 7884/2 7884/6
UNITED [11] 7670/1 7670/3 7670/3 7670/10
7670/13 7670/16 7798/5 7862/12 7862/15

**[second column top]**
7862/16 7864/15
**V**
vadd [1] 7884/4
unknown [1] 7811/19
unlawful [4] 7957/20 7958/8 7958/20 7958/22
unlegally [1] 7960/12
unless [10] 7711/7 7836/21 7837/1 7872/22
7879/15 7891/4 7894/10 7915/4 7930/6
7944/15
unlike [1] 7718/19
unpacked [1] 7673/23
unquestionable [1] 7688/15
unquestionably [2] 7874/20 7874/24
unreasonable [1] 7818/14
unredacted [3] 7716/16 7951/2 7952/20
unrelated [13] 7674/2 7675/3 7706/22 7711/15
7726/7 7726/11 7726/16 7726/18 7727/13
7730/1 7735/17 7737/14 7738/21
unrepresented [1] 7874/8
unsigned [15] 7730/12 7735/3 7749/3 7749/4
7749/22 7749/24 7750/8 7750/16 7750/17
7751/19 7753/15 7754/12 7755/8 7756/7
7756/10
untoward [1] 7899/9
untrue [1] 7759/8
unusual [1] 7888/5
unwind [2] 7692/17 7705/12
unwitting [1] 7732/7
up [109] 7672/8 7672/11 7675/6 7675/18
7677/3 7678/8 7678/11 7679/11 7679/14
7680/20 7681/21 7683/19 7690/17 7691/18
7692/3 7695/9 7695/10 7695/25 7696/1
7697/12 7697/12 7698/17 7698/19 7700/11
7700/11 7702/1 7703/25 7704/17 7705/3
7705/4 7705/5 7706/7 7710/1 7710/2 7744/3
7746/9 7746/18 7746/24 7747/1 7747/23
7748/7 7748/10 7748/13 7748/19 7749/12
7749/15 7757/5 7757/20 7757/21 7761/12
7761/19 7763/24 7764/24 7765/4 7768/25
7777/12 7777/13 7778/19 7784/13 7788/9
7788/15 7788/24 7789/17 7790/2 7790/6
7790/8 7792/8 7793/6 7793/7 7793/12 7794/13
7794/20 7798/16 7802/25 7803/10 7803/12
7804/18 7805/17 7817/20 7818/25 7822/19
7825/24 7826/16 7826/17 7832/22 7838/17
7849/20 7851/14 7852/20 7853/1 7855/8
7859/21 7862/10 7870/8 7887/16 7898/5
7898/23 7899/4 7906/1 7906/22 7918/25
7919/15 7921/25 7926/2 7929/7 7937/19
7960/22 7971/4 7971/20
up-to-date [1] 7862/10
update [1] 7797/13
updating [1] 7798/3
upper [1] 7790/20
urging [2] 7733/7 7967/1
uses [2] 7692/17 7692/18
utility [1] 7730/16
utilize [1] 7900/16
utter [1] 7813/18
utterly [1] 7686/23

**V**

vague [1] 7818/22
Valeant [7] 7672/3 7678/1 7678/1 7678/3
7704/7 7705/2 7705/6
Valeur [13] 7707/19 7716/15 7716/16 7727/3
7727/7 7728/11 7728/21 7725/23 7733/7
7734/3 7737/24 7739/14 7739/18
Valeur-Jensen [5] 7716/15 7716/16 7728/11
7728/21 7733/7
Valeur-Jensen's [1] 7734/3
Valeur-Jensen/Aselage [1] 7731/25
valid [4] 7856/25 7858/7 7940/17 7941/12
valuation [2] 7704/15 7774/11
value [7] 7754/18 7783/4 7867/24 7905/5
7936/23 7948/10 7948/13
various [2] 7710/6 7832/7
varying [1] 7866/12
vehemently [1] 7926/5

**[third column top]**
vehicle [1] 7959/11
venting [1] 7821/9
verbally [1] 7850/6 7858/9
verbatim [1] 7963/14
verdict [2] 7814/5 7814/7
verification [1] 7807/2
verify [1] 7795/8
version [1] 7880/10
versus [7] 7818/16 7862/12 7862/15 7862/16
7864/15 7925/10 7951/15
vessel [1] 7735/13
video [17] 7880/21 7884/15 7884/21 7884/22
7884/23 7892/1 7892/14 7892/20 7892/24
7892/25 7893/1 7893/19 7896/15 7897/7
7897/12 7897/15 7897/20
videotape [6] 7883/3 7883/6 7890/10 7890/11
7891/8 7891/10
videotapes [1] 7880/18
view [47] 7672/20 7673/5 7673/17 7674/1
7674/18 7678/18 7680/16 7681/4 7689/5
7692/25 7802/25 7833/9 7850/4 7850/17
7851/1 7851/9 7851/22 7863/8 7864/11
7870/25 7883/15 7883/15 7896/5 7910/25
7911/1 7911/3 7911/5 7911/6 7923/21 7926/21
7936/3 7936/12 7937/5 7941/22 7944/1 7944/2
7944/5 7944/9 7944/10 7945/9 7945/24 7946/7
7946/7 7948/18 7948/20 7949/18 7952/10
views [3] 7868/5 7881/16 7881/17
vigorously [1] 7822/6
violate [1] 7962/10
violation [2] 7926/20 7964/10
violations [1] 7792/5
virtually [1] 7740/1
virtue [1] 7734/1
vis [4] 7833/10 7833/10 7972/20 7972/20
vis-a-vis [2] 7833/10 7972/20
visible [1] 7898/6
visualize [1] 7885/5
voir [1] 7821/10
volume [1] 7960/22
voluntarily [2] 7758/25 7869/21
volunteer [1] 7759/6
volunteered [2] 7707/9 7759/2
vote [2] 7941/16 7948/25
vouching [3] 7931/10 7931/11 7938/25

**W**

wagging [1] 7898/4
wait [3] 7693/8 7933/23 7934/25
waiting [2] 7694/1 7887/16
waive [27] 7831/25 7854/19 7857/9 7858/9
7863/20 7867/7 7867/11 7868/19 7871/6
7871/15 7871/15 7874/17 7876/2 7879/3
7879/16 7881/6 7921/16 7922/3 7922/5 7922/6
7922/10 7922/14 7922/21 7924/19 7925/5
7927/10 7969/19
waived [54] 7718/3 7847/19 7850/5 7850/7
7850/11 7851/8 7851/17 7851/21 7852/7
7852/8 7853/7 7853/20 7855/13 7856/10
7859/1 7863/17 7864/6 7872/4 7874/4 7874/25
7875/3 7875/22 7878/16 7878/22 7879/6
7879/8 7879/21 7880/1 7881/13 7882/1
7883/18 7883/24 7888/3 7888/5 7888/6 7888/8
7888/9 7888/13 7888/16 7889/25 7892/11
7892/22 7894/2 7894/3 7897/16 7897/21
7914/22 7918/24 7921/4 7922/7 7924/13
7925/1 7969/12 7969/12
waiver [19] 7867/7 7870/15 7870/20 7871/2
7873/3 7874/19 7876/6 7878/6 7878/6 7881/18
7883/4 7885/13 7885/21 7886/1 7892/18
7894/13 7897/9 7922/22 7921/20
waivers [4] 7873/5 7881/15 7883/2 7895/15
waives [5] 7863/8 7867/5 7867/22 7869/24
7919/9
waiving [8] 7852/10 7852/12 7869/22 7877/10
7882/14 7888/10 7888/24 7927/17
wake [1] 7900/8
walk [1] 7793/19

**W**

**walked [8]** 7817/18 7817/19 7817/20 7818/24 7819/4 7849/5 7885/23 7889/6
**walking [2]** 7859/11 7897/23
**wants [9]** 7704/6 7738/20 7791/17 7793/19 7814/14 7841/13 7886/14 7900/21 7924/18
**war [1]** 7805/9
**warning [2]** 7873/6 7885/22
**warnings [21]** 7876/3 7881/12 7882/10 7882/14 7883/2 7883/10 7883/10 7885/6 7885/12 7885/12 7885/13 7888/20 7889/25 7891/13 7893/9 7893/9 7893/12 7894/1 7894/2 7920/22 7922/21
**waste [2]** 7821/12 7928/2
**watched [9]** 7890/11 7891/8 7892/4 7892/20 7892/23 7893/1 7893/19 7897/15 7897/20
**watches [2]** 7892/1 7897/12
**watching [3]** 7891/9 7896/15 7897/7
**ways [3]** 7804/20 7926/18 7964/3
**weak [1]** 7687/5
**web [1]** 7960/6
**weeds [1]** 7972/14
**week [6]** 7700/20 7707/3 7707/25 7774/23 7892/2 7972/4
**weekend [2]** 7967/22 7972/17
**weeks [11]** 7728/23 7734/25 7738/14 7738/15 7738/18 7739/5 7894/20 7904/10 7904/20 7904/22 7904/23
**weight [4]** 7866/23 7923/19 7924/20 7946/17
**Weinstein [7]** 7829/9 7829/18 7829/20 7829/21 7830/23 7831/17 7850/19
**Weinstein's [6]** 7829/23 7830/10 7830/18 7830/22 7831/3 7831/7
**welcome [2]** 7822/18 7971/4
**whatever's [1]** 7963/10
**whatsoever [1]** 7868/2
**whereas [1]** 7811/9
**wherefore [1]** 7948/23
**Whispering [1]** 7898/6
**white [2]** 7926/6 7926/17
**whiteout [1]** 7807/13
**whole [17]** 7700/11 7700/24 7713/17 7733/1 7741/8 7741/9 7787/23 7798/20 7833/21 7851/20 7866/8 7885/13 7885/20 7921/21 7964/21 7970/1 7970/2
**wide [1]** 7918/16
**wife [2]** 7851/15 7868/17
**Wigmore [3]** 7866/7 7866/16 7881/20
**Wigmore's [1]** 7867/17
**willing [3]** 7784/18 7819/14 7923/4
**willingness [1]** 7817/5
**wind [1]** 7909/18
**WINSTON [1]** 7670/19
**wisdom [1]** 7867/17
**wish [1]** 7830/8
**wit [2]** 7828/2 7849/3
**withdraw [9]** 7748/19 7776/20 7786/12 7836/11 7838/25 7839/1 7839/2 7840/3 7899/17
**withdrawn [9]** 7708/16 7747/19 7750/20 7750/22 7778/12 7780/12 7780/12 7909/11 7913/17
**withdrew [1]** 7727/21
**withhold [2]** 7734/14 7741/21
**witness [92]** 7684/11 7684/12 7687/21 7687/22 7687/23 7688/1 7689/20 7690/11 7696/12 7697/14 7697/18 7697/22 7710/3 7711/10 7714/25 7717/21 7718/10 7719/21 7728/2 7734/18 7735/8 7751/23 7752/12 7755/14 7755/15 7755/17 7794/23 7799/16 7800/4 7802/9 7803/2 7803/6 7811/16 7811/20 7824/16 7824/18 7824/19 7824/19 7824/21 7852/1 7853/2 7854/24 7855/14 7856/1 7856/6 7857/11 7857/23 7859/24 7860/7 7860/11 7860/12 7862/16 7863/25 7865/3 7873/1 7873/4 7873/7 7875/13 7875/17 7877/22 7879/24 7881/10 7881/11 7881/14 7882/17 7882/18 7886/3 7886/6 7888/24 7891/18 7891/21

7894/8 7894/18 7895/13 7895/13 7895/14 7898/25 7898/11 7900/24 7900/21 7899/6 7909/23 7909/24 7917/25 7920/19 7925/25 7928/13 7928/21 7952/21 7965/11 7968/4 7973/2
**witness' [2]** 7687/20 7826/18
**witnesses [19]** 7683/11 7732/21 7850/23 7865/1 7865/5 7898/17 7927/1 7928/7 7929/21 7929/22 7930/19 7930/22 7951/19 7965/16 7965/23 7966/5 7966/13 7968/18 7971/8
**witnesses' [1]** 7899/23
**woke [1]** 7851/14
**wonder [1]** 7870/22
**wondering [2]** 7837/21 7951/7
**wonders [1]** 7741/19
**Wood [1]** 7717/10
**word [25]** 7730/14 7730/14 7752/9 7752/12 7753/4 7754/9 7755/5 7763/12 7805/9 7810/15 7810/18 7811/12 7813/18 7816/25 7818/20 7820/22 7821/18 7823/8 7823/11 7823/14 7823/21 7825/3 7886/13 7951/13 7963/18
**wording [1]** 7769/18
**words [28]** 7685/1 7746/8 7753/6 7759/3 7759/4 7759/5 7763/6 7763/7 7763/10 7763/20 7763/21 7777/2 7777/5 7784/3 7784/20 7787/17 7791/7 7791/8 7797/17 7814/22 7820/12 7867/17 7914/7 7920/12 7958/25 7962/7 7963/16 7968/23
**works [5]** 7706/4 7897/4 7897/21 7909/17 7921/24
**world [2]** 7962/13 7962/14
**worried [6]** 7715/6 7716/22 7813/3 7813/5 7853/22 7854/12
**worth [2]** 7866/11 7951/12
**write [1]** 7800/20
**writes [1]** 7706/5
**writing [7]** 7846/12 7846/13 7883/11 7885/6 7888/21 7894/2 7894/14
**written [10]** 7674/6 7718/20 7758/19 7787/9 7809/17 7866/8 7867/7 7873/2 7881/12 7960/5
**wrongdoing [1]** 7950/15
**wrote [4]** 7681/20 7802/16 7805/2 7812/5
**Wu [1]** 7813/21

**X**

**X,Y [1]** 7919/22

**Y**

**year [3]** 7740/1 7740/24 7758/13
**years [3]** 7877/8 7884/10 7927/5
**yelling [1]** 7849/19
**yellow [10]** 7930/9 7933/24 7934/22 7949/8 7949/11 7949/13 7949/15 7949/22 7949/24 7950/9
**yesterday [17]** 7682/15 7689/16 7689/23 7707/4 7712/10 7726/6 7735/12 7740/8 7740/10 7815/17 7820/13 7825/25 7826/14 7926/1 7936/13 7956/9 7956/13
**YORK [10]** 7670/1 7670/4 7670/13 7670/14 7670/18 7670/18 7793/10 7847/2 7918/8 7962/8
**Your Honor [117]** 7743/5 7743/12 7743/18 7743/25 7745/17 7747/14 7751/6 7751/22 7752/4 7752/10 7752/18 7754/1 7754/10 7754/20 7755/9 7756/13 7756/16 7757/22 7759/9 7761/2 7761/25 7762/18 7764/5 7764/11 7764/14 7764/18 7764/19 7766/19 7767/6 7770/11 7770/14 7770/22 7771/15 7772/3 7773/3 7773/12 7823/4 7824/13 7824/24 7825/21 7825/24 7827/8 7827/14 7827/16 7828/6 7828/20 7828/21 7828/22 7830/17 7830/21 7833/12 7834/4 7836/8 7836/23 7837/8 7837/9 7840/3 7840/10 7840/18 7841/4 7841/11 7841/20 7842/15 7842/17 7843/4 7843/5 7843/14 7844/7 7844/12 7844/23 7845/13 7846/7 7846/14 7846/23 7847/20 7850/14 7850/20 7851/1 7851/12 7852/16

7855/1 7855/22 7856/3 7856/21 7857/4 7858/7 7858/20 7860/2 7898/6 7899/24 7899/25 7900/1 7900/9 7901/8 7901/25 7907/13 7908/12 7909/21 7912/16 7913/11 7913/22 7913/24 7914/18 7915/17 7960/2 7962/15 7966/25 7967/9 7968/12 7968/13 7970/21 7970/23 7971/2
**Your Honor's [1]** 7899/21
**yourself [2]** 7717/7 7763/17

**Z**

**Zammit [1]** 7762/24
**zero [3]** 7855/12 7910/18 7961/22
**zoom [1]** 7789/4