7974

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                        15-CR-00637(KAM)
 3   UNITED STATES OF AMERICA,
                                        United States Courthouse
 4                                      Brooklyn, New York

 5           -against-                  December 06, 2017
                                        9:00 a.m.
 6   EVAN GREEBEL,

 7           Defendant.

 8   ------------------------------x

 9           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
               BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                 UNITED STATES DISTRICT JUDGE
                        BEFORE A JURY
11
     APPEARANCES
12
     For the Government:        BRIDGET M. ROHDE, ESQ.
13                              Acting United States Attorney
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  DAVID PITLUCK, ESQ.
                                BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                              BY:  DAVID KESSLER, ESQ.
                                Assistant United States Attorneys
17
     For the Defendant:         GIBSON DUNN & CRUTCHER
18                              200 Park Avenue, 48th Floor
                                New York, New York 10166
19                              BY:  REED BRODSKY, ESQ.
                                BY:  RANDY MASTRO, ESQ.
20                              BY:  MYLAN LEE DENERSTEIN, ESQ.
                                BY:  JOSHUA DUBIN, ESQ.
21                              BY:  LISA RUBIN, ESQ.

22   Court Reporter:            Rivka Teich, CSR, RPR, RMR
                                Phone:  718-613-2268
23                              Email:  RivkaTeich@gmail.com

24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

                          PROCEEDINGS

1              (In open court.)

2              COURTROOM DEPUTY:  All Rise.

3              THE COURT:  Mr. Chan, did you and Ms. Rubin make

4     further --

5              MR. CHAN:  We are about to file something.  The

6     witnesses it relates to are not likely to go today, if at all.

7     One of them might go today at the very end.  We're about to

8     file within the next five minutes.  It relates only to the one

9     witness that might testify today.

10             THE COURT:  I will be on trial, I don't know when

11    you want me to deal with the outstanding issues.  You people

12    are just beyond the pail in pushing the envelope on

13    submissions and how quickly you expect the Court to react.

14             MR. CHAN:  I think there is almost no chance that --

15    I'm talking about Professor Lewis, that he will testify today.

16    That witness is the fourth potential witness today, if we have

17    a case today.  Even beyond this witness and even beyond Rule

18    29 arguments, I don't think that witness is going today.

19             THE COURT:  Have you given the Government your

20    lineup?

21             MR. CHAN:  Yes.

22             THE COURT:  Are we then at the point --

23             MS. SMITH:  Your Honor, to put it on the record, we

24    got a lineup at 7:30, and then we got a revised lineup at 2:30

25    in the morning.

7976

PROCEEDINGS

1        THE COURT:  2:30 in the morning.

2        MS. SMITH:  Which we picked up this morning.

3        THE COURT:  Did they change the order?

4        MS. SMITH:  Yes, not for the first witness.

5        MR. BRODSKY:  For clarity, on the record that is

6   important to us --

7        THE COURT:  Do you deny you submitted something at

8   2:30 in the morning that revised your order of witnesses?  Do

9   you deny that?

10        MR. BRODSKY:  No, your Honor.  We gave them the

11   names of four people, last week we gave the names of five

12   people in likely order.  We understood we should give the

13   order of the three most likely people in the order in which

14   they appear.

15        We gave four names and we just switched -- so we

16   gave one name, a second name, then on the third since we

17   didn't know about the expert situation, we said either this

18   person or this person either, Professor Lewis or this other

19   person.  Then we switched because they were the three people

20   fact witnesses, we switched the second and the third fact

21   witness.

22        So we understood the Government was preparing for

23   all three to go.  We did switch the second and third for our

24   own scheduling and other issues that we're having.  We are

25   juggling and the challenges that the Government had expressed

PROCEEDINGS

1    to us when they changed orders in their case in chief, which

2    did happen.

3                THE COURT:  Did they tell you at two in the morning

4    before the witness was to testify what their order was going

5    to be?

6                MR. BRODSKY:  I don't remember an e-mail.

7                THE COURT:  I don't believe they did or I would have

8    heard about it, wouldn't I?

9                MR. BRODSKY:  We got updates from the Government,

10   your Honor, the Friday before, or the Thursday before the

11   prior week.  And then that week's order often changed because

12   of people's schedule.  What would happen is we would get an

13   order, then at about eight or 9:00 o'clock we would e-mail

14   them.  We would say, can you tell us who is going tomorrow.

15   And then they would get back to us late at night telling us

16   who is going the next day.

17               So I think the Government understands the challenges

18   that are here.  But if you --

19               MS. SMITH:  For the record, I do not want to get

20   into it but because we are making a record, the Government

21   always before the end of the court day, at the end of the

22   court day, provided the defense with the witness for the next

23   day.  There are no late night e-mails changing witnesses.

24   There were no witnesses that were changed the morning of.

25   There weren't.  If Mr. Brodsky wants to give us an example

PROCEEDINGS

1   that's fine.

2          MR. BRODSKY:  Ms. Smith, I'm sorry, there are

3   multiple examples.  Ms. Denerstein is the one who handled

4   scheduling.  There are multiple examples when we asked you at

5   the end of court who is going tomorrow, and you said we don't

6   know, we're dealing with scheduling issues.

7          MS. SMITH:  I'm not getting into it.  I disagree

8   with Mr. Brodsky's characterization but we should move things

9   along.

10          THE COURT:  All right.  Is there anything else we

11   need to deal with before we decide to bring the jury in?

12          MR. BRODSKY:  Just one.

13          MR. DUBIN:  We'd like to respond to the Government's

14   submission last night about the consciousness of innocence.

15   And what we propose, as I mentioned to the Court before the

16   end of the day, was just two questions for Special Agent

17   Delzotto.  Was to point him to his testimony that he testified

18   that one of the reasons that he didn't speak to Mr. Greebel

19   before arresting him is that, quote, "He was an attorney.

20   He's well aware of his rights so the odds of him speaking to

21   me are nil," that was at page 7911 lines 13 through 15.

22          Just to ask him, "When you testified, 'He's well

23   aware of his rights,' you meant that he knew that he could

24   just inform you that he wanted an attorney and refuse to speak

25   to you, that's what he's referring to?"  Then follow up with,

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    "Isn't it a fact that once he was arrested he spoke to your

2    colleague without an attorney for several hours."

3            We won't mention anything about waiving his rights

4    or anything like that.  And that he knew that the interview

5    was recorded.  I think that we were very careful in looking

6    through the transcript last night and we know of no case law

7    or precedent that says that we're not permitted to explore

8    this area.  So that was the question that we wanted to front

9    to the Court.

10           THE COURT:  All right.  May I hear from the

11   Government?

12           MR. PITLUCK:  Your Honor, we did submit a letter

13   last night.  We apologize for the hour, but this is an

14   important issue, one without clear precedent.  We wanted to

15   gather the case law in addition to doing a number of other

16   things for the Court.

17           Our concerns are many on this line of inquiry,

18   particularly since there is no evidence in the record of a

19   post-arrest interview at this point.  Obviously I don't want

20   to rehash our letter, but we want to point to two practical

21   situations here.  One is in responding to an argument about a

22   post-arrest interview, which will undoubtedly be raised in

23   summation.  We'd like to have -- if the Court is inclined to

24   permit this line of questioning, we'd like to consider whether

25   Special Agent Delzotto is the appropriate witness, if the

7980

PROCEEDINGS

1  Court is still inclined to consider this.  We believe it's

2  inappropriate, as we said in our letter.

3          How we respond to that -- the Court raised that

4  issue yesterday.  We thought a lot about it.  In summation and

5  rebuttal summation how do you respond to an argument about

6  what a defendant says or doesn't say, or does or doesn't do

7  after they are arrested is kind of ripe for disaster in the

8  event there is an appeal.  We have to be, we feel the need

9  that we're going to have to address it.  We're not going to

10  leave it alone.  The issue is what do we say that doesn't

11  impinge bring on a Fifth Amendment right.

12          The other issue, as we were considering it, is

13  you're asking the jury to draw conclusions about hearsay

14  statements that are out of court not before the jury.  And

15  that's, I appreciate that the defense acknowledges that they

16  can't address the actual statement, but the fact that

17  statements were made and the fact that they are not before the

18  jury with no hearsay exception means the jury is considering

19  hearsay that is not in evidence.

20          The third and most practical point is there is no

21  clear precedent.  As we point out, Biaggi has been basically

22  limited to the facts of immunity.  We cited a number of cases

23  in which virtually every other application, including all the

24  implications in Biaggi have been soundly rejected by courts in

25  this circuit because the implication, the practical

7981

PROCEEDINGS

1    implication, here is one that is highly problematic going

2    forward with precedent.  Which is, if a defendant invokes,

3    waives Miranda, and makes statements, and they are allowed to

4    put in the fact that they made statements without the

5    statements coming in, then every time a defendant waives

6    Miranda rights and makes statements, regardless of whether

7    they are false, exculpatory confessions, whatever it is, it is

8    permissible for the jury to hear that they made statements.

9    Even if the Government, the party that gets to put them in if

10   they so choose hasn't put them before the jury, that's highly

11   problematic going forward and will dramatically alter how

12   procedures are done.

13           This is kind of a far-reaching issue.  It makes us

14   nervous that this is a potentially precedential issue that

15   does not appear to comport with Second Circuit case law.

16           The immunity context is totally different.  The

17   courts all make that perfectly clear.  There is no other

18   implication to draw.  And the fact that you waive Miranda

19   rights and speak to the law enforcement says nothing.

20           So your Honor, for the reasons in our letter we

21   think this line should not be permitted at all.  It's

22   incredibly problematic under the rules of evidence.  But we --

23   and if the Court, as the Court indicated before, hopefully now

24   that we have a better recitation of the post Biaggi case law,

25   we've been able to persuade the Court otherwise, but we really

PROCEEDINGS

1   have to consider what questions can be asked and who they are

2   asked of.  As I said, this is creating a problematic response.

3   In order for us to address this issue we are going to have all

4   sorts of problems on rebuttal in invoking Fifth Amendment

5   rights, which is something and our appeals team monitor in

6   every single case, as the Court is aware.

7        MR. DUBIN:  I'll be brief in my response.  None of

8   what Mr. Pitluck just said applies to this situation.

9        We also to the took a close look at Biaggi.  That

10  deals with the substance of the post-arrest statements, the

11  substance of them.  We, after your Honor's ruling at sidebar

12  yesterday, I think you saw us huddle in the corner.  We made

13  the conscious decision to steer clear of it with Special Agent

14  Delzotto.

15       He offered it up.  He said -- and I won't keep on

16  repeating it, the Court is well aware of what he said -- but

17  he raised it.  And we should have an opportunity to rebut what

18  he said.

19       THE COURT:  He didn't raise it.  Excuse me.  He

20  didn't raise it in the context of the post-arrest statements.

21  He raised in response to a question as to why he didn't

22  interview Mr. Greebel prior to his arrest.  It had nothing to

23  do with post-arrest statements.

24       MR. DUBIN:  Agreed.  But the implications is when

25  the stakes are arguably a lot lower for somebody that is

PROCEEDINGS

1   either potentially going to be arrested or realizes that he's

2   being investigated, when the stakes are a lot lower, what

3   Special Agent Delzotto has communicated to this jury is that

4   even when he just knows that he might be investigated he won't

5   say anything, he will lawyer-up.  Because according to Special

6   Agent Delzotto's view of it, he's well aware of his rights.

7   Now when the stakes are even arguably higher, much higher, he

8   knows he's a lawyer, according to Special Agent Delzotto, what

9   his rights are, and if there were ever a right to remain

10  silent and say nothing it's when you've been arrested and

11  sitting in custody handcuffed to a wall.

12          What Mr. Greebel does, is in fact say I'll speak

13  anyways.  We won't mention waiving the rights.  But I think

14  what Special Agent Delzotto said and it being in the

15  pre-arrest scenario made it ten times worse.

16          And there is this notion that we're going to ask

17  him -- I just fronted the questions.  I won't say that, don't

18  you know that he had a right to remain silent, he waived his

19  rights.  None of that.  The question will be, here was your

20  testimony, it's a fact that he did the opposite of what you're

21  saying you would expect him to do with full knowledge of his

22  rights pre-arrest.

23          We have the right to impeach.  He assumed

24  Mr. Greebel would not talk even pre-arrest.  But he did talk,

25  that's all we want to bring out.  We think we should be

PROCEEDINGS

1    permitted to do that.  Lest the jury be left with the

2    misimpression because Mr. Greebel is an attorney and was well

3    aware of his rights, the odds of him speaking are nil.

4           Completely different subject as to the whether or

5    not we'll call the agent that actually sat there when he

6    waived his rights, with full knowledge of his rights, got a

7    waiver.  We won't get into any of that.  We should certainly

8    be permitted to go through this.

9           I'll point to the Court, also, that his knowledge of

10   the fact that he knew or became aware that he waived his

11   rights needs to be viewed in the context of imputed knowledge

12   amongst law enforcement.  Think about the opposite scenario,

13   if you will, for a moment.  There is a constructive knowledge

14   of a waiver.  If one Special Agent goes in the room and had

15   Mr. Greebel said, you know what, I don't want to speak.  I've

16   invoked my right to counsel.  And then another agent could

17   have then come in the room and said, well, you didn't say is

18   it to me, so come on, now you're going to talk, right.  There

19   is constructive knowledge, imputed knowledge.  So you can't

20   have it both ways.

21          He certainly -- we're respectful of the Court's

22   ruling.  We won't get into whether or not he was there, if he

23   was read the rights, did he read the form, nothing like that

24   at all.  We should be permitted to confront him.

25          He has told this jury he assumed that he wouldn't

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1   talk and the chances were nil.  And we want to bring out, and

2   we know that we think that we are permitted, quite

3   respectfully, your Honor, to bring it out.

4              THE COURT:  Bring what out?  Not the waiver.

5              MR. DUBIN:  Not the waiver, just say the fact is --

6              THE COURT:  Mr. Greebel spoke to the agents after he

7   was arrested.

8              MR. DUBIN:  Yes.

9              THE COURT:  Without an attorney.

10             MR. DUBIN:  Yes.

11             MR. PITLUCK:  Your Honor, if we could be heard on

12   that.  I think --

13             THE COURT:  Wait.  I know that your letter addresses

14   a much broader scenario.  They have a fairly targeted precise

15   set of questions they want to ask.  One, that Mr. Greebel

16   after he was arrested did speak to agents of the FBI.  That's

17   pretty much it.

18             MR. DUBIN:  Yes, without an attorney.  Correct.

19             MR. PITLUCK:  That's the precise concern.  This is

20   not impeachment.  Special Agent Delzotto's answer to a

21   question about pre-arrest, why they didn't do something, is

22   totally unrelated to the issue of what actually happened after

23   the arrest.  It is not impeachment of his belief that they

24   wouldn't speak to somebody.  To say that he actually did

25   speak -- they are totally unrelated issues.  And they are

PROCEEDINGS

1   putting it in front of the jury.  The issue of the post-arrest

2   statements, which is, there is no correlation, there are is no

3   relation between the two.

4            They want to get it in front of the jury.  It's

5   hearsay and they want to make an inference that because there

6   were no statements said that whatever was said must have been

7   good.  That violates the hearsay rule.

8            If defense counsel will stipulate that they are not

9   going to argue that he made statements to law enforcement

10  after he was arrested regardless of whether he waived Miranda,

11  regardless of whether he was represented, there is no issue.

12           Our concern is what implication is going to be from

13  this.  I respect the Court's view that this is, it's been

14  narrowed a lot, but the narrowing still very much concerns us.

15           One, because it's totally unrelated.  It's

16  bootstrapping an unrelated issue that was in response to a

17  question on cross.  It's not about impeachment on credibility,

18  but his belief.  If they had said, well, you spoke to this

19  person before us and they did speak to you, that's arguably

20  relevant, that's not at issue here.

21           This is taking a pre-arrest situation and imputing

22  it on post-arrest and trying to bring something that is not

23  before the jury, not properly before the jury.  So your Honor,

24  the hearsay issue, the constructive knowledge and Miranda

25  waiver is a constitutional protection.  That's totally

PROCEEDINGS

1    unrelated to the rules of evidence and hearsay, as the Court

2    knows, obviously, and Ms. Smith mentioned yesterday.  We will

3    have to put people -- if we want to present events we have to

4    put on a law enforcement that was there.  We can't say, you

5    saw a video or somebody told you, you had constructive

6    knowledge.  That's different than the Miranda issue.

7    Regardless of whether -- that's a tertiary issue.

8         The main issue is whether these questions can be

9    asked simply because of the response that the Special Agent

10   gave in a totally unrelated context, pre-arrest issue.  There

11   is no impeachment.  This is very, very clear.  They want the

12   inference that the statements he made are good for them.  That

13   violates hearsay.  We can't respond to it properly it's not

14   before the jury.  They are trying to bootstrap something that

15   is unrelated.

16        MR. DUBIN:  Your Honor, we're trying to do nothing

17   of the sort.  We really aren't.  This what is concerning about

18   this.  They can throw around words like bootstrap and

19   unrelated; this could not be more related.

20        He has intentionally injected into the, before this

21   jury, as Special Agent Delzotto the notion that Mr. Greebel

22   knows his rights and would never say anything, would never say

23   anything, the odds were nil.  His credibility, as the Court

24   recognized yesterday, is fair game for cross-examination.

25   What he's saying, he's floating the notion out there that even

PROCEEDINGS

1    if he wasn't in custody, even if he was being investigated, he

2    wouldn't talk.

3           Let me be clear, so I'm not mincing words,

4    absolutely we have the view that event notwithstanding your

5    Honor's instruction, which we think is a proper instruction,

6    that law enforcement can use whatever investigative techniques

7    they want and that's not for the jury to speculate, we

8    understand what the instruction is.  That does not preclude us

9    from making the argument, because he even, Mr. Delzotto said

10   it himself, that it's not like there is no opportunity to

11   speak to the target of an investigation.  He himself said US

12   Attorney officers do that.  They can explain their reasons why

13   they did it.  He can and did explain the reasons why he did

14   it.

15          The fact is, he opened the door to us to ask the

16   simple question to rebut the inference.  We think the

17   inference he put before this jury yesterday is that as an

18   attorney who knows his rights he would never talk, would never

19   say anything.

20          And the case that has been up for discussion, the

21   Biaggi case, couldn't be more on point.  The fact that --

22   we're not looking to put the substance of his statements in or

23   ask the jury to infer that what he said was in fact true, was

24   in fact evidence, that if you take the substance of what he

25   said that he's innocent.  They have the ability and the right

PROCEEDINGS

1    to put on his post-arrest statements.  If they chose not to do

2    so, so be it.

3           We are simply going to ask the question that he

4    talked, after was arrested.  He did the opposite of what

5    you're saying the odds are that he wouldn't do, pre-arrest or

6    post-arrest.  And we'll make the distinction.  You said

7    pre-arrest, that the odds of speaking because he's an attorney

8    and knew his rights were nil.  But once he was arrested and in

9    custody he spoke without an attorney there.  That's it.  I

10   think we should be permitted to ask that simple question.  We

11   have the right.

12          The Government, quite respectfully, their view of

13   what is impeachment and what isn't, and what is a fair

14   question to call into question Special Agent Delzotto's

15   credibility, is for argument.

16          MR. PITLUCK:  Your Honor, I'm sorry, but I have to

17   make a quick point.  There are two issues being conflated.

18   The issue is for Special Agent Delzotto's impeachment of his

19   statements is irrelevant and improper.  Then that is the only

20   use it can be argued for.  Which is, you heard testimony from

21   Special Agent Delzotto, he can't be believed because he was

22   wrong about whether the defendant would speak to

23   investigators.  It cannot be used for the substantive point

24   of, he spoke therefore he had nothing to hide, which is

25   clearly what this is being offered for.  You can't take an

7990

PROCEEDINGS

1    impeachment question and turn it into something substantively

2    true.

3            MR. DUBIN:  Practically speaking, your Honor, when

4    you say somebody knows their right and doesn't speak, the

5    practical implication is that they have something to hide.  I

6    couldn't have deeper respect for a criminal defendant or the

7    accused's Fifth Amendment right, but the practical reality is

8    that some people hear the words lawyering-up or wouldn't speak

9    and draw the quite opposite inference, is that they did that

10   because they have something to hide.  Which is something that

11   everybody considers when, or that all criminal defense lawyers

12   should, and I hope do, consider and certainly the accused

13   consider when they decide whether or not they are going to

14   testify.  These are completely different issues.

15           The inference that he put before the jury, Special

16   Agent Delzotto, is that he wouldn't speak because he's an

17   attorney and knows his rights.  We're quite concerned, deeply

18   concerned, that the jury will draw the inference that he had

19   something to hide.  That is the implication.  That is why he

20   said what he said.

21           We believe regardless of what his intention was, we

22   are proposing a very targeted question steering clear of him

23   saying, of us inferring that, well, he was read his rights,

24   waived his rights, anything like that.

25           The question is simple:  "Isn't it a fact, once he

7991

PROCEEDINGS

1    was arrested he spoke to your colleague without an attorney

2    for several hours and you recorded it and he knew it was

3    recorded and said fine."  That's it.

4            MR. PITLUCK:  Your Honor, obviously that just

5    directly displays what this is being offered for.  Special

6    Agent Delzotto asked (sic) that question because he was

7    confronted a number of times on why he didn't interview

8    Mr. Greebel.  He gave the answer.  This was not an attempt to

9    portray the hypothetical view of somebody not speaking to them

10   pre-arrest at an attempt that they had something to hide.

11   These questions are being asked, he spoke to you for several

12   hours without an attorney.  For several hours without an

13   attorney, to show something the, presence of something there

14   is no absence of.

15           This is, it's being bootstrapped on a totally

16   unrelated theory.  It's not, it's not offered for impeachment.

17   It's offered to show that the defendant spoke to law

18   enforcement without an attorney for several hours and

19   everything they can argue off of that, which is impossible for

20   us to respond to.

21           MR. DUBIN:  We looked at the transcript.  He was

22   asked if he spoke to Mr. Greebel, if he attempted to interview

23   him, yes or no.  He offered an explanation.  He wasn't

24   confronted, he wasn't confronted about his, about whether or

25   not he would lawyer-up or what his rights were or you knew

PROCEEDINGS

1    that he might speak to you, or anything like that.  He was

2    simply asked, "Did you approach or attempt to speak to

3    Mr. Greebel, yes or no?"  He offered this explanation.  We are

4    asking for the opportunity to confront him with the simple

5    question.  We think that we should, quite respectfully, be

6    permitted to do so.

7              MR. PITLUCK:  It's not a simple question, that's our

8    issue.  This involves very serious constitutional rights that

9    have not been raised to this jury.

10             MR. DUBIN:  We believe they have been, your Honor.

11             THE COURT:  I understand.  I think that what an

12   agent does while he is in the throws of an investigation, and

13   before an arrest of a target is effected, they have

14   considerations about what steps to take or not take, vis-a-vis

15   the target.  In this agent's view, I think that he reasonably

16   could have believed that because Mr. Greebel is an attorney

17   and works in a law firm for several years, where he has

18   colleagues, perhaps even friends and supporters, that speaking

19   to Mr. Greebel or members of the firm would not be prudent in

20   terms of preserving the integrity of the investigation.

21   That's not a surprising concept.

22             The fact that he was incorrect about Mr. Greebel's

23   willingness to speak, doesn't mean that he's not credible or

24   believable.  But rather, it means that he was incorrect about

25   Mr. Greebel.  All right.

PROCEEDINGS

1        I do think that there is, that it would be

2   appropriate for you to elicit from the witness on cross that

3   Mr. Greebel after his arrest did speak to the agents.  I don't

4   think that you should get into a videotape.  I don't think you

5   should get into the length of time.  I do think it's

6   appropriate for you to ask a simple question as to whether

7   this agent is aware that Mr. Greebel post-arrest, and if he

8   want to say post Miranda warnings, spoke to the agents, and

9   that's it.

10        MR. DUBIN:  Very well.

11        THE COURT:  I appreciate the Government's research.

12   I see that there are numerous cases in which the Second

13   Circuit has upheld the preclusion of evidence regarding offers

14   to take a polygraph, rejections to plea offers, Biaggi was a

15   rejection of an immunity offer.

16        I think that there are two issues at play.  One is

17   the defendant is allowed to confront the agent with the fact

18   that he mistakenly believed that Mr. Greebel would not speak

19   to him.  It doesn't undermine, in any respect, his conduct of

20   the investigation and the means by which he chose to interview

21   or not interview certain witnesses.

22        I will emphasize that the FBI and the Government are

23   not on trial.  I will say that now and I can say that again in

24   my main instructions.  That's not an issue for the jury.

25        But to the extent the defense wishes to, and wishes

7994

PROCEEDINGS

1    to present evidence of Mr. Greebel's state of mind, which is

2    an issue in this case, they are not obligated to present that

3    evidence, but to the extent they want to assume the risk that

4    a jury may infer if he does not take the stand here that the

5    converse of any inference is true.  They run that risk.

6           And Mr. Brodsky and you, Mr. Dubin, along with your

7    team and Mr. Greebel, are making an informed decision to

8    assume a risk that despite my instructions to the jury about a

9    defendant's right not to testify and the instruction they

10   cannot draw inferences from that and that they cannot even

11   discuss it, I'll tell them they cannot even discuss that fact

12   if Mr. Greebel doesn't testify, if you make too much of a fact

13   that his post-arrest statement is consciousness of innocence,

14   you should be well aware that most reasonable people would

15   wonder about the opposite --

16          MR. DUBIN:  We understand, your Honor.

17          THE COURT:  -- the opposite inference.  Mr. Greebel

18   has a right, that we fought very hard I would defend and you

19   would defend and I think the Government would defend, the

20   right not to testify and put the Government to its proof.  But

21   by raising this and planting the seed you are running a risk,

22   which if this case is on appeal you may have issues.

23          MR. DUBIN:  We --

24          THE COURT:  You opened this door.  And I think we'll

25   have to talk about how the Government confronts that evidence

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1  without running afoul of Mr. Greebel's rights, if he chooses

2  to do so during this trial.

3          MR. DUBIN:  Understood, your Honor.

4          MR. PITLUCK:  Your Honor --

5          THE COURT:  I think that if we narrow it to that one

6  question, without reference to a videotape, without reference

7  to the length of time, but simply the fact that he made a

8  statement after he was arrested, that would be sufficient.

9          MR. DUBIN:  Thank you, your Honor.

10         MR. PITLUCK:  Your Honor, obviously we respectfully

11 disagree with the Court's decision.  We understand and we will

12 follow it, but I think what we are seeking guidance on, now is

13 it seems like the Court's decision is based in the impeachment

14 or the questioning of Special Agent Delzotto.  We would like

15 clear guidance as to what the defendant can use to argue from

16 those statements in closing.  And as the Court indicated, how

17 we may respond because we have to consider our options, both

18 for redirect and the possibility of consulting our appeals

19 division, before that question is asked to see if there

20 anything we need to do.

21         THE COURT:  I don't want to the give you advice on

22 that, that is for your appellate division.

23         MR. PITLUCK:  What we're looking for guidance from

24 the Court on is to inform our decision-making process in the

25 next five minutes.  If it's limited to the impeachment of the

PROCEEDINGS

1   agent in summation, then we can appropriately rebut without

2   running into issues.  If this is, as the Court alluded, going

3   to be argued for consciousness of innocence in a closing that

4   the defendant spoke to investigators, we have to be able to

5   respond to it.  I don't think that's appropriate, based on the

6   Court's ruling.  That's not implicated, that's an

7   inappropriate argument to make based on the impeachment of the

8   case agent.

9           THE COURT:  You're asking me to rule whether or not

10  they can argue that this is consciousness of innocence?

11          MR. PITLUCK:  Yes.

12          THE COURT:  All right.  It seems --

13          MR. DUBIN:  We'd like to the opportunity to respond

14  to the letter first.

15          THE COURT:  -- it seems to me the case law is

16  consistent that they cannot make that argument.

17          MR. PITLUCK:  Cannot.

18          THE COURT:  Based on the cases you cited.  If you

19  come up with cases that hold to the contrary...

20          MR. DUBIN:  We think that it's completely

21  permissible.  We think the case law holds it.

22          THE COURT:  Show me the cases.

23          MR. DUBIN:  We'll respond today.

24          MR. PITLUCK:  Your Honor, obviously, once these

25  questions are asked, this is out of the bag and our redirect

PROCEEDINGS

1    has to be related to -- we don't want to further open the

2    door, but we need to appropriately respond as to what

3    appropriate redirect is.  If it's simply for impeachment

4    purposes and argued as such, we don't have to ask questions

5    about the case agent's experience related to defendants or

6    targets who do and don't speak, whether those people end up

7    pleading guilty or convicted of crimes.  If it's offered for

8    conscientiousness of innocence, that's appropriate rebuttal

9    testimony.  But once we elicit that, then the defense is going

10   to argue that the door is open fully.  If the door is closed,

11   we'll keep it closed.

12            MR. DUBIN:  I'll represent to the Court, the purpose

13   of that, are the objective is for impeachment right now.  I

14   can't make a representation about what we are or aren't going

15   to argue during our summation.  Your Honor -- can I finish.

16            I can't make a representation what we are going to

17   argue during our summation.  I'm not faulting them for the

18   late hour of the submission, but we have to have a chance to

19   respond to the letter.

20            MR. BRODSKY:  We obviously are not going to argue

21   the consciousness of innocence without the Court knowing on

22   ruling after the briefing.  We will respond to the letter

23   based on, not on what this witness says, but if we were going

24   to introduce the evidence, we understand, your Honor, that we

25   would have to do it in our case in chief and call the Special

PROCEEDINGS

1   Agent who actually took -- as we understand your Honor's

2   ruling, took statements.  We won't be eliciting the

3   statements.  We will respond to the Government's brief and

4   then --

5          THE COURT:  What I'm disinclined to allow is an

6   argument by the defendant that this specific act of

7   Mr. Greebel, making a post-arrest statement, is evidence of

8   his conscientiousness of innocence.

9          MR. DUBIN:  I'll make the representation now to the

10  Court and to the Government, that based on the fact that he

11  just, just the fact that he spoke to them in the question as

12  posited, it will not be used to argue consciousness of

13  innocence.

14         THE COURT:  All right.

15         MR. PITLUCK:  So your Honor, this is obviously

16  putting the cart in front of the horse.  There is an

17  indication that they want to call one of the case agents who,

18  one of the FBI agents, who was present during the interview.

19  And that's a separate but different issue.  Obviously, we

20  think under the law that's precluded.  But the having this

21  testimony elicited from the Special Agent, if they are going

22  to go down the road to argue that, then we are entitled and we

23  should be able to have one of the case agents, the person who

24  was first confronted with the issue, respond to it as

25  appropriate.  Because you can't say it's for impeachment then

PROCEEDINGS

1   bring in another case agent, then argue that both of them said

2   it.

3           THE COURT:  This is the thing, I'm wondering whether

4   or not, if all the defense wants to elicit is the fact that a

5   statement was made post-arrest, I think agent Delzotto already

6   said --

7           MR. DUBIN:  He did.

8           THE COURT:  -- that he was aware of it.  If that is,

9   if we are limiting the use of that testimony to impeaching his

10  view that Mr. Greebel as an attorney would never speak to law

11  enforcement, at least prior to his arrest, and if this agent

12  has already stated before this jury, and we haven't stricken

13  it, there has been no application to do so, he already stated

14  to the jury that he's aware that Mr. Greebel made a

15  post-arrest statement, then maybe we don't need the agent to

16  come in.  Why would we?

17          MR. PITLUCK:  I agree, your Honor.  But on the

18  premise or on the Court's holding just now that this is going

19  to be limited at closing to impeachment of the agent and not

20  the consciousness of innocence, I'm a little concerned.  It

21  happens all the time, that during the trial we are limited to

22  what we can argue in closing on both sides based on what

23  evidence comes in.  I'm a little concerned if we do this then

24  all of a sudden something is going to change.  And that, I

25  guess, that's our concern.

8000

PROCEEDINGS

1              THE COURT:  If this comes out during argument, I

2      will strike it from the record.  I will remind the jury that

3      arguments are not evidence and that they should disregard the

4      statement.

5              MR. DUBIN:  Okay.

6              THE COURT:  We need to bring the jury in, they are

7      waiting 45 minutes.

8              MR. BRODSKY:  One request, you indicated you were

9      going to instruct the jury.  We ask not to instruct the jury,

10     with respect to the FBI is not on trial, during the agent's

11     testimony.  The reason for that there is a lengthy instruction

12     that comes with something like that.  It's balanced.  If you

13     give the instruction during the testimony --

14             MR. DUBIN:  You indicated you would do it during --

15             THE COURT:  I was going to -- my sense was there are

16     a lot of questions about the agent, whether he looked at every

17     document; whether he got documents from Katten; whether he

18     spoke to any partners of Mr. Greebel; whether he spoke to any

19     employees of Katten; whether he spoke to any departed

20     employees of Katten; whether he tried to speak to Mr. Greebel

21     himself; whether he tried to find out about Mr. Greebel's

22     reputation within the firm; whether he subpoenaed documents

23     from sources other than Katten; whether he saw every document

24     that he now has before he arrested Mr. Greebel, all of those

25     questions were asked.  And it I think the inference was, that

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    the inference that was created is that somehow the FBI is on

2    trial.

3           You also asked whether he violated FBI policy, and

4    isn't it a fact that the FBI should be doing X, Y, Z before

5    they arrest somebody for non-violent, white collar case.

6    There was a lot of that, right.

7           So my concern is that the jury may be distracted

8    thinking, wow, we can think about whether or not the FBI

9    performed adequately in evaluating this evidence, which really

10   is not about the FBI.  The case is about whether the

11   Government can prove the charges against Mr. Greebel.

12          MR. DUBIN:  We know that instruction is going to be

13   given at the end of the case.  We have grave concerns for your

14   Honor to do that now right in the middle of his testimony.

15   Here is why.

16          When Mr. Aselage or Mr. Richardson, in our view,

17   excused vernacular, were screwing our client to the wall, with

18   what we think was ridiculous and not credible testimony, it

19   would be tantamount to your Honor right in the middle of their

20   testimony saying, Ladies and gentlemen, they are calling into

21   question Mr. Greebel's guilt or innocence here and they are

22   painting him as a guilty man.  But I remind you, ladies and

23   gentlemen, that the presumption of innocence still attaches.

24          We would have loved that instruction.

25          THE COURT:  I say that at the end of every day.  I

8002

PROCEEDINGS

1    remind them to keep an open mind, that this case is not over

2    until both parties rest.  We've given that instruction.  I

3    think at the end of every day I tell them to maintain an open

4    mind.

5         MR. DUBIN:  I think, quite respectfully, your Honor,

6    that is very different than, keeping an open mind is different

7    than continuingly reminding them that he's presumed innocent.

8         I think the jury is going to get this instruction at

9    the end of the case.  We have no quarrels with the

10   instruction.  We went in eyes wide open knowing that will be

11   the instruction.  But to call attention to it right in the

12   middle of the testimony is, we think, highly prejudicial,

13   quite respectfully.

14        THE COURT:  I'll hear from, Mr. Pitluck.

15        MR. PITLUCK:  Well, your Honor, we think the Court

16   has given a number of instructions to the jury during the

17   case, including as recently as yesterday, that are appropriate

18   for the circumstances at the time.  That, as your Honor

19   pointed out, this is an appropriate instruction given at this

20   point in time.  There is absolutely nothing that says you

21   can't give the instruction at trial.  We think it's

22   appropriate.  We would certainly ask for it.

23        But I would also, I know we're in a hurry, but I

24   would make two quick requests in light of the ruling on this

25   view.  We would ask that for the questions that are actually

8003

PROCEEDINGS

1    going to be asked to be proffered to the Court in advance,

2    Mr. Dubin read some, and we appreciate that.  It sounds like

3    the Court narrowed them.  We would like to know what is going

4    to be asked.  We would like to instruct Special Agent Delzotto

5    or inform him that he's going to be asked these questions, yes

6    or no; and he should answer yes or no.  We're very concerned

7    about him saying something that goes afield of what the

8    Court's ruling is and what the Court's concern is.

9              MR. BRODSKY:  With respect, your Honor, to the jury

10   instruction.  As your Honor considers it, if you consider it,

11   your Honor, we think, to be balanced, we're going to request a

12   jury instruction that says pursuant to Second Circuit case

13   law, if the failure to use a particular investigative

14   technique raises reasonable doubt about any element of the

15   offense, then you must acquit.

16             THE COURT:  Let's do this, let's put an end to it.

17   I will wait until the end to give the instructions on the both

18   those subjects.  It might appear that I'm trying to support

19   the FBI agent in someway.  I don't want to make that, create

20   that impression.  I think the end of the trial instructions

21   will be adequate to address all of those concerns.

22             With regard to the questions, I do think that I've

23   made a ruling, I've been pretty clear about what the

24   parameters are.  Mr. Brodsky, I'll warn you now, do not go

25   beyond that.  Make sure you're not going to include in your

8004

PROCEEDINGS

1  yes or no questions making statements that go beyond what I've

2  ruled.  I would be very concerned.  I don't what to admonish

3  you in front of the jury, but I will if you cause me to do so.

4          MR. BRODSKY:  Yes, your Honor.  I was just trying --

5  I will follow it.  I was trying to change the question now.

6  I'll follow your Honor's instruction.

7          MS. SMITH:  We've done this before in other tricky

8  areas.  We would like to know the question ahead of time.

9          THE COURT:  They want to instruct the agent based on

10 the question that he should confine himself.

11         MR. BRODSKY:  I was going to say, "Sir, yes or no,

12 you know that after Mr. Greebel was arrested, Mr. Greebel

13 spoke to the FBI agents.  So you're assumption that" --

14         MS. SMITH:  Anything about an assumption is

15 inappropriate.  Again --

16         MR. BRODSKY:  I'll leave it.  He struck it.

17         MS. SMITH:  Thank you, Mr. Dubin.

18         MR. BRODSKY:  Mr. Dubin struck my second question.

19         MR. PITLUCK:  It's that question.

20         MR. DUBIN:  We'll remind him of the testimony and

21 then ask.

22         MR. PITLUCK:  Can Mr. Brodsky go with me to talk to

23 the agent?

24         THE COURT:  If he wants to.

25         MR. PITLUCK:  Just to tell Special Agent Delzotto

PROCEEDINGS

1    he'll be asked one yes or no question about the defendant's

2    post-arrest interview, and he's to answer yes or no.  And

3    that's it.

4                MR. BRODSKY:  I tweaked it, "Sir, yes or know, you

5    know after Mr. Greebel was arrested Mr. Greebel did in fact

6    speak to the FBI agents."

7                MR. PITLUCK:  That's fine, your Honor.  We'll take

8    one minute.

9                THE COURT:  We're going to bring the jury in

10   meanwhile.

11               (Continued following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DELZOTTO - CROSS - MR. BRODSKY

1          (WHEREUPON, commencing at 10:00 a.m., the following

2    further proceedings were had in open court, in the presence

3    and hearing of the jury, to wit:)

4          THE COURT:  Good morning.  All members of the jury

5    are present.  Again, thank you for your patience, and we will

6    get started momentarily.  Have a seat, everybody.

7          I did want to raise with the jury, I think there was

8    a request to adjourn at 2:00 on Friday.  One of the jurors had

9    a commitment and an obligation that afternoon, and I think if

10   I understand the juror's request, it was to be excused by

11   2:00.  Is that correct, sir?

12         All right.  So we will excuse you at 2:00 on

13   Friday --

14         UNIDENTIFIED JUROR:  Thank you.

15         THE COURT:  -- just for planning purposes.  We do

16   hope to sit the entire week next week, 9:00 to 5:30, and I

17   appreciate your patience and your service.

18         So we have the agent back on the stand, he is still

19   under oath, and Mr. Brodsky is going to continue his

20   cross-examination.

21         MR. BRODSKY:  Good morning.

22         THE WITNESS:  Good morning.

23         (Witness takes the witness stand.)

24

25

DELZOTTO - CROSS - MR. BRODSKY

1   CHRISTOPER DELZOTTO, called as a witness, having been

2   previously first duly sworn/affirmed, was examined and

3   testified further as follows:

4   CROSS-EXAMINATION

5   CROSS-EXAMINATION (Resumed)

6   BY MR. BRODSKY:

7   Q    Special Agent Delzotto, you were shown Government 546, in

8   evidence.  Will you put that up, 546.

9        And let me direct your attention to the bottom of

10  the e-mail.  It is an e-mail from Martin Shkreli to Evan

11  Greebel, dated March 11, 2013, at 2:07 p.m.  Do you see that?

12  A    Yes, I see it.

13  Q    And the subject says numbers?

14  A    Correct.

15  Q    And then it lists five people underneath, correct?

16  A    It does.

17  Q    One, Marek, for Marek Biestek?

18  A    Marek Biestek, correct.

19  Q    Two, Tom, for Tom Fernandez?

20  A    Yes.

21  Q    Three, Ron, for Rod Tilles, correct?

22  A    Correct.

23  Q    Four, Andrew, for Andrew Vaino, correct?

24  A    Correct.

25  Q    Five, Ed Sullivan, correct?

DELZOTTO - CROSS - MR. BRODSKY

1    A    Yes.

2    Q    And then you were shown, can we put up, Government

3    Exhibit 548 in evidence.  This e-mail, which is a

4    continuation -- another offshoot, shall we say, of the same

5    e-mail chain, if you go to the second page, it has the list of

6    the same five people, correct, and the same e-mail, March 11,

7    2013, at 2:07 p.m.

8    A    Yes.

9    Q    And the Bates number on this document in the lower

10   left-hand corner, RO23245 to 246, correct?

11   A    Correct.

12            MR. BRODSKY:  Your Honor, may I approach?

13            THE COURT:  Yes.

14   BY MR. BRODSKY:

15   Q    I am showing you Defense Exhibit DX-124-88 for

16   identification, and it is a two-page document, dated March 11,

17   2013, the top e-mail at 5:40 p.m., correct?

18   A    Yes.

19   Q    And the Bates number on this, at the bottom right-hand

20   corner, it is not in evidence, but the Bates number RO23243,

21   and the next page it is 244, correct?

22   A    Correct.

23   Q    So it is the two pages that precede in Bates number

24   Government Exhibit 548, correct?

25   A    The Bates number precedes the numbers on Government

DELZOTTO - CROSS - MR. BRODSKY

1    Exhibit 548, yes.

2    Q    And then you see that it is an e-mail exchange between

3    Mr. Shkreli and Mr. Greebel, correct?

4    A    It is an exchange between Mr. Shkreli and Mr. Greebel,

5    yes.

6    Q    And the bottom e-mail is the date of March 11, 2013, in

7    DX-124-88 for identification, correct?

8    A    Correct.

9    Q    And in Government Exhibit 548, in evidence, it is the

10   same date, March 11, 2013, correct?

11   A    Yes.

12   Q    And the e-mail, the bottom e-mail from Mr. Shkreli to

13   Mr. Greebel in DX-124-88, on March 11, 2013, is at 1:39 p.m.,

14   correct?

15   A    It is at 1:39 p.m., yes.

16   Q    And the e-mail on Government Exhibit 548, that we just

17   went over, where it says numbers and lists five people, is at

18   2:07 p.m., correct?

19   A    Yes.

20   Q    And the -- without reading or disclosing the content of

21   the e-mail in DX-124-88 for identification, the bottom e-mail

22   relates to the subject of escrow stock, correct?

23   A    It mentions escrow stock in DX-124-88.

24        MR. BRODSKY:  Your Honor, we offer DX-124-88, not

25   for the truth, but for completion and for the effect on the

DELZOTTO - CROSS - MR. BRODSKY

1   listener and state of mind.

2           MR. PITLUCK:  Your Honor, with that limitation, we

3   have no objection.

4           THE COURT:  All right.  We will admit DX-124-88, not

5   for the truth, but for the effect on the recipient and the

6   state of mind.

7           (Defendant Exhibit DX-124-88, was received in

8   evidence.)

9   BY MR. BRODSKY:

10  Q    So prior to, in Government Exhibit 548, prior to

11  Mr. Shkreli sending to Mr. Greebel a list of five names with

12  numbers, Mr. Greebel received this e-mail on March 11, 2013,

13  at 1:39 p.m., in DX-124-88, correct?

14  A    Yes, correct.

15  Q    And that e-mail reads from Mr. Shkreli:  Got 4/5 okays

16  for escrow stock.  Let's get this wrapped up so Lindsay is out

17  of the way, end quote.

18          Correct, that's what it says?

19  A    That's the words on the page, yes.

20  Q    And then the response from Mr. Greebel, quote:  Okay.  I

21  need to get Heskett to go along with new plan.  I'll follow up

22  with him, end quote.

23          Correct?  That's what it reads?

24  A    The plan to control the Fearnow shares, no.

25          MR. BRODSKY:  Move to strike, Your Honor.

DELZOTTO - CROSS - MR. BRODSKY

1          THE COURT:  Sir, you just are being asked whether

2    the statements on the page are as Mr. Brodsky's reading them,

3    so just answer yes or no, please.

4          THE WITNESS:  Those are the words on the page, yes.

5    BY MR. BRODSKY:

6    Q     Special Agent Delzotto, you are not a lawyer, right?

7    A     Am I lawyer, no.

8    Q     Okay.  Now, you had testified, sir, that -- and you would

9    agree, Special Agent Delzotto, that the jury should follow the

10   instructions of the judge on the law, correct?

11         MR. PITLUCK:  Objection, Your Honor.

12         THE COURT:  Sustained.

13   BY MR. BRODSKY:

14   Q     Now, you had testified yesterday, quote, everything that

15   had to do with Katten Muchin went through Eastern District of

16   New York because it was a law firm, end quote.  Do you

17   remember that testimony?

18   A     I do remember it, yes.

19   Q     So the Eastern District of New York, the prosecutors --

20   yes or no, decided that the FBI should not interview anyone at

21   Katten Muchin prior to arresting Mr. Greebel?

22         MR. PITLUCK:  Objection, Your Honor.  Calls for

23   speculation.

24         THE COURT:  I guess he is asking a yes or no

25   question.

DELZOTTO - CROSS - MR. BRODSKY

1    MR. BRODSKY:  Yes.  Yes or no.

2    THE COURT:  If it can be answered yes or no.

3    THE WITNESS:  It can't be.  I'm sorry, it cannot be.

4    THE COURT:  Cannot.

5  BY MR. BRODSKY:

6  Q    And you know, yes or no, Special Agent Delzotto, you know

7  no rule prohibits the FBI from interviewing a lawyer at a law

8  firm; yes or no?

9  A    I am not comfortable saying yes or no to that.  It

10  requires a little bit more.

11  Q    And you know no rule prohibits the FBI from interviewing

12  a former lawyer at a law firm; yes or no?

13  A    Same answer as before.  Requires more than yes or no.

14  Q    When it comes to a subpoena for documents, a subpoena

15  demanding the production of documents, you know, yes or no,

16  that every office -- every US Attorney's office outside

17  Washington DC must go to the US Department of Justice

18  headquarters to get approval before issuing that subpoena to a

19  law firm; yes or no?

20  A    I'm not sure if I was aware of that or not.  I can't

21  comment on that.  Again, they -- the prosecutors dealt with

22  the law firm.

23  Q    And although -- you were asked the reason you thought

24  there was a risk to speak with Mr. Greebel prior to arrest,

25  and you testified yesterday, quote, there's a litany of

DELZOTTO - CROSS - MR. BRODSKY

1    things, end quote, and you listed some things, correct?

2    A    I did, yes.

3    Q    And let me ask you about the second thing you listed.

4    You said, quote:  Two is he could destroy evidence.  If I

5    spoke to people that he worked with, either former employees

6    or current employees, however you want to describe, it could

7    have let him know of the investigation and he could have

8    gotten rid of evidence or destroyed evidence, end quote.

9              Do you remember your testimony?

10   A    I recall that statement, yes.

11   Q    You knew Mr. Greebel no longer worked at the law firm of

12   Katten Muchin; yes or no?

13   A    Yes, I knew that.

14   Q    And you knew then that there was no risk that Mr. Greebel

15   could destroy any documents at Katten Muchin's offices --

16             MR. PITLUCK:  Objection, Your Honor.

17   BY MR. BRODSKY?

18   Q    -- yes or no?

19             THE COURT:  Overruled.

20             THE WITNESS:  I don't know that, no.  I don't know

21   what his access was there, I don't know potentially what his

22   friends could have helped him do or former employers.  I

23   wouldn't take that risk.

24   BY MR. BRODSKY:

25   Q    So is your testimony, sir, that in your mind, prior to

DELZOTTO - CROSS - MR. BRODSKY

1    arresting Mr. Greebel, that you thought Mr. Greebel, having

2    left the law firm of Katten Muchin, and now working at a

3    different law firm, might have had access to the offices of

4    Katten Muchin to potentially destroy documents; that's your

5    testimony?

6              MR. PITLUCK:  Objection, Your Honor.

7              THE COURT:  Sustained.

8    BY MR. BRODSKY:

9    Q    Your mind, you thought -- one of the things you thought

10   prior to arresting Mr. Greebel was that even though he was at

11   the law firm of Kaye Scholer, he might have had access to the

12   documents at Katten Muchin?

13             MR. PITLUCK:  Objection, Your Honor.  Asked and

14   answered.

15             THE COURT:  I will overrule that objection.

16             If you can answer it yes or no, please do.

17             THE WITNESS:  Like I said, there was a -- it is not

18   one --

19   BY MR. BRODSKY:

20   Q    It is a yes or no question, Special Agent Delzotto.

21   A    It requires more than just a yes or no.

22   Q    And you knew Mr. Greebel was no longer doing legal work

23   for Retrophin; yes or no?

24   A    He was doing legal work for KaloBios.

25             MR. BRODSKY:  Move to strike, Your Honor.

DELZOTTO - CROSS - MR. BRODSKY

1    THE COURT:  At what time?  This is at what point in

2    time?  I am confused by the question.

3    MR. BRODSKY:  Understood, Your Honor, but I think

4    the answer should be stricken because --

5    THE COURT:  All right.

6    MR. BRODSKY:  -- it wasn't responsive.

7    THE COURT:  We'll strike the question and we'll

8    strike the answer, and you can start over.

9    MR. BRODSKY:  Thank you, Your Honor.

10   BY MR. BRODSKY:

11   Q    Prior to arresting Mr. Greebel, Special Agent Delzotto --

12   THE COURT:  So we are talking about December --

13   BY MR. BRODSKY:

14   Q    Prior to December 2015 --

15   THE COURT:  2015.

16   BY MR. BRODSKY:

17   Q    -- you knew Mr. Greebel was no longer doing work for the

18   company of Retrophin, Inc., correct?

19   A    I don't think he was.  I don't know if he was or not, to

20   be quite honest.

21   Q    Yes or no, Special Agent Delzotto, certainly you thought

22   prior to the arrest of Mr. Greebel there was zero risk that

23   Mr. Greebel could enter the offices of Retrophin, Inc., to try

24   to destroy documents located there?

25   A    No, I didn't know that.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    You knew, sir, prior to December of 2015, that MSMB's

2    offices were the same as Retrophin, Inc.'s, offices, correct?

3    A    Yes.

4    Q    And prior to December 2015, you knew that MSMB's servers

5    storing e-mails and documents were at Retrophin, Inc.; yes or

6    no?

7    A    I don't know where their servers were located, to be

8    honest with you.

9    Q    You knew -- even if you don't know where the location of

10   the servers were, you knew the MSMB servers were in the

11   possession, custody, or control prior to the December of 2015,

12   of Retrophin, Inc.; yes or no?

13   A    I can't answer anything about servers.  I don't know

14   anything about them.

15   Q    Now, when the FBI arrested Mr. Greebel, the FBI did not,

16   yes or no, did not have a search warrant for documents,

17   correct?

18            MR. PITLUCK:  Objection, Your Honor, to form.

19            THE COURT:  Sustained.

20   BY MR. BRODSKY:

21   Q    At the -- on the day of the arrest of Mr. Greebel, the

22   FBI did not have any search warrant for documents relating to

23   the matter concerning Mr. Greebel; yes or no?

24   A    Did we have a search warrant?  No, we didn't, on the day

25   of his arrest.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    And when the FBI went to Mr. Greebel's home to arrest

2    him, they did not take a single piece of document from

3    Mr. Greebel's home; yes or no?

4              MR. PITLUCK:  Objection, Your Honor.

5              THE COURT:  I'll overrule the objection.

6              MR. PITLUCK:  Objection, Your Honor.  It is hearsay.

7              THE COURT:  Oh, all right.  Sustained.

8    BY MR. BRODSKY:

9    Q    As the colead case agent, you knew, prior to December

10   2015, if any documents had been taken from the house of

11   Mr. Greebel when he was arrested there, correct?  Yes or no?

12             MR. PITLUCK:  Objection, Your Honor.

13             THE COURT:  Sustained.

14   BY MR. BRODSKY:

15   Q    When the FBI's concerned about possible destruction of

16   documents, isn't it a fact, yes or no, the FBI uses search

17   warrants?

18   A    We use search warrants, but --

19   Q    Is that a -- it's a yes or no question, sir.

20   A    It is not a yes or no answer.

21   Q    Had the FBI thought Mr. Greebel had documents that they

22   couldn't get elsewhere, they could have used the search

23   warrant on the day of his arrest; yes or no?

24   A    Could have, yes.

25   Q    And prior to ever approaching Mr. Greebel, prior to

DELZOTTO - CROSS - MR. BRODSKY

1    December of 2015, you had the ability to go to Retrophin to

2    obtain any documents you needed, correct?

3    A      Again, when it came to Retrophin and Katten Muchin, the

4    prosecutors of Eastern District of New York dealt with them.

5    Q      But if you were concerned, sir, prior to December of

6    2015, that Mr. Greebel could access the offices of Katten

7    Muchin, or access the offices of Retrophin, or had friends in

8    either location to access documents, nothing prevented you,

9    yes or no, Special Agent Delzotto, nothing prevented you from

10   getting what you needed from those locations, in terms of

11   documents, before ever approaching Mr. Greebel to talk to

12   him --

13             MR. PITLUCK:  Objection to form, Your Honor.

14   BY MR. BRODSKY:

15   Q      -- yes or no?

16             THE COURT:  I think the form of the question is

17   convoluted and complex.  You will have to rephrase.

18   BY MR. BRODSKY:

19   Q      Let me break it down a little bit.

20             Prior to arresting Mr. Greebel in December of 2015,

21   you could have sought with the prosecutors the documents you

22   needed at Retrophin, correct?

23   A      We could have sought?  What does that mean?

24   Q      You could have requested, subpoenaed, correct?

25   A      Sure.

DELZOTTO - CROSS - MR. BRODSKY

1    Q    And you could have requested, prior to arresting

2    Mr. Greebel in December of 2015, you could have requested or

3    sought or voluntarily asked for or subpoenaed documents at

4    Retrophin; yes or no?

5    A    Could we have done that?

6    Q    Yes.

7    A    Yes, we could have done that.

8    Q    Now, you had testified that another reason why you did

9    not attempt to interview Mr. Greebel prior to his arrest was

10   that you said, quote:  Plus, in investigations, you do not --

11   you typically don't approach the main subject of a case

12   because you know he's -- you approach lower level people, to

13   have -- to see if they will cooperate and give you information

14   on the higher level person, end quote.

15           Do you remember that?

16   A    I do, remember that, yes.

17   Q    Prior to arresting Mr. Greebel, yes or no, you never

18   attempted to approach any of the associates at Katten Muchin

19   who worked on any of the matters relating to Retrophin, Inc.;

20   yes or no?

21           MR. PITLUCK:  Objection, Your Honor.  Asked and

22   answered.

23           THE COURT:  Sustained.

24   BY MR. BRODSKY:

25   Q    Prior to arresting Mr. Greebel, you never approached any

DELZOTTO - CROSS - MR. BRODSKY

1  lower level people, so-called lower level people, at Katten

2  Muchin --

3         MR. PITLUCK:  Objection, Your Honor.

4  BY MR. BRODSKY:

5  Q    -- correct?

6         THE COURT:  Sustained.

7         We have covered all of the employees past and -- you

8  know, current at the time, yesterday.

9         MR. BRODSKY:  Understood, Your Honor.

10         THE COURT:  So those were Katten employees.  If you

11  have other questions that don't duplicate what's been asked

12  and answered, you can --

13         MR. BRODSKY:  Understood, Your Honor.  Understood.

14  BY MR. BRODSKY:

15  Q    Special Agent Delzotto, yes or no, you had testified that

16  the number one reason you did not speak to Mr. Greebel before

17  arresting him -- well, the first reason you offered was,

18  quote, he was an attorney, he's well aware of his rights, so

19  the odds of him speaking to me are nil, end quote.

20         You said that, right?

21  A    I did say that, yes.

22  Q    Sir, yes or no, you know that after Mr. Greebel was

23  arrested, Mr. Greebel did, in fact, speak to the FBI?

24  A    Do I know that?  Yes, I do know that, which is not

25  unusual.

DELZOTTO - CROSS - MR. BRODSKY

1    THE COURT:  Sir, yes or no.  It is yes or no.

2    THE WITNESS:  Sorry.

3    THE COURT:  Okay.  Thank you.

4  BY MR. BRODSKY:

5  Q    You also testified yesterday that something the US

6  Attorney's office does in some cases is speak to people prior

7  to arresting them, right?  You testified to that?

8  A    Speak to what people?

9  Q    People who are the subject of the investigation; yes or

10 no?

11 A    I have heard of that, but it is few and far between.

12 Q    I'm sorry, I didn't hear the last part --

13 A    I said it is few and far between.  It is -- it does

14 happen, again --

15 Q    Sir, you know that from your own personal experience,

16 that that is the practice of the Southern District of New

17 York, the US Attorney's office, correct?

18    MR. PITLUCK:  Objection, Your Honor.

19    THE COURT:  Sustained.

20 BY MR. BRODSKY:

21 Q    Before the FBI and the prosecution decided to arrest

22 Mr. Greebel, did it ever occur to you, sir, yes or no, that he

23 might be able to provide you with an explanation about what he

24 believed or what he understood about the subject matter in

25 e-mails --

DELZOTTO - CROSS - MR. BRODSKY

1        MR. PITLUCK:  Objection, Your Honor.

2   BY MR. BRODSKY:

3   Q    -- yes or no?

4        THE COURT:  Sustained.

5   BY MR. BRODSKY:

6   Q    Did you leave open the possibility, Special Agent

7   Delzotto, prior to arresting Mr. Greebel, you might have been

8   wrong --

9        MR. PITLUCK:  Objection, Your Honor.

10  BY MR. BRODSKY:

11  Q    -- about your interpretation of the e-mails that you

12  introduced into evidence during your direct examination?

13       MR. PITLUCK:  Objection, Your Honor.

14       THE COURT:  I'll overrule the objection.

15       THE WITNESS:  Might have been wrong?  No, I don't

16  believe I was wrong.

17       MR. BRODSKY:   One moment, Your Honor.

18       (Short pause.)

19       MR. BRODSKY:  No further questions, Your Honor.

20       THE COURT:  All right.  We have some redirect?

21       MR. PITLUCK:  Yes, Your Honor, briefly.

22       Your Honor, I'm providing the witness and Court with

23  some binders to make this go a little quicker.

24       THE COURT:  Thank you.

25  REDIRECT EXAMINATION

DELZOTTO - REDIRECT - MR. PITLUCK

1    REDIRECT EXAMINATION

2    BY MR. PITLUCK:

3    Q    So, good morning, Special Agent Delzotto.

4    A    Good morning.

5    Q    I am going to ask you a few questions on redirect.  You

6    were shown Government Exhibit 459 during your

7    cross-examination, correct?

8    A    Yes.

9    Q    And could we put that up, please.  Sorry.  Sorry for the

10   delay, Your Honor.

11            You recall being shown this e-mail correct?

12   A    I do recall it, yes.

13   Q    This is an exchange between Mr. Shkreli and the

14   defendant, between November 25 and November 26, 2012, correct?

15   A    Correct, sir.

16   Q    And then you were also shown Defense Exhibit 124-61 on

17   cross-examination, right?  This is an exchange -- another

18   document you were shown, correct, dated Sunday, November 25,

19   2012, right?

20   A    Yes.

21   Q    And this bottom e-mail here, it is from Martin Shkreli.

22   Who is it to?

23   A    It is to Robert Bertolini, Thomas Koestler, Brent

24   Saunders, Sarah Hassan, copying Martin Shkreli.

25   Q    And that's dated September 25, 2012, correct?

8024

DELZOTTO – REDIRECT – MR. PITLUCK

1   A    Correct.

2        MR. BRODSKY:  Your Honor, I think Mr. Pitluck may

3   have made a mistake.  I think he said it was September 25.

4        THE COURT:  Yes, he did.

5        MR. PITLUCK:  I'm sorry.  November.  I apologize.

6        THE COURT:  Yes.  Thank you, Mr. Brodsky.

7        The e-mail's dated November 25, 2012.

8   BY MR. PITLUCK:

9   Q    I would like to show you now what's marked Government

10  Exhibit 111-9 in evidence.  Who is this e-mail from and who is

11  it to?

12  A    It is from Martin Shkreli to David Kravitz, Evan Greebel,

13  and Jackson Su.

14  Q    What's the date of the e-mail?

15  A    May 14, 2012.

16  Q    And what's the subject?

17  A    It says, Retrophin Shkreli transfer summaries.

18  Q    Can you read what Mr. Shkreli wrote in that e-mail?

19  A    He writes:  This sums up the transfers I have made

20  personally.  You should have all confirming and completely

21  executed documents.  Brent Saunders, 60,000.  Tom Fernandez,

22  50,000.  Tom Koestler, 35,000.  Kevin Mulleady, 30,000.

23  Dynagrow, LLP, Sarah Hassan, 5,000.  Robert Bertolini, 5,000.

24  Q    So can we put this exhibit up side by side next to

25  124-61, please.  Go to the -- I am going to put 124-61 back up

DELZOTTO - REDIRECT - MR. PITLUCK

1    on the ELMO.

2              Is Tom Fernandez a recipient of this e-mail from

3    Martin Shkreli?

4    A    He is not a recipient of either e-mail on that exhibit.

5    Q    What about Kevin Mulleady?

6    A    No.

7    Q    During your cross-examination, were you shown any

8    transfer agreements for Dynagrow or Sarah Hassan?

9    A    I don't recall if I was shown that or not.

10   Q    What about for Brent Saunders?

11   A    No.

12   Q    What about for Robert Bertolini?

13   A    No.

14   Q    What about Tom Koestler?

15   A    No.

16   Q    I would also like to show you -- withdrawn.

17             You were shown Government Exhibit 487 during

18   cross-examination, correct?

19   A    Yes.

20   Q    And you were asked questions about this e-mail?

21   A    Yes.

22   Q    This is a December 13, 2012 e-mail exchange between the

23   defendant Martin Shkreli, on the bottom e-mail is Marek

24   Biestek and Edmund Sullivan, correct?

25   A    Correct.

DELZOTTO - REDIRECT - MR. PITLUCK

1    Q    And Mr. Greebel top e-mail says, FYI, deal with this

2    latest request, right?

3    A    Right.

4    Q    And the time of that e-mail, I believe you testified, is

5    either 10:58 or 5:58 p.m., correct?

6    A    Correct.

7    Q    I would like to show you -- you were also shown Defense

8    Exhibit 124-8, which is a December 13, 2012 e-mail chain, and

9    the top e-mail is from Gregg Jaclin to Mr. Greebel; do you

10   recall that?

11   A    Yes, I recall Gregg Jaclin.

12   Q    So I would like to go to the third page of this

13   attachment, and this is the opinion that's the draft opinion

14   that's attached to that e-mail, right?

15   A    Yes.

16   Q    Were you asked questions about this?

17   A    I do not believe so.

18   Q    So going to the next page, see where it says, under the

19   terms of the Court order?

20   A    Yes.

21   Q    Can you just read that sentence and the recipients?

22   A    Sure.  It says:  Under the terms of the court order, the

23   Fearnow shares were not yet issued, but Fearnow in advance

24   thereof did sell a portion of the shares to the following

25   individuals, to wit, Kevin P. Mulleady, 350,000, Tom E.

DELZOTTO - REDIRECT - MR. PITLUCK

1    Fernandez, 300,000, Marek Lucian Biestek, 300,000, Timothy J.

2    Pierotti, 350,000, Claridge Capital, LLC, that's Rod Tilles,

3    350,000, Andrew R. Vaino, 250,000, Edmund J. Sullivan,

4    100,000.

5    Q    And then going a little bit down to the third page, you

6    were pointed to the highlighted language there in that

7    paragraph, correct?

8    A    Yes.

9    Q    So I'd like to direct your attention to Government

10   Exhibit 495, which is in evidence.

11   A    Okay.

12   Q    And if you go to the third -- that you were shown this on

13   direct examination, correct?

14   A    Yes.

15   Q    I would like to go to the third page of that document,

16   and that bottom e-mail, is that the e-mail that we just saw in

17   Government Exhibit 4 -- I'm sorry, Defense Exhibit 124-8?

18   A    Yes, it is identical.

19   Q    Okay.  What was Mr. Greebel's response at the top?

20   What's the date and time of that?

21   A    The response on which, Defense Exhibit 124-8?

22   Q    No, I'm sorry.  On Government Exhibit 495, the response

23   on top of the e-mail from Mr. Jaclin?

24   A    Mr. Greebel states:  I was told that the shares were

25   deemed to be issued on Monday after the order was signed.  The

DELZOTTO - REDIRECT - MR. PITLUCK

1   recipients of the stock are not current stockholders, and I do

2   not understand why the recipient has anything to do with an

3   opinion to de-legend stock.  This opinion does not relate to

4   the sale or transfer, merely it relates to the de-legending of

5   the stock held by Troy Fearnow.

6   Q    And that's December 13, 2012, at 5:48 p.m.?

7   A    Yes.

8   Q    That's ten minutes before the e-mail that we saw on

9   Government Exhibit 487, from Mr. Greebel to Mr. Shkreli, it is

10  up on the screen, if that helps.

11  A    Yes.

12  Q    So I would like to show you what's been marked as

13  Government Exhibit 111-41, which is in evidence.  This is an

14  e-mail exchange between -- the top e-mail's between Jackson

15  Su, the defendant and, George Huang, correct?

16  A    Yes.

17  Q    If we go down to third or fourth e-mail in the chain --

18  actually, one more below.  Sorry.  It is on the next page.

19  What did Mr. Su ask Mr. Shkreli and the defendant in that?

20  A    He asked Martin Shkreli and the defendant, what is the

21  split on the Fearnow stock.

22  Q    And what's the date and time of that e-mail?

23  A    December 12, 2012.

24  Q    So the day before the e-mails we just saw on the prior

25  exhibits?

DELZOTTO - REDIRECT - MR. PITLUCK

1   A     Yes.

2   Q     Okay.  And what was Mr. Greebel's response to that?

3   A     The response, he lists Kevin P. Mulleady, 400,000, Thomas

4   E. Fernandez, 400 thousand, Marek Biestek, 350,000, Timothy

5   Pierotti, 400,000, Claridge Capital, LLC, 400,000, Andrew

6   Vaino, 300,000, and Edmund Sullivan, 150,000.

7   Q     Same people we saw on the letter from Mr. Jaclin, or

8   people or entities that we saw on the letter from Mr. Jaclin?

9   A     Yes.

10  Q     I'd like to go to the last page of this document, it's

11  small, but if we can focus on the left column over there.  Is

12  this where Mr. Su attached a cap table?

13  A     This is a cap table, yes.

14  Q     And what does it read in the top left-hand corner there?

15  A     Comments.doc pre-money, pre-merger.

16  Q     And is Mr. Vaino listed there?

17  A     Yes, he's the first one.

18  Q     And what does it say under vested and unvested?

19  A     18,333.

20  Q     What about Mr. Sullivan?

21  A     Mr. Sullivan, it says 10,000.

22  Q     And Marek Biestek?

23  A     Marek Biestek, 10,000.

24  Q     And can we go back to the first page of this document,

25  please.  And what date and time did Mr. Su send this cap table

DELZOTTO – REDIRECT – MR. PITLUCK

1    to the defendant and George Huang?

2    A    It was December 12, 2012, 11:03 p.m.

3    Q    Now, you were asked a number of questions on

4    cross-examination regarding your decision not to interview the

5    defendant before he was arrested; do you recall that?

6    A    Yes.

7    Q    And do you recall you were asked questions about whether

8    or not you knew where the defendant worked prior to his arrest

9    in 2015, correct?

10   A    Yes.

11   Q    Where did he work?

12   A    He worked at Katten Muchin, and then he worked at Porter

13   and -- sorry, I forget the name, Arnold Porter, something like

14   that.

15   Q    I think you testified on cross -- or you were asked

16   questions on cross about Kaye Scholer; does that refresh your

17   recollection?

18   A    Kaye Scholer, yes.

19             MR. BRODSKY:  Your Honor, object to the leading.

20             THE COURT:  Well, we're -- he was having trouble.

21   It was just a refresh, okay, with reference to your question

22   on cross, so I am overruling the objection.

23   BY MR. PITLUCK:

24   Q    Now, did you have -- did you know prior to his arrest in

25   December of 2015 if the defendant had a professional

DELZOTTO – REDIRECT – MR. PITLUCK

1   relationship with Martin Shkreli while he was working at Kaye

2   Scholer?

3   A      Did he have a professional relationship?  Yes.

4           MR. BRODSKY:  Objection, Your Honor.

5           THE COURT:  Overruled.

6   BY MR. PITLUCK:

7   Q      And what was the professional relationship they had?

8           MR. BRODSKY:  Objection.  Your Honor, can we have a

9   sidebar on this?

10          THE COURT:  All right.

11          (Sidebar conference.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

1        (WHEREUPON, the following proceedings were had at

2    sidebar, out of the hearing of the open courtroom, to wit:)

3        MR. BRODSKY:  Your Honor, on his cross-examination,

4    he listed reasons as to why he did not arrest Mr. Greebel

5    prior to his arrest.  None of the reasons listed were a

6    relationship between Mr. Shkreli and Mr. Greebel.  Now we have

7    the government trying to elicit and suggest that because of

8    the relationship that existed between them, that was one

9    reason they didn't approach Mr. Greebel.

10        Mr. Shkreli had gone into the US Attorney's office,

11   as Your Honor knows, voluntarily, to interview the US

12   Attorney's office.  Never told that to Mr. Greebel.  And

13   that's neither here nor there.  But the government should not

14   be able to elicit any information about KaloBios or Daraprim

15   or, you know, what work, if any, Mr. Greebel did with

16   Mr. Shkreli after September 2014.

17        Mr. Greebel's now in a different law firm.

18   Mr. Greebel was -- had clients at that law firm, and he was

19   doing legal work.  That's first.  So it is under 401, not

20   probative, under 403, extremely prejudicial, unduly

21   prejudicial, and pursuant to Your Honor's pretrial rulings,

22   inadmissible in the government's representations.

23        Second, it is all hearsay.  Special Agent Delzotto's

24   knowledge about where Mr. Greebel worked, what clients he had,

25   was based on interviews he had with witnesses.  So he's basing

8033

SIDEBAR

1    his testimony -- he has no foundation.  His foundation is all

2    hearsay.  It is either documents he received, which he can't

3    testify about, or it's about witnesses he interviewed to learn

4    about who were Mr. Greebel's clients, what was the

5    relationship with Mr. Shkreli.

6            So it is inadmissible hearsay being offered for the

7    truth about the nature of the relationship between Mr. Shkreli

8    and Mr. Greebel, and, therefore, for the second -- for the

9    third -- under Rule 401, 403, and 801, it is inadmissible.

10           MR. PITLUCK:  Your Honor, defense counsel asked

11   Special Agent Delzotto, by my count, at least a dozen

12   questions about why he didn't interview Mr. Greebel

13   beforehand, including the firm that he worked at and his

14   access to documents.

15           We are entitled to elicit that Mr. Greebel had an

16   ongoing professional relationship with Martin Shkreli, another

17   target in the case of another defendant in the case, that

18   would require them, and we can argue that because he had that

19   ongoing relationship, it does not make sense for him to

20   approach the defendant.  Because if he approached the

21   defendant, they could tell Martin Shkreli.  There have been a

22   number of questions that -- can I finish before you start

23   throwing your hands in the air.

24           MR. BRODSKY:  Sorry.

25           MR. PITLUCK:  There have been a number of questions

8034

SIDEBAR

1    asked about why he didn't do it.  That is an incredible

2    probative reason.  Second of all, there is -- Your Honor's

3    pretrial rulings on KaloBios were limited to the fact of

4    whether we can introduce evidence of the Daraprim transaction.

5    That is what we said, that's going over a year ago, this is

6    being established for the continued relationship between

7    Mr. Greebel and Mr. Shkreli, including for the time of the

8    investigation up until arrest, which was the focus, almost the

9    exclusive focus of cross-examination, and that the

10   impeachment, not only, the decision not to interview the

11   defendant.

12        Second of all, it is not based on hearsay.  There

13   are public SEC files, which I am happy to show the defendant

14   and introduce into evidence, describing that Mr. Greebel at

15   Kaye Scholer represented KaloBios, which is Martin Shkreli was

16   a CEO.  Those are publicly filed documents.  This is not based

17   on hearsay.  And Mr. Brodsky's speculation is just completely

18   inaccurate about where the knowledge came from.

19        Second of all, it is being offered for the effect --

20   it's both being offered for the truth that he did work there,

21   and, because it is not hearsay, and for the effect that it had

22   on Special Agent Delzotto in not interviewing Mr. Shkreli.

23        So this isn't going anywhere near Your Honor's

24   pretrial rulings.  We are not asking about Daraprim.  We are

25   asking if they continued to work together because it is

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

SIDEBAR

1   incredibly probative of what was the main issue called into

2   question, why he didn't interview him.

3            MR. BRODSKY:  The problem is, Your Honor, that in an

4   open-ended way, Special Agent Delzotto said the reasons he

5   didn't, and none of the reasons had to do with the

6   relationship between Mr. Shkreli and Mr. Greebel.  And the

7   fact that Mr. Shkreli knew about the US Attorney's office

8   investigation, was interviewed by the US Attorney's office,

9   had counsel which was communicating with the US Attorney's

10  office, and apparently claiming that Mr. Greebel was his

11  personal lawyer, which had acquired the US Attorney's office

12  to go to Judge Weinstein to get an order, shows that this

13  reason is completely specious.  It was not one of the reasons

14  given by the FBI agent.

15           MR. PITLUCK:  Judge, that's the point of redirect.

16           MR. BRODSKY:  No, no, I am going to have to go

17  into --

18           THE COURT:  May I just -- sorry.

19           MR. BRODSKY:  Yes.

20           THE COURT:  I think on cross you brought up whether

21  or not -- well, you established that he was at Kaye Scholer at

22  the time of his arrest.

23           MR. BRODSKY:  I did, Your Honor.

24           THE COURT:  That he had left Katten.

25           MR. BRODSKY:  I did.

SIDEBAR

1      THE COURT:  You asked him whether he continued to

2  have a relationship or a legal -- whether he was aware whether

3  Mr. Greebel was still performing work for Retrophin.

4      MR. BRODSKY:  I did that.

5      THE COURT:  The jurors heard a lot of evidence that

6  Retrophin and Mr. Shkreli were very inextricably intertwined,

7  that at least at the early stages, Mr. Shkreli, you have

8  argued, was Retrophin.

9      The question was whether he continued to do work for

10 Retrophin, and the witness started to say, well, he did do

11 work for Mr. Shkreli's new company, or on this deal, whatever

12 it was, KaloBios, whatever it was, and we cut him off.  And I

13 said yes or no.

14     But it was discussed on cross, and I do think that

15 in terms of the line of questioning that you gave to the

16 witness on cross, you were exploring the ongoing relationship,

17 if any, that Mr. Greebel had with Retrophin or Mr. Shkreli,

18 and it doesn't --

19     MR. BRODSKY:  Not Mr. Shkreli, Your Honor.

20     THE COURT:  Well --

21     MR. BRODSKY:  I was very careful, and this is really

22 beyond the scope of the --

23     THE COURT:  But you have argued, and you have said

24 this in front of the jury that Retrophin and Mr. Shkreli were

25 the same thing.

8037

SIDEBAR

1          MR. BRODSKY:  But my point was --

2          THE COURT:  At that point, yes, they weren't, but I

3  think the point is, is that, I don't -- you know, the

4  government seems to be very careful not to go beyond, you

5  know, too far beyond my previous rulings, but my ruling was

6  really about the whole prejudicial effect of talking about

7  KaloBios and Daraprim and all this other --

8          MR. BRODSKY:  KaloBios is one of them.  It is

9  publicly owned.  What KaloBios did, it's extraordinarily

10  prejudicial to bring up KaloBios.  There are people on this

11  jury, Your Honor, who know about what happened, there are

12  emotional reactions to the drug hikes in the prices.  This is

13  extremely damaging, Your Honor.  My elicitation was focused on

14  solely documents and access to documents.  What the government

15  is doing, Your Honor, is suggesting that they didn't approach

16  Mr. Greebel because they had a concern that Mr. Greebel would

17  tell Mr. Shkreli about the investigation.

18          THE COURT:  There was an ongoing relationship

19  between Mr. Greebel and Mr. Shkreli.  That's the point.

20          MR. BRODSKY:  I understand.

21          THE COURT:  What you elicited on cross --

22          MR. BRODSKY:  Your Honor, the fundamental premise of

23  that is, one, Mr. Greebel had a relationship with Mr. Shkreli

24  in December of 2015.  Two, if you tell Mr. Greebel and

25  interview him, he will tell Mr. Shkreli about the US

SIDEBAR

1  Attorney's office investigation.  But the problem is, that's

2  completely undermined by the fact that Mr. Shkreli knew about

3  the US Attorney's office --

4        THE COURT:  That's not in evidence.  What you have

5  put in evidence is --

6        MR. BRODSKY:  I am going to cross --

7        MS. SMITH:  In fact, it has been kept out by the

8  defense.

9        MR. BRODSKY:  They opened the door to this,

10  Your Honor.  I am allowed to -- I am allowed to recross, and I

11  am allowed --

12        THE COURT:  They are not going to open the door that

13  Mr. Shkreli was also a target and codefendant of Mr. Greebel's

14  and that Mr. Shkreli was talking to the US Attorney's office.

15        MR. BRODSKY:  They are doing it right now.

16        MS. SMITH:  No.

17        THE COURT:  You are saying -- you are doing it.

18        MR. BRODSKY:  They are doing it.

19        THE COURT:  You were going to open it.  You have

20  started -- what you have done, sir, is threatened to open it.

21  They have not opened it.

22        MR. BRODSKY:  They are opening it now, though.

23        THE COURT:  What you have done, though, is you asked

24  about an ongoing relationship in the context of Agent

25  Delzotto's reluctance to interview Mr. Greebel, even after he

SIDEBAR

1   left Kaye Scholer and was working at -- I mean, after he left

2   Katten and was working at Kaye Scholer, and asked whether he

3   was doing any work for Retrophin.  And, you know, I think the

4   agent started to talk about an ongoing representation that

5   Mr. Greebel still had with one of Mr. Shkreli's companies, not

6   Retrophin, but we cut him off.

7            MR. BRODSKY:  But there are no documents at KaloBios

8   that are relevant here.  My focus is on --

9            THE COURT:  You are not getting into documents, are

10  you?

11           MR. PITLUCK:  No.

12           MR. BRODSKY:  Our focus was it's beyond the scope of

13  the cross because my cross was focused on his litany of

14  explanation as to why, and my focus was on the destruction of

15  documents.  That's what he said.  And so where you destroy

16  documents -- Retrophin and -- but this --

17           THE COURT:  The focus also was on the possibility of

18  the agent's mind, that if they were still in some sort of

19  relationship, the attorney-client or attorney --

20           MR. BRODSKY:  Not with Mr. Shkreli.

21           THE COURT:  If these two were still in contact, that

22  they could alert each other to the investigation, and --

23           MR. BRODSKY:  They haven't offered that up as a

24  reason.

25           THE COURT:  Yes.  But I am saying that you explored

8040

SIDEBAR

1   what happened to Mr. Greebel and his relationship with

2   Mr. Shkreli and/or his companies after he left Retrophin.

3           MS. SMITH:  Yes.

4           MR. BRODSKY:  I understand, Your Honor, but I

5   never -- I was very careful.  I was extremely careful not to

6   go into this area.  I feel that if they go into this area,

7   Your Honor, I believe it is extraordinarily prejudicial.  We

8   have been careful not to go beyond the scope of the charges.

9   They go into the relationship, post charge, into Mr. Shkreli's

10  relationship with Mr. Greebel, it is -- in my view,

11  Your Honor, respectfully, not responsive to this

12  cross-examination, not responsive to the litany of reasons

13  that Special Agent Delzotto offered for why he didn't go

14  arrest Mr. Greebel.  He didn't say one of the reasons was an

15  ongoing relationship with Mr. Shkreli.  And the reason he

16  didn't say that was they weren't concerned about warning

17  Mr. Shkreli, because Mr. Shkreli knew.  He had been

18  interviewed by the US Attorney's office, he had -- he was

19  communicating with the US Attorney's office about the nature

20  of the investigation.  And so Mr. Shkreli was the one who

21  knew, Mr. Greebel was the one who did not know.

22          And so going to Mr. Greebel and interviewing

23  Mr. Greebel would have no problem.  Now if they elicit that

24  one, I have the right to say Mr. Shkreli had counsel,

25  Mr. Shkreli knew about the investigation, Mr. Shkreli made the

SIDEBAR

1   following -- I have a right to go into it.  And I am just

2   saying, Your Honor, I think it is extraordinarily prejudicial,

3   I think it is -- I hate to use this word, I use it rarely and

4   sparingly.  I think it is reversible error for the government

5   to go into this area.  I do believe that, I believe it is

6   extraordinarily prejudicial.

7       MR. PITLUCK:  Your Honor, the defendant -- defense

8   counsel asked Special Agent Delzotto a series of yes or no

9   questions about the reasons why he did it.  They would not let

10  him expand, and the purpose of redirect examination is to

11  allow the witness to explain other reasons.

12      The relationship -- ongoing relationship between

13  Mr. Shkreli and Mr. Greebel was one of the reasons why they

14  did not speak to him.  They were in contact, they are going to

15  elicit that he had knowledge of Mr. Shkreli destroyed

16  documents, which is why --

17      THE COURT:  Why don't you first lay the foundation

18  if there are any other reasons, since he was sort of very

19  tightly controlled in his responses on cross, generally, yes

20  or no, and then he articulated some of those reasons, then he

21  was, you know, pushed on to another question, yes or no.

22      MR. PITLUCK:  I am laying the foundation.

23      MR. BRODSKY:  Your Honor should also know Special

24  Agent Delzotto swore out an affidavit before Judge Weinstein

25  in which he said in the affidavit that the reason they are

SIDEBAR

1    putting it under seal is because the concern that Mr. Shkreli

2    is going to tell Mr. Greebel.  It wasn't because we are

3    concerned that Mr. Greebel's going to tell Mr. Shkreli.

4           And so if he testifies in any way, Your Honor,

5    that's a false statement, in my view.  If he testifies he was

6    concerned that Mr. Greebel would tell Mr. Shkreli, I believe

7    that's contradictory to what he said under oath to Judge

8    Weinstein, and we are entitled to cross-examine him on that.

9           MR. PITLUCK:  It is not a false statement, Judge, to

10   say, one thing he's concerned about.  That doesn't mean he's

11   not concerned about the other.  That just says he said one

12   thing.  This is preposterous, Judge.

13          MR. BRODSKY:  He said, under oath, he -- that

14   Mr. Shkreli knew about the investigation, was aware of the

15   investigation.  So it is impossible for there to be a concern

16   about approaching Mr. Greebel, because Mr. Greebel would tell

17   Mr. Shkreli.  That is fundamentally --

18          THE COURT:  I don't know what he would say.  I don't

19   even know whether he would say that he was worried that

20   Mr. Greebel would tell Mr. Shkreli.  I don't know what he

21   would say.

22          MR. PITLUCK:  There are any number of things to be

23   worried about, two targets in the investigation are both

24   communicating prior to arrest.

25          MS. SMITH:  There's also a temporal issue with

8043

SIDEBAR

1   Mr. Shkreli, who called the US Attorney's office.  Again,

2   let's be honest, the defendant knew that there was a US

3   Attorney's office investigation generally, in 2014, from --

4   you know, from Mr. Rosensaft.  Mr. Rosensaft handled it.

5           So we didn't go into it in our case in chief, we are

6   not getting into the timing of that.  But just so Your Honor

7   is aware --

8           THE COURT:  Mr. Rosensaft, his partner --

9           MS. SMITH:  Yes.

10          THE COURT:   -- was representing Mr. Greebel?

11          MS. SMITH:  Was representing both Retrophin and

12   Mr. Shkreli in connection with the US Attorney's office

13   investigation.  After Mr. Shkreli was fired, there was

14   obviously conflict.  So they moved on to a different --

15   Mr. Shkreli got Arnold & Porter --

16          MR. BRODSKY:  There was an insider trading

17   investigation.

18          MS. SMITH:  I recognize the investigation morphed,

19   but there was an investigation that they were aware of.

20          Mr. Shkreli came in voluntarily in March of 2015.

21   There was no further contact between the US Attorney's office

22   and Mr. Shkreli after that interview.  We are talking about

23   November, December of 2015.  And as Your Honor knows, the

24   stage of the investigation and what -- there's, you know, many

25   different reasons why at that point, even if he knew that he

8044

SIDEBAR

1    came in and spoke, does he know it is an ongoing

2    investigation, does he necessarily understand where we are in

3    the investigation, which is different, from, you know -- I

4    think we are -- this is a very simple straightforward kind of

5    redirect point, because Mr. Brodsky left the jury with the

6    misimpression he didn't do any work for Retrophin, cut him

7    off, that there was -- once he was at Kaye Scholer, he's no

8    longer at Katten, which the suggestion is there's no contact

9    between the two of them.

10               MR. BRODSKY:  Your Honor, first, a few points for

11   Your Honor to know.

12               The US Attorney's office investigation that you

13   precluded was into Retrophin's acquisition of Manchester and

14   people who traded in that.  Certainly Mr. Greebel would have

15   no reason to believe and no -- and he was never the subject of

16   that investigation.  It was completely different.  Second,

17   Your Honor, after Mr. Shkreli came into the US Attorney's

18   office, he was represented by Arnold & Porter, and Arnold &

19   Porter was communicating with the US Attorney's office and

20   claiming to the US Attorney's office through the months of

21   2015 that he had had a personal attorney-client relationship

22   with Mr. Greebel, and, therefore, he was asserting privilege

23   to documents that Retrophin was seeking, which prompted them

24   to seek an application before Judge Weinstein.

25               So they obviously knew, because Arnold & Porter

SIDEBAR

1   represented Mr. Shkreli, was up to date on the nature of the

2   investigation.

3           THE COURT:  Well, given that background, my concern

4   is that you have left this misimpression that the agent was

5   somehow negligent or, you know, purposefully turning his

6   attention away from evidence that -- for the reasons you just

7   explained, he may have been restrained in terms of, you know,

8   going directly to an attorney, a law firm, seeking documents,

9   plowing through privileges that have been asserted by one of

10  the targets.  I mean, I think there was a lot going on that

11  the jury hasn't heard, and an impression has been created or

12  has been created through the cross that this agent was somehow

13  at fault for not doing certain steps.

14          But given what you've described, and given what the

15  true landscape was behind the scenes, other than what the jury

16  has been led to believe --

17          MR. BRODSKY:  I understand, Your Honor, but this --

18          THE COURT:  Okay.  So let's talk about how the

19  redirect could be done.

20          Let me just give the jurors a mid-morning break.

21          MR. PITLUCK:  I would love to have a rest room

22  break, too, after we're done.

23          (Sidebar conference ends.)

24          (Continued on the next page.)

25

PROCEEDINGS

1              (Open court; jury present)

2              THE COURT:  I am going to ask the jurors to take a

3    mid-morning break at this time.  Please don't talk about the

4    case.  We will retrieve you.

5              (WHEREUPON, at 10:58 a.m., the jury exited the

6    courtroom.)

7              (Open court; no jury present)

8              THE COURT:  I think the most efficient way to get to

9    the point is to find out where the government intends to go

10   with this line of redirect, and I can make a ruling whether or

11   not Mr. Greebel's counsel has opened the door by inquiring

12   about what was going on at Kaye Scholer when Mr. Greebel had

13   moved to that firm and Mr. Shkreli and/or his companies.

14             MR. PITLUCK:  Your Honor, it is very

15   straightforward.  It is in response to, as Your Honor pointed

16   out, the repeated accusations that Special Agent Delzotto

17   should have interviewed Mr. Greebel before his arrest, and it

18   is simply to establish that at Kaye Scholer, Mr. Greebel

19   worked on KaloBios, which was a company associated with Martin

20   Shkreli, that they had a continued professional relationship

21   in that -- through that context, and I am going to ask him

22   what effect, if any, did the continued professional

23   relationship between the defendant and Mr. Shkreli have on

24   your decision whether to interview the defendant.  That's it.

25             THE COURT:  I think if we can avoid and instruct the

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

8047

PROCEEDINGS

1    witness not to mention KaloBios or Daraprim or anything like

2    that --

3            MR. PITLUCK:  Well, Your Honor, I think -- I can

4    certainly instruct him not to mention Daraprim.

5            THE COURT:  Just that there was an ongoing

6    professional relationship --

7            MR. PITLUCK:  I can say a different pharmaceutical

8    company, so there's no mention of KaloBios.

9            MR. BRODSKY:  I think that creates a greater

10   impression of the relationship, but, Your Honor, our

11   concern --

12           THE COURT:  There's an ongoing professional

13   relationship between -- that they had reason to be in contact

14   for professional reasons once Mr. Greebel transitioned to Kaye

15   Scholer.

16           MR. PITLUCK:  Your Honor, my --

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

8048

PROCEEDINGS

1                  (In open court; jury not present.)

2                  MR. BRODSKY:  The fundamental problems with this,

3     Your Honor, the agent already testified in a free flowing and

4     open way and never mentioned once any concern about

5     Mr. Shkreli and the relationship Mr. Greebel.  And the

6     government is now, for their own reasons, offering up

7     explanations in a leading fashion to the agent.  But the agent

8     never offered that as one of the reasons why he didn't

9     approach Mr. Greebel.  He offered three reasons and he said

10    those were the reasons and not one of them had to do with this

11    relationship.

12                 And second, again, Your Honor, it is -- not only is

13    it unduly prejudicial to offer this up and introduce it, but

14    the concept of it is fundamentally opposite of the truth, so

15    it's misleading.  The reason for that is, the government is

16    suggesting that one of the reasons why they didn't go

17    interview Mr. Greebel before arresting him is because

18    Mr. Shkreli -- Mr. Greebel would warn Mr. Shkreli about the

19    investigation.  But, again, if Mr. Shkreli is aware of the

20    investigation and his counsel is communicating with the U.S.

21    Attorney's Office, then the premise of the reason for their

22    view that Mr. Greebel would tell Mr. Shkreli and warn him

23    about an investigation --

24                 THE COURT:  I don't know that's the case though.  I

25    don't know whether the agent would articulate that as being a

PROCEEDINGS

1    concern.

2              MR. BRODSKY:  He didn't.

3              THE COURT:  That -- right, we're just speculating.

4    I don't think we can -- I am not going to premise my decision

5    on, as speculation, what the agent hasn't testified to that

6    Mr. Shkreli would have warned Mr. Greebel and, meanwhile, you

7    have told me at sidebar about all this other behind the scenes

8    reasons why it wouldn't make sense.  So I don't know what the

9    agent would say about the fact that Mr. Shkreli and

10   Mr. Greebel continued to interact on a professional basis once

11   Mr. Greebel left Katten.  The impression that was left is that

12   once Mr. Greebel left Katten that was just the end of any

13   contact and that at that point there should have been no

14   concern on the part of the agent that, you know, trying to

15   approach Mr. Greebel or trying to approach other members of

16   his former firm, Katten, or obtain documents would have posed

17   a situation that would have endangered the ongoing

18   investigation.

19             MR. BRODSKY:  I understand, Your Honor --

20             THE COURT:  So --

21             MR. BRODSKY:  -- but, first, the government is

22   introducing this concept which misstates the evidence in the

23   record.  The agent offered his reasons in a non-leading

24   fashion on cross-examination as to the reasons why he didn't

25   approach Mr. Greebel.  He didn't list for, one, any reason

PROCEEDINGS

1    that it was the nature of the relationship between Mr. Shkreli

2    and Mr. Greebel.  Two, I went into the areas.  In response to

3    that answer that he said I was concerned about the destruction

4    of documents, I wanted point out that we believe that's an

5    absurd reason, because he had left Retrophin -- the government

6    introduced the evidence that Ms. Valeur-Jensen had sent him an

7    email saying stand down, no more matters, relationship is

8    over.  That's the government that introduced that evidence.

9    So that wasn't introducing any concept that the government

10   hadn't already introduced.  The fact that Mr. Greebel had left

11   Katten meant that they could go to Katten to get documents

12   because he was no longer working there.

13            And so my point was -- I didn't go anywhere near on

14   cross the relationship between Mr. Shkreli and Mr. Greebel

15   post September 30, 2014.  The agent did not offer that as any

16   reason.

17            THE COURT:  He started to and he was cut off because

18   you wanted a yes or no answer.  He started to talk about

19   KaloBios and you said it's a yes or no question so I

20   admonished him it's a yes or no question and he should answer

21   yes or no.  So he was cut off because you wanted him to answer

22   in that form.  He started to talk about -- I believe he was

23   going to talk about the ongoing professional relationship.

24            MR. BRODSKY:  Well, Your Honor --

25            THE COURT:  He started to say it, but at your

PROCEEDINGS

1    request I cut him off so I did.  And on redirect it seems to

2    me fair that he would be able to explain because he kept

3    saying, I can't answer that yes or no, there's more of an

4    explanation I'd like to give.  And the KaloBios issue once

5    Mr. Greebel was at Kaye Scholer started to come out of his

6    mouth, but we cut him off at your request so I think --

7              MR. BRODSKY:  I understand, Your Honor.

8              THE COURT:  -- that on redirect as long as you don't

9    get too far into the weeds it seems to me --

10              MR. PITLUCK:  Your Honor, I don't have any intention

11    of getting into the weeds, but the agent -- a lot of things

12    have been called into question about the agent's judgment.  He

13    should be allowed to explain, as Your Honor has already ruled

14    permissible scope of cross -- or redirect, why that

15    relationship between the two of them led him not to do.  It's

16    related to the ongoing -- Mr. Brodsky's interpretation of the

17    facts or the evidence is not the one that controls.  It's the

18    agent's subjective belief.  And there were things going on

19    related to Mr. Shkreli that made him not want to believe

20    that -- made him not want to alert two people who have worked

21    together in the past that there is an ongoing investigation.

22    He's entitled to explain that.

23              So it's not in the weeds, we're not going into

24    anything related KaloBios.  I can say another pharmaceutical

25    company, because, Your Honor, respectfully it's got to be

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    clear that it's not Retrophin.  Because that's been abundantly

2    offered in and we have to make it a clear that it's a new, a

3    different company then Retrophin.

4              THE COURT:  Why don't you just say a different

5    company rather than another pharmaceutical company if there is

6    a sensitivity to Mr. Shkreli's post Retrophin dealings and

7    biopharmaceuticals.  Just say -- rather than use Retrophin or

8    another pharmaceutical company, just another company that

9    Mr. Shkreli --

10             MR. BRODSKY:  He could say a public company --

11             THE COURT:  -- has involvement with.  Another

12   company.

13             MR. BRODSKY:  -- because that distinguishes it from

14   the Daraprim company and it prevents, we hope, again --

15             THE COURT:  I think --

16             MR. BRODSKY:  -- we reserve our objection.

17             THE COURT:  -- this jury, based on the voir dire

18   they are far less aware of the granular details of

19   Mr. Shkreli's career -- yes, they're all aware of Daraprim and

20   not all of our jurors but in our venire we had a number of

21   that we excused for cause.

22             But I do think that the agent was starting to

23   explain why, even after Mr. Greebel left Katten, he was

24   hesitant to approach him and he started to explain that there

25   was an ongoing professional relationship and again he was cut

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    off.  So I think that there is a fair ground for redirect.

2    The government must frame its questions in a way that doesn't

3    elicit anything that might trigger something in the jurors'

4    mind about Daraprim.  So I think you can carefully craft a

5    question that would refer to another public company, as

6    Mr. Brodsky suggests, or some other ongoing different

7    professional relationship that might have been going on.

8              MR. PITLUCK:  With Your Honor's permission I can

9    lead the special agent a little bit and say are you familiar

10   with the professional relationship between the defendant and

11   Mr. Shkreli at a different public company following

12   Martin Shkreli's departure from Retrophin.

13             MR. BRODSKY:  Okay.  I still preserve my objection,

14   but I'm not objecting to the leading of the question because

15   we offered him a leading question and, you know, we spoke to

16   him about a leading question and he was going to continue

17   during the cross.  So we'll be vigilant.

18             MR. PITLUCK:  I will go -- and now he's on redirect

19   I will instruct the witness not to say KaloBios and certainly

20   not to say Daraprim or Turing because again we're far afield,

21   but I intend to ask him the open-ended question of what

22   effect, if any -- because he's entitled to explain to the

23   jury, what effect that continued relationship had on his

24   decision not to interview Mr. Greebel prior to arrest.

25             MR. BRODSKY:  And, Your Honor, are they going into

8054

PROCEEDINGS

1    any other areas given that this -- to preclude another

2    sidebar?  I don't want to keep asking for a sidebar.

3              THE COURT:  Look, at your request and in respect to

4    the idea of a cross-examination being confined to generally

5    yes or no answers, I try to keep control of the witness.  I

6    don't know what else he said.  I think he did say repeatedly,

7    I have more to say or I've got to explain --

8              MR. BRODSKY:  Understood.

9              THE COURT:  -- or I can't answer that yes or no.

10             MR. BRODSKY:  All right.

11             THE COURT:  So that really is why we have redirect.

12             MR. BRODSKY:  I understand.

13             THE COURT:  Okay.

14             MR. BRODSKY:  I understand, Your Honor.

15             THE COURT:  Okay.

16             MR. BRODSKY:  I understand.

17             THE COURT:  So I think everybody wanted a quick

18   break?

19             MR. PITLUCK:  Yes, Your Honor.

20             THE COURT:  Be quick.

21             (Recess.)

22             (Jury enters courtroom.)

23             THE COURT:  All jurors are present.  Please have a

24   seat everybody.

25             You may resume your redirect.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

DELZOTTO – REDIRECT – PITLUCK

1        MR. PITLUCK:  Thank you, Your Honor.

2    REDIRECT EXAMINATION

3    BY MR. PITLUCK::

4    Q    Special Agent Delzotto, prior to the defendant's arrest,

5    were you aware of a professional relationship between

6    Martin Shkreli and the defendant through a public company that

7    was not Retrophin?

8    A    Yes.

9    Q    And what effect, if any, did that continued relationship

10   have on your decision not to interview the defendant prior to

11   his arrest?

12   A    It had a huge effect.  They continued to work together so

13   I took the same stance as I had before.

14   Q    Now you were asked a lot of questions about your

15   investigation into the defendant on cross-examination,

16   correct?

17   A    Correct.

18   Q    Approximately how long did you work on your investigation

19   in this case before you arrest -- before the defendant was

20   arrested?

21   A    I'd say approximately two years.

22   Q    I'm sorry?

23   A    I'm sorry.  Approximately two years.

24   Q    And prior to the defendant's arrest, did you serve

25   subpoenas for documents on Retrophin?

DELZOTTO - REDIRECT - PITLUCK

1    A    Did I personally serve?

2    Q    Did the FBI or the government serve subpoenas on

3    Retrophin?

4    A    The government did.

5            MR. BRODSKY:  Hearsay.

6            It's okay, Your Honor, it's okay.

7            THE COURT:  All right.  The objection is withdrawn.

8            MR. PITLUCK:  Okay.  Let me ask it again then.

9    Q    Prior to the defendant's arrest in December of 2015, did

10   the government serve subpoenas on Retrophin?

11   A    Yes.

12   Q    And did the government obtain documents through those

13   subpoenas?

14   A    Yes.

15   Q    And following the defendant's arrest in December 2015,

16   did your investigation continue?

17   A    Yes.

18   Q    And following the defendant's arrest, did the government

19   obtain documents from Katten Muchin?

20   A    Yes.

21   Q    Now, finally, I'd like to show you a document you were

22   shown on cross-examination, Defense Exhibit 108-68A or as it's

23   marked, Judge, Defense Exhibit 108-68A.

24           And, Special Agent Delzotto, do you recall being

25   shown this document on cross-examination?

DELZOTTO - REDIRECT - PITLUCK

1    A    Yes.

2    Q    This was a email from David Kravitz to Mark at Retrophin

3    copying the defendant dated May 9th, 2014?

4    A    Correct.

5    Q    What's the subject here?

6    A    Retrophin Draft Board of Directors and Committee Minutes.

7    Q    Now, are there attachments on this email?

8    A    Yes, there is.

9    Q    I'd like to have you flip to page R024325.

10   A    Okay.

11   Q    Are these draft minutes of a special meeting of the board

12   of directors of Retrophin?

13   A    Yes.

14   Q    What's the date of that meeting of these draft minutes?

15   A    March 20th, 2014.

16   Q    Can you read the second paragraph.  It starts "the

17   following."

18   A    The following members of the board were present in person

19   or by telephone:  Martin Shkreli, Cornelius Golding, Jeffrey

20   Paley, and Stephen Aselage.  Marc Panoff, the company's chief

21   financial officer and Evan L. Greebel of Katten Muchin

22   Rosenman LLP counsel to the company were also present.

23   Q    Can you go to the next page, R024326.  Can you read the

24   paragraph that starts at the very bottom of the page and

25   continues on the next page.

DELZOTTO - REDIRECT - PITLUCK

1    A    Mr. Shkreli asked Mr. Greebel to update the board on

2    various litigations and possible litigations.  Mr. Greebel

3    updated the board on the outstanding litigation with Tim

4    Pierotti, a former employee of the company.  Mr. Greebel

5    advised that Mr. Pierotti was willing to settle the litigation

6    in exchange for 165,000-dollar payment and that he would

7    transfer 50,000 shares of common stock of the company to

8    Mr. Shkreli, in parentheses, the Pierotti settlement.

9    Mr. Shkreli explained that such stock was originally

10   Mr. Shkreli's and that Mr. Pierotti made promises to him which

11   caused him to transfer the stock to Mr. Pierotti.

12   Q    What does the bottom, the last line of that read?

13   A    The board discussed the proposed settlement with

14   Mr. Pierotti.

15   Q    And going to the next page, two more pages, R024328, you

16   see the -- one more back up.  You see the settlement, the

17   short settlement that's the fourth full line down, further

18   resolved.  Can you read that one, that's the Pierotti.

19   A    Further resolved, that the Pierotti settlement be and

20   hereby is adopted and approved in all respects.

21             MR. PITLUCK:  Your Honor, can I have one moment,

22   please?

23             THE COURT:  Yes.

24             MR. PITLUCK:  No further redirect.

25             THE COURT:  Any recross, Mr. Brodsky?

Case 1:15-cr-00637-KAM   Document 512   Filed 01/10/18   Page 86 of 365 PageID #: 14296

DELZOTTO – RECROSS – BRODSKY

1          MR. BRODSKY:  Yes, just one I think.

2    RECROSS EXAMINATION

3    BY MR. BRODSKY::

4    Q    Special Agent Delzotto, yes or no, the first time the FBI

5    and the U.S. Attorney's Office ever interviewed an employee

6    from Katten Muchin was after July of 2017, this year?

7    A    I don't know the exact dates so I can't answer that.

8          MR. BRODSKY:  No further questions, Your Honor.

9          MR. PITLUCK:  No re-redirect, Your Honor.

10          THE COURT:  Sir, you are excused.  Thank you for

11   your time.  Have a safe trip back.

12          THE WITNESS:  Thank you.

13          THE COURT:  Does the government have any other

14   witnesses?

15          MR. PITLUCK:  Your Honor, can we have a very brief

16   sidebar.

17          THE COURT:  Yes.

18          (Sidebar conference.)

19          (Continued on the next page.)

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          THE COURT:  Yes.

2          MS. SMITH:  We have been going back and forth with

3   the defense about the admitted exhibits at the end of the day,

4   we've been trying to do on a weekly basis.  There are maybe

5   one or two outstanding issues.  I don't think there are any

6   outstanding issues, and Ms. Rubin can correct me, with any of

7   the government exhibits.  I think we're in agreement as to

8   which ones come in.  There may be one or two outstanding

9   discrepancies and before we finally rest I just don't know --

10  we may need a little bit more time to make sure we're all

11  comfortable with what's been admitted.  There is also one

12  issue with one defense exhibit which was characterized as an

13  attachment to a document that it's not an attachment to.  It

14  came in a different way, we just want to put on the record

15  before we rest -- and it doesn't need to be in front of the

16  jury -- just what the status of that document is so that's

17  clear.

18          So that's my only concern.  We don't have any more

19  witnesses, we're ready to rest.  Otherwise, I do want to just

20  make sure we work any of those issues out.  I don't think they

21  are actually going to be issues for the Court, but I just want

22  to make sure.

23          THE COURT:  There are other documents where you were

24  going substitute in redacted pages or substitute in more

25  complete copies.

SIDEBAR CONFERENCE

1          MS. SMITH:  Yes, we've been discussing those all the

2     way through.

3          THE COURT:  Has that been done?

4          MS. SMITH:  For the most part.  I think we just want

5     to dot our Is and cross our Ts.

6          MS. RUBIN:  There may be a couple of outstanding

7     issues, but I believe Ms. Smith and I can resolve them.

8          MS. SMITH:  They are just not done right now.

9          THE COURT:  I am trying to think how we can most

10    efficiently use our time.  It's a little early for a lunch

11    break.

12         MR. DUBIN:  There is no way for the government to

13    rest subject to this discussion?

14         MS. SMITH:  Yes, I just don't want to do it in front

15    of the jury in case there is a document issue.  That's all.

16    We can excuse them, we can do a Rule 29, it wouldn't be

17    anything other than that but --

18         MR. PITLUCK:  Can we say subject to our discussion

19    at sidebar the government rests.

20         MS. SMITH:  Yes, that's fine.  I just wanted to make

21    sure that we're clear.

22         MR. PITLUCK:  If there is an issue with a document,

23    we're not going to pull a witness out of the hallway but if

24    there is an issue with a document we might need to put it

25    before the Court and jury before we actually rest, but I think

SIDEBAR CONFERENCE

1    that's okay.

2            MS. SMITH:  I don't anticipate there going to be any

3    issues, just as a technical matter.

4            MR. DUBIN:  We don't either, Your Honor.  We think

5    these are more housekeeping and cleanup.

6            THE COURT:  Also please double check your list

7    against Ms. Jackson's list --

8            MS. SMITH:  We have been.

9            THE COURT:  Because she, hopefully, has got it and I

10   think your paralegal have been pretty much on top of this as

11   well and probably someone on your team too, I just don't know

12   which one of you has the honors.

13           MS. RUBIN:  That would be me, Your Honor.

14           MR. PITLUCK:  That way, Judge, we give the jury a

15   fairly lengthy lunch break, which I don't think they would

16   mind and we can rest and if there are issues we can address

17   them and the Rule 29.

18           THE COURT:  Do you want to rest after the lunch

19   break?

20           MS. SMITH:  Yes.

21           THE COURT:  We will do an early --

22           MR. PITLUCK:  I don't know if we can do the Rule 29

23   until we've actually rested.

24           THE COURT:  Okay.

25           MR. BRODSKY:  Do you want to rest subject to the

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1   discussion and then do the Rule 29.

2          MS. SMITH:  That's fine.

3          MR. MASTRO:  That's fine by us.

4          MR. DUBIN:  That way we can get the Rule 29 in

5   before lunch.

6          MR. PITLUCK:  We can then all of us take a break,

7   the attorneys get a quick break for lunch.

8          THE COURT:  You don't get to eat, you keep going.

9          MR. PITLUCK:  Judge, the only thing that's keeping

10  me going right now.

11         THE COURT:  You were going to make the statement.

12  You will make the statement.

13         MS. SMITH:  Yes.

14         (End of sidebar conference.)

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

8064

PROCEEDINGS

1          (In open court.)

2          MS. SMITH:  Your Honor, subject to the conversation

3     that we just had at sidebar, the government is resting its

4     case.

5          THE COURT:  Thank you.  Members of the jury at this

6     time we have some issues to resolve that are legal issues, so

7     I am going to give you a long lunch break starting now, and

8     it's now about 20 of 12, so do the parties think that 1:30 or

9     2:00 o'clock would be sufficient –– 2:00 o'clock.  This is a

10    long lunch break so please enjoy yourselves.

11          Maintain an open mind, avoid media attention and

12    remember the instructions I've given you about the presumption

13    of innocence and the burdens of proof.  Don't discuss the

14    case.  Thank you.  We will see you at 2:00 o'clock.

15          (Jury exits courtroom for luncheon recess.)

16          (In open court; jury not present.)

17          THE COURT:  All right.  Have a seat.

18          Mr. Mastro, you wanted to be heard.

19          MR. MASTRO:  Yes, Your Honor.  I'd like to make a

20    Rule 29 application to dismiss these charges.

21          Your Honor, we recognize that the standard under

22    Rule 29 is that such a motion should be granted if no rational

23    trier of fact could have found the essential elements of the

24    crime beyond a reasonable doubt.  And that while on such a

25    motion the Court must view the evidence in the light most

PROCEEDINGS

1    favorable to the prosecution, there is no light in which the

2    government's case could possibly pass muster.

3            Now, Your Honor, I'm not going to go through the

4    multiple witnesses the government called to implode it on that

5    stand and ask Your Honor to take their credibility into

6    account.  I am going to talk about the evidence and the lack

7    of evidence about Evan Greebel.  Because, Your Honor, we said

8    at the outset of this trial, we said before this trial when we

9    moved to dismiss Count Seven, that what the government was

10   going to do was to retry the Shkreli case and we implored Your

11   Honor not to let them do that.  We said that this was a case

12   of guilt by association and that the evidence would show and

13   the lack of evidence would make plain that Evan Greebel should

14   never have been charged.  And, Your Honor, that's exactly what

15   we have seen over the last nearly eight weeks.

16           Your Honor, witness after witness took the stand and

17   had virtually nothing to say about Evan Greebel.  It was

18   Shkreli, every day, every week.  Evan Greebel, many of these

19   witnesses said they never even met him.  They barely talked to

20   him.  They had only modest email communication with him.  And,

21   Your Honor, when we said they were going to retry the Shkreli

22   case, I know Your Honor knows that to be true because the vast

23   majority of the government's witnesses got on that stand and

24   it was like old home week, they've been here before, they were

25   coming back to this courtroom to basically do a redux of

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

8066

PROCEEDINGS

1   testimony they had given previously.  Because the vast

2   majority of these witnesses also testified in the Shkreli

3   trial.

4           Now, Your Honor, I want to break it down, and I know

5   Rule 29s are not easily granted.  But many times, many times

6   courts in this district and in the Southern District and in

7   the Second Circuit have granted Rule 29s.  And I'm happy to

8   pass those cases up to Your Honor, but we know when we moved

9   to dismiss Count Seven, *Rodriguez*, Second Circuit case, Judge

10  Nickerson granted a Rule 29 as to a co-conspirator and charged

11  the jury.

12          THE COURT:  I'm aware that judges do grant Rule 29

13  motions despite the burdens and the standards I am to apply, I

14  would like you to focus on the lack of evidence to support

15  Count Seven and Eight, please.

16          MR. MASTRO:  Yes, Your Honor.  I just want to point

17  out one decision in particular because I think it's very

18  instructive.  It is Judge Gleeson's decision in *United States*

19  versus *Irving*, which involved a Rule 29 --

20          THE COURT:  Do you have a cite for that?

21          MR. MASTRO:  Yes.

22          -- of an attorney defendant, Your Honor.  682 F.Supp

23  2d. 243 at pages 249 through 251, that's Eastern District case

24  in 2010.

25          The acquittal is particularly instructive because

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    there Judge Gleeson found that despite the attorney's, quote,

2    close working relationship, end quote, with the clients at

3    issue, quote, the defendant was not present for the criminal

4    interactions between other defendants, rather the government

5    sought to connect the attorney defendant to them through a

6    handful of her actions during the relevant time period.  They

7    support an inference that the defendant was present at various

8    times while the criminal conduct was underway and even if the

9    defendant's own action assisted the crime, that was the

10   government's theory, quote, but the evidence fell considerably

11   short proving beyond a reasonable doubt that the attorney

12   defendant had the knowledge and intent necessary to establish

13   her participation in any of the attempted offenses or in the

14   conspiracy, end quote, to commit those offenses.

15          Now, Your Honor, we submit that that's exactly why

16   the government's case fails here.  I want to start with Count

17   Seven.  Count Seven, a conspiracy charge.  A conspiracy wire

18   fraud to defraud Retrophin.  Let's talk about Evan Greebel.

19   Let's talk about the three elements there that the government

20   alleges are part of the conspiracy to defraud Retrophin:  The

21   backdating, the settlement agreements, and the consulting

22   agreements.

23          Let's talk about what the evidence showed about Evan

24   Greebel.  On the backdating, the government called Mr. Su.  It

25   was elicited on Mr. Su's cross-examination that Mr. Su, in

PROCEEDINGS

1    fact, was responsible for the backdating, that backdating was

2    perfectly appropriate and legitimate thing to do if an

3    agreement was reached at an earlier point in time that Mr. Su

4    had done it in other contexts, including for board members

5    like Mr. Aselage and that when the issue arose -- this is what

6    the evidence showed, not brought by the government but brought

7    out on cross-examination and the documents that exist, what

8    the evidence showed was that Mr. Greebel, upon seeing a date,

9    he raises the issue about what is this, what is this date.

10   And Mr. Shkreli responds and says, oh, that was an agreement

11   reached in June and that was the appropriate date.  That's the

12   extent of Mr. Greebel's knowledge.  That tells you what's in

13   his state of mind.  That tells you Mr. Greebel asked

14   appropriate questions and was assured by the CEO of the

15   company as to the earlier date and then Mr. Su effectuates

16   that.  How can that scheme -- and I'm not going to, Your

17   Honor, get into the particulars of why the government didn't

18   prove anything about the backdating, I'm talking about the

19   evidence of Mr. Greebel and his role.  He's an outside

20   attorney, he asked appropriate questions and he gets an answer

21   from the CEO client, Mr. Su gets that same answer and that's

22   how the date ends up being put on there by Mr. Su.

23        Now, Your Honor, we also submit that the government

24   failed to prove harm to Retrophin from the backdating, that

25   these were privately traded shares, all of those issues that

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    we raised on the motion to dismiss and Your Honor said you

2    would revisit them -- that we could revisit them at the

3    conclusion of the government's case, but I submit the clearest

4    consistent with what Judge Gleeson ruled in *Irving*, the

5    clearest evidence that that piece of Count Seven has to go is

6    the evidence about Evan Greebel.  The only evidence about Evan

7    Greebel, the evidence about Evan Greebel on backdating is he

8    sees it, he raises the question, what is this, Mr. Shkreli,

9    CEO of Retrophin, responds, ah, that was an agreement reached

10   back in June and Mr. Su effectuates that.  Mr. Greebel -- the

11   state of knowledge of Mr. Greebel and his state of mind

12   bespeak of an outside lawyer doing his job, end of story.

13           Number two, settlement agreements.  Let's talk about

14   the settlement agreements.  Your Honor I think has already

15   recognized at multiple points during this trial -- and the

16   settlement agreements and consulting agreements share some

17   similar elements.  Individuals who received settlement

18   agreements, the evidence at this trial repeatedly was, threats

19   of litigation, Mr. Rosenwald and others, specific threats of

20   litigation, attorney letters, Mr. Rosenwald's attorney writes

21   a multiple page letter laying out all the different claims

22   he's going to bring against Shkreli, the MSMB entities and

23   Retrophin.  Evidence, every single one of those people had a

24   claim.

25           And, Your Honor, the evidence admitted by so many

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

8070

PROCEEDINGS

1   witnesses that the government put on this stand, including

2   inside company witnesses of a commingling MSMB and Retrophin,

3   same offices, same personnel, paying this part of the salary,

4   paying that expense, trying to unpack the commingling in a

5   perfectly responsible way.  Mr. Greebel doing what a lawyer

6   should be doing always working with other lawyers at his law

7   firm and Your Honor --

8           THE COURT:  I understand Mr. Greebel was aware of

9   the commingling of funds and how the monies were being used.

10  I know that at some point during the Citrin Cooperman review

11  of the books some of these issues were brought to the

12  attention of Mr. Greebel, but are you saying that all along he

13  knew how Mr. Shkreli was intermingling.

14          MR. MASTRO:  No, Your Honor, what I'm saying he was

15  aware -- absolutely not saying that, Your Honor.  What I'm

16  saying is that he was aware of people raising claims about

17  issues relating to MSMB and conversion to Retrophin, meaning

18  that Retrophin could be sued because of the conversions that

19  went on.  And, therefore, he acted responsibly as an attorney

20  in responding to the CEO of Retrophin who negotiated

21  settlements documenting those settlements.  There isn't any

22  question that there were actual threats of litigation against

23  Retrophin and that individuals raised claims that implicated

24  Retrophin.

25          If an outside lawyer can be charged with a crime

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1   because he and his law firm helped settle lawsuits against a

2   company and a company's CEO at the direction of the CEO and

3   others at the company to see if you can resolve those claims,

4   that is a shocking concept to me.  But that's all the evidence

5   showed about Evan Greebel, that he helped document and paper

6   settlements knowing of potential claims and actual threats of

7   litigation against Retrophin.

8           And, Your Honor let's turn to the consulting

9   agreements for a second.  What does the evidence show that

10  Evan Greebel knew about the consulting agreements?  Evan

11  Greebel knew that there were resolutions occurring through the

12  form of a consulting agreement.  Evan Greebel helped in

13  documenting those particular settlements and he knew that he

14  was -- his understanding, it's clear from the documents, is

15  they were going to be consulting agreements.  And there isn't

16  a shred of evidence, a shred of evidence in this record that

17  Evan Greebel knew anything other than these people at

18  Martin Shkreli's direction to him were going to become

19  consultants of Retrophin and in that context resolve certain

20  outstanding issues.  Nobody testified, nobody testified in the

21  context of those consulting agreements that Evan Greebel did

22  anything other than proper lawyering and that Evan Greebel did

23  anything other than it was to be framed as a consulting

24  agreement.  And in fact, the witnesses they called said things

25  like, Evan Greebel was professional, he acted appropriately

PROCEEDINGS

1    and Mr. Geller, the last one that was on here, Mr. Al Geller

2    said he thought the consulting agreement was perfectly legal.

3    Nothing illegal about it.

4              So, Your Honor, Mr. Greebel functioning as a lawyer,

5    this is what we do at private law firms, okay.  We work with

6    clients, we help resolve issues, we take direction from the

7    clients and there isn't a shred of evidence in this record

8    that Mr. Greebel knew anything other than that he was

9    executing -- he was facilitating the drafting of settlement

10   agreements and consulting agreements that were at the

11   direction of a CEO of Retrophin.  They were perfectly

12   appropriate in the settlement context because of threats of

13   litigation and --

14             THE COURT:  Are you saying you believe there is no

15   evidence that Mr. Greebel was aware with regard to the

16   consultants that they were formerly investors in MSMB Capital

17   or MSMB Healthcare?

18             MR. MASTRO:  Your Honor, I don't think that that

19   makes any difference.  I think that the fact of the matter is

20   that he was made aware by the client, Mr. Shkreli, that those

21   individuals would become consultants in the context of

22   resolving whatever issues they had.

23             THE COURT:  They were made aware of --

24             MR. MASTRO:  That's --

25             THE COURT:  And he was also made aware by some of

8073

PROCEEDINGS

1   the investors themselves or their attorneys because I believe

2   he was given or forwarded copies of emails that showed the

3   investors' view of their investment and what they thought it

4   was worth and why they were in the course of negotiating a

5   consulting agreement demanding X number of shares or cash, and

6   the question is whether also Mr. Greebel agreed with others to

7   use Retrophin shares to settle some of those debts or to

8   provide compensation to the consultants.

9            MR. MASTRO:  Let's unpack that, Your Honor, okay.

10           THE COURT:  I mean, I think what I would like and

11   appreciate from you would be arguments that are focused on the

12   evidence --

13           MR. MASTRO:  Yes.

14           THE COURT:  -- rather than more general.

15           MR. MASTRO:  Your Honor, I'm going to do that.  Let

16   me unpack the questions Your Honor just asked.

17           The reason I say that's the extent to which he

18   focused on their claims or not is really the specific claims.

19   Mr. Shkreli is the one -- every witness testified Mr. Shkreli

20   is the one who negotiated terms of settlements.  Mr. Greebel,

21   every one of the witnesses, whether it's settlement agreements

22   or consulting agreements, every one of them testified that

23   Evan Greebel only came into the picture as someone documenting

24   settlement terms that Martin Shkreli, CEO of Retrophin, told

25   him were the terms of the settlement or the terms of the

PROCEEDINGS

1   consulting agreement.  So from Mr. Greebel's perspective then,

2   he knows that there are claims that implicate Retrophin,

3   threats of suit against Retrophin by a number of these

4   parties, but repeatedly these witnesses, whether in the

5   settlement agreement context or the consulting agreement

6   context, testified that they had claims and, therefore, there

7   were settlement agreements or consulting agreements being

8   entered into.

9           Mr. Greebel, on the consulting agreements -- and

10  there's only two witnesses in that regard, Your Honor -- he's

11  being told by Mr. Shkreli it's a consulting agreement.  The

12  person is going to provide consulting services.  I believe,

13  Your Honor, the evidence is overwhelming in this trial that

14  services were provided by both Mr. Blanton and Mr. Geller.

15  But that's really irrelevant to whether a charge can go

16  forward whether it's possible to prove beyond a reasonable

17  doubt that Evan Greebel was part of any conspiracy in this

18  regard because he's being told terms by the CEO of Retrophin,

19  he's being told these folks are going to be consultants and

20  then he is memorializing those terms.  And there isn't a shred

21  of evidence that Mr. Greebel knew anything other than that the

22  resolutions, as described and dictated by Mr. Shkreli in that

23  context, included an element of consulting for those two

24  individuals and that they would be consultants.  That is what

25  the evidence shows.  There is nothing to suggest anything

PROCEEDINGS

1  other than when Mr. Greebel memorialized those agreements that

2  he understood the terms by which any claims were being

3  resolved and that those individuals would serve as

4  consultants.  There is nothing to suggest in this record that

5  Evan Greebel knew anything other than that those two

6  individuals are going to be consultants.

7          Now on the settlement agreements, again Mr. Shkreli

8  negotiates the terms and Mr. Greebel documents them.  The CEO

9  of Retrophin on -- at the direction of the CEO of Retrophin he

10  documents settlements negotiated by Mr. Shkreli.

11          I understand Your Honor's point, but these are

12  claims, the record evidence I believe is clear, these are

13  claims that arise from what was a conversion from MSMB Capital

14  or MSMB Healthcare where money actually went from MSMB

15  Healthcare into Retrophin.

16          THE COURT:  What about for MSMB Capital though, they

17  had no money.

18          MR. MASTRO:  Let me just go through both, Your

19  Honor.  For MSMB Healthcare, and many of these investor

20  witnesses were MSMB Healthcare, the evidence is undisputed

21  that money was put into Retrophin.  There's really no question

22  about that.  So those people should really be taken off the

23  table entirely.

24          But even as to MSMB Capital, Mr. Shkreli, the record

25  evidence is, told all investors there was going to be a

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    conversion.  There's no evidence here that Mr. Shkreli told

2    the truth to Mr. Greebel anymore so than the evidence shows he

3    told the truth to investors.  There's no evidence of what

4    Mr. Shkreli told Mr. Greebel at all other than in the context

5    of how to document the settlements.

6            THE COURT:  Are there not emails that Mr. Shkreli

7    sent Mr. Greebel in response to his request to be paid

8    attorney's fees that he had no money, that he couldn't pay,

9    you know, couldn't pay a lot of his creditors including

10   another law firm.

11           MR. MASTRO:  Your Honor, I don't think that says

12   anything about a criminal intent by a law firm that's still

13   providing services to a corporation.

14           THE COURT:  No, but the point is whether MSMB

15   Capital was able to invest in Retrophin --

16           MR. MASTRO:  Your Honor, I think --

17           THE COURT:  -- given that it was completely at zero

18   funds as of certain date.

19           MR. MASTRO:  Sure, I appreciate Your Honor's

20   question.  The way to look at this, remember, the government

21   has to prove beyond a reasonable doubt that Mr. Greebel had

22   criminal intent to participate in a conspiracy with others,

23   and I'm going to come to whether there are any others the

24   government has proven besides Mr. Shkreli, and whether

25   Mr. Greebel can, you know, be found beyond a reasonable doubt

PROCEEDINGS

1    to have had the intent to participate in any kind of

2    conspiracy.

3              THE COURT:  He cannot be found.

4              MR. MASTRO:  He cannot be found.

5              THE COURT:  I think you said can.

6              MR. MASTRO:  Yes, that's my point, Your Honor.  I

7    think the perspective here to is look at the place in which

8    Mr. Greebel comes into the equation.  Mr. Greebel comes into

9    the equation with claims by investors against not just the

10   MSMB entities but also against Retrophin.  And he comes into

11   the equation when these settlements are being done after

12   whatever conversions have occurred have occurred.  And he

13   comes into the equation in documenting settlements or

14   consulting agreements at a particularly sensitive time for

15   Retrophin where Retrophin is just making that private to

16   public, where Retrophin is out there trying to raise money and

17   witness after witness, including the board members, testified

18   how volatile that time was, infancy of Retrophin and how you

19   had the potential from litigation claims and adverse publicity

20   and the like to really derail the company.

21             So, Your Honor, it's not a question -- when you're

22   looking at Mr. Greebel's knowledge that it's a question of

23   Mr. Greebel at that moment in time looking at how this effects

24   Retrophin, the potential claims against Retrophin, actual

25   attorneys and individuals, but actual attorneys threatening to

PROCEEDINGS

1    sue Retrophin over the conversion from MSMB to Retrophin.

2    Retrophin was not going to be left out of that equation

3    whether Mr. Shkreli should have purported to do conversions

4    from MSMB Capital, he actually did put money from MSMB

5    Healthcare, investor money, into Retrophin.  The fact of the

6    matter is Mr. Greebel is outside counsel, we're in 2013,

7    people are threatening to sue, they are having lawyer letters

8    sent, Retrophin is implicated.  They are all acknowledging

9    whether they said they were going to sue or not that they had

10   claims.  They're not going to sit back and go, I'm only going

11   to sue one individual or I'm only going to sue one company,

12   they are going to bring whatever claims they have against

13   anyone.

14         Some of them have lawyers like Mr. Rosenwald

15   threatening specifically to sue Retrophin under those

16   circumstances.  And Mr. Greebel, as outside counsel, under the

17   direction of a CEO of a company who negotiated terms with

18   these parties threatening to sue or having claims potentially

19   against Retrophin, he documents settlements.  How does that

20   say anything about -- necessary to establish a state of mind

21   for a criminal charge?  How does that say anything about a

22   crime whatsoever?  It's an outside lawyer documenting

23   settlements or consulting agreements and the record evidence

24   shows he's doing that, seeing that there are claims and

25   threats by lawyers and lawyer letters and getting direction

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    from the client through a person with apparent authority on

2    behalf of Retrophin, the CEO.

3              And the record also shows, Your Honor, to be crystal

4    clear that Mr. Greebel on a number of occasions asked

5    questions, said certain things like a consulting agreement,

6    could be surfaced up to the board and should be before it was

7    finalized.

8              THE COURT:  So that brings me back to a question,

9    would a jury be able to infer from the fact that Mr. Greebel

10   was acting as secretary and attended board meetings and was

11   responsible for giving litigation updates, would they be able

12   to infer that Mr. Greebel, as counsel for Retrophin, failed to

13   inform the board at those meetings where he was giving

14   litigation updates of the settlement or consulting agreements

15   other than Mr. Pierotti?

16             MR. MASTRO:  Sure.  So, Your Honor, I think the

17   record evidence is that there weren't actual lawsuits brought

18   so he didn't have an obligation to inform the board of actual

19   lawsuits and the potential litigations --

20             THE COURT:  Did Mr. Pierotti bring an actual

21   lawsuit?  He was sued but he might have brought a

22   counterclaim, but he was sued and --

23             MR. MASTRO:  He brought -- there was a lawsuit

24   brought against him.  But, Your Honor, the settlement of

25   claims --

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1        THE COURT:  So you're saying litigation updates

2   don't include threats of litigation and, therefore, the

3   settlements or consulting agreements need not be disclosed, is

4   that your position?

5        MR. MASTRO:  Your Honor --

6        THE COURT:  I'm trying to understand.

7        MR. MASTRO:  Yes, and I want to be crystal clear

8   about our position, Your Honor.  The fact of the matter is

9   that those instances that arose where there was a lawyer

10  letter or an investor who raised a claim, they were in fact

11  resolved and settled.  They were, in fact, either a settlement

12  agreement or a consulting agreement and, therefore, Your

13  Honor, the notion that he had to report those as actual or

14  threatened litigations when, in fact, there was a settlement

15  structure or a consulting agreement contemplated, I think puts

16  it in the wrong bucket for purposes of Mr. Greebel's state of

17  mind where Mr. Shkreli has negotiated certain terms and

18  Mr. Greebel comes into play when he's documenting the

19  settlement or the consulting agreement.

20       But, Your Honor, Mr. Greebel does say on more than

21  one occasion in contemporaneous documents about an issue

22  potentially going to the board including a consulting

23  agreement and I think the record makes very clear that when

24  the settlement agreements issue arose and was identified, that

25  that was completely disclosed to the board level and that the

PROCEEDINGS

1    board ratified those agreements and it was all publicly

2    disclosed.  The board ratified it under a particular

3    structure.  There is no suggestion by anyone, including the

4    outside auditors, that Mr. Greebel did anything, anything

5    wrong in that regard and it was all fully disclosed.  And on

6    the consulting agreements I think the record is also very

7    clear that those were disclosed to the board.  And that's what

8    the contemporaneous documents show, it was on board agendas

9    and that's what in fact the outside auditors, you know, who

10   they called testified to.

11          So, Your Honor, it's a little hard to understand how

12   in any of these regards Mr. Greebel did anything wrong other

13   than function as an outside lawyer doing a job and taking

14   direction by a CEO on behalf of a company and then having the

15   board ratify those things that had been done fully and

16   completely, all publicly disclosed and vetted through an

17   outside auditor who gets on the stand and says, outside

18   auditor, no evidence of fraud and, yes, he had the cooperation

19   that was necessary in making the disclosures.

20          So, Your Honor, I think that however you look at it,

21   what Mr. Greebel was doing was what outside lawyers do in

22   documenting settlements or consulting agreements.  Whatever

23   Mr. Shkreli is telling him, what we know of that is that he's

24   telling him what the terms of those agreements would be,

25   telling him in the case of two of those agreements that they

8082

PROCEEDINGS

1    were consultants and Mr. Greebel is appropriately flagging, in

2    a number of contemporaneous emails, issues that should go to

3    the board and when an audit was being done Mr. Greebel,

4    according to the auditor you heard Mr. Jain on the stand, it

5    was discussed at the board level, had Mr. Greebel's

6    cooperation and they fully disclosed the information and the

7    board ratified under a structure that was disclosed publicly.

8           So I don't understand how, based on this record,

9    anyone could say that Mr. Greebel possibly had any intent to

10   have a conspiracy with Mr. Shkreli or anyone else that could

11   possibly be said to have had any criminal intent.  And if

12   we're going to start stretching the criminal law in this way

13   about judgment calls by lawyers and lawyers working with CEOs,

14   it's going to be a very sad day for the legal profession and

15   those us of at large law firms.  Because what Mr. Greebel did

16   was what outside lawyers do working with corporate clients to

17   protect those corporate clients, taking direction from

18   officers of the corporate clients and that's all the evidence

19   showed in this case.

20          Whatever the evidence showed about Mr. Shkreli, and

21   again this was Shkreli redux, the do-over, the government

22   tries to sweep Mr. Greebel in with a broad brush when there

23   isn't a shred of evidence that he did anything criminal.

24   There wasn't a single witness who testified in this case, a

25   single witness who's a fact witness, not summary FBI witness,

PROCEEDINGS

1    there wasn't a single fact witness in this case who testified

2    that Mr. Greebel did anything wrong, anything illegal,

3    anything improper.  Whatever judgment calls some may have had

4    about his, you know, would have preferred to do this, would

5    have preferred to be more independent, would have preferred,

6    you know, that I had heard something sooner, nobody said ever

7    that Evan Greebel did anything wrong or illegal.  And Your

8    Honor heard the same testimony I did.

9            So when I break it down, Your Honor, I look at the

10    backdating.  Mr. Greebel did -- the only evidence in this

11    record, Mr. Greebel did the right thing, asked the right

12    questions, got answers and backdating, which Mr. Su testified

13    was actually something commonly done there, it could be

14    perfectly appropriate.  Mr. Aselage said the same thing.

15            (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

8084

PROCEEDINGS

1          (In open court.)

2          MR. MASTRO:  Mr. Shkreli told him it was an

3   agreement in June, and then Mr. Su changes the date on the

4   consulting agreements and the.

5          THE COURT:  I just want the record to reflect -- I

6   think the record evidence is that Mr. Su put the date of

7   September 20th on the document because that was the date that

8   the document is dropped on his desk and he thought that the

9   document should be dated as of that date.

10          Now, he was not responsible for putting on the

11   earlier June or July date.  I think there were two different

12   sets of dates.

13          MR. MASTRO:  I didn't say he was, your Honor.

14          THE COURT:  You can --

15          MR. MASTRO:  He testified.  He actually is the one

16   who physically put the date on.

17          THE COURT:   The September 20th date.

18          MR. MASTRO:   And then there were questions about

19   the appropriate date raised by Mr. Greebel, and then

20   Mr. Shkreli said what the actual date of the agreement was,

21   and that's the date that was put on the document.

22          What Mr. Shkreli represented to Mr. Greebel and to

23   Mr. Su was the date of the agreement.  But Mr. Greebel is not

24   the one who defined the date.  Mr. Greebel is not the one who

25   changed the date.  Mr. Greebel is not the one who put the date

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1    on any of these documents.  Mr. Greebel is one who asked, Why

2    is that the date on there?  And then Mr. Shkreli said, well,

3    the agreement was actually an earlier date.  And that was

4    ultimately the date used because, as Mr. Su testified, as

5    Mr. Aselage had to admit on the stand, it's perfectly

6    appropriate when an agreement was reached at a particular date

7    to use that date.

8         And all Mr. Greebel knows and all Mr. Su knew was

9    that Mr. Shkreli told him was the actual date of the

10   agreement.  That's what the evidence shows.  It doesn't show

11   that Evan Greebel did anything wrong in that regard.  It

12   doesn't show that he did anything wrong in connection with

13   settlement agreements that that were in Retrophin's interest,

14   and consulting agreements that were in Retrophin's interest,

15   that were ultimately ratified by the board and publicly

16   disclosed.

17        So, your Honor, I think as to Count Seven, and I'm

18   focusing here on what the evidence of what Mr. Greebel knew or

19   didn't know.  What Mr. Greebel was told or wasn't told.  The

20   actual evidence at this trial does not support any charge

21   whatsoever against Evan Greebel on Count Seven.

22        And I have to come to another point, your Honor,

23   which is with co-conspirators, all right?

24        On co-conspirators, the Shkreli trial was a trial

25   where the Government alleged Mr. Shkreli and Mr. Greebel were

PROCEEDINGS

1     co-conspirators on Count Seven.  The Government didn't offer

2     any proof on Count Seven of other co-conspirators besides

3     mentioning on the rebuttal argument that Lee Yaffit should be

4     considered a co-conspirator.  And, your Honor, they didn't

5     even call Lee Yaffit.  And Lee Yaffit is like so many other

6     investor-witnesses said he didn't really know Evan Greebel at

7     all.

8            Then the Government decides to change its theory,

9     right?  And your Honor said they have the right to change

10    their theory in a second trial.  We protested that but, you

11    know, they can try and name more co-conspirators.  Well, so

12    who --

13           THE COURT:  It's not a change of theory, that's just

14    additional information that they are providing in this trial.

15    Don't misconstrue my words.

16           MR. MASTRO:  I'm not, your Honor.  I meant to say

17    the Government has a right to try to prove additional

18    co-conspirators in the second trial.  And I think it's a

19    different approach.  I meant theory only in the sense that the

20    Government didn't really attempt to prove certain other

21    co-conspirators in the first trial.  So they attempt in the

22    second trial to prove certain co-conspirators.

23           They attempt to prove Mr. Panoff as a

24    co-conspirator.  Your Honor, I think the evidence shows

25    clearly Mr. Panoff came very late in the day.  Your Honor

PROCEEDINGS

1    raised questions about whether Mr. Panoff could be considered

2    a co-conspirator, and the Government said wait 'till the FBI

3    agent's off the stand and you'll see all the documents.

4          There was no testimonial evidence, given how late in

5    the game Mr. Panoff came, and given the testimony of certain

6    witnesses about how Mr. Panoff conducted himself that he could

7    possibly be considered a co-conspirator.  But we saw all the

8    documents now that the Government is offering and Mr. Panoff,

9    in those documents, is often raising questions and not in any

10   way, shape, or form appearing to be a co-conspirator.  So I

11   think that it is right to find that the Government hasn't and

12   shouldn't have the right to go to the jury about Mr. Panoff

13   being a co-conspirator.

14         I don't know what other person on Count Seven the

15   Government could possibly argue could have been a

16   co-conspirator based on the evidence in this trial.  But I

17   will say this, your Honor, we reiterate that if the Government

18   is left with only Martin Shkreli as Mr. Greebel's

19   co-conspirator, the Government, to prove conspiracy, has to

20   prove beyond a reasonable doubt that the defendant agreed to

21   participate in a conspiracy and that at least one other person

22   agreed to be his co-conspirator.  And the Government has to

23   prove that beyond a reasonable doubt as to both.  And we have

24   already explained to your Honor in our pretrial motion to

25   dismiss that that co-conspirator can't be Martin Shkreli and

PROCEEDINGS

1    we've asked your Honor to charge in that regard.

2            The Government has to prove somebody else because

3    Martin Shkreli was acquitted at his trial of being a

4    co-conspirator on Count Seven, and the Government should not

5    be permitted to argue to this jury that Martin Shkreli, since

6    it could not argue in any subsequent proceeding, that Martin

7    Shkreli was a co-conspirator.

8            So we believe that your Honor should not allow the

9    Government to argue that Mr. Shkreli is a co-conspirator when

10   this case goes to the jury, if it goes to the jury, and,

11   therefore, if that's the case, the Government hasn't proven

12   any co-conspirator with Mr. Greebel let alone prove that

13   Mr. Greebel himself ever had any agreement or intent beyond a

14   reasonable doubt to participate in the conspiracy.

15           Your Honor, that concludes what I have to say about

16   Count Seven.  I'd like to go to Count Eight unless the Court

17   has any questions.

18           THE COURT:  I don't think you're done with Count

19   Seven.  I think Mr. Dubin has something more to discuss.

20           MR. DUBIN:  I just wanted to address a few of your

21   Honor's direct questions about evidence.

22           With regard to board knowledge.  We heard from two

23   board members, Mr. Aselage and Mr. Richardson.  There's

24   evidence in this record that Mr. Aselage, by his own

25   admission, was "farting around," quote, unquote and not paying

PROCEEDINGS

1   much attention.

2           Mr. Richardson was forwarded materials about the

3   settlements and many other matters and he's in Mykonos on

4   vacation and claims he didn't have enough time to review it.

5           There's not a shred of evidence in this record, your

6   Honor, that either of those two individuals were paying any

7   attention.  In fact, the evidence is to the contrary.  They

8   would get documents, leaf through them, not pay attention,

9   wouldn't read SEC filings, weren't paying any particular

10  attention.  And it's their testimony, based on nothing, no

11  prior experience being on the board of a public company that

12  somehow Mr. Greebel should have taken his finger and pointed

13  to the line in a settlement agreement and pointed it out.  And

14  there's no evidence to suggest that that was his duty or

15  responsibility.

16          Mr. Richardson, as your Honor is aware, had it on an

17  agenda, and in his own hand, puts an arrow to it.  So the fact

18  that they weren't paying attention to things that were pointed

19  out to them cannot be borne on Mr. Greebel.

20          Again, much has been made about whether or not

21  Mr. Greebel signed the board minutes whether they saw them or

22  not.  There's evidence in the record that the board minutes

23  went to the CFO of the company.  There's no suggestion, and

24  the Government didn't put on any evidence in this case, that

25  said that Mr. Greebel had some obligation to then hand deliver

PROCEEDINGS

1    the board minutes to the board members.  The CFO of the

2    company has them.  Doesn't anyone have any responsibility at

3    the company?  And we're putting all of the onus on

4    Mr. Greebel.

5              And I'll point out, your Honor, the timing.  The

6    settlement agreements end up getting executed in, I think,

7    May.  So by the time there's another board meeting, the

8    settlements are entered into.  So any updates that had to be

9    provided to the board were.  And our concern with regard

10   to --

11             THE COURT:  So before the board could approve them?

12             MR. DUBIN:  I'm sorry.

13             THE COURT:  So they were executed before the board's

14   next meeting so that they could approve them and review them.

15             MR. DUBIN:  But that leaves the question of whether

16   or not --

17             THE COURT:  I'm just saying that's what the evidence

18   shows.

19             MR. DUBIN:  But the evidence is that the CEO, and

20   what is in Mr. Greebel's mind, is that the CEO had the

21   authority to enter into these agreements.  So I understand

22   that the Government wants to now say, okay, well, he should

23   have still gone to the board.  They haven't put on any expert

24   or anyone in corporate governance that said that's what his

25   obligation was.  He's dealing directly with the CEO, this

PROCEEDINGS

1  wasn't something -- I'm sure your Honor is aware having now

2  been through the second trial -- this wasn't a company that

3  had a massive corporate board where they're sitting around a

4  table.  It's being done by phone.  He's dealing in a closely

5  held public company with the CEO of the company who he

6  believes, and there's no evidence to the contrary, had the

7  authority to enter into these agreements.

8          And, you know, the best evidence that it didn't

9  matter to them is that they see them, they get them on

10  agendas, and they just don't pay attention.  They don't care,

11  they're not paying attention to it anyway.  So to the extent

12  that there's some suggestion that they would have said, oh,

13  no, you can't enter into these is not only not supported by

14  the he, but the evidence is the contrary on that.

15          And the last thing that I'll say, and I will sit

16  down and let Mr. Mastro take over on Count Seven.

17          With all due respect, your Honor may be confusing

18  the transfer of the Biestek shares with the transfer of the

19  Aselage because the date --

20          THE COURT:  No, I was giving examples of Mr. Su

21  backdating documents and he used the Aselage situation where

22  Mr. Su put a date on the document and the other situation, you

23  know, I think that the handwriting was similar and it looked

24  like Mr. Su's handwriting, and I think that he also admitted

25  that he had put a date on another document.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1          I was just trying to question Mr. Mastro's broad

2     generalization which I thought misstated the evidence about

3     Mr. Su and I forgot what he said.

4               MR. DUBIN:  I know what your Honor is talking about.

5               THE COURT:  He put two dates on documents related to

6     that.

7               MR. DUBIN:  The transfer agreement that involved the

8     backdating.  If your Honor recalls, it was dropped on his desk

9     in November, right?  And it ends up getting backdated to, I

10    think, to September.  Here, and this is the only cite I'll

11    give you and then I'll sit.

12              Mr. Su, at Page 5114 of the record, was asked the

13    following:

14    "QUESTION:  And you had no reason to believe that Mr. Shkreli
      hadn't transferred 4,167 shares to Mr. Biestek in June;
15    right?"
      "ANSWER:  Right."
16    "QUESTION:  And then you say you'll correct the date; right?"
      "ANSWER:  I said, 'my mistake, I'll correct the date.'"
17    "QUESTION:  But it's your testimony that you didn't actually
      correct the date?"
18    "ANSWER:  Correct."

19              That's what Mr. Greebel has to base his knowledge

20    on.  The CFO of the company, excuse me, the COO of the company

21    says, "It was my mistake," and then he gets on the stand, does

22    Mr. Su, and says I had reason to believe that it actually did

23    happen in June.  So how can we then ask a jury to draw the

24    negative inference that somehow Mr. Greebel should have

25    thought otherwise or suspected otherwise?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1        I fear, your Honor, that it's because now in

2   hindsight, looking back and knowing what we know about Shkreli

3   and the things that he's done and the wave of emotional tumult

4   that comes with all of his behavior, that the concern is that

5   some knowledge should be imputed to Mr. Greebel that at the

6   time, contemporaneously that is the information that he is

7   getting.

8        What Mr. Su says is "It's my mistake."  And then

9   Mr. Su comes into this courtroom and gets on the stand and

10  says that's what I believed at the time, that the transaction

11  had happened earlier and that is all Mr. Greebel has to go on.

12       Thank you, your Honor.

13       MR. MASTRO:  And, your Honor, just to put a fine

14  point on it.  At the next opportunity, the issue of the

15  settlement agreements are raised with the board and fully

16  vetted through Marcum.  Marcum concludes there is nothing

17  improper or fraudulent about anything that's happened.  That's

18  what the notes of report say and the board ends up ratifying

19  those agreements and publicly disclosing them and explaining

20  the circumstances.

21       So, your Honor, I think that that sequence of events

22  tells you all you need to know about Evan Greebel's state of

23  mind, and it tells you all you need to know about why there

24  shouldn't be any kind of criminal charge pending against Evan

25  Greebel in those regards, and Mr. Dubin has just quoted the Su

8094

PROCEEDINGS

1    testimony.

2         But the evidence in this trial showed not just

3    through Mr. Su's testimony but also the contemporaneous

4    documents that Mr. Greebel asked the right questions at the

5    time about why the date was on that document, and that the

6    representations were made in the agreement by Mr. Shkreli.

7    The agreement was actually made in June and Mr. Su owned up to

8    it being his mistake and the date got fixed on that basis.

9    That tells you what Evan Greebel, his state of mind; that

10   tells you Mr. Su's state of mind, and it tells you that Evan

11   Greebel shouldn't be criminally charged in regard to the

12   backdating.

13        Your Honor, going to Count Eight, your Honor, again,

14   I want to focus on what the evidence showed about Evan Greebel

15   and what Evan Greebel knew or didn't know.  And, of course,

16   the Count Eight allegations by the Government were, to a large

17   extent, come down to what Tim Pierotti said on the stand.  But

18   your Honor doesn't have to make determinations about

19   Mr. Pierotti's credibility at this point in time, that's not

20   what one does on a Rule 29 even if we believe --

21        THE COURT:  It's what any reasonable jury could have

22   believed him.

23        MR. MASTRO:  I understand.  So I'm not going to

24   comment on Mr. Pierotti's credibility because Mr. Pierotti

25   admitted that the key times in terms of when he says

8095

PROCEEDINGS

1    Mr. Shkreli and others talked about share allocations and what

2    to do.  They had a meeting, they get together for a meeting.

3    Some people on the phone.  Some people are in person.  He

4    testified Mr. Greebel wasn't at that meeting or on that call.

5           And then we look at the key documents about Count

6    Eight and the communications that Mr. Shkreli or others have

7    with this core group.  And Mr. Greebel isn't on those e-mails

8    or those documents.

9           So, your Honor, I respectfully submit that even

10   according to Mr. Pierotti's testimony when he describes

11   the -- what he says was what Mr. Shkreli was trying to do.

12   Mr. Greebel isn't at the meeting, isn't on the phone, and

13   isn't on the key documents.

14          So, your Honor, on Count Eight, I think that the

15   evidence just is insufficient to show that Mr. Greebel had any

16   knowledge or intent in that regard.

17          The Government makes a big deal out of, well, there

18   was Mr. Greebel knew about Mr. Pierotti wrote to him at one

19   point in time about the terrible things that Shkreli did in

20   contacting his wife, and then Katten brings a lawsuit against

21   Pierotti and this all supposedly shows that Mr. Greebel did

22   something wrong by his firm representing the company in a

23   lawsuit against Pierotti, right?

24          Well, that was vetted at Katten, other lawyers at

25   Katten do the litigation.  Frankly, your Honor, there isn't a

8096

PROCEEDINGS

1   shred of evidence in this record that Mr. Greebel was ever

2   aware, ever, or had any intent to do anything wrong in

3   connection with Count Eight because he wasn't at the pivotal

4   meeting Mr. Pierotti described, and he wasn't on any of the

5   key documents that those people communicating with one

6   another.

7           It's a lack of evidence, your Honor, about

8   Mr. Greebel.  Whatever the evidence shows about Mr. Shkreli or

9   others in that regard and, of course, your Honor there's

10  considerable evidence in this record of people selling, not

11  just Mr. Pierotti and Mr. Vaino and others selling, and

12  selling a lot, which seems completely inconsistent with the

13  Government's theory.

14          But, your Honor, the evidence actually about Evan

15  Greebel.  There's no there there on Count Eight because he

16  wasn't at the pivotal meeting Mr. Pierotti describes and he

17  wasn't on any of the key documents.

18          So, your Honor, on that basis as well, we believe

19  that count has to be dismissed against Evan Greebel and I will

20  just say one other thing, your Honor.  I think the case law is

21  very clear that, and SEC doctrine, documentation from the SEC,

22  that for a company to go into an IPO or going public that

23  actually the company has an interest in seeing that insiders

24  don't flood the market when the company is trying to get off

25  the ground in a public market to protect public markets to try

PROCEEDINGS

1    and make sure that there isn't a flood on the market that

2    affects the company's launch in a public sense.

3            There's nothing illegal about that.  Those are not

4    unusual.  They're common and they're perfectly legal, and they

5    don't fall within the prescriptions of when people might

6    ordinarily be accused of something for coordinating trading.

7    That's perfectly appropriate.  That hasn't been taken into

8    account at all in the Government's presentation.

9            We submit, your Honor, in terms of potential jury

10   charges, while we hope your Honor will dismiss that count,

11   that that's something that needs to be addressed as well so

12   the jury understands that, that that's a legitimate thing for

13   a company that has just gone public and is trying to establish

14   a market and get off the ground and raise funds.  That's

15   something perfectly appropriate for a company to be concerned

16   about.

17           THE COURT:  It was a merger.  It was a public

18   company.  Desert Gateway was a public company to merged with

19   Retrophin and it remained a public company and had free

20   trading shares and it had restricted shares.  That aspect of

21   the concept of an IPO is very different from a reverse merger.

22           MR. MASTRO:  I understand.  There's a distinction,

23   your Honor, but the reverse merger and then establishing a

24   market for Retrophin, Desert Gateway had been a moribund

25   entity, your Honor.  Retrophin was getting off the ground and

PROCEEDINGS

1   a reverse merger was to help to get it off the ground, be able

2   to get it publicly traded to be able to raise funds.

3          I submit there's analogy there.  I do recognize the

4   distinction your Honor is drawing.

5          To be clear, to be crystal clear, there is a --

6          THE COURT:  Should it have been that Mr. Shkreli was

7   remaining in control of the Fearnow shares by dictating which

8   of those share recipients should surrender their shares to pay

9   off disappointed MSM investors?

10         MR. MASTRO:  No, your Honor.

11         Those are privately held shares.  There was no

12  obligation to do that.  And I don't think there's anything in

13  this case that should be assumed to think that there was any

14  obligation in that regard and I didn't understand that to be

15  the Government theory.  But even if it were, I think it would

16  be incredibly misguided.

17         Your Honor, the fact of the matter is Mr. Greebel

18  wasn't involved in the meeting where Mr. Pierotti describes

19  Mr. Shkreli laying out his plan.  Mr. Greebel was not on any

20  of the key e-mails.  And, your Honor, I'm just going to give

21  my client because I see him writing something a last chance to

22  give me any other points in this regard and then I will

23  conclude very briefly.

24         (A brief pause in the proceedings was held.)

25         MR. MASTRO:  Your Honor, just to be clear, I think

8099

PROCEEDINGS

1    the record evidence was undisputed that all the Fearnow share

2    recipients approved of this particular structure because --

3    and the use of Fearnow shares in the ways that they were being

4    distributed -- because they cared about Retrophin ultimately

5    succeeding.

6          At the point in time, I know your Honor heard this

7    testimony both from investors and insiders, the value of

8    Retrophin shares at inception meant many of them back in 2013

9    were concerned that they might be worth nothing.  The Fearnow

10   share recipients cared about, and some of them said that on

11   the stand, the witnesses the Government called, but they

12   settled on a basis where some of them were private shares,

13   some of them were Retrophin shares.

14         But, your Honor, all the Fearnow share recipients

15   had the same interest in seeing the company get past the point

16   when you couldn't really establish whether it would survive

17   and thrive, have any real value.  They all had an interest in

18   seeing that the company survive and that that stock appreciate

19   in value; and so, that their Fearnow shares, their

20   allocations, would be worth more.

21         So they had an interest, even if it meant giving

22   some shares back, at that point in time, those shares,

23   according to the testimony even of government witnesses, were

24   worth very little, if anything, if the company didn't survive

25   and thrive, they would have just been pieces of paper.  So

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1   they would have an interest in seeing that everything was done

2   to help the company get past claims, potential claims, threats

3   of litigation, and so they all agreed to participate.

4            Now, having said that, your Honor, this is in one

5   sense the conundrum of this case because the conundrum of this

6   case is not only that a lawyer has been falsely charged, the

7   conundrum of this case is that all of the things that happened

8   in this 2013, 2012 into 2013 timeframe and even into 2014 they

9   ultimately proved to be of tremendous benefit to Retrophin and

10  to shares.

11           Retrophin ultimately not only survived, it thrived

12  big time and became that nearly billion dollar company that

13  Martin Shkreli could only dream of no matter what his bravado

14  at the time.  Every one of these investor witnesses made

15  three, four, five, six times their investment when they stayed

16  the course.  The fear the distribution of Fearnow shares and

17  those who received them, they all made -- Mr. Pierotti and

18  others -- they all made money because the company did get

19  through that incredibly difficult, volatile period when it had

20  just gone public.  There were potential claims against the

21  company, and the situation was navigated through.

22           It is a very unusual theory to me that there was

23  claims of fraud and securities fraud when, at the end of the

24  day, investors and insiders all -- and the company -- all did

25  well.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1          And, your Honor, Evan Greebel whatever you think of

2     Martin Shkreli, and we make no excuses for Martin Shkreli,

3     Martin Shkreli, the evidence showed in this trial, also lied

4     to Evan Greebel, his lawyer.  But, your Honor, and treated him

5     abysmally and people at the Katten firm and ridiculed his

6     lawyers with things like they're lazy and stupid and things

7     like that in some of the e-mail traffic, your Honor, saw it

8     coming in here.

9          But, your Honor, what Evan Greebel did was

10    functioning as a lawyer at an outside firm taking direction

11    from a party at the point a CEO who had apparent authority to

12    bind the company and doing things at his direction that

13    involved papering agreements and trying to do things the right

14    way.

15         And at the end of the day, Retrophin did very well

16    and Evan Greebel did nothing wrong.  But certainly, your

17    Honor, the evidence in this case does not establish in any

18    way, shape, or form that Evan Greebel had any intent to

19    conspire with Martin Shkreli or anyone else to commit any

20    crimes whatsoever.  And, your Honor, I just want to say this

21    in closing thank you.

22         MR. DUBIN:  I just want to address one question.

23         MR. MASTRO:  Go ahead.

24         MR. DUBIN:  Your Honor, I'm going to hand up to you

25    an exhibit that came in today DX124-88 to address the specific

PROCEEDINGS

1    question that you asked, or if you want to refers to the

2    number.

3              MR. KESSLER:  Your Honor, it's not in the record.

4              MR. DUBIN:  This exhibit is not in the record?

5              MR. Kessler:  I thought you meant to arrived today.

6              MR. DUBIN:  No, it's in evidence.

7              Your Honor, I would like to hand this copy to your

8    clerk because I wanted your Honor to have the benefit of

9    considering this as you are thinking about Count Eight

10   because, in response to your question of, you know, Martin

11   Shkreli controlling the shares and Evan Greebel's knowledge of

12   it here is an e-mail that he gets that Martin Shkreli says to

13   Evan Greebel, "About 4/5 okay for escrow stock.  Let's get

14   this wrapped up so Lindsay is out of the way."

15             And what Evan Greebel says is, "Okay.  I need to get

16   Heskett to go along with the new plan."

17             Heskett is the attorney for Fearnow.

18             So what the evidence is is that what is in Evan

19   Greebel's mind is that his client is telling him that these

20   people have approved it.  4/5 --

21             THE COURT:  These people being?

22             MR. MASTRO:  The Fearnow recipients.

23             MR. DUBIN:  The Fearnow recipients.

24             So what we're asking is for the jury to say whatever

25   Evan Greebel should do is say:  No, Martin.  What I want you

PROCEEDINGS

1   to do is wheel them in here and I want to see them say yes

2   that they agree to it.  There's no suggestion that he has that

3   duty or has any reason at this point to believe that Martin

4   Shkreli isn't telling him the truth.  He was pretty good, and

5   I think the record evidence is clear, is that if Martin

6   Shkreli, if he was good at one thing, he was good at getting

7   people to trust him.

8          MR. MASTRO:  Your Honor, the reason why we say no

9   rational juror could conclude that Evan Greebel committed

10   conspiracy on Count Seven or Count Eight is because the

11   evidence, the evidence and the lack of evidence scream out

12   that Evan Greebel doesn't possibly be convicted in this case.

13          Your Honor, it's exactly what we said when we came

14   here before trial.  This was a case about Martin Shkreli,

15   inflammatory evidence about Martin Shkreli, and what we can

16   look back now in hindsight and see about Martin Shkreli but

17   this was not a case about Evan Greebel.  These witnesses

18   didn't know Evan Greebel.  They had no contact or virtually no

19   contact with Evan Greebel.  And the actual evidence of what

20   Evan Greebel knew, or was told by Martin Shkreli, all points

21   to Evan Greebel having simply functioned as an outside lawyer

22   taking direction from officers of a company he was

23   representing.

24          Your Honor, we can look back in hindsight and say

25   would have could have --

8104

PROCEEDINGS

1          THE COURT:  I want to caution you against repeating

2     your yourself.

3          MR. MASTRO:  I'm not going to repeat myself, your

4     Honor.  But to question judgment calls is one thing.  To

5     accuse a good man, a lawyer at a law firm, of a crime under

6     these circumstances to us, your Honor, is shocking.  His

7     nightmare needs to end.  We hope your Honor will do it now.

8          I understand that your Honor -- and sometimes, in

9     these circumstances, wants to reserve, hear from the jury.  I

10    understand those things, your Honor, so I know your Honor may

11    prefer to do that, we respect that.  But we respectfully

12    submit that the evidence of this case doesn't permit this case

13    to go to the jury and we've been here for now almost eight

14    weeks now.  There will be a defendant's case in all

15    likelihood, and --

16         THE COURT:  Well, somebody ought to tell us that one

17    way or the other so I know what my calendar is going to look

18    like.

19         MR. MASTRO:  But, your Honor, the defense doesn't

20    need to put on a case given the evidence that the Government

21    presented here.

22         Thank you, your Honor.

23         THE COURT:  Who is going to speak for the

24    Government?

25         MR. Kessler:  I will, your Honor.

PROCEEDINGS

1          I'm just going to try to walk through some of the

2     points that Mr. Mastro raised, although I'm happy to address

3     questions if that's more efficient.

4          THE COURT:  If I have questions, I will interject.

5     I think you should focus on Count Seven what evidence that

6     there is no other co-conspirators other than Mr. Shkreli.  Why

7     I should determine that Mr. Panoff is a co-conspirator.

8          Whether in your motion to dismiss you characterize

9     the object of the Count Seven conspiracy as being one of those

10    three schemes.  And then, at the end, you said that the

11    object -- I think you said in other submissions or elsewhere

12    in that submission that the object of the conspiracy was to

13    defraud Retrophin of money and assets through one of these

14    three means.

15         I think the confusion I'm having, and maybe it's

16    just a semantic one, at one point you define these three

17    schemes as being the objects of the conspiracy, and in other

18    places you say the object is to defraud Retrophin through one

19    of these three means.

20         So which is to?

21         MR. KESSLER:  All right.  I can get to that.

22         THE COURT:  If you look at your memo of law, we can

23    give you the page cites, but let's talk about each of those

24    three, and Mr. Greebel's knowledge.

25         MR. KESSLER:  Sure.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

 1        THE COURT:  Knowledge and agreement to join the

 2   conspiracy and/or one of three schemes.

 3        MR. KESSLER:  Okay.  So the first question was about

 4   other co-conspirators.

 5        THE COURT:  Yes.

 6        MR. KESSLER:  As I think we briefed in the motion to

 7   dismiss context, there don't need to be other co-conspirators

 8   other than Mr. Shkreli.  The idea that Mr. Shkreli got

 9   acquitted does not disqualify him from being a co-conspirator

10   in this case.  I believe the Court's memorandum dismissing the

11   motion to dismiss made the point that even if all the evidence

12   in this case were going to be the same, you know, there would

13   be no difference.  So that's sort of point one.

14        With respect to the other co-conspirators.  As we

15   discussed I think last week, with respect to the other

16   co-conspirators for Count Seven, with Mr. Mulleady who is

17   involved in the backdating who made misrepresentations to

18   Mr. Kocher, David Geller, possibly Allan Geller, we've laid

19   that out.  Thomas Fernandez and Marek Biestek, who were

20   involved in the ways we explained.  Then there's Mr. Panoff.

21        In our letter that we had submitted, we laid out

22   some of the evidence that about Mr. Panoff.  We made the point

23   that more evidence would come in.  More evidence has come in.

24        So, and I think in particular what the evidence has

25   shown is that by the time in the August timeframe and

PROCEEDINGS

1    Mr. Panoff is engaging on the settlement agreements, and

2    particularly, this Skyler Marshall and Marcum's agreements.

3    He knows what's going on.  He knows Retrophin money is being

4    used to pay MSMB debts.  He knows the story is changing.

5         Just a couple e-mails about the story changing.  He

6    raises the point that there's too much risk.  He might have to

7    go to the board and resign.  So he's clearly aware of what's

8    going on.  It clearly concerns him and he facilitates it and

9    goes along with it.  There's no requirement that a

10   co-conspirator, you know, not ask questions of other

11   co-conspirators.  There's no requirement that co-conspirators

12   agree on everything.

13        So the fact that not everyone is aligned on every

14   single thing does not mean Mr. Panoff is not a co-conspirator.

15   And I think it's one of the standard jury instructions I was

16   looking at this morning, certainly, from the Shkreli trial.

17        Mr. Panoff's involved with the control memo that

18   Mr. Greebel drafts.  Mr. Shkreli says parts of it aren't true.

19   That makes the control memo in the same form anyway --

20        THE COURT:   The control memo being that statement?

21        MR. KESSLER:  The August 19th, August 20th kind of

22   one-page document that ends with the idea that in the future,

23   the CFO will sign off on related-party transactions.  So he

24   participates in that.

25        He participates in -- there's an e-mail chain where,

PROCEEDINGS

1    I forget the order, but he and Mr. Greebel discuss removing a

2    reference to the Skyler Marshall payment from the

3    related-party transaction section.  It's either the 10K or the

4    10Q even though everyone knows he's an MSMB investor what's

5    going on they just discussed that.  So that's certainly enough

6    evidence of a test from which a reasonable jury could conclude

7    that Mr. Panoff was part of the conspiracy.

8            The evidence about Mr. Shkreli and everyone is well

9    aware of Mr. Shkreli's role.  So those are the co-conspirators

10   we identified and we've shown.

11           The Court asked about the object of the conspiracy

12   and there was a reference to a memorandum of law.  I just

13   don't know which memorandum.

14           THE COURT:  The Government's opposition to the

15   defendant's motion to dismiss Count Seven of the superseding

16   indictment, Document No. 345.  And so, for example --

17           MR. Kessler:  I'm sorry your Honor, I have a copy.

18           THE COURT:  Yes, on Page 10, Section 2.  The

19   heading, "There's No Legal Basis to Strike the Backdating

20   Object of the Conspiracy Charged in Count Seven and Evidence

21   of Backdating is Admissible."

22           And you, again, refer to the object of the

23   conspiracy charged in Count Seven to include the creation of

24   the MSMB Capital interest.

25           And then you say on Page 26, "Third, even if Count

PROCEEDINGS

1   Seven of the superseding indictment somehow could be read to

2   allege a conspiracy with multiple objectives remedy is not

3   dismissal of the count.  Instead, where a charged conspiracy

4   has multiple objectives, the defendant need only to prove

5   agreement on one of the objectives charged in the indictment

6   in order to establish the that a conspiracy existed."

7           MR. KESSLER:  Yes.

8           THE COURT:  Are you with me?

9           MR. KESSLER:  Yes.

10           THE COURT:  Okay.  I'm seeking clarification because

11   you tend to use an object of the conspiracy to describe the

12   three schemes, and you also talk about those three schemes as

13   the means by which the object of the conspiracy which was to

14   defraud Retrophin was achieved.

15           MR. KESSLER:  So there is one conspiracy to

16   misappropriate assets from Retrophin to satisfy Mr. Shkreli's,

17   I think, we said personal debts and obligations but whatever.

18   The wording is, it is as alleged in Paragraph 56 which is the

19   specific alleging of Count Seven in violation of

20   18 U.S.C. 1349.

21           The indictment lays out a number of means, methods,

22   in which the co-conspirators pursued that conspiracy.  There's

23   no need to charge overt acts in a 1349 charge, but they kind

24   of function similarly to that.  So these are all just ways in

25   which the co-conspirators went about the conspiracy.

PROCEEDINGS

1              You could think about it another way.  You could

2     think about it this is all as evidence of the conspiracy.  The

3     multiple conspiracy, the multiple objective/multiple

4     conspiracy instruction on Page 26 that the Court raised, that

5     was in response to the defense argument, so we don't agree

6     that there are multiple conspiracies.

7              And then I believe the Court's last question in this

8     area was the evidence related to Mr. Greebel.

9              Let me turn to that.

10             THE COURT:  Maybe you can segregate the evidence of

11    Mr. Greebel's knowledge vis--vis the three means that you

12    described.

13             MR. KESSLER:  Sure.  So with respect to the

14    backdating, and let me just highlight some evidence, but there

15    was a lot of discussion about this evidence, e-mail exchanged

16    with Marek Biestek, which is November 29th with his shares.

17             But the backdating relates to a December 3rd.  The

18    specific backdating that actually creates this interest that

19    didn't exist in MSMB Capital is the December 3rd transfer.

20    The Court recalls that the document we used is an e-mail from

21    Mr. Su to Mr. Greebel where he attaches a number of transfers

22    all of which has June or July handwritten or typed dates and

23    then one transfer related to Mr. Su which has a November date.

24             One of those transfers is the, I want to say it's

25    July 1st, but it's the June or July transfer from Mr. Shkreli

PROCEEDINGS

1    to MSMB Capital Management.  That's the one that really

2    matters because that's the one that creates the interest that

3    didn't exist.

4            So Mr. Greebel's knowledge includes the fact that he

5    routinely received cap tables, Katten sent cap tables.  None

6    of them showed this interest at any point before the backdated

7    transfer.  So he's certainly on notice that this interest did

8    not, in fact, exist despite the fact that the document has a

9    June or July date.  The Marek Biestek, it's called, Backdating

10   on November 29th certainly provides a notice of what is going

11   on.  The same thing with the November 25th e-mail.  We talked

12   about on redirect about a surrender agreement.  There's a lot

13   of indications that these interests are being created

14   contemporaneously and not far in the past as they're

15   represented to me.

16           There's also the fact that there's testimony that

17   Mr. Greebel, at one point, said the transfer should be

18   considered a gift and then he fills out, or he sends

19   Mr. Shkreli a draft 13(d) form which ultimately gets filed in

20   the same form which indicates that this interest was purchased

21   using working capital, which it clearly wasn't, whether or not

22   it was a gift.

23           So there's certainly evidence that he knows the

24   interest did not exist at the time even setting aside the fact

25   that he later becomes aware of facts showing that Mr. Brodsky

PROCEEDINGS

1     capital management had no assets.

2             THE COURT:  But if Marek Biestek is transferring his

3     own shares of Retrophin to Mr. Shkreli, how does that harm

4     Retrophin?

5             MR. KESSLER:  That transfer is more about notice

6     that backdating is occurring, that these transactions that are

7     occurring contemporaneously are being represented to have

8     occurred in the past.  The harm to Retrophin is the primary

9     way this furthers the conspiracy is it creates -- puts

10    Retrophin on the hook.  Creates an interest, or it purports to

11    create an interest in Retrophin for MSMB Capital Management

12    investors when no such interest existed.

13            THE COURT:  I'm sorry.

14            MR. Kessler:  And, in fact, when it comes to the

15    settlement context, there are investors who are told, oh, your

16    investment is now Retrophin shares.  And some of them make, I

17    think, one of them really threatens to sue Retrophin, some of

18    them express varying degrees of displeasure about that.

19            THE COURT:  The shares from Mr. Biestek to

20    Mr. Shkreli was not a misappropriation of Retrophin shares

21    those were his shares.

22            MR. KESSLER:  Understood.  But I don't think we're

23    saying that that transfer is a misappropriation.

24            THE COURT:  All right.

25            MR. KESSLER:  I think some of what's going on with

PROCEEDINGS

1  the evidence is that the clearest evidence of the occurrence

2  of backdating is the series of documents related to

3  Mr. Biestek but that's actually not the transfer that is most

4  significant for purposes of MSMB Capital Management.

5          THE COURT:  All right.  I'm just looking at the

6  document.

7          MR. KESSLER:  I think it's the difference that

8  backdating is occurring of which there is evidence about

9  multiple transactions and then there's this 75,000-share

10 transaction which is the one that actually puts Retrophin on

11 the hook when it wasn't before.  It allows Mr. Shkreli to

12 claim that these investors had been invested in Retrophin when

13 they were, in fact, not.

14         But Mr. Shkreli, as a transfer of these shares,

15 these involved his own shares not Retrophin shares.  The

16 75,000 shares.

17         MR. KESSLER:  They're shares of Retrophin, but they

18 are not from a, like, the company's pool.

19         THE COURT:  All right.

20         MR. KESSLER:  Yes, they are shares that were owned

21 by Mr. Shkreli or transferred to him.

22         THE COURT:  So why is that a problem if someone

23 transfers their own shares to MSMB Capital.

24         MR. KESSLER:  Because it's done in a manner that

25 suggests there was a investment in Retrophin much earlier and

PROCEEDINGS

1    allows the fiction that these MSMB Capital investors had

2    invested in Retrophin their money was all gone in 2011.

3              THE COURT:  All right.  So Mr. Shkreli was putting

4    up his own shares not using Retrophin shares to create that

5    interest.  He's transferring his shares to MSMB in order to

6    create an impression that MSMB invested in Retrophin.

7              MR. KESSLER:  Yes.

8              THE COURT:  But, at the end of the day, these were

9    Mr. Shkreli's shares.

10             MR. Kessler:  Right.  It's the fiction of the

11   investment that then puts Retrophin in jeopardy and causes

12   legal threats and causes Retrophin to allocate shares to those

13   investors.  All of those things.

14             THE COURT:  Okay.

15             MR. KESSLER:  So with respect to settlement

16   agreements, I am trying to see if anything I want to address

17   other than -- let me just walk through.

18             Just briefly.  The first thing it is true that

19   Dr. Rosenwald sent a letter, or his lawyer, sent a letter in

20   which they discussed claims against MSMB and Retrophin.  I

21   believe he is the only person who has actually suggested suing

22   Retrophin.  Certainly, some other investors never threatened

23   to sue Retrophin or anyone.  Sarah Hassan never threatened to

24   sue Retrophin.

25             THE COURT:  We have Mr. Kocher, Mr. Marshall, the

PROCEEDINGS

1    Gellers, maybe about going to the public, exercising other
2    options, going to the media.  And I think some of them had
3    threatened to go to the SEC.  There were definitely threats of
4    which Mr. Greebel was aware.
5            MR. KESSLER:  I'm not denying there were threats.  I
6    think what I'm trying to say is I'm not going to dwell on what
7    the investors said.  I am going to transition to what
8    Mr. Greebel, what else he knew in a minute.
9            But I want to make a point that the record is
10   actually much less clear that there were threats against
11   Retrophin by all the investors.
12           THE COURT:  Well, wouldn't an attorney who is
13   representing Retrophin and MSMB and hearing threats by MSMB
14   investors that they're going to sue be prudent in looking to
15   protect Retrophin from those threats if the investor didn't
16   say, I'm going to sue only Martin Shkreli and only MSMB.  The
17   investors, in fact, said we may exercise our legal rights, we
18   may consult a lawyer, and I thought my investment was worth X,
19   and I need to be, you know, compensated for the value of my
20   investment when its conversion into Retrophin shares were
21   made.  It's clear that these investors are at least signaling
22   that they're willing to go after Retrophin at that point.
23           Would you agree?
24           MR. KESSLER:  No.
25           THE COURT:  Or a lawyer would reasonably believe

PROCEEDINGS

1    that even if it wasn't explicit, wouldn't a lawyer, a prudent

2    lawyer, who represents both and he says, look, there are

3    threats of litigation here and these are people whose

4    investments -- they believe their investments in MSMB were

5    rolled into Retrophin.  They were told in the wind-down letter

6    that we've now talked all of this hedge fund money into

7    Retrophin.

8              Why wouldn't an attorney reasonably perceive that to

9    be exposure on behalf of one of his clients?

10             MR. KESSLER:  I think for some of them, a reasonable

11   attorney might perceive that, but I think there's more going

12   on.

13             First of all, Mr. Greebel is not just being that at

14   that told that investors think their investment was rolled

15   over in some ways.  They were being told that conversions

16   unauthorized.  The wind-down e-mail which suggests these

17   investors have made multiples of their original investment.

18   They can get their money in cash.

19             THE COURT:  We have evidence in the record that

20   their very own subscription agreements gave the manager the

21   authority to make the kind of investment in Retrophin or roll

22   their assets in.

23             On the one hand, those agreements said we're going

24   to be a long-short diversified fund.  But, on the other hand,

25   they also said that the manager has authority to make these

PROCEEDINGS

1    investments and there are very few legal remedies against the

2    manager or fund because of those decisions.

3         MR. KESSLER:  There's remedy for fraud or gross

4    negligence, and there's no evidence that Mr. Greebel was aware

5    of those PPMs, and the PPMs strictly the investment of funds

6    into the sort of private -- the kind of Retrophin, the

7    investment in Retrophin as opposed to a long position or a

8    short position in equity.  But I think -- let me move to what

9    I think is perhaps the stronger evidence.

10        I think the record that everyone just threatened to

11   su Retrophin at any point is not the record.  And certainly,

12   the idea that these threats were taken seriously is not clear.

13   Mr. Shkreli tells Mr. Greebel to ignore various investors

14   ignore Sarah Hassan, Lavelle isn't going anywhere, ignore

15   David Geller's requests.  So I don't think the record is as

16   clear as it's been represented that these threats were really

17   perceived as threats to sue Retrophin.

18        But moving beyond that.  I think the real question

19   is what actually happened, right?  So what happens is

20   Retrophin pays for all of these settlements when Retrophin did

21   nothing wrong.  The investors are accusing Martin Shkreli and

22   possibly MSMB of fraud and Retrophin is made to pay

23   everything.  If there's no negotiation, there's no saying

24   Retrophin didn't do anything wrong.  MSMB should be

25   responsible, Martin Shkreli should be responsible.  If you

PROCEEDINGS

1    actually look at the Rosenwald settlement, Mr. Shkreli is the

2    person who has to pay it and Retrophin gets protected.

3            Then, in all the other settlements, Retrophin pays

4    and Mr. Shkreli MSMB and Retrophin gets protected.  Retrophin

5    ends up paying these claims which have nothing to do with

6    Retrophin.  And, you know, I think sort of a proof by

7    contradiction but if you --

8            THE COURT:  Shouldn't an attorney have waited until

9    the lawsuit was filed and then ask the client to spend money

10   to draft a motion to dismiss and to get the case dismissed

11   than risk the adverse publicity of a new start-up company.

12           Why wouldn't an attorney who receives e-mails from a

13   CEO of Retrophin that indicate investors are ready to sue.

14   They're saying they're retaining lawyers, they ask for

15   litigation holds, they're saying they're going to exercise

16   their rights if this can't be resolved.  They're saying

17   they're going to turn remedies such as going to the media,

18   going to the SEC, and enforcing their legal rights.

19           Why wouldn't an attorney say, all right, we better

20   settle up.  Even if Retrophin doesn't have exposure, even if

21   he believes that, and we don't know, we don't really have much

22   evidence about what Mr. Greebel believed or knew.  But even if

23   he believed that these would be completely frivolous lawsuits,

24   what would be wrong with a prudent attorney listening to the

25   CEO of a company like Retrophin who directs him to enter these

PROCEEDINGS

1    settlement agreements.  Why wouldn't he reasonably and really

2    enter into an agreement and draft an agreement?

3               (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          MR. KESSLER:  It's self-dealing.  The CEO is accused

2     of fraud by the people who are threatening to sue the company.

3     It's not a question of whether Retrophin should have been

4     protected in someway.

5          The point is Mr. Greebel takes Retrophin's money and

6     uses it to protect Mr. Shkreli and Mr. Greebel and Retrophin

7     also gets protected.  But you know, here is what doesn't

8     happen, these litigations isn't recorded to anyone, the

9     settlements don't get disclosed to anyone.

10         THE COURT:  They were disclosed.  They were in the

11    Board minute agendas.  And, yes, Mr. Richardson made a point

12    of saying this is really unfair to give us all of these

13    voluminous documents less than 48 hours or 36 or 24 hours

14    before a Board meeting.  He's raising this as a concern, yet

15    there was the document that the defense pointed out where in

16    Richardson's own handwriting is indicating that he's got

17    questions and issues.  He's got an awareness of the settlement

18    agreements regarding certain of the MSMB investors.

19         And the fact that Mr. Aselage and Mr. Richardson, as

20    one of Board members at the time, didn't bother to read

21    through the volume of documents or didn't see something in the

22    agenda and say, hold up, I need time to look at this before we

23    discuss it, or let's table this until the next meeting or

24    something.  There was evidence they were given information

25    about these settlements.

PROCEEDINGS

1            MR. KESSLER:  They were given information that

2     settlement payments were made on behalf of a related party.

3     They were given that information after the settlements were

4     discovered by the auditors, not when they were disclosed at

5     the time in some announcement that the company had been

6     protected.  They were hidden until the auditors asked them.

7     Then there were these disclosures, which are written to

8     provide limited information that do not disclose that the

9     investors, all or many of them, suggested that Mr. Shkreli had

10    defrauded them.  The Dr. Rosenwald settlement was never

11    disclosed.

12            So there were, there was information provided.  But

13    that's very different than what, than the full information was

14    disclosed.  You can't ratify --

15            THE COURT:  But do you have any proof about what

16    Mr. Shkreli told Mr. Greebel about the circumstances under

17    which these investors were claiming that he as CEO of

18    Retrophin and previously as the founding member of the MSMB

19    entities, defrauded them, why Mr. Greebel wouldn't think there

20    was some exposure for Retrophin whom he also represented?

21            MR. KESSLER:  So there is lots of evidence in the

22    record about what the investors told Mr. Greebel about what

23    had happened at MSMB:  Unauthorized conversions, this a scam,

24    my investment was supposed to be this, you told me this, it's

25    nothing.

PROCEEDINGS

1        THE COURT:  There is also the piece the investors

2   are saying my investment was rolled into Retrophin, or I

3   bought into Retrophin, or according to wind down letter the

4   funds are all the main seed money for the --

5        MR. KESSLER:  The wind down e-mail does not say

6   that.  The wind down e-mail says the funds are shutting down,

7   you can have your money or have stock.

8        THE COURT:  We focused a lot of attention into

9   Retrophin.  I think there was -- maybe I'm --

10       MR. KESSLER:  The entity MSMB, whichever entity is

11  it, is focusing its efforts on Retrophin.  The wide down

12  e-mail absolutely does not say your investment is rolled into

13  Retrophin.  It says the opposite.

14       THE COURT:  There are e-mails to those investors at

15  or about the same time, or shortly after, or maybe even

16  shortly before with some of them that we are now going to go

17  into Retrophin.  And you have the opportunity, or I'm going to

18  put your money, or I have put your money into Retrophin.

19       MR. KESSLER:  Without your authorization or consent,

20  after I told you you made a huge amount of money and you can

21  have it in cash.  It's very different than, hey, here is an

22  accurate statement about your investment, I haven't lied to

23  you, if you want you can roll it over.

24       THE COURT:  That's Mr. Shkreli's problem.  We're

25  talking about Mr. Greebel.

Case 1:15-cr-00637-KAM   Document 512   Filed 01/10/18   Page 150 of 365 PageID #: 14360

PROCEEDINGS

1          As the attorney who is, we don't know what exactly

2    Mr. Shkreli told him, we do know he's getting information from

3    these investors that we're going to sue you if we don't get

4    our money back, we're going to sue you.

5          MR. KESSLER:  He's getting information that a fraud

6    has been committed related to Mr. Shkreli and MSMB.  One of

7    them, possibly two of them, suggest that they also sue

8    Retrophin.  Mr. Kocher asked for an accounting.  Mr. Marshall

9    has a litigation hold after he gets the settlement agreement,

10   that's a different situation anyway.

11         The point is then the conspirators just have

12   Retrophin pay this off.  There is no discussion, there is no

13   question about, hey, should we talk about the fact that the

14   CEO has been is accused of fraud and now these investors want

15   to use our money?  There is no suggestion that Mr. Shkreli

16   paid for it.  He's the one being accused of fraud.  There is

17   no suggestion that MSMB pay for it, until after they get

18   caught.  Then Mr. Greebel suggests this idea of using notes to

19   indemnify Retrophin.

20         Remember what ultimately happens in the control

21   memo, which Mr. Greebel drafts the control memo, says these

22   are not Retrophin obligations, these were MSMB obligations and

23   Retrophin should be indemnified.

24         So as soon as they are discovered, you know,

25   explanation isn't, we had to protect Retrophin.  The

PROCEEDINGS

1   explanation is these were actually MSMB things, we'll have

2   Mr. Shkreli and MSMB indemnify.  The indemnification notes is

3   also a problem they are also focused, but that's a second

4   point.

5           Moving on, take the Schuyler Marshall settlement.

6   If there was no problem with the earlier settlements, if they

7   were really normal, why does the Schuyler Marshall settlement

8   get divided into two?  And there is a fight with Marc Panoff,

9   and then it gets removed from the related party disclosure.

10  Why do Mr. Geller and Mr. Blanton afterwards get consulting

11  agreements instead of settlement agreements?  Consulting

12  agreements is a better way to hide the claim.  That's what

13  Mr. Mastro said the purpose was, to resolve a claim in the

14  form of a consulting agreement.  That hides the settlement a

15  lot better.

16          THE COURT:  I think these consulting agreements, if

17  the defense were to have testimony and evidence, that

18  typically they are used to head off litigation threats and to

19  appease outgoing directors, founders or executives.  I agree

20  with you, that's a different context than consulting with an

21  angry investor and a related entity.  But the consulting

22  agreements at issue apparently didn't demand much of the

23  investor signing on to it.  There was no minimal requirement

24  or no specific metrics that the person had to meet.  They are

25  purposely vague to allow the company to use or not use the

8125

PROCEEDINGS

1    consultant's services.

2              And I'm trying to, in my mind, understand whether

3    there is a distinction, a material distinction, between a

4    consulting agreement to appease an out-going executive,

5    founder, Board of Director with a consulting agreement that's

6    used to appease an investor who believes that he or she has an

7    interest in the company who is going to pay him or her for

8    consultant services in exchange for a release of that

9    company's liability.

10             MR. KESSLER:  So, Mr. Johnson's testimony is not in

11   the record for --

12             THE COURT:  I know it's not.  But I'm just --

13             MR. KESSLER:  I understand the question.  So the

14   first thing is, neither Darren Blanton nor Al Geller believed

15   anything of the sort.  They believed that they had wanted to

16   get their money paid and they were going to sign anything.

17             THE COURT:  But Blanton actually did do work for

18   Retrophin by introducing him to investors and --

19             MR. KESSLER:  Two things about Blanton.

20             THE COURT:  -- trying to get money for the company.

21             MR. KESSLER:  Blanton was offered, I think this is

22   the order, a settlement agreement, consulting agreement,

23   option agreement, all for the same thing.

24             There is no -- clearly, the same way to get

25   different people money, that's what is going on.  The point is

PROCEEDINGS

1    to get money.  The second thing Mr. Blanton testified --

2              THE COURT:  What is fraudulent at the end of the

3    day?  They decide it's a consulting agreement and Mr. Blanton

4    is out there raising capital and introducing Mr. Shkreli to

5    investors, trying to get people to come and meet him, put

6    money into the company.

7              MR. KESSLER:  What is fraudulent is Retrophin paid

8    Mr. Blanton millions of dollars based on his claims against

9    Mr. Shkreli in the MSMB context calling it a consulting

10   agreements, not disclosing it anywhere.  There is no evidence

11   that the Darren Blanton consulting agreement was ever attached

12   to a Board package or shown to the Board.  There is a

13   reference to a consulting agreement that appears to be a

14   Darren Blanton consulting agreement in the 2013 or 2014, 10K,

15   when it says, we hired an adviser and we gave him 200,000

16   shares.  It's never disclosed.

17             Even if it were disclosed, there is no way from

18   reading that contract, you have any idea that Darren Blanton

19   is actually an MSMB investor who is angry with Mr. Shkreli

20   about MSMB.  It's the same thing with Mr. Geller.

21             The point is, none of these investors thought they

22   were going to do any consulting.  The fact that it's a

23   consulting agreement is just a way to hide what it's actually

24   doing, is settling a claim they have, and the claim they have

25   is against MSMB.  It's a way for Retrophin shares to be sent

PROCEEDINGS

1   to the MSMB investors to satisfy their dispute with

2   Mr. Shkreli.

3              THE COURT:  But if the CEO is telling these

4   attorneys, settle this, they are threatening to sue the

5   company.  Assuming, we don't have proof of what Mr. Shkreli

6   told Mr. Greebel, why would Mr. Greebel be, why would he be

7   guilty of a fraud if he listened to his client.  And said, all

8   right, I will draft the consulting agreements based on the

9   terms that you tell me.  Because he's not actually, there is

10  some instances where Mr. Greebel is actually negotiating with

11  attorneys for some is the disappointed investors.  And

12  Mr. Shkreli, we have that e-mail where he tells one of the

13  investors, look, deal with my lawyer.  But, Mr. Greebel's

14  marching orders from the CEO of the company that he

15  represents, is to resolve the liability.  And consulting

16  agreements or settlement agreements is the way we're going to

17  do it.

18             MR. KESSLER:  A couple of things.  First thing, his

19  client is Retrophin not Martin Shkreli.

20             THE COURT:  He's the CEO.

21             MR. KESSLER:  Who is asking to have his personal

22  obligations satisfied with the company's money.  That's what

23  is going on.

24             With respect to who told whom about a consulting

25  agreements, Evan Greebel suggests the consulting agreements

8128

PROCEEDINGS

1    idea to Martin Shkreli for Al Geller as a way to get Al Geller

2    his shares which relate to MSMB.  So this is not a situation

3    where Evan Greebel is just sitting there and Martin Shkreli

4    tells him to do something and he goes and does it.  He knows

5    the background.  He knows what is going on, that's what's in

6    the record.

7            Mr. Mastro said, we don't know what Mr. Shkreli said

8    to Mr. Greebel.  We know the evidence that is in the record.

9    A reasonable juror can draw the inferences from all of the

10   evidence and the course of conduct that this conspiracy

11   existed.  That's the point here.

12           The fact that Mr. Shkreli could have told

13   Mr. Greebel something else that isn't in the record, maybe

14   that's a jury argument.  But based on the evidence, that

15   Mr. Greebel is the one that suggested the consulting

16   agreements, he knows what is going on, he knows the deal with

17   Darren Blanton.

18           There is one point where they are talking about

19   having Mr. Blanton get his shares and recanting his SEC

20   complaint.  The entire course of conduct --

21           THE COURT:  That would be part of a reasonable step

22   by an attorney who is trying to resolve issues.

23           MR. KESSLER:  It's an SEC complaint against MSMB.

24           THE COURT:  But he also represents MSMB.

25           MR. KESSLER:  Then he has a conflict of interest

PROCEEDINGS

1    because he's shuffling Retrophin.

2                THE COURT:  So maybe he's in violation of his

3    ethical obligations to one client or the other.  But the

4    question is whether he's guilty of fraud against Retrophin.

5                MR. KESSLER:  The point is, from the entire course

6    of conduct and the evidence in the record a reasonable jury

7    can infer that his intent, which i the real question of

8    intent, we know the actions that happened, that his intent

9    satisfies the statute.

10                There is going to be a closing argument.  They are

11    free to argue that the jury should draw all the inferences in

12    the other direction -- one minute -- but that's what is going

13    on.

14                This is a -- I'm not saying you can't make the other

15    argument.  But the question of the Rule 29 stage here is can a

16    reasonable jury/juror draw the inferences in the direction,

17    taking all the evidence in the light most favorable to the

18    Government, and that's what we're saying.  Taking this entire

19    course of conduct, all the actions, the failures to disclose,

20    the fact that Mr. Greebel suggested consulting agreements, the

21    hiding the settlement agreements, originally the splitting of

22    the Marshall agreement, all the knowledge about where the

23    frauds lie and who is responsible, a reasonable jury can

24    infer -- I think that's the right word -- could find the

25    element satisfied.  That's the standard.  That's what the

PROCEEDINGS

1    evidence shows.

2              I'm pointed out, the SEC recanting that would be

3    obstruction of justice to give someone 100,000 shares to

4    recant their SEC complaint.  I use that as an example.

5              The point is there is full knowledge this is not

6    about Retrophin.  It's not Retrophin business.  It's not

7    Retrophin's interest.  This is about satisfying disgruntled

8    investors, who have claims against Mr. Shkreli, who are upset

9    about MSMB, and Retrophin money is being used to pay for it.

10   And Retrophin money is not Martin Shkreli money.  A public

11   company with a lot of investors and their money, their

12   resources, are being used for these personal ends.  The fact

13   that Retrophin was ultimately successful, okay, but...

14             THE COURT:  It wasn't because of the alleged fraud,

15   it was because Mr. Shkreli left and the company became

16   successful.

17             I don't think Mr. Mastro is arguing the fraud was a

18   good thing, because ultimately, that the alleged fraud was a

19   good thing.

20             MR. KESSLER:  I didn't mean to suggest that was the

21   argument.  What I'm saying there is a no ultimate harm jury

22   instruction.  It doesn't matter that Retrophin ultimately

23   ended up doing well or the investors who got all this

24   Retrophin asset, all these Retrophin assets, ended up doing

25   well.  So that's really the point.

PROCEEDINGS

1          At this stage, given the evidence, a reasonable jury

2    can draw the inferences in the direction, we're saying giving

3    the entire course of conduct.  The ultimate question is was

4    there an agreement to take Retrophin assets to satisfy

5    Mr. Shkreli's personal obligations.  That's what there is.

6    The jury can reach its own conclusions.  The evidence allows

7    for them to draw the inferences that way.

8          I don't know if the Court wants me to address Count

9    Eight?

10          THE COURT:  Yes, sure.

11          MR. KESSLER:  Or any other question by the Court?

12          THE COURT:  I have a few questions about, if we

13   could circle back.  When you were talking about the backdating

14   scheme, you said that the backdating interest caused Retrophin

15   to allocate shares to MSMB capital investors.  Could you

16   explain?

17          MR. KESSLER:  To MSMB Capital.

18          THE COURT:  Okay.

19          MR. KESSLER:  MSMB Capital has the interest in

20   Retrophin.  When Retrophin goes public there is the cap table

21   conversions and however many shares go to MSMB Capital.  And

22   if the Court remembers, each investor gets in the mail some

23   certificate with a somewhat random number of shares.  So it's

24   not a direct allocation.  It's an allocation from Retrophin to

25   MSMB Capital, then in the transfer agent records you can trace

PROCEEDINGS

1    how they get broken out to the investors.

2              THE COURT:  All right.  Well, the source of those

3    backdated shares was Martin Shkreli.

4              MR. KESSLER:  Yes.

5              THE COURT:  So how do they become Retrophin shares?

6              MR. KESSLER:  Sorry, maybe it was semantics.

7         The shares become --

8              THE COURT:  The 75,000.

9              MR. KESSLER:  In the name of MSMB Capital.

10             THE COURT:  The 75,000 shares were given by Martin

11   Shkreli to MSMB Capital.

12             MR. KESSLER:  Then at the time of the reverse

13   merger, those 75,000 shares and all the other shares in

14   Retrophin Inc., the private company, become shares of Desert

15   Gateway, which then becomes Retrophin the public.

16             THE COURT:  You're saying at that time MSMB had

17   taken its shares and somehow merged them with Retrophin?

18             MR. KESSLER:  No.

19             THE COURT:  Because they are a stand-alone entity in

20   possession of Mr. Shkreli as 75,000 shares.  So the reverse

21   merger should have no effect on MSMB's ability to have shares

22   that once belonged to Mr. Shkreli.

23             MR. KESSLER:  I didn't mean to suggest that it

24   would.  I'm sorry if there was confusion there.

25             THE COURT:  How does that then become Retrophin's

PROCEEDINGS

1    problem or why is that transaction a fraud against Retrophin?

2            MR. KESSLER:  It is in furtherance of this

3    conspiracy.  That's the point.  It's one of the ways in which

4    this conspiracy to get Retrophin assets to repay Mr. Shkreli's

5    debts takes place.

6            Once MSMB Capital has this phantom, then it becomes

7    real, but at the start phantom interest in Retrophin, then the

8    investors when they are told you're getting Retrophin shares,

9    bring up their concerns about the investment of Retrophin.  So

10   the investors weren't told, I lost all your money.  The

11   investors were told, you've invested in Retrophin all along

12   here, are your shares.  But those shares only appear based on

13   this backdated transaction, which makes it look as if there

14   has been an investment in the past.  So sort of consistent

15   with the misrepresentations that Mr. Shkreli has been telling

16   them the whole time.

17           THE COURT:  Right.  So the piece that I think

18   defense is focusing on is, does Mr. Greebel know of this.

19           MR. KESSLER:  He knows about the backdating for the

20   reasons I got to originally, from the cap table that there was

21   no investment.  He knows that all the other documents that

22   show up at the same time are related to individuals who had

23   their shares in the past and they are now transferring them

24   back.  So that's, his knowledge is that the transactions that

25   are occurring in December that are dated in June and July did

PROCEEDINGS

 1    not occur in June or July.

 2                 THE COURT:  All right.  So do you want to go to

 3    Count Eight?

 4                 MR. KESSLER:  Sure.

 5                 THE COURT:  I do have a question just to start.

 6    What is the Government's theory, because I think the defense

 7    has raised the argument that the Fearnow shares are, belong to

 8    those who were allowed to purchase them at a much discounted

 9    price.  Those Fearnow shares are purchased for consideration

10    by the five individuals identified by Mr. Shkreli.

11                 MR. KESSLER:  Seven.

12                 THE COURT:  Seven, I'm sorry.  But they are not --

13    they are being purchased from Mr. Fearnow, not from Retrophin.

14    And they are not -- how do these become, again, a fraud

15    against or controlling shares of Retrophin?  Because I guess

16    my confusion is, the original deal I thought was for 300 or

17    400,000, the reverse merger, right?

18                 MR. KESSLER:  200 or 400.

19                 THE COURT:  Then because they didn't have enough

20    money they allowed Troy Fearnow to retain what I think were

21    $200,000 worth of shares.

22                 MR. KESSLER:  400,000.

23                 THE COURT:  I'm sorry.  Then Mr. Fearnow starts to

24    sell at minimal prices to the chosen seven.  They then have

25    the shares, for which they paid fair consideration,

PROCEEDINGS

1   Mr. Pierotti thinks these are my shares.  Mr. Vaino starts

2   selling, for whatever reason, maybe he believes these are his

3   shares.  The others hold the shares and give them back.  There

4   is no evidence that there is any consideration, but they give

5   them back to Mr. Shkreli at his request to satisfy the

6   settlements that Mr. Greebel is helping Mr. Shkreli execute.

7   Is that, that holding of the shares and control of the shares,

8   is what you're alleging Count Eight is about?  Am I

9   understanding you correctly?

10          MR. KESSLER:  Mostly.  What happens is at the time

11  of the merger, Retrophin, Retrophin not Mr. Shkreli, pays half

12  of the price of the shell, the Desert Gateway shell.

13          THE COURT:  Are the Fearnow really Retrophin's?

14          MR. KESSLER:  At the point that Retrophin makes

15  the -- Retrophin clearly has control over them.  They are

16  allocated by Mr. Shkreli.  Retrophin's money is the only money

17  that goes to Mr. Fearnow.  It goes to whoever, Mr. Fearnow's

18  lawyer.  It goes to buy the shell.  Based on the acquisition

19  of the shell, Mr. Shkreli and Mr. Greebel direct the

20  allocation of these Fearnow shares.  Some are held in escrow

21  then released when the second payment, I forget 100 or

22  $200,000, installment paid is made.  Not a real escrow, but

23  that's the idea, it's being held back.

24          And so they are nominally held in the names of the

25  seven individuals, but they are controlled by Mr. Shkreli.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    And they are controlled in a way to limit their trading to

2    prop up the price and make it appear like there is liquidity.

3            It's not the fact that they are Retrophin, like

4    Retrophin owns them or not.  That's really the key.  They are

5    shares in Retrophin.  They are being controlled by

6    Mr. Shkreli.  It's not a securities fraud against Retrophin;

7    it's a securities fraud in general, I guess, the market.

8            There is control over the shares.  There is a

9    restriction of supply.  These are almost all the free-trading

10   shares, the vast, vast majority.  So there is a restriction of

11   supply and that allows of manipulation of price and volume in

12   this vulnerable time period that Mr. Mastro talked about.

13           THE COURT:  You're not claiming that they were

14   successful in the conspiracy to control, but rather they just

15   agreed to control, whether or not it was necessarily

16   successful.

17           MR. KESSLER:  I think the evidence is that it may

18   well have been successful up until the pipe.  Certainly, had

19   everyone dumped their shares, the price would have collapsed

20   and we don't know what would have happened.  But it is true

21   that succes is not a, not one of the elements.  So the

22   evidence is consistent with success, but that's not a

23   requirement.

24           THE COURT:  Okay.  Why don't we talk about

25   Mr. Greebel's culpability for Count Eight, the evidence that

PROCEEDINGS

1    you believe exists, when the defense has argued passionately

2    there is none.

3              MR. KESSLER:  There is no question that Mr. Greebel

4    affects all of these things, affects as in makes happen.

5              THE COURT:  Effects.

6              MR. KESSLER:  He drafts the documents, deals with

7    the lawyers, gets transfers, dealing with Marek Biestek to get

8    people to sign documents, say things, he's involved in that

9    sense.  He's involved, there is again no question, in the

10   allocation of some of these individual shares.  As we saw in

11   the series of e-mails with Special Agent Delzotto to satisfy

12   Lindsay Rosenwald and Sarah Hassan, all those.  He's involved

13   in all of the steps that are taken.

14             With respect to his knowledge, I think one of our, I

15   think one of the most powerful pieces of evidence about his

16   knowledge is Mr. Greebel's actions related to Mr. Pierotti.

17   He helps figure out -- he's aware of the fact that someone is

18   selling is a problem, selling at high volume is a problem.

19   There is this e-mail about, you can't send a -- I forget -- a

20   threat to a specific e-mail to Mr. Pierotti that can open up a

21   can of worms given your agreement with him.  That is a very

22   powerful piece of evidence that Mr. Greebel is trying to

23   prevent Mr. Shkreli from getting into the agreement with

24   Mr. Pierotti.  That's part of the conspiracy right there.  He

25   wouldn't dump these shares or sell them at high volume, which

PROCEEDINGS

1    is what he was doing.  The concealment of things like

2    Mr. Pierotti's -- or the threat against Mr. Pierotti, show

3    that.

4            And then if you go back to all of those e-mails

5    about allocating shares, there is the reference to these

6    people as purchasers in quotation marks.  Reference to finding

7    someone you can trust to avoid a Pierotti problem.  To

8    Mr. Shkreli telling Mr. Greebel, you know, these guys will do

9    what they are told.

10           There is lots and lots of evidence that there is

11   control over all of these shares.  The control is not

12   disclosed in the 13D, I guess the beneficial ownership is not

13   disclosed in the 13D.  They are Mr. Greebel's actions to get

14   the shares back to Mr. Shkreli personally when they are not

15   Mr. Shkreli's shares.

16           And so the jury can infer from that that Mr. Greebel

17   is involved.  That he's not involved in the sense that he did

18   things, but involved in the sense that he's agreed to join the

19   conspiracy.

20           THE COURT:  I know that there is a lot of overlap

21   Count Seven and Eight.  We know that they used the control

22   group shares to pay off some the disappointed investors.  But

23   again, those are the individuals' own shares for which they

24   paid consideration to Mr. Fearnow.

25           MR. KESSLER:  They are shares held in their name.

PROCEEDINGS

1          THE COURT:  They actually paid for them.

2          MR. KESSLER:  A few hundred dollars.

3          THE COURT:  $300.  Every one of those guys paid

4    money to Fearnow, which Mr. Fearnow agreed to accept.

5          MR. KESSLER:  I agree.

6          THE COURT:  So they were shares that belonged to the

7    individuals.

8          MR. KESSLER:  Yes.

9          THE COURT:  And those individuals then relinquished

10   their shares at Mr. Shkreli's request to pay off investors.

11         I think Count Seven talks about using Retrophin

12   property shares and money to pay off investors, while some of

13   the money might have come from Retrophin, it seems like a lot

14   of those shares came from the Fearnow holders.

15         MR. KESSLER:  I think Dr. Rosenwald and Mr. Kocher

16   shares --

17         THE COURT:  We saw all those e-mails where

18   Mr. Shkreli and Mr. Greebel are discussing which of those

19   seven is going to kick in shares to settle which liabilities.

20         MR. KESSLER:  Right.  They ultimately go to

21   Mr. Kocher.  To the extent they are used in that way, they go

22   to Mr. Kocher and Dr. Rosenwald.

23         THE COURT:  You're saying the rest of the shares to

24   settle came from Retrophin?

25         MR. KESSLER:  Spielberg and Lavelle get Retrophin

8140

PROCEEDINGS

1   shares.  And then obviously Blanton and Geller get shares

2   issued by the company.

3           Remember, originally the shares start out as

4   Retrophin is the one buying the shell.

5           THE COURT:  Yes.

6           MR. KESSLER:  Taking advantage of that, Mr. Shkreli

7   allocates the shares to his friends.  Those shares could have

8   been allocated to investors, to other people to satisfy other

9   Retrophin goals as opposed to Mr. Shkreli's beneficial

10  ownership.  Ultimately, the fact that some of those shares

11  get, end up with the investors is also in a way --

12          THE COURT:  It's not like he allocated the Fearnow

13  shares.  He asked the investors to pay Mr. Fearnow for their

14  shares.

15          MR. KESSLER:  He's the one -- Troy Fearnow would

16  have sold.  Mr. Shkreli -- he could have sold them to

17  Mr. Shkreli.  They didn't want Mr. Shkreli to have to disclose

18  that size of an ownership.

19          The point is, in buying the shell, Retrophin had the

20  right to or the influence to Mr. Fearnow to direct how the

21  shares could be out paid.

22          THE COURT:  Anything else?

23          MR. KESSLER:  I don't think so.  Let me just check.

24          I'm happy to answer anything else.  We're happy to

25  layout specific exhibits to extent I haven't mentioned them,

PROCEEDINGS

1    if that ends up being helpful to the court.

2                THE COURT:  I'm thinking maybe Mr. Mastro you may

3    want to be heard.  I appreciate that.

4                I'm thinking that it night be necessary to reserve

5    my decision based on the length of the trial, all the evidence

6    obviously.  I'm recalling pieces of it, but perhaps not with

7    that clarity.  So can you do this in about ten minutes or

8    less?  I think everybody wants to eat something.  How about

9    five minutes?

10               MR. MASTRO:  Yes, your Honor.  I'll try for five; I

11   promise ten.

12               THE COURT:  Just don't repeat yourself.

13               MR. MASTRO:  I won't, your Honor.  Let's get to the

14   heart of it.

15               I think there were some extraordinary admissions

16   there under your Honor's questions.  There were extraordinary

17   admissions that in fact what we're talking about in Count

18   Seven aren't shares, aren't Retrophin shares, they are shares

19   of Retrophin stock.

20               And what we're talking about is not the Government's

21   theory.  I think the phrase that Mr. Kessler used was, the

22   Government's theory is that Retrophin was somehow defrauded,

23   because his words, there was the creation of a, quote,

24   "fiction of the investment of MSMB into Retrophin," end quote.

25               Let's talk about what Mr. Greebel knew at the time.

8142

PROCEEDINGS

1  Because, in fact, there is absolutely nothing wrong with the

2  private transfers from one party to another.  And we finally

3  got to the heart of that, that is the case.

4          But the Government has a theory because MSMB had

5  some, ended up with some investment in Retrophin some shares,

6  there is something wrong with that.

7          What does Mr. Greebel know.  Mr. Greebel, he's not

8  deciding cap tables.  The only evidence that was cited by

9  Mr. Kessler of Mr. Greebel's supposed knowledge was he got the

10 cap tables.  Guess what, the cap tables kept changing.  Who

11 decides what is in the cap table, Mr. Shkreli and Mr. Su.

12 Mr. Greebel didn't decide that.  So Mr. Greebel is seeing

13 every changing cap tables.  That doesn't tell him anything

14 about the bona fides.  But he's also seeing public press

15 releases in that 2012, early 2013 time period.

16         Your Honor will recall them, it says MSMB Capital

17 led Retrophin action.  They are putting out publicly and

18 that's what he's reading, MSMB Capital leading the Retrophin

19 effort.  Those are the words that are used in public releases

20 that he sees.

21         This has got to be what Mr. Greebel knew or didn't

22 know.  I think it's shocking that we're here after eight weeks

23 of trial and that's the best they can point to as to what

24 Mr. Greebel knew about MSMB, and their whole thing hangs on

25 MSMB.

PROCEEDINGS

1          Your Honor had it absolutely right on the backdating

2     and the shares that were involved those are privately held

3     shares being transferred.  That is nothing about Retrophin.

4          Second, on the settlement agreements, and the

5     consulting agreements, let's call it what it is, your Honor

6     had it absolutely right, we have Rosenwald and we have

7     Marshall and we have Kocher and we have David Geller and

8     others all talking about potential suits.  We have Rosenwald

9     with a lawyer, a very lawyer letter.  This is what Evan

10    Greebel knows.  He knows that these people say they have

11    claims, they got lawyers, they say they are going to sue

12    Retrophin.  That's what Mr. Rosenwald's letter says in the

13    letter.  This is it what Mr. Greebel knows.

14         Of course, we hear all the time as outside lawyers

15    people complaining, your client did this, or that, or did

16    something grossly wrong, committed this, committed that.  The

17    fact of the matter is, he knows there is potential lawsuits

18    against Retrophin.  Even lawyers threatening potential

19    lawsuits about Retrophin.  What they are doing is they are

20    threatening them because they are saying their complaints,

21    their claims, are about the conversion of whatever MSMB

22    Healthcare or MSMB investment they had into Retrophin.

23         Your Honor had it absolutely right, the subscription

24    agreements, the private placement memos, they gave the right

25    to do a conversion.  The complaints are, I didn't get enough.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    I don't think the conversion was right.  I think I'm entitled

2    to more.

3            Of course they are going to sue Retrophin.  The

4    conversion is MSMB or MSMB Healthcare into Retrophin.  Of

5    course they are going to sue Retrophin and specific lawyer

6    threats to sue Retrophin.

7            End of story on what Mr. Greebel's state of mind is

8    and him doing the right thing.  Because let's just call it

9    what it is, private lawyers who know that there are direct

10   threats or implied threats to sue your corporate client, and a

11   CEO giving direction on how to settle them.  You're going to

12   settle them and you're going to reasonably believe you should

13   settle them.  And even if nasty things were said about the

14   CEO, you realize your corporate client is in jeopardy.

15           Your Honor had it right, the reason why it was so

16   important in this critical period is based as adverse

17   publicity and lawsuits.  When they have just gone public, when

18   they are just doing a pipe trying to raise money.  Retrophin

19   never would have made it.  They would have been dead on

20   arrival.

21           If the Government's theory were right, it would be

22   an impossible standard for any, any lawyer at a private law

23   firm to meet that standard.  This is the most incredible

24   thing.

25           He said, Mr. Kessler, Retrophin didn't have

PROCEEDINGS

1    exposure, as if that's an ipse dixit.  Of course Retrophin had

2    exposure.  There were lawyers writing that he got the letters

3    saying we're going to sue Retrophin.  Of course Retrophin was

4    implicated in a conversion from MSMB to Retrophin.

5              Your Honor, Count Seven is DOA, got to go.  The

6    consulting agreement's next, that's the last piece.

7              The notion that Mr. Kessler posits that the

8    consulting agreements were done as some sort of work around

9    after the settlement agreements started it had to be

10   disclosed, is belied by the testimony of Al Geller who was

11   offered a consulting agreements at the same time his brother

12   was offered a settlement in the spring of 2013, before there

13   arose any issue of disclosure.

14             What does Mr. Greebel do?  He says to Al Geller,

15   it's got to go to the Board.  He said to Blanton it had to go

16   to the Board.  Mr. Greebel did everything the right way.

17             But the fact of the matter is, that the decision to

18   offer people consulting agreements in certain instances, in Al

19   Geller's case in particular, remember the date on the draft

20   consulting agreements was April 2014 at the same time his

21   brother is getting a settlement agreement, is the obviously

22   because Martin Shkreli really valued Al Geller as his trusted

23   adviser and psychological helper as a life coach,

24   Mr. Shkreli's words.

25             THE COURT:  Those weren't services to Retrophin,

PROCEEDINGS

1    even though Retrophin was paying for them.  These were

2    personal, very personal coaching, by Mr. Geller and giving him

3    individual advice.

4           MR. MASTRO:  Your Honor, Mr. Shkreli saying to

5    Mr. Greebel, I want a consulting agreement with Al Geller.

6    And then having certain boiler plate about the scope of

7    services and Al Geller actually continuing to provide those

8    services.  And Mr. Blanton, who also Mr. Shkreli says I want

9    him as a consultant.  And he provides valuable services,

10   making introductions of potential investors, and who to go to

11   for investments, and introductions for Mr. Shkreli in

12   important places.  The direction on consulting agreements came

13   from Mr. Shkreli.  Mr. Greebel is just the scrivener.  He

14   doesn't negotiate the deals; he just memorializes them as told

15   to him by Mr. Shkreli.

16          And it's not true, it's demonstratively false what

17   Mr. Kessler said about consulting agreements being a work

18   around after settlement agreements started to have to be

19   disclosed.  Because a consulting agreement was offered to Al

20   Geller in the spring of 2013 at the very time others were

21   being offered settlement agreements, because Mr. Shkreli

22   viewed him differently.

23          Your Honor, it's all about what is in Mr. Greebel's

24   head.  What was his intent, what did he know.

25          When you look at Count Seven the only evidence you

PROCEEDINGS

1    have of what he knew and what he was, what his understandings

2    were, are that he was a lawyer doing a job.  There is no basis

3    for allowing Count Seven to go forward against Mr. Greebel.

4         Now, I realize my time is limited so I'm going to

5    try to be quick.  But I will just say that Mr. Greebel did

6    what a reasonable lawyer would be expected to do on behalf of

7    a client at the direction of a CEO.  And he did it in

8    conjunction, as the record shows, with other lawyers from

9    Katten who worked with him on various of these issues,

10   including some of these agreements, that's in the record.

11        Now your Honor, saying that, making that clear,

12   we're talking about three categories, none of which implicate

13   Mr. Greebel in having done anything wrong at all or having

14   known of any illicit purpose behind any of these things.

15   Whatever you want to say about Shkreli, the record evidence in

16   this trial after eight weeks is that Mr. Greebel was not a

17   co-conspirator, had no criminal intent, the things he did were

18   the things that lawyers reasonably do on behalf of corporate

19   clients, at the direction of corporate officers.

20        Your Honor, Count Seven should be dead on arrival

21   against Mr. Greebel.

22        In Count Eight, let me just be very, very brief.

23   What we know about what Mr. Greebel knew on Count Eight, some

24   of these things were said in very general terms.  There is no

25   evidence of that Mr. Greebel knew anything about Mr. Shkreli's

PROCEEDINGS

1    effort to control and there was an agreement with the other

2    Fearnow recipients about control and what to do with them.

3    Mr. Greebel was not in that meeting around that call.  He's

4    not on any off those documents.

5            What we do know is of one thing, we know he knew

6    there was consent by the other Fearnow share recipients to

7    changing allocations and making some of their shares

8    available.  He knows that, but he doesn't know of any plan.

9    There is no shred of evidence that he had a plan to do

10   anything differently.  That's a Mr. Shkreli issue.  And that

11   group of Fearnow share holders, they all paid money for their

12   shares.

13           It's not true what Mr. Kessler said, that Retrophin

14   had any role in paying for or acquiring those shares.  The

15   Fearnow recipients all paid money to get their shares.  That's

16   what Mr. Pierotti said.  That's what the evidence shows.  And

17   then they made decisions that, to protect the company at a

18   critical time, some of them would give up pieces.

19           THE COURT:  Not tiny pieces, they were substantial

20   pieces, 50,000 shares here.

21           MR. MASTRO:  Your Honor, absolutely right.  You know

22   something, they kept substantial portions.  They each had

23   large allocations that they paid for.  And they kept the

24   lion's share of their shares.  And they, at the end of the

25   day, it was a wise decision on their part to be helpful.

PROCEEDINGS

1          THE COURT:  Was it a returnable donation to keep

2    Retrophin out of harms way, or did they receive consideration

3    for the shares?

4          MR. MASTRO:  The consideration was the protection of

5    the value of shares they retained, your Honor.  That is ample

6    consideration.  Because when they were able to sell, as Mr.

7    Pierotti said on that stand, made a lot of money.  They knew

8    the jeopardy that Retrophin was in at that point in time.  And

9    how it was in its infancy, how fragile a time it was for that

10   young company, and they made conscious decisions to protect

11   the rest of their investment.  They all contributed.  These

12   are things that they chose to do, and it proved to be a very

13   wise choice.  It wasn't a gift.  They put money in.  They

14   understood the risks.  They understood the risks that all

15   those paper shares could be worth nothing and would be worth

16   nothing if Retrophin went under.

17          Your Honor, all I'm saying with regard to Count

18   Eight, you got to look at what Mr. Greebel knew.  What the

19   evidence shows about his knowledge and his state of mind.  On

20   Count Eight as well, I submit to you, that the evidence isn't

21   there that Evan Greebel knew what Martin Shkreli was allegedly

22   up to.

23          Count Seven, dead on arrival.  There is a reason why

24   the Government lost the trial against Mr. Shkreli.

25   Mr. Greebel, it's incredible that he's here.  Count Eight

PROCEEDINGS

1   should also be dismissed.

2           Your Honor, I know your Honor is going to reserve,

3   and we appreciate all the time you're giving to this and

4   appreciate your reserving, but please end Mr. Greebel's

5   nightmare now.  He should not have to spend another day under

6   this cloud.  His family is here.  It's been a nightmare for

7   him.  It's been a horrific experience.  Please remove the

8   cloud.  Thank you, your Honor.

9           THE COURT:  It's 2:00 o'clock.  I think we can

10  either keep going with the trial, if there is going be a

11  defense case.  As I said, I'm going to reserve my decision.

12          How do the parties want to proceed?  Is there going

13  to be a defense case or not?

14          MR. BRODSKY:  Your Honor, we would just like 15, 20

15  minutes to talk to Mr. Greebel, then come back and have a

16  decision.

17          THE COURT:  All right.

18          MR. MASTRO:  Your Honor, if I could put one more

19  thing, one document, to refer your Honor to in this regard

20  particularly as it relates to Count Seven, the Marcum

21  September 18, 2013, report to Retrophin and its Board, that

22  went to the Board, that explains the different settlements out

23  there, what was going on, how MSMB had promissory notes,

24  Mr. Shkreli backed the notes, they might be collectible, but

25  revealing to the Board entirely the nature of the settlement

8151

PROCEEDINGS

1    agreements the MSMB angle on the obligation, the promissory

2    notes Mr. Shkreli behind them.  And understanding all of that

3    at Marcum, which was then all publicly disclosed, multiple

4    public filings, them telling the Board, we've reviewed it all,

5    Marcum, but -- and this is on page nine, Government's Exhibit

6    114-21 -- that no fraud or illegal acts were noted, even

7    though the settlements were scrutinized by Marcum, the outside

8    auditors and found to be something to disclose.  But the MSMB

9    connection noting MSMB promissory notes as a result, probably

10   can't pay, the Board ratifies, then discloses.

11           Where is the crime in any of this?  There isn't one.

12   Certainly not on Mr. Greebel's part.

13           Thank you, your Honor.

14           THE COURT:  I think I note for the record that the

15   Marcum audit stated explicitly that it was relying on the

16   truthfulness of the representations and of the management that

17   they were getting in order to formulate their decision about

18   the lack of fraud and other matters in the audit.  So I don't

19   find that particularly dispositive any of the issues.

20           In any event, the jury is probably ready to come

21   back.  You want 15 minutes, so 2:15, you'll be able to make a

22   decision?

23           MR. BRODSKY:  Could we, your Honor?

24           THE COURT:  Yes, you could, 15 minutes.

25           MR. MASTRO:  Thank you, your Honor.  Thank you for

PROCEEDINGS

1    all the time.

2              THE COURT:  I don't have the 26.2 information yet

3    from the defense -- do we have it?

4              I don't know how you people expect me to deal with

5    all these issues that you probably want to know answers to

6    before you start your case or decide a case, but...

7              MR. BRODSKY:  If you have general guidance, even if

8    it was just in a general way, with respect to Mr. Johnson.  I

9    know there are issues with respect to each expert.

10             THE COURT:  Is Mr. Johnson first up at bat?

11             MR. BRODSKY:  No, no, your Honor, just for purposes

12   of having a conversation with our client.

13             THE COURT:  Mr. Johnson, I think it's a difficult

14   situation.  Because Mr. Johnson is a consultant for departing

15   executives Board members and founders who had an affiliation

16   with a company.  He also pulled data on huge established

17   companies, he said that himself.  He's not talking about

18   considerations with regard to consulting agreements that a

19   new, fledging, thinly-funded start-up would enter into.

20   However, the Government has made allegations that certain

21   terms in the consulting agreements are indicia of fraud.

22             MS. SMITH:  Your Honor, I don't think that the

23   Government suggested that certain terms in the consulting

24   agreements are indicia.  That's Mr.-- I just don't think we've

25   ever made that argument, so that's clear.

PROCEEDINGS

1          THE COURT:  You're saying the agreements themselves

2     are fraudulent because there is no demand for services, as I

3     recall, there is no clear demand for services.  I think I read

4     this in the past.  No?  You've made those arguments, have you

5     not?

6          MS. SMITH:  It makes it clear that they were not

7     legitimate consulting agreements.  I don't think there has

8     been a suggestion that facially --

9          THE COURT:  Does Mr. Greebel have to be here?

10          MR. BRODSKY:  No, your Honor.  Can I waive his

11     appearance?

12          THE COURT:  Maybe we should wait.

13          MR. BRODSKY:  I know he's not here, and I'll report

14     back, do you have a view, just generally, of where you are in

15     terms of Mr. Johnson, whether you're narrowing him or whether

16     you're leaning, I know this is not a final decision.

17          THE COURT:  I'm inclined to say that he can testify

18     about the characteristics in the consulting agreements that he

19     found to be typical.  But I do think that he needs to be very

20     clear that the agreements that he reviewed were for much

21     larger established companies, that his expertise is in the

22     area of departing executives, Board members and founders.

23     That he doesn't opine at all on the situation we have here,

24     which is people who had no prior affiliation with Retrophin,

25     except perhaps a belief that they had an investment in the

8154

PROCEEDINGS

1    corporation.

2              With regard to the termination clauses, that seems

3    to be somewhat more on point.  Although again, I believe he

4    looked mostly at companies that had much more established and

5    much far more assets.  These were large companies that he

6    looked at for the termination clauses.  So I think that he

7    would have to be very specific about the limited experience

8    and limited scope of his testimony.

9              MR. BRODSKY:  Understood.  Thank you, your Honor.

10   We'll go meet with him now.

11             THE COURT:  This is just an inclination.  I would

12   probably give a more fulsome explanation.

13             MR. BRODSKY:  I appreciate it.

14             THE COURT:  But we were getting submissions as late

15   as today on some of these experts.

16             (Continued following page.)

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          A F T E R N O O N   S E S S I O N

2                    (2:20 p.m.)

3          (In open court; jury not present.)

4          THE COURT:  Good afternoon, have a seat.

5          MR. BRODSKY:  Our client made the decision to put on

6  a case, Your Honor.  Our first witness is Howard Jacobs, he's

7  in the little room.  Would you like me to bring him out or do

8  you want the jury to come out first?  Whatever is your

9  preference.

10          THE COURT:  I think that we can have him called --

11          MR. BRODSKY:  Sure, absolutely.

12          THE COURT:  -- the witness if you want -- or there

13  is no harm in putting him on the seat right now.  We won't

14  make any announcement, I will just ask whether the defense

15  wishes to present a case.  Is that all right?

16          MR. BRODSKY:  Sure, sure, sure.

17          THE COURT:  Okay.

18          MR. BRODSKY:  We're also happy to get him and do it

19  in front of the jury, either way, Your Honor.

20          THE COURT:  I don't have a preference.

21          MR. BRODSKY:  We'll leave him there and then I'll

22  come get him.

23          THE COURT:  Okay.

24          (Jury enters courtroom.)

25          THE COURT:  All our jurors are back.  Please have a

JACOBS – DIRECT – BRODSKY

1    seat.

2              Does the defense wish to present a case?

3              MR. BRODSKY:  We do, Your Honor.  We call our first

4    witness, Howard Jacobs.

5              THE COURT:  All right, thank you.

6              Good afternoon.

7              THE COURTROOM DEPUTY:  Please raise your right hand.

8    HOWARD JACOBS, called as a witness, having been first duly

9    sworn/affirmed, was examined and testified as follows:

10             THE COURTROOM DEPUTY:  Have a seat and state and

11   spell your full name for me.

12             THE WITNESS:  Howard Jacobs, H-O-W-A-R-D

13   J-A-C-O-B-S.

14   DIRECT EXAMINATION

15   BY MR. BRODSKY::

16   Q    Good afternoon, Mr. Jacobs.

17   A    Good afternoon.

18   Q    Where do you work today?

19   A    I'm retired.

20   Q    What was your most recent position?

21   A    I was counsel to root9B Technologies, Inc.

22   Q    Is that a private or public company?

23   A    It's a public company.

24   Q    While you were -- were you in-house counsel or outside

25   counsel to root9B?

8157

JACOBS – DIRECT – BRODSKY

1    A    In-house counsel.

2    Q    While you were in-house counsel at root9B, who did most

3    of the legal work?

4    A    Outside counsel.

5    Q    What did you do before you were in-house counsel at

6    root9B?

7    A    I was a partner at Katten Muchin Rosenman.

8    Q    For how long were you a partner at Katten Muchin Rosenman

9    and any predecessor firms that merged with Katten?

10   A    Twenty-one years.

11   Q    What type of practice did you have at Katten Muchin?

12   A    I'm a general corporate and securities practice

13   representing public and private companies, venture capital

14   funds, hedge funds, private equity firms and giving general

15   corporate advice to public and private companies.

16   Q    Before we go into your professional history, do you know

17   Evan Greebel?

18   A    Yes, I do.

19   Q    Approximately how long have you known Mr. Greebel?

20   A    Seven or eight years -- oh, 15 years I know him.

21   Q    When did you first meet him?

22   A    I met him 15 years ago; he was an associate at Katten

23   Muchin.

24   Q    And how long did you work with Mr. Greebel while you were

25   at Katten Muchin?

JACOBS - DIRECT - BRODSKY

1  A      Seven or eight years.

2  Q      And did Mr. Greebel remain an associate during those

3  seven or eight years or did his title change?

4  A      His title changed, he became a non-equity partner.

5  Q      Based on your observations and your work with

6  Mr. Greebel, what type of lawyer was Mr. Greebel?

7  A      He was an excellent lawyer.  Extremely smart, hard

8  working, very knowledgeable about the law, ethical, honest and

9  always trying to do a good job at anything he worked on.

10 Q      Was he professional or unprofessional?

11 A      Extremely professional for his age.

12 Q      And when you said he was hard working, describe his work

13 ethic?

14 A      He was always there way before me in the morning and way

15 after I left at night.  I would say he averaged something like

16 2500 billable hours a year for all the time I knew him and

17 that doesn't include lunch and breaks during the day, which is

18 very high level of work in a law firm.

19 Q      Based on your observations and your work with him, was he

20 the type of attorney who did whatever clients wanted or did he

21 push back and refuse to do what clients wanted?

22         MS. SMITH:  Objection, Your Honor.

23         THE COURT:  Sustained.

24 Q      Well, based on your observations and work with him, did

25 Mr. Greebel always agree with the client, never agree with the

JACOBS – DIRECT – BRODSKY

1    client, or somewhere in between?

2              MS. SMITH:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    A    I would say --

5              MS. SMITH:  Objection.

6              THE COURT:  It was sustained.

7    A    I didn't hear, sorry.

8              THE COURT:  Sorry, I will try to be a little louder.

9    I will use my mic.

10   BY MR. BRODSKY::

11   Q    Based on your observations and your work with

12   Mr. Greebel, did you ever observe Mr. Greebel do anything that

13   violated the law?

14             MS. SMITH:  Objection, Your Honor.

15             THE COURT:  Sustained.

16   Q    Did you ever observe Mr. Greebel do anything wrong?

17             MS. SMITH:  Objection, Your Honor.

18             THE COURT:  Sustained.

19   Q    Before getting into your professional background and

20   interactions and observations of Mr. Greebel, let me ask you a

21   few questions about your family.

22   A    Okay.

23   Q    Are you married --

24             MS. SMITH:  Objection.

25   Q    -- or single?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1  A    Married.

2  Q    Do you have children or grandchildren or both?

3  A    I have two children, two sons-in-law and four

4  grandchildren.

5  Q    Does your family know Mr. Greebel, his wife and children?

6  A    I don't believe so.

7  Q    Are your families close in any way?

8  A    No.

9  Q    Other than Katten social events, did your family ever

10 have dinner, for example, with Mr. Greebel and his family?

11 A    No.

12 Q    Let me talk a little bit your professional background.

13 Where did you grow up?

14 A    In Queens, in Jamaica.

15 Q    And where did you go to college?

16 A    I went to the University of Vermont.

17 Q    Approximately when did you graduate?

18 A    1964.

19 Q    Did you have a degree or degrees from the University of

20 Vermont?

21 A    I received a bachelor of science degree in accounting.

22 Q    Did you continue to go to school after the University of

23 Vermont?

24 A    Yes, I went to George Washington Law School.

25 Q    Did you work while you were in law school or just focus

JACOBS - DIRECT - BRODSKY

1    on law school?

2    A    I worked in my last year of law school for the Department

3    of Commerce.

4    Q    Approximately what year did you graduate from the

5    university of -- from George Washington Law School?

6    A    June 1967.

7    Q    And after you graduated from law school, what did you do

8    next?

9    A    I worked for two months at the Treasury Department and

10   then I worked for two and a half years at the Securities and

11   Exchange Commission in Washington, D.C.

12   Q    And what part of the Securities and Exchange Commission

13   did you work at in Washington, D.C.?

14   A    I was in the Division of Enforcement.

15   Q    What is the Division of Enforcement?

16   A    It's kind of the litigation section of the Securities and

17   Exchange Commission.

18   Q    And what did you do next after you worked at the SEC's

19   Division of Enforcement?

20   A    I was recruited to a firm in New York City Weiss

21   W-E-I-S-S, Rosenthal, R-O-S-E-N-T-H-A-L, and Heller,

22   H-E-L-L-E-R.

23   Q    How long were you at Weiss Rosenthal & Heller?

24   A    I was there from November 1969 to January 1981.

25   Q    Describe in general your practice there.

JACOBS – DIRECT – BRODSKY

1   A    My practice was, although I was doing litigation for the

2   SEC, this firm recruited me, they were basically a corporate

3   security practice firm.  They worked on public and private

4   offerings for mostly small to medium sized companies.  I

5   worked on every type of security and corporate document you

6   can think of and we did business advice for all kinds of

7   different clients.

8   Q    Did you -- what did you do next in or about 1981?

9   A    I went to with the senior partner at Weiss Rosenthal, I

10  went to a firm called Spengler, Carlson & Gubar,

11  S-P-E-N-G-L-E-R, C-A-R-L-S-O-N, G-U-B-A-R.

12  Q    And Weiss Rosenthal, where were they located, which

13  office did you work?

14  A    They only had one office, 295 Madison Avenue.

15  Q    In Manhattan?

16  A    In New York.

17  Q    And Spengler, Carlson, Gubar, which office did you work?

18  A    One office, 281 Park Avenue, New York.

19  Q    How long were you at Spengler, Carlson & Gubar?

20  A    Until March 1992 I joined Shea & Gould.

21  Q    What type of practice did you have at Spengler Carlson?

22  A    Throughout all these different firms I always had a

23  corporate securities practice in the small and mid market

24  firms.

25  Q    And then when you went to Shea & Gould, how long did you

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1    practice there?

2    A    Until June of 1994 I left there and I went to Rosenman &

3    Colin.

4    Q    And Rosenman & Colin, does that have any connection at

5    all to Katten?

6    A    Yes.  In 2001, we merged with Katten Muchin, it was a

7    Chicago-based more national firm.  Weiss Rosenthal was

8    primarily New York, Charlotte and Los Angeles.

9    Q    And what practice did you have at Katten?

10   A    Also corporate securities work, small and medium-sized

11   companies.

12   Q    Approximately when did you leave Katten?

13   A    I left Katten in April of 2015.  They had mandatory

14   retirement and I had to leave.

15   Q    During your time there from about 1994 to April 2015, did

16   you serve on any committees at Katten?

17   A    Yes.  I served on -- well, first, in Rosenman I served on

18   the management committee which was a five person partners of

19   committee that ran the firm that was elected by the partners

20   in the firm.  So I worked on that management committee, then I

21   was in charge of the merger committee that merged Rosenman

22   into Katten.

23        Once I joined Katten I served on the executive

24   committee for four years, their compensation committee for

25   four years, and the billing and collection committee for 10

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1   years.

2   Q    And let me ask you about each of those committees.  Which

3   office did you work in with respect to that?

4   A    I worked in the New York office.

5   Q    You mentioned you were on the executive committee, how

6   big, how large is the executive committee at Katten at that

7   time?

8   A    The executive committee was made up of 11 partners:  Four

9   from New York, five from Chicago, one from Los Angeles, one

10  from Washington.

11  Q    And during what years at Katten were you on the executive

12  committee?

13  A    2001 to about 2006 or '7, I'm not sure.  I think I said

14  four years, I'm not sure if it was four or six years.  It was

15  two year terms.

16  Q    Directing your attention to the compensation committee,

17  is that one of the other committees you mentioned?

18  A    Yes, it is.

19  Q    How many people were on the compensation committee?

20  A    Also 11.  Almost the same numbers, four from New York,

21  five from Chicago, one from Washington, one from LA.

22  Q    During what years were you on the compensation committee?

23  A    Also four to six years.

24  Q    And what years would that be?

25  A    2001 through about 2007.

8165

JACOBS - DIRECT - BRODSKY

1    Q    And you mentioned the billing committee, what did you

2    mean by the billing -- was it billing or billing and

3    collections committee?

4    A    Billing and collections.

5    Q    During what years did you serve on the billing and

6    collections committee?

7    A    Well, I was on at Rosenman for about five years, then I

8    was on from 2001 to 2014, the end of 2014.

9    Q    And what did -- during that time from 2001 roughly

10   through 2014 or during that period, what did the billing and

11   collections committee do?

12   A    Well, basically we tried to collect as much money as

13   possible for the firm.  What happens is the way Katten worked

14   their compensation committee and billing and collection is

15   that in the middle of September you would make a pledge to the

16   firm of what you thought you could bring in for the remainder

17   of the year, which went through January 31st.  We had a fiscal

18   year rather than a calendar year.  And you would make a pledge

19   of the money you could bring in during that period of time.

20   Then the billing and collection committee would continue to

21   meet with all the partners in the firm and anyone else that

22   had outstanding invoices to make sure that they collected the

23   money that they needed to collect so that the firm could

24   collect as much money as possible.

25   Q    Where did the money go when it was collected?  Did it go

JACOBS - DIRECT - BRODSKY

1  directly to any partners who collected the money, or did it go

2  to firm, or somewhere else?

3  A     It goes to the firm.

4  Q     Did non-equity partners or income partners get any

5  percentage of what was collected from any client?

6  A     No.

7  Q     And in your role on the billing and invoice -- billing

8  and collections committee, what, if any, role did you have in

9  the New York office?

10  A     Well, I would say that approximately 70 percent of all

11  revenue for a law firm comes in the last four months, so our

12  job was to break up -- there was one other senior corporate

13  partner and myself that were in charge of billing and

14  collection in New York.  We would make a list of all the

15  partners and the executive committee would break that into two

16  groups and each one of us would get a group of partners for us

17  that we were in charge of.  And it was our job to go meet with

18  them, make sure we collected the money that they put on their

19  pledges and revise their list every month because they were

20  working on things during the year and we wanted to make sure

21  they collected as much money as possible during that time

22  period.

23  Q     During this period of time that you were on the billing

24  and collections committee, did you meet with Mr. Greebel in

25  connection with his outstanding bills?

JACOBS - DIRECT - BRODSKY

1    A      Yes, he was on my list.

2    Q      And how often, in general, did you meet with the partners

3    who had outstanding bills during this time period at the end

4    of every year through the January 31st of the following year?

5    A      Well, the billing and collection committee met let's say

6    in October twice -- once every two weeks and after that we met

7    every week.  I believe I met with Evan a number of times

8    during that time period between November and January 31.

9    Q      And during these meetings with the partners including

10   Mr. Greebel, what, if anything, are you telling the partners?

11              MS. SMITH:  Objection, hearsay.

12              THE COURT:  Sustained.

13              MR. BRODSKY:  Your Honor, can we have a sidebar on

14   this?

15              THE COURT:  Sure.

16              (Sidebar conference.)

17              (Continued on the next page.)

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1    MR. BRODSKY:  Your Honor, these are percipient

2    witnesses just like Ross Silverman, just like Ms. Davida.

3    What he told partners, what he told Mr. Greebel about invoices

4    and collection is not hearsay, it's what he told them.  I'm

5    not eliciting hearsay.  I'm eliciting statements --

6         THE COURT:  You are eliciting his out of court

7    statement, so you are offering it for the effect on the

8    listener of Mr. Greebel, is that what you are doing?

9         MR. BRODSKY:  No, my view is

10        MS. SMITH:  It's an out of Court statement that is

11   being offered for the truth of what was told to Mr. Greebel.

12        MR. BRODSKY:  Your Honor, respectfully, he is the

13   witness.  If I was offering an out of court statement not by

14   Mr. Jacobs, if I were offering an out of Court statement that

15   Mr. Silverman told to Mr. Jacobs, that would be an out of

16   court statement by a declarant, Mr. Silverman, to Mr. Jacobs.

17   And if I asked him what Mr. Silverman had to say, that would

18   be hearsay, but when you have somebody on the stand, for

19   example, Mr. Aselage, we asked Mr. Aselage what did you say at

20   a board meeting, Mr. Aselage's statements at a board meeting

21   are not hearsay because they are his statements.

22        I'm asking Mr. Jacobs about statements that he made.

23   I'm not asking him about statements somebody else made.  A

24   witness can only testify as to what they see, what they hear,

25   and what they say.  They're the declarant.  They can be cross

SIDEBAR CONFERENCE

1  examine without their own statements.  This is not hearsay at

2  all, these are his own statements to people.  It's not a form

3  of the question -- if it's form of the question that I

4  understand, but it is certainly not hearsay.

5           Mr. Aselage, Mr. Richardson, Mr. Su, Mr. Pierotti,

6  every one of these witnesses took the stand, as Your Honor

7  knows, and they testified about what they told to other

8  people.  They could not testify about what someone told

9  them --

10          THE COURT:  Okay.

11          MR. BRODSKY:  -- unless the standard was satisfied

12  there was an exception.

13          MS. SMITH:  Your Honor, it's any out of Court

14  statement even -- whoever is on the witness stand.  People

15  testified about general topic areas, there were hearsay

16  exceptions for why their out of Court statements came in, why

17  their documents come in.  So there is certainly topics they

18  can't put someone on the stand and then anything they said

19  outside the courtroom can be said.

20          MR. BRODSKY:  As long as it's not relevant, Your

21  Honor, it's not hearsay.

22          THE COURT:  Here it is defined, the declarant does

23  not make while testifying at the current trial or hearing and

24  a party offers evidence to prove the truth of the matter

25  asserted in the statement.

SIDEBAR CONFERENCE

1          It is hearsay as defined under 801, but I'm

2    wondering --

3          MR. BRODSKY:  But, Your Honor --

4          MS. SMITH:  I'm surprised that Mr. Brodsky is

5    confused.

6          MR. BRODSKY:  No, no.

7          THE COURT:  No, no, it's a basic.

8          MR. BRODSKY:  I know, Your Honor statements that

9    meets the following conditions are not hearsay.  A declarant

10   witness' prior statement -- I'm sorry, Your Honor, it's not

11   that.

12         But it's just like Mr. Aselage, Your Honor, when he

13   made statements to others or others, anything somebody said in

14   the past, if they are on the witness stand they can be

15   cross-examined about the statements they made.

16         Mr. Silverman testified about all sorts of things he

17   told people.

18         THE COURT:  That would be a prior inconsistent

19   statement.  The point is when he is recounting a statement

20   that he made outside the courtroom, that statement he's

21   recounting is hearsay under the definition of 801.

22         MR. BRODSKY:  And Mr. Aselage was able to testify

23   repeatedly about what he said in board meetings and

24   Mr. Richardson as well, why, because --

25         THE COURT:  Well, one, there wasn't a hearsay

SIDEBAR CONFERENCE

1    objection and, two, it was offered -- there wasn't an hearsay

2    objection, let me put it that way so I didn't have to decide

3    when they elicited from Mr. Aselage or any other witness, what

4    did you say at this given time or what did you tell

5    Mr. Shkreli or Mr. so and so, there wasn't an objection to

6    that necessarily, right.

7              MS. SMITH:  Yes, I mean to the extent they were

8    having a conversation with Mr. Greebel.  We didn't in fact ask

9    Mr. Silverman what he told anybody.  We asked him about his

10   perception, what decisions were made, but not conversations.

11   This is an out of Court conversation.

12             MR. BRODSKY:  What I would say --

13             THE COURT:  Offer it for some other reason.

14             MR. BRODSKY:  I will then just narrow it to what he

15   meant with Mr. Greebel and what he told Mr. Greebel.

16             MS. SMITH:  No.

17             MR. BRODSKY:  Because that goes to Mr. Greebel's

18   state of mind that is certainly a relevant exception.  And the

19   government cannot keep out a declarant's testimony that's

20   relevant, that passes Rule 403 of statements made to

21   Mr. Greebel that go to his state of mind.  Otherwise, we'll

22   have zero defense.

23             If we can't put on witnesses who say, I told

24   Mr. Greebel this about a bill, or I told Mr. Greebel to

25   collect bills and that's relevant, then that certainly makes a

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1  fact of consequence more or less likely, depending on what I

2  elicit, and it directly goes to what information Mr. Greebel

3  received.  So it's effect on Mr. Greebel and it goes to his

4  state of mind.

5          MS. SMITH:  I'm a little concerned that this going

6  to swallow the rule because any statement made to Mr. Greebel,

7  the argument could be, the effect on the listener and so

8  unless there is going to be an instruction after every

9  question that Mr. Brodsky asks that it's not being offered for

10 the truth and that in fact it's being offered for the effect

11 on the listener, unless he can articulate an actual hearsay

12 objection, which he's not --

13         MR. BRODSKY:  803.3.

14         THE COURT:  Exception you mean.

15         MS. SMITH:  Exception.

16         MR. BRODSKY:  803.3 and it goes to state of mind,

17 Your Honor.

18         MS. SMITH:  How is this relevant?  Because unless

19 it's about the MSMB and Retrophin bills it's not in fact

20 relevant.

21         803.3 is not just effect on the listener --

22         MR. BRODSKY:  It's the state of mind.

23         MS. SMITH:  It's the mental, emotional.

24         THE COURT:  Slow down and don't hit her, please.

25         MS. SMITH:  Sorry, your Honor, a little fried today

SIDEBAR CONFERENCE

1    to be honest.

2              It's a statement of the declarant's then existing

3    state of mind.  The declarant is Mr. Jacobs, not the

4    defendant.

5              MR. BRODSKY:  The information Mr. -- I'm happy with

6    any instruction you want to give the jury, Your Honor.

7              There were hundreds of exhibits that came in and if

8    you want to give the instruction and that's what the

9    government wants, that's fine.

10             The information that was told to Mr. Greebel about

11   invoices or collection process or any other relevant area is

12   entirely admissible.  The government can't just shut it down

13   by saying it's too much.

14             THE COURT:  No, they're saying it's hearsay.

15             MR. BRODSKY:  It's a valid exception.  And for a

16   defendant to put on a case, there is zero way other than to

17   force the defendant to take the stand.  For a defendant to put

18   on a case other than to say what relevant information did he

19   receive at the time.

20             MS. SMITH:  There's -- I don't want to tell

21   Mr. Brodsky how to elicit this testimony, there is certainly a

22   way to discuss the sorts of topics that were covered without

23   specific hearsay statements being elicited.

24             I also am making a relevance objection.  Obviously,

25   some background is appropriate, but I haven't even heard

SIDEBAR CONFERENCE

1    necessarily that he has a memory of discussing the bills and

2    collections at issue in this case.

3              THE COURT:  Well, I think one of the statements you

4    made in your opening was Mr. Greebel was motivated in part to

5    perform these legal services because he cared about his

6    compensation.

7              MS. SMITH:  Absolutely, but, again, I believe he

8    testified that he was Mr. Greebel's billing and collection

9    person through 2014, so I assume -- since we have gotten no

10   26.2 material I have no idea who this witness is -- that he

11   was the billing and collection person for Mr. Greebel for MSMB

12   and Retrophin.  It should really focus on that.

13             We certainly didn't say anything about his general

14   collections and any other information about any other clients

15   other than tangentially is not relevant.

16             THE COURT:  Just to cut through this.

17             MR. BRODSKY:  Yes.

18             THE COURT:  I agree with you it's hearsay and I

19   agree with you that the exceptions cannot swallow the rule,

20   but I think that there is a way to elicit the testimony you

21   want that is --

22             MR. BRODSKY:  Understood.

23             THE COURT:  -- what Mr. Greebel --

24             MR. BRODSKY:  Received, information he received

25   that's relevant.

8175

SIDEBAR CONFERENCE

1          THE COURT:  Yes.  Not what he told him specifically,

2    but he's set up that are these weekly meetings through during

3    November, December and January to try to get all of the

4    pledges performed in terms of what they are going to collect

5    and I think --

6          MR. BRODSKY:  I believe, Your Honor, the statements

7    that -- I'm sorry.

8          THE COURT:  I'm listening.

9          MR. BRODSKY:  I believe the statements that are made

10   that are relevant and can pass 401, there is no 403 objection,

11   or passes 403, and there are statements made to Mr. Greebel

12   under 803.3 or under effect on the listener, it is perfectly

13   acceptable for us to put in the evidence.

14          If you look at the *Biaggi* case, for example, they

15   talked about how critical in a case about the state of mind it

16   is to a defense, and this is the Second Circuit case that we

17   all know is on consciousness of innocence, but we have

18   prepared, Your Honor, and we're happy to submit it, a state of

19   mind brief and -- because, based on the government's

20   objections two days ago, we got concerned that they would stop

21   any defense whatsoever, but there is wide latitude given to a

22   defense to put in information that is relevant that's received

23   by Mr. Greebel.

24          THE COURT:  Let's focus on the issue at sidebar.

25          MR. BRODSKY:  Understood.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1          THE COURT:  We will talk about how we are going to

2    offer the information that you want through this witness

3    without hearsay.

4          MR. BRODSKY:  I understand.  I'm going to --

5          THE COURT:  Maybe Ms. Smith can help you.  You want

6    Ms. Smith to give you a suggestion?

7          MR. BRODSKY:  No, thank you, Your Honor.

8          THE COURT:  Well, okay.

9          MR. BRODSKY:  I'm going to withdraw the question and

10   I will reformulate it to make it more specific and relevant to

11   communications with Mr. Greebel during the relevant time

12   period, and then I'm going to go into relevant topic areas

13   during the relevant time period.

14         THE COURT:  All right, without eliciting statements

15   that he or Mr. Greebel made.

16         MR. BRODSKY:  Well, I believe I'm entitled to elicit

17   statements that Mr. Jacobs made to Mr. Greebel that are

18   relevant, that pass 403, that have an effect on Mr. Greebel.

19   And I'll lay the foundation, Your Honor, and we'll have to see

20   how the objections go, but I believe that no defendant would

21   ever be able to put on a defense if they couldn't call

22   witnesses to say, here's what I observed and here's what I

23   told this person to be doing or not to do.  And so, you know,

24   that's our plan going forward.

25         And I know Ms. Smith said she had no idea who this

SIDEBAR CONFERENCE

1   person is, he does appear repeatedly in the invoices that the

2   government admitted into evidence on MSMB matters, it's meet

3   with Evan Greebel, provide advice to Evan Greebel, all sorts

4   of things and it includes Retrophin.

5            Second, Your Honor, there is a lot of information

6   out there in the public about his background, who he is, he's

7   been at multiple law firms, he's a fairly prominent person.

8            MS. SMITH:  And that was with respect to this case.

9   He billed the majority of his time on MSMB with the exception

10  of one half hour was billed in 2011 and there was a very small

11  amount billed to Retrophin, and obviously he has not appeared

12  on a single document proffered by either the government or the

13  defense so far in this case, so that is why I was making the

14  comment, not about his public stature.

15           MR. BRODSKY:  They are about to see them.

16           MS. SMITH:  Well, we didn't receive them.

17           MR. BRODSKY:  Yes, you did.

18           MS. SMITH:  When did we receive them?

19           MR. BRODSKY:  Pretrial.

20           MS. SMITH:  We'll see.

21           THE COURT:  All right.  Be sure.

22           MR. BRODSKY:  Thank you.

23           (End of sidebar conference.)

24           (Continued on the next page.)

25

JACOBS – DIRECT – BRODSKY

1          (In open court.)

2    BY MR. BRODSKY::

3    Q    Let me reformulate my question.  Let's take the years

4    between in or about 2011 through 2014.  As a member of the

5    billing and collections committee, did you meet with

6    Mr. Greebel during the end of the year period through the

7    following January of the next year?

8    A    Yes.

9    Q    And during those meetings, what was the purpose of your

10   meeting with Mr. Greebel during that period?

11   A    Solely to determine if he was going to collect the money

12   he pledged the firm.

13   Q    And if -- as time went on between October, November,

14   December into January, were there occasions when you met with

15   Mr. Greebel and bills remained outstanding?

16   A    Yes.

17   Q    And how, if at all, did you handle that?

18   A    Just ask him to try to collect it, ask him if he can use

19   any help to collect it.  He had administrative people that

20   would call the client.  And we would just ask him to the

21   collect the money.  It was the same with any other partner in

22   the firm.

23   Q    Let me show you -- I'm going to hand to you a binder to

24   make this easy.

25   A    Thank you.

JACOBS – DIRECT – BRODSKY

1    Q    Sure.

2              MR. BRODSKY:  Your Honor, I have a binder for you

3    and a binder for the government.

4              THE COURT:  Thank you.

5    Q    If you would turn to Tab 1 and, for the record, I'm

6    showing you Defense Exhibit 3057 for identification.  And let

7    me ask you if you recognize the top email exchange between you

8    and Mr. Greebel?

9    A    Yes, I recognize it.

10   Q    And does this relate to the collection of an invoice

11   relating to MSMB?

12   A    I'm not sure.

13   Q    Let me direct your attention to the bottom email, does

14   that relate to -- is that bottom email from Mr. Shkreli,

15   Martin Shkreli?

16   A    I'm sorry, where?

17   Q    If you go to DX3057, we have it on the screen for you.

18   A    I have it here.  What do you want me to look at?

19   Q    That same exhibit, DX3057.

20   A    Right.

21   Q    And the bottom email on that first page, October 31, 2011

22   with the name Martin Shkreli.

23   A    Okay, I see that.

24             MR. BRODSKY:  Your Honor, we offer DX3057.

25             MS. SMITH:  Objection, Your Honor, hearsay and also

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1    the basis for knowing that it is for a particular client.

2              MR. BRODSKY:  We don't need to offer it for the

3    truth, Your Honor.

4              MS. SMITH:  Still have the objection to foundation,

5    Your Honor.

6              THE COURT:  Why don't you try to just lay a

7    foundation on the client issue.

8    BY MR. BRODSKY::

9    Q    Does this relate to a billing collection?

10   A    Yes.

11   Q    And was this in your capacity on the –– being one of the

12   members of the billing and collections committee of Katten or

13   not in your capacity?

14   A    It was in my capacity ––

15             MR. BRODSKY:  We offer it Your Honor ––

16   A    –– as a member of the billing collection committee.

17             MR. BRODSKY:  –– not for the truth, Your Honor, but

18   for the information received by Mr. Greebel.

19             MS. SMITH:  Same objection to foundation, who the

20   client is.

21             THE COURT:  What she's objecting to, in case you

22   can't hear her ––

23             MR. BRODSKY:  I can't hear her.

24             THE COURT:  All right.  She's objecting on the basis

25   that the foundation hasn't been laid as to who the client is.

JACOBS - DIRECT - BRODSKY

1    BY MR. BRODSKY::

2    Q    Do you see where it says Martin Shkreli and the email

3    address?

4            MS. SMITH:  Objection to reading what's not in

5    evidence.

6            THE COURT:  Just try to direct him without reading

7    the document.  It's not in evidence yet.

8    BY MR. BRODSKY::

9    Q    Let me do this.  Go to Tab 2, Mr. Jacobs.

10   A    Okay.

11   Q    If you look at Tab 2, do you see an invoice -- this is

12   Government Exhibit 802 it's in evidence, so let's put it up on

13   the screen.

14           If we can -- is this an invoice from MSMB Healthcare

15   LP dated August 5th, 2011?

16   A    Yes.

17   Q    And if we go to the first page, do we see time entries

18   for you, Mr. Jacobs, on July 7th, 2011 and July 8th, 2011?

19   A    Yes.

20   Q    And if we go to the next page, do we see time entries for

21   July 11th, 2011, July 12th, 2011, July 13th, 2011?

22   A    Yes.

23   Q    And going into the next page, do we see additional time

24   entries for various dates of your time entries?

25   A    Yes.

JACOBS – DIRECT – BRODSKY

1    Q    Are you familiar with this invoice generally?

2    A    Generally.

3    Q    The form of the invoice?

4    A    That's the form of the invoice, yes.

5    Q    If you skip to the last page, which is KATUSAO146.  Do

6    you see the top where it has the attorney, Bernadette Davida?

7    A    Is this page 5 of this?

8    Q    It is page 7, I would say the very last page of the

9    document -- of the invoice.

10   A    Yes, I see that.

11   Q    Did you know Bernadette Davida?

12   A    Yes.  She was a partner in Katten.

13   Q    Which office did she work in?

14   A    The New York office.

15   Q    Does it have a client listed there?

16   A    It does.

17   Q    What's the client?

18   A    MSMB Healthcare LP.

19   Q    If we can skip back now to DX3057 for identification in

20   Tab 1.

21   A    Okay.

22   Q    If you look down, I'd ask you to read this time the email

23   exchange, it starts on the second page and then I'd like you

24   to read each email silently to yourself and when you're done

25   let me know.

JACOBS - DIRECT - BRODSKY

1          (Witness reviewing document.)

2    A    Okay.

3    Q    With respect to this invoice, without describing the

4    content of the email, in what capacity were you receiving this

5    email in October 2001 -- 2011?

6    A    Evan was just alerting me that the money was coming in.

7          MS. SMITH:  Objection, Your Honor, he's testifying

8    to a document not in evidence.

9          THE COURT:  Well, he's just giving context, so I'll

10   overrule the objection.

11   Q    And what was the purpose for alerting you as a member of

12   the billing and collections committee of money that has come

13   in?

14   A    Can you rephrase that?

15   Q    Yes.  What is your understanding of the reason you're

16   being informed about money coming into the firm?

17   A    I'm on the billing collection committee, I had a

18   conversation with Evan about this.

19         MS. SMITH:  Objection, Your Honor, hearsay.

20         THE COURT:  Sustained.

21   A    I'm on the billing -- you sustained it?

22         THE COURT:  Yes.  Hearsay grounds --

23         THE WITNESS:  Okay.  Sorry.

24         THE COURT:  -- is the objection.

25   Q    Without telling us --

JACOBS – DIRECT – BRODSKY

1          THE WITNESS:  Sorry, Judge.

2          THE COURT:  That's all right.

3   BY MR. BRODSKY::

4   Q    Without telling us the content of your communication with

5   Mr. Greebel, you had a conversation with Mr. Greebel about a

6   collection of a bill?

7   A    Yes.

8   Q    And which client did that relate to?

9   A    I'm not sure which one.

10  Q    And what was the purpose of having a meeting with

11  Mr. Greebel for the collection of a bill?

12  A    I met with him as part of the billing and collection

13  committee.  Probably made a pledge that he was collecting X

14  number of dollars, this was part of it.  He was just showing

15  me he was collecting it.

16          MR. BRODSKY:  Your Honor, we offer 3057 for

17  identification, not for the truth of the matter asserted, but

18  for the effect on the listener and for state of mind.

19          MS. SMITH:  Your Honor, same objections just to

20  foundation for which client.  The witness has testified that

21  he doesn't know.

22          MR. BRODSKY:  Your Honor, I think the document

23  speaks for itself as to which client.

24          THE COURT:  I think on grounds of which client I am

25  not convinced that the document reflected in Defense

JACOBS − DIRECT − BRODSKY

1   Exhibit 3057 does, unless you are telling us that the client

2   is the person whose name appears here.

3          MR. BRODSKY:  Well, without being able to explain,

4   Your Honor --

5          THE COURT:  Well, do you want to come to sidebar

6   because the client -- I don't know if you are --

7          MR. BRODSKY:  That's all right, Your Honor.  I'll

8   keep moving through.  And the email in and of itself is --

9   I'll keep moving through.

10  Q    So what were the consequences, if any, to the law firm of

11  Katten Muchin if there was a failure to collect bills?

12  A    If partners didn't collect the bills, the firm didn't do

13  as well profit wise and each partner, equity partner in the

14  firm would have a lower percentage of the dollars bringing in.

15  Q    And during the period of time that you were on the

16  committees you described, the executive committee, the

17  compensation committee and the billing and collections

18  committee, approximately how many attorneys were in total at

19  the law firm?  And if it helps you can give us a range of

20  attorneys.

21  A    I'd say there's 110 to 125 equity partners, and 125 to

22  150 non-equity partners.

23  Q    And during -- is that just in New York or is that outside

24  New York?

25  A    That's the entire firm.

JACOBS – DIRECT – BRODSKY

1    Q    And you mentioned that there was mandatory retirement.

2    At what point was there mandatory retirement for you at the

3    law firm?

4    A    When you're 70 years old.

5    Q    Did you stay until 70 or did you stay on afterwards?

6    A    I stayed until I was 70, but I stayed on afterwards.

7    Q    Why did you stay on afterwards?

8    A    The firm came to me at the end of -- the beginning of

9    2014 I believe and they asked me to stay for another year and

10   transition my corporate practice to Evan Greebel.

11   Q    How much, in general, just a general range in terms of

12   dollars was your corporate practice in or about 2013, 2012,

13   2014?

14   A    It was a million and a half to three and a half million

15   dollars; it fluctuated.

16   Q    And let me now back up and ask you a few questions about

17   Katten Muchin.  Did the management committee have any

18   involvement in determining people's compensation?

19   A    No, compensation committee.

20   Q    And did attorneys, in general, while you were there, bill

21   by the hour, by the task, or both?

22   A    Almost 99 percent was by the hour.  Occasionally there

23   would be a fixed fee arrangement.

24   Q    Who determined the hourly rate?

25   A    The management committee and the chairman of the firm.

JACOBS – DIRECT – BRODSKY

1    Q    And when you were there, let's focus on the years from

2    2011 through 2014 in the New York office, based on your

3    observations and your work on the billing and collections

4    committee, was a partner able to reduce their own rate or

5    change their rate?

6    A    Only with consent of the management committee or the

7    chairman.

8    Q    You had mentioned you knew Evan Greebel when he was an

9    associate.  Could you give us approximately what year you

10   first met Mr. Greebel?

11   A    2002 or 2003 I believe.

12   Q    Did there come a time what year that you started working

13   with him?

14   A    2007 approximately, maybe 2008, in that period of time.

15   Q    And describe your working relationship with Mr. Greebel

16   between about 2007 through what year did you continue to work

17   with Mr. Greebel?

18   A    Until he left the firm I think in beginning of 2015 or

19   the end of 2014 somewhere in that time period.

20        So you want me to describe what I did?

21   Q    Describe your working relationship.

22   A    Well, my first arrangement with Evan was in 2007 I got

23   called by a friend of mine that was selling his business.  I

24   needed a younger partner to work with me on the transaction

25   and I asked Evan to work with me on the deal.  He was very

JACOBS - DIRECT - BRODSKY

1  familiar with mergers and acquisitions and understood the

2  deal.  He worked on that deal for me.  It was a little

3  complicated to say the least, but we eventually got the deal

4  done.  Evan did a terrific job.  And after that we started to

5  work more together on deals.  He worked with other people in

6  the firm, and he also had his own clients at that time.

7           After that we decided to -- I got retained by a

8  company to do a public offering for a Chinese company.  And

9  Evan and I worked on that transaction and we saw that a lot of

10 Chinese companies were doing offerings in the United States

11 and Evan and I prepared a memorandum, we went to the

12 management committee in order to set up a little group that

13 would just work on Chinese public offerings.  And we worked on

14 four of them, the firm allowed us to do it and they also

15 allowed us to hire an associate who spoke Chinese because a

16 lot of people that we were dealing with did not speak English.

17 In fact, the firm also sent Evan to China for two weeks to see

18 some of these companies and meet the people.  It was kind of

19 expensive so only one person went and Evan got the short

20 straw, so he went.  He spent some time there.  We did four

21 offerings, one of which we filed with the SEC.  It involved

22 drafting a public offering, a registration statement.  We also

23 drafted one for two other companies, only one we filed with

24 the SEC.

25           After that we represented a private equity firm, it

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1   was a client of mine.  I knew the president, he was about my

2   age he had just brought his son into the business.  They were

3   managing about three-quarters of a billion dollars and they

4   were using another firm.  I introduced Evan to the president's

5   son, they got along very well.  They started giving us more

6   business.  We did four or five transactions for them.

7           Then we represented an investment banking firm.  We

8   put together a fund working with our private equity group in

9   Katten and we produced a big domestic and offshore hedge fund

10   and private equity fund.

11          Then the last couple of things we worked on is I was

12   retained by two public companies.  One was a small public

13   company, it's the one I eventually went to work for.  They

14   were doing an acquisition and they had a conflict in the board

15   room so they set up a special committee and Evan and I

16   represented the special committee for that company.

17          And then we represented another large public

18   company, substantially larger listed on the New York Stock

19   Exchange.  They had a problem with their board.  I knew their

20   general counsel, he used to be a partner of mine.  He called

21   me up, he retained us, I brought Evan into that deal.  We

22   represented that special committee and we had two other

23   litigators on our committee because it was a very big case.

24   The case continued on after I left and Evan left the firm.

25          There were probably other general corporate things

JACOBS – DIRECT – BRODSKY

1    along the way, but those tended to be the major items that we

2    were working on.

3                (Continued on the next page.)

JACOBS – DIRECT – BRODSKY

1    MR. BRODSKY:

2    (Continuing.)

3    Q    Did there come a time when your offices were located near

4    each other?

5    A    Yes.  Initially when we did our first transaction we were

6    across the hall.  Actually, my secretary sat in between us in

7    a little room.  And then they were doing construction on that

8    floor, so we moved to another floor.  Our rooms were right

9    next to each other.  And when they moved back to the original

10   floor, we also were right next to each other.

11   Q    And what years were you next to each other?  Were you

12   next to each other between 2011 and 2014?

13   A    Yes.  We were together from '11 to when Evan left the

14   firm.

15   Q    During that period, let's say focusing on that period

16   2014.  Having offices next to each other, what, if anything,

17   did that mean in terms of working to the?

18   A    Made it very easy to go ask someone a question.  You

19   didn't have to call them up and wait for them call you back.

20   If I had a question, I could go into his room.  If he had a

21   question, he could come into a room.

22   Q    During that period of time, 2011 to 2014, when your

23   offices were next to each other, did Mr. Greebel come to your

24   office?

25        MS. SMITH:  Objection to the leading, your Honor.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JACOBS - DIRECT - BRODSKY

1          THE COURT:  Well, try to reformulate your questions

2    into non-leading form.

3    EXAMINATION BY

4    MR. BRODSKY:

5    (Continuing.)

6    Q    Between 2011 and 2014, did Mr. Greebel come to your

7    office or not come to your office?

8    A    He came to my office.

9    Q    And how often did Mr. Greebel come to your office between

10   2011 and 2014?

11   A    Could be daily, could be weekly.  He came there often and

12   I came to his office often.

13   Q    And when you --

14          When Mr. Greebel came to your office often, was he

15   asking -- were the discussions about only the matters you were

16   working on together or other matters?

17          MS. SMITH:  Objection to leading, your Honor.

18          MR. BRODSKY:  It's a non-leading question.

19          THE COURT:  It's close, but I'm going to overrule

20   the objection.

21          You can answer question.

22          THE WITNESS:   Can you repeat that the question,

23   please.

24   Q    Yes.

25          During the period of 2011 to 2014 when your offices

JACOBS - DIRECT - BRODSKY

1    were together, when Mr. Greebel came to your office, were the

2    discussions about only the matters you were working on

3    together or other matters and the matters you were working

4    object?

5           MS. SMITH:  Objection.  Compound, your Honor.

6           THE WITNESS:    Usually --

7           THE COURT:  I'm going overrule the objection.  I

8    think the witness understands the question.

9    A    Usually, we discussed matters we were working on.

10   Q    And during that period of time, you say usually.  Were

11   there occasions when you did not?

12   A    When the Giants lost.

13   Q    And were there occasions when Mr. Greebel came to your

14   office for other reasons not related to the matters you were

15   working on but for anything?

16   A    He might come just to talk.  It wasn't only professional.

17   Q    And let me ask you.  During the period of time you worked

18   for him, did you go into his office for any reason?

19   A    Yes.

20   Q    What were the reasons you went into his office?

21   A    I would be asking him about things he was working on for

22   me, or I'd be asking him things about the law, or I'd ask him

23   for a form of an agreement, or I ask him for advice on certain

24   deals I was working on.

25   Q    Let me take all three of those.

JACOBS - DIRECT - BRODSKY

1          You said forms, advice, and what was the first one?

2     A     Questions of law.

3     Q     Questions of law.

4          Taking each one, did Mr. Greebel between 2011

5     through 2014 ask you questions about law unrelated to the

6     matters you were working on?

7          MS. SMITH:  Objection to the leading, your Honor.

8          THE COURT:  Yes.  I think you need to reformulate

9     your questions, Mr. Brodsky.

10         MR. BRODSKY:  Yes, Your Honor.

11    Q     Did Mr. Greebel, from time to time, from 2011 to 2014

12    come to your office to ask questions about the law or

13    unrelated to matters or he did never did that?

14         MS. SMITH:  Objection to the form, your Honor.

15         THE COURT:  You know, I'm going to -- I think the

16    form is problematic, but I think I'm going to overrule the

17    objection and ask the witness if he can answer the question in

18    the form posed.

19    A     He asked me questions about the law.  About matters we

20    were working on and other things.

21    Q     And with respect to questions you asked Mr. Greebel on,

22    forms and advice, did Mr. Greebel come to you with similar

23    questions, or he did not come to you with those questions?

24    A     He came to me with questions.

25    Q     All right.  Did you ever work with Mr. Greebel on any

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1   reverse merger transactions?

2   A     Yes.

3   Q     One or more than one?

4   A     I believe there were two.

5   Q     And do you recall the name of one of the reverse merger

6   transactions you worked on with him?

7   A     Tanke Bioscience.

8   Q     And did that transaction take place or not take place?

9   A     It took place.

10  Q     And did the law firm continue to work for Tanke

11  Bioscience?

12        MS. SMITH:  Objection to the form to leading, the

13  last few questions.

14        MR. BRODSKY:  I could ask him what happened.

15        THE COURT:  All right.

16        MR. BRODSKY:  I will ask it in a non-leading way.

17  Q     What happened with respect to the relationship, the firm

18  relationship with Tanke Bioscience?

19  A     We did a reverse merger, we worked on a registration

20  statement, we filed it with the SEC.  The SEC came back with

21  significant financial comments.  Comments about the financial

22  statements contained in the registration statement.

23        Evan and I tried to track down the answers to those

24  questions.  We were unable to do it, and Evan came to me and

25  since said since we can't do this --

JACOBS – DIRECT – BRODSKY

1          MS. SMITH:  Objection to hearsay.

2          THE COURT:  No hearsay, sir.

3          THE WITNESS:     Excuse me.

4          THE COURT:  No hearsay may be conveyed.

5          THE WITNESS:     Okay.

6          THE COURT:  Your response.

7    A    The SEC gave us comments.  The comments were too hard to

8    track down.  We decided not to go forward with that

9    transaction.

10   Q    By not going forward with the transaction, did the firm,

11   law firm, what happened to the billings with respect to the

12   law firm?

13   A    We kept whatever we collected and we were owed some money

14   at the end of the transaction.  But we felt that it would be

15   better not to go forward with the deal than to go forward with

16   it.

17   Q    Let me ask you with respect to your work with

18   Mr. Greebel.

19          What types of clients did you work on with

20   Mr. Greebel?

21   A    It was multiple clients.  Private companies, public

22   companies, private equity firms, boards of directors,

23   individuals high net worth people, investors, stockholders.  A

24   variety of different people in different businesses and

25   different corporations.

JACOBS - DIRECT - BRODSKY

1   Q     Before we get to any specific topics relating to the work

2   you and Mr. Greebel did, I'd like to talk about your

3   preparation for your testimony.

4               Prior to coming to court today, did you prepare for

5   your testimony?

6   A     I did.

7   Q     Did you meet with Gibson Dunn to prepare for your

8   testimony?

9   A     Yes, I met with you.

10  Q     Approximately, how many times to prepare for your

11  testimony?

12  A     Twice before yesterday, I met you for about ten minutes.

13  And today, I met you for about 15 minutes.

14  Q     And before those two meetings, how many other meetings

15  did you ever to prepare for your testimony with me?

16  A     I didn't have any.

17  Q     You said so how many in total?

18  A     Two, four I guess altogether.

19  Q     And have you received anything of any kind in return for

20  your testimony today?

21              MS. SMITH:   Objection, your Honor.

22              THE COURT:   Overruled.

23  A     No.

24  Q     Since the indictment of Mr. Greebel in December of 2015,

25  have you spoken with Mr. Greebel by telephone?

JACOBS – DIRECT – BRODSKY

1    A     Yes.

2    Q     Approximately how many times?

3    A     Ten, twelve times approximately.

4    Q     On average, how long were these calls?

5    A     Five minutes at most, maybe seven minutes.

6    Q     Since the charges were brought against Mr. Greebel in

7    December of 2015, have you met with Mr. Greebel in person?

8    A     Yes.

9    Q     Approximately how many times?

10   A     Four or five times.

11   Q     Where did you meet with Mr. Greebel?

12   A     We had lunch.

13   Q     And why did you meet with Mr. Greebel -- why did you

14   speak with Mr. Greebel on the telephone and meet with him in

15   person on these occasions since the charges were brought

16   against him?

17   A     On the telephone, I was off my computer from Katten.

18   Once you retire, you get off the database.  I would need

19   certain forms.  Evan had all my forms, and some other forms of

20   his own such as employment agreements and shareholders'

21   agreements and other types of agreements.  I would ask him to

22   send me copies of them.  Then I ask him for advice on certain

23   matters I'm working on.  He had experience in some areas that

24   I did not have much experience in.  We were doing a tender

25   offer and I needed some advice.  And I would ask him generally

JACOBS - DIRECT - BRODSKY

1  for information that I needed that as counsel for the public

2  company.

3  Q    On the occasions that you met with him in person and

4  spoke to him by phone, did you discuss the allegations against

5  Mr. Greebel, yes or no?

6  A    Yes.

7  Q    And was that on one occasion or more than one occasion?

8  A    On one occasion.

9  Q    Without saying the content, how long was that

10 communication between you and Mr. Greebel regarding the

11 allegations?

12 A    A minute.

13 Q    And why didn't you speak to him about the allegations

14 beyond that one minute?

15          MS. SMITH:  Objection, your Honor.  Just to

16 relevance.

17          We can do a sidebar.

18          MR. BRODSKY:  I am happy to move on and withdraw the

19 question and keep going.

20 EXAMINATION BY
   MR. BRODSKY:
21 (Continuing.)

22 Q    Have you ever spoken with the FBI or anyone on the

23 prosecution team?

24 A    The FBI called my house on Friday, this past Friday.  I

25 didn't call them back.  They showed up at my apartment on

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JACOBS – DIRECT – BRODSKY

1    Sunday afternoon.  I saw them, I took their cards, and I told

2    them I didn't want to speak with them.

3    Q    Now, let me talk to you about a specific topic.

4         Directing your attention to capitalization tables

5    you're familiar with capitalization tables?

6    A    I am.

7    Q    Now, did Mr. Greebel ever work on capitalization tables

8    with you relating to private companies before going public?

9    A    Yes, he did.

10   Q    And did you have conversations with Mr. Greebel regarding

11   capitalization tables in connection with your work with them?

12   A    Yes.

13   Q    Describe in general your work with Mr. Greebel on

14   capitalization tables?

15   A    Well, the first time I think we had this conversation was

16   with this private company that did a reverse merger into a

17   public shell so we can go public.  I told him --

18            MS. SMITH:  Objection to hearsay.

19            THE COURT:  Excuse me, sir, you can't testify about

20   what you said or someone said to you again because of the

21   hearsay rule.

22            THE WITNESS:   Okay.

23            THE COURT:  All right.  Thank you.

24   EXAMINATION BY
     MR. BRODSKY:
25   (Continuing.)

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JACOBS - DIRECT - BRODSKY

1    Q    Just for this purpose, Mr. Jacobs, would you describe the

2    work you did with Mr. Greebel without describing the

3    communications about capitalization tables?

4              MS. SMITH:  Objection, your Honor.  Can we get which

5    clients, the name of client.

6              THE COURT:  Is this just a general question.

7              THE WITNESS:    I mentioned the client.

8    Q    Which client was it?

9    A    Tanke Bioscience.

10   Q    Okay.

11   A    I worked on the cap table.  I tried to make sure that all

12   the shares were properly set forth on the cap table.  What

13   happens sometimes in a small private company is that their

14   records are not so good.  So that you have to make sure

15   through your due diligence that all of the shares are properly

16   shown on the cap table.

17             A lot of people, when you're ready to go public, all

18   of a sudden show up and say they're entitled to stock in the

19   company.  Some of them have some agreement.  Some of them used

20   to work for the company.  Some of them have oral agreements.

21             What I would try to do is determine who owned the

22   shares, make sure that the table was correct by talking to

23   management of the company because it's primarily the company

24   and the CFO, who maintains the stock records of the company

25   when they're private.  If they're oral agreements, I try to

JACOBS - DIRECT - BRODSKY

1  track down the oral agreements.  Who made them?  Are they

2  accurate?  And then if it was accurate, we would check with

3  the president or CEO of the company.  Then I would try to

4  draft up an agreement to reflect the facts that they said took

5  place.

6  Q    When you mentioned due diligence, what did you mean by

7  the due diligence that you would do?

8  A    Due diligence -- looking at agreements that are in place,

9  talking to management, talking to the CFO.  Just making sure

10 that what's there is accurate because you're filing with an

11 SEC registration.  You want to go public you want to make

12 everything egg is accurate.

13 Q    And when you were working with Mr. Greebel on this

14 capitalization table, why, if at all -- why did you rely on

15 management for the information?

16 A    Management is usually the people who keep track of what

17 was going on.  They usually know who they entered into an

18 agreements with, who they had verbal agreements with.

19 Companies usually not -- lawyers are not usually involved in

20 day-to-day activities, so they wouldn't know what the CFO or

21 management is involved with.

22        Also, CFOs change, management changes, and sometimes

23 things fall through the cracks.  You don't know who knows

24 what.  So you try to check out everything in order to make

25 sure it's accurate.

JACOBS – DIRECT – BRODSKY

1   Q    When you say, "Check out everything," who are you

2   checking that with?

3   A    The present management.  And, if necessary, going to

4   prior management.

5   Q    In the course of --

6            And how, if at all, I think you mentioned the

7   capitalization table.  Does it change or not change during

8   that time period?

9   A    I found that in these private companies that go public,

10  they change almost every week up until the time you go

11  effective with the SEC.  There's always someone that comes

12  forward that says they're entitled to something, or there's a

13  stock option agreement that wasn't signed properly.  They find

14  all of a sudden at the end someone was promised stock and

15  didn't get it, or there were warrants outstanding.  It's a

16  very fluid document.  A very fluid cap table.

17           MS. SMITH:  Your Honor, can we have a brief sidebar,

18  please?

19           THE COURT:  Sure.

20           (Continued on the next page.)

21

22

23

24

25

SIDEBAR

1              (Sidebar conference held on the record in the

2      presence of the Court and counsel, out of the hearing of the

3      jury.)

4              MS. SMITH:  Your Honor, I'm trying to be patient

5      because I certainly have dealt with plenty of witnesses on

6      direct, but the witness is giving long, paragraphs; long

7      answers with no questions interchanged.  He's offering up what

8      is getting very dangerously close to expert opinions on

9      transactions that have nothing to do with the case.  If he had

10     experience with the cap table in this case, then we can hear

11     about it if we want to do a little bit of background that he

12     had experience with working with Mr. Greebel on cap tables

13     that might be relevant.

14             But it's these kind of long, rambling answers about

15     what he had done in other situations and what his general

16     practice is and what the best practice is, again, is getting

17     very close to a sort of expert-ish testimony especially since

18     it's totally untethered from the facts of this case.

19             MR. BRODSKY:  Your Honor, because of the

20     Government's hearsay objection.  I'm asking general questions

21     and they're form objections.  I'm trying to ask general

22     questions about Mr. Jacobs's work with Mr. Greebel on

23     capitalization tables to get out their working experience

24     together on capitalization tables.  It's non-hearsay, and it

25     actually does go to -- it's all relevant.  It's Mr. Greebel's

SIDEBAR

1  work on capitalization tables on Tanke Biosciences and it was

2  work he does in 2012 with respect to MSMB, with respect to

3  Retrophin.

4          THE COURT:  So the timing of this first cap table

5  experience that they shared together is before?

6          MR. BRODSKY:  I can only say.

7          MS. SMITH:  I feel like it's all just very amorphous

8  these paragraphs, long answers.  I don't want to be

9  interrupting.  He moves from tangent to tangent, so if the

10  question can be a little more broken down, so I will if I need

11  to interrupt him and object.

12          MR. BRODSKY:  Every time I ask a broken down

13  question of either this or this because I ask the witness is

14  70-plus years old and I guess I draw an objection so I'm

15  trying to keep my questions more general, much more open

16  because I'm trying to avoid drawing objections from the

17  Government.

18          THE COURT:  The objections, as you know, are based

19  on either leading or hearsay.  Those are the extent.

20          MR. BRODSKY:  Yes.

21          THE COURT:  Mostly for foundation.

22          MR. BRODSKY:  Yes.

23          THE COURT:  But I think either the generally long

24  narrative answers are not appropriate from a fact witness,

25  and, you know, I think if you can just sort of focus him on if

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR

1    he's.

2              MR. BRODSKY:  More specifics.

3              THE COURT:  The deal that he worked on with

4    Mr. Greebel, put it in context.  If this is after the fact

5    after the Desert Gateway or the cap table issues that were at

6    issue in this case.

7              MR. BRODSKY:  I believe it's before.  I will elicit

8    that.

9              MS. SMITH:  Just to be clear.  Our objection is it's

10   peering into opinion practice to practice of a corporate

11   lawyer and it wasn't the appropriate thing to do on a cap

12   table and I think it's trying to make that clear.

13             THE COURT:  Testifying about what he did with

14   Mr. Greebel on cap tables.

15             MS. SMITH:  I'm saying we're getting very close to

16   best practices.

17             MR. BRODSKY:  I'm trying to elicit without drawing

18   objections I will focus him on work with Mr. Greebel on this

19   reverse merger during this year.

20             THE COURT:  All right.  Thank you.

21             (Sidebar discussion concludes.)

22             (Continued on the next page.)

23

24

25

JACOBS – DIRECT – BRODSKY

1        (In open court.)

2   MR. BRODSKY:

3   (Continuing.)

4   Q    Just for a little chronology, Mr. Jacobs,

5   the Tanke Biosciences was approximately 2011.

6            Is that fair to say?

7   A    I think around there, yes.

8   Q    And your in the matter you were -- this is the reverse

9   merger that you were involved in?

10  A    Yes.

11  Q    And that involved capitalization tables?

12  A    Yes.

13  Q    In that matter that you were working on with Mr. Greebel

14  relating to capitalization tables were there stock transfers

15  between private parties?

16  A    Yes.

17  Q    And in your work with Mr. Greebel, what affect on those

18  capitalization tables did stock transfers between private

19  parties have on the company?

20  A    Nothing.

21  Q    Why not?

22  A    Well, unless the stock was increasing or going down,

23  there was no problem on the stock table.  It's just a matter

24  of exchanging shares between two people.  So it might just

25  indicate who owned what, but the number of shares outstanding

JACOBS - DIRECT - BRODSKY

1    would usually remain the same.

2    Q    Have you served as outside counsel to public companies?

3    A    Yes.

4    Q    In 2013, did you have any discussions with Mr. Greebel

5    relating to board meetings?

6              MS. SMITH:  Objection, your Honor, to the extent

7    it's calling for hearsay.

8              THE COURT:  Okay.  Well, if the witness has been

9    told, and I think he'll remember, that hearsay is not going to

10   be permitted.  This is just a general question about subjects

11   that he might have discussed.

12             THE WITNESS:   I didn't think it was hearsay.

13             THE COURT:  No, it's not.  That's why I'm not

14   sustaining the objection.

15             THE WITNESS:   Okay.

16             THE COURT:  This is sort of an introductory question

17   to a subject, I believe.

18             MR. BRODSKY:  Yes, Your Honor.

19   EXAMINATION BY
     MR. BRODSKY:
20   (Continuing.)

21   Q    What topics were your discussions with Mr. Greebel

22   relating to.

23             MR. BRODSKY:  Well, withdrawn.

24   Q    Do you remember in general the context of your

25   discussions with Mr. Greebel in 2013 remitting to board

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JACOBS - DIRECT - BRODSKY

1    meetings.

2            In other words, you remember in general what company

3    or companies to dealt with?

4    A    Yes.

5    Q    Which ones?

6    A    I believe that we had some discussions about

7    Route 9B Holdings.  He set up -- we represented a special

8    committee of the board of directors and I talked to him about

9    that.

10   Q    And did Mr. Greebel in connection -- and that's matter

11   you worked on with him?

12   A    Yes.

13   Q    Did you have discussions with Mr. Greebel about matters

14   that you did not work on with him relating to board meetings?

15   A    Yes.

16   Q    Which company or companies did they relate to?

17   A    I'm not sure exactly which company, but I did have

18   conversations with him about a public company.

19   Q    And what --

20            In what context did you have those conversations?

21   Where were you when you were having these conversations with

22   Mr. Greebel?

23   A    Either my office or his office.

24   Q    And which years was this?  Which year or years?

25   A    I would say 2013 or early 2014.

JACOBS – DIRECT – BRODSKY

1   Q    And in those conversations, did Mr. Greebel ask any

2   questions?

3   A    Yes.

4   Q    Without saying what the answers were for the moment, what

5   questions did Mr. Greebel ask?

6               MS. SMITH:  Objection, your Honor.

7               THE COURT:  Hearsay.  Sustained.

8               MR. BRODSKY:  Your Honor?

9               THE COURT:  The question.

10              MR. BRODSKY:  Just the question.  I'm eliciting

11  questions.

12              THE COURT:  All right.

13              MS. SMITH:  Objection to relevance, your Honor.

14              We can do a sidebar.

15              THE COURT:  All right.  Let's give the jurors the

16  midafternoon break.

17              Thank you for your attention.  Don't discuss the

18  case.

19              And the witness may step down, too, and have a

20  break.

21              Yes.  Thank you.

22              (Jury exits courtroom.)

23              (Witness leaves the witness stand.)

24              THE COURT:  All right.

25              MS. SMITH:  Your Honor, I'm not sure what the

PROCEEDINGS

1    relevance is.  He's not sure what client they're discussing.

2              MR. BRODSKY:  I think, your Honor, once you hear

3    some of the questions, you'll understand the client.  He knows

4    the client.

5              MS. SMITH:  He doesn't know the client.

6              MR. BRODSKY:  He does, actually.  I proffered to

7    your Honor he's told us he knows the client.

8              THE COURT:  Which client?

9              MS. SMITH:  He just --

10             MR. BRODSKY:  Retrophin.

11             MS. SMITH:  He just testified that he didn't know

12   who the client was.

13             MR. BRODSKY:  Well, your Honor, you'll hear the

14   questions and some of the questions are from Mr. Greebel, I

15   expect, I mean, obviously, I'm not the declarant, I'm not on

16   the witness stand.  I'm not the person who is going to be

17   giving the testimony.  But one of the questions, for example,

18   is what does an acting secretary do?

19             But we've already laid sufficient foundation, your

20   Honor, for the admissibility of these questions.  Questions

21   are not hearsay.  This is 2013 and early 2014.  Mr. Greebel is

22   asking questions about the board, a role on the board, and the

23   only company that related to matters that he's not working on

24   with Mr. Jacobs and the only company where Mr. Greebel is

25   serving as outside counsel to a board is Retrophin in 2013 and

PROCEEDINGS

1    early 2014.

2              So we've certainly laid sufficient foundation for

3    the relevance of it which is the lowest standard possible, and

4    the I'm eliciting about it elicit the questions that he was

5    asked.

6              Now, your Honor, respectfully, I'm allowed to elicit

7    the answers because if one of the questions is, what does an

8    acting secretary do?  And we know, of course, that

9    Mr. Greebel's only served as acting secretary to Retrophin in

10   2013.

11             MS. SMITH:  Your Honor, that's not in the record.

12             THE COURT:  How do we know that?

13             MR. BRODSKY:  I will ask the Wednesday.

14             MS. SMITH:  How does the witness know that?

15             THE COURT:  How Mr. Jacobs know that?  How does

16   Mr. Jacobs know what else Mr. Greebel is doing and what role

17   he's serving with regard to some of his clients.

18             MR. BRODSKY:  We have all of Mr. Greebel's matters

19   admitted into evidence by the Government.

20             THE COURT:  How does Mr. Jacobs know that?  How does

21   he know whether or not Mr. Greebel is serving as a secretary

22   for any other of his clients?

23             MR. BRODSKY:  We'll ask him.

24             MR. KESSLER:  It would be hearsay.

25             MS. SMITH:  This is all hearsay.  The questions may

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1    not be hearsay potentially, but I'm still not sure what the

2    relevance is and the answers are absolutely hearsay.  This is

3    an attempt to get Mr. Greebel's -- conversations with

4    Mr. Greebel into evidence that are not proper.  He wasn't

5    working on Retrophin.  He wasn't even able to say the name of

6    the company that they were having a discussion about it.

7    Mr. Brodsky cannot merely assert that this is the only public

8    company that Mr. Greebel was serving as outside counsel for.

9    I don't even know if that's correct.

10              MR. BRODSKY:  Your Honor, it is.

11              MS. SMITH:  Based on what?

12              MR. BRODSKY:  Based on the Government's own evidence

13   that they've admitted with all their matters.

14              And respectfully, your Honor, I'm not middle of my

15   direct examination and I'm constantly being interrupted when I

16   have non-hearsay -- I have a non-hearsay question and the

17   Government is objecting to a non-hearsay question and they're

18   interrupting it.  I'm trying to lay a foundation.  He is of a

19   certain age, so I'm trying to do the best I can.

20              THE COURT:  This gentleman is not the least bit

21   lacking in any mental acuity despite whatever his age may be.

22   He's very sharp.

23              MR. BRODSKY:  All right, your Honor.

24              THE COURT:  He may not hear my rulings, and I'll try

25   to be better about speaking loudly into the microphone, but I

PROCEEDINGS

1    don't think there's any reason to say witness that this is a

2    witness who needs leading questions to assist him in

3    testifying which is one of the reasons some of the judges

4    will, under certain circumstances, allow it.

5           You were very aggressive about interrupting with

6    leading objections.  She's objections.  I'm not saying it's an

7    eye for an eye.  I'm hoping it's not.  She's trying make her

8    record and trying to protect her records as much as you were.

9    I'm not ascribe anything ill motive, but she's making

10   legitimate hearsay objections and also leading objections.  I

11   have sustained some and I have also overruled some.  When I

12   think it's just going to get to the point more quickly.  But

13   you have no basis to say that Mr. Jacobs has any way to know

14   that Mr. Greebel only served as a secretary for Retrophin and

15   no one else.

16          MR. BRODSKY:  Mr. Jacobs was in a billing

17   collections committee position meeting with Mr. Greebel on all

18   his outstanding invoices so he knew what work Mr. Greebel was

19   doing.

20          Second, he billed time to the Retrophin matter, and

21   so I can bring out the -- I'm going to go through the invoices

22   with him.  But he did bill time to Retrophin.  And the reality

23   is, your Honor, is he did advise Mr. Greebel about some very

24   critical issues.  So, for example, unquestionably, he got a

25   question from Mr. Greebel about being acting secretary on a

PROCEEDINGS

1    board regardless of whether or not I can, I think I can, but

2    regardless of whether or not -- the question is 2013, and if

3    that's the only, and I know that he billed time to Retrophin,

4    Mr. Jacobs, I know we all know it's in the evidence in the

5    record is that Mr. Greebel served as acting secretary of

6    Retrophin.  Those undisputed facts.

7           And so, I can elicit, your Honor, respectfully I

8    believe I can elicit I've laid enough foundation to make it

9    under 401 more likely than not that a question from

10   Mr. Greebel to Mr. Jacobs what does an acting secretary do in

11   2013 is certainly make a fact of consequence more relevant

12   which is Mr. Greebel was appropriately seeking the advice of

13   somebody who'd been a corporate partner for decades about the

14   role of an acting secretary.

15          Respectfully, I think the answer is admissible under

16   401 because it makes a fact of consequence more likely than

17   not which is what was the information and the knowledge that

18   Mr. Greebel received from others from a senior partner at

19   Katten about the role of acting secretary.  And that's very

20   critical because it's information and advice that Mr. Greebel

21   received about what to do as an acting secretary.  There is no

22   question it's relevant.  It makes a fact of consequence more

23   likely which is what Mr. Greebel did as the acting secretary

24   based on what he was told form a senior partner and mentor.

25   Makes it more likely that he followed it and did it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1          Now, the jury, he can't, Mr. Jacobs is not going to

2     be table to testify based on observations of what happened in

3     the board room and I'm requesting go ask.

4          MS. SMITH:  Your Honor, he billed .8 eight hours to

5     Retrophin in 2013.

6          MR. BRODSKY:  I will elicit your Honor, and you'll

7     hear, those were his years ending 2013, 2014 into '15.  It was

8     past his mandatory retirement age and he stopped billing

9     things.

10         THE COURT:  His mandatory retirement was?

11         MR. BRODSKY:  70.

12         THE COURT:  2015 is when he left and he was asked in

13    2014 to stay on so he was definitely still at the firm.

14         MR. PITLUCK:  He got that wrong, your Honor.

15         THE COURT:  How do we know that?

16         MR. BRODSKY:  I'm proffering it to you it was 2013.

17    I'm just telling you I know you see him with someone with

18    perfect acuity.

19         THE COURT:  No, I'm not saying perfect.  He's not

20    an elderly person who doesn't have a clear memory.  He's

21    giving dates, he's not hesitating.  And you're saying it's

22    wrong, I don't know that it's wrong.

23         MR. BRODSKY:  I just proffered to you as an officer

24    of the Court that I know that, based on my prior conversations

25    with the witness, that it's -- they came to him at the end of

PROCEEDINGS

1    2013, not the end of 2014.  They did come to him again in 2014

2    and asked him to stay another year in order to continue to

3    transition his practice to Mr. Greebel.  So the firm came to

4    him in late 2013 and asked him.  I'm proffering to you what

5    the witness would say or what the witness has told us.

6              THE COURT:  He's told you one thing that's in

7    conflict with what he's telling the jury.

8              MS. SMITH:  Sounds like a prior inconsistent

9    statement.  Part of the reason -- excuse me.

10             MR. BRODSKY:  I was just talking.  Please.

11             THE COURT:  See the problem is --

12             MR. BRODSKY:  May address it, your Honor.

13             THE COURT:  -- we've got two dates that you say are

14   inconsistent.  One is incorrect.  We don't have any way of

15   knowing what date is incorrect.  But the bottom line is this

16   witness cannot know what other companies Mr. Greebel served in

17   the capacity as acting secretary.

18             MR. BRODSKY:  He knows it's Retrophin.  I know he

19   knows it's Retrophin.

20             THE COURT:  It's fine he knows it's Retrophin, but

21   you can't make the statement that this is the only company.

22             MR. BRODSKY:  Well, I can because I know.  But I'm

23   just proffering it to your Honor.

24             THE COURT:  But this witness --

25             MR. BRODSKY:  This witness cannot.  I agree this

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

8218

PROCEEDINGS

1    witness will not be able to --

2              THE COURT:  Okay.

3              MR. BRODSKY:  No, I'm not going to elicit that, but

4    let me correct what I think is -- I just want to be clear on

5    the record about the dates of 2013 and 2014.

6              The firm came to him in late 2013 and say stay for

7    another year to transition your practice to Mr. Greebel.  They

8    came to him again in late 2014 and say can you stay longer and

9    transition your practice to Mr. Greebel.

10             Now, it isn't inconsistent that Mr. Jacobs said the

11   firm came to him in late 2014 and asked him to transition the

12   practice to 2014.  It's he left out a year.  So I do want to

13   be clear he's not making a prior inconsistent statement will

14   he's completely consistent with his testimony it's just he has

15   not included the year 2013 to 2014.

16             But, your Honor, I do believe that his answer which

17   is what's more important to me is that the answer he gives, if

18   I can lay a proper foundation, which I believe I have but I

19   will continue to do it.  If his answer of his advice about

20   what it means to be an acting secretary of a board from

21   somebody in his position whose given constant advice to

22   Mr. Greebel is relevant.  It doesn't violate Rule 403, and

23   it's certainly coming with an exception to the hearsay rule

24   with the effect on the listening.  When this whole case is

25   about Mr. Greebel's state of mind, the Government has put in

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1    one way state of mind evidence.  We have to be permitted to

2    put in countervailing state of mind evidence or information

3    that Mr. Greebel received because if we're not allowed to do

4    that, your Honor, a misleading portrait will be made.

5            The reality is that he did, and the Government has

6    painted a portrait on it, they opened on it about some

7    betrayal of trust of a company.  And they opened on this whole

8    notion and then not a single witness --

9            THE COURT:  They'd like to come back.

10           MS. SMITH:  Your Honor, before we go on there are a

11   couple of issues here.

12           First of all, anything that's for the effect of the

13   listener is not being offered for the truth.  So if we're

14   going to go down that road we're going to get the instruction

15   on every question.

16           Second part of the reason I'm objecting so often is

17   we do not have any 26.2 material.  I have no idea what's going

18   to come out of the witness's mouth.

19           Mr. Brodsky has very detailed notes of whatever

20   conversations that he had with the witness, and so he has a

21   sense of where we're going.  We don't.  And so, that is part

22   of the reason that I'm objecting so much.

23           He cannot use this witness to put in the defendant's

24   statements if there is not a hearsay objection.  And state of

25   mind is not going to get in all of the conversations between

PROCEEDINGS

1   this witness and the defendant.

2          Mr. Brodsky is not testifying.  And so, if the

3   witness cannot remember which client it is, which year, what

4   conversations.  Mr. Brodsky cannot cure those issues by

5   proffering to your Honor evidence that's not in the record.  I

6   recognize that we put in evidence of all of the clients, but

7   unless this witness can go through and say from personal

8   knowledge what each client was and exactly what work the

9   defendant was doing for each client, then he can't make an

10  assertion that this is the only public company for whom he was

11  serving as secretary and I am still not convinced, you know,

12  especially give then confusion about the years.  I don't know

13  how it's 2013.

14         MR. BRODSKY:  They testified it's 2013.  And your

15  Honor she's calling into question --

16         THE COURT:  Don't interrupt her.

17         MS. SMITH:  My only point is only in 2013 that was

18  in the question.  And I am, you know, again he only billed

19  .8 hours to Retrophin and the question was this is in January,

20  is it in December?  I believe he said between 2013 and early

21  2014.  I don't know how many conversations there were, and I

22  am a little -- it sounds like Mr. Brodsky thinks he can put in

23  both questions and answers.  I believe that questions are not

24  hearsay but they also need to be relevant.  And I still

25  haven't heard exactly I've heard that this can suggest that he

PROCEEDINGS

1   is asking what an acting secretary does.  I'm not entirely

2   sure how that is relevant, but, you know.

3              THE COURT:  All right.  Look, the hearsay rules and

4   other rules of evidence apply to the Government and to the

5   defendant.  No one is above the law.  No one gets out from

6   under the rules.  The rules apply evenly.  And to the extent

7   hearsay is being elicited, it's not going to be allowed unless

8   there is a hearsay exception that's offered.  This witness has

9   been advised, and I don't think he's intentionally trying to

10  slip in hearsay, but from time to time when he starts to

11  recount what he said or Mr. Greebel said, there's an objection

12  and it's going to be sustained.  The question itself is not

13  hearsay the answer is.  So we can move on and bring the jury

14  in.

15             MR. DUBIN:  Would you like me to get him?

16             THE COURT:  Sure.  We're going to bring in the jury.

17             (A brief pause in the proceedings was held.)

18             (Witness takes the witness stand.)

19

20

21

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JACOBS - DIRECT - MR. BRODSKY

1          (Jury enters the courtroom.)

2          THE COURT:  All jurors are present.  Have a seat.

3          You may resume your direct examination, Mr. Brodsky.

4    MR. BRODSKY:

5    Q    We stopped at a point, Mr. Jacobs, where you were about

6    to inform us of questions Ms. Greebel asked in 2013, I believe

7    you said through early 2014, relating to the Board or Boards?

8    A    Okay can.  I talk about things he told me, or no?

9    Q    Just the questions, just the questions he asked you, then

10   we'll come back.

11   A    He asked me, Do you circulate the Board minutes to

12   different people on the Board.  What do you do when you are

13   the Acting Secretary of the meeting.  And that's primarily

14   what he asked me.

15   Q    Now, let me turn to, before we get to those discussions,

16   let me ask you to turn in your binder to tab 20, Government's

17   Exhibit 845 in evidence.  If we can put that on the scene,

18   Mr. Carter.

19          Do you see the tab?  You are you there?

20   A    I'm there is, that Government's Exhibit 845?

21   Q    Correct.

22   A    I'm there.

23   Q    Do you see which company is being this invoiced, directed

24   to?

25   A    Yes, I do.

JACOBS - DIRECT - MR. BRODSKY

1    Q    What company?

2    A    Retrophin.

3    Q    When is the first time you heard of Retrophin?

4    A    Maybe 2012, I'm not exactly sure the date.

5    Q    And if you scroll through the document you see there is a

6    time entry on August 19, 2013, with your name, do you see

7    that?  Where it says, "Review memo for Evan Greebel"?  It

8    should be on page R048657?

9    A    Okay, I'm on 48657.

10   Q    I'm directing your attention to the billing entry

11   August 19, 2013, do you see that?

12   A    Yes.

13   Q    You see .8 hours?

14   A    Yes.

15   Q    Now is that the only time in 2013 that you provided any

16   advice relating to Retrophin matters?

17   A    I don't know.

18   Q    Did you in any conversations with Mr. Greebel in 2013,

19   when he came to your office, did you bill that time or not

20   bill that time?

21   A    I rarely billed the time.

22   Q    Why did you rarely bill the time in 2013 when Mr. Greebel

23   came to your office to seek advice?

24   A    I didn't need the hours in the firm and he would come in

25   and it would maybe be a five-minute conversation, ten-minute

JACOBS - DIRECT - MR. BRODSKY

1    conversation.  I just didn't see it a necessity to bill it.

2    Q    Now, if we can go back to the questions that Mr. Greebel

3    asked you in 2013.  You said he asked you, What do you do when

4    you are Secretary.  Do you remember Mr. Greebel asking you

5    that question?

6    A    Yes.

7    Q    Do you remember approximately when Mr. Greebel asked you

8    that question?

9    A    I don't have a time period.

10   Q    And where were you with Mr. Greebel when he asked you?

11   A    Probably my office or his office.

12   Q    Did you respond to Mr. Greebel, without giving your

13   response, did you respond to him?

14   A    Yes.

15   Q    And when you responded to him, what was that based on?

16   A    Experience.

17   Q    And had you ever served, prior to 2013 when you had this

18   conversation with Mr. Greebel, had you ever served as an

19   Acting Secretary or as outside -- withdrawn.

20        Had you ever served in the capacity as Acting

21   Secretary?

22        MS. SMITH:  Objection to relevance, your Honor.

23        THE COURT:  I'll overrule it.

24   A    Yes.

25   Q    Was that one time, more than one time?

JACOBS - DIRECT - MR. BRODSKY

1    A    Several times.

2    Q    Prior to having this conversation with Mr. Greebel, did

3    you have any other experience in connection with

4    communications with Boards?

5    A    Yes.

6    Q    Describe in general that experience?

7    A    I sat on a Board of a major public company for ten years.

8    I was also their outside counsel.  I've gone to Board meetings

9    of clients when they requested that I show up if I'm outside

10   counsel.  And I've acted as Acting Secretary of meetings when

11   I've been requested.

12   Q    And did you answer Mr. Greebel's question when he asked

13   you, what do you do when you're secretary or Acting Secretary?

14              MS. SMITH:  Objection.  Asked and answered.

15              THE COURT:  Sustained.

16              MR. BRODSKY:  I only asked him whether he answered

17   the question.  I'm sorry if I asked that and he answered.  I

18   apologize, your Honor.

19              THE COURT:  You did.  No need to apologize.  You

20   did.  It was asked and answered.  Whether he answered the

21   question Mr. Greebel asked about what to do as Acting

22   Secretary.

23              MR. BRODSKY:  Okay.

24   Q    What did you tell Mr. Greebel with respect to, What you

25   do when you are Secretary?

JACOBS – DIRECT – MR. BRODSKY

1            MS. SMITH:  Objection, your Honor.  Hearsay.

2            MR. BRODSKY:  Fact on listener, your Honor.  State

3   of mind of Mr. Greebel.

4            MS. SMITH:  Can we have sidebar?

5            (Continued on the next page.)

6            (Sidebar conference.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE.

1          MS. SMITH:  Your Honor, again, we object to this

2     hearsay.  Mr. Brodsky has tried to bolster the witness's

3     background and experience in an attempt to show the advice,

4     the truth of whatever advice he's giving was correct or would

5     have been followed by Mr. Greebel.  And this is just --

6          MR. BRODSKY:  Your Honor, I'm not offering it as a

7     truth.  I did that as a foundation.  I thought I was going to

8     get an objection, they can't possibly answer the question.  So

9     I laid the foundation that he has knowledge about it, that

10    does give credibility to why he would be asked the question.

11    It lays a foundation for why he would be able to give a

12    response.  That's perfectly permissible.  There was no

13    objection from the Government for that, so I don't know why

14    we're talking about that.

15         MS. SMITH:  There were objections.  I said to

16    relevance.

17         MR. KESSLER:  If it's for the effect on the

18    listener, your Honor, then the only issue would be what were

19    the words, and what did Mr. Greebel do in response.  Doesn't

20    matter if Mr. Jacobs knows what he's talking about or not.

21    The fact that the resume is introduced, he said it was

22    introduced to be accurate.

23         THE COURT:  That has already come before the jury.

24    He's not going to offer it for the truth.  We'll instruct the

25    jury this is not offered for the truth.

SIDEBAR CONFERENCE.

1        MS. SMITH:  I can see Mr. Brodsky arguing in

2   summations, look, there is this partner he had conversations,

3   he had lots of experience communicating with Boards, this is

4   what he told Mr. Greebel so it's perfectly acceptable for

5   whatever Mr. Greebel did.

6        I would like a proffer of what he told Mr. Greebel,

7   first of all.  Because, again, we don't have any idea.  And if

8   we're letting in hearsay, we have to understand what that is

9   in case there a different objection I don't want it out in

10   front of the jury.

11        MR. BRODSKY:  We've been here before.  I've

12   requested it and the Government declined to give such

13   proffers.

14        MS. SMITH:  For co-conspirators.

15        MR. BRODSKY:  They've proffered co-conspirator

16   statements.  They've proffered things with co-conspirators.

17   They refused at sidebars to give what those proffers were.

18   They said, let's let the witness testify.

19        I don't think I have to come over at sidebar every

20   time I've established a foundation.  And it's a question and

21   then there is an answer.  I'm not admitting it for the truth.

22   I'm admitting it for the effect on listener.

23        MR. KESSLER:  What if he told him, don't take notes.

24        MR. BRODSKY:  Then you can move to strike.  You can

25   move to strike.  It has an effect on listener.  It's relevant.

SIDEBAR CONFERENCE.

1        THE COURT:  Advice could be wrong.  The advice could

2   be just completely off the wall.  The question is, them

3   offering it to show the effect on Mr. Greebel.  Mr. Greebel

4   proving what he did or said in the context of that advice, and

5   I think that it is relevant to his actions, which are in the

6   record, relevant to his statements regarding minutes.

7        MS. SMITH:  Could potentially.  It's possible, like

8   you said, he asks a question and he answers something

9   completely off the wall, in which case it would not be

10  relevant.

11       MR. KESSLER:  Or that he answers in a time period in

12  2013, when it didn't effect the action.  The point of the

13  effect on the listener is to show that there was an effect,

14  but this is just what did you tell him.

15       MR. BRODSKY:  For every document the Government put

16  in and said effect on the listener, they did not explain and

17  dot their I's and cross their T's why there was an effect on

18  the listener.  This is relevant.  It's admissible for the

19  effect on the listener.  Let's hear what the testimony is then

20  we can take it question by question.

21       THE COURT:  The documents that I'm recalling were

22  e-mail chains that you objected to that included Mr. Greebel,

23  it might have inserted someone who's name is not in this case

24  who was an outside person or who wasn't party of Mr. Shkreli's

25  group.  And the little piece of that e-mail was admitted to

SIDEBAR CONFERENCE.

1    provide background and context and also ultimately how that

2    person's statement in that e-mail had an effect on the

3    recipients of that e-mail.

4                MR. BRODSKY:  I do believe there was other testimony

5    that didn't relate to Mr. Greebel where they offered it for

6    the effect on the listener.

7                THE COURT:  Try to get an example.

8                MR. KESSLER:  We were pretty careful explaining why

9    there was an effect, for this reason.  If there was general

10   statements that it had some effect at some point.

11               THE COURT:  What effect would this have on

12   Mr. Greebel, what his mentor tells him?

13               MR. BRODSKY:  They are going to object.  And I have

14   to come and proffer every statement.

15               MS. SMITH:  So don't proffer the statement tell us

16   what the effect was.

17               MR. BRODSKY:  I have to go through my direct

18   examination at sidebar question by question, I don't think

19   that's proper, your Honor.  As an officer of the court, I tell

20   you the answer will be relevant.  It's admissible.  And I

21   should be allowed to ask the question and have him answer.

22               THE COURT:  What is the effect on the listener of

23   Mr. Jacobs' advice on the response, whatever that may be?

24               MR. BRODSKY:  Mr. Jacobs has demonstrated, based on

25   his position, where his office is located, and the matters

SIDEBAR CONFERENCE.

1   he's worked on with Mr. Greebel, that clearly he's a sort of a

2   mentor to Mr. Greebel.  I would argue that's reasonably

3   inferred from the evidence.

4          And so, in 2013, and again Mr. Jacobs doesn't

5   remember when in 2013, but in 2013 when he's asked this

6   question and he gives the answer, the effect will be, we know

7   Mr. Greebel is Acting Secretary on Retrophin.  And that has an

8   effect on how he does Acting Secretary on Retrophin.  There is

9   a reasonable inference to be drawn.

10          I won't be able to argue to the jury that we know

11   this is the truth.  Or I won't be able to argue to the jury,

12   you know, that Acting Secretaries are supposed to do this and

13   not supposed to do this, because you heard from Mr. Jacobs

14   that is offering for the truth.

15          What we will say, maybe, during summation, you heard

16   from Mr. Jacobs, you heard what he told Mr. Greebel, that has

17   an effect on Mr. Greebel.  And look at the evidence about what

18   Mr. Greebel did as Acting Secretary.

19          MR. KESSLER:  They are trying to show that

20   Mr. Greebel acted in accordances with the advice, without

21   showing that he acted in accordance with the advice.

22          MR. CHAN:  That doesn't make sense --

23          MR. KESSLER:  How does it connect, that's the point.

24          MS. SMITH:  We don't know what he's going to say.

25          THE COURT:  If Mr. Jacobs said, you don't have to

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE.

1    take notes, you don't have to serve Board minutes to the

2    members of the Board, there is evidence in the record that

3    Mr. Greebel didn't send them to the Board but he sent drafts

4    to Mr. Panoff and then sent final minutes to

5    Ms. Valeur-Jensen.  The effect of that on the listener may be

6    that Mr. Greebel thought he didn't have to send them the

7    minutes.

8            MR. KESSLER:  If that were the advice.

9            THE COURT:  We don't know.

10            MR. KESSLER:  We don't know the effect, we don't

11    know the advice.

12            THE COURT:  Maybe we're getting ahead of ourself.

13            MS. SMITH:  The concern is, we have no idea what he

14    is going to say.  I have to wait for the answer then object

15    and have it struck.

16            THE COURT:  I hope we don't have to go down that

17    road.

18            MS. SMITH:  I think the effect on the listener to

19    the extent there is a lot of this, we're worried about

20    swallowing the rule.  Hearsay is not, it is not a general

21    anything anyone every said to Mr. Greebel related to Retrophin

22    comes in, I want to make that clear.

23            THE COURT:  They will be instructed that it is not

24    offered for the truth.  The jury should not assume that this

25    advice was.

SIDEBAR CONFERENCE.

1          MS. SMITH:  I think just not offered for the truth

2    is fine.  But we would like that instruction after either, I

3    don't know, if there is a set of questions or after the

4    question.

5          MR. BRODSKY:  I don't know.  Because I do have Q and

6    A, but I often don't guy by it.  I listen to him then I follow

7    up with a question.

8          MS. SMITH:  So maybe an instruction before he gives

9    the testimony that anything that he might have said in

10   response to those questions is being offered for the effect on

11   the listener and not for the truth of anything, not for the

12   truth.

13         MR. KESSLER:  Just not for the truth.

14         MS. SMITH:  Not being offered for the truth.

15         THE COURT:  Okay.

16         (End of sidebar conference.)

17         (Continued on the next page.)

18

19

20

21

22

23

24

25

JACOBS – DIRECT – MR. BRODSKY

1          (In open court.)

2     BY MR. BRODSKY::

3     Q     Mr. Jacobs, we last left off with Mr. Greebel had asked

4     you in 2013, What do you do when you are Acting Secretary.

5              What did you say in response?

6              MR. BRODSKY:  Your Honor, I don't offer it for the

7     truth of whatever information is provided.

8              THE COURT:  So the jury is instructed that what

9     Mr. Jacobs told Mr. Greebel in response to his question is not

10    being offered for the truth.

11             MR. BRODSKY:  Just offered for the effect, your

12    Honor, on the listener.

13    BY MR. BRODSKY::

14    Q     Mr. Jacobs, what did you say in response to Mr. Greebel

15    in 2013 when he asked you, What do you do when you are Acting

16    Secretary?

17    A     You take notes; you draft the minutes; you deliver it

18    usually to the president, the CEO, or the Chairman of the

19    Board, and the CFO.  And ask them if they have comments on

20    those minutes.  You then get comments back.  You redraft the

21    minutes and you deliver them to the Chairman of the Board and

22    the CFO.  And you say, if these are okay, sign them, and put

23    them in the minute book.

24    Q     And what else, if anything, did you say about being

25    Acting Secretary to Mr. Greebel?

JACOBS - DIRECT - MR. BRODSKY

1   A    Acting Secretary is nothing more than a scrivener taking

2   notes, no responsibility, just taking notes and delivering it

3   to whoever it's supposed to be given to.

4   Q    And in response to Mr. Greebel's question, I think you

5   already answered this, but the question was, Do you circulate

6   Board minutes, if you've already answered then you've already

7   answered, but what did you say in response?

8              MS. SMITH:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10             THE WITNESS:  You asked that?

11             THE COURT:  Well, you gave an answer.

12             THE WITNESS:  I must have missed it.

13             THE COURT:  You just gave an answer that was

14  responsive to that question.  What do you do as Secretary

15  regarding the Board minutes.

16             THE WITNESS:  Okay.

17             THE COURT:  And the notes you take.

18             Did you not just answer that?

19             THE WITNESS:  I did say that.

20             THE COURT:  I thought you did.

21             THE WITNESS:  I thought he was going further.

22  BY MR. BRODSKY::

23  Q    Well, other than what you've already told us with respect

24  to what you told Mr. Greebel, is there anything else you told

25  him in response to his specific question, Do you circulate

JACOBS - DIRECT - MR. BRODSKY

1    Board minutes?

2    A      No.

3    Q      Let me direct your attention to the matter where you and

4    Mr. Greebel represented a special committee of the Board of

5    directors of a public company, do you remember your testimony

6    on that?

7    A      Yes.

8    Q      Who were the people who served on that -- what year was

9    that?

10   A      That was 2013, I believe.

11   Q      What who was on the Board?

12   A      Board was made, a special committee, made up of the

13   Board.  They were doing an acquisition made up of two

14   corporate people that were independent Board members, two

15   corporate independent directors, and Harvey Pitt, former SEC

16   Commissioner.

17   Q      Did you, who from -- trying to ask this -- what was your

18   role in connection with the special committee of the Board

19   with Mr. Pitt and the two corporate partners?

20   A      We were retained to represent the outside special

21   committee.  There was a conflict on the Board.  The Chairman

22   of the company also sat on the Board of the company that was

23   being acquired, so he set up a special committee with these

24   three gentleman and they asked us to represent them.  And I

25   brought Evan with me to represent them.

JACOBS - DIRECT - MR. BRODSKY

1    Q    When you said you brought Mr. Greebel with you, where

2    were you going?

3    A    Well, he was at every, we had special meetings about

4    every two weeks while the acquisition was being honored.  I

5    wanted Evan there with me so we could hear what was going on,

6    we could tell them what was going on, and we would take notes

7    of what was said, and we would write-up memos of what was

8    said.

9    Q    And did at each next special committee meeting of the

10   Board, did the special committee ask for any notes or memos

11   relating to the prior meeting?

12   A    No.

13   Q    You had testified that you had informed Mr. Greebel where

14   to circulate the minutes.  Did you have experience in cases

15   where there was no Chairman of the Board?

16        MS. SMITH:  Objection to leading.

17        THE COURT:  Overruled.

18   A    Yes.  Whoever ran the meeting, that's who got the

19   minutes.  It was either the Chairman of the Board, the

20   president of the company, the Chief Executive Officer, and

21   usually the Chief Financial Officer, one of those people

22   usually ran the meeting.

23   Q    Did you ever explain to Mr. Greebel why it was to the

24   Chairman or the CEO or the president or the CFO?

25        MS. SMITH:  Objection to hearsay.

JACOBS - DIRECT - MR. BRODSKY

1          MR. BRODSKY:  Offering for the effect to the

2  listener.  I'm just asking a yes or no answer, not the

3  content.

4          THE COURT:  I'll overrule the objection.  You can

5  answer it.

6  A     Yes.

7          MR. BRODSKY:  And I'm about to ask, your Honor, what

8  did Mr. Jacobs say.  I offer that for the effect on the

9  listener, not for the truth of the statements made.

10          MS. SMITH:  Objection, your Honor.

11          THE COURT:  I think I've given you latitude, sir,

12  but I'm going to sustain this objection.

13  Q     Do you have a general recollection of hearing about

14  Martin Shkreli, just in general?

15  A     Yes.

16  Q     When was the first time you heard about Mr. Shkreli?

17  A     Sometime in 2011, 2012, something like that.

18  Q     Without going into the content, do you have specific

19  recollections of speaking with Mr. Greebel relating to

20  Mr. Shkreli?

21  A     Nothing specific.

22  Q     Let me ask you to turn in your binder to Government's

23  Exhibit 802 in evidence.

24  A     Which binder?

25          MR. BRODSKY:  May I approach, your Honor?

JACOBS - DIRECT - MR. BRODSKY

1    Q    Sorry, tab two.

2    A    Thank you.

3    Q    Do you see where it says Project Plasma, on the first

4    page MSMB Healthcare?

5    A    Yes.

6    Q    And let's scroll back to the second page of this document

7    of 802 in evidence.  There is the entry where it says July 7,

8    2011, "speak with Evan Greebel, Mike Jahrmarkt, Chris

9    Jahrmarkt re: financing."  Do you remember what that was

10   about?

11   A    Yes.

12   Q    What was that about?

13   A    He, Evan, was working with a client that needed

14   financing. both Mr. Jahrmarkts are clients of mine.  They run

15   a private equity firm.  They were interested in financing

16   companies in the bio-pharma area.  So I introduced Evan to

17   Mike Jahrmarkt and Chris Jahrmarkt.

18   Q    If you turn to the next page, July 11, 2011, under your

19   name, "speak with Evan Greebel Retrophin Delaware law."  Do

20   you see that?

21   A    Yes.

22   Q    Do you remember what Delaware law you were talking about?

23   A    No.

24   Q    Do you have a general recollection, one way or the other,

25   of speaking on occasion to Mr. Greebel about Delaware law?

JACOBS – DIRECT – MR. BRODSKY

1    A    Yes.

2    Q    And in general, without any specific conversation, why

3    Delaware law?

4              MS. SMITH:  Objection, your Honor.

5              THE COURT:  Overruled.

6    A    Well, I think Retrophin was formed under Delaware law.

7    That's where most companies are formed.

8              MS. SMITH:  Objection, your Honor, just to the MSMB

9    bill.

10             MR. BRODSKY:  I was divorcing my question from the

11   bill and asking generally about, speaking about Delaware law.

12             THE COURT:  Overruled.

13             THE WITNESS:  I can speak about that?

14             THE COURT:  You started to say that Retrophin and

15   most companies are incorporated in Delaware.

16   A    Okay.  So a lot of questions come up with companies we

17   work with under Delaware law.  We were possibly looking at

18   something in the certificate of incorporation set forth there,

19   something about shareholder approval.  It could be any number

20   of items under Delaware law that we were discussing.  I don't

21   know what particular one was involved here.

22   Q    And if you go to the next, if you go to how much time you

23   billed under this matter, this MSMB Healthcare matter, in

24   August 5, 2011 bill, it says 4.5 hours.  Do you see that?

25   A    Yes.

JACOBS – DIRECT – MR. BRODSKY

1   Q    In 2011, when Mr. Greebel was speaking with you, did you

2   tend to bill that time or not bill that time during that year?

3   A    I indicated, sometimes I billed it and sometimes I

4   didn't.

5   Q    If you would go to Government's Exhibit 803 in evidence?

6   A    Is that the next tab?

7   Q    Tab three.  You see on the top MSMB Capital Management

8   LLC?

9   A    Yes.

10  Q    Do you remember that MSMB Capital Management LLC as a

11  client of Katten?

12  A    No.

13  Q    If you scroll to the next pages, you see your time

14  entries for example August 11, 2011, "Cranium meet with Evan

15  to discuss strategy"?

16  A    I see that.  Is that 8/18?

17  Q    That is on tab three.

18  A    I'm there.

19  Q    Second page, 8/11/2011?

20  A    I see that, okay.  I don't know what that was.

21  Q    Then down below, August 12, 2011, "cranium speak with

22  Evan Greebel re: strategy on transaction"?

23  A    Okay.

24  Q    Do you, sitting here today, do you remember what that

25  specific conversation was about?

JACOBS – DIRECT – MR. BRODSKY

1   A      I don't remember the specific conversation.

2   Q      The next page has time entries on August 15, 16, 17, 18,

3   19, 29, 31, do you see that, Government's Exhibit 803, tab

4   three?

5   A      Which dates are you talking about?

6   Q      The dates highlighted on the screen, all your attorney or

7   assistant entries?

8   A      I see them now.

9   Q      If you would read those silently to yourself.

10  A      I read them.  I don't remember what it's in reference to.

11  Q      Let me just keep going to Government's Exhibit 804 in

12  evidence.

13  A      Okay.

14  Q      Looking at the first page you see the invoice for

15  September 19, 2011?

16  A      I see it.

17  Q      Tab four.

18  A      I got it.  804?

19  Q      804.  You see related to Project Iron Man?

20  A      I see that.

21  Q      Do you remember what Project Iron Man was for MSMB

22  Capital Management?

23  A      No.

24  Q      Turning to the next page, looking at your time entry,

25  time entry on --

JACOBS - DIRECT - MR. BRODSKY

1    A     There is none.

2    Q     I don't see any time entries for you.

3          Do you see Mr. Greebel's time entry on August 1st,

4    2011, on page two, where it says, "conversation with M.

5    Shkreli, D. Kravtiz, H. Jacobs, review and edit letter, review

6    securities laws and corp documents"?

7    A     I see it.

8    Q     Did you ever meet Mr. Shkreli in person?

9    A     No.

10   Q     Did you ever talk on the telephone with Mr. Shkreli?

11   A     No.

12   Q     Do you know one way or another when in the time entry it

13   says, "conversation with M. Shkreli, D. Kravitz, H. Jacobs,"

14   it means one conversation with all three of you together or a

15   separate conversation with each of you?

16   A     Since I never met him, and I never spoke to him --

17         MS. SMITH:  Objection, your Honor.

18   A     -- I assume.

19         MS. SMITH:  Assume.

20         THE COURT:  I'm sorry, sir, just the best of your

21   recollection, no assumptions.

22   A     The best of my recollection, since I never met him or had

23   a conversation with him, I would imagine, I believe --

24         MS. SMITH:  Objection, your Honor.

25         THE COURT:  Okay.  To the best of your recollection.

JACOBS - DIRECT - MR. BRODSKY

1    A    To the best of my recollection it was separate

2    conversation concerning securities law.

3    Q    Since I don't see a time entry -- do you see a time entry

4    one way or the other for you on August 1st, 2011?

5    A    No.

6    Q    Then going to the next date, page three, August 19, 2011

7    down on the bottom.  There a reference to conversation with H.

8    Jacobs, M. Fisher, E. Press, D. Kravitz, M. Shkreli review

9    securities law and research"?

10   A    I see that.

11   Q    Do you remember this conversation at all, one way or the

12   other, with Mr. Greebel?

13   A    No.

14   Q    Is there a time entry for you for that conversation with

15   Mr. Greebel?

16   A    None for me, Press, or Fisher.

17   Q    Let me turn to tab five, Government's Exhibit 805 in

18   evidence.  Do you see the matter is project Plasma?

19   A    I see that.

20   Q    Do you remember one way or the other what project Plasma

21   related to?

22   A    No.

23   Q    Turning to the next page, do you see the time entry for,

24   for example, August 1st, 2011, "speak with Evan Greebel re:

25   plan going forward and other acquisitions"?

JACOBS – DIRECT – MR. BRODSKY

1    A    I don't recall.

2    Q    You don't remember one way or the other what that related

3    to?

4    A    No.

5    Q    This time entry under project Plasma, you billed this,

6    which matter number did you bill to on August 1st, 2011?

7    A    Looks like MSMB Capital Management LLC.

8    Q    There is an invoice number on the first page and a client

9    number, do you see that?

10   A    Yes, I do.

11   Q    There is also under project Plasma a firm matter number,

12   you see where it says one?

13   A    Yes.

14   Q    If you go back to tab four, you look at project Iron Man,

15   what matter number is that?

16   A    That's four.

17        MS. SMITH:  Your Honor, for the record --

18   Q    I was looking at, for the record, Government's Exhibit

19   804 is matter four.

20        And how did you know, one way or the other, on

21   August 1st, 2011, to bill time to matter number one in

22   Government's Exhibit 805 for MSMB Capital Management, as

23   opposed to matter number four in Government's Exhibit 804?

24   A    To the best of my recollection, I asked which matter I

25   should bill my time to.

JACOBS – DIRECT – MR. BRODSKY

1   Q     On August 2, 2011, there is a time entry for you in

2   Government's Exhibit 805 that says, "speak with Evan Greebel

3   re: North Light and PowerPoint and other items," do you see

4   that?

5   A     I'm looking, 83.

6   Q     Tab five, Government's Exhibit 805 on August 2, 2011?

7   A     To the best of my recollection, this was a PowerPoint

8   presentation to North Light, where the Jahrmarkts work,

9   concerning this transaction.

10  Q     So what does North Light have to do with the Jahrmarkts?

11  A     Michael Jahrmarkt is president of North Light.  Chris

12  Jahrmarkt his, executive vice president.  North light is with

13  my client, private equity firm.

14  Q     Turning to tab six, Government's Exhibit 806 in evidence.

15  A     I'm there.

16  Q     This is project Iron Man matter number four, do you see

17  that?

18  A     I see.

19  Q     If you turn the page, we'll highlight on the screen,

20  September 7, 2011, September 8, 2011, "speak with Evan

21  Greebel."

22  A     Also on the seven and eight, I see that.

23  Q     Sitting here today, do you remember one way or the other

24  what these conversations with about?

25  A     No, I do not.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

JACOBS - DIRECT - MR. BRODSKY

1   Q    Then if you go to the next page, on September 15, 2011,

2   there is a time entry for you, "speak with Evan Greebel

3   re:strategy."  Sitting here today do you remember what that

4   conversation was about, one way or the other?

5   A    No.

6   Q    Then I'll ask you to turn to Government's Exhibit 807 in

7   evidence, tab seven.  Another invoice for MSMB Capital,

8   correct?

9   A    Yes.

10  Q    If you go to the time entry page, do you remember, in

11  general, in September 2011 meeting and speaking with

12  Mr. Greebel relating to project Cranium for MSMB Capital?

13  A    I don't recall.

14       MR. BRODSKY:  One moment your Honor.

15  Q    Let me ask you to turn to tab 14, Government's Exhibit

16  826 in evidence.  Do you see the invoice going to Retrophin

17  LLC on February 24, 2012?

18  A    I do.

19  Q    Do you have a recollection of when -- let me direct your

20  attention on this Government's Exhibit in evidence, 826, to

21  the page RO48357, so the last few digits on the bottom

22  right-hand corner is 357, you see where it says?

23  A    8357?

24  Q    8357.

25  A    February 24, 2012?

JACOBS – DIRECT – MR. BRODSKY

1    Q    Correct.

2    A    I see it.

3    Q    Do you remember project Candlestick?

4    A    No.

5    Q    If you turn the page, there is on the bottom, in the

6    middle of the page an entry for you on January 23, 2012?

7    A    Okay.  I see it.

8    Q    Do you see where it says, "Retrophin meet with Evan

9    Greebel to discuss offering memo and Series A preferred

10   stock"?

11   A    I see it.

12   Q    Two hours?

13   A    I see it.

14   Q    Do you remember that meeting with Mr. Greebel in

15   connection with offering memorandum in Series A preferred

16   stock?

17   A    I remember discussing, to the best of my recollection, I

18   remember discussing the Series A proffered stock offering.  I

19   don't know if it was on this date, I have to believe it was.

20   Q    If you go to the next document, the next page on

21   January 25, 2012, it talks about meeting with Evan Greebel to

22   "discuss offering memo, subscription agreement and termination

23   offering," do you see that?

24   A    To the best of my recollection I remember having this

25   conversation.

JACOBS – DIRECT – MR. BRODSKY

1    Q    You do remember?

2    A    I do remember.

3    Q    And what was, in general, the topic of conversation?

4    A    Exactly what I wrote there, to discuss the offering

5    memorandum, subscription agreement, and the termination of the

6    offering.

7    Q    Let me show you, if you can turn -- and the date of that

8    is January 25, 2012, correct?

9    A    That's right.

10   Q    Let me ask you to turn to, before we get to the document,

11   there is another entry for you on January 26, 2012, "meet with

12   Evan Greebel re: offering and reverse stock split."  Do you

13   see that?

14   A    Yes.

15   Q    The next page there is another time entry for you on

16   January 31, 2012, "Retrophin meet with Evan Greebel and David

17   Kravitz re: shares"?

18   A    I see that.

19   Q    Let me ask you to turn, then I'll ask you about a

20   particular document, Government's Exhibit 827 in evidence, the

21   front page, what is the date of the invoice?

22   A    March 21, 2012.

23   Q    Who is it going to?

24   A    Retrophin.

25   Q    Is that Retrophin Inc. or Retrophin LLC?

JACOBS - DIRECT - MR. BRODSKY

1   A    Retrophin LLC.

2   Q    If I can ask you to turn to the page RO48368?

3   A    Four what.

4   Q    48368.

5   A    Okay.

6   Q    And you see your time entries there, in general?

7   A    I see them in general.

8   Q    Let me ask you to turn now to, the last entry on

9   February 6, on that page, February 6, 2012, correct, "speak

10  with Evan Greebel"?

11  A    Yes.

12  Q    Let me ask you to turn to tab 16, turn to Defense Exhibit

13  for identification 111-90 for identification.

14  A    I see it.

15  Q    Is this an e-mail exchange between you and Mr. Greebel?

16  A    Yes, it is.

17  Q    Does it relate to the time you billed for Retrophin LLC

18  in February of 2012?

19  A    Yes.

20  Q    Does it relate to Darren Blanton?

21  A    Yes.

22       MR. BRODSKY:  Your Honor, we offer DX111-90 for

23  identification.

24       MS. SMITH:  Objection to hearsay, your Honor.

25       (Continued following page.)

JACOBS – DIRECT – MR. BRODSKY

1          THE COURT:  Sustained.

2     BY MR. BRODSKY:

3     Q    On February 7, 2012, in connection with Darren Blanton,

4     did you -- did Mr. Greebel ask you any questions?

5     A    I'm not sure if he asked me about Mr. Blanton, but he did

6     ask me about this transaction.

7     Q    What question do you remember -- question or questions do

8     you remember Mr. Greebel asking you relating to this -- the

9     time you billed from February 2012 for Retrophin LLC?

10    A    To the best of my recollection, I remembered discussing

11    with Mr. Greebel the fact that --

12          THE COURT:  Sir, sir --

13          THE WITNESS:  I remember, to the best of my

14    recollection --

15    BY MR. BRODSKY:

16    Q    The question, I am asking.

17          THE COURT:  The question is what you are going to

18    tell us, please, if you can remember.  Thank you.

19    BY MR. BRODSKY:

20    Q    The questions that Mr. Greebel asked you, but not the

21    answers.

22    A    The questions he asked me?

23    Q    Yes.

24    A    Okay.  If an LLC is not funded and the papers are not

25    signed, is it a valid transaction.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

JACOBS - DIRECT - MR. BRODSKY

1  Q    Was that the only question, or did he ask you other

2  questions?

3  A    That was the primary question.

4  Q    And did you provide advice to Mr. Greebel in response,

5  which you billed -- billed or didn't bill?  Did you provide

6  advice?

7  A    Yes.

8         MR. BRODSKY:  Your Honor, we offer the answer

9  Mr. Jacobs gave for the effect on the listener, not for its

10  truth.

11        MS. SMITH:  I am not sure if he's asking about the

12  document or --

13        THE COURT:  Are you offering -- you are offering

14  Government -- DX-190 --

15        MR. BRODSKY:  I am happy to offer that, and I am

16  also asking for the answer to the question that was -- that I

17  elicited from Mr. Jacobs.

18        MS. SMITH:  Again, we have the same objection.

19  Hearsay.

20        MR. BRODSKY:  To the document they have the

21  objection to?

22        MS. SMITH:  Both the document and the answer.

23        THE COURT:  All right.

24        MR. BRODSKY:  I am happy to redact, Your Honor.  I

25  am not offering the document for the truth, I'm --

JACOBS - DIRECT - MR. BRODSKY

1          THE COURT:  I think -- I know that you have offered

2     it on other bases before.  I'm not sure that I can see that

3     bases applying to DX-1190.

4          MR. BRODSKY:  If we redact the portion under

5     "importance high," above Mr. Greebel's name, and then the rest

6     of it is not being offered for the truth, but being offered

7     for information being provided to Mr. Jacobs, as the

8     foundation for the -- as part of the foundation for the answer

9     to the question that I --

10          MS. SMITH:  Objection.  Hearsay, Your Honor.

11          MR. BRODSKY:   -- seeking to elicit from him.

12          MS. SMITH:  He didn't ask if he received information

13     or not.

14          THE COURT:  I am going to sustain the objection,

15     Mr. Brodsky.

16          MR. BRODSKY:  May I ask Mr. Jacobs to -- well, I

17     will ask.

18     BY MR. BRODSKY:

19     Q    Mr. Jacobs, for purposes of, not for the truth, but the

20     effect on the listener, what answer did you give to

21     Mr. Greebel to his question?

22          THE COURT:  Just a moment.  I'm not sure what

23     question's reflected in this document.  What question are you

24     referring to?

25          MR. BRODSKY:  Oh.  I had elicited from Mr. Jacobs

JACOBS - DIRECT - MR. BRODSKY

1    moments ago --

2                THE COURT:  About that?  Yes.  Okay.

3                MR. BRODSKY:   Yes.  About unfunded and --

4                THE COURT:  Does the government have a view?

5                MS. SMITH:  Objection.  Hearsay, Your Honor.

6                THE COURT:  I am going to ask you for a sidebar

7    because I am a little confused about the order of the

8    testimony and in relation to this document.

9                MR. BRODSKY:  Yes, Your Honor.

10               (Sidebar conference.)

11               (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

1          (WHEREUPON, the following proceedings were had at

2    sidebar, out of the hearing of the open courtroom, to wit:)

3          MR. BRODSKY:  Where I am going, Your Honor, is that

4    Government Exhibit 103-17 in evidence is Mr. Greebel's

5    February 10, 2012 e-mail to Darren Blanton at Colt Ventures.

6    It was a letter from Retrophin LLC.  They put in evidence a

7    letter to Mr. Blanton saying, please see the attached letter

8    from Retrophin LLC.  A copy of this letter is also being sent

9    to you by Federal Express.

10          And the letter that's attached is a February 10,

11   2012 letter to Mr. Blanton, talking about how we have been

12   retained by Retrophin LLC as the legal counsel, on multiple

13   occasions in 2011, including September 6 and October 6,

14   Edwards Wildman, prior counsel to Retrophin, and sent the

15   following documents to you either electronically or via

16   Federal Express.  And there is a list of a series of

17   documents.  The government elicited evidence during their

18   direct -- during their case in chief with respect to

19   Mr. Blanton and the cancellation of Mr. Blanton's founder

20   shares because he didn't sign, I think, in sum and substance,

21   he didn't sign the documents.

22          On February 7, days before, there were -- on

23   February 6, I posit, that although Mr. Jacobs doesn't

24   necessarily remember the dates, he does remember generally

25   talking about -- and he doesn't remember Mr. Blanton, he

SIDEBAR

1    remembers the topic generally, but I -- my proffer to you is

2    that I have a time entry of February 6, 2012, I have

3    Mr. Greebel on the next day sending to Mr. Jacobs the

4    documents from Edwards Wildman relating to Darren Blanton.

5    And Mr. Greebel writes:  Further to our conversation, they

6    never signed the LLC agreement, any of the transfer documents.

7    I think we can unilaterally terminate them.

8           I am trying to elicit, Your Honor, that Mr. Jacobs

9    provided advice regarding the termination of Mr. Blanton's

10   ownership in the founder shares.  He billed time to the

11   matter.  And then he was forwarded this information -- he

12   received this information, was forwarded the information by

13   Mr. Greebel, prior -- days before Mr. Greebel sends the letter

14   in Government Exhibit 103-17.  So I think it is relevant, I

15   think it is -- there's no Rule 403 issue, and I am not trying

16   to offer the -- the content of these attachments for the

17   truth, I'm just trying to establish that Mr. Greebel was --

18   received advice from Mr. Jacobs in connection with the

19   cancellation and the termination of Mr. Blanton's founder

20   shares.  And that's what I am trying to do.

21          MS. SMITH:  Well, I guess the government's objection

22   is he's soliciting he sought advice.  I don't know why the

23   specific advice is relevant.  I mean, what is the relevance of

24   him seeking and receiving advice on this particular -- I mean,

25   he doesn't have an advice of counsel defense.  So I am just

SIDEBAR

1    trying to understand what the relevance is.

2              MR. BRODSKY:  Again, Your Honor, the government

3    elicited this, and they elicited from Mr. Blanton that the

4    shares were cancelled, they put into the record this

5    document --

6              THE COURT:   The cancellation, but not --

7              MR. BRODSKY:  The cancellation.

8              THE COURT:   -- what went on between Mr. Greebel and

9    his partner.

10             MR. BRODSKY:  No, of course, and that's why I

11   believe it is half the story.

12             THE COURT:  Because?

13             MR. BRODSKY:  Because there seems to be, and I, you

14   know, I don't know what the government's going to argue from

15   it, but I have concerns that the government is going to argue

16   in some way or some fashion, whether they do or not, I have

17   concerns that an impression was created, that there was

18   something improper, wrong about sending the cancellation to

19   Mr. Blanton.  That evidence is before the jury.  So it makes a

20   fact of consequence, did Mr. Greebel do anything wrong in

21   advising Mr. Shkreli to cancel Mr. Blanton's shares.  I

22   believe it makes it less likely he did anything wrong by the

23   fact that, one, he sought advice from Mr. Jacobs, and, two,

24   and discussed it with Mr. Jacobs.  It is not seeking advice,

25   it is he had a conversation with another partner who billed

SIDEBAR

1   time to the matter, both working for Retrophin LLC, and the

2   senior partner told him to -- that it was that cancellation or

3   termination is appropriate.

4           And so I think the effect on Mr. Greebel is

5   relevant.  I think it is relevant alone that he -- that's what

6   he thought was the best thing to do.  And because it remains a

7   fact of consequence, was there anything wrong with the

8   termination.

9           THE COURT:  Well, what it looks like here, based on

10  Defense Exhibit 1190, is that the junior partner, Mr. Greebel,

11  is telling the senior partner, Mr. Jacobs, they didn't sign

12  it, I think we can unilaterally terminate, he's saying.  It is

13  not like it is a -- he's giving a directive or giving

14  information to Mr. Jacobs.  He's not -- there's nothing here

15  that indicates that he's acting based on advice or in response

16  to answers that he got from Mr. Jacobs.

17          MR. BRODSKY:  Well, I draw the following reasonable

18  inferences.  On February 6 he has a meeting with them and

19  there are some other meetings regarding termination.  They all

20  relate, in my view, based on the government's own evidence to

21  Mr. Blanton.

22          Mr. Jacobs has testified that Mr. Greebel asked him

23  the question, what do you do.  What do we do in this

24  circumstance.  I don't remember the exact words.

25          But that was the question, so there's no question

SIDEBAR

1    Mr. Greebel asked Mr. Jacobs advice relating to this.  And so

2    he starts this e-mail with, "further to our conversation,"

3    which means, of course, they had a conversation about it.

4    He's forwarding to him, to Mr. Jacobs, all these Blanton

5    transfer documents.  And so I -- my reasonable inference I

6    draw is the day before or in the preceding days, Mr. Greebel

7    asked this question, Mr. Jacobs provided advice or worked with

8    him and said what he would do or his view, and then

9    Mr. Greebel looked at the documents and forwarded the

10   documents to --

11            THE COURT:  Mr. Jacobs.

12            MR. BRODSKY:   -- Mr. Jacobs in response.

13            THE COURT:  So I think we should terminate.

14            MR. BRODSKY:  We can unilaterally terminate.

15            So I view that as -- I am not offering it for the

16   truth, I am offering it for what decisions were made, what

17   information Mr. Jacobs received, and for the purposes of

18   showing that Mr. Jacobs was involved in the decision to

19   unilaterally terminate Mr. Blanton.

20            MS. SMITH:  I haven't heard anything that's a

21   hearsay exception.  He can certainly ask if he received

22   information.  But I don't -- I don't see any hearsay

23   objection -- exception that allows this document into

24   evidence.  I am also not sure what the subjective belief of

25   Mr. Jacobs was.  We have no information about what he even

SIDEBAR

1  knew about the underlying circumstances.  He doesn't know who

2  Darren Blanton is.  So I am not sure what his subjective

3  belief about kind of a general question.  I mean, Mr. -- I am

4  concerned that there's -- we're heading into propensity

5  territory.  This is going to be used to ask, well, see, this

6  is -- you know, Mr. Greebel sought advice, and the advice must

7  have been good, and he must have, you know, subjectively then

8  thought that he was doing the right thing on this particular

9  issue.

10      I mean, if he wants to ask -- he's already asked a

11 bunch of questions about the transaction.  If he wants to ask

12 did Mr. Greebel provide information, that's all fine.  I don't

13 know how the document comes in, under what hearsay exception.

14      MR. BRODSKY:  The government put in the same

15 information.  This is their letter in Government Exhibit

16 103-17, which has the letter listing all these transfers.  The

17 transfers are attached to DX-1190 so the content of this

18 communication is important for the transmittal of information

19 to Mr. Jacobs.  That's not hearsay.

20      We are perfectly fine with redacting, if Your Honor

21 wants, this statement from Mr. Greebel in the document.  But I

22 do think it is relevant because the government elicited all

23 this evidence about the cancellation of Mr. Blanton's shares,

24 it's relevant for us to establish that Mr. Greebel sent these

25 documents to Mr. Jacobs, Mr. Jacobs obviously received them,

SIDEBAR

1    Mr. Jacobs discussed what he thought was the best thing to do,

2    and Mr. Jacobs -- and Mr. Jacobs said it.  And so Mr. Jacobs'

3    response is for the effect on Mr. Greebel.  Obviously, days

4    later Mr. Greebel goes out and cancels and sends the letter

5    terminating Mr. Blanton's founder shares.  So given that

6    Mr. Blanton is an important witness in the case, he's somebody

7    the government claims had a sham consulting agreement, his

8    credibility certainly is substantially at issue, this is --

9    makes facts of consequence more likely, which is it is more

10   likely Mr. Greebel did the right thing in cancelling the

11   shares, it is more likely the fact of consequence he didn't do

12   anything wrong.  He -- and it is -- it's certainly not unduly

13   prejudicial.  And if we redact this statement, not offering

14   the trans- -- the purpose is to offer the transmittal to

15   Mr. Jacobs.

16           MS. SMITH:  I'm hearing Mr. Brodsky say because he

17   got advice from Mr. Jacobs, it's more likely that he did the

18   right thing.  First of all, this is very far afield from, you

19   know, the actual circumstances of the consulting agreement in

20   terms of, you know, this is in 2012, there's no evidence that

21   this witness had anything to do with the actual consulting

22   agreement at that point.

23           MR. BRODSKY:  The government put in Government

24   Exhibit 103-17, which --

25           MS. SMITH:  Yes, as part of the --

SIDEBAR

1    MR. BRODSKY:   -- is dated February 10, 2012.  And

2    for Your Honor to -- for them to tell you this document that

3    they put in, which relates to the cancellation of the shares,

4    which they elicited on their direct examination of Mr. Blanton

5    is not relevant to the proceedings, I don't think they can say

6    that.  They elicited the evidence, and we are allowed to

7    respond to that.

8         THE COURT:  So this is the explanation as to why the

9    shares were cancelled?

10        MR. BRODSKY:  Yes.  His shares are eventually

11   cancelled, his founder shares.  And what I believe happens is

12   Mr. Blanton then has a claim, a founder's claim against

13   Retrophin once Retrophin goes public, which leads to all their

14   conversations regarding the resolution.  And so it -- why it

15   is important to us, Your Honor, to establish, it is because we

16   believe that, one, Mr. Blanton had a potential founder's claim

17   against Retrophin, that -- and that's certainly possible and

18   plausible.  And that's an important predicate to leading to

19   resolution between Mr. Blanton and Retrophin.

20        MS. SMITH:  I mean, the evidence that Mr. Greebel in

21   fact cancelled the shares is already in evidence.  There's a

22   whole letter explaining why.  He didn't sign the paperwork as

23   a result of the cancellation of shares.  I am still not clear

24   on why the specifics of Mr. Jacobs's advice or the fact that

25   Mr. Jacobs gave him advice on this particular transaction is

SIDEBAR

1     relevant in this case other than for what Mr. Brodsky seems to

2     be arguing, is that it must have been the right thing to do

3     because he got advice from Mr. Jacobs, which is, in fact, a

4     very inference that he would like to draw, which is for the

5     truth of what the advice was.

6          MR. BRODSKY:  Regardless of whether it was the truth

7     or not the truth, it had an effect on Mr. Greebel about his

8     actions.  And so the government, again, is painting a portrait

9     that's misleading about Mr. Greebel, that he cancelled these

10    shares in some secret room with Mr. Shkreli to get rid of

11    Mr. Blanton, and now he's doing all sorts of things that are

12    improper with respect to Mr. Blanton.  This completely

13    undercuts that entire predicate with respect to the

14    cancellation of Mr. Blanton shares.

15         If you are in a legal conspiracy with Mr. Shkreli to

16    do something bad to Mr. Blanton, to do something bad to people

17    who are founders of the company, well, would you include

18    Howard Jacobs and forward him all the documents?

19         THE COURT:  The conspiracy isn't to do something bad

20    to the investors, it is to do something bad to Retrophin.

21         The bottom line is, you know, Mr. Jacobs has

22    testified that he was asked a question touching on this very

23    issue, what do you do if these documents are not signed.  And

24    what Mr. Brodsky seeks is the answer, not because the answer

25    is necessarily truthful or accurate or correct, but, rather,

SIDEBAR

1   to explain what Mr. Greebel did, which I think is fair.  So I

2   am going to allow you to elicit what he told Mr. Greebel, and

3   whether the jury interprets this as, you know, this document

4   DX-1190, as Mr. Greebel asking a question or sort of

5   affirmatively stating to Mr. Jacobs, "We're going to cancel,"

6   and whether that's in response to the advice that he

7   purportedly got from Mr. Jacobs is for them to decide.  So I

8   will allow it.

9               MS. SMITH:  Okay.  And that's -- Mr. Brodsky said we

10  should just redact what he actually said to -- if the purpose

11  is to show the transmittal of information, since this is not

12  in fact a question, we should redact Mr. Greebel's statement.

13              THE COURT:  You can just take White Out tape and get

14  rid of it.  We have some if you need it.  Do you have a copy?

15              MR. BRODSKY:  Mr. Carter can do it on the computer.

16              THE COURT:  Oh, okay.

17              (Sidebar conference ends.)

18              (Continued on the next page.)

19

20

21

22

23

24

25

JACOBS - DIRECT - BRODSKY

1   MR. BRODSKY:

2   Q    Mr. Jacobs, we need to go back to the transcript -- well,

3   in response Mr. Greebel's question -- in response to

4   Mr. Greebel's question to you, what did you say?

5           MR. BRODSKY:  And again, I offer that, Your Honor,

6   not for the truth but for the effect it has on Mr. Greebel.

7   A    What did I say about this document?

8   Q    No.  Put aside the document.  You had testified about a

9   question Mr. Greebel had asked you.  Do you remember that?

10          I can get the testimony.  Let me scroll back on the

11  transcript.

12          MR. BRODSKY:  Sorry, Your Honor.

13  Q    I had asked you the questions that Mr. Greebel asked you

14  not the answers.

15          "Answer:  The questions he asked me?

16          "I said, yes.

17          "You said, okay.  If an LLC is not funded and the

18  papers are not signed is it a valid transaction?"

19          And what did you say in response?

20  A    I answered no.

21  Q    Did you provide any information to -- that you can

22  remember to Mr. Greebel in your response as to why?

23  A    My response, to the best of my recollection, is that if

24  documents are not executed and not funded, it's not a valid

25  agreement.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS - DIRECT - BRODSKY

1        MR. BRODSKY:  And, Your Honor, pursuant to that we

2   offer also pursuant to the sidebar discussion, DX1190 with the

3   redaction of the first line under the email from Mr. Greebel,

4   from importance high to Mr. Greebel's block signature.

5        THE COURT:  All right.  Defense Exhibit 1190,

6   pursuant to our discussion at sidebar, is being offered not

7   for truth but to show the effect of the transmission on the

8   recipient and to show the effect of Mr. Jacob's response on

9   the recipient -- on the sender, sorry, of this email.

10        (Defendant Exhibit 1190, was received in evidence.)

11   Q    If you could blow up the top.  Let's go to the original

12   email in this chain -- before we do that, let's -- before we

13   get to this, let me just go forward and put up, Mr. Carter,

14   Government Exhibit 103-17 in evidence.  Can you blow up the

15   top of the page.

16        Mr. Jacobs, you're not copied on this email

17   Government Exhibit 103-17, correct?

18   A    No, I'm not.

19   Q    Do you see who it is from and who it is to?

20   A    It's from Mr. Greebel to D. Blanton.

21   Q    And if you turn to the next page with respect to

22   Mr. Blanton, do you see the letter is addressed to Darren

23   Blanton?

24   A    This is Tab 17?

25   Q    This is Tab 17.

JACOBS - DIRECT - BRODSKY

1    A    I see it.

2    Q    And under the, Dear Mr. Blanton, would you just read the

3    first two sentences.

4    A    We have been retained by Retrophin, LLC as legal counsel.

5    On multiple occasions in 2011, including September 6 and

6    October 6, Edwards Wildman LLP, prior counsel to Retrophin,

7    sent the following documents to you either electronically or

8    via Federal Express.

9    Q    And then does it have a series of documents listed there?

10   A    Yes.

11   Q    If you would turn to the last page of that exhibit, which

12   is Government Exhibit 103-17, you see it is, Sincerely, with

13   Evan L. Greebel?

14   A    I see that.

15   Q    If we can turn back now to Defense Exhibit 1190 in

16   evidence and we go up to the top, this email is three days

17   before on February 7, 2012 and again this is Tab 16?

18   A    Yes, I see it.

19   Q    That's from Mr. Greebel to Mr. Jacobs, that's you

20   correct?

21   A    That's me.

22   Q    And below that you see the email from Andrew Grumet at

23   Edwards Wildman?

24   A    I see that.

25   Q    And there are a series of all these attachments to the

JACOBS - DIRECT - BRODSKY

1  document, correct -- to the email?

2  A    Yes.

3  Q    Let me ask you now to turn to -- yes, let me ask you to

4  turn now to the next exhibit, Government Exhibit 828 in

5  evidence, which is tab, for you, 18.

6  A    I see it.

7  Q    If you go to the page that's R048383.

8  A    Yes.

9  Q    Do you see entries that you made, time entries you made

10 on March 5th, 6th, 8th, 12th, 13th of 2012?

11 A    It starts on March 12th.

12 Q    March 5th?

13 A    I'm sorry, March 5th I see.  And March 8th I see.  I see

14 them.

15 Q    Okay.  Do you remember these conversations where it says,

16 meet with Evan Greebel, and it is the first entry on

17 March 5th, 2012, .5, a half hour of time?

18 A    No, I don't remember.

19 Q    Then the next page over has dates of March 21st, 2012 and

20 March 22nd, 2012, do you see the entries discuss a supplement

21 to PPM, review supplement to PPM, give comments?

22 A    I don't recall.

23 Q    Let me ask you to turn to Government Exhibit 831 in

24 evidence and direct your attention to an entry -- and does

25 this relate to Retrophin, LLC too, which is your Tab 18?

JACOBS – DIRECT – BRODSKY

1   A    Yes.

2   Q    You see an entry down June 27th, 2012 relating to meet

3   with Evan Greebel?

4   A    On 8411 I don't see it.

5   Q    48415.

6   A    Thank you.  I see it.

7   Q    Do you remember what the nature of the conversation was

8   with Mr. Greebel on June 27th, 2012 --

9   A    No.

10  Q    -- relating to Retrophin LLC?

11  A    I don't.

12  Q    Now did there come a time when you discussed with

13  Mr. Greebel the topic of consulting agreements?

14  A    Yes.

15  Q    And did Mr. Greebel ask you any questions relating to

16  consulting agreements?

17  A    To the best of my recollection we discussed generally

18  consulting agreements.

19  Q    Do you remember what year it was?

20  A    No.

21  Q    Do you remember whether it was when Mr. Greebel was an

22  associate or Mr. Greebel was a partner at Katten?

23  A    When he was a partner.

24  Q    Do you remember whether it was the early years that he

25  was a partner or in the later years?

JACOBS – DIRECT – BRODSKY

1   A    The middle years.  I don't recall, I'm sorry.

2   Q    Okay.  And what questions -- do you remember any

3   questions that Mr. Greebel asked you in connection with

4   consulting agreements?

5            MS. SMITH:  Objection to relevance, Your Honor.

6            THE COURT:  Overruled.

7   A    I was asked whether or not I had a form of a consulting

8   agreement which he could use.  We discussed, generally, what's

9   included in a consulting agreement.  I gave him advice on what

10  I thought should be included in the consulting agreement.

11  Q    And did you provide him with a form consulting agreement?

12  A    I believe I did.

13  Q    And how did you have a form consulting agreement?

14  A    I had done consulting agreements over the years.  I had a

15  whole file of them.

16  Q    Now did you have any recollection of the name Al Geller

17  at all?

18  A    No.

19  Q    Do you have any recollection of the name Steven Rosenfeld

20  at all?

21  A    No.

22  Q    Do you know one way -- do you recall one way or the other

23  speaking with Mr. Greebel about a consulting agreement with Al

24  Geller?

25  A    No.

JACOBS - DIRECT - BRODSKY

1  Q    Do you recall one way or the other speaking with

2  Mr. Greebel about a consulting agreement with Dr. -- with

3  Steven Rosenfeld?

4  A    No.

5  Q    What about do you recall one way or the other having a

6  conversation with Mr. Greebel about a consulting agreement for

7  Darren Blanton?

8  A    No.

9  Q    Did there come a time when you and Mr. Greebel had a

10 conversation about settlement agreements?

11 A    Yes.

12 Q    Do you generally recall when that conversation took

13 place?

14 A    2011, '12, something like that.

15 Q    Do you have -- do you know where you were when you had

16 this conversation with -- was it one conversation or more than

17 one conversation?

18 A    I don't recall how many conversations, but we had a

19 conversation.

20 Q    Do you recall it was one or more than one or you sitting

21 here today you don't remember?

22 A    I don't remember how many.  It might be more than one but

23 I'm not sure.

24 Q    What questions did Mr. Greebel ask you relating to

25 settlement agreements?

JACOBS – DIRECT – BRODSKY

1          MS. SMITH:  Objection to relevance, Your Honor.

2          THE COURT:  Overruled.

3          MS. SMITH:  The time period.

4    A    He asked me --

5          THE COURT:  I'm overruling the objection.

6          THE WITNESS:  Did you say overruled?

7          THE COURT:  I'm overruling the objection, you may

8    answer the question.

9    A    He asked me if I had forms of settlement agreements,

10   which I did have which I provided to him.  We discussed,

11   generally, what goes into a settlement agreement.  Although he

12   was pretty familiar with them, had seen them himself, but I

13   did give him a form of settlement agreement.

14   Q    How did you have a form settlement agreement?

15   A    I had done settlement agreements over the years.  I had

16   the documents.

17   Q    How have you done settlement agreements given that you're

18   a corporate transactional lawyer?

19         MS. SMITH:  Objection, Your Honor, to relevance.

20         THE COURT:  Overruled.

21   A    Basically settlement agreements are just agreements that

22   he is working on for the company that he represents or an

23   individual, if you're representing an individual.  I am just

24   very knowledgeable about settlement agreements and I'm used to

25   preparing them.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

JACOBS - DIRECT - BRODSKY

1          There was no one else to ask.  That's how I was

2    trained as I worked up the ladder of a corporate lawyer.

3    Q    Did you discuss the topic of -- at any point with

4    Mr. Greebel the topic of a release?

5    A    Yes.

6    Q    Do you remember when that discussion took place?

7    A    Yes, it would be the same time we discussed settlement

8    agreements in general.

9    Q    And what did Mr. Greebel -- did Mr. Greebel ask you any

10   questions with releases?

11   A    Yes, he asked me if I had a form of release that I used.

12   We discussed, generally, what goes into a release.  I gave him

13   a form of the release that I've used over the years and

14   developed through a number of transactions.  And I told him

15   make sure if you do a settlement agreement have a release.

16   Q    And what -- why did you say that?

17            MS. SMITH:  Objection, Your Honor.

18            THE COURT:  Overruled.

19   A    I said that's because if --

20            MS. SMITH:  Objection.

21            THE COURT:  Excuse me.

22            MS. SMITH:  Sorry, can I have just a very brief

23   sidebar?

24            THE COURT:  Yes.

25            MR. BRODSKY:  Your Honor, the clock is ticking down.

PROCEEDINGS

1        THE COURT:  All right.  I am going to give the

2   jurors thanks for their service and ask you if you would avoid

3   all media coverage, keep an open mind, don't talk about the

4   case.

5        I will see you tomorrow morning.  Thank you.

6        (Jury exits courtroom.)

7        THE COURT:  I'm going to excuse the witness as well.

8        (Witness excused.)

9        MR. BRODSKY:  Sorry, Your Honor.

10       MS. SMITH:  Your Honor, just the way the question

11  was asked obviously we object for relevance since this is not

12  in the time period, it's not specific to the settlement or

13  consulting agreements at issue in this case.

14       THE COURT:  It's before, right?

15       MS. SMITH:  It is before, but it is several years

16  before and we don't think that a general conversation is

17  relevant at all in this case.  I think we've laid that

18  objection, I don't want to reargue that.

19       The specific objection to that question, again not

20  agreeing with the idea that any of this is coming in, but

21  unless Mr. Jacobs explained to Mr. Greebel why he gave that

22  advice, it's not relevant.  So if it was something that

23  Mr. Jacobs was thinking in his mind about why the advice --

24  about why you should always get a release is important and it

25  never actually gets conveyed to Mr. Greebel, then it's not in

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1  fact relevant under Mr. Brodsky's effect on the listener

2  exception, which he's been using for all of this testimony.

3          So if he can lay the foundation, which he hadn't

4  done before the question, that the reason why you always get a

5  release was something that the witness conveyed to

6  Mr. Greebel, then again, while we object, under Mr. Brodsky's

7  theory that would come in.  But if it's just something in

8  Mr. Jacob's head and was never actually conveyed to

9  Mr. Greebel, then it would be objectionable.

10         THE COURT:  The question was after Mr. Jacobs said,

11  I told him make sure if you do a settlement agreement have a

12  release.  Mr. Brodsky did ask, and why did you say that.  So

13  he's asking him.

14         MS. SMITH:  Why did you say that as opposed to did

15  you explain to him why you should get a settlement agreement.

16  Because if Mr. Jacobs -- just getting Mr. Jacobs' opinion on

17  why a release is important --

18         THE COURT:  You just want him to rephrase and say,

19  did you explain the why to Mr. Greebel.

20         MS. SMITH:  Exactly.  And if he didn't then the why

21  cannot be relevant for the effect on the listener.  Because

22  what Mr. Jacobs thinks or doesn't think about a release,

23  unless we're giving expert testimony, is not relevant.

24  Mr. Brodsky is using an effect on the listener exception which

25  we do not agree with, but if it's an effect on the listener it

PROCEEDINGS

1    has to be something actually conveyed to the listener.

2              THE COURT:  Assuming Mr. Jacobs just told

3    Mr. Greebel get a release, always get a release and didn't

4    explain why and the effect on the listener, Mr. Greebel, would

5    be whenever I do a settlement I'm getting a release.

6              MS. SMITH:  That's right.  My point if -- that's

7    right.  Then the testimony lies where it is.  If he also

8    explains why, then potentially the effect would be whatever

9    the reason why is.  But we don't need Mr. Jacobs to explain

10   why he said that unless that was also conveyed to Mr. Greebel.

11             I am not sure why that's relevant unless he's going

12   to be testifying as an expert why you generally get releases.

13   If the issue is what does -- what information was given to

14   Mr. Greebel about releases, then if he said you always get a

15   release and that's it, that's the information he got.  If he

16   said, you always get a release and here's why, then that's the

17   information he got.  So you need the predicate question of

18   whether or not he actually explained his advice or he just

19   gave the advice.  That's my point.  If the exception is going

20   to be the effect on the listener.

21             THE COURT:  All right.  Mr. Brodsky, do you want to

22   be heard?

23             MR. BRODSKY:  No, Your Honor.  I'm happy to hear

24   what Your Honor's ruling is on it.  I know you overruled the

25   objection so I don't want to -- I like your ruling.

PROCEEDINGS

1      THE COURT:  Change my mind.

2      MS. SMITH:  I was trying to give an explanation for

3  why that second question was objected to.  Obviously, I've

4  been objecting generally, but again if it's not actually

5  conveyed to Mr. Greebel then it can't cause an effect on him

6  and it's not relevant.

7      THE COURT:  Well, I think if he were to rephrase the

8  question.

9      MS. SMITH:  Yes, and say explain why.

10      THE COURT:  Did you tell Mr. Greebel why.

11      MS. SMITH:  And if he says no, we stop.  If he says

12  yes, then under this general exception that Mr. Brodsky has

13  been using, then it would be appropriate.  He needs to set the

14  foundation that something was actually told to Mr. Greebel.

15      THE COURT:  All right.  Beyond --

16      MS. SMITH:  Beyond whatever the advice.

17      THE COURT:  Beyond the advice always get a release.

18      MS. SMITH:  If we're going to get an explanation for

19  the advice there needs to be conveyed as well.

20      THE COURT:  All right.

21      MS. SMITH:  Your Honor, we don't have a witness

22  order for tomorrow.  It was our understanding that

23  Mr. Rosensaft would be going tomorrow morning, Mr. Cotton was

24  second on the list we got the other day.

25      MR. BRODSKY:  We will call their counsels right

PROCEEDINGS

1    after this -- we've been challenged by the same challenges the

2    government had in terms of juggling given witness' schedules

3    we will call them right after --

4              THE COURT:  Why don't you want call them right now,

5    there's four lawyers sitting right there.

6              MR. DUBIN:  Your Honor, we just got an email as

7    we're sitting here --

8              MR. CHAN:  From the lawyer.  I'm sorry.

9              MR. DUBIN:  We just got an email from the lawyer

10   from some of the witnesses we're calling who is asking us to

11   change them to Friday.  So we're doing our best.  We're going

12   call them right when we leave.  He's not available right now,

13   the lawyer.  We're going to call him, as soon as we find out

14   we'll tell the government.

15             MS. SMITH:  That's fine.  Your Honor, I'm asking in

16   part because the other person -- there was Mr. Cotton,

17   Mr. Rosensaft, and the other person was a potential third.

18             MR. BRODSKY:  Was Professor Lewis.

19             MS. SMITH:  Professor Lewis.  I think there may be

20   some outstanding issues and obviously an expert takes a little

21   bit -- we have more stuff to bring.  So we just -- that's why

22   we're asking and also for the Court to know in case there's

23   anything that needs to be ruled on.  There's a 26.2 for

24   Mr. Lewis.

25             MR. CHAN:  So I think what I can say is that of

PROCEEDINGS

1    those three people, those are still our three people for

2    tomorrow.  Lewis is definitely going tomorrow because of

3    travel schedules so whether or not Lewis is directly after

4    this person or one of the other two will be right after, we

5    don't know.

6              MR. BRODSKY:  Well, Your Honor, if he has to go --

7              MR. CHAN:  Yeah, I think --

8              THE COURT:  Decide what you want to say on the

9    record, don't mess up the record, please, because you are

10   talking over each other.

11             MR. CHAN:  We'll commit that Lewis will be our

12   second witness.

13             MS. SMITH:  It sounds like either Rosensaft or

14   Cotton after that depending on --

15             MR. CHAN:  Right.

16             THE COURT:  I want to advise the parties that, as

17   you know, December 8th, this Friday, is going to -- there will

18   hopefully be a continuing resolution to keep our government

19   open.  In the extraordinary event that that does not occur by

20   midnight on December 8th, most federal entities will have to

21   implement shutdown.  The judiciary will not, but we will be

22   funded through, they hope, through December 29th.  So as of

23   Monday everyone is going to report to work and we're going to

24   hope the judiciary's money can be sustained through

25   December 29th, but I'm warning you now, you have to get this

8280

PROCEEDINGS

1    case finished.  I'm hoping it's going to be December 15th.

2           MS. SMITH:  Your Honor, obviously we're in the same

3    boat in shutdown, but we understand.

4           MR. BRODSKY:  May I ask Your Honor just because of

5    these extraordinary circumstances, I've never been in a

6    situation in the middle of trial near the end where there

7    could be a potential government shutdown what happens, Your

8    Honor?

9           THE COURT:  We have lawyers who are CJA funded who

10   refuse to come to work.  We've managed to try to cobble

11   together money from what we have to keep things going.

12          MR. BRODSKY:  What happens if the jury is in the

13   middle of deliberations and there's a government shutdown?

14          THE COURT:  Well, we may not be able to pay them

15   right away, we may have to hope they keep serving.

16          MR. BRODSKY:  But we would be able to come to the

17   courthouse?

18          THE COURT:  Yes, we would be on a reduced situation

19   with regard to our personnel.  We're hoping that it would not

20   affect our functioning.

21          It does appear the judiciary will be all right at

22   least starting December 11th, which is next Monday, but

23   there's a concern that the judiciary can sustain they hoped --

24   let me put it this way.  The judiciary should be able to

25   sustain paid operations through the use of fee authority and

PROCEEDINGS

1    know your appropriations for possibly three weeks.

2                MR. BRODSKY:  That sounds hopeful, Your Honor.

3                THE COURT:  Well, we have managed to dodge a

4    complete shutdown of our courthouse, but we have had issues

5    with certain components of the judiciary and they always hope

6    it does not result in anybody especially our very devoted

7    Court staff and court reporters that we don't have issues.

8                MR. BRODSKY:  Understood.

9                MS. SMITH:  Thank you, Your Honor.

10               THE COURT:  May I ask the defense how long they

11   think their defense case will last?  We have a number of

12   issues, some personal to me and some regarding other calendar

13   matters.  We've moved things around almost on a daily basis to

14   try to keep this trial going, but I do have issues and

15   concerns with some of my other cases, some of them criminal.

16   I have other scheduling matters.  I have a sentencing that I

17   put over.  I've got a lot of civil trials that have been

18   kicked way down the road into next year.  I need to know.

19               I know Mr. Greebel and his team may not want to

20   provide much information to the government, but for scheduling

21   purposes I need to know.  And I will also tell you that I have

22   said this before, I have some medical things I have put off, I

23   want to get them done before the end of the year.  I have them

24   scheduled for the week of December 18th, I cannot push them

25   back further please --

PROCEEDINGS

1       MR. DUBIN:  Yes, Your Honor, our best --

2       THE COURT:  -- please let me know.

3       MR. DUBIN:  May I?  Sorry.  Our best estimate right

4   now is Wednesday of next week we'll be done.  That is if

5   Mr. Greebel decides not to testify.  If he decides to testify,

6   possibly taking us to Friday of next week.  Our best estimate

7   right now we should be done by Wednesday of next week.

8       THE COURT:  I just am concerned.  I'm not going to

9   be postponing further matters after Friday of next week.

10      MR. DUBIN:  Okay, we understand.

11      THE COURT:  I can't.  Both on my court calendar and

12  other issues.  I just think we have tried very hard to

13  accommodate the length of this trial.  I think it has lasted

14  longer than it needed and a lot of that is due to the fact

15  that the parties seem unable to interact in a cordial,

16  cooperative way which is unfortunate.  But I think at some

17  point I need to put an end to this and just maintain the rest

18  of my responsibilities to my other cases.

19      MR. DUBIN:  Understood, Your Honor.  We just started

20  our case today, we're going to try to streamline it.

21      THE COURT:  I understand the direct case lasted a

22  long time, I don't think the fault lies with any particular

23  person solely, but there are a lot of disagreements, a lot of

24  motions, a lot of things that you've asked the Court to decide

25  that should have been brought up prior to trial and --

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1          MR. DUBIN:  I'm going to try.

2          THE COURT:  -- this continues to be a problem.

3          MR. DUBIN:  We're going to try to confer with the

4   government also on our plan on summary witness.  Perhaps there

5   are some of those documents we can agree to by stipulation.

6   I'm hopeful that we can and that might speed it up.

7          THE COURT:  All right.  I can give you further

8   guidance on Johnson if you would like.  Does that even matter

9   anymore?

10         MR. BRODSKY:  No, I think we'll take the guidance.

11         MR. DUBIN:  Of course it matters.

12         MS. SMITH:  Your Honor, just given that information,

13  we would just renew our request.

14         THE COURT:  Start what?

15         MS. SMITH:  Start the charge conference on Friday at

16  2.  I recognize we probably won't finish, but maybe we can

17  spend those two and a half hours and get through some piece of

18  it.  Because my concern is if the case isn't over until

19  Wednesday, then there has to be a charge conference which has

20  to be done before closing.  We can get at least some of it

21  done.

22         THE COURT:  I have a guilty plea that has to be

23  taken in the afternoon.  The defendant is unwilling to

24  stipulate to a magistrate judge.  I have other matters on my

25  calendar.

PROCEEDINGS

1        MS. SMITH:  Then we would also suggest potentially

2   doing a charge conference and obviously --

3        THE COURT:  The plea shouldn't take more than 45

4   minutes --

5        THE COURTROOM DEPUTY:  Forty-five minutes.

6        THE COURT:  -- at most.

7        MR. DUBIN:  The defense is happy to start the charge

8   conference as well on Friday.

9        THE COURT:  I also have a status conference.  We

10  have adjourned his initial appearance before me several times.

11  I am very reluctant to adjourn it again.  So these are two

12  separate matters that I've pushed to the afternoon of Friday.

13  Maybe we can start at 3:30.

14        MS. SMITH:  Your Honor, we were just trying --

15        THE COURT:  I'll go without lunch, as I seem to be

16  doing during this trial.

17        MS. SMITH:  Your Honor, we're just trying to think

18  of ways to --

19        THE COURT:  Yes.

20        MS. SMITH:  -- fit these things in.  Obviously, the

21  government is always available, we can do it at night, before.

22  I recognize if there is a government shutdown we experience

23  extra hours in the Court after regular business hours.

24  Business hours we're not getting paid for anyway but certainly

25  overtime for court staff I don't know what the options are,

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    but I'm just saying the government is willing to kind of fit

2    that in wherever at night or on Friday because we don't want

3    to be in a situation where we could hit that 15th and be done,

4    but for we haven't started the charge conference.

5              MR. DUBIN:  We're happy to accommodate Your Honor's

6    schedule and meet at night or in the morning as well.  If the

7    government shuts down, we can do it at my office.  I don't

8    think so.

9              THE COURT:  Well, I guess the issue would be to get

10   the support staff that we need for a trial.  I suppose I'm

11   willing to work on the weekends or at night as well.

12             MS. SMITH:  Okay.

13             MR. DUBIN:  We do not want Your Honor to go without

14   lunch to accommodate us.

15             THE COURT:  That's fine.  I'm not worried about that

16   so much as I just have all these other cases that are -- this

17   case is important to the parties, it is important to me,

18   but --

19             MR. DUBIN:  We understand, Your Honor.

20             THE COURT:  -- I can't say it's more important than

21   the other 300 cases I'm responsible for.

22             MR. DUBIN:  We get it, we get it.  Understood.

23             THE COURT:  I want to go over my understanding of

24   what Mr. Johnson's expert opinions will be following the

25   Daubert hearing and, please correct me if I have overstated or

PROCEEDINGS

1  understated.

2          First, that companies often settlement litigation

3  risk through use of consulting agreements with broad release

4  conditions.  Consulting, settlement provisions and agreements

5  are motivated primarily by the need to settle potential claims

6  rather than to actually receive consulting services.

7          The characteristics of consulting agreements that

8  are entered into to avoid litigation are characterized by

9  vague descriptions of consulting services, relatively little,

10 if any, time requirements, payment terms and connected to work

11 performed and relatively detailed descriptions of covenants

12 and releases, so non-disparagement and releases.

13         Consulting and settlement agreements usually are not

14 the product of either side's wanting or requesting consulting

15 services but are rather generally the product of lawyers who

16 negotiate settlements.

17         Consulting and settlement agreements are publicly

18 available via Google searches and demonstrate the use of the

19 terms described in the second opinion regarding why we do

20 settlement agreements and how they are characterized.  The

21 example agreements are similar to in some respects the

22 consulting agreements at issue in this case.

23         Is there anything else I've overlooked?

24         MR. KESSLER:  Yes.

25         MR. CHAN:  In terms -- if the question is what the

PROCEEDINGS

1    testimony --

2              THE COURT:  My understanding is this is what his

3    opinion will be.

4              MR. CHAN:  Yes, so I don't think the government

5    should ask what we expect our expert to testify to, but the

6    Court actually captured what we believe his opinion would be,

7    what his opinion was at the Daubert hearing and what we will

8    limit his opinion to in the event that we are permitted to

9    call him in this trial.

10             THE COURT:  Well, one of the pieces is termination

11   of clause.

12             MR. CHAN:  I meant as to the consulting agreement.

13             THE COURT:  Okay.  That was the other part that he

14   testified to.  He says that is not unique to have the type of

15   language that we find, the common threads about what is for

16   cause in agreements, employment agreements.  He has experience

17   in executive compensation and has advised clients about

18   termination provisions.

19             And the legal standards I believe you're familiar

20   with in terms of the one who may qualify as an expert through

21   knowledge, skill, experience or training.  Their knowledge,

22   experience or training or specialized technical skills have to

23   be helpful to the trier of fact to understand the evidence to

24   determine a fact in issue.

25             It has to be based on sufficient facts or data, must

PROCEEDINGS

1   be the product of reliable principles and methodologies and

2   the expert must have reliably applied the principles and

3   methods to the facts of the case.

4          Now I recognize that I serve a gatekeeping function

5   as proscribed in *Daubert* versus *Merrell Dow*.  I also recognize

6   the Second Circuit has generally applied fairly liberal

7   standards for admitting expert testimony.  Nonetheless, I do

8   have authority to exclude opinion evidence where there is

9   simply too great an analytical gap between the data and the

10  opinion proffered.  The gaps or inconsistencies in reasoning

11  leading to the opinion go to the weight of the evidence not

12  necessarily its admissibility, that's *Restivo* versus

13  *Hessemann*, 846 F.3d 547 decided in 2017 by the Second Circuit

14  and pin site is 577.

15         The government objects to Mr. Johnson's testimony on

16  four grounds:  First, he's not qualified to offer any of the

17  opinions disclosed by the defendant in this case which relate

18  to consulting agreements in general.

19         Second, that to the extent Johnson is qualified to

20  opine about a narrow subset of consulting agreements, his

21  narrow opinions are irrelevant because they do not relate to

22  any fact in issue in this case.

23         I think it's clear that his opinions are based on,

24  as I said earlier at lunchtime, departing executives, founders

25  and board members usually of large established -- I don't want

PROCEEDINGS

1    to say Fortune 500, but in that category of corporation.  He

2    talked about large entities that he pulled consulting

3    agreements off of.  And those seem to be Kimberly Clark, Tyson

4    Foods, there were other large entities that he used as

5    examples.

6              MR. CHAN:  Actually I think, Your Honor, his

7    experience is both for large and small companies, private and

8    public.  The examples that he picked for purposes of

9    explanation did come from large public companies, but that's a

10   function of the fact that only those kinds of companies would

11   have their consulting agreements available on the SEC website.

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          MR. KESSLER:  I don't disagree with that.  I think

2     the key point is that he limited his expertise, specifically

3     to a very defined subset of consulting agreements, which I

4     think we quoted this in our brief.  So I guess my only

5     question is, before the Court continues the original opinions

6     that the Court read through, there are five or six of them, I

7     took it that those are limited to the kinds of consulting

8     agreements in which Mr. Johnson himself said he was an expert.

9     So not all consulting agreements, but the very -- I don't have

10    it off the top of my head -- the departing executive,

11    settlement consulting agreements with broad general releases,

12    however he formulated it.

13         THE COURT:  As I said at lunch I was inclined

14    because of all of the evidence that consulting agreements and

15    the fact that these purportedly sham consulting agreements are

16    one of the means by which Mr. Greebel is allegedly charged in,

17    he's charged to have committed in the Count Seven, it's one of

18    the bases, that it seems to me that Mr. Johnson's opinions

19    about consulting agreements and the terms and the whys for

20    those terms would be helpful to the jury to understand.

21         I know Ms. Smith had said that the Government is not

22    alleging that these terms are necessarily indicia of the

23    fraud, but I think that's what's been said repeatedly is, you

24    know, the performance of duties was very loosely defined, some

25    of these folks didn't do anything at all.  What they consulted

8291

PROCEEDINGS

1   on was personal to Mr. Shkreli, not beneficial to the

2   corporation.

3           So because of those types of arguments I think that

4   it is appropriate to allow the witness to testify within the

5   confines of the narrow subset of consulting agreements that

6   these are terms.

7           The Government also criticized or objects to the

8   methodology, which was a little haphazard and frankly changing

9   at one point.  He was doing SEC searches and then he switched

10  to just general Google searches, typing in search words.  But

11  nonetheless, he did come up with consulting agreements that

12  had arguably similar language to those at issue in this case.

13          The Government, I think the fourth objection, is

14  that he's not qualified to opine on the with cause termination

15  provisions.

16          MR. KESSLER:  I don't think that was the argument,

17  although I could be misremembering.

18          THE COURT:  Okay.  Well, the reason I would allow

19  him to testify about this is because he did testify at the

20  Daubert hearing that he did have experience in termination

21  clauses and executive and employment agreements.

22          MR. KESSLER:  I think, I don't think, we don't think

23  he's -- We have concerns about his qualifications for all the

24  other opinions.  We don't think they are relevant, of course,

25  the Court has determined that.  The termination clause, he may

PROCEEDINGS

1   well be qualified to talk about it.  Our point is it's totally

2   irrelevant that at some point he's seen that clause in some

3   other contract.

4              THE COURT:  This was testimony at trial that I think

5   Mr. Richardson said, based on his vast HR experience that he

6   had never seen a termination clause like that before.  And

7   suggests that Mr. Shkreli had somehow put in the language that

8   was highly beneficial to him and made it very difficult for

9   Retrophin to terminate him, except under narrow prescribed

10  circumstances.  And I think that because of that, his

11  testimony would be relevant.

12             MR. KESSLER:  I understand.  But his opinion is not

13  that agreements like Mr. Shkreli's are common or are typical.

14  It's that the specific clause in Mr. Shkreli's agreement also

15  appears in other agreements, that also have other sorts of

16  clauses.  So that's why we were saying it wasn't relevant, but

17  it's not a qualification.

18             THE COURT:  The expert cannot opine on the ultimate

19  issue.  So I wouldn't allow him to testify that Mr. Shkreli's

20  termination clause was somehow infirm or fraudulent, because

21  these are issues for the jury.  Right?

22             MR. KESSLER:  I agree.  My understanding was what

23  Mr. Johnson was saying that this clause that says the only for

24  cause termination is for a felony or --

25             THE COURT:  Conviction.

PROCEEDINGS

 1          MR. KESSLER:  Something like a conviction, has

 2   appeared in other contracts.  Which --

 3          THE COURT:  He proffered termination clauses.

 4          MR. KESSLER:  He found four, I think, agreements

 5   where that clause appeared, then there were other ways to

 6   terminate the executive.

 7          THE COURT:  Right.

 8          MR. KESSLER:  That's his opinion.

 9          THE COURT:  I think that's something that -- how

10   exhaustive his search was, who knows.  He typed in these

11   search terms into Google, into the SEC website, and came up

12   with four which he cited during his testimony.  I think that

13   those termination clauses bore some similarity to those in the

14   one that Mr. Shkreli had.

15          MR. KESSLER:  The point is there were lots of other

16   termination clauses in the same agreements.

17          THE COURT:  Right.  But isn't that ground for cross

18   rather than a reason to preclude?

19          MR. KESSLER:  Well, it seems of extremely minimal

20   relevance and has potential to distract the jury.  But our

21   objection is not a qualification objection, on that opinion.

22   I think, frankly, that is what he's qualified to talk about

23   and not the other thing.

24          THE COURT:  I think that Mr. Johnson's testimony

25   regarding the consulting agreements must be confined to these

8294

PROCEEDINGS

1    are the kinds of consulting agreements one would have if a

2    senior executive or Board member or founding member were

3    leaving, and the company had some concerns about litigation.

4    He can't say that in a situation that we have here, involving

5    investors of an affiliate or related company, that these

6    consulting agreements would make sense.

7              MR. CHAN:  Just to clarify, your Honor, he's saying

8    in his experience in context of executives, directors and

9    founders when they have separation issues that get converted

10   into consulting agreements.  It wasn't just executives.

11             THE COURT:  I said founders, executives and

12   departing Board members is what he testified to.

13             MR. CHAN:  I was just clarifying.

14             THE COURT:  These disappointed MSMB investors don't

15   fit into any of those categories.

16             MR. CHAN:  He's not going to say he has expertise

17   beyond what his expertise is.  The Government will cross as to

18   what his experience is as to what context his experience is.

19             MR. KESSLER:  Mr. Chan is not committing to the

20   founder piece, which as added right before the Daubert

21   hearing.  They are going to argue that Darren Blanton was a

22   founder.  And so we should be very clear that when Mr. Johnson

23   testifies, and I made it very clear with him on the record,

24   that all of his experience was a situation where the founder

25   also had a current or former role as an executive at the

PROCEEDINGS

1    company.  That is clear in the record.

2            So I think we should be clear before we get started

3    that Darren Blanton is not in the category of Alan Johnson.  I

4    call it departing executive, I understand he said executive,

5    Board member, founder.  He made it clear that everyone had an

6    employment role in that company.  So that's the area he was

7    talking about.

8            THE COURT:  I agree with that.  That's my

9    recollection, that these were all folks who had some role as

10   an employee of the company.  They had served in the company

11   and --

12           MR. CHAN:  We're not going to ask him about specific

13   people in this case and ask him what his thoughts are about

14   the use of the consulting agreements with them.  I'll ask

15   about his experience, his experience with founders.  He could

16   have crossed and said what kind of founder.  I don't think we

17   should limit what his experience is.  I'm not defining his

18   experience.  I'm not going to ask him question, does your

19   experience that it doesn't apply.  If his experience applies

20   to founders, his view of what a founder is what his view is.

21   The Government can cross him on the experience of a founder.

22           MR. KESSLER:  The point of the Daubert hearing is

23   what we established what his views are.  So there is no reason

24   to elicit testimony, that is inconsistent with his view.  We

25   all agree with what his view was.

PROCEEDINGS

1        MR. CHAN:  I don't.

2        MR. KESSLER:  He said it.

3        MR. CHAN:  He said it in a particular to one

4   question and one answer.  There could be clarification to that

5   question.  If the Government feels its inconsistent, he can

6   sought out the prior testimony and read it to him and ask is

7   that inconsistent.

8        I cannot cabin what his testimony is going to be as

9   to what his experience is.  I think to the extent the

10  Government is trying to cabin our expert now and saying his

11  facts, his opinion cannot mirror what this case is incorrect.

12       THE COURT:  No, but I can qualify him as an expert

13  in consulting agreements for departing executives, Board

14  members, and founders who actually had a role in the company

15  before they were departed because that's what I think is

16  appropriate.

17       MR. CHAN:  But if he had experience.

18       THE COURT:  He's not qualified as an expert to

19  testify about other situations where somebody is considered

20  either on his own or by a CEO to be a founder by virtue of the

21  fact that he put a lot of money into the company but didn't

22  otherwise play a significant role that one would envision for

23  somebody who is actually in a start-up, working every day for

24  the good of the company.

25       MR. CHAN:  I don't disagree with that.

PROCEEDINGS

1          THE COURT:  It's a different situation.

2          MR. CHAN:  The Government is characterizing

3     Mr. Blanton as that founder.  If we don't agree that

4     Mr. Blanton is not a founder without involvement with the

5     company.  We think that Blanton is both a founder -- by the

6     way, Mr. Blanton was also a director, that is clearly

7     involvement in the company.  If he's providing investment

8     opportunities for the company, he's involved.

9          But if the question -- if the Court is limiting it

10    to, what I remember his testimony being, that his experience

11    was with founders with involvement, without defining because

12    the Government didn't go into what does involvement mean.  But

13    I agree, that it should be limited to founders with

14    involvement.  I'm not agreeing that Blanton in this case

15    equals a founder with no involvement.

16         MR. KESSLER:  So I did not say with involvement.

17    The transcript says what it says.

18         But the reason we had a Daubert hearing, there is an

19    opportunity for redirect, which was declined on this point, is

20    so we understood the boundaries of his experience.  That's the

21    whole point.

22         MR. CHAN:  The Government asked the open-ended

23    question, founders with some level of involvement with the

24    company.  That's how they left it.

25         MR. KESSLER:  I'm happy to pull the transcripts.

PROCEEDINGS

1          MR. CHAN:  The Government did not say founder who's

2     only involvement was to be given cash in connection with the

3     CEO's desire to give that person cash, right?  The Government

4     did not ask enough specific questions designed to conceal the

5     fact that he was trying to say, trying to characterize and

6     limit the expert's experience to a factually specific scenario

7     that was sought to be defined as Mr. Blanton.

8          MR. KESSLER:  I think it's in our letter

9     specifically.

10          MR. CHAN:  That doesn't mean the witness was

11     confronted with it.

12          MR. KESSLER:  I mean the transcript.  Your Honor, we

13     can submit the exact page if the Court doesn't have it handy.

14     I don't have the transcript with me.

15          THE COURT:  As I said, I think his testimony will be

16     relevant given that we've heard from the following investors

17     who had consulting agreements:  Darren Blanton, Steve

18     Rosenfeld, Al Geller.  They were offered consulting agreements

19     with Retrophin.  There was evidence about whether they

20     understood what consulting services they should be providing

21     or whether they gave any consulting services.  And the charge

22     that these are sham consulting agreements that are just

23     obfuscating fraudulent acquisitions of Retrophin assets to pay

24     off debts unrelated to Retrophin, I think is an issue that is

25     going to be, it is in the case and the consulting agreements

PROCEEDINGS

1    are going to be relevant to the extent Mr. Johnson has an

2    opinion to express about the terms.

3            My clerk handed me a page from the transcript.  Page

4    47, question, this is Mr. Kessler's cross-examination, "And

5    then he asked you about founders exiting investments?

6            "Answer:  Yes, he asked about founders, yes.

7            "Question:  How many of the specific type of

8    consulting agreements in which you are an expert have you seen

9    that involved a founder exiting an investment, just I want out

10   of my investment not playing a role.

11           "Answer:  Founder exiting investment or exiting a

12   company?

13           "Question:  So you tell me.

14           "Answer:  Well, I think I've seen a fair number

15   where a founder would leave an organization and they would

16   work out some type of agreement similar to what we're talking

17   about here with the founder.  So he would be exiting a company

18   or a business.

19           "Question:  How many times?

20           "ANSWER:

21           "Answer:  Twenty times, maybe.

22           "Question:  20?

23           "Answer:  Yes.

24           "Question:  And in all of those cases was the

25   founder also an officer or a Board member at the point they

PROCEEDINGS

1   were leaving?

2          "Answer:  Probably, yes.

3          "Question:  You can't recall where the founder was

4   not, did not also have some other role at the company?

5          "Answer:  Usually he would have an active role.  I

6   don't recall, but he could have been an emeritus.  He could

7   have been partly retired or something.  Usually he would have

8   all those titles and more.

9          "Question:  In the cases where he didn't have an

10  active role, he or she had previously had an active role at

11  some point?

12         "Answer:  Yes.

13         "Question:  So founded the company, had a role as

14  officer or director, then transitions to some emeritus title.

15         "Answer:  Yes.

16         "Question:  So have you ever seen one of the

17  specific type of settlement consulting agreements on which

18  you're offering an expert opinion in which the person getting

19  the consulting agreements had never been an officer or a

20  director of the company.

21         "Answer:  Yes.  My expertise, I have not.  Again,

22  the work that I do I have not seen it used for people that

23  never had an employment arrangement at some time with the

24  company.

25         "Question:  The founder is sort of an extra thing

PROCEEDINGS

1    that might also relate to one of the people who had an

2    employment relationship.

3              "Answer:  The founder usually would have had an

4    employment relationship at some point."

5              MR. KESSLER:  So that's my memory.

6              MR. CHAN:  I think that's not, it's confusing, it

7    goes back and forth.  It's not directly limited to that

8    because, he does say --

9              THE COURT:  He says there is an employment

10   relationship.

11             MR. CHAN:  But he also says a founder who exits the

12   company and goes on to have an active role or emeritus role.

13             THE COURT:  But you exit a company in if you have a

14   role.  Otherwise he's exiting the company as an employee and

15   has, is now an emeritus.  And he's or she is continuing to

16   render services in the capacity as emeritus or up the terms of

17   the consulting agreements.  I think he was pretty clear.  He

18   got confused, he changed his answer, but he said --

19             MR. CHAN:  I think it's also moot because Blanton

20   also served as director, right.  I understand the Court's

21   ruling.

22             THE COURT:  There is inside directors and outside

23   directors.

24             MR. CHAN:  He didn't limit his expertise to inside

25   versus outside.  Blanton is clearly an outside director.  He's

PROCEEDINGS

1    not --

2              THE COURT:  Because he's not an employee.

3              MR. CHAN:  That's true.  He was never an employee.

4              MR. KESSLER:  Your Honor, I don't think there is

5    anything in the record to say Darren Blanton was a director or

6    a Board member.

7              MR. CHAN:  I think otherwise.

8              THE COURT:  That's sounding familiar to me, I think

9    he was a director.

10             MR. KESSLER:  I'm consulting with the Blanton

11   expert.

12             MS. SMITH:  That's a factual -- I think there is

13   statements from Mr. Shkreli.  I think he was asked to be on

14   the Board.  I think it was a little unclear if he, they never

15   had a Board meeting.  There was never actually the Board, the

16   Board was never enshrined.  He wasn't on the Board for example

17   when Mr. Richardson was on the Board when he was asked to

18   join.  That's a factual issue.  That is different than the

19   qualifications of the expert.

20             MR. CHAN:  The PPM lists Darren Blanton as a

21   director.

22             MR. KESSLER:  They also list auditors and law firms

23   that had nothing to do with the company.

24             MR. CHAN:  That's facts in evidence.  They haven't

25   proven that it's false.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1          MR. KESSLER:  I think we agree that Darren Blanton's

2    status is a fact question one way or another.

3          But I understand the Court's ruling about the scope

4    of Mr. Johnson's opinions regardless of who they apply or do

5    not apply to in this specific case.

6          MR. KESSLER:  Thank you.

7          THE COURT:  All right.  Was there anything else on

8    Johnson you needed to talk about?  I hope to give you rulings

9    then tomorrow morning on the others.  Other ones are Klein --

10         MR. CHAN:  Minkoff, Lewis -- the Government knows.

11         MR. KESSLER:  Klein and Minkoff.  Ferruolo on the

12   lock-up point, because we still haven't gotten anything to

13   supplement that.

14         THE COURT:  I warned the defense that he could be

15   precluded on that point if --

16         MR. CHAN:  Our disclosures are our disclosures.  We

17   stand on them.

18         THE COURT:  All right.

19         MR. CHAN:  I think we can't, there is nothing else

20   we can disclose on him that we feel we haven't disclosed.

21         THE COURT:  All right.

22         MR. KESSLER:  We think it's totally irrelevant for

23   all the reasons we discussed before.  It's also quite

24   confusing for the jury since there is no lock-up agreement or

25   any other agreement that could resemble a lock-up in a private

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1  offering.  There is nothing, certainly nothing I'm aware of,

2  maybe they'll introduce a lock-up agreement that we're not

3  aware of.  It hasn't been proffered.  And Professor Dean

4  Ferruolo -- we'll stand on that objection based on that

5  opinion.  I believe that's it.  They've withdrawn Professor

6  Giller and notified us of that.  We didn't have an objection

7  to that, that unfortunately does not change the work load.

8          THE COURT:  Right.  Then were there any objections

9  to Lewis?

10         MR. KESSLER:  We're waiting on the 26.2 material.

11         THE COURT:  Okay.  Let me, I did receive that this

12 afternoon.  I haven't really looked at it just yet.  But I did

13 get something from defense counsel today this afternoon.

14         MR. KESSLER:  I think there is, in theory, 26.2

15 material that we know of for Ferruolo, Klein, and Lewis.  But

16 I think Lewis would be the priority because it seems like he

17 is testifying tomorrow and the other two are not.

18         THE COURT:  I'll issue an order.  I have something

19 under seal in the docket.  I can perhaps issue an order or

20 figure out technically with my clerk how to provide

21 information that's consistent with my ruling based on what the

22 defense has submitted.

23         I just want to be clear, Mr. Chan, that what is not

24 highlighted and is just left alone in the text -- I'll just

25 hold it up, no one can read it from here -- this you're going

PROCEEDINGS

1    to disclose?

2             MR. CHAN:  That they already have.

3             THE COURT:  They have.  So the question is what

4    more.

5             MR. CHAN:  Correct.

6             THE COURT:  Thank you.

7             MR. KESSLER:  Thank you

8             (Proceedings adjourned at 6:15 p.m. to resume on

9    December 07, 2017 at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2     WITNESS                               PAGE

3

      CHRISTOPER DELZOTTO
4
      CROSS-EXAMINATION      BY MR. BRODSKY     8009
5     REDIRECT EXAMINATION   BY MR. PITLUCK     8025
      RECROSS EXAMINATION    BY MR. BRODSKY     8061
6

7     HOWARD JACOBS

8     DIRECT EXAMINATION       BY MR. BRODSKY   8158

9

10                          I N D E X

11                          EXHIBITS

12    DEFENDANT              PAGE
      DX-124-88              8012
13    1190                   8268

14

15

16

17

18

19

20

21

22

23

24

25

**"ANSWER: [1]** 8299/19

**BY MR. BRODSKY:: [11]** 8059/2 8156/14
8159/9 8178/1 8180/7 8180/25 8181/7 8184/2
8234/1 8234/12 8235/21

**BY MR. PITLUCK:: [1]** 8055/2

**COURTROOM DEPUTY: [1]** 7975/1

**MR. BRODSKY: [235]** 7976/4 7976/9 7977/5
7977/8 7978/1 7978/11 7997/19 8000/7 8003/8
8004/3 8004/10 8004/15 8004/17 8005/3
8006/20 8008/11 8009/23 8010/24 8011/25
8014/24 8015/2 8015/5 8015/8 8020/8 8020/12
8022/16 8022/18 8024/1 8030/18 8031/3
8031/7 8032/2 8033/23 8035/2 8035/15
8035/18 8035/22 8035/24 8036/3 8036/18
8036/20 8036/25 8037/7 8037/19 8037/21
8038/5 8038/8 8038/14 8038/17 8038/21
8039/6 8039/11 8039/19 8039/22 8040/3
8041/22 8042/12 8043/15 8044/9 8045/16
8047/8 8048/1 8049/1 8049/18 8049/20
8050/23 8051/6 8052/9 8052/12 8052/15
8053/12 8053/24 8054/7 8054/9 8054/11
8054/13 8054/15 8056/4 8058/25 8059/7
8062/24 8150/13 8151/22 8152/6 8152/10
8153/9 8153/12 8154/8 8154/12 8155/4
8155/10 8155/15 8155/17 8155/20 8156/2
8167/12 8167/17 8168/8 8168/11 8169/10
8169/19 8170/2 8170/5 8170/7 8170/21
8171/11 8171/13 8171/16 8172/12 8172/15
8172/21 8173/4 8173/14 8174/16 8174/21
8174/23 8175/5 8175/8 8175/24 8176/3 8176/6
8176/8 8176/15 8177/14 8177/16 8177/18
8177/21 8179/1 8179/23 8180/1 8180/14
8180/16 8180/22 8184/15 8184/21 8185/2
8185/6 8194/9 8195/13 8195/15 8199/17
8204/18 8205/5 8205/11 8205/19 8205/21
8206/1 8206/6 8206/16 8208/17 8208/22
8210/7 8210/9 8211/1 8211/5 8211/9 8211/12
8212/12 8212/17 8212/22 8213/9 8213/11
8213/22 8214/15 8216/5 8216/10 8216/15
8216/22 8217/9 8217/11 8217/17 8217/21
8217/24 8218/2 8220/13 8225/15 8225/22
8226/1 8227/5 8228/10 8228/14 8228/23
8229/14 8230/3 8230/12 8230/16 8230/23
8233/4 8234/5 8234/10 8237/25 8238/6
8238/24 8240/9 8247/13 8250/21 8252/7
8252/14 8252/19 8252/23 8253/3 8253/10
8253/15 8253/24 8254/2 8254/8 8255/2 8257/1
8257/6 8257/9 8257/12 8258/16 8259/11
8259/13 8260/12 8261/22 8261/25 8262/9
8263/5 8264/14 8265/4 8265/11 8265/25
8273/24 8274/8 8276/22 8277/24 8278/17
8279/5 8280/3 8280/11 8280/15 8281/1 8281/7
8283/9

**MR. CHAN: [38]** 7975/4 7975/13 7975/20
8231/21 8278/7 8278/24 8279/6 8279/10
8279/14 8286/24 8287/3 8287/11 8289/5
8294/6 8294/12 8294/15 8295/11 8295/25
8296/2 8296/16 8296/24 8297/1 8297/21
8297/25 8298/9 8301/5 8301/10 8301/18
8301/23 8302/2 8302/6 8302/19 8302/23
8303/9 8303/15 8303/18 8305/1 8305/4

**MR. DUBIN: [56]** 7978/12 7982/6 7982/23
7985/4 7985/7 7985/9 7985/17 7987/15 7990/2
7991/20 7992/9 7993/9 7994/15 7994/22
7995/2 7995/8 7996/12 7996/19 7996/22
7997/11 7998/8 7999/6 8000/4 8000/13
8001/11 8002/4 8004/19 8061/11 8062/3
8063/3 8088/19 8090/11 8090/14 8090/18
8092/3 8092/6 8101/21 8101/23 8102/3 8102/5
8102/22 8221/14 8278/5 8278/8 8281/25
8282/2 8282/9 8282/18 8282/25 8283/2
8283/10 8284/6 8285/4 8285/12 8285/18
8285/21

**MR. KESSLER: [115]** 8102/2 8102/4 8104/24
8105/20 8105/24 8106/2 8106/5 8107/20
8108/16 8109/6 8109/8 8109/14 8110/12
8112/4 8112/13 8112/21 8112/24 8113/6

8113/16 8113/19 8113/23 8114/6 8114/9
8114/14 8114/23 8115/18 8117/2 8119/6
8120/25 8121/20 8122/4 8122/9 8122/18
8123/4 8125/9 8125/12 8125/18 8125/20
8126/6 8127/17 8127/20 8128/22 8128/24
8129/4 8130/19 8131/10 8131/16 8131/18
8132/3 8132/5 8132/8 8132/11 8132/17
8132/22 8133/1 8133/18 8134/3 8134/10
8134/17 8134/21 8135/9 8135/13 8136/16
8137/2 8137/5 8138/24 8139/1 8139/4 8139/7
8139/14 8139/19 8139/24 8140/5 8140/14
8140/22 8212/23 8216/16 8228/22 8229/10
8230/7 8231/18 8231/22 8232/7 8232/9
8233/12 8286/23 8289/12 8291/15 8291/21
8292/11 8292/21 8292/25 8293/3 8293/7
8293/14 8293/18 8294/18 8295/21 8296/1
8297/15 8297/24 8298/7 8298/11 8301/4
8302/3 8302/9 8302/21 8302/25 8303/5
8303/10 8303/21 8304/9 8304/13 8305/6

**MR. MASTRO: [42]** 8063/2 8064/18 8066/15
8066/20 8070/13 8072/17 8072/23 8073/8
8073/12 8073/14 8075/17 8076/10 8076/15
8076/18 8077/3 8077/5 8079/15 8079/22
8080/4 8080/6 8084/1 8084/12 8084/14
8084/17 8086/15 8093/12 8094/22 8097/21
8098/9 8098/24 8101/22 8102/21 8103/7
8104/2 8104/18 8141/9 8141/12 8146/3
8148/20 8149/3 8150/17 8151/24

**MR. PITLUCK: [68]** 7979/11 7985/10 7985/18
7989/15 7991/3 7992/6 7995/3 7995/9 7995/22
7996/10 7996/16 7996/23 7998/14 7999/16
8002/14 8004/18 8004/21 8004/24 8005/6
8010/1 8011/10 8011/21 8013/15 8014/5
8014/12 8016/17 8017/3 8017/5 8017/11
8018/12 8019/20 8020/2 8021/17 8021/25
8022/8 8022/12 8022/20 8024/4 8033/9
8033/24 8035/14 8039/10 8041/6 8041/21
8042/8 8042/21 8045/20 8046/13 8047/2
8047/6 8047/15 8051/9 8053/7 8053/17
8054/18 8054/25 8056/7 8058/20 8058/23
8059/8 8059/14 8061/17 8061/21 8062/13
8062/21 8063/5 8063/8 8216/13

**MS. RUBIN: [2]** 8061/5 8062/12

**MS. SMITH: [160]** 7975/22 7976/1 7976/3
7977/18 7978/6 8004/4 8004/13 8004/16
8038/6 8038/15 8040/2 8042/24 8043/8
8043/10 8043/17 8060/1 8060/25 8061/3
8061/7 8061/13 8061/19 8062/1 8062/7
8062/19 8063/1 8063/12 8064/1 8152/21
8153/5 8158/21 8159/1 8159/4 8159/13
8159/16 8159/23 8167/10 8168/9 8169/12
8170/3 8171/6 8171/15 8172/4 8172/14
8172/17 8172/22 8172/24 8173/19 8174/6
8177/7 8177/15 8177/17 8177/19 8179/24
8180/3 8180/18 8181/3 8183/6 8183/18
8184/18 8191/24 8192/16 8193/4 8194/6
8194/13 8195/11 8195/25 8197/20 8199/14
8200/17 8201/3 8203/16 8204/3 8205/6 8206/8
8206/14 8208/5 8210/5 8210/12 8210/24
8211/4 8211/8 8211/10 8212/10 8212/13
8212/24 8213/10 8216/3 8217/7 8219/9
8220/16 8224/21 8225/13 8225/25 8226/3
8226/6 8227/14 8227/25 8228/13 8229/6
8230/14 8231/23 8232/12 8232/17 8232/25
8233/7 8233/13 8235/7 8237/15 8237/24
8238/9 8240/3 8240/7 8243/16 8243/18
8243/23 8245/16 8250/23 8252/10 8252/17
8252/21 8253/9 8253/11 8254/4 8256/20
8259/19 8261/15 8261/24 8262/19 8264/8
8270/4 8271/25 8272/2 8272/18 8273/16
8273/19 8273/21 8274/9 8274/14 8275/13
8275/19 8276/5 8277/1 8277/8 8277/10
8277/15 8277/17 8277/20 8278/14 8278/18
8279/12 8280/1 8281/8 8283/11 8283/14
8283/25 8284/13 8284/16 8284/19 8285/11
8302/11

**THE COURT: [500]**

**THE COURTROOM DEPUTY: [3]** 8156/6

8156/9 8284/4

**THE WITNESS: [27]** 8006/12 8011/3 8012/2
8013/19 8014/16 8021/1 8022/14 8059/11
8156/11 8183/22 8183/25 8192/21 8193/5
8196/2 8196/4 8200/21 8201/6 8208/11
8208/14 8235/9 8235/11 8235/15 8235/18
8235/20 8240/12 8251/12 8272/5

**UNIDENTIFIED JUROR: [1]** 8006/13

**$**

**$200,000 [2]** 8134/21 8135/22
**$300 [1]** 8139/3

**'11 [1]** 8191/13
**'12 [1]** 8271/14
**'15 [1]** 8216/7
**'7 [1]** 8164/13
**'He's [1]** 7978/22
**'my [1]** 8092/16
**'till [1]** 8087/2

**-**

**-- about [1]** 8022/11
**-- correct [1]** 8020/5
**-- just [1]** 8006/15
**-- we've [1]** 8217/13
**-- yes [3]** 8013/18 8018/15 8022/3
**-- you [1]** 8015/17
**------------------------------x [2]** 7974/2 7974/8
**-against [1]** 7974/5

**.**

**.5 [1]** 8268/17
**.8 [3]** 8216/4 8220/19 8223/13
**.8 hours [1]** 8220/19

**0**

**00637 [1]** 7974/2
**06 [1]** 7974/5
**07 [1]** 8305/9

**1**

**10 [5]** 8108/18 8163/25 8255/5 8255/10 8262/1
**10,000 [2]** 8029/21 8029/23
**100 [1]** 8135/21
**100,000 [2]** 8027/4 8130/3
**1066 [1]** 7974/18
**103-17 [4]** 8255/4 8256/14 8260/16 8261/24
**10:00 [1]** 8006/1
**10:58 [2]** 8026/5 8046/5
**10K [2]** 8108/3 8126/14
**10Q [1]** 8108/4
**11 [11]** 8007/11 8008/6 8008/16 8009/6
8009/10 8009/13 8010/12 8164/8 8164/20
8239/18 8241/14
**110 [1]** 8185/21
**111-41 [1]** 8028/13
**11-9 [1]** 8024/10
**111-90 [1]** 8250/13
**11201 [1]** 7974/14
**114-21 [1]** 8151/6
**1190 [7]** 8253/3 8258/10 8260/17 8264/4
8266/5 8266/10 8267/15
**11:03 [1]** 8030/2
**11th [2]** 8181/21 8280/22
**12 [4]** 8028/23 8030/2 8064/8 8241/21
**124-61 [3]** 8023/16 8024/25 8024/25
**124-8 [3]** 8026/8 8027/17 8027/21
**125 [2]** 8185/21 8185/21
**12th [3]** 8181/21 8268/10 8268/11
**13 [5]** 7978/21 8025/22 8026/8 8028/6 8111/19
**1349 [2]** 8109/20 8109/23
**13D [2]** 8138/12 8138/13
**13th [2]** 8181/21 8268/10
**14 [2]** 8024/15 8247/15
**15 [8]** 7978/21 8150/14 8151/21 8151/24
8157/20 8157/22 8242/2 8247/1

## 1

**15 minutes** [1] 8197/13
**15-CR-00637** [1] 7974/2
**150** [1] 8185/22
**150,000** [1] 8029/6
**15th** [2] 8280/1 8285/3
**16** [1] 8242/2 8250/12 8267/17
**165,000-dollar** [1] 8058/6
**17** [10] 8242/2 8255/4 8256/14 8260/16
8261/24 8266/14 8266/17 8266/24 8266/25
8267/12
**18** [6] 8109/20 8150/21 8241/16 8242/2 8268/5
8268/25
**18,333** [1] 8029/19
**18th** [1] 8281/24
**19** [5] 8223/6 8223/11 8242/3 8242/15 8244/6
**190** [1] 8252/14
**1964** [1] 8160/18
**1967** [1] 8161/6
**1969** [1] 8161/24
**1981** [2] 8161/24 8162/8
**1992** [1] 8162/20
**1994** [2] 8163/2 8163/15
**19th** [1] 8107/21
**1:30** [1] 8064/4
**1:39** [3] 8009/13 8009/15 8010/13
**1st** [6] 8110/25 8243/3 8244/4 8244/24 8245/6
8245/21

## 2

**20** [4] 8064/8 8150/14 8222/16 8299/22
**200** [2] 7974/18 8134/18
**200,000** [1] 8126/15
**2001** [6] 8163/6 8164/13 8164/25 8165/8
8165/9 8183/5
**2002** [1] 8187/11
**2003** [1] 8187/11
**2006** [1] 8164/13
**2007** [4] 8164/25 8187/14 8187/16 8187/22
**2008** [1] 8187/14
**2010** [1] 8066/24
**2011** [44] 8114/2 8177/10 8178/4 8179/21
8181/15 8181/18 8181/18 8181/21 8181/21
8181/21 8183/5 8187/2 8191/12 8191/22
8192/6 8192/10 8192/25 8194/4 8194/11
8207/5 8238/17 8239/8 8239/18 8240/24
8241/1 8241/14 8241/19 8241/21 8242/15
8243/4 8244/4 8244/6 8244/24 8245/6 8245/21
8246/1 8246/6 8246/20 8246/20 8247/1
8247/11 8255/13 8267/5 8271/14
**2012** [40] 8023/14 8023/19 8023/25 8024/7
8024/15 8025/22 8026/8 8028/6 8028/23
8030/2 8100/8 8142/15 8186/12 8205/2 8223/4
8238/17 8247/17 8247/25 8248/6 8248/21
8249/8 8249/11 8249/16 8249/22 8250/9
8250/18 8251/3 8251/9 8255/5 8255/11 8256/2
8261/20 8262/1 8267/17 8268/10 8268/17
8268/19 8268/20 8269/2 8269/8
**2013** [52] 8007/11 8008/7 8008/17 8009/6
8009/10 8009/13 8010/12 8078/6 8099/8
8100/8 8100/8 8126/14 8142/15 8145/12
8146/20 8150/21 8186/12 8208/4 8208/25
8209/25 8211/21 8211/25 8212/10 8215/2
8215/11 8216/5 8216/7 8216/16 8217/1 8217/4
8218/5 8218/6 8218/15 8220/13 8220/14
8220/17 8220/20 8222/6 8223/6 8223/11
8223/15 8223/18 8223/22 8224/3 8224/17
8229/12 8231/4 8231/5 8231/5 8234/4 8234/15
8236/10
**2014** [39] 8032/16 8043/3 8050/15 8057/3
8057/15 8100/8 8126/14 8145/20 8165/8
8165/8 8165/10 8174/9 8178/4 8186/9 8186/13
8187/2 8187/19 8191/12 8191/16 8191/22
8192/6 8192/10 8192/25 8194/5 8194/11
8209/25 8211/21 8212/1 8216/7 8216/13
8217/1 8217/1 8218/5 8218/8 8218/11 8218/12
8218/15 8220/21 8222/7
**2015** [24] 8015/14 8015/15 8016/1 8016/4

## 

**8016/11** 8017/10 8018/1 8018/6 8018/20
8018/2 8030/9 8035/5 8037/24 8043/20
8043/23 8044/21 8056/9 8056/15 8163/13
8163/15 8187/18 8197/24 8198/7 8216/12
**2017** [4] 7974/5 8059/6 8288/13 8305/9
**20th** [4] 8057/15 8084/7 8084/17 8107/21
**21** [2] 8151/6 8249/22
**21st** [1] 7974/22
**2268** [1] 7974/22
**22nd** [1] 8268/20
**23** [1] 8248/6
**24** [3] 8120/13 8247/17 8247/25
**243** [1] 8066/23
**244** [1] 8008/21
**246** [1] 8008/10
**249** [1] 8066/23
**25** [7] 8023/14 8023/18 8023/25 8024/3 8024/7
8248/21 8249/8
**250,000** [1] 8027/3
**2500** [1] 8158/16
**251** [1] 8066/23
**25th** [1] 8111/11
**26** [4] 8023/14 8108/25 8110/4 8249/11
**26.2** [6] 8152/2 8174/10 8219/17 8278/23
8304/10 8304/14
**271** [1] 7974/14
**27th** [2] 8269/2 8269/8
**281** [1] 8162/18
**29** [14] 7975/18 8061/16 8062/17 8062/22
8063/1 8063/4 8064/20 8064/22 8066/10
8066/12 8066/19 8094/20 8129/15 8242/3
**295** [1] 8162/14
**29s** [2] 8066/5 8066/7
**29th** [4] 8110/16 8111/10 8279/22 8279/25
**2:00** [3] 8006/8 8006/11 8006/12
**2:00 o'clock** [4] 8064/9 8064/9 8064/14 8150/9
**2:07** [3] 8007/11 8008/7 8009/18
**2:15** [1] 8151/21
**2:20** [1] 8155/2
**2:30** [3] 7975/24 7976/1 7976/8
**2d** [1] 8066/23

## 3

**30** [1] 8050/15
**30,000** [1] 8024/22
**300** [2] 8134/16 8285/21
**300,000** [3] 8027/1 8027/1 8029/6
**3057** [3] 8179/6 8184/16 8185/1
**31** [4] 8167/8 8179/21 8242/3 8249/16
**31st** [2] 8165/17 8167/4
**345** [1] 8108/16
**35,000** [1] 8024/22
**350,000** [4] 8026/25 8027/2 8027/3 8029/4
**357** [1] 8247/22
**36** [1] 8120/13
**3:30** [1] 8284/13
**3rd** [2] 8110/17 8110/19

## 4

**4,167** [1] 8092/14
**4.5** [1] 8240/24
**4/5** [3] 8010/15 8102/13 8102/20
**400** [2] 8029/4 8134/18
**400,000** [5] 8029/3 8029/5 8029/5 8134/17
8134/22
**401** [5] 8032/19 8033/9 8175/10 8215/9
8215/16
**403** [8] 8032/20 8033/9 8171/20 8175/10
8175/11 8176/18 8218/22 8256/15
**41** [1] 8028/13
**45** [2] 8000/7 8284/3
**459** [1] 8023/6
**47** [1] 8299/4
**48** [1] 8120/13
**48368** [1] 8250/4
**48415** [1] 8269/5
**48657** [1] 8223/9
**487** [2] 8025/17 8028/9

## 48

**48th** [1] 7974/18
**495** [2] 8027/10 8027/22

## 5

**5,000** [2] 8024/23 8024/23
**50,000** [3] 8024/22 8058/7 8148/20
**500** [1] 8289/1
**5114** [1] 8092/12
**546** [2] 8007/7 8007/8
**547** [1] 8288/13
**548** [6] 8008/3 8008/24 8009/1 8009/9 8009/16
8010/10
**56** [1] 8109/18
**577** [1] 8288/1
**5:30** [1] 8006/16
**5:40** [1] 8008/17
**5:48** [1] 8028/6
**5:58** [1] 8026/5
**5th** [5] 8181/15 8268/10 8268/12 8268/13
8268/17

## 6

**60,000** [1] 8024/21
**61** [3] 8023/16 8024/25 8024/25
**682** [1] 8066/22
**68A** [2] 8056/22 8056/23
**6:15** [1] 8305/8
**6th** [1] 8268/10

## 7

**70** [4] 8186/4 8186/5 8186/6 8216/11
**70 percent** [1] 8166/10
**70-plus** [1] 8205/14
**718-613-2268** [1] 7974/22
**75,000** [5] 8113/16 8132/8 8132/10 8132/13
8132/20
**75,000-share** [1] 8113/9
**7911** [1] 7978/21
**7:30** [1] 7975/24
**7th** [1] 8181/18

## 8

**8/11/2011** [1] 8241/19
**8/18** [1] 8241/16
**801** [3] 8033/9 8170/1 8170/21
**802** [3] 8181/12 8238/23 8239/7
**803** [2] 8241/5 8242/3
**803.3** [4] 8172/13 8172/16 8172/21 8175/12
**804** [5] 8242/11 8242/18 8242/19 8245/19
8245/23
**805** [4] 8244/17 8245/22 8246/2 8246/6
**806** [1] 8246/14
**807** [1] 8247/6
**826** [2] 8247/16 8247/20
**827** [1] 8249/20
**828** [1] 8268/4
**83** [1] 8246/5
**831** [1] 8268/23
**8357** [2] 8247/23 8247/24
**8411** [1] 8269/4
**845** [2] 8222/17 8222/20
**846** [1] 8288/13
**88** [10] 8008/15 8009/7 8009/13 8009/21
8009/23 8009/24 8010/4 8010/7 8010/13
8101/25
**8th** [5] 8181/18 8268/10 8268/13 8279/17
8279/20

## 9

**90** [2] 8250/13 8250/22
**99 percent** [1] 8186/22
**9:00** [3] 7974/5 8006/16 8305/9
**9:00 o'clock** [1] 7977/13
**9th** [1] 8057/3

## A

**a.m** [4] 7974/5 8006/1 8046/5 8305/9
**ability** [3] 7988/25 8018/1 8132/21

**A**

**able [25]** 7981/25 7996/4 7998/23 8021/23
8032/14 8051/2 8076/15 8079/9 8079/11
8098/1 8098/2 8149/6 8151/21 8170/22
8176/21 8185/3 8187/4 8213/5 8218/1 8227/11
8231/10 8231/11 8280/14 8280/16 8280/24
**absence [1]** 7991/14
**absolutely [12]** 7988/4 8002/20 8070/15
8122/12 8142/1 8143/1 8143/4 8143/6 8143/23
8148/21 8155/11 8174/7 8213/2
**absurd [1]** 8050/5
**abundantly [1]** 8052/1
**abysmally [1]** 8101/5
**accept [1]** 8139/4
**acceptable [2]** 8175/13 8228/4
**access [8]** 8013/21 8014/3 8014/11 8018/6
8018/7 8018/8 8033/14 8037/14
**accommodate [3]** 8282/13 8285/5 8285/14
**accordance [2]** 8231/21
**accordances [1]** 8231/20
**according [6]** 7983/5 7983/8 8082/4 8095/10
8099/23 8122/3
**account [2]** 8065/6 8097/8
**accounting [2]** 8123/8 8160/21
**accurate [8]** 8122/22 8202/2 8202/2 8202/10
8202/12 8202/25 8227/22 8263/25
**accusations [1]** 8046/16
**accuse [1]** 8104/5
**accused [5]** 7990/12 8097/6 8120/1 8123/14
8123/16
**accused's [1]** 7990/7
**accusing [1]** 8117/21
**achieved [1]** 8109/14
**acknowledges [1]** 7980/15
**acknowledging [1]** 8078/8
**acquired [2]** 8035/11 8236/23
**acquiring [1]** 8148/14
**acquisition [5]** 8044/13 8135/18 8189/14
8236/13 8237/4
**acquisitions [3]** 8188/1 8244/25 8298/23
**acquit [1]** 8003/15
**acquittal [1]** 8066/25
**acquitted [2]** 8088/3 8106/9
**act [1]** 7998/6
**acted [5]** 8070/19 8071/25 8225/10 8231/20
8231/21
**acting [30]** 7974/13 8079/10 8211/18 8212/8
8212/9 8214/25 8215/5 8215/10 8215/14
8215/19 8215/21 8215/23 8217/17 8218/20
8221/1 8222/13 8224/19 8224/20 8225/10
8225/13 8225/21 8231/7 8231/8 8231/12
8231/18 8234/4 8234/15 8234/25 8235/1
8258/15
**action [3]** 8067/9 8142/17 8229/12
**actions [7]** 8067/6 8129/8 8129/19 8137/16
8138/13 8229/5 8263/8
**active [4]** 8300/5 8300/10 8300/10 8301/12
**activities [1]** 8202/20
**acts [2]** 8109/23 8151/6
**actual [16]** 7980/16 8070/22 8071/6 8077/24
8077/25 8079/17 8079/18 8079/20 8080/13
8084/20 8085/9 8085/20 8103/19 8172/11
8261/19 8261/21
**acuity [2]** 8213/21 8216/18
**added [1]** 8294/20
**addition [1]** 7979/15
**additional [3]** 8086/14 8086/17 8181/23
8062/16 8088/20 8101/22 8101/25 8105/2
8114/16 8131/8 8181/3 8217/12
**addressed [2]** 8097/11 8226/22
**addresses [1]** 7985/13
**adequate [1]** 8003/21
**adequately [1]** 8001/9
**adjourn [2]** 8006/8 8284/11
**adjourned [2]** 8284/10 8305/8
**administrative [1]** 8178/19
**admissibility [2]** 8211/20 8288/12

**admissible [5]** 8108/21 8173/12 8215/15
8221/1 8230/2
**admission [1]** 8088/25
**admissions [2]** 8141/15 8141/17
**admit [2]** 8010/4 8085/5
**admitted [9]** 8060/3 8060/11 8069/25 8091/24
8094/25 8177/2 8212/19 8213/13 8229/25
**admitting [3]** 8228/21 8228/22 8288/7
**admonish [1]** 8004/2
**admonished [1]** 8050/20
**adopted [1]** 8058/20
**advance [2]** 8003/1 8026/23
**advantage [1]** 8140/6
**adverse [3]** 8077/19 8118/11 8144/16
**advice [56]** 7995/21 8146/3 8157/15 8162/6
8177/3 8193/23 8194/1 8194/22 8198/22
8198/25 8215/12 8215/20 8218/19 8218/21
8223/16 8223/23 8227/3 8227/4 8229/1 8229/1
8229/4 8230/23 8230/21 8231/21 8232/8
8232/11 8232/25 8252/4 8252/6 8256/9
8256/18 8256/22 8256/23 8256/24 8256/25
8257/23 8257/24 8258/15 8259/1 8259/7
8260/6 8260/6 8261/17 8262/24 8262/25
8263/3 8263/5 8264/6 8270/9 8274/22 8274/23
8276/18 8276/19 8277/16 8277/17 8277/19
**advise [2]** 8214/23 8279/16
**advised [3]** 8058/5 8221/9 8287/17
**adviser [3]** 8126/15 8145/23
**advising [1]** 8257/21
**affect [2]** 8207/17 8280/20
**affects [3]** 8097/2 8137/4 8137/4
**affidavit [2]** 8041/24 8041/25
**affiliate [1]** 8294/5
**affiliation [2]** 8152/15 8153/24
**affirmatively [1]** 8264/5
**affirmed [2]** 8007/2 8156/9
**afield [3]** 8003/7 8053/20 8261/18
**afoul [1]** 7995/1
**afternoon [10]** 8006/9 8155/4 8156/6 8156/16
8156/17 8200/1 8283/23 8284/12 8304/12
8304/13
**afterwards [4]** 8124/10 8186/5 8186/6 8186/7
**age [5]** 8158/11 8189/2 8213/19 8213/21
8216/8
**agenda [2]** 8089/17 8120/22
**agendas [3]** 8081/8 8091/10 8120/11
**agent [80]** 7978/16 7979/25 7982/13 7983/3
7983/6 7983/8 7983/14 7984/5 7984/14
7984/16 7985/20 7987/9 7987/21 7989/14
7989/18 7989/21 7990/16 7991/6 7992/12
7993/7 7993/17 7995/14 7996/1 7996/8 7998/1
7998/21 7999/1 7999/5 7999/11 7999/15
7999/19 8000/16 8003/4 8003/19 8004/9
8004/23 8004/25 8006/18 8007/7 8011/6
8011/9 8012/6 8014/20 8015/11 8015/21
8017/9 8018/9 8020/15 8022/6 8023/3 8032/23
8033/11 8034/22 8035/4 8035/14 8038/24
8039/4 8040/13 8041/8 8041/24 8045/4
8045/12 8046/16 8048/3 8048/7 8048/7
8048/25 8049/5 8049/9 8049/14 8049/23
8050/15 8051/11 8052/22 8053/9 8055/4
8056/24 8059/4 8131/25 8137/11
**agent's [7]** 7992/15 7997/5 8000/10 8039/18
8051/12 8051/18 8261/20
**agents [9]** 7985/6 7985/16 7993/3 7993/8
7998/17 7998/18 7998/23 8004/13 8005/6
**aggressive [1]** 8214/5
**ago [4]** 8034/5 8157/22 8175/20 8254/1
**agree [21]** 7999/17 8011/9 8103/2 8107/12
8110/5 8115/23 8124/19 8139/5 8158/25
8158/25 8174/18 8174/19 8217/25 8275/25
8283/5 8292/22 8295/8 8295/25 8297/3
8297/13 8303/1
**agreed [8]** 7982/24 8073/6 8087/20 8087/22
8100/3 8136/15 8138/18 8139/4
**agreeing [2]** 8274/20 8297/14
**agreement [85]** 8060/7 8068/3 8068/10 8069/9
8071/12 8071/24 8072/2 8073/5 8074/1 8074/5

8074/5 8074/11 8079/5 8080/12 8080/12
8080/16 8080/18 8080/21 8081/3 8083/10
8084/23 8085/3 8085/6 8085/10 8088/13
8089/13 8092/7 8094/6 8094/7 8106/1 8109/5
8111/12 8119/2 8119/2 8123/9 8124/14 8125/4
8125/5 8125/22 8125/22 8125/23 8126/3
8126/11 8126/13 8126/14 8126/23 8129/22
8131/4 8137/21 8137/23 8145/21 8146/5
8146/19 8148/1 8193/23 8201/19 8202/4
8203/13 8248/22 8249/5 8256/6 8261/7
8261/19 8261/22 8265/25 8270/8 8270/9
8270/10 8270/11 8270/13 8270/23 8271/2
8271/6 8272/11 8272/13 8272/14 8273/5
8275/11 8275/15 8287/12 8292/14 8299/16
8303/24 8303/25 8304/2
**agreement's [1]** 8145/6
**agreements [148]** 8025/8 8067/21 8067/22
8069/13 8069/14 8069/16 8069/16 8069/18
8071/9 8071/10 8071/15 8071/21 8072/10
8072/10 8073/21 8073/22 8074/7 8074/7
8074/9 8075/1 8075/7 8077/14 8078/23
8079/14 8080/3 8080/24 8081/1 8081/6
8081/22 8081/24 8081/25 8084/4 8085/13
8085/14 8090/6 8090/21 8091/7 8093/15
8093/19 8101/13 8107/1 8107/2 8114/16
8116/20 8116/23 8119/1 8120/18 8124/11
8124/11 8124/12 8124/16 8124/22 8126/10
8127/8 8127/16 8127/16 8127/25 8127/25
8128/16 8129/20 8129/21 8143/4 8143/5
8143/24 8145/8 8145/9 8145/11 8145/18
8145/20 8146/12 8146/17 8146/18 8146/21
8147/10 8151/1 8152/18 8152/21 8152/24
8153/1 8153/7 8153/18 8153/20 8198/20
8198/21 8198/21 8201/20 8201/25 8202/1
8202/8 8202/18 8202/18 8269/13 8269/16
8269/18 8270/4 8270/14 8271/10 8271/25
8272/9 8272/15 8272/17 8272/21 8272/21
8272/24 8273/8 8274/13 8286/3 8286/4 8286/7
8286/13 8286/17 8286/20 8286/21 8286/22
8287/16 8287/17 8288/18 8288/20 8289/3
8289/11 8290/3 8290/8 8290/9 8290/11
8290/14 8290/15 8290/19 8291/5 8291/11
8291/21 8292/13 8292/15 8293/4 8293/16
8293/25 8294/1 8294/6 8294/10 8295/14
8296/13 8298/17 8298/18 8298/22 8298/25
8299/8 8300/17 8300/19 8301/11
**ahead [3]** 8004/8 8101/23 8232/12
**aided [1]** 7974/25
**air [1]** 8033/23
**Al [14]** 8072/1 8125/14 8128/1 8128/1 8145/10
8145/14 8145/18 8145/22 8146/5 8146/7
8146/19 8270/16 8270/23 8298/18
**Alan [1]** 8295/3
**alert [2]** 8039/22 8051/20
**alerting [2]** 8183/6 8183/11
**aligned [1]** 8107/13
**ALIXANDRA [1]** 7974/15
**Allan [1]** 8106/18
**allegations [5]** 8094/16 8152/20 8199/4
8199/11 8199/13
**allege [1]** 8109/2
**alleged [4]** 8085/25 8109/18 8130/14 8130/18
**allegedly [2]** 8149/21 8290/16
**alleges [1]** 8067/20
**alleging [3]** 8109/19 8135/8 8290/22
**allocate [2]** 8114/12 8131/15
**allocated [3]** 8135/16 8140/8 8140/12
**allocates [1]** 8140/7
**allocating [1]** 8138/5
**allocation [4]** 8131/24 8131/24 8135/20
8137/10
**allocations [4]** 8095/1 8099/20 8148/7 8148/23
**allow [10]** 7998/5 8041/11 8088/8 8124/25
8214/4 8264/2 8264/8 8291/4 8291/18 8292/19
**allowed [15]** 7981/3 7993/17 8038/10 8038/10
8038/11 8051/13 8134/8 8134/20 8188/14
8188/15 8212/6 8219/3 8221/7 8230/21 8262/6
**allowing [1]** 8147/3

**A**

allows [5] 8113/11 8114/1 8131/6 8136/11 8259/23
alluded [1] 7996/2
almost [8] 7975/14 8034/8 8104/13 8136/9 8164/20 8186/22 8203/10 8281/13
alone [5] 7980/10 8088/12 8132/19 8258/5 8304/24
alter [1] 7981/11
altogether [1] 8197/18
Amendment [3] 7980/11 7982/4 7990/7
AMERICA [1] 7974/3
amorphous [1] 8205/7
amount [2] 8122/20 8177/11
ample [1] 8149/5
analogy [1] 8098/3
analytical [1] 8288/9
Andrew [5] 8007/23 8007/23 8027/3 8029/5 8267/22
Angeles [2] 8163/8 8164/9
angle [1] 8151/1
angry [2] 8124/21 8126/19
announcement [2] 8121/5 8155/14
answer [65] 7985/20 7991/8 8003/6 8005/2 8011/3 8012/13 8014/16 8015/4 8015/8 8016/13 8017/20 8050/3 8050/18 8050/20 8050/21 8051/3 8054/9 8059/7 8068/20 8068/21 8092/15 8092/16 8092/18 8140/24 8192/21 8194/17 8215/15 8218/16 8218/17 8218/19 8221/13 8225/12 8227/8 8228/21 8230/20 8230/21 8231/6 8232/14 8235/11 8235/13 8235/18 8238/2 8238/5 8252/8 8252/16 8252/22 8253/8 8253/20 8263/24 8263/24 8265/15 8272/8 8296/4 8299/6 8299/11 8299/14 8299/21 8299/23 8300/2 8300/5 8300/12 8300/15 8300/21 8301/3 8301/18
answered [14] 8012/2 8014/14 8019/22 8020/12 8225/14 8225/16 8225/17 8225/20 8225/20 8235/5 8235/6 8235/7 8235/8 8265/20
answers [17] 8054/5 8083/12 8152/5 8195/23 8204/7 8204/14 8205/8 8205/24 8210/4 8212/7 8213/2 8220/23 8229/8 8229/11 8251/21 8258/16 8265/14
anticipate [1] 8062/2
anyway [4] 8091/11 8107/19 8123/10 8284/24
anyways [1] 7983/13
apartment [1] 8199/25
apologize [4] 7979/13 8024/5 8225/18 8225/19
apparent [2] 8079/1 8101/11
appeal [2] 7980/8 7994/22
appeals [2] 7982/5 7995/18
appear [7] 7976/14 7981/15 8003/18 8133/12 8136/2 8177/1 8280/21
appearance [2] 8153/11 8284/10
APPEARANCES [1] 7974/11
appeared [3] 8177/11 8293/2 8293/5
appearing [1] 8087/10
appease [3] 8124/19 8125/4 8125/6
appellate [1] 7995/22
application [4] 7980/23 7999/13 8044/24 8064/20
applied [2] 8288/2 8288/6
applies [2] 7982/8 8295/19
apply [6] 8066/13 8221/4 8221/6 8295/19 8303/4 8303/5
applying [1] 8253/3
appreciate [11] 7980/15 7993/11 8003/2 8006/17 8073/11 8076/19 8099/18 8141/3 8150/3 8150/4 8154/13
approach [15] 7992/2 8008/12 8019/11 8019/12 8019/18 8032/9 8033/20 8037/15 8048/9 8049/15 8049/15 8049/25 8052/24 8086/19 8238/25
approached [2] 8019/25 8033/20
approaching [3] 8017/25 8018/11 8042/16
appropriate [27] 7979/25 7993/2 7993/6 7996/5 7997/3 7997/8 7998/25 8002/17

8002/19 8002/22 8068/2 8068/11 8068/14 8068/25 8072/12 8080/11 8084/19 8085/6 8097/7 8097/15 8173/25 8205/24 8206/11 8258/3 8277/13 8291/4 8296/16
appropriately [5] 7996/1 7997/2 8071/25 8082/1 8215/12
appropriations [1] 8281/1
approval [2] 8012/18 8240/19
approve [2] 8090/11 8090/14
approved [3] 8058/20 8099/2 8102/14
April [3] 8145/20 8163/13 8163/15
April 2014 [1] 8145/20
April 2015 [1] 8163/15
area [6] 7979/8 8040/6 8040/6 8041/5 8110/8 8153/22 8173/11 8239/16 8295/6
areas [6] 8004/8 8050/2 8054/1 8169/15 8176/12 8198/23
arguably [4] 7982/25 7983/7 7986/19 8291/12
argue [24] 7986/9 7991/19 7995/15 7996/10 7997/10 7997/15 7997/17 7997/20 7998/12 7998/22 7999/1 7999/22 8033/18 8087/15 8088/5 8088/6 8088/9 8129/11 8231/2 8231/10 8231/11 8257/14 8257/15 8294/21
argued [6] 7989/20 7996/3 7997/4 8036/8 8036/23 8137/1
arguing [3] 8130/17 8228/1 8263/2
argument [18] 7979/21 7980/5 7988/9 7989/15 7996/7 7996/16 7998/6 8000/1 8086/3 8110/5 8128/14 8129/10 8129/15 8130/21 8134/7 8152/25 8172/7 8291/16
arguments [5] 7975/18 8000/3 8073/11 8153/4 8291/3
arise [1] 8075/13
Arnold [5] 8030/13 8043/15 8044/18 8044/18 8044/25
arose [4] 8068/5 8080/9 8080/24 8145/13
arrangement [3] 8186/23 8187/22 8300/23
arrest [55] 7979/19 7979/22 7982/10 7982/20 7982/22 7982/23 7983/15 7983/22 7983/24 7985/21 7985/23 7986/1 7986/21 7986/22 7987/10 7989/1 7989/5 7989/6 7989/7 7991/10 7992/13 7993/3 7993/7 7994/13 7998/7 7999/5 7999/11 7999/15 8001/5 8005/2 8012/24 8015/22 8016/21 8016/25 8017/1 8017/23 8019/9 8021/21 8030/8 8030/24 8032/4 8032/5 8034/8 8035/22 8040/14 8042/24 8046/17 8053/24 8055/4 8055/11 8055/19 8055/24 8056/9 8056/15 8056/18
arrested [19] 7979/1 7980/7 7983/1 7983/10 7985/7 7985/16 7986/10 7989/4 7989/8 7991/1 7995/8 8000/24 8004/12 8005/5 8016/15 8017/11 8020/23 8030/5 8055/20
arresting [13] 7978/19 8011/21 8014/1 8014/10 8015/11 8018/20 8019/1 8019/17 8019/25 8020/17 8021/7 8022/7 8048/17
arrival [3] 8144/20 8147/20 8149/23
arrived [1] 8102/5
arrow [1] 8089/17
art [1] 8283/14
articulate [2] 8124/25 8172/11
articulated [1] 8041/20
ascribe [1] 8214/9
Aselage [16] 8001/16 8057/20 8068/5 8083/14 8085/5 8088/23 8088/24 8091/19 8091/21 8120/19 8168/19 8168/19 8169/5 8170/12 8170/22 8171/3
Aselage's [1] 8168/20
aside [2] 8111/24 8265/8
asking -- were [1] 8192/15
aspect [1] 8097/20
assert [1] 8213/7
asserted [3] 8045/9 8169/25 8184/17
asserting [1] 8044/22
assertion [1] 8220/10
asset [1] 8130/24
assets [9] 8105/13 8109/16 8112/1 8116/22 8130/24 8131/4 8133/4 8154/5 8298/23
assist [1] 8214/2

assistant [2] 7974/16 8242/7
assisted [1] 8067/7
associate [5] 8157/22 8158/2 8187/9 8188/15 8269/22
associated [1] 8046/19
associates [1] 8019/18
association [1] 8065/12
assume [6] 7994/3 7994/8 8174/9 8232/24 8243/18 8243/19
assumed [3] 7983/23 7984/25 8098/13
Assuming [1] 8127/5 8276/2
assumption [2] 8004/13 8004/14
assumptions [1] 8243/21
assured [1] 8068/14
attached [6] 8026/14 8029/12 8126/11 8255/7 8255/10 8260/17
attaches [3] 8001/23 8110/21
attachment [1] 8026/13 8060/13 8060/13
attachments [3] 8057/7 8256/16 8267/25
attempt [9] 7991/8 7991/10 7992/2 8019/9 8086/20 8086/21 8086/24 8213/3 8227/3
attempted [5] 7991/22 8019/18 8067/13
attended [1] 8079/10
attention [22] 8002/11 8007/9 8027/9 8045/6 8064/11 8070/12 8089/1 8089/7 8089/8 8089/10 8089/18 8091/10 8091/11 8122/8 8164/16 8179/13 8200/4 8210/17 8223/10 8236/3 8247/20 8268/24
attorney [43] 7974/13 7978/19 7978/24 7979/2 7984/2 7985/9 7985/18 7988/12 7988/18 7989/7 7989/9 7990/17 7991/1 7991/12 7991/13 7991/18 7992/16 7999/10 8020/18 8039/19 8039/19 8044/21 8044/25 8065/8 8066/22 8067/5 8067/11 8068/20 8069/20 8069/20 8070/19 8102/17 8115/12 8116/8 8116/11 8118/8 8118/12 8118/19 8118/24 8123/1 8128/22 8158/20 8182/6 8242/6
attorney's [26] 8012/16 8021/6 8021/17 8032/10 8032/12 8035/7 8035/8 8035/9 8035/11 8038/1 8038/3 8038/14 8040/18 8040/19 8043/1 8043/12 8043/21 8044/12 8044/17 8044/19 8044/20 8048/21 8059/5 8067/1 8076/8
attorney-client [2] 8039/19 8044/21
attorneys [10] 7974/16 8063/7 8073/1 8077/25 8077/25 8127/4 8127/11 8185/18 8185/20 8186/20
audit [3] 8082/3 8151/15 8151/18
auditor [3] 8081/17 8081/18 8082/4
auditors [6] 8081/4 8081/9 8121/4 8121/6 8151/8 8302/22
August [18] 8106/25 8107/21 8107/21 8181/15 8223/6 8223/11 8240/24 8241/14 8241/21 8242/2 8243/3 8244/4 8244/6 8244/24 8245/6 8245/21 8246/1 8246/6
August 11 [1] 8241/14
August 12 [1] 8241/21
August 19 [3] 8223/6 8223/11 8244/6
August 19th [1] 8107/21
August 1st [5] 8243/3 8244/4 8244/24 8245/6 8245/21
August 2 [2] 8246/1 8246/6
August 20th [1] 8107/21
August 5th [1] 8181/15
authority [8] 8079/1 8090/21 8091/7 8101/11 8116/21 8116/25 8280/25 8288/8
authorization [1] 8122/19
available [5] 8148/8 8278/12 8284/21 8286/18 8289/11
Avenue [3] 7974/18 8162/14 8162/18
average [1] 8198/4
averaged [1] 8158/15
avoid [6] 8046/25 8064/11 8138/7 8205/16 8274/2 8286/8
aware [17] 7978/20 7978/23 7982/6 7982/16 7983/6 7984/3 7984/10 7993/7 7994/14 7999/8 7999/14 8012/20 8020/18 8036/2 8042/14 8043/7 8043/19 8048/18 8052/19

**A**

aware... **[20]** 8055/5 8066/12 8070/8 8070/15
8070/16 8072/15 8072/20 8072/23 8072/25
8089/16 8091/1 8096/2 8107/7 8108/9 8111/25
8115/4 8117/4 8137/17 8304/1 8304/3
**awareness [1]** 8120/17

**B**

**bachelor [1]** 8160/21
**backdated [4]** 8092/9 8111/6 8132/3 8133/13
**backdating [26]** 8067/21 8067/24 8068/1
8068/1 8068/18 8068/24 8069/7 8083/10
8083/12 8091/21 8092/8 8094/12 8106/17
8108/19 8108/21 8110/14 8110/17 8110/18
8111/9 8112/6 8113/2 8113/8 8131/13 8131/14
8133/19 8143/1
**backed [1]** 8150/24
**background [9]** 8045/3 8128/5 8159/19
8160/12 8173/25 8177/6 8204/11 8227/3
8230/1
**bad [4]** 8263/16 8263/16 8263/19 8263/20
**bag [1]** 7996/25
**balanced [2]** 8000/12 8003/11
**banking [1]** 8189/7
**barely [1]** 8065/19
**base [1]** 8092/19
**based [45]** 7995/13 7996/5 7996/7 7996/18
7997/23 7998/10 7999/22 8004/9 8032/25
8034/12 8034/16 8052/17 8082/8 8087/16
8089/10 8126/8 8127/8 8128/14 8133/12
8135/18 8141/5 8144/16 8158/5 8158/19
8158/24 8159/11 8163/7 8175/19 8187/2
8205/18 8213/11 8213/12 8215/24 8216/2
8216/24 8224/15 8230/24 8258/9 8258/15
8258/20 8287/25 8288/23 8292/5 8304/4
8304/21
**bases [3]** 8253/2 8253/3 8290/18
**basic [1]** 8170/7
**basing [1]** 8032/25
**basis [11]** 8049/10 8060/4 8094/8 8096/18
8099/12 8108/19 8147/2 8180/1 8180/24
8214/13 8281/13
**bat [1]** 8152/10
**Bates [5]** 8008/9 8008/19 8008/20 8008/23
8008/25
**became [7]** 7984/10 8100/12 8130/15 8158/24
**become [7]** 8071/18 8072/21 8132/5 8132/7
8132/14 8132/25 8134/14
**becomes [3]** 8111/25 8132/15 8133/6
**beforehand [1]** 8033/17
**beginning [2]** 8186/8 8187/18
**behalf [6]** 8079/2 8081/14 8116/9 8121/2
8147/6 8147/18
**behavior [1]** 8093/4
**behind [4]** 8045/15 8049/7 8147/14 8151/2
**belied [1]** 8145/10
**belief [6]** 7985/23 7986/18 8051/18 8153/25
8259/24 8260/3
**believable [1]** 7992/24
**believes [4]** 8091/6 8118/21 8125/6 8135/2
**belong [1]** 8134/7
**belonged [2]** 8132/22 8139/6
**below [3]** 8028/18 8241/21 8267/22
**beneficial [4]** 8138/12 8140/9 8291/1 8292/8
**benefit [2]** 8100/9 8102/8
**Bernadette [2]** 8182/6 8182/11
**Bertolini [3]** 8023/23 8024/23 8025/12
**bespeak [1]** 8069/12
**best [23]** 8091/8 8142/23 8204/16 8206/16
8213/19 8243/20 8243/22 8243/25 8244/1
8245/24 8246/7 8248/17 8248/24 8251/10
8251/13 8258/6 8261/1 8265/23 8269/17
8278/11 8282/1 8282/3 8282/6
**betrayal [1]** 8219/7
**better [6]** 7981/24 8118/19 8124/12 8124/15
8196/15 8213/25
**between [49]** 7986/3 8009/2 8009/4 8021/11
8021/13 8023/13 8023/14 8025/22 8028/14

8028/14 8032/6 8032/8 8033/7 8034/6 8035/6
8037/17 8040/21 8041/6 8046/18 8047/1
8047/13 8050/1 8050/14 8051/15 8053/10
8055/5 8067/4 8125/3 8159/1 8167/8 8178/4
8178/13 8179/7 8187/16 8191/6 8191/12
8192/6 8192/9 8194/4 8199/10 8207/15
8207/18 8207/24 8219/25 8220/20 8250/15
8257/8 8262/19 8288/9
**beyond [24]** 7975/12 7975/17 7975/17 8003/25
8004/1 8036/22 8037/4 8037/5 8039/12 8040/8
8064/24 8067/11 8074/16 8076/21 8076/25
8087/20 8087/23 8088/13 8117/18 8199/14
8277/15 8277/16 8277/17 8294/17
**Biaggi [7]** 7980/21 7980/24 7981/24 7982/9
7988/21 7993/14 8175/14
**Biestek [16]** 8007/17 8007/18 8025/24 8027/1
8029/4 8029/22 8029/23 8091/18 8092/14
8106/19 8110/16 8111/9 8112/2 8112/19
8113/3 8137/7
**big [5]** 8095/17 8100/12 8164/6 8189/9
8189/23
**bill [18]** 8171/24 8184/6 8184/11 8186/20
8214/22 8223/19 8223/20 8223/22 8224/1
8240/9 8240/11 8240/24 8241/2 8241/2 8245/6
8245/21 8245/25 8252/5
**billable [1]** 8158/16
**billed [17]** 8177/9 8177/10 8177/11 8214/20
8215/3 8216/4 8220/18 8223/21 8240/23
8241/3 8245/5 8250/17 8251/9 8252/5 8252/5
8256/10 8257/25
**billing [30]** 8163/25 8165/1 8165/2 8165/2
8165/2 8165/4 8165/5 8165/10 8165/14
8165/20 8166/7 8166/7 8166/14 8166/23
8167/5 8174/8 8174/11 8178/5 8180/9 8180/12
8180/16 8183/12 8183/17 8183/21 8184/12
8185/17 8187/3 8214/16 8216/8 8223/10
**billings [1]** 8196/11
**billion [2]** 8100/12 8189/3
**bills [8]** 8166/25 8167/3 8171/25 8172/19
8174/1 8178/15 8185/11 8185/12
**bind [1]** 8101/12
**binder [6]** 8178/23 8179/2 8179/3 8222/16
8238/22 8238/24
**binders [1]** 8022/23
**bio [1]** 8239/16
**bio-pharma [1]** 8239/16
**biopharmaceuticals [1]** 8052/7
**Bioscience [4]** 8195/7 8195/11 8195/18
8201/9
**Biosciences [2]** 8205/1 8207/5
**bit [9]** 8012/10 8018/19 8027/5 8053/9 8060/10
8160/12 8204/11 8213/20 8278/21
**Blanton [60]** 8074/14 8124/10 8125/14
8125/17 8125/19 8125/21 8126/1 8126/3
8126/8 8126/11 8126/14 8126/18 8128/17
8128/19 8140/1 8145/15 8146/8 8250/20
8251/3 8251/5 8255/5 8255/7 8255/11 8255/19
8255/25 8256/4 8257/3 8257/19 8258/21
8259/4 8259/19 8260/2 8261/6 8262/4 8262/12
8262/16 8262/19 8263/11 8263/12 8263/14
8263/16 8266/20 8266/22 8266/23 8267/2
8271/7 8294/21 8295/3 8297/3 8297/4 8297/5
8297/6 8297/14 8298/7 8298/17 8301/19
8301/25 8302/5 8302/10 8302/20
**Blanton's [7]** 8255/19 8256/9 8256/19 8257/21
8260/23 8261/5 8303/1
**block [1]** 8266/4
**blow [2]** 8266/11 8266/14
**board [105]** 8057/6 8057/11 8057/18 8058/1
8058/3 8058/13 8068/4 8077/17 8079/6
8079/10 8079/13 8079/18 8080/22 8080/25
8081/1 8081/2 8081/7 8081/8 8081/15 8082/3
8082/5 8082/7 8085/15 8088/22 8088/23
8089/11 8089/21 8089/22 8090/1 8090/1
8090/7 8090/9 8090/11 8090/23 8091/3
8093/15 8093/18 8107/7 8120/11 8120/14
8120/20 8125/5 8126/12 8126/12 8145/15
8145/16 8150/21 8150/22 8150/24 8150/24

8151/10 8152/15 8153/22 8168/20 8168/20
8170/23 8185/18 8185/19 8205/5 8208/25
8209/8 8209/14 8211/22 8211/22 8211/25
8215/1 8216/3 8218/20 8222/7 8222/11
8222/12 8225/7 8225/8 8232/1 8232/2 8232/3
8234/19 8234/23 8236/3 8236/15 8236/1
8236/4 8236/11 8236/12 8236/13 8236/14
8236/18 8236/21 8236/22 8237/10 8237/15
8237/19 8288/25 8294/2 8294/12 8295/5
8296/13 8299/25 8302/6 8302/14 8302/15
8302/15 8302/16 8302/16 8302/17
**board's [1]** 8090/13
**boards [4]** 8196/22 8222/7 8225/4 8228/3
**boat [1]** 8280/3
**boiler [1]** 8146/6
**bolster [1]** 8227/2
**bona [1]** 8142/14
**book [1]** 8234/23
**books [1]** 8070/11
**bootstrap [2]** 7987/14 7987/18
**bootstrapped [1]** 7991/15
**bootstrapping [1]** 7986/16
**bore [1]** 8293/13
**borne [1]** 8089/19
**bother [1]** 8120/20
**bottom [18]** 8007/9 8008/19 8009/6 8009/12
8009/21 8023/21 8025/23 8027/16 8057/24
8058/12 8179/13 8179/14 8179/21 8217/15
8244/7 8247/21 8248/5 8263/21
**bought [1]** 8122/3
**boundaries [1]** 8297/20
**bravado [1]** 8100/13
**break [18]** 8018/19 8045/20 8045/22 8046/3
8054/18 8061/11 8062/15 8062/19 8063/6
8063/7 8064/7 8064/10 8066/4 8083/9 8166/12
8166/15 8210/16 8210/20
**breaks [1]** 8158/17
**Brent [3]** 8023/23 8024/21 8025/10
**BRIDGET [1]** 7974/12
**brief [10]** 7982/7 7998/3 8059/15 8098/24
8147/22 8175/19 8203/17 8221/17 8273/22
8290/4
**briefed [1]** 8106/6
**briefing [1]** 7997/22
**briefly [3]** 8022/21 8098/23 8114/18
**bring [2]** 7978/11 7980/11 7983/25 7985/1
7985/3 7985/4 7986/22 7999/1 8000/6 8005/9
8037/10 8069/22 8078/12 8079/20 8133/9
8155/7 8165/16 8165/19 8214/21 8221/13
8221/16 8278/21
**bringing [1]** 8185/14
**brings [2]** 8079/8 8095/20
**broad [4]** 8082/22 8092/1 8286/3 8290/11
**broader [1]** 7985/14
**BRODSKY [72]** 7974/19 7977/25 7994/6
8003/24 8004/22 8006/19 8007/6 8008/14
8010/9 8011/5 8011/13 8012/5 8013/17
8013/24 8014/8 8014/19 8015/10 8015/13
8015/16 8016/20 8017/8 8017/14 8018/14
8018/18 8019/24 8020/4 8020/14 8021/4
8021/20 8022/2 8022/5 8022/10 8024/6 8044/5
8053/6 8058/25 8111/25 8170/4 8172/9
8173/21 8191/1 8192/4 8192/18 8194/9
8199/20 8200/24 8207/2 8208/19 8213/7
8219/19 8220/2 8220/4 8220/22 8222/3 8227/2
8228/1 8251/2 8251/15 8251/19 8253/15
8253/18 8261/16 8263/1 8263/24 8264/9
8275/12 8275/24 8276/21 8277/12 8306/4
8306/5 8306/8
**Brodsky's [6]** 7978/8 8011/2 8034/17 8051/16
8275/1 8275/6
**broken [3]** 8132/1 8205/10 8205/12
**Brooklyn [2]** 7974/4 7974/14
**brother [2]** 8145/11 8145/21
**brought [15]** 8035/20 8068/6 8068/6 8070/11
8079/17 8079/21 8079/23 8079/24 8189/2
8189/21 8198/6 8198/15 8236/25 8237/1
8282/25

**B**

brush [1] 8082/22
bucket [1] 8080/16
bunch [1] 8260/11
burdens [2] 8064/13 8066/13
business [8] 8130/6 8162/6 8187/23 8189/2 8189/6 8284/23 8284/24 8299/18
businesses [1] 8196/24
buy [1] 8135/18
buying [2] 8140/4 8140/19

**C**

C-A-R-L-S-O-N [1] 8162/11
cabin [2] 8296/8 8296/10
Cadman [1] 7974/14
calendar [5] 8104/17 8165/18 8281/12 8282/11 8283/25
cancel [2] 8257/21 8264/5
cancellation [10] 8255/19 8256/19 8257/6 8257/7 8257/18 8258/2 8260/23 8262/3 8262/23 8263/14
cancelled [5] 8257/4 8262/9 8262/11 8262/21 8263/9
cancelling [1] 8261/10
cancels [1] 8261/4
Candlestick [1] 8248/3
cannot [24] 7989/23 7994/10 7994/10 7994/11 7996/16 7996/17 8012/3 8012/4 8077/3 8077/4 8089/19 8171/19 8174/19 8213/7 8217/16 8217/25 8219/23 8220/3 8220/4 8275/21 8281/24 8292/18 8296/8 8296/11
cap [22] 8029/12 8029/13 8029/25 8111/5 8111/5 8131/20 8133/20 8142/8 8142/10 8142/10 8142/11 8142/13 8201/11 8201/12 8201/16 8203/16 8204/10 8204/12 8205/4 8206/5 8206/11 8206/14
capacity [2] 8180/11 8180/13 8180/14 8183/4 8217/17 8224/20 8301/16
capital [36] 8027/2 8029/5 8072/16 8075/13 8075/16 8075/24 8076/15 8078/4 8108/24 8110/19 8111/1 8111/21 8112/1 8112/11 8113/4 8113/23 8114/1 8126/4 8131/15 8131/7 8131/19 8131/21 8131/25 8132/9 8132/11 8133/6 8142/16 8142/18 8157/13 8241/7 8241/10 8242/22 8245/7 8245/22 8247/7 8247/12
capitalization [14] 8200/4 8200/5 8200/7 8200/11 8200/14 8201/3 8202/14 8203/7 8204/23 8204/24 8205/1 8207/11 8207/14 8207/18
captured [1] 8287/6
cards [1] 8200/1
care [1] 8091/10
cared [3] 8099/4 8099/10 8174/5
career [1] 8052/19
careful [7] 7979/5 8036/21 8037/4 8040/5 8040/5 8040/8 8230/8
carefully [1] 8053/4
Carlson [2] 8162/10 8162/17 8162/19 8162/21
cart [1] 7998/16
Carter [3] 8222/18 8264/15 8266/13
case [120] 7975/17 7977/1 7979/6 7979/15 7981/15 7981/24 7982/6 7988/20 7988/21 7994/2 7994/22 7996/8 7996/15 7996/21 7997/5 7997/25 7998/17 7998/23 7999/1 8001/5 8001/10 8001/13 8002/1 8002/9 8002/17 8003/12 8017/9 8019/11 8033/17 8033/17 8043/5 8046/4 8048/24 8055/19 8061/15 8064/4 8064/14 8065/2 8065/10 8065/11 8065/22 8066/9 8066/23 8067/16 8069/3 8081/25 8082/19 8082/24 8083/1 8088/10 8088/11 8089/24 8096/20 8098/13 8100/5 8100/6 8100/7 8101/17 8103/12 8103/14 8103/17 8104/12 8104/12 8104/14 8104/20 8106/10 8106/12 8118/10 8142/3 8145/19 8150/11 8150/13 8152/6 8152/6 8155/6 8155/15 8156/2 8173/16 8173/18 8174/2 8175/14 8175/15 8175/16 8177/8

8177/13 8180/21 8189/23 8189/24 8204/9 8204/11 8209/24 8211/5 8210/19 8218/24 8228/9 8229/9 8229/23 8255/18 8261/6 8263/1 8274/4 8274/13 8274/17 8278/22 8280/1 8281/11 8282/20 8282/21 8283/18 8285/17 8286/22 8288/3 8288/17 8288/22 8291/12 8295/13 8296/11 8297/14 8298/25 8303/5
cases [14] 7980/22 7993/12 7996/18 7996/19 7996/22 8021/6 8066/8 8237/14 8281/15 8282/18 8285/16 8285/21 8299/24 8300/9
cash [5] 8073/5 8116/18 8122/21 8298/2 8298/3
categories [2] 8147/12 8294/15
category [2] 8289/1 8295/3
caught [1] 8123/18
caused [2] 8058/11 8131/14
causes [2] 8114/11 8114/12
caution [1] 8104/1
CEO [35] 8034/16 8068/14 8068/21 8069/9 8070/20 8071/2 8071/2 8072/11 8073/24 8074/18 8075/8 8075/9 8078/17 8079/2 8081/14 8090/19 8090/20 8090/25 8091/5 8101/11 8118/13 8118/25 8120/1 8121/17 8123/14 8127/3 8127/14 8127/20 8144/11 8144/14 8147/7 8202/3 8234/18 8237/24 8296/20
CEO's [1] 8298/3
CEOs [1] 8082/13
certain [20] 7993/21 8045/13 8071/19 8076/18 8079/5 8080/17 8086/20 8086/22 8087/5 8120/18 8145/18 8146/6 8152/20 8152/23 8193/23 8198/19 8198/22 8213/19 8214/4 8281/5
certainly [34] 7984/7 7984/21 7990/12 8002/22 8015/21 8044/14 8047/4 8053/19 8101/16 8107/16 8108/5 8111/7 8111/10 8111/23 8114/22 8117/11 8136/18 8151/12 8169/4 8169/17 8171/18 8171/25 8173/22 8174/13 8204/5 8212/2 8215/11 8218/23 8259/21 8261/8 8261/12 8262/17 8284/24 8304/1
certificate [2] 8131/23 8240/18
CFO [10] 8089/23 8090/1 8092/20 8107/23 8201/24 8202/9 8202/20 8234/19 8234/22 8237/24
CFOs [1] 8202/22
chain [5] 8008/5 8026/8 8028/17 8107/25 8266/12
chains [1] 8229/22
chairman [8] 8186/25 8187/7 8234/18 8234/21 8236/21 8237/15 8237/19 8237/24
challenged [1] 8278/1
challenges [3] 7976/25 7977/17 8278/1
Chan [3] 7975/3 8294/19 8304/23
chance [3] 7975/14 7997/18 8098/21
chances [1] 7985/1
change [15] 7976/3 7999/24 8004/5 8086/8 8086/9 8086/13 8158/3 8187/5 8202/22 8203/7 8203/7 8203/10 8207/1 8278/11 8304/7
changed [6] 7977/1 7977/11 7977/24 8084/25 8158/4 8301/18
changes [3] 8084/3 8202/22
changing [7] 7977/23 8107/4 8107/5 8142/10 8142/13 8148/7 8291/8
characteristics [2] 8153/18 8286/7
characterization [1] 7978/8
characterize [2] 8105/8 8298/5
characterized [3] 8060/12 8286/8 8286/20
characterizing [1] 8297/2
charge [18] 8040/9 8067/17 8074/15 8078/21 8085/20 8088/1 8093/24 8109/23 8109/23 8163/21 8166/13 8166/17 8283/15 8283/19 8284/2 8284/7 8285/4 8298/21
charged [11] 8065/14 8066/10 8070/25 8094/11 8100/6 8108/20 8108/23 8109/3 8109/5 8290/16 8290/17
charges [6] 8001/11 8040/8 8064/20 8097/10 8198/6 8198/15
Charlotte [1] 8163/8

check [5] 8062/6 8140/23 8202/2 8202/24 8292/7
checking [1] 8203/2
Chicago [3] 8163/7 8164/9 8164/21
Chicago-based [1] 8163/7
chief [7] 7977/1 7997/25 8043/5 8057/20 8237/20 8237/21 8255/18
children [3] 8160/2 8160/3 8160/5
China [1] 8188/17
Chinese [4] 8188/8 8188/10 8188/13 8188/15
choice [1] 8149/13
choose [1] 7981/10
chooses [1] 7995/1
chose [3] 7989/1 7993/20 8149/12
chosen [1] 8134/24
Chris [3] 8239/8 8239/17 8246/11
CHRISTOPHER [1] 8007/1
chronology [1] 8207/4
circle [1] 8131/13
circuit [9] 7980/25 7981/15 7993/13 8003/12 8066/7 8066/9 8175/16 8288/6 8288/13
circulate [4] 8222/11 8235/5 8235/25 8237/14
circumstance [1] 8258/24
circumstances [11] 8002/18 8078/16 8093/20 8104/6 8104/9 8121/16 8214/4 8260/1 8261/19 8280/5 8292/10
cite [2] 8066/20 8092/10
cited [4] 7980/22 7996/18 8142/8 8293/12
cites [1] 8105/23
Citrin [1] 8070/10
City [1] 8161/20
civil [1] 8281/17
CJA [1] 8280/9
claim [10] 8069/24 8080/10 8113/12 8124/12 8124/13 8126/24 8126/24 8262/12 8262/12 8262/16
claiming [4] 8035/10 8044/20 8121/17 8136/13
claims [33] 8069/21 8070/16 8070/23 8071/3 8071/6 8073/18 8073/18 8074/2 8074/6 8075/2 8075/12 8075/13 8077/9 8077/19 8077/24 8078/10 8078/12 8078/18 8078/24 8079/25 8089/4 8100/2 8100/2 8100/20 8100/23 8114/20 8118/5 8126/8 8130/8 8143/11 8143/21 8261/7 8286/5
Claridge [2] 8027/2 8029/5
clarification [2] 8109/10 8296/4
clarify [1] 8294/7
clarifying [1] 8294/13
clarity [2] 7976/5 8141/7
Clark [1] 8289/3
clause [8] 8287/11 8291/25 8292/2 8292/6 8292/14 8292/20 8292/23 8293/5
clauses [7] 8154/2 8154/6 8291/21 8292/16 8293/3 8293/13 8293/16
cleanup [1] 8062/5
clear [48] 7979/14 7980/21 7981/17 7982/13 7987/11 7988/3 7990/22 7995/15 8003/23 8052/1 8052/2 8060/17 8061/21 8071/14 8075/12 8079/4 8080/7 8080/23 8081/7 8096/21 8098/5 8098/9 8098/25 8103/5 8115/10 8115/21 8117/12 8117/16 8147/11 8152/25 8153/3 8153/6 8153/20 8206/9 8206/12 8216/20 8218/4 8218/13 8232/22 8262/23 8288/23 8294/23 8295/1 8295/2 8295/5 8301/17 8304/23
clearest [3] 8069/3 8069/5 8113/1
clearly [10] 7989/25 8086/25 8107/7 8107/8 8111/21 8125/24 8135/15 8231/1 8297/6 8301/25
clerk [3] 8102/8 8299/3 8304/20
client [52] 8001/17 8039/19 8044/21 8068/21 8072/20 8079/1 8098/21 8102/19 8118/9 8127/7 8127/19 8129/3 8143/15 8144/16 8144/14 8147/7 8152/12 8155/5 8158/25 8159/1 8166/5 8178/20 8180/1 8180/7 8180/20 8180/25 8182/15 8182/17 8184/8 8184/20 8184/23 8184/24 8185/1 8185/6 8189/1 8201/5 8201/7 8201/8 8211/1 8211/3 8211/4 8211/5

# C

**client... [10]** 8211/7 8211/8 8211/12 8220/3 8220/8 8220/9 8239/13 8241/11 8245/8 8246/13

**clients [25]** 8032/18 8032/24 8033/4 8067/2 8072/6 8072/7 8082/16 8082/17 8082/18 8116/9 8147/19 8158/20 8158/21 8162/7 8174/14 8188/6 8196/19 8196/21 8201/5 8212/17 8212/22 8220/6 8225/9 8239/14 8287/17

**clock [1]** 8273/25

**close [7]** 7982/9 8067/2 8160/7 8192/19 8204/8 8204/17 8206/15

**closed [2]** 7997/10 7997/11

**closely [1]** 8091/4

**closing [7]** 7995/16 7996/3 7999/19 7999/22 8101/21 8129/10 8283/20

**cloud [2]** 8150/6 8150/8

**co [41]** 8066/10 8085/23 8085/24 8086/1 8086/2 8086/4 8086/11 8086/18 8086/21 8086/22 8086/24 8087/2 8087/7 8087/10 8087/13 8087/16 8087/19 8087/22 8087/25 8088/4 8088/7 8088/9 8088/12 8105/6 8105/7 8106/4 8106/7 8106/9 8106/14 8106/16 8107/10 8107/11 8107/11 8107/14 8108/9 8109/22 8109/25 8147/17 8228/14 8228/15 8228/16

**co-conspirator [21]** 8066/10 8086/4 8086/24 8087/2 8087/7 8087/10 8087/13 8087/16 8087/19 8087/22 8087/25 8088/4 8088/7 8088/9 8088/12 8105/7 8106/9 8107/10 8107/14 8147/17 8228/15

**co-conspirators [20]** 8085/23 8085/24 8086/1 8086/2 8086/11 8086/18 8086/21 8086/22 8105/6 8106/4 8106/7 8106/14 8106/16 8107/11 8107/11 8108/9 8109/22 8109/25 8228/14 8228/16

**coach [1]** 8145/23

**coaching [1]** 8146/2

**cobble [1]** 8280/10

**codefendant [1]** 8038/13

**colead [1]** 8017/9

**Colin [2]** 8163/3 8163/4

**collapsed [1]** 8136/19

**collar [1]** 8001/5

**colleague [2]** 7979/2 7991/1

**colleagues [1]** 7992/18

**collect [3]** 8165/12 8165/23 8165/24 8171/25 8175/4 8178/11 8178/18 8178/19 8178/21 8185/11 8185/12

**collected [7]** 8165/22 8165/25 8166/1 8166/5 8166/18 8166/21 8196/13

**collectible [1]** 8150/24

**collecting [2]** 8184/13 8184/15

**collection [16]** 8163/25 8165/14 8165/20 8166/14 8167/5 8168/4 8173/11 8174/8 8174/11 8179/10 8180/9 8180/16 8183/17 8184/6 8184/11 8184/12

**collections [14]** 8165/3 8165/4 8165/6 8165/11 8166/8 8166/24 8174/2 8174/14 8178/5 8180/12 8183/12 8185/17 8187/3 8214/17

**college [1]** 8160/15

**Colt [1]** 8255/5

**column [1]** 8029/11

**comfortable [2]** 8012/9 8060/11

**coming [8]** 7981/5 8065/25 8101/8 8183/6 8183/16 8197/4 8218/23 8274/20

**commencing [1]** 8006/1

**comment [3]** 8012/21 8094/24 8177/14

**comments [7]** 8195/21 8195/21 8196/7 8196/7 8234/19 8243/24 8268/21

**Comments.doc [1]** 8029/15

**Commerce [1]** 8161/3

**commingling [3]** 8070/2 8070/4 8070/9

**Commission [3]** 8161/11 8161/12 8161/17

**Commissioner [1]** 8236/16

**commit [3]** 8067/14 8101/19 8279/11

**commitment [1]** 8006/9

**committed [5]** 8103/9 8123/6 8143/16 8143/16 8160/1

**committee [53]** 8057/6 8163/18 8163/19 8163/20 8163/21 8163/24 8163/24 8163/25 8164/5 8164/6 8164/8 8164/12 8164/16 8164/19 8164/22 8165/1 8165/3 8165/6 8165/11 8165/14 8165/20 8166/8 8166/15 8166/24 8167/5 8178/5 8180/12 8180/16 8183/12 8184/13 8184/15 8185/16 8185/17 8186/17 8186/9 8186/25 8187/4 8187/6 8188/12 8189/15 8189/16 8189/22 8189/23 8209/8 8214/17 8236/4 8236/12 8236/8 8236/21 8236/23 8237/9 8237/10 8238/18 8289/7 8289/9 8289/10

**committees [4]** 8163/16 8164/2 8164/17 8185/16

**committing [1]** 8294/19

**common [4]** 8058/7 8097/4 8287/15 8292/13

**commonly [1]** 8083/13

**communicated [1]** 7983/3

**communicating [7]** 8035/9 8040/19 8042/24 8044/19 8048/20 8096/5 8228/3

**communication [4]** 8065/20 8184/4 8199/10 8260/18

**communications [4]** 8095/6 8176/11 8201/3 8225/4

**companies [32]** 8039/5 8040/2 8046/13 8152/17 8153/21 8154/4 8154/5 8157/13 8157/15 8162/4 8163/11 8188/10 8188/18 8188/23 8189/12 8196/21 8196/22 8200/8 8202/19 8203/9 8208/2 8209/3 8209/16 8217/16 8239/16 8240/7 8240/15 8246/10 8286/2 8289/7 8289/9 8289/10

**company [132]** 8015/18 8036/11 8046/19 8047/8 8051/25 8052/3 8052/5 8052/5 8052/8 8052/8 8052/10 8052/12 8052/14 8053/5 8053/11 8055/6 8057/22 8058/4 8058/7 8068/15 8070/2 8071/2 8071/3 8077/20 8078/11 8078/17 8081/14 8089/11 8089/23 8090/2 8090/3 8091/2 8091/5 8091/5 8092/20 8092/20 8095/22 8096/22 8096/23 8096/24 8097/13 8097/15 8097/18 8097/18 8097/19 8099/15 8099/18 8099/24 8100/2 8100/12 8100/10 8100/21 8100/24 8101/12 8103/22 8118/11 8118/25 8120/2 8121/5 8124/25 8125/7 8125/20 8126/6 8127/5 8127/14 8130/11 8130/15 8132/14 8140/2 8148/17 8149/10 8152/16 8156/22 8156/23 8188/8 8188/9 8189/13 8189/16 8189/18 8199/2 8200/16 8201/13 8201/19 8201/20 8201/23 8201/23 8201/24 8202/3 8207/19 8209/2 8209/10 8209/18 8211/23 8211/24 8213/6 8213/8 8217/21 8219/7 8220/10 8222/23 8223/1 8225/7 8236/5 8236/22 8236/22 8237/20 8263/17 8272/22 8294/3 8294/5 8295/1 8295/6 8295/10 8295/10 8296/14 8296/21 8296/24 8297/5 8297/7 8297/8 8297/24 8299/12 8299/17 8300/4 8300/13 8300/20 8300/24 8301/12 8301/13 8301/14 8302/23

**company's [6]** 8057/20 8071/2 8097/2 8113/18 8125/9 8127/22

**compensated [1]** 8115/19

**compensation [11]** 8073/8 8163/24 8164/16 8164/19 8164/22 8165/14 8174/6 8185/17 8186/18 8186/19 8287/17

**complaining [1]** 8143/15

**complaint [3]** 8128/20 8128/23 8130/4

**complaints [2]** 8143/20 8143/25

**complete [2]** 8060/25 8281/4

**completely [17]** 7984/4 7990/14 7996/20 8024/20 8034/17 8035/13 8038/2 8044/16 8076/17 8080/25 8081/16 8096/12 8118/23 8218/14 8229/2 8229/9 8263/12

**completion [1]** 8009/25

**complex [1]** 8018/17

**complicated [1]** 8188/3

**components [1]** 8281/5

**comport [1]** 8081/15

# Compound [1] 8193/5

**computer [3]** 7974/26 7975/11 7976/9

**computer-aided [1]** 7974/25

**conceal [1]** 8298/4

**concealment [1]** 8138/1

**concept [6]** 7992/21 8048/14 8049/22 8050/9 8071/4 8097/21

**concern [20]** 7985/19 7986/12 7999/25 8001/7 8003/8 8037/16 8042/1 8042/15 8045/3 8047/11 8048/4 8049/1 8049/14 8060/18 8090/9 8093/4 8120/14 8232/13 8280/23 8283/18

**concerned [20]** 7990/17 7990/18 7999/20 7999/23 8003/6 8004/2 8017/15 8018/5 8040/16 8042/3 8042/6 8042/10 8042/11 8050/3 8097/15 8099/9 8172/5 8175/20 8260/4 8282/8

**concerning [4]** 7987/17 8016/23 8244/2 8246/9

**concerns [11]** 7979/17 7986/14 8001/13 8003/21 8107/8 8133/9 8257/15 8257/17 8281/15 8291/23 8294/3

**conclude [3]** 8098/23 8103/9 8108/6

**concludes [3]** 8088/15 8093/16 8206/21

**conclusion [1]** 8069/3

**conclusions [2]** 7980/13 8131/6

**conditions [2]** 8170/9 8286/4

**conduct [7]** 7993/19 8067/8 8120/10 8128/20 8129/6 8129/19 8131/3

**conducted [1]** 8087/6

**confer [1]** 8283/3

**conference [17]** 8031/11 8045/23 8059/18 8063/14 8167/16 8177/23 8204/1 8226/6 8233/16 8254/10 8264/17 8283/19 8284/2 8284/8 8284/9 8285/4

**confessions [1]** 7981/7

**confine [1]** 8004/10

**confined [3]** 8054/4 8293/25

**confines [1]** 8291/5

**confirming [1]** 8024/20

**conflated [1]** 7989/17

**conflict [5]** 8043/14 8128/25 8189/14 8217/7 8236/21

**confront [3]** 7984/24 7992/4 7993/17

**confronted [5]** 7991/7 7991/24 7991/24 7998/24 8298/11

**confronts [1]** 7994/25

**confused [4]** 8015/2 8170/5 8254/7 8301/18

**confusing [3]** 8091/17 8301/6 8303/24

**confusion [4]** 8105/15 8132/24 8134/16 8220/12

**conjunction [1]** 8147/8

**connect [2]** 8067/5 8231/23

**connected [1]** 8286/10

**connection [15]** 8043/12 8085/12 8096/3 8151/9 8163/4 8166/25 8200/11 8209/10 8225/3 8236/18 8248/15 8251/3 8256/18 8270/3 8298/2

**connection -- and [1]** 8209/10

**conscientiousness [2]** 7997/8 7998/8

**conscious [2]** 7982/13 8149/10

**consciousness [8]** 7978/14 7994/13 7996/3 7996/10 7997/21 7998/12 7999/20 8175/17

**consent [3]** 8122/19 8148/6 8187/6

**consequence [8]** 8172/1 8215/11 8215/16 8215/22 8257/20 8258/7 8261/9 8261/11

**consequences [1]** 8185/10

**consider [7]** 7979/24 7980/1 7982/1 7990/12 7990/13 7995/17 8003/10

**considerable [1]** 8096/10

**considerably [1]** 8067/10

**consideration [7]** 8134/9 8134/25 8135/4 8138/24 8149/2 8149/4 8149/6

**considerations [1]** 7992/14 8152/18

**considered [5]** 8086/4 8087/1 8087/7 8111/18 8296/19

**considering [3]** 7980/12 7980/18 8102/9

**considers [2]** 7990/11 8003/10

**C**

**consistent [6]** 7996/16 8069/4 8133/14
8136/22 8218/14 8304/21
**conspiracies [1]** 8110/6
**conspiracy [40]** 8067/14 8067/17 8067/17
8067/20 8074/17 8076/22 8077/2 8082/10
8087/19 8087/21 8088/14 8103/10 8105/9
8105/12 8105/17 8106/2 8108/7 8108/11
8108/20 8108/23 8109/2 8109/3 8109/6
8109/11 8109/13 8109/15 8109/22 8109/25
8110/2 8110/3 8110/4 8112/9 8128/10 8133/3
8133/4 8136/14 8137/24 8138/19 8263/15
8263/19
**conspirator [21]** 8066/10 8086/4 8086/24
8087/2 8087/7 8087/10 8087/13 8087/16
8087/19 8087/22 8087/25 8088/4 8088/7
8088/9 8088/12 8105/7 8106/9 8107/10
8107/14 8147/17 8228/15
**conspirators [21]** 8085/23 8085/24 8086/1
8086/2 8086/11 8086/18 8086/21 8086/22
8105/6 8106/4 8106/7 8106/14 8106/16
8107/11 8107/11 8108/9 8109/22 8109/25
8123/11 8228/14 8228/16
**conspire [1]** 8101/19
**constant [1]** 8218/21
**constantly [1]** 8213/15
**constitutional [2]** 7986/25 7992/8
**construction [1]** 8191/7
**constructive [4]** 7984/13 7984/19 7986/24
7987/5
**consult [1]** 8115/18
**consultant [3]** 8125/8 8146/9 8152/14
**consultant's [1]** 8125/1
**consultants [9]** 8071/19 8072/16 8072/21
8073/8 8074/19 8074/24 8075/4 8075/6 8082/1
**consulted [1]** 8290/25
**consulting [127]** 7995/18 8067/21 8069/16
8071/8 8071/10 8071/12 8071/15 8071/21
8071/23 8072/2 8072/10 8073/5 8073/22
8074/1 8074/5 8074/7 8074/9 8074/11 8074/12
8074/23 8077/14 8078/23 8079/5 8079/14
8080/3 8080/12 8080/15 8080/19 8080/22
8081/6 8081/22 8084/4 8085/14 8124/10
8124/11 8124/14 8124/16 8124/20 8124/21
8125/4 8125/5 8125/22 8126/3 8126/9 8126/11
8126/13 8126/14 8126/22 8126/23 8127/8
8127/15 8127/24 8127/25 8128/15 8129/20
8143/5 8145/6 8145/8 8145/11 8145/18
8145/20 8146/5 8146/12 8146/17 8146/19
8152/18 8152/21 8152/23 8153/7 8153/18
8261/7 8261/19 8261/21 8269/13 8269/16
8269/18 8270/4 8270/7 8270/9 8270/10
8270/11 8270/13 8270/14 8270/23 8271/2
8271/6 8274/13 8286/3 8286/4 8286/6 8286/7
8286/9 8286/13 8286/14 8286/17 8286/22
8287/12 8288/18 8288/20 8289/2 8289/11
8290/3 8290/7 8290/9 8290/11 8290/14
8290/15 8290/19 8291/5 8291/11 8293/25
8294/1 8294/6 8294/10 8295/14 8296/13
8298/17 8298/18 8298/20 8298/21 8298/22
8298/25 8299/8 8300/17 8300/19 8301/17
8302/10
**contact [8]** 8039/21 8041/14 8043/21 8044/8
8047/13 8049/13 8103/18 8103/19
**contacting [1]** 8095/20
**contained [1]** 8195/22
**contemplated [1]** 8080/15
**contemporaneous [4]** 8080/21 8081/8 8082/2
8094/3
**contemporaneously [3]** 8093/6 8111/14
8112/7
**content [8]** 8009/20 8183/4 8184/4 8199/9
8238/3 8238/18 8256/16 8260/17
**context [26]** 7981/16 7982/20 7984/11
7987/10 8038/24 8046/21 8071/19 8071/21
8072/12 8072/21 8074/5 8074/6 8074/23
8076/4 8106/7 8112/15 8124/20 8126/9 8183/9
8206/4 8208/24 8209/20 8229/4 8230/1 8294/8

8294/18
**contexts [1]** 8084/4
**continuation [1]** 8008/4
**continue [9]** 8006/19 8053/16 8056/16
8160/22 8165/20 8187/16 8195/10 8217/2
8218/19
**continued [31]** 8005/11 8031/12 8034/6
8034/25 8036/1 8036/9 8045/24 8046/20
8046/22 8047/17 8049/10 8053/23 8055/9
8055/12 8059/19 8063/15 8083/15 8119/3
8154/16 8167/17 8177/24 8189/24 8190/3
8203/20 8206/22 8226/5 8233/17 8250/25
8254/11 8264/18 8289/12
**continues [3]** 8057/25 8283/2 8290/5
**continuing [9]** 8146/7 8191/2 8192/5 8199/21
8200/25 8207/3 8208/20 8279/18 8301/15
**continuingly [1]** 8002/7
**contract [2]** 8126/18 8292/3
**contracts [1]** 8293/2
**contradiction [1]** 8118/7
**contradictory [1]** 8042/7
**contrary [4]** 7996/19 8089/7 8091/6 8091/14
**contributed [1]** 8149/11
**control [19]** 8010/24 8016/11 8054/5 8098/7
8107/17 8107/19 8107/20 8123/20 8123/21
8135/7 8135/15 8136/8 8136/14 8136/15
8138/11 8138/11 8138/21 8148/1 8148/2
**controlled [4]** 8041/19 8135/25 8136/1 8136/5
**controlling [2]** 8102/11 8134/15
**controls [1]** 8051/17
**conundrum [3]** 8100/5 8100/5 8100/7
**conversation [39]** 8064/2 8152/12 8171/8
8171/11 8183/18 8184/5 8200/15 8223/25
8224/1 8224/18 8225/2 8240/2 8241/25 8242/1
8243/4 8243/13 8243/14 8243/15 8243/23
8244/2 8244/7 8244/11 8244/14 8247/4
8248/25 8249/3 8256/5 8257/25 8259/2 8259/3
8269/7 8271/6 8271/10 8271/12 8271/16
8271/16 8271/17 8271/19 8274/16
**conversations [18]** 8171/10 8200/10 8209/18
8209/20 8209/21 8210/1 8213/3 8216/24
8219/20 8219/25 8220/4 8220/21 8223/18
8228/2 8246/24 8262/14 8268/15 8271/18
**converse [1]** 7994/5
**conversion [10]** 8070/17 8075/13 8076/1
8078/1 8115/20 8143/21 8143/25 8144/1
8144/4 8145/4
**conversions [6]** 8070/18 8077/12 8078/3
8116/15 8121/23 8131/21
**converted [1]** 8294/9
**conveyed [8]** 8196/4 8274/25 8275/5 8275/8
8276/1 8276/10 8277/5 8285/22
**convicted [2]** 7997/7 8103/12
**conviction [2]** 8292/25 8293/1
**convinced [2]** 8184/25 8220/11
**convoluted [1]** 8018/17
**COO [1]** 8092/20
**cooperate [1]** 8019/13
**cooperation [2]** 8081/18 8082/6
**cooperative [1]** 8282/16
**Cooperman [1]** 8070/10
**coordinating [1]** 8097/6
**copied [1]** 8266/16
**copies [3]** 8060/25 8073/2 8198/22
**copy [4]** 8102/7 8108/17 8255/8 8264/14
**copying [2]** 8023/24 8057/3
**cordial [1]** 8282/15
**core [1]** 8095/7
**Cornelius [1]** 8057/19
**corner [5]** 7982/12 8008/10 8008/20 8029/14
8247/22
**corp [1]** 8243/6
**corporate [26]** 8082/16 8082/17 8082/18
8090/24 8091/3 8144/10 8144/14 8147/18
8147/19 8157/12 8157/15 8162/2 8162/5
8162/23 8163/10 8166/12 8186/10 8186/12
8189/25 8206/10 8215/13 8236/14 8236/15
8236/19 8272/18 8273/2

**corporation [4]** 8076/13 8154/11 8289/1 8291/2
**corporations [3]** 8162/25
**correct [78]** 7985/18 8006/11 8007/14 8007/15
8007/18 8007/21 8007/22 8007/23 8007/24
8007/25 8008/6 8008/10 8008/11 8008/17
8021/8 8022/8 8008/24 8009/3 8009/7
8009/8 8009/10 8009/14 8009/18 8009/22
8010/13 8010/14 8010/18 8010/23 8011/10
8013/1 8015/18 8016/2 8016/17 8017/11
8018/2 8018/22 8018/24 8020/5 8021/17
8023/7 8023/11 8023/14 8023/15 8023/18
8023/25 8024/1 8025/18 8025/24 8025/25
8026/5 8026/6 8027/7 8027/13 8028/15 8030/9
8055/16 8055/17 8057/4 8060/6 8092/16
8092/16 8092/17 8092/18 8201/22 8213/9
8218/4 8222/21 8227/4 8247/8 8248/1 8249/8
8250/9 8263/25 8266/17 8267/20 8268/1
8285/25 8305/5
**correctly [1]** 8135/9
**correlation [1]** 7986/2
**Cotton [3]** 8277/23 8278/16 8279/14
**counsel [33]** 7984/16 7986/8 8033/10 8035/9
8040/24 8041/8 8046/11 8048/20 8057/22
8078/6 8078/16 8079/12 8156/21 8156/24
8156/25 8157/1 8157/2 8157/4 8157/5 8189/20
8199/1 8204/2 8208/2 8211/25 8213/8 8225/8
8225/10 8255/12 8255/14 8256/25 8267/4
8267/6 8304/13
**counsels [1]** 8277/25
**count [56]** 8033/11 8065/9 8066/9 8066/15
8067/16 8067/17 8069/5 8085/17 8085/21
8086/1 8086/2 8087/14 8088/4 8088/16
8088/16 8088/18 8091/16 8094/13 8094/16
8095/5 8095/14 8096/3 8096/15 8096/19
8097/10 8102/9 8103/10 8103/10 8105/5
8105/9 8106/16 8107/15 8108/20 8108/23
8108/25 8109/3 8109/19 8131/8 8134/3 8135/8
8136/25 8138/21 8139/11 8141/17 8145/5
8146/25 8147/3 8147/20 8147/22 8147/23
8149/17 8149/20 8149/23 8149/25 8150/20
8290/17
**Count Eight [5]** 8088/16 8094/13 8094/16
8102/9 8103/10
**counterclaim [1]** 8079/22
**countervailing [1]** 8219/2
**couple [5]** 8061/6 8107/5 8127/18 8189/11
8219/11
**course [20]** 8073/4 8094/15 8096/9 8100/16
8128/10 8128/20 8129/5 8129/19 8131/3
8143/14 8144/3 8144/5 8145/1 8145/3 8203/5
8212/8 8257/10 8259/3 8283/11 8291/24
**Court's [12]** 7984/21 7986/13 7995/11 7995/13
7996/6 7999/18 8003/8 8003/8 8106/10 8110/7
8301/20 8303/3
**courthouse [3]** 7974/3 8280/17 8281/4
**courtroom [13]** 8032/2 8046/6 8054/22
8064/15 8065/25 8093/9 8155/24 8169/19
8170/20 8210/22 8222/1 8255/2 8274/6
**courts [3]** 7980/24 7981/17 8066/6
**covenants [1]** 8286/11
**coverage [1]** 8274/3
**covered [2]** 8020/7 8173/22
**CR [1]** 7974/2
**cracks [1]** 8202/23
**craft [1]** 8053/4
**cranium [1]** 8241/14 8241/21 8247/12
**create [4]** 8003/19 8112/11 8114/4 8114/6
**created [5]** 8001/1 8045/11 8045/12 8111/13
8257/17
**creates [5]** 8047/9 8110/18 8111/2 8112/9
8112/10
**creating [1]** 7982/2
**creation [2]** 8108/23 8141/23
**credibility [8]** 7986/17 7987/23 7989/15 8065/5
8094/19 8094/24 8227/10 8261/8
**credible [2]** 7992/23 8001/18
**creditors [1]** 8076/9
**crime [6]** 8064/24 8067/9 8070/25 8078/22

## C

crime... [2] 8104/5 8151/11
crime [2] 7997/7 8101/20
criminal [14] 7974/9 7990/6 7990/11 8067/3
8067/8 8076/12 8076/22 8078/21 8082/11
8082/12 8082/23 8093/24 8147/17 8281/15
criminally [1] 8094/11
critical [5] 8144/16 8148/18 8175/15 8214/24
8215/20
criticized [1] 8291/7
cross [45] 7986/17 7987/24 7993/2 8006/20
8007/4 8007/5 8023/7 8023/17 8025/7 8025/18
8030/4 8030/15 8030/16 8030/22 8032/3
8034/9 8035/20 8036/14 8036/16 8037/21
8038/6 8039/13 8039/13 8040/12 8041/19
8042/8 8045/12 8049/24 8050/14 8051/14
8053/17 8054/4 8055/15 8056/22 8056/25
8061/5 8067/25 8068/7 8168/25 8170/15
8229/17 8293/17 8294/17 8295/21 8299/4
cross-examination [20] 7987/24 8006/20
8007/4 8007/5 8023/7 8023/17 8025/7 8025/18
8030/4 8032/3 8034/9 8040/12 8049/24 8054/4
8055/15 8056/22 8056/25 8067/25 8068/7
8299/4
cross-examine [1] 8042/8
cross-examined [1] 8170/15
crossed [1] 8295/16
CRUTCHER [1] 7974/17
crystal [3] 8073/7 8080/7 8098/5
CSR [1] 7974/22
culpability [1] 8136/25
cure [1] 8220/4
current [5] 8013/6 8020/8 8028/1 8169/23
8294/25
custody [4] 7983/11 7988/1 7989/9 8016/11
cut [9] 8036/12 8039/6 8044/6 8050/17
8050/21 8051/1 8051/6 8052/25 8174/16

## D

D.C [2] 8161/11 8161/13
daily [2] 8192/11 8281/13
damaging [1] 8037/13
dangerously [1] 8204/8
Daraprim [10] 8032/14 8034/4 8034/24 8037/7
8047/1 8047/4 8052/14 8052/19 8053/4
8053/20
Darren [18] 8125/14 8126/11 8126/14 8126/18
8128/17 8250/20 8251/3 8255/5 8256/4 8260/2
8266/22 8271/7 8294/21 8295/3 8298/17
8302/5 8302/20 8303/1
data [3] 8152/16 8287/25 8288/9
data on [1] 8152/16
database [1] 8198/18
date [50] 8009/6 8009/10 8024/14 8027/20
8028/22 8029/25 8045/1 8057/14 8068/8
8068/9 8068/11 8068/15 8068/22 8076/18
8084/3 8084/6 8084/7 8084/9 8084/14 8084/16
8084/17 8084/19 8084/20 8084/21 8084/23
8084/24 8084/25 8084/25 8085/2 8085/3
8085/4 8085/6 8085/7 8085/9 8091/19 8091/22
8091/25 8092/16 8092/17 8094/5 8094/8
8110/23 8111/9 8145/19 8217/15 8223/4
8244/6 8248/19 8249/7 8249/21
date.' [1] 8092/16
dated [10] 8007/11 8008/16 8023/18 8023/25
8024/7 8057/3 8084/9 8133/25 8181/15 8262/1
dates [12] 8059/7 8084/12 8092/5 8110/22
8181/24 8216/21 8217/13 8218/5 8242/5
8242/6 8255/24 8268/19
Daubert [7] 8285/25 8287/7 8288/5 8291/20
8294/20 8295/22 8297/18
DAVID [8] 7974/15 7974/16 8024/12 8057/2
8106/18 8117/15 8143/7 8249/16
Davida [3] 8168/2 8182/6 8182/11
day-to-day [1] 8202/20
days [6] 8175/20 8255/22 8256/13 8259/6
8261/3 8267/16
DC [1] 8012/17

## D [continued]

de [2] 8028/3 8028/4
de-legend [1] 8028/3
de-legending [1] 8028/4
dead [3] 8144/19 8147/20 8149/23
deal [16] 7975/11 7978/11 8026/1 8036/11
8095/17 8127/13 8128/16 8134/16 8152/4
8187/25 8188/2 8188/2 8188/3 8189/21
8196/15 8206/3
dealing [6] 7978/6 8090/25 8091/4 8120/1
8137/7 8188/16
dealings [1] 8052/6
deals [5] 7982/10 8137/6 8146/14 8188/5
8193/24
dealt [4] 8012/21 8018/4 8204/5 8209/3
Dean [2] 8304/3
Dear [1] 8267/2
debts [5] 8073/7 8107/4 8109/17 8133/5
8298/24
decades [1] 8215/13
December [37] 7974/5 8015/12 8015/14
8016/1 8016/4 8016/11 8017/9 8018/1 8018/5
8018/20 8019/2 8025/22 8026/8 8028/6
8028/23 8030/2 8030/25 8037/24 8043/23
8056/9 8056/15 8110/17 8110/19 8133/25
8175/3 8178/14 8197/24 8198/7 8220/20
8279/17 8279/20 8279/22 8279/25 8280/1
8280/22 8281/24 8305/9
December 07 [1] 8305/9
December 11th [1] 8280/22
December 15th [1] 8280/1
December 18th [1] 8281/24
December 2015 [1] 8056/15
December 29th [2] 8279/22 8279/25
December 3rd [2] 8110/17 8110/19
December 8th [2] 8279/17 8279/20
decide [9] 7978/11 7990/13 8126/3 8142/12
8152/6 8171/2 8264/7 8279/8 8282/24
decided [5] 8011/20 8021/21 8188/7 8196/8
8288/13
decides [4] 8086/8 8142/11 8282/5 8282/5
deciding [1] 8142/8
decision [23] 7982/13 7994/7 7995/11 7995/13
7995/24 8030/4 8034/10 8046/24 8049/4
8053/24 8055/10 8066/17 8066/18 8141/5
8145/17 8148/25 8150/11 8150/16 8151/17
8151/22 8153/16 8155/5 8259/18
decision-making [1] 7995/24
decisions [5] 8117/2 8148/17 8149/10 8171/10
8259/16
declarant [6] 8168/16 8168/25 8169/22 8170/9
8173/3 8211/15
declarant's [2] 8171/19 8173/2
declined [1] 8228/12 8297/19
deemed [1] 8027/25
deeper [1] 7990/6
deeply [1] 7990/17
defend [3] 7994/18 7994/19 7994/19
defendant [56] 7974/7 7974/17 7980/6 7981/2
7981/5 7989/22 7990/6 7991/17 7993/17
7995/15 7996/4 7998/6 8010/7 8023/14
8025/23 8028/15 8028/19 8028/20 8030/1
8030/5 8030/8 8030/25 8033/17 8033/20
8033/21 8034/11 8034/13 8041/7 8043/2
8046/23 8046/24 8053/10 8055/6 8055/10
8055/15 8055/19 8057/3 8066/22 8067/3
8067/5 8067/7 8067/12 8087/20 8104/9 8173/4
8173/16 8173/17 8173/17 8176/20 8220/1
8220/9 8221/5 8266/10 8283/23 8288/17
8306/12
defendant's [11] 7994/9 8005/1 8055/4
8055/24 8056/9 8056/15 8056/18 8067/9
8104/14 8108/15 8219/23
defendants [2] 7997/5 8067/4
defense [50] 7977/22 7980/15 7986/8 7990/11
7993/25 7997/9 7999/4 8008/15 8023/16
8026/7 8027/17 8027/21 8033/10 8038/8
8041/7 8056/22 8056/23 8060/3 8060/12
8104/19 8110/5 8120/15 8124/17 8133/18

8134/6 8137/1 8150/11 8150/13 8152/3
8155/16 8162/21 8165/4 8173/5 8175/24
8175/22 8176/21 8177/13 8179/6 8184/25
8250/12 8256/25 8258/10 8266/5 8267/15
8281/10 8281/11 8284/7 8303/14 8304/13
8304/22
define [1] 8105/16
defined [6] 8084/24 8169/22 8170/1 8290/3
8290/24 8298/7
defining [2] 8295/17 8297/11
definitely [3] 8115/3 8216/13 8279/2
definition [1] 8170/21
defraud [5] 8067/18 8067/20 8105/13 8105/18
8109/14
defrauded [3] 8121/10 8121/19 8141/22
degree [2] 8160/19 8160/21
degrees [2] 8112/18 8160/19
Delaware [9] 8239/19 8239/22 8239/25 8240/3
8240/6 8240/11 8240/15 8240/17 8240/20
delay [1] 8023/10
deliberations [1] 8280/13
deliver [3] 8089/25 8234/17 8234/21
delivering [1] 8235/2
Delzotto [38] 7978/17 7979/25 7982/14 7983/3
7983/8 7983/14 7987/21 7988/9 7989/21
7990/16 7991/6 7995/14 7999/5 8003/4
8004/25 8007/1 8007/7 8011/6 8011/9 8012/6
8014/20 8015/11 8015/21 8018/9 8020/15
8022/7 8023/3 8033/11 8034/22 8035/4
8040/13 8041/8 8041/24 8046/16 8055/4
8056/24 8059/4 8137/11
Delzotto's [6] 7983/6 7985/20 7989/14
7989/18 8032/23 8038/25
demand [3] 8124/22 8153/2 8153/3
demanding [1] 8012/15 8073/5
demonstrate [1] 8286/18
demonstrated [1] 8230/24
demonstratively [1] 8146/16
DENERSTEIN [2] 7974/20 7978/3
deny [2] 7976/7 7976/9
denying [1] 8115/5
departed [2] 8000/19 8296/15
departing [7] 8152/14 8153/22 8288/24
8290/10 8294/12 8295/4 8296/13
Department [3] 8012/17 8161/2 8161/9
departure [1] 8053/12
derail [1] 8077/20
describe [10] 8013/6 8109/11 8158/12 8161/25
8187/15 8187/20 8187/21 8200/13 8201/1
8225/6
described [6] 8045/14 8074/22 8096/4
8110/12 8185/16 8286/19
describes [3] 8095/10 8096/16 8098/18
describing [3] 8034/14 8183/3 8201/2
descriptions [2] 8286/9 8286/11
Desert [5] 8097/18 8097/24 8132/14 8135/12
8206/5
Desert Gateway [3] 8097/18 8097/24 8206/5
designed [1] 8298/4
desire [1] 8298/3
desk [2] 8084/8 8092/8
despite [5] 7994/8 8066/13 8067/1 8111/8
8213/21
destroy [5] 8013/4 8013/15 8014/4 8015/24
8039/15
destroyed [2] 8013/8 8041/15
destruction [3] 8017/15 8039/14 8050/3
detailed [2] 8219/19 8286/11
details [1] 8052/18
determinations [1] 8094/18
determine [4] 8105/7 8178/11 8201/21
8287/24
determined [2] 8186/24 8291/25
determining [1] 8186/18
developed [1] 8273/14
devoted [1] 8281/6
dictated [1] 8074/22
dictating [1] 8098/7

**D**

difference [3] 8072/19 8106/13 8113/7
different [38] 7981/16 7984/4 7987/6 7990/14
7998/19 8002/6 8002/6 8014/3 8032/17
8043/14 8043/25 8044/3 8044/16 8047/7
8052/3 8052/4 8053/6 8053/11 8060/14
8069/21 8084/11 8086/19 8097/21 8121/13
8122/21 8123/10 8124/20 8125/25 8150/22
8162/7 8162/22 8196/24 8196/24 8196/25
8222/12 8228/9 8297/1 8302/18
differently [2] 8146/22 8148/10
difficult [3] 8100/19 8152/13 8292/8
digits [1] 8247/21
diligence [4] 8201/15 8202/6 8202/7 8202/8
dinner [1] 8160/10
dire [1] 8052/17
direct [22] 8007/9 8022/12 8027/9 8027/13
8088/21 8131/24 8135/19 8140/20 8144/9
8156/14 8179/13 8181/6 8204/6 8213/15
8222/3 8230/17 8236/3 8247/19 8255/18
8262/4 8268/24 8282/21
directed [1] 8222/23
directing [3] 8164/16 8200/4 8223/10
direction [19] 8071/2 8071/18 8072/6 8072/11
8075/9 8078/17 8078/25 8081/14 8082/17
8101/10 8101/12 8103/22 8129/12 8129/16
8131/2 8144/11 8146/12 8147/7 8147/19
directive [1] 8258/13
directly [7] 7991/5 8045/8 8090/25 8166/1
8172/2 8279/3 8301/7
director [9] 8125/5 8297/6 8300/14 8300/20
8301/20 8301/25 8302/5 8302/9 8302/21
directors [10] 8057/6 8057/12 8124/19
8196/22 8209/8 8236/5 8236/15 8294/8
8301/22 8301/23
directs [1] 8118/25
disagree [4] 7978/7 7995/11 8290/1 8296/25
disagreements [1] 8282/23
disappointed [4] 8098/9 8127/11 8138/22
8294/14
disaster [1] 7980/7
disclose [6] 8121/8 8129/19 8140/17 8151/8
8303/20 8305/1
disclosed [23] 8080/3 8080/25 8081/2 8081/5
8081/7 8081/16 8082/6 8082/7 8085/16 8120/9
8120/10 8121/4 8121/11 8121/14 8126/16
8126/17 8138/12 8138/13 8145/10 8146/19
8151/3 8288/17 8303/20
discloses [1] 8151/10
disclosing [3] 8009/20 8093/19 8126/10
disclosure [2] 8124/9 8145/13
disclosures [4] 8081/19 8121/7 8303/16
8303/16
discounted [1] 8134/8
discovered [2] 8121/4 8123/24
discrepancies [1] 8060/9
discuss [15] 7994/11 7994/11 8064/13
8088/19 8108/1 8120/23 8173/22 8199/4
8210/17 8241/15 8248/9 8248/22 8249/4
8268/20 8273/3
discussed [17] 8036/14 8058/13 8082/5
8106/15 8108/5 8114/20 8193/9 8208/11
8257/24 8261/1 8269/12 8269/17 8270/8
8272/10 8273/7 8273/12 8303/23
discussing [8] 8061/1 8139/18 8174/1 8211/1
8240/20 8248/17 8248/18 8251/10
discussion [11] 7988/20 8061/13 8061/14
8063/1 8110/15 8123/12 8206/21 8213/6
8266/2 8266/6 8273/6
discussions [8] 8192/15 8193/2 8208/4
8208/21 8208/25 8209/6 8209/13 8222/15
disgruntled [1] 8130/7
disinclined [1] 7998/5
dismiss [11] 8064/20 8065/9 8066/9 8069/1
8087/25 8097/10 8105/8 8106/7 8106/11
8108/15 8118/10
dismissal [1] 8109/3
dismissed [3] 8096/19 8118/10 8150/1

dismissing [1] 8106/10
disparagement [1] 8066/12
displays [1] 7991/5
displeasure [1] 8112/18
dispositive [1] 8151/19
dispute [1] 8127/1
disqualify [1] 8106/9
disregard [1] 8000/3
distinction [5] 7989/6 8097/22 8098/4 8125/3
8125/3
distinguishes [1] 8052/13
distract [1] 8293/20
distracted [1] 8001/7
distributed [1] 8099/4
distribution [1] 8100/16
district [11] 7974/1 7974/1 7974/10 7974/13
8011/15 8011/19 8018/4 8021/16 8066/6
8066/6 8066/23
diversified [1] 8116/24
divided [1] 8124/8
division [5] 7995/19 7995/22 8161/14 8161/15
8161/19
divorcing [1] 8240/10
dixit [1] 8145/1
do-over [1] 8082/21
DOA [1] 8145/5
docket [1] 8304/19
doctrine [1] 8096/21
document [62] 8000/17 8000/23 8008/9
8008/16 8017/2 8023/18 8027/15 8029/10
8029/24 8056/21 8056/25 8060/13 8060/16
8061/15 8061/22 8061/24 8071/5 8076/5
8084/7 8084/8 8084/9 8084/21 8091/22
8091/25 8094/5 8107/22 8108/16 8110/20
8111/8 8113/6 8120/15 8150/19 8162/5
8177/12 8181/7 8182/9 8183/1 8183/8 8184/22
8184/25 8203/16 8223/5 8229/15 8239/6
8248/20 8249/10 8249/20 8252/12 8252/20
8252/22 8252/25 8253/23 8254/8 8257/5
8259/23 8260/13 8260/21 8262/2 8264/3
8265/7 8265/8 8268/1
Document No. 345 [1] 8108/16
documentation [1] 8096/21
documenting [7] 8070/21 8071/13 8073/23
8077/13 8078/22 8080/18 8081/22
documents [85] 8000/17 8000/22 8012/14
8012/15 8013/15 8014/4 8014/12 8015/24
8016/5 8016/16 8016/22 8017/10 8017/16
8017/21 8018/2 8018/8 8018/11 8018/21
8019/3 8024/21 8033/2 8033/14 8034/16
8037/14 8037/14 8039/7 8039/9 8039/15
8039/16 8041/16 8044/23 8045/8 8049/16
8050/4 8050/11 8055/25 8056/12 8056/19
8060/23 8068/7 8071/14 8075/8 8075/10
8078/19 8080/21 8081/8 8085/1 8087/3 8087/8
8087/9 8089/8 8091/21 8092/5 8094/4 8095/5
8095/8 8095/13 8096/5 8096/17 8113/2
8120/13 8120/21 8133/21 8137/6 8137/8
8148/4 8169/17 8229/21 8243/6 8255/15
8255/17 8255/21 8256/4 8256/6 8259/5 8259/9
8259/10 8260/25 8263/18 8263/23 8265/24
8267/7 8267/9 8272/16 8283/5
dodge [1] 8281/3
dollar [1] 8058/6 8102/14
dollars [7] 8126/8 8139/2 8184/14 8185/14
8186/12 8186/15 8189/3
domestic [1] 8189/9
donation [1] 8149/1
done [35] 7981/12 8004/7 8019/5 8019/7
8038/20 8038/23 8045/19 8045/22 8061/3
8061/8 8068/4 8077/11 8081/15 8082/3
8083/13 8088/18 8091/4 8093/3 8100/1
8113/24 8145/8 8147/13 8182/24 8188/14
8204/15 8217/14 8272/15 8272/17 8275/4
8281/23 8282/4 8282/7 8283/20 8283/21
8285/3
door [8] 7988/15 7994/24 7997/2 7997/10
8003/1 8034/17 8040/12 8046/11

dot [2] 8061/5 8229/17
double [1] 8062/5
doubt [9] 8003/14 8064/24 8067/11 8074/17
8076/21 8076/25 8087/20 8087/23 8088/14
Dow [1] 8288/5
down [35] 7998/22 8018/19 8027/5 8028/17
8050/7 8058/17 8066/4 8083/9 8091/16
8094/17 8116/5 8116/16 8122/3 8122/5 8122/6
8122/6 8122/11 8172/24 8173/12 8182/22
8195/23 8196/8 8202/1 8205/10 8205/12
8207/22 8210/19 8219/14 8232/16 8241/21
8244/7 8269/2 8275/25 8281/18 8285/7
dozen [1] 8033/11
Dr [2] 8121/10 8271/2
Dr. [3] 8114/19 8139/15 8139/22
Dr. Rosenwald [3] 8114/19 8139/15 8139/22
draft [11] 8026/13 8057/6 8057/11 8057/14
8111/19 8118/10 8119/2 8127/8 8145/19
8202/4 8234/17
drafted [1] 8188/23
drafting [2] 8072/9 8188/22
drafts [4] 8107/18 8123/21 8137/6 8232/3
dramatically [1] 7981/11
draw [15] 7980/13 7981/18 7990/9 7990/18
7994/10 8092/23 8128/9 8129/11 8129/16
8131/2 8131/7 8205/14 8258/17 8259/6 8263/4
drawing [3] 8098/4 8205/16 8206/17
drawn [1] 8231/9
dream [1] 8100/13
dropped [2] 8084/8 8092/8
drug [1] 8037/12
DUBIN [7] 7974/20 7994/6 8003/2 8004/17
8004/18 8088/19 8093/25
due [6] 8091/17 8201/15 8202/6 8202/7 8202/8
8282/14
duly [2] 8007/2 8156/8
dump [1] 8137/25
dumped [1] 8136/19
DUNN [2] 7974/17 8197/7
duplicate [1] 8020/11
during [54] 7995/2 7997/15 7997/17 7998/18
7999/21 8000/1 8000/10 8000/13 8000/14
8002/16 8022/12 8023/6 8025/7 8025/17
8053/17 8067/6 8069/19 8070/10 8158/2
8158/17 8163/15 8164/11 8164/22 8165/5
8165/9 8165/10 8165/19 8166/20 8166/21
8166/23 8167/3 8167/8 8167/9 8175/2 8176/11
8176/13 8178/6 8178/9 8178/10 8185/15
8185/23 8191/15 8191/22 8192/25 8193/10
8193/17 8203/7 8206/19 8231/15 8241/2
8255/17 8255/18 8284/16 8293/12
duties [1] 8290/24
duty [2] 8089/14 8103/3
dwell [1] 8115/6
DX [13] 8008/15 8009/7 8009/13 8009/21
8009/23 8009/24 8010/4 8010/7 8010/13
8252/14 8253/3 8260/17 8264/4
DX-1190 [2] 8253/3 8260/17 8264/4
DX-124-88 [9] 8008/15 8009/7 8009/13
8009/21 8009/23 8009/24 8010/4 8010/7
8010/13
DX-190 [1] 8252/14
DX111 [1] 8250/22
DX111-90 [1] 8250/22
DX1190 [1] 8266/2
DX124 [1] 8101/25
DX124-88 [1] 8101/25
DX3057 [4] 8179/17 8179/19 8179/24 8182/19
Dynagrow [1] 8024/23 8025/8

**E**

e-mail [59] 7977/6 7977/13 8007/10 8007/10
8008/3 8008/5 8008/6 8008/17 8009/2 8009/6
8009/12 8009/12 8009/16 8009/21 8009/21
8010/12 8010/15 8023/11 8023/21 8024/10
8024/14 8024/18 8025/2 8025/4 8025/20
8025/22 8025/23 8026/1 8026/4 8026/8 8026/9
8026/14 8027/16 8027/16 8027/23 8028/8

**E**

**e-mail... [23]** 8028/14 8028/17 8028/22 8101/7 8102/12 8107/25 8110/15 8110/20 8111/11 8116/16 8122/5 8122/6 8122/12 8127/12 8137/19 8137/20 8229/22 8229/25 8230/2 8230/3 8250/15 8255/5 8259/2
**e-mail's [2]** 8024/7 8028/14
**e-mails [13]** 7977/23 8016/5 8021/25 8022/11 8028/24 8095/7 8098/20 8107/5 8118/12 8122/14 8137/11 8138/4 8139/17
**early [10]** 8036/7 8061/10 8062/21 8142/15 8209/25 8211/21 8212/1 8220/20 8222/7 8269/24
**easily [1]** 8066/5
**East [1]** 7974/14
**EASTERN [6]** 7974/1 7974/13 8011/15 8011/19 8018/4 8066/23
**easy [2]** 8178/24 8191/18
**eat [2]** 8063/8 8141/8
**Ed [1]** 8007/25
**edit [1]** 8243/5
**Edmund [3]** 8025/24 8027/3 8029/6
**Edwards [4]** 8255/14 8256/4 8267/6 8267/23
**effect [64]** 8009/25 8010/5 8034/19 8034/21 8037/6 8046/22 8053/22 8053/23 8055/9 8055/12 8132/21 8168/7 8172/3 8172/7 8172/10 8172/21 8175/12 8176/18 8184/18 8218/24 8219/12 8227/17 8228/22 8228/25 8229/3 8229/12 8229/13 8229/13 8229/16 8229/17 8229/19 8230/2 8230/6 8230/9 8230/10 8230/11 8230/16 8230/22 8231/6 8231/8 8231/17 8232/5 8232/10 8232/18 8233/10 8234/11 8238/1 8238/8 8252/9 8253/20 8258/4 8261/3 8263/7 8265/6 8266/7 8266/8 8275/1 8275/21 8275/24 8275/25 8276/4 8276/8 8276/20 8277/5
**effected [1]** 7992/13
**effective [1]** 8203/11
**effects [2]** 8077/23 8137/5
**effectuates [2]** 8068/15 8069/10
**efficient [2]** 8046/8 8105/3
**efficiently [1]** 8061/10
**effort [2]** 8142/19 8148/1
**efforts [1]** 8122/11
**egg [1]** 8202/12
**eight [30]** 7977/13 8065/15 8066/15 8088/16 8094/13 8094/16 8095/6 8095/14 8096/3 8096/15 8102/9 8103/10 8104/13 8131/9 8134/3 8135/8 8136/25 8138/21 8142/22 8147/16 8147/22 8147/23 8149/18 8149/20 8149/25 8157/20 8158/1 8158/3 8216/4 8246/22
**either [26]** 7976/17 7976/18 7983/1 8013/5 8018/8 8025/4 8026/5 8033/2 8062/4 8080/11 8089/6 8108/3 8150/10 8155/19 8177/12 8205/13 8205/19 8205/23 8209/23 8233/2 8237/19 8255/15 8267/7 8279/13 8286/14 8296/20
**elderly [1]** 8216/20
**elected [1]** 8163/19
**electronically [2]** 8255/15 8267/7
**ELEIS [1]** 7974/15
**element [3]** 8003/14 8074/23 8129/25
**elements [4]** 8064/23 8067/19 8069/17 8136/21
**elicit [25]** 7993/2 7997/9 7999/4 8032/7 8032/14 8033/15 8040/23 8041/15 8053/3 8172/2 8173/21 8174/20 8176/16 8206/7 8206/17 8212/4 8212/6 8215/7 8215/8 8216/6 8218/3 8253/11 8256/8 8264/2 8295/24
**elicitation [1]** 8037/13
**elicited [14]** 7998/21 8037/21 8067/25 8171/3 8173/23 8221/7 8252/17 8253/25 8255/17 8257/3 8257/3 8260/22 8262/4 8262/6
**eliciting [7]** 7998/2 8168/5 8168/5 8168/6 8176/14 8210/10 8212/4
**ELMO [1]** 8025/1
**elsewhere [2]** 8017/22 8105/11

**email [24]** 7974/23 8050/7 8057/2 8057/7 8064/20 8170/17 8180/14 8181/4 8181/4 8181/7 8181/9 8181/20 8181/24 8181/25 8181/3 8182/2 8182/24 8183/4 8183/5 8185/8 8266/3 8266/9 8266/12 8266/16 8267/16 8267/22 8268/1 8278/6 8278/9
**emails [9]** 8073/2 8076/6 8082/2
**emeritus [5]** 8300/6 8300/14 8301/12 8301/15 8301/16
**emotional [3]** 8037/12 8093/3 8172/23
**emphasize [1]** 7993/22
**employee [6]** 8058/4 8059/5 8295/10 8301/14 8302/2 8302/3
**employees [6]** 8000/19 8000/20 8013/5 8013/6 8020/7 8020/10
**employers [1]** 8013/22
**employment [8]** 8198/20 8287/16 8291/21 8295/6 8300/23 8301/2 8301/4 8301/9
**end [52]** 7975/7 7977/21 7977/21 7978/5 7978/16 7997/6 8001/13 8001/25 8002/3 8002/9 8003/16 8003/17 8003/20 8010/17 8010/22 8011/16 8013/1 8013/8 8019/14 8020/19 8049/12 8060/3 8063/14 8067/2 8067/14 8069/12 8090/6 8100/23 8101/15 8104/7 8105/10 8114/8 8126/2 8140/11 8141/24 8144/7 8148/24 8150/4 8165/8 8167/3 8177/23 8178/6 8186/8 8187/19 8196/14 8203/14 8216/25 8217/1 8233/16 8280/6 8281/23 8282/17
**endangered [1]** 8049/17
**ended [6]** 8035/4 8053/21 8130/23 8130/24 8142/5 8297/22
**ending [1]** 8216/7
**ends [9]** 8045/23 8068/22 8092/9 8093/18 8107/22 8115/8 8130/12 8141/1 8264/17
**enforcement [10]** 7981/19 7984/12 7986/9 7987/4 7988/6 7991/18 7999/11 8161/14 8161/15 8161/19
**enforcing [1]** 8118/18
**engaging [1]** 8107/1
**English [1]** 8188/16
**enjoy [1]** 8064/10
**enshrined [1]** 8302/16
**enter [7]** 8015/23 8090/21 8091/7 8091/13 8118/25 8119/2 8152/19
**entered [4]** 8074/8 8090/8 8202/17 8286/8
**enters [3]** 8054/22 8155/24 8222/1
**entire [7]** 8006/16 8128/20 8129/5 8129/18 8131/3 8185/25 8263/13
**entirely [4]** 8075/23 8150/25 8173/12 8221/1
**entities [7]** 8029/8 8069/22 8077/10 8121/19 8279/20 8289/2 8289/4
**entitled [9]** 7998/22 8033/15 8042/8 8051/22 8053/22 8144/1 8176/16 8201/18 8203/12
**entity [5]** 8097/25 8122/10 8122/10 8124/21 8132/19
**entries [12]** 8181/17 8181/20 8181/24 8181/24 8241/14 8242/2 8242/7 8243/2 8250/6 8268/9 8268/9 8268/20
**entry [23]** 8223/6 8223/10 8239/7 8242/24 8242/25 8243/3 8243/12 8244/3 8244/3 8244/14 8244/23 8245/5 8246/1 8247/2 8247/10 8248/6 8249/11 8249/15 8250/8 8256/2 8268/16 8268/24 8269/2
**envelope [1]** 7975/12
**envision [1]** 8296/22
**equals [1]** 8297/15
**equation [5]** 8077/8 8077/9 8077/11 8077/13 8078/2
**equity [13]** 8117/8 8157/14 8158/4 8166/4 8185/13 8185/21 8185/22 8188/25 8189/8 8189/10 8196/22 8239/15 8246/13
**error [1]** 8041/4
**escrow [6]** 8009/22 8009/23 8010/16 8102/13 8135/20 8135/22
**especially [3]** 8204/17 8220/12 8281/6
**ESQ [9]** 7974/12 7974/15 7974/15 7974/16 7974/19 7974/19 7974/20 7974/20 7974/21
**essential [1]** 8064/23

**establish [10]** 8046/18 8067/12 8078/20 8097/13 8099/5 8163/8 8175/10 8175/14 8260/24 8262/15
**established [8]** 8034/6 8035/21 8152/16 8153/21 8154/4 8228/20 8288/25 8295/23
**establishing [1]** 8097/23
**estimate [2]** 8282/3 8282/6
**ethic [1]** 8158/13
**ethical [2]** 8129/3 8158/8
**evaluating [1]** 8001/9
**EVAN [101]** 7974/6 8007/10 8024/12 8057/21 8065/7 8065/13 8065/17 8065/18 8067/18 8067/23 8069/6 8069/6 8069/7 8071/5 8071/10 8071/10 8071/12 8071/17 8071/21 8071/22 8071/25 8073/23 8074/17 8075/5 8083/7 8085/11 8085/21 8086/6 8093/22 8093/24 8094/9 8094/10 8094/14 8094/15 8096/14 8096/19 8101/1 8101/4 8101/9 8101/16 8101/18 8102/11 8102/13 8102/15 8102/18 8102/25 8103/9 8103/12 8103/17 8103/18 8103/19 8103/20 8103/21 8127/25 8128/3 8143/9 8149/21 8157/17 8167/7 8177/3 8177/3 8183/6 8183/18 8186/10 8187/8 8187/22 8187/25 8188/4 8188/9 8188/11 8188/17 8188/19 8189/4 8189/15 8189/21 8189/24 8191/13 8195/23 8195/24 8198/19 8223/7 8236/25 8237/5 8239/8 8239/13 8239/16 8239/19 8241/14 8241/22 8244/24 8246/2 8246/20 8247/2 8248/8 8248/21 8249/12 8249/16 8250/10 8267/13 8268/16 8269/3
**evenly [1]** 8221/6
**event [5]** 7980/8 7988/4 8151/20 8279/19 8287/8
**events [3]** 7987/3 8093/21 8160/9
**eventually [3]** 8188/3 8189/13 8262/10
**evidence [220]** 7979/18 7980/19 7981/22 7987/1 7988/24 7993/13 7994/1 7994/3 7994/25 7997/24 7998/7 7999/23 8000/3 8001/9 8007/8 8008/3 8008/20 8009/9 8010/8 8013/4 8013/8 8013/8 8022/12 8024/10 8027/10 8028/13 8034/4 8034/14 8036/5 8038/4 8038/5 8045/6 8049/22 8050/6 8050/8 8051/17 8064/25 8065/6 8065/7 8065/12 8065/13 8066/14 8067/10 8067/23 8068/6 8068/8 8068/19 8069/5 8069/6 8069/6 8069/7 8069/18 8069/23 8069/25 8071/4 8071/9 8071/16 8071/16 8072/7 8072/15 8073/12 8074/13 8074/21 8074/25 8075/12 8075/20 8075/25 8076/1 8076/2 8076/3 8078/23 8079/17 8081/18 8082/18 8082/20 8082/23 8083/10 8084/6 8085/10 8085/18 8085/20 8086/24 8087/4 8087/16 8087/21 8088/24 8089/5 8089/7 8089/14 8089/22 8089/24 8090/17 8090/19 8091/6 8091/8 8091/14 8092/2 8094/2 8094/14 8095/15 8096/1 8096/7 8096/8 8096/10 8096/14 8099/1 8101/3 8101/7 8102/6 8102/18 8103/5 8103/11 8103/11 8103/11 8103/15 8103/19 8104/12 8104/20 8105/5 8106/11 8106/22 8106/23 8106/23 8106/24 8108/6 8108/8 8108/20 8110/2 8110/8 8110/10 8110/14 8110/15 8111/23 8111/3 8113/1 8113/1 8113/8 8116/19 8117/4 8117/9 8118/22 8120/24 8121/21 8124/17 8126/10 8128/8 8128/10 8128/14 8129/6 8129/17 8130/1 8131/1 8131/6 8135/4 8136/17 8136/22 8136/25 8137/15 8137/22 8138/10 8141/5 8142/8 8146/25 8147/15 8147/25 8148/9 8148/16 8149/19 8149/20 8169/24 8175/13 8177/2 8181/5 8181/7 8181/12 8183/8 8212/19 8213/4 8213/12 8215/4 8219/1 8219/2 8220/5 8220/6 8221/4 8222/17 8231/3 8231/17 8232/2 8238/23 8239/7 8241/5 8242/12 8244/18 8246/14 8247/7 8247/16 8247/20 8249/20 8255/4 8255/6 8255/17 8257/19 8258/20 8259/24 8260/20 8261/20 8262/6 8262/20 8262/21 8266/10 8266/14 8267/16 8268/5 8268/24 8287/23 8288/8 8288/11 8290/14 8298/19 8302/24

**exact [3]** 8059/7 8258/24 8298/13

**exactly [10]** 8065/14 8067/15 8103/13 8123/1 8209/17 8220/8 8220/25 8223/4 8249/4 8275/20

**examination [36]** 7987/24 8006/20 8007/4 8007/5 8022/12 8022/25 8023/1 8023/7 8023/17 8025/7 8025/18 8027/13 8030/4 8032/3 8034/9 8040/12 8041/10 8049/24 8054/4 8055/2 8055/15 8056/22 8056/25 8059/2 8067/25 8068/7 8156/14 8192/3 8199/20 8200/24 8208/19 8213/15 8222/3 8230/18 8262/4 8299/4

**examine [2]** 8042/8 8169/1

**examined [3]** 8007/2 8156/9 8170/15

**example [13]** 7977/25 8108/16 8130/4 8160/10 8168/19 8175/14 8211/17 8214/24 8230/7 8241/14 8244/24 8286/21 8302/16

**examples [5]** 7978/3 7978/4 8091/20 8289/5 8289/8

**excellent [1]** 8158/7

**except [2]** 8153/25 8292/9

**exception [16]** 7980/18 8169/12 8171/18 8172/14 8172/14 8173/15 8177/9 8218/23 8221/8 8259/21 8259/23 8260/13 8275/2 8275/24 8276/19 8277/12

**exceptions [2]** 8169/16 8174/19

**exchange [15]** 8009/2 8009/4 8023/13 8023/17 8025/22 8028/14 8058/6 8125/8 8161/11 8161/12 8161/17 8179/7 8182/23 8189/19 8250/15

**exchanged [1]** 8110/15

**exchanging [1]** 8207/24

**exclude [1]** 8288/8

**exclusive [1]** 8034/9

**exculpatory [1]** 7981/7

**excuse [9]** 7982/19 8006/12 8061/16 8092/20 8196/3 8200/19 8217/9 8273/21 8274/7

**excused [5]** 8001/17 8006/10 8052/21 8059/10 8274/8

**excuses [1]** 8101/2

**execute [1]** 8135/6

**executed [4]** 8024/21 8090/6 8090/13 8265/24

**executing [1]** 8072/9

**executive [18]** 8125/4 8163/23 8164/5 8164/6 8164/8 8164/11 8166/15 8185/16 8237/20 8246/12 8287/17 8290/10 8291/21 8293/6 8294/2 8294/25 8295/4 8295/4

**executives [8]** 8124/19 8152/15 8153/22 8288/24 8294/8 8294/10 8294/11 8296/13

**exercise [2]** 8115/17 8118/15

**exercising [1]** 8115/1

**exhaustive [1]** 8293/10

**exhibit [65]** 8008/3 8008/15 8008/24 8009/1 8009/9 8009/16 8010/7 8010/10 8023/6 8023/16 8024/10 8024/24 8025/4 8025/17 8026/8 8027/10 8027/17 8027/17 8027/21 8027/22 8028/9 8028/13 8056/22 8056/23 8060/12 8101/25 8102/4 8151/5 8179/6 8179/19 8181/12 8185/1 8222/17 8222/20 8238/23 8241/5 8242/3 8242/11 8244/17 8245/18 8245/22 8245/23 8246/2 8246/6 8246/14 8247/6 8247/15 8247/20 8249/20 8250/12 8255/4 8256/14 8258/10 8260/15 8261/24 8266/5 8266/10 8266/14 8266/11 8267/11 8267/12 8267/15 8268/4 8268/4 8268/23

**Exhibit 103-17 [3]** 8266/14 8266/17 8267/12

**Exhibit 108-68A [2]** 8056/22 8056/23

**Exhibit 1190 [2]** 8266/5 8267/15

**Exhibit 3057 [2]** 8179/6 8185/1

**Exhibit 802 [1]** 8181/12

**Exhibit 828 [1]** 8268/4

**Exhibit 831 [1]** 8268/23

**exhibits [6]** 8028/25 8060/3 8060/7 8140/25 8173/7 8306/11

**exist [5]** 8068/7 8110/19 8111/3 8111/8 8111/24

**existed [4]** 8032/8 8109/6 8112/12 8128/11 8131/2 8173/22

**existing [1]** 8173/21

**exists [1]** 8137/1

**exit [1]** 8301/13

**exited [1]** 8046/5

**exiting [6]** 8299/5 8299/9 8299/11 8299/11 8299/17 8301/14

**exits [4]** 8064/15 8210/22 8274/6 8301/11

**expand [1]** 8041/10

**expect [7]** 7975/13 7983/21 8152/4 8211/15 8287/5

**expected [1]** 8147/6

**expense [1]** 8070/4

**expensive [1]** 8188/19

**experience [40]** 7997/5 8021/15 8089/11 8150/7 8154/7 8198/23 8198/24 8204/10 8204/12 8204/23 8205/5 8224/16 8225/3 8225/6 8227/3 8228/3 8237/14 8284/22 8287/16 8287/21 8287/22 8289/7 8291/20 8292/5 8294/8 8294/18 8294/18 8294/24 8295/15 8295/15 8295/17 8295/18 8295/19 8295/19 8295/21 8296/9 8296/17 8297/10 8297/20 8298/6

**expert [22]** 7976/17 8090/23 8152/9 8204/8 8204/17 8275/23 8276/12 8278/20 8285/24 8287/5 8287/20 8288/8 8288/7 8290/8 8292/18 8296/10 8296/12 8296/18 8299/8 8300/18 8302/11 8302/19

**expert's [1]** 8298/6

**expert-ish [1]** 8204/17

**expertise [6]** 8153/21 8290/2 8294/16 8294/17 8300/21 8301/24

**experts [1]** 8154/15

**explain [20]** 7988/12 7988/13 8041/11 8051/2 8051/13 8051/22 8052/23 8052/24 8053/22 8054/7 8131/16 8185/3 8229/16 8237/23 8264/1 8275/15 8275/19 8276/4 8276/9 8277/9

**explained [6]** 8045/7 8058/9 8087/24 8106/20 8274/21 8276/18

**explaining [5]** 8093/19 8230/8 8262/22

**explains [2]** 8150/22 8276/8

**explanation [12]** 7991/23 7992/3 8021/23 8039/14 8051/4 8123/25 8124/1 8154/12 8262/8 8277/2 8277/18 8289/9

**explanations [1]** 8048/7

**explicit [1]** 8116/1

**explicitly [1]** 8151/15

**explore [1]** 7979/7

**explored [1]** 8039/25

**exploring [1]** 8036/16

**exposure [5]** 8116/9 8118/20 8121/20 8145/1 8145/2

**express [3]** 8112/18 8255/9 8255/16 8267/8 8299/2

**expressed [1]** 7976/25

**extent [16]** 7993/25 7994/3 8068/12 8073/17 8091/11 8094/17 8139/21 8140/25 8171/7 8205/19 8208/6 8221/6 8232/19 8288/19 8296/9 8299/1

**extra [2]** 8284/23 8300/25

**extraordinarily [4]** 8037/9 8040/7 8041/2 8041/6

**extraordinary [4]** 8141/15 8141/16 8279/19 8280/5

**extremely [6]** 8032/20 8037/13 8040/5 8158/7 8158/11 8293/19

**eye [2]** 8214/7 8214/7

**eyes [1]** 8002/10

---

**F**

**F.3d [1]** 8288/13

**F.Supp [1]** 8066/22

**facially [1]** 8153/8

**facilitates [1]** 8107/8

**facilitating [1]** 8072/9

**fact [103]** 7976/20 7976/20 7979/1 7980/16 7980/17 7981/4 7981/18 7983/12 7983/20 7984/10 7985/5 7988/15 7988/21 7988/23

---

7988/24 7990/25 7992/22 7993/17 7994/11 7997/21 7998/1 7998/10 7998/17 7998/25 8001/4 8005/5 8017/16 8020/23 8034/3 8035/7 8038/2 8038/7 8049/9 8050/10 8064/23 8068/1 8071/24 8072/19 8078/5 8079/9 8080/8 8080/10 8080/11 8080/14 8081/9 8082/25 8083/1 8089/7 8089/17 8098/17 8107/13 8111/4 8111/8 8111/8 8111/16 8111/24 8112/14 8113/13 8115/17 8120/19 8123/13 8126/22 8128/12 8129/20 8130/12 8136/3 8137/17 8140/10 8141/17 8142/1 8143/17 8145/17 8171/8 8172/1 8172/10 8172/19 8188/17 8205/24 8206/4 8215/11 8215/16 8215/22 8226/2 8227/21 8251/11 8257/20 8257/23 8258/7 8261/11 8262/21 8262/24 8263/3 8264/12 8275/1 8282/14 8287/23 8287/24 8288/22 8289/10 8290/15 8296/21 8298/5 8303/2

**facts [11]** 7980/22 8051/17 8111/25 8202/4 8204/18 8215/6 8261/9 8287/25 8288/3 8296/11 8302/24

**factual [2]** 8302/12 8302/18

**factually [1]** 8298/6

**failed [2]** 8068/24 8079/12

**fails [1]** 8067/16

**failure [1]** 8003/13 8185/11

**failures [1]** 8129/19

**fair [8]** 7987/24 7989/13 8051/2 8053/1 8134/25 8207/6 8264/1 8299/14

**fairly [4]** 7985/14 8062/15 8177/7 8288/6

**fall [2]** 8097/5 8202/23

**false [5]** 7981/7 8042/5 8042/9 8146/16 8302/25

**falsely [1]** 8100/6

**familiar [7]** 8053/9 8182/1 8188/1 8200/5 8272/12 8287/19 8302/8

**families [1]** 8160/7

**family [5]** 8150/6 8159/21 8160/5 8160/9 8160/16 8161/22

**far [11]** 7981/13 8021/11 8021/13 8037/5 8051/9 8052/18 8053/20 8111/14 8154/5 8177/13 8261/18

**far-reaching [1]** 7981/13

**farting [1]** 8088/25

**fashion [3]** 8048/7 8049/24 8257/16

**fault [2]** 8045/13 8282/22

**faulting [1]** 7997/17

**favorable [2]** 8065/1 8129/17

**FBI [30]** 7985/16 7993/22 7998/18 8000/10 8001/1 8001/3 8001/4 8001/8 8001/10 8003/19 8004/13 8005/6 8011/20 8012/7 8012/11 8016/15 8016/15 8016/22 8017/1 8017/16 8017/21 8020/23 8021/21 8035/14 8056/2 8059/4 8082/25 8087/2 8199/22 8199/24

**FBI's [1]** 8017/15

**fear [2]** 8093/1 8100/16

**Fearnow [35]** 8010/24 8026/23 8026/23 8028/5 8028/21 8098/7 8099/1 8099/3 8099/9 8099/14 8099/19 8100/16 8102/17 8102/22 8102/23 8134/7 8134/9 8134/13 8134/20 8134/23 8135/13 8135/17 8135/20 8138/24 8139/4 8139/4 8139/14 8140/12 8140/13 8140/15 8140/20 8148/2 8148/6 8148/11 8148/15

**Fearnow's [1]** 8135/17

**February [15]** 8247/17 8247/25 8250/9 8250/9 8250/18 8251/3 8251/9 8255/5 8255/10 8255/22 8255/23 8256/2 8258/18 8262/1 8267/17

**February 24 [2]** 8247/17 8247/25

**February 6 [2]** 8250/9 8250/9

**February 7 [1]** 8267/17

**federal [4]** 8255/9 8255/16 8267/8 8279/20

**fee [2]** 8186/23 8280/25

**fees [1]** 8076/8

**fell [1]** 8067/10

**felony [1]** 8292/24

**felt [1]** 8196/14

**F**

**Fernandez [6]** 8007/19 8024/21 8025/2 8027/1 8029/4 8106/19

**Ferruolo [3]** 8303/11 8304/4 8304/15

**few [12]** 8021/11 8021/13 8023/5 8044/10 8088/20 8117/1 8131/12 8139/2 8159/21 8186/16 8195/13 8247/21

**fiction [3]** 8114/1 8114/10 8141/24

**fides [1]** 8142/14

**Fifth [3]** 7980/11 7982/4 7990/7

**fight [1]** 8124/8

**figure [2]** 8137/17 8304/20

**file [3]** 7975/5 7975/8 8270/15

**filed [6]** 8034/16 8111/19 8118/9 8188/21 8188/23 8195/20

**files [1]** 8034/13

**filing [1]** 8202/10

**filings [2]** 8089/9 8151/4

**fills [1]** 8113/17

**final [2]** 8153/16 8232/4

**finalized [1]** 8079/7

**finally [3]** 8056/21 8060/9 8142/2

**financial [4]** 8057/21 8195/21 8195/21 8237/21

**financing [3]** 8239/9 8239/14 8239/15

**fine [14]** 7978/1 7991/3 8005/7 8061/20 8063/2 8063/3 8093/13 8173/9 8217/20 8233/2 8260/12 8260/20 8278/15 8285/15

**finger [1]** 8089/12

**finish [3]** 7997/15 8033/22 8283/16

**finished [1]** 8280/1

**fired [1]** 8043/13

**firm [75]** 7992/17 7992/19 8000/22 8011/16 8012/8 8012/12 8012/19 8012/22 8013/11 8014/2 8014/3 8014/11 8032/17 8032/18 8033/13 8045/8 8046/13 8049/16 8070/7 8071/1 8076/10 8076/12 8095/22 8101/5 8101/10 8104/5 8144/23 8158/18 8161/20 8162/2 8162/13 8162/10 8163/7 8163/19 8163/20 8165/13 8165/16 8165/21 8165/23 8166/2 8166/3 8166/11 8178/12 8178/22 8183/16 8185/10 8185/12 8185/14 8185/19 8185/25 8186/3 8186/8 8186/25 8187/18 8188/6 8188/14 8188/17 8188/25 8189/4 8189/7 8189/24 8191/14 8195/10 8195/17 8196/10 8196/11 8196/12 8216/13 8217/3 8218/6 8218/11 8223/24 8239/15 8245/11 8246/13

**firms [9]** 8072/5 8082/15 8157/9 8157/14 8162/22 8162/24 8177/7 8196/22 8302/22

**first [46]** 7976/4 7996/14 7998/24 8007/2 8020/17 8029/17 8029/24 8032/19 8041/17 8044/10 8049/21 8059/4 8086/21 8106/3 8114/18 8116/13 8125/14 8127/18 8152/10 8155/6 8155/8 8156/3 8156/8 8157/21 8163/17 8179/21 8181/17 8187/10 8187/22 8191/5 8194/1 8200/15 8205/4 8219/12 8223/3 8228/7 8238/16 8239/3 8242/14 8245/8 8261/18 8266/3 8267/3 8268/16 8286/2 8288/16

**fiscal [1]** 8165/17

**Fisher [2]** 8244/8 8244/16

**fit [3]** 8284/20 8285/1 8294/15

**five [24]** 7975/8 7976/11 7995/25 8007/15 8007/25 8008/6 8009/17 8010/11 8100/15 8134/10 8141/9 8141/10 8163/18 8164/9 8164/21 8165/7 8186/9 8198/5 8198/10 8223/25 8244/17 8246/6 8284/5 8290/6

**five-minute [1]** 8223/25

**fixed [2]** 8094/8 8186/23

**flagging [1]** 8082/1

**fledging [1]** 8152/19

**flip [1]** 8057/9

**floating [1]** 7987/25

**flood [2]** 8096/24 8097/1

**floor [4]** 7974/18 8191/8 8191/8 8191/10

**flowing [1]** 8048/3

**fluctuated [1]** 8186/15

**fluid [2]** 8203/16 8203/16

**focus [16]** 8029/11 8034/8 8034/9 8039/8

**focused [6]** 8037/13 8039/13 8073/11 8073/18 8122/8 8124/3

**focusing [4]** 8085/18 8122/11 8133/18 8191/15

**folks [5]** 8074/19 8290/25 8295/9

**follow [7]** 7978/25 7995/12 8004/5 8004/6 8010/21 8011/9 8233/6

**followed [2]** 8215/25 8227/5

**following [22]** 8005/11 8006/1 8026/24 8032/1 8041/1 8053/11 8056/15 8056/18 8057/17 8057/18 8092/13 8154/16 8167/4 8170/9 8178/7 8250/25 8255/1 8255/15 8258/17 8267/7 8285/24 8298/16

**follows [2]** 8007/3 8156/9

**Foods [1]** 8289/4

**force [1]** 8173/17

**forget [4]** 8030/13 8108/1 8135/21 8137/19

**forgot [1]** 8092/3

**form [31]** 7984/23 8016/18 8018/13 8018/16 8050/22 8071/12 8087/10 8101/18 8107/19 8111/19 8111/20 8124/14 8169/2 8169/3 8182/3 8182/4 8192/2 8193/23 8194/14 8194/16 8194/18 8195/12 8204/21 8215/24 8270/7 8270/11 8272/13 8272/13 8272/14 8273/11 8273/13

**formed [2]** 8240/6 8240/7

**former [7]** 8012/12 8013/5 8013/22 8049/16 8058/4 8236/15 8294/25

**formerly [1]** 8072/16

**forms [6]** 8194/1 8194/22 8198/19 8198/19 8198/19 8272/9

**formulate [1]** 8151/17

**formulated [1]** 8290/12

**forth [4]** 8060/2 8201/12 8240/18 8301/7

**Fortune [1]** 8289/1

**Forty [1]** 8284/5

**Forty-five [1]** 8284/5

**forward [13]** 7981/2 7981/11 8074/16 8147/3 8176/24 8196/8 8196/10 8196/15 8196/15 8203/12 8244/25 8263/18 8266/13

**forwarded [5]** 8073/2 8089/2 8256/11 8256/12 8259/9

**forwarding [1]** 8259/4

**fought [1]** 7994/18

**foundation [24]** 8033/1 8033/1 8041/17 8041/22 8176/19 8180/4 8180/7 8180/19 8180/25 8184/20 8205/21 8211/19 8212/2 8213/18 8215/8 8218/18 8227/7 8227/9 8227/11 8228/20 8253/8 8253/8 8275/3 8277/14

**founded [1]** 8300/13

**founder [28]** 8125/5 8255/19 8256/10 8256/19 8261/5 8262/11 8294/20 8294/22 8294/24 8295/5 8295/16 8295/20 8295/21 8296/20 8297/3 8297/4 8297/5 8297/15 8298/1 8299/9 8299/11 8299/15 8299/17 8299/25 8300/3 8300/3 8301/3 8301/11

**founder's [2]** 8262/12 8262/16

**founders [15]** 8124/19 8152/15 8153/22 8263/17 8288/24 8294/9 8294/11 8295/15 8295/20 8296/14 8297/11 8297/13 8297/23 8299/5 8299/6

**founding [2]** 8121/18 8294/2

**four [29]** 7976/11 7976/15 8007/23 8100/15 8160/3 8163/24 8163/25 8164/8 8164/14 8164/14 8164/20 8164/23 8166/11 8188/14 8188/20 8189/6 8197/18 8198/10 8242/17 8245/14 8245/16 8245/19 8245/23 8246/16 8250/3 8278/5 8288/16 8293/4 8293/12

**fourth [4]** 7975/16 8028/17 8058/17 8291/13

**fragile [1]** 8149/9

**frame [1]** 8053/2

**framed [1]** 8071/23

**frankly [5]** 8095/25 8291/8 8293/22

**fraud [23]** 8067/14 8081/18 8100/23 8100/23

8039/12 8039/14 8039/17 8066/14 8094/14 8108/3 8166/25 8178/24 8187/7 8204/10 8205/25 8206/18

**focused [6]** 8037/13 8039/13 8073/11 8073/18 8122/8 8124/3

8100/23 8101/19 8103/20 8136/4 8184/16 8185/11 8186/20 8196/15 8205/24 8206/4 8208/25 8209/15 8210/2 8282/15

**frauds [1]** 8129/23

**fraudulent [6]** 8093/17 8126/2 8126/7 8153/2 8292/20 8298/23

**free [4]** 8048/3 8097/19 8129/11 8136/9

**free-trading [1]** 8136/9

**Friday [13]** 7977/10 8006/8 8006/13 8199/24 8199/24 8278/11 8279/17 8282/6 8282/9 8283/15 8283/4 8284/12 8285/2

**fried [1]** 8172/25

**friend [1]** 8187/23

**friends [4]** 7992/18 8013/22 8018/7 8140/7

**frivolous [1]** 8118/23

**front [11]** 7979/8 7986/1 7986/4 7998/16 8004/3 8036/24 8060/15 8061/14 8155/19 8203/10 8249/21

**fronted [1]** 7983/17

**full [6]** 7983/21 7984/6 8058/17 8121/13 8130/5 8156/11

**fully [5]** 7997/10 8081/5 8081/15 8082/6 8093/15

**fulsome [1]** 8154/12

**function [4]** 8081/13 8109/24 8288/4 8289/10

**functioned [1]** 8103/21

**functioning [3]** 8072/4 8101/10 8280/20

**fund [6]** 8116/6 8116/24 8117/2 8189/8 8189/9 8189/10

**fundamental [2]** 8037/22 8048/2

**fundamentally [2]** 8042/17 8048/14

**funded [6]** 8152/19 8251/24 8265/17 8265/24 8279/22 8280/9

**funds [9]** 8070/9 8076/18 8097/14 8098/2 8117/5 8122/4 8122/6 8157/14 8157/14

**furtherance [1]** 8133/2

**furthers [1]** 8112/9

**future [1]** 8107/22

**FYI [1]** 8026/1

**G**

**G-U-B-A-R [1]** 8162/11

**game [2]** 7987/24 8087/5

**gap [1]** 8288/9

**gaps [1]** 8288/10

**gatekeeping [1]** 8288/4

**Gateway [5]** 8097/18 8097/24 8132/15 8135/12 8206/5

**gather [1]** 7979/15

**Geller [22]** 8072/1 8072/1 8074/14 8106/18 8106/18 8124/10 8125/14 8126/20 8128/1 8128/1 8140/1 8143/7 8145/10 8145/14 8145/22 8146/2 8146/5 8146/7 8146/20 8270/16 8270/24 8298/18

**Geller's [2]** 8117/15 8145/19

**Gellers [1]** 8115/1

**general [43]** 8073/14 8136/7 8147/24 8152/7 8152/8 8157/12 8157/14 8161/25 8167/2 8169/15 8174/13 8186/11 8186/11 8186/20 8189/20 8189/25 8200/13 8201/6 8204/15 8204/20 8204/21 8205/15 8208/10 8208/24 8209/2 8225/6 8230/9 8232/20 8238/13 8238/14 8239/24 8240/2 8247/11 8249/3 8250/6 8250/7 8260/3 8273/8 8274/16 8277/12 8288/18 8290/11 8291/10

**generalization [1]** 8092/2

**generally [20]** 8041/19 8043/3 8054/4 8153/14 8182/1 8182/2 8198/25 8205/23 8240/11 8255/24 8256/1 8269/17 8270/8 8271/12 8272/11 8272/13 8276/12 8277/4 8286/15 8288/6

**gentleman [2]** 8213/20 8236/24

**gentlemen [2]** 8001/20 8001/23

**George [4]** 8028/15 8030/1 8160/24 8161/5

**Giants [1]** 8193/12

**GIBSON [2]** 7974/17 8197/7

**gift [1]** 8111/18 8111/22 8149/13

8117/3 8117/22 8120/2 8123/5 8123/14 8125/16 8126/25 8126/25 8128/10 8130/5 8130/18 8133/1 8134/14 8136/6 8136/7 8151/6 8151/18 8152/21 8206/18

**G**

**Giller [1]** 8304/6
**given [35]** 7975/19 8001/13 8002/2 8002/16
8002/19 8035/14 8045/3 8045/14 8045/14
8054/1 8064/12 8066/1 8073/2 8076/17 8087/4
8087/5 8104/20 8120/24 8121/1 8121/3 8131/1
8132/10 8137/21 8171/4 8175/21 8218/21
8235/3 8238/11 8261/5 8272/17 8276/13
8278/2 8283/12 8298/2 8298/16
**Gleeson [2]** 8067/1 8069/4
**Gleeson's [1]** 8066/18
**gmail.com [1]** 7974/23
**goals [1]** 8140/9
**Golding [1]** 8057/19
**Google [3]** 8286/18 8291/10 8293/11
**Gould [2]** 8162/20 8162/25
**governance [1]** 8090/24
**government [157]** 7974/12 7975/19 7976/22
7976/25 7977/9 7977/17 7977/20 7979/11
7981/9 7989/12 7993/22 7994/19 7994/20
7994/25 7998/10 8001/11 8007/7 8008/2
8008/24 8008/25 8009/9 8009/16 8010/10
8023/6 8024/9 8025/17 8027/9 8027/17
8027/22 8028/9 8028/13 8032/7 8032/13
8037/4 8037/14 8041/4 8046/9 8048/6 8048/15
8049/21 8050/5 8050/8 8050/9 8053/2 8056/2
8056/4 8056/10 8056/12 8056/18 8059/13
8060/7 8061/12 8061/19 8064/3 8065/4 8065/9
8067/4 8067/19 8067/24 8068/6 8068/17
8068/23 8070/1 8076/20 8076/24 8082/21
8085/25 8086/1 8086/8 8086/17 8086/20
8087/2 8087/8 8087/11 8087/15 8087/17
8087/19 8087/22 8088/2 8088/4 8088/9
8088/11 8089/24 8090/22 8094/16 8095/17
8098/15 8099/11 8099/23 8104/20 8104/24
8129/18 8142/4 8149/24 8152/20 8152/23
8171/19 8173/9 8173/12 8177/2 8177/12
8179/3 8181/12 8205/17 8212/19 8213/17
8218/25 8219/5 8221/4 8227/13 8228/12
8229/15 8252/14 8254/4 8255/4 8255/17
8256/14 8257/2 8257/15 8260/14 8260/15
8260/22 8261/7 8261/23 8261/23 8263/8
8266/14 8266/17 8267/12 8268/4 8268/23
8278/2 8278/14 8279/18 8280/7 8280/13
8281/20 8283/4 8284/21 8284/22 8285/1
8285/7 8287/4 8288/15 8290/21 8291/7
8291/13 8294/17 8295/21 8296/5 8296/10
8297/2 8297/12 8297/22 8298/1 8298/3
8303/10
**government's [40]** 7978/13 7993/11 7998/3
8032/22 8065/2 8065/23 8067/10 8067/16
8069/3 8096/13 8097/8 8108/14 8134/6
8141/20 8141/22 8144/21 8151/5 8175/19
8204/20 8213/12 8222/16 8222/20 8238/22
8241/5 8242/3 8242/11 8244/17 8245/18
8245/22 8245/23 8246/2 8246/6 8246/14
8247/6 8247/15 8247/20 8249/20 8256/21
8257/14 8258/20
**graduate [2]** 8160/17 8161/4
**graduated [1]** 8161/7
**grandchildren [2]** 8160/2 8160/4
**grant [1]** 8066/12
**granted [4]** 8064/22 8066/5 8066/7 8066/10
**granular [1]** 8052/18
**grave [1]** 8001/13
**great [1]** 8288/9
**greater [1]** 8047/9
**GREEBEL [575]**
**Greebel's [52]** 7992/22 7994/1 7995/1 8000/21
8001/21 8017/1 8017/3 8027/19 8029/2
8032/17 8033/4 8038/13 8042/3 8046/11
8068/12 8074/1 8077/22 8080/16 8082/5
8087/18 8090/20 8093/22 8102/11 8102/19
8105/24 8110/11 8111/4 8127/13 8136/25
8137/16 8138/13 8142/9 8144/7 8146/23
8150/4 8151/12 8171/17 8174/8 8204/25
8212/9 8212/18 8213/3 8218/25 8225/12
8234/5 8243/3 8255/4 8255/4 8264/12 8265/3

**gross [1]** 8117/3
**grossly [1]** 8143/16
**ground [6]** 8053/1 8096/25 8097/14 8097/25
8098/1 8293/17
**grounds [2]** 8183/22 8184/24 8288/16
**group [7]** 8095/7 8138/22 8148/11 8166/16
8188/12 8189/8 8229/25
**groups [1]** 8166/16
**grow [1]** 8160/13
**Grumet [1]** 8267/22
**Gubar [3]** 8162/10 8162/17 8162/19
**guess [11]** 7999/25 8011/24 8134/15 8136/7
8138/12 8142/10 8197/18 8205/14 8256/21
8285/9 8290/4
**guidance [6]** 7995/12 7995/15 7995/23 8152/7
8283/8 8283/10
**guilt [2]** 8021/18 8065/12
**guilty [5]** 7997/7 8001/22 8127/7 8129/4
8283/22
**guy [1]** 8233/6
**guys [2]** 8138/8 8139/3

**H**

**H-E-L-L-E-R [1]** 8161/22
**H-O-W-A-R-D [1]** 8156/12
**half [8]** 8135/11 8163/10 8177/10 8186/14
8186/14 8257/11 8268/17 8283/17
**hall [1]** 8191/6
**hallway [1]** 8061/23
**hand [12]** 8008/10 8008/19 8029/14 8089/17
8089/25 8101/24 8102/7 8116/23 8116/24
8156/7 8178/23 8247/22
**handcuffed [1]** 7983/11
**handed [1]** 8299/3
**handful [1]** 8067/6
**handle [1]** 8178/17
**handled [2]** 7978/3 8043/4
**hands [1]** 8033/23
**handwriting [3]** 8091/23 8091/24 8120/16
**handwritten [1]** 8110/22
**handy [1]** 8298/13
**hangs [1]** 8142/24
**haphazard [1]** 8291/8
**happy [15]** 8034/13 8066/7 8105/2 8140/24
8140/24 8155/18 8173/5 8175/18 8199/18
8252/15 8252/24 8276/23 8284/7 8285/5
8297/25
**hard [6]** 7994/18 8081/11 8158/7 8158/12
8196/7 8282/12
**harm [5]** 8068/24 8112/3 8112/8 8130/21
8155/13
**harms [1]** 8149/2
**Harvey [1]** 8236/15
**Hassan [4]** 8023/24 8024/23 8025/8 8114/23
8117/14 8137/12
**hate [1]** 8041/3
**head [4]** 8124/18 8146/24 8275/8 8290/10
**heading [2]** 8108/19 8260/4
**headquarters [1]** 8012/18
**Healthcare [12]** 8072/17 8075/14 8075/15
8075/19 8075/20 8078/5 8143/22 8144/4
8181/14 8182/18 8239/4 8240/23
**hear [19]** 7979/10 7981/8 7990/8 8002/14
8021/12 8104/9 8143/14 8159/7 8168/24
8180/22 8180/23 8204/10 8211/2 8211/13
8213/24 8216/7 8229/19 8237/5 8276/23
**heard [24]** 7977/8 7985/11 7989/20 8021/11
8036/5 8045/11 8064/18 8082/4 8083/6 8083/8
8088/22 8099/6 8141/3 8173/25 8220/25
8220/25 8223/3 8231/13 8231/15 8231/16
8238/16 8259/20 8288/2 8298/16
**hearing [14]** 8006/3 8032/2 8115/13 8169/23
8204/2 8238/13 8255/2 8261/16 8285/25
8287/7 8291/20 8294/21 8295/22 8297/18
**hearsay [80]** 7980/13 7980/18 7980/19 7986/5
7986/7 7986/24 7987/1 7987/13 8017/6

**gross [1]** 8117/3 — 8265/4 8266/4
8032/23 8033/2 8033/6 8034/12 8034/17
8041/21 8056/5 8169/4 8173/7 8185/7
8168/18 8168/21 8169/1 8169/4 8169/15
8169/21 8170/1 8170/9 8170/21 8170/25
8171/1 8172/11 8173/14 8173/23 8174/18
8176/3 8179/25 8183/19 8183/22 8196/1
8196/2 8196/4 8200/18 8200/21 8204/20
8204/24 8205/19 8208/7 8208/9 8208/12
8210/7 8211/21 8212/24 8212/25 8213/1
8213/2 8213/16 8213/6 8213/17 8214/10
8218/23 8219/24 8220/24 8221/3 8221/7
8221/8 8221/10 8221/13 8226/1 8227/2 8228/8
8232/20 8237/25 8250/24 8252/19 8253/10
8254/5 8259/21 8259/22 8260/13 8260/19
**heart [2]** 8141/14 8142/3
**hedge [3]** 8116/6 8157/14 8189/9
**held [11]** 8028/5 8091/5 8098/11 8098/24
8135/20 8135/23 8135/24 8138/25 8143/2
8204/1 8221/17
**Heller [2]** 8161/21 8161/23
**help [5]** 8072/6 8098/1 8100/2 8176/5 8178/19
**helped [4]** 8013/22 8071/1 8071/5 8071/12
**helper [1]** 8145/23
**helpful [4]** 8141/1 8148/25 8287/23 8290/20
**helping [1]** 8135/6
**helps [3]** 8028/10 8137/17 8185/19
**hereby [1]** 8058/20
**hesitant [1]** 8052/24
**hesitating [1]** 8216/21
**Heskett [3]** 8010/21 8102/16 8102/17
**Hessemann [1]** 8288/13
**hidden [1]** 8121/6
**hide [7]** 7989/24 7990/5 7990/10 7990/19
7991/10 8124/12 8126/23
**hides [1]** 8124/14
**hiding [1]** 8129/21
**high [6]** 8137/18 8137/25 8158/18 8196/23
8253/5 8266/4
**higher [3]** 7983/7 7983/7 8019/14
**highlight [2]** 8110/14 8246/19
**highlighted [3]** 8027/6 8242/6 8304/24
**highly [4]** 7981/1 7981/10 8002/12 8292/8
**hikes [1]** 8037/12
**himself [9]** 7988/10 7988/11 8000/21 8004/10
8087/6 8088/13 8152/17 8272/12 8290/8
**hindsight [3]** 8093/2 8103/16 8103/24
**hire [1]** 8188/15
**hired [1]** 8126/15
**history [1]** 8157/16
**hit [2]** 8172/24 8285/3
**hold [5]** 7996/19 8120/22 8123/9 8135/3
8304/25
**holders [2]** 8139/14 8148/11
**holding [2]** 7999/18 8135/7
**Holdings [1]** 8209/7
**holds [2]** 7996/21 8118/15
**home [3]** 8017/1 8017/3 8065/24
**honest [5]** 8015/20 8016/8 8043/2 8158/8
8173/1
**Honor [402]**
**Honor's [14]** 7982/11 7988/5 7998/1 8004/6
8032/21 8034/2 8034/23 8053/8 8075/11
8076/19 8088/21 8141/16 8276/24 8285/5
**HONORABLE [1]** 7974/9
**honored [1]** 8237/4
**honors [1]** 8062/12
**hook [2]** 8112/10 8113/11
**hope [11]** 7990/12 8006/16 8052/14 8097/10
8104/7 8212/16 8279/22 8279/24 8280/15
8281/5 8303/8
**hoped [1]** 8280/23
**hopeful [2]** 8281/2 8283/6
**hopefully [3]** 7981/23 8062/9 8279/18
**hoping [3]** 8214/7 8280/1 8280/19
**horrific [1]** 8150/7
**horse [1]** 7998/16
**hour [6]** 7979/13 7997/18 8177/10 8186/21
8186/22 8268/17

**H**

**hourly** [1] 8186/24
**hours** [18] 7979/2 7991/2 7991/12 7991/12
7991/18 8120/13 8120/13 8158/16 8216/4
8220/19 8223/13 8223/24 8240/24 8248/12
8283/17 8284/23 8284/23 8284/24
**house** [6] 8017/10 8156/24 8157/1 8157/2
8157/5 8199/24
**housekeeping** [1] 8062/5
**Howard** [5] 8155/6 8156/4 8156/8 8156/12
8263/18
**HR** [1] 8292/5
**Huang** [2] 8028/15 8030/1
**huddle** [1] 7982/12
**huge** [3] 8055/12 8122/20 8152/16
**hundred** [1] 8139/2
**hundreds** [1] 8173/7
**hurry** [1] 8002/23
**hypothetical** [1] 7991/9

**I**

**I N D E X** [1] 8306/10
**I's** [1] 8229/17
**idea** [14] 8054/4 8106/8 8107/22 8117/12
8123/18 8126/18 8128/1 8135/23 8174/10
8176/25 8219/17 8228/7 8232/13 8274/20
**identical** [1] 8027/18
**identification** [9] 8008/16 8009/7 8009/21
8179/6 8182/19 8184/17 8250/13 8250/13
8250/23
**identified** [3] 8080/24 8108/10 8134/10
**ignore** [3] 8117/13 8117/14 8117/14
**ill** [1] 8214/9
**illegal** [5] 8072/3 8083/2 8083/7 8097/3 8151/6
**illicit** [1] 8147/14
**imagine** [1] 8243/23
**immunity** [3] 7980/22 7981/16 7993/15
**impeach** [1] 7983/23
**impeaching** [1] 7999/9
**impeachment** [16] 7985/20 7985/23 7986/17
7987/11 7989/13 7989/18 7990/1 7991/16
7995/13 7995/25 7996/7 7997/3 7997/13
7998/25 7999/19 8034/10
**impinge** [1] 7980/11
**implement** [1] 8279/21
**implicate** [2] 8074/2 8147/12
**implicated** [4] 7996/6 8070/23 8078/8 8145/4
**implication** [6] 7980/25 7981/1 7981/18
7986/12 7990/5 7990/19
**implications** [1] 8020/24 7982/24
**implied** [1] 8144/10
**implode** [1] 8065/4
**implored** [1] 8065/10
**importance** [2] 8253/5 8266/4
**important** [14] 7976/6 7979/14 8144/16
8146/12 8218/17 8260/18 8261/6 8262/15
8262/18 8274/24 8275/17 8285/17 8285/17
8285/20
**impossible** [3] 7991/19 8042/15 8144/22
**impression** [6] 8003/20 8045/11 8047/10
8049/11 8114/6 8257/17
**improper** [5] 7989/19 8083/3 8093/17 8257/18
8263/12
**imputed** [3] 7984/11 7984/19 8093/5
**imputing** [1] 7986/21
**in-house** [4] 8156/24 8157/1 8157/2 8157/5
**inaccurate** [1] 8034/18
**inadmissible** [3] 8032/22 8033/6 8033/9
**inappropriate** [2] 7980/2 7996/7 8004/15
**Inc** [8] 8015/18 8015/23 8016/5 8016/12
8019/19 8132/14 8156/21 8249/25
**Inc.'s** [1] 8016/2
**inception** [1] 8099/8
**inclination** [1] 8154/11
**inclined** [4] 7979/23 7980/1 8153/17 8290/13
**include** [5] 8003/25 8080/2 8108/23 8158/17
8263/17
**included** [5] 8074/23 8218/15 8229/22 8270/9
8270/10
**includes** [2] 8119/4 8177/4
**including** [14] 7980/23 8002/17 8033/13
8034/7 8068/4 8070/1 8076/9 8077/17 8080/22
8081/3 8147/10 8167/9 8255/13 8267/5
**income** [1] 8166/4
**inconsistencies** [1] 8288/10
**inconsistent** [9] 8096/12 8170/18 8217/8
8217/14 8218/10 8218/13 8295/24 8296/5
8296/7
**incorporated** [1] 8240/15
**incorporation** [1] 8240/18
**incorrect** [5] 7992/22 7992/24 8217/14
8217/15 8296/11
**increasing** [1] 8207/22
**incredible** [1] 8034/1 8144/23 8149/25
**incredibly** [4] 7981/22 8035/1 8098/16 8100/19
**indemnification** [1] 8124/2
**indemnified** [1] 8123/23
**indemnify** [2] 8123/19 8124/2
**independent** [3] 8083/5 8236/14 8236/15
**indicate** [2] 8118/13 8207/25
**indicated** [5] 7981/23 7995/16 8000/8 8000/14
8241/3
**indicates** [2] 8111/20 8258/15
**indicating** [1] 8120/16
**indication** [1] 7998/17
**indications** [1] 8111/13
**indicia** [3] 8152/21 8152/24 8290/22
**indictment** [5] 8108/16 8109/1 8109/5 8109/21
8197/24
**individual** [5] 8078/11 8137/10 8146/3 8272/23
8272/23
**individuals** [15] 8026/25 8069/17 8070/23
8072/21 8074/24 8075/3 8075/6 8077/25
8089/6 8133/22 8134/10 8135/25 8139/7
8139/9 8196/23
**individuals'** [1] 8138/23
**inextricably** [1] 8036/16
**infancy** [2] 8077/18 8149/9
**infer** [7] 7988/23 7994/4 8079/9 8079/12
8129/7 8129/24 8138/16
**inference** [16] 7986/5 7987/12 7988/16
7988/17 7990/9 7990/15 7990/18 7994/5
7994/17 8000/25 8001/1 8067/7 8092/24
8231/9 8259/5 8263/4
**inferences** [7] 7994/10 8128/9 8129/11
8129/16 8131/2 8131/7 8258/18
**inferred** [1] 8231/3
**inferring** [1] 7990/23
**infirm** [1] 8292/20
**inflammatory** [1] 8103/15
**influence** [1] 8140/20
**inform** [6] 7978/24 7995/24 8003/5 8079/13
8079/18 8222/6
**information** [50] 8019/13 8032/14 8082/6
8086/14 8093/6 8120/24 8121/1 8121/3 8121/8
8121/12 8121/13 8123/2 8123/5 8152/2 8172/2
8173/5 8173/10 8173/18 8174/14 8174/24
8175/22 8176/2 8177/5 8180/18 8199/1
8202/15 8215/17 8215/20 8219/2 8234/7
8253/7 8253/12 8256/11 8256/12 8256/12
8258/14 8259/17 8259/22 8259/25 8260/12
8260/15 8260/18 8264/11 8265/21 8276/13
8276/15 8276/17 8281/20 8283/12 8304/21
**informed** [3] 7994/7 8183/16 8237/13
**initial** [1] 8284/10
**injected** [1] 7987/20
**innocence** [13] 7978/14 7994/13 7996/3
7996/10 7997/8 7997/21 7998/8 7998/13
7999/20 8001/21 8001/23 8064/13 8175/17
**innocent** [2] 7988/25 8002/7
**inquiring** [1] 8046/11
**inquiry** [1] 7979/17
**inserted** [1] 8229/23
**inside** [3] 8070/2 8301/22 8301/24
**insider** [1] 8043/16
**insiders** [3] 8096/23 8099/7 8100/24
**installment** [1] 8135/22
**instances** [2] 8076/2 8291/10
**instead** [2] 8109/3 8124/11
**instruct** [8] 8000/9 8000/9 8003/4 8004/9
8046/25 8047/4 8053/19 8227/24
**instructed** [2] 8232/23 8234/8
**instruction** [25] 7988/5 7988/5 7988/8 7994/9
8000/11 8000/13 8001/12 8001/24 8002/2
8002/8 8002/10 8002/11 8002/19 8002/21
8003/10 8003/12 8004/6 8110/4 8130/22
8172/8 8173/6 8173/8 8219/14 8233/2 8233/8
**instructions** [8] 7993/24 7994/8 8002/16
8003/17 8003/20 8011/10 8064/12 8107/15
**instructive** [1] 8066/18 8066/25
**insufficient** [1] 8095/15
**integrity** [1] 7992/20
**intend** [1] 8053/21
**intends** [1] 8046/9
**intent** [15] 8067/12 8076/12 8076/22 8077/1
8082/9 8082/11 8088/13 8095/16 8096/2
8101/18 8129/7 8129/8 8129/8 8146/24
8147/17
**intention** [2] 7990/21 8051/10
**intentionally** [1] 7987/20 8221/9
**interact** [2] 8049/10 8282/15
**interactions** [3] 8067/4 8159/20
**interchanged** [1] 8204/7
**interest** [24] 8085/13 8085/14 8096/23
8099/15 8099/17 8099/21 8100/1 8108/24
8110/18 8111/2 8111/6 8111/7 8111/20
8111/24 8112/10 8112/11 8112/12 8114/5
8125/7 8128/25 8130/7 8131/14 8131/19
8133/7
**interested** [1] 8239/15
**interests** [1] 8111/13
**interject** [1] 8105/4
**intermingling** [1] 8070/13
**interpretation** [2] 8022/11 8051/16
**interprets** [1] 8264/3
**interrupt** [2] 8205/11 8220/16
**interrupted** [1] 8213/15
**interrupting** [3] 8205/9 8213/18 8214/5
**intertwined** [1] 8036/6
**interview** [24] 7979/4 7979/19 7979/22
7982/22 7991/7 7991/22 7993/20 7993/21
7998/18 8005/2 8011/20 8019/9 8030/4
8032/11 8033/12 8034/10 8035/2 8037/25
8038/25 8043/22 8046/24 8048/17 8053/24
8055/10
**interviewed** [5] 8033/3 8035/8 8040/18
8046/17 8059/5
**interviewing** [4] 8012/7 8012/11 8034/22
8040/22
**interviews** [1] 8032/25
**introduce** [5] 7997/24 8034/4 8034/14 8048/13
8304/2
**introduced** [8] 8022/12 8050/6 8050/8 8050/10
8189/4 8227/21 8227/22 8239/16
**introducing** [1] 8049/22 8050/9 8125/18
8126/4
**introductions** [2] 8146/10 8146/11
**introductory** [1] 8208/16
**invest** [1] 8076/15
**invested** [4] 8113/12 8114/2 8114/6 8133/11
**investigated** [3] 7983/2 7983/4 7988/1
**investigation** [35] 7988/11 7992/12 7992/20
7993/20 8013/7 8021/9 8034/8 8035/8 8037/17
8038/1 8039/22 8040/20 8040/25 8042/14
8042/15 8042/23 8043/3 8043/13 8043/17
8043/18 8043/19 8043/24 8044/2 8044/3
8044/12 8044/14 8045/2 8048/19 8048/20
8048/23 8049/18 8051/21 8055/15 8055/18
8056/16
**investigations** [1] 8019/10
**investigative** [2] 7988/6 8003/13
**investigators** [2] 7989/23 7996/4
**investment** [29] 8073/3 8100/15 8112/16
8113/25 8114/11 8115/18 8115/20 8116/14

**I**

investment... [21] 8116/17 8116/21 8117/5
8117/7 8121/24 8122/2 8122/12 8122/22
8133/9 8133/14 8133/21 8141/24 8142/5
8143/22 8149/11 8153/25 8189/7 8297/7
8299/9 8299/10 8299/11
investments [5] 8116/4 8116/4 8117/1
8146/11 8299/5
investor [12] 8075/19 8078/5 8080/10 8086/6
8100/14 8108/4 8115/15 8124/21 8124/23
8125/6 8126/19 8131/22
investor-witnesses [1] 8086/6
investors [58] 8072/16 8073/1 8075/25 8076/3
8077/9 8098/9 8099/7 8100/24 8112/12
8112/15 8113/12 8114/1 8114/13 8114/22
8115/7 8115/11 8115/14 8115/17 8115/21
8116/14 8116/17 8117/13 8117/21 8118/13
8120/18 8121/9 8121/17 8121/22 8122/1
8122/14 8123/3 8123/14 8125/18 8126/5
8126/21 8127/1 8127/11 8127/13 8130/8
8130/11 8130/23 8131/15 8132/1 8133/8
8133/10 8133/11 8138/22 8139/10 8139/12
8140/8 8140/11 8140/13 8146/10 8196/23
8263/20 8294/5 8294/14 8298/16
investors' [1] 8073/3
invoice [14] 8166/7 8179/10 8181/11 8181/14
8182/1 8182/3 8182/4 8182/9 8183/9 8183/3 8242/14
8245/8 8247/7 8247/16 8249/21
invoiced [1] 8222/23
invoices [6] 8165/22 8168/3 8173/11 8177/1
8214/18 8214/21
invoked [1] 7984/16
invokes [1] 7981/2
invoking [1] 7982/4
involved [24] 8066/19 8092/7 8098/18 8101/13
8106/17 8106/20 8107/17 8113/15 8137/8
8137/9 8137/12 8138/17 8138/17 8138/18
8143/2 8188/21 8202/19 8202/21 8207/9
8207/11 8240/21 8259/18 8297/8 8299/9
involvement [11] 8052/11 8186/18 8297/4
8297/7 8297/11 8297/12 8297/14 8297/15
8297/16 8297/23 8302/4
involves [1] 7992/8
involving [1] 8294/4
IPO [2] 8096/22 8097/21
ipse [1] 8145/1
Iron [4] 8242/19 8242/21 8245/14 8246/16
irrelevant [5] 7989/19 8074/15 8288/21 8292/2
8303/22
Irving [2] 8066/19 8069/4
ish [1] 8204/17
issue [60] 7979/14 7980/4 7980/10 7980/12
7981/13 7981/14 7982/3 7985/22 7986/1
7986/11 7986/16 7986/20 7986/24 7987/6
7987/7 7987/8 7987/10 7989/18 7992/8
7993/24 7994/2 7998/19 7998/24 8035/1
8042/25 8051/4 8060/12 8061/15 8061/22
8061/24 8067/3 8068/5 8068/9 8080/21
8080/24 8093/14 8124/22 8145/13 8148/10
8174/2 8175/24 8180/7 8206/6 8227/18
8256/15 8260/9 8261/8 8263/23 8274/13
8276/13 8285/9 8286/22 8287/24 8288/22
8291/12 8292/19 8298/24 8302/18 8304/18
8304/19
issued [3] 8026/23 8027/25 8140/2
issues [43] 7975/11 7976/24 7978/6 7985/25
7989/17 7990/14 7993/16 7994/22 7996/2
8060/5 8060/6 8060/20 8060/21 8061/7 8062/3
8062/16 8064/6 8064/6 8068/25 8070/11
8070/17 8071/20 8072/6 8072/22 8082/2
8120/17 8128/22 8147/9 8151/19 8152/5
8152/9 8206/5 8214/24 8219/11 8220/4
8278/20 8281/4 8281/7 8281/12 8281/14
8282/12 8292/21 8294/9
issuing [1] 8012/18
items [3] 8190/1 8240/20 8246/3
itself [3] 8184/23 8185/8 8221/12

**J**

J-A-C-O-B-S [1] 8156/13
Jackson [2] 8024/13 8028/14
Jackson's [1] 8062/7
Jaclin [5] 8026/9 8026/11 8027/23 8029/7
8029/8
Jacob's [2] 8266/8 8275/8
Jacobs [87] 8155/6 8156/4 8156/8 8156/12
8156/16 8168/14 8168/15 8168/16 8168/22
8173/3 8176/17 8181/9 8181/18 8201/1 8207/4
8211/24 8212/15 8212/16 8212/20 8214/13
8214/16 8215/4 8215/10 8216/1 8218/10
8222/5 8227/20 8230/24 8231/4 8231/13
8231/16 8231/25 8234/3 8234/9 8234/14
8238/8 8243/5 8243/13 8244/8 8252/9 8252/17
8253/7 8253/16 8253/19 8253/25 8255/23
8256/3 8256/8 8256/18 8257/23 8257/24
8258/11 8258/14 8258/16 8258/22 8259/1
8259/4 8259/7 8259/11 8259/12 8259/17
8259/18 8259/25 8260/19 8260/25 8260/25
8261/1 8261/2 8261/2 8261/15 8261/17
8262/25 8263/3 8263/18 8263/21 8264/5
8264/7 8265/2 8266/16 8267/19 8274/21
8274/23 8275/10 8275/16 8275/22 8276/2
8276/9
Jacobs' [3] 8230/23 8261/2 8275/16
Jacobs's [2] 8204/22 8262/24
Jahrmarkt [6] 8239/8 8239/9 8239/17 8239/17
8246/11 8246/12
Jahrmarkts [3] 8239/14 8246/8 8246/10
Jain [1] 8082/4
Jamaica [1] 8160/14
January [13] 8161/24 8165/17 8167/4 8167/8
8175/3 8178/7 8178/14 8220/19 8248/6
8248/21 8249/8 8249/11 8249/16
January 1981 [1] 8161/24
January 23 [1] 8248/6
January 25 [2] 8248/21 8249/8
January 26 [1] 8249/11
January 31 [2] 8167/8 8249/16
January 31st [2] 8165/17 8167/4
Jeffrey [1] 8057/19
Jensen [2] 8050/6 8232/5
jeopardy [3] 8114/11 8144/14 8149/8
job [7] 8069/12 8081/13 8147/2 8158/9
8166/12 8166/17 8188/4
Johnson [3] 8152/8 8152/10 8152/13
8152/14 8153/15 8283/8 8288/19 8290/8
8292/23 8294/22 8295/3 8299/1 8303/8
Johnson's [6] 8125/10 8285/24 8288/15
8290/18 8293/24 8303/4
join [3] 8106/1 8138/18 8302/18
joined [2] 8162/20 8163/23
JOSHUA [1] 7974/20
judge [18] 7974/10 8011/10 8035/12 8035/15
8041/24 8042/7 8042/9 8042/12 8044/24
8056/23 8062/14 8063/9 8066/9 8066/18
8067/1 8069/4 8184/1 8283/24
judges [2] 8066/12 8214/3
judgment [4] 8051/12 8082/13 8083/3 8104/4
judiciary [5] 8279/21 8280/21 8280/23 8280/24
8281/5
judiciary's [1] 8279/24
juggling [2] 7976/25 8278/2
July [15] 8059/6 8084/11 8110/22 8110/25
8110/25 8111/9 8133/25 8134/1 8181/18
8181/18 8181/21 8181/21 8181/21 8239/7
8239/18
July 11 [1] 8239/18
July 11th [1] 8181/21
July 12th [1] 8181/21
July 13th [1] 8181/21
July 1st [1] 8110/25
July 7 [1] 8239/7
July 7th [1] 8181/18
July 8th [1] 8181/18
June [16] 8068/11 8069/10 8084/3 8084/11
8092/14 8092/23 8094/7 8110/22 8110/25

8111/9 8133/25 8134/1 8161/6 8163/2 8269/2
8269/8
June 1967 [1] 8161/6
June 27th [2] 8269/2 8269/8
junior [1] 8258/10
juror [3] 8103/9 8128/9 8129/16
juror's [1] 8006/10
jurors [10] 8006/8 8036/5 8045/20 8046/2
8052/20 8054/23 8155/25 8210/15 8222/2
8274/2
jurors' [1] 8053/3
jury [115] 7974/9 7974/10 7978/11 7980/13
7980/14 7980/18 7980/18 7981/8 7981/10
7983/3 7984/1 7984/25 7986/1 7986/4 7986/23
7986/23 7987/14 7987/21 7988/7 7988/17
7988/23 7990/15 7990/18 7992/9 7993/24
7994/4 7994/8 7999/12 7999/14 8000/2 8000/6
8000/9 8000/9 8001/7 8002/8 8002/16 8003/9
8003/12 8004/3 8005/9 8006/3 8006/4 8007/6
8011/9 8036/24 8037/11 8044/5 8045/11
8045/15 8046/1 8046/5 8046/7 8048/1 8052/17
8053/23 8054/22 8060/16 8061/15 8061/25
8062/14 8064/5 8064/15 8064/16 8066/11
8079/9 8087/12 8088/5 8088/10 8088/10
8092/23 8094/21 8097/9 8097/12 8102/24
8104/9 8104/13 8107/15 8108/6 8128/14
8129/6 8129/11 8129/16 8129/23 8130/21
8131/1 8131/6 8138/16 8151/20 8155/3 8155/8
8155/19 8155/24 8173/6 8204/3 8210/22
8216/1 8217/7 8221/13 8221/16 8222/1
8227/23 8227/25 8228/10 8231/10 8231/11
8232/24 8234/8 8257/19 8264/3 8274/6
8281/24 8290/20 8292/21 8293/20 8303/24
jury/juror [1] 8129/16
justice [2] 8012/17 8130/3

**K**

KaloBios [17] 8014/24 8032/14 8034/3
8034/15 8036/12 8037/7 8037/8 8037/9
8037/10 8039/7 8046/19 8047/1 8047/8
8050/19 8051/4 8051/24 8053/19
KAM [1] 7974/2
Katten [62] 8000/17 8000/19 8000/20 8000/23
8011/5 8011/21 8013/12 8013/15 8014/2
8014/4 8014/12 8018/3 8018/6 8019/18 8020/1
8020/10 8030/12 8035/24 8039/2 8044/8
8049/11 8049/12 8049/16 8050/11 8050/11
8052/23 8056/19 8057/21 8059/6 8095/20
8095/24 8095/25 8101/5 8111/5 8147/9 8157/7
8157/8 8157/9 8157/11 8157/22 8157/25
8160/9 8163/5 8163/6 8163/9 8163/12 8163/13
8163/16 8163/24 8164/6 8164/11
8165/13 8180/12 8182/12 8185/11 8186/17
8189/9 8198/17 8215/19 8241/11 8269/22
KATUSAO146 [1] 8182/5
Kaye [13] 8014/11 8030/16 8030/18 8031/1
8034/15 8035/21 8039/1 8039/2 8044/7
8046/12 8046/18 8047/14 8051/5
keep [20] 7982/15 7997/11 8002/1 8054/2
8054/5 8063/8 8149/1 8150/10 8171/19 8185/8
8185/9 8199/19 8202/16 8205/15 8242/11
8274/3 8279/18 8280/11 8280/15 8281/14
keeping [2] 8002/6 8063/9
kept [6] 8038/7 8051/2 8142/10 8148/22
8148/23 8196/13
KESSLER [3] 7974/16 8141/21 8142/9
8144/25 8145/7 8146/17 8148/13
Kessler's [1] 8299/4
Kevin [4] 8024/22 8025/5 8026/25 8029/3
Key [8] 8094/25 8095/5 8095/13 8096/5
8096/17 8098/20 8136/4 8290/2
kick [1] 8139/19
kicked [1] 8281/18
Kimberly [1] 8289/3
kind [16] 7980/7 7981/13 8044/4 8077/1
8093/24 8107/21 8109/23 8116/21 8117/6
8161/16 8188/18 8197/19 8204/14 8260/3
8281/8 8295/16

**K**

**kinds [4]** 8162/6 8289/10 8290/7 8294/1
**KIYO [1]** 7974/9
**Klein [3]** 8303/9 8303/11 8304/15
**knowing [6]** 7997/21 8002/10 8071/6 8093/2
8180/1 8217/15
**knowledge [37]** 7983/21 7984/6 7984/9
7984/11 7984/13 7984/19 7984/19 7986/24
7987/6 8032/24 8034/18 8041/15 8067/12
8068/12 8069/11 8077/22 8088/22 8092/19
8093/5 8095/16 8102/11 8105/24 8106/1
8110/11 8111/4 8129/22 8130/5 8133/24
8137/14 8137/16 8142/9 8149/19 8215/17
8220/8 8227/9 8287/21 8287/21
**knowledgeable [2]** 8158/8 8272/24
**known [2]** 8147/14 8157/19
**knows [38]** 7983/4 7983/8 7987/2 7987/22
7988/18 7990/4 7990/17 8002/11 8043/23
8065/22 8074/2 8085/8 8107/3 8107/3 8107/4
8108/4 8111/23 8128/4 8128/5 8128/16
8128/16 8133/19 8133/21 8143/10 8143/10
8143/13 8143/17 8148/8 8169/7 8202/23
8211/3 8217/1 8217/18 8217/19 8217/20
8227/20 8293/10 8303/10
**Kocher [7]** 8106/18 8114/25 8123/8 8139/15
8139/21 8139/22 8143/7
**Koestler [3]** 8023/23 8024/22 8025/14
**Kravitz [5]** 8024/12 8057/2 8243/13 8244/8
8249/17
**Kravtiz [1]** 8243/5

**L**

**LA [1]** 8164/21
**lack [6]** 8065/6 8065/13 8066/14 8096/7
8103/11 8151/18
**lacking [1]** 8213/21
**ladder [1]** 8273/2
**ladies [2]** 8001/20 8001/22
**laid [8]** 8106/18 8106/21 8180/25 8211/19
8212/2 8215/8 8227/9 8274/17
**landscape [1]** 8045/15
**language [4]** 8027/6 8287/15 8291/12 8292/7
**large [15]** 8082/15 8094/16 8148/23 8154/5
8164/6 8189/17 8288/25 8289/2 8289/4 8289/7
8289/9
**larger [2]** 8153/21 8189/18
**last [25]** 7976/11 7978/14 7979/6 7979/13
8021/12 8029/10 8058/12 8065/15 8072/1
8091/15 8098/21 8106/15 8110/7 8145/6
8161/2 8166/11 8182/5 8182/8 8189/11
8195/13 8234/3 8247/21 8250/8 8267/11
8281/11
**lasted [2]** 8282/13 8282/21
**late [10]** 7977/15 7977/23 7997/18 8086/25
8087/4 8154/14 8217/4 8218/6 8218/8 8218/11
**latest [1]** 8026/2
**latitude [2]** 8175/21 8238/11
**launch [1]** 8097/2
**Lavelle [2]** 8117/14 8139/25
**law [77]** 7979/6 7979/15 7981/15 7981/19
7981/24 7984/12 7986/9 7987/4 7988/6
7991/17 7992/17 7996/15 7996/21 7998/20
7999/10 8003/13 8011/10 8011/16 8012/7
8012/12 8012/19 8012/22 8013/11 8014/2
8014/3 8014/11 8032/17 8032/18 8045/8
8070/6 8071/1 8072/5 8076/10 8076/12
8082/12 8082/15 8096/20 8104/5 8105/22
8108/12 8144/22 8158/8 8158/18 8159/13
8160/3 8160/24 8160/25 8161/1 8161/2 8161/5
8161/7 8166/11 8177/7 8185/10 8185/19
8186/3 8193/22 8194/2 8194/3 8194/5 8194/12
8194/19 8195/10 8196/11 8196/12 8221/5
8239/19 8239/22 8239/25 8240/3 8240/6
8240/11 8240/17 8240/20 8244/2 8244/9
8302/22
**laws [1]** 8243/6
**lawsuit [5]** 8079/21 8079/23 8095/20 8095/23
8118/9

**lawsuits [7]** 8071/1 8079/17 8079/19 8118/23
8243/1 8243/1 8243/10
**lawyer [43]** 7983/5 7983/8 7991/25 8011/6
8011/7 8012/7 8012/12 8035/11 8069/12
8070/5 8070/25 8072/4 8078/7 8078/22
8078/25 8080/9 8081/13 8100/6 8101/4
8101/10 8103/21 8104/5 8114/19 8115/18
8115/25 8116/1 8116/2 8127/13 8135/18
8143/9 8143/9 8144/5 8144/22 8147/2 8147/6
8158/6 8158/7 8206/11 8272/18 8273/2 8278/8
8278/9 8278/13
**lawyer-up [2]** 7983/5 7991/25
**lawyering [2]** 7990/8 8071/22
**lawyering-up [1]** 7990/8
**lawyers [23]** 7990/11 8070/6 8078/14 8078/25
8081/21 8082/13 8082/13 8082/16 8095/24
8101/6 8118/14 8137/7 8143/11 8143/14
8143/18 8144/9 8145/2 8147/8 8147/18
8202/19 8278/5 8280/9 8286/15
**lay [6]** 8041/17 8176/19 8180/6 8213/18
8218/18 8275/3
**laying [3]** 8041/22 8069/21 8098/19
**layout [1]** 8140/25
**lays [2]** 8109/21 8227/11
**lazy [1]** 8101/6
**lead [1]** 8053/9
**leading [21]** 8030/19 8048/7 8049/23 8053/14
8053/15 8053/16 8142/18 8191/25 8192/2
8192/17 8192/18 8194/7 8195/12 8195/16
8205/19 8214/2 8214/6 8214/10 8232/15
8262/18 8288/11
**leads [1]** 8262/13
**leaf [1]** 8089/8
**leaning [1]** 8153/16
**learn [1]** 8033/3
**least [9]** 7999/11 8033/11 8036/7 8087/21
8115/21 8188/3 8213/20 8280/22 8283/20
**leave [8]** 7980/10 8004/16 8022/6 8155/21
8163/12 8163/14 8278/12 8299/15
**leaves [2]** 8090/15 8210/23
**leaving [2]** 8294/3 8300/1
**led [3]** 8045/16 8051/15 8142/17
**LEE [4]** 7974/20 8086/3 8086/5 8086/5
**left [32]** 7984/1 8008/10 8014/2 8029/11
8029/14 8035/24 8039/1 8039/1 8040/2 8044/5
8045/4 8049/11 8049/11 8049/12 8050/5
8050/10 8052/23 8078/2 8087/18 8130/15
8158/15 8163/2 8163/13 8187/18 8189/24
8189/24 8191/13 8216/12 8218/12 8234/3
8297/24 8304/24
**left-hand [2]** 8008/10 8029/14
**legal [19]** 8014/22 8014/24 8032/19 8036/2
8064/6 8072/2 8082/14 8097/4 8108/19
8114/12 8115/17 8117/1 8118/18 8157/3
8174/5 8255/12 8263/15 8267/4 8287/19
**legend [1]** 8028/3
**legending [1]** 8028/4
**legitimate [4]** 8068/2 8097/12 8153/7 8214/10
**length [4]** 7993/5 7995/7 8141/5 8282/13
**lengthy [2]** 8000/11 8062/15
**less [6]** 8052/18 8115/10 8120/13 8141/8
8172/1 8257/22
**Lest [1]** 7984/1
**letter [34]** 7979/12 7979/20 7980/2 7981/20
7985/13 7996/14 7997/19 7997/22 8029/7
8029/8 8069/21 8080/10 8106/21 8114/19
8114/19 8116/5 8122/3 8143/9 8143/12
8143/13 8243/5 8255/6 8255/7 8255/7 8255/8
8255/10 8255/11 8256/13 8260/15 8260/16
8261/4 8262/22 8266/22 8298/8
**letters [4]** 8069/20 8078/7 8078/25 8145/2
**letting [1]** 8228/8
**level [8]** 8019/12 8019/14 8020/1 8020/1
8080/25 8082/5 8158/18 8297/23
**Lewis [12]** 7975/15 7976/18 8278/18 8278/19
8278/24 8279/2 8279/3 8279/11 8303/10
8304/9 8304/15 8304/16
**liabilities [1]** 8139/19

**liability [2]** 8125/9 8127/15
**liberal [1]** 8289/4
**lie [1]** 8129/23
**lied [2]** 8101/3 8122/22
**lies [2]** 8276/7 8282/22
**life [1]** 8145/23
**light [9]** 8002/24 8064/25 8065/1 8129/17
8246/3 8246/8 8246/10 8246/11 8246/12
**likelihood [1]** 8104/15
**likely [13]** 7975/6 7976/12 7976/13 8172/1
8215/9 8215/16 8215/23 8215/25 8257/22
8261/9 8261/10 8261/11 8261/17
**limit [5]** 8136/1 8287/8 8295/17 8298/6
8301/24
**limitation [1]** 8010/2
**limited [13]** 7980/22 7995/25 7999/19 7999/21
8034/3 8121/8 8147/4 8154/7 8154/8 8290/2
8290/7 8297/13 8301/7
**limiting [2]** 7999/9 8297/9
**Lindsay [3]** 8010/16 8102/14 8137/12
**line [11]** 7979/17 7979/24 7981/21 8036/15
8046/10 8058/12 8058/17 8089/13 8217/15
8263/21 8266/3
**lines [2]** 7978/21
**lineup [3]** 7975/20 7975/24 7975/24
**lion's [1]** 8148/24
**liquidity [1]** 8136/2
**LISA [1]** 7974/21
**list [11]** 8008/5 8010/11 8049/25 8062/6
8062/7 8166/14 8166/19 8167/1 8255/16
8277/24 8302/22
**listed [8]** 8013/1 8013/3 8029/16 8032/4
8032/5 8182/15 8189/18 8267/9
**listen [1]** 8233/6
**listened [1]** 8127/7
**listener [33]** 8010/1 8168/8 8172/7 8172/11
8172/21 8175/12 8184/18 8219/13 8226/2
8227/18 8228/22 8228/25 8229/13 8229/16
8229/18 8229/19 8230/6 8230/22 8232/5
8232/18 8233/11 8234/12 8238/2 8238/9
8252/9 8253/20 8275/1 8275/1 8275/24
8275/25 8276/1 8276/4 8276/20
**listening [3]** 8118/24 8175/8 8218/24
**listing [1]** 8260/16
**lists [4]** 8007/15 8009/17 8029/3 8302/20
**litany [3]** 8012/25 8039/13 8040/12
**litigation [23]** 8058/3 8058/5 8069/19 8069/20
8070/22 8071/7 8072/13 8077/19 8079/11
8079/14 8080/1 8080/2 8095/25 8100/3 8116/3
8118/15 8123/9 8124/18 8161/16 8162/1
8286/2 8286/8 8294/3
**litigations [5]** 8058/2 8058/2 8079/19 8080/14
8120/8
**litigators [1]** 8189/23
**LLC [20]** 8027/2 8029/5 8241/8 8241/10
8245/7 8247/17 8249/25 8250/1 8250/17
8251/9 8251/24 8255/6 8255/8 8255/12 8256/6
8258/1 8265/17 8267/4 8268/25 8269/10
**LLP [3]** 8024/23 8057/22 8267/6
**load [1]** 8304/7
**located [8]** 8015/24 8016/7 8162/12 8191/3
8230/25
**location [2]** 8016/9 8018/8
**locations [1]** 8018/10
**lock [4]** 8303/12 8303/24 8303/25 8304/2
**lock-up [4]** 8303/12 8303/24 8303/25 8304/2
**long-short [1]** 8116/24
**look [26]** 7982/9 8054/3 8076/20 8077/7
8081/20 8083/9 8095/5 8103/16 8103/24
8104/17 8105/22 8116/2 8118/1 8120/22
8127/13 8133/13 8146/25 8149/18 8175/14
8179/18 8181/11 8182/22 8221/3 8228/2
8243/17 8245/14
**looked [7]** 7991/21 8000/16 8091/23 8154/4
8154/6 8259/9 8304/12
**looking [15]** 7979/5 7988/22 7995/23 8077/22
8077/23 8093/2 8107/16 8113/5 8115/14
8202/8 8240/17 8242/14 8242/24 8245/18

**looking... [1]** 8246/5
**looks [2]** 8245/7 8258/9
**loosely [1]** 8290/24
**Los [2]** 8163/8 8164/9
**lost [3]** 8133/10 8149/24 8193/12
**louder [1]** 8159/8
**loudly [1]** 8213/25
**love [1]** 8045/21
**loved [1]** 8001/24
**lower [7]** 7982/25 7983/2 8008/9 8019/12 8020/1 8020/1 8185/14
**lowest [1]** 8212/3
**LP [2]** 8181/15 8182/18
**Lucian [1]** 8112/2
**lunch [12]** 8061/10 8062/15 8062/18 8063/5 8063/7 8064/7 8064/10 8158/17 8198/12 8284/15 8285/14 8290/13
**luncheon [1]** 8064/15
**lunchtime [1]** 8288/24

## M

**Madison [1]** 8162/14
**magistrate [1]** 8283/24
**mail [60]** 7977/6 7977/13 8007/10 8007/10 8008/3 8008/5 8008/6 8008/17 8009/2 8009/6 8009/12 8009/12 8009/16 8009/21 8009/21 8010/12 8010/15 8023/11 8023/21 8024/10 8024/14 8024/18 8025/2 8025/4 8025/20 8025/22 8025/23 8026/1 8026/4 8026/8 8026/9 8026/14 8027/16 8027/16 8027/23 8028/8 8028/14 8028/17 8028/22 8101/7 8102/12 8107/25 8110/15 8110/20 8111/11 8116/16 8122/5 8122/6 8122/12 8127/12 8131/22 8137/19 8137/20 8229/22 8229/25 8230/2 8230/3 8250/15 8255/5 8259/2
**mail's [2]** 8024/7 8028/14
**mails [13]** 7977/23 8016/5 8021/25 8022/11 8028/24 8095/7 8098/20 8107/5 8118/12 8122/14 8137/11 8138/4 8139/17
**main [5]** 7987/8 7993/24 8019/11 8035/1 8122/4
**maintain [3]** 8002/3 8064/11 8282/17
**maintains [1]** 8201/24
**major [2]** 8190/1 8225/7
**majority [4]** 8065/23 8066/2 8136/10 8177/9
**man [6]** 8001/22 8104/5 8242/19 8242/21 8245/14 8246/16
**managed [2]** 8280/10 8281/3
**management [24]** 8111/1 8112/1 8112/11 8113/4 8151/16 8163/18 8163/20 8186/17 8186/25 8187/6 8188/12 8201/23 8202/9 8202/15 8202/16 8202/21 8202/22 8203/3 8203/4 8241/7 8241/10 8242/22 8245/7 8245/22
**manager [3]** 8116/20 8116/25 8117/2
**managing [1]** 8189/3
**Manchester [1]** 8044/13
**mandatory [5]** 8163/13 8186/1 8186/2 8216/8 8216/10
**Manhattan [1]** 8162/15
**manipulation [1]** 8136/11
**manner [1]** 8113/24
**Marc [2]** 8057/20 8124/8
**March [19]** 8007/11 8008/6 8008/16 8009/6 8009/10 8009/13 8010/12 8043/20 8057/15 8162/20 8249/22 8268/10 8268/11 8268/12 8268/13 8268/13 8268/17 8268/19 8268/20
**March 12th [1]** 8268/11
**March 1992 [1]** 8162/20
**March 20th [1]** 8057/15
**March 21 [1]** 8249/22
**March 21st [1]** 8268/19
**March 22nd [1]** 8268/20
**March 5th [4]** 8268/10 8268/12 8268/13 8268/17
**March 8th [1]** 8268/13
**marching [1]** 8127/14

**Marcum [7]** 8093/16 8093/16 8150/20 8151/3 8151/5 8164/7 8186/6
**Marcum's [1]** 8107/2
**Marek [13]** 8007/17 8007/17 8007/18 8025/23 8027/1 8029/4 8029/22 8029/23 8106/19 8110/16 8111/9 8112/2 8137/7
**Mark [1]** 8057/2
**marked [3]** 8024/9 8028/12 8056/23
**market [7]** 8096/24 8096/25 8097/1 8097/14 8097/24 8136/7 8162/23
**markets [1]** 8096/25
**marks [1]** 8138/6
**married [2]** 8159/23 8160/1
**Marshall [8]** 8107/2 8108/2 8114/25 8123/8 8124/5 8124/7 8129/22 8143/7
**Martin [51]** 8007/10 8023/21 8023/24 8024/12 8025/3 8025/23 8028/20 8031/1 8033/16 8033/21 8034/15 8046/19 8053/12 8055/6 8057/19 8071/18 8073/24 8087/18 8087/25 8088/3 8088/5 8088/6 8100/13 8101/2 8101/2 8101/3 8101/19 8102/10 8102/12 8102/25 8103/3 8103/5 8103/14 8103/15 8103/16 8103/20 8115/16 8117/21 8117/25 8127/19 8128/1 8128/3 8130/10 8132/3 8132/10 8145/22 8149/21 8175/15 8179/22 8181/2 8238/14
**Martin Shkreli [6]** 8055/6 8057/19 8073/24 8179/15 8179/22 8181/2
**Martin Shkreli's [1]** 8053/12 8071/18
**massive [1]** 8091/3
**MASTRO [9]** 7974/19 8064/18 8091/16 8105/2 8124/13 8128/7 8130/17 8136/12 8141/2
**Mastro's [1]** 8092/1
**material [5]** 8125/3 8174/10 8219/17 8304/10 8304/15
**materials [1]** 8089/2
**MATSUMOTO [1]** 7974/9
**matter [35]** 8016/23 8021/24 8062/3 8072/19 8078/6 8080/8 8091/9 8098/17 8100/13 8130/22 8143/17 8145/17 8169/24 8184/17 8207/8 8207/13 8207/23 8209/10 8214/20 8227/20 8236/3 8240/23 8240/23 8244/18 8245/6 8245/11 8245/15 8245/19 8245/21 8245/23 8245/24 8246/16 8256/11 8258/1 8283/8
**matters [29]** 8019/19 8050/7 8089/3 8111/2 8151/18 8177/2 8192/15 8192/16 8193/2 8193/3 8193/3 8193/9 8193/14 8194/6 8194/13 8194/19 8198/23 8209/13 8211/23 8212/18 8213/13 8223/16 8230/25 8281/13 8281/16 8282/9 8283/11 8283/24 8284/12
**May 9th [1]** 8057/3
**mean [23]** 7992/23 8018/23 8039/1 8042/10 8045/10 8073/10 8107/14 8130/20 8132/23 8165/2 8171/7 8172/14 8191/17 8202/6 8211/15 8256/23 8256/24 8260/3 8260/10 8262/20 8297/12 8298/10 8298/12
**meaning [1]** 8070/17
**means [12]** 7980/18 7992/24 7993/20 8105/14 8105/19 8109/13 8109/21 8110/11 8218/20 8243/14 8259/3 8290/16
**meant [9]** 7978/23 8050/11 8086/16 8086/19 8099/8 8099/21 8102/5 8171/15 8287/12
**meanwhile [2]** 8005/10 8049/6
**mechanical [1]** 7974/24
**media [4]** 8064/11 8115/2 8118/17 8274/3
**medical [1]** 8281/22
**medium [2]** 8162/4 8163/10
**medium-sized [1]** 8163/10
**meet [24]** 8124/24 8126/5 8144/23 8154/10 8157/21 8165/21 8166/17 8166/24 8167/3 8177/2 8178/5 8188/18 8197/7 8198/11 8198/13 8194/14 8241/14 8248/8 8249/11 8249/16 8268/16 8269/2 8285/6
**meeting [29]** 8057/11 8057/14 8090/7 8090/14 8095/2 8095/2 8095/4 8095/12 8096/4 8096/16 8098/18 8120/14 8120/23 8148/3 8168/20 8168/20 8178/10 8184/10 8214/17 8222/13

**8237/9 8237/11 8237/18 8237/22 8247/11 8248/16 8248/21 8288/8 8302/15
**meetings [15]** 8079/10 8079/13 8167/9 8170/23 8175/2 8178/9 8197/14 8197/14 8208/5 8209/1 8209/14 8225/8 8225/10 8237/3 8258/19
**meets [1]** 8170/9
**member [9]** 8121/18 8178/4 8180/16 8183/11 8294/2 8294/2 8295/5 8299/25 8302/6
**members [18]** 7992/19 8006/4 8049/15 8057/18 8064/5 8068/4 8077/17 8088/23 8090/1 8120/20 8152/15 8153/22 8180/12 8232/2 8236/14 8288/25 8294/12 8296/14
**memo [9]** 8105/22 8107/17 8107/19 8107/20 8123/21 8123/21 8223/7 8248/9 8248/22
**memorandum [6]** 8106/10 8108/12 8108/13 8188/11 8248/15 8249/5
**memorialized [1]** 8075/1
**memorializes [1]** 8146/14
**memorializing [1]** 8074/20
**memory [3]** 8174/1 8216/20 8301/5
**memos [3]** 8143/24 8237/7 8237/10
**mental [2]** 8172/23 8213/21
**mention [5]** 7979/3 7983/13 8047/1 8047/4 8047/8
**mentioned [12]** 7978/15 7987/2 8048/4 8140/25 8164/5 8164/17 8165/1 8186/1 8187/8 8201/7 8202/6 8203/6
**mentioning [1]** 8086/3
**mentions [1]** 8009/23
**mentor [3]** 8215/24 8230/12 8231/2
**merely [2]** 8028/4 8213/7
**merged [5]** 8097/18 8132/17 8157/9 8163/6 8163/21
**merger [16]** 8029/15 8097/17 8097/21 8097/23 8098/1 8132/13 8132/21 8134/17 8135/11 8163/21 8195/1 8195/5 8195/19 8200/16 8206/19 8207/9
**mergers [1]** 8188/1
**Merrell [1]** 8288/5
**mess [1]** 8279/9
**met [15]** 8065/19 8157/22 8167/5 8167/6 8167/7 8178/14 8184/12 8187/10 8197/9 8197/12 8197/13 8198/7 8199/3 8243/16 8243/22
**methodologies [1]** 8288/1
**methodology [1]** 8291/8
**methods [2]** 8109/21 8288/3
**metrics [1]** 8124/24
**mic [1]** 8159/9
**Michael [1]** 8246/11
**microphone [1]** 8213/25
**mid [3]** 8045/20 8046/3 8162/23
**mid-morning [2]** 8045/20 8046/3
**midafternoon [1]** 8210/16
**middle [9]** 8001/14 8001/19 8002/12 8165/15 8213/14 8248/6 8270/1 8280/6 8280/13
**midnight [1]** 8279/20
**might [29]** 7975/7 7975/9 7983/4 7992/1 8003/18 8014/3 8014/11 8021/23 8022/7 8022/15 8053/3 8053/7 8061/24 8079/21 8097/5 8099/9 8107/6 8116/11 8139/13 8150/24 8193/16 8204/13 8207/24 8208/11 8229/23 8233/9 8271/22 8283/6 8301/1
**Mike [2]** 8239/8 8239/17
**million [2]** 8186/14 8186/14
**millions [1]** 8126/8
**mincing [1]** 7988/3
**mind [41]** 7994/1 8002/1 8002/4 8002/6 8010/1 8010/6 8013/25 8014/9 8039/18 8053/4 8062/16 8064/11 8068/13 8069/11 8078/20 8080/17 8090/20 8093/23 8094/9 8094/12 8102/10 8125/2 8144/7 8149/19 8171/18 8171/21 8172/4 8172/16 8172/22 8173/3 8175/15 8175/19 8184/18 8218/25 8219/1 8219/2 8219/25 8226/3 8274/3 8274/23 8277/1
**mine [4]** 8187/23 8189/1 8189/20 8239/14
**minimal [3]** 8124/23 8134/24 8239/19

**M**

**Minkoff [1]** 8303/10 8303/11

**minute [9]** 8005/8 8115/8 8120/11 8129/12 8199/12 8199/14 8223/25 8223/25 8234/23

**minutes [34]** 7975/4 7995/25 8000/7 8028/8 8057/6 8057/11 8057/14 8089/21 8089/22 8090/1 8141/7 8141/9 8150/15 8151/21 8151/24 8197/12 8197/13 8198/5 8198/5 8222/11 8229/6 8232/1 8232/4 8232/7 8234/17 8234/20 8234/21 8235/6 8235/15 8236/1 8237/14 8237/19 8284/4 8284/5

**Miranda [7]** 7981/3 7981/6 7981/18 7986/10 7986/24 7987/6 7993/8

**mirror [1]** 8296/11

**misappropriate [1]** 8109/16

**misappropriation [2]** 8112/20 8112/23

**misconstrue [1]** 8086/15

**misguided [1]** 8098/16

**misimpression [3]** 7984/2 8044/6 8045/4

**misleading [3]** 8048/15 8219/4 8263/9

**misremembering [1]** 8291/17

**misrepresentations [2]** 8106/17 8133/15

**missed [1]** 8235/12

**misstated [1]** 8092/2

**misstates [1]** 8049/22

**mistake [5]** 8024/3 8092/16 8092/21 8093/8 8094/8

**mistakenly [1]** 7993/18

**modest [1]** 8065/20

**moment [7]** 7984/13 8022/17 8058/21 8077/23 8210/4 8247/14 8253/22

**momentarily [1]** 8006/6

**moments [2]** 8254/1

**Monday [3]** 8027/25 8279/23 8280/22

**money [62]** 8029/15 8075/14 8075/17 8075/21 8076/8 8077/16 8078/4 8078/5 8100/18 8105/13 8107/3 8114/2 8116/6 8116/18 8118/9 8120/5 8122/4 8122/7 8122/18 8122/18 8122/20 8123/4 8123/15 8125/16 8125/20 8125/25 8126/1 8126/6 8127/22 8130/9 8130/10 8130/10 8130/11 8133/10 8134/20 8135/16 8135/16 8139/4 8139/12 8139/13 8144/18 8148/11 8148/15 8149/7 8149/13 8165/12 8165/19 8165/23 8165/24 8165/25 8166/1 8166/18 8166/21 8178/11 8178/21 8183/6 8183/12 8183/16 8196/13 8279/24 8280/11 8296/21

**monies [1]** 8070/9

**monitor [1]** 7982/5

**month [1]** 8166/19

**months [3]** 8044/20 8161/9 8166/11

**moot [1]** 8301/19

**moribund [1]** 8097/24

**morning [19]** 7975/25 7976/1 7976/2 7976/8 7977/3 7977/24 8006/4 8006/21 8006/22 8023/3 8023/4 8045/20 8046/3 8107/16 8158/14 8274/5 8277/23 8285/6 8303/9

**morphed [1]** 8043/18

**most [18]** 7976/13 7980/20 7994/14 8046/8 8061/4 8061/9 8064/25 8113/3 8129/17 8137/15 8144/23 8156/20 8157/2 8198/5 8240/7 8240/15 8279/20 8284/6

**mostly [4]** 8135/10 8154/4 8162/4 8205/21

**motion [8]** 8064/22 8064/25 8069/1 8087/24 8105/8 8106/6 8106/11 8108/15 8118/10

**motions [2]** 8066/13 8282/24

**motivated [2]** 8174/4 8286/5

**motive [1]** 8214/9

**mouth [2]** 8051/6 8219/18

**move [8]** 7978/8 8010/25 8014/25 8117/8 8199/18 8221/13 8228/24 8228/25

**moved [7]** 8043/14 8046/13 8065/9 8066/8 8191/8 8191/9 8281/13

**moves [1]** 8205/9

**moving [4]** 8117/18 8124/5 8185/8 8185/9

**Mr. [1092]**

**Mr. Al [1]** 8072/1

**Mr. Aselage [13]** 8001/16 8068/5 8083/14

8085/5 8088/23 8088/24 8120/19 8168/19 8168/19 8215/19 8282/12 8291/3

**Mr. Aselage's [1]** 8168/20

**Mr. Biestek [1]** 8092/14 8112/19 8113/3

**Mr. Blanton [28]** 8074/14 8124/10 8126/1 8126/3 8146/8 8255/7 8255/11 8255/19 8255/25 8257/3 8257/19 8258/21 8259/19 8261/6 8262/4 8262/12 8262/16 8262/19 8263/11 8263/12 8263/14 8263/16 8266/22 8267/2 8297/3 8297/4 8297/6 8298/7

**Mr. Blanton's [6]** 8255/19 8256/9 8256/19 8257/21 8260/23 8261/5

**Mr. Brodsky [31]** 7977/25 7994/6 8003/24 8004/22 8006/19 8024/6 8044/5 8053/6 8058/25 8111/25 8170/4 8172/9 8173/21 8194/9 8213/7 8219/19 8220/2 8220/4 8220/22 8222/3 8227/2 8228/1 8253/15 8261/16 8263/1 8263/24 8264/9 8275/12 8275/24 8276/21 8277/12

**Mr. Brodsky's [6]** 7978/8 8011/2 8034/17 8051/16 8215/5 8256/11

**Mr. Carter [3]** 8222/18 8264/15 8266/13

**Mr. Chan [3]** 7975/3 8294/19 8304/23

**Mr. Cotton [2]** 8277/23 8278/16

**Mr. Delzotto [1]** 7988/9

**Mr. Dubin [6]** 7994/6 8003/2 8004/17 8004/18 8088/19 8093/25

**Mr. Fearnow [6]** 8134/13 8134/23 8135/17 8138/24 8139/4 8140/13

**Mr. Fearnow's [1]** 8135/17

**Mr. Geller [5]** 8072/1 8074/14 8124/10 8126/20 8146/2

**Mr. Greebel [499]**

**Mr. Greebel's [48]** 7992/22 7994/1 7995/1 8000/21 8001/21 8017/1 8017/3 8027/19 8029/2 8032/17 8033/4 8038/13 8042/3 8046/11 8068/12 8074/1 8077/22 8080/16 8082/5 8087/18 8090/20 8105/24 8110/11 8111/4 8127/13 8136/25 8137/16 8142/9 8144/7 8146/23 8150/4 8151/12 8171/17 8174/8 8204/25 8212/9 8212/18 8213/3 8218/25 8225/12 8235/4 8243/3 8253/5 8255/4 8264/12 8265/3 8265/4 8266/4

**Mr. Jaclin [3]** 8027/23 8029/7 8029/8

**Mr. Jacob's [2]** 8266/8 8275/8

**Mr. Jacobs [77]** 8156/16 8168/14 8168/15 8168/16 8168/22 8173/3 8176/17 8181/9 8181/18 8201/1 8207/4 8211/24 8212/15 8212/16 8212/20 8214/13 8214/16 8215/4 8215/10 8216/1 8218/10 8222/5 8230/24 8231/4 8231/16 8231/25 8234/3 8234/9 8234/14 8238/8 8252/9 8252/17 8253/7 8253/12 8253/19 8253/25 8253/25 8256/3 8256/8 8256/18 8257/23 8257/24 8258/11 8258/14 8258/16 8258/22 8259/1 8259/4 8259/7 8259/11 8259/12 8259/17 8259/18 8259/25 8260/19 8260/25 8260/25 8261/1 8261/2 8261/2 8261/15 8261/17 8262/25 8263/3 8263/21 8264/5 8264/7 8265/2 8266/16 8267/19 8274/21 8274/23 8275/10 8275/16 8275/22 8276/2 8276/9

**Mr. Jacobs' [3]** 8230/23 8261/2 8275/16

**Mr. Jacobs's [2]** 8204/22 8262/24

**Mr. Jahrmarkts [1]** 8239/14

**Mr. Jain [1]** 8082/4

**Mr. Johnson [9]** 8152/8 8152/10 8152/13 8152/14 8153/15 8290/8 8292/23 8294/22 8299/1

**Mr. Johnson's [5]** 8285/24 8288/15 8290/18 8293/24 8303/4

**Mr. Kessler [5]** 8141/21 8142/9 8144/25 8145/7 8148/13

**Mr. Kessler's [1]** 8299/4

**Mr. Kocher [6]** 8106/18 8114/25 8123/8 8139/15 8139/21 8139/22

**Mr. Lewis [1]** 8278/24

**Mr. Marshall [2]** 8135/4 8123/8

**Mr. Mastro [7]** 8064/18 8105/2 8124/13 8128/7

8130/17 8136/12 8141/2

**Mr. Mulleady [1]** 8106/16

**Mr. Panoff [14]** 8086/23 8086/25 8087/1 8087/5 8087/6 8087/8 8087/12 8105/7 8106/20 8106/22 8107/1 8107/14 8108/7 8232/4

**Mr. Panoff's [1]** 8107/17

**Mr. Pierotti [17]** 8058/5 8058/10 8058/11 8058/14 8079/15 8079/20 8094/24 8095/18 8096/4 8096/11 8096/16 8098/18 8100/17 8135/1 8137/20 8137/24 8138/2

**Mr. Pierotti's [4]** 8094/19 8094/24 8095/10 8138/2

**Mr. Pitluck [2]** 7982/8 8002/14

**Mr. Pitt [1]** 8236/19

**Mr. Richardson [10]** 8001/16 8088/23 8089/2 8089/16 8120/11 8120/19 8169/5 8170/24 8292/5 8302/17

**Mr. Rosensaft [4]** 8043/4 8043/8 8277/23 8278/17

**Mr. Rosenwald [2]** 8069/19 8078/14

**Mr. Rosenwald's [2]** 8069/20 8143/12

**Mr. Shkreli [183]** 8009/3 8009/4 8009/12 8010/11 8010/15 8023/13 8024/18 8028/9 8028/19 8032/6 8032/10 8032/16 8033/5 8033/7 8034/7 8034/22 8035/6 8035/7 8036/6 8036/7 8036/17 8036/19 8036/24 8037/17 8037/19 8037/23 8037/25 8038/2 8038/13 8038/14 8039/20 8040/2 8040/15 8040/17 8040/17 8040/20 8040/24 8040/25 8040/25 8041/13 8041/15 8042/1 8042/3 8042/6 8042/14 8042/17 8042/20 8043/1 8043/12 8043/13 8043/15 8043/20 8043/22 8044/17 8045/1 8046/13 8046/23 8048/5 8048/18 8048/18 8048/19 8048/22 8049/6 8049/9 8050/1 8050/14 8051/19 8052/9 8053/11 8058/1 8058/8 8058/9 8068/10 8069/8 8070/13 8072/20 8073/19 8073/19 8074/11 8074/22 8075/7 8075/10 8075/24 8076/1 8076/4 8076/6 8076/24 8078/3 8080/17 8081/23 8082/10 8082/20 8084/2 8084/20 8084/22 8085/2 8085/9 8085/25 8088/9 8092/14 8094/6 8095/1 8095/6 8095/11 8096/8 8098/6 8098/19 8105/6 8106/8 8106/8 8107/18 8108/8 8110/25 8111/19 8112/3 8112/20 8113/11 8113/14 8113/21 8114/3 8117/13 8118/1 8118/4 8120/6 8121/9 8121/16 8123/2 8123/6 8123/15 8124/2 8126/4 8126/9 8126/19 8127/2 8127/5 8127/12 8128/7 8128/12 8130/8 8130/15 8132/20 8132/22 8133/15 8134/10 8135/5 8135/6 8135/11 8135/16 8135/19 8135/25 8136/6 8137/23 8138/8 8138/14 8139/18 8140/6 8140/16 8140/17 8140/17 8142/11 8146/4 8146/8 8146/11 8146/13 8146/15 8146/21 8148/10 8149/24 8150/24 8151/2 8171/5 8179/14 8238/16 8238/20 8243/8 8243/10 8257/21 8263/10 8263/15 8291/1 8292/7 8293/14 8302/13

**Mr. Shkreli's [21]** 8036/11 8039/5 8040/9 8052/6 8052/19 8058/10 8108/9 8109/16 8114/9 8122/24 8131/5 8133/4 8138/15 8139/10 8140/9 8145/24 8147/25 8229/24 8292/13 8292/14 8292/19

**Mr. Silverman [5]** 8168/15 8168/16 8168/17 8170/16 8171/9

**Mr. so [1]** 8171/5

**Mr. Su [27]** 8028/19 8029/12 8029/25 8067/24 8067/25 8068/3 8068/15 8068/21 8068/22 8069/10 8083/12 8084/3 8084/6 8084/6 8084/23 8085/4 8085/8 8091/20 8091/22 8092/3 8092/12 8092/22 8093/8 8093/9 8094/7 8110/21 8110/23 8169/5

**Mr. Su's [4]** 8067/25 8091/24 8094/3 8094/10

**Mr. Sullivan [2]** 8029/20 8029/21

**Mr. Vaino [2]** 8096/11 8135/1

**Ms. [14]** 7975/3 7978/2 7978/3 7987/2 8050/6 8060/6 8061/7 8062/7 8168/2 8176/6 8176/25 8289/9 8290/4 8295/2 8290/21

**M**

**Ms. Davida [1]** 8168/2
**Ms. Denerstein [1]** 7978/3
**Ms. Greebel [1]** 8222/6
**Ms. Jackson's [1]** 8062/7
**Ms. Rubin [2]** 7975/3 8060/6
**Ms. Smith [6]** 7978/2 7987/2 8061/7 8176/6 8176/25 8290/21
**Ms. Valeur-Jensen [2]** 8050/6 8232/5
**MSM [1]** 8098/9
**MSMB [98]** 8016/10 8069/22 8070/2 8070/17 8072/16 8072/17 8075/13 8075/14 8075/14 8075/16 8075/19 8075/20 8075/24 8076/14 8077/10 8078/1 8078/4 8078/4 8107/4 8108/4 8108/24 8110/19 8111/1 8112/11 8113/4 8113/23 8114/1 8114/5 8114/6 8114/20 8115/13 8115/13 8115/16 8116/4 8117/22 8117/24 8118/4 8120/18 8121/18 8121/23 8122/10 8123/6 8123/17 8123/22 8124/1 8124/2 8126/9 8126/19 8126/20 8126/25 8127/1 8128/2 8128/23 8128/24 8130/9 8131/15 8131/17 8131/19 8131/21 8131/25 8132/9 8132/11 8132/16 8133/6 8141/24 8142/4 8142/16 8142/18 8142/24 8142/25 8143/21 8143/22 8144/4 8144/4 8145/4 8150/23 8151/1 8151/8 8151/9 8172/19 8174/11 8177/2 8177/9 8179/11 8181/14 8182/18 8205/2 8239/4 8240/8 8240/23 8247/7 8241/10 8242/21 8245/7 8245/22 8247/7 8247/12 8294/14
**MSMB Capital [7]** 8108/24 8110/19 8111/1 8112/11 8113/4 8113/23 8114/1
**MSMB's [3]** 8016/1 8016/4 8132/21
**Muchin [22]** 8011/15 8011/21 8013/12 8014/2 8014/4 8014/12 8018/3 8018/7 8019/18 8020/2 8030/12 8056/19 8057/21 8059/6 8157/7 8157/8 8157/11 8157/23 8157/25 8163/6 8185/11 8186/17
**Muchin's [1]** 8013/15
**Mulleady [5]** 8024/22 8025/5 8026/25 8029/3 8106/16
**multiple [17]** 7978/3 7978/4 8065/4 8069/15 8069/21 8109/2 8109/4 8110/3 8110/3 8110/3 8110/6 8113/9 8151/3 8177/7 8196/21 8255/12 8267/5
**multiples [1]** 8116/17
**must [12]** 7986/6 8003/15 8012/17 8053/2 8064/25 8235/12 8260/6 8260/7 8263/2 8287/25 8288/2 8293/25
**muster [1]** 8065/2
**Mykonos [1]** 8089/3
**MYLAN [1]** 7974/20

**N**

**name [18]** 7976/16 7976/16 8030/13 8086/11 8132/9 8138/25 8156/11 8179/22 8185/2 8195/5 8201/5 8213/5 8223/6 8229/23 8239/19 8253/5 8270/16 8270/19
**names [5]** 7976/11 7976/11 7976/15 8010/11 8135/24
**narrative [1]** 8205/24
**narrow [6]** 7995/5 8171/14 8288/20 8288/21 8291/5 8292/9
**narrowed [2]** 7986/14 8003/3
**narrowing [2]** 7986/14 8153/15
**nasty [1]** 8144/13
**national [1]** 8163/7
**nature [6]** 8033/7 8040/19 8045/1 8050/1 8150/25 8269/7
**navigated [1]** 8100/21
**near [4]** 8034/23 8050/13 8191/3 8280/6
**nearly [2]** 8065/15 8100/12
**necessarily [8]** 8044/2 8136/15 8171/6 8174/1 8255/24 8263/25 8288/12 8290/22
**necessary [5]** 8067/12 8078/20 8081/19 8141/4 8203/3
**necessity [1]** 8224/1
**need [36]** 7978/11 7980/8 7995/20 7997/2

**net [1]** 8196/23
**never [35]** 7987/22 7987/22 7988/18 7988/18 7999/10 8019/17 8019/25 8032/12 8040/5 8044/15 8048/4 8048/8 8065/14 8065/19 8114/22 8114/23 8121/10 8126/16 8144/19 8158/25 8194/13 8243/16 8243/16 8243/22 8256/6 8274/25 8275/8 8280/5 8292/6 8300/19 8300/23 8302/3 8302/14 8302/15 8302/16
**new [30]** 7974/1 7974/4 7974/13 7974/14 7974/18 7974/18 8010/21 8011/16 8011/19 8018/4 8021/16 8036/11 8052/2 8102/16 8118/11 8152/19 8161/20 8162/16 8162/18 8163/8 8164/4 8164/9 8164/20 8166/9 8166/14 8182/14 8185/23 8185/24 8187/2 8189/18
**next [68]** 7975/8 7977/16 7977/22 7995/25 8006/16 8008/21 8024/24 8026/18 8028/18 8031/12 8045/24 8047/17 8057/23 8057/25 8058/15 8059/19 8063/15 8083/15 8090/14 8093/14 8119/3 8120/23 8145/6 8161/8 8161/18 8162/8 8167/17 8177/24 8178/7 8181/20 8181/23 8190/3 8191/9 8191/10 8191/11 8191/12 8191/16 8191/23 8203/20 8206/22 8226/5 8233/17 8237/9 8239/18 8240/22 8241/6 8241/13 8242/2 8242/24 8244/6 8244/23 8247/1 8248/20 8248/20 8249/15 8254/11 8256/3 8264/18 8266/21 8268/4 8268/19 8280/22 8281/18 8282/4 8282/6 8282/7 8282/9 8289/12
**Nickerson [2]** 8066/10
**night [11]** 7977/15 7977/23 7978/14 7979/6 7979/13 8141/4 8158/15 8284/21 8285/2 8285/6 8285/11
**nightmare [3]** 8104/7 8150/5 8150/6
**nil [6]** 7978/21 7984/3 7985/1 7987/23 7989/8 8020/19
**nine [1]** 8151/5
**No. [1]** 8108/16
**nobody [3]** 8071/20 8071/20 8083/6
**nominally [1]** 8135/24
**non [13]** 8001/5 8049/23 8158/4 8166/4 8185/22 8192/2 8192/18 8195/16 8204/24 8213/16 8213/16 8213/17 8286/12
**non-disparagement [1]** 8286/12
**non-equity [3]** 8158/4 8166/4 8185/22
**non-hearsay [6]** 8204/24 8213/16 8213/16 8213/17
**non-leading [4]** 8049/23 8192/2 8192/18 8195/16
**non-violent [1]** 8001/5
**none [10]** 7982/7 7983/19 8032/5 8035/5 8111/5 8126/21 8137/2 8147/12 8243/1 8244/16
**nonetheless [2]** 8288/7 8291/11
**normal [1]** 8124/7
**North [5]** 8246/3 8246/8 8246/10 8246/11 8246/12

**note [1]** 8151/14
**noted [1]** 8165/6
**notes [16]** 8093/18 8123/18 8124/2 8150/23 8150/24 8151/2 8151/9 8219/19 8228/23 8232/1 8234/17 8235/2 8235/2 8235/17 8237/6 8237/10
**nothing [34]** 7981/19 7982/22 7983/10 7984/23 7987/16 7989/24 8002/20 8018/8 8018/9 8065/17 8072/3 8074/25 8075/4 8089/10 8093/16 8097/3 8099/9 8101/16 8117/21 8118/5 8121/25 8142/1 8143/3 8149/15 8149/16 8204/9 8207/20 8235/1 8238/21 8258/14 8302/23 8303/19 8304/1 8304/1
**notice [3]** 8111/7 8111/10 8112/5
**notified [1]** 8304/6
**noting [1]** 8151/9
**notion [6]** 7983/16 7987/21 7987/25 8080/13 8145/7 8219/8
**notwithstanding [1]** 7988/4
**November [15]** 8023/14 8023/14 8023/18 8024/5 8024/7 8043/23 8092/9 8110/16 8110/23 8111/10 8111/11 8161/24 8167/8 8175/3 8178/13
**November 1969 [1]** 8161/24
**November 25th [1]** 8111/11
**November 29th [2]** 8110/16 8111/10
**number [39]** 7979/15 7980/22 7991/7 8002/16 8008/9 8008/19 8008/20 8008/23 8008/25 8020/16 8030/3 8033/22 8033/25 8042/22 8052/20 8069/13 8073/5 8074/3 8079/4 8082/2 8102/2 8109/21 8110/21 8131/23 8167/7 8184/14 8207/25 8240/19 8245/6 8245/8 8245/9 8245/11 8245/15 8245/21 8245/23 8246/16 8273/14 8281/11 8299/14
**numbers [5]** 8007/13 8008/25 8009/17 8010/12 8164/20
**numerous [1]** 7993/12

**O**

**o'clock [5]** 7977/13 8064/9 8064/9 8064/14 8150/9
**oath [3]** 8006/19 8042/7 8042/13
**obfuscating [1]** 8298/23
**object [17]** 8030/19 8105/9 8105/11 8105/12 8105/18 8108/11 8108/20 8108/22 8109/11 8109/13 8193/4 8205/11 8227/1 8230/13 8232/14 8274/11 8275/6
**objected [2]** 8229/22 8277/3
**objecting [7]** 8053/14 8180/21 8180/24 8213/17 8219/16 8219/22 8277/4
**objection [109]** 8010/3 8011/11 8011/22 8013/16 8014/6 8014/13 8014/15 8016/18 8017/4 8017/5 8017/6 8017/12 8018/13 8019/21 8020/3 8021/18 8022/1 8022/9 8022/13 8022/14 8030/22 8031/4 8031/8 8052/16 8053/13 8056/7 8158/22 8159/2 8159/5 8159/14 8159/17 8159/24 8167/11 8171/1 8171/2 8171/5 8172/12 8173/24 8175/10 8179/25 8180/4 8180/19 8181/4 8183/7 8183/10 8183/19 8183/24 8191/25 8192/17 8192/20 8193/5 8193/7 8194/7 8194/14 8194/17 8195/12 8196/1 8197/21 8199/15 8200/18 8201/4 8204/20 8205/14 8206/9 8208/6 8208/14 8210/6 8210/13 8219/24 8221/11 8224/22 8225/14 8226/1 8227/8 8227/13 8228/9 8235/8 8237/16 8237/25 8238/4 8238/10 8238/12 8240/4 8240/8 8243/17 8243/24 8250/24 8252/12 8252/21 8253/10 8253/14 8254/5 8256/21 8259/23 8270/5 8272/1 8272/5 8272/7 8272/19 8273/17 8273/20 8274/18 8274/19 8276/25 8291/13 8293/21 8293/21 8304/4 8304/6
**objectionable [1]** 8275/9
**objections [13]** 8175/20 8176/20 8184/19 8204/21 8205/16 8205/18 8206/18 8214/6 8214/6 8214/10 8214/10 8227/15 8304/8
**objective [2]** 7997/13 8110/3

**7999/15 8000/6 8010/21 8060/10 8060/15 8061/2 8063/12 8069/23 8102/15 8104/20 8106/7 8109/4 8109/23 8115/19 8120/22 8180/2 8194/8 8198/18 8205/10 8220/24 8223/24 8225/19 8264/14 8265/2 8276/9 8276/17 8281/18 8281/21 8282/17 8285/10 8286/5**
**needed [10]** 8018/2 8018/10 8018/22 8165/23 8187/24 8198/25 8199/1 8239/13 8282/14 8303/8
**needs [8]** 7984/11 8097/11 8104/7 8153/19 8214/2 8277/13 8277/19 8278/23
**negative [1]** 8092/24
**negligence [1]** 8117/4
**negligent [1]** 8045/5
**negotiate [2]** 8146/14 8286/16
**negotiated [5]** 8070/20 8073/20 8075/10 8078/17 8080/17
**negotiates [1]** 8075/8
**negotiating [2]** 8073/4 8127/10
**negotiation [1]** 8117/23
**nervous [1]** 7981/14

## O

**objective/multiple [1]** 8110/3
**objectives [3]** 8109/2 8109/4 8109/5
**objects [3]** 8105/17 8288/15 8291/7
**obligated [1]** 7994/2
**obligation [7]** 8006/9 8079/18 8089/25 8090/25 8098/12 8098/14 8151/1
**obligations [6]** 8109/17 8123/22 8123/22 8127/22 8129/3 8131/5
**observations [7]** 8158/5 8158/19 8158/24 8159/11 8159/20 8187/3 8216/2
**observe [2]** 8159/12 8159/16
**observed [1]** 8176/22
**obstruction [1]** 8130/3
**obtain [4]** 8018/2 8049/16 8056/12 8056/19
**obviously [24]** 7979/19 7987/2 7991/4 7995/10 7996/24 7997/20 7998/15 7998/19 8043/14 8044/25 8140/1 8141/6 8145/21 8173/24 8177/11 8211/15 8260/25 8261/3 8274/11 8277/3 8278/20 8280/2 8284/2 8284/20
**occasion [5]** 8080/21 8199/7 8199/7 8199/8 8239/25
**Occasionally [1]** 8186/22
**occasions [8]** 8079/4 8178/14 8193/11 8193/13 8198/15 8199/3 8255/13 8267/5
**occur [3]** 8021/22 8134/1 8279/19
**occurred [3]** 8077/12 8077/12 8112/8
**occurrence [1]** 8113/1
**occurring [5]** 8071/11 8112/6 8112/7 8113/8 8133/25
**October [6]** 8167/6 8178/13 8179/21 8183/5 8255/13 8267/6
**October 2001 [1]** 8183/5
**October 31 [1]** 8179/21
**October 6 [1]** 8267/6
**odds [6]** 7978/20 7984/3 7987/23 7989/5 7989/7 8020/19
**offense [1]** 8003/15
**offenses [2]** 8067/13 8067/14
**offer [24]** 7993/15 8009/24 8048/13 8050/15 8086/1 8145/18 8171/13 8176/2 8179/24 8180/2 8180/15 8184/16 8198/25 8227/24 8234/6 8238/8 8250/22 8252/8 8252/15 8256/16 8261/14 8265/5 8266/2 8288/16
**offered [43]** 7982/15 7989/25 7991/5 7991/16 7991/17 7991/23 7992/3 7997/7 8020/17 8033/6 8034/19 8034/20 8039/23 8040/13 8048/8 8048/9 8049/23 8052/2 8053/15 8125/21 8145/11 8145/12 8146/19 8146/21 8168/11 8171/1 8172/9 8172/10 8219/13 8221/8 8227/25 8230/5 8232/24 8233/1 8233/10 8233/14 8234/10 8234/11 8253/1 8253/6 8253/6 8266/6 8298/18
**offering [28]** 8048/6 8087/8 8168/7 8168/13 8168/14 8188/8 8188/22 8204/7 8227/6 8229/3 8231/14 8238/1 8248/9 8248/15 8248/18 8248/22 8248/23 8249/4 8249/6 8249/12 8252/13 8252/13 8252/25 8259/15 8259/16 8261/13 8300/18 8304/1
**offerings [4]** 8162/4 8188/10 8188/13 8188/21
**offers [3]** 7993/13 7993/14 8169/24
**office [55]** 8012/16 8012/16 8021/6 8021/17 8032/10 8032/12 8035/7 8035/8 8035/10 8035/11 8038/1 8038/3 8038/14 8040/18 8040/19 8043/1 8043/3 8043/12 8043/21 8044/12 8044/18 8044/19 8044/20 8048/21 8059/5 8162/13 8162/14 8162/17 8162/18 8164/3 8164/4 8166/9 8182/13 8182/14 8187/2 8191/24 8192/7 8192/7 8192/8 8192/9 8192/12 8192/14 8193/1 8193/14 8193/18 8193/20 8194/12 8209/23 8209/23 8223/19 8223/23 8224/11 8224/11 8230/25 8285/7
**officer [8]** 8057/21 8216/23 8230/19 8237/20 8237/21 8299/25 8300/14 8300/19
**officers [4]** 7988/12 8082/18 8103/22 8147/19
**offices [12]** 8013/15 8014/3 8015/23 8016/2 8016/2 8018/6 8018/7 8070/3 8191/3 8191/16 8191/23 8192/25

**offshoot [1]** 8008/4
**offshore [2]** 8088/25 8189/6
**often [10]** 7977/11 8087/9 8167/2 8192/9 8192/11 8192/12 8192/14 8219/16 8233/6 8286/2
**okays [1]** 8010/15
**old [3]** 8065/24 8186/4 8205/14
**once [18]** 7979/1 7989/8 7990/25 7996/24 7997/9 8044/7 8047/14 8048/4 8049/10 8049/12 8051/4 8132/22 8133/6 8163/23 8167/6 8198/18 8211/2 8262/13
**one [205]** 7975/7 7975/8 7976/16 7978/1 7978/12 7978/18 7979/14 7979/21 7981/1 7984/14 7985/15 7986/15 7993/16 7995/5 7998/17 7998/18 7998/23 8000/8 8005/1 8005/8 8006/8 8007/17 8014/9 8014/18 8020/16 8022/17 8028/18 8029/17 8032/8 8035/13 8037/8 8037/23 8039/5 8040/14 8040/20 8040/21 8040/24 8041/13 8042/10 8042/11 8045/9 8048/8 8048/10 8048/16 8049/25 8051/17 8058/16 8058/18 8058/21 8059/1 8060/5 8060/8 8060/11 8060/12 8062/12 8066/17 8069/23 8072/1 8073/19 8073/20 8073/21 8073/22 8078/11 8078/11 8080/21 8084/15 8084/24 8084/24 8084/25 8085/1 8087/21 8094/20 8095/18 8096/5 8096/20 8100/4 8100/14 8101/22 8103/6 8104/4 8104/16 8105/9 8105/13 8105/16 8105/16 8105/18 8106/2 8106/13 8107/15 8107/22 8109/5 8109/15 8110/23 8110/24 8111/1 8111/2 8111/17 8112/17 8113/10 8116/9 8116/23 8120/20 8123/6 8123/16 8127/12 8128/15 8128/18 8129/3 8129/12 8133/3 8136/21 8137/14 8137/15 8139/3 8140/4 8140/15 8142/2 8148/5 8150/18 8150/19 8151/11 8157/10 8162/14 8162/18 8164/9 8164/9 8164/17 8164/21 8164/21 8166/12 8166/16 8169/6 8170/25 8174/3 8177/10 8180/11 8184/9 8188/19 8188/21 8188/23 8188/23 8189/12 8189/12 8194/1 8194/4 8195/3 8195/3 8195/5 8199/7 8199/7 8199/8 8199/14 8211/17 8212/7 8214/3 8214/15 8217/6 8217/14 8219/1 8221/5 8221/5 8224/25 8224/25 8237/21 8239/24 8240/21 8243/12 8243/14 8244/4 8244/11 8244/20 8245/2 8245/12 8245/20 8245/21 8246/23 8247/4 8247/14 8257/23 8262/16 8270/22 8270/22 8271/1 8271/5 8271/16 8271/17 8271/20 8271/22 8273/1 8279/4 8287/10 8287/20 8290/16 8290/17 8291/9 8293/14 8294/1 8296/3 8296/4 8296/22 8300/16 8301/1 8303/1 8303/22 8304/25
**one-page [1]** 8107/22
**ones [3]** 8060/8 8209/5 8303/9
**ongoing [17]** 8033/16 8033/19 8036/16 8037/18 8038/24 8039/4 8040/15 8041/12 8044/1 8047/5 8047/12 8049/17 8050/23 8051/16 8051/21 8052/25 8053/6
**onus [1]** 8090/3
**open [33]** 7975/1 7997/1 7997/10 8002/1 8002/3 8002/6 8002/10 8006/2 8022/6 8032/2 8035/4 8038/12 8038/19 8038/20 8046/1 8046/7 8048/1 8048/4 8053/21 8064/1 8064/1 8064/16 8084/1 8137/20 8153/3 8178/1 8205/15 8207/1 8234/1 8255/2 8274/3 8279/19 8297/22
**open-ended [3]** 8035/4 8053/21 8297/22
**opened [7]** 7988/15 7994/24 8038/9 8038/21 8046/11 8219/6 8219/7
**opening [2]** 8038/22 8174/4
**operations [2]** 8280/25
**opine [4]** 8153/23 8288/20 8291/14 8292/18
**opinion [21]** 8026/13 8026/13 8028/3 8028/3 8206/10 8275/16 8286/19 8287/3 8287/6 8287/7 8287/8 8288/18 8288/21 8288/11 8292/12 8293/8 8293/21 8296/11 8299/2 8300/18 8304/5
**opinions [9]** 8204/8 8285/24 8288/17 8288/21

**8288/23 8290/5 8290/18 8291/24 8303/24**
**opportunities [1]** 8309/9
**opportunity [7]** 7982/17 7988/10 7992/4 7996/13 8093/14 8122/17 8297/19
**opposed [4]** 8117/7 8140/9 8245/23 8275/14
**opposite [8]** 7983/20 7984/12 7989/4 7990/9 7994/15 7994/17 8048/14 8122/13
**opposition [1]** 8108/14
**option [2]** 8125/23 8203/13
**options [3]** 7995/17 8115/2 8284/25
**oral [3]** 8201/20 8201/25 8202/1
**order [25]** 7976/3 7976/8 7976/12 7976/13 7976/13 7977/4 7977/11 7977/13 7982/3 8026/19 8026/22 8027/25 8025/12 8108/1 8109/6 8114/5 8125/22 8151/17 8188/12 8202/24 8217/2 8254/7 8277/22 8304/18 8304/19
**orders [2]** 7977/1 8127/14
**ordinarily [1]** 8097/6
**organization [1]** 8299/15
**original [5]** 8116/17 8134/16 8191/9 8266/11 8290/5
**originally [4]** 8058/9 8129/21 8133/20 8140/3
**otherwise [8]** 7981/25 8060/19 8092/25 8092/25 8171/21 8296/22 8301/14 8302/7
**ought [1]** 8104/16
**ourself [1]** 8232/12
**out-going [1]** 8125/4
**outgoing [1]** 8124/19
**outset [1]** 8065/8
**outside [34]** 8012/16 8068/19 8069/12 8070/25 8078/6 8078/16 8078/22 8081/4 8081/9 8081/13 8081/17 8081/17 8081/21 8082/16 8101/10 8103/21 8143/14 8151/7 8156/24 8157/4 8169/19 8170/20 8185/23 8208/2 8211/25 8213/8 8224/19 8225/8 8225/9 8229/24 8236/20 8301/22 8301/24 8301/25
**outstanding [15]** 7975/11 8058/3 8060/5 8060/6 8060/8 8061/6 8071/20 8165/22 8166/25 8167/3 8178/15 8203/15 8207/25 8214/18 8278/20
**overlap [1]** 8138/20
**overlooked [1]** 8286/23
**overrule [9]** 8014/15 8017/5 8022/14 8183/10 8192/19 8193/7 8194/16 8224/23 8238/4
**overruled [13]** 8013/19 8031/5 8197/22 8214/11 8237/17 8240/5 8240/12 8270/6 8272/2 8272/6 8272/20 8273/18 8276/24
**overruling [3]** 8030/22 8272/5 8272/7
**overstated [1]** 8285/25
**overt [1]** 8109/23
**overtime [1]** 8284/25
**overwhelming [1]** 8074/13
**owed [1]** 8196/13
**own [22]** 7976/24 8021/15 8048/6 8067/9 8088/24 8089/17 8112/3 8113/15 8113/23 8114/4 8116/20 8120/16 8131/6 8138/23 8169/1 8169/2 8187/4 8188/6 8198/20 8213/12 8258/20 8296/20
**owned [5]** 8037/9 8094/7 8113/20 8201/21 8207/25
**ownership [4]** 8138/12 8140/10 8140/18 8256/10
**owns [1]** 8136/4

## P

**p.m [12]** 8007/11 8008/7 8008/17 8009/13 8009/15 8009/18 8010/13 8026/5 8028/6 8030/2 8155/2 8305/8
**package [1]** 8126/12
**page [89]** 7978/21 8005/11 8008/5 8008/16 8008/21 8010/19 8011/2 8011/4 8026/12 8026/18 8027/5 8027/15 8028/18 8029/10 8029/24 8031/12 8045/24 8047/17 8057/9 8057/23 8057/24 8057/25 8058/15 8059/19 8063/15 8069/21 8083/15 8092/12 8105/23 8107/22 8108/18 8108/25 8110/4 8119/3 8151/5 8154/16 8167/7 8177/24 8179/21

page... [50] 8181/17 8181/20 8181/23 8182/5
8182/7 8182/8 8182/8 8182/23 8190/3 8203/20
8206/22 8223/8 8226/5 8233/17 8239/4 8239/6
8239/18 8241/19 8242/2 8242/14 8242/24
8243/4 8244/6 8244/23 8245/8 8246/19 8247/1
8247/10 8247/21 8248/5 8248/6 8248/20
8249/15 8249/21 8250/2 8250/9 8250/25
8254/11 8264/18 8266/15 8266/21 8267/11
8268/7 8268/19 8289/12 8298/13 8299/3
8299/3 8306/2 8306/12
Page 10 [1] 8108/18
Page 26 [2] 8108/25 8110/4
page 5 [1] 8182/7
page 7 [1] 8182/8
pages [5] 8008/23 8058/15 8060/24 8066/23
8241/13
pages 249 [1] 8066/23
paid [15] 8076/7 8123/16 8125/16 8126/7
8134/25 8135/22 8138/24 8139/1 8139/3
8140/21 8148/11 8148/15 8148/23 8280/25
8284/24
pail [1] 7975/12
painted [1] 8219/6
painting [2] 8001/22 8263/8
Paley [1] 8057/20
Panoff [16] 8057/20 8086/23 8086/25 8087/1
8087/5 8087/6 8087/8 8087/12 8105/7 8106/20
8106/22 8107/1 8107/14 8108/7 8124/8 8232/4
Panoff's [1] 8107/17
paper [3] 8071/5 8099/25 8149/15
papering [1] 8101/13
papers [2] 8251/24 8265/18
paperwork [1] 8262/22
paragraph [4] 8027/7 8057/16 8057/24
8109/18
Paragraph 56 [1] 8109/18
paragraphs [2] 8204/6 8205/8
paralegal [1] 8062/10
parameters [1] 8003/24
parentheses [1] 8058/8
Park [2] 7974/18 8162/18
part [22] 8021/12 8049/14 8061/4 8067/20
8070/3 8074/17 8108/7 8128/21 8137/24
8148/25 8151/12 8161/12 8174/4 8184/12
8184/14 8217/9 8219/16 8219/21 8253/8
8261/25 8278/16 8287/13
participate [2] 8076/22 8077/1 8087/21
8088/14 8100/3
participates [2] 8107/24 8107/25
participation [1] 8067/13
particular [17] 8003/13 8066/17 8071/13
8081/2 8085/6 8089/9 8099/2 8106/24 8145/19
8180/1 8240/21 8249/20 8256/24 8260/8
8262/25 8282/22 8296/3
particularly [6] 7979/18 8066/25 8077/14
8107/2 8150/20 8151/19
particulars [1] 8068/17
parties [10] 8002/2 8064/8 8074/4 8078/18
8150/12 8207/15 8207/19 8279/16 8282/15
8285/17
partly [1] 8300/7
partner [25] 8043/8 8157/7 8157/8 8158/4
8162/9 8166/13 8178/21 8182/12 8185/13
8185/13 8187/4 8187/24 8189/20 8215/13
8215/18 8215/24 8228/2 8257/9 8257/25
8258/2 8258/10 8258/11 8269/22 8269/23
8269/25
partners [18] 8000/18 8163/18 8163/19 8164/8
8165/21 8166/1 8166/4 8166/4 8166/15
8166/16 8167/2 8167/9 8167/10 8168/3
8185/12 8185/21 8185/22 8236/19
parts [1] 8107/18
party [9] 7981/9 8101/11 8107/23 8108/3
8121/2 8124/9 8142/2 8169/24 8229/24
pass [4] 8065/2 8066/8 8175/10 8176/18
passes [2] 8171/20 8175/11
passionately [1] 8137/1

past [12] 8020/7 8051/21 8099/15 8100/2
8101/1 8114/22 8163/4 8163/23 8163/4
8170/14 8199/24 8216/8
patience [2] 8006/5 8006/17
patient [1] 8204/4
pause [3] 8022/18 8098/24 8221/17
pay [19] 8076/8 8076/9 8089/8 8091/10 8098/8
8107/4 8117/22 8118/2 8123/12 8123/17
8125/7 8130/9 8138/22 8139/10 8139/12
8140/13 8151/10 8280/14 8298/23
paying [10] 8070/3 8070/4 8088/25 8089/6
8089/9 8089/18 8091/11 8118/5 8146/1
8148/14
payment [4] 8058/6 8108/2 8135/21 8286/10
payments [1] 8121/2
pays [3] 8117/20 8118/3 8135/11
peering [1] 8206/10
pending [1] 8093/24
people [74] 7975/11 7976/11 7976/12 7976/13
7976/19 7987/3 7990/8 7994/14 7997/6
8007/15 8008/8 8009/17 8013/5 8019/12
8020/1 8020/1 8021/6 8021/8 8021/9 8029/7
8029/8 8037/10 8044/14 8051/20 8069/23
8070/16 8071/17 8075/22 8078/7 8095/3
8095/3 8096/5 8096/10 8097/5 8101/5 8102/20
8102/21 8103/7 8116/3 8120/2 8125/25 8126/5
8137/8 8138/6 8140/8 8143/10 8143/15
8145/18 8152/4 8153/24 8164/19 8169/2
8169/8 8169/14 8170/17 8178/19 8188/5
8188/16 8188/18 8196/23 8196/24 8201/17
8202/16 8207/24 8222/12 8236/8 8236/14
8237/21 8263/16 8279/1 8279/1 8295/13
8300/22 8301/1
people's [1] 7977/12 8186/18
perceive [2] 8116/8 8116/11
perceived [1] 8117/17
percent [2] 8166/10 8186/22
percentage [2] 8166/5 8185/14
perception [1] 8171/10
percipient [1] 8168/1
perfect [2] 8216/18 8216/19
perfectly [14] 7981/17 8068/2 8070/5 8072/2
8072/11 8083/14 8085/5 8097/4 8097/7
8097/15 8175/12 8227/12 8228/4 8260/20
perform [8] 8174/5
performance [1] 8290/24
performed [3] 8001/9 8175/4 8286/11
performing [1] 8036/3
perhaps [6] 7992/18 8117/9 8141/6 8153/25
8283/4 8304/19
period [29] 8067/6 8100/19 8136/12 8142/15
8144/16 8165/10 8165/19 8166/22 8166/23
8167/3 8167/8 8176/12 8176/13 8178/6
8178/10 8185/15 8187/14 8187/19 8191/15
8191/15 8191/22 8192/25 8193/10 8193/17
8203/8 8224/9 8229/11 8272/3 8274/12
permissible [4] 7981/8 7996/21 8051/14
8227/12
permission [1] 8053/8
permit [2] 7979/24 8104/12
permitted [12] 7979/7 7981/21 7984/1 7984/8
7984/24 7985/2 7989/10 7992/6 8088/5
8208/10 8219/1 8287/8
person [36] 7976/18 7976/18 7976/19 7986/19
7998/23 8019/14 8057/18 8074/12 8079/1
8087/14 8087/21 8095/3 8114/21 8118/2
8124/24 8163/18 8174/9 8174/11 8176/23
8177/1 8177/7 8185/2 8188/19 8198/7 8198/15
8199/3 8211/16 8216/20 8229/24 8243/8
8278/16 8278/17 8279/4 8282/23 8298/3
8300/18
person's [1] 8230/2
personal [12] 8021/15 8035/11 8044/21
8109/17 8127/21 8130/12 8131/5 8146/2
8146/2 8220/7 8281/12 8282/14
personally [3] 8024/20 8056/1 8138/14
personnel [2] 8070/3 8280/19
perspective [2] 8074/1 8077/7

persuade [1] 7981/25
phantom [1] 7983/3 8058/7
pharma [1] 8239/16
pharmaceutical [4] 8047/7 8051/24 8052/5
8052/8
phone [5] 7974/22 8091/4 8095/3 8095/12
8199/4
phrase [1] 8141/21
physically [1] 8084/16
picked [2] 7976/2 8289/8
picture [1] 8073/23
piece [9] 8017/2 8069/5 8122/1 8133/17
8137/22 8145/6 8229/25 8283/17 8294/20
pieces [7] 8099/25 8137/15 8141/6 8148/18
8148/19 8148/20 8287/10
Pierotti [31] 8027/2 8029/5 8058/4 8058/5
8058/8 8058/10 8058/11 8058/14 8058/18
8058/19 8079/15 8079/20 8094/17 8094/24
8095/18 8095/21 8095/23 8096/4 8096/11
8096/16 8098/18 8100/17 8135/1 8137/16
8137/20 8137/24 8138/2 8138/7 8148/16
8149/7 8169/5
Pierotti's [4] 8094/19 8094/24 8095/10 8138/2
pin [1] 8288/14
pipe [2] 8136/18 8144/18
PITLUCK [9] 7974/15 7982/8 8002/14 8023/2
8024/2 8024/8 8030/23 8031/6 8306/5
Pitt [2] 8236/15 8236/19
pivotal [2] 8096/3 8096/16
place [9] 8077/7 8133/5 8195/8 8195/8 8195/9
8202/5 8202/8 8271/13 8273/6
placement [2] 8143/24
places [2] 8105/18 8146/12
plain [1] 8065/13
plan [9] 8010/21 8010/24 8098/19 8102/16
8148/8 8148/9 8176/24 8244/25 8283/4
planning [1] 8006/15
planting [1] 7994/21
Plasma [5] 8239/3 8244/18 8244/20 8245/5
8245/11
plate [1] 8146/6
plausible [1] 8262/18
play [3] 7993/16 8080/18 8296/22
playing [1] 8299/10
Plaza [1] 7974/14
plea [3] 7993/14 8283/22 8284/3
pleading [1] 7997/7
pledge [3] 8165/15 8165/18 8184/13
pledged [1] 8178/12
pledges [2] 8166/19 8175/4
plenty [1] 8204/5
plowing [1] 8045/9
plus [2] 8019/10 8205/14
point [92] 7975/22 7978/17 7979/19 7979/20
7980/20 7980/21 7984/9 7988/21 7989/17
7989/23 8002/20 8015/1 8035/15 8037/1
8037/2 8037/3 8037/19 8043/25 8044/5 8046/9
8049/13 8050/4 8050/13 8066/16 8068/3
8070/10 8075/11 8076/14 8077/6 8085/22
8090/5 8093/14 8094/19 8095/19 8099/6
8099/15 8099/22 8101/11 8103/3 8105/16
8106/11 8106/13 8106/22 8107/6 8111/6
8111/17 8115/9 8115/22 8117/11 8120/5
8120/11 8123/11 8124/4 8125/25 8126/21
8128/11 8128/18 8129/5 8130/5 8130/25
8133/3 8135/14 8140/19 8142/23 8149/8
8154/3 8170/19 8186/2 8214/12 8220/17
8222/5 8229/12 8230/10 8231/23 8261/22
8273/3 8276/6 8276/19 8277/12 8290/2 8291/9
8292/1 8292/2 8293/15 8295/22 8297/19
8297/21 8299/25 8300/11 8301/4 8303/12
8303/15
pointed [8] 8002/19 8027/6 8046/15 8089/12
8089/13 8089/18 8120/15 8130/2
points [5] 8044/10 8069/15 8098/22 8103/20
8105/2
policy [1] 8001/3
polygraph [1] 7993/14

**P**

pool [1] 8113/18
Porter [6] 8030/12 8030/13 8043/15 8044/18
8044/19 8044/25
portion [2] 8026/24 8253/4
portions [1] 8148/22
portrait [3] 8219/4 8219/6 8263/8
portray [1] 7991/9
posed [2] 8049/16 8194/18
posit [1] 8255/23
posited [1] 7998/12
position [8] 8080/4 8080/8 8117/7 8117/8
8156/20 8214/17 8218/21 8230/25
posits [1] 8145/7
possession [2] 8016/11 8132/20
possibility [3] 7995/18 8022/6 8039/17
possible [9] 8017/15 8058/2 8074/16 8165/13
8165/24 8166/21 8212/3 8229/7 8262/17
possibly [13] 8065/2 8082/9 8082/11 8087/7
8087/15 8103/12 8106/18 8117/22 8123/7
8227/8 8240/17 8281/1 8282/6
post [20] 7979/19 7979/22 7981/24 7982/10
7982/20 7982/23 7986/1 7986/22 7989/1
7989/6 7993/7 7993/8 7994/13 7998/7 7999/5
7999/15 8005/2 8040/9 8050/15 8052/6
post-arrest [15] 7979/19 7979/22 7982/10
7982/20 7982/23 7986/1 7986/22 7989/1
7989/6 7993/7 7994/13 7998/7 7999/5 7999/15
8005/2
postponing [1] 8282/9
potential [17] 7975/16 8071/6 8077/19
8077/24 8079/19 8097/9 8100/2 8100/20
8143/8 8143/17 8143/18 8146/10 8262/16
8278/17 8280/7 8286/5 8293/20
potentially [10] 7981/14 7983/1 8013/21
8014/4 8078/18 8080/22 8213/1 8229/7 8276/8
8284/1
powerful [2] 8137/15 8137/22
PowerPoint [2] 8246/3 8246/7
PPM [3] 8268/21 8268/21 8302/20
PPMs [2] 8117/5 8117/5
practical [5] 7979/20 7980/20 7980/25 7990/5
7990/7
Practically [1] 7990/3
practice [20] 8021/16 8157/11 8157/12
8161/25 8162/1 8162/3 8162/21 8162/23
8163/1 8163/9 8186/10 8186/12 8204/16
8204/16 8206/10 8206/10 8217/3 8218/7
8218/9 8218/12
practices [1] 8206/16
pre [11] 7983/15 7983/22 7983/24 7985/21
7986/21 7987/10 7989/5 7989/7 7991/10
8029/15 8029/15
pre-arrest [9] 7983/15 7983/22 7983/24
7985/21 7986/21 7987/10 7989/5 7989/7
7991/10
pre-merger [1] 8029/15
pre-money [1] 8029/15
precede [1] 8008/23
precedent [4] 7979/7 7979/14 7980/21 7981/2
precedential [1] 7981/14
precedes [1] 8008/25
preceding [1] 8259/6
precise [2] 7985/14 7985/19
preclude [3] 7988/8 8054/1 8293/18
precluded [3] 7998/20 8044/13 8303/15
preclusion [1] 7993/13
predecessor [1] 8157/9
predicate [3] 8262/18 8263/13 8276/17
prefer [1] 8104/11
preference [2] 8155/9 8155/20
preferred [5] 8083/4 8083/5 8083/5 8248/9
8248/15
prejudicial [10] 8002/12 8032/20 8032/21
8037/6 8037/10 8040/7 8041/2 8041/6 8048/13
8261/13
premise [4] 7999/18 8037/22 8048/21 8049/4
preparation [1] 8197/3

prepare [4] 8197/4 8197/7 8197/10 8197/15
prepared [2] 8179/6 8196/24
preparing [2] 7976/22 8272/25
preposterous [1] 8042/12
prescribed [1] 8292/9
prescriptions [1] 8097/5
presence [3] 7991/13 8006/2 8204/2
present [19] 7987/3 7994/1 7994/2 7998/18
8006/5 8046/1 8046/7 8048/1 8054/23 8057/18
8057/22 8064/16 8067/3 8067/7 8155/3
8155/15 8156/2 8203/3 8222/2
presentation [2] 8097/8 8246/8
presented [1] 8104/21
preserve [1] 8053/13
preserving [1] 7992/20
president [7] 8189/1 8202/3 8234/18 8237/20
8237/24 8246/11 8246/12
president's [1] 8189/4
press [3] 8142/14 8244/8 8244/16
presumed [1] 8002/7
presumption [2] 8001/23 8064/12
pretrial [5] 8032/21 8034/3 8034/24 8087/24
8177/19
pretty [7] 7985/17 8003/23 8062/10 8103/4
8230/8 8272/12 8301/17
prevent [1] 8137/23
prevented [2] 8018/8 8018/9
prevents [1] 8052/14
previous [1] 8037/5
previously [4] 8007/2 8066/1 8121/18 8300/10
price [5] 8134/9 8135/12 8136/2 8136/11
8136/19
prices [2] 8037/12 8134/24
primarily [4] 8163/8 8201/23 8222/13 8286/5
primary [2] 8112/8 8252/3
principles [2] 8288/1 8288/2
priority [1] 8304/16
private [30] 8072/5 8077/15 8099/12 8117/6
8132/14 8142/2 8143/24 8144/9 8144/22
8156/22 8157/13 8157/14 8157/15 8162/3
8188/25 8189/8 8189/10 8196/21 8196/22
8200/8 8200/16 8201/13 8201/25 8203/9
8207/15 8207/18 8239/15 8246/13 8289/7
8303/25
privately [3] 8068/25 8098/11 8143/2
privilege [1] 8044/22
privileges [1] 8045/9
probative [3] 8032/20 8034/2 8035/1
problem [15] 8035/3 8038/1 8040/23 8113/22
8122/24 8124/3 8124/6 8133/1 8137/18
8137/18 8138/7 8189/19 8207/23 8217/11
8283/2
problematic [5] 7981/1 7981/11 7981/22
7982/2 8194/16
problems [2] 7982/4 8048/2
procedures [1] 7981/12
proceed [3] 8150/12
proceeding [1] 8088/6
proceedings [8] 7974/24 8006/2 8032/1
8098/24 8221/17 8255/1 8262/5 8305/8
process [2] 7995/24 8173/11
produced [2] 7974/25 8189/9
product [3] 8286/14 8286/15 8288/1
production [1] 8012/15
profession [1] 8082/14
professional [22] 8030/25 8031/3 8031/7
8033/16 8046/20 8046/22 8047/6 8047/12
8047/14 8049/10 8050/23 8052/25 8053/7
8053/10 8055/5 8071/25 8157/16 8158/10
8158/11 8159/19 8160/12 8193/16
Professor [5] 7975/15 7976/18 8278/18
8278/19 8304/3 8304/5
proffer [4] 8228/6 8230/14 8230/15 8256/1
proffered [10] 8003/1 8177/12 8211/6 8216/23
8215/25 8228/16 8248/18 8288/10 8293/3
8304/3
proffering [6] 8216/16 8217/4 8217/23 8220/5
proffers [3] 8228/13 8228/17

profit [1] 8185/13
profits [2] 8012/6 8012/11
project [11] 8239/3 8242/19 8242/21 8244/18
8244/20 8245/5 8245/11 8245/14 8246/16
8247/12 8248/3
prominent [1] 8177/7
promise [1] 8141/11
promised [1] 8203/14
promises [1] 8058/10
promissory [3] 8150/23 8151/1 8151/9
prompted [1] 8044/23
proof [6] 7994/20 8064/13 8086/2 8118/6
8121/15 8127/5
prop [1] 8136/2
propensity [1] 8260/4
proper [5] 7988/5 8071/22 8213/4 8218/18
8230/19
properly [5] 7986/23 7987/13 8201/12 8201/15
8203/13
property [1] 8139/12
propose [1] 7978/15
proposed [1] 8058/13
proposing [1] 7990/22
proscribed [1] 8288/5
prosecution [3] 8021/21 8065/1 8199/23
prosecutors [4] 8011/19 8012/21 8018/4
8018/21
protect [8] 8082/17 8096/25 8115/15 8120/6
8123/25 8148/17 8149/10 8214/8
protected [5] 8118/2 8118/4 8120/4 8120/7
8121/6
protection [2] 7986/25 8149/4
protested [1] 8086/10
prove [16] 8001/11 8068/18 8068/24 8074/16
8076/21 8086/17 8086/20 8086/22 8086/23
8087/19 8087/20 8087/23 8088/2 8088/12
8109/4 8169/24
proved [2] 8100/9 8149/12
proven [3] 8076/24 8088/11 8302/25
provide [14] 8021/23 8073/8 8074/12 8121/8
8146/7 8177/3 8230/1 8252/4 8252/5 8260/12
8265/21 8270/11 8281/20 8304/20
provided [10] 7977/22 8074/14 8090/9
8121/12 8223/15 8234/7 8253/7 8256/9 8259/7
8272/10
provides [2] 8111/10 8146/9
providing [5] 8022/22 8076/13 8086/14 8297/7
8298/20
proving [2] 8067/11 8229/4
provisions [3] 8286/4 8287/18 8291/15
prudent [4] 7992/19 8115/14 8116/1 8118/24
psychological [1] 8145/23
public [55] 8034/13 8052/10 8053/5 8053/11
8055/6 8077/16 8089/11 8091/5 8096/22
8096/25 8096/25 8097/2 8097/13 8097/17
8097/18 8097/19 8100/20 8115/1 8130/10
8131/20 8132/15 8142/14 8142/19 8144/17
8151/4 8156/24 8156/23 8157/13 8157/15
8162/3 8177/6 8177/14 8188/8 8188/13
8188/22 8189/12 8189/12 8189/17 8196/21
8199/1 8200/8 8200/17 8200/17 8201/17
8201/11 8203/9 8208/2 8209/18 8213/7
8220/10 8225/7 8236/5 8262/13 8289/8 8289/9
publicity [3] 8077/19 8118/11 8144/17
publicly [11] 8034/16 8037/9 8081/1 8081/16
8082/7 8085/15 8093/19 8098/2 8142/17
8151/3 8286/17
pull [2] 8061/23 8297/25
pulled [2] 8152/16 8289/2
purchase [3] 8134/8
purchased [3] 8111/20 8134/9 8134/11
purchasers [1] 8138/6
purported [1] 8078/3
purportedly [2] 8264/7 8290/15
purports [1] 8112/10
purpose [10] 7997/12 8041/10 8124/13
8147/14 8178/9 8183/11 8184/10 8201/1
8261/24 8264/10

**P**

**purposefully [1]** 8045/5
**purposely [1]** 8124/25
**purposes [9]** 7997/4 8006/15 8080/16 8113/4
8152/11 8253/19 8259/17 8281/21 8289/8
**pursuant [5]** 8003/12 8032/21 8266/1 8266/2
8266/6
**pursued [1]** 8109/22
**push [2]** 8158/21 8281/24
**pushed [2]** 8041/21 8284/12
**pushing [1]** 7975/12
**put [74]** 7975/23 7981/4 7981/9 7981/10
7987/3 7987/17 7988/17 7988/22 7989/1
7990/15 7994/20 8003/16 8007/8 8008/2
8023/9 8024/24 8024/25 8038/5 8060/14
8061/24 8068/22 8070/1 8075/21 8078/4
8084/6 8084/16 8084/21 8084/25 8089/24
8090/23 8091/22 8091/25 8092/5 8093/13
8104/20 8122/18 8122/18 8126/5 8149/13
8150/18 8155/5 8166/18 8169/18 8171/2
8171/23 8173/16 8173/17 8175/13 8175/22
8176/21 8181/12 8189/8 8206/4 8218/25
8219/2 8219/23 8220/6 8220/22 8222/17
8229/15 8234/22 8255/6 8257/4 8260/14
8261/23 8262/3 8265/8 8266/13 8280/24
8281/17 8281/22 8282/17 8292/7 8296/21
**puts [5]** 8080/15 8089/17 8112/9 8113/10
8114/11
**putting [8]** 7986/1 7998/16 8042/1 8084/10
8090/3 8114/3 8142/17 8155/13

**Q**

**qualification [2]** 8292/17 8293/21
**qualifications [2]** 8291/23 8302/19
**qualified [6]** 8288/16 8288/19 8291/14 8292/1
8293/22 8296/14
**qualify [2]** 8287/20 8296/12
**quarrels [1]** 8002/9
**quarters [1]** 8189/3
**Queens [1]** 8160/14
**question's [1]** 8253/23
**questioning [3]** 7979/24 7995/14 8036/15
**questions [102]** 7978/16 7982/1 7983/17
7985/15 7987/8 7991/11 7996/25 7997/4
8000/16 8000/25 8002/25 8003/5 8003/22
8004/1 8020/11 8022/19 8023/5 8025/20
8026/16 8030/3 8030/7 8030/16 8032/12
8033/22 8033/25 8041/9 8053/2 8055/14
8059/8 8068/14 8068/20 8073/16 8079/5
8083/12 8084/18 8087/1 8087/9 8088/17
8088/21 8094/4 8105/3 8105/4 8107/10
8120/17 8131/12 8141/16 8159/21 8186/16
8192/1 8194/2 8194/3 8194/5 8194/9 8194/12
8194/19 8194/21 8194/23 8194/23 8194/24
8195/13 8195/24 8204/7 8204/20 8204/22
8205/15 8210/2 8210/5 8210/11 8211/3
8211/14 8211/14 8211/17 8211/20 8211/20
8211/22 8212/4 8212/7 8212/25 8214/2
8220/23 8220/23 8222/6 8222/9 8222/9 8224/2
8233/3 8233/10 8240/16 8251/4 8251/7
8251/20 8251/22 8252/2 8260/11 8265/13
8265/15 8269/15 8270/2 8270/3 8271/24
8273/10 8298/4
**quick [6]** 7989/17 8002/24 8054/17 8054/20
8063/7 8147/5
**quicker [1]** 8022/23
**quickly [2]** 7975/13 8214/12
**quite [9]** 7985/2 7989/12 7990/9 7990/17
7992/5 8002/5 8002/13 8015/20 8303/23
**quotation [1]** 8138/6
**quote [22]** 7978/19 8010/17 8010/20 8010/22
8011/14 8011/16 8012/25 8013/1 8013/4
8013/8 8019/10 8019/14 8020/18 8020/19
8067/1 8067/2 8067/3 8067/10 8067/14
8088/25 8141/23 8141/24
**quoted [2]** 8093/25 8290/4

**R**

**R-O-S-E-N-T-H-A-L [1]** 8161/21

**R024325 [1]** 8057/9
**R024326 [1]** 8057/23
**R024328 [1]** 8058/15
**R048383 [1]** 8268/7
**R048657 [1]** 8223/8
**raise [8]** 7982/19 7982/20 8006/7 8077/16
8097/14 8098/2 8144/18 8156/7
**raised [14]** 7979/22 7980/3 7982/17 7982/21
7992/9 8069/1 8070/23 8080/10 8084/19
8087/1 8093/15 8105/2 8110/4 8134/7
**raises [4]** 8003/14 8068/9 8069/8 8107/6
**raising [5]** 7994/21 8070/16 8087/9 8120/14
8126/4
**rambling [1]** 8204/14
**ran [3]** 8163/19 8237/18 8237/22
**random [1]** 8131/23
**RANDY [1]** 7974/19
**range [3]** 8185/19 8186/11
**rarely [3]** 8041/3 8223/21 8223/22
**rate [3]** 8186/24 8187/4 8187/5
**rather [11]** 7992/24 8052/5 8052/7 8067/4
8073/14 8136/14 8165/18 8263/25 8286/6
8286/15 8293/18
**ratified [4]** 8081/1 8081/2 8082/7 8085/15
**ratifies [1]** 8151/10
**ratify [2]** 8081/15 8121/14
**ratifying [1]** 8093/18
**rational [2]** 8064/22 8103/9
**re [7]** 8059/9 8239/9 8241/22 8244/24 8246/3
8249/12 8249/17
**re-redirect [1]** 8059/9
**re:strategy [1]** 8247/3
**reach [1]** 8131/6
**reached [4]** 8068/3 8068/11 8069/9 8085/6
**reaching [1]** 7981/13
**react [1]** 7975/13
**reactions [1]** 8037/12
**read [23]** 7984/23 7984/23 7990/23 8003/2
8024/18 8026/21 8029/14 8057/16 8057/23
8058/12 8058/18 8089/9 8109/1 8120/20
8153/3 8182/22 8182/24 8242/9 8242/10
8267/2 8290/6 8296/6 8304/25
**reading [6]** 8009/20 8011/2 8126/18 8142/18
8181/4 8181/6
**reads [5]** 8010/15 8010/23
**ready [4]** 8060/19 8118/13 8151/20 8201/17
**real [5]** 8099/17 8117/18 8129/7 8133/7
8135/22
**reality [3]** 7990/7 8214/22 8219/5
**realize [2]** 8144/14 8147/4
**realizes [1]** 7983/1
**really [27]** 7981/25 7987/17 8001/9 8036/21
8037/6 8054/11 8073/18 8074/15 8075/21
8075/22 8077/20 8086/6 8086/20 8099/16
8111/1 8112/17 8117/16 8118/21 8119/1
8120/12 8124/7 8130/25 8135/13 8136/4
8145/22 8174/12 8304/12
**reargue [1]** 8274/18
**reason [40]** 8000/11 8012/23 8019/8 8020/16
8020/17 8032/9 8034/2 8035/13 8039/24
8040/15 8041/25 8044/15 8047/13 8048/15
8048/21 8049/25 8050/5 8050/16 8073/17
8092/14 8092/22 8103/3 8103/8 8135/2
8144/15 8149/23 8171/13 8183/15 8193/18
8214/1 8217/9 8219/16 8219/22 8230/9 8275/4
8276/9 8291/18 8293/18 8295/23 8297/18
**reasonable [23]** 7994/14 8003/14 8064/24
8067/11 8074/16 8076/21 8076/25 8087/20
8087/23 8088/14 8094/21 8108/6 8116/10
8128/9 8128/21 8129/6 8129/16 8129/23
8131/1 8147/6 8231/9 8258/17 8259/5
**reasonably [7]** 7992/15 8115/25 8116/8 8119/1
8144/12 8147/18 8231/2
**reasoning [1]** 8288/10
**reasons [32]** 7978/18 7981/20 7988/12
7988/13 8032/4 8032/5 8035/4 8035/5 8035/13

**raise [23]** [see column 3]

8040/12 8040/25 8041/9 8041/11 8041/13
8041/16 8047/20 8048/23 8045/6 8047/24
8048/6 8048/8 8048/9 8048/10 8048/16 8049/8
8049/23 8049/24 8133/20 8193/14 8193/20
8214/3 8303/23
**rebut [3]** 7982/17 7988/16 7996/1
**rebuttal [4]** 7980/5 7982/4 7997/8 8086/3
**recalling [1]** 8141/6 8229/21
**recant [1]** 8130/4
**recanting [2]** 8128/19 8130/2
**receive [6]** 8149/2 8173/19 8177/16 8177/18
8286/6 8304/11
**received [23]** 8010/7 8010/12 8033/2 8069/17
8100/17 8111/5 8160/21 8172/3 8174/24
8174/24 8175/22 8180/18 8197/19 8215/18
8215/21 8219/3 8253/12 8256/12 8256/18
8259/17 8259/21 8260/25 8266/10
**receives [1]** 8118/12
**receiving [2]** 8183/4 8256/24
**recent [1]** 8156/20
**recently [1]** 8002/17
**recess [2]** 8054/21 8064/15
**recipient [6]** 8010/5 8025/2 8025/4 8028/2
8266/8 8266/9
**recipients [12]** 8026/21 8028/1 8098/8 8099/2
8099/10 8099/14 8102/22 8102/23 8148/2
8148/6 8148/15 8230/3
**recitation [1]** 7981/24
**recite [1]** 8238/19
**recognize [10]** 8043/18 8064/21 8098/3 8179/7
8179/9 8220/6 8283/16 8284/22 8288/4 8288/5
**recognized [2]** 7987/24 8069/15
**recollection [19]** 8030/17 8238/13 8239/24
8243/21 8243/22 8243/25 8244/1 8245/24
8246/7 8247/19 8248/17 8248/24 8251/10
8251/14 8265/23 8269/17 8270/16 8270/19
8295/9
**recollections [1]** 8238/19
**record [64]** 7975/23 7976/5 7977/19 7977/20
7979/18 8000/2 8049/23 8060/14 8071/16
8072/7 8075/4 8075/12 8075/24 8078/23
8079/3 8079/17 8080/23 8081/6 8082/8
8083/11 8084/5 8084/6 8088/24 8089/5
8089/22 8092/12 8096/1 8096/10 8099/1
8102/3 8102/4 8103/5 8115/9 8116/19 8117/10
8117/11 8117/15 8121/22 8125/11 8128/6
8128/8 8128/13 8129/6 8147/8 8147/10
8147/15 8151/14 8179/5 8204/1 8212/11
8214/8 8215/5 8218/5 8220/5 8229/6 8232/2
8245/17 8245/18 8257/4 8279/9 8279/9
8294/23 8295/1 8302/5
**recorded [5]** 7974/24 7979/5 7991/2 7991/3
8120/8
**records [4]** 8131/25 8201/14 8201/24 8214/8
**recount [1]** 8221/11
**recounting [2]** 8170/19 8170/21
**recross [3]** 8038/10 8058/25 8059/2
**recruited [2]** 8161/20 8162/2
**redact [5]** 8252/24 8253/4 8261/13 8264/10
8264/12
**redacted [1]** 8060/24
**redacting [1]** 8260/20
**redaction [1]** 8266/3
**redirect [24]** 7995/18 7996/25 7997/3 8022/20
8022/25 8023/1 8023/5 8035/15 8041/10
8044/5 8045/19 8046/10 8051/1 8051/8
8051/14 8053/1 8053/18 8054/11 8054/25
8055/2 8058/24 8059/9 8111/12 8297/19
**redraft [1]** 8234/20
**reduce [1]** 8187/4
**reduced [1]** 8280/18
**redux [2]** 8065/25 8082/21
**REED [1]** 7974/19
**refer [3]** 8053/5 8108/22 8150/19
**reference [10]** 7995/6 7995/6 8030/21 8108/2
8108/12 8126/13 8138/5 8138/6 8242/10
8244/7
**referring [2]** 7978/25 8253/24
**refers [1]** 8102/1

**reflect [2]** 8084/5 8202/4
**reflected [2]** 8184/25 8253/23
**reformulate [4]** 8176/10 8178/3 8192/1 8194/8
**refresh [2]** 8030/16 8030/21
**refuse [3]** 7978/24 8158/21 8280/10
**refused [1]** 8228/17
**regard [20]** 8003/22 8072/15 8074/10 8074/18
8081/5 8085/11 8088/1 8088/22 8090/9
8094/11 8095/16 8096/9 8098/14 8098/22
8149/17 8150/19 8152/18 8154/2 8212/17
8280/19
**regarding [13]** 7993/13 8030/4 8120/18
8199/10 8200/10 8229/6 8235/15 8256/9
8258/19 8262/14 8281/12 8286/19 8293/25
**regardless [9]** 7981/6 7986/10 7986/11 7987/7
7990/21 8215/1 8215/2 8263/6 8303/4
**regards [5]** 8081/12 8093/25
**registration [4]** 8188/22 8195/19 8195/22
8202/11
**regular [1]** 8284/23
**rehash [1]** 7979/20
**reiterate [1]** 8087/17
**rejected [1]** 7980/24
**rejection [1]** 7993/15
**rejections [1]** 7993/14
**relate [15]** 8028/3 8128/2 8179/10 8179/14
8180/9 8184/8 8209/16 8230/5 8250/17
8250/20 8258/20 8268/25 8288/17 8288/21
8301/1
**related [25]** 7987/19 7997/1 7997/5 8051/16
8051/19 8051/24 8092/5 8107/23 8108/3
8110/8 8110/23 8113/2 8121/2 8123/6 8124/9
8124/21 8133/22 8137/16 8193/14 8211/23
8232/21 8242/19 8244/21 8245/2 8294/5
**related-party [2]** 8107/23 8108/3
**relates [7]** 7975/6 7975/8 8009/22 8028/4
8110/17 8150/20 8262/3
**relating [22]** 8016/22 8019/19 8070/17
8179/11 8197/1 8200/8 8207/14 8208/5
8208/22 8209/14 8222/7 8223/16 8237/11
8238/19 8247/12 8251/8 8256/4 8259/1 8269/2
8269/10 8269/15 8271/24
**relation [2]** 7986/3 8254/8
**relationship [50]** 8031/1 8031/3 8031/7 8032/6
8032/8 8033/5 8033/7 8033/16 8033/19 8034/6
8035/6 8036/2 8036/16 8037/18 8037/23
8038/24 8039/19 8040/1 8040/9 8040/10
8040/15 8041/12 8041/12 8044/21 8046/20
8046/23 8047/6 8047/10 8047/13 8048/5
8048/11 8050/1 8050/7 8050/14 8050/23
8051/15 8052/25 8053/7 8053/10 8053/23
8055/5 8055/9 8067/2 8187/15 8187/21
8195/17 8195/18 8301/2 8301/4 8301/10
**relatively [2]** 8286/9 8286/11
**release [18]** 8125/8 8273/4 8273/11 8273/12
8273/13 8273/15 8274/24 8275/5 8275/12
8275/17 8275/22 8276/3 8276/3 8276/5
8276/15 8276/16 8277/17 8286/3
**released [1]** 8135/21
**releases [8]** 8142/15 8142/19 8273/10 8276/12
8276/14 8286/12 8286/12 8290/11
**relevance [15]** 8173/24 8199/16 8210/13
8211/1 8212/3 8213/2 8224/22 8227/16
8256/23 8257/1 8270/5 8272/1 8272/19
8274/11 8293/20
**relevant [53]** 7986/20 8039/8 8067/6 8169/20
8171/18 8171/20 8171/25 8172/18 8172/20
8173/11 8173/18 8174/15 8174/25 8175/10
8175/22 8176/10 8176/11 8176/12 8176/13
8176/18 8204/13 8204/25 8215/11 8215/22
8218/22 8220/24 8221/2 8228/25 8229/5
8229/6 8229/10 8229/18 8230/20 8256/14
8256/23 8258/5 8258/5 8260/22 8260/24
8262/5 8263/1 8274/17 8274/22 8275/1
8275/21 8275/23 8276/11 8277/6 8291/24
8292/11 8292/16 8298/16 8299/1
**reliable [1]** 8288/1

**reliably [1]** 8288/2
**relinquished [1]** 8130/9
**reluctance [1]** 8038/25
**reluctant [1]** 8284/11
**rely [1]** 8202/14
**relying [1]** 8151/15
**remain [4]** 7983/9 7983/18 8158/2 8208/1
**reminder [1]** 8165/16
**remained [2]** 8097/19 8178/15
**remaining [1]** 8098/7
**remains [1]** 8258/6
**remedies [2]** 8117/1 8118/17
**remedy [2]** 8109/2 8117/3
**remember [60]** 7977/6 8011/17 8011/18
8013/9 8019/15 8019/16 8064/12 8076/20
8123/20 8140/3 8145/19 8208/9 8208/24
8209/2 8220/3 8224/4 8224/7 8231/5 8236/5
8239/9 8239/22 8241/10 8241/24 8242/1
8242/10 8242/21 8244/11 8244/20 8245/2
8246/23 8247/3 8247/10 8248/3 8248/14
8248/17 8248/18 8248/24 8249/1 8249/2
8251/7 8251/8 8251/13 8251/18 8255/24
8255/24 8255/25 8258/24 8265/9 8265/22
8268/15 8268/18 8269/7 8269/19 8269/21
8269/24 8270/2 8271/21 8271/22 8273/6
8297/10
**remembered [1]** 8251/10
**remembers [2]** 8131/22 8256/1
**remind [4]** 8000/2 8001/22 8002/1 8004/20
**reminding [1]** 8002/7
**remitting [1]** 8208/25
**remove [1]** 8150/7
**removed [1]** 8124/9
**removing [1]** 8108/1
**render [1]** 8301/16
**renew [1]** 8283/13
**repay [1]** 8133/4
**repeat [3]** 8104/3 8141/12 8192/22
**repeated [1]** 8046/16
**repeatedly [6]** 8054/6 8069/18 8074/4 8170/23
8177/1 8290/23
**repeating [2]** 7982/16 8104/1
**rephrase [4]** 8018/17 8183/14 8275/18 8277/7
**report [5]** 8080/13 8093/18 8150/21 8153/13
8279/23
**Reporter [1]** 7974/22
**reporters [1]** 8281/7
**represent [4]** 7997/12 8236/20 8236/24
8236/25
**representation [4]** 7997/14 7997/16 7998/9
8039/4
**representations [3]** 8032/22 8094/6 8151/16
**represented [16]** 7986/11 8034/15 8044/18
8045/1 8084/22 8111/15 8112/7 8117/16
8121/20 8188/25 8189/7 8189/16 8189/17
8189/22 8209/7 8236/4
**representing [7]** 8043/10 8043/11 8095/22
8103/23 8115/13 8157/13 8272/23
**represents [4]** 8116/2 8127/15 8128/24
8272/22
**reputation [1]** 8000/22
**request [12]** 8000/8 8003/11 8006/8 8006/10
8026/2 8051/1 8051/6 8054/3 8076/7 8135/5
8139/10 8283/13
**requested [6]** 8018/24 8019/1 8019/2 8225/9
8225/11 8228/12
**requesting [2]** 8216/3 8286/14
**requests [2]** 8002/24 8117/15
**require [1]** 8033/18
**requirement [4]** 8107/9 8107/11 8124/23
8136/23
**requirements [1]** 8286/10
**requires [3]** 8012/10 8012/13 8014/21
**research [1]** 7993/11 8244/9
**resemble [1]** 8303/25
**reserve [5]** 8052/16 8104/9 8141/4 8150/2
8150/11
**reserving [1]** 8150/4

**resign [1]** 8107/7
**resolution [3]** 8262/19 8262/19 8270/8
**resolutions [2]** 8071/11 8074/22
**resolve [8]** 8061/7 8064/6 8071/3 8071/19
8072/6 8124/13 8127/15 8128/22
**resolved [5]** 8058/18 8058/19 8075/3 8080/11
8118/16
**resolving [1]** 8072/22
**resources [1]** 8130/12
**respect [31]** 7986/13 7990/6 7993/19 8000/10
8003/9 8054/3 8091/17 8104/11 8106/14
8106/15 8110/13 8114/15 8127/24 8137/14
8152/8 8152/9 8164/3 8177/8 8183/3 8194/21
8195/17 8196/11 8196/17 8205/2 8205/2
8225/24 8235/23 8255/18 8263/12 8263/13
8266/21
**respectful [1]** 7984/21
**respectfully [15]** 7985/3 7989/12 7992/5
7995/10 8002/5 8002/13 8040/11 8051/25
8095/9 8104/11 8168/12 8212/6 8213/14
8215/7 8215/15
**respects [2]** 8058/20 8286/21
**respond [17]** 7978/13 7980/3 7980/5 7987/13
7991/20 7995/17 7996/5 7996/13 7996/23
7997/2 7997/19 7997/22 7998/3 7998/24
8224/12 8224/13 8262/7
**responded [2]** 8224/15
**responding [2]** 7979/21 8070/20
**responds [2]** 8068/10 8069/9
**response [39]** 7982/2 7982/7 7982/21 7986/16
7987/9 8010/20 8027/19 8027/21 8027/22
8029/2 8029/3 8046/15 8050/2 8076/7 8102/10
8110/5 8196/6 8224/13 8227/12 8227/19
8230/23 8233/10 8234/5 8234/9 8234/14
8235/4 8235/7 8235/25 8252/4 8258/15
8259/12 8261/3 8264/6 8265/3 8265/3 8265/9
8265/22 8265/23 8266/8
**responses [1]** 8041/19
**responsibilities [1]** 8282/18
**responsibility [3]** 8089/15 8090/2 8235/2
**responsible [8]** 8068/1 8070/5 8079/11
8084/10 8117/25 8117/25 8129/23 8285/21
**responsibly [1]** 8070/19
**responsive [4]** 8015/6 8040/11 8040/12
8235/14
**rest [14]** 8002/2 8045/21 8060/9 8060/15
8060/19 8061/13 8061/25 8062/16 8062/18
8062/25 8139/23 8149/11 8253/5 8282/17
**rested [1]** 8062/23
**resting [1]** 8064/3
**Restivo [1]** 8288/12
**restrained [1]** 8045/7
**restricted [1]** 8097/20
**restriction [2]** 8136/9 8136/10
**rests [1]** 8061/19
**result [3]** 8151/9 8262/23 8281/6
**resume [4]** 8054/25 8222/3 8227/21 8305/8
**Resumed [1]** 8007/5
**retain [1]** 8134/20
**retained [7]** 8149/5 8188/7 8189/12 8189/21
8236/20 8255/12 8267/4
**retaining [1]** 8118/14
**retire [1]** 8198/18
**retired [2]** 8156/19 8300/7
**retirement [5]** 8163/14 8186/1 8186/2 8216/8
8216/10
**retrieve [1]** 8046/4
**Retrophin [287]** 8014/23 8015/18 8015/23
8016/2 8016/5 8016/12 8018/1 8018/3 8018/7
8018/22 8019/4 8019/19 8024/17 8036/3
8036/6 8036/8 8036/10 8036/17 8036/24
8039/3 8039/6 8039/16 8040/2 8043/11 8044/6
8044/23 8050/5 8052/1 8052/3 8052/6 8052/7
8053/12 8055/7 8055/25 8056/3 8056/10
8057/2 8057/6 8057/12 8067/18 8067/20
8068/24 8069/9 8069/23 8070/2 8070/17
8070/18 8070/20 8070/23 8070/24 8071/7
8071/19 8072/11 8073/7 8073/24 8074/2

## R

**Retrophin... [231]** 8074/3 8074/18 8075/9
8075/9 8075/15 8075/21 8076/15 8077/10
8077/15 8077/15 8077/16 8077/18 8077/24
8077/24 8078/1 8078/1 8078/2 8078/5 8078/8
8078/15 8078/19 8079/2 8079/12 8097/19
8097/24 8097/25 8099/4 8099/8 8099/13
8100/9 8100/11 8101/15 8105/13 8105/18
8107/3 8109/14 8109/16 8112/3 8112/4 8112/8
8112/10 8112/11 8112/16 8112/17 8112/20
8113/10 8113/12 8113/15 8113/17 8113/25
8114/2 8114/4 8114/6 8114/11 8114/12
8114/20 8114/22 8114/23 8114/24 8115/11
8115/13 8115/15 8115/20 8115/22 8116/5
8116/7 8116/21 8117/6 8117/7 8117/11
8117/17 8117/20 8117/20 8117/22 8117/24
8118/2 8118/3 8118/4 8118/4 8118/6 8118/13
8118/20 8118/25 8120/3 8120/6 8121/18
8121/20 8122/2 8122/3 8122/9 8122/11
8122/13 8122/17 8122/18 8123/8 8123/12
8123/19 8123/22 8123/23 8123/25 8125/18
8126/7 8126/25 8127/19 8129/1 8129/4 8130/6
8130/6 8130/9 8130/10 8130/13 8130/22
8130/24 8130/24 8131/4 8131/14 8131/20
8131/20 8131/24 8132/5 8132/14 8132/15
8132/17 8133/1 8133/4 8133/7 8133/8 8133/9
8133/11 8134/13 8134/15 8135/11 8135/11
8135/14 8135/15 8136/3 8136/4 8136/5 8136/6
8139/11 8139/13 8139/24 8139/25 8140/4
8140/9 8140/19 8141/18 8141/19 8141/22
8141/24 8142/5 8142/17 8142/18 8143/3
8143/12 8143/18 8143/19 8143/22 8144/3
8144/4 8144/5 8144/6 8144/18 8144/25 8145/1
8145/3 8145/3 8145/4 8145/25 8146/1 8148/13
8149/2 8149/8 8149/16 8150/21 8153/24
8172/19 8174/12 8177/4 8177/11 8205/3
8211/10 8211/25 8212/9 8213/5 8214/14
8214/20 8214/22 8215/3 8215/6 8216/5
8217/18 8217/19 8217/20 8220/19 8223/2
8223/3 8223/16 8231/7 8231/8 8232/21
8239/19 8240/6 8240/14 8247/16 8248/8
8249/16 8249/24 8249/25 8249/25 8250/1
8250/17 8251/9 8255/6 8255/8 8255/12
8255/14 8258/1 8262/13 8262/13 8262/17
8262/19 8263/20 8267/4 8267/6 8268/25
8269/10 8292/9 8298/19 8298/23 8298/24

**Retrophin's [8]** 8044/13 8085/13 8085/14
8120/5 8130/7 8132/25 8135/13 8135/16

**retry [2]** 8065/10 8065/21

**return [1]** 8197/19

**returnable [1]** 8149/1

**revealing [1]** 8150/25

**revenue [1]** 8166/11

**reverse [13]** 8097/21 8097/23 8098/1 8132/12
8132/20 8134/17 8195/1 8195/5 8195/19
8200/16 8206/19 8207/8 8249/12

**reversible [1]** 8041/4

**review [8]** 8070/10 8089/4 8090/14 8223/7
8243/5 8243/5 8244/8 8268/21

**reviewed [2]** 8151/4 8153/20

**reviewing [1]** 8183/1

**revise [1]** 8166/19

**revised [2]** 7975/24 7976/8

**revisit [2]** 8069/2 8069/2

**Richardson [10]** 8001/16 8088/23 8089/2
8089/16 8120/11 8120/19 8169/5 8170/24
8292/5 8302/17

**Richardson's [1]** 8120/16

**rid [3]** 8013/8 8263/10 8264/14

**ridiculed [1]** 8101/5

**ridiculous [1]** 8001/18

**right-hand [2]** 8008/19 8247/22

**rights [28]** 7978/20 7979/3 7981/6 7981/19
7982/5 7983/6 7983/9 7983/13 7983/19
7983/22 7984/3 7984/6 7984/6 7984/11
7984/23 7987/22 7988/18 7989/8 7990/17
7990/23 7990/24 7991/25 7992/8 7995/1
8018/9 8115/17 8118/16 8118/18

**rights,' [1]** 7978/23

**ripe [1]** 7980/7

**Rise [1]** 7975/2

**risk [11]** 7994/3 7994/5 7994/8 7994/21
8012/24 8013/14 8013/23 8015/22 8107/6
8118/11 8286/3

**risks [2]** 8149/14 8149/14

**Rivka [1]** 7974/22

**RivkaTeich [1]** 7974/23

**RMR [1]** 7974/22

**RO23243 [1]** 8008/20

**RO23245 [1]** 8008/10

**RO48357 [1]** 8247/21

**RO48368 [1]** 8250/2

**road [4]** 7998/22 8219/14 8232/17 8281/18

**Robert [3]** 8023/23 8024/23 8025/12

**Rod [2]** 8007/21 8027/2

**Rodriguez [1]** 8066/9

**ROHDE [1]** 7974/12

**role [24]** 8068/19 8108/9 8148/14 8166/7
8166/8 8211/22 8212/16 8215/14 8215/19
8236/18 8294/25 8295/6 8295/9 8296/14
8296/22 8299/10 8300/4 8300/5 8300/10
8300/10 8300/13 8301/12 8301/12 8301/14

**roll [2]** 8116/21 8122/23

**rolled [4]** 8116/5 8116/14 8122/2 8122/12

**Ron [1]** 8007/21

**room [10]** 7984/14 7984/17 8045/21 8155/7
8189/15 8191/7 8191/20 8191/21 8216/3
8263/10

**rooms [1]** 8191/8

**root9B [4]** 8156/21 8156/25 8157/2 8157/6

**Rosenfeld [3]** 8270/19 8271/3 8298/18

**Roseman [8]** 8057/22 8157/7 8157/8 8163/2
8163/4 8163/17 8163/21 8165/7

**Rosensaft [6]** 8043/4 8043/4 8043/8 8277/23
8278/17 8279/13

**Rosenthal [5]** 8161/21 8161/23 8162/9
8162/12 8163/7

**Rosenwald [10]** 8069/19 8078/14 8114/19
8118/1 8121/10 8137/12 8139/15 8139/22
8143/6 8143/8

**Rosenwald's [2]** 8069/20 8143/12

**Ross [1]** 8168/2

**roughly [1]** 8165/9

**Route [1]** 8209/7

**Route 9B Holdings [1]** 8209/7

**routinely [1]** 8111/5

**RPR [1]** 7974/22

**RUBIN [32]** 7974/21 7975/3 8060/6

**rule [28]** 7975/17 7986/7 7996/9 8012/7
8012/11 8033/9 8061/16 8062/17 8062/22
8063/1 8063/4 8064/20 8064/22 8066/5 8066/7
8066/10 8066/12 8066/19 8094/20 8129/15
8171/20 8172/6 8174/19 8200/21 8218/22
8218/23 8232/20 8256/15

**Rule 29 [1]** 8094/20

**Rule 403 [1]** 8218/22

**ruled [4]** 8004/2 8051/13 8069/4 8278/23

**rules [6]** 7981/22 7987/1 8221/3 8221/4 8221/6
8221/6

**ruling [15]** 7982/11 7984/22 7996/6 7997/22
7998/2 8002/24 8003/8 8003/23 8037/5
8046/10 8276/24 8276/25 8301/21 8303/3
8304/21

**rulings [6]** 8032/21 8034/3 8034/24 8037/5
8213/24 8303/8

**run [2]** 7994/5 8239/14

**running [3]** 7994/21 7995/1 7996/2

## S

**S-P-E-N-G-L-E-R [1]** 8162/11

**sad [1]** 8082/14

**safe [1]** 8059/11

**salary [1]** 8070/3

**sale [1]** 8028/4

**Sarah [6]** 8023/24 8024/23 8025/8 8114/23
8117/14 8137/12

**sat [4]** 7984/5 8191/6 8225/7 8236/22

**satisfied [3]** 8127/20 8129/25 8169/1

**satisfies [1]** 8129/9

**satisfy [9]** 8109/16 8127/1 8131/4 8135/5
8137/11 8140/8

**satisfying [1]** 8130/7

**Saunders [3]** 8023/24 8024/21 8025/10

**saw [15]** 7982/12 7987/5 8000/23 8027/16
8028/8 8028/24 8029/7 8029/8 8087/7 8089/21
8101/7 8137/10 8139/17 8188/9 8200/1

**scam [1]** 8121/23

**scenario [4]** 7983/15 7984/12 7985/14 8298/6

**scene [1]** 8222/17

**scenes [2]** 8045/15 8049/7

**schedule [2]** 7977/12 8285/6

**scheduled [1]** 8281/24

**schedules [2]** 8278/2 8279/3

**scheduling [5]** 7976/24 7978/4 7978/6
8281/16 8281/20

**scheme [2]** 8068/16 8131/14

**schemes [5]** 8105/10 8105/17 8106/2 8109/12
8109/12

**Scholer [13]** 8014/11 8030/16 8030/18 8031/2
8034/15 8035/21 8039/1 8039/2 8044/7
8046/12 8046/18 8047/15 8051/5

**school [7]** 8160/22 8160/24 8160/25 8161/1
8161/2 8161/5 8161/7

**Schuyler [2]** 8124/5 8124/7

**science [1]** 8160/21

**scope [7]** 8036/22 8039/12 8040/8 8051/14
8146/6 8154/8 8303/3

**scream [1]** 8103/11

**screen [5]** 8028/10 8179/17 8181/13 8242/6
8246/19

**screwing [1]** 8001/17

**scrivener [2]** 8146/13 8235/1

**scroll [4]** 8223/5 8239/6 8241/13 8265/10

**scrutinized [1]** 8151/7

**seal [2]** 8042/1 8304/19

**search [9]** 8016/16 8016/22 8016/24 8017/16
8017/18 8017/22 8291/10 8293/10 8293/11

**searches [3]** 8286/18 8291/9 8291/10

**seat [8]** 8006/6 8054/24 8064/17 8155/4
8155/13 8156/1 8156/10 8222/2

**SEC [22]** 8034/13 8089/9 8096/21 8096/21
8115/3 8118/18 8128/19 8128/23 8130/2
8130/4 8162/2 8188/21 8188/24 8195/20
8195/20 8196/7 8202/11 8203/11 8236/15
8289/11 8291/9 8293/11

**SEC's [1]** 8161/18

**second [42]** 7976/16 7976/20 7976/23 7981/15
7993/12 8003/12 8004/18 8008/5 8013/3
8032/23 8033/8 8034/2 8034/12 8034/19
8044/16 8048/12 8057/16 8066/7 8066/9
8071/9 8086/10 8086/18 8086/22 8091/7
8124/3 8126/1 8135/21 8143/4 8175/16 8177/5
8182/23 8214/20 8219/16 8239/6 8241/19
8273/5 8277/24 8279/12 8286/19 8288/6
8288/13 8288/19

**secret [1]** 8263/10

**Secretaries [1]** 8231/12

**secretary [35]** 8079/10 8191/6 8211/18 8212/8
8212/9 8212/21 8214/14 8214/25 8215/5
8215/10 8215/14 8215/19 8215/21 8215/23
8217/17 8218/20 8220/11 8221/1 8222/13
8224/4 8224/19 8224/21 8225/10 8225/13
8225/13 8225/22 8225/25 8231/7 8231/8
8231/18 8234/4 8234/16 8234/25 8235/1
8235/14

**section [3]** 8108/3 8108/18 8161/16

**Section 2 [1]** 8108/18

**securities [12]** 8100/23 8136/6 8136/7 8157/12
8161/10 8161/12 8161/16 8162/23 8163/10
8243/6 8244/2 8244/9

**security [2]** 8162/3 8162/5

**see [104]** 7993/12 7995/19 8007/11 8007/12
8009/2 8019/13 8026/18 8058/16 8058/16
8064/14 8071/3 8087/3 8091/9 8098/21 8103/1

S

see... [89] 8103/16 8114/16 8120/21 8168/24
8176/19 8177/15 8177/20 8179/23 8181/2
8181/11 8181/17 8181/20 8182/3 8182/6
8182/10 8188/17 8216/17 8217/11 8222/19
8222/23 8223/5 8223/6 8223/11 8223/13
8224/1 8228/1 8239/3 8239/20 8240/24 8241/7
8241/13 8241/16 8241/20 8242/3 8242/8
8242/14 8242/16 8242/19 8242/20 8243/2
8243/3 8243/7 8244/3 8244/3 8244/10 8244/18
8244/19 8244/23 8245/9 8245/12 8246/3
8246/16 8246/18 8246/22 8247/16 8247/22
8248/2 8248/7 8248/8 8248/11 8248/13
8248/23 8249/13 8249/18 8250/6 8250/7
8250/14 8253/2 8255/7 8259/22 8260/5
8266/19 8266/22 8267/1 8267/12 8267/14
8267/18 8267/22 8267/24 8268/6 8268/9
8268/13 8268/13 8268/13 8268/20 8269/2
8269/4 8269/6 8274/5
seed [2] 7994/21 8122/4
seeing [8] 8068/8 8078/24 8096/23 8099/15
8099/18 8100/1 8142/12 8142/14
seek [2] 8044/24 8223/23
seeking [8] 7995/12 8044/23 8045/8 8109/10
8215/12 8253/11 8256/24 8257/24
seeks [1] 8263/24
seem [3] 8282/15 8284/15 8289/3
sees [2] 8069/8 8142/20
segregate [1] 8110/10
self [1] 8120/1
self-dealing [1] 8120/1
sell [4] 8026/24 8134/24 8137/25 8149/6
selling [8] 8096/10 8096/11 8096/12 8135/2
8137/18 8137/18 8187/23
semantic [1] 8105/16
semantics [1] 8132/6
send [5] 8029/25 8137/19 8198/22 8232/3
8232/6
sender [1] 8266/9
sending [3] 8010/11 8256/3 8257/18
sends [3] 8111/18 8256/13 8261/4
senior [7] 8162/9 8166/12 8215/18 8215/24
8258/2 8258/11 8294/2
sense [12] 8000/15 8033/19 8049/8 8086/19
8097/2 8100/5 8137/9 8138/17 8138/18
8219/21 8231/22 8294/6
sensitive [1] 8077/14
sensitivity [1] 8052/6
sent [14] 8050/6 8076/7 8078/8 8111/5
8114/19 8114/19 8126/25 8188/17 8232/3
8232/4 8255/8 8255/14 8260/24 8267/7
sentence [1] 8026/21
sentences [1] 8267/3
sentencing [1] 8281/16
separate [4] 7998/19 8243/15 8244/1 8284/12
separation [1] 8294/9
September [16] 8023/25 8024/3 8032/16
8050/15 8084/7 8084/17 8092/10 8150/21
8165/15 8242/15 8246/20 8246/20 8247/1
8247/11 8255/13 8267/5
September 15 [1] 8247/1
September 18 [1] 8150/21
September 19 [1] 8242/15
September 2011 [1] 8247/11
September 20th [1] 8084/17
September 30 [1] 8050/15
September 6 [1] 8267/5
September 7 [1] 8246/20
September 8 [1] 8246/20
sequence [1] 8093/21
series [9] 8041/8 8113/2 8137/11 8248/9
8248/15 8248/18 8255/16 8267/9 8267/25
serious [1] 7992/8
seriously [1] 8117/12
serve [9] 8055/24 8056/1 8056/2 8056/10
8075/3 8163/16 8165/5 8232/1 8288/4
served [14] 8163/17 8163/17 8163/23 8208/2
8212/9 8214/14 8215/5 8217/16 8224/17

8224/18 8224/20 8236/8 8295/10 8301/20
servers [5] 8015/14 8016/7 8016/10 8016/10
8016/13
service [2] 8006/17 8274/2
services [18] 8074/12 8074/14 8076/13 8125/1
8125/8 8145/25 8146/7 8146/8 8146/9 8153/2
8153/3 8174/5 8286/6 8286/9 8286/15 8298/20
8298/21 8301/16
serving [6] 8211/25 8212/17 8212/21 8213/8
8220/11 8280/15
set [10] 7985/15 8175/2 8188/12 8189/15
8201/12 8209/7 8233/3 8236/23 8240/18
8277/13
sets [1] 8084/12
setting [1] 8111/24
settle [11] 8058/5 8071/1 8073/7 8118/20
8127/4 8139/19 8139/24 8144/11 8144/12
8144/13 8286/5
settled [2] 8080/11 8099/12
settlement [74] 8058/8 8058/13 8058/16
8058/17 8058/18 8067/21 8069/13 8069/14
8069/16 8069/17 8072/9 8072/12 8073/21
8073/24 8073/25 8074/5 8074/7 8075/7
8079/14 8079/24 8080/11 8080/14 8080/19
8080/24 8085/13 8089/13 8090/6 8093/15
8107/1 8112/15 8114/15 8118/1 8119/1
8120/17 8121/2 8121/10 8123/9 8124/5 8124/7
8124/11 8124/14 8125/22 8127/16 8129/21
8143/4 8145/9 8145/12 8145/21 8146/18
8146/21 8150/25 8271/10 8271/25 8272/9
8272/11 8272/13 8272/14 8272/15 8272/17
8272/21 8272/24 8273/7 8273/15 8274/12
8275/11 8275/15 8276/5 8286/2 8286/4
8286/13 8286/17 8286/20 8290/11 8300/17
settlements [25] 8070/21 8070/21 8071/4
8071/13 8073/20 8075/10 8076/5 8077/11
8077/13 8078/19 8078/23 8080/3 8081/22
8089/3 8090/8 8117/20 8118/3 8120/9 8120/25
8121/3 8124/6 8135/6 8150/22 8151/7 8286/16
settling [1] 8126/24
seven [45] 8065/9 8066/9 8066/15 8067/17
8067/17 8069/5 8085/17 8085/21 8086/1
8086/2 8087/14 8088/4 8088/16 8088/19
8091/16 8103/10 8105/5 8105/9 8106/16
8108/15 8108/20 8108/23 8109/1 8109/19
8134/11 8134/12 8134/24 8135/25 8138/21
8139/11 8139/19 8141/18 8145/5 8146/25
8147/3 8147/20 8149/23 8150/20 8157/20
8158/1 8158/3 8198/5 8246/22 8247/7 8290/17
several [9] 7979/2 7991/2 7991/11 7991/12
7991/18 7992/17 8225/1 8274/15 8284/10
shall [1] 8008/4
sham [3] 8261/7 8290/15 8298/22
shape [2] 8087/10 8101/18
share [10] 8069/16 8095/1 8098/8 8099/1
8099/10 8099/14 8113/9 8148/6 8148/11
8148/24
shared [1] 8205/5
shareholder [1] 8240/19
shareholders' [1] 8198/20
shares [143] 8010/24 8026/23 8026/24
8027/24 8058/7 8068/25 8073/5 8073/7
8091/18 8092/14 8097/20 8097/20 8098/7
8098/8 8098/11 8099/3 8099/8 8099/12
8099/13 8099/19 8099/22 8099/22 8100/10
8100/16 8112/11 8110/16 8112/3 8112/16
8112/19 8112/20 8112/21 8113/14 8113/15
8113/15 8113/16 8113/17 8113/20 8113/23
8114/4 8114/4 8114/5 8114/9 8114/12 8115/20
8126/16 8126/25 8128/2 8128/19 8130/3
8131/15 8131/21 8131/23 8132/3 8132/5
8132/7 8132/10 8132/13 8132/13 8132/14
8132/17 8132/20 8132/21 8133/8 8133/12
8133/12 8133/23 8134/7 8134/9 8134/15
8134/21 8134/25 8135/1 8135/3 8135/3 8135/7
8135/7 8135/20 8136/5 8136/8 8136/10
8136/19 8137/10 8137/25 8138/5 8138/11
8138/19 8138/20 8138/22 8138/23 8139/11

8139/6 8139/10 8139/12 8139/14 8139/16
8139/16 8139/23 8140/4 8140/7 8140/7 8140/7
8140/7 8140/10 8140/13 8140/14 8140/21
8141/18 8141/18 8141/18 8142/5 8143/2
8143/3 8148/7 8148/12 8148/14 8148/15
8148/20 8148/24 8149/3 8149/5 8149/15
8201/12 8201/15 8201/22 8207/24 8207/25
8249/17 8255/20 8256/10 8256/20 8257/4
8257/21 8260/23 8261/5 8261/11 8262/3
8262/9 8262/10 8262/11 8262/21 8262/23
8263/10 8263/14
sharp [1] 8213/22
Shea [2] 8162/20 8162/25
shell [7] 8135/12 8135/12 8135/18 8135/19
8140/4 8140/19 8200/17
Shkreli [246] 8007/10 8009/3 8009/4 8009/12
8010/11 8010/15 8023/13 8023/21 8023/24
8024/12 8024/17 8024/18 8025/3 8025/23
8028/9 8028/19 8028/20 8031/1 8032/6
8032/10 8032/16 8033/5 8033/7 8033/16
8033/21 8034/7 8034/15 8034/22 8035/6
8035/7 8036/6 8036/7 8036/17 8036/19
8036/24 8037/17 8037/19 8037/23 8037/25
8038/2 8038/13 8038/14 8039/20 8040/2
8040/15 8040/17 8040/17 8040/20 8040/24
8040/25 8040/25 8041/13 8041/15 8042/1
8042/3 8042/6 8042/14 8042/17 8042/20
8043/1 8043/12 8043/13 8043/15 8043/20
8043/22 8044/17 8045/1 8046/13 8046/20
8046/23 8048/5 8048/18 8048/18 8048/19
8048/22 8049/6 8049/9 8050/1 8050/14
8051/19 8052/9 8053/11 8055/6 8057/19
8058/1 8058/8 8058/9 8065/10 8065/18
8065/21 8066/2 8068/10 8069/8 8069/22
8070/13 8072/20 8073/19 8073/19 8073/24
8074/11 8074/22 8075/7 8075/10 8075/24
8076/1 8076/4 8076/6 8076/24 8078/3 8080/17
8081/23 8082/10 8082/20 8082/21 8084/2
8084/20 8084/22 8085/2 8085/9 8085/24
8085/25 8087/18 8087/25 8088/3 8088/5
8088/7 8088/9 8092/14 8093/2 8094/6 8095/1
8095/6 8095/11 8095/19 8096/8 8098/6
8098/19 8100/13 8101/2 8101/2 8101/3
8101/19 8102/11 8102/12 8103/4 8103/6
8103/14 8103/15 8103/16 8103/20 8105/6
8106/8 8106/8 8107/16 8107/18 8108/8
8110/25 8111/19 8112/3 8112/20 8113/11
8113/14 8113/21 8114/3 8115/16 8117/13
8117/21 8117/25 8118/1 8118/4 8120/6 8121/9
8121/16 8123/2 8123/6 8123/15 8124/2 8126/4
8126/9 8126/19 8127/2 8127/5 8127/12
8127/19 8128/1 8128/3 8128/7 8128/12 8130/8
8130/10 8130/15 8132/3 8132/11 8132/20
8132/22 8133/15 8134/10 8135/5 8135/6
8135/11 8135/16 8135/19 8135/25 8136/6
8137/23 8138/8 8138/14 8139/18 8140/6
8140/16 8140/17 8140/17 8142/11 8145/22
8146/4 8146/8 8146/11 8146/13 8146/15
8146/21 8147/15 8148/10 8149/21 8149/24
8150/24 8151/2 8171/5 8179/14 8179/15
8179/22 8181/2 8238/14 8238/16 8238/20
8243/5 8243/8 8243/10 8243/13 8244/8
8257/21 8263/10 8263/15 8291/1 8292/7
8293/14 8302/13
Shkreli's [23] 8036/11 8039/5 8040/9 8052/6
8052/19 8053/12 8058/10 8071/18 8108/9
8109/16 8114/9 8122/24 8131/5 8133/4
8138/15 8139/10 8140/9 8145/24 8147/25
8229/24 8292/13 8292/14 8292/19
shocking [3] 8071/4 8104/6 8142/22
short [6] 8022/18 8058/17 8067/11 8116/24
8117/8 8188/19
shortly [2] 8122/15 8122/16
show [28] 7991/13 7991/17 7996/22 8024/9
8025/16 8026/7 8028/12 8034/13 8056/21
8065/12 8071/9 8081/8 8085/10 8085/12
8095/15 8133/22 8138/2 8178/23 8201/18
8225/9 8227/3 8229/3 8229/13 8231/19 8249/7

# S

**show...** [3] 8264/11 8266/7 8266/8
**showed** [12] 8067/23 8068/6 8068/8 8071/5 8073/2 8082/19 8082/20 8094/2 8094/14 8101/3 8111/6 8199/25
**showing** [6] 8008/15 8111/25 8179/6 8184/14 8231/21 8259/18
**shown** [17] 8007/7 8008/2 8023/6 8023/11 8023/16 8023/18 8025/7 8025/9 8025/17 8026/7 8027/12 8056/22 8056/25 8106/25 8108/10 8126/12 8201/16
**shows** [14] 8035/12 8074/25 8076/2 8078/24 8079/3 8085/10 8086/24 8090/18 8095/21 8096/8 8130/1 8147/8 8148/16 8149/19
**shred** [8] 8071/16 8071/16 8072/7 8074/20 8082/23 8089/5 8096/1 8148/9
**shuffling** [1] 8129/1
**shut** [1] 8173/12
**shutdown** [6] 8279/21 8280/3 8280/7 8280/13 8281/4 8284/22
**shuts** [1] 8285/7
**shutting** [1] 8122/6
**sic** [1] 7991/6
**side** [2] 8024/24 8024/24
**side's** [1] 8286/14
**sidebar** [35] 7982/11 8031/9 8031/11 8032/2 8045/23 8049/7 8054/2 8054/2 8059/16 8059/18 8061/19 8063/14 8064/3 8167/13 8167/16 8175/24 8177/23 8185/5 8199/17 8203/17 8204/1 8206/21 8210/14 8226/4 8226/6 8228/19 8230/18 8233/16 8254/6 8254/10 8255/2 8264/17 8266/2 8266/6 8273/23
**sidebars** [1] 8228/17
**sides** [1] 7999/22
**sign** [8] 8107/23 8125/16 8137/8 8234/22 8255/20 8255/21 8258/11 8262/22
**signaling** [1] 8115/21
**signature** [1] 8266/4
**signed** [7] 8027/25 8089/21 8203/13 8251/25 8256/6 8263/23 8265/18
**significant** [3] 8113/4 8195/21 8296/22
**signing** [1] 8124/23
**silent** [1] 7983/10 7983/18
**silently** [2] 8182/24 8242/9
**Silverman** [6] 8168/2 8168/15 8168/16 8168/17 8170/16 8171/9
**similar** [6] 8069/17 8091/23 8194/22 8286/21 8291/12 8299/16
**similarity** [1] 8293/13
**similarly** [1] 8109/24
**simple** [7] 7988/16 7989/10 7990/25 7992/4 7992/7 7993/6 8044/4
**simply** [7] 7987/9 7989/3 7992/2 7995/7 7997/3 8046/18 8103/21 8288/9
**Sincerely** [1] 8267/12
**single** [10] 7982/6 8017/2 8069/23 8082/24 8082/25 8083/1 8107/14 8159/25 8177/12 8219/8
**sit** [4] 8006/16 8078/10 8091/15 8092/11
**site** [1] 8288/14
**sitting** [9] 7983/11 8091/3 8128/3 8241/24 8246/23 8247/3 8271/20 8278/5 8278/7
**situation** [17] 7976/17 7982/8 7986/21 8049/17 8091/21 8091/22 8100/21 8123/10 8128/2 8152/14 8153/23 8280/6 8280/18 8285/3 8294/4 8294/24 8297/1
**situations** [3] 7979/21 8204/15 8296/19
**six** [5] 8100/15 8164/14 8164/23 8246/14 8290/6
**size** [1] 8140/18
**sized** [2] 8162/4 8163/10
**skill** [1] 8287/22
**skills** [1] 8287/22
**skip** [2] 8182/5 8182/19
**Skyler** [2] 8107/2 8108/2
**slip** [1] 8221/10
**Slow** [1] 8172/24

**small** [8] 8029/11 8162/4 8162/23 8163/10 8190/1 8194/12 8202/13 8287/7
**smart** [1] 8158/7
**SMITH** [8] 7974/15 7978/2 7987/2 8061/7 8176/5 8176/6 8176/25 8290/21
**so-called** [1] 8020/1
**social** [1] 8160/9
**sold** [2] 8140/16 8140/16
**solely** [3] 8037/14 8178/11 8282/23
**soliciting** [1] 8256/22
**someone** [14] 8062/11 8073/23 8113/22 8130/3 8137/17 8138/7 8169/8 8169/18 8191/18 8200/20 8203/11 8203/14 8216/17 8229/23
**Sometime** [1] 8238/17
**sometimes** [5] 8104/8 8201/13 8202/22 8241/3 8241/3
**someway** [2] 8003/19 8120/4
**somewhat** [2] 8131/23 8154/3
**somewhere** [3] 8159/1 8166/2 8187/19
**son** [2] 8189/2 8189/5
**sons** [1] 8160/3
**sons-in-law** [1] 8160/3
**soon** [2] 8123/24 8278/13
**sooner** [1] 8083/6
**sorry** [42] 7978/2 7989/16 8012/3 8021/2 8021/12 8023/9 8023/9 8024/5 8027/17 8027/22 8028/18 8030/13 8033/24 8035/18 8055/22 8055/23 8090/12 8108/17 8112/13 8132/6 8132/24 8134/12 8134/23 8159/7 8159/8 8170/10 8172/25 8175/7 8179/16 8183/23 8184/1 8225/17 8239/1 8243/20 8265/12 8266/9 8268/13 8270/1 8273/22 8274/9 8278/8 8282/3
**sort** [15] 7987/17 8039/18 8041/18 8106/13 8117/6 8118/6 8125/15 8133/14 8145/8 8204/17 8205/25 8208/16 8231/1 8264/4 8300/25
**sorts** [6] 7982/4 8170/16 8173/22 8177/3 8263/11 8292/15
**sought** [9] 8018/21 8018/23 8019/3 8067/5 8256/22 8257/23 8260/6 8296/6 8298/7
**sounding** [1] 8302/8
**soundly** [1] 7980/24
**sounds** [5] 8003/2 8217/8 8220/22 8279/13 8281/2
**source** [1] 8132/2
**sources** [1] 8000/23
**Southern** [1] 8021/16 8066/6
**sparingly** [1] 8041/4
**speaking** [15] 7978/20 7984/3 7989/7 7990/3 7991/9 7992/18 8020/19 8213/25 8238/19 8239/25 8240/11 8241/1 8247/11 8270/23 8271/1
**speaks** [1] 8184/23
**special** [58] 7978/16 7979/25 7982/13 7983/3 7983/5 7983/8 7983/14 7984/14 7985/20 7987/9 7987/21 7989/14 7989/19 7989/21 7990/15 7991/5 7995/14 7997/25 7998/21 8003/4 8004/25 8007/7 8011/6 8011/9 8012/6 8014/20 8015/11 8015/21 8018/9 8020/15 8022/6 8023/3 8032/23 8033/11 8034/22 8035/4 8040/13 8041/8 8041/23 8046/16 8053/9 8055/4 8056/24 8057/11 8059/4 8137/11 8189/15 8189/16 8189/22 8209/7 8236/4 8236/12 8236/18 8236/20 8236/23 8237/3 8237/9 8237/10
**specialized** [1] 8287/22
**specific** [31] 7998/6 8069/19 8073/18 8101/25 8109/19 8110/18 8124/24 8137/20 8140/25 8144/5 8154/7 8173/23 8176/10 8197/1 8200/3 8235/25 8238/18 8238/21 8240/2 8241/25 8242/1 8256/23 8274/12 8274/19 8292/14 8295/12 8298/4 8298/6 8299/7 8300/17 8303/5
**specifically** [4] 8078/15 8175/1 8290/2 8298/9
**specifics** [2] 8206/2 8262/24
**specious** [1] 8035/13
**speculate** [1] 7988/7

**speculating** [1] 8049/3
**speculation** [5] 8049/1 8049/9 8049/11 8049/14 8049/21
**speed** [1] 8283/6
**spell** [1] 8156/11
**spend** [3] 8118/9 8150/5 8283/17
**Spengler** [4] 8162/10 8162/17 8162/19 8162/21
**spent** [1] 8188/20
**Spielberg** [1] 8139/25
**split** [2] 8028/21 8249/12
**splitting** [1] 8129/21
**spoken** [2] 8197/25 8199/22
**spring** [2] 8145/12 8146/20
**St** [1] 8283/14
**staff** [3] 8281/7 8284/25 8285/10
**stage** [3] 8043/24 8129/15 8131/1
**stages** [1] 8036/7
**stakes** [3] 7982/25 7983/2 7983/7
**stance** [1] 8055/13
**stand** [29] 7994/4 8006/18 8006/23 8050/7 8065/5 8065/16 8065/23 8070/1 8081/17 8082/4 8085/5 8087/3 8092/21 8093/9 8094/17 8099/11 8132/19 8149/7 8168/18 8169/6 8169/11 8169/14 8169/18 8170/14 8173/17 8210/23 8211/16 8221/18 8303/17 8304/4
**stand-alone** [1] 8132/19
**standard** [7] 8064/21 8107/15 8129/25 8144/22 8144/23 8169/11 8212/3
**standards** [3] 8066/13 8287/19 8288/7
**start** [14] 8015/8 8033/22 8067/16 8082/12 8118/11 8133/7 8134/5 8140/3 8152/6 8152/19 8283/15 8284/7 8284/13 8296/23
**start-up** [3] 8118/11 8152/19 8296/23
**started** [19] 8006/6 8036/10 8038/20 8039/4 8050/17 8050/18 8050/22 8050/25 8051/5 8052/24 8145/9 8146/18 8187/12 8188/4 8189/5 8204/14 8282/19 8285/4 8295/2
**starting** [3] 8052/22 8064/7 8280/22
**starts** [8] 8057/16 8057/24 8134/23 8135/1 8182/23 8221/10 8259/2 8268/11
**state** [28] 7994/1 8010/1 8010/6 8068/13 8069/11 8069/11 8078/20 8080/16 8093/22 8094/9 8094/10 8144/7 8149/19 8156/10 8171/18 8171/21 8172/4 8172/16 8172/22 8173/3 8175/5 8175/18 8184/18 8218/25 8219/1 8219/2 8219/24 8226/2
**statement** [39] 7980/16 7994/13 7995/8 7998/7 7999/5 7999/15 8000/4 8013/10 8042/5 8042/9 8063/11 8063/12 8107/20 8122/22 8168/7 8168/10 8168/13 8168/14 8168/16 8169/14 8169/25 8170/10 8170/19 8170/19 8170/20 8172/6 8173/2 8188/22 8195/20 8195/22 8217/9 8217/21 8218/13 8230/2 8230/14 8230/15 8260/21 8261/13 8264/2
**statements** [48] 7980/14 7980/17 7981/3 7981/4 7981/5 7981/6 7981/8 7982/10 7982/20 7982/23 7986/2 7986/6 7986/9 7987/12 7988/22 7989/1 7989/19 7995/16 7998/2 7998/3 8004/1 8011/2 8168/5 8168/20 8168/21 8168/22 8168/23 8169/1 8169/2 8169/16 8170/8 8170/13 8170/15 8171/20 8173/23 8174/3 8175/6 8175/9 8175/11 8176/14 8176/17 8195/22 8219/24 8228/16 8229/6 8230/10 8238/9 8302/13
**states** [9] 7974/1 7974/3 7974/3 7974/10 7974/13 7974/16 8027/24 8066/18 8188/10
**stating** [1] 8264/5
**stature** [1] 8177/14
**status** [3] 8060/16 8284/9 8303/2
**statute** [1] 8129/9
**stay** [8] 8186/5 8186/5 8186/7 8186/9 8216/13 8217/2 8218/6 8218/8
**stayed** [3] 8100/15 8186/6 8186/6
**steer** [1] 7982/13
**steering** [1] 7990/22
**stenography** [1] 7974/24
**step** [2] 8128/21 8210/19
**Stephen** [1] 8057/20

**S**

**steps** [1]  7992/14 8045/13 8137/13
**Steve** [1]  8298/17
**Steven** [2]  8270/19 8271/3
**still** [19]  7980/1 7986/14 8001/23 8006/18
8036/3 8039/5 8039/18 8039/21 8053/13
8076/12 8090/23 8180/4 8213/1 8216/13
8220/11 8220/24 8262/23 8279/1 8303/12
**stipulate** [2]  7986/8 8283/24
**stipulation** [1]  8283/5
**stock** [27]  8009/22 8009/23 8010/16 8028/1
8028/3 8028/5 8028/21 8058/7 8058/9 8058/11
8099/18 8102/13 8122/7 8141/19 8189/18
8201/18 8201/24 8203/13 8203/14 8207/14
8207/18 8207/22 8207/23 8248/10 8248/16
8248/18 8249/12
**stockholders** [2]  8028/1 8196/23
**stop** [2]  8175/20 8277/11
**stopped** [2]  8216/8 8222/5
**storing** [1]  8016/5
**story** [5]  8069/12 8107/4 8107/5 8144/7
8257/11
**straightforward** [2]  8044/4 8046/15
**strategy** [2]  8241/15 8241/22
**straw** [1]  8188/20
**streamline** [1]  8282/20
**stretching** [1]  8082/12
**stricken** [2]  7999/12 8015/4
**strictly** [1]  8117/5
**strike** [8]  8000/2 8010/25 8014/25 8015/7
8015/8 8108/19 8228/24 8228/25
**stronger** [1]  8117/9
**struck** [3]  8004/16 8004/18 8232/15
**structure** [4]  8080/15 8081/3 8082/7 8099/2
**stuff** [1]  8278/21
**stupid** [1]  8101/6
**su** [32]  8024/13 8028/15 8028/19 8029/12
8029/25 8067/24 8067/25 8068/3 8068/15
8068/21 8068/22 8069/10 8083/12 8084/3
8084/6 8084/23 8085/4 8085/8 8091/20
8091/22 8092/3 8092/12 8092/22 8093/8
8093/9 8093/25 8094/7 8110/21 8110/23
8117/11 8142/11 8169/5
**Su's** [4]  8067/25 8091/24 8094/3 8094/10
**subject** [14]  7984/4 8007/13 8009/22 8019/11
8021/9 8021/24 8024/16 8044/15 8057/5
8061/13 8061/18 8062/25 8064/2 8208/17
**subjective** [3]  8051/18 8259/24 8260/2
**subjectively** [1]  8260/7
**subjects** [2]  8003/18 8208/10
**submission** [3]  7978/14 7997/18 8105/12
**submissions** [3]  7975/13 8105/11 8154/14
**submit** [11]  7979/12 8067/15 8068/23 8069/3
8095/9 8079/7 8098/3 8104/12 8149/20
8175/18 8298/13
**submitted** [3]  7976/7 8106/21 8304/22
**subpoena** [3]  8012/14 8012/14 8012/18
**subpoenaed** [3]  8000/22 8018/24 8019/3
**subpoenas** [4]  8055/25 8056/2 8056/10
8056/13
**subscription** [4]  8116/20 8143/23 8248/22
8249/5
**subsequent** [1]  8088/6
**subset** [3]  8288/20 8290/3 8291/5
**substance** [5]  7982/10 7982/11 7988/22
7988/24 8255/20
**substantial** [2]  8148/19 8148/22
**substantially** [2]  8189/18 8261/8
**substantive** [1]  7989/23
**substantively** [1]  7990/1
**substitute** [2]  8060/24 8060/24
**succeeding** [1]  8099/5
**succes** [1]  8136/21
**success** [1]  8136/22
**successful** [5]  8130/13 8130/16 8136/14
8136/16 8136/18
**sudden** [3]  7999/24 8201/18 8203/14
**sue** [25]  8078/1 8078/7 8078/9 8078/11

8078/11 8078/15 8078/18 8112/17 8114/23
8120/3 8120/15 8120/18 8120/19 8120/22
8120/2 8123/3 8123/4 8123/7 8127/4 8143/11
8144/3 8144/5 8144/6 8144/10 8145/3
**sued** [3]  8070/18 8079/21 8079/22
**sufficient** [5]  7995/8 8064/9 8211/19 8212/2
8287/25
**suggest** [9]  8032/7 8074/25 8075/4 8089/14
8123/7 8130/20 8132/23 8220/25 8284/1
**suggested** [5]  8114/21 8121/9 8128/15
8129/20 8152/23
**suggesting** [2]  8037/15 8048/16
**suggestion** [9]  8044/8 8081/3 8089/23
8091/12 8103/2 8123/15 8123/17 8153/8
8176/6
**suggests** [6]  8053/6 8113/25 8116/16 8123/18
8127/25 8292/7
**suing** [1]  8114/21
**suit** [1]  8074/3
**suits** [1]  8143/8
**Sullivan** [6]  8007/25 8025/24 8027/3 8029/6
8029/20 8029/21
**sum** [1]  8255/20
**summaries** [1]  8024/17
**summary** [2]  8082/25 8283/4
**summation** [7]  7979/23 7980/4 7980/5 7996/1
7997/15 7997/17 8221/11
**summations** [1]  8228/2
**sums** [1]  8024/19
**Sunday** [2]  8023/18 8200/1
**superseding** [2]  8108/15 8109/1
**supplement** [3]  8268/20 8268/21 8303/13
**supply** [2]  8136/9 8136/11
**support** [5]  8003/18 8066/14 8067/7 8085/20
8285/10
**supported** [1]  8091/13
**supporters** [1]  7992/18
**suppose** [1]  8285/10
**supposed** [5]  8121/24 8142/9 8231/12
8231/13 8235/3
**supposedly** [1]  8095/21
**surfaced** [1]  8079/6
**surprised** [1]  8170/4
**surprising** [1]  7992/21
**surrender** [2]  8098/8 8111/12
**survive** [3]  8099/16 8099/18 8099/24
**survived** [1]  8100/11
**suspected** [1]  8091/13
**sustain** [4]  8238/12 8253/14 8280/23 8280/25
**sustained** [24]  8011/12 8014/7 8016/19 8017/7
8017/13 8019/23 8020/6 8021/19 8022/4
8158/23 8159/3 8159/6 8159/15 8159/18
8167/12 8183/20 8183/21 8210/7 8214/11
8221/12 8225/15 8235/9 8251/1 8279/24
**sustaining** [1]  8208/14
**swallow** [2]  8172/6 8174/19
**swallowing** [1]  8232/20
**sweep** [1]  8082/22
**switch** [1]  7976/23
**switched** [4]  7976/15 7976/19 7976/20 8291/9
**swore** [1]  8041/24
**sworn** [2]  8007/2 8156/9
**sworn/affirmed** [2]  8007/2 8156/9

**T**

**T's** [1]  8229/17
**tab** [24]  8179/5 8181/9 8181/11 8182/20
8222/16 8222/19 8239/1 8241/6 8241/7
8241/17 8242/3 8242/17 8244/17 8245/14
8246/6 8246/14 8247/7 8247/15 8250/12
8266/24 8266/25 8268/4 8268/5 8268/25
**Tab 1** [2]  8179/5 8182/20
**Tab 16** [1]  8267/17
**Tab 17** [2]  8266/24 8266/25
**Tab 18** [1]  8268/25
**Tab 2** [2]  8181/9 8181/11
**table** [22]  8029/12 8029/13 8029/25 8073/23
8091/4 8120/23 8131/20 8133/20 8142/11

8201/11 8201/12 8201/16 8201/22 8202/14
8203/6 8203/8 8204/4 8204/5 8205/1 8205/2
8206/12 8207/23 8216/2
**tables** [20]  8111/5 8111/5 8142/8 8142/10
8142/10 8142/13 8200/4 8200/5 8200/7
8200/11 8200/14 8201/3 8204/12 8204/23
8204/24 8205/1 8206/14 8207/11 8207/14
8207/18 8207/22 8207/23 8248/10 8248/16
**talks** [2]  8139/11 8248/21
**tangent** [2]  8205/9 8205/9
**tangentially** [1]  8174/15
**Tanke** [6]  8195/7 8195/10 8195/18 8201/9
8205/1 8207/5
**Tanke Bioscience** [2]  8195/18 8201/9
**tantamount** [1]  8001/19
**tape** [1]  8264/13
**target** [5]  7988/11 7992/13 7992/15 8033/17
8038/13
**targeted** [2]  7985/14 7990/22
**targets** [3]  7997/6 8042/23 8045/10
**task** [1]  8186/21
**team** [5]  7982/5 7994/7 8062/11 8199/23
8281/19
**technical** [2]  8062/3 8287/22
**technically** [1]  8304/20
**technique** [1]  8003/14
**techniques** [1]  7988/6
**Technologies** [1]  8156/21
**Teich** [1]  7974/22
**telephone** [5]  8057/19 8197/25 8198/14
8198/17 8243/10
**temporal** [1]  8042/25
**ten** [8]  7983/15 8028/8 8141/7 8141/11
8197/12 8198/3 8223/25 8225/7
**ten-minute** [1]  8223/25
**tend** [1]  8109/11 8241/2
**tended** [1]  8190/1
**tender** [1]  8198/24
**terminate** [7]  8256/7 8258/12 8259/13 8259/14
8259/19 8292/9 8293/6
**terminating** [1]  8261/5
**termination** [20]  8154/2 8154/6 8248/22
8249/5 8256/9 8256/19 8258/3 8258/8 8258/19
8287/10 8287/18 8291/14 8291/20 8291/25
8292/6 8292/20 8292/24 8293/3 8293/13
8293/16
**terms** [41]  7992/20 8018/10 8026/19 8026/22
8036/15 8045/7 8073/20 8073/24 8073/25
8073/25 8074/18 8074/20 8075/2 8075/8
8078/17 8080/17 8081/24 8094/25 8097/9
8127/9 8147/24 8152/21 8152/23 8153/15
8164/15 8175/4 8186/11 8191/17 8261/20
8278/2 8286/10 8286/19 8286/25 8287/20
8290/19 8290/20 8290/22 8291/6 8293/11
8299/2 8301/16
**terrible** [1]  8095/19
**terrific** [1]  8188/4
**territory** [1]  8260/5
**tertiary** [1]  7987/7
**test** [1]  8108/6
**testified** [43]  7978/17 7978/22 8007/3 8011/8
8011/14 8012/25 8019/8 8020/15 8021/5
8021/7 8026/4 8030/15 8048/3 8049/5 8066/2
8071/20 8071/22 8073/19 8073/22 8074/6
8077/17 8081/10 8082/24 8083/1 8083/12
8084/15 8085/4 8095/4 8126/1 8156/9 8169/7
8169/15 8170/16 8174/8 8184/20 8211/11
8220/14 8237/13 8258/22 8263/22 8265/8
8287/14 8294/12
**testifies** [3]  8042/4 8042/5 8294/23
**testify** [23]  7975/9 7975/15 7977/4 7990/14
7994/9 7994/12 7994/20 8033/3 8153/17
8168/24 8169/8 8170/22 8202/19 8216/2
8228/18 8282/5 8282/5 8287/5 8291/4 8291/19
8291/19 8292/19 8296/19
**testifying** [7]  8169/23 8183/7 8206/13 8214/3
8220/2 8276/12 8304/17
**testimonial** [1]  8087/4

testimony [66]  7978/17 7983/20 7989/20
7997/9 7998/21 7999/9 8000/11 8000/13
8001/14 8001/18 8001/20 8002/12 8004/20
8011/17 8013/9 8013/25 8014/5 8033/1 8066/1
8083/8 8087/5 8089/10 8092/17 8094/1 8094/3
8095/10 8099/7 8099/23 8111/16 8124/17
8125/10 8145/10 8154/8 8171/19 8173/21
8174/20 8197/3 8197/5 8197/8 8197/11
8197/15 8197/20 8204/17 8211/17 8218/14
8229/19 8230/4 8233/9 8236/5 8254/8 8265/10
8275/2 8275/23 8276/7 8287/1 8288/7 8288/15
8292/4 8292/11 8293/12 8293/24 8295/24
8296/6 8296/8 8297/10 8298/15
text [1]  8304/24
the -- what [1]  8095/11
the Tanke Biosciences [1]  8207/5
themselves [2]  8073/1 8153/1
theory [16]  7991/16 8067/10 8086/8 8086/10
8086/13 8086/19 8096/13 8098/15 8100/22
8134/6 8141/21 8141/22 8142/4 8144/21
8275/7 8304/14
therefore [8]  7989/24 8033/8 8044/22 8070/19
8074/6 8080/2 8080/12 8088/11
thereof [1]  8206/24
they've [5]  8065/24 8213/13 8228/15 8228/16
8304/5
thinking [5]  8001/8 8102/9 8141/2 8141/4
8274/23
thinks [3]  8135/1 8220/22 8275/22
thinly [1]  8152/19
thinly-funded [1]  8152/19
third [12]  7976/16 7976/20 7976/23 7980/20
8026/12 8027/5 8027/12 8027/15 8028/17
8033/9 8108/25 8278/17
Thomas [3]  8023/23 8029/3 8106/19
thoughts [1]  8295/13
thousand [1]  8029/4
threads [1]  8287/15
threat [2]  8137/20 8138/2
threatened [6]  8038/20 8080/14 8114/22
8114/23 8115/3 8117/10
threatening [8]  8077/25 8078/7 8078/15
8078/18 8120/2 8127/4 8143/18 8143/20
threatens [1]  8112/17
threats [23]  8069/18 8069/19 8070/22 8071/6
8072/12 8074/3 8078/25 8080/2 8100/2
8114/12 8115/3 8115/5 8115/10 8115/13
8115/15 8116/3 8117/12 8117/16 8117/17
8124/18 8144/6 8144/10 8144/10
three [30]  7976/13 7976/19 7976/23 8007/21
8048/9 8067/19 8100/15 8105/10 8105/14
8105/16 8105/19 8105/24 8106/2 8109/12
8109/12 8110/11 8147/12 8186/14 8189/3
8193/25 8236/24 8241/7 8241/17 8242/4
8243/14 8244/6 8267/16 8279/1 8279/1 8281/1
three-quarters [1]  8189/3
thrive [2]  8099/17 8099/25
thrived [1]  8100/11
Throughout [1]  8162/22
throw [1]  7987/18
throwing [1]  8033/23
throws [1]  7992/12
Thursday [1]  7977/10
ticking [1]  8273/25
tightly [1]  8041/19
Tilles [2]  8007/21 8027/2
Tim [2]  8058/3 8094/17
timeframe [2]  8100/8 8106/25
timing [3]  8043/6 8090/5 8205/4
Timothy [2]  8027/1 8029/4
tiny [1]  8148/19
title [3]  8158/3 8158/4 8300/14
titles [1]  8300/8
to -- I [1]  8194/15
to -- it's [1]  8204/25
today [22]  7975/6 7975/7 7975/9 7975/15
7975/16 7975/17 7975/18 7996/23 8101/25

8102/5 8154/15 8156/18 8172/25 8197/4
8207/1 8247/20 8248/24 8248/23 8271/8
8271/21 8282/20 8304/13
together [14]  8034/25 8051/21 8055/12 8095/2
8188/5 8189/8 8191/13 8192/16 8193/1 8193/3
8204/24 8205/5 8243/14 8280/11
Tom [7]  8007/19 8007/19 8024/21 8024/22
8025/2 8025/14 8026/25
tomorrow [9]  7977/14 7978/5 8274/5 8277/22
8277/23 8279/2 8279/2 8303/9 8304/17
took [12]  7982/9 7998/1 7998/2 8055/13
8065/16 8169/6 8195/9 8200/1 8202/4 8271/12
8273/6 8290/7
top [15]  8028/17 8026/1 8026/9 8027/19
8027/23 8028/14 8029/14 8062/10 8179/7
8182/6 8241/7 8266/11 8266/15 8267/16
8290/10
topic [8]  8169/15 8176/12 8200/3 8249/3
8256/1 8269/13 8273/3 8273/4
topics [4]  8169/17 8173/22 8197/1 8208/21
total [2]  8185/18 8197/17
totally [10]  7981/16 7985/22 7985/25 7986/15
7986/25 7987/10 7991/15 8204/18 8292/1
8303/22
touching [1]  8263/22
trace [1]  8131/25
track [4]  8195/23 8196/8 8202/1 8202/16
traded [5]  8044/14 8068/25 8098/2
trading [5]  8043/16 8097/6 8097/20 8136/1
8136/9
traffic [1]  8101/7
trained [1]  8273/2
training [2]  8287/21 8287/22
trans [1]  8261/14
transaction [20]  8034/4 8093/10 8108/3
8113/10 8133/1 8133/13 8187/24 8188/9
8191/5 8195/8 8196/9 8196/10 8196/14
8241/22 8246/9 8251/6 8251/25 8260/11
8262/25 8265/18
transactional [1]  8272/18
transactions [9]  8107/23 8112/6 8113/9
8133/24 8189/6 8195/1 8195/6 8204/9 8273/14
transcript [10]  7974/9 7974/24 7979/6 7991/21
8265/2 8265/11 8297/17 8298/12 8298/14
8299/3
transcription [1]  7974/25
transcripts [1]  8297/25
transfer [20]  8024/17 8025/8 8028/4 8058/7
8058/11 8091/18 8091/18 8092/7 8110/19
8110/23 8110/25 8111/7 8111/17 8112/5
8112/23 8113/3 8113/14 8131/25 8256/6
8259/5
transferred [3]  8092/14 8113/21 8143/3
transferring [3]  8112/2 8114/5 8133/23
transfers [10]  8024/19 8110/21 8110/24
8113/23 8137/7 8142/2 8207/14 8207/18
8260/16 8260/17
transition [6]  8115/7 8186/10 8217/3 8218/7
8218/9 8218/11
transitioned [1]  8047/14
transitions [1]  8300/14
transmission [1]  8266/7
transmittal [3]  8260/18 8261/14 8264/11
travel [1]  8279/3
Treasury [1]  8161/9
treated [1]  8101/4
tremendous [1]  8100/9
trial [44]  7974/9 7975/10 7993/23 7995/2
7999/21 8000/10 8001/2 8002/21 8003/20
8065/8 8065/8 8066/3 8069/15 8069/18
8074/13 8085/20 8085/24 8085/24 8086/10
8086/14 8086/18 8086/21 8086/22 8087/16
8088/3 8091/2 8094/2 8101/3 8103/14 8107/16
8141/5 8142/23 8147/16 8149/24 8150/10
8169/23 8280/6 8281/14 8282/13 8282/25
8284/16 8285/10 8287/9 8292/4
trials [1]  8281/17
tricky [1]  8004/7

tried [7]  8000/20 8000/21 8165/12 8195/23
8263/16 8282/2 8294/6
trier [2]  8064/23 8287/23
tries [1]  8082/22
trigger [1]  8053/3
trip [1]  8059/11
trouble [1]  8030/20
Troy [3]  8028/5 8134/20 8140/15
true [11]  7988/23 7990/2 7994/5 8045/15
8065/22 8107/18 8114/18 8136/20 8146/16
8148/13 8302/3
trust [3]  8103/7 8138/7 8219/7
trusted [1]  8145/22
truth [42]  8009/25 8010/5 8033/7 8034/20
8048/14 8076/2 8076/3 8103/4 8168/11
8169/24 8172/10 8180/3 8180/17 8184/17
8219/13 8227/4 8227/7 8227/24 8227/25
8228/21 8231/11 8231/14 8232/24 8233/1
8233/11 8233/12 8233/13 8233/14 8234/7
8234/10 8238/9 8252/10 8252/25 8253/6
8253/19 8256/17 8259/16 8263/5 8263/6
8263/7 8265/6 8266/7
truthful [1]  8263/25
truthfulness [1]  8151/16
try [25]  8015/23 8054/5 8086/11 8086/17
8096/25 8105/1 8141/10 8147/5 8159/8 8175/3
8178/18 8180/6 8181/6 8192/1 8201/21
8201/25 8202/3 8202/24 8213/24 8230/7
8280/10 8281/14 8282/20 8283/1 8283/3
trying [52]  7986/22 7987/14 7987/16 8003/18
8004/4 8004/5 8032/7 8049/14 8049/15 8060/4
8061/9 8070/4 8077/16 8080/6 8092/1 8095/11
8096/24 8097/13 8101/13 8114/16 8115/6
8125/2 8125/20 8126/5 8128/22 8137/22
8144/18 8158/9 8204/4 8204/21 8205/15
8205/16 8206/12 8206/17 8213/18 8213/19
8214/7 8214/8 8221/9 8231/19 8236/17 8256/8
8256/15 8256/17 8256/20 8257/1 8277/2
8284/14 8284/17 8296/10 8298/5 8298/5
Ts [1]  8061/5
tumult [1]  8093/3
Turing [1]  8053/20
turn [27]  7990/1 8071/8 8110/9 8118/17
8179/5 8222/15 8222/16 8238/22 8239/18
8244/17 8246/19 8247/6 8247/15 8248/5
8249/7 8249/10 8249/19 8250/2 8250/8
8250/12 8250/12 8266/21 8267/11 8267/15
8268/3 8268/4 8268/23
turning [4]  8045/5 8242/24 8244/23 8246/14
tweaked [1]  8005/4
twelve [1]  8198/3
Twenty [2]  8157/10 8299/21
Twenty-one [1]  8157/10
twice [2]  8167/6 8197/12
two [66]  7977/3 7978/16 7979/20 7986/3
7989/17 7993/16 8002/24 8007/19 8008/16
8008/23 8013/4 8037/24 8039/21 8042/23
8044/9 8050/2 8051/15 8051/20 8055/21
8055/23 8058/15 8060/5 8060/8 8069/13
8074/10 8074/23 8075/5 8081/25 8084/11
8088/22 8089/6 8092/5 8123/7 8124/8 8125/19
8160/3 8160/3 8161/9 8161/10 8164/15
8166/15 8167/6 8171/1 8175/20 8188/17
8188/23 8189/12 8189/22 8195/4 8197/14
8197/18 8207/24 8217/13 8236/13 8236/14
8236/19 8237/4 8239/1 8243/4 8248/12
8257/23 8267/3 8279/4 8283/17 8284/11
8304/20
two-page [1]  8008/16
type [9]  8157/11 8158/6 8158/20 8162/5
8162/21 8287/14 8299/7 8299/16 8300/17
typed [2]  8110/22 8293/10
types [3]  8196/19 8198/21 8291/3
typical [2]  8153/19 8292/13
typically [2]  8019/11 8124/18
typing [1]  8291/10
Tyson [1]  8289/3

**U**

**U.S.C. [1]** 8109/20

**U.S.C. 1349 [1]** 8109/20

**ultimate [3]** 8130/21 8131/3 8292/18

**ultimately [13]** 8085/4 8085/15 8099/4 8100/9 8100/11 8111/19 8123/20 8130/13 8130/18 8130/22 8139/20 8140/10 8220/1

**unable [2]** 8195/24 8282/15

**unauthorized [2]** 8116/16 8121/23

**unclear [1]** 8302/14

**under [46]** 7981/22 7998/20 8006/19 8026/18 8026/22 8029/18 8032/19 8032/20 8033/9 8042/1 8042/7 8042/13 8064/21 8078/15 8078/16 8081/2 8082/7 8104/5 8121/16 8141/16 8149/16 8150/5 8170/1 8170/21 8175/12 8175/12 8214/4 8215/9 8215/15 8221/6 8239/18 8240/6 8240/17 8240/20 8240/23 8245/5 8245/11 8253/4 8260/13 8266/3 8267/2 8275/1 8275/6 8277/12 8292/9 8304/19

**undercuts [1]** 8263/13

**underlying [1]** 8260/1

**undermine [1]** 7993/19

**undermined [1]** 8038/2

**underneath [1]** 8007/15

**understandings [1]** 8147/1

**understated [1]** 8286/1

**understood [22]** 7976/12 7976/22 7995/3 8015/3 8020/9 8020/13 8020/13 8021/24 8054/8 8075/2 8112/22 8149/14 8149/14 8154/9 8174/22 8175/25 8188/1 8281/8 8282/19 8285/22 8297/20 8298/20

**underway [1]** 8067/8

**undisputed [2]** 8075/20 8099/1 8215/6

**undoubtedly [1]** 7979/22

**unduly [3]** 8032/20 8048/13 8261/12

**unfair [1]** 8120/12

**unfortunate [1]** 8282/16

**unfortunately [1]** 8304/7

**unfunded [1]** 8254/3

**unilaterally [4]** 8256/7 8258/12 8259/14 8259/19

**unique [1]** 8287/14

**UNITED [8]** 7974/1 7974/3 7974/3 7974/10 7974/13 7974/16 8066/18 8188/10

**university [4]** 8160/16 8160/19 8160/22 8161/5

**unless [13]** 8088/16 8169/11 8172/8 8172/11 8172/18 8185/1 8207/22 8220/7 8221/7 8274/21 8275/23 8276/10 8276/11

**unpack [3]** 8074/4 8073/9 8073/16

**unprofessional [1]** 8158/10

**unquestionably [1]** 8214/24

**unquote [1]** 8088/25

**unrelated [12]** 7985/22 7985/25 7986/15 7986/16 7987/1 7987/10 7987/15 7987/19 7991/16 8194/5 8194/13 8298/24

**untethered [1]** 8204/18

**unusual [3]** 8020/25 8097/4 8100/22

**unvested [1]** 8029/18

**unwilling [1]** 8283/23

**up [94]** 7976/2 7978/25 7982/15 7983/5 7988/20 7990/8 7991/25 7996/19 7997/6 8007/8 8008/2 8010/16 8010/21 8023/9 8024/19 8024/24 8024/25 8028/10 8034/8 8035/20 8037/10 8039/23 8045/1 8048/6 8048/13 8058/16 8066/8 8068/22 8079/6 8090/6 8092/9 8093/18 8094/7 8101/24 8102/14 8114/4 8118/5 8118/11 8118/20 8120/22 8130/23 8130/24 8133/9 8133/22 8136/2 8136/18 8137/20 8140/11 8141/1 8142/5 8148/18 8149/22 8152/10 8152/19 8160/13 8164/8 8166/12 8175/2 8181/12 8186/16 8188/12 8189/15 8189/21 8191/19 8199/25 8201/18 8202/4 8203/10 8204/7 8209/7 8225/9 8233/7 8236/12 8236/13 8236/23 8237/7 8240/16 8266/11 8266/13 8266/14 8267/16 8273/2 8279/9 8282/25 8283/6 8291/11 8293/11 8296/23 8301/16

8303/12 8303/24 8303/25 8304/2 8304/25 **update [1]** 8058/1

**updated [1]** 8058/3

**updates [5]** 7977/9 8079/11 8079/14 8080/1 8090/8

**upheld [1]** 7993/13

**upset [1]** 8130/8

**uses [2]** 8017/16 8120/6

**V**

**vacation [1]** 8089/4

**vague [2]** 8124/25 8286/9

**Vaino [6]** 8007/23 8027/3 8029/6 8029/16 8096/11 8135/1

**Valeur [2]** 8050/6 8232/5

**valid [5]** 8173/15 8251/25 8265/18 8265/24

**valuable [1]** 8146/9

**value [5]** 8099/7 8099/17 8099/19 8115/19 8149/5

**valued [1]** 8145/22

**variety [1]** 8196/24

**various [5]** 8058/2 8067/7 8117/13 8147/9 8181/24

**varying [1]** 8112/18

**vast [5]** 8065/22 8066/1 8136/10 8136/10 8292/5

**venire [1]** 8052/20

**venture [1]** 8157/13

**Ventures [1]** 8255/5

**verbal [1]** 8202/18

**Vermont [3]** 8160/16 8160/20 8160/23

**vernacular [1]** 8001/17

**versus [4]** 8066/19 8288/5 8288/12 8301/25

**vested [1]** 8029/18

**vetted [3]** 8081/16 8093/16 8095/24

**via [3]** 8255/15 8267/8 8286/18

**vice [1]** 8246/12

**video [1]** 7987/5

**videotape [2]** 7993/4 7995/6

**view [24]** 7983/6 7986/13 7988/4 7989/12 7991/9 7992/15 7999/10 8001/16 8002/25 8040/10 8042/5 8048/22 8064/25 8073/3 8153/14 8168/9 8254/4 8258/20 8259/8 8259/15 8295/20 8295/20 8295/24 8295/25

**viewed [2]** 7984/11 8146/22

**views [1]** 8295/23

**vigilant [1]** 8053/17

**violate [1]** 8218/22

**violated [2]** 8001/3 8159/13

**violates [2]** 7986/7 7987/13

**violation [2]** 8109/19 8129/2

**violent [1]** 8001/5

**virtually [3]** 7980/23 8065/17 8103/18

**virtue [1]** 8296/20

**vis [4]** 7992/14 7992/14 8110/11 8110/11

**vis--vis [1]** 8110/11

**vis-a-vis [1]** 7992/14

**voir [1]** 8052/17

**volatile [1]** 8077/18 8100/19

**volume [4]** 8120/21 8136/11 8137/18 8137/25

**voluminous [1]** 8120/13

**voluntarily [3]** 8019/3 8032/11 8043/20

**vulnerable [1]** 8136/12

**W**

**W-E-I-S-S [1]** 8161/21

**wait [6]** 7985/13 8003/17 8087/2 8153/12 8191/19 8232/14

**waited [1]** 8118/8

**waiting [2]** 8000/7 8304/10

**waive [2]** 7981/18 8153/10

**waived [5]** 7983/18 7984/6 7984/10 7986/10 7990/24

**waiver [5]** 7984/7 7984/14 7985/4 7985/5 7986/25

**waives [2]** 7981/3 7981/5

**waiving [2]** 7979/3 7983/13

**walk [2]** 8105/1 8114/17

**wall [4]** 7983/11 8001/17 8229/2 8229/9

**wants [11]** 7977/25 7999/4 8004/24 8090/22 8104/9 8131/8 8141/8 8173/9 8260/10 8260/11 8260/21

**warn [3]** 8003/24 8048/18 8048/22

**warned [2]** 8049/6 8303/14

**warning [2]** 8040/16 8279/25

**warnings [1]** 7993/8

**warrant [4]** 8016/16 8016/22 8016/24 8017/23

**warrants [3]** 8017/17 8017/18 8203/15

**Washington [7]** 8012/17 8160/24 8161/5 8161/11 8161/13 8164/10 8164/21

**wave [1]** 8093/3

**ways [8]** 7984/20 8099/3 8106/20 8109/24 8116/15 8133/3 8284/18 8293/5

**website [2]** 8289/11 8293/11

**Wednesday [4]** 8212/13 8282/4 8282/7 8283/19

**weeds [3]** 8051/9 8051/11 8051/23

**week [14]** 7976/11 7977/11 8006/16 8006/16 8065/18 8065/24 8106/15 8167/7 8203/10 8281/24 8282/4 8282/4 8282/6 8282/7 8282/9

**week's [1]** 7977/11

**weekends [1]** 8285/11

**weekly [3]** 8060/4 8175/2 8192/11

**weeks [8]** 8065/15 8104/14 8142/22 8147/16 8167/6 8188/17 8237/4 8281/1

**weight [1]** 8288/11

**Weinstein [4]** 8035/12 8041/24 8042/8 8044/24

**Weiss [5]** 8161/20 8161/23 8162/9 8162/12 8163/7

**were -- this [1]** 8207/8

**whatsoever [4]** 8078/22 8085/21 8101/20 8175/21

**wheel [1]** 8103/1

**whichever [1]** 8122/10

**white [2]** 8001/5 8264/13

**who'd [1]** 8215/13

**whole [8]** 8037/6 8133/16 8142/24 8218/24 8219/7 8262/22 8270/15 8297/21

**whys [1]** 8290/19

**wide [3]** 8002/10 8122/11 8175/21

**wife [2]** 8095/20 8160/5

**Wildman [4]** 8255/14 8256/4 8267/6 8267/23

**willing [4]** 8058/5 8115/22 8285/1 8285/11

**willingness [1]** 7992/23

**wind [5]** 8116/5 8116/16 8122/3 8122/5 8122/6

**wind-down [2]** 8116/5 8116/16

**wire [1]** 8067/17

**wise [3]** 8148/25 8149/13 8185/13

**wish [1]** 8156/2

**wishes [3]** 7993/25 7993/25 8155/15

**wit [4]** 8006/3 8026/25 8032/2 8255/2

**withdraw [2]** 8176/9 8199/18

**withdrawn [5]** 8025/16 8056/7 8208/23 8224/19 8304/5

**witness [87]** 7975/9 7975/16 7975/16 7975/17 7975/18 7976/4 7976/21 7977/4 7977/22 7979/25 7993/2 7997/23 8006/23 8006/23 8007/1 8022/22 8036/10 8036/16 8041/11 8047/1 8053/19 8054/5 8061/23 8065/16 8065/16 8073/19 8077/17 8077/17 8082/24 8082/25 8082/25 8082/25 8083/1 8155/6 8155/12 8156/4 8156/8 8163/13 8168/24 8169/14 8170/14 8171/3 8174/10 8176/2 8183/1 8184/20 8193/8 8194/17 8204/6 8205/13 8205/24 8208/8 8210/19 8210/23 8210/23 8211/16 8212/14 8214/1 8214/2 8216/25 8217/5 8217/5 8217/16 8217/24 8217/25 8218/1 8219/8 8219/20 8219/23 8220/1 8220/3 8220/7 8221/8 8221/18 8221/18 8228/18 8261/6 8261/21 8274/7 8274/8 8275/5 8277/21 8279/12 8283/4 8291/4 8298/10 8306/2

**witness' [2]** 8170/10 8278/2

**witness's [2]** 8219/18 8227/2

**witnesses [33]** 7975/6 7976/8 7976/20

## W

**witnesses... [30]**  7977/23 7977/24 7993/21
8032/25 8033/3 8059/14 8060/19 8065/4
8065/19 8065/23 8066/2 8070/1 8070/2
8071/24 8073/21 8074/4 8074/10 8075/20
8086/6 8087/6 8099/11 8099/23 8100/14
8103/17 8168/2 8169/6 8171/23 8176/22
8204/5 8278/10
**wonder [1]**  7994/15
**wondering [2]**  7999/3 8170/2
**word [2]**  8041/3 8129/24
**wording [1]**  8109/18
**words [13]**  7987/18 7988/3 7990/8 8010/19
8011/4 8086/15 8141/23 8142/19 8145/24
8209/2 8227/19 8258/24 8291/10
**works [1]**  7992/17
**worms [1]**  8137/21
**worried [4]**  8042/19 8042/23 8232/19 8285/15
**worse [1]**  7983/15
**worth [9]**  8073/4 8099/9 8099/20 8099/24
8115/18 8134/21 8149/15 8149/15 8196/23
**wow [1]**  8001/8
**wrapped [2]**  8010/16 8102/14
**write [1]**  8237/7
**write-up [1]**  8237/7
**writes [3]**  8024/19 8069/20 8256/5
**writing [2]**  8098/21 8145/2
**written [1]**  8121/7
**wrote [3]**  8024/18 8095/18 8249/4

## Y

**Yaffit [3]**  8086/3 8086/5 8086/5
**year [30]**  8034/5 8059/6 8158/16 8161/2
8161/4 8164/15 8165/17 8165/18 8165/18
8166/20 8167/4 8167/4 8178/6 8178/7 8186/9
8187/9 8187/12 8187/16 8206/19 8209/24
8217/2 8218/7 8218/12 8218/15 8220/3 8236/8
8241/2 8269/19 8281/18 8281/23
**years [38]**  7992/17 8055/21 8055/23 8157/10
8157/20 8157/20 8157/22 8158/1 8158/3
8161/10 8163/24 8163/25 8164/1 8164/11
8164/14 8164/14 8164/22 8164/23 8164/24
8165/5 8165/7 8178/3 8186/4 8187/1 8191/11
8205/14 8209/24 8209/24 8216/7 8220/12
8225/7 8269/24 8269/25 8270/1 8270/14
8272/15 8273/13 8274/15
**yesterday [11]**  7980/4 7982/12 7987/2 7987/24
7988/17 8002/17 8011/14 8012/25 8020/8
8021/5 8197/12
**YORK [24]**  7974/1 7974/4 7974/13 7974/14
7974/18 7974/18 8011/16 8011/19 8018/4
8021/17 8161/20 8162/16 8162/18 8163/8
8164/4 8164/9 8164/20 8166/9 8166/14
8182/14 8185/23 8185/24 8187/2 8189/18
**young [1]**  8149/10
**younger [1]**  8187/24
**Your Honor [67]**  8008/12 8009/24 8010/2
8010/25 8011/11 8011/22 8013/16 8014/6
8014/13 8014/25 8015/3 8015/9 8016/18
8017/4 8017/6 8017/12 8019/21 8020/3 8020/9
8021/18 8022/1 8022/9 8022/13 8022/17
8022/19 8022/21 8022/22 8023/10 8024/2
8031/4 8032/3 8032/11 8033/10 8035/3
8035/23 8036/19 8037/13 8037/15 8037/22
8038/10 8040/4 8040/7 8040/11 8041/2 8041/7
8041/23 8042/4 8043/6 8043/23 8044/10
8044/11 8044/17 8045/17 8046/14 8046/15
8047/3 8047/16 8252/8 8252/24 8253/10
8254/5 8254/9 8256/8 8257/2 8260/20 8262/2
8262/15
**Your Honor's [1]**  8034/23
**yourself [4]**  8104/2 8141/12 8182/24 8242/9
**yourselves [1]**  8064/10

## Z

**zero [4]**  8015/22 8076/17 8171/22 8173/16