8307

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        15-CR-00637(KAM)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5           -against-                   December 07, 2017
                                        9:00 a.m.
6    EVAN GREEBEL,

7           Defendant.

8    ------------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                UNITED STATES DISTRICT JUDGE
                       BEFORE A JURY
11
     APPEARANCES
12
     For the Government:        BRIDGET M. ROHDE, ESQ.
13                              Acting United States Attorney
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  DAVID PITLUCK, ESQ.
                                BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                              BY:  DAVID KESSLER, ESQ.
                                Assistant United States Attorneys
17
     For the Defendant:         GIBSON DUNN & CRUTCHER
18                              200 Park Avenue, 48th Floor
                                New York, New York 10166
19                              BY:  REED BRODSKY, ESQ.
                                BY:  RANDY MASTRO, ESQ.
20                              BY:  MYLAN LEE DENERSTEIN, ESQ.
                                BY:  JOSHUA DUBIN, ESQ.
21                              BY:  WINSTON CHAN, ESQ.

22   Court Reporter:            Rivka Teich, CSR, RPR, RMR
                                Phone:  718-613-2268
23                              Email:  RivkaTeich@gmail.com

24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

1                (In open court.)

2                THE COURT:  Have a seat.  We did issue an order and

3      the defense, I believe, has provided additional 26.2

4      disclosures for expert witnesses.

5                Can we confirm that, Mr. Chan?

6                MR. CHAN:  We e-mailed that to the Government.

7                THE COURT:  We had additional issues based on the

8      Government's motion to preclude certain experts based on

9      relevance.  And I do think that Mr. Lewis' testimony, to the

10     extent he's being proffered as a witness who will provide

11     information regarding the blue sheet data and whether or not

12     the trading patterns of the Fearnow shareholders established

13     or are consistent with a conspiracy to control price and

14     volume, is relevant to the issues of the case.  And I don't

15     believe that there would be a reason to preclude his

16     testimony.  I think he's the first one up today, right?

17               MR. CHAN:  Yes, after the current witness.

18               THE COURT:  The issue that I have with Mr. Ferruolo,

19     or Dean Ferruolo, is that the supplemental opinion I believe

20     is not appropriate.  And I would be disinclined to permit it

21     because I think we have a situation where he's discussing a

22     lock-up agreement, which is not what we have in the record

23     here.  And he's also making an ultimate conclusion on the law,

24     which is beyond his appropriate province regarding whether or

25     not something is permitted and lawful under the SEC rules and

PROCEEDINGS

1    regulations and statutes.  So I would not permit the

2    supplemental opinion.

3         Mr. Minkoff's testimony regarding the ethical and

4    professional responsibilities of an attorney in terms of

5    settlement, I believe is relevant to this, the issues in this

6    case.

7         Although the Government contends that Mr. Greebel is

8    not being charged with somehow preparing faulty settlement

9    agreements or refusing to prepare settlement agreements, what

10   is at issue is his state of mind.  And what we have is

11   evidence in the record that he was aware of threats of

12   lawsuits.  And he was aware that Mr. Shkreli, as CEO of

13   Retrophin, had directed that he provide settlement agreements.

14   And therefore, I believe that Mr. Minkoff's testimony

15   regarding the ethical and professional responsibilities of an

16   attorney to follow client's directives or requests to execute

17   settlement agreements is relevant to the issues in this case.

18        Ms. Klein, I was concerned initially with her

19   initial planned testimony that she was going to interpret New

20   York and Delaware law and talk about causes of action under

21   both of those state laws.  I don't think that's appropriate.

22        I want to confirm with the defense that she's not

23   going to be doing that anymore?

24        MR. CHAN:  Correct.

25        THE COURT:  What exactly will she be doing?  Will

PROCEEDINGS

1    she just be saying that in her opinion as a plaintiff's

2    attorney, given her experience that there is a colorable,

3    good-faith basis to sue Retrophin in certain circumstances,

4    or, what is she going to say?

5              MR. CHAN:  I think she would say that.  And she

6    would say that there are colorable claims.  She might

7    categorize the types of claims, fiduciary or breach claims,

8    but not cite specific statutes.

9              And she might talk about strategies involved as a

10   plaintiff's attorney in communicating her ability if there was

11   a claim against them, punitive defendant.

12             THE COURT:  I think she was going to talk about not

13   just whether an attorney in good faith would have a colorable

14   claim, but she was also going to talk about the adverse impact

15   of a publicity and possible cost of litigation.

16             MR. CHAN:  That's right, your Honor.  That goes into

17   her assisting how she might communicate a demand to a target.

18             MR. KESSLER:  There is nothing about assisting in

19   her disclosures.  The disclosure was about whether there was a

20   claim.

21             MR. CHAN:  There is a bullet, I don't have it in

22   front of me, the Court is obviously thinking of something that

23   we wrote.  There is a bullet --

24             THE COURT:  It wasn't described as strategy, it was

25   just as part of her opinion that as a plaintiff's attorney,

PROCEEDINGS

1    when a plaintiff's attorney is threatening litigation, her

2    view is that the responding party would be concerned about

3    adverse publicity or --

4              MR. KESSLER:  She's now going to be offered to

5    testify about what Mr. Greebel must have been thinking,

6    although he's not a plaintiff's attorney and he doesn't know

7    any of the things she's saying.  There is no basis that

8    Mr. Greebel knew any of the things that Ms. Klein is going to

9    talk about.

10             THE COURT:  What we have, though, are attorneys and

11   investors who say they've retained attorneys, threatening to

12   exercise their rights against Retrophin.

13             MR. KESSLER:  Agreed.

14             THE COURT:  And so to the extent that there is an

15   argument that the threat of litigation was not existent or

16   real or serious or colorable, I think that the defense should

17   be allowed to proffer somebody who is going to say, well,

18   actually, yes, there are good faith, colorable claims that

19   Mr. Greebel reasonably could have perceived and being of

20   concern and would have been relevant to his state of mind when

21   he was asked to prepare settlement agreements.

22             MR. KESSLER:  Mr. Greebel's perception might be

23   relevant; but Ms. Klein has nothing to do with Mr. Greebel's

24   perception.  The threats, to the extent they were made, were

25   made.  They are in the record.  Dr. Rosenwald's lawyers listed

PROCEEDINGS

1  a bunch of statutes, the other people made vague references to

2  accounting or litigation.  That's in the record.  They can

3  argue what Mr. Greebel thought.

4         They are now trying to have a plaintiff's lawyer, a

5  litigator, come in and either validate in the abstract these

6  claims or say what Mr. Greebel might have thought.

7         MR. CHAN:  To clarify, our expert won't say, If I

8  were standing in Mr. Greebel's shoes I would think X, Y, Z.

9         THE COURT:  She couldn't say that.

10        MR. CHAN:  The expert would only be saying, If I

11 were the plaintiff's attorney in this situation, I think they

12 were A, claims; B, I would communicate my belief in the

13 validity of those claims to the company's counsel in the

14 following manner, designed to make the company's counsel be

15 concerned about the legitimacy of the claims, time it with

16 vulnerability of the company, I would make it known that this

17 litigation is not worth the hassle.

18        Those are traditional things that plaintiff

19 attorneys do to file a lawsuit.

20        THE COURT:  I don't think she can testify in this

21 the first person.  Because I think some of your submissions

22 seem to suggest that she would say that I as plaintiff's

23 attorney would do X, Y, Z.  I think I would be more

24 comfortable if she said, a reasonable attorney would have good

25 faith claim.

PROCEEDINGS

1          Now, the problem is that we have evidence in the

2     record that Retrophin should not be obligated to pay

3     obligations of Mr. Shkreli or MSMB, which I think is a valid

4     piece of evidence.  But the inference to be drawn is that

5     therefore Retrophin had no exposure.

6          MR. KESSLER:  That's not the argument.  We're not

7     arguing it was not legally impossible to sue Retrophin.  As

8     the Court said yesterday, you can sue people for --

9     Dr. Rosenwald's lawyers were probably not making up the fact

10    that there was a potential claim under Martin under state law.

11         The issue was, what was done about it what

12    Mr. Greebel was thinking.

13         I understand the Court's questions from yesterday

14    about what an attorney faced with such a threat might have

15    done or not done, that's a live argument in the case.  But

16    this is now testimony from a lawyer, who wasn't involved in

17    the case, about what a reasonable plaintiff's attorney -- so

18    she's talking about what Dr. Rosenwald's attorney -- might do.

19         THE COURT:  So are you not contending that

20    Mr. Greebel -- are you saying that Mr. Greebel reasonably

21    could have been concerned about litigation threats in agreeing

22    with Mr. Shkreli's request to formulate settlement agreements?

23         MR. KESSLER:  We're not taking -- we don't know what

24    Mr. Greebel was thinking.  There is going to be an argument --

25         THE COURT:  You have to prove that he had a mind, a

PROCEEDINGS

1    state of mind, that would, in which he would agree to an

2    illegal scheme to pull money out of Retrophin and do it via

3    settlement agreements.

4              MR. KESSLER:  Completely agree.  All I'm saying is

5    what a reasonable plaintiff's attorney might have thought

6    about a claim, doesn't have anything to do with that question.

7    So I'm not trying to litigate the entire case here.  All I'm

8    saying is, whether or not Dr. Rosenwald's attorney reasonably

9    believed that the claims they were suggesting they might have

10   had, were valid or not, doesn't factor in here.  Because

11   Mr. Greebel is not a plaintiff's attorney.  Ms. Klein doesn't

12   know what he was thinking.

13             And so they are trying to validate the threat in the

14   hypothetical; but the threat was made or not made, depending

15   on the case.  If Ms. Klein gets in and says a reasonable

16   plaintiff's attorney could have well have done X, Y, Z, okay,

17   but we actually know what happened in this case.

18             THE COURT:  So you're not going to argue to the jury

19   that no reasonable lawyer in Mr. Greebel's shoes would have

20   thought this was a serious threat of litigation, or that these

21   were not serious threats of litigation.  Are you going to be

22   arguing in any respect that threats of litigation by investors

23   or lawyers were not credible or valid or meritorious?

24             MS. SMITH:  No.  I don't think there is an argument

25   that Lindsay Rosenwald thought that he could bring a claim

PROCEEDINGS

1   against Retrophin.

2           The question is, what did Mr. Greebel think and why

3   was he doing what he was doing.  I think there is no dispute

4   that if he legitimately, if the defense can prove that he

5   legitimately thought he was acting in the best interest of

6   Retrophin, then we haven't proved our case.

7           THE COURT:  They don't have to prove anything.

8           MS. SMITH:  Of course they don't.  But they can't

9   put a expert witness in to say what a plaintiff's -- what was

10  in Mr. Rosenwald's attorney's head.

11          What they are trying to do is draw the inference

12  what Mr. Greebel was thinking based on what a reasonable

13  plaintiff's attorney might have done in this situation, and

14  that's improper.  What Mr. Greebel was thinking has to do with

15  what information he got at the time, not what a hypothetical

16  plaintiff's lawyer might or might not have done.

17          We know, as Mr. Kessler said, what Mr. Rosenwald's

18  attorney actually did.  We know what they put in their letter.

19  There is more than enough to argue from Mr. Greebel what he

20  thought or what he did based on that information.

21          What does a hypothetical plaintiff's lawyer with

22  other claims they could possibly have brought, other

23  strategies, they could have done, which did not in fact happen

24  in this case, how can those possibly go to Mr. Greebel's state

25  of mind in this case?

PROCEEDINGS

1      MR. KESSLER:  So that's the point.  It's that the

2    specific testimony this expert is offering doesn't effect

3    anything that's relevant in the case.

4      MR. CHAN:  I couldn't disagree more.  The Government

5    from the moment they charged this case has argued that the

6    settlement payments paid for claims that were completely

7    invalid, that Retrophin should never have paid for.  That

8    encompasses a broad range of should-pay-for concepts.  Whether

9    or not the claims were actually substantive, actually

10   meritorious, or as your Honor pointed out in the Rule 29

11   argument, a company can pay for claims that it believes

12   frivolous because it endangers the company but it still is

13   worth paying for in that sense.

14     MS. SMITH:  Yes, but that is not what Ms. Klein is

15   doing.

16     THE COURT:  Let him finish.

17     MR. CHAN:  The Government is arguing from the

18   beginning and they will argue that to the jury, they argued

19   that to your Honor in the Rule 29 conference yesterday, they

20   are arguing that this is a conspiracy to take money from

21   Retrophin to pay off grieved investors.  The basis, the

22   assumption of that argument, is that the settlement payments

23   should never have been paid by the company.  They argued that

24   vigorously.

25     We're entitled to put on an expert to say, in their

PROCEEDINGS

1    view, these are claims to both as a substantive matter but

2    also because if this is a time, an appropriate time, a company

3    that it feels vulnerable may be even more willing to pay and

4    settle off a claim that maybe is not 100 percent guaranteed to

5    win.  Those are things that this witness will testify about,

6    as we disclosed in our opinion.

7              MS. SMITH:  Your Honor, what Ms. Klein is not doing

8    is she's not offering an opinion on what it is reasonable for

9    Retrophin to do.  That is the issue here, was it reasonable

10   for Mr. Greebel to take the steps that he took, to take the

11   money from Retrophin and pay off the defrauded MSMB investors.

12   What Ms. Klein is doing is talking as if she represented a

13   defrauded pharmaceutical investor, what would she do.  The

14   question is, what did Mr. Greebel do, and was it reasonable

15   for Retrophin.

16             She's not offering expert opinion, and she cannot

17   offer expert opinions, about what is reasonable for Retrophin

18   to do in response to what she might have done if she might

19   have been a plaintiff's lawyer in this case.

20             MR. CHAN:  That's a cross topic.

21             MS. SMITH:  No, it's not.  It's not an opinion that

22   is relevant.  If the question was, was it reasonable for

23   Mr. Rosenwald to sue, then yes, bring a plaintiff's attorney

24   in and see whether Mr. Rosenwald was pursuing an improper

25   claim or if he was trying to use litigation improperly in this

PROCEEDINGS

1    case.  In that situation, Ms. Klein's opinion might be

2    relevant.

3            But to what Retrophin did, it is not relevant to

4    what a plaintiff's lawyer might have done.  Again, especially

5    in this case where we have what a plaintiff's lawyer in fact

6    did for Mr. Rosenwald.

7            THE COURT:  I understand the point that you're

8    making.  But the concern I have is that there has been, in the

9    Indictment and in arguments to the -- or opening statements to

10   the jury, the implication has been that Retrophin had no

11   valid, legal obligation or no valid reason to pay a settlement

12   to MSMB investors and to seek releases jointly with

13   Mr. Shkreli and the MSMB entities because it really had

14   nothing to do with these debts.

15           MS. SMITH:  In fact, the company determined that.

16   The control memo itself, written by Mr. Greebel, says these

17   are not the obligations of Retrophin.

18           The question of whether or not there might have been

19   ancillary reasons to settle these, the potential press, the

20   potential SEC complaints, other reasons, those are frankly all

21   in the record already.  We don't need Ms. Klein to come in and

22   say there might have been other reasons that people would have

23   brought attention, or they would have brought a claim.

24   Frankly, her opinion on that is irrelevant.  We already have

25   evidence in the record that that happened.  I just really

PROCEEDINGS

1    don't see why her opinion of what else a plaintiff's lawyer

2    might have done would change that.

3            We have, the defense has argued that there are these

4    concerns about going to the press, concerns about going to the

5    SEC, which had already happened frankly, concerns about a

6    lawsuit, that's all in there.  The question of whether or not

7    there was a legal obligation is actually not in dispute.

8    Mr. Greebel himself found there was no legal obligation.

9    These were the obligations of MSMB.  He chose to do what he

10   did and the reasons why he did that are frankly exactly why

11   he's on trial.

12           But what a plaintiff's lawyer may or may not have

13   done in this situation is totally irrelevant because we know

14   what in fact happened.

15           MR. CHAN:  That's plain wrong.  Mr. Greebel did not

16   determine that the legal liability was solely that of Martin

17   Shkreli.  That control memo, the Government also argued

18   incorrectly.  The control memo says nothing remarkable.  It

19   says in the company's view, this is Martin's fault.  But that

20   is not inconsistent with a desire by the company to settle the

21   claim.

22           Companies consistently settle things that are the

23   fault of Employee B, Employee A.  But they are going to do it

24   anyway because they are the company.  A determination that

25   something was, an event was caused by this person, does not

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    mean that the company does not have an obligation or feel the

2    need or desire or feel that it should engage in a deal

3    settlement.

4            MR. KESSLER:  Again, you just listen to that, that's

5    talking about the company not the plaintiff's lawyer.

6            THE COURT:  Well, I think if there is doubt about

7    whether the company and Mr. Greebel, let's focus on

8    Mr. Greebel since his state of mind is what is relevant,

9    whether he reasonably thought that there was exposure for his

10   client, Retrophin, or his client MSMB --

11           MR. KESSLER:  That's based on what is in his head,

12   based on the information he had when it actually happened.

13   That's in the record.  We're going to argue about that.

14           Ms. Klein's discussion about what a hypothetical

15   plaintiff lawyer, who wasn't in the case, didn't make the

16   claims, might have done doesn't tell you anything about what

17   is in Mr. Greebel's head.  That's the point we're making.  It

18   doesn't say anything about it.  It's not that the other

19   arguments that Mr. Chan makes, that we've been making, that

20   the Court is asking, we get the arguments, those are arguments

21   that are going to be in this case.  This just isn't relevant.

22           THE COURT:  Well, nonetheless, I do think that the

23   Government's -- to the extent there may be arguments that the

24   Government has made or will make to the jury that Retrophin

25   was the victim of this wire fraud, in part, because

PROCEEDINGS

1   settlements were paid to investors to whom Retrophin had no

2   obligation or no reason to be concerned about its exposure or

3   the down side of litigation, or litigation risk or expense, it

4   seems to me that the plaintiff's testimony that in fact these

5   aren't idle claims.  And that the fact that Retrophin was a

6   new, start-up, thinly-funded, trying to make sure that it

7   stayed off the media radar in terms of adverse publicity,

8   making sure it would stay off any regulatory scrutiny, I think

9   that it's a valid and relevant proffer of opinion testimony.

10  I think that I would allow her testimony so long as she does

11  not opine about any laws.

12          MR. KESSLER:  I just -- we disagree but we

13  understand.  We want to make sure that Ms. Klein's testimony

14  will be strictly limited to what a reasonable plaintiff's

15  lawyer would have done or thought, not what Retrophin thought,

16  the company would have thought, the defendant would have

17  thought, Mr. Greebel would have thought, a defense lawyer

18  would have thought, just what a plaintiff's attorney,

19  hypothetical plaintiff's attorney, considering hypothetical

20  claims under unidentified laws would have thought.

21          THE COURT:  No expert is allowed to opine on an

22  ultimate issue and tell the jury what facts to find based on

23  their opinions.

24          MR. KESSLER:  I understand.

25          THE COURT:  You want a commitment from the defense?

8322

PROCEEDINGS

1          MR. KESSLER:  Our concern is, we're concerned about

2     the ultimate issue.  But I didn't think that was what the

3     opinion was going to be.

4          It's the suggestion that Ms. Klein's testimony will

5     start veering into what a reasonable defense attorney might

6     have thought, what a reasonable defendant would have thought,

7     what a reasonable company would have thought.  Those are not

8     noticed; and second of all, not her area of expertise.  If her

9     testimony is confined to what a reasonable plaintiff's

10    attorney would have thought, taking into account facts that

11    Mr. Greebel didn't even know, okay, we disagree with the

12    relevance but we understand.

13          THE COURT:  Taking facts Mr. Greebel didn't know?

14          MR. KESSLER:  Look at her disclosure.  She looks a

15    bunch of different things.  I don't believe the defense is

16    saying Mr. Greebel is aware of those facts.  That is an issue

17    of contention.

18          The basis for her claims, it relates to all sorts of

19    things.  Again, if that's her testimony we don't think it's

20    relevant, but we understand.  But we are deeply concerned if

21    her testimony is going to get into what any defense attorney

22    might have thought, defendant would have thought, anything

23    like that -- reasonable, a reasonable defendant, a reasonable

24    defense attorney, someone faced with a claim of the type that

25    Ms. Klein would have brought, would have thought, something,

PROCEEDINGS

1    would have done, those are totally improper.

2           So it's not so much a commitment from the defense as

3    an understanding from the Court of what the specific area of

4    her testimony will be.

5           THE COURT:  My ruling was going to, A, caution her

6    not to speak in the first person.  But also it would be a

7    reasonable plaintiff's attorney, not anything regarding the

8    recipient of the reasonable plaintiff's attorneys

9    communications regarding litigation.

10          MR. KESSLER:  Okay.

11          THE COURT:  Mr. Chan, you need to just instruct her

12   if you're the one.  Are you presenting her?

13          MR. CHAN:  We haven't decided yet.

14          THE COURT:  She needs to be instructed.  There is

15   enough of you, regardless of who presents her testimony, to

16   instruct her that she must be confined to a reasonable

17   plaintiff's attorney and what the reasonable plaintiff's

18   attorney would do.

19          MR. CHAN:  That's fine, your.  Honor just so

20   everyone knows, she does both.  So if the Government --

21          THE COURT:  Doesn't matter.  I'm not going to allow

22   it to go beyond that.

23          MR. CHAN:  In the Government asks unfair questions

24   of her, that's the Government opening the door.  But we won't

25   elicit it on direct.

JACOBS – DIRECT – MR. BRODSKY

```
 1              MR. KESSLER:  That's always the case.  We

 2    understand.

 3              THE COURT:  If the jurors are here we'll bring them

 4    in.

 5              Before the jury comes in, is there any expert who I

 6    didn't address?

 7              MR. KESSLER:  I think that's everyone.  We covered

 8    Alan Johnson, we covered Mr. Lewis, we've covered Ferruolo,

 9    Klein Minkoff.  That's it.

10              MR. CHAN:  That's it.

11              THE COURT:  Okay.

12              (Whereupon, the witness resumes the stand.)

13              (Jury enters the courtroom. Time 9:35 a.m.)

14              THE COURT:  All jurors are present.

15              Good morning, members of the jury.  Have a seat.

16              Mr. Brodsky, you may continue your direct.

17              MR. BRODSKY:  Thank you, your Honor.

18              (Witness takes the witness stand.)

19    HAROLD JACOBS, called as a witness, having been previously

20    first duly sworn/affirmed, was examined and testified further

21    as follows:

22    DIRECT EXAMINATION

23    MR. BRODSKY:

24    Q    Mr. Jacobs, yesterday we left off talking about

25    settlement agreements.  I had asked you, transcript page 8273
```

JACOBS - DIRECT - MR. BRODSKY

1  lines 9 through 15, I had asked you, "What did Mr. Greebel --

2  did Mr. Greebel ask you any questions with releases?"  You

3  said, "Yes.  He asked me if I had a form of release that I

4  use.  We discussed generally what goes into a release.  I gave

5  him a form of the release that I've used over the years and

6  developed through a number of transactions.  And I told him

7  make sure if you do a settlement agreement have a release."

8           In your conversation with Mr. Greebel, what did you

9  tell Mr. Greebel goes into a release?

10          MS. SMITH:  Objection, your Honor.

11          THE COURT:  I'm going to sustain that objection.

12          MR. BRODSKY:  Your Honor, I'm following up on his

13  testimony where he says we discussed generally what goes into

14  a release.

15          THE COURT:  The Government is making a hearsay

16  objection, correct?

17          MS. SMITH:  Yes, your Honor.

18          MR. BRODSKY:  For the effect on the listener, your

19  Honor, in terms of what he said.

20          MS. SMITH:  Could we have a time period?

21          MR. BRODSKY:  But I've already elicited the relevant

22  time period.

23          THE COURT:  When was the conversation, sir?  So you

24  can refresh our recollections about when you had this

25  conversation with Mr. Greebel?

JACOBS – DIRECT – MR. BRODSKY

1            THE WITNESS:  I believe somewhere between 2013,

2     between '11, 2011, 2013.  I don't know the specific time.

3            THE COURT:  All right.  I will overrule the

4     objection.

5            And just instruct the jury that his response is not

6     being offered for the truth, but rather for the effect on the

7     listener.

8     MR. BRODSKY:

9     Q    Mr. Jacobs, when you testified, quote, "We discussed

10    generally what goes into a release," end quote, with

11    Mr. Greebel, what did you tell Mr. Greebel goes into a

12    release?

13    A    I told Mr. Greebel that the release should be very broad.

14    And it should indicate that usually you have a release in

15    connection with a claim of some sort, so you want to say that

16    you're getting a release from the beginning of time to the

17    present so you make sure you get rid of all factors that are

18    involved in that claim.  And you want to make sure that you

19    don't only ask the releasor to release you, but you say:  The

20    releasor, the heirs, beneficiaries, assignees, affiliates,

21    persons connected with him; and if it's an entity you want to

22    say, officers, directors, employees, agents, representatives,

23    shareholders.  You want as broad a release as possible so that

24    claimant cannot come back and ask for additional money or

25    stock or whatever he's asking for.

JACOBS - DIRECT - MR. BRODSKY

1    Q    What did you mean by affiliates when you said affiliates?

2    A    Someone who is control --

3            MS. SMITH:  Objection, your Honor.

4            THE COURT:  Sustained.

5    Q    You testified that, quote, "I told him make sure if you

6    do a settlement agreement have a release," end quote, that's

7    on the transcript page 8273, line 14 to 15.

8            Did you explain to Mr. Greebel why he should make

9    sure, if he does a settlement agreement, he should have a

10   release, and that's a yes or no question.

11   A    Yes.

12   Q    What did you tell him?

13   A    Can you repeat that question?

14   Q    Yes.  What did you discuss or tell Mr. Greebel with

15   respect to why he should make sure if he does a settlement

16   agreement he should have a release?

17   A    Well, you want to make sure if you're settling a claim

18   that you get that claimant to release any other claims he

19   might have against the company or the person so that you

20   protect yourself going forward.

21   Q    And did you discuss the topic of doing a settlement

22   versus litigation with Mr. Greebel?

23           MS. SMITH:  Objection, your Honor.

24           THE COURT:  Sustained.  Rephrase.

25   Q    Did you discuss the topic of, in your discussion with

JACOBS - DIRECT - MR. BRODSKY

1   respect to settlement agreements, did you discuss the topic of

2   litigation with Mr. Greebel?

3   A    Yes.

4   Q    What did you say to Mr. Greebel?

5        MS. SMITH:  Objection, your Honor.  The subject of

6   litigation?

7        THE COURT:  I'll sustain the objection.

8   Q    Did you discuss with Mr. Greebel with this discussion of

9   a settlement agreement, settling a claim versus going forward

10  with litigation?

11       MS. SMITH:  Objection, your Honor.

12       MR. BRODSKY:  I'll try to do it in a non-leading.

13       MS. SMITH:  The objection is to hearsay.

14       THE COURT:  It's a hearsay objection.  I think,

15  again, I'm going to ask the witness if this is still within

16  the same conversation regarding the 2011 and 2013?

17       THE WITNESS:  Yes.

18       THE COURT:  And I'm trying to understand the

19  question about litigation.  Meaning?

20       MR. BRODSKY:  Let me ask a better question.

21  Q    Did you discuss the benefits, up-sides and down-sides, of

22  settling a claim versus proceeding with litigation?

23       MS. SMITH:  Objection, your Honor.

24       Can we have a brief sidebar?

25       (Continued on the next page.)

JACOBS – DIRECT – MR. BRODSKY

1              (Sidebar conference.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE.

1          MS. SMITH:  Your Honor, I think the relevance of

2     this --

3          MR. BRODSKY:  I'm sorry?

4          MS. SMITH:  I'll like to proffer what the relevance

5     is in terms of effect on Mr. Greebel.  This is a time period,

6     he doesn't exactly when it took place.  I will note that the

7     time period today is different from the time period yesterday.

8          THE COURT:  A lot broader.

9          MS. SMITH:  A lot broader.  After multiple

10     conversations with defense counsel, and so.

11          THE COURT:  Yesterday he said 2011 to 2012.

12          MR. BRODSKY:  He said something like that.  I'll get

13     the transcript.

14          THE COURT:  It's different.

15          MR. BRODSKY:  I want to get the transcript.

16          MS. SMITH:  This is again, we're driving a trunk

17     through the hearsay exception.  I've objected, I will continue

18     to object.  I recognize your Honor's ruling.  I'm putting this

19     on the record.  Again, the objection for hearsay, state of

20     mind, is for the declarant's state of mine.  This declarant's

21     state of mind is not relevant to the case.

22          The only way to get this testimony in is for the

23     effect on the listener.  I don't have the case in front of me,

24     but it's the Gupta case, Second Circuit.  And effect on the

25     listener, if it were to confuse the jury under 403, for the

8331

SIDEBAR CONFERENCE.

1    fact of what is said, the assertion of fact, it has to have

2    some sort of separate relevance.

3           Here there is an exception of fact what this witness

4    told Mr. Greebel.  And it has to have an effect on the

5    listener that is separate and apart from what the assertion of

6    fact is.

7           If the jury would be confused about this as sort of

8    expert testimony, about why it's important to settle

9    litigation versus the effect that this specific conversation

10   that this individual has no idea when it took place had on

11   Mr. Greebel, that is the burden of Mr. Brodsky to reach and to

12   show.  I don't believe he can do it.

13          MR. BRODSKY:  Your Honor, respectfully, we did look

14   at the case law last night.  We anticipated continued

15   objections.  We have a brief on it.  I don't have it with me.

16          THE COURT:  I'm not going to consider these late

17   briefs.  You have got to stop this.  You could have litigated

18   this before.

19          MR. BRODSKY:  The Government is coming up now at the

20   last minute with US V. Gupta and they are citing it.  But

21   there are multiple Second Circuit cases --

22          THE COURT:  I want there to be a case for what you

23   are, what both sides are proffering.  But don't tell me you

24   have a brief in your back pocket and you're going to throw it

25   before me at the last minute.

SIDEBAR CONFERENCE.

1          MR. BRODSKY:  I don't have the cases right before

2    me, is what I'm saying.

3          THE COURT:  Who has the brief among your lawyer

4    team?

5          MR. BRODSKY:  It was supposed to be here this

6    morning.  I don't know where it is right now.  I apologize,

7    your Honor.

8              But the case law shows --

9          MS. SMITH:  Your Honor, for the record the Gupta

10   case is 747 F.3d 111 at 132.  Again Rule 403 requires the

11   preclusion of evidence for which it would be exceedingly

12   difficult for the jury to distinguish between what could

13   possibly be the state of mind or intent of declarant or

14   listener, and the truth of the assertions that are otherwise

15   barred.  So there is no hearsay exception that permits these

16   statements to come in.  We haven't heard one.

17             So the only possible reason to offer these is for

18   the effect on the listener of Mr. Greebel.  And I have not

19   heard Mr. Brodsky give a relevant reason why it should come in

20   for effect on the listener that would not confuse the jury as

21   to the truth of the assertions that this witness is making.

22         MR. BRODSKY:  Your Honor, respectfully, I believe

23   the Government is leading the Court down the very wrong pass,

24   opposite actually the Second Circuit case law, the Second

25   Circuit which we looked at last night.  There is extensive

SIDEBAR CONFERENCE.

1   Second Circuit case law that says when the state of mind of

2   the defendant is the key issue in the case, the defense is

3   allowed to elicit the relevant information that is provided to

4   a defendant for the purposes of proving what information the

5   defendant had at the time he made decisions.  The case law

6   actually says, the state of mind exception and the effect on

7   the listener are the essentially the same.  The case law says

8   that.  And we have multiple Second Circuit cases on it.

9           THE COURT:  Just give me one.

10          MR. BRODSKY:  I'm waiting for my colleagues to

11  provide me with the cases, I apologize, your Honor.

12          Essentially, in the Second Circuit, and it's not

13  just one, your Honor, it's a plethora of cases, where the

14  state of mind of the defendant is at issue, the defendant has

15  to be allowed relevant testimony about what information he

16  received at the time he's given advice.

17          Here we have a witness who was his monitor, sat next

18  to him on the Katten Muchin executive committees, essentially

19  transitioning his book of business to Mr. Greebel, he actually

20  billed time to MSMB --

21          THE COURT:  Don't go over this whole litany of

22  evidence.  Just give me the law.  Don't go over the evidence.

23  I was hear, I saw it, I heard it.

24          MR. BRODSKY:  I understand, your Honor.  We're

25  trying --

SIDEBAR CONFERENCE.

1      MS. SMITH:  In the meantime, under this theory we

2   can call --

3      THE COURT:  They walked away, wait.

4      MS. SMITH:  Your Honor, under this theory we can

5   call Mr. Mr. Greebel's law school professor and ask, what did

6   Mr. Greebel learn in law school?  Did he understand that he

7   had a loyalty to his client?  Did he understand in law school,

8   prior to when this case happened, if he worked with his client

9   to defraud, if he worked with Mr. Greebel (sic) to defraud

10  Retrophin, that would be a crime.  We can go find one of

11  Mr. Greebel's law school professors and say, he sat there in

12  class.

13     MR. BRODSKY:  May I respond?

14     MR. PITLUCK:  We're still arguing the defense

15  argument.  Everything he was told unhinged to any connection

16  to an event in this case.  MR.Jacobs testified to A two-year

17  time period in the first instance, now one-year, unhinged to

18  any conversation, unhinged to anything that had an effect.

19  And is now offering anything that was told to the defendant at

20  any point in time is now being used, is going to be used to

21  argue to the jury at closing that this is what he was told,

22  this is what was in his mind, this is why he did it.  That is

23  offered for the truth.  The offer for the truth that his

24  mentor, somebody who had nothing to do with this, who billed

25  .8 hours to Retrophin, advised him that it was appropriate to

SIDEBAR CONFERENCE.

1   do what he was doing.  That is offered for are the truth.

2          That is particular to what the Gupta case says

3   cannot happen.  It cannot be the case that everything that was

4   told to the defendant throughout this entire case is relevant.

5   There is no stomping on the constitutional right.  There is no

6   issue on the constitutional rights.  There are options.  He

7   can testify.  He can do anything.  He's not required to, but

8   that does not mean you can have other people say what was in

9   his mind because he was told.  That's the bar on hearsay.

10         MS. SMITH:  It's 403.  If the jury will be confused,

11  and I believe frankly what the defense argued, it his mentor,

12  this is what he understood, that's for the truth not for the

13  effect of the listener at a particular time.

14         THE COURT:  If we instruct the jury that this is, A,

15  not for the truth, they are not to assume that this advice is

16  correct, right, that it's correct advice, but it's to be

17  considered in the context of what Mr. Greebel understood based

18  on this.

19         MR. PITLUCK:  That's still prejudicial.  You can't

20  separate the truth from this, and they are not going to.  They

21  are going to argue that this is what is in his mind, this is

22  why he did what he did.

23         Judge, the instruction, respectfully, we've been

24  doing this throughout, for the truth does not limit the jury's

25  consideration of what he's going to do.

SIDEBAR CONFERENCE.

1     He's talking to his mentor who obtained settlement

2  agreements, broad release, that's exactly what he did.  That's

3  the argument.  That's 403 and hearsay.  It's offered for the

4  truth, Judge.

5     Judge we're trying, we want to get this done, but we

6  can't drive a truck through the hearsay objections.  We're

7  going to have a week long case for every attorney he ever

8  worked with and what he said to them.

9     THE COURT:  I'm going to give the defense --

10    MR. BRODSKY:  I'm waiting for my phone.

11    THE COURT:  Do you have a cite?  One of you can't

12 pull it up on the computer?  Can't get access to the brief

13 that you've been promising me?  Just give me a case.

14    MR. BRODSKY:  I have it your Honor, I'm sorry.

15    I'm going to site a series of cases for you for the

16 proposition that defense is permitted to offer in statements

17 made by a declarant on the witness stand to the defendant for

18 purposes of demonstrating the defendant's state of mind.

19    One is United States Versus Vallee, 304 F. App'x 916

20 Second Circuit.  The appellant-defendant challenged the

21 admission of a prior out of court statement, specifically the

22 Government offered the testimony that she told the trial

23 counsel that Carter was a sole witness against Vallee in a

24 Canadian drug prosecution, affirming the conviction the Second

25 Circuit said was the testimony about her own prior statements

SIDEBAR CONFERENCE.

1   wasn't hearsay, wasn't admitted for the truth, but rather to

2   Vallee's state of mind.

3          MS. SMITH:  This is the defendant, your Honor.

4          THE COURT:  That was not the defendant's state of

5   mind.

6          MR. BRODSKY:  It was the Canadian prosecutor's

7   statements to his trial counsel.  The person who was on the

8   witness stand was not the defendant.

9          In United States Versus Kanovsky, the defendant

10  appealed his obstruction of justice conviction,618 F.2d 229.

11  It was for an allegation of false, evasive Grand Jury

12  testimony.  And rather than conclude that the testimony was

13  inadmissible hearsay, as the appellant contended court held

14  the testimony was not offered to show the truth, but rather

15  the appellant's current state of mind of statements made to

16  him by the AUSA.

17         MS. SMITH:  These are all offered by the Government.

18  It sounds like these are defendants appealing the admission of

19  hearsay.  You're saying that they are cases --

20         MR. BRODSKY:  That was a defendant appealing the

21  refusal of the Court to allow him to put into evidence the

22  AUSA's statements to him in the Grand Jury, which he said

23  explained his state of mind as to why he answered certain

24  questions when he was found convicted for obstruction of.

25         MS. SMITH:  But --

SIDEBAR CONFERENCE.

1      MR. BRODSKY:  I didn't interfere with you.

2      MS. SMITH:  I'll wait.

3      MR. BRODSKY:  There is this other Second Circuit

4  case, your Honor.  In United States Versus Kohan, 806 F.2d 18

5  Second Circuit 1986.

6           The second Circuit stated that the testimony of the

7  defendant appellant's roommate about the defendant's

8  statements in their apartment was excluded erroneously.  The

9  defendant appellant was not basing his defense on the truth of

10  those statements, but on the fact that they were made and the

11  appellant believed them to be true.  The Court held that the

12  roommate's proffered testimony was admissible as

13  circumstantial evidence of the defendant appellant's state of

14  mind, his belief as to his co-defendant's activities.  The

15  exclusion of that testimony adversely affected his right to a

16  fair trial.  It was not harmless because, quote, "it would

17  have been received on the appellant's direct case rather than

18  during cross-examination of Government witnesses," end quote,

19  would have corroborated the statements that he made; thereby,

20  diminishing the effect of their self-serving nature.

21           In United States Versed DiMaria 727 F.2d 265 second

22  Circuit case, 1984, the defense wanted to elicit an FBI's

23  testimony of what he told other agents before he approached

24  the defendant, and before his arrest.  And the defendant said

25  in response, "I thought you guys were investigating

SIDEBAR CONFERENCE.

1  white-collar crime, what are you doing here?"  The court

2  accepted the defendant's argument that his statement about

3  what he was doing here was not being offered.  His statement

4  about, "you guys are investigating white-collar crime, what

5  are you doing," here reflected his state of mind and was

6  admissible during his case to show his state of mind.  So he

7  was allowed to call the agent and testify as to his statement

8  to the agent for his state of mind.  And the Court reversed

9  the conviction because the exclusion for the state of mind

10  evidence was reversible error under the Government's argument

11  that --

12         THE COURT:  I'm not, we're not going to be read a

13  letter that you haven't filed or given to the Government.

14  You're not going to do this.  You're not going to go into this

15  anymore until I get a chance to read your letter, which you

16  haven't filed and the Government needs to respond.  I want to

17  look at Second Circuit case myself.  You're not going to

18  elicit any further out of court statements or hearsay

19  statements.

20         MR. BRODSKY:  May I move to this topic, which I

21  believe I --

22         THE COURT:  I'm going to sustain.

23         MR. BRODSKY:  -- connected directly to Retrophin.

24  He remembers that in the summer, this is what he's told me, in

25  the summer of 2013 Mr. Greebel asked him about a re-statement.

SIDEBAR CONFERENCE.

1   And he knows Mr. Greebel told him it was in connection with

2   Retrophin.  He knows it's in connection with Retrophin.  He

3   made statements to Mr. Greebel about making a, doing a

4   re-statement.  So that's connected to Retrophin.  It's

5   connected to the time period.  It's a relevant issue.  There

6   is no undue prejudice or confusion.  It directly goes to

7   Mr. Greebel's state of mind.  We should be able to elicit it,

8   your Honor.

9           MS. SMITH:  I was actually going to say,

10  Mr. Brodsky's cases, I think if you look at them, in all of

11  those cases, the conversation at issue is directly in

12  connection with whatever the crime is being committed.  These

13  settlement --

14          So for example, what he has just proffered, we'll

15  hear how it comes out, that sounds much closer to something of

16  that might have had an effect on the defendant at the time of

17  whatever was going on.  Some conversation years before about

18  settlement agreements in general, is not what any of these

19  cases talking about.  They're talking about a statement made

20  in an apartment right before a crime is committed or a

21  statement made to the person as they are lying or potentially

22  lying in the Grand Jury.  Those are very different things than

23  conversations that happened years before on vague topics.

24          MR. BRODSKY:  Your Honor, respectfully, the

25  Government is essentially trying to exclude admissible

SIDEBAR CONFERENCE.

1    evidence 401, 403.

2              THE COURT:  I appreciate that.  Give me your brief,

3    file it, give the Government a copy now.  I'm not going to

4    have sidebar after sidebar and have you read a brief to me,

5    again, that you haven't filed and you haven't served on the

6    Government.  I would like to look at the cases.

7              I do think that I've given you some latitude.  I

8    think that you're going all over the place with this witness

9    on all sorts of topics that occurred last -- yesterday it was

10   between 2011 and 2012 and today between 2011 and 2014.

11             MR. BRODSKY:  2013.

12             THE COURT:  2013.  I think that we need to the look

13   at the cases that you cite, look at the cases the Government

14   may proffer.  They haven't had an opportunity.  This is

15   somewhat of an ambush on me, all right.

16             MR. BRODSKY:  Respectfully.

17             THE COURT:  I feel it's an ambush on me.  If you

18   intend to go down this road, you should have given me notice.

19   But once again, I'm left with I situation where I'm supposed

20   to decide, what you characterize as a critical constitutional

21   right.  Well, you know what, I want to be right on that.  But

22   I'm not going to be right if you throw something at me that's

23   multiple pages, single-spaced, reading cases to me, taking

24   time from the jury.  This is not going to happen anymore.  I

25   warned you.  It's not going to happen anymore.

SIDEBAR CONFERENCE.

1          MR. BRODSKY:  Your Honor made a series of rulings,

2    absolutely correct, over objections of the Government.  I was

3    following up on the conversations.

4          Second, your Honor, it is the Government who came to

5    sidebar, and not me.

6          Third, it is the Government who --

7          THE COURT:  Of course you're not going to object to

8    your own questions.

9          Yesterday it was more specifically targeted to

10   particular situations.  This is like a three-year period, some

11   conversation.

12         MR. BRODSKY:  I will target more, your Honor.

13         THE COURT:  All right.  But I'm telling you right

14   now --

15         MR. BRODSKY:  I'll make it very targeted.

16         THE COURT:  -- if you're soliciting hearsay, until I

17   see and read those cases and hear from the Government, you're

18   not going to be allowed to put it in.  If you have to call

19   Mr. Jacobs back, you'll have to do that.  This is not how

20   we're going to do it, question by question, go to sidebar,

21   read me a brief that you haven't filed.  That's just not

22   appropriate.

23         MR. BRODSKY:  I'm only reading the cases in

24   preparation for the defense.  Because the Government came over

25   to the sidebar citing United States Versus Gupta.  They didn't

SIDEBAR CONFERENCE.

1    file a brief.  It was their obligation to reverse your Honor's

2    rulings from yesterday and try to file a brief on it.  It

3    wasn't my obligation to file a brief when I agreed with your

4    ruling.

5            THE COURT:  I'm not saying you should file a brief.

6    I told you before, that the 11th hour brief is not

7    appropriate.  These are issues -- if you wanted to solicit

8    hearsay from this witness --

9            MR. BRODSKY:  Okay, your Honor.

10           THE COURT:  -- this is something you could have

11   front-loaded in a motion to try to get a ruling, instead of

12   having us bounce back and forth to sidebar every other

13   question, every other document.  That's my problem.

14           MR. BRODSKY:  I understand.

15           THE COURT:  The whole way this case has been

16   presented...

17           MS. SMITH:  For any of these, if we can get a clear

18   time period before we start eliciting anything so we have an

19   idea if that is connected.

20           MR. PITLUCK:  So for example, when you were asking,

21   when we asked Jackson Su about conversations we had with

22   the -- he had the defendant -- there were objections and

23   requests for time periods, whether slightly before December 4,

24   or slightly after December 4.  Now we're getting statements

25   about in the summer of 2013, that could be late May it could

SIDEBAR CONFERENCE.

1   be late August.  That actually matters quite a bit in this

2   case, potentially could matter quite a bit.

3           To have Mr. Jacobs say in the summer of the 2013 at

4   some point I had some conversation, the relevance of that is

5   getting pretty thin, unless there is something more specific.

6   We ask that the witness give a better estimate of the time

7   period because it's hard to evaluate the relevance of some

8   statement made in summer of 2013, especially when the defense

9   was very, very adamant whenever we asked about time periods

10  with respect to conversations from Mr. Greebel and we would be

11  specific.  I'm not faulting them for wanting to know the

12  specificity, I'm just saying we also want to know the

13  specificity.  They are not wrong to ask for the time period;

14  we also would like to know the time period with the level of

15  specificity they were seeking from us.

16          MR. BRODSKY:  Your Honor, the other case I would

17  site to your Honor --

18          THE COURT:  Just give me a copy of the brief and

19  serve them.

20          You take it first.

21          MS. SMITH:  Thank you.

22          (End of sidebar conference.)

23          (Continued on the next page.)

24

25

Rivka Teich CSR, RPR, RMR
Official Court Reporter

JACOBS – DIRECT – MR. BRODSKY

1   BY MR. BRODSKY:

2   Q    Mr. Jacobs, let me ask you, when you had this

3   conversation with Mr. Greebel, let me ask you whether at some

4   point, at any point, one way or the other, you recall any

5   discussion with Mr. Greebel regarding specific settlement

6   agreements?

7   A    No.

8   Q    And, for example, do you know somebody called Lindsay

9   Rosenwald?

10  A    I do know that name.

11  Q    Do you recall any conversations -- do you know who

12  Lindsay Rosenwald is, generally?

13  A    I believe a venture capital investor.

14  Q    Do you recall any conversations with Lindsay Rosenwald --

15  with Mr. Greebel relating to Lindsay Rosenwald?

16  A    No.

17  Q    Any specific conversations?

18  A    No.

19  Q    Do you recall any specific conversations with Sarah

20  Hassan, with Mr. Greebel, relating to Sarah Hassan?

21  A    No.

22  Q    Now, did there come a time when you had a conversation

23  with Mr. Greebel on the topic of a restatement?

24  A    Yes.

25  Q    Approximately when?

JACOBS - DIRECT - MR. BRODSKY

1    A     Sometime in the middle of 2013, maybe in the summer

2    sometime.

3    Q     And in connection with a specific company or in general?

4    A     In connection with Retrophin.

5    Q     And what do you remember telling Mr. Greebel regarding a

6    restatement in -- a possible restatement in connection with

7    Retrophin?

8    A     I remember --

9              MS. SMITH:  Objection, Your Honor.

10             THE COURT:  Sustained.

11             THE WITNESS:   Did you sustain that?

12             THE COURT:  Yes, I did.

13   BY MR. BRODSKY:

14   Q     Did Mr. Greebel ask you questions regarding a restatement

15   in connection with Retrophin?

16   A     Yes.

17   Q     What questions did Mr. Greebel ask you?

18   A     Generally questions concerning whether or not it is

19   necessary to do a restatement in certain instances.

20             MR. BRODSKY:  Your Honor, I offer the statements

21   Mr. Jacobs made to Mr. Greebel in this conversation, not for

22   the truth, but for the effect on the listener.

23             MS. SMITH:  Government's going to object.

24             THE COURT:  I am sustaining the objection.

25   BY MR. BRODSKY:

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

JACOBS - DIRECT - MR. BRODSKY

1    Q    Did you, without saying what you -- what you said to him,

2    did you answer Mr. Greebel's questions?

3    A    Yes.

4    Q    And did you bill for that time or not bill for that time?

5    A    Probably not.

6    Q    And did there come a time when you were being considered

7    for Retrophin's board of directors?

8    A    Yes.

9    Q    Approximately when?

10   A    Late 2013 or early 2014.

11   Q    Had you served on any boards of directors before you were

12   being considered for Retrophin's board?

13   A    Yes, I had.

14   Q    How many boards?

15   A    I sat on three boards.

16   Q    Private companies or public companies, or both?

17   A    Two private companies and one large public company.

18   Q    When you say a large public company, what do you mean by

19   large?

20   A    Billion dollars in revenue.

21   Q    And how did you learn you were being -- well, withdrawn.

22        Describe how you -- how you learned you were being

23   considered for a Retrophin's board, or describe what led to

24   your -- you being considered for Retrophin's board?

25   A    I discussed that with Evan.

JACOBS - DIRECT - MR. BRODSKY

1    Q    Did Mr. Greebel ask you any questions?

2    A    No.

3    Q    Did there come a time when you learned whether or not you

4    would get the position on Retrophin's board?

5    A    Yes.

6    Q    And did you join Retrophin's board?

7    A    No.

8    Q    Did you interview for the position?

9    A    No.

10   Q    Now, from 2012 through 2015, did you ever see drafts of

11   Mr. Greebel's memoranda to the income partner committee?

12   A    Yes.

13   Q    How did you see those drafts?

14   A    Evan gave them to me to look at.

15   Q    And if we can turn to -- and when Mr. -- when

16   approximately each year did Mr. Greebel give you a draft of

17   his compensation memo to review?

18   A    It was probably in either December or January of

19   February, in that time period.

20   Q    And upon receiving it, what did you do?

21   A    I reviewed it and gave him comments.

22   Q    And having sat on the equity partner compensation

23   committee, did you have a reaction to the draft memos that

24   Mr. Greebel gave you to be submitted to the income partner

25   compensation committee?

JACOBS – DIRECT – MR. BRODSKY

1          MS. SMITH:   Objection, Your Honor, to Mr. Jacobs'

2    reaction.

3          THE COURT:  Well, I am going to overrule the

4    objection in terms of you were given the memos to review.

5          THE WITNESS:  Yes.

6          THE COURT:  And the question is whether you had a

7    reaction to them.

8          THE WITNESS:  Yes.

9          THE COURT:  You may answer the question.

10          THE WITNESS:  I had a reaction to them.

11   BY MR. BRODSKY:

12   Q    What was your reaction to them?

13   A    I thought they were very good.  Very well written,

14   spelled out exactly what he wanted to say, in the format that

15   the compensation committee would want to receive, and I

16   thought they were excellently drafted.

17   Q    And were they similar since you had served on the equity

18   partner compensation committee at Katten in the past, were

19   they similar or dissimilar in kind to other compensation

20   memos?

21   A    It was basically the format that every partner worked on.

22   Q    Now, let me ask you to turn to Government Exhibit 123-3

23   in evidence.

24   A    Is that in this folder?

25   Q    And you will turn to your tab 26.

JACOBS - DIRECT - MR. BRODSKY

1    A    Okay.

2    Q    And if you turn to tab 26 and look at 123-3, let me ask

3    you if you're familiar in general with some of the clients

4    that Mr. Greebel billed time to during this relevant period,

5    which is under Government Exhibit 123-3, for the periods from

6    February 2012 to January 2013?

7    A    I am familiar with some of them.

8    Q    And are some of them your clients?

9    A    Yes.

10   Q    Which ones can you identify as your clients?

11             MS. SMITH:  Objection, Your Honor.  Just, privilege.

12             MR. BRODSKY:  I'm sorry, I didn't hear the

13   objection, Your Honor.

14             THE COURT:  Well, I believe that there's privilege

15   that has been asserted by the firm.

16             MR. BRODSKY:  Your Honor, this is a Government

17   Exhibit in evidence of a list of clients of Mr. Greebel.  It

18   is in evidence, Your Honor.

19             THE COURT:  All right.

20             MS. SMITH:  Your Honor?

21             (Continued on following page.)

22

23

24

25

JACOBS - DIRECT - MR. BRODSKY

1            THE COURT:   What?  Do we need to have a sidebar

2   again?

3            MS. SMITH:  I can do it very briefly, I just --

4            THE COURT:   Okay.  I mean, I just -- I'm

5   recalling -- okay.

6            (Sidebar conference.)

7            (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

1      (WHEREUPON, the following proceedings were had at

2 sidebar, out of the hearing of the open courtroom, to wit:)

3      MS. SMITH:   I recognize the names of the clients

4 are in evidence.  I just know that there was an objection last

5 time when there was any further discussion with the Winklevoss

6 brothers, what work was done, which partners worked on it,

7 what kinds of work was completed, you know, details about

8 those actual client relationships.  It is not my privilege so

9 I don't know exactly the bounds of it, but in terms of any

10 discussion of the types of work being done for other clients

11 as opposed to the fact that time was billed.  That's the --

12 and, again, it is not really our objection, so much as I am

13 just putting that --

14      MR. BRODSKY:  Your Honor, respectfully, I find it --

15 this is a Government Exhibit in evidence.

16      THE COURT:  We understand that.  But the question is

17 whether you are going to solicit information from him about

18 work that was done.

19      MR. BRODSKY:  The nature of the client, what kind of

20 client it is, I think when you look at this list, Your Honor,

21 you see a list of clients without any information about it.

22 There's a lot of public information, for example, about who

23 Guggenheim Investment Management is, if you go to the web

24 site.  He has personal knowledge as to who Guggenheim is, and

25 he can describe generally it's a multi-billion dollar asset

SIDEBAR

1   manager.  I wasn't going to go into specific transactions.

2              MS. SMITH:  There was some of that yesterday, I

3   mean, I didn't object, but, for example, I am surprised he

4   would want to discuss this specific name of the client and

5   details about --

6              MR. BRODSKY:  It was public.

7              MS. SMITH:   -- the work that they have -- specific

8   work they had done certainly for a different client.  I am

9   just raising it.

10             MR. BRODSKY:  Your Honor, if you recall the

11  testimony, it was about 9.B, he was an in-house counsel there,

12  he knows exactly what's public and not public.  It's a public

13  company.

14             MS. SMITH:  It was Tanke --

15             MR. BRODSKY:  Tanke Biosciences was also public.  It

16  went public.  There's public information about Katten's

17  representation.  So I don't understand where the objection is

18  coming from here.  There's public information, for example,

19  Winklevoss twins and what they did on Bitcoin, and I have

20  documents to --

21             THE COURT:  What the firm did for the Winklevoss

22  brothers, I think --

23             MR. BRODSKY:  That's public, too.

24             THE COURT:   -- the attorney that was here earlier

25  made objections when there was more detailed discussions,

SIDEBAR

1   about the nature of the work.

2           MS. SMITH:  It's fine.  If you want to --

3           MR. MASTRO:  It was when I got into doing trust and

4   estate work them individually.  There wasn't an objection to

5   talking about them doing Bitcoin work for the Winklevoss.

6           MR. BRODSKY:  It was public.

7           THE COURT:  No, I am just saying that we had a

8   representative here earlier, in the back row, who did make

9   objections from time to time.  So just be mindful of when

10  those occurred and try to --

11          MS. SMITH:  I assume Mr. Brodsky discussed it with

12  Katten what the limits are for this kind of questioning.  So

13  we have had those discussion with our witnesses, so.

14          MR. BRODSKY:  Your Honor, respectfully, may I ask --

15          THE COURT:  Did you have discussions with the

16  attorney for Katten who was here earlier?

17          MR. BRODSKY:  I informed -- I spoke to Mr. Verde.  I

18  informed Mr. Verde the government had -- when he had made an

19  objection about clients, I told Mr. Verde in response, I had

20  asked him to make less redactions to the company.  He said he

21  did not want to make less redactions to the client list.  So I

22  respected that.  I then informed him the government had

23  admitted a list of clients.  He was surprised by it and said

24  the government had not informed him they were doing that, and

25  he was a little bit bothered by it, but he said he understood

SIDEBAR

1    that it is already in evidence.  And I told him I was not

2    going to elicit any testimony about specific transactions with

3    any specific clients, and he said fine.

4          I said, what I was going to do was with the use of

5    the compensation memos, to the extent Mr. Jacobs was generally

6    familiar with them since he had seen them, I was not going to

7    mention any client names, I was going to say, do you know

8    whether this was an asset management -- what type of client

9    this was.  Don't tell us the --

10         THE COURT:   Work.

11         MR. BRODSKY:  The work.

12         MS. SMITH:   Okay.

13         MR. BRODSKY:  Your Honor, since we are at sidebar,

14   can I take advantage of the fact that we are here and ask you,

15   I elicited that the specific time period was the middle of

16   2013.  He was asked a specific question relating Retrophin on

17   the restatement.  We know from Mr. Jain's testimony that it

18   was in the July 2013 time period that the restatement issue

19   had come up, might have been June, but definitely by July of

20   2013.  So squarely within the admissible time period the

21   restatement issue was coming up, Mr. Greebel was asking

22   questions about it.  It is relevant, and it is certainly

23   connected to the actual evidence in the case.  May I ask,

24   why -- why can't I elicit what Mr. Jacobs said to Mr. Greebel

25   about that?

8356

SIDEBAR

1           THE COURT:  Well, what I told you when we were here

2     last at the sidebar, that because you and the government had

3     differing views of what the Second Circuit allows and doesn't

4     allow on evidence that is hearsay being proffered for its

5     effect on the listener, that I was going to sustain all

6     hearsay objections going forward until I have an opportunity

7     to look at those cases.  That was the only reason why I

8     sustained it.  When she made an objection, she said it was

9     based on hearsay.  I would want to look at those cases.  I

10    don't want to make a mistake.

11          MR. BRODSKY:  I understand.

12          THE COURT:  And, you know, I will try to look at

13    those cases and see if we can reach a different result on my

14    ruling on the objection, as soon as I can, but I can't do it

15    right now, obviously.

16          MR. BRODSKY:  I thought the government's basis for

17    their objection was potential confusion of the issues and not

18    a particular date.  Here we have a particular date totally

19    related to Retrophin that's squarely within the restatement.

20    Even under any consideration of Second Circuit case law,

21    wherever you land, this is directly relevant and on point

22    without any 403 issues.

23          THE COURT:  I thought when I asked her the basis, I

24    thought she confirmed it was hearsay, and that's why I

25    sustained it.  If you want to re-think your objection --

8357

SIDEBAR

1          MS. SMITH:  We don't have a specific date.  He said

2   restatements generally, and what general circumstances

3   people --

4          THE COURT:  In connection with --

5          MS. SMITH:  Because he had a restatement, but to say

6   he brought the Retrophin restatements with him --

7          THE COURT:  I thought it was a 2013 date, wasn't it?

8          MS. SMITH:  Yes.

9          THE COURT:  Was it summer?

10          MS. SMITH:  Summer.

11          THE COURT:  In connection with Retrophin.  I mean,

12   that's --

13          MR. KESSLER:  Retrophin arises in August or very

14   late July.

15          MR. BRODSKY:  That's the summer.

16          MR. KESSLER:  If the statement is in June, it has no

17   relevance.  I mean, we know what the statement is -- if the

18   statement -- it is important in a restatement to make sure

19   XYZ, and XYZ has nothing do with this restatement, then, you

20   know, then it wouldn't be.

21          MR. BRODSKY:  Your Honor, the case law is not going

22   to change based on this, which is that their objection is that

23   it is not June, it could be June --

24          THE COURT:  That's --

25          MR. BRODSKY:  They are cutting it so finely, it'll

                              SIDEBAR

1    never be able to be admitted into evidence.

2              THE COURT:   It's close enough, temporal period, I

3    think it could be appropriate.  But, you know, you had made a

4    hearsay objection, so I just -- the effect on the listener may

5    be more appropriate in this case.

6              MS. SMITH:  I am going to continue to object, so,

7    because I still think this is --

8              THE COURT:   On every single one?

9              MS. SMITH:  It depends.  I don't know when exactly

10   it took place.  I don't know what the witness is going to say.

11   I don't know if he said restatements generally.  We talked

12   about settlement agreements generally.

13             THE COURT:  He said a restatement for Retrophin in

14   summer of 20 --

15             MS. SMITH:  Did you discuss restatements generally.

16   That was the next question.

17             MR. BRODSKY:  I will specify, Your Honor, in -- I

18   will ask directly following up to the summer of 2013, when you

19   were talking about a restatement in connection with Retrophin,

20   what did you say to Mr. Greebel?

21             THE COURT:  What I would like to do is this.  Just

22   ask --

23             MS. SMITH:  First, what questions did he ask, right?

24   Because --

25             THE COURT:  He did elicit that.

                  Annette M. Montalvo, CSR, RDR, CRR
                       Official Court Reporter

SIDEBAR

1          MR. BRODSKY:  I don't want it to be asked and

2     answered.

3          MS. SMITH:  That's my problem.

4          THE COURT:   It was a very general response.

5          But what I would like to ask the parties to consider

6     is to -- I understand your objection, and I think it is a

7     valid one, and I do want to look at the case law.  But if it

8     is fairly targeted and tied to the specific event in the

9     record, as that question was, I would just ask you to consider

10    withdrawing it.  I do think that we have had a series of

11    questions that -- you know, I gave you latitude, and I felt

12    like you tried to --

13         MR. BRODSKY:  Persuade you.

14         THE COURT:   -- enlarge it.  No, no.

15         MR. BRODSKY:  I didn't mean to enlarge it,

16    Your Honor.  I didn't mean to.

17         THE COURT:   I think it pushed the boundaries of

18    what I was trying to do in being lenient in terms of that

19    ruling.  But when you start to ask these general questions

20    that are extended over a temporal period of years, I just

21    think it is, without tethering it to something that's in this

22    case --

23         MR. BRODSKY:  I won't do that, Your Honor.

24         THE COURT:  Well, I would like to think that that

25    last -- I mean, the reason I did sustain the objection was

SIDEBAR

1    because I was very troubled by what had gone on, and I felt

2    the government would -- had not been able to respond to the

3    letter.  I am just looking up now to see whether you actually

4    even filed that letter.  I don't know that you have, but I

5    just think it is unfair, and it's unfair, as I said, not just

6    to the progress of this case, and it has an effect on

7    Mr. Greebel because it may require prolonging this trial and

8    losing jurors if Mr. Jacobs has to come back, but it's grossly

9    unfair to the government, and, frankly, in terms of my ability

10   to make what I think are the best sound rulings I can, it

11   makes it very difficult when you throw up a multi-page letter

12   at me at sidebar --

13            MR. BRODSKY:  Your Honor, we weren't --

14            THE COURT:  -- which should have been front-loaded

15   prior to trial.

16            MR. BRODSKY:  We were not planning on doing that,

17   actually.  We respected Your Honor's rulings yesterday.  We

18   thought it would continue.  The government, when they came

19   forward with the US v. Gupta case, we were thinking the

20   government would have a midnight filing or morning filing on

21   this.  And so we wanted this prepared in response.  We did not

22   intend to file it, unless the government came forward.

23            THE COURT:  The point is, it's fairly, narrowly

24   tailored and targeted to events yesterday, and this morning it

25   was wide open.  And that's why I think the objections --

8361

SIDEBAR

1        MR. BRODSKY:  Your Honor, I'll just submit the

2    restatements, and I will move onto the comp memos, and then I

3    will not go back to the other areas.  And I don't want to -- I

4    don't want to delay Your Honor's proceedings.

5        THE COURT:  It is all of our proceedings.

6        MR. BRODSKY:  All our proceedings.

7        THE COURT:  But --

8        MS. SMITH:  I am going to maintain my objection.  I

9    don't think I have specificity and I have no proffer of what

10   the witness is going to say.  I understand what ruling

11   Your Honor is going to make.  So that's where we are.

12       MR. KESSLER:  It's hard to evaluate the effect on

13   the listener without knowing what was said.

14       MS. SMITH:  Right.

15       MR. KESSLER:  To know if it could have a relevant

16   effect.

17       THE COURT:   Will you not give them a proffer?

18       MR. BRODSKY:  Repeatedly, Your Honor, I have

19   requested repeated proffers on all sorts of statements from

20   the government.  They came to sidebar, and they refused.  And

21   I noticed it.  I said, look.  I am asking for a proffer, and

22   they repeatedly refused.  And I feel like once they did that,

23   they set in motion that no party should be proffering what

24   their statements are, and I feel like it is a double standard

25   if the government is asking us to do something they were

SIDEBAR

1   refusing to do at our request.

2           MS. SMITH:  I am -- we are not going to get into it.

3   I think there's very different kind of landscape in terms of

4   what information we have about this witness and what

5   information defense had about their witnesses.  That is our

6   objection, without a further proffer.  I have to object, I may

7   seek to strike depending on what it is.

8           THE COURT:  I will maintain my ruling, and we will

9   just keep moving.

10          MR. BRODSKY:  Even with respect to the restatement

11  issue?  Because it is narrowly tailored, and it is directly

12  relevant to Retrophin.  It is the last one I would elicit, and

13  then I would move on to the comp memos.  And then I will move

14  on.

15          MS. SMITH:  Why don't you just proffer what the

16  witness would say, and if judge agrees that it is specific

17  enough, then we will do it, and she will overrule me.

18          THE COURT:  Or if I allow the question and it

19  appears to be --

20          MR. BRODSKY:  I know the risk of a strike.  I

21  believe -- I don't want to proffer, Your Honor, respectfully,

22  because he is 70-plus something years old, and, respectfully,

23  Your Honor, I have asked him questions, and I know you believe

24  he's very smart.  He is.  But when I have talked to him over

25  the last two years, I have noticed that on some days he does

SIDEBAR

1  remember events, and then on other days there are days that he

2  does not remember a particular event.

3          And I try to use the documents and the memos to

4  refresh his recollection, and that's why I went through the

5  comp memos hoping he would remember certain meetings.

6          THE COURT:  Why don't we continue with that line of

7  questioning, all right, and just because we are in the middle

8  of the --

9          MR. BRODSKY:  Comp memos.

10         THE COURT:   -- comp memos, and then if you want to

11  circle back and try again and lay a specifically tailored set

12  of questions for this witness, and I will make my ruling

13  depending on if the government objects or doesn't object.  I

14  am going -- if they don't object, we will hear from him and

15  if --

16         MR. BRODSKY:  The government's always going to

17  object.

18         THE COURT:  If they object -- well, they might.  If

19  they object and if I overrule it and he says something, then

20  you move to strike, I will consider that.

21         MR. BRODSKY:  Thank you.

22         (Sidebar conference ends.)

23         (Continued on the next page.)

24

25

JACOBS - DIRECT - MR. BRODSKY

1           (Open court.)
BY MR. BRODSKY:
2    Q    When we left last off, you were going to -- I had asked

3    you if you could identify the ones -- the clients listed in

4    Government Exhibit 123-3, which covers the period from

5    February 2012 to January 2013, which clients were your clients

6    at -- while you were at Katten.

7           Would you please identify them, generally.  I mean,

8    as best as you can remember.

9    A    You want the names?

10   Q    Yes.  They are in the record, if you can go

11   alphabetically and just identify them.

12   A    Alexander Capital.  John Bivona.  China Electronics.

13   Felix Investments.  LuxeYard.

14           THE COURT:   Sorry, what was that?

15           THE WITNESS:  LuxeYard.  L-u-x-e-Y-a-r-d.

16           Northlight Financial.  Redwood Fund.  Tanke

17   BioSciences.  I believe that's all of them.

18   BY MR. BRODSKY:

19   Q    And let me go back and ask you just in general the type

20   of client Alexander Capital was?

21   A    It was a small investment bank.

22   Q    And John V. Bivona, just an individual?

23   A    He was an individual, but he was chairman of that -- he

24   was an officer of that brokerage firm.

25   Q    A large brokerage firm or a small brokerage firm?

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

JACOBS - DIRECT - MR. BRODSKY

1    A    Medium, small.  On the small side.

2    Q    China Electronics Holdings?

3    A    China Electronics was a Chinese company that wanted to go

4    public in the United States.

5    Q    Felix Investments?

6    A    That was part of Alexander Capital.  They were the

7    brokerage firm.

8    Q    LuxeYard?

9    A    Was a company we were doing some transactions for.

10   Q    Northlight Financial?

11   A    It was a private equity company.

12   Q    Is this where Mr. Chris Jahrmarkt and Michael Jahrmarkt,

13   the people you talked about yesterday?

14   A    Yes.  Michael Jahrmarkt and Chris Jahrmarkt worked at

15   Northlight.

16   Q    Redwood?

17   A    Redwood was a small fund that did some financings that we

18   did work for them.

19   Q    Tanke BioSciences Corporation?

20   A    It was a Chinese company that wanted to go public in the

21   United States.

22   Q    If you scroll over on Tanke BioSciences, there's, under

23   write-offs, there's 64,962.  Column 1, 2, 3, 4, 5.  Do you see

24   that?

25   A    Yes.

JACOBS – DIRECT – MR. BRODSKY

1    Q    And do you have an explanation for the write off in

2    connection with Tanke BioSciences?

3            MS. SMITH:  Objection to relevance.

4            THE COURT:  Sustained.

5    BY MR. BRODSKY:

6    Q    What, in general, is a write-off, what does that mean, a

7    write-off?

8    A    Write-off is time you can't collect.

9    Q    Now, let me ask you to look at in your binder the comp

10   memo in tab 27, GX-121-3.

11   A    Okay.

12   Q    And if you would look at this, and it should be in front

13   of you, when you saw this draft, do you remember in general

14   looking at a draft of this memo prior to Mr. Greebel

15   submitting it on or about February 10, 2012?

16   A    I do.

17   Q    And directing your attention to -- I would like to direct

18   your attention to certain portions.  Please don't say what the

19   client's name is, and don't describe any specific transactions

20   in connection with the client.

21   A    Okay.

22   Q    The fourth bullet point there says:  I continued to

23   expand our relationship with, and it is blacked out, which is

24   the largest, blank, in the world.

25            In general, without mentioning the name, do you have

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

JACOBS – DIRECT – MR. BRODSKY

1    a general understanding of the type of client that was?

2    A    It's blacked out.  I'm not sure.

3    Q    Fair enough.

4         If you go to the next page, on page 2, at the top,

5    there's a discussion there of, "I helped Howard Cotton develop

6    a new relationship with," and there's a blank.  And then it

7    goes on to say, based on this relationship we represented,

8    blank, in their first, blank.  Blank has advised us that this

9    will be a new platform for them, they will be making similar

10   investments in fiscal 2013, and we will be counsel in such

11   transactions as well as the blank.  Walter Weinberg and Henry

12   Bregstein will be assisting us in forming the funds.

13        Do you have a general recollection of the nature of

14   the company that's being discussed there?

15   A    Yes, I do.

16   Q    And without saying the name, what is the type of company

17   that's being discussed there?

18   A    It is a very large investment bank.

19   Q    And by "investment bank," what do you mean?

20   A    Invest bank that gives advice to clients, helps them

21   raise money, invests in transactions.  Just a large bank.

22   Q    When you say "large," what do you mean by "large"?

23   Multi-million dollar, multi-billion dollar, trillion dollar

24   bank?

25   A    Multi-billion.

JACOBS - DIRECT - MR. BRODSKY

1    Q    In the next paragraph there's a discussion, of our

2    representation of Chinese companies continued in fiscal 2012.

3    We completed our first transaction first quarter fiscal 2012,

4    and filed three registration statements in fiscal 2012.

5    Practice continues to be active, however, per the firm's

6    request, we have not developed additional Chinese clients

7    until.  And there's a blank there.

8             Without filling in the blank, do you have any

9    personal knowledge of the representation of Chinese companies?

10   A    Yes, I do.

11   Q    And how do you have that knowledge?

12   A    Well, I was retained to represent one of these Chinese

13   companies that wanted to go public, and I mentioned it before,

14   Tanke BioSciences.  Evan and I worked on that registration and

15   the other three registrations.  We went to the firm at this

16   point, and we wrote a memo to the management committee

17   requesting that we form a small group to do registrations

18   statements for Chinese companies.  And Evan and I would be in

19   that group, we would use other associates in the firm, and we

20   also requested the ability to hire someone who spoke Chinese,

21   which we eventually hired.

22   Q    The next paragraph talks about, as a result of my

23   long-standing relationship with the senior lawyer at, blank,

24   Karen Ash and I developed it as a client.  We currently

25   represent them in a variety of licensing matters, and I am

JACOBS - DIRECT - MR. BRODSKY

1    hopeful that in the coming years we will represent it in

2    additional matters.

3            Without, again, naming the client, do you have

4    knowledge of what particular client that is?

5    A    Yes, I do.

6    Q    And without, again, mentioning the name, what type of

7    client was it?

8    A    They were in the fragrance business.

9    Q    Was it a public company or a private company?

10   A    Very large public company, international company.

11   Q    The next paragraph says, despite the continued decrease

12   in corporate transactions during the last fiscal year, I

13   billed more than any other partner in our New York corporate

14   department.  I was one of the top billing corporate attorneys

15   firm-wide.

16           Based on your observations and personal experience,

17   do you know Mr. Greebel's billing at the New York corporate

18   department during this time?

19   A    Yes.

20   Q    And what was that -- what was the type of billing that he

21   did?  In other words, describe in general his -- whether this

22   was -- he was one of the top billing partners in the corporate

23   attorneys for what?

24   A    Well, I know for a fact he was one of the largest billers

25   in the corporate department, you know, firm-wide.  I know what

JACOBS - DIRECT - MR. BRODSKY

1    was being billed in New York, and I also knew what was being

2    billed in other offices.

3    Q    In the next paragraph there's, based on my strong

4    relationship with the active investor, he introduced us to a

5    private biotechnology company that retained us for a variety

6    of matters in fiscal 2013, including an equity financing

7    licensing agreements and a merger with a public company.

8         You have a general recollection of what that relates

9    to?

10   A    I knew he was doing activist work, but I'm not sure of

11   the individual person.

12   Q    Next it says, it also, blank, recently engaged us to do

13   blank and a blank.  Walter Weinberg is assisting in the blank,

14   and Jack Governale is assisting in the blank.  These funds

15   represent a new direction in blank's business and demonstrates

16   my efforts to expand our relationship with them.

17        Again, without describing the name of the client, do

18   you have a general understanding of what the -- of the nature

19   of the client?

20   A    I knew that client.  It was a small investment banking

21   firm that was setting up some funds onshore and offshore.  And

22   Evan and I made a presentation to them when we brought them

23   into the firm as a client.

24   Q    Approximately when did you make this presentation?

25   A    Sometime in, I think, 2012.

JACOBS – DIRECT – MR. BRODSKY

1    Q    This memo is dated February 10, 2012.  Is that --

2    A    Oh, would have been 2011.

3    Q    The next paragraph says, describes the hours on -- you

4    know, in addition to my billable hours, I spent approximately

5    1,100 hours on client development and preparing and presenting

6    the firm's roundtables, attending seminars and conferences,

7    and following up with the breakfast, lunch, or dinner

8    meetings.  As I anticipated and advised the firm in February

9    2011, my billings in fiscal 2012 were consistent with my

10   performance in fiscal 2011, and I generated more business.

11           Are you familiar, based on your observations and

12   work with Mr. Greebel, as to the client development and

13   roundtables that Mr. Greebel participated in?

14   A    I was.

15   Q    Describe in general that, based on your observations and

16   your work with Mr. Greebel?

17   A    Mr. Greebel did an amazing amount of client development

18   work with marketing, meeting with clients, lunches, dinners,

19   breakfast.  Half his time in his life I think was going around

20   to meet clients, and he did a terrific job.  And he set up

21   these roundtables, where they would have people coming in and

22   talking to the firm, and he would talk to them.  And he did a

23   lot of work in this area, which was nonbillable.

24   Q    And by nonbillable, what do you mean by that?

25   A    The firm did not get paid for his time.  It was his time

JACOBS - DIRECT - MR. BRODSKY

1    that he was spending on his own, on behalf of the firm.

2    Q    The last paragraph says, based upon the new client

3    relationships that I have developed or significantly assisted

4    in developing revenue I generated and hours billed, I believe

5    that I should receive a significantly higher bonus than last

6    year and a significant increase in base salary.

7         Based on your experience on the equity partner

8    income compensation -- equity partner compensation committee

9    and your review of this memo in draft form, was this statement

10   similar or dissimilar to what other people wrote in their

11   memos?

12   A    I would say it is similar to about 90 percent of the

13   lawyers in the firm.

14   Q    May I ask you to turn to government -- your next tab.

15   For you it is tab 28, which is Government Exhibit 121-5, in

16   evidence.

17   A    That's February 2013?

18   Q    Yes.

19   A    I'm there.

20   Q    Okay.  Let me direct your attention to a few of the --

21   did you review this draft memo prior to Mr. Greebel submitting

22   it on or about February 8, 2013, in Government Exhibit 121-5?

23   A    Yes.

24   Q    In the paragraph where it says, fourth bullet point down,

25   I continued to expanded our relationship with, blank, and

JACOBS - DIRECT - MR. BRODSKY

1    revenue derived from it increased to approximately $445,000,

2    which represented a 250 percent increase from the prior year.

3              Again, without mentioning the client's name or any

4    specific transaction, would you describe generally, if you

5    know, what this related to?

6    A    I think I know that client.

7    Q    And what -- without naming the client, please, what --

8    generally, the type of business the client was in, if you

9    know.  If you don't, please don't guess.

10   A    I won't.

11             I believe it was an exchange that -- a stock

12   exchange that had been set up to trade in non -- unrestricted

13   stock -- restricted stock.  I'm sorry.

14   Q    And the next bullet point, it says, I significantly

15   strengthened our relationship with a, blank, which resulted in

16   them moving significant portions of their work to us from

17   Ropes & Gray.

18             Do you see that?

19   A    Yes.

20   Q    Are you familiar with -- again, without naming the

21   specific client, are you familiar with that client?

22   A    Yes, I am very familiar.

23   Q    What type of client was it?

24   A    It was a private equity firm.

25   Q    And are you familiar with the name Ropes & Gray?

JACOBS - DIRECT - MR. BRODSKY

1    A      Yes.

2    Q      What is Ropes & Gray?

3    A      Ropes & Gray is a large law firm, has its main office in

4    Boston, I believe, but it is all over the world.

5    Q      And do you know from personal knowledge whether or not

6    Mr. Greebel significantly strengthened the relationship with

7    this client?

8    A      He definitely strengthened the relationship.

9    Q      Do you know whether or not from personal knowledge it

10   resulted in them moving significant portions of their work to

11   Katten from Ropes & Gray?

12   A      Yes, I know.

13   Q      And moving to the next bullet point, it says, I

14   significantly strengthened our relationship with a, blank, and

15   the client advised that we will receive a vast majority of the

16   their deals.

17          Do you know -- without -- again, without naming a

18   specific client, do you know the nature of that client?

19   A      I am not sure on that one.

20   Q      The next paragraph talks about, Howard Cotton and I

21   continue to expand relationship with, blank.  And he mentions

22   Walter Weinberg and Henry Bregstein.  Is that the same client,

23   the investment bank that you talked about --

24   A      Yes.

25   Q      -- in connection with the last memo?

JACOBS - DIRECT - MR. BRODSKY

1          At the top, on page 2 of Government Exhibit 121-5 in

2     evidence, it says, I was the lead corporate partner on a,

3     blank, on which we were initially retained by the, blank, and

4     subsequently retained by, blank.  Our subsequent retention was

5     because they were very impressed with our work product, and

6     when the deal changed, they had the opportunity to retain us.

7     I also -- I was also the lead corporate partner on the blank,

8     which was originated with Steve Eckhaus.

9          Are you, again, without naming the specific client

10    or the nature of the transactions, would you describe in

11    general -- are you familiar with the name of the -- the nature

12    of the client?

13    A    I was -- I remember the transactions, but I don't

14    remember what those companies did that he was retained on.

15    Q    Do you remember the type of company it was, whether it

16    was a large company or a small company?

17    A    They were both large companies, but I don't remember

18    their names, and I don't remember what they did.

19    Q    The next paragraph refers to, Howard Jacobs and I were

20    referred to, blank, to, blank, in connection with, blank.  And

21    it mentions Jack Governale, assisted us in the, blank, and

22    Kathleen Moriarty and Peter Shea will be assisting us in the,

23    blank.

24         Again, are you familiar with, have personal

25    knowledge of the nature of that matter, without naming a

JACOBS – DIRECT – MR. BRODSKY

1  specific client?

2  A    I am.

3  Q    What type of client was it?

4  A    This was a small investment bank that was starting to set

5  up funds onshore and offshore in order to raise money to make

6  investments in other companies.

7  Q    Is this the same that you were referring to in a prior

8  compensation memo?

9  A    Yes.  But here they were expanding their business.  We

10  had never done work for them in this area, but Evan and I made

11  a presentation to them, I would say primarily Evan, but we

12  made a presentation to them about our ability to do fund work.

13  And they retained us, even though they had never done work

14  with us in this particular area.

15  Q    And the next paragraph says, due to my long-standing

16  relationship with the founder and CEO of, blank, we were

17  retained to, blank.  This new business for, blank, has been so

18  successful that the, blank, and refers to Jack Governale and

19  the relationship.

20        What -- do you have a general recollection of what

21  the nature of this client was?

22  A    No.

23  Q    There's, in the next paragraph, a statement of, I billed

24  approximately 150 hours in writing a chapter which will appear

25  in Mergers and Acquisitions Law 2013, by Aspatore Books, a

JACOBS – DIRECT – MR. BRODSKY

1    Thompson Reuters business, as well as writing To Our Client

2    memoranda on developments of the JOBS Act and recent

3    bankruptcy developments that affect M&A transactions.

4              Are you familiar with Mr. Greebel's work in writing

5    that chapter and doing that writing on To Our Client

6    memoranda?

7    A    I am.

8    Q    What do you know about that?

9    A    Just know that he worked on that, that article.  It

10   appeared in that book.  Other an that, I don't know too much

11   about it.

12   Q    And are you familiar with To Our Client memoranda, what

13   that relates to?

14   A    Yes, we -- the corporate department, I believe, had a

15   memo, a little newsletter that we used to send out to clients.

16   The JOBS Act was adopted by Congress, and Evan wrote an

17   article about it at that time.

18   Q    The paragraph where it says, few paragraphs down, I am a

19   member of the board of directors of the New York chapter of

20   ACG, an organization of investment funds, and was asked to be

21   on the nominating committee to help and identify and select

22   future officers and board members.

23             Are you familiar, in general, with that chapter,

24   that organization?

25   A    Yes.

JACOBS - DIRECT - MR. BRODSKY

1    Q     What is that organization?

2    A     Pretty clear, an organization of investment funds, and it

3    was -- he was asked to do these things.  He was active in that

4    chapter.

5    Q     Would you turn to the next tab, 29, Government Exhibit

6    121-7.

7    A     Can I just go to the last paragraph in that memo?

8    Q     Sure, I'm sorry.  Yes, please.

9    A     This was very important for the New York corporate

10   department as well.  Evan and David Landau were the assigning

11   partners in the corporate department, so they determined who

12   got the work, who did the work, and by doing that, he also was

13   able to mentor a lot of the younger people in the firm.  And

14   they both ran that department, the assigning group for a

15   number of years.  Took a lot of time.  I'm sorry.

16   Q     No.

17         Paragraph -- tab 29, if would you go to Government

18   Exhibit 121-7 in evidence.

19   A     Okay.

20   Q     Looking at this memoranda, did you review a draft of this

21   prior to Mr. Greebel submitting it on or about February 7,

22   2014?

23   A     I did.

24   Q     And I would like to direct your attention to the third

25   bullet point, where it says, I started our firm's virtual

JACOBS - DIRECT - MR. BRODSKY

1    currency practice, which resulted in Katten being named, for

2    the first time, one of the Financial Times US Innovative

3    Lawyers.

4              Are you familiar with that virtual currency

5    practice?

6    A    I am.

7    Q    What -- based on your personal knowledge, what do you

8    know from the firm's virtual currency practice in leading up

9    to February 27, 2014?

10   A    The firm had no virtual currency practice in 2013, until

11   Evan found that the Bitcoin company, the Bitcoin currency, was

12   going to be immense.  And he studied up on it, read up on it,

13   met people on it, discussed it, and he was the virtual

14   currency practice in the firm.  And he became an expert way

15   before anyone was talking a lot about Bitcoin, which was, I

16   think, hit 15,000 this morning.  This was a nondescript

17   currency in 2013, and it is amazing how much of an expert he

18   became in a short period of time.

19   Q    In two paragraphs below that, it says, we created the

20   first, blank, and are working with, blank, to develop, blank,

21   which will be -- they will be debuting over the next 9 to 12

22   months.

23              Are you familiar with that client?

24   A    Yes.

25   Q    And what are you familiar with there?

JACOBS — DIRECT — MR. BRODSKY

1  A    They were involved in the Bitcoin business, they were

2  going to set up an exchange.  Evan was working with them and

3  working with the entities in New York to try to get this

4  exchange passed.  And I believe over a period of time it

5  eventually did become exchanged, but this was kind of early on

6  in the Bitcoin currency time.

7  Q    And was there -- do you remember the public press

8  relating to Katten Muchin's involvement in the development of

9  this matter in that bullet point?

10  A    This was the first time I think we were ever mentioned in

11  one of these financial newsletters.  And they came and they

12  interviewed Evan, and they published a major article about him

13  and this currency.  It was -- it was an amazing article.

14  Q    And what client, was it public, which client it related

15  to?

16  A    I don't know if it was current -- I don't know if it was

17  public.

18         MR. BRODSKY:  Let me -- may I approach, Your Honor?

19         THE COURT:  Yes.

20  BY MR. BRODSKY:

21  Q    DX-201-2, showing you DX201-2 for identification, and if

22  you can turn to the newspaper article, which I will mark

23  DX-201-3.

24         If you look at the newspaper article first, 201 --

25  DX-201-3, was -- does this refresh your recollection as to

JACOBS - DIRECT - MR. BRODSKY

1    whether in or about July 2013 it was public that Katten Muchin

2    was selected to -- was representing this client?

3    A    I don't think I have the newspaper article.  What -- is

4    it 201-3?

5    Q    Yes.

6    A    Okay, I have that.

7    Q    201-3.

8    A    Yes.  Those are the two brothers that he was

9    representing.

10   Q    Does it -- which brothers were they?

11   A    The Winklevoss brothers.  They're known because they

12   indicated that they cofounded Facebook with Mark Zuckerberg,

13   there was a lawsuit.  They eventually settled, and they left

14   Facebook.

15   Q    And do you know, based on your personal knowledge at

16   Katten, in February of 2014, whether this was significant or

17   insignificant at Katten Muchin?

18            MS. SMITH:  Objection, Your Honor.

19            THE COURT:  You will have to rephrase your question.

20   BY MR. BRODSKY:

21   Q    Do you know whether or not Katten Muchin's representation

22   of the Winklevoss twins in connection with starting this

23   exchange traded fund for Bitcoin was significant or

24   insignificant for the law firm of Katten Muchin at this time?

25            MS. SMITH:  Objection, Your Honor.

JACOBS - DIRECT - MR. BRODSKY

1          THE COURT:  I think the form of the question; is

2   that correct?

3          MS. SMITH:  Yes.  And also speaking for the firm.

4          THE COURT:  I think what you could do, Mr. Brodsky,

5   is try to rephrase your question.

6          MR. BRODSKY:  Sure.

7   BY MR. BRODSKY:

8   Q    In your role at Katten in February of 2014, you were on

9   the billing and collections committee, correct?

10  A    Yes.

11  Q    And what other -- did you have any other position of

12  responsibility at Katten at that time?

13  A    No.

14  Q    From your perspective, from your personal observations,

15  what did -- what was your view as to the significance or

16  insignificance of the fact that there was public disclosure at

17  Katten Muchin was selected to represent the Winklevoss

18  brothers for plans for an exchange traded fund for Bitcoin?

19          MS. SMITH:  Objection to relevance, Your Honor.

20          THE COURT:  Overruled.  You can answer the question.

21          THE WITNESS:  This was a major accomplishment in the

22  firm.  First of all, the Winklevosses were very large

23  investors in a number of other companies.  For them to retain

24  Evan to represent them was a major coup for Evan and the firm.

25  We've never gotten anywhere near this.  And this was really

JACOBS - DIRECT - MR. BRODSKY

1    early on in the Bitcoin world.  And it was just starting.  And

2    it just shows what a role he played in the developing this

3    virtual currency with the firm and being an expert outside of

4    the firm.

5    Q    Let me direct your attention to the bottom of the page on

6    Government Exhibit 121-7, where it says, as a result of our

7    work on virtual currencies, we are the leading legal thought

8    leader in the space.  I have been interviewed twelve times by

9    national periodicals, including the Wall Street Journal, the

10   New York Times, Wired, and The Deal, and was quoted in

11   articles with the firm identified at least five times.

12   Kathleen Moriarty has also been interviewed repeatedly in

13   connection with our work on virtual currencies, and we have

14   received inbound calls from potential clients due to the press

15   coverage that we have received, end quote.

16            Are you familiar with the articles that were

17   published in connection with the virtual currency work?

18   A    I saw some of them, yes.  I am familiar with them.

19   Q    And from your observations, was this significant or

20   insignificant at the time in early 2014?

21            MS. SMITH:  Objection, Your Honor.

22            THE COURT:  Sustained.  Rephrase.

23   BY MR. BRODSKY:

24   Q    From your perspective and your observations, what, if

25   any, effect did this have on Katten Muchin in or about 2013

JACOBS - DIRECT - MR. BRODSKY

1    through February 7, 2014?

2            MS. SMITH:  Objection, Your Honor.

3            THE COURT:  I think the question should be

4    rephrased.

5            MR. BRODSKY:  Sorry.  Struggling with my form today.

6            THE COURT:  Just look at your question or think

7    about your question, and just -- you need to be more -- you

8    have -- need to be more specific.

9    BY MR. BRODSKY:

10   Q    From your personal perspective, based on your

11   observations at the firm of Katten Muchin, what was your view

12   regarding the publication of interviews of Evan Greebel and

13   Kathleen Moriarty in connection with the virtual currency

14   work?

15           MS. SMITH:  Objection to relevance.

16           THE COURT:  I will overrule that objection.

17           You may answer that question.

18           THE WITNESS:  This was really major for the firm.

19   It was early on the virtual currency.  No one knew about it.

20   Evan had learned about it.  He was interviewed.  He brought

21   our firm out -- it was marketing material by doing these

22   articles in these different papers, and writing articles, and

23   just being out there.  This was a major accomplishment for

24   Evan at this time.

25   BY MR. BRODSKY:

JACOBS - DIRECT - MR. BRODSKY

1    Q    If you look at 121-7, let me ask you one further question

2    on this page.  Where it says, due to my relationship with the

3    CEO of Retrophin, Inc., a Nasdaq-listed company, we are their

4    designated counsel for our corporate, litigation, and

5    licensing matters.  As such, Howard Cotton and Michael Gordon

6    are representing Retrophin in three commercial litigations,

7    and Jim Calder is representing Retrophin in a major antitrust

8    lawsuit that initiated in federal court.

9         Do you have any personal knowledge as to --

10   withdrawn.  Before I get to that.

11        Who is or at this time was Howard Cotton and Michael

12   Gordon at the law firm of Katten Muchin?

13   A    Howard Cotton was a senior litigating partner, and

14   Michael Gordon was an nonequity litigation partner.

15   Q    And do you have any personal knowledge of the three

16   commercial litigations that -- where Mr. Cotton and Michael

17   Gordon were representing Retrophin?

18   A    I have no personal involvement in any of those

19   litigations.  I do know that there were --

20        MS. SMITH:  Objection, Your Honor.

21        THE COURT:  Sustained.

22        MR. BRODSKY:  The Court sustained, not the "I have

23   no personal knowledge," I take it, Your Honor?

24        THE COURT:  Well, that's the end of the answer.

25        MR. BRODSKY:  Okay.

JACOBS – DIRECT – BRODSKY

1    DIRECT EXAMINATION (Continued)

2    BY MR. BRODSKY::

3    Q    With respect to Jim Calder's representing Retrophin in a

4    major antitrust lawsuit that is initiated in federal court,

5    who was Jim Calder at this time in February 2014?

6    A    He was a senior partner in the federal trade commission

7    type of work and antitrust work.

8    Q    On the next page of Government Exhibit 121-7, there's --

9    in the third paragraph it mentions your name and says, Howard

10   Jacobs and I strengthened our relationship with blank and

11   worked on blank last year.  They've advised us that we will be

12   receiving a significant number of their deals going forward.

13   Howard has been transitioning the client to me.

14              Are you familiar with that client?

15   A    Yes.

16   Q    And what is the nature of that client?

17   A    It's a private equity firm.

18   Q    And what -- and do you have personal knowledge of whether

19   or not you were transitioning that client Mr. Greebel?

20   Obviously a personal -- well, withdrawn.

21              Were you transitioning that client to Mr. Greebel at

22   this time?

23   A    I was.

24   Q    And it makes a statement, They have advised us they will

25   be receiving a significant number of the deals going forward.

JACOBS – DIRECT – BRODSKY

1    Do you have personal knowledge as to whether or not

2 this client advised you and Mr. Greebel that the firm would be

3 receiving a significant number of their deals going forward?

4 A    Right, they actually told us that they were going to give

5 us many more deals going forward.

6    (Exhibit published.)

7 Q    Okay, finally moving to the next one, Government

8 Exhibit 121-9, did you see a draft of this before Mr. Greebel

9 submitted it on or about February 6, 2015?

10 A    To the best of my recollection, I saw it.

11 Q    Now, let me ask you to go back to the discussion with

12 Mr. Greebel on the topic of a restatement.

13    In connection with that discussion of a restatement

14 in the summer of 2013, in connection with Retrophin, do you

15 remember where you were having this conversation with

16 Mr. Greebel?

17 A    It was either my office or his office.

18 Q    And what do you recall telling Mr. Greebel with respect

19 to a restatement in connection with Retrophin in the summer of

20 2013?

21    MS. SMITH:  Objection.

22    THE COURT:  I'll overrule the objection.

23 A    Can you just repeat that.

24 Q    Yes.

25    What do you recall telling Mr. Greebel regarding a

JACOBS – DIRECT – BRODSKY

1    restatement in connection with Retrophin in the summer of

2    2013?

3    A    It was my view that the accountants would usually come

4    forward and say whether or not you had to do a restraint of

5    financial statements.

6         I indicated that my thought process was you should

7    try to convince the accountants that a restatement was not

8    necessary.  But barring that, if a restatement had to be done,

9    it was really up to the accountants and the chief financial

10   officer.  And, therefore, if they were recommending it, you

11   probably had to do it.

12   Q    And did you explain to Mr. Greebel why he should try

13   convince the accountants that a restatement was not necessary?

14        MS. SMITH:  Objection to leading.

15        THE COURT:  Overruled.

16        This is with regard to this particular restatement.

17        THE WITNESS:  Yes.

18        THE COURT:  Okay.

19   Q    Yes, in connection with a restatement relating to

20   Retrophin in the summer of 2013, during your conversation with

21   Mr. Greebel, did you tell Mr. Greebel your view as to why he

22   should try to convince the accountants that a restatement was

23   not necessary?

24   A    My view was --

25        MS. SMITH:  Objection to the question.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

JACOBS - DIRECT - BRODSKY

1       THE COURT:  The question is --

2   A    It was my view.

3            I'm sorry.

4            MR. BRODSKY:  I'll ask a more precise question.

5   Q    Mr. Jacobs, in the summer of 2013, in connection with

6   your conversation with Mr. Greebel relating to a

7   restatement -- relating to Retrophin, during that

8   conversation, did you tell Mr. Greebel why you believed he

9   should try to convince the accountants that a restatement was

10  not necessary?

11  A    Yes.

12  Q    What did you say to him in this conversation?

13           MS. SMITH:  Objection, Your Honor.

14           THE COURT:  I will give the instruction.

15           This line of questioning regarding what Mr. Jacobs

16  told Mr. Greebel on the issue of a restatement for Retrophin

17  in the summer of 2013 is not being offered for the truth, it's

18  being offered to show the effect of the statement on the

19  recipient or the listener.

20  Q    Do you need me to restate the question, Mr. Jacobs?

21  A    Sure.

22           MR. BRODSKY:  Would you mind reading it back.

23           (Whereupon, the record was read.)

24  Q    In the summer of 2013 in connection with the restatement

25  relating to Retrophin, what do you say to Mr. Greebel about

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

JACOBS - DIRECT - BRODSKY

1    why you believed he should try to convince the accountants

2    that a restatement was not necessary?

3    A     If you do a restatement, you're actually restating the

4    financial statements that the company's filed in their reports

5    with the SEC.  And, therefore, if you restate them, it usually

6    comes out that either business, revenue, or profits are not as

7    good as they were and, therefore, it would affect the stock

8    price of the company's outstanding trade and stock, which may

9    lead to potential stockholders lawsuits saying that if they

10   knew knows facts they wouldn't have bought the stock, and it

11   usually has some effect on the stock and the reputation of the

12   company.  Although many large companies have done

13   restatements.

14   Q     And in that same conversation, did you tell Mr. Greebel

15   that --

16              MS. SMITH:  Objection to leading.

17              THE COURT:  Sustained.

18   Q     You had mentioned that -- in this conversation that you

19   told Mr. Greebel if the auditors insisted on a restatement,

20   you should do -- you should agree.

21   A     Yes.

22   Q     Did you, in this same conversation, explain to

23   Mr. Greebel -- tell Mr. Greebel why you believed that if the

24   auditors insisted on doing a restatement, he should agree?

25   A     It's basically --

JACOBS – DIRECT – BRODSKY

1    Q    The first question is yes or no.

2    A    Yes.

3    Q    And what did you say to Mr. Greebel?

4    A    Thank you.

5         Well basically it's the company's financial

6    statements, the accountants are only auditing.  But if the

7    auditors want to restate it, you have no choice but to restate

8    it.

9         Usually what happens is an accountants --

10        MS. SMITH:  Objection to what usually happens.

11        THE COURT:  Yes, this is just did you tell

12   Mr. Greebel all of this.

13        THE WITNESS:  Yes.

14        All right, then he can convey what it was he was

15   explaining to Mr. Greebel about why he should follow the

16   accountant's advice.

17   Q    Mr. Jacobs, limit your answer not to just generally, but

18   to what you told Mr. Greebel in the summer of 2013 when you

19   were explaining why he should agree with the auditors if they

20   insist on a restatement.

21   A    It's hard to put into words, but let me just say that I

22   just told him do it.  If the auditors wanted it, do the

23   restatement.

24   Q    Now, before I finish up, Mr. Jacobs, I forgot to ask you.

25        Did we -- since your testimony, have you and I

Case 1:15-cr-00637-KAM   Document 513   Filed 01/10/18   Page 86 of 305 PageID #: 14661

1    spoken?

2    A    Yes.

3    Q    Since yesterday?

4    A    Yes.

5    Q    How many occasions?

6    A    Just once.

7    Q    And when was the occasion that we spoke?

8    A    This morning.

9    Q    How long did we speak?

10   A    Ten minutes.

11   Q    And let me ask you the following:

12        You had testified that the firm had come to you to

13   transition your work, your practice to Mr. Greebel.

14        Do you remember whether they came to you on one

15   occasion, two occasions, or more than -- more than two

16   occasions to do this?

17   A    Two occasions.

18   Q    When was the -- approximately when was the first

19   occasion, to the best of your recollection?

20   A    First occasion was in April of 2013.  It might be March.

21   March or April of 2013.

22   Q    And when was the -- approximately when was the second

23   occasion?

24   A    February, March, or April 2014.

25   Q    And what -- were you, in fact -- well, what, if anything,

JACOBS – DIRECT – BRODSKY

1   were you doing to transition your practice to Mr. Greebel in

2   2013 and 2014?

3   A    I introduced Evan to all of my clients, all of the people

4   that I've done business with over the years.  We did a lot of

5   a marketing together so that we can develop business for him

6   going forward.

7            I was supposed to retire from the firm, and

8   basically the firm came to me and said you can stay on for

9   another year if you transition your entire practice to Evan.

10  Which I agreed to do.

11  Q    What did you do to do that?  Besides -- in addition to

12  introducing Mr. Greebel to the clients.

13  A    I introduced -- I went to marketing meetings with him.

14  That's what I did.  I introduced him to all my clients, my

15  friends, everyone that we had done business with over the

16  years.  Even people Evan didn't know at that time.  I took him

17  to these meetings.  I introduced him.  Told the people that I

18  was retiring and they should use Evan.  It was -- I did as

19  much as I could to get all my clients and friends to use Evan

20  going forward.

21  Q    And what was the result of those meetings and those

22  marketing meetings with Mr. Greebel?

23  A    Almost everyone that we met agreed to use Evan.  All my

24  clients, especially Northlight, which was my largest client,

25  agreed to use Evan if I was there or not.

JACOBS – DIRECT – BRODSKY

1    Q    Based on your observations, were there times when

2    Mr. Greebel -- you had described a situation where

3    Mr. Greebel, with respect to a particular company Mr. Greebel

4    told you not to do work for that -- not doing work for that

5    company moving forward.

6             MS. SMITH:  Objection to the question.

7             THE COURT:  Try to -- I think you need to rephrase

8    that question.

9             MR. BRODSKY:  Okay.

10   Q    In connection with your testimony yesterday on the

11   reverse merger for Tanke BioSciences.

12            Do you remember your testimony related to that?

13   A    I do.

14   Q    And do you remember your testimony in connection with

15   Mr. Greebel's recommendation that because the financial

16   statements were not satisfactory to him, he recommended not

17   moving forward with that client?

18   A    I remember that.

19   Q    Was there any other situation that you remember when you

20   were working with Mr. Greebel where Mr. Greebel had a similar

21   recommendation to you?

22   A    Yes.

23   Q    Please describe that.

24            THE COURT:  Without naming the client.

25            MR. BRODSKY:  Without naming the client.

JACOBS – DIRECT – BRODSKY

1           THE COURT:  Or the work.

2    A    It was a client that was doing payday loans and auto

3    loans.  We were requested to represent the investors.

4           MS. SMITH:  Your Honor, at this point can we have a

5    very brief sidebar?

6           THE COURT:  Yes.

7           Would you like a break?

8           THE JURY:  Yes.

9           THE COURT:  Thank you.  You can all take a break.

10          (Jury exits the courtroom.)

11

12          (Continued on the next page.)

13          (Sidebar conference.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1        (The following occurred at sidebar.)

2        THE COURT:  All right, have a seat.

3        MS. SMITH:  Your Honor, I just wanted to bring to

4   the Court's attention that Mr. Brodsky was testifying about or

5   asking questions about Biosciences was not actually elicited

6   yesterday.  It took me a minute to find it in the transcript.

7   The testimony was about what Mr. Greebel said in connection

8   with the Tanke BioSciences reverse merger and it was struck as

9   hearsay.  It actually was not elicited.

10       So Mr. Brodsky just asked a question about something

11  that was testified to yesterday about stopping a reverse

12  merger being submitted in the financials, and that was not

13  actually elicited yesterday, it was struck as hearsay.

14       MR. BRODSKY:  I'll go back to the record, Your

15  Honor, I remember --

16       THE COURT:  Why don't you look at the record.  Let's

17  not argue until we come back.

18       MS. SMITH:  It's transcript page 8195.

19       I believe the testimony was talking about the

20  reverse merger for Tanke BioSciences.  And the witness said,

21  Evan and I tried to track down the answers to those questions.

22  We were unable to do it and Evan came to me and said, since we

23  can't do this, and I said objection to hearsay.  You sustained

24  it.  And then the rest of the testimony was:  The SEC gave us

25  comments.  The comments were too hard to track down.  We

SIDEBAR CONFERENCE

1   decided not to go forward with that transaction, but nothing

2   about what Mr. Greebel said or recommended in connection with

3   that transaction.

4           MR. BRODSKY:  I can go back and quote, Your Honor,

5   we decided not to go forward with it.  But I believe that

6   before I can go back and elicit that's what Mr. Greebel

7   recommended --

8           MS. SMITH:  That was the hearsay that was not

9   permitted.

10          THE COURT:  That was objected to.

11          MS. SMITH:  And I'm just concerned now that that

12  statement that was not elicited originally is now embedded in

13  Mr. Brodsky's question, as if it was actually testified to.

14          MR. BRODSKY:  If may I take a moment, Your Honor, to

15  look at the transcript.

16          THE COURT:  Sure.

17          The question that the Government is objecting to was

18  the question that said, today just now:

19          Do you remember your testimony in connection with

20  Mr. Greebel's recommended statement.

21          Strike that, I'm just having trouble with the page.

22          (Pause.)

23          MR. BRODSKY:  Your Honor, I think nothing was

24  stricken, but on page 8195 the answer to the question was not

25  stricken.  Ms. Smith objected to hearsay after the following

SIDEBAR CONFERENCE

1    came out, and Your Honor said, No hearsay, sir.  And the

2    witness said, Excuse me?  And the Court said, No hearsay may

3    be conveyed.  Okay.

4          So what's in the record not stricken is the

5    following question and the following answer on 8195, 17 to 25.

6          "QUESTION:  What happened with respect to the

7    relationship, the firm relationship, with Tanke BioScience?

8          "ANSWER:  We did a reverse merger.  We worked on a

9    registration statement.  We filed with the SEC.  With the SEC.

10   The SEC came back with significant financial comments.

11   Comments about the financial statements contained in the

12   registration statement.  Evan and I tried to track down the

13   answers to those questions.  We were unable to do it and Evan

14   came to me and said since -- and since said we can't do this."

15         MS. SMITH:  Yes, and the fact that I objected after

16   that first "Evan said since we can't do this," the objection

17   was to that testimony which came out before I can give an

18   objection.  Obviously my objection to hearsay would strick if

19   Evan said since we can't do this.

20         MR. BRODSKY:  Whenever we've parties have moved to

21   strike, we move to strike.  I've been doing it and our team

22   has been doing it and so has the Government been doing it with

23   specificity.

24         And that is in the record along with the next

25   statement, which was not objected to on 8196, lines 10 to

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    15 -- 16:

2           By not going forward with the transaction with the

3    firm, law firm, what happened to the billings with respect to

4    the law firm?

5           "ANSWER:  We kept whatever we collected.  And we

6    were owed some money at the end of the transaction, but we

7    felt that it would be better not to go forward with the deal

8    then to go forward with it."

9           And that's in the record.  And so with all respect

10   to the Government, it's in the record that with respect to a

11   reverse merger on Tanke BioScience, Mr. Greebel did come to

12   him and said we can't do it, and the firm decided not to do

13   the deal and not to go forward.

14          MS. SMITH:  What Mr. Brodsky's question was that

15   since Mr. Greebel recommended we not do it, that's not in the

16   record.

17          MR. BRODSKY:  That's on line 8195, lines 24 to 25.

18          MS. SMITH:  It says, since we can't do this, not

19   Mr. Greebel recommended.

20          MR. BRODSKY:  The line before says, "Evan came to me

21   and since said since we can't do this."

22          MS. SMITH:  I mean I recognize that Mr. Brodsky is

23   using a technical loophole that I didn't specifically strike

24   that.  I will make sure I say "strike that" every single time

25   that a hearsay is improperly elicited.

SIDEBAR CONFERENCE

1          THE COURT:  I think that's the problem with the long

2     narrative answers, which is something we did discuss at

3     sidebar that the witness shouldn't -- because despite the fact

4     that he's a lawyer, despite the fact that he should understand

5     the hearsay rule, he keeps blurting out hearsay.

6          And so when it's out and there's an objection and

7     it's sustained, which I did sustain, it's rather unfair to say

8     I understand your point she didn't technically move to strike

9     it but I did sustain the objection because he did testify as

10    to hearsay.

11         And I think what -- I think you might be able to

12    cure this by rephrasing your question, not in terms of a

13    recommendation by Mr. Greebel but what you read later was that

14    the firm decided not to go forward.  Mr. Greebel said, "We

15    can't do this."  I don't know whether that's properly

16    characterized as a recommendation, a statement of his view,

17    whether that is something that Mr. Jacobs had -- whether had

18    he his own view, I don't -- the concern is the way you asked

19    the question this morning, it sounded like there's a

20    recommendation by Mr. Greebel and Mr. Jacobs decided to follow

21    it.

22         But as you have said over and over again, Mr. Jacobs

23    is the mentor, he's the partner who is -- the equity partner

24    who is bringing Mr. Greebel along and grooming him to be the

25    replacement for his client.  And so I think that the problem

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1   lies in your phrasing of the question this morning.  And I do

2   think that, yes, if there's an objection and it's sustained,

3   it means that the hearsay should have been excluded and --

4              MR. BRODSKY:  Your Honor --

5              THE COURT:  -- whether we start interrupting the

6   record any further to strike as opposed now --

7              MS. SMITH:  Yes, Your Honor.

8              MR. BRODSKY:  Well, Your Honor, may I respond.

9              THE COURT:  You're speaking at the same time.

10             MR. BRODSKY:  I'm sorry.

11             THE COURT:  What were you saying?

12             MS. SMITH:  I haven't been -- frankly, I wasn't

13  watching the transcript closely enough to see that it actually

14  came out to strike, but I will just say "strike" in the future

15  if any word comes out of the witness' mouth before or after my

16  objection.  I'll just add it on.

17             MR. BRODSKY:  Your Honor, a few points.  One, I

18  believe that the statement is not hearsay, which is -- it's

19  not a recommendation, actually.

20             THE COURT:  Then you characterized it.

21             MR. BRODSKY:  I made a misstatement.

22             THE COURT:  That's my point.

23             MR. BRODSKY:  "Evan said we can't do this," in my

24  view is a commend.  It's not a hearsay statement, it is a, "we

25  can't do this."  That is not a hearsay statement.  It is I'm

SIDEBAR CONFERENCE

1   not doing it.  We're not doing it.  We can't do this.

2           I don't think that's a hearsay statement, and I

3   think it's admissible.  The rest of it might have been

4   potentially hearsay if he continued to describe what Evan said

5   to him.

6           Second, Your Honor, you know, that's all I want to

7   say.  What I will do, Your Honor, is just quote from the

8   transcript to be safe and not try to -- I was trying to

9   summarize prior testimony, and I agree I didn't summarize it

10  correctly.  So I should just quote from the testimony, which

11  is what I will do.

12          MS. SMITH:  Your Honor, the quote was since we can't

13  do this, not we can't do this, which is different.  But

14  Mr. Brodsky is leaving out the word "since," and so since we

15  are being careful about strikes, I'm going to ask for the

16  record that we strike the question that Mr. Brodsky said:  And

17  do you remember your testimony in connection with

18  Mr. Greebel's recommendation that the statements were not

19  satisfactory to him, he recommended not moving forward with

20  that client.

21          And also strike the question and answer for the

22  question:  Was there anybody's situation who was working with

23  Mr. Greebel where Mr. Greebel had a similar recommendation to

24  you?

25          MR. BRODSKY:  I'll withdraw the question, Your

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    Honor.  As Your Honor knows, questions are not evidence.

2              THE COURT:  Well, I'll just take them out of the

3    record in order to avoid any confusion.  And the court

4    reporter will strike the question that starts with:  And do

5    you remember your testimony, the answer.

6              And the question:  Was there anybody's situation

7    that you remember -- I think this is when you were working

8    with Mr. Greebel where Mr. Greebel had a similar

9    recommendation to you and the answer.

10             MR. BRODSKY:  Yes, Your Honor.

11             THE COURT:  Now, is it going to be necessary to

12   instruct the jury that that is stricken?

13             MS. SMITH:  Yes, Your Honor.  You can just say the

14   last -- I don't want to repeat it.  Just say the last two

15   questions and answers were stricken.

16             MR. BRODSKY:  Your Honor, may I just withdraw it.

17             THE COURT:  But the answers are there so you can't

18   withdraw his answers, so I will just strike the question and

19   the answer.

20             MR. BRODSKY:  All right.  I'll just go back to the

21   quote.  Thank you, Your Honor.

22             (Whereupon, a recess was taken at 11:27 a.m.)

23

24

25

SIDEBAR CONFERENCE

1          THE COURT:  Hi, have a seat.

2          We talked about the objection to the questions where

3    Mr. Greebel had asked Mr. Jacobs to tell the jury what he said

4    in response to Mr. Greebel's questions.

5          And the concern is whether this trial will be

6    prolonged if we have Mr. Jacobs come back to finish testifying

7    once the Government submits its response to this letter that

8    was filed at 10:20 this morning.

9          It's three single-spaced pages of legal citations in

10   support of their position that the defense should be able to

11   elicit testimony from this witness as to what he told

12   Mr. Greebel because it's relevant to his state of mind.

13         I did want to hear from the Government as to how you

14   can both accommodate their concern; that is, in fairness, the

15   concern that they should be able to respond, and getting this

16   witness finished and moving through the other witnesses.

17         MS. SMITH:  Your Honor, we're happy to respond

18   briefly after this witness is finished.  To the extent that

19   Mr. Brodsky, it sounded like this was his last set of

20   questions, he can correct me if I'm not wrong, but if he is

21   not eliciting any further statements that were made to

22   Mr. Greebel, we can leave the record as it is now, although

23   our objection stands.  If there's going to be extensive

24   further or additional further elicitations of those kinds of

25   statements, I think we want the opportunity to brief them.

SIDEBAR CONFERENCE

1           MR. BRODSKY:  Your Honor, it's very clear that I

2    can't attempt to elicit -- I don't want more sustained

3    objections.  I know the Government has indicated and made very

4    clear they will object to any elicitation I make, if I can't

5    pinpoint it to a very specific time, like I did with the

6    restatement.  I believe the Government is incorrect.  I

7    believe their view of Rule 104(1) and 403 is incorrect as well

8    as state of mind.

9           I have plans to continue to ask Mr. Jacobs questions

10   along those lines.  I'm not doing it now because I understand

11   the Government will object, as they said very clearly, and

12   Your Honor has indicated that given you want the chance for

13   the Government to respond, Your Honor would sustain the

14   objection.

15          So that is the only reason why I'm doing it.  I

16   believe the Government's request to finish this question and

17   have him recalled is extraordinarily prejudicial to us and

18   damaging to our case, but that is the Government's position

19   and I understand where we are.

20          So, you know, I believe the Government should

21   respond to the letter and submit something and we should

22   resolve this issue.  We're very confident in our view of the

23   law, and we do feel, Your Honor, that in a state-of-mind case,

24   the Government is taking extraordinary positions to preclude

25   the defense from eliciting relevant testimony from somebody

SIDEBAR CONFERENCE

1    who spoke to him and billed on the matters and spoke to him

2    about very relevant issues, and I don't believe they can

3    pinpoint a single case, and I could be proven wrong, Your

4    Honor, but I don't believe under Rule 401 or 403 they will

5    find a case which precluded defendant from admitting the

6    statement because he couldn't pinpoint the time of a

7    conversation.

8              And the 2011 to 2013, we have a man who, based on

9    billing records does not recall specific communications.  I

10   don't think that's unreasonable.  They put on witnesses like

11   Mr. Aselage who did remember a single thing that happened.

12             THE COURT:  Please stop --

13             MR. BRODSKY:  I understand, Your Honor.

14             THE COURT:  -- and let's just focus on the issues.

15   Every time there's an argument, I don't need a rehash of what

16   the Government witnesses did, or the defense witnesses did, or

17   whether the Government objected or whether the defense

18   objected.  Stay focused on the issues.  I don't want to hear

19   it.

20             MR. BRODSKY:  I understand, Your Honor, but I

21   believe it's persuasive to our argument that if the Government

22   was allowed to elicit testimony from a witness who had zero

23   recall about a particular event, and that witness was able to

24   testify in general about his view of the event, even over our

25   objections at times, then I believe that the Government is

SIDEBAR CONFERENCE

1    taking a completely opposite position with respect to our

2    witnesses and they're doing something extraordinary, which is

3    in a state-of-mind case, which is all Mr. Greebel's intent,

4    and all about what he knew and when he knew it, when we have a

5    mentor on the stand, who's a senior partner at Katten who

6    served in supervisory positions and was clearly -- his office

7    right next to Mr. Greebel -- clearly advising him and

8    conferring with him relating to all sorts of matters and

9    didn't bill a lot of his time because he didn't have to

10   because he was retiring.  I believe we have established the

11   relevance under 401.

12           There's no confusion because the settlement

13   agreement and a release is directly at issue in the case.  A

14   consulting agreement and whether or not it's broad or narrow

15   and the terms of the consulting agreement are directly at

16   issue in the case.  And if we can establish evidence that

17   Mr. Greebel was taught and instructed and learned from his

18   mentor about how to do certain things, and they are opposite

19   of what the Government is arguing should have been done, then

20   I believe it's powerful evidence of innocence and the

21   Government is making a very, I think, precarious decision in

22   affirmatively moving to prevent us from putting on that type

23   of case.

24           MS. SMITH:  Your Honor, again, the defense needs

25   show the effects on a listener.  There is no hearsay exception

SIDEBAR CONFERENCE

1    that's been proffered, and so it's a very narrow, not to the

2    truth of a listener is not limited to the time period.  The

3    time period certainly helps show whether or not it would be

4    something that would, in fact, have an effect on Mr. Greebel

5    at the time he started committing the crime.  But it is more

6    than that, you need to be able to show a direct effect.

7           As Your Honor -- if Your Honor permitted, you know,

8    all sorts of testimony about the consulting agreements in

9    general, settlement agreements in general untethered to

10   Retrophin sometime in a two-year span and at the point at

11   which Mr. Greebel, you know, kind of went off the rails and

12   started talking about, you know, much a broader topic was the

13   point at which -- sorry, that Mr. Jacobs started talking about

14   much broader topics and being asked about much broader topics

15   was the point at which Your Honor actually constrained the

16   testimony.

17          Mr. Brodsky has been allowed to elicit extensive

18   testimony about what this individual told Mr. Greebel at

19   various points in time.  It's not always clear he actually has

20   a specific recollection of the conversation and yet he's

21   testified about what he thinks he might have said extensively.

22          We think that the Court's rulings so far, obviously

23   our objections are what they are, but to the extent they've

24   been sustained because they're appropriate, we don't think

25   that this needs further briefing for this witness.  I do think

SIDEBAR CONFERENCE

1    we will respond to the brief, because I think we're going to

2    encounter this with future witnesses and we want to give Your

3    Honor the law so that there's a sense, but if Mr. Brodsky

4    wants to elicit the kind of stuff that Your Honor sustained,

5    then he can call Mr. Jacobs back or, frankly, we have to take

6    a break because the three of us are here we don't have, you

7    know...

8            And then the other problem is we can't agree now

9    that it would have any relevance.  I think a lot of this

10   testimony that has come out did not, in fact -- I think the

11   argument that it had an effect on Mr. Greebel from a legal

12   standpoint is not sound.  But certainly because we don't know

13   what Mr. Brodsky is going to elicit, we can't say what our

14   objections would be or would not be.  And so if they want to

15   recall Mr. Jacobs for those conversations, I don't know what

16   the topics are, then they can do that.

17           We had other issues where we had to put people on

18   hold and move on.  If they have their expert witness here,

19   we're happy to move on to the next witness.

20           THE COURT:  All right, well let's do this then,

21   since it doesn't seem that there's a way forward.  What I was

22   hoping is that maybe we could, with Mr. Brodsky's agreement,

23   to tether the questions regarding what Mr. Jacobs told

24   Mr. Greebel on a given topic to a temporal period and to an

25   issue that is in this case, then I would be likely to allow

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

8410

SIDEBAR CONFERENCE

1    that.  And I think Mr. Brodsky misunderstood that because I

2    have overruled objections.

3           But if you're planning, Mr. Brodsky, to just ask

4    open-ended questions about some period when Mr. Jacobs may

5    have had a conversation with Mr. Greebel about any given topic

6    that may touch on this case that may not be tethered to

7    anything that is an event or, you know, relevant, directly

8    relevant to the issues in the case, that's what I wanted know.

9           MR. BRODSKY:  Well, Your Honor, there are a couple

10   of areas where objections had been sustained this morning that

11   were followups to conversations that that over the Government's

12   objection Your Honor allowed.  And so, for example, in

13   connection with a conversation that Mr. Jacobs had with

14   Mr. Greebel regarding releases, I followed up today with

15   respect to their conversation about settlements, the upsides

16   and downsides of settlements versus litigation, and he

17   testified he received the same conversation and, therefore, I

18   was allowed to elicit a number of statements that were already

19   over the Government's objection considered relevant past

20   Rule 403 that were related to settlement agreements and

21   releases.  And when I tried to follow up continuing in that

22   conversation, I was precluded from doing so.

23          THE COURT:  Well, that was in my mind a problem with

24   the question.  Did you have conversations about litigation?

25   That was the first question.  The objection was sustained

SIDEBAR CONFERENCE

1  because that was so broad and general.  And then it was:  Did

2  you have a conversation about litigation versus settlement?

3  Again, very broad.

4              MR. BRODSKY:  I did, Your Honor, the -- sorry, Your

5  Honor.

6              THE COURT:  No, I'm just saying that it just seemed

7  such a broad and vague question.  And even Mr. Jacobs I think

8  at one point seemed a little confused as to what you were

9  getting at.

10             MR. BRODSKY:  Yes, Your Honor, those questions --

11             THE COURT:  It's a 403 consideration --

12             MR. BRODSKY:  Yes, Your Honor.

13             THE COURT:  -- that the probative value at some

14 point is going to be outweighed by the prejudice, undue

15 prejudice and confusion to the jury if they have no idea why

16 the question, or the answers that you're seeking are relevant

17 to issues in this case is something you have to be mindful off

18 because I know, and I've instructed the jury you're not

19 offering it for the truth, but if the general view is that a

20 general question about did you ever talk to him about

21 litigation, and then there's an answer, yes, I did, and here's

22 what I told him.  But, you know, it becomes a concern that the

23 jury is just going to be confused about why that conversation

24 is untethered to anything of relevance or that is at issue.

25 They may have difficulty with that.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    MR. BRODSKY:  Your Honor, I understand the

2  objections to the form of those questions.  I asked a better

3  question eventually, and my better question I believe was, did

4  you discuss the upsides and downsides of litigation as opposed

5  to settling?

6    THE COURT:  In context to what?

7    MR. BRODSKY:  In that conversation about settlement

8  agreements and releases.

9    Release, he had already said, was all about trying

10  to release claims from the beginning of time to the end of

11  time.  Those are my words not necessarily his words.

12    And so there is a debate in this case, a material

13  issue of fact in dispute, about whether or not when

14  Mr. Greebel receives Lindsay Rosenwald's letter about a

15  lawsuit that they were going to file against MSMB, Martin

16  Shkreli and Retrophin, whether or not Mr. Greebel, the

17  Government says, didn't reasonably believe that this was a

18  real threat to Retrophin.

19    THE COURT:  I think we're talking about

20  Mr. Jacobs --

21    MR. BRODSKY:  Understood.

22    THE COURT:  -- whether he saw that letter he never

23  heard of Dr. Rosenwald.  You asked those questions, you were

24  not restrained at all.

25    MR. BRODSKY:  Your Honor, if I may.  He did hear of

SIDEBAR CONFERENCE

1   Rosenwald, and he knew he was a venture capitalist.  And

2   you're right, he didn't know in the context of settlement,

3   Your Honor.

4          But in that conversation about settlement agreements

5   and about a release, I eventually got to a good question,

6   which was the upsides and -- did you discuss with Mr. Greebel

7   in this conversation -- I'm trying to ask it in a non-leading

8   way -- the upsides and the downsides, or the downsides of

9   litigation versus settlement.  That is an open-ended question.

10  He said, "yes".  I asked What did you say?

11         There is a fact in dispute regarding what

12  information did Mr. Greebel have, what was his state of mind

13  when he received Dr. Rosenwald's letter or other indications

14  people were making claims.

15         The Government has taken the extreme position, with

16  all respect to the Government, they're taking the position

17  that, oh, if somebody receives that, there's no reasonable

18  lawyer who would believe that, oh, that has nothing to do with

19  Retrophin, I don't need to settle that claim, go ahead and

20  file your lawsuit.  That's the Government's position.

21         Our position is, any reasonable lawyer, any

22  experienced lawyer, any inexperienced lawyer, would get that

23  claim, know it's from Dr. Rosenwald, who is an extraordinary

24  venture capitalist with extraordinary resources, and would

25  take the claim.

SIDEBAR CONFERENCE

1        So having heard from Mr. Jacobs earlier during the

2   period from 2011 to 2013 in the context of discussing

3   settlement agreements and a release whether or not there's a

4   benefit to litigation versus settlement, and what

5   Mr. Greebel -- what Mr. Jacobs had to say to him is quite

6   informative.  And the Government I believe -- I don't think

7   the jury would be confused in the least by it.  I think the

8   only confusion would be that the Government keeps objecting

9   and jumping up and objecting.

10       I have learned from yesterday, and this is why I'm

11   doing it, Your Honor, that I have to restate my question after

12   a sidebar or an objection to Mr. Jacobs to get him back to

13   where we were, and that's what I'm doing.  But I don't

14   understand why the Government can object in a valid way to my

15   followup question in, there's a discussion of settlement

16   agreements, it's already been admitted; there's a discussion

17   of a release, and in that same conversation he talks about the

18   upsides and downsides of settlement versus litigation.

19       I don't see how that's impermissible under Rule 401,

20   the lowest possible standard possible making a fact of

21   consequence more less likely, and I don't see how that

22   confuses issues or is unduly prejudicial to the Government.

23       MS. SMITH:  Your Honor, this is why it's being

24   offered for the truth.  He just tied it to the letter that

25   Mr. Rosenwald sent.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

8415

SIDEBAR CONFERENCE

1          The idea that the conversation about what's the

2   benefit of settling versus not settling.  I mean we all went

3   to law school.  We don't need to hear that from Mr. Jacobs two

4   years before this particular settlement and release and say

5   somehow that that had an effect on Mr. Greebel that act --

6   required him to act in a particular way when he got a letter

7   from Dr. Rosenwald.

8          MR. BRODSKY:  Is the Government going to stipulate

9   that in front of the jury that any law student and any

10  graduate of law school who received Dr. Rosenwald's claim

11  would understand reasonably that there's a threat of

12  litigation against Retrophin?  Because as I understand it, the

13  Government's taking the exact opposite position.

14         MS. SMITH:  That's not what Mr. Jacobs is saying any

15  way.  It's not tied to Retrophin.

16         What I'm saying is anyone who went to law school,

17  and even if don't go to law school, know that -- I mean we

18  have lay people testify here that, you know, it's sometimes --

19  litigation is expensive and so there are benefits to settling

20  when you are faced with litigation.  That is what it sounds

21  like the general conversation was two years somewhere, you

22  know, before this an agreement.

23         (Continued on next page.)

24

25

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR

1            THE COURT:  If I understand the Government's problem

2       with these questions is, even if they're not offered for the

3       truth, it can be confusing to the jury if then the answer, no

4       matter what it might be, say he says, well, settling is always

5       better than litigation and here's why, if the jury is then

6       asked to infer that the settlement agreements were a better

7       option than litigation, that would be an offer for the truth.

8            The concern is, yes, I want to be able to provide

9       the jury with information about the effect on Mr. Greebel and

10      how that might have -- and his state of mind, and why he took

11      actions or didn't take certain actions.  But as posed, I

12      thought it was so amorphous.  You can look at any threat of

13      litigation and any plaintiff and any defendant and make a

14      completely different assessment specific to that circumstance

15      whether litigation is better than settlement.  I don't think

16      you can make a general, or you shouldn't have a general

17      statement from this witness as though it were true that

18      litigation may be better than settlement or settlement better

19      than litigation.  I think it's a case by case situation.

20           That was my intern, you were going to elicit a broad

21      untethered response that would, although it was instructed to

22      the jury it's not for the truth but for the listener, it would

23      be so broad that it could lack probative value to any issue in

24      this case ultimately.

25           MR. BRODSKY:  It was definitely probative value.

SIDEBAR

1   Whether or not litigation or settle, if you're in the position

2   of Mr. Greebel, outside counsel of Retrophin and receiving

3   information about Dr. Rosenwald and others --

4            Ms. Smith, let me finish, please.  I ask you for a

5   little time.

6            Second, the Government has repeatedly put in exhibit

7   after exhibit for the effect on the listener.  And repeatedly

8   at sidebar objected to instructions during their case in chief

9   repeatedly that this is being offered not for the truth but

10  for the effect on the listener; and they took the position

11  that, oh, that would be confusing to the jury to constantly do

12  it.

13           And your Honor respected their position, and only

14  during the case agent did we do that on a document by document

15  basis.  So the jury on a document by document basis, during

16  the case agent's testimony, heard with individualized emails,

17  that this e-mail, which was pure hearsay only for the effect

18  on the listener, was admissible.  So we have the Government's

19  case in chief, with all respect, they are allowed to do it,

20  but us --

21           THE COURT:  All right, I'm --

22           MR. BRODSKY:  I understand, your Honor.

23           THE COURT:  Let me tell you about those exhibits.

24  Those were documents that were submitted with Mr. Greebel on

25  the e-mail and you were objecting to portions within that

SIDEBAR

1    e-mail between Mr. Shkreli and Mr. Greebel or Mr. Greebel and

2    one of the Retrophin individuals or alleged co-conspirators --

3              MR. BRODSKY:  Yes, your Honor.

4              THE COURT:  -- where there was inserted in that a

5    statement from some other third-party.

6              MR. BRODSKY:  Correct.

7              THE COURT:  And your objection was to that being

8    inserted.  Because there was a colorable, good-faith argument

9    that that third-party e-mail was necessary to give context and

10   understanding --

11             MR. BRODSKY:  Yes, your Honor.

12             THE COURT:  -- to the responses that Mr. Greebel

13   made or what he knew it was admissible.  It's not the same

14   thing as what you are doing.

15             MR. BRODSKY:  Your Honor --

16             THE COURT:  It's just not -- I, I resent and caution

17   you against saying this was unfair and you're not being

18   treated fairly.  I bent over backwards.

19             MR. BRODSKY:  I won't go to that.

20             THE COURT:  Your examples are not --

21             MR. BRODSKY:  With respect to this particular

22   testimony, let me focus on Mr. Jacobs' testimony.  I believe

23   that a statement by Mr. Jacobs to Mr. Greebel that, for

24   example, if Mr. Jacobs told Mr. Greebel when you represent a

25   public company and you have a claim it is better to settle

SIDEBAR

1    then that litigate and explaining why, does have an effect on

2    Mr. Greebel as he practices law and what he does when he's

3    representing Retrophin in 2013.

4            Yes, Mr. Jacobs can't tether this conversation to

5    2011, 2012, or 2013.  I believe from reasonable inferences

6    that I would be able to argue it's 2013, because if you look

7    at his list of clients, if you look at what the context is, I

8    believe it was 2013.  But I can't point to a document or to an

9    e-mail because it wasn't in that, it was in the office of

10   Mr. Jacobs or Mr. Greebel where this advice was given.  I

11   believe I have a relevant time period before these threats

12   were made, in the mind of Mr. Greebel, coming from Mr. Jacobs

13   is what he was told from a senior partner who represented

14   public companies on a repeated basis, who tells him you better

15   settle.  Now if you get that --

16           MS. SMITH:  That's not the testimony.

17           MR. BRODSKY:  I'm proffering that that could be the

18   testimony from Mr. Jacobs.

19           THE COURT:  That it's always better, always settle.

20           MR. BRODSKY:  Let's hear what he has to say.  I

21   believe Mr. Jacobs will say, if it's a claim against the

22   company it's better settle it than litigate it if they are

23   going to file the claim.  I have to tell you, having been in

24   practice, it's exactly right.

25           MS. SMITH:  It's offered for the truth.

8420

SIDEBAR

1          MR. BRODSKY:  Excuse me, Ms. Smith.

2          It's the effect on the listener.

3          MS. SMITH:  Because you think that --

4          MR. BRODSKY:  Regardless whether it's true or not,

5    it's the effect on the listener.  It is a reasonable effect

6    for the listener, for Mr. Greebel, to hear from Mr. Jacobs and

7    change his state of mind.  Why does the Government believe

8    it's confusing to elicit evidence relating to Mr. Greebel's --

9    what information he received from a mentor about what to do in

10   this context, having already elicited statements related to

11   that very conversation?  I believe the Government's position

12   is way out of bounds, way out of line with Rule 401, Rule 403.

13         MS. SMITH:  The jury is going to hear it as this is

14   what he was told to do, and this is what he did, as if that is

15   the truth of what happened and the truth of what you should do

16   in this situation.  Basically using him as an expert witness

17   and trying to say that this conversation was, which they can't

18   pin down in time, yesterday he said between '11 and '12, today

19   '11 and '13, after conversations with defense counsel.  And

20   now suddenly it's definitely the same settlement agreements

21   that this is somehow offered for the effect on Mr. Greebel.

22         If that were the case, I suppose the argument would

23   be Mr. Greebel at some point in these two years heard this

24   conversation and once as a result did this in response to

25   what, got the letter from the Rosenwald.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR

1        They can't make that temporal connection.  It is

2   confusing.  And it is in fact offered for the truth.

3   Mr. Brodsky said ten time, reasonable advice, good advice.  Of

4   course that's what you would do, that's the argument that they

5   are going to be making, it's for the truth.

6        Again, I think your Honor pointed out the difference

7   between what the Government has already in terms of -- through

8   the first thousand pages, the defense made the argument 18

9   times and the Government once.  So this is not --

10       THE COURT:  What argument is that?

11       MS. SMITH:  The idea that something should be

12  admitted for the effect on the listener.

13       MR. BRODSKY:  Your Honor --

14       THE COURT:  Look, I think we've had enough.  I was

15  hoping that I could get the two of you to, the two sides, to

16  come to some sort an approach that would not require more

17  argument --

18       MR. BRODSKY:  Yes, your Honor.

19       THE COURT:  -- more contention, more submissions and

20  more delays in this trial.

21       MR. BRODSKY:  I appreciate that, your Honor.

22       THE COURT:  At some point --

23       MR. BRODSKY:  I appreciate it.

24       THE COURT:  -- at some point this trial has to end.

25  It seems to me that we have no choice but to proceed as we

SIDEBAR

1    are.

2              MR. BRODSKY:  Understood, your Honor.

3              THE COURT:  I tried.

4              MR. BRODSKY:  I appreciate you trying, your Honor.

5              THE COURT:  We'll bring the jury and I'll instruct

6    them about the strikes.

7              (Whereupon, the witness resumes the stand.)

8              (Jury enters the courtroom.)

9              THE COURT:  We have all jurors present.  Have a

10   seat.

11             Before we move forward, I have instructions for the

12   jury about questions and responses that will be stricken from

13   the record.

14             "Question:  And do you remember your testimony in

15   connection with Mr. Greebel's recommendations that statements

16   were not satisfactory to him you, recommended not moving

17   forward with that client?

18             "Answer:  I remember that.

19             "Question:  Was there anybody, was there any

20   situation, anybody situation that you remember when you were

21   working with Mr. Greebel where Mr. Greebel had a similar

22   recommendation to you?

23             "Answer:  Yes."

24             You may move forward.

25             MR. BRODSKY:  Thank you, your Honor.

JACOBS – DIRECT BRODSKY

1    BY MR. BRODSKY::

2    Q    Mr. Jacobs, let me quote the transcript to be more

3    accurate about your testimony from yesterday.  Page 8195, line

4    17 to 25, you were asked, do you remember being asked this

5    question and giving this answer:  "What happened with respect

6    to the relationship, the firm relationship, with Tanke

7    BioScience?

8            "Answer:  We did a reverse merger.  We worked on a

9    registration statement.  We filed it with the SEC.  The SEC

10   came back with significant financial comments, comments about

11   the financial statements contained in the registration

12   statement.  Evan and I tried to track down the answers to

13   those questions, we were unable to do it.  And Evan came to me

14   and said -- and Evan came to me and since said, since we can't

15   do this."

16           Do you remember that question and that answer?

17   A    Yes.

18   Q    And then you gave, there was on page 8196, lines ten

19   through 16, the question, "By not going forward with the

20   transaction, did the firm, law firm, what happened to the

21   billings with respect to the law firm?

22           "Answer:  We kept whatever we collected.  We were

23   owed some money at the end of the transaction, but we felt

24   that it would be better not to go forward with the deal than

25   to go forward with it," end quote.

JACOBS – DIRECT BRODSKY

1          Do you remember giving (sic) that question and

2     giving that answer?

3     A    Yes.

4     Q    Was there any other situation similar to Tanke BioScience

5     where you and Mr. Greebel decided not to go forward with the

6     deal than to go forward with it?

7     A    Yes.

8     Q    Without naming the client or the with specificity of the

9     transaction involved, please describe that situation?

10    A    We were doing a transaction and the client was making a

11    loan to a company that was in the auto lease business.  The

12    information coming to us didn't seem to be accurate, based on

13    due diligence, and we recommended to the client not to go

14    forward with the transaction.

15         MR. BRODSKY:  Your Honor, no further questions.

16         MS. SMITH:  If we're recalling the witness I'll wait

17    for that to happen.

18         THE COURT:  They are going to wait on their cross

19    until the witness is recalled.

20         We can excuse Mr. Jacobs now.

21         Sir, you may be recalled.

22         THE WITNESS:  I'm going out of town.

23         MR. BRODSKY:  Your Honor, given that situation, I

24    think Mr. Jacobs and his schedule and his time, we'll move

25    forward.  If we're in this situation, we'll move forward.  We

JACOBS – DIRECT BRODSKY

1  don't want to breakup our witnesses.  We'll move forward with

2  the cross-examination.

3           MS. SMITH:  Can we have a brief sidebar?

4           (Continued on the next page.)

5           (Sidebar conference.)

SIDEBAR CONFERENCE.

1          MS. SMITH:  I want to the record to the clear that

2    we're more than happy to wait and have Mr. Brodsky litigate

3    these issues and then have Mr. Jacobs testify.

4          MR. BRODSKY:  Your Honor, I think --

5          MS. SMITH:  Just I don't want any argument that they

6    were prejudiced by the fact that this issue came up and there

7    wasn't sufficient time during the examination to fully -- you

8    know, Mr. Brodsky seems to want to make additional arguments

9    in connection with your Honor's rulings.  That's fine with us.

10   But if we move forward, then those arguments are waived with

11   respect to this testimony; otherwise, we cannot forward.

12         MR. BRODSKY:  The Government is trying to induce us

13   to waive any rights we have.  They don't have the right to do

14   that.  We have the right to present the evidence as we wish.

15   We want the witness to go forward.  The witness is an elderly

16   man, he should go forward with the cross-examination.  The

17   orderly presentation of our evidence would be severely

18   interrupted if the cross does not begin today and now.

19         Second, your Honor, if there is a situation where

20   your Honor permits additional examination.  Your Honor has

21   already said we could recall Mr. Jacobs.  So we understand

22   that.  We understand we could recall Mr. Jacobs, if your Honor

23   makes certain rulings.  And your Honor would allow us to have,

24   you know, whatever small number of questions and cross on

25   that.

SIDEBAR CONFERENCE.

1          THE COURT:  Well, the problem I'm having also, is I

2     don't know what you are avoiding asking based on what you

3     anticipate to be my rulings.

4          MR. BRODSKY:  Understood.

5          THE COURT:  We talked about if you could narrowly

6     frame and tie the advice and the events at issue in this case

7     together.

8          MR. BRODSKY:  Yes, your Honor.

9          THE COURT:  Then we shouldn't have a problem.  And

10    all likelihood if there is an objection, I'll overrule it.

11    But if it's going to be general type of question that's

12    untethered to time, a three-year period, and not necessarily

13    in relation to an event in this case, then it makes it very

14    difficult to admit that kind of testimony.  So I don't know.

15         MR. BRODSKY:  I will tell you, I will proffer to

16    your Honor what it is now.  Specificity is, with respect to

17    the conversations about the settlement agreements and the

18    release, which already has come out.  Mr. Jacobs, I

19    anticipate -- again, this is what I anticipate he would say.

20    He said, in sum and substance, that he taught him it's always

21    better to settle than to fight the cost of litigation and

22    potential litigation, hiring litigators, going through that

23    process far outweighs the benefits from settling the matter.

24    And he also taught him that it was better to do the settlement

25    yourself, than give it to litigators who would charge a lot of

SIDEBAR CONFERENCE.

1   money.  And he had developed settlement agreements that were

2   satisfactory, and overtime, and he thought were very strong.

3   And therefore, he said that would save a lot of time and

4   expense.  That's one.

5           THE COURT:  To give it to litigators within the

6   firm?

7           MR. BRODSKY:  Yes, to litigators within the firm.

8           The second, your Honor, piece would be with respect

9   to, already his testimony about consulting agreements that

10  he's already testified about.  He would testify, I believe he

11  testified already about them, about his conversation with

12  Mr. Greebel.  I believe he would add to that that if I asked

13  him -- let me get the specificity your Honor.  He had

14  testified on page 8270, line seven to 12, that Mr. Greebel had

15  asked him whether or not he had a form of a consulting

16  agreements which he could use.  In response --

17          MS. SMITH:  Are there notes of his response?

18          MR. BRODSKY:  I do not have notes of his response.

19  Thank you, Ms. Smith.  I know you're looking at my

20  attorney-client documents.

21          MS. SMITH:  I am not.

22          MR. BRODSKY:  In response, I believe I expect him to

23  say that -- further I asked him on page 8270, lines eight to

24  nine, we discussed generally what is included in a consulting

25  agreements.  I would ask him, what did you tell Mr. Greebel

SIDEBAR CONFERENCE.

1    about what is included in a consulting agreements.  I

2    anticipate that he would testify:  Don't be specific, be as

3    general as possible, the more specific you are it means you

4    have to go back and amend the consulting agreements.

5         That is very specific advice that he gave him that

6    informs and had an effect on Mr. Greebel in drafting

7    consulting agreements.  And so those are two specific pieces.

8         I would also, your Honor, proffer to your Honor that

9    we would go back to the Board conversation and in connection

10   with his work on Boards.  I would ask him that -- let me try

11   to find it, your Honor.  I would ask him whether or not he

12   discussed with Mr. Greebel who signed the Board minutes.  And

13   approximately when did the conversation occur.  Sitting here

14   right now, I don't remember what his answer would be as to

15   when, but he had told me that the Acting Secretary signs them

16   and puts them in the minute book.  That may be, it's in the

17   record that he sent them either to the Chairman, the CEO or

18   the CFO.  Then he said either the CEO or CFO if there is no

19   Chairman, it's in the record.  If you get comments, make the

20   changes and put them in the minute book.

21        THE COURT:  He's saying the Acting Secretary putting

22   them in the minute book or the CFO or CEO?

23        MR. BRODSKY:  I thought his testimony to date was

24   that the Acting Secretary, the one who did the draft minutes

25   would put them in the minute book.  That's how I --

SIDEBAR CONFERENCE.

1     MS. SMITH:  That was his testimony.

2     MR. BRODSKY:  -- understood his testimony.  I would

3 follow that up with a specific question, did you discuss who

4 signs them.

5     I proffer to the Court, I anticipate he would say

6 the Acting Secretary.  Whoever took the notes, whoever

7 prepared them signs it, that's the Acting Secretary.  The

8 Acting Secretary is who would keep the notebook.

9     MS. SMITH:  We're obviously going to object to all

10 of that.  I do think it needs to be briefed.  I can do the

11 cross.  He can do the redirect.  If they want to recall him,

12 potentially, if your Honor rules it doesn't come in then he

13 doesn't have to come back.  I do want to move it along.  My

14 cross is very short.

15     It's not right.  We should just recall him on

16 direct.  We had to do that when timing didn't work out.  I

17 think all of this should be excluded.  And so we do need to

18 brief it.  It's significant.  And it's being offered for the

19 truth, from our perspective.

20     I will do my cross.  He can do whatever redirect he

21 wants.  We can brief this.  And if we need Mr. Jacobs to come

22 back, we will.

23     THE COURT:  Give me a minute.  You object to all of

24 this.

25     MS. SMITH:  All of it.  We need to brief it.  Again,

SIDEBAR CONFERENCE.

1   it's not being offered for the truth, these are frankly

2   Mr. Greebel's arguments that I heard throughout the trial now

3   embodied in Mr. Jacobs' testimony.  The time period, again, is

4   very fluid.  So I just think I would feel more comfortable,

5   especially I have not seen the cases specifically that

6   Mr. Brodsky cited.  But I think that they cover much different

7   sets of circumstances than we're talking about here.  Frankly,

8   different than some of the specific instances you let in.

9           THE COURT:  Just so I understand what we're doing

10  here.  These proffered Q&As are going to be held in abeyance.

11  You will do your cross.  You will then brief whether this or

12  other witnesses' similar Q&As would be acceptable.  Then if I

13  rule in favor of the defense, Mr. Jacobs will come back.

14          MS. SMITH:  I suppose we could do the redirect too,

15  get it done.  If he's waiting on the redirect, then we're

16  waiting on the cross.  The cross should be on the full

17  examination.  If we finish the examination direct, cross,

18  redirect, done.  Then you can't go back into anything that is

19  discussed already, that's fine.  If Mr. Brodsky tries to

20  rehash when this person comes back other issues or not do his

21  redirect now, then we need to hold the direct.  That's just

22  the way it works.

23          MR. BRODSKY:  Your Honor, with respect to the

24  Government, I don't believe they get to determine how we put

25  in our case.  I believe your Honor is correct, that, one, they

SIDEBAR CONFERENCE.

1    should proceed with the cross.  Two, we should do our

2    redirect.

3          THE COURT:  I didn't make a ruling yet.  I was just

4    asking.

5          MR. BRODSKY:  We would like to proceed with the

6    cross.  We would like to do the redirect.  I don't know

7    whether or not a 70-year-plus old man, we're recalling him.

8    We didn't make that judgment, your Honor.  I believe the

9    Government doesn't have a fair argument as to why they can

10   move to preclude these specific statements.  We should proceed

11   with the cross.  We should do the redirect.  Then we can argue

12   after that, depending on your Honor's rulings on these

13   specific cases, whether or not, if your Honor overrules the

14   Government's objection, we'll make a decision as to whether or

15   not to recall Mr. Jacobs and the implications of recalling

16   him.  And try to balance the benefit of having them listen to

17   this additional proffered testimony with respect to our case.

18         THE COURT:  Okay.  I think he indicated he's going

19   out of town.  When I said he may have to come back, he said,

20   I'm going out of town.

21         MR. BRODSKY:  He has his own schedule.  I knew he

22   was going out of town.  I knew he had to be on this week; he

23   was insistent on it.  Having him come back, I told him, I'm a

24   very bad predictor of timing.  I thought he would be done

25   yesterday.  I think he's not, it's not well taken with him

SIDEBAR CONFERENCE.

1   that he's back today.  I think he's fine.  But I know he's

2   insistent that he had to be done today with respect to us.

3          THE COURT:  Do you know when he's leaving?

4          MR. BRODSKY:  We didn't serve him with a trial

5   subpoena.  I don't know.

6          MS. SMITH:  We had this with multiple witness.  We

7   had a witness who had to fly to Europe and come back.

8          MR. BRODSKY:  We would like to proceed, your Honor.

9   Given scheduling issues if your Honor has rulings on these

10  now, fantastic, we would love it.

11         THE COURT:  It would be cunning the Government's

12  opportunity to respond.  I think they asked multiple times for

13  the opportunity to look at the cases and to respond, and

14  frankly, I haven't had time given the 10:20 a.m. submission

15  today to really look at the case.  My clerk has gotten a

16  preliminary look, but I would feel more comfortable having

17  full opportunities for both sides.  So why don't we hold these

18  in abeyance.  And then you'll proceed with your cross.

19         MS. SMITH:  Sure.

20         THE COURT:  We'll see what happens.

21         (End of sidebar conference.)

22         (Continued on the next page.)

23

24

25

JACOBS - CROSS - MS. SMITH

1              (In open court.)

2              MS. SMITH:  May I proceed?

3              THE COURT:  Yes.

4    CROSS-EXAMINATION

5    BY MS. SMITH::

6    Q    Good afternoon, Mr. Jacobs.

7    A    Good afternoon.

8    Q    Yesterday you gave us a little bit about your background.

9    You said you were at Katten Muchin until April 2015; is that

10   right?

11   A    That's correct.

12   Q    You said after --

13   A    Yes, that's correct.

14   Q    Is that right?

15   A    Yes.

16   Q    You said after you left Katten Muchin in April 2015 you

17   continued to stay in contact with Mr. Greebel; is that right?

18   A    I did, yes.

19   Q    And in the years prior to 2015, 2012, 2013, 2014, you

20   were transitioning into retirement; is that right?

21   A    Correct.

22   Q    You said that during that time period that you sometimes

23   spoke to Mr. Greebel for five- to ten-minute conversations and

24   sometimes you billed for those conversations and sometimes you

25   didn't, right?

JACOBS - CROSS - MS. SMITH

1          MR. BRODSKY:  Objection.  Compound, your Honor.

2          THE COURT:  Try to break it down please.

3     BY MS. SMITH::

4     Q     Yesterday you testified that in that time period, 2012 to

5     2015, when you were transitioning into retirement you

6     sometimes spoke to Mr. Greebel for short conversations,

7     correct?

8     A     Yes.

9     Q     Five to ten minute conversations?

10    A     No.

11    Q     There were a series of short conversations that you

12    testified to yesterday, do you remember that?

13    A     I remember that.

14    Q     So for those short conversations you said that sometimes

15    you billed the conversations and sometimes you didn't; is that

16    right?

17    A     That's correct.

18    Q     And you said that you didn't bill those conversations,

19    the short ones, sometimes, because you were going to be

20    retired and it wasn't as important for you to bill; is that

21    right?

22    A     That's correct.

23    Q     But you would agree with me, to the extent you did

24    substantive work for a client you billed that work, didn't

25    you?

JACOBS - CROSS - MS. SMITH

1    A    If I did substantive work I can bill it, yes.

2              THE COURT:  Not whether you could, did you.

3              THE WITNESS:  I guess I did, I did.

4    Q    You were asked questions about some of the billing that

5    you did for the MSMB entities and Retrophin in your last few

6    years at Katten, right?

7    A    Yes.

8    Q    And for the MSMB entities, which entities were those?

9    A    I don't remember.

10   Q    You were not the principal attorney or the responsible

11   attorney for those entities, were you?

12   A    That's correct.

13   Q    You were not the principal attorney or the responsible

14   attorney for Retrophin, right?

15   A    That's correct.

16   Q    You didn't get any origination credit for the MSMB

17   entities, correct?

18   A    That's correct.

19   Q    You didn't get any origination credit for Retrophin,

20   right?

21   A    Correct.

22   Q    You didn't get any share credit for the MSMB entities,

23   right?

24   A    Yes.

25   Q    You didn't get any share credit for Retrophin either, did

JACOBS – CROSS – MS. SMITH

1   you?

2   A    That's correct.

3   Q    You didn't sign the engagement letter for any MSMB

4   entity, right?

5   A    That's correct.

6   Q    You didn't sign the engagement letter for Retrophin,

7   right?

8   A    That's correct.

9   Q    You didn't see the engagement letters for any of those

10  entities while you were at Katten, correct?

11  A    I'm not sure if I saw them.

12  Q    Do you remember seeing them?

13  A    I don't recollect, but I might have.

14  Q    Mr. Brodsky asked you a few questions on cross -- on

15  direct, about the role of Acting Secretary at a Board meeting,

16  right?

17  A    Yes, he did.

18  Q    At one point you said that the Acting Secretary is a

19  scrivener, correct?

20  A    That's correct.

21  Q    You would agree with me, when you said the Acting

22  Secretary is a scrivener, you were describing the very

23  specific role of Acting Secretary, correct?

24  A    Can you repeat that question?

25  Q    When you said the Acting Secretary is a scrivener, the

JACOBS – CROSS – MS. SMITH

1   scrivener piece of the Acting Secretary, that's the role of

2   the Acting Secretary, right?

3           MR. BRODSKY:  Objection.

4           THE COURT:  Overruled.

5   A     That's correct.

6   Q     That doesn't apply to when you're also serving as outside

7   counsel for the company, correct?

8   A     No.

9   Q     Because when you're outside counsel for a company you're

10  far more than a scrivener, right?

11  A     You asked me about being an Acting Secretary, different

12  than being outside counsel.

13  Q     If you are serving as Acting Secretary while you are also

14  outside counsel you wear both hats, right?

15  A     Technically, yes.

16  Q     So the hat in which you are just the scrivener and just

17  taking notes is the Acting Secretary hat, correct?

18  A     Correct.

19  Q     And the outside counsel hat, if you're playing that role,

20  you have far more responsibilities than just being a

21  scrivener, correct?

22  A     No.

23  Q     You have no more responsibility as an outside counsel to

24  a company than taking notes on what the company says?

25  A     You asked me whether or not Acting Secretary and as legal

JACOBS - CROSS - MS. SMITH

1    counsel, whether they are the same.

2    Q    That wasn't my question, sir.

3    A    Then I'm sorry, please restate.

4    Q    I will restate.

5         My question is with respect to Acting Secretary

6    being a scrivener.  When you served as outside counsel for a

7    Board, have you also served as Acting Secretary?

8    A    Yes.

9    Q    So when you're serving as outside counsel to a Board or

10   company, your responsibilities are broader than an Acting

11   Secretary's, correct?

12   A    Not necessarily.

13   Q    So you're saying that when you serve as outside counsel

14   to a company, you don't provide advice to the company?

15   A    I provide, yes, as outside counsel you would provide

16   advice if you were asked something.

17   Q    And as outside counsel, you owe your client a duty of

18   loyalty, right?

19   A    Excuse me?

20   Q    You owe --

21        MR. BRODSKY:  Your Honor, objection.  Beyond the

22   scope of the direct.

23        THE COURT:  I'll sustain that objection.

24   Q    As outside counsel do you have any responsibilities to

25   your client?

JACOBS - CROSS - MS. SMITH

1    A     You have responsibilities.

2    Q     Are those responsibilities important?

3    A     Yes.

4    Q     Do those responsibilities include things other than

5    taking notes at a Board meeting?

6    A     Yes.

7    Q     You said you've been a corporate attorney since about

8    1970; is that right?

9    A     1967.

10   Q     Between 1967 and 1970 you worked for the SEC; is that

11   right?

12   A     Yes.

13   Q     In that time period, since 1967, you've worked with lots

14   of corporate clients, correct?

15   A     That's correct.

16   Q     Those clients included hedge funds, right?

17   A     Yes.

18   Q     And private companies?

19   A     Yes.

20   Q     And public companies?

21   A     Yes.

22   Q     And you know that as outside counsel to those sorts of

23   clients, it's important to have an understanding of the key

24   documents to those clients, correct?

25            MR. BRODSKY:  Objection to form.  Outside the scope.

JACOBS – CROSS – MS. SMITH

1          THE COURT:  Overruled.

2   A     You probably know most of the documents, yes.

3   Q     For example, like the partnership agreement?

4   A     I'm sorry?

5   Q     Like the partnership agreement, is that an important

6   document to a company?

7   A     For a partnership, yes.

8   Q     For a hedge fund an important document is a private

9   placement memorandum, correct?

10         MR. BRODSKY:  Your Honor, this is beyond the scope

11  with respect to a hedge fund.

12         THE COURT:  Well, he said he did represent hedge

13  funds.

14         MR. BRODSKY:  I understand, but, my objection is the

15  role.

16         MS. SMITH:  If we're speaking, we'll do sidebar.

17         THE COURT:  I think that there was elicited from

18  this witness a long history of his distinguished career as a

19  lawyer and his broad experience.  I'm going to allow the

20  question.

21  BY MS. SMITH::

22  Q     I said for a hedge fund, as outside counsel it's

23  important to understand a document like a private placement

24  memorandum, correct?

25  A     I don't know if it's important.  You might want to do it,

JACOBS - CROSS - MS. SMITH

1    depends if you had handle the offering, if you drafted the

2    offering memorandum, depends when it was done, it may or may

3    not be something that you look at.

4    Q    You were asked questions about the compensation memos for

5    Mr. Greebel?

6    A    Yes.

7    Q    You didn't sit on the committee that determined his

8    compensation between 2011 and 2015, did you?

9    A    No, I did not.

10   Q    In preparation for your testimony today you met with

11   attorneys for the defendant, right?

12   A    I met with Mr. Brodsky.

13   Q    You said that you met with Mr. Brodsky four times to

14   prepare for your testimony; is that right?

15   A    I said two times, I met with him.  Then, yes, I guess a

16   total of four times.

17   Q    In addition to the four times you also testified today

18   about a fifth meeting that you had last night; is that right?

19   A    I said this morning.

20   Q    This morning.  And during that meeting you discussed your

21   testimony from yesterday; is that right?

22   A    Yes.

23   Q    You discussed your testimony for today; is that right?

24   A    Yes.

25   Q    During that meeting were you shown any documents to

JACOBS - CROSS - MS. SMITH

1   refresh your recollection?

2   A    No.

3   Q    Mr. Brodsky asked you some questions on direct about your

4   role on the billing committee and your interactions with

5   Mr. Greebel in that context.  He specifically asked you what

6   the consequences were to the law firm of Katten Muchin if

7   there is a failure to collect bills, that's at transcript page

8   8185?

9   A    Is that in here?

10  Q    Are there consequences to a -- excuse me.

11       There are consequences to a non-equity partner if

12  there is a failure to collect bills for his or her clients, it

13  that correct?

14  A    What do you mean by consequence?

15  Q    Realization rate is an important factor to the salary of

16  a non-equity partner?

17  A    It is one of the criteria, yes.

18  Q    You weren't personally involved in collection of payments

19  for MSMB Capital, MSMB Healthcare or Retrophin, correct?

20  A    Not personally, no.

21  Q    You have no idea where the money to pay Katten Muchin's

22  invoices for Retrophin came from, correct?

23  A    No.

24  Q    You testified on direct you never met Mr. Martin Shkreli,

25  correct?

JACOBS - CROSS - MS. SMITH

1    A    That's correct.

2    Q    You never spoke to him on the telephone, correct?

3    A    That's correct.

4    Q    You never had any kind of conversation with him?

5    A    Not to my recollection.

6    Q    In fact, you didn't have any contact with any employees

7    for Retrophin, did you?

8    A    No.

9    Q    Or any officers of Retrophin?

10   A    No.

11   Q    Or any management of Retrophin?

12   A    No.

13   Q    Or any Board members for Retrophin?

14   A    No.

15   Q    You never spoke to them by phone, correct?

16   A    I never spoke to them by phone.

17   Q    Never met them in person?

18   A    That's correct.

19   Q    You also never had any contacts with any employees of

20   MSMB Capital, right?

21   A    That's correct.

22   Q    Never had any contact with the management of MSMB

23   Capital?

24   A    That's correct.

25   Q    And you never had any contact with anyone at MSMB

JACOBS - CROSS - MS. SMITH

1   Healthcare, right?

2   A    That's correct.

3   Q    You weren't present for any interactions between anyone

4   at MSMB Capital and Mr. Greebel, right?

5   A    That's correct.

6   Q    You weren't present for any interactions between

7   Mr. Greebel and anyone at MSMB Healthcare, correct?

8   A    That's correct.

9   Q    You weren't present for any interactions between

10  Mr. Greebel or anyone at Retrophin, correct?

11  A    That's correct.

12  Q    You also weren't present for any conversations between

13  Mr. Shkreli and Mr. Greebel, correct?

14  A    Correct.

15  Q    So you didn't personally observe any interaction between

16  Mr. Shkreli and Mr. Greebel?

17  A    I did not.

18  Q    You don't know how frequently they spoke on the phone?

19  A    No, other than the time sheets, I wouldn't know.

20  Q    I don't have any personal knowledge of what Mr. Greebel

21  and Mr. Shkreli discussed during any interactions, correct?

22  A    That's correct.

23  Q    You don't have any personal information about what

24  information was provided to Mr. Greebel by Mr. Shkreli during

25  those interactions?

JACOBS – REDIRECT – MR. BRODSKY

1    A    That's correct.

2              MS. SMITH:   One minute, your Honor.

3              No further questions.

4              MR. BRODSKY:   A little redirect, your Honor, on

5    those very topics?

6    REDIRECT EXAMINATION

7    MR. BRODSKY:

8    Q    You were asked on cross-examination, when an outside

9    counsel is serving as both outside counsel to a public company

10   and Acting Secretary, do you remember those questions on

11   cross-examination by Ms. Smith?

12   A    I do.

13   Q    In those situations, had you been outside counsel and

14   Acting Secretary at the same time?

15   A    Yes.

16   Q    When you were outside counsel to a public company and

17   Acting Secretary at a Board meeting, what role were you

18   playing when you were Acting Secretary at that Board meeting?

19   A    When I was a Acting Secretary, I was taking notes of the

20   minutes, for the minutes.  When I was counsel I would sit in

21   there and answer questions as counsel if anyone asked me a

22   question.

23   Q    If no one asked you any questions?

24   A    Didn't say anything.

25   Q    You were asked questions about being outside counsel to a

JACOBS – REDIRECT – MR. BRODSKY

1    hedge fund and whether you needed to understand or not

2    understand a PPM, do you remember those questions by

3    Ms. Smith?

4    A    Yes.

5    Q    Now, when you were outside counsel to a hedge fund, did

6    you rely on the representations of management at the hedge

7    fund or not rely on the representations of management at the

8    hedge fund?

9    A    I relied on the representations of management.

10   Q    And you were asked questions about whether or not you had

11   an idea of where the fees paid for MSMB bills were coming

12   from, do you remember Ms. Smith's questions about that?

13   A    Yes.

14   Q    Now, when you were at Katten and a client wired money to

15   Katten, did you know where the money was coming from?

16   A    I would manage from the person who wired it.

17   Q    And did you see any documentation as to where the wire

18   was coming from?

19   A    No.

20   Q    Have you had situations, yes or no, whether or not --

21            MS. SMITH:  Objection to leading, your Honor.

22            MR. BRODSKY:  I'll withdraw that.

23   BY MR. BRODSKY::

24   Q    Do you know one way or the other, whether or not you've

25   represented clients at Katten and bills were being paid by the

JACOBS – REDIRECT – MR. BRODSKY

1   client or an affiliate of the client?

2   A    No.

3   Q    And have you had situations had Katten, yes or no, where

4   a client of yours their bills were being paid by an

5   affiliation?

6          MS. SMITH:  Objection.  Asked and answered.

7          THE COURT:  I think not.  I'll overrule that

8   objection.

9   A    No.

10  Q    Did you know one way or the other whether an affiliate

11  paid the bill or didn't pay the bill?

12         THE COURT:  That has been asked and answered.

13  Q    Where did the wire, when a wire when you were at Katten

14  and a wire was paid, what notification do you get, did you get

15  as a partner?

16  A    You would just be told that the money came in.

17  Q    And who receives the wire payment?

18  A    The firm.

19  Q    Had you been in situations where a company paid for an

20  outstanding bill owed by a subsidiary or an affiliate or

21  related party?

22         MS. SMITH:  Objection to, asked and answered.

23         THE COURT:  Sustained.

24  Q    Had you been in situations where a company's bill was

25  being paid for by some other party?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

JACOBS - REDIRECT - MR. BRODSKY

1   A    Yes.

2   Q    And did you, when some other party paid for the bill, did

3   you object?

4   A    No.

5   Q    Did anybody at the firm object?

6        MS. SMITH:  Objection to leading.

7   A    Not to my knowledge.

8        THE COURT:  Just let's not lead the witness.  All

9   right.

10       MR. BRODSKY:  Yes, your Honor.

11  Q    You were asked about whether or not you were present for

12  any communications between Mr. Shkreli and Mr. Greebel, do you

13  remember the questions Ms. Smith asked you and your answers?

14  A    Yes.

15  Q    Now in 2013, did you go to work every day?

16  A    Yes.

17  Q    In 2012 did you go to work every day?

18       MS. SMITH:  Objection, your Honor.  Beyond the

19  scope.

20       MR. BRODSKY:  I'm laying the foundation for my

21  question, your Honor, with respect to interactions.

22       THE COURT:  All right.  I'll give you some latitude.

23       MR. BRODSKY:  Thank you, your Honor.

24  Q    Your office in 2012, was it, I believe you testified it

25  was next to Mr. Greebel's office?

JACOBS - REDIRECT - MR. BRODSKY

1   A    Yes, it was.

2   Q    And in 2013 your office was next to Mr. Greebel's office?

3   A    Yes, it was.

4   Q    In 2014 did you go to work every day?

5   A    Yes.

6   Q    And was your office next to Mr. Greebel's?

7   A    Yes.

8   Q    In 2012, did you ever observe Mr. Shkreli coming to visit

9   Mr. Greebel at his office?

10  A    No.

11  Q    Not one occasion?

12         MS. SMITH:  Objection to leading.

13         THE COURT:  You're going to have to refrain the

14  questions, we've had a lot of objections about leading.

15         MR. BRODSKY:  Understood.

16  Q    In 2013 during any time of that year did you observe or

17  not observe Mr. Shkreli ever come to the office of

18  Mr. Greebel?

19  A    I don't recall observing him.

20  Q    And in 2014 did you ever observe or not observe

21  Mr. Shkreli coming to the office of Mr. Greebel?

22  A    We didn't usually meet people in our office, we met them

23  at a conference center.  I did not observe anyone coming to

24  his office.

25  Q    In 2012 did you ever observe Mr. Greebel meeting with

JACOBS – REDIRECT – MR. BRODSKY

1    Mr. Shkreli in a conference room?

2    A    Not to my recollection.

3    Q    And in 2013 did you ever observe Mr. Shkreli meeting with

4    Mr. Greebel?

5    A    Not to my recollection.

6    Q    And in 2014?

7    A    Not to my recollection.

8    Q    Now do you know one way or the other whether on occasion

9    a Board meeting was held at Katten Muchin, physically, in

10   2014?

11              MS. SMITH:  Objection to what Board meeting.

12              MR. BRODSKY:  Board meeting -- of Retrophin.  I'll

13   withdraw.

14   Q    Do you know whether or not in 2014 a Board meeting of

15   Retrophin was held at the offices of Katten Muchin?

16              MS. SMITH:  Objection.  Beyond the scope.

17              THE COURT:  I'm just trying to think whether I could

18   find a way or what your argument would be within the scope of

19   your --

20              MR. BRODSKY:  Interactions between Mr. Shkreli and

21   Mr. Greebel.

22              THE COURT:  This is about a Board meeting.  I'll

23   sustain the objection.

24   BY MR. BRODSKY::

25   Q    During the time you spent with Mr. Greebel between 2012

JACOBS - REDIRECT - MR. BRODSKY

1    and 2014, did you meet any of Mr. Greebel's clients?

2    A    I don't think so.

3            MR. BRODSKY:  No further questions, your Honor.

4            MS. SMITH:  No redirect, your Honor.

5            THE COURT:  All right.  Sir, you're excused.

6            THE WITNESS:  Thank you.

7            MR. BRODSKY:  I have a request that I think -- I can

8    do it outside of the presence of the jury.  This might be a

9    good time, your Honor -- I just have a -- I'm sorry, I can't

10   articulate it, it involves Mr. Jacobs.  It's a suggestion.

11           THE COURT:  May I excuse him for the day or?

12           MR. BRODSKY:  I have a suggested approach with

13   regard to the sidebar issue.

14           THE COURT:  So sir, if you'd like have a seat and

15   well have a brief sidebar.

16           MR. BRODSKY:  I don't know if this is a good time,

17   your Honor, I don't know when you were planning on taking --

18           THE COURT:  If this is a brief sidebar, if it is

19   something we can resolve and we can give Mr. Jacobs an answer

20   and the jury can hear testimony or take lunch, we'll decide at

21   sidebar.

22           (Continued on the next page.)

23           (Sidebar conference.)

24

25

SIDEBAR

1    MR. BRODSKY:  Mr. Mastro's suggestion was we excuse

2    the jury, and while Mr. Jacobs is here, outside the presence

3    of the jury, I ask these questions and elicit the testimony.

4    Then if your Honor decides, based on the question and the

5    answer, is admissible or not admissible, then that could be

6    read to the jury at a subsequent, whatever portion, could be

7    read to the jury.  This way we don't have to recall Mr. Jacobs

8    for three questions.

9           THE COURT:  Then they don't get the cross.

10          MR. BRODSKY:  They would cross here.

11          MS. SMITH:  Absolutely not, your Honor.

12          MR. MASTRO:  Simply to preserve the testimony, your

13   Honor.  It's only a five-minute examination.

14          MS. SMITH:  It's a jury trial.  They need to observe

15   the testimony.

16          MR. MASTRO:  We have depositions when a witness is

17   absent.

18          MS. SMITH:  Video deposition.

19          MR. MASTRO:  Not always video depositions.  When you

20   have to preserve a witness's testimony.  And your Honor, I

21   think this is really for three questions.  We may never be

22   able to call him back.  Whatever your Honor rules, your Honor

23   rules.  This is three questions and three answers.  They can

24   cross.  Five minutes.  Preserve it.  And then it could be read

25   later.  If you ruled in our favor, if you ruled against us

SIDEBAR

1    then it doesn't comes in.

2         MR. BRODSKY:  When you consider that Mr. Shkreli's

3    trial, for example, it often happens where the Government

4    wants to put into evidence, a defendant's statements, there is

5    not a videotape.  They often put in the statements, as they

6    did during Mr. Shkreli's trial, the jury doesn't get to

7    observe the statements being made.  Here they observed

8    Mr. Jacobs.

9         THE COURT:  Refresh me, what happened in the

10   Mr. Shkreli trial?

11        MS. SMITH:  We put in statements of Mr. Shkreli's

12   SEC deposition.  It's the defendant.

13        MR. MASTRO:  I'm not doing it for the purpose of

14   saying there was anything wrong with putting in the

15   statements.  I'm offering as an example in a criminal it's not

16   always the case when statements are in evidence of somebody,

17   whether a defendant or somebody else, there is actual

18   videotape or actual observation of the statement being made.

19   So given that they have seen Mr. Jacobs, we just thought this

20   was an eloquent solution to this difficult situation with

21   Mr. Jacobs.  It's a suggestion, your Honor.  We can excuse the

22   jury because, whatever your decision is for lunch, if your

23   Honor, whatever your decision is it doesn't involve the jury.

24        MS. SMITH:  Your Honor, this is unavailable witness.

25   I've never, even with that, this is a criminal federal trial.

8455

SIDEBAR

1    If you have a witness testify, they testify.  You don't take a

2    deposition.  The very few circumstances where you have a

3    witness's testimony that they are not live in front of the

4    jury, it is a videotaped deposition where both sides have a

5    chance to ask questions on cross and the jury can observe the

6    witness.  This is simply just not done.  I don't even have any

7    kind of authority at my fingerprints because it's so

8    outrageous; otherwise we would all do this and read things

9    into the record.  But you can decide it later.

10            THE COURT:  The credibility determinations of the

11   jury are very critical here.  I think that it would be not be

12   appropriate in these circumstances.  In the Shkreli trial, if

13   you're referring to SEC testimony, it's apples and oranges, in

14   my view.

15            I think that we've sort of set out a game plan for

16   dealing with this problem, which I think, frankly, as I've

17   said, could have been front-loaded from the trial and it

18   wasn't.  So whatever the fall out is from the decision to

19   bring this up when it was brought up is not.  I think that the

20   parties are --

21            MR. BRODSKY:  It might be, since it's almost one, it

22   depends whatever your Honor wants to do.

23            THE COURT:  I'll ask the jury.

24            (End of sidebar conference.)

25            (Continued on the next page.)

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1              (In open court.)

2              THE COURT:  Does anyone have any objection to

3    excusing Mr. Jacobs?

4              MR. BRODSKY:  No.

5              THE COURT:  Sir, you can step down.  You're excused

6    for now.  We'll be in touch.  Thank you.

7              THE WITNESS:  Thank you.

8              (Whereupon, the witness was excused.)

9              THE COURT:  Would the jurors like to have lunch now

10   or would you prefer to go to the next witness?

11             THE JURY:  (Collectively) Lunch.

12             THE COURT:  Lunch.  All right.

13             (Jury exits the courtroom.)

14             THE COURT:  Have a seat.  Unless there is something

15   that we need to deal with right now, I'm going to go up and

16   work on charges for an hour.  I'd like to try to post them

17   ideally today or tomorrow morning.  We will try to do the

18   charging conference on Friday afternoon as we discussed.

19             I understand that there is a hard stop time on

20   Friday, given that we're on standard time again.

21             THE DEFENDANT:  4:45.

22             THE COURT:  Can we get a time that the Government

23   will respond to the letter?

24             MS. SMITH:  6:30.

25             THE COURT:  I'll give you to 6:30.

PROCEEDINGS

1          MS. SMITH:  The only thing is, I want to look at the

2   transcript what Mr. Brodsky proffered what the witness will

3   say.  We can do it when the transcript comes in.

4          THE COURT:  Thank you.

5          (Lunch recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1              (Open court; no jury present.)

2              THE COURT:  Have a seat.  Are we ready to bring the

3     jury back?

4              MR. PITLUCK:  Yes.

5              MS. DENERSTEIN:  Your Honor, do you want us to put

6     the witness in the witness stand?

7              THE COURT:  Sure.

8              MS. DENERSTEIN:  Okay.

9              THE COURT:  Do you want to see if the jurors are

10    back?

11             THE LAW CLERK:  Sure.

12             (Short pause.)

13             THE COURT:  I think we had one missing juror, but

14    hopefully, she's back.

15             (WHEREUPON, at 2:08 p.m., the jury re-entered the

16    courtroom.)

17             THE COURT:  All jurors are present.  Please have a

18    seat.  And the defense may call its next witness.

19             MS. DENERSTEIN:  Your Honor, the defense calls

20    Professor Craig Lewis.

21             (Witness takes the witness stand.)

22    CRAIG LEWIS, called as a witness, having been first duly

23    sworn/affirmed, was examined and testified as follows:

24             THE COURTROOM DEPUTY:  State and spell your full

25    name.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS – DIRECT – MS. DENERSTEIN

1          THE WITNESS:  My name is Craig Lewis, C-r-a-i-g,

2     L-e-w-i-s.

3          THE COURT:   Please proceed.

4     DIRECT EXAMINATION

5     BY MS. DENERSTEIN:

6     Q    What is your educational background?

7     A    I am an accounting undergrad from Ohio State University,

8     and I have a masters of science, and a Ph.D. in finance from

9     the University of Wisconsin at Madison.

10    Q    And what years did you obtain those three degrees?

11    A    My -- obtained my undergrad degree in 1978, my masters

12    degree in 1984, and my Ph.D. in 1987.

13    Q    Let's the talk about your career.

14         Where do you work?

15    A    I work at Vanderbilt University.

16    Q    And what where is Vanderbilt University located?

17    A    It is in Nashville, Tennessee.

18    Q    And where do you work at Vanderbilt University?

19    A    The Owen Graduate School of management.

20    Q    And is that a business school?

21    A    Yes.

22    Q    What do you do?

23    A    I am a professor, and I teach courses in finance.

24    Q    How long have you been a professor, Professor Lewis?

25    A    Approximately 30 years.

LEWIS – DIRECT – MS. DENERSTEIN

1    Q    What do you do as a professor of finance?

2    A    I primarily teach classes in corporate finance, I also

3    engage in academic research where I publish papers based on my

4    research program.

5    Q    Do you hold any particular chair as a professor of

6    finance at Vanderbilt?

7    A    Yes.  I am the Madison S. Wigginton professor of finance.

8    Q    And what is that?

9    A    That is an honorary position that's awarded based on your

10   academic accomplishments.

11   Q    And how long have you held that position -- that chair?

12   A    Approximately ten years.

13   Q    Are you also a professor at Vanderbilt Law School?

14   A    I have an honorary degree at the law school, but I do not

15   teach law classes.  I am not a lawyer.

16   Q    What types of courses have you taught over the last 30

17   years?

18   A    So my current teaching load is I teach a course in

19   company valuation, I teach another course in corporate

20   financial policy, I have taught option pricing classes, an

21   introductory option pricing class and an advanced derivative

22   securities class.  I have also taught Ph.D. classes in

23   empirical methods.

24   Q    Whom do you teach?

25   A    I almost exclusively teach MBA and masters of science

LEWIS – DIRECT – MS. DENERSTEIN

1   students.

2   Q    Have you won any awards for excellence in teaching?

3   A    Yes.  I have won a number of teaching awards over the

4   years.  I have been nominated as the outstanding teacher by

5   both the MBA and our executive MBA classes.  I've also

6   received the Dean's award for teaching excellence.

7   Q    What is the executive MBA class?

8   A    It is a full-time MBA program where working professionals

9   are able to obtain a degree while they maintain their current

10  position.

11  Q    Have you held any visiting professorships?

12  A    Yes.  Over the past 30 years I have had a number of

13  visiting professorships.  I have visited at Dartmouth College

14  at the Amos Tuck School of Management, the Donau University in

15  Austria, I have taught at Goethe University in Frankfort

16  Germany, and last summer I had a visiting professorship at

17  Bacone University, which is in Milan, Italy.

18  Q    And what do you do as a visiting professor?

19  A    You teach classes and you assist in creating new research

20  ideas.  I worked on new research projects with the professors

21  at these universities, as well as taught some courses.

22  Q    In connection with your career in academia, have you

23  conducted any research?

24  A    Yes, I have.

25  Q    What types of research have you conducted?

LEWIS - DIRECT - MS. DENERSTEIN

1    A    My research broadly follows the courses that I teach.  I

2    conducted research in corporate finance in a number of

3    different areas.  I'm primarily an empirical corporate finance

4    person.  That means I study the issue decisions that companies

5    make to issue certain types of securities, whether it is debt

6    or equity.  I have performed research in the area of equity

7    research analysts, trying to understand whether some analysts

8    are better analysts than others in how markets respond to the

9    different types of research that equity analysts release.  I

10   have also -- more on the asset pricing of the derivative side,

11   I've worked in areas of forecasting volatility and trying to

12   understand how the markets come up with these estimates of

13   volatility.

14   Q    In connection with your academic research, have you won

15   any awards for your scholarship?

16   A    I have won a number of best paper awards in some of our

17   leading academic journals.  My work in equity analysts won a

18   best paper award at journal -- one of the top three journals

19   in the field called the Journal of Financial Economics.  Last

20   year I won a best paper award at Institutional Investor for a

21   paper that I wrote on the credit default swap market.  I have

22   had a number of other editor recognitions for my work as well

23   in other journals.

24   Q    In connection with your scholarship, have you published

25   in other journals than what you've just described?

LEWIS - DIRECT - MS. DENERSTEIN

1    A    Yes.  I published in a wide range of journals.  Many of

2    the leading finance journals that would include the Journal of

3    Financial Economics, obviously, the Review of Financial

4    Studies, Journal of Financial Quantitative Analysis, Journal

5    of Corporate Finance, I've published in an economics journal,

6    the Journal of Econometrics, some of my volatility work.

7    Q    Do you serve on any editorial boards?

8    A    I do.  I am an associate editor on a number of journals.

9    The Journal of Corporate Finance, I've been an associate

10   editor of the Journal of Financial Research, Journal of

11   Finance Banking.

12   Q    What work, if any, have you done for private companies

13   over the last 30 years?

14   A    I've done -- I've had -- I've done a significant amount

15   of consulting with private companies over the past 30 years.

16   Q    What types of consulting, generally speaking?

17   A    It has ranged from valuation exercises to simple advising

18   on different types of decisions that firms would like to make.

19   I have developed some option trading systems for an option

20   trading firm in Chicago, for example.

21   Q    Are you currently a consultant to a specific firm?

22   A    Yes.  I am a senior advisor at Potomac Global Advisors.

23   Q    What do you do there?

24   A    I primarily do regulatory consulting.  I have written a

25   number of white papers that are designed to inform policy

LEWIS - DIRECT - MS. DENERSTEIN

1   decisions.

2   Q    In addition to being a professor and consulting with

3   private companies, have you also served in government

4   positions?

5   A    Yes, I have.  I was the -- I worked at the SEC over the

6   period 20 -- US Securities and Exchange Commission, over the

7   period 2011 to 2014, where I served as the director of the

8   division of economic and risk analysis.  I also had a joint

9   title as a chief economist as well.

10  Q    What does the SEC do?

11  A    The SEC is a financial regulator that is primarily

12  concerned with investor protection and the maintenance of

13  efficient and orderly capital markets.

14  Q    And what are capital markets generally?

15  A    Capital markets represent the place where firms come to

16  raise new money to take on projects and investors find places

17  to buy and sell securities.

18  Q    What does the division of economic and risk analysis do?

19  A    We are the division -- we.  The division of economic and

20  risk analysis is the division that basically provides economic

21  analysis to support rule making that the commission

22  promulgates, and it also has a -- sort of a data analytic and

23  risk assessment side that is largely designed to support

24  enforcement matters.

25  Q    What did you do as director?

LEWIS - DIRECT - MS. DENERSTEIN

1    A    I oversaw the administration of the commission on the

2    policy side.  I was probably -- I would say I was the chief

3    architect of the economic analyses that were contained in SEC

4    rule makings.  And on the enforcement side, I oversaw a number

5    of risk assessment initiatives, as well as we had a group

6    within there called the office of litigation economics that

7    was a group of economists that was designed to provide support

8    for enforcement cases.

9    Q    What did you do as chief economist?

10   A    In the role of chief economist, that was the primarily

11   the -- that -- in that role, that was where I was primarily

12   performing in helping to decide how to write the economic

13   analysis, that are analyses that are required to be in every

14   SEC rule making.

15   Q    Is the chief economist the highest position for an

16   economist at the SEC?

17   A    Yes.

18   Q    And what is -- what was the difference between the

19   position of director and chief economist?

20   A    The chief economist, it primarily serves in the capacity

21   of designing and helping to craft the economic analyses,

22   whereas the director is a mainly -- is an administrative

23   position that supervises the functioning of the division and

24   its many different offices.  If I can analogize a little bit,

25   like being the dean of a business school, in the director

LEWIS – DIRECT – MS. DENERSTEIN

1   position.

2   Q    Are you familiar with the International Organization of

3   Securities Commissioners?

4   A    Yes, I am.

5   Q    And what is that?

6   A    IOSCO is a group of -- basically, it is a global

7   organization that brings together security market regulators

8   like the SEC to weigh in on a number of issues and how they

9   affect global capital markets.

10  Q    Did you hold a particular position with respect to that

11  organization?

12  A    Yes.  I was -- I worked within a specific group within

13  IOSCO, it was the committee on emerging risks, and that group

14  was where the economists were effectively all located.  It was

15  primarily comprised of chief economists from around the world,

16  from other security market regulators, and I was the

17  vice-chairman of that particular group.

18  Q    And how big was the division of economic and risk

19  analysis?

20  A    When I first became director in 2011, it was

21  approximately 50 people.  By the time I left to go back to

22  Vanderbilt, it had grown to about 135 people.

23  Q    And what was the reason for its growth?

24  A    It was largely -- the growth was driven largely by a

25  decision by the commission to put greater emphasis on the

LEWIS – DIRECT – MS. DENERSTEIN

1    economic analysis that accompany every rule making.

2    Q    Over the past 30 years, what experience do you have in

3    analyzing markets and trading data?

4    A    I would say that my career is based on the analysis of

5    market data, you know, price and volume and return data,

6    largely through my academic research, but, also, in my role as

7    chief economist at the SEC, we frequently weighed in and

8    evaluated market data in a number of different applications,

9    whether it was designed to support rule making, specific rule

10   making, or whether it was designed to help litigate

11   enforcement cases, like insider trading cases.

12   Q    Does any of your scholarship address markets and trading

13   activity?

14   A    Yes.  I would say most of my scholarship addresses market

15   and trading activities.

16   Q    Could you provide the jury with a couple of examples?

17   A    Typically, when you look at corporate financing

18   decisions, you're interested in understanding how the market

19   would respond to a particular decision.  So if a firm was

20   going to issue equity, or a debt issue, as a company, you

21   would like to know how will your stock price be affected by

22   the decision.  So, typically, looking at stock price reactions

23   to those types of announcements helps to inform how firms

24   might think about which choices make the most sense.  And when

25   I have looked at equity research analysts, I am interested in

LEWIS - DIRECT - MS. DENERSTEIN

1    does equity research actually have any type of an impact on

2    stock prices.  And so we looked at things like does equity

3    research create trading volume, does equity research actually

4    cause stock prices to change.

5    Q    And by equity research, what do you mean?

6    A    Typically, an equity analyst works for a large firm, and

7    it supplies research reports that are designed to help

8    investors make decisions that can be as simple as providing

9    what they think next quarter's earning might be, to actually

10   writing a full-blown report on why they think this might be a

11   good stock to buy or sell.

12   Q    Have you testified before?

13   A    This would be the first time I have testified in court,

14   but I have testified in front of Congress.

15   Q    And when did you testify in Congress -- in front of

16   Congress, and for what purpose?

17   A    I believe it was in 2011, where I was -- I testified

18   before the Senate Banking and Finance Committee to basically

19   provide an overview of what was happening in my division at

20   the SEC.

21         MS. DENERSTEIN:  Your Honor, we move to qualify

22   Professor Lewis as an expert in analyzing markets and trading

23   data.

24         MR. PITLUCK:  Your Honor, pursuant to the opinions

25   offered, no objection.

LEWIS - DIRECT - MS. DENERSTEIN

1          THE COURT:  All right.  We will qualify Professor

2    Lewis as an expert in analyzing markets and trading data.

3    BY MS. DENERSTEIN:

4    Q     Professor Lewis, do you know Evan Greebel?

5    A     No.

6    Q     Have you ever met Evan Greebel?

7    A     No.

8    Q     Have you spoken to Mr. Greebel?

9    A     No.

10   Q     What is a stock?

11   A     A stock is a security that provides its owner with a

12   claim or a right to own a part of a company.

13   Q     And what is a public company?

14   A     A public company is a firm that has decided to allow

15   investors to buy its stock, any investor to buy its stock, and

16   in exchange for that right to sell securities to almost

17   anybody, it obligates itself to certain mandatory filings with

18   the US Securities and Exchange Commission.

19   Q     And what is a private company?

20   A     A private company is a firm that has chosen not to have a

21   public listing of its stock, and the owners in that company

22   would be restricted to certain types.

23   Q     Certain types of what?

24   A     Certain types of investors.

25   Q     What are some ways that a private company can become a

LEWIS - DIRECT - MS. DENERSTEIN

1   public company?

2   A     There are two principal ways a private company can become

3   public.  One is the more traditional route, which is something

4   called an initial public offering, where that company decides

5   to list on an organized exchange and raise money that way by

6   selling shares of stock in its company.  An alternative way to

7   actually become a public company, if you are private, is to

8   acquire a publicly traded company, typically a shell company

9   that really doesn't have any active business and effectively

10  become a public company through that shell company.

11  Q     Is the second thing you just mentioned called a reverse

12  merger?

13  A     Yes.

14  Q     What is the purpose of issuing stock to the public

15  generally speaking?

16  A     Generally speaking, companies issue stock to the public

17  because they need to find money to take on new investments and

18  run their business.

19  Q     Is it common for public companies to have different types

20  of financing?

21  A     Yes.

22  Q     What are some of those types of financing?

23  A     Firms have a wide choice of different financings.  They

24  can borrow money from the bank, for example, they can issue

25  debt in a public market, and they can issue equity as well.

LEWIS – DIRECT – MS. DENERSTEIN

1    Stock.

2    Q    What is Nasdaq?

3    A    Nasdaq is one of the largest -- it is the second largest

4    exchange for trading stock.

5    Q    And what kind of requirements, generally speaking, does a

6    company have to meet to be exchanged on Nasdaq?

7    A    To be listed on Nasdaq, a company typically has to meet

8    certain financial requirements, solvency, certain amount of

9    capital.  It also obligates itself to certain corporate

10   governance conditions, such as you have for your board of

11   directors, you have to have an independent board, you have to

12   have an independent board, you have to have a compensation

13   committee that is independent, as an example.

14   Q    What is the over-the-counter bulletin board stock market?

15   A    The over-the-counter bulletin board stock market is a

16   venue where you can buy and sell stocks that are not listed on

17   public exchanges but are still held by public investors.

18   Q    How do the regulatory requirements compare, generally

19   speaking, for over-the-counter bulletin board market versus

20   Nasdaq?

21   A    As a general rule, you are not obli- -- you are not held

22   to the same set of standards, so the regulatory touch is

23   lighter on the over-the-counter bulletin board market than it

24   would be on a public exchange like Nasdaq.

25   Q    What types of companies, generally speaking, trade on the

LEWIS - DIRECT - MS. DENERSTEIN

1    over-the-counter bulletin board market?

2    A    The typical company on the over-the-counter bulletin

3    board market would be a firm that an investor would consider

4    to be highly speculative, they are typically relatively very

5    small companies that are in early stages of their lifecycle.

6    Q    And what do you mean by "speculative"?

7    A    I mean that they are risky as an investment.  Stock

8    prices change quite a bit from day-to-day, relative to a firm

9    that would be listed on the Nasdaq.

10   Q    Why is that?

11   A    Because they are younger, less established companies.

12   They tend to have less developed business models.  They may

13   not even be profitable at the point they are listed on the OTC

14   bulletin board.  You can -- I guess you want to think about

15   them, and you can think about them almost as being lottery

16   tickets, and a lot of people analogize to OTC bulletin board

17   stocks as lottery tickets.

18   Q    What is a broker?

19   A    A broker is an entity that facilitates the buying and

20   selling of stock for an individual investor.

21   Q    What is a market maker?

22   A    A market maker is an entity that actually engages in the

23   buying and selling of those stocks.

24   Q    Do market makers always receive an equal number of buy

25   and sell orders on a daily basis?

LEWIS - DIRECT - MS. DENERSTEIN

1    A    Market makers, no.

2    Q    And why is that?

3    A    Because the number of transactions that a market maker

4    executes depends on the demands by its customers to buy stock

5    and to sell stock.

6    Q    What is share price?

7    A    Share price is simply what you would have to pay to buy a

8    share of a particular company's stock.

9    Q    And what typically happens to share price when more

10   investors are buying?

11   A    It typically goes up.

12   Q    And what typically happens to share price when more

13   investors are selling it?

14   A    It typically goes down.

15   Q    In your experience, do all -- in your experience, what

16   types of trading strategies do -- what are some examples of

17   trading strategies that investors employ?

18   A    Investors employ a number of different trading

19   strategies.  One can simply be to buy securities today and

20   earn a fair rate of return for holding an investment, so it is

21   called buy and hold strategy where you are simply trying to

22   earn money based on how risky that company is.  You are not

23   making a real judgment call on whether you think it is

24   overvalued in the market or undervalued in the market.  Other

25   investors buy securities because they believe they are

LEWIS – DIRECT – MS. DENERSTEIN

1    underpriced and they are worth a lot more than they currently

2    have to pay in the market.  So those are two examples of

3    trading strategies.

4    Q    Let's turn to Retrophin.  Can I -- you have a book in

5    front of you?

6    A    Yes.

7    Q    Can you turn to Government Exhibit 960, which I believe

8    is in the second half of the book, in evidence.

9    A    Yes.  I'm there.

10   Q    And that is -- what is that?

11   A    This is an 8-K filing for Desert Gateway.

12   Q    And what date of the report is there?

13   A    I'm sorry.  I didn't hear your question.

14   Q    What is the date?  Sorry.

15   A    The date is December 12, 2012.

16   Q    And are you familiar with this document?

17   A    Yes.

18   Q    What is an 8-K?

19   A    An 8-K is an mandatory filing that companies are required

20   to submit to the SEC when there's been a material event.

21   Q    Are 8-Ks available to the public?

22   A    Yes.

23   Q    Does it cost for the public to look at an 8-K?

24   A    No.

25   Q    How would you do that if you wanted to?

LEWIS - DIRECT - MS. DENERSTEIN

1   A    You would go to the SEC web site and go to the EDGAR spot

2   in the SEC web site, and you could download it.

3   Q    And what is this the 8-K for?

4   A    This 8-K is for Retrophin's reverse merger with Desert

5   Gateway.

6   Q    Can you turn to page 2 at the bottom.  Can you please

7   read that paragraph.

8   A    Pursuant to an agreement in plan of merger, dated

9   December 12, 2012, or the merger agreement, by and among

10  Desert Gateway, Inc., a Delaware corporation which is referred

11  to herein as the company, Desert Gateway Acquisition Corp, a

12  Delaware corporation, and wholly-owned subsidiary of the

13  company, or merger sub, and Retrophin, Inc., a Delaware

14  corporation, which is referred to hereinafter as Retrophin,

15  merger submerged with and into Retrophin, with Retrophin

16  remaining as the surviving entity and a wholly-owned operating

17  subsidiary of the company.  This transaction is referred to

18  throughout this report as the merger.  The merger was

19  effective as of December 12, 2012, upon the filing of the

20  certificate of merger with the Secretary of State of the State

21  of Delaware.

22  Q    Can you turn to page 75 of 80 in the lower left-hand

23  corner.  And can you look down where it says on December 10,

24  2012?

25  A    Yes.  On December 10, 2012, in connection with the

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS - DIRECT - MS. DENERSTEIN

1    conversion of a convertible promissory note, the company

2    issued 2,500,000 shares to the holder of such note.

3    Q     And then the next paragraph?

4    A     As of December 17, 2012, we had outstanding 8,338,837

5    shares of common stock.  Of these shares, 5,838,837, are

6    restricted securities under Rule 144, in that they were issued

7    in private transactions not involving a public offering.

8    Q     What does restricted security mean?

9    A     It means you are unable to generally buy and sell them.

10   Q     And from this, how -- from this exhibit, how many freely

11   traded shares are available?

12   A     There are 2,500,000 freely traded shares.

13   Q     And this is as of what date?

14   A     December 17, 2012.

15   Q     And what does "free trading shares" mean?

16   A     It means that you can sell those shares so they are at --

17   you're free to buy and sell these shares.

18   Q     At this time, could you buy these shares on a public --

19   an exchange like Nasdaq?

20   A     No.

21   Q     Where could you buy them?

22   A     It would be on the over-the-counter bulletin board

23   market.

24   Q     And what is the risk level associated with the

25   over-the-counter bulletin board market?

LEWIS – DIRECT – MS. DENERSTEIN

1    A      It is very high.  It's a highly speculative place -- it's

2    a place for highly speculative securities to trade.

3    Q      Are risk factors disclosed in this 8-K?

4    A      Yes, they are.

5    Q      Directing your attention to page 23 --

6    A      Yes.

7    Q      -- can you read the first paragraph?

8    A      Our business, as well as our shares of common stock, are

9    highly speculative and involve a high degree of risk.

10   Investing in our common stock involves a high degree of risk.

11   Our securities should be purchased only by persons who can

12   afford to lose their entire investment.  You should carefully

13   consider the risks and uncertainties described below together

14   with all of the other information included herein, including

15   the financial statements and related notes, before deciding to

16   invest in our common stock.  If any of the following risks

17   actually occur, they would materially harm our business,

18   prospects, financial condition and results of operations.  In

19   this event, the market price of our common stock could decline

20   and you could lose part or all of your investment.

21   Q      If you flip through this document, getting on this page,

22   are there other risks that are disclosed?

23   A      Yes.

24   Q      And are there over 20 pages worth of risks that are

25   disclosed?

LEWIS - DIRECT - MS. DENERSTEIN

1    A    There are.

2    Q    I want to turn to Defense Exhibit 116-52 in evidence.  It

3    is Retrophin's December 2013 S-1 form.  Should be in the front

4    half.

5    A    Okay.  I'm there.

6    Q    Are you familiar with this document?

7    A    Yes, I am.

8    Q    What is it?

9    A    This is a form S-1.  This is a document that declares

10   Retrophin's intent to uplist their stock on the Nasdaq

11   exchange.

12   Q    And "uplist" means what?

13   A    It means to basically move from the over-the-counter

14   bulletin board to the Nasdaq exchange.

15   Q    I want to direct your attention to page 66 of 186 in the

16   lower right corner.

17   A    Okay.

18   Q    Can you read the top, please.

19   A    In January 2013, we sold an aggregate of 272,221 shares

20   of common stock at 3 dollars per share in certain private

21   placement transactions, for an aggregate purchase price of

22   $816,664 in cash.  The issuance of such shares of common stock

23   was not registered under the Securities Act as such issuance

24   was exempt from registration under Section 4(2) of the

25   Securities Act and Regulation D promulgated thereunder.

LEWIS - DIRECT - MS. DENERSTEIN

1  Q    The next paragraph, please.

2  A    On February 14, 2013, we closed a private placement of

3  3,045,929 shares of our common stock, at a purchase price of 3

4  dollars per share, or 9,137,787 in the aggregate, and warrants

5  to purchase up to an aggregate of 1,597,969 shares of common

6  stock, with an exercise price of $3.60 per such share

7  underlying any warrant.

8  Q    Can you skip to the next paragraph, please.

9  A    On August 15, 2013, we closed a private placement and

10  sold 5,531,401 shares of our common stock, at a purchase price

11  of $4.50 per share, or 24,891,303, in the aggregate.

12  Q    What do these disclosures mean?

13  A    They mean that Retrophin at two different points in time

14  raised capital in what -- in a vehicle that is known as a

15  PIPE.

16  Q    And are you talking about in February 2013 and August

17  2013?

18  A    Actually, I was referring to January and February, also

19  in August of '13, they also had another PIPE.

20  Q    So how many PIPEs?

21  A    Three PIPEs.

22  Q    And PIPEs means what?

23  A    It means private issuance of public equity.

24  Q    So on three different occasions in 2013, Retrophin raised

25  money?

LEWIS – DIRECT – MS. DENERSTEIN

1   A    Correct.

2   Q    According to this document?

3        And how much money was raised in January 2013?

4   A    It says $816,664.

5   Q    And how much was raised on February 14, 2013?

6   A    $9,137,787.

7   Q    How much was raised on August 15, 2013?

8   A    $24,891,303.

9   Q    I am going to show you -- or you have in front of you,

10  actually, Defense Exhibit 130-85.  Professor Lewis, let me

11  know when you have it.

12  A    I have it.

13        THE COURTROOM DEPUTY:  Is it in evidence?

14        MS. DENERSTEIN:  Yes.

15  BY MS. DENERSTEIN:

16  Q    Retrophin's January 10, 2014 press release announcing a

17  public offering.  What's a public offering?

18  A    A public offering is one of the vehicles that you can use

19  to have your -- to sell equity on a public exchange.

20  Q    What does the first paragraph of this release describe?

21  A    It describes Retrophin's intent to sell 4,705,882 shares

22  of common stock at price of $8.50.

23  Q    If this is a public offering, who would the stock be

24  available to?

25  A    The stock would be available to all investors.

LEWIS – DIRECT – MS. DENERSTEIN

1    Q    And, again, how many shares were they –– were issued?

2    A    4,705,882.

3    Q    And how much was going to be raised?

4    A    Approximately $40 million.

5    Q    And how are each of these –– each of the four financings

6    dates we discussed significant?

7    A    Every –– they're significant to the extent that each time

8    a company enters capital markets to raise new funds, they are

9    needed to run and maintain their business.  So they are all

10   important events for a firm like Retrophin.

11   Q    In the second paragraph, does this state where Retrophin

12   will be listed?

13   A    Yes.

14   Q    What does it state?

15   A    It says it will –– it has received approval to list its

16   common stock on the Nasdaq global market under the ticker

17   symbol RTRX.

18   Q    And going back to the top of this document, what date is

19   it?

20   A    January 10, 2014.

21   Q    And are you aware that Retrophin became listed on Nasdaq?

22   A    Yes.

23   Q    What would you expect to happen to trading activity after

24   an over-the-counter company –– a company that's traded

25   over-the-counter uplists to Nasdaq?

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS - DIRECT - MS. DENERSTEIN

1   A    Well, there are more shares in circulation, so you would

2   expect there to be more shares bought and sold.

3   Q    What benefit is it to a company to be listed on Nasdaq?

4   A    Being listed on a large public exchange like Nasdaq

5   provides the company with a number of I think important

6   benefits, but maybe the most is the ability to efficiently buy

7   and sell shares, so -- and give you a chance to change your

8   position in a relatively cost and -- low cost manner.  It

9   also, for the company, the reason the company would want to

10  actually list on an exchange is that it is typically

11  associated with lower cost of capital.  That means it will

12  require less money to actually go out and borrow money or

13  obtain money financing.

14  Q    Does the company have greater visibility when it is

15  listed on Nasdaq?

16  A    Yes.  There is all -- there's a lot more attention paid

17  to a company on Nasdaq than there would be on the OTC bulletin

18  board.

19  Q    What time periods are important to public companies?

20  A    For a firm like Retrophin that is engaging in a number of

21  capital transactions, all -- basically, all the time, before,

22  during, and after, a capital raise is important.

23  Q    I would like at this point to show you Government Exhibit

24  992, in evidence.

25  A    Okay.

LEWIS - DIRECT - MS. DENERSTEIN

1    Q    What is this?

2    A    This is a chart of Retrophin, and it -- on the chart it

3    displays daily closing prices and share volume over the period

4    December 17, 2012 through September 30, 2014.  The red

5    graph -- the red line on the graph represents the price, and

6    the blue bars on the graph represent the amount of volume that

7    was traded that day.

8    Q    And what is the source for the volume and price of this

9    chart?

10   A    This chart was prepared using a data service provider

11   called Bloomberg.

12   Q    If you look to January 2014, the bottom --

13   A    Yes.

14   Q    -- what happens to the volume of the stock once it is

15   uplisted on Nasdaq?

16   A    Yes.

17   Q    The share volume.

18   A    You can see that once the company's uplisted to Nasdaq,

19   that the level of trading volume go up significantly.

20   Q    And what about the level of trading volume -- before it

21   is uplisted to Nasdaq?

22   A    Well, it is difficult to see on the figure, but there

23   are -- that is the trading -- the aggregate trading activity

24   that took place on the same scale, as what we see after it

25   went -- after it uplisted.  You can detect a few bars, but

LEWIS - DIRECT - MS. DENERSTEIN

1    there are not a lot -- it is hard to see them.

2    Q    And what date does this chart begin?

3    A    It begins on December 17, 2012.

4    Q    And what date does it conclude?

5    A    On September 29, 2014.  September 30, 2014.

6    Q    Where -- you mentioned earlier there were financings that

7    occurred over Retrophin's public existence before it was

8    uplisted to Nasdaq?

9    A    Yes.

10   Q    Where -- can you direct us to this chart where -- was one

11   in August of 2013?

12   A    That's correct.

13        MS. DENERSTEIN:  Mr. Carter, can you go to August

14   now.  Can you blow that up.  That would be great.

15   BY MS. DENERSTEIN:

16   Q    So there's one in August of 2013, correct?

17   A    Correct.

18        MS. DENERSTEIN:  Put a little arrow on -- in between

19   August 5 and August 27, Mr. Carter.  Down by the date.  Good.

20   BY MS. DENERSTEIN:

21   Q    Okay.  And then you also mentioned there was a financing

22   in February -- on February 14, 2013?

23   A    Yes.

24   Q    Sorry.  No, February -- yes.

25   A    February.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS - DIRECT - MS. DENERSTEIN

1   Q    That would be somewhere in here?

2   A    Yes.

3         MS. DENERSTEIN:   Can you put an arrow there,

4   Mr. Carter.

5   BY MS. DENERSTEIN:

6   Q    And then there was a financing in January of 2013?

7   A    Yes.

8   Q    And then there was also a financing, if we go over --

9         MR. PITLUCK:  Your Honor, I'm just going to object

10  to the leading.

11        THE COURT:  I am going to allow this limited leading

12  just to get through to the point, all right.

13        MR. PITLUCK:  Okay.

14        THE COURT:  Don't worry, I will be fair to both

15  sides.

16        MR. PITLUCK:  Okay.

17        MS. DENERSTEIN:  I will do better, Your Honor.

18        THE COURT:  I think she is just trying to get dates

19  and arrows put in the right spot, so we can give her some

20  latitude.

21  BY MS. DENERSTEIN:

22  Q    I am going to direct your attention to January of 2014.

23  Is that when the uplisting happens?

24  A    Yes, that is.

25  Q    Going to try to put an arrow there.  We lost the other

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS – DIRECT – MS. DENERSTEIN

1    arrow.

2            So over this time period between December 17, 2012

3    and January 2014, there are four financings events that occur,

4    correct?

5    A    Correct.

6    Q    And is the amount of money that's raised by Retrophin

7    increasing over time?

8    A    It does.

9    Q    Okay.  Do you know Martin Shkreli?

10           MS. DENERSTEIN:  You can take this down, please,

11   Mr. Carter.  Thank you.

12   BY MS. DENERSTEIN:

13   Q    Do you know Martin Shkreli, Ed Sullivan, Ron Tilles,

14   Andrew Vaino, Tim Pierotti, Kevin Mulleady, Tom Fernandez, any

15   of those names?

16   A    No.

17   Q    Have you spoken to any of the people who I just named?

18   A    No.

19   Q    Do you know anybody who works at Retrophin?

20   A    No.

21   Q    Did you speak to anybody at Retrophin -- who works at

22   Retrophin?

23   A    No.

24   Q    At this point I want to turn to Government Exhibit 990 in

25   evidence.  And what does this summary chart show, Professor

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS - DIRECT - MS. DENERSTEIN

1    Lewis?

2    A    This summary chart shows the stock holdings of the

3    individuals identified in this group, as well as the total

4    number of freely trading shares as of December 17, 2012.

5    Q    And, again, how many freely trading shares were there as

6    of December -- in December 2012?

7    A    2,500,000.

8    Q    And how many were distributed to this group of the

9    2,500,000?

10   A    2 million, or 80 percent.

11   Q    And can you review the names of each of these individuals

12   and how much free trading shares they had, according to this

13   chart?

14   A    Kevin Mulleady has 350,000 shares.  That represents 14

15   percent of the total free trading shares.  Thomas Fernandez

16   has 300,000 shares.  That's 12 percent.  Marek Biestek also

17   has 300,000.  Tim Pierotti has 350,000.  Claridge Capital has

18   350,000.  Andrew Vaino has 250,000.  That represents 10

19   percent of the freely trading shares.  And Ed Sullivan has

20   100,000, which represents 4 percent of the total freely traded

21   shares.

22   Q    Does this chart indicate who owns the remaining 500,000

23   shares?

24   A    No, it does not.

25   Q    What percentage of the 2.5 million free trading shares

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

LEWIS – DIRECT – MS. DENERSTEIN

1    was held by Kevin Mulleady, Tom Fernandez, Marek Biestek,

2    Claridge Capital, Andrew Vaino, and Ed Sullivan, combined?

3    A     Without including Tim Pierotti or with Tim Pierotti?

4    Q     Without including Tim Pierotti?

5    A     So he owns 14 percent, so out of the 80, that would be 66

6    percent of the freely traded shares.

7    Q     What portion of total trading would you expect each of

8    the six free trading -- of the free trading shareholders to

9    account for in -- during this -- to account for?

10              MR. PITLUCK:  Objection, Your Honor.

11              THE COURT:  Overruled.

12              MR. PITLUCK:  What time period?  Foundation.

13              THE COURT:  Is that -- are you talking about in

14   December of 2012?

15   BY MS. DENERSTEIN:

16   Q     2012, January, that's December through February 28?

17              THE COURT:  And the question is?

18   BY MS. DENERSTEIN:

19   Q     2013.

20              What portion of total trading would you expect each

21   of the six free trading shareholders to account for between

22   December 17, 2012 and February 28, 2013?

23              THE COURT:  Go ahead and answer it, sir.

24              THE WITNESS:  They own a large fraction of the total

25   shares, so I would expect them to be transacting a relatively

LEWIS – DIRECT – MS. DENERSTEIN

1    large fraction of the total shares.

2    BY MS. DENERSTEIN:

3    Q     And what about if you -- does your answer change if you

4    include Tim Pierotti with the group of six, during the same

5    period of time, between December 17, 2012 and February 28,

6    2013?

7    A     No.

8    Q     Sorry, I couldn't hear you, Professor Lewis.

9    A     No.

10   Q     And why would you expect them to be a percentage -- a

11   large percentage of the trade?

12   A     Because they own a large percentage of the company.

13   Q     What are some reasons investors buy stock?

14   A     Investors buy stock as an investment.

15   Q     And what are some reasons investors sell stock?

16   A     Investors may sell stock for a number of reasons.  One

17   could be they no longer like the prospects of the company, and

18   it doesn't provide good fit for their portfolio.  Investors

19   also sell securities because they need the money for

20   liquidity, such as to make a down payment on a home, something

21   like that.

22   Q     And what is the reason investors hold stock, might hold

23   stock?

24   A     Either to earn a return, commensurate with its risk, or

25   for speculative purposes because you think it is undervalued.

LEWIS – DIRECT – MS. DENERSTEIN

1    Q    If a group of investors wanted to prevent the price of a

2    stock from dropping, what would you expect them to do?

3    A    I would expect them to buy the stock or hold it.

4    Q    And what would you expect them to do if they wanted to

5    keep the price stable?

6    A    There -- not sell the stock.  Or not buy the stock.  Just

7    not transact at all.

8    Q    Did you analyze specific trading activity for the period

9    December 17, 2012 through September 19, 2014 for the accounts

10   of Martin Shkreli, Marek Biestek, Kevin Mulleady, Thomas

11   Fernandez, Claridge Capital, Andrew Vaino, Edmund Sullivan,

12   and Timothy Pierotti?

13   A    Yes.

14   Q    And was that analysis based on Bluesheet data?

15   A    Yes.

16   Q    And was it based on Bluesheet data in Government Exhibits

17   950, 951, 952, 953, 954, for that same period of time?

18   Government Exhibit 1001.

19   A    I'm sorry, I'm having trouble locating this.

20            MS. DENERSTEIN:  It is just the stip.

21            THE WITNESS:  Yes.

22            (Continued on the next page.)

23

24

25

LEWIS – DIRECT – DENERSTEIN

1    DIRECT EXAMINATION (Continued)

2    BY MS. DENERSTEIN::

3    Q    Okay, so you analyzed that data.

4    A    I did.

5    Q    For the account.

6    A    Yes.

7    Q    And who told you which accounts to analyze?

8    A    The defense.

9    Q    I'm going to show you now Government Exhibit 221-04

10   and -- I'm sorry, Defense Exhibit 221-04 and Defense

11   Exhibit 221-05 for identification.

12         You have them in your binder.

13   A    I do, yes.

14         MS. DENERSTEIN:  Mr. Pitluck, do you need a copy?

15         MR. PITLUCK:  I'm good.  Thank you.

16   Q    Do you have them, Professor Lewis?

17   A    Yes.

18   Q    So have you reviewed these exhibits?

19   A    Yes, I have.

20   Q    And what are they?

21   A    The exhibits --

22   Q    Do not explain them because they're not in evidence yet.

23   A    These are exhibits that provided analysis of trading

24   activity on the part of the individuals that we just

25   discussed.

LEWIS - DIRECT - DENERSTEIN

1    Q    And are they a fair and accurate depiction of your blue

2    sheet analysis?

3    A    They are.

4              MS. DENERSTEIN:  At this time the defense offers

5    Defense Exhibit, 2104 and Defense Exhibit 2105 in evidence.

6              MR. PITLUCK:  No objection, Your Honor.

7              THE COURT:  Received in evidence, Defense

8    Exhibits 221-04 and 221-05.

9              (Defendant Exhibit 221-04, was received in

10   evidence.)

11             (Defendant Exhibit 221-05, was received in

12   evidence.)

13             (Exhibit published.)

14   Q    So turning to 221-05.

15             Can you explain for the jury what this is?

16   A    This particular exhibit provides the trading activity for

17   Marek Biestek on a monthly basis.  It shows -- each row in

18   this exhibit is a month, and then columns represent the gross

19   number of buys, that means how many shares of stock

20   Mr. Biestek purchased during those various months.

21             The next column is gross sales.  That's how many

22   shares of stock Mr. Biestek sold during the months.

23             The column labeled "net volume" is the difference

24   between those two columns.

25             And final column called "cumulative volume" just

LEWIS - DIRECT - DENERSTEIN

1   adds up the net volume numbers on a month-to-month basis to

2   give you a picture or a view as to how much he had been

3   trading in the aggregate.

4   Q    And what does this -- can you go across a particular

5   column starting with number 1?

6   A    So number 1 is for the month of December 2012.  In that

7   month, Mr. Biestek did not buy any of Retrophin common stock,

8   but he did sell a thousand shares.  So his net volume was he

9   sold a thousand shares, and so the cumulative volume in that

10  case would be a thousand shares sold.

11  Q    And what about in February 2013?

12  A    So in February of 2013, that would be row 3, Mr. Biestek

13  did -- once again, did not buy any shares of Retrophin but he

14  did sell 2,350 shares for net volume on the month on net he

15  sold more than he bought by the amount 2,350 shares.

16           And the cumulative volume simply takes what is net

17  selling it then up to that point, which was a thousand shares,

18  and it added the 2,350.  So his cumulative volume was he was a

19  net seller of 3,350 shares.

20  Q    And so if you go to column 20 -- row 22, what does that

21  tell you?

22  A    Row 22 tells you, once again, the same information during

23  that month:  How many shares did he buy, how many did he sell,

24  and what his net activity was.

25           But the final number down in the lower right-hand

LEWIS - DIRECT - DENERSTEIN

1    corner represents the total amount of net activity over that

2    entire time period from 2012 to -- from December of 2012 to

3    September 2014 he was a net seller of 10,850 shares.

4    Q    And what does it mean to be a net seller?

5    A    It means he sold more shares than he purchased.

6    Q    And turning to page 2.

7    A    Okay.

8    Q    What does page 2 -- does page 2 represent the same type

9    of information for Mr. Fernandez as the first page?

10   A    Yes, it does.

11        And it demonstrates that Mr. Fernandez did not trade

12   any Retrophin stock at all over this time period.

13   Q    Turn to page 3.

14        What does this reflect?

15   A    This provides the same analysis for Kevin Mulleady.

16   Q    Over the same period of time?

17   A    Yes.

18   Q    And if you go to 22, row 22, what does row 22 reflect?

19   A    It indicates that Mr. Mulleady sold 370,178 more shares

20   than he purchased over this period.

21   Q    Is Mr. Mulleady a net seller?

22   A    Yes, he is.

23   Q    And during which month is Mr. Mulleady selling?  Can you

24   also tell this from this chart?

25   A    Yes, he's a net -- he's a net seller.  Starting in

LEWIS - DIRECT - DENERSTEIN

1  January 2013 through February 2014, he is a net seller in

2  every one of those months.

3  Q    And is that 13 months?

4  A    That's 14 months.

5  Q    Your math's better than mine.

6         Turning to page 4.

7         What does this represent

8  A    This is the same analysis for Ed Sullivan.

9  Q    And over this period of time, what is Ed Sullivan?

10  A    Over this entire period of time, Mr. Sullivan is a net

11  buyer of Retrophin common stock.

12  Q    And can we turn to the next page.

13  A    Okay.

14  Q    What is Mr. Tilles?

15  A    Mr. Tilles is also a net buyer of Retrophin common stock.

16  But he only made purchases on two months over that entire time

17  period.

18  Q    And how much did he purchase?

19  A    7,100 shares.

20  Q    And going to Mr. Vaino, the next page?

21  A    It's the same analysis for Mr. Vaino, and looking at the

22  lower right-hand corner, you can see that he was a net seller

23  of 210,953 shares.

24  Q    And if you go to January, February of 2013, what is

25  Mr. Vaino doing?

LEWIS - DIRECT - DENERSTEIN

1   A   He's selling stock.

2   Q   And how much does he sell?

3   A   From January -- over the months of January and

4   February 2013, he sells 55,000 shares.

5   Q   Does he also sell in December of 2012?

6   A   Yes, he does, he sells an additional 12,000 shares.

7   Q   Turn to the next page.

8       What does this reflect?

9   A   This is the same analysis for Martin Shkreli.

10  Q   What does Martin Shkreli do over this time period?

11  A   He, if you look in the lower right-hand corner, he ends

12  up being a net seller of 91,372 shares of Retrophin common

13  stock.

14  Q   And on the final page?

15  A   This is the same analysis for Tim Pierotti.

16  Q   And what does it show?

17  A   That he is a net seller of 350,000 shares.

18  Q   So let's go to Defense Exhibit 2104.

19  A   Okay.

20  Q   And what do these pages represent?

21  A   These pages are a graphical representation of exactly the

22  same information that we just went through.  It shows the

23  monthly trading activity of this group of individuals.

24  Q   And how can you tell from this chart what is a buy?

25  A   Well, buys would be depicted as blue bars on this chart.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

LEWIS - DIRECT - DENERSTEIN

1   Q    And how can you tell what is a sell?

2   A    They are depicted as red bars on this chart.

3   Q    And how can you tell what period of time?

4   A    At the bottom of the figure, you see December '12 through

5   September '14.  Those indicate the months, the same months

6   that we analyzed in the prior set of exhibits.

7   Q    And what does the left column represent?

8   A    That represents the number of shares that were bought or

9   sold.

10  Q    And what does the box in the middle represent?

11  A    That is the net trading activity that would represent

12  what was in the lower right-hand corner of the prior exhibits.

13  Q    And what does that represent on this chart for Marek

14  Biestek?

15  A    That box indicates that Marek Biestek sold 10,850 more

16  shares than he purchased over the period of December 2012

17  through September 2014.

18  Q    And then turning to the next page.

19  A    Okay.

20  Q    What does it tell you?

21  A    This is the same analysis for the same graphical --

22  excuse me, analysis for Thomas Fernandez.  And it shows just

23  like before, he did the trading.

24  Q    And turning to the next page, 3, Kevin Mulleady?

25  A    It's the same analysis that we just looked at for Kevin

LEWIS – DIRECT – DENERSTEIN

1   Mulleady.

2   Q     And how much does he sell over this time period?

3   A     He sells 370,178 more shares than he purchases.

4   Q     And is he selling between January 2013 and February 2014?

5   A     Yes.

6   Q     Let's turn to the next page, page 4.

7   A     Okay.

8   Q     What does this chart show for Ed Sullivan?

9   A     This chart shows his trading activity.  You can see that

10  Mr. Sullivan buys and sells stock over this period, but on net

11  he is -- he bought 22,879 more shares than he sold.

12  Q     And when is his first sale?

13  A     His first sale?

14  Q     On this chart.

15  A     It occurs in April 2013.

16  Q     And when is his first buy?

17  A     It is in November of 2013.

18  Q     Is most of Mr. Sullivan's trading activity after November

19  of 2013?

20  A     Yes.

21  Q     Turn to the next chart, page 5.

22        What does this represent?

23  A     This is the monthly trading activity of Ron Tilles.

24  Q     And what does it show?

25  A     It shows that he was a buyer of Retrophin stock over this

LEWIS – DIRECT – DENERSTEIN

1   period of time.

2   Q      And when did he buy?

3   A      November 2013 and June of 2014.

4   Q      It's hard to see the November of '13.

5          And how much did he buy in total?

6   A      7,100 shares.

7   Q      Turning to the next page, page 6.

8   A      Okay.

9   Q      What does that show?

10  A      It shows the monthly trading activity of Andrew Vaino.

11  Q      And during what periods did Mr. Vaino sell?

12  A      He's selling between -- December 2012 and March 2013.  He

13  also sells in April of 2014, august of 2014, and September of

14  2014.

15  Q      And what is his net trading activities?

16  A      It is -- he has sold 210,953 more shares than he

17  purchased.

18  Q      Turning to page 7.  What does that show?

19  A      It shows a monthly trading activity of Martin Shkreli in

20  a graphic form.

21  Q      And when does he sell?

22  A      He sells -- he sells one time in May of 2014.

23  Q      And when is he buying?

24  A      He is buying in February of 2013, August of 2013, and

25  over the period of January 2014 to April 2014.

LEWIS – DIRECT – DENERSTEIN

1          And then he has a final settle.  He also trades buys

2     stock in September 2014.

3  Q     Now, we've just gone through the different activities --

4     oh, last one.  Page 8.

5          What does Tim Pierotti do?

6  A     Tim Pierotti is selling stock over -- over the period of

7     December 12 -- I'm sorry, over December 2012 through August

8     2013.  And he's a net seller of 350,000 shares.

9  Q     Now, I'd like to show you Defense Exhibit 221-06 for

10    identification.  Okay.

11         What is it?

12  A     This is the aggregate -- this is the individual monthly

13    net volume over the period December 17th, 2012 through

14    September 19th, 2014.

15         It is providing the monthly net transactions for

16    each of the individuals in this group.

17  Q     So if you could just use the first row to explain each

18    column.

19  A     So row 1 of this chart is December of 2012 and it shows

20    that Marek Biestek sold 1,000 more shares than he purchased in

21    that month.  Kevin Mulleady bought 600 more shares than he

22    sold.  And Andrew Vaino sold 12,000 more shares than he

23    bought.  And Martin Shkreli bought 200 shares.

24         The next column sums that activity, the total net

25    activity for the group, and that particular set of individuals

LEWIS - DIRECT - DENERSTEIN

1    sold 12,200 more shares than they purchased.  And then Tim

2    Pierotti, who's indicated separately, sold 43,900 shares over

3    that same time period.

4           So all of these individuals together sold 56,100

5    more shares than they purchased.

6    Q    So if you go to the bottom --

7           Can we offer Defense Exhibit 221-06 into evidence.

8           MR. PITLUCK:  No objection.

9           THE COURT:  We receive Defense Exhibit 221-06.

10          (Defendant Exhibit 221-06, was received in

11   evidence.)

12          (Exhibit published.)

13   Q    So if you look at column -- row 22.

14   A    Yes.

15   Q    The bottom.  And we go to what's highlighted in yellow,

16   where it says "653374".

17          What does that reflect?

18   A    That number indicates that the group of individuals in

19   the first seven columns sold 653,374 more shares than they

20   purchased over the period beginning in December 2012 and

21   ending in September 2014.

22   Q    How many shares did they sell?

23          MR. PITLUCK:  Objection, Your Honor.

24          THE COURT:  Sustained.

25   Q    If you go over to total net volume, that column.

LEWIS - DIRECT - DENERSTEIN

1    A      Okay.

2    Q      What does that number reflect under the total?

3    A      That column reflects that if you also include the trading

4    activity of Tim Pierotti, this group of individuals sold

5    1,003,374 shares -- more shares than they purchased over the

6    time period indicated.

7    Q      If you had to look at this group in the aggregate, were

8    they net sellers as a group?

9    A      Yes.

10   Q      And by how much?

11   A      1,003,374 shares.

12   Q      If you removed Tim Pierotti, were they still net sellers

13   in the aggregate?

14   A      Yes.

15   Q      By about how much?

16   A      653,374 -- 653,374 shares.

17   Q      Why did you want to look -- why did you look at the

18   buying and selling activity, what conclusions can you draw

19   from looking at the buying and selling activity of these

20   individuals over this period of time?

21   A      I can conclude that as a group that they were net sellers

22   of Retrophin common stock.

23   Q      And what conclusion do you draw from the fact that they

24   are net sellers?

25   A      That the data does not to provide any indicators that

LEWIS - DIRECT - DENERSTEIN

1  they were behaving in a coordinated manner to cause that

2  Retrophin stock to go up in value or to be maintained at a

3  safe price.

4  Q    And what is that based on?

5  A    It's based on the fact that when investors sell stock,

6  stock prices tend to go down.

7  Q    Okay.  Over this period of time between December 2012 --

8  I'm sorry, between December 17, 2012 and September 19, 2014,

9  do you recall how much stock Mr. Vaino sold in total?

10 A    I have an entry for that, too, in one of the other

11 exhibits.

12 Q    You can refer back.

13 A    You want the net amount that he sold or do you want the

14 actual?

15 Q    Net.

16         MR. PITLUCK:  Can we get whichever exhibit the

17 witness is looking at?

18         THE COURT:  Yes.

19         (Exhibit published.)

20 A    I'm still looking at 22 -- 221-06.  I can answer the

21 question from this exhibit.

22         MR. PITLUCK:  Thank you.

23 A    Mr. Vaino, ended up selling 210,953 more shares than he

24 purchased.

25 Q    And Mr. Mulleady, how many shares did he sell in total

LEWIS - DIRECT - DENERSTEIN

1    over this period of time?

2    A    So Mr. Mulleady sold 370,178 more shares than he

3    purchased over this period.

4    Q    Going back very quickly to Government Exhibit 990 in

5    evidence.

6              (Exhibit published.)

7              How many shares, according to this chart, did

8    Mr. Mulleady have to sell?

9    A    He has 353,000 shares.

10   Q    And how many shares did Mr. Vaino have to sell?

11   A    Mr. Vaino had 250,000 shares.

12   Q    And how many did Mr. Pierotti have?

13   A    Mr. Pierotti had 350,000 shares.

14   Q    Going back to Defense Exhibit 221-06 --

15   A    Okay.

16   Q    -- how many shares did Mr. Pierotti sell?

17   A    Mr. Pierotti sold 350,000 shares.

18   Q    So is it fair to say that Mr. Pierotti, Mr. Vaino,

19   Mr. Mulleady sold the vast majority of all of their free

20   trading shares they acquired?

21   A    Yes, that is correct.

22   Q    Let's turn to Defense Exhibit 221-07 for identification.

23   A    Okay.

24   Q    What is it?

25   A    This is a graphical representation of the chart of the

LEWIS - DIRECT - DENERSTEIN

1  numerical analysis that we just examined.

2          MS. DENERSTEIN:  Your Honor, the defense offers

3  Exhibit 221-07 in evidence.

4          MR. PITLUCK:  No evidence.

5          THE COURT:  We receive as Defense Exhibit 221-07.

6          (Defendant Exhibit 221-07, was received in

7  evidence.)

8          (Exhibit published.)

9  Q    Can you just briefly explain this chart to the jury?

10 A    This chart shows in a graphical format the net trans --

11 net activity of the various individuals that are indicated in

12 the box in the lower left-hand corner, and the colors are

13 coded to the individual.

14         So bars that are above the line represent net buying

15 activity, the bars that are below the line represent net

16 selling activity, and we're tracking that activity from

17 December 17th, 2012 through September 19th, 2014.

18 Q    What's this based on?

19 A    The exact -- it would be based on Exhibit 221-06.

20 Q    What's the underlying source of the data?

21 A    It is the blue sheet data.

22 Q    And what does the left-hand column represent?

23 A    It represents the number of net -- it's the number of

24 shares, the number of net shares that were traded during that

25 particular month.

LEWIS – DIRECT – DENERSTEIN

1   Q    And what does the column on the bottom represent, the

2   period of time?

3   A    It's broken up by month.  And the months begin in

4   December 2012 and they end in September 2014.

5   Q    And could you please name the accounts that are described

6   on this chart?

7   A    Yes.

8        Marek Biestek is represented by blue bars.

9        Thomas Fernandez who didn't trade, it doesn't

10  actually appear on this graph.

11       Kevin Mulleady is the green bars.

12       Ed Sullivan the brown bars.

13       Ron Tilles is the slightly differentiated of blue.

14       Andrew Vaino is orange.

15       Martin Shkreli is red.

16       And Tim Pierotti is purple.

17  Q    On this chart, the colors are doing different things,

18  correct, over this period of time?

19  A    The only thing they're doing differently is designating

20  which individual was responsible for the trading activity.

21  Q    With respect to each month, the chart's -- each select

22  account is engaging in the same activity; is that right?

23  A    That is correct.

24       MR. PITLUCK:  Objection, Your Honor.  To form.

25  Q    What is Marek Biestek doing -- how can you tell what

LEWIS – DIRECT – DENERSTEIN

1   Marek Biestek is doing on this chart?

2   A    By looking for the lighter blue bars on the chart and

3   identifying where they -- where there are blue bars.

4   Q    And so how would you identify what Andrew Vaino is doing?

5   A    Andrew Vaino is represented by the orange bars on the

6   chart.

7   Q    And what is he doing over this period of time?

8   A    Andrew Vaino is basically selling more than he's buying.

9   He's a net seller over this period of time.

10  Q    And what about different Kevin Mulleady?

11  A    Kevin Mulleady is also a net seller over this time

12  period.

13  Q    And how is he identified on the chart, by what color?

14  A    He is represented by the green bars.

15  Q    So for each individual, you just match the color to the

16  month of the trade to figure out what they're doing?

17  A    Yes.

18  Q    Trading-wise.

19         I would like to show you Government Exhibit 995 in

20  evidence.

21         (Exhibit published.)

22         THE COURT:  I think it might be a good time to give

23  everybody a mid-afternoon break.

24         So please put your notebooks face down.  Don't talk

25  about the case.  Remain open minded.  And he will come and

LEWIS - DIRECT - DENERSTEIN

1   retrieve you soon.  Thank you very much.

2              (Jury exits the courtroom.)

3              THE COURT:  All right, let's take ten minutes.

4              MR. MASTRO:  I just have one thing, Your Honor.

5         I noticed just before the break, and I handed a note

6   to Ms. Denerstein.  When we see the immediate transcription,

7   and I know you go back and correct, but she asked the

8   question:  Each account is not engaging in the same activity

9   and the witness said "correct," but the word "not" was left

10  out of the transcript, and that completely changes --

11             MR. KESSLER:  Why don't you just ask the question

12  again.

13             MR. MASTRO:  She elicited testimony how each account

14  had different trading activity, but the question she actually

15  asked was each account is not engaging in the same activity

16  and he answered correct.  The "not" is missing in the

17  question.

18             MS. SMITH:  Your Honor, he can just strike the

19  question.

20             MR. MASTRO:  I don't think we need to strike it.  I

21  know you also record, too, or you just...  I know that the

22  transcripts get cleaned up, but the "not" missing completely

23  changes the answer.

24             MR. KESSLER:  We're not objecting to anything, just

25  for purposes of altering the transcript, since we don't have a

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

LEWIS - DIRECT - DENERSTEIN

1   recollection of what actually was said, let's just ask the

2   question again.

3               MR. MASTRO:  Do you see what I mean, Your Honor?

4               It was towards the very end of his testimony on the

5   last exhibit that she was using, Ms. Denerstein.

6               THE COURT:  Was it the question she asked

7   specifically about Mr. Vaino?

8               MR. MASTRO:  Yes, it was before she asked specific

9   questions about the individual's trading activity.  She

10  asked --

11              THE COURT:  Yes, it reads:

12              "QUESTION:  With respect to each month, the

13  chart, each account is engaging in the same activity;

14  is that right?

15              "ANSWER:  That's correct."

16              Is that the problem?

17              MR. MASTRO:  Correct, he said -- the question was

18  not engaging and then, of course, she elicits testimony about

19  them not engaging in the same trading activity.

20              THE COURT:  All right, so she'll rephrase the

21  question or she'll just ask the question again?

22              MR. MASTRO:  Correct.

23              THE COURT:  Or would you rather just have it

24  stricken?

25              MS. SMITH:  It's up to the defense, but rather than

LEWIS – DIRECT – DENERSTEIN

1    just edit the transcript just have the question reasked.

2              MR. MASTRO:  It's fine.  She can reask the question.

3    And I'm sure she'll get the same answer she got before.

4              THE COURT:  Well, just to be clear in the record,

5    why don't we strike the question and answer, she'll reask the

6    question, and we will get his answer.  Just because if they

7    want a read back, I don't want to forget that that happened.

8              MR. MASTRO:  It's no problem.  It's no problem.

9              We can just strike the question and answer now, and

10   then she'll just reask it.

11             THE COURT:  Do the parties from any objection to

12   just striking it without announcing it to the jury?  I think

13   will just confuse them.

14             MR. MASTRO:  Correct.

15             THE COURT:  All right, so do you know what we're

16   talking about.

17             All right we'll take a break.

18             (Whereupon, a recess was taken at 3:33 p.m.)

19

20

21

22

23

24

25

LEWIS - DIRECT - DENERSTEIN

1          (Jury enters the courtroom.)

2          THE COURT:  All the jurors are present.  Have a

3    seat.

4          You may resume your direct, Ms. Denerstein.

5    BY MS. DENERSTEIN::

6    Q    Mr. Carter, can you put up Defense 221-07.

7          Mr. Lewis, do you have it?

8    A    I see it yes, I have it.

9    Q    Based on this chart it shows that each account is not

10   engaging in the same trading activity over this period of

11   time, correct?

12   A    Correct.

13   Q    Okay.  Can we go to Government's Exhibit 995 in evidence.

14   What is this?

15   A    This is an exhibit of daily closing prices and volume for

16   Retrophin common stock over the period December 17, 2012,

17   through February 28, 2013.

18   Q    And what does the left column represent?

19   A    Total, it represents total share of volume.

20   Q    What does the bottom represent?

21   A    It represents days over that time period.

22   Q    And what do the green bars show?

23   A    The green bars show the trading volume for the

24   individuals in select accounts which are identified in the

25   upper, right-hand corner of the screen Martin Shkreli, Kevin

LEWIS – DIRECT – DENERSTEIN

1    Mulleady, Andrew Vaino, Martin Biestek.

2    Q    If you were going to -- does this chart reflect any of

3    the pipes that you discussed previously in your testimony?

4    A    Yes.  It covers a period for the first two pipes that

5    Retrophin issued.

6    Q    Was the first pipe in January?

7    A    January 2013, yes.

8    Q    And when was the second pipe?

9    A    It would be in February, February 14, 2013.

10   Q    And when does the chart end?

11   A    February 28, 2013.

12   Q    Is that ten days after, approximately, the February 14

13   pipe?

14   A    Yes, approximately.

15   Q    Does this chart reflect the August 2013 pipe?

16   A    No.

17   Q    Does it reflect the public offering in January 2014?

18   A    No.

19   Q    Are those significant events?

20   A    Yes.

21   Q    What doesn't this chart describe with respect to the

22   select accounts in green?

23   A    You're unable to disentangle the actual trading behavior

24   of the individuals in the account.  For example, you don't

25   know if one individual is buying and the other one was

LEWIS - DIRECT - DENERSTEIN

1   selling, so it mixes buying and selling together.

2   Q     What about with respect to the purple bar?

3   A     That is the trading activity of Tim Pierotti, also

4   identified in the upper, right-hand corner.

5   Q     Can you tell whether Tim Pierotti is buying or selling

6   from this chart?

7   A     Not from this chart.

8   Q     Why does this matter whether somebody is buying or

9   selling?

10  A     Because generally speaking, prices are responding to

11  buying pressure or selling pressure in the market.  So if

12  investors are, if a group is buying stock, that sends stock

13  prices to go up.  If they are selling stock, it tends to cause

14  stock prices to go down.

15  Q     Does this chart describe any activity by Mr. Fernandez?

16  A     It does not.

17  Q     Does it describe any activity by Mr. Sullivan?

18  A     It does not.

19  Q     And why does it matter whether the select account is

20  selling as opposed to buying, based on your analysis?

21  A     Because it would be, you would expect it to influence,

22  the direction of the price would change.

23  Q     And how would the price change if you were selling?

24  A     It would tend to reduce prices.  When a market maker

25  observes a lot of investors coming to the market who want to

LEWIS - DIRECT - DENERSTEIN

1   sell the stock, that market maker infers that they may know

2   something that he doesn't, so he lowers the price that he's

3   willing to pay for that stock.

4   Q    So if you were looking for coordinating trading activity

5   to support a price increase or stabilizing the price, what

6   would you look for?

7   A    I would look for volume and price changes simultaneously.

8   Q    Would you also look at buying?

9   A    I would if I wanted to look for evidence that the price

10  was going up or, I would expect to see buying so I would look

11  for buying.

12  Q    Over this period of time -- let's go to something, let's

13  go to Defendant's Exhibit 221-02 for identification, what is

14  that?

15  A    This is the trading activity over this time period for

16  the individuals that we, that I had previously identified, so

17  a group of individuals that includes Martin Shkreli and Tim

18  Pierotti.

19           MS. DENERSTEIN:  The defense offers 221-02 in

20  evidence.

21           MR. PITLUCK:  No objection, your Honor.

22           THE COURT:  We will receive Defense Exhibit 221-02

23  in evidence.

24           (Defendant Exhibit 221-02, was received in

25  evidence.)

LEWIS - DIRECT - DENERSTEIN

1    BY MS. DENERSTEIN::

2    Q    Can you describe this chart to the jury, please?

3    A    This chart looks at the net trading activity of these

4    individuals over the same period as the exhibit that we just

5    examined.  And what you can conclude from that is that over

6    this period of time, Thomas Fernandez, Ed Sullivan, Ron Tilles

7    did not trade.  Martin Biestek, Kevin Mulleady, Andrew Vaino

8    and Tim Pierotti all traded.  They all sold.

9            One of the things that you can see, if you look at

10   Kevin Mulleady, who is the third column over, is that over

11   that period he bought 4,400 shares and sold 31,150 shares.  So

12   the box in the middle is the net trading activity.  It

13   indicates that collectively for all these individuals they

14   sold 226,505 more shares than they bought.

15   Q    Why did you look at the period of December 17, 2012

16   through February 28, 2013?

17   A    Because that was the time period that the Government was

18   examining.

19   Q    And what did you conclude when you say it was net trading

20   activity?

21   A    I concluded as a group, these individuals, are net

22   sellers of Retrophin common stock.

23   Q    How did that you impact your analysis?

24   A    I don't understand your question.

25   Q    What do you conclude from the fact that they were net

LEWIS – DIRECT – DENERSTEIN

1  sellers?

2  A    I can conclude that as a group that there is no, the data

3  does not, is not consistent with this group behaving in a

4  coordinated matter over that time period to try to attempt to

5  cause Retrophin stock price to go up or remain stable.

6  Q    Just for clarity, blue equals what?

7  A    Blue bars represent the total number of shares that were

8  sold over this time period -- the total number of shares that

9  were purchased over this time period by these groups of

10  individuals.

11  Q    And red is?

12  A    That would represent the number of shares that were

13  actually sold by these individuals over this time period.

14  Q    And again, if you remove Mr. Pierotti's trading activity,

15  what happens to the trading?

16  A    It has the same qualitative characteristics, even if you

17  exclude Mr. Pierotti.  This group was still selling more

18  shares than they were purchasing.

19  Q    At this time can we show you Defendant's Exhibit 221-03

20  for identification.  What is that?

21  A    This exhibit is an analysis of trading activity by the

22  same group of individuals that we just looked at over the

23  period December 17, 2012, through February 28, 2013.  The key

24  difference here is we are providing that trading activity on a

25  monthly basis for the months of December 2012, through

LEWIS - DIRECT - DENERSTEIN

1    February 2013.  So the --

2              MS. DENERSTEIN:  We offer Defendant's Exhibit 221-03

3    in evidence into.

4              MR. PITLUCK:  No objection.

5              THE COURT:  We receive Defendant's Exhibit 221-03.

6              (Defendant Exhibit 221-03, was received in

7    evidence.)

8    BY MS. DENERSTEIN::

9    Q    Can you describe this for the jury, please?

10   A    Yes.  Each of the first three rows in this exhibit

11   illustrate the number of shares that the individuals either

12   bought or sold over these various months.

13             So if I could just take the first row and explain

14   how that was put together.  In December 2012 Marek Biestek

15   sold 1000 shares, Kevin Mulleady bought 600 shares, Andrew

16   Vaino sold 12,000 shares, Martin Shkreli bought 200 shares,

17   and Tim Pierotti sold 43,900 shares.  Mr. Fernandez, Sullivan

18   and Claridge did not trade over that period.

19   Q    What happens in the next row, January 2013?

20   A    Over that period Mr. Mulleady purchased 3,300 shares and

21   sold 15,100 shares.  Mr. Vaino sold 42,000 shares.  And

22   Mr. Pierotti sold 14,500 shares.

23   Q    Is net selling consistent with a coordinated effort to

24   stabilize or push up share price?

25             MR. PITLUCK:  Objection.  Leading.

LEWIS - DIRECT - DENERSTEIN

1          THE COURT:  Sustained.

2     Q     Based on your analysis, what did you conclude about

3     whether or not these accounts were net sellers?

4     A     I was able to conclude, if you look at the bottom row,

5     which is the net activity over this entire period, that this

6     group of individuals, with the exception of Martin Shkreli,

7     were all net sellers of Retrophin common stock.  As a group

8     they were collectively net sellers of Retrophin common stock.

9     Q     Who hired you?

10    A     The defense.

11    Q     When?

12    A     Last August.

13    Q     Do you know anyone at Gibson Dunn prior to being hired?

14    A     I met, I was a guest speaker for Gibson Dunn attorneys

15    class at Georgetown Law School while at the SEC.  But I

16    actually don't remember his name.

17    Q     Is that Gibson Dunn lawyer, who's name you don't

18    remember, involved in this case?

19    A     No, he's not.

20    Q     Do you know anybody at Dubin Consulting?

21    A     No, I don't.

22    Q     Are you being paid?

23    A     Yes.

24    Q     By whom?

25    A     The defense.

LEWIS - DIRECT - DENERSTEIN

1    Q    How much are you being paid?

2    A    $1,000 an hour.

3    Q    How many hours have you worked on this matter to date?

4    A    Approximately 70.

5    Q    And so how much is due to you?

6    A    Approximately $70,000.

7    Q    Are you also being paid for your time in court today?

8    A    Yes, I am.

9    Q    Let's just, did you meet with Gibson Dunn in advance of

10   your testimony?

11   A    Yes, I did.

12   Q    And how many times did you meet with Gibson Dunn?

13   A    I met with Gibson Dunn attorneys in person this week and

14   had a number of phone calls with them over the period of

15   August until this week.  I don't know the exact number, but I

16   would guess somewhere in the order of six to seven calls.

17   Q    How many meetings did you have with attorneys from Gibson

18   Dunn in person?

19   A    I met, I came up to New York on, last week.  So I was

20   here for two days last week, and three days, so five days.

21   Q    What happened during those meetings?

22   A    I discussed the analysis that I had directed and prepared

23   for purposes of this testimony.

24   Q    And did Gibson Dunn ask you questions about that

25   analysis?

LEWIS - DIRECT - DENERSTEIN

1   A     Yes.

2   Q     What are some general representative factors that can

3   effect the price of stock?

4   A     There are a lot of different things that can effect stock

5   price.

6           THE COURT:  May I ask you, I'm sorry, general

7   representative factors, what does that mean?

8   Q     What are some general factors that can effect the price

9   of the stock?

10  A     Basically stock prices change because of information.  So

11  information about the company's future prospects, so the

12  things that are informative to investors would be the filings

13  they make at the Securities & Exchange Commission, annual

14  reports, quarterly reports.  Analysts collect information and

15  distribute it, news reports, general factors about the economy

16  and how its doing and how Retrophin may behave relative to the

17  economy.  Things like that are generally things that investors

18  are attempting to identify that can help them forecast the

19  future profits and cash flows that they think a company will

20  generate.

21  Q     What are general reasons why investors might hold stock?

22  A     Investors tend to hold stock I think for two basic

23  reasons.  One, is because they would like to have exposure to

24  certain types of assets in their portfolio.  And when you buy

25  securities you hope to earn a return on those.  Most investors

LEWIS - DIRECT - DENERSTEIN

1    are hoping to earn a fair return on their securities.  If you

2    ever invested in, through your pension fund or something, in a

3    mutual fund like a large S&P 500 type fund, you're saying I'm

4    somebody who wants to earn a fair return over time.

5           Other investors will buy stocks because they think

6    they are not selling for the right price, they think they are

7    too low.  You might buy a stock for speculative reasons,

8    hoping if you buy low, you'll be able to realize a profit when

9    it goes to the price you believe it should be selling at.

10   Q    Okay.  Let's turn to the a different topic.

11          If a group of investors were coordinating to keep a

12   stock's price up or stable, how would you expect them to react

13   to drops in price?

14   A    I would expect, if they were trying to stabilize the

15   price or cause it to go up in response to a drop in price, I

16   would expect them to step in and begin to buy stock in an

17   effort to try and bring the price back to the level they

18   wanted it to trade at.

19   Q    Can I show you now Defendant's Exhibit 221-10A?

20   A    Okay.

21   Q    What is this?

22   A    This is an analysis that I directed that was designed to

23   ask a question following stock price declines:  Was there any

24   evidence on the part of this group of individuals that they

25   were stepping in this, to actually buy stock in an effort to

LEWIS − DIRECT − DENERSTEIN

1   push it back to a price that it was before it dropped.

2             MS. DENERSTEIN:  The defense offers Exhibit 221−10A

3   in evidence.

4             MR. PITLUCK:  No objection.

5             THE COURT:  We will receive Defendant's Exhibit

6   221−10A in evidence.

7             (Defendant Exhibit 221−10A, was received in

8   evidence.)

9   BY MS. DENERSTEIN::

10  Q    Professor Lewis, can you explain this chart to the jury?

11  A    Yes.  This chart is a summary of trades on days following

12  stock price declines.

13            So if yesterday there was a drop in stock price this

14  is going to analyze the trading activity of this group of

15  individuals the next day.  So if I can go through and just

16  explain a row.

17            So if you take row one.  What happened was on the

18  prior day there was a price decline of .15.

19  Q    Where did that information come from?

20  A    From Bloomberg data.  And that was December 20, 2012.  On

21  that day you see that Kevin Mulleady bought 100 shares of

22  stock.  If you look at second row you'll see that on

23  December 21, the next day, 2012, there was a price drop of

24  .50, so a larger price drop.  And on that day Marek Biestek

25  sold 1,000 shares, as did Andrew Vaino sold 500 shares.

LEWIS – DIRECT – DENERSTEIN

1   Q    What does the column, the sale column, represent?

2   A    The sale column represents the number of shares, the

3   total number of shares that this group of individuals

4   collectively sold.

5   Q    Over what period of time does this chart cover?

6   A    It covers period December 17, 2012, through September 19,

7   2014.

8   Q    Can you describe row 11?

9   A    So on row 11, on January 29, 2013, so on let's say

10  January 28 the stock price was selling for $10 higher, so it

11  drops by -- .10, .10 higher.  It drops .10, on that day

12  Mr. Vaino sold 1,500 shares.  No one bought any shares over

13  that period, so the buy column is zero and because it was only

14  Mr. Vaino who was selling.  The total was 1500.

15  Q    What about the next day, let's go to page five -- page

16  three, row 61.

17  A    On row 61, on that day there was a .14 drop in stock

18  price, that day was June 20, 2014.  Mr. Sullivan sold 2,204

19  shares.

20  Q    Let's go back to row 50, page two?

21  A    On row 50 that would be April 4, 2014, on that day

22  Retrophin stock price dropped by $2.25.  Mr. Sullivan bought

23  1,500 shares, Mr. Vaino sold 5,000 shares, Mr. Martin Shkreli

24  bought 8,000 shares.

25            Over the course of the day there were 9,500 shares

LEWIS - DIRECT - DENERSTEIN

1    purchased by this group, and 5,000 shares that were sold by

2    this group.

3    Q    Let's go back to row 18.

4    A    On row 18, there was a .20 stock price drop over the day,

5    relative to the prior day close, that was on February 21,

6    2013.  And Marek Biestek sold 1,325 shares.

7    Q    What about row 23?

8    A    On that day there was a .1, March 8, 2013, a .1 drop in

9    share price.  And Mr. Mulleady sold 6,000 shares.

10   Q    What about row 24?

11   A    On that day was March 12, 2013, .90 drop in share stock.

12   Mr. Biestek sold 1,000 shares.

13   Q    What about row 27?

14   A    On May 17, 2013, there was a .36 drop in share price.

15   And Mr. Mulleady sold 2,800 shares.

16   Q    What data did you find that individuals in this group

17   were making large-scale buys on days following share price

18   decline?

19              MR. PITLUCK:  Object to the form, your Honor.

20              THE COURT:  I would ask you to rephrase the

21   question, please.

22              MS. DENERSTEIN:  Sure, your Honor.

23   Q    What did you conclude from the data about whether or not

24   individuals in this group were regularly making large-scale

25   buys on days following share price decline?

LEWIS - DIRECT - DENERSTEIN

1   A    I would conclude that the data in this exhibit suggests

2   that individuals were both buying and selling on these days;

3   but there are preponderance of days that they were actually

4   selling stock.

5   Q    What do you mean there are preponderance of days where

6   they are selling?

7   A    More days when they were net sellers of Retrophin stock

8   than net buyers of Retrophin stock.

9   Q    Again, this is following a stock price decline?

10  A    Correct.

11  Q    Going now, can we show you Defendant's Exhibit 221-10 --

12  221-09, what is this?

13  A    This is just a represented day from that prior graph that

14  tries to give you a little more color.  So it's for

15  January 14, 2013.  What it shows is on that day, even though

16  the stock price declined at 1.10, Mr. Mulleady sold 100 shares

17  and Mr. Vaino sold 2,500 shares.  And then the graph

18  immediately below that in the box shows you what the stock

19  price was in the three days prior to actually the 14th, so on

20  January 9 it was $5.10.

21  Q    I'm going to slow you down, it hasn't been put in

22  evidence.

23           MS. DENERSTEIN:  We offer 221-09 in evidence.

24           MR. PITLUCK:  No objection.

25           THE COURT:  We received 221-09.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

LEWIS – DIRECT – DENERSTEIN

1        (Defendant Exhibit 221-09, was received in

2   evidence.)

3   Q     Now the jury can see it too.

4   A     Now you can see it.

5   Q     If you can explain?

6   A     Yes.  So now that you can see what I was explaining I'll

7   repeat myself.

8        This is January 14, 2013.  It is a way of trying to

9   get a little more color on the analysis that we just went

10  through.  So on January 14 it shows that Kevin Mulleady sold

11  100 shares, Andrew Vaino sold 2,500 shares.  So they were net

12  sellers of 2,600 shares on that day.

13       That was a day that experienced the 1.10 drop in

14  stock price.  And the bottom box just shows you what the stock

15  price was on the three days prior to the 14th.  It was selling

16  for $5.10 on the 9th; $5.10 on the 10th; and it dropped to $4

17  on January 11, 2013.

18  Q     What is wash trade?

19  A     Wash trading is a type of trading that is typically

20  associated with price manipulation in which a group of

21  investors tend to buy and sell exactly the same number of

22  shares.

23  Q     What would you look for to identify whether a group were

24  engaged in wash trading, as you described it?

25  A     I would look for evidence that a group of individuals was

Rivka Teich CSR, RPR, RMR
Official Court Reporter

LEWIS - DIRECT - DENERSTEIN

1  buying and selling the same number of shares.

2  Q    Did you do that analysis with respect to the blue sheets

3  in this matter?

4  A    Yes, I did.

5  Q    I'm going to show you Defendant's Exhibit 221-08 for

6  identification.  What is this, briefly, then I'll try to offer

7  it?

8  A    This is a summary of days where that group of individuals

9  were simultaneously buying stock and selling stock in the

10  market.

11           MS. DENERSTEIN:  Your Honor, defense offers

12  Defendant's Exhibit 221-08 eight in evidence.

13           MR. PITLUCK:  No objection.

14           THE COURT:  We receive in evidence Exhibit 221-08.

15           (Defendant Exhibit 221-08, was received in

16  evidence.)

17  BY MS. DENERSTEIN::

18  Q    Professor Lewis, can you explain this chart for the jury?

19  A    Yes.  So what this chart represents is it shows that

20  there were 23 days in which this group of individuals, at

21  least one or two of them, was simultaneously buying shares and

22  selling shares.

23  Q    Twenty-three days out of what number?

24  A    Out of 427 days, so approximately 5 percent of the days

25  that were examined over this period involved trades where one,

LEWIS - DIRECT - DENERSTEIN

1    at least one, of the group members was buying stock and at

2    least one of the group members was selling stock.

3    Q    And what is the number 427 based on?

4    A    That number is based on the time period that covers

5    December 17, 2012, through September 19, 2014.  That would be

6    the number of the trading days over that period.

7    Q    What are trading days as opposed to regular days?

8    A    Trading days are days when the market is open for people

9    to buy and sell stock.  So weekends would not be trading days,

10   holidays is not trading days.

11   Q    Again, it was this period of time December 17, 2012, to

12   September 19, 2014?

13   A    That's correct.

14   Q    Can you then continue explaining the chart?

15   A    So the chart shows the days, each row is a day when there

16   was simultaneous buying and selling.  We have, I have listed

17   the individual members of this group.  So each column

18   represents the trading activity on these particular days for

19   those individuals.  Black numbers on chart represent buys, the

20   red numbers on the chart represent sell orders.

21            So what you can see, if we take an example would be

22   the first row on the exhibit, that would be for December 26,

23   2012.  What we see is that Kevin Mulleady bought 300 shares,

24   Andrew Vaino sold 2,000 shares, and Martin Shkreli bought 100

25   shares.  No one else in that group traded on that day.

LEWIS - DIRECT - DENERSTEIN

1          The next set of the columns represent aggregating

2     the buys and the sells.  So the column labeled buy just takes

3     all the buy trades and adds them up.  So the 300 from

4     Mr. Mulleady, the 100 from Mr. Martin Shkreli, adds up to 400.

5     The sale column represents the sum of all the sale trades.

6     Mr. Vaino is the only seller, so 2,000 shares.

7          Then the final column, which is identified as the

8     buy/sale ratio is just the number of buys divided by the

9     number of sales.  So for that first row there were .2 buys for

10    every sale.

11    Q    What do you want to calculate the buy/sale ratio?

12    A    To give an indication, let's the data speak, but provide

13    an indication of whether there was evidence of wash trading.

14    If there is evidence of wash trading, you would expect the

15    ratio to be one, for every buy there be one sell.

16    Q    Based on your review of the Retrophin blue sheet data,

17    did you find any evidence of wash trading by this group?

18    A    This data is inconsistent with wash trading.

19    Q    What is your opinion regarding the relationship between

20    trading volume and share price?

21    A    In my opinion, volume itself is not sufficient to try and

22    make predictions about how stock prices are going to change.

23    What you want, what you need, what you need to infer from data

24    is if you see a lot of volume you want to know whether people

25    tend to be buying stock, then you would expect stock prices to

LEWIS - DIRECT - DENERSTEIN

1    go up.  Or if they are tending to sell the stock, where you

2    expect stock prices to go down.  Volume by itself doesn't tell

3    you whether that group of investors, whether buying it or

4    selling it, it only tells you how much activity there actually

5    was.

6    Q    Directing you to Government's Exhibit 955 in evidence,

7    can you tell the jury what this is?

8    A    This is the chart we looked at earlier that shows the

9    daily closing prices and volume numbers over the period

10   December 17, 2012, through February 28, 2013.  And it provides

11   numbers for Mr. Pierotti individually.

12   Q    I think you're looking at the wrong exhibit.

13   A    995?

14   Q    955.

15   A    My apologies.  I'm there.

16   Q    What is this?

17   A    This is Bloomberg data that provides closing price and

18   share volume over the period December 17, 2012, through

19   September 30, 2014.

20   Q    During the time period between December 17 and

21   February 28, 2013, how many trading days are there?

22   A    Approximately 47.

23   Q    What is the price range during that period of time for

24   Retrophin, the end of day closing price for Retrophin?

25   A    High price $7.69.  And appears the low price is $2.90.

LEWIS - DIRECT - DENERSTEIN

1    Q    Is that what you describe as volatile?

2    A    Yes.

3    Q    On how many days does the stock price decline between

4    December 17, 2012 and February 28, 2013 based on the closing

5    price?

6    A    I'll need a minute.  I calculated 27 days for the price

7    declined over that period.

8    Q    Of those 27 days where the price declined, are there

9    instances where the share volume, according to this chart, is

10   10,000 or greater?

11   A    Yes.

12   Q    How many days are those?

13             THE COURT:  In the same day range?

14   Q    Same day range, December 17, 2012 through February 28,

15   2013.

16   A    There are 11 days where the stock price, where share

17   volume over that period is greater than 10,000.

18   Q    On how many days of those days is the closing price lower

19   than the previous day?

20   A    Six.

21   Q    On how many days then is the closing price higher?

22   A    It would be higher on five of those days.

23   Q    What is the summary of your findings regarding the

24   trading pattern of the individual accounts you reviewed?

25   A    That over the time period that I examined, which would be

LEWIS – DIRECT – DENERSTEIN

1   12/17/2012, through 9/30/2014, they were net sellers of

2   Retrophin common stock.

3   Q    And what did you conclude, based on your analysis that

4   they were net sellers, about whether or not they were engaged

5   in a coordinated pattern trading pattern to increase or

6   stabilize price of the stock?

7   A    I conclude that net selling activity is inconsistent with

8   a coordinated attempt to cause stock prices to go up or to

9   stabilizer.

10  Q    Why did you look at whether or not the select accounts

11  were selling stock after a price decline?

12  A    If there was an attempt to stabilize price, that would be

13  a period of time where I felt you would be more likely to

14  detect it.

15  Q    And based on what activity?

16  A    Based on trading activity.

17  Q    What type of trading activity?

18  A    I would expect to see buys, more buys, buys, net buying

19  activity following a price decline, if there was an attempt to

20  cause stock prices to stabilize and push them back up.

21          MS. DENERSTEIN:  One moment, your Honor.

22          No further questions.

23          MR. PITLUCK:  May I inquire, Judge.

24          THE COURT:  Yes, you may.

25  CROSS-EXAMINATION

Rivka Teich CSR, RPR, RMR
Official Court Reporter

LEWIS - CROSS - MR. PITLUCK

1    BY MR. PITLUCK::

2    Q     Good afternoon, Professor Lewis.

3    A     Good afternoon.

4    Q     How are you?

5    A     Good.

6    Q     My name is David Pitluck.  I'm an Assistant United States

7    Attorney here in the Eastern District of New York.  We've

8    never met before, correct?

9    A     That's correct.

10   Q     Now, you testified that you were retained in August of

11   2016 or August of 2017?

12   A     It would be August 2017.

13   Q     August 2017.  And since that time, sir, you testified you

14   worked about 70 hours on this case, correct?

15   A     Approximately.

16              (Continued following page.)

17

18

19

20

21

22

23

24

25

LEWIS - CROSS - MR. PITLUCK

1  Q     And that includes your meetings with the defense,

2  correct?

3  A     Correct.

4  Q     And it includes any work you've done preparing charts,

5  correct?

6  A     Correct.

7  Q     And we saw some of the charts that you testified about,

8  correct?

9  A     Correct.

10 Q     And did you prepare those charts, sir?

11 A     No.

12 Q     Who prepared those charts?

13 A     Consultant for the defense.

14 Q     A consultant for the defense prepared that chart.

15        The consultant is not an employee of yours, is he,

16 sir?

17 A     No.

18 Q     Doesn't work at Vanderbilt University with you?

19 A     No.

20 Q     But you reviewed those charts, correct, sir?

21 A     I reviewed and verified the accuracy of the charts.

22 Q     You reviewed and verified the accuracy of each of the

23 charts?

24 A     Yes, sir.

25 Q     And that doesn't just include the charts that were

LEWIS - CROSS - MR. PITLUCK

1    introduced today, right?

2    A    That includes the charts that were introduced today.

3    Q    Okay.  But you are aware, aren't you, Professor Lewis,

4    that other charts were produced that -- in your name, correct?

5    A    Correct.

6    Q    That you created expert disclosures, right?

7    A    Yes.

8    Q    And you reviewed those as well?

9    A    Yes.

10   Q    And, Professor Lewis, who was the consultant that

11   prepared the chart?

12   A    That was Cornerstone.

13   Q    Okay.  And do you know, sitting here today, how much

14   Cornerstone was paid to create those charts?

15   A    No.

16   Q    Did you direct Cornerstone in preparing those charts?

17   A    In preparing those charts?

18   Q    In preparing the charts, yes.

19   A    Yes, sir.

20   Q    Approximately how long did it take Cornerstone to prepare

21   those charts?

22   A    I don't know.

23   Q    They prepared the charts that you testified to today,

24   right?

25   A    Yes.

LEWIS - CROSS - MR. PITLUCK

1   Q    And they prepared the charts that were produced in prior

2   disclosures, right?

3   A    I don't understand what you mean by "prior disclosures."

4   Q    Okay.  You are aware, are you not, Professor Lewis, that

5   in September 2017, the defense disclosed charts that you

6   prepared, correct?

7   A    I am not aware.  I'm not familiar with procedures.

8   Q    Okay.  Can I show you what's been marked for

9   identification as Government Exhibit 132-2, Exhibit C --

10  sorry, 132-3.  We are going to get you a copy of that.

11           THE COURT:  It is Exhibit C to that?

12           MR. PITLUCK:  Government Exhibit 132-3.

13           THE COURT:  Okay.

14           MS. DENERSTEIN:  Mr. Pitluck, can you tell me -- oh,

15  Exhibit C.

16           MR. PITLUCK:  Yes.  Exhibit C.

17  BY MR. PITLUCK:

18  Q    Can you just take a look at those.  Take as much time as

19  you need, Professor.

20  A    Okay.

21  Q    Have you seen those before, Professor Lewis?

22  A    Yes.

23  Q    And there's approximately 206 pages of charts and data

24  produced there, correct?

25  A    Correct.

LEWIS – CROSS – MR. PITLUCK

1   Q    And those are all -- they all say Lewis Exhibit 1.1 to

2   Lewis Exhibit 5.1, right?

3   A    Yes.

4   Q    Okay.  And did Cornerstone assist you with preparing

5   those?

6   A    Yes.

7   Q    But you reviewed these, correct?

8   A    Yes.

9   Q    And they're accurate, right?

10  A    I did not verify them.

11  Q    You did not verify them?

12  A    No, I did not.

13  Q    Okay.  But you were aware that they were produced with

14  your name on them, right?

15  A    Correct.

16  Q    Now, Professor Lewis, Cornerstone wasn't paid out of your

17  hourly rate, were they?

18  A    I don't know.

19  Q    Did you pay Cornerstone for their consulting work?

20  A    No, I did not.

21  Q    Let's talk a little bit about your background, Professor

22  Lewis.  You are currently a professor at Vanderbilt

23  University; is that right?

24  A    Yes.

25  Q    And you said you have been in academia for 30-some-odd

LEWIS – CROSS – MR. PITLUCK

1   years; is that right, sir?

2   A     Yes.

3   Q     And other than your time at the SEC, you have been

4   exclusively working in academia, right?

5   A     Yes.

6   Q     Now, when you were at the SEC, I think you testified that

7   you had two roles; is that right, sir?

8   A     Yes.

9   Q     You were the chief economist, and the head of -- I'm

10  going to use the acronym, if you don't mind, DERA?

11  A     DERA.

12  Q     And DERA is kind of known as the SEC's think tank; is

13  that right, sir?

14  A     That would be one way to characterize it, yes.

15  Q     And I think you testified about some of the -- some of

16  the things that DERA does, right?

17  A     Yes.

18  Q     It gets integrating financial economics to the core

19  mission of the SEC, you said something along those lines; is

20  that right, sir?

21  A     I didn't say that, but that's an accurate representation

22  of what it does.

23  Q     Okay.  And it's fair to say that DERA's economic analysis

24  is consistent with best practice, right?

25  A     Yes.

LEWIS - CROSS - MR. PITLUCK

1    Q    And I think you testified that you -- you testified a

2    moment before that this is the first time you have testified

3    in a criminal trial, right?

4    A    Yes.

5    Q    And the first time you testified in any trial, right?

6    A    Yes.

7    Q    And other than the time you testified before Congress,

8    this is the first time you have ever testified at all, right?

9    A    I was deposed as a summary witness in an SEC matter while

10   I was at the commission.

11   Q    So it's safe to say that in your career in academia and

12   your time at DERA, you've never actually investigated a market

13   manipulation case, right?

14   A    Could you restate the question.

15   Q    Sure.

16        You would agree with me, yes or no, Professor Lewis,

17   that in your academia career in your time at the SEC, you've

18   never actually investigated a market manipulation case, right?

19   A    I have -- while I was in DERA, my role as chief

20   economist, I supervised and assisted in the market

21   manipulation cases, yes.

22   Q    So you, as the director of the economic research

23   analysis, you supervised people who actually investigated

24   market manipulation?

25   A    Yes.

LEWIS - CROSS - MR. PITLUCK

1   Q    And you've never directly been the lead investigator in

2   an SEC enforcement case, right?

3   A    The summary witness that I just described was part of an

4   SEC enforcement case, but --

5   Q    We will get to that, Professor Lewis, but you were a

6   summary witness in that case, right?

7   A    Correct.

8   Q    And that's just somebody who presents charts as part of a

9   deposition, summarizing data?

10  A    Yes.

11  Q    And am I correct in that case, Professor Lewis, you

12  didn't prepare any of those charts, right?

13  A    I did not.

14  Q    You had a staff prepare them, right?

15  A    Yes.

16  Q    And you reviewed them and deposed -- were deposed about

17  what they contained, right?

18  A    Yes.

19  Q    Now, you testified about some of the background knowledge

20  you have of this case, right?  You read the 8-K that was

21  presented --

22  A    Yes.

23  Q    -- to you, and you read the S-1, correct?

24  A    Not in detail, but, yes, I did read parts of both of

25  those documents.

LEWIS - CROSS - MR. PITLUCK

1   Q    Parts of them.

2        But you weren't involved in the events related to

3   this case, right?

4   A    No, I was not.

5   Q    And you testified on direct examination you don't know

6   the defendant, Evan Greebel, right?

7   A    No, I do not.

8   Q    And you don't know what his role in this case is, right?

9   A    No.

10  Q    And you testified about some of the people that were in

11  your select accounts, correct?

12  A    Yes.

13  Q    Marek Biestek, right?

14  A    Yes.

15  Q    Thomas Fernandez, right?

16  A    Yes.

17  Q    Tim Pierotti?

18  A    Yes.

19  Q    Ron Tilles?

20  A    Yes.

21  Q    Andrew Vaino?

22  A    Yes.

23  Q    Martin Shkreli?

24  A    Yes.

25  Q    But you -- you testified you don't know any of those,

LEWIS – CROSS – MR. PITLUCK

1    correct?

2    A    I do not.

3    Q    So you don't know what relationship, if at all, those

4    people have, if any of those people have with each other,

5    right?

6    A    I do not.

7    Q    And you testified about how they got shares of stock,

8    correct?

9    A    Correct.

10   Q    You don't know where they obtained those shares of stock,

11   right?

12   A    I believe it was in the convertible promissory note.

13   Q    Okay.  Do you know how much they paid for their shares of

14   stock?

15   A    I do not.

16   Q    Do you know -- you don't know sitting here today, do you,

17   how they were the ones who were able to purchase those shares

18   of stock, right?

19   A    I do not.

20   Q    And just to be clear, you don't know of any relationship

21   between those people, correct?

22   A    Correct.

23   Q    Now, you testified on direct about some exhibits you

24   prepared, right?

25   A    Yes.

LEWIS - CROSS - MR. PITLUCK

1    Q    Can I direct you back to 221-09. The DX-221-09, which is

2    in evidence. You testified a little bit about that, right?

3    Let me know if you have it in front of you, sir.

4    A    Yes, I do.

5    Q    Now, you testified about this in connection with a trade

6    following a day where there was a stock price decline, right?

7    A    Yes.

8    Q    And you didn't prepare this chart, correct, sir?

9    A    Correct.

10   Q    But you have reviewed this, correct?

11   A    Yes.

12   Q    And it is accurate?

13   A    Yes.

14   Q    And on this chart, the price from -- on January 9 is

15   $5.10, right?

16   A    Yes.

17   Q    Price of the share.

18        And the price on January 10, 2013 is $5.10, as well,

19   right?

20   A    Yes.

21   Q    Can I -- and then in -- January 11, 2013, it goes down to

22   4 dollars; is that right?

23   A    Yes.

24   Q    I'd like to direct your attention to Government Exhibit

25   955, which you were shown on direct, which is you

LEWIS - CROSS - MR. PITLUCK

1    probably --you have a couple binders there, so I don't want to

2    confuse you, sir.  But in the one that our paralegal just

3    handed you, it is behind tab 38.  It is also up on the screen.

4    A    Yes.

5    Q    So this is Bloomberg price and volume data, correct?

6    A    Correct.

7    Q    You would agree with me, Professor Lewis, that Bloomberg

8    is a widely-accepted source of stock prices, correct?

9    A    Yes.

10   Q    And it is accurate, as far as you know?

11   A    As far as I know.

12   Q    Okay.  And it is also a widely-accepted source of public

13   share volume, right?

14   A    Yes.  It discloses -- it provides share volume data.

15   Q    It provides share volume.  And it is relied on in the

16   financial sector; is that right, sir?

17   A    By certain parts of the financial sector.

18   Q    Certainly the public parts of the financial sector,

19   right, invest -- public investors who need share volume will

20   use Bloomberg to get their source, right?

21   A    Can you define what you mean by "public investor"?

22   Q    People who are -- your normal mom and pa investor who

23   need to obtain public share volume, they would go to a source

24   like Bloomberg to obtain their share volume, right?

25   A    Bloomberg is a paid service, so assuming that ma and pa

LEWIS - CROSS - MR. PITLUCK

1    were able to buy the provided service, then that would be a

2    useful source of volume information for them, yes.

3    Q    So, Government Exhibit 955, can you point me to where the

4    share closing price for January 10, 2013 is on there?

5    A    It is not on this chart.

6    Q    Not on there, sir.

7           And you know, don't you, Professor Lewis, based on

8    your experience, that if there are not enough -- not enough

9    shares traded of an individual stock, they don't have -- there

10   is no public share price reported on Bloomberg, correct?

11   A    I do not know the specifics of how Bloomberg discloses

12   data.

13   Q    Okay.  You also said you looked at the Bluesheet data in

14   this case, right?

15   A    Yes, sir.

16   Q    Okay.  Can I show you -- I am going to have my paralegal

17   pull up Government Exhibit 950.  This is the Bluesheet data in

18   evidence, and you reviewed this data, sir, right?

19   A    Yes.

20   Q    And you're familiar with Bluesheet data generally,

21   correct?

22   A    I am familiar with these particular exhibits.

23   Q    These particular exhibits.  But you have interpreted

24   Bluesheet data before, right?

25   A    I have never physically examined Bluesheet data, detailed

LEWIS - CROSS - MR. PITLUCK

1    Bluesheet data before, but I have supervised analyses that

2    have used Bluesheet data.

3    Q     You have never actually interpreted the Bluesheet data

4    yourself?

5    A     Not until I examined this data.

6    Q     Okay.  So I would like to direct your attention to --

7    we're going to go to January 14, 2013.  I'm sorry, January --

8    yes.  January 14, 2013.  I think it is line 647.  I'm sorry,

9    January 10.  I apologize.

10          Professor Lewis, do you see there's 50 shares of

11   Desert Gateway traded there?

12   A     Yes, sir.

13   Q     What's the price there?

14   A     It is five dollars.

15   Q     So it's five dollars.

16          So you -- is it -- you would agree with me, yes or

17   no, Professor Lewis, that the $5.10 share price that you

18   listed on DX-221-09 is inaccurate?

19   A     Yes.  I did not rely on the Bluesheet data to make

20   that -- to pull up that.

21   Q     Well, according to your exhibit, Professor Lewis, you

22   relied on the Bloomberg price data, correct?

23   A     That's correct.

24   Q     And there's no Bloomberg price data for January 10, 2013;

25   is that right?

LEWIS – CROSS – MR. PITLUCK

1   A    That's correct.

2   Q    So this chart is inaccurate, right, sir?

3        THE COURT:  Which chart?

4        MR. PITLUCK:  Defense Exhibit 221-09.

5        THE WITNESS:  According to the Bluesheet data, the

6   price is five dollars.

7   BY MR. PITLUCK:

8   Q    So there's no price on Bloomberg, right?

9   A    That's correct.

10  Q    And according to the Bluesheet data --

11  A    According to the exhibit.

12  Q    And according to the Bluesheet data, it is five -- the

13  only trade 50 shares that day were five dollars, right, sir?

14  A    Yes.

15  Q    Now, I would like to direct your attention to defense

16  Exhibit 221-01 for identification.  This is a chart you

17  prepared, correct, sir?

18  A    Yes.  I directed to have prepared, yes.

19  Q    You directed to have it prepared.

20        It wasn't introduced into evidence, was it, as far

21  as you recall --

22  A    I don't recall.

23  Q    -- did you testify to this?

24  A    I don't recall.

25  Q    You don't recall testifying to this on direct

LEWIS - CROSS - MR. PITLUCK

1    examination?

2    A    No.

3    Q    But you prepared the direction of this chart, right, sir?

4    A    Yes.

5    Q    And you confirmed its accuracy?

6    A    Yes.

7              MR. PITLUCK:  Your Honor, I would offer Defense

8    Exhibit 221-01 in evidence.

9              MS. DENERSTEIN:   Object.

10             THE COURT:  Is this something we need to discuss at

11   sidebar?

12             MS. DENERSTEIN:  Yes.

13             THE COURT:  Okay.

14             (Sidebar conference.)

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR

1

2              (WHEREUPON, the following proceedings were had at

3      sidebar, out of the hearing of the open courtroom, to wit:)

4              THE COURT:  So, Ms. Denerstein, your objection?

5              MS. DENERSTEIN:  Yes.  I wanted to know what is the

6      basis for offering it?  It is a hearsay objection.  He didn't

7      prepare it.  He already testified he didn't prepare this.

8              MR. PITLUCK:  He didn't prepare any of this, Judge.

9      He just testified he reviewed it and verified its accuracy.

10             MS. DENERSTEIN:  He didn't say he reviewed and

11     verified this.

12             MR. PITLUCK:  He just said that.

13             THE COURT:   He said he directed its preparation.

14             MS. DENERSTEIN:  Directed its preparation.

15             MR. PITLUCK:  And he reviewed and verified its

16     accuracy.

17             MS. DENERSTEIN:  He said he did not.  Did not.

18             MR. PITLUCK:  I have to look at the transcript,

19     Judge.  I heard him say I reviewed it and verified its

20     accuracy.  This was a defense exhibit produced today.  It

21     was --

22             MR. KESSLER:  About the exact same topic he has --

23             MS. DENERSTEIN:  It is beyond the scope of direct.

24     We haven't asked any questions about Bluesheet data volume.

25             MR. PITLUCK:  Judge, I would offer two bases for it.

SIDEBAR

1    I want to confirm that he did say he directed it and he

2    reviewed and verified it for accuracy, because if that's

3    enough, then it is his chart, it can be introduced.  He was

4    asked extensive questions about price and volume, and he's

5    also verified its accuracy.

6              MR. KESSLER:  He said, he verified its accuracy.

7    Question:  Did you verify its accuracy?  Answer:  Yes.

8              THE COURT:  Okay.

9              MR. CHAN:  It doesn't matter.  It's still outside

10   the scope of the direct.

11             MR. PITLUCK:  How are price and volume outside the

12   scope of the direct?

13             MR. CHAN:  He didn't testify about this chart.  His

14   opinion on this topic was not entered into evidence.  Why even

15   cross on this opinion now in evidence?  We sought to reduce

16   our expert opinions.  To streamline this case, we removed

17   things from our disclosures so that the expert is not

18   testifying about them, and now the government wants to ask

19   questions about topics that we removed from this scope of our

20   direct.  How is that appropriately in the scope?

21             MR. PITLUCK:  He testified about price and volume on

22   direct.  I will do one better, Judge, about its credibility

23   because that chart is materially inaccurate.

24             MR. CHAN:  Credibility can't be proven by intrinsic

25   evidence.

SIDEBAR

1        MR. PITLUCK:  I can absolutely prove credibility by

2   intrinsic evidence when it is an exhibit he prepared and

3   verified its accuracy --

4        MS. DENERSTEIN:  He did not prepare the chart.

5        MR. PITLUCK:  He verified its accuracy.

6        THE COURT:  He directed its preparation.

7        MR. CHAN:  Doesn't matter.

8        MR. PITLUCK:  He just said --

9        THE COURT:  Excuse me.

10       MR. PITLUCK:  Sorry, Judge.

11       THE COURT:  He directed its preparation and verified

12   its accuracy.  And it is sourced from Bluesheet data, which he

13   said he reviewed during the timeframes starting December 17,

14   2012, he focused mostly on a date up through -- I guess it was

15   February or something, 2013, for many of these charts, but he

16   also did admit data through September of 2014.

17       MR. PITLUCK:  I think, Judge, his opinion was

18   through September of 2014, too.

19       MR. CHAN:  It's -- sorry.

20       THE COURT:  I think it is fair for him for cross if

21   he verified it, directed his preparation, and it calls into

22   question his testimony, I think it is appropriate to allow the

23   government to cross-examine him.  It is not beyond the scope

24   because he talked about the stock price and volume.  He was

25   offered as an expert in stock price and volume during this

SIDEBAR

1  very time period.  So how could we say it is not within the

2  scope?

3          MR. CHAN:  The government hasn't laid the

4  foundation.  They haven't asked -- they haven't sought to

5  elicit the testimony that supposedly this is in contradiction

6  to.  They haven't said, do you remember that you testified

7  about XYZ, and then given him a chance to review it.

8          And there is still no rule of evidence that the

9  government has pointed to that allows them to prove a prior

10  inconsistent statement through extrinsic evidence.  It was a

11  specifically enumerated exception that includes prior

12  testimony, that's sworn, it does not include a draft chart

13  that he previously approved and reviewed.  That is not within

14  the exception.

15          MS. DENERSTEIN:  Prepared by someone else.

16          MR. CHAN:  Prepared by someone else, that he

17  reviewed.  That is not an exception to the hearsay rules for

18  proving up a prior inconsistent statement.

19          MR. KESSLER:  Pretty sure when the Rule 806 when --

20  when the hearsay statement is offered, that a declarant's

21  credibility can be supported or attacked with other hearsay

22  statements.

23          MR. PITLUCK:  Judge --

24          MR. CHAN:   Wrong.

25          MR. PITLUCK:  Judge, the witness testified

SIDEBAR

1   extensively about the correlation between price and volume.

2   He provided his opinion about the correlation between price

3   and volume.  He prepared and supervised a chart that

4   correlates price and volume.  And he looked at the

5   government's chart correlating price and volume.  This is his.

6   He's accepted.  He's adopted it.  There's no further

7   foundation, Judge.

8           MR. CHAN:  Except for this.  They are trying to say

9   you said something inconsistent in a piece of paper to the

10  defense team.  This witness did not say this supposedly

11  inconsistent statement to the jury.  So what is inconsistent

12  about what -- the source of the inconsistent statement is

13  being offered as if he said it in a setting in which that

14  setting makes a difference here.  I can understand if they

15  would try to compare a public opinion versus a public opinion,

16  or testimony versus testimony.

17          But to have him try -- to have the government try to

18  show he's made an inconsistent statement here, with a chart

19  that he ultimately decided not to introduce, or that the

20  defense team decided not to introduce, does not show any

21  inconsistent statements.

22          MS. DENERSTEIN:  And when Exhibit C was provided, it

23  said the analysis was ongoing.  It did not say it was final,

24  and we provided charts at that time.  Literally in our letter

25  it says the analysis is ongoing.  Doesn't say it was

SIDEBAR

1    conclusive.

2              MR. KESSLER:  The letter said it reflects his

3    findings and he never verified them.

4              MR. PITLUCK:  He just said he verified them.

5              THE COURT:  Right.  Excuse me.

6              (Short pause.)

7              MR. PITLUCK:  Judge, I think, most importantly,

8    Judge, there's no inconsistency.  He has offered opinions on

9    Retrophin stock price and volume between the same date.  He's

10   prepared this chart.  I am entitled to show it to him and ask

11   him the question.

12             MS. DENERSTEIN:  That's not true.  He offered

13   opinions actually on what the select accounts did.  And when

14   he was referring to share volume, he actually used Bloomberg,

15   and he used your exhibit that's already in evidence.

16             THE COURT:  This chart, Footnote 1 says, the volume

17   refers to the same volume across all trades marked Bluesheet

18   data, source is Bloomberg price data, Retrophin Bluesheet

19   volume data.

20             MR. CHAN:  I don't think that's what the government

21   has been crossing on.

22             THE COURT:  Well, this is the point.  They are

23   not -- I am not sure how it is hearsay, if they are offering

24   this to show that it is an error.  They are not offering it

25   for the truth.  They are offering to show that it is wrong,

SIDEBAR

1   but it is not the truth.

2            MR. CHAN:  Why does --

3            THE COURT:  It is not hearsay.  I don't think that's

4   the basis for keeping it out.  He said he directed his

5   preparation, he said that he had looked at it and verified it,

6   and I think there's -- it is ripe ground for cross.  So I

7   would overrule the objection.

8            MR. PITLUCK:  Thank you, Judge.

9            THE COURT:  Wait.  They have one more point.

10           MR. CHAN:  How is this different than offering the

11  actual 3500 report of a witness?  I don't see any difference.

12  The 3500 indicates a prior inconsistent statement that the

13  government isn't allowed to put in.  In fact, the rule here is

14  attacking it, 801(d), which lists the bases to attack

15  credibility of a defendant -- of a witness' prior statement,

16  are, A, things that are inconsistent but were given under

17  penalty of perjury, B, is inconsistent and is offered to rebut

18  an express or implied charge that the declarant recently

19  fabricated it, or to rehabilitate the declarant's credibility.

20  So that's to rebut.  Or, C, identifies a person as someone

21  that declarant perceived earlier.  None of these exceptions go

22  to being able to prove a prior inconsistent statement through

23  an actual document.

24           MR. PITLUCK:  It is not an inconsistent statement,

25  Judge.

SIDEBAR

1          MR. CHAN:  That's what they said.

2          MR. PITLUCK:  It impeaches credibility.  806.  It is

3    also directly related to the scope of his testimony.

4          THE COURT:  It is within the scope of the direct.

5    He's testified to this very subject in this very time period.

6    He's testified to the source of the information, and it's not

7    being offered for the truth so it is not hearsay.  It is

8    cross-examination on credibility.  And I think it is fair

9    grounds.  So the objection, respectfully, is overruled.

10          (Sidebar conference ends.)

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEWIS - CROSS - MR. PITLUCK

1          (Open court.)

2          THE COURT:   The objection is overruled.

3          MR. PITLUCK:  Your Honor, we would offer Defense

4     Exhibit 221-01 into admission.

5          THE COURT:  The Court admits Defense Exhibit 221-01.

6          (Defendant Exhibit 221-01, was received in

7     evidence.)

8     BY MR. PITLUCK:

9     Q    You had a chance to take a look at that, Professor Lewis?

10    A    Yes, sir.

11    Q    This is a chart that you did not prepare, correct, sir?

12    A    I did not prepare it.

13    Q    You reviewed it and you verified its accuracy, correct?

14    A    You are unable to verify the accuracy of this chart using

15    data I had because of the difference in the scale on the chart

16    versus the granularity of the --

17         MS. DENERSTEIN:  Objection.

18         THE COURT:  Excuse me.  Let him just finish his --

19    did you finish your answer?  I didn't hear the end of it.  You

20    said you couldn't --

21         THE WITNESS:   I said I don't think it's possible

22    for me to verify the accuracy of the chart, as it is

23    presented.

24         THE COURT:  Did you direct the preparation of this

25    chart?

LEWIS – CROSS – MR. PITLUCK

1              THE WITNESS:  Yes, I did.

2              THE COURT:  All right.

3    BY MR. PITLUCK:

4    Q    And I believe you testified a moment ago, Professor

5    Lewis, that you verified it was accurate before it was

6    produced, correct?

7    A    If I did, I misspoke.

8    Q    So your testimony here today, Professor Lewis, is that

9    you did not check the accuracy of this chart, correct?

10   A    221-01, that's correct.

11              (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEWIS – CROSS – PITLUCK

1   Q    Because, according to your testimony, it is impossible to

2   verify the accuracy of this chart?

3   A    That is correct.  Well, I could not do it.

4   Q    So you see at the bottom that the source is Bloomberg

5   pricing there, correct?

6           MS. DENERSTEIN:  Objection.

7           MR. PITLUCK:  It's in evidence, Judge, I can ask

8   questions about it.

9           MS. DENERSTEIN:  Move to strike.

10          THE COURT:  We had a sidebar about this a few

11   minutes ago and I made my ruling.

12   BY MR. PITLUCK::

13   Q    So you see the source is Bloomberg price data and that's

14   for the price, the blue line on this chart, correct, sir?

15   A    Correct.

16   Q    And the blue sheet data, RTRX, that's Retrophin, right,

17   Professor?

18   A    Correct.

19   Q    The blue sheet data is for the volume, correct?

20   A    Correct.

21   Q    And you already looked at the Bloomberg price data in

22   Government Exhibit 955, correct, sir?

23   A    Correct.

24   Q    And we looked at the blue sheet data, at least part of

25   it, in Government Exhibit 950, right, sir?

LEWIS – CROSS – PITLUCK

1    A    Yes.

2    Q    So presumably, Professor Lewis, you could have checked

3    the accuracy of this chart by taking those two simple pieces

4    of data and comparing them, right?

5    A    The scale on the chart does allow to a complete and

6    accurate verification, it's broadly consistent with what you

7    see.

8    Q    Your testimony, Professor Lewis, is that you directed the

9    preparation of the chart that you couldn't verify the accuracy

10   of; is that right?

11   A    For this chart, yes, it's just meant to be an

12   illustrative chart.

13              THE COURT:  I'm sorry, I didn't hear you.

14   A    It's an illustrative chart.

15   Q    This is something that you directed the preparation of,

16   correct?

17   A    Correct.

18              MS. DENERSTEIN:  Objection.  Asked and answered.

19              THE COURT:  Sustained.

20   Q    Now, Professor Lewis, you were asked a lot of questions

21   about some of the exhibits that you prepared and testified

22   regarding, correct?

23   A    Correct.

24   Q    So I'm going to show you Defense Exhibit 221-02, which is

25   in evidence.

LEWIS – CROSS – PITLUCK

1          (Exhibit published.)

2          And you remember your testimony on this one,

3   correct?

4   A    Yes.

5   Q    And this is a chart of trading activity between

6   December 17th, 2012 and February 28th, 2013; is that right,

7   sir?

8   A    Yes.

9   Q    And approximately, I think you testified about this on

10  direct, but you testified that there were 2.5 million

11  free-trading shares of Retrophin stock as of December 17th,

12  2012, right?

13  A    Yes.

14  Q    And you got that from the 8-K for the Retrophin merger,

15  right?

16  A    Yes.

17  Q    And you believe that's accurate, right, sir?

18  A    Yes.

19  Q    And you testified, did you not, sir, that the individuals

20  listed on this chart owned 2 million of those shares,

21  2 million of those Retrophin shares, right?

22  A    Yes.

23  Q    And sitting here today, you don't know who owned the

24  other 500,000, correct?

25  A    Correct.

LEWIS – CROSS – PITLUCK

1    Q    And you don't know if those shares could be traded,

2    right?

3    A    The other 500,000 would be freely trading shares so it

4    could be traded.

5    Q    You don't know if there are any other restrictions on the

6    ability to trade those, correct?

7    A    If they're freely trading shares, they're free to trade.

8    Q    And, so according to your analysis, the eight people on

9    this chart controlled 2 million shares, correct?

10   A    Yes.

11   Q    And in this time period, I believe that your analysis was

12   that three people sold no shares.

13   A    Correct.

14   Q    Thomas Fernandez, Edmund Sullivan and Ron Tillis did not

15   sell any shares, correct?

16   A    Correct.

17   Q    And do you know if Mr. Shkreli had free-trading shares,

18   sir?

19   A    No, sir.

20   Q    You don't know.

21        And all of these people together had a net trading

22   activity of 226,505 shares in that three-month period,

23   correct?

24   A    Yes.

25   Q    So that's less than 10 percent of the free-trading shares

LEWIS - CROSS - PITLUCK

1   outstanding, right?

2   A    Yes.

3   Q    And Marek Biestek only sold 3,350 of the shares, right?

4   A    Yes.

5   Q    And that Tim Pierotti sold 132,125, correct?

6   A    Yes.

7   Q    More than -- I'm going to ask you to do a little simple

8   math.  That's about 60 percent of the net trading activity of

9   this account, right?

10  A    That's about right.

11  Q    132,000 out of 226?

12  A    Right.

13  Q    I'm going to defer to you then, Professor Lewis, about

14  how much is that?

15  A    226, 132, so we're looking at about 80,000 left over.  So

16  I'll say approximately 60 percent.

17  Q    And, in fact, Mr. Pierotti sold more than all of the

18  other individuals on this chart put together in that time

19  period, correct?

20  A    Yes.

21  Q    And the only other person -- and he sold more than twice

22  as much as Andrew Vaino, correct, or nearly twice as much as

23  Andrew Vaino?

24  A    Nearly twice as much.

25  Q    And you, Professor Lewis, you didn't compare this to the

LEWIS - CROSS - PITLUCK

1    total volume traded over this time period, correct?

2    A    That's correct.

3    Q    You never did any analysis that pertained to that?

4    A    No.

5    Q    Never -- I'm sorry, I didn't mean to cut you off, sir.

6    A    I didn't -- what I testified to, I have not done any

7    analysis that would -- about that.  But there are some

8    exhibits that we did earlier that looked at total trading

9    activity.

10   Q    Looked at trading activity of this select group as

11   compared to the buying of Retrophin stock, correct?

12   A    Yes.

13   Q    And I think I gave you a moment ago what I marked as

14   Government Exhibit 13 -- I don't want to direct you to the

15   wrong place, Professor Lewis, so I'm going to show you what's

16   been marked as Government Exhibit 1325.

17            I'm sorry.  Showing you what's been marked for

18   identification Government Exhibit 1325.

19            Would you take a look at that, and I'm going to

20   direct you to the last page, sir.

21   A    Okay.

22   Q    Have you seen this before, sir?

23   A    Yes.

24   Q    And did you direct the production of these documents?

25   A    I did.

LEWIS - CROSS - PITLUCK

1    Q    Did you verify that they're accurate?

2    A    I have not.

3    Q    You have not verify that they are?

4    A    No, sir.

5    Q    But does this refresh your actual recollection,

6    Professor Lewis, that this is the analysis you prepared

7    regarding trading volume as compared to the total trading of

8    the stock?

9              MS. DENERSTEIN:  Objection.

10             THE COURT:  Overruled.

11   A    This is an analysis that was designed to compare the

12   trading volume in this case of Tim Pierotti and the other like

13   individuals, and how the volume, as we were measure it, from

14   the blue sheet data compared to volume on the Bloomberg data.

15   Q    And does it refresh your recollection, sir, that for the

16   total individuals and Tim Pierotti between December 17th, 2012

17   and February 28th, 2013, they constituted 69.87 percent of the

18   total volume of the Retrophin shares traded in that time

19   period?

20   A    Yes.

21   Q    So 70 -- nearly 70 percent of all trading in Retrophin

22   shares were conducted by Tim Pierotti and the other selected

23   individuals?

24   A    According to Bloomberg volume.

25   Q    According to Bloomberg data.  The publicly-available

LEWIS - CROSS - PITLUCK

1  Bloomberg data.

2  A     Correct.

3  Q     I'd like to direct your attention to 221.

4        But that's not on 221-02, is it, your chart?

5  A     I'm sorry?

6  Q     Going back to Defense Exhibit 221-02.  I apologize, I

7  moved.  Sometimes speak faster than I think, sir.

8        221-02, which we were just looking at --

9  A     Yes, I'm there, can you repeat your question.

10 Q     Yes.  There's no indication of what percentage of the net

11 trading activity this constituted during the time period,

12 right?

13 A     Correct.

14 Q     Now, I'd like to show you what you looked at -- and your

15 conclusion was -- withdrawn.

16       I'd like to show you what's been marked in evidence

17 as 221-03.

18       You looked at this, right?

19 A     Yes, sir.

20 Q     Now, this is the trading activity, I believe you

21 testified, this showed the net trading for the select

22 individuals during December 17th, 2012 to February 28th, 2013;

23 is that right, sir?

24 A     Yes.

25 Q     And during this time period, according to this chart,

LEWIS – CROSS – PITLUCK

1   Andrew Vaino sold 12,000 shares, right, in December of 2012?

2   A     In December 2012, he sold 12,000 shares.

3   Q     And in the same month, Tim Pierotti sold 43,900 shares,

4   right?

5   A     Yes.

6   Q     So nearly four times as many, correct?

7   A     Nearly.

8   Q     And in January 2013, Andrew Vaino sold 42,000 shares,

9   right?

10  A     Yes.

11  Q     And Tim Pierotti's dropped to 14,500, correct?

12  A     Correct.

13  Q     And you would have -- sitting here today, you have no

14  knowledge as to why Tim Pierotti sold nearly 30,000 shares

15  less that month, correct?

16  A     Correct.

17  Q     And in February 2013, Mr. Vaino, Andrew Vaino, only sold

18  13,000 shares, correct?

19  A     Yes.

20  Q     But Mr. Pierotti sold 73,000 shares, correct?

21  A     73,725 shares, yes.

22  Q     So over five times the shares as Mr. Vaino during that

23  period during that month?  Actually closer to six.

24  A     Over than five times.

25  Q     And you, sitting here today, have no knowledge as to why

LEWIS – CROSS – PITLUCK

1   Mr. Pierotti's share sales jumped almost 60,000 shares that

2   month, right?

3   A    I do not.

4   Q    But you weren't asked about those changes during your

5   direct examination; were you?

6   A    No, I was not.

7   Q    And, again, you weren't -- this doesn't compare to the

8   total volumes of shares that were sold, correct?

9   A    Correct.

10  Q    And isn't it true, Professor Lewis, that in this time

11  period, there's about -- you said, you testified 226,000

12  shares sold by these eight individuals?

13  A    I'd have to refresh my --

14  Q    Sure.  Go back to 221-02.

15  A    221-02?

16  Q    Yes.

17  A    Oh, yes.  Now I recall.

18  Q    So about 10 percent of the total free-trading shares were

19  sold during that time period, correct?

20  A    Yes.

21  Q    And the other 90 percent were not traded at all.

22  A    That's correct.

23  Q    I'd like to show you -- direct you to 221-10A.

24                (Exhibit published.)

25                This is -- do you have it in front of you?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

LEWIS – CROSS – PITLUCK

1    A    I do.

2    Q    I don't know if we have 10A.  It's in evidence, yes, I'm

3    sorry.

4    A    Yes.

5    Q    You were shown this on direct examination, right, sir?

6    A    Yes.

7    Q    And this is a summary of the trades on days following

8    stock price declines, correct?

9    A    Yes.

10   Q    And this is the only data that you showed the jury in

11   which the trades were broken out by day, correct?

12   A    I also showed broken out by day for buys and sells on the

13   same day.

14   Q    Okay.  And that was 221 -- I think it was 221-09?

15        No, I'm sorry.  221-08.

16   A    08.

17   Q    Yes.

18        This isn't all the days, though, right, sir?

19        THE COURT:  Which is "this"?

20   Q    I'm sorry, 221-10A.  I apologize, Your Honor.

21        These are just the days on which there were trades

22   following the stock price declines, right?

23   A    That's correct.

24   Q    Now, this is chart is the from December 17th, 2012 to

25   September 19th, 2014, correct?

LEWIS - CROSS - PITLUCK

1    A    Yes.

2    Q    And on those days, Andrew Vaino sells on number 2 through

3    number 16, right?

4    A    Yes.

5    Q    Those are a variety of days between December 21st, 2012

6    and February 12th, 2013, correct?

7    A    Yes.

8    Q    And, in fact, from that time period, the only other

9    person who sells -- the only other two people who sell any

10   shares on those daily trades are Mr. Biestek and Mr. Mulleady,

11   correct?

12   A    Correct.

13   Q    Mr. Fernandez doesn't sell any shares, right?

14   A    Right?

15   Q    Mr. Sullivan doesn't sell any shares, right?

16   A    Right.

17   Q    Mr. Tilles doesn't sell any shares, right?

18   A    Yes.

19   Q    So Shkreli just buys shares, correct?

20   A    Correct.

21   Q    And Mr. Pierotti is not on this chart, correct?

22   A    That's correct.

23   Q    And did you analyze the other days in which trades were

24   made that did not follow stock price declines?

25   A    No.

LEWIS - CROSS - PITLUCK

1   Q    So sitting here today, you don't know what the greatest

2   amount of shares that Andrew Vaino sold on a given day between

3   December and February of 2013?

4   A    That's correct.

5   Q    According to this chart, he never sold more than 4,000

6   share in a single day, correct?

7   A    Correct.

8   Q    And you don't have any charts in here that showed how --

9   or you weren't shown any charts on direct examination where

10  Mr. Pierotti's daily trading was disclosed, correct?

11  A    Correct.

12  Q    You don't have any charts you can show the jury

13  demonstrating when Mr. Pierotti sold shares on each individual

14  day, correct?

15  A    Correct.

16  Q    Do you have any knowledge of that, sir?

17  A    No, sir.

18  Q    So you don't know whether Tim Pierotti sold 19,200 shares

19  on December 27th, 2012?

20  A    I do not.

21  Q    You don't know whether Tim Pierotti sold 24,700 shares on

22  December 28th, 2012?

23  A    No.

24  Q    So you don't know on just those days he sold more than

25  44,000 shares, correct?  Just those two days.

LEWIS - CROSS - PITLUCK

1   A   What are you asking me?

2   Q   I'm asking if you know between those two days that

3   Mr. Pierotti sold more than 44,000 shares in December of 2012.

4         MS. DENERSTEIN:  Objection.  That's answered.  He

5   didn't know.

6         THE COURT:  I don't know if it was answered.

7   A   I don't know about trading on particular days for

8   Mr. Pierotti.

9   Q   It didn't seem that important to your analysis, sir?

10  A   Not to this analysis.

11  Q   I'd like to -- Judge, I'm just cognizant of the time

12  so...

13        THE COURT:  Okay.

14  Q   I'd like to direct your attention to Government

15  Exhibit 221 -- I'm sorry, force of habit -- Defense Exhibit

16  221-06, which you were shown on direct examination, correct?

17  A   Correct.

18  Q   And this was your individual monthly volume chart, right?

19  A   That's correct.

20  Q   You directed the preparation of this chart?

21  A   Yes.

22  Q   And confirmed that it's accurate?

23  A   I did.

24  Q   Now, looking at December of 2012, that's the first row

25  there, right, sir?

LEWIS - CROSS - PITLUCK

1    A    Yes.

2    Q    And the total net volume, where the box is around it,

3    that's the total net volume sold for the seven individuals or

4    entities, correct?

5    A    Yes.

6    Q    That's 12,200 shares, correct?

7    A    Correct.

8    Q    So those seven individuals in that month, between

9    December 17th and December 31st, sold 12,200 shares, correct?

10   A    Correct.

11   Q    And that would constitute less than one half of 1 percent

12   for the total free-trading shares, right?

13   A    I don't know.

14   Q    Well, 12,200 out of 2.5 million, Professor Lewis?

15   A    If I could do the math, but I'm willing to take your word

16   if that's the correct number.

17   Q    About one half of 1 percent?

18   A    Yes.

19   Q    But Mr. Pierotti sold -- it's in the column just to the

20   right -- sold 43,900 shares, right?

21   A    Yes.

22   Q    It's nearly four times as much as the whole group to the

23   left, correct?

24   A    Correct.

25   Q    And when you add in that, you get your 56,100 shares,

LEWIS - CROSS - PITLUCK

1    right?

2    A    Yes.

3    Q    And that's roughly 2 percent of all the shares traded,

4    correct?

5    A    Yes.

6    Q    All the free-trading shares?

7    A    Uh-huh.

8    Q    And that's important to your analysis, right, sir?

9    A    Yes.

10   Q    Now, same thing in February, 53,800 shares were traded by

11   the seven individuals.  I'm not to go through them all but

12   we'll say the select individuals minus Mr. Pierotti; is that

13   fair?

14   A    Yes.

15   Q    And that's about 2 percent of the free-trading shares of

16   the stock, right?

17   A    Uh-huh.  Yes.

18   Q    So it's accurate to say, yes or no, Professor Lewis, that

19   in that month, only 2 percent of the free-trading shares were

20   traded by these individuals?  In January of 2013?

21   A    That would be the net trading volume but, yes.

22   Q    The net trading volume.  And, again, your testimony is --

23   and with Mr. Pierotti it's 68,300, right?

24   A    Yes.

25   Q    That's about a little under 3 percent of all the shares

LEWIS - CROSS - PITLUCK

1    traded, of all the free-trading shares?

2    A    Yes.

3    Q    And your testimony on direct examination was that they

4    owned 2 million of the 2.5 million shares.

5    A    Yes.

6    Q    So of the 2 million shares that they owned, they only

7    traded 68,300.

8    A    Correct.  Net.

9    Q    Net, right.  But I think you -- withdrawn.

10        So there's no analysis that you had showed to the

11   jury about -- other than what we just walked through about how

12   the total trading of these individuals compared to the total

13   trading of Retrophin shares.

14   A    That's correct.

15   Q    And you would agree with me, would you not,

16   Professor Lewis, that the -- withdrawn.

17        Your Honor, can I have a moment, please?

18        THE JURY:  Yes.

19        (Pause.)

20   Q    Sorry, Professor Lewis, one final set of questions.

21        You testified on cross-examination a little while

22   ago that you had served as a summary witness in a prior case,

23   correct?

24   A    Correct.

25   Q    And that was while you were employed at the SEC or the

LEWIS - CROSS - PITLUCK

1    Securities and Exchange Commission?

2    A    Yes.

3    Q    And I think you testified, I don't want to rehash, but

4    that you were there to provide summary data, correct?

5    A    Yes.

6    Q    And that was a market manipulation case, sir?

7    A    I don't remember.

8    Q    Can I show you something that might refresh your

9    recollection?

10   A    Yes.

11   Q    I will show you Government Exhibit 1336 for

12   identification.

13             Does the Court have one, Your Honor?

14             THE COURT:  I should, if it's in this binder.

15             MR. PITLUCK:  It's behind Tab 36.

16   Q    Just take a look at that and let me know if that

17   refreshes your recollection as to what kind of case it was?

18   A    I've reviewed this.

19   Q    Does that refresh your recollection as to what kind of

20   case you testified in?

21   A    Not really, but go ahead.

22   Q    Okay.  Do you remember testifying in a case United States

23   versus Batian, et al.?

24   A    I remember the name "Batian."

25   Q    Okay.  And is that a press release --

LINDA D. DANELCZYK, RPR, CSR
*Official Court Reporter*

LEWIS - CROSS - PITLUCK

1        THE COURT:  Sorry, you need to speak so we can hear

2   you.  And she made an objection.

3        MR. PITLUCK:  I'm sorry, Judge.

4        THE COURT:  So do you want to reframe the question

5   because I don't think the court reporter heard the entire

6   question.

7   Q    I think the question I asked was:

8        Do you remember testifying in the case United States

9   versus Batian?

10  A    I don't know for sure.

11  Q    Okay.  I'm going to show you something else to refresh

12  your recollection, Government Exhibit 1330 for identification.

13       Does that refresh your recollection?

14  A    This will help me.

15  Q    And you testified in United States versus Batian,

16  correct?

17  A    Yes.

18  Q    Does it refresh your recollection that it was a market

19  manipulation case?

20  A    Yes.

21  Q    Okay.  And you were a summary witness in that case,

22  right?

23  A    Yes, I was.

24  Q    And in that case, you testified related to the price and

25  volume of a particular stock, right?

LEWIS - CROSS - PITLUCK

1    A    I don't remember --

2    Q    Okay.

3    A    -- the details or the nature of my testimony.

4    Q    Let's see if I can refresh your recollection, sir.

5         Can you go to transcript page 50 of that exhibit.

6    A    Yes, I'm here.

7    Q    You see line 20, and you can just read that to yourself,

8    through line 8 on page 51.

9         THE COURT:  Line 20 through 8?  Oh, I see.

10        MR. PITLUCK:  Yeah, it goes over two pages.  I

11   apologize.

12        THE COURT:  Thank you.

13        (Whereupon, the witness is reviewing the document.)

14   Q    Okay.  Does that refresh your recollection you testified

15   to price and volume data during this deposition?

16   A    I see that I did.

17   Q    And that you used Bloomberg price and volume data for the

18   summary exhibit in your deposition?

19   A    Yes.

20        MR. PITLUCK:  Your Honor, I have nothing further at

21   this time.

22        THE COURT:  Ms. Denerstein.

23        MS. DENERSTEIN:  Mr. Pitluck said "United States

24   versus Batian," and this says the "Securities and Exchange

25   Commission versus Batian," just for purposes of the record.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

LEWIS - REDIRECT - DENERSTEIN

1      MR. PITLUCK:  That's correct, I apologize.  It's the

2  Securities and Exchange Commission versus Batian.

3      THE COURT:  All right.

4      And you agree with that, sir, the appropriate name

5  of the case in which you testified, correct, sir?

6      THE WITNESS:  Yes.

7      THE COURT:  All right.  Thank you.

8  REDIRECT EXAMINATION

9  MS. DENERSTEIN:

10  Q    Okay, just referring you to Defense Exhibit 221-09.

11  A    Yes.

12      THE COURT:  Could you get close to the mic,

13  Ms. Denerstein?

14      MS. DENERSTEIN:  Yes.  Sorry.

15  Q    Directing your attention to Defense Exhibit 221-009.

16  Does it change your conclusion because the blue sheet data

17  shows a price of 5 for January 10th --

18      MR. PITLUCK:  Objection.

19  Q    -- would that have made any difference to your opinion?

20      THE COURT:  Sustained.  Please rephrase.

21  Q    What impact did the blue sheet data stating that

22  January 10th was $5 have on your opinion?

23  A    It wouldn't have affected the analysis at all.  There was

24  still a stock price drop over the period of 1/10 to 1/11.  It

25  would have been from $5 to $4 instead of as recorded here, 5,

LEWIS - REDIRECT - DENERSTEIN

1    10 and 4.  But we would have had the exact same exhibit

2    without any changes.

3    Q    Does the percentage of trading volume by the select

4    accounts affect your conclusion?

5    A    No, it does not.

6    Q    And why not?

7    A    Because I was examining evidence for a coordinated

8    attempt by the select individuals to cause stock prices to

9    increase or remain stable.  And the fact that they were net

10   sellers over that period is, in my view, inconsistent with

11   that.

12   Q    Does the failure to trade indicate stock manipulation?

13   A    No, it does not.

14   Q    Referring you to Defense Exhibit 221-36.

15              (Exhibit published.)

16   A    Okay, I'm there.

17   Q    Individual net month -- individual monthly net volume.

18              Mr. Pitluck spent some time talking about January,

19   correct?

20   A    He did.

21   Q    He said the net volume is 68,000?

22   A    Yes.

23   Q    Mr. Pierotti owned more stock than Mr. Vaino; isn't that

24   correct?  If you go to Government Exhibit 990.

25   A    Yes, Mr. Pierotti owned more stock than Mr. Vaino.

LEWIS - REDIRECT - DENERSTEIN

1   Q    And Mr. Pitluck was simply focusing on one month,

2   January 2013, correct?

3            MR. PITLUCK:  Objection, Your Honor.

4            THE COURT:  Sustained.

5   Q    Mr. Pitluck asked you questions about net volume in

6   January 2013, correct?

7   A    He did.

8   Q    And when did Retrophin go public?

9   A    It went public in --

10  Q    On an exchange.

11  A    On an exchange in -- I would have to look at the --

12  Q    Let me rephrase.

13           If I may, I withdraw my question, Your Honor.

14           On December 17, 2012, according to Government

15  Exhibit 990, is that when the shares of -- freely-trading

16  shares of stock became available?

17  A    They became available and they were traded on the OTC

18  bulletin board.

19  Q    So Mr. Pitluck is asking you to focus on January 2013,

20  which is days after the company first began trading on an

21  exchange, correct?

22           MR. PITLUCK:  Objection to form.

23           THE COURT:  Sustained.

24           You know what, I'll overruled the objection, just in

25  the interest of time is ticking.

PROCEEDINGS

1              MS. DENERSTEIN:  You can answer the question.

2    A     Could you restate the question.

3    Q     Mr. Pitluck was focused on the net volume in January of

4    2013, correct?

5    A     Correct.

6    Q     Retrophin stock only began trading on the

7    over-the-counter bulletin board on December 17th, 2012; isn't

8    that correct?

9    A     Correct.

10   Q     You analyzed an entire period of time, correct?

11   A     Correct.

12             MS. DENERSTEIN:  No further questions.

13             THE COURT:  Anything else, Mr. Pitluck?

14             MR. PITLUCK:  No recross.

15             THE COURT:  All right, sir, thank you.  You're

16   excused.

17             And the jury is also excused for the evening.  Thank

18   you very much for your attention.

19             We will see you tomorrow morning at 9, and we will

20   dismiss you as 2, as promised.  Maybe think about a shorter

21   lunch, if that's all right.

22             Okay, thank you.  Have a good night.  Thank you for

23   your service.  Please don't discuss or think about the case

24   until tomorrow morning when you're back.

25             (Jury exits the courtroom.)

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

8583

PROCEEDINGS

1          THE COURT:  We've issued an order that the defense

2    should submit any briefing they wish to make by tonight at

3    7:00 on the issues of consciousness of innocence and the

4    issues we talked about yesterday because we hadn't received it

5    and we need to get it ASAP because it affects the charges.

6          Is there anything else we need to address before we

7    adjourn?  No?

8          MS. SMITH:  It's our understanding that

9    Mr. Rosenwald will be tomorrow morning.  And then we were just

10   wondering who the witness will be after Mr. Rosenwald?

11         THE COURT:  Can we confirm the next two witnesses

12   for tomorrow and that we'll get through two.

13         MR. CHAN:  Mr. Cotton.

14         We don't think we will finish those two.

15         THE COURT:  All right.  Thank you.

16              *     *     *     *     *

17         (Proceedings adjourned at 5:30 p.m. to resume on

18   December 8, 2017 at 9:00 a.m.)

19

20

21

22

23

24

25

8584

```
1                        I N D E X

2  WITNESS                              PAGE

3  HAROLD JACOBS

4  DIRECT EXAMINATION     BY MR. BRODSKY    8326
   CROSS-EXAMINATION      BY MS. SMITH      8436
5  REDIRECT EXAMINATION   BY MR. BRODSKY    8448

6  CRAIG LEWIS

7  DIRECT EXAMINATION     BY MS. DENERSTEIN 8461
   CROSS-EXAMINATION      BY MR. PITLUCK    8535
8  REDIRECT EXAMINATION   BY MS. DENERSTEIN 8581

9
   *              *              *              *
10

11                       I N D E X

12                       EXHIBITS

13 DEFENDANT              PAGE
   221-04                 8494
14 221-05                 8494
   221-06                 8503
15 221-07                 8507
   221-02                 8516
16 221-03                 8519
   221-10A                8524
17 221-09                 8528
   221-08                 8529
18 221-01                 8559

19

20

21

22

23

24

25
```

Rivka Teich CSR, RPR, RMR
Official Court Reporter

**"ANSWER: [3]** 8398/7 8399/4 8509/14
**"QUESTION: [2]** 8398/5 8509/11
**BY MR. BRODSKY:: [4]** 8386/1 8422/25
8447/22 8451/23
**BY MR. PITLUCK:: [2]** 8532/25 8559/11
**BY MS. DENERSTEIN:: [6]** 8491/1 8511/4
8514/25 8517/7 8522/8 8527/16
**BY MS. SMITH:: [3]** 8434/4 8435/2 8441/20
**MR. BRODSKY: [166]** 8324/16 8325/11
8325/17 8325/20 8328/11 8328/19 8330/2
8330/11 8330/14 8331/12 8331/18 8331/25
8332/4 8332/21 8333/9 8333/23 8334/12
8336/9 8336/13 8337/5 8337/19 8337/25
8338/2 8339/19 8339/22 8340/23 8341/10
8341/15 8341/25 8342/11 8342/14 8342/22
8343/8 8343/13 8344/15 8346/19 8350/11
8350/15 8352/13 8352/18 8353/5 8353/9
8353/14 8353/22 8354/5 8354/13 8354/16
8355/10 8355/12 8356/10 8356/15 8357/14
8357/20 8357/24 8358/16 8358/25 8359/12
8359/14 8359/22 8360/12 8360/15 8360/25
8361/5 8361/17 8362/9 8362/19 8363/8
8363/15 8363/20 8380/17 8382/5 8384/4
8385/21 8385/24 8389/3 8389/21 8394/8
8394/24 8396/13 8397/3 8397/13 8397/22
8398/19 8399/16 8399/19 8401/3 8401/7
8401/9 8401/16 8401/20 8401/22 8402/24
8403/9 8403/15 8403/19 8404/25 8406/12
8406/19 8410/8 8411/3 8411/9 8411/11
8411/25 8412/6 8412/20 8412/24 8415/7
8416/24 8417/21 8418/2 8418/5 8418/10
8418/14 8418/18 8418/20 8419/16 8419/19
8419/25 8420/3 8421/12 8421/17 8421/20
8421/22 8422/1 8422/3 8422/24 8424/14
8424/22 8426/3 8426/11 8427/3 8427/7
8427/14 8428/6 8428/17 8428/21 8429/22
8430/1 8431/22 8432/4 8432/20 8433/3 8433/7
8434/25 8438/2 8439/20 8440/24 8441/9
8441/13 8446/3 8447/21 8449/9 8449/19
8449/22 8450/14 8451/11 8451/19 8452/2
8452/6 8452/11 8452/15 8452/23 8453/9
8454/1 8455/20 8456/3
**MR. CHAN: [30]** 8308/5 8308/16 8309/23
8310/4 8310/15 8310/20 8312/6 8312/9 8316/3
8316/16 8317/19 8319/14 8323/12 8323/18
8323/22 8324/9 8550/8 8550/12 8550/23
8551/6 8551/13 8552/2 8552/15 8552/23
8553/7 8554/19 8555/1 8555/9 8555/25
8583/12
**MR. KESSLER: [27]** 8310/17 8311/3 8311/12
8311/21 8313/5 8313/22 8314/3 8315/25
8320/3 8320/10 8321/11 8321/23 8321/25
8322/13 8323/9 8323/25 8324/6 8357/12
8357/15 8361/11 8361/14 8508/10 8508/23
8549/21 8550/5 8552/18 8554/1
**MR. MASTRO: [15]** 8354/2 8453/11 8453/15
8453/18 8454/12 8508/3 8508/12 8508/19
8509/2 8509/7 8509/16 8509/21 8510/1 8510/7
8510/13
**MR. PITLUCK: [60]** 8334/13 8335/18 8343/19
8458/3 8468/23 8485/8 8485/12 8485/15
8488/9 8488/11 8491/14 8492/5 8501/7
8501/22 8503/15 8503/21 8505/3 8506/23
8514/20 8517/3 8517/24 8522/3 8524/18
8525/23 8527/12 8532/22 8536/11 8536/15
8547/3 8548/6 8549/7 8549/11 8549/14
8549/17 8549/24 8550/10 8550/20 8550/25
8551/4 8551/7 8551/9 8551/16 8552/22
8552/24 8554/3 8554/6 8555/7 8555/23 8556/1
8557/2 8559/6 8576/14 8577/2 8578/9 8578/19
8578/25 8579/17 8581/2 8581/21 8582/13
**MS. DENERSTEIN: [43]** 8458/4 8458/7
8458/18 8468/20 8480/13 8484/12 8484/17
8485/2 8485/16 8486/9 8490/19 8491/13
8492/3 8505/1 8514/18 8517/1 8522/1 8524/21
8525/22 8527/10 8532/20 8536/13 8548/8
8548/11 8549/4 8549/9 8549/13 8549/16

8549/22 8551/3 8552/14 8553/21 8554/11
8557/1 8560/5 8565/9 8560/17 8565/8 8578/6
8578/22 8579/13 8581/25 8582/11
**MS. SMITH: [125]** 8314/23 8315/7 8316/13
8317/6 8317/20 8318/14 8325/9 8325/16
8325/19 8327/2 8327/22 8328/4 8328/10
8328/12 8328/22 8329/1 8330/3 8330/8
8330/15 8332/8 8333/25 8334/3 8335/9 8337/2
8337/16 8337/24 8338/1 8340/8 8343/16
8344/20 8346/8 8346/22 8348/25 8350/10
8350/19 8351/2 8352/2 8353/1 8353/6 8353/13
8354/1 8354/10 8355/11 8356/25 8357/4
8358/5 8358/8 8358/14 8358/22 8359/2 8361/7
8361/13 8362/1 8362/14 8366/2 8381/17
8381/24 8382/2 8382/18 8383/20 8384/14
8385/19 8387/20 8388/13 8388/24 8389/12
8390/15 8391/9 8394/5 8395/3 8396/2 8396/17
8397/7 8397/10 8398/14 8399/13 8399/17
8399/21 8401/6 8401/11 8402/11 8403/12
8404/16 8407/23 8414/22 8415/13 8419/15
8419/24 8420/2 8420/12 8421/10 8424/15
8425/2 8425/5 8426/4 8428/16 8428/20
8429/25 8430/8 8430/24 8431/13 8433/5
8433/18 8434/1 8441/15 8446/1 8447/20
8448/5 8448/21 8449/5 8449/17 8450/11
8451/10 8451/15 8452/3 8453/10 8453/13
8453/17 8454/10 8454/23 8456/23 8456/25
8508/17 8509/24 8583/7
**THE COURT: [301]**
**THE COURTROOM DEPUTY: [2]** 8458/23
8480/12
**THE DEFENDANT: [1]** 8456/20
**THE JURY: [3]** 8395/7 8456/10 8575/17
**THE LAW CLERK: [1]** 8458/10
**THE WITNESS: [22]** 8325/25 8328/16 8346/10
8349/4 8349/7 8349/9 8364/14 8382/20
8384/17 8388/16 8391/12 8424/21 8436/2
8452/5 8456/6 8458/25 8488/23 8490/20
8547/4 8557/20 8557/25 8579/5

**$**

**$1,000 [1]** 8519/2
**$10 [1]** 8523/10
**$2.25 [1]** 8523/22
**$2.90 [1]** 8530/25
**$24,891,303 [1]** 8480/8
**$3.60 [1]** 8479/6
**$4 [2]** 8526/16 8579/25
**$4.50 [1]** 8479/11
**$40 [1]** 8481/4
**$445,000 [1]** 8373/1
**$5 [2]** 8579/22 8579/25
**$5.10 [6]** 8525/20 8526/16 8526/16 8543/15
8543/18 8546/17
**$7.69 [1]** 8530/25
**$70,000 [1]** 8519/6
**$8.50 [1]** 8480/22
**$816,664 [2]** 8478/22 8480/4
**$9,137,787 [1]** 8480/6

**'**

**'11 [3]** 8326/2 8420/18 8420/19
**'12 [2]** 8420/18 8497/4
**'13 [3]** 8420/19 8479/19 8499/4
**'14 [1]** 8497/5

**-**

**-- can [1]** 8477/7
**-- in [1]** 8374/25
**-- to [1]** 8540/23
**-- what [1]** 8483/14
**-- which [1]** 8360/14
**-------------------------x [2]** 8307/2 8307/8
**-against [1]** 8307/5

**.**

**.1 [2]** 8524/8 8524/8
**.10 [3]** 8523/11 8523/11 8523/11

**.14 [1]** 8523/17
**.45 [1]** 8523/05
**.2 [1]** 8529/9
**.20 [1]** 8524/4
**.36 [1]** 8524/14
**.50 [1]** 8522/24
**.8 [1]** 8334/25
**.90 [1]** 8524/11

**0**

**0637 [1]** 8307/2
**009 [1]** 8579/15
**01 [6]** 8547/16 8548/8 8557/4 8557/5 8557/6
8558/10
**02 [10]** 8514/13 8514/19 8514/22 8514/24
8560/24 8566/4 8566/6 8566/8 8568/14
8568/15
**03 [5]** 8516/19 8517/2 8517/5 8517/6 8566/17
**04 [4]** 8491/9 8491/10 8492/8 8492/9
**05 [4]** 8491/11 8492/8 8492/11 8492/14
**06 [8]** 8500/9 8501/7 8501/9 8501/10 8503/20
8504/14 8505/19 8572/16
**07 [6]** 8307/5 8504/22 8505/3 8505/5 8505/6
8511/6
**08 [6]** 8527/5 8527/12 8527/14 8527/15
8569/15 8569/16
**09 [10]** 8525/12 8525/23 8525/25 8526/1
8543/1 8543/1 8546/18 8547/4 8569/14
8579/10

**1**

**1 percent [2]** 8573/11 8573/17
**1,000 [3]** 8500/20 8522/25 8524/12
**1,003,374 [2]** 8502/5 8502/11
**1,100 [1]** 8371/5
**1,325 [1]** 8524/6
**1,500 [2]** 8523/12 8523/23
**1,597,969 [1]** 8479/5
**1.1 [1]** 8537/1
**1.10 [2]** 8525/16 8526/13
**1/10 [1]** 8579/24
**1/11 [1]** 8579/24
**10 [15]** 8366/15 8371/1 8398/25 8475/23
8475/25 8480/16 8481/20 8487/18 8525/11
8543/18 8545/4 8546/9 8546/24 8579/24
8580/1
**10 percent [2]** 8562/25 8568/18
**10,000 [2]** 8531/10 8531/17
**10,850 [2]** 8494/3 8497/15
**100 [6]** 8317/4 8522/21 8525/16 8526/11
8528/24 8529/4
**100,000 [1]** 8487/20
**1000 [1]** 8517/15
**1001 [1]** 8490/18
**10166 [1]** 8307/18
**104 [1]** 8405/7
**10:20 a.m [1]** 8433/14
**10:20 this [1]** 8404/8
**10A [7]** 8521/19 8522/2 8522/6 8522/7 8568/23
8569/2 8569/20
**10th [3]** 8526/16 8579/17 8579/22
**11 [6]** 8523/8 8523/9 8526/17 8531/16 8543/21
8579/24
**111 [1]** 8332/10
**11201 [1]** 8307/14
**116-52 [1]** 8371/5
**11:27 [1]** 8403/22
**11th [1]** 8343/6
**12 [8]** 8379/21 8428/14 8474/15 8475/9
8475/19 8487/16 8500/7 8524/11
**12,000 [5]** 8496/6 8500/22 8517/16 8567/1
8567/2
**12,200 [4]** 8501/1 8573/6 8573/9 8573/14
**12/17/2012 [1]** 8532/1
**121-5 [3]** 8372/15 8372/22 8375/1
**121-7 [4]** 8378/6 8378/18 8383/6 8385/1
**123-3 [4]** 8349/22 8350/2 8350/5 8364/4
**12th [1]** 8570/6

**1**
**13** [2] 8495/3 8564/14
**13,000** [1] 8567/18
**130-85** [1] 8479/12
**132** [2] 8332/10 8563/15
**132,000** [1] 8563/11
**132,125** [1] 8563/5
**132-2** [1] 8536/9
**132-3** [2] 8536/10 8536/12
**1325** [2] 8564/16 8564/18
**1330** [1] 8577/12
**1336** [1] 8576/11
**135** [1] 8466/22
**14** [14] 8327/7 8479/2 8480/5 8484/22 8487/14 8488/5 8495/4 8512/9 8512/12 8525/15 8526/8 8526/10 8546/7 8546/8
**14,500** [2] 8517/22 8567/11
**144** [1] 8476/6
**14th** [2] 8526/19 8526/15
**15** [5] 8325/1 8327/7 8399/1 8479/9 8480/7
**15,000** [1] 8379/16
**15,100** [1] 8517/21
**15-CR-00637** [1] 8307/2
**150** [1] 8376/24
**1500** [1] 8523/14
**16** [3] 8399/1 8423/19 8570/3
**17** [26] 8398/5 8423/4 8476/4 8476/14 8483/4 8484/3 8486/2 8487/4 8488/22 8489/5 8490/9 8503/8 8511/16 8515/15 8516/23 8523/6 8524/14 8528/5 8528/11 8530/10 8530/18 8530/20 8531/4 8531/14 8551/13 8581/14
**17th** [9] 8500/13 8505/17 8561/6 8561/11 8565/16 8566/22 8569/24 8573/9 8582/7
**18** [4] 8338/4 8421/8 8524/3 8524/4
**186** [1] 8478/15
**19** [5] 8490/9 8503/8 8523/6 8528/5 8528/12
**19,200** [1] 8571/18
**1967** [3] 8440/9 8440/10 8440/13
**1970** [2] 8440/8 8440/10
**1978** [1] 8459/11
**1984** [2] 8338/22 8459/12
**1986** [1] 8338/5
**1987** [1] 8459/12
**19th** [3] 8500/14 8505/17 8569/25

**2**
**2 million** [5] 8561/20 8561/21 8562/9 8575/4 8575/6
**2 percent** [3] 8574/3 8574/15 8574/19
**2,000** [2] 8528/24 8529/6
**2,204** [1] 8523/18
**2,350** [3] 8493/14 8493/15 8493/18
**2,500** [2] 8525/17 8526/11
**2,500,000** [4] 8476/2 8476/12 8487/7 8487/9
**2,600** [1] 8526/12
**2,800** [1] 8524/15
**2.5** [1] 8487/25
**2.5 million** [3] 8561/10 8573/14 8575/4
**20** [8] 8358/14 8464/6 8477/24 8493/20 8522/20 8523/18 8578/7 8578/9
**200** [3] 8307/18 8500/23 8517/16
**201** [1] 8380/24
**201-3** [2] 8381/4 8381/7
**2011** [15] 8326/2 8328/16 8330/11 8341/10 8341/10 8371/2 8371/9 8371/10 8406/8 8414/2 8419/5 8442/8 8464/7 8466/20 8468/17
**2012** [82] 8330/11 8341/10 8348/10 8350/6 8364/5 8366/15 8368/2 8368/3 8368/4 8370/25 8371/1 8371/9 8419/5 8434/19 8435/4 8449/17 8449/24 8450/8 8450/25 8451/25 8474/15 8475/9 8475/19 8475/24 8475/25 8476/4 8476/14 8483/4 8484/3 8486/2 8487/4 8487/6 8488/14 8488/16 8488/22 8489/5 8490/9 8493/6 8494/2 8494/2 8496/5 8497/16 8499/12 8500/7 8503/10 8509/19 8501/20 8503/7 8503/8 8505/17 8506/4 8511/16 8515/15 8516/23 8516/25 8517/14 8522/20 8522/23 8523/6 8528/5 8528/11 8528/23 8530/10
**2013** [120] 8326/1 8326/2 8328/16 8339/25 8341/11 8341/12 8343/25 8344/3 8344/8 8346/1 8347/10 8350/6 8355/16 8355/18 8355/20 8357/7 8358/18 8364/5 8367/10 8370/6 8372/17 8372/22 8376/25 8379/10 8379/17 8381/1 8383/25 8387/14 8387/20 8388/2 8388/20 8389/5 8389/17 8389/24 8391/18 8392/20 8392/21 8393/2 8406/8 8414/2 8419/3 8419/5 8419/6 8419/8 8434/19 8449/15 8450/2 8450/16 8451/3 8478/3 8478/19 8479/2 8479/9 8479/16 8479/17 8479/24 8480/3 8480/7 8484/1 8484/16 8484/22 8485/6 8488/19 8488/22 8489/6 8493/1 8493/12 8495/1 8495/24 8496/4 8498/4 8498/15 8498/17 8498/19 8499/3 8499/12 8499/24 8499/24 8500/8 8511/17 8512/7 8512/9 8512/11 8512/15 8515/16 8516/23 8517/1 8517/19 8523/9 8524/6 8524/8 8524/14 8525/15 8526/8 8526/8 8526/17 8530/10 8530/21 8531/4 8531/15 8543/18 8543/21 8545/4 8546/7 8546/8 8546/24 8551/15 8561/6 8565/17 8566/22 8567/7 8570/6 8571/3 8574/20 8581/2 8581/6 8581/19 8582/4
**2014** [56] 8341/10 8347/10 8378/22 8379/9 8381/16 8382/8 8383/20 8384/1 8386/5 8392/24 8393/2 8434/19 8450/4 8450/20 8451/6 8451/10 8451/14 8452/1 8464/7 8480/16 8481/20 8483/4 8483/12 8484/5 8484/5 8485/22 8486/3 8490/9 8494/3 8495/1 8497/17 8498/4 8499/3 8499/13 8499/13 8499/14 8499/22 8499/25 8499/25 8500/2 8500/14 8501/21 8503/8 8505/17 8506/4 8512/7 8523/7 8523/18 8523/21 8525/5 8528/12 8530/19 8532/1 8551/16 8551/18 8569/25
**2015** [7] 8348/10 8387/9 8434/9 8434/16 8434/19 8435/5 8442/8
**2016** [1] 8533/11
**2017** [6] 8307/5 8533/11 8533/12 8533/13 8536/5 8583/18
**206** [1] 8536/23
**21** [2] 8522/23 8524/5
**210,953** [3] 8495/23 8499/16 8503/23
**2104** [2] 8492/5 8496/18
**2105** [1] 8492/5
**21st** [1] 8570/5
**22** [7] 8493/20 8493/22 8494/18 8494/18 8494/18 8501/13 8503/20
**22,879** [1] 8498/11
**221** [3] 8566/3 8569/14 8572/15
**221-009** [1] 8579/15
**221-01** [6] 8547/16 8548/8 8557/4 8557/5 8557/6 8558/10
**221-02** [8] 8514/13 8514/19 8514/22 8514/24 8566/4 8566/8 8568/14 8568/15
**221-03** [5] 8516/19 8517/2 8517/5 8517/6 8566/17
**221-04** [2] 8491/10 8492/9
**221-05** [3] 8492/8 8492/11 8492/14
**221-06** [3] 8501/10 8503/20 8572/16
**221-07** [2] 8505/6 8511/6
**221-08** [5] 8527/5 8527/12 8527/14 8527/15 8569/15
**221-09** [7] 8525/12 8525/23 8525/25 8526/1 8543/1 8547/4 8569/14
**221-10** [1] 8525/11
**221-10A** [6] 8521/19 8522/2 8522/6 8522/7 8568/23 8569/20
**221-36** [1] 8580/14
**226** [2] 8563/11 8563/15
**226,000** [1] 8568/11
**226,505** [2] 8515/14 8562/22
**2268** [1] 8307/22

**229** [1] 8337/10
**23** [3] 8477/9 8524/2 8527/20
**24** [2] 8399/17 8524/10
**24,700** [1] 8571/21
**24,891,303** [1] 8479/11
**25** [3] 8398/5 8399/17 8423/4
**250** [1] 8373/2
**250,000** [2] 8487/18 8504/11
**26** [3] 8349/25 8350/2 8528/22
**26.2** [1] 8308/3
**265** [1] 8338/21
**27** [6] 8366/10 8379/9 8484/19 8524/13 8531/6 8531/8
**271** [1] 8307/14
**272,221** [1] 8478/19
**27th** [1] 8571/3
**28** [13] 8372/15 8488/16 8488/22 8489/5 8511/17 8512/11 8515/16 8516/23 8523/10 8530/10 8530/21 8531/4 8531/14
**28th** [4] 8561/6 8565/17 8566/22 8571/22
**29** [6] 8316/10 8316/19 8378/5 8378/17 8484/5 8523/9
**2:08** [1] 8458/15

**3**
**3 percent** [1] 8574/25
**3,045,929** [1] 8479/3
**3,300** [1] 8517/20
**3,350** [2] 8493/19 8563/3
**30** [9] 8459/25 8460/16 8461/12 8463/13 8463/15 8467/2 8483/4 8484/5 8530/19
**30,000** [1] 8567/14
**30-some-odd** [1] 8537/25
**300** [2] 8528/23 8529/3
**300,000** [2] 8487/16 8487/17
**304** [1] 8336/19
**31,150** [1] 8515/11
**31st** [1] 8573/9
**350,000** [7] 8487/14 8487/17 8487/18 8496/17 8500/8 8504/13 8504/17
**3500** [2] 8555/11 8555/12
**353,000** [1] 8504/9
**36** [2] 8576/15 8580/14
**370,178** [3] 8494/19 8498/3 8504/2
**38** [1] 8544/3
**3:33** [1] 8510/18

**4**
**4,000** [1] 8571/5
**4,400** [1] 8515/11
**4,705,882** [2] 8480/21 8481/2
**400** [1] 8529/4
**401** [5] 8341/1 8406/4 8407/11 8414/19 8420/12
**403** [11] 8330/25 8332/10 8335/10 8336/3 8341/1 8356/22 8405/7 8406/4 8410/20 8411/11 8420/12
**42,000** [2] 8517/21 8567/8
**427** [2] 8527/24 8528/3
**43,900** [4] 8501/2 8517/17 8567/3 8573/20
**44,000** [2] 8571/25 8572/3
**47** [1] 8530/22
**48th** [1] 8307/18
**4:45** [1] 8456/21

**5**
**5 percent** [1] 8527/24
**5,000** [2] 8523/23 8524/1
**5,531,401** [1] 8479/10
**5,838,837** [1] 8476/5
**5.1** [1] 8537/2
**50** [6] 8466/21 8523/20 8523/21 8546/10 8547/13 8578/5
**500** [2] 8521/3 8522/25
**500,000** [3] 8487/22 8561/24 8562/3
**51** [1] 8578/8
**52** [1] 8478/2
**53,800** [1] 8574/10

**5**
**55,000** [1] 8496/4
**56,100** [2] 8501/4 8573/25
**5:30** [1] 8583/17

**6**
**6,000** [1] 8524/9
**60** [1] 8563/8
**60 percent** [1] 8563/16
**60,000** [1] 8568/1
**600** [2] 8500/21 8517/15
**61** [2] 8523/16 8523/17
**64,962** [1] 8365/23
**647** [1] 8546/8
**653,374** [3] 8501/19 8502/16 8502/16
**653374** [1] 8501/16
**66** [2] 8478/15 8488/5
**68,000** [1] 8580/21
**68,300** [2] 8574/23 8575/7
**69.87 percent** [1] 8565/17
**6:30** [2] 8456/24 8456/25

**7**
**7,100** [2] 8495/19 8499/6
**70** [3] 8519/4 8533/14 8565/21
**70 percent** [1] 8565/21
**70-plus** [1] 8362/22
**70-year-plus** [1] 8432/7
**718-613-2268** [1] 8307/22
**727** [1] 8338/21
**73,000** [1] 8567/20
**73,725** [1] 8567/21
**747** [1] 8332/10
**75** [1] 8475/22
**7:00** [1] 8583/3

**8**
**8,000** [1] 8523/24
**8,338,837** [1] 8476/4
**8-K** [9] 8474/11 8474/18 8474/19 8474/23
8475/3 8475/4 8477/3 8540/20 8561/14
**8-Ks** [1] 8474/21
**80** [3] 8475/22 8487/10 8488/5
**80,000** [1] 8563/15
**801** [1] 8555/14
**806** [3] 8338/4 8552/19 8556/2
**8185** [1] 8443/8
**8195** [5] 8396/18 8397/24 8398/5 8399/17
8423/3
**8196** [2] 8398/25 8423/18
**8270** [2] 8428/14 8428/23
**8273** [2] 8324/25 8327/7
**85** [1] 8480/10

**9**
**9,137,787** [1] 8479/4
**9,500** [1] 8523/25
**9.B** [1] 8353/11
**9/30/2014** [1] 8532/1
**90** [1] 8372/12
**90 percent** [1] 8568/21
**91,372** [1] 8496/12
**916** [1] 8336/19
**950** [3] 8490/17 8545/17 8559/25
**951** [1] 8490/17
**952** [1] 8490/17
**953** [1] 8490/17
**954** [1] 8490/17
**955** [5] 8530/6 8530/14 8543/25 8545/3
8559/22
**960** [1] 8474/2
**990** [4] 8486/24 8504/4 8580/24 8581/15
**992** [1] 8482/24
**995** [3] 8507/19 8511/13 8530/13
**9:00** [2] 8307/5 8583/18
**9:35** [1] 8324/13
**9th** [1] 8526/16

**A**
**a.m** [5] 8307/5 8324/13 8403/22 8433/14
8583/18
**abeyance** [1] 8431/10 8433/18
**ability** [6] 8310/10 8360/9 8368/20 8376/12
8482/6 8562/6
**able** [18] 8340/7 8358/1 8360/2 8378/13
8400/11 8404/10 8404/15 8406/23 8408/6
8416/8 8419/6 8453/22 8461/9 8518/4 8521/8
8542/17 8545/1 8555/22
**absent** [1] 8453/17
**absolutely** [3] 8342/2 8453/11 8551/1
**abstract** [1] 8312/5
**academia** [5] 8461/22 8537/25 8538/4 8539/11
8539/17
**academic** [5] 8460/3 8460/10 8462/14 8462/17
8467/6
**acceptable** [1] 8431/12
**accepted** [4] 8339/2 8544/8 8544/12 8553/6
**access** [1] 8336/12
**accommodate** [1] 8404/14
**accompany** [1] 8467/1
**accomplishment** [2] 8382/21 8384/23
**accomplishments** [1] 8460/10
**according** [16] 8480/2 8487/12 8504/7 8531/9
8546/21 8547/5 8547/10 8547/11 8547/12
8559/1 8562/8 8565/24 8565/25 8566/25
8571/5 8581/14
**account** [14] 8322/10 8488/9 8488/9 8488/21
8491/5 8506/22 8508/8 8508/13 8508/15
8509/13 8511/9 8512/24 8513/19 8563/9
**accountant's** [1] 8391/16
**accountants** [9] 8388/3 8388/7 8388/9
8388/13 8388/22 8389/9 8390/1 8391/6 8391/9
**accounting** [2] 8312/2 8459/7
**accounts** [11] 8490/9 8491/7 8506/5 8511/24
8512/22 8518/3 8531/24 8532/10 8541/11
8554/13 8580/4
**accuracy** [20] 8534/21 8534/22 8548/5 8549/9
8549/16 8549/20 8550/2 8550/5 8550/6 8550/7
8551/3 8551/5 8551/12 8557/13 8557/14
8557/22 8558/9 8559/2 8560/3 8560/9
**accurate** [13] 8423/3 8424/12 8492/1 8537/9
8538/21 8543/12 8543/14 8558/5 8560/6
8561/17 8565/1 8572/22 8574/18
**ACG** [1] 8377/20
**acquire** [1] 8470/8
**acquired** [1] 8504/20
**Acquisition** [1] 8475/11
**Acquisitions** [1] 8376/25
**acronym** [1] 8538/10
**act** [27] 8307/13 8315/5 8429/15 8429/21
8429/24 8430/6 8430/7 8430/8 8437/15
8437/18 8437/21 8437/23 8437/25 8438/1
8438/2 8438/11 8438/13 8438/17 8438/25
8439/5 8439/7 8439/10 8446/10 8446/14
8446/17 8446/18 8446/19
**acting** [1] 8309/20
**actions** [2] 8416/11 8416/11
**active** [4] 8368/5 8370/4 8378/3 8470/9
**activist** [1] 8370/10
**activities** [4] 8338/14 8467/15 8499/15 8500/3
**activity** [60] 8467/13 8481/23 8483/23 8490/8
8491/24 8492/16 8493/24 8494/1 8496/23
8497/11 8498/9 8498/18 8498/23 8499/10
8499/19 8500/24 8500/25 8502/4 8502/18
8502/19 8505/11 8505/15 8505/16 8505/16
8506/20 8506/22 8508/8 8508/14 8508/15
8509/9 8509/13 8509/19 8511/10 8513/3
8513/15 8513/17 8514/4 8514/15 8515/3
8515/12 8515/20 8516/14 8516/21 8516/24
8518/5 8522/14 8528/18 8530/4 8532/7
8532/15 8532/16 8532/17 8532/19 8561/5
8562/22 8563/8 8564/9 8564/10 8566/11
8566/20
**actual** [9] 8352/8 8355/23 8454/17 8454/18

**503/14** 8512/23 8555/11 8555/23 8565/5
8581/4 8584/5
**adamant** [1] 8344/9
**add** [3] 8401/16 8428/12 8573/25
**added** [1] 8493/18
**addition** [4] 8371/4 8393/11 8442/17 8464/2
**additional** [10] 8308/3 8308/7 8326/24 8368/6
8369/2 8404/24 8426/8 8426/20 8432/17
8496/6
**address** [3] 8324/6 8467/12 8583/6
**addresses** [1] 8467/14
**adds** [3] 8493/1 8529/3 8529/4
**adjourn** [1] 8583/7
**adjourned** [1] 8583/17
**administration** [1] 8465/1
**administrative** [1] 8465/22
**admissible** [9] 8338/12 8339/6 8340/25
8355/20 8402/3 8417/18 8418/13 8453/5
8453/5
**admission** [3] 8336/21 8337/18 8557/4
**admit** [2] 8427/14 8551/16
**admits** [1] 8557/5
**admitted** [5] 8337/1 8354/23 8358/1 8414/16
8421/12
**admitting** [1] 8406/5
**adopted** [2] 8377/16 8553/6
**advance** [1] 8519/9
**advanced** [1] 8460/21
**advantage** [1] 8355/14
**adverse** [3] 8310/14 8311/3 8321/7
**adversely** [1] 8338/15
**advice** [12] 8333/16 8335/15 8335/16 8367/20
8391/16 8419/10 8421/3 8421/3 8427/6 8429/5
8439/14 8439/16
**advised** [7] 8334/25 8367/8 8371/8 8374/15
8386/11 8386/24 8387/2
**advising** [2] 8407/7 8463/17
**advisor** [1] 8463/22
**Advisors** [1] 8463/22
**affect** [4] 8377/3 8390/7 8466/9 8580/4
**affected** [3] 8338/15 8467/21 8579/23
**affects** [1] 8583/5
**affiliate** [3] 8448/1 8448/10 8448/20
**affiliates** [3] 8326/20 8327/1 8327/1
**affiliation** [1] 8448/5
**affirmatively** [1] 8407/22
**affirmed** [2] 8324/20 8458/23
**affirming** [1] 8336/24
**afford** [1] 8477/12
**afternoon** [6] 8434/6 8434/7 8456/18 8507/23
8533/2 8533/3
**agent** [3] 8339/7 8339/8 8417/14
**agent's** [1] 8417/16
**agents** [2] 8326/22 8338/23
**aggregate** [10] 8478/19 8478/21 8479/4
8479/5 8479/11 8483/23 8493/3 8500/12
8502/7 8502/13
**aggregating** [1] 8529/1
**ago** [4] 8558/4 8559/11 8564/13 8575/22
**agree** [14] 8314/1 8314/4 8390/20 8390/24
8391/19 8402/9 8409/8 8435/23 8437/21
8539/16 8544/7 8546/16 8575/15 8579/4
**agreed** [5] 8311/13 8343/3 8393/10 8393/23
8393/25
**agreeing** [1] 8313/21
**agreement** [15] 8308/22 8325/7 8327/6 8327/9
8327/16 8328/9 8407/13 8407/14 8407/15
8409/22 8415/22 8441/3 8441/5 8475/8 8475/9
**agreements** [31] 8309/9 8309/9 8309/13
8309/17 8311/21 8313/22 8314/3 8324/25
8328/1 8336/2 8340/18 8345/6 8358/12 8370/7
8408/8 8408/9 8410/20 8412/8 8413/4 8414/3
8414/16 8416/6 8420/20 8427/17 8428/1
8428/9 8428/24 8428/25 8429/1 8429/4 8429/7
**agrees** [1] 8362/16
**ahead** [3] 8413/19 8488/23 8576/21
**aided** [1] 8307/25
**al** [1] 8576/23
**Alan** [1] 8324/8

**A**

**Alexander [3]** 8364/12 8364/20 8365/6
**ALIXANDRA [1]** 8307/15
**allegation [1]** 8337/11
**alleged [1]** 8418/2
**allow [12]** 8321/10 8323/21 8337/21 8356/4 8362/18 8409/25 8426/23 8441/19 8469/14 8485/11 8551/22 8560/5
**allowed [12]** 8311/17 8321/21 8333/3 8333/15 8339/7 8342/18 8406/22 8408/17 8410/12 8410/18 8417/19 8555/13
**allows [8]** 8356/3 8552/9
**almost [6]** 8393/23 8455/21 8460/25 8469/16 8472/15 8568/1
**alphabetically [1]** 8364/11
**altering [1]** 8508/25
**alternative [1]** 8470/6
**amazing [3]** 8371/17 8379/17 8380/13
**ambush [2]** 8341/15 8341/17
**amend [2]** 8429/4
**AMERICA [1]** 8307/3
**amorphous [1]** 8416/12
**Amos [1]** 8461/14
**amount [9]** 8371/17 8463/14 8471/8 8483/6 8486/6 8493/15 8494/1 8503/13 8571/2
**analogize [2]** 8465/24 8472/16
**analyses [4]** 8465/3 8465/13 8465/21 8546/1
**analysis [46]** 8463/4 8464/8 8464/18 8464/20 8464/21 8465/13 8466/19 8467/1 8467/4 8490/14 8491/23 8492/2 8494/15 8495/8 8495/21 8496/9 8496/15 8497/21 8497/22 8497/25 8505/1 8513/20 8515/23 8516/21 8518/2 8519/22 8519/25 8522/21 8526/9 8527/2 8532/3 8538/23 8539/23 8553/23 8553/25 8562/8 8562/11 8564/3 8564/7 8565/6 8565/11 8572/9 8572/10 8574/8 8575/10 8579/23
**analyst [1]** 8468/6
**analysts [7]** 8462/7 8462/7 8462/8 8462/9 8462/17 8467/25 8520/14
**analytic [1]** 8464/22
**analyze [4]** 8490/8 8491/7 8522/14 8570/23
**analyzed [3]** 8491/3 8497/6 8582/10
**analyzing [3]** 8467/3 8468/22 8469/2
**ancillary [1]** 8318/19
**Andrew [24]** 8486/14 8487/18 8488/2 8490/11 8499/10 8500/22 8506/14 8507/4 8507/5 8507/8 8512/1 8515/7 8517/15 8522/25 8526/11 8528/24 8541/21 8563/22 8563/23 8567/1 8567/8 8567/17 8570/2 8571/2
**announcements [1]** 8467/23
**announcing [2]** 8480/16 8510/12
**annual [1]** 8520/13
**answer [36]** 8347/2 8349/9 8382/20 8384/17 8385/24 8391/17 8397/24 8398/5 8402/21 8403/5 8403/9 8403/19 8411/21 8416/3 8422/18 8422/23 8423/5 8423/8 8423/16 8423/22 8424/2 8429/14 8446/21 8452/19 8453/5 8488/23 8489/3 8503/20 8508/23 8510/3 8510/5 8510/6 8510/9 8550/7 8557/19 8582/1
**answered [9]** 8337/23 8359/2 8448/6 8448/12 8448/22 8508/16 8560/18 8572/4 8572/6
**answers [10]** 8396/21 8398/13 8400/2 8403/15 8403/17 8403/18 8411/16 8423/12 8449/13 8453/23
**anticipate [5]** 8427/3 8427/19 8427/19 8429/22 8430/5
**anticipated [1]** 8331/14 8371/8
**antitrust [3]** 8385/7 8386/4 8386/7
**anyway [1]** 8319/24
**apart [1]** 8331/5
**apartment [2]** 8338/8 8340/20
**apologies [1]** 8530/15
**apologize [7]** 8332/6 8333/11 8546/9 8566/6 8569/20 8578/11 8579/1
**App'x [1]** 8336/19
**appealed [1]** 8337/10
**appealing [2]** 8337/18 8337/20
**appeals [2]** 8337/24 8500/14
**APPEARANCES [1]** 8307/11
**appeared [1]** 8377/10
**appellant [4]** 8336/20 8337/13 8338/9 8338/11
**appellant's [4]** 8337/15 8338/7 8338/13 8338/17
**appellant-defendant [1]** 8336/20
**apples [1]** 8455/13
**applications [1]** 8467/8
**apply [1]** 8438/6
**appreciate [4]** 8341/2 8421/21 8421/23 8422/4
**approach [3]** 8380/18 8421/16 8452/12
**approached [1]** 8338/23
**appropriate [13]** 8308/20 8308/24 8309/21 8317/2 8334/25 8342/22 8343/7 8358/3 8358/5 8408/24 8455/12 8551/22 8579/4
**appropriately [1]** 8550/20
**approval [1]** 8481/15
**approved [1]** 8552/13
**April [9]** 8392/20 8392/21 8392/24 8434/9 8434/16 8498/15 8499/13 8499/25 8523/21
**April 2013 [1]** 8498/15
**April 2014 [1]** 8499/25
**April 2015 [2]** 8434/9 8434/16
**April 4 [1]** 8523/21
**architect [1]** 8465/3
**area [6]** 8322/8 8323/3 8371/23 8376/10 8376/14 8462/6
**areas [4]** 8361/3 8410/10 8462/3 8462/11
**argue [10]** 8312/3 8314/18 8315/19 8316/18 8320/13 8334/21 8335/21 8396/17 8419/6 8432/11
**argued [6]** 8316/5 8316/18 8316/23 8319/3 8319/17 8335/11
**arguing [6]** 8313/7 8314/22 8316/17 8316/20 8334/14 8407/19
**argument [23]** 8311/15 8313/6 8313/15 8313/24 8314/24 8316/11 8316/22 8334/15 8336/3 8339/2 8339/10 8406/15 8406/21 8409/11 8418/8 8420/22 8421/4 8421/8 8421/10 8421/17 8426/5 8432/9 8451/18
**arguments [8]** 8318/9 8320/19 8320/20 8320/20 8320/23 8426/8 8426/10 8431/2
**arises [1]** 8357/13
**arrest [1]** 8338/24
**arrow [4]** 8484/18 8485/3 8485/25 8486/1
**arrows [1]** 8485/19
**article [7]** 8377/9 8377/17 8380/12 8380/13 8380/22 8380/24 8381/1 8381/3
**articles [4]** 8383/11 8383/16 8384/22 8384/22
**articulate [1]** 8452/10
**ASAP [1]** 8583/5
**Aselage [1]** 8406/11
**Ash [1]** 8368/24
**Aspatore [1]** 8376/25
**asserted [1]** 8350/15
**assertion [2]** 8331/1 8331/5
**assertions [2]** 8332/14 8332/21
**assessment [3]** 8416/14 8464/23 8465/5
**asset [3]** 8352/25 8355/8 8462/10
**assets [1]** 8520/24
**assignees [1]** 8326/20
**assigning [2]** 8378/10 8378/14
**assist [2]** 8461/19 8537/4
**Assistant [1]** 8307/16 8533/6
**assisted [3]** 8372/3 8375/21 8539/20
**assisting [6]** 8310/17 8310/18 8367/12 8370/13 8370/14 8375/22
**associate [2]** 8463/8 8463/9
**associated [3]** 8476/24 8482/11 8526/20
**associates [1]** 8368/19
**assume [2]** 8335/15 8354/11
**assuming [1]** 8544/25
**assumption [1]** 8316/22
**attack [1]** 8555/14
**attacked [1]** 8552/21
**attacking [1]** 8555/14
**attempt [6]** 8405/2 8516/4 8532/8 8532/12 8532/16 8583/8
**attempting [1]** 8520/18
**attending [1]** 8371/6
**attention [18]** 8318/23 8366/17 8366/18 8372/20 8378/24 8383/5 8396/4 8477/5 8478/15 8482/16 8485/22 8543/24 8546/6 8547/15 8566/3 8572/14 8579/15 8582/18
**attorney [41]** 8307/13 8309/4 8309/16 8310/2 8310/10 8310/13 8310/25 8311/1 8311/6 8312/11 8312/23 8312/24 8313/14 8313/17 8313/18 8314/5 8314/8 8314/11 8314/16 8315/13 8315/18 8317/23 8321/18 8321/19 8322/5 8322/10 8322/21 8322/24 8323/7 8323/17 8323/18 8336/7 8353/24 8354/16 8428/20 8436/10 8436/11 8436/13 8436/14 8440/7 8533/7
**attorney's [1]** 8315/10
**attorney-client [1]** 8428/20
**attorneys [11]** 8307/16 8311/10 8311/11 8312/19 8323/8 8369/14 8369/23 8442/11 8518/14 8519/13 8519/17
**auditing [1]** 8391/6
**auditors [5]** 8390/19 8390/24 8391/7 8391/19 8391/22
**august [21]** 8344/1 8357/13 8479/9 8479/16 8479/19 8480/7 8484/11 8484/13 8484/16 8484/19 8484/19 8499/13 8499/24 8500/7 8512/15 8518/12 8519/15 8533/10 8533/11 8533/12 8533/13
**August 2013 [1]** 8512/15
**August 2017 [2]** 8533/12 8533/13
**AUSA [1]** 8337/16
**AUSA's [1]** 8461/15
**Austria [1]** 8461/15
**authority [1]** 8455/7
**auto [2]** 8395/2 8424/11
**available [7]** 8474/21 8476/11 8480/24 8480/25 8565/25 8581/16 8581/17
**Avenue [1]** 8307/18
**avoid [1]** 8403/3
**avoiding [1]** 8427/2
**award [3]** 8461/6 8462/18 8462/20
**awarded [1]** 8460/9
**awards [4]** 8461/2 8461/3 8462/15 8462/16
**aware [8]** 8309/11 8309/12 8322/16 8481/21 8535/3 8536/4 8536/7 8537/13

**B**

**background [4]** 8434/8 8459/6 8537/21 8540/19
**backwards [1]** 8418/18
**Bacone [1]** 8461/17
**bad [1]** 8432/24
**balance [1]** 8432/16
**bank [9]** 8364/21 8367/18 8367/19 8367/20 8367/21 8367/24 8374/23 8376/4 8470/24
**banking [3]** 8370/20 8463/11 8468/18
**bankruptcy [1]** 8377/3
**bar [2]** 8335/9 8513/2
**barred [1]** 8332/15
**barring [1]** 8388/8
**bars [16]** 8483/6 8483/25 8496/25 8497/2 8505/14 8505/15 8506/8 8506/11 8506/12 8507/2 8507/3 8507/5 8507/14 8511/22 8511/23 8516/7
**base [1]** 8372/6
**based [46]** 8308/7 8308/8 8315/12 8315/20 8320/11 8320/12 8321/22 8335/17 8356/9 8357/22 8367/7 8369/16 8370/3 8371/11 8371/15 8372/2 8372/7 8379/7 8381/15 8384/10 8394/1 8406/8 8424/12 8427/2 8453/4 8460/3 8460/9 8467/4 8473/22 8490/14 8490/16 8503/4 8503/5 8505/18 8505/19 8511/9 8513/20 8518/2 8528/3 8528/4 8529/16 8531/4 8532/3 8532/15 8532/16 8545/7
**bases [2]** 8549/25 8555/14
**basic [1]** 8520/22

**B**

**basing [1]** 8338/9
**basis [15]** 8310/3 8311/7 8316/21 8322/18 8356/16 8356/23 8417/15 8417/15 8419/14 8472/25 8492/17 8493/1 8516/25 8549/6 8555/4
**Batian [7]** 8576/23 8576/24 8577/9 8577/15 8578/24 8578/25 8579/2
**became [6]** 8379/14 8379/18 8466/20 8481/21 8581/16 8581/17
**become [5]** 8380/5 8465/25 8470/2 8470/7 8470/10
**becomes [1]** 8411/22
**began [2]** 8581/20 8582/6
**begin [4]** 8426/18 8484/2 8506/3 8521/16
**beginning [4]** 8316/18 8326/16 8412/10 8501/20
**begins [1]** 8484/3
**behalf [1]** 8372/1
**behave [1]** 8520/16
**behaving [2]** 8503/1 8516/3
**behavior [1]** 8512/23
**behind [2]** 8544/3 8576/15
**belief [2]** 8312/12 8338/14
**believes [1]** 8316/11
**below [4]** 8379/19 8477/13 8505/15 8525/18
**beneficiaries [1]** 8326/20
**benefit [4]** 8414/4 8415/2 8432/16 8482/3
**benefits [4]** 8328/21 8415/19 8427/23 8482/6
**bent [1]** 8418/18
**best [9]** 8315/5 8360/10 8364/8 8387/10 8392/19 8462/16 8462/18 8462/20 8538/24
**better [21]** 8328/20 8344/6 8399/7 8412/2 8412/3 8416/5 8416/6 8416/15 8416/18 8416/18 8418/25 8419/14 8419/19 8419/22 8423/24 8427/21 8427/24 8462/8 8485/17 8495/5 8550/22
**between [44]** 8326/1 8326/2 8332/12 8341/10 8341/10 8418/1 8420/18 8421/7 8440/10 8442/8 8445/3 8445/6 8445/9 8445/12 8445/15 8449/12 8451/20 8451/25 8465/18 8484/18 8486/2 8488/21 8489/5 8492/24 8498/4 8499/12 8503/7 8503/8 8529/19 8530/20 8531/3 8542/21 8553/1 8553/2 8554/9 8561/5 8565/16 8570/5 8571/2 8572/2 8573/8
**beyond [8]** 8308/24 8323/22 8439/21 8441/10 8449/18 8451/16 8549/23 8551/23
**Biestek [23]** 8487/16 8488/1 8490/10 8492/17 8492/20 8492/22 8493/7 8493/12 8497/14 8497/15 8500/20 8506/8 8506/25 8507/1 8512/1 8515/7 8517/14 8522/24 8524/6 8524/12 8541/13 8563/3 8570/10
**big [1]** 8466/18
**bill [11]** 8347/4 8347/4 8407/9 8435/18 8435/20 8436/1 8448/11 8448/11 8448/20 8448/24 8449/2
**billable [1]** 8371/4
**billed [13]** 8333/20 8334/24 8350/4 8352/11 8369/13 8370/1 8370/2 8372/4 8376/23 8406/1 8434/24 8435/15 8435/24
**billers [1]** 8369/24
**billing [8]** 8369/14 8369/17 8369/20 8369/22 8382/9 8406/9 8426/4 8443/4
**billings [3]** 8371/9 8399/3 8423/21
**billion [4]** 8347/20 8352/25 8367/23 8367/25
**bills [5]** 8443/7 8443/12 8447/11 8447/25 8448/4
**binder [3]** 8366/9 8491/12 8576/14
**binders [1]** 8544/1
**BioScience [4]** 8398/7 8399/11 8423/7 8424/4
**Biosciences [10]** 8353/15 8364/17 8365/19 8365/22 8366/2 8368/14 8394/11 8396/5 8396/8 8396/20
**biotechnology [1]** 8370/5
**bit [11]** 8344/1 8344/2 8354/25 8434/8 8465/24 8472/8 8537/21 8543/2
**Bitcoin [10]** 8353/19 8354/5 8379/11 8379/11 8379/15 8380/1 8380/6 8381/23 8382/18

8383/1
**Bitcoin's [2]** 8367/15 8366/22
**Black [1]** 8528/19
**blacked [2]** 8366/23 8367/2
**blank [36]** 8366/24 8367/6 8367/8 8367/8 8367/8 8367/11 8368/7 8368/8 8368/23 8370/12 8370/13 8370/13 8370/13 8370/14 8372/25 8373/15 8374/14 8374/21 8375/3 8375/3 8375/4 8375/7 8375/20 8375/20 8375/20 8375/21 8375/23 8376/16 8376/17 8376/17 8376/18 8378/20 8379/20 8379/20 8386/10 8386/11
**blank's [1]** 8370/15
**Bloomberg [23]** 8483/11 8522/20 8530/17 8544/5 8544/7 8544/20 8544/24 8544/25 8545/10 8545/11 8546/22 8546/24 8547/8 8554/14 8554/18 8559/4 8559/13 8559/21 8565/14 8565/24 8565/25 8566/1 8578/17
**blow [1]** 8484/14
**blown [1]** 8468/10
**blue [20]** 8308/11 8483/6 8492/1 8496/25 8505/21 8506/8 8506/13 8507/2 8507/3 8516/6 8516/7 8527/2 8529/16 8559/14 8559/16 8559/19 8559/24 8565/14 8579/16 8579/21
**Bluesheet [18]** 8490/14 8490/16 8545/13 8545/17 8545/20 8545/24 8545/25 8546/1 8546/2 8546/3 8546/19 8547/5 8547/10 8547/12 8549/24 8551/12 8554/17 8554/18
**blurting [1]** 8400/5
**board [39]** 8347/7 8347/12 8347/23 8347/24 8348/4 8348/6 8377/19 8377/22 8429/9 8429/12 8437/15 8439/7 8439/9 8440/5 8444/13 8446/17 8446/18 8451/9 8451/11 8451/12 8451/14 8451/22 8471/10 8471/11 8471/12 8471/14 8471/15 8471/19 8471/21 8472/1 8472/3 8472/14 8472/16 8476/22 8476/25 8478/14 8482/17 8581/18 8582/7
**boards [5]** 8347/11 8347/14 8347/15 8429/10 8463/7
**bonus [1]** 8372/5
**book [8]** 8333/19 8377/10 8429/16 8429/20 8429/22 8429/25 8474/4 8474/8
**Books [1]** 8376/25
**borrow [2]** 8470/24 8482/12
**Boston [1]** 8374/4
**bothered [1]** 8354/25
**bottom [11]** 8383/5 8475/6 8483/12 8497/4 8501/6 8501/15 8506/1 8511/20 8518/4 8526/14 8559/4
**bought [19]** 8390/10 8482/2 8493/15 8497/8 8498/11 8500/21 8500/23 8500/23 8515/11 8515/14 8517/12 8517/15 8517/16 8522/7 8523/12 8523/22 8523/24 8523/8 8528/24
**bounce [1]** 8343/12
**boundaries [1]** 8359/17
**bounds [2]** 8352/9 8420/12
**box [7]** 8497/10 8497/15 8505/12 8515/12 8525/18 8526/14 8573/2
**breach [1]** 8310/7
**break [7]** 8395/7 8395/9 8409/6 8435/2 8507/23 8508/5 8510/17
**breakfast [2]** 8371/7 8371/19
**breakup [1]** 8425/1
**Bregstein [2]** 8372/12 8374/22
**BRIDGET [1]** 8307/12
**brief [24]** 8328/24 8331/15 8331/24 8332/3 8336/12 8341/2 8341/4 8342/4 8343/1 8343/2 8343/3 8343/5 8343/6 8344/18 8395/5 8404/25 8409/1 8425/3 8430/18 8430/21 8430/25 8431/11 8452/15 8452/18
**briefed [1]** 8430/10
**briefing [2]** 8408/25 8583/2
**briefly [4]** 8351/3 8404/18 8505/9 8527/6
**briefs [1]** 8331/17
**bring [8]** 8354/25 8317/23 8324/3 8396/3 8422/5 8455/19 8458/2 8521/17
**bringing [1]** 8400/24
**brings [1]** 8466/7

**broad [11]** 8316/8 8326/13 8326/23 8336/2 8407/16 8407/18 8408/4 8411/7 8416/8 8416/23 8441/19
**broader [6]** 8330/8 8330/9 8408/12 8408/14 8408/14 8439/10
**broadly [2]** 8462/1 8560/6
**BRODSKY [42]** 8307/19 8324/16 8331/11 8332/19 8345/1 8346/13 8346/25 8349/11 8354/11 8364/1 8364/18 8366/5 8380/20 8381/20 8382/4 8382/7 8383/23 8384/9 8384/25 8396/4 8396/10 8399/22 8402/14 8402/16 8404/19 8408/17 8409/3 8409/13 8410/1 8410/3 8421/3 8426/2 8426/8 8431/6 8431/19 8437/14 8442/12 8442/13 8443/3 8457/2 8584/4 8584/5
**Brodsky's [4]** 8340/10 8397/13 8399/14 8409/22
**broken [3]** 8506/3 8569/11 8569/12
**broker [2]** 8472/18 8472/19
**brokerage [4]** 8364/24 8364/25 8364/25 8365/7
**Brooklyn [2]** 8307/4 8307/14
**brothers [6]** 8352/6 8353/22 8381/8 8381/10 8381/11 8382/18
**brought [8]** 8315/22 8318/23 8318/23 8322/25 8357/6 8370/22 8384/20 8455/19
**brown [1]** 8506/12
**bullet [8]** 8310/21 8310/23 8366/22 8372/24 8373/14 8374/13 8378/25 8380/9
**bulletin [14]** 8471/14 8471/15 8471/19 8471/23 8472/1 8472/2 8472/14 8472/16 8476/22 8476/25 8478/14 8482/17 8581/18 8582/7
**bunch [2]** 8312/1 8322/15
**burden [1]** 8331/11
**business [22]** 8333/19 8369/8 8370/15 8371/10 8373/8 8376/9 8376/17 8377/1 8380/1 8390/6 8393/4 8393/5 8393/15 8424/11 8459/20 8465/25 8470/9 8470/18 8472/12 8477/8 8477/17 8481/9
**buy [42]** 8464/17 8468/11 8469/15 8469/15 8471/16 8472/24 8473/4 8473/7 8473/19 8473/21 8473/23 8476/9 8476/17 8476/18 8476/21 8482/6 8489/13 8489/14 8490/3 8490/6 8493/7 8493/13 8493/23 8496/24 8498/16 8499/2 8499/5 8520/24 8521/5 8521/7 8521/8 8521/16 8521/25 8523/13 8526/21 8528/9 8529/2 8529/3 8529/8 8529/11 8529/15 8545/1
**buy/sale [2]** 8529/8 8529/11
**buyer [3]** 8495/11 8495/15 8498/25
**buyers [1]** 8525/8
**buying [29]** 8472/19 8472/23 8473/10 8499/23 8499/24 8502/18 8502/19 8505/14 8507/8 8512/25 8513/1 8513/5 8513/8 8513/11 8513/12 8513/20 8514/8 8514/10 8514/11 8525/2 8527/1 8527/9 8527/21 8528/1 8528/16 8529/25 8530/3 8532/18 8564/11
**buys [15]** 8492/19 8496/25 8498/10 8500/1 8524/17 8524/25 8528/19 8529/2 8529/8 8529/9 8532/18 8532/18 8532/18 8569/12 8570/19

**C**

**C-r-a-i-g [1]** 8459/1
**Cadman [1]** 8307/14
**calculate [1]** 8529/11
**calculated [1]** 8531/6
**Calder [2]** 8385/7 8386/5
**Calder's [1]** 8386/3
**Canadian [2]** 8336/24 8337/6
**cannot [5]** 8317/16 8326/24 8335/3 8335/3 8426/11
**capacity [1]** 8465/20
**capital [21]** 8345/13 8364/12 8364/20 8365/6 8443/19 8444/20 8444/23 8445/4 8464/13 8464/14 8464/15 8466/9 8471/9 8479/14 8481/8 8482/11 8482/21 8482/22 8487/17 8488/2 8490/11

**C**

**capitalist [2]** 8413/1 8413/24

**career [6]** 8441/18 8459/13 8461/22 8467/4 8539/11 8539/17

**careful [1]** 8402/15

**carefully [1]** 8477/12

**Carter [6]** 8336/23 8484/13 8484/19 8485/4 8486/11 8511/6

**case [108]** 8308/14 8309/6 8309/17 8313/15 8313/17 8314/7 8314/15 8314/17 8315/6 8315/24 8315/25 8316/3 8316/5 8317/19 8318/1 8318/5 8320/15 8320/21 8324/1 8330/21 8330/23 8330/24 8331/14 8331/22 8332/8 8332/10 8332/24 8333/1 8333/2 8333/5 8333/7 8334/8 8334/16 8335/2 8335/3 8335/4 8336/7 8336/13 8338/4 8338/17 8338/22 8339/6 8339/17 8343/15 8344/2 8344/16 8355/23 8356/20 8357/21 8358/5 8359/7 8359/22 8360/6 8360/19 8405/18 8405/23 8406/3 8406/5 8407/3 8407/13 8407/16 8407/23 8409/25 8410/6 8410/8 8411/17 8412/12 8416/19 8416/19 8416/24 8417/8 8417/14 8417/16 8417/19 8420/22 8427/6 8427/13 8431/25 8432/17 8433/15 8454/16 8493/10 8507/25 8518/18 8533/14 8539/13 8539/18 8540/2 8540/4 8540/6 8540/11 8540/20 8541/3 8541/8 8545/14 8550/16 8565/12 8575/22 8576/6 8576/17 8576/20 8576/22 8577/8 8577/19 8577/21 8577/24 8579/5 8582/23

**cases [26]** 8331/21 8332/1 8333/8 8333/11 8333/13 8336/15 8337/19 8340/10 8340/11 8340/19 8341/6 8341/13 8341/13 8341/23 8342/17 8342/23 8356/7 8356/9 8356/13 8431/5 8432/13 8433/13 8465/8 8467/11 8467/11 8539/21

**cash [2]** 8478/22 8520/19

**categorize [1]** 8310/7

**caused [1]** 8319/25

**causes [1]** 8309/20

**caution [2]** 8323/5 8418/16

**center [1]** 8450/23

**CEO [6]** 8309/12 8376/16 8385/3 8429/17 8429/18 8429/22

**certain [20]** 8308/8 8310/3 8337/23 8346/19 8363/5 8366/18 8407/18 8416/11 8426/23 8462/5 8469/17 8469/22 8469/23 8469/24 8471/8 8471/8 8471/9 8478/20 8520/24 8544/17

**certainly [5]** 8353/8 8355/22 8408/3 8409/12 8544/18

**certificate [1]** 8475/20

**CFO [3]** 8429/18 8429/18 8429/22

**chair [2]** 8460/5 8460/11

**chairman [2]** 8364/23 8429/17 8429/19 8466/17

**challenged [1]** 8336/20

**CHAN [4]** 8307/21 8308/5 8320/19 8323/11

**chance [6]** 8339/15 8405/12 8455/5 8482/7 8552/7 8557/9

**change [12]** 8319/2 8357/22 8420/7 8468/4 8472/8 8482/7 8489/3 8513/22 8513/23 8520/10 8529/22 8579/16

**changed [1]** 8375/6

**changes [6]** 8429/20 8508/10 8508/23 8514/7 8568/4 8580/2

**chapter [5]** 8376/24 8377/5 8377/19 8377/23 8378/4

**characteristics [1]** 8516/16

**characterize [2]** 8341/20 8538/14

**characterized [2]** 8400/16 8401/20

**charge [2]** 8427/25 8555/18

**charged [2]** 8410/9 8510/4 8542/20

**charges [2]** 8456/16 8583/5

**charging [1]** 8456/18

**chart [96]** 8483/2 8483/2 8483/9 8483/10 8484/2 8484/10 8486/25 8487/2 8487/13 8487/22 8494/24 8496/24 8496/25 8497/2

8497/13 8498/8 8498/9 8498/14 8498/21 8500/1 8504/7 8506/5 8506/9 8505/10 8506/6 8506/17 8507/1 8507/2 8507/6 8507/13 8509/13 8511/9 8512/2 8512/10 8512/15 8512/21 8513/6 8513/7 8513/15 8515/2 8515/3 8522/10 8522/11 8523/5 8527/18 8527/19 8528/14 8528/15 8528/19 8528/20 8530/8 8531/9 8534/14 8535/11 8543/8 8543/14 8545/5 8547/2 8547/3 8547/16 8548/3 8550/3 8550/13 8550/23 8551/4 8552/12 8553/3 8553/5 8553/18 8554/10 8554/16 8557/11 8557/14 8557/15 8557/22 8557/25 8558/9 8559/2 8559/14 8560/3 8560/5 8560/9 8560/11 8560/12 8560/14 8561/5 8561/20 8562/9 8563/18 8566/4 8566/25 8569/24 8570/21 8571/5 8572/18 8572/20

**chart's [1]** 8506/21

**charts [26]** 8534/4 8534/7 8534/10 8534/12 8534/20 8534/21 8534/23 8534/25 8535/2 8535/4 8535/14 8535/16 8535/17 8535/18 8535/21 8535/23 8536/1 8536/5 8536/23 8540/8 8540/12 8551/15 8553/24 8571/8 8571/9 8571/12

**check [1]** 8558/9

**checked [1]** 8560/2

**Chicago [1]** 8463/20

**chief [14]** 8388/9 8417/8 8417/19 8464/9 8465/2 8465/9 8465/10 8465/15 8465/19 8465/20 8466/15 8467/7 8538/9 8539/19

**China [3]** 8364/12 8365/2 8365/3

**Chinese [8]** 8365/3 8365/20 8368/2 8368/6 8368/9 8368/12 8368/18 8368/20

**choice [3]** 8391/7 8421/25 8470/23

**choices [1]** 8467/24

**chose [1]** 8319/9

**chosen [1]** 8469/20

**Chris [2]** 8365/12 8365/14

**circle [1]** 8363/11

**Circuit [16]** 8330/24 8331/21 8332/24 8332/25 8333/1 8333/8 8333/12 8336/20 8336/25 8338/3 8338/5 8338/6 8338/22 8339/17 8356/3 8356/20

**circulation [1]** 8482/1

**circumstance [1]** 8416/14

**circumstances [5]** 8310/3 8357/2 8431/7 8455/2 8455/12

**circumstantial [1]** 8338/13

**citations [1]** 8404/9

**cite [3]** 8310/8 8336/11 8341/13

**cited [1]** 8431/6

**citing [2]** 8331/20 8342/25

**claim [25]** 8310/11 8310/14 8310/20 8312/25 8313/10 8314/6 8314/25 8317/4 8317/25 8318/23 8319/21 8322/24 8326/15 8326/18 8327/17 8328/9 8328/22 8413/19 8413/23 8413/25 8415/10 8418/10 8418/25 8419/21 8419/23 8469/12

**claimant [2]** 8326/24 8327/18

**claims [21]** 8310/6 8310/7 8310/7 8311/18 8312/6 8312/12 8312/13 8312/15 8314/9 8315/22 8316/6 8316/9 8316/11 8317/1 8320/16 8321/5 8321/20 8322/18 8327/18 8412/10 8413/14

**Claridge [4]** 8487/17 8488/2 8490/11 8517/18

**clarify [1]** 8312/7

**clarity [1]** 8516/6

**class [5]** 8334/12 8460/21 8460/22 8461/7 8518/15

**classes [6]** 8460/2 8460/15 8460/20 8460/22 8461/5 8461/19

**cleaned [1]** 8508/22

**clear [8]** 8343/17 8378/2 8405/1 8405/4 8408/19 8426/1 8510/4 8542/20

**clearly [3]** 8405/11 8407/6 8407/7

**clerk [1]** 8433/15

**client [75]** 8320/10 8320/10 8334/7 8334/8 8352/8 8352/19 8352/20 8353/4 8353/8 8354/21 8355/7 8355/8 8364/24 8366/20

**client's [3]** 8309/16 8366/19 8373/3

**clients [32]** 8350/3 8350/8 8350/10 8350/17 8352/3 8352/10 8352/21 8354/19 8354/23 8355/3 8364/3 8364/6 8364/5 8367/20 8368/6 8371/18 8371/20 8377/15 8383/14 8393/3 8393/12 8393/14 8393/19 8393/24 8419/7 8440/14 8440/16 8440/23 8440/24 8443/12 8447/25 8452/1

**close [3]** 8358/2 8524/5 8579/12

**closed [2]** 8479/2 8479/9

**closely [1]** 8401/13

**closer [2]** 8340/15 8567/23

**closing [10]** 8334/21 8483/3 8511/15 8530/9 8530/17 8530/24 8531/4 8531/18 8531/21 8545/4

**co [2]** 8338/14 8418/2

**co-conspirators [1]** 8418/2

**co-defendant's [1]** 8338/14

**coded [1]** 8505/13

**cofounded [1]** 8381/12

**cognizant [1]** 8572/11

**collar [2]** 8339/1 8339/4

**colleagues [1]** 8333/10

**collect [4]** 8366/8 8443/7 8443/12 8520/14

**collected [2]** 8399/5 8423/22

**collection [1]** 8443/18

**collections [1]** 8382/9

**collectively [4]** 8456/11 8515/13 8518/8 8523/4

**College [1]** 8461/13

**color [4]** 8507/13 8507/15 8525/14 8526/9

**colorable [6]** 8310/2 8310/6 8310/13 8311/16 8311/18 8418/8

**colors [2]** 8505/12 8506/17

**column [25]** 8365/23 8492/21 8492/23 8492/25 8493/5 8493/20 8497/7 8500/18 8500/24 8501/13 8501/25 8502/3 8505/22 8506/1 8511/18 8515/10 8523/1 8523/1 8523/2 8523/13 8528/17 8529/2 8529/5 8529/7 8573/19

**column 20 [1]** 8493/20

**columns [4]** 8492/18 8492/24 8501/19 8529/1

**combined [1]** 8488/2

**comfortable [3]** 8312/24 8431/4 8433/16

**coming [14]** 8331/19 8353/18 8355/21 8369/1 8371/21 8419/12 8424/12 8447/11 8447/15 8447/18 8450/8 8450/21 8450/23 8513/25

**commend [1]** 8401/24

**commensurate [1]** 8489/24

**comments [8]** 8348/21 8396/25 8396/25 8398/10 8398/11 8423/10 8423/10 8429/19

**commercial [2]** 8385/6 8385/16

**commission [11]** 8386/6 8464/6 8464/21 8465/1 8466/25 8469/18 8520/13 8539/10 8576/1 8578/25 8579/2

**Commissioners [1]** 8466/3

**commitment [2]** 8321/25 8323/2

**committed [2]** 8340/12 8340/20

**committee [14]** 8348/11 8348/23 8348/25 8349/15 8349/18 8368/16 8372/8 8377/21 8382/9 8442/7 8443/4 8466/13 8468/18 8471/13

**committees [1]** 8333/18

**committing [1]** 8408/5

**common [23]** 8470/19 8476/5 8477/8 8477/10 8477/16 8477/19 8478/20 8478/22 8479/3

**CHAN** (continued)

**C** (continued from column)

**8367/1** 8368/24 8369/3 8369/4 8369/7 8370/17 8370/18 8370/20 8371/6 8371/5 8371/9 8371/17 8372/2 8373/6 8373/7 8373/8 8373/21 8373/21 8373/23 8374/7 8374/15 8374/18 8374/18 8374/22 8375/9 8375/12 8376/1 8376/3 8376/21 8377/1 8377/5 8377/12 8379/23 8380/14 8380/14 8381/2 8386/13 8386/14 8386/16 8386/19 8386/21 8387/2 8393/24 8394/17 8394/24 8394/25 8395/2 8400/25 8402/20 8422/17 8424/8 8424/10 8424/13 8428/20 8435/24 8439/17 8439/25 8447/14 8448/1 8448/1 8448/4

**C**

**common...** **[14]** 8479/5 8479/10 8480/22 8481/16 8493/7 8495/11 8495/15 8496/12 8502/22 8511/16 8515/22 8518/7 8518/8 8532/2

**communicate [2]** 8310/17 8312/12

**communicating [1]** 8310/10

**communications [3]** 8323/9 8406/9 8449/12

**comp [6]** 8361/2 8362/13 8363/5 8363/9 8363/10 8366/9

**companies [27]** 8319/22 8347/16 8347/16 8347/17 8368/2 8368/9 8368/13 8368/18 8375/14 8375/17 8376/6 8382/23 8390/12 8419/14 8440/18 8440/20 8462/4 8463/12 8463/15 8464/3 8470/16 8470/19 8471/25 8472/5 8472/11 8474/19 8482/19

**company [92]** 8312/16 8316/11 8316/12 8316/23 8317/2 8318/15 8319/20 8319/24 8320/1 8320/5 8320/7 8321/16 8322/7 8327/19 8346/3 8347/17 8347/18 8353/13 8354/20 8365/3 8365/9 8365/11 8365/20 8367/14 8367/16 8369/9 8369/9 8369/10 8369/10 8370/5 8370/7 8375/15 8375/16 8375/16 8379/11 8385/3 8390/12 8394/3 8394/5 8418/25 8419/22 8424/11 8438/7 8438/9 8438/24 8438/24 8439/10 8439/14 8439/14 8441/6 8446/9 8446/16 8448/19 8460/19 8467/20 8469/12 8469/13 8469/14 8469/19 8469/20 8469/21 8469/25 8470/1 8470/2 8470/4 8470/6 8470/7 8470/8 8470/8 8470/10 8470/10 8471/6 8471/7 8472/2 8473/22 8475/11 8475/13 8475/17 8476/1 8481/8 8481/24 8481/24 8482/3 8482/5 8482/9 8482/9 8482/14 8482/17 8489/12 8489/17 8520/19 8581/20

**company's [10]** 8312/13 8312/14 8319/19 8390/4 8390/8 8391/5 8448/24 8473/8 8483/18 8520/11

**compare [5]** 8471/18 8553/15 8563/25 8565/11 8568/7

**compared [4]** 8564/11 8565/7 8565/14 8575/12

**comparing [1]** 8560/4

**compensation [13]** 8348/17 8348/22 8348/25 8349/15 8349/18 8349/19 8355/5 8372/8 8372/8 8376/8 8442/4 8442/8 8471/12

**complaints [1]** 8318/20

**complete [1]** 8560/5

**completed [2]** 8352/7 8368/3

**completely [6]** 8314/4 8316/6 8407/1 8416/14 8508/10 8508/22

**Compound [1]** 8435/1

**comprised [1]** 8466/15

**computer [2]** 8307/25 8336/12

**computer-aided [1]** 8307/25

**concepts [1]** 8316/8

**concern [9]** 8311/20 8318/8 8322/1 8400/18 8404/5 8404/14 8404/15 8411/22 8416/8

**concerned [9]** 8309/18 8311/2 8312/15 8313/21 8321/2 8322/1 8322/20 8397/11 8464/12

**concerning [1]** 8346/18

**concerns [3]** 8319/4 8319/4 8319/5

**conclude [13]** 8337/12 8484/4 8502/21 8515/5 8515/19 8515/25 8516/2 8518/2 8518/4 8524/23 8525/1 8532/3 8532/7

**concluded [1]** 8515/21

**conclusion [5]** 8308/23 8502/23 8566/15 8579/16 8580/4

**conclusions [1]** 8502/18

**conclusive [1]** 8554/1

**condition [1]** 8477/18

**conditions [1]** 8471/10

**conducted [4]** 8461/23 8461/25 8462/2 8565/22

**conference [15]** 8316/19 8329/1 8344/22 8351/6 8363/22 8395/13 8425/5 8433/21 8450/23 8451/1 8452/23 8455/24 8456/18

8548/14 8556/10

**conferences [1]** 8360/6

**conferring [1]** 8407/8

**confident [1]** 8405/22

**confined [1]** 8322/9 8323/16

**confirm [4]** 8308/5 8309/22 8550/1 8583/11

**confirmed [3]** 8356/24 8548/5 8572/22

**confuse [4]** 8330/25 8332/20 8510/13 8544/2

**confused [5]** 8331/7 8335/10 8411/8 8411/23 8414/7

**confuses [1]** 8414/22

**confusing [4]** 8416/3 8417/11 8420/8 8421/2

**confusion [6]** 8340/6 8356/17 8403/3 8407/12 8411/15 8414/8

**Congress [5]** 8377/16 8468/14 8468/15 8468/16 8539/7

**connected [6]** 8326/21 8339/23 8340/4 8340/5 8343/19 8355/23

**connection [6]** 8326/15 8334/15 8340/1 8340/2 8340/12 8346/3 8346/4 8346/6 8346/6 8357/4 8357/11 8358/19 8366/2 8366/20 8374/25 8375/20 8381/22 8383/13 8383/17 8384/13 8387/13 8387/14 8387/19 8388/1 8388/19 8389/5 8389/24 8394/10 8394/14 8396/7 8397/2 8397/19 8402/17 8410/13 8421/1 8422/15 8426/9 8429/9 8461/22 8462/14 8462/24 8475/25 8543/5

**consciousness [1]** 8583/3

**consequence [2]** 8414/21 8443/14

**consequences [3]** 8443/6 8443/10 8443/11

**consider [7]** 8331/16 8359/5 8359/9 8363/20 8454/2 8472/3 8477/13

**consideration [3]** 8335/25 8356/20 8411/11

**considered [6]** 8335/17 8347/6 8347/12 8347/23 8347/24 8410/19

**considering [1]** 8321/19

**consistent [6]** 8308/13 8371/9 8516/3 8517/23 8538/24 8560/6

**consistently [1]** 8319/22

**conspiracy [2]** 8308/13 8316/20

**conspirators [1]** 8418/2

**constantly [1]** 8417/11

**constitute [1]** 8573/11

**constituted [5]** 8465/17 8566/11

**constitutional [3]** 8335/5 8335/6 8341/20

**constrained [1]** 8408/15

**consultant [5]** 8463/21 8534/13 8534/14 8534/15 8535/10

**consulting [15]** 8407/14 8407/15 8408/8 8428/9 8428/15 8428/24 8429/1 8429/4 8429/7 8463/15 8463/16 8463/24 8464/2 8518/20 8537/19

**contact [4]** 8434/17 8444/6 8444/22 8444/25

**contacts [1]** 8444/19

**contained [4]** 8398/11 8423/11 8465/3 8540/17

**contended [1]** 8337/13

**contending [1]** 8313/19

**contends [1]** 8309/7

**contention [2]** 8322/17 8421/19

**context [8]** 8335/17 8412/6 8413/2 8414/2 8418/9 8419/7 8420/10 8443/5

**continue [8]** 8324/16 8330/17 8358/6 8360/18 8363/6 8374/21 8405/9 8528/14

**continued [25]** 8328/25 8331/14 8344/23 8350/21 8351/7 8363/23 8366/22 8368/2 8369/11 8372/25 8386/1 8395/12 8402/4 8415/23 8425/4 8433/22 8434/17 8452/22 8455/25 8490/22 8491/1 8533/16 8548/15 8556/11 8558/11

**continues [1]** 8368/5

**continuing [1]** 8410/21

**contradiction [1]** 8552/5

**control [5]** 8308/13 8318/16 8319/17 8319/18 8327/2

**controlled [1]** 8562/9

**conversation [44]** 8325/8 8325/23 8325/25 8328/16 8331/9 8334/18 8340/1 8340/17

8342/11 8344/4 8345/3 8345/22 8346/21 8387/16 8388/20 8388/23 8389/20 8390/14 8390/18 8390/22 8406/7 8408/20 8410/5 8410/13 8410/15 8411/17 8410/22 8411/2 8411/23 8412/7 8413/4 8413/7 8414/17 8415/1 8415/21 8419/4 8420/11 8420/17 8420/24 8428/11 8429/13 8444/4 **conversations [23]** 8330/10 8340/23 8342/3 8343/21 8344/10 8345/11 8345/14 8345/17 8345/19 8409/15 8410/11 8410/24 8420/9 8427/17 8434/23 8434/24 8435/6 8435/9 8435/11 8435/14 8435/15 8435/18 8445/12

**conversion [1]** 8476/1

**convertible [1]** 8476/1 8542/12

**convey [1]** 8391/14

**conveyed [1]** 8398/3

**convicted [1]** 8337/24

**conviction [2]** 8336/24 8339/9

**conviction,618 [1]** 8337/10

**convince [5]** 8388/7 8388/13 8388/22 8389/9 8390/1

**coordinated [6]** 8503/1 8516/4 8517/23 8532/5 8532/8 8580/7

**coordinating [2]** 8514/4 8521/11

**copy [4]** 8341/3 8344/18 8491/14 8536/10

**core [1]** 8538/18

**corner [9]** 8475/23 8478/16 8494/1 8495/22 8496/11 8497/12 8505/12 8511/25 8513/4

**Cornerstone [7]** 8535/12 8535/14 8535/16 8535/20 8537/4 8537/16 8537/19

**Corp [1]** 8475/11

**corporate [22]** 8369/12 8369/13 8369/14 8369/17 8369/22 8369/25 8375/2 8375/7 8377/14 8378/9 8378/11 8385/4 8440/7 8440/14 8460/2 8460/19 8462/2 8462/3 8463/5 8463/9 8467/7 8471/9

**corporation [4]** 8365/19 8475/10 8475/12 8475/14

**correct [216]** 8309/24 8325/16 8335/16 8335/16 8342/2 8382/2 8382/9 8404/20 8418/6 8431/25 8434/11 8434/13 8434/21 8435/7 8435/17 8435/22 8436/12 8436/15 8436/17 8436/18 8436/21 8437/2 8437/5 8437/8 8437/10 8437/19 8437/20 8437/23 8438/5 8438/7 8438/17 8438/18 8438/21 8439/11 8440/14 8440/15 8440/24 8441/9 8441/24 8443/13 8443/19 8443/22 8443/25 8444/1 8444/2 8444/3 8444/15 8444/18 8444/21 8444/24 8445/2 8445/5 8445/7 8445/8 8445/10 8445/11 8445/13 8445/14 8445/21 8445/22 8446/1 8480/1 8484/12 8484/16 8484/17 8486/4 8486/5 8504/21 8506/18 8506/23 8508/7 8508/9 8508/16 8509/15 8509/17 8509/22 8510/14 8511/11 8511/12 8525/10 8528/13 8533/8 8533/9 8533/14 8534/2 8534/3 8535/5 8536/6 8536/4 8534/9 8534/20 8535/4 8535/5 8536/6 8536/24 8536/25 8537/7 8537/15 8540/7 8540/11 8540/23 8541/11 8542/1 8542/8 8542/9 8542/21 8542/22 8543/8 8543/9 8543/10 8544/5 8544/6 8544/8 8545/10 8545/21 8546/22 8546/23 8547/1 8547/9 8547/17 8557/11 8557/13 8558/6 8558/9 8558/10 8559/3 8559/5 8559/14 8559/15 8559/19 8559/20 8559/22 8559/23 8560/16 8560/17 8560/22 8560/23 8561/3 8561/24 8561/25 8562/6 8562/9 8562/11 8562/15 8562/16 8562/23 8563/5 8563/19 8563/22 8564/1 8564/2 8564/11 8566/2 8566/13 8567/6 8567/11 8567/12 8567/15 8567/16 8567/18 8567/20 8568/8 8568/9 8568/19 8568/22 8569/8 8569/11 8569/23 8569/25 8570/6 8570/11 8570/12 8570/19 8570/20 8570/22 8571/4 8571/6 8571/7 8571/10 8571/11 8571/14 8571/15 8571/25 8572/16 8572/17 8572/19 8573/4 8573/6 8573/7 8573/9 8573/10 8573/16 8573/23 8573/24 8574/4 8575/8 8575/14 8575/23 8576/4 8577/16 8579/1

## C

**correct... [12]** 8579/5 8580/19 8580/24 8581/2 8581/6 8581/21 8582/4 8582/5 8582/8 8582/9 8582/10 8582/11
**correctly [1]** 8402/10
**correlates [1]** 8553/4
**correlating [1]** 8553/5
**correlation [2]** 8553/1 8553/2
**corroborated [2]** 8338/19
**cost [6]** 8310/15 8427/21 8474/23 8482/8 8482/8 8482/11
**Cotton [7]** 8367/5 8374/20 8385/5 8385/11 8385/13 8385/16 8385/21
**counsel [33]** 8312/13 8312/14 8330/10 8336/23 8337/7 8353/11 8367/10 8385/4 8417/2 8420/19 8438/7 8438/9 8438/12 8438/14 8438/19 8438/23 8439/1 8439/6 8439/9 8439/13 8439/15 8439/17 8439/24 8440/22 8441/22 8446/9 8446/9 8446/13 8446/16 8446/20 8446/21 8446/25 8447/5
**counter [12]** 8471/14 8471/15 8471/19 8471/23 8472/1 8472/2 8476/22 8476/25 8478/13 8481/24 8481/25 8582/7
**coup [1]** 8382/24
**couple [3]** 8410/9 8467/16 8544/1
**course [7]** 8315/8 8342/7 8421/4 8460/18 8460/19 8509/18 8523/25
**courses [4]** 8459/23 8460/16 8461/21 8462/1
**Court's [2]** 8313/13 8396/4 8408/22
**Courthouse [1]** 8307/3
**courtroom [10]** 8324/13 8352/2 8395/10 8422/8 8456/13 8456/16 8508/2 8511/1 8549/3 8582/25
**cover [2]** 8431/6 8523/5
**coverage [1]** 8383/15
**covered [3]** 8324/7 8324/8 8324/8
**covers [4]** 8364/4 8512/4 8523/6 8528/4
**CR [1]** 8307/2
**craft [1]** 8465/21
**Craig [3]** 8458/20 8458/22 8459/1
**create [3]** 8468/3 8535/14
**created [2]** 8379/19 8535/6
**creating [1]** 8461/19
**credibility [9]** 8455/10 8550/22 8550/24 8551/1 8552/21 8555/15 8555/19 8556/2 8556/8
**credible [1]** 8314/23
**credit [5]** 8436/16 8436/19 8436/22 8436/25 8462/21
**crime [6]** 8334/10 8339/1 8339/4 8340/12 8340/20 8408/5
**criminal [4]** 8307/9 8454/15 8454/25 8539/3
**criteria [1]** 8443/17
**critical [2]** 8341/20 8455/11
**cross [33]** 8317/20 8338/18 8424/18 8425/2 8426/16 8426/18 8426/24 8430/11 8430/14 8430/20 8431/11 8431/16 8431/16 8431/17 8432/1 8432/6 8432/11 8433/18 8434/4 8437/14 8446/8 8446/11 8453/9 8453/10 8453/24 8455/5 8532/25 8550/15 8551/20 8551/23 8555/6 8556/8 8575/21
**cross-examination [9]** 8338/18 8425/2 8426/16 8434/4 8446/8 8446/11 8532/25 8556/8 8575/21
**cross-examine [1]** 8551/23
**crossing [1]** 8554/21
**CRUTCHER [1]** 8307/17
**CSR [1]** 8307/22
**cumulative [4]** 8492/25 8493/9 8493/16 8493/18
**cunning [1]** 8433/11
**cure [1]** 8400/12
**currencies [2]** 8383/7 8383/13
**currency [13]** 8379/1 8379/4 8379/8 8379/10 8379/11 8379/14 8379/17 8380/6 8380/13 8383/3 8383/17 8384/13 8384/19
**current [5]** 8308/17 8337/15 8380/16 8460/18 8461/9
**customers [1]** 8473/4

**cut [1]** 8564/5
**cutting [1]** 8357/25

## D

**daily [6]** 8472/25 8483/3 8511/15 8530/9 8570/10 8571/10
**damaging [1]** 8405/18
**Dartmouth [1]** 8461/13
**data [69]** 8308/11 8464/22 8467/3 8467/5 8467/5 8467/8 8468/23 8469/2 8483/10 8490/14 8490/16 8491/3 8502/25 8505/20 8505/21 8516/2 8522/20 8524/16 8524/23 8525/1 8529/12 8529/16 8529/18 8529/23 8530/17 8536/23 8540/9 8544/5 8544/14 8545/12 8545/13 8545/17 8545/18 8545/20 8545/24 8545/25 8546/1 8546/2 8546/3 8546/5 8546/19 8546/22 8546/24 8547/5 8547/10 8547/12 8549/24 8551/12 8551/16 8554/18 8554/18 8554/19 8557/15 8559/13 8559/16 8559/19 8559/21 8559/24 8560/4 8565/14 8565/14 8565/25 8566/1 8569/10 8576/4 8578/15 8578/17 8579/16 8579/21
**date [16]** 8356/18 8356/18 8357/1 8357/7 8429/23 8474/12 8474/14 8474/15 8476/13 8481/18 8484/2 8484/4 8484/19 8519/3 8551/14 8554/9
**dated [2]** 8371/1 8475/8
**dates [2]** 8481/6 8485/18
**DAVID [4]** 8307/15 8307/16 8378/10 8533/6
**day-to-day [1]** 8472/8
**days [52]** 8362/25 8363/1 8363/1 8511/21 8512/12 8519/20 8519/20 8519/20 8522/11 8524/17 8524/25 8525/2 8525/3 8525/5 8525/7 8525/19 8526/15 8527/8 8527/20 8527/23 8527/24 8527/24 8528/6 8528/7 8528/7 8528/8 8528/8 8528/9 8528/10 8528/15 8528/18 8530/21 8531/3 8531/6 8531/8 8531/12 8531/16 8531/18 8531/21 8531/22 8569/7 8569/18 8569/21 8570/2 8570/5 8570/23 8571/24 8571/25 8572/2 8572/7 8581/20
**deal [8]** 8320/2 8375/6 8383/10 8399/7 8399/13 8423/24 8424/6 8456/15
**dealing [1]** 8455/16
**deals [5]** 8374/16 8386/12 8386/25 8387/3 8387/5
**dean [2]** 8308/19 8465/25
**Dean's [1]** 8461/6
**debate [1]** 8412/12
**debt [3]** 8462/5 8467/20 8470/25
**debts [1]** 8318/14
**debuting [1]** 8379/21
**December [73]** 8307/5 8343/23 8343/24 8348/18 8474/15 8475/9 8475/19 8475/23 8475/25 8476/4 8476/14 8478/3 8483/4 8484/3 8486/2 8487/4 8487/6 8487/6 8488/14 8488/16 8488/22 8489/5 8490/9 8493/6 8494/2 8496/5 8497/4 8497/16 8499/12 8500/7 8500/7 8500/13 8500/19 8501/20 8502/8 8503/8 8505/17 8506/4 8511/16 8515/15 8516/23 8516/25 8517/14 8522/20 8522/23 8523/6 8528/5 8528/11 8528/22 8530/10 8530/18 8530/20 8531/4 8531/14 8551/13 8561/6 8561/11 8565/16 8566/22 8567/1 8567/2 8569/24 8571/9 8571/19 8571/22 8572/3 8572/24 8573/9 8573/9 8581/14 8582/7 8583/18
**December 17 [14]** 8503/8 8511/16 8515/15 8516/23 8523/6 8528/5 8528/11 8530/10 8530/18 8530/20 8531/4 8531/14 8551/13 8581/14
**December 17th [9]** 8500/13 8505/17 8561/6 8561/11 8565/16 8566/22 8569/24 8573/9 8582/7
**December 20 [1]** 8522/20
**December 2012 [8]** 8493/6 8497/16 8499/12 8500/7 8501/20 8506/4 8516/25 8517/14
**December 21 [1]** 8522/23

**December 21st [1]** 8570/5
**December 26th [1]** 8568/2
**December 27th [1]** 8571/19
**December 28th [1]** 8571/22
**December 31st [1]** 8573/9
**December 4 [2]** 8343/23 8343/24
**December 8 [1]** 8583/18
**decide [6]** 8341/20 8452/20 8455/9 8465/12 8467/14 8400/24 8424/5 8469/14 8553/19 8553/20
**decides [2]** 8453/4 8470/4
**deciding [1]** 8477/15
**decision [8]** 8407/21 8432/14 8454/22 8454/23 8455/18 8466/25 8467/19 8467/22
**decisions [6]** 8333/5 8462/4 8463/18 8464/1 8467/18 8468/8
**declarant [4]** 8332/13 8336/17 8555/18 8555/21
**declarant's [4]** 8330/20 8330/20 8552/20 8555/19
**declares [1]** 8478/9
**decline [9]** 8477/19 8522/18 8524/18 8524/25 8525/9 8531/3 8532/11 8532/19 8543/6
**declined [3]** 8525/16 8531/7 8531/8
**declines [5]** 8521/23 8522/12 8569/8 8569/22 8570/24
**decrease [1]** 8369/11
**deeply [1]** 8322/20
**default [1]** 8462/21
**defendant [45]** 8307/7 8307/17 8310/11 8321/16 8322/6 8322/22 8322/23 8333/2 8333/4 8333/5 8333/14 8333/14 8334/19 8335/4 8336/17 8336/20 8337/3 8337/8 8337/9 8337/20 8338/7 8338/9 8338/13 8338/24 8338/24 8340/16 8343/22 8406/5 8416/13 8442/11 8454/12 8454/17 8492/9 8492/11 8501/10 8505/6 8514/24 8517/6 8522/7 8526/1 8527/15 8541/6 8555/15 8557/6 8584/13
**defendant's [15]** 8336/18 8337/4 8338/7 8338/14 8339/2 8454/4 8514/13 8516/19 8517/2 8517/5 8521/19 8522/5 8525/1 8527/5 8527/12
**defendants [1]** 8337/18
**defense [77]** 8308/3 8309/22 8311/16 8315/4 8319/3 8321/17 8321/25 8322/5 8322/10 8322/21 8322/24 8323/2 8330/10 8333/2 8334/14 8335/11 8336/9 8336/16 8338/9 8338/22 8342/24 8344/8 8362/5 8404/10 8405/25 8406/16 8406/17 8407/24 8420/19 8421/8 8431/13 8458/18 8458/19 8472/2 8480/10 8491/8 8491/10 8491/10 8492/4 8492/5 8492/5 8492/7 8496/18 8500/9 8501/7 8501/9 8504/14 8504/22 8505/2 8505/5 8509/25 8511/6 8514/19 8514/22 8518/10 8518/25 8522/2 8527/11 8534/1 8534/12 8534/14 8536/5 8547/4 8547/15 8548/7 8549/20 8553/10 8553/20 8557/3 8557/5 8560/24 8566/6 8572/15 8579/10 8579/15 8580/14 8583/1
**defer [1]** 8563/13
**define [1]** 8544/21
**definitely [4]** 8355/19 8374/8 8416/25 8420/20
**defraud [2]** 8334/9 8334/9
**defrauded [2]** 8317/11 8317/13
**degree [6]** 8459/11 8459/12 8460/14 8461/9 8477/9 8477/10
**degrees [1]** 8459/10
**Delaware [5]** 8309/20 8475/10 8475/12 8475/13 8475/21
**delay [1]** 8361/4
**delays [1]** 8421/20
**demand [1]** 8310/17
**demands [1]** 8473/4
**demonstrates [2]** 8370/15 8494/11
**demonstrating [2]** 8336/18 8571/13
**DENERSTEIN [20]** 8307/20 8459/5 8469/3 8480/15 8484/15 8484/20 8485/5 8485/21

**D**

**DENERSTEIN... [12]** 8486/12 8488/15 8488/18 8489/2 8508/6 8509/5 8511/4 8549/4 8578/22 8579/13 8584/7 8584/8
**department [7]** 8369/14 8369/18 8369/25 8377/14 8378/10 8378/11 8378/14
**depicted [2]** 8496/25 8497/2
**depiction [1]** 8492/1
**deposed [3]** 8539/9 8540/16 8540/16
**deposition [7]** 8453/18 8454/12 8455/2 8455/4 8540/9 8578/15 8578/18
**depositions [2]** 8453/16 8453/19
**DERA [6]** 8538/10 8538/11 8538/12 8538/16 8539/12 8539/19
**DERA's [1]** 8538/23
**derivative [2]** 8460/21 8462/10
**derived [1]** 8373/1
**describe [19]** 8347/22 8347/23 8352/25 8366/19 8369/21 8371/15 8373/4 8375/10 8394/23 8402/4 8424/9 8480/20 8512/21 8513/15 8513/17 8515/2 8517/9 8523/8 8531/1
**described [7]** 8310/24 8394/2 8462/25 8477/13 8506/5 8526/24 8540/3
**describes [2]** 8371/3 8480/21
**describing [2]** 8370/17 8437/22
**Desert [5]** 8474/11 8475/4 8475/10 8475/11 8546/11
**designated [1]** 8385/4
**designating [1]** 8506/19
**designed [9]** 8312/14 8463/25 8464/23 8465/7 8467/9 8467/10 8468/7 8521/22 8565/11
**designing [1]** 8465/21
**desire [2]** 8319/20 8320/2
**despite [3]** 8369/11 8400/3 8400/4
**detail [1]** 8540/24
**detailed [2]** 8353/25 8545/25
**details [3]** 8352/7 8353/5 8578/3
**detect [2]** 8483/25 8532/14
**determination [1]** 8319/24
**determinations [1]** 8455/10
**determine [2]** 8319/16 8431/24
**determined [3]** 8318/15 8378/11 8442/7
**develop [3]** 8367/5 8379/20 8393/5
**developed [7]** 8325/6 8368/6 8368/24 8372/3 8428/1 8463/19 8472/12
**developing [2]** 8372/4 8383/2
**development [4]** 8371/5 8371/12 8371/17 8380/8
**developments [2]** 8377/2 8377/3
**difference [8]** 8421/6 8465/18 8492/23 8516/24 8553/14 8555/11 8557/15 8579/19
**different [30]** 8322/15 8330/7 8330/14 8340/22 8353/8 8356/13 8362/3 8384/22 8402/13 8416/14 8431/6 8431/8 8438/11 8462/3 8462/9 8463/18 8465/24 8467/8 8470/19 8470/23 8473/18 8479/13 8479/24 8500/3 8506/17 8507/10 8508/14 8520/4 8521/10 8555/10
**differentiated [1]** 8506/13
**differently [1]** 8506/14
**differing [1]** 8356/3
**difficult [5]** 8332/12 8360/11 8427/14 8454/20 8483/22
**difficulty [1]** 8411/25
**diligence [1]** 8424/13
**DiMaria [1]** 8338/21
**diminishing [1]** 8338/20
**dinner [1]** 8371/7
**dinners [1]** 8371/18
**direct [51]** 8323/25 8324/16 8324/22 8338/17 8366/17 8372/20 8378/24 8383/5 8386/1 8408/6 8430/16 8431/17 8431/21 8437/15 8439/22 8443/3 8443/24 8459/4 8478/15 8484/10 8485/22 8491/1 8511/4 8535/16 8541/5 8542/23 8543/1 8543/24 8543/25 8546/6 8547/15 8547/25 8549/23 8550/10 8550/12 8550/20 8550/22 8556/4 8557/24 8561/10 8564/14 8564/20 8564/24 8566/3 8568/5 8568/23 8569/5 8571/9 8572/14

8572/16 8575/3
**directed [2]** 8300/5 8019/13 8510/22 8512/22
**directing [4]** 8366/17 8477/5 8530/6 8579/15
**direction [3]** 8370/15 8513/22 8548/3
**directives [1]** 8309/16
**directly [11]** 8339/23 8340/6 8340/11 8356/21 8358/18 8362/11 8407/13 8407/15 8410/7 8540/1 8556/3
**director [7]** 8464/7 8464/25 8465/19 8465/22 8465/25 8466/20 8539/22
**directors [5]** 8326/22 8347/7 8347/11 8377/19 8471/11
**disagree [3]** 8316/4 8321/12 8322/11
**disclosed [6]** 8317/6 8477/3 8477/22 8477/25 8536/5 8571/10
**discloses [2]** 8544/14 8545/11
**disclosure [3]** 8310/19 8322/14 8382/16
**disclosures [7]** 8308/4 8310/19 8479/12 8535/6 8536/2 8536/3 8550/17
**discuss [14]** 8327/14 8327/21 8327/25 8328/1 8328/8 8328/21 8353/4 8358/15 8400/2 8412/4 8413/6 8430/3 8548/10 8582/23
**discussed [19]** 8325/4 8325/13 8326/9 8347/25 8354/11 8367/14 8367/17 8379/13 8428/24 8429/12 8431/19 8442/20 8442/23 8445/21 8456/18 8481/6 8491/25 8512/3 8519/22
**discussing [2]** 8308/21 8414/2
**discussion [13]** 8320/14 8327/25 8328/8 8345/5 8352/5 8352/10 8354/13 8367/5 8368/1 8387/11 8387/13 8414/15 8414/16
**discussions [2]** 8353/25 8354/15
**disentangle [1]** 8512/23
**disinclined [1]** 8308/20
**displays [1]** 8483/3
**dispute [4]** 8315/3 8319/7 8412/13 8413/11
**dissimilar [2]** 8349/19 8372/10
**distinguish [1]** 8332/12
**distinguished [1]** 8441/18
**distribute [1]** 8520/15
**distributed [1]** 8487/8
**DISTRICT [5]** 8307/1 8307/1 8307/10 8307/13 8533/7
**divided [1]** 8529/8
**division [8]** 8464/8 8464/18 8464/19 8464/19 8464/20 8465/23 8466/18 8468/19
**document [17]** 8343/13 8417/14 8417/14 8417/15 8417/15 8419/8 8441/6 8441/8 8441/23 8474/16 8477/21 8478/6 8478/9 8480/2 8481/18 8555/23 8578/13
**documentation [1]** 8447/17
**documents [9]** 8353/20 8363/3 8417/24 8428/20 8440/24 8441/2 8442/25 8540/25 8564/24
**dollar [4]** 8352/25 8367/23 8367/23 8367/23
**dollars [8]** 8347/20 8478/20 8479/4 8543/22 8546/14 8546/15 8547/6 8547/13
**Donau [1]** 8461/14
**done [37]** 8313/11 8313/15 8313/15 8314/16 8315/13 8315/16 8315/23 8317/18 8318/4 8319/2 8319/13 8320/16 8321/15 8323/1 8336/5 8352/6 8352/10 8352/18 8353/8 8376/10 8376/13 8388/8 8390/12 8393/4 8393/15 8407/19 8431/15 8431/18 8432/24 8433/2 8442/2 8455/6 8463/12 8463/14 8463/14 8534/4 8564/6
**door [1]** 8323/24
**double [1]** 8361/24
**doubt [1]** 8320/6
**down [25]** 8321/3 8328/21 8332/23 8341/18 8372/24 8377/18 8396/21 8396/25 8398/12 8420/18 8422/12 8435/2 8456/5 8473/14 8475/23 8484/19 8486/10 8489/20 8493/25 8503/6 8507/24 8513/14 8525/21 8530/2

8543/21
**down-sides [1]** 8328/25
**download [1]** 8475/2
**downsides [5]** 8410/16 8412/4 8413/8 8413/8 8414/18
**Dr. [10]** 8311/25 8313/9 8313/18 8314/8 8412/23 8413/13 8413/23 8415/7 8415/10 8417/3
**Dr. Rosenwald [4]** 8412/23 8413/23 8415/7 8417/3
**Dr. Rosenwald's [6]** 8311/25 8313/9 8313/18 8314/8 8413/13 8415/10
**draft [10]** 8348/16 8348/23 8366/13 8366/14 8372/9 8372/21 8378/20 8387/8 8429/24 8552/12
**drafted [2]** 8349/16 8442/1
**drafting [1]** 8429/6
**drafts [2]** 8348/10 8348/13
**draw [3]** 8315/11 8502/18 8502/23
**drawn [1]** 8313/4
**drive [1]** 8336/6
**driven [1]** 8466/24
**driving [1]** 8330/16
**drop [11]** 8521/15 8522/13 8522/23 8522/24 8523/17 8524/4 8524/8 8524/11 8524/14 8526/13 8579/24
**dropped [4]** 8522/1 8523/22 8526/16 8567/11
**dropping [1]** 8490/2
**drops [3]** 8521/13 8523/11 8523/11
**drug [1]** 8336/24
**DUBIN [2]** 8307/20 8518/20
**due [5]** 8376/15 8383/14 8385/2 8424/13 8519/5
**duly [2]** 8324/20 8458/22
**DUNN [9]** 8307/17 8518/13 8518/14 8518/17 8519/9 8519/12 8519/13 8519/18 8519/24
**during [42]** 8338/18 8339/6 8350/4 8369/12 8369/18 8388/20 8389/7 8414/1 8417/8 8417/14 8417/15 8426/7 8434/22 8442/20 8442/25 8445/21 8445/24 8450/16 8451/25 8454/6 8482/22 8488/9 8489/4 8492/20 8492/22 8493/22 8494/23 8499/11 8505/24 8519/21 8530/20 8530/23 8551/13 8551/25 8566/1 8566/22 8566/25 8567/22 8567/23 8568/4 8568/19 8578/15
**duty [1]** 8439/17
**DX [5]** 8380/21 8380/23 8380/25 8543/1 8546/18
**DX-201-2 [1]** 8380/21
**DX-201-3 [2]** 8380/23 8380/25
**DX-221-09 [2]** 8543/1 8546/18
**DX201 [1]** 8380/21
**DX201-2 [1]** 8380/21

**E**

**e-mail [5]** 8417/17 8417/25 8418/1 8418/9 8419/9
**e-mailed [1]** 8308/6
**early [6]** 8347/10 8380/5 8383/1 8383/20 8419/14 8472/5
**earn [6]** 8473/20 8473/22 8489/24 8520/25 8521/1 8521/4
**earning [1]** 8468/9
**East [1]** 8307/14
**EASTERN [3]** 8307/1 8307/13 8533/7
**Eckhaus [1]** 8375/8
**Econometrics [1]** 8463/6
**economic [11]** 8464/8 8464/18 8464/19 8464/20 8465/3 8465/12 8465/11 8466/18 8467/1 8538/23 8539/22
**economics [5]** 8462/19 8463/3 8463/5 8465/6 8538/18
**economist [10]** 8462/9 8465/9 8465/10 8465/15 8465/16 8465/19 8465/20 8467/7 8538/9 8539/20
**economists [3]** 8465/7 8466/14 8466/15
**economy [2]** 8520/15 8520/17
**Ed [9]** 8486/13 8487/19 8488/2 8495/8 8495/9

**E**

**Ed...** [3] 8498/8 8506/12 8515/6
**EDGAR** [1] 8475/1
**edit** [1] 8510/1
**editor** [3] 8462/22 8463/8 8463/10
**editorial** [1] 8463/7
**Edmund** [2] 8490/11 8562/14
**educational** [1] 8459/6
**effect** [42] 8316/2 8325/18 8326/6 8330/5 8330/23 8330/24 8331/4 8331/9 8332/18 8332/20 8333/6 8334/18 8335/13 8338/20 8340/16 8346/22 8356/5 8358/4 8360/6 8361/12 8361/16 8383/25 8389/18 8390/11 8408/4 8408/6 8409/11 8415/5 8416/9 8417/7 8417/10 8417/17 8419/1 8420/2 8420/5 8420/5 8420/21 8421/12 8429/6 8520/3 8520/4 8520/8 8453/3 8552/5
**effective** [1] 8475/19
**effectively** [2] 8466/14 8470/9
**effects** [1] 8407/25
**efficient** [1] 8464/13
**efficiently** [1] 8482/6
**effort** [3] 8517/23 8521/17 8521/25
**efforts** [1] 8370/16
**eight** [4] 8428/23 8527/12 8562/8 8568/12
**either** [9] 8312/5 8348/18 8387/17 8390/6 8429/17 8429/18 8436/25 8489/24 8517/11
**elderly** [1] 8426/15
**Electronics** [3] 8364/12 8365/2 8365/3
**ELEIS** [1] 8307/15
**elicit** [21] 8323/25 8333/3 8338/22 8339/18 8340/7 8355/2 8355/24 8358/25 8362/12 8397/6 8404/11 8405/2 8406/22 8408/17 8409/4 8409/13 8410/18 8416/20 8420/8 8453/3 8552/5
**elicitation** [1] 8405/4
**elicitations** [1] 8404/24
**elicited** [10] 8325/21 8355/15 8396/5 8396/9 8396/13 8397/12 8399/25 8420/10 8441/17 8508/13
**eliciting** [3] 8343/18 8404/21 8405/25
**elicits** [1] 8509/18
**eloquent** [1] 8454/20
**Email** [1] 8307/23
**emails** [1] 8417/16
**embedded** [1] 8397/12
**embodied** [1] 8431/3
**emerging** [1] 8466/13
**emphasis** [1] 8466/25
**empirical** [2] 8460/23 8462/3
**employ** [2] 8473/17 8473/18
**employed** [1] 8575/25
**employee** [2] 8319/23 8319/23 8534/15
**employees** [3] 8326/22 8444/6 8444/19
**encompasses** [1] 8316/8
**encounter** [1] 8409/2
**end** [18] 8326/10 8327/6 8338/18 8344/22 8383/15 8385/24 8399/6 8412/10 8421/24 8423/23 8423/25 8433/21 8455/24 8506/4 8509/4 8512/10 8530/24 8557/19
**endangers** [1] 8316/12
**ended** [3] 8410/4 8413/9 8503/23
**ending** [1] 8501/21
**ends** [3] 8363/22 8496/11 8556/10
**enforcement** [6] 8464/24 8465/4 8465/8 8467/11 8540/2 8540/4
**engage** [2] 8320/2 8460/3
**engaged** [3] 8370/12 8526/24 8532/4
**engagement** [3] 8437/3 8437/6 8437/9
**engages** [1] 8472/22
**engaging** [8] 8482/20 8506/22 8508/8 8508/15 8509/13 8552/9 8509/19 8511/10
**enlarge** [2] 8359/14 8359/15
**entered** [2] 8458/15 8550/14
**enters** [4] 8324/13 8422/8 8481/8 8511/1
**entire** [10] 8314/7 8335/4 8393/9 8477/12 8494/2 8495/10 8495/16 8518/5 8577/5 8582/10
**entities** [10] 8318/13 8380/3 8436/5 8436/8

**8436/8 8436/11 8436/17 8436/22 8437/10 8534/13**
**entitled** [2] 8316/25 8554/10
**entity** [5] 8326/21 8437/4 8472/19 8472/22 8475/16
**entry** [1] 8503/10
**enumerated** [1] 8552/11
**equal** [1] 8516/6
**equals** [1] 8516/6
**equity** [25] 8348/22 8349/17 8365/11 8370/6 8372/7 8372/8 8373/24 8386/17 8400/23 8443/11 8443/16 8462/6 8462/6 8462/9 8462/17 8467/20 8467/25 8468/1 8468/2 8468/3 8468/5 8468/6 8470/25 8479/23 8480/19
**erroneously** [1] 8338/8
**error** [2] 8339/10 8554/24
**especially** [4] 8318/4 8344/8 8393/24 8431/5
**ESQ** [9] 8307/12 8307/15 8307/15 8307/16 8307/19 8307/19 8307/20 8307/20 8307/21
**essentially** [4] 8333/7 8333/12 8333/18 8340/25
**establish** [1] 8407/16
**established** [3] 8308/12 8407/10 8472/11
**estate** [1] 8354/4
**estimate** [1] 8344/6
**estimates** [1] 8462/12
**et** [1] 8576/23
**ethical** [2] 8309/3 8309/15
**Europe** [1] 8433/7
**evaluate** [2] 8344/7 8361/12
**evaluated** [1] 8467/8
**EVAN** [40] 8307/6 8347/25 8348/14 8368/14 8368/18 8370/22 8376/10 8376/11 8377/16 8378/10 8379/11 8380/2 8380/12 8382/24 8382/24 8384/12 8384/20 8384/24 8393/3 8393/9 8393/16 8393/18 8393/19 8393/23 8393/25 8396/21 8396/22 8398/12 8398/13 8398/16 8398/19 8399/20 8401/23 8402/4 8423/12 8423/13 8423/14 8469/4 8469/6 8541/6
**evasive** [1] 8337/11
**evening** [1] 8582/17
**event** [10] 8319/25 8334/16 8359/8 8363/2 8406/23 8406/24 8410/7 8427/13 8474/20 8477/19
**events** [7] 8360/24 8363/1 8427/6 8481/10 8486/3 8512/19 8541/2
**eventually** [5] 8368/21 8380/5 8381/13 8412/3 8413/5
**evidence** [87] 8309/11 8313/1 8313/4 8318/25 8332/11 8333/22 8333/22 8337/21 8338/13 8339/10 8341/1 8349/23 8350/17 8350/18 8352/4 8352/15 8355/1 8355/23 8356/4 8358/1 8372/16 8375/2 8378/18 8403/1 8407/16 8407/20 8420/8 8426/14 8426/17 8454/4 8454/16 8474/8 8478/2 8480/13 8482/24 8486/25 8491/22 8492/9 8492/10 8492/12 8501/11 8504/3 8505/6 8505/8 8505/8 8505/19 8507/19 8507/21 8509/5 8511/13 8511/15 8514/13 8514/22 8514/24 8515/4 8516/19 8516/21 8517/2 8517/5 8517/10 8521/19 8522/2 8522/5 8522/7 8525/1 8525/11 8526/1 8527/5 8527/12 8527/14 8527/15 8528/22 8530/6 8530/12 8536/9 8536/9 8536/11 8536/12 8536/15 8536/16 8536/17 8537/2 8543/24 8545/3 8545/17 8546/21 8547/4 8547/11 8547/16 8548/8 8549/20 8551/2 8553/22 8554/15 8557/4 8557/5 8557/6 8559/22 8559/25 8560/24 8561/1 8564/14 8564/16 8564/18 8566/6 8568/24 8572/15 8572/15 8576/11 8577/12 8578/5 8578/18 8579/10 8579/15 8580/15 8580/24 8581/15
**exact** [5] 8415/13 8505/19 8519/15 8549/22 8580/1
**exactly** [11] 8309/25 8319/10 8330/6 8336/2 8349/14 8352/9 8353/12 8358/9 8419/24 8496/21 8526/21
**examination** [27] 8324/22 8338/18 8386/1 8425/2 8426/7 8426/16 8426/20 8431/17 8431/17 8434/4 8446/6 8446/8 8446/11 8453/13 8459/4 8491/1 8532/25 8541/5 8548/1 8556/8 8568/5 8569/5 8571/9 8572/16 8575/3 8575/21 8578/8

**examine** [1] 8551/23
**examined** [6] 8324/24 8335/25 8505/5 8527/25 8531/25 8545/25 8546/5
**examining** [2] 8515/18 8580/7
**example** [16] 8340/14 8343/20 8345/8 8352/22 8353/3 8353/18 8410/12 8418/24 8441/3 8454/3 8454/15 8463/20 8470/24 8471/13 8512/24 8528/21
**examples** [4] 8418/20 8467/16 8473/16 8474/2
**exceedingly** [1] 8332/11
**excellence** [2] 8461/2 8461/6
**excellently** [1] 8349/16
**Except** [1] 8553/8
**exception** [9] 8330/17 8331/3 8332/15 8333/6 8407/25 8518/6 8552/11 8552/14 8552/17
**exceptions** [1] 8555/21
**exchange** [25] 8373/11 8373/12 8380/2 8380/4 8381/23 8382/18 8464/6 8469/16 8469/18 8470/5 8471/4 8471/24 8476/19 8478/11 8478/14 8480/19 8482/4 8482/10 8520/13 8576/1 8578/24 8579/2 8580/11 8581/11 8581/21
**exchanged** [2] 8380/5 8471/6
**exchanges** [1] 8471/17
**exclude** [2] 8340/25 8516/17
**excluded** [3] 8338/8 8401/3 8430/17
**exclusion** [2] 8338/15 8339/9
**exclusively** [2] 8460/25 8538/4
**excuse** [12] 8398/2 8420/1 8424/20 8439/19 8443/10 8452/11 8453/1 8454/21 8497/22 8551/9 8554/5 8557/18
**excused** [5] 8452/5 8456/5 8456/8 8582/16 8582/17
**excusing** [1] 8456/3
**execute** [1] 8309/16
**executes** [1] 8473/4
**executive** [3] 8333/18 8461/5 8461/7
**exempt** [1] 8478/24
**exercise** [2] 8311/12 8479/6
**exercises** [1] 8463/17
**exhibit** [125] 8349/22 8350/5 8350/17 8352/15 8364/4 8372/15 8372/22 8375/1 8378/5 8378/18 8383/6 8386/8 8387/6 8387/8 8417/6 8417/7 8474/7 8476/10 8478/2 8480/10 8482/23 8486/24 8490/18 8491/9 8491/10 8491/11 8492/5 8492/5 8492/9 8492/11 8492/13 8492/16 8492/18 8496/18 8500/9 8501/7 8501/9 8501/10 8501/12 8503/16 8503/19 8503/21 8504/4 8504/6 8504/14 8504/22 8505/3 8505/5 8505/8 8505/8 8505/19 8507/19 8507/21 8509/5 8511/13 8511/15 8514/13 8514/22 8514/24 8515/4 8516/19 8516/21 8517/2 8517/5 8517/10 8521/19 8522/2 8522/5 8522/7 8525/1 8525/11 8526/1 8527/5 8527/12 8527/14 8527/15 8528/22 8530/6 8530/12 8536/9 8536/9 8536/11 8536/12 8536/15 8536/16 8536/17 8537/2 8543/24 8545/3 8545/17 8546/21 8547/4 8547/11 8547/16 8548/8 8549/20 8551/2 8553/22 8554/15 8557/4 8557/5 8557/6 8559/22 8559/25 8560/24 8561/1 8564/14 8564/16 8564/18 8566/8 8568/24 8572/15 8572/15 8576/11 8577/12 8578/5 8578/18 8579/10 8579/15 8580/24 8581/15
**Exhibit 121-7** [1] 8386/8
**Exhibit 121-9** [1] 8387/8
**Exhibit 13** [1] 8564/14
**Exhibit 1325** [2] 8564/16 8564/18
**Exhibit 1330** [1] 8577/12
**Exhibit 1336** [1] 8576/11
**Exhibit 2104** [1] 8496/18
**Exhibit 221** [1] 8572/15
**Exhibit 221-02** [2] 8560/24 8566/6
**Exhibit 221-04** [1] 8491/9
**Exhibit 221-05** [1] 8491/11
**Exhibit 221-06** [5] 8500/9 8501/7 8501/9 8504/14 8505/19

**E**

**Exhibit 221-07 [3]** 8504/22 8505/3 8505/5
**Exhibit 221-09 [1]** 8579/10
**Exhibit 950 [1]** 8559/25
**Exhibit 955 [1]** 8559/22
**Exhibit 990 [3]** 8504/4 8580/24 8581/15
**Exhibit 995 [1]** 8507/19
**exhibits [15]** 8417/23 8490/16 8491/18 8491/21 8491/23 8492/8 8497/6 8497/12 8503/11 8542/23 8545/22 8545/23 8560/21 8564/8 8584/12
**Exhibits 221-04 [1]** 8492/8
**existence [1]** 8484/7
**existent [1]** 8311/15
**exits [4]** 8395/10 8456/13 8508/2 8582/25
**expand [3]** 8366/23 8370/16 8374/21
**expanded [1]** 8372/25
**expanding [1]** 8376/9
**expect [19]** 8428/22 8481/23 8482/2 8488/7 8488/20 8488/25 8489/10 8490/2 8490/3 8490/4 8513/21 8514/10 8521/12 8521/14 8521/16 8529/14 8529/25 8530/2 8532/18
**expense [2]** 8321/3 8428/4
**expensive [1]** 8415/19
**experience [8]** 8310/2 8369/16 8372/7 8441/19 8467/2 8473/15 8473/15 8545/8
**experienced [2]** 8413/22 8526/13
**expert [22]** 8308/4 8312/7 8312/10 8315/9 8316/2 8316/25 8317/16 8317/17 8321/21 8324/5 8331/8 8379/14 8379/17 8383/3 8409/18 8420/16 8468/22 8469/2 8535/6 8550/16 8550/17 8551/25
**expertise [1]** 8322/8
**experts [1]** 8308/8
**explain [12]** 8327/8 8388/12 8390/22 8491/22 8492/15 8500/17 8505/9 8517/13 8522/10 8522/16 8526/5 8527/18
**explained [1]** 8337/23
**explaining [5]** 8391/15 8391/19 8419/1 8526/6 8528/14
**explanation [1]** 8366/1
**exposure [4]** 8313/5 8320/9 8321/2 8520/23
**express [1]** 8555/18
**extended [1]** 8359/20
**extensive [4]** 8332/25 8404/23 8408/17 8550/4
**extensively [2]** 8408/21 8553/1
**extent [9]** 8308/10 8311/14 8311/24 8320/23 8355/5 8404/18 8408/23 8435/23 8481/7
**extraordinarily [1]** 8405/17
**extraordinary [4]** 8405/24 8407/2 8413/23 8413/24
**extreme [1]** 8413/15
**extrinsic [1]** 8552/10

**F**

**F.2d [3]** 8337/10 8338/4 8338/21
**F.3d [1]** 8332/10
**fabricated [1]** 8555/19
**face [1]** 8507/24
**Facebook [2]** 8381/12 8381/14
**faced [3]** 8313/14 8332/24 8415/20
**facilitates [1]** 8472/19
**fact [35]** 8313/9 8315/23 8318/5 8318/15 8319/14 8321/4 8321/5 8331/1 8331/1 8331/3 8331/6 8338/10 8352/11 8355/14 8369/24 8382/16 8392/25 8398/15 8400/3 8400/4 8408/4 8409/10 8412/13 8413/11 8414/20 8421/2 8426/6 8444/6 8502/23 8503/5 8515/25 8555/13 8563/17 8570/8 8580/9
**factor [2]** 8314/10 8443/15
**factors [6]** 8326/17 8477/3 8520/2 8520/7 8520/8 8520/15
**facts [5]** 8321/22 8322/10 8322/13 8322/16 8390/10
**failure [3]** 8443/7 8443/12 8580/12
**fair [13]** 8338/16 8367/3 8432/9 8473/20 8485/14 8492/1 8504/18 8521/1 8521/4 8538/23 8551/20 8556/8 8574/13

**fairly [3]** 8359/8 8360/23 8418/18
**faithfully [1]** 8404/16
**faith [5]** 8310/3 8310/13 8311/18 8312/25 8418/8
**fall [1]** 8455/18
**false [1]** 8337/11
**familiar [25]** 8350/3 8350/7 8355/6 8371/11 8373/20 8373/21 8373/22 8373/25 8375/11 8375/24 8377/4 8377/12 8377/23 8379/4 8379/23 8379/25 8383/16 8383/18 8386/14 8466/2 8474/16 8478/6 8536/7 8545/20 8545/22
**fantastic [1]** 8433/10
**far [7]** 8408/22 8427/23 8438/10 8438/20 8544/10 8544/11 8547/20
**faster [1]** 8566/7
**fault [2]** 8319/19 8319/23
**faulting [1]** 8344/11
**faulty [1]** 8339/10
**favor [2]** 8431/13 8453/25
**FBI's [1]** 8338/22
**Fearnow [1]** 8308/12
**February [55]** 8348/19 8350/6 8364/5 8366/15 8371/1 8371/8 8372/17 8372/22 8378/21 8379/9 8381/16 8382/8 8384/1 8386/5 8387/9 8392/24 8479/2 8479/16 8479/18 8480/5 8484/22 8484/22 8484/24 8484/25 8488/16 8488/22 8489/5 8493/11 8493/12 8495/1 8495/24 8496/4 8498/4 8499/24 8511/17 8512/9 8512/9 8512/1 8512/12 8515/16 8516/23 8517/1 8524/5 8530/10 8530/21 8531/4 8531/14 8551/15 8561/6 8565/7 8566/2 8567/17 8570/6 8571/3 8574/10
**February 12th [1]** 8570/6
**February 14 [2]** 8512/9 8512/12
**February 2013 [4]** 8493/11 8496/4 8517/1 8567/17
**February 2014 [2]** 8386/5 8495/1
**February 21 [1]** 8524/5
**February 28 [8]** 8511/17 8512/11 8515/16 8516/23 8530/10 8530/21 8531/4 8531/14
**February 28th [3]** 8561/6 8565/7 8566/22
**federal [4]** 8385/8 8386/4 8386/6 8454/25
**fees [1]** 8447/11
**Felix [2]** 8364/13 8365/5
**felt [5]** 8359/11 8360/1 8399/7 8423/23 8532/13
**Fernandez [14]** 8486/14 8487/15 8488/1 8490/11 8494/9 8494/11 8497/22 8506/9 8513/15 8515/6 8517/17 8541/15 8562/14 8570/13
**Ferruolo [3]** 8308/18 8308/19 8324/8
**few [8]** 8372/20 8377/18 8401/17 8436/5 8437/14 8455/2 8483/25 8559/10
**fiduciary [1]** 8310/7
**field [1]** 8462/19
**fifth [1]** 8442/18
**fight [1]** 8427/21
**figure [3]** 8483/22 8497/4 8507/16
**file [10]** 8312/19 8341/3 8341/3 8343/2 8343/3 8343/5 8360/22 8412/15 8413/20 8419/23
**filed [10]** 8339/13 8339/16 8341/5 8342/21 8360/4 8368/4 8390/4 8398/9 8404/8 8423/9
**filing [5]** 8360/20 8360/20 8474/11 8474/19 8475/19
**filings [2]** 8469/17 8520/12
**filling [1]** 8368/8
**final [7]** 8492/25 8493/25 8496/14 8500/1 8529/7 8553/23 8575/20
**finally [1]** 8387/7
**finance [13]** 8459/8 8459/23 8460/1 8460/2 8460/6 8460/7 8462/2 8462/3 8463/2 8463/5 8463/9 8463/11 8468/18
**financial [27]** 8364/16 8365/10 8379/2 8380/11 8388/5 8388/9 8390/4 8391/5 8394/15 8398/10 8398/11 8423/10 8423/11 8460/20 8462/19 8463/3 8463/3 8463/4 8463/10 8464/11 8471/8 8477/15 8477/18 8538/18 8544/16 8544/17

**fairly** [continued]
**financing [8]** 8370/6 8467/17 8470/20 8470/22 8482/13 8484/21 8485/6 8485/8
**financings [5]** 8365/17 8470/23 8481/5 8484/6 8486/3
**findings [2]** 8531/23 8554/3
**fine [7]** 8323/19 8354/2 8355/3 8426/9 8431/19 8433/1 8510/2
**finely [1]** 8357/25
**fingerprints [1]** 8455/7
**finish [9]** 8316/16 8391/24 8404/6 8405/16 8417/4 8431/17 8557/18 8557/19 8583/14
**finished [2]** 8404/16 8404/18
**firm [63]** 8350/15 8353/21 8364/24 8364/25 8364/25 8365/7 8368/15 8368/19 8369/15 8369/25 8370/21 8370/23 8371/8 8371/22 8371/25 8372/1 8372/13 8373/24 8374/3 8378/13 8379/10 8379/14 8381/24 8382/3 8382/22 8382/24 8383/3 8383/4 8383/11 8384/1 8384/18 8384/21 8385/12 8386/17 8387/2 8392/12 8393/7 8393/8 8398/7 8399/3 8399/3 8399/4 8399/12 8400/14 8423/6 8423/20 8423/20 8423/21 8428/6 8428/7 8443/6 8448/18 8449/5 8463/20 8463/21 8467/19 8468/6 8469/14 8469/20 8472/3 8472/8 8481/10 8482/20
**firm's [4]** 8368/5 8371/6 8378/25 8379/8
**firm-wide [2]** 8369/15 8369/25
**firms [4]** 8463/18 8464/15 8467/23 8470/23
**first [43]** 8308/16 8312/21 8323/6 8324/20 8334/17 8344/20 8358/23 8367/8 8368/3 8368/3 8379/2 8379/20 8380/10 8380/24 8382/22 8391/1 8392/18 8392/20 8398/16 8410/25 8421/8 8458/22 8466/20 8468/13 8477/7 8480/20 8494/9 8498/12 8498/13 8498/16 8500/17 8501/19 8512/4 8512/6 8517/10 8517/13 8528/22 8529/9 8539/2 8539/5 8539/8 8572/24 8581/20
**fiscal [8]** 8367/10 8368/2 8368/3 8368/4 8369/12 8370/6 8371/9 8371/10
**fit [1]** 8489/18
**five [15]** 8383/11 8434/23 8435/9 8453/13 8453/24 8519/20 8523/15 8531/22 8546/14 8546/15 8547/6 8547/12 8547/13 8567/22 8567/24
**five-minute [1]** 8453/13
**flip [1]** 8477/21
**Floor [1]** 8307/18
**flows [1]** 8520/19
**fluid [1]** 8431/4
**fly [1]** 8433/7
**focus [4]** 8320/7 8406/14 8418/22 8581/19
**focused [3]** 8406/18 8551/14 8582/3
**focusing [1]** 8581/1
**folder [1]** 8349/24
**follow [6]** 8309/16 8391/15 8400/20 8410/21 8430/3 8570/12
**followed [1]** 8410/14
**following [24]** 8312/14 8325/12 8342/3 8350/21 8352/1 8358/18 8371/7 8392/11 8396/1 8397/25 8398/5 8398/5 8477/16 8521/23 8522/11 8524/17 8524/25 8525/9 8532/19 8533/16 8543/6 8549/2 8569/7 8569/22
**follows [3]** 8324/21 8458/23 8462/1
**followup [1]** 8414/15
**followups [1]** 8410/11
**Footnote [1]** 8554/16
**force [1]** 8572/15
**forecast [1]** 8520/18
**forecasting [1]** 8462/11
**forget [1]** 8510/7
**forgot [1]** 8391/24
**form [15]** 8325/3 8325/5 8368/17 8372/9 8382/1 8384/5 8412/2 8428/15 8440/25 8478/3 8478/9 8499/20 8506/24 8524/19 8581/22
**format [2]** 8349/14 8349/21 8505/10

## F

**forming** [1] 8367/12
**formulate** [1] 8313/22
**forth** [1] 8343/12
**forward** [39] 8327/20 8328/9 8356/6 8360/19
8360/22 8386/12 8386/25 8387/3 8387/5
8388/4 8393/6 8393/20 8394/3 8394/17 8397/1
8397/5 8399/2 8399/7 8399/8 8399/13 8400/14
8402/19 8409/21 8422/11 8422/17 8422/24
8423/19 8423/24 8423/25 8424/5 8424/6
8424/14 8424/25 8424/25 8425/1 8426/10
8426/11 8426/15 8426/16
**foundation** [4] 8449/20 8488/12 8552/4 8553/7
**founder** [1] 8376/16
**four** [7] 8442/13 8442/16 8442/17 8481/5
8486/3 8567/6 8573/22
**fourth** [2] 8366/22 8372/24
**fraction** [2] 8488/24 8489/1
**fragrance** [1] 8369/8
**frame** [1] 8427/6
**Frankfort** [1] 8461/15
**frankly** [12] 8318/20 8318/24 8319/5 8319/10
8335/11 8360/9 8401/12 8409/5 8431/1 8431/7
8433/14 8455/16
**fraud** [1] 8320/25
**free** [19] 8476/15 8476/17 8487/12 8487/15
8487/25 8488/8 8488/8 8488/21 8504/19
8561/11 8562/7 8562/17 8562/25 8568/18
8573/12 8574/6 8574/15 8574/19 8575/1
**free-trading** [9] 8561/11 8562/17 8562/25
8568/18 8573/12 8574/6 8574/15 8574/19
8575/1
**freely** [10] 8476/10 8476/12 8487/4 8487/5
8487/19 8487/20 8488/6 8562/3 8562/7
8581/15
**freely-trading** [1] 8581/15
**frequently** [2] 8445/18 8467/7
**Friday** [2] 8456/18 8456/20
**friends** [2] 8393/15 8393/19
**frivolous** [1] 8316/12
**front** [15] 8310/22 8330/23 8343/11 8360/14
8366/12 8415/9 8455/3 8455/17 8468/14
8468/15 8474/5 8478/3 8480/9 8543/3 8568/25
**front-loaded** [3] 8343/11 8360/14 8455/17
**full** [5] 8431/16 8433/17 8458/24 8461/8
8468/10
**full-blown** [1] 8468/11
**full-time** [1] 8461/8
**fully** [1] 8426/7
**functioning** [1] 8465/23
**fund** [15] 8364/16 8365/17 8376/12 8381/23
8382/18 8441/8 8441/11 8441/22 8447/1
8447/5 8447/7 8447/8 8521/2 8521/3 8521/3
**funded** [1] 8321/6
**funds** [9] 8367/12 8370/14 8370/21 8376/5
8377/20 8378/2 8440/16 8441/13 8481/8
**future** [5] 8377/22 8401/14 8409/2 8520/11
8520/19

## G

**game** [1] 8455/15
**Gateway** [5] 8474/11 8475/5 8475/10 8475/11
8546/11
**general** [36] 8340/18 8346/3 8350/3 8357/2
8359/4 8359/19 8364/19 8366/6 8366/13
8366/25 8367/1 8367/13 8369/21 8370/8
8370/18 8371/15 8375/11 8376/20 8377/23
8406/24 8408/9 8408/9 8411/1 8411/19
8411/20 8415/21 8416/16 8416/16 8427/11
8429/3 8471/21 8520/2 8520/6 8520/8 8520/15
8520/21
**generally** [27] 8325/4 8325/13 8326/10
8345/12 8346/18 8352/25 8355/5 8357/2
8358/11 8358/12 8358/15 8364/7 8373/4
8373/8 8391/17 8428/24 8463/16 8464/14
8470/15 8470/16 8471/5 8471/18 8471/25
8476/9 8513/10 8520/17 8545/20
**generate** [1] 8520/20

**generated** [2] 8371/10 8372/4
**Georgetown** [1] 8501/13
**Germany** [1] 8461/16
**GIBSON** [9] 8307/17 8518/13 8518/14 8518/17
8519/9 8519/12 8519/13 8519/17 8519/24
**given** [18] 8310/2 8333/16 8339/13 8341/7
8341/18 8349/4 8405/12 8409/24 8410/5
8419/10 8424/23 8433/9 8433/14 8454/19
8456/20 8552/7 8555/16 8571/2
**global** [4] 8463/22 8466/6 8466/9 8481/16
**gmail.com** [1] 8307/23
**Goethe** [1] 8461/15
**good-faith** [2] 8310/3 8418/8
**Gordon** [4] 8385/5 8385/12 8385/14 8385/17
**Governale** [3] 8370/14 8375/21 8376/18
**governance** [1] 8471/10
**government** [119] 8307/12 8308/6 8309/7
8316/4 8316/17 8319/17 8320/24 8323/20
8323/23 8323/24 8325/14 8331/19 8332/23
8336/22 8337/17 8338/18 8339/13 8339/16
8340/25 8341/3 8341/16 8341/3 8342/2 8342/4
8342/6 8342/17 8342/24 8349/22 8350/5
8350/16 8352/15 8354/18 8354/22 8354/24
8356/2 8360/2 8360/9 8360/18 8360/20
8360/22 8361/20 8361/25 8363/13 8364/4
8372/14 8372/15 8372/22 8375/1 8378/5
8378/17 8383/6 8386/8 8387/7 8397/17
8398/22 8399/10 8404/7 8404/13 8405/3
8405/6 8405/11 8405/13 8405/20 8405/24
8406/16 8406/17 8406/21 8406/25 8407/19
8407/21 8412/17 8413/15 8413/16 8414/6
8414/8 8414/14 8414/22 8415/8 8417/6 8420/7
8421/7 8421/9 8426/12 8431/24 8432/9 8454/3
8456/22 8464/3 8474/7 8482/23 8486/24
8490/16 8490/18 8491/9 8504/4 8507/19
8515/17 8536/9 8536/12 8543/24 8545/3
8545/17 8550/18 8551/23 8552/3 8552/9
8553/7 8554/20 8555/13 8559/22 8559/25
8564/14 8564/16 8564/18 8572/14 8576/11
8577/12 8580/24 8581/14
**government's** [20] 8308/8 8320/23 8339/10
8346/23 8356/16 8363/16 8405/16 8405/18
8410/11 8410/19 8413/20 8415/13 8416/1
8417/18 8420/11 8432/14 8433/11 8511/13
8530/6 8553/5
**graduate** [2] 8415/10 8459/19
**Grand** [3] 8337/11 8337/22 8340/22
**granularity** [1] 8557/16
**graph** [6] 8483/5 8483/5 8483/6 8506/10
8525/13 8525/17
**graphic** [1] 8499/20
**graphical** [4] 8496/21 8497/21 8504/25
8505/10
**Gray** [5] 8373/17 8373/25 8374/2 8374/3
8374/11
**great** [1] 8484/14
**greater** [4] 8466/25 8482/14 8531/10 8531/17
**greatest** [1] 8571/1
**GREEBEL** [190] 8307/6 8309/7 8311/5 8311/8
8311/19 8312/3 8312/6 8313/12 8313/20
8313/20 8313/24 8314/11 8315/2 8315/12
8315/14 8315/19 8317/10 8317/14 8318/16
8319/8 8319/15 8320/7 8320/8 8321/17
8322/11 8322/13 8322/16 8325/1 8325/2
8325/8 8325/9 8325/25 8326/11 8326/11
8326/13 8327/8 8327/14 8327/22 8328/2
8328/4 8328/8 8330/5 8331/4 8331/11 8332/18
8333/19 8334/6 8334/9 8335/17 8339/25
8340/1 8340/3 8344/10 8345/3 8345/5 8345/15
8345/20 8345/23 8346/5 8346/14 8346/17
8346/21 8348/1 8348/16 8348/24 8350/4
8350/17 8355/21 8355/24 8358/20 8360/7
8366/14 8371/12 8371/13 8371/16 8371/17
8372/21 8374/6 8378/21 8384/12 8386/19
8386/21 8387/2 8387/8 8387/12 8387/16
8387/18 8387/25 8388/12 8388/21 8388/21
8389/6 8389/8 8389/16 8389/25 8390/14
8390/19 8390/23 8390/23 8391/3 8391/12

**generated [2]** 8371/10 8372/4

8391/15 8391/18 8392/13 8393/1 8393/12
8393/23 8394/2 8394/8 8394/13 8394/20
8394/20 8396/7 8397/2 8397/6 8399/11
8399/15 8399/19 8400/13 8400/14 8400/20
8400/24 8402/23 8402/23 8403/8 8403/8
8404/3 8404/12 8404/22 8407/7 8407/17
8408/4 8408/11 8408/18 8409/11 8409/24
8410/5 8410/14 8412/14 8412/16 8413/6
8413/12 8414/5 8415/5 8416/9 8417/2 8417/24
8418/1 8418/1 8418/12 8418/23 8418/24
8419/2 8419/10 8419/12 8420/6 8420/21
8420/23 8422/21 8422/21 8424/5 8428/12
8428/14 8428/25 8429/6 8429/12 8434/17
8434/23 8435/6 8442/5 8443/5 8445/4 8445/7
8445/10 8445/13 8445/16 8445/20 8445/24
8449/12 8450/9 8450/18 8450/21 8450/25
8451/4 8451/21 8451/25 8469/4 8469/6 8469/8
8541/6
**Greebel's** [25] 8311/22 8311/23 8312/8
8314/19 8315/24 8320/17 8334/5 8334/11
8340/7 8347/2 8348/11 8369/17 8377/4
8394/15 8397/20 8402/18 8404/4 8407/3
8420/8 8422/15 8431/2 8449/25 8450/2 8450/6
8452/1
**green** [5] 8506/11 8507/14 8511/22 8511/23
8512/22
**grieved** [1] 8316/21
**grooming** [1] 8400/24
**gross** [2] 8492/18 8492/21
**grossly** [1] 8360/8
**ground** [1] 8555/6
**grounds** [1] 8556/9
**group** [51] 8368/17 8368/19 8378/14 8465/5
8465/7 8466/6 8466/12 8466/13 8466/17
8487/3 8487/8 8489/4 8490/1 8496/23 8500/16
8500/25 8501/18 8502/4 8502/7 8502/8
8502/21 8513/12 8514/17 8515/21 8516/2
8516/3 8516/17 8516/22 8518/6 8518/7
8521/11 8521/24 8522/14 8523/3 8524/1
8524/2 8524/16 8524/24 8526/20 8526/23
8526/25 8527/8 8527/20 8528/1 8528/2
8528/17 8528/25 8529/17 8530/3 8564/10
8573/22
**groups** [1] 8516/9
**grown** [1] 8466/22
**growth** [2] 8466/23 8466/24
**guaranteed** [1] 8317/4
**guess** [6] 8373/9 8436/3 8442/15 8472/14
8519/16 8551/14
**guest** [1] 8518/14
**Guggenheim** [2] 8352/23 8352/24
**Gupta** [6] 8330/24 8331/20 8332/9 8335/2
8342/25 8360/19
**guys** [2] 8338/25 8339/4
**GX** [1] 8366/10
**GX-121-3** [1] 8366/10

## H

**habit** [1] 8572/15
**half** [5] 8371/19 8474/8 8478/4 8573/11
8573/17
**hand** [9] 8475/22 8493/25 8495/22 8496/11
8497/12 8505/12 8505/22 8511/25 8513/4
**handed** [2] 8508/5 8544/3
**handle** [1] 8442/1
**happy** [3] 8404/17 8409/19 8426/2
**hard** [7] 8344/7 8361/12 8391/21 8396/25
8456/19 8484/1 8499/4
**harm** [1] 8477/17
**harmless** [1] 8338/16
**HAROLD** [1] 8324/19
**Hassan** [2] 8345/20 8345/20
**hassle** [1] 8312/17
**hat** [3] 8438/16 8438/17 8438/19
**hats** [1] 8438/14
**head** [4] 8315/10 8320/11 8320/17 8538/9
**Healthcare** [3] 8443/19 8445/1 8445/7
**hear** [18] 8333/23 8340/15 8342/17 8350/12

## H

**hear...** [14] 8363/14 8404/13 8406/18 8412/25 8415/3 8419/20 8420/6 8420/13 8452/20 8474/13 8489/8 8557/19 8560/13 8577/1
**heard** [10] 8332/16 8332/19 8333/23 8412/23 8414/1 8417/16 8420/23 8431/2 8549/19 8577/5
**hearing** [2] 8352/2 8549/3
**hearsay** [47] 8325/15 8328/13 8328/14 8330/17 8330/19 8332/15 8335/9 8336/3 8336/6 8337/1 8337/13 8337/19 8339/18 8342/16 8343/8 8356/4 8356/6 8356/9 8356/24 8358/4 8396/9 8396/13 8396/23 8397/8 8397/25 8398/1 8398/2 8398/18 8399/25 8400/5 8400/5 8400/10 8401/3 8401/18 8401/24 8401/25 8402/2 8402/4 8407/25 8417/17 8549/6 8552/17 8552/20 8552/21 8554/23 8555/3 8556/7
**hedge** [9] 8440/16 8441/8 8441/11 8441/12 8441/22 8447/1 8447/5 8447/6 8447/8
**heirs** [1] 8326/20
**held** [10] 8332/13 8338/11 8431/10 8451/9 8451/15 8460/11 8461/11 8471/17 8471/21 8488/1
**help** [5] 8377/21 8467/10 8468/7 8520/18 8577/14
**helped** [1] 8367/5
**helping** [2] 8465/12 8465/21
**helps** [3] 8367/20 8408/3 8467/23
**Henry** [1] 8367/11 8374/22
**herein** [1] 8475/11 8477/14
**hereinafter** [1] 8475/14
**Hi** [1] 8404/1
**high** [4] 8477/1 8477/9 8477/10 8530/25
**higher** [5] 8372/5 8523/10 8523/11 8531/21 8531/22
**highest** [1] 8465/15
**highlighted** [1] 8501/15
**highly** [4] 8472/4 8477/1 8477/2 8477/9
**himself** [1] 8319/8
**hire** [1] 8368/20
**hired** [3] 8368/21 8518/9 8518/13
**hiring** [1] 8427/22
**history** [1] 8441/18
**hit** [1] 8379/16
**hold** [11] 8409/18 8431/21 8433/17 8460/5 8466/10 8473/21 8489/22 8489/22 8490/3 8520/21 8520/22
**holder** [1] 8476/2
**holding** [1] 8473/20
**holdings** [2] 8365/2 8487/2
**holidays** [1] 8528/10
**home** [1] 8489/20
**Honor** [197] 8310/16 8316/10 8316/19 8317/7 8323/19 8324/17 8325/10 8325/12 8325/17 8325/19 8327/3 8327/23 8328/5 8328/11 8328/23 8330/1 8331/13 8332/7 8332/9 8332/22 8333/11 8333/13 8333/24 8334/4 8336/14 8337/3 8338/4 8340/8 8340/24 8342/1 8342/4 8342/12 8343/9 8344/16 8344/17 8346/9 8346/20 8349/1 8350/11 8350/13 8350/16 8350/18 8350/20 8352/14 8352/20 8353/10 8354/14 8355/13 8357/21 8358/17 8359/16 8359/23 8360/13 8361/1 8361/11 8361/18 8362/21 8362/23 8380/18 8381/18 8381/25 8382/19 8383/21 8384/2 8385/20 8385/23 8389/13 8395/4 8396/3 8396/15 8397/4 8397/14 8397/23 8398/1 8401/4 8401/7 8401/8 8401/17 8402/6 8402/7 8402/12 8403/1 8403/1 8403/10 8403/13 8403/16 8403/21 8404/17 8405/1 8405/12 8405/13 8405/23 8406/4 8406/13 8406/20 8407/24 8408/7 8408/7 8408/15 8409/3 8409/4 8410/9 8410/12 8411/4 8411/5 8411/10 8411/12 8412/1 8412/25 8413/3 8414/11 8414/23 8417/13 8417/22 8418/3 8418/11 8418/15 8421/6 8421/13 8421/18 8421/21 8422/2 8422/4 8422/25 8424/15 8424/23 8426/4 8426/19 8426/20 8426/20 8426/22 8426/23 8427/8 8427/15 8428/8 8429/10 8429/18 8429/19 8429/1 8430/12 8431/23 8431/25 8432/8 8432/13 8433/8 8433/9 8435/1 8439/21 8441/10 8446/2 8446/4 8447/21 8449/10 8449/18 8449/21 8449/23 8452/3 8452/4 8452/9 8452/17 8453/4 8453/11 8453/13 8453/20 8453/22 8453/22 8454/21 8454/22 8454/24 8455/22 8458/5 8458/19 8468/21 8468/24 8485/9 8485/17 8488/10 8492/6 8501/23 8505/2 8506/24 8508/4 8508/18 8509/3 8514/21 8524/19 8524/22 8527/11 8532/21 8548/7 8557/3 8569/20 8575/17 8576/13 8578/20 8581/3 8581/13
**Honor's** [6] 8330/18 8343/1 8360/17 8361/4 8426/9 8432/12
**HONORABLE** [1] 8307/9
**honorary** [2] 8460/9 8460/14
**hope** [1] 8520/25
**hopeful** [1] 8369/1
**hopefully** [1] 8458/14
**hoping** [5] 8363/5 8409/22 8421/15 8521/1 8521/8
**hour** [3] 8343/6 8456/16 8519/2
**hourly** [1] 8537/17
**hours** [8] 8334/25 8371/3 8371/4 8371/5 8372/4 8376/24 8519/3 8533/14
**house** [1] 8353/11
**Howard** [8] 8367/5 8374/20 8375/19 8385/5 8385/11 8385/13 8386/9 8386/13
**hypothetical** [6] 8314/14 8315/15 8315/21 8320/14 8321/19 8321/19

## I

**I N D E X** [1] 8584/11
**idea** [7] 8331/10 8343/19 8411/15 8415/1 8421/11 8443/21 8447/11
**ideally** [1] 8456/17
**ideas** [1] 8461/20
**identification** [12] 8380/21 8491/11 8500/10 8504/22 8514/13 8516/20 8527/6 8536/9 8547/16 8564/18 8576/12 8577/9
**identified** [7] 8383/11 8487/3 8507/13 8511/24 8513/4 8514/16 8529/7
**identifies** [1] 8555/20
**identify** [8] 8370/10 8364/3 8364/7 8364/11 8377/21 8507/4 8520/18 8526/23
**identifying** [1] 8507/3
**idle** [1] 8321/5
**illegal** [1] 8314/2
**illustrate** [1] 8517/11
**illustrative** [2] 8560/12 8560/14
**immediate** [1] 8508/6
**immediately** [1] 8525/18
**immense** [1] 8379/12
**impact** [4] 8310/14 8468/1 8515/23 8579/21
**impeaches** [1] 8556/2
**impermissible** [1] 8414/19
**implication** [1] 8318/10
**implications** [1] 8432/15
**implied** [1] 8555/18
**important** [8] 8339/1 8357/18 8378/9 8435/20 8440/2 8440/23 8441/5 8441/8 8441/23 8441/25 8443/15 8481/10 8482/5 8482/19 8482/22 8572/9 8574/8
**importantly** [1] 8554/7
**impossible** [2] 8313/7 8559/1
**impressed** [1] 8375/5
**improper** [3] 8315/14 8317/24 8323/1
**improperly** [2] 8317/25 8399/25
**in-house** [1] 8353/11
**inaccurate** [3] 8546/18 8547/2 8550/23
**inadmissible** [1] 8337/13
**inbound** [1] 8383/14
**Inc** [3] 8385/3 8475/10 8475/13
**include** [6] 8440/4 8463/2 8489/4 8502/3 8534/25 8552/12
**included** [5] 8428/24 8429/1 8440/16 8477/14

**includes** [5] 8514/17 8534/1 8534/4 8535/2 8552/17
**including** [6] 8370/6 8383/9 8477/14 8488/3 8488/4
**income** [3] 8348/11 8348/24 8372/8
**inconsistency** [1] 8554/8
**inconsistent** [17] 8319/20 8529/18 8532/7 8552/10 8552/18 8553/9 8553/11 8553/11 8553/12 8553/18 8553/21 8555/12 8555/16 8555/17 8555/22 8555/24 8580/10
**incorrect** [2] 8405/6 8405/7
**incorrectly** [1] 8319/18
**increase** [5] 8372/6 8373/2 8514/5 8532/5 8580/9
**increased** [1] 8373/1
**increasing** [1] 8486/7
**independent** [3] 8471/1 8471/12 8471/13
**indicate** [4] 8326/14 8487/22 8497/5 8580/12
**indicated** [8] 8381/12 8388/6 8405/3 8405/12 8432/18 8501/2 8502/6 8505/11
**indicates** [5] 8494/19 8497/15 8501/18 8515/13 8555/12
**indication** [3] 8529/12 8529/13 8566/10
**indications** [1] 8413/13
**indicators** [1] 8502/25
**Indictment** [1] 8318/9
**individual** [18] 8331/10 8364/22 8364/23 8370/11 8408/18 8472/20 8500/12 8505/13 8506/20 8507/15 8512/25 8528/17 8531/24 8545/9 8571/13 8572/18 8580/17 8580/17
**individual's** [1] 8509/9
**individualized** [1] 8417/16
**individually** [2] 8354/4 8530/11
**individuals** [48] 8418/2 8487/3 8487/11 8491/24 8496/23 8500/16 8500/25 8501/4 8501/18 8502/4 8502/20 8505/11 8511/24 8512/24 8514/16 8514/17 8515/4 8515/13 8515/21 8516/10 8516/13 8516/22 8517/11 8518/6 8521/24 8522/15 8523/3 8524/6 8524/24 8525/2 8526/25 8527/8 8527/20 8528/19 8561/19 8563/18 8565/13 8565/16 8565/23 8566/22 8568/12 8573/3 8573/8 8574/11 8574/12 8574/20 8575/12 8580/8
**induce** [1] 8426/12
**inexperienced** [1] 8413/22
**infer** [2] 8416/6 8529/23
**inference** [2] 8313/4 8315/11
**inferences** [1] 8419/5
**infers** [1] 8514/1
**influence** [1] 8429/6
**inform** [2] 8463/25 8467/23
**information** [31] 8308/11 8315/15 8315/20 8320/12 8333/3 8333/4 8333/15 8352/17 8352/21 8352/22 8353/16 8353/18 8362/4 8362/5 8413/12 8416/9 8417/3 8420/9 8424/12 8445/23 8445/24 8477/14 8493/22 8494/9 8496/22 8520/10 8520/11 8522/14 8522/19 8545/2 8556/6
**informative** [1] 8414/6 8520/12
**informed** [4] 8354/17 8354/18 8354/22 8354/24
**informs** [1] 8429/6
**initial** [2] 8309/19 8470/4
**initiated** [2] 8385/8 8386/4
**initiatives** [1] 8465/5
**innocence** [2] 8407/20 8583/3
**Innovative** [1] 8379/2
**inquire** [1] 8532/23
**inserted** [2] 8418/4 8418/8
**insider** [1] 8467/11
**insignificance** [1] 8382/16
**insignificant** [3] 8381/17 8381/24 8383/20
**insist** [1] 8391/20
**insisted** [2] 8390/19 8390/24
**insistent** [2] 8432/23 8433/2
**instance** [1] 8334/17
**instances** [3] 8346/19 8431/8 8531/9
**instead** [2] 8343/11 8579/25

**I**

**Institutional [1]** 8462/20
**instruct [6]** 8323/11 8323/16 8326/5 8335/14 8403/12 8422/5
**instructed [4]** 8323/14 8407/17 8411/18 8416/21
**instruction [2]** 8335/23 8389/14
**instructions [2]** 8417/8 8422/11
**integrating [1]** 8538/18
**intend [2]** 8341/18 8360/22
**intent [4]** 8332/13 8407/3 8478/10 8480/21
**interaction [1]** 8445/15
**interactions [8]** 8443/4 8445/3 8445/6 8445/9 8445/21 8445/25 8449/21 8451/20
**interest [2]** 8315/5 8581/25
**interested [2]** 8467/18 8467/25
**interfere [1]** 8338/1
**intern [1]** 8416/20
**international [2]** 8369/10 8466/2
**interpret [1]** 8309/19
**interpreted [2]** 8545/23 8546/3
**interrupted [1]** 8426/18
**interrupting [1]** 8401/5
**interview [1]** 8348/8
**interviewed [4]** 8380/12 8383/8 8383/12 8384/20
**interviews [1]** 8384/12
**intrinsic [2]** 8550/24 8551/2
**introduce [2]** 8553/19 8553/20
**introduced [9]** 8370/4 8393/3 8393/13 8393/14 8393/17 8535/1 8535/2 8547/20 8550/3
**introducing [1]** 8393/12
**introductory [1]** 8460/21
**invalid [1]** 8316/7
**invest [3]** 8367/20 8477/16 8544/19
**invested [1]** 8521/2
**investigated [3]** 8539/12 8539/18 8539/23
**investigating [2]** 8338/25 8339/4
**investigator [1]** 8540/1
**investing [1]** 8477/10
**investment [14]** 8352/23 8364/21 8367/18 8367/19 8370/20 8374/23 8376/4 8377/20 8378/2 8472/7 8473/20 8477/12 8477/20 8489/14
**investments [5]** 8364/13 8365/3 8367/10 8376/6 8470/17
**investor [10]** 8317/13 8345/13 8370/4 8462/20 8464/12 8469/15 8472/3 8472/20 8544/21 8544/22
**investors [39]** 8317/11 8314/22 8316/21 8317/11 8318/12 8321/1 8382/23 8395/3 8464/16 8468/8 8469/15 8469/24 8471/17 8473/10 8473/13 8473/17 8473/18 8473/25 8480/25 8489/13 8489/14 8489/15 8489/16 8489/18 8489/22 8490/1 8503/5 8513/12 8513/25 8520/12 8520/17 8520/21 8520/22 8520/25 8521/5 8521/11 8526/21 8530/3 8544/19
**invests [1]** 8367/21
**invoices [1]** 8443/22
**involve [2]** 8454/23 8477/9
**involved [9]** 8310/9 8313/16 8326/18 8380/1 8424/9 8443/18 8518/18 8527/25 8541/2
**involvement [2]** 8380/8 8385/18
**involves [2]** 8452/10 8477/10
**involving [1]** 8476/7
**IOSCO [2]** 8466/6 8466/13
**irrelevant [2]** 8318/24 8319/13
**issuance [3]** 8478/22 8478/23 8479/23
**issue [34]** 8308/2 8308/18 8309/10 8313/11 8317/9 8321/22 8322/2 8322/16 8333/2 8333/14 8335/6 8340/5 8340/11 8355/18 8355/21 8362/11 8389/16 8405/22 8407/13 8407/16 8409/25 8411/24 8412/13 8416/23 8426/6 8427/6 8452/13 8462/4 8462/5 8467/20 8467/20 8470/16 8470/24 8470/25
**issued [5]** 8476/2 8476/6 8481/1 8512/5 8583/1

**issues [20]** 8308/7 8308/14 8309/5 8309/17 8337/3 8336/17 8383/21 8404/24 8406/1 8406/18 8409/17 8410/8 8411/17 8414/22 8426/3 8431/20 8433/9 8466/8 8583/3 8583/4
**issuing [1]** 8470/14
**it'll [1]** 8357/25
**Italy [1]** 8461/17
**itself [3]** 8318/16 8469/17 8471/9 8529/21 8530/2

**J**

**Jack [3]** 8370/14 8375/21 8376/18
**Jackson [1]** 8343/21
**JACOBS [63]** 8324/19 8324/24 8326/9 8342/19 8344/3 8345/2 8346/21 8355/5 8355/24 8360/8 8375/19 8386/10 8389/5 8389/15 8389/20 8391/17 8391/24 8400/17 8400/20 8400/22 8404/3 8404/6 8405/9 8408/13 8409/5 8409/15 8409/23 8410/4 8410/13 8411/7 8412/20 8414/1 8414/5 8414/12 8415/13 8415/14 8418/23 8418/24 8419/4 8419/10 8419/12 8419/18 8419/21 8420/6 8423/2 8424/20 8424/24 8426/3 8426/21 8426/22 8427/18 8430/21 8431/13 8432/15 8434/6 8452/10 8452/19 8453/2 8453/7 8454/8 8454/19 8454/21 8456/3
**Jacobs' [3]** 8349/1 8418/22 8431/3
**Jahrmarkt [4]** 8365/12 8365/12 8365/14 8365/14
**Jain's [1]** 8355/17
**January [48]** 8348/18 8350/6 8364/5 8478/19 8479/18 8480/3 8480/16 8481/20 8483/12 8485/6 8485/22 8486/3 8488/16 8495/1 8495/24 8496/3 8496/3 8498/4 8499/25 8512/6 8512/7 8512/17 8517/19 8523/9 8523/10 8525/15 8525/20 8526/8 8526/10 8526/17 8543/14 8543/18 8543/21 8545/4 8546/7 8546/7 8546/8 8546/9 8546/24 8567/8 8574/20 8579/17 8579/22 8580/18 8581/2 8581/6 8581/19 8582/3
**January 10th [2]** 8579/17 8579/22
**January 11 [1]** 8526/17
**January 14 [3]** 8525/15 8526/8 8526/10
**January 2013 [7]** 8495/1 8498/4 8512/7 8517/19 8567/8 8581/2 8581/6
**January 2014 [2]** 8499/25 8512/17
**January 28 [1]** 8523/10
**January 29 [1]** 8523/9
**January 9 [1]** 8525/20
**Jim [3]** 8385/7 8386/3 8386/5
**job [1]** 8371/20
**JOBS [2]** 8377/2 8377/16
**John [2]** 8364/12 8364/22
**Johnson [1]** 8324/8
**join [1]** 8348/6
**joint [1]** 8464/8
**jointly [1]** 8318/12
**JOSHUA [1]** 8342/9
**journal [11]** 8383/9 8462/18 8462/19 8463/2 8463/4 8463/4 8463/5 8463/6 8463/9 8463/10 8463/10
**journals [7]** 8462/17 8462/18 8462/23 8462/25 8463/1 8463/2 8463/8
**judge [22]** 8307/10 8335/23 8336/4 8336/5 8362/16 8532/23 8549/8 8549/19 8549/25 8550/22 8551/10 8551/17 8552/23 8552/25 8553/7 8554/7 8554/8 8555/8 8555/25 8559/7 8572/11 8577/3
**judgment [2]** 8432/8 8473/23
**July [4]** 8355/18 8355/19 8357/14 8381/1
**jumped [1]** 8568/1
**jumping [1]** 8414/9
**June [6]** 8355/19 8357/16 8357/23 8357/23 8499/3 8523/18
**June 20 [1]** 8523/18
**juror [1]** 8458/13
**jurors [8]** 8324/3 8324/14 8360/8 8422/9 8456/9 8458/9 8458/17 8511/2

**jury [76]** 8307/9 8307/10 8314/18 8316/18 8316/1 8320/24 8320/24 8321/5 8324/8 8324/15 8326/5 8330/25 8331/7 8332/12 8332/20 8334/21 8335/10 8335/14 8337/17 8337/22 8340/22 8341/24 8395/10 8403/12 8404/3 8411/15 8411/18 8411/23 8414/7 8415/9 8416/3 8416/5 8416/9 8416/22 8417/11 8417/15 8420/13 8422/5 8422/8 8422/12 8452/8 8452/20 8453/2 8453/3 8453/6 8453/7 8453/14 8454/6 8454/22 8454/23 8455/4 8455/5 8455/11 8455/23 8456/13 8458/1 8458/3 8458/15 8467/16 8492/15 8505/9 8508/2 8510/12 8511/1 8515/2 8517/9 8522/10 8526/3 8527/18 8530/7 8553/11 8569/10 8571/12 8575/11 8582/17 8582/25
**jury's [1]** 8335/24
**justice [1]** 8337/10

**K**

**KAM [1]** 8307/2
**Kanovsky [1]** 8337/9
**Karen [1]** 8368/24
**Kathleen [3]** 8375/22 8383/12 8384/13
**Katten [33]** 8333/18 8349/18 8354/12 8354/16 8364/6 8374/11 8379/1 8380/8 8381/1 8381/16 8381/17 8381/21 8381/24 8382/8 8382/12 8382/17 8383/25 8384/11 8385/12 8407/5 8434/9 8434/16 8436/6 8437/10 8443/6 8443/21 8447/14 8447/15 8447/25 8448/3 8448/13 8451/9 8451/15
**Katten's [1]** 8353/16
**keep [4]** 8362/9 8430/8 8490/5 8521/11
**keeping [1]** 8555/4
**keeps [2]** 8400/5 8414/8
**kept [2]** 8399/5 8423/22
**KESSLER [2]** 8307/16 8315/17
**Kevin [18]** 8486/14 8487/14 8488/1 8490/10 8494/15 8497/24 8497/25 8500/21 8506/11 8507/10 8507/11 8511/25 8515/7 8515/10 8517/15 8522/21 8526/10 8528/23
**key [3]** 8333/2 8440/23 8516/23
**kind [14]** 8349/19 8352/19 8354/12 8362/3 8380/5 8408/11 8409/4 8427/14 8444/4 8455/7 8471/5 8538/12 8576/17 8576/19
**kinds [2]** 8352/7 8404/24
**KIYO [1]** 8307/9
**Klein [11]** 8309/18 8311/8 8311/23 8314/11 8314/15 8316/14 8317/7 8317/12 8318/21 8322/25 8324/9
**Klein's [4]** 8318/1 8320/14 8321/13 8322/4
**knowing [1]** 8361/13
**knowledge [20]** 8352/24 8368/9 8368/11 8369/4 8374/5 8374/9 8375/25 8379/7 8381/15 8385/9 8385/15 8385/23 8386/18 8387/1 8445/20 8449/7 8540/19 8567/14 8567/25 8571/16
**known [4]** 8312/16 8381/11 8479/14 8538/12
**knows [6]** 8323/20 8340/1 8340/2 8353/12 8390/10 8403/1
**Kohan [1]** 8338/4
**Ks [1]** 8474/21

**L**

**L-e-w-i-s [1]** 8459/2
**L-u-x-e-Y-a-r-d [1]** 8364/15
**labeled [2]** 8492/23 8529/2
**lack [1]** 8416/23
**laid [1]** 8552/3
**land [1]** 8356/21
**Landau [1]** 8378/10
**landscape [1]** 8362/3
**large [23]** 8347/17 8347/18 8347/19 8364/25 8367/18 8367/21 8367/22 8367/23 8390/12 8374/3 8375/16 8375/17 8382/22 8390/10 8468/6 8482/4 8488/24 8489/1 8489/11 8489/12 8521/3 8524/17 8524/24
**large-scale [2]** 8524/17 8524/24
**largely [3]** 8464/23 8466/24 8466/24 8467/6

**L**

**larger** [1] 8522/24
**largest** [5] 8366/24 8369/24 8393/24 8471/3
8471/3
**last** [32] 8331/14 8331/20 8331/25 8332/25
8341/9 8352/4 8356/2 8359/25 8362/12
8362/25 8364/2 8369/12 8372/2 8372/5
8374/25 8378/7 8386/11 8403/14 8403/14
8404/19 8436/5 8442/18 8460/16 8461/16
8462/19 8463/13 8500/4 8509/5 8518/12
8519/19 8529/20 8564/20
**late** [5] 8331/16 8343/25 8344/1 8347/10
8357/14
**latitude** [4] 8341/7 8359/11 8449/22 8485/20
**law** [38] 8308/23 8309/20 8313/10 8331/14
8332/8 8332/24 8333/1 8333/5 8333/7 8333/22
8334/5 8334/6 8334/7 8334/11 8356/20
8357/21 8359/7 8374/3 8376/25 8381/24
8385/12 8399/3 8399/4 8405/23 8409/3 8415/3
8415/9 8415/10 8415/16 8415/17 8419/2
8423/20 8423/21 8443/6 8460/13 8460/14
8460/15 8518/15
**lawful** [1] 8308/25
**laws** [3] 8309/21 8321/11 8321/20
**lawsuit** [7] 8312/19 8319/6 8381/13 8385/8
8386/4 8412/15 8413/20
**lawsuits** [2] 8309/12 8390/9
**lawyer** [24] 8312/4 8313/16 8314/19 8315/16
8315/21 8317/19 8318/4 8318/5 8319/1
8319/12 8320/5 8320/15 8321/15 8321/17
8332/3 8368/23 8400/4 8413/18 8413/21
8413/22 8413/22 8441/19 8460/15 8518/17
**lawyers** [5] 8311/25 8313/9 8314/23 8372/13
8379/3
**lay** [2] 8363/11 8415/18
**laying** [1] 8449/20
**lead** [5] 8375/2 8375/7 8390/9 8449/8 8540/1
**leader** [1] 8383/8
**leading** [16] 8328/12 8332/23 8379/8 8383/7
8388/14 8390/16 8413/7 8447/21 8449/6
8450/12 8450/14 8462/17 8463/2 8485/10
8485/11 8517/25
**learn** [2] 8334/6 8347/21
**learned** [6] 8347/22 8348/3 8384/20 8407/17
8414/10
**lease** [1] 8424/11
**least** [6] 8383/11 8414/7 8527/21 8528/1
8528/2 8559/24
**leave** [1] 8404/22
**leaving** [2] 8402/14 8433/3
**led** [1] 8347/23
**LEE** [1] 8307/20
**left** [14] 8324/24 8341/19 8364/2 8381/13
8434/16 8466/21 8475/22 8497/7 8505/12
8505/22 8508/9 8511/18 8563/15 8573/23
**left-hand** [3] 8475/22 8505/12 8505/22
**legal** [8] 8318/11 8319/7 8319/8 8319/16
8383/7 8404/9 8409/11 8438/25
**legally** [1] 8313/7
**legitimacy** [1] 8312/15
**legitimate** [2] 8315/4 8315/5
**lenient** [1] 8359/18
**less** [9] 8354/20 8354/21 8414/21 8472/11
8472/12 8482/12 8562/25 8567/15 8573/11
**letter** [19] 8315/18 8339/13 8339/15 8360/3
8360/4 8360/11 8404/7 8405/21 8412/14
8412/22 8413/13 8414/24 8415/6 8420/25
8437/3 8437/6 8456/23 8553/24 8554/2
**letters** [1] 8437/9
**level** [5] 8344/14 8476/24 8483/19 8483/20
8521/17
**Lewis** [47] 8324/8 8458/20 8458/22 8459/1
8459/24 8468/22 8469/2 8469/4 8480/10
8487/1 8489/8 8491/16 8511/7 8522/10
8527/18 8532/3 8535/3 8535/10 8536/4
8536/21 8537/1 8537/2 8537/16 8537/22
8539/16 8540/5 8540/11 8544/7 8545/7
8546/10 8546/17 8546/21 8557/9 8558/5

8558/8 8560/2 8560/8 8560/20 8563/13
8563/25 8564/1 8566/10 8573/17 8573/20
8574/18 8575/16 8575/20
**Lewis'** [1] 8308/9
**liability** [1] 8319/16
**licensing** [3] 8368/25 8370/7 8385/5
**lies** [1] 8401/1
**life** [1] 8371/19
**lifecycle** [1] 8472/5
**lighter** [2] 8471/23 8507/2
**likelihood** [1] 8427/10
**likely** [3] 8409/25 8414/21 8532/13
**limit** [2] 8335/24 8391/17
**limited** [3] 8321/14 8408/2 8485/11
**limits** [1] 8354/12
**Lindsay** [6] 8314/25 8345/8 8345/12 8345/14
8345/15 8412/14
**line** [16] 8327/7 8363/6 8389/15 8399/17
8399/20 8420/12 8423/3 8428/14 8483/3
8505/14 8505/15 8546/8 8559/14 8578/7
8578/8 8578/9
**line 20** [2] 8578/7 8578/9
**line 8** [1] 8578/8
**line 8195** [1] 8399/17
**lines** [7] 8325/1 8398/25 8399/17 8405/10
8423/18 8428/23 8538/19
**lines 10** [1] 8398/25
**lines 24** [1] 8399/17
**liquidity** [1] 8489/20
**list** [9] 8350/17 8352/20 8352/21 8354/21
8354/23 8419/7 8470/5 8481/15 8482/10
**listed** [15] 8311/25 8364/3 8385/3 8471/7
8471/16 8472/9 8472/13 8481/12 8481/21
8482/3 8482/4 8482/15 8528/16 8546/18
8561/20
**listen** [2] 8320/4 8432/16
**listener** [25] 8325/18 8326/7 8330/23 8330/25
8331/5 8332/14 8332/18 8332/20 8333/7
8335/13 8346/22 8356/5 8358/4 8361/13
8389/19 8407/25 8408/2 8416/22 8417/7
8417/10 8417/18 8420/2 8420/5 8420/6
8421/12
**listing** [1] 8469/21
**lists** [1] 8555/14
**litany** [1] 8333/21
**Literally** [1] 8553/24
**litigate** [5] 8314/7 8419/1 8419/22 8426/2
8467/10
**litigated** [1] 8331/17
**litigating** [1] 8385/13
**litigation** [43] 8310/15 8311/1 8311/15 8312/2
8312/17 8313/21 8314/20 8314/21 8314/22
8317/25 8321/3 8321/3 8323/9 8327/22 8328/2
8328/6 8328/10 8328/19 8328/22 8331/9
8385/4 8385/14 8410/16 8410/24 8411/2
8411/21 8412/4 8413/9 8414/4 8414/18
8415/12 8415/19 8415/20 8416/5 8416/7
8416/13 8416/15 8416/18 8416/19 8417/1
8427/21 8427/22 8465/6
**litigations** [3] 8385/6 8385/16 8385/19
**litigator** [1] 8312/5
**litigators** [4] 8427/22 8427/25 8428/5 8428/7
**live** [2] 8313/15 8455/3
**load** [1] 8460/18
**loaded** [3] 8343/11 8360/14 8455/17
**loan** [1] 8424/11
**loans** [2] 8395/2 8395/3
**located** [2] 8459/16 8466/14
**locating** [1] 8490/19
**lock** [1] 8308/22
**lock-up** [1] 8308/22
**long-standing** [2] 8368/23 8376/15
**look** [58] 8322/14 8331/13 8339/17 8340/10
8341/6 8341/12 8341/13 8348/14 8350/2
8352/20 8356/7 8356/12 8356/12 8359/7
8361/21 8366/9 8366/12 8380/24 8384/6
8385/1 8396/16 8397/15 8416/12 8419/6
8419/7 8421/14 8433/13 8433/15 8433/16

8442/3 8457/1 8467/17 8474/23 8475/23
8491/12 8495/1 8500/10 8502/7 8502/23
8502/17 8514/6 8514/7 8514/8 8514/9 8514/10
8515/9 8515/15 8518/4 8522/22 8526/23
8526/25 8532/10 8536/18 8549/18 8557/9
8564/19 8576/16 8581/11
**looked** [15] 8332/25 8467/25 8468/2 8497/25
8516/22 8530/8 8545/13 8553/4 8555/5
8559/21 8559/24 8564/8 8564/10 8566/14
8566/18
**looking** [15] 8360/3 8366/14 8378/20 8428/19
8467/22 8495/21 8502/19 8503/17 8503/20
8507/2 8514/4 8530/12 8563/15 8566/8
8572/24
**looks** [2] 8322/14 8515/3
**loophole** [1] 8399/23
**lose** [2] 8477/12 8477/20
**losing** [1] 8360/8
**lost** [1] 8485/25
**lottery** [2] 8472/15 8472/17
**love** [1] 8433/10
**low** [4] 8482/8 8521/7 8521/8 8530/25
**lower** [9] 8475/22 8478/16 8482/1 8493/25
8495/22 8496/11 8497/12 8505/12 8531/18
**lowers** [1] 8514/2
**lowest** [1] 8414/20
**loyalty** [2] 8334/7 8439/18
**lunch** [8] 8371/7 8452/20 8454/22 8456/9
8456/11 8456/12 8457/5 8582/21
**lunches** [1] 8371/18
**LuxeYard** [3] 8364/13 8364/15 8365/8
**lying** [2] 8340/21 8340/22

**M**

**Madison** [2] 8459/9 8460/7
**mail** [5] 8417/17 8417/25 8418/1 8418/9
8419/9
**mailed** [1] 8308/6
**main** [2] 8374/3
**maintain** [4] 8361/8 8362/8 8461/9 8481/9
**maintained** [1] 8503/2
**maintenance** [1] 8464/12
**major** [7] 8380/12 8382/21 8382/24 8384/18
8384/23 8385/7 8386/4
**majority** [2] 8374/15 8504/19
**maker** [5] 8472/21 8472/22 8473/3 8513/24
8514/1
**makers** [2] 8472/24 8473/1
**makings** [1] 8465/4
**man** [3] 8406/8 8426/16 8432/7
**manage** [1] 8447/16
**management** [10] 8352/23 8355/8 8368/16
8444/11 8444/22 8447/6 8447/7 8447/9
8459/19 8461/14
**manager** [1] 8353/1
**mandatory** [2] 8469/17 8474/19
**manipulation** [8] 8526/20 8539/13 8539/18
8539/21 8539/24 8576/6 8577/19 8580/12
**manner** [3] 8312/14 8482/8 8503/1
**March** [6] 8392/20 8392/21 8392/24 8499/12
8524/8 8524/11
**March 12** [1] 8524/11
**March 2013** [1] 8499/12
**March 8** [1] 8524/8
**Marek** [15] 8487/16 8488/1 8490/10 8492/17
8497/13 8497/15 8500/20 8506/8 8506/25
8507/1 8517/14 8522/24 8524/6 8541/13
8563/3
**mark** [2] 8380/22 8381/12
**marked** [6] 8536/8 8554/17 8564/13 8564/16
8564/17 8566/16
**market** [38] 8462/21 8466/7 8466/16 8467/5
8467/8 8467/14 8467/18 8470/25 8471/14
8471/15 8471/19 8471/23 8472/1 8472/3
8472/21 8472/22 8472/24 8473/1 8473/3
8473/24 8473/24 8474/2 8476/23 8476/25
8477/19 8481/16 8513/11 8513/24 8513/25
8514/1 8527/10 8528/8 8539/12 8539/18

**M**

market... **[4]** 8539/20 8539/24 8576/6 8577/18
marketing **[5]** 8371/18 8384/21 8393/5
8393/13 8393/22
markets **[11]** 8462/8 8462/12 8464/13 8464/14
8464/15 8466/9 8467/3 8467/12 8468/22
8469/2 8481/8
Martin **[22]** 8313/10 8319/16 8412/15 8443/24
8486/9 8486/13 8490/10 8496/9 8496/10
8499/19 8500/23 8506/15 8511/25 8512/1
8514/17 8515/7 8517/16 8518/6 8523/23
8528/24 8529/4 8541/23
Martin's **[1]** 8319/19
masters **[3]** 8459/8 8459/11 8460/25
MASTRO **[1]** 8307/19
Mastro's **[1]** 8453/1
match **[1]** 8507/15
material **[3]** 8384/21 8412/12 8474/20
materially **[2]** 8477/17 8550/23
math **[2]** 8563/8 8573/15
math's **[1]** 8495/5
MATSUMOTO **[1]** 8307/9
matter **[15]** 8317/1 8323/21 8344/2 8375/25
8380/9 8416/4 8427/23 8513/8 8513/19 8516/4
8519/3 8527/3 8539/9 8550/9 8551/7
matters **[8]** 8344/1 8368/25 8369/2 8370/6
8385/5 8406/1 8407/8 8464/24
May 17 **[1]** 8524/14
MBA **[5]** 8460/25 8461/5 8461/5 8461/7 8461/8
mean **[34]** 8320/1 8327/1 8335/8 8347/18
8351/4 8353/3 8357/11 8357/17 8359/15
8359/16 8359/25 8364/7 8366/6 8367/19
8367/22 8371/24 8399/22 8415/2 8415/17
8443/14 8468/5 8472/6 8472/7 8476/8 8476/15
8479/12 8479/13 8494/4 8509/3 8520/7 8525/5
8536/3 8544/21 8564/5
Meaning **[1]** 8328/19
means **[12]** 8401/3 8429/3 8462/4 8476/9
8476/16 8478/12 8478/13 8479/22 8479/23
8482/11 8492/19 8494/5
meant **[1]** 8560/11
meantime **[1]** 8334/1
measure **[1]** 8565/13
mechanical **[1]** 8307/24
media **[1]** 8321/7
Medium **[1]** 8365/1
meet **[7]** 8371/20 8450/22 8452/1 8471/6
8471/7 8519/9 8558/12
meeting **[15]** 8371/18 8437/15 8440/5 8442/18
8442/20 8442/25 8446/17 8446/18 8450/25
8451/3 8451/9 8451/11 8451/12 8451/14
8451/22
meetings **[9]** 8363/5 8371/8 8393/13 8393/17
8393/21 8393/22 8519/17 8519/21 8534/1
member **[1]** 8377/19
members **[6]** 8324/15 8377/22 8444/13 8528/1
8528/2 8528/17
memo **[14]** 8318/16 8319/17 8319/18 8348/17
8366/10 8366/14 8368/16 8371/1 8372/9
8372/21 8374/25 8376/8 8377/15 8378/7
memoranda **[5]** 8348/11 8377/2 8377/6
8377/12 8378/20
memorandum **[3]** 8441/9 8441/24 8442/2
memos **[12]** 8348/23 8349/4 8349/20 8355/5
8361/2 8362/13 8363/3 8363/5 8363/9 8363/10
8372/11 8442/4
mention **[1]** 8355/7
mentioned **[6]** 8368/13 8380/10 8390/18
8470/11 8484/6 8484/21
mentioning **[3]** 8366/25 8369/6 8373/3
mentions **[3]** 8374/21 8375/21 8386/9
mentor **[8]** 8334/24 8335/11 8336/1 8378/13
8400/23 8407/5 8407/18 8420/9
merger **[18]** 8370/7 8394/11 8396/8 8396/12
8396/20 8398/8 8399/11 8423/8 8470/12
8475/4 8475/8 8475/9 8475/13 8475/15
8475/18 8475/18 8475/20 8561/14
Mergers **[1]** 8376/25

meritorious **[2]** 8314/23 8316/10
met **[14]** 8379/13 8393/23 8449/10 8442/10
8442/13 8442/15 8443/24 8444/17 8450/22
8469/6 8518/14 8519/13 8519/19 8533/8
methods **[1]** 8460/23
mic **[1]** 8579/12
Michael **[6]** 8365/12 8365/14 8385/5 8385/11
8385/14 8385/16
mid **[1]** 8507/23
mid-afternoon **[1]** 8507/23
middle **[5]** 8346/1 8355/15 8363/7 8497/10
8515/12
midnight **[1]** 8360/20
might **[44]** 8310/6 8310/9 8310/17 8311/22
8312/6 8313/14 8313/18 8314/5 8314/9
8315/13 8315/16 8315/16 8317/18 8317/18
8318/1 8318/4 8318/18 8318/22 8319/2
8320/16 8322/5 8322/22 8327/19 8340/16
8355/19 8363/13 8392/20 8400/11 8402/3
8408/21 8416/4 8416/10 8437/13 8441/25
8452/8 8455/21 8467/24 8468/9 8468/10
8489/22 8507/22 8520/21 8521/7 8576/8
Milan **[1]** 8461/17
million **[12]** 8367/23 8481/4 8487/10 8487/25
8561/10 8561/20 8561/21 8562/9 8573/14
8575/4 8575/4 8575/6
mind **[37]** 8309/10 8311/20 8313/25 8314/1
8315/25 8320/8 8330/20 8330/21 8332/13
8333/1 8333/6 8333/14 8334/22 8335/9
8335/21 8336/18 8337/2 8337/5 8337/15
8337/23 8338/14 8339/5 8339/6 8339/8 8339/9
8340/7 8389/22 8404/12 8405/8 8405/23
8407/3 8410/23 8413/12 8416/10 8419/12
8420/7 8538/10
minded **[1]** 8507/25
mindful **[2]** 8354/9 8411/17
mine **[2]** 8330/20 8495/5
Minkoff **[1]** 8324/9
Minkoff's **[2]** 8309/3 8309/14
minus **[1]** 8574/12
minute **[13]** 8331/20 8331/25 8396/6 8429/16
8429/20 8429/22 8429/25 8430/23 8434/23
8435/9 8446/2 8453/13 8531/6
minutes **[8]** 8392/10 8429/12 8429/24 8446/20
8446/20 8453/24 8508/3 8559/11
missing **[3]** 8458/13 8508/16 8508/22
mission **[1]** 8538/19
misspoke **[1]** 8549/10
misstatement **[1]** 8401/21
mistake **[1]** 8356/10
misunderstood **[1]** 8410/1
mixes **[1]** 8513/1
models **[1]** 8472/12
mom **[1]** 8544/22
moment **[7]** 8316/5 8397/14 8532/21 8539/2
8558/4 8564/13 8575/17
money **[25]** 8314/2 8316/20 8317/11 8326/24
8367/21 8376/5 8399/6 8423/23 8428/1
8443/21 8447/14 8447/15 8448/16 8464/16
8470/5 8470/17 8470/24 8473/22 8479/25
8480/3 8482/12 8482/12 8482/13 8486/6
8489/19
monitor **[1]** 8333/17
month **[23]** 8492/18 8493/1 8493/1 8493/6
8493/7 8493/14 8493/23 8494/23 8500/21
8505/25 8506/3 8506/21 8507/16 8509/12
8562/22 8567/3 8567/15 8567/23 8568/2
8573/8 8574/19 8580/17 8581/1
month-to-month **[1]** 8493/1
monthly **[10]** 8492/17 8496/23 8498/23
8499/10 8499/19 8500/12 8500/15 8516/25
8572/18 8580/17
months **[13]** 8372/9 8492/20 8492/22 8495/2
8495/3 8495/4 8495/16 8496/3 8497/5 8497/5
8506/3 8516/25 8517/12
Moriarty **[3]** 8375/22 8383/12 8384/13
morning **[16]** 8324/15 8332/6 8360/20 8360/24
8376/16 8392/8 8400/19 8401/1 8404/8

8410/10 8442/19 8442/20 8456/17 8582/19
8582/24 8583/5
most **[7]** 8441/2 8467/14 8467/24 8482/6
8498/18 8520/25 8554/7
mostly **[1]** 8551/14
motion **[3]** 8308/8 8343/11 8361/23
mouth **[1]** 8401/15
move **[20]** 8339/20 8361/2 8362/13 8362/13
8363/20 8398/21 8400/8 8409/18 8409/19
8422/11 8422/24 8424/24 8424/25 8425/1
8426/10 8430/13 8432/10 8468/21 8478/13
8559/9
moved **[2]** 8398/20 8566/7
moving **[11]** 8362/9 8373/16 8374/10 8374/13
8387/7 8394/5 8394/17 8402/19 8404/16
8407/22 8422/16
**Mr. [434]**
Mr. Aselage **[1]** 8406/11
Mr. Biestek **[6]** 8492/20 8492/22 8493/7
8493/12 8524/12 8570/10
Mr. Brodsky **[24]** 8331/11 8332/19 8354/11
8382/4 8396/4 8396/10 8399/22 8402/14
8402/16 8404/19 8408/17 8409/3 8409/13
8410/1 8410/3 8421/3 8426/2 8431/6 8431/19
8437/14 8442/12 8442/13 8443/3 8457/22
Mr. Brodsky's **[4]** 8340/10 8397/13 8399/14
8409/22
Mr. Carter **[5]** 8484/13 8484/19 8485/4
8486/11 8511/6
Mr. Chan **[3]** 8308/5 8320/19 8323/11
Mr. Chris **[1]** 8365/12
Mr. Cotton **[2]** 8385/16 8583/13
Mr. Fernandez **[4]** 8494/9 8494/11 8513/15
8517/17
Mr. Ferruolo **[1]** 8308/18
Mr. Greebel **[185]** 8309/7 8311/5 8311/8
8311/19 8312/3 8312/6 8313/12 8313/20
8313/20 8313/24 8314/11 8315/2 8315/12
8315/14 8315/19 8317/10 8317/14 8318/16
8319/8 8319/15 8320/7 8320/8 8321/17
8322/11 8322/13 8322/16 8325/1 8325/2
8325/8 8325/9 8325/25 8326/11 8326/11
8326/13 8327/8 8327/14 8327/22 8328/2
8328/4 8328/8 8330/5 8331/4 8331/11 8332/18
8333/19 8334/6 8334/9 8335/17 8339/25
8340/1 8340/3 8344/10 8345/3 8345/5 8345/15
8345/20 8345/23 8346/5 8346/14 8346/17
8346/21 8348/1 8348/16 8348/24 8350/4
8350/17 8355/21 8355/24 8358/20 8360/7
8366/14 8371/12 8371/13 8371/16 8371/17
8372/21 8374/6 8378/21 8386/19 8386/21
8387/2 8387/8 8387/12 8387/16 8387/18
8387/25 8388/12 8388/21 8388/21 8389/6
8389/8 8389/16 8389/25 8390/14 8390/19
8390/23 8390/23 8391/3 8391/12 8391/15
8391/18 8392/13 8393/1 8393/12 8393/22
8394/2 8394/3 8394/3 8394/20 8394/20 8396/7
8397/2 8397/6 8399/11 8399/15 8399/19
8400/13 8400/14 8400/20 8400/24 8402/23
8402/23 8403/8 8403/8 8404/3 8404/12
8404/22 8407/7 8407/17 8408/4 8408/11
8408/18 8409/11 8409/24 8410/5 8410/14
8412/14 8412/16 8413/6 8413/12 8414/5
8415/5 8416/9 8417/2 8417/24 8418/1 8418/1
8418/12 8418/23 8418/24 8419/2 8419/10
8419/12 8420/6 8420/21 8420/23 8422/21
8422/21 8424/5 8428/12 8428/14 8428/25
8429/6 8429/12 8434/17 8434/23 8435/6
8442/5 8443/5 8445/4 8445/7 8445/10 8445/13
8445/16 8445/20 8445/24 8449/12 8450/9
8450/18 8450/21 8450/25 8451/4 8451/21
8451/25 8469/8
Mr. Greebel's **[25]** 8311/22 8311/23 8312/8
8314/19 8315/24 8320/17 8334/5 8334/11
8340/7 8347/2 8348/11 8369/17 8377/4
8394/15 8397/20 8402/18 8404/4 8407/3
8420/8 8422/15 8431/2 8449/25 8450/2 8450/6
8452/1

## M

**Mr. Jacobs [58]** 8324/24 8326/9 8342/19 8344/3 8345/2 8346/21 8355/5 8355/24 8360/8 8389/5 8389/15 8389/20 8391/17 8391/24 8400/17 8400/20 8400/22 8404/3 8404/6 8405/9 8408/13 8409/5 8409/15 8409/23 8410/4 8411/3 8411/7 8412/20 8414/1 8414/5 8414/12 8415/3 8415/14 8418/23 8418/24 8419/4 8419/10 8419/12 8419/18 8419/21 8420/6 8423/2 8424/20 8424/24 8426/3 8426/21 8426/22 8430/21 8431/13 8432/15 8434/6 8452/10 8452/19 8453/2 8453/7 8454/8 8454/21 8456/3
**Mr. Jacobs' [3]** 8349/1 8418/22 8431/3
**Mr. Jain's [1]** 8355/17
**Mr. Kessler [1]** 8315/17
**Mr. Lewis [2]** 8324/8 8511/7
**Mr. Lewis' [1]** 8308/9
**Mr. Martin [3]** 8443/24 8523/23 8529/4
**Mr. Mastro's [1]** 8453/1
**Mr. Minkoff's [1]** 8309/14
**Mr. Mulleady [13]** 8494/19 8494/21 8494/23 8503/25 8504/2 8504/8 8504/19 8517/20 8524/9 8524/15 8525/16 8529/4 8570/10
**Mr. Pierotti [19]** 8504/12 8504/13 8504/16 8504/17 8504/18 8516/17 8517/22 8530/11 8563/17 8567/20 8570/21 8571/13 8572/3 8572/8 8573/19 8574/12 8574/23 8580/23 8580/25
**Mr. Pierotti's [3]** 8516/14 8568/1 8571/10
**Mr. Pitluck [8]** 8491/14 8578/23 8580/18 8581/1 8581/5 8581/19 8582/3 8582/13
**Mr. Rosenwald [6]** 8317/23 8317/24 8318/6 8414/25 8583/9 8583/10
**Mr. Rosenwald's [2]** 8315/10 8315/17
**Mr. Shkreli [17]** 8309/12 8313/3 8318/13 8418/1 8445/13 8445/16 8445/21 8445/24 8449/12 8450/8 8450/17 8450/21 8451/1 8451/3 8451/20 8454/10 8562/17
**Mr. Shkreli's [4]** 8313/22 8454/2 8454/6 8454/11
**Mr. Sullivan [5]** 8495/10 8498/10 8513/17 8523/18 8570/15
**Mr. Sullivan's [1]** 8498/18
**Mr. Tilles [2]** 8495/14 8495/15
**Mr. Vaino [19]** 8495/20 8495/21 8495/25 8499/11 8503/9 8503/23 8504/10 8504/11 8504/18 8509/7 8523/12 8523/14 8523/23 8525/17 8529/6 8567/17 8567/22 8580/23 8580/25
**Mr. Verde [3]** 8354/17 8354/18 8354/19
**MR.Jacobs [1]** 8334/16
**Ms. [25]** 8309/18 8311/8 8311/23 8314/11 8314/15 8316/14 8317/7 8317/12 8318/21 8320/14 8321/13 8322/4 8322/25 8397/25 8428/19 8446/11 8447/3 8447/12 8449/13 8508/6 8509/5 8511/4 8549/4 8578/22 8579/13
**Ms. Denerstein [6]** 8508/6 8509/5 8511/4 8549/4 8578/22 8579/13
**Ms. Klein [10]** 8309/18 8311/8 8311/23 8314/11 8314/15 8316/14 8317/7 8317/12 8318/21 8322/25
**Ms. Klein's [3]** 8320/14 8321/13 8322/4
**Ms. Smith [5]** 8397/25 8428/19 8446/11 8447/3 8449/13
**Ms. Smith's [1]** 8447/12
**MSMB [21]** 8313/3 8317/11 8318/12 8318/13 8319/9 8320/10 8333/20 8412/15 8436/5 8436/8 8436/16 8436/22 8437/3 8443/19 8443/19 8444/20 8444/22 8444/25 8445/4 8445/7 8447/11
**Muchin [13]** 8333/18 8381/1 8381/17 8381/24 8382/17 8383/25 8384/11 8385/12 8434/9 8434/16 8443/6 8451/9 8451/15
**Muchin's [3]** 8380/8 8381/21 8443/21
**Mulleady [31]** 8486/14 8487/14 8488/1 8490/10 8494/15 8494/19 8494/21 8494/23 8497/24 8498/1 8500/21 8503/25 8504/2

8504/8 8504/19 8506/11 8507/10 8507/11 8521/1 8521/7 8516/10 8517/19 8517/20 8522/21 8524/9 8524/15 8525/16 8526/10 8528/23 8529/4 8570/10
**multi [5]** 8352/25 8360/11 8367/23 8367/23 8367/25
**multi-billion [3]** 8352/25 8367/23 8367/25
**Multi-million [1]** 8367/23
**multi-page [1]** 8360/11
**multiple [6]** 8330/9 8331/21 8333/8 8341/23 8433/6 8433/12
**must [2]** 8311/5 8323/16
**mutual [1]** 8521/3
**MYLAN [1]** 8307/20

## N

**name [21]** 8345/10 8353/4 8366/19 8366/25 8367/16 8369/6 8370/17 8373/3 8373/25 8375/11 8386/9 8458/25 8459/1 8506/5 8518/16 8518/17 8533/6 8535/4 8537/14 8576/24 8579/4
**named [2]** 8379/1 8486/17
**names [6]** 8352/3 8355/7 8364/9 8375/18 8486/15 8487/11
**naming [9]** 8369/3 8373/7 8373/20 8374/17 8375/9 8375/25 8394/24 8394/25 8424/8
**narrative [1]** 8400/2
**narrow [2]** 8407/14 8408/1
**narrowly [3]** 8360/23 8362/11 8427/5
**Nasdaq [22]** 8385/3 8471/2 8471/3 8471/6 8471/7 8471/20 8471/24 8472/9 8476/19 8478/10 8478/14 8481/16 8481/21 8481/25 8482/3 8482/4 8482/12 8482/17 8483/15 8483/18 8483/21 8484/8
**Nasdaq-listed [1]** 8385/3
**Nashville [1]** 8459/17
**national [1]** 8383/9
**nature [12]** 8338/20 8352/19 8354/1 8367/13 8370/18 8374/18 8375/10 8375/11 8375/25 8376/21 8386/16 8578/3
**near [1]** 8382/25
**nearly [7]** 8563/22 8563/24 8565/21 8567/6 8567/7 8567/14 8573/22
**necessarily [3]** 8412/11 8427/12 8439/12
**necessary [8]** 8346/19 8388/8 8388/13 8388/23 8389/10 8390/2 8403/11 8418/9
**need [33]** 8318/21 8320/2 8323/11 8341/12 8351/1 8384/7 8384/8 8389/20 8394/7 8406/15 8408/6 8413/19 8415/3 8430/17 8430/21 8430/25 8431/21 8453/14 8456/15 8470/17 8489/19 8491/14 8508/20 8529/23 8529/23 8531/6 8536/19 8544/19 8544/23 8548/10 8577/1 8583/5 8583/6
**needed [2]** 8447/1 8481/9
**needs [5]** 8323/14 8339/16 8407/24 8408/25 8430/10
**net [75]** 8492/23 8493/1 8493/8 8493/14 8493/14 8493/16 8493/19 8493/24 8494/1 8494/3 8494/4 8494/21 8494/25 8494/25 8495/1 8495/10 8495/15 8495/22 8496/12 8496/17 8497/11 8498/10 8499/15 8500/8 8500/13 8500/15 8500/24 8501/25 8502/8 8502/12 8502/22 8502/24 8503/13 8503/15 8505/10 8505/11 8505/15 8505/23 8505/24 8507/9 8507/11 8515/3 8515/12 8515/19 8515/21 8515/25 8517/23 8518/3 8518/6 8518/7 8518/8 8525/7 8525/8 8526/11 8532/1 8532/4 8532/7 8532/18 8562/21 8563/8 8566/10 8566/21 8573/2 8573/3 8574/21 8574/22 8575/8 8575/9 8580/9 8580/17 8580/17 8580/21 8581/5 8582/3
**never [28]** 8316/7 8316/23 8358/1 8376/10 8376/13 8382/25 8412/22 8443/24 8444/2 8444/4 8444/15 8444/16 8444/17 8444/19 8444/22 8444/25 8453/21 8454/25 8533/8 8539/12 8539/18 8540/1 8545/25 8546/3 8554/3 8564/3 8564/5 8571/5
**new [27]** 8307/1 8307/4 8307/13 8307/14

830Z/18 8307/18 8309/19 8321/6 8367/6 8367/8 8368/16 8371/9 8372/1 8372/2 8372/2 8376/17 8377/19 8378/9 8380/3 8383/10 8461/19 8461/20 8464/16 8470/17 8481/8 8519/19 8533/7
**news [1]** 8520/15
**newsletter [1]** 8377/15
**newsletters [1]** 8380/11
**newspaper [3]** 8380/22 8380/24 8381/3
**next [62]** 8328/25 8333/17 8344/23 8351/7 8358/16 8363/23 8367/4 8368/1 8368/22 8369/11 8370/3 8370/12 8371/3 8372/14 8373/14 8374/13 8374/20 8375/19 8376/15 8376/23 8378/5 8379/21 8386/8 8387/7 8395/12 8398/24 8407/7 8409/19 8415/23 8425/4 8433/22 8449/25 8450/2 8450/6 8452/22 8455/25 8456/10 8458/18 8468/9 8476/3 8479/1 8479/8 8490/22 8492/21 8495/12 8495/20 8496/7 8497/18 8497/24 8498/6 8498/21 8499/7 8500/24 8517/19 8522/15 8522/23 8523/15 8529/1 8548/15 8556/11 8558/11 8583/11
**night [4]** 8331/14 8332/25 8442/18 8582/22
**nine [1]** 8428/24
**nominated [1]** 8461/4
**nominating [1]** 8377/21
**non [5]** 8328/12 8373/12 8413/7 8443/11 8443/16
**non-equity [2]** 8443/11 8443/16
**non-leading [2]** 8328/12 8413/7
**nonbillable [2]** 8371/23 8371/24
**nondescript [1]** 8379/16
**None [1]** 8555/21
**nonequity [1]** 8385/14
**nonetheless [1]** 8320/22
**normal [1]** 8544/22
**Northlight [4]** 8364/16 8365/10 8365/15 8393/24
**note [5]** 8330/6 8476/1 8476/2 8508/5 8542/12
**notebook [1]** 8430/8
**notebooks [1]** 8507/24
**notes [8]** 8428/17 8428/18 8430/6 8438/17 8438/24 8440/5 8446/19 8477/15
**nothing [10]** 8310/18 8311/23 8318/14 8319/18 8334/24 8357/19 8397/1 8397/23 8413/18 8578/20
**notice [1]** 8341/18
**noticed [4]** 8322/8 8361/21 8362/25 8508/5
**notification [1]** 8448/14
**November [4]** 8498/17 8498/18 8499/3 8499/4
**November 2013 [1]** 8499/3
**number [54]** 8325/6 8378/15 8382/23 8386/12 8386/25 8387/3 8410/18 8426/24 8461/3 8461/12 8462/2 8462/16 8462/22 8463/8 8463/25 8465/4 8466/8 8467/8 8472/24 8473/3 8473/18 8482/5 8482/20 8487/4 8489/16 8492/19 8493/5 8493/6 8493/25 8497/8 8501/18 8502/2 8505/23 8505/25 8505/24 8516/7 8516/8 8516/12 8517/11 8519/14 8519/15 8523/2 8523/3 8526/21 8527/1 8527/23 8528/3 8528/4 8528/6 8529/8 8529/9 8570/2 8570/3 8573/16
**numbers [5]** 8493/1 8528/19 8528/20 8530/9 8530/11
**numerical [1]** 8505/1

## O

**object [21]** 8330/18 8342/7 8346/23 8353/3 8358/6 8362/6 8363/13 8363/14 8363/17 8363/18 8363/19 8405/4 8405/11 8414/14 8430/9 8430/23 8449/3 8449/5 8485/9 8524/19 8548/9
**objected [8]** 8330/17 8397/10 8397/25 8398/15 8398/25 8406/17 8406/18 8417/8
**objecting [5]** 8397/17 8414/8 8414/9 8417/25 8508/24
**objection [114]** 8325/10 8325/11 8325/16 8326/4 8327/3 8327/23 8328/5 8328/7 8328/11

## O

**objection... [105]** 8328/13 8328/14 8328/23 8330/19 8346/9 8346/24 8349/1 8349/4 8350/11 8350/13 8352/4 8352/12 8353/17 8354/4 8354/19 8356/8 8356/14 8356/17 8356/25 8357/22 8358/4 8359/6 8359/25 8361/8 8362/6 8366/3 8381/18 8381/25 8382/19 8383/21 8384/2 8384/15 8384/16 8385/20 8387/21 8387/22 8388/14 8388/25 8389/13 8390/16 8391/10 8394/6 8396/23 8398/16 8398/18 8398/18 8400/6 8400/9 8401/2 8401/16 8404/2 8404/23 8405/14 8410/12 8410/19 8410/25 8414/12 8418/7 8427/10 8432/14 8435/1 8438/3 8439/21 8439/23 8440/25 8441/14 8447/21 8448/6 8448/8 8448/22 8449/6 8449/18 8450/12 8451/11 8451/16 8451/23 8456/2 8468/25 8488/10 8492/6 8501/8 8501/23 8506/24 8510/11 8514/21 8517/4 8517/25 8522/4 8525/24 8527/13 8549/4 8549/6 8555/7 8556/9 8557/2 8557/17 8559/6 8560/18 8565/9 8572/4 8577/2 8579/18 8581/3 8581/22 8581/24

**objections [16]** 8331/15 8336/6 8342/2 8343/22 8353/25 8354/9 8356/6 8360/25 8405/3 8406/25 8408/23 8409/14 8410/2 8410/10 8412/2 8450/14

**objects [1]** 8363/13

**obli [1]** 8471/21

**obligated [1]** 8313/2

**obligates [2]** 8469/17 8471/9

**obligation [7]** 8318/11 8319/7 8319/8 8320/1 8321/2 8343/1 8343/3

**obligations [3]** 8313/3 8318/17 8319/9

**observation [1]** 8454/18

**observations [8]** 8369/16 8371/11 8371/15 8382/14 8383/19 8383/24 8384/11 8394/1

**observe [12]** 8445/15 8450/8 8450/16 8450/17 8450/20 8450/20 8450/23 8450/25 8451/3 8453/14 8454/7 8455/5

**observed [1]** 8454/7

**observes [1]** 8513/25

**observing [1]** 8450/19

**obstruction [2]** 8337/10 8337/24

**obtain [5]** 8459/10 8461/9 8482/13 8544/23 8544/24

**obtained [3]** 8336/1 8459/11 8542/10

**obviously [7]** 8310/22 8356/15 8386/20 8398/18 8408/22 8430/9 8463/3

**occasion [4]** 8392/7 8392/15 8392/19 8392/20 8392/23 8450/11 8451/8

**occasions [5]** 8392/5 8392/15 8392/16 8392/17 8479/24

**occur [3]** 8429/13 8477/17 8486/3

**occurred [4]** 8341/9 8354/10 8396/1 8484/7

**occurs [1]** 8498/15

**odd [1]** 8537/25

**offer [13]** 8317/17 8332/17 8334/23 8336/16 8346/20 8416/7 8501/7 8517/2 8525/23 8527/6 8548/7 8549/25 8557/3

**offered [27]** 8311/4 8326/6 8334/23 8335/1 8336/3 8336/22 8337/14 8337/17 8339/3 8389/17 8389/18 8414/24 8416/2 8417/9 8419/25 8420/21 8421/2 8430/18 8431/1 8468/25 8551/25 8552/20 8553/13 8554/8 8554/12 8555/17 8556/7

**offering [20]** 8316/2 8317/8 8317/16 8334/19 8411/19 8442/1 8442/2 8454/15 8470/4 8476/7 8480/17 8480/17 8480/18 8480/23 8512/17 8549/6 8554/23 8554/24 8554/25 8555/10

**offers [5]** 8492/4 8505/2 8514/19 8522/2 8527/11

**office [16]** 8374/3 8387/17 8387/17 8407/6 8419/9 8449/24 8450/25 8450/2 8450/2 8450/6 8450/9 8450/17 8450/21 8450/22 8450/24 8465/6

**officer [2]** 8364/24 8388/10

**officers [3]** 8326/22 8377/22 8444/9

**offices [3]** 8370/2 8451/15 8465/24

**offs [1]** 8365/23

**often [2]** 8454/3 8454/5

**Ohio [1]** 8459/7

**old [2]** 8362/22 8432/7

**once [10]** 8341/19 8361/22 8392/6 8404/7 8420/24 8421/9 8483/14 8483/18 8493/13 8493/22

**one [78]** 8308/16 8323/12 8332/16 8333/9 8333/13 8334/10 8334/17 8336/11 8336/19 8345/4 8347/17 8358/8 8359/7 8362/12 8368/12 8369/14 8369/22 8369/24 8374/19 8379/2 8380/11 8384/19 8385/1 8387/7 8392/14 8401/17 8411/8 8428/2 8428/4 8429/24 8431/25 8437/18 8443/17 8446/2 8446/23 8447/24 8450/10 8450/11 8451/8 8455/21 8458/13 8462/18 8470/3 8471/3 8473/19 8480/18 8484/10 8484/16 8489/16 8495/2 8499/22 8500/4 8503/10 8508/4 8512/25 8512/25 8515/9 8520/23 8522/17 8523/12 8527/21 8527/25 8528/1 8528/2 8528/25 8529/15 8529/15 8532/21 8538/14 8544/2 8550/22 8555/9 8561/2 8573/11 8573/17 8575/20 8576/13 8581/1

**one-year [1]** 8334/17

**ones [4]** 8350/10 8364/3 8435/19 8542/17

**ongoing [2]** 8553/23 8553/25

**onshore [2]** 8370/21 8376/5

**open [13]** 8308/1 8352/2 8360/25 8364/1 8410/4 8413/9 8434/1 8456/1 8458/1 8507/25 8528/8 8549/3 8557/1

**open-ended [2]** 8410/4 8413/9

**opening [2]** 8318/9 8323/24

**operating [1]** 8475/16

**operations [1]** 8477/18

**opine [2]** 8321/11 8321/21

**opinion [23]** 8308/19 8309/2 8310/1 8310/25 8317/6 8317/8 8317/16 8317/21 8318/1 8318/24 8319/1 8321/9 8322/3 8529/19 8529/21 8550/14 8550/15 8551/17 8553/2 8553/15 8553/15 8579/19 8579/22

**opinions [6]** 8317/7 8321/23 8468/24 8550/16 8554/8 8554/13

**opportunities [1]** 8433/17

**opportunity [6]** 8341/14 8356/6 8375/6 8404/25 8433/12 8433/13

**opposed [3]** 8352/11 8401/6 8412/4 8513/20 8528/7

**opposite [4]** 8332/24 8407/1 8407/18 8415/13

**option [5]** 8416/7 8460/20 8460/21 8463/19 8463/19

**options [1]** 8335/6

**orange [2]** 8506/14 8507/5

**oranges [1]** 8455/13

**order [5]** 8308/2 8376/5 8403/3 8519/16 8583/1

**orderly [2]** 8426/17 8464/13

**orders [2]** 8472/25 8528/20

**organization [3]** 8377/20 8377/24 8378/1 8378/2 8466/2 8466/7 8466/11

**organized [3]** 8470/5

**originally [1]** 8397/12

**originated [1]** 8375/8

**origination [2]** 8436/16 8436/19

**OTC [4]** 8472/13 8472/16 8482/17 8581/17

**otherwise [3]** 8332/14 8426/11 8455/8

**outrageous [1]** 8455/8

**outside [27]** 8383/3 8417/2 8438/6 8438/9 8438/12 8438/14 8438/19 8438/23 8439/6 8439/9 8439/13 8439/15 8439/17 8439/24 8440/22 8440/25 8441/22 8446/8 8446/9 8446/13 8446/16 8446/25 8447/5 8452/8 8453/2 8550/9 8550/11

**outstanding [5]** 8390/8 8448/20 8461/4 8476/4 8563/1

**outweighed [1]** 8411/14

**outweighs [1]** 8427/23

**over-the-counter [12]** 8471/14 8471/15

**offs...** 8471/19 8471/23 8472/1 8472/2 8476/22 8476/24 8479/3 8479/6 8481/25 8582/1

**overrule [9]** 8326/3 8349/3 8362/17 8363/19 8384/16 8387/22 8427/10 8448/7 8555/7

**overruled [10]** 8382/20 8388/15 8410/2 8438/4 8441/1 8488/11 8556/9 8557/2 8565/10 8581/24

**overrules [1]** 8432/13

**oversaw [2]** 8465/1 8465/4

**overtime [1]** 8428/2

**overvalued [1]** 8473/24

**overview [1]** 8468/19

**owe [2]** 8439/17 8439/20

**owed [3]** 8399/6 8423/23 8448/20

**Owen [1]** 8459/19

**own [8]** 8336/25 8342/8 8372/1 8400/18 8432/21 8469/12 8488/24 8489/12

**owned [8]** 8475/12 8475/16 8561/20 8561/23 8575/4 8575/6 8580/23 8580/25

**owner [1]** 8469/11

**owners [1]** 8469/21

**owns [2]** 8487/22 8488/5

## P

**p.m [8]** 8458/15 8510/18 8583/17

**page [65]** 8324/25 8327/7 8328/25 8344/23 8350/21 8351/7 8360/11 8363/23 8367/4 8367/4 8375/1 8383/5 8385/2 8386/8 8395/12 8396/18 8397/21 8397/24 8415/23 8423/3 8423/18 8425/4 8428/14 8428/23 8433/22 8443/7 8452/22 8455/25 8475/6 8475/22 8477/5 8477/21 8478/15 8490/22 8494/6 8494/8 8494/8 8494/9 8494/13 8495/6 8495/12 8495/20 8496/7 8496/14 8497/18 8497/24 8498/6 8498/6 8498/21 8499/7 8499/7 8499/18 8500/4 8523/15 8523/15 8523/20 8533/16 8548/15 8556/11 8558/11 8564/20 8578/5 8578/8 8584/2 8584/13

**page 2 [3]** 8494/6 8494/8 8494/8

**page 3 [1]** 8494/13

**page 4 [2]** 8495/6 8498/6

**page 5 [1]** 8498/21

**page 50 [1]** 8578/5

**page 51 [1]** 8578/8

**page 6 [1]** 8499/7

**page 7 [1]** 8499/18

**Page 8 [1]** 8500/4

**page 8195 [1]** 8396/18

**pages [8]** 8341/23 8404/9 8421/8 8477/24 8496/20 8496/21 8536/23 8578/10

**paid [21]** 8316/6 8316/7 8316/23 8321/1 8371/25 8447/11 8447/25 8448/4 8448/11 8448/14 8448/19 8448/25 8449/2 8482/16 8518/22 8519/1 8519/7 8535/14 8537/16 8542/13 8544/25

**paper [5]** 8462/16 8462/18 8462/20 8462/21 8553/9

**papers [3]** 8384/22 8460/3 8463/25

**paragraph [22]** 8368/1 8368/22 8369/11 8370/3 8371/3 8372/2 8372/24 8374/20 8375/19 8376/15 8376/23 8377/18 8378/7 8378/17 8386/9 8475/7 8476/3 8477/7 8479/1 8479/8 8480/20 8481/11

**paragraphs [2]** 8377/18 8379/19

**paralegal [2]** 8544/2 8545/16

**Park [1]** 8307/18

**part [10]** 8310/25 8320/25 8365/6 8469/12 8477/20 8491/24 8521/24 8540/3 8540/8 8559/24

**participated [1]** 8371/13

**particular [28]** 8335/2 8335/13 8342/10 8356/18 8356/18 8363/2 8369/4 8376/14 8388/16 8394/3 8406/23 8415/4 8415/6 8418/21 8460/5 8466/10 8466/17 8467/19 8473/8 8492/16 8493/4 8500/25 8505/25 8528/18 8545/22 8545/23 8572/7 8577/25

**parties [4]** 8359/5 8398/20 8455/20 8510/11

**partner [20]** 8348/11 8348/22 8348/24 8349/18

**P**

**partner...** [16] 8349/21 8369/13 8372/7 8372/8 8375/2 8375/7 8385/13 8385/14 8386/6 8400/23 8400/23 8407/5 8419/13 8443/11 8443/16 8448/15

**partners** [3] 8352/6 8369/22 8378/11

**partnership** [3] 8441/3 8441/5 8441/7

**parts** [4] 8540/24 8541/1 8544/17 8544/18

**party** [7] 8311/2 8361/23 8418/5 8418/9 8448/21 8448/25 8449/2

**pass** [1] 8332/23

**passed** [1] 8380/4

**past** [5] 8349/18 8410/19 8461/12 8463/15 8467/2

**pattern** [3] 8531/24 8532/5 8532/5

**patterns** [1] 8308/12

**pause** [4] 8397/22 8458/12 8554/6 8575/19

**pay** [13] 8313/2 8316/8 8316/11 8316/21 8317/3 8317/11 8318/11 8443/21 8448/11 8473/7 8474/2 8514/3 8537/19

**payday** [1] 8395/2

**paying** [1] 8316/13

**payment** [2] 8429/17 8489/20

**payments** [3] 8316/6 8316/22 8443/18

**penalty** [1] 8555/17

**pension** [1] 8521/2

**people** [33] 8312/1 8313/8 8318/22 8335/8 8357/3 8365/13 8371/21 8372/10 8378/13 8379/13 8393/3 8393/16 8393/17 8409/17 8413/14 8415/18 8450/22 8466/21 8466/22 8472/16 8486/17 8528/8 8529/24 8539/23 8541/10 8542/4 8542/4 8542/21 8544/22 8562/8 8562/12 8562/21 8570/9

**per** [5] 8368/5 8478/20 8479/4 8479/6 8479/11

**perceived** [2] 8311/19 8555/21

**percent** [24] 8317/4 8372/12 8373/2 8487/10 8487/15 8487/16 8487/19 8487/20 8488/5 8488/6 8527/24 8562/25 8563/8 8563/16 8565/17 8565/21 8568/18 8568/21 8573/11 8573/17 8574/3 8574/15 8574/19 8574/25

**percentage** [6] 8487/25 8489/10 8489/11 8489/12 8566/10 8580/3

**perception** [2] 8311/22 8311/24

**performance** [1] 8371/10

**performed** [1] 8462/6

**performing** [1] 8465/12

**period** [120] 8325/20 8325/22 8330/5 8330/7 8330/7 8334/17 8340/5 8342/10 8343/18 8344/7 8344/13 8344/14 8348/19 8350/4 8355/15 8355/18 8355/20 8358/2 8359/20 8364/4 8379/18 8380/4 8408/2 8408/3 8409/24 8410/4 8414/2 8419/11 8427/12 8431/3 8434/22 8435/4 8440/13 8464/6 8464/7 8483/3 8486/2 8488/12 8489/5 8490/8 8490/17 8494/2 8494/12 8494/16 8494/20 8495/9 8495/10 8495/17 8496/10 8497/3 8497/16 8498/2 8498/10 8499/1 8499/25 8500/6 8500/13 8501/3 8501/20 8502/6 8502/20 8503/7 8504/1 8504/3 8506/2 8506/18 8507/7 8507/9 8507/12 8511/10 8511/16 8511/21 8512/4 8514/12 8514/15 8515/4 8515/6 8515/11 8515/15 8515/17 8516/4 8516/8 8516/9 8516/13 8516/23 8517/18 8517/20 8518/5 8519/14 8523/5 8523/6 8523/13 8527/25 8528/4 8528/6 8528/11 8530/9 8530/18 8530/20 8530/23 8531/7 8531/17 8531/25 8532/13 8552/1 8556/5 8562/1 8562/22 8563/19 8564/1 8565/19 8566/11 8566/25 8567/23 8568/11 8568/19 8570/8 8579/24 8580/10 8582/10

**periodicals** [1] 8383/9

**periods** [5] 8343/23 8344/9 8350/5 8482/19 8499/11

**perjury** [1] 8555/17

**permit** [2] 8308/20 8309/1

**permits** [2] 8332/15 8426/20

**permitted** [4] 8308/25 8336/16 8397/9 8408/7 8537/7 8340/21 8370/11 8431/20 8444/17

**personal** [19] 8352/24 8368/9 8369/16 8374/5 8374/9 8375/24 8379/7 8381/15 8382/14 8384/10 8385/9 8385/15 8385/18 8385/23 8386/18 8386/20 8387/1 8445/20 8445/23

**personally** [3] 8443/18 8443/20 8445/15

**persons** [2] 8326/21 8477/11

**perspective** [4] 8382/14 8383/24 8384/10 8430/19

**Persuade** [1] 8359/13

**persuasive** [1] 8406/21

**pertained** [1] 8564/3

**Peter** [1] 8375/22

**Ph.D** [3] 8459/8 8459/12 8460/22

**pharmaceutical** [1] 8317/13

**phone** [6] 8307/22 8336/10 8444/15 8444/16 8445/18 8519/14

**phrasing** [1] 8401/1

**physically** [2] 8451/9 8545/25

**picture** [1] 8313/4

**piece** [4] 8313/4 8428/8 8438/1 8553/9

**pieces** [2] 8429/7 8560/3

**Pierotti** [47] 8486/14 8487/17 8488/3 8488/3 8488/4 8489/4 8490/12 8496/15 8500/5 8500/6 8501/2 8502/4 8502/12 8504/12 8504/13 8504/16 8504/17 8504/18 8506/16 8513/3 8513/5 8514/18 8515/8 8516/17 8517/17 8517/22 8530/11 8541/17 8563/5 8563/17 8565/12 8565/16 8565/22 8567/3 8567/14 8567/20 8570/21 8571/13 8571/18 8571/21 8572/3 8572/8 8573/19 8574/12 8574/23 8580/23 8580/25

**Pierotti's** [4] 8516/14 8567/11 8568/1 8571/10

**pin** [1] 8420/18

**pinpoint** [3] 8405/5 8406/3 8406/6

**pipe** [6] 8479/15 8479/19 8512/6 8512/8 8512/13 8512/15

**pipes** [5] 8479/20 8479/21 8479/22 8512/3 8512/4

**PITLUCK** [16] 8307/15 8491/14 8533/6 8536/14 8536/17 8547/7 8557/8 8558/3 8578/23 8580/18 8581/1 8581/5 8581/19 8582/3 8582/13 8584/7

**place** [9] 8330/6 8331/10 8341/8 8358/10 8464/15 8477/1 8477/2 8483/24 8564/15

**placement** [3] 8441/9 8441/23 8478/21 8479/2 8479/9

**places** [1] 8464/16

**plain** [1] 8319/15

**plaintiff** [3] 8312/18 8320/15 8416/13

**plaintiff's** [32] 8310/1 8310/10 8310/25 8311/1 8311/6 8312/4 8312/11 8312/22 8313/17 8314/5 8314/11 8314/16 8315/9 8315/13 8315/16 8315/21 8317/19 8317/23 8318/4 8318/5 8319/1 8319/12 8320/5 8321/4 8321/14 8321/18 8321/19 8322/9 8323/7 8323/8 8323/17 8323/17

**plan** [2] 8455/15 8475/8

**planned** [1] 8309/19

**planning** [3] 8360/16 8410/3 8452/17

**plans** [2] 8382/18 8405/9

**platform** [1] 8367/9

**played** [1] 8383/2

**playing** [2] 8438/19 8446/18

**Plaza** [1] 8307/14

**plethora** [1] 8333/13

**plus** [2] 8362/22 8432/7

**pocket** [1] 8331/24

**point** [37] 8316/1 8318/7 8320/17 8334/20 8344/4 8345/4 8345/4 8356/21 8360/23 8366/22 8368/16 8372/24 8373/14 8374/13 8378/25 8380/9 8395/4 8400/8 8401/22 8408/10 8408/13 8408/15 8411/8 8411/14 8419/8 8420/23 8421/22 8421/24 8437/18 8472/13 8482/23 8485/12 8486/24 8493/17 8545/3 8554/22 8555/9

**pointed** [3] 8316/10 8421/6 8552/9

**points** [3] 8401/17 8408/19 8479/13

**policy** [3] 8452/20 8452/24 8453/1

**portfolio** [2] 8489/18 8520/24

**portion** [3] 8453/6 8488/7 8488/20

**portions** [4] 8366/18 8373/16 8374/10 8417/25

**posed** [1] 8416/11

**position** [24] 8348/4 8348/8 8382/11 8404/10 8405/18 8407/1 8413/15 8413/16 8413/20 8413/21 8415/13 8417/1 8417/10 8417/13 8420/11 8460/9 8460/11 8461/10 8465/15 8465/19 8465/23 8466/1 8466/10 8482/8

**positions** [3] 8405/24 8407/6 8464/4

**possible** [8] 8310/15 8326/23 8332/17 8346/6 8414/20 8414/20 8429/3 8557/21

**possibly** [3] 8315/22 8315/24 8332/13

**post** [1] 8546/2

**potential** [7] 8313/10 8318/19 8318/20 8356/17 8383/14 8390/9 8427/22

**potentially** [4] 8340/21 8344/2 8402/4 8430/12

**Potomac** [1] 8463/22

**powerful** [1] 8407/20

**PPM** [1] 8447/2

**practice** [11] 8368/5 8379/1 8379/5 8379/8 8379/10 8379/14 8392/13 8393/1 8393/9 8419/24 8538/24

**practices** [1] 8419/2

**precarious** [1] 8407/21

**precise** [1] 8389/4

**preclude** [4] 8308/8 8308/15 8405/24 8432/10

**precluded** [2] 8406/5 8410/22

**preclusion** [1] 8332/11

**predicter** [1] 8432/24

**predictions** [1] 8529/22

**prefer** [1] 8456/10

**prejudice** [3] 8340/6 8411/14 8411/15

**prejudiced** [1] 8426/6

**prejudicial** [3] 8335/19 8405/17 8414/22

**preliminary** [1] 8433/16

**preparation** [12] 8342/24 8442/10 8549/13 8549/14 8551/6 8551/11 8551/21 8555/5 8557/24 8560/9 8560/15 8572/20

**prepare** [14] 8309/9 8311/21 8442/14 8534/10 8535/20 8540/12 8540/14 8543/8 8549/7 8549/7 8549/8 8551/4 8557/11 8557/12

**prepared** [22] 8360/21 8430/7 8483/10 8519/22 8534/12 8534/14 8535/11 8535/23 8536/1 8536/6 8542/24 8547/17 8547/18 8547/19 8548/3 8551/2 8552/15 8552/16 8553/3 8554/10 8560/21 8565/6

**preparing** [7] 8309/8 8371/5 8534/4 8535/16 8535/17 8535/18 8537/4

**preponderance** [2] 8525/3 8525/5

**presence** [2] 8452/8 8453/2

**present** [12] 8324/14 8326/17 8422/9 8426/14 8445/3 8445/6 8445/9 8445/12 8449/11 8458/1 8458/17 8511/2

**presentation** [5] 8370/22 8370/24 8376/11 8376/12 8426/17

**presented** [3] 8343/16 8540/21 8557/23

**presenting** [2] 8323/12 8371/5

**presents** [2] 8323/15 8540/8

**preserve** [3] 8453/12 8453/20 8453/24

**press** [6] 8318/19 8319/4 8380/7 8383/14 8480/16 8576/25

**pressure** [2] 8513/11 8513/11

**presumably** [1] 8560/2

**pretty** [3] 8344/5 8378/2 8552/19

**prevent** [2] 8407/22 8490/1

**previous** [1] 8531/19

**previously** [4] 8324/19 8512/3 8514/16 8552/13

**price** [112] 8308/13 8390/8 8467/5 8467/21 8467/22 8473/6 8473/7 8473/9 8473/12 8477/19 8478/21 8479/3 8479/6 8479/10 8480/22 8483/5 8483/8 8490/1 8490/5 8503/3 8513/22 8513/23 8514/2 8514/5 8514/5 8514/7 8514/9 8516/5 8517/24 8520/3 8520/5 8520/8 8521/6 8521/9 8521/12 8521/13 8521/15

**P**

**price...** [75] 8521/15 8521/17 8521/23 8522/1
8522/12 8522/13 8522/18 8522/23 8522/24
8523/10 8523/18 8523/22 8524/4 8524/9
8524/14 8524/17 8524/25 8525/9 8525/16
8525/19 8526/14 8526/15 8526/20 8529/20
8530/17 8530/23 8530/24 8530/25 8530/25
8531/3 8531/6 8531/6 8531/8 8531/16 8531/18
8531/21 8532/6 8532/11 8532/12 8532/19
8543/6 8543/14 8543/17 8543/18 8544/5
8545/4 8545/10 8546/13 8546/17 8546/22
8546/24 8547/6 8547/8 8550/4 8550/11
8550/21 8551/24 8551/25 8553/1 8553/2
8553/4 8553/5 8554/9 8554/18 8559/13
8559/14 8559/21 8569/8 8569/22 8570/24
8577/24 8578/15 8578/17 8579/17 8579/24
**prices** [19] 8468/2 8468/4 8472/8 8483/3
8503/6 8511/15 8513/10 8513/13 8513/14
8513/24 8520/10 8529/22 8529/25 8530/2
8530/9 8532/8 8532/20 8544/8 8580/8
**pricing** [4] 8460/20 8460/21 8462/10 8559/5
**primarily** [9] 8376/11 8460/2 8462/3 8463/24
8464/11 8465/10 8465/11 8465/20 8466/15
**principal** [3] 8436/10 8436/13 8470/2
**private** [2] 8347/16 8347/17 8365/11 8369/9
8370/5 8373/24 8386/17 8440/18 8441/8
8441/23 8463/12 8463/15 8464/3 8469/19
8469/20 8469/25 8470/2 8470/7 8476/7
8478/20 8479/2 8479/9 8479/23
**privilege** [3] 8350/11 8350/14 8352/8
**probably --you** [1] 8544/1
**probative** [3] 8411/13 8416/23 8416/25
**problem** [14] 8313/1 8343/13 8359/3 8400/1
8400/25 8409/8 8410/23 8416/1 8427/1 8427/9
8455/16 8509/16 8510/8 8510/8
**procedures** [1] 8536/7
**proceed** [8] 8421/25 8432/1 8432/5 8432/10
8433/8 8433/18 8434/2 8459/3
**proceeding** [1] 8328/22
**proceedings** [7] 8307/24 8352/1 8361/4
8361/5 8361/6 8549/2 8583/17
**process** [2] 8388/6 8427/23
**produced** [7] 8307/25 8535/4 8536/1 8536/24
8537/13 8549/20 8558/6
**product** [1] 8375/5
**production** [1] 8564/24
**professional** [2] 8309/4 8309/15
**professionals** [1] 8461/8
**professor** [53] 8334/5 8458/20 8459/23
8459/24 8459/24 8460/1 8460/5 8460/7
8460/13 8461/18 8464/2 8468/22 8469/1
8469/4 8480/10 8486/25 8489/8 8491/16
8522/10 8527/18 8533/2 8535/3 8535/10
8536/4 8536/19 8536/21 8537/16 8537/21
8537/22 8539/16 8540/5 8540/11 8544/7
8545/7 8546/10 8546/17 8546/21 8557/9
8558/4 8558/8 8559/17 8560/2 8560/8 8560/20
8563/13 8563/25 8564/15 8565/6 8568/10
8573/14 8574/18 8575/16 8575/20
**Professor Lewis** [13] 8491/16 8560/2 8560/8
8560/20 8563/13 8563/25 8564/15 8565/6
8568/10 8573/14 8574/18 8575/16 8575/20
**professors** [2] 8334/11 8461/20
**professorship** [1] 8461/16
**professorships** [2] 8461/11 8461/13
**proffer** [13] 8311/17 8321/9 8330/4 8341/14
8361/9 8361/17 8361/21 8362/6 8362/15
8362/21 8427/15 8429/8 8430/5
**proffered** [8] 8308/10 8338/12 8340/14 8356/4
8408/1 8431/10 8432/17 8457/2
**proffering** [3] 8331/23 8361/23 8419/17
**proffers** [1] 8361/19
**profit** [1] 8521/8
**profitable** [1] 8472/13
**profits** [2] 8390/6 8520/19
**program** [2] 8460/4 8461/8
**progress** [1] 8360/6
**projects** [2] 8461/20 8464/16

**prolonged** [1] 8404/6
**prolonging** [1] 8360/7
**promised** [1] 8582/20
**promising** [1] 8336/13
**promissory** [2] 8476/1 8542/12
**promulgated** [1] 8478/25
**promulgates** [1] 8464/22
**properly** [1] 8400/15
**proposition** [1] 8336/16
**prosecution** [1] 8336/24
**prosecutor's** [1] 8337/6
**prospects** [3] 8477/18 8489/17 8520/11
**protect** [1] 8327/20
**protection** [1] 8464/12
**prove** [6] 8313/25 8315/4 8315/7 8551/1
8552/9 8555/22
**proved** [1] 8315/6
**proven** [2] 8406/3 8550/24
**provide** [14] 8308/10 8309/13 8333/11 8416/8
8439/14 8439/15 8439/15 8465/7 8467/16
8468/19 8489/19 8502/25 8529/12 8576/4
**provided** [8] 8308/3 8333/3 8445/24 8491/23
8545/1 8553/2 8553/22 8553/24
**provider** [1] 8483/10
**provides** [9] 8464/20 8469/11 8482/5 8492/16
8494/15 8530/10 8530/17 8544/14 8544/15
**providing** [3] 8468/8 8500/15 8516/24
**province** [1] 8308/24
**proving** [2] 8333/4 8552/18
**public** [69] 8347/16 8347/17 8347/18 8352/22
8353/6 8353/12 8353/12 8353/12 8353/15
8353/16 8353/16 8353/18 8353/23 8354/6
8365/4 8365/20 8368/13 8369/9 8369/10
8370/7 8380/7 8380/14 8380/17 8381/1
8382/16 8418/25 8419/14 8440/20 8446/9
8446/16 8469/13 8469/14 8469/21 8470/1
8470/3 8470/4 8470/7 8470/10 8470/14
8470/16 8470/19 8470/25 8471/17 8471/17
8471/24 8474/21 8474/23 8476/7 8476/18
8479/23 8480/17 8480/17 8480/18 8480/19
8480/23 8482/4 8482/19 8484/7 8512/17
8544/12 8544/18 8544/19 8544/21 8544/23
8545/10 8553/15 8553/15 8581/8 8581/9
**publication** [1] 8384/12
**publicity** [3] 8310/15 8311/3 8321/7
**publicly** [2] 8470/8 8565/25
**publicly-available** [1] 8565/25
**publish** [1] 8460/3
**published** [15] 8380/12 8383/17 8387/6
8462/24 8463/1 8465/5 8492/13 8501/12
8503/19 8504/6 8505/8 8507/21 8561/1
8568/24 8580/15
**pull** [4] 8314/2 8336/12 8545/17 8546/20
**punitive** [1] 8310/11
**purchase** [6] 8478/21 8479/3 8479/5 8479/10
8495/18 8542/17
**purchased** [16] 8477/11 8492/20 8494/5
8494/20 8497/16 8499/17 8500/20 8501/1
8501/5 8501/20 8502/5 8503/24 8504/3 8516/9
8517/20 8524/1
**purchases** [2] 8495/16 8498/3
**purchasing** [1] 8516/18
**pure** [1] 8417/17
**purple** [2] 8506/16 8513/2
**purpose** [3] 8454/13 8468/16 8470/14
**purposes** [6] 8333/4 8336/18 8489/25 8508/25
8519/23 8578/25
**pursuant** [2] 8468/24 8475/8
**pursuing** [1] 8317/24
**push** [3] 8517/24 8522/1 8532/20
**pushed** [1] 8359/17
**put** [27] 8315/9 8315/18 8316/25 8337/21
8342/18 8391/21 8406/10 8409/17 8417/6
8429/20 8429/25 8431/24 8454/4 8454/5
8454/11 8458/5 8466/25 8484/18 8485/3
8485/19 8485/25 8507/24 8511/16 8517/14
8525/21 8555/13 8563/18
**puts** [1] 8429/16

**putting** [5] 8330/18 8352/13 8407/22 8429/21
8454/14

**Q**

**qualify** [2] 8468/21 8469/1
**qualitative** [1] 8516/16
**Quantitative** [1] 8463/4
**quarter** [1] 8368/3
**quarter's** [1] 8468/9
**quarterly** [1] 8469/1
**questioning** [3] 8354/12 8363/7 8389/15
**questions** [66] 8313/13 8323/23 8325/2
8337/24 8342/8 8346/14 8346/17 8346/18
8347/2 8348/1 8355/22 8358/23 8359/11
8359/19 8362/23 8363/12 8396/5 8396/21
8398/13 8403/1 8403/15 8404/2 8404/4
8404/20 8405/9 8409/23 8410/4 8411/10
8412/2 8412/23 8416/2 8422/12 8423/13
8424/15 8426/24 8436/4 8437/14 8442/4
8443/3 8446/3 8446/10 8446/21 8446/23
8446/25 8447/2 8447/10 8447/12 8449/13
8450/14 8452/3 8453/3 8453/8 8453/21
8453/23 8455/5 8509/9 8519/24 8532/22
8549/24 8550/4 8550/19 8559/8 8560/20
8575/20 8581/5 8582/12
**quickly** [1] 8504/4
**quite** [4] 8344/1 8344/2 8414/5 8472/8
**quote** [14] 8326/9 8326/10 8327/5 8327/6
8338/16 8338/18 8383/15 8397/4 8402/7
8402/10 8402/12 8403/21 8423/2 8423/25
**quoted** [1] 8383/10

**R**

**radar** [1] 8321/7
**rails** [1] 8408/11
**raise** [6] 8367/21 8376/5 8464/16 8470/5
8481/8 8482/22
**raised** [7] 8479/14 8479/24 8480/3 8480/5
8480/7 8481/3 8486/6
**raising** [1] 8353/9
**ran** [1] 8378/14
**RANDY** [1] 8307/19
**range** [5] 8316/8 8463/1 8530/23 8531/13
8531/14
**ranged** [1] 8463/17
**rate** [3] 8443/15 8473/20 8537/17
**rather** [8] 8326/6 8337/1 8337/12 8337/14
8338/17 8400/7 8509/23 8509/25
**ratio** [3] 8529/8 8529/11 8529/15
**re** [4] 8339/25 8340/4 8356/25 8458/15
**re-entered** [1] 8458/15
**re-statement** [2] 8339/25 8340/4
**re-think** [1] 8356/25
**reach** [2] 8331/11 8356/13
**react** [1] 8521/12
**reaction** [5] 8348/23 8349/2 8349/7 8349/10
8349/12
**reactions** [1] 8467/22
**read** [20] 8339/12 8339/15 8341/4 8342/17
8342/21 8379/12 8389/23 8400/13 8453/6
8453/7 8453/24 8455/8 8475/7 8477/7 8478/18
8510/7 8540/20 8540/23 8540/24 8578/7
**reading** [3] 8341/23 8342/23 8389/22
**reads** [1] 8509/11
**ready** [1] 8458/2
**real** [3] 8311/16 8412/18 8473/23
**Realization** [1] 8443/15
**realize** [1] 8521/8
**really** [10] 8318/13 8318/25 8352/12 8382/25
8384/18 8388/9 8433/15 8453/21 8470/9
8576/21
**reask** [3] 8510/2 8510/5 8510/10
**reasked** [1] 8510/1
**reason** [11] 8308/15 8318/11 8321/2 8332/17
8332/19 8356/7 8359/25 8405/15 8466/23
8482/9 8489/22
**reasonable** [28] 8312/24 8313/17 8314/5
8314/15 8314/19 8315/12 8317/8 8317/9

R

**reasonable... [20]** 8317/14 8317/17 8317/22
8321/14 8322/5 8322/6 8322/7 8322/9 8322/23
8322/23 8322/23 8323/7 8323/8 8323/16
8323/17 8413/17 8413/21 8419/5 8420/5
8421/3
**reasonably [6]** 8311/19 8313/20 8314/8 8320/9
8412/17 8415/11
**reasons [1]** 8318/19 8318/20 8318/22
8319/10 8489/13 8489/15 8489/16 8520/21
8520/23 8521/7
**rebut [2]** 8555/17 8555/20
**recalled [1]** 8405/17 8424/19 8424/21
**recalling [4]** 8351/5 8424/16 8432/7 8432/15
**receive [10]** 8349/15 8372/5 8374/15 8472/24
8501/9 8505/5 8514/22 8517/5 8522/5 8527/14
**received [23]** 8333/16 8338/17 8383/14
8383/15 8410/17 8413/13 8415/10 8420/9
8461/6 8481/15 8492/7 8492/9 8492/11
8501/10 8505/6 8514/24 8517/6 8522/7
8525/25 8526/1 8527/15 8557/6 8583/4
**receives [3]** 8412/14 8413/17 8448/17
**receiving [5]** 8348/20 8386/12 8386/25 8387/3
8417/2
**recent [1]** 8377/2
**recently [2]** 8370/12 8555/18
**recess [3]** 8403/22 8457/5 8510/18
**recipient [2]** 8323/8 8389/19
**recognitions [1]** 8462/22
**recognize [3]** 8330/18 8352/3 8399/22
**recollect [1]** 8437/13
**recollection [24]** 8363/4 8367/13 8370/8
8376/20 8380/25 8387/10 8392/19 8408/20
8443/1 8444/5 8451/2 8451/5 8451/7 8509/1
8565/5 8565/15 8576/9 8576/17 8576/19
8577/12 8577/13 8577/18 8578/4 8578/14
**recollections [1]** 8325/24
**recommendation [10]** 8394/15 8394/21
8400/13 8400/16 8400/20 8401/19 8402/18
8402/23 8403/9 8422/22
**recommendations [1]** 8422/15
**recommended [9]** 8394/16 8397/2 8397/7
8397/20 8399/15 8399/19 8402/19 8422/16
8424/13
**recommending [1]** 8388/10
**record [32]** 8308/22 8309/11 8311/25 8312/2
8313/2 8318/21 8318/25 8320/13 8330/19
8332/9 8359/9 8364/10 8389/23 8396/14
8396/16 8398/4 8398/24 8399/9 8399/10
8399/16 8401/6 8402/16 8403/3 8404/22
8422/13 8426/1 8429/17 8429/19 8455/9
8508/21 8510/4 8578/25
**recorded [2]** 8307/24 8579/25
**records [1]** 8406/9
**recross [1]** 8582/14
**red [6]** 8483/4 8483/5 8497/2 8506/15 8516/11
8528/20
**redactions [2]** 8354/20 8354/21
**redirect [13]** 8430/11 8430/20 8431/14
8431/15 8431/18 8431/21 8432/2 8432/6
8432/11 8446/4 8446/6 8452/4 8579/8
**reduce [2]** 8513/24 8550/15
**Redwood [3]** 8364/16 8365/16 8365/17
**REED [1]** 8307/19
**refer [1]** 8503/12
**references [1]** 8312/1
**referred [4]** 8375/20 8475/10 8475/14 8475/17
**referring [6]** 8376/7 8455/13 8479/18 8554/14
8579/10 8580/14
**refers [3]** 8375/19 8376/18 8554/17
**reflect [8]** 8494/14 8494/18 8496/8 8501/17
8502/2 8512/2 8512/15 8512/17
**reflected [1]** 8339/5
**reflects [2]** 8502/3 8554/2
**refrain [1]** 8450/13
**reframe [1]** 8577/4
**refresh [15]** 8325/24 8363/4 8380/25 8443/1
8454/9 8565/5 8565/15 8568/13 8576/8

8576/19 8577/11 8577/13 8577/18 8578/4
8578/6
**refreshes [1]** 8576/17
**refusal [1]** 8337/21
**refused [2]** 8361/20 8361/22
**refusing [2]** 8309/9 8362/1
**regard [2]** 8388/16 8452/13
**regarding [20]** 8308/11 8308/24 8309/3
8309/15 8323/7 8323/9 8328/16 8345/5 8346/5
8346/14 8384/12 8387/25 8389/15 8409/23
8410/14 8413/11 8529/19 8531/23 8560/22
8565/7
**regardless [2]** 8323/15 8420/4
**registered [1]** 8478/23
**registration [7]** 8368/4 8368/14 8398/9
8398/12 8423/9 8423/11 8478/24
**registrations [2]** 8368/15 8368/17
**regular [1]** 8528/7
**regularly [1]** 8524/24
**Regulation [1]** 8478/25
**Regulation D [1]** 8478/25
**regulations [1]** 8309/1
**regulator [1]** 8464/11
**regulators [2]** 8466/7 8466/16
**regulatory [4]** 8321/8 8463/24 8471/18
8471/22
**rehabilitate [1]** 8555/19
**rehash [3]** 8406/15 8431/20 8576/3
**related [11]** 8356/19 8373/5 8380/14 8394/12
8410/20 8420/10 8448/21 8477/15 8541/2
8556/3 8577/24
**relates [3]** 8322/18 8370/8 8377/13
**relating [10]** 8345/15 8345/20 8355/16 8380/8
8388/19 8389/6 8389/7 8389/25 8407/8 8420/8
**relation [1]** 8427/13
**relationship [23]** 8366/23 8367/6 8367/7
8368/23 8370/4 8370/16 8372/25 8373/15
8374/6 8374/8 8374/14 8374/21 8376/16
8376/19 8385/2 8386/10 8398/7 8398/7 8423/6
8423/6 8529/19 8542/3 8542/20
**relationships [2]** 8352/8 8372/3
**relative [3]** 8472/8 8520/16 8524/5
**relatively [3]** 8472/4 8482/8 8488/25
**release [30]** 8325/3 8325/4 8325/5 8325/7
8325/9 8325/14 8326/10 8326/12 8326/13
8326/14 8326/16 8326/19 8326/23 8327/6
8327/10 8327/16 8327/18 8336/2 8407/13
8412/9 8412/10 8413/5 8414/3 8414/17 8415/4
8427/18 8462/9 8480/16 8480/20 8576/25
**releases [3]** 8318/12 8325/2 8410/14 8410/21
8412/8
**releasor [2]** 8326/19 8326/20
**relevance [14]** 8308/9 8322/12 8330/1 8330/4
8331/2 8344/4 8344/7 8357/17 8366/3 8382/19
8384/15 8407/11 8409/9 8411/24
**relevant [33]** 8308/14 8309/5 8309/17 8311/20
8311/23 8316/3 8317/22 8318/2 8318/3 8320/8
8320/21 8321/9 8322/20 8325/21 8330/21
8332/19 8333/3 8333/15 8335/4 8340/5 8350/4
8355/22 8356/21 8361/15 8362/12 8404/12
8405/25 8406/2 8410/7 8410/8 8410/19
8411/16 8419/11
**relied [3]** 8447/9 8544/15 8546/22
**rely [3]** 8447/6 8447/7 8546/19
**remain [3]** 8507/25 8516/5 8580/9
**remaining [2]** 8475/16 8487/22
**remarkable [1]** 8319/18
**remember [49]** 8346/5 8346/8 8363/1 8363/2
8363/5 8364/8 8366/13 8375/13 8375/14
8375/15 8377/17 8375/18 8380/7 8387/15
8392/14 8394/12 8394/14 8394/18 8394/19
8396/15 8397/19 8402/17 8403/5 8403/7
8406/11 8422/14 8422/18 8422/20 8423/4
8423/16 8424/1 8429/14 8435/12 8435/13
8436/9 8437/12 8446/10 8447/2 8447/12
8449/13 8518/16 8518/18 8552/6 8561/2
8576/7 8576/22 8576/24 8577/8 8578/1
**remembers [1]** 8339/24

**remove [1]** 8516/14
**removed [3]** 8302/13 8550/16 8550/16
**repeat [6]** 8327/13 8387/23 8403/14 8437/24
8526/7 8566/9
**repeated [2]** 8361/19 8419/14
**repeatedly [6]** 8361/18 8361/22 8383/12
8417/6 8417/7 8417/9
**rephrase [9]** 8327/24 8381/19 8382/5 8383/22
8394/7 8509/20 8524/20 8579/20 8581/12
**rephrased [1]** 8384/4
**rephrasing [1]** 8400/12
**replacement [2]** 8400/25
**report [4]** 8468/10 8474/12 8475/18 8555/11
**reported [1]** 8545/10
**reporter [3]** 8307/22 8403/4 8577/5
**reports [5]** 8390/4 8468/7 8520/14 8520/14
8520/15
**represent [32]** 8368/12 8368/25 8369/1
8370/15 8382/17 8382/24 8395/3 8418/24
8441/12 8464/15 8483/6 8492/18 8494/8
8495/7 8496/20 8497/7 8497/10 8497/11
8497/13 8498/22 8505/14 8505/15 8505/22
8506/1 8511/18 8511/20 8516/7 8516/12
8523/1 8528/19 8528/20 8529/1
**representation [7]** 8353/17 8368/2 8368/9
8381/21 8496/21 8504/25 8538/21
**representations [3]** 8447/6 8447/7 8447/9
**representative [3]** 8354/8 8520/2 8520/7
**representatives [1]** 8326/22
**represented [9]** 8317/12 8367/7 8373/2
8419/13 8447/25 8506/8 8507/5 8507/14
8525/13
**representing [5]** 8381/2 8381/9 8385/6 8385/7
8385/17 8386/3 8419/3
**represents [13]** 8483/5 8487/14 8487/18
8487/20 8494/1 8497/8 8505/23 8511/19
8511/21 8523/2 8527/19 8528/18 8529/5
**reputation [1]** 8390/11
**request [5]** 8313/22 8362/1 8368/6 8405/16
8452/7
**requested [3]** 8361/19 8368/20 8395/3
**requesting [1]** 8368/17
**requests [2]** 8309/16 8343/23
**require [3]** 8360/7 8421/16 8482/12
**required [4]** 8335/7 8415/6 8465/13 8474/19
**requirements [3]** 8471/5 8471/8 8471/18
**requires [1]** 8332/10
**research [21]** 8460/3 8460/4 8461/19 8461/20
8461/23 8461/25 8462/1 8462/2 8462/6 8462/7
8462/9 8462/14 8463/10 8467/6 8467/25
8468/1 8468/3 8468/3 8468/5 8468/7 8539/22
**resent [1]** 8418/16
**resolve [2]** 8405/22 8452/19
**resources [1]** 8413/24
**respect [34]** 8314/22 8327/15 8328/1 8344/10
8362/10 8386/3 8387/18 8394/3 8398/6 8399/3
8399/9 8399/10 8407/1 8410/15 8413/16
8417/19 8418/21 8423/5 8423/21 8426/11
8427/16 8428/8 8431/23 8432/17 8433/2
8439/5 8441/11 8449/21 8466/10 8506/21
8509/12 8512/21 8513/2 8527/2
**respected [3]** 8354/22 8360/17 8417/13
**respectfully [10]** 8331/13 8332/22 8335/23
8340/24 8341/16 8352/14 8354/14 8362/21
8362/22 8556/9
**respond [14]** 8334/13 8339/16 8360/2 8401/8
8404/15 8404/17 8405/13 8405/21 8409/1
8433/12 8433/13 8456/23 8462/8 8467/19
**responding [2]** 8311/2 8513/10
**response [15]** 8317/18 8326/5 8338/25
8354/19 8359/4 8360/21 8404/4 8404/7
8416/21 8420/24 8428/16 8428/17 8428/18
8428/22 8521/15
**responses [2]** 8418/12 8422/12
**responsibilities [8]** 8309/4 8309/15 8438/20
8439/10 8439/24 8440/1 8440/2 8440/4
**responsibility [2]** 8382/12 8438/23
**responsible [3]** 8436/10 8436/13 8506/20

**R**

**rest** [2] 8396/24 8402/3
**restate** [9] 8389/20 8390/5 8391/7 8391/7 8414/11 8439/3 8439/4 8539/14 8582/2
**restatement** [36] 8345/23 8346/6 8346/6 8346/14 8346/19 8355/17 8355/18 8355/21 8356/19 8357/5 8357/18 8357/19 8358/13 8358/19 8362/10 8387/12 8387/13 8387/19 8388/1 8388/7 8388/8 8388/13 8388/16 8388/19 8388/22 8389/7 8389/9 8389/16 8389/24 8390/2 8390/3 8390/19 8390/24 8391/20 8391/23 8405/6
**restatements** [6] 8357/2 8357/6 8358/11 8358/15 8361/2 8390/13
**restating** [1] 8390/3
**restrained** [1] 8412/24
**restraint** [1] 8388/4
**restricted** [4] 8373/13 8469/22 8476/6 8476/8
**restrictions** [1] 8562/5
**result** [5] 8356/13 8368/22 8383/6 8393/21 8420/24
**resulted** [3] 8373/15 8374/10 8379/1
**results** [1] 8477/18
**resume** [2] 8511/4 8583/17
**resumes** [2] 8324/12 8422/7
**retain** [2] 8375/6 8382/23
**retained** [9] 8311/11 8368/12 8370/5 8375/3 8375/4 8375/14 8376/13 8376/17 8533/10
**retention** [1] 8375/4
**retire** [1] 8393/7
**retired** [1] 8435/20
**retirement** [2] 8434/20 8435/5
**retiring** [2] 8393/18 8407/10
**retrieve** [1] 8508/1
**Retrophin** [126] 8309/13 8310/3 8311/12 8313/2 8313/5 8313/7 8314/2 8315/1 8315/6 8316/7 8316/21 8317/9 8317/11 8317/15 8317/17 8318/3 8318/10 8318/17 8320/10 8320/24 8321/1 8321/5 8321/15 8334/10 8334/25 8339/23 8340/2 8340/2 8340/4 8346/4 8346/7 8346/15 8355/16 8356/19 8357/6 8357/11 8357/13 8358/13 8358/19 8362/12 8385/3 8385/6 8385/7 8385/17 8386/3 8387/14 8387/19 8388/1 8388/20 8389/7 8389/16 8389/25 8408/10 8412/16 8412/18 8413/19 8415/12 8415/15 8417/2 8418/2 8419/3 8436/5 8436/14 8436/19 8436/25 8437/6 8443/19 8443/22 8444/7 8444/9 8444/11 8444/13 8445/10 8451/12 8451/15 8474/4 8475/13 8475/14 8475/15 8475/15 8479/13 8479/24 8481/10 8481/11 8481/21 8482/20 8483/2 8486/6 8486/19 8486/21 8486/22 8493/7 8493/13 8494/12 8495/11 8495/15 8496/12 8498/25 8502/22 8503/2 8511/16 8512/5 8515/22 8516/5 8518/7 8518/8 8520/16 8523/22 8525/7 8525/8 8529/16 8530/24 8530/24 8532/2 8554/9 8554/18 8559/16 8561/11 8561/14 8561/21 8564/11 8565/18 8565/21 8575/13 8581/8 8582/6
**Retrophin's** [12] 8347/7 8347/12 8347/23 8347/24 8348/4 8348/6 8475/4 8478/3 8478/10 8480/16 8480/21 8484/7
**return** [6] 8467/5 8473/20 8489/24 8520/25 8521/1 8521/4
**Reuters** [1] 8377/1
**revenue** [4] 8347/20 8372/4 8373/1 8390/6
**reverse** [10] 8343/1 8394/11 8396/8 8396/11 8396/20 8398/8 8399/11 8423/8 8470/11 8475/4
**reversed** [1] 8339/8
**reversible** [1] 8339/10
**review** [9] 8348/17 8349/4 8372/9 8372/21 8378/20 8463/3 8487/11 8529/16 8552/7
**reviewed** [21] 8348/21 8491/18 8531/24 8534/20 8534/21 8534/22 8535/8 8537/7 8540/16 8543/10 8545/18 8549/9 8549/10 8549/15 8549/19 8550/2 8551/13 8552/13 8552/17 8557/13 8576/18

**reviewing** [1] 8578/13
**revise** [1] 8362/17
**right-hand** [6] 8493/25 8495/22 8496/11 8497/12 8511/25 8513/4
**rights** [3] 8311/12 8335/6 8426/13
**ripe** [1] 8555/6
**risk** [13] 8321/3 8362/20 8464/8 8464/18 8464/20 8464/23 8465/5 8466/18 8476/24 8477/3 8477/9 8477/10 8489/24
**risks** [5] 8466/13 8477/13 8477/16 8477/22 8477/24
**risky** [2] 8472/7 8473/22
**Rivka** [1] 8307/22
**RivkaTeich** [1] 8307/23
**RMR** [1] 8307/22
**road** [1] 8341/18
**ROHDE** [1] 8307/12
**role** [14] 8382/8 8383/2 8437/15 8437/23 8438/1 8438/19 8441/15 8443/4 8446/17 8465/10 8465/11 8467/6 8539/19 8541/8 8541/19 8562/14
**roles** [1] 8538/7
**Ron** [6] 8486/13 8498/23 8506/13 8515/6 8541/19 8562/14
**room** [1] 8451/1
**roommate** [1] 8338/7
**roommate's** [1] 8338/12
**Ropes** [5] 8373/17 8373/25 8374/2 8374/3 8374/11
**Rosenwald** [7] 8314/25 8317/23 8317/24 8318/6 8345/9 8345/12 8345/14 8345/15 8412/23 8413/1 8413/23 8414/25 8415/7 8417/3 8420/25 8583/9 8583/10
**Rosenwald's** [9] 8311/25 8313/9 8313/18 8314/8 8315/10 8315/17 8412/14 8413/13 8415/10
**roughly** [1] 8574/3
**roundtables** [1] 8307/3
**route** [1] 8470/3
**row** [31] 8354/8 8492/17 8493/12 8493/20 8493/22 8494/18 8494/18 8500/17 8500/19 8501/13 8517/13 8517/19 8518/4 8522/16 8522/17 8522/22 8523/8 8523/9 8523/16 8523/17 8523/20 8523/21 8524/3 8524/4 8524/7 8524/10 8524/13 8528/15 8528/22 8529/9 8572/24
**row 1** [1] 8500/19
**row 22** [5] 8493/20 8493/22 8494/18 8494/18 8501/13
**rows** [1] 8517/10
**RPR** [1] 8307/22
**RTRX** [2] 8481/17 8559/16
**rule** [22] 8316/10 8316/19 8332/10 8400/5 8405/7 8406/4 8410/20 8414/19 8420/12 8420/12 8431/13 8464/21 8465/4 8465/14 8467/1 8467/9 8467/9 8471/21 8476/6 8552/8 8552/19 8555/13
**Rule 401** [2] 8406/4 8414/19
**Rule 403** [1] 8410/20
**ruled** [2] 8453/25 8453/25
**rules** [5] 8308/25 8430/12 8453/22 8453/23 8552/17
**ruling** [11] 8323/5 8330/18 8343/4 8343/11 8356/14 8359/19 8361/10 8362/8 8363/12 8432/3 8559/11
**rulings** [10] 8342/1 8343/2 8360/10 8360/17 8408/22 8426/9 8426/23 8427/3 8432/12 8433/9
**run** [2] 8470/18 8481/9

**S**

**S-1** [3] 8478/3 8478/9 8540/23
**safe** [3] 8402/8 8503/3 8539/11
**salary** [2] 8372/6 8443/15
**sale** [9] 8498/12 8498/13 8523/1 8523/2 8529/5 8529/9 8529/8 8529/10 8529/11
**sales** [3] 8492/21 8529/9 8568/1
**Sarah** [2] 8345/19 8345/20
**sat** [3] 8333/1 8344/18 8347/15 8348/22

**satisfactory** [4] 8394/16 8402/19 8422/16 8426/20
**save** [1] 8428/3
**saw** [7] 8333/23 8366/13 8383/18 8387/10 8412/22 8437/11 8534/7
**scale** [5] 8483/24 8524/17 8524/24 8557/15 8560/5
**schedule** [2] 8424/24 8432/21
**scheduling** [1] 8433/9
**scheme** [1] 8314/2
**scholarship** [4] 8462/15 8462/24 8467/12 8467/14
**school** [15] 8334/5 8334/6 8334/7 8334/11 8415/3 8415/10 8415/16 8415/17 8459/19 8459/20 8460/13 8460/14 8461/14 8465/25 8518/15
**science** [2] 8459/8 8460/25
**scope** [15] 8439/22 8440/25 8441/10 8449/19 8451/16 8451/18 8459/23 8550/10 8550/12 8550/19 8550/20 8551/23 8552/2 8556/3 8556/4
**screen** [2] 8511/25 8544/3
**scrivener** [8] 8437/19 8437/22 8437/25 8438/1 8438/10 8438/16 8438/21 8439/6
**scroll** [1] 8365/22
**scrutiny** [1] 8321/8
**seat** [10] 8308/2 8324/15 8396/2 8404/1 8422/10 8452/14 8456/14 8458/2 8458/18 8511/3
**SEC** [34] 8308/25 8318/20 8319/5 8390/5 8396/24 8398/9 8398/9 8398/10 8423/9 8423/9 8440/10 8454/12 8455/13 8464/5 8464/10 8464/11 8465/3 8465/14 8465/16 8466/8 8467/7 8468/20 8474/20 8475/1 8475/2 8518/15 8538/3 8538/6 8538/19 8539/9 8539/17 8540/2 8540/4 8575/25
**SEC's** [1] 8538/12
**second** [29] 8322/8 8330/24 8331/21 8332/24 8332/24 8333/1 8333/8 8333/12 8336/20 8336/24 8338/3 8338/5 8338/6 8338/21 8339/17 8342/4 8356/3 8356/20 8392/22 8402/6 8417/6 8426/19 8428/8 8470/11 8471/3 8474/8 8481/11 8512/8 8522/22
**Secretary** [25] 8429/15 8429/21 8429/24 8430/6 8430/7 8430/8 8437/15 8437/18 8437/22 8437/23 8437/25 8438/1 8438/2 8438/11 8438/13 8438/17 8438/25 8439/5 8439/7 8446/10 8446/14 8446/17 8446/18 8446/19 8475/20
**Secretary's** [1] 8439/11
**Section** [1] 8478/24
**sector** [3] 8544/16 8544/17 8544/18
**securities** [21] 8460/22 8462/5 8464/6 8464/17 8466/3 8469/16 8469/18 8473/19 8473/25 8476/6 8477/2 8477/11 8478/23 8478/25 8489/19 8520/13 8520/25 8521/1 8576/1 8578/24 8579/2
**security** [4] 8466/7 8466/16 8469/11 8476/8
**see** [50] 8317/24 8319/1 8342/17 8348/10 8348/13 8352/21 8356/13 8360/3 8365/23 8373/18 8387/8 8401/13 8414/19 8414/21 8433/20 8437/9 8447/17 8458/9 8483/18 8483/22 8483/24 8484/1 8495/22 8497/4 8498/9 8499/4 8508/6 8509/3 8511/8 8514/10 8515/9 8522/21 8522/22 8526/3 8526/4 8526/6 8528/21 8528/23 8529/24 8532/18 8546/10 8555/11 8559/4 8559/13 8560/7 8578/4 8578/7 8578/9 8578/16 8582/19
**seeing** [1] 8437/12
**seek** [2] 8318/12 8362/7
**seeking** [2] 8344/15 8411/16
**seem** [4] 8312/22 8409/21 8424/12 8572/9
**select** [13] 8377/21 8506/21 8511/24 8512/22 8513/19 8532/10 8541/11 8554/13 8564/10 8566/21 8574/12 8580/3 8580/8
**selected** [3] 8381/2 8382/17 8565/22
**self** [1] 8338/20
**self-serving** [1] 8338/20

**sell [42]** 8464/17 8468/11 8469/16 8471/16
8472/25 8473/5 8476/9 8476/16 8476/17
8480/19 8480/21 8482/7 8489/15 8489/16
8489/19 8490/6 8493/8 8493/14 8493/23
8496/2 8496/5 8497/1 8498/2 8499/11 8499/21
8501/22 8503/5 8503/25 8504/8 8504/10
8504/16 8514/1 8526/21 8528/9 8528/20
8529/15 8530/1 8562/15 8570/9 8570/13
8570/15 8570/17

**seller [13]** 8493/19 8494/3 8494/4 8494/21
8494/25 8495/1 8495/22 8496/12 8496/17
8500/8 8507/9 8507/11 8529/6

**sellers [14]** 8502/8 8502/12 8502/21 8502/24
8515/22 8516/1 8518/3 8518/7 8518/8 8525/7
8526/12 8532/1 8532/4 8580/10

**selling [41]** 8470/6 8472/20 8472/23 8473/13
8493/17 8494/23 8496/1 8498/4 8499/12
8500/6 8502/18 8502/19 8503/23 8505/16
8507/8 8513/1 8513/1 8513/5 8513/9 8513/11
8513/13 8513/20 8513/23 8516/17 8517/23
8521/6 8521/9 8523/10 8523/14 8525/2 8525/4
8525/6 8526/15 8527/1 8527/9 8527/22 8528/2
8528/16 8530/4 8532/7 8532/11

**sells [11]** 8496/4 8496/6 8498/3 8498/10
8513/3 8499/22 8499/22 8529/2 8569/12
8570/2 8570/9

**seminars [1]** 8371/6

**Senate [1]** 8468/18

**send [1]** 8377/15

**sends [1]** 8513/12

**senior [6]** 8368/23 8385/13 8386/6 8407/5
8419/13 8463/22

**sense [3]** 8316/13 8409/3 8467/24

**sent [2]** 8414/25 8429/17

**separate [3]** 8331/2 8331/5 8335/20

**separately [1]** 8501/2

**September [22]** 8483/4 8484/5 8484/5 8490/9
8494/3 8497/5 8497/17 8499/13 8500/2
8500/14 8501/21 8503/8 8505/17 8506/4
8523/6 8528/5 8528/12 8530/19 8536/5
8551/16 8551/18 8569/25

**September 19 [4]** 8503/8 8523/6 8528/5
8528/12

**September 19th [3]** 8500/14 8505/17 8569/25

**September 2014 [5]** 8494/3 8497/17 8500/2
8501/21 8506/4

**September 30 [1]** 8530/19

**series [4]** 8336/15 8342/1 8359/10 8435/11

**serious [3]** 8311/16 8314/20 8314/21

**serve [4]** 8344/19 8433/4 8439/13 8463/7

**served [9]** 8341/5 8347/11 8349/17 8407/6
8439/6 8439/7 8464/3 8464/7 8575/22

**serves [1]** 8465/20

**service [4]** 8483/10 8544/25 8545/1 8582/23

**serving [5]** 8338/20 8438/6 8438/13 8439/9
8446/9

**set [13]** 8361/23 8363/11 8371/20 8373/12
8376/4 8380/2 8404/19 8455/15 8471/22
8497/6 8500/25 8529/1 8575/20

**sets [1]** 8431/7

**setting [3]** 8370/21 8553/13 8553/14

**settle [13]** 8317/4 8318/19 8319/20 8319/22
8331/8 8413/19 8417/1 8418/25 8419/15
8419/19 8419/22 8427/21 8500/1

**settled [1]** 8381/13

**settlement [46]** 8309/5 8309/8 8309/9 8309/13
8309/17 8311/21 8313/22 8314/3 8316/6
8316/22 8318/11 8320/3 8324/25 8325/7
8327/6 8327/9 8327/15 8327/21 8328/1 8328/9
8336/1 8340/10 8340/18 8345/5 8358/12
8407/12 8408/9 8410/20 8411/2 8412/7 8413/2
8413/4 8413/9 8414/3 8414/4 8414/15 8414/18
8415/4 8416/6 8416/15 8416/18 8416/18
8420/20 8427/17 8427/24 8428/1

**settlements [3]** 8321/1 8410/15 8410/16

**settling [9]** 8327/17 8328/9 8328/22 8412/5
8415/2 8415/2 8415/19 8416/4 8427/23

**seven [6]** 8428/14 8501/19 8519/16 8573/3
8573/4 8574/11

**severely [1]** 8426/17

**share [37]** 8436/22 8436/25 8473/6 8473/7
8473/8 8473/9 8473/12 8478/20 8479/4 8479/6
8479/11 8483/3 8483/17 8511/19 8517/24
8524/9 8524/11 8524/14 8524/17 8524/25
8529/20 8530/18 8531/9 8531/16 8543/17
8544/13 8544/14 8544/15 8544/19 8544/23
8544/24 8545/4 8545/10 8546/17 8554/14
8568/1 8571/6

**shareholders [4]** 8308/12 8326/23 8488/8
8488/21

**shares [197]** 8470/6 8476/2 8476/5 8476/5
8476/11 8476/12 8476/15 8476/16 8476/17
8476/18 8477/8 8478/9 8478/22 8479/3
8479/5 8479/10 8480/21 8481/1 8482/1 8482/2
8482/7 8487/4 8487/5 8487/12 8487/14
8487/15 8487/16 8487/19 8487/21 8487/23
8487/25 8488/6 8488/25 8489/1 8492/19
8492/22 8493/8 8493/9 8493/10 8493/13
8493/14 8493/15 8493/17 8493/19 8493/23
8494/3 8494/5 8494/19 8495/19 8495/23
8496/4 8496/6 8496/12 8496/17 8497/8
8497/16 8498/3 8498/11 8499/6 8499/16
8500/8 8500/20 8500/21 8500/22 8500/23
8501/1 8501/2 8501/5 8501/19 8501/22 8502/5
8502/5 8502/11 8502/16 8503/23 8503/25
8504/2 8504/7 8504/9 8504/10 8504/11
8504/13 8504/16 8504/17 8504/20 8505/24
8505/25 8511/1 8515/11 8515/14 8516/7
8516/8 8516/12 8516/18 8517/11 8517/15
8517/15 8517/16 8517/16 8517/17 8517/20
8517/21 8517/21 8517/22 8522/21 8522/25
8522/25 8523/2 8523/3 8523/12 8523/12
8523/19 8523/23 8523/23 8523/24 8523/25
8524/1 8524/6 8524/9 8524/12 8524/15
8525/16 8525/17 8526/11 8526/11 8526/12
8526/22 8527/1 8527/21 8527/22 8528/23
8528/24 8528/25 8529/6 8542/7 8542/10
8542/13 8542/17 8545/9 8546/10 8547/13
8561/11 8561/20 8561/21 8562/1 8562/3
8562/7 8562/9 8562/12 8562/15 8562/17
8562/22 8562/25 8563/3 8565/18 8565/22
8567/1 8567/2 8567/3 8567/8 8567/14 8567/18
8567/20 8567/21 8568/1 8568/8 8568/8
8568/12 8568/18 8570/10 8570/13 8570/15
8570/17 8570/19 8571/2 8571/13 8571/18
8571/21 8571/25 8572/3 8573/6 8573/9
8573/12 8573/20 8573/25 8574/3 8574/6
8574/10 8574/15 8574/19 8574/25 8575/1
8575/4 8575/6 8575/13 8581/15 8581/16

**Shea [1]** 8375/22

**sheet [10]** 8308/11 8492/2 8505/21 8529/16
8559/16 8559/19 8559/24 8565/14 8579/16
8579/21

**sheets [2]** 8445/19 8527/2

**shell [2]** 8470/8 8470/10

**Shkreli [38]** 8309/12 8313/3 8318/13 8319/17
8412/16 8418/1 8443/24 8445/13 8445/16
8445/21 8445/24 8449/12 8450/8 8450/17
8450/21 8451/1 8451/3 8451/20 8454/10
8455/12 8486/9 8486/13 8490/10 8496/9
8496/10 8499/19 8500/23 8506/15 8511/25
8514/17 8517/16 8518/6 8523/23 8528/24
8529/4 8541/23 8562/17 8570/19

**Shkreli's [4]** 8313/22 8454/2 8454/6 8454/11

**shoes [2]** 8312/8 8314/19

**short [8]** 8379/18 8430/14 8435/6 8435/11
8435/14 8435/19 8458/12 8554/6

**shorter [1]** 8582/20

**should-pay-for [1]** 8316/8

**show [40]** 8331/12 8337/14 8339/6 8389/18
8407/25 8408/3 8408/6 8480/9 8482/23
8486/25 8491/9 8496/16 8498/8 8498/24
8499/9 8499/18 8500/9 8507/19 8511/22
8511/23 8516/19 8521/19 8525/11 8527/5
8536/8 8545/16 8553/18 8553/20 8554/10

**showed [5]** 8566/21 8569/10 8569/12 8571/8
8575/10

**showing [2]** 8380/21 8564/17

**shown [5]** 8442/25 8543/25 8569/5 8571/9
8572/16

**shows [21]** 8332/8 8383/2 8487/2 8492/17
8496/22 8497/22 8498/9 8498/25 8499/10
8499/19 8500/19 8505/10 8511/9 8525/15
8525/18 8526/10 8526/14 8527/19 8528/15
8530/8 8579/17

**sic [2]** 8334/9 8424/1

**side [6]** 8321/3 8365/1 8462/10 8464/23
8465/2 8465/4

**sidebar [38]** 8328/24 8329/1 8341/4 8341/4
8342/5 8342/20 8342/25 8343/12 8344/22
8351/1 8351/6 8352/2 8355/13 8356/2 8360/12
8361/20 8363/22 8395/5 8395/13 8396/1
8400/3 8414/12 8417/8 8425/3 8425/5 8433/21
8441/16 8452/13 8452/15 8452/18 8452/21
8452/23 8455/24 8548/11 8548/14 8549/3
8556/10 8559/10

**sides [7]** 8328/21 8328/21 8331/23 8421/15
8433/17 8455/4 8485/15

**sign [2]** 8437/3 8437/6

**signed [1]** 8429/12

**significance [1]** 8382/15

**significant [16]** 8372/6 8373/16 8374/10
8381/16 8381/23 8383/19 8386/12 8386/25
8387/3 8398/10 8423/10 8430/18 8463/4
8481/6 8481/7 8512/19

**significantly [6]** 8372/3 8372/5 8373/14 8374/6
8374/14 8483/19

**signs [3]** 8429/15 8430/4 8430/7

**similar [11]** 8349/17 8349/19 8367/9 8372/10
8372/12 8394/20 8402/23 8403/8 8422/21
8424/4 8431/12

**simple [4]** 8463/17 8468/8 8560/3 8563/7

**simply [7]** 8453/12 8455/6 8473/7 8473/19
8473/21 8493/16 8581/1

**simultaneous [1]** 8528/16

**simultaneously [3]** 8514/7 8527/9 8527/21

**single [7]** 8341/23 8358/8 8399/24 8404/9
8406/3 8406/11 8571/6

**single-spaced [2]** 8341/23 8404/9

**sit [2]** 8442/7 8446/20

**site [5]** 8336/15 8344/17 8352/24 8475/1
8475/2

**sitting [7]** 8429/13 8535/13 8542/16 8561/23
8567/13 8567/25 8571/1

**situation [20]** 8308/21 8312/11 8315/13
8318/1 8319/13 8341/19 8394/2 8394/19
8402/22 8403/6 8416/19 8420/16 8422/20
8422/20 8424/4 8424/9 8424/23 8424/25
8426/19 8454/20

**situations [6]** 8342/10 8446/13 8447/20
8448/3 8448/19 8448/24

**six [6]** 8488/8 8488/21 8489/4 8519/16
8531/20 8567/23

**skip [1]** 8479/8

**slightly [3]** 8343/23 8343/24 8506/13

**slow [1]** 8525/21

**small [11]** 8364/21 8364/25 8365/1 8365/1
8365/17 8368/17 8370/20 8375/16 8376/4
8426/24 8472/5

**smart [1]** 8362/24

**SMITH [12]** 8307/15 8357/8 8357/10 8384/2
8397/25 8417/4 8420/1 8428/19 8446/11
8447/3 8449/13 8584/4

**Smith's [1]** 8447/12

**sold [80]** 8478/19 8479/10 8482/2 8492/22
8493/9 8493/10 8493/15 8494/5 8494/19
8497/9 8497/15 8498/11 8499/16 8500/20
8500/22 8500/22 8501/1 8501/2 8501/4
8501/19 8502/4 8503/9 8503/13 8504/2
8504/17 8504/19 8515/8 8515/11 8515/14

**S**

sold... **[51]** 8516/8 8516/13 8517/12 8517/15
8517/16 8517/17 8517/21 8517/21 8517/22
8522/25 8522/25 8523/4 8523/12 8523/18
8523/23 8524/1 8524/6 8524/9 8524/12
8524/15 8525/16 8525/17 8526/10 8526/11
8528/24 8562/12 8563/3 8563/5 8563/17
8563/21 8567/1 8567/2 8567/3 8567/8 8567/14
8567/17 8567/20 8568/8 8568/12 8568/19
8571/2 8571/5 8571/13 8571/18 8571/21
8571/24 8572/3 8573/3 8573/9 8573/19
8573/20
sole **[1]** 8336/23
solely **[1]** 8319/16
solicit **[2]** 8343/7 8352/17
soliciting **[1]** 8342/16
solution **[1]** 8454/20
solvency **[1]** 8471/8
someone **[6]** 8322/24 8327/2 8368/20 8552/15
8552/16 8555/20
sometime **[4]** 8346/1 8346/2 8370/25 8408/10
sometimes **[9]** 8415/18 8434/22 8434/24
8434/24 8435/6 8435/14 8435/15 8435/19
8566/7
somewhat **[1]** 8341/15
somewhere **[4]** 8326/1 8415/21 8485/1
8519/16
soon **[2]** 8356/14 8508/1
sorry **[41]** 8330/3 8336/14 8350/12 8364/14
8373/13 8378/8 8378/15 8384/5 8389/3
8401/10 8408/13 8411/4 8439/3 8441/4 8452/9
8474/13 8474/14 8484/24 8489/8 8490/19
8491/10 8500/7 8503/8 8520/6 8536/10 8546/7
8546/8 8551/10 8551/19 8560/13 8564/5
8564/17 8566/5 8569/3 8569/15 8569/20
8572/15 8575/20 8577/1 8577/3 8579/14
sort **[6]** 8326/15 8331/2 8331/7 8421/16
8455/15 8464/22
sorts **[6]** 8322/18 8341/9 8361/19 8407/8
8408/8 8440/22
sought **[2]** 8550/15 8552/4
sound **[2]** 8360/10 8409/12
sounded **[2]** 8400/19 8404/19
sounds **[5]** 8337/18 8340/15 8415/20
source **[12]** 8483/8 8505/20 8544/8 8544/12
8544/20 8544/23 8545/2 8553/12 8554/18
8556/6 8559/4 8559/13
sourced **[1]** 8329/15
space **[1]** 8383/8
spaced **[2]** 8341/23 8404/9
span **[1]** 8408/10
speaker **[1]** 8518/14
speaking **[10]** 8382/3 8401/9 8441/16 8463/16
8470/15 8470/16 8471/5 8471/19 8471/25
8513/10
specific **[46]** 8310/8 8316/2 8323/3 8326/2
8331/9 8344/5 8344/11 8345/5 8345/17
8345/19 8346/3 8353/1 8353/4 8353/7 8355/2
8355/3 8355/15 8355/16 8357/1 8359/8
8362/16 8366/19 8373/4 8373/21 8374/18
8375/9 8376/1 8384/8 8405/5 8406/9 8408/20
8416/14 8429/2 8429/3 8429/5 8429/7 8430/3
8431/8 8432/10 8432/13 8437/23 8463/21
8466/12 8467/9 8490/8 8509/8
specifically **[8]** 8336/21 8342/9 8363/11
8399/23 8431/5 8443/5 8509/7 8552/11
specificity **[8]** 8344/12 8344/13 8344/15
8361/9 8398/23 8424/8 8427/16 8428/13
specifics **[1]** 8545/11
specify **[1]** 8358/17
speculative **[7]** 8472/4 8472/6 8477/1 8477/2
8477/9 8489/25 8521/7
spell **[1]** 8458/24
spelled **[1]** 8349/14
spending **[1]** 8372/1
spent **[3]** 8371/4 8451/25 8580/18
spoken **[1]** 8392/1 8469/8 8486/17
spot **[2]** 8475/1 8485/19

squarely **[2]** 8355/20 8356/19
stabilize **[1]** 8521/14
stabilizer **[1]** 8532/9
stabilizing **[1]** 8514/5
stable **[4]** 8490/5 8516/5 8521/12 8580/9
staff **[1]** 8540/14
stages **[1]** 8472/5
stand **[8]** 8324/12 8324/18 8336/17 8337/8
8407/5 8422/7 8458/6 8458/21
standard **[3]** 8361/24 8414/20 8456/20
standards **[1]** 8471/22
standing **[3]** 8312/8 8368/23 8376/15
standpoint **[1]** 8409/12
stands **[1]** 8404/23
start **[5]** 8321/6 8322/5 8343/18 8359/19
8401/5
start-up **[1]** 8421/8
started **[4]** 8378/25 8408/5 8408/12 8408/13
starting **[6]** 8376/4 8381/22 8383/1 8493/5
8494/25 8551/13
starts **[1]** 8403/4
state **[38]** 8309/10 8309/21 8311/20 8313/10
8314/1 8315/24 8320/8 8330/19 8330/20
8330/21 8332/13 8333/1 8333/6 8333/14
8336/18 8337/2 8337/4 8337/15 8337/23
8338/13 8339/5 8339/6 8339/9 8339/9 8340/7
8404/12 8405/8 8405/23 8407/3 8413/12
8416/10 8420/7 8458/24 8459/7 8475/20
8475/20 8481/11 8481/14
state-of-mind **[2]** 8405/23 8407/3
statement **[43]** 8336/21 8339/2 8339/3 8339/7
8339/25 8340/4 8340/19 8340/21 8344/8
8357/16 8357/17 8357/18 8372/9 8376/23
8386/24 8389/18 8397/12 8397/20 8398/9
8398/12 8398/25 8400/16 8401/18 8401/24
8401/25 8402/2 8406/6 8416/17 8418/5
8418/23 8423/9 8423/12 8454/18 8552/10
8552/18 8552/20 8553/11 8553/12 8553/18
8555/12 8555/15 8555/22 8555/24
statements **[41]** 8318/9 8332/16 8336/16
8336/25 8337/7 8337/15 8337/22 8338/8
8338/10 8339/18 8339/18 8339/19 8340/3
8343/24 8346/20 8361/19 8361/24 8368/4
8368/18 8388/5 8390/4 8391/6 8394/16
8398/11 8402/18 8404/21 8404/25 8410/18
8420/10 8422/15 8423/11 8432/10 8454/4
8454/5 8454/7 8454/11 8454/15 8454/16
8477/15 8552/22 8553/21
STATES **[18]** 8307/1 8307/3 8307/3 8307/10
8307/13 8307/16 8336/19 8337/9 8338/4
8338/21 8342/25 8365/4 8365/21 8533/6
8576/22 8577/8 8577/15 8578/23
stating **[1]** 8579/21
statutes **[3]** 8309/1 8310/8 8312/1
stay **[4]** 8321/8 8393/8 8406/18 8434/17
stayed **[1]** 8321/7
stenography **[1]** 8307/24
step **[2]** 8456/5 8521/16
stepping **[1]** 8521/25
steps **[1]** 8317/10
Steve **[1]** 8375/8
still **[12]** 8316/12 8328/15 8334/14 8335/19
8358/7 8471/17 8502/12 8503/20 8516/17
8550/9 8552/8 8579/24
stip **[1]** 8490/20
stipulate **[1]** 8415/8
stock **[153]** 8326/25 8373/11 8373/13 8373/13
8390/7 8390/8 8390/10 8390/11 8467/21
8467/22 8468/2 8468/4 8468/11 8469/10
8469/11 8469/15 8469/15 8469/21 8470/5
8470/14 8470/16 8471/1 8471/4 8471/14
8471/15 8472/7 8472/20 8473/4 8473/5 8473/8
8476/5 8477/8 8477/10 8477/16 8477/19
8478/10 8478/20 8478/22 8479/3 8479/6
8479/10 8480/22 8480/23 8480/25 8481/16
8483/14 8487/2 8489/13 8489/14 8489/15
8489/16 8489/23 8490/23 8490/2 8490/3

8490/6 8490/6 8492/19 8492/22 8493/7
8494/12 8495/1 8496/8 8496/9 8496/1 8496/17
8498/10 8498/25 8500/2 8500/6 8502/22
8503/2 8503/5 8503/6 8503/9 8511/16 8513/12
8513/12 8513/13 8513/14 8514/1 8514/3
8515/22 8516/5 8518/7 8518/8 8520/3 8520/4
8520/9 8520/10 8520/21 8520/22 8521/7
8521/16 8521/23 8521/25 8522/12 8522/13
8522/22 8523/10 8523/17 8523/22 8524/4
8524/11 8525/4 8525/7 8525/8 8525/9 8525/16
8525/18 8526/14 8526/14 8527/9 8527/9
8528/1 8528/2 8528/9 8529/22 8529/25
8529/25 8530/1 8530/2 8531/3 8531/16 8532/2
8532/6 8532/8 8532/11 8532/20 8542/7
8542/10 8542/14 8542/18 8543/6 8544/8
8545/9 8551/24 8551/25 8554/9 8561/11
8564/11 8565/8 8569/8 8569/22 8570/24
8574/16 8577/25 8579/24 8580/8 8580/12
8580/23 8580/25 8581/16 8582/6
stock's **[1]** 8521/12
stockholders **[1]** 8390/9
stocks **[4]** 8471/16 8472/17 8472/23 8521/5
stomping **[1]** 8335/5
stop **[3]** 8331/17 8406/12 8456/19
stopping **[1]** 8396/11
strategies **[5]** 8310/9 8315/23 8473/16
8473/17 8473/19 8474/3
strategy **[2]** 8310/24 8473/21
streamline **[1]** 8550/16
Street **[1]** 8383/9
strengthened **[5]** 8373/15 8374/6 8374/8
8374/14 8386/10
strick **[1]** 8398/18
stricken **[7]** 8397/24 8397/25 8398/4 8403/12
8403/15 8422/12 8509/24
strictly **[1]** 8321/14
strike **[21]** 8362/7 8362/20 8363/20 8397/21
8398/21 8398/21 8399/23 8399/24 8400/8
8401/6 8401/14 8401/14 8402/16 8402/21
8403/4 8403/18 8508/18 8508/20 8510/5
8510/9 8559/9
strikes **[1]** 8402/15 8422/6
striking **[1]** 8510/12
strong **[2]** 8370/3 8428/2
struck **[2]** 8396/8 8396/13
Struggling **[1]** 8384/5
student **[1]** 8415/9
students **[1]** 8461/1
studied **[1]** 8379/12
Studies **[1]** 8463/4
study **[1]** 8462/4
stuff **[1]** 8409/4
Su **[1]** 8343/21
sub **[1]** 8475/13
subject **[2]** 8328/5 8556/5
submerged **[1]** 8475/15
submission **[1]** 8433/14
submissions **[2]** 8312/21 8421/19
submit **[4]** 8361/1 8405/21 8474/20 8583/2
submits **[1]** 8404/7
submitted **[4]** 8348/24 8387/9 8396/12
8417/24
submitting **[3]** 8366/15 8372/21 8378/21
subpoena **[1]** 8433/5
subsequent **[3]** 8375/4 8453/6
subsequently **[1]** 8375/4
subsidiary **[3]** 8448/20 8475/12 8475/17
substance **[1]** 8427/20
substantive **[4]** 8316/9 8317/1 8435/24 8436/1
suddenly **[1]** 8420/20
sue **[4]** 8310/3 8313/7 8313/8 8317/23
sufficient **[2]** 8426/7 8529/21
suggest **[1]** 8312/22
suggested **[1]** 8452/12
suggesting **[1]** 8314/9
suggestion **[4]** 8322/4 8452/10 8453/1
8454/21

**S**

suggests [1] 8525/1
Sullivan [17] 8486/13 8487/19 8488/2 8490/11
8495/8 8495/9 8495/10 8498/8 8498/10
8506/12 8513/17 8515/6 8517/17 8523/18
8523/22 8562/14 8570/15
Sullivan's [1] 8498/18
sum [2] 8427/20 8529/5
summarize [2] 8402/9 8402/9
summarizing [1] 8540/9
summary [13] 8486/25 8487/2 8522/11 8527/8
8531/23 8539/9 8540/3 8540/6 8569/7 8575/22
8576/4 8577/21 8578/18
summer [20] 8339/24 8339/25 8343/25 8344/3
8344/8 8346/1 8357/9 8357/10 8357/15
8358/14 8358/18 8387/14 8387/19 8388/1
8388/20 8389/5 8389/17 8389/24 8391/18
8461/16
sums [1] 8500/24
supervised [4] 8539/20 8539/23 8546/1
8553/3
supervises [1] 8465/23
supervisory [1] 8407/6
supplemental [2] 8308/19 8309/2
supplies [1] 8468/7
support [6] 8404/10 8464/21 8464/23 8465/7
8467/9 8514/5
supported [1] 8552/21
suppose [2] 8420/22 8431/14
supposed [3] 8332/5 8341/19 8393/7
supposedly [1] 8552/5 8553/10
surprised [2] 8353/3 8354/25
surviving [1] 8475/16
sustain [3] 8325/11 8328/7 8339/22 8346/11
8356/5 8359/25 8400/7 8400/9 8405/13
8439/23 8451/23
sustained [25] 8327/4 8327/24 8346/10 8356/8
8356/25 8366/4 8383/22 8385/21 8385/22
8390/17 8396/23 8400/7 8401/2 8405/2
8408/24 8409/4 8410/10 8410/25 8448/23
8501/24 8518/1 8560/19 8579/20 8581/4
8581/23
sustaining [1] 8346/24
swap [1] 8462/21
sworn [3] 8324/20 8458/23 8552/12
sworn/affirmed [2] 8324/20 8458/23
symbol [1] 8481/17
systems [1] 8463/19

**T**

tab [9] 8349/25 8350/2 8366/10 8372/14
8372/15 8378/5 8378/17 8544/3 8576/15
Tab 36 [1] 8576/15
tailored [3] 8360/24 8362/11 8363/11
talks [3] 8368/22 8374/20 8414/17
tank [1] 8538/12
Tanke [14] 8353/14 8353/15 8364/16 8365/19
8365/22 8366/2 8368/14 8394/11 8396/8
8396/20 8398/7 8399/11 8423/6 8424/4
target [2] 8310/17 8342/12
targeted [4] 8342/9 8342/15 8359/8 8360/24
taught [8] 8407/17 8427/20 8427/24 8460/16
8460/20 8460/22 8461/15 8461/21
teach [9] 8459/23 8460/2 8460/15 8460/18
8460/19 8460/24 8460/25 8461/19 8462/1
teacher [1] 8461/4
teaching [4] 8460/18 8461/2 8461/3 8461/6
team [4] 8332/4 8398/21 8553/10 8553/20
technical [1] 8399/23
technically [2] 8400/8 8438/15
Teich [1] 8307/22
telephone [1] 8444/2
temporal [8] 8358/2 8359/20 8409/24 8421/1
ten [8] 8392/10 8421/3 8423/18 8434/23
8435/9 8460/12 8508/3 8512/12
ten-minute [1] 8434/23
tend [6] 8472/12 8503/6 8513/24 8520/22
8526/21 8529/25

tending [1] 8530/1
tends [1] 8513/1
Tennessee [1] 8459/17
terms [12] 8309/4 8321/7 8325/19 8330/5
8349/4 8352/9 8359/18 8360/9 8362/3 8400/12
8407/15 8421/7
terrific [1] 8371/20
testified [64] 8324/20 8326/9 8327/5 8334/16
8392/12 8396/11 8397/13 8408/21 8410/17
8428/10 8428/11 8428/14 8435/4 8435/12
8442/17 8443/24 8449/24 8458/23 8468/12
8468/13 8468/14 8468/17 8533/10 8533/13
8534/7 8535/23 8538/6 8538/15 8539/1 8539/1
8539/2 8539/5 8539/7 8539/8 8540/19 8541/5
8541/10 8541/25 8542/7 8542/23 8543/2
8543/5 8549/7 8549/9 8550/21 8552/6 8552/25
8556/5 8556/6 8558/4 8560/21 8561/9 8561/10
8561/19 8564/6 8566/21 8568/11 8575/21
8576/3 8576/20 8577/15 8577/24 8578/14
8579/5
testify [16] 8311/5 8312/20 8317/5 8335/7
8339/7 8400/9 8406/24 8415/18 8426/3
8428/10 8429/2 8455/1 8455/1 8468/15
8547/23 8550/13
testifying [6] 8396/4 8404/6 8547/25 8550/18
8576/22 8577/8
testimony [98] 8308/9 8308/16 8309/3 8309/14
8309/19 8313/16 8316/2 8321/4 8321/9
8321/10 8321/13 8322/4 8322/9 8322/19
8322/21 8323/4 8323/15 8325/13 8330/22
8331/8 8333/15 8336/22 8336/25 8337/12
8337/12 8337/14 8338/6 8338/12 8338/15
8338/23 8353/11 8355/2 8355/17 8391/25
8394/10 8394/12 8394/14 8396/7 8396/19
8396/24 8397/19 8398/17 8402/9 8402/10
8402/17 8403/5 8404/11 8405/25 8406/22
8408/8 8408/16 8408/18 8409/10 8417/16
8418/22 8418/22 8419/16 8419/18 8422/14
8423/3 8426/11 8427/14 8428/9 8429/23
8430/1 8430/2 8431/3 8432/17 8442/10
8442/14 8442/21 8442/23 8452/20 8453/3
8453/12 8453/15 8453/20 8455/3 8455/13
8508/13 8509/4 8509/18 8512/3 8519/10
8519/23 8551/22 8552/5 8552/12 8553/16
8553/16 8556/3 8558/8 8559/1 8560/8 8561/2
8574/22 8575/3 8578/3
tether [2] 8409/23 8419/4
tethered [1] 8410/6
tethering [1] 8359/21
theory [1] 8334/1 8334/4
thereby [1] 8338/19
therefore [7] 8309/14 8313/5 8388/10 8390/5
8390/7 8410/17 8428/3
thereunder [1] 8478/25
they've [1] 8311/11 8386/11 8408/23
thin [1] 8344/5
thinking [8] 8310/22 8311/5 8313/12 8313/24
8314/12 8315/12 8315/14 8360/19
thinks [1] 8408/21
thinly [1] 8321/6
thinly-funded [1] 8321/6
third [6] 8342/6 8378/24 8386/9 8418/5 8418/9
8515/10
third-party [1] 8418/5 8418/9
Thomas [7] 8487/15 8490/10 8497/22 8506/9
8515/6 8541/15 8542/14
Thompson [1] 8377/1
thousand [5] 8421/8 8493/8 8493/9 8493/10
8493/17
threat [8] 8311/15 8313/14 8314/13 8314/14
8314/20 8412/18 8415/11 8416/12
threatening [2] 8311/1 8311/11
threats [6] 8309/11 8311/24 8313/21 8314/21
8314/22 8419/11
three [25] 8342/10 8347/15 8368/4 8368/15
8385/6 8385/15 8404/9 8409/6 8427/12 8453/8
8453/21 8453/23 8453/20 8459/10 8462/18
8479/21 8479/24 8517/10 8519/20 8523/16

8525/19 8526/15 8527/23 8562/12 8562/22
three-month [1] 8562/22
three-year [2] 8342/10 8427/12
throughout [4] 8335/4 8335/24 8431/2
8475/18
throw [3] 8331/24 8341/22 8360/11
ticker [1] 8481/16
tickets [2] 8472/16 8472/17
ticking [1] 8581/25
tie [1] 8427/6
tied [3] 8359/8 8414/24 8415/15
Tilles [8] 8486/13 8495/14 8495/15 8498/23
8506/13 8515/6 8541/19 8570/17
Tillis [1] 8562/14
Tim [28] 8486/14 8487/17 8488/3 8488/3
8488/4 8489/4 8496/15 8500/5 8500/6 8501/1
8502/4 8502/12 8506/16 8513/3 8513/5
8514/17 8515/8 8517/17 8541/17 8563/5
8565/12 8565/16 8565/22 8567/3 8567/11
8567/14 8571/18 8571/21
timeframes [1] 8551/13
timing [2] 8430/16 8432/24
Timothy [1] 8490/12
title [1] 8464/9
today [28] 8308/16 8330/7 8341/10 8384/5
8397/18 8410/14 8420/18 8426/18 8433/1
8433/2 8433/15 8442/10 8442/17 8442/23
8456/17 8473/19 8519/7 8535/1 8535/2
8535/13 8535/23 8542/16 8549/20 8558/8
8561/23 8567/13 8567/25 8571/1
together [9] 8393/5 8427/7 8466/7 8477/13
8501/4 8513/1 8517/14 8562/21 8563/18
Tom [2] 8486/14 8488/1
tomorrow [5] 8456/17 8582/19 8582/24 8583/9
8583/12
tonight [1] 8583/2
took [11] 8317/10 8330/6 8331/10 8358/10
8378/15 8393/16 8396/6 8416/10 8417/10
8430/6 8483/24
top [7] 8367/4 8369/14 8369/22 8375/1
8462/18 8478/18 8481/18
topic [13] 8317/20 8327/21 8327/25 8328/1
8339/20 8345/23 8387/12 8408/12 8409/24
8410/5 8521/10 8549/22 8550/14
topics [7] 8340/23 8341/9 8408/14 8408/14
8409/16 8446/5 8550/19
total [33] 8442/16 8487/3 8487/15 8487/20
8488/7 8488/20 8488/24 8489/1 8494/1 8499/5
8500/24 8501/25 8502/2 8503/9 8503/25
8511/19 8511/19 8516/7 8516/8 8523/3
8523/14 8564/1 8564/8 8565/7 8565/16
8565/18 8568/8 8568/18 8573/2 8573/3
8573/12 8575/12 8575/12
totally [3] 8319/13 8323/1 8356/18
touch [3] 8410/6 8456/6 8471/22
towards [1] 8509/4
town [4] 8424/22 8432/19 8432/20 8432/22
track [4] 8396/21 8396/25 8398/12 8423/12
tracking [1] 8505/16
trade [18] 8373/12 8386/6 8390/8 8471/25
8477/2 8489/11 8494/11 8506/9 8507/16
8515/7 8517/18 8521/18 8526/18 8543/5
8547/13 8562/6 8562/7 8580/12
traded [25] 8381/23 8382/18 8470/8 8476/11
8476/12 8481/24 8483/7 8487/20 8488/6
8505/24 8515/8 8528/25 8545/9 8546/11
8562/1 8562/4 8564/1 8565/18 8568/21 8574/3
8574/10 8574/20 8575/1 8575/7 8581/17
trades [11] 8500/1 8522/11 8527/25 8529/3
8529/5 8554/17 8569/7 8569/11 8569/21
8570/10 8570/23
trading [118] 8308/12 8463/19 8463/20 8467/3
8467/11 8467/12 8467/15 8468/3 8468/22
8469/2 8471/4 8473/16 8473/17 8473/18
8474/3 8476/15 8481/20 8483/19 8483/20
8483/23 8483/23 8487/4 8487/5 8487/12
8487/15 8487/19 8487/25 8488/7 8488/8
8488/8 8488/20 8488/21 8490/8 8491/23

**T**

**trading... [84]** 8492/16 8493/3 8496/23
8497/11 8497/23 8498/9 8498/18 8498/23
8499/10 8499/15 8499/19 8502/3 8504/20
8506/20 8507/18 8508/14 8509/9 8509/19
8511/10 8511/23 8512/23 8513/3 8514/4
8514/15 8515/3 8515/12 8515/19 8516/14
8516/15 8516/21 8516/24 8522/14 8526/19
8526/19 8526/24 8528/6 8528/7 8528/8 8528/9
8528/10 8528/18 8529/13 8529/14 8529/17
8529/18 8529/20 8530/21 8531/24 8532/5
8532/16 8532/17 8561/5 8561/11 8562/3
8562/7 8562/17 8562/21 8562/25 8563/8
8564/8 8564/10 8565/7 8565/7 8565/12
8565/21 8566/11 8566/20 8566/21 8568/18
8571/10 8572/7 8573/12 8574/6 8574/15
8574/19 8574/21 8574/22 8575/1 8575/12
8575/13 8580/3 8581/15 8581/20 8582/6
**Trading-wise [1]** 8507/18
**traditional [2]** 8312/18 8470/3
**trans [1]** 8505/10
**transact [1]** 8490/7
**transacting [1]** 8488/25
**transaction [12]** 8368/3 8373/4 8397/1 8397/3
8399/2 8399/6 8423/20 8423/23 8424/9
8424/10 8424/14 8475/17
**transactions [16]** 8325/6 8353/1 8355/2
8365/9 8366/19 8367/11 8367/21 8369/12
8375/10 8375/13 8377/3 8473/3 8476/7
8478/21 8482/21 8500/15
**transcript [20]** 8307/9 8307/24 8324/25 8327/7
8330/13 8330/15 8396/6 8396/18 8397/15
8401/13 8402/8 8423/2 8443/7 8457/2 8457/3
8508/10 8508/25 8510/1 8549/18 8578/5
**transcription [2]** 8307/25 8508/6
**transcripts [1]** 8508/22
**transition [3]** 8392/13 8393/1 8393/9
**transitioning [6]** 8333/19 8386/13 8386/19
8386/21 8434/20 8435/5
**treated [1]** 8418/18
**trial [21]** 8307/9 8319/11 8336/22 8337/7
8338/16 8360/7 8360/15 8404/5 8421/20
8421/24 8431/2 8433/4 8453/14 8454/3 8454/6
8454/10 8454/25 8455/12 8455/17 8539/3
8539/5
**tried [6]** 8359/12 8396/21 8398/12 8410/21
8422/3 8423/12
**tries [2]** 8431/19 8525/14
**trillion [1]** 8367/23
**trouble [2]** 8397/21 8490/19
**troubled [1]** 8360/1
**truck [1]** 8336/6
**true [5]** 8338/11 8416/17 8420/4 8554/12
8568/10
**trunk [1]** 8330/16
**trust [1]** 8354/3
**truth [33]** 8326/6 8332/14 8332/21 8334/23
8334/23 8335/1 8335/12 8335/15 8335/20
8335/24 8336/4 8337/1 8337/14 8338/9
8346/22 8389/17 8408/2 8411/19 8414/24
8416/3 8416/7 8416/22 8417/9 8419/25
8420/15 8420/15 8421/2 8421/5 8430/19
8431/1 8554/25 8555/1 8556/7
**try [29]** 8328/12 8343/2 8343/11 8354/10
8356/12 8363/3 8363/11 8380/3 8382/5 8388/7
8388/12 8388/22 8389/9 8390/1 8394/7 8402/8
8429/10 8432/16 8435/2 8456/16 8456/17
8485/25 8516/4 8521/17 8527/6 8529/21
8553/15 8553/17 8553/17
**trying [25]** 8312/4 8314/7 8314/13 8315/11
8317/25 8321/6 8328/18 8333/25 8336/5
8340/25 8359/18 8402/8 8412/9 8413/7
8420/17 8422/4 8422/16 8451/17 8462/7
8462/11 8473/21 8485/18 8521/14 8526/8
8553/8
**Tuck [1]** 8461/14
**turn [20]** 8348/15 8349/22 8349/25 8350/2
8372/14 8378/5 8380/22 8474/4 8474/7 8475/6

**turning [7]** 8492/14 8494/6 8495/6 8497/18
8497/24 8499/7 8499/18
**twelve [1]** 8383/8
**Twenty [1]** 8527/23
**Twenty-three [1]** 8527/23
**twice [3]** 8563/21 8563/22 8563/24
**twins [2]** 8353/19 8381/22
**two [38]** 8334/16 8347/17 8362/25 8379/19
8381/8 8392/15 8392/15 8392/17 8403/14
8408/10 8415/3 8415/21 8420/23 8421/15
8421/15 8429/7 8432/1 8442/15 8470/2 8474/2
8479/13 8492/24 8495/16 8512/4 8519/20
8520/22 8523/20 8527/21 8538/7 8549/25
8560/3 8570/9 8571/25 8572/2 8578/10
8583/11 8583/12 8583/14
**two-year [1]** 8334/16 8408/10
**type [19]** 8322/24 8355/8 8364/19 8367/1
8367/16 8369/6 8369/20 8373/8 8373/23
8375/15 8376/3 8386/7 8407/22 8427/11
8468/1 8494/8 8521/3 8526/19 8532/17
**types [17]** 8310/7 8352/10 8460/16 8461/25
8462/5 8462/9 8463/16 8463/18 8467/23
8469/22 8469/23 8470/24 8470/19 8470/22
8471/25 8473/16 8520/24
**typical [1]** 8472/2
**typically [12]** 8467/17 8467/22 8468/6 8470/8
8471/7 8472/4 8473/9 8473/11 8473/12
8473/14 8482/10 8526/19

**U**

**ultimate [3]** 8308/23 8321/22 8322/2
**ultimately [2]** 8416/24 8553/19
**unable [6]** 8396/22 8398/13 8423/13 8476/9
8512/23 8557/14
**unavailable [1]** 8454/24
**uncertainties [1]** 8477/13
**under [22]** 8308/25 8309/20 8313/10 8313/10
8321/20 8330/25 8334/1 8334/4 8339/10
8350/5 8356/20 8365/22 8406/4 8407/11
8414/19 8476/6 8478/23 8478/24 8481/16
8502/2 8555/16 8574/25
**undergrad [2]** 8457/9 8459/11
**underlying [2]** 8479/7 8505/20
**underpriced [1]** 8474/1
**understood [8]** 8335/12 8335/17 8354/25
8412/21 8422/2 8427/4 8432/2 8450/15
**undervalued [2]** 8473/24 8489/25
**undue [2]** 8340/6 8411/14
**unduly [1]** 8414/22
**unfair [6]** 8323/23 8360/5 8360/5 8360/9
8400/7 8418/17
**unhinged [3]** 8334/15 8334/17 8334/18
**unidentified [1]** 8321/20
**UNITED [18]** 8307/1 8307/3 8307/3 8307/10
8307/13 8307/16 8336/19 8337/9 8338/4
8338/21 8342/25 8365/4 8365/21 8533/6
8576/22 8577/8 8577/15 8578/23
**universities [1]** 8461/21
**University [10]** 8459/7 8459/9 8459/15
8459/16 8459/18 8461/14 8461/15 8461/17
8534/18 8537/23
**unless [3]** 8344/5 8360/22 8456/14
**unreasonable [1]** 8406/10
**unrestricted [1]** 8373/12
**untethered [4]** 8408/9 8411/24 8416/21
8427/12
**up [64]** 8308/16 8308/22 8313/9 8321/6
8325/12 8328/21 8331/19 8336/12 8342/3
8355/19 8355/21 8358/18 8360/3 8360/11
8370/21 8371/7 8371/20 8373/12 8376/5
8379/8 8379/12 8379/12 8380/2 8388/9
8391/24 8410/14 8410/21 8414/9 8426/6
8430/3 8455/19 8455/19 8456/15 8462/12
8473/11 8479/5 8483/19 8484/14 8493/1
8493/17 8496/12 8503/2 8503/23 8506/3
8508/22 8509/25 8511/6 8513/11 8514/10

**U**

**ultimate [3]** ...
**undergrad [2]** ...

**U**

**up [64]** ...

**8475/22 8478/2 8486/24 8494/13 8495/12
8498/7 8499/4 8503/16 8504/22 8521/10**

**8516/5 8517/24 8519/19 8521/12 8521/15
8525/2 8535/2 8536/10 8541/3 8542/20 8544/3
8545/17 8546/20 8551/14 8552/18
up-sides [1]** 8328/21
**uplist [2]** 8478/10 8478/12
**uplisted [5]** 8483/15 8483/18 8483/21 8483/25
8484/8
**uplisting [1]** 8485/23
**uplists [1]** 8481/25
**upper [2]** 8511/25 8513/4
**upsides [5]** 8410/15 8412/4 8413/6 8413/8
8414/18
**useful [1]** 8545/2

**V**

**vague [3]** 8312/1 8340/23 8411/7
**Vaino [44]** 8486/14 8487/18 8488/2 8490/11
8495/20 8495/21 8495/25 8499/10 8499/11
8500/22 8503/9 8503/23 8504/10 8504/11
8504/18 8506/14 8507/4 8507/5 8507/8 8509/7
8512/1 8515/7 8517/16 8517/21 8522/25
8523/12 8523/14 8523/23 8525/17 8526/11
8528/24 8529/6 8541/21 8563/22 8563/23
8567/1 8567/8 8567/17 8567/17 8567/22
8570/2 8571/2 8580/23 8580/25
**valid [8]** 8313/3 8314/10 8314/23 8318/11
8318/11 8321/9 8359/7 8414/14
**validate [2]** 8312/5 8314/13
**validity [1]** 8312/13
**Vallee [2]** 8336/19 8336/23
**Vallee's [1]** 8337/2
**valuation [2]** 8460/19 8463/17
**value [4]** 8411/13 8416/23 8416/25 8503/2
**Vanderbilt [8]** 8459/15 8459/16 8459/18
8460/6 8460/13 8466/22 8534/18 8537/22
**variety [1]** 8368/25 8370/5 8570/5
**various [4]** 8408/19 8492/20 8505/11 8517/12
**vast [2]** 8374/15 8504/19
**veering [1]** 8322/5
**vehicle [1]** 8479/14
**vehicles [1]** 8480/18
**venture [3]** 8345/13 8413/1 8413/24
**venue [1]** 8471/16
**Verde [3]** 8354/17 8354/18 8354/19
**verification [1]** 8560/6
**verified [18]** 8534/21 8534/22 8549/9 8549/11
8549/15 8549/19 8550/2 8550/5 8550/6 8551/3
8551/5 8551/11 8551/21 8554/3 8554/4 8555/5
8557/13 8558/5
**verify [9]** 8537/10 8537/11 8550/7 8557/14
8557/22 8559/2 8560/9 8565/1 8565/3
**Versed [3]** 8338/21
**versus [24]** 8327/22 8328/9 8328/22 8331/9
8336/19 8337/9 8338/4 8342/25 8410/16
8411/2 8413/9 8414/4 8414/18 8415/2 8471/19
8553/15 8553/16 8557/16 8576/23 8577/9
8577/15 8578/24 8578/25 8579/2
**via [1]** 8314/2
**vice [1]** 8466/17
**vice-chairman [1]** 8466/17
**victim [1]** 8320/25
**video [2]** 8453/18 8453/19
**videotape [2]** 8454/5 8454/18
**videotaped [1]** 8455/4
**view [19]** 8311/2 8317/1 8319/19 8382/15
8384/11 8388/3 8388/21 8388/24 8389/2
8400/16 8400/18 8401/24 8405/7 8405/22
8406/24 8411/19 8455/14 8493/2 8580/10
**views [1]** 8356/3
**vigorously [1]** 8316/24
**virtual [11]** 8378/25 8379/4 8379/8 8379/10
8379/13 8383/3 8383/7 8383/13 8383/17
8384/13 8384/19
**visibility [1]** 8482/14
**visit [1]** 8450/8
**visited [1]** 8461/13
**visiting [4]** 8461/11 8461/13 8461/16 8461/18
**volatile [1]** 8531/1

## V

volatility [3] 8462/11 8462/13 8463/6
volume [76] 8308/14 8467/5 8468/3 8483/3
8483/6 8483/8 8483/14 8483/17 8483/19
8483/20 8492/23 8492/25 8493/1 8493/8
8493/9 8493/14 8493/16 8493/18 8500/13
8501/25 8511/15 8511/19 8511/23 8514/7
8529/20 8529/21 8529/24 8530/2 8530/9
8530/18 8531/9 8531/17 8544/5 8544/13
8544/14 8544/15 8544/19 8544/23 8544/24
8545/2 8549/24 8550/4 8550/11 8550/21
8551/24 8551/25 8553/1 8553/3 8553/4 8553/5
8554/9 8554/14 8554/16 8554/17 8554/19
8559/19 8564/1 8565/7 8565/12 8565/13
8565/14 8565/18 8565/24 8572/18 8573/2
8573/3 8574/21 8574/22 8577/25 8578/15
8578/17 8580/3 8580/17 8580/21 8581/5
8582/3
volumes [1] 8568/8
vulnerability [1] 8312/16
vulnerable [1] 8317/3

## W

wait [6] 8334/3 8338/2 8424/16 8424/18
8426/2 8555/9
waiting [4] 8333/10 8336/10 8431/15 8431/16
waive [1] 8426/13
waived [1] 8426/10
walked [2] 8334/3 8575/11
Wall [1] 8383/9
Walter [3] 8367/1 8370/13 8374/22
wants [6] 8409/4 8430/21 8454/4 8455/22
8521/4 8550/18
warned [1] 8341/25
warrant [1] 8479/7
warrants [1] 8479/4
wash [7] 8526/18 8526/19 8526/24 8529/13
8529/14 8529/17 8529/18
watching [1] 8401/13
ways [2] 8469/25 8470/2
wear [1] 8438/14
web [3] 8352/23 8475/1 8475/2
week [6] 8336/7 8432/22 8519/13 8519/15
8519/19 8519/20
weekends [1] 8528/9
weigh [1] 8466/8
weighed [1] 8467/7
Weinberg [3] 8367/1 8370/13 8374/22
whereas [1] 8465/22
whichever [1] 8503/16
white [3] 8339/1 8339/4 8463/25
white-collar [2] 8339/1 8339/4
whole [3] 8333/21 8343/15 8573/22
wholly [2] 8475/12 8475/16
wholly-owned [2] 8475/12 8475/16
wide [5] 8360/25 8369/15 8369/25 8463/1
8470/23
widely [2] 8544/8 8544/12
widely-accepted [2] 8544/8 8544/12
Wigginton [1] 8460/7
willing [3] 8317/3 8514/3 8573/15
win [1] 8317/5
Winklevoss [7] 8352/5 8353/19 8353/21
8354/5 8381/11 8381/22 8382/17
Winklevosses [1] 8382/22
WINSTON [1] 8307/21
wire [6] 8320/25 8447/17 8448/13 8448/13
8448/14 8448/17
wired [3] 8383/10 8447/14 8447/16
Wisconsin [1] 8459/9
wise [1] 8507/18
wish [2] 8426/14 8583/2
wit [2] 8352/2 8549/3
withdraw [6] 8402/25 8403/16 8403/18
8447/22 8451/13 8581/13
withdrawing [1] 8359/10
withdrawn [6] 8347/21 8385/10 8386/20
8566/15 8575/9 8575/16

witness [71] 8308/10 8308/17 8315/9 8317/5
8324/1 8324/13 8324/19 8324/19 8328/1
8331/3 8332/21 8333/17 8336/17 8336/23
8337/8 8341/8 8343/8 8344/6 8358/10 8361/10
8362/4 8362/16 8363/12 8396/20 8398/2
8400/3 8404/11 8404/16 8404/18 8406/22
8406/23 8408/25 8409/18 8409/19 8416/17
8420/16 8422/7 8424/16 8424/19 8426/15
8426/15 8433/6 8433/7 8441/18 8449/8
8453/16 8454/24 8455/1 8455/6 8456/8
8456/10 8457/2 8458/6 8458/6 8458/18
8458/21 8458/21 8458/22 8503/17 8508/9
8539/9 8540/3 8540/6 8552/25 8553/10
8555/11 8575/22 8577/21 8578/13 8583/10
8584/2
witness' [2] 8401/15 8555/15
witness's [2] 8453/20 8455/3
witnesses [12] 8308/4 8338/18 8354/13
8362/5 8404/16 8406/10 8406/16 8406/16
8407/2 8409/2 8425/1 8583/11
witnesses' [1] 8431/12
won [6] 8461/2 8461/3 8462/14 8462/16
8462/17 8462/20
wondering [1] 8583/10
word [4] 8401/15 8402/14 8508/9 8573/15
words [4] 8369/21 8391/21 8412/11 8412/11
works [4] 8431/22 8468/6 8486/19 8486/21
world [4] 8366/24 8374/4 8383/1 8466/15
worry [1] 8485/14
worth [4] 8312/17 8316/13 8474/1 8477/24
write [6] 8365/23 8366/1 8366/6 8366/7 8366/8
8465/12
write-off [3] 8366/6 8366/7 8366/8
write-offs [1] 8365/23
writing [6] 8376/24 8377/1 8377/4 8377/5
8384/22 8468/10
written [3] 8318/16 8349/13 8463/24
wrote [5] 8310/23 8368/16 8372/10 8377/16
8462/21

## X

XYZ [3] 8357/19 8357/19 8552/7

## Y

year [14] 8334/16 8334/17 8342/10 8348/16
8369/12 8372/6 8373/2 8386/11 8393/9
8408/10 8427/12 8432/7 8450/16 8462/20
years [25] 8325/5 8340/17 8340/23 8359/20
8362/22 8362/25 8369/1 8378/15 8393/4
8393/16 8415/4 8415/21 8420/23 8434/19
8436/6 8459/10 8459/25 8460/12 8460/17
8461/4 8461/12 8463/13 8463/15 8467/2
8538/1
yellow [1] 8501/15
yesterday [28] 8313/8 8313/13 8316/19
8324/24 8330/7 8330/11 8341/9 8342/9 8343/2
8353/2 8360/17 8360/24 8365/13 8392/3
8394/10 8396/6 8396/11 8396/13 8414/10
8420/18 8423/3 8432/25 8434/8 8435/4
8435/12 8442/21 8522/13 8583/4
YORK [16] 8307/1 8307/4 8307/13 8307/14
8307/18 8309/20 8369/13 8369/17
8370/1 8377/19 8378/9 8380/3 8383/10
8519/19 8533/7
younger [2] 8378/13 8472/11
Your Honor [32] 8346/9 8346/20 8349/1
8350/11 8350/16 8350/18 8352/20 8357/21
8358/17 8359/16 8359/23 8361/11 8361/18
8362/21 8362/23 8380/18 8381/18 8381/25
8382/19 8383/21 8384/2 8385/20 8385/23
8458/5 8458/19 8468/21 8468/24 8485/9
8485/17 8488/10 8548/7 8557/3
Your Honor's [1] 8360/17
yourself [4] 8327/20 8427/25 8546/4 8578/7

## Z

zero [2] 8406/22 8523/13
Zuckerberg [1] 8381/12