8585

1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3    UNITED STATES OF AMERICA,     : 15-CR-00637 (KAM)
                                   :
4             Plaintiff,           :
                                   : United States Courthouse
5         -against-                : Brooklyn, New York
                                   :
6    EVAN GREEBEL,                 :
                                   : Friday, December 8, 2017
7             Defendant.           : 9:00 a.m.
- - - - - - - - - - - - - - - -X
8
             TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
9           BEFORE THE HONORABLE KIYO A. MATSUMOTO
              UNITED STATES DISTRICT JUDGE
10                  BEFORE A JURY

11            A P P E A R A N C E S :

12   For the Government:     BRIDGET ROHDE, ESQ.
                            Acting United States Attorney
13                          Eastern District of New York
                            271 Cadman Plaza East
14                          Brooklyn, New York 11201
                            BY:  ALEXIS ELEIS SMITH, ESQ.
15                               DAVID PITLUCK, ESQ.
                                 DAVID KESSLER, ESQ.
16                               Assistant United States Attorney

17   For the Defendant:      GIBSON DUNN & CRUTCHER
                            200 Park Avenue, 48th Floor
18                          New York, New York 10166
                            BY:  REED BRODSKY, ESQ.
19                               RANDY MASTRO, ESQ.
                                 MYLAN LEE DENERSTEIN, ESQ.
20                               WINSTON Y. CHAN, ESQ.

21

22   Court Reporter:         DAVID R. ROY, RPR
                            225 Cadman Plaza East
23                          Brooklyn, New York 11201
                            drroyofcr@gmail.com
24
     Proceedings recorded by Stenographic machine shorthand,
25   transcript produced by Computer-Assisted Transcription.

```
                        Proceedings                    8586
```

1           (In open court; outside the presence of the jury.)

2           COURTROOM DEPUTY:  All Rise.

3           THE COURT:  Is there anything we need to address

4    preliminarily?

5           (No audible response.)

6           THE COURT:  No?  Good.

7           (Jury enters the courtroom at 9:21 a.m.)

8           THE COURT:  We have all the jurors present.  Please

9    have a seat.

10          Is the defense ready to call its next witness?

11          MR. DUBIN:  Yes, your Honor.  Defense calls Michael

12   Rosensaft.

13          THE COURT:  Thank you.

14          (Witness takes the witness stand.)

15   MICHAEL ROSENSAFT,

16          called as a witness having been

17          first duly sworn/affirmed, was examined and

18          testified as follows:

19          COURTROOM DEPUTY:  State and spell your full name

20   for the record.

21          THE WITNESS:  My name is Michael Rosensaft, last

22   name R-O-S-E-N-S-A-F-T.

23          MR. DUBIN:  May approach and hand the Court a

24   binder?

25          THE COURT:  Yes, thank you.

Rosensaft - Direct - Dubin                    8587

1          MR. DUBIN:  May I proceed, Your Honor?

2          THE COURT:  Yes.

3    DIRECT EXAMINATION

4    MR. DUBIN:

5    Q    Good morning, Mr. Rosensaft.  How are you?

6    A    Good morning, good.

7    Q    Where do you work, sir?

8    A    I'm a partner at Katten Muchin Rosen.

9    Q    What is your title?

10   A    Partner.

11   Q    Prior to being a partner at Katten Muchin, where did you

12   work?

13   A    I worked at the United States Attorney's Office in the

14   Southern District of New York in Manhattan.

15   Q    What position did you hold there?

16   A    I was an Assistant United States attorney.

17   Q    Can you describe for the ladies and gentlemen of the jury

18   your practice, in general?

19   A    Sure.  I'm in the white-collar group at Katten.  So I

20   defend individuals, companies, who are under investigation.  I

21   also do internal investigations for companies when there is

22   alleged wrongdoing.  Then I represent companies and

23   individuals in responding to subpoenas or giving testimony,

24   whether it be in United States District Court or in front of

25   the SEC.

Rosensaft - Direct - Dubin                    8588

1    Q      Do you know Evan Greebel?

2    A      I do.

3    Q      And when did you first meet Mr. Greebel?

4    A      I first met him I believe it was late 2012.

5    Q      And how long did you work together with Mr. Greebel --

6    and you met him at Katten?

7    A      Yes.

8    Q      How long did you work together.

9    A      I worked with him from late 2012 or beginning of 2013,

10   through I believe it was the fall of 2014.

11   Q      Now based on your interactions with Mr. Greebel, based on

12   your observations, can you please describe in general for the

13   ladies and gentlemen of the jury, Mr. Greebel's work, your

14   impression of it?

15   A      So Mr. Greebel and I, we were in different departments.

16   I was a litigator, I worked in this court.  Mr. Greebel was a

17   corporate attorney, he drafted documents, worked with

18   companies.  But I worked with him on basically two matters.

19   He seemed very diligent, very attentive to his clients,

20   hard-working.

21   Q      In what you observed, sir, did you ever observe

22   Mr. Greebel do anything that you perceived to be wrong?

23   A      Wrong as in illegal?  No.

24   Q      Did you, sir, have an opportunity to work with

25   Mr. Greebel on matters involving MSMB?

Rosensaft - Direct - Dubin                    8589

1   A    Yes.

2   Q    And Retrophin?

3   A    Correct.

4   Q    Now, are you married, sir?

5   A    I am.

6   Q    Do you have children?

7   A    Yes, I do.

8   Q    How many?

9   A    I have twins, two children.

10  Q    Does your family socialize with Mr. Greebel's family?

11  A    No, they do not.

12  Q    And are your families close in any way?

13  A    No.

14  Q    Where did you grow up?

15  A    I grew up in Oklahoma City.

16  Q    And where did you go to -- let me do it this way.

17  Explain to the ladies and gentlemen of the jury a little bit

18  about your educational background?

19  A    Sure.  So I went to college at Johns Hopkins in

20  Baltimore, which is where I met my wife.  After that I went to

21  the University of Pennsylvania Law School.  Then I started

22  working, I first clerked for a Judge, then became an associate

23  at a law firm.

24  Q    Where was the Judge, you don't have to tell me the name,

25  where was that?

Rosensaft - Direct - Dubin                    8590

1  A     She was on the Third Circuit Court of Appeals.  Her

2  chambers was in Wilmington, Delaware, but when we heard cases

3  it was in Philadelphia.

4  Q     Going back to after you graduated from law school, where

5  did you go to work what did you do?

6  A     After law school that's when I clerked for the Judge for

7  a year.  Then following that I was an associate at the law

8  firm of Cleary Gottlieb.  And I was there for approximately

9  two years before joining the United States Attorney's Office.

10 Q     Cleary Gottlieb, would you consider that a large firm or

11 a smaller firm?

12 A     A very large firm.

13 Q     Which office was that?

14 A     It was in New York.

15 Q     Now, so it was after Cleary, just to get the timeline

16 straight, after Cleary you went to work as a prosecutor in the

17 United States Attorney's Office?

18 A     That's correct.  I started in the United States

19 Attorney's Office in 2006.

20 Q     Did you work on any -- tell the ladies and gentlemen of

21 the jury the types of cases you worked on as a prosecutor?

22 A     So I a started working on a variety of smaller cases,

23 although every case was significant.  Wire frauds, bank

24 frauds, small gun cases, narcotics cases.  Then my more senior

25 unit that I moved into was the terrorism and international

Rosensaft - Direct - Dubin                    8591

1  narcotics unit where I worked on cases involving terrorism,

2  international narcotics, money laundering.  During my work

3  there I traveled I believe to 14 different countries, working

4  with prosecutors around the world to stop terrorism.

5  Q    It was after you left the U.S. Attorney's Office in

6  Manhattan that you went to work for Katten?

7  A    That's correct.

8  Q    Aside from your responsibilities representing clients as

9  a partner at Katten, do you have any other responsibilities at

10 the firm?

11 A    Yes, I oversee the training of our litigation associates.

12 Q    What is that, briefly, what does that entail?

13 A    We have regular training throughout the year where we

14 teach them about evidence, courtroom discovery in litigation,

15 a lot of stuff that they learned in law school but in an

16 academic way.  And we teach them how it works in the law firm.

17        Then we do a mock trial in Chicago where our main

18 office is every spring.  And in that I serve as the judge for

19 trial the associates try a case.  And we actually have jurors

20 or mock jurors that we bring in outside of the firm who judge

21 the case.

22 Q    Do you wear a robe?

23 A    I don't, but I'm very serious.  The last time one the

24 jurors raised their hands afterwards and asked if I was a real

25 judge and if it was real.  We try to do it in a very serious

Rosensaft - Direct - Dubin                    8592

1    manner.

2    Q    Now, prior to coming to testify today did you meet with

3    members of Mr. Greebel's defense team?

4    A    Yes.

5    Q    And how many times?

6    A    I had in-person meetings with them twice; then I spoke on

7    the phone once.

8    Q    Who did you meet with?

9    A    I met with Mr. Brodsky primarily.

10   Q    Did you also meet with the prosecutors in this case?

11   A    Yes, I did.

12   Q    And the FBI as well?

13   A    That's correct.

14   Q    How many times did you meet with the prosecutors and/or

15   the FBI?

16   A    The same amount of times actually.  I met with them in

17   person twice, then I also had a phone call with them.

18   Q    Can you tell the ladies and gentlemen of the jury the

19   first time you met with the prosecutors?

20   A    I believe, I mean it was very recently, I want to say

21   August of this year.

22   Q    Let me see if I can refresh your recollection.

23            MR. DUBIN:  May I approach, your Honor?

24            THE COURT:  Yes.

25   Q    Do you recall when you met with the FBI and the

Rosensaft - Direct - Dubin                    8593

1   prosecutors, whether they were taking notes?

2   A    Yes, they were taking notes.

3   Q    And putting before you two things to see if this

4   refreshes your recollection about the dates.

5         THE COURT:  Would you identify for the record what

6   you're showing the witness.

7         MR. DUBIN:  I'm showing what I'll mark for

8   identification as GX3500MR-1A and GX3500-M R-2A.

9         THE COURT:  Thank you.

10  Q    Mr. Rosensaft, does that refresh your recollection when

11  you met with the prosecutors and the FBI for the first time in

12  this case?

13  A    I see the dates.  They are a little bit later, but it

14  doesn't refresh my recollection.

15  Q    In any event, it was in sometime the fall of this year?

16  A    Correct.

17  Q    Did the prosecutors or the FBI show you any documents

18  during those meetings?

19  A    Yes, they did.

20  Q    They asked you questions about the documents and you gave

21  answers?

22  A    Correct.

23  Q    Now, do you recall the first time you heard the name

24  Martin Shkreli?

25  A    It was either in the very late 2012 or early 2013.

```
                      Rosensaft - Direct - Dubin                8594
```

1  Q    Without telling me the substance of any conversations,
2  who informed you about Martin Shkreli?
3  A    Mr. Greebel.
4  Q    How did that come about?
5  A    Should I tell you the substance of the conversation?
6  Q    Did he ask you any questions?
7  A    Yes.
8  Q    What did he ask you, just what he asked you?
9  A    He asked me if I could help represent his clients in an
10 SEC investigation.
11 Q    Do you recall whether this was in-person or on the
12 telephone, just if you recall?
13 A    I believe the first, the very first contact was an
14 e-mail, but then we discussed it shortly thereafter in person.
15 Q    Did you agree to do that?
16 A    Yes.
17 Q    In the context of that call, did Mr. Greebel ask you any
18 specific question?
19 A    The only thing I remember is whether I could represent
20 his client.
21 Q    At some point in time were you asked anything about
22 trading Retrophin?
23 A    Yes.
24 Q    And do you recall when that was?
25 A    There were two times I was asked about trading.

1   Q     By whom?

2   A     The first time was Mr. Greebel.

3   Q     What did he ask you?

4   A     His client --

5              MS. SMITH:  Can we get a time period?

6   Q     Do you recall approximately when that was?

7   A     I believe it was early 2013 or maybe part of the way

8   through the year.

9   Q     Okay.  And what did Mr. Greebel ask you, that you recall?

10  A     He told me that his client --

11             MS. SMITH:  Objection to hearsay, your Honor.

12             THE COURT:  I think he's asking you for questions

13  that Mr. Greebel asked, but not for statements that he made to

14  you, if you can distinguish those.

15             THE WITNESS:  Sure.

16             THE COURT:  Thank you.

17  A     He asked me if I can give advice on trading that his

18  client -- Mr. Shkreli was doing.

19  Q     Did you provide that advice?

20  A     I did.

21  Q     And did he ask you, did Mr. Greebel ask you if --

22             MS. SMITH:  Objection to leading, your Honor.

23             THE COURT:  Try to rephrase your question,

24  Mr. Dubin.

25  Q     Did the questions Mr. Greebel ask have to do with the

1   legality of the trading?

2   A      Yes.

3   Q      What did you tell Mr. Greebel?

4           MS. SMITH:  Objection, your Honor.  Hearsay.

5           THE COURT:  Sustained.

6           MR. DUBIN:  Your Honor, for the effect on the

7   listener and Mr. Greebel's state of mind.

8           MS. SMITH:  Can we do a sidebar?

9           THE COURT:  Yes.

10          (Continued on the next page.)

11          (Sidebar conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    Sidebar Conference                    8597
```

 1          MR. DUBIN:  Your Honor, I couldn't imagine a more

 2   applicable exception to the hearsay rule than this.  Here is

 3   Mr. Greebel going and asking a question about whether or not

 4   something is permissible under the law and one of his

 5   colleagues telling is him that it is, and in his view in,

 6   Mr. Rosensaft's view that it is, nothing can be more relevant

 7   to Mr. Greebel's state of mind.  It's just square within the

 8   hearsay exception.

 9          Let me correct the record, I misspoke.  That

10   Mr. Rosensaft told Mr. Greebel that it was impermissible and

11   that he should communicate that to Mr. Shkreli.

12          MS. SMITH:  I just don't know what trading we're

13   talking about and how it --

14          THE COURT:  In order to make your, to be more clear

15   about, what questions he was asking about what particular

16   trades.

17          MR. BRODSKY:  So the foundation would be Mr. Shkreli

18   came to Mr. Greebel said that I would like to trade a certain

19   way.

20          THE COURT:  Of what?

21          MR. BRODSKY:  Of Retrophin stock.  Mr. Greebel

22   said -- well, Mr. Rosensaft --

23          MS. SMITH:  This is not Rosensaft.  This is double

24   hearsay.

25          MR. BRODSKY:  If can finish.

```
                    Sidebar Conference                  8598
```

1      THE COURT:  We're trying to get an answer to your

2  question.

3      MR. BRODSKY:  I'd like to tell the complete story to

4  the Judge.

5      Mr. Greebel went to Mr. Rosensaft and said what

6  Mr. Shkreli said to him.  Mr. Rosensaft said, I don't think

7  you can do that, but I should do some research.  Mr. Rosensaft

8  did some research.  Came back to Mr. Greebel and said, no, he

9  can't do that.  Mr. Greebel said we should call Mr. Shkreli

10  and tell him he cannot do that.  So I believe they both called

11  together.  He called Mr. Shkreli and said, you cannot do that.

12  Mr. Shkreli said, okay, I won't do it.

13      THE COURT:  What is "it"?

14      MR. BRODSKY:  The "it," I believe what Mr. Rosensaft

15  testified to, is he would use the term painting the tape.  I

16  believe what he means is a wash trade, where you buy 100

17  shares and you sell 100 shares on the same day intentionally

18  between two people.  And so Mr. Rosensaft did research in that

19  and said that was not proper.  And they told Mr. Shkreli

20  that's improper.

21      MS. SMITH:  There is no allegation that there are

22  wash trades in this case.  I don't know how it relates to

23  anything.  There is no indication of what stock is being

24  traded.

25      MR. BRODSKY:  It's Retrophin stock.  It relates to

1   Retrophin stock.  The reason it's very relevant is that the

2   Government has alleged through Mr. Pierotti's testimony, if

3   you remember during Mr. Shkreli's trial, they said it was wash

4   trading.

5            THE COURT:  During who's testimony?

6            MR. BRODSKY:  Mr. Pierotti.  He said there was a

7   plan to do what he described in general as wash trading.

8            THE COURT:  Didn't your expert say there was no wash

9   trading?

10           MR. BRODSKY:  Because we believe what happened was,

11   respectfully, is this question was asked of Mr. Rosensaft.

12   Mr. Rosensaft and Mr. Greebel told Mr. Shkreli, no, you cannot

13   do that; and Mr. Shkreli did not do it.

14           And so, to us, it's evidence of Mr. Greebel's state

15   of mind.  He spots a problem, potential wrongdoing or

16   potential issue with respect to what Mr. Shkreli's plan is in

17   trading of Retrophin stock, he goes to Mr. Rosensaft, an

18   expert in the field, Mr. Rosensaft does research comes back.

19           THE COURT:  You can't represent him as an expert.

20   He's got narcotics money laundering and international

21   terrorism, that's not an expert in securities.

22           MR. BRODSKY:  I'm not suggesting an expert in that

23   sense.

24           Mr. Rosensaft does research, comes back, and says,

25   no, you can't do it.  They tell Mr. Shkreli you can't do it,

1   which goes to Mr. Greebel's state of whined, which is that he

2   is trying to stop Mr. Shkreli from doing something that's not

3   proper in connection with Retrophin stock.

4             THE COURT:  So the inference is that Mr. Greebel

5   would ask for some guidance, if he believed Mr. Shkreli had a

6   question, that was beyond his expertise and he would go to a

7   former prosecutor to ask questions.  And based on those

8   answers he would advise his client accordingly.

9             MR. BRODSKY:  He would do it with, he did it with

10  Mr. Rosensaft to tell Mr. Shkreli don't do it.

11            MR. DUBIN:  I'm going to get to that.

12            MR. BRODSKY:  Mr. Shkreli agreed not to do it.  So

13  to us it's good faith intent in a conspiracy theory, under

14  Count Eight, there is an alleged conspiracy that Mr. Greebel

15  and Mr. Shkreli and others wanted to manipulate the price of

16  Retrophin securities.  This evidence demonstrates that it's

17  the exact opposite with respect to Mr. Greebel's intent.

18  Which is, when Mr. Greebel learned of a red flag, of an issue,

19  he brought it to somebody who is a former prosecutor, the

20  former prosecutor researched it, said, no, it's not right.

21  And he called, I believe it's with --

22            MR. DUBIN:  I'm going to ask him.

23            MR. BRODSKY:  I don't want to proffer for your Honor

24  exactly how the testimony would come out, my understanding is

25  on prior conversations with Mr. Rosensaft, Mr. Rosensaft will

Sidebar Conference                                           8601

1    say he called with Mr. Greebel.  Mr. Rosensaft has described

2    himself as sort of somebody that Mr. Greebel came to as sort

3    of like a policeman when an issue came up.

4             THE COURT:  He didn't say that.

5             MR. BRODSKY:  Not yet, I'm proffering to your Honor

6    what I believe the testimony will show.

7             THE COURT:  He's the securities expert, not

8    Mr. Rosensaft.

9             MR. BRODSKY:  One is corporate securities, which is

10   completely different than litigation-type securities.  So

11   there is corporate securities, filing SEC forms, representing

12   a corporation.  Then there is a specialized practice of

13   litigation within the Securities & Exchange Commission where

14   it's a different area.  Corporate securities lawyers won't

15   know the area within what the litigators will know and this is

16   a litigation area.

17             So Mr. Rosensaft did research in the litigation

18   area.

19             THE COURT:  Okay.

20             MR. PITLUCK:  It sounds like they want to elicit a

21   double hearsay conversation that Mr. Greebel had with

22   Mr. Shkreli that was then relayed to Mr. Rosensaft in a very

23   generalized period of time, sometime in the first six months

24   of 2013, about trades that are generally related to Retrophin

25   stock, that have absolutely no connection, that he's proffered

1   at this point, to the charged conduct to which they don't know

2   if the defendant participated with Mr. Shkreli, likely another

3   hearsay conversation, for the general effect that it had on

4   Mr. Greebel in an amorphous period of time unrelated to the

5   charges.

6              This is creating an exception that you could drive a

7   truck through.  On the general theory because he took one

8   issue to a lawyer, or he says he took an issue to a lawyer,

9   that it's then affected on the state of mind, it negates his

10  intent to unrelated charges.

11             MS. SMITH:  If it would come in on such a limited

12  fashion, not what Mr. Shkreli said to Mr. Greebel, it would

13  have to be what advice --

14             THE COURT:  So far all we have is the question that

15  Mr. Greebel asked of Mr. Rosensaft.

16             MS. SMITH:  I'm concerned, this is part of what we

17  briefed last night.  Even if it comes in under one of these

18  exceptions, we need a limiting instruction not offered for the

19  truth of what happened or was told.  It needs to come in in a

20  narrow fashion.

21             I don't think what Mr. Shkreli told Mr. Greebel,

22  which was relayed to Mr. Rosensaft, there is an exception that

23  fits that.  It has to be what Mr. Rosensaft conveyed to

24  Mr. Greebel.

25             THE COURT:  Just between the two of them.

```
              Sidebar Conference                   8603
```

1          MS. SMITH:  Just between the two of them.  It would

2     need to be a limited instruction how it's not offered for the

3     truth, offered for the fact that, the effect, if any, on what

4     Mr. Greebel heard.

5          THE COURT:  The part that is going to be

6     problematic, that I foresee, whether or not Mr. Rosensaft was

7     involved in conveying the information back to Mr. Shkreli.  If

8     he wasn't involved and has no personal knowledge, that can't

9     be elicited.  The only way he would know that would be

10    hearsay.

11         MS. SMITH:  But even the conversation between

12    Mr. Greebel and Mr. Shkreli is hearsay and doesn't come in.

13         THE COURT:  Yes.  So the question could be posed, so

14    far we're right at that point, that Mr. Greebel came with a

15    question to Mr. Rosensaft.

16         MS. SMITH:  What was the question?  Because the

17    question --

18         THE COURT:  I think it did come in.

19         MR. DUBIN:  It did come in.

20         THE COURT:  Then Mr. Rosensaft gave a response back

21    to Mr. Greebel, period.

22         MR. DUBIN:  Then I'll tell what you comes next.

23    There was a call that Mr. Rosensaft and Mr. Greebel are on in

24    conveying the advice to Mr. Shkreli.  I'm not going to into

25    other conversations that Mr. Greebel had with Mr. Shkreli.

```
                    Sidebar Conference                 8604
```

1   I'm going to ask him what he conveyed to Mr. Shkreli.

2           THE COURT:  What Mr. Rosensaft conveyed.

3           MR. DUBIN:  To Mr. Greebel on the phone.

4           THE COURT:  But not what Mr. Greebel said to

5   Mr. Shkreli.  What Mr. Rosensaft said to Mr. Shkreli.

6           MS. SMITH:  With Mr. Greebel on the phone.  We want

7   the limiting instruction that this is not offered for the

8   truth of anything but for the effect.

9           This is part of what we briefed yesterday.  We can't

10  get all sorts stuff far afield in just because there is this

11  particular thing.

12          MR. DUBIN:  I'm trying to stream line this.  That's

13  why I'm asking him about questions, I want to move this along

14  quickly.

15          THE COURT:  Now that you know the parameters, we'll

16  trust you to adhere to them.  We will then make sure that we

17  instruct the jury, I guess, at this point that the statements

18  are being offered not to not for the truth but to establish

19  Mr. Greebel's state of mind.

20          MS. SMITH:  Okay.

21          THE COURT:  State of mind.

22          MS. SMITH:  That's fine.

23          (End of sidebar conference.)

24          (Continued on the next page.)

25

Rosensaft - Direct - Dubin                    8605

1          THE COURT:  Members of the jury, this line of

2   questioning and the answers you may hear, the answers, as you

3   know are evidence not the question.  You may consider both in

4   the context of the evidence before you.

5          So the answers to these questions are not being

6   offered for the truth, but rather to establish the effect on

7   the listener.

8          MR. DUBIN:  May I proceed?

9          THE COURT:  Yes.

10          MR. DUBIN:  Thank you.

11   BY MR. DUBIN:

12   Q    By the way, when you and Mr. Greebel had this discussion

13   was it a long or short discussion, if you recall?

14   A    It was I would say ten-minute discussion.

15   Q    Did you conduct any legal research after the call.

16   A    I did.

17   Q    Did there come a point in time when you and Mr. Greebel

18   conveyed information to Mr. Shkreli on a call that you

19   remember?

20   A    We conveyed a lot of information to Mr. Shkreli on calls.

21   Q    Let me be more specific, Mr. Rosensaft.  In connection

22   with that advice, did there come a time when you conveyed that

23   advice or the results of your research about the trading or

24   the proposed trading to Mr. Greebel -- to Mr. Shkreli with

25   Mr. Greebel on the phone.

1  A     Yes.

2  Q     Can you tell the ladies and gentlemen of the jury the

3  advice you gave him?

4  A     The question concerned whether Mr. Shkreli and others

5  that he knew could trade stock to each other essentially.  And

6  the advice I gave was that that could be considered what is

7  known as wash trades.  So if Mr. Shkreli is trading with other

8  people that he knows, it could create a false sense in the

9  market that there is a lot of trading going on when, it's

10 really just him trading with other people.  So my advice was

11 that's not a good idea.  That's something that the SEC could

12 look into and may decide to investigate.

13 Q     Now did Mr. Greebel ever do anything that indicated to

14 you that he disagreed with your advice?

15 A     No.

16 Q     Did Mr. Shkreli, as far as you know, take that advice?

17             MS. SMITH:  Objection, your Honor.

18             THE COURT:  Sustained.

19 Q     Did Mr. Shkreli have a reaction to what you told him?

20             MS. SMITH:  Objection, your Honor to hearsay.

21 Q     That he articulated to you?

22             THE COURT:  Sustained.

23 Q     From your understanding, did Mr. Shkreli agree to take

24 your advice?

25             MS. SMITH:  Objection to hearsay.

```
                    Rosensaft - Direct - Dubin              8607
```

1              THE COURT:  Sustained.

2  Q     I'll move on.

3              Did there come a time when you started to represent

4  MSMB in connection with an SEC investigation?

5  A     Yes.

6  Q     Do you recall when that was?

7  A     I believe it was early 2013.

8  Q     Let me see if I can refresh your recollection of the

9  date.  Go to tab one of your binder, I can put it on the

10  screen, it's in evidence.  GX842, do you recognize this to be

11  a cover letter for a bill?  Flip through it.

12  A     I can see it is a cover letter for a bill, although I

13  don't remember the specific bill.

14  Q     Go to -- to see if it refreshes your recollection -- if

15  your Honor wishes, I take it off the screen?

16             THE COURT:  It's in evidence that's fine.

17  Q     Bates stamp 48567 and take a look at the May 13 time

18  entry that bears your name.  Does that refresh your

19  recollection that it was in the spring of 2013 that you first

20  came to learn of the SEC investigation?

21  A     I see the time entry, but my recollection was it was

22  early 2013.

23  Q     Okay.  And fair to say that you might just be mistaken as

24  to when it actually happened?

25  A     Sure, it's possible.

Rosensaft - Direct - Dubin                         8608

1  Q     That time entry says, "Call with E. Greebel to discuss

2  SEC subpoena, review subpoena, call with SEC to discuss

3  investigation and time table."  Sitting here today do you

4  recall that conversation at all?

5  A     I recall the initial conversation with Mr. Greebel, if

6  this is referring to that, I do recall that.

7  Q     Do you recall receiving the actual -- strike that.

8        The do you recall receiving a subpoena from the SEC,

9  a copy of a subpoena that the SEC served?

10 A     I received many subpoenas from the SEC during the time I

11 worked on MSMB Capital.

12 Q     If you can take that off the screen.

13        I'm showing you tab two, marked for identification

14 DX202-one, if you just flip through that I want to see if that

15 refreshes your recollection as to the time frame regarding

16 when you received the first subpoena related to this matter?

17 A     I see the date on the subpoena.  I can't be sure this is

18 the first subpoena or not.

19 Q     Okay.  And this was sent to you by Mr. Greebel, correct?

20 Actually is this an e-mail on May 13, 2013 at 2:58 p.m., from

21 Mr. Greebel to you?

22 A     Yes.

23 Q     It attaches the subpoena, correct?

24        THE COURT:  I'm sorry, is this in evidence?

25        MR. DUBIN:  I was going to move it into evidence.

1            MS. SMITH:  We don't have a copy of it.

2            MR. DUBIN:  It's in your binder.

3            Do you mind if I lay the foundation?

4            THE COURT:  Yes.

5   BY MR. DUBIN:

6   Q    This is an e-mail sent to you by Mr. Greebel on May 13 at

7   2:58 p.m., correct?

8   A    Correct, that's in the chain.

9   Q    And there is an attachment to the e-mail, correct?

10  A    There is an attachment to the top e-mail.  I'm not sure

11  if it was also attached to the lower e-mails, although the

12  subject matter seems to indicate it was.

13           MR. DUBIN:  I move DX202-1 into evidence, your

14  Honor.

15           MS. SMITH:  We have an objection as to authenticity.

16           THE COURT:  Do you want to try to establish or meet

17  her concerns?

18  Q    You see, sir, that is your e-mail address at Katten,

19  correct?

20  A    That's my name, that's an e-mail that was sent by me to

21  Mr. Gordon.

22  Q    You see that was sent -- do you recall sending this

23  e-mail or do you recall the e-mail as you see it?

24  A    Yes.

25  Q    And that is a true and accurate copy of the e-mail that

Rosensaft - Direct - Dubin                          8610

1   you sent, correct?

2   A    Correct.

3             MR. DUBIN:  I move it into evidence.

4             THE COURT:  We will admit Defendant's Exhibit 202-1.

5             (Defendant's Exhibit Number 202-1 so marked and

6   received in evidence.)

7   Q    If we scroll down to the bottom e-mail, you see it says

8   from Retrophin scanner at Retrophin.com?

9   A    Yes.

10  Q    Had you received documents from the Retrophin scanner?

11  Do you know what that is?

12  A    I don't.  I don't remember that specifically.

13  Q    Do you ever receive documents at Katten that comes from a

14  scanner, that's the scanner's e-mail address?

15            THE COURT:  For anything?

16            MR. DUBIN:  Just generally.

17  A    I don't believe so.

18  Q    Not important.

19            So to Martin Shkreli.  You see then that it says

20  subject scanned from Retrophin, right?

21  A    Correct.

22  Q    Then that is forwarded, if you go to the e-mail above it,

23  forwarded from Mr. Shkreli to Mr. Greebel at 11:45, right?

24  A    Correct.

25  Q    And if you go up then what Mr. Greebel appears to do is

Rosensaft - Direct - Dubin                        8611

1   to forward it to you, right?

2   A    Yes, he forwards me the part below it.

3   Q    And can you please just read to the jury, you see there

4   is an attachment at the top e-mail that you then send some

5   questions on the e-mail with the attachment to Michael Gordon

6   and Mr. Greebel, correct?

7   A    I copy Mr. Greebel and sent it to Michael Gordon.

8   Q    Why did you send it to Michael Gordon directly and only

9   copy Mr. Greebel as opposed to sending it just to Mr. Greebel?

10  A    Mr. Gordon was handling litigation for the client MSMB.

11  And it was my understanding that in that litigation he had

12  already received documents from MSMB.  So one of the places I

13  was looking for documents in responding to the subpoena was

14  from Mr. Gordon, things we already had.

15  Q    And can you please explain, can you read the e-mail to

16  the jury?

17  A    "Basically we need, one, all e-mails to Rothstein; two,

18  all periodic reports to limited partners; and three, all info

19  re: OREX trades and ML arbitration."

20  Q    You know what the ML arbitration is, right?

21            MS. SMITH:  Leading.

22            THE COURT:  Sustained.

23            MR. DUBIN:  Withdrawn.

24  Q    Do you know what ML stood for?

25  A    Yes.

Rosensaft - Direct - Dubin                          8612

1   Q    What it does stand for?

2   A    Merrill Lynch.

3   Q    Tell the ladies and gentlemen of the jury what you knew

4   about the Merrill Lynch arbitration at that time?

5   A    I don't remember exactly if I learned it at this time or

6   when I exactly learned it, although, it was early in the

7   representation of MSMB Capital, but there was an arbitration

8   between Mr. Shkreli and Merrill Lynch related to trades he

9   placed in the security OREX, O-R-E-X, that was resolved before

10  I started working on the case.

11  Q    Could we go to the first page of attachment, please

12  Mr. Carter, and what is that, sir?

13  A    A subpoena from the Securities Commission.

14  Q    It says "In the matter of MSMB Capital Management LLC

15  valuation," can explain what that line signifies?

16  A    It's the name of the SEC's investigation.

17  Q    If you go to the next page, keep scrolling down, it is

18  addressed to Martin Shkreli and it's addressed to him at

19  Retrophin Inc., right?

20  A    Correct.

21  Q    Did you have an understanding as to if Martin Shkreli ran

22  any other entities out of that address?

23  A    Yes, there were at least two MSMB entities, MSMB Capital,

24  and MSMB Healthcare, and he also ran Retrophin out of that

25  same address.

1   Q    If you go down, stay right there, it says, just to go

2   through it quickly, it's asking Mr. Shkreli to produce certain

3   documents and that he needs to testify before the SEC,

4   correct?

5   A    Yes.

6   Q    Now, why don't you go to the next page to show the jury

7   what the subpoena looks like.  That's the attachment.  It

8   contains some definitions, correct?

9   A    Correct.

10  Q    Fairly standard in your experience?

11        MS. SMITH:  Objection to leading, your Honor.

12  Q    Was it standard in your experience?

13        THE COURT:  Still leading but I'll allow it.  Avoid

14  leading questions.

15        MR. DUBIN:  Sorry, trying to move it.

16  Q    Go down --

17        THE COURT:  Did you want him to answer the question?

18  Q    Sure.  If can you go back to the top, can you read to the

19  jury what that top line says?

20  A    "Attachment to subpoena dated May 2, 2013, to Martin

21  Shkreli.  Definitions, construction, and instructions."

22              (Continued following page.)

23

24

25

Rosensaft - Direct - Durbin                 8614

1   BY MR. DUBIN:

2   Q    Okay.  Could you go to the next page, please?

3        And can you read the heading there for the jury,

4   please.

5   A    Documents To Be Produced.

6   Q    Okay.  And based on your experience, Mr. Rosensaft,

7   were the requests the SEC was making common or uncommon; did

8   you have a view on it?

9   A    Well, it's common for the SEC to make a request.

10  Q    Okay.  That was really my question.

11  A    I mean, of companies that I investigated.

12  Q    These type of requests, the requests listed in

13  *subpoena*?

14  A    Every *subpoena* is different.

15  Q    And in your experience, the *subpoena*s asks what; what

16  do *subpoena*s often ask for in SEC investigations that you

17  handled, just generally speaking.

18  A    Still depends on the *subpoena*, for the documents.

19  Q    Documents, okay.

20       Now, what did you do next in connection with the

21  SEC investigation?

22  A    I had a number of meetings with Mr. Shkreli, and I

23  tried to gather the documents that were responsive to the

24  *subpoena*.

25  Q    Okay.  Did Mr. Greebel attend every meeting that you

Rosensaft - Direct - Durbin                    8615

1   had with Mr. Shkreli?

2   A    No.

3   Q    And did he ever indicate to you in any way that he

4   needed to be there any time you met with Mr. Shkreli?

5             MS. SMITH:  Objection to leading, Your Honor.

6             THE COURT:  Sustained.

7   BY MR. DUBIN:

8   Q    Did Mr. Greebel ever attempt to interfere with your

9   ability to meet with Mr. Shkreli in any way?

10  A    No.

11  Q    How long, just generally speaking, were these meetings

12  with Mr. Shkreli that you had; did they range?

13            MS. SMITH:  Objecting to leading, Your Honor.

14  Q    When do you remember the first time that you meet with

15  Mr. Shkreli?

16  A    It was shortly after I started on the case, I would say

17  within two weeks.

18            THE COURT:  When you say after you started on the

19  case, is that in reference to May 23rd, the *subpoena*?

20            THE WITNESS:  To my best recollection, it's the

21  beginning of 2013.

22  Q    Now, did you come to learn whether or not that was the

23  first request for information or the first *subpoena* to

24  Mr. Shkreli?

25  A    It was not.

Rosensaft - Direct - Durbin                    8616

1   Q    Okay.  And can you tell the Ladies and Gentlemen of the

2   Jury, if you came -- well, strike that.

3          Did you learn that he had been contacted before

4   your representation of him?

5   A    By the SEC, yes.

6   Q    And who was representing Mr. Shkreli in connection with

7   that, if you know?

8   A    No one was.

9   Q    Okay.  Was he representing himself?

10  A    He was interfacing with the SEC himself.

11  Q    And so just to be clear, he did not have counsel, as

12  far as you knew?

13         MS. SMITH:  Objection to leading Your Honor.

14         THE COURT:  Sustained.

15  Q    Did he have counsel as far as you knew?

16         MS. SMITH:  Objection, asked and answered.

17         THE COURT:  All right.  Sustained.

18         Please move on.

19         MR. DUBIN:  Okay.

20  Q    After meeting with Mr. Shkreli -- well, let me ask you,

21  did you ever review any documents -- did you ever review

22  anything that Mr. Shkreli received prior to receiving that

23  *subpoena* that we just showed in evidence as Defense

24  Exhibit 202-1?

25         MS. SMITH:  Objection, Your Honor.  Form.

Rosensaft - Direct - Durbin                    8617

1          MR. DUBIN:  Let me clarify it, Your Honor.

2    Q    Prior to receiving the *subpoena* that we just went

3    through in May of the 2013, did you ever review any other

4    *subpoena*s that Mr. Shkreli ever received prior to that?

5    A    I do no have a specific memory of that.

6    Q    Okay.  Let me see if I can refresh your recollection.

7    If you turn to Tab 3 in your binder, and I'm going to show

8    you what I have marked for identification as Defense

9    Exhibit 4747-A.  And I just want you to read that to

10   yourself and see if you recall receiving that or ever

11   reviewing it?

12   A    I do remember this document.

13   Q    Okay.  I would move DX 4747-A into evidence,

14   Your Honor.

15          MS. SMITH:  Your Honor, we have an objection.  But

16   could we have a brief sidebar?

17          THE COURT:  Yes.

18          MR. DUBIN:  You know what, Your Honor?  I'll

19   withdraw it.

20          MS. SMITH:  No objection to the document coming

21   in.  We just need a brief sidebar.

22          THE COURT:  All right.  Excuse us.

23          (Continued on next page.)

24

25

1          (The following occurred at sidebar.)

2          MS. SMITH:  Your Honor, I am just putting on the

3    record that we had a potentially half hour to 45-minute

4    sidebar when the defense attempted to seek this document

5    out.  So we have no objection to it coming in.  Having it

6    come in, we tried to slip the document in, and I just -- I

7    just felt that that was necessary to note for the record

8    because we really did have an extensive, extensive sidebar

9    with defense objecting to this.

10          MR. PITLUCK:  With the case agent.

11          MS. SMITH:  With the case agent.

12          THE COURT:  Right.

13          MR. DUBIN:  Our problem is, though, that we

14    objected very strongly at sidebar to the admission of both

15    documents.  Then the Government finished with their case

16    agent, and we decided to put on our case in chief.  And

17    having considered all the evidence, we then became fearful

18    that because the Government had put in the document that was

19    responsive by Mr. Shkreli, having reviewed it, we thought an

20    impression was going to be created that Mr. Greebel was

21    aware of it.

22          We became really concerned, because there was no

23    evidence that he was ever aware of it.  And we felt that if

24    we put on a case in chief, then we should put in both of

25    them because we just became concerned that there would be

Sidebar Conference                            8619

1    some sense from just Mr. Shkreli's response that the initial

2    request would have come from Mr. Greebel because he was

3    counsel to MSMB and we just became concerned about it.

4              MS. SMITH:  I just wanted to put that on the

5    record, Your Honor.

6              THE COURT:  Yes.

7              MR. DUBIN:  Thank you.

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rosensaft - Direct - Durbin                    8620

1          (Sidebar ends; in open court.)

2          THE COURT:  You may proceed.

3          MR. DUBIN:  Thank you, Your Honor.

4          So I will move DX 4747-A into evidence,

5   Your Honor.

6          THE COURT:  Any objection?

7          MS. SMITH:  No, none.

8          THE COURT:  All right.  We will receive in

9   evidence Defense Exhibit 4747-A.

10          (Defendant's Exhibit Number 4747-A so marked and

11   received in evidence.)

12  BY MR. DUBIN:

13  Q    So is this the document that you recall reviewing, sir,

14  reflecting Mr. Shkreli's initial contact with the SEC?

15  A    Yes.

16  Q    Okay.

17          MR. DUBIN:  And if we could just below up the top

18  portion of the e-mail?

19          Thank you, Mr. Carter.

20  Q    And who is Eric Schmidt?

21  A    He was the SEC attorney that was handling the

22  investigation primarily.

23  Q    And it was sent directly to Martin Shkreli; is that

24  right?

25          THE COURT:  Please don't lead.

1    A     Correct.

2          THE COURT:  Please don't lead.

3          MR. DUBIN:  Okay.

4    Q     Who was it sent to?

5    A     Mr. Shkreli.

6    Q     And is anyone copied on that e-mail?

7    A     No.

8    Q     Okay.  And if you can go to the first page of the

9    attachment?  Can you please read for the jury -- by the way

10   that address, do you recognize that address at the top,

11   330 Madison Avenue?

12   A     I do not.

13   Q     Okay.  And do you know one way or another whether MSMB

14   moved offices at some point, if you know?

15   A     I don't remember.

16   Q     Okay.  And if you go down, who is this addressed to,

17   this letter?

18   A     Mr. Shkreli.

19   Q     And will you read just the first paragraph for the

20   jury?

21   A     "The staff of the United States Securities and Exchange

22   Commission is conducting an informal investigation in the

23   above-referenced matter to determine whether there had been

24   violations of the federal securities laws.  In connection

25   with this investigation the staff requests that MSMB as

Rosensaft - Direct - Durbin                8622

1    defined in the attached document request, voluntarily

2    produce the documents and information described in the

3    attachment by October 16, 2012.

4    Q    Okay.  And can you go to the last paragraph.

5    A    (Witness complies.)

6    Q    I'll read that one.  It says, The staff request MSMB

7    produce all documents in electronic searchable form.  The

8    staff requests that any electronic production be in

9    accordance to the attached SEC status delivery standard.

10        Do you see that, sir?

11   A    Yes.

12   Q    Have you in your experienced received similar, such

13   letters in your representation of clients being investigated

14   by the SEC?

15   A    Yes.

16   Q    Okay.

17        Now I would like to show you what I will mark for

18   identification as Tab 4 of you binder DX4868.

19   A    All right:

20   Q    And do you recall also reviewed this document, sir?

21   A    I do not.

22   Q    Okay.  And do you -- can you turn to the next page?

23   A    (Witness complies.)

24   Q    See if that refreshes your recollection.  I just ask

25   you to read through it.

Rosensaft - Direct - Durbin                    8623

1    A    I don't have a specific memory of that.

2    Q    Okay.  Did you come to learn at some point that

3    Mr. Shkreli had responded on his own to the SEC requests for

4    information that we just saw in DX 4747-A?

5    A    Yes.

6    Q    Okay.  Had you ever had a client prior to your

7    representation of Mr. Shkreli represent himself in an SEC

8    investigation?

9    A    Well, I started at the firm in 2012 of November.  So

10   before that, I was at the U.S. Attorney's Office.  I didn't

11   have clients, other than the Government.  And as an

12   associate at Cleary Gottlieb, I hadn't had a client who

13   represented him or herself.

14   Q    Did they always have counsel, in your experience, prior

15   to that?

16              MS. SMITH:  Objection.

17              THE COURT:  Sustained.

18              Refresh if you would like.

19              MR. DUBIN:  Sure.

20   Q    Well, who represented those clients in your experience?

21              THE COURT:  At Cleary?

22              MR. DUBIN:  At Cleary, yes.

23   Q    Or -- yeah.  Prior to coming to Katten?

24   A    Other lawyers.

25   Q    Okay.

1          All right.  Now, did there come a time when you

2   gathered documents in response to the *subpoena*?

3   A    Yes.

4   Q    Okay.  And I'm talking just for the jury's benefit, the

5   *subpoena* that you actually received in May of 2013.

6   A    Okay.

7   Q    All right.

8          And can you tell the jury what you did to respond

9   to that *subpoena*?

10  A    I spoke to Mr. Shkreli, and I spoke to him about

11  retrieving responsive documents.  I spoke to his

12  partner/colleague, Marek Biestek, who is the MB in MSMB

13  about retrieving documents.  And then I also spoke to

14  Mr. Gordon at our firm because he had already received some

15  documents in connection with his representation in the

16  litigation.

17  Q    Okay.  So at this point in time, in May of 2013, who

18  was your client?

19  A    MSMB Capital.

20  Q    Okay.  And other than gathering the documents together

21  in response to SEC *subpoena*, can you just give the jurors a

22  general overall review of what your role was; what was the

23  scope of your reputation was?

24  A    My role was to represent MSMB Capital in front of the

25  SEC to find out as much about their investigation as I could

Rosensaft - Direct - Durbin                    8625

1   and try to resolve it and to respond to the SEC's request

2   for information.

3   Q    Mr. Shkreli, did Mr. Greebel have any role whatsoever

4   in assisting your gather and analyzing documents to respond

5   to that SEC *subpoena*?

6               MS. SMITH:  Objection to leading, Your Honor.

7               THE COURT:  Overruled.

8   A    Not that I remember.

9   Q    Okay.  And did Mr. Greebel have any role in deciding

10  what documents were responsive to that *subpoena*?

11  A    No.

12  Q    Whose responsibility was that?

13  A    Mine.

14  Q    Did Mr. Greebel have any role whatsoever in

15  communicating with the staff of the SEC?

16  A    No.

17  Q    Okay.  And whose role was that?

18  A    Mine as well.

19  Q    All right.  Well, how would you communicate with the

20  SEC?

21  A    I had phone calls with them, e-mails, and then I met

22  with them in person as well.

23  Q    Okay.  And the phone calls, e-mails, and meetings that

24  you had with the SEC, did Evan Greebel ever participate in

25  those?

Rosensaft - Direct - Durbin                    8626

1    A    No.

2    Q    Were there times when you called Martin Shkreli during

3    your gathering documents to respond to the *subpoena*?

4    A    Yes.

5    Q    Did you check with Evan Greebel before you called him?

6    A    Not that I remember.

7    Q    Okay.  Well, why not?

8    A    Because I was the one responsible for gathering the

9    documents.  Evan represented the client brother matters, but

10   he was not working on the SEC investigation.

11   Q    Now, did there come a point in time when you met with

12   Martin Shkreli to prepare him for his testimony before the

13   SEC?

14   A    Yes.

15   Q    Okay.  And do you recall when that was?

16   A    It was shortly before his testimony or the weeks

17   leading up to his testimony.  His testimony, I believe, was

18   August of 2013, so I met with him, I would say, June and

19   July of 2013.

20   Q    Okay.  And did Evan Greebel go with you to that first

21   meeting?

22   A    I believe he did go with me to the first meeting.

23   Q    Do you recall whether or not he had a preference of

24   whether or not to attend those meetings?

25             MS. SMITH:  Objection, Your Honor.

Rosensaft - Direct - Durbin                    8627

1          THE COURT:  Sustained.

2   Q    Well, let me show you under -- actually, I'm going to

3   hand this one up to you if you don't mind because it's a

4   stamped copy.

5          MR. DUBIN:  May I approach, Your Honor?

6          THE COURT:  Yes.

7          MR. DUBIN:  Okay.

8   Q    I am handing you I will mark for identification as DX

9   202-21.  I'll ask you to review the e-mail in front of you,

10  Mr. Rosensaft.

11  A    (Witness complies.)

12  Q    Do you see this is an e-mail from you to Mr. Shkreli

13  copying Mr. Greebel in the summer of 2013?

14  A    The bottom e-mail, the chain is.

15  Q    Right.  July 22nd at 3:28 p.m.  By the way, that's

16  Eastern Standard Time there, right?

17  A    Yes.

18  Q    Okay.  And do you recall Mr. Greebel responded to you

19  e-mail?

20  A    I don't recall the specific response or the specific

21  e-mail.

22  Q    Okay.  But in any event, Mr. Greebel asked -- appears

23  to ask you a question and you appear to respond; is that

24  correct?

25  A    Correct.

Rosensaft - Direct - Durbin                    8628

1    Q    Okay.

2         MR. DUBIN:  I would move DX 202-21 into evidence,

3    Your Honor.

4         MS. SMITH:  Your Honor, can we have a brief

5    sidebar on the document?

6         THE COURT:  Yes.  Excuse us.

7         (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following occurred at sidebar.)

2            MS. SMITH:  Your Honor, I am just not sure that

3    this document was ever produced to us.  It doesn't have a

4    Bates Stamp, and they produced a bunch of documents for us

5    on Saturday, and I don't have a recollection of this being

6    within those documents.  And so I would ask that -- you

7    know, we're trying to conform with all of the details.  I

8    don't believe that we've seen it.  We went -- I went through

9    all the documents that were produced to us.

10            THE COURT:  Assuming it's -- no one can confirm

11   that it was -- what is your request.

12            MS. SMITH:  Pursuant to Rule 16, again, this is a

13   document without a Bates Stamp.  They've had it in their

14   possession for I don't know how long.  They did produce to

15   us some documents without Bates Stamps on Saturday.  If this

16   is among them, I would be -- I would be mistaken, but I

17   honestly do not remember seeing this, and I cannot confirm

18   if we actually ever received it, and we ask that it be

19   included under Your Honor's rule, which is that if they

20   produce any documents, they were going to get them to us

21   prior to introduction.

22            MR. BRODSKY:  Your Honor, I'm sorry.  We did not

23   include this in our production --

24            THE COURT:  Okay.

25            MR. BRODSKY:  -- when we gave the marked

```
                     Sidebar Conference                  8630
```

1   documents.

2           MR. DUBIN:  I'll just ask him if it refreshes his

3   recollection.

4           MR. PITLUCK:  Well, he just said he doesn't

5   recall, Judge.

6           MR. DUBIN:  Yeah, not the email.  But I'm going to

7   ask him if it refreshes his recollection whether Mr. Greebel

8   had a preference.  He said he didn't remember.

9           MR. PITLUCK:  Okay.

10          MR. BRODSKY:  One way or the other.

11          MR. DUBIN:  One way or the other.

12          THE COURT:  A preference about what?

13          MR. DUBIN:  Attending prep sessions.

14          THE COURT:  Mr. Greebel's question, Do you need me

15  there?

16          MR. DUBIN:  Right.

17          THE COURT:  And he says no.

18          MR. DUBIN:  Right.  In other words, Do you need me

19  there?

20          MR. PITLUCK:  What preference is being expressed

21  in the question, Judge?

22          MR. DUBIN:  I will phrase it differently.

23          MS. SMITH:  Well, how are you going to rephrase

24  it?  I don't think it's -- he doesn't recall.

25          MR. BRODSKY:  Does this refresh your recollection

Sidebar Conference                              8631

1    one way or the other whether or not Mr. Greebel expressed

2    whether he wanted to attend or didn't want to attend the

3    meeting?  This may refresh -- you can use anything to

4    refresh your recollection.  So we can use a napkin, or we

5    can use --

6                THE COURT:  I know.  You have given me that

7    lecture.  I understand, Mr. Brodsky.  Thank you.  Okay?

8                The question is whether it was produced.  If it

9    wasn't, I told you it would be precluded, so it's precluded.

10               Now, whether you want to ask the question

11   whether -- to refreshes his recollection about whether or

12   not Mr. Greebel asked if he needed to be there.

13               MR. BRODSKY:  Or not.

14               THE COURT:  It's not a preference.

15               MR. BRODSKY:  Understood, Your Honor.

16               MR. DUBIN:  Understood.

17               THE COURT:  All right.

18               MR. PITLUCK:  Judge, the way that you rephrased

19   it, we're fine with.

20               THE COURT:  Okay.

21               (Continued on next page.)

22

23

24

25

Rosensaft - Direct - Durbin                    8632

1            (Sidebar ends; in open court.)

2   BY MR. DUBIN:

3   Q    Mr. Rosensaft, does this refresh your recollection

4   about whether or not Mr. Greebel ever expressed to you that

5   he even needed to be there or not or didn't need to be

6   there?

7   A    Well, I do have a specific memory of that.  I don't

8   need my recollection refreshed.

9   Q    Okay.  You tell us what your recollection is.

10  A    Generally, Mr. Greebel was at the first meeting while I

11  was getting introduced to the client.  But he never

12  expressed any desire to be at future meetings unless I

13  needed him.

14  Q    Okay.  Now, when -- did Mr. Shkreli make

15  representations to you -- without telling us what the

16  substance is, did Mr. Shkreli make representations --

17  certain representations to you about documents or facts

18  related to the SEC matter?

19  A    Sure.

20  Q    And did you accept his representations?

21  A    Unless I had a reason to doubt it, yes.

22  Q    Okay.  And so why did you accept his representations?

23  A    He's my client.  I'm looking out for his interest.

24  Unless I'm shown otherwise, I take his representation.  If

25  anything seemed like it could be questionable in what he's

Rosensaft - Direct - Durbin                    8633

1   telling me, I do my best in trying to find out if that may

2   or may not be true.  But as a general matter, I think his

3   representation -- I take his representations as true.

4   Q    Okay.  And at some point did you have a conversation

5   with the SEC staff about the *subpoena*?

6   A    Yes.

7   Q    Okay.  Now, regarding Retrophin -- well, strike that.

8        Were you responsible for sending out bills to

9   Retrophin in connection with this matter?

10  A    No, I was not.

11       MS. SMITH:  Objection, Your Honor.

12       THE WITNESS:  I'm sorry.

13       MS. SMITH:  To Retrophin?

14  BY MR. DUBIN:

15  Q    To Martin Shkreli or MSMB?

16       THE COURT:  Or Retrophin?

17  BY MR. DUBIN:

18  Q    Or Retrophin?

19       THE COURT:  Okay.

20  Q    Were you responsible for sending those out to anyone?

21  A    Not in connection with my work in this matter.

22  Q    Now, after you collected the documents in response to

23  the SEC *subpoena*, what did you do with them?

24  A    I reviewed them.

25  Q    Okay.  And did there come a time when you met with the

Rosensaft - Direct - Durbin                    8634

1   SEC to discuss the documents that were responsive to the

2   *subpoena*?

3   A    Well, I meet with the SEC very early on to try to find

4   out as much about their investigation as I could.

5   Q    And do you recall when that was?

6   A    I don't remember.  I don't remember exactly, but it was

7   very early in my representation of MSMB.

8   Q    Well, let me see if I can refresh your recollection

9   about one of the times that you met with them.  If you go to

10  Tab 6 in your binder --

11          MR. DUBIN:  And you can put it up on the screen,

12  because it's in evidence --

13  Q    GX 857-A please -- well, I'll just ask you to take a

14  look at the document?

15          MR. DUBIN:  Is the Elmo on?

16          THE COURTROOM DEPUTY:  Yes, it's on.

17          THE COURT:  Well, put the document on the blank

18  screen.

19          MR. DUBIN:  Understood, Your Honor.  I just didn't

20  know it would happen that fast.

21          THE COURT:  Excuse me?

22          MR. DUBIN:  I didn't know it would happen that

23  fast.

24          THE COURT:  When the light goes on, it's on.

25          MR. DUBIN:  It's magic.

Rosensaft - Direct - Durbin                    8635

1              THE COURT:  Yes, magic.
2   BY MR. DUBIN:
3   Q    Let me show you a -- we've highlighted some entries:
4   I'm showing you what's already in evidence as GX 857-A.
5              Do you see that, sir?
6   A    Yes.
7   Q    And this is a September 30, 2014 cover letter to a
8   bill, correct?
9   A    Yes.
10  Q    All right.  And I'll show you ending in Bates Stamp
11  129 -- 49129.
12  A    Okay.
13  Q    And can you just read for the jury some of the dates
14  and the entries on this page that are highlighted?
15  A    Do you want me to read all the highlighted?
16  Q    Why don't you read every other one so we don't have to
17  go through all of them.
18  A    All right.
19              June 4, 2013, Michael M. Rosensaft, meeting with
20  M. Shkreli and E. Greebel to discuss investigation.
21  Research on SEC actions regarding short locate and close-out
22  requirements.
23              June 11, 2013, Michael M. Rosensaft, review recent
24  SEC cases -- I guess I should say the hours.  The first one
25  was 3.4.  The second one was .2.

Rosensaft - Direct - Durbin                8636

1          June 13th -- or June 21st, 2013, again, my name,

2     gather and analyze documents responsive to SEC requests.

3     Q    Wait.  I'll stop you there so we don't have to go

4     through all of them.

5     A    Okay.

6     Q    But who is Tenley?  I do not to butcher the last name.

7     Is it --

8     A    Mochizuki.

9     Q    Mochizuki, okay.  Tenley Mochizuki, who is that?

10    A    She's an associate at Katten who worked with me on this

11    matter.

12    Q    Okay.

13          All right.  And I'm showing you Bates Stamp 49130,

14    and as you see so on July 30, 2013, it appears at the bottom

15    of the page, it says Prepare for and attend meeting with SEC

16    and attorney?

17          MR. DUBIN:  Now I know I'm not doing that very

18    well.

19          THE COURTROOM DEPUTY:  Mr. Carter is.

20          MR. DUBIN:  Okay.

21    Q    All right.  So do you recall one way or the another

22    whether that was your first meeting with the SEC?

23    A    I don't remember if it was the first meeting or not.

24    Q    Evan Greebel was not at that meeting, correct?

25    A    He was at -- he was never at a meeting with the SEC.

Rosensaft - Direct - Durbin                    8637

1   Q    Okay.

2        All right.  Now, when you met with SEC, did they

3   inform you about what the scope of their investigation was

4   with entity?

5   A    Yes.

6   Q    And what was your understanding of what the scope of to

7   invest investigation was?

8   A    It was of MSMB Capital.

9   Q    All right.  Do you recall when the first time

10  Mr. Shkreli testified before the SEC was?

11  A    It was, I believe, in August of 2013.

12  Q    Okay.  And did you meet with Mr. Shkreli before he

13  testified?

14  A    Yes.

15  Q    Did you review with him the subject matter that you

16  felt he would be asked about?

17  A    Yes.

18  Q    Did he answer those questions to your satisfaction?

19       MS. SMITH:  Objection to leading, Your Honor.

20       THE COURT:  Rephrase.

21  Q    Did he answer the questions that you asked him?

22  A    Yes, it wasn't just me asking a question and him

23  answering.  But, yes, it was a discussion between us.

24  Q    Okay.  What else happened at those meetings, without

25  telling you us any advice you gave to him or anything he

1  said to you, just generally?

2  A    Generally, we went through documents that were relevant

3  to their investigation.  I spoke to him about questions I

4  thought that would come up.  I also asked him questions

5  about the topics that would come up for my own information,

6  made sure I knew everything about what had happened.

7  Q    Okay.  Now, after Mr. Shkreli testified before the SEC,

8  did you discuss that testimony with Mr. Greebel?

9  A    Yes.

10  Q    Okay.  Did you go over -- well, tell the jury about

11  what you told Mr. Greebel.

12           MS. SMITH:  Objection to hearsay, Your Honor.

13           THE COURT:  Sustained.

14  Q    Were the conversations general or specific?

15  A    General.

16  Q    After Mr. Shkreli testified before the SEC, what do you

17  recall happening next?

18  A    They had follow-up document requests; *subpoena*s, some

19  of which were based on the testimony, some of which were

20  not.  They also asked that Mr. Shkreli come back for more

21  testimony.

22  Q    Okay.  And did you prepare -- well, what did you do in

23  response to that *subpoena*?

24  A    Like before, I went over the *subpoena* with Mr. Shkreli.

25  I asked him to retrieve responsive documents.  I also spoke

1   to Marek Biestek about getting responsive documents.

2   Q    Okay.  And, Mr. Greebel, was he involved in either

3   collecting or reviewing the documents responsive to that?

4   A    No.

5   Q    Okay.  And let me show you what I will mark as DX 1218

6   under Tab 7 in your binder for identification.

7   A    Okay.

8   Q    This is an e-mail to you, sir, from Mr. Schmidt in

9   summer of 2013, August 12th of 2013, correct?

10  A    Correct.

11  Q    And it says --

12            MR. DUBIN:  Well, I will move DX 1218 into

13  evidence.

14            MS. SMITH:  No objection, Your Honor.

15            THE COURT:  All right.  We admit Defense

16  Exhibit 1218.

17            (Defendant's Exhibit Number 1218 so marked and

18  received in evidence.)

19  BY MR. DUBIN:

20  Q    So tell us what you recall about what was going on in

21  this request.  What were you requesting?

22  A    So this was the *subpoena* that followed his testimony

23  based on what I believe to be the subject of concern that

24  the SEC had during that testimony.

25  Q    And what us was your understanding of the area of

Rosensaft - Direct - Durbin                 8640

1    concern?

2    A    Initially they were asking questions about that trade,

3    the Orex trade.  But it became clear during the testimony

4    they were very focused on what he was communicating to

5    investors when he lost money during that trade.

6    Q    Okay.  Now, did there come a time when you suggested to

7    the SEC that they speak to certain investors?

8              MS. SMITH:  Objection to leading, Your Honor.

9              THE COURT:  Well, it is leading, but I am going to

10   give you some latitude just on this question.  But please,

11   again --

12             MR. DUBIN:  Understood, Your Honor.

13             THE COURT:  -- no leading questions.

14             MR. DUBIN:  Understood Your Honor.  I apologize.

15             THE COURT:  All right.  If we can just move this

16   along.

17             MR. DUBIN:  I got it.

18             MS. SMITH:  Also objection to the question to the

19   extent that it calls for hearsay.

20             THE COURT:  All right.

21   BY MR. DUBIN:

22   Q    Let me show you what I will mark as DX 8255 for

23   identification.  It's under Tab 8 of your binder.

24   A    All right.

25   Q    Okay.  And this is a letter that you sent to the SEC in

Rosensaft - Direct - Durbin                8641

1    September of 2013, correct?

2    A    Correct.

3    Q    Okay.

4              MR. DUBIN:  I move DX 8255 into evidence.

5              MS. SMITH:  Objection to hearsay, Your Honor.

6              MR. DUBIN:  He wrote the document, Your Honor.

7              THE COURT:  It is technically hearsay.

8              MR. DUBIN:  I'm sorry?

9              THE COURT:  It is technically hearsay.

10             MR. DUBIN:  This goes directly to --

11             THE COURT:  Can we do a sidebar if you want to

12   make a --

13             MR. DUBIN:  Sure, Your Honor.

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

```
                      Sidebar Conference                  8642
```

 1              (The following occurred at sidebar.)

 2         MR. DUBIN:  May I proceed?

 3         THE COURT:  Yes.

 4         MR. DUBIN:  Your Honor, this is a document that I

 5    am not offering it for the truth.  I am happy for Your Honor

 6    to give an instruction.  This is to show that he transmitted

 7    communication to a government agency.  I am not offing it

 8    for the truth in any manner asserted in this document.

 9         THE COURT:  I'm just trying to figure out how it

10    goes to any issue that's relevant to this case in terms of,

11    you know, it's certainly not affect on Mr. Greebel or to

12    establish that Mr. Greebel was aware of it or anything like

13    that.

14         MS. SMITH:  So no --

15         THE COURT:  I'm not sure --

16         MS. SMITH:  And if this is a question you have to

17    ask him about, but the document itself which is -- and they

18    are in a sense offering it for the truth of what was said in

19    the document.

20         MR. BRODSKY:  Your Honor, we are not offering it

21    for the truth of whether or not the statements made, you

22    know, are accurate relating to the documents or the

23    information provided.  We're offering it to show there's

24    been some -- there's an allegation in this case that

25    Mr. Greebel was concealing or hiding the investigation --

Sidebar Conference                    8643

1   SEC investigation from the board.  The Government -- I

2   believe that's the Government's allegation.  One of the

3   allegations is that Mr. Richardson goes in and speaks to --

4   as you may remember, speaks to SEC in March.

5        What is significant to us is that there is a

6   transmittal from Katten to Mr. Rosensaft to the SEC.

7   Whether or not it's true or not, saying you can speak with

8   Mr. Richardson or Mr. Blanton, it is the opposite of what

9   you would do if you were concealing an investigation from

10  the SEC -- from the board.  If you were in a conspiracy

11  to -- Mr. Greebel in a conspiracy to conceal an

12  investigation from the board of directors, the last thing

13  you would ever do is allow or enable a recommendation to go

14  forward to the SEC that the SEC actually speak with the

15  board of directors.

16       THE COURT:  But they're being proffered as

17  investors not as board members, are they not, or are they --

18  I didn't get to look at that.

19       MS. SMITH:  Sure.

20       THE COURT:  I'm sorry.

21       MR. BRODSKY:  I believe that's correct,

22  Your Honor.  But if you're trying to hide an SEC

23  investigation from Retrophin, which is the Government's

24  allegation, you do not recommend to the SEC that they go

25  talk to the SEC, the board -- the Retrophin board members.

1   And so the purpose for this is for the transmittal of -- we

2   ask you -- you know, we invite you to go speak with

3   Mr. Richardson because that conveys to us an intent or a

4   reflects an intent inconsistent with the Government's theory

5   of prosecution.

6            THE COURT:  But I'm wondering what Mr. Greebel has

7   to do with this letter and the response by Mr. Rosensaft,

8   because he's testified repeatedly that Mr. Greebel wasn't in

9   on the conversations.  He wasn't in on the responses to the

10  SEC.  He didn't sit in on any meetings.  He had no role.

11           MR. BRODSKY:  True.

12           THE COURT:  He didn't check with Mr. Greebel

13  before he responded, so I just don't see how that

14  establishes anything that we want to establish.

15           MR. BRODSKY:  Here's why, Your Honor.  It is one

16  fact, it is not the only fact, but it is one fact among

17  many, that help us establish Mr. Greebel's intent.  So we

18  would like to show the jury that there are multiple facts

19  that reflect that he didn't try to control the

20  investigation.  That's one good fact for us.

21           Another good fact is that the person who was

22  handling the investigation is telling the SEC staff, along

23  with Mr. Shkreli, because Mr. Shkreli is the one who is

24  giving this information to Mr. Rosensaft, Go talk to

25  Mr. Richardson.  And so we believe it's reflective not in an

Sidebar Conference                          8645

1   attempt to conceal an investigation from Retrophin's board.

2   But rather reflect the opposite.  It's just another fact

3   inconsistent with the Government's theory of hiding an SEC

4   investigation from Retrophin.

5          They're going to make much, Your Honor, of the

6   fact that Mr. Greebel had in their case in chief delayed

7   sending a bill out relating to the representation of MSMB in

8   connection with the SEC investigation, and they put in the

9   September 30, 2014 letter from Mr. Greebel to Mr. Shkreli's

10  personal e-mail address forwarding the bill.  So we believe

11  to counter that and provide full information one significant

12  factor is Mr. Greebel never interfered and never stopped and

13  never suggested, Don't recommend Mr. Richardson -- the SEC

14  talk to Mr. Richardson.

15         THE COURT:  Well, if he presumably didn't know

16  about it, he wouldn't have stopped it, right?

17         What you've established thus far is that this

18  witness did not consult with or confer with Mr. Greebel

19  about his responses to the SEC.  I just think that this

20  is --

21         MR. BRODSKY:  I can make one more attempt,

22  Your Honor --

23         THE COURT:  Okay.

24         MR. BRODSKY:  -- which is that the conspiracy

25  between Mr. Greebel and Mr. Shkreli --

Sidebar Conference                                       8646

1              THE COURT:  And others.

2              MR. BRODSKY:  -- and so -- and others, and so we

3      can show --

4              THE COURT:  He's not a co-conspirator.

5              MR. BRODSKY:  No, absolutely not.  No,

6      Mr. Rosensaft in no way, shape, or form is a co-conspirator.

7      There's zero evidence Mr. Rosensaft has done anything wrong.

8      All evidence shows Mr. Rosensaft has done everything right.

9              And so, Your Honor, the fact that Mr. Shkreli

10     is directed -- pursuant to the directing -- directing

11     Mr. Rosensaft to recommend Mr. Richardson, it undercuts

12     the Government's argument that Mr. Shkreli was trying to

13     keep the SEC investigation from the board of directors.  It

14     makes it more reasonable for Mr. Greebel and Mr. Rosensaft

15     for people to believe that Mr. Shkreli is not trying to hide

16     the SEC investigation from the board of directors.

17             And this becomes relevant, Your Honor, in 2014

18     when Mr. Greebel is -- Mr. Rosensaft is lied to, as well as

19     Mr. Greebel, although it hasn't come out, with respect to

20     what Mr. Shkreli's informing the board with intent to the

21     SEC investigation.  So that's why it's important.

22             MR. DUBIN:  May I just point something out to

23     Brodsky real quick?

24             MS. SMITH:  Your Honor, it's hearsay.  Again, it

25     can't be offered for the effective listener.  I haven't

1    heard an actual hearsay exception.  By looking at this

2    document --

3            MR. PITLUCK:  And it's clearly offered for the

4    truth of the matter asserted, which is what's written,

5    Judge, rather than proffering everything to 20 minutes.

6            THE COURT:  Yes.

7            MR. DUBIN:  Okay.  I'll just ask him a question

8    about whether he informed the SEC that they could speak to

9    anyone.

10            MS. SMITH:  That's hearsay, Your Honor.

11            THE COURT:  So you're asking him to testify about

12    an out of court statement that he made?  That is hearsay.

13            MR. DUBIN:  Well, I'm going to say, Did you ever

14    encourage the SEC that they -- to interview investors in

15    Retrophin or in MSMB?

16            THE COURT:  You know, that is kind of in the

17    background of Mr. Richardson who said, I was asked by

18    Mr. Shkreli to testify before the SEC.  I did testify.  I

19    did it in my capacity as an investor.  I think it's in the

20    record.  I don't think we need to put more hearsay into the

21    record.

22            MR. BRODSKY:  Two points about that:  That came

23    from Mr. Richardson's testimony.  It's significant that it

24    comes from Katten for recommendation.

25            Second, Your Honor, the question is not -- is not

Sidebar Conference                          8648

 1    hearsay, and so if we can elicit to Mr. Rosensaft, ask the
 2    SEC, Would you consider interviewing Mr. Richardson or
 3    Mr. Blanton or others?  That's a question --
 4              THE COURT:  I think there's a way to ask that
 5    wouldn't be leading and wouldn't necessarily be hearsay.
 6              MR. BRODSKY:  Do you have a suggestion?
 7              MR. PITLUCK:  You can't rephrase a statement into
 8    a question to make it not hearsay.  This is a statement.
 9              THE COURT:  It would have to be what, if anything,
10    did Mr. Rosensaft -- what steps did he take in response to
11    this.
12              MR. PITLUCK:  But that's communicating hearsay,
13    Judge.
14              THE COURT:  No.
15              MR. PITLUCK:  That's elicited hearsay.  He didn't
16    ask -- this is the statement.  This is what he told them.
17              MR. BRODSKY:  It does go, Your Honor, to
18    Mr. Shkreli's state of mind.  That is relevant because of
19    the conspiracy.  So if they're going to allege a conspiracy
20    between Mr. Shkreli and Mr. Greebel, and we can show
21    Mr. Shkreli's state of mind, it's not to hide the
22    investigation from the board, then that -- that is important
23    defense for us.  So I think we should be allowed to ask
24    Mr. Rosensaft, elicit evidence that countervails the
25    Government's dealing with Mr. Shkreli's state of mind with

Sidebar Conference                          8649

1  respect to the SEC investigation, and that is that

2  Mr. Shkreli knew about what writer were being transmitted

3  and what information was being transmitted to the SEC, and

4  that Mr. Shkreli wanted Mr. Rosensaft to ask the SEC to

5  interview Mr. Richardson.  And I understand it's in the

6  record already through Mr. Richardson's testimony.  The

7  Government has elicited that, so I don't know why they're --

8  they elicited it on their case and we cannot elicit it in

9  our case, very similar evidence, but now comes --

10           THE COURT:  Well, they elicited through live

11  testimony of the witness about his act of testifying before

12  the SEC.  You know, if you are trying to seek out-of-court

13  statements, it's hearsay.

14           MS. SMITH:  Yes.  And the state of mind of 8033,

15  for the declarant's state of mind, the declarant is

16  Mr. Richardson.

17           MR. DUBIN:  Let me try to do it another way so

18  that I'm not going to --

19           MR. PITLUCK:  Judge, we have now had five

20  proffers.

21           MR. DUBIN:  I'm going to think about it on my way

22  from here to the podium, and I promise, Your Honor, that I

23  will for once get the form right.

24           THE COURT:  Okay.  But don't do it --

25           MR. DUBIN:  I won't do it in the end.

Sidebar Conference                           8650

1        THE COURT:  There's going to be an objection

2   to hearsay.

3        MR. PITLUCK:  We don't want to come back to

4   sidebar.

5        MR. DUBIN:  Your Honor, but in cross mode.

6        THE COURT:  No, I know.  The Government's lawyer

7   are usually not crossing and you are not directing.

8        MR. PITLUCK:  We didn't get a lot of latitude on

9   leading, Judge.

10        THE COURT:  I know you didn't.  Sometimes just I

11   just -- you know, it's just more expedient.

12        I will try to -- I am trying very hard to treat

13   both sides equally, but do mot solicit hearsay.

14        MR. DUBIN:  I won't.  Okay.  Thank you.

15        THE COURT:  Thank you.

16        (Continued on next page.)

17

18

19

20

21

22

23

24

25

Rosensaft - Direct - Durbin                8651

1              (Sidebar ends; in open court.)

2    BY MR. DUBIN:

3    Q    Mr. Rosensaft, did you make witnesses available to the

4    SEC?

5    A    I wouldn't characterize it as making witnesses

6    available.

7    Q    Okay.  How would you characterize it?

8    A    I told the SEC --

9              MS. SMITH:  Objection.

10             THE COURT:  Sustained.

11   Q    If you can do it in a way that is not hearsay.

12             MS. SMITH:  Objection to the question.

13             THE COURT:  Good thing he's a lawyer and

14   understands the law.

15             MR. DUBIN:  I understand.

16   A    I cannot answer that question without talking about my

17   communication with the SEC.

18   Q    Okay.  Do you know who Steven Richardson is?

19   A    Yes.

20   Q    Okay.  Who is he?

21   A    I believe he was the president at Retrophin and also an

22   investor in the MSMB Capital.

23   Q    Okay.  And what was your -- well, let me think this

24   through --

25   A    I should say -- he was definitely a board member of

1   Retrophin.  I believe he was an officer.  I'm not sure about

2   president, though.  I'm not sure whether he was the

3   president or not.

4   Q    The president of what?

5   A    Of Retrophin.

6   Q    Okay.

7        All right.  Do you recall whether or not you made

8   Mr. Richardson available to the SEC to testify?

9             MS. SMITH:  Objection, Your Honor.

10            THE COURT:  Overruled.

11  A    Again, I wouldn't characterize anything I did as making

12  him available.

13  Q    Okay.  Can you take a look at for identification at

14  DX 8255 in front of you?

15  A    Yes.

16  Q    And look at the second page.  And that -- and the

17  second to last paragraph that begins "if," and just read

18  that paragraph to yourself.

19  A    Okay.

20  Q    Okay.  Does that refresh your recollection that you

21  encouraged in one way or another that the SEC speak to

22  Mr. Richardson?

23            MS. SMITH:  Objection, Your Honor.

24            THE COURT:  Overruled.

25  A    That I remember that I did tell the SEC that.

1           MS. SMITH:  Objection.

2    A    That was -- I'm sorry.

3           MR. DUBIN:  Could you read the question back?  I'm

4    sorry.

5           MS. SMITH:  We move to strike that.

6           THE COURT:  Yes, it's stricken.

7           MR. DUBIN:  Could we read the question back,

8    please?

9           THE COURT:  Yes, you may have the question read

10   back.

11          (Requested portion read back.)

12          THE COURT:  The question and answer are stricken.

13          MR. DUBIN:  Well, I thought that Your Honor

14   overruled the objection to that?  That was why I had him

15   read it back.

16          THE COURT:  Oh, I'm sorry.  Okay.

17          Yes, I struck the statement that the witness made

18   that would be hearsay.  Sorry.

19          MR. DUBIN:  No problem.  You never have to

20   apologize to me, Your Honor.

21   Q    You can answer the question.

22   A    Well, your question was, Does it refresh my

23   recollection?  The answer to that is, I have a clear memory

24   of that.  I don't need my recollection refreshed.

25   Q    Okay.  And did you ask the SEC if they would speak to

Rosensaft - Direct - Durbin                    8654

1   anyone?

2   A    I suggested that they do.

3   Q    Okay.  And who?

4   A    Mr. Richardson and Mr. Blanton.

5   Q    Okay.  Now, I want to -- to your knowledge, did anyone

6   at Katten contact MSMB investors to talk with them about the

7   SEC investigation, other than you?

8   A    Not at Katten, no.

9   Q    Okay.  And did you communicate at all with the MSMB

10  investors relating to the SEC investigation?

11  A    No.

12  Q    Never?

13  A    Never.

14  Q    Okay.  And let me show you -- take a look at Tab 28,

15  what I will marked for identification as DX 10435 on the

16  bottom.

17  A    Okay.

18  Q    If you could, read the bottom e-mail to yourself?

19  A    I reviewed it.

20  Q    Okay.  Does that refresh your recollection that you, in

21  fact, were contacted by an investor?

22           MS. SMITH:  Objection to the characterization.

23           THE COURT:  Sustained.

24  Q    Okay.  Were you aware that any investors contacted

25  Martin Shkreli?

Rosensaft - Direct - Durbin                8655

1    A    Yes.

2    Q    And what was your understanding of what they contacted

3    Mr. Shkreli about?  And just to be clear and narrow it,

4    regarding the SEC investigation?

5              MS. SMITH:  Objection to hearsay, Your Honor.

6              THE COURT:  What was your understanding of what

7    the investors contacted Mr. Shkreli about?

8              MR. DUBIN:  Yes, just the subject matter.

9              THE COURT:  I will allow the question.

10   A    I was aware that investors had contacted Mr. Shkreli

11   about the SEC investigation.

12   Q    And did Mr. Shkreli encourage them one way or another,

13   or do you know what Mr. Shkreli -- well, strike that.

14             Did Mr. Shkreli, to your knowledge, encourage them

15   to speak to the SEC?

16             MS. SMITH:  Objection to hearsay, Your Honor.

17             THE COURT:  Sustained.

18   Q    Well, what is your understanding of whether or not the

19   investors were encouraged by anyone one way or another to

20   speak to the SEC?

21             MS. SMITH:  Objection, Your Honor.

22             THE COURT:  Sustained.

23   Q    Were the investors encouraged by you or anyone else as

24   far as you know to communicate with the SEC?

25             MS. SMITH:  Objection, Your Honor.

Rosensaft - Direct - Durbin                    8656

1              THE COURT:  Sustained.

2   Q    Do you know of anything that was done to prevent

3   investors from talking to the SEC?

4   A    No.

5   Q    Are you aware that there was a willingness amongst the

6   management, including Martin Shkreli, to allow or encourage

7   investors to speak to the SEC?

8              MS. SMITH:  Objection, Your Honor.

9              THE COURT:  Sustained.

10  Q    Did you ever discourage Martin Shkreli or anyone else

11  or any of the investors, for that matter, from speaking to

12  the SEC?

13  A    No.

14  Q    Are you aware of anyone at MSMB, Retrophin, or

15  anywhere -- or any other entity that Martin Shkreli was

16  involved in, that discouraged investors from speaking to the

17  SEC?

18              MS. SMITH:  Objection.  Asked and answered.

19              THE COURT:  Sustained.

20  Q    Now, based on your experience as -- well, let me ask

21  you this:  Did you ever communicate with the SEC staff --

22  without tell telling me the substance -- did you ever

23  communicate with the SEC staff about contacting MSMB

24  investors?

25  A    Yes.

Rosensaft - Direct - Durbin                    8657

1   Q    Okay.  Why?

2   A    Without getting into what people told me, because I

3   believe that if the SEC contacted those investors, it would

4   help their investigation and be favorable to my client.

5   Q    Okay.  And why did you think it would be favorable?

6   A    Based on what Mr. Shkreli told me.

7   Q    So based on all of your prior experience, both your

8   work as a prosecutor and your work at Cleary, how did you

9   view at this point in time the SEC's position regarding

10  their investigation?

11          MS. SMITH:  Objection, Your Honor.

12          THE COURT:  Sustained.

13  Q    Okay.  What was your view -- well, did you have a view

14  about the SEC's position at this point in time?

15          MS. SMITH:  Objection to what point the time?

16          MR. DUBIN:  I'm sorry.  I didn't hear her.

17          THE COURT:  She wants to know what point in time

18  you're referring to?

19          MR. DUBIN:  Okay.

20  Q    After -- let's see where I was -- in March of 2014?

21  A    Yes.

22  Q    Okay.  What use your perspective on it?

23          MS. SMITH:  Objection to form.

24          THE COURT:  Would you rephrase your question,

25  please.

Rosensaft - Direct - Durbin                 8658

1   BY MR. DUBIN:

2   Q    All right.  In 2013 did you have a view, all of 2013,

3   about the SEC's position regarding their investigation?

4             MS. SMITH:  Objection, Your Honor, to what the

5   SEC's position was.

6             MR. DUBIN:  I'm asking for his point of view.

7             THE COURT:  You're asking what his view is about

8   the SEC's position regarding their investigation?

9             MR. DUBIN:  Correct.

10            THE COURT:  Do you want to just rephrase the

11  question.

12  BY MR. DUBIN:

13  Q    What was your understanding of the SEC's position in

14  2013 regarding that investigation, your understanding?

15  A    It evolved throughout that year.

16  Q    Okay.  And tell me about the evolution.

17  A    At the beginning my hope was that it could be resolved

18  without any action taken by the SEC.  As the year went on

19  and into 2014, it became clear to me that it was going to

20  involve some kind of an agreement with the SEC, most likely

21  a money judgment of some sort.

22  Q    Okay.  And just so we're clear, is that -- a money

23  judgment, is that a civil penalty or a criminal penalty?

24  A    Civil.

25  Q    Now, what happened next, as far as you recall?

Rosensaft - Direct - Durbin                    8659

1    A    In 2014?

2    Q    Did you get another *subpoena* at some point?

3    A    I don't remember exactly when I received all the

4    *subpoena*s, but there were regular *subpoena*s through this

5    period.

6    Q    Okay.  Take a look at Tab 9 in your binder.

7    A    (Witness complies.)

8    Q    Okay.  I might have -- I think I can -- I'm in

9    September of 2013 now, okay?

10   A    Okay.

11   Q    September of 2013.

12            This is an e-mail that you received from Eric

13   Schmidt, correct?

14   A    Correct.

15   Q    September 26, 2013, right?

16   A    Correct.

17            MR. DUBIN:  I move DX 1212 into evidence,

18   Your Honor.

19            MS. SMITH:  No objection, Your Honor.

20            THE COURT:  All right.  We will receive in

21   evidence Defense Exhibit 1212.

22            (Defendant's Exhibit Number 1212 so marked and

23   received in evidence.)

24   Q    Can you explain to the Ladies and Gentlemen of the

25   Jury, Mr. Rosensaft, what this *subpoena* was about?

Rosensaft - Direct - Durbin                    8660

1  A    The SEC was asking for additional documents about

2  payment of management fees to the MSMB advisors, what they

3  call them.

4  Q    Okay.  And did there come a time that the SEC sent a

5  *subpoena* to Retrophin?

6  A    Yes.

7  Q    Okay.  And approximately when was that?

8  A    It was either the end of the 2013 or the beginning of

9  2014.

10  Q    Okay.  And prior to the SEC -- well, prior to sending

11  the *subpoena*, did the SEC ask you if it was okay to

12  represent Retrophin?

13  A    I don't know if it was okay.  They asked me if I was

14  representing Retrophin as well.

15  Q    Okay.  And did they ask you if you could accept service

16  of the *subpoena* for Retrophin as well as MSMB -- well,

17  strike that.

18        You had already accepted service for MSMB's

19  *subpoena*, right?

20  A    Correct.

21  Q    And did they ask you at some point if you could also

22  receive service for Retrophin's *subpoena*?

23  A    Yes.

24  Q    Okay.  And what happened next?

25  A    I told them that I could.

Rosensaft - Direct - Durbin                8661

1           MS. SMITH:  Objection.  Leading.

2           THE COURT:  Sustained.

3    Q    Did you --

4    A    I --

5    Q    Did you, in fact, accept service on behalf of

6    Retrophin?

7    A    Yes.

8    Q    And without telling me the substance, did you ask

9    Mr. Shkreli if it was okay for you to accept service on

10   behalf of Retrophin?

11   A    Yes.

12   Q    Okay.  And did it present any issue for you to accept

13   service on behalf of Retrophin?

14   A    At that point I saw no conflict, if that's what you're

15   asking me.

16   Q    Okay.  Why not?

17   A    Well, we were already representing Retrophin for

18   initial matters.  And I saw no -- I saw a common interest in

19   responding to the *subpoena*s directed to Retrophin and also

20   my work for MSMB.

21   Q    Okay.  And in September of 2013, Mr. Rosensaft, what

22   was your understanding of what the focus of the

23   investigation was, MSMB or Retrophin?

24   A    MSMB.

25   Q    Okay.  And I want to show you what I will mark for

1  identification as DX 1216.  It's Tab 11 in your binder.  Is

2  this another e-mail that you got from Mr. Schmidt of the

3  SEC?

4  A    Yes.

5  Q    Okay.  And what is attached?

6  A    Two *subpoena*s.

7  Q    Okay.

8           MR. DUBIN:  I move DX 1216 into evidence,

9  Your Honor.

10           MS. SMITH:  No objection, Your Honor.

11           THE COURT:  We will receive in evidence

12  Defendant's Exhibit 1216.

13           (Defendant's Exhibit Number 1216 so marked and

14  received in evidence.)

15  BY MR. DUBIN:

16  Q    Okay.  Now at this point in time, did you view the

17  investigation as being an investigation into Retrophin?

18  A    No.

19  Q    Okay.  Why not?

20  A    The SEC didn't change the title of their investigation.

21  In addition, their requests about Retrophin all were

22  centered on how the MSMB investors became investors in

23  Retrophin, not on Retrophin exactly.

24           (Continued on the next page.)

25

*Rosensaft - Direct/Mr. Dubin*                    **8663**

1    EXAMINATION BY

2    MR. DUBIN (Continuing.):

3    Q    Okay.  And if we go to the next page, just the title of

4    the subpoena, it still says there "In the matter of MSMB

5    Capital Management, LLC valuation."

6              Right?

7    A    Correct.

8    Q    All right.

9              Is that what you meant when you said it didn't

10   change the title of the investigation?

11   A    Correct.

12   Q    And do you recall --

13             Well, do you know what a litigation hold is or a

14   document hold is?

15   A    Yes.

16   Q    Can you explain briefly to the jury what that is from

17   your understanding?

18   A    When there is litigation, or you receive a subpoena,

19   typically, you would sent to the company and talk to the

20   company about sending out a memo to everyone who might have

21   relevant documents to make sure they're not destroyed or

22   thrown away.

23   Q    Do you recall one way or another whether you initiated a

24   litigation hold or a document hold to Retrophin?

25   A    I believe I did.

*Rosensaft - Direct/Mr. Dubin*                     **8664**

1   Q    And why did you do that?

2   A    To make sure that no documents were either destroyed or

3   thrown away inadvertently.

4   Q    I want to shift the focus now and change subjects.

5         Do you recall being asked questions about a D and O

6   questionnaire at some point in time by Mr. Greebel?

7   A    Yes.

8   Q    I want to show you what I want to mark for identification

9   as DX-1178.  It's at Tab 13 in your binder, sir.

10        And I'm going to direct your attention to Bates

11  Stamp ending 9154.

12        Do you see that, sir?

13  A    Yes.

14  Q    Do you recognize that document, sir?  If you flip ahead

15  to Paragraph 7.6.1, it's on Page 9 of that document.  The

16  document, if you flip to Page 9 of that questionnaire?

17  A    The Bates Number?

18  Q    119962.  I put it up on the screen if you want to see it.

19        Do you recognize that paragraph, sir?

20  A    Yes.

21  Q    Okay.  And at some point --

22        Well, let me show you.  At some point, were you

23  asked about by Mr. Greebel about how that question should be

24  answered in connection with Martin Shkreli?

25        MS. SMITH:  Objection to timeframe and what

*Rosensaft - Direct/Mr. Dubin*                    *8665*

1    question.

2         MR. DUBIN:  Well, you know what, I move -- I'll move

3    DX-1178 into evidence.

4         MS. SMITH:  Your Honor, I believe this is already a

5    Government Exhibit.

6         MR. DUBIN:  Okay.

7         MS. SMITH:  I don't have the Government Exhibit

8    right now, but we don't have an objection to it.

9         THE COURT:  We will admit DX-1178 with the

10   understanding that it may already be a Government Exhibit.

11        (Defendant's Exhibit Number DX-1178 was marked in

12   evidence as of this date.)

13        MS. SMITH:  Can we just get the date of the document

14   for the record.

15        MR. DUBIN:  Sure.  The date of the document is

16   February 11, 2014.

17   EXAMINATION BY

18   MR. DUBIN:

19   (Continuing.)

20   Q    And do you recall --

21        Can you read that question out loud for the jury,

22   please?

23   A    "Have you been, or are you presently, the subject of any

24   investigation by the SEC, the Commodity Futures Trading

25   Commission, FINRA, or any other regulatory or self-regulatory

*Rosensaft - Direct/Mr. Dubin*                    **8666**

1    organization that could result in the finding of a violation

2    of any federal or state securities or commodities laws?"

3    Q    And are you familiar with this form generally?

4    A    I'm not sure what you mean generally.

5    Q    What a D and O questionnaire?

6    A    I'm familiar with it, yes.

7    Q    Can you explain to the ladies and gentlemen of the jury

8    what it is?

9    A    Based on obligations that the company has, usually, in

10   public filings or other obligations, they have to get

11   information from their directors and officers so they can

12   respond to regulators in the right way.

13   Q    Okay.  And did there come a time when Mr. Greebel came to

14   you and asked you a question, sir, about how 7.6.1 should be

15   answered?

16   A    Yes.

17   Q    And what did you tell them?

18   A    I told him that Mr. Shkreli was not the subject of the

19   SEC investigation, the specific subject was MSMB Capital.

20   Q    So I'll ask you to turn to Tab 14 in your binder and show

21   you what I'll mark for identification as DX-944A?

22   A    Do you mean DX-9644A?

23   Q    Yes, thank you.  DX-9644A.

24        And I direct your attention to the Bates Stamp

25   ending 832.  And I put it up on your screen if you need to see

*Rosensaft - Direct/Mr. Dubin*                    *8667*

1    it?

2              Is that the same question, sir?

3    A    Yes.

4              MR. DUBIN:  I would move DX-9644A into evidence.

5              MS. SMITH:  No objection, your Honor.

6              THE COURT:  We admit DX-9644A.

7              (Defendant's Exhibit Number DX-9644A was marked in

8    evidence as of this date.)

9    EXAMINATION BY

10   MR. DUBIN:

11   (Continuing.)

12   Q    So this is --

13             I'm showing you the D and O questionnaire with the

14   check mark on it, do you see that?  Or an X on it?

15   A    Yes, I see that.

16   Q    Now, based on your handling of the SEC investigation,

17   your advice, Mr. Rosensaft was that --

18             MS. SMITH:  Objection to the leading, your Honor.

19             THE COURT:  Yes, sustained.

20   Q    What was your advice about how that should be answered?

21             THE COURT:  To whom?

22             MR. DUBIN:  To Mr. Greebel.

23             MS. SMITH:  Asked and answered, your Honor.

24             THE COURT:  Sustained.

25   Q    Does this reflect the advice that you gave?

1          Did you have any quarrel with it?

2          THE COURT:  This being for the record?

3          MR. DUBIN:  Yes, this being the way the question was

4    answered.

5          THE COURT:  Defense Exhibit 9644A.  And you're

6    pointing to.

7          MR. DUBIN:  I'm pointing to where it says, "I am

8    not."

9          THE COURT:  No, let's just point to the page,

10   please --

11         MR. DUBIN:  I'm sorry.

12         THE COURT:  -- of this exhibit so we have it for the

13   record.

14         MR. DUBIN:  Bates Stamp ending 832.  168832,

15   Paragraph 7.6.1.

16   Q    Do you see that?

17   A    Yes.

18   Q    I am not the subject of any investigation regarding

19   violations of any federal or state securities or commodities

20   laws.

21         Do you see that?

22   A    Yes.

23   Q    Was that consistent with the advice you gave?

24   A    Yes.

25   Q    Okay.

*Rosensaft - Direct/Mr. Dubin*                    *8669*

1          Now, did there come a time when you became involved

2    with a posting on a website called Scribd?

3    A    Yes.

4    Q    What is Scribd as best you can understand it?

5    A    It's a website on the Internet where people can freely

6    post documents, typically, well, I'll leave it at that.

7    Q    Okay.  Do you recall when this incident occurred?

8    A    I believe it was very late December or very, very early

9    January, well, late December of 2013 or very early January of

10   2014.

11   Q    Okay.  And you recall what the incident was,

12   Mr. Rosensaft?

13   A    Yes.

14   Q    Please tell the ladies and gentlemen of the jury what

15   happened?

16   A    There was a posting on Scribd of one of the subpoenas in

17   the MSMB investigation and it was a confidential investigation

18   at that time, and so, it caused us concern.

19   Q    And what did you do in response to this?

20   A    I spoke to my clients and then I also spoke to the

21   Securities and Exchange Commission.  I drafted a letter to the

22   individual who we believe had posted it to his attorney, and I

23   also spoke to Scribd as well.

24   Q    Okay.  I'd like to show you what I'll mark for

25   identification as DX-9539 under Tab 15 of your binder.

*Rosensaft - Direct/Mr. Dubin*                          **8670**

1              Do you see that, sir?

2    A    Yes.

3    Q    Is this an e-mail that you sent to an

4    mdanblock@hotmail.com on January 2, 2014, at 10:57 p.m.

5    Central Standard Time.

6    A    The bottom e-mail in the chain is that, yes.

7    Q    Then you forwarded it, or you copied Mr. Gordon, Michael

8    Gordon, he was your partner at Katten; correct?

9    A    Correct.

10   Q    Who else did you talk to?

11              MS. SMITH:  Objection to the document not in

12   evidence.

13              THE COURT:  I beg your pardon.

14              MS. SMITH:  The document is not in evidence.

15              MR. DUBIN:  I move it into evidence and we

16   apologize.

17              MS. SMITH:  We object to hearsay.

18              THE COURT:  Sustained.

19              MR. DUBIN:  Could you take a look at the next page,

20   please, your Honor.

21              THE COURT:  Sustained.  It's based on hearsay.

22   Q    Did there come a point in time when you wrote a letter

23   to -- who did you write a letter to?

24   A    To Jackson Su's attorney.

25   Q    Okay.  And why did you do that?

1  A    Because we believed that Jackson Su was the one who

2  had --

3          MS. SMITH:  Objection to the foundation for his

4  knowledge of what he was going to testify to.

5  Q    Did you do some investigation to determine who may have

6  posted this SEC subpoena on Scribd?

7  A    I spoke to Mr. Shkreli who had done an investigation.

8  Q    Did you accept his representations?

9  A    Yes.

10 Q    And did you look at the results of his investigation

11 before you sent that letter after?

12 A    Yes.

13 Q    Okay.  And were you satisfied that what he represented to

14 you was true?

15 A    Yes.

16 Q    Okay.  And so, what did you do next?

17 A    I contacted Mr. Jackson's lawyer about it.

18 Q    Or Mr. Su's lawyer?

19 A    I'm sorry, Mr. Su's lawyer.

20 Q    Okay.  And what was the --

21          Generally, what did you --

22          What did you contact him and communicate?

23          THE COURT:  About?

24 Q    About Mr. Su's posting, or the suspicion that he had

25 posted this SEC subpoena on Scribd?

*Rosensaft - Direct/Mr. Dubin*          *8672*

1        MS. SMITH:  Objection to the extent it calls for

2   hearsay.

3        THE COURT:  Yes, if you can answer it without

4   testifying about hearsay you may do so, sir.

5   A    Well, maybe I can answer.  The purpose of me contacting

6   him was to alert him to something we believed his client had

7   done.

8   Q    What did you believe his client did?

9        MS. SMITH:  Objection to the extent that the

10  foundation is hearsay.

11       THE COURT:  Overruled.

12  A    Unauthorized, well, accessed Retrophin's computers in an

13  unauthorized manner, taken the subpoena, and then posted it on

14  Scribd.

15  Q    And from your perspective, was that proper?

16  A    No.

17       MS. SMITH:  Objection, your Honor.

18       THE COURT:  Overruled.

19  A    No.

20  Q    Why not?

21  A    Because it's a crime for other reasons.

22  Q    Is that the legal position you took when you contacted

23  Mr. Su and his lawyer?

24  A    Yes.

25  Q    Now, did you ever receive a response from Mr. Su or his

*Rosensaft - Direct/Mr. Dubin*                    **8673**

1    lawyer?

2    A    No.

3    Q    Did that concern you?

4    A    I don't know about concern.  I wouldn't characterize it

5    as concern.

6    Q    How would you characterize it?

7    A    A lawyer being a lawyer.

8    Q    All right.  Did you contact, well, what did you do next?

9    Did you contact Scribd?

10   A    Yes.

11   Q    And what did you -- what were you -- what was the purpose

12   of your contacting Scribd?

13   A    To try to get them to take down the posting.

14   Q    Did they?

15   A    Yes, ultimately.

16   Q    Who else did you contact?

17   A    Eric Schmidt at the Securities and Exchange Commission.

18   Q    Okay.  So let me, well, what was the purpose of

19   contacting Mr. Schmidt?

20   A    To try to see if he could also contact Scribd in an

21   effort to get the posting down.

22   Q    Mr. Rosensaft, could you tell the jury what the SEC did?

23   A    They contacted Scribd and told them certain things.

24   Q    What is your understanding of what the purpose of the

25   SEC's contacting Scribd was?

*Rosensaft - Direct/Mr. Dubin*          8674

1  A    They conveyed a message that I asked them to convey to

2  Scribd about the subpoena.

3  Q    Okay.  What was your reaction to the SEC agreeing to

4  contact Scribd?

5           MS. SMITH:  Objection.

6           THE COURT:  Sustained.

7  Q    Did you have a reaction --

8           MS. SMITH:  Objection.

9  Q    -- it the SEC agreeing to contact Scribd?

10           THE COURT:  Sustained.  Did I mistake --

11           MS. SMITH:  Objection, your Honor.

12           THE COURT:  Okay.

13  Q    Did you ever consider, Mr. Rosensaft, bringing the matter

14  of Mr. Su, of what Mr. Su did to the federal authorities?

15  A    Not report it to the police if that's what you mean.  We

16  did not do that.

17  Q    No.  I said, Did you ever consider that?

18  A    Yes.

19  Q    And why didn't you do that ultimately?

20  A    The initial thing we were concerned about is getting the

21  subpoena down as quickly as possible.  When it actually came

22  down, there was also litigation going on with Mr. Su and we

23  decided it's best left to that litigation.

24  Q    Was your objective in your mind satisfied once it was

25  taken down?

*Rosensaft - Direct/Mr. Dubin*                    *8675*

1    A     My objective, yes.

2    Q     Okay?

3    A     Although there would be further litigation as well.

4    Q     Got it.  Now, in late --

5              THE COURT:  May I just ask one question?  When you

6    use the term "we decided," or "we thought," who is we besides

7    you?

8              THE WITNESS:  Myself, Mr. Greebel, and Mr. Shkreli.

9    Q     And Mr. Rosensaft, I want to focus your attention on late

10   January 2014, okay?

11   A     Okay.

12   Q     What happened next in connection with the SEC

13   investigation?

14   A     They asked for Mr. Shkreli to testify again, and they

15   generally continued sending requests for documents.

16   Q     Okay.  And did they communicate anything to you about

17   what the topics of the testimony was going to be, or the topic

18   of the questions they were asking going to ask Mr. Shkreli

19   would be?

20   A     Generally, yes.

21   Q     Okay.  And what was your understanding of what the topics

22   would be related to MSMB or Retrophin?

23   A     MSMB.  And also how the MSMB investors became investors

24   in Retrophin.

25   Q     Did Mr. Shkreli indeed testify again in February?

*Rosensaft - Direct/Mr. Dubin*                    **8676**

1   A    Yes.

2   Q    Okay.  Same question.  Was it related to MSMB primarily?

3   A    Yes.  And again, how those investors became investors of

4   Retrophin.

5   Q    Okay.  What, if anything, did Mr. Shkreli tell the SEC

6   staff about payment of the Merrill Lynch settlement?

7            MS. SMITH:  Objection to hearsay.

8            THE COURT:  Sustained.

9   Q    Did you come to learn at any point in time what

10  Mr. Shkreli -- how Mr. Shkreli paid the settlement of the

11  Merrill Lynch matter?

12  A    Yes.

13  Q    What was your understanding?

14  A    That part of the money came from him personally, and part

15  of the money came from MSMB Healthcare which was another MSMB

16  entity.

17  Q    And did you provide any advice to Martin Shkreli in

18  connection with his payment of the settlement of the Merrill

19  Lynch matter?

20  A    Yes.

21  Q    What generally was your position on that?

22  A    My answer would necessitate telling me kind of how much

23  he characterized that payment from MSMB Healthcare.

24  Q    Okay.  Well, I don't want to do that.

25            Just generally speaking, did you give him advice on

1    things that he should do next?

2    A    Yes.

3    Q    Okay.  And without telling us the substance of what you

4    communicated, could you tell us what your position was on what

5    should be done?

6    A    My position was that all of the money should have come

7    from Martin himself as opposed to MSMB Healthcare.

8    Q    And did you encourage that advice at some point?

9    A    I conveyed that advice.

10   Q    And did you convey that advice to Evan Greebel at any

11   time?

12   A    I informed Evan Greebel about what had happened.

13   Q    Did he disagree with you in any way about the advice you

14   gave?

15   A    No.

16   Q    Okay.  Now, in March of 2014, were more subpoenas sent by

17   the SEC?

18   A    I can't be sure of the exact date, but the SEC continued

19   it send subpoenas.

20   Q    And they continued to send subpoenas related to what?

21   A    Again, their investigation of MSMB Capital.

22   Q    And did -- for any of these subpoenas, did Evan Greebel

23   ever play a role in helping respond to those subpoenas or

24   reviewing documents in response to those subpoenas?

25   A    He never reviewed documents and never prepared the

1    response.

2    Q    You were primarily in charge of that?

3    A    Correct.

4    Q    Okay.  Now, did you ever get a copy of the transcript of

5    Mr. Shkreli's testimony before the SEC?

6    A    No.

7    Q    Okay.  I just have a few more quick subjects.

8           Do you know who a gentleman by the name of Darren

9    Blanton is?

10   A    Yes.

11   Q    Who is Darren Blanton?

12   A    He was an investor in MSMB Capital, and also later he had

13   a role at Retrophin.

14   Q    Did you have, or did you gain, an understanding of what

15   his particular expertise --

16   A    Yes.

17   Q    -- or experience?

18   A    Through what Mr. Shkreli told me.

19   Q    I don't want to know that.

20          Did you come to learn that he had any expertise

21   based on any independent research that you did?

22   A    No.

23   Q    Did you accept the representations that Mr. Shkreli

24   communicated to you or made to you about Mr. Blanton as true?

25   A    About his experience, yes.

*Rosensaft - Direct/Mr. Dubin*                    **8679**

1   Q    Did you have, in your course of dealing, and we're going

2   to get into them in a little bit of detail, was there anything

3   that you learned through your involvement with the Darren

4   Blanton issue that contradicted what Mr. Shkreli communicated

5   to you about his background or experience?

6              MS. SMITH:  Objection to form.

7              THE COURT:  I'll overrule it.

8   A    No.

9   Q    Now, did you come to learn anything about Mr. Blanton's

10  dispute with Mr. Shkreli?

11  A    Yes.

12  Q    Okay.  And please tell the jury what you learned about

13  that?

14  A    He was one of the investors in MSMB Capital who lost his

15  money because of Mr. Shkreli's trades.

16  Q    Okay.  And did you understand that Mr. Blanton took

17  the --

18              Well, what position did Mr. Blanton take?

19  A    That Mr. Shkreli lost all his money and he wanted to be

20  repaid.

21  Q    Okay.  At some point, were you copied on some e-mail

22  communications regarding this matter?

23  A    Yes.

24  Q    I want to show you what I'll mark for identification as

25  DX-7917 and that's under Tab 20 in your binder.

 1          That's an e-mail from Martin Shkreli to Darren

 2   Blanton, and it copies you and Mr. Greebel.  I'm on the bottom

 3   of that page.  That's at August 10, 2013.

 4   A     Yes.

 5          THE COURT:  Mr. Dubin, I don't want interrupt you

 6   inquiry on this exhibit.  Otherwise, I would suggest perhaps a

 7   midmorning juror break.

 8          MR. DUBIN:  I will never quarrel with a break.

 9          THE COURT:  All right.

10          Members of the jury, we'll give you your midmorning

11   break at this time.

12          Please don't talk about the case, and we will come

13   and retrieve you have when we're ready.

14          (Jury exits courtroom at 11:28 a.m.)

15          THE COURT:  All right.  Let's take a quick break.

16          Sir, you can step down width stand.

17          THE WITNESS:  Thank you, your Honor.

18          MR. DUBIN:  Ten minutes, your Honor.

19          THE COURT:  Yes.

20          (A recess in the proceedings was taken.)

21          THE COURT:  Mr. Brodsky, do you want to see if the

22   jurors would sit without lunch?  I think I told them they can

23   take a shorter lunch, maybe half an hour.  I just feel like

24   maybe they might be better about everything.  Just everyone

25   feels better when they have a little food.  We don't want any

*Rosensaft - Direct/Mr. Dubin*                    *8681*

1    hangry jurors.

2              MR. BRODSKY:  Yes, your Honor.

3              THE COURT:  Is everyone back?

4              MS. SMITH:  I think we're waiting.  Sorry.

5              (Witness takes the witness stand.)

6              COURTROOM DEPUTY:  All rise.

7              (Jury enters courtroom at 11:45 a.m.)

8              THE COURT:  All jurors are present.  Please have a

9    seat.

10             MR. DUBIN:  May I proceed, your Honor?

11             THE COURT:  Just let me check with the jurors about

12   the question regarding lunch.

13             Yesterday, I told you that I would dismiss you at

14   2:00 o'clock, and I'm wondering if we could indulge upon you

15   to either take a shorter lunch or an extra maybe little bit

16   longer break so that you're out between 20 and 30 minutes

17   would than acceptable to everybody.

18             THE JURY: (Collectively) Yes.

19             THE COURT:  Give us the signal when you're hungry

20   and ready to take your 30-minute break.  Thank you.

21             You may proceed.

22             MR. DUBIN:  Thank you, your Honor.

23   EXAMINATION BY

24   MR. DUBIN: (Continuing.)

25   Q    So I think when we left off, Mr. Rosensaft, I showed you

*Rosensaft - Direct/Mr. Dubin*                    **8682**

1    DX-7917.

2            Do you have that in front of you behind Tab 20 of

3    your binder?

4    A    I do.

5    Q    Okay.  And Martin Shkreli sent you, or copied you, on an

6    e-mail to Darren Blanton and also copied Mr. Greebel; correct?

7    A    Yes.

8    Q    And that's on August 10, 2013.

9            And then when Mr. Blanton responds on August 15th,

10   you're copied on that as well and remain copied through the

11   rest of the chain that ends at 9:08 in the morning on

12   August 15th; correct?

13   A    Correct.

14           MR. DUBIN:  I move DX-7917.  Do you have that, your

15   Honor?

16           THE COURT:  I beg your pardon.

17           MR. DUBIN:  I would move DX-7917 into evidence.

18           MS. SMITH:  Your Honor, no objection.  I believe the

19   chain is in evidence already.

20           THE COURT:  I believe so, too, but we'll admit it

21   anyway.  DX-7917 is in evidence.

22           (Defendant's Exhibit DX-7917 was marked in evidence

23   as of this date.)

24   Q    Do you recognize this e-mail chain?

25   A    I do.

*Rosensaft - Direct/Mr. Dubin*                    *8683*

1   Q    And see that line in the middle, there you go, when

2   Martin Shkreli, at some point, says, "My lawyers are lazy and

3   stupid and paid too much.  I send them important e-mails and

4   they don't respond.  Guys, please use the same agreement we

5   used with AG."

6          Do you know who AG was, by the way?

7   A    I believe it's his first name is Al, last name is Geller.

8   Q    What did you know about that agreement?

9          MS. SMITH:  Objection to the form of the question.

10  Q    Did you know --

11         THE COURT:  Sustained.

12  Q    Did you know about that agreement?

13         MS. SMITH:  Objection to the form of the question.

14  No agreement that's been asked.

15         THE COURT:  Do you want to lay a foundation?

16         MR. DUBIN:  Sure, your Honor.

17  Q    Did you have an understanding that there was, one way or

18  another whether, whether there was an agreement with

19  Mr. Geller?

20  A    Not that I remember before I saw this e-mail.

21  Q    Okay.  So when you saw this e-mail and it says, "Please

22  use the same agreement we used with AG."

23         One way or another, did you know what that meant?

24  A    Only that Geller had an agreement previously.

25  Q    Okay.  And so, when Mr. Shkreli says, "My lawyers are

*Rosensaft - Direct/Mr. Dubin*                    *8684*

1  lazy and stupid and paid too much," what was your reaction to

2  that?

3  A    Frankly, I did not take it as being directed toward me

4  but directed toward Mr. Greebel.

5  Q    Well, there is an "S" on the end of lawyers; right?

6  A    I see that, but I was not involved in preparing those

7  agreements.  So, again, I felt like I had a different

8  relationship with Mr. Shkreli than Mr. Greebel did.

9  Q    Okay.  Well, did you observe Mr. Shkreli?

10        Well, how did you observe Mr. Shkreli treat

11 Mr. Greebel?

12 A    He treated him poorly, often insulting him.

13 Q    And did Mr. Greebel, at all times, when he was insulted

14 by Mr. Shkreli, how did Mr. Greebel respond?

15 A    He just shook it off.

16 Q    Did he act professional?

17 A    Yes.

18 Q    As an attorney, are you required to take abuse from

19 clients?

20        MS. SMITH:  Objection to the question.

21        THE COURT:  Sustained.

22 Q    Now, you see in the top of the e-mail chain where Martin

23 Shkreli responds, well, I just want to put it into context,

24 Mr. Carter.

25        So let's go down to the bottom e-mail.  So there's

1  an e-mail from Mr. Shkreli to Mr. Blanton copying you and

2  Mr. Greebel; correct?

3  A    Correct.

4  Q    He writes:  "Hi, guys.  Darren and I have an agreement

5  that I will give him a 100,000 shares of my stock.  Please

6  effect the transaction and send him documents ASAP.  Darren,

7  as you know, has been waiting extremely patiently to resolve

8  this matter and we are letting him down.  There will be

9  further discussion on resolution, but this immediate transfer

10 should be begin this process.  Thanks, Martin."

11         Right?

12 A    Correct.

13 Q    And then the next e-mail is from Mr. Blanton back to

14 Mr. Shkreli copying you and Mr. Greebel, and Mr. Blanton

15 writes, "Is there anything we need to be doing?  Are we still

16 moving forward with this?"

17         Correct?

18 A    Yes.

19 Q    And than Martin Shkreli sends that response, correct,

20 that we just went through?

21 A    Correct.

22 Q    And then Mr. Greebel responds to him and you're not on

23 that e-mail; correct?

24 A    That's right.

25 Q    All right.  And it says, "AG had a forward option.  Is DB

*Rosensaft - Direct/Mr. Dubin*                    *8686*

1    getting the same thing?"

2             Who did you understand DB to be?

3    A    Darren Blanton.

4    Q    And also I assume we want a release from him; right?

5    A    Correct.

6    Q    And Mr. Shkreli adds you back to the chain; right?

7    A    That's right.

8    Q    And he adds you back to the chain and says, "Yes.  Also,

9    we want him to talk to SEC."

10            Do you see that?

11   A    Yes.

12   Q    What was your reaction when you read those words, "Also,

13   want him to talk to SEC"?

14   A    It immediately set off alarm bells for me.

15   Q    Why?

16   A    Because there was an active SEC investigation where they

17   were considering whether the investors of MSMB Capital,

18   including Darren Blanton, was harmed.  The SEC, we believe,

19   was likely speaking to investors, and I didn't want anyone

20   speaking to the investors about their testimony that they may

21   give to the SEC.

22   Q    And without telling us the substance of what you said,

23   did you communicate those concerns at some point to

24   Mr. Shkreli?

25   A    Yes.

*Rosensaft - Direct/Mr. Dubin*                      *8687*

1   Q    And was that on the phone or in person?

2   A    That was on the phone.

3   Q    And was Mr. Greebel on that call?

4   A    I don't believe he was on that particular call.

5   Q    Okay.  But did you also ask Mr. Greebel to talk to

6   Mr. Shkreli about this?

7   A    Yes.

8            THE COURT:  This being?

9            MR. DUBIN:  The advice.

10           THE COURT:  About Mr. Blanton?

11  Q    The advice regarding not speaking to the -- not requiring

12  them to speak to the SEC.

13           Do you follow my question?

14  A    Yes.  I spoke to Mr. Greebel about making sure Martin was

15  not talking to any investors about speaking to the SEC.

16  Q    Mr. Rosensaft, did Mr. Greebel agree with your advice?

17  A    He -- yes, he did.

18  Q    And I want to show you what is already in evidence, I

19  believe, as GX116-40.

20           Yes, that's it.

21           Okay.  You recall this e-mail exchange?

22           Just scroll down.

23           See the one I'm particularly focusing on?  The one

24  in the middle there where, on December 28th at 2:08 a.m.,

25  where it says, "I basically want to discuss having the plain

*Rosensaft - Direct/Mr. Dubin*                    *8688*

1  complainer, Darren Blanton, recant his complaint.  I have to

2  give him some stock ASAP."

3          Do you see that?

4  A    Yes.

5  Q    And do you recall this?

6  A    Yes.

7  Q    And did you speak to Mr. Shkreli about this?

8  A    I did.

9  Q    Without going through -- what was your reaction to that,

10  and what advice did you --

11          What was your reaction to that?

12  A    Again, it set off alarm bells for the same reason here.

13  I didn't want Mr. Shkreli talking to Mr. Blanton at all about

14  recanting his complaint for talking to the SEC in any

15  particular manner.

16  Q    And you communicated your advice to Mr. Shkreli; correct?

17  A    Correct.

18  Q    And there came a time, just to move it along, where you

19  were involved in some of the settlement negotiations with

20  Mr. Blanton; right?

21  A    Yes.

22  Q    Okay.  So let me show you Tab 22 in your binder and mark

23  it for identification as DX-1051.

24  A    Okay.

25  Q    Well, do you recall -- let me put the document aside.

*Rosensaft - Direct/Mr. Dubin*                     *8689*

1            Do you recall ever being in contact with

2   Mr. Blanton's attorneys?

3   A    Yes.

4   Q    What was the attorney's name?

5   A    I want to say his last name was -- I don't remember

6   specifically.

7   Q    See if the document in front of you refreshes your

8   recollection?

9   A    Yes, it does.

10   Q    Okay.  What was the attorney's name?

11   A    J.D. McCullough.

12   Q    Do you remember a call with J.D. McCullough?

13   A    I do.

14   Q    And what do you recall about the call?

15            MS. SMITH:  The time period, please.

16            MR. DUBIN:  Sure.  This is the end of 2013.

17   December 30, 2013.

18   A    Generally speaking, the call was to discuss the transfer

19   of stock and settling the dispute with Mr. Blanton.

20   Q    And do you recall that there was some back and forth

21   about how many freely traded -- well, what do you recall the

22   back and forth being about in the discussion?

23   A    One of the issues was whether Mr. Blanton was going to

24   receive restricted stock that he couldn't tell immediately or

25   freely traded stock that he could immediately turn into money.

*Rosensaft - Direct/Mr. Dubin*                    **8690**

1   Q    Okay.  Why don't you turn to Tab 24 in your binder.  Do

2   you recall what's been marked for identification as DX-9556.

3          Do you remember this e-mail exchange, sir?

4   A    Not specifically.

5   Q    This is an e-mail exchange between you, Martin Shkreli,

6   and Evan Greebel; correct?

7   A    Correct.

8   Q    And this is on January 3, 2014; correct?

9   A    That's right.

10          MR. DUBIN:  I move DX-9556 into evidence.

11          MS. SMITH:  Objection, your Honor.

12          THE COURT:  Sustained.

13   Q    Did you have conversations, without telling us the

14   substance of the conversations, did you have conversations

15   about the settlement with both Mr. Greebel and Mr. Shkreli at

16   some point?

17          THE COURT:  You mean the Mr. Blanton settlement?

18          MR. DUBIN:  Yes I'm sorry.

19   Q    And Mr. Blanton's settlement with Mr. Greebel and

20   Mr. Shkreli?

21   A    Yes.

22   Q    Okay.  And what do you recall about Mr. Blanton?

23   A    That he was one of the biggest investors in MSMB Capital.

24   He was angry at Martin for how Martin had handled

25   MSMB Capital, the investments.  And I got the impression that

*Rosensaft - Direct/Mr. Dubin*                              **8691**

1   Mr. Shkreli and Mr. Blanton were close at least at one point.

2   Q    And did there come a time that they came to an agreement?

3   A    Yes.

4   Q    All right.  And are you familiar, sir, with Mr. Blanton's

5   consulting agreement?

6              MS. SMITH:  Objection to the leading, your Honor.

7              THE COURT:  Overruled.

8   A    I saw an agreement that resolved a dispute between

9   Mr. Blanton and Mr. Shkreli.

10  Q    What type of an agreement was it?

11  A    It was a consulting agreement with a release for any

12  dispute that they had.

13  Q    And did you have any reaction to it being a consulting

14  agreement?

15  A    Yes.

16  Q    Okay.  And what was your reaction to it?

17  A    That I wanted to ensure actually it was a consulting

18  agreement.

19  Q    Okay.  And did you communicate that to anyone?

20  A    Yes.

21  Q    It who?

22  A    I communicated it to Mr. Greebel and to Mr. Gordon and

23  Mr. Shkreli.

24  Q    So Mr. Gordon was aware of this agreement as well?

25  A    Yes.

*Rosensaft - Direct/Mr. Dubin*                    **8692**

1    Q    And when you communicated it to Mr. Shkreli, were you

2    satisfied that he understood your advice from your

3    perspective?

4    A    Yes.

5    Q    Did you get assurances that made you comfortable?

6    A    Yes.

7    Q    Okay.  Now, did you ever review the Blanton consulting

8    agreement?

9    A    I reviewed one of the agreements.  I can't remember,

10   specifically, it was the Blanton one, but I believe it was the

11   Blanton one.

12   Q    Okay.  Let me see if I can skip ahead to my last subject.

13            Now, how did you bill your time for the Retrophin

14   matters?

15   A    Initially, it was billed under a client matter number

16   four MSMB Capital.  There was work later, though, I did for

17   Retrophin and that was billed under a Retrophin number.

18   Q    Okay.  And did Mr. Greebel ever ask you not to enter your

19   time on your bills?

20            MS. SMITH:  Objection to the to leading.

21            THE COURT:  I'll sustain the objection.

22   Q    Did you ever have any conversations with Mr. Greebel or

23   receive any e-mails regarding how you should handle your

24   billing of those matters?

25   A    Yes.

*Rosensaft - Direct/Mr. Dubin*                    8693

1    Q    And did Mr. Greebel ever ask you to do anything in terms

2    of entering your time or how you billed it you felt it was

3    improper?

4    A    No.

5    Q    Okay.  Now, did there come a point in time when you

6    learned at some point that the bill for your time on the SEC

7    matter had not gone out?

8    A    No.  I believe it had gone out.  It hadn't been paid.

9    Q    It hadn't been paid.  What was your reaction to that?

10   A    I was surprised and annoyed that all that work hadn't

11   been paid for yet.

12   Q    And have you ever had an instance where a client was

13   behind on payment of bills?

14   A    Sure.

15   Q    Okay.  And what was your understanding of who would be

16   paying the bill?

17   A    After that meeting or -- after that discussion I had or

18   before that discussion.

19   Q    After the discussion you had when you, I think you said

20   annoyed, that the bill hadn't been paid?

21        MS. SMITH:  Can we get a timeframe?

22   Q    When do you recall this occurring?

23   A    To my best recollection, I believe the spring of 2014.

24   Q    Okay.

25        THE COURT:  So can I just back up?

*Rosensaft - Direct/Mr. Dubin*                    *8694*

1          You talked about a discussion in the spring of 2014.

2          THE WITNESS:  Yes.

3          THE COURT:  Who was that with?

4          THE WITNESS:  That was with Mr. Greebel and

5    Mr. Shkreli.

6          THE COURT:  Thank you.

7    Q    Now, at some point, did you confront Mr. Shkreli about

8    the nonpayment of the bill?

9          MS. SMITH:  Objection to leading.

10          THE COURT:  Sustained.

11   Q    What, if anything, did you do in an attempt to get the

12   bill paid?

13   A    I spoke to Mr. Shkreli and Mr. Greebel about it.

14   Q    And what, if anything, did you come to learn about the

15   delay and why it wasn't paid yet?

16          MS. SMITH:  Objection to hearsay, your Honor.

17          THE COURT:  Sustained.  No hearsay.  If you can

18   answer it without hearsay you can do so, sir.

19          THE WITNESS:  I can't answer it without hearsay.

20   Q    Well, did you come to learn at some point whether or not

21   there was an arrangement --

22          MR. DUBIN:  Strike that.

23   Q    Did you come to learn at some point that Mr. Shkreli was

24   making an attempt to get the bill paid?

25   A    This was based on what was told too me, yes.

*Rosensaft - Direct/Mr. Dubin*                        **8695**

1    Q    All right.  And were you satisfied that at least an

2    attempt was being made to get the bill paid?

3    A    I was glad an attempt was being made.  I still wasn't

4    satisfied that the bill wasn't getting paid.

5    Q    Okay.  And do you know one way or another whether or not

6    Mr. Shkreli had conversations with anybody either at Retrophin

7    or --

8         MR. DUBIN:  Strike that.

9    Q    Do you recall whether or not there -- learning that there

10   was an arrangement between Mr. Shkreli and any of his entities

11   in terms of who would be paying the bill?

12   A    I do -- I did learn that.

13   Q    Okay.  And did it involve a public company?

14   A    This is based on what Mr. Shkreli told me.

15   Q    Don't tell me that then.  I will just stick with your

16   answer to the prior question.

17        At some point, you learned that; correct?

18   A    Yes.

19   Q    Now, in all of your dealings with -- in giving advice to

20   Mr. Shkreli that Mr. Greebel had -- was involved with?  Was

21   there ever a still instance when Mr. Greebel went against your

22   advice?

23   A    No.

24        MS. SMITH:  Objection to knowledge about what

25   Mr. Greebel did.

*Rosensaft - Direct/Mr. Dubin*                    *8696*

1          THE COURT:  Sustained.

2          MS. SMITH:  The answer struck -- can we have the

3   answer struck?

4          THE COURT:  The question and answer will be

5   stricken.

6   EXAMINATION BY

7   MR. DUBIN (Continuing.):

8   Q    Well, did Mr. Greebel tell you all of the

9   conversations --

10         Did he report to you about every conversation he had

11  with Mr. Shkreli?

12  A    No.

13         MR. DUBIN:  One moment, your Honor.

14         (A brief pause in the proceedings was held.)

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1           MR. DUBIN:  I ask the Court and jury's indulgence.

2           (Short pause.)

3    BY MR. DUBIN:

4    Q    Two quick things I would like to show you.  I want to go

5    back to the Blanton consulting agreement, and it will be my

6    last subject.  Can we show GX-61 in evidence.  Can we go to

7    paragraph 8A.

8           MR. DUBIN:  Would you highlight the last sentence,

9    Mr. Carter, please.

10   BY MR. DUBIN:

11   Q    You recall that sentence in the Blanton consulting

12   agreement, sir?

13   A    Yes.

14   Q    Can you read it out loud, please.

15   A    This section does not apply to any discussions that

16   consultant has been advised by counsel, is required by law, or

17   otherwise required pursuant to the United States securities

18   laws.

19   Q    Who added that sentence to the consulting agreement?

20   A    I believe I actually -- I didn't draft exact words, but I

21   was the one, I believe, that came up with that idea that that

22   should be added.

23          MR. DUBIN:  Okay.  Let me just confer, but I think I

24   have no further questions.

25          (Short pause.)

PROCEEDINGS                                    8698

1          MR. DUBIN:  I have nothing further, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Is the government prepared to cross?

4          MS. SMITH:  Yes.  Although, I know we're stopping at

5   2:00, and we're going to take a lunch break.  If we take it

6   now, I might be actually able to cut down actually what we are

7   going to do for cross.

8          THE COURT:  Okay.  Would the jurors be able to come

9   back and be ready to recommence by 12:40?  Thank you.  Please

10  don't talk about the case or think about the case until we

11  come and retrieve you.  Thank you.

12          (WHEREUPON, at 12:09 p.m., the jury exited the

13  courtroom.)

14          (Open court; no jury present.)

15          THE COURT:  We'll take a half an hour.  Is there

16  anything we need to deal with, or just take the half an hour?

17          MS. SMITH:  Just take the half an hour.

18          THE COURT:  Okay.

19          (WHEREUPON, a recess was had from 12:10 p.m. to

20  12:40 p.m.)

21          (Continued on the next page.)

22

23

24

25

Rosensaft - Cross - Smith                    8699

1              A F T E R N O O N   S E S S I O N

2              (Jury enters the courtroom at 12:46.)

3              (Jury present.)

4              (Witness resumes the witness stand.)

5              THE COURT:  All jurors are present.  Please have a

6    seat.

7              Mr. Rosensaft, you're still under oath.  And

8    Ms. Smith, you may commence on your cross.

9    CROSS-EXAMINATION

10   BY MS. SMITH:

11   Q    Good afternoon, Mr. Rosensaft.

12   A    Good afternoon.

13   Q    You testified on direct that you started work at Katten

14   as a partner in November of 2012; is that right?

15   A    Yes.

16   Q    And you were hired as a nonequity partner; is that

17   correct?

18   A    That's correct.

19   Q    And for the first two years and a half you were hired

20   you had a guaranteed fixed salary, right?

21   A    That's correct.

22   Q    And so for your first two years only, your salary was

23   not tied to any other factor?

24   A    Correct.

25   Q    And only after the first two years were up, was your

Rosensaft - Cross - Smith                    8700

1  salary set by the compensation committee that evaluates the

2  compensation for nonequity partners, correct?

3  A    That's right.

4  Q    So turning your attention to when you started for

5  Katten in November of 2012, the first time that you worked

6  with the defendant, Mr. Greebel, was on matters related to

7  Mr. Shkreli, correct?

8  A    Yes.

9  Q    And you started to work together when the defendant

10 came to you and told you that he had a client that was

11 handling an SEC investigation on his own, right?

12 A    That's correct.

13 Q    And that client needed a lawyer to help handle the SEC

14 investigation?

15 A    Correct.

16 Q    And you later came to learn that the client was Martin

17 Shkreli, correct?

18 A    Yes.

19 Q    And the conversation with the defendant told you about

20 Mr. Shkreli handling the SEC investigation on his own, took

21 place relatively shortly after you started at Katten in

22 November of 2012?

23 A    Yes.  It was relativity shortly after he first

24 approached me to help with his client.

25 Q    And so you would estimate that the first conversation

Rosensaft - Cross - Smith                8701

1  about helping with the client, Martin Shkreli, took place in
2  December of 2012 or January 2013?
3  A    That's my memory.
4  Q    And at the end of that conversation the defendant said
5  he would speak to Mr. Shkreli and get back to you; is that
6  right?
7  A    Yes.
8  Q    And shortly thereafter, he let you know that
9  Mr. Shkreli had agreed to have you handle the SEC
10 investigation, correct?
11 A    Correct.
12 Q    And after that took place, did you initially have a
13 phone call with Mr. Shkreli and Mr. Greebel?
14 A    I believe we first did have a phone call and then an
15 in-person meeting shortly followed.
16 Q    And where did that meeting take place?
17 A    It was at the 3rd Avenue office of Retrophin and
18 MSMB Capital.
19 Q    And at that meeting was yourself and Mr. Greebel and
20 Mr. Shkreli, correct?
21 A    That's correct.
22 Q    And you said that meeting took place maybe two or three
23 weeks after your initial conversation with Mr. Greebel,
24 correct?
25 A    Yes.

Rosensaft - Cross - Smith                    8702

1    Q     And at that first meeting, Mr. Shkreli said that

2    MSMB Capital was a hedge fund, right?

3    A     Yes.

4    Q     And he also said that he had had a trading loss for

5    MSMB Capital which resulted in him losing the investors'

6    money at MSMB Capital, correct?

7    A     That's right.

8    Q     And the SEC was asking questions about that trading

9    loss?

10   A     Correct.

11   Q     And the SEC is a civil regulatory authority; is that

12   correct?

13   A     That's right.

14   Q     And the SEC can't bring any criminal charges?

15   A     No.

16   Q     At that first meeting at the offices where Mr. Greebel

17   and Mr. Shkreli were present and you were discussing the

18   trading losses for MSMB Capital, Retrophin didn't come up at

19   that meeting, right?

20   A     I don't remember -- specifically remember Retrophin

21   coming up.  Although I learned about Retrophin early in the

22   representation.

23   Q     And in addition to that first meeting with Mr. Shkreli

24   and Mr. Greebel, you had one or two other meeting in that

25   same time period of early 2013; is that right?

Rosensaft - Cross - Smith                    8703

1    A    That sounds right.

2    Q    And those early meetings were also attended by you and

3    Mr. Shkreli and Mr. Greebel?

4    A    I don't remember if Mr. Greebel was at every one.  He

5    was definitely at multiple ones, though.

6    Q    And those meetings you were also discussing the loss of

7    the MSMB Capital investors' money?

8    A    Yes.

9    Q    All right.  And at the time of the first meeting with

10   Mr. Shkreli and Mr. Greebel, Mr. Shkreli had received a

11   *subpoena* from the SEC and responded to it; is that right, on

12   his own?

13   A    Yes.  Although I don't remember if it was a *subpoena* or

14   a request, but he had responded to it on his own.

15   Q    And at that point that you were having these first

16   meetings, you had not yet received a second request from the

17   SEC for documents, correct?

18   A    I can't remember.

19   Q    And you had said that in that initial conversation with

20   Mr. Greebel, he explained that Mr. Shkreli had handled the

21   request for SEC documents on his own, right?

22   A    That's right.

23          MR. DUBIN:  Your Honor, could we have a timeframe

24   for that conversation?

25   Q    And that initial conversation was in December of 2012

Rosensaft - Cross - Smith                    8704

1   or January of 2013, correct?

2   A    That's my memory.

3   Q    And we also saw the both the initial SEC request for

4   documents and Mr. Shkreli's response, correct?

5   A    Yes.

6   Q    And you have a clear memory of exactly when you saw

7   that initial request and Mr. Shkreli's response?

8   A    That is correct.

9   Q    But you would have reviewed the request and

10  Mr. Shkreli's response before you accompanied Mr. Shkreli

11  for his testimony before the SEC in August of 2013; is that

12  right?

13  A    Yeah, absolutely.

14  Q    All right.  And then Mr. Greebel asked you to keep him

15  updated on what was going on with the SEC investigation,

16  correct?

17  A    Yes.

18  Q    And you did keep him updated throughout to SEC

19  investigation, right?

20  A    That is correct.

21  Q    You let him know when the SEC made document requests --

22  A    Yes.

23  Q    -- right?

24  A    Yes.

25  Q    And you let him know when the SEC wanted to take

Rosensaft - Cross - Smith                    8705

1   testimony from Mr. Shkreli?

2   A    Yes.

3   Q    And you were asked on direct if Mr. Greebel was

4   involved in helping gathering documents for SEC's requests.

5   Do you remember that?

6   A    Yes, I do.

7   Q    I'm going to show you what has been marked as

8   Government's Exhibit 116-31 for identification.

9   A    Is it in one of my tabs?

10  Q    It's not there.

11  A    Okay.

12  Q    Can you read it on the screen?

13  A    I can, but if you blow it up a little bit more, it

14  might help.

15  Q    I think we might have a second one.  Hold on.

16            (Pause in proceedings.)

17  Q    Actually there is apparently a binder all the way up

18  there.

19  A    Okay.

20            THE COURT:  Do you want -- he's got one on his

21  desk.

22            MS. SMITH:  Yes.  I think that's right -- okay.

23  Q    Yes.  If you could look at Tab 1, please.

24            MS. SMITH:  My paralegal is always two steps ahead

25  of me.

Rosensaft - Cross - Smith                  8706

1   A    Okay.

2   Q    And do you recognize this document?

3   A    Yes.

4   Q    And is it your memory that Mr. Greebel was involved in

5   helping gather documents to respond to SEC's request for the

6   MSMB Capital SEC investigation?

7   A    Not gathered documents.  I see this e-mail where he

8   contacted Marek with respect to gathering documents.

9   Q    Okay.

10  A    I believe this was just kind of an introduction,

11  though.

12  Q    Do you have a memory of him at other points in the

13  investigation gathering documents for SEC's responses.

14  A    Not that I remember.

15  Q    Okay.

16          All right.  I'm going to show you what has been

17  marked -- or what is in evidence as Government

18  Exhibit 857-A.  And if you could just look at this first

19  e-mail here.

20          THE COURT:  Is it in his binder?

21          MS. SMITH:  It's not actually in the binder,

22  Your Honor.

23          THE COURT:  Okay.

24  Q    And do you recognize this as a --

25          MR. DUBIN:  Your Honor, could we just correct the

Rosensaft - Cross - Smith                    8707

1    record?

2              MS. SMITH:  I'm sorry.  I should have --

3    Q    The document says via e-mail; is that right?

4    A    It does.

5    Q    And is this a cover letter attaching an invoice?

6    A    (No audible response.)

7    Q    Does it say attaching an invoice?

8    A    Yes.

9    Q    And if we could turn to Page 7 of this .pdf, which ends

10   in Bates Number 133?

11   A    (Witness complies.)

12   Q    And if we could focus in on the top section there, and

13   who is Tenley Mochizuki?

14   A    Well, she is an associate who worked with me on this

15   matter.

16   Q    And could you just read her time entry there?

17   A    Communications with E. Greebel, M. Rosensaft,

18   D. Kravitz, and R. Brady, Re:  Collection of documents for

19   production to SEC.  Oversee creation of document database,

20   review publicly filed documents for Retrophin, Inc., draft

21   cover letter enclosing production, and FOYA request letter

22   and send to M. Rosensaft for comments.

23   Q    And can you also turn to Page 8 of the .pdf and focus

24   on the time entry from the December 30th -- also from Tenley

25   Mochizuki?  Can you read that entry?

Rosensaft - Cross - Smith                    8708

1   A    Communications with E. Greebel, Re:  Further document

2   collection for response to latest SEC *subpoena*s.  Review

3   e-mails from M. Rosensaft, R. Brady, and SEC, read technical

4   issues with last production to SEC.

5   Q    And then if we can also look further down the page on

6   January 4th -- I'm sorry, excuse me -- January 2nd of 2014

7   from Ms. Mochizuki?  And can you just read that entry?

8   A    Communications with E. Greebel and M. Harrison,

9   Retrophin controller.  Re:  Document collection to

10  supplement response to latest SEC *subpoena*s.  Review and

11  analyze bank statements and subscription agreements, draft

12  summary of documents, and send to M. Rosensaft.

13  Q    Turning back to the early meetings that you had with

14  Mr. Greebel and Mr. Shkreli, you said that at some point you

15  learned about Retrophin; is that right?

16  A    Yes.

17  Q    And what kind of company was Retrophin?

18  A    It was a health care company.

19  Q    And Retrophin was also a client of Mr. Greebel's,

20  correct?

21  A    That's correct.

22  Q    And Mr. Shkreli told you in one of those early meetings

23  with himself and Mr. Greebel, that although he had lost the

24  investors' money in MSMB Capital, they had gotten Retrophin

25  shares; is that right?

Rosensaft - Cross - Smith                          8709

1    A    Correct.

2    Q    And you didn't have an understanding of exactly how the

3    MSMB Capital investors had gotten the Retrophin shares,

4    right?

5    A    That's right.

6    Q    And Mr. Greebel never told you how the MSMB Capital

7    investors got the Retrophin shares, correct?

8    A    Not that I remember.

9    Q    So in connection with your work on the SEC

10   investigation as you testified on direct, you came to learn

11   about an arbitration between Merrill Lynch and Mr. Shkreli,

12   MSMB Capital, Mr. Biestek related to the Orex trading losses

13   that it caused the loss of the investors' money in

14   MSMB Capital, correct?

15   A    Yes.

16   Q    And you learned about that Merrill Lynch arbitration

17   when the SEC asked for documents related to the arbitration;

18   is that correct?

19   A    That's correct.

20   Q    And you weren't told by Mr. Shkreli about the

21   Merrill Lynch arbitration in an oral meeting discussing the

22   SEC investigation, correct?

23   A    I don't believe I was told that.

24   Q    And Mr. Greebel didn't tell you about this

25   Merrill Lynch arbitration at those early meetings either?

1    A    Not that I remember.

2    Q    And at some point after you learned about the

3    Merrill Lynch arbitration, Mr. Shkreli told you as you

4    testified on direct that he had paid the settlement

5    personally and with respect to MSMB Health Care, correct?

6    A    No.  That's not correct what he initially told me.

7    Q    So what did he tell you initially?

8    A    He told me that he had paid the settlement himself.

9    Q    And as the SEC investigation progressed, the SEC asked

10   for documents to show that payment; is that right?

11   A    That's right.

12   Q    And when Mr. Shkreli provided the documents in

13   connection with the payment, it turned out that part of the

14   payment to the MSMB arbitration had come from Mr. Shkreli's

15   other hedge fund, MSMB Health Care; is that right?

16   A    That's right.

17   Q    And at that point, Mr. Shkreli told you that the money

18   that had come from MSMB Health Care was a loan to himself;

19   is that right?

20   A    Yes.

21   Q    And you discussed with Mr. Greebel the fact that

22   Mr. Shkreli had paid part of the Merrill Lynch arbitration

23   settlement with a personal loan with money taken from

24   MSMB Health Care, correct?

25   A    That's right.

Rosensaft - Cross - Smith                    8711

1   Q    And Mr. Greebel agreed that Mr. Shkreli should repay
2   that loan, right?
3   A    Yes.
4   Q    So Mr. Greebel never told you that he had discussions
5   with Mr. Shkreli about payments for the Merrill Lynch
6   settlement before the payments --
7             MR. DUBIN:  Objection --
8   Q    -- were made?
9             MR. DUBIN:  I'm sorry.
10            Objection, Your Honor.
11            THE COURT:  All right.  Is this in need of a
12   sidebar, or do you want to give me grounds for your
13   objection in one word?  I mean, just enough so we --
14            MR. DUBIN:  Assumes facts not in evidence,
15   Your Honor.
16            THE COURT:  Excuse me?
17            MR. DUBIN:  Assumes facts not in evidence.
18            THE COURT:  Okay.
19            MS. SMITH:  I could proffer facts in evidence at
20   sidebar if you want?
21            THE COURT:  All right.  If that would help satisfy
22   Mr. Dubin's concern, I think we should.
23            MS. SMITH:  Sure.
24            THE COURT:  Thank you.
25            (Continued on next page.)

Sidebar Conference                              8712

1          (The following occurred at sidebar.)

2          THE COURT:  Okay.  So proffer.

3          MS. SMITH:  Your Honor, I believe to the testimony

4    of Mr. Delzotto, which primary to the documents that came in

5    through Mr. Delzotto, there are emails back and forth

6    between Mr. Greebel and Mr. Shkreli about the payments for

7    that same.  There's an e-mail, I don't remember off the top

8    of my head, about the other things.  We talked about a

9    payment of $125,000 on -- I don't want to get it wrong -- I

10   think January 18th, 2013, and I believe they delayed the

11   other big payment until March.  And as you remember, those

12   payments line up exactly with when the payments were made in

13   connection with the Merrill Lynch arbitration.

14          I will say that the way I am asking the question

15   is just to confirm that they never had any discussion.  No

16   matter what, it is an appropriate question, but that is

17   actually my good-faith basis for asking.

18          MR. PITLUCK:  Your Honor, they were repeated on

19   cross with the Government witnesses, You never discussed

20   this?  You never talked about what facts were proffered into

21   evidence that were not -- these are in evidence --

22          THE COURT:  You are talking too fast.  Start over,

23   please.

24          MR. PITLUCK:  I was saying, we repeated on cross

25   of the witnesses facts were proffered and asked if he had

Sidebar Conference                          8713

1   knowledge of them to confirm that they no understanding of

2   them.  There is a basis, factual basis for the question, and

3   it's also asking if he ever -- he did not invest he told us

4   that.  So it's proper for both, Judge.

5             MR. BRODSKY:  Your Honor, the question is

6   objectionable for two reasons:  First, it mischaracterizes

7   completely the record.  Ms. Smith said they are relying on

8   inference upon inference upon inference from documents.

9   Now, they may do that at summation.  But we have a

10  completely different view of those facts.  I am not going to

11  lay them all out here for you.

12            THE COURT:  Okay.  But don't they have a

13  good-faith basis to ask the question, because that's their

14  view of the facts and there's evidence to support their view

15  of the facts.  All you need to ask the question in good

16  faith.

17            MS. SMITH:  I mean, you asked questions about

18  Mr. --

19            MR. BRODSKY:  Would you mind not interrupting?

20            MS. SMITH:  I'm sorry.

21            THE COURT:  No.  You know, I think that's the

22  baseline for requesting a question.

23            MR. BRODSKY:  When we tried to ask questions of

24  people like Mr. Richardson about facts that they didn't have

25  any personal knowledge about, there were objections and they

1    were sustained, because even though we had a good-faith

2    factual basis for something happening in the record, we

3    could actually prove it, Your Honor correctly ruled at the

4    time that the witness did not have personal knowledge of it.

5              THE COURT:  Yes, but she has confirmed that the

6    witness didn't have knowledge, didn't learn about it.

7              MS. SMITH:  They just never had discussions

8    about --

9              MR. BRODSKY:  May I?

10             MS. SMITH:  I'm sorry.

11             MR. BRODSKY:  I keep getting interrupted.

12             THE COURT:  But the point is that --

13             MR. BRODSKY:  But we weren't able to answer the

14   question, Your Honor.  So when we wanted to ask certain

15   questions of certain witnesses, and it was clear that they

16   had no personal knowledge of it, because it's clear

17   Mr. Rosensaft has no personal knowledge of any of these

18   e-mail communications that they are interpreting, and it's

19   an unfair question.  It is conveying to the jury very, very

20   clearly that this is a fact.  And did you know X or did you

21   know Y assumes a fact that they believe is true and we

22   believe is false.  So if we get up for example on redirect

23   and we say, Mr. Rosensaft, isn't it true X or isn't it true

24   Y, they disagree with those facts, I'm sure that they are

25   going to objection and sa that it mischaracterizes the

Sidebar Conference                    8715

1   evidence in the record, and so --

2            THE COURT:  Well, if you proffered some basis in

3   the record to ask a question, that's fine.  I think -- you

4   know, again, I'm always concerned that we have some

5   good-faith basis for asking a question.  And whether or not

6   you agree with the interpretation of that that evidence

7   should be given, I think the question was, Were aware of

8   these communications between Mr. Greebel and Mr. Shkreli on

9   X subject, and they pointed you to an e-mail that is one of

10  the basis for that question.

11           MR. BRODSKY:  It's an inappropriate question,

12  Your Honor.  Mr. Rosensaft was not on those e-mails.  We

13  suggested to the jury in a summary fashion as to what we

14  believe the evidence should be.  We have a completely

15  contrary view of that evidence.  They can't get up and ask

16  conclusory questions based on their view of the evidence and

17  say, Sir, isn't it true you didn't know about X, Y, or Z?

18           First of all, it's their inference upon inference,

19  Your Honor.  It mischaracterizes the testimony and the

20  evidence in the record.  It's not coming through testimony

21  or documents.

22           THE COURT:  All right.

23           Okay.  What's your -- did you have a second ground

24  to --

25           MR. BRODSKY:  Yes.

```
                      Sidebar Conference                      8716
```

 1            THE COURT:  Okay.

 2            MR. BRODSKY:  My second ground, Your Honor, is

 3    that it -- first it mischaracterizes the documents in

 4    question.

 5            Second, Your Honor, it goes beyond -- it's not

 6    asking -- they can ask him about his personal knowledge

 7    about a subject matter, but they can't go beyond asking

 8    personal knowledge and start going, Did you know there was

 9    an e-mail communication on this date or that date that

10    Mr. Rosensaft is not on.  It's beyond his ability to answer

11    the question because he has no personal knowledge of it.  So

12    it lacks foundation to be able to be able to ask this

13    witness questions about documents that he's not on.

14            THE COURT:  Okay.  I may have misstated the

15    question the Government asked.

16            I thing that what we were getting at was whether

17    Mr. Greebel ever told him that he and Martin Shkreli or that

18    Martin Shkreli had communicated certain facts to him?

19            MS. SMITH:  Yes, that was the question.

20            THE COURT:  So it wasn't about his awareness of

21    the e-mail.

22            MR. BRODSKY:  Can you repeat the question, then?

23            THE COURT:  Sure.

24            MR. BRODSKY:  I believe --

25            THE COURT:  I'm sorry.

```
                        Sidebar Conference                    8717
```

1             MR. BRODSKY:  I believe you can't ask a question

2    of a witness where you know he has no personal knowledge of

3    it and you know it's based on e-mail communications which he

4    is not on, and he's already testified as to what he knows.

5             THE COURT:  Well --

6             MR. BRODSKY:  I believe that's improper cross.

7             THE COURT:  She's just trying to find out whether

8    Mr. Greebel ever communicated certain information to him for

9    which there is an existing e-mail in evidence between

10   Mr. Greebel and Mr. Shkreli about a specific subject, so...

11            MS. SMITH:  That's all.

12            THE COURT:  Was there a third reason you didn't

13   think it should come in?  I just want to make sure I have

14   the whole argument.

15            MR. BRODSKY:  Can we restate the question?  In the

16   midst of the arguments, I forgot the --

17            THE COURT:  Okay.  Well, do you want to just tell

18   him what the question was, or would you rather have the

19   court reporter read it back?

20            MR. BRODSKY:  No, either way.

21            THE COURT:  Okay.

22            MS. SMITH:  It's just whether or not Mr. Greebel

23   ever told -- whether Mr. Greebel never told you that he had

24   discussions with Mr. Shkreli about payments for the

25   Merrill Lynch settlement before the payments were made.

```
                    Sidebar Conference                8718
```

1              MR. BRODSKY:  So, Your Honor --

2              THE COURT:  Isn't it true.

3              MS. SMITH:  It's between Mr. Greebel and

4     Mr. Shkreli.  I'm not asking whether he knows.  I'm asking

5     whether he had a conversation with Mr. Greebel about -- with

6     Mr. Greebel about payments -- I mean, the payments were

7     asked about on direct --

8              MR. BRODSKY:  So --

9              MS. SMITH:  -- prior to when the payments were

10    made.

11             MR. BRODSKY:  So my objection, Your Honor, is she

12    is characterizing it as discussions, and then she referred

13    Your Honor to certain e-mail communications which cannot be

14    characterizes as discussions.  And again it's inference upon

15    inference in which she's suggesting that she knows what

16    these e-mails mean when she hasn't ask Mr. Shkreli, she

17    hasn't asked -- she's not able to ask Mr. Greebel.

18             I believe it's a completely improper question.  It

19    suggests to the jurors as to what actually took place in

20    these e-mail communications.

21             THE COURT:  I think Mr. Brodsky's problem is that

22    you can't establish that those e-mails -- and let's call

23    them just --

24             MR. BRODSKY:  Communications.

25             THE COURT:  -- communications --

```
                        Sidebar Conference                    8719
```

1          MS. SMITH:  Okay.

2          THE COURT:  -- were about the Merrill Lynch

3     payments.

4          MS. SMITH:  But I have a good-faith basis to ask

5     whether Mr. Greebel ever told him that he did have

6     conversations about the payments.  It's -- you know, it's

7     cross-examination.  I don't even --

8          THE COURT:  Right, right.

9          MS. SMITH:  I mean, this is so much more within

10    the cross-examination that many of the questions that were

11    asked by defense in the past eight weeks.

12         THE COURT:  Okay.

13         Okay.  I'm going to overrule your objection with

14    respect, and I understand your --

15         MR. BRODSKY:  Okay, Your Honor.

16         All right.  I'm just concerned, Your Honor, that

17    we're heading in a direction where the Government's getting

18    involved in a series of assumptions based on their

19    interpretation of documents that came in with Special Agent

20    Rosato and not testimony, and I believe it's improper to ask

21    a question of a witness who has no personal knowledge of

22    those.  It implies, Your Honor, when you ask that question,

23    Did you ever tell any of this, it implies there's an

24    obligation to tell.

25         THE COURT:  Okay.  Thank you.

Sidebar Conference                          8720

(Continued on next page.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Rosensaft - Cross - Smith                    8721

1          (Sidebar ends; in open court.)

2    BY MS. SMITH:

3    Q    So, Mr. Rosensaft, we were talking about the

4    conversation you had with Mr. Greebel where he agreed with

5    you that Mr. Shkreli needed to repay the loan that he had

6    gotten from MSMB Health Care which had been used to pay the

7    Merrill Lynch settlement, right?

8    A    Yes.

9    Q    And Mr. Greebel never told you that he had discussions

10   with Mr. Shkreli about payments to the Merrill Lynch

11   settlement before those payments were made, correct?

12          MR. DUBIN:  Just for the record, just the same

13   objection, that it's...

14          THE COURT:  All right.  It's overruled.

15   A    But before the payments were actually sent in?

16   Q    Yes.

17   A    No.

18   Q    Mr. Shkreli testified before the SEC for the first time

19   on August 7th, 2013 in connection with the SEC investigation

20   of MSMB Capital, right?

21   A    That's correct.

22   Q    And that testimony, in the testimony the questioning of

23   Mr. Shkreli by one of the two individuals there from the SEC

24   was more hostile than you had expected; is that right?

25   A    Yes.  One of the attorneys there was definitely more

Rosensaft - Cross - Smith                    8722

1   hostile.

2   Q    And the focus of the questioning of the SEC testimony

3   was whether or not MSMB investors been told about the

4   trading loss of some of the Orex trades; is that right?

5   A    That was one of the topics.

6   Q    And after Mr. Shkreli's testify, did Mr. Greebel ask

7   you to tell you what had happened after the testimony?

8   A    I don't remember if Mr. Greebel prompted me to tell him

9   or I just called him, but I did convey to him what had

10  happened.

11  Q    And Mr. Shkreli testified a second time before the SEC

12  in February of 2014; is that right?

13  A    That's correct.

14  Q    And is it fair to say that the questions in the second

15  testimony were more aggressive than the questions in the

16  first testimony?

17  A    Yes.

18  Q    And that the questions in the second testimony were

19  focused on whether Mr. Shkreli had told the truth to

20  MSMB Capital investors, correct?

21  A    Yes.

22  Q    And you provided updates to Mr. Greebel about the

23  second time that Mr. Shkreli testified before the SEC as

24  well, correct?

25  A    That's correct.

Rosensaft - Cross - Smith                    8723

1   Q    Let's talk a little bit about billing.  Who is the

2   principal attorney for MSMB Capital?

3   A    Mr. Greebel.

4           (Pause in proceedings.)

5           THE COURT:  We can proceed.  There was a lapse in

6   the live fee.  We have the live feed again.

7   BY MS. SMITH:

8   Q    I believe I asked you who is the principal attorney for

9   Retrophin?

10  A    It's Mr. Greebel, as that term is used for billing

11  purposes.

12  Q    And focusing on billing, when you started doing work

13  for the SEC investigation, you were told by Mr. Greebel that

14  the client for the matter was MSMB Capital; is that right?

15  A    Yes, the one that I was working on.

16  Q    And so you initially billed your time for MSMB Capital

17  matter number that Mr. Greebel gave you; is that right?

18  A    That's correct.

19  Q    All right.  And when you billed time, either you or

20  your secretary entered that time into the phone system; is

21  that right?

22  A    That's right.

23  Q    And then after you entered that time, you didn't

24  subsequently review your billing entries to see what bill

25  they wound up on; is that right?

Rosensaft - Cross - Smith                    8724

1  A    That's correct, I did not review them.

2  Q    And you never reviewed any invoicing or billing records

3  for either MSMB Capital or for Retrophin?

4  A    That's correct.

5  Q    And you also didn't make any decisions about what time

6  should or should not be written off; is that correct?

7  A    That's correct.

8  Q    Did you bill for all of the work that you did on the

9  SEC investigation?

10 A    I entered my time for all the work I did.

11 Q    And at some point in 2014 you had a conversation with

12 Mr. Greebel where he said he was transferring your time from

13 one client matter number to another client matter number; is

14 that right?

15 A    Yes.  Although I can't remember the specific time, but

16 it was later in my representation.

17 Q    And at that time he told you to just keep billing as

18 you had been billing; is that correct?

19 A    Yes.  He said he was transferring my time when he

20 reviewed the bills and I could just keep billing as I had

21 been.

22 Q    And at some point after Retrophin got a *subpoena* for

23 documents related to the SEC investigation, you billed some

24 of your time to Retrophin as well; is that right?

25 A    That's right.

1    Q    Do you know what Project Candlestick is?

2    A    I remember the name and I remember it being a billing

3    matter.  I don't remember specifically what it is, though,

4    no.

5    Q    And earlier we talked about your compensation and how

6    it was set for your first two years at Katten.  During that

7    period, you did not pay close attention to the realization

8    rates for your matters; is that right?

9    A    When I started, I didn't even know what that was.  But,

10   yes, I didn't pay close attention until later on.

11   Q    And at some point later on when you got closer to being

12   evaluated for compensation on a yearly basis, the issue of

13   whether the time that you had billed was actually paid,

14   became something that you did care about; is that right?

15   A    Yes.

16   Q    Okay.

17   A    Although I should say, I always cared about it, but

18   that was when I became more attentive to it.

19   Q    At the time of your SEC investigation, and let's say it

20   went between the period that we talked about, you know,

21   December of 2012 or January 2013 until September of 2014?

22   A    That's correct.

23   Q    So in that time period, you didn't know anything about

24   pretrading shares call Fearnow shares; is that right?

25   A    Not that I can remember.

Rosensaft - Cross - Smith                    8726

1   Q    And you never had a conversation with Mr. Greebel about

2   Fearnow shares, correct?

3   A    Not that I remember.

4   Q    And at the time of your work on the SEC investigation

5   between 2012 and September of 2014, you didn't know anything

6   about a fall 2013 receiptment of the financials at

7   Retrophin, correct?

8   A    Not that I remember.

9   Q    And Mr. Greebel didn't tell you anything about a fall

10  of 2013 restatement for the financials at Retrophin?

11            MR. DUBIN:  Asked and answered, Your Honor.

12  Objection.

13            THE COURT:  Sustain.

14            MS. SMITH:  Your Honor, the question was

15  whether -- was he told by Mr. Greebel.

16            THE COURT:  Then I will allow the witness to

17  answer that question.

18  A    Again, not that I remember.

19            MS. SMITH:  If we can get the Elmo?

20            THE COURT:  Is this --

21  BY MS. SMITH:

22  Q    So I'm showing you what has been marked as

23  Defense Exhibit 9644-A.  It was admitted on direct

24  examination.  And if we can just look at the cover e-mail

25  here?

Rosensaft - Cross - Smith                    8727

1    A    Yes.

2    Q    Who is the e-mail from?

3    A    From Christine Giordano.

4    Q    And is it to Mr. Kravitz and Mr. Greebel?

5    A    Yes.

6    Q    And is the date January 10, 2014?

7    A    That's correct.

8    Q    And the subject matter is Retrophin, Inc., Director and

9    officer questionnaire, FINRA questionnaire, and lack of

10   agreement signature page; is that right?

11   A    Yes.

12   Q    And I'm just going to show you the attachment which you

13   were shown on direct examination.  And this is a

14   questionnaire for Mr. Shkreli for directors and executive

15   officers; is that correct?

16   A    Yes.

17   Q    And I just want to direct your attention to the page

18   that you were looking at on direct examination, and that is

19   the page ending in Bate's Number R168832.

20         On direct examination you were asked about the

21   Question 7.6.1 for Mr. Shkreli's questionnaire.  And the

22   question asked whether he's ever been a subject of

23   investigation by the SEC and number of other entities.  And

24   you testified on direct that Mr. Greebel asked for your

25   advice in answering the question for Mr. Shkreli; is that

1   right?

2   A     That's right.

3               (Continued on next page.)

1   BY MS. SMITH:

2   Q    Were you asked about the question below here, which is

3   question 7.6.2, have you ever been a party to any settlement

4   in connection with the alleged violation of any federal or

5   state securities or commodities law?

6                MR. DUBIN:  Objection, Your Honor.

7                THE COURT:  Overruled.

8                THE WITNESS:  I don't remember being asked about

9   that.

10  BY MS. SMITH:

11  Q    I am going to actually also show you the page that ends

12  in Bates number 835.

13               Did Mr. Greebel ask you for your advice on section

14  8.2, which involves lawsuits, investigations, inquiries, or

15  actions?

16  A    Not that I remember.

17               MR. DUBIN:  Can you give me the Bates number of the

18  last document?

19               MS. SMITH:  Sure.  The last page was Bates stamped

20  R168835.

21               MR. DUBIN:  Thank you.

22  BY MS. SMITH:

23  Q    I am showing you what's been marked Bates stamp R168843.

24  And I am going to ask you about question number 19, which

25  discussed relationships and related transactions in excess of

1   $120,000, or 1 percent of the average of the company's total

2   assets.

3           Mr. Greebel didn't ask you for your advice on

4   answering this question either, correct?

5   A    That's correct.

6   Q    You were also asked questions on direct about an

7   individual named Darren Blanton; is that right?

8   A    Yes.

9   Q    And you never spoke to Darren Blanton, directly?

10  A    That's correct.

11  Q    And the first time that you were aware of Mr. Shkreli

12  reaching out to Mr. Blanton about the dispute over

13  Mr. Blanton's loss of his money in MSMB Capital was in August

14  2013, after the SEC testimony?

15  A    I can't pinpoint it specifically, but it was around that

16  time.

17  Q    And you weren't aware of any contact between Mr. Blanton

18  and Mr. Greebel regarding his dispute over the MSMB Capital

19  investment prior to those e-mails in August of 2013 that we

20  looked at, correct?

21  A    Correct.

22  Q    And prior to those e-mails, you were not aware of any

23  direct contact between Mr. Greebel and any other investor who

24  had a dispute over their MSMB Capital investment, correct?

25  A    The e-mail referenced the agreement with Geller, but

*ROSENSAFT - CROSS - SMITH*                                  8731

1    besides that, no.

2    Q    And it was your understanding that Mr. Shkreli was going

3    to give Mr. Blanton his own Retrophin shares to resolve their

4    dispute, correct?

5    A    Yes.

6    Q    You were also asked on direct about conversations that

7    you had related to Mr. Blanton being a consultant for

8    Retrophin where you expressed a concern that he needed to be

9    actually consulting for Retrophin, correct?

10   A    Correct.

11   Q    And you conveyed to both Mr. Shkreli and Mr. Greebel that

12   Mr. Blanton needed to be a real consultant, correct?

13   A    Yes.

14   Q    And that he needed to be providing actual services to the

15   company, correct?

16   A    That's right.

17   Q    And both Mr. Greebel and Mr. Shkreli gave you assurances

18   that he would be, correct?

19   A    Mr. Shkreli gave me assurances, Mr. Greebel told me he

20   understood that, that he understood that he had to be a real

21   consultant.

22   Q    When you started working on the SEC investigation, you

23   didn't know that Mr. Greebel was attending Retrophin's board

24   meetings, correct?

25   A    Correct.

1   Q    And you didn't learn that Mr. Greebel was attending board

2   meetings until very late in your work on the investigation,

3   correct?

4   A    That's right.

5   Q    And Mr. Greebel never asked you to draft an update for

6   the Retrophin board meetings on the status of the SEC

7   investigation?

8            MR. DUBIN:  Objection, Your Honor.  Beyond the

9   scope, Your Honor, and assumes facts not in evidence.

10           THE COURT:  Sustained.

11  BY MS. SMITH:

12  Q    You never spoke to or had any direct contact with

13  Mr. Steve Richardson, correct?

14  A    Correct.

15  Q    And you never spoke to or had any direct contact with any

16  Retrophin board members, correct?

17  A    Correct.

18  Q    And you did not attend any Retrophin board meetings,

19  right?

20  A    That's right.

21  Q    And you testified on direct that at one point you had

22  suggested that the SEC speak to Mr. Richardson and Mr. Blanton

23  about their MSMB Capital investments, correct?

24  A    Yes.

25  Q    And that was at the direction of Mr. Shkreli, correct?

1    A    It was prompted by a conversation with Mr. Shkreli.

2    Q    Because you never met or spoke to Mr. Richardson or

3    Mr. Blanton directly, correct?

4    A    That's right.

5    Q    And Mr. Greebel never told you that he had met with

6    Mr. Richardson to discuss having him meet with the SEC about

7    the investigation, correct?

8              MR. DUBIN:  Objection, Your Honor.  Assumes facts

9    not in evidence and mischaracterizes testimony.

10             THE COURT:  Overruled.

11             THE WITNESS:  Can you read the question.

12   BY MS. SMITH:

13   Q    Sure.

14             Mr. Greebel never told you that he had met with

15   Mr. Richardson to discuss having Mr. Richardson meet with the

16   SEC about the investigation, correct?

17             MR. DUBIN:  Objection.  Assumes facts not in

18   evidence.  Mischaracterizes the testimony.

19             THE COURT:  We will have a sidebar on this, if you'd

20   like.

21             (Sidebar conference.)

22             (Continued on the next page.)

23

24

25

*SIDEBAR CONFERENCE*                                          8734

1          (WHEREUPON, the following proceedings were had at

2    sidebar, out of the hearing of the open courtroom, to wit:)

3          MR. DUBIN:  Your Honor, there is no evidence in this

4    record that there was any meeting between Mr. Greebel and

5    Mr. Richardson, not even by Mr. Richardson's testimony.  He

6    alleges a phone call, but there was no meeting.  And there was

7    no -- there's no evidence that there was a meeting.  So this

8    is -- this is a classic mischaracterization of testimony in

9    assuming facts not in evidence.  It is improper.

10          MS. SMITH:  I don't -- frankly, I mean,

11   Mr. Richardson said -- I believe he said that he met with

12   Mr. Greebel to discuss.  If they discussed it on the phone

13   call, I am happy to say Mr. Greebel never said that he had a

14   phone call with Mr. Richardson, but that is in evidence, that

15   they spoke about Mr. Richardson, asked by Mr. Shkreli, to talk

16   to the SEC.  He went to Mr. Greebel before he went to the SEC

17   to make sure that it had nothing to do with Retrophin, and he

18   got an assurances that it didn't.  And then he went in and

19   spoke to the SEC.

20          THE COURT:  So maybe you should characterize it as

21   communication with Mr. Greebel rather than a meeting.  That

22   should assuage the concern about --

23          MR. DUBIN:  Withdraw the question.

24          THE COURT:  I will strike the question.

25          MR. DUBIN:  Thank you.

1          THE COURT:  She will start it over.

2          (Sidebar conference ends.)

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (Open court.)

2          THE COURT:  The government's last question will be

3  stricken from the record, and she will rephrase the question.

4  BY MS. SMITH:

5  Q    Mr. Rosensaft, Mr. Greebel never told you that he had

6  communications with Mr. Richardson to discuss having

7  Mr. Richardson meet with the SEC about the investigation,

8  correct?

9  A    That's correct.

10 Q    You were asked on direct examination about a number of

11 subpoenas that both MSMB Capital and Retrophin received in

12 connection with the SEC investigation.  I am going to show you

13 what's been marked as Government Exhibit 113-36, which is tab

14 9 of your binder.

15 A    Okay.

16         MS. SMITH:  And I actually believe this is a defense

17 exhibit that was admitted on direct examination, but I don't

18 have the defense number.  So if Mr. Dubin agrees, I can either

19 put it in as a government exhibit or we can figure out what

20 the defense exhibit number is for it.

21         MR. DUBIN:  We can admit it as a -- I just don't

22 have it in front of me.  We can admit it as a government

23 exhibit, and it is duplicate -- it is in evidence already as

24 DX-121-6.

25 BY MS. SMITH:

*ROSENSAFT - CROSS - SMITH*                                8737

1    Q    So I will -- if you can look at tab 9, and then I will

2    use the ELMO with the -- my version.  But it is the defense

3    exhibit number that Mr. Dubin just used.

4              MR. DUBIN:  I am fine with you showing it, if you

5    want to show it on the screen, showing the jury.

6              MS. SMITH:  Okay.  So, Ms. Balbin, if you can bring

7    up 113-36 on the prosecution laptop.

8              THE COURT:  Didn't you say 113-36, or is it 116?

9              MS. SMITH:  116-36.

10   BY MS. SMITH:

11   Q    And I believe you were shown this on direct examination,

12   it is an e-mail from Mr. Schmidt to yourself, on November 25,

13   2013.  And it is attaching two subpoenas; is that right?

14   A    That's right.

15   Q    One is to Retrophin, and the other one is to Martin

16   Shkreli and MSMB Healthcare?

17   A    Correct.

18   Q    And what's the date again on that e-mail?

19   A    November 25, 2013.

20   Q    And I am going to show you what's been marked for

21   identification as Government Exhibit 646.  And that's tab 8 in

22   your binder.

23             MR. DUBIN:  Your Honor, I object.  It is hearsay.

24             MS. SMITH:  I was showing it to him for

25   identification first.

1   BY MS. SMITH:

2   Q     So do you recognize this document?

3   A     I do.

4   Q     And is it a document that you sent?

5   A     Yes.

6   Q     And it is a document that you sent to Mr. Greebel?

7   A     Yes, and Mr. Shkreli.

8   Q     And is it an update in connection with the SEC

9   investigation?

10  A     Yes.

11          MS. SMITH:  Your Honor, the government offers

12  Government Exhibit 646.

13          MR. DUBIN:  Object.  It is hearsay, Your Honor.

14          THE COURT:  Overruled.

15          (Government Exhibit 646 received in evidence.)

16  BY MS. SMITH:

17  Q     So if we can look at Government Exhibit 646, now in

18  evidence.  And, again, that's an e-mail from yourself; is that

19  correct?

20  A     That's right.

21  Q     And it is sent on the same date as the e-mail we looked

22  at from Mr. Schmidt, correct?

23  A     Yes.

24  Q     And it is to both Mr. Shkreli and Mr. Greebel?

25  A     That's right.

ROSENSAFT - CROSS - SMITH                                8739

1  Q    And in the e-mail you are providing an update about your

2  conversation with Mr. Schmidt; is that correct?

3  A    Yes.

4  Q    And then he indicated that he wanted to send -- in that

5  update you are conveying that Mr. Schmidt wanted to send a

6  subpoena for additional documents, including to Retrophin,

7  correct?

8  A    That's right.

9  Q    And this is one of the updates that you provided to

10  Mr. Greebel about the status of the investigation as it

11  proceeded, correct?

12  A    Yes.

13  Q    And as you testified on direct, at some point you learned

14  that the bill for the SEC investigation had not been paid; is

15  that correct?

16  A    That's right.

17  Q    It was your understanding that it had gone out, but it

18  hadn't actually -- no money for it had come in, correct?

19  A    That's right.

20  Q    And you testified on direct that it occurred sometime in

21  the spring of 2014; is that right?

22  A    That's my best recollection.

23  Q    At that point did you know whether or not bills for other

24  MSMB Capital or Retrophin matters were being paid?

25  A    I did not.

1   Q    And you learned that the bill for the SEC investigation

2   had not been paid at a meeting at Retrophin's offices,

3   correct?

4   A    That's correct.

5   Q    And that was a meeting with Mr. Shkreli and Mr. Greebel,

6   right?

7   A    Yes.

8   Q    And is it fair to say that when you heard that the bill

9   hadn't been paid, you were surprised?

10  A    Yes.

11  Q    And that you were a little bit upset; is that fair?

12  A    "Annoyed" is the word I used, but yes.

13  Q    And after you learned that the SEC investigation had not

14  been paid, Mr. Shkreli left the meeting for a short period; is

15  that right?

16  A    Yes.

17  Q    And you asked Mr. Greebel at that point about the bill

18  not being paid, correct?

19  A    Correct.

20  Q    And he assured you that the bill would be paid, correct?

21  A    Yes.

22  Q    And when Mr. Shkreli returned to the room, he told you in

23  front of Mr. Greebel that the board had agreed to indemnify

24  him for the cost associated with the SEC investigation of MSMB

25  Capital; is that right?

1   A    That's correct.

2   Q    And indemnify him just means Retrophin was going to pay

3   the bill; is that right?

4   A    Yes.

5   Q    And Mr. Greebel did not disagree with Mr. Shkreli when he

6   said that; is that right?

7   A    I don't remember him saying anything in response.

8   Q    And after that conversation, you followed up with

9   Mr. Greebel a few months later and asked if the bill had been

10  paid; is that right?

11  A    Yes.

12  Q    And Mr. Greebel said at that point that the board just

13  had to vote on actually paying for the bill; is that correct?

14  A    Yes.

15  Q    And at the end of September of the 2014, you never had a

16  discussion with Mr. Greebel about sending Mr. Shkreli the bill

17  for the SEC investigation, correct?

18  A    Not that I remember.

19  Q    And at the end of September 2014, Mr. Greebel never

20  discussed with you a plan to remove members of the Retrophin

21  board of directors, who are not favorable to Mr. Shkreli,

22  correct?

23            MR. DUBIN:  Objection, Your Honor.

24            I objected, Your Honor.

25            THE COURT:  I know you did.  I am just waiting for

1    your one-word basis.

2            MR. DUBIN:  It's outside the scope, Your Honor.

3            THE COURT:  Okay.  I will sustain your objection.

4            MS. SMITH:  Can you hold on one moment, Your Honor.

5            THE COURT:  Yes.

6            (Short pause.)

7            MS. SMITH:  Thank you, Your Honor.  I have no more

8    questions.

9            THE COURT:  Redirect?

10           MR. DUBIN:  Yes, Your Honor.

11           THE COURT:  All right.

12                     REDIRECT EXAMINATION

13   BY MR. DUBIN:

14   Q    Mr. Rosensaft, you were asked some questions about this

15   conversation where you -- where Martin Shkreli told you that

16   the board was going to indemnify them.  You recall those

17   questions just a minute ago?

18   A    Yes.

19   Q    And then you were asked whether or not the board --

20   whether or not Mr. Greebel said anything when Martin Shkreli

21   said that, correct?

22   A    Yes.

23   Q    Did you have any reason to believe that Mr. Greebel -- or

24   strike that.

25           Did you have any reason to believe that Mr. Greebel

*ROSENSAFT - REDIRECT - DUBIN* 8743

1    was in possession of any information that would contradict

2    what Martin Shkreli said?

3             MS. SMITH:  Object to leading, Your Honor.

4             THE COURT:  Sustained.

5    BY MR. DUBIN:

6    Q    You accepted the representation that Martin Shkreli made,

7    correct?

8    A    Yes.

9    Q    Was there anything peculiar or odd to you that Evan

10   Greebel did the same thing?

11           MS. SMITH:  Objection to what Mr. Greebel --

12           THE COURT:  Sustained.

13   BY MR. DUBIN:

14   Q    Now, you were shown some bills from the early part of

15   2014, and time entries in December 2013 or 2014, correct?

16   A    Yes.

17   Q    And when was the first time you recall meeting Martin

18   Shkreli, for the first time?

19   A    It was in early 2013.  It was a few weeks after I was

20   introduced to him on the telephone.

21   Q    Is it possible that you're mistaken about that?

22   A    Anything's possible, it was a long time ago.

23   Q    Okay.  So I am going to --

24           MR. DUBIN:  May I approach, Your Honor?

25           THE COURT:  Yes.

ROSENSAFT - REDIRECT - DUBIN                            8744

1   BY MR. DUBIN:

2   Q    I am going to hand you a series of exhibits, GX-837,

3   GX-838, GX-839, GX-840, GX-841, and then GX-842, and I flagged

4   for you time entries, okay.  And I ask you just to look

5   through these and see if this refreshes your recollection as

6   to when you actually first met him.

7            THE COURT:  Do you mean in person or just

8   communicating?

9            MR. DUBIN:  In person.  Yes.  In person.

10           THE COURT:  These are in evidence, for the record.

11           MR. DUBIN:  Yes, Your Honor.

12           THE WITNESS:  I don't seem to be on the first one.

13  BY MR. DUBIN:

14  Q    Okay.  Let me just put a question to you as you are

15  looking through them.

16  A    Okay.

17  Q    Could it be that you're mistaken and that your first time

18  entry regarding meeting Martin Shkreli about the active SEC

19  investigation isn't until May?

20           MS. SMITH:  Object to form, Your Honor.

21  BY MR. DUBIN:

22  Q    Or June, rather.

23           MS. SMITH:  Still object to form.

24           THE COURT:  Could you rephrase your question,

25  Mr. Dubin.

BY MR. DUBIN:

Q    The first time entry regarding a meeting between you and

Mr. Shkreli, a physical meeting in person, isn't until June?

          MS. SMITH:  Objection to form, Your Honor.  It is

leading.

          THE COURT:  I'll overrule it, but, you know, this

would maybe go faster if you could just maybe refer the

witness to the specific --

          MR. DUBIN:  Well, I don't want to take him through

every invoice, Your Honor.

BY MR. DUBIN:

Q    Sitting here, would you be able to point the jury -- do

it this way, and then we can deal with it later.

          Would you be able to point to the jury in any of the

exhibits before you to a time entry between the beginning of

the year -- and I flagged the ones that you're on related to

the SEC -- would you be able to point the jury to any -- a

single time entry that reflects a meeting between you and

Martin Shkreli prior to June, regarding the SEC investigation?

A    You may have handed me the wrong exhibits.  I don't seem

to be on the pages you flagged.

Q    No, I think they're the right exhibits.  They're bills,

and that was my point.

          Is there a time entry that you can point the jury

to, or that you recall sitting here, in which -- that reflects

1  a meeting with you and Martin Shkreli regarding the SEC

2  investigation prior to June?

3           MS. SMITH:  Objection to compound, Your Honor.

4           THE COURT:  Try to rephrase your question,

5  Mr. Dubin.

6           MR. DUBIN:  Let me show you -- can we just put up

7  857-A.

8           THE COURT:  Government 857-A?

9           MS. SMITH:  It is a government exhibit.

10          MR. DUBIN:  Yes.  It is already in evidence.

11          THE COURT:  Thank you.

12  BY MR. DUBIN:

13  Q    And can we go to page 2 or 3, if you can skip to the next

14  page --

15          THE COURT:  Mr. Dubin, keep your voice up, or turn

16  your mikes on over there.

17          MR. DUBIN:  I will, Your Honor.

18  BY MR. DUBIN:

19  Q    See the first entry, June 4, 2013, and it says meeting

20  with M. Shkreli and E. Greebel to discuss investigation?

21  A    Yes.

22  Q    Sitting here today, can you point the jury to any entry

23  in any bill before this date that reflects a meeting between

24  you and Martin Shkreli about the SEC investigation?

25  A    I'd have to review this entire stack of documents.

1   Q    Could it be -- just to speed it up.

2        Could it be that you're mistaken about the time you

3   first met him, and that it wasn't until June?

4        MS. SMITH:  Objection to asked and answered,

5   Your Honor.

6        THE COURT:  Sustained.

7   BY MR. DUBIN:

8   Q    You were asked some questions about the restatement; do

9   you recall that?

10  A    Yes.

11  Q    And I think you were asked whether or not Evan Greebel

12  ever communicated to you anything about the restatement; do

13  you recall that?

14  A    Yes.

15  Q    And you said, not that you remember, correct?

16  A    Correct.

17  Q    Is it possible that he told you and you just don't

18  recall?

19  A    It is possible.

20  Q    Okay.  And you were asked some questions about the

21  Merrill Lynch arbitration; do you recall that?

22  A    Yes.

23  Q    Do you know one way or another whether or not Mr. Greebel

24  was involved at all in that arbitration?

25  A    From what I know, I don't believe he was.

*ROSENSAFT - REDIRECT - DUBIN* 8748

1 Q    Okay.  You were shown Government Exhibit 116-31, and it

2 was put into evidence; do you recall this?

3 A    Yes.

4 Q    Do you recall, sir, whether what's on the screen was

5 something that you sent to Evan Greebel, and that he just cut

6 and pasted and forwarded in that e-mail?

7 A    I do remember giving him the categories, so that would be

8 the bullet points.  The rest of the e-mail, I don't think I

9 gave him.

10 Q    Let me see if I can show you something that would refresh

11 your recollection.

12          Showing you what I will mark for identification --

13          MR. DUBIN:  May I approach, Your Honor?

14          THE COURT:  Yes, you may.

15 BY MR. DUBIN:

16 Q    -- as DX-202-23.

17          MR. DUBIN:  And I apologize for approaching before I

18 asked.

19          THE COURT:  That's all right.

20          MS. SMITH:  Your Honor, I'm going to have the same

21 objection to this document as I did to the one previously,

22 about reduction.

23          MR. DUBIN:  I am just using it to refresh

24 recollection, Your Honor.

25          THE COURT:  All right.  Well, do you have an

1  objection to him just using this to refresh --

2          MS. SMITH:  Anything can be used to refresh, Your

3  Honor.

4          THE COURT:  Okay.  Even a napkin.

5          MS. SMITH:  Even a napkin.

6  BY MR. DUBIN:

7  Q    Your Honor -- sorry.  It's Friday.

8          Mr. Rosensaft?

9  A    I take it as a compliment.

10         (Laughter.)

11 BY MR. BRODSKY:

12 Q    It was intended as a compliment.

13         Does that e-mail that I just put before you, which I

14 marked DX-202-23 for identification, does that refresh your

15 recollection that the exact bullet points that appeared in the

16 government exhibit were what you sent to Evan Greebel, and he

17 just simply cut and pasted and forwarded along?

18 A    I don't need my recollection refreshed.  That's what I

19 testified to.

20 Q    And, in fact, it was what you sent him, word for word,

21 right?

22 A    I don't remember if it was word for word or not, but I do

23 remember giving him the categories that he then sent on.

24 Q    Okay.  Now, you were asked about whether Mr. Greebel told

25 you about Merrill Lynch discussions that he had with Martin

1   Shkreli prior to the payment of the Merrill Lynch settlement;

2   do you recall that?

3   A    Yes.

4   Q    Do you have any knowledge that any such conversations

5   occurred between Evan Greebel and Martin Shkreli?

6   A    No.

7   Q    Now, you were shown -- can we put back up 9644-A.  I

8   believe that is a defense exhibit already in evidence.  And if

9   we can flip to the paragraph 7.6.2, and I will give you the

10   Bates stamp in a moment.

11        MR. DUBIN:  Is there an attachment to that?  Is

12   there multiple pages in that, Mr. Carter?  Bates stamp

13   R168832.  Thank you, Mr. Carter.  Can we show 7.6.2, please.

14   BY MR. DUBIN:

15   Q    It says:  Have you been a party to any settlement in

16   connection with an alleged violation of any federal or state

17   securities or commodities law.

18        Do you remember being asked about this during the

19   cross-examination a little while ago?

20   A    Yes.

21   Q    And then you were asked a question about the Orex trade,

22   right?

23   A    I don't remember the order, but I was asked questions

24   about that.

25   Q    Sir, the Orex trade doesn't involve a violation of SEC

*ROSENSAFT - REDIRECT - DUBIN*                          8751

1   law, federal or state securities or commodities law, does it?

2   A    I think there was a regulation related to that trade that

3   was violated.

4   Q    A regulation?

5   A    Yes.

6   Q    Right.  But that was a repayment of money that Martin

7   Shkreli -- excuse me, not repayment, but it was money that

8   Martin Shkreli owed, correct?

9   A    To Merrill Lynch, yes.

10  Q    Right.  And there was no -- there was a settlement,

11  right?

12  A    Yes.

13  Q    Right.  And in the settlement, do you know -- did you

14  read the settlement agreement?

15  A    I don't remember if I did or not.

16  Q    So you don't know whether or not there was an allegation

17  that a federal or state commodities law -- federal or state

18  securities or commodities law was a part of that settlement

19  agreement, do you?

20  A    As I said, I don't remember.

21  Q    So sitting here, you can't opine on whether or not the

22  answer to that is right or wrong, correct?

23            MS. SMITH:  Objection, Your Honor.

24            THE COURT:  Sustained.

25  BY MR. DUBIN:

*ROSENSAFT - REDIRECT - DUBIN*                    8752

1   Q    Do you know if Mr. Greebel advised Mr. Shkreli about how

2   to answer that question?

3   A    I do not.

4   Q    And do you know whether or not Mr. Greebel took it upon

5   himself to answer that question one way or another?

6   A    I do not.

7   Q    Do you know whether Mr. Shkreli would sometimes hear your

8   advice but go off and do what he wanted?

9             MS. SMITH:  Objection, Your Honor.

10            THE COURT:  Sustained.

11  BY MR. DUBIN:

12  Q    Did he always follow your advice, sir?

13            MS. SMITH:  Objection, Your Honor, to the knowledge

14  of what Mr. Shkreli did.

15            THE COURT:  Sustained.

16  BY MR. DUBIN:

17  Q    From your understanding, based on what you know, did

18  Mr. Shkreli always follow your advice?

19  A    No.

20  Q    Okay.  Based on what you know, did he always follow

21  Mr. Greebel's advice?

22            MS. SMITH:  Objection, Your Honor.

23            THE COURT:  Sustained.

24  BY MR. DUBIN:

25  Q    Okay.  I want to bring you to Bates stamp 8835 in the

1 same document.  And do you see where -- on 8.2, you were asked

2 some questions about that; do you recall those questions?

3 A    Yes.

4 Q    Do you recall whether or not at the time this was filled

5 out, whether there were actually any lawsuits, investigations,

6 inquiries or action that has affected or involved or has the

7 potential to affect or involve the company?  Do you know one

8 way or another?

9 A    I would say yes, as to that one.

10 Q    Okay.  And to that one, do you know whether or not,

11 again, Evan Greebel ever advised Martin Shkreli about what --

12 how he should answer that?

13 A    I do not.

14 Q    When it came time to ask a question about this D&O form,

15 Mr. Greebel asked you a question about one -- Mr. Greebel

16 sought your advice on one question, right?

17 A    Correct.

18 Q    And from what you know, he communicated that advice to

19 Mr. Shkreli, correct?

20          MS. SMITH:  Objection to the leading, Your Honor.

21          THE COURT:  Sustained.  Sustained.  Sustained.

22 BY MR. DUBIN:

23 Q    Did he, from what you understand, communicate that

24 advice?

25          MS. SMITH:  Objection to asked and answered.

*ROSENSAFT - REDIRECT - DUBIN*                              8754

1          THE COURT:  Sustained.

2   BY MR. DUBIN:

3   Q    For any question on this form, do you know if Martin

4   Shkreli asked Evan Greebel any questions other than the 7.6.1?

5   A    I don't know what Mr. Shkreli asked Mr. Greebel.

6   Q    Okay.  Now, you were asked some questions about the

7   Blanton consulting agreement; do you recall that?

8   A    Yes.

9   Q    All right.  Now, do you know whether or not Mr. Blanton

10  ended up performing consulting work?

11  A    I do not.

12  Q    You were asked some questions about Mr. Richardson; do

13  you recall those questions?

14  A    Yes.

15  Q    And about whether or not anything was communicated to you

16  about conversations that occurred between Mr. Richardson and

17  Mr. Greebel; do you remember that?

18  A    Yes.

19  Q    You have never met Mr. Richardson, have you?

20  A    I have not.

21  Q    Do you have any knowledge sitting here today about

22  Mr. Richardson's reputation for truthfulness?

23          MS. SMITH:  Objection, Your Honor.

24          THE COURT:  Sustained.

25  BY MR. DUBIN:

1    Q    Do you know whether or not Mr. Richardson ever said

2    anything to Mr. Greebel that wasn't so?

3              MS. SMITH:  Objection, Your Honor.

4              THE COURT:  Sustained.

5    BY MR. DUBIN:

6    Q    You were asked some questions about the board

7    indemnification.  Actually, let me just actually ask you one

8    last question about Mr. Richardson.

9              Do you recall that you were aware -- do you

10   remember -- strike that.

11             Do you remember you were asked some questions by

12   Ms. Davis -- Ms. Smith about whether or not you were aware of

13   Mr. Richardson going and testifying to the SEC?

14   A    Yes.

15   Q    Okay.  Do you recall that you were made aware that he

16   received a subpoena to testify before the SEC?

17   A    I don't remember that.

18             MR. DUBIN:  I would like to -- may I approach,

19   Your Honor?

20             THE COURT:  Yes.

21   BY MR. DUBIN:

22   Q    I am going to show you what I have marked for

23   identification as DX-202-22.  This was an e-mail that you

24   received from Martin Shkreli on March 9, 2014.  Correct?

25   A    Yes, that's what it says.

ROSENSAFT - REDIRECT - DUBIN                     8756

1   Q    And do you recall when it was that Mr. Richardson went

2   and was interviewed by the SEC?

3   A    I don't have a memory that he was interviewed.

4   Q    Okay.  You don't know one way or another?

5   A    Correct.

6   Q    Okay.  And does it refresh your recollection, reading the

7   top e-mail, the last paragraph -- excuse me, the last

8   sentence, that you were made aware that Mr. Richardson got a

9   subpoena from Eric Schmidt of the SEC to come in and

10  testify -- or to come in and get interviewed?

11  A    I see that what's conveyed.  I don't have a memory of

12  that, though.

13  Q    Okay.  I would -- do you recall --

14          MR. DUBIN:  Actually, I move DX-202-22 into

15  evidence.

16          MS. SMITH:  Objection, Your Honor.  It is hearsay.

17          THE COURT:  Sustained.

18  BY MR. DUBIN:

19  Q    Do you recall receiving this e-mail?  Why don't you read

20  through the bottom e-mails as well.

21          MS. SMITH:  Objection to asked and answered, Your

22  Honor.

23          MR. DUBIN:  I just focused him on the top e-mail, I

24  think, earlier.

25          THE COURT:  I think he did, he was asked to read the

*ROSENSAFT - REDIRECT - DUBIN*                              8757

1  whole thing, but --

2                MR. DUBIN:  Okay.

3                THE COURT:  -- if you want to ask him once again if

4  he recalls it.

5  BY MR. DUBIN:

6  Q     Do you recall receiving this e-mail?

7  A     I do remember the content of this e-mail, other than that

8  part about the subpoena.

9                MR. DUBIN:  I move it in, DX-202-22.

10               MS. SMITH:  Objection.  It is hearsay.

11               MR. DUBIN:  For the effect on the listener.

12               MS. SMITH:  We can do it at sidebar.

13               THE COURT:  I'm going to sustain the objection.

14               MR. DUBIN:  I would like to discuss it, Your Honor.

15  Briefly.

16               THE COURT:  All right.  Well, we are going to

17  dismiss the jury at 2:00, and --

18               MR. DUBIN:  Oh, no.  Then I don't want to discuss

19  it.

20               THE COURT:  It's fine, but --

21               MR. DUBIN:  No.

22               THE COURT:  -- if there's recross, you have to give

23  the opportunity --

24               MR. DUBIN:  No, it's okay.  I think that I -- I have

25  no further questions.

1           THE COURT:  All right.  Is there any recross?

2           MS. SMITH:  No, Your Honor.

3           THE COURT:  All right.  Sir, you are excused.  Thank

4    you.  Have a nice day.

5           THE WITNESS:  Thank you, Your Honor.

6           (WHEREUPON, the witness was excused.)

7           THE COURT:  Members of the jury, I promised you

8    2:00.  So I will dismiss you.  Please don't talk about the

9    case.  Please consciously avoid any media coverage about

10   anything touching on this case.  I will see you Monday at 9:00

11   a.m.  Thank you for your attention.  Have a good weekend.

12          (WHEREUPON, at 2:00 p.m., the jury exited the

13   courtroom.)

14          (Open court; no jury present.)

15          THE COURT:  So we are very close to getting the

16   instructions.  We are finishing up.  I wanted to focus on the

17   testimony before I approved the last instruction.  I think we

18   are ready to upload it soon.  It will be uploaded as a draft,

19   Court Exhibit No. 1.  All right.

20          (Court Exhibit 1 was received in evidence.)

21          MR. PITLUCK:  Is it going to be e-mailed to the

22   parties or ECF?

23          THE COURT:  Would you like us to e-mail it to you or

24   put it on ECF?  What is the easiest for everybody?

25          MR. KESSLER:  Doesn't matter.

*PROCEEDINGS*                                                    8759

1            MR. PITLUCK:  E-mail is probably just as easy,

2    Your Honor.

3            THE COURT:  We will do both, how's that?

4            MR. BRODSKY:  What time would you like us back?

5            THE COURT:  We have a plea and what else?

6            THE COURTROOM DEPUTY:  And a quick status.

7            (WHEREUPON, discussion was had off the record.)

8            THE COURT:  So why don't you come back at 3:15.  Is

9    that all right?

10           MR. BRODSKY:  Yes, Your Honor.

11           MR. PITLUCK:  Sure.  That's fine.  Stopping at 4:45?

12           THE COURT:  Yes.

13           (WHEREUPON, a recess was had from 2:03 p.m. to 3:15

14   p.m.)

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    *8760*

1          (In open court; 3:24 p.m.)

2          THE COURT:  We're ready to go.

3          MR. BRODSKY:  I think, your Honor, this is a good

4    timing to do it because it's Friday afternoon and there is

5    some time, but we would request a little bit more time to

6    review it, consider it, and analyze it because it's just

7    difficult to absorb all of it given when it was filed and when

8    we are now.

9          I understand, your Honor, that there's time to do it

10   now, but that would be our request, to have a little more time

11   to absorb it, consider it.

12         THE COURT:  Well, I would expect that this will

13   continue to next week.  Hopefully, early Monday evening after

14   we finish the trial, but I just want to feel that I need to

15   put on the record that we got submissions on these charges as

16   late as this weekend.  And meanwhile, I could count up the

17   number of submissions relating to the ongoing trial that I got

18   this week, and there are a lot of lawyers available to do a

19   multitude of tasks related to this case.

20         There is one judge and there is one law clerk trying

21   to respond to everything, and so I expect that we won't be

22   able to finish tonight in any event, but I want to be very

23   clear that I'm not going to entertain any new instructions

24   unless there are instructions that could not have been, you

25   know, provided because so, for example, we don't know whether

*Proceedings* 8761

1   Mr. Greebel is going to testify.

2          So we would have to add that or take it out.  But in

3   terms of new iterations of instructions or something

4   different, I'm not willing to entertain more.  We have asked

5   for charges and we've given the parties additional time to

6   submit charges.  And, at some point, we just have to say to

7   the parties that they've had ample opportunity, and if they

8   haven't provided something by all the numerous deadlines that

9   I've given and extensions of deadlines, we're just not going

10  to be able to entertain more.

11         We'll get started today.  We'll get as far as we

12  can, and if we need to continue, we can hear further from the

13  defendants.  I just want to be very clear -- and from the -- I

14  just want to be clear, I'm not going to welcome any more

15  submissions about the instructions unless I ask for them.

16         So, for example, if somebody believes that the law

17  requires a particular instruction be given or not given, and

18  you haven't previously had an opportunity to provide law for

19  your positions, I would allow you to do that.  But, otherwise,

20  I think, you know, we're going to deal with what we have so

21  far from the parties.

22         MR. BRODSKY:  Yes, your Honor.

23         And, your Honor, it is perfectly understandable

24  given the volume of work your Honor has received from us

25  collectively, and certainly, from our side in terms of our

*Proceedings*                                              8762

1    filings and our requests and the issues we're raising which

2    are very critical and some of them unprecedented that -- we

3    completely, your Honor, are not complaining or suggesting that

4    the Court -- you know we expected to receive the draft charge

5    earlier today, in fact, we're amazed that your Honor was able

6    to provide us with a draft charge today given all of your

7    Honor's other work and obligations and this trial this week

8    and the issues.

9           So it's just that your Honor and, again, not

10   suggesting your Honor provided to today was not appropriate,

11   in fact, as I've said it's impressive we just haven't had a

12   chance to absorb the proposed charges, and we just don't want

13   to waive as we go through it and come back, your Honor, on

14   Monday and say, look, on Friday having not had enough time to

15   go through it, we missed that.

16          THE COURT:  So we'll continue this not Monday but

17   Tuesday evening.  All right.  I'll cancel my commitment on

18   Tuesday and make sure we continue if we need to.

19          So let's start.  The way I like to do it maybe you

20   were here or the Shkreli charge conference or some of your

21   colleagues were.

22          MR. BRODSKY:  I was not here.

23          THE COURT:  Mr. Brodsky, my practice is to go

24   through the instructions, and when a party has a particular

25   comment or a suggested edit, then I will, you know, we'll stop

*Proceedings*                                          *8763*

1      there and we'll talk about it.

2            So why don't we start?

3            General introduction and the general instructions as

4      you may know are fairly standard and they're not atypical and

5      they're not extraordinary or specific necessarily to the case

6      in terms of being something out of the ordinary or

7      complicated.

8            So does anyone have any comment so far on the

9      introductory portions of this?

10           MR. BRODSKY:  I'm going through right now, your

11     Honor.  I did go through the introduction first page, I'm now

12     scrolling through if you would give us a moment to go through

13     the other ones.

14           THE COURT:  Would it be more beneficial to focus on

15     the parties' differences of opinion regarding the instructions

16     on certain topics like multiple conspiracies, wash trades, and

17     lock-ups?

18           MR. BRODSKY:  However you want to do it, your Honor.

19           THE COURT:  Well, I want to get something done

20     between now and 4:45.  So let's do something that the parties

21     are prepared to address.

22           MR. BRODSKY:  Well, one thing that we could address,

23     your Honor, is the conscious -- if I would ask your Honor to

24     focus on one thing and notice the conscious avoidance

25     instruction.  I believe to have, and I don't know if your

*Proceedings*                                                    *8764*

1    Honor wants to go to that.

2           THE COURT:  That's fine.

3           MR. BRODSKY:  And I believe your Honor has it on

4    Page 68 of your December 8, 2017, draft jury instructions.

5    It.

6           As we understand it, your Honor, the conscious

7    avoidance instruction should be given; there are a number of

8    prerequisites to give it.  One of those prerequisites is there

9    has to be evidence in the record that Mr. Greebel was aware of

10   a high probability of a fact in dispute.

11          And, in addition, there has to be an evidentiary

12   record established that Mr. Greebel consciously avoided

13   confirming that fact.  And now, as we went through and

14   analyzed it.  We did not see how there was evidence in the

15   record to satisfy those prerequisites and that's established

16   in the case law *U.S. v. Adeniji* which is 31 F.3d 58.

17   Second Circuit 1994.  It's established in *United States v.*

18   *Ferrarini*, 219 F.3d 145.  Second Circuit 2000.

19          Those were cases where, for example, there were

20   problems with conscious avoidance instructions because those

21   were given, there wasn't a sufficient factual predicate from

22   the record that would permit a rational juror to conclude

23   beyond a reasonable doubt that there was a high probability of

24   some fact in dispute that the -- that Mr. Greebel was aware of

25   it, and that he consciously avoided confirming it.

*Proceedings*                                                          *8765*

1           So we're just concerned about it because we're just

2    not sure what facts the Government thinks they've established

3    in the record Mr. Greebel had this conscious avoidance --

4    they're trying to seek this conscious avoidance predicate and

5    they satisfied the standard.

6           THE COURT:  Does the Government wish to address the

7    defense concerns on this?

8           [!EZ SPEAKER 07]:  We can.  But what we thought

9    would be more helpful on this very specific point because I

10   think I agree with Mr. Brodsky.

11          The two things that seem to cause problems with the

12   conscious avoidance charge are when the instruction that if

13   the defendant actually believed that something was lawful, the

14   defendant can't be convicted.  So sometimes that is left out

15   and that causes appellate issues.  That's in the Court's

16   charge, so I don't think that's an issue.

17          Then with respect to the factual predicate.  What we

18   thought would be helpful to the Court, and we hoped to have

19   ready at this point, but I think now we might do it better on

20   Tuesday is just to provide for the Court, you know, exhibit

21   cites and testimony cites that establish that predicate

22   because we agree with Mr. Brodsky you have to establish the

23   predicate.  And I think that would probably be the most

24   helpful way to do it just so everyone can really consider the

25   evidence on that point.

*Proceedings*                                          *8766*

 1           But we agree that the question is really is has the

 2    I don't think we have Ferrarini in our draft, but my memory is

 3    every one of these cases says the exact same requirements for

 4    the charge, the same predicate.  We believe they're settled.

 5    We thought it would be more helpful to lay things out.

 6           THE COURT:  I think that would be helpful for the

 7    defense and the Court.  I just note that *United States v.*

 8    *Svoboda*, 347 F.3d 471 at 480.  Decided in 2003 by the Circuit

 9    provided the same general predicate.  It's a more recent case

10    and one that we were looking at in determining.

11           So, for example, the factual predicate regarding

12    consulting agreements or any of the other charged conduct.

13           [!EZ SPEAKER 07]:  And, your Honor, I recently had a

14    trial in front of Judge Mauskopf where the defendant was an

15    attorney and this exact same charging question came up and

16    everyone relied on, I think, it's *Svoboda*, however you

17    pronounce it, and a couple of other cases.  I don't think the

18    requirements of the law run clear.  The question is making

19    sure we satisfy the predicate, we have, but we want to lay it

20    out for the Court just so that everyone is working on the same

21    specific piece of evidence.

22           THE COURT:  All right.  So what's next?

23           MR. BRODSKY:  I can --

24           THE COURT:  I'm happy to hear about multiple

25    conspiracies since that seems to be somewhat at issue, or is

*Proceedings*                                                    *8767*

1    that not an issue.

2           I know the Government takes the position of one

3    conspiracy, three means or schemes that are related to that

4    count, Count Seven, and I thought the defense had suggested an

5    instruction on multiple conspiracies.  We didn't think it

6    should go in, but I'm happy to hear the defense arguments

7    since it's their suggestion.

8           MR. BRODSKY:  Your Honor, I think our view is that

9    you have, although the Government has tried to weave a

10   narrative in Count Seven as one.  I think it's three different

11   theories of the case.  I think the first one is the

12   MSMB Capital theory of backdating which I know your Honor

13   heard Rule 29 on so we won't repeat it.  And I think that's a

14   separate alleged conspiracy from the use of, purported use, of

15   settlement agreements it allegedly misappropriate assets of

16   Retrophin.

17          So I just think that that's, where our view is that

18   they are different alleged conspiracies and it's, I think,

19   it's appropriate to give that instruction that we request to.

20          THE COURT:  Does the Government want to be heard?

21          [!EZ SPEAKER 07]:  Your Honor, yes.  We think the

22   charge is inapplicable here.  There is case law in our motion

23   in limine briefing related to the motion to dismiss where both

24   parties address this.  I can preview again some of the cases.

25          But basically the point is, the multiple

*Proceedings*                                                    *8768*

1   conspiracies charge.  Some case law say it's never an

2   appropriate when there is a single defendant in any event, and

3   all the cases make clear that we would meet our multiple

4   different overlapping maybe related conspiracies and then the

5   charge might be appropriate.

6            So we can have a debate about whether we've shown,

7   you know, the means and methods or provided all the evidence

8   of the conspiracy that's charged in the indictment, but there

9   is one conspiracy.  We think there is a conspiracy to

10  misappropriate Retrophin assets.  That's how it's charged;

11  that's how it's always been charged; that's how it is.

12           So there can be plenty of argument about whether

13  we've met all the elements beyond a reasonable doubt but

14  there's no, there's nothing coming close to a suggestion that

15  there are multiple different conspiracies.

16           MR. BRODSKY:  Your Honor, I know that's their

17  theory, but the MSMB Capital backdating is distinguishable in

18  time period, in alleged participants, and in the nature of the

19  allegation.

20           In the superseding indictment, the charges that are

21  faced with an SEC inquiry, Mr. Shkreli allegedly decided that

22  he needed it to provide shares to MSMB Capital in order to

23  cover up lies that he told to the SEC regarding the assets

24  under management at MSMB Capital.  And that is a separate

25  alleged conspiracy from anything to do with Retrophin, Inc.,

*Proceedings*                                                    *8769*

1   did not exist when the MSMB Capital backdating theory was

2   around.  Retrophin, Inc., comes into existence on or about

3   December 12, 2012, and it was uncertain whether that would

4   even happen at the time of this purported MSMB Capital

5   backdating theory.

6           And the Government's own superseding indictment is

7   based on this theory that Mr. Shkreli needed to cover up with

8   the SEC by getting assets in MSMB Capital.  And the people who

9   were allegedly involved in that, many of them are very clearly

10  adverse to -- at least a few of them -- are adverse when it

11  comes to 2013 post-Retrophin, Inc.

12          I think that there's no question in our mind that

13  the evidence, the Government has failed to satisfy that there

14  is one conspiracy.  They may have charged it that way, but

15  that's not how the evidence turned out.  And it unquestionably

16  MSMB Capital backdating even though you can try to speculate

17  about it, or you can speculate that Mr. Shkreli did it for a

18  host of other reasons.  There's just no evidence in the record

19  backing up any of those reasons that the Government speculates

20  about.  And their only reason in the record is what's charged

21  in the indictment about faced with an SEC inquiry.

22          So I just think they're totally different, the

23  backdating, from the settlements and the consulting

24  agreements.  And it is a separate alleged conspiracy charge.

25  It is a separate charge.

*Proceedings*                                                    *8770*

1        [!EZ SPEAKER 07]:  What's charged in the indictment

2   is a single conspiracy, it cannot be clearer.  And I think if

3   the Court wants to review the case law whatever Mr. Brodsky,

4   the defense, cites from their motion in limine briefing, we

5   cited in our ours, the result is not going to charge.

6        MR. BRODSKY:  In *United States v. Guybell*, 369 F.3d

7   362.  Second Circuit 2004.  The Second Circuit said that, "In

8   order to prove a single conspiracy, the Government must show

9   that each alleged member agreed to participate in what he knew

10  to be a collective venture directed toward a common goal."

11  That's the pinpoint cite 689.

12        The MSMB Capital backdating theory of Mr. Shkreli

13  getting shares through MSMB Capital to cover up his lies to

14  the SEC is, you know, one, only evidence of a limited number

15  of people.  There's only evidence that Mr. Shkreli only knew

16  about his lies to the SEC.  And, two, Retrophin, Inc., didn't

17  exist.  So if there is the purported collective venture

18  towards a common goal, and the Government has very clearly

19  laid out with respect to settlements and consulting

20  agreements, the common goal was to defraud Retrophin, Inc., of

21  its assets.  MSMB Capital backdating theory.  Retrophin, Inc.,

22  does not exist and at the time that this alleged theory

23  occurred, Martin Shkreli, undisputedly in the record, had

24  complete control over Retrophin, LLC and he could do almost

25  anything he wanted with where he wanted to put the assets.

*Proceedings*                                                    8771

1    And more than that, it's undisputed that he gifted these

2    shares.

3              And so, you know, he gifted 50,000 Common B Units to

4    Mr. Aselage.  Nobody's claiming that those units, which are

5    now worth $5 million today, are part of some defrauding of

6    Retrophin, Inc.  In fact, Mr. Aselage testified he would never

7    give those back, he would not give those back because there

8    wasn't a fraud.

9              So I just think that the Government's theory you

10   have to break it down between pre-Retrophin, Inc., because you

11   can't be defrauding Inc., when it doesn't exist.  And

12   post-Retrophin, Inc., which is the Government's theory in

13   Count Seven.

14             THE COURT:  My understanding of the evidence so far

15   in the trial, and I could be mistaken, so the Government and

16   the defense can correct me if I'm wrong.  My understanding

17   about the backdating scheme was that MSMB Capital had been

18   wiped out financially because of the OREX trade, it had no

19   money.  Yet, it continued to send the investors statements

20   that led them to believe that they had, you know, increased

21   the value of their investments.

22             So when Mr. Shkreli used Retrophin shares to gift to

23   MSMB Capital, a significant number of shares, it became a

24   vehicle through which the MSMB Capital investors could be paid

25   in part with Retrophin shares when they became upset and

*Proceedings*                                                  *8772*

1    demanded liquidation or shares in order to compensate them and

2    to make them whole for what think were told was the value of

3    their investment.

4           And so, the shares were part of, I don't know the

5    nomenclature, whether it's a scheme or a predicate act or

6    whatever that is, it is contained within Count One as part of

7    the Count One -- I'm saying "Count One" but I mean Count

8    Seven, Count Seven conspiracy.  Count Seven conspiracy to

9    continue to perpetuate the expectation of MSMB Capital

10   investors that they had, in fact, Retrophin and that they

11   would then be able to be paid with Retrophin shares.

12          Now, if I've misstated or misunderstood tell me I'm

13   wrong.  I think that's what I understand from the outset.

14          MR. BRODSKY:  I don't think that's -- your Honor,

15   respectfully, there's zero evidence.  This is a theory and

16   there are three fundamental problems with it.

17          The first fundamental problem is if the common

18   venture is to defraud Retrophin, Inc., the public company, it

19   comes into existence on December 12, 2012, Mr. Shkreli's

20   gifting of, or arrangement, or somehow transfer of his own

21   shares to MSMB Capital cannot be part of any conspiracy to

22   defraud Retrophin, Inc. Because by definition, Retrophin,

23   Inc., A, at that time doesn't exist.  And, B, it's his own

24   shares.

25          So when Retrophin becomes a public company, these

*Proceedings*                                                    8773

1    75,000 units become Retrophin, Inc. Shares, but it doesn't

2    change the fundamental form that if Mr. Shkreli had kept those

3    shares for himself, he would have owned the shares not

4    Retrophin, Inc.

5              And so, when those shares change on December 12th

6    from units to Retrophin, Inc., common shares -- oh, I'm sorry

7    they changed September 20th to LLC shares, and then when they

8    change in December '12 to become the shares a public company

9    and they had a five times value or seven times value depending

10   on the type of shares, they still remain in kind the same

11   source where they come from.

12             And so, it's an impossibility, your Honor, to have

13   defrauded Retrophin to have a common goal.  It can't be a goal

14   to defraud Retrophin with those shares.  It's just an

15   impossibility.  Because Retrophin, Inc., never owned those

16   shares.  And Retrophin, LLC never owned those shares.  And so,

17   that's the first fundamental problem.

18             The second fundamental problem with it is that

19   there's zero evidence in the record other than speculation by

20   the Government.  There is absolutely no evidence in the record

21   that as of the time that he made these transfers he was

22   somehow thinking that, oh, I'm going to have a public company,

23   and then one day somebody is going to come and seek assets

24   from me and I'm going to now use these gifted shares that are

25   eventually going to become Retrophin shares to pay back

*Proceedings*                                                    *8774*

1   settlements.  It's just, to doesn't exist, but the indictment

2   itself is all about faced with a public -- faced with an SEC

3   inquiry.  That's the purpose that he did it, and that's what

4   the evidence, actually, if you look at the evidence in the

5   light most favorable to the Government, the backdating theory

6   is supported only with respect to the following, which is on

7   November 29th and on December 3rd when he made those arranged

8   transfer shares.  In the light most favorable to the

9   Government, I've got to disagree with the inferences to be

10  drawn.

11          But the only theory that is plausible, if you view

12  every inference in favor of the Government and assume all the

13  facts are true, is that he was trying to cover up for a lie he

14  had told the SEC with respect to how many assets he had under

15  management in MSMB Capital.  And that is not event with the

16  same theory under the settlement agreements and the consulting

17  agreement.

18          Now, the Government can come back say, well, our

19  theory is he predicted this would happen.  There's no evidence

20  in the record for it, zero.  There there's no evidence in the

21  record that somebody at the time he made these transfers was

22  knocking on his door and saying, hey, when you go public, I

23  want to convert my shares and I want a piece of my money back.

24  It just doesn't exist in the record.

25          THE COURT:  Well, I think one of the issues before

*Proceedings*                                                    *8775*

1    the jury is whether these transfer occurred late in 2012 or in

2    the summer of 2012.

3            MR. BRODSKY:  I'm assuming all the facts as the

4    Government has alleged them to be true which is that the

5    transfer, assume they're current, November 29th and assume

6    they're current December 3rd.

7            THE COURT:  All right.  Why don't I do this, I'll

8    let the Government speak.  But since I've heard from

9    Mr. Brodsky at length.

10           MR. BRODSKY:  Sorry.

11           THE COURT:  It's all right.

12           And we've also had briefing.  Is the Government --

13   did you want to respond at all to Mr. Brodsky?

14           [!EZ SPEAKER 07]:  I'm going to say two quick things

15   and I'm happy to do it.

16           The first is read the indictment and it's who is

17   being defrauded from what time periods.  Second, there is

18   evidence of a conspiracy about the filing of the 13(d) which

19   occurs when the company goes public.  It's not an LLC in

20   December 2012, the company merges to backdating become a

21   public company.

22           We think we can argue about whether the, you know,

23   what the jury will ultimately conclude.  But the evidence is

24   clear for a single conspiracy shown in different ways as

25   outlined in the indictment.

*Proceedings*                                                    *8776*

1           MR. BRODSKY:  Your Honor --

2           [!EZ SPEAKER 07]:  That's what we're resting on it.

3           MR. BRODSKY:  It's always hard, your Honor, to argue

4    against an ipse dixit theory which is I say it's so, so it is

5    so.  It's clearly so, so it's there.  The allegations are

6    alleged clearly, so the allegations are clear.  And those kind

7    of tautologies, with all respect to the Government, it's

8    impossible for us to ever demonstrate to your Honor why their

9    theory is ever wrong if the response is always:  It's clear.

10   If the response is, the indictment is clear, we're not going

11   to identify the language we're relying on, we're not going to

12   identify any evidence in the record we're relying on.  It's

13   just clear because it's clear, we have no response to it.

14          THE COURT:  Well, I think the point about clarity is

15   that the indictment charges that the conspirators, utilizing

16   an artifice, fraud, conspired to obtain assets from Retrophin

17   through the use of wires, and that is what the indictment

18   clearly alleges.

19          But I think what, if I'm hearing you right,

20   Mr. Brodsky, you're not so much challenging the allegations in

21   the indictment or the way the indictment is framed, but rather

22   whether or not the backdating shares were a separate

23   conspiracy or one conspiracy.

24          MR. BRODSKY:  Yes, for this particular --

25          THE COURT:  And the Government's indictment sort of

*Proceedings*                                                    *8777*

1    states that the Count Seven conspiracy for wire fraud was

2    employed these three different schemes or means to achieve the

3    object of the conspiracy which was to defraud Retrophin.

4              MR. BRODSKY:  I understand, your Honor.  I don't

5    believe it satisfied *Guybell*.  I don't think they've

6    demonstrated a collective venture toward a common goal.  I

7    think their indictment says it's for one purpose and the

8    evidence is opposite of what their new theory is and I think

9    that --

10             THE COURT:  I would just like to quote, since you're

11   talking about *Guybell*, and the exact same page you just

12   quoted, 359 F.3d at 689 states, "A single conspiracy is not

13   transformed into multiple conspiracies merely by virtue of the

14   fact that it may involve two or more phases or spheres of

15   operation so long as there is sufficient proof of mutual

16   depends and assistance."

17             MR. BRODSKY:  I a hundred percent agree with that,

18   your Honor, embrace it, and say to your Honor that that is

19   further proof for us that there wasn't -- this MSMB backdating

20   theory could never plausibly by fact or by law ever be part of

21   a sphere of a collective venture to defraud Retrophin, Inc., a

22   public company that starts as a public company in December 12,

23   2012.  I think it's a factual and legal impossibility, I'm

24   sorry, your Honor, you have our argument on that.

25             THE COURT:  Was there anything else you wanted to

*Proceedings*                                          *8778*

1    argue about, Mr. Brodsky?

2         MR. BRODSKY:  On the multiple conspiracies, your

3    Honor, I think that you've been -- you've heard our main

4    arguments.

5         THE COURT:  All right.  Do you want to talk about

6    lock-ups or wash trades?

7         MR. BRODSKY:  Sure, your Honor, I'm happy to discuss

8    it.

9         I haven't read where, if you can direct me where in

10   your --

11        THE COURT:  We didn't put it in.

12        MR. BRODSKY:  Well, that makes it easier.

13        THE COURT:  So that's why I want to hear why you

14   think it should be in.

15        MR. BRODSKY:  Well, your Honor, I believe that the

16   record is, and I don't have a pinpoint cite for you from

17   Mr. Pierotti's testimony, but I believe the record, there is

18   evidence in the record that there is a theory that what the

19   individuals who were the -- in December 2012 in Mr. Shkreli's

20   office with Mr. Shkreli sitting in the chair and other people

21   sitting on the floor like Mr. Pierotti were discussing was

22   increasing the volume of Retrophin, Inc., securities.

23        We put into evidence through Professor Lewis that

24   there was zero evidence of a wash trade.  Professor Lewis did

25   define it, but it is a legal term.  It's a term that the

*Proceedings*                                              *8779*

1    instruction on it should come from your Honor.  And it

2    shouldn't replace, it should be the governing term for what

3    wash trade is.  And I think it's very helpful for the jury to

4    know what the wash trade is because I think your Honor puts

5    the term in there which is we put a Second Circuit definition

6    from *Reddy v. CFTC*, 191 F.3d 109-115.  Second Circuit 1999.

7    It will define what a wash trade is for purposes of the jury.

8            As your Honor knows Mr. Rosensaft testified a little

9    bit about some of the testimony relating to trading today.  We

10   put in evidence about why there is no wash trading, and we

11   think it would be helpful for the jury to the extent that the

12   jury is evaluating the evidence and Mr. Pierotti's testimony

13   and the documents and the trading.  We think it would be

14   helpful to the jury to know what a wash trade is from the

15   Second Circuit.

16           (Continued on the next page.)

17

18

19

20

21

22

23

24

25

```
                         Proceedings                    8780
```

 1            MR. KESSLER:  That's proof that it's not an

 2    appropriate jury instruction.  They called an expert to

 3    testify about wash trade.  They explained what they were it

 4    is in the record.  This is not a jury question.

 5            MR. BRODSKY:  Well --

 6            THE COURT:  The Government is not charging or

 7    alleging that wash trades happen; is that correct?

 8            MR. KESSLER:  No.

 9            THE COURT:  So that the parties conspire from wash

10    trade.

11            MR. PITLUCK:  There's only one place the wash

12    trade is in effect in this case and that's through Professor

13    Lewis who defined them, described what they were.  That's

14    what the jury should rely on, not an instruction from the

15    Court about wash trades.

16            THE COURT:  Yeah, it seems to me that the jury may

17    cure that and say why are we dealing with wash trades?  How

18    is that part of this case?  There were two witnesses offered

19    by the defense who testified about wash trades to the extent

20    Mr. Pierotti mentioned it happened in terms of the idea that

21    there's early December about wash trades, among other

22    things.  Really more about who is going to get the shares,

23    where are they going to get them, what they're going to pay

24    for them what -- how they are to deal with their shares?

25            MR. BRODSKY:  Your Honor, I think what we could do

```
                        Proceedings                    8781
```

1    is look at Mr. Pierotti's testimony.

2              THE COURT:  Okay.

3              MR. BRODSKY:  And identify for you what we believe

4    is the testimony in the record.

5              THE COURT:  But isn't it --

6              MR. BRODSKY:  But that he was suggesting that

7    there was an effort to trade among the people for purposes

8    of increasing volume.  I don't think the alleged conspiracy

9    in Count 8 is for people to get Fearnow shares.  I think

10   that the alleged conspiracy --

11             THE COURT:  Controlled --

12             MR. BRODSKY:  -- wants to receive it, it is what

13   are you doing with them?  And my understanding from

14   Mr. Pierotti's testimony and we'll go back again to the

15   record -- it is the record that controls is that he said "on

16   transcript Page 5944, Page 21 through 24 and this is, I

17   believe, the Government's direct examination, Question:  To

18   Mr. Pierotti by the Government, What were the things he

19   said, referring to Mr. Shkreli, that made you nervous.

20             Answer:  The two things he said that made me

21   nervous was that, you know, people who have experienced

22   trading could trade the shares back and create more volume.

23   And then he said Line 25 going over to 5945, then he said,

24   You know, at some point if we go tight, you know, you guys

25   could buy back in.  But it is your money, they are agreed

Proceedings                                      8782

1    shares, you do whatever you want with them.

2            So that line, Your Honor, is evidence in the

3    record Lines 22 to 24 transcript page 5944.  And when

4    Mr. Shkreli said that these people are experienced can trade

5    the shares back and create more volume, the most reasonable

6    inference, of course, from that is that you're talking about

7    wash trading.  And I believe his testimony during

8    Mr. Shkreli's trial was more particularized and if I had --

9    my recollection is correct, it is not always correct, is

10   that he was even more particularized about how people would

11   trade their shares back and forth with each other in the

12   same number to increase the volume that's classic wash

13   trading.

14           THE COURT:  Well, you put a label on it that was

15   not before the jury.  Isn't what Mr. Pierotti said, it is

16   not before the jury, you know, in terms of what Mr. Greebel

17   is charged with.

18           You introduced an expert who defined the term and

19   I think on direct you elicited from Mr. Rosensaft whether he

20   had been asked questions about wash trading.

21           But that testimony that you offered from

22   Mr. Pierotti, you know, you are -- I think what you are

23   saying is he never used the term to describe something that

24   your expert is defining wash trading, but he is not being

25   charged for that.  It is like -- I am trying to think of the

Proceedings                                    8783

1    analogy.

2            MR. BRODSKY:  Your Honor --

3            THE COURT:  If a witness testified about something

4    that was unlawful that is not being charged, so many times

5    in drug cases there may be other things like money

6    laundering going on, but if the charge is about money

7    laundering then the instructions are going to be on that

8    not -- I'm sorry, if the indictment charges drug trafficking

9    and there is evidence in the record about money laundering,

10   it does not necessarily warrant an instruction about -- that

11   requires the Court to define money laundering.

12           In fact, I think a better instruction may be that

13   Mr. Shkreli -- Mr. Greebel is not being charged with wash

14   trading.

15           MR. BRODSKY:  Your Honor.

16           THE COURT:  Unless you want to say that.

17           MR. BRODSKY:  Well, respectfully, within Count 8

18   it is a conspiracy to commit securities fraud Retrophin

19   unrestricted securities scheme.  Paragraph 58 specifically

20   alleges what the statutory elements of that scheme are which

21   is to employ manipulative and deceptive devices and

22   contrivances.  The Government has alleged that the purpose

23   was in part to create volume.  You create volume through

24   wash trading.  Their sole witness, their sole and singular

25   witness on Count 8 who testified about the alleged plan

Proceedings                                    8784

1    hatched in the room that he does enjoin is the who one

2    testifies about what the plan was, which is to trade shares

3    with each other.

4         For the Government to suggest that that is not the

5    theory is, I think, Your Honor, a concession that should be

6    dismissed.  But if they're not -- I don't understand why the

7    Government is refusing to allow Your Honor or objecting to

8    Your Honor instructing the jury when their own witness said

9    what the type of trading was supposed to be done, we put on

10   an expert who defined what we believe to be wash trading but

11   as Your Honor knows your instructions govern the law, not

12   any expert's opinion.

13        And you will instruct the jury about experts and

14   what their opinions and the weight that can be held upon

15   them.  But your instruction on the law about the wash

16   trading is what controls and that is not some instruction

17   that the Government disputes.  It is undisputable what the

18   definition of what a wash trade is.  And if the Government

19   wanted to stand up and concede that there is no evidence of

20   wash trading, then of course Mr. Pierotti's testimony about

21   what the plan was, that should be evident to the jury.  In

22   other words, Your Honor, what I'm trying to say is if we do

23   not get an instruction on wash trades, which is the evidence

24   elicited by their sole witness about what the plan was, we

25   will be severely prejudiced from arguing to the jury that

Proceedings                                  8785

1    this is the alleged plan that they hatched and this is how

2    you define how wash trading occurs.

3            And here's the evidence in the record that wash

4    trading did not place, place at all, not a singular one.

5            THE COURT:  It is a conspiracy.

6            MR. BRODSKY:  But, Your Honor, undoubtedly.

7            THE COURT:  It is not going to stay.

8            MR. BRODSKY:  It does not have to be place.

9            THE COURT:  Security fraud is washed trades.

10           MR. BRODSKY:  Your Honor, it does not have to be

11   that way, but from Mr. Pierotti's testimony that is what he

12   said the plan was.

13           MR. KESSLER:  Your Honor, a charge conference --

14   Mr. Brodsky is characterizing a single piece of evidence in

15   the entire record saying that the only evidence is what

16   happened.  Then he is saying his jury instruction on it

17   because it is our only theory in the case.  There is no

18   basis for the jury instruction.  The only question to that

19   is should there be a jury instruction on the definition of

20   wash trade?  There should not.  There is no case law that

21   says there should be a definition of wash trading.  There is

22   an expert who defined it, it is in the record.  Whether or

23   not wash trading occurred is in the record.  Whatever all

24   the witnesses said is in the record.  All the other evidence

25   is in the record.  We are all going to argue it.

Proceedings                          8786

1        MR. BRODSKY:  Your Honor, they asked for a

2   definition of affiliate and you gave it to them and we

3   respectfully disagree with the definition and we'll talk

4   about that.

5        THE COURT:  All right.  Let's talk about that.

6        MR. BRODSKY:  But I want to talk about first the

7   wash trades one.  Because the denial of wash trading

8   definition, which the Government does not dispute the actual

9   definition and they could have objected when we put in the

10  evidence of wash trading.  They did not stand up and object,

11  they did not move to preclude the wash trading evidence.  If

12  Your Honor -- and respectfully, Your Honor, if you do not

13  give a jury instruction of what the definition of what is of

14  wash trading, we are prejudiced.  Your Honor can deny it and

15  that is fine.  But the Government does not dispute our

16  definition.  It is an indisputable definition from the

17  Second Circuit case law.  We believe it directly comes from

18  if sole singular witness of the Government who is at this

19  meeting about when the conspiracy is hatched and that is

20  Page 5944, Lines 22 and 24.  And Your Honor can -- I

21  understand, Your Honor, you haven't put it in your written

22  instructions.  It is incredibly prejudicial for us not to

23  have a court defined definition because the definition is

24  something that should come from the Judge as an instruction.

25  And the fact that the Government does not include it means

Proceedings                    8787

1    that we are prejudiced.

2         They will include the definitions that they think

3    they can support.

4         THE COURT:  You asked for a definition, so please

5    do not mistake a representation --

6         MR. BRODSKY:  As they did, Your Honor.

7         THE COURT:  Yes, both sides did it and I get it.

8    Do not tell me what I did because the Government asked me

9    and you did not.  I'm tired of the mischaracterization,

10   Mr. Brodsky.

11        MR. BRODSKY:  What I mean, Your Honor --

12        THE COURT:  You asked for a definition and so did

13   the Government.

14        MR. BRODSKY:  Your Honor, what I mean by when I

15   said the Government --

16        THE COURT:  An affiliate information is all over

17   the record.  There are SEC filings and there is testimony

18   about statements being signed about affiliates and so, you

19   know, I just -- I am just concerned.  You continue to --

20        MR. BRODSKY:  I'm sorry, Your Honor.

21        THE COURT:  -- say that.

22        MR. BRODSKY:  What I meant by --

23        THE COURT:  It is not the first time.

24        MR. BRODSKY:  What I meant by it, Your Honor, was

25   that I believe you adopted the terminology of the Government

Proceedings                                    8788

1    and not our terminology and I think our terminology is

2    correct on the law and the Government's terminology is wrong

3    on the law and that is what I meant by the affiliates.

4    The Government introduced this evidence in their direct case

5    about the purpose of what the conspiracy was.  And my view

6    is that by denying us and I will stop, Your Honor, but by

7    denying us a court defined definition of a wash trade we are

8    prejudiced from proving to the jury that what Mr. Pierotti

9    said occurred actually did not occur.

10           And I know it is a conspiracy but when there is

11   actual evidence that what the co-conspirators allegedly said

12   they were going to do, does not happen, it is significant

13   compelling evidence that the conspiracy was never hatched.

14   I am not saying it is required but it is certainly

15   compelling evidence that such a conspiracy never existed.

16           I said my peace, Your Honor.

17           THE COURT:  I am sorry you disagree with the

18   definition that was used for affiliate.  It was taken from

19   the SEC CFR 17, Section 230.124.

20           MR. BRODSKY:  We believe it is incomplete,

21   Your Honor.  We believe that if you go to the SEC website

22   and if you go to actually what the SEC has fully and

23   completely said, they include director, officer and

24   10 percent shareholder.  And the reason why that is so

25   important, Your Honor, is because those are the very words

Proceedings                                    8789

1    that are used in the legal opinion letter of Jaclin --

2    Anslow & Jaclin.  Those are the very words that are used in

3    the certifications that Mr. Greebel sought and the

4    affirmative statements that Mr. Greebel sought from the

5    Fearnow recipients pursuant to that legal opinion.

6              The fact that the Government has excluded them is

7    troubling to us and that is actually how practitioners look

8    at it.

9              So we've given a definition of affiliate since

10   we're on that, Your Honor.  We are providing a definition of

11   affiliate to the jury, which I believe is chronological in

12   its terminology.  I believe it creates confusion.  I read it

13   over multiple times this afternoon as we got these requested

14   charge and I still do not understand what it means and it is

15   talking about -- it is control and it is controlling.  And I

16   think that it is defined in practice and on the SEC website

17   and through the case law we cite as an officer, a director

18   or a 10 percent shareholder.  Large shareholder.

19             THE COURT:  Well, the publication, not the

20   regulation, the publication gives as examples for an

21   affiliate, the executive officer, director or large

22   shareholder in relation of control to the issuer and then it

23   defines control.  You are citing from a publication, not the

24   regulation.  I do not think publications have, you know, the

25   rule -- I wouldn't cite that as a legal instruction.  It is

Proceedings                          8790

1  an -- it is given as an example.  It is not what the

2  regulation itself provides.

3           You cite it in your footnote but it is really

4  not -- it is really not in the Code of Federal Regulations,

5  unless you can show me where it is.  If I have missed it,

6  correct me but...

7           MR. BRODSKY:  We cited in substantial part from

8  the American standard no action letter, Your Honor, issued

9  by the SEC.  It is the key definition that is used by every

10 securities practitioner in the country.

11          THE COURT:  Well, I do not know that.

12          MR. BRODSKY:  Well, Your Honor, we're happy to

13 provide an expert opinion on it.

14          THE COURT:  I am looking at the regulation.

15          MR. BRODSKY:  Your Honor, the regulation, and

16 people look to the regulation and then look to the SEC

17 American standard no action letter.  And the practitioners

18 use it.  And so the reason why it is important is -- and it

19 is what is actually used in this case.  And the definition

20 that is provided, which is on Your Honor's jury instruction

21 Draft 1 December 8, 2017, talks about control affiliate is

22 someone directly or indirectly through one or more

23 intermediaries controls or is controlled by or under common

24 control with the issuer.  And control is defined by the

25 power and direct management policies of the company if

Proceedings                                8791

1    question.

2          This definition, Your Honor, respectfully as

3    defined I believe is -- is un -- nobody could understand

4    that.  I am -- with all respect, Your Honor, I do not think

5    a jury of laymen -- because I can't understand it.  And I do

6    not believe it will be understandable to anybody.  And I

7    think what the American standard no action letter did was

8    say this is what we mean when we say affiliate.  It is a

9    director, it is an officer or it s a 10 percent shareholder.

10   The Government's omission of it is severely prejudicial to

11   us.  We ask Your Honor to include it in the definition.

12         I know it was not included in Mr. Shkreli's trial

13   but Mr. Shkreli's counsel did not object to it.

14         THE COURT:  17CFR Section 230.405 defines terms

15   including, but not limited to, affiliates and control.

16         (Interruption in proceedings.)

17         THE COURT:  What I tried to do is quote from the

18   regulation, the Code of Federal Regulations.  The

19   regulations promulgated by the agency in determining the

20   terms at issue in this case.  You want me to go to some

21   other source that is not a regulation and I am not going to

22   represent to the jury that this is a statement of the law,

23   regardless of whether or not you think most practitioners in

24   the United States rely upon it.

25         The Code of Federal Regulations sets forth the

Proceedings                                    8792

1   definition for affiliate and control and that is what I have

2   used.

3          MR. BRODSKY:  Your Honor.

4          THE COURT:  You cannot say to me that that is

5   inappropriate.

6          MR. BRODSKY:  Your Honor.

7          THE COURT:  Or you believe it, that is fine.

8          MR. BRODSKY:  Your Honor, I am going to your

9   citation from the SEC website.  I am going directly to it.

10  And I am doing it right now, nand it says Rule 144 seller

11  restricted and controlled securities dated January 16th,

12  2013.  It is defined as exactly as we say on Paragraph 2,

13  the control securities are those held by an affiliate of the

14  issuing company.  And then it says, as we request, an

15  affiliate is a person, such as an executive officer, a

16  director or large shareholder in a relationship of control

17  with issuer.

18          That language, Your Honor, directly from the SEC

19  which comes from the American standard no action letter is

20  the critical language that fact issuers go to the SEC

21  website and if an executive officer, director or large

22  shareholder.  That is how it is defined and it is from the

23  SEC.  And I -- you know, all I can do, Your Honor, is

24  Your Honor to put that language in.  We are not saying it

25  comes from some other language.

Proceedings                          8793

1            MR. KESSLER:  Your Honor, we are trying to look at

2    that but it sounded to me like what the court read, was a

3    person such as an officer, a director, a large shareholder.

4            THE COURT:  Yes.  It as an example from a

5    publication by the SEC.  It is not quoted what the defense

6    is proffering is from the SEC publication but it is not

7    quoting the regulation, which is what the law -- the law is

8    the regulation, not --

9            MR. BRODSKY:  The law -- the law is what the

10   SEC --

11           THE COURT:  Not necessarily the SEC publication.

12           MR. BRODSKY:  But that is not true, Your Honor.

13   The SEC is the one that has the authority given to it under

14   Section 1933 and 1934 Acts that allows the SEC with the

15   authority to promulgate the regulations and explain what the

16   terms are.  And this is the leading authority that every

17   securities corporate lawyer looks to.  And I am sorry,

18   Your Honor --

19           THE COURT:  You asked for an definition --

20           MR. BRODSKY:  Yes, Your Honor.

21           THE COURT:  -- not an example.  What you want is

22   an example, not a definition.  The definitions are as set

23   forth.

24           MR. BRODSKY:  Your Honor --

25           THE COURT:  I put the definition that you

Proceedings                                          8794

1   requested, the definition of an affiliate as set forth in

2   this CFR.  The examples that are given in the publication

3   are examples.  They are not definitions.  You wanted a

4   definition as did the Government.  I gave the definition.

5           MR. BRODSKY:  Your Honor, we are asking for the

6   language coming from the SEC website, which is the language

7   that the SEC regulators tell the practitioners.  Our client

8   is a corporate lawyer.  He looks to, as did Anslow & Jaclin,

9   what the SEC has defined.  Those examples are the examples

10  that are given by the SEC to everybody; an executive

11  officer, a director or a 10 percent shareholder, large

12  shareholder.  That is the keystone.  That is what people

13  use.  And so without that, the definition is misleading and

14  the problem is, Your Honor, a what the jury will draw the

15  adverse inference from Mr. Greebel that what he did was he

16  defined it himself.  He came up with a definition that it

17  had to be a director, an officer or a 10 percent shareholder

18  and he came up with that out of thin air.  But if you look

19  through the SEC regulations that is what they define it as.

20          And so why is it important to us?  Because in

21  defending a corporate lawyer from charges, we have to be

22  able to instruct the jury as to what the law is as corporate

23  lawyers receive it, study it and use it.  And if the

24  Government cherry picks the definition, which they have and

25  advocates against putting this in, which they are, they are

Proceedings                              8795

1    misleading the jury and we ask Your Honor not to adopt their

2    approach.   It is misleading the jury because this case is

3    about the state of mind of our client and if we do not have

4    a jury instruction fleshing out that the affiliate

5    definition -- you can put in the entire definition, Your

6    Honor, from the SEC website, but it is important to us --

7    the Government can argue that it is just an example, but to

8    us those examples are reflected exactly as to what the

9    evidence is.

10          THE COURT:   The Government has not made that

11   argument.   The SEC said these are examples.   Okay?

12          MR. BRODSKY:   But it is important that it comes

13   from the SEC.

14          THE COURT:   And -- could I finish.

15          MR. BRODSKY:   Yes, Your Honor.   I am sorry.

16          THE COURT:   And your footnote at 83 of your

17   proposed instructions cite as a first authority for your

18   definition of affiliate the very regulation that I quote in

19   the instructions 17CFR 230.144.

20          MR. BRODSKY:   And, Your Honor, we also cite

21   American standard and we cite the same -- I believe we would

22   probably cite the same website that we cite.   In

23   Your Honor's citation we have no objection to it.   We have

24   no objection to the citation 17CFR 230.405.   We have no

25   objection to a second cite, which is to the SEC rule.

Proceedings                                8796

1          And where you go to the SEC rule under 70 and you

2     just said that you include the full scope of the definition.

3     Because a partial definition is incredibly prejudicial to us

4     and it omits a significant portion and the one that we

5     believe is the most important part.

6               THE COURT:  All right.  Well, why don't we just

7     move on.

8               MR. BRODSKY:  Yes, ma'am.

9               THE COURT:  Okay.  I will consider what you said.

10              MR. BRODSKY:  Thank you, Your Honor.

11              THE COURT:  I think what I instruct on the law I

12    want to give them the statute or the regulation or a

13    definition as prescribed by, you know, a Court that has --

14    to which I, you know, must give deference in terms of legal

15    definitions.

16         So I am -- what I am doing is giving the

17    regulatory definition.  You are asking for examples in a

18    letter or a bulletin by the SEC.  I am tired of defense

19    argument about suggesting that when I give a definition that

20    is within the Code of Federal Regulations and, in fact,

21    quoting verbatim, that that somehow is unfair to the

22    defense.  I appreciate your argument.  You've made it.  I

23    have heard you.

24              MR. BRODSKY:  Your Honor, in one last hope and I

25    just ask you do this:  I withdraw the analogy to the

Proceedings                                    8797

1   following:  You could give the statutory definition of wire

2   fraud and you could just give it without defining knowingly,

3   wilfully, without defining device, scheme, without defining

4   materiality, without defining any of those definitions, and

5   it would be incomplete and the jury would be confused and no

6   jury would know what to do.  And what do Courts do, as

7   Your Honor has done in your jury instructions, you look to

8   case law, you look to the other -- to the development of

9   *Sand* and the instructions that define and give life to the

10  statutory terms.  Without giving the SEC, which is the

11  authority on regulations, how they view it, we have -- we

12  will give the statutory terms from the regulation of CFR

13  which are not -- they do not give it light, that do not give

14  it any kind of sense for the jury with what do with it.  And

15  therefore that is why I say it is prejudicial, Your Honor.

16  I believe you have the complete authority to add to it based

17  on SEC -- I am not asking you to look to some, you know,

18  obtuse site, I am asking you to look to the very citation

19  Your Honor has offered in the -- in your citations, which I

20  think is the right place to go, and flesh it out.  That is

21  our last approach on this issue.  Thank you for hearing us

22  out.

23          THE COURT:  All right.  I will say again for the

24  record that I think that an example that is given by a

25  regulatory agency like the SEC, where they use the terms

1   such as, those are examples, are not necessarily the

2   definition that one would look to in a regulation.  And, you

3   know, look, maybe the Government does not oppose this and

4   maybe we have just been arguing for a long time wasting a

5   lot of time about nothing.

6              MR. PITLUCK:  Judge, at the risk of reopening

7   this, we think the definition we proposed, the Court has

8   valiantly decided it was appropriate, it was given at the

9   Shkreli trial.  I think it is accurate, it is in the

10  regulation.  I do not want to -- we do not want to -- we

11  think it is appropriate and we would ask the Court to keep

12  it.

13             THE COURT:  Well, what's next?  Do you want to

14  talk about lockup?

15             MR. BRODSKY:  Sure, Your Honor.  Is that -- again,

16  prior to coming here I did not have time to read your

17  proposed instructions, Your Honor.  Is that in your --

18             THE COURT:  No.

19             MR. BRODSKY:  -- proposed instructions?

20             THE COURT:  No.

21             MR. BRODSKY:  Let me find our proposal.

22             THE COURT:  I think there were some came in today

23  where the word "lockup" was used, if I am not mistaken.  At

24  the time when we initially went through the instructions we

25  thought there really was not any basis and I did exclude

Proceedings                                        8799

1    Mr. Ferruolo from testifying about it because to me it was

2    not relevant at all to anything here.  I am just trying to

3    remember what I heard or saw.

4           MS. SMITH:  Well, Your Honor, the Defense Exhibit

5    that was entered today where Mr. Shkreli was signing his SEC

6    questionnaire for the uplifting from NASDAQ in January of

7    2014.  That, one of the attachments mention a lockup

8    agreement.  I do believe there was a lockup period at some

9    point in 2014 which Mr. Shkreli violated.  But it is

10   completely unrelated to the conduct charged in Count 8 which

11   has to do with the control of the Fearnow shares at the time

12   of the reverse merger in December of 2012.  So that is the

13   context in which the word came up today.

14          If you remember at the last trial there was

15   testimony about how Mr. Shkreli had violated the lockup

16   provision.  I -- and I can't remember if it was in

17   connection with Manchester and there was some testimony

18   about who knew about it when and when the Board found out,

19   that was part of the reason why Mr. Shkreli was removed as

20   CEO or one of the things in the mix.  I am not sure that

21   that specific testimony came out at this trial because we

22   kind of limited some of Mr. Shkreli's bad conduct testimony

23   in the trial, but it is completely unrelated to the conduct

24   that is actually charged in Count 8.

25          (Continued on next page.)

*PROCEEDINGS - CHARGE CONFERENCE*                    8800

04:25   1            (Open court; no jury present.)

04:26   2            MS. SMITH:  I'm not sure that that specific

04:26   3    testimony came out at this trial because we kind of limited

04:26   4    some of Mr. Shkreli's bad conduct testimony in this trial,

04:27   5    but, again, it is completely unrelated to the conduct that's

04:27   6    actually charged in Count 8.

04:27   7            MR. BRODSKY:  Your Honor, at the risk of being

04:27   8    locked up myself with the court marshals, may I just return to

04:27   9    the definition of affiliate and ask Your Honor to add the

04:27   10   following request.  In pretrial motions, the government

04:27   11   conceded and agreed that the mere fact that an individual was

04:27   12   an employee of Retrophin, Inc., did not make that person an

04:27   13   affiliate.  So we would ask, Your Honor, in addition to our

04:27   14   request that you consider adding in the example from the SEC

04:27   15   regulatory authority that we discussed, that you add language

04:27   16   to the effect that the mere fact that an individual is an

04:27   17   employee of a public company does not make them an affiliate

04:27   18   of that public company.

04:27   19           THE COURT:  Any objection?

04:27   20           MS. SMITH:  Your Honor, can we just think about it,

04:27   21   since this is a brand new suggestion?  I'm not saying we

04:28   22   necessarily oppose, but we will think about it and be ready to

04:28   23   let you know by the next time we do the charge conference.

04:28   24   And if we consent, we will let you know before the charge

04:28   25   conference.

*PROCEEDINGS - CHARGE CONFERENCE*                    8801

04:28  1          THE COURT:  All right.  So what you should do is
04:28  2    agree on exactly what language, if there's -- hopefully
04:28  3    there's going to be an agreement.
04:28  4          MR. KESSLER:  We will try to work that out.
04:28  5          MR. BRODSKY:  And just the cite -- is this the
04:28  6    transcript page from the pretrial hearing?  We cite the
04:28  7    pretrial hearing where the government recognized it and agreed
04:28  8    with it, which is at page 191 of the transcript, lines 11 to
04:28  9    20.  I am memorializing the government's agreement, the
04:28  10   government did not disagree that they have agreed.
04:28  11         So back to lock-ups, Your Honor, before I get locked
04:28  12   up.
04:28  13         THE COURT:  Don't say that.
04:28  14         MR. BRODSKY:  I'm sorry, Your Honor.
04:28  15         THE COURT:  I haven't threatened you with anything
04:28  16   like that.
04:28  17         MR. BRODSKY:  No, no, no.  I'm joking, Your Honor.
04:28  18         THE COURT:  No.  We are not joking.  I am not in the
04:28  19   mood to joke.
04:28  20         MR. BRODSKY:  Sorry.  Sorry.  I know that,
04:29  21   Your Honor, you're the last person who would do that.  So I
04:29  22   withdraw that.
04:29  23         THE COURT:  Let's just get this done, please.
04:29  24         MR. BRODSKY:  What's important to us on lock-ups,
04:29  25   Your Honor, is the following.  There is the perception here,

*PROCEEDINGS - CHARGE CONFERENCE*                                    8802

04:29   1   the allegation here, that there is something wrong, that it is

04:29   2   unlawful for a CEO of a public company to try to restrict

04:29   3   trading at all in the securities of a new public company.  And

04:29   4   what the case law and what the SEC bulletins and the SEC

04:29   5   regulation show is that when -- at a time that some company

04:29   6   becomes a new public company, it is the most vulnerable time

04:29   7   for that public company, and there are lots of permissible

04:29   8   things that companies can do in order to restrict trading, in

04:29   9   order to protect the company, in the best interests of the

04:29  10   company and the shareholders.  One of those things is

04:29  11   lock-ups.  It doesn't have to be necessarily these words,

04:30  12   Your Honor, that we propose in proposed instruction 44 of

04:30  13   Docket No. 461-2.

04:30  14        THE COURT:  Were there lock-up agreements actually

04:30  15   in the record?

04:30  16        MR. BRODSKY:  There are no lock-up agreements as --

04:30  17   written lock-up agreements.  And there are no lock-up

04:30  18   agreements, as I understand the term, which is, okay, you --

04:30  19   an underwriter enters in a lock-up agreement where the shares

04:30  20   cannot enter the public market too soon after some offering,

04:30  21   whether it is a reverse merger or an IPO.

04:30  22        THE COURT:  But weren't the Fearnow shares given as

04:30  23   incentives?

04:30  24        MR. BRODSKY:  Yes.

04:30  25        THE COURT:  And with the idea that those shares had

*PROCEEDINGS - CHARGE CONFERENCE*                    8803

04:30  1   vesting provisions?

04:30  2           MR. BRODSKY:  There was no vesting because they

04:30  3   were --

04:30  4           THE COURT:  No?

04:30  5           MR. BRODSKY:  They were the result of a convertible

04:30  6   note that at the time that the company, you know, DGTE

04:30  7   became -- merged into -- the shell company merged in

04:31  8   Retrophin, they became freely trading.  And there was no

04:31  9   vesting at that time, as I understand it.  The government can

04:31  10  correct me if there -- if I am wrong on their theory.

04:31  11          MR. PITLUCK:  Judge, can we just --

04:31  12          THE COURT:  So why would we give -- I just want to

04:31  13  know why we would give an instruction on lock-ups if there's

04:31  14  no evidence in the record about --

04:31  15          MR. BRODSKY:  That's why I'm saying, you don't have

04:31  16  to use the word "lock-ups," Your Honor.  What's important to

04:31  17  us is the concept and our view that it is important for the

04:31  18  Court to express that there's nothing -- there is -- there are

04:31  19  practices that are perfectly permissible that allow companies

04:31  20  to attempt to restrict trading in their shares following a new

04:31  21  issuance, following the birth of a public company.  And

04:31  22  Your Honor can put the language that says, you know, however,

04:31  23  you know, if parties -- if two or more people agree to

04:31  24  illegally control the shares, you know, in violation of the

04:32  25  law, if you want to put countervailing language.  What's

*PROCEEDINGS - CHARGE CONFERENCE*                    8804

04:32  1   important to us is that the record reflect what the law is,

04:32  2   which is the concept that, blessed by the Securities and

04:32  3   Exchange Commission, companies have various methods in which

04:32  4   they can restrict trading in the securities to protect the

04:32  5   interests of the company and the shareholders.

04:32  6            THE COURT:  Okay.  Your proposed instruction on

04:32  7   lock-ups, I ask the government to look at it and see if there

04:32  8   are issues that they would agree to, including the proposed

04:32  9   language that Mr. Brodsky has just stated.  There's also

04:32  10  brackets saying "to be supplemented at the end of any defense

04:32  11  case."  What is that?  What should we be expecting on that?

04:32  12           MR. BRODSKY:  Well, we weren't sure we were putting

04:32  13  on a defense case when we wrote this, Your Honor.

04:32  14           THE COURT:  Right, I know, but you had a defense

04:32  15  case in your mind that you would maybe supplement something

04:32  16  about lock-ups.  What would you say?

04:33  17           MR. BRODSKY:  Well, what we would say is that in --

04:33  18  following "the government alleges that Mr. Greebel and others

04:33  19  conspired to enable Shkreli to control the price and trading

04:33  20  of the Fearnow shares of stock," Mr. Greebel argues that there

04:33  21  was no such conspiracy to control the price and trading and --

04:33  22  and any limitations.

04:33  23           THE COURT:  So if there was no agreement, why would

04:33  24  I tell the jury that it didn't happen, but there's nothing

04:33  25  wrong with it?  Is that what you want me to do?

*PROCEEDINGS - CHARGE CONFERENCE*                8805

04:33  1          MR. BRODSKY:  Your Honor, why don't we provide you

04:33  2   with the language rather than do it now, sitting here.

04:33  3          THE COURT:  I am going to either deal with this

04:33  4   lock-up language as proposed, which, again, was received by

04:33  5   the Court after many, many, many extensions and opportunities.

04:33  6   I am just trying to get this finished, and I don't really have

04:34  7   the ability to keep rehashing what could have and should have

04:34  8   been provided.

04:34  9          What I want to know from the government is whether

04:34  10  they have an issue with proposed lock-up language, whether

04:34  11  they believe that it shouldn't come in at all, whether there's

04:34  12  some compromise, you know.

04:34  13         MR. PITLUCK:  Your Honor, can we be heard very

04:34  14  briefly?

04:34  15         THE COURT:  Yes.

04:34  16         MR. PITLUCK:  Your Honor, this is utterly irrelevant

04:34  17  language that serves no purpose other than to confuse the

04:34  18  jury.  There are no -- there have been no agreement -- no

04:34  19  evidence related to lock-up agreements whatsoever.  It is an

04:34  20  attempt to insert in the jury's mind that in totally unrelated

04:34  21  situations, in totally unrelated factual predicates, in

04:34  22  instances where a company may go through an SEC process to

04:34  23  lock up shares, that because in certain instances it is

04:34  24  permitted, it should be considered here.

04:34  25         It is confusing and it is prejudicial to the

*PROCEEDINGS - CHARGE CONFERENCE*                    8806

04:34  1   government, and to the law, because it is like saying,

04:34  2   somebody's on trial for murder, but in certain circumstance

04:35  3   and situations it is legal to kill somebody for self-defense,

04:35  4   when self-defense is not a defense in the case.

04:35  5          Now, I don't want to create another 15-minute

04:35  6   monologue, but there are no issues related to lock-ups.

04:35  7   There's no evidence that they were discussed, there's no

04:35  8   evidence that they were disclosed, there's no evidence that

04:35  9   they were proposed.  The term literally hasn't come up.  And

04:35  10  to inject into the jury's mind that in totally unrelated

04:35  11  situations of unrelated cases in IPOs, which weren't even

04:35  12  discussed here, a lock-up agreement may be permitted, confuses

04:35  13  the jury as to what the relevant factual legal issues are

04:35  14  here.

04:35  15         And we would note, whether these were granted as

04:35  16  incentive compensation as -- we strenuously oppose.  We think

04:35  17  that these were given to Mr. Shkreli's friends for control,

04:35  18  and the evidence has shown that.  But that's a matter for the

04:35  19  jury to decide.  And injecting them with an unrelated

04:35  20  situation of when a lock-up agreement is appropriate serves no

04:35  21  purpose here.  This instruction is confusing and misleading

04:36  22  and is not relevant to the issues.

04:36  23         THE COURT:  Okay.  I understand the government's

04:36  24  position.

04:36  25         MR. PITLUCK:  Sorry, Judge.

*PROCEEDINGS - CHARGE CONFERENCE*                              8807

04:36  1          THE COURT:  It's all right.

04:36  2          MR. PITLUCK:  I apologize.  I don't get to talk

04:36  3    much.

04:36  4          MR. BRODSKY:  It was passionately given, Your Honor.

04:36  5          THE COURT:  Let's talk about GAAP.  Did you want --

04:36  6    you stated something on GAAP, and I know that the term has

04:36  7    been used.  They defined it, the witnesses did define the GAAP

04:36  8    term as generally acceptable accounting principles or

04:36  9    something like that.  But do we -- I don't know if we need an

04:36  10   instruction on GAAP.

04:36  11         MR. PITLUCK:  Judge, can we just table it?  We want

04:36  12   to review the GAAP instruction.  We haven't -- there is no

04:36  13   GAAP instruction, as I understand, now, right?

04:36  14         THE COURT:  No.

04:36  15         MR. PITLUCK:  Okay.  And as the Court has requested,

04:36  16   we'll look at it and see, because we haven't considered it,

04:36  17   Judge, so I don't want to -- the one that they submitted.

04:37  18   Sorry, Judge, if I am not clear.  We will look at the one they

04:37  19   submitted and come back to it because I am sure the Court will

04:37  20   want our position before hearing debate on it.

04:37  21         THE COURT:  Yes.

04:37  22         MR. BRODSKY:  I am confident, Your Honor, that they

04:37  23   will be persuaded by our definition.

04:37  24         THE COURT:  Okay.

04:37  25         MR. PITLUCK:  I'm less confident, but we will

*PROCEEDINGS - CHARGE CONFERENCE*                              8808

04:37    1    certainly look at it.

04:37    2            THE COURT:  Okay.  Then we have alter ego.  I

04:37    3    think -- I was getting a little wind of this, I guess, in

04:37    4    Ms. Klein's proposed disclosures where she talked about

04:37    5    piercing the corporate veil, which has absolutely no

04:37    6    relationship or relevance or application in this case.

04:37    7            I think the government now is -- well, not the

04:37    8    government.  Sorry.  The defense is proposing alter ego.  I am

04:37    9    not going to give a veil piercing.  How is veil piercing even

04:37   10    relevant?

04:37   11            MR. BRODSKY:  Well, it is actually, Your Honor, not

04:37   12    only quite relevant, but a central issue in the settlements

04:38   13    theory.  So one of the reasons why Retrophin, Inc., in 2013

04:38   14    was vulnerable to a lawsuit and was sued from time to time

04:38   15    because of MSMB actions is because of the alter ego theory.

04:38   16            THE COURT:  No, they actually, respectfully, the

04:38   17    veil piercing says whether a corporate officer or principal or

04:38   18    founder can be found liable.  Usually in the corporate form,

04:38   19    the idea is to shield the corporate officer from liability.

04:38   20    And let's not forget that here, you want to apply this theory

04:38   21    to protecting the corporation from the acts of the officer.  I

04:38   22    think it works -- you know, the veil piercing usually is

04:38   23    applied to reach an individual who's generally not liable if

04:39   24    they are a corporate officer.  It is rather the depiction of

04:39   25    the corporation that would be liable.  I mean, unless I am

04:39    1    just missing --

04:39    2         MR. BRODSKY:  Your Honor, you may be right in some

04:39    3    of the cases that it is to reach individuals, which is a well

04:39    4    established -- we ask Your Honor to look at it, we cited cases

04:39    5    for it.  There is a well-established concept of piercing the

04:39    6    corporate veil when that's common control between entities,

04:39    7    and under various factors, and it happens, you know, to

04:39    8    corporate America's chagrin, it happens a lot.  And there are

04:39    9    well-established factors under Delaware law and lots of cases

04:39   10    on this.

04:39   11         So I won't, you know, I won't belabor the point, but

04:39   12    we're very confident if Your Honor looked at it, what a lawyer

04:39   13    would do looking at Retrophin, Inc., is I'll sue Retrophin,

04:39   14    Inc., and the way to do it, what MSMB did, is through this

04:39   15    alter ego theory, which would be actually quite effective in

04:40   16    the circumstances of MSMB and Retrophin.  One of the factors,

04:40   17    for example, is whether or not you have a common shareholder

04:40   18    or owner that's in control.  And Mr. Shkreli owned, you know,

04:40   19    such a substantial portion of Retrophin during the relevant

04:40   20    period, and he owned such a substantial proportion of MSMB

04:40   21    during the relevant period.  Another factor is commingling.

04:40   22    And there's undisputed evidence in the record about

04:40   23    commingling between Retrophin's offices and MSMB's offices,

04:40   24    and they're using the same e-mails, and all that stuff.

04:40   25         THE COURT:  Which are --

*PROCEEDINGS - CHARGE CONFERENCE*                          8810

04:40   1          MR. BRODSKY:  I would cite to Your Honor *United*
04:40   2   *States v. Evseroff.*  We put this in our papers.  It is 2012 WL
04:40   3   1514860, pinpoint cite 13 to 14, an Eastern District of New
04:41   4   York case, April 30, 2012.  It says, quote:  The alter ego
04:41   5   doctrine allows a creditor to disregard the corporate form.
04:41   6   We cite a number of other cases, Your Honor, for the
04:41   7   proposition, including a Supreme Court case, and we cite the
04:41   8   Second Circuit case.  So we do believe that these are
04:41   9   well-established concepts for piercing corporate veils between
04:41   10  entities.
04:41   11         MR. KESSLER:  So, Your Honor, we can take a look at
04:41   12  instruction, but it is not relevant.  This is another example
04:41   13  of -- I don't think alter ego or veil piercing has been
04:41   14  mentioned in this case by any witness, and I don't think it is
04:41   15  on any document.  Further -- so we are injecting an issue that
04:41   16  is not in the case.  Furthermore, they are apparently going to
04:41   17  call Ms. Klein to testify about who she would have sued or not
04:41   18  sued.  So she will say whatever she's going to say, that's
04:41   19  from the plaintiff's side, and that will be the evidence.
04:41   20  But, again, this is an effort to bolster Ms. Klein through a
04:41   21  jury instruction about an issue that isn't relevant to the
04:42   22  case at all in the first place.
04:42   23         MR. BRODSKY:  Your Honor, you've heard a lot about
04:42   24  commingling, extensive evidence of commingling through
04:42   25  multiple witnesses.

04:42  1          THE COURT:  But I've also heard a lot of questions

04:42  2   that Mr. Greebel was unaware of it.

04:42  3          MR. BRODSKY:  Commingling, I'm sorry, Your Honor --

04:42  4          THE COURT:  Except for the accounting, but that he

04:42  5   didn't have access to the bank accounts, and he didn't really

04:42  6   understand what -- he didn't discuss or have knowledge about,

04:42  7   or there's no evidence that he had knowledge of Mr. Shkreli's

04:42  8   use of funds from one entity to pay the obligations of the

04:42  9   other, except the charges here.

04:42 10          And so I -- I think that -- I want to stick to what

04:42 11   we talked about now, which is alter ego as veil piercing.

04:42 12          MR. BRODSKY:  And commingling is included in that.

04:42 13          THE COURT:  I know it is part of that, I know it is

04:42 14   part of that.  But the bottom line is --

04:42 15          MR. BRODSKY:  Judge, you're asking --

04:42 16          THE COURT:  The bottom line is, what evidence is

04:42 17   there that any of that was even in Mr. Greebel's head.  What

04:42 18   we do have evidence of is that the threats by many investors

04:43 19   and their counsel to Mr. Shkreli, and copying Mr. Greebel, or

04:43 20   having Mr. Shkreli copy Mr. Greebel on these threats, that he

04:43 21   perceived that these folks were going to come after Retrophin.

04:43 22   And so -- and even MSMB, to the extent there was any reason to

04:43 23   do it.

04:43 24          But there's no evidence at all about the commingling

04:43 25   being a factor in Mr. Greebel's head or that he thought about

*PROCEEDINGS - CHARGE CONFERENCE*                    8812

04:43  1    those issues.  What's important, I think, and what is relevant

04:43  2    to the defense case is that Mr. Greebel knew there were

04:43  3    threats.

04:43  4              MR. BRODSKY:  No, Your Honor, it is beyond that.

04:43  5    Respectfully, Your Honor, Mr. Greebel absolutely knew about

04:43  6    commingling from the very basics.  He doesn't need to have

04:43  7    access to a bank account to know about commingling.  Corey

04:44  8    Massella testified about all the intermingling between MSMB,

04:44  9    and there's extensive evidence --

04:44  10             THE COURT:  I just said that.  I just said that.

04:44  11             MR. BRODSKY:  Yes, Your Honor.

04:44  12             THE COURT:  I know that, Counsel.

04:44  13             MR. BRODSKY:  Even testified about commingling and

04:44  14   his concern about commingling, and we elicited a lot of

04:44  15   evidence about it because it was incredibly relevant to us,

04:44  16   and we will establish to our defense case more of the

04:44  17   relevance in the mind of Mr. Greebel relating to commingling

04:44  18   and piercing the corporate veil and this alter ego concept.

04:44  19   And it is not just that there's a threat, Your Honor.  It is

04:44  20   not just that I, Lindsay Rosenwald, venture capitalist,

04:44  21   extraordinarily successful with, you know, multi-million

04:44  22   dollar ability to file a lawsuit, and sending you a corporate

04:44  23   threat letter through Mr. Stanfield, a real lawyer.  It is not

04:44  24   just that.  It is not just the allegations of a conflict of

04:44  25   interest that are being alleged, but it is the actual

*PROCEEDINGS - CHARGE CONFERENCE*                           8813

04:45   1   knowledge that MSMB and Retrophin used the same offices.  It
04:45   2   is the actual knowledge that they are in control by the same
04:45   3   person.  It is the actual -- there's no denying that everybody
04:45   4   knew he controlled MSMB, and he also controlled Retrophin,
04:45   5   LLC.  And during the 2012 period, during the relevant period,
04:45   6   these are facts that Mr. Massella, Mr. Aselage, numerous other
04:45   7   witnesses, Your Honor, Mr. Richardson, everybody drew
04:45   8   attention to this.  In fact, Mr. Richardson testified that
04:45   9   there was an overlap period.  And a long period of time in
04:45  10   2013, he understood that there had to be true-ups because of
04:45  11   the overlap between the two entities.
04:45  12          This is definitely part of Mr. Greebel's state of
04:45  13   mind in 2013.  Despite Mr. Kessler shaking his head no, this
04:45  14   is part of his state of mind in 2013 when there were threats
04:45  15   being made at Retrophin, Inc.
04:45  16          Your Honor, if Retrophin, Inc., had nothing do with
04:45  17   MSMB, if one was located in Nebraska and one was -- and MSMB
04:46  18   was located in Nebraska, and Retrophin, Inc., was located in
04:46  19   New York, and they had separate management and separate
04:46  20   corporate structures, and everything was separate, when a
04:46  21   threat came in to Retrophin, Inc., there wouldn't be a concern
04:46  22   that there would be a lawsuit.
04:46  23          THE COURT:  The key that you are missing is that
04:46  24   there isn't evidence about what was in Mr. Greebel's head
04:46  25   about what is clear.  And what I think is your strongest bit

| | |
|---|---|
| 04:46 | 1 |

of evidence on this is that Mr. Greebel was aware that people

were suing.  It doesn't really matter whether it was under an

alter ego theory that some expert's going to come in and talk

about maybe -- or whether it is torts or conversion or unjust

enrichment.  He knows there are threats.  I don't think all

the other details or the possible theories or the little

pieces of evidence that you want to say were in Mr. Greebel's

mind when he settled cases or drafted settlement agreements or

consulting agreements as client's request are really the key.

What's key is he knew there were threats against his clients,

okay.

          And so I think you are going to end up confusing the

jury, they are going to start to wonder what evidence there is

that Mr. Greebel was even aware of all these theories or

actually thought about them.  I think the cleanest, most

basic, most compelling evidence I think in the record is that

these threats were made by lawyers and by investors.  And they

didn't set out theories that we're going to sue you under a

theory of alter ego, we're going to sue your client under a

theory of veil piercing.  They just said, we're going to sue

you.  We are going to exercise our legal remedies and come

after you.

          I don't know why you want to muddle up the record

and confuse the jury and all of that.

          MR. BRODSKY:  Your Honor, our client has heard you

PROCEEDINGS - CHARGE CONFERENCE                    8815

04:48  1   and we would like to think about it.  We'd like to think about

04:48  2   your comments, and we will talk to him this weekend in light

04:48  3   of Your Honor's comments.

04:48  4           THE COURT:  Okay.  I mean, I don't -- I am not

04:48  5   trying to tell you how to do your case.

04:48  6           MR. BRODSKY:  No, I understand, but I think --

04:48  7           THE COURT:  But I'd just like --

04:48  8           MR. BRODSKY:  -- we would like to talk to him about

04:48  9   it over the weekend.

04:48  10          MR. PITLUCK:  Your Honor, I notice we're approaching

04:48  11  the hour that we need to leave.

04:48  12          THE COURT:  Oh, yes.

04:48  13          MR. PITLUCK:  I'd like to raise two quick nonjury

04:48  14  charge issues before we break for the weekend.

04:48  15          And the first is, we are looking forward to the

04:48  16  defense's remaining witnesses tonight, for next week, on the

04:48  17  representation that we would be done by Wednesday.  And we are

04:48  18  looking for that.

04:48  19          The second is that this afternoon after we broke,

04:48  20  defense counsel issued another Rule 17 subpoena to Retrophin,

04:48  21  seeking 21 documents based on -- appears to be the same set of

04:48  22  documents that were not provided to us and consistent with --

04:48  23  I don't know what Retrophin's position is going to be,

04:49  24  obviously, but consistent with the Court's position last time,

04:49  25  we would request that the Court order the defense counsel to

*PROCEEDINGS - CHARGE CONFERENCE*                    8816

04:49  1    turn over the underlying documents for each of those 21

04:49  2    subpoenas, noting, of course, that we are now getting to the

04:49  3    conclusion of the defense case or what -- they obviously

04:49  4    should be precluded based on the timeliness and the -- for all

04:49  5    the other reasons, and I know we're late in time so I am going

04:49  6    to save the argument.  But at the very least, until Retrophin

04:49  7    decides their position and until we have a chance to know what

04:49  8    these are, we would ask that they be provided to us, as

04:49  9    consistent with what the --

04:49  10        THE COURT:  The underlying documents, the 21

04:49  11   documents that are listed in the subpoena.

04:49  12        MR. PITLUCK:  Unless the Court just wants to

04:49  13   preclude the subpoena based on its timeliness at this point

04:49  14   anyway.

04:49  15        MR. BRODSKY:  Your Honor, our team has told us that

04:49  16   there were 20 document requests in the subpoena, 15 of those

04:49  17   20 were given to the government last Saturday.  So they may

04:49  18   want to amend that.  There are only 5 of the 20 that we just

04:49  19   identified as documents that we want to use, and so they have

04:50  20   15 as of last Saturday when I believe Your Honor had

04:50  21   instructed us to give them documents, so we did give -- if

04:50  22   they weren't on the subpoena -- so let me back up.

04:50  23        Your Honor, we had two subpoenas, and I believe on

04:50  24   or about November 28 is in my head, Your Honor issued an order

04:50  25   saying give them any documents of those you intend to use.  So

| | | |
|---|---|---|
| 04:50 | 1 | we did.  But then we added 15 more, which we had not issued a |
| 04:50 | 2 | subpoena for, but we knew we were going to.  So we gave them |
| 04:50 | 3 | those additional 15.  We hadn't issued the subpoena.  So they |
| 04:50 | 4 | had an extra 15 last Saturday, which weren't included in the |
| 04:50 | 5 | November 28 subpoenas.  And then we took those 15, we did |
| 04:50 | 6 | issue a subpoena with respect to those 15, and we added five |
| 04:50 | 7 | more documents. |
| 04:50 | 8 | And, I am sorry, 19, not 20.  15 already provided. |
| 04:50 | 9 | So there are four -- of the 20 -- of the 19, only four were |
| 04:51 | 10 | not given to the government last Saturday.  Because we had not |
| 04:51 | 11 | identified them as ones we would use, and we intended to use |
| 04:51 | 12 | in our case in chief. |
| 04:51 | 13 | MS. SMITH:  And, Your Honor, for the -- obviously, |
| 04:51 | 14 | defense didn't let us know that when they served the subpoena, |
| 04:51 | 15 | so to the extent that we received them by Your Honor's |
| 04:51 | 16 | deadline of last Saturday, those 15, if they are able to get |
| 04:51 | 17 | them from Retrophin and verify their authenticity, we won't |
| 04:51 | 18 | have any objection.  For the four documents that were not |
| 04:51 | 19 | provided by Your Honor's deadline, they should be precluded. |
| 04:51 | 20 | They were clearly in the defense's possession, they chose not |
| 04:51 | 21 | to provide them, and this is, you know, a very, very late |
| 04:51 | 22 | hour, not only after the government's case, but after |
| 04:51 | 23 | witnesses have testified in the defense case. |
| 04:51 | 24 | MR. BRODSKY:  Your Honor, our case is allowed to |
| 04:51 | 25 | evolve.  We are allowed to hear the testimony of witnesses, we |

04:51  1   are allowed to examine documents, we are allowed to evolve our

04:51  2   defense case.  Let me remind the government that during their

04:51  3   government case in chief, they added over 200 new government

04:51  4   exhibit during their case in chief.  During their case in

04:52  5   chief.  And that violated all sorts of, you know, last minute

04:52  6   requests.

04:52  7          So during the government's case in chief, they

04:52  8   marked new exhibits, and we did not stand here and stop the

04:52  9   government from doing it.  Yet when we put on a defense case

04:52  10  in chief, the government then insists that, oh, there's a

04:52  11  deadline for you to put on evidence.  Stop.  And I have to

04:52  12  say, Your Honor, having put on evidence of innocence, that the

04:52  13  government never spoke to people prior to indictment or even

04:52  14  prior to July of 2017, we stand here incredulous that the

04:52  15  government is asking Your Honor to deny us four additional

04:52  16  documents.

04:52  17         MS. SMITH:  Your Honor, this is a Rule 16 issue.

04:52  18  They were in their possession.  The exhibits that we added to

04:52  19  our exhibit list during trial were either exhibits that they

04:52  20  had, or documents that they've had, we produced them in

04:52  21  Rule 16, or in a very limited set of circumstances, and

04:52  22  usually in response to a defense subpoena that was being

04:53  23  served on Retrophin.  We did serve new subpoenas for documents

04:53  24  that were not in our possession previously.

04:53  25         This is a Rule 16 issue.  They had them in their

*PROCEEDINGS - CHARGE CONFERENCE*                        8819

04:53   1   possession last week, unless Mr. Brodsky can say that they

04:53   2   didn't, that these are -- that somehow they provided these

04:53   3   very specific requests to Retrophin for documents they never

04:53   4   heard of before.  They are not new documents, they're

04:53   5   documents that were in their possession.  They chose not to

04:53   6   provide them to us last Saturday, and the deadline passed.  It

04:53   7   was for the same reasons that we argued in our Rule 16 motion

04:53   8   last week.

04:53   9           MR. BRODSKY:  Ms. Smith is correct, we did have

04:53   10  them, Your Honor, but we had not identified them as ones we

04:53   11  intended to use.  And as we understand the Rule 16, it's ones

04:53   12  we intend to use.  We did give them the additional 15, which I

04:53   13  think demonstrates the good faith.  We were trying to give

04:53   14  them everything we intended to use in our case in chief.  We

04:53   15  would just ask Your Honor to consider that.

04:53   16          THE COURT:  I have considered it.  I accept the

04:53   17  representation that these additional four documents were not

04:53   18  intended at the time.  The other documents to be used, they

04:54   19  are going to be used then.  Did you give them copies of those

04:54   20  additional four?

04:54   21          MR. BRODSKY:  I am being told by Ms. Rubin there are

04:54   22  five, I apologize, there are five additional ones, we will

04:54   23  give them today.  We will e-mail them immediately after the

04:54   24  proceeding ends.

04:54   25          THE COURT:  Okay.  And then I wouldn't preclude them

PROCEEDINGS - CHARGE CONFERENCE                    8820

04:54  1    on Rule 16 grounds just because I think these may have become

04:54  2    important to them as the case evolved and their intention is

04:54  3    to use them may have been of more recent vintage.  But you

04:54  4    better them e-mail them tonight.

04:54  5            MR. BRODSKY:  We will e-mail them tonight.

04:54  6            THE COURT:  And if there's another issue that we

04:54  7    have to deal with regarding these documents, I will deal with

04:54  8    it.

04:54  9            MR. BRODSKY:  And our likely order of witnesses,

04:54  10   Your Honor --

04:54  11           THE COURT:  Yes.  Who are they?

04:54  12           MR. BRODSKY:  -- for next week.

04:54  13           THE COURT:  I would like to know, too, because I

04:54  14   have to schedule -- I need to know when we are going to charge

04:54  15   the jury, and, you know, how we are going to inform the jury,

04:54  16   if we are, which I think we will have to, that they are not

04:54  17   going to be finished by the 15th of December.

04:54  18           MR. BRODSKY:  So during the break, Your Honor, we

04:54  19   were focused on the requested charge.  Between when court

04:55  20   ended around 2:00 or 2:15, we focused on the requested charge

04:55  21   with our client.  He is taking the train back now.  When he

04:55  22   gets out of the subway, we will speak to him from the train to

04:55  23   his home, so we can talk to him about the witnesses for next

04:55  24   week, and then we will e-mail them to Your Honor, and we will

04:55  25   e-mail them to the government.  We just wanted to talk to our

*PROCEEDINGS - CHARGE CONFERENCE*                    8821

04:55  1   client about the likely order of the witnesses and who we're

04:55  2   going to call.

04:55  3          THE COURT:  Well, without prejudice to your changing

04:55  4   the order, could you just tell us now who you are calling --

04:55  5          MR. BRODSKY:  Certainly on Monday morning,

04:55  6   Your Honor --

04:55  7          THE COURT:  -- on Monday and Tuesday.

04:55  8          MR. BRODSKY:  -- I think it is highly likely, Your

04:55  9   Honor, on Monday morning, no question, we would call Howard

04:55  10  Cotton as our first witness.  That's definitive.  I think it

04:55  11  is likely, although we have to speak to him, that will be

04:55  12  Professor Johnson.  We're not sure.  We need to talk to him.

04:55  13  Dr. Rosenfeld would likely go Tuesday.  I think we have some

04:56  14  scheduling issues with him.  And --

04:56  15         MR. KESSLER:  You said Professor Johnson.  Did you

04:56  16  mean Mr. Johnson?

04:56  17         MR. BRODSKY:  I'm sorry.  Alan Johnson.  I call all

04:56  18  my experts, our experts, professors, even though they're not.

04:56  19  Sorry, Your Honor.  That's how I think of them.

04:56  20         But we will fill out the rest of the list.  That is

04:56  21  as far as -- we have a debate among ourselves as to who we're

04:56  22  calling.

04:56  23         THE COURT:  All right.  We'll continue this.  It

04:56  24  will have to be Tuesday evening at 5:00 or 5:30.

04:56  25         MR. BRODSKY:  Your Honor, I just want to be clear.

*PROCEEDINGS - CHARGE CONFERENCE*                           8822

04:56  1   We are not going to submit a writing on the requested charge,

04:57  2   right?  You do not want us to go through --

04:57  3              THE COURT:  I think you have had enough opportunity.

04:57  4              MR. BRODSKY:  No, no.  With respect to the charges

04:57  5   you already have.  If it is helpful, it is helpful.  If it's

04:57  6   not, we won't do it.  If it is helpful to you to go through

04:57  7   the requested charge, for example, that you provided, and

04:57  8   provide you with our annotations or our thoughts on it, we can

04:57  9   do it.  But if that was unhelpful as an exercise, we won't do

04:57  10  it.  We defer to Your Honor.  I just wanted to offer it up as

04:57  11  a possibility, if you thought that was easier.

04:57  12             THE COURT:  This is what I am interested in.  If I

04:57  13  am committing legal error by stating something in some way

04:57  14  that the parties would like me to change, I am interested in

04:57  15  hearing about it, okay.  But if I make a judgment call about

04:57  16  whether an instruction should be given, you know, I would like

04:57  17  to try to just have some understanding that based on our

04:57  18  review of the law and what we think is appropriate, given the

04:57  19  record, that that is the instruction we are going to give or

04:58  20  not give.  I just don't want more instructions --

04:58  21             MR. BRODSKY:  Understood.

04:58  22             THE COURT:  -- and I am happy to be told if there's

04:58  23  some legal error.  Saying that something's extremely unfair or

04:58  24  extremely prejudicial, without case law it doesn't really help

04:58  25  me.

04:58  1           MR. BRODSKY:  Okay.

04:58  2           THE COURT:  I want to see the cases, if you have

04:58  3    cases, but you really should have given me the cases long ago

04:58  4    because the time and the opportunity, multiple opportunities,

04:58  5    has long since passed.

04:58  6           MR. PITLUCK:  Your Honor, we intend to review the

04:58  7    case law and be prepared to address any issues at the charge

04:58  8    conference, consistent with Your Honor's ruling.  We don't

04:58  9    intend to submit anything in writing.

04:58  10          THE COURT:  All right.  You can also discuss amongst

04:58  11   yourselves issues that are in dispute.  I mean, the more you

04:58  12   can agree to, the better.  Or maybe just by talking to each

04:58  13   other, if someone -- if one side really wants an instruction,

04:58  14   there could be some middle ground about how that language

04:58  15   could be utilized to make it appropriate.  But I am concerned

04:59  16   in -- about confusing the jury, prolonging unnecessarily their

04:59  17   deliberations with issues that aren't really in the case,

04:59  18   et cetera.

04:59  19          MR. BRODSKY:  Yes, Your Honor.

04:59  20          THE COURT:  I just think we've had enough

04:59  21   submissions, for the most part.  If I need more, I will put an

04:59  22   order in.

04:59  23          MR. BRODSKY:  Understood.

04:59  24          MR. PITLUCK:  Thank you.

04:59  25          MR. BRODSKY:  Thank you, Your Honor, for doing it so

04:59   1    quickly.

04:59   2              THE COURT:  All right.

    3              MS. SMITH:  Have a good weekend.

    4              THE COURT:  Have a good weekend.  Thank you.

    5              (WHEREUPON, at 5:00 p.m., the proceedings were

    6    adjourned until 9:00 a.m., Monday, December 11, 2017.)

    7

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25

```
                         INDEX                        8825
```

 1                      I N D E X

 2

 3                  W I T N E S S E S

 4

 5          M I C H A E L   R O S E N S A F T

 6
     DIRECT EXAMINATION                              8587
 7   MR. DUBIN

 8   CROSS-EXAMINATION                               8699
     BY MS. SMITH:
 9
     REDIRECT EXAMINATION                            8742
10   BY MR. DUBIN

11

12                  E X H I B I T S

13

14   Defendant's Exhibit Number DX-1178            8665

15   Defendant's Exhibit Number DX-9644A           8667

16   Defendant's Exhibit Number DX-7917            8682

17   Defendant's Exhibit Number 202-1              8610

18   Defendant's Exhibit Number 4747-A             8620

19   Defendant's Exhibit Number 1218               8639

20   Defendant's Exhibit Number 1212               8659

21   Defendant's Exhibit Number 1216               8662

22   Government Exhibit Number 646                 8738

23   Court's Exhibit Number 1                      8758

24

25