UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ECF Case |
| -against- | No. 15-cr-00637 (KAM) |
| EVAN GREEBEL, | <u>ORAL ARGUMENT REQUESTED</u> |
| *Defendant.* | |

**MR. GREEBEL'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR JUDGMENT**
<u>**OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**</u>

# TABLE OF CONTENTS

**I.   THE GOVERNMENT'S EVIDENCE ON COUNTS SEVEN AND EIGHT IS INSUFFICIENT TO SURVIVE RULE 29.** ................................................................. 6

**A.   Legal Standard** .......................................................................................... 6

**B.   The Evidence as to Count Seven** ............................................................. 7
  1.   The Insufficient Evidence as to Settlement Agreements ...................................... 7
  2.   The Insufficient Evidence as to the Two Consulting Agreements ..................... 11
  3.   The Evidence on Count Seven Was Insufficient for a Reasonable Juror to Conclude that Mr. Greebel Had the Requisite Specific Intent to Defraud Retrophin...................................... 14
  4.   The Government Did Not Offer Sufficient Evidence for a Reasonable Juror to Find that Mr. Greebel Conspired with Any of the Unnamed Co-Conspirators on Count Seven, as Required Under Second Circuit Precedent. .............................................................. 17
  5.   The Government Did Not Offer Sufficient Evidence for a Reasonable Juror to Find the Existence of a Criminal Agreement with Mr. Shkreli or that Mr. Greebel Knowingly Joined Such an Agreement .................................................................... 19

**C.   The Evidence as to Count Eight** ............................................................. 24
  1.   The Government's Proof Was Insufficient for a Reasonable Juror to Find the Existence of the Conspiracy Alleged in Count Eight. ................................................. 24
  2.   The Government Presented No Proof That Mr. Greebel Entered a Conspiracy to Control the Price and Trading of Retrophin Stock.................................................. 27

**II.   SEVERAL PROCEDURAL SHORTFALLS RESULTED IN AN UNFAIR TRIAL AND REQUIRE A NEW TRIAL UNDER RULE 33.** .......................................... 29

**A.   Legal Standard** ........................................................................................ 29

**B.   Jury Instructions** .................................................................................... 30
  1.   The Jury Was Ill-Informed as to Mr. Greebel's State of Mind Because It Was Not Instructed on Alter Ego and Veil-Piercing Law. ................................................ 30
  2.   The Court Should Allow a New Jury to Render a Verdict with the Benefit of a Jury Instruction Consistent with *United States v. Rodriguez*.......................................... 33

**C.   The Government's Pattern and Practice of *Brady* and *Giglio* Violations Resulted in an Unfair Trial** ...................................................................................... 35

**D.   The Jury Was Deprived of Key Evidence in Support of Mr. Greebel's "Rush-to-Judgment" Defense Relating to the Government's Treatment of Steven Rosenfeld** ........... 44

**E.   Constructive Amendment** ...................................................................... 45

**F.   Juror Misconduct** ................................................................................... 50

**G.   The Admission of Hearsay Statements by Marc Panoff Violated *Bourjaily*** ................. 52

1.   Procedural History ................................................................ 52

2.   The Evidence Proffered Was Insufficient to Overcome the Court's Initial Finding that Mr. Panoff Was Not a Co-Conspirator. ............................................ 53

**H.   Evidentiary Rulings** ...................................................... **56**

1.   Mr. Greebel's Consciousness of Innocence ................................ 56

2.   Highly Prejudicial Threat Evidence ........................................ 56

3.   Evidence Relating to Mr. Shkreli ........................................... 57

**I.   Jackson Su Immunity Letter** ............................................ **59**

**J.   Venue** .................................................................... **60**

**III.   CONCLUSION** .......................................................... **61**

## PRELIMINARY STATEMENT

Despite there being insufficient evidence as to (i) the existence of any illegal conspiracies to defraud Retrophin or manipulate the trading or market price of Retrophin stock, (ii) Mr. Greebel's knowing and intentional membership in any such conspiracies, or (iii) Mr. Greebel's fraudulent intent, Mr. Greebel stands convicted on both Counts Seven and Eight.[1]  Notably, Mr. Greebel is now the sole "conspirator" convicted of the "scheme" alleged in Count Seven; he also stands convicted of Count Eight despite no testimonial or documentary evidence that he had any knowledge whatsoever of an unlawful scheme to manipulate the market of Retrophin stock.  Mr. Greebel's right to a fair trial was also compromised due to multiple procedural shortfalls, from inadequate jury instructions to prosecutorial overreach.  Accordingly, the jury's verdict must be set aside.

_**First**_, the government failed to prove the existence of the scheme alleged in Count Seven. Far from proving an agreement "to defraud Retrophin by misappropriating Retrophin's assets," Superseding Ind. ¶ 21, the government merely offered evidence that Mr. Greebel, at the request of Mr. Shkreli, the CEO of Mr. Greebel's client, prepared the necessary documents to finalize certain agreed-upon settlement agreements in response to multiple, widespread threats of litigation from Mr. Shkreli's former investors.  The evidence showed, at most, that Mr. Greebel intended *not* to harm Retrophin but to protect it from harmful litigation.

_**Second**_, the government's proof on Count Eight is woefully insufficient to satisfy Federal Rule of Criminal Procedure 29.  Not only did the government fail to prove that an agreement "to control the price and trading" of Retrophin stock is itself unlawful or improper, the government

---

[1]   All references to Count Seven correspond to the charge of wire fraud conspiracy, which in the final verdict sheet was referenced as Count One; references to Count Eight correspond to the charge of securities fraud conspiracy, cited in the final verdict sheet as Count Two.  See Dkt. 502.

also failed to prove that Mr. Greebel had any knowledge whatsoever of any such agreement. Indeed, not one government witness testified to his or her personal knowledge of Mr. Greebel's involvement in the "scheme" alleged in Count Eight, and the government was unable to point to any evidence to corroborate the existence of any agreement among the so-called "Fearnow recipients."

**_Third_**, several factors, both individually and cumulatively, resulted in an unfair trial. Specifically, the jury's verdict is based on (i) inadequate jury instructions; (ii) a pattern of _Brady_ and _Giglio_ violations; (iii) the denial of key evidence relating to a key defense theory; (iv) the government's improper constructive amendment of the charges against Mr. Greebel; (v) juror misconduct; and (vi) certain prejudicial evidentiary rulings.  Accordingly, the jury's verdict should be set aside under Rule 29 or, in the alternative, Mr. Greebel should receive a new trial pursuant to Federal Rule of Criminal Procedure 33.

## I.    THE GOVERNMENT'S EVIDENCE ON COUNTS SEVEN AND EIGHT IS INSUFFICIENT TO SURVIVE RULE 29.

The government's evidence on Count Seven shows, at most, that Mr. Greebel, relying on statements made by Mr. Shkreli, the CEO of his client Retrophin, prepared documents relating to settlement and consulting agreements after learning of widespread, significant litigation threats from sophisticated investors with vast financial resources.  Even viewing all reasonable inferences in the light most favorable to the government, the evidence does not demonstrate the existence of a shared criminal enterprise to *defraud* Retrophin, let alone that Mr. Greebel knowingly and willingly participated in this alleged conspiracy.  The same is true on Count Eight, where (i) there was insufficient evidence to show the existence of an *illegal* agreement to manipulate Retrophin shares; (ii) not one witness testified to Mr. Greebel's involvement in the alleged conspiracy; and (iii) the government's interpretation of vague and ambiguous emails is woefully insufficient to prove Mr. Greebel's *knowing and intentional* participation in the conspiracy alleged in that count.

### A.    Legal Standard

In order for Mr. Greebel's conviction to withstand scrutiny under Federal Rule of Criminal Procedure 29, the Court must be satisfied that, at trial, the government "introduce[d] sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged ha[d] been proven beyond a reasonable doubt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  It is not enough for the government to introduce evidence "'at least as consistent with innocence as with guilt.'"  *Id*. (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).  "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury [would have] necessarily entertain[ed] a reasonable doubt,'"

and the Court must enter a judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). The government's evidence as to Counts Seven and Eight fell well short of this mark. The Court therefore should enter a judgment of acquittal on each count.

In the alternative, this Court should find that, considering the record as a whole, letting a guilty verdict stand would be a "manifest injustice," and thus should grant Mr. Greebel a new trial. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (affirming district court grant of a new trial under Rule 33).

**B.    The Evidence as to Count Seven**

Count Seven arose from several settlement and two consulting agreements between investors in MSMB Capital LP and MSMB Healthcare LP (the "MSMB Entities"), Martin Shkreli, and Retrophin, Inc. ("Retrophin"). The evidence adduced at trial was insufficient for a reasonable juror to conclude that Mr. Greebel had the specific intent to defraud Retrophin; that any criminal scheme existed in the first place; or that Mr. Greebel joined any such scheme with Mr. Shkreli or anyone else.

**1.    The Insufficient Evidence as to Settlement Agreements**

The government contended at trial that the Settlement Agreements were executed in furtherance of the alleged conspiracy to defraud Retrophin by misappropriating its assets. But in light of the evidence that the assets of MSMB and Retrophin were commingled, and that several MSMB investors threatened to sue MSMB, Retrophin, or Mr. Shkreli, no reasonable jury could rely on the agreements as evidence of Mr. Greebel's guilt on Count Seven. *See United States v. Bryant*, 885 F. Supp. 2d 749, 765 (D.N.J. 2012) (acquitting a defendant of mail fraud, bribery, and extortion where "innocent and indeed, more likely, explanation alone creates reasonable doubt").

First and foremost (and critical to Mr. Greebel's state of mind), the evidence showed that there was significant commingling of assets between the MSMB Entities and Retrophin, which Mr. Greebel knew had legal consequences for his client Retrophin.  For example, Retrophin board member Steven Richardson testified that Retrophin and MSMB Capital "were using the same office space" and sharing resources and staff.  Tr. 2077:24–2078:7.  It was undisputed that employees of Mr. Shkreli's companies were simultaneously retained by "MSMB Capital Management LLC, MSMB Healthcare Management LLC . . . Retrophin LLC, and its affiliated entities[.]"  GX 111-1.  Jackson Su testified that he "understood when Mr. Aselage said . . . there were commingled monies that the money of Retrophin was mixed in with the money of MSMB[.]"  Tr. 5220:18–21.  Timothy Pierotti testified with respect to Retrophin and the MSMB Entities that "they were all interchangeable to me."  Tr. 5878:21–24.  Stephen Aselage testified that "rents [] were . . . being shared between MSMB and Retrophin"; that "Retrophin's original office space was actually where MSMB existed"; and that "employees of MSMB were . . . being transferred to become employees of Retrophin."  Tr. 4639:2–10.

It was also well known that MSMB funds were rolled into Retrophin to help found the then-fledgling company.  For example, when Mr. Shkreli decided to wind down MSMB, he sent an email to MSMB investors offering them the option to redeem their MSMB shares for shares in Retrophin.  GX 222.  Even Mr. Richardson, who had already switched his investment from MSMB to Retrophin, testified that this email was "consistent with what Mr. Shkreli had told [him] about giving MSMB Capital investors the opportunity to either redeem in cash or to move over their investment into Retrophin[.]"  Tr. 1764:7–10.

Notably, the evidence showed that *Mr. Greebel* himself recognized the risks of conflating Retrophin with the MSMB Entities, warning Mr. Shkreli's sister that she should "not refer to

Retrophin and MSMB Capital as the same personnel or the same company . . . . [T]here are significant legal implications which we want to avoid."  DX 1902.  And even the Court "underst[ood] Mr. Greebel was aware of the commingling of funds" between Retrophin and the MSMB Entities.  Tr. 8070:8–9.  The evidence also showed that all of the MSMB investors who executed settlement agreements made explicit litigation threats toward Mr. Shkreli, the MSMB Entities, and/or Retrophin.  To name only a few, the following investors threatened severe consequences—litigation and otherwise—as a result of their lost investments in the MSMB entities:

- **Lindsey Rosenwald** testified at trial that he "threatened to bring litigation in February of 2013" and that he "threatened to sue Mr. Shkreli, MSMB, Retrophin, all of them[.]"  Tr. 3495:11–16.  Indeed, Dr. Rosenwald's attorney wrote to Mr. Shkreli "in an effort to resolve Dr. Rosenwald's claims against [Mr. Shkreli], MSMB Capital Management LP ('MSMB Capital') and Retrophin, Inc. ('Retrophin') prior to Dr. Rosenwald commencing litigation."  GX 100-16.

- **Sarah Hassan**, daughter of well-known pharmaceutical executive Fred Hassan, retained Proskauer Rose LLP—an international law firm—in connection with her efforts to regain her investment in MSMB.  *See* Tr. 1626:20–1627:2.  In late February 2013, the same month that Dr. Rosenwald threatened to bring litigation, Mr. Shkreli sent Mr. Greebel an email telling him that Sarah Hassan was the "same situation as Lindsay *[sic]*."  GX 525.

- **Schuyler Marshall** wrote to Mr. Shkreli demanding "the preservation of documents in case they are needed" and stating that he "hope[d] [they could] conclude this without the expense of litigation."  DX 112-8.  He testified that he sent this demand to "ratch[et] up the pressure," Tr. 3071:13–14, and to clarify that certain documents "might be needed in case there's litigation," Tr. 3071:5–6.  He elaborated that, at times, the *threat* of litigation might be sufficient to force a counterparty to "perform the agreement."  Tr. 3071:7–9 (complying with a litigation hold is "a hassle, quite honestly, and I thought rather than go through that, they just go ahead and perform the agreement").

- **Michael Lavelle**, a high-profile investor with significant financial resources, wrote to Mr. Shkreli that he did "not want . . . [his] relationship to become adversarial[.]"  GX 108-10.  Indeed, Mr. Greebel expressed his concerns to Mr. Shkreli that, "[b]ased on the tenor of [his] conversation with [Mr. Lavelle,]" Mr. Lavelle was "very serious about pursuing [this]."  Mr. Greebel was also aware that Mr. Lavelle had retained a

well-reputed law firm, Linklaters LLP, in connection with his attempts to recover his investment.  GX 108-13.

- **David Geller** wrote to Mr. Shkreli, "I really don't understand your actions;  I would never act like this.  *Please don't force me to go to the next level.*"  GX 106-20 (emphasis added).  And in his first direct communication with Mr. Greebel, Mr. Geller wrote that he would "be contacting [Mr. Greebel] with all correspondence going forward" and that he had "retained counsel to start legal action."  GX 106-28.

- **Spencer Spielberg** wrote to Mr. Shkreli, copying Mr. Greebel, that he would "prefer . . . settling this prior to [his] having to take legal recourse to receive my equitable share."  GX 107-7.

- **Richard Kocher** informed Mr. Shkreli that he had "been in touch with council *[sic]* that is versed in this kind of litigation.  You should be hearing from them soon."  GX 104-9.  Mr. Greebel was well aware of potential threats, as he warned Mr. Shkreli that "[K]ocher's lawyer keeps calling me . . . he said Kocher has instructed him to prepare papers."  GX 575.  And Mr. Kocher had copied Mr. Greebel—as well as his own attorney—on an earlier email to Mr. Shkreli, in which Mr. Kocher wrote that he was "aware that our hedge fund [MSMB] which funded Retrophin directly should benefit directly," and that Mr. Shkreli's management of both MSMB and Retrophin "seem[ed] to [him], to be a conflict of interest."  GX 104-5-A.

- **Marc Panoff** received an email from Mr. Shkreli, who also copied Mr. Greebel, stating that "investors are ready to sue Retrophin for reasonable claims they have against Retrophin—to circumvent that, we will settle with them. . . . But I do need this settled soon or threats will become filed claims."  GX 621.

Mr. Greebel, with full knowledge of the extensive commingling between Retrophin and the MSMB entities, was made aware of these threats and others.  Indeed, as the Court itself recognized, "there's no doubt that as an attorney [Mr. Greebel] and Mr. Shkreli perceived the investor statements as threats that could involve litigation not just against Mr. Shkreli and MSMB but against Retrophin."  Tr. 3436:24–3437:2.  Mr. Greebel was thus well aware of the very real risks—legal fees, adverse publicity, and follow-on consequences—to Retrophin, a still-fledgling company at a particularly fragile time in its history.  Even Mr. Aselage, a key *government* witness, admitted to the jury that lawsuits are "expensive" and "time consuming"; that there "can be" certain "reputational risks" involved with litigation; and that "[t]here's a huge spectrum of costs associated with litigation."  Tr. 4528:2–4530:2.

10

With this as the backdrop, and at the request of Retrophin's CEO, Mr. Greebel assisted Retrophin in documenting the settlement agreements as negotiated by Mr. Shkreli.  Indeed, several investor witnesses made clear that their only involvement with Mr. Greebel was to finalize and execute the agreed-upon terms of their settlement agreements, the details of which were negotiated by these investors and *Mr. Shkreli alone.  See, e.g.,* Tr. 3000:6–3001:2 (David Geller testifying that "all of [his] negotiations about the terms of the settlement were directly with Mr. Shkreli" and that "Evan Greebel's role was simply to write up the settlement agreement"); Tr. 1621:20–23 (Sarah Hassan testifying that, as far as she knew, "[a]ll the conversations that [she] had on the phone about the settlement agreement" included only her and Mr. Shkreli, and Mr. Greebel was not involved).

### 2.    The Insufficient Evidence as to the Two Consulting Agreements

The government alleges that two consulting agreements at issue in Count Seven were "shams" and that they were executed in furtherance of the alleged conspiracy to defraud Retrophin.  But the jury's verdict and government's allegations ignore the fact that Retrophin received significant benefits from the consulting agreements at issue, both from legitimate and valuable consulting services *and* from the broad release of liability executed by the allegedly "sham" consultants.  *See United States v. Delossantos*, 536 F.3d 155, 161 (2008) ("[I]nnocent explanations" for a defendant's conduct, when plausible, can be "enough to engender reasonable doubts about [the defendant's] guilt.").

The government's allegations on Count Seven involved only two consulting agreements: Darren Blanton's and Al Geller's.  Dkt. 422, at 1 n.1 (conceding that "the consulting agreements now at issue in this case" were "the consulting agreements given to investors AG and DB").  Both of these consultants testified, however, that they provided legitimate services in their roles as consultants to Retrophin and Mr. Shkreli.  Al Geller, for example, provided much-needed

11

professional executive coaching to Mr. Shkreli—Retrophin's admittedly young and rough-around-the-edges CEO.  Mr. Geller frequently referred to his "coaching tip[s]," GX 105-25, calling himself one of Mr. Shkreli's "trusted advisor[s]," DX 117-6; *see also* Tr. 6841:6–24 (Mr. Geller confirmed that he referred to himself as a "trusted adviser"; that he gave "life tips" to Mr. Shkreli; and that Mr. Shkreli was receptive to those tips);  Tr. 6845:4–13 (Mr. Geller provided "advice about life tips on how to manage" and "coaching on how to be a better manager").  Mr. Geller also testified that he provided these services to Mr. Shkreli "both before and after [he] entered into [his] consulting agreement[.]"  Tr. 6842:24–6843:2.  And to the extent Mr. Geller's services were aimed at coaching Mr. Shkreli individually, those "tips" inevitably inured to Retrophin's benefit since the company clearly stood to gain from a more professional, mature, and efficient CEO.

The evidence also showed that Mr. Blanton offered valuable relationships with new investors in the cash-starved startup.  *See, e.g.*, DX 115-14 ("I also need to introduce you to John Strauss and Aaron Fletcher ASAP.").  Mr. Blanton even worked proactively, emailing to ask Mr. Shkreli for the "latest PPT [PowerPoint] on Retrophin" and indicating that he had "several other private investors that are interested."  DX 115-15; *see also* Tr. 3795:18–21 ("Q: And you write to Mr. Shkreli: I'm ready to work on stuff with you. Correct? A: Correct.").  Mr. Blanton testified that he "introduce[ed] [two investors] to Mr. Shkreli in response to his request that you introduce him to folks he could pitch the stock to as an investor[.]"  Tr. 3684:24–3685:3.  Even the Court recognized that Mr. Blanton provided legitimate consulting services.  *See* Tr. 8125:17–20 (The Court: "But Blanton actually did do work for Retrophin by introducing him to investors and . . . trying to get money for the company.").

Further, the evidence showed that the substance of both consulting agreements was widely accepted—and entirely appropriate—within the business community. Alan Johnson testified, for example, that Messrs. Blanton and Geller's agreements were "very similar to the agreements that you would find [] in other companies." Tr. 9068:3–4. Mr. Johnson explicitly testified that provisions calling for a broad description of consulting services, a release from liability, non-disparagement, and a cap on the consultant's time and availability are common and appropriate within the context of ordinary termination or separation agreements for corporate executives. Tr. 9065:4–9067:9.

Moreover, Mr. Greebel, relying largely on information he received from Mr. Shkreli, held a good-faith belief that Retrophin needed the assistance of these consultants. Indeed, Mr. Greebel was aware that the young company was eager to attract new and well-intentioned investors, hence Darren Blanton's assistance with wealthy potential investors in Texas. Mr. Greebel also was under the good-faith belief that Mr. Shkreli was duly empowered—pursuant to a directive of Retrophin's board and in accordance with Delaware law—to execute consulting agreements on behalf of the company. Indeed, Mr. Greebel knew the board had voted that Mr. Shkreli be "authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver[] any and all agreements that do not require payments of a material amount of cash. . . ." DX 118-26A, at R057678; *see also* GX 565 (Mr. Greebel encouraged Mr. Shkreli to "get blanket approval from the board . . . to retain consultants"). In an abundance of caution, Mr. Greebel also urged Mr. Shkreli to raise Mr. Geller's and Mr. Blanton's consulting agreements at a subsequent board meeting. *See* DX 8207 (showing Mr. Greebel's additions to the September 2013 board itinerary, including the discussion of consulting agreements for Messrs. Geller and Blanton). No reasonable juror could find that Mr. Greebel had the specific

intent to hide these consulting agreements from Retrophin in light of explicit documentary evidence showing Mr. Greebel's intent to do just the opposite.

It is also worth noting that Retrophin—the supposed *victim* of these settlement and consulting agreements—received the benefit of the releases contained in settlement and consulting agreements alike; that, as a result of those releases, MSMB investors did not ultimately sue Retrophin to recover their losses; and that Retrophin was thus protected from the "huge spectrum of costs associated with litigation" as identified by Mr. Aselage.  Tr. 4528:2–4530:2.

### 3.      The Evidence on Count Seven Was Insufficient for a Reasonable Juror to Conclude that Mr. Greebel Had the Requisite Specific Intent to Defraud Retrophin.

As the Court's charge made clear, the key issue before the jury with respect to Count Seven was whether Mr. Greebel had the specific intent to defraud Retrophin through the execution of certain settlement and consulting agreements:  "[A] person acts knowingly and intentionally if he acts voluntarily, deliberately, and purposefully, and not because of ignorance, mistake, accident, negligence or carelessness.  In other words, did Mr. Greebel participate in the conspiracy *with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective*?"  Final Jury Instructions, Dkt. 498 at 36 (emphasis added).

Where the crime alleged requires proof of *specific intent*, courts in the Second Circuit have been careful to hold the government to its theory of proof.  Judge Gardephe granted Rule 29 with respect to the conspiracy charge in *United States v. Valle*, 301 F.R.D. 53 (S.D.N.Y. 2014), *aff'd in relevant part by United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015).  In what the Second Circuit called a "thorough and thoughtful 118-page opinion, the district court . . . granted [the defendant's] Rule 29 motion with respect to the conspiracy charge.  While remaining 'mindful of the jury's critical role in our legal system,'" Judge Gardephe acknowledged his

responsibility to ensure that the government satisfies its burden of establishing proof beyond a
reasonable doubt.  The judge concluded that, notwithstanding the jury's verdict to the contrary,
the prosecutors had "failed to prove beyond a reasonable doubt that [the defendant] and his
alleged co-conspirators had entered into a conspiracy to kidnap *or that [the defendant] had
formed the requisite specific intent to kidnap*."  *Id.* (emphasis added and internal citations
omitted).  "What is required is that a defendant must have participated with *knowledge of at
least some of the purposes* or objectives of the conspiracy and with *the intention of aiding in
the accomplishment of those unlawful ends*."  Final Jury Instructions, Dkt. 498 at 39 (emphasis
added).

As in *Valle*, the government's evidence against Mr. Greebel was woefully insufficient to
show he "formed the requisite specific intent" to defraud Retrophin or that he "participated with
knowledge . . . of those unlawful ends."  Rather, the evidence at trial—showing that Mr. Greebel
(i) was aware of the company's extensive litigation risks, (ii) was cognizant of the financial and
reputational costs associated with even bogus litigation threats (let alone litigation itself), and
(iii) had a good-faith belief that Mr. Shkreli was empowered to execute agreements on behalf of
the company—indicates that Mr. Greebel acted not to defraud Retrophin, but to help it.  Like the
prosecution in *Bryant*, however, the government—relying on little more than vague and
ambiguous emails between Mr. Greebel and Mr. Shkreli—asks the Court to "disregard this
explanation without any evidentiary basis for doing so[.]"  *Bryant*, 885 F. Supp. 2d at 765; *see
also id.* (the court "refuse[d] to adopt the prosecution's theory, 'where little more than conjecture
supports the hypothesis of guilt'") (quoting *United States v. Marti*, 294 Fed. App'x 439, 444
(11th Cir. 2008)).  And even assuming *arguendo* that these agreements were deemed harmful by
Retrophin (despite rampant litigation risk and despite the legitimate consulting services provided

15

by Messrs. Blanton and Geller), there is no evidence that *Mr. Greebel* had the specific criminal objective of defrauding Retrophin by executing these agreements.

Perhaps most notably, Mr. Greebel willingly disclosed these agreements not only to Retrophin's newly hired Chief Financial Officer, board of directors, and external auditor, *see, e.g.*, Jain Testimony, Tr. 5436:1–10; *id.* at 5436:21–5437:6; *id.* at 5440:14–17, he also disclosed the agreements in multiple public SEC filings, providing Retrophin shareholders and the investing public with full transparency as to the details of the consulting and settlement agreements at issue in Count Seven. *See* DX 116-102 (disclosing settlement agreements in Retrophin's 2013 10-K); DX 116-52 (disclosing settlements, including a form template settlement agreement, in Retrophin's 2013 S-1). Mr. Greebel could not have possibly known that Retrophin board members, charged with the responsibility of overseeing and directing the company's affairs, were "farting around" and "not really spending any serious time" on important decisions or transactions. Tr. 4522:18–21. Mr. Greebel attended multiple board meetings where Retrophin's directors signed off on SEC filings that publicly disclosed the settlement and consulting agreements, but he was unaware that board members only "skimmed through the documents and did not review them with the depth that [they] should have." Tr. 6581:14-16 (referencing Retrophin's Form 10-K for the year ended 2013, DX 116-102).

Fraud fundamentally requires acts of deception, concealment, or misrepresentation. *See In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 512 (S.D.N.Y. 1987) ("A scheme to defraud is a plan whose object is 'to deprive one of property through fraudulent or deceptive means, such as material misrepresentation [or] concealment.") (internal citations omitted). Yet we are confronted with a very rare case of fraud where the alleged "deception" was disclosed in its entirety to the very parties charged with the stewardship and financial oversight of the

company, as well as to the United States Securities and Exchange Commission and Retrophin shareholders. Because (i) a reasonable juror could not simultaneously believe that Mr. Greebel defrauded Retrophin through settlement and consulting agreements while nonetheless disclosing those very agreements, (ii) there has been no evidence of Mr. Greebel's specific intent to defraud Retrophin, and (iii) in fact, the only evidence to date has shown that Mr. Greebel's intent was to shield Retrophin from costly litigation and to garner legitimate consulting services from certain qualified individuals, the government's evidence on Count Seven is insufficient to survive Rule 29.

> **4.    The Government Did Not Offer Sufficient Evidence for a Reasonable Juror to Find that Mr. Greebel Conspired with Any of the Unnamed Co-Conspirators on Count Seven, as Required Under Second Circuit Precedent.**

Circuit precedent requires the government to prove a conspiracy between Mr. Greebel and someone other than Mr. Shkreli. Mr. Greebel's conviction on Count Seven can only survive Rule 29 if there is sufficient evidence for a reasonable juror to find that Mr. Greebel conspired with someone who has *not already been acquitted of the same conspiracy charge*. The Court stated unequivocally that it was "open to hearing from the defense after the Government rests. If the evidence is insufficient, I will not hesitate to dismiss Count 7[.]" Tr. 73:6-74:12.

In *United States v. Batista*, No. 06 Cr. 265 (S-5), 2010 WL 1193314, at *10–12 (E.D.N.Y. Mar. 24, 2010), the court granted the defendant's motion for a judgment of acquittal of conspiracy on the grounds that the defendant could not be found guilty as a matter of law where his co-defendant had been acquitted and there was no evidence that any other person had entered the alleged conspiracy. There, the government alleged that Batista, an NYPD detective at the time, had conspired with co-defendants Henry Conde and William Valerio to obstruct an EDNY grand jury investigation. *Id.* at *11. When the jury acquitted Conde of the conspiracy

charge, Batista argued that his conviction should be dismissed. Batista asserted that the verdicts were inconsistent and "Conde's acquittal negates the possibility of an agreement between Batista and Conde, and thereby denies the existence of any conspiracy at all." *Id*. at *10. Faced with inconsistent verdicts against Conde (who was acquitted) and Batista (who was convicted), the government argued that Batista had conspired with Valerio, the government's cooperator and witness. *Id*. Judge Irizarry scrutinized Valerio's testimony to determine if he had "ever entered into any agreement with Batista to obstruct justice" and held that, despite Valerio's conclusory statement to the contrary, there was no evidence of an illegal agreement between Valerio and Batista. *Id.* at *11. Moreover, "a thorough review of the record [did not] support an inference that Batista conspired to obstruct with others apart from Conde, who was acquitted." *Id*. at *12. Accordingly, because the government failed to "proffer[] evidence about additional participants in the charged conspiracy," Judge Irizarry granted Batista's motion for a judgment of acquittal on that charge. *Id*.

Although the Court did not grant our motion to dismiss Count Seven before trial, in large part because the Court wanted to give the government a chance to present its case against Mr. Greebel (rather than relying on testimony from Mr. Shkreli's trial), we now have the benefit of the full trial record, and the government's proffered evidence is entirely insufficient for a reasonable juror to conclude that Mr. Greebel conspired with someone *other than Mr. Shkreli* to defraud Retrophin through the settlement and consulting agreements at issue in Count Seven. The government's proof on Count Seven consisted of (i) emails admitted through the FBI case agent and (ii) testimony from MSMB investors, Retrophin board members Steven Richardson and Stephen Aselage, and Retrophin's external accountants Sunil Jain and Corey Massella.

None of the testifying witnesses described the involvement of anyone other than Messrs. Shkreli and Greebel.  And the evidence offered through the case agent is a far cry from sufficient evidence to convict Mr. Greebel of conspiracy.  The jury could not, for example, conclude that a mere smattering of emails is sufficient to find that Mr. Greebel conspired—*without Mr. Shkreli*—to defraud Retrophin with the help of CFO Marc Panoff.  Nor could these emails support a verdict that Mr. Greebel conspired with Marek Biestek or Kevin Mulleady.  Indeed, neither of these men had substantial contact with Mr. Greebel; neither of these men had decisionmaking or supervisory authority at Retrophin (in fact, Mr. Mulleady did not even work at Retrophin or have contact with Mr. Greebel during the period alleged in Count Seven); and neither Mr. Biestek nor Mr. Mulleady were even mentioned by many of the government's Count Seven witnesses.  In fact, Messrs. Biestek and Mulleady, both of whom the government named as co-conspirators on Count Seven, were primarily involved in the alleged backdating "scheme" that the Court dismissed during the trial.

As the Court knows, a conviction of conspiracy requires the jury to find that there was a criminal "meeting of the minds," *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 337 (E.D.N.Y. 2010), *aff'd*, 417 Fed. App'x 96 (2d Cir. 2011), but we challenge the government to point the Court to the totality of proof that Mr. Greebel entered into a shared criminal enterprise ***not*** with Martin Shkreli but with some other alleged co-conspirator.  Because no such evidence exists, and because Mr. Greebel lacked the requisite fraudulent intent to conspire with Mr. Shkreli, the jury's verdict on Count Seven should be set aside.

> **5.      The Government Did Not Offer Sufficient Evidence for a Reasonable Juror to Find the Existence of a Criminal Agreement with Mr. Shkreli or that Mr. Greebel Knowingly Joined Such an Agreement**

Most fundamentally, even assuming *arguendo* that *Rodriguez* and *Batista* do not apply here, the government entirely failed to offer proof sufficient to survive Rule 29 that Evan

Greebel agreed to participate in a conspiracy with Martin Shkreli to defraud Retrophin, Mr.

Greebel's own client.  The government's remaining theories of fraud on Count Seven have never

made—and still do not make—any sense, particularly as they relate to Mr. Greebel.  The proof at

trial was nonexistent that Mr. Greebel agreed to have Retrophin enter into fraudulent settlement

agreements and sham consulting agreements to defraud Mr. Greebel's corporate client.

The Court properly instructed the jury regarding the first element of Count Seven, the

"Existence of the Agreement":

> The first element that the government must prove beyond a
> reasonable doubt for Count [Seven] is that Mr. Greebel and at least
> one other person entered into the charged agreement to commit wire
> fraud. . . . It is sufficient if the government proves, beyond a
> reasonable doubt, that the conspirators tacitly came to a ***mutual
> understanding to accomplish an unlawful act*** by means of a joint
> plan or common design. But proof that people simply met together
> from time to time and talked about common interests, or engaged in
> similar conduct, is not enough to establish a ***criminal agreement***.

Dkt. 498, at 34–35 (emphasis added).  The Court then instructed the jury on the second element

of Count Seven, "Membership in the Conspiracy":

> The second element the government must prove beyond a
> reasonable doubt for Count [Seven] is that Mr. Greebel knowingly
> and intentionally became a member in the charged conspiracy. . . .
> In sum, the defendant, ***with an understanding of the unlawful
> character of the conspiracy***, must have intentionally engaged,
> advised or assisted in it ***for the purpose of furthering the illegal
> undertaking***.

*Id.* at 36–39 (emphasis added).

Despite these fundamental elements of Count Seven, the government failed to prove the

existence of a criminal conspiracy or that Mr. Greebel joined such a conspiracy.  There is no

proof that there was a "mutual understanding to accomplish an unlawful act" as required under

the Court's instructions.  Indeed, the evidence proffered by the government does not show any

"understanding" whatsoever; to the contrary, the evidence shows only that Mr. Greebel, relying

on representations made by the CEO of his client Retrophin, merely did the fairly ordinary work

of external counsel—*i.e.*, he prepared documentation for certain agreements, the substance of

which had been negotiated by Mr. Shkreli.  The government's interpretation of incomplete email

communications between Mr. Greebel and Mr. Shkreli "is not enough to establish a criminal

agreement."  *Id.* at 35.  The government admitted, for example, GX 575, wherein Mr. Shkreli

instructs Mr. Greebel regarding multiple MSMB investors, "[D]on't let them sue us."  If

anything, the clear takeaway from these emails is that Mr. Greebel and Mr. Shkreli had only one

goal: to finalize pending settlement agreements in order to ***protect*** Retrophin from harmful

lawsuits.  This is a far cry from a "common design . . . for the accomplishment of the unlawful

purpose stated in the Superseding Indictment."  Dkt. 498 at 36.

The same is true with respect to the second element of Count Seven.  As noted above, the

government was required to prove that Mr. Greebel acted knowingly and intentionally "***with an***

***understanding of the unlawful character of the conspiracy***" and "***for the purpose of furthering***

***the illegal undertaking***."  *Id.* at 39.  But the government's evidence falls well short of this mark.

The government's own witness, Retrophin's external auditor Sunil Jain, testified as follows:

> Q:     And you have no basis to testify here today that you
>        believed the settlements agreements were improper
>        agreements in and of themselves?
> A:     I don't believe so, that they were improper.

Tr. 5442:4–7.  Mr. Jain further testified that there was no effort whatsoever to conceal the

existence of the settlement and consulting agreements in connection with Retrophin's SEC

filings:

> Q:     He [alleged co-conspirator Marc Panoff] didn't ask you not
>        to mention the settlement agreements to anyone else,
>        correct?

21

| | |
|---|---|
| A: | Yes. |
| Q: | **He didn't ask you to keep a secret, right?** |
| A: | Yes, **he did not.** |
| Q: | **He didn't say don't tell the board no matter what you do, right?** |
| A: | **No.** |
| Q: | He went and got them and gave them to you? |
| A: | Yes. |

Tr. 5436:24–5437:8 (emphasis added).

| | |
|---|---|
| Q: | In your experience when Mr. Panoff told you that he just missed the issue, you understood that maybe a mistake had happened at most, correct? |
| A: | My understanding not only these settlement agreements but in general the company was like not giving us the documents on a timely basis and they were missing many times.  It was not the first time. |
| Q: | But in your understanding it was a product of inadvertence as opposed to a conscious effort to conceal things from you, correct? |
| A: | **I don't think so that they were hiding anything from me**. |

Tr. 5439:20–5440:14 (objection omitted) (emphasis added).

| | |
|---|---|
| Q: | You learned about [the Schuyler Marshall settlement] in time to put it into the financial statement; right? |
| A: | In the subsequent events, yes. |
| Q: | And, again, that **additional settlement agreement wasn't hidden from you**; correct? |
| A: | **No**. |

Tr. 5450:13–18 (emphasis added).

Additional evidence showed Mr. Greebel's continual efforts to urge Mr. Shkreli to disclose settlement and consulting agreements to Retrophin's investors, its board of directors, or both.  Mr. Greebel wrote to Mr. Shkreli, for example, attaching the "accounting release" from Retrophin's auditor, Marcum LLP, and informing Mr. Shkreli that the release "requires recognition of a subsequent event" if certain requirements are met relating to litigation threats and settlement agreements.  DX 1266.  Other evidence showed that Mr. Greebel rebuffed Mr.

22

Shkreli's suggestions to avoid disclosure requirements by "annul[ling]" certain settlement agreements.  GX 618 at R023350-51.  Indeed, Mr. Greebel wrote to Mr. Shkreli that his suggestions would "open up some very big issues" and encouraged Mr. Shkreli, instead, to disclose the agreements in Retrophin's SEC filings.  *Id.*  And yet the government has failed to connect these actions to Mr. Greebel's "awareness of at least some of the basic aims and purposes of the unlawful agreement" or his "intent to help it succeed."  Dkt. 498 at 38.  Such vague and ambiguous emails do not satisfy this crucial element of the conspiracy alleged in Count Seven, nor do they rebut the perfectly plausible *innocent* explanation of Mr. Greebel's actions—*i.e.*, that he acted to protect Retrophin from the clear risk of litigation.  *See Bryant*, 885 F. Supp. 2d at 760 ("Simply put, the existence of a reasonable innocent explanation of the evidence creates reasonable doubt.").

Notably, the government did not call one witness who testified that Mr. Greebel and Mr. Shkreli conspired to defraud Retrophin through settlement and consulting agreements.  Indeed, the evidence at trial showed just the opposite—*i.e.*, that there was very good reason to enter into the settlement agreements, that the two consultants at issue did perform legitimate consulting work, and that, critically, there was no evidence in the record that *Evan Greebel* actually believed the consulting agreements were sham agreements.

Whether Mr. Shkreli intended to defraud his company with settlement agreements or consulting agreements is not at issue—and, of course, a jury acquitted him of such conduct.  The issue here is whether there was sufficient proof for a reasonable jury to find *that Mr. Greebel conspired with Martin Shkreli to agree to engage in a plan to defraud his own corporate client through fraudulent settlement agreements or two sham consulting agreements*.  The evidence

adduced at trial does not come close to meeting this threshold.  Thus, our Rule 29 motion should certainly be granted as to Count Seven.

Because there is insufficient evidence to prove the existence of a conspiracy or Mr. Greebel's membership in any conspiracy, his conviction on Count Seven cannot survive Rule 29.

### C.        The Evidence as to Count Eight

The Government's proof against Mr. Greebel on Count Eight is insufficient to survive Rule 29.  Count Eight arose from Mr. Shkreli's gifting of shares to several colleagues, whereby Mr. Shkreli granted seven individuals (the "Fearnow recipients") the right to acquire certain shares of freely trading Retrophin stock at a nominal rate.  Because the government offered no evidence of the existence of a criminal scheme to "control [] the price and trading of Retrophin's stock," Superseding Ind. ¶ 37, and because there was no evidence that Mr. Greebel knowingly and intentionally entered any such scheme, the jury's verdict on Count Eight cannot stand.

### 1.        The Government's Proof Was Insufficient for a Reasonable Juror to Find the Existence of the Conspiracy Alleged in Count Eight.

***First***, the government offered no evidence that the alleged scheme—to artificially inflate or buoy the price of Retrophin stock by preventing sales—is itself unlawful.  A prerequisite for a guilty conspiracy verdict requires the jury to identify a shared ***criminal*** objective.  *United States v. Courtois*, No. S81 Cr. 53-CSH, 1981 WL 1639, at *19 (S.D.N.Y. June 5, 1981) (conspiracy charge under Section 371 must be dismissed "if the actions forming the subject matter of the conspiracy do not themselves constitute substantive crimes").  But an agreement for owners of a company's stock to ***hold*** stock—rather than to sell or buy such stock—is not itself improper.  Indeed, companies frequently exercise *lawful* control of the price and trading of their stock.  In many cases, as was the case with Retrophin, companies are ***required*** to close the trading window for investors possessing material non-public information.  U.S. Sec. & Exch. Comm'n, Fast

24

Answers – Insider Trading (Jan. 15, 2013), https://www.sec.gov/fast-answers/ answers insiderhtm.html (noting that insider trading cases have been brought against associates of a company's officers, directors, and employees who traded the company's stock after receiving such information).

Even the Securities and Exchange Commission (the "SEC") recognizes that an agreement to freeze or hold certain portions of outstanding stock is an entirely acceptable and extremely common objective:  "Lockup agreements prohibit company insiders—including employees . . . —from selling their shares for a set period of time. . . . Before a company goes public, the company and its underwriter typically enter into a lockup agreement to ensure that shares owned by these insiders don't enter the public market too soon after the offering."  *See* Sec. & Exch. Comm'n, Fast Answers – Initial Public Offerings: Lockup Agreements (Sept. 16, 2011), https://www.sec.gov/fast-answers/answerslockuphtm.html.

In *Lowinger v. Morgan Stanley & Co. LLC*, the SEC filed an *amicus* brief "setting forth its views" that "[lock-up] agreements are common because they prevent pre-IPO shares from flooding and destabilizing the market for newly issued shares."  Brief for S.E.C. as Amicus Curiae at *12, *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122 (2d Cir. 2016).  The SEC explained that "[t]ypical lock-up agreements between shareholders and underwriters have *nothing to do with potential control, long-term ownership, or evading disclosure rules.*  Rather, they facilitate the offering process by maintaining an orderly market and preventing a rush of pre-IPO shares from exerting substantial downward pressure on the market price of the newly issued shares."  *Id.* at *21 (internal citations omitted).

This is the very reason that convictions for market manipulation require a finding that the **sole intent** behind the trading in question constitutes an "improper purpose."  "[I]f a transaction

would have been conducted for investment purposes or other economic reasons, and regardless of the manipulative purpose, then it can no longer be said that it is 'artificially' affecting the price of the security or injecting inaccurate information into the market, which is the principal concern about manipulative conduct." *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 373 (S.D.N.Y. 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (manipulative "conduct [is] designed to deceive or defraud investors by controlling or artificially affecting the price of securities")). The government elicited no testimony and introduced no documents showing any improper purpose for the conspiracy alleged in Count Eight, and the government's proof is insufficient that this alleged conspiracy involved a shared objective that was in itself illegal. Thus, the evidence is insufficient for a reasonable juror to find the existence of a criminal conspiracy.

**_Second_**, the evidence showed that the Fearnow recipients' trading behavior was entirely inconsistent with the existence of the conspiracy alleged in Count Eight. Timothy Pierotti, the only Fearnow recipient to testify, readily admitted that he sold his shares within weeks of the alleged "agreement" to hold Retrophin shares. *See* Pierotti Testimony, Tr. 6301:24–6302:1 ("Q. Do you deny that you began selling [your shares] 16 days after entering into the agreement? A. I don't deny it."). Mr. Pierotti, *whom the government did not name a co-conspirator in Count Eight*, further testified that he had "no idea if anyone agreed with Martin Shkreli to do anything" relating to the trading volume of the stock. Tr. 6284:12–22. Expert testimony also confirmed that market activity of the Fearnow recipients was not indicative of the illegal scheme proffered by the government. Indeed, Professor Craig Lewis testified that (a) the Fearnow recipients' "net selling activity is inconsistent with a coordinated attempt to cause stock prices to go up or to stabilize[]," Tr. 8532:7–9, and (b) "the data is inconsistent with wash trading," Tr. 8529:18.

Thus, even assuming (against the weight of authority) that the objective of the Count Eight

conspiracy was itself improper, the evidence is insufficient to sustain the jury's verdict.

> **2.     The Government Presented No Proof That Mr. Greebel Entered a
> Conspiracy to Control the Price and Trading of Retrophin Stock.**

Viewing the government's evidence as a whole, a reasonable jury could not find that *Mr.*

*Greebel* entered into the conspiracy alleged in Count Eight.  In its entire case, the government

presented only two witnesses, Jackson Su and Timothy Pierotti, who testified about the alleged

conspiracy to control the Fearnow shares, but neither witness testified to any personal knowledge

concerning Mr. Greebel's involvement.  *See, e.g.*, Tr. 6282:21–24 (Pierotti said nothing to Mr.

Greebel and had "no knowledge" that Mr. Shkreli said anything to Mr. Greebel concerning an

agreement to control the Fearnow shares); Tr. 6293:20–6294:3 (Pierotti admitted that although

an email from Mr. Shkreli's assistant to the Fearnow recipients "gave the appearance of" an

attempt to control the shares, Mr. Pierotti never reported that concern to anyone, including Mr.

Greebel); Tr. 5136:11–25 (Su's meeting was "just [him] and Mr. Shkreli" and he did not email or

tell anyone about this meeting); Tr. 5140:8–10 (Su did not tell Mr. Greebel about meeting with

Mr. Shkreli).

Indeed, neither witness testified that Mr. Greebel was present at the meeting in late 2012

between Mr. Shkreli and the Fearnow recipients where they allegedly agreed to control

Retrophin shares.  To the contrary, Mr. Pierotti explicitly testified that Mr. Greebel was *not*

*present* for this meeting.

> Q:     Right. Okay. You mentioned a bunch of people were there,
> too, approximately five; correct?
> A:     Yes.
> Q:     And that those people were the other people that were part
> of the buying group; correct?
> A:     As I recall, yes.
> Q:     ***Evan Greebel was not there; correct?***

A:     *No, he wasn't.*

Tr. 6281:18–25 (emphasis added).

The government's non-testimonial evidence was also insufficient for a jury to conclude that Mr. Greebel was in any way a member of the conspiracy alleged in Count Eight.  The government argued in summation, for example, that an email from Mr. Shkreli's assistant, GX 112-12, asked the Fearnow recipients to "report back any trading they had done in the Retrophin stock on a daily basis" and thus constituted evidence of the alleged Count Eight conspiracy.  Tr. 10345:12–21.  Notably, however, Mr. Greebel did not receive this email.  The government also pointed to an email from Mr. Shkreli to certain Fearnow recipients expressing his hopes of "increasing the trading volume in [Retrophin's] stock."  GX 112-21.  Remarkably, the government cited this email in summation as one of "the ways in which . . . *the defendant and Mr. Shkreli* controlled the price and trading volume of stock[.]"  Tr. 10343:12–14.  Yet the government ignores the fact—as its own witness confirmed—that Mr. Greebel neither received this email nor is mentioned in it.  Tr. 6294:13–16.

Similarly, the government argued that Mr. Shkreli's so-called "over-the-wall" email was evidence of the conspiracy alleged in Count Eight.  GX 507.  Specifically, the government referenced an email exchange between Mr. Greebel and Mr. Shkreli from December 30, 2012, wherein Mr. Shkreli sought Mr. Greebel's advice in drafting an email to "all the Fearnow share recipients[.]"  Tr. 10351:7.  The government argued that the goal of Mr. Shkreli's email was to "force [the Fearnow recipients] to get inside information so they can't trade anymore"  and that this email was thus evidence of a conspiracy to control the Fearnow shares.  Tr. 10351:7-8.  But the government failed to mentioned that Mr. Greebel—less than two weeks before this email exchange—explicitly told another Fearnow recipient that he was free to "sell the stock however and to whomever you want except to affiliates of the company."  DX 1283.  The government's

28

cherry-picked use of a one-off email exchange thus disregards Mr. Greebel's undeniable good faith and his utter lack of participation in the alleged scheme to control Retrophin stock.

At bottom, the government's evidence is entirely insufficient for a reasonable juror to conclude (i) that the Count Eight conspiracy involved an illegal or improper objective; (ii) that any agreement (regardless of its propriety) ever existed in the first place; and (iii) that, in any event, Mr. Greebel intentionally and willingly joined the conspiracy alleged in Count Eight.  For all these reasons, the verdict as to Mr. Greebel on Count Eight cannot survive Rule 29.

## II.    SEVERAL PROCEDURAL SHORTFALLS RESULTED IN AN UNFAIR TRIAL AND REQUIRE A NEW TRIAL UNDER RULE 33.

Not only was there insufficient evidence to sustain Mr. Greebel's convictions on Counts Seven and Eight, but allowing the verdict to stand in light of several procedural shortfalls would also constitute a "manifest injustice." *Ferguson*, 246 F.3d at 134.  Specifically, the jury's verdict is infirm on the grounds that (i) it was premised on improper and incomplete jury instructions; (ii) the cumulative effect of the government's *Brady* and *Giglio* violations resulted in an unfair trial; (iii) Mr. Greebel should have been allowed to present highly relevant evidence relating to the government's treatment of Steven Rosenfeld; (iv) the government's constructive amendment of the charges in the Superseding Indictment violated Mr. Greebel's due process rights; (v) the verdict was the result of juror misconduct; (vi) the admission of certain hearsay evidence violated the standards laid out in *Bourjaily*, and (vii) the verdict was based on multiple prejudicial evidentiary rulings.  Accordingly, the Court should grant Mr. Greebel a new trial under Rule 33.

### A.    Legal Standard

A motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 may be granted "if the interest of justice so requires."  Fed. R. Crim. P. 33.  Whether to grant a motion

for a new trial pursuant to Rule 33 rests within the broad discretion of the trial judge.  *Ferguson*,

246 F.3d at 133.  Unlike a Rule 29 motion, in deciding whether to grant a Rule 33 motion, a

judge may weigh the evidence and determine the credibility of witnesses.  *United States v.*

*Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  The Court is not required to view the evidence in

the light most favorable to the government.  *United States v. Tarantino*, No. 08 Cr. 0655 (JS),

2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012).  The Court's discretion is limited in that it

should only grant a new trial when it "concludes that, despite the abstract sufficiency of the

evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the

verdict that a serious miscarriage of justice may have occurred."  *United States v. Lincoln*, 630

F.2d 1313, 1319 (8th Cir. 1980). "'The ultimate test [on a Rule 33 motion] is whether letting a

guilty verdict stand would be a manifest injustice.'  To grant the motion, '[t]here must be a real

concern that an innocent person may have been convicted.'"  *United States v. Aguiar*, 737 F.3d

251, 264 (2d Cir. 2013) (quoting *Ferguson*, 246 F.3d at 134).

## B.    Jury Instructions

### 1.    The Jury Was Ill-Informed as to Mr. Greebel's State of Mind Because It Was Not Instructed on Alter Ego and Veil-Piercing Law.

The Court should grant a new trial under Rule 33 so that a jury can render an adequate

verdict as to Mr. Greebel's state of mind.  Under relevant law, the undisputed commingling

between Retrophin and the MSMB Entities posed a real and legitimate veil-piercing risk.

Federal courts interpreting the federal and Delaware veil-piercing jurisprudence have

recognized that "an alter ego analysis must start with an examination of factors which reveal how

the corporation operates and the particular defendant's relationship to that operation.  These

factors include whether the corporation was adequately capitalized . . . whether the corporation

was solvent; ***whether . . . corporate records kept, officers and directors functioned properly,***

*and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds*; and whether, in general, the corporation simply *functioned as a facade for the dominant shareholder.*"  *See, e.g.*, *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988), *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989), *and aff'd sub nom. Appeal of J.L. Capano, Inc.*, 879 F.2d 857 (3d Cir. 1989), *and aff'd* 879 F.2d 860 (3d Cir. 1989) (emphasis added).  The Second Circuit has similarly recognized that under Delaware law "the distinction between the entity and its owner 'may be disregarded' to require an owner to answer for the entity's debts."  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (citing *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)).  "To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness."  *Id.* (citation omitted).

These crucial tenets of veil-piercing law were omitted from the Court's final jury instructions, over Mr. Greebel's objection,[2] and the jury was thus left to judge Mr. Greebel's state of mind without an understanding of the legal concepts that would have informed his state of mind as a lawyer advising a client.  *Cf. Delossantos*, 536 F.3d at 161 ("[T]he Supreme Court has instructed us not to consider individual facts in isolation but to examine the totality of the circumstances.").  A fraud trial is, after all, about a defendant's state of mind.  Yet how can the

---

[2]     Mr. Greebel's proposed jury instructions included "Proposed Instruction 37:  Alter Ego/Piercing the Corporate Veil," which provided that "[f]or purposes of evaluating Mr. Greebel's and the government's contentions, I instruct you that, under Delaware law, whether MSMB Capital and MSMB Healthcare investors would be able to successfully file a lawsuit against Retrophin would depend on multiple factors regarding the relationship between MSMB entities and Retrophin[,]" including "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether corporate formalities were observed; and whether the dominant shareholder siphoned corporate funds."  Dkt. 461-1, at 61.

jury render a verdict as to Mr. Greebel's true state of mind if it cannot adequately step into his shoes?  The Court, the government, and the defense—including Mr. Greebel himself—all have the benefit of a legal education, allowing us to understand the *legal ramifications* of certain facts. We take for granted, for example, that a long-established body of Delaware and New York law allows plaintiffs to pursue claims against parent and subsidiary companies alike when certain conditions are met—*i.e.*, it allows plaintiffs to "pierce the corporate veil."  It was this crucial fact that gave rise to the very real litigation risks faced by Retrophin *despite* Retrophin's lack of involvement in the MSMB investor losses.  In other words, Mr. Greebel—armed with his legal education and decades of legal experience—knew that sloppy bookkeeping; mixed bank accounts and "comingled monies," Tr. 5220:18–21; overlapping employees, management, and decisionmakers, GX 111-1; shared office space, Tr. 4639:2–10 (Mr. Aselage's recognition that "Retrophin's original office space was actually where MSMB existed"); mixed use of Retrophin and MSMB email addresses, Tr. 5252:14–5253:15 (Mr. Su acknowledging that he "us[ed] the MSMB Capital e-mail for doing Retrophin work" and that "that happened many times"); and public (and private) recognition that Retrophin was a successor to the MSMB Entities or that the entities were "interchangeable," Tr. 5878:21–24, exposed Retrophin to liability for MSMB's actions.

Three pieces of information are necessary to conclude that Retrophin faced the risk of direct involvement in the threatened litigation: (1) knowledge of commingling, (2) knowledge of litigation threats, and (3) knowledge of the law.  As the Court recognized, the evidence clearly showed that there was substantial commingling: "I understand Mr. Greebel was aware of the commingling of funds and how the monies were being used." Tr. 8070:8–9.  The same is true with respect to the widespread and consistent litigation threats from multiple MSMB investors:

"What we do have evidence of is that the threats by many investors and their counsel to Mr. Shkreli, and copying Mr. Greebel, or having Mr. Shkreli copy Mr. Greebel on these threats, that he perceived that these folks were going to come after Retrophin." Tr. 8811:17–21.  Yet the jury was left to judge Mr. Greebel's state of mind without the final, crucial piece.  Without this instruction, the lay jury could not make the leap as to the *consequences* of the substantial commingling between Retrophin and the MSMB Entities.  (Indeed, the jury would likely worry that making such a leap would run afoul of the Court's instruction to look only at the evidence adduced at trial and to strictly follow the Court's instructions.)  Consequently, the jury reached a verdict as to Mr. Greebel's state of mind with an incomplete and inadequate understanding of the context in which *Mr. Greebel's* decisions were made.

> **2.     The Court Should Allow a New Jury to Render a Verdict with the Benefit of a Jury Instruction Consistent with *United States v. Rodriguez.***

In *United States v. Rodriguez*, 983 F.2d 455 (2d Cir. 1993), the Second Circuit explained that inconsistent conspiracy verdicts are prohibited where there is no probative evidence demonstrating beyond a reasonable doubt that the defendant conspired with anyone else to commit the crime.  *Id.* at 459.  There, Maritza Rodriguez was returning from Venezuela when she was arrested at the JFK airport with 1,939 grams of cocaine in a bulging suitcase.  *Id*. at 456. Rodriguez gave a patently absurd account that she bought the suitcase at a flea market in Venezuela, had no knowledge of what was inside, and flew back to the United States without having examined its contents.  *Id*.  Crucially, after the district court dismissed the indictment against Rodriguez's co-defendant (Yesenia Maria Taveras) who traveled with Rodriguez back to the United States, having found no probative evidence that Taveras agreed to commit any narcotics offenses, the district court instructed the jury that it could find Rodriguez guilty of conspiracy only if the government proved that Rodriguez had entered into an illegal agreement

with *someone other than Tavares* to possess and import cocaine.  *Id*. at 459.  Because the

government proved beyond a reasonable doubt that Rodriguez had conspired with someone other

than Tavares, Rodriguez's conspiracy conviction withstood scrutiny.  *Id*.

      The Court recognized before trial the rare circumstances of this case and acknowledged

that the government bore the burden of offering new evidence that Mr. Greebel conspired with

someone other than Mr. Shkreli:

> I think it is rather complicated, but I think what we find ourselves in
> is an area where there isn't clear guidance because this is a pretty
> unique situation…. I will tell you, frankly, is that the government
> has represented as officers of the Court that it has evidence that it
> did not present at the Shkreli trial, that they are prepared to present
> against Mr. Greebel, and that there are other co-conspirators besides
> Mr. Shkreli and Mr. Yaffee *[sic]* that they are prepared to present
> evidence on. . . . I am certainly open to hearing from the defense
> after the Government rests. If the evidence is insufficient, I will not
> hesitate to dismiss Count 7[.]

Tr. 73:6–74:12.

      With the benefit of the trial record, we now know the government does not have any new

evidence as to other alleged co-conspirators on Count Seven.  At a minimum, the jury should

have been informed that Mr. Shkreli—as the undisputed leader of the conspiracy alleged in

Count Seven—was acquitted of the very same charges.  One key aspect of the Second Circuit's

decision in *Rodriguez* was the fact that the district court had "properly charged the jury" that it

could not consider the acquitted co-conspirator in determining whether a conspiracy existed.

*Rodriguez*, 983 F.2d at 459.  This instruction would have been highly relevant—and helpful—in

guiding the jury's determination as to whether the government met its burden of proof.  Even if

the Court saw fit to tailor the *Rodriguez* instruction to account for the fact that Shkreli's acquittal

was based on a jury verdict, as opposed to a judicial determination,[3] the Court could have done

so in a way that simultaneously honored Second Circuit precedent and gave the jury the benefit

of highly relevant and probative information regarding Mr. Shkreli's acquittal.  The failure to do

so resulted in a verdict that was based on an incomplete and misleading understanding as to the

scope of Mr. Greebel's liability.  This fundamentally prejudiced Mr. Greebel by broadening the

grounds on which Mr. Greebel could be convicted, particularly where so much of the

government's proof focused on the wrongdoing not of Mr. Greebel himself but of acquitted

alleged co-conspirator Martin Shkreli.

> **C.**   **The Government's Pattern and Practice of *Brady* and *Giglio* Violations Resulted in an Unfair Trial.**

Government disclosure of exculpatory material and impeachment evidence is part of the

constitutional guarantee to a fair trial.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v.*

*United States*, 405 U.S. 150, 154 (1972).  The law requires the disclosure of exculpatory and

impeachment evidence when such evidence is material to guilt or punishment.  *Brady*, 373 U.S.

at 87; *Giglio*, 405 U.S. at 154.  Materiality does not require that the defendant "would more

likely than not have received a different verdict with the evidence."  *Kyles v. Whitley*, 514 U.S.

419, 434 (1995).  Rather, the Court need only find that "the likelihood of a different result is

great enough to 'undermine confidence in the outcome of the trial.'"  *Smith v. Cain*, 565 U.S. 73,

75–76 (2012) (alteration omitted) (quoting *Kyles*, 514 U.S. at 434).  And, because *Brady* applies

---

[3]     To be sure, the Court denied our motion to dismiss Count Seven, reasoning in part that
*Rodriguez* was based on a *judicial determination*, as opposed to a jury verdict.  Dkt. 402, Mem.
and Order Regarding Motion to Dismiss, at 5–6 (Oct. 13, 2017).  But the Court also explained
that it was premature to grant our request before trial since the government was free to present
new evidence of other alleged co-conspirators:  "[T]he government has not yet presented its case
against Mr. Greebel. . . . The government [] is not bound to repeat the same case it proffered
against Mr. Shkreli; it may present additional or different evidence and may argue that additional
individuals conspired with Mr. Greebel." *Id*. at 7–8.

exclusively to criminal trials, "a different result" means only the jury retaining reasonable doubt—that is, not reaching a subjective state of near certitude of guilt. *Victor v. Nebraska*, 511 U.S. 1, 15 (1994); *see In re Winship*, 397 U.S. 358, 363 (1970) (noting reasonable-doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error").

In crafting the materiality standard, the Court has been cautious "to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles*, 514 U.S. at 440.  For a court to conclude that withheld evidence is not material, the question is not whether a jury "*could* have disbelieved" the withheld evidence; a court must instead have "confidence that it *would* have done so." *Smith*, 565 U.S. at 76.  Notably, a court considers the suppressed evidence "collectively, not item by item." *Kyles*, 514 U.S. at 436.  And it evaluates that evidence "in the context of the entire record"—that is, "the existing or potential evidentiary record." *United States* v. *Agurs*, 427 U.S. 97, 112 (1976); *Kyles*, 514 U.S. at 439.  Accordingly, "additional evidence of relatively minor importance" can be material in comparatively weak cases. *Agurs*, 427 U.S. at 113.  Because *Brady* and *Giglio* are constitutional obligations, *Brady* and *Giglio* evidence must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence. *Kyles*, 514 U.S. at 432–33.  Here, in fact, we made multiple requests for any and all *Brady* and *Giglio* material in the government's possession.[4]

---

[4]     Prosecutors are also instructed to take a broad view with respect to their disclosure obligations.  Indeed, The Department of Justice Discovery Policy memorandum lays out "Discovery Obligations" for Assistant United States Attorneys in the criminal division: "Exculpatory and impeachment evidence is material to a finding of guilt—and thus the Constitution requires disclosure—when there is a reasonable probability that effective use of the evidence will result in an acquittal. *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Because it is sometimes difficult to assess the materiality of evidence before trial, **prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and**

Despite these broad obligations, it became clear throughout trial that the government failed to disclose information within the purview of *Brady* and *Giglio*.  After we repeatedly brought this to the Court's attention, the Court recognized that we were entitled to exculpatory information not contained in the 3500 material.  Indeed, the Court acknowledged that "the concern is the government has acted as the gatekeeper as to what it perceives as being *Brady* which may be different from what defense or a court may perceive as being *Brady* . . . [T]here might be some omission of information that, in the defense view, is exculpatory."  The Court then ordered the government to review its witness materials and confirm that it had complied with *Brady* and *Giglio* obligations.  Tr. 3730:10–16 (ordering the government to "go back and review the notes you or the agents or anyone took to see if there's anything" where "a witness is speaking in a positive manner about Mr. Greebel's lawyering skills or whatever else, his integrity, and that you should provide that if it exists.").  The government did not provide any additional materials.

The cumulative effect of the government's pattern of *Brady* and *Giglio* violations violated Mr. Greebel's right to a fair trial.  *Smith*, 565 U.S. at 77 (vacating a conviction due to *Brady* violations and explaining that the "materiality determination must be made in the context of the entire record and turns on the cumulative effect of all such evidence suppressed by the government") (internal citations omitted).  Even a sampling of the exculpatory and impeachment evidence the government failed to disclose is sufficient to demonstrate the adverse effect of such non-disclosure on Mr. Greebel's trial.

---

***impeaching evidence***.  *Kyles*, 514 U.S. at 439."  Dep't of Justice, "Discovery Policy," at 1, https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/can_discovery_policy.pdf (last visited Feb. 6, 2018) [hereinafter "Discovery Policy"] (emphasis added).

*First*, the government's opening witness, Bernadette Davida, testified that she respected Mr. Greebel; that Mr. Greebel was "respected internally at Katten"; that he "was highly regarded"; that she "never observed Evan Greebel doing anything wrong" at Katten; and that she "never observed Evan Greebel lying to anyone at the firm" or to "any client[.]" Tr. 1238:24–1239:24.  Ms. Davida later testified that she conveyed these positive views of Mr. Greebel when she spoke to the prosecution:

> Q:   During your meetings with the prosecution team, did they ask you about your observations of Evan Greebel during the time you were at the law firm?
> A:   Yes. Yes.
> Q:   Did you tell them the same positive things you told to me when I first started talking to you this afternoon?
> A:   I don't -- yes, basically.
> Q:   Yes? Is that a yes?
> A:   Yes.

Tr. 1269:6–16 (objection omitted).  Ms. Davida also confirmed that members of the prosecution team, either attorneys or FBI agents, were taking notes during her meeting with them.  Tr. 1268:24–1269:5.  Yet none of this information was reflected in Ms. Davida's 3500 material or in correspondence from the government.

The government stated in its opening argument that Mr. Greebel was "trusted to look out for Retrophin's best interest" but that he "betrayed that trust" by conspiring with Mr. Shkreli. Tr. 1074:18–24.  But Ms. Davida's statements regarding Mr. Greebel's reputation for honesty, the fact that Mr. Greebel was held in high regard at Katten, and her explicit statements that she had never known Mr. Greebel to have committed any wrongdoing or betrayed a client's trust directly undercut the government's theory that Mr. Greebel has betrayed the trust of his client. These statements thus fall squarely within the sort of exculpatory evidence that should have been disclosed under *Brady* and its progeny.  The government's failure to disclose these statements,

despite Ms. Davida's sworn testimony regarding the notes taken at her witness interviews, raises grave concerns regarding the government's compliance with its disclosure obligations.

**_Second_**, it became clear during the cross-examination of Corey Massella that he had informed the government about the circumstances of his departure from Citrin Cooperman, whereby he was essentially asked to leave the firm because he concealed that he had loaned $200,000 to the firm's client.  Tr. 4195:6–4196:1.  "[I]t is well settled that impeachment evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness' falls within the *Brady* rule."  *United States v. Avellino*, 129 F. Supp. 2d 214, 217 (E.D.N.Y. 2001) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)); *see also Giglio*, 405 U.S. at 154 ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the *Brady* rule].") (internal citations omitted).  Mr. Massella's conduct relating to his departure from Citrin Cooperman fit squarely within this definition of *Brady* and *Giglio* material.  Mr. Massella intentionally misled his employer regarding a large financial transaction with one of the firm's clients; this transaction—and Mr. Massella's attempts to deceive his employer—go directly to his character for truthfulness and would easily constitute appropriate impeachment evidence of a government witness.  The government represented to the Court that it "did not discuss the underlying circumstances for [Mr. Massella's] separation agreement" with him, Tr. 3713:1–4, and in fact "had no idea" about the information. Tr. 3718:15.  But Mr. Massella admitted on cross-examination that he had discussed this information with the government prior to testifying. *See* Tr. 4195:7–4196:13 (Mr. Massella confirming that he told the prosecution team that he had made a loan to a Citrin Cooperman client; that he had not informed Citrin Cooperman of the loan; and that the resulting dispute with Citrin Cooperman and the firm's "unhappiness" with

Mr. Massella led to his departure).  This information goes directly to Mr. Massella's bias against Mr. Greebel, and is only heightened by the fact that Evan Greebel's father-in-law is the head of the very company that forced Mr. Massella out.  Nonetheless, the government failed to disclose this information before Mr. Massella's trial testimony.

      ***Third***, the government's conduct with respect to Timothy Pierotti's prior statements to the United States Attorney's Office for the Southern District of New York, including the circumstances and details of Mr. Pierotti's non-prosecution agreement ("NPA") in *United States v. Rajaratnam* 11 Cr. 416 (S.D.N.Y.), raises grave concerns regarding the government's compliance with its *Brady* and *Giglio* obligations.  We argued at the pretrial conference that we had a right to Mr. Pierotti's "statements about his prior acts before he received the [NPA]" with the Southern District of New York.  Tr. 92:19–21.  We reiterated to the Court (as we had repeatedly told the government) that we "believe[d] there [was] an electronic copy [of Mr. Pierotti's statements] at the Southern District of New York[.]"  Tr. 94:20–21.  Yet the government nonetheless insisted that they "did check with the Southern District" and that "whatever file system Mr. Brodsky and his colleagues were using for that trial does not have a copy of the non-prosecution agreement."  Tr. 95:9–12.  The government continued, "We have tried to find it.  I don't have an answer for that."  Tr. 95:12–13.  These were the representations the government made to the Court at the pretrial conference on October 6, 2017.  Then, just four days later on October 10—only ***after*** the Court ordered the disclosure of Mr. Pierotti's 3500 material—the government was able to find (i) a memorandum from an FBI  interview of Mr. Pierotti on November 21, 2011, (ii) a memorandum from April 5, 2012, (iii) a memorandum from April 6, 2012, (iv) a memorandum from April 13, 2012, and (v) an unsigned NPA between Mr. Pierotti and the Southern District of New York.

As the Court is well aware, *Brady* and *Giglio* material must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence, *see Kyles*, 514 U.S. at 432–33, yet in this instance the government disclosed Mr. Pierotti's 302s and his NPA *after* multiple requests and *after* being ordered by the Court to do so.  *See, e.g.*, Greebel Ltr. Regarding Pierotti Materials (Oct. 12, 2017 12:20 p.m.) (sent via email and copying the Court), Ex. B.  This is a far cry from the DOJ's directive that prosecutors take a "broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence."  Discovery Policy at 1.

**_Fourth_**, the government failed to inform the defense that it had contacted former Retrophin consultant Dr. Steven Rosenfeld in an effort to pressure him to (i) recant his story regarding the legitimate consulting services he provided to Retrophin; (ii) drop his pending arbitration against Retrophin relating to unpaid fees for those services; and (iii) pay Retrophin $170,000.  The government also failed to inform us that Dr. Rosenfeld consistently maintained that he did, in fact, provide legitimate consulting services.  Dr. Rosenfeld's consistency alone constitutes the very sort of exculpatory material that should be disclosed under *Brady*, since his insistence that he performed legitimate consulting services cuts against the very heart of the government's theory on Count Seven.  Yet we first learned of these communications several weeks into trial.  Even then, we did not learn of Dr. Rosenfeld's consistent exculpatory statements from the government; rather, we coincidentally gleaned this information from a happenstance conversation with Dr. Rosenfeld himself.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████.



This eleventh-hour disclosure cuts against the government's obligations under *Brady* and its progeny, which also require the timely disclosure of potentially exculpatory information, information that might impeach witnesses, information reflecting bias or incentives to lie, and any prior inconsistent statements of potential witnesses. While the government need not make disclosures upon defendant's demand, the defendant must possess "*Brady* evidence in time for its effective use." *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2002). This requires disclosure with enough time to allow "a responsible lawyer to use the information with some degree of calculation and forethought." *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001). █

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *United States v. Barret*, 824 F. Supp. 2d 419, 455 (E.D.N.Y. 2011) (ordering early disclosure of *Giglio* materials within 45 days of this Court's order because later disclosure "has great potential to disrupt the flow of trial");

*see also Leka*, 257 F.3d at 101 ("The limited *Brady* material disclosed to [defendant] could have

led to specific exculpatory information only if the defense undertook further investigation").

The government's pattern of non-disclosure with respect to exculpatory statements from

Bernadette Davida and Steven Rosenfeld and impeachment material for Corey Massella,

Timothy Pierotti, ██████████████ constitutes an impermissible disregard for the

government's obligations under *Brady* and *Giglio*.[5]  This pattern had the cumulative effect of

depriving Mr. Greebel of the opportunity to adequately prepare for the cross-examination of

government witnesses or to conduct a thorough investigation in the months before trial.  Had we

known, for example, that the *government's own witness* believed Mr. Greebel was highly

regarded at his law firm and that he had never lied or done anything wrong with respect to one of

his clients, we would have mentioned it in our opening statements.  Similarly, we could have

alerted the jury at the beginning of trial that several government witnesses were of dubious

credibility—*e.g.*, Mr. Pierotti and Mr. Massella.  And had we known about the government's

treatment of Dr. Rosenfeld—including the government's attempt to pressure Dr. Rosenfeld to

recant his story that he provided legitimate consulting services to Retrophin—we could have

reminded the jury of the government's thin evidence supporting its allegations against Mr.

Greebel.

---

[5]     Yet another example of the government's failure to comply with its disclosure obligations
became clear during Jackson Su's cross-examination, where he admitted that he mentioned to the
government his involvement in backdating of certain documents in his role as an employee of
Retrophin and the MSMB Entities.  *See* Tr. 5057:7–17 (Mr. Su testifying that he did not "see . . .
anything wrong" with "put[ting] on the document an agreement between the parties as of . . .
yesterday's date," and that he had done so and "told that to the prosecution team" prior to
testifying.).  While we believe that all backdating evidence should have been precluded in its
entirety, *see infra* Section II.E, these statements by Mr. Su should have been disclosed as they
were clearly contrary to one of the government's then-existing theories of Mr. Greebel's liability.

Thus, the government's failure to comply with its obligations, "collectively, not item by item," *Kyles*, 514 U.S. at 436, had the cumulative effect of depriving Mr. Greebel of his right to a fair trial.  Indeed, taken together, the government's disclosure violations prevented Mr. Greebel from adequately addressing the government's sparse evidence, from adequately alerting the jury to significant flaws in the government's case, and from sufficiently holding the government to its burden of proof.  Accordingly, the government's failure to abide by its obligations raises a very genuine concern that "the likelihood of a different result [had the government followed its obligations under *Brady*] is great enough to 'undermine confidence in the outcome of the trial.'" *Smith*, 565 U.S. at 75–76 (alteration and internal citations omitted).

> **D.** **The Jury Was Deprived of Key Evidence in Support of Mr. Greebel's "Rush-to-Judgment" Defense Relating to the Government's Treatment of Steven Rosenfeld.**

At a minimum, Mr. Greebel should have been allowed to present to the jury critical evidence relating to the prosecution's attempt to intimidate former Retrophin consultant Dr. Steven Rosenfeld, because this evidence was highly relevant to Mr. Greebel's rush-to-judgment defense.  To be sure, it is well settled that the defense cannot insinuate that the government is required to use any particular investigative technique.  But as we made clear at the pretrial conference and throughout trial, we are entitled to point to certain prosecutorial missteps or omissions insofar as they relate to the government's burden to prove its charges beyond a reasonable doubt.  Tr. 197:22–198:24.  The government's treatment of Dr. Rosenfeld, whose consulting agreement is referenced in the Superseding Indictment and was presented to the grand jury, relates directly to the prosecution's ever-changing and ill-founded theory regarding the consulting agreements at issue in Count Seven.

The very fact that Dr. Rosenfeld—a highly respected and accomplished doctor and investor and a non-party to this case with nothing to gain from either side—consistently told the

government that he did, in fact, provide legitimate consulting services undermines the government's theory regarding "sham" consulting agreements.  But equally as relevant is the fact that the government, after learning Dr. Rosenfeld's story, tried to intimidate him into changing that story.  Indeed, that FBI agents visited Dr. Rosenfeld's apartment unannounced and that a member of the government team spoke to Dr. Rosenfeld by phone and demanded a payment on behalf of ***Retrophin*** demonstrate how desperate the government was for corroborative evidence. We should have been allowed to present this evidence to the jury, *not* to "put the government on trial" but to demonstrate the paucity of the government's evidence and to highlight the fact that the government failed to meet its burden of proof.

> ### E.       Constructive Amendment

Without returning to the grand jury, the government improperly shifted its theories of the charges against Mr. Greebel.  Despite Mr. Greebel's Fifth and Sixth Amendment rights to know the charges against him and to prepare an adequate defense against those charges, the government's theories as to Mr. Greebel's charges changed both before and during trial, and Mr. Greebel was left to continually adapt to the government's changing landscape.  In short, Mr. Greebel was shooting at a moving target.  This violated his due process rights and resulted in an unfair trial.

"No person shall be held to answer for a . . . crime, unless on a presentment or indictment of a grand jury[.]"  U.S. Const. amend V.  "In all criminal prosecutions, the accused shall . . . be informed of the nature and cause of the accusation[.]"  U.S. Const. amend. VI.  Constructive amendment of a charge in a grand jury indictment violates the Fifth Amendment's Grand Jury Clause.  *See Stirone v. United States*, 361 U.S. 212, 215–16 (1960).  A constructive amendment occurs when the government seeks to admit evidence, argument, or jury instructions that "broaden [] the possible bases for conviction" beyond those provided in the indictment.  *United*

*States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005). "The theory of 'constructive amendment' is based on the fundamental principle that 'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.'" *United States v. Davis*, No. 13 Cr. 923 (LAP), 2017 WL 3328240, at *28 (S.D.N.Y. Aug. 3, 2017), *appeal withdrawn*, No. 17-3190, 2017 WL 6803303 (2d Cir. Dec. 7, 2017) (quoting *Stirone*, 361 U.S. at 215–16). "[C]onstructive amendments to an indictment are generally considered prejudicial *per se*," *United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988), and district courts in the Second Circuit will vacate convictions based on either the constructive amendment of the grand jury indictment or prejudicial variance from it. *See generally Davis*, 2017 WL 3328240, at *28–35 (collecting cases).

In *Davis*, the court vacated a conviction on constructive amendment grounds, reasoning that the government's shifting theories were such that the Court was "uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Id.* at *32. Because "no allegation in the indictment encompass[ed]" the government's newfound factual allegations, the indictment did not "put the Defendants fairly on notice" of the charges against them. *Id.* at *33. The same is true here, where Mr. Greebel was left to prepare for trial based on the charges identified—and the allegations made—in the June 3, 2016 Superseding Indictment. But the government's many, significant changes to its theories of liability rendered the Superseding Indictment obsolete.

**_First_**, the government's theory as to the alleged backdating of MSMB Capital's interest in Retrophin not only changed before trial at the pretrial conference, but was then withdrawn by the government as a standalone theory of liability before being dismissed in its entirety by the Court during the trial. More troubling is the fact that the government was nonetheless allowed to

admit substantial evidence relating to backdating, which amounted to improper propensity evidence in circumvention of Rule 404(b).

The Superseding Indictment initially alleged that Mr. Greebel entered into "a scheme to fabricate an investment by MSMB Capital in Retrophin," Superseding Ind. ¶¶ 22–25.  The government alleged that Mr. Greebel and Mr. Shkreli, "*[f]aced with an SEC inquiry*… engineered a series of fraudulent transactions that were backdated to the summer of 2012 to create the appearance of an investment by MSMB Capital prior to the SEC inquiry." *Id.* ¶ 25 (emphasis added).  In other words, the government's allegations in June 2016 were that Mr. Greebel assisted Mr. Shkreli in dealing with the pending SEC investigation.  Yet at the pretrial conference, the government changed its theory, arguing that the alleged backdating was no longer an attempt to avoid SEC inquiry but "a pretext to give Retrophin shares to various investors.  That's one of the reasons Retrophin is defrauded through the backdating[.]"  Tr. 59:19–23.  Finally, on December 14, 2017—nine weeks into trial and only days before the jury began deliberating—the government notified the Court and the defense, for the first time, that it would "not argue that the backdating, the fact that a backdated [] interest was created in and of itself defrauded Retrophin[.]"  Tr. 9600:7–9.

Although the Court ultimately dismissed the government's backdating theory, Tr. 9608:2–5, Mr. Greebel prepared for trial and planned his defense under the impression that the government was alleging ***three*** interrelated schemes as to Count Seven.  Indeed, the government maintained these allegations until days before the conclusion of trial, and only *after* the Court expressed its clear doubts as to this theory of liability did the government change its tune.  Yet the prejudice to Mr. Greebel could not be undone, since the jury had already seen swaths of documentary and testimonial evidence relating to Mr. Greebel's involvement in the alleged

backdating "scheme."  This eleventh-hour amendment to the charged conduct constituted a material and substantial change of the charges against Mr. Greebel, yet Mr. Greebel's time, energy, and resources had already been spent on months of trial preparation based on the June 2016 Superseding Indictment.  The government's constructive amendment of the allegations relating to Count Seven thus violated Mr. Greebel's due process rights, and—at a minimum—all backdating evidence should have been disallowed entirely or stricken from the record.

**_Second_**, having never mentioned that Retrophin CFO Marc Panoff was a co-conspirator (i) in the Superseding Indictment, (ii) in the government's letter identifying the unnamed parties in the Superseding Indictment, or (iii) at Mr. Shkreli's trial,[6] the government for the first time identified Mr. Panoff as a co-conspirator on Count Seven on October 10, 2017.  Ex. D.  This not only allowed the government to admit several out-of-court statements by Mr. Panoff pursuant to the co-conspirator hearsay exception under Rule 801(d)(2)(e), but it also

---

[6]    Despite ample opportunities (and requests from the Court) at Mr. Shkreli's trial to identify the unnamed co-conspirators, the government never mentioned Mr. Panoff.  *See, e.g.*, Shkreli Trial Tr. 4515:4–10 (The Court:  "I would like you to point me to evidence that shows there are co-conspirators.  I mean, honestly it was not really clear to me going into this trial, . . . who your co-conspirators were and even though you identified some of them, I am not sure what evidence there is to show that they are co-conspirators."); *id.* 5239 (alleging Marek Biestek and Kevin Mulleady are co-conspirators for the charges relating to MSMB Healthcare (Counts Four and Five)); *id*. 2144 (connecting Kevin Mulleady to the "conspiracy counts with respect to the fund" (Counts One, Two, Four, and Five)); *id*. 4597 (alleging that Ron Tilles is a co-conspirator for Count Eight); *id*. 4744–45 (identifying Andrew Vaino as an alleged co-conspirator for Count Eight); *id.* 4248 (alleging Marek Biestek as a co-conspirator for Count Eight); *id*. 4732 (describing Mulleady's knowledge of Mr. Shkreli's misrepresentations (Counts One, Two, Four, and Five)); *id*. 5230-31 (Mulleady's role in editing the MSMB pitch book (Counts One, Two, Four, and Five)); *id*. 5239 ("for MSMB Healthcare, the co-conspirators involved again are Marek Biestek and . . . Kevin Mulleady" (Counts Four and Five)); *id*. 5204 (discussing "the conspiracy between [Mr. Shkreli] and Marek Biestek" for MSMB Capital (Counts One and Two)); *id*. 5215 (describing Mr. Shkreli's "co-conspirator, Kevin Mulleady" with respect to MSMB Healthcare (Counts Four and Five)).

fundamentally "broaden[ed] [] the possible bases for conviction," *Milstein*, 401 F.3d at 65, and thus constructively amended the charges against Mr. Greebel.

**_Third_**, the government's theories regarding former MSMB investor Lee Yaffe changed drastically. In a September 30, 2016 letter, the government submitted "a chart of individuals and entities referred to by defined terms or pseudonyms in the Superseding Indictment[.]" Ex. E, Gov't Ltr., at 1 (Sept. 30, 2016). Among the defined terms was only one unnamed co-conspirator, "Co-Conspirator 1," whom the government identified as Marek Biestek. Notably, the government made no mention of Lee Yaffe as a co-conspirator for either of the charges against Mr. Greebel. The government did identify Mr. Yaffe as the "Elea Capital investor" and "advise[d] that the defrauded investors from MSMB Healthcare, MSMB Capital, and Elea Capital . . . are Rosenfeld, Blanton, Alan Geller, and Yaffe." *Id.* at 4–5. In short, the government identified Yaffe as a victim of the defendant's fraud.

Yet on October 10, 2017, after our multiple requests for the government to identify the unnamed co-conspirators in Count Seven, the government wrote that it would "offer evidence . . . that [Mr. Greebel] conspired with one or more of the following unindicted co-conspirators: Mulleady, Fernandez, Biestek, *Yaffe* and Marc Panoff." Ex. D, Gov't Ltr., at 2 (Oct. 10, 2017) (emphasis added). Thus, the government—having received a Superseding Indictment from the grand jury in June 2016 and having relied, in part, on its theory that Lee Yaffe was a "defrauded investor"—changed its theory and named Lee Yaffe a co-conspirator on Count Seven.

Despite its shifting backdating theory on Count Seven, its late-in-the-game naming of Mr. Panoff as a co-conspirator, and its changing theories with respect to Mr. Yaffe, not once did the government return to the grand jury. Here, as in *Davis*, the government's frequent and untimely changes to its theories left Mr. Greebel without notice of the charges against him, and to this day

Mr. Greebel is "uncertain whether [he] was convicted of conduct that was the subject of the grand jury's indictment."  2017 WL 3328240, at *32.  Had Mr. Greebel been aware of the government's shifting theories, he could have prepared for trial with a clear understanding of his alleged involvement in the charged conduct.  The government's expansion of alleged co-conspirators also impermissibly "broaden[ed] the possible bases for conviction" on Count Seven and Eight, *Milstein*, 401 F.3d at 65, thus violating Mr. Greebel's fundamental rights under the Fifth and Sixth Amendments and depriving him of a fair trial.

### F.    Juror Misconduct

Recently discovered facts have confirmed our previous concerns regarding juror misconduct and, in fact, have shown this misconduct to be broader than we initially believed. We therefore request that the Court vacate the verdict on the grounds that (i) the jury clearly disregarded the Court's instructions throughout trial and during deliberations; and (ii) threats against Juror No. 5[7], based partially on his religion, constitute improper coercion and thus render the verdict void under Supreme Court and Second Circuit case law.

***First***, it is clear that the jury disregarded the Court's instructions throughout trial. Despite the Court's repeated, daily instructions for the jury *not* to discuss anything about the case during the trial, several jurors openly discussed their likely vote as to Mr. Greebel's charges *during trial.*  Juror No. 1, for example, told Mr. Sankar that there was "going to be a hung jury"; that the other jurors would "never get his vote"; and that he believed "Evan is innocent."  Sankar Aff. ¶ 14.  Mr. Sankar also described a subsequent conversation during trial where Juror No. 1

---

[7]    We have previously referred to Mr. Sankar as Juror No. 6.  *See* Jan. 2, 2016 Letter from Josh Dubin to Hon. Kiyo A. Matsumoto, Dkt. 506 (filed under seal).  However, for the sake of consistency, all references to juror numbers in Mr. Greebel's motion and the attached affidavit relate to each juror's final seat at the conclusion of trial.  Accordingly, Mr. Sankar is correctly referred to herein as Juror No. 5.

asked, with respect to the evidence, "What do you think?"  Juror  No. 5 responded that he

believed "Mr. Greebel was innocent," and Juror No. 1 agreed.  *Id.* ¶ 15.  Several weeks before

jury deliberations, Juror No. 9 told Mr. Sankar, *in the middle of trial*, that she "did not see

anything showing that Mr. Greebel was guilty."  *Id.* ¶ 16.

> **_Second_**, it is now clear that the Court did not have the benefit of the full story regarding

the jury's threats toward Mr. Sankar.  A "'criminal defendant . . . being tried by a jury is entitled

to the uncoerced verdict of that body.'"  *Anderson v. Miller*, 206 F. Supp. 2d 352, 360 (E.D.N.Y.

2002) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988)).  But Mr. Sankar clearly voted

to convict Mr. Greebel in response to repeated threats by his fellow jurors.  Indeed, several jurors

derided Mr. Sankar, telling him that he could never "be fair and vote to convict" because was

Catholic.  *Id.* ¶ 9.  These threats are corroborated by a second juror's apology for the way Mr.

Sankar was treated.  On December 26, 2017 at 6:57 p.m., after the first full day of deliberations,

Mr. Sankar received a text message from Juror No. 6 apologizing for the jury's treatment of Mr.

Sankar:  "I do not feel good about what we the fellow jurors [p]ut you through. . . . [I]t was not

fair."  *Id.* ¶ 12; *see* Ex. A.  Mr. Sankar confirmed that he felt threatened; was pressured to vote

"guilty" during deliberations after he requested to see more evidence relating to the charges; and

was told by the other jurors that he would be removed if he did not vote "guilty" on both counts

against Mr. Greebel.  *Id.* ¶¶ 10–12.

> "No person may lawfully be convicted by a jury unless every juror actually agrees that

upon the evidence and the law of the case that a person is guilty.  If a verdict of guilty is returned

for any other reason, it is a perversion of the constitutional guaranty to a jury trial."  *Anderson*,

346 F.3d at 326.  Taken together, the jurors' disregard for the Court's instructions and the

improper threats against Juror No. 5 run afoul of Mr. Greebel's Fifth and Sixth Amendment rights to a fair and impartial jury. The jury's verdict should thus be set aside.

### G. The Admission of Hearsay Statements by Marc Panoff Violated *Bourjaily*.

#### 1. Procedural History

On November 27, 2017, before the government's case agent took the stand, the Court addressed our argument regarding the government's plans to admit several out-of-court statements by alleged co-conspirators under Rule 801(d)(2)(E). The Court initially instructed the government that, "at a minimum," before admitting those statements it, "should at least be able to point to evidence in addition to the alleged co-conspirators' own statements." Tr. 6770:12–14. The following day the Court addressed the admissibility of hearsay statements made by Retrophin CFO Marc Panoff:

> I'm not aware of any case law that would say that Mr. Panoff as CFO, by not being assertive enough with Mr. Shkreli and being new to the job and raising concerns as he did from time to time with Mr. Richardson and Mr. Aselage, while in the process of trying to get a handle on the financial landscape of the organization to be found by a preponderance to be a co-conspirator. The fact that Mr. Massella, Mr. Jain asked him for information, he gave it within a couple of days. He was learning about how to book certain expenses. He provided settlement agreements when asked. He was instructed to focus on related party transactions and try to, you know, figure out how to allocate between MSMB Capital and Retrophin the various charges. ***It doesn't rise to a preponderance of the evidence that Mr. Panoff is a conspirator with Mr. Greebel or Mr. Shkreli in my view***.

Tr. 7044:2–17 (emphasis added). The Court continued, "[T]he fact that Mr. Richardson doesn't think" Mr. Panoff sent certain board materials "does not necessarily rise to the level of making [Mr. Panoff] a co-conspirator. . . . I'm just not seeing that Panoff conspired to withhold." Tr. 7045:9–19. The Court was similarly skeptical as to whether "Mr. Aselage's view that Mr. Panoff was not forthcoming" was sufficient to render Mr. Panoff a co-conspirator. Tr. 7046:15–

16.  With respect to the government's argument "that Mr. Greebel drafted a response from Mr.

Panoff to give to the auditors" regarding MSMB's ability to repay certain promissory notes, the

Court explained as follows:

> There's no evidence that Mr. Panoff had any idea that, in fact, Mr.
> Shkreli and members had no intention to repay.  If the Government
> has the evidence, maybe you should tell me. And I think the same is
> true for Mr. Greebel.  There's no evidence that he knew that Mr.
> Shkreli and MSMB board had no intention of paying or were unable
> to pay.  I haven't seen it.

Tr. 7047:9–17.  Nonetheless, on November 28, 2017, the Court ultimately decided that, "given

the representation by the government," and "given that they've as officers of the Court have told

me that they have evidence, in addition to the hearsay exception evidence, that would establish

Mr. Panoff's status as a co-conspirator, I will allow [his statements] to come into the record; and

then at the end, if I am not satisfied, we will take appropriate action."  Tr. 7063:13–19.  But at a

sidebar the following day of trial, the Court found that there *had* been sufficient "evidence thus

far at least to establish by a preponderance that Mr. Panoff was a co-conspirator[.]"  *See* Tr.

7408:9–11.

## 2.   The Evidence Proffered Was Insufficient to Overcome the Court's Initial Finding that Mr. Panoff Was Not a Co-Conspirator.

To admit a statement pursuant to Federal Rule of Evidence 801(d)(2)(E), this Court must

find that: (1) there was a conspiracy; (2) the members included the declarant and the party

against whom the statement is offered; and (3) the statement was made both during the course of

and in furtherance of the conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  The

government must prove the preliminary facts relevant to Rule 801(d)(2)(E), the existence of a

conspiracy, and the involvement of both the declarant and the party against whom the statement

is offered, by a preponderance of the evidence.  *Id*.  Moreover, the government must show that

the declarant and defendant had a "unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E)." *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) (defendant's membership in a network of criminal activity, such as organized crime, does not constitute a conspiracy for the purpose of Rule 801(d)(2)(E)).

These preliminary questions "must be resolved by the district court before a challenged statement may be admitted under Rule 801(d)(2)(E)." 5 Weinstein's Federal Evidence § 801.34[6][c][i].  The court may not rely on the out-of-court statements alone to establish those preliminary facts.  *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996).  Instead, the court must find "some independent corroborating evidence" of the declarant and defendant's participation in the conspiracy.  *Id.* (reversing convictions because the court improperly admitted a hearsay statement under Rule 801(d)(2)(E) without independent corroborating proof); *United States v. Clark*, 18 F.3d 1337, 1341–42 (6th Cir. 1994) ("Since *Bourjaily*, all circuits addressing the issue have explicitly held absent *some* independent, corroborating evidence of defendant's knowledge of and participation in the conspiracy, the out-of-court statements remain inadmissible.").

Here, the only new evidence offered by the government after the Court's initial finding that Mr. Panoff was not a co-conspirator consisted of miscellaneous emails admitted through the government's case agent.  Of the 124 documents admitted between the Court's initial finding that Mr. Panoff was *not* a co-conspirator on November 28 and its subsequent finding that Mr. Panoff *was* a co-conspirator on December 4, Mr. Panoff was only on twelve of them.  All twelve documents are attached hereto as Ex. F through Q.

Some of those documents related to issues involving Mr. Panoff's attempts to provide adequate disclosure to Retrophin's auditor Marcum LLP in connection with Marcum's audit.

54

*See* Ex. F–K.  Other documents related to the promissory notes and indemnification agreements between Retrophin and the MSMB Entities.  Ex. L–N.  Two documents relate both to issues involving disclosure for Marcum's audit and MSMB's promissory notes and indemnification agreements.  Ex. O–P.  The final email in the twelve Panoff-related documents contains communications with Retrophin's transfer agent about the cost basis at which Al Geller's shares should be transferred.  Ex. Q.

These documents—whether viewed individually or together—are insufficient as a matter of law to overcome the Court's initial finding that there was not enough evidence to satisfy *Bourjaily* as to out-of-court statements by Mr. Panoff.  As to the Marcum-related documents, nothing in these four documents contains sufficient evidence to show (beyond a preponderance of the evidence or otherwise) that Mr. Panoff possessed a "unity of interest[] stemming from a specific shared criminal task" with Mr. Greebel or Mr. Shkreli.  *Gigante*, 166 F.3d at 83.  The same is true for the handful of documents relating to MSMB's promissory notes and indemnification agreements with Retrophin.  Specifically, nothing in these documents rebuts the Court's initial finding that there was "no evidence that Mr. Panoff had any idea that, in fact, Mr. Shkreli and members had no intention to repay" these obligations to Retrophin.  Tr. 7047:9–11.  And there is no evidence in the single email relating to the transfer of shares to Mr. Geller that offers "independent corroborating evidence" of Mr. Panoff's participation in any agreement to achieve a specific criminal goal.  *Tellier*, 83 F.3d at 580.  Accordingly, the admission of Mr. Panoff's out-of-court statements—both before and after the Court's rulings, and especially during the testimony of Special Agent Delzotto—was improper.  The jury's verdict is thus based on evidence that should have been stricken from the record; as such, Mr. Greebel's convictions should be vacated or, at a minimum, he should be granted a new trial under Rule 33.

### H.      Evidentiary Rulings

#### 1.      Mr. Greebel's Consciousness of Innocence

Evidence relating to Mr. Greebel's "consciousness of innocence" is directly probative of the key questions in this case and thus should have been presented to the jury.  The Second Circuit has recognized that evidence relating to a defendant's consciousness of innocence is admissible where it demonstrates "that he is unaware of any wrongdoing about which he could testify" and where his actions are "probative of a state of mind devoid of guilty knowledge." *United States v. Biaggi*, 909 F.2d 662, 690 (2d Cir. 1990).  At bottom, the key issues before the jury turned on its interpretation of *Mr. Greebel's* state of mind—*i.e.*, whether he willingly entered the conspiracies alleged in Counts Seven and Eight; whether he possessed the requisite fraudulent intent; and whether there was a "meeting of the minds" between Mr. Greebel and his alleged co-conspirators.  Yet the jury was deprived of highly probative evidence relating to Mr. Greebel's willingness to meet—***voluntarily and without counsel***—with multiple FBI agents for multiple hours immediately following his arrest.  A reasonable juror could conclude that Mr. Greebel's decision to speak with the FBI for approximately three hours demonstrates his genuine belief that he was innocent—*i.e.*, Mr. Greebel's mind was "devoid of guilty knowledge." *Id.*  In short, Mr. Greebel had nothing to hide, and this fact alone is probative of Mr. Greebel's innocence.  (Of course, to the extent the jury found this argument unpersuasive, it was free to disregard this evidence.  But that goes to the weight of the proffered evidence, not its admissibility.)  The government would have suffered absolutely no prejudice from the admission of this evidence, and this evidence would have allowed the jury to decide the ultimate issue with a fuller understanding of Mr. Greebel's true state of mind.

#### 2.      Highly Prejudicial Threat Evidence

The Court denied our motion *in limine* to preclude evidence relating to Mr. Shkreli's threats toward former Retrophin employee Timothy Pierotti and Mr. Pierotti's family.  At trial, the government then admitted Mr. Shkreli's letter to Mr. Pierotti's wife, GX 112-27, wherein Mr. Shkreli wrote, "I hope to see you and your four children homeless and will do whatever I can do to assure this. . . . I know you have no interest in you and in your husband being sued for fraud and your bank terminating your mortgage, something I assure you I will stop at nothing to accomplish."  The Court likely remembers the audible gasp that arose from the jury box when the government asked Mr. Pierotti to read this letter, only confirming our initial concern that Mr. Shkreli's threat would inflame the emotions of the jury.  It bears repeating, as we noted in our pretrial motion, that Mr. Greebel had no involvement whatsoever with Mr. Shkreli's threat to Mr. Pierotti, and thus this evidence was of marginal (if any) relevance to the issues in this case.  Such "graphic and profane" evidence, however, was both "highly charged" and "toxic" to the jury's perception of the defendant.  *United States v. Morgan*, 786 F.3d 227, 234 (2d Cir. 2015) (district court's admission of threat letter was an abuse of discretion).  The fundamental rationale for Rule 403 is to ensure that the jury does not make its decision on an improper—*i.e.*, an emotional—basis.  *See Gonzalez*, 8 F. Supp. 2d at 199 (quoting *Old Chief*, 519 U.S. 172).  But this evidence was highly prejudicial, hardly relevant, and garnered the very sort of emotional reaction from the jury against which Rule 403 seeks to guard.

### 3.    Evidence Relating to Mr. Shkreli

Evidence of uncharged "other" acts is admissible pursuant to Rule 404(b) if relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See United States v. Ortiz,* 857 F.2d 900, 903 (2d Cir. 1988).  Such evidence is correctly admitted if: (1) it is offered for a proper purpose; (2) it is relevant to a disputed trial

issue; (3) its probative value substantially outweighs any possible prejudice; and (4) the trial court administers an appropriate limiting instruction. *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003). Notably, however, the Advisory Committee Notes for Rule 404(b) explicitly state that the carveout for "other" act evidence relates only to "evidence of an ***accused's*** extrinsic acts"—*i.e.*, this rule does not allow evidence of the extrinsic acts of someone other than the defendant. Fed. R. Evid. 404(b), Advisory Committee Notes (1991).

Nonetheless, the government spent several weeks at trial eliciting testimony and admitting documents relating to *Mr. Shkreli's* operation of the MSMB hedge funds; the representations made by *Mr. Shkreli* and his colleagues in soliciting fund investors; and the alleged losses suffered by MSMB investors. It is undisputed that Mr. Greebel had absolutely no involvement in the operation of the MSMB funds; nor did he have any involvement in the alleged frauds charged in Counts One through Six in *Mr. Shkreli's* trial. This evidence thus fails to satisfy the plain meaning of Rule 404(b). Moreover, this evidence was neither offered for a proper purpose nor relevant to a disputed trial issue, as required under Rule 404(b). Rather, the government's clear intent in introducing this evidence was to taint the juror's perception of Mr. Greebel by linking him to Mr. Shkreli and the alleged frauds perpetrated on MSMB investors.

Notably, the Second Circuit has recognized that, in the absence of "***pertinent similarities or connections between the two acts***" (*i.e.*, between the alleged wrongdoing and the evidence proffered under Rule 404(b)), "***other act evidence is not relevant and should not be received in evidence***." *Edwards*, 342 F.3d at 177 (internal citation omitted) (emphasis added). Here, however, evidence relating to Mr. Shkreli's alleged deception of MSMB investors, the representations made by Messrs. Shkreli and Mulleady (and others) to potential fund investors, and Mr. Shkreli's operation of his hedge funds bore no similarities whatsoever to the schemes

58

alleged against Mr. Greebel.  Indeed, Mr. Greebel was charged with two very narrow and very specific counts of conspiracy—both relating to legal work Mr. Greebel performed on behalf of his client Retrophin.  The issues relating to Mr. Greebel's involvement in certain settlement and consulting agreements at issue in Count Seven, or relating to Mr. Greebel's alleged involvement in the alleged "Fearnow scheme" in Count Eight, bear no resemblance to the other conspiracies with which Mr. Shkreli was charged.  Admitting this evidence thus ran afoul of Rule 404(b) and should have been precluded.

**I.      Jackson Su Immunity Letter**

Despite our good-faith belief that former Retrophin employee Jackson Su had violated federal criminal statutes, our cross examination of this critical government witness was limited and the jury was deprived of critical evidence relating to Mr. Su's credibility.  Mr. Su's hacking of Retrophin's computer systems—a clear act of deceit and secrecy—goes directly to his character for truthfulness, and the jury should have been informed that his actions constitute potentially criminal conduct.  The government argued, somewhat remarkably, that it did not "actually think [Mr. Su's conduct] goes to truthfulness or untruthfulness," Tr. 4937:21-23, and that—despite the fact that the government was on the verge of giving Mr. Su an immunity agreement—we should not be allowed to "suggest [Mr. Su] ha[d] committed a crime and cross-examine [him] on committing the crime," Tr. 4938:16-18.

The Court ultimately precluded us from inquiring into whether Mr. Su's conduct constituted a crime.  Tr. 4940:9-10.  As we argued before Mr. Su took the stand, he of course would have been free to dispute whether his actions constituted a federal crime, and the jury would have been free to draw conclusions as to Mr. Su's credibility.  As noted above, Mr. Su was one of only two witnesses who testified as to the facts alleged in Count Eight.  He was also a key employee at Retrophin and the MSMB Entities during the period at issue in this trial.  His

testimony—and the jury's conclusions drawn therefrom—are a critical piece of Mr. Greebel's

trial.  The jury was thus prevented from thoroughly assessing Mr. Su's credibility, and Mr.

Greebel's convictions are undermined by the jury's inadequate consideration of the relevant

facts.

> **J.      Venue**

Despite the government's conclusory statements to the contrary, the evidence was

insufficient to prove that venue was appropriate in the Eastern District of New York.  The Court

instructed the jury as follows:

> Thus, as to the conspiracy charged in Count[s] [Seven and Eight],
> the government must prove that it is more likely than not that the
> agreement was formed or that an overt act in furtherance of the
> conspiracy was committed in the Eastern District of New York,
> which includes the boroughs of Queens, Brooklyn (also known[.]

Dkt. 498, at 39-40.  With respect to Count Seven, the government argued that it satisfied the

requirements for venue because Mr. Biestek was a resident of Queens County; Mr. Rosenwald

was a resident of Nassau County; and Mr. Spielberg was a resident of Brooklyn.  But reciting the

counties of residence for certain individuals is not enough.  The government did not connect

these individuals to "an overt act in furtherance of the conspiracy" that was committed in the

Eastern District.  The government's argument that Alan Geller "would fly through LaGuardia" is

also insufficient to satisfy venue.  The government did not allege that Mr. Geller is a co-

conspirator on Count Seven or that his flights to New York were in furtherance of a shared

criminal scheme among Mr. Geller, Mr. Shkreli, or Mr. Greebel.

On Count Eight, the government argued, "[O]n the venue point that there had to be [an]

act in the Eastern District of New York, we know that the Fearnow shares themselves were

distributed to at least two people in Brooklyn."  Tr. 10368:23–10369:1.  But this conclusory

statement is insufficient to prove that the conspiracy alleged in Count Eight was formed in the

Eastern District or that any overt act in furtherance of that alleged conspiracy actually took place there.  Accordingly, Mr. Greebel's convictions cannot survive Rule 33.


**III.   CONCLUSION**

 For all these reasons, we respectfully submit that the Court should vacate Mr. Greebel's convictions on Counts Seven and Eight pursuant to Rule 29 or, in the alternative, should grant Mr. Greebel a new trial under Rule 33.

Dated: New York, New York
       February 16, 2018

                                        */s/ Reed Brodsky*
                                        Reed Brodsky
                                        Winston Y. Chan
                                        Mylan D. Denerstein
                                        Randy M. Mastro

                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        (212) 351-4000
                                        rbrodsky@gibsondunn.com
                                        *Counsel for Defendant Evan Greebel*