9814

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3  UNITED STATES OF AMERICA,      : 15-CR-00637 (KAM)
                                  :
4            Plaintiff,           :
                                  : United States Courthouse
5         -against-              : Brooklyn, New York
                                  :
6  EVAN GREEBEL,                  :
                                  : Monday, December 18, 2017
7            Defendant.          : 9:00 a.m.
- - - - - - - - - - - - - - - -X
8
            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
9         BEFORE THE HONORABLE KIYO A. MATSUMOTO
             UNITED STATES DISTRICT JUDGE
10                    BEFORE A JURY

11            A P P E A R A N C E S :

12  For the Government:       BRIDGET ROHDE, ESQ.
                             Acting United States Attorney
13                           Eastern District of New York
                             271 Cadman Plaza East
14                           Brooklyn, New York 11201
                             BY:  ALEXIS ELEIS SMITH, ESQ.
15                                DAVID PITLUCK, ESQ.
                                  DAVID KESSLER, ESQ.
16                                Assistant United States Attorney

17  For the Defendant:       GIBSON DUNN & CRUTCHER
                             200 Park Avenue, 48th Floor
18                           New York, New York 10166
                             BY:  REED BRODSKY, ESQ.
19                                RANDY MASTRO, ESQ.
                                  JOSHUA EVAN DUBIN, ESQ.
20                                MYLAN LEE DENERSTEIN, ESQ.
                                  WINSTON Y. CHAN, ESQ.
21

22  Court Reporter:          DAVID R. ROY, RPR
                             225 Cadman Plaza East
23                           Brooklyn, New York 11201
                             drroyofcr@gmail.com
24
   Proceedings recorded by Stenographic machine shorthand,
25  transcript produced by Computer-Assisted Transcription.

Proceedings                                  9815

1          (In open court; outside the presence of the jury.)

2          THE COURT:  All right.  So everybody is here.

3    This is continuance of trial for Mr. Greebel.

4          We did reach out to the jurors last evening and we

5    expect everybody will be in except for juror in

6    Seat Number 9.  I think what I will do is just have

7    Alternate 1 sit where she is so we are not shuffling around.

8    It might be better if we are spread out a little bit because

9    there is a lot of coughing going on, unless the parties have

10   an objection to that.

11         But just to confirm, in the parties' joint letters

12   yesterday, they agreed that Juror Number 9 should be excused

13   and we will seat Alternate Number 1 in her stead.  And

14   hopefully we will not loose anybody else.

15         I am also going to propose to the jurors that we

16   go through without lunch today, and instead that we adjourn

17   at 1:00, because I have to get up to a doctor's appointment.

18   And tomorrow they are predicting another two-hour

19   appointment starting at 7:45, so I probably will be in until

20   10:30.  Unfortunately, I have pushed them back a couple of

21   times and I have to get them done.

22         (Pause in proceedings.)

23         THE COURT:  All right.  So we are also in receipt

24   of the parties' proposed instructions and the points of

25   difference, and I appreciate the parties' willingness to

Proceedings                              9816

1    work together.  We are going to try to post another version

2    of the instruction that we hope will incorporate both

3    parties' position, and we will put those up either later

4    today or first thing in the morning.

5              Does anybody have anything else they want to

6    raise?

7              (No audible response.)

8              THE COURT:  No?

9              MR. KESSLER:  No.

10             THE COURT:  All right.  Thank you.  We will see if

11   everybody is here.

12             (Pause in proceedings.)

13             MR. KESSLER:  We're continuing to confer.

14             THE COURT:  Great.

15             All right.  So when the jurors come in, as the

16   parties have agreed, I am going to announce that the juror

17   seated in Number 9 is excused and we will indicate that

18   Alternate 1 will be seated and leave it at that and we will

19   then move forward.

20             Is Dr. Rosenfeld here this morning?

21             MR. MASTRO:  Yes, Your Honor.

22             THE COURT:  Okay.

23             (Pause in proceedings.)

24             MR. MASTRO:  Your Honor, would you like

25   Dr. Rosenfeld on the stand?

```
                      Proceedings                    9817
```

1           THE COURT:  That will be fine.

2           (Jury enters the courtroom.)

3           (Jury present.)

4           (Witness takes the stand.)

5           THE COURT:  All jurors are present.  Please have a

6    seat.

7           Members of the jury, I would like to advise you

8    that we are going to excuse Juror Number 9.  You need not

9    speculate why, but that will mean the juror sitting in

10   Alternate 1 seat will be part of the Jury, and if you would

11   like to sit where you are, that is fine.  I know that you

12   are a little bit packed in that jury box, and so you can

13   maintain your seat or you can move into the Number 9 seat.

14          And for the record, the juror sitting in

15   Seat Number 9 was previously designated as Juror Number 11.

16          I also want to advise the jury that we will

17   adjourn today at 1:00 o'clock.  I would like to ask if it

18   would be all right to go through without lunch.  We will

19   give you a couple of mid-morning breaks in order to

20   facilitate your comfort.  And then tomorrow we won't be

21   starting until 10:30 in the morning so you need not rush in

22   to be here by 9:00.  If you could please arrive no later

23   than 10:30, we would be very grateful and we will try to

24   push through as much as we can.

25          So with that, I will ask Mr. Mastro if he is ready

Rosenfeld - Direct - Mastro                9818

1    to resume the direct examination of Dr. Rosenfeld.

2            MR. MASTRO:  Yes, Your Honor.  Thank you very

3    much, Your Honor.

4    **STEVEN ROSENFELD,**

5        called as a witness, having been previously duly

6        sworn, continued examined and testified as follows:

7    DIRECT EXAMINATION (CONTINUED)

8    BY MR. MASTRO:

9    Q    Welcome back, Dr. Rosenfeld.

10   A    Thank you.

11   Q    Doctor, you testified last week about your arbitration

12   proceeding against Retrophin for breach of contract.  Do you

13   remember that testimony, sir?

14   A    I do, yes.

15   Q    Over the six days of hearings in your arbitration case

16   against Retrophin, how many of those days were you on the

17   witness stand being questioned by your own counsel and

18   Retrophin's counsel?

19   A    Approximately six days.

20   Q    Almost every one of those days you were on examination;

21   is that correct, sir?

22   A    Well, let me expand on that.

23            There were four attorneys there.

24            MR. PITLUCK:  Objection, Your Honor.

25            THE COURT:  Sustained.

Rosenfeld - Direct - Mastro                 9819

1   BY MR. MASTRO:

2   Q    Sir, most of those days you were subject to examination

3   during the arbitration, correct?

4   A    That's correct.

5   Q    At the end of the arbitration, when the arbitrator

6   ruled in your favor, did Retrophin appeal that decision?

7               MR. PITLUCK:  Objection, Your Honor.

8               THE COURT:  Sustained.

9   Q    Sir, is that -- did Retrophin comply with the

10  arbitrator's decision?

11  A    Immediately.

12              THE COURT:  You can push the microphone away from

13  you.  You don't need to be right on top of it.

14              THE WITNESS:  Okay.

15              THE COURT:  Okay.  Thank you.

16              THE WITNESS:  Okay.

17  Q    Dr. Rosenfeld, I would like to turn your attention to

18  Defendant's Exhibit 203-4.

19              MR. MASTRO:  Mr. Carter, can you move it over?

20              Thank you, sir, and bring up the text.

21              Thank you.

22  BY MR. MASTRO:

23  Q    This is a March 14, 2013 e-mail from Martin Shkreli to

24  you and Ron Tilles copying Evan Greebel.  Do you recall

25  being asked questions about that, sir?

Rosenfeld - Direct - Mastro                    9820

1   A    I do.

2   Q    And in particular being asked about the sentence,

3   quote, Ron Tilles informed me you are considering legal

4   action against our company.

5         Do you recall being asked about that?

6   A    Yes.

7   Q    And do you recall testifying on Page 9307 when you were

8   here last week that you understood our company to mean

9   Retrophin; do you recall that testimony, sir?

10  A    I do.

11  Q    Now, sir, did you have conversations with Ron Tilles of

12  Retrophin informing him of your consideration of bringing

13  legal action?

14  A    Yes.

15  Q    At or about that time, March, 2013?

16  A    Yes.

17  Q    And besides Retrophin, did you tell him -- was anyone

18  else you were also considering suing in addition to

19  Retrophin?

20  A    MSMB Healthcare, Martin Shkreli.

21  Q    Okay.  You were considering all of them; is that right,

22  sir?

23         MR. PITLUCK:  Objection to the leading,

24  Your Honor.

25         THE COURT:  Sustained.

Rosenfeld - Direct - Mastro                    9821

1          MR. MASTRO:  I'm sorry, Your Honor.

2          THE COURT:  And please don't retread ground that

3    we've already covered last week.

4    Q    Sir, you testified last week about not always

5    identifying yourself as being a consultant for Retrophin

6    when you were doing your consulting work between February,

7    2014 and December, 2014.  Do you recall that, sir?

8    A    I do.

9    Q    What effect did you think it would have on potential

10   business contacts you were reaching out to as a consultant

11   to Retrophin to identify or not identify yourself as a

12   consultant to Retrophin?

13         MR. PITLUCK:  Objection, Your Honor, to form and

14   asked and answered.

15         THE COURT:  Sustained.

16   Q    Sir, besides what you have already testified to, were

17   there any other reasons why you didn't always identify

18   yourself in your business contacts as a consultant to

19   Retrophin as contacting them on behalf of Retrophin?

20         MR. PITLUCK:  Objection to the form, Your Honor.

21         THE COURT:  I'll allow this.

22         MR. MASTRO:  Thank you, Your Honor.

23         THE COURT:  And then we are going to move on.  I

24   do not want to retread what we have already covered.

25         MR. MASTRO:  I do not want to, Your Honor.

1   Please.

2          THE COURT:  Well, you are, but I will give you

3   latitude here.

4          MR. MASTRO:  Thank you, Your Honor.

5          THE COURT:  Please do not argue with me.

6          MR. MASTRO:  Certainly, Your Honor.

7          THE COURT:  Thank you.

8   A    I didn't reveal the name Retrophin because the

9   competitor is essentially in the same field, could go around

10  me and in effect go directly to Retrophin.

11  Q    Sir, directing your attention to July of 2015, your

12  testimony about a meeting with two FBI agents in your

13  apartment.  Do you recall that testimony, sir?

14  A    I do.

15  Q    Without telling us what they said to you or you said to

16  them, the subject of your consulting agreement with

17  Retrophin discussed at that meeting?

18          MR. PITLUCK:  Objection, Your Honor, asked and

19  answered.

20          THE COURT:  Sustained.

21  Q    Was the subject of the consulting work you did for

22  Retrophin discussed at that meeting?

23          MR. PITLUCK:  Same objection, Judge.

24          THE COURT:  I will allow this and then I am

25  telling you, Mr. Mastro, I would like you to comply with my

Rosenfeld - Direct - Mastro                    9823

1    rulings.

2              MR. MASTRO:  All right.

3              THE COURT:  I will let him answer this, but we are

4    not going to retread what we have done already.

5              You may answer the question.

6    A    Yes.

7    Q    Directing your attention to September of 2015, did

8    there come a time when you had another meeting with

9    representatives of the Government?

10   A    Yes.

11   Q    Without telling us what they said to you or you said to

12   them, was the subject of your consulting agreement with

13   Retrophin addressed at that meeting?

14   A    Yes.

15   Q    Was the subject of your consulting work for Retrophin

16   addressed at that meeting?

17   A    Definitively, yes.

18   Q    Was the subject of your arbitration with Retrophin

19   discussed at that meeting?

20   A    Yes.

21   Q    How long did that meeting last?

22   A    A few hours.

23   Q    Who, in addition to yourself, was in attendance at that

24   meeting, if you can recall?

25   A    Government officials, Security Exchange Commission

1   officials, FBI officials, that's what I recall.

2   Q     Did anyone else attend with you on your behalf?

3   A     Yes.

4   Q     Who was that, sir?

5   A     My attorney Andrew St. Laurent.

6   Q     Where was the meeting held?

7   A     It was held at juxtapose to this building.

8   Q     At the U.S. Attorneys' office?

9   A     Yes.

10  Q     Sir, are you appearing here today pursuant to a

11  *subpoena* issued by the defense?

12  A     That is correct.

13  Q     Do you know whether that *subpoena* required you to meet

14  voluntarily with anyone from the defense before you

15  testified here today?

16          THE COURT:   Required him to meet voluntarily?

17  Could you rephrase the question.

18          MR. MASTRO:   Certainly.

19  Q     Sir, do you know whether that *subpoena* required you to

20  meet with anyone from the defense before you testified here

21  today?

22  A     I am not sure, because I did not see it.

23  Q     Did you agree to meet with representatives of the

24  defense before today?

25  A     Yes.

Rosenfeld - Direct - Mastro                    9825

1   Q    How many times did you meet with me and others from the

2   defense before today?

3   A    Approximately three.

4   Q    Sir, why did you do that?

5             MR. PITLUCK:  Objection.

6             THE COURT:  Sustained.

7   Q    Dr. Rosenfeld, can you explain to this jury why you

8   were willing to meet voluntarily with the defense before you

9   testified here today?

10            MR. PITLUCK:  Objection, Your Honor.

11            THE COURT:  Sustained.

12  Q    Dr. Rosenfeld, after you had that meeting in September,

13  2015 for several hours at the U.S. Attorneys' office with

14  Government officials, when was the next time you heard from

15  anyone in the Government?

16  A    I am not sure of the chronology, but I did hear from --

17  Q    Sir, since that September, 2015 meeting, his anyone

18  from the Government asked you to meet with them again since

19  that September, 2015 meeting?

20  A    No.

21  Q    Sir, to your knowledge what, if anything, did Evan

22  Greebel do wrong in connection with your consulting

23  agreement with Retrophin?

24            MR. PITLUCK:  Objection.

25  Q    What, if anything, did Evan Greebel do wrong in

1   connection with you consummating a settlement agreement and

2   release with Retrophin?

3            MR. PITLUCK:  Objection, Your Honor.

4            THE COURT:  Sustained.

5   Q    Dr. Rosenfeld, do you consider yourself to have done

6   anything wrong by entering into a consulting agreement with

7   Retrophin?

8   A    No.

9            MR. MASTRO:  No further questions, Your Honor.

10            THE COURT:  All right.  Would you like to cross,

11  Mr. Pitluck?

12            MR. PITLUCK:  I would, Your Honor.

13            Just give me a moment, Judge, please.

14            (Pause in proceedings.)

15            MR. PITLUCK:  May I proceed, Judge?

16            THE COURT:  Yes.

17  CROSS-EXAMINATION

18  BY MR. PITLUCK:

19  Q    Good morning, Dr. Rosenfeld.

20  A    Good morning.

21  Q    My name is David Pitluck.  I am an Assistant United

22  States Attorney here in the Eastern District of New York.

23  We have never met before, correct, sir?

24  A    I am not sure.

25  Q    Okay.  But you did testify that you have met with

Rosenfeld - Cross - Pitluck                9827

1   defense counsel in this case, correct?

2   A    Yes.

3   Q    And you testified, I think, just a few minutes ago that

4   you have met with them approximately three times; is that

5   right, sir?

6   A    That is correct.

7   Q    When did you first speak to lawyers for the defendant?

8   A    A number of weeks ago.

9   Q    That was the first time you spoke to them was a number

10  of weeks ago; is that right?

11  A    May have been a number of months ago.  A little blurry

12  with respect to that.

13  Q    What about anybody else connected to the defendant,

14  when was the first time you spoke to anybody connected to

15  the defendant?

16          MR. MASTRO:  Objection, Your Honor, form.

17          THE COURT:  Could you rephrase just to give --

18  Q    When was the first time you spoke to anyone corrected

19  to the defendant?

20          MR. MASTRO:  Objection to form.

21          THE COURT:  I think if you could be more precise

22  in your wording of the question it would alleviate the

23  concerns.

24          MR. PITLUCK:  Okay.

25  Q    When did you speak to anybody that you believe had a

                    Rosenfeld - Cross - Pitluck              9828

1   connection to the defendant?

2              MR. MASTRO:  Same objection, Your Honor.

3              THE COURT:  Overruled.

4   A    My guesstimate is a few months ago.

5   Q    Isn't it true, sir, that you spoke to somebody

6   representing the defendant before your arbitration

7   proceeding?

8   A    I am not sure.

9   Q    What about your lawyers, do you know if they spoke to

10  somebody, the lawyers for the defendant before your

11  arbitration proceeding?

12             MR. MASTRO:  Objection.  Hearsay, Your Honor.

13             MR. PITLUCK:  Asked for his knowledge, Judge.

14             THE COURT:  Overruled.

15  A    They may have but I am not sure.

16  Q    Okay.

17             So you testified that there were approximately

18  three conversations you had with the defense counsel before

19  testifying, correct?

20  A    That is correct.

21  Q    When did those conversations take place?

22  A    Within the last few months.

23  Q    Do you speak to the defense counsel since you testified

24  here last week?

25  A    Yes.

1    Q     For how long?

2    A     Ten or fifteen minutes.

3    Q     Was that a phone call or was it in person?

4    A     That was in person.

5    Q     All right.  What about before your testimony last week,

6    how long before your testimony did you meet with defense

7    counsel?

8    A     Would you repeat that question because when you say how

9    long, I am not sure what you mean.

10   Q     Approximately how long before your testimony last week

11   did you meet with defense counsel?

12   A     Approximately 15 minutes.

13   Q     Okay.  What about the first meeting that you had, how

14   long was that meeting?

15   A     May have been about an hour.

16   Q     And other than those three meetings, did you have any

17   telephone calls with defense counsel?

18   A     No.

19   Q     Now, who was present during these meetings with defense

20   counsel?

21   A     My attorney.

22   Q     Anybody else?

23   A     There may have been another attorney, so two attorneys

24   on my side.

25   Q     Okay.  And what about on the defense side, who was

1    there?

2    A    Possibly the same two attorneys.  It is a guesstimate,

3    two or -- there was two.

4    Q    Two defense counsel attorneys?

5    A    That is a guesstimate, yes.

6    Q    That is a guesstimate.

7         You do not remember who it was?

8    A    Sometimes it was Jason and other times it was Reed or

9    other times it was Randy.

10   Q    Anybody else there besides the people you just

11   mentioned?

12   A    To the best of my knowledge, no.

13   Q    But you did have your lawyer there, correct?

14   A    That is correct.

15   Q    Okay.  For all of the meetings you had with defense

16   counsel?

17   A    Yes.

18   Q    Which lawyers did you have present with you?

19         THE COURT:  At what meetings?

20         MR. PITLUCK:  At the meeting with defense counsel.

21   I am sorry, Judge.

22   A    It was Andrew St. Laurent.

23   Q    Now, were you paid by the defense in connection with

24   your meetings that you had with them prior to testimony?

25   A    No.

Rosenfeld - Cross - Pitluck                    9831

1  Q    What about your attorneys' fees, were those paid by
2  anybody else?
3  A    No.
4  Q    You paid for those yourself?
5  A    That is correct.
6  Q    Now, were these the same attorneys that represented
7  you -- I am sorry.  Were your attorneys that represented you
8  in these meetings with defense counsel, were those the same
9  attorneys that represented you in the arbitration
10 proceeding?
11 A    No.
12 Q    But you testified on direct about the arbitration case
13 you had against Retrophin, correct?
14 A    Yes.
15 Q    And you filed that arbitration -- you filed a demand in
16 that arbitration proceeding in April of 2015; is that right,
17 sir?
18 A    Approximately, yes.
19 Q    And the actual proceeding where you testified, that was
20 in September of 2016; is that right, sir?
21 A    Yes.
22 Q    And you just a little while ago testified -- or
23 testified here that your -- you testified in your
24 arbitration proceeding in September of 2016, correct?
25 A    I believe so, yes.

1  Q    And you were under oath during that arbitration

2  proceeding?

3  A    I was.

4  Q    And you told the truth during that arbitration

5  proceeding?

6  A    Yes.

7  Q    And as part of the arbitration proceeding you produced

8  documents to Retrophin and the arbitrator; isn't that right,

9  sir?

10  A    Yes.

11  Q    And the documents that you produced were stamped with a

12  Rosenfeld Bates Stamp; isn't that right, sir?

13  A    I do not understand.

14  Q    The documents that you produced as part of the

15  arbitration proceeding were stamped to identify them.

16  You're familiar with that, aren't you, sir?

17  A    Yes.

18  Q    And your stamp, the documents that you produced, were

19  stamped with Rosenfeld, your last name; isn't that right,

20  sir?

21  A    Yes.

22  Q    Now, you testified last week about your background;

23  isn't that right, sir?

24  A    Yes.

25  Q    And you testified that you went to medical school,

Rosenfeld - Cross - Pitluck                    9833

1    correct?

2    A    That is correct.

3    Q    And that was a medical school in the

4    Dominican Republic, wasn't it, sir?

5    A    It was a combination of schools.

6    Q    But you actually got your degree from a medical school

7    in the Dominican Republic; isn't that right, sir?

8    A    That is right.

9    Q    The medical school called CETEC, C-E-T-E-C; is that

10   right?

11   A    That is correct.

12   Q    And you graduated in what year, sir?

13   A    '82.

14   Q    And you know, don't you, Dr. Rosenfeld, that that

15   medical school was shut down two years later by Dominican

16   authorities, don't you?

17           MR. MASTRO:  Objection, Your Honor.

18           THE COURT:  Overruled.

19   A    I do not know the time span when it was shut down, but

20   I know it was shut down after I graduated.

21   Q    And you also testified on direct that during medical

22   school you did a rotation at a psychiatry clinic; is that

23   right, sir?

24   A    That is correct.

25   Q    And after you graduated you never got a license to

Rosenfeld - Cross - Pitluck                9834

1   practice medicine?

2   A    That is correct.

3   Q    And never actually intended to practice medicine, did

4   you, Dr. Rosenfeld?

5   A    Correct.

6   Q    Never had a residency at a hospital, right?

7   A    That is correct.

8   Q    Or an internship?

9   A    That is correct.

10  Q    So you've never actually treated a patient since the

11  early 1980s; is that right, sir?

12  A    That is correct.

13  Q    And you talked at length about your background, your

14  employment after you graduated from medical school in the

15  early 1980s; isn't that right, sir?

16  A    Yes.

17  Q    You testified about a job you had operating some

18  medical centers; is that right?

19  A    That is correct.

20  Q    And having founded a company that made glow-in-the-dark

21  necklaces; is that right?

22  A    That is correct.

23  Q    And then you testified that you moved on to

24  biotechnology investing; is that right?

25  A    Yes.

Rosenfeld - Cross - Pitluck                    9835

1    Q    And I think you testified on direct at transcript

2    Page 9273 that you now do research in the medical field; is

3    that right, sir?

4    A    That is correct.

5    Q    And you've been doing that for quite awhile, haven't

6    you, Dr. Rosenfeld?

7    A    Yes.

8    Q    I think you testified on direct on the same page that

9    you have been involved in many different types of cancer

10   opportunities and research; is that right?

11   A    Correct.

12   Q    Can you just describe for the jury the cancer

13   opportunities and the research you have worked on?

14   A    Well, they vary from offering drugs to different types

15   of systemic cancers.

16   Q    So what lab did you work at, sir?

17   A    I do not work in a lab.  I do everything independently.

18   Q    What experiments do you run?

19   A    It really depends on the situation.

20   Q    What cancer do you focus on researching?

21   A    Again, it's a gamut of different cancers depending on

22   the opportunity.

23   Q    And you have written journal articles about your

24   research, correct, sir?

25   A    No.

Rosenfeld - Cross - Pitluck                    9836

1    Q    But you have given scientific research on your
2    presentations, right?
3    A    No.
4    Q    Isn't it true, Dr. Rosenfeld, that what you really do
5    is find drugs to invest in and try to make money off of
6    them?
7    A    That is part of the equation.
8    Q    Okay.  You do not actually develop the drug, do you,
9    sir?
10   A    I confer with my network and we all work together to
11   try to figure things out.  So it's a -- it's a situation
12   where you wear many different hats, so I am not a publisher
13   of research.  That is not my interest, or if I saw something
14   interesting, I do not think I would publish it because I
15   would again amalgamate everyone's thoughts and try to see if
16   we can push the drug and get it to a successful and final --
17   Q    So what cancer --
18   A    -- FDA approval.
19   Q    I am sorry, I did not mean to cut you off.
20        What cancer drugs have you gotten FDA approval
21   for, sir?
22   A    Some of them have -- it's a motley thought, but some of
23   them have been brought to the FDA.  For example, I can the
24   think of one where we -- it was a company called Merlin, we
25   sold that off.  And I think Cell Genesys bought it or

1    Somatix bought it.  I am not sure which company bought it.

2           But our goal is to look at early stage

3    opportunities, analyze them with a group of different people

4    who are skilled in what they do, and basically you learn

5    from every different opportunity and nobody's an expert in

6    any field.  And I can tell you that a lot of these

7    opportunities are risky, and if I had to think fast, maybe

8    one out of a dozen that are done work out.  Most of them do

9    not work out.  It is a very hard to process so it is a lot

10   of legwork, teamwork and I enjoy it and that is why I am in

11   it.

12   Q    Okay.  So that is really consistent with your testimony

13   last week where you said you are a self-employed investor

14   with interest in the biotechnology field; is that right?

15   A    Amongst other fields, yes.

16   Q    Well, let's unpack that a little bit.  You do not have

17   any formal financial training, do you?

18   A    Well, I was in business when I was 18 years old dealing

19   with the Department of Defense.

20   Q    You testified about that last week.  Your father's

21   company, right, sir?

22   A    I did not say the Department of Defense.

23   Q    Okay.  But you do not have an MBA, right, a Master's of

24   Business Administration, right?

25   A    Well, the analogy I think of --

Rosenfeld - Cross - Pitluck                9838

1  Q    It is a yes-or-no question, sir.

2         Do you have an MBA?

3  A    No.

4  Q    Never had a job on Wall Street?

5  A    No.

6  Q    Never worked in an investment bank?

7  A    No.

8  Q    Do not have any securities licenses, do you, sir?

9  A    No.

10  Q    Series 7?

11  A    No.

12  Q    Series 63?

13  A    No.

14  Q    Do you know what those are?

15  A    I have friends who have those licenses.

16  Q    So your investing experience in the biotechnology field

17  would you put Retrophin in that category, sir?

18  A    As an orphan drug company, yes.

19  Q    Your role in Retrophin, as you testified on direct, was

20  to invest $95,000, correct?

21         MR. MASTRO:  Objection to form, Your Honor.

22         THE COURT:  Try to rephrase it, Mr. Pitluck, if

23  you could.

24  Q    When you made your investment in Retrophin you invested

25  $95,000 to purchase shares; is that right, sir?

1   A    I am not sure if it was 95 or $100,000.  I believe it

2   was 100,000.

3   Q    Maybe I can show you something to refresh your

4   recollection, sir.

5          You wrote a check in connection with your

6   investment in Retrophin?

7   A    Yes.

8   Q    And did you sign a subscription agreement in connection

9   with your check for Retrophin; your investment in Retrophin?

10  A    Yes.

11  Q    I would like to show you just for identification

12  Government's Exhibit 117-10.  I would just like you to take

13  a look at that and let me know when you are through.

14          THE COURT:  That is exhibit --

15          MR. PITLUCK:  Government's Exhibit 117-10.

16          THE COURT:  117-10.  Thank you.  I just was not

17  sure if it was 510 or 10.  Thank you.

18  Q    Okay.  Did you have a chance to look at that,

19  Dr. Rosenfeld?

20  A    Yes.

21  Q    Is that the check from Park Avenue Discoveries?

22  A    Yes.

23  Q    Does that refresh your recollection how much you

24  invested in Retrophin initially?

25  A    It does.

Rosenfeld - Cross - Pitluck                    9840

1    Q    And how much did you invest in Retrophin initially,

2    sir?

3    A    I believe it was 100,000.

4    Q    So this check is wrong?

5    A    There was an additional check for $5,000.

6    Q    Okay.

7    A    I believe.

8    Q    You believe.

9          Okay.  Now you testified on direct examination

10   about your investment in MSMB Healthcare.  Do you remember

11   that, sir?

12   A    Yes.

13   Q    And you testified that you invested in MSMB Healthcare

14   based on a recommendation from your friend Ron Tilles.  Do

15   you remember that?

16   A    I do.

17   Q    Isn't it true, sir, that the first contact that Ron

18   Tilles had with you about companies associated with Martin

19   Shkreli was actually with Retrophin, right?

20   A    No.

21   Q    No, it was not?

22   A    No.

23   Q    So in March of 2011 Ron Tilles did not send you a

24   presentation on Retrophin seeking your input?

25   A    My first recollection of investing was in MSMB

Rosenfeld - Cross - Pitluck                    9841

1    $200,000.

2    Q    Well, that was not my question, sir.

3         My question was what was the first opportunity

4    Ron Tilles brought to you that was connected to Martin

5    Shkreli?

6         MR. MASTRO:  Objection, asked and answered,

7    Your Honor.

8         MR. PITLUCK:  Your Honor, it was not.

9         THE COURT:  No.  Well, I would overrule the

10   objection.  I do not believe it was asked and answered.

11        You may answer it.

12        Do you need it read back or do you remember the

13   question?

14        THE WITNESS:  Okay.  Read it back, please.

15        THE COURT:  Could you do that, please, sir.  Thank

16   you.

17        (Requested portion read back.)

18   A    As far as I can recall, it was MSMB but that is what I

19   recall.

20        MR. PITLUCK:  Your Honor --

21   Q    Is there other documents that may refresh your

22   recollection that you received from Ron Tilles related to

23   Retrophin, maybe?

24   A    Can you repeat the question, I am sorry.

25        MR. PITLUCK:  You know what -- Your Honor, may I

Rosenfeld - Cross - Pitluck                    9842

1   approach?

2          THE COURT:  Yes.

3   Q    I am showing you what has been marked for

4   identification as Government's Exhibit 117-1 and 117-2.

5   A    Thank you very much.

6   Q    Let me know when you have had a chance to look at

7   those, please.

8          MR. PITLUCK:  And, Judge, that is Tab 1 and 2 in

9   your binder.

10         THE COURT:  Thank you.

11         This is just identified not in evidence.

12         MR. PITLUCK:  Just for identification.

13         THE COURT:  Thank you.

14         (Pause in proceedings.)

15  BY MR. PITLUCK:

16  Q    And, sir, I do not want to interpret you.  I am just

17  asking very high level questions about this right now.  I

18  know some of these are dense.  If you want to continue

19  reading, I am happy to give you time.

20  A    Just another one or two minutes.

21  Q    Sure.  Absolutely, sir.  I do not want to rush you.

22         (Pause in proceedings.)

23         (Continued on next page.)

24

25

1   BY MR. PITLUCK:

2   Q    Have you had a chance to look at those now,

3   Dr. Rosenfeld?

4   A    Yes, quickly.

5   Q    Does that refresh your recollection that Mr. Tilles sent

6   you presentations and documents related to Retrophin in March

7   of 2015 and February of 2012?

8   A    It does.

9   Q    Prior to the time that you invested in MSMB Healthcare?

10  A    Yes.

11  Q    And you testified on direct that you, at this point in

12  time, had a business relationship with Mr. Tilles, correct?

13  A    Yes.

14  Q    You had known him for, I think you said, five to ten

15  years at this time, right?

16  A    Approximately, yes.

17  Q    And you were not just -- didn't just have a business

18  relationship, you were also friends with Mr. Tilles, right?

19  A    Yes.

20  Q    And you had done some transactions together, invested in

21  some transactions together, correct?

22  A    That's correct.

23  Q    One of them was a deal you did with MIT, correct,

24  tracking containers; is that right?

25  A    It was a system being used to track, from what I recall,

ROSENFELD - CROSS - PITLUCK                    9844

1   pharmaceuticals and many other things that were of high value,

2   and MIT gave it -- or claimed that it was one of their better

3   opportunities.  It won an award, which I am not --

4   Q    And you invested in that one at Mr. Tilles' suggestion,

5   correct?

6   A    I did.

7   Q    And you also invested in a business, solar power

8   business; is that right, sir?

9   A    Yes.  I am involved in green --

10  Q    Just yes or no answer.

11            THE COURT:  Yes or no, please.

12            THE WITNESS:  Yes.

13  BY MR. PITLUCK:

14  Q    And, yes or no, Dr. Rosenfeld, you also did -- you had

15  some art dealings with Mr. Tilles, right?

16  A    That's correct.

17  Q    You're still friends with Mr. Tilles, aren't you, sir?

18  A    That's correct.

19  Q    And Mr. Tilles was the one who brought you MSMB

20  Healthcare as a potential investment opportunity; is that

21  right?

22  A    Yes.

23  Q    And he introduced you to Martin Shkreli in connection

24  with that opportunity; is that right, sir?

25  A    That's correct.

*ROSENFELD - CROSS - PITLUCK*                               9845

1  Q     And you invested $200,000 in MSMB Healthcare on June 20,

2  2012; is that right, sir?

3  A     That's correct.

4  Q     And prior to that meeting, you met with Martin Shkreli,

5  right?

6  A     Yes.

7  Q     And prior to that meeting you had discussions with

8  Mr. Tilles about MSMB Healthcare, as an investment

9  opportunity, correct?

10  A     Yes.

11  Q     And Mr. Tilles gave you his views on MSMB Healthcare as

12  an investment opportunity, right?

13  A     Yes.

14  Q     Including returns he expected to get out of MSMB

15  Healthcare, right?

16  A     Yes.

17  Q     He told you, sir, that he thought Martin Shkreli was

18  going to get a 20 percent return on MSMB Healthcare; isn't

19  that right?

20  A     Yes.

21  Q     And in connection with your investment in MSMB Healthcare

22  you signed a subscription agreement, right, sir?

23  A     Yes.

24  Q     And as a biotechnology investor, you're familiar with

25  what a subscription agreement is, right, sir?

1  A    Yes.

2  Q    You reviewed that agreement before you signed it?

3  A    Yes.

4  Q    And isn't it true, sir, that soon after you invested in

5  June of 2012, you learned that MSMB Healthcare was going to be

6  winding down; is that right?

7  A    Your definition of soon?

8  Q    Within a few months you learned of investing in MSMB

9  Healthcare, you learned it was going to be winding down,

10  right?

11  A    I think it was close to four to five months,

12  approximately.

13  Q    You invested in June of 2012, right?

14  A    That's correct.

15  Q    I would like to see if I can refresh your recollection.

16        MR. PITLUCK:  Can I have 117-136, please.

17        Judge, can I approach?

18        THE COURT:  Yes.

19  BY MR. PITLUCK:

20  Q    Showing the witness what's been marked for identification

21  only as Government Exhibit 117-136.

22  A    Thank you.

23        MR. PITLUCK:  Your Honor, do you have a copy of

24  that?

25        THE COURT:  Yes, I do.  Thank you.

1          Does Government Exhibit 117-36 refresh your

2   recollection?

3          THE WITNESS:  Yes.

4          MR. PITLUCK:  Thank you, Judge.

5          And just for the record, it's 117-136.  Tab 136.

6          THE COURT:  It's labeled as dash 36.

7          MR. PITLUCK:  I hope not, Judge.  There is a 36, but

8   I think it is a different document.

9   BY MR. PITLUCK:

10  Q    Dr. Rosenfeld, you have one with 117-136 on the bottom,

11  don't you, sir?

12  A    I do.

13  Q    And does that refresh your recollection, sir, that on

14  September 10, 2012, you learned that MSMB Healthcare was going

15  to be winding down?

16  A    Yes.

17  Q    So less than three months after your -- you made your

18  investment, right?

19  A    I think that's approximate.

20  Q    Okay.  And you learned that from Mr. Tilles, right?

21  A    Yes.

22  Q    And after you learned this, you -- that was when you

23  invested what you testified was $100,000 into Retrophin

24  directly, correct?

25  A    Between 95 and 100.  I am just not actually sure if the

ROSENFELD - CROSS - PITLUCK                    9848

1    other $5,000 was allocated.

2    Q    Okay.  So either 95 or 100,000 dollars, whatever it was,

3    your investment in Retrophin was after you received this

4    e-mail telling you that Retrophin was winding down, correct?

5              MR. MASTRO:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    BY MR. PITLUCK:

9    Q    And you always viewed that -- withdrawn.

10             You viewed that as a separate investment from your

11   MSMB Healthcare investment, correct, Dr. Rosenfeld?

12   A    I did.

13   Q    Isn't it also true, Dr. Rosenfeld, that you learned on --

14   in December of 2012, that your MSMB Healthcare investment was

15   going to be liquidated, correct?

16   A    Yes.

17   Q    And you were notified of that through an e-mail from MSMB

18   Healthcare, correct?  To the best of your recollection?

19   A    Yes.

20   Q    And when you learned of that, sir, you wanted to redeem

21   your MSMB Healthcare investment in cash, right, sir?

22   A    I did.

23   Q    The $200,000 you had invested and whatever -- in earnings

24   that had accrued on that investment, correct?

25   A    Correct.

1   Q     And, yes or no, Dr. Rosenfeld, within a few days of

2   learning that MSMB Healthcare was going to be liquidated, you

3   started reaching out to Martin Shkreli to get your money back,

4   correct?

5   A     That's correct.

6   Q     And, in fact, between December 21 and December 28, 2012,

7   you reached out to Martin Shkreli at least four times, trying

8   to get in touch with him to get your money back; is that

9   right, sir?

10  A     I'm not sure on the amount of time, but I definitely did

11  reach out to him.

12  Q     More than once; is that right?

13  A     Yes.

14  Q     And is it safe to say, Dr. Rosenfeld, that Mr. Shkreli

15  wasn't really responsive to your requests in December of 2012?

16  A     Correct.

17  Q     Having a tough time getting a hold of him?

18  A     Yes.

19  Q     Despite these repeated contacts, Martin Shkreli was not

20  getting back to you on your request for money, correct?

21  A     Yes.

22  Q     And at the same time, in December of 2012, you were also

23  reaching out to your friend Ron Tilles about your MSMB

24  Healthcare investment, weren't you, sir?

25  A     That's correct.

1    Q    Were you -- isn't it true you were contacting Mr. Tilles

2    repeatedly, trying to get information from him about your

3    investment; is that right?

4    A    That's right.

5    Q    And pushing Mr. Tilles to go to Martin Shkreli and figure

6    out when you were going to get your money back, right?

7    A    Right.

8    Q    And that continued through the new year into January

9    2013; isn't that right?

10    A    Yes.

11    Q    And it wasn't until early January of 2013 that Martin

12    Shkreli responded to you and basically told you, you couldn't

13    get your money out, right?

14    A    Right.

15    Q    And Mr. Shkreli told you to reach out to Ron Tilles for

16    further information, didn't he?

17    A    He did.

18    Q    And isn't it true that you asked Mr. Shkreli for your PPM

19    and your LPA; is that right?

20    A    I believe so.

21    Q    Can you explain to the jury what a PPM and a LPA are?

22    A    PPM is an acronym for private placement memorandum.

23    Q    What about LPA?

24    A    I'm not familiar with that acronym.

25    Q    But you asked Martin Shkreli for it anyway?

1   A    I believe I had some legal guidance.

2   Q    I am not asking for legal guidance, sir, but I want to

3   make that clear.  But you asked for those from Martin Shkreli,

4   and you asked for those two documents from Ron Tilles, right?

5   A    I believe so.

6   Q    And Mr. Shkreli's response to you that you couldn't get

7   your money out right away, that didn't stop you from trying to

8   get it back, did it?

9   A    That's correct.

10  Q    You were trying to get your $200,000 plus profits back

11  even after -- in cash, even after Martin Shkreli told you you

12  couldn't, right?

13  A    That's right.

14  Q    Isn't it true, Dr. Rosenfeld, that at this point in time,

15  January 2013, you are starting to get pretty suspicious of

16  what's going on at MSMB Healthcare, aren't you?

17  A    Yes.

18  Q    An inability to get your money out is concerning, right,

19  sir?

20  A    Yes.

21  Q    And isn't it true that on January 14, 2013, you sent a

22  formal letter to Martin Shkreli demanding a return of your

23  money by January 31, 2013?

24  A    Yes.

25  Q    You sent it to Martin Shkreli and MSMB Capital, seeking

1    your investment return in MSMB Healthcare; is that right?

2    A    Yes.

3    Q    And after you sent this letter to Martin Shkreli in the

4    middle of January 2013, you didn't get a response from Martin

5    Shkreli, did you?

6    A    I am not sure of the dates on that.  So when he did get

7    back to me.  Sorry.

8    Q    Isn't it true, Dr. Rosenfeld, that on January 19, 2013,

9    about five days after you sent that redemption letter, you

10   contacted Ron Tilles and said, you got to put me in touch with

11   Martin, or I am going to refer you to my lawyer; isn't that

12   right?

13   A    Yes.

14   Q    And that was a communication over text message, correct?

15   A    I believe so.

16   Q    Did you text fairly frequently with Mr. Tilles at this

17   time?

18   A    Yes.

19   Q    So this is in January of 2013, and you are indicating

20   that if Martin doesn't start responding to you, you are going

21   to bring in your lawyer, right?

22   A    That's correct.

23   Q    And you -- but despite that, you still had a lot of

24   trouble getting a hold of Martin Shkreli in January and

25   February of 2013; isn't that right, Dr. Rosenfeld?

1    A    Yes.

2    Q    In fact, you scheduled two lunches with him to try to

3    meet with him about MSMB Healthcare; isn't that right?

4    A    I'm not sure.

5    Q    Do you remember testifying about that in your arbitration

6    proceedings, sir?

7    A    About two lunches?

8    Q    That you tried to schedule with Mr. Shkreli, and then he

9    then cancelled?

10   A    I do.

11   Q    And you remember that you tried to schedule two lunches

12   with Mr. Shkreli in January, February 2013, but he cancelled

13   them both?

14   A    Yes, I think that sounds correct.  I'm not definitive.

15   Q    Okay.  And those lunches that you tried to schedule would

16   have been about your investment in MSMB Healthcare; isn't that

17   right?

18   A    Yes.

19   Q    Trying to find out when you were going to get your money

20   back?

21   A    Correct.

22   Q    And after, best of your recollection, Mr. Shkreli

23   cancelled both of these lunches, your suspicions grew; didn't

24   they, sir?

25   A    Yes.

ROSENFELD - CROSS - PITLUCK                    9854

1   Q    And now you're really worried about your MSMB Healthcare

2   investment, right, sir?

3   A    Yes.

4   Q    And you're also, at this time, not getting a clear answer

5   from Ron Tilles about where your money is, are you, sir?

6   A    That's correct.

7   Q    Sometimes Ron would tell you, we've got a check,

8   sometimes he would tell you, we don't, right?

9   A    Yes.

10  Q    But you're still chasing your money, right?

11  A    For over a year, yes.

12  Q    For over a year.

13          And isn't it true that in March of 2013, you learned

14  that your investment in MSMB Healthcare is going to be

15  delivered to you in shares of Retrophin, right?

16  A    Right.

17  Q    Without telling me what you said on this conversation,

18  you spoke to someone at Retrophin named Michael Smith about

19  how your investment was going to be redeemed; isn't that

20  right, sir?

21  A    That I don't recall, Michael Smith.

22  Q    Do you recall speaking to anyone at Retrophin about the

23  share certifications you were going to get in Retrophin stock?

24  A    Yes.

25  Q    And you don't remember who it was, though, sitting here

1   today?

2   A    Well, I spoke to Ron Tilles about it, I spoke to the CFO.

3   Q    I'm talking in March 2013, sir.  Yes or no, you don't

4   remember who you spoke to?

5   A    I am not clear on it.

6   Q    Okay.  And you wanted to know, in this time, March 2013,

7   how many shares you were getting and what the strike price

8   was, right, sir?

9   A    Yes.

10  Q    Because that would tell you how much your shares in

11  Retrophin were worth, your investment in Retrophin was worth,

12  right?

13  A    Yes.

14  Q    And isn't it true that when you learned the number of

15  shares you were receiving and the strike price, you were

16  really disappointed in the number of Retrophin shares you had

17  received, correct?

18  A    Yes.

19  Q    And you thought it was less than you had deserved, right?

20  A    Yes.

21  Q    Less than your $200,000 investment in MSMB Healthcare,

22  right?

23  A    Yes.

24  Q    And you also wanted to know if you had the same strike

25  price as Martin Shkreli, right?

1    A    Yes.

2    Q    And, in fact, sir, didn't you learn when you figured out

3    how much shares of Retrophin you had, that you lost about

4    $100,000 of your MSMB Healthcare investment?

5    A    I'm not sure of that statement.

6    Q    You're not sure that you lost money, or you're not sure

7    that you lost $100,000?

8    A    I'm not sure that I lost $100,000.

9    Q    But you knew, sir, that you were -- your investment in

10   MSMB had converted to Retrophin stock at a loss to you,

11   correct?

12   A    I would have to do the math on that one, but I'm not

13   sure.

14   Q    Do you remember testifying about this in your arbitration

15   proceeding, sir?

16   A    I'm sorry, can you be more specific.

17   Q    Do you remember testifying about how much money you

18   believed you lost when your MSMB Healthcare investment was

19   converted into Retrophin shares?

20   A    I just knew that there was some inequities going on, and

21   I was just chasing my money, so.  As far as the math was

22   concerned, I don't think I did the math on how much money I

23   lost.  I hope that answers your question.

24   Q    I want to see if I can refresh your recollection, sir.

25             MR. PITLUCK:  May I approach, Judge.

*ROSENFELD - CROSS - PITLUCK*                        9857

1          THE COURT:  Yes.

2    BY MR. PITLUCK:

3    Q    I'm going to hand you a binder, sir, that contains

4    your -- the transcript of your deposition in the arbitration,

5    and transcripts of your deposition.

6    A    Thank you.

7    Q    I am going to ask you to turn to page 812.  Let me know

8    when you're there, please, sir.  It is behind tab 2.  Are you

9    there, sir?

10   A    Yes.

11   Q    You see at the bottom you were asked the question:  Sir

12   you were, being told, in effect, that you lost money on your

13   MSMB Healthcare investment.  You put into 200,000, you are

14   getting back less than 100,000, or you are getting back shares

15   worth less than 100,000?

16         MR. MASTRO:  Objection, Your Honor.  To refresh

17   recollection, he should refer him to read it and see if it

18   refreshes recollection.

19         MR. PITLUCK:  Judge, this is done repeatedly over

20   the last --

21         THE COURT:  Well, let's try to stay with the

22   protocols for refreshing recollection.

23         MR. PITLUCK:  Sure, Judge.

24         THE COURT:  All right.  You can direct him to the

25   pages and lines and ask if this refreshes his recollection.

1          MR. PITLUCK:  Absolutely, Your Honor.

2     BY MR. PITLUCK:

3     Q    You see the question, page 812, line 20, in your answer

4     at line 25?  Just five lines.

5     A    I do.

6     Q    Does that refresh your recollection that at the time you

7     thought you were -- you had lost about $100,000 in your MSMB

8     Healthcare investment?

9     A    Yes.

10    Q    And that's okay, Dr. Rosenfeld, you can put it aside now.

11    We will refer back to that.

12    A    Thank you.

13    Q    Thank you.

14          And you were upset by that conversion that resulted

15    in you losing $100,000 in your investment, right?

16    A    Yes.

17    Q    And isn't it true that you immediately reached out to Ron

18    Tilles after you learned of this conversion?

19    A    Yes.

20    Q    And nobody ever asked you if you wanted to convert your

21    MSMB Healthcare stock into Retrophin, right?

22    A    That's correct.

23    Q    You wanted your cash, right?

24    A    Yes.

25    Q    And isn't it true that on March 13, 2013 you again told

ROSENFELD - CROSS - PITLUCK                    9859

1   Ron Tilles that you were considering legal action against

2   Martin Shkreli, right?

3   A    That's correct.

4   Q    And that, in fact, you had already brought in a lawyer,

5   right?

6   A    I was contemplating that, correct.

7   Q    Your friend -- withdrawn.

8        Your lawyer Stuart Meissner, right?

9   A    Yes.  I was contemplating hiring him, yes.

10  Q    And that was the day that you got the e-mail that you saw

11  on direct examination from Martin Shkreli, saying that he had

12  learned you told Ron Tilles you wanted to -- were engaging a

13  lawyer and that you should only speak to his lawyer from there

14  on out, right?

15  A    That's correct.

16  Q    And that was March 13, 2013, right, sir?

17  A    Seems right.

18  Q    And you don't have a recollection one way or the other,

19  do you, Dr. Rosenfeld, whether you contacted the defendant on

20  March 13, 2013?

21  A    The defendant being?

22  Q    Evan Greebel.

23  A    I'm not sure.

24  Q    You are not sure if you contacted Evan Greebel after

25  receiving an e-mail from Martin Shkreli that said you should

ROSENFELD - CROSS - PITLUCK                          9860

1    contact Evan Greebel?

2    A    Oh, then, yes, I am sure I did or my attorney did.

3    Q    You are sure now that you did or your attorney did

4    contacted Evan Greebel on that day?

5    A    Actually, I take that back.  I'm not sure, but it would

6    be -- it would make sense to me that there was some

7    communications going on either by e-mail, telephone, or

8    communications between Ron Tilles and Greebel.

9    Q    Between Ron Tilles and Greebel, that's what you think?

10   A    I would think so.

11   Q    You would think -- but you have no specific recollection

12   sitting here, one way or the other, whether you spoke to Evan

13   Greebel?

14   A    I may have.

15   Q    You may have?  You just don't remember?

16   A    Again, I'm not sure.  I'm sorry.

17   Q    But you are sure, correct, Dr. Rosenfeld, that you

18   continued to speak to Ron Tilles after receiving this e-mail

19   from Mr. Shkreli, right?

20   A    That's correct.

21   Q    And Ron Tilles at that point you believed worked at

22   Retrophin, right?

23   A    Yes.

24   Q    And based on your understanding, Ron Tilles worked at

25   Retrophin throughout the end of 2012 and beginning of 2013,

1  right?

2  A    Yes.

3  Q    And you were speaking to him the whole time about your

4  investment in MSMB Healthcare and Retrophin, right?

5  A    Right.

6  Q    And isn't it true that the day after you got this e-mail

7  from Martin Shkreli, Ron Tilles bought 3,000 shares of your

8  Retrophin stock at a discount?

9  A    I believe so, yes.

10  Q    Because you needed the cash, right?

11  A    Yes.  And, also, because in the field of biotech, stock

12  can be ten dollars and tomorrow it can be a penny.  So

13  sometimes it is best just to take your money off the table

14  rather than continually roll the dice in the complex and

15  entropy of biotech.

16  Q    But just to be clear, the day after Martin Shkreli sends

17  you letter telling you you are getting more Retrophin stock,

18  your friend Ron Tilles, a Retrophin employee, buys 3,000 of

19  your shares at a discount?

20  A    I believe so, that's correct.

21  Q    Now, after this March 13, 2013 e-mail, you don't recall

22  having direct communications with the defendant, Mr. Greebel,

23  right?

24  A    I think there were communications, again, via the e-mail

25  system, and telephone exchanges with Ron and possibly others,

1    et al.

2    Q    So let's unpack that a little bit.  There were -- you

3    believe there were e-mail exchanges involving Ron and others,

4    and the defendant, right?

5    A    Yes.

6    Q    And were you a part of those, sir?

7    A    Yes.

8    Q    And do you remember any specifics about any conversation

9    that you had in March or April of 2013, with the defendant?

10   A    To the best of my knowledge, I believe various

11   communications, but I'm not sure if they were by voice or

12   e-mail or text.

13   Q    All right.  So we talked a little bit, you testified

14   about this on direct, and in April 2013, you agreed to accept

15   a consulting agreement to resolve the open issues with your

16   MSMB Healthcare investment, right?

17   A    Can you please repeat that date?

18   Q    Sure.  I said, in around April 2013, you agreed to accept

19   a consulting agreement in connection with the open issues

20   surrounding your MSMB Healthcare investment, right?

21            MR. MASTRO:  Objection to form, Your Honor.  Not

22   consistent.

23            MR. PITLUCK:  Your Honor, speaking.

24            THE COURT:  All right.

25            MR. PITLUCK:  Fair question.

*ROSENFELD - CROSS - PITLUCK*                           9863

1          THE COURT:  Overruled.

2    BY MR. PITLUCK:

3    Q    You can answer, sir.

4    A    I believe there was a --

5    Q    It's a yes or no question, sir.

6    A    Oh.  Repeat that question one more time, please.

7          MR. PITLUCK:  Can the court reporter read it back?

8    I'm sorry.

9          THE COURT:  Yes, please.  Thank you.

10         (WHEREUPON, the record was read by the reporter as

11   requested.)

12         THE WITNESS:  Your definition of "accept"?

13   BY MR. PITLUCK:

14   Q    Your quibble, sir, is with my definition of "accept"?

15   A    My apologies, but I did --

16         MR. MASTRO:  Objection, Your Honor.  Arguing with

17   the witness.

18         MR. PITLUCK:  I asked a question.

19         THE COURT:  Are you asking for his meaning of

20   "accept," or are you having difficulty understanding that?

21         THE WITNESS:  The question I have is --

22   BY MR. PITLUCK:

23   Q    Let me rephrase, Dr. Rosenfeld.

24   A    Please.  My apologies.

25   Q    We'll try it again.

1    A    Right.

2    Q    Isn't it true that in April 2013, you agreed to enter

3    into a consulting agreement to resolve the open issues

4    surrounding your MSMB Healthcare investment?

5              MR. MASTRO:  Objection to form.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    BY MR. PITLUCK:

9    Q    Yes.

10             And you saw that, a draft of that consulting

11   agreement on direct examination; do you remember that, sir?

12   A    I do.

13   Q    Do you still have, sir, do you still have your binder

14   that defense counsel gave you?

15   A    Yes.

16   Q    Can you open it up to tab 10, which is DX-203-3.  It is

17   in evidence.  This is an e-mail that you saw and testified

18   about on direct, from February 2014, from the defendant to

19   you, copying Marc Panoff.  Do you remember that, sir?

20   A    I do.

21   Q    Can you go to the next page, which is the first page of

22   the consulting agreement and release, right?

23   A    Yes.

24   Q    Sorry.  I will put it up.  I apologize.

25             You see at the top there where it says, description

1   of services?

2   A    I do.

3   Q    It says, strategic and corporate governance matters?

4   A    Yes.

5   Q    Yes or no, sir, you never discussed the strategic or

6   corporate governance services you were going to provide

7   Retrophin with the defendant, did you?

8   A    No.

9   Q    But you testified on direct, sir -- let me just take a

10  step back.  That was a signed agreement.  You signed that in

11  February of 2014; do you recall that?

12  A    I do.

13  Q    I think you testified a moment ago that it took almost a

14  year to actually finalize this agreement, right?

15  A    Approximately, yes.

16  Q    And between -- do you recall sitting here when you got

17  the first draft of the consulting agreement in connection with

18  Retrophin?

19  A    April 2013.

20  Q    So prior to April 2013, you didn't have any discussions

21  with anybody about -- at Retrophin, about what your consulting

22  role would be, did you, Dr. Rosenfeld?

23  A    No.

24  Q    So it wasn't until you actually got a consulting

25  agreement that, according to your testimony on direct, you

1    actually started to discuss your consulting role, right?

2    A    That's absolutely correct.

3    Q    And people that you testified on direct that you

4    discussed this with, after you received the draft of the April

5    2013, were Ron Tilles, right?

6    A    Yes.

7    Q    And Mr. Tilles was, you testified today, your friend,

8    correct?

9    A    Yes.

10   Q    And an employee of Retrophin, right?

11   A    Yes.

12   Q    And somebody else you discussed it with was Ken Banta; is

13   that right, sir?

14   A    That's correct.

15   Q    I think you testified last week that you believe

16   Mr. Banta was on Retrophin's board of directors?

17   A    Yes.

18   Q    And you learned that from Mr. Banta?

19   A    I'm not sure.  I think I saw it in some of the promotions

20   that he was senior vice president.  I'm just not sure anymore,

21   but I know he was involved somehow with the board.  That's how

22   it was presented.

23   Q    And you also spoke to, I think you testified on direct,

24   the CFO of Retrophin; is that right?

25   A    That's right.

1    Q    You don't remember his name?

2    A    Marc Panoff.

3    Q    And, again, you had that -- those conversations after you

4    received the first draft of the consulting agreement in April

5    2013, correct?

6    A    I think it may have been before.

7    Q    Oh, so now it was before?  Didn't you just tell me two

8    minutes ago that you didn't speak to anybody until after you

9    received the draft in April 2013?

10   A    I may have been mistaken.  I remember, now that you asked

11   the question, on a declaring basis, I believe that I had

12   conversations leading up to then, because this is, you know, a

13   number of years ago, then leading to this consulting

14   agreement.  I think that was their solution, as an aggregate

15   of information between them, they presented this to me.  And I

16   have to say, I was unhappy about this.  I wanted -- I had no

17   other choice.  I didn't want to be a consultant, but they

18   said, "Look.  If you do this work, based upon this contract,

19   we will give you your shares."  I guess that was the way they

20   were going to pay me, and I was reluctant to do the work, but

21   I wanted to get my money back at least, so I did it.  And I

22   did it with alacrity.

23              THE COURT:  When you say "they," who is "they"?

24              THE WITNESS:  I'm sorry.  That would be Ron Tilles,

25   Mr. Shkreli, and Mr. Banta, and Mr. Panoff.

ROSENFELD - CROSS - PITLUCK                                    9868

1   BY MR. PITLUCK:

2   Q    And -- I'm sorry, go ahead.

3   A    Those are the people that I had conferred with.

4   Q    And it is your testimony here today that you conferred

5   with all of those people prior to receiving your agreement in

6   April of 2013?

7             MR. MASTRO:  Objection to form, Your Honor.

8             THE COURT:  Overruled.

9             THE WITNESS:  Yes.

10            MR. PITLUCK:  Your Honor, this might be a good time

11   for a break.

12            THE COURT:  All right.  Why don't we give the jurors

13   their mid-morning break.

14            Don't talk about the case, please.  And we will come

15   and retrieve you soon.

16            And, sir, you can step down.

17            THE WITNESS:  Thank you.

18            (WHEREUPON, at 10:48 a.m., the jury exited the

19   courtroom.)

20            THE COURT:  All right.  See you in ten minutes.

21            MR. PITLUCK:  Thank you.

22            (WHEREUPON, a recess was had at 10:50 a.m.)

23

24

25

*Proceedings*                                                    *9869*

1              (In open court; 10:55 a.m.)

2              MR. BRODSKY:  Your Honor, I just wanted to put

3    something on the record.

4              THE COURT:  Yes.

5              MR. BRODSKY:  It gives me no pleasure to say it.

6              THE COURT:  Just speak up for the record.

7              MR. BRODSKY:  I'll put the mic on.

8              It gives me no pleasure to bring up this issue, your

9    Honor, and to say it.  Several people in the gallery have

10   observed Mr. Kessler laughing, nodding towards particular

11   jurors during the testimony of Dr. Rosenfeld.  I did not

12   personally see it.

13             During the trial, we have noticed Mr. Kessler

14   expressing emotion during the testimony of witnesses.  What we

15   would ask, your Honor, is that your Honor look over on

16   occasion.  I know you're paying attention to the witness and

17   many things --

18             THE COURT:  I think may be since Mr. Kessler is not

19   in the room -- he's just entering now -- I think that you

20   should say what you need to say about Mr. Kessler in his

21   presence.

22             MR. BRODSKY:  Sure.

23             Again, it gives me no pleasure to raise the issue

24   about Mr. Kessler but several people in the audience noticed

25   that during the testimony of Mr. Rosenfeld, Mr. Kessler was

*Proceedings*                                                      *9870*

1    visibly laughing and he was exchanging laughter with

2    particular jurors on the jury.

3         Mr. Kessler's -- we have notice the -- I didn't

4    notice this personally but several people in the gallery did

5    this morning.  We have noticed Mr. Kessler, in the past,

6    during the trial, being visible with respect to his

7    expressions with respect to witnesses.  But it got to the

8    point today that I think we believe we had to raise it with

9    the Court.

10        What we're asking for, your Honor, is that you -- we

11   hope that our putting it on the record and that your Honor

12   would from time to time look over and see whether or not

13   there's any visible expression from prosecutors, from

14   Mr. Kessler in particular, to just discourage the -- to

15   discourage that.

16        Thank you, your Honor.

17        THE COURT:  All right.

18        Well, I will say I have not noticed.  I do see from

19   time to time things going on at both the defense table and the

20   prosecutor's table that looks like chatter and maybe, you

21   know, little eyebrow raises or smirks.  It's happened with

22   both.  I'm not aware that the jurors are seeing it.  I'm not

23   aware, I mean, I would certainly not say that anyone is trying

24   to send signals to the jury, but I will try to be aware of it

25   and I would just ask Mr. Brodsky whether the folks in the

*Proceedings*                                                      *9871*

1    galley have observed it.

2              Can you identify who they are?

3              MR. BRODSKY:  Yes, Your Honor our colleague Jason

4    Halpern and the father of Mr. Greebel.

5              THE COURT:  All right.  Thank you.

6              Mr. Kessler, if that is happening, please refrain.

7    I would like everybody to try to keep a very mask-like

8    expression toward the jury.  I understand this has been a long

9    trial, and that from time to time tempers and frustrations

10   have grown, but let's just try to get through the finish of

11   this as smoothly as we can.

12             All right.  So we will bring the jury back this

13   time.

14             I just have to say that Mr. Kessler's back is to

15   both of the individuals that you claim observed this, but I

16   will definitely keep my eyes open.

17             MR. BRODSKY:  Your Honor, to that point --

18             THE COURT:  I'm just saying.

19             MR. BRODSKY:  It was so visible, it was so obvious

20   that that's what they say.  We asked them as well.  But the

21   laughter and the shaking and I noticed, for the record, your

22   Honor, Mr. Kessler is not disputing it.

23             THE COURT:  Well, we can see if he disputes it.  I

24   don't know.

25             Mr. Kessler, you haven't -- I haven't asked you to

*Proceedings*                                                    *9872*

1    speak for your yourself.

2            MR. KESSLER:  I didn't think there was anything I

3    needed to address, but I'm not communicating with any jurors

4    and we're trying to be composed here and communicate amongst

5    the prosecution team when we need to about issues that are

6    coming up during the cross that are related to other parts of

7    the trial that we're getting ready to get it.

8            THE COURT:  All right.  Thank you.

9            (A brief pause in the proceedings was held.)

10           MR. BRODSKY:  I will also note, your Honor, that

11   there are two people sitting in the back row that have

12   indicated they saw it as well.  Two women.

13           THE COURT:  Who they affiliated with?

14           MR. BRODSKY:  I don't know who they are.

15           THE COURT:  Are they with a law firm.

16           AUDIENCE MEMBER:  We're just friends with our friend

17   Jodi.  And we saw one of the jurors, a blond woman in the

18   front, snickering when there was some of the stuff going on.

19           THE COURT:  Well, jurors may from time to time, all

20   right, but I do think the allegation is that Mr. Pitluck --

21   Mr. Kessler --

22           MR. PITLUCK:  I'm just asking questions, Judge.

23           THE COURT:  Sorry, David Kessler was communicating

24   in some way with the jurors through facial expressions.  We

25   can't prevent what the jurors say or feel since they've been

*Proceedings*                                                    *9873*

1    here for nine months -- nine weeks -- and I'm sorry that they

2    are, they shouldn't be doing that, but I'd like to just finish

3    this trial.

4              When you say "Jodi," you mean Jodi, Mr. Greebel's

5    wife?  Yes?

6              MR. BRODSKY:  I believe so yes, Your Honor.

7              THE COURT:  They nodded their heads I was hoping to

8    get an answer on the record.

9              AUDIENCE MEMBER:  Yes, Your Honor.

10             THE COURT:  Give us your names again.  The court

11   reporter didn't hear you.

12             AUDIENCE MEMBER:  Sharon Scholnick.

13             THE COURT:  I don't believe your companion spoke,

14   did she?

15             AUDIENCE MEMBER:  I'm not sure I spoke loud enough

16   that anyone heard me.

17             THE COURT:  I don't think I heard you.  If you want

18   to be heard, I'm happy to put your statement on the record.

19             AUDIENCE MEMBER:  I also saw Mr. Kessler making

20   faces U your Honor.  Dana Wiczyk, W-i-c-z-y-k.

21             THE COURT:  Thank you.

22             (A brief pause in the proceedings was held.)

23             COURTROOM DEPUTY:  All rise.

24             (Jury enters courtroom at 11:10 a.m.)

25             THE COURT:  All jurors are present.  Please have a

*Dr. Rosenfeld - Cross/Mr. Pitluck*        **9874**

1    seat.  You may resume your cross, Mr. Pitluck.

2            MR. PITLUCK:  Thank you, your Honor.

3    EXAMINATION BY

4    MR. PITLUCK:

5    (Continuing.)

6    Q    Yes or no, Dr. Rosenfeld, you know that Marc Panoff

7    wasn't hired as a CEO of Retrophin until May of 2013?

8    A    No.

9            THE COURT:  Is the microphone on?

10           You can answer the question.

11   A    No.

12   Q    But in May of 2013, you were pushing Ron Tilles to get

13   this disagreement resolved; correct?

14   A    Correct.

15   Q    And do you recall receiving an updated draft of the

16   consulting agreement on May 28, 2013?

17   A    I remember in April --

18   Q    Okay.  Let me see if I can refresh your recollection.

19   A    -- of 2013.

20           MR. PITLUCK:  Your Honor, if I may approach?  I

21   would like to show the witness Government Exhibit 117-50?

22           THE COURT:  All right.  Thank you.

23           MR. PITLUCK:  For identification.

24           (Approaching the witness.)

25   Q    Let me know, please, sir, when you've had a chance to

*Dr. Rosenfeld - Cross/Mr. Pitluck*          **9875**

1  look at that and whether it refreshes your recollection that

2  you received an updated draft of the consulting agreement on

3  May 28, 2013.

4  A    Yes.

5           MR. PITLUCK:  Your Honor, we offer Government

6  Exhibit 117-50 into evidence.

7           MR. MASTRO:  No objection, your Honor.

8           THE COURT:  We receive in evidence Government

9  Exhibit 117-50.

10           (Government's Exhibit 117-50 was received in

11  evidence as of this date.)

12           MR. PITLUCK:  If I could have the Elmo, please,

13  Ms. Jackson.

14  Q    There is an e-mail exchange that you received on May 28,

15  2013; correct?

16  A    Correct.

17  Q    From Ron Tilles; is that right?

18  A    Correct.

19  Q    And it's forwarding an e-mail from the defendant to

20  Mr. Tilles on May 24, 2013; right?

21  A    Right.

22  Q    And if I can direct your attention to the third page of

23  the document.

24           You'll see that there's a description of services

25  there; right?

1    A    Right.

2    Q    Saying "Description of Services," or "Strategic and

3    Corporate Governance Matter for the Management of the

4    Company"?

5    A    Yes.

6    Q    And, as compensation, you're getting 60,000 shares of

7    common stock.

8              Do you see that?

9    A    Yes.

10   Q    And I just want to move down real quick to the

11   Representation and Warranty paragraph, do you see that?

12             Paragraph 4A.  It says, "Consultant represents and

13   warrants to company that."

14             Do you see that there towards the middle of the

15   screen?

16   A    Yes.

17   Q    And there are Roman numerals I through VI.  Do you see

18   those?

19   A    I do.

20   Q    Do you recall asking to have those removed from your

21   consulting agreement?

22   A    I'm not sure.

23   Q    You're not sure one way or the other?

24   A    I don't recall.

25   Q    Okay.  Now, after you received this draft, you asked for

*Dr. Rosenfeld - Cross/Mr. Pitluck*          **9877**

1    more shares of stock; right?

2    A    Yes.

3    Q    You asked for 15,000 shares more?

4    A    I did ask for more, but I'm not sure of the number.

5    Q    And you asked for more, Dr. Rosenfeld, because you

6    believed that your money had been used as a bridge loan for

7    two years and you were entitled to more than 60,000 shares;

8    right?

9    A    Right.

10   Q    But you don't remember asking specifically for 15,000

11   shares?

12   A    I definitely asked for more, but the exact amounts I

13   think there was in negotiations throughout prior to the April,

14   I mean, after the April 2013 consulting agreement leading up

15   to the February 2014 consulting agreement.

16   Q    We'll get to that, Dr. Rosenfeld.

17           But when I ask you specifically if you remember

18   meeting with Ron Tilles on June 12, 2013?

19   A    Yes, it's possible.  Sure.

20   Q    Yes, it's possible; or, yes, you actually remember

21   meeting him on June 12, 2013?

22   A    I'm not sure of the date.

23   Q    Okay.  Let me see if I can give you something that

24   refreshes your recollection.

25           MR. PITLUCK:  Approach, Judge.

*Dr. Rosenfeld - Cross/Mr. Pitluck*          *9878*

1          THE COURT:  Yes.

2          MR. PITLUCK:  Showing the witness for identification

3   117-55, a one-page document.

4          (Handing).

5   Q    If I can just direct you to about two-thirds of the way

6   down the page and ask if that refreshes your recollection that

7   you met with Ron Tilles on June 12, 2013?

8   A    It does.

9   Q    And during your meeting with Ron Tilles on June 12, 2013,

10  do you recall asking him for more shares of Retrophin to go

11  away so that you can go awe?

12          MR. MASTRO:  Objection.  Hearsay.

13          MR. PITLUCK:  It's not for the truth, Judge.  State

14  of mind.

15          THE COURT:  All right.  I will admit, members of the

16  jury, not for the truth but to show the state of mind.

17  EXAMINATION BY

18  MR. PITLUCK:

19  (Continuing.)

20  Q    Dr. Rosenfeld, do you recall telling Ron Tilles during

21  that meeting that you wanted more shares of Retrophin to go

22  away?

23          MR. MASTRO:  Same objection, your Honor.

24          THE COURT:  Overruled.

25  A    That's possible.

1   Q    You didn't actually resolve your dispute with Martin

2   Shkreli in June of 2013, did you, sir?

3   A    I did not.

4   Q    In fact, through July and August of 2013, you're

5   continuing to get in touch with Ron Tilles to ask what's going

6   on with your investment in MSMB Healthcare; right?

7   A    Right.

8   Q    When Mr. Tilles could talk to you about Retrophin; right?

9   A    Right.

10  Q    And that's, in fact, going on through September of 2013;

11  right, sir?

12  A    Yes.

13  Q    Now, do you recall exchanging text messages with

14  Mr. Tilles in September 2013 where you tell him that you're

15  getting tired of getting jerked around?

16          MR. MASTRO:  Objection.  Hearsay.

17          THE COURT:  Sustained.

18          MR. PITLUCK:  Same state of mind.  This isn't being

19  offered --

20          THE COURT:  All right.

21          Again, members of the jury, this testimony is not

22  being offered for the truth, but to give you -- it's offered

23  as evidence of the state of mind of the individuals involved

24  in the exchanges.

25          THE WITNESS:  Yes.  I'm not sure of the exact date,

*Dr. Rosenfeld - Cross/Mr. Pitluck*          **9880**

1    though, in September.

2    Q    But you do remember telling Mr. Tilles that you were

3    getting tired of getting jerked around?

4         MR. MASTRO:  Same objection, your Honor.

5         THE COURT:  Same ruling.  Overruled.

6    A    Yes.

7    Q    And at the same time, you're trying to set up a meeting

8    with the CFO of Retrophin; right?

9         If you can't remember, sir, I will try to refresh

10   your recollection.

11   A    Please.

12   Q    I'm going to show you what's been marked for

13   identification only Government Exhibit 117-76.  I'm asking you

14   to focus on the e-mails on the first page or the messages on

15   the first page.

16   A    Thank you.

17        (Handing).

18   Q    Does that refresh your recollection, sir, that at the end

19   of September 2013, you're trying to get Ron Tilles to set up a

20   meeting with the CFO?

21   A    Yes.

22   Q    And, in October of 2013, you're still communicating with

23   Ron Tilles trying to get a resolution to this dispute; right?

24   A    Yes.

25   Q    And, in fact, in October of 2013, you wrote Mr. Tilles an

*Dr. Rosenfeld - Cross/Mr. Pitluck*      **9881**

1  e-mail laying out your claims related to the MSMB Healthcare

2  investment and asking for more shares.

3           Do you remember that?

4           MR. MASTRO:  Objection.  Hearsay.

5           THE COURT:  Same basis Mr. Pitluck?

6           MR. PITLUCK:  Your Honor, I'm just asking if he

7  remembers sending an e-mail.

8           THE COURT:  All right.  Overruled.

9  Q    Do you remember that, sir?

10  A    Again, I'm not sure of the date, but I do remember

11  negotiating with Ron Tilles.

12  Q    And sending him an e-mail pursuant to those negotiations?

13  A    An e-mail or a text, yes.

14           MR. PITLUCK:  May I approach, Judge.

15           THE COURT:  Yes.

16           MR. PITLUCK:  Showing the witness what has been

17  marked for identification as Government Exhibit 117-80.

18           (Handing).

19  Q    That's an e-mail from you to Ron Tilles on October 7,

20  2013?

21  A    Yes.

22           MR. PITLUCK:  Your Honor, we'd offer Government

23  Exhibit 117-80 into evidence.

24           MR. MASTRO:  No objection, your Honor.

25           THE COURT:  We receive in evidence Government

*Dr. Rosenfeld - Cross/Mr. Pitluck*          *9882*

1    Exhibit 117-80.

2            (Government's Exhibit 117-80 was received in

3    evidence as of this date.)

4    EXAMINATION BY

5    MR. PITLUCK:

6    (Continuing.)

7    Q    Putting it up there so the jury can see it,

8    Dr. Rosenfeld, this is an e-mail that you wrote to

9    rontilles@gmail.com; correct, on October 7, 2013?

10   A    Yes.

11   Q    That's your e-mail address stevenrosenfeldmd@gmail.com?

12   A    Yes.

13   Q    You wrote in the subject line, "Draft, Confidential and

14   Not for Distribution."  Right?

15   A    Yes.

16   Q    And this e-mail was an effort to resolve a dispute

17   related to your MSMB Healthcare; correct, sir?

18   A    Correct.

19   Q    And you wrote, "Pre-IPO $200,000 was commingled into

20   Retrophin without my permission.  Reference your bank

21   account."

22            Is that right, sir?

23   A    That's right.

24   Q    You wrote, "Retrophin had less assets post-IPO than what

25   was written."

*Dr. Rosenfeld - Cross/Mr. Pitluck*          *9883*

1                  Is that right, sir?

2    A    Yes.

3    Q    And you wrote, "Please review your evaluation of

4    Retrophin post-IPO and pre-IPO."

5                  Correct?

6    A    Correct.

7    Q    And finally, you wrote, "Family and friends around

8    pre-IPO justifies," I'm interpreting that's a greater than,

9    "300,000 shares."

10                 Is that right, sir?

11   A    That's correct.

12   Q    And you were trying to get more than 300,000 shares as a

13   resolution of your dispute; right, sir?

14   A    Right.

15   Q    No mention of consulting in this e-mail, though; right,

16   sir?

17                 Yes or no?

18   A    Yes.

19   Q    Yes, I'm right there's no mention of consulting?

20   A    That's correct.

21   Q    Okay.  And also, in this time in October of 2013, you met

22   with Ken Banta; right?

23   A    That's correct.

24   Q    And isn't it true, Dr. Rosenfeld, that this is the first

25   time that you met Ken Banta?

*Dr. Rosenfeld - Cross/Mr. Pitluck*          **9884**

1   A    Yes.

2   Q    And you met Ken Banta in October of 2013 because Ron

3   Tilles put you in touch with him; right?

4   A    Right.

5   Q    Six months after you were first given a draft of the

6   consulting agreement, approximately, six months?

7   A    Yes.

8   Q    As you proceeded through October and November 2013, you

9   still haven't been able to resolve your dispute; correct?

10  A    Correct.

11  Q    But you're staying in touch with Ron Tilles; right?

12  A    Right.

13  Q    And you're pushing him to try to go to Retrophin and see

14  if he can get something done; right?

15  A    Right.

16  Q    Isn't it true, sir, that in November of 2013, you wrote

17  to Mr. Tilles that, "This negotiation is becoming bizarre and

18  I'm jerked around to buy them time."

19        MR. MASTRO:  Objection.  Hearsay.

20        MR. PITLUCK:  Same purpose, Judge.

21        THE COURT:  Overruled.  Again, this is offered to

22  show state of mind.  Not for the truth.

23        You may answer the question.

24  A    Yes.  I'm not sure of the exact date, but that statement

25  is made.

*Dr. Rosenfeld - Cross/Mr. Pitluck*          **9885**

1   Q    And then, as we proceeded into December of 2013, you were

2   pushing Ron Tilles to get you an offer in writing; right?

3   A    Yes.

4   Q    Something that you could sign and get your shares;

5   correct?

6   A    Correct.

7   Q    And you believe that this time that Ron Tilles was

8   stalling you; right?

9   A    Yes.

10  Q    And that if he didn't get something in writing soon you

11  were going to engage Stuart Meissner to talk to the defendant;

12  right?

13  A    Right.

14  Q    And in mid-December 2010, you wrote to Mr. Tilles that

15  you were willing to settle but Retrophin was not.

16       Do you remember writing that, sir?

17  A    Can you go over that date again, please?

18  Q    Middle of December 2010?

19  A    2010?

20  Q    I'm sorry, I apologize, December 10, 2013.

21       THE COURT:  Why don't you rephrase the question.

22  Q    Do you recall writing on December 10, 2013, that you were

23  willing to settle but Retrophin is not?

24  A    Yes.

25  Q    In fact, in early January 2014, you went to Ron Tilles

1    and Marc Panoff and offered to settle for $1 million?

2    A    They proposed that to me and I said, okay, I'll take

3    that.

4    Q    Your testimony is they proposed it to you and you said --

5              MR. MASTRO:  Objection.  Hearsay.

6              THE COURT:  It's the same basis?  Am I correct or

7    not?

8              MS. SMITH:  Same basis, Judge.

9              THE COURT:  Overruled.  Do you want a sidebar,

10   Mr. Mastro?

11             MR. MASTRO:  Your Honor, I'd rather not have a

12   sidebar, but --

13             MS. SMITH:  Your Honor, I would rather have a

14   speaking objection.

15             THE COURT:  If there's anything going beyond the

16   objection and a basis.

17             MR. MASTRO:  I will be very brief, your Honor.

18   Sorry.

19             (Continued on the next page.)

20

21

22

23

24

25

*Sidebar*                                                    *9887*

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          MR. MASTRO:  I'll be very brief.  It's one thing

5    that he said reflecting his state of mind of state of mind is

6    the state of mind of the declarant.  Under the rule now, he's

7    elicited testimony he asked, "Did you say this?"  But then he

8    responded, "They proposed the 1 million."  So that doesn't --

9    that doesn't come in under state of mind exception to hearsay,

10   a declaration by him.

11         THE COURT:  I understand it's the effect on the

12   listener.  Then there's a negotiation going on, so.

13         MR. PITLUCK:  Offers are not hearsay.  An offer from

14   the party -- we've had this.  An offer from one person to

15   another is not hearsay, it can't be.

16         THE COURT:  They're negotiating during this time;

17   right?

18         MR. MASTRO:  Well, your Honor, we actually had some

19   issues where we said an offer was made.

20         THE COURT:  That's not true.  I've given you a lot

21   of latitude and I've let things in on the same grounds that

22   you are proffering here and those were not even negotiations.

23   I admitted a lot of evidence that were negotiations that you

24   were offering either as the effect on the listener, or the

25   then existing state of mind of the declarant.  The Government

*Sidebar*                                                          *9888*

1    is offering these as negotiations which I can instruct the

2    jury that --

3              MR. PITLUCK:  Judge, I don't think that an offer is

4    hearsay requiring an instruction.

5              THE COURT:  It's true.

6              MR. PITLUCK:  The fact that it was said to him an

7    offer was made.

8              MR. MASTRO:  I simply suggest, your Honor, that

9    since that offer was described as an offer which was actually

10   just a discussion and not something that is ever formally

11   offered or later agreed upon, you have any discussion with

12   something at a lower level of a company that doesn't realize

13   it's an offer made by the company.

14             So I think it's a little misleading to the jury to

15   describe it that way.

16             THE COURT:  Mr. Shkreli has referred Dr. Rosenfeld

17   to Ron Tilles and gave him apparent authority to negotiate

18   with Dr. Rosenfeld about parameters of any resolution of this.

19             So whether or not they're authorized to negotiate

20   with the company is not the issue.  The issue is whether he

21   was given reason to believe that Mr. Tilles was able to

22   negotiate on behalf of the company.

23             MR. MASTRO:  Okay.  I understand, your Honor's

24   ruling.

25             THE COURT:  Thank you.

*Sidebar*                                                                  *9889*

1              (Sidebar discussion concludes.)

2              (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Dr. Rosenfeld - Cross/Mr. Pitluck*          *9890*

1              (In open court.)

2              THE COURT:  Did you want to rephrase your question

3     or reask it so that --

4              MR. PITLUCK:  Quite frankly, I forgot what question

5     I was asking.

6              Can the court reporter read it back?

7              (The requested portion of the record was read back

8     by the Official Court Reporter.)

9              THE COURT:  You'll have to rephrase the question

10    then.

11    EXAMINATION BY

12    MR. PITLUCK:

13    (Continuing.)

14    Q    So, Dr. Rosenfeld, I believe you testified before the

15    brief sidebar that Mr. Panoff and Mr. Tilles offered you

16    $1 million to settle your dispute and you accepted it; is that

17    right?

18    A    Ron Tilles was the one who mentioned it to me over the

19    phone.

20    Q    Okay.  So it was just Mr. Tilles who made that offer to

21    you over the phone; is that right?

22    A    That's right.

23    Q    And did you ever discuss that offer with the defendant,

24    Evan Greebel?

25    A    I don't think so.

1  Q    And you recall offering Mr. Tilles in the January 9,

2  2014, to settle for $125,000 in cash and $125,000 in

3  free-trading Retrophin shares.

4         Do you recall making that offer?

5  A    There were various negotiations.  It's very possible I

6  made that offer.

7  Q    You also spoke to Ken Banta around this time, and you

8  said you were looking for an agreement on paper that would

9  bring things to a close.

10        Do you remember saying that?

11 A    Yes.

12 Q    And, as we saw on your direct examination, in

13 February 2014 you finally signed an agreement; right?

14 A    Right.

15 Q    You testified a little bit about that agreement, sir, but

16 isn't to true that you got $200,000 and 66,000 shares of

17 Retrophin stock; right?

18 A    Right.

19 Q    And wouldn't you agree with me, Dr. Rosenfeld, that at

20 the time you signed this offer that equaled about a million

21 dollars?

22 A    I'm not sure of the stock price at the time, but I know

23 it was extremely volatile at all times.

24 Q    Do you remember being asked about this issue in your

25 arbitration proceeding?

*Dr. Rosenfeld - Cross/Mr. Pitluck*          *9892*

1  A    Yes, but in one moment, since they were restricted

2  shares, I just want everyone to know that means you cannot

3  sell them for six months and, therefore, being the

4  prognosticator that I was, I took a chance and decided that

5  six months was a long time and shares can go up and they can

6  go down.  It's very precarious.

7           (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rosenfeld - Cross - Pitluck                9893

1   BY MR. PITLUCK:

2   Q    Thank you, Dr. Rosenfeld.  That was not really my

3   question.

4        My question was, do you remember being asked in

5   the arbitration proceeding whether the value of your money

6   and stock received in the consulting agreement equalled

7   approximately $1 million?

8   A    That is possible.

9   Q    Do you remember agreeing with that?

10  A    I do not recall.

11  Q    Let me see if I can refresh your recollection.

12       Can you go to the binder I gave you in the

13  deposition transcript in there and go to Page 922.

14  Question 24 to 923, Question 5 -- or Line 5, I'm sorry.

15  A    It is a big assumption.

16  Q    Did you agree with it, 923, Line 5?

17  A    Yes.

18  Q    And you got 66,000 shares in four different tranches,

19  correct, Dr. Rosenfeld?

20  A    Yes.

21  Q    Now, isn't it true, Dr. Rosenfeld, that of the shares

22  you received in Retrophin, you sold most of them to Ron

23  Tilles?

24  A    Yes.

25  Q    And you sold most of them to him at a discount

Rosenfeld - Cross - Pitluck                    9894

1   somewhere between 20 and 40 percent market rates; is that

2   right?

3   A    Yes.

4   Q    Now, prior to signing this consulting agreement in

5   February of 2014, yes or no, you never had a consulting

6   agreement before, correct, sir -- or I'm sorry, yes or no,

7   you have never had a consulting agreement before?

8   A    That is correct.

9   Q    This is your first one, right?

10  A    That is correct.

11  Q    And, yes or no, you have never been paid in any way for

12  consulting services, right?

13  A    That is correct.

14  Q    Never been an employee of a biotechnology company,

15  right, sir?

16  A    Only an investor.

17  Q    Only an investor.

18       But you have never been an employee of a

19  pharmaceutical company, right?

20  A    That is correct.

21  Q    And when you signed this agreement in February of

22  2013 -- I'm sorry, February of 2014, you were not an

23  executive of Retrophin were you?

24  A    No.

25  Q    You were not an employee of Retrophin, right?

Rosenfeld - Cross - Pitluck                    9895

1    A    Right.

2    Q    You were not departing from Retrophin in any way,

3    right?

4    A    Right.

5    Q    And, yes or no, Dr. Rosenfeld, that after you signed

6    this consulting agreement in February of 2014, the only

7    person you spoke with at Retrophin about your consulting was

8    Ron Tilles, right?

9    A    Yes.

10   Q    You never consulted with Martin Shkreli, right,

11   following after you signed this agreement in February of

12   2014?

13   A    Right.

14   Q    Never consulted with someone named Stephen Aselage,

15   right?

16   A    Right.

17   Q    Never consulted with any of the scientists that may

18   have been employed at Retrophin, right?

19   A    Right.

20   Q    Never spoke to somebody named Alan Geller, right?

21   A    Right.

22   Q    Or somebody named Darren Blanton?  Never spoke to him,

23   right?

24   A    Right.

25   Q    You do not know either of those individuals, do you,

1    Dr. Rosenfeld?

2    A    No.

3    Q    And you did know, sir, at the time you signed your

4    agreement that Retrophin had a separate business development

5    group in February, 2014, right?

6    A    I'm not sure about that the statement.

7    Q    Okay.  You are not sure one way or the other if you

8    knew whether Retrophin had a separate business development

9    crew?

10   A    It is possible, but I'm not sure.

11   Q    So I guess it is safe to say, then, Dr. Rosenfeld, you

12   never spoke to anybody in Retrophin, a Retrophin business

13   development group during your course as a consultant for

14   Retrophin, right?

15           MR. MASTRO:  Objection, Your Honor.  Objection to

16   form.

17           MR. PITLUCK:  Your Honor, I'll withdraw the

18   question.

19           THE COURT:  All right.  Re-ask.

20   Q    So you never spoke to anyone, any Retrophin business

21   development agreement after signing your consulting

22   agreement in February, 2014, correct?

23           MR. MASTRO:  Objection.

24           THE COURT:  Overruled.

25   A    Just Ron Tilles who was business development.

1    Q    Just Ron, Ron Tilles.

2          And you were never given any kind of internal

3    Retrophin documents about how they developed drugs; is that

4    correct?

5    A    That is correct.

6    Q    Or what drug they were interested in in their pipeline,

7    correct?

8    A    I think public information, I did know what they were

9    interested in.

10   Q    The public information that was released in SEC filings

11   and press releases; is that right?

12   A    That is right.

13   Q    And you, Dr. Rosenfeld, didn't generate any kind of

14   reports related to your work for Retrophin, did you?

15   A    No.

16   Q    No time records keeping track of your development

17   efforts?

18   A    I have a volume of telephone calls to Ron Tilles

19   discussing different items and different various topics.

20   Q    Just to be clear, Dr. Rosenfeld, when you say volume of

21   telephone calls, you mean your phone records, right?

22   A    That is correct.

23   Q    Showing that you made calls to Ron Tilles, correct?

24   A    That is correct.

25   Q    And you didn't create any presentations for Retrophin,

Rosenfeld - Cross - Pitluck                9898

1   right?

2   A    That is correct.

3   Q    And other than Ron Tilles you do not have any records

4   of communication either by phone or e-mail with anyone at

5   Retrophin during the period of your consulting agreement,

6   right?

7   A    Repeat that again, I'm sorry.

8   Q    Sure.

9        You do not have a record, yes or no, sir, of any

10  communications you had, either e-mail or phone calls, with

11  anyone at Retrophin that was not Ron Tilles?

12  A    I think that is accurate, yes.

13  Q    Now, you learned, Dr. Rosenfeld, didn't you, that

14  Martin Shkreli was fired from Retrophin in September of

15  2014, correct?

16  A    Yes.

17  Q    I think you testified about it on direct that after

18  Martin Shkreli was fired, Mr. Aselage reached out to you in

19  October of 2014, right?

20  A    Right.

21  Q    And I think we saw, and I would like the direct your

22  attention to Defense Exhibit 203-5, which is Tab 14 in the

23  binder that Mr. Mastro gave you.  Can you go to that, sir;

24  do you have that?

25  A    Yes.

1   Q    Do you remember looking at this on direct examination,

2   sir?

3   A    Yes.

4        MR. PITLUCK:  I realize now that it is in evidence

5   and I'm not posting it for the jury, Your Honor, I am just

6   going to put this on the Elmo.

7        THE COURT:  All right.

8   Q    Okay.  This is a three-paged document, correct,

9   Dr. Rosenfeld?

10       MR. MASTRO:  Your Honor, I do not believe it was

11  admitted into evidence.

12       THE COURT:  I'm not showing it either.

13       MR. PITLUCK:  Oh, I apologize, Judge, I had it.

14       THE COURT:  Okay.  Just --

15       MR. PITLUCK:  Well, Your Honor, at this point we

16  would offer it into evidence.

17       THE COURT:  Do you want to use the Defense Exhibit

18  designation 203-5?

19       MR. PITLUCK:  That is fine, Judge.

20       THE COURT:  All right.

21       Okay.  Any objection, Mr. Mastro.

22       MR. MASTRO:  No objection, Your Honor.

23       THE COURT:  All right.  We will receive in

24  evidence Defense Exhibit 203-5 offered by the Government.

25            (Defendant's Exhibit Number 203-5 so marked and

Rosenfeld - Cross - Pitluck                    9900

1    received in evidence.)

2           MR. PITLUCK:  Thank you, Your Honor.

3    Q    I'm going to direct your attention to the second page

4    of this document, Dr. Rosenfeld, which is actually the first

5    e-mail.  There's nothing on the third page.  But is this an

6    October 15, 2014, e-mail from Mr. Aselage to you?

7    A    Yes.

8    Q    And could you just read it for the jury, please.

9    A    Dear Dr. Rosenfeld, As you are probably aware,

10   Mr. Shkreli is no longer with Retrophin.  In reviewing a

11   number of contracts, it came to light that the company has a

12   consulting contract with you and has paid both cash and

13   stock to you in exchange for your consulting services.

14          Apparently, additional stock will be owed in

15   December.  Specifically it mentions you helping with

16   governance.  I was head of governance committee last year

17   and do not recall any interaction with you.

18          Can you tell me what exactly has been the

19   consulting you have done for the company?

20          Thanks in advance, Steve Aselage --

21   Q    And -- I'm sorry.  Go ahead.

22   A    -- Interim CEO.

23   Q    All right.  That was October 15th, 2014, correct,

24   Dr. Rosenfeld?

25   A    Correct.

Rosenfeld - Cross - Pitluck                9901

1    Q    Do you remember receiving this e-mail, sir?

2    A    I do.

3    Q    If we go up one more line to your response on

4    November 20th, 2014.  I'm sorry, that is blurry.

5            Can you see that, Dr. Rosenfeld, your response on

6    October 20, 2014?

7    A    I do.

8    Q    It is a little over a month later, correct, sir?

9    A    Correct.

10   Q    Can you read what you wrote in response to

11   Mr. Aselage's e-mail?

12   A    Hi, Steve, Sorry I missed this.  I received your

13   inquiry and I am quite surprised.  I have provided

14   substantive services.

15           Steve, please let me know if there is an issue

16   with my shares in December.  Best regards, Steven.

17   Q    That is November 20th, 2014, correct, sir?

18   A    Correct.

19   Q    I'm just going to show you the front page of this

20   e-mail.  The bottom e-mail, if you can see that, it is an

21   e-mail on November 20th, 2014, same day, from Mr. Aselage to

22   you?

23   A    I'm sorry, what date?

24   Q    Oh, I'm sorry.  If you look on the screen,

25   Dr. Rosenfeld --

Rosenfeld - Cross - Pitluck                9902

1  A    Oh, okay.

2  Q    -- it may be helpful.  Looking at the bottom e-mail

3  November 20th, 2014, at 12:39 p.m.  And I would just like

4  you to read what Mr. Aselage wrote to you.

5  A    It says, Please send documentation of the services you

6  provided.  At this time, there is indeed, an issue.  Thank

7  you.

8  Q    And if you can just go up to the next e-mail also on

9  November 20th, 2014, from you to Mr. Aselage, what did you

10  write there?

11  A    It says, Hi, Steve, Just to be clear are you saying you

12  will not issue my earned shares in December.  Kind regards,

13  Stephen.

14  Q    Finally in the top e-mail, which is also on

15  November 20th, 2014, what did Mr. Aselage write?

16  A    Need documentation of your consulting activities to

17  issue additional shares.

18  Q    So in that e-mail exchange, Dr. Rosenfeld, am I correct

19  that Mr. Aselage asks for information on your consulting

20  activity three separate times?

21  A    Yes.

22  Q    But as far as you know, as far as you recall, you did

23  not respond to this last e-mail from Mr. Aselage on

24  November 20th, 2014; is that right?

25           MR. MASTRO:  Objection to form.

1               THE COURT:  Can you rephrase it, it is a little

2      garbled?

3               MR. PITLUCK:  I'll try, Judge.

4               THE COURT:  All right.

5               MR. PITLUCK:  I will back up so you can see it.

6      Q    This top e-mail from Mr. Aselage on November 20th,

7      2014, as far as you recall, you never responded to that

8      e-mail, correct, sir?

9               MR. MASTRO:  Same objection.

10              THE COURT:  Overruled.

11     A    I guess I'm not sure if I did respond, but I know it

12     was a very busy timeframe.  And I conferred with my lawyers.

13              THE COURT:  Do not tell us what your lawyers said.

14              THE WITNESS:  Right.

15     Q    So I'm definitely not asking you about the

16     conversations with your lawyers, Dr. Rosenfeld, but I am

17     going to ask you if you were communicating with Ron Tilles

18     at the time that you received that e-mail from Mr. Aselage

19     on November 20th, 2014?

20     A    Yes.

21     Q    And, in fact, you were speaking to Mr. Tilles about the

22     e-mail that you received from Mr. Aselage, correct?

23     A    Correct.

24     Q    And, in fact, Mr. Tilles reached out to you to ask what

25     happened with Mr. Aselage, didn't he?

Rosenfeld - Cross - Pitluck                    9904

1   A    Yes.

2   Q    And you responded to Mr. Tilles about how you were

3   going to respond Mr. Aselage, correct?

4   A    Yes.

5   Q    And isn't it true that you wanted to meet with

6   Mr. Tilles around this time to discuss your response?

7   A    Yes, that is possible.

8   Q    And that Mr. Tilles suggested that you wait to get back

9   to Mr. Aselage, do you recall that?

10  A    I'm not sure on that.

11  Q    Okay.  Maybe I can show you something that will refresh

12  your recollection.

13  A    Thank you.

14       MR. PITLUCK:  For identification only this is

15  Government's Exhibit 117-110.

16  BY MR. PITLUCK:

17  Q    I would like to direct your attention to the middle of

18  the page to the text messages between you and Mr. Tilles,

19  particularly the text message on October 16, 2014, at

20  9:04 a.m.

21       See if that refreshes your recollection.

22  A    It does.

23  Q    It does refresh your recollection that Mr. Tilles asked

24  you wait to answer Mr. Aselage's e-mail, correct?

25  A    Correct.

Rosenfeld - Cross - Pitluck                    9905

1   Q    And a moment ago we looked at an e-mail where you wrote

2   to Mr. Aselage that you had missed his e-mail, do you

3   remember that, sir?

4   A    Yes.

5   Q    In fact, you had not missed his e-mail, had you?

6   A    As far as I remember, that is what I wrote.

7   Q    But didn't we just look at text messages from the same

8   date that Mr. Aselage sent you an e-mail where you were

9   discussing that very same e-mail?

10  A    Yes.

11  Q    Okay.  So you did not miss the e-mail, did you,

12  Dr. Rosenfeld?

13  A    No.

14  Q    Now, it was after this exchange you continue to try to

15  get the last set of shares that were owed to you in December

16  of 2014, correct?

17  A    That is correct.

18  Q    And you did not receive them, right?

19  A    Right.

20  Q    And you did not receive them and that is why you filed

21  your arbitration demand in April of 2015, correct?

22  A    Yes.

23  Q    And prior to filing your arbitration demand, did you

24  ever tell Mr. Aselage to consult -- the specific consulting

25  services you had performed?

Rosenfeld - Cross - Pitluck                 9906

1    A    I think I discussed it with Ron Tilles.

2    Q    You discussed it with Ron Tilles.  But, Dr. Rosenfeld,

3    that was not what I asked.  I asked if you discussed it with

4    Mr. Aselage between his e-mail on October, 2014 and your

5    arbitration demand in April of 2015?

6    A    I did not.

7    Q    But during your arbitration proceeding and again here

8    today you testified or -- withdrawn.

9              In your arbitration proceeding you testified about

10   some of the consulting services you said you provided,

11   correct?

12   A    Yes.

13   Q    And you discussed some of them last week on direct

14   examination, right?

15   A    Right.

16   Q    And I think one of the ones you discussed last week was

17   something called Axiomee.  Do you remember testifying about

18   that, sir?

19   A    I do.

20   Q    I believe your testimony at Page 9279 was that it was a

21   German prosthetics distribution company you learned of; is

22   that right, sir?

23   A    That is correct.

24   Q    And you learned of this investment from your friend

25   Dr. David Carter; is that right?

1    A    Mr. David Carter.

2    Q    Oh, I'm sorry.

3              Okay.  Mr. David Carter.

4              And you learned that you said Axiomee was looking

5    to raise $1 million, correct?

6    A    Correct.

7    Q    And isn't it true, Dr. Rosenfeld, that Mr. Carter asked

8    you to invest in Axiomee, right?

9    A    Correct.

10   Q    And I think it was your testimony on direct examination

11   that you passed that opportunity on to Mr. Tilles, right?

12   A    Correct.

13   Q    And did you pass it on to anybody else at Retrophin

14   besides Mr. Tilles?

15   A    No.

16   Q    And yes or no, Dr. Rosenfeld, you believed at the time

17   that Retrophin an orphan drug company would be interested in

18   investing in a German prosthetics distribution company?

19   A    Absolutely.

20   Q    And yes or no, Dr. Rosenfeld, but if Retrophin had

21   invested in Axiomee Mr. Carter would are have paid you a

22   finder's fee for that, right?

23   A    No.

24   Q    Do you remember being asked about this in your

25   arbitration proceedings?

1    A    When I say no, I mean that if he wanted to, he might

2    have said, well, you should get something out of this.  But

3    I do not think that was the intention, we were just trying

4    to see at that time whether Retrophin would be interested in

5    this company.  And again, I think it was Dr. Proper, the

6    pediatrician via Dean Cayman --

7    Q    Dr. Rosenfeld, it was a yes-or-no question.  Do you

8    recall being asked about this in your arbitration

9    proceeding?

10   A    Yes.

11   Q    Okay.  And do you recall testifying that you hopefully

12   would have gotten something if Retrophin had invested in

13   Axiomee?

14   A    Yes.

15   Q    And Retrophin never invested in Axiomee, right?

16   A    No.

17   Q    And you also testified on direct examination about

18   another opportunity related to a drug called -- and correct

19   me if I am wrong -- AmiKet or Amicar?  Which one is it,

20   Dr. Rosenfeld?

21   A    AmiKet.

22   Q    AmiKet.  Can you just spell for the court reporter,

23   please, to make sure?  I do not know how to spell it.  I

24   apologize, Dr. Rosenfeld.

25   A    I'm not the greatest speller, but it is A-M as in Mary,

Rosenfeld - Cross - Pitluck                9909

1   I as in ice cream, K as in kitchen, E as in Elmo, T as in

2   Tom.

3   Q     And this was a drug developed by a biotechnology

4   company, right?

5   A     That is correct.

6   Q     And what kind of drug was it?

7   A     To be a pain cream.

8   Q     A pain cream?

9   A     Cream.

10  Q     Like you apply on your skin?

11  A     Correct, topical.

12  Q     And that deal first came to you in 2013, correct?

13  A     Approximately around that time.

14  Q     So before you entered into your consulting agreement

15  with Retrophin, right?

16  A     Correct.

17  Q     And isn't it true, Dr. Rosenfeld, that you were

18  actually pursuing that deal as a principal investor,

19  correct?

20  A     Correct.

21  Q     And I think that you testified that you were

22  considering flipping it over to Retrophin for their

23  investment; is that right?

24  A     That is right.

25  Q     And you discussed that with Ron Tilles?

Rosenfeld - Cross - Pitluck                    9910

1   A    I did, but I never mentioned the name of the drug.  I

2   just told him it was a phase three opportunity.

3   Q    You never mentioned the name of the drug, but you told

4   him it was phase three opportunity in the pain treatment

5   cream area?

6   A    In the cancer area.

7   Q    In the cancer area, okay.

8        And, yes or no, Dr. Rosenfeld, you would have

9   pursued this opportunity without your consulting agreement,

10  correct?

11  A    Yes, that is correct.

12  Q    You testified last week and again today that the only

13  person that you spoke to directly at Retrophin about your

14  consulting services was Mr. Tilles, correct, sir?

15        MR. MASTRO:  Objection.  Asked and answered, Your

16  Honor.

17        THE COURT:  Sustained.

18        MR. PITLUCK:  Okay.

19  Q    Isn't it true, Dr. Rosenfeld, that between February,

20  2014 when you signed your consulting agreement and October

21  of 2014, you only sent one e-mail to Ron Tilles; is that

22  right?

23  A    Can you repeat that?

24  Q    Sure.  Between February of 2014 when you signed your

25  consulting agreement and October of 2014, you only sent one

1  e-mail to Mr. Tilles, correct?

2  A    I'm not sure of that.

3  Q    See if I can refresh your recollection.  Do you

4  remember being asked the same question in the arbitration

5  proceeding?

6  A    It is possible.

7  Q    So if you could flip in your -- in your binder with the

8  arbitration transcript to Page 1016, Lines 16 -- oh, I'm

9  sorry 1017, Lines 4 through Line 11.

10          Do you see that, sir?

11  A    I do not.

12  Q    Does that refresh your recollection that you only sent

13  one e-mail to Mr. Tilles between February of 2014 and

14  October of 2014?

15  A    I'm sorry.  I do not see it.

16  Q    Page 1017, Line 4.  Maybe it is easier if you go up to

17  Page 1016, Line 16, you see the question that led to it.

18  A    Yes.

19  Q    So that refreshes your recollection, sir?

20  A    Yes.

21  Q    And isn't it true, Dr. Rosenfeld, that the single

22  e-mail you sent to Ron Tilles had to do with something

23  called E Live Choice; is that right, sir?

24  A    Yes.

25  Q    And E Live Choice is a company who manufactures

Rosenfeld - Cross - Pitluck          9912

1   electronic cigarettes, correct, sir?

2   A    I believe they distribute them.

3   Q    And it is your testimony that you thought E Live Choice

4   would be a good opportunity for Retrophin, correct?

5   A    I sent this to Ron Tilles to see if he would -- he was

6   interested or had any ideas.

7   Q    To Ron Tilles, your friend, or Ron Tilles the Retrophin

8   employee?

9   A    Both.

10  Q    So it is your testimony that you thought at the time

11  Retrophin the orphan drug company may be interested in

12  E Live Choice, the electronic cigarette company?

13            MR. MASTRO:  Objection.  Asked and answered.

14            THE COURT:  Overruled.

15  A    Yes.  Because it was very clear to me that Retrophin

16  was looking for income producing deals, distribution deals,

17  phase three deals.  And at the time I sent him this e-mail,

18  that was the beginning of that industry.  I flew to China,

19  went to the factories and came back with a delivery system

20  that was unique.  And we were one of the first looking at

21  it, not to E Live, but just looking at it on our own to put

22  other potential pharmaceuticals in a delivery system.

23  Q    Okay.

24  A    So that was my only interest.

25  Q    Okay.  Now I want to go back to your testimony in the

Rosenfeld - Cross - Pitluck                    9913

1   arbitration proceeding in September of 2016.  Now yes or no,

2   Dr. Rosenfeld, but prior to your testimony in the

3   arbitration proceeding, you were in contact with counsel for

4   Mr. Greebel?

5            MR. MASTRO:  Asked and answered, Your Honor.

6            THE COURT:  Overruled.

7            MR. PITLUCK:  I do not think so, Judge.

8            THE COURT:  Overruled.

9   A    I do not recall having any contact with Mr. Greebel.

10  Q    Do you have any recollection of authorizing your

11  lawyers to give information to Mr. Greebel and his team?

12  A    I do not know if I can answer that.

13           MR. MASTRO:  Your Honor --

14           MR. PITLUCK:  Your Honor, I'm happy to provide the

15  non-privileged basis, if you would like.

16           THE COURT:  All right.  Why don't we discuss this

17  briefly at sidebar.  Excuse us, members of the jury.

18               (The following occurred at sidebar.)

19               (Continued on the next page.)

20

21

22

23

24

25

*SIDEBAR CONFERENCE*                                          9914

1          (WHEREUPON, the following proceedings were had at

2    sidebar, out of the hearing of the open courtroom, to wit:)

3          THE COURT:  The question was asked initially as to

4    whether or not he contacted or had any contact with

5    Mr. Greebel's lawyers.  The response was, he doesn't recall

6    contacting Mr. Greebel.

7          MR. PITLUCK:  Okay.

8          THE COURT:  So, and then next question was whether

9    his lawyers contacted Mr. Greebel's lawyers, or is it back to

10   whether he had any contact with Mr. Greebel's lawyers?

11         MR. PITLUCK:  Your Honor, I will clear up the

12   primary question, but the next question I would ask is whether

13   he authorized his lawyers to communicate with Mr. Greebel's

14   lawyers, and he was asked about this in the arbitration

15   proceeding, and he provided answers.

16         MR. BRODSKY:  Your Honor, there are a couple of

17   problems with it.  An arbitration proceeding is completely

18   different than this court proceeding in the rules of evidence.

19   In a number of respects, this is improper.

20         First, they are trying to elicit his communications

21   with counsel, which are completely privileged and they're

22   confidential.  They have objected on similar grounds when such

23   questions were asked during communications with respect to

24   certain witnesses that they called and their lawyers.

25         Second, Your Honor, what's the relevance?  There's

1   no relevance whatsoever to any communications between

2   Dr. Rosenfeld's counsel and Mr. Greebel's counsel, in any way,

3   except to try to insinuate that there's something improper

4   about it or that there's something, you know, wrong about it.

5   Whether or not Dr. Rosenfeld's counsel communicated with us

6   has no relevance or bearing on any fact of consequence to this

7   trial.

8           THE COURT:  I think both sides have elicited from

9   various witnesses, A, whether they have been in contact with

10  that lawyer or the lawyer's firm before, and, B, whether that

11  witness has been in contact with opposing counsel.  That has

12  been done repeatedly throughout this trial.

13          MR. BRODSKY:  Understood.

14          THE COURT:  And Mr. Pitluck is looking to elicit

15  testimony, whether this witness had any contact with

16  Mr. Greebel's counsel before September 2016.

17          MR. BRODSKY:  We have no objection to any questions

18  to Dr. Rosenfeld about his communications with us.  Absolutely

19  none.  But what they're asking now is not that.  They're

20  asking whether or not Dr. Rosenfeld's counsel, Dr. Rosenfeld's

21  counsel, communicated with Mr. Greebel's counsel.  What that

22  requires, Your Honor, is reviewing a communication between

23  Dr. Rosenfeld and his lawyer, which is presumptively

24  privileged and confidential, and, also, then Dr. Rosenfeld's

25  counsel's communications with him, which are presumptively

1   privileged and confidential, and there is no relevance, and we

2   never did ask or inquire as to whether or not, for example,

3   Mr. Blanton's lawyer communicated with the US Attorney's

4   office.  If we had started asking questions of witnesses like

5   Mr. Aselage, Mr. Blanton, Mr. Richardson, whether they knew

6   their lawyers were communicating with the US Attorney's office

7   and what their lawyers told the US Attorney's office, we --

8   that, first, would be improper, because we would be eliciting

9   privileged communications, and, second -- between the witness

10  and their lawyers, and, second, Your Honor, what would be the

11  relevance?  There would be no relevance to us trying to elicit

12  from Mr. Blanton what his lawyers were telling the US

13  Attorney's office.

14          THE COURT:  Let's stay on the topic of this

15  witness --

16          MR. BRODSKY:  Yes, Your Honor.

17          THE COURT:  -- and this witness and their attorney.

18  Let's not start going through the whole trial.  Let's focus on

19  this witness.  Let's just get through it.

20          MR. PITLUCK:  So I can finish by 1:00 p.m., and so

21  Dr. Rosenfeld doesn't have to come back.

22          In his arbitration proceeding in front of numerous

23  law firms, including counsel for Retrophin, he was asked and

24  permitted to answer whether he authorized his attorneys to

25  speak to counsel for Mr. Greebel.  That is a clear privilege

1   waiver, and it goes to his bias.  That's the relevance.  So I

2   don't want to go into this, but I agree, going into privileged

3   communication is inappropriate.  This is something he was

4   asked and answered in an arbitration proceeding with counsel

5   for the other side present.  That's it.

6          THE COURT:  And his counsel was present?

7          MR. PITLUCK:  Absolutely.

8          MR. BRODSKY:  Your Honor, my objection to this is

9   he's already testified he met with us.  So that is -- if they

10  want to argue bias --

11         THE COURT:  This question is whether he met before

12  the arbitration, okay.

13         MR. BRODSKY:  I don't mind if Dr. Rosenfeld, if they

14  ask if he met with us.  That's perfectly fine and goes to

15  bias.  What they are trying to get out, Your Honor, is that

16  somehow Dr. Rosenfeld's counsel, his meeting with us, and

17  insinuate that that's improper or relevant, and my objection

18  to that, Your Honor, is that there's zero relevance to the

19  fact that Dr. Rosenfeld's counsel talked to us, it doesn't say

20  anything about what was said, and what was said, if they try

21  to elicit that, is certainly privileged.

22         MR. PITLUCK:  I'm not going to ask what was said.  I

23  was going to ask if he authorized him to communicate.

24         MR. BRODSKY:  What's the relevance?

25         MR. PITLUCK:  How is that not relevant?

1          THE COURT:  The proffer he made is to relevance.  It

2   goes to his bias.  That's what cross-examination is, you know.

3          MR. BRODSKY:  I agree.

4          THE COURT:  One of the purposes is to show whether a

5   witness is in alignment with one side or the other.  So I

6   think it is fair ground, for cross.  The arbitration was

7   inquired into.  He's not asking this out of the blue, he has a

8   good faith basis for asking it, and I think that, you know, if

9   he's presenting the doctor with his arbitration testimony,

10  then it is appropriate for him to do that, and confronting him

11  and crossing him.

12         MR. BRODSKY:  Your Honor, if they do this, then I

13  think it opens up the door for us to ask Dr. Rosenfeld about

14  the communications that Retrophin had, he knows Retrophin had

15  with the US Attorney's office in connection with the

16  arbitration.

17         THE COURT:  He doesn't know what Retrophin did

18  with --

19         MR. BRODSKY:  We believe he does.

20         THE COURT:  -- the US Attorney's office.

21         MR. BRODSKY:  We believe he does.

22         THE COURT:  The question is whether he is aware of

23  his own counsel's communications with counsel for Mr. Greebel.

24  It is a far cry for him to ask whether or not he's aware of

25  any other communications that don't involve his lawyer, and

1   any other party, which is what you are asking.  I would

2   overrule --

3            MR. BRODSKY:  If he has personal knowledge of it.

4            THE COURT:  I would not allow that line of testimony

5   to ask Dr. Rosenfeld whether he's aware of communications

6   between people other than his own lawyer and other parties to

7   the arbitration.

8            MR. BRODSKY:  And if we wanted to elicit them,

9   Your Honor, he knew his lawyers communications with the US

10  Attorney's office, then that would be proper as well.  So, in

11  other words, they are eliciting communications --

12           THE COURT:  If his attorneys spoke with the US

13  Attorney's office?

14           MR. PITLUCK:  Judge, I am simply asking if he

15  authorized his attorneys to speak to Mr. Greebel's lawyers.  I

16  think a fair properly limited scope of that, which, by the

17  way, he didn't waive on, but I think it is fair if he says,

18  did you authorize your attorneys to speak to the US Attorney's

19  office, I think that's a fair directive, obviously.

20           THE COURT:  It is for a limited.  Don't -- you are

21  not going to go --

22           MR. PITLUCK:  I am not going into related to

23  conversations, Judge.

24           THE COURT:  All right.  Thank you.

25           (Sidebar conference ends.)

SIDEBAR CONFERENCE                                    9920

1            (Continued on the next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*ROSENFELD - CROSS - PITLUCK*                              9921

1    (Open court.)

2    BY MR. PITLUCK:

3    Q    So just taking a step back, Dr. Rosenfeld, I believe you

4    testified that you, prior to your arbitration proceeding,

5    never spoke to counsel for -- or you never spoke to

6    Mr. Greebel, correct?

7    A    Could you repeat that?

8    Q    Sure.

9         I believe you testified, just before our break, that

10   you, personally, never spoke to Mr. Greebel before your

11   arbitration proceeding, correct?

12   A    That's correct.

13   Q    What about for counsel to Mr. Greebel, did you speak to

14   any counsel for Mr. Greebel before your arbitration

15   proceeding?

16   A    I don't believe so.

17   Q    But you did authorize your attorneys to speak to

18   Mr. Greebel's attorneys before your arbitration proceeding,

19   correct?

20   A    Yes.

21   Q    And isn't it true, Dr. Rosenfeld, that Mr. Greebel's

22   attorneys paid for the court reporter in your arbitration

23   proceeding?

24   A    Correct.

25   Q    And isn't it true, Dr. Rosenfeld, that some of the money

*ROSENFELD - CROSS - PITLUCK*                               9922

1   that you raised to pay for your lawyers during the arbitration

2   proceeding came from Mr. Tilles, right?

3   A    I did sell shares to him so I don't know whom -- I did

4   sell some art to him, but that's the only -- you know, he got

5   something in return.  And I undersold everything.  So that's

6   how I can answer that question.  I hope I did, by the way.

7   Q    And you testified earlier today that you produced

8   documents to Retrophin as part of your arbitration, correct?

9        Remember, we had a discussion about the Rosenfeld

10  Bates stamp; do you remember that?

11  A    Yes.

12  Q    Isn't it true, Dr. Rosenfeld, that you know that some of

13  those documents came from counsel to Mr. Greebel?

14  A    I don't know that.

15  Q    You don't have personal knowledge of that?

16        MR. MASTRO:  Asked and answered, Your Honor.

17        THE COURT:  Overruled.

18  BY MR. PITLUCK:

19  Q    Maybe I can refresh your recollection.  I would like to

20  show you what's been marked as Government Exhibit 117-133.  It

21  is a long document, Dr. Rosenfeld.  I am just going to ask you

22  to focus on the first page.

23        Dr. Rosenfeld, I certainly don't want you to go

24  through the entire document, but focusing on the front page,

25  you see in the bottom right that there's a Bates stamp

*ROSENFELD - CROSS - PITLUCK*                                      9923

1    Rosenfeld 005964?

2    A     I do.

3    Q     And it is an e-mail.  I am not going to go through

4    everybody on it, from Marc Panoff for a recipient -- to a

5    group of recipients, attaching, with a subject, board agenda.

6    Do you see that, sir?

7    A     I do.

8    Q     You are not copied on this document in any way, are you,

9    sir?

10   A     That's correct.

11   Q     And you, sitting here today, don't know how this document

12   came into your possession you produced as part of the

13   arbitration proceeding?

14   A     I'm not sure, but that's correct.

15   Q     I'm sorry, Dr. Rosenfeld.  I just want to make sure I

16   understand.  You said, "I am not sure that's correct," or "I'm

17   not sure, that's correct."  That's going really play well in

18   the transcript.

19          I'm sorry, could you just rephrase your answer,

20   Dr. Rosenfeld?

21   A     I believe there was some communication between the

22   attorneys, but I'm not copied on it, so that's my answer.

23          MR. PITLUCK:  Okay.  Your Honor, can I have one

24   quick moment?

25          THE COURT:  Yes.

1           (Short pause.)

2           MR. PITLUCK:  Nothing further, Judge.

3           THE COURT:  All right.  Mr. Mastro, please.  Would

4  you like to redirect?

5           MR. MASTRO:  Yes.  Thank you, Your Honor.

6  BY MR. MASTRO:

7  Q    Sir, let me be clear.  The document that's in front of

8  you, Dr. Rosenfeld --

9           THE COURT:  Government Exhibit 117-133, Mr. Mastro?

10          MR. MASTRO:  Yes.

11 BY MR. MASTRO;

12 Q    That same document comes out of Retrophin's files, right?

13 A    Yes.

14 Q    And didn't Retrophin have obligations to produce

15 documents --

16          THE COURT:  Sir, we're not leading.

17          MR. PITLUCK:  Objection.

18          MR. MASTRO:  Sorry.  Just trying to speed this

19 along, Your Honor.

20          THE COURT:  Well, we are not going to lead, to do

21 that.

22 BY MR. MASTRO:

23 Q    What, Dr. Rosenfeld, were Retrophin's obligations to

24 produce documents to you during the arbitration?

25 A    I left it to my lawyers.

ROSENFELD - REDIRECT - MASTRO                                    9925

1   Q    Okay.  Sir, didn't Retrophin also pay for a transcript

2   from the court reporter in the arbitration?

3   A    I'm not sure.

4   Q    Are you aware, sir, whether or not Mr. Greebel wanted a

5   transcript?

6            MR. PITLUCK:  Objection to the leading, Your Honor.

7            THE COURT:  Sustained.  Rephrase.

8   BY MR. MASTRO:

9   Q    Sir, you were asked whether you authorized your lawyers

10  to speak with Mr. Greebel's counsel.  Did you also authorize

11  your lawyers to speak to the government?

12  A    During what period of time?

13  Q    In the period 2015, mid 2015, when you were first

14  contacted in July of 2015 by FBI agents and since, have you

15  ever authorized your lawyers to speak to the government?

16  A    Are you saying have my lawyers --

17           MR. PITLUCK:  Your Honor, objection.

18           THE COURT:  The question -- do you want it reread,

19  sir.

20           THE WITNESS:  Please.  Please.

21           THE COURT:  All right.  Could the court reporter --

22           MR. MASTRO:  I will rephrase it, Your Honor.

23  BY MR. MASTRO:

24  Q    Since the first time you were contacted by the FBI in

25  July 2015, have you ever authorized your lawyers to speak to

ROSENFELD - REDIRECT - MASTRO                              9926

1   anyone from the government; yes or no?

2   A    Yes.

3   Q    And, sir, I want to -- I hope you still have it in front

4   of you, it is Government Exhibit marked 117-110.  That's a

5   series of text messages between you and Ron Tilles.  Do you

6   see that, sir?

7   A    I do.

8   Q    You were asked questions on cross-examination about how

9   many e-mails you sent to Mr. Tilles between mid February 2014

10  and late 2014.  Do you recall those questions, sir?

11  A    I do.

12  Q    How else, if any other way, did you communicate with

13  Mr. Tilles between mid February 2014 and late 2014?

14  A    Telephone, text, meetings.

15  Q    How many times did you meet with Mr. Tilles between mid

16  February 2014 and the end of 2014?

17  A    Numerous times.  Meaning that -- could have been over 50

18  times to a hundred times.

19  Q    And even more texts and e-mails --

20            MR. PITLUCK:  Objection, Your Honor.

21  BY MR. MASTRO:

22  Q    -- during that --

23            THE COURT:  Sustained.

24            MR. MASTRO:  Strike that.  Strike that.  Strike

25  that.

ROSENFELD - REDIRECT - MASTRO                              9927

1    BY MR. MASTRO:

2    Q     Sir, let me -- do you have Government Exhibit, marked for

3    identification, 117-110, in front of you?

4    A     I do.

5    Q     And this is a series of text messages between yourself

6    and Mr. Tilles, from October 15 through October 20 of 2014?

7    A     Yes.

8              MR. MASTRO:  Your Honor, I ask that the exhibit be

9    received in evidence.

10             MR. PITLUCK:  Your Honor, this is clearly hearsay.

11   That's why we didn't admit it.

12   BY MR. MASTRO:

13   Q     Am I correct, sir, that in October -- strike that.

14             When you had this exchange of texts with Mr. Tilles

15   after you received the mid October e-mail from Mr. Aselage,

16   did you make clear to Mr. Tilles that you intended to send

17   Mr. Aselage --

18             MR. PITLUCK:  Objection, Your Honor.

19   BY MR. MASTRO:

20   Q     -- information regarding consulting after receiving --

21             THE COURT:  Sustained.  Sustained.  Rephrase the

22   question so you are not leading the witness, please.

23   BY MR. MASTRO:

24   Q     Dr. Rosenfeld, am I correct that after --

25             MR. PITLUCK:  Objection to the leading.

*ROSENFELD - REDIRECT - MASTRO*                                    9928

1              MR. MASTRO:  Strike that.  Strike that.

2   BY MR. MASTRO:

3   Q    How did you respond to Mr. Tilles when he asked you what

4   happened with Mr. Aselage?

5   A    Responded that Mr. Aselage was giving me a difficult

6   time, and I had to speak to counsel.

7   Q    Sir, referring you to the texts you exchanged with

8   Mr. Tilles at that time, the text where he asked you, so

9   what --

10              MR. PITLUCK:  Objection, Your Honor.  It is not in

11   evidence.

12              THE COURT:  Try to rephrase your question,

13   Mr. Mastro, please.

14              MR. MASTRO:  Certainly.

15   BY MR. MASTRO:

16   Q    What steps, if any, did you intend to take in responding

17   to Mr. Aselage after review by counsel?

18   A    To go to arbitration.

19   Q    Did you in early 2015 advise Mr. Aselage that you were

20   going to arbitration?

21              MR. PITLUCK:  Objection.

22              THE COURT:  Sustained.  Please rephrase your

23   question.

24   BY MR. MASTRO:

25   Q    What communication did you have with Mr. Aselage in early

ROSENFELD - REDIRECT - MASTRO                          9929

1   2015 about arbitration?

2   A    We were exchanging e-mails and texts, I guess.

3   Q    Sir, did there come a time in early 2015 when you sent

4   him a handwritten note?

5   A    Yes.

6   Q    Can I refer you to tab 15 of the binder, what's been

7   marked as DX-12329.  Can you identify what this document is,

8   sir?

9   A    I was sending Mr. Aselage a small note based upon the

10  potential or filling out an application for arbitration, and

11  telling him that I was sorry --

12              MR. PITLUCK:  Objection.

13              THE WITNESS:  -- that it had to come down to this.

14              THE COURT:  Sustained.

15              MR. MASTRO:  Your Honor, I ask that DX-12329 be

16  received in evidence.

17              MR. PITLUCK:  Your Honor, it is a hearsay document.

18              THE COURT:  I am not quite sure what basis -- what

19  your basis is for offering.  In one word, if you can tell me,

20  please, the admissibility of this document.

21              MR. MASTRO:  Not truth, notice, Your Honor.

22              THE COURT:  I beg your pardon?

23              MR. MASTRO:  Not truth, notice.

24              MR. PITLUCK:  To who?

25              THE COURT:  Both the note and the --

*ROSENFELD - REDIRECT - MASTRO*                          9930

1           MR. MASTRO:  Yes, Your Honor.

2           THE COURT:  -- form?

3           MR. MASTRO:  Yes, Your Honor.

4           THE COURT:  I will allow it.  Defense Exhibit 12329

5    is admitted.

6           MR. MASTRO:  Thank you, Your Honor.

7           (Defense Exhibit 12329 received in evidence.)

8    BY MR. MASTRO:

9    Q    Publishing it to the jury, is that your handwriting,

10   Dr. Rosenfeld?

11   A    Yes.

12   Q    Dated April 29, 2015?

13   A    Yes.

14   Q    "Stephen" there, who's that referring to?

15   A    Mr. Aselage.

16   Q    And what did you write to him there?

17   A    "Stephen, sorry it had to come down to this."

18   Q    And, sir, attached to this note, going to the second

19   page, what is that, sir?

20   A    It is a demand for arbitration before JAMS.

21   Q    Who filled out that form, sir?

22   A    I did.

23   Q    Am I correct, sir, that -- strike that.

24          MR. PITLUCK:  Objection, Your Honor.

25          MR. MASTRO:  Strike that.  Strike that.

ROSENFELD - REDIRECT - MASTRO                              9931

1   BY MR. MASTRO:

2   Q    From late 2014 into early 2015, what was your

3   understanding, if anything, about Ron Tilles communicating to

4   Mr. Aselage the consulting work you had been doing for

5   Retrophin?

6          MR. PITLUCK:  Objection to hearsay, Your Honor.

7          THE COURT:  I am just trying to -- Dr. Rosenfeld,

8   you can't testify about anything that anyone said to you.  But

9   if you have an understanding that is derived from something

10  other than what you might have learned from somebody telling

11  you something, you can answer the question.  If you can.

12         THE WITNESS:  I'm sorry, please repeat the question.

13  I just want to be very accurate.

14         MR. MASTRO:  Sure.  If you can read it back, please.

15         (WHEREUPON, the record was read by the reporter as

16  requested.)

17         THE WITNESS:  I thought he was reporting back to

18  Mr. Shkreli or to his people at Retrophin.

19  BY MR. MASTRO:

20  Q    Sir, directing your attention to what's been marked as

21  DX-6745.  Can you bring that up, please?

22         MR. PITLUCK:  What tab?

23         MR. MASTRO:  DX-6745, tab number 8.

24         Can you please bring up the first page, Mr. Carter.

25  Bring up the -- just the two addresses.

*ROSENFELD - REDIRECT - MASTRO*                          9932

1          THE COURT:  Is this not in evidence?

2          MR. MASTRO:  It is.

3          MR. PITLUCK:  It is.

4          MR. MASTRO:  It is in evidence, Your Honor.

5          THE COURT:  Okay.

6    BY MR. MASTRO:

7    Q    April 23, 2013, do you see that, Dr. Rosenfeld?

8    A    I do.

9    Q    And its subject is consulting agreement, right?

10   A    Right.

11   Q    The bottom e-mail is Mr. Greebel to Ron Tilles, right?

12   A    Yes.

13   Q    And then the top e-mail, forwarding the document to you,

14   is from Ron Tilles to you, correct?

15   A    Correct.

16   Q    Now, you were shown during your cross-examination,

17   Government Exhibit 117-50, a revised draft of a consulting

18   agreement.  Do you remember being asked questions about that,

19   sir?

20   A    I do.

21   Q    Can I use the ELMO, please.  Here we go.

22          Again, bottom e-mail.  Who's the bottom e-mail,

23   May 24, 2013, from?

24   A    Mr. Greebel.

25   Q    To?

ROSENFELD - REDIRECT - MASTRO                    9933

1    A    Ron Tilles.

2    Q    And the top e-mail forwarding it on to you, is from whom?

3    A    Ron Tilles.

4    Q    Were you having any direct communication with Mr. Greebel

5    during this period, or through Ron Tilles?

6              MR. PITLUCK:  Objection to the leading, Your Honor.

7              MR. MASTRO:  Strike that, Your Honor.

8              THE COURT:  All right.  Rephrase.

9    BY MR. MASTRO:

10   Q    What -- how was it that you were receiving these draft

11   consulting agreements?  Through whom?

12   A    Through Ron Tilles.

13             MR. MASTRO:  No further questions, Your Honor.

14   Thank you.

15             THE COURT:  Did you want to -- are you still

16   pursuing, or did you withdraw your request to admit Government

17   Exhibit 117-10?  You just jumped to the next question.

18             MR. MASTRO:  I would like it received, Your Honor,

19   but I didn't want to have a sidebar.

20             MR. PITLUCK:  Judge, 117-10?

21             THE COURT:  I'm sorry, 117-110.

22             MR. MASTRO:  117-110.

23             THE COURT:  Yes.

24             MR. PITLUCK:  Yes, Judge.

25             THE COURT:  I cite Rule 612 as a basis to admit it,

ROSENFELD - REDIRECT - MASTRO                          9934

1   if the parties had provisions of this that it believed should

2   be admitted.

3            MR. MASTRO:  I would appreciate it being admitted,

4   Your Honor.  I move its admission.

5            MR. PITLUCK:  That's fine, Judge.

6            THE COURT:  All right.

7            MR. PITLUCK:  That's fine.

8            THE COURT:  It is all right to admit it?

9            MR. PITLUCK:  Just this one, Judge.

10           THE COURT:  All right.

11           MR. MASTRO:  Thank you.  If I can just --

12   Your Honor --

13           THE COURT:  I am speaking, sorry.

14           MR. MASTRO:  Sorry, Your Honor.

15           THE COURT:  All right.  So we will admit Government

16   Exhibit 117-110.

17           (Government Exhibit 117-110 received in evidence.)

18           MR. MASTRO:  If Your Honor --

19           MR. PITLUCK:  Judge, I would --

20           MR. MASTRO:  Since it has been admitted, if I can

21   just ask one question about it.

22           MR. PITLUCK:  I would ask for the instruction and to

23   have a copy shown to the jury that's not been marked up.

24           MR. MASTRO:  Sorry.  Can I borrow a copy from you?

25           THE COURT:  Members of the jury, Government Exhibit

1  117-110 is not being offered for the truth, but rather to --

2  well, it is not being offered for the truth.  Let's leave it

3  at that.

4           I have my copy.  Do you need a clean copy?

5           MR. MASTRO:  That would be fantastic, Your Honor, if

6  I could.  I will be very, very brief.  I promise.

7           THE COURT:  Just return it, please.

8           MR. MASTRO:  Certainly, Your Honor.

9  BY MR. MASTRO:

10 Q    Dr. Rosenfeld, you see there towards the top, a text you

11 received from Ron Tilles on October 15, 2014, at 7:52 p.m.?

12 Second one from the top?

13 A    Yes.

14 Q    Is that from Mr. Tilles to you, saying, quote, so what

15 happened with Aselage?

16 A    Yes.

17 Q    And can you please read to the jury your response on

18 October 15, 2014, at 10:00 p.m., starting with Ron?  What do

19 you say to Ron?

20 A    Ron, will send you an e-mail regarding consulting on

21 finding potential companies after review by counsel.  We're

22 leaving earlier, can you meet to discuss.

23 Q    And by "him," you are referring to Mr. Aselage, correct?

24           MR. PITLUCK:  Objection to the leading, Your Honor.

25           THE COURT:  Sustained.  Don't lead the witness.

*ROSENFELD - REDIRECT - MASTRO*                              9936

1          MR. MASTRO:  Strike that.

2    BY MR. MASTRO:

3    Q    Who were you referring to when you referred to him in

4    that e-mail -- text, I mean?

5    A    Mr. Aselage.

6          MR. MASTRO:  No further questions, Your Honor.

7          THE COURT:  All right.  Any recross, Mr. Pitluck?

8          MR. PITLUCK:  No, Your Honor.  Thank you.

9          THE COURT:  Sir, you are excused.  Thank you for

10   your time.

11         MR. MASTRO:  Thank you, Dr. Rosenfeld.

12         THE COURT:  Have a nice day.

13         THE WITNESS:  Thank you, Your Honor.

14         (WHEREUPON, the witness was excused.)

15         THE COURT:  Mr. Mastro, may I have that exhibit

16   back.

17         MR. MASTRO:  Sorry, Your Honor.  Absolutely.

18         THE COURT:  Thank you.

19         All right.  Was the defense ready to call its next

20   witness?

21         MS. DENERSTEIN:  Yes, Your Honor.  We are prepared

22   to call Mr. Dooley back to the stand.

23         THE COURT:  All right.  So perhaps we can get

24   started.

25         As I indicated to the jury, we would adjourn today

*DOOLEY - DIRECT - DENERSTEIN*                    9937

1   at 1:00.  So let's see how far we can get.  Thank you.

2          MS. DENERSTEIN:  Mr. Dooley, do you have any of your

3   binders up there?

4          THE COURT:  These are mine.

5          MS. DENERSTEIN:  They are coming in.

6          THE COURT:  I am happy to share.

7          MS. DENERSTEIN:  No, we're good.

8   J O S E P H    D O O L E Y,

9       called as a witness, having been previously duly

10      sworn, continued examined and testified as follows:

11  DIRECT EXAMINATION (CONTINUED)

12  BY MS. DENERSTEIN:

13  Q    Good afternoon, Mr. Dooley.

14  A    Good afternoon.

15         MS. DENERSTEIN:  Your Honor, I would like to start

16  by reading into the record the various exhibits that were

17  discussed on December 16 and -- I'm sorry, December 14 and

18  December 15.  So may I --

19         THE COURT:  As stipulated for admission, you mean?

20         MS. DENERSTEIN:  Per our discussion with the Court

21  and the Court's rulings.

22         So, at this time, the defense offers Defense Exhibit

23  8207 in evidence, Defense Exhibit 104-97A, Defense Exhibit

24  1055, Defense Exhibit 1069, Defense Exhibit 1070, Defense

25  Exhibit 1071, Defense Exhibit 1072, Defense Exhibit 1106,

1   Defense Exhibit 1151-A, Defense Exhibit 1154, Defense Exhibit

2   1157, Defense Exhibit 1167, Defense Exhibit 1189, Defense

3   Exhibit 1228, Defense Exhibit 1242, Defense Exhibit 1243,

4   Defense Exhibit 1255, Defense Exhibit 1260, Defense Exhibit

5   1274, Defense Exhibit 1285, Defense Exhibit 1289, Defense

6   Exhibit 1292, Defense Exhibit 1294, Defense Exhibit 1295,

7   Defense Exhibit 1296, Defense Exhibit 1298, Defense Exhibit

8   1299, Defense Exhibit 1309, Defense Exhibit 1314, Defense

9   Exhibit 1327, Defense Exhibit 1328, Defense Exhibit 1345,

10  Defense Exhibit 1348, Defense Exhibit 1901, Defense Exhibit

11  1902, Defense Exhibit 1903, Defense Exhibit 2949, Defense

12  Exhibit 5181, Defense Exhibit 6239, Defense Exhibit 8342,

13  Defense Exhibit 8901, Defense Exhibit 9151, Defense Exhibit

14  9168, Defense Exhibit 9198, Defense Exhibit 11573, Defense

15  Exhibit 11663, Defense Exhibit 13056, Defense Exhibit 13075,

16  in evidence.

17              (Continued on the next page.)

18

19

20

21

22

23

24

25

Proceedings                          9939

1        MR. KESSLER:  Your Honor we have no objection
2    subject to prior conversations and some of those documents
3    speak -- it's not for the truth and some have redactions.
4        THE COURT:  All right.  It does appear that the
5    majority of these documents are going to be admitted not for
6    the truth, and some of these documents are also going to
7    have redactions; however, the jury should not speculate
8    about the redactions, the reasons for them, or what lies
9    underneath the redaction.
10       MS. DENERSTEIN:  And, Your Honor, for purposes of
11   the record as well, we had discussed
12   Defendant's Exhibit 10830-A and Defendant's Exhibit 10868-A,
13   but those had already been admitted previously, and I just
14   got back with Mr. Kessler.
15       (Defense Exhibit 8207, Defense Exhibit 104-97A,
16   Defense Exhibit 1055, Defense Exhibit 1069, Defense Exhibit
17   1070, Defense Exhibit 1071, Defense Exhibit 1072, Defense
18   Exhibit 1106, Defense Exhibit 1151-A, Defense Exhibit 1154,
19   Defense Exhibit 1157, Defense Exhibit 1167, Defense Exhibit
20   1189, Defense Exhibit 1228, Defense Exhibit 1242, Defense
21   Exhibit 1243, Defense Exhibit 1255, Defense Exhibit 1260,
22   Defense Exhibit 1274, Defense Exhibit 1285, Defense Exhibit
23   1289, Defense Exhibit 1292, Defense Exhibit 1294, Defense
24   Exhibit 1295, Defense Exhibit 1296, Defense Exhibit 1298,
25   Defense Exhibit 1299, Defense Exhibit 1309, Defense Exhibit

Proceedings                                          9940

1   1314, Defense Exhibit 1327, Defense Exhibit 1328, Defense

2   Exhibit 1345, Defense Exhibit 1348, Defense Exhibit 1901,

3   Defense Exhibit 1902, Defense Exhibit 1903, Defense Exhibit

4   2949, Defense Exhibit 5181, Defense Exhibit 6239, Defense

5   Exhibit 8342, Defense Exhibit 8901, Defense Exhibit 9151,

6   Defense Exhibit 9168, Defense Exhibit 9198, Defense Exhibit

7   11573, Defense Exhibit 11663, Defense Exhibit 13056, Defense

8   Exhibit 13075 so marked and received in evidence.)

9   BY MS. DENERSTEIN:

10  Q    Okay.  Let's turn back to -- Mr. Dooley, do you have

11  Binder 2 in front of you?

12  A    I do.

13  Q    And let's turn back to the board minutes in 2013, which

14  is Defendant's Exhibit 118-26A.

15  A    Yes.

16  Q    Okay.  I am at this point going to show you a chart

17  that has been marked for identification as Defendant's

18  Exhibit 8A.

19       Mr. Dooley, have you had an opportunity to look at

20  this?

21  A    I have.

22  Q    And it is not in evidence yet, but can you describe

23  briefly what it is?

24  A    It's a chart which summarizes certain documents related

25  to the certain board meetings on various dates over a

Dooley - Direct - Denerstein                9941

1    several-month period, including the exhibit number of the

2    document, the date of the document, the subject matter or

3    the subject line in the e-mail, from/to if it exists, and

4    CC.

5              MS. DENERSTEIN:  Your Honor, at this point, the

6    defendant would like to offer Defense Exhibit 8A as a

7    demonstrative aid pursuant to your Court's prior ruling.

8              MR. KESSLER:  And so no objection to it being used

9    as a demonstrative.  Objection if it is being used as an

10   exhibitive, but I assume it is being offered as an

11   demonstrative.

12             THE COURT:  Well, I think that's what she said,

13   correct.

14             MS. DENERSTEIN:  That is correct.

15             THE COURT:  All right.

16             MS. DENERSTEIN:  That is what I said.

17             THE COURT:  Defense Exhibit 8-A will be admitted

18   as a demonstrative exhibit.

19             (Defendant's Exhibit Number 8-A so marked and

20   received in evidence for demonstrative purposes only.)

21   BY MS. DENERSTEIN:

22   Q    Mr. Dooley, can you please state the title of this

23   chart?

24   A    Board Meetings.

25   Q    And then looking at the blue row on the chart, can you

1   please describe each of the categories?

2   A    Sure.  The first column is an exhibit number, which

3   relates to --

4   Q    Can you speak up?  I am having a hard time hearing you.

5   Thank you.

6   A    The first column is an exhibit number column, which

7   relates to a defense or a government exhibit.  The second

8   column is the date, date of the document, date of the

9   e-mail.  The subject column is the type document or subject

10  line from the e-mail.  The from/to and the CC are fairly

11  self-explanatory.  It's s an e-mail chain, who it's from,

12  who it's to, and if anyone is cc'd on that.

13  Q    And going down to the first green row?

14  A    Uh-huh, yes.

15  Q    What date is there?

16  A    April 22nd, 2013.

17  Q    And what does the date represent?

18  A    The date represents the date if the board meeting.

19  Q    Okay.  Did that date came from Defendant's

20  Exhibit 118-26A?

21  A    Yes, it did.

22  Q    Now, going down to, for example, Defense Exhibit 13064,

23  the very first row.  Could you just go across and explain

24  what that is?

25  A    Sure.  It's a -- it's a press release with a

Dooley - Direct - Denerstein                    9943

1    description in the subject column, Retrophin Sponsors

2    Seventh International NBIA Disorders Association Family

3    Conference.  It's a document that is a press release that is

4    dated April 8, 2013, and it has that defense exhibit number

5    on that document.

6    Q    Okay.  So let's turn back to Defense Exhibit 118-26A in

7    evidence and go back to the April 22nd, 2013 board meeting.

8    A    (Witness complies.)

9    Q    And very briefly --

10           MS. DENERSTEIN:  Oops.  I am just waiting for it

11   to come back on so that the jurors can see.

12           Thank you Mr. Carter.

13   Q    Can you remind the jury of who was present in person or

14   by phone?

15           MS. DENERSTEIN:  And thank you, Mr. Carter.

16           MR. KESSLER:  Objection.  He's testifying about

17   who wasn't present?

18           MS. DENERSTEIN:  According to this document.

19           THE COURT:  Sustained.

20   Q    Who does the document say was present in person or by

21   phone?

22   A    The following members of the board were present in

23   person or by telephone:  Martin Shkreli, Stephen Aselage,

24   Steven Richardson, Evan Greebel of Katten, Muchin, Rosenman,

25   counsel of the company was also present.

Dooley - Direct - Denerstein                    9944

1   Q    Now, I'm going to ask you to turn the page to

2   Bates Number 677.

3        MS. DENERSTEIN:  And let's go down to the Further

4   Resolved section keep going.

5        Mr. Carter, can you highlight the two Further

6   Resolved sections?

7        Thank you.

8   Q    Mr. Dooley, can you read -- I'm sorry.

9        MS. DENERSTEIN:  Mr. Carter, just highlight the

10  second Further Resolved section.

11       Thank you.

12  Q    Could you read that, Mr. Dooley?

13  A    Further resolved that the chief executive officer be,

14  and he hereby is authorized and powered and directed in the

15  name and on behalf of the company to execute and deliver any

16  and all employment and consultant agreements from employees

17  and consultants to the company provided that such employees

18  or consultants are not material to the company and that

19  their agreements would not be required to be disclosed in a

20  current or periodic report filed with the Securities and

21  Exchange Commission.

22  Q    Okay.

23       And now let's turn to Government's Exhibit 565 in

24  your binder.

25       THE COURT:  May I ask?  If this is a good stopping

Dooley - Direct - Denerstein                    9945

1    point for the jury at this point?  I do have another matter

2    that is scheduled, and I do have to, as we discussed this

3    morning, deal with another issue.  So I would to excuse the

4    jury at this time.

5              Please do not talk about the case.  Tomorrow we

6    are going to start, as I said, at 10:30.  So in the

7    meantime, please avoid any media exposure and please do not

8    talk about the case and take care of yourselves.

9              Thank you.  I will see you tomorrow at 10:30.

10             (Jury exits the courtroom.)

11             (The following matters occurred outside the

12   presence of the jury.)

13             THE COURT:  Sir, you can step down.

14             THE WITNESS:  Thank you.

15             THE COURT:  I'll see you tomorrow.

16             We're starting at 10:30.

17             THE COURTROOM DEPUTY:  Thank you.

18             (Witness exits the witness stand.)

19             THE COURT:  All right.  So I will see you tomorrow

20   morning at 10:30.  Thank you.

21             (Matter adjourned to Tuesday, December 19 at

22   10:30 a.m.)

23                          -ooOoo-

24

25

```
                           INDEX                    9946

1

2                        I N D E X

3                       WITNESSES

4               S T E V E N   R O S E N F E L D

5
         DIRECT EXAMINATION (CONTINUED)            9818
         BY MR. MASTRO

7        CROSS-EXAMINATION                         9826
         BY MR. PITLUCK
8

9                 J O S E P H   D O O L E Y

10

11       DIRECT EXAMINATION (CONTINUED)            9937
         BY MS. DENERSTEIN
12

13

14                    E X H I B I T S

15
         Government's Exhibit Number 117-50        9875
16
         Government's Exhibit Number 117-80        9882
17
         Government Exhibit Number 117-110         9934
18
         Defense Exhibit Number 203-5             9899
19
         Defense Exhibit Number 12329             9930
20
         Defense Exhibit Number 8207              9940
21
         Defense Exhibit Number 104-97A           9940
22
         Defense Exhibit Number 1055              9940
23
         Defense Exhibit Number 1069              9940
24
         Defense Exhibit Number 1070              9940
25
                                                  9940
```

```
                           INDEX                    9947
```

```
 1                  E X H I B I T S (CONTINUED)

 2      Defense Exhibit Number 1071                 9940

 3      Defense Exhibit Number 1072                 9940

 4      Defense Exhibit Number 1106                 9940

 5      Defense Exhibit Number 1151-A               9940

 6      Defense Exhibit Number 1154                 9940

 7      Defense Exhibit Number 1157                 9940

 8      Defense Exhibit Number 1167                 9940

 9      Defense Exhibit Number 1189                 9940

10      Defense Exhibit Number 1228                 9940

11      Defense Exhibit Number 1242                 9940

12      Defense Exhibit Number 1243                 9940

13      Defense Exhibit Number 1255                 9940

14      Defense Exhibit Number 1260                 9940

15      Defense Exhibit Number 1274                 9940

16      Defense Exhibit Number 1285                 9940

17      Defense Exhibit Number 1289                 9940

18      Defense Exhibit Number 1292                 9940

19      Defense Exhibit Number 1294                 9940

20      Defense Exhibit Number 1295                 9940

21      Defense Exhibit Number 1296                 9940

22      Defense Exhibit Number 1298                 9940

23      Defense Exhibit 1299                        9940

24      Defense Exhibit Number 1309                 9940

25      Defense Exhibit Number 1314                 9940
```

```
                        INDEX                    9948

 1              E X H I B I T S (CONTINUED)

 2    Defense Exhibit Number 1327              9940

 3    Defense Exhibit Number 1328              9940

 4    Defense Exhibit Number 1345              9940

 5    Defense Exhibit Number 1348              9940

 6    Defense Exhibit Number 1901              9940

 7    Defense Exhibit Number 1902              9940

 8    Defense Exhibit Number 1903              9940

 9    Defense Exhibit Number 2949              9940

10    Defense Exhibit Number 5181              9940

11    Defense Exhibit Number 6239              9940

12    Defense Exhibit Number 8-A               9941

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*