9949

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3   UNITED STATES OF AMERICA,      : 15-CR-00637 (KAM)
                                   :
4            Plaintiff,            :
                                   : United States Courthouse
5        -against-                 : Brooklyn, New York
                                   :
6   EVAN GREEBEL,                  :
                                   : Tuesday, December 19, 2017
7            Defendant.            : 10:45 a.m.
- - - - - - - - - - - - - - - -X
8
             TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
9           BEFORE THE HONORABLE KIYO A. MATSUMOTO
                UNITED STATES DISTRICT JUDGE
10                   BEFORE A JURY

11              A P P E A R A N C E S :

12  For the Government:      BRIDGET ROHDE, ESQ.
                             Acting United States Attorney
13                           Eastern District of New York
                             271 Cadman Plaza East
14                           Brooklyn, New York 11201
                             BY:  ALEXIS ELEIS SMITH, ESQ.
15                                DAVID PITLUCK, ESQ.
                                  DAVID KESSLER, ESQ.
16                                Assistant United States Attorney

17  For the Defendant:       GIBSON DUNN & CRUTCHER
                             200 Park Avenue, 48th Floor
18                           New York, New York 10166
                             BY:  REED BRODSKY, ESQ.
19                                JOSHUA EVAN DUBIN, ESQ.
                                  MYLAN LEE DENERSTEIN, ESQ.
20                                WINSTON Y. CHAN, ESQ.

21

22  Court Reporter:         DAVID R. ROY, RPR
                            225 Cadman Plaza East
23                          Brooklyn, New York 11201
                            drroyofcr@gmail.com
24
    Proceedings recorded by Stenographic machine shorthand,
25  transcript produced by Computer-Assisted Transcription.

Proceedings                                9950

1              (In open court; outside the presence of the jury.)

2              THE COURT:  All right.  Are the parties ready to

3       bring the jurors in?

4              MR. DUBIN:  Yes, Your Honor.

5              THE COURT:  I just wanted the also mention if we

6       could do the sidebars I'm going to probably not come down

7       the stairs.  I have a problem with my knee today, so if we

8       could just do it here at the right, but I would like to

9       avoid the stairs.

10             MS. DENERSTEIN:  Okay, sure.

11             THE COURT:  Hopefully we won't have sidebars.

12             (Pause in proceedings.)

13             (Witness takes the witness stand.)

14             THE WITNESS:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             (Jury enters the courtroom.)

17             (Jury present.)

18             THE COURT:  All jurors are present.  Please have a

19      seat.

20             You may continue your direct examination and,

21      Mr. Dooley, you are still under oath.

22      J O S E P H   D O O L E Y,

23          called as a witness, having been previously duly

24          sworn, was examined and testified as follows:

25      DIRECT EXAMINATION (CONTINUED)

1    BY MS. DENERSTEIN:

2    Q    Good morning, Mr. Dooley.

3    A    Good morning.

4    Q    Can I have you, please, look at Defense Exhibit 118-26A

5    to begin with.

6    A    Yes.

7          MS. DENERSTEIN:  Mr. Carter, can you pull that up

8    for us, please.

9    Q    And I'm going to direct your attention to Page

10   Number 676.

11   A    Yes.

12   Q    So these are minutes from the April 22nd, 2013,

13   meeting, correct?

14   A    Yes, correct.

15   Q    Turning the page to Bates Number 677.

16         MS. DENERSTEIN:  Mr. Carter, if you could blow up

17   the second Further Resolved paragraph on the bottom of that

18   page.

19   Q    Mr. Dooley, I believe at the break yesterday, this is

20   what you read to the jury.

21   A    Yes, I believe it was.

22   Q    And this paragraph says what?

23         MR. KESSLER:  Objection to the form.

24   Q    What does the paragraph do?  What does the paragraph

25   state?

1    A    It authorized --

2             MR. KESSLER:  Objection.

3             THE COURT:  Well, if you want to just ask him, I

4    think that might just be the best way to --

5    Q    Okay.  You can read it again.

6    A    Further resolved the chief executive officer --

7    Q    I'm going to ask you to just slow down a little bit.

8    A    And he hereby is authorized empowered and directed in

9    the name and on behalf of the company to execute and deliver

10   any and all employment and consultant agreements from

11   employees and consultants to the company, provided that such

12   employees or consultants are not material to the company and

13   that their agreements would not be required to be disclosed

14   in a current or periodic report filed with the Securities

15   and Exchange Commission.

16            MS. DENERSTEIN:  Mr. Carter, could you now blow up

17   the first Further Resolved on the next page, which is 678.

18   Q    Mr. Dooley, could you please read that paragraph to the

19   jury.

20   A    Further resolved that the chief executive officer be

21   and he hereby is authorized, empowered and directed in the

22   name and on behalf of the company to execute and deliver any

23   and all agreements that do not require payments of a

24   material amount of cash or equity and which are not required

25   to be disclosed in a current or periodic report filed with

Dooley - Direct - Denerstein                 9953

1    the Securities and Exchange Commission.

2    Q    Now, I would like to direct Your to Binder 2, Tab A,

3    Government's Exhibit 565.

4    A    Yes.

5    Q    Can you read the --

6         MS. DENERSTEIN:  Can you scroll down, Mr. Carter.

7    Q    And read the bottom e-mail.

8         MS. DENERSTEIN:  Mr. Carter, can we go back up to

9    257?  Great.  Stop right there.  Perfect.

10   Q    Is this an e-mail from Alan Geller to Evan Greebel on

11   April 18, 2013?

12   A    It is.

13   Q    And what does the e-mail state?

14   A    Evan, can we move on this agreement today, meaning

15   Friday?  Al Geller.

16        MS. DENERSTEIN:  Can we move up to the next e-mail

17   please, Mr. Carter?  Blow that up.

18   Q    And is this an e-mail from Evan Greebel to Martin

19   Shkreli the same date?

20   A    It is.

21   Q    And what does it state?

22   A    Consulting agreement is done.  I need the transfer

23   numbers from you to tie up that piece.

24        MS. DENERSTEIN:  Can we go up to the next e-mail

25   above.

Dooley - Direct - Denerstein                    9954

1   Q    And is that an e-mail from Martin Shkreli to Evan

2   Greebel?

3   A    Evan Greebel, yes.

4   Q    And what does it state?

5   A    Send me drafts.

6           MS. DENERSTEIN:  Can you go to the top of the

7   chain.

8   Q    Is that an e-mail from Evan Greebel to Martin Shkreli

9   on April 19th, 2013?

10  A    Yes, it is.

11  Q    And what does it state?

12  A    Attach is a draft of a form.  I think you should get

13  blanket approval from the Board before you retain

14  consultants who may be paid in cash or stock up to an

15  aggregate amount of blank dollars.

16  Q    And is this date, April 19th, how far ahead of the

17  April 22nd, 2013, Board meeting is that?

18  A    Three days.

19  Q    Okay.  Let's turn back to the Board minutes, 678.  And

20  118 -26A, Defense Exhibit.  Bates Number 678.

21  A    Yes.

22  Q    Do you see the signature on that page?

23  A    I do.

24  Q    And what's the name?

25  A    Evan Greebel, acting secretary.

Dooley - Direct - Denerstein                    9955

1   Q    And let's now skip ahead to the September 9th, 2013,

2   Board meeting minutes contained in DX 118-26A.

3        5700 Bates Number.

4   A    Yes.

5   Q    Okay.  We briefly discussed this, I think, last week.

6   But can you remind the jury who was present at that meeting?

7   A    Martin Shkreli.

8        MR. PITLUCK:  Object to form who was present.

9   Q    Who does the document say was present at the meeting?

10  A    The following members of the Board were present in

11  person or by telephone:  Martin Shkreli, Stephen Aselage,

12  Steven Richardson.  Also present were Marc Panoff, the

13  company's chief financial officer, Evan Greebel of Katten,

14  Muchin, Rosenman, counsel for the company, and Edward

15  Hackert and Sunil Jain of Marcum, LLP, the company's

16  independent registered public accounting firm.

17  Q    And can we skip now to Page 701.  The second paragraph

18  beginning Mr. Shkreli, asked Mr. Panoff to advise?

19  A    Mr. Shkreli asked Mr. Panoff to advise the Board on

20  point of matters.

21  Q    Stop.  Can we go to the last sentence, please.

22  A    Mr. Panoff also reviewed the terms of the consulting

23  agreements offered to Al Geller and Ken Banta.

24  Q    Now, let's turn to Bates to Page 702 Bates Number.  And

25  in the middle of the page the Further Resolved that's the

Dooley - Direct - Denerstein                 9956

1    consulting agreement.

2           MS. DENERSTEIN:  Can we blow that up, Mr. Carter.

3    Q    Could you please read that slowly.

4    A    Further resolved that the consulting agreements for Al

5    Geller and Ken Banta in or substantially in the form and

6    containing substantially the terms and provisions of the

7    consulting agreements attached hereto be and they hereby are

8    ratified, affirmed, approved and adopted in all respects and

9    that subject to the execution of such consulting agreements,

10   you authorize officers B and each of them hereby is

11   authorized, empowered and directed in the name and on behalf

12   of the company to execute and deliver the consulting

13   agreements with such changes, modifications or amendments

14   thereto as the authorized officer executing the same shall

15   approve the execution and delivery thereof to be conclusive

16   evidence of such approval.

17   Q    Now I'm going to ask you to go back to Binder 2 and

18   turn to Tab E, Defense Exhibit 8207.

19   A    E as in Edward?

20          MS. DENERSTEIN:  Yes.

21          THE COURT:  Yes.

22   Q    Defense Exhibit 8207 in Binder 2.  It is followed --

23   A    Yes, yes, I'm sorry.

24   Q    That's okay.

25   A    Yes, 8207.

Dooley - Direct - Denerstein                    9957

1    Q     Okay.  Is this an e-mail from --

2           MS. DENERSTEIN:  Let's go to the bottom e-mail

3    first.

4    Q     Is this an e-mail from Marc Panoff on September 4,

5    2013, to Evan Greebel with the subject line Telephonic Board

6    Meeting Agenda 9/6/2013?

7    A     It is.

8           MS. DENERSTEIN:  Can we go back.

9    Q     And is this a response from Mr. Greebel to Mr. Panoff

10   on Wednesday, September 4, 2013, with an attachment

11   Telephonic Board Meeting Agenda 9/6/2013?

12   A     Yes, it is.

13   Q     And what does the e-mail state?

14   A     Please see comments.

15          MS. DENERSTEIN:  Can we turn to the next page,

16   which is Bates Number 468.

17   Q     And what does the top of the document state?

18   A     Retrophin, Inc., Telephonic Meeting of the Board of

19   Directors Agenda Friday, September 6th, 2016.

20          MS. DENERSTEIN:  And can we go down the document.

21   Keep going.

22   Q     And what is Item Number 10?

23   A     Approve retaining Al Geller, Ken Banta and Darren

24   Blanton as consultants.

25   Q     And is and Darren Blanton in a parenthetical?

Dooley - Direct - Denerstein                9958

1   A    Yes.

2   Q    In parentheses?

3   A    Correct.

4   Q    Can you goes to the next number.

5   A    11, review and approve an indemnification agreement for

6   directors and officers.

7   Q    The next number?

8   A    12 is --

9   Q    Wait, hold on.  Hold on.  Let the jury catch up to you.

10  I'm sorry, 12?

11  A    Discuss status of filing S1.

12  Q    And Number 13?

13  A    Management update.

14  Q    Are these edits in Track Change?

15  A    Yes.

16  Q    And can you explain the track changes to the jury?

17  A    Sure.  Whenever you make an edit to a document it

18  highlights on the left and underlines whatever has been

19  changed on a document, marks it up.

20          As you see on the top of the page if you go back

21  up to the top of the page somebody deleted the and that was

22  scratched off.

23          And then if you go back down to 10, 10 was added,

24  11 was added, 12 was added and then management update was

25  moved down to 13 because it had moved because of those three

Dooley - Direct - Denerstein                    9959

1   additions to this agenda.

2   Q    And is this the document that was attached to the

3   e-mail that Evan Greebel sent to Marc Panoff?

4   A    It was -- or it is.

5   Q    Okay.  Let's turn to Government's Exhibit 245.  Is this

6   an e-mail from Marc Panoff on Monday, September 9, 2013, to

7   Steven Richardson, Stephen Aselage and Martin Shkreli

8   copying Evan Greebel and the subject is Board Agenda with

9   several attachments listed?

10  A    Yes, it is.

11  Q    And what does the e-mail state?

12  A    All:  Attached please find the Board agenda and all

13  supporting documents with the exception of the amended 10-K,

14  amended March 10-Q and the June 10-Q (Exhibits A through D)

15  we are waiting on comments from Martin and will have these

16  documents to you as soon as we can prior to the call.

17  Q    Going up to the attachment.

18          MS. DENERSTEIN:  If you can blow that up,

19  Mr. Carter.

20  Q    What is attachment Exhibit J?

21  A    Consulting agreement Banta.

22  Q    And what is attachment Exhibit I?

23  A    Geller consulting agreement.

24  Q    And now I would like to direct your attention to page

25  Bates Number 6063 in this document.

Dooley - Direct - Denerstein                    9960

1    A    Yes.

2    Q    And what does the header of this document say?

3    A    Consulting agreement and release.

4    Q    And what individual is named in this agreement?

5    A    Alan Geller.

6    Q    What does the description of service state?

7              MS. DENERSTEIN:  If you could just blow it up.

8    Q    And read that.

9    A    Consultant will serve as an advisor to the company and

10   provide consulting services (the services on strategic and

11   corporate governance matter to the management of the

12   company).  Consultant shall be permitted to undertake other

13   employment or activities provided that such employment and

14   activities are not in violation of the terms of this

15   agreement or -- or compete with the business or activities

16   of the company.

17   Q    I would like to now direct your attention to Bates

18   Number 6083.

19   A    Yes.

20   Q    And what is the title of this document?

21   A    Consulting Agreement.

22   Q    And who is the document between?

23   A    Ken Banta and Retrophin, Inc.

24   Q    And what is the description of the services?

25   A    Consultant will serve as an advisor to the company and

Dooley - Direct - Denerstein                9961

1    provide consulting services (the services on strategic and

2    corporate governance matters to the management of the

3    company) and over matters at the request of the management

4    of the company for each project company and consultant will

5    agree on the scope of service -- services, deliverables and

6    timetable.

7    Q    If we go down the document further to Item Number 2,

8    compensation.  Does this describe that part of the

9    compensation will be stopped?

10   A    It does.

11   Q    And going back to Bates Number 6063, the consulting

12   agreement, the draft agreement for Alan Geller, Paragraph 2,

13   Compensation.  Does the compensation section describe

14   payment as stocks?

15   A    It does.

16   Q    Now, I would like to direct your attention to Bates

17   Number 6070.

18   A    Yes.

19   Q    And what is this?

20   A    The Retrophin, Inc., Telephonic Meeting of the Board of

21   Directors Agenda Monday, September 9, 2013.

22   Q    And can you read Item 2?

23   A    Review and approve amendments to the 2012 10-K and the

24   10-Q for the quarter ended March 31, 2013.

25   Q    Can we go down to Item 9 through 11.

Dooley - Direct - Denerstein                    9962

1    A    Number 9, approved retaining Al Geller and Ken Banta as

2    consultants.

3           Number 10, review and approve indemnification

4    agreement for directors and officers.

5           Number 11, discuss status of filing S1.

6    Q    Is Mr. Blanton's name listed on Item 9?

7    A    It is -- no, it is not, excuse me.

8    Q    Can we compare Defense Exhibit 8207 to this page, 6070

9    of Government's Exhibit 245?

10   A    245 to this one?

11   Q    The to agenda?

12   A    Yes.  Government's Exhibit 245 or Defense 8207?

13   Q    It is comparing the agenda on the back of the second

14   page of Defense Exhibit 8207 --

15   A    Correct.

16   Q    -- with the agenda in Government's Exhibit 245, which

17   is on Bates Page 6070 and --

18           MS. DENERSTEIN:  Can we make them a little bigger,

19   Mr. Carter?  Is that possible?

20   Q    Mr. Dooley, can you use the computer screen or the

21   binder?

22   A    The question is review them and compare them?

23   Q    Yes.

24   A    They're similar but there are differences.

25   Q    What is the difference with respect to approving

Dooley - Direct - Denerstein                    9963

1   consultants?

2   A    None -- well, approving -- retaining Al Geller and Ken

3   Banta as consultants.  On the marked-up version Darren

4   Blanton is not listed.

5   Q    Let's go through this again.  On which version is

6   Darren Blanton not listed, which exhibit?

7   A    On Exhibit Number 245, Government's Exhibit Number 245,

8   excuse me.

9   Q    And on which exhibit is Darren Blanton included?

10  A    On Defense Exhibit 8207.

11  Q    Going back the Defense Exhibit 8207 the cover page --

12  A    Yes.

13  Q    -- Mr. Greebel is e-mailing Marc Panoff the attached

14  agenda that contains Darren Blanton, correct?

15  A    Correct.

16  Q    Okay.  Let's turn back to Defense Exhibit 118-26A, the

17  September 9th meeting, Page Number 7700.

18  A    Yes.

19  Q    Can we read the paragraph that Mr. Shkreli asks

20  Mr. Panoff?

21  A    Mr. Shkreli asks Mr. Panoff to advise the Board on the

22  financial condition of the company and recent accounting

23  determinations.  Mr. Panoff advised the Board that

24  management of the company determined that it is appropriate

25  to restate the audited financials for the year ended

Dooley - Direct - Denerstein                    9964

1   December 31, 2012, and the three months ended March 31st,

2   2013, as set forth in the company's annual report on

3   Form 10-K for the year ended December 31, 2012, the 2012

4   10-K and the company's quarterly report on Form 10-Q for

5   three months ended March 31, 2013, the first quarter 2013

6   10-Q respectively.

7           Mr. Panoff explained that it would be necessary to

8   restate the subsequent event and liquidity footnotes in the

9   audited financials for 2012 and the financial statements for

10  the three months ended March 30, 2012, as well as amend

11  management's discussion and analysis of financial condition

12  and results of operation in the 2012 10-K and the first

13  quarter of 2013 10-Q, a draft of which was previously

14  provided to the Board.

15          Mr. Panoff also explained that such restatements

16  and amendments were due to noncash changes required by the

17  accounting rules as a result of various settlement

18  agreements entered into by the company.

19  Q    Can we turn to Page 7701?

20  A    7701?

21  Q    Uh-huh.  Sorry, the next page.

22  A    Yes.

23  Q    Going down to the bottom, Now, Therefore Be It?

24  A    Yes.

25  Q    It is hereby resolved.  Can you continue reading that.

Dooley - Direct - Denerstein                    9965

1   A    That the restatement of the audited financials for the

2   year ended December 31st, 2012, and the financial statements

3   for the quarter ended March 31st, 2013, be and hereby is

4   approved in all material respects.

5   Q    Can we continue to the next page, please, and could you

6   read that Further Resolved, please.

7   A    Further resolved that the amendments to the 2012 10-K

8   and the first quarter of 2013 10-Q be and they hereby are

9   approved for filing with the SEC subject to final review by

10  members of the Board, and other editorial comments and other

11  minor changes deemed necessary or desirable by the chief

12  executive officer of the company and the chief financial

13  officer of the company, each an authorized officer.  Filing

14  such report and the mailing of same to the company's

15  stockholders.

16  Q    Can we please now turn to Government's Exhibit 247.

17  A    Yes.

18  Q    Is this an e-mail from Marc Panoff on September 9th,

19  2013, to Steve Richardson, Stephen Aselage, and Martin

20  Shkreli copying Evan Greebel, Ed Hackert, and Sunil Jain?

21  A    It is.

22  Q    And is the subject line Additional Board Documents?

23  A    It is.

24  Q    Are there attachments?

25  A    There are.

Dooley - Direct - Denerstein                    9966

1    Q    Can you please read the e-mail.

2    A    Attached please find the latest draft of the amended

3    10-K for December 31, 2012.

4             The latest draft of the amended 10-Q for March 31,

5    2013.

6             Marcum, LLP's audit communication letter for the

7    quarter ended June 30, 2013.

8             Draft 10-Q or for the quarter ended June 30th,

9    2013.

10   Q    And is the name underneath that Marc Panoff?

11   A    It is.

12   Q    Can we turn to Bates Number 9334 in the same document,

13   just two pages in.

14   A    Yes, yes.

15   Q    And what is that?

16   A    It is a Form 10-K Amendment Number 1 to the U.S.

17   Securities and Exchange Commission for Retrophin, Inc., for

18   the transition period March 1 of 2012 to December 31, 2012.

19   Q    I am now going to direct your attention to 9399.

20   A    Yes.

21   Q    Item Number 4 is titled what?

22   A    Significant unusual transactions.

23   Q    And going down to During the Second Quarter.

24             MS. DENERSTEIN:  Will you blow that language up.

25   Q    Could you please read that.

Dooley - Direct - Denerstein                9967

1   A    During the second quarter of 2013, the company, its

2   chief executive officer and MSMB Capital (MSMB) became

3   parties to a series of agreements to settle up to $2,286,511

4   of liabilities which company management believes are the

5   primary obligation of MSMB.  The company and MSMB have

6   entered into indemnification agreements whereby MSMB has

7   agreed to defend and hold the company harmless against all

8   such obligations and amounts, whether paid or unpaid,

9   arising from these agreements.

10              Notwithstanding the indemnification the company

11   recorded the 2,286,511-dollar charge to operations during

12   the quarter ended June 30, 2013, that was offset by a

13   corresponding liability of $1,691,400 for the difference

14   between A, the aggregate amount of all such settlements and,

15   B, $593,111 of cash and noncash consideration that the

16   company paid to immediately settle a portion of the

17   agreement on behalf of MSMB.

18              The $1,691,411 is past due as of the date of this

19   filing and there is uncertainty as to whether the MSMB will

20   have sufficient liquidity to repay the company or fund the

21   indemnification agreements, should it become necessary.

22   Q    And can we skip the paragraph beginning with

23   Concurrent, and go to the paragraph beginning MSMB is

24   currently in the process of dissolving its operations?

25   A    MSMB is currently in the process of dissolving its

Dooley - Direct - Denerstein                    9968

1    operations in accordance with the new adopted accounting

2    standard 2013-04.  The company has reported the full amount

3    of the settlements as a charge to its operations due

4    uncertainty as to whether the affiliate will have sufficient

5    liquidity to repay the company or fund the indemnification

6    agreements, should it become necessary.

7                Any amounts that the company may recover under the

8    note due from MSMB or under the terms of the indemnification

9    agreement if, in fact, any amounts are recovered at all

10   would be characterized as a capital contribution as the date

11   such payments are received.

12   Q    If we go to the top of this page, does it say draft or

13   discussion purpose only?

14   A    It does.

15   Q    And is the date on the left-hand side September 9,

16   2013?

17   A    It is.

18   Q    And if you turn to the last page of this document which

19   is Bates Number 9405, and go to the bottom, who is this

20   from?

21   A    Edward F. Hackert, CPA.

22   Q    And under the very truly yours, what is the company

23   listed?

24   A    Marcum, LLP.

25   Q    If we go to the very next page which is Bates

Dooley - Direct - Denerstein                     9969

1    Number 406.

2    A    Yes.

3    Q    Is this the Form 10-Q that was attached to the e-mail?

4    A    It is.

5    Q    And for the period ended June 30, 2013?

6    A    Yes.

7    Q    Going to Bates Number 9414, Note 9.  Related party

8    transaction.

9         MS. DENERSTEIN:  Can you blow up the paragraph

10   underneath that.

11        Keep going, Mr. Carter, more, another paragraph,

12   please.  Great.

13   Q    Does this language describe various settlement

14   agreements?

15   A    It does.

16   Q    I do not think we need to read it, so we'll keep going.

17        Going to Defense Exhibit 8281.  Is this the agenda

18   from the Board of Directors' meeting on Monday,

19   September 29, 2013?

20   A    It is.

21   Q    And are there notes written on it?

22   A    Yes.

23   Q    Handwritten notes?

24   A    Yes, there are.

25   Q    And is this Mr. Richardson's notes?

Dooley - Direct - Denerstein                    9970

1    A    They are.

2         MR. KESSLER:  Objection, lack of personal

3    knowledge.

4         THE COURT:  Sustained.  The court --

5         MS. DENERSTEIN:  It is in evidence.

6         THE COURT:  This witness does not have personal

7    knowledge of whose handwriting it is.

8         MR. KESSLER:  And could we just strike that

9    question?

10        THE COURT:  Yes, certainly.

11   BY MS. DENERSTEIN:

12   Q    Could you go to Item 9?

13   A    Yes.

14   Q    And above approved retaining Al Geller, Ken Banta as

15   consultants, can you read what the handwriting says?

16   A    Minute time expectations, question mark.

17   Q    And going below the approved retaining Al Geller, Ken

18   Banta as consultants, can you read what the words say?

19   A    Cost structures, question mark.

20   Q    And can we compare this agenda to the draft agenda in

21   Government's Exhibit 245 Bates Number 6070?

22   A    They appear to be identical minus the notes.

23   Q    Let's turn to Defense Exhibit 1189.

24        MS. DENERSTEIN:  And can we blow up the top,

25   Mr. Carter.

Dooley - Direct - Denerstein                9971

1   Q    Is this an e-mail from Marc Panoff sent on Friday,

2   September 13th, 2013, to Stephen Aselage, Martin Shkreli,

3   Steve Richardson, copying Evan Greebel?

4   A    It is.

5   Q    And does it have various attachments?

6   A    It does.

7   Q    And is this after the September 9, 2013, Board meeting?

8   A    Yes, it is.

9   Q    Can you read the text in the e-mail?

10  A    Members of the Board, attached please find printer

11  versions of the amended 10-Q, amended 10-Q, June 10-Q and

12  8-K disclosing the restatements.  There are a few nits that

13  need to be addressed but wanted to get these to you to

14  review.

15            Please review and approve electronically if you

16  have no comments.  I will send the final docs once received.

17  I will also be forwarding the S1 registration statement

18  within the hour.  Thanks, Marc.

19  Q    Can we go to the bottom e-mail on this document where

20  it says Begin Forwarded Message?  Is this from E Data

21  Customer Service to Michelle Griswold and copying Evan

22  Greebel and Marc@Retrophin.com?

23  A    It is.

24  Q    And is this the date, September 13th?

25  A    It is.

Dooley - Direct - Denerstein                    9972

1   Q    And could you read the text of the e-mail, please.

2   A    Michelle, please find attached .pdfs for the 10-Q/A --

3   10-Q/A, 10-Q and 8-K for Retrophin.

4        Any questions please contact our customer service.

5   Q    Can I know direct your attention to Bates Number 9336.

6   Is this the Form 10-K Amendment Number 1 attached to the

7   e-mail?

8   A    It is.

9   Q    And it is for Retrophin, Inc.?

10  A    Yes, for the transition period March 1, 2012, to

11  December 31, 2012.

12  Q    Directing your attention to Page 9366, Note 12

13  subsequent events.

14       MS. DENERSTEIN:  Okay.  Can we scroll down further

15  under subsequent events to the paragraph in the second

16  quarter?  Mr. Carter, on the screen in front of me can we

17  move it over a little bit to the left.  Perfect.

18  Q    Does this paragraph describe disclosures relating to

19  settlement agreements?

20  A    It does.

21  Q    Is it similar to language we've previously reviewed?

22  A    It is.

23  Q    Would you like to read it?  No, I'm just kidding.

24       Okay.  Let's go to Page 9436.

25       Is this the Form 8-K that was attached to the

1   e-mail?

2   A     It is.

3   Q     For Retrophin, Inc.?

4   A     Yes.

5   Q     Did for what period?  What is the date of the report on

6   this?

7   A     September 1, 2013.

8   Q     Does it have a blank space where September is?

9   A     A blank space?

10  Q     Between September and 2013?

11  A     Yes, it does.

12  Q     So it does not have a one?

13  A     Correct.  It does not have a 1.  September blank, 2013.

14  Q     And now I am going to direct your attention to 9373

15  quickly.

16  A     Yes.

17  Q     Let's move to directing your attention to 9405, the

18  Retrophin Bates Stamp Number 9405.

19  A     Yes.

20        MS. DENERSTEIN:  Go to the top of that page.

21        There we go.

22  Q     Is that the Form 10-Q Amendment Number 1 that was

23  attached to the e-mail?

24  A     Yes, it is.

25  Q     And is it for the period ending March 31st, 2013?

Dooley - Direct - Denerstein                9974

1    A    Yes.

2    Q    And is it for Retrophin?

3    A    It is.

4         MS. DENERSTEIN:  Can we go back to 9373, the 10-Q,

5    cover page.  Bates Number is from Retrophin.

6    A    Yes.

7    Q    And is that the Form 10-Q?

8    A    It is.

9    Q    That was attached to the e-mail?

10   A    Yes.  For the quarterly period ending June 30, 2013.

11   Q    Okay.  Let's turn to Defense Exhibit 116-75.

12        MS. DENERSTEIN:  Can we go to the bottom of the

13   e-mail?  Go up again.

14   Q    Does the bottom e-mail state, Please find attached the

15   .pdfs for the 10-K/A, 10-Q/A and Q and 8-K for Retrophin?

16   A    Yes.

17   Q    And is the name addressed to Michelle?

18   A    Yes, it is.

19   Q    And Michelle Griswold of Kattenlaw.com?

20   A    Yes.

21   Q    And is Mr. Greebel copied?

22   A    He is.

23   Q    And is the top of that e-mail, the next e-mail Marc

24   Panoff's e-mail forwarding those documents to the members of

25   the Board on September 13th, 2013?

Dooley - Direct - Denerstein                 9975

1   A    It is.

2   Q    And is the top e-mail from Mr. Steve Aselage on the

3   same date, September 13th, 2013 --

4   A    It is.

5   Q    -- to Marc Panoff?

6   A    It is, yes.

7   Q    And what does it state?

8   A    Approved.

9        MS. DENERSTEIN:  Can we turn to Defense

10  Exhibit 1242 and can we go to the middle e-mail, please.

11  Q    Is the middle e-mail from Steve Aselage to Marc Panoff

12  on Friday, September 13th, 2013?

13  A    It is.

14  Q    And what does the e-mail state?

15  A    Approved.

16  Q    And does the bottom e-mail contain the same documents

17  that we have just been discussing?

18  A    It does.

19  Q    Can we turn to Defense Exhibit 1243?

20  A    Yes.

21       MS. DENERSTEIN:  Can we go to the middle e-mail,

22  please.

23       Can we go up one, please.

24  Q    Is this an e-mail from Steve Richardson on Friday,

25  September 13th, 2013, to Marc Panoff?

Dooley - Direct - Denerstein                9976

1    A    It is.

2    Q    Can you read the e-mail, please.

3    A    Hi, Marc.  No other nit in the 10-K/A doc on the CEO

4    certification page.  It lists Martin as principal financial

5    officer.  I approved the documents and attached the

6    signature page.  I believe there was just the one page and

7    wanted directors to sign.  Let me know if there are others.

8    Have a good weekend, Steve.

9    Q    Turning to Government's Exhibit 968.  Is this the

10   Form 10-Q Amendment Number 1?

11   A    It is.

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

DOOLEY - DIRECT - DENERSTEIN                                9977

1    BY MS. DENERSTEIN:

2    Q    And is it for the period from March 1, 2012 to December

3    31, 2012?

4    A    It is.

5    Q    Is it for Retrophin?

6    A    Yes.

7    Q    I'm going to direct your attention to page 14 of 39.

8    Should be the signature page.

9    A    Yes.

10   Q    Who are listed as the signatories?

11   A    Martin Shkreli, chief executive officer and director,

12   Marc Panoff, chief financial officer, Stephen Aselage,

13   director, Steven Richardson, director.

14   Q    Can we -- can I turn your attention to page 38, mainly

15   39, but 38, we'll start with, of this document.  Note 12,

16   subsequent events?

17   A    Yes.

18   Q    Going to the top of the next page, "in the second

19   quarter" paragraph.  Can you blow that up, please.

20           Does this paragraph describe the disclosure of

21   certain settlement agreements?

22   A    It does.

23   Q    Can we turn to Defense Exhibit 116-80.  This is form

24   10-Q, amendment number 1?

25   A    Yes, for the quarterly period ending March 31, 2013.

DOOLEY - DIRECT - DENERSTEIN                    9978

1   Q    And directing your attention to page 24 of 36, is there a

2   title called settlement agreements?

3   A    There is.

4   Q    Let me blow up that paragraph.  Does this also disclose

5   certain settlement agreements?

6   A    It does.

7   Q    Can we turn to Defense Exhibit 116-81.  Is this the form

8   10-Q for Retrophin for the quarterly period ended June 30,

9   2013?

10  A    It is.

11  Q    Can we turn to page 18 of 38.

12  A    Yes.

13  Q    Under "related party transactions," "in the second

14  quarter," does this document also have language disclosing

15  settlement agreements?

16  A    It does.

17  Q    Okay.  Let's turn back to the minutes, please, for

18  September 9, Bates No. 7700 -- sorry, 7703.

19  A    Yes.

20  Q    Is that Mr. Greebel's -- is Mr. Greebel listed as the

21  signatory?

22  A    He is.

23  Q    And this is on the September 9 meeting?

24  A    It is.

25  Q    I would like to go back to Defense Exhibit 8A, which is

DOOLEY - DIRECT - DENERSTEIN                           9979

1    the board meetings chart.  Can we scroll down to September 9.

2    So September 29, 2013, represents the board meeting, correct?

3    A      September 9, 2015.

4    Q      And underneath there are various exhibits listed?

5    A      There are.

6    Q      How many?

7    A      11.

8    Q      And are those the exhibits we just reviewed?

9    A      They are.

10   Q      And do they relate to topics addressed at the board

11   meeting on September 9?

12          MR. KESSLER:  Objection to the form.

13          THE COURT:  I'll overrule the objection.

14          THE WITNESS:  They do.

15   BY MS. DENERSTEIN:

16   Q      And is that how this chart is organized?

17   A      It is.

18   Q      Okay.  After going back to Defense Exhibit 118-26A, after

19   the September 9 meeting, are there other board meetings in

20   this document?

21   A      There are.

22   Q      Can you turn to 704?

23   A      Yes.

24   Q      What day is that board meeting?

25   A      September 12, 2013.

1    Q    Can we turn to the next page, numbered 706.  What is the

2    date of that board meeting?

3    A    September 17, 2013.

4    Q    Can we turn to the next page, until we get to the

5    November 8.  What is the date of this meeting?

6    A    November 8, 2013.

7    Q    And if you could go to who was present.  "The following

8    members of the board were present."  Can you continue reading?

9    A    (Reading...)  In person or by telephone, Martin Shkreli,

10   Stephen Aselage, Steven Richardson, and Cornelius Golding.

11   Also present were Marc Panoff, the company's chief financial

12   officer, Evan Greebel of Katten Muchin Rosenman, LLP, counsel

13   to the company, and Edward Hackert, and Ginger Pagulo, of

14   Marcum LLP, the company's independent registered public

15   accounting firm, paren, Marcum.

16   Q    Can we go down to the first paragraph beginning,

17   "Mr. Shkreli began the meeting."

18   A    (Reading...)  Mr. Shkreli began the meeting by asking

19   Mr. Panoff to review the draft of the company's quarterly

20   report on Form 10-Q for the period ending November 30, 2013,

21   paren, the third quarter, 2013 10-Q.  Mr. Shkreli then asked

22   Marcum to update the board on the third quarter 2013 10-Q.

23   Marcum delivered a report on the following issues.

24   Q    Okay, great.  We can stop there.

25        Can we go -- skip down to, "next Mr. Shkreli."

1    A    (Reading...)  Next, Mr. Shkreli discussed the status of

2    Jeffrey Paley's nomination to the board -- to join the board,

3    noting Dr. Paley's clinical and business background.

4    Mr. Aselage and Richardson reported to the board that they had

5    each interviewed Dr. Paley over the phone and believed that

6    Dr. Paley would be an excellent addition to the board.

7    Q    Can we go to the next page, 710.

8    A    Yes.

9    Q    The second sentence.  Could you read that, please?

10   A    (Reading...)  Messrs. Panoff and Greebel noted that the

11   securities laws require that any stock option plan be approved

12   by the company's stockholders.

13   Q    Can we go to the next paragraph, beginning, "Mr. Panoff

14   provided a management update," and skip down to "Mr. Panoff

15   then provided an update."

16   A    (Reading...)  Mr. Panoff then provided an update

17   regarding the company's plan to proceed with an underwritten

18   public offering of the company's common stock.  Mr. Panoff

19   noted that he had spoken with several investment banks

20   interested in underwriting such a transaction.  The board then

21   discussed the merits of such an underwritten offering and the

22   benefits of a listing on the New York Stock Exchange or

23   NASDAQ.

24   Q    Okay.  Now let's turn to Government Exhibit 251.  Is this

25   an e-mail from Marc Panoff, on November 6, 201, to Neal, Steve

1   Richardson, Steve Aselage, and Martin Shkreli?

2   A    It is.

3   Q    And is Mr. Greebel and Ed Hackert and Sunil Jain copied?

4   A    They are.

5   Q    And is the subject board agenda?

6   A    Yes.

7   Q    And does it contain several attachments?

8   A    It does.

9   Q    And what is Exhibit C, the attachment?

10  A    Shkreli employment agreement.

11  Q    And can I now direct your attention to page 8714.  Is

12  this the agenda?

13  A    It is.

14  Q    That was attached to the e-mail?

15  A    Yes.

16  Q    And what is item numbers 2 through 5?

17  A    (Reading...)  Number 3, review Marcum LLP audit

18  communication letter for September 30, 2013 quarterly review.

19  Number 3, review an approval of 10-Q for the quarter ended

20  September 30, 2013.  Number 4, discuss appointment about

21  Dr. Jeff Paley's appointment to the board.  Number 5, review

22  an approval of Martin Shkreli employment agreement.

23  Q    I'm going to turn to -- to Defense Exhibit 8901.  And is

24  the bottom e-mail -- blow that up -- from Marc Panoff on

25  November 11, 2013 to nealcorneliusgolding.com, Steve Aselage,

DOOLEY - DIRECT - DENERSTEIN                          9983

1   Steve Richardson, and is Martin Shkreli and Evan Greebel

2   copied?

3   A    Yes.

4   Q    And what does this e-mail state?

5   A    Members of the board, attached, please find a marked copy

6   of the 10-Q for your review.  We are keeping the face of the

7   financial statements as is for Q3 and will work to simplify

8   the line items to, quote, research and development, end quote,

9   and, quote, selling general administrative, end quote, for the

10  10-K and all subsequent filings.  Please let me know if you

11  have any questions.  If not, please send an e-mail approving

12  the document so we can file tomorrow.  Best regards, Marc.

13  Q    And what does the top e-mail state?

14  A    Sounds good, okay.

15  Q    And who is it from?

16  A    Neal Golding.

17  Q    And is it to Mr. Panoff, Mr. Aselage, Mr. Richardson?

18  A    Yes, with ccs to Mr. Shkreli and Mr. Greebel.

19  Q    Turning to Government Exhibit 972, is this the Form 10-Q?

20  A    It is.

21  Q    For the quarterly period ended September 30, 2013?

22  A    Yes, it is.

23  Q    And for Retrophin?

24  A    Yes.

25  Q    Directing your attention to Defense Exhibit 13075, what

DOOLEY - DIRECT - DENERSTEIN                                    9984

1    is this?

2    A    It is a press release from Retrophin.

3    Q    And is the title, Jeffrey Paley, MD, joins Retrophin,

4    Inc.'s, board of directors?

5    A    Yes.

6    Q    And could you read the first sentence, "Retrophin, Inc."?

7    A    (Reading...)  Retrophin, Inc., today announced that it

8    has appointed Jeffrey Paley, MD, to its board of directors,

9    effective November 15, 2013.

10   Q    Going back to Defense Exhibit 118-26A, on Bates number

11   7111, 7111, again, is this -- is Mr. Greebel the signatory?

12   A    He is.

13   Q    And are there meetings after that date in this document,

14   in this document?

15   A    There are not.

16   Q    And so going back to exhibit, Defense Exhibit 8A, to the

17   November 8, 2013 date?

18   A    Yes.

19   Q    Are these exhibits that relate to topics described in the

20   November 8, 2013 minutes?

21   A    Yes, they are.

22   Q    And one quick thing, if we could go back to Defense

23   Exhibit 1348.

24   A    Yes.

25   Q    Can you blow up the top.  Is this from Mr. Aselage?

1  A    It is.

2  Q    And is it to Mr. Richardson, marc@retrophin.com,

3  nealcorneliusgolding.com, copying martin@retrophin.com, and

4  evangreebel@kattenlaw.com?

5  A    It is.

6  Q    And is the date Monday, November 11, 2013?

7  A    Yes.

8  Q    And does Mr. Aselage state you have my approval as well?

9  A    He does.

10 Q    And if you go down to the next e-mail, is this approval

11 for the 10-Q?

12 A    It is.

13 Q    Okay.  Let's turn to binder 3.  Do you have Defense

14 Exhibit 7A?

15 A    I do.

16        MS. DENERSTEIN:  This isn't in evidence yet,

17 Mr. Carter.

18 BY MS. DENERSTEIN:

19 Q    Mr. Dooley, are you looking at Defense Exhibit 7A?

20 A    I am.

21 Q    Okay.  What is it?

22 A    It is a chart of the e-mail distribution of board

23 minutes.

24        MS. DENERSTEIN:  Your Honor, at this time the

25 defense, subject to Your Honor's prior ruling, would like to

1    publish Defense Exhibit 7A to the jury, as a demonstrative

2    aid.

3              MR. KESSLER:  That's right, Your Honor.  No

4    objection to it as a demonstrative, objection to it coming

5    into evidence as an exhibit.

6              THE COURT:  All right.  You may publish this Defense

7    Exhibit 7A as a demonstrative exhibit.  It will not be

8    received in evidence.

9    BY MS. DENERSTEIN:

10   Q    Okay.  So can you read the header to the jury, please.

11   A    The header, for the jury, first column on the left, like

12   all the other charts, exhibit number --

13   Q    Let's stop with the very top.  What does it say?

14   A    E-mail distribution of minutes.

15   Q    Okay.  Now, let's go -- please take up from where you

16   were.

17   A    Exhibit number, the far left column, the date of the

18   e-mail, the subject line of the e-mail, who it is from, who it

19   is to, and any cc.

20   Q    So take us across the first column, please.

21   A    Sure.

22          The Defense Exhibit 9151, was an e-mail dated

23   December 12, 2013, with a subject line 2013, board minutes,

24   from Evan Greebel to Marc Panoff.

25   Q    And the "cc" is left blank because?

DOOLEY - DIRECT - DENERSTEIN                                9987

1    A    There was no cc.

2    Q    Can we turn to Defense Exhibit 951, which is in binder 3,

3    behind tab B.  It is at the very back, almost to the end.

4    A    Yes.

5              THE COURT:  Did you say 9151 or 951?

6              MS. DENERSTEIN:  I meant to say 9151.

7              THE COURT:  Okay.  Thank you.

8    BY MS. DENERSTEIN:

9    Q    Okay.  So can you read who this is to and from?

10   A    It is from Evan Greebel, to Marc Panoff, December 12,

11   2013, with a subject line 2013 board minutes.

12   Q    And does it contain various attachments?

13   A    It does.

14   Q    And are the attachments -- do they state the words

15   "minutes" in them?

16   A    They do.

17   Q    And what does the e-mail state?

18   A    Attached are drafts of the 2013 board minutes.

19   Q    Okay.  Can we -- and then attached to this e-mail are

20   there various drafts?

21   A    Yes.

22   Q    Can we turn to Defense Exhibit 1274.  Can we go to the

23   bottom e-mail first, please.  Is this e-mail, with the

24   exception of the time, identical to the e-mail in Defense

25   Exhibit 9151?

DOOLEY - DIRECT - DENERSTEIN                              9988

1    A    Yes, it is.

2    Q    And what does it say?

3    A    (Reading...)  Attached are drafts of the 2013 board

4    minutes.

5    Q    Going to the top of the chain, does Mr. Marc Panoff reply

6    in this e-mail to Evan Greebel on December 12, 2013?

7    A    He does.

8    Q    And what does he state?

9    A    I'm okay with these.

10   Q    And going back to Defense Exhibit 9151, if you flip

11   through the attachments, are they drafts of board minutes?

12   A    They are.

13   Q    Let's go to the next thing, back to chart 7A.  What's

14   next on the list?

15   A    DX-118-26A.

16   Q    And was that the document that you -- we used in

17   connection with Defense Exhibit 8A?

18   A    Yes.

19   Q    And did Defense Exhibit 118-26A contain various drafts of

20   minutes from 2013?

21   A    Yes.  These were -- there was no draft on the top of most

22   of these.

23   Q    That's correct.  Actually, if you go to the cover page of

24   the e-mail, at 118-26A, can you read the statement?

25   A    (Reading...)  Please see the requested executed minutes.

DOOLEY - DIRECT - DENERSTEIN                          9989

1    Q    Let's go back then to -- actually, let's keep going and

2    go to the next document on the list, Defense Exhibit 10830A.

3    And what are these?  What is the e-mail, who is it from and

4    who it is it to?

5    A    E-mail to Evan Greebel from Marc Panoff, May 6, 2014 with

6    a subject line, Retrophin, March 20, 2014 audit committee

7    minutes.

8    Q    And are there minutes attached?

9    A    Yes, there are.

10   Q    And if you turn the page to the minutes, do they say

11   "draft" on them?

12   A    They do.

13   Q    Turning to Defense Exhibit 10868A.  Can we blow up the

14   top, the chain.  Is this from davidkravitz@kattenlaw.com on

15   May 9, 2014 to marc@retrophin, copying Evan Greebel?

16   A    It is.

17   Q    And what's the subject line?

18   A    Retrophin draft board of directors and committee minutes.

19   Q    And what are the -- does this have various attachments?

20   A    It does.

21   Q    And do the attachments have "minutes" in their name?

22   A    They do.

23   Q    And could you please read the e-mail.

24   A    (Reading...)  Marc, attached for your review are draft

25   minutes to the following meetings, March 17, 2014 board of

1    directors meeting, March 20, 2014, board of directors meeting,

2    March 20, 2014, nominating and corporate governance committee

3    meeting, and April 7, 2014, board of directors meeting.

4    Please let us know if you have any questions or comments.

5    Best, David.

6    Q    And does this correspond with row number 5 on Defense

7    Exhibit 7A?

8    A    It does.

9    Q    Turning to the next Defense Exhibit, 11305.

10           MS. DENERSTEIN:  Can we blow up the top, Mr. Carter.

11   BY MS. DENERSTEIN:

12   Q    Is this an e-mail from Evan Greebel to -- on Monday,

13   August 4, 2013 -- 2014, excuse me, to Marc Panoff, with a

14   subject, draft audit committee minutes?

15   A    It is.

16   Q    And do the attachments have the words, "audit committee

17   minutes"?

18   A    They do.

19   Q    And what does the e-mail state?

20   A    Attached are drafts of the minutes for the 5/8 and 5/14

21   audit committee meetings.

22   Q    And if you turn the pages, do the minutes say "draft"?

23   A    They do.

24   Q    And are the minutes attached to the e-mail?

25   A    They are.

DOOLEY - DIRECT - DENERSTEIN                    9991

1   Q    And does this correspond with the next row on the chart?

2   A    It does.  Row 6.

3   Q    Let's turn to the next document, which is Defense Exhibit

4   11573.  Is this an e-mail from Evan Greebel dated Wednesday,

5   September 24, 2014, to Meg Valeur-Jensen, with a subject,

6   2/24/14 minutes?

7   A    Yes, it is.

8   Q    And what does the e-mail state?

9   A    (Reading...)  Meg, as requested, attached are the minutes

10  from the 2/24/14 meeting of the board and the comp committee

11  as well as the various attachments that are referenced

12  therein.  Thanks, Evan.

13  Q    And are the minutes attached?

14  A    They are.

15  Q    And does this correspond with another row on the chart in

16  Defense Exhibit 7A?

17  A    Yes, it does.  Top row on page 2.

18  Q    Okay.  Let's go to the next exhibit, Government Exhibit

19  286.  Is this an e-mail from Evan Greebel on September 24 to

20  Meg Valeur-Jensen?

21  A    It is.

22  Q    And does it -- is the subject 2014 minutes, with parens,

23  through May?

24  A    It is.

25  Q    And are there attachments?

1    A    Yes.

2    Q    And what does the e-mail state?

3    A    (Reading...)  Hi, Meg.  Here are the 2014 minutes from

4    January through April.  I have not received the minutes from

5    May through the summer yet from my files department and will

6    send next week when I return, paren, as I assume they will

7    arrive before I am back in the office, closed paren.  Thanks,

8    Evan.

9    Q    Can we go to Defense Exhibit 11663, to the top e-mail.

10   Is this from Evan Greebel to Meg Valeur-Jensen on October 3,

11   2014, and is the subject "additional minutes"?

12   A    It is.

13   Q    And are there attachments containing additional minutes?

14   A    There are.

15   Q    And what does -- what does the e-mail state?

16   A    (Reading...)  Meg, following up on our e-mail from last

17   week, attached are minutes of board and audit committee

18   meetings in May and June.  Please let me know if you need

19   additional minutes.  Thanks, Evan.

20   Q    Let's go back to -- and are there minutes attached?

21   A    Yes, there are.

22   Q    Let's go back to Defense Exhibit 7A.

23   A    Yes.

24   Q    On how many occasions does Evan Greebel e-mail minutes to

25   Mr. Panoff or Meg Valeur-Jensen?

DOOLEY - DIRECT - DENERSTEIN                           9993

1    A    Seven.

2    Q    And on how many occasions does David Kravitz e-mail

3    minutes to Marc Panoff?

4    A    One.

5    Q    So is that a total of eight times minutes are sent to

6    either Marc Panoff or Meg Valeur-Jensen?

7    A    Yes.

8    Q    Okay.

9    A    Can I make a correction to the chart?

10   Q    Yes.

11   A    In the row, the second row on page 2, GX-286, 9/24/2014,

12   in the third column under "subject," it should be 2014 minutes

13   through May, not 2013 minutes through May.

14   Q    Okay.  That's it for minutes.

15   A    Thank you.

16   Q    Okay.  I'm going to ask you to turn back to binder 2, to

17   the end of binder 2, to tab F.

18   A    Yes.

19   Q    Okay.  Do you have Defense Exhibit 9 for identification?

20   A    I do.

21   Q    And this is not in evidence.  Can you describe what it

22   is?

23   A    It is a chart listing all documents related to an M.

24   Shkreli employment agreement.

25              MS. DENERSTEIN:  Your Honor, at this time, the

1  defense would like to publish Defense Exhibit 9, subject to

2  Your Honor's prior rulings, as a demonstrative, but also want

3  to note for the record we think it should come in for

4  evidence, as a piece of evidence.

5          MR. KESSLER:  So no objection to it being used as a

6  demonstrative, only.

7          THE COURT:  All right.  Defense Exhibit 9 is going

8  to be admitted as a demonstrative exhibit.  It will not be

9  independently admitted.  You may publish.

10 BY MS. DENERSTEIN:

11 Q    Okay.  Can you read the title?

12 A    M. Shkreli employment agreement.

13 Q    And can we go through the first row, again?

14 A    Similar to the other charts, it lists the exhibit number,

15 the date of the document, the subject line, if any, from, to,

16 and cc.  This includes documents others than e-mails.  So

17 there are some at the end that are -- it is not an e-mail,

18 just a document.

19 Q    Okay.  And so let's start with defense exhibit, the last

20 exhibit first, which is -- should be the last exhibit in the

21 binder, which is Defense Exhibit 9016.

22 A    Yes.

23 Q    Is this the unanimous written consent of the board of

24 directors of Retrophin, Inc., dated November 26, 2013?

25 A    Yes, it is.

1    Q    And going down the first page, stop there, the "whereas

2    the board believes."  Can you read that, please.

3    A    (Reading...)  Whereas the board believes to be in the

4    best interests of the corporation and its stockholders for the

5    corporation to enter into an employment agreement with Martin

6    Shkreli, the corporation's chief executive officer, paren, the

7    Shkreli employment agreement, pursuant to which Martin Shkreli

8    will continue to serve as the corporation's chief executive

9    officer.

10   Q    Can we go to the next "whereas" clause, please.  The very

11   next one.

12   A    (Reading...)  Whereas, as a party to the Shkreli

13   employment agreement, Martin Shkreli has recused himself from

14   participating in any discussions of its approval.

15   Q    Can we turn to page 2, which is the next page, to the

16   fourth going -- keep going, "resolved that the corporation."

17        Blow that up for the jury.  Please read that?

18   A    (Reading...)  Resolved, that the corporation enter into

19   the Shkreli employment agreement in, or substantially in, the

20   form and containing substantially the terms and provisions of

21   the Shkreli employment agreement attached hereto as Exhibit B,

22   and that the form, terms, and provisions of the Shkreli

23   employment agreement be, and they hereby are, ratified,

24   affirmed, approved and adopted in all respects, and that the

25   officers of the corporation be, and each of them hereby is,

1  authorized, empowered, and directed on behalf of the

2  corporation to execute and deliver the Shkreli employment

3  agreement, with such changes therein and additions thereto as

4  may be deemed necessary, appropriate, or advisable by the

5  officer executing the same on behalf of the corporation, and

6  the execution thereof by such officer to be conclusive

7  evidence of the approval by the corporation of such changes

8  and additions.

9  Q    And if you keep -- let's go to Bates No. 189.  Who's

10 signature is on this unanimous written consent?

11 A    Stephen Aselage.

12 Q    If we turn to Bates No. 190, whose signature is on this

13 unanimous written content?

14 A    Steve Richardson.

15 Q    If we turn to Bates No. 191, whose signature is on this

16 unanimous written consent?

17 A    Cornelius E. Golding.

18 Q    And if we turn to Bates No. 192, whose signature is on

19 this unanimous written consent?

20 A    Jeffrey Paley, MD.

21 Q    Let's go back to Defense Exhibit 1167.  Let's go to the

22 top of the e-mail.  Is this an e-mail from Evan Greebel on

23 Friday, November 22, 2013, to Steve Richardson, S. Aselage,

24 neal@corneliusgolding.com, jsphealth@optonline.net, and Martin

25 Shkreli?

DOOLEY - DIRECT - DENERSTEIN                                      9997

1   A    Yes, with a cc to Marc Panoff.

2   Q    And what's the subject?

3   A    RTRX written consent.

4   Q    And is the -- what are the attachments described?

5   A    Unanimous written consent, repurchase plan, Shkreli

6   employment agreement, Shkreli employment agreement, Retrophin

7   stock purchase plan.

8   Q    And what does the e-mail state?

9   A    (Reading...)  Gentlemen, attached is a written consent

10  for Retrophin, Inc., for the approval of Martin's employment

11  agreement, and a repurchase agreement to be entered into with

12  Ladenburg Thalmann.  Also, attached for your review are copies

13  of Martin's employment agreement and the agreement with

14  Ladenburg.  Please sign the unanimous written consent and PDF

15  it to me.  If it is easier to fax, my fax number is.  If you

16  have any questions or comments, please call me.  Best regards,

17  Evan.

18  Q    Okay.  And is the attachment -- is the employment

19  agreement attached on page 973?

20  A    It is.

21  Q    Can we turn to Defense Exhibit 1294.

22  A    Yes.

23  Q    Is this neal@corneliusgolding on Saturday, November 23,

24  2013, e-mailing Evan Greebel, regarding the forwarded

25  Retrophin written consent?

DOOLEY - DIRECT - DENERSTEIN                          9998

1   A     It is.

2   Q     And what does he state?

3   A     "I agree with consent."

4   Q     Is this document number 2 on Defense Exhibit 9?

5   A     It is.

6   Q     Let's turn to Defense Exhibit 8983.  Is this from Steve

7   Richardson on Monday, November 25, 2013, to

8   evangreebel@kattenlaw.com to saselage@sbcglobal.net,

9   neal@corneliusgolding.com, jsphealth@optonline.net, and Martin

10  Shkreli, copying Marc Panoff?

11  A     It is.

12  Q     And can you just go to item -- read item -- the e-mail

13  states:  Evan, I hope you have a good Thanksgiving planned

14  this week.

15            Then can you skip and read item 2.

16  A     (Reading...)  With regard to the CEO agreement, a few

17  points.  It would have been preferable to have had the board

18  engage with the outside consultant preparing the compensation

19  strategy/plan for the company so we could see the alignment of

20  thinking with the CEO compensation, too.  I realize we need to

21  lock Martin's agreement, but we should accelerate the work

22  Marc is doing with the compensation consultant and get the

23  board engaged with it.  One specific language I call for under

24  3(b), at present, the bonus is left in a very vague form,

25  albeit at the board's discretion.  I would like to see

1    something along these lines added at the discretion of the

2    board based upon the specific goals and performance metrics

3    agreed from time to time with the CEO.

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Dooley - Direct/Ms. Denerstein*                    **10000**

1   Q     We can stop there.  Okay.  Let's go to Defense Exhibit

2   1295.

3         And let's go to the bottom e-mail on

4   Page 385 -- there you go.

5         Is that the e-mail you just read portions of?

6   A     It is.

7   Q     Can we go up one?

8         Is this e-mail from Marc Panoff back to Steve

9   Richardson, Evan Greebel --

10  A     Yes, it is.

11  Q     -- Aselage all the same people, Monday, November 25,

12  2013.

13        And what does Marc Panoff say?

14  A     Attached, please find the analysis performed by our

15  compensation consultants.

16  Q     And what does Mr. Richardson respond in the top e-mail?

17  A     Thanks for sharing this.  I am fine with the numbers in

18  the CEO's agreement.  Skewing it to medium/long-term value

19  creation is a strong message.  We can reward the short-term

20  achievements performance via the annual bonus.  Happy to sign

21  the consent once Evan makes the changes to the agreement that

22  I referenced to in my earlier e-mail.  Have a good

23  Thanksgiving.

24  Q     Let's go to Defense Exhibit 1296.  And let's go to the

25  second e-mail from -- there you go.

*Dooley - Direct/Ms. Denerstein*          **10001**

1          Blow that up, please.

2          Is this an e-mail from Evan Greebel to Steve

3  Richardson, marc@retrophin, Stephen Aselage, Neil Cornelius

4  Golding, jsphealth@optonline.net, and martin@retrophin.com?

5  A    It is.

6  Q    And is the date, Tuesday, November 26, 2013?

7  A    Yes, it is.

8  Q    What is written on the e-mail by Mr. Greebel?

9  A    Gentlemen, attached is a marked revise the draft of

10 Martin's employment agreement reflecting the change that Steve

11 requested to Section 3(b).  Also --

12 Q    Okay.  Let's stop there and just skip to the next

13 sentence.  "If the revised agreement is acceptable."

14 A    Please send me an e-mail confirming your approval.

15 Q    And the next sentence?

16 A    If you have any guess or comments, please cal me at

17 (212) 940-6383.

18 Q    And the next?

19 A    Best regards, Evan.

20 Q    What is the top e-mail from Mr. Aselage on November 26,

21 2013, to Evan Greebel and what does he state?

22 A    Approved.  You should have received the PDF of the

23 signature sheet yesterday.  Steve.

24 Q    Turning to Defense Exhibit 1298.  Going to the middle

25 e-mail.

*Dooley - Direct/Ms. Denerstein*                          *10002*

1          Is that an e-mail from Mr. Greebel that you read

2    previously parts of?

3    A    It is.

4    Q    Can we go to the top e-mail?

5          Is this an e-mail from Jeff Calais on November 26,

6    2013, to Evan Greebel.  The subject:  RTRX written consent?

7    A    It is.

8    Q    And does this -- by Retrophin written consent, does it

9    state input?

10   A    It does.

11   Q    And what does Mr. Calais respond?

12   A    I consent.

13   Q    Going to Defense Exhibit 1299.  The middle e-mail is the

14   date -- is the e-mail from neil@corneliusgolding.com sent,

15   Tuesday, November 26, 2013, to Evan Greebel Re: Forward RTRX

16   written consent input?

17   A    Yes.

18   Q    And what does Mr. Golding respond?

19   A    Evan:  Okay by me.  Thanks.

20   Q    Now, finally, going back to what we already have reviewed

21   which is Defense Exhibit 9016.

22          So do the four board of directors with the

23   exception -- do the four board of directors --

24          MS. DENERSTEIN:  Let me rephrase.

25   Q    Of the five directors, do four --

*Dooley - Direct/Ms. Denerstein*                    **10003**

1              Who is the person that doesn't sign the unanimous

2    written consent regarding the written employment agreement?

3    A    Martin Shkreli.

4    Q    Do all the other directors sign?

5    A    They do.

6    Q    And that document, Defense Exhibit 9016 is an approval of

7    the consent written consent to -- of Martin Shkreli's

8    employment agreement?

9    A    Yes, it is.  Among other things.

10   Q    Going back to Defense Exhibit 9.  Does this document --

11             Does Defense Exhibit 9 titled, "Martin Shkreli

12   Employment Agreement," contain the various documents we just

13   reviewed -- describe the various documents we just reviewed?

14   A    It does.

15   Q    Including the approvals from the various board members?

16   A    Yes.

17   Q    Okay.  I think we are done with this section.

18             Let's turn to Defense Exhibit 6-B for

19   identification.

20             Can you describe what this is?

21   A    It's a list -- it's a chart that lists when settlement

22   agreements are disclosed in certain SEC filings.

23             MS. DENERSTEIN:  Your Honor, at this time, the

24   defense would like to offer Defense Exhibit 6-B into evidence.

25             MR. KESSLER:  I object to it coming into evidence.

*Dooley - Direct/Ms. Denerstein*          **10004**

1    I don't object to it being used as a demonstrative.

2          MS. DENERSTEIN:  Your Honor, I would like to be

3    heard on this if possible.

4          THE COURT:  All right.  This is not something we've

5    already discussed extensively during conference.  If you must,

6    we'll hear from you.

7          Let's go to sidebar.

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                    *10005*

1          (Sidebar conference held on the record in the

2      presence of the Court and counsel, out of the hearing of the

3      jury.)

4          THE COURT:  Okay.  Did we talk about this one?

5          MS. DENERSTEIN:  This one is different from the ones

6      we've previously discussed because, one, these documents are

7      incredibly voluminous they're two binders so there's thousands

8      of pages.

9          Two, they -- it's not just a brief -- it's not just,

10     you know, the SEC filing document, it actually lists where the

11     disclosure of settlement occurs for each one.  So I think it's

12     entirely appropriate to be admitted because it's not just, you

13     know, to from who it's actually containing important

14     information about where in these documents that are very

15     voluminous as your Honor knows the settlement agreements are

16     disclosed.  So I think it's an entirely appropriate chart.

17         MR. KESSLER:  So that explains why it's a

18     demonstrative to show the jury where things are and not a

19     summary of voluminous records.  It's not a summary of

20     anything.  It's just a roadmap that the defense wants the jury

21     to have with it so the jury can find the pages that the

22     defense characterizes as settlement agreement disclosures to

23     take with and that's not appropriate under Rule 1006.  Fine,

24     it's a demonstrative.  I am not going to object to the

25     heading.  This is exactly what Rule 1006 is not meant to

*Sidebar*                                                      *10006*

1   allow.

2          We've had a 45-minute discussion about these charts

3   and the fact, you know, this chart originally didn't have this

4   column, so I wasn't going to object to it because it was just

5   like the others like a demonstrative.  Now, there's more in

6   here, it doesn't cure the problem, it makes worse makes, it's

7   very clear it's not a summary.

8          MS. DENERSTEIN:  I respectfully disagree.  These are

9   voluminous documents and there is -- it's very clear from each

10  of these, Liquidity and Capital Resources, actually disclosing

11  31 different things.  So I don't think it's entirely

12  appropriate, and your Honor has completely discretion.  Even

13  if it were a demonstrative to send back to the jury, courts

14  don't preclude that.  But I don't think it is.

15         I do think this is different from the other ones and

16  these are very voluminous records and it would aid the jury

17  and this goes to weight.  They're free to argue that the

18  disclosures are improper and that they don't agree with them

19  but they are in these documents that are incredibly weighty.

20         MR. KESSLER:  I'm not objecting to that, but the

21  fact that a document is long does not make something a §1006

22  summary exhibit.  A summary exhibit summarizes something,

23  that's not what this is.  You don't get to send your closing

24  slides back to the jury.  This is an argument about what is

25  being disclosed, how it's being disclosed, and where it's

*Sidebar*                                                   10007

1    being disclosed.

2         THE COURT:  I think it's sufficient, Ms. Denerstein,

3    since we spent a lot of time already discussing these types of

4    exhibits.  You can publish it, you can walk the witness

5    through it.  The jury has notepads, they can take notes.  But

6    it doesn't go back to the jury, doesn't get admitted as an

7    exhibit in evidence.  It's a published exhibit that is a

8    demonstrative and I think it would be inappropriate to

9    consider this exhibit as listing a summary of the contents of

10   the document because as you point out these form 10Ks and 10Qs

11   and S1s have a lot of other information.  So it's not really a

12   summary per se it's not, you know, it's a selective

13   highlighting of specific points within a document.

14        MR. KESSLER:  And, your Honor, while we're here,

15   just one planning thing so we don't have to talk about it at

16   the break.  We're down to maybe six or seven documents that we

17   disagree on.  So my suggestion was going to if we just come

18   back from wherever we break for lunch 15 minutes early or

19   20 minutes early, I don't think Ms. Denerstein is going to get

20   to these documents before lunch.

21        THE COURT:  I have a 1:00 o'clock conference, so I'd

22   like to break for lunch soon.  They've been here since 10:30

23   without a break so we can break now.

24        MS. DENERSTEIN:  That would be fine.

25        THE COURT:  And try to resolve the issues on these

*Sidebar*                                                    **10008**

1    additional documents.

2              Would now be a good time?

3              MR. KESSLER:  That's fine.

4              THE COURT:  I have a 1:00 conference.

5              MR. KESSLER:  Either way.  That's fine.  We can do

6    it now.

7              THE COURT:  We should give them their lunch break.

8              (Sidebar concludes.)

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                    *10009*

1          (Back in open court.)

2          THE COURT:  Members of the jury, we're going to

3    excuse you for lunch at this time.  I would say please be back

4    in the jury room at approximately 1:40 and we will resume.

5    Don't talk about the case and thank you for your ongoing

6    attention.

7          (Jury exits courtroom at 12:35 p.m.)

8          THE COURT:  Mr. Dooley, you can step off the witness

9    stand.

10         (Witness leaves the witness stand.)

11         THE COURT:  I prefer to do it now and the phone

12   conference can always be pushed back.  So come back as soon as

13   you can.  Thank you.

14         (A recess in the proceedings was taken.)

15         THE COURT:  Let's take care of these exhibits.

16         MR. KESSLER:  So we just eliminated another one from

17   issue.

18         THE COURT:  Just show me the ones or tell me the

19   ones that are an issue, please.

20         MS. DENERSTEIN:  Defense Exhibit 104-99 we had

21   started discussing with your Honor and that is one we are not

22   offering for the truth.

23         MR. KESSLER:  So we don't object on that basis.

24         THE COURT:  Okay.  So you'll allow it to be admitted

25   subject to the instruction.

*Proceedings*                                              *10010*

1             Okay.  What else?

2             MS. DENERSTEIN:  Then the next one, we actually

3    would be 1314 -- we already did that one.

4             THE COURT:  Defense Exhibit 1314.

5             MS. DENERSTEIN:  I'm sorry.  That one we already

6    did.

7             Do you have the next one, Mr. Kessler?

8             MR. KESSLER:  5458.

9             MS. DENERSTEIN:  Yes, that's next.

10            THE COURT:  Defense Exhibit 5458.

11            MR. KESSLER:  Correct.

12            THE COURT:  Are you guys using the mic?

13            MR. KESSLER:  Sorry about that.

14            MS. DENERSTEIN:  Okay.  Better?

15            THE COURT:  Yes.

16            MS. DENERSTEIN:  Okay.

17            MR. KESSLER:  Should we go through them one at a

18   time, or did we give you the list?

19            THE COURT:  Let's go one by one, isn't that what you

20   all wanted to do because I don't have them before me right

21   now.

22            MR. KESSLER:  They're all in Binder 4.

23            THE COURT:  Okay.  Thank you.

24            MS. DENERSTEIN:  And towards the end, your Honor.

25            THE COURT:  Okay.  5458.

1              MR. KESSLER:  It's most of the way to the end.

2              THE COURT:  Under tab what?

3              MR. KESSLER:  5458.

4              THE COURT:  H.

5              MR. KESSLER:  Oh, I'm sorry.  Yes.

6              THE COURT:  I'm just looking.

7              MR. KESSLER:  Yes, tab H.

8              THE COURT:  I'm sorry.  I'm just not seeing it.

9     Okay.  I've got to.  Sorry.

10             MR. KESSLER:  December 10th e-mail.

11             MS. DENERSTEIN:  It's short, fortunately.

12             THE COURT:  Yes, Defense Exhibit 5458.

13             MR. KESSLER:  So the objection is that the bottom

14    e-mail is Mr. Shkreli describing what he and others have

15    agreed to so it's hearsay.

16             MS. DENERSTEIN:  It's actually --

17             THE COURT:  Okay.  Go ahead.

18             MS. DENERSTEIN:  It's actually ends with a question.

19    Our hope is to -- so he's asking a question, which is not

20    hearsay, and then he's also describing what his thinking of

21    doing with respect to the Fearnow stocks.  So that goes to

22    Mr. Shkreli's state of Mind and it doesn't have to be offered

23    for the truth.  And then Mr. Greebel is simply responding to

24    Mr. Shkreli's questions which also go to Mr. Greebel's state

25    of mind which shows his understanding of his role and really

*Proceedings*                                    *10012*

1    his advice is that you need to talk to a tax accountant about

2    this, I don't know, I can't answer this.  So its effect on the

3    listener because Evan Greebel is explaining his understanding

4    based on what Mr. Shkreli has said.

5         MR. KESSLER:  Then I think we can redact the first

6    sentence in the bottom e-mail which is the one that's really

7    describing what other people thought.

8         MS. DENERSTEIN:  Well, without that, I don't think

9    the rest makes sense because it's in response to that.  And,

10   again, that can be not offered for the truth which we've been

11   doing lib really.

12        THE COURT:  Is this relevant to any of the charges

13   or defenses?

14        MS. DENERSTEIN:  Yes.

15        THE COURT:  It's asking about tax implications.

16   It's not a tax case.

17        MS. DENERSTEIN:  No, but it shows Mr. Greebel's

18   understanding of his role and his limited role as outside

19   counsel.  It's not to actually prove that Martin Shkreli's

20   question is related to tax planning as opposed to legal

21   advice.  It also, one, does have an effect on the listener,

22   Mr. Greebel, because the bottom e-mail goes to what his

23   understanding because Mr. Shkreli is telling him what they are

24   thinking of doing with the Fearnow stock and that is at issue

25   in this case.  So it's the effect on the listener.

*Proceedings*                                        *10013*

1        THE COURT:  It's being offered to show that

2   Mr. Greebel is performing his duties as an attorney and

3   telling him, go see a planner or a tax, you know, advisor.  It

4   does then make sense to strike the first sentence and leave

5   the question for Mr. Shkreli's, Can we pay bills this way with

6   pretax money, et cetera.  That last sentence would remain

7   because it's not hearsay.  And then Mr. Greebel's advice as

8   counsel to -- outside counsel -- is telling him to get tax

9   advice on this.

10        MR. KESSLER:  And so, we wouldn't object to that.

11   With that redaction, we wouldn't object.

12        THE COURT:  Let's take out that first sentence,

13   okay, you can use it.

14        MS. DENERSTEIN:  Your Honor, respectfully, we object

15   to removing that sentence because that's what A, Mr. Greebel

16   is responding to.  He can't respond to whether this is a

17   taxation event without having that first sentence.  And it's

18   Mr. Shkreli talking about his intent about what he's thinking

19   of doing with the Fearnow stock and that does have an effect

20   on the listener.  So I think it's directly relevant to Count

21   eight, so I think it should be included but not offered for

22   the truth just as we have with other documents.

23        MR. KESSLER:  Mr. Shkreli's describing what other

24   people agree to, that's my issue.  The point is to show tax

25   lawyering and doing lawyer work, then the content of the tax

*Proceedings*                                        **10014**

1    advice doesn't matter and the question and the advice should

2    suffice to make the point.

3              MS. DENERSTEIN:  He's referring to himself.  He

4    says, We were thinking, not they were thinking.

5              THE COURT:  So he's the lawyer.

6              MS. DENERSTEIN:  Yes.

7              THE COURT:  I don't think so.

8              MR. KESSLER:  So we won't object with the first

9    sentence.

10             THE COURT:  "Our hope is we were thinking can we pay

11   bills."  I mean, I think the first sentence of the Shkreli

12   e-mail is reflecting a discussion that he's had about how to

13   structure the Fearnow stocks.

14             MS. DENERSTEIN:  Which will definitely have an

15   effect on Mr. Greebel and that's who the e-mail is to.  He's

16   the listener.

17             MR. KESSLER:  The e-mail is being offered to show

18   tax advice.  The e-mail shows tax advice with or without the

19   hearsay sense.

20             THE COURT:  Right because when I asked you what the

21   relevance of this was and you said it was to show he's giving

22   Mr. Shkreli advice to seek tax expertise to straighten out

23   this question and he's not overstepping his own, you know,

24   role as outside counsel.  He's saying, look, go talk to a tax

25   expert on this, a personal accountant, tax planner.  I mean, I

1    don't know what you want me to say, that's my ruling.  You

2    don't have to offer it if you don't want to.

3              MR. KESSLER:  The next document is 1280 --

4              THE COURT:  Just to be clear, Defense Exhibit 5458

5    is going to be admissible if the defense wants to admitted to

6    with the first two sentences of Mr. Shkreli's e-mail redacted.

7              MR. KESSLER:  So the next document is 1283.  And we

8    will, my objection to 1283 is to hearsay, but I think a

9    not-for-the-truth instruction will satisfy that.

10             MS. DENERSTEIN:  That's fine.

11             THE COURT:  All right 1283.  Offered not for the

12   truth.

13             What else?

14             MR. KESSLER:  1306.  My objection is to the bottom

15   e-mail.  Again, it's being, I'm sorry, when the Court is

16   there.

17             THE COURT:  I'm there.

18             MR. KESSLER:  It's hearsay about what someone else

19   is asking Mr. Greebel.

20             MS. DENERSTEIN:  This goes to it's -- first of all,

21   it's not just someone else, it's Martin Shkreli and he's

22   talking about Marek Biastec, an alleged co-conspirator, and

23   they're asking about procedures and rule for bringing people

24   over the wall.  He also asks if a "Confi" is not in place,

25   confidential agreement.

*Proceedings*                                              *10016*

1          And Mr. Shkreli responds, there is a "confi" in

2     place for everyone.  That definitely has an effect on the

3     listener, so I'm not saying it's true, Mr. Shkreli's response.

4     I think it's not being offered for the truth.

5          But then Mr. Greebel's response is that's all that

6     matters because barring that we would have a different type of

7     regulatory issue, an FD issue, so this definitely goes to Evan

8     Greebel.

9          THE COURT:  What's an FD?  Financial disclosure?

10         MR. KESSLER:  Reg. FD.  It's an SEC regulation.

11         MS. DENERSTEIN:  Full disclosure.

12         THE COURT:  Okay.

13         MR. KESSLER:  So, your Honor, my objection is to the

14    bottom portion which is being offered for the truth to show

15    what Marek Biastec was doing if the relevance is to the fact

16    there was a statement that the confidentiality agreement is in

17    place and then otherwise there would be a Reg. FD issue then

18    the top two e-mails can come in without the bottom.

19         MS. DENERSTEIN:  I mean, I think we could if avoid

20    this issue if we took out, Marek is asking me, but just left

21    of the rest of the sentence because that makes -- this can't

22    be parsed that way with making any sense.  So I think if

23    that's your objection, we can get rid of those three words.

24         Is that acceptable?

25         MR. KESSLER:  I don't think it's necessary to have

*Proceedings*                                              10017

1   any of it because I think the information is conveyed.  But I

2   prefer that to the entire hearsay coming in.

3              THE COURT:  So this would read -- you're taking out.

4              MS. DENERSTEIN:  Marek is asking me.

5              THE COURT:  The first four words.  It'll read, About

6   procedures/rules for bringing people over the wall.  And then

7   delete, He also asked.

8              MR. KESSLER:  That makes sense.

9              THE COURT:  What happens if a "Confi" is not in

10  place?

11             Does that work.

12             MR. KESSLER:  That's fine.

13             MS. DENERSTEIN:  We'll do that.

14             THE COURT:  First four words of Mr. Greebel's e-mail

15  dated December 31st sent at 1:47 p.m. will be redacted from

16  the first sentence.  And then, with regard to the second

17  sentence, we're redacting the first three words of the same

18  e-mail, all right?

19             MR. KESSLER:  So next is 1325 "confi."

20             THE COURT:  And I trust the Government if they are

21  asking for a limiting instructions --

22             MR. KESSLER:  I will say something.

23             THE COURT:  -- they will ask.

24             MR. KESSLER:  So 1325 is an e-mail chain between

25  Mr. Greebel and Mr. Tilles about someone named Harley Lippman

*Proceedings*                                    10018

1    who appears to work at a company named Genesis 10.  So aside

2    from some of the e-mails in here being hearsay it's not

3    relevant.

4              THE COURT:  Proffer of evidence, please.

5              MS. DENERSTEIN:  This is admissible to show the fact

6    that Evan Greebel received Mr. Tilles' request who is also an

7    alleged co-conspirator, so I think he is relevant.  And his

8    request about a certain investment and Mr. Greebel is saying

9    in response that Mr. Tilles' characterization of the

10   investment is not correct.  And it's admissible to show Evan's

11   understanding of which entity -- his understanding, not for

12   the truth his understanding -- of which entity would have

13   issued the shares to this individual who invested a hundred

14   thousand dollars.  I mean, I don't care about the name of the

15   individual, but what I care about is being able to show that

16   it reflects Mr. Greebel's understanding and his state of mind

17   about what this investment should be, not that it's correct.

18             MR. KESSLER:  Mr. Lippman's investment is obviously

19   not relevant to this case, so that generic -- the importance

20   of the generic understanding is not clear to me.

21             MS. DENERSTEIN:  Mr. Tilles e-mailing Evan Greebel

22   as counsel asking him about what this investment -- Mr. Tilles

23   is explaining to Evan what his understanding of the investment

24   is, and Evan Greebel is responding saying what his

25   understanding is.  They're both alleged to be co-conspirators,

*Proceedings*                                                    *10019*

1    so I think it's entirely appropriate.

2             MR. KESSLER:  It's about Mr. Lippman's investment

3    which isn't at issue.

4             MS. DENERSTEIN:  I'm happy to redact that.

5             MR. KESSLER:  The suggestion will be about an

6    investment that might be at issue.

7             THE COURT:  I think it's going to make for a

8    confusing record.  One, if you leave Mr. Lippman's name in,

9    the jury is going to wonder who he is and whether he's part of

10   the allege conduct.  And if you leave it out, they're going to

11   assume that it has to do with one of the other investors whose

12   names have been published to the jury.  I'm just not sure why

13   this particular investment is at all relevant to anything.

14            Mr. Greebel does seem to be focused on the date of

15   the investment and how it should be classified, but I don't

16   even know whether there is an issue regarding stock

17   classification in this case, so I'm not sure why it's relevant

18   at all.

19            (Continued on the next page.)

20

21

22

23

24

25

Proceedings                                    10020

1           MS. DENERSTEIN:  I think it is an example of

2    Mr. Greebel trying to correct misinformation that is sort

3    of, for example, Mr. Tilles for sloppy paperwork and

4    Mr. Greebel, what was his understanding of what would have

5    to be true for this to be in that document.  So I think,

6    again, it goes to Mr. Greebel's state of mind and it shows

7    him giving advice and saying he could not have invested in

8    Series A preferred on that day, they were not selling

9    Series A preferred.  If they had already done the merger, he

10   would have had to have invested it.

11          THE COURT:  How do we advise the jury that this is

12   not in the case?  This is not one of the investors that

13   matters in this case, this transaction is not charged and

14   it's not part of the defense.

15          I am just concerned that they are going to get all

16   confused and maybe read more into it than they should --

17          MS. DENERSTEIN:  Your Honor --

18          THE COURT:  -- about why.

19          MS. DENERSTEIN:  We can move on, Your Honor.  We

20   will respect the Court's ruling.

21          THE COURT:  Okay.  13.5 then are not being

22   admitted?  I am just asking questions.

23          MS. DENERSTEIN:  No, I know.

24          THE COURT:  I don't want to proffer.

25          MR. KESSLER:  The next is 1315?

```
                        Proceedings                    10021
```

1              THE COURT:  Okay.

2              MR. KESSLER:  And so objection to two portions,

3     that's hearsay, first.

4              THE COURT:  Oh, I have a status conference right

5     now.  Are they outside?

6              (Pause in proceedings.)

7              MR. KESSLER:  We can just take a break.

8              THE COURT:  Do you think you have ten more minutes

9     left?

10             MR. KESSLER:  I think we are almost done.

11             THE COURT:  Okay.  1315.

12             MR. KESSLER:  So there's two hearsay portions.  At

13    the bottom of the first page there is Mr. Greebel describing

14    a conversation with Mr. -- with Corey, I assume that's Corey

15    Massella from the context.

16             And then the e-mail and then the second to the top

17    e-mail.  There is an e-mail from Mr. Shkreli that says been

18    in the close contact with them since -- I think he's

19    referring to Board of Directors.  And so we are objecting to

20    that as hearsay to the extent it is being offered to show

21    that Mr. Shkreli was in contact with the Board.

22             MS. DENERSTEIN:  Your Honor, two things.  First of

23    all we would agree to redact the part that Mr. Kessler has

24    proposed on the bottom e-mail, getting rid of the, Corey, we

25    thing, blah, blah, blah.  We can just redact that.

Proceedings                                        10022

1           This e-mail you send your Board an e-mail update

2   when you get a chance to reflect Mr. Greebel's plan and

3   understanding, which I know you are not objecting to.  And

4   then Mr. Shkreli's response if critically important, not for

5   the truth because it is what he's telling Mr. Greebel.

6   Whether he did it or not, who knows, but he is telling

7   Mr. Greebel, I've been in close contact with him so there is

8   no need to do anything else.  And Mr. Greebel's response is

9   reflecting the effect it has on him as a listener.  He says,

10  even better.  So I actually think it is critically important

11  that this comes in.

12          MR. KESSLER:  That is fine.  We can just do that

13  not for the truth.

14          THE COURT:  I will admit the Defense Exhibit 1315.

15          (Defendant's Exhibit Number 1315 so marked and

16  received in evidence.)

17          MR. KESSLER:  1315.

18          THE COURT:  Just not for the truth.

19          MR. KESSLER:  So next --

20          THE COURT:  And with redactions, sorry.

21          MR. PITLUCK:  So next is 1010.

22          THE COURT:  Okay.

23          MR. KESSLER:  This is an e-mail from Mr. Shkreli

24  to Mr. Vaino and Mr. Greebel attaching an employment

25  agreement in March of 2013.  So to the extent this document

Proceedings                                     10023

1   has any relevance, I imagine it would be to try to show that

2   Mr. Vaino entered into a employment agreement in March of

3   2013, and so this would be hearsay.

4              MS. DENERSTEIN:  And, Your Honor, our response is

5   this is a verbal act.  It is a document that reflects terms

6   about an employment agreement.  And as you know Mr. Vaino is

7   also an alleged co-conspirator.

8              MR. KESSLER:  So it is not signed.  It is not an

9   executed document.  It does not have any legal force.  It is

10  talking about Mr. Shkreli but not by Mr. Vaino, so it is not

11  a legal document.

12             If it is being offered for the fact that this

13  document existed, the relevancy is to be attenuated.

14             MS. DENERSTEIN:  I mean, I can state a relevance

15  as to Mr. Vaino's employment throughout this whole time

16  period that is at issue.  I do not think it is attenuated.

17  One of the Government's allegations is that Mr. Vaino's

18  firing was fake and obviously the defense disputes that.  So

19  I think it is entirely appropriate for it to come in.

20             Again, not as for the truth of the matter asserted

21  but under the relevance of --

22             THE COURT:  What if we just committed the top

23  e-mail, wouldn't that have the same effect?

24             MS. DENERSTEIN:  I am sorry, meaning what?

25             THE COURT:  That Mr. Shkreli is enclosing and

Proceedings                                    10024

1    sending to Mr. Vaino and Mr. Greebel the Vaino executed

2    self-evident agreement.  Just the top e-mail.

3              MR. KESSLER:  I think frankly, Your Honor --

4              THE COURT:  Forget all the other stuff that is

5    from Martin to his sister and Michael Smith.  Mr. Greebel is

6    not on it.

7              And then his sister forwards it to Mr. Shkreli and

8    Mr. Smith.  Mr. Greebel is not even in the second and third

9    e-mail, and you would admit the first e-mail, which is the

10   one that Mr. Greebel is copied and he has given an executed

11   self-evident agreement with Mr. Vaino.

12             MR. KESSLER:  Okay.

13             THE COURT:  Doesn't that achieve what you want?

14             MS. DENERSTEIN:  Well, that is acceptable to the

15   defense.

16             MR. KESSLER:  That is okay.  And then just two

17   flags for the parties.  I think we will have a few documents

18   also related to Mr. Vaino in this time period that we will

19   offer either on cross or rebuttal, and we will try to talk

20   them through with defense first.  But under the

21   understanding that all these hearsay communications about

22   Mr. Vaino are coming in to some extent.  We may have some to

23   offer.

24             THE COURT:  All right.  So 1010 will be admitted

25   as exception.

```
                        Proceedings                    10025
```

1             (Government's Exhibit Number 1010 so marked and

2    received in evidence.)

3             MR. KESSLER:  And then 1317.

4             THE COURT:  Okay.

5             MR. KESSLER:  So this is -- did I skip something?

6             MS. DENERSTEIN:  One second.

7             (Pause in proceedings.)

8             MS. DENERSTEIN:  One second, Your Honor.  Sorry.

9             MR. KESSLER:  We have multiple lists that we are

10   all trying to --

11            MS. DENERSTEIN:  We are trying to narrow it.

12            MR. KESSLER:  -- all be on the same page.

13            THE COURT:  I've got so many copies floating

14   around.

15            MS. DENERSTEIN:  So we are skipping it?

16            MR. KESSLER:  All right.  We are skipping 1317.

17            MS. DENERSTEIN:  Narrow the list even more.

18            MR. KESSLER:  And then I think the last one is

19   1307 which is actually much more focused -- in the binder.

20            THE COURT:  So you're skipping 1317?

21            MR. KESSLER:  No.  Skipping in the sense that the

22   defense is not offering it.

23            THE COURT:  Okay.

24            MR. KESSLER:  So there is no need to discuss it.

25            THE COURT:  Okay.  So now we are going to

Proceedings                                    10026

1   Defendant's 1307.

2            MR. KESSLER:  That is correct.  And that is

3   actually ahead of -- it is right --

4            (Pause in proceedings.)

5            MS. DENERSTEIN:  I don't have that.

6            MR. KESSLER:  It is behind Tab E.

7            MS. DENERSTEIN:  Your Honor, we can just hand you

8   up one.

9            THE COURT:  I have to it.  Okay.

10           MR. KESSLER:  So, Your Honor, this is an e-mail

11  from Mr. Greebel to Clifford Brandeis, B-R-A-N-D-E-I-S.

12  Mr. Brandeis is Mr. Kevin Mulleady's lawyer in a

13  litigation -- this is the prelitigation stage, I think.

14  Mr. Brandeis is Mr. Mulleady's lawyer, and ultimately

15  Mr. Mulleady engages in all sorts of settlement agreements

16  with the company.  There are drafts with the plaintiff

17  circulated.  There is a whole sort of sideshow related to

18  Mr. Mulleady's litigation.  So that is my first objection.

19           But the second and more fundamental objection,

20  this email is entirely hearsay.  We are accounting

21  Mr. Greebel's conversations with Mr. Mulleady, what

22  Mr. Mulleady was doing, what Retrophin proposes to do.  Who

23  can access whose computer.

24           THE COURT:  So is this representation about

25  Retrophin asking him to do this or Retrophin wanting him to

1    do that?

2              MS. DENERSTEIN:  So --

3              THE COURT:  Is that --

4              MS. DENERSTEIN:  I am sorry.

5              THE COURT:  Is that Retrophin itself, the other

6    Board or is it Mr. Shkreli?

7              MR. KESSLER:  Nothing in the record one way or

8    another.

9              MS. DENERSTEIN:  Your Honor, I think this is

10   Mr. Greebel calling Mr. Brandeis, I mean writing to

11   Mr. Brandeis and it reflects Mr. Greebel's understanding of

12   the share.  And again, it is not necessarily offered for

13   truth, but as Your Honor knows, Mr. Mulleady is alleged to

14   be a co-conspirator on Count 8.  And here Mr. Greebel is

15   saying -- it is not offered for the truth, it goes to

16   Mr. Greebel's state of mind that his understanding is that

17   he would surrender claims to receive additional shares of

18   Fearnow and Retrophin will facilitate those shares.  I think

19   we can redact the other -- I don't think the second

20   sentence, Also understand the company -- we would be happy

21   to redact that sentence.

22             But I do think that this is important to show that

23   Mr. Greebel's state of mind and his understanding.  Again,

24   not offered for the truth.

25             MR. KESSLER:  The problem is, this is recounting

```
                          Proceedings                      10028
```

1   conversations and various facts.  It is going to be taken as

2   true.

3               MS. DENERSTEIN:  I think an instruction and given

4   all the other documents that we can cure that.

5               MR. KESSLER:  But I think this is exactly the kind

6   of document that cannot be cured by that.

7               THE COURT:  What if we redacted all those

8   sentences from the first paragraph except the last sentence?

9               MR. KESSLER:  So that is just a request --

10              THE COURT:  Uh-huh.

11              MR. KESSLER:  -- in other words?

12              THE COURT:  Then all the hearsay is out because

13  what the e-mail describes is conversation with Mr. Mulleady.

14  Does that work?

15              MS. DENERSTEIN:  It works.

16              MR. KESSLER:  Yes.  That is fine.

17              MS. DENERSTEIN:  We are done.

18              MR. KESSLER:  I think that is it.

19              MS. DENERSTEIN:  Yeah.

20              THE COURT:  Just a second.  Then the second

21  paragraph also reflecting an understanding that Mr. Greebel

22  has from somebody.

23              MR. KESSLER:  I think the defense agreed to redact

24  that.

25              MS. DENERSTEIN:  Yes.  We will redact that.

```
                          Proceedings                    10029
```

1          THE COURT:  Okay.  The second paragraph is coming

2     out?

3          MS. DENERSTEIN:  Yes.

4          THE COURT:  That is it.

5          MR. KESSLER:  I think we should redact the if you

6     have any questions.  We can leave if you have any questions,

7     but if you would like to discuss the assignment of stock or

8     the computer issue, the reference to the computer issue

9     is no longer going to make sense because we have taken out

10    the computer issue.

11         MS. DENERSTEIN:  I think we can redact the

12    computer issue but the remainder should just remain because

13    it is basically if you have --

14         THE COURT:  So it will read what, please.

15         MS. DENERSTEIN:  If you have any questions or

16    would like to discuss either the assignment of stock, please

17    call me at (212) 940-6383 and we would redact or the

18    computer issue.

19         THE COURT:  All right.  What about also either

20    just because it does not make sense grammatically.

21         MR. KESSLER:  Yeah.

22         MS. DENERSTEIN:  Of course.  It is nice to be

23    grammatically correct.

24         MR. KESSLER:  And, Your Honor, just so the Court

25    understands where we are, I think Mr. Dooley has some time

Proceedings                              10030

1    left.

2              MS. DENERSTEIN:  Maybe an hour.

3              MR. KESSLER:  And then we intend to do a

4    cross-examination of Mr. Dooley.  I do not think that will

5    be long.

6              I also think it is possible that any documents we

7    would want to admit as either a part of the cross or as a

8    potential rebuttal could be admitted through Mr. Dooley.  We

9    are going to try to figure that out.  If, in fact, the

10   defense rests and, in fact, we do want to put on a brief

11   rebuttal case, it would at this point be to admit a few

12   documents and we will have a witness ready to go at any

13   point this afternoon to do that.  So we'll try to avoid that

14   if we can, but...

15             MS. DENERSTEIN:  Your Honor, as I said last Friday

16   when we were here and quite productive, it would be really

17   helpful if it is six or eight documents, at this point

18   the Government has had what we intend to admit for quite

19   some time and I don't imagine that this is -- I cannot

20   imagine that they are just figuring this out right now.  So

21   I think the sooner they could share the documents with us.

22   I know this jury has been so patient with all of us and we

23   would like to just get this done quickly and I don't want to

24   have a huge sidebar at the break if we can just look at them

25   and figure it out.

```
                        Proceedings                  10031
```

1          MR. KESSLER:  We will work it out.

2          MS. DENERSTEIN:  But that was also on Friday what

3    was said.

4          THE COURT:  Yeah, give it to them if you can,

5    please.

6          Are we prepared to sit next week?  I don't know

7    whether the jurors will be but...

8          MR. KESSLER:  I think if -- permit my pause.  If

9    the jurors were deliberating next week we would have some

10   accommodation of people who could be hear and address notes.

11   You know, I think there is obviously a bigger question about

12   the jurors' schedules and that thing, but I think maybe that

13   is something we should address at end of the day.

14         THE COURT:  Yeah.  I think at some point we are

15   going have to talk to the jurors depending on where we are

16   in our timing.  I don't want the jurors to feel rushed in

17   their deliberations but, you know, whether we are going to

18   end up losing everybody next week and having a mistrial or

19   whether they are willing to come back week after next.  I

20   don't know what the situation will be.  But I feel very

21   uncomfortable about where we are right now given how long

22   this is going on and I just want to make sure that the

23   jurors have plenty of time to deliberate.  So you should

24   maybe talk about this and figure out what we are going to

25   tell the jurors at the end of the week.

Proceedings                                    10032

1          MR. KESSLER:  I think everyone shares the same

2    concern and so we will try to figure out a unified stance on

3    what we should be telling the jurors and whatnot.

4          THE COURT:  Okay.  Thank you.  I'll see you very

5    shortly.

6          (Lunch recess taken at 1:21 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    10033

1              A F T E R N O O N   S E S S I O N

2          (In open court; outside the presence of the jury at

3     1:53 p.m.)

4          THE COURT:  We hope to post up the third version of

5     the charges and the verdict sheet within the hour or less.

6     And that will give you plenty of time to prepare for the

7     closings, which may start as soon as tomorrow.

8          MR. DUBIN:  Will the updated version have the

9     Court's ruling on the withdrawal of Count Seven?

10         THE COURT:  Yes.

11         MR. DUBIN:  Okay.

12         THE COURT:  Withdrawal of the backdating scheme.

13    Yes, we didn't use the term backdating scheme because we

14    looked through the transcripts and didn't see any specific

15    reference to it, it wasn't called that.  So we just used the

16    descriptor, the descriptive language.  And Mr. Tata will send

17    the parties a black line so you can see what the changes are.

18         MR. DUBIN:  Thank you, your Honor.

19         MR. PITLUCK:  Judge, just in terms of scheduling and

20    notification, we had a chance to confer and I think based on

21    our reasonable interpretation of schedule and timing going

22    forward we think it's likely that the jury will be charged by

23    Thursday afternoon; I'm looking at Mr. Dubin for confirmation.

24         Obviously things can change, your Honor, but that's

25    what we mutually think is foreseeable, what we're all working

Proceedings                    10034

1    towards, including likely starting summations tomorrow

2    morning.

3              Given that, we would like to, as the Court

4    indicated, tell the jury that there is the, at least the

5    possibility, that they will have the case and their

6    deliberations may extend into the following week.  We would

7    like to carefully come up with language that says that they

8    can, but don't have to, or that they can but they don't have

9    to, resolve it before of Christmas, but they can deliberate

10   the next week.  And then suggest that we are planning on

11   sitting the week starting after Christmas on the 26th, that

12   week.  Obviously, Judge, if anybody has conflicts we don't

13   want to lose the jury because someone says I'm traveling the

14   26th, 27th.  We can amalgamate that and see what the

15   likelihood is to get the jury in for a few days, two days or

16   all four days next week.  We had a pretty solid jury, we

17   haven't lost many people recently.  We're now talking about

18   the week after Christmas.

19             I think obviously if nobody is available our

20   preference at least would be have them come back the second

21   rather than lose the entire jury and have to do this all over

22   again.  I think we need to know.  It's better to notify them

23   today that that's a possibility.

24             THE COURT:  All right.  I have a plea that the

25   parties want to do before me on Thursday, a two-hour plea, and

*Rivka Teich, CSR, RPR, RMR  -  Official Court Reporter*

Proceedings                              10035

1   some of the parties and lawyers are coming from abroad.  We're

2   trying very hard to move it, Ms. Jackson will do her best.

3            MR. PITLUCK:  The afternoon on Thursday?

4            THE COURT:  I believe so.

5            MR. PITLUCK:  There is a possibility they may be

6   charged and deliberating on Thursday.

7            THE COURT:  If there is an hour-and-a-half plea, and

8   there is a note from the jury, it's hard to interrupt a plea

9   and it's hard to keep the jury waiting with a response.

10            We're trying to push it off until hopefully

11   mid-January when this case will be over.

12            MR. PITLUCK:  So that's our thought on scheduling

13   and informing the jury.

14            THE COURT:  Would you rather wait until the end of

15   the day or did you want to come up with language, or what do

16   you want to do?

17            MR. PITLUCK:  I think it probably makes sense to

18   wait until the end of the day.  If there is something that

19   comes up, there is an outstanding issue, that would throw that

20   timing off.

21            MR. DUBIN:  We're in agreement with the Government

22   on this and we'll work together to come up with language, your

23   Honor.

24            THE COURT:  We have a continuing resolution that

25   expires this Friday, same issues.  We're hoping it will be

Dooley - Direct - Denerstein                    10036

1  extended through January 19, but we've just been given notice

2  of the possibility.  We don't plan to shut down in any event.

3          Was the defense offering Defense Exhibit 3A and

4  Defense Exhibit 110-47?

5          MS. DENERSTEIN:  The consulting one, I don't think

6  so.

7          THE COURT:  110-47 looks like --

8          MS. DENERSTEIN:  Yes.

9          THE COURT:  Any issue on this one?

10          MR. KESSLER:  Just the same.

11          MS. DENERSTEIN:  That one is --

12          MR. KESSLER:  That one, I actually -- is a chart.

13          THE COURT:  110-47, so it will be admitted without

14  objection.

15          You'll formally offer it?

16          MS. DENERSTEIN:  Yes.  Do you want us to get

17  Mr. Dooley?

18          THE COURT:  Yes, please.

19          (Whereupon, the witness resumes the stand.)

20          (Jury enters the courtroom at 2:03 p.m.)

21          THE COURT:  All jurors are present.  Have a seat.

22          You may resume your direct.

23  DIRECT EXAMINATION

24  BY MS. DENERSTEIN:

25  Q    Mr. Dooley, do you have Defense Exhibit 6B --

Dooley - Direct - Denerstein                    10037

1   A     I do.

2   Q     -- for identification.

3          MS. DENERSTEIN:  Your Honor, at this time the

4   defense would offer Defense Exhibit 6B as a demonstrative aid

5   subject to your Honor's prior ruling.

6          MR. KESSLER:  No objection to that.

7          THE COURT:  All right.  We will allow Defense

8   Exhibit 6B to be published to the jury as a demonstrative

9   exhibit.

10          (Defense Exhibit Number 6B so marked and received in

11   evidence for demonstrative purposes only.)

12   BY MS. DENERSTEIN:

13   Q     Mr. Dooley, can you explain what this is?

14   A     It's a chart similar to the other charts that we've

15   discussed.  This chart is focused on the disclosure of

16   settlement agreements in various SEC filings.

17   Q     So can you take us across the first row, for example?

18   A     Sure.  The exhibit number of the particular document, the

19   date of the document, the description of the document, where

20   within the document the settlement agreement is disclosed.

21   Q     Over what period of time does this cover?

22   A     September 2013 through March 2014.

23   Q     How many times were there disclosures about settlement

24   agreements based on this document?

25   A     In eight documents, and I believe it was 27 times in

Dooley - Direct - Denerstein                    10038

1    various eight documents.  Twenty-nine, if I did my math right

2    -- 27.

3    Q    Okay.  Let's turn to Government's Exhibit 968, walk

4    through one or two examples, then move on.

5             So turning to Government's Exhibit 968, which in

6    binder two.

7    A    Yes.

8    Q    What is the first page?

9    A    It's a form 10K-A amendment number one for Retrophin Inc.

10   For the transition period March 1, 2012, through December 31,

11   2012.

12   Q    Is that captured in the first three columns of this chart

13   in row one?

14   A    In row one of the chart, Exhibit GX968, is the first line

15   on the chart.

16   Q    So then turning to settlement agreement disclosure, can

17   we go to the section liquidity and capital resources, page

18   seven of 39, go down to in the second quarter.  Is this

19   language similar to language you read previously?

20   A    Yes, it is.

21   Q    Now, Mr. Carter, could we go to note two, liquidity and

22   financial condition and management's plans, page 24 of 39, and

23   go down in the second quarter.  Again, is this language

24   similar to language you've previously read to the jury?

25   A    Yes, it is.

Dooley - Direct - Denerstein                    10039

1   Q    Mr. Carter could we turn to three, note 12, subsequent

2   events page 39 of 39, it's the top paragraph.  This language

3   similar to language you previously read disclosing settlement

4   agreement?

5   A    Yes, it is.

6   Q    And so let's go to the next column, on Defense Exhibit

7   6B, so it states Defense Exhibit 116-80?

8   A    Yes.

9   Q    What date?

10  A    September 13, 2013.

11  Q    What form?

12  A    Form 10Q amendment number one for Retrophin Inc. For the

13  period March, quarterly period March 31, 2013.

14  Q    Can you please read the box completed under settlement

15  disclosure?

16  A    Liquidity and capital resources, page 30 of 36.  Note

17  three, liquidity financial condition and management plan, page

18  12 of 36.

19  Q    Is that where there would be language about settlement

20  disclosures?

21  A    Yes.

22  Q    Referring to Defense Exhibit 116-81, what is the date?

23  A    September 13, 2013.

24  Q    What is the description?

25  A    Form 10Q Retrophin Inc. For the quarterly period June 30,

Dooley - Direct - Denerstein                    10040

1    2013.

2    Q    Referring to the final column, in places where there is

3    1, 2, 3 does that describe locations within the document where

4    settlement agreements were disclosed?

5    A    Yes.

6    Q    Go to the next column please, with respect to Defense

7    Exhibit 8432, what date is that filed?

8    A    September 13, 2013.

9    Q    What is the description?

10   A    It's the Form S1 amended for Retrophin Inc. Registration

11   statement with the SEC.

12   Q    In the fourth column, where there are numbers one through

13   four, is that places where the settlement agreements with

14   disclosed?

15   A    Yes.

16   Q    And on, or there is reference to them, with respect to

17   the next column -- next row GX972?

18   A    That I might need some help finding, counsel.

19   Q    In binder three.

20   A    Got it.

21   Q    Just referring to Defense Exhibit 6B --

22   A    Yes.

23   Q    -- the chart.  What is the date of the exhibit

24   Government's Exhibit 972?

25   A    November 12, 2013.

Dooley - Direct - Denerstein                    10041

1    Q    The description?

2    A    Form 10Q for Retrophin Inc. For the quarterly ended

3    September 30, 2013.

4    Q    And again, are the numbers one, two, three in the fourth

5    column, do they refer to settlement disclosures?

6    A    They do.

7    Q    And again, if we keep going through this chart

8    Government's Exhibit 978, Defense Exhibit 116-52 and Defense

9    Exhibit 116-102, are these also forms that were filed with the

10   SEC?

11   A    They are.

12   Q    If you go to the fourth column do they also have numbers

13   and pages stating where disclosure about settlement agreements

14   would occur?

15   A    Correct.

16   Q    Let's turn back to binder three -- I meant binder two.

17   If we could turn to Defense Exhibit 1285, is this an e-mail

18   between Evan Greebel and Martin Shkreli on March 14, 2013, and

19   the subject is S1?

20   A    I'm not there yet.

21   Q    Sorry.  In the front of binder three -- I'm sorry, I said

22   two, I meant three.

23   A    Yes.

24   Q    Is this an e-mail between Evan Greebel and Martin Shkreli

25   on March 14, 2013 regarding the S1?

Dooley - Direct - Denerstein                    10042

1   A    Yes, it is.

2   Q    Can you read the text please?

3   A    "As discussed, the S1 is done.  I just reviewed the

4   rights agreement if the S1 is not filed by tomorrow we will

5   owe the investors 2 percent of the amount raised for every 30

6   days that it is late with a cap.  And such amount is prorated

7   if filed within the 30-day period.  In addition, if the S1 is

8   not declared effective within four months of the pipe closing,

9   then the warrant may be cashless exercised i.e. the warrant

10  holders do not have to pay the company more money to invest

11  rather they will receive less shares."

12  Q    Can we turn to Defense Exhibit 1289, can we go to the

13  bottom of the page, to the first e-mail.  Is this an e-mail

14  from Evan Greebel on July 31, 2013, to Martin Shkreli and Marc

15  Panoff and the subject is Mike Smith employment agreement?

16  A    It is.

17  Q    What does the e-mail state?

18  A    "Attached is the draft of Mike Smith's employment

19  agreement."

20  Q    Can we go to the next, is this another is this an e-mail

21  from Evan Greebel to Martin Shkreli on August 13, 2013?

22  A    It is.

23  Q    And what does it state?

24  A    "FYI, as discussed the option portion needs to be

25  approved by the Board," BD.

Dooley - Direct - Denerstein                    10043

1    Q    Can we go to the next e-mail please.  Is this an e-mail

2    from Martin Shkreli to Steve Richardson, Steve Aselage,

3    copying Evan Greebel dated August 13, with the subject line

4    forward Mike Smith employment agreement?

5    A    It is.

6    Q    What does that state?

7    A    "I wanted to offer options to one of my hardest working

8    guys, Michael Smith.  He has been at Retrophin for one year

9    and is one of the most loyal, hard-working people I've met.

10   Please let me know if you agree."

11   Q    Can you go to the next e-mail in the chain, from Steve

12   Richardson to Martin@R?

13              (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q    And what is the date?

2    A    January 17th, '13.

3    Q    And what does the first paragraph state?

4    A    Retrophin NASDAQ RTRX is a thinly covered

5    pharmaceutical company that carries, in my opinion,

6    tremendous upside potential.

7    Q    And what does the next sentence state?

8    A    The company has four drugs in the pipeline with one

9    RE-021 being in Phase 2 trials.

10    Q    And what does the third paragraph first sentence state?

11    Just give Mr. Carter one minute to catch up.

12    A    Retrophin was founded by a businessman with a history

13    in markets that has a passion for Pharma, has followed it

14    for years and over those years has come to understand how

15    the science of big Pharma works as well as the business

16    itself.

17    Q    Let's then go to the last paragraph.  Can you please

18    read that?

19    A    It was only a matter of time before Shkreli was

20    managing his own hedge funds under MSMB, a company founded

21    by Shkreli and his partner Martin Biestek --

22    Q    Marek Biestek?

23    A    Excuse me, Marek Biestek.  Marek Biestek from the roots

24    of MSMB came what equated to a potential with the

25    development of a drug RE-021 that would be the basis for the

Dooley - Direct - Denerstein                    10045

1    creation of Retrophin.  Shkreli formed Retrophin and to this

2    day owns half of the shares of the company.  That is another

3    important factor as investors considered this company.

4    Q    Can we turn to Defense Exhibit 1071.

5              Is this also from Seeking Alpha?

6    A    Yes, it is.

7    Q    And what is the title?

8    A    Retrophin, a new player in the orphan and ultra-orphan

9    drug spaces.

10   Q    And what is the date?

11   A    August 25th, '13.

12   Q    And can you read the first sentence?

13   A    Biotech companies developing and marketing orphan and

14   ultra-orphan drugs have done exceptionally well in 2013 and

15   in recent years.

16   Q    Can we go to the next paragraph?

17   A    One company on few investor's radar is Retrophin NASDAQ

18   RTRX developing an ultra-orphan drug for disease known as

19   PKAN, P-K-A-N, Patothenate kinase-associated

20   neurodegeneration.

21   Q    That's greet.

22             Let's go to Exhibit 1072.

23             What publication is this?

24   A    Forbes.

25   Q    And what is the date?

1    A    December 12, 2013.

2    Q    And what is the title?

3    A    Can the trust hormone make it as a treatment for

4    schizophrenia and autism.

5    Q    And what does the first sentence state in the article?

6    A    Martin Shkreli, the 30-year-old hedge fund manager

7    turned biotech CEO, is curled up in a chair in his 22nd

8    floor Manhattan offices looking like a teenager with his

9    shaggy hair, red Polo and bright blue sweater cardigan.

10   Q    Can we turn to the second page of 207.  Going to that

11   first paragraph in the middle where it says, This morning?

12   A    Yes.

13             MS. DENERSTEIN:  Can you pull that up.

14   Q    Can you read that, please?

15   A    This morning Shkreli's company Retrophin is announcing

16   that it has purchased the U.S. rights of the drug known by

17   the brand name of Syntocinon from Novartis for $5 million

18   plus a 20 percent royalty.

19   Q    And can you go to the next paragraph, read the first

20   couple sentences, please.

21   A    That is not the big opportunity Shkreli is eyeing,

22   though.  He plans to test the nose spray Oxytocin as a

23   schizophrenia drug.  Retrophin is also announcing a

24   100-patient clinical trial testing Syntocinon in the

25   psychiatric disorder and in autism where small studies have

1    also shown a glimmer of hope that might be helpful.

2    Q    Can we turn to Page 5 of 7 to It's easy to admire.  Can

3    you read the sentence, please.

4    A    It's easy to admire Shkreli's courage in pushing into

5    psychiatry in an area that most drug companies are

6    abandoning.

7    Q    And the next sentence.

8    A    If you're really smart you're doubling down the central

9    nervous system disorders, he says.

10   Q    And the next sentence, please.

11   A    And he is right that Syntocinon deserves to be tested

12   in schizophrenia and autism.

13   Q    Okay.  Let's turn to Defense Exhibit 13056.  What is

14   the date?

15   A    February 21, 2012.

16   Q    Is this a press release?

17   A    It is.

18   Q    For Retrophin?

19   A    Yes.

20   Q    And the title states Ligand Licenses DARA Program to

21   Retrophin?

22   A    It does.

23   Q    And what does the first sentence state?

24   A    Ligand Pharmaceuticals, Incorporated and Retrophin,

25   LLC, announced that the companies have entered into an

Dooley - Direct - Denerstein                10048

1   agreement in which Ligand has licensed rights to DARA (a

2   Dual Acting Receptor Antagonist of Angiotensin and

3   Endothelin receptors to Retrophin.

4           MS. DENERSTEIN:  And can we go to the bottom of

5   this document where it says about Retrophin and can we

6   highlight that.

7   Q    And can we read the last sentence of the this

8   paragraph?

9   A    Retrophin's Series A financing was led by MSMB Capital

10  and several current and former senior executives at Global

11  Pharmaceutical and Healthcare companies.

12          MS. DENERSTEIN:  Can we turn to Defense

13  Exhibit 1055.

14          Can we go to the bottom of the exhibit, please.

15  There you go.  Thank you, Mr. Carter.

16  Q    Is this an e-mail from Mr. Greebel sent on

17  September 20th, 2012 to Martin Shkreli?

18  A    It is.

19  Q    Who is copied?

20  A    David Kravitz.

21  Q    What is the subject?

22  A    Capitalization tables.

23          MS. DENERSTEIN:  And can we go to the bottom

24  e-mail.

25  Q    Can you read the text of the e-mail.

1   A    As -- as discussed, attached are two cap tables, one

2   showing the capitalization of LLC as of today and the other

3   showing the capitalization of Inc., immediately following

4   the conversion.  The Inc., cap table assumed that Class A

5   common is converted to 1 to 1.  Class B common is converted

6   according to the formula that we discussed and Series A

7   Preferred is converted 1 to 1.

8   Q    Can we read the next sentence, please.

9   A    Immediately following the conversion you will own

10  47.63 percent of the outstanding equity. (It does not

11  include the 98,000 that has not vested).  You will -- you

12  along with MSMB Health will own 53.55 percent of the

13  outstanding equity. (Does not include the 98K that has not

14  vested).  Please confirm in writing.

15  Q    Wait just a second.

16       MS. DENERSTEIN:  Mr. Carter, can you highlight the

17  last sentence.

18  Q    Can you raid that, Mr. Dooley?

19  A    Please confirm in writing that these numbers/cap tables

20  are correct.

21       MS. DENERSTEIN:  Can you go to the response?

22  Q    What does Martin Shkreli respond?

23  A    This looks good to me.

24       MS. DENERSTEIN:  Can we go to next e-mail in the

25  chain.

Dooley - Direct - Denerstein                    10050

1   Q    What does Mr. Greebel ask?

2   A    Are the numbers accurate and accurately reflect your

3   movements and internal records?

4   Q    And what does Mr. Shkreli respond?

5   A    Substantially so, yes.

6   Q    And is Mr. Kravitz copied on this e-mail?

7   A    He is.

8   Q    And is the date September 20, 2012?

9   A    Yes, it is.

10  Q    Okay.

11          Now, I would like to show you the Defense

12  Exhibit 110-47 for identification.

13          And you should be looking at

14  Government's Exhibit 111-26.  Ready?

15  A    Yes.

16  Q    Is Defense Exhibit 110-47 a fair and accurate summary

17  of Government's Exhibit 111-26?

18  A    It is.

19          MS. DENERSTEIN:  Your Honor, at this time the

20  defense offers Defense Exhibit 110-47 in evidence.

21          MR. KESSLER:  No objection.

22          THE COURT:  We will in evidence Defense

23  Exhibit 110-47.

24          (Defendant's Exhibit Number 110-47 so marked and

25  received in evidence.)

Dooley - Direct - Denerstein                10051

1    Q    Can we first go to Government's Exhibit 111-26?

2    A    Yes.

3    Q    And is this an e-mail from Jackson Su on December 3rd

4    to Susan Chew copying Corey Massella?

5    A    Yes.

6    Q    And is the subject share transfer documents?

7    A    It is.

8    Q    And can you read the text?

9    A    Attached - more share transfers.  Kevin Mulleady to

10   Martin Shkreli; Tom Fernandez to Martin Shkreli; Martin

11   Shkreli to MSMB Healthcare; Marek Biestek to Martin Shkreli,

12   I think you have this already.

13   Q    And is this from Jackson Su?

14   A    It is.

15   Q    And are there attachments?

16   A    There are.

17   Q    And what are the attachments briefly?

18   A    Transfer and donee representation letters.

19   Q    Okay.  And going to the chart, back to DX 110-47, can

20   you explain the top row?

21   A    Sure.  Who transferred the shares, the number of units,

22   the type of share, and who received the shares.

23   Q    So turning to the first column, can you explain that?

24   A    Sure.  Marek Biestek transferred 4,167 units Class B

25   shares to Martin Shkreli.

Dooley - Direct - Denerstein                10052

1    Q    You just read that whole row across?

2    A    Yes.

3    Q    And is that from document Bates Number 12850?

4    A    Yes, it is.

5    Q    And turning back in the chart, the second row, so back

6    to Defense Exhibit 110-47.  Can you read that row?

7    A    Sure.  Kevin Mulleady transferred 10,000 Class B shares

8    to Martin Shkreli.

9    Q    And if you add the units together, what are the total

10   number of Class B units that were transferred to Shkreli?

11   A    14,167 shares -- units.

12   Q    Going to the next row, can you explain that to the

13   jury?

14   A    Sure.  Mr. Shkreli transferred 75,000 Class B units to

15   MSMB Capital.

16   Q    And what is the total Class B units to MSMB Capital?

17   A    75,000 units.

18   Q    And going to the next category.  Who is the transfer,

19   if you go through these rows, please.

20   A    Sure.  There was a transfer, a voided transfer and then

21   another -- a successful transfer.  Excuse me.  There's a

22   transfer from Mr. Fernandez to Mr. Shkreli 50,000 Class A

23   shares.

24   Q    And what does the voided transfer reflect?

25   A    It was initiated and then canceled.

Dooley - Direct - Denerstein                10053

1    Q    And going to the total of Class A units to Shkreli?

2    A    80,000.

3    Q    And did the information for this chart come from

4    Government's Exhibit 111-26?

5    A    Yes.

6    Q    I'm going to --

7              MS. DENERSTEIN:  Your Honor, could I just have one

8    second?

9              THE COURT:  Yes.

10             (Pause in proceedings.)

11   Q    I would like you to turn Defendant's Exhibit 1327.  Is

12   this from Andrew Vaino sent Sunday, December 30, 2012, to

13   Jackson Su?

14   A    Yes, it is.

15   Q    And is Martin Shkreli and Michael Smith copied?

16   A    Yes, they are.

17   Q    And what is the subject?

18   A    Retrophin's/MSMB Capital e-mail accounts.

19   Q    Is Evan Greebel on this e-mail?

20   A    He is not.

21   Q    Can you read what the text states.

22   A    Jackson, would you please ensure that any possible

23   access to these accounts from any of my devices is disabled.

24   (I assume this can be done by resetting the password).

25             Going forward I can be reached by e-mail at this

Dooley - Direct - Denerstein                10054

1    address.  As always, please ensure that no nonpublic

2    information regarding Retrophin or MSMB is sent to me.

3    Thanks, Andy.

4    Q    Can we turn to Defendant's Exhibit 1328.

5              And is this an e-mail from Mark Taylor to Andy

6    Vaino?

7    A    Yes, it is.

8    Q    And what date is it sent?

9    A    February 7th, 2013.

10   Q    Okay.

11             MS. DENERSTEIN:  Can we go to the bottom e-mail

12   first.

13   Q    And is that an e-mail from Andy Vaino?

14   A    Yes.

15   Q    And what does he state?

16   A    Hi, Mark, I hope all is well.  I am seeking a new

17   position as a biotech analyst.  Do you know anyone at

18   Tamarack Capital?  I note that they are one of a very small

19   number of health care funds in San Diego.  Cheers, Andy.

20   Q    And what does Mr. Taylor respond February 27, 2013?

21   A    I know Justin.  Try him.  Good guy, very smart.

22   Realized they like revenue.  Mark Taylor.

23             MS. DENERSTEIN:  Can we turn to Defendant's

24   Exhibit 6239.

25             Go to the bottom e-mail first.

Dooley - Direct - Denerstein                    10055

1   Q    Is this an e-mail from Martin Shkreli to Andy Vaino on
2   March 6, 2013?
3   A    It is.
4   Q    And is the subject formalized EA?
5   A    Yes.
6   Q    Could you please read the e-mail.
7   A    You will get 100K upfront.  Please let me know if you
8   want taxes taken out.  You will forego the escrowed Fearnow
9   shares.  You will receive a handsome stock option or RSU
10  grant.  Okay.  Am I missing anything?
11  Q    And what does Mr. Vaino respond?
12  A    Please do take taxes out.  Everything else on.  Should
13  probably specify San Diego as California area.  It's
14  currently blank.
15  Q    And is this on March 7th?
16  A    Yes it is.
17  Q    And is Mr. Greebel on this e-mail?
18  A    He is not.
19  Q    Turning to Defense Exhibit 1901.  Can you read the top,
20  please.
21  A    It is an e-mail from Jackson Su to Martin Shkreli on
22  November 12, 2012, with the subject line e-mailing form
23  donee rep letter SA.
24  Q    And is there an attachment?
25  A    There is.

1    Q    And what does the body of the e-mail say, the text?

2    A    Form donee rep letter SA.

3    Q    Can you read the text underneath in the e-mail?

4    A    Your message is ready to be sent with the following

5    file or link attachments, form donee rep letter SA.

6    Q    And if you turn to the next page, what is the header of

7    this document?

8    A    Retrophin, LLC, transfer and donee representation

9    letter.

10   Q    And can you read the first pass, first part of this

11   sentence until 50,000?

12   A    For value received Martin Shkreli, the transferor does

13   hereby grant, sell, assign, transfer and convey unto Stephen

14   Aselage the transferee, its successors and assigns all of

15   its right, title, and interest to 50,000.

16   Q    And is the last part Class B common units?

17   A    Yes.

18   Q    Of Retrophin, LLC?

19   A    Yes.

20   Q    And going back to the first page of the Defense

21   Exhibit 1901.

22   A    Yes.

23   Q    Is Evan Greebel on this e-mail?

24   A    No, he is not.

25   Q    Turning to Defense Exhibit 1307 which I think you are

Dooley - Direct - Denerstein                10057

1   going to have to look at on the computer.

2   A    All right.

3   Q    Is this an e-mail from Evan Greebel?

4   A    It is.

5   Q    What date?

6   A    March 14th, 2013.

7   Q    To who?

8   A    Clifford Brandeis.

9   Q    What is the subject?

10  A    Kevin Mulleady.

11  Q    And can you read what the e-mail states?

12  A    Mr. Brandeis, to clarify, Retrophin would like Kevin to

13  surrender any claims that he has to receive additional

14  shares from Troy Fearnow and Retrophin will facilitate such

15  shares being transferred to certain investors in Retrophin.

16  CHECK ON.

17  Q    And can you please read the next sentence?

18  A    If you have any questions, would like to discussion the

19  assignment of stock, please call me at... Best regards,

20  Evan.

21  Q    And there is a phone number after please call me at,

22  correct?

23  A    (212) 940-6383.

24  Q    Can we turn to --

25              THE COURT:  Did you want were you wanted to admit

Dooley - Direct - Denerstein                    10058

1   this?

2              MS. DENERSTEIN:  Yes, Your Honor.

3              THE COURT:  Okay.  We have just been going through

4   a lot of exhibits I am not sure.  We have not been admitting

5   a lot of exhibits.  I am assuming they are in unless you are

6   moving them in.  This one I know is not in.

7              MS. DENERSTEIN:  Yeah.  I can clean that up.

8              THE COURT:  Well, some of these with being

9   admitted for certain purposes.

10             MS. DENERSTEIN:  Right.  And pursuant to our

11   discussion, Mr. Kessler was going to let you know he had

12   wanted these particular.

13             THE COURT:  Well, so would you advise the jury if

14   we are going to admit them for one purpose or not just so

15   the record is clear and the jury understands.

16             MS. DENERSTEIN:  So --

17             THE COURT:  Let's just start with 1307 since that

18   is where we are right now.  Do you want to offer them?

19             MS. DENERSTEIN:  Yes.  At this point the defense

20   would offer Defense Exhibit 1307 into evidence.

21             MR. KESSLER:  No objection subject to our

22   discussion.

23             THE COURT:  All right.  So the jury is instructed

24   that Defense Exhibit 1507 is admitted not for the truth.

25             MS. DENERSTEIN:  Your Honor, I think we are going

Dooley - Direct - Denerstein                10059

1    to be moving for admission Defense Exhibit 1307, 104-99,

2    5458, 1283, 1306, 1315, 1010 and 1309 into evidence pursuant

3    to our conversation with Your Honor at lunch.

4              MR. PITLUCK:  No objection subject to that.

5              THE COURT:  I just wanted to clarify something

6    about many of these exhibits are not being offered for the

7    truth.  So I am going to read in the ones that I understand

8    that would be the case.  There are some where I do not think

9    it was entirely clear whether the Government is consenting

10   to have exhibits offered as long as it is not for the truth.

11             So Defense Exhibit 104-99 is admitted but not

12   offered for the truth.

13             (Defense Exhibit Number 104-99 so marked and

14   received in evidence.)

15             THE COURT:  Defense Exhibit 1283 is admitted under

16   the same condition.

17             (Defense Exhibit Number 1283 so marked and

18   received in evidence.)

19             THE COURT:  Defense Exhibit 1315 is admitted but

20   not offered for the truth.

21             (Defense Exhibit Number 1315 so marked and

22   received in evidence.)

23             THE COURT:  And the others we made different

24   rulings, but have I overlooked any of those exhibits?

25             MR. KESSLER:  I do not believe so.

Dooley - Direct - Denerstein                    10060

1          THE COURT:  All right.  So we will then otherwise

2     admit Defense Exhibit 5458 as discussed at sidebar.

3          And Defense Exhibit 1306.

4          And 1309.

5          And Defense Exhibit the 1307 is admitted but not

6     for the truth.

7          MS. DENERSTEIN:  Okay.  We were on Defense

8     Exhibit 1307.

9          Could we just blow up the text again.

10    Q    And, Mr. Dooley, could you just reread this exhibit?

11    A    Mr. Brandeis to clarify, Retrophin would like Kevin to

12    surrender any claims that he has to receive additional

13    shares from Troy Fearnow and Retrophin will facilitate such

14    shares being transferred to certain investors in Retrophin.

15    If you have any questions or would like to discuss the

16    assignment of stock, please call me at (212) 940-6383.  Best

17    regards, Evan.

18    Q    Okay.

19         MS. DENERSTEIN:  Can we turn to Defense

20    Exhibit 1902.  And can we go to the second e-mail.

21    Q    And is this an e-mail from Evan Greebel on Monday,

22    March 25, 2013, to Lenora Izerne?

23    A    It is.

24    Q    And is the subject assignment?

25    A    Yes, it is.

1  Q    And can we go to the text of the e-mail.

2  A    Hi, Nora, I hope you had a good weekend.  If you have a

3  moment, please ask Linda for a copy of the executed lease

4  and we will prepare the assignment.

5         Also in the future, please do not refer to

6  Retrophin and MSMB Capital as the same personnel or the same

7  company.  But there are significant legal implications which

8  we want to avoid.  I'm happy to discuss if you have any

9  questions.  Evan.

10  Q    And is there a response from Ms. Izerne?

11  A    There is.

12  Q    And can you read the first couple of sentences.

13  A    Hi, Evan, Hope all is well.  Okay, got it.  And thank

14  you for clarifying since you often just gives me legal/real

15  estate jargon and expects me to know or understand what she

16  means without the least bit of detail.

17  Q    That is sufficient.

18         MS. DENERSTEIN:  And let's turn to Defense

19  Exhibit 1228.

20  Q    Is this an e-mail between Martin Shkreli and Alan

21  Geller?

22  A    It is.

23  Q    And what is the date?

24  A    April 30th, 2013.

25  Q    And can we go to the bottom e-mail.  The same date?

Dooley - Direct - Denerstein                10062

1    A    Yes.

2    Q    And what does the e-mail state?

3    A    Martin, 8 o'clock Friday at the Wolfgang on Park

4    Avenue.  Looking forward to it.  Would love to wrap this up

5    in New York.  Al.

6    Q    And can we go to the top e-mail from Mr. Shkreli?

7    A    See you --

8    Q    Go ahead, I'm sorry.

9    A    See you Friday.  I will nudge Evan.  Do not know what

10   the issue is.

11   Q    Okay.

12            MS. DENERSTEIN:  Can we turn to the next section

13   to Defense Exhibit 2949, and can we go to the first e-mail

14   which is on the bottom.

15   Q    Is this an e-mail from Evan Greebel sent on Thursday,

16   October 13th, 2011?

17   A    Yes.

18   Q    And who is it to?

19   A    Martin Shkreli.

20            MS. DENERSTEIN:  And, Mr. Carter, can you

21   highlight the text.

22   Q    What does it say?

23   A    Please send me the AUM number to file.

24            MS. DENERSTEIN:  Can we go to the very next e-mail

25   and blow that up.

Dooley - Direct - Denerstein                    10063

1    Q    What does Martin Shkreli respond to Mr. Greebel?

2    A    40M.

3              MS. DENERSTEIN:  And can we go to the next e-mail,

4    please.

5    Q    And is this an e-mail in response from Mr. Greebel to

6    Martin Shkreli dated the same date?

7    A    Yes, it is.

8    Q    And can you read what the question is and what the

9    answer is?

10   A    Q:  Please provide support for the statement that MSMB

11   is leading investment firm focused on global healthcare and

12   biotechnology opportunities.  Please include additional

13   disclosure describing your business assets under management

14   and relevant investments or transactions of a nature similar

15   to your proposed transaction with AMAG.

16   Q    Okay.  Can we stop for a second.

17             MS. DENERSTEIN:  And can we blow up beginning as

18   of October 1st, 2011.

19             THE COURT:  And the answer portion?

20             MS. DENERSTEIN:  Uh-huh.  Yes, Your Honor.

21             THE COURT:  And this one is admitted not for the

22   truth, correct?

23             MR. KESSLER:  Yes.

24             MS. DENERSTEIN:  Yes, Your Honor.

25   Q    Can you read that sentence as of October 1, 2011?

1   A    As of October 1, 2011, MSMB and its affiliates at

2   $40 million in assets under management.  Neither MSMB nor

3   its affiliates have publicly announced or completed a

4   leverage buyout or take private transaction.

5        MS. DENERSTEIN:  And if you go down again to the

6   bottom e-mail.  Stop right there and blow up that.

7   Q    That is e-mail is from Martin Shkreli to Evan Greebel

8   stating 40M, correct?

9   A    40M, yes.

10  Q    Can we turn to Government's Exhibit 916?

11       MS. DENERSTEIN:  Can you blow up the header of

12  what this says, MSMB Capital Man?

13  Q    Does this say MSMB Capital Management, LP, and the

14  account balances?

15  A    It does.

16  Q    And if you go to the column ending balances, and go all

17  the way to the end of the chart, July, 2011.  What is the

18  balance?

19  A    Negative 33 cents.

20       MS. DENERSTEIN:  Can we turn to

21  Government's Exhibit 917.

22  Q    What is the heading of this chart?

23  A    MSMB Healthcare, LP, ending account balances.

24  Q    If you go to the exhibit October, 2011, to the combined

25  total.

Dooley - Direct - Denerstein                    10065

1    A    Yes.

2    Q    What is the combined total?

3    A    $340,000 -- $340,792.

4    Q    Is that $40 million?

5    A    No.

6    Q    Okay.  Can we turn to Defendant's Exhibit 104-99.  A

7    few ahead.

8         Let me know when you are there.

9    A    I'm there.

10   Q    Great.

11        MS. DENERSTEIN:  Can we go to the bottom e-mail,

12   please.

13        The very last one.  It is on Bates Number 9808.

14   Q    Is this an e-mail from Evan Greebel to Martin Shkreli

15   on February 7, 2013?

16   A    Yes, it is.

17   Q    And what does the e-mail state?

18   A    What is the aggregate amount of the notes that

19   Retrophin owes MSMB, you or other affiliates?

20   Q    And does Mr. Shkreli respond?

21   A    He does.

22   Q    And what does he say?

23   A    Less than $1 million.  Will check full amount.

24   Q    And what does Mr. Greebel respond?

25   A    Thanks.  Please also identify all affiliates that have

1    notes.

2    Q    And what does Mr. Shkreli respond?

3    A    What is this for?

4    Q    And what does Mr. Greebel respond?

5    A    The schedules.  They are all affiliate transactions and

6    if they are wrong, the investors could sue.

7    Q    And what does Mr. Shkreli respond?

8    A    Can you just refer to what is on the 8-K?

9    Q    And what does Mr. Greebel respond?

10   A    The 8-K refers to it as a note payable to a related

11   party.  I have never determined whether MSMB and Retrophin

12   are affiliates for SEC purposes, but for the schedules I

13   would rather err on the side of caution.  The 8-K references

14   a 900K note then valued at 914K.  And then employee note for

15   30K with 15 percent interest.  Were any others done?

16   Q    And what does Mr. Shkreli respond?

17   A    The 30K note was paid back.  There is a 10K note, I

18   believe.  The 900K note has partially been paid back.

19           MS. DENERSTEIN:  And can we go to the top, the

20   next e-mail.  Stop.  Blow that up, please.

21   Q    What does Mr. Greebel respond?

22   A    A 10K note is not referenced.  Here is the language

23   from the 8-K.

24   Q    And can we go back to the language, Note 4, notes

25   payable.  Is that part of this e-mail?

Dooley - Direct - Denerstein                    10067

1   A    Yes, it is.

2   Q    And is there a section also on related party

3   transactions Note 5 in this e-mail?

4   A    Yes, there is.

5   Q    And above this is where Mr. Greebel says here's the

6   language from the 8-K?

7   A    Yes.

8   Q    What does Mr. Shkreli respond?

9   A    It was a subsequent event.

10   Q    What does Mr. Greebel respond?

11   A    Anytime the company wants to borrow money the Board

12   needs to approve it.

13   Q    Then what does Mr. Shkreli respond?

14   A    200K has been paid back to MSMB recently.  The 10K note

15   was an equity purchase by Steve Richardson.  The 35K note

16   was paid back completely.

17   Q    And then what does Mr. Greebel respond?

18   A    The 10K I need to see the sub docs so I can have the

19   transfer agent process.  Based on the other statements, I

20   will not revise the schedule.

21          MS. DENERSTEIN:  Can we turn to Defendant's

22   Exhibit 1314.  Can we go to the bottom e-mail on the first

23   page.

24   Q    Is this an e-mail from Evan Greebel dated September 11,

25   2012, to Martin Shkreli, George Wang, and Jackson Su?

Dooley - Direct - Denerstein                        10068

1    A     It is.

2    Q     And does it refer to a diligence request list?

3    A     It does.

4    Q     What does it say?

5    A     Guys, Attached is the diligence request list that I

6    want to send to Valiant.  Please advise if you want me to

7    add anything.  Evan.

8    Q     And what does Mr. Shkreli respond?

9    A     This is way too long and insane.

10   Q     And what does Mr. Greebel respond?

11   A     You are about to spend $100 million on an asset.  It is

12   important to know what you are buying.  During the call I

13   learned that Valiant outsources and also does their own

14   manufacturing.  They expect you to buy from them after the

15   close for a period of time.  Diligence requests -- request

16   lists are designed to cover all applicable situations.

17             (FYI, the list to buy a company is approximately

18   12 to 13 pages).

19   Q     And does Mr. Greebel send this to Mr. Wang and Mr. Su

20   as well as Mr. Shkreli?

21   A     He does.

22             MS. DENERSTEIN:  And can we go to the top e-mail,

23   please.

24   Q     Is this from Mr. Wang to Mr. Greebel copied and also

25   Mr. Shkreli and Jackson Su?

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Dooley - Direct - Denerstein                    10069

1    A    Yes, it is.

2    Q    What does he say?

3    A    I think the list is comprehensive.  Nothing to add on

4    my end.  I will defer to you expertise here.

5              MS. DENERSTEIN:  Can we go to Defense Exhibit 5181

6    and to the bottom of the chain, please.

7    Q    Is this an e-mail from Mr. Greebel on Tuesday,

8    November 27, 2012, to Mr. Shkreli?

9    A    It is.

10   Q    And what does the e-mail state?

11   A    Peter's guys keep hounding me for a post-money cap

12   table.  So please consider the conversion and get me

13   something to show the --

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

*Dooley - Direct/Ms. Denerstein*                          10070

1    Q    And does Mr. Greebel, I'm sorry, what's the next e-mail

2    in the chain?

3    A    From Martin Shkreli to Evan Greebel on December

4    November 27, 2012, Does that include the Fearnow note?

5    Q    And what does Mr. Greebel respond?

6    A    Everything should be on there (including Ligand).

7    Q    And how does Mr. Shkreli respond?

8    A    Can we really represent what Fearnow might do with his

9    note?

10   Q    And what does Mr. Greebel respond to Mr. Shkreli?

11   A    I think it should be a line item.

12   Q    And what does Mr. Shkreli respond to Mr. Greebel?

13   A    It's not our capitalization, though.

14   Q    And what does Mr. Greebel respond to Mr. Shkreli?

15   A    But post money it's your company.

16   Q    Can we turn to next to Defense Exhibit 5458.  And can we

17   go to the bottom of the chain.

18         Is this an e-mail from Martin Shkreli to Evan

19   Greebel on Monday December 10, 2012?

20   A    It is.

21   Q    And is the subject Retrophin?

22   A    Yes.

23   Q    And what does the e-mail state?

24   A    One question is can we pay bills this way with pretax

25   money to Ligand, Katten, and/or others and not pay the capital

*Dooley - Direct/Ms. Denerstein*                    10071

1    gains tax?

2    Q    And what does Mr. Greebel respond?

3    A    Once you sell the stock, it creates a taxable event.

4    Investing the proceeds in a separate transaction is a separate

5    event.  Doing it through an IRA or 401(k) may have a different

6    outcome.  It's a question for personal accountant.

7    Q    And what does Mr. Shkreli respond?

8    A    Forget 401(k)/IRA, we won't use that.

9    Q    And what does Mr. Greebel respond?

10   A    It's tax planning stuff.  You are better off speaking

11   with an accountant.

12   Q    Can we go to Defense Exhibit 1283 and can we go to the

13   bottom e-mail.

14        Is this an e-mail from Marek Biastec on December 18,

15   2012, to Evan Greebel, the subject Stock Questions?

16   A    Yes.

17   Q    And what does the e-mail state?

18   A    Evan, can any of us sell RTRX stock privately for the

19   same price we bought it for to someone else, thanks MB.

20   Q    And what does Mr. Greebel respond?

21   A    You can sell the stock, however, and to whomever you want

22   except to affiliates of the company avoiding tax penalties

23   that may be imposed on the taxpayer.

24   Q    And what does Mr. Biastec respond?

25   A    But can it be sold for the same price i.e., .001 dollars

*Dooley - Direct/Ms. Denerstein*                    *10072*

1    per share.

2    Q    And what does Mr. Greebel respond?

3    A    Up to you.

4    Q    And what does Mr. Biastec respond?

5    A    Do you have any documentation that you can provide that

6    shows the Fearnow stock is not restricted from trading?

7    Q    And what does Mr. Greebel respond?

8    A    There is no legend on it.  Restricted stock always has a

9    legend on it.

10   Q    And what is the date of this e-mail?

11   A    December 9, 2012.

12   Q    Did you say December 9th?

13   A    Excuse me, 19th.  December 19th.

14   Q    Okay.  Let's turn to Defense Exhibit 1306.

15        Can we go to the bottom e-mail.

16        Is this an e-mail between Evan Greebel and Martin

17   Shkreli?

18   A    It is.

19   Q    And is the date December 31, 2012?

20   A    Yes, it is.

21   Q    And can you read the text?

22   A    Procedures/rules for bringing people over the wall.  What

23   happens if a "confi" is not in place?

24   Q    Does Mr. Shkreli respond?

25   A    He does.

*Dooley - Direct/Ms. Denerstein*                          *10073*

1    Q    That same day?

2    A    Yes, the same day.

3    Q    And what does he respond?

4    A    "Confi" in place for everyone.

5    Q    And does Mr. Greebel respond?

6    A    He does.

7    Q    And it's the same date?

8    A    Yes, it is.

9    Q    And what does he say?

10   A    That's all that matters BC barring that we would have a

11   FD issue.

12   Q    Okay.  Let's turn to Defense Exhibit 1903.

13        Is this then e-mailed from Meg?

14        Actually, let's go down to the bottom e-mail.

15        Is this an e-mail on September 30, 2014, from Evan

16   Greebel?

17   A    It is.

18   Q    And what does he state?

19   A    Marc and Meg, As previously discussed attached is the

20   response is the confidential treatment comment letter which we

21   sent to the SEC today.  Atherion's counsel reviewed and

22   approved the response prior to it being sent.  Please let mow

23   know if you have enough questions.  Best regards, Evan.

24   Q    Does Ms. Valeur Jensen respond?

25   A    She does.

1    Q    Does she respond on September 30th, the same day?

2    A    She does.

3    Q    Is Mr. Panoff copied?

4    A    He is.

5    Q    And what does she respond to Mr. Greebel?

6    A    Evan, please stand down on all Retrophin matters other

7    than active litigation until we can review all open matters.

8    Thanks.

9    Q    Okay.  Can we go to Defense Exhibit 1315.

10              THE COURT:  Was this in evidence?

11              MS. DENERSTEIN:  It was on the list I read earlier

12    to you.

13              THE COURT:  You mean yesterday?

14              MS. DENERSTEIN:  No, I mean today.

15              THE COURT:  All right.

16    Q    Defense Exhibit 1315.  Can we go to the bottom e-mail.

17              Go up one.

18              Is this an e-mail from Mr. Greebel to Martin Shkreli

19    dated February 15, 2013?

20    A    Yes.

21    Q    And what does it say?

22    A    Thanks.  100K a day works for me until we get there.

23    Q    What does Martin Shkreli respond?

24    A    Great.

25    Q    And what does Mr. Greebel respond?

*Dooley - Direct/Ms. Denerstein*                    **10075**

1   A    You should send your BD an e-mail update when you get a

2   chance.

3   Q    And what does Martin Shkreli respond?

4   A    Been in close contact with them since, no need.

5   Q    And what does Mr. Greebel respond?

6   A    Even better.

7   Q    Can we turn to Defense Exhibit 1010 in evidence.

8        Is this an e-mail from Martin Shkreli to Andrew

9   Vaino on March 7, 2013?

10  A    It is.

11  Q    Is the subject Vaino Employment Agreement?

12  A    Yes.

13  Q    And is the Andy Vaino Employment Agreement listed as the

14  attachment?

15  A    It is.

16  Q    And is there an employment agreement attached?

17  A    Yes, there is.

18  Q    And what is the date of the employment agreement in the

19  first paragraph of the document on Bates Page 1223?

20  A    March 7, 2013.

21  Q    Can we go to Bates Page 1223 just the top.  Can we go to

22  the last page which is 1232?

23       Is this document signed?

24  A    It is.

25  Q    By whom?

*Dooley - Direct/Ms. Denerstein*                  **10076**

1    A    Martin Shkreli, CEO.

2    Q    Can we turn to Defense Exhibit 1309?

3              Can we go to the bottom e-mail, please.

4              Is this an e-mail from Evan Greebel to Mike Lavelle

5    on May 3, 2013.

6    A    He is.

7    Q    Is he copied?

8    A    Yes.

9    Q    Is this subject:  Draft Settlement Agreement?

10   A    Yes.

11   Q    What does it say?

12   A    Hi, Michael.  As discussed, attached is a draft of the

13   settlement agreement.  If you have any questions or comments

14   please called mean at (212) 940-6383.  Best regards, Evan.

15   Q    Does Mr. Lavelle respond?

16   A    He does.

17   Q    And what does he state?

18   A    Thank you, Evan.  I will run the document past the lawyer

19   but see no material issues with the principle or agreement in

20   detail.  The amounts, however, are not what I expected.  At

21   the time of our conversation, the mark I had on MSMB was

22   $1,267,000 and the stock as at five.  We discussed two times

23   my initial investment in a mix of cash and stock.  Stock at

24   the time was worth $645,000, so we have a $355,000 gap which I

25   will agree can either be in cash or stock.  Please discuss

*Dooley - Direct/Ms. Denerstein*                    10077

1   with Martin.  I have Linkletters reviewing your agreement and

2   am confident that we can resolve quickly.  Regards, Michael.

3   Q    And is this e-mail forwarded to Mr. -- or given to

4   Mr. --

5           Is this e-mail in the e-mail to Mr. Shkreli that

6   comes next?

7   A    Yes, it is.

8   Q    And what does Mr. Greebel say to Mr. Shkreli?

9   A    Please see below from Lavelle.

10  Q    And does Mr. Shkreli respond?

11  A    He does.

12  Q    And on the e-mail that Mr. Greebel sends to Mr. Shkreli,

13  is Mr. Lavelle copied going back down?

14  A    No.

15  Q    And in Mr. Shkreli's response, whom does he copy if

16  anybody?

17  A    Michael Lavelle.

18  Q    And what does he say?

19  A    I agree to should be a total of two times your initial

20  investment.  Please fix, Evan.  I was very, very clear on the

21  call with Lavelle.  I am, therefore, disappointed that you

22  sent him an underwhelming non-agreed upon deal.  The 300K

23  dollar savings doesn't help me and only frustrates a key

24  partner of ours and myself embodied in the deal we agreed

25  upon, please.

*Dooley - Direct/Ms. Denerstein*                    10078

1  Q    And what does Mr. Lavelle respond and to whom?

2  A    To Mr. Shkreli and Mr. Greebel.  Thank you, I look

3  forward to the revised document.  As I said, legal comments

4  are not material.

5            MS. DENERSTEIN:  Your Honor, may I have one moment?

6            THE COURT:  Yes.

7  Q    Mr. Dooley, we've shown you a lot of charts.  Who

8  prepared the charts?

9  A    Gibson Dunn.

10           MS. DENERSTEIN:  No further questions, your Honor.

11           THE COURT:  All right.  Are the jurors ready for a

12 midafternoon break?

13           THE JURY: (Collectively) Yes.

14           THE COURT:  Okay.

15           (Jury exits courtroom at 3:29 p.m.)

16           THE COURT:  Sir, you can step down.

17           THE WITNESS:  Thank you, your Honor.

18           (Witness leaves the witness stand.)

19           THE COURT:  Ten minutes.  We have a note that the

20 jurors want to know when this trial will end.  They would like

21 clarification.

22           MR. PITLUCK:  So, your Honor, I've provided

23 Mr. Dubin with some proposed language.  We'll talk about it

24 now and we'll have something agreed upon for the Court to say

25 to the jury at the conclusion of the day.

*Proceedings*                                              *10079*

1        THE COURT:  Very good.  Thank you.

2        (A recess in the proceedings was taken.)

3        THE COURT:  Are we ready to go back on the record?

4        MR. KESSLER:  Yes.

5        THE COURT:  I have a sense of unease about the way

6   those exhibits came in and whether instructions were given at

7   the appropriate time.  There were a number of numbers ticked

8   off yesterday and then today, I felt like there were exhibits

9   coming in there were no instructions requested; there was no

10  motion to move them in.

11       I know we discussed them, but the parties should not

12  assume that they are in evidence.  If you haven't moved them

13  in, and if the transactions have not been given.  So I hope

14  that you will make sure the record reflects what the parties

15  intend.

16       I also have a proposed, jointly proposed, language

17  to read to the jury after today's proceeding concludes.  I

18  would add that at least a couple of jurors, Ms. Jackson has

19  indicated, they care not to come in the week following the

20  Christmas holiday.  The week between Christmas and New Year's.

21       But the instruction that the parties have agreed to

22  reads as follows:

23       The parties anticipate that the case will be

24  completed and the jury will be charged and deliberating by the

25  end of this week.  You are, of course, free to deliberate as

1    long as you deem necessary.

2         In the event that your deliberations are not

3    completed by Friday, and I will say December 22nd so we're

4    clear, we anticipate returning to court to resume

5    deliberations on Tuesday, December 26th following the holiday.

6         With the exception of the New Year's holiday on

7    Monday, January 1st, the Court will sit each day until you

8    have completed your deliberations.

9         If you have any scheduling conflicts that cannot be

10   moved, please let my courtroom deputy know as soon as

11   possible.

12        So we'll float that this is the plan and they should

13   speak up if they can't come in.  I'm just not sure whether

14   this is a strong preference or whether it's really something

15   where the jurors are unavailable.  They just said this they do

16   not want to company in.  Some of them.

17        MR. PITLUCK:  It's also possible, Judge, that their

18   position might change if they know they're going to be

19   deliberating as opposed to hearing evidence.  So we would

20   respectfully request that the Court deliver that and see if it

21   changes it.  Obviously, if there are problems or commitments

22   that can't be moved, then we will address those as they arise.

23        THE COURT:  All right.  Just so I'm clear, also, is

24   the Government not offering a rebuttal case?

25        MR. PITLUCK:  I'll let Mr. Kessler address that.

*Proceedings*                                                    *10081*

1          MR. KESSLER:  We're down to one exhibit we disagree

2    about.

3          THE COURT:  Okay.

4          MR. KESSLER:  Mr. Brodsky's current position is that

5    if the exhibit was to come in at all, it should come in

6    through the a rebuttal witness, so we're thinking about that.

7    But we're talking about a rebuttal case with one document at

8    this point.

9          THE COURT:  Is there a ground or admission that the

10   parties want to offer and have me rule on the admissibility as

11   we have for all the other exhibits.

12         MR. KESSLER:  I'm happy to.

13         MR. BRODSKY:  We're happy to debate it, your Honor.

14   The issue would be whether or not it would come in through

15   Mr. Dooley because we think that, I mean, we can debate the

16   issue and show you the exhibit.  But we debated this one

17   before and your Honor has ruled on it and you ruled it

18   inadmissible.  We think if it comes in, we should be able to

19   get in other related exhibits which because we think it's

20   misleading and there are a number of grounds which we don't

21   think it's admissible.

22         MR. KESSLER:  I'm happy to explain and we could

23   decide.

24         THE COURT:  I have no idea what exhibit it is.

25         MR. KESSLER:  Government Exhibit 613.

1           THE COURT:  And would the Government want to admit

2     the entire document because, once again, as we've previously

3     discussed, this document includes investors whose names --

4           MR. KESSLER:  Exactly.

5           THE COURT:  -- are not before the jury and it could

6     create the same kind of confusion that we had about some of

7     these other exhibits.

8           The concerns that we have about some of the other

9     exhibits confusing the jury where they may believe that, you

10    know, they may speculate beyond what the parties are actually

11    contesting here.

12          MR. KESSLER:  I understand the concern.  We don't

13    need to introduce the entire exhibit.  We're happy to redact

14    the names.  The real point, as the Court may recall on

15    cross-examination, one of the documents shown to Mr. Dooley

16    there were several documents shown to Mr. Dooley that were

17    offered to sort of talk to the defendant's state of Mind about

18    how consulting agreements were used.  And one of the documents

19    as an e-mail relating to Stuart Weg who is not -- who has not

20    appeared at all in, I'm not sure who he is, and it is really

21    offered for the top e-mail in which Mr. Shkreli hidden payment

22    I don't want it, but if it's a real consulting agreement

23    that's okay.

24          So this e-mail is being offered for a similar point.

25    The party or he, Mr. Shkreli and Mr. Greebel's, understanding

*Proceedings*                                                    **10083**

1   of how consulting agreements were being used.

2           On the first page at the bottom, Mr. Greebel asked

3   Mr. Shkreli, do you want the remaining 15K, the 15,000 shares

4   to come from the fully traded group talking about shares owed

5   to Mr. Koestler.  Mr. Shkreli says, I'd rather the shares come

6   from the company and Mr. Greebel says, So consulting

7   agreement?

8           And the jury is entitled to draw an inference that

9   the defendant and Mr. Shkreli are viewing consulting

10  agreements as simply a vehicle for funneling shares from the

11  company because the company has to approve the issuance of

12  shares.  There has to be some pretext for why the shares are

13  issued and the consulting agreement is that pretext.

14          So it goes to same point as this Stuart Weg e-mail

15  which is the understanding of what a consulting agreement

16  does.  The fact that it's Mr. Koestler doesn't matter, we

17  don't need his name, the rest of the e-mail chain is not

18  necessary.  That's really the point.

19          MR. BRODSKY:  Your Honor, we have multiple grounds

20  of objections.

21          First, your Honor already ruled on Mr. Koestler and

22  is based on the Government's own statements with respect to

23  Mr. Koestler prior to trial.  The Government tried to admit

24  this exhibit on their case-in-chief and it was precluded

25  because the Government had made representations to us with

*Proceedings*                                           *10084*

1    respect to Mr. Koestler.

2            We did not cross-examine Mr. Aselage and

3    Mr. Richardson and other witnesses relating to Mr. Koestler

4    based on the Government's representations prior to trial.

5            Mr. Koestler, as your Honor knows, won an

6    arbitration proceeding and we had pretrial motions relating to

7    Mr. Koestler.  The Government had said that they weren't going

8    to true any evidence related to him.

9            This document in and of itself contains hearsay

10   throughout the document that's inadmissible for any purpose.

11   This document in and of itself does not respond to anything

12   related to Mr. Weg and that particular consulting agreement.

13           This is misleading because this consulting agreement

14   is actually never entered into and there is an entire story

15   around why and the purpose.  They're taking one snippet of an

16   e-mail which is out of context and help want to offer it up

17   with the state of mind, but this was not the proper state of

18   mind if you look at all the facts relating to Mr. Koestler and

19   our view is if they want to introduce this exhibit, we think

20   it's inadmissible, and if your Honor ruled otherwise, they

21   should have their own witness on the stand so we would be able

22   to introduce the countervailing documents that show that this

23   is a misleading document.

24           And so, we don't think this is admissible.  This

25   doesn't respond to any part of the rebuttal case.  We never

*Proceedings*                                    *10085*

1    opened the door relating to Mr. Koestler.  We purposely kept

2    it out.  We never introduced any documents relating to

3    Mr. Koestler for that reason.  And we relied on your Honor's

4    ruling with respect to the inadmissibility of Mr. Koestler in

5    preparing other rebuttal case.

6              MR. KESSLER:  But the point here is simply the

7    reaction to a desire to send shares from the company and the

8    proposal is to use a consulting agreement as opposed to from

9    the freely traded group.  I can't imagine that the defense

10   closing is going to focus on Stuart Weg.  The argument is

11   going to be about that top e-mail and it's not going to be

12   limited to Stuart Weg.

13             So the fact that someone else's name was on that

14   e-mail I don't think has bearing here.  It's responsive to the

15   reason that Stuart Weg e-mail is actually being offered which

16   is for the state of mind of the people engaged in the

17   conversation.  Again, we don't have to use Mr. Koestler's

18   name, none of that is necessary.

19             MR. BRODSKY:  Your Honor, this is disconnected in

20   time from the Weg e-mail and it's also disconnected to all

21   other evidence around this time which we would want to offer

22   in evidence.  It countervailed this view about the state of

23   mind relating to Mr. Koestler.

24             This is very peculiar to Mr. Koestler, and if the

25   Government had actual responsive documents with respect to

*Proceedings*                                   *10086*

1   Weg, they could introduce those particular documents that

2   respond to that.  But this is a very -- this is a whole

3   separate -- there's a whole separate stream of case -- of

4   e-mail communications, a line of communications relating to

5   Mr. Koestler which is the subject of a huge arbitration,

6   multi-day arbitration.

7           THE COURT:  I'm afraid it will -- I mean if there is

8   any reference to Koestler, it will certainly get into a

9   distraction and a confusion.  I was thinking about whether

10  there were ways to excise his name or take out the e-mail

11  story of August 20th at 11:27 a.m. from Steve Cavelli

12  everything after that or prior to that, I should say, in time.

13          MS. DENERSTEIN:  The problem is, your Honor, if you

14  take out Mr. Koestler's name, you take out context.  Then

15  we're not going to be able to respond at all to all the

16  history related to Mr. Koestler.  We would want the ability to

17  be able to respond and bring in -- if they're going to bring

18  this in, which we think is inadmissible because we haven't

19  opened the door to Mr. Koestler.

20          They're opening the door to Mr. Koestler.  They told

21  us in pretrial rulings they weren't going to do it.  This is a

22  reversal.  They tried this, your Honor, in their case-in-chief

23  and your Honor precluded it.  This does not respond to the Weg

24  e-mail.  This is not responsive in any way to that.

25          MR. KESSLER:  So I take it that Mr. Brodsky the Weg

*Proceedings*                                                    *10087*

1   e-mail will not be used to argue anything about any consulting

2   agreement other than Stuart Weg.

3           MR. BRODSKY:  Yes.

4           MR. KESSLER:  And if it is mentioned --

5           MR. BRODSKY:  Admit it into evidence, you know,

6   that's how -- we're not going to argue -- we're going not

7   going argue beyond that state of mind with respect to that

8   e-mail.

9           MR. KESSLER:  But the state of mine related to

10  Stuart Weg is totally irrelevant in the case.

11          THE COURT:  Which is why the jury would have, if it

12  hasn't been instructed that this is not being offered for the

13  truth, but was proffered by the defense to show state of mind

14  of Mr. Shkreli.

15          MR. KESSLER:  Generally.  Not about Stuart Weg in

16  the same way this is general state of mind, not about

17  Mr. Koestler.  That's the point.

18          The Stuart Weg e-mail that kept -- that e-mail was

19  not admitted to address Stuart Weg who has nothing to do with

20  this case.  That e-mail was admitted for a general viewpoint

21  and I understand it's going to be used that way.  And so, you

22  know, that's the discussion we had yesterday.  It wasn't

23  Martin Shkreli's understanding that Stuart Weg was important.

24  It has nothing to do with anything.

25          MR. BRODSKY:  It was the timing of that particular

1    e-mail.

2              MR. KESSLER:  Late July.

3              MR. BRODSKY:  Which is relevant with respect to

4    disclosures to Marcum and the state of mind of that particular

5    point.  The Government is arguing propensity essentially.  If

6    they want to get this in, they're going to argue that this is

7    somehow a propensity.  And the problem is, your Honor, that

8    Mr. Koestler is a special story.  There's a special story with

9    hundreds of e-mails and communications relating to

10   Mr. Koestler over a long period of time.  And to introduce it

11   this way, it can't be redacted because it's highly

12   prejudicial, it be precludes us from responding in kind.

13             And so, we relied on the Government's own

14   representations.  We relied on the fact when we were putting

15   on a rebuttal case that we -- that this was precluded from

16   being introduced into evidence.  If we knew this was coming

17   into evidence, we would have had a different rebuttal case as

18   well.  We weren't able to question Mr. Aselage and

19   Mr. Richardson about it.

20             MR. KESSLER:  It's a single e-mail that directly

21   addresses something on the defense case.  It's not -- there's

22   no defense rebuttal case, no one is injecting Koestler

23   wholesale in this case.  It's simply being offered for state

24   of mind and that's our offer and we're happy to redact

25   portions.  And, you know, we'll accept the Court's ruling

*Proceedings*                                    *10089*

1    either way.

2            THE COURT:  I mean, if you've made a representation

3    to the defense, and if they've predicated at least parts of

4    their defense on that representation, you would not be

5    introducing evidence regarding Mr. Koestler.  Then I do think

6    you should --

7            MR. KESSLER:  We didn't.

8            THE COURT:  -- abide by it.

9            MR. KESSLER:  We didn't in our case-in-chief.

10           THE COURT:  Mr. Brodsky says that you did make that

11    representation and this was objecting --

12           MR. KESSLER:  We made the representation about our

13    case-in-chief, we didn't.  This is now responding to an e-mail

14    we couldn't possibly have conceived would have come into

15    evidence because this is about Stuart Weg.  That came into

16    evidence, that did not come into evidence to talk about Stuart

17    Weg.  It was about three weeks prima facie this e-mail.  It

18    came for Mr. Shkreli and Mr. Greebel's state of mind about

19    consulting agreements.  That's the only reason it's different

20    than our representation which is we're not getting into the

21    Koestler arbitration.

22           MR. BRODSKY:  The Weg e-mail is three weeks after.

23    It's not three weeks before.

24           Your Honor, you were very particular, your Honor,

25    when you ruled with respect to Delzotto.  And if they were

*Proceedings*                                            *10090*

1    going to get into evidence cross-examining Mr. Delzotto, it

2    would have to be narrow and would have to be directed towards

3    the particular e-mail.

4         And so, we identified a narrow group of e-mails that

5    were particularly responsive to particular e-mails of

6    Special Agent Delzotto that he was introducing.  We have the

7    equivalent summary witness on the stand and now they're

8    trueing an e-mail completely disconnected from the Weg e-mail

9    in both time and both topic and subject matter and, again, it

10   is -- to does affect us that they made this representation

11   prior to trial and we relied on it and they tried to get this

12   document into evidence during their case-in-chief.  It's not

13   like they didn't try, they did, and your Honor precluded to.

14        THE COURT:  Right.  So I guess part of the issue is

15   that the defense chose to provide documents to the Government

16   regarding its case after the Government rested and didn't

17   really tell the Government whether it was going to present a

18   defense case and I think the documents themselves came in

19   little trickles and I did try to resolve as many of the

20   defense exhibits as possible over the course of the more

21   recent days to try to define what was admissible and what

22   would save time.

23        So the Government could not necessarily have

24   anticipated that the Weg e-mail would be used to show

25   Mr. Shkreli's frame of mind, you know.  It's obviously an

*Proceedings*                                    10091

1   exculpatory e-mail that Mr. Shkreli is saying, you know, I

2   don't want these consulting agreements it be meaningless.

3           So the Government in its rebuttal case wants to say,

4   well, here's an e-mail that shows a state of mind where the

5   parties are Mr. Shkreli and Mr. Greebel are talking about

6   using the consulting agreement to tap into shares from the

7   company.

8           MR. BRODSKY:  They never actually do it, your Honor,

9   this has a whole stream of communications.  There were other

10  communications related to it.  They may never actually do

11  this.  The Government had the Weg e-mail for days.

12          THE COURT:  Was it --

13          MR. BRODSKY:  They never brought this up that they

14  were trying to introduce this in response.  It was incumbent

15  upon them to tell us if we were going to introduce that e-mail

16  this was going to be the argument in return.

17          MR. KESSLER:  We did.  When Ms. Denerstein was

18  here -- you can check the transcript -- we mentioned

19  Government Exhibit 613 maybe two or three trial days ago as we

20  were talking about these various e-mails that went to the

21  defendant's state of mind I believe Mr. Pitluck brought it up.

22          MS. DENERSTEIN:  I don't recall that but I also

23  recall your Honor withdrew certain exhibits on that section in

24  response that had to do with consulting.  The only thing that

25  was left was Dr. Weg and then Ken Banta which is already part

*Proceedings*                                            10092

1   of this case.  But that was in response to some of what you

2   said.

3            I don't recall whether 613 was mentioned or not, but

4   I also respectfully disagree with the characterization of the

5   production.  I mean, they've had our documents for a number of

6   days before Mr. Dooley finished testifying and they gave us

7   these at lunch, so --

8            MR. BRODSKY:  Today.

9            THE COURT:  I'm just saying that they the Government

10  may not have been able to be aware that you were going to use

11  the Ken -- the Weg e-mail to argue state of mind of

12  Mr. Shkreli.  And so, I do think the less we open up issues

13  that are not necessary the better.

14           I just wanted to say on the record that I understand

15  why this is coming up now.  I still don't know that it's a

16  good idea to allow this document to be admitted because

17  Koestler is a name that the jurors haven't heard about.

18           There's obviously an agreement here to prep the

19  consulting agreements with the idea in mind that Retrophin

20  shares will be used.  And whether or not that ever came to

21  fruition is not that relevant, frankly, in terms of the

22  conspiracy charge.  They don't necessarily have had to have

23  succeeded in defrauding Retrophin if there was an agreement to

24  do it as you know.

25           Nonetheless, I think we are so close to being

*Proceedings*                              *10093*

1   finished here and if this is the only document.  I do think

2   that they are raising this under §403 for not opening the door

3   to information that would compel the defense to introduce a

4   multitude of other e-mails that they think are relevant to

5   this to counteract exhibit, Government Exhibit 613, and I

6   would be disinclined to admit it before testimony regarding it

7   with all respect for the government.

8            MR. KESSLER:  For the record, it's transcript 9773

9   is when we discussed this document on Friday.

10           THE COURT:  That was at a bench conference when we

11  were discussing --

12           MR. KESSLER:  When Ms. Denerstein and I were going

13  through it.

14           MS. DENERSTEIN:  I was not given the document.  I

15  don't know if they mentioned it, there was a lot going on.  I

16  certainly didn't have any understanding that that was their

17  objective.

18           But regardless, your Honor, I apologize for the

19  exhibits.  We'll look at the rough transcript tonight.  I've

20  talked to Ms. Smith and we do intend to rest after Mr. Dooley,

21  but we'll put it in subject to the review the exhibits.

22           And, again, I just was probably doing too much, so I

23  think we got them all any apologize.

24           THE COURT:  I have a sense of unease about the way

25  exhibits have come in and whether the Government has had an

*Proceedings*                                            *10094*

1    tuned to make whatever qualifications had been agreed to.

2          The Court's list I don't think makes those fine

3    points to could, but it doesn't.  And so.

4          MS. DENERSTEIN:  We can prepare such a list.

5          THE COURT:  You should confer and also confer with

6    Ms. Jackson.

7          MS. DENERSTEIN:  We will.

8          THE COURT:  Are you going to reserve your resting

9    until tomorrow?

10          MS. DENERSTEIN:  We would like to rest after we

11   resolve subject any exhibit issues.

12          THE COURT:  Would you want to make those known to

13   the jury?

14          MS. DENERSTEIN:  I think it depends.  If we've

15   already read it and it simply just offering it, I think we can

16   just probably do it on the record if the Government agrees.

17          THE COURT:  So please work that out as soon as you

18   can.

19          MS. DENERSTEIN:  We will.  It will be done.

20          (A brief pause in the proceedings was held.)

21          MR. KESSLER:  Your Honor, setting aside that

22   exhibit, there are and my understanding no other exhibits, no

23   other objections to the documents we'll were offered during

24   the cross and they were very few.

25          THE COURT:  That's good do hear thank you.

*Proceedings*                                    *10095*

1          (A brief pause in the proceedings was held.)

2          THE COURT:  The charge have been up for about an

3    hour and a half I would encourage you all to read them.  Read

4    the verdict sheet hopefully we have no other issues, and we

5    can move forward.

6          (A brief pause in the proceedings was held.)

7          (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dooley - Cross - Kessler                    10096

1               THE COURT:  Does the defense want to retrieve the
2       exhibits?
3               MR. KESSLER:  I think if we leave them there it will
4       be more efficient.
5               (Whereupon, the witness resumes the stand.)
6               (Jury enters the courtroom.)
7               THE COURT:  All jurors are present.
8               Mr. Dooley, you're still under oath and at this
9       time.
10              Mr. Kessler, you may commence your
11      cross-examination.
12              MR. KESSLER:  Thank you.
13      CROSS EXAMINATION
14      BY MR. KESSLER:
15      Q    Good afternoon, Mr. Dooley.
16      A    Good afternoon.
17      Q    I think you told us when you first began testifying that
18      you're paid $575 an hour; is that right?
19      A    That's correct.
20      Q    How many hours have you worked as of now on this case?
21      A    Well, when I last testified last week about that I think
22      I accumulated about $24,000 in hours.  I don't know what it is
23      today.  I haven't totaled those numbers.
24      Q    Do you have an estimate how much more time you spent
25      since you began testifying?

Dooley - Cross - Kessler                    10097

1    A    Maybe 16 more hours.

2    Q    So about another eight or $9,000, so between 30 and

3    $40,000 in your hourly billing?

4    A    Approximately, yes.

5    Q    Do you have a staff or associates who also work with you

6    on this case?

7    A    No.

8    Q    Are you being compensated in any other way for your

9    testimony, other than through your hourly billing?

10   A    My hotel rate is picked up, my meals.

11   Q    You said you were retained by the defense in August of

12   2017; is that right?

13   A    That's correct.

14   Q    You met with defense counsel repeatedly since then?

15   A    Yes.

16   Q    You've reviewed documents as part of this case?

17   A    Yes, I have.

18   Q    I want to ask you first about your understanding of the

19   events in this case.  You didn't participate in any events

20   related to this case between 2012 and 2015, correct?

21   A    Correct.

22   Q    You have no first-hand knowledge of the events in this

23   case at all?

24   A    None.

25   Q    You didn't create any of the documents you testified

Dooley - Cross - Kessler                    10098

1    about on direct?

2    A    I did not.

3    Q    You didn't send or receive any of them?

4    A    No.

5    Q    You didn't pick the documents you testified about?

6    A    I did not.

7    Q    Those are all picked by defense counsel?

8    A    Yes.

9    Q    Did you read all the documents that were selected by

10   defense counsel?

11   A    Yes.

12   Q    You also testified about a number of demonstrative charts

13   that were shown to the jury, do you recall that?

14   A    I do.

15   Q    I believe you testified that the defense counsel prepared

16   those charts; is that right?

17   A    That's right.

18   Q    Did you have any input into what went on the chart?

19   A    I ticked and tied the chart to make sure the exhibit

20   number was correct, the date was correct, the subject matter

21   was correct, the to the from, the CC was all correct.

22   Q    When you say the subject matter, you mean the subject

23   line of an e-mail?

24   A    Correct.

25   Q    So not the subject matter of the document in general.

Dooley - Cross - Kessler                    10099

1    A    Correct, the subject line of the e-mail.

2    Q    You didn't pick which documents went on the chart?

3    A    I did not.

4    Q    Now, you're aware that these charts have been revised

5    several times both before and during your testimony, correct?

6    A    Yes.

7    Q    So the final demonstratives shown to the jury in some

8    cases were not the same in all respects as the initial

9    demonstratives that were created?

10   A    Yes.  And I actually made sure that some of those

11   corrections were made.

12   Q    Okay.  So did you reverify the accuracy in each of the

13   demonstratives each time it was recreated?

14   A    I tried to, but during my testimony you can see I missed

15   something in one of my earlier charts, I corrected that on the

16   stand.

17   Q    If I can have the Elmo.  I want to ask you to start with

18   one of these charts, this is Defense Exhibit 110-27.  Do you

19   remember that?

20   A    110-47?

21   Q    Forty-seven, there we go.  You remember testifying about

22   this on direct?

23   A    Yes, I do.

24   Q    You didn't create this chart?

25   A    I did not.

1    Q     Do you know when this chart was created?

2    A     I do not.

3    Q     This chart shows some share transfers related to

4    Government's Exhibit 111-26?

5    A     Yes, I recall.

6    Q     I think you testified on direct that it was a fair and

7    accurate representation of the documents in Government's

8    Exhibit 111-26?

9    A     Yes.

10   Q     But this doesn't show all of the information from

11   Government's Exhibit 111-26, right?

12   A     Yes, I believe that's correct.  I believe there are a

13   number of other charts that also don't include all of the

14   documents.

15   Q     So what makes it fair and accurate?

16   A     It's a fair and accurate representation of what I'm

17   talking about, what I've been asked to speak about.

18   Q     So you were just asked to speak about the share transfers

19   on this particular chart?

20   A     Yes.

21   Q     So for example, you weren't asked to talk about the dates

22   of any of these transfers, right?

23   A     No.

24   Q     The defense chart, which you verified, doesn't say

25   anything about the dates of these transfers, right?

1    A    It does not.

2    Q    So this chart is fair and accurate in the your view only

3    to the extent that the data on the actual chart matched to the

4    document?

5    A    Correct.

6    Q    You're not offering any opinion about anything else that

7    this chart shows or doesn't show?

8    A    I am not.

9    Q    Do you recall testifying today about a consulting

10   agreement related to Mr. Blanton?

11   A    Yes.

12   Q    I think you looked at Defense Exhibit 1106, which was an

13   e-mail from March 2014, in which I believe it was Mr. Greebel

14   who wrote, "Blanton is done," do you remember that?

15   A    I remember those words.  I don't remember the exhibit

16   number.

17   Q    You remember it was a March 2014 e-mail, right?

18   A    I don't remember that.

19   Q    Well, so you're aware that Mr. Blanton received an option

20   agreement in August of 2013, right?

21   A    No, I'm not.

22   Q    You didn't testify about the option agreement, right?

23   A    I don't remember testifying about an option agreement

24   Mr. Blanton.

25   Q    You're aware that Blanton received a consulting

1  agreement, a draft, in September 2013?

2  A    Could you show me the document to refresh my

3  recollection?

4  Q    I'm tying to see having testified about the final

5  version, I'm trying to see if you remember the other

6  documents.  Did you remember there was a September 2013 draft

7  consulting agreement for Darren Blanton?

8  A    Again, without seeing the document -- unfortunately, I

9  testified to a lot of documents, counselor.

10 Q    You didn't testify about a September 2013 draft

11 consulting agreement, right?

12 A    I don't remember if I did or not.

13 Q    You didn't testify about an October 2013 settlement

14 agreement that was offered to Darren Blanton, did you?

15 A    I don't have any recollection of any document that you're

16 referring to.

17 Q    And you were also, when you were talking about consulting

18 agreement, you were shown a document related to someone named

19 Stuart Weg, MD; do you remember that?

20 A    I remember the name, yes.

21 Q    You have no idea who Stuart Weg MD is, right?

22 A    I do not.

23 Q    You were shown a number of Board minutes, do you remember

24 that?

25 A    Yes.

1    Q    You have no idea what was actually discussed at any of

2    the Board meetings associated with those minutes, right?

3    A    That's correct.

4    Q    And you have no idea what was agreed ed to or not agreed

5    to at any of those meetings, right?

6    A    Correct.

7    Q    You have no idea if the minutes are accurate?

8    A    I do not.

9    Q    You just read the minutes that were put in front of you.

10   A    I read the minutes that were represented as minutes in

11   the documents, represented to me as Government and defense

12   exhibits.

13   Q    Represented minutes, they said minutes, someone told you

14   they were minutes?

15   A    Correct.

16   Q    You testified about a chart that shows some distribution

17   of minutes, do you remember that?  It's Defense Exhibit 7A,

18   I'll put it up.

19   A    Yes.

20   Q    This is one of the demonstrative charts, do you recall

21   testifying about Defense Exhibit 7A?

22   A    Yes, I do.

23   Q    I believe you testified that this demonstrative lists

24   several exhibits that show when Board minutes or sets of Board

25   minutes were sent to various people; is that correct?

Dooley - Cross - Kessler                    10104

1    A    Correct.

2    Q    So the first e-mail that's on your -- defense counsel's

3    demonstrative is December 2013, right?

4    A    Yes.

5    Q    So that's the first e-mail on this demonstrative showing

6    that Board minutes were sent to anyone associated with

7    Retrophin, right?

8    A    I don't know if that's accurate.  It's the e-mail

9    distribution of minutes that I was provided in the chart that

10   I referred to and the documents that I referred to.  I have no

11   idea if there are distribution minutes before December 12,

12   2013.

13   Q    I just asked, the first e-mail on the chart you testified

14   about in this trial is December 2013, right?

15   A    Correct.

16   Q    Nothing before that?

17   A    Nothing that I know of but.

18   Q    If we look at the first 1, 2, 3 entries there are all

19   dated December 12, 2013; is that right?

20   A    That's correct.

21   Q    Those are e-mails between Mr. Greebel and Mr. Panoff and

22   in one case Mr. Jain and Mr. Hackert, correct?

23   A    Correct.

24   Q    Then there is one in May that also goes to Mr. Hackert?

25   A    Correct.

Dooley - Cross - Kessler                    10105

1    Q    Another one many May also goes to Mr. Hackert?

2    A    Correct.

3    Q    Another one in August that goes to Mr. Hackert?

4    A    Correct.

5    Q    No e-mails on the first page of your chart that go to the

6    Retrophin Board of Directors, right?

7    A    On this chart, yes.

8    Q    If we go to the second page of the chart, three more

9    entries for September and October 2014.  Do you see that?

10   A    I do.

11   Q    I apologize for the handwriting, you had switched the

12   2013 to 2014 so I did that too.

13   A    Thank you.

14   Q    The first e-mail that goes to someone associated with the

15   Retrophin Board of Directors in your demonstrative is

16   September 2014, correct?

17            MS. DENERSTEIN:  Objection.

18            THE COURT:  Rephrase.

19   Q    Do you know who Meg Valeur-Jensen is?

20   A    I do not.

21   Q    So the first e-mail that went to Meg Valeur-Jensen was

22   September 2014, right?

23   A    Yes, on this chart.

24   Q    On this chart, right.  You were also shown an e-mail

25   where Mr. Panoff -- strike that.

Dooley - Cross - Kessler                    10106

1              Do you remember DX9151, an e-mail from Mr. Greebel

2   to Mr. Panoff that attaches a number of Board minutes, do you

3   remember that?

4   A    Yes.

5   Q    One of those sets of Board minutes was for April 2013, do

6   you recall that?

7   A    I don't recall that without looking back at DX9151.

8   Q    You can check or accept my representation that the

9   April 2013 Board minutes -- it's toward the end of binder

10  three.

11  A    Thank you.  Yes.

12  Q    So the April 2013 Board minutes were included in that

13  9151 e-mail, right?

14  A    April 22, 2013.

15  Q    Right.  So that's included in that e-mail, right?

16  A    It is.

17  Q    You were also shown the next e-mail, DX1274, where

18  Mr. Panoff responded about 12 hours later to that e-mail

19  saying, "I'm okay with these," right?

20  A    Yes.

21  Q    You know Mr. Panoff wasn't working at the company in

22  April 2013, right?

23  A    I don't know that.

24  Q    Well, he couldn't have verified the accuracy of the

25  minutes for a time when he wasn't working at company, right?

1          MS. DENERSTEIN:  Objection.

2          THE COURT:  Overruled.  You can answer.

3   A    I don't know that.

4   Q    Moving on.  You were shown DX1289, which is also in

5   binder three toward the front.  You see this is an August 2013

6   e-mail between Mr. Richardson, Mr. Shkreli, Mr. Greebel and

7   Mr. Aselage about the Mike Smith employment agreement?

8   A    Yes.

9   Q    I'd like to show you another document marked for

10  identification as Government's Exhibit 1385.

11         MR. KESSLER:  May I approach, your Honor?

12         THE COURT:  Yes.

13  Q    Do you have Government's Exhibit 1385 in front of you,

14  Mr. Dooley?

15  A    I do.

16  Q    Can you turn to the second page of the document and look

17  at the bottom e-mail, you see that's the same e-mail that's at

18  the bottom of Defense Exhibit 1289?

19  A    Yes, it appears to be the same document.

20  Q    Then there is another e-mail chain in Government's

21  Exhibit 1385 that is not the same as the e-mail chain in

22  Defense Exhibit 1289.

23  A    Yes.

24         MR. KESSLER:  Your Honor, I offer Government's

25  Exhibit 1385.

1          MS. DENERSTEIN:  No objection.

2          THE COURT:  We receive in evidence Government's

3     Exhibit 1385.

4          (Government's Exhibit Number 1385 so marked and

5     received in evidence.)

6     Q    Mr. Dooley I'm starting on the second page on the bottom,

7     you see there is an e-mail from Mr. Greebel to Mr. Shkreli

8     that says, "attached is a draft of Mike Smith's employment

9     agreement"?

10    A    Yes.

11    Q    That's the same e-mail that we saw on Defense Exhibit

12    1289, right?

13    A    Yes.

14    Q    Then there is e-mails back and forth between Mr. Shkreli

15    and Mr. Greebel and Mr. Panoff.  And at the top of this second

16    page, July 31, 2013, 1:35 p.m. Mr. Shkreli writes, "Board

17    approval is not necessary for an 85K guy," do you see that?

18    A    I do.

19    Q    First page, Mr. Greebel responds on the bottom, "The

20    issue is the options not the cash portion."  Do you see that?

21    A    I do.

22    Q    Mr. Shkreli says, "It's also a tiny amount who cares," do

23    you see that?

24    A    I do.

25    Q    Mr. Greebel writes, "The issue is giving out equity.

Dooley - Cross - Kessler                    10109

1  Since there is no plan, equity grants are either approved by

2  the Board or the CEO is given blanket discretion up to a

3  certain number.  I tried getting the latter for you, but

4  Richardson wanted the consultant to come in.  We can send an

5  e-mail to the Board for a digital sign off to give you

6  discretion."  Do you see that?

7  A     I do.

8  Q     Mr. Shkreli writes back, "Yeah that's stupid.  I should

9  be able to hire people without at approving every single EA.

10 Whatever it takes, just do it," you see that?

11 A     Yes.

12 Q     Mr. Greebel sends this e-mail to Mr. Panoff, right?

13 A     Yes.

14 Q     You can set that aside.

15        Do you recall you were also shown some e-mails

16 related to someone named Andrew Vaino?

17 A     Yes.

18        MR. KESSLER:  May I approach?

19        THE COURT:  Yes.

20        Could you identify what the exhibit is?

21 Q     I've put in front of you several exhibits, Government's

22 Exhibit 1355, 1370, 1393, 1394, and 1395.  Do you see those?

23 A     I do.

24        MR. KESSLER:  Your Honor, I offer all of these.

25        MS. DENERSTEIN:  No objection, your Honor.

Dooley - Cross - Kessler                    10110

1          THE COURT:  All right.  We receive in evidence

2    Government's Exhibit 1355, 1370, 1393, 1394 and 1395.

3          (Government's Exhibit Numbers 1355, 1370, 1393,

4    1394, and 1395 so marked and received in evidence.)

5    Q    Let's start with 1355.  You see on the bottom of this

6    e-mail chain there is an e-mail from Mr. Vaino to Scottrade

7    customer support on December 14, 2012?

8    A    I do.

9    Q    Mr. Vaino writes, "I'll be depositing stock certificates

10   for shares of DGTE on Monday morning at the Scottrade office

11   in Encinitas, California."  Do you see that?

12   A    I do.

13   Q    Then the top e-mail is a reply from Scottrade customer

14   support to Mr. Vaino, "Dear Andrew, we have received your

15   document."  Do you see that?

16   A    I do.

17   Q    Let's go to the next document, this Government's Exhibit

18   1370.  You see this an e-mail chain January 2013 between

19   Mr. Shkreli, an e-mail address ending SFGNYC.com, George

20   Huang, Marek Biestek and eventually Mr. Vaino.  Do you see all

21   those?

22   A    Yes.

23   Q    You testified on direct about the I believe December 31

24   e-mail where Mr. Vaino said, please use my Yahoo address going

25   forward, or words to that effect.  Do you remember that?

Dooley - Cross - Kessler                    10111

1   A    I have to look at the document you're referring to to say
2   I did or did not.
3   Q    You remember testifying about a couple of e-mails
4   relating to Mr. Vaino?
5   A    I do.
6   Q    One of them was December 2013 -- 2012, I'm sorry.
7   A    I don't know that.
8   Q    Okay.  If you look at the bottom of this Government's
9   Exhibit 1370, you see Mr. Shkreli is forwarding a voicemail?
10  A    I do.
11  Q    In the next e-mail January 19, 2013, 8:17 p.m.
12  Mr. Shkreli writes, "SRPT forward new voicemail has been
13  received," that's the subject, right?
14  A    Yes.
15  Q    Mr. Shkreli writes to the e-mail address ending
16  SFGNYC.com, to George Huang and Marek Biestek, "Please take a
17  listen to my friend Peter Rheinstein's brief voicemail on
18  SRPT.  Peter was one of the senior people at FDA for many
19  decades and has been my go-to guy for all things regulatory."
20  A    Yes.
21  Q    You understand FDA to be Food and Drug Administration?
22  A    Yes.
23  Q    Then Mr. Shkreli goes on, "He points out an interesting
24  thing here that I have not heard before, which is Sarepta will
25  likely have to do a bridging study to prove new large-scale

Dooley - Cross - Kessler                    10112

1    product is equivalent to old, small-scale product.  This won't

2    be a trivial thing because of the oligomer nature of the

3    product?"  Do you see that.

4    A    Yes, I do.

5    Q    Sarepta is a company that works on Duchenne Muscular

6    Dystrophy drug?

7    A    I don't.

8    Q    If you look up Mr. Biestek forwards the e-mail I just

9    read to Mr. Vaino, right?

10   A    Yes.

11   Q    And Mr. Vaino writes back a long answer, which we'll get

12   to in a minute, do you see that?

13   A    Yes.

14   Q    Then Mr. Shkreli responds to both Mr. Vaino and

15   Mr. Biestek related to that long answer, right?

16   A    Yes.

17   Q    So let's read the first paragraph of Mr. Vaino's

18   response.  "I think he's wrong on a requirement for a bridging

19   study.  Eteplirsen is a 29 mer pseudo oligonucleoside, not a

20   biologic.  The synthesis is entirely chemical, though strictly

21   all drugs are, and is accurately characterized with HPLC.  If

22   even one of the 86 stereogenic centers is incorrect it will

23   affect the chromatogram.  Is there a example of a non-biologic

24   that required a bridging study with the same chemical

25   composition?"  Do you see that?

Dooley - Cross - Kessler                    10113

1    A    I do.

2    Q    Fair to say Mr. Vaino is weighing in on a scientific

3    question?

4              MS. DENERSTEIN:  Objection.

5              THE COURT:  I would sustain the objection.

6    Q    Before we go to the next e-mail related to Mr. Vaino, I

7    ask you to take a quick look at Defense Exhibit 104-97A, which

8    is towards the back of binder four.  This is the Desert

9    Gateway 8K, correct?

10   A    Yes.

11   Q    December 12, 2012?

12   A    Yes.

13   Q    If you look at page six of the document you see there is

14   an overview of Retrophin?

15   A    Yes.

16   Q    If you look at this disclosure here, starting with, "Our

17   second development program is RE-024 a series of molecules

18   designed to treat PKAN.  Our preclinical development, RE-024

19   is the being carried out with the St. Jude's Children Research

20   Hospital"?

21   A    I do.

22   Q    "We expect to file an IND for lead compound in the RE-024

23   program by 2014.  Our third product in development in RE-001,

24   a modified protein intended to treat DMD."  Do you see that?

25   A    I do.

Dooley - Cross - Kessler                    10114

1   Q     DMD is Duchenne Muscular Dystrophy, right?

2             MS. DENERSTEIN:  Objection.

3             THE COURT:  Do you know, sir?

4             THE WITNESS:  I do not.

5   Q     To be clear, the second development program disclosed in

6   this December 12, 2012, program is the RE-024 molecule, which

7   is being developed in collaboration with St. Jude's, correct?

8             MS. DENERSTEIN:  Objection.

9   A     I don't know.

10            THE COURT:  You can refrain the question, if you

11  would like, Mr. Kessler.

12  Q     Let me try it this way.  You see a reference to

13  St. Jude's, right?

14  A     I do.

15  Q     Now I'd like you to take -- strike that.

16            I'd like you to take a look at Government's Exhibit

17  1394, which is in the stack of papers I gave you.  Do you have

18  that?

19  A     I do.

20  Q     You see Government's Exhibit 1394, is a February 14

21  e-mail chain between Martin Shkreli, Rouslan Michtenko and

22  Andrew Vaino?

23  A     I do.

24  Q     And so the bottom email Mr. Shkreli writes to

25  Mr. Michtenko, copying Mr. Vaino, "Hi Rouslan, I wanted to see

Dooley - Cross - Kessler                    10115

1    if you can make compound two between 1.0 and 1.5 grams and

2    ship it to our partner St. Jude's in the next few weeks"?

3    A    I do.

4    Q    That was sent two months after the Desert Gateway 8K that

5    we just saw on December 12, 2012, correct?

6    A    Yes.

7    Q    Then Mr. Michtenko responds to Mr. Shkreli, again copying

8    Mr. Vaino, "Hi Martin, I'm traveling but will try to find out

9    if we can accommodate the synthesis as requested.  Could you

10   or Andy please confirm the structure of the molecule to be on

11   the same page," do you see that?

12   A    I do.

13   Q    This e-mail is February 14, right?

14   A    It is.

15   Q    Take a look at Government's Exhibit 1393, also in your

16   pile.  This is another e-mail chain from February 14, 2013,

17   right?

18   A    Yes.

19   Q    If we look at the bottom, there is an email from someone

20   named MichaelShuster@Fenwick.com to Martin Shkreli?

21   A    Yes.

22   Q    Fenwick is a law firm, right?

23              MS. DENERSTEIN:  Objection.

24              THE COURT:  If you know.

25              THE WITNESS:  I don't know.

Dooley - Cross - Kessler                    10116

1   Q    You see Mr. Shuster's signature block there at the

2   bottom, Michael Shuster Fenwick and West LLP, do you see that?

3   A    I do.

4   Q    Then Mr. Shuster is described as partner, IP Group?

5   A    I see that.

6   Q    IP means intellectual property?

7            MS. DENERSTEIN:  Objection.

8            THE COURT:  If you know.

9   A    I don't know.

10  Q    You don't know?

11           MS. DENERSTEIN:  Objection.

12           THE COURT:  Asked and answered.

13  A    It could mean a lot of things.

14  Q    Okay.  So you see that Mr. Shuster writes, "Martin, was

15  really fun to meet you today.  Looking forward to working on a

16  first project with you.  Probably best way to start would be

17  to get me a copy of provisional application."  Do you see

18  that?

19  A    Yes, I do.

20  Q    Then Mr. Shkreli responds that It was nice to meet

21  Mr. Shuster.  Then Mr. Shuster responds, "How would you

22  recommend we move forward on converting your provisional

23  application?  Can I send a draft engagement letter to you?

24  Can you give me some info regarding the filed provisional?"

25  Do you see that?

Dooley - Cross - Kessler                    10117

1   A    I do.

2   Q    Mr. Shkreli responds to Mr. Shuster copying Mr. Biestek

3   and Andrew Vaino using the Yahoo e-mail, do you see that?

4   A    Yes.

5   Q    Mr. Shkreli writes, "Sure you can send a draft EL.  I

6   CCed a colleague who should be able to get you the rest."  Do

7   you see that?

8   A    I do.

9   Q    Finally, I'd like you to take a look at Government's

10  Exhibit 1395.

11  A    Yes.

12  Q    You see on the bottom there is an e-mail from Marek

13  Biestek to Berge Minassian on February 25?

14  A    Yes.

15  Q    That copies Tom Fernandez, Michael Smith, Martin Shkreli,

16  and himself?

17  A    Yes.

18  Q    Then there is a discussion about something called Lafora

19  disease?

20  A    Yes.

21  Q    Mr. Biestek asked at end if there is a time convenient

22  for a call, do you see that?

23  A    Yes.

24  Q    Mr. Minassian responds, "Next Monday or Friday would be

25  good.  Please arrange with my secretary."  Do you see that?

Dooley - Cross - Kessler                    10118

1    A    I do.

2    Q    On the top Mr. Biestek sends that e-mail to Mr. Vaino at

3    his Yahoo address, do you see that?

4    A    Yes.

5    Q    On February 25?

6    A    Yes.

7    Q    And he says, "Hey, would you join us on this call?"  Do

8    you see that?

9    A    I do.

10   Q    I want to shift topics to something else you testified

11   about.  I believe you testified about this next demonstrative

12   on your first day here, this is Defense Exhibit 5, do you

13   remember this?

14   A    Yes.

15   Q    This is a chart with a number of e-mails from different

16   people associated with MSMB Healthcare and MSMB Capital?

17   A    I don't know who they are associated with.

18   Q    You remember you read a number of these e-mails including

19   the bottom two, the one related to Schuyler Marshall and the

20   one related to David Geller?

21   A    I read some e-mails, I don't know if those were

22   specifically read.

23   Q    Do you recall reading an e-mail showing that Mr. Marshall

24   had been offered a settlement agreement before the e-mail you

25   read on this chart?

1   A    I don't recall that, counsel.

2   Q    Do you recall reading an e-mail showing that Mr. Geller

3   had signed the settlement agreement before the e-mail you read

4   on this chart?

5   A    If I could go to the exhibits, I don't know.  I don't

6   know if I read that e-mail.

7   Q    Okay.  I next want to ask you about Defense Exhibit 7707,

8   which is in binder two.  Have you found it?

9   A    I have.

10  Q    So this is a document you testified about on direct; is

11  that right?

12  A    It could be, I testified about a lot of documents, a lot

13  of Board meetings, a lot of Board minutes, a lot of Board

14  e-mails.

15  Q    So let's talk about this one.  This is a July 23, 2013,

16  e-mail, do you see that?

17  A    I do.

18  Q    From Mr. Panoff to Martin Shkreli, Stephen Aselage,

19  Steven Richardson, right?

20  A    Yes.

21  Q    Copies Mr. Greebel, Mr. /KERT and Mr. Jain?

22  A    Yes, it does.

23  Q    This e-mail relates to a July Retrophin Board meeting,

24  right?

25  A    Yes.

Dooley - Cross - Kessler                    10120

1    Q    If you turn to the second page of the document, you see

2    there is a letter there from Marcum to Mr. Shkreli and

3    Mr. Panoff?

4    A    Yes.

5    Q    This is an engagement letter of some sort?

6    A    Yes.

7    Q    Then if you flip ahead in the document to the page that

8    has Bates number 107168, do you see there is another

9    communication there to Retrophin?

10   A    107168, yes.

11   Q    You understand this is another letter from Marcum to

12   Retrophin?

13   A    I don't know that.  There is no header on the document.

14   Q    Okay.  You see it begins, "In connection with our review

15   of the interim condensed consolidated financial statements of

16   Retrophin Inc. And subsidiary the company for the quarterly

17   period ended March 31, 2013," do you see that?

18   A    I do.

19   Q    If you go all the way ahead to the document, the page

20   where it's Bates stamp 174?

21   A    Yes.

22   Q    You see that's page seven of this letter signed, "Very

23   truly yours Marcum LLP Edward F. Hackert"?

24   A    Yes.

25   Q    You remember you read a letter, an excerpt, from Marcum

1  to the Board later in time?

2  A    I don't know if was later in time.  I read a letter from

3  Marcum, when it was I don't recall, counsel.

4  Q    You read in that letter from a significant unusual

5  transaction section as well, do you remember that?  You read a

6  disclosure about settlement agreements?

7  A    I read several disclosures of settlement agreements,

8  whether it was within the significant accounting policy

9  practices, I don't recall.

10  Q    You see here there is number four, significant unusual

11  transactions on page 170?

12  A    Yes, significant unusual transactions.

13  Q    There is no discussion of settlement payments in this

14  July 23 letter from the auditor, is there, in this section?

15  A    A discussion of settlement agreements?

16  Q    Yes.

17  A    No.

18  Q    You can flip through the rest, if you want, but you'll

19  accept my representation there is no discussion of settlement

20  at any point in this seven-page letter?

21  A    I don't know without looking through the whole document

22  to answer that question.

23            MR. KESSLER:  Okay.  I have no further questions.

24            THE COURT:  Any redirect?

25            MS. DENERSTEIN:  Very briefly, your Honor.

1    REDIRECT EXAMINATION

2    BY MS. DENERSTEIN:

3    Q    On exhibits 1395, 1293, 1394, 1373, 1370 Mr. Greebel is

4    not on any of these e-mails, is he?

5    A    Not on 1395, not on 1393, not on 1394, not on 1355, not

6    on 1370.

7    Q    Did you say 1373?

8    A    1373, there is no 1373.  There is a 1393.

9    Q    Is Mr. Vaino, are these -- is Mr. Vaino responding to any

10   of these e-mails, Government's Exhibit 1393?

11   A    No, he's not.

12   Q    And is he responding in Government's Exhibit 1395?

13   A    No he's not.

14   Q    Is he responding in Government's Exhibit 1394?

15   A    No he's not.

16   Q    And in Government's Exhibit 1370, he does respond,

17   correct?

18   A    Yes, he does.

19   Q    You don't have any idea what they are communicating about

20   in this e-mail, do you?

21   A    I do not.

22   Q    With respect to Government's Exhibit 1385, if we just

23   pull that up.  In the e-mail from Mr. Greebel to Mr. Panoff

24   and Mr. Shkreli at 10:57 a.m., what does Mr. Greebel state

25   about Board approval?  The e-mail begins with, "Yes, I'm

Dooley - Redirect - Denerstein                10123

1    working on that."

2             It might be easier to look at the computer.

3    A    I have it.

4    Q    Bates number 081.

5    A    I have it.  10:57 a.m. from Evan Greebel to Martin

6    Shkreli and Marc Panoff re: Mike Smith employment agreement.

7    "Yes, I am working on that and will provide.  The royalty

8    agreement will need to be approved by the Board.  Since you

9    are awarding Mike options, I suggest you have the Board sign

10   off on his employment agreement since the comp seven

11   consultant has not delivered the report yet."

12   Q    So this e-mail is dated July 31, 2013, correct?

13   A    Yes.

14   Q    Let's go to Defense Exhibit 1,289.  If we go to the

15   bottom, it's an e-mail chain about Mike Smith's employment

16   agreement, right?

17   A    Yes.

18   Q    If we go to the e-mail at August 13, 2013, from

19   Mr. Greebel at 9:50 a.m.?

20   A    Yes.

21   Q    Is this dated later than the e-mail exchange in

22   Government's Exhibit 1,385?

23   A    Yes, it is.

24   Q    What is the date of the e-mail in Government's Exhibit

25   1,385?

Dooley - Redirect - Denerstein                    10124

1    A     July 31, 2013.

2    Q     What is the date of this e-mail in August 13, 2013 --

3    what is the date in this e-mail between Mr. Greebel and

4    Mr. Shkreli?

5    A     August 13, 2013.

6    Q     And is Mr. Greebel stating that the option portion needs

7    to be approved by the Board?

8    A     That's what stated in the e-mail.

9             MS. DENERSTEIN:  I don't have any further questions.

10            MR. KESSLER:  Nothing further.

11            THE COURT:  Sir, you're excused.  Thank you, have a

12   nice day.

13            (Whereupon, the witness was excused.)

14            MR. BRODSKY:  Your Honor, with the exception of

15   reserving on some exhibits that we're conferring with the

16   Government on, the defense rests.

17            THE COURT:  All right.  Well, let me then advise the

18   jurors where we are because I know you must be wondering.

19            The defense has rested.  And we anticipate that you

20   will be charged with the instructions and will be deliberating

21   by the end of this week.  What comes next are closing

22   arguments or summations.

23            You are free to deliberate as long as you deem

24   necessary.  This has been a long trial, and there is a lot of

25   evidence before you.  In the event that you're deliberations

1    are not completed by this Friday, December 22, we anticipate

2    returning to court so that you can resume your deliberations

3    on Tuesday, December 26, following the Christmas holiday.

4    With the exception of New Year's Day on Monday, January 1st,

5    the court will sit each day until you have completed your

6    deliberations.

7              If you have any scheduling conflicts, please advise

8    Ms. Jackson as soon as possible so that we can plan

9    accordingly.

10             So as I said, tomorrow summations, I'll charge you

11   with the instructions, and you may commence your

12   deliberations.  We believe that can happen before the end of

13   this week, all of that.

14             But again, we don't want the jury to feel rushed in

15   deliberations.  There is a lot of material and so we will be

16   available for you to sit and continue deliberations next week

17   starting next Tuesday.  If that presents an issue, when we

18   dismiss you for the day, please let Ms. Jackson know the

19   nature of your conflict, if there is one.  We hope there won't

20   be, but if there is, for example, travel plans or other issues

21   let her know the nature of your any issues.  All right.

22             With that we are prepared to adjourn for the

23   evening.  I want to thank you very much for your attention.

24   Tomorrow you will hear summations.

25             And in the meantime, please remain open minded,

Dooley - Redirect - Denerstein                    10126

1   don't expose yourself to any media deliberately, avoid any

2   media coverage, don't talk about the case with anyone

3   including your family members and each other.  The time for

4   you to talk about the case with each other is not going to

5   occur until after you hear the charges, the instructions.

6            Thank you very much.  We'll see you tomorrow

7   morning.  Please be prepared to start at 9:00 o'clock.  So if

8   you're here at 9:00 and you're all present, we'll start with

9   the summations.  Thank you.  Have a good night.

10           (Jury exits the courtroom.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                10127

1              (In open court; outside the presence of the jury.)

2              THE COURT:  Have a seat.

3              So in terms of the exhibits that are a little bit

4     jumbled up, did the parties propose to read a stipulation or

5     are you going to read into the record what we discussed in

6     terms of agreement to admit but not for the truth or how do

7     you propose to close the loop?

8              MR. KESSLER:  Let us confer and we will have a

9     proposal.

10             THE COURT:  Do you expect we will start summing up

11    tomorrow morning?

12             MS. SMITH:  Yes, Your Honor.

13             THE COURT:  All right.  Do we have a rough

14    estimate about timing and is the Government going to reserve

15    rebuttal time.

16             MS. SMITH:  Yes, the Government's going to reserve

17    rebuttal time.  I just want to put on the record since the

18    defense has rested it's apparent that the defendant has made

19    the decision not to testify.

20             THE COURT:  All right.

21             MS. SMITH:  And then in terms of the closing

22    argument.

23             THE COURT:  Well, let me just advise Mr. Greebel.

24    Sir, as you know, it is your right to testify and it is also

25    your right not to testify.  I will be instructing the jury

Proceedings                                    10128

1   that because you have chosen not to testify, they may not

2   hold that against you and I will also instruct them that

3   they cannot discuss that fact in their deliberations.

4         I just want to be sure, Mr. Greebel, that you

5   understand that you do have the right both to testify if you

6   choose to do so and also not to testify.

7         Do you understand that right, sir?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  And have you discussed this decision

10  with your attorneys?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  All right.  Thank you.  And have any

13  threats or promises been made to you that let to your

14  decision not to testify here today?

15        THE DEFENDANT:  No, Your Honor.

16        THE COURT:  All right.  Thank you.

17        Ms. Smith, I'll hear from you now.

18        MS. SMITH:  In terms of timing, obviously it is

19  always per the Judge.  The Government estimates that its

20  closing argument will be approximately three hours, maybe a

21  little bit longer than that.  So hopefully we can get

22  started first thing in the morning, that with the

23  mid-morning break I will be done by the lunch break.  That

24  is kind of the goal.

25        THE COURT:  And the defense?

```
                          Proceedings                  10129
```

1           MR. BRODSKY:  Your Honor, we have not fully run

2     through our summation.  We are still working on it.

3           THE COURT:  Well, can you give me a rough

4     estimate, please.

5           MR. BRODSKY:  I believe it will be longer than

6     three hours, Your Honor, and I will have a better estimate

7     tomorrow morning if Your Honor needs a more exact.

8           THE COURT:  All right.

9           MR. BRODSKY:  But we will be longer than three

10    hours.

11          THE COURT:  All right.  Then you will be prepared

12    the start --

13          MR. BRODSKY:  Oh yes.

14          THE COURT:  -- even if you have to go into the

15    next day.

16          MR. BRODSKY:  Oh, yes, Your Honor.

17          THE COURT:  Okay.

18          MR. BRODSKY:  We would like --

19          THE COURT:  Okay.

20          MR. BRODSKY:  -- to proceed.

21          THE COURT:  All right.  And I guess does the

22    Government have any idea about any rebuttal argument?

23          MR. PITLUCK:  Your Honor, it 100 percent depends

24    on the scope --

25          THE COURT:  I see.

Proceedings                                    10130

1              MR. PITLUCK:  -- of closing.

2              THE COURT:  All right.

3              I thought what I might do is just check with

4     Ms. Jackson, see if she got any strong push back on the

5     jurors.  No?

6              All right.

7              MR. DUBIN:  Your Honor, we just want to get a

8     little bit of guidance from you.

9              THE COURT:  They will be available next week.

10             MR. DUBIN:  We plan, because we have a long

11    summation and we are going to be covering a lot of different

12    stuff.  Mr. Brodsky and I plan to split it with me doing the

13    first hopefully first just 2 hours and then doing the back

14    end.  We will be covering different subject matter.

15             So I just wanted a little bit of guidance from

16    Your Honor on one thing.  There have been different -- when

17    the Government has raised an objection, and the answer was

18    not struck or the question was not struck and Your Honor

19    then directed a witness to answer the question yes or no, is

20    Your Honor comfortable with, you know, us reading this

21    portion of the transcript where you have directed a witness

22    to answer yes or no.

23             THE COURT:  Typically, the rulings of the Court

24    should be disregarded if the objection is sustained, right?

25             MR. DUBIN:  Correct.

Proceedings                                    10131

1          THE COURT:  Both the questions, the answers and
2   the rulings should be disregarded.
3          If I have given specific direction to answer yes
4   or no to a witness, I suppose it makes sense to give that
5   answer context.
6          MR. DUBIN:  Yeah.  I am just talking about --
7          THE COURT:  I am just not sure how --
8          MR. DUBIN:  Yes.  Let me give you a better
9   example.  Just an example where there was not an objection
10  sustained and there was an instance where Your Honor said --
11  there was an objection and then Your Honor said to the
12  witness, you know, the question calls for a yes or no
13  response, can you just answer yes or no.
14         That was it.
15         THE COURT:  All right.  Is there any issue that
16  the Government has with Mr. Dubin reading that part of the
17  transcript?
18         MS. SMITH:  I think it may depend on a
19  case-by-case basis.  Generally that is not done.  I don't
20  know why --
21         THE COURT:  I have never had that done.
22         MS. SMITH:  Especially if the question was asked
23  as a yes or no, I don't know why they Court's additional
24  instruction should be included just like any other Court
25  ruling.

```
                        Proceedings                    10132
```

1           THE COURT:  Well, I guess the only issue, we do

2    not usually read --

3           MS. SMITH:  The instruction --

4           THE COURT:  I do not usually have anyone read from

5    the transcript in the trial unless it is more substantive.

6           MR. DUBIN:  Do you mean during --

7           THE COURT:  Yes, during summations.

8           But if the answer is a yes-or-no answer, and that

9    context is important for the witness' answer so that, you

10   know, the jury heard the instruction.

11          MR. DUBIN:  I understand, Your Honor.

12          THE COURT:  I suppose given the length of the

13   trial it would not hurt to refresh them.

14          MS. SMITH:  Your Honor, I think if the question is

15   a yes-or-no question, then the Court's additional

16   instruction is unnecessary.  In fact, the Court's

17   instruction, jury instructions say, you know, sustained

18   objections, you know, how the objections themselves should

19   not be included.  So I suppose I can see a situation where

20   if it is not a yes-or-no question because the question was

21   not asked clearly, that may provide additional context but

22   if it is a yes-or-no question, the witness did not answer

23   yes or not, it was struck and then the Court instructed them

24   to answer yes or no, I do not know why that back and forth

25   would not be struck as any other objection, sustained

```
                        Proceedings                    10133
```

1    objection.

2           THE COURT:  All right.  And I am just trying to

3    envision, I think that came up during Agent Delzotto's

4    testimony.

5           MR. DUBIN:  Yes, among others.

6           THE COURT:  Where the response was not yes or no

7    and there was a request that I strike the answer and direct

8    the witness to answer yes or no?

9           MR. DUBIN:  Correct.

10          THE COURT:  So in that regard, what is important

11   is what the witness answered, whether it was yes or no and

12   not all the intervening.

13          MR. DUBIN:  Okay.  I understand.

14          THE COURT:  Because if something was stricken, I

15   do not know why --

16          MR. DUBIN:  It wasn't stricken.

17          THE COURT:  Oh okay.

18          MR. DUBIN:  It was just an instance where there

19   was nothing stricken, it was just a directive to him to

20   answer yes or no.

21          THE COURT:  Because you objected that he was not

22   answering yes or no?

23          MR. DUBIN:  I will have to go back and look.

24          THE COURT:  I mean, it is hard for me to --

25          MR. DUBIN:  I understand.

Proceedings                                    10134

1          THE COURT:  -- to visualize what my --

2          MR. DUBIN:  I might --

3          THE COURT:  I would prefer that we try to stick as

4    much to what the evidence is.

5          MR. DUBIN:  I think it would probably be more

6    appropriate in that instance, then, just to avoid the

7    problem just read the questions and answers and take out

8    Your Honor's comments.

9          That is what I will do.

10          THE COURT:  All right.  Well, if there's an

11   objection by a lawyer to the answer.

12          MR. DUBIN:  But in an instance where you did not

13   rule on the objection, you just directed the witness.  So

14   the objection just -- I think the way Your Honor dealt with

15   it in certain instances, not just with Special Agent

16   Delzotto but with various witnesses where, you know, if you

17   did not sustain the objection or overrule it, you might have

18   just turned to the witness perfectly, you know, appropriate

19   and in the flow of the questioning and say, can you just

20   answer it yes or no, and then they either would or would

21   not?  But in an abundance of caution, I will just leave

22   Your Honor's comments out.

23          THE COURT:  I think what happened in some

24   instances is the objection came after the answer, or if

25   there was an objection before I could rule, the question

```
                        Proceedings                 10135
```

1   would be rephrased and then the answer would be

2   forthcoming --

3           MR. DUBIN:  Okay.

4           THE COURT:  -- without an objection.  I just do

5   not know in a vacuum what exactly is at issue but...

6           MR. DUBIN:  That is why I will just err on the

7   side of caution and just leave Your Honor's comments out.

8           THE COURT:  All right.  Unless they are important

9   to understand the answer.

10          MR. DUBIN:  Okay.

11          THE COURT:  But I do not know exactly what you are

12  referring to.

13          MR. DUBIN:  Okay.

14          THE COURT:  So would you be putting it up on the

15  Elmo or up on the screen?

16          MR. DUBIN:  We intend to put testimony.

17          THE COURT:  All right.  So if you do that --

18          MR. DUBIN:  We will make sure we take out,

19  Your Honor's comments.

20          THE COURT:  All right.  What I would like to avoid

21  is either jumping up and objecting in the middle of

22  someone's closing.

23          MR. DUBIN:  Yes, Your Honor.

24          THE COURT:  But if it is appropriate, certainly.

25  If it mischaracterizes the evidence or if it goes into areas

```
                            Proceedings                    10136
```

1   that I directed the parties not to go into and there was an

2   objection, then it will be sustained.

3          MR. DUBIN:  Okay.

4          MS. SMITH:  And, Your Honor, we are just going to

5   review the transcript tonight.  There were a couple of

6   rulings about how documents or areas could be argued or not

7   argued in summation and if we have any remaining questions

8   after reviewing the transcript we will just raise them

9   tomorrow morning.

10         THE COURT:  All right.  It would be nice if you

11  could raise them with the defense team so you could

12  hopefully come to --

13         MS. SMITH:  We can try.

14         THE COURT:  -- some agreement.

15         MS. SMITH:  Absolutely.

16         MR. BRODSKY:  Your Honor, just as a comment and it

17  sounds like they have things in mind to read it tomorrow on

18  the day of summation which would require us changing our

19  summation just doesn't seem right.  If they have some

20  oblique reference to some issue that they thing they do not

21  want us to say during summation, they really should inform

22  us by tonight so we could address it in our summation.  The

23  last thing we want to do is hear about it tomorrow morning

24  and then have to somehow adapt so some position they are

25  taking which Your Honor accepts.

```
                        Proceedings                    10137
```

1          MS. SMITH:  Your Honor, we are happy to confer

2     right now and see if there are any issues.

3          I just have not had a chance to go through the

4     transcript.  We were not sure exactly when we would finish,

5     but we are happy to take a couple of minutes and do that

6     right now.

7          MR. DUBIN:  We can hang around.

8          THE COURT:  Did you want me to hang around too and

9     make rulings?

10          MR. CHAN:  Your Honor, if there is a chance, I

11     would like to talk about the most recent version of the

12     charge.

13          THE COURT:  If you are talking about another --

14     all right I will hear from you but I am not going to rehash

15     old rulings if that is what --

16          MR. CHAN:  Well, some of them related to things

17     that we have not argued yet because we only submitted things

18     in writing.  Some of them are not related to things we

19     submitted over the weekend and we have not argued to the

20     Court yet so I wanted to just --

21          THE COURT:  Well, you do not get to argue on

22     everything.  Okay?

23          MR. CHAN:  That is fine.  I am just asking if we

24     can.  If we can't, we can't.

25          THE COURT:  What did you want to argue about?

```
                        Proceedings                    10138
```

1   Mr. Chan, just give me the subject and I will decide whether

2   or not I will hear argument.

3          MR. CHAN:  Okay.  The first is with respect to

4   Page 50 of the black line that was just circulated, which is

5   the respect of the duty language.  I had understood from our

6   prior conferences that the Court was not going to include

7   the language about the duty applicable to corporate

8   officers.

9          THE COURT:  I was going to do it but make clear

10  that it wasn't applicable to Mr. Greebel.

11         MR. CHAN:  Well, so my question is why is it in

12  there?  If it is not a basis for liability in this case,

13  then why do we have the instruction?

14         THE COURT:  Because the Government made the

15  argument that Mr. Shkreli had a duty in the capacity as a

16  corporate officer.  And the duty to disclose ran Mr. Shkreli

17  with regard to his duty as an officer and the Government

18  viewed that the duty of disclosure runs separately to

19  Mr. Greebel in his capacity as an attorney and fiduciary

20  relationship with Retrophin.

21         So the idea was to advise the jury that there were

22  two duties, separate duties, that would have obligated them

23  to disclose certain information.

24         MR. CHAN:  Yeah.  And I thought from our

25  conference that the Court had ruled that the Government can

Proceedings                                    10139

1    proceed on this later theory, which is the theory that

2    because Mr. Shkreli owed a duty of loyalty to the company

3    that Mr. Greebel could be liable for any omission made by

4    Mr. Shkreli.

5              THE COURT:  I think we stated in the Charge that

6    Mr. Greebel could not be held liable for Mr. Shkreli's

7    violation of the duty.  I mean, I do not have it right now

8    with me so...

9              MR. CHAN:  Okay.

10             THE COURT:  What else do you have a problem with?

11             MR. CHAN:  So I understood that to be allowing for

12   the possibility but if the Court is saying it is not going

13   to allow for that then I do not have an issue.

14             THE COURT:  I am sorry if what?

15             MR. CHAN:  I thought the Court was saying exactly

16   what you just said just now, which is that Mr. Greebel could

17   not be liable for the omissions of Mr. Shkreli's duty,

18   right?  But I read the current language as allowing for that

19   possibility, which is why I am raising this.

20             If the Court is saying that, yes, you are adhering

21   to what I thought was your prior ruling that that secondary

22   basis of liability could not be a basis, then I do not

23   have an issue.  So I was asking if the Court was rethinking

24   its prior ruling.

25             THE COURT:  Was there language in that instruction

Proceedings                                      10140

1  or language that is not in that instruction that is

2  different from what we discussed previously?

3            MR. CHAN:  Yeah, because it merely says that there

4  is this other duty that belongs to Mr. Shkreli and that is

5  it.  It doesn't limit the basis for which the jury can

6  consider that duty in respect of Mr. Greebel's liability.

7  And I thought that that silence was on purpose by the Court

8  to leave open the possibility for the jury to find that as a

9  grounds for Mr. Greebel's violation of any omission.

10           THE COURT:  It is intended to discuss the two

11 separate duties vis-à-vis their separate submission.  CHECK

12 ON CHECK ON.

13           MR. CHAN:  True but I think it does now, it leaves

14 open for the jury to find Mr. Greebel guilty on Count 1

15 based on omissions made by Mr. Shkreli that violate

16 Mr. Shkreli's duty of loyalty as an officer, which is a

17 possibility that I thought we had argued in the prior

18 conferences that the Government was not going to be allowed

19 to argue.

20           THE COURT:  Yeah, I do not think they are going

21 it.  Are you, Mr. Pitluck?  I think --

22           MR. PITLUCK:  Your Honor, I think it is an

23 inaccurate statement of the law.  My recollection of the

24 conference was that we could not inject Martin Shkreli's

25 duty of loyalty attributed to Evan Greebel's knowledge which

Proceedings                               10141

1    we are not going to do.  We think the proposed Charge as

2    given makes clear who has what duty in this very specific

3    context and that is arguing an accurate statement of the

4    law.

5              THE COURT:  I guess the question is whether there

6    would be an objection if there was language added.  Is that

7    what you are advocating, Mr. Chan?

8              MR. CHAN:  Yeah.

9              THE COURT:  The jury may not find Mr. Greebel

10   guilty if they find that Mr. Shkreli did not abide by or

11   perform his duty as a corporate officer.

12             MR. CHAN:  Yes, Your Honor, that is what I would

13   ask.

14             THE COURT:  Which I think is what would be an

15   appropriate clarification.

16             MR. KESSLER:  I think that is accurate.  But it is

17   also the case that Mr. Shkreli's conduct is certainly

18   evident of Mr. Greebel's mind-set, his actions, that sort of

19   thing.

20             THE COURT:  Right.  But that is a different

21   statement.  You are saying that you can consider this

22   evidence versus you may not find Mr. Greebel guilty on the

23   basis of a finding.

24             MR. CHAN:  And I think if the Court limits it to

25   this language to the narrow version that you originally

Proceedings                                   10142

1   proposed about --

2          MR. KESSLER:  Sorry.  We are talking through the

3   difference between a conspiracy and a substantive charge.

4          THE COURT:  No.  I understand you have made that

5   argument before.

6          MR. KESSLER:  It is correct that, you know, if

7   Mr. Shkreli committed wire fraud, substantive wire fraud,

8   that might or might not help prove the conspiracy against

9   Mr. Greebel.  But Mr. Shkreli committing wire fraud would

10  not in itself make Mr. Greebel guilty of the conspiracy.  I

11  think that is the difference we are teasing out.

12         Does that make sense?

13         THE COURT:  Well, the question I have for you is

14  whether you would object to adding a clarifying sentence

15  that the jury may not find Evan Greebel guilty on the

16  grounds that Mr. Shkreli violated his duty as an officer or

17  director of Retrophin.

18         MR. PITLUCK:  Judge, I think that is actually

19  legally inaccurate in a conspiracy charge.  I think that

20  confuses it more than currently which has, makes it very

21  clear what Mr. Greebel's specific duty is.

22         MR. CHAN:  Well, I disagree.  I think that adding

23  the language about the separate corporate duty leaves us

24  hanging Chad basically what that means for the jury's

25  deliberations and I disagree that it is actually the law.

```
                            Proceedings                    10143
```

1    We have not found a case where that can be so in the context

2    of a wire fraud conspiracy, although *Wolson* aside as a

3    substantive case where the defendant was alleged to have

4    caused the duty violation of the officer and that is not the

5    case here.

6              THE COURT:  All right.

7              So you have no objections; is that right?

8              MR. PITLUCK:  Well, Judge we do have an objection.

9    We do think it is not legally accurate that a person

10   cannot be convicted because a co-conspirator violated their

11   fiduciary duty.  Now, we are obviously limited to language

12   that is charged here.  We are not going to allege that

13   Mr. Greebel had the fiduciary duty as an officer or director

14   which is what the Court clearly instructs.

15             THE COURT:  Isn't there language in there that

16   says he is not an officer.

17             MR. PITLUCK:  Yeah, there is, absolutely.

18             THE COURT:  Okay.

19             MR. CHAN:  But it doesn't say that he can't be

20   liable for the duties, violation of duties by Mr. Shkreli

21   who is an officer.

22             THE COURT:  You know, my clerk just confirmed what

23   I was recalling that the Government did, in fact, argue that

24   Mr. Greebel could be found guilty if he conspired with

25   Mr. Shkreli or Mr. Shkreli to violate his duty to Retrophin.

```
                        Proceedings                    10144
```

1           MR. PITLUCK:  That is right, Judge, because it is
2      a conspiracy.
3           THE COURT:  Right, right.
4           MR. CHAN:  They argue that but I thought
5      Your Honor had denied that application.
6           THE COURT:  Well, I want to keep it clear and I do
7      not want the jury to make mistakes about considering
8      Mr. Greebel's culpability based on a duty that they find was
9      violated by Mr. Shkreli.  The only way he could be liable
10     would be if he conspired or directed Mr. Shkreli to violate
11     his duty i.e., do not disclose to the Board.
12          I mean, I -- look --
13          MR. PITLUCK:  Your Honor, I think the affirmative
14     instruction that you cannot find him liable if he did, is
15     incorrect.
16          THE COURT:  Well, I think it is not aided and
17     abetted.  I am just saying you cannot find him guilty on the
18     ground that Mr. Shkreli violates his duty as an officer or
19     director of Retrophin.  The word aiding and abetting is not
20     in there and so, you know, it is a conspiracy charge.  But I
21     just wanted them to be clear that in order to find
22     Mr. Greebel guilty based on Mr. Shkreli's violation of his
23     corporate duty to Retrophin as an officer or director, it
24     would require an intentional knowing agreement by
25     Mr. Greebel to encourage Mr. Shkreli or to agree with him

Proceedings                                    10145

1   that he would violate his corporate duty.

2          MR. PITLUCK:  Judge, I think it is thoroughly

3   confusing that way.  If the Court's inclined to raise the

4   duty and say you cannot find this based on the duty our

5   prefer would be to take out the duty of both the duty of

6   loyalty.

7          THE COURT:  Take out Mr. Shkreli's duty

8   completely?

9          MR. PITLUCK:  Even though it should be in there

10  Judge.  Because obviously violation of the duty is not an

11  element of the Charge.

12         THE COURT:  Right.

13         MR. PITLUCK:  I think the Court may that

14  abundantly clear.

15         So if the Court is holding, I think, counter to

16  what we have argued then I think counter to the applicable

17  law on conspiracy, that Mr. Greebel cannot be convicted

18  based on Mr. Shkreli's violation of his duty, then there's

19  really no reason to have the duty in there at all.  It is

20  just surplusage to put something up and then say something

21  that is unrelated to it to undercut it.

22         So if that is the Court's inclination, we think

23  that is an accurate statement of the law and it has been

24  given in a number of conspiracy and wire fraud instructions,

25  but if the Court is inclined to add that based on our

Proceedings                                    10146

1    argument, then we would just request that that paragraph be

2    taken out.

3              MR. CHAN:  Well --

4              THE COURT:  I would have to look at what we got

5    because I do not have a copy here and I am not appreciative

6    of this because we spent hours and days and hours and days.

7              MR. CHAN:  Your Honor, the only reason I raise

8    because I thought the Court ruled the opposite.

9              THE COURT:  Stop interrupting me, Mr. Chan.  I am

10   sick and tired of it.  Seriously tired of it.  All of you.

11   It is constantly.

12             I mean, we have stayed here as long as I was

13   willing to stay here late into the night and the only reason

14   we adjourned is because somebody had to leave.  And now you

15   are telling me on the eve of closing, on the eve of charging

16   that there is an issue.

17             I tried many times to have the charging conference

18   between the parties but there is always something and we

19   stopped and now here we are.  And you are complaining you

20   could not argue it.  I just really think this record, your

21   characterization is dishonest and inaccurate and I do not

22   accept it.

23             MR. CHAN:  Your Honor, I think it is wrong to say

24   that I am being is dishonest.

25             THE COURT:  Not you, I am saying the

Proceedings                                          10147

1   characterization you do not have a chance the argue it is

2   dishonest and not inaccurate.

3          MR. CHAN:  I did not say about this one I did not

4   get a chance to argue, I raised this one because I thought

5   the Court had ruled the opposite which is the only reason I

6   am raising it now owed because I was confused as to why if

7   the Court ruled the opposite the last time we met it is now

8   appearing in the language that we did not expect to see.

9          THE COURT:  I am just going to excuse myself and

10  go get a copy.  I do not -- okay.

11         MR. CHAN:  I have an additional copy if you want

12  to use it as a copy.

13         THE COURT:  All right.  Thank you.

14         MR. CHAN:  So I think that the Government's

15  proposal as a solution, I agree with them is the solution.

16         THE COURT:  All right.

17         MR. CHAN:  Which would be to just delete the

18  paragraph starting There is no such duty, and then the

19  second paragraph would stay in except for the clause With

20  regard would come out and is that sentence would just start

21  In order.

22         THE COURT:  In order?

23         MR. CHAN:  Yes.  In order for a failure to

24  disclose material information.

25         THE COURT:  Is there any disagreement with that

1   change, Counsel for the Government?

2            MR. PITLUCK:  There is, Judge, because there is a

3   reference in the paragraph above to the fiduciary duty such

4   as the attorney/client relationship.  The paragraph that is

5   staying in.

6            MR. CHAN:  Well, then fine, we could just delete

7   Or the duty of loyalty from the first clause.  Saying with

8   regard to fiduciary duty comma.

9            MR. PITLUCK:  That is fine.

10           THE COURT:  All right.

11           What else?

12           MR. CHAN:  And with respect to the -- this goes to

13  Page 55 now and going to Page 55 with respect to the

14  instructions on Dr. Rosenfeld, I respectfully suggest that

15  the language that the Court added at the end of the

16  Rosenfeld instruction which said, the arbitration decision

17  does bind you in any way.  As I have previously stated you,

18  the jury, are solely responsibile for finding the facts in

19  this case based solely on the evidence at this trial.  I

20  think that that leaves open for the jury to conclude that

21  that the Rosenfeld consulting agreement was a sham

22  consulting agreement even though the Government said and the

23  Court instructs here that the Rosenfeld consulting agreement

24  is not a sham consulting agreement.  So I would suggest

25  taking out those last two sentences.

Proceedings                                    10149

1              MR. KESSLER:  Your Honor, it is not misleading in

2       any way.  Three sentences earlier Court said the Government

3       does not allege in with Count 1 that Dr. Rosenfeld's

4       consulting agreement and release defrauded Retrophin.  There

5       is absolutely nothing confusing at all.  The Court's

6       instruction is valid.  We made submissions about those.

7              MR. CHAN:  But if the arbitration decision is not

8       to be used to be based by the jury as a basis for finding

9       the consulting agreement was a sham, then there is in fact

10      finding for them to do on the basis of the arbitration

11      decision.

12             THE COURT:  Well, the thing is when the

13      arbitration decision was introduced, Dr. Rosenfeld was

14      walked through each particular section of the agreement.

15      And my concern is that the jury would be found or feel bound

16      that they had to make the same findings.  And this really

17      was introduced solely because it was defining the party

18      i.e., Retrophin owed Dr. Rosenfeld money for his consulting

19      and Dr. Rosenfeld provided it was not an agreement where

20      he was not owed.  And my concern is that juries often get

21      confused, so for example, in a discrimination case they see

22      an EEO decision they feel that they have to be bound by that

23      decision.  And this was made clear that the issues in this

24      trial are different.  I believe we took out language in the

25      arbitration agreement that issues regarding criminal

1    liability involving specific individuals was not for the

2    arbitrator and that that was decided in a different forum

3    and I think that, you know, this is just telling the jury

4    look, that was one decision and here you have a different

5    decision to make.

6           And by the way, we have been very clear that

7    the Government does not allege that the Rosenfeld

8    arbitration is a sham.  But I was concerned that because

9    Dr. Rosenfeld had been walked through on direct in detail

10   every single, virtually every single page in that

11   arbitration decision that they needed to realize that they

12   have a duty to find facts in this trial and not simply say,

13   well, the arbitrator found X, so we should all define this,

14   whatever that can X may be.

15          MR. CHAN:  Okay.  Understood.

16          The last one I want to raise is the next one on

17   the same, Page 56, concerning the backdating transcripts.

18   So here we would ask that the Court -- the Court did not add

19   the language that we had proposed where it informs the jury

20   that the backdating theory was dismissed.  We would ask the

21   Court to apprise the jury of that in these instructions.

22   Right now it just says that the Government does not allege.

23   As the Court obviously knows the Government did allege and

24   that allegation has been dismissed.

25          I note that throughout our jury conferences some

Proceedings                                    10151

1    of the Government fallback position had been that the model

2    Sand instructions should control, the model Sand instruction

3    as to when particular counts are dismissed have the Court

4    informing the jury of the fact that the dismissal, and so we

5    would ask the same here.

6              MR. KESSLER:  Your Honor, we submitted written

7    suggestions, the Court considered them.  There is nothing

8    wrong with the Court's Charge.  We should stick with it and

9    as we said about 27 times, there is nothing to dismiss.

10   There is one Count.  It is the same Count.  We are not

11   advancing one argument related to that Count which the Court

12   makes clear.  There is nothing to tell the jury they have

13   got to dismiss.

14             THE COURT:  That is the concern.  I do not think

15   it is accurate to say something was dismissed.

16             The Count remains.  One theory of exposure under

17   that Count has been withdrawn.  It is not going to be

18   proffered.  It is not something the Government is going to

19   argue.  And do not forget we are not reading the indictment,

20   the entire indictment, the different schemes to the jury.

21   They are not getting the indictment and they may not even

22   know what this is.  I mean, my concern was I know you had

23   proposed the backdating scheme.  We just did not see that

24   anywhere in the record.  I think that was something we

25   discussed at sidebar or in bench conferences but it wasn't

1    something that the jurors heard called the backdating

2    scheme.  There was testimony about backdating documents and

3    whether that was okay under the circumstances for which that

4    was done.  But it has never been, you know, it is not an

5    indictment.  It is not going to be described to the jury in

6    my Charges and the Government's simply not going to be

7    arguing to the jury about it.

8              MR. CHAN:  Well, I think the only difference in

9    this case is that they opened on -- they might have not

10   called it uses the word the backdating scheme.

11             THE COURT:  They did not.

12             MR. CHAN:  But in their opening statement -- no,

13   no, no I agree with that.

14             But in the opening statement it was clear that

15   that talked about three manners in which Count 1 was

16   violated.  And so by saying here that the Government does

17   not the allege, although currently true, it was not true at

18   the beginning of this trial.

19             MR. KESSLER:  Your Honor, we went through the

20   opening the last time.  There is no allegation that there is

21   three different plans.  There is a story.  It was

22   chronological; first thing happens, second thing happens,

23   third thing happens.  We are over this.  We went over this

24   in a prior conference.  There is just nothing more to

25   address.  The Court's Charge is correct.

Proceedings                                    10153

1           MR. BRODSKY:  The only other issue, Your Honor, I

2    would point out is that we did open with three theories,

3    prosecution based on what the Government had told us prior

4    to trial.  We did open that way.  We called it backdating.

5    We then went through settlements and consulting agreement we

6    did that based on the representation the Government made and

7    what they were going to prove.  And so we opened that way,

8    the jury heard it they way.  And for them to just say, oh,

9    we are not alleging it, we have to be able to say they

10   alleged it, they are withdrawing it, and otherwise,

11   Your Honor, it was completely misleading to us, leading us

12   to open in a certain way.

13          MR. PITLUCK:  Your Honor, we respectfully

14   disagree.  This is the night before the close.  We want to

15   work on this.  We think the Charge language is entirely

16   accurate and considered by the Court and --

17          THE COURT:  We tried to look through the entire

18   transcript.  We did word searches for this backdating and,

19   you know, to the extent there was a story in the opening by

20   the Government and the defense gave their view of that story

21   and what they thought the evidence would show.  I do not

22   think the jury has it in their head that this is a separate

23   basis on which the Government seeks to find -- strike that.

24          I do not believe that the jury has been told that

25   they can or should find Mr. Greebel guilty based on the

Proceedings                              10154

1  theory of the backdating.  It was a narrative of the

2  evidence and what is clear in this instruction is that they

3  cannot find him guilty based on those transcripts.

4         And, in fact, I think this is almost too general

5  and too broad because there has been a lot of evidence about

6  transfers in so many different contexts and a lot of you got

7  transferred shares.

8         The Fearnow shares were transferred around.  But

9  this is within, I think we should say Count 1, right?  And

10 it does say you cannot find Mr. Greebel guilty of Count 1

11 solely on the basis of evidence about these transfers.  That

12 is about as close as I can get without calling it the

13 backdating scheme which is not, again, in the record.

14        MR. CHAN:  Very well, Your Honor.  Thank you for

15 hearing us.

16        MR. PITLUCK:  Thank you.

17        MR. KESSLER:  Thank you.

18        THE COURT:  Have a nice night.

19        MR. KESSLER:  You too.

20        (Pause in proceedings.)

21        THE COURT:  All right.

22        MR. PITLUCK:  So, Your Honor, I apologize for

23 coming back.  I hope this is very brief, but we have

24 conferred and there are two issues that the Government

25 believes the Court has ruled on related to arguments that

Proceedings                                    10155

1    can be made at closing.  We have conferred, it seems we have

2    a difference of view.  We wanted to raise them to the Court.

3    The first is the rush to judgment issue and whether that can

4    argued at closing.

5              We interpreted the Judge's lengthy oral ruling to

6    mean that under the case law while the defense can certainly

7    argue about the absence of evidence, they cannot argue that

8    there was a rush to judgment.  And I do not want to rehash

9    the arguments because the Court is very, very familiar with

10   them, but the second issue in which we believe the Court

11   ruled and the defense represented that they weren't going to

12   argue it was the consciousness of innocence related to the

13   testimony of Special Agent Delzotto that the defendant did

14   give a statement.  And we were under the impression, which I

15   think is pretty clear in the record that that was only used

16   as a way to impeach Special Agent Delzotto on his view that

17   a lawyer would never speak to the Government.  And so we

18   would -- and obviously this impacts closings but we just

19   were seeking clarification from the Court as to the

20   appropriate scope of both of those arguments.

21             MR. DUBIN:  Your Honor, we understood Your Honor's

22   evidentiary ruling, but nothing precludes us from making any

23   argument that we feel based on the evidence we can make.  We

24   certainly are entitled to and there is nothing that should

25   ever prohibit us from arguing that in our view, our argument

Proceedings                                      10156

1    is that there was indeed a rush to judgment here.  We

2    understand that Your Honor's going to give the instruction

3    and we have read Your Honor's instruction carefully that the

4    Government is not on trial and they do not have to follow

5    any particular investigative technique and we can

6    acknowledge that.  But that does not preclude us from saying

7    that there is nothing that prevented them from speaking to

8    Mr. Greebel, that they could have done that and it is for

9    jury to decide.  And if we feel that that was a rush to

10   judgment, we should not be precluded from arguing that.

11   Those evidentiary rulings Your Honor made never in any way,

12   shape, or form were intended as we see it, to limit us from

13   making arguments during summation.  And with respect to what

14   Special Agent Delzotto testified to, we stayed within the

15   confines of Your Honor's ruling.

16           He offered up testimony as to the reason why he

17   did not speak to Mr. Greebel before arresting him because he

18   was an attorney and that the chances of him speaking were

19   null.  We are not going to go much further than comment on

20   his statement on his testimony.  We are not going to say

21   that and because he spoke, that was consciousness of

22   innocence.

23           (Continued on next page.)

24

25

*Proceedings*                                                        *10157*

1          (In open court; 5:36 p.m.)

2          MR. DUBIN:  So I think with all respect to the

3     Government and we -- Mr. Pitluck and I have a very nice

4     rapport -- we really vehemently disagree with being precluded

5     from making two critical, critical arguments.

6          The rush to judgment is a key to our defense and

7     they can argue that it wasn't and they can give all the

8     reasons why not.  But we I've never heard of being cut off

9     from making an argument during submissions.  That is perfectly

10    within the bounds of the evidence and, you know, that the case

11    law certainly doesn't prohibit.

12         MR. PITLUCK:  So, your Honor, obviously, there are a

13    number of arguments that you can't -- that either side can't

14    make, are precluded legally from making.  And I think the

15    Court's ruling and I'm giving a case cite of 9594, sorry,

16    transcript cite of 9594 which says in which the Court said:

17    Thus, the defense certainly may argue that some testimony or

18    document undercuts the Government's proof.  It should not,

19    however, focus on the course or timeline of the Government's

20    investigation with a purpose of arguing that had the

21    Government known certain facts at any given point in time it

22    would or should have declined to prosecute Mr. Greebel.

23         THE COURT:  Are you going there?

24         MR. DUBIN:  No, I'm not going to say they should

25    have declined to prosecute him.  But the very fact that there

*Proceedings*                                          10158

1  are documents that could be -- that are open to

2  interpretation.  And there were various witnesses that, you

3  know, that we think that the Government opened and represented

4  that a document meant X and we think we've brought out that it

5  meant Y.  So here's where I'm going.

6           THE COURT:  That's fine.

7           MR. DUBIN:  But we think that had we think that had

8  the FBI or the U.S. Attorney's Office taken the time to sit

9  down with Mr. Greebel and ask his explanation, we might not be

10 here.

11          Now, they can reject that and they can say that the

12 Court is going to instruct you that there's no obligation to

13 conduct an investigation in any particular way and that the

14 Government's not on trial, that's fine, they can argue that.

15 But we shouldn't be precluded from arguing that we think that

16 before you arrest someone you can talk to them.

17 Special Agent Delzotto testified about it and he gave a litany

18 of reasons why he wouldn't want to speak to them, but he also

19 said that nothing precluded him, nothing prevented him from

20 speaking to him first.  Why shouldn't we be able to argue

21 that?

22          THE COURT:  Well, because it does seem like what

23 you're doing is calling into question the agent's

24 investigative decisions.  He was on this case for two years

25 and he made the decision that interviewing Mr. Greebel was not

*Proceedings*                                               *10159*

1   something that he thought would be advisable and it could

2   impair his investigation.  I'm not saying it would have

3   happened, but I think any agent is concerned about destruction

4   of evidence or, you know, colluding or that kind of thing and

5   he made a decision.  It was an investigative decision within

6   his discretion about what to do or not do with regard to his

7   investigation.

8           Rush to judgment, as I understand it, we were trying

9   to really understand exactly how it comes up.  General rush to

10  judgment comes up if the police have obvious leads to follow.

11  So, for example, in a rape case they don't get a DNA sample

12  from the victim, or they don't get blood samples from a murder

13  scene or something, that would be that.  They go ahead and

14  arrest someone where there's obvious evidence that they could

15  have obtained or should have obtained but they make an arrest

16  without fully exploring.

17          It's a different situation to call into question

18  whether an agent should have talked to this person or that

19  person or got documents from source A, B, C at any given

20  point.  Think what the focus of the argument is that whatever

21  the agents did.  There's insufficient evidence to prove that

22  Mr. Greebel had the appropriate state of mind or they haven't

23  proven the charges set forth in Counts One and Two.

24          MR. DUBIN:  Your Honor, they had the opportunity to

25  and nothing prevented them from speaking to him first.  And

*Proceedings*                                                    **10160**

1   they can give all the reasons as Mr. -- and I would with all

2   respect to your Honor and the court, he shouldn't have been

3   able to testify, Special Agent Delzotto, but the litany of

4   reasons why he didn't do it first and, your Honor --

5               THE COURT:  You asked.

6               MR. DUBIN:  But your Honor --

7               THE COURT:  You asked.

8               MR. DUBIN:  I work on wrongful incarceration cases,

9   it's a big part of my practice.  This is no different.

10              THE COURT:  But if you --

11              MR. DUBIN:  Can I finish?

12              THE COURT:  How should you say he shouldn't have

13  been allowed to testify.  He said this on direct.

14              MR. DUBIN:  Your Honor --

15              THE COURT:  You said why didn't you.  Why didn't you

16  do this.  Why didn't do you that.  You didn't do this, did

17  you.  And so, but why didn't you speak to Mr. Greebel that was

18  the question.

19              MR. DUBIN:  I know, but he gave the reasons why he

20  never spoke to him first.  And it wasn't -- that testimony was

21  allowed and now we're being faced with not being able to

22  argue.

23              Your Honor, I work on wrongful incarceration cases

24  and DNA cases and work at The Innocence Project.  There are a

25  litany of cases that are no different just because it's a

*Proceedings*                                      10161

1   white collar case if the police have evidence that three

2   witnesses came forward and said person Y did it and the police

3   get a hunch because of the story that they heard from these

4   three witnesses and then don't go out and interview other

5   eyewitnesses.

6            How is that any different than if they get a bunch

7   of documents, don't have the full universe and don't interview

8   witnesses.  We think the most appropriate witness was

9   Mr. Greebel.  How could they say that we quantity bring that

10  out to the jury.

11           THE COURT:  You can't argue as a matter of law that

12  a law enforcement officer is obligated to interview the target

13  of their investigation.

14           MR. DUBIN:  I don't intend to do that.

15           THE COURT:  Or that it's a rush to judgment.  That's

16  basically what you're saying.  That Mr. Greebel should have

17  been interviewed because he wasn't.

18           MR. DUBIN:  Just to clarify.  At the risk of

19  stepping on your words which I don't intend to do.

20           THE COURT:  I'm sorry.  If I interrupted you.

21           MR. DUBIN:  No, that's okay.  I think that you have

22  credit in the bank on that one.

23           My point is that I am not going to say that he was

24  under an obligation to interview him or any obligation.  All I

25  simply intend to say is that that was an option available to

*Proceedings*                                           *10162*

1    him.  And for whatever reason he testified to and the

2    Government can argue, he decided not to do that.

3          Why should I be precluded from saying that to the

4    jury?  He has his reasons why.  He espoused those reasons

5    before this jury.  How is it, your Honor, that I can't say,

6    well, we disagree with that.

7          I mean, this man has been put I understand there's a

8    lot at stake for both sides but he has been for two years with

9    this cloud over him.  All he ever wanted to say was let me

10   give you my explanation.

11         THE COURT:  What you're doing is you're disagreeing

12   with the investigative decisions of a law enforcement officer

13   and that's what I believe the case law counsels against.

14         MR. DUBIN:  It doesn't --

15         THE COURT:  It's fine to say the Government did a

16   lousy job and, therefore, they don't have sufficient evidence

17   to convict Mr. Greebel.  They have, in fact, all the evidence

18   that that was presented.  The full totality before the jury,

19   in fact, is not only insufficient but, you know, it's

20   exculpatory.  If you're going to go there.

21         But I think that you can't second guess by saying

22   that Mr. Delzotto, Agent Delzotto should then A, B, and C, and

23   talk to X, Y, and Z person and solicited documents.  That does

24   go to the heart of law enforcement discretionary decisions

25   about how to conduct an investigation and the jury will be I

*Proceedings*                                          **10163**

1    think --

2           MR. DUBIN:  Your Honor, there is nothing in the case

3    law, period of whatsoever, that precludes us from arguing

4    about the sufficiency of the investigation.  They can argue

5    against it.  And I submit to your Honor, if we're cut off from

6    making this argument, the record is going to be rife with a

7    big problem, really.  I say that with all respect, your Honor,

8    not in a way.

9           THE COURT:  It's not about sufficiency of the

10   evidence.  You can make all the arguments you want.

11          MR. DUBIN:  It's not about sufficiency of the

12   investigation.  We think that this was an incomplete

13   investigation and that there was a rush to judge Evan Greebel.

14   I'm getting so animated because I can't even believe that the

15   Government's taking this position and that we would be faced

16   on the eve of closings that we can't argue that they never

17   spoke to this man and he had an explanation.

18          There is nothing whatsoever in Second Circuit case

19   law that says we are precluded from making that argument

20   especially when the record as it stands has

21   Special Agent Delzotto going through a litany of reasons why

22   he did it.  They have their argument, we have ours.  I'm not

23   going to say he was obligated to do it.  I'm not going to say

24   that, you know, I'm going -- I am actually going to

25   acknowledge your Honor's instruction.  I am going to

*Proceedings*                                          **10164**

1    acknowledge that, look, respectfully, the judge will give you

2    the instructions at the end of the trial and we're not putting

3    the Government on trial.  I'm going to acknowledge that.

4             But they're certainly able to use their common sense

5    and say you know what, to me, it seems like why not speak to

6    him.  And there is nothing that prohibits us in the case law

7    from making that argument.

8             Again, I am not going to get into that he was

9    obligated to do it, that there was some sort of code that says

10   he should do it, but there is just no authority to prevent us

11   from making there argument.

12            MR. PITLUCK:  Respectfully, your Honor, we disagree.

13   We think that the authority that the Court has cited is clear.

14   We think that this has been espoused by the Court throughout

15   the trial.

16            Mostly importantly, as the Court pointed out, the

17   rationale for Special Agent Delzotto's decision not to

18   interview the defendant was elicited on cross.  I didn't raise

19   it on direct, it's inappropriate.

20            And, Judge, what I'm hearing is, if they have spoken

21   to him, he would have given exculpatory explanations for

22   everything.

23            MR. DUBIN:  That's not what I'm going to say.

24            MR. PITLUCK:  How do we respond to that?  That's the

25   reason why this is precluded.

*Proceedings*                                                    *10165*

1          THE COURT:  It's just -- it creates an impression

2    that had they spoken to Mr. Greebel, or had they spoken to

3    other of his partners or anyone else that you were examining

4    Agent Delzotto about that the Government would never have

5    brought this prosecution which is just not appropriate.

6          MR. DUBIN:  I'm not going to say that.

7          THE COURT:  What the agent was so rabidly determined

8    to prosecute Mr. Greebel that he ignored all other evidence

9    and willfully blinded himself to other evidence.

10         MR. DUBIN:  I don't think it's willful.  I think

11   great cops, and I think great agents, it happens.  It does

12   happen and it happens far too often where they think that they

13   have the right guy and they think that their theory is right

14   and they make the ends justify the means.  And not for a

15   moment would I stand before this court and think there is any

16   ill motive.  I have deep respect for law enforcement and

17   especially the FBI.  But unfortunately, your Honor, in our

18   country, and I think your Honor is aware, it happens.  And I

19   think tunnel vision is a real thing.  In fact, I know it's a

20   real thing.

21         So I'm not saying he willfully blinded himself or

22   anything like that.  I think that he had a reason why he

23   thought it was a certain way, and whether he was unwilling to,

24   didn't want to, was -- that's for the jury to decide.

25         But we know of no authority that prevents us from

*Proceedings*                                                    **10166**

1   making this argument and I think it is extraordinarily

2   prejudicial to us not to be able to bring -- I will not for a

3   moment suggest that he would have not been charged.  I will

4   not for a moment suggest that he violated some investigatory

5   protocol or anything like that.

6          What I plan to say is that this was available to

7   him, and for the reasons that he put before the jury, he

8   didn't.  We think he should have.

9          MR. KESSLER:  The only conceivable reason to bring

10  that up is to suggest that Mr. Greebel would have said

11  something exculpatory there's absolutely nothing else.

12         MR. PITLUCK:  It's also directly putting the

13  Government on trial which is contrary to the Court's position.

14         Respectfully, Judge, I promised the court reporter

15  we would be brief, it's 6:00 o'clock on the eve before closing

16  and I think also I'm getting an underpinning of consciousness

17  of innocence which Mr. Dubin represented clearly to the at the

18  time we were and I don't like using transcripts cites, but the

19  time we were discussing what Special Agent Delzotto could be

20  asked it was clear do everybody that the Government or that

21  the defendant's willingness to speak to law enforcement would

22  not be used for consciousness of continues and it seems like

23  these two are conflating.

24         So we're just before we go back and try to finalize

25  our summations and 14 short hours, we just -- we respectfully

*Proceedings*                                           *10167*

1  just ask the Court to give us guidelines because I don't think

2  either party wants to be objecting during closings.

3          THE COURT:  I mean.  My decision on this point was

4  based on what I believe the Second Circuit has stated which is

5  the law enforcement techniques and decisions, discretionary

6  decisions, they make as to how to conduct their investigation

7  is not ruling an appropriate issue for the jury.

8          If, however, the law enforcement techniques amount

9  to an insufficiency of the evidence that you bring that

10 there's evidence that the law enforcement overlooked neglected

11 didn't pursue and that is insufficient to convict Mr. Greebel.

12 That is acceptable and the case law supports that.  But it

13 call into question the timing and who they talk to and what

14 documents they got and when they got them, that it starts to

15 sound and feel and directly point the jury to questioning the

16 legitimacy of the Government's investigation.

17         MR. DUBIN:  Understood, your Honor.  I think I made

18 the record.  If you have some spare time tonight, if you do

19 happen to look at a case, or what we submitted on this.

20         THE COURT:  We did at look at your cases.

21         MR. DUBIN:  Okay.

22         THE COURT:  We did our own research, too.

23         MR. DUBIN:  Understood.  I will focus on the

24 insufficiency of the evidence.

25         THE COURT:  Right.

*Proceedings*                                                    *10168*

1          MR. DUBIN:  Is permissible for me to tie that that

2    the insufficiency is because there was -- I mean, I'm trying

3    to make sure that I stay within the confines and don't draw an

4    objection.  But the fact that certain people weren't

5    interviewed until this summer, I have to be permitted to bring

6    that out.  How is that not relevant?  People were asked those

7    questions during the trial.  It's in the record.

8          How could I not argue that that, you know, there was

9    an insufficiency of the evidence and certain witnesses weren't

10   even interviewed until the summer.  Of course, they -- but

11   that's okay.

12         I respectfully think that that is so permissible.  I

13   don't know anything that will preclude the timing of the

14   investigation has nothing to do with, you know, the manner in

15   which they get evidence goes directly to the insufficiency of

16   the evidence.

17         If Mr. Greebel has already been charged, and sits

18   here under indictment facing these charges.  And then

19   witnesses that have critical evidence are only interviewed

20   after the fact, and the charges aren't dropped and the case

21   not dismissed, how could we not argue that he is sitting here

22   but critical evidence, there's a insufficiency of the evidence

23   because they didn't speak to people that we think would have

24   been critically relevant to the determination of whether or

25   not he did something wrong.

*Proceedings*                                    *10169*

1          (Continued on the next page.)

Proceedings                                   10170

1          MR. KESSLER:  The insufficiency is the evidence is

2    evaluated now.  Michael Rosensaft came in and testified.  Any

3    argument about when someone talked to Michael Rosensaft, he

4    was here, they can evaluate the testimony.

5          THE COURT:  By arguing that the evidence is

6    insufficient and therefore suggesting that not only the FBI

7    but the Government pursued charges wrongfully is something

8    that I don't think the case law allows.

9          MR. DUBIN:  I'm not going to say they pursued

10   charges wrongfully.

11         THE COURT:  You're going to say they went ahead

12   because they have didn't interview this witness until X date,

13   or that witness until Y date, because they didn't obtain

14   documents by whatever date you think they should have gotten

15   it, that equals insufficiency.

16         It's fine to argue that they haven't proven and

17   cannot prove and there is insufficient evidence to convict

18   Mr. Greebel.  But to tie that to the timing is a side issue

19   what the jury has to consider is what is before them.

20         It doesn't matter whether it was obtained a year

21   ago, six months ago, or four months ago, what matters is what

22   is admissible, what has been put before the jury.  They decide

23   the case based on not on the agent's timing, the agent's

24   motive, the Government's motive, their investigative

25   techniques, all of that is not relevant under case law.  The

*Rivka Teich, CSR, RPR, RMR  -  Official Court Reporter*

Proceedings                                    10171

1  case law, I don't think, allows the arguments that you're

2  proposing.

3          MR. DUBIN:  Your Honor, I respectfully disagree.  I

4  understand your ruling.

5          THE COURT:  We have looked at number of support in

6  your submissions, we didn't find it.

7          MR. DUBIN:  I know of no case that stands for the

8  proposition in the Second Circuit and/or in the Ninth Circuit

9  or any other circuit that would preclude the defense from

10  standing up and saying that the Government did not interview

11  critical sources of evidence, witnesses, until this summer.  I

12  just cannot fathom that we can't argue that, because they

13  testified to it.  And regardless of whether we brought it out

14  or they brought it out, I don't think the Government objected

15  when Katten lawyers took the stand and they weren't

16  interviewed until 2017 and they get up here and they say I

17  never saw him do anything wrong, the man kept me in the loop

18  on things, how can we not argue that they weren't spoken to

19  until 2017?

20          THE COURT:  But it still boils down to whether the

21  jury finds beyond a reasonable doubt that there is sufficient

22  evidence to convict Mr. Greebel.  It doesn't matter when or

23  how that evidence was obtained.  What matters is the evidence

24  before the jury sufficient.  By saying it's a timing issue

25  that somehow is relevant and goes to the sufficiency is not

Proceedings                                      10172

1    accurate.

2           I think that what you could say is that the evidence

3    itself is not sufficient.  Also, if there had been missed

4    opportunity, that if a key witness was not interviewed, that

5    witness has died, and that witness, there is evidence that

6    that witness would have said X, Y, Z, that's a different

7    situation.  But that's not what we have here.

8           We have a body of evidence that's been presented to

9    the jury and when and how they got it --

10          MR. DUBIN:  So your Honor --

11          THE COURT:  -- is irrelevant.

12          MR. DUBIN:  I want to make sure I don't run afoul.

13   This is the last question I ask.  I understand your ruling and

14   I will make the necessary adjustments.

15          Is it your Honor's position that I can't say the

16   words "there was a rush to judgment here."

17          THE COURT:  I know that's your theory.  When you say

18   rush to judgment, what do you mean?  When you make that

19   argument, what would you back it up with?

20          MR. DUBIN:  I mean -- well, I don't want to give

21   away my whole --

22          THE COURT:  I know, I'm trying to think.  The

23   summation is a summation of the evidence, okay.  We have

24   evidence as to what the agent did --

25          MR. DUBIN:  Your Honor --

Proceedings                                        10173

1          THE COURT:  -- or what he didn't.

2          MR. DUBIN:  -- there is certain documents that we

3   had to bring out that we think that why, if they are saying

4   Mr. Greebel did X, Y, Z and we say, no, no, that's not so.

5   Take a look at B, C, D and we brought that out, why did that

6   have to happen?  We submit that it's because there was a rush

7   to judgment.  That there is an assumption that he was guilty

8   and that they worked backwards from that proposition.

9          I'm not impugning the Government or saying that they

10  had some ill will in doing it.  I'm not even going to mention

11  the Government.  I should certainly be able to make that

12  argument.

13         MR. KESSLER:  That's the same argument that the

14  Court just ruled shouldn't be made.

15         MR. DUBIN:  It is not.

16         MR. KESSLER:  The words, an hour ago, a week ago, or

17  a year ago B, C, D before the jury, if it shows the evidence

18  is insufficient, it isn't.

19         MR. DUBIN:  I've never had the contours of an

20  argument sculpted like this.  I just, I'm so exacerbated

21  because I've never heard that a defendant be precluded from

22  saying there was a rush to judgment.

23         MR. PITLUCK:  Both parties are regularly precluded

24  making legally improper arguments.  And we heard the Court's

25  ruling.  We'd love to go work on this.  It seems very clear to

1    me what is appropriate and what is not.  The Court has, I

2    think, made it abundantly clear that timing does not matter.

3    How something was discovered does not matter.  What matters is

4    what is before the jury.

5            MR. DUBIN:  What I'm struggling with is I'm talking

6    about the timing of something that didn't happen.  How would I

7    prove it?

8            THE COURT:  I am just trying --

9            MR. DUBIN:  For instance --

10           THE COURT:  -- talking about a timing of something

11   that happened.

12           MR. DUBIN:  -- let me give you a good example.  If

13   I'm not able to draw out the timing of when a certain's

14   interview is after the fact, a few months ago, for instance,

15   then that witness, the government never had that, right, it

16   wasn't baked into the equation at all.  So the jury, if I

17   can't draw out the timing, what this jury might be left to

18   think or believe is that, well, because I don't know when that

19   person was interviewed or when the Government got that

20   evidence it might be that they looked at that, didn't think

21   that it mattered.

22           That's why the timing is so critical, your Honor,

23   for us.  So in other words --

24           THE COURT:  But the timing, okay, getting to your

25   point, suppose they discovered three weeks before trial that

Proceedings                                      10175

1   some witness would say something that would completely

2   exonerate Mr. Greebel and/or so strongly exculpatory the

3   Government has folded and withdrawn a prosecution under those

4   rare circumstances where that happens.

5          The timing is not critical to that decision.  What

6   is critical is whether or not the Government, based on its

7   discovery or change of circumstances could prove its case

8   beyond a reasonable doubt.  So I think, see, the timing I

9   think is a little bit of a distraction and it's just not a

10  relevant factor.

11         MR. DUBIN:  It's really going to present huge

12  problem for us, your Honor.  I think the jury ends up left

13  with a misimpression that the Government had this evidence all

14  along and just considered it and for whatever reason decided

15  to press forward.  And I think that it is just critical that

16  we be able to show when they obtained certain information.

17         And your Honor is going to give the instruction,

18  that's why the instruction is there, that there is no

19  particular investigative techniques.  If we weren't able to

20  talk about the investigative techniques, it would obviate the

21  need for that instruction, you wouldn't need that instruction.

22  Of course we can talk about it.

23         I mean, we can talk about the sufficiency of the

24  investigation or the insufficiency of the evidence.  I

25  understand your Honor's ruling with respect to a rush to

Proceedings                              10176

1   judgment, but just to preclude us from talking about the

2   timing of when witnesses were interviewed, that I think is

3   just, I don't even know how we could close on that.

4            THE COURT:  What would the point be what inference

5   you would want the jury to make of that?  Because the

6   Government didn't interview Katten lawyers until the summer or

7   whenever and hear positive things about Mr. Greebel, yet they

8   still went ahead, is the inference that the Government is just

9   rapidly pursuing Mr. Greebel regardless of what the evidence

10  shows?

11           MR. PITLUCK:  Judge, that's the exactly, the Court

12  held this -- I'm sorry, but we want to go -- the Court held

13  the timing is not relevant.  And Mr. Dubin just keeps arguing

14  in different ways that the timing is relevant to the jury's

15  determination of guilt or innocence.  It is not.  It is the

16  evidence, not when it is obtained or how it is obtained.

17  There is a number of factors.  That's were the case law says

18  this.  Your Honor, this has been briefed before the Court for

19  literally months.

20           MR. DUBIN:  Not this issue, your Honor, this has not

21  been briefed before the Court.  With all respect to

22  Mr. Pitluck, he just raised it to me.  I'm responding to it.

23  I never thought in a million years we would be up here, we

24  would get an objection to making a summation and how we want

25  to argue it.  I just I can't --

Proceedings                              10177

1          MR. PITLUCK:  We raised it because in the abundance

2    of caution.  We thought the Court's ruling has been and

3    continues to be very clear.  Respectfully, Judge, I don't want

4    to keep arguing, this we want to go work on summation.

5          MR. DUBIN:  This is the last thing I'll say, please

6    take a look at this because we agree a summation is a

7    summation of the evidence.  We agree completely.  The evidence

8    is, from the our point of view, that key witnesses were not

9    interviewed.  That goes directly to the heart of the

10   insufficiency of the evidence.

11         THE COURT:  What key witness wasn't --

12         MR. DUBIN:  I don't want to reveal.  I'm going to

13   say it in 12 hours, tomorrow.  There were key witnesses, in

14   our mind, that were never interviewed, that came in here and

15   testified --

16         THE COURT:  Would you asking to speculate what those

17   witnesses would say?  And the instruction that I give says

18   both parties are able to get evidence and the parties should

19   not speculate about what -- evidence not before you might have

20   shown or what it would be.  It's inviting speculation what

21   that key witness would have said.

22         MR. DUBIN:  No, they said it on the witness stand,

23   what they would have said.  They testified.

24         MR. PITLUCK:  They are trying to say key witnesses

25   who testified here, who's testimony is before you, didn't give

Proceedings                          10178

1   their testimony earlier.  That is directly foreclosed by the

2   case law.

3          THE COURT:  But the jury will say based on that key

4   witness's testimony here before the trial whether, A, they

5   find it credible; B, they are going to give it weight or no

6   weight.  And the evidence is the evidence.  They are going to

7   evaluate.  If there is a key witness out in the ether who you

8   think should have been spoken to and should have been called

9   into court to testify, that's the instruction that says you

10  can't, the jury shouldn't speculate about those witnesses

11  whoever they may be.

12         MR. DUBIN:  The witnesses came into this court and

13  said certain things about the evidence and Mr. Greebel.  Okay.

14  They were never interviewed by the Government, some of them.

15         Is it the Court's ruling I can't bring that out?

16         THE COURT:  The jury will evaluate what the witness

17  had to say about issues relevant to the case.

18         MR. DUBIN:  But I want to be able to say to the jury

19  they never interviewed this person.  How can it be that that

20  critical evidence that the witness testified to and gave that

21  testimony, that they never interviewed them?  With all

22  respect, I really do think this would create a major problem.

23  I would urge the Court just to take another look.

24         I know how thorough your Honor is, and you read the

25  cases known, perhaps with more thoroughness than is even

Proceedings                                          10179

1   required sometimes, I just think that for us not to able to

2   argue about their investigation whatsoever, to be foreclosed

3   from that, I think is a big problem.

4            THE COURT:  I said you could argue that their

5   investigation did not yield sufficient evidence to convict

6   Mr. Greebel.  The case law says you can do that.  I would not

7   preclude you from doing that.  To the extent you can link the

8   investigation to the sufficiency of the evidence, that is

9   acceptable.

10           I think ultimately the jury has to decide the case

11  based on the evidence at this trial.  Not based on when it was

12  obtained and how it was obtained and from whom it was

13  obtained.

14           Unless your argument is the next logical step, and

15  all of that equals overwhelming evidence of exculpatory

16  evidence and therefore the Government by pursuing this must be

17  operating in bad faith.

18           MR. DUBIN:  That's not what I'll be arguing.

19           THE COURT:  That's the logical conclusion.

20           MR. DUBIN:  What we're asking the jury, and there is

21  no case law out there that says that we cannot say in a

22  closing argument, that they indicted, that Mr. Greebel was

23  indicted without the benefit of the evidence, all of the

24  evidence that you saw here.

25           MR. KESSLER:  That's exactly the argument that's

*Rivka Teich, CSR, RPR, RMR  -  Official Court Reporter*

Proceedings                                    10180

1   foreclosed.  We've done this six times.

2          THE COURT:  The Grand Jury, yes, it's been said they

3   will indict a ham sandwich.  But the bottom line is there was

4   a Grand Jury, the Grand Jury issued the Indictment, the Grand

5   Jury issued a Superseding Indictment.  So they found probable

6   cause, not proof beyond a reasonable doubt, they found

7   probable cause to charge Mr. Greebel as they did, as it did in

8   the Indictment.

9          And the Government, whether or not they talked to

10  witness A, B, C, as I said, later than you think they should

11  have, is irrelevant to whether or not the jury in looking at

12  the evidence is going to find that there is sufficient

13  evidence to convict Mr. Greebel.

14         MR. DUBIN:  Okay.  Your Honor, I disagree.

15         THE COURT:  We're going around in a circle.

16         MR. DUBIN:  We're stuck now.  There being testimony

17  in the record where people have testified that they were not

18  interviewed until the summer this year, then we're left with

19  nothing to do with it.

20         THE COURT:  I know that was brought out on cross.

21  There might have been an objection or I might have overruled

22  it.

23         MR. PITLUCK:  Just because evidence is elicited

24  doesn't mean it can be used to be marshal into improper

25  argument.  I think that's clear.  Judge, I think --

```
                          Proceedings                    10181
```

1          MR. DUBIN:  How else can we use it?  I can't refer

2     to testimony in the record now?

3          THE COURT:  Can you do that.  Please don't make this

4     worse; don't put words in my mouth.

5          MR. DUBIN:  I have not.

6          THE COURT:  I didn't rule that you can't refer to

7     evidence in the record.  If it hasn't been stricken, it's fair

8     ground for argument.  I'm just saying what I think the case

9     law permits and what it doesn't permit.

10          MR. DUBIN:  I'm going to then, so I had don't run

11     afoul, I'm going to say that X person who was interviewed for

12     the first time, he testified to X.  I won't make an argument

13     about it.

14          THE COURT:  He was interviewed for the first time in

15     August of 2017.

16          MR. DUBIN:  Okay.  Thank you, your Honor.

17          THE COURT:  If you have a case that tells me that I

18     need to let you do this, I've had so many submissions on this.

19     I know that your team is very, highly staffed, highly skilled,

20     highly experienced team, we didn't find cases and you didn't

21     present cases.  If you have find cases contrary --

22          MR. DUBIN:  If I find one --

23          THE COURT:  Don't give me from the District of Ohio,

24     with all do with respect to my colleagues in Ohio.  Second

25     Circuit, Supreme Court, that is controlling the law that would

```
                          Proceedings                    10182
```

1   frame what would be appropriate and what wouldn't be

2   appropriate.

3         I've tried to make the best call I can based on what

4   I understand the law to be.

5         MR. PITLUCK:  There is, to be clear, there is no

6   other purpose to elicit the timing when someone was

7   interviewed other than to imply that it was before X, or after

8   Y, or before Y.

9         The notion that because something is in the record

10  and hasn't been stricken could be marshaled or addressed,

11  there were all sorts of things that were precluded that are in

12  the record.  The timing of evidence is not relevant.  That's

13  clear.  So there is no reason to say not interviewed until

14  this specific time.

15        MR. DUBIN:  Now I'm told Mr. Pitluck is saying

16  forget about marshaling it or making a comment, now Mr.

17  Pitluck argues is I can't refer to testimony in the record.

18        THE COURT:  He can refer to evidence in the record.

19  That's what you can do in a summation.  How he, what kind of

20  argument he makes based on the evidence is, I think, we made

21  it clear.

22        MR. KESSLER:  So then where we stand is --

23        THE COURT:  You might find a reason to argue from --

24        MR. DUBIN:  I might just read the question and

25  answer.

Proceedings                              10183

1          I understand the Court's ruling.  It's the last

2    thing I want to do, is draw an objection during the summation.

3    I'll be very careful.  If I find a case that is so on point

4    that I'm jumping out of my skin tonight --

5          THE COURT:  You know, the argument is about there is

6    reasonable doubt, there is insufficient evidence --

7          MR. DUBIN:  I understand.

8          THE COURT:  -- this witness is incredible, this

9    witness was motivated by X, Y, Z, that's the kind of argument

10   that is typical.  It's focused on the evidence, sufficiency of

11   it, and the weight that it should be given, that kind of

12   thing.

13         MR. DUBIN:  Good evening.

14         THE COURT:  The consciousness of innocence.

15         MR. KESSLER:  That argument is not going to be made.

16   And the Court made it clear it will be stricken if we object.

17         MR. PITLUCK:  Thank you.

18         MR. DUBIN:  Thank you.

19         (Proceedings adjourned at 6:20 p.m. to resume on

20   Wednesday, December 20, 2017 at 9:00 a.m.)

21

22                        --oo0oo--

23

24

25

*Rivka Teich, CSR, RPR, RMR  -  Official Court Reporter*

```
                      INDEX                    10184

 1                 I N D E X

 2

 3              W I T N E S S E S

 4

 5         J O S E P H   D O O L E Y

 6   DIRECT EXAMINATION (CONTINUED)          9950
     BY MS. DENERSTEIN
 7
     CROSS EXAMINATION                      10096
 8   BY MR. KESSLER

 9   REDIRECT EXAMINATION                   10122
     BY MS. DENERSTEIN
10

11              E X H I B I T S

12

13   Defense Exhibit Number 1315           10022

14   Defense Exhibit Number 6B             10037

15   Defense Exhibit Number 110-47         10050

16   Defense Exhibit Number 104-99         10059

17   Defense Exhibit Number 1283           10059

18   Defense Exhibit Number 1315           10059

19   Government's Exhibit Number 1010      10025

20   Government's Exhibit Number 1385      10108

21   Government's Exhibit Number 1355      10110

22   Government's Exhibit Number  1370     10110

23   Government's Exhibit Number  1393     10110

24   Government's Exhibit Number  1394     10110

25   Government's Exhibit Number  1395     10110
```