10185

1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3  UNITED STATES OF AMERICA,     : 15-CR-00637 (KAM)
                                 :
4           Plaintiff,           :
                                 : United States Courthouse
5        -against-               : Brooklyn, New York
                                 :
6  EVAN GREEBEL,                 :
                                 : Wednesday, December 20, 2017
7           Defendant.           : 9:00 a.m.
- - - - - - - - - - - - - - - -X
8
          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
9         BEFORE THE HONORABLE KIYO A. MATSUMOTO
          UNITED STATES DISTRICT JUDGE
10                  BEFORE A JURY

11            A P P E A R A N C E S :

12  For the Government:      BRIDGET ROHDE, ESQ.
                            Acting United States Attorney
13                          Eastern District of New York
                            271 Cadman Plaza East
14                          Brooklyn, New York 11201
                            BY:  ALEXIS ELEIS SMITH, ESQ.
15                               DAVID PITLUCK, ESQ.
                                 DAVID KESSLER, ESQ.
16                               Assistant United States Attorney

17  For the Defendant:       GIBSON DUNN & CRUTCHER
                            200 Park Avenue, 48th Floor
18                          New York, New York 10166
                            BY:   REED BRODSKY, ESQ.
19                                JOSHUA EVAN DUBIN, ESQ.
                                  MYLAN LEE DENERSTEIN, ESQ.
20                                WINSTON Y. CHAN, ESQ.

21

22  Court Reporter:      DAVID R. ROY, RPR
                        225 Cadman Plaza East
23                      Brooklyn, New York 11201
                        drroyofcr@gmail.com
24
Proceedings recorded by Stenographic machine shorthand,
25  transcript produced by Computer-Assisted Transcription.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Proceedings                                    10186

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Good morning.  The jurors are all here.

3    Have a seat.  We received a submission last evening from

4    Mr. Dubin at 10:00 o'clock, a little after 10:00 o'clock,

5    which I believe reflects either a deliberate or unintentional

6    misunderstanding of my ruling certainly, the rulings reflected

7    in the letter mischaracterize what I ruled.  And I would like

8    to clarify on the record in case the defense team still

9    doesn't understand what has been litigated many times, and

10   raised before this court many times, and ruled upon many

11   times.  Is that the defense is free to argue that there is

12   insufficient evidence and reasonable doubt, or abundant doubt

13   as Mr. Brodsky said, based upon what it believes are failures

14   in the investigative techniques.

15          What we talked about at length yesterday was the

16   timing.  The timing of when the Government took steps A, B or

17   C with regard to interviewing witnesses or retrieving

18   documents.  The timing is not relevant to the jury's

19   determination.

20          What is relevant to the jury's determination, as

21   counsel here well know, is the evidence before the court.

22   What the jury may consider is the evidence that has been

23   presented at this trial.

24          By arguing that the Government's timing of certain

25   investigative steps was incorrect and shows a motive to push

Proceedings                          10187

1    ahead with an investigation regardless of what the evidence

2    shows, is an argument that I don't think is supported by the

3    law.  It's not been articulated by the defense.

4         So for example, is the defense arguing that had the

5    Government interviewed a witness earlier than it did, would

6    that witness's statement have persuaded the Government not to

7    proceed with its investigation?  Those witnesses, as stated by

8    Mr. Dubin, testified here in court.  Their credibility and the

9    weight of their evidence will be evaluated by the jury.  And

10   by suggesting or arguing to the jury that had the Government

11   talked to these witnesses earlier the Government would have

12   taken different steps, is not really, not fully explained or

13   flushed out.

14        I don't believe the defense has made a reasoned

15   argument, unless they are arguing that the case never should

16   have been brought in the first place.  Which then puts the

17   Government's prosecutorial decisions on trial, which is not,

18   as you know, appropriate under the Second Circuit case law.

19        You may argue, as I said numerous times, that the

20   Government's investigative techniques resulted in an

21   insufficiency of the evidence, or that there is reasonable

22   doubt based on evidence that the Government didn't obtain.

23   That is completely acceptable and that has been clear from day

24   one.

25        So if somebody on the defense team wants to explain

Proceedings                                     10188

1    to me what they think what is unclear to them, or what they

2    think they are not permitted to do, I'll straighten it out for

3    the umpteenth time, but I don't agree with the

4    mischaracterization of my rulings as reflected in this most

5    recent letter, document number 499 in the docket.

6              Since Mr. Dubin wrote the letter, may I ask to hear

7    from him or anyone else?

8              MR. DUBIN:  Certainly, your Honor, there was no

9    deliberate attempt to mischaracterize.

10             THE COURT:  I said deliberate or unintentional.  I'm

11   not ascribing any motive to you.  I'm surprised there is a

12   lack of understanding of parameters.  What we focused on

13   yesterday, for almost 45 minutes, what the timing of certain

14   steps the Government took.  And I said, well, what would have

15   been different?  You said, it was exactly what the same

16   witnesses that were interviewed a week before the trial or a

17   year before the trial were here testifying.  And I didn't get

18   a clear articulation about what that timing issue would have

19   reflected.

20             MR. DUBIN:  Your Honor, it wouldn't be the first

21   time I have been confused about something.  I freely admit

22   that.  I am struggling, I freely concede that I'm struggling

23   with how you do the former without doing the latter.  That is,

24   how do you argue that there were inadequacies in the

25   investigative techniques without arguing that one of them was

1    the timing of when they spoke to witnesses.  That, I guess, is

2    what I'm struggling with.

3              THE COURT:  It's the relevance of it.  Articulate

4    that for me -- I'm struggling.  I don't understand how the

5    timing of when they spoke to a witness could be relevant.  The

6    way it would be relevant would be if that witness was an eye

7    witness to an incident and had the Government talked to the

8    witness earlier they might have learned that the witness would

9    have said the defendant didn't have the gun.  That's a

10   completely different factual scenario than what you're

11   describing.

12             MR. DUBIN:  Here is what I can say to clear up our

13   argument -- I'm being mindful of the fact that we're about to

14   start summation I don't want to give too much of it away.

15             Our argument about why the investigation was

16   inadequate is that you cannot have a full picture without

17   speaking to, who we feel, were critical witnesses, critical

18   witnesses.  So that goes right to the timing.  They didn't

19   speak to them.  So how do I make that argument without, there

20   has to be a tie to timing.

21             Because when they are investigating, and you're

22   talking about their investigative techniques, one of the

23   techniques that law enforcement uses is determining whether or

24   not they should talk to certain witnesses.  For whatever

25   reasons that they put forth to the jury, Special Agent

Proceedings                                    10190

1    Delzotto testified about them, and they'll argue I'm sure

2    during summation why what he said were sound reasons, how is

3    it that we can't say that, okay, but in our estimation our

4    criticism of the investigative technique was that they didn't

5    interview critical witnesses.  They didn't interview them.

6              THE COURT:  The next step is, what would those

7    critical witnesses have said.  They were here at trial.  They

8    were testifying.  They went through cross-examination and

9    direct examination.

10             MR. DUBIN:  Right.

11             THE COURT:  So what relevance could the timing be?

12   The jury heard their testimony.  They were fully cross

13   examined.  They are going to evaluate the weight and

14   credibility; and whether the witness said the same thing a

15   year before trial or the day before trial is really

16   irrelevant.  What matters is what the witness said.

17             MR. DUBIN:  To us it's really relevant.  Because

18   they would have said that then.  There were witnesses for the

19   Government that testified that these e-mails that the

20   Government says are smoking gun, evidence of proof, or strong

21   evidence of proof of Mr. Greebel's guilt, can be read and are

22   open to interpretation.  Why not get the interpretation of

23   some of the people that actually wrote them?

24             THE COURT:  The jury is going to decide those

25   issues, Mr. Dubin.

Proceedings                                      10191

1              MR. DUBIN:  I understand.  That's our criticism of

2      their investigative technique.  That at the time they are

3      investigating they didn't interview these people and say is

4      there another explanation for this.  How can I argue that

5      without -- I have to say they didn't interview them, they

6      weren't first interviewed until this past summer.

7              THE COURT:  You can argue based on the evidence

8      before the jury where a witness has testified and explained

9      his or her e-mail.  You can argue that here is an explanation

10     based on the credible testimony of this witness explaining his

11     or her e-mail that there is reasonable doubt or it's

12     insufficient.  And timing is irrelevant.

13             Unless you're suggesting that the witness would have

14     changed his or her testimony, or that testimony or evidence is

15     lost because of the timing.

16             MR. DUBIN:  I'm going to have to do it very

17     carefully.  And then after doing that, refer to the fact that

18     there is testimony in the case that they said that they were

19     not interviewed until the summer of this year.

20             THE COURT:  You can emphasize the timing.

21             MR. DUBIN:  Okay.

22             THE COURT:  I think that what is, what you're

23     missing or what I'm just not understanding is how the timing

24     of the same witnesses who testified here in court, how the

25     timing of the Government's interview or contact with that

Proceedings                                    10192

1    witness affects the jury's deliberations of the weight and

2    credibility of the evidence.

3            I think the cases that you cite Zapata, there the

4    Court gave the specific instruction, "That no duty to use

5    particular techniques included the following:  Your

6    disapproval of the techniques or the fact that particular

7    techniques were not used is not an issue to enter into your

8    deliberations.  Your concern is to determine whether or not

9    based on your evaluation of the evidence before you, the guilt

10   of the defendant you are considering has been proved beyond a

11   reasonable doubt."

12           As in Zapata, I'm permitting you to argue that the

13   jury should draw certain inferences from the Government's

14   failure to use specific investigative techniques, which still

15   have not yet been identified.

16           MR. DUBIN:  Again --

17           THE COURT:  It's about timing but the evidence is

18   the same whether or not it was elicited or whether or not the

19   Government even interviewed the witness, the witnesses were

20   called here.

21           MR. DUBIN:  I agree.

22           THE COURT:  They testified.  That's what the jury is

23   going to --

24           MR. DUBIN:  Your Honor, I don't want to keep -- you

25   and I both conceded we were going in circles last night and I

Proceedings                                        10193

1   don't want to keep doing it.  I don't know a better way to

2   articulate my point, I don't.

3           THE COURT:  Is there a specific claim that should

4   have been used, blood sample or DNA?

5           MR. DUBIN:  There can be no dispute that an

6   investigative technique what falls under that umbrella are

7   what witnesses you decide to interview; that is an

8   investigative technique, absolutely.  I have done wrongful

9   incarceration cases with the Innocence Project.  I work with

10  police practice experts, former FBI agents, not a single one

11  of them would ever say to you that who we interview or decide

12  not to interview is not an investigative technique, it clearly

13  is.  It clearly is.  It makes no difference if you're testing

14  somebody's blood and you're looking at DNA swabs, cheek swab,

15  or if you're deciding to talk to a particular witness, those

16  are all investigative techniques just different investigative

17  techniques.

18          THE COURT:  What is your argument?  That had the

19  Government interviewed a witness before Mr. Greebel's arrest

20  as opposed to after Mr. Greebel's arrest the evidence, the

21  statements from that witness would have been different?

22  Explain that, how would that --

23          MR. DUBIN:  That's for the jury to decide one way or

24  another.  We're certainly permitted to argue.

25          THE COURT:  You're asking the jury to speculate or

Proceedings                                10194

1   suggesting to the jury that this witness would have changed

2   their story had they been interviewed earlier.

3          MR. DUBIN:  Just to the contrary.

4          THE COURT:  What is important to the witness -- what

5   is important to the jury's decision is observing the witness's

6   demeanor, listening to what he or she says on direct and

7   cross, and weighing that evidence deciding whether it's

8   credible, and deciding whether those facts are sufficient to

9   meet the Government's proof beyond a reasonable doubt, or

10  whether that testimony raises doubt.  But it's just not

11  relevant about whether that witness was interviewed at all,

12  whether that witness was interviewed before the arrest or

13  after the arrest.

14         MR. DUBIN:  Your Honor, I think maybe, I just, I

15  think I just identified where we're passing each other.  I'm

16  not articulating clearly enough.

17             I am not going to argue that what they would have

18  said would have been different.  I'm going to argue directly

19  the opposite.  That their testimony is consistent, there is no

20  reason to believe it would have been anything other than what

21  they said here.  How is that not relevant?  So in other

22  words -- that is my argument.

23         THE COURT:  The inference you're asking the jury to

24  draw is that the Government was motivated by some ill motive.

25         MR. DUBIN:  No, I'm not.

Proceedings                              10195

1          THE COURT:  To push forward with the investigation,

2     the prosecution, regardless of what that witness would have

3     said.

4          MR. DUBIN:  No, that's not what I'm arguing.  What

5     I'm arguing, let me say it again very, very clearly, as

6     clearly as I know how.  I am not saying that they had an ill

7     motive.  As I've said before, I have deep respect for law

8     enforcement, but sometimes they get it wrong.  And one of ways

9     in which they get it wrong -- unfortunately they get it wrong

10    sometimes and innocent people sometimes get convicted because

11    they get it wrong -- one of the ways in which he they got it

12    wrong here was that they did an incomplete investigation, in

13    our opinion.  One of the investigative techniques that we will

14    clearly seek to criticize is that they only spoke to who they

15    thought was appropriate to speak to.  And we feel we should be

16    permitted to argue that they should have spoke to other people

17    to get the full story.  That's clearly a investigative

18    technique.

19          THE COURT:  I want to go on the record that Zapata

20    has nothing whatsoever to do with the argument that you are

21    making.  Zapata involved the Government's failure to use

22    certain investigative techniques, handwriting and fingerprint

23    analysis as items seized as evidence.  That was completely

24    different than whether or not the Government interviewed a

25    given witness on a given day.  Those witnesses were here.

Proceedings                                    10196

1   That is just completely distinguishable.

2               MR. DUBIN:  I think that's where we have a

3   difference of opinion.  I've stated my position for the

4   record.

5               THE COURT:  You're allowed to argue, I've never

6   ruled that you could not argue that the Government's

7   investigative techniques failed to yield proof beyond a

8   reasonable doubt or sufficient evidence to convict

9   Mr. Greebel.  And you're also welcome to argue that the

10  Government's investigative techniques resulted in other

11  evidence that you presented, the defense presented, that

12  raises abundant reasonable doubt.  You're not being precluded

13  from any of that.

14              MR. DUBIN:  I understand, your Honor.

15              THE COURT:  The whole timing about --

16              MR. DUBIN:  The thing where I'm having a hard time

17  is in between your two statements, is that the failure to

18  yield evidence that we think was critical is directly related

19  to their investigative technique of deciding not to talk to

20  certain critical witnesses.  That's where we have a

21  difference.

22              THE COURT:  Ultimately the jury will decide what

23  weight to give that evidence.  What probative value that

24  evidence has, regardless of when it came or how it came or who

25  gave it, who presented it, the jury could convict or acquit

1   based only on one party's presentation of the evidence.  I

2   just want to be clear.

3          MR. DUBIN:  I think at least identified at a minimum

4   where we respectfully disagree with the Court's ruling

5   insomuch as us being able to affirmatively say the reason why

6   they couldn't come up with sufficient evidence is because they

7   didn't speak to critical witnesses.

8          THE COURT:  I'm just wondering if you're going to

9   identify who those critical witnesses are, because --

10          MR. DUBIN:  We will.

11          THE COURT:  -- because as you know, there is an

12   instruction that these witnesses, no one has a burden,

13   especially the defendant, to present any evidence whatsoever,

14   the Government has no obligation to present witness testimony

15   or evidence, it's entitled to try its case.  Old Chief makes

16   it very clear and that's as high an authority for that notion

17   as I can imagine.

18          MR. DUBIN:  I think what Zapata says, our reading of

19   Zapata, the reason why I am positing to the Court that we're

20   permitted to make this argument, is the exact reason why the

21   Court then properly, as your Honor is going to do, will

22   instruct the jury that the Government doesn't have to employ

23   any particular investigative technique and the Government is

24   not on trial.  There is no reason for that instruction if I

25   wasn't making the arguments.

1          THE COURT:  Zapata was specifically presented with a

2     defense argument that substantive specific evidence, like

3     fingerprints and handwriting analyses, were lacking, the

4     Government just ignored that.  You have not said that the

5     Government, that certain witnesses were not here testifying

6     before the jury.

7          MR. DUBIN:  Right.  I think, just the difference --

8          THE COURT:  What you said is because of the timing

9     somehow the jury should infer some ill motive on the part of

10    the agents or the Government and not interviewing them.  The

11    agent explained during his, I believe during his cross, the

12    reasons why he didn't interview Mr. Greebel and certain

13    members of his law firm.  And whether the jury thinks that's a

14    good reason or not, that's up to them.  But it doesn't, and I

15    guess it just doesn't bear on or limit your ability to make

16    arguments.

17         MR. DUBIN:  The only difference of opinion,

18    respectfully, that we're having, is whether or not speaking to

19    certain witnesses an investigative technique or not.  We feel

20    it is.

21         THE COURT:  Of course it is, interviewing witnesses.

22    But the Government has discretion and the agent's exercise

23    their discretion in deciding who to speak to.  When you probed

24    Agent Delzotto he gave you reasons why he chose not to speak

25    to witnesses.  You can't represent to me as a defense lawyer,

Proceedings                                          10199

1   because I know of no case, where an agent's decision not to

2   interview a subject or target of their investigation was

3   somehow called into question.  That somehow showed that the

4   agent's discretion was abused, that his investigatory or her

5   investigatory techniques were amounted to an abuse of

6   discretion that they didn't do something that the defense

7   thinks the agent should have done.

8            MR. DUBIN:  Never, not going to say that it was the

9   result of ill will, not going to say that it was the result of

10  a deliberate attempt to frame Mr. Greebel or to get him

11  somehow.

12           What we are going to say is that that was a result

13  of an assumption, right, that they had a hypothesis, that they

14  had a theory of how this happened and what happened.  They

15  went in and they investigated it the way they wanted to.  He

16  had the authority to do that.  They have the discretion to do

17  that.  We have the discretion, and I think Zapata clearly

18  stands for the proposition, to call into question how they

19  went about it.

20           THE COURT:  You do; and I never said you couldn't.

21  I think the logical extension of your argument is how the

22  Government, had the Government interviewed witness A, B, C on

23  days 1, 2, 3, rather than on the days they did, the Government

24  would not have pursued their prosecution.

25           MR. DUBIN:  That's for the jury to decide whether

Proceedings                                10200

1    they would have or not.

2          THE COURT:  That's the impropriety, the improper

3    argument, to say that the Government somehow should not be

4    pursuing a prosecution or doing this in fact because one

5    witness would have said something different or one witness's

6    testimony on the stand before the jury would have been

7    different or would have made a difference in the Government's

8    view.

9          MR. PITLUCK:  Judge, it's a very narrow issue.  The

10   Court ruled on it.  We argued 45 minutes yesterday and 20

11   minutes today.  The timing when the Government interviewed

12   witnesses, who testified here in court, that were in

13   interviewed by the Government, the timing is irrelevant under

14   case law.  Your Honor has said that ten different times.  And

15   what I'm hearing is regardless of the ruling, they want to

16   argue that.

17          That's the only issue, Judge.  The timing of when we

18   spoke to them is not a relevant investigative technique for

19   the jury to consider under Second Circuit law.  Your Honor has

20   held that.  We would like to establish those ground rules and

21   move on with summations.  We argued this for an hour.

22          (Continued following page.)

23

24

25

Proceedings                    10201

1          THE COURT:  Well, I just felt that the letter

2     either, as I said, unintentionally or deliberately just

3     twisted my ruling.  You are free to argue that the

4     investigative techniques resulted in insufficient evidence to

5     convict Mr. Greebel or raised reasonable doubt or whatever

6     else.  The investigative techniques were -- you can make

7     arguments based on the evidence.  You're not being precluded

8     from doing that.  And to say that that's what I ruled is

9     incorrect.

10         MR. DUBIN:  Here's the problem.

11         THE COURT:  The timing --

12         MR. DUBIN:  Your Honor, this is not a case that

13    involves DNA or fingerprints or a lie detector test.  All

14    right, so I think this that --

15         THE COURT:  The *Zapata* case does, as I'm allowing

16    you to do, to argue that the jury should draw certain

17    inferences from the government's failure to use certain

18    techniques, but there the distinction was fingerprint and

19    handwriting analysis.

20         And in the *Bloom* case, which you also cited, another

21    highly distinguishable case.  There the law enforcement

22    witness had interviewed the kingpin in the drug organization

23    in which the defendant was charged.

24         The officer on cross-examination testified about the

25    post-arrest statement of the kingpin that he had sold drugs to

Proceedings                                    10202

1    the defendant.

2         And I believe that the defense elicited this

3    testimony to show that the investigating officers

4    interpretation of certain intercepted wire, you know, phone

5    calls was influenced by the kingpin's statement about his

6    relationship with the defendant.

7         Well, when somebody's doing a law enforcement

8    investigation over a period of years, yes, they interview many

9    people and certain witnesses may have investigators

10   investigating agents find more credibility, more weight, more

11   influence on the agent's in the case.  But the agent's view of

12   the case is not on trial.  What's on trial is the evidence and

13   whether it's sufficient.

14        MR. DUBIN:  Understood, Your Honor, and again I

15   just -- I think that there's no limit, there's no box in which

16   here are the only investigative techniques that there are in

17   the world.  There are in cases that involve DNA and

18   fingerprints.  There are those type of investigative

19   techniques that will be germane to that investigation.

20        Here it just doesn't apply, and my -- respectfully

21   and then I'll sit, we think that in a case that is all about

22   emails, okay, that the critical investigative technique, and

23   it's about interpretation of emails.  We think that as

24   critical as it is to test DNA in a violent crime case that it

25   is just as critical in a case that is a white color case

Proceedings                    10203

1   involving emails to speak to the witnesses who can interpret

2   it.

3          And the final thing I'll say --

4          THE COURT:  So let's assume that had those witnesses

5   who testified here been spoken to --

6          MR. DUBIN:  Yes, consistent with their testimony

7   here, right.

8          THE COURT:  -- how would that testimony in your view

9   have affected the government's prosecutorial decisions?

10         MR. DUBIN:  That's for the government -- I mean

11  that's for the jury to decide.

12         THE COURT:  It is not for the jury to decide.  What

13  weight that has to do -- what the jury's to decide is the

14  weight, present value and credibility of the evidence.

15         MR. DUBIN:  We think that the relevancy of that and

16  how the jury would evaluate that goes directly to the

17  inadequacy of the investigation.

18         That is our position.  I respect and understand Your

19  Honor's ruling.  It puts us in a odd position.

20         THE COURT:  You said that last night and then I get

21  a 10:00 letter saying that I don't understand.

22         I thought we had made it as clear as we can.  We've

23  argued this many times.  I've made numerous rulings.  I've

24  tried the best I can to be clear.  You're not being prohibited

25  from arguing that the investigative techniques resulted in,

 1    you know, a lack of sufficient evidence to convict.

 2              MR. DUBIN:  The only problem that we have, Your

 3    Honor, is that Mr. Brodsky stood up ten weeks ago in opening

 4    and said there was a rush to judgment here --

 5              THE COURT:  Yes.

 6              MR. DUBIN:  -- and that Evan was swept up in this

 7    effort get Martin Shkreli.  And now I feel like we can't refer

 8    to that.

 9              There was no objection to that at all and now I

10    can't say "rush to judgment" in the summation?

11              THE COURT:  No, you're not being prevented from

12    saying "rush to judgment," you can do that in the context of

13    the insufficiency of the evidence and --

14              MR. PITLUCK:  Judge, I just want to be clear.  The

15    Court's ruling on this is clear and we're being accused of not

16    objecting to something in opening that was improper and ruled

17    upon in a motion in limine.

18              Now interrupting a summation is something that we

19    are going to do because we want the Court's clear ruling

20    articulated that the timing of when witnesses whose testified

21    in court was interviewed is improper and not a proper

22    criticism of the government's technique.  I think that's

23    clear.  And we just want to make sure it's clear for the

24    record because obviously we'll object, but I don't think this

25    should come up.  This is what the Court has said and it's and

Proceedings                                                     10205

 1   skirted around and the Court's ruling is being kind of

 2   misinterpreted.  We want to make sure that this is crystal

 3   clear because objecting during summation is something we don't

 4   want to do, and once it's out, it's out.

 5               MR. DUBIN:  I'm agreeing with Mr. Pitluck that I

 6   don't want to draw an objection during the summation but, for

 7   instance, Mr. Rosensaft testified that he was not interviewed.

 8   It was his testimony that the first time he was interviewed by

 9   law enforcement was in the summer of this year.  I'm going to

10   refer to his testimony.  I have to.  It's in the record.  Why

11   can't -- I mean I should be able to refer to his testimony.

12               MR. PITLUCK:  Judge, we went through this last

13   night.  Referring to testimony that's in the record, just

14   because it's in the record doesn't mean it can be marshaled in

15   a specific way.  We are very clearly restricted from arguing

16   certain evidence on certain points that have come up

17   throughout the trial.

18               But just because he testified he was interviewed in

19   the summer, he was interviewed, and his testimony here today

20   is relevant, not when it came out.  Because as the Court has

21   repeatedly pointed out, it's asking the jury to draw improper

22   inferences is precluded.  I don't want to keep going back and

23   forth over this.  We're having literally the same argument

24   over and over and over.

25               MR. DUBIN:  It's my understanding last night that

 1    the Court ruled that I can refer to this testimony.

 2              THE COURT:  I've made it as clear as I can.

 3              MR. PITLUCK:  Judge, if he refers to the timing of

 4    the testimony, there is really no proper basis to do so other

 5    than to imply that he should have been interviewed earlier.

 6              THE COURT:  Well, what is the relevance of when

 7    particular witnesses were interviewed --

 8              MR. DUBIN:  I can't --

 9              THE COURT:  -- that they would not have brought the

10    prosecution?

11              MR. DUBIN:  No, that their investigative techniques

12    were inadequate and incomplete.

13              MR. PITLUCK:  That's the same argument we've been

14    making, Judge.  You just said that's why we're going to

15    marshal his testimony.

16              MR. DUBIN:  So now I'm being told that I can't refer

17    to testimony that's in this record.  I certainly think that I

18    have the right to do that.

19              MR. PITLUCK:  Not for an irrelevant purpose that

20    runs counter to the law, Judge.

21              MR. DUBIN:  It's in the record as evidence.

22              MR. PITLUCK:  There's a lot of things in the record

23    in evidence that we can't argue.

24              Judge, they're trying for a jury nullification

25    verdict what is clearly irrelevant, which is the timing of

Proceedings                          10207

1    when somebody spoke.

2              MR. DUBIN:  We're trying for a verdict based on the

3    evidence.  And that's in the evidence.

4              THE COURT:  But the relevant evidence is not when

5    the government spoke to a witness.  That is not relevant and

6    you cited no case that supports that view.

7              MR. DUBIN:  I think we have.

8              THE COURT:  What is relevant is the weight, whether

9    there is sufficient evidence or reasonable doubt or a lack of

10   credible evidence.

11             You know, you have not cited a case.  We've looked

12   for those cases because you didn't cite them and I don't

13   believe *Zapato* or *Bloom* stands for that proposition either

14   with regard to the timing, especially when these witnesses

15   were here in court.  It's up to the jury to evaluate the

16   substance of that testimony.

17             MR. DUBIN:  So is it Your Honor's ruling, just so I

18   don't draw an objection, if you're precluding it, I won't

19   raise it, that I cannot refer to Mr. Rosensaft's testimony

20   that he was interviewed in 2017?

21             THE COURT:  Well, you know, I guess I'm trying to

22   understand what the argument would be based upon the timing,

23   and I just don't hear anything articulated other than that

24   this means the government's investigation was incomplete.

25   Which, you know, again, it doesn't go to the weight, the

1   sufficiency, the relevance of the evidence or whether or not

2   there's reasonable doubt based on the statements of a witness.

3           MR. DUBIN:  We think it does, and if Your Honor is

4   precluding me from doing it, I won't raise it so there's no

5   objection.

6           MR. PITLUCK:  Thank you, Judge.

7           THE COURT:  All right.  Are all the jurors here?

8           MS. DENERSTEIN:  Your Honor you asked Mr. Kessler

9   and I to confer about the exhibits on Mr. Dooley, and we have,

10  and I think we agreed on a list of what was admitted and for

11  what purposes.

12          There were three exhibits that were not formally

13  offered.  We'd like to offer them.  And I spoke to Mr. Kessler

14  about this, I don't believe -- and we can do this right now

15  for purposes of the record, and we don't need to do any

16  reading to the jury.

17          MR. KESSLER:  That's correct.

18          THE COURT:  And Mr. Kessler agrees to admitting the

19  exhibits?

20          MR. KESSLER:  I do.

21          THE COURT:  And, I'm sorry, the limitation on these

22  exhibits, offered for the truth only or not?

23          MR. KESSLER:  I don't believe on these that

24  Ms. Denerstein has a chart.

25          THE COURT:  So you're both advocating that I not

Proceedings                                    10209

1   advise the jury as to which exhibits they may not consider for

2   the truth, or you're saying you don't want this read to the

3   jury?

4           MS. DENERSTEIN:  I don't think that reading it to

5   the jury will serve a useful purpose.  I don't think they'll

6   remember the numbers.  I think that when both sides have

7   wanted the instruction, they have requested Your Honor to

8   provide it.

9           THE COURT:  Well, no, there are a whole slew of

10  exhibits that either were not moved for admission or were

11  moved in bulk and then when the witness was actually --

12  yesterday I did try to identify which were not offered for the

13  truth.  The day before there were also a number of exhibits

14  that came in where they were in bulk, I think there was a long

15  list of exhibits and specific instructions as to each exhibit

16  were not given.

17          MR. KESSLER:  Your Honor, I think there's two

18  different things.  I don't think we need to read exhibits.  I

19  think we can just offer the exhibits now for purposes of the

20  record.

21          I think for purposes of informing the jury which

22  exhibits are offered not for the truth, that is something the

23  Court can tell the jury.  We can make a list that goes back

24  with the exhibits just to make that clear.  That's completely

25  fine.

Proceedings                                   10210

1          THE COURT:  All right.  I think that might be a good

2     solution that would save time rather than go through and

3     expect the jury to just remember numbers.

4          Would that be acceptable since you reached an

5     agreement and the way that the exhibits came in in bulk, it

6     was not made clear to the jury.

7          MR. BRODSKY:  Your Honor, I do think we should do

8     that.  That's -- we closed our case, the government's closed

9     their case.  There's a huge record of Your Honor's rulings

10    with respect to various exhibits.  We will have to poor

11    through the record, and I know Your Honor with respect to

12    specific testimony, since certain testimony was, in effect,

13    elicited but not for the truth.  The jury's paying attention.

14    They know which exhibits.  They were taking notes.

15         THE COURT:  If you take the position that the

16    record's closed then the record's closed.  I mean we're trying

17    to make the record complete and accurate.

18         Ms. Denerstein offered a number of exhibits in bulk.

19         MR. BRODSKY:  Understood.

20         THE COURT:  After we specifically and painstakingly

21    went through each one and decided the grounds for

22    admissibility.  When they were moved in in bulk, they were not

23    identified to the jury as to which ones were offered and not

24    for the truth and -- and yesterday exhibits were shown to the

25    jury but never moved in.  They're not officially in the

Proceedings                                  10211

1   record.  So I tried to fix it yesterday by going through and

2   listing which ones were offered not for truth and which ones

3   weren't.  But to say that the record's closed and the defense

4   has rested is to suggest that she shouldn't be allowed to put

5   in the exhibits she forgot to move in.

6              MR. BRODSKY:  My suggestion, Your Honor, is not to

7   go back through the whole record and not go back to all the

8   exhibits and not provide the --

9              THE COURT:  No, he's is not trying to do that --

10             MR. BRODSKY:  We're just talking about the exhibits

11   in the last few days.  The record isn't clear about which of

12   those should be admitted.  The two options are the Court can

13   read the entire list to the jury so it's in the transcript or

14   we can give the jury a list.

15             THE COURT:  I mean I can read it into the transcript

16   and that way they can get a read back if they want, if you

17   don't want a list going back.  All right?

18             So before we have closings, I should probably do

19   that.  Do we have the final list?

20             MR. KESSLER:  Ms. Denerstein has it.

21             And, Your Honor, if the Court remembers, the defense

22   rested yesterday subject to addressing this exhibit issue.

23             MR. BRODSKY:  If it's easier for Your Honor, we'll

24   give them a list and we'll put a chart together, we'll agree

25   on it and we can give it to Your Honor for the record.

1          THE COURT:  However, you want to do it, I don't make

2     decisions based on what's easy for me.

3          MR. BRODSKY:  Nor do I.

4          THE COURT:  If it's easier to read it in and they

5     can get the transcript read back every time they forget or

6     need an exhibit, that's fine, we will get a lot of notes and

7     that's fine, I'll just call you up and we'll read the note, or

8     we' can give them a list, it doesn't matter to me.

9          MS. DENERSTEIN:  We have conferred, we'll give them

10    a list but, Your Honor, with all due respect just so that the

11    record is clear, I did talk to Mr. Kessler about how I was

12    going to proceed in offering it in bulk, it wasn't a surprise.

13    So I just would like the record to reflect that I have

14    conferred with the government about this, that it wasn't an

15    intent to --

16         THE COURT:  I'm not accusing you of any intent, I'm

17    just saying the record -- I know that exhibits were offered

18    did not reflect the painstaking lengthy review of each

19    individual document.

20         MS. DENERSTEIN:  Correct.

21         THE COURT:  And the rulings I made.

22         MR. DUBIN:  Correct.  But if you recall, our

23    discussion was that Mr. Kessler objected at the time or asked

24    the Court to give an instruction, but regardless we'll send a

25    list back and just to read back we'd like to inform it was

1   moved in evidence.

2          THE COURT:  And I think there were some also that

3   you were not offering for the truth in any event.  But that

4   distinction wasn't made when they were offered in bulk, that's

5   my only point and I felt that the record, and still feel that

6   the record could benefit from some clarification --

7          MR. DUBIN:  So --

8          THE COURT:  I'm not accusing anybody of wrongdoing.

9          MS. DENERSTEIN:  -- the list I think is fine because

10  they have the list.  I think we'll just figure it out

11  afterwards.

12         MR. KESSLER:  So the only thing we need to do before

13  the close of evidence is to the extent there are exhibits that

14  should have been offered and weren't, they need to go into the

15  record and then the list needs to be prepared to go back with

16  the exhibits.

17         THE COURT:  All right, so do you want to make your

18  offer?

19         MS. DENERSTEIN:  Yes.  The first one is Defense

20  Exhibit 1010 was received into evidence at sidebar but was

21  incorrectly noted as a government exhibit.  This is trial

22  transcript page 10,024 and 25.

23         THE COURT:  10,024 and 25?

24         MS. DENERSTEIN:  Correct, the pages.

25         THE COURT:  Okay, so it's still Defense Exhibit 1010

Proceedings                                10214

1    not Government Exhibit.

2              MS. DENERSTEIN:  Correct.

3              The second one, the record just needs to be

4    corrected to reflect that Defense Exhibit 8432 is not Defense

5    Exhibit 8342.

6              THE COURT:  So the correct number is 8432 and not --

7              MS. DENERSTEIN:  8342.

8              THE COURT:  Okay.

9              MS. DENERSTEIN:  And then the final one, which is

10   the only one that was not formally offered but was discussed

11   at sidebar was Defense Exhibit 11,305.

12             THE COURT:  All right, now, have you straightened

13   out how you want to deal with those exhibits that were offered

14   by a party but were, in fact, already in evidence, and you

15   said you would straighten that out.  If you're giving both to

16   go back to the jury that's fine, too.

17             MR. KESSLER:  I think at this point, to the extent

18   there are two different documents in the record, we can just

19   have the jury get the two documents rather than try to go back

20   and edit the transcript essentially.

21             THE COURT:  Okay.  So without objection from the

22   government, the Court will received in evidence Defense

23   Exhibit 1010; Defense Exhibit 8432, and any references in the

24   transcript to Defense Exhibit 8342 should be corrected to

25   reflect the correct exhibit number; and finally the Court

Proceedings                            10215

1   receives in evidence Defense Exhibit 11,305.

2          MR. KESSLER:  I guess I should say no additional

3   objection subject to the previous objections that we talked

4   through already.

5          THE COURT:  All right.  And are these going to be

6   offered not for the truth or -- because they should be on the

7   list in any event.

8          MR. KESSLER:  They are on the list.

9          MS. DENERSTEIN:  1010 we redacted, but we'll work

10  that out.

11          (Defense Exhibit Number 1010, was received in

12  evidence.)

13          (Defense Exhibit Number 8432, was received in

14  evidence.)

15          (Defense Exhibit Number 11,305, was received in

16  evidence.)

17          THE COURT:  All right, so the list will reflect

18  whether or not there are any limitations upon the jury's

19  consideration of the exhibit.

20          MR. KESSLER:  Just say not for the jury room.

21          THE COURT:  All right, are we now ready to bring the

22  jury in?

23          MS. SMITH:  Can we take a two-minute bathroom break?

24          THE COURT:  Sure.  All right.

25          (Whereupon, a recess was taken at 10:02 a.m.)

```
                      Summation - Ms. Smith                    10216
```

 1          THE COURT:  I just want to make a correction.  I

 2    think I might have referred to the second case as *Bloom* and it

 3    should have been *Martin*.  There were two parties in that case.

 4          MR. DUBIN:  That's what I was just asked.  Thank

 5    you, Your Honor.

 6          THE COURT:  The case that I referred to as *Bloom*

 7    should be referred to as *Martin*.

 8          (Jury enters the courtroom.)

 9          THE COURT:  Please have a seat.  All jurors are

10    present.

11          At this time, members of the jury, the parties are

12    going to offer summations.  Just as I told you about opening

13    statements, summations are not evidence, rather summations are

14    an opportunity that each side has to interpret the evidence

15    for you and to argue to you what conclusions you should reach

16    based on the evidence that you heard during the trial and

17    based on the documents that have been submitted as exhibits in

18    evidence.

19          So with that in mind, I will ask the government if

20    they are ready to proceed.

21          MS. SMITH:  Yes, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MS. SMITH:  Good morning, ladies and gentlemen.

24          THE JURY:  Good morning.

25          MS. SMITH:  Over the past two month you have seen

1   and heard overwhelming evidence of two criminal conspiracies,

2   conspiracies with that man, the defendant, Evan Greebel, he

3   with Shkreli and others to defraud Retrophin, a

4   publicly-traded company, his client, and to illegally control

5   the trading of his client's stock and deceive the investing

6   public.

7           As my colleague, Mr. Kessler, told you in his

8   opening statement, the defendant had a duty to act in the best

9   interest of his client, Retrophin, a publicly-traded company.

10  But he betrayed that duty.  Rather than acting in Retrophin's

11  interest, the defendant acted in his own self-interests and

12  the interests of his coconspirator, Martin Shkreli.  He used

13  his skills as a lawyer to work behind the scenes and enabled

14  Martin Shkreli to steal millions of dollars from Retrophin.

15  And one fraud was not enough for the defendant.  He also

16  schemed with Shkreli and others to illegally control the

17  trading of Retrophin stock and to defraud the investing

18  public.

19          This has been a long trial.  And we thank you for

20  your patience, but we are now at the end and you have before

21  you all of the evidence that has come in over the past ten

22  weeks.  You have heard the testimony.  You have seen the

23  emails.  You have read the records.  You have seen how the

24  defendant helped to use Retrophin's money to pay back Martin

25  Shkreli's defrauded hedge fund investors.  You have seen how

1    he helped Martin Shkreli control the Fearnow shares and

2    restrict trading in those shares to make sure Retrophin shares

3    were not sold in the public market.

4          And you've seen emails that were just between the

5    defendant and Martin Shkreli, emails that they thought would

6    never see the light of day.  Emails that further reveal the

7    true nature and role of the defendant.  The man behind the

8    scene.  The man who was scheming with Martin Shkreli to commit

9    a fraud against his client that was paying the defendant's law

10   firm millions of dollars in legal fees.

11         So why did he do it?  Why did the defendant commit

12   these crimes?  You know the answer.  For the oldest reason in

13   the book.  For money.  The defendant did it for money, to move

14   up the ranks in his firm, and he did it to please and to

15   protect Martin Shkreli, the man who controlled the purse

16   strings of Retrophin without Shkreli's stamp of approval, the

17   defendant could have lost Retrophin, his biggest and most

18   important client.  To protect millions of dollars in fees, he

19   committed these two crimes, and in doing so, the defendant

20   crossed the line from legal adviser to criminal coconspirator.

21         So let me take a step back and give you a sense of

22   what you're going to hear this morning.  I won't be able to

23   mention every single piece of evidence that you saw, otherwise

24   we will be here for another ten weeks, but I will help you put

25   together the key evidence.  The key information that you see

1    so you can see the whole story.  And that's important because

2    each of the witnesses that came in before you only had a small

3    piece of that much bigger story.  They were present for only

4    certain events, knew only certain people, or got only certain

5    emails.  And, in fact, many of the witnesses who came before

6    you didn't have a lot of direct contact with the defendant.

7    That was intentional.

8           For these schemes to succeed the defendant had to

9    play his role, and that role was to be the man operating

10   behind the scene, out of sight.  He was the one that made

11   these massive frauds look legitimate and look legal.  It is

12   only by taking all of these different pieces of evidence from

13   all of these different witnesses, documents and putting them

14   in a context of the emails between the defendant and Martin

15   Shkreli that you saw come in through Special Agent Delgado

16   that we assembled a clear picture of what happened; the

17   defendant's role in the fraud and the overwhelming evidence of

18   the guilt.

19          So I have just a few notes before we start walking

20   through the evidence.  Judge Matsumoto is going to instruct

21   you on the law and what the judge says controls.  But I'm

22   going to preview for you some of the legal elements that

23   you're going to consider during deliberations.  And I'm going

24   to show you how we've proven each of those legal elements

25   beyond a reasonable doubt.

1           And second, you're not going to get a copy of the

2    PowerPoint slides that I'm going to go through today, instead

3    I'm going to use them to help us walk through the evidence.

4    But I'm going to note the exhibit numbers as I go through and

5    transcript sites and you can take notes on any of those as we

6    talk about them.

7           So with that said, we're going to start with the

8    first of the two counts, Count One, which is the wire fraud

9    conspiracy.

10          And this conspiracy charges that the defendant and

11   his coconspirators, which included Martin Shkreli and others,

12   conspired to defraud Retrophin by stealing money and shares

13   from a public company to pay the debt of Martin Shkreli and

14   the MSMB entities through the settlement and its holding

15   agreement that we've heard so much about.

16          And so these are the elements of the wire fraud

17   conspiracy.  I'm going to touch on them very briefly in the

18   beginning here, and we'll talk about them again at the end and

19   then the Judge will also give you these during your actual

20   deliberations and instructions.

21          And there are two elements of wire fraud conspiracy.

22   First, that there was a conspiracy to commit wire fraud; and

23   second, that the defendant knowingly and intentionally became

24   a member of the conspiracy.  And a conspiracy, as Mr. Kessler

25   told you in the beginning, is just an agreement.  And

1  underneath there was also the element of wire fraud, which is

2  the underlying crime.

3          So what this means in a nutshell is that it is a

4  crime to agree to take money or property from somebody, and

5  here in this count we're charging that Retrophin is a public

6  company, based on lies or omissions.  And for some of the

7  elements of this crime, there's no dispute as to what

8  happened.  There's no dispute that money was taken from

9  Retrophin to pay MSMB investors.  And there's no dispute that

10 wires such as emails or bank transfers were made.

11         So what we need to prove to you is that the

12 defendant agreed to do this with at least one other person.

13 And that he did so knowingly and intentionally through

14 material lies and omissions with the intent to defraud

15 Retrophin.

16         Lies are easy.  They're just false statements and

17 misrepresentations and we'll walk through those

18 misrepresentations.  And an omission is just a failure to

19 disclose.  A failure to speak up and say something.  And

20 you'll hear that that only matters if you have a duty to speak

21 up.

22         And here the defendant had that duty to Retrophin

23 because he was the company's lawyer.  So he had the

24 responsibility to provide them with certain information.  And

25 you'll hear that he did not disclose material important

1    information related to the settlement and consulting

2    agreement.

3           And, again, it's important to remember that a

4    conspiracy is just an agreement.  And you'll hear from the

5    judge that there's no requirement of success.  So that even if

6    the defendant and others agreed to defraud Retrophin by taking

7    money and property from it, and never actually did it, that

8    would be good enough for the crime.  As is clear from the

9    evidence that you're going to see, they did, in fact, carry

10   out that plan.

11          And I will now walk you through the evidence that

12   shows beyond a reasonable doubt that the defendant is guilty

13   of the conspiracy.  And I had like to start and set the stage

14   by talking about the two hedge funds that Martin Shkreli ran;

15   MSMB Capital and MSMB Healthcare that turned out to be frauds,

16   and it's important background for the conspiracy charge in

17   Count One because without the fraud, we don't have the angry

18   investors that need to be paid back with the money and shares

19   going to Retrophin.

20          So starting with MSMB Capital, which is the first of

21   the hedge funds, you know that this was a hedge fund run by

22   Martin Shkreli and you heard from a number of investors in the

23   fund, including Sarah Hassan and Darren Blanton.  And you know

24   that what happened was those investors put the money into the

25   fund, and then on February 1st, 2011, Shkreli lost all the

1  money in the fund by a series of trades called the Orex

2  trades, and he not only lost all the money in the fund, but

3  the way he did the trade he also wound up owing Merrill Lynch

4  $7 million. And that was in, again, February 2011. And we

5  saw the bank accounts that showed that after those trades

6  MSMB Capital had no money left.

7              You also know that Retrophin was actually founded

8  after MSMB Capital lost all of its money and that no money was

9  ever transferred from MSMB Capital to Retrophin, that was the

10  bank accounts, Government's Exhibit 91C and 902C.

11             And you know that the defendant knew that

12  MSMB Capital had never invested in Retrophin. And how do you

13  know that? You know that from a cap table. And there were a

14  lot of cap tables that we looked at over the course of this

15  trial.

16             But what's important about the cap table again is

17  that it indicates who had shares in the company. And it

18  indicates who invested shares or who had gotten shares in a

19  different way. And you know that the defendant maintained the

20  cap table because he was the lawyer for the company. And you

21  know from Howard Jacob's testimony that he was diligent and

22  hard working and he understood how cap tables worked.

23             And this cap table, which I'm showing you here, is

24  Government Exhibit 1114 from February 2012. And it's not very

25  complicated. There aren't a lot of companies on it. And at

1    this point in February 2012, you can see that only MSMB

2    Healthcare is on the cap table.  It's the only hedge fund

3    that's actually invested in Retrophin.  And you know that

4    MSMB Capital has not invested in Retrophin.

5              And, again, there's a cap table from September 2012

6    that the defendant maintained for MSMB Capital, did not invest

7    money in Retrophin.  So that's important to keep in mind as

8    well, that the defendant understood that MSMB Capital hadn't.

9              And then with respect to the second hedge fund, MSMB

10   Healthcare, you heard lots of testimony that MSMB Healthcare

11   wasn't operated by Shkreli as an actual hedge fund.  It was

12   supposed to be a place where you put money in and then the

13   fund invested in a lot of different public companies and they

14   had a long and short positions, and instead what the defendant

15   did was took everybody's money, put it in the hedge fund and

16   then funneled it over to Retrophin.

17             And you saw that from the trading and bank records

18   for MSMB Healthcare, that trading actually decreased for MSMB

19   Healthcare by March of 2012.  And by the end of the year, in

20   September of 2012, MSMB Healthcare had $614.  And that's

21   Government Exhibit 917.

22             So you know that MSMB Healthcare was pitched to

23   these investors.  Some investors that you heard from, Richard

24   Kocher, Alan Geller, David Geller, and that hedge fund, in

25   fact, was being used to support Retrophin.

Summation - Ms. Smith                    10225

1    BY MS. SMITH (CONTINUED):

2         And you also heard that Shkreli lied to the

3    investors and told them that this is not what was happening

4    so that they understood, they believed they were operating

5    as a hedge fund even though it was only being used to help

6    him.  And again, the defendant was aware that the money from

7    MSMB Healthcare was being put into Retrophin because

8    MSMB Healthcare was on the cap table, unlike MSMB Capital.

9         And so then we get to September, 2012 when we get

10   the wind-down which all of the investors talked about.  And

11   the wind-down e-mail from Martin Shkreli said to his hedge

12   fund investors in MSMB Capital and MSMB Healthcare, Hey,

13   guys, I have decided to wind down the hedge fund.  You can

14   get your investment back in either cash or shares of

15   Retrophin, but it's up to you, and I will refund that money.

16   If you want to get it back and reinvest in Retrophin, you

17   can or you can just get your investment back.

18        And here's where the lies come in.  So again,

19   MSMB Capital actually had no money.  MSMB Healthcare, all

20   the money has been put into Retrophin, but at the same time,

21   all the investors are receiving performance updates that you

22   have heard about.  So they are being told that their

23   investments grew and are much bigger than when they put

24   their money in.  But, in fact, for MSMB Capital, the money's

25   all gone, and for MSMB Healthcare everything was in

1    Retrophin.  And we will talk it about in a minute, Retrophin

2    isn't doing very well.  So this is really key to what comes

3    next because Martin Shkreli has made these representations,

4    Your investment has gotten much bigger.  You can get your

5    money back, but, in fact, there is no money in MSMB Capital,

6    and MSMB Healthcare only has Retrophin and Retrophin is not

7    doing very well.

8           So this is what set the stage for the conspiracy

9    that is charged in Count 1.  What Martin Shkreli needs to do

10   is something with respect to MSMB Capital because he had no

11   money left.  He has never invested in Retrophin.  He has

12   nothing to give these investors who he has promised he can

13   give money or shares back to.  So he has to make it look

14   like MSMB Capital actually put money into Retrophin, and

15   that way he can actually give those people at least

16   Retrophin shares, you know, when they come knocking and

17   asking for their investment back.  And the defendant played

18   a key role in getting MSMB on the cap table, and more

19   importantly making it look like MSMB Capital actually

20   invested money into Retrophin.  Which will be very important

21   when we get to the settlement.

22          So again, if we start with what the defendant

23   knew, and remember, the defendant started working for

24   MSMB Healthcare and MSMB Capital in the summer of 2011.  We

25   heard from Bernadette Davida about the introduction and then

1    beginning in 2012 he was working for Retrophin as

2    Retrophin's lawyer.  Retrophin did not have an in-house

3    counsel and Mr. Greebel was serving as outside counsel, but

4    there was no other lawyer, so he was functioning as

5    Retrophin's lawyer in this time period.  And again, he is

6    maintaining the cap table so he knows in February of 2012

7    that MSMB Capital had not invested the money.  And he is

8    also learning throughout 2012 who is getting shares and how

9    shares were moving around and you heard a lot of testimony

10   about this, the cap table.  And you see that he has learned

11   that Mr. Shkreli transferred shares to various people,

12   including Mulleady and Mr. Fernandez, and this is an e-mail

13   from the that time period in May of 2012 where he is

14   learning about the various transfers that Mr. Shkreli has

15   made.

16         And then we get to September of 2012, which is

17   time of the wind-down e-mail.  And this is

18   Government's Exhibit 445.  And we can see that what is on

19   the cap table are those transfers that Mr. Shkreli had made

20   transfers of shares to Mr. Biestek and Mr. Fernandez,

21   Mr. Mulleady.  They are all on the cap table.  MSMB Capital

22   is nothing, clearly did not put money into Retrophin.  It is

23   not on the cap table at this point.

24         And we can look again by the time we get to

25   November of the 2012, the story is the same.  You saw a lot

1    of cap tables in between.  There are no cap tables before

2    September of 2012, which we will look at that actually had

3    MSMB Capital on the cap table.  And again, this is not a big

4    complicated cap table.  It is very clear to see who has put

5    money into this company.

6          And then we get to the end of November, 2012,

7    November 25th.  And there was this e-mail conversation that

8    we looked at with Special Agent Delzotto between the

9    defendant and Mr. Shkreli.  And they are talking about

10   unwinding share transfers.  And Mr. Shkreli says, Can you

11   prepare a surrender agreement?  And you can see that

12   Mr. Greebel's response is, What is the surrender agreement?

13   What do you want to do?  And Mr. Shkreli says, I want to

14   cancel a specific transfer I made before.  So they are

15   talking November, 2012 about canceling something, and they

16   are talking about it doing it at the present time in

17   November of 2012.

18         And if we continue with Government's Exhibit 459,

19   the defendant said, It is hard to unwind stuff, so it is

20   hard to unwind the transfer you did, but it is easier if the

21   person just transfers the shares back to you.  And

22   Mr. Shkreli said, Okay.  That works.  And that is a

23   conversation they have on November 25th.  And that is very

24   important to keep in mind because, as you remember from the

25   testimony, there is a whole series of transfers that happen

1    right after that.  And they are transfers of shares back

2    from other people to Mr. Shkreli exactly as it is discussed

3    in this e-mail, and those transfers eventually get dates put

4    on them that are not November of 2012 but, in fact, are June

5    and July of 2012.  And this is the conversation that the

6    defendant and Mr. Shkreli have right before that series of

7    transfers takes place.

8              And so this is the series of transfers that I want

9    to talk about.  This is Government's Exhibit 111-15, and

10   this is basically Mr. Shkreli carrying out exactly what he

11   and the defendant discussed with the exception of instead of

12   I'm going to have shares transferred back to me now, the

13   dates wind up getting made much earlier, even though it was

14   clear that the transfers are, in fact, taking place in

15   November.

16             So this is the e-mail from Jackson Su to the

17   defendant, Mr. Shkreli and Mr. Biestek, who is another

18   co-conspirator on November 29th, 2012 attaching a share

19   transfer.  And we looked at these a bunch.  But this is the

20   first share transfer that comes in and it has November 29th

21   as the date on it.  It also has kind of the scan where it

22   was sideways, and you heard testimony from Jackson Su that

23   this document was kind of dropped on his desk on that date

24   from Mr. Shkreli and he just put the date that he received

25   it on his desk.

1          And we got the testimony from Corey Massella, the

2    famous WTF e-mail and his reaction was, you know, twofold.

3    One was, again, where all of these kind of things that were

4    changing on the cap table.

5          But secondly, he thought that the transfer was

6    very strange because it was a transfer of shares from

7    Mr. Biestek to Mr. Shkreli.  And he testified that it is

8    very odd for an employee to be transferring shares back to

9    the CEO.  And so this was one of the reasons he kind of kept

10   an eye on it and made sure he understood what was going on,

11   and we will talk about that in a minute.

12         And then we get the response from the defendant.

13   And the defendant says, Please re-execute the transfer

14   agreement because the document transferring shares from

15   Mr. Biestek to Mr. Shkreli was for Retrophin, LLC, and by

16   this time in November of 2012 it is actually Retrophin, Inc.

17   So the defendant is saying you're making a transfer today,

18   it needs to be Retrophin, Inc.  You know, the document isn't

19   right.

20         And then Mr. Shkreli responds and says that

21   transfer happened in June, and we know that that is not true

22   because they are discussing November, 2012 getting things

23   transferred back and then we get this transfer agreement

24   that shows up.  But nonetheless, Mr. Shkreli says that

25   agreement happened in June.  And then what happens is that

1    he provided Mr. Su with a second copy.  And all of a sudden

2    we have this signature block here with the whiteout tape on

3    it.  And so instead of having the date on which the document

4    was actually dropped off and the date that was put on by

5    Mr. Su, all of a sudden we have a date of July 1st, 2012.

6    And keep in mind Mr. Shkreli's e-mail said that agreement

7    was signed in June.  So it is not even the same date that

8    Mr. Shkreli is claiming in the e-mail.  And as you can

9    imagine this gets a reaction, because the defendant says to

10   Jackson Su please call me.  And what winds up happening is

11   that Mr. Shkreli creates a third version of the document and

12   this time the date is June 1st of 2012.  So as between the

13   three versions, we get November 29th, the date the document

14   was actually dropped on Jackson Su's desk, then we get

15   July 1st, and then we get June 1st, all within a span of a

16   couple of hours.

17            And we know that the defendant discussed this

18   transfer with Marek Biestek because there is an e-mail after

19   he sends the response saying, Hey, guys, the document is not

20   right because the transfer is happening now, but the

21   document is for Retrophin, LLC, which has not existed since

22   the fall.  He then has a conversation with Mr. Biestek about

23   it the next day on November 30th of 2012.  And that timing

24   is very important because the other thing that happened on

25   November 30th of 2012 is that Mr. Shkreli had conversations

1    with two other people.  He wants to have transfer shares

2    with him, Mr. Mulleady and Mr. Fernandez.  And this is

3    Government's Exhibit 447.  On November 30, 2012, that exact

4    same date, Mr. Mulleady agrees to transfer his shares back

5    to Mr. Shkreli and he says he does it in order to get the

6    Fearnow shares.  And we will talk about the Fearnow shares

7    more in Count 2.  But you know this transfer happens on

8    November 30, 2012, because they are discussing it in the

9    e-mail the same way that the defendant and Shkreli discussed

10   the share transfer before they happened, the same way the

11   defendant discussed Mr. Biestek's transfer on the same day.

12          And you have again an e-mail with

13   Government's Exhibit 462 where Mr. Shkreli is saying the

14   same thing to Mr. Fernandez.  You know, transfer me back

15   those shares and I will give you the opportunity to get

16   Fearnow shares.  And as we will talk about in Count 2, the

17   defendant is intimately involved in figuring out who to

18   distribute the shares to for the Fearnow shares and how many

19   and who is getting what.  And all of these conversations

20   about the transfers are happening in that same time period.

21          And so what happens next on December 3, 2012,

22   Jackson Su sends this final share transfer, and there are

23   actually four share transfers attached.  And there is the

24   three that we have already talked about, the transfer of

25   stuff from Biestek to Mr. Shkreli; from Mr. Fernandez to

1    Mr. Shkreli; and from Mr. Mulleady to Mr. Shkreli.  So three

2    employees transferring stock back to the CEO, which again,

3    as Mr. Massella thought, is a very strange mix there.  And

4    all three of these, you know, have the June or July of 2012,

5    even though we know that these transfers actually happened

6    in November.

7              And then the last transfer that is attached to

8    this e-mail is a transfer of stock from Mr. Shkreli to

9    MSMB Capital.  And this is the transfer that is really

10   significant.  The other three transfers are the ones that

11   let you know that the defendant knew that these transfers

12   happened in November.  They are all happening at the same

13   time.  And then we also get this transfer from Mr. Shkreli

14   to MSMB Capital with the same date as two of the others,

15   July 1st, 2012 only showing up on December 3rd, 2012; and we

16   know that MSMB Capital had never been on the cap table prior

17   to that.  And this is the key transfer from Mr. Shkreli to

18   MSMB Capital, and that is Government's Exhibit 111-26A.  And

19   keep in mind, this is December 3, 2012, on the exact same

20   date Mr. Shkreli sends an updated cap table and for the

21   first time, MSMB Capital is on the cap table and shows that

22   it has 75,000 shares in Retrophin.

23             And then the defendant and Mr. Shkreli have a

24   conversation with Mr. Massella.  And again, Mr. Massella is

25   the accountant.  He is trying to put the books together for

1    the reverse merger and he is asking what is the purpose of

2    these share transfers, because if the share transfers are

3    some sort of compensation to Mr. Shkreli, they are going to

4    have to record it a certain way.  And he is also kind of

5    questioning what is going on because there are transfers

6    from the employees to the CEO, and he has a conversation

7    with Mr. Shkreli and with Mr. Greebel.  What is the purpose

8    of the transfers?  And he told you that this conversation

9    was both about an initial Biestek/Shkreli transfer and then

10   eventually about all four transfers that show up in that

11   e-mail.

12           And this is the testimony that Mr. Massella gave.

13   He said for all of these share transfers, the explanation we

14   received was that these were gifts outside the company

15   between individuals, so it had no effect on the company's

16   financials.  And this was clear and unambiguous testimony

17   that the defendant was telling Mr. Massella, that these

18   transfers were a gift.  They were not received by

19   MSMB Capital because MSMB Capital put any money into

20   Retrophin, it is because Mr. Shkreli gave the shares to

21   MSMB Capital.  And that is really, really important for what

22   happens next.  Because what happens next is that at the time

23   of the reverse merger, there is a filing called a Form 13-D

24   that is made and that Deb Oremland testified that the

25   Form 13-D is the form that discloses information about the

1   company, and it is important that that information be

2   accurate because people in the public will read the document

3   and make decisions about whether to invest or not to invest

4   based on the information they are getting about the company.

5   And the Form 13-D has a bunch of information in it, and we

6   will talk about it with respect to Count 2 as well, but one

7   set of information that it had in it was information about

8   how the shares were received from MSMB Capital.

9               (Pause in proceedings.)

10              THE COURT:  Do you want to continue?

11              MS. SMITH:  Okay.

12              THE COURT:  We will get some technical help.

13              MS. SMITH:  So we were talking about the

14  Form 13-D.

15              Before we talk about the actual form, I want to

16  talk about Government's Exhibit 635, which is an e-mail

17  between the defendant and Mr. Shkreli on December 18, 2012,

18  and they are discussing the filing of the Form 13-D.  And

19  they are also talking about money that Mr. Shkreli owes to

20  the defendant's law firm.  And Mr. Shkreli said, I'll send

21  you another $25,000 for the bill if you get my Form 13-D

22  filed.  And then at the top of the e-mail after they have

23  had a little more discussion about the bill, he says give me

24  a call on the 13-D.  So we know that they discussed the 13-D

25  on December 18, 2012.  And then on December 19, 2012, the

1    next day, the defendant sends a draft of the Form 13-D, and

2    this Form 13-D disclosing that MSMB Capital had shares in

3    Retrophin and it says 375,000 shares.  If you remember the

4    way that when the reverse merger took place, everyone who

5    had shares on the cap table, there was a multiple of seven,

6    and so if you had one share, you wound up with seven.  So

7    the transfer was for 75,000 shares, but by the time it gets

8    to the reverse merger, MSMB Capital had 375,000.

9           And so the document, this is a draft and it says

10   that MSMB Capital had 375,000 shares of Retrophin.  And it

11   says, Source of funds, and there is a notation there that

12   says WC.  And Deb Oremland, who is from FINRA, testified

13   that WC means working capital, which means that MSMB's money

14   was put in for these shares.  So basically this document

15   told the public that MSMB Capital invested money in

16   Retrophin in order to get those 375,000 shares.

17          You know that is not true.  Mr. Shkreli knew that

18   was not true and the defendant knew that was not true

19   because they just had that whole conversation with

20   Mr. Massella about how the shares were a gift.  And so

21   internally they are classifying them as a gift, and then

22   they are telling the public that the shares were purchased

23   with working capital.  And so this is the 13-D that the

24   defendant drafted.  And then Government's Exhibit 962 is the

25   13-D that actually gets filed, and it had the same

1    information in it and it is filed the next day, which is

2    December 30, 2012.

3           And why was this misrepresentation made to the

4    public about MSMB Capital?  And it was made because

5    Mr. Shkreli wanted to be able to tell the MSMB Capital

6    investors that he had invested their money from MSMB Capital

7    into Retrophin because he has to explain at some point, as

8    we will see, where that money went, and he did not want to

9    tell them that he lost the money in the trade and that he

10   had been lying to them with performance updates.  And so he

11   has this document which is not publically filed and makes it

12   look like MSMB Capital had money, and that money was

13   invested in Retrophin and Retrophin shares were gotten as a

14   result.

15          And, in fact, if you look at

16   Government's Exhibit 103-29, Mr. Shkreli uses this document

17   for that exact purpose on the same date that the defendant

18   drafts it.  He sends it to Darren Blanton and he says,

19   Darren Blanton, you know, you were asking me what happened

20   to my investment, because if you remember, Darren Blanton

21   tried to get his money out even before the wind-down e-mail

22   and Mr. Shkreli just strung him along and wouldn't give him

23   any answers and send some money back and not enough, and it

24   is what makes Darren Blanton go to the SEC.  And so this is

25   Mr. Shkreli on the same day that the defendant drafted that

1    13-D using it to say, Hey, Darren Blanton, this is what

2    happened to your money.  It is in MSMB Capital on a

3    Form 13-D.  We are filing with the public to show you that

4    MSMB Capital invested in Retrophin.

5           So that creation of the backdated interest for

6    MSMB Capital in Retrophin is kind of the very first piece of

7    the story of the conspiracy.  And it is very important for a

8    couple of reasons.  One, it obviously pushes back the date

9    on which MSMB Capital led you to believe he got the

10   Retrophin shares.  But it is far more important because it

11   was classified internally as gifts, but then a lie was told

12   to the public and to the investors about the investment,

13   that it was never made by MSMB Capital into Retrophin.  And

14   it shows that the defendant knew this, made the false

15   statement on the 13-D anyway and is perpetuating a lie that

16   Mr. Shkreli is telling those hedge fund investors about what

17   happened to their investment.  And all of this happens in

18   November and December of 2012.  And you know that the first

19   angry investors who wind up getting a settlement agreements

20   started hearing sort of in February of 2013.

21          And before we get to February of 2013 and the

22   settlement agreements, I want to talk about what is going on

23   in general in that time period and what the defendant knows

24   about the hedge fund fraud before those angry investors

25   actually even start showing up and the settlement agreements

1   start getting done.  And so for that I want to talk about

2   the testimony of Michael Rosensaft.  And you know that

3   Michael Rosensaft was one of the defendant's partners at

4   Katten and that in December of 2012 or January of 2013, the

5   defendant told him that he had a client who had been

6   handling an SEC investigation on their own, and that client

7   was Mr. Shkreli.  And that Mr. Rosensaft had a couple of

8   early meetings with the defendant and Mr. Shkreli about the

9   SEC investigation.  And you know from all the testimony that

10  you have heard and all the evidence that you saw that the

11  SEC investigation was into the hedge fraud that we are

12  talking about.  What did Martin Shkreli do with everybody's

13  money that was invested in MSMB Capital and MSMB Healthcare?

14  And you know that at those early meetings, Mr. Shkreli said

15  he lost all of the money in MSMB Capital through the Orex

16  trades and the defendant was at those meetings.  So he knows

17  at this point in December of 2012, January of 2013 that all

18  the money in MSMB Capital was lost to the Orex trades.

19          You also know about what Mr. Rosensaft was not

20  told.  And he was not told by the defendant how MSMB Capital

21  wound up with Retrophin shares after all the money was lost

22  in the Orex trades.  So at the very same time that the

23  defendant was creating this interest in MSMB Capital in

24  Retrophin for MSMB Capital, he is not telling Mr. Rosensaft

25  who is overseeing the response to the SEC investigation how

1    those shares came to be.

2           You also know that Mr. Rosensaft said that he did

3    not learn of the Merrill Lynch arbitration in the first

4    meeting.  And you remember the Merrill Lynch arbitration

5    again the Orex trades, Mr. Shkreli loses all the money and

6    he also owes all of this money to Merrill Lynch.  And so

7    what winds up happening is he winds up having to pay

8    Merrill Lynch about $1.5 million in connection with the Orex

9    trades, and that is money that he did not have to pay

10   because he had lost all the money in the fund.  And that

11   happened, the agreement was signed in about September

12   of 2012.  And so at the time that they were discussing with

13   Mr. Rosensaft the SEC investigation and the investigation to

14   the hedge fund fraud, neither the defendant nor Mr. Shkreli

15   told him that there was an arbitration and that, in fact,

16   Mr. Shkreli owed Merrill Lynch money in connection with

17   those Orex trades.  And Mr. Rosensaft also said that the

18   defendant, Mr. Shkreli, never said that they were discussing

19   payments related to the Merrill Lynch arbitration.

20           (Pause in proceedings.)

21           MS. SMITH:  And one thing we know from the e-mail

22   between the defendant and Mr. Shkreli that we saw coming

23   through Agent Delzotto is that the defendant knew about the

24   Merrill Lynch arbitration.  And he didn't just know about

25   the Merrill Lynch arbitration, but he and Mr. Shkreli

Summation - Ms. Smith                    10241

1    discussed the Merrill Lynch arbitration in code, and they

2    are doing this right in the same time period after that

3    MSMB Capital interest is created, and they are doing it

4    before they start talking about the settlement agreement.

5    And this is an e-mail from December 28, 2012, and an e-mail

6    at the bottom from the defendant said, What happened to the

7    other thing?

8              And then Mr. Shkreli responds:  Still no news on

9    the other thing.  I am doing my best to get the funds.  And

10   again this is December 28th, 2012.

11             And how do we know that the other thing is the

12   Merrill Lynch arbitration?  Well, in

13   Government's Exhibit 687, which is an e-mail between the

14   defendant and Mr. Shkreli, on January 4, 2013, the title of

15   the e-mail is quote, "the other thing."  And Mr. Shkreli

16   says to Mr. Greebel, I got them down to 125,000 by

17   January 15th, and the big check by March 1st.  And you know

18   from the Merrill Lynch settlement agreement and amendments,

19   which came in through stipulation, which is

20   Government's Exhibit 110-3, that these are the payments for

21   the Merrill Lynch arbitration.  You can see it right in the

22   document.  By March 1st, 2013, the large payment needs to be

23   made, and in the meantime, the second additional payment of

24   $125,000 needs to made by January 5, 2013.  So the other

25   thing that is being discussed in this e-mail in code is the

Summation - Ms. Smith                    10242

1   Merrill Lynch arbitration.  And not only do they discuss it

2   before the Merrill Lynch arbitration payments are sorted

3   out, not only are they discussing it as the Merrill Lynch

4   payment arbitration has been made, but then they discuss it

5   afterwards on January 17, 2013.

6           And this is an e-mail, Government's Exhibit 515 in

7   which the defendant and Mr. Shkreli are discussing the state

8   of Retrophin's finances in general, and they are discussing

9   about how Mr. Shkreli is trying to get money into Retrophin,

10  and they are discussing it in part because the defendant

11  wants again, to have his bills paid, legal bills paid.

12          And Mr. Shkreli claims on January 17th, 2013 that

13  he put out from money that has come in $125,000 out for that

14  thing.  And we know again from the e-mail that we just saw

15  that that is a payment to Merrill Lynch.  So right here it

16  is clear that the defendant knows about the Merrill Lynch

17  arbitration, he knows about the Orex trades and the fact

18  that Mr. Shkreli lost all money in MSMB Capital because they

19  are talking about it and they are talking about paying for

20  it.

21          And the other thing we know about this time period

22  is that we know that the defendant knows that MSMB has no

23  money.  And the reason we know this is because there, again,

24  are these discussions about getting the Katten bills paid.

25  And there is a point in December of 2012 where Mr. Shkreli

1   says MSMB cannot pay Retrophin's bills any further.  I wish

2   it could.  And there is lot of discussion in this time

3   period about MSMB is not paying its bills and the defendant

4   is trying to get money in for those bills.  And if you

5   remember the testimony from Corey Massella that what

6   happened by March of 2013 is that there is this $600,000

7   that Retrophin has paid to Katten that no one can account

8   for, and it turns out that it is for the MSMB bills.  So we

9   know that the defendant knows that MSMB does not have any

10  money.

11          And so this is all of the information that you

12  need to keep in mind going into the settlement agreement.

13  So we know that the MSMB Capital and Healthcare fund frauds

14  were committed by Mr. Shkreli.  We know that there was the

15  wind-down e-mail and that all of these investors are going

16  to start to ask for their money back in either cash or

17  shares.  We know that the backdated interest has been

18  created and now it looks like MSMB Capital has invested in

19  Retrophin even though it has not.  You know that the

20  defendant knows that Mr. Shkreli lost the money in the funds

21  because they say they had these discussions with Mr.

22  Rosensaft about the SEC investigation, and you know that the

23  defendant and Mr. Shkreli knew about the Merrill Lynch

24  arbitration and they did not tell Mr. Rosensaft.  And you

25  know that the defendant knows that MSMB funds don't have any

1   money.  And this is all of the information that is really

2   important to keep in mind as you think about what the

3   defendants did once those angry investors showed up and

4   started asking for money.

5           The two other things I want to kind of note and

6   have you keep in mind is during this time period which is

7   what we are going to discuss in Count 2, December of 2012,

8   January of 2013, Retrophin is really struggling prior to

9   that first hype in February of 2013.  And that is where the

10  scheme to control the Fearnow shares and to make sure that

11  the price of Retrophin does not bottom out and the company

12  does not go under is taking place.  So all of that is

13  ultimately taking place in, you know, the January of 2013

14  time period.

15          And then the last thing I want you to keep in mind

16  goes back to the bills that I just mentioned a number of

17  times.  And so we will get into this more in the end, but in

18  this time period, the late fall of 2012, beginning of 2013,

19  Katten, the defendant's law firm, is owed close to $700,000

20  by Retrophin.  Money that has not been paid because we know

21  that Retrophin at this point does not have a lot of money.

22  And the defendant is under a lot of pressure and is putting

23  Mr. Shkreli under a lot of pressure to get those bills paid.

24  And so that is all very, very important context, but what

25  happened next is the Government.

1          And so what makes these angry investors start

2     showing up in the kind of January, February 2013 time

3     period?  Again, if you remember MSMB Capital and

4     MSMB Healthcare now have these shares in Retrophin, and

5     in the January of 2013, February of 2013 time period, a lot

6     of these investors testified that they just got in the mail

7     shares of Retrophin.  And what happened is Mr. Shkreli said

8     you can have your investment back in cash or shares, and

9     instead, he just sent them Retrophin shares.  And they were

10    surprised because, A, a lot of them had wanted cash back as

11    you heard from people like Sarah and Richard Kocher.  And

12    they were surprised because the shares that they got did not

13    line up with what Mr. Shkreli had told them their investment

14    was worth.  So Sarah Hassan is just one example.  She put

15    $300,000 into MSMB Capital.  Based on those performance

16    updates that Mr. Shkreli was sending, she thought she had

17    $435,000 in the investment and then what she actually

18    received was about 58,000 shares, and based on the share

19    price at the time, those 58,000 shares would have been worth

20    a lot less, about $227,000.

21          And you also heard everybody complaining because

22    the shares they got were restricted and they could not trade

23    them, and they were not sure Retrophin was going to be worth

24    anything.  And so that is the reason these investors start

25    showing up and saying, Mr. Shkreli, what did you do with our

1   money?  What is going on?  This is not what I was told that

2   I had and I demand that you make me whole.

3              And that sets the stage for the settlement

4   agreement.  And we are going to look at this chart a number

5   of times, but basically it lists out the investor, that each

6   investor that got a settlement agreement, the first contact

7   that that investor had with the defendant, which is really

8   important and we will walk through that, the date on which

9   the settlement agreement was signed, the cash paid and the

10  source of that cash and all of the cash that was paid out

11  from Retrophin.  And then to the extent that there were

12  shares paid out, how many shares and the source of those

13  shares.  And the shares came from two places.  They either

14  came from the Fearnow shares or they came from Retrophin

15  directly, and we will talk about the differences in those.

16             And we are going to look at what the defendant

17  knew and what he did and how you know that his actions were

18  part of the conspiracy to defraud Retrophin, to steal money

19  and shares for Mr. Shkreli.  And I'm going to explain to you

20  why his actions are inconsistent with protecting Retrophin

21  or acting in Retrophin's best interest.  And again it is

22  important to remember the defendant tying with Retrophin, a

23  public company, and not Mr. Shkreli.  And we are going to

24  look at his actions both in the time period of when the

25  settlement agreements took place and then also what happens

Summation - Ms. Smith                    10247

1    after Marcum, the auditors, actually discover the settlement

2    agreement.  So again, keeping in mind everything the

3    defendant already knows, the SEC investigation and the angry

4    investors and Martin Shkreli's fraud.

5            Let's take a look at when the investors first

6    contacted the defendant, what other information he gets from

7    them about Mr. Shkreli's fraud.  So if you will remember

8    Mr. Rosenwald testified, he is an MSMB Capital investor, and

9    he was the first investor to contact the defendant.  And he

10   received this letter from Mr. Rosenwald's lawyer that lays

11   out exactly why Mr. Rosenwald is seeking money, because as

12   Mr. Rosenwald said, he is an investor in MSMB Capital and it

13   lays right out in the letter, which is

14   Government's Exhibit 100-16.  We understand you recently

15   liquidated and converted Dr. Rosenwald investment in MSMB

16   Capital in shares of Retrophin stock without Dr. Rosenwald's

17   authority or consent.  We have serious concerns that your

18   unauthorized conversion of Dr. Rosenwald's investment

19   violates federal and state securities law.

20           And so the first thing the defendant told

21   Mr. Rosenwald is that Mr. Shkreli is being accused of

22   committing security fraud, that this is a fraud.  And keep

23   in mind, again, the defendant already had a lot of this

24   information, but this is the absolute first contact he gets

25   Mr. Rosenwald, additional information about what Mr. Shkreli

1     did wrong with these hedge funds.

2           And this e-mail, Government's Exhibit 116 was sent

3     directly to Mr. Shkreli, but then it was subsequently

4     forwarded to the defendant because he received it on the

5     same day.  And then the first time the defendant had any

6     contact or discussing Sarah Hassan is three days later, and

7     Mr. Shkreli tells him that Sarah Hassan is in the same

8     situation as Dr. Rosenwald.  And you heard Sarah Hassan say

9     that, that her investment had also been converted to

10    Retrophin shares without her permission.

11          And then you get to March 1st, 2013, and the

12    defendant gets a copy of a draft of the settlement agreement

13    proposed by Rosenwald.  And there is language in the

14    settlement agreement itself that explains the fraud that

15    Mr. Shkreli has committed, the same information that he

16    liquidated the investment in MSMB Capital and he transferred

17    it into shares of Retrophin without Mr. Rosenwald's

18    authority or consent and that he violated securities laws.

19    And that is the language that is in the settlement agreement

20    that the defendant takes out of the settlement agreement.

21    The final draft does not have any information in it about

22    the fraud that Mr. Shkreli committed.

23          We also see communications from Richard Kocher on

24    March 6, 2013.  The defendant is being told the same thing,

25    these shares were converted without my permission and

1    Mr. Kocher actually re-forwards the wind-up e-mail where

2    Mr. Shkreli lied and said that they could get their money

3    back in cash or shares.

4            In the middle of this time period when all these

5    investors are coming forward, you also know that the

6    defendant got an e-mail from Jackson Su.  And Jackson Su in

7    the context of complaining about not getting paid from his

8    employment also talks about the SEC investigation and the

9    fact that Martin had been lying about the amount of money

10   that he actually had in the hedge fund.  That is

11   Government's Exhibit 111-45.

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. SMITH:  On March 31, 2013, the defendant hears

2    from Mr. Lavelle, who was an investor in MSMB Healthcare, and

3    you can see, Government 108-10, Mr. Lavelle saying, "I was not

4    given an opportunity to debate transfer from MSMB and want to

5    understand it."

6          And you also heard about conversation that David

7    Geller, who's an MSMB Healthcare investor, had directly with

8    the defendant in April of 2013.  And in this conversation,

9    David Geller said he told the defendant what had happened,

10   that his investment in MSMB Healthcare had been converted and

11   that he expected that Mr. Shkreli was going to pay him back.

12   And we also know that they had a conversation, David Geller

13   and the defendant, where David Geller said he was worried

14   about being scammed.  And we were going to get back to that

15   later.  But you know by this point in April 2013, that

16   defendant knows David Geller was, in fact, scammed at this

17   point.

18          And it's important to keep in mind, and we'll go

19   back to the chart in a minute, that all of this is happening

20   at the same time.  So it is not just one person complaining,

21   or one little piece of information.  You can see that the

22   defendant and Mr. Shkreli are talking about Kocher, Alan and

23   David Geller, and Lavelle, all in the same conversation.  So

24   there's overwhelming evidence that the defendant knew exactly

25   why these investors were angry, and that they were angry

1  because of the fraud that Mr. Shkreli had committed.  And he

2  knew that those frauds had nothing to do with Retrophin, and

3  they had everything to do with Mr. Shkreli and his lies and

4  the way that he operated those hedge funds.

5          And you'll see later on in what's called the control

6  memo, that the defendant admits this, he admits that the

7  reason that the investors were angry and the reason they

8  wanted their money back, had nothing to do with Retrophin.

9          And so what does the defendant do in the face of

10  these investors?  He helps Shkreli take money and shares from

11  Retrophin to pay them back.  He uses his legal skills and his

12  position of trust, as Retrophin's lawyer, to paper a series of

13  agreements that result in cash and shares being taken from the

14  company to cover up Shkreli's wrongdoing.  And I am going to

15  walk you through the mechanics of how this was done because

16  that's very important.

17          And we are going to start with Dr. Rosenwald, who's

18  the first person to receive the settlement agreement.  And

19  Dr. Rosenwald is actually an outlier, we will see from his

20  agreement here.  He's the first settlement agreement, and he's

21  the only settlement agreement where no cash or shares come

22  directly from Retrophin.

23          If you can see the settlement agreement itself, it

24  says that Mr. Shkreli agrees to give him 80,000 freely traded

25  shares.  And, you know, if that's how all of the agreements

1  were done, and Mr. Shkreli had said, "Hey, guys, I screwed up,

2  I took your money, I did something with it I didn't tell you,

3  and now I am going to pay you back, and I am going to pay you

4  back with my money and my shares," we wouldn't be here on

5  Count 1.  So the reason that we're here on Count 1 is this is

6  not what happened.  This is the only settlement agreement

7  that's structured this way, and, in fact, these shares did not

8  come from Mr. Shkreli.

9           And if you look at the language, it is worded very

10  carefully.  It says Shkreli agrees to deliver or cause to be

11  delivered to Rosenwald.  And he did not, in fact, deliver his

12  own shares.  And 80,000 shares.  Where did those shares come

13  from?  If you look at Government Exhibit 558, and there was a

14  lot of discussion about this, and you also heard from Amy

15  Merrill, who is the transfer agent, about how all these

16  transfers happened.  But the shares that are used for the

17  Rosenwald settlement are actually Fearnow shares.  And they

18  are not shares that Mr. Shkreli owned, but they are shares

19  that he controlled in connection with Count 2.  And we'll talk

20  about that.

21           They were held in the names of other people, but he

22  directed them, and he directed how those shares would be used.

23  And as we'll discuss in Count 2, the shares were actually paid

24  for by Retrophin because the only way that these shares became

25  available, these were escrowed shares, was because Retrophin

1  made a second payment for the Desert Gateway shell, and

2  allowed these shares to be used.  So Retrophin actually

3  ultimately paid for these shares.  They didn't come directly

4  from Retrophin's stock, but they were Fearnow shares that

5  Retrophin paid for.  And the defendant and Mr. Shkreli moved

6  the shares around to pay off Dr. Rosenwald.

7          And you can see that the shares were originally held

8  in the name of Marek Biestek, and, also, in the name of Edmund

9  Sullivan.  30,000 to Marek Biestek, 50,000 held in the name of

10  Edmund Sullivan.  They are moved around and they're used to

11  pay off Dr. Rosenwald.  And this settlement agreement, and we

12  will see this later, is actually never disclosed.  So no one

13  is ever told that this settlement agreement happens.

14          The second settlement agreement that I want to talk

15  about is the settlement agreement for Spencer Spielberg.  And

16  this settlement agreement is also a little unusual, it's dated

17  April 30, 2013, but if you remember, Spencer Spielberg started

18  contacting the defendant and Shkreli in March of 2013.  And

19  Mr. Spielberg received $25,000 and also a small number of

20  shares, and both from Retrophin.

21          And this settlement agreement, while it was signed

22  on April 30, 2013, the money was actually already paid.  So

23  the money is taken from Retrophin on March 14, 2013.  There's

24  no negotiation, there's no discussion, who should pay, you

25  know, how should this get paid.  There's a wire sent from

1    Retrophin, and it is sent immediately when Mr. Spielberg

2    complains.  And then later on there's a settlement agreement

3    to paper the wire that went out already, and then also to

4    provide Mr. Spielberg with some additional shares.

5             And how do we know this?  Well, there's an e-mail

6    that's Government Exhibit 567.  And it is in the e-mail to

7    Mr. Shkreli, the defendant, Mr. Biestek, and Leonora Izerne,

8    who's Mr. Shkreli's sister, are discussing the wire transfer

9    that went out in March.  And Martin Shkreli is saying that he

10   wants to have the wire transfer sent to Mr. -- to the

11   defendant so that they can paper the settlement agreement.

12   And Leonora finds the evidence of the wire and sends it to the

13   defendant, and he says, "I'm working on the settlement

14   agreement."

15            So this is a situation where there was an investor

16   who was unhappy with her MSMB investment, the money just gets

17   paid from Retrophin, no discussion, no settlement agreement,

18   and then the next month they actually go ahead and paper it.

19            And then the last agreement I want to talk about

20   separately is the Hassan settlement agreement.  And this one

21   is more along the lines of the remaining settlement agreements

22   that happened.  And you can see that in this e-mail, which is

23   in April of 2013, the defendant and Mr. Shkreli are discussing

24   the -- how the settlement agreement is going to get signed.

25   And if you remember, it is important for this, Sarah Hassan

1   never threatened to sue Retrophin.  She actually never

2   threatened to sue an MSMB entity or Mr. Shkreli either.  She

3   doesn't even know why she got a settlement agreement.  She was

4   just expecting to be repaid.  And so that's the context for

5   this discussion.  She didn't ask for a settlement agreement,

6   she just wanted her money back, but the defendant and

7   Mr. Shkreli tell her that she needs a settlement agreement.

8           So if you remember, there's a draft that gets sent

9   to her, and then she sends a draft back, and there are a

10  couple that are exchanged.  And, here, the defendant and

11  Mr. Shkreli are discussing one of those drafts.  And

12  Mr. Shkreli says Retrophin will be making the payment.  And so

13  you can see here that there is a conscious decision to have

14  the payment made not by Mr. Shkreli, who's the one who caused

15  the situation, but to take the money from Retrophin.  And,

16  here, Mr. Shkreli says that the agreement should contemplate

17  releasing any liability from Retrophin, and that's one of the

18  reasons or benefits of the exchange.  And so that's the

19  justification, is that we are going to release Retrophin for

20  liability, and that's how we are going to justify taking money

21  from Retrophin.  But it is a total fiction because Retrophin

22  was never being threatened to be sued by Ms. Hassan, and

23  there's no reason for Retrophin to have any liability.  And so

24  these are the kind of e-mails, the plan is actually being

25  discussed, and Retrophin is the one who's having the money

1    taken from it to pay for things that Mr. Shkreli has done.

2          And we know that the defendant does exactly what

3    Mr. Shkreli asked him to.  Because you can see that in the

4    draft that Ms. Hassan sent, she had Shkreli or the MSMB

5    entities agreeing to pay the settlement amount because that's

6    who lost her money.  And, instead, the defendant makes the

7    change, takes out Shkreli and the MSMB entities, and says the

8    money comes from Retrophin.

9          And so, again, if you go back to the chart, we have

10   been through the Rosenwald, the Hassan, and the Spielberg

11   agreements, and, you know, also, there were others for Kocher,

12   David Geller, and Schuyler Marshall.  For Mr. Kocher, similar

13   kind of as Sarah Hassan.  There was a number of drafts that

14   went back and forth, and, ultimately, he received more than

15   $100,000 directly from Retrophin, and shares that came from

16   the Fearnow shares.  David Geller received money directly from

17   Retrophin.  And then Schuyler Marshall, we are going to talk

18   about separately, because Schuyler Marshall is a special case.

19   He is the last settlement agreement that gets done, and it

20   gets done in a particular way, and it is because Marcum at

21   that point has discovered the settlement agreements.

22          But we know that the defendant was intimately

23   involved, not only in drafting the agreements and approving

24   the agreements, but, also, in making sure that the money and

25   shares actually got taken from Retrophin.  And we know that

1    because of the share transfer records that we saw with Amy

2    Merrill.  So, for example, the topic, the exhibit here is

3    Government Exhibit 115-30, where Mr. Greebel is sending to

4    Spencer Spielberg a settlement agreement to the share transfer

5    agent and asking for the shares to be taken from Retrophin and

6    given to Spencer Spielberg in connection with that agreement.

7              And then Government Exhibit 582.  There's a

8    discussion there about -- actually, and I think that's

9    actually the wrong exhibit on the slide.  But there are

10   e-mails, we saw with Spencer Spielberg, they are discussing

11   the actual wire.  There's also an e-mail, for example, where

12   the defendant is directing Ms. Izerne to send a wire to

13   Mr. Kocher's lawyers in connection with the settlement.  So

14   the defendant is involved in getting the shares paid out, he's

15   involved in getting the money paid out on Retrophin.

16             And so the next thing I want to talk about is kind

17   of how you know, again, that the defendant intended to defraud

18   Retrophin through these settlement agreements.  And there's

19   been a lot of discussion about the investors were threatening

20   to sue Retrophin.  And I think it's important to be very

21   clear, and you can go through the evidence yourself, that the

22   only investor who directly threatened to sue Retrophin was

23   Mr. Rosenwald.  And it is in that letter that we looked at,

24   and it is clear that he's threatening to sue everyone

25   directly.

1      But everybody else never threatened to sue

2  Retrophin.  Ms. Hassan, as we said, never threatened to sue

3  anybody.  Mr. Geller didn't raise any threats to sue, or

4  threats to go to the SEC, until after he had a signed

5  settlement agreement, and the settlement agreement wasn't

6  being paid.

7      Mr. Lavelle, there's an e-mail where he says I --

8  Mr. Shkreli says, "Here's my counsel," and Mr. Lavelle says,

9  "Why would I need counsel?"  He wasn't threatening to sue at

10  that point.

11      Mr. Marshall, as you heard, testified that he never

12  threatened to sue.  At some point he's frustrated with how

13  long it's taking, and he says he wants a litigation hold, but

14  he never directly threatened to sue.  Mr. Kocher threatened to

15  sue Mr. Shkreli and the MSMB funds, but never Retrophin

16  directly.  And Mr. Spielberg in an e-mail said that he would

17  like to resolve it amicably, and never directly threatens to

18  sue.

19      So I think it is important to kind of look at the

20  record, because this idea that everybody was clamoring to sue

21  Retrophin is not supported by the evidence.  That said, even

22  if they were, the defendant's actions are not consistent with

23  the actions of a lawyer seeking to protect his client from

24  people who are trying to sue him.

25      They are, in fact, consistent with what happened,

1   which is a conspiracy to take money and shares from Retrophin

2   to pay back Mr. Shkreli's defrauded investors and to cover up

3   what Mr. Shkreli had done.

4           And you would think that if Mr. Greebel, if the

5   defendant was acting in the best interests of Retrophin, and

6   was taking seriously legal threats and working to save the

7   company, that he would have taken a number of steps, and none

8   of those steps were actually taken.

9           So let's just look at how his behavior is actually

10  inconsistent with working to protect Retrophin.

11          As you can see, this is the Marcum letter that was

12  talked about during Sunil Jain's testimony.  It's Government

13  Exhibit 124-2.  And this is a letter that was sent by Katten,

14  the law firm, to Retrophin, in connection with the Marcum

15  audit, on May 31, 2013.  And it is talking about the audit

16  date through December 31, 2012.

17          And in the letter, the defendant and Katten

18  represent that Katten has not been engaged to represent the

19  company with respect to overtly threatened or pending

20  litigation that existed at the audit date, which is the

21  December 31, 2012, or at any time from the audit date to the

22  date of the letter, which is May 31, 2012.

23          And you can see that there are other sort of

24  litigations discussed in this letter, so there's actually a

25  little note here about two employees suing the company, which

1  was a reference to Jackson Su and George Huang for an amount

2  of $80,000.  But there's no reference in here to any

3  litigation threats.  And at this point, on May 31, 2013,

4  obviously, there had been a number of settlement agreements

5  already executed.  Schuyler Marshall had not yet received the

6  settlement agreement, and we'll talk about the consulting

7  agreements, but people like Alan Geller and Darren Blanton had

8  not yet received the agreements.  And so if this was really a

9  concern about all these people suing Retrophin, that would

10 have shown up in this letter.

11         Because what was the defendant doing, other than

12 doing all of these settlement agreements and entering into all

13 of these negotiations during this time period.  And it is not

14 in this letter as something that he's doing to prevent

15 litigation against Retrophin.  And yet much smaller

16 litigations, $80,000 for two disgruntled employees are in

17 here, not the settlement agreements, which were for $2.2

18 million.

19         And you also know that the defendant wasn't acting

20 to protect Retrophin because he never told anybody.  And you

21 would think that if a lawyer for the company had spent all of

22 this time and energy and expended all of this money, $2.2

23 million, at a time when the company didn't have a lot of

24 money, he would stand up and say, "Hey, guys.  Look what I

25 did.  I protected the company.  All these people were going to

1    sue, and I went out and made sure that didn't happen.  And

2    this is how I did it."

3             That doesn't happen.  The defendant never tells

4    anybody.  As we know from the testimony of Steve Richardson

5    and Steve Aselage, there was no litigation update between

6    February 2013 and November 2013 in any of this time period

7    when the settlement agreements were being done about

8    threatened litigation, pending litigation, we resolved these

9    threats, we paid this money, it was necessary to save

10   Retrophin.  It is not in board e-mails, it is not in agendas,

11   it's not in the minutes.  And we also know that when the

12   settlement agreements were discussed, and we will get to that

13   in a minute, they weren't discussed in the context of the

14   litigation.

15            And there are a number of other steps the defendant

16   didn't take, that if what he was doing was protecting

17   Retrophin you would have seen.  And that includes he didn't

18   put in place a litigation hold.  He didn't make sure that

19   there weren't any documents that were going to be destroyed or

20   potentially destroyed in connection with these settlement

21   agreements.  He didn't talk to anybody else at Retrophin who

22   didn't have a conflict.  You know, you can see the e-mails in

23   that time period, where people like Mr. Shkreli, who obviously

24   has a self-interest in getting these payments made, and

25   Mr. Biestek, another coconspirator.  But he's not talking to

1    board members.  He's not talking to anybody else within

2    Retrophin to determine whether or not these settlement

3    agreements should be reached.

4           There's no evidence that there's any negotiation in

5    connection with the settlement agreements on behalf of

6    Retrophin.  I mean, Spencer Spielberg gets paid without even a

7    settlement agreement being in place.  There's no release for

8    Retrophin, there's no protection for Retrophin at that point.

9    The money goes out the door, and they paper it later.

10          It's also really significant that the defendant does

11   not tell anybody else at Katten.  And we know that there were

12   other Katten attorneys involved in other things, and we heard

13   testimony from Mr. Cotton and Mr. Rosensaft.  And you know

14   that the defendant didn't tell Mr. Rosensaft or Mr. Cotton

15   about these settlement agreements.

16          The defendant did not tell Mr. Rosensaft, in fact,

17   that he was in contact with angry investors in this time

18   period, at the very time period that the SEC investigation is

19   going on, about those frauds.  Mr. Rosensaft has no idea that

20   Mr. Greebel is dealing with all of these investors at this

21   exact time about their disputes with Mr. Shkreli.

22          And you would think that if the defendant was

23   working in the best interest of Retrophin, he would let

24   everybody know what had happened, and that this is all taken

25   care of, and the investors are now satisfied.  And he never

1    tells Mr. Rosensaft.

2            And Mr. Cotton testified that he didn't even know

3    that there were MSMB investors who had threatened to sue

4    Retrophin.  And, remember, Mr. Cotton is a litigation partner.

5    This is what Mr. Cotton does, he's involved in the Pierotti

6    litigation, the Su litigation.  And this is threatened

7    litigation, Mr. Cotton has no idea that any of this has taken

8    place.

9            The other way you know that this is inconsistent

10   with concerns about litigation or imminent litigation threats

11   is that there's lot of delay.  And this is Mr. Shkreli's

12   hallmark.  You saw this when Mr. Blanton testified.  It is put

13   everybody off, put everybody off, you know, I don't want to

14   deal with this.  And so there's a lot of discussion about

15   ignore people.

16           So, for example, Government Exhibit 546, you can

17   ignore Sarah, which is a reference to Sarah Hassan, for now.

18           Government Exhibit 562 says Lavelle isn't going

19   anywhere.

20           Government Exhibit 585, the defendant and

21   Mr. Shkreli are discussing both David Geller and Alan Geller,

22   and Mr. Shkreli says, Alan Geller is high maintenance.  And

23   the defendant says, how do you want to discuss the request,

24   which are, again, these requests for payment.  And Mr. Shkreli

25   says, ignore.

1          And so there's a lot of delay for someone, you know,

2     if the justification is that they were sort of litigation

3     threats that had to be taken care of immediately, they just

4     put people off until they need to deal with them.

5          And how else do you know that the defendant was not

6     acting in the best interest of Retrophin, but, in fact, acting

7     to defraud Retrophin?  Well, he stood by while Mr. Shkreli

8     continued to provide false information to investors.  And he,

9     in fact, provided information that wasn't true to investors in

10    this time period.

11         So this is Government Exhibit 108-10.  It is an

12    e-mail exchange between Mr. Shkreli and Mr. Lavelle, who again

13    was an MSMB Healthcare investor.  And Mr. Greebel, the

14    defendant, gets added at the top so he can see the whole

15    chain.  And you can see at the bottom that Mr. Shkreli tells

16    Mr. Lavelle, "Unfortunately, you were virtually the only

17    investor I am forwarding to our counsel."  And Mr. Greebel

18    eventually gets copied on this e-mail.  And we know that's not

19    true.  We just went through all of the settlement agreements

20    and everyone that the defendant was dealing with.

21         We also know that Mr. Greebel provided information

22    that wasn't accurate and was highly misleading to the

23    investors.  This is Government Exhibit 572.  It is an e-mail

24    from the defendant to Mr. Spielberg, on April 30, 2013.  And

25    Mr. Spielberg is frustrated because the stock that he gets

1   through the settlement agreement is directly from Retrophin,

2   and it's restricted.  He can't trade it right away.  And he

3   thought he was going to get freely trading stock.  And the

4   defendant says the company has no way to give you unrestricted

5   or free trading stock.  And, again, this is April 30, 2013.

6   And this is highly misleading because as a technical matter,

7   that's true, if the company issued stock it would be

8   restricted stock.  But we know that the defendant and

9   Mr. Shkreli was making freely tradeable stock available to

10  other investors who wanted it by using Fearnow stock.  And

11  this is April 30, he does -- he talks about this a week later

12  on May 7.  In the context of the Kocher settlement agreement.

13  They talk about where the 47,000 shares are coming from, the

14  free trading shares, and the defendant says, "I assume it is

15  coming out of the Fearnow stock."  So he's telling

16  Mr. Spielberg that they can't get him free trading shares, and

17  then a week later they are talking about getting free trading

18  shares for Mr. Kocher.

19          And then there's the conversation that the defendant

20  had with David Geller in April of 2013.  And, you know, at

21  this point all of the evidence that the defendant has is that

22  David Geller's money had been -- that was invested in MSMB

23  Healthcare had not been treated properly, that Mr. Shkreli had

24  done things wrong, that these frauds had been committed.

25          And we saw that both from all the information that

1    he had before this settlement agreements came in, and all the

2    information he's getting from all of the other investors.

3              And then what does he tell David Geller in April of

4    2013?  David Geller says, "I thought, and I said it before, I

5    was scammed."  And then he was asked, "What, if anything, did

6    Mr. Greebel say to you when you said that?"  And David Geller

7    said, "He said, he told me I wasn't, and Martin was working on

8    a payment plan with me."  So he's reassuring him that Martin

9    is working on a payment plan, when, in fact, the money is

10   going to come from Retrophin.

11             And it is clearly false because Mr. Shkreli wasn't

12   paying any of these people back.  He was taking the money and

13   the shares from Retrophin.  And you know that this is, you

14   know, evidence of the defendant's intent to defraud because he

15   is reassuring a defrauded investor on behalf of Mr. Shkreli

16   when that's absolutely no reason to do so.  And he's doing it,

17   knowing that the money that's going to repay the investor is

18   actually coming from the company.

19             The other reason you know that the defendant acted

20   with intent to defraud is because knowing that these frauds

21   had nothing to do with Retrophin, and knowing that Mr. Shkreli

22   was the one who committed the frauds and who owed the money

23   back, he took the money from Retrophin anyway.  And he took

24   it, knowing that Mr. Shkreli had the ability to pay these

25   people back.  And how do you know that?  Because Mr. Shkreli

1    had 2.5 million in shares in Retrophin at this point.  Not the

2    Fearnow shares, which we will talk about later, but 2.5

3    million of his own shares.  And we saw that in the transfer

4    records.  This is Government Exhibit 115-1.  We saw at the

5    time of the reverse merger, on December 13, 2012, he had 2.5

6    million shares, and that's also disclosed publicly in the 13D

7    and other filings, and the defendant had access to that

8    information.

9             And then we saw that on January 15, 2014, after all

10   of the settlement agreements were signed, how many shares does

11   Mr. Shkreli have?  He still has that same 2.5 million shares.

12   He did not take a single share of his own to pay for these

13   settlement agreements, and the consulting agreements that we

14   will see later.  The shares that were taken were taken from

15   Retrophin.  And it is no answer to say that the people wanted

16   free trading shares because some of the investors, including

17   Lavelle and Spielberg, got restricted shares from Retrophin.

18   There was absolutely no reason that Mr. Shkreli couldn't have

19   used his own shares to pay back these investors that he

20   defrauded.  And, instead, the defendant worked to take those

21   shares from Retrophin, knowing full well that the -- that

22   Mr. Shkreli had them and just chose not to provide them.

23             Because even if these shares were restricted, and

24   they were, they could have been transferred.  And Ms. Merrill

25   told you that.  So just because they couldn't have been free

1    trading immediately, they could have been transferred to the

2    investors.

3            We also know that the defendant knew that

4    Mr. Shkreli had money.  And we know this because of the

5    records that went back and forth with Citrin Cooperman.  So,

6    for example, on March 31, 2013, there's a series of wire

7    transfers that are discussed.  And if you can remember, it was

8    a spreadsheet, and then Mr. Shkreli put in his comments, and

9    it was a spreadsheet of wires where Citrin Cooperman trying to

10   figure out what was going on.  And that spreadsheet included

11   transfers of money to MSMB Healthcare and to Mr. Shkreli

12   directly.  And the transfer to Mr. Shkreli was $575,000, which

13   is Government Exhibit 113-17.

14           So, you know, he knows in March of 2013, that

15   Mr. Shkreli is receiving $575,000 from Retrophin.  And what

16   does he do?  He has the company pay for these settlement

17   agreements.  So, for example, Sarah Hassan's settlement

18   agreement was for $400,000, the following month.  Well,

19   defendant knows that Mr. Shkreli has received money.  He's not

20   asking Mr. Shkreli to use his own money.  He goes to Retrophin

21   instead to get that money.

22           And there's also evidence that the settlement

23   agreements themselves were concealed at the time.  For

24   example, in connection with the Rosenwald settlement, the

25   defendant sends Mr. Shkreli an e-mail, when he sends the final

1   executed agreement, and says, "I wasn't sure who else knew

2   about this agreement, so I didn't cc your assistants."

3          There's an e-mail earlier about the Spencer

4   Spielberg agreement, where Mr. Shkreli sister said to the

5   defendant and Mr. Shkreli, "I didn't think anybody else needed

6   to know about this, these wires."  And so there's all of this

7   evidence at the time that suggests that these settlement

8   agreements were being done for Mr. Shkreli's benefit so that

9   he didn't have to pay them himself.  Nobody was being told.

10         And then we get to the board.  And we are jumping

11  ahead a little bit in time.  This is Government Exhibit 618.

12  It is an e-mail that's sent in August of 2013, but it is a

13  really, really important e-mail.  And it is devastating

14  evidence that the board had no idea about the settlement

15  agreements at the time that they were being done.

16         Because you can see in August of 2013 that the

17  defendant is telling Mr. Greebel there were serious faults

18  with the agreements, including lack of board approval.  And

19  there's a whole chain of conversation that defendant writes

20  back, and he doesn't say, "No, no, there was board approval,"

21  "No, no, the board was told."  This is a clear admission that

22  the board never approved these agreements and was never told

23  about these agreements.

24         And it is really important to keep in mind because

25  this is August of 2013.  We will talk about the restatement in

1    September of 2013, but this should color everything else that

2    you see related to the board and what the board knew.  Because

3    the defendant and Shkreli know that they never brought this to

4    the board for approval, they never told anybody.

5            And you know this, too, from the public filings.

6    So, for example, there's the 2012 10-K, which is up here, in

7    subsequent events section.  And so in all the public filings

8    that were made up until the point where Marcum makes the

9    discovery, there's no mention of the settlement agreements.

10   And here this is the subsequent events section and includes

11   something like an agreement and employment agreement from May

12   of 2013.  But it doesn't include any of the settlement

13   agreements that have been signed up until this point.  And at

14   this point, the defendant and Shkreli had already forced

15   Retrophin to pay settlement agreements with Rosenwald, Hassan,

16   Kocher, Spielberg, David Geller, and Lavelle.  So this is,

17   again, this is clear evidence that nobody was told of this as

18   of the filing of the 2012 10-K, which is June 13, 2013.

19           So one document I want to talk about is the cash

20   flow summary from the July 2, 2013 board meeting.  And there's

21   been a lot of discussion about this cash flow summary.  And if

22   you remember, the cash flow summary showed that at this point

23   in time Retrophin was like really bleeding money, that they

24   had raised $10 million in the February PIPE, and it was kind

25   of all going out the door.

1            And it includes a tiny line item that's called MSMB

2    settlements, and it is blown up here.  It references

3    Spielberg, Hassan, and something called Trachtenberg & Rhodes,

4    which is, as you remember from the testimony, the law firm

5    that Kocher used.  So it is referencing three of the

6    settlements.

7            And there are a couple things to note here.  First

8    of all, all of the settlement, except for Marshall, had been

9    signed at this point.  Not all the money had gone out, so this

10   doesn't necessarily even mention all of the settlements that

11   had already been signed.  In addition, there was no

12   explanation, at the board meeting for what this was, no

13   discussion of it.  There were, as both Mr. Aselage and Richard

14   testified, there were overlaps between MSMB and Retrophin.

15   They both occupied the same space.  They sometimes, you know,

16   used similar vendors.  And so there was this period of time

17   where they were trying to figure out what did MSMB owe and

18   what did Retrophin owe.

19           And so it wasn't unusual for there to be, you know,

20   issues about what was MSMB's payment versus what was

21   Retrophin's payment.  And those discussions in the financials,

22   and we will see that when we get to the restatement as well.

23   But what Richardson and Aselage understood was that Retrophin

24   would pay what it owed, and MSMB would pay what it owed.  And

25   so this was not necessarily clear to them what exactly these

1   MSMB settlements were.  They certainly had no understanding

2   that Retrophin was paying things for MSMB.

3          And we know from both Richardson and Aselage's

4   testimony that they did not -- there was no discussion at this

5   meeting of that particular line item.  So this is Richardson

6   testimony at 1866, that there was -- he had no understanding

7   of the names in that line item, there was no discussion of it,

8   and there was no litigation update given at this board

9   meeting.

10          And the same is true for Mr. Aselage, at transcript

11   4412.  No discussion of who those people were, no idea who

12   those people were, no litigation update.  And the defendant

13   didn't say anything.  And, again, this is the July 2, 2013

14   board meeting.  If you are the lawyer for the company, and you

15   have saved the company from, you know, going under because you

16   have prevented these litigation threats, you say something.

17   You explain, "Hey, guys, these are the settlements we entered

18   into because I needed to do that to save the company."  And it

19   is never discussed.  And that is a deliberate decision by the

20   defendant not to provide that information.

21          And keep in mind, altogether, these settlement

22   agreements are about $2.2 million.  That's how Marcum kind of

23   analyzes them.  And the $2.2 million doesn't include the

24   Rosenwald settlement.  And that cash flow spreadsheet, the

25   company had about $10 million at that point.  So you are

1    spending a fifth of the company's money to save the company,

2    and you do not say anything about it ever.

3            And the other way that you know that the settlement

4    agreements weren't disclosed is because it wouldn't have made

5    any sense with what the board members had otherwise been told.

6    So Mr. Aselage actually understood that the hedge funds had

7    been successful because that's what Mr. Shkreli had said, and

8    he didn't have the information that the defendant had about

9    what had actually happened.  And so he didn't have any idea

10   that there would be unhappy investors looking to be repaid.

11           Mr. Richardson had been told that certain investors

12   were unhappy not because their investments had been converted

13   without their permission, but just that they weren't happy

14   with the valuation.  And he was told that that difference

15   would be made up by Mr. Shkreli himself, that Mr. Shkreli

16   would be providing those people with additional shares.  And

17   that is exactly, in fact, what people like Mr. Rosensaft

18   thought, and we will get to that with Mr. Blanton because

19   Mr. Rosensaft didn't know about any of the settlement

20   agreements.  But to the extent that he thought that people

21   were getting additional shares, he thought they were coming

22   from Mr. Shkreli.

23           And you know that the discussion about Mr. Shkreli

24   providing his own shares to make people whole is something

25   that Mr. Richardson understood because there are a number of

1    e-mails where Mr. Shkreli is talking about providing his own

2    shares to make Mr. Richardson whole.

3              So that's Government Exhibit 306, 244, and 248.  And

4    the defendant is copied on those.  Mr. Shkreli is like, "I am

5    going to enter into an options agreement.  I am going to make

6    you whole, Mr. Richardson."

7              So that's where we stand in July of 2013.  All the

8    information that the defendant has, what the defendant and

9    Mr. Shkreli have done to take the money and shares from

10   Retrophin, and what happens then is that Marcum discovers the

11   settlement agreements.

12             Is this --

13             THE COURT:  Yes.  This might be a good time for the

14   mid-morning break.  Please don't talk about the case, and we

15   will come retrieve you soon.  Thank you.

16             (WHEREUPON, at 11:35 a.m., the jury exited the

17   courtroom.)

18             (Continued on the next page.)

19

20

21

22

23

24

25

1   (Open court; no jury present.)

2            THE COURT:  Have a seat everybody, or take a break.

3            MR. BRODSKY:  I just have one thing to -- we have

4   one item to raise.  We are going to check the record.  I

5   believe that Ms. Smith mistakenly included in her summation

6   something that was redacted from an e-mail.  There was

7   discussion with respect to one of the settlements.  You may

8   remember, Your Honor redacted a statement in an e-mail that

9   Ms. Izerne had said to -- Leonora Izerne had said to

10  Mr. Shkreli, or Mr. Greebel, "You are the only one who knows

11  about this."

12           We'll check the record, but I believe Ms. Smith

13  referred to that e-mail and included what had been redacted

14  for the jury.  So we want to check that.  We didn't jump up

15  and object.  But we thought that was --

16           THE COURT:  We will get it resolved.

17           MS. SMITH:  Your Honor, for the record, there were

18  actually two e-mails that discussed that Spencer Spielberg

19  agreement.  One of them Ms. Izerne said, "Mr. Shkreli said

20  you're the only one who needs this information."  That is the

21  e-mail that didn't come in.

22           There was a second e-mail, which is the e-mail that

23  was actually on the slide.  And I am going to find it right

24  now.  And that is Government Exhibit 567, and that's the

25  e-mail that I referred to.  And Ms. Izerne says in that

*PROCEEDINGS*                                                   10276

1    e-mail, "Nobody else needed this information as far as I

2    know."  And that was an e-mail to Mr. Biestek, Mr. Shkreli,

3    and the defendant.  And that is the e-mail to which I was

4    referring, and that is the e-mail that's on the slide.

5              There was a second e-mail where Ms. Izerne said

6    specifically, "Mr. Shkreli said nobody else needed this

7    information," but this is the e-mail that actually came in.

8              THE COURT:  All right.  Thank you.  Well, I am sure

9    Mr. Brodsky will check.

10             MR. BRODSKY:  Yes, we are going to check.

11             THE COURT:  And if there's a discrepancy, we will

12   figure out how to resolve it.  Okay.  Please take ten minutes.

13             (WHEREUPON, a recess was had at 11:38 a.m.)

14             (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings                           10277

1           (In open court; outside the presence of the jury.)

2           THE COURT:  Counsel, the plea I told you about that

3     I thought I was going to try to reschedule, the parties have

4     flown in from Singapore and they are here now.  So I'm going

5     to propose that we hear, I will hear the plea on Friday during

6     the lunch hour.  By then I think the jurors are likely to be

7     deliberating, it shouldn't cause a disruption.  If they are

8     eating, hopefully they have won't come with a note at that

9     time.  I'll ask Ms. Jackson to speak to them.

10           I apologize to the parties who traveled here from

11    Singapore that we weren't able to reach you in time to advise

12    you of this problem.  We did not anticipate, obviously, that

13    the trial would still be ongoing.  That is the reality.

14           So with apologies from The court, we'll reschedule

15    you and hear you on Friday.

16           MR. BRODSKY:  We had a chance to look at the

17    transcript.  While we disagree with Ms. Smith's interpretation

18    of 567, I think it's an interpretation issue, I don't think

19    it's referring to a redacted matter.

20           THE COURT:  I want to remind Ms. Smith, I think I

21    might have heard you at one point refer to the defendant when

22    you were intending to refer to Mr. Shkreli.  It's important to

23    keep that distinction.

24           MS. SMITH:  I will make sure I keep that in mind.

25           THE COURT:  Maybe refer to Mr. Greebel or whatever

1    you need to do to make sure that we don't hear the word

2    defendant in reference to Mr. Greebel when in fact you're

3    referring to Mr. Shkreli.

4              MS. SMITH:  Yes.

5              THE COURT:  I think that only happened once at the

6    beginning.

7              MS. SMITH:  Thank you.

8              THE COURT:  Are we ready for the jury to come back?

9              MR. DUBIN:  Yes, your Honor.

10             (Jury enters the courtroom at 11:55 a.m.)

11             THE COURT:  All jurors are present.  Please have a

12   seat.

13             Ms. Smith, you may continue your summation.

14             MS. SMITH:  So before the break we were talking

15   about the settlement agreements themselves, how the

16   defendant's actions were not consistent with acting in the

17   best interest of Retrophin but consistent with what he

18   actually did, which was work with Mr. Shkreli to commit a

19   fraud by stealing money and shares from Retrophin.

20             When we broke we were talking about July of 2013.

21   In July of 2013 is when Marcum discovers the settlement

22   agreements.  What happens after Marcum discovers the

23   settlement agreements is further evidence of the defendant's

24   knowledge of and participation in the fraud scheme.

25             Let's talk about Sunil Jain's testimony.  If you

1    remember, Sunil Jain is one of the team that Marcum put

2    together for the audit for Retrophin.  He told you that the

3    settlement agreement were discovered due to a variance

4    analysis that was done in the quarter ending of June 2013.  He

5    explained what a variance analysis is, when the auditors are

6    looking at the books of the company they do kind of a quick

7    check and they look at how much cash is going out of the

8    company in this quarter and they compare it to a similar

9    quarter from earlier on.  They look to see if there are any

10   big differences.  It's called a variance analysis.  They did

11   this analysis for the quarter ending June 2013.

12           And what happened was that they saw there was a

13   $2 million difference between what they had seen for a similar

14   quarter and what they were seeing for the quarter June 2013.

15   He described it as a significant difference that was not in

16   general course of the business for a company like Retrophin.

17           So Marcum was doing this kind of test.  They see

18   this huge out flow of cash that is very different from how

19   Retrophin was running the company in prior quarters.  He said

20   he needed to figure out why was there this difference.  And he

21   asked the comptroller, Mike Harrison, for Retrophin what is

22   explaining the difference.  And Mike Harrison said he didn't

23   know.  And then they had to go and ask Marc Panoff.

24           If you remember, Marc Panoff was hired in about May

25   of 2013 to be the Chief Financial Officer for Retrophin.

1   Prior to that they didn't have anyone internally who was

2   handling the finances.  You heard from Massella that Jackson

3   Su was in that role prior to the merger, then Ron Tilles, then

4   Marek Biestek.  And Citrin was handling the books.  They

5   finally hired Marc Panoff.

6          Sunil Jain said they do this analysis, $2 million

7   out the door, they want to figure out what is going on.  They

8   ask the comptroller, he doesn't know.  They ask Marc Panoff,

9   it takes Marc Panoff a couple of days to get back to Sunil

10  Jain and it turns out that there is the settlement agreements.

11  And the settlement agreements had not previously been provided

12  to Marcum, told to Marcum.  We saw the litigation letter that

13  was filed.  They didn't know that there was a pending

14  litigation.  They didn't know there was settlement agreements

15  because the defendant did not tell them in that letter.

16         You heard Sunil Jain say when they got the

17  settlement agreements, which took a little while, Marcum

18  determined that as an accounting matter they had to be

19  disclosed.  And they had to be disclosed because they were

20  related-party transactions, because MSMB and Retrophin both

21  had Mr. Shkreli as the overlap.  There was an inherent

22  conflict of interest in related-party transactions and they

23  need to be disclosed no matter how much money they are.  So

24  even if it was a tiny, tiny transaction you need to disclose

25  if there is a related party involved.  In addition to that,

1    Marcum determined that the transactions were, in fact,

2    material to the company.

3              So that even if they hadn't been related-party

4    transactions, they would have needed to be disclosed because

5    it was so much money relative to how much money Retrophin had

6    at the time.

7              So that's how Marcum comes across the settlement

8    agreements.  Not because they are brought to the attention by

9    Marc Panoff or the defendant or Mr. Shkreli, but because they

10   do this analysis they realize that something is off.

11             There is this period in which they are determining

12   how exactly are they going to deal with disclosing these

13   settlement agreements as an accounting matter.  This is an

14   e-mail conversation between Mr. Shkreli, Mr. Panoff and the

15   defendant in August of 2013 after Marcum discusses discovering

16   the settlement agreements.  All of the SEC filings are delayed

17   because they need to figure out how they are actually going to

18   disclose these agreements in financials.  So Marc Panoff is

19   saying that the 10Q has been delayed.  And Mr. Shkreli's

20   response is to, "Fix the fucking issue.  There is no issue.

21   How many times do we have to talk about this."  So you can see

22   that Mr. Shkreli doesn't want to deal with this, doesn't want

23   to have these settlement agreements disclosed.  And there is

24   more back and forth with the defendant that we'll get into in

25   a minute.  He doesn't want to hear about it.  And he is

1    resistant to the idea of providing disclosure or statement

2    relating to the settlement.

3            If you remember, Sunil Jain also testified that when

4    there was a conversation with the defendant about the

5    settlement agreements on the phone, the defendant also did not

6    want to restate them.  So Marcum discovers the settlement

7    agreements, and what is the reaction of the defendant,

8    Mr. Shkreli, there is no issue, nothing to see, nothing to

9    restate.

10           As we know, Marcum ultimately insists because they

11   are related-party transactions, they are material, they need

12   to be in the SEC filings.

13           So what does the defendant do?  The defendant drafts

14   what is called a control memo, and this is Government's

15   Exhibit 609-A, a really important document.  It's an important

16   document because it shows you that the defendant was

17   committing fraud and not acting in the best interest of the

18   company.  You know that because the control memo itself admits

19   as much as the defendant needs to admit to satisfy Marcum, it

20   does not tell the whole story.

21           So what the control memo says is that in April and

22   May of 2013 certain investors and funds affiliated with MSMB

23   advise MSMB that they objected to the number and/or value of

24   the shares of common stock in the company that they received

25   as distribution from the funds.  "The company, which is

Summation - Ms. Smith                    10283

1   Retrophin, was advised of such investors' objections and the

2   company, MSMB, its related funds, and such investors entered

3   into settlement and release agreements in which the company

4   and MSMB and its related funds agreed to make certain payments

5   to such investors in consideration for a full release from

6   such investors to MSMB, its related funds and the company for

7   any claims any such investor has had or may have against the

8   company MSMB and its related funds."

9           The control memo also says, again, this is drafted

10  by the defendant then sent to Mr. Panoff then that is sent to

11  Marcum, it says, "The objections raised by investors related

12  solely to actions undertaken by MSMB and its related funds.

13  The settlement and release agreements included a release by

14  investors in favor of the company in order to prevent such

15  investors from initiating a claim against the company."

16          What does the control memo say?  First of all, it

17  makes very clear that Retrophin has nothing to do with what

18  the investors are complaining about.  The objections raised by

19  the investors related solely to actions undertaken by MSMB.

20  This is something that the defendant has to admit at this

21  point.  Because it's clear that these have nothing to do with

22  Retrophin.  This is something that the defendant knew at the

23  time that the settlement agreements were entered into, that

24  Retrophin was not on the hook or not responsible for anything

25  that the investors were complaining about.  So when Marcum

1   finds out, the defendant has to admit this.  But what is not

2   in this control memo is what is really important.

3           What is not in the control memo is that the

4   investors aren't happy because Mr. Shkreli has committed a

5   fraud.  It has this language in here that the investors

6   objected to the number or value of the shares of common stock

7   that they received.  It doesn't explain that they weren't

8   suppose to receive, in the case of MSMB Capital, shares of

9   common stock in Retrophin.  They were supposed to get their

10  cash back or their shares or shares in Retrophin, if they

11  chose.  It doesn't say anything about the fact that the

12  investors investments were converted by Mr. Shkreli against

13  their will.  And it doesn't explain the underlying fraud that

14  Mr. Shkreli committed.  It's a very, very important omission.

15          Because this on its face doesn't actually explain

16  what happened and make it clear not only that it's not

17  Retrophin's obligation but these payments were made to cover

18  up a fraud.

19          Then the next thing the defendant does, not only

20  does he draft this control memo that kind of tells as much of

21  the story that he needs to tell to cover himself but not the

22  whole story, he drafts promissory notes and indemnification

23  agreements, 689, so these are basically notes that say that

24  MSMB will pay back the money for the settlement agreements.

25  That they will do it in the amounts that they, Retrophin,

1   outlaid.  And they are dated as of the settlement agreements,

2   so it's basically an agreement to have MSMB paid back.  This

3   is itself another affirmative lie that the defendant tells.

4           Again, at this point, this is August of 2013,

5   defendant knows that the MSMB entities haven't had any money

6   since December 2012.  That's the whole reason that Retrophin

7   was used as a piggy bank for Mr. Shkreli in the first place.

8   So this is just papering over something that is never going to

9   happen.  The defendant knows that Mr. Shkreli is never going

10  to pay these back.  He had shares and money himself that he

11  didn't use.  They were taken from Retrophin and MSMB has no

12  more money.  And this is just designed to make the auditors

13  happy that someone is going to pay this back.  Retrophin

14  wasn't supposed to pay the money, but don't worry, we have

15  this piece of paper that says Retrophin is going to get the

16  money back.  You know this is just a way to paper over what

17  happened because of the conversations that the defendant and

18  Mr. Shkreli had about the indemnification agreements.

19          Let's look at Government's Exhibit 618, this is the

20  e-mail we looked at originally, on the bottom, August 23,

21  where Mr. Shkreli says, there were serious problems with the

22  agreements including lack of Board approval.  The defendant

23  responds on August 23, 2013, his response is really

24  significant.  Because what Mr. Shkreli is saying, serious

25  issues with the Board not approving the agreements, maybe we

Summation - Ms. Smith                    10286

1   should just redo the agreements, we'll just redate them we'll

2   cancel them, we'll create new agreements right now.  And the

3   defendant responds, "that will open up some very big issues."

4          The current thinking is, let Retrophin pay, get a

5   note from the fund, and if the fund can't fulfill the note

6   Retrophin will write it off as bad debt.  It would be easier

7   than the road you were referring to.  Also Marcum will get

8   very spooked with what you were talking about, which could

9   spook your investors.  The defendant writes back, I'm

10  currently thinking that works for me.

11         What is this conversation about?  This is the

12  defendant telling Mr. Shkreli we'll do it this way, we'll get

13  the notes, you'll never pay it back, and they'll write it off

14  as bad debt.

15         How do we know that the defendant knew that this was

16  going to work?  Well, it happened before.  If you remember

17  when Mr. Massella testified, there was the issue with the

18  Katten bills.  And Retrophin, while paying $600,000 more to

19  Katten than there were invoices for.  There was a whole

20  conversation where Mr. Massella was asking the defendant why

21  is there $600,000 difference, the defendant wouldn't answer,

22  wouldn't give him an explanation.  We saw the e-mail from

23  Mr. Massella to his colleague where he says, you know, Evan

24  won't tell me why and it must be for the MSMB funds.

25         Then we heard testimony from Mr. Jain that the

1  $600,000 was for MSMB bills, and that it got written off as

2  bad debt.  Retrophin paid for the Katten bills for MSMB.  MSMB

3  couldn't repay and they wrote it off as bad debt.  Retrophin

4  paid.  They never get repaid.  Put it as a line item for

5  Retrophin.  That had already happened by this point.

6           When the defendant is telling Mr. Shkreli, we'll get

7  some notes then just write it off as bad debt, he's saying

8  you're never going to have to repay this, this is just

9  papering this, don't worry about it, Retrophin will still have

10  to pay you're not going to have to.

11           There a series of e-mails, starting with

12  Government's Exhibit 619 where you can see Mr. Panoff's role

13  in this.  Mr. Panoff comes into this later in the process.

14  And he expressed discomfort with what is going on at different

15  points.  Then he is convinced to go along.  He agrees, and you

16  can see in the e-mails, then the acts he takes afterwards not

17  to provide any additional information to the Board and to go

18  along with this scheme to make it look like they are complying

19  with what Marcum asked for and the restatement that is going

20  to be done is all above Board and that there aren't any

21  issues.

22           If you can see in this e-mail on August 26, someone

23  for Schuyler Marshall, I believe Schuyler Marshall said that

24  was his administrative assistant, is sending wiring

25  instructions to the defendant because -- to Martin Shkreli --

1    because Marshall wants to get his settlement agreement paid.

2          At this point he has kind of an agreement in

3    principle but doesn't have the actual agreement.  He's putting

4    pressure on Mr. Shkreli to pay out.  Mr. Shkreli says,

5    "getting pressure do we have a solution?"  He's talking to

6    Mr. Panoff.  Mr. Panoff then says to Mr. Greebel, "Waiting to

7    hear back from Marcum this morning.  The fact that we keep

8    changing our story to them doesn't help."  This is Mr. Panoff

9    expressing concern that what information Marcum is getting

10   isn't necessarily consistent.  He's concerned about how this

11   the settlement agreement issue is being handled.

12         Then if we look at Government's Exhibit 621, the

13   same day, in response to a follow up e-mail in the same chain,

14   Mr. Panoff says, "I think this is a little too much for my

15   risk tolerance.  I was told that MSMB was going to handle

16   these outstanding settlements prior to the financing, a

17   reference to the pipe, we are changing our story.  If you're

18   going to force me to pay through Retrophin, I'm going to have

19   to ask the Board for guidance or resign.  This is not

20   something I'm comfortable deciding on an island.  The issue

21   has caused me tremendous amount of stress and sleepless

22   nights.  It is affecting my personal life and it is not worth

23   it for me to continue to operate this way."

24         This is right in the time period where they are

25   discussing the promissory notes, the indemnifications, and

1    Mr. Panoff's expression of concern is the same expression that

2    MSMB was going to pay, and now everything is paid through

3    Retrophin and we're just getting these notes.  This is a clear

4    expression of what is wrong with what the defendant and

5    Mr. Shkreli were doing.  What happened afterwards, however, is

6    that Mr. Panoff agrees to go along.

7            You can see that because we get to the Board

8    meeting.  Mr. Panoff doesn't list any of the concerns listed

9    in the e-mails here, in fact, he agrees with the defendant to

10   represent that Mr. Shkreli will in fact repay the notes.

11   That's Government's Exhibit 627.

12           This is an exhibit where the defendant is drafting

13   for Mr. Panoff a response to Marcum, because Marcum wants to

14   know if we've got the notes how are they going to get repaid.

15   So Mr. Greebel drafts this e-mail and says that, "MSMB has

16   advised us that it has received assurances from its managing

17   member that it will have the resources to pay the obligations

18   set forth in the notes and the indemnification agreements.

19   MSMB has advised us that the managing member provided

20   documentation demonstrating that it owns securities with an

21   estimated value in excess of $8 million."  This is legalese

22   speak.  This is the defendant kind of putting on paper what is

23   going on in a way that is very hard to understand.

24           The managing member of MSMB for both MSMB Capital

25   and MSMB Healthcare is Mr. Shkreli.  What Mr. Shkreli has is

1  the 2.5 million shares of Retrophin stock.  So what the

2  defendant is proposing is that Mr. Shkreli can repay these

3  notes with those 2.5 million shares.  We know you know that

4  the defendant is not being truthful here.  He had those

5  2.5 million shares to begin with, he didn't use them.  He's

6  not planning to use any of them.  They talk about how it's

7  going to be written off as bad debt.

8          So this is just another way in which the defendant

9  is operating behind the scenes, drafting it for Mr. Panoff who

10 will send it to Marcum to kind of grease the wheels, get the

11 paperwork done, to satisfy the accountants make sure that they

12 don't actually have to repay the money and to cover up the

13 reason that the payments were taken from Retrophin.  It's

14 purposely misleading.

15         So at the end of the Marcum story, after Marcum

16 discovers everything, they ultimately include five settlement

17 agreements in which they put in the SEC filings.  That's the

18 Spielberg, Hassan, Kocher, Geller and Lavelle settlement

19 agreements.  They do not include the Rosenwald agreement

20 because no one ever tells them about the Rosenwald settlement

21 agreement because it was paid entirely with Fearnow shares.

22 Again, you can see the calculation is for these five, not the

23 Rosenwald, it's $2.2 million.

24         What is really significant about this is two things.

25 One, is that we heard Sunil Jain testify that he is not in the

1   process, the business of detecting fraud.  His job was to

2   figure out, okay, there is $2 million that went out, what

3   happens, what is the impact on the accounting.  So this whole

4   exercise with Marcum is to determine how do we account for it.

5   It is not a question of whether or not those payments should

6   have been made in the first place.  And we know that that is

7   something the defendant was aware of, because of the way in

8   which he drafted that control memo, which doesn't actually get

9   to the true purpose of what the agreements were for but it

10  provides just enough information to classify these party

11  transactions, figure out how they, including the SEC filings,

12  with as little information as possible, as little of the story

13  as possible, and figure out how to have the least impact and

14  to create the least notice for what happened.

15          Again, this is consistent with committing a fraud

16  and inconsistent with protecting Retrophin.  Because if this

17  had been something done to protect Retrophin, first of all,

18  they would have talked about it much sooner than this.  Second

19  of all, they would have explained what happened.  Instead of

20  this whole kind of control memo saying some people weren't

21  happy, not explaining the full story, making sure that Marcum

22  has just enough information but not too much information at

23  different points in the process.

24          What is also significant, the second thing, is what

25  happens next with Schuyler Marshall's settlement agreement.

1   Before Marcum discovered the settlement agreements, all of

2   them had been done, not all of them had been paid but all of

3   them had been finalized except for Schuyler Marshall.  He had

4   gotten a draft, but he hadn't actually gotten the agreement.

5   You can see that Mr. Shkreli and the defendant discussed how

6   to handle Schuyler Marshall because his agreement hasn't been

7   signed and the money hasn't gone out the door.  Now they have

8   the control memo they have to deal with, which says if they

9   are going to do something like this in the future they need to

10  make sure that they follow certain procedures.

11          So this is an e-mail, Government's Exhibit 611,

12  between the defendant and Mr. Shkreli talking about how to

13  handle the Schuyler Marshall agreement given the new approach,

14  which is the control memo, and the fact that Marcum now knows

15  about the settlement agreements.  So what the defendant winds

16  up doing is taking the Marshall settlement agreement, he was

17  owed $300,000 and then 6300 shares.  So he takes the

18  settlement agreement that he originally drafted, and splits it

19  into two.  Now there are two settlement agreements, one is for

20  the cash and one is for the shares, that's Government's

21  Exhibits 57B and 57A.

22          The agreement for the cash is just between Schuyler

23  Marshall and Retrophin for $300,000.  And the agreement for

24  the shares is just between Schuyler Marshall and then Martin

25  Shkreli and the MSMB entities, that's just for the shares.  So

1    you can see the two agreements here.  You can see that one is

2    for the shares and one is for the cash.  Then you also see

3    that the way the releases worked is that the agreement for

4    cash just released Retrophin; and the agreement for shares

5    just released Martin Shkreli and the MSMB entities.  So what

6    winds up happening is that Mr. Marshall gets these two

7    separate agreements instead of one agreement, one with

8    Retrophin one with MSMB entities and Martin Shkreli.

9            And this is really, really important because the

10   agreement that is with Retrophin that gets signed after the

11   control memo is a straight up fact of money from Retrophin.

12   Because the defendant already admitted that the complaint that

13   Mr. Marshall had, to the extent he had complaints, had nothing

14   to do with Retrophin, that's in the control memo.  Retrophin

15   isn't responsible for making any of these payments.  And by

16   putting them in two different agreements, one with just

17   Retrophin, they don't have to follow the extra procedures set

18   out in the control memo.  It makes it look like the agreement

19   with Retrophin was with Retrophin, and they don't disclose the

20   separate agreement for shares.

21           So this is after everything that has happened,

22   Marcum has discovered it.  He said these agreements had

23   nothing to do with Retrophin, yet he goes ahead and creates a

24   agreement solely between Retrophin and Schuyler Marshall and

25   has Retrophin paid $300,000 in connection with that agreement.

1          What happened won't surprise you, but the separate

2     agreement for shares never gets paid.  So when it's an

3     agreement that Mr. Shkreli has to pay himself or the MSMB

4     entities, they never actually deliver the 6300 shares, but

5     they make sure that Retrophin pays the $300,000.

6          You can see that here in the final Marcum document,

7     which is Defense Exhibit 118-46.  The final agreement for

8     Schuyler Marshall is listed as just with Retrophin, not with

9     MSMB.  And there is no separate agreement with Schuyler

10    Marshall for shares.  We'll circle back, just keep in mind

11    that Schuyler Marshall never gets paid those shares.

12         This agreement is slipped in right before the

13    September 9, 2013 Board meeting.  We'll see, as we go through,

14    it's not actually made known in any kind of SEC filings later

15    on.  So they do this one under-the-wire, the control memo

16    comes in.  They agreed to pay Marshall.  They make it just

17    Retrophin even though at this point it is clear that's totally

18    improper and it also won't surprise you there is no

19    indemnification note that is made for the Schuyler Marshall

20    settlement agreement because they disguised it as purely a

21    payment from Retrophin.  Mr. Shkreli doesn't bother papering

22    it with an indemnification note and pretending that is ever

23    going to be paid back, the money is just taken from Retrophin.

24    All of this is done before we get to the September 9, 2013,

25    Board meeting.

1          It's really important to keep in mind what happens

2    at the Board meeting, what the discussion is actually about

3    and how the settlement agreements are kind of presented.  It's

4    presented as an accounting issue, as you heard both from

5    Richardson and Aselage.  It's a restatement, there was

6    something wrong with our accounting, we need to restate, we

7    need to readjust the accounting, we need to explain why we're

8    adjusting the accounting.  It was a discussion that was had at

9    a very, high level with Marcum.  They walked through the

10   auditor letter, which we'll see.

11         And there is no discussion ever of the SEC

12   investigation, Martin Shkreli's hedge fund frauds, the fact

13   that the MSMB investors are unhappy because of the way that

14   their investments were converted into Retrophin without their

15   permission.  There is no specific discussion of a litigation

16   update.  There is none of that information that, again, you

17   would hear if this was all above board.

18         The reason the defendant and Mr. Shkreli do not

19   provide this information at the Board meeting is because they

20   don't want anyone to know what they do.  They don't want them

21   to fully understand it.  You will see from the language that

22   gets put in the SEC filings, that nobody really understands

23   what happened.  It is, again, just enough to satisfy Marcum,

24   just enough to get them over the line and get the restatements

25   done, and not the full story of what happens.

1         There is a reason.  That's because they committed a

2    fraud by taking money and shares from Retrophin.  So if you

3    look at Mr. Richardson's testimony about that September Board

4    meeting, if you remember, he had that conversation with

5    Mr. Panoff over the summer where Mr. Panoff was again

6    explaining that there were some things like rent, where MSMB

7    and Retrophin had shares and they need to know who owed what.

8    Mr. Panoff never told him that Retrophin was paying for MSMB.

9    So the restatement was kind of put in the context we're

10   straightening out who has to pay for what, that's what the

11   restatement is about.  Mr. Aselage had similar testimony.

12        The other thing that Mr. Richardson told you about

13   that Board call was about the indemnification notes, the

14   promissory notes and the indemnification notes.

15        If you remember, he said that Mr. Shkreli was very

16   kind of strong on that call.  He said, "I don't know why we're

17   talking about this.  I'm standing by the notes.  I'll repay

18   them."  That was something that he said on the call.  That's

19   also really important because, again, the defendant knows

20   that's not true, Mr. Shkreli knows that's not true.  If he

21   wanted to pay the settlement agreements, he would have done

22   it.  They just did the Marshall settlement agreement that they

23   took money from Retrophin, he had no intention of paying any

24   of these back.  He makes that point on the call.  Again, it's

25   not clear what the settlement agreements are for, but he's

1    saying things are straightened out, what needs to be paid,

2    there is nothing for anybody to worry about.

3            Again, it's really important to think about what was

4    not said on that call, in addition to what Mr. Shkreli just,

5    what was just described as Mr. Shkreli's representations.

6    There is no disclosure that the settlement agreements were

7    repaid, Capital and Healthcare investment shares taken from

8    Retrophin.  There is no disclosure that the settlement

9    agreements, MSMB Capital and MSMB Healthcare management

10   investors, because their investments had been converted with

11   Retrophin without their permission.  If you remember,

12   Mr. Richardson thought everybody who did it had been like him

13   and said I want Retrophin stock; when in fact, that wasn't

14   true.  People like Mr. Kocher and Ms. Hassan had wanted the

15   cash back.

16           Again, they weren't presented as part of a

17   litigation update.  There was no discussion of how these

18   settlements were necessary to save the company or

19   indemnification.

20           The agreements themselves were never provided to the

21   Board.  Again, this is the testimony that where Mr. Shkreli

22   insisted that the indemnification would be repaid.

23           Mr. Richardson testified that Mr. Shkreli jumped in,

24   verbally quite forcefully when the subject of the agreements

25   came up saying, this has been discussed a number of times.

1    You know MSMB.  I'm standing by the promissory note that was

2    referenced in there.  Why is this being discussed and brought

3    up again.  It was a forceful interaction.

4            The last thing to remember about Mr. Richardson is,

5    again, he did understand that there were some MSMB investors

6    who wanted more shares, but his understanding was those shares

7    were coming from Mr. Shkreli, just like Mr. Shkreli was going

8    to provide him with more shares for his MSMB Healthcare

9    management.  So there was never any understanding that any

10   agreements or resolutions would involve money or shares coming

11   from the company or that money or shares had come from the

12   company.

13           So let's just look again at the audit letter that

14   goes around to the Board and then discussed at a high level at

15   the September meeting.  I know that this language has been

16   read into the record by a whole bunch of witnesses, I'm not

17   going to reread it.  But if you look at it, it doesn't say any

18   of the key information that we've been talking about.  It

19   doesn't provide any information about who got the settlements,

20   what the purpose was, that there were money shares taken from

21   Retrophin to repay defrauded investors.  It is just this kind

22   of bland language that didn't give the Board any information

23   about what had really happened.  Again, just enough to satisfy

24   the accountants, just enough to deal with the restatements,

25   not the story of what happened.

1          That language from that audit letter is then stuck

2    into all sorts of SEC filings.  Defense made a big deal out of

3    this.  There were a bunch of different filings, a 10Q every

4    quarter, then a 10K, the S1, which is what happens when you're

5    going to issue shares.  There are all sorts of SEC filings

6    that a public company has to pay.  These paragraphs get stuck

7    into every SEC filing going forward for however many months,

8    but the same language.  It's the exact same language, for the

9    most part, we'll get to that in a minute.  The same kind of

10   bland language that doesn't provide any information.  It

11   doesn't matter if it's in there a hundred times, it is doesn't

12   actually tell the Board what happened.

13          You'll notice that the September letter also doesn't

14   include the Marshall agreement, which had been done in August.

15   And it doesn't include the Rosenwald agreement, which never

16   gets disclosed.  The Marcum audit letter for November does

17   include the second, the last agreement, the Marshall

18   agreement, for 300,000.  But it doesn't explain that this one

19   was done later in connection with the control memo that there

20   was absolutely no reason for Retrophin to pay this.  And it

21   doesn't mention the separate shares of Mr. Shkreli and MSMB.

22          Then again, you can see how the language makes its

23   way into all the filings; once you have something like this,

24   it needs to be put in all the subsequent filings.  There is a

25   filing that happened a little bit later, December 2013, that

1   has a little bit more information.  This is the S1 for

2   December 2013.  This has the more information.  It has who the

3   actual related parties are, the MSMB entities, instead of

4   saying related party.  Though that information was also

5   included in the Marcum letter.  When Mr. Shkreli was jumping

6   in saying, I'm MSMB, that information had already been

7   provided.

8           This filing has one additional kind of sentence that

9   wasn't in the prior filings.  That actually contains fulsome

10  information and was never specifically discussed with the

11  Board.  So a lot of tiny print there, but it talks about they

12  entered into a series of agreements, and this is the sixth

13  line down, owed to certain investors in the MSMB entities

14  which had invested in the company and objected to the number

15  of shares of common stock in the company that they received as

16  a distribution from such funds.  So again, that's not language

17  that was in the Marcum letters.  It wasn't any language that

18  was discussed with the Board, but at the end of the day it's

19  the same kind of false information that was in the control

20  memo.  It doesn't actually say why the investors weren't

21  happy.  And more importantly, it says that the funds, which

22  include both MSMB Health Care and MSMB Capital, invested in

23  Retrophin.  We know that the MSMB Capital never invested in

24  Retrophin.  So this additional language doesn't provide any

25  other information that let's you know the fraud occurred, in

1    fact, it provides false information about MSMB Capital's

2    investment into Retrophin.

3              So that's the settlement agreements.  And for Count

4    One you know that there are also consulting agreements.  The

5    defendant and Mr. Shkreli did not just defraud Retrophin

6    through the settlement agreements, but also through consulting

7    agreements which were used as a vehicle to provide defrauded

8    MSMB investors with large amounts of shares.

9              There are two agreements at issue in this case.  The

10   agreement for Al Geller and the agreement for Darren Blanton,

11   both of who you heard of.  You also heard testimony during the

12   defense case from an individual Steven Rosenfeld, who also

13   received a consulting agreement.  Who, the Judge will instruct

14   you, his agreement is not part of the charged conspiracy in

15   Count One.

16             So what I want to focus on are the two agreements

17   that are charged in the conspiracy, Al Geller and Darren

18   Blanton.

19             Let's start with Al Geller.  Just quick background,

20   he was an MSMB Healthcare investor who invested $1 million in

21   the fund.  He was unhappy with the number of shares he

22   received.  If you remember he was the outliner.  He was the

23   one investor, like Mr. Richardson, who said he was fine with

24   getting Retrophin shares.  He just wasn't happy with how many

25   he got.  He never threatened to sue.  Then, significantly, he

1  never discussed providing the consulting services with

2  Mr. Shkreli or anyone at Retrophin.  And it was the defendant

3  and Mr. Shkreli who proposed a consulting agreement to him in

4  order to resolve this dispute.  So let's just walk through his

5  story.

6          We can start with Government's Exhibit 560, which is

7  where the defendant drafts an e-mail to Alan Geller for

8  Mr. Shkreli.  This is another example of what I talked about

9  at the beginning, Mr. Greebel's role in the background.  He

10 was behind the scenes.  The reason a lot of people didn't have

11 contact with him is he's operating back here, making

12 everything happen.  Mr. Shkreli is out front, dealing with

13 people.

14         So the defendant drafts an e-mail for Mr. Shkreli to

15 send to Al Geller.  April 2013 e-mail is, "Hi Al, would you be

16 willing to sign a consulting agreement in connection with the

17 issuance of 31,500 shares to you?  It would be the quickest

18 way to the get the stock issued to you and satisfy any

19 requests that the transfer agent may have.  If so, I'll have

20 Evan prepare something for you."

21         That language is something to keep in mind.  It says

22 the quickest way to the get the stock issued to you and

23 satisfy any request the transfer agent may have.  You remember

24 from de Morrell's testimony, in order for the company to issue

25 shares they need authorization.  So they need a Board

Summation - Ms. Smith                    10303

1   resolution or someone to tell them why, who at the company

2   approved getting shares.  So if you had a consulting agreement

3   you can go to the transfer agent and say, hey, this person got

4   a consulting agreements, give them shares.  What the defendant

5   is saying here is the consulting agreement is a way to get

6   shares out of the company.  It's something I can show the

7   transfer agent to get the shares.  Drafting this e-mail for

8   Mr. Shkreli, this is the quickest way to get it done.

9        You can see Mr. Geller's response, Government

10  Exhibit 105-7, his response is, "What does that mean?  What

11  are the ramifications of that?"  It's very clear from this

12  response, and we'll see his testimony in a minute, it never

13  occurred that the consulting agreement or being a consultant,

14  he doesn't know what Mr. Shkreli is talking about in this

15  e-mail that the defendant drafted.

16       Then the defendant himself follows up with

17  Mr. Geller saying that, "Martin for forwarded me your e-mail.

18  Are you available for a quick call."  So the defendant and

19  Alan Geller have a conversation.  And before the conversation,

20  Alan Geller told you when he came to testify, that prior to

21  getting that e-mail that the defendant had drafted he had

22  never discussed a consulting agreement, he never acted as a

23  consultant, he never discussed with anybody, he never had

24  consulting agreements before that's, in the transcript 6737.

25       Then if you remember, the defendant had a similar

1    conversation with Al Geller as he had with David Geller.  With

2    Al Geller also at this point hasn't gotten his money from the

3    MSMB investment, didn't have an understanding how many shares

4    he had, felt like he was getting scammed.  He was trying to

5    probe the defendant for information.  And the defendant said

6    in this response he was, he, the defendant -- excuse me, the

7    defendant said in response to Al Geller's questions, that he

8    was reassuring, don't worry about it, Martin Shkreli is a good

9    guy, it's not that at all, it's not a scam.  And he made Al

10   Geller feel better.  So this is again the defendant working on

11   behalf of Mr. Shkreli to appease these angry investors to tell

12   them don't worry about it, we're going to take care of you,

13   I'm going to help you get this resolved.

14        He also reassured Mr. Geller that a consulting

15   agreements could be used to resolve his dispute.  He said the

16   defendant said it's a common type of thing, making him feel

17   like it was fine, just a way of getting something done.

18        If you remember, Al Geller also had a conversation

19   with Kevin Mulleady along the same lines, that this is fine,

20   we'll just use a consulting agreement, we'll take care of it

21   this way.  And Al Geller said that between Kevin Mulleady and

22   the defendant he felt comforted that it was okay to use a

23   consulting agreement.

24        If you remember, after speaking to the defendant on

25   the call itself and after the call he never had a

1  conversation, Al Geller, never had a conversation with the

2  defendant or Mr. Shkreli about any actual services that he

3  would provide.  You remember Al Geller owned a series of

4  thrift shops.  That's his job.  He told you that he didn't

5  have any specific information about drug companies.  And at

6  one point was asked, did you know a strategic and corporate

7  governance, which is the language in the consulting agreement,

8  he said something about taking a guess at what that meant.

9       This was a consulting agreement that was designed to

10  do exactly what the defendant says, to get shares out of

11  Retrophin to Al Geller, to settle this dispute.  There was

12  never a discussion of consulting services.  There was never an

13  intention to do consulting services.  It was a document to get

14  him the shares that he needed from Retrophin.

15       If you remember, after this conversation that he had

16  with the defendant in April, all through the summer while

17  David Geller is getting his settlement agreement, Al Geller is

18  discussing and nudging the defendant and Mr. Shkreli where is

19  my agreement, where is my agreement.  In any of those

20  agreements there is no discussion of consulting.  We know that

21  the Al Geller consulting agreement that ultimately gets signed

22  was never actually approved by the Board.  Both were members,

23  it was never discussed at Board.  And both Board members were

24  never told that Al Geller was an MSMB Healthcare investor

25  seeking for repayment.

Summation - Ms. Smith                    10306

1        You know that the draft Al Geller consulting

2   agreement that was attached to the Board meeting minutes --

3   the Board meeting e-mail that went around that consulting

4   agreement on its face, which is similar to the final

5   consulting agreement, doesn't say that he's an MSMB Healthcare

6   investor looking to get repaid.  It says he's a consultant who

7   is going to provide strategic and corporate governance.

8        Now there is an e-mail, which is Government's

9   Exhibit 105-48, in September of 2013, actually dated

10  September 10, 2013, right after the September 9 Board meeting,

11  where the defendant represents to Al Geller that the Board has

12  in fact approved his consulting agreement.  This is again

13  despite the testimony from Aselage that he has no memory of

14  discussing the Al Geller agreement.  And despite the testimony

15  from Steven Richardson that he knew that they didn't get to

16  that line item because it was a consulting agreement for Al

17  Geller and he knew Ken Banta.  He remembered they did not

18  actually discuss those consulting agreements at the meeting.

19       In this e-mail the defendant says to Al Geller,

20  "Would the Board approve the agreement and request that I add

21  provided services and when reasonably requested but not in

22  excess of 20 percent of your time."  During Mr. Richardson's

23  testimony he actually asked about Board agenda on which he had

24  taken notes, Defense Exhibit 8281.  If you see the agenda,

25  number nine, was about approving Al Geller and Ken Banta,

1   Richardson testified he never got to it.  He also testified

2   that his notes on the Board agenda where it says, minimum time

3   expectation depression.  That when he had gotten those drafts

4   right before the Board meeting e-mail, had a couple of minutes

5   to look at them, he wanted to make sure when they talked about

6   the consulting agreements.  They talked about the minimal

7   amount of time that the consultants to serve to make sure that

8   they would be worth what Retrophin would be paying him.

9                    (Continued following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. SMITH:

2              And he was asked specifically on cross-examination,

3    didn't the Board say no more than, no more than 20 percent,

4    maximum 20 percent?  And he said, No.  Before the meeting, I

5    wanted to make sure there was a minimum time, not a maximum

6    time.  So the defendant's statement to Al Geller that the

7    Board had approved that they wanted a maximum time are

8    inconsistent with Richardson's testimony and what actually

9    happened.  Again, the agreement was not discussed and what

10   Richardson would have wanted was a minimum time, not a

11   maximum time.  And you also know in the context of the

12   Al Geller agreement that the Board never gave blanket

13   approval to Mr. Shkreli or anybody else to enter into

14   consulting agreements without bringing them to the Board, and

15   that is because the grant of shares from the company needed

16   to be approved by the Board.  And you know that because

17   Richardson testified to it, and you know the defendant knew

18   this because at one point, they were discussing issuing

19   Richardson shares for his prior Board service and the

20   defendant said the Board will have to approve the issuance of

21   those shares.  So everybody knows that if you are going to

22   issue shares, you need to get the Board's approval, and they

23   did not actually bring Al Geller's consulting agreement to

24   the Board.  And both Board members testified that they never

25   agreed to provide blanket approval.

1          You saw during the trial these April, 2013 Board

2    minutes, and I think we saw them during the testimony of

3    Mr. Dooley and there is a clause in those Board minutes,

4    which I will pause, the Board minutes came in not for the

5    truth of what was in there, but they are things that were

6    written by the defendant, and there has been a lot of

7    testimony about them not being circulated to the Board and

8    not being approved by the Board members to verify what was in

9    them was accurate.  And we know that the April, 2013 Board

10   minutes never actually went to the people who were present at

11   the Board meeting to confirm their accuracy.  So there is a

12   section in those Board minutes that suggest that some sort of

13   blanket approval was provided, but both Mr. Aselage and

14   Mr. Richardson testified that that never happened.

15          And then we also have Government's Exhibit 1385,

16   which is an e-mail in July of 2013 where the defendant

17   himself says that he did not get blanket approval for the

18   consultants.  And in the e-mail the defendant and Mr. Shkreli

19   are discussing an employment agreement with Michael Smith,

20   who is somebody else.  And the defendant said he thinks he

21   was giving up equity since there is no plan.  Equity grants

22   are either approved by the Board where the CEO is given

23   blanket discretion to a certain limit.  I tried getting the

24   latter for you, but Richardson wanted the consultants to come

25   in.

1           So the defendant himself is saying that he never

2    got kind of blanket approval from the Board to issue shares

3    to consultants in this July 2013 e-mail.

4           And then finally, you know, in general the Board

5    never discussed using consulting agreements to repay

6    MSMB Capital or MSMB Healthcare investors.  Neither for Al

7    Geller nor for Darren Blanton later on.  There was no

8    general discussion, just like there was no general

9    discussion about using money and shares to repay investors

10   with settlements.

11          And finally you see the executed consulting

12   agreement with Al Geller which gives him 300,000 shares and

13   then an extra 31,500 shares in stocks over a certain period

14   of time.  And, again, talks about the strategic corporate

15   governance matters is the reason the consultant work he is

16   allegedly going to do.

17          And finally you heard from Al Geller himself that

18   he did not actually perform any consulting services for

19   Retrophin.  He did some life coaching or life providing

20   personal advice providing to Mr. Shkreli.  He did that

21   before the agreement, he did that after the agreement, but

22   it was not in connection with the consulting agreement and

23   he was not actually providing services to Retrophin.  And so

24   as a result, Retrophin paid 331,500 shares to Al Geller, the

25   thrift store owner in September of 2013, which at the time,

1   and keep in mind, they were restricted.  They could be sold

2   later for more, but at the time $2.1 million and got

3   absolutely nothing in response to that.  And this was a debt

4   that had been created by Mr. Shkreli's fraud and it should

5   have been paid by Mr. Shkreli or MSMB that Retrophin was

6   paying as a result of the consulting agreement.

7         And you remember that Al Geller also told you that

8   when he was first interviewed by the FBI, he said that he

9   had provided consulting services.  He was concerned and

10  nervous about the agreement and then later admitted that he,

11  in fact, had not.  And that was the non-publication

12  agreement that he entered into with the Government as a

13  result of telling that lie.

14        And then the last consulting agreement that I want

15  to talk about is Darren Blanton.  And then Darren Blanton

16  was an MSMB Capital investor and he had a little more

17  complicated back story.  As you remember, he invested

18  1.25 million in MSMB Capital.  He was not a Retrophin

19  employee and had no investment in Retrophin, but at the very

20  beginning of Retrophin, he had kind of given Mr. Shkreli the

21  idea.  He had a friend who had a son who obtained muscular

22  dystrophy, which is a terrible disease, and suggested that

23  Retrophin kind of be taken on to take on this disease and

24  find a cure.  And so he was involved in Retrophin in that

25  early stage in that way, but he actually never invested and

1    he was never actually an employee of Retrophin.

2           He and Mr. Shkreli have a falling out because

3    he had concerns about his investment.  If you remember, he

4    is the one person who asked for his investment back before

5    the wind-down e-mail, and Mr. Shkreli gave him back part of

6    it and then basically vanished, and so he went to the SEC

7    and reported what had happened and then continued to try and

8    get Mr. Shkreli to pay him back.  So between November of

9    2011 when he first asked for his money back and when he

10   actually gets a consulting agreement in March of 2016, he is

11   kind of hounding Mr. Shkreli on a regular basis, you know,

12   to get repaid.  That said, he never made overt threats to

13   sue MSMB Capital, Mr. Shkreli, or Retrophin.  What he said

14   and testified to is, Well, I went in the SEC because I

15   wanted law enforcement to help me out.  But he never

16   threatened to sue or pursue the lawsuit.

17          So the defendant becomes involved in Mr. Blanton

18   very early on, actually, because Mr. Shkreli had said he was

19   going to give Mr. Blanton shares as a result of this idea

20   for the muscular dystrophy drug, and then he takes those

21   shares back, they were kind of founder shares that we talked

22   about.  And Mr. Greebel is actually the person who sends the

23   paperwork and rescinds the shares, so that actually happened

24   in February of 2012.

25          There is also interaction between the defendant

Summation - Ms. Smith                    10313

1    and J.D. McCulloch who is someone who works for Mr. Blanton

2    in early of January, 2013, where they are talking about the

3    stock certificates that he gets as a distribution from

4    MSMB Capital.  So the defendant had a couple of contacts

5    with Mr. Blanton early on.  He knows Mr. Blanton is an

6    MSMB Capital investor.  He knows from the SEC investigation

7    and is alerted to the fact that they suspect that

8    Mr. Blanton has gone to the SEC.  So the defendant had a lot

9    of information about Darren Blanton.  And you can see

10   Government's Exhibit 606 here is an e-mail from Mr. Shkreli

11   to Mr. Blanton, Mr. Rosensaft, and the defendant in August

12   of 2013 where Mr. Shkreli says, Darren and I have agreed

13   that I will give him 100,000 shares of my stock.

14           And so if you remember, what does Mr. Rosensaft

15   want?  Now Mr. Rosensaft does not know about any of the

16   settlement agreements.  He does not know about the other

17   consulting agreements.  Do you remember there is a reference

18   to Al Geller in one of these e-mails and Mr. Rosensaft said

19   I thought that was some other thing that had already

20   happened when, in fact, in August of 2013 it hadn't?  And he

21   did not have any information about who Al Geller was.  And

22   so Mr. Rosensaft thought that Mr. Blanton and Mr. Shkreli

23   were going to work it out and Mr. Shkreli was going to give

24   him his shares.  And that is consistent, you will see in the

25   e-mail with what is going on.  He does not understand that

1    the shares are necessarily going to come from Retrophin.

2            And so this is the original e-mail in August

3    of 2013 where Mr. Shkreli says, draft up an agreement.  I'm

4    going to give Mr. Blanton my shares to resolve our

5    disagreement.

6            The Government's Exhibit 103-42 is then option

7    agreement that the defendant sends that Mr. Rosensaft was

8    copied on where Mr. Shkreli is going to give his own shares

9    to Mr. Blanton in order to settle up their disagreement.

10           And then what happens next is the defendant sends

11   Mr. Blanton a consulting agreement.  So he first sends an

12   option agreement and then he sends a consulting agreement.

13   And he says as per your conversation with Martin, the

14   package is a draft consulting agreement.

15           And do you remember this initial consulting

16   agreement he was going to give him like 900,000 shares and

17   $900,000 which is a lot of money and Mr. Blanton says he did

18   not even know about -- this did not even sound like in the

19   ballpark what they were talking about, he is surprised by

20   it.

21           And he also testified that he, too, before

22   receiving that consulting agreement had never discussed the

23   consulting services, had never had discussion with either

24   the defendant or Mr. Shkreli.  He was employed, he had his

25   own job.  He was not looking to be a consultant.

1          And he also testified that after he received the

2     draft agreement and after the other final agreement, he

3     never discussed serving as a consultant to Retrophin.  And

4     that he did not even know what it meant, the strategic

5     corporate governance services, he did not know what that

6     actually meant, and that is transcript 3641.

7          And then there is an e-mail in October of 2013,

8     which is Government's Exhibit 643 between the defendant and

9     Mr. Shkreli.  And again this is an explanation of why a

10    consulting agreement was sent to Darren Blanton.  And if you

11    look at the bottom e-mail, the defendant says that one of

12    Blanton's guys just called me and said they don't want an

13    option from you, he wants 100,000 shares of stock and he

14    preferred registered stock, but he will accept unregistered

15    stock, but he does not want to participate in the consulting

16    agreement.

17         And Mr. Shkreli says, Fine with me.  And then the

18    defendant writes, and this is significant, Where will the

19    100,000 come from?  If it is from the company it will need

20    to be in a consulting agreement.

21         And that is a false statement because we know that

22    the company has issue stock without a consulting agreement.

23    It can decide, the Board can approve the issuance of stock.

24    We've seen settlement agreements where stock is issued, so

25    there is no need if stock is going to come from the company

1   itself where it is in a consulting agreement.

2           What the defendant is saying is it is 100,000

3   coming from you, it will come from you.  If it is coming

4   from the company, we should use a consulting agreement

5   because that is going to be the easiest way to get this done

6   without anybody really knowing what is going on and what the

7   true purpose is and then we can get the company to issue

8   shares.  And, again, keep in mind that Mr. Shkreli has

9   2.5 million of his own shares at this point and Mr. Blanton

10  is saying here is the care of the free trading an option, so

11  this CHECK ON question should not even be happening.

12  Mr. Shkreli should be resolving his dispute with Mr. Blanton

13  himself.  And instead what they are doing is talking about

14  using a consulting agreement to get shares out of the

15  company.

16          And then the leader of the e-mail conversation

17  between the two of them, Mr. Shkreli said why would it have

18  to be a consulting agreement?  And the defendant responds we

19  can call it a settlement agreement, but given Marcum's

20  recent behavior and that is the reference to the whole

21  settlement discussion and restatement, they may require this

22  to be disclosed in the financials.  I was trying to prevent

23  that.  And then Mr. Shkreli responds, maybe we won't have

24  Marcum.  Does not matter if it is disclosed it is preferable

25  but that it is not.  So again it is something that shows the

1    defendant's intent and his knowledge.  He knows Mr. Shkreli

2    has the ability to buy these shares himself.  He is

3    troubleshooting for Mr. Shkreli.  His is figuring out a way

4    to take the shares from the company.

5           And again the company is the defendant's client.

6    He owes a duty to the company.  He is virtually looking out

7    for the best interest of the company.  But instead he is

8    working with Mr. Shkreli to figure out how he can use the

9    company shares to pay for something that Mr. Shkreli owes.

10          And we saw that after this e-mail exchange he

11   actually sent a draft settlement agreement which is

12   Government's Exhibit 103-46 and it shows, you know, the

13   option the consulting, the settlement agreement.  These are

14   all interchangeable.  It does not have anything to do with

15   consulting.  It had to do with resolving the dispute and

16   getting the dispute paid for.

17          And then what happens is in January of 2014 none

18   of the first three options, consulting, settlement

19   agreements actually get resolved.  And then in January

20   of 2014 they are finally talking about resolving the

21   dispute.  And on two different occasions the defendant again

22   suggests using a consulting agreement to resolve the dispute

23   and get the shares out of the company and that is

24   Government's Exhibit 660 and 663.

25          And if you remember in this time period Rosensaft

1   said, you know, because this is the only agreement he

2   has any firsthand knowledge of and certainly the only one

3   that he is copied on at all.  And remember he thinks the

4   shares are coming from Mr. Shkreli and even he says this

5   better be a real consulting agreement.  This guy better

6   actually be providing services.  You shouldn't be using a

7   scheme agreement if he is not a consultant.  And you know

8   that the defendant knows that he is not a consultant.  He

9   had been using all these different types of agreements, it

10  does not matter which one, and the consulting agreement is

11  brought up to get shares out of the company instead of from

12  Mr. Shkreli which is something that Mr. Rosensaft does not

13  know.

14          And then again this is the final consulting

15  agreement that gets signed d for Darren Blanton.  And like

16  the one for Al Geller at the time that it is signed in March

17  of 2014 it is for 200,000 shares, it is worth approximately

18  $3.7 million.  So the company is having $3.7 million worth

19  of shares go out of the company for Darren Blanton to settle

20  a despite for Martin Shkreli.  And you know that the Board

21  never approved this agreement, either.  Both Richardson and

22  Aselage testified to that.

23          And you also know that Mr. Blanton testified that

24  he understood the purpose of the agreement was to get repaid

25  for his dispute with Mr. Shkreli both the MSMB Capital and

1    then the whole dispute in the beginning about issuing

2    founder shares and taking them back and that he never

3    actually provided any consulting services for Retrophin.

4    Again, he did not know what strategic and corporate

5    governance meant.  To the extent that he was introducing

6    Mr. Shkreli to investors, that was something he did with all

7    of his investments and he did it both before the agreement

8    and after the agreement.

9            And one other way that you know that the

10   consulting agreements were just a way to get shares out of

11   Retrophin, remember before I told you that I had put a pin

12   in the fact that Marshall agreements for shares never

13   actually get paid.  They divided it into pieces and

14   Retrophin paid one and Mr. Shkreli was supposed to pay the

15   other and he just does not do it.

16           So if you look at this e-mail which is

17   Government's Exhibit 665 at the bottom the defendant says he

18   just spoke to Schuyler and resolved the alleged issue.  He

19   mentioned that you and he discussed he would receive 15,000

20   additional shares.  Was that meant to come from you or

21   should we do a consulting agreement for him.  And

22   Mr. Marshall was complaining because he never got the 5,300

23   shares he is owed and now it is later in time and he wants

24   more shares.  The defendant's knee jerk reaction is were the

25   shares supposed to come from you or if they are going to

Summation - Ms. Smith                10320

1    come from Retrophin should we do a consulting agreement.

2    And Mr. Shkreli says ask him if he will tolerate a

3    consulting agreement and the defendant says okay.

4           And they do not ever enter into a consulting

5    agreement.  None of this ever happens because as usual

6    Mr. Shkreli does not follow through if people are not kind

7    of bugging him.  But this is the way in which the defendant

8    and Mr. Shkreli were using consulting agreements to take

9    shares out of the company.  Either the shares are going to

10   come from you or they are going to come from the company.

11   If they are to come from the company, at this point you have

12   got disclosure issues if you do a settlement agreement.  So

13   let's use a consulting agreement.

14          THE COURT:  Is now a good time to break for the

15   jurors' lunch?  Are you ready to take lunch now or would you

16   like to hear a little bit more?  Would you like lunch now?

17          ALL JURORS:  Yes.

18          THE COURT:  All right.  Please do not talk about

19   the case.  The time to discuss the case has not yet come.

20   We will see you in about one hour.  Thank you for your

21   ongoing attention.

22          (Jury exits the courtroom.)

23          (The following matters occurred outside the

24   presence of the jury.)

25          THE COURT:  All right.  Let's take one hour.  In

1  the meantime we will get the microphone fixed.  I apologize

2  again.  This is an ongoing problem.

3            (Lunch recess taken at 1:05 p.m.)

4            (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2         (Time, 1:58 p.m.; Open court; No jury present.)

3         THE COURT:  All right.  We are getting the jury

4    lined up.  I would like to know when we can get started.  They

5    are lining up.

6         MR. MASTRO:  Mr. Greebel should be back any second,

7    Your Honor.

8         (Short pause.)

9         THE COURT:  Still waiting for Mr. Greebel.

10        (Short pause.)

11        THE COURT:  All right.  Let's bring in the jury.

12        (WHEREUPON, at 2:10 p.m., the jury re-entered the

13   courtroom and the proceedings continued in open court, to

14   wit:)

15        THE COURT:  All jurors are present.  Please have a

16   seat.

17        You may resume, Ms. Smith, with your summation.

18        MS. SMITH:  So, before the break -- I have a

19   microphone now.

20        (Laughter.)

21        MS. SMITH:  Before the break, we walked through all

22   of the evidence for Count 1, and you saw all of the evidence

23   of the defendant's intent and his knowledge and the actions

24   that he took.  The one other thing I want to mention here that

25   I am going to address again in the end, you have the evidence

1    that shows what the defendant knew, and the steps that he

2    took, but one of the questions is why did he do what he did,

3    why was he protecting Mr. Shkreli and not looking out for the

4    best interests of Retrophin.

5           And as we have talked about consistently throughout

6    the trial, it is important to keep in mind the context, that

7    in the fall of 2012, beginning of 2013, the MSMB entities and

8    Retrophin owed Katten more than $700,000.  And at the time,

9    the defendant was an income partner making about $355,000.

10   And by the time of the end of the conspiracy charged in

11   Count 1, and the last consulting agreement is in March of

12   2014, and it goes to the end of September 2014, the defendant

13   has -- is the principal attorney for the bills for Katten, and

14   there are millions of dollars in bills that are being paid in

15   that time period, and the defendant has gone from being kind

16   of an income partner sort of in the middle of the ranking at

17   the law firm to the top income partner in the entire firm.

18          And so the -- when we talk about the motive being

19   money, it is a direct correlation between keeping Retrophin as

20   a client, keeping Mr. Shkreli happy, and the defendant's own

21   salary.  And, again, we will walk through that in more detail

22   at the end, but keep that in mind when you think about the

23   evidence for Count 1 as well as for Count 2.

24          And so I just want to end with Count 1 on the

25   elements again.  Again, the two elements are, is that there's

1    a conspiracy to commit wire fraud, and then, second, the

2    defendant knowingly and intentionally became a member of the

3    conspiracy.  And I submit to you that all of the evidence that

4    we talked through proves both of these elements beyond a

5    reasonable doubt.  And, again, keep in mind that a conspiracy

6    is just an agreement, and so the agreement to commit the crime

7    is in and of itself the crime, and there is no requirement

8    that conspirators actually carry out their plan, but all of

9    the evidence that you've seen about the settlement and

10   consulting agreements shows you that they, in fact, did.  And

11   all of the evidence that we talked about shows that the

12   defendant acted knowingly and intentionally.

13            And there were just a couple of other legal points

14   that I want to make sure to discuss.  The intent to defraud,

15   as you will hear the judge instruct you, is just the intent to

16   take money and property from Retrophin.  There's not a larger

17   intent to harm.  It is the taking of money and property, which

18   clearly happened with the settlement and consulting

19   agreements.  And you know, again, while we don't need to show

20   any specific misrepresentations or omissions, that there were

21   multiple specific misrepresentations and omissions in

22   connection with the crime charged in Count 1.  So there's the

23   consulting agreements which say that they are consulting

24   agreements, when, in fact, the individuals are providing no

25   consulting services, and it is simply a way to get shares out

1   of the company.  There are the indemnification agreements and

2   the notes which say that Mr. Shkreli is going to repay the

3   company, which is in and of itself a lie.  There's the lie

4   that Mr. Shkreli tells on the board call that he will repay

5   when he has no intention of doing so.  And then, obviously,

6   there's all the information that the defendant, who had a duty

7   to his client to disclose material important information, did

8   not provide about the purpose of the settlement agreements,

9   that the settlement agreements had happened at all, the

10  consulting agreements.

11         In terms of the conspiracy, you know that the

12  defendant agreed with Mr. Shkreli to commit these crimes.

13  That is clear from the evidence.  But you also know that there

14  were other people involved, including Mr. Panoff, who went

15  along with the conspiracy, Mr. Biestek, Mr. Mulleady, and

16  Mr. Fernandez, who at various points also contributed to the

17  conspiracy.

18         And then the last legal element that I want you to

19  think about is venue, which just means an act in furtherance

20  of the conspiracy had to happen somewhere in the Eastern

21  District of New York, which is Queens, Staten Island,

22  Brooklyn, and Long Island.  And the judge will instruct you

23  that for venue, there's actually a different standard of

24  proof.  Rather than reasonable doubt, it is just

25  preponderance, which means more likely than not.  And there is

1    no question that we have met the preponderance standard for

2    venue for Count 1.

3            You saw that coconspirator Marek Biestek is a

4    resident of Queens.  You can see the East Rockaway Queens on

5    that backdated interest.  Mr. Rosenwald was a resident of

6    Lawrence, New York, which is in Nassau County, and

7    communicated with Mr. Shkreli in connection with the

8    settlement agreement.  The Fearnow shares that were nominally

9    assigned to Mr. Biestek were used to satisfy Mr. Rosenwald's

10   agreement.  Mr. Spielberg was a resident of Brooklyn.  And

11   then, even yesterday, for example, you saw that Mr. Geller, Al

12   Geller, traveled to New York to discuss the settlement -- his

13   consulting agreement with Mr. Shkreli, and he told you that

14   when he came to New York he would fly through LaGuardia to do

15   that.

16           So that is the end of Count 1.  And the second crime

17   that I want to discuss is Count 2, which is the securities

18   fraud conspiracy.  And in Count 2, the defendant and his

19   coconspirators, including Martin Shkreli, engaged in a

20   conspiracy to defraud investors and potential investors in

21   Retrophin, seeking to control the price and trading volume of

22   Retrophin's stock.

23           And we are going to walk through the evidence, but

24   this count includes the distribution of the free trading

25   shares, or the Fearnow shares, to a group of associates and

1    Mr. Shkreli with the intention of controlling those shares,

2    the form 13D that failed to disclose Mr. Shkreli's beneficial

3    ownership of those shares, and then the ways in which the

4    defendant and Mr. Shkreli sought to control the free trading

5    shares in order to control the price and volume of Retrophin

6    stock.

7              So, again, at the beginning, I just want to point

8    out the elements so you can be thinking about them as we talk

9    through the evidence, and then I will go through them again at

10   the end.

11             But for securities fraud conspiracy, again, just an

12   agreement.  But, first, there's a conspiracy to commit

13   securities fraud, the defendant knowingly and intentionally

14   became a member of the conspiracy, the defendant or one of his

15   coconspirators knowingly committed one of the overt acts

16   charged in the indictment.  And I'll go through that at the

17   end, but overt acts are just a series of specific acts in

18   furtherance of the charged conspiracy.  And then, fourth, the

19   overt acts were done to further some object of the conspiracy.

20             And then again, as with wire fraud, while we are not

21   proving securities fraud, we are proving a conspiracy, it is

22   helpful to know what the crime of securities fraud actually

23   is.  And securities fraud requires that a defendant employ the

24   device, scheme, or artifice to defraud, made an untrue

25   statement of material fact or omitted to state a material fact

1    necessary to make the statements made in light of the

2    circumstances under which they were made misleading, or

3    engaged in an act, practice, or course of business that

4    operated or would operate as a fraud or deceit upon a

5    purchaser or seller.  And you will also hear the judge say

6    that any conduct that's designed to deceive or defraud

7    investors by controlling or artificially affecting the price

8    of securities is prohibited.

9           And the last point there is something that Deb

10   Oremland talked about.  You remember in her testimony she's

11   talking about the importance of providing accurate

12   information, all of the public filings, because the people in

13   the market are relying on that information when they decide

14   whether or not they are going to buy the stock.  And so if

15   that information is not right, or if there's something else

16   going on that they are not aware of, like someone's

17   controlling the price or the volume of the stock, then when

18   you are going to make a decision about whether to buy this

19   stock, they don't have all the information that they are

20   supposed to have to do that, and it is not fair.  And so that

21   is kind of the essence of the securities fraud to keep in

22   mind.

23          So just to set the stage for Count 2, and keep in

24   mind that some of this actually overlaps with Count 1, which

25   is what I was talking about before, but from the perspective

1    of Retrophin, the company, in the fall of 2012, it is a

2    private company, and as you heard from multiple witnesses,

3    there was a discussion of taking the company public.  And,

4    ultimately, the decision is made to take the company public

5    through a reverse merger, and you heard a lot about that, that

6    it basically means merging into a shell company that already

7    exists that's public, but doesn't have anything going on, and

8    then you merge with that company and you become a new public

9    company.

10         And so you also heard a lot of testimony, and you

11    saw the bank records.  This was a very difficult time for

12    Retrophin.  It didn't have a lot of assets, they had been

13    trying to get some drugs through the Valeant deal, and it fell

14    apart.  And so when they go public, they don't have a lot of

15    money, and the company is struggling.  And they -- until they

16    get to the PIPE in February, there's a real concern that

17    Retrophin is not actually going to make it.  And that is kind

18    of at the heart of the reason why Mr. Shkreli and the

19    defendant and others want to be able to control the price and

20    volume of Retrophin stock, to make sure that it doesn't

21    collapse and then the whole company goes under.

22         And before we start talking about the specific

23    conduct, I want to talk about Government Exhibit 506, which is

24    a discussion of the -- a liquidation press release that

25    Mr. Shkreli drafts.  And so, in December of 2012, specifically

1    December 29, at the very end, as all of this conduct is going

2    on, there's really a concern that Retrophin might not make it.

3    And so Mr. Shkreli drafts this press release announcing that

4    Retrophin has shut down, kind of as a like, "This is what I

5    will send out because I think we are not going to make it."

6    And he sends it to Mr. Greebel.

7           And Mr. Greebel's response is, which are Government

8    Exhibit 506A and 506B, are very telling.  So Mr. Shkreli sends

9    out the release, and then 506A, the defendant says, "Did I

10   miss something?"  And Mr. Shkreli responds, "Too much stress,

11   too many liabilities."  And that's also on December 28, 29.

12          And 506B, which is the same e-mail but a different

13   chain, the defendant writes back, Ligand said they would

14   extend, Roth is ready to do a raise.  I don't hear anyone

15   breathing down your neck for Monday.

16          So you can see that the defendant is really

17   encouraging Mr. Shkreli to push forward.  At this point, as we

18   just discussed, there's $600,000 outstanding due to Katten.

19   He knows that if the company doesn't survive, Katten's not

20   going to get paid, and it is going to impact his bottom line,

21   and he's motivated to help Mr. Shkreli figure out a way to

22   make the company work.

23          And it is in this context that everything else that

24   we're talking about happens.  And the agreement to control the

25   price and trading volume of Retrophin is an agreement that is

1    designed to get the company past this hump and to the point

2    where they can actually raise money.  And so it is important

3    to keep the timing of this kind of liquidation press release

4    in mind as we talk about everything else.  Because this is the

5    reason, this is the driving reason behind the desire to make

6    sure that the price doesn't crater for Retrophin.

7            So taking a step back in time to November of 2012,

8    there was the discussion about which shell to actually use.

9    And you know from all the testimony that they wound up with

10   the Desert Gateway shell.  And Jackson Su testified, I

11   believe, about clean versus dirty shells.  So you can actually

12   find a shell that doesn't have any shares associated with it,

13   or you can find a shell that does.

14           And there's a discussion between Mr. Shkreli and the

15   defendant in November of 2012, which is Government Exhibit

16   458, where Mr. Shkreli is explaining that he wants this shell

17   that has the free trading shares.  The defendant asks, "Is

18   there any reason other than the 2.5 million that you want this

19   shell?  A new clean shell would definitely be cheaper."  And

20   the defendant says, "The 2.5 million help a lot."

21           And we will see exactly how they help as we go

22   forward.  But keep in mind, it says a new clean shell will

23   definitely be cheaper.  Because the money that is paid for the

24   shell is what enables the defendant and Mr. Shkreli to assign

25   those free trading shares to other people.

1    And we can see that here.  Retrophin is actually the

2    entity that pays for the shell, and they pay $200,000, and

3    they pay the first $100,000 on December 13, 2013.  And but for

4    Retrophin paying for the shell, they would not have had the

5    opportunity to get the 2.5 million free trading shares.  The

6    defendant just said it in the last e-mail, a clean shell

7    without any shares attached would be cheaper.

8         The reason that they have access to the 2.5 million

9    shares is because Retrophin is paying for the Desert Gateway

10   shell.  And so the shares should be Retrophin's because

11   Retrophin is paying for the shell.  But, instead, what happens

12   is that they distribute it to other people, and they use these

13   purchase agreements to make it look like it is separate from

14   the company.

15        And just a couple other ways that you know that the

16   Fearnow shares are made available, only because Retrophin pays

17   for the shell.  The legal opinion that gets written, we will

18   talk about it in minute, that allows the shares to actually be

19   distributed, there's a discussion between the defendant and

20   Mr. Shkreli, on December 13, 2012, about how the legal opinion

21   isn't going to be released for the Fearnow shares until the

22   shell payment is made.

23        And then the other way you know that the Fearnow

24   shares are only made available because Retrophin pays for the

25   shell is as you heard from Mr. Pierotti and as you can see in

1    Government Exhibit 479, originally, they were going to get all

2    2.4 million Fearnow shares, and then they actually windup

3    having to hold some back.  They had to hold 400,000 back

4    because Retrophin doesn't have the full $200,000, they only

5    have $100,000.  And so the deal that they strike with Fearnow

6    is that they will pay on the second 100,000 later, and in

7    return, Fearnow can hold onto the 400,000 shares.  And if for

8    some reason they didn't make the second payment, they wouldn't

9    get those second 400 shares.  So that's another way that you

10   know that the Fearnow shares only become available, because of

11   the money that Retrophin's actually paying for the shell.

12           And so what happens at the beginning of December,

13   which is Government Exhibit 468, is that they've decided

14   they're going to buy the shell, Retrophin's going to buy

15   Desert Gateway, and the defendant and Mr. Shkreli are going to

16   distribute the shares that come along with the shell to a

17   group of people that they're associated with, and that

18   Mr. Shkreli thinks he can control.

19           And Mr. Greebel lays out the steps by which that's

20   going to happen in this e-mail.  And, basically, what it is is

21   that the shares are held by someone associated with the shell,

22   and they are made available because Retrophin's buying the

23   shell, but instead of just giving them to Retrophin, they have

24   those shares sold, and it is sale, in quotation marks, to

25   seven associates.  And we'll walk through that --

1    Mr. Pierotti's purchase agreements, specifically, but,

2    basically, he pays $400 for 400,000 shares.

3            So there's this sale between Fearnow and those

4    individuals that doesn't look like it has anything to do with

5    Retrophin, but, in fact, it is only happening because

6    Retrophin is paying for the shell.  And those purchase

7    agreements make it look like those seven people are getting

8    those shares completely unconnected to Mr. Shkreli or to

9    Retrophin.

10           And we know that Mr. Shkreli is the one that

11   selected the group to receive the shares, and Mr. Pierotti

12   testified to that during his direct.  And he listed out who

13   was given the opportunity to buy the shares.

14           And, again, he was the one that said that Martin

15   Shkreli was the one who selected the group who could actually

16   buy the shares, and, also, the amount.  And you can see that

17   in the e-mails, where the defendant and Mr. Shkreli are going

18   back and forth on how much each person's going to get.

19           And we know, just as a little call back to Count 1,

20   that Mr. Fernandez and Mr. Mulleady agreed to transfer their

21   shares they already had gotten in Retrophin back to

22   Mr. Shkreli, at the same time they were getting the

23   opportunity to buy the Fearnow shares.  And we know that the

24   defendant and Mr. Biestek had a conversation about those

25   transfers right in this same time period, November 30.

1          So the defendant is involved in drafting the

2    purchase agreements, sending them out to the Fearnow shares

3    recipients, then collects all of the signed purchase

4    agreements, and he sends them both to the lawyer for Fearnow,

5    which is Heskett and Heskett, and then also he forwards them

6    to Mr. Shkreli.  So he is papering this entire transaction.

7    And that's Government Exhibit 480.  And then Government

8    Exhibit 990, which is just a demonstrative, is just showing

9    you the actual distribution of the Fearnow shares.

10          And, again, if you remember, that there were 2.5

11   million free trading shares.  100,000 were owned by someone

12   named Ruth Shepley, who was connected to Mr. Fearnow, she was

13   Mr. Fearnow's partner.  There were 400,000 that were held

14   back, those were the escrowed until that second payment was

15   made.  And they were supposed to be held back from each

16   individual person, and we will see that in a minute.  And then

17   the remaining 2 million shares were distributed out to those

18   seven associates, which were Kevin Mulleady, Thomas Fernandez,

19   Marek Biestek, Tim Pierotti, Claridge Capital, which is the

20   entity for Ron Tilles, Andy Vaino, and Edmund Sullivan.

21          And this is just, Government Exhibit 115-4, this is

22   just the actual distribution of the Fearnow shares.  I point

23   this out only because you can see that Edmund Sullivan is in

24   Brooklyn, New York, as is Marek Biestek.  When we talk about

25   venue for this count, the Fearnow shares that they received

1    from this first tranche actually get sent to Brooklyn.  And

2    there's the Fearnow shares for Ron Tilles actually get sent

3    directly to the defendant.

4           So we also know that there's evidence in the record

5    that Mr. Shkreli discussed his desire to control the Fearnow

6    shares prior to when they were distributed.  So at transcript

7    5940, Mr. Pierotti testified about -- that he -- that

8    Mr. Shkreli said that because he owned all the shares or he

9    controlled all the shares, he needs to distribute them out to

10   people, sell them to a lot of people that were close to him.

11   And we also heard from Jackson Su that Mr. Shkreli told him,

12   and that's transcript 4777, that Mr. Shkreli would control the

13   selling of the stock, and that when he sold it, and the person

14   would get the profit share, and, basically, he would be the

15   one that would control what happens with the stock, even

16   though it was in that individual's name.

17          And then the final step the defendant takes in

18   connection with the distribution of the shares is this getting

19   procurement of the legal opinion.  And, basically, they need a

20   legal opinion, the same way that we saw at different points to

21   lift restrictions on stock and to make sure that stock could

22   actually be free trading, they needed an opinion from an

23   outside law firm that said that the Fearnow share recipients

24   were neither affiliates of Retrophin, nor together with

25   anybody else exercised control over Retrophin.

1              And so the defendant asked everybody to send that

2    e-mail back, which is at the bottom, which said that

3    represented that they were not an officer, director, or holder

4    of ten percent or more of the equity security in Desert

5    Gateway, and do not alone or together with any other person

6    exercise control over Desert Gateway.  And keep in mind, this

7    e-mail is written on December 13, 2013.  This is a day after

8    the reverse merger, so Desert Gateway has already become

9    Retrophin at this point.

10             And he's asking those seven people to represent that

11   they're not an officer, director, or holder of more than ten

12   percent, and they are not an affiliate.  And you heard Deb

13   Oremland testified that an affiliate has a specific

14   definition, which will also be in the jury instructions.  And

15   so the issue is whether or not that person qualifies under any

16   of these categories or together with others could control the

17   company.

18             And then you will see that the defendant gathers all

19   that information, and then, ultimately, the law firm issues

20   the opinion saying that none of these people are affiliates of

21   the company.  And the reason that's important is because if

22   you're an affiliate then -- or you could exercise control, the

23   shares wouldn't be free trading.  And they need everyone not

24   to be an affiliate because they need to make sure the shares

25   are free trading, because that's how you're going to control

1    the price and volume of the stock.  If the shares are

2    restricted and you can't trade them, then there's nothing --

3    you know, then there's no way to actually control the price

4    and volume of the stock.

5            And keep in mind at this point, it is a very, very,

6    very small company.  And we are going to see that a number of

7    the Fearnow share recipients, despite statements by

8    Mr. Shkreli, are, in fact, working at the company.  And that

9    together with Mr. Shkreli, they agree to exercise control over

10   the Fearnow stock, and they may or may not be involved in

11   other decision making at the company.  So the assertion that

12   they are not affiliates is questionable at least for some of

13   the Fearnow share recipients.

14           There's also, in addition to making sure that the

15   Fearnow share recipients say they are not affiliates, there

16   are also a number of steps that the defendant and Mr. Shkreli

17   take to make sure that the individuals who receive the Fearnow

18   shares aren't deemed employees or consultants of the company.

19   And this doesn't necessarily have any kind of legal

20   significance, but it is important because they want to make

21   sure that nobody that got the Fearnow shares can be restricted

22   from trading the stock.  So if you're an employee or

23   consultant who might have inside information, as Mr. Pierotti

24   testified, you might not be able to trade your shares.

25           It also puts distance between Mr. Shkreli and the

1   people who he's going to control the shares of.  It makes it

2   look like they are not closely affiliated.  It was certainly

3   steps that they took because they wanted it to make -- to make

4   it look like these Fearnow share recipients didn't have a

5   connection to the company, didn't have a connection to

6   Mr. Shkreli.

7          So one of the steps, for example, the defendant

8   says, "Should I send everybody shares to the address, the work

9   address, courtesy of MSMB."  Mr. Shkreli says, no.  And you

10  know they actually got distributed, for the most part, to

11  their home addresses.

12         The defendant also sends this e-mail, which is

13  Government Exhibit 500, on December 17, 2012, and it is only

14  to -- it's sent firm wide, and then all of the Fearnow share

15  recipients are copied.  And it basically says that everybody's

16  fired.  That the only people who are left as employees are

17  these few individuals, Leonora Izerne, Mr. Shkreli's sister,

18  Jackson Su, and Michael Smith and himself.

19         And, as we know, you know, the Fearnow share

20  recipients, some of them continued to work for Retrophin

21  consistently from before the merger until after the merger.

22  And you can actually see at the very time that they are

23  receiving shares, they are working for the company.  So, for

24  example, in Government Exhibit 499, if you look at Kevin

25  Mulleady, on December 16, 2012, there's a conversation where

1   Mr. Shkreli says he wants to get a replacement server for

2   Retrophin, he's asking Mr. Mulleady to change all sorts of

3   things on Retrophin's web site, and to put a new bio up for

4   himself.  And then in response, on the right-hand side,

5   Mr. Mulleady responded, "I set up this e-mail."  So he set up

6   a non-Retrophin e-mail, again, to make it look like he's not

7   actually working for the company.

8            And then he's talking about waiting for the FedEx,

9   which is the FedEx with the Fearnow shares.  And Mr. Shkreli

10  says, "Call FedEx and track the package.  Don't stay home."

11  And Mr. Mulleady responds, "I'll be in in a little, not

12  feeling well."  And Mr. Shkreli responds at the top there,

13  "No, get in on time, WTF, need you here."

14           So the very same day that Mr. Shkreli is sending the

15  e-mail that everybody's fired and saying that they are not

16  employees, he's telling Mr. Mulleady to keep an eye out for

17  his Fearnow shares and get himself into the office.

18           And you know that Kevin Mulleady and Mr. Shkreli had

19  an on and off again relationship, but -- and was working and

20  not working at various times.  But, consistently, he's listed

21  as having a termination date of January 2013.  And we know

22  that's right because a lot of the MSMB Healthcare investors

23  who were dealing with Mr. Mulleady were dealing with him up

24  until that time.  There are e-mails, like the e-mail that we

25  just looked at, showing he's doing work for Retrophin until

1    that point.

2           And the same is true of a number of the other

3    Fearnow share recipients, that they worked for Retrophin from

4    before the merger, straight through until at least 2014.  And

5    I -- for Mr. Biestek, you heard testimony from Mr. Aselage and

6    Mr. Massella, for Mr. Fernandez, you heard testimony from

7    Mr. Richardson, Mr. Aselage, for Mr. Tilles, you heard

8    testimony from Mr. Massella and Mr. Aselage, and for

9    Mr. Vaino, you heard testimony from Mr. Richardson and

10   Mr. Aselage.

11          And there are e-mails as well.  So, for example, you

12   know from Mr. Massella that Ron Tilles, right after the merger

13   and Jackson Su leaves, serving as the CFO, and there are

14   Citrin e-mails where he's responding to various accounting

15   work.

16          And so, significantly, as we saw with Count 1, the

17   board is not informed of this decision to allegedly fire

18   everyone and have them not serve as employees.  And so this is

19   something that's being done by Mr. Shkreli in connection with

20   the Fearnow share recipients for a very specific purpose, but

21   it is not made known to the board what is actually being done.

22   And, in fact, as far as the board members know from what they

23   see, these individuals are continuing to work at Retrophin.

24          And you also know that the board wasn't all about

25   the Fearnow share distribution.  This is Richardson's

1   testimony at 1792.  He didn't know that the shell, which, by

2   the way, he provided money in connection with purchasing, had

3   came with any free trading shares, how they were distributed.

4   And that wasn't information that Mr. Shkreli gave him, and it

5   wasn't information that the defendant gave him.  And you know

6   from Mr. Aselage, who's the other board member at the time,

7   was that he is understanding that the note was going to make

8   shares available to the company, which is not, in fact, what

9   happened.

10          And then the next thing that the defendant and

11  Mr. Shkreli do is again with the form 13D, although there is

12  this plan to control the Fearnow shares, he does not disclose

13  Mr. Shkreli's beneficial ownership of the shares in the 13D.

14  So, again, Mr. Shkreli has his own 2.5 million personal

15  shares, and then there's also disclosed in the 13D that MSMB

16  Capital and MSMB Healthcare have shares.  But the free trading

17  Fearnow shares are not listed as owned or controlled by

18  Mr. Shkreli, as they would be required to be under the 13D.

19          And so we will see, going forward, how he -- how

20  Mr. Shkreli, with the defendant's help, in fact, controlled

21  many of those shares, but this 13D did not disclose that

22  control.  And, again, the defendant is the one who drafted the

23  13D, we saw that in the last section.

24          (Continued on the next page.)

25

1          MS. SMITH:  And this is the actual 13B filing which

2     lists the total amount of shares that Mr. Shkreli either

3     owned or controlled at that point, that was 40.5 percent.

4     Obviously with an additional 2.5 million shares and there are

5     only 8 million shares outstanding, he would be by far the

6     majority controlled owner of Retrophin, having those

7     2.5 million shares be disclosed.  And one of the reasons that

8     they weren't is because he didn't want anyone to know that he

9     had the ability to control not only almost all of the

10    free-trading shares of the company, but in terms of control

11    of the company generally, more than 50 percent.

12          And so the next section I want to talk about the

13    ways in which you know that the defendant and Mr. Shkreli

14    controlled the price and trading volume of stock or attempted

15    to.  And so Mr. Shkreli discussed at a number of points

16    actually wanting to increase trading volume and liquidity for

17    the stock.  This is an email from December 18th, which is

18    Government Exhibit 112-21, sent out to a number of people

19    stating that one of his priorities for the future is

20    increasing the trading volume of the stock.

21          But the clearest example of the defendant and

22    Mr. Shkreli seeking to control the price in trading volume of

23    the Retrophin stock in this time period through the Fearnow

24    shares is actually the Tim Pierotti story.

25          And so I want to take a minute and talk about Tim

1   Pierotti's background.  You know that he came to MSMB

2   Consumer, which was another hedge fund in 2011.  And that he

3   worked there kind of through the summer of 2012.  And then at

4   some point MSMB Consumer was shut down by Mr. Shkreli and he,

5   Mr. Pierotti, was working on the Garreco transaction and some

6   other transactions that he was working on separately from

7   Retrophin.

8          And you know that Mr. Pierotti had a termination

9   agreement in November of 2012, which is Government

10  Exhibit 112-10.  And he testified that the agreement was

11  actually with both MSMB Healthcare and Retrophin, even though

12  he had not worked Retrophin or MSMB Healthcare, but he signed

13  an agreement in order to get his 20,000 severance payment on

14  November 12th.

15         And he testified at transcript 5903 to 04 that had

16  he not performed work for Retrophin before or after signing

17  the termination agreement.  And he testified that that was

18  because there was no row role for him at Retrophin.  It's a

19  biotech, I was a political science major from Boston College.

20  So his area of expertise is consumer, not biotech or pharma.

21         And he testified that he was given the opportunity

22  to buy the Fearnow shares through Marek Biestek.  Marek had

23  set him up with Mr. Shkreli and that he made the initial

24  discussions with Mr. Shkreli and Mr. Biestek.  He actually had

25  some concerns right up front whether this was legal and got

1    himself comfortable with it at the beginning.

2              And then once he had actually purchased the shares,

3    he started to become very uncomfortable with the way in which

4    Mr. Shkreli was trying to exercise control of the shares.

5              So the first way in which he said he was

6    uncomfortable was this email that was sent by Michael Smith on

7    December 11, 2012, Government Exhibit 112-12.  This is an

8    email from Mr. Shkreli's assistant, the Fearnow share

9    recipients with the exception of Mr. Sullivan saying that he

10   wanted the -- everybody to give him their Scottrade account,

11   so their brokerage accounts, and to give them a summary of

12   their trading every day.  So basically he was asking everyone

13   to report back any trading they had done in the Retrophin

14   stock on a daily basis.

15             And you heard Mr. Pierotti's testimony that his

16   reaction to this email was that it was a major red flag

17   because he thought it made clear that Martin had an interest,

18   at least monitoring if not controlling, what they were doing

19   with the shares.  And so this was kind of first thing that

20   happened that made him very concerned that Mr. Shkreli was

21   trying to monitor what everybody was doing with the stock.

22             And we know that the defendant was involved in

23   setting up the Scottrade account because there's an email

24   communication between Mr. Biestek and the defendant asking for

25   a letter, a supporting letter to be drafted so everyone can

1   get their shares deposited in the Scottrade accounts.  And

2   then the testimony from Mr. Dooley yesterday when Mr. Vaino

3   tried to open a Scottrade account as well.

4           And then the second thing that Mr. Pierotti

5   testified that made him very nervous was that Mr. Shkreli

6   wanted him in the Retrophin office.

7           If you remember, when he was working on Garreco,

8   Mr. Shkreli said we're going to be switching over to

9   Retrophin, everyone needs to get out and get find their own

10  space.  But once he got the Fearnow shares, he wanted

11  Mr. Pierotti to report to the Retrophin office.  And it made

12  Mr. Pierotti very uncomfortable.  He thought this was another

13  way in which Mr. Shkreli was trying to control him.  He was

14  also concerned that he might get inside information by being

15  in the office that would prevent him from trading the shares.

16          So he had a conversation with the defendant around

17  the same time.  And he asked the defendant what he should do

18  and the defendant said, Well, you should come into the office

19  but you can just close your door so you don't get any inside

20  information.

21          And the defendant -- and Mr. Pierotti said that

22  didn't satisfy him because Mr. Shkreli often talked about

23  inside information and he was concerned about being in the

24  office and having Mr. Shkreli try and actually control what he

25  was doing with the shares.

1           And Mr. Pierotti also testified about the

2   conversation that he had with Mr. Shkreli about trading to

3   affect the volume.  So that Mr. Shkreli had made some

4   statements about trading the shares back and forth or trying

5   to generate increased liquidity.  Which is similar to that

6   email we just looked at where Mr. Shkreli encouraged other

7   people to do that as well.

8           So it's very clear that at this time Mr. Shkreli is

9   very fixated on the price and volume of Retrophin stock; how

10  it's doing.  And, again, this is all in the same time period

11  of that liquidation sale and that's why it's so important to

12  keep the price of Retrophin stock up.

13          And then we get to Government Exhibit 510, which is

14  a conversation between the defendant and Mr. Shkreli, and at

15  it's a very significant moment because it shows the

16  defendant's knowledge of the plan and his understanding of

17  Mr. Shkreli's attempts to control the stock and the reasons

18  why he is doing it to keep the price up.

19          So this is December 28th, 2012 which, again, is

20  right around the same time as that liquidation email.  They're

21  very concerned about the success and the ability of Retrophin

22  to survive.  And Mr. Shkreli says at the bottom:  The stock is

23  trading like crazy.  Someone is selling the shit out of it.

24  And the defendant responds:  I don't know, there is no

25  freely-trading stock other than you guys and the 500K that

1   Fearnow has.

2          Remember that 500K, 400 of it is actually being held

3   in escrow, so it's not even being traded.  And there's no

4   freely-trading stock other than you guys.

5          And by that he mean the Fearnow shares.  And he

6   knows that the purposes of giving it to Martin Shkreli's

7   associates is that Martin Shkreli can control it.  And they're

8   surprised because some one is, quote, selling the shit out of

9   it and it's not -- they think they know kind of who has it and

10  what they're doing with the stock.

11         And Mr. Shkreli in response says:  Uh-huh.  And then

12  the defendant says:  I'm going to confer with the transfer

13  agent that there's no other freely-trading stock.

14         And we heard during Amy Merrill's testimony, which

15  is Government Exhibit 115-51, that the defendant, in fact, on

16  that same day reached out to Amy Merrill and asked for the

17  float.  And the float is the amount of free-trading stock for

18  any particular company.

19         And you can see she wrote out is 2.51 --

20  2.5 million.  They're about 19,000 additional shares and there

21  were some Desert Gateway legacy shares kind of hanging out

22  there.  But she's confirming that other than those 2.5 million

23  free trading they know about and they think they know what's

24  going on with them, there is a very, very small number of

25  additional shares out there.  So this is the defendant

1   confirming that information.

2            And then in the next line, this is Government

3   Exhibit 504, going back to Mr. Shkreli and you can see the

4   bottom email is actually the defendant in the Standard

5   Registrar email that then gets forwarded to Mr. Shkreli.  And

6   the defendant says:  FYI.  And then Mr. Shkreli says:

7   Amazing, someone shorted 60K in the last two days.  And then

8   the defendant's response in red there is:  How will they

9   cover?

10           And this is really significant.  If you remember Deb

11  Oremland talked about short selling.  And she was using the

12  analogy with the umbrellas.  And she said:  If you want to

13  short a stock, which is take a bet that the stock will go down

14  you need to actually have additional shares available to

15  borrow in order to locate them and know that if you --

16  depending on how the bet shakes out, you can get those shares

17  available to cover the short position.

18           And so what the defendant is basically saying is

19  Mr. Shkreli is saying there's 60,000 shares that have been

20  shorted, and the defendant is saying:  How will they cover:

21  Who is out there making shares available to actually use for

22  theses short trades.  And so this is -- this response how will

23  they cover?  Shows that, again, they think they have a handle

24  on what's going on with all of the free-trading shares, the

25  same as the prior email.

1           And Mr. Shkreli's response is:  I think it might be

2     Tim selling.  And, again, there's there concern that

3     somebody's not going along with the plan.  They're taking

4     their shares and they just selling them like crazy and its

5     affecting the share price.  And we will see when we get to the

6     end of the section, the charts that Deb Oremland did you can

7     see the spike on these days where those -- that enormous

8     amount of selling is going on by Mr. Shkreli.

9           And you know that Mr. Shkreli has decided that it's

10    Tim Pierotti because they have a conversation around the same

11    time where Mr. Shkreli wants him to return the shares.  To

12    stop selling, to stop affecting the Retrophin stock price and

13    to give the shares back to Mr. Shkreli.  And surprised that it

14    was a very contentious phone call and a lot of yelling.  And

15    he refused to actually give the shares back.

16          And so what did the defendant and Mr. Shkreli do

17    next?  Because they haven't been able to kind of force

18    Mr. Pierotti to give the shares back and he's selling them.

19    They want to actually make sure that he can't sell them.  So

20    they hatch a plan to basically provide him with inside

21    information to make him unable to sell.  Because if you have

22    inside information, you can't necessarily trade on the stock

23    depending on what's going on.

24          And so he won't come into the office.  And he won't

25    give the shares back, so what are they going to do?  And so

1   Government Exhibit 507 you heard a lot of testimony about

2   bringing somebody over the wall, which just basically means

3   I'm going to tell you this and once you have that information,

4   insider information, you won't be able to trade for a certain

5   period of time because you have that information.

6           And so Mr. Shkreli's drafts an email that's going to

7   be sent to all the Fearnow share recipients, basically force

8   them to get inside information so they can't trade any more.

9   And they're going to do this to creatively stop Mr. Pierotti

10  from selling because they don't like what he's doing to the

11  shares price.

12          And Mr. Greebel responds to Mr. Shkreli's suggestion

13  saying:  Cory, whether you want defend all or identify who

14  your sending it to.

15          And then the email chain continues and Mr. Shkreli

16  and the defendant debate whether if they send the email this

17  will actually work.  Can you actually bring someone over the

18  wall in an email.  Will Mr. Pierotti read it.  How can we make

19  sure he reads it.  They're kind of planning to make sure that

20  this works.

21          And then Government Exhibit 112-24 is the actual

22  over-the-wall email that gets sent to Mr. Pierotti and all the

23  rest of the Fearnow share recipients.  And in the email

24  Mr. Shkreli says exactly what his concerns are:  I must admit

25  to you all I've been extremely stressed about Retrophin, the

1   declining stock price is particularly alarming.  Please

2   consider that if you deposited your founder stock, will you

3   consider it making unshortable.  So, again, this is this idea

4   that only these people can make it available to trade.

5          As we were contemplating these financings, it is not

6   a good idea for the stock to be declining.  Obviously now that

7   you are over the wall you may not sell any stock until the

8   transactions are completed.

9          So, again, the purpose of this email was to control

10  Tim Pierotti's shares.  And he response to the email and

11  Mr. Mulleady's writes back and doubles down.  And he says:

12  Anyone who can sell is on this email.  Because this email is

13  the Fearnow share recipients.  And he says:  I'd like to

14  mention that the stock is falling on high volume and anyone

15  that can sell it is on this email.  So the four investors that

16  are taking advantage of the recent liquidity to reconfirm

17  their long-term success of Retrophin.  And basically not just

18  go ahead and sell your stock.

19         And you heard Mr. Pierotti's response to the

20  over-the-wall email and he talks about it.  He basically says

21  he had the experience of being brought over the wall and it's

22  worked many times.  It doesn't happen over email.  You don't

23  do it without someone's permission.  It's not something that's

24  done as like a sword to prevent somebody from doing something.

25  You're bringing someone over the wall because you want them to

1    be involved in the transaction and in doing that you ask them

2    if they want that information first.  And that's at transcript

3    page 5980.

4            And as we know, the over-the-wall email itself

5    didn't work because Mr. Pierotti continued to sell.  And so

6    the next step that the defendant and Mr. Shkreli take to try

7    and prevent this is an email that's Government Exhibit 511.

8            Mr. Shkreli sends to Mr. Greebel this email which is

9    a litigation email that he's drafting to send to Mr. Pierotti

10   and he's checking out what the defendant thinks of it first.

11           And Mr. Shkreli writes:  Hi, Tim.  I decided to

12   commence litigation against you for failing to honor the

13   agreement we made in our office on December 10th.  You agreed

14   to work for MSMB, growing and managing its investments and

15   engaging with me on new opportunities.  Instead, you have

16   failed to come to the office and will not even return my phone

17   calls.  This is classic cut bait fraud.

18           And then Mr. Shkreli's suggesting that the agreement

19   was that Mr. Pierotti would receive the shares in return for

20   working, and you can see it very clearly here, "MSMB."

21           At this point we know that Mr. Pierotti had stopped

22   working for MSMB Consumer and for Retrophin and was doing

23   these side projects.  The purchase agreement that he had,

24   which we will see was with Troy Fearnow, it was not an

25   agreement with Mr. Shkreli.  There was nothing in that written

Summation - Ms. Smith                    10354

1   agreement that suggested that he would be working in return

2   for receiving the shares.

3           And the defendant's response that same day is:  Very

4   risky, given your agreement was.  Could be opening a much

5   bigger can of worms.

6           And so the concern that the defendant is expressing

7   is if you go after Mr. Pierotti, you will be opening up a much

8   bigger can of worms.  This whole scheme might actually come to

9   light.  And you don't actually have any control over

10  Mr. Pierotti because he purchased those shares through that

11  agreement and you should maybe think about whether this is a

12  good idea before you move forward.

13          And the top email on this chain which isn't on the

14  screen here is Mr. Shkreli asking the defendant to call him.

15  And that's on January 2nd.

16          And that same day after Mr. Shkreli asks the

17  defendant to call him, he goes ahead, and this is Government

18  Exhibit 112-25, and sends the email to Mr. Pierotti, the

19  litigation email.  It has a little bit of a different language

20  in it.  So instead of saying you agreed to work for MSMB,

21  which is the first draft.  It says you agreed to work for me.

22          And we'll see when we get to the litigation that

23  changes again.  So originally it was you agreed to work for

24  MSMB.  Then it was agreed work for me.  And when we get to the

25  litigation, they claim he agreed to work for Retrophin.  So

1    that story changes multiple times over the course of the

2    spring, and it's not consistent with what actually happened in

3    December.

4            The next thing that happens is after the litigation

5    email is sent, there was testimony, and you'll see it in this

6    letter that Mr. Pierotti had told Mr. Biestek where he had

7    actually put his shares in some sort of small brokerage.  And

8    then Mr. Shkreli got that information from someone, but

9    Mr. Pierotti had only given it to Mr. Biestek, and actually

10   called the brokerage house and froze the brokerage account.

11   And it took Mr. Pierotti the entire month of January to get

12   his shares out and put them somewhere else.

13           And so you'll see that in the chart as well.  When

14   the over the wall didn't work, and the litigation email didn't

15   work, Mr. Shkreli actually went and tried to freeze the shares

16   at the actual brokerage account.

17           What happens next after that is that at Government

18   Exhibit 112-27, Mr. Shkreli threatened Mr. Pierotti's wife to

19   get him to return the free-trading shares.  And we saw that

20   letter, which is postmarked January 15th, 2013.

21           And we also know that Mr. Shkreli had a conversation

22   with the defendant around the same time where he said:  I have

23   a funny Tim update for you.  So the defendant and Mr. Shkreli

24   are discussing the steps that Mr. Shkreli is taking with

25   respect to Mr. Pierotti at the very same time that he is

1   sending this threatening letter.

2           And the letter itself, as you remember, talked about

3   freezing Mr. Pierotti's stock account in the brokerage firm.

4   That he's a very determined person.  That he was going to get

5   the shares back.  He talks about making Mr. Pierotti's wife

6   and his four children homeless.  It's a long letter and it's

7   very clear that he's intent at all costs on controlling the

8   shares and having them returned to him.

9           And then the defendant gets involved in negotiating

10  with Mr. Pierotti to try and get the shares back.  And this is

11  an email that's sent by the defendant, February 14th, 2013,

12  and it includes the following language which is that they're

13  discussion what the proposal for how much money is Mr. Shkreli

14  going to give Mr. Pierotti for his shares.  And he says in the

15  second sentence:  You either currently own or are entitled to

16  50,000 shares held by Fearnow.  And those are the 50,000

17  shares that were supposed to be for Mr. Pierotti that were

18  being held in escrow.

19          And at the last sentence he also says:  As for the

20  Fearnow stock, the company wants that assigned to it and the

21  company will deal with Fearnow.

22          And so this is clear evidence that the defendant is

23  assisting Mr. Shkreli in trying to control the shares.

24  Because the first agreement the defendant himself drafted, as

25  we can see, is between Mr. Troy Fearnow and Mr. Pierotti.  And

Mr. Shkreli is not anywhere in this agreement. And so the idea that the defendant is saying you don't have any title to those 50,000 shares is completely contradicted by the purchase agreement that he himself drafted.

The other thing in Mr. -- in the defendant's email is that the Fearnow stocks the company wants that assigned to and the company will deal with Fearnow. As we will see when those shares actually get redistributed at the end in connection with the Pierotti agreement, they go back to Mr. Shkreli, they don't go back to the company.

And there are a couple additional communications between the defendant and Mr. Pierotti around the same time. And Mr. Pierotti in Government Exhibit 518 is responding to Mr. Greebel's email. And in this email, as we saw before, he cuts and pastes portions of that threatening letter that Mr. Shkreli sent him in the email and sends it to the defendant.

And Mr. Pierotti testified, and you can see it as part of the email chain that the defendant didn't ask about the letter, didn't seem concerned about, it didn't seem surprised. And, you know, when he forwards the response to Mr. Shkreli, he doesn't say what are you talking about with the threats?

The threats are important because those are never disclosed to the board. The story that gets told to the

Summation - Ms. Smith                     10358

1   board, as we'll see in a minute about the Pierotti litigation,

2   is completely different than what actually happened, and

3   they're not disclosed to anybody else at Retrophin, and

4   they're not disclosed to the Katten partner that ultimately

5   winds working on the Tim Pierotti litigation.  If you

6   remember, Howard Cotton testified that he didn't learn about

7   the threat until January 2014 and this is in February 2013.

8           And then the final email in that chain that I just

9   want to show you is in this negotiation Mr. Shkreli is telling

10  the defendant what he is willing to offer to Mr. Pierotti.

11  And one of the things he offers is zero restitution

12  permanently and I will stay away from him and his family.

13          So he is suggesting that one of the things he can

14  offer Mr. Pierotti that he will not harass him or harass his

15  family.  And the defendant says that he'll counter with what

16  he wrote.

17          So this is the defendant doing Mr. Shkreli's dirty

18  work with respect to the shares.  And then Mr. Shkreli said:

19  It was very important we get personal and say exactly what I

20  wrote.

21          And as we know from Mr. Pierotti's testimony, these

22  negotiations don't work out.  And the defendant and

23  Mr. Shkreli have Retrophin actually sue Mr. Pierotti to get

24  the shares back.  So none of these other steps work, they sue

25  Mr. Pierotti and they go forward with the lawsuit based on

1   Mr. Shkreli's representations and representations made by the

2   other coconspirators who received Fearnow shares.

3          And we know that towards the end of the litigation,

4   Mr. Pierotti was actually trying to get his remaining escrow

5   Fearnow shares out, and both the defendant and Mr. Shkreli

6   prevented him from doing that.  So that's testimony at

7   transcript 6029.

8          And then at Government Exhibit 115-48, the

9   defendant's communicating directly with the transfer agent and

10  is saying to put a hold not only on Mr. Pierotti's Fearnow

11  shares but all the remaining Fearnow shares.  And we're going

12  to see all those emails where they're controlling and

13  directing the Fearnow shares at different points.  So this is

14  a clear example of the defendant and Mr. Shkreli controlling

15  those shares, which according to the purchase agreement have

16  actually been owned by other people.

17         And then finally, ultimately, Mr. Pierotti resolved

18  the litigation with Retrophin and transfers those 50,000

19  Fearnow shares to Mr. Shkreli, not to the company.  And you

20  remember how Cotton testified that he didn't know why those

21  shares went to Mr. Shkreli personally instead of back to

22  Retrophin.

23         And if we look at Mr. Richardson's testimony about

24  what Mr. Shkreli said about the Pierotti litigation, we know

25  Mr. Shkreli was not honest with the board about what had

1   happened.

2          Then Mr. Shkreli gave an update basically saying

3   that he had given his own shares to Mr. Pierotti because

4   Mr. Pierotti had fallen on hard times and then Mr. Pierotti

5   refused to give them back, and that's what the lawsuit was

6   about.

7          And then you see at Government Exhibit 286, these

8   are actually some of the board minutes that were drafted by

9   the defendant.  It's Government Exhibit 286 and they were

10  provided to Ms. Valeur-Jensen only in September 2014 after

11  multiple requests, and they never went to Mr. Richardson or

12  anybody else to approve.

13         But what the defendant wrote about the meeting was

14  that Mr. Shkreli advised that the stock, the 50,000 shares was

15  originally Mr. Shkreli's and that Mr. Pierotti made promises

16  to him which caused him to transfer the stock to Mr. Pierotti.

17         And we know that those Fearnow shares were actually

18  purchased directly by Mr. Pierotti, they never were

19  Mr. Shkreli's.  If they were anybody's to begin with, they

20  were Retrophin's.  And so this is what's being said at the

21  board meeting by Mr. Shkreli, and the defendant doesn't

22  correct him, doesn't provide the accurate information about

23  what happened.

24         And so that is the Tim Pierotti story and the

25  clearest evidence of the defendant's knowledge, intent --

1    knowledge of the plan and intent to perpetuate and to help

2    control the price and trading volume of Retrophin stock.

3              The other evidence, in addition to what you've seen,

4    are the emails where the defendant and Mr. Shkreli are moving

5    around the Fearnow shares that were in escrow.

6              So we looked at this slide in the beginning,

7    Government Exhibit 479, but originally they decided how many

8    shares everyone would get, and then they held back a portion

9    from everybody until that second payment was made for the

10   additional second payment for the shell.

11             And we can see that that shell payment gets made in

12   Government Exhibit 910-E in February of 2013.

13             And we also know that the defendant described that

14   share -- that shell payment as a payment to a consultant

15   related to a reverse merger instead of as a payment for the

16   shell itself.

17             And then as a result of paying that original

18   payment, they get access to those escrow shares.  And remember

19   they have been working to control all the Fearnow shares that

20   were in escrow that were available to freely trade before.

21             And so what you saw, particularly through the

22   testimony of Agent Delgado, is a series of emails where the

23   defendant and Mr. Shkreli are talking about the exercise and

24   control over the shares and how they're going to move them

25   around for Mr. Shkreli's benefit.  And this is Government

1    Exhibit 542.

2         And they're showing the sources of the Fearnow

3    shares; TF and MB, RT.  And you heard Mr. Delgado testify that

4    the Tom Fernandez, Marek Biestek, Ron Tilles, these are all

5    the different people whose names -- in the names they were

6    held and here they are going to get used.  So LR is Lindsay

7    Rosenwald.  They're basically moving these shares around for

8    Mr. Shkreli's benefit.

9         And in Government Exhibit 542, the defendant is

10   discussing the concerns that he has with some of these shares,

11   and he talks about something called the Pierotti problem,

12   which is at the bottom of the email here, which is the email

13   at 5:22 p.m.  His concern is that, you know, because they

14   should set this up so that these are agreements between Troy

15   Fearnow and whoever purchased the stock, that if they don't

16   agree to go along with the plan that they set up in the

17   beginning, then they're going to have a Pierotti problem,

18   which is when someone goes rogue and they take their shares

19   and they don't let Mr. Shkreli control them.

20        So a lot of this is discussing what's the best way

21   to move these shares so we don't wind up in a situation where

22   someone doesn't go along with what we want.  And Mr. Shkreli

23   says in response:  If that's to happen with anonymous and the

24   five people doing it don't know exactly where it's going.

25        So they're trying to move all these shares around

1   with the least amount of information given to the people who

2   held them on the hopes that they're just going to continue to

3   go along with the plan.

4           And you can see that there are a bunch of these

5   emails.  I'm not going to walk through all the details of each

6   one.  But farther up in the same email of Government

7   Exhibit 522 they refer to the purchasers of the Fearnow shares

8   as the purchasers in quotes.

9           And then there's additional discussions, for

10  example, Government Exhibit 543 about how to figure out how to

11  get the shares to other people; worrying about Fearnow risk,

12  which is the same idea as the Pierotti problem if someone

13  doesn't go along.

14          Government Exhibit 544, further discussions where

15  Mr. Shkreli says to the defendant that everybody will do as

16  directed.

17          And then Government Exhibit 579, is talking again

18  about how the different shares will be allocated, and you can

19  see that some go to the Rosenwald settlement, some go to

20  Kocher, many of them go back to Mr. Shkreli himself at some

21  point.

22          And all of these movements are discussed by the

23  defendant and Mr. Shkreli at the time and he decides what they

24  need them for, what they need them to do, and everybody else

25  goes along with them.

1          And the defendant is involved in papering this.

2     There are agreements that are signed for the shares transfer.

3     But as you can see, there's an assumption that everybody's

4     going to do as directed.

5          And then this is the last example, Government

6     Exhibit 650, talks about what's left of the Fearnow stock.

7     They're talking about in December of 2013.  They talk about

8     how Mr. Kocher got a certain number of shares from Mr. Vaino's

9     portion.  Lindsay Rosenwald got shares.  Who still has stock

10    available.  Who's still left in the piggy bank that we can

11    move their stock around.

12         And so these emails again show Mr. Shkreli

13    exercising control over the stock and control that is not

14    disclosed in the 13B, and control that was designed to make

15    sure the price and volume of Retrophin stock will be at a

16    certain point.

17         And finally, as we talked about before, you know, a

18    conspiracy is an agreement.  There doesn't need to be --

19    sorry, one thing I just want to make sure I make clear.  I

20    apologize.

21         So Government Exhibit 113-17, I said that this is an

22    example of where Mr. Shkreli -- and if I didn't say

23    Mr. Shkreli, I apologize.  Again, 113-17 is the email that

24    Mr. Shkreli sends in connection with Citrin's request.  And

25    there's that long spreadsheet of all of the payments that are

1   going out of Retrophin in the beginning of 2013.

2            And Citrin is asking:  What are all of these

3   payments for?  And there's a column at the end says:  Martin's

4   comments.  And so Mr. Shkreli goes through the spreadsheet and

5   talks about what each payment is for.  And Mr. Greebel is

6   copied as a recipient of that email.  That's Government

7   Exhibit 113-17.

8            And Mr. Shkreli describes in that email that

9   Mr. Greebel received that the payment to Heskett, Rachale, is

10  for, quote, a consultant-related reverse merger.  So if I

11  misspoke about who sent and received that email I apologize.

12           So just turning to the last section, which is,

13  again, because it's a conspiracy, you don't need to show

14  success.  So the plan to do this is enough to commit the

15  crime.  But, in fact, as we saw from looking at the actual

16  trading records, there's evidence that the plan was

17  successful.

18           And we talked about Ms. Oremland, which is

19  Government Exhibit 992, this is the chart of the trading

20  volume and stock for Retrophin for the entire period from the

21  reverse merger to September 30th, 2014, which is the date on

22  which Mr. Shkreli was removed from Retrophin.

23           And you can see that in the very beginning the

24  volume is the blue at the bottom and the red is the stock

25  price.  And you can see that until they uplist on NASDAQ in

1    2014 the volume is very, very low.

2         And the Deb Oremland had a second chart, which is

3    Government Exhibit 995.  And this is the chart I was

4    mentioning a little bit earlier.  So this the key time period

5    where it's important to make sure that the price of Retrophin

6    stays stable, because this is -- until they get the money for

7    the pipe and can ensure that Retrophin is actually a

8    successful company, they need to make sure that the price

9    isn't greater.

10        And remember I told you that you can see on this

11   chart Mr. Pierotti's sales and the point at which they were

12   worried about Pierotti's selling and wondering who would be

13   selling because they know everybody who's has free-trading

14   stock and how they were able to short the stock.

15        So if you look at those two big spikes there, and

16   the purple is Mr. Pierotti.  You can see that there was an

17   incredible amount of stock he was selling on those two days,

18   which is what tipped the defendant and Mr. Shkreli off to the

19   fact that he wasn't following the plan and he went ahead and

20   just sold massive amounts of his own stock.

21        And you can see that otherwise the amount of trading

22   by the Fearnow share recipients is very, very low during that

23   period.  And, in fact, many of them didn't trade at all.  And

24   we heard from Ms. Oremland that the affect on price if there

25   are fewer shares available to trade, is that there's more of a

Summation - Ms. Smith                          10367

1    chance that the price would remain stable.

2          And so she was asked:  Is it beneficial for

3    controlling shareholders to limit of amount of shares

4    available for sale?  And she said, "Yes."  And she explained

5    that because then you have a less likelihood that the share

6    price can decline if there's too much stock on the market.

7          And then finally you also heard from the defendant's

8    expert, Mr. Lewis, saying that if a group of investors wanted

9    to prevent the price of a stock from dropping, what would you

10   expect them to do?  I would expect them to buy the stock or

11   hold it.

12         And that's what they were trying to do and that's

13   why they were so upset that Mr. Pierotti was selling in such a

14   large quantities without consulting with Mr. Shkreli and not

15   in accordance with the agreement that they reached.

16         And Mr. Lewis also testified that they if wanted to

17   keep the price stable, they wouldn't sell the stock or not buy

18   it and it might not transact at all.

19         And so that is the evidence for Count Two.  And as I

20   submit that it's overwhelming evidence of, again, the

21   defendant's knowledge to knowingly and intentionally join the

22   conspiracy, and the existence of the conspiracy with

23   Mr. Shkreli and others to control the price and trading volume

24   of Retrophin stock.

25         With this conspiracy, as I told you, there's the

1   additional requirement of the overt act.  And we have listed

2   them out here.  You'll see in the jury instructions that there

3   are a list of specific acts that are taken.  They all

4   correspond to a document or email that is in evidence.  And

5   I'll just give you two examples.

6           Overt act D is Government Exhibit 503.  And it's

7   just the defendant sending the draft 13D to Mr. Shkreli.

8           And then overt act K is Government Exhibit 579, and

9   it was an email that they were discussing how they whether

10  going to move Fearnow stock to accomplish some of the

11  settlement agreements.

12          And Mr. Shkreli says in response to Mr. Greebel's

13  question:  Take from anyone, I don't care.  Do the math.  And

14  that's a really, really clear example of how he's exercising

15  control over these shares because you can take them from

16  anyone, anyone in this group.

17          As with the first conspiracy, we've also

18  demonstrated clearly there were coconspirators, clearly the

19  defendant and Mr. Shkreli, but also the other individuals who

20  had Fearnow stock and allowed it to be controlled by

21  Mr. Shkreli, including Mr. Fernandez, Mr. Mulleady, Mr. Vaino,

22  Mr. Tilles, and Mr. Sullivan.

23          And, again, on the venue point that there had to be

24  act in the Eastern District of New York, we know that the

25  Fearnow shares themselves were distributed to at least two

1    people in Brooklyn.

2          And then finally, in addition to all of the other

3    overwhelming evidence you've seen so far, there are a couple

4    of additional pieces of evidence that I want you to think

5    about with respect to both Counts One and Count Two.  And this

6    is evidence that helps, in addition, answer the two questions:

7    Why would the defendant do what he did.  And how do you know

8    that he acted with the intent to defraud.

9          And as we said all along, the motive was money, and

10   we're going to walk through that evidence.  And we've also

11   said all along that you know he acted with the intent to

12   defraud because every time he was given the opportunity to

13   choose between helping his client, Retrophin, and Mr. Shkreli,

14   he chose Mr. Shkreli.

15         And so on the question of salary.  There was a lot

16   of testimony from Mr. Silverman and then all the Katten

17   attorneys about how an income partner's salary is calculated

18   and there's all these factors that are considered.

19   Mr. Silverman said it was a holistic calculation.

20         But the truth of the matter is he also said that

21   realization rate is really important.  And realization rate,

22   as you heard, is you're going to bill a bunch time but those

23   people actually have to pay it.  Because if they don't pay it,

24   the law firm doesn't get any money, and you don't get any

25   credit for bringing in business when the people aren't paying.

Summation - Ms. Smith                    10370

1          And we can see that in these whole hard numbers for

2    the defendant.  For fiscal year 2013, and if you remember the

3    fiscal year goes through January 2013.  And so fiscal year

4    2013 through January 2013.  The defendant's salary was

5    $355,000.  And the Retrophin realization rate was only

6    65 percent.

7          In fiscal year 2014, the defendant's salary was

8    $900,000.  And that's because the Retrophin realization rate

9    was 101 percent.

10         And then in fiscal year 2015, after the defendant

11   was removed from his position as CEO, the defendant's salary

12   went back down to $423,000 and the realization rate for

13   Retrophin was 34 percent.

14         So it's very clear that Retrophin was the key driver

15   of the defendant's salary.  And you heard this from

16   Mr. Silverman that the increase to the $900,000 was because of

17   Retrophin, and the decrease was because of Retrophin stopped

18   paying.

19         And we also know that the defendant's rank within

20   the firm changed.  When he was making the 350,000, he was

21   ranked somewhere in the middle of all the income partners.  By

22   the time he was making $900,000, he was the number one income

23   partner of Katten in the entire country.

24              (Continued on next page.)

25

1          MS. SMITH:  We talked about the outstanding bills
2     at the end of 2012.  I wanted to lay them out for you.  You
3     can see in September, November, December, Retrophin owes in
4     excess of $600,000 to Katten for legal bills, that's in
5     addition to any legal bills racked up as the defendant is
6     working on things like the reverse merger.  So this was a
7     really significant driver for the defendant.  You can see
8     that in all of the e-mails that he's exchanging with
9     Mr. Shkreli about needing to get paid.  If we look at the
10    amounts that were paid to Katten in total $6.3 million.
11    Prior to October 2012, it was about $830,000.  And after
12    November 2012 it was about $5.6 million.  There was an
13    incredible incentive to make sure that Retrophin stayed a
14    viable client and continued to pay.
15          It wasn't just the work that the defendant was
16    doing, as we heard.  He brought in work for other partners,
17    which generated business for the company, which increased the
18    amount of billings when he was able to collect on them.  The
19    realization was high.  It resulted in a higher salary for him.
20    And not just a higher salary, but a salary almost three times
21    what he was making before.  And in fact, the highest salary
22    for his type of partner in his firm.
23          Government's Exhibit 514 is just an example of some
24    of the bills that in that time period, late 2012 January 2013,
25    the defendant is hounding Mr. Shkreli over and over and over

Summation - Ms. Smith                              10372

1  to get the bills paid.  That's right at the time of the

2  creation of the MSMB Capital interest, it's at the time of the

3  Fearnow share distribution, and the attempt to keep Retrophin

4  afloat, right before the settlement agreements start.

5          Then in terms of additional knowledge of the

6  defendant -- additional evidence of the defendant's knowledge

7  and intent.  Again, think about every time there is a decision

8  between his client, to who he owes a duty, and Mr. Shkreli he

9  chooses Mr. Shkreli.  It is clear that he and Mr. Shkreli are

10  involved in discussing and figuring out ways in which to get

11  things done for Mr. Shkreli that are not to the benefit of

12  Retrophin.

13          There is this discussion in Government's Exhibit

14  535, if you remember during Mr. Massella's testimony, that he

15  was asking about what the employment agreement was for

16  Mr. Shkreli, if it was $250,000, because he's looking at some

17  of the cash payments that are going out to Mr. Shkreli.  And

18  if you remember this e-mail, the defendant forwards to

19  Mr. Shkreli and says, "Tell him it's a misprint or something

20  else."  By misprint he's talking about the $250,000 salary.

21          In response Mr. Shkreli says, "It's a misprint."

22  The defendant says okay.  So they are discussing here how to

23  go back and suggest that Mr. Shkreli's salary should be higher

24  than what it was reported as.  And if you can see, it is

25  defendant who suggests that the $250,000 is a misprint.

Summation - Ms. Smith                    10373

1            If you remember from Mr. Massella, this is

2    Government's Exhibit 537, further down in the chain,

3    Mr. Massella says, "We disclosed the $250,000 as a salary all

4    over the place.  If it was a misprint we're going to have to

5    restate all of our financials."  The defendant and Mr. Shkreli

6    have an additional conversation about what they can do to

7    avoid the restatement but make sure that Mr. Shkreli gets paid

8    more money.  There is a discussion about reviewing his

9    employment agreement, what they can do to date it to a certain

10   point, make it retroactive, get him a one-time bonus.

11           The other thing I want to you remember is the SEC

12   investigation.  As there was testimony, Mr. Richardson didn't

13   learn about it until January 2014.  So again, not only is he

14   not told about the settlement agreement and consulting

15   agreements, and the true purpose, but he's not told that the

16   SEC is looking into the hedge funds.  You know that's in part

17   because Mr. Richardson didn't invest in MSMB Capital

18   originally.

19           And then in the spring of 2014 Mr. Shkreli asked

20   Mr. Richardson to go talk to the SEC.  Mr. Shkreli tells

21   Mr. Richardson that SEC investigation is based on disgruntled

22   employees.  Mr. Richardson goes to the defendant to check with

23   him before he goes to give his testimony.  The defendant says

24   in this discussion that they have that his understanding of

25   what the SEC complaint was about and he said very similar to

1    what Mr. Shkreli had said, this was likely a disgruntled

2    employee that had filed a complaint.  Mr. Greebel felt it

3    would be very useful for me and one or two MSMB investors to

4    go along.

5            You know that this isn't accurate information.  You

6    know that the defendant knew that Darren Blanton, Mr. Shkreli

7    suspected that Darren Blanton, who was an angry MSMB investor,

8    had been the one that complained.  And you also knew that in

9    the discussions that he had with the defendant and Rosensaft

10   that there were angry investors.  You also know from

11   Mr. Rosensaft, that the defendant never told Mr. Rosensaft

12   that he discussed with Mr. Richardson going in to talk to the

13   SEC.  And in fact, that he didn't have any memory that

14   Mr. Richardson had talked to the SEC during the time of the

15   SEC investigation.  So the defendant is withholding from the

16   individual dealing with the SEC investigation the fact that he

17   talked to Mr. Richardson about his SEC interview.

18           Then you remember Mr. Richardson testified that when

19   he went in and talked to the SEC he was very surprised and

20   upset because Retrophin came up a number of times.  Although

21   the SEC said that the focus of their investigation wasn't

22   Retrophin, they asked him a lot of questions about how

23   Retrophin had been valued, they asked about the Valeant deal,

24   they asked a number of questions about Retrophin.  When

25   Mr. Richardson came out he was very angry and went back to the

Summation - Ms. Smith                    10375

1   defendant and he said, why didn't you tell me they were going

2   to ask about Retrophin?  That's the whole reason I came to you

3   in the first place.  And the defendant said, that surprises

4   me, I didn't expect Retrophin to be mentioned at all.

5           Remember that Mr. Richardson went in to talk to the

6   SEC in March of 2014.  You heard from Mr. Rosensaft that

7   Retrophin had received a subpoena for the SEC investigation in

8   November of 2013, so five months earlier.  You know from the

9   bank records -- the time records that that subpoena requested

10  information from Retrophin related to Valeant and the

11  valuation of Retrophin's assets in the MSMB entities.  And you

12  know from the time records that Mr. Greebel was involved in

13  gathering and forwarding documents to people working on the

14  SEC investigations on those topics.

15          So while the focus of the SEC investigation may not

16  have been Retrophin, there is no question that the defendant

17  understood that they had been asking about Retrophin related

18  to the Valeant deal and valuation, the exact things that came

19  up in Mr. Richardson's interview.  And yet he expressed to

20  Mr. Richardson that he was surprised that Retrophin had come

21  up.  Again this conversation and the fact that Mr. Richardson

22  went in was never communicated to Mr. Rosensaft.

23          Also I want to talk to about the SEC indemnification

24  bill.  If you remember, Mr. Richardson was asked whether the

25  Board ever agreed to indemnify or pay for Mr. Shkreli's legal

1    bills in connection with the SEC investigation.  So obviously

2    when Katten is going to work on that investigation they bill

3    for it.  And if you remember from Mr. Rosensaft, they were

4    originally were billing to MSMB Capital, that was the client.

5    Then at some point, the defendant said I'm going to move your

6    time around.  And Mr. Rosensaft didn't pay a lot of attention.

7    At that point his salary wasn't contingent on the realization

8    rates.  You know that Mr. Richardson said the Board never

9    agreed to indemnify Mr. Shkreli.

10              You heard from Mr. Rosensaft there was this

11   conversation in the spring of 2014.  During that conversation

12   which was with the defendant and Mr. Shkreli, Mr. Rosensaft

13   thought the bill for the indemnification for the SEC

14   investigation had already gone out.  He was told during that

15   discussion that the bill had not been paid.  He was told that

16   the Board had agreed to pay the bill, so agreed to indemnify

17   Mr. Shkreli for those costs, but they just hadn't gotten

18   around to formally approving the bill.

19              That was statements that were made by Mr. Shkreli

20   with the defendant in the room, and the defendant did not

21   correct him.  Keep in mind the defendant is at every Board

22   meeting, so the defendant would know if the Board had agreed

23   to pay an indemnification bill.

24              Mr. Rosensaft is surprised and a little upset that

25   the bill hasn't been paid.  He asks the defendant about it

1   again later on in 2014, and the defendant says again that they

2   just hasn't gotten around to approving it.

3        We know that the indemnification bill did not go

4   out.  We know what happened from the testimony of

5   Ms. Marsilio.  These are the prebills, Government's Exhibit

6   1271 and 1272.  The time for the SEC investigation which

7   amounted to about $200,000 in billing, was sitting in the

8   prebill.  So it wasn't going out in the general bills to

9   Retrophin, it was sitting at Katten in the one area.  It was

10  originally classified under the project Candlestick.  Then

11  reclassified in September under an SEC indemnification matter.

12       And when does the defendant open the SEC

13  indemnification matter?  He opens it on September 29, 2014.

14  What is the significance of that date?  That is the date that

15  Mr. Richardson and Mr. Aselage go into Mr. Shkreli's office

16  and say we're going to remove you as CEO because we don't

17  think that it's a good position for you anymore.  There is a

18  Board meeting tomorrow on September 30, we're going to make it

19  formal then.  That is the day on which the defendant opens up

20  the SEC indemnification matter for the first time and moved

21  all the time over into that matter.

22       Then we can see on December -- September 30, 2013,

23  which is Defense Exhibit 106-41, the defendant then sends that

24  bill, which is now that time is moved over into this new bill,

25  he sends to Mr. Shkreli's AOL account.  Not to his Retrophin

1    account, to his AOL account, his personal account.  He knows

2    that the Mr. Shkreli has been removed.  It hasn't been

3    formalized because the Board is meeting on September 30, but

4    he had this conversation and he knows that is what is

5    happening.

6              It's significant because Retrophin, as you can see

7    from the billing records is paying millions of dollars to

8    Katten.  At this point a $200,000 bill is not, in the scope of

9    that, a tremendous amount of money.  The reason that bill

10   isn't sent out isn't because of the money, it's because of

11   what the bill is for.  It's for the SEC investigation.  And

12   the defendant does not want to send it to Retrophin and risk

13   having information about the SEC investigation be something

14   that people are looking at.  So he holds that bill.  He

15   doesn't have it paid.  And then when he knows that Mr. Shkreli

16   is being removed, sends it directly to Mr. Shkreli.

17             This leads us into his other actions on the

18   September 29 and September 30.  These are again clear examples

19   of the defendant choosing to work for Mr. Shkreli and not for

20   Retrophin, his client.  You can see on September 29, again

21   2014, which is Government's Exhibit 676, that the defendant

22   sends again to Mr. Shkreli's AOL account, his personal

23   account, a document, the document that he sends is a draft of

24   a written consent for majority of stockholders to remove

25   directors, "I'm available to discuss tonight and also

1    reviewing your EA," or employment agreement, "tonight."  Then

2    attaches a written consent of shareholders to remove the Board

3    of Board of Directors.

4         So by September 29, 2014, for a variety of reasons

5    the Board is done with Mr. Shkreli and no longer thinks he can

6    serve as CEO.  Retrophin, the company, is Mr. Greebel's

7    client.  The defendant's client is the company.  When the

8    company decides to remove Mr. Shkreli as CEO, what does he do?

9    He helps Mr. Shkreli draft a consent that he can use and get

10   enough shareholders to remove the Board.  He's helping

11   Mr. Shkreli act against the current Board of Directors in

12   order to ensure that Mr. Shkreli stays as CEO because

13   Mr. Shkreli is his meal ticket.  Mr. Shkreli is his

14   connection.

15        We know at this point that Meg Valeur-Jensen has

16   been hired.  That Katten is -- there is a concern about

17   whether Katten is going to continue to do the same amount of

18   work.  He wants to keep Mr. Shkreli in as CEO.  There are a

19   couple of other e-mails in the same time period.

20        Government's Exhibit 686 is a series of e-mails on

21   September 30, where Mr. Shkreli is asking the defendant to

22   register new pharmaceutical companies for him.  And then they

23   are also discussing the defendant -- excuse me, Mr. Shkreli's

24   employment agreement.

25        You heard a lot of testimony about the employment

1   agreement, that it had this clause, this termination clause,

2   that only allowed Mr. Shkreli to be removed if he was

3   convicted of a felony. You heard from Mr. Aselage's testimony

4   and Mr. Richardson's testimony that was an unusual clause,

5   something they didn't expect to see. You know that the

6   defendant is the one who circulated the agreement. And that

7   the Board signed off on the employment agreement, but they had

8   not been focused by the defendant or anybody else on that

9   termination provision.

10          So we can see in Government's Exhibit 686 that the

11  defendant is the using that termination provision to tell

12  Mr. Shkreli that he can fight his removal as CEO because he

13  hasn't been convicted of a felony, so he can't be removed.

14          That's advice that he's giving him on September 30,

15  in addition to the advice that he's giving him on how to

16  remove the Board. And the help that he's giving him in

17  creating these new pharmaceutical companies.

18          We know that Mr. Shkreli takes that advice in

19  Government 290. He turns around, tells the Board you can't

20  terminate my employment according to the EA. And he provides

21  the same link to the publicly available version for the EA

22  that the defendant had sent him earlier.

23          Then finally we can see Government's Exhibit 290

24  that Mr. Aselage at the bottom writes to the defendant and

25  Mr. Shkreli and is saying to Mr. Shkreli that, "You have been

1    placed on leave.  You have no more authority as CEO."  This is

2    October 4.  He says, "Mr. Greebel, you're on very dangerous

3    ground if you hope to continue to practice law.  Suggest you

4    take a deep breath and think about where you were going with

5    Martin."  The defendant writes back, he takes Mr. Shkreli off

6    the e-mail.  He says, "Steve, I have not advised Martin of

7    anything."  Which we know is not true.  Because we just saw

8    all of the e-mails where he provides the advice of the

9    employment agreement, how to remove the Board of Directors,

10   how to set up a new pharmaceutical company.  He says, "I take

11   my ethical obligation seriously.  I'm available to discuss

12   with you."

13           So again this is powerful, powerful evidence that

14   the defendant is operating against the interest of Retrophin.

15   He's operating for Mr. Shkreli.

16           I ask you to keep all of that additional evidence in

17   mind about the defendant's salary, the outstanding bills for

18   Retrophin, the times at which he chose Mr. Shkreli's interest

19   over the company's interest in mind when you think about all

20   of the other overwhelming evidence that we talked about with

21   respect to Count One and Count Two.

22           The evidence that you've seen shows that the

23   defendant agreed to help steal from Retrophin.  And he agreed

24   to help lie to investors about Retrophin stock.  That he did

25   it for the money, for hundreds of thousands of dollars.  It

1    proves beyond a reasonable doubt that the defendant is guilty

2    of both conspiracies.  The defendant offered what nobody else

3    in those two conspiracies could offer, he was trusted to

4    represent Retrophin and he had the legal skills to make what

5    he was doing, and what Mr. Shkreli was doing and the other

6    co-conspirators were doing, legitimate.  But he betrayed that

7    trust and he used to his legal skills to commit crimes.

8              After the defense's summation we'll have the

9    opportunity to come back in front of you again and speak to

10   you a little bit further about the evidence.  At that time

11   we'll ask you to return the only verdict that is supported by

12   the evidence and by your common sense, that is that the

13   defendant is guilty on both counts.  Thank you.

14             THE COURT:  Maybe we'll give the jury a brief

15   afternoon break at this time.  And then can you hear from the

16   defense.  Thank you.  Don't discuss the case.

17             (Jury exits the courtroom.)

18             (Outside the presence of the jury.)

19             THE COURT:  Would the defense like to set up on the

20   podium or wherever you're comfortable.  Mr. Dubin, would you

21   like to use the podium or the mechanical podium?

22             MR. DUBIN:  I think the podium, your Honor.  But I

23   won't stay here the whole time, I'll keep my voice up.

24             THE COURT:  Mr. Dubin, can you let me know how the

25   defense summation is split up?

```
                    Proceedings                  10383
```

 1          MR. DUBIN:  By topic.

 2          THE COURT:  You're going to cover the first half of

 3   it or I just want to find out for purposes of timing because

 4   the court reporters were asking.

 5          MR. BRODSKY:  I think what will happen is, your

 6   Honor, given the time, I think Mr. Dubin will go for the rest

 7   of the time we have for the jury.  We hope he will finish his

 8   part, which should take us through, it will stop short of

 9   probably Count Seven and Eight, but cover other areas.  It

10   will cover the backdating that they allege and some other

11   areas.  And then -- we just didn't think we'd start this late,

12   but that's fine.

13          THE COURT:  We had an hour of argument, as you know,

14   which I thought was resolved.

15          MR. DUBIN:  What time were you stopping today?

16          THE COURT:  5:30 or six.  I'd like to go as far as I

17   can.

18          MR. DUBIN:  I can finish my part.

19          THE COURT:  The instructions, as you know, are

20   74-and-a-half pages.

21          MR. DUBIN:  I can endeavor to finish my part by six.

22          THE COURT:  By six.

23          MR. DUBIN:  Then start fresh with Mr. Brodsky.

24          (Jury enters the courtroom.)

25          THE COURT:  All jurors are present.  If the defense

1    would like to commence, you may do so.

2         MR. DUBIN:  Ladies and gentlemen, Mr. Greebel is an

3    innocent man.  I'll say it again, because it warrants

4    repeating.  He sits there before you today, ladies and

5    gentlemen, an innocent man, wrongly accused of crimes he did

6    not commit.

7         Mr. Brodsky stood up here before you, what must seem

8    like a lifetime ago for many of you, some ten weeks ago, and

9    said the evidence isn't going to show it.  The evidence will

10   be clear that he committed no crime.

11        You sat here day, after day, after day, and isn't

12   that exactly what unfolded before you.  They can stand up here

13   and throw around adjectives, it's overwhelming, the proof is

14   overwhelming.  And theory after theory of what an e-mail

15   meant.  And can you assume this because he said, please call

16   me.  They can do that all day.  It doesn't make it so.

17        You the 12 of you -- the 14 of you -- are the ones

18   that make that determination.  Overwhelming.

19        One thing that we can all agree on is overwhelming,

20   I say to you, I say to all assembled today, one thing that is

21   overwhelming is that this is an innocent man.  At a very

22   minimum, at a very minimum what is overwhelming is that there

23   is a mountain of reasonable doubt, to say the least.

24        Did I hear this correctly, a few minutes ago did the

25   prosecution stand up here and said that Martin Shkreli was

1    this man's meal ticket?  That is absurd, ladies and gentlemen.

2         You heard from Mr. Cotton.  You heard over and over

3    and over again, that Mr. Shkreli was representing the

4    Winklevoss twins of Bitcoin, the Winklevoss twins at the time

5    when that was just taking off.  The Winklevoss twins who

6    successfully sued Facebook.  That a whole book of business

7    from a retiring partner at Katten was being transitioned over

8    to Mr. Greebel.  But Martin Shkreli was his meal ticket?  Just

9    because they say it doesn't make it so.

10        Witness after witness after witness came in this

11   courtroom, took that witness stand, and told you the same

12   thing about Evan Greebel.  That he was at all times diligent,

13   hard-working, always professional.  And that he maintained his

14   professionalism even in the face of insults and being berated

15   over and over and over again by Martin Shkreli.

16        Martin Shkreli, it's clear, one thing the evidence

17   did show is he is many things, they certainly proved that.

18   That he was brilliant.  Their own witnesses said it.  He is a

19   genius, a visionary, quirky would be a kind word, I think.

20        But you know, and you know full well having sat here

21   for the last two-plus months, that he was much more than that.

22   He was deceitful.  He was a liar.  He was someone that lied to

23   Evan Greebel over and over and over again.  I'm going to show

24   you the examples.  He lied to him right from the outset of

25   their relationship.  He was the king of deception.  He lied to

1    investors.  He lied to employees.  He lied to Government

2    regulators.

3              You know from the proof that he was secretive and he

4    was good at lying.  He fooled a lot of people, sophisticated

5    people, successful business men, Schuyler Marshall.  You saw

6    him, he was in here.  You remember him, it was a long time

7    ago.  An impressive guy, a lawyer for many, many years, went

8    into business on his own.  He was fooled.  Sarah Hassan was

9    fooled.  Everyone that got a performance statement was fooled.

10   Impressive individual after impressive individual.

11             And they say that -- and list goes on and on, we

12   could be here for days with the people that he fooled and lied

13   to.  But their position is that Evan Greebel, he should have

14   sussed it out.  He, above all others, should have sussed it

15   out.

16             We're going to show you how absurd that it is.

17   Ladies and gentlemen, you learned from Mr. Rosensaft who came

18   in this courtroom, a former federal prosecutor, Mr. Greebel's

19   colleague at Katten.  You remember, he took the stand.  And I

20   asked him, I said, Mr. Rosensaft, did Martin Shkreli always

21   take your advice?  He said, no, he didn't.

22             Not a single witness in this case, not one, came

23   into in this courtroom and testified that Evan Greebel joined

24   a conspiracy to manipulate or control the shares of Retrophin.

25   That he entered into a conspiracy to commit wire fraud or

1    securities fraud or any type of fraud.  Not a single witness

2    came in this courtroom and testified that they heard Evan say

3    or do anything wrong.  Not a single witness came into this

4    courtroom and said that they saw Evan Greebel do anything

5    wrong, not one.

6            How many times, how many times did you sit here and

7    hear about the misgivings of Martin Shkreli, the lies of

8    Martin Shkreli, the phony performance updates.  There is zero

9    evidence in this record, zero that Evan Greebel knew a thing

10   about those phony performance updated.  There is zero evidence

11   that anyone knew what was unfolding in real time.

12           So you have to ask yourselves, and I respectfully

13   say to you, that it's fair for you to ask yourselves why did

14   they keep on bringing up Martin Shkreli over and over and over

15   again?  And sometimes the reprehensible behavior that he

16   engaged, why?  Why, when witness after witness after witness

17   came in here and said, I had little or no contact with

18   Mr. Greebel.  It wasn't just one.  I don't even have enough

19   room on the slide to show it.  Sarah Hassan, question, "Did

20   you ever have any direct contact with Mr. Greebel?"  Answer,

21   "I don't believe so."  Richard Kocher, "Can you identify Evan

22   Greebel in the courtroom today?"  Answer, "No."  The list went

23   on and on.

24           Very little, if any, contact with Mr. Greebel.  And

25   it didn't stop there.  Jackson Su said it.  Sunil Jain said

Summation - Mr. Dubin                    10388

1  it.  Deb Oremland said it.  Mr. Pierotti.

2          We'll get to Mr. Pierotti soon, Mr. Pierotti.  This

3  is who they bring before you?  This is who they tell you you

4  should trust and believe?  Tim Pierotti, the guy that goes on

5  American Greed and doesn't mention a thing about what he is

6  engaged in regarding the Smuckers transaction at Galleon.

7          All of these people came before you and said we had

8  no contact with Evan Greebel.  We barely dealt with him.  We

9  don't know him.  We can't identify him in the courtroom.

10         So the prosecutor stood up here during their closing

11 they said, well, that's because he was the guy behind the

12 scenes.  He's the guy behinds the scenes.  He was the puppet

13 master.  Ladies and gentlemen, just because they say it

14 doesn't make it so.

15         It seems that the prosecution has an answer for

16 everything when it comes to Mr. Greebel.  No one saw him, no

17 one dealt with him, no one had any interactions with him, no

18 one saw him do or say anything wrong.  So, well, he was the

19 man behind the scenes.

20         Ladies and gentlemen, you heard over and over again,

21 well, Evan Greebel said, please call me, and you know that a

22 conversation followed.  A conversation followed and you can

23 assume this and you should assume that.  That is not what we

24 do here.  We don't assume guilt.  We presume innocence.  I'm

25 going to get to that important concept again soon.  It's at

1    the very bedrock of our Constitution.

2            They came in here over and over again and they said,

3    well, none of us had any contact with Mr. Greebel.  And on top

4    of it, I have no idea what Mr. Shkreli was telling

5    Mr. Greebel.  Same deal.  They have no idea what Mr. Shkreli

6    was saying to Mr. Greebel.  Who knows what Mr. Shkreli said

7    and did?

8            I respectfully ask you, ladies and gentlemen, to ask

9    yourselves then, so why all the evidence about the misgivings

10   and the misdeeds of Martin Shkreli?  Why did they do that?

11   Well, we feel that it's their hope that you will find him

12   guilty by association.  What do I mean by that?

13           I listened very intently and the prosecution who

14   just stood up here and said that the defendant was the CEO of

15   Retrophin.  He was?  He was the CEO of Retrophin?  They mixed

16   them up so many times I lost count.  They are trying to, you

17   know what, it's not even guilt by association, that's not what

18   it is.  That's not what it is, make no mistake about it.

19           Is there any evidence before you that Evan Greebel

20   associated with Martin Shkreli?  They showed you an e-mail

21   where he referenced a Rangers game.  Ah-hah, they are hockey

22   buddies now.  Because he went to a Rangers game with him

23   that's the right-hand man?

24           Ladies and gentlemen, you heard from Evan Greebel's

25   partners at Katten what Evan did is he worked long hours.

1    They told you that.  Do you know his family, one I think knew

2    his wife.  Had you ever gone to dinner with him?  Did you ever

3    associate with him or his family?  No.  The evidence is clear

4    that Evan Greebel kept his work at work, and his personal life

5    at home.  He's got a wife and three children, and that's what

6    he did when he left work every day.  Even if it was late at

7    night, he didn't associate with Martin Shkreli.  What he did

8    was represent him.  So that's what it is.  Guilt by

9    representation.

10          Ladies and gentlemen, the evidence demonstrates that

11   Mr. Greebel worked hard and long hours.  That he did the best

12   job he could do with the information he had.

13          Please, when you are back there deliberating and

14   you're looking at the evidence, it is so important, nothing

15   can be more important, that you don't take the negative

16   inference, you don't look at a document and say, well, it

17   could mean this, which is a negative inference.  Because Evan

18   Greebel had the misfortune of meeting Martin Shkreli and being

19   retained to represent a hedge fund that he ran and a company

20   that he founded.

21          The evidence has demonstrated that Evan Greebel was

22   not Martin Shkreli's personal lawyer.  You recall the

23   beginning of the trial there was a lot of, well, did he say my

24   lawyer or the company's lawyer, the prosecution asked witness

25   after witness that.  Well, was it your impression that he

1    represented Martin Shkreli personally?  And witnesses would

2    say, well, personally, the company, both.  There is no

3    evidence -- did you see a retainer agreement between Martin

4    Shkreli personally and Evan Greebel?  Evan was a corporate

5    lawyer helping funds and companies.  That was his job.

6            This concept of guilt by representation is so

7    dangerous.  It is absolutely illogical, ladies and gentlemen,

8    that someone, that the evidence shows had the dedication that

9    Mr. Greebel did to his work would risk it all for a person,

10   for a person he barely knew, a 20-something-year old kid who's

11   company was a long shot, a lottery ticket at best during the

12   events at issue in this case.

13            (Continued following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. DUBIN:

2           And there was much to be said during the

3    prosecution's closing argument about well, Evan was trying to

4    ascend the ranks of his firm.  Evan was his guy.

5           Ladies and gentlemen, why didn't they tell you or

6    do you recall at the end of the day, they weren't paying

7    their bills?  They were behind hundreds and hundreds of

8    thousands of dollars on their bill.  There is e-mail after

9    e-mail where Evan Greebel is saying you need to catch up, you

10   need to pay us.  And at the end they are stuck, Katten is,

11   with millions of dollars in unpaid bills.  That is his meal

12   ticket?  It makes no sense.  It is illogical.  His lack of

13   motive is stunning here, ladies and gentlemen.

14          Now, the prosecutors sit here during their opening

15   statement and said that one of the ways in which Mr. Greebel

16   conspired to commit wire fraud was to, quote/unquote, arrange

17   for the backdating of documents.  Do you recall when the

18   prosecutor stood up here, she said I'm going to go through

19   the backdating evidence with you.  Well, here is what they

20   said in their opening.  Here is what they said in their

21   opening, quote, and this is at Page 1077 of the transcript,

22   Lines 13 through 15, quote, To understand how this fraud

23   worked, we have to go back in time to those two hedge funds I

24   mentioned before that Shkreli had been running.  And then

25   they went on to tell you how MSMB Capital lost all its money

1   by 2011 and Shkreli had not told the investors that he lost

2   his money and how he sent out those fake performance updates

3   and then he started a fund that they called the

4   MSMB Health Net, but there is no MSMB Health Net.  Maybe they

5   meant MSMB Healthcare.  You heard no evidence about an

6   MSMB Health Net.  That is how they opened.

7          And then Mr. Shkreli continues to send fake

8   performance statements and then that fund got shut down.  And

9   they said this at Page 1078, quote, So the defendant and

10  Shkreli hatched a plan, that he hatched a plan, to pay the

11  investors by stealing money from Retrophin.

12         And further down on the same page at 1078, quote,

13  So what did the defendant do?  First, he helped make it look

14  that that first hedge fund, MSMB Capital, had invested in

15  Retrophin when it had not.  And then, Look at this.  Watch

16  this.  This is what they stood before you and said, quote, So

17  the defendant arranged for a series of backdated transaction

18  documents, including one document you will see where the date

19  is changed with White-Out paper, redacting tape, to make it

20  look like an investment had taken place when it had not.

21         Ladies and gentlemen, the Judge is going to

22  instruct you on the law after the closing arguments.  We

23  expect Her Honor to instruct you that you cannot find Evan

24  Greebel guilty on the basis of this backdating evidence.  Let

25  me say that again:  That you cannot find Evan Greebel guilty

1   on the basis of this backdating evidence.  The prosecution

2   has essentially withdrawn this as a basis for the fraud.

3   They say background, or I don't know what it is, but you

4   can't -- they've withdrawn this theory.  You can't find him

5   guilty on that.  This should be nothing short of shocking to

6   you.  This should be shocking to you.  You sat through day,

7   after day, after day of evidence from Jackson Su and Corey

8   Massella about some phantom scheme.  Evan Greebel didn't

9   arrange for White-Out tape.  He didn't arrange for redaction

10  tape.  He didn't arrange for anything.  To stand before you

11  and say he arranged for a series of backdated documents, that

12  is shocking, ladies and gentlemen.

13        The prosecution stood before you and accused him of

14  something that turned out to be flat-out false and that

15  unravelled that backdating theory that Evan Greebel arranged

16  it.  It unravelled right before you.  It collapsed.  They

17  were forced to shift tactics now.  This is a wall of

18  reasonable doubt.  I'm going to talk to you about it in a

19  little while, about walls of reasonable doubt.  All you need

20  is one.  I'm going to show you wall, after wall, after wall.

21        Mr. Brodsky is going to come up here tomorrow and

22  talk to you about Count 1 and Count 2, and he's going to go

23  through the evidence in detail.  And as he goes through it

24  show you wall, after wall, after wall of reasonable doubt.

25  But I want to show you the exhibits about this backdating

1    theory.  And why am I showing it to you?  You might be asking

2    yourselves, well, you just said that we're going to get

3    instructed at the end of the case that this cannot be a basis

4    to convict him.  Well, ladies and gentlemen, it is so

5    symbolic.  It is so symbolic.  They stand here and tell you

6    this, and it turns out to be a completely different way.  We

7    do not have the burden of proof to do or show anything.  We

8    do not have to say anything.  The burden of proof rests at

9    this table with the prosecution.  Watch this.  Watch what

10   happens.

11          You will recall that the Government -- you probably

12   are having bad dreams about this document at this point you

13   have seen it so much, right?  This is

14   Government's Exhibit 459.  And the way I get it was, you

15   know, how an e-mail you have to read from the bottom up to

16   try to keep track.  I did it from the top down so you can

17   read it in sequence that way.

18          So the prosecution's theory is that Evan Greebel

19   gets this e-mail on November 25th from Martin Shkreli.  And

20   Martin Shkreli says, Did you prepare a surrender agreement

21   for the Retrophin shares I've given out?  And Evan writes

22   back to him, What is a surrender agreement?  What do you want

23   to do?

24          And then Martin writes back, Cancel a transfer I

25   made.

1          And then Evan writes back, Hard to unwind stuff.

2    Easier if they transfer it back.

3          Now, what they have tried to do was link this to

4    the backdating, the backdating evidence.  And they said,

5    Look, this is linked to GX111-18.  There is a link between

6    the two that four days later when Mr. Greebel gets the

7    transfer agreements, you remember he said, Please execute the

8    transfer agreement for Retrophin, Inc., and a transfer of the

9    common stock.  The one you said was for Retrophin, LLC, and

10   Class B common, however, LLC has not existed since

11   mid-September.

12         Ladies and gentlemen, that was right, it has not

13   existed.  He said, You have got the wrong entity here.

14         And then Martin Shkreli says, The agreement was

15   signed in June.

16         And then Evan said, Please call me.

17         Ladies and gentlemen, they have tried to link these

18   two documents together.  I'm going go through them again.  Do

19   not worry.  I am going to go through them.

20         But then we have had to come in here and show

21   you -- and please, these exhibits are so critical to this

22   case.  Please write these down.  We had to bring in DX 124-61

23   and show you what really happened.  What really happened,

24   right, so there is the November 25th exchange again.  Here is

25   what really happened:  What really happened, look at the time

1   stamps.  Before any of the e-mails on the left side of the

2   screen happened, Martin Shkreli is having a conversation.

3   Evan Greebel is not on it.  And you remember it was this

4   Valiant, same day November 25th, Retrophin is executing its

5   deal with Valiant and new investors.  I am asking you to,

6   quote/unquote, give up your common stock.  He then at 10:36

7   and 29 seconds, milliseconds, milliseconds.  Do you remember

8   that, milliseconds Agent Delzotto said, that means

9   milliseconds, 10:36:29 Martin Shkreli forwards that e-mail to

10  Evan.

11          So look at it in sequence.  Here is what it is

12  really about.  Here is the sequence.  Martin Shkreli is

13  having a conversation with other folks about giving up stock

14  related to Valiant.  He then writes to Evan Greebel seven

15  minutes later and says, Can you prepare a surrender agreement

16  for the Retrophin shares I have given out?

17          Evan Greebel says, What is a surrender agreement?

18  What do you want to do?

19          Martin says, Sell it.  10:36.  Cancel a specific

20  transfer I made.  And then Martin forwards him this e-mail on

21  a completely unrelated topic at 10:36:29.

22          And Evan responds to that and says, Hard to unwind

23  stuff.  Easier if they transfer it back.

24          Ladies and gentlemen, I just said we do not have

25  the burden of proof.  Why is it if this is really a search

1   for the truth and about giving you the whole story, we

2   brought that out?  We showed that to you.  This puts the lie

3   to this theory about backdating.  This is a wall of

4   reasonable doubt.  Did you hear the prosecutor said these are

5   e-mails they thought would never see the light of day?  Trust

6   me, we want them to see the light of day.  We brought them to

7   the light of day.  There it is.  In the light of day.  That

8   the conversation was about something completely different.

9   This is stunning evidence.  And you recall they objected.

10  They have the right to object to anything.  They objected to

11  this Document Number 5 coming into evidence.

12          Ladies and gentlemen, there can be no doubt that

13  the 11/25 e-mail exchange was in response to a question he

14  was asked the same day.  Even if you had a question and said,

15  Oh, well, maybe it could be interpreted both ways.  We submit

16  there is no doubt about what the conversation was about.

17  Even if you could read the inference in either way, doesn't

18  the presumption of innocence mean that you err on the side of

19  accepting a logical explanation?  Isn't that what the

20  presumption of innocence is?

21          Now, Judge Matsumoto will instruct you on the law

22  at the end of the case, as I said.  And what Her Honor says

23  goes.  And we expect that Her Honor will instruct you that

24  prosecutors and the FBI can conduct investigations any way

25  they want.  The Government is not on trial here, and we

1    agree.  But that does not mean that you cannot consider their

2    investigative technique.  Nothing prevented them, nothing,

3    from going to speak to Mr. Greebel to get his point of view

4    about these e-mails.

5         You are going to hear from Mr. Brodsky, he will

6    talk to you a little bit more about this, but he brought out

7    with Agent Delzotto.  Agent Delzotto, you recall he came on

8    the stand and said that there were risks in speaking to

9    Mr. Greebel; that he could destroy evidence, that, quote, He

10   was an attorney, so the odds of him speaking to me are nil.

11   What?  The evidence is, is that Evan Greebel did speak to

12   them.  He got arrested and he spoke to them right away.  Do

13   you remember they talked about the interview room?  He spoke

14   to them right away.

15        You recall that Agent Delzotto said up there on

16   direct examination and he just read the e-mails in, if you

17   remember, just read them.  What does this one say; what does

18   that one say, and he just read them.

19        And do you remember when Mr. Brodsky was

20   cross-examining him, everything changed.  Well, it says this

21   and here is what it meant.  This was about the Fearnow, the

22   Fearnow control theory.  This was about this.  This was about

23   that.  Well, he tried to inject his views over and over

24   again, and then he said that another reason that they did not

25   speak to Mr. Greebel was, quote, We typically do not -- and

1    this is at Page 7911 of the transcript -- We typically do not

2    approach the main subject of a case because, you know, he

3    is -- you approach the lower-level people to see if they will

4    cooperate and give you information on the higher-level

5    person.

6              Well, they did not do that.  We had to call

7    Mr. Rosensaft.  We had to call Mr. Katten.  We had to call

8    them before you, other partners at Katten.

9              So who did they call?  Who do they call as part of

10   their case from Katten?  Now, this will really seem like --

11   now what have I done to you -- because I think she was the

12   first witness in the case.  They called Ms. Davida,

13   Bernadette Davida.  Now she was the one, if you will

14   remember, that introduced Mr. Greebel to Mr. Shkreli, right?

15   And that Mr. Greebel gave her credit, right, for some of his

16   billing.

17             They called someone that had no involvement or

18   knowledge of the events at issue, zero knowledge, zero

19   involvement.  We were the ones that had to call the Katten

20   attorneys.  We have no burden to do anything, not to

21   cross-examine a single witness, not to call a single witness

22   on our own case.  We did that because we embraced the

23   evidence.  We embraced the evidence.  We wanted you to hear

24   from people that had actual knowledge about what went on.

25   That is why we called Mr. Katten.  That is why we called

1   Mr. Gordon.  That is why we called Mr. Rosensaft, so that you

2   could not just get inference and speculation and innuendo, so

3   you could see the whole picture.  We think you are entitled

4   to that, don't you?

5           Ladies and gentlemen, even Agent Delzotto conceded

6   that e-mails can have multiple meanings.  He was asked at

7   Page 7621 of the record:

8           Question:  Special Agent Delzotto, do you recognize

9   that sometimes e-mails can have more than one meaning?

10          Answer:  Sometimes they cannot -- maybe he is a

11  glass-half-empty kind of guy -- sometimes they cannot and

12  sometimes they can.

13          Question:  And you agree that sometimes words in

14  e-mails can have more than one interpretation?

15          Sometimes they can.  Sometimes that can't.

16          Question:  And you, in your experience, have seen

17  an e-mail, obtained an e-mail, interrupted it one way and

18  then actually spoke to the participants on the e-mail and

19  found out it meant something else, right?  That has happened

20  to you, correct?

21          Answer:  Are you talking about the specific

22  instance -- this is a simple answer of yes.

23          But it goes on.  In general, Special Agent Delzotto

24  in your experience doing cases, has there ever been an

25  experience, yes-or-no, ever when you have obtained an e-mail

1  in the course of discovery or obtaining documents and you

2  interpreted the plain face of the e-mail one way, but when

3  you talk to people about it, you learned it meant something

4  else, yes or no?

5          Answer:  Yes, that is possible.

6          Well, so why assume every negative inference?  Why?

7  You know what they say about what happens when you assume.

8  You were picked as jurors in this case not because you were

9  the last ones standing, but for your common sense.  You do

10  not check that at the door.  We considered your backgrounds.

11  We considered everything.  And we know that you can look at

12  the e-mails and look at both interpretations and not just one

13  just because the prosecutors stand up here and say it is so.

14  There was no need to assume.  How about asking someone, When

15  you wrote this what did it mean?  What did you mean by that?

16  They did not even leave open the possibility that they could

17  have gotten it wrong because finally Mr. Delzotto was asked:

18          Question:  Did you leave open the possibility,

19  Special Agent Delzotto -- this is at Page 8022 of the

20  transcript -- you might have been wrong, that you might have

21  been wrong about your interpretation of the e-mails that you

22  introduced into evidence during your direct examination?

23          Answer:  Might have been wrong?  No, I do not

24  believe I was wrong.

25          Ladies and gentlemen, that wasn't an empty

1   question.  There is no possibility of his interpretation is

2   wrong.  Luckily, ladies and gentlemen, it is your

3   interpretation that matters.  It is your interpretation that

4   matters.  That is the presumption of innocence under two

5   logical explanations and they both make sense to you.  This

6   one, I submit to you there is only one logical explanation.

7   But even if you come to the conclusion on some of these that

8   there are two, you presume Mr. Greebel innocent.

9           Here is what happened with this backdating period.

10  Here is how it started, all right?  You were shown in

11  evidence -- this was me, my attempt to reemphasize the times

12  there again, so I am just going to read through it.

13          Now, you were shown this evidence.  Do you recall

14  this, this is in evidence as GX111-15.  And this is the

15  e-mail exchange where Jackson Su is e-mailing Mr. Greebel,

16  and there are some folks from Citrin Cooperman, Mr. Massella,

17  and Ms. Chew copied on there and the attachments and it says,

18  this is the 4,167 Marek Biestek shares.  And then --

19          (Brief interruption.)

20          MR. DUBIN:  That is okay.  It happened to me once,

21  too.

22  BY MR. DUBIN:

23          And this exchange is the attachment where it has

24  the Marek Biestek transfer agreement on it.  And Jackson Su

25  writes Mr. Greebel and others, Marek Biestek transfer to

Summation - Mr. Dubin                    10404

1    Martin Shkreli attached

2          So first of all as an initial matter, keep this in

3    mind:  This agreement is between two private individuals

4    exchanging shares.  Nothing is being taken away from

5    Retrophin.  Retrophin did not own them, not a single share.

6    Retrophin did not have any right to what has been referred to

7    as the Fearnow shares.  These are private people deciding to

8    exchange shares.

9          So what happens next, right?  On the attachment of

10   that e-mail, and it is crooked like that because that is the

11   way it was produced, on the attachment of that e-mail,

12   Jackson Su handwrites the date November 29, 2012, and you

13   will remember that he said, I put that date on there because

14   that is the date it was dropped on my desk.  So he testified

15   that he did not ask Mr. Shkreli or Mr. Biestek about the

16   date, so he handwrites that date on there without knowing

17   anything about when the agreement was reached.

18         So what happens next?  So after that is this

19   e-mail, right, that you just saw.  And Mr. Greebel points out

20   the mistake.  He spots the error, right.  He is saying that

21   the date is 11/29/2012.  You can't have a stop transfer

22   agreement of Retrophin, LLC, because that entity does not

23   exist anymore.  It ceased to exist back in September.

24         So what does he do, Mr. Greebel?  He does his job.

25   He does what he is supposed to do.  He does what any good

1   lawyer should do is spot a mistake in the document.  His

2   advice that you see in that top e-mail on GX111-16, his

3   advice is the best evidence that he has got no clue of what

4   is going on.  If he knew that that was being backdated, he is

5   not going to advise Mr. Su to put Retrophin, Inc., on there.

6   Wouldn't you expect to see him saying, You have got to change

7   the date.  You have got to change the date.  But not change

8   Retrophin, LLC, when the name on the document.  He had

9   absolutely no involvement whatsoever in the date change.

10          What the prosecutors would have you believe is that

11  that was suspicious.  He should have known it was suspicious.

12  And do you remember this, that he removed Mr. Massella from

13  the e-mail, do you remember, because he is doing his job.  He

14  is doing his job and he wants to protect the attorney/client

15  privilege.

16          And it would make -- well, who's on the e-mail now?

17  Other people are dropped off, people are put on.  Why would a

18  lawyer take someone that is not his client off an e-mail?

19  You know why.  Because once you start including third

20  parties, there is no more privilege.  So he is doing the

21  right thing.  But everything is ominous.  Someone gets

22  dropped off an e-mail, listen, we will get to the WTF e-mail

23  in a minute

24          Mr. Massella drops Jackson -- drops everybody else

25  off the e-mail and just writes to Jackson Su, WTF.  Something

1    is amiss here.  Something is wrong.  They did not say a word

2    about that.  But everything that they look at they want you

3    to draw the worst inference, assume the worst about

4    Mr. Greebel.  That is not the presumption of innocence.  That

5    is the assumption of guilt

6          So Martin Shkreli writes back to Mr. Greebel and

7    says that agreement was signed in June and Mr. Su says, what?

8    My misstate.  I will correct the date.

9          Why should Evan Greebel have any reason to

10   disbelieve either of them?  This is the CEO of his client.

11   This is the COO of his client.  And you see who is on the

12   exchange?  It is Mr. Biestek.  Do you remember who he is?

13   He is the "MB" of MSMB.

14         So what does Evan do?  He says --

15         MR. DUBIN:  Go to the next one.

16   BY MR. DUBIN:

17         Okay.  Well, I get those documents, right, and they

18   made a big deal about the redaction tape and starting from

19   the top to the bottom and then he gets one back and it has

20   redaction tape on it.  It says 7/1/12.  And then Evan says,

21   Please call me.  Please call me.  Please call me.

22         Now, isn't that the right thing to do?  Like why --

23   you just told me that the transfers happened in June.  Now I

24   am getting a document that says July 1st.  He had just been

25   told it happened in June.  He sees a different date and says,

1   Please call me.  Remember, we're talking about a private

2   company at this point in time run by some young guy led by a

3   20-something-year-old.  And what they want you to assume here

4   is that Evan should have said fraud.  Oh, no, there is a

5   fraud.

6           How about sloppiness?  How about sloppiness?  And

7   am I saying that with no evidence to support it?  No, you

8   know.  You heard from witness, after witness, after witness

9   that came in here.  I am going to show you the testimony in a

10  minute.  It was a mess of a company, a disorganizational

11  mess.  No internal controls

12          And besides, again, no fraud here because private

13  people transferring shares.  And what did Mr. Su testify,

14  okay?

15          MR. DUBIN:  Can you back up a second?

16  BY MR. DUBIN:

17          Do you see where Mr. Su writes back on the bottom

18  e-mail in evidence as I believe GX111, is it 10?  I believe

19  it is -- oh, 111-19.  And he writes back, Correction.  Please

20  see attached for date of transfer.

21          Now it has got the date that Mr. Greebel was just

22  told the transfer happened.  And thankfully we have

23  cross-examination, right?  How many times did you sit here

24  and listen to a witness on direct, and then we would come up

25  and cross and you would think to yourself, Oh, okay.  I did

1    not think about that.  Remember Mr. Su got on the witness

2    stand and said this:  He said that what was going on here,

3    what was going on here is that, you know, this was weird

4    because it was a transfer between two people, the CEO of the

5    company and an employee.  And then he was shown by

6    Mr. Brodsky that he had testified differently in a prior

7    proceeding.  Mr. Brodsky asked him, Now, is it fair to say

8    that when you testified today you added something about the

9    conversation that you had not testified to in a prior

10   proceeding?

11          Mr. Su said, Well, I do not remember what you are

12   referring to.

13          Question:  Well today, sir, did you not say that

14   there was a discussion between you and Mr. Greebel about, LLC

15   versus, Inc.?

16          Answer:  Right.

17          Question:  And then you also said that you, you

18   told -- I am sorry, I am getting Mr. Su and

19   Mr. Massella mixed up.  What Mr. Su tried to say was that he

20   said, look, Evan, you and Martin work it out.  He had never

21   said that before.  He testified in a prior proceeding all

22   about this, never said that, right?  And he finally had to

23   concede.

24          Here is how he testified at a prior proceeding.  Do

25   you recall the conversation we talked about, the share

1    transfer and I recall him explaining to me the difference in

2    LLC and was replaced by the Inc., for records and that is

3    what I remember from the conversation.

4              Do you recall anything else from that phone call?

5              I do not.

6              So why did he come in here and try to add

7    something?  Why?  What, did his memory get better as time

8    went on?  Or could it be this:

9              You are going to hear that part of your awesome

10   responsibility is that you are the judges of the witnesses'

11   credibility and you can weigh that into consideration.  You

12   saw Jackson Su on the witness stand, and something really

13   remarkable happened.  Do you remember Jackson Su took the

14   witness stand and he was confronted by Mr. Brodsky about

15   hacking into the computer systems of Retrophin; do you recall

16   that?

17             (Continued on next page)

18

19

20

21

22

23

24

25

1            MR. DUBIN:  And then he shows up here the next day,

2    the next day and he's got -- he's got an agreement from the

3    prosecutors that they won't prosecute him for that, right in

4    the middle of his testimony.  If I had more hair on my head

5    I'd pull it out.  They said -- they say that you can trust

6    this man.  Do you think he's got an axe to grind with

7    Martin Shkreli?  So he comes in here and he's trying to what,

8    stick it to Mr. Greebel and add stuff?  And he's not the only

9    one.  Ladies and gentlemen, you can consider their bias.  That

10   when they came in here and tried to add things to try to make

11   Mr. Greebel look bad that their testimony is worthless on that

12   topic.

13            Thankfully, we had his testimony from a prior

14   proceeding and we were able to lock him in in that instance.

15   And look at this, look at this, Jackson Su came in here and

16   said he, himself, had no reason to believe that the transfer

17   hadn't happened back in June.  So think about what the

18   prosecution is saying to you.  The COO of the company had no

19   reason -- and, look, he had bias, he had every reason to try

20   to make that up, right, and say, well, I suspected it didn't

21   happen in June, he came before you and said I had no reason to

22   believe that the date that I wrote 11/29 and then redacting

23   tape, you know, to July, even after all of that he had no

24   reason to believe that it didn't actually happen back in June.

25   But what they're asking you to do is to assume and infer that

1   Mr. Greebel must have known, he had to have known.  Why?

2   Because they say it's so?

3          The clear testimony in this case is that these are

4   private transfers.  They took nothing away from Retrophin and

5   there's nothing wrong with that.  And Jackson Su told you

6   that.  This is from Mr. Shkreli personal holdings?

7          Answer:  Yes.

8          Question:  It's not taking anything away from

9   Retrophin?

10         Answer, correct.  Mr. Shkreli is the transferor.

11         Even if you were to assume, it's so dangerous, but

12   even if you took them at their word and say it harmed

13   Retrophin, what evidence is there that Evan Greebel should

14   have started asking questions or -- that's just speculation.

15         He did what he was supposed to do, his job, and said

16   the entities are wrong, then he's told that it happens on an

17   earlier date.

18         Now a lot was made of this next email, GX113-3 in

19   evidence.  Do you remember this?  And I asked him, what does

20   WTF mean?  Well, Mr. Massella writes to Jackson Su, WTF.  So

21   what was this all about?  What was this all about?  This

22   company at the time was a mess, there's no dispute about that.

23   Now, he was the one that came in here, Mr. Massella, and tried

24   to tell you, well, here's what it was about.  I thought there

25   was something weird here because this is the CEO and an

1    employee and a transfer of stock.  The government would have

2    you believe, the prosecutors are saying to you that

3    Mr. Massella thought something was wrong.  What he ended up

4    testifying to is that he wrote WTF because the dates kept

5    changing and it was going to cause him more paperwork.  That's

6    it.  Su kept sending the stock transfer agreements and each

7    change meant that Mr. Massella had to redo it.  Remember, he

8    talked about how frustrated that made him.  So he tried to add

9    this extra thing.  Now, he, too, ultimately had to concede the

10   truth.  So why did he try to add it?  Don't you recall what

11   happened when he was on the stand, Mr. Massella?  Do you

12   remember what happened?  He was fired or forced out or a

13   combination of both by Mr. Greebel's father-in-law's company,

14   Citrin Cooperman and the allegations were that he had engaged

15   in improprieties.  Remember, it was regarding a loan that he

16   gave to the client and the client still owed Citrin Cooperman

17   money and that he tried to get his money back before he got

18   his employer paid, do you remember that?  And we brought that

19   out.

20            Do you remember Mr. Massella on the witness stand

21   when that came out?  Do you think he has warm and fuzzy

22   feelings about Martin Shkreli?  Is that why he tried to add

23   something?  I don't know why he tried to add something.  I

24   don't know.  But ultimately he had to concede what really

25   happened too.

1          Question:  Mr. Massella, you remember you just

2     testified a few minutes ago about what that meant, WTF.

3          Answer:  Yes, sir.

4          Isn't that the case, sir, that your testimony as to

5     the reason you wrote WTF contradicts what you said in a prior

6     proceeding?  And he said to you, no, no.

7          Now if there were no ability to keep on probing and

8     cross examining you might be left there saying, well, why

9     shouldn't I believe him.  Well, why you shouldn't believe him

10    is because when he was confronted with his prior testimony he

11    ultimately had to concede it.  Is it not the case that the WTF

12    had directly to do with the fact that you were frustrated the

13    cap table kept changing.  That's why cross-examination is so

14    critical.

15         You know, it's been said that cross-examination,

16    cross-examination is the greatest legal invention ever for

17    discovering the truth.  We agree.  It's critical.  Witness

18    after witness after witness would say one thing and then you

19    show them here's how you testified before or here's the

20    document.  What's the best evidence of what he really meant

21    and what really frustrated him?  The best evidence is that

22    witness after witness came in here and said this company was a

23    mess.  We'll get to Steven Richardson later, but he came in

24    here and said the internal controls of Retrophin were in a

25    state of disorganization.  Certainly, definitely.

1   Mr. Massella even said it.

2          Question:  And the capitalization tables were a mess

3   in 2012, weren't they, Mr. Massella?

4          Answer:  Yes.

5          Mr. Aselage, question, in plain English, the company

6   was a disorganizational mess, correct?

7          Answer:  I would agree with that.  He didn't agree

8   to much, but he agreed with that.

9          You remember Sunil Jain.

10          Question:  This was a disorganized company, right,

11   Mr. Jain?  And what does the evidence show you, what is

12   happening in realtime, what is unfolding in realtime?  Exactly

13   what Massella had to ultimately admit to because he writes

14   back in a fit of frustration, Jackson, every time we receive

15   these, it changes everything we created already.  Are these

16   the final transfers?

17          Excuse me, one moment.  We ask you to look at the

18   contemporaneous evidence, look at what's happening.  The

19   contemporaneous evidence shows you.  They showed you an

20   exhibit during their closing, 451 from Marek Biestek -- I

21   think it's 461 from Marek Biestek on November 30th that asks

22   if Evan Greebel could call him and then they told you about a

23   conversation, do you remember, that Evan Greebel must have had

24   with Marek Biestek.  Ladies and gentlemen, why didn't they

25   call Marek Biestek?  You can't just assume your way to what

Summation - Mr. Dubin                    10415

1   conversations must have -- what must have been said on these

2   conversations.

3            And you saw evidence about the cap table, you saw it

4   over and over and over again and the prosecutor stood up here

5   earlier and said, well, it's an easy cap table to read, not a

6   lot on there.  Ladies and gentlemen, the evidence is that that

7   cap table changed all the time.  Do you remember you kept on

8   seeing version after version and it would say final version,

9   and then there would be yet another one and another one.  And

10  you don't have -- look, I keep on showing you the testimony

11  and the evidence because I'm essentially ceding the floor to

12  the evidence.  Jackson Su testified that cap table changes

13  after December 12th, 2012.  Well, remember this, this keeps

14  changing over and over again.  They are making changes or

15  Jackson Su and Corey Massella after the company goes public.

16           We'll get to that in a minute, but you remember

17  Mr. Jacobs, who was a mentor of sorts for Mr. Greebel, look,

18  they relied on Mr. Jacobs' testimony during their closing

19  argument.  We ask to you rely on it too.  He testified in no

20  uncertain terms:

21           Question:  And how, if at all, I think you mentioned

22  the capitalization table, does it change or not change during

23  that time period.

24           Answer:  I found that in these private companies

25  that go public they change almost every week.  And he goes on

1    to say, there's always someone that comes forward that says

2    they're entitled to something, someone was promised stock.

3    It's a very fluid document.

4         Did you see any evidence to the contrary?  Was that

5    challenged ever?  They would have you believe that when the

6    cap table changes that means only the numbers change, that's

7    not so.  That's not what people testified to.  Different

8    people appear on it, different entities appear on it and you

9    know that that's the case because you saw that evidence.

10   Mr. Aselage himself suddenly appears on the cap table in the

11   fall of 2012.  Do you recall that Mr. Shkreli gifted him

12   50,000 shares?  Do you remember that?  And then Mr. Aselage

13   appears on the cap table.  Boom, there is.  Is that fraud?

14   50,000 shares, a new name, that's not fraud.

15        There's another reason none of this should have

16   raised alarm bells.  Management is responsible for the cap

17   table.  You heard from Ms. Davida and Mr. Rosensaft.  You're

18   entitled to rely on the information that your client provides

19   you.  Let's not go changing what the rules are and the

20   standard for Mr. Greebel.  What is he supposed to say, you

21   tell me that you have this much money in the bank, I want

22   backup, give me all your bank statements.  You're going to see

23   in a moment Jackson Su didn't even have access to the bank

24   statements.

25        When you go to a doctor and they say -- or do you

Summation - Mr. Dubin                              10417

1   smoke, are you a smoker?  And you say no.  Does the doctor say

2   let me smell your hands.  Let me see if I can smell smoke on

3   your hands.  Let me see your teeth, are they yellow.  He's

4   entitled to accept their representations.

5           Ladies and gentlemen, Mr. Jacobs said the same

6   thing.  Mr. Rosensaft said it too.  He accepted Mr. Shkreli's

7   representations, he's my client.  As a general matter I take

8   his representation.  I take his representation as true, a

9   former federal prosecutor.  Mr. Jacobs says the same thing.

10          Question:  And when you were working with

11  Mr. Greebel -- and this is right on the money on the

12  capitalization table -- why, if at all, why did you rely on

13  management for the information?  And Mr. Jacobs said

14  management is usually the people who keep track of what was

15  going on.  They usually know who they entered into an

16  agreement with.

17          Ladies and gentlemen, when Retrophin LLC converted

18  into Retrophin Inc., you remember it's still a private company

19  in September, September of 2012, Evan questioned Mr. Shkreli

20  directly about the cap table.  They wanted you to believe or

21  infer that, you know, here's evidence of his state of mind.

22  Here's evidence of his state of mind.  This is in evidence at

23  DX-1055.  Mr. Greebel writes in September of 2012, as

24  discussed attached are two cap tables, right, and he explains

25  what they are.  Then Shkreli responds, this looks good to me.

Summation - Mr. Dubin                    10418

1   And Mr. Greebel asks him, are the numbers accurate and

2   accurately reflect your movements and internal records?  He's

3   asking his client, he's doing his job, and he says

4   substantially so, yes.  That is proof, direct proof, when we

5   have no burden, that he relied on Mr. Shkreli's

6   representations.  There's no reason to disbelieve them at this

7   point in time.

8           Look, anybody can stand here and with the benefit of

9   hindsight and knowing everything that is known now about

10  Mr. Shkreli and say, well, he should have known, he should

11  have known.  So all of them should have known.  Everyone

12  should have known.

13          Ladies and gentlemen, Mr. Massella came in here and

14  told you he made changes to the cap table on his own, no

15  permission from anyone, relying on Mr. Su, no documents to

16  back it up.  He's shown DX110-22 and 111-23 he's asked:  Does

17  it refresh your recollection that after the reverse merger,

18  after the company goes public, right?  After the reverse

19  merger you and Jackson Su decided to change numbers on the cap

20  table.

21          Answer:  No, that's when Su instructing me to change

22  the numbers.  I would not electively change the numbers.

23          Question:  So is Evan Greebel on either one of those

24  communications?

25          Answer:  Absolutely not.

1          And we know, because Mr. Massella testified to it,

2    that edits were made to the cap table on December 16th without

3    Mr. Greebel's involvement.  And both Jackson Su and Corey

4    Massella testified that they were allowed to do that based on

5    Mr. Shkreli's representations.

6          Now think about this, ladies and gentlemen, please,

7    think about this, if Jackson Su and Corey Massella were

8    allowed to make not even 11th hour these are 13th hour

9    changes, this is after the company goes public, all of a

10   sudden now Evan Greebel is not allowed to accept the company's

11   representation?  He should be saying, no, I don't believe you.

12   Is that what they're saying that he should just start

13   questioning everything they tell him.  I don't believe your

14   representation.  When auditors are accepting it, accountants

15   are accepting Mr. Shkreli's representations, the COO of the

16   company are accepting his representations.  So they say, well,

17   still alarm bells should have been raised, alarm bells should

18   have been raised.  Really?

19         Well, Mr. Aselage took the witness stand and told

20   you about the 50,000 shares that he received as a gift from

21   Mr. Shkreli, do you recall that?  And then we asked Mr. Su,

22   Mr. Brodsky asked him, nothing wrong with Mr. Aselage getting

23   50,000 Class B common units.  I wouldn't think so.

24         Question:  You could have given your shares that you

25   received from Mr. Shkreli to anybody you wanted, right?

1          Answer:  If it wasn't prohibited within the

2     agreement -- and we know it wasn't, ladies and gentlemen.

3          Question:  You can give it to anyone you want,

4     anybody you want?

5          Answer:  If it allowed for it, yeah.

6          Do you see any evidence that it wasn't allowed for?

7     There is none.

8          The agreement.  This is stunning, this is -- look at

9     what happens here.  They want to talk about backdating, watch

10    what happens.  Look at the date of this email.  This is from

11    Martin Shkreli to Jackson Su on November 2nd, 2012 and it

12    attaches Form Donee Rep Letter S.A.  It says, for value

13    received, Martin Shkreli does hereby grant, sell, assign,

14    transfer and convey unto Stephen Aselage the transferee, its

15    successors and assigns all of his right, title, and interest

16    to 50,000 Class B units, right?  And do you see at the bottom,

17    there are no signatures, there are no dates, there is nothing.

18    Then watch what happens.  Here's the date here, November 2nd.

19    So now Jackson Su sends the executed agreement, right, with

20    Mr. Shkreli's signature and Mr. Aselage's signature onto

21    Citrin Cooperman, Mr. Massella and his colleague, and there's

22    no signature.  You see he writes Jackson Su, Stephen Aselage

23    share transfer, that's one of the attachments.  There's also

24    his employment agreement attached.

25          So then Citrin Cooperman sends him an email a couple

1    of days later and says, well, how do I validate the date in

2    which the transfer happened for Steve?  And Jackson Su writes

3    back, should clear up.  I think he probably meant should clear

4    it up.  And look at what happens.  There's a date.  A date

5    appears.  There's a date.  Jackson Su backdates the gift.

6    Those emails are going back and forth in November and he

7    writes in September.  And the prosecution says there's nothing

8    wrong with this, nothing wrong with this.  Well, we agree.  We

9    agree.

10           You think Mr. Aselage when he was asked, are you

11   going to give it back?  Remember, when he was on the stand

12   Mr. Brodsky asked him, well, Mr. Shkreli gifted you 50,000

13   Class B common units and Mr. Brodsky said to him, well, isn't

14   it the case that the 50,000 class common units at conversion

15   when Retrophin went public today would be worth over

16   $5 million?

17           Answer:  Yes.

18           Question:  Sir, since -- and Mr. Aselage he wanted

19   to get it right, wanted to get it right, he said actually six,

20   worth 6 million now.

21           Mr. Brodsky asked him, having received those shares

22   from Mr. Shkreli as a gift in 2012, and having Mr. Shkreli

23   decline to get those shares back, are you now, as the CEO of

24   Retrophin, going to return the shares that Mr. Shkreli gave

25   you?

Summation - Mr. Dubin                     10422

1           Answer:  To the shareholders?  Am I going to give

2    them back?

3           Mr. Brodsky said, to the company.  And Mr. Aselage

4    said, nope.  He's not giving them back.

5           Your Honor, if --

6           THE COURT:  Well, is the jury willing to stay until

7    5:30 so we can get some more of his closing?

8           THE JURY:  Yes.

9           THE COURT:  Keep going.

10          MR. DUBIN:  Keep going.

11          Now, remember -- so we're stopping at 5:30 not six,

12   Your Honor?

13          THE COURT:  Well, unless the jury can stay until six

14   BUT that might be pushing.  I'd like to get as far long as we

15   can.

16          MR. DUBIN:  Sure.

17          THE COURT:  Does any juror have a problem staying

18   until six, just raise your hand.

19          THE JUROR:  The train situation is bad.  5:30 is all

20   right.

21          THE COURT:  Is 5:30 all right, sir?

22          THE JUROR:  Yes.

23          THE COURT:  All right, 5:30 it is.  Please keep

24   going.

25          MR. DUBIN:  Thank you, Your Honor.

1              Now, remember, Retrophin made a series of public

2     announcements throughout 2012 that MSMB Capital had led a

3     Series A financing for Retrophin.  Let's talk about logical

4     inferences.  Isn't it a logical inference that Evan or anyone

5     reading those announcements would reasonably believe that MSMB

6     Capital had invested earlier in the year.

7              Here's a press release, and there were a bunch of

8     them, I'm not going to bore you with all of them, in May of

9     2012 and it's in evidence as DX-13057.  Retrophin LLC, a

10    privately held New-York-based biotechnology company focused on

11    discovering developing treatments for rare and

12    life-threatening diseases today announced completion of its

13    Series A financing.  The 4 million-dollar round was led by

14    who?  By MSMB Capital.  And they want you to think that it was

15    unreasonable for Mr. Greebel to believe that MSMB Capital had

16    invested in Retrophin?  And, oh, when MSMB lands on the cap

17    table at the end of the year Mr. Greebel should have been very

18    alarmed.  Why is it not reasonable to infer that he believed

19    it was due to nothing more than the same sloppiness everybody

20    else testified to about this cap table that constantly changed

21    all the time.  Why is it not reasonable?  Isn't that what the

22    presumption of innocence demands.  There is no reason for

23    Mr. Greebel to believe that the investment hadn't been made.

24             I'm going to show you something right now that I

25    please ask you to remember.  They have no response for this,

Summation - Mr. Dubin                    10424

1   no credible response.  Did you hear any evidence that

2   QuickBooks -- some of you may be familiar with QuickBooks, the

3   accounting software, did you hear any evidence that QuickBooks

4   could be -- could be or was manipulated?  You didn't hear any

5   evidence of that.

6               THE COURT:  Would you keep your voice up, please,

7   sir.

8               MR. DUBIN:  Sorry.

9               THE COURT:  I can't hear you.

10              MR. DUBIN:  You didn't hear any evidence of that did

11  you?  DX110-9 on the screen now.  There can be no dispute that

12  Retrophin's QuickBooks accounting system recorded an MSMB

13  Capital investment in Retrophin in both April of 2012 and July

14  of 2012.  The prosecution has no answer to this document on

15  the screen.  They have no answer to it, no credible response.

16              This is from Mr. Massella's colleague at Citrin

17  Cooperman.  You see at the bottom the QuickBook entries, down

18  here, MSMB Capital 25,000 shares on April 24th, 2012.

19  July 27th, 2012 for 50,000 shares.  But their position is that

20  Evan should suss it out.  He didn't have any access to MSMB

21  bank records or brokerage records.  Mr. Su didn't even have

22  access, he's the COO of the company.  But the COO doesn't have

23  access, he works there internally but somehow Evan had the

24  password?  Where is the evidence of that?  There is no

25  evidence.

Summation - Mr. Dubin                          10425

1          Mr. Su was asked:

2          Question:  Did you ever have access to the bank

3    account statements for MSMB Capital Management?

4          Answer:  No.

5          So here's the COO of MSMB and Retrophin, he doesn't

6    even have access.  But Evan somehow should have telepathically

7    figured it out.  Is that the argument?  He had no idea, ladies

8    and gentlemen.

9          You heard evidence about these arrangements with

10   Mulleady and Fernandez, do you recall that, for them to return

11   stock that Mr. Shkreli had gifted to them and they arranged

12   for them to purchase shares from Troy Fearnow.  And I think

13   you were shown these during the government's closing

14   arguments, but if you weren't I'll show them to you.  GX-447

15   from Martin Shkreli to Kevin Mulleady were these transfers.

16   Who is not on that email?  Mr. Greebel.

17         Regarding Mr. Fernandez, in evidence as GX-462,

18   Mr. Greebel is not on that email.  You cannot infer your way

19   to his knowledge.  You cannot assume your way to his state of

20   mind.  He's not on either email.  He's not even charged with

21   this anymore.  But it is so critical to the lack of evidence

22   here.

23         If this is somehow background to anything about

24   these conspiracy charges, whatever background it is

25   Mr. Greebel knows nothing about it.

1          This is so important about what Mr. Greebel's state

2   of mind was.  Take a close look at his reaction upon receiving

3   the December 30th, 2012 stock -- the cap table, I'm sorry, on

4   12/3/12.  Look at his reaction.  In evidence as DX-111-27 and

5   28.  Mr. Shkreli writes to him:  Here's what the final cap

6   table will look like with all the conversions put into effect.

7   And then he sends him an email with the final cap table and

8   Mr. Greebel says, uh-oh, please call me to discuss.  Very

9   ominous, somehow please call me to discuss is now, oh, they

10  must have been talking about crime.  Nonsense.  Please call me

11  to discuss.  Then he says, guys, can the three of us talk,

12  these numbers are not matching up.  He's asking why is MSMB

13  suddenly appearing on the cap table.  That's what's going on

14  here.

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1          MR. DUBIN:  (Cont'g.)  Look at the evidence.  Here's

2    the evidence.  Look at the timeline.  10:54 p.m.  Guys, can

3    the three of us talk.  It's not making sense to him.  He sees

4    MSMB appears on the cap table.  So what happens next?  He

5    doesn't know about these transfer agreements.  And then, at

6    11:23 p.m., Jackson Su sends them to him.  Now it makes sense.

7    Critical.  Critical.  Critical to Mr. Greebel's state of mind.

8          And there was some argument or some suggestion that

9    the 12/3, that these transfers should have been accounted for

10   properly, and that Mr. Greebel somehow has some involvement in

11   that.

12         Here's proof that he has no involvement and told

13   everybody that they're not -- Katten and Mr. Greebel are not

14   responsible for accounting treatment.  He tells them on

15   December 7th at the bottom:  Accounting treatment is not our

16   responsibility.  We're not qualified to give advice on that.

17         And you heard during the prosecution's closing

18   argument about this 13D, and what the prosecutor said to you:

19   That's proof.  That Evan Greebel did what?  That he made a

20   misrepresentation to the SEC.  Are they kidding?

21         Ladies and gentlemen, they suggested to you that

22   what Mr. Massella meant when he testified is that Mr. Greebel

23   told him that the Martin Shkreli transfer is transferring

24   shares to MSMB Capital that was a gift.  Ladies and gentlemen,

25   that is not what Corey Massella testified to.  Look at the

1  testimony.

2  Q    Who, if anyone, did you discuss this transfer

3  with?

4          "ANSWER:  At some point I did discuss it with Evan.

5          "QUESTION:  Okay.  And what did Mr. Greebel tell you

6  about this transfer?

7          "ANSWER:  That it was outside the company, and that

8  it was -- it was a gift.

9          "QUESTION:  And what does that mean for it to be a

10  gift?

11  A    It would -- well, it was -- it was -- if it was a

12  gift between two individuals, two individuals outside

13  the company."

14          Not Martin Shkreli and MSMB, the individuals that

15  are transferring the shares.  Who had every right to do it.

16  That was -- these were questions about the 11/29 transfer.

17          And then next, and I think that the prosecutor

18  showed you this during their closing.  Look at the answer.

19          For all the share transfers, the explanation we

20  received is that these were -- these were gifts outside the

21  company between the individuals.

22          So Mr. Massella testified about the transfers

23  between the individuals being the gift, the individuals, not

24  the transfer from Shkreli to MSMB Capital.

25          Please, it's so critical that you look at the

1   evidence.  Look at what the testimony is.  This is not some

2   game of gotcha where we're trying to make something fit a

3   theory.  We're talking about a human being over there facing

4   these accusations.  What are we doing here?

5           Then they said -- look at this one, they showed you

6   an email and they said:  Evan is saying to Mr. Shkreli give me

7   a call.  And they say:  Oh, more inference and guess work.

8   They tell you what the call was and what was discussed.

9           Here's a critical point.  They cannot infer and

10  assume their way to what happened on phone calls.  If Evan

11  didn't even fill out the 13D, he wasn't the one that wrote the

12  words on that form "WC," which they say mean working capital.

13  We'll get to that in a minute.  If he's not the one that wrote

14  those words, doesn't that mean something to you?  Shouldn't it

15  mean something to you?

16          You're going to see evidence tomorrow.

17  Mr. Brodsky's going to show you the invoice.  He didn't even

18  write -- he didn't even fill out the form.  But they just

19  stood here before you and said it was Mr. Greebel put WC on

20  there and it was misleading.  A Katten lawyer named Michelle

21  Griswold wrote it.  We don't even know what it means, but

22  let's take them at their word, okay?  Whether it means working

23  capital or anything else.

24          Evan Greebel didn't certify to the truth of what's

25  in that form.  Ask for the form, it's in evidence.  You can

1    look at it yourself.  Martin Shkreli is the one that certifies

2    as the truth and accuracy of that form.  But now somehow

3    Mr. Greebel should be responsible for the representations that

4    his client made?  That's what I meant by "guilt by

5    representation."  It's not right.  You shouldn't accept it.

6            Even if you assume that it means working capital,

7    that certainly includes sweat equity; does it not?  Because

8    they give you a different definition it doesn't include sweat

9    equity.  You decide.

10           Work is done on behalf of Retrophin by MSMB Capital.

11   That's not working capital?  Sweat equity.  You saw the press

12   release.  MSMB led $4 million in financial.  That doesn't

13   matter?  It doesn't make a difference?

14           The prosecutor then said:  Here's another theory on

15   it.  Well, the same day that 13D was filed, Mr. Shkreli sends

16   an email to Darren Blanton and explains that the 13D

17   represented MSMB's investment in Retrophin.

18           Ask for the email, ladies and gentlemen.  Evan

19   Greebel is not on that email.  They can't assume his way on to

20   the cc of that email.  He's not on it.  He doesn't know that

21   Martin Shkreli said that.

22           Why did Martin Shkreli transfer shares to

23   MSMB Capital?  We can be here to determine that this case was

24   about trying to figure out what was in Martin Shkreli's mind

25   at any given time about any given thing.

1      The prosecution's theory is that Martin Shkreli lied

2  to the SEC staff about the MSMB Capital assets under

3  management and had to gift MSMB Capital some Retrophin shares

4  to make up a value and back it up with this lie.

5      Evan Greebel doesn't know anything about what

6  Shkreli told the SEC staff.  There's no evidence of that.  He

7  doesn't know back at the time while it's happening that

8  Shkreli is representing himself.  I submit to you that he's

9  representing himself because for whatever reason he's trying

10 to keep it to himself.

11     He concealed that inquiry by the SEC for Mr. Greebel

12 in 2012, and there's no evidence to the contrary.  He only

13 brings in Katten when the inquiry turns into a formal

14 investigation when subpoenas start getting issued in 2013.

15     That's when he's responding as Martin Shkreli on his

16 own to the SEC.  You remember you saw the emails between Eric

17 Schmidt of the SEC and Martin Shkreli?  With no one else on

18 them.  That's in 2012.

19     So the prosecution wants you to speculate that he

20 knew, that Evan knew about Martin Shkreli's lies to the SEC

21 staff in November and they did this by pointing to

22 Mr. Rosensaft's testimony.

23     There are a ton of problems with this theory, so

24 many I don't even know where to begin.  Let me give you a few.

25     First of all, and I'll show you his testimony in a

1    minute.  Mr. Rosensaft seemed to be mistaken about when he

2    learned.  Because I asked him:  Might you be mistaken?  You

3    remember he said:  I think it was in the beginning of the

4    year.  And then I showed him his time entries and I said:

5    Might you be mistaken?  And he said, "Yes."

6              He testified that he billed for all of his time.

7    Even if you assume that Mr. Greebel learned at some point

8    early 2013 that Mr. Shkreli had been representing himself

9    there's no evidence that Mr. Shkreli told Evan what he was

10   telling the SEC staff.  At a minimum, you know, ladies and

11   gentlemen, you know that he certainly wasn't telling Evan that

12   he lied to the SEC staff about his assets under management at

13   MSMB Capital.  You want to know why?  I'm going to show you in

14   a minute that he lied to Evan.  He lied to Evan.  Evan asked

15   him:  What are your assets under management?  He told Evan he

16   had 40 million.

17             So all of a sudden through the process of, what,

18   osmosis or telepathy he's supposed to somehow figure it all

19   out and crack the case and look into his mind and see what's

20   going on?  Mr. Shkreli was the master of deception.  He was a

21   pro at this.

22             Even if you assume that he had a copy of what

23   Shkreli told the SEC staff, all he would see is yet another

24   representation from Mr. Shkreli that MSMB Capital had invested

25   in Retrophin.  How would that mean anything to Evan?

Summation - Mr. Dubin                          10433

1          At that time, Evan Greebel has no idea that

2   MSMB Capital had blown up.  That it had no assets at the time.

3   And if there's any suggestion, any suggestion in their

4   rebuttal that Mr. Greebel deleted entries or, you know, went

5   into the Katten billing system, your common sense tells you

6   that those systems catch all entries.  That's just pure

7   speculation.

8          Here was the evidence on the SEC investigation.

9   Right?  October 2012, here's Mr. Schmidt of the SEC, in

10  evidence as GX448A.  Asking Mr. Shkreli for documents:  As we

11  discussed, Evan, attaching a copy of the request for voluntary

12  production of documents that I sent to you today via overnight

13  delivery.  No one else on the email but the SEC and Martin

14  Shkreli.  We'll put that on the timeline.  That's on

15  October 1st, 2012.

16         Martin Shkreli responds, November 4, 2012 and says:

17  Please find attached documents responsive to that inquiry.

18  The password for the protected file, and he provides the

19  password.

20         That's on -- no one's on the email but Mr. Shkreli

21  and the SEC.  That's in November 2012, November 4, 2012.

22         Now you saw evidence of billing entries.  This is

23  GX841.  Look at the date.  You see it's a April 13th, Evan

24  Greebel conversation with M. Rosensaft.  What is that relating

25  to?

1         Here's the guy that -- here's the guy that they

2    say -- they say that this man is not telling anyone what's

3    going on and he's keeping things from people.  It's about the

4    Pierotti litigation.  Nothing to with the SEC inquiry.  That

5    is his first time entry, Mr. Rosensaft, for Retrophin, in

6    April.

7         What happens next?  His first time entry appears on

8    May 13th.  On May 13th.  Keep this date that mind.  May 13th,

9    2013.  This is important.

10         Call with E. Greebel to discuss SEC subpoena.

11    Review subpoena.  Call with SEC to discuss investigation and

12    timetable.

13         So what happens next?  What happens next?

14    Mr. Greebel is sent the subpoena and then what does he do on

15    the same day?  He forwards it, on May 13th, 2013, to his

16    partner at Katten, a former federal prosecutor.  That's what

17    happened.  That's what the evidence shows.

18         So when I asked Mr. Rosensaft at 8607 of the record,

19    you remember because the prosecutors were trying to suggest

20    that he knew about this SEC investigation in the beginning of

21    the year, and therefore Mr. Greebel should have known.  He

22    said it himself, when I showed him that time entry that you

23    just saw, I said:

24         "QUESTION:  Is it fair to say that you might be

25    mistaken as to what had actually happened?"

1          And he said:  Sure, it's possible.

2          Ladies and gentlemen, this back dating theory or

3   whatever it was collapsed right before you.  It collapsed

4   right in front of you.

5          There was multiple examples of back dating over and

6   over again.  Look at this.  Here's some from Marcum.  Here's

7   someone from Marcum, the external auditor asking for support

8   for something related to MSMB Healthcare's investment in

9   Retrophin.  This is in January, apparently in January of 2012.

10  Right?

11         And they say:  Hi, Jackson.  This is the auditor.

12  Hi, Jackson.  This is the agreement which I many missing.  I

13  cannot delete the $2040 because it is part of the equity

14  schedule.  And there, he's talking about this entry,

15  1/19/2012.

16         Jackson Su writes back:  My mistake, the agreement

17  was 2,000 shares at $40.  I will send you the document when I

18  return to the office possibly as late a Monday.

19         What happens next?  What happens next?  Jackson Su,

20  on December 16th, sends Martin Shkreli, Evan Greebel nowhere

21  on this email.  Sends -- Su sends to Shkreli and copies

22  Michael Smith and says:  Sign and the return first thing in

23  the morning.  Date of subscription 1/19.  This is in December.

24  This is at the end of year.  Date of subscription.  The

25  beginning of the year, 1/19.  Price, $40.  Shares, 2,000.

1           Watch what happens.  Jackson Su forwards it along to

2   the auditors and says:  Here it is.  Look, here's the

3   subscription agreement.  And he writes in the date earlier in

4   the year.  And look at the email.  He tells Martin Shkreli the

5   information on the left, 2000 shares at $40.  MSMB Healthcare

6   total of 80,000.  And it all ends up in the subscription

7   agreement.  They backdate this document to the beginning of

8   the year.  Su admitted he backdated documents.

9           Ladies and gentlemen, my last five minutes, so we

10  can catch the train on time and let you get some rest, let me

11  say this:  This backdating evidence should tell you everything

12  you need to know.  This should frame the context of what --

13  this should frame the context for everything that Mr. Brodsky

14  will stand up here tomorrow and go through with you on Counts

15  One and Two.

16          Time and time again, you just saw the evidence, the

17  prosecutor stood up here and tried to make a case when there's

18  no case to be made.  Now, it's quite a thing, ladies and

19  gentlemen, quite a thing, to put your faith in the hands of

20  12 -- 14 people you never met.  I cannot begin to imagine what

21  that might be like.

22          Sitting here over the last two -- last month, one

23  thing that has given me comfort, given Mr. Brodsky,

24  Mr. Mastro, Ms. Denerstein, Mr. Chan and our whole team

25  comfort was watching the 14 of you.

Summation - Mr. Dubin                          10437

1           The thing that gives us comfort that it's you

2     sitting in judgment of Mr. Greebel because as this trial has

3     unfolding, I've sat there often marveled at your willingness

4     to sit through but readily admit it's not the most

5     scintillating of story lines, not the most interesting subject

6     matter, an unsavory cast of characters from time to time.  Who

7     can forget the sidebars.  Who can forget the sidebars.

8           Look through it all.  We've watched you take notes.

9     We've watched how you listen so carefully and just been so

10    attentive, and from the bottom of our hearts, we thank you.

11    We cannot thank you enough to be willing to take part in

12    perhaps one of the most important things, I'll say it with the

13    risk of sounding corny that you give it the highest of civic

14    responsibilities, one of the most important things you can do

15    for your fellow woman or man.  In this instance that most

16    critically important thing is to help Mr. Greebel put behind

17    him what has been a nightmare of all nightmares and let his

18    family and him get on with their lives in peace.

19          I'll leave you with this before I come back here

20    tomorrow and you'll only have to hear from me for 15 or 20

21    more minutes.  But I'm a sucker for quotes, I really am.  And

22    it is said that:  Do not let those gloat over me or my enemies

23    without cause.  Do not let those who hate me without reason

24    maliciously look wink the eye.  They do not speak peaceably,

25    but devise false accusations against those who live quietly in

1    the land.

2         All Evan Greebel wanted to do was his job.  He was a

3    hard working, diligent professional.  He never did anything

4    unethical or illegal.  He had no motive.

5         When we come back tomorrow, I'm going to talk to you

6    briefly about the concept of reasonable doubt, presumption of

7    innocence.  And then I'm going to cede the floor to the rest

8    of the evidence and Mr. Brodsky.  I thank you so much today

9    for your attention and I'll see you tomorrow.

10        THE COURT:  All right, members of the jury, we are

11   prepared to dismiss you at this time.  Please don't talk about

12   the case.  Have a safe trip home.  See you tomorrow morning

13   9:00 and we will get started as soon as everybody is here.

14        Thank you for your attention and service.

15        (Jury exits the courtroom.)

16        THE COURT:  All right, have a seat.

17        Is there anything we need to address before we

18   adjourn for the evening?

19        So, Mr. Dubin, you are going to be speaking for 15

20   more minutes and then Mr. Brodsky will take over.

21        MR. DUBIN:  Yes, Your Honor.

22        THE COURT:  And I trust it won't be repetition,

23   correct?

24        MR. BRODSKY:  Correct, Your Honor.

25        THE COURT:  All right.  It's rather unusual to have

INDEX                                    10439

1   two people do the closing, but I'm allowing it as long as

2   there's no duplication.

3          All right, so we will see you all tomorrow morning,

4   and have a good night.

5          MR. PITLUCK:  Thank you.

6          MR. BRODSKY:  Thank you.

7                    *    *    *    *    *

8          (Proceedings adjourned at 5:30 p.m. to resume on

9   December 21, 2017 at 9:00 a.m.)

10

11

12

13

14

15                        I N D E X

16

17    Defense Exhibit Number 1010                    10215

18    Defense Exhibit Number 8432                    10215

19    Defense Exhibit Number 11,305                  10215

20

21

22

23

24

25