2208

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        15-CR-637(KAM)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4              Plaintiff,              Brooklyn, New York

5              -against-               October 30, 2017
                                        9:00 a.m.
6    EVAN GREEBEL,

7              Defendant.
     ------------------------------x
8
                   TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
9              BEFORE THE HONORABLE KIYO A. MATSUMOTO
                     UNITED STATES DISTRICT JUDGE
10                        BEFORE A JURY

11   APPEARANCES

12   For the Government:        BRIDGET M. ROHDE, ESQ.
                                Acting United States Attorney
13                              Eastern District of New York
                                271 Cadman Plaza East
14                              Brooklyn, New York 11201
                                BY:  ALIXANDRA ELEIS SMITH
15                                   DAVID PITLUCK
                                     DAVID KESSLER
16                              Assistant United States Attorneys

17   For the Defendant:         GIBSON, DUNN & CRUTCHER LLP
                                200 Park Avenue
18                              48th Floor
                                New York, New York 10166-0193
19                              BY:  REED M. BRODSKY, ESQ.
                                     RANDY MASTRO, ESQ.
20                                   WINSTON Y. CHAN, ESQ.
                                     MYLAN LEE DENERSTEIN, ESQ.
21                                   JOSHUA EVAN DUBIN, ESQ.
                                     GRACE TSOU, ESQ.
22
     Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, OCR
23                              Phone:  718-613-2330
                                Fax:    718-804-2712
24                              Email:  LindaDan226@gmail.com

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

PROCEEDINGS                                    2209

1              (In open court; Jury not present.)

2              THE COURT:  Have seat, everybody.

3              All right.  Have a seat, please.

4              My understanding is we have one juror that we're

5    waiting on, but I did want to address one issue that did come

6    up over the weekend before the jury comes in, and that was

7    with regards to 17 subpoenas, including information that

8    Mr. Richardson may have submitted or may be confronted with on

9    cross.

10             Is there any such material?

11             MR. BRODSKY:  Mr. Richardson was never -- I don't

12   believe we received any documents from Mr. Richardson pursuant

13   to a 17C.

14             THE COURT:  Were you planning to bring it up on

15   cross and attack him, depending on what he responded?

16             I think the Government had asked to preclude that as

17   well.

18             MR. BRODSKY:  I think the only relevant one, Your

19   Honor, and I'm not sure I'm going to do it on

20   cross-examination, but the only relevant one would be that we

21   had subpoenaed both Retrophin and Mr. Richardson for any

22   document, any email, anything at all reflecting a request, a

23   written request to Mr. Greebel to provide minutes of the

24   board.  And neither -- we received a production from Retrophin

25   and Richardson -- Mr. Richardson's counsel said that Retrophin

1    that respond on his behalf.  And there was nothing responsive.

2              So in other words, we have not received any document

3    whatsoever reflecting a request -- a written request by

4    Mr. Richardson to Mr. Greebel or anyone at Katten for board

5    minutes.

6              THE COURT:  All right then, I would assume that it

7    would be acceptable form the Government, for Mr. Richardson to

8    be cross-examined on whether he ever wrote or contacted

9    Mr. Greebel requesting board minutes.

10             MR. BRODSKY:  He testified in February 2014 he had

11   made at the dinner an oral request.

12             THE COURT:  But do you want to examine him as to a

13   written request?

14             MR. BRODSKY:  I might.  I don't know, Your Honor.

15   You're refreshing my memory about it because I was not going

16   to do it, but I might.

17             THE COURT:  I saw the Government indicate but let's

18   have the response on the record.

19             MS. SMITH:  Yes, so the question whether he knows of

20   any written response, that's fine.

21             MR. BRODSKY:  It always has been to be based on his

22   personal knowledge, Your Honor.

23             THE COURT:  Right.

24             MR. BRODSKY:  I can't ask him about what someone

25   else did.  But I wish I could.

1          And I think with respect to the Government's motion,

2    they basically took a wide path through all -- every single

3    set of -- almost every single 17C subpoenas, as far as I can

4    that we served.  We would like a little time to respond

5    because it's comprehensive.  We would like the opportunity to

6    put in our submission on Sunday.

7          I would say, Your Honor, respectfully just so you

8    have background, Your Honor.  We have no ability like the

9    Government does and the Government has been doing and they've

10   told us to call up people like financial institutions or

11   others and ask them to volunteer to produce documents.

12         Unfortunately, sitting in the position where are,

13   companies and entities do not volunteer to produce documents

14   to us.  They have been volunteering without trial subpoenas to

15   produce documents to the Government, that's one.

16         Two, our 17C subpoenas have been very targeted and

17   we've been trying to obtain evidence sometimes of the lack of

18   information.  So in order to prove the Government's

19   speculation and theories in their case and with all due

20   respect to the Government, some of their theories requires us

21   to prove a negative.

22         So, for example --

23         THE COURT:  You don't necessarily do that by asking

24   for everything in a broad general way and then seeing if you

25   get anything.  The more logical approach, I would think, would

1   be to ask specifically whether they have to certain

2   information.  And if they say we have no such responsive

3   information, that's a much more efficient way.

4                MR. BRODSKY:  Yes.

5                THE COURT:  My concern is the description of the

6   request is quite broad and it does fall outside of the

7   permissible scope of the 17C subpoena under *Nixon*.  As you

8   know, it's not, you know, it's hard to determine whether all

9   correspondence between two people could possibly be relevant,

10  admissible, and certainly it's not specific.

11               MR. BRODSKY:  Yes, Your Honor.

12               THE COURT:  So I think that you need to be mindful.

13               And one thing that I would suggest to help narrow

14  this would be to identify what specific documents, if any, you

15  receive from the subpoena that you would like to use so that

16  we could have a targeted and intelligent conversation about

17  what documents are in dispute.

18               MR. BRODSKY:  Got it.

19               THE COURT:  As either, you know, irrelevant,

20  inadmissible or not specific and not to the issues and

21  defenses.  It's just hard in a vacuum, and I'm certainly not

22  going to go through all 50,000 documents and make that call

23  without knowing how each party wants to use the document or

24  the basis on which the party would object.

25               MR. BRODSKY:  Just a few points about that, Your

1    Honor.

2              First, we tried to be targeted.  Second, a lot of

3    recipients of the subpoenas would call us up and say you need

4    to narrow it.  And so there are verbal understandings where

5    they narrowed it.

6              So, for example, Innisfree.

7              THE COURT:  Well if that exists, you should have let

8    the Government know because they spilled a lot of ink over

9    eight pages single spaced, you know, bring to the Court's

10   attention issues that it has with these very broad subpoenas.

11             MR. BRODSKY:  Well, Your Honor, we're in the midst

12   of trial, we're preparing for witnesses.

13             THE COURT:  I understand that.

14             MR. BRODSKY:  The Government launched this without

15   having a meet and confer with us.  They could have called us

16   up and said here's our motion, here's what we plan to do what

17   is this narrow, what is this subpoena.  They didn't do that.

18   They just filed their motion broad based without having all

19   the information.

20             We did have conversations, for example, with

21   Innisfree.  Their counsel said, no, we're not going to produce

22   all those documents.  Under *Nixon*, this is what we believe is

23   narrow and targeted and we say, okay.  And that's what they

24   produced.

25             There's a law firm, a very large law firm, Paul

PROCEEDINGS                                    2214

1    Weiss that also said, look, we'll produce this type of narrow

2    information, we're not going to produce a broader amount of

3    information and we said, okay.

4          So there are various recipients.  And, Your Honor,

5    they have very sophisticated, very smart counsel who

6    understand what *US v Nixon* stands for and what the test is.

7    And they responded to us and they defended their own rights

8    and they said, look, this is narrow and this is narrow.

9          And so the third point I would make, Your Honor, is

10   just a broader point, Your Honor, I would like you to

11   consider.  As we respond to the motion and we would like to

12   engage in a meet and confer with the Government about it, if

13   they would ever, you know, before we'll do it after they file

14   the motion now.

15         But consider this, Your Honor.  You know, the

16   Government has had and subpoenaed 3 million plus pages of

17   documents.  We are sending out narrow subpoenas, for example,

18   to various entities which are producing what we believe to be

19   as evidence of innocence.  And we believe it's extremely

20   important to us, for example -- well, I won't give you or

21   bother with examples.  But we sent out subpoenas which we

22   tried to be targeted.  We are receiving documents that we

23   believe show evidence of innocence.

24         As the Government's case develops, and they didn't

25   have any right to -- they didn't have any obligation, I should

1    say, to tell us what their case was about.  They said it was a

2    different case than Mr. Shkreli's trial, different evidence

3    coming out from witnesses, and so they didn't have an

4    obligation to tell us their order of proof.

5             As we're learning things through witnesses, we do

6    want to send targeted, narrow subpoenas, for example, to

7    Retrophin as represented by Cooley to obtain information.

8             And one example would be this, Your Honor, and

9    you're going to see it on cross-examination.  There was an

10   elicitation on direct examination by the Government relating

11   to the employment agreement.  And you're going to see it this

12   morning.  And Mr. Richardson testified about reviewing the

13   employment agreement and how he didn't have much time.  And

14   then he had a conversation in February 2014 or somewhere

15   thereabouts about it.

16            We have an email that was redacted by Retrophin

17   which we asked them to unredact or we would move before the

18   Court and we said we need this to be unredacted.

19            The unredaction shows in November 2013 that

20   Mr. Richardson made edits to the employment agreement.  And

21   that document to us is exculpatory evidence and incredibly

22   important, and some of the redactions that were made go

23   directly to what he knew at the time about the employment

24   agreement.  And so we will bring it out on cross-examination,

25   but this is an example without the power --

PROCEEDINGS                                    2216

1          THE COURT:  Edits about the terms under which

2    Mr. Shkreli could terminate him?

3          MR. BRODSKY:  No, there are no edits, but what there

4    are edits are the edits reflect that he reviewed the entire

5    agreement, and I'll bring that out on cross-examination.

6          THE COURT:  All right, Mr. Kessler.

7          MR. KESSLER:  Couple of things.

8          First of all, Mr. Richardson testified that he

9    reviewed the agreement and provided comments.  So I don't

10   understand how this is material.

11         Second of all, the unredaction of that document was

12   not pursuant to a Rule 17C subpoena, that was pursuant to a

13   request to Retrophin, or based on the original Rule 17

14   subpoena from a long time ago.  So that's actually not an

15   example of Rule 17 subpoena that was used in trial.  But there

16   were two of those served this weekend.

17         THE COURT:  Let me be just very clear.  I'm not sure

18   I'm going to permit you to go to December 4th.  I mean I have

19   three trials, and December 4th I start yet a fourth trial,

20   which is major civil litigation that is going to go for

21   several weeks.

22         In addition, because, you know, I'm going to try to

23   accommodate you but I don't want the parties to think they can

24   keep pushing this down the calendar because some of our jurors

25   are going to start to the drop out after Thanksgiving.

PROCEEDINGS                                    2217

1   They've made it very clear that they can only be here for the

2   five weeks and we were very clear that this was the maximum

3   amount.

4           So if you're thinking of going well into

5   December 4th, I think you do so at some peril.  I'm saying

6   this collectively to everybody.  I think there needs to be

7   more efficiency.  One thing that could make it more efficient

8   would be to have conversations with each other in advance so

9   we can get agreement, hopefully, and resolution between the

10  parties about disputed evidence.  I don't appreciate weekend,

11  you know, concerns that maybe could have been worked out had

12  the parties conferred.  And I'm certainly not going to take

13  time from the jury from trial dates to do that.

14          Because I was not aware that you were actually

15  thinking of pushing it into December, I will tell you right

16  now that I have a judicial council meeting that I must be

17  present at, so I will not be able to sit the 29th, 30th and

18  1st of December.  I've got, you know, commitments and I have

19  attendance on this committee meeting.

20          So I think everybody has been has to be very mindful

21  that you're going to lose jurors that the trial calendar after

22  the targeted date of five weeks is going to look very

23  different and, again, I already am going to adjourn pretrials,

24  but I do have a fourth that I'm going to be very hard pressed

25  to adjourn.  I set this date almost a year ago and it was

1    targeted for December 4th to start a jury trial for trial.

2              MR. BRODSKY:  Understood, Your Honor.

3              THE COURT:  Please be mindful of that.  I don't know

4    what will happens after that.

5              MR. BRODSKY:  Understood, Your Honor.

6              In light of that, Your Honor, I did want you know.

7    We have some witnesses this is week which are very short

8    cross-examinations, people who had no contact with Mr. Greebel

9    or just a email or two.  So they will be short.

10             I did want you to know I let the Government know

11   about Thursday of last week that my cross-examination of

12   Mr. Richardson was going to run into the afternoon and he is a

13   witness who had contact with Mr. Greebel and had statements to

14   say about Mr. Greebel, so his cross-examination will be a

15   little bit longer.

16             THE COURT:  I'm not going to preclude, I just say

17   please bear in mind --

18             MR. BRODSKY:  Understood, Your Honor.

19             THE COURT:  -- for the sake of the trial and the

20   parties, the parties should be very mindful that our jurors

21   may start objecting and they may ask to be excused.

22   Fortunately we have six extras, but may I'm concerned we may

23   start losing jurors.

24             And so the other thing I think we needed to address

25   was setting a date for a Daubert hearing?

PROCEEDINGS                              2219

1          MR. KESSLER:  Yes, Your Honor, right before that, if

2   I can close the loop on the Rule 17 subpoena because I think

3   we can do this efficiently.

4          I believe the only witness this week who may be

5   implicated in some way and is Mr. Su.  There are a number of

6   issues relating to Rule 17 subpoenas.

7          So perhaps what we can do to ease the burden on

8   Court and make this faster, is if we can talk with defense

9   counsel and they can tell us any of the materials we believe

10  were improper or improperly obtained that they intend or might

11  use, but that might be used.  And then we can see if we can

12  reach an agreement.  And then we can bring to the Court just

13  the Jackson Su-related issues that we have not resolved,

14  because Mr. Su may testify tomorrow.

15         THE COURT:  I mean usually in the past, and I think

16  Mr. Greebel's counsel is aware of this, parties have generally

17  submitted subpoenas for my review and signature.  When you

18  send a subpoena with just the clerk's stamp on it, there's

19  still a suggestion that a court or a judge has reviewed and

20  ordering that production.

21         And my concern is that at least for some of the

22  subpoenas it does appear that it is improper, the contents are

23  improper.  I'm not saying that all of it but some of it would

24  not be appropriate under *Nixon* and its progeny and so I do

25  think we need to be very careful.

1          So, for example, when one subpoena is educational

2    records, which are generally subject to privacy laws and bank

3    records or text messages of telephone calls, this is generally

4    material that is not available to, you know, a person without

5    Court order.  And I certainly haven't ordered it, and I'm

6    concerned about whether this is really information that's

7    relevant to the charges or the defense, whether it is specific

8    enough and whether it is going to be admissible.

9          So I am somewhat at a loss because I don't know what

10   documents are going to be used and what may be in dispute.  If

11   you agree to something, that's fine.  But if there's something

12   in dispute, I don't want to be handed an entire production of

13   2,000 documents and being told in a vacuum to go through and

14   decide whether it meets innocence standards.  So hopefully you

15   all can work it out as expeditiously this week of trial.

16         MR. BRODSKY:  Understood, Your Honor.  We haven't

17   received thousands of pages in response to subpoenas.

18         And then we're happy to meet and confer with the

19   Government.  We obviously don't want to tell the Government

20   what our cross-examination will be of Mr. Su in advance.

21         But if we plan to use any document that we think --

22   we not going to use, for example, Mr. Su's Syracuse record if

23   we had put him on as a witness.  We might use it.  But we're

24   not putting him on as a witness because the Government's

25   calling him.

1          And, you know, Su Mr. Su's arrest record will only

2    come in on cross-examination to the extent Mr. Su lies about

3    his arrest and --

4          THE COURT:  Which arrest?

5          MR. BRODSKY:  He was arrested in Manhattan for

6    assault which led I think to his -- a problem that he had at

7    Goldman Sachs and a lie that he -- he denies that it was a

8    lie, but a situation at Goldman Sachs regarding his dismissal

9    from Goldman Sachs or his departure from Goldman Sachs.

10         MR. KESSLER:  So, Your Honor, we'll just confer with

11   defense counsel.  And, you know, obviously don't admit to

12   their cross-examination, but if there are documents we can

13   rule out, that will make this a lot easier.

14         THE COURT:  All right.

15         So are all the jurors here yet?

16         THE COURTROOM DEPUTY:  Yes, Judge.

17         MR. KESSLER:  And, Your Honor, I didn't mean to cut

18   the Court off earlier about the Daubert schedule.  We're happy

19   for the Court to schedule it at the Court's convenience.

20         THE COURT:  How much time do you think you're going

21   to need for that?

22         MR. KESSLER:  A few hours, at most.

23         THE COURT:  We will have to take it from a trial

24   day.  I just want to say we can squeeze it in either in the

25   lunch hour or after, you know, 5:00 on some day, but that

PROCEEDINGS                                    2222

1    might be -- I'll have to check with our court reporters to

2    make sure that will be acceptable to them --

3              MR. KESSLER:  That will be fine.

4              THE COURT:  -- otherwise we'll have to lose a trial

5    day, which I'm very reluctant to do.

6              MR. KESSLER:  I think we can start at 5 and go to 7,

7    if that will work with the court reporter.

8              THE COURT:  We will check with our court reporters

9    to see if they can find someone to work with us.

10             So whether that happens this week or next week, I

11   suppose it's a question.  Ms. Jackson will check with the

12   court reporters today and get some guidance.

13             MR. KESSLER:  Whatever's convenient.

14             MR. CHEN:  We will have to check with the expert

15   witness, too, as to that witness' availability.  We would ask

16   to put it off, pursuant to our papers, you know, as late as

17   possible, so we would ask maybe next week.

18             THE COURT:  Well, the question I have is whether you

19   are definitely going to call this witness.  Because I don't

20   want to spend that time if you're still not certain if you're

21   going to call him.

22             MR. CHEN:  I think we are going to call him.  That's

23   the assumption at this point.

24             If you want to waste time, maybe the Government can

25   withdraw its motion.

1           THE COURT:  I have an obligation to make sure the

2    jury is hearing experts who are, in fact, appropriate for that

3    purposes.

4           And I don't know what the specific challenges there

5    will be with regard to the witness but I think as we found,

6    many of the witnesses that were identified have been

7    withdrawn, so I just want to make sure that we have certainty

8    that the expert will be called and that it is necessary to

9    have that hearing.

10          All right, we're going to bring the jury in.

11          THE COURTROOM DEPUTY:  Thank you, Your Honor.

12          (Whereupon, the witness resumes the stand.)

13          (Jury enters the courtroom.)

14          THE COURT:  All jurors are present.  Good morning,

15   members of the jury.  Thank you for your attention.

16          Mr. Richardson, you're still under oath and

17   Mr. Brodsky you may proceed.

18          MR. BRODSKY:  Thank you so much.

19          Good morning, Mr. Richardson.

20   CROSS-EXAMINATION

21   BY MR. BRODSKY:

22   Q   Mr. Richardson, let's start with December 2012, if you

23   may.

24          In December of 2012, Mr. Shkreli emailed you that he

25   needed to borrow money for Retrophin for unexpected merger

RICHARDSON - CROSS - BRODSKY                    2224

1   costs relating to the reverse merger, correct?

2   A    Yes.

3   Q    And you were given the option, a couple of options from

4   Mr. Shkreli as to how to give the money, correct?

5   A    Yes.

6   Q    One of the options was to gift the money, correct?

7   A    Not gift, no.

8   Q    Gift.

9   A    Excuse me.

10  Q    One of the options was to give him a gift, correct?

11  A    No.  No.

12  Q    One of the options was to buy in to the stock?

13  A    Yes.

14  Q    Another option was to give a loan.

15  A    Yes.

16  Q    And you chose to wire $10,000 to Retrophin on

17  December 17th, 2012 before knowing whether this was going to

18  be a loan or an equity investment, correct?

19  A    I believe we made a decision within a day or two.

20  Q    And you chose that it was going to be a loan?

21  A    I chose a loan, yes.

22  Q    And Mr. Shkreli confirmed that to you through an email,

23  correct?

24  A    Yes, he did.

25  Q    And that email was sent on December 17th where he said to

RICHARDSON – CROSS – BRODSKY                    2225

1   you, we received the $10,000 and we're booking it as a loan.

2   A    I remember the -- I don't remember the exact date,

3   Counsel, I do remember the email.

4   Q    Okay.  Let me show you the two documents so we can get

5   the dates down.

6            You remember that shortly after this loan was made,

7   Retrophin filed what's called a super 8-K?

8            Do you know what a super 8-K is?

9   A    I don't know the phrase "super 8-K."

10  Q    Do you know what document was filed with the SEC with

11  respect to the reverse merger?

12  A    I remember a filing for the reverse merger, yes.

13  Q    Do you remember it was on a form 8-K?

14  A    I believe so, yes.

15  Q    Do you know whether -- isn't it true that any loan made

16  by a member of the board of directors to the company has to be

17  disclosed in that public filing?

18  A    I wasn't aware of that.

19  Q    Wouldn't it be considered a related-party transaction

20  that is a transaction between a member of the board of

21  directors and the company?

22            MS. SMITH:  Objection, Your Honor.

23            THE COURT:  Sustained.  Can you rephrase.

24  BY MR. BRODSKY:

25  Q    Do you remember on your direct examination you talked

RICHARDSON - CROSS - BRODSKY                    2226

1    about what a related-party transaction is?

2    A    Yes.

3    Q    You gave your interpretation of related-party

4    transaction?

5    A    Yes.

6    Q    And under that interpretation, your own interpretation of

7    related-party transaction, isn't it a case that your loan to

8    the company would have to be disclosed?

9    A    I don't know the exact timing here, Counsel, because we

10   very quickly agreed that I would actually roll it in as a

11   investment into Retrophin.  I don't remember the exact timing

12   of that sequence of events.

13         THE COURT:  You mean the loan was rolled into an

14   investment?

15         THE WITNESS:  Yes, Mr. Shkreli and I had

16   subsequently said it would rolled in as Retrophin stock.  I

17   just don't remember the timing of these various discussions.

18   BY MR. BRODSKY:

19   Q    And then -- we'll get to the timing with some documents,

20   Mr. Richardson.

21         Did you know whether or not Mr. Shkreli -- what

22   Mr. Shkreli told to Evan Greebel about whether this was a loan

23   or an equity investment?

24   A    No, I'm not aware of the dialogue he had with

25   Mr. Greebel.

1  Q    Do you know whether or not Mr. Greebel provided advice

2  with respect to what the board knew to would approve of this

3  loan?

4  A    I'm not aware of that dialogue.

5  Q    All right.  Let me show you -- may I approach, Your

6  Honor?

7          THE COURT:  Yes.

8  Q    I'm showing you two exhibits, Mr. Richardson, for

9  identification.  The first one is DX5592 for identification.

10 The second one did DX104-96.

11         THE COURT:  Thank you.

12         MR. BRODSKY:  Thank you, Your Honor.

13         THE COURT:  104-96?

14         MR. BRODSKY:  Yes, 104-96.

15         THE COURT:  Okay.

16         MR. BRODSKY:  Take a moment to review those

17 exhibits, and when you've had the chance let me know.

18             (Whereupon, the witness is reviewing the document.)

19 A    Yes, I do recall the emails.

20 Q    The first one, DX5592 for identification, you recognize

21 it as an email exchange you had with Mr. Shkreli on

22 December 15th, 2012 relating to this loan?

23 A    Yes, I do.

24         THE COURT:  Your Honor, we offer it.

25         MS. SMITH:  No objection.

 1            THE COURT:  All right.  We will receive DX5592.

 2            was received in evidence.)

 3            was received in evidence.)

 4            (Defense Exhibit DX5592, was received in evidence.)

 5   BY MR. BRODSKY:

 6   Q    And let's start with the bottom, Mr. Carter.  That's

 7   Mr. Shkreli, on December 14th, 2012 at 1:36 p.m., sending you

 8   an email saying, Thanks for last night drinking for fun for

 9   once.  We are raising $50,000 from five people to cover an

10   expensed merger shell cost for Retrophin.

11            That's the cost for the reverse merger?

12            THE JURY:  We don't have the document.

13            THE COURTROOM DEPUTY:  It's not up?

14            THE COURT:  Can the jurors see the big screen or the

15   one to the side?  We can roll that screen further towards you,

16   if that will help.

17            Can the jurors see?

18   BY MR. BRODSKY:

19   Q    Mr. Richardson, December 14th, 2012, Mr. Shkreli sent you

20   an email, correct, saying we're raising $50,000 from five

21   people to recover unexpected merger shell costs for Retrophin,

22   correct?

23   A    Yes.

24   Q    And that was in connection -- the reverse merger has

25   already happened, correct?

RICHARDSON - CROSS - BRODSKY                    2229

1    A    Yes, it's in this time window; yes.

2    Q    And this is a reflection, Mr. Richardson, of how

3    Retrophin didn't have much money at this time, correct?

4    A    Oh, absolutely, yes.

5    Q    We'll look at the public filing.  But a lot of its costs

6    it was extraordinarily expensive in terms of operating costs,

7    correct?

8    A    Yes.  But also at this time part of the reason for this

9    was the fact that the owner of the Desert Gateway had asked

10   for extra funds, effectively when they did the original deal.

11   That was the -- there's a separate communication between me

12   and Mr. Shkreli about the reason for this.

13   Q    It was an unexpected cost in the negotiations with the

14   counter-party for the shell company that's being -- that's

15   being used for the reverse merger?

16   A    Yes.

17   Q    And it says here Brent and the MSMB partners are so far

18   in.

19              What did you understand that to mean?

20   A    I just took it that they were part of the -- helping with

21   the solution.

22   Q    Brent meaning Brent Saunders?

23   A    That's my understanding.  Brent Saunders, yes.

24   Q    And the MSMB partners are the MSMB partners who are

25   invested in Retrophin?

RICHARDSON - CROSS - BRODSKY                    2230

1    A    I didn't register -- I didn't register one way or the
2    other at this point.
3    Q    You were -- did you consider yourself an MSMB partner?
4    A    Not at this point.
5    Q    At this point because in June of 2012, you had exchanged
6    all of your interests in MSMB into Retrophin?
7    A    That's correct.
8    Q    Then there's a question, is there any way you can support
9    us as well time frame, would be today, Monday.  Also they
10   assigned us a ticker symbol on Monday, RTRX, will be live, our
11   very own company.
12            What did you understand that to me?
13   A    That's confirming we will be public traded under the new
14   symbol for Retrophin, RTRX.
15   Q    Okay.  And you responded, Mr. Richardson, you say,
16   correct, I am -- Hi, M, really fun evening, thanks for making
17   it happens.  Always good to he see the team let its hair down.
18            Do you see that?
19   A    Yes.  It was the Christmas party.  It was the Christmas
20   party of the Retrophin employees.
21   Q    I see.
22            And then it says, on the $50,000, is this a sunk
23   cost?
24            Did you understand that to mean you were just making
25   the contribution?

RICHARDSON - CROSS - BRODSKY                2231

1  A    No, I wanted to understand -- yes, it carries on further,

2  buy into the stock.  It's back to this issue of would it be a

3  loan or would it be, you know, a stock immediately.

4  Q    And Mr. Shkreli responds at 2:24 p.m. saying, The other

5  thing that would work is a loan.

6  A    Yes.

7  Q    Give you the funds back by December 31.

8  A    Yes.

9  Q    We just ran short on this going public thing and they

10  want their money ASAP, right?

11  A    Yes.

12  Q    And so you went with the loan?

13  A    Yes, I did.

14  Q    And then if we turn to Exhibit DX104-96 for

15  identification, that's Mr. Shkreli email to you on

16  December 17.

17          Do you recognize it?

18          THE COURT:  Is this one in evidence?

19          MR. BRODSKY:  No, not yet.  We offer it, Your Honor.

20          THE COURT:  Okay.

21          Any objection?

22          MS. SMITH:  No objection.

23          THE COURT:  All right.  We will receive Defense

24  Exhibit 104-96.

25          (Defense Exhibit 104-96, was received in evidence.)

```
1    BY MR. BRODSKY:
2    Q    Do you see that, Mr. Richardson?
3    A    Yes.
4    Q    So that's two days later approximately, right?
5    A    Yes.
6    Q    And you had wired the money, correct?
7    A    Yes, I had at that point.
8    Q    And you didn't know whether it was being booked as a
9    loan, he's telling you there it's being booked as loan.
10   A    Yes.  As I said, I don't recall exactly when I had the
11   follow-up conversation about making it into stock.
12   Q    And then are you aware that there's a public filing
13   that's filed shortly thereafter?
14   A    You had mentioned it earlier, I believe.  You said the
15   8-K.
16   Q    And do you know that it was filed on or about
17   December 18th?
18   A    I don't recall the dates.
19   Q    All right, let's show you 104-97 for identification.
20            Your Honor, may approach?
21            THE COURT:  Yes.
22   Q    Mr. Richardson, I'm showing you DX104-97 for
23   identification.
24            If you would take a moment to look at that document,
25   and the date that you will find if you're looking for the date
```

RICHARDSON - CROSS - BRODSKY                    2233

1   you'll find that on the page 81 of 81, if you have the -- on

2   the last page.  There's some exhibits attached to 81 to 81.

3   A    The cover page says December 12th, 2012.

4   Q    You remember December 12th, 2012 as the date of the

5   reverse merger?

6   A    No, I'm just looking at the document in front of me.

7   Q    Right.  And what about if you go to page 81 of 81 where

8   Mr. Shkreli has his name above of chief executive officer?

9   Upper right-hand column --

10  A    Excuse me.

11  Q    -- where it says 81 of 81.

12  A    I have the page, Counsel.

13  Q    And you see his signature, correct?

14  A    Yes.

15  Q    Now, your background and your role is described in this

16  document, correct, if you go to page 70 of 81?

17  A    Yes, the bio is on each of the directors.

18  Q    Mr. Aselage, you, and Mr. Shkreli.

19  A    Yes.

20           MR. BRODSKY:  Your Honor, we offer 104-97.

21           MS. SMITH:  No objection.

22           THE COURT:  We received 104-97.

23           (Defense Exhibit 104-97, was received in evidence.)

24  BY MR. BRODSKY:

25  Q    So, Mr. Richardson, this is filed on December 18th, 2012,

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

RICHARDSON - CROSS - BRODSKY                2234

1   the day after Mr. Shkreli sends you an email and says the

2   $10,000 will be treated as a loan, correct?

3   A    Yes.

4   Q    Is it your testimony that between December 17th and the

5   day this is filed, that that loan becomes an equity

6   investment?

7   A    I don't recall the date he and I had that conversation.

8   Q    What's the latest -- did you have that conversation on

9   whether or not that loan became a equity investment in March

10  of 2013?

11  A    I honestly don't recall, Counsel.

12  Q    2013 at all?  If you take the entire year of 2013, do you

13  know what happened in 2013?

14  A    Well, I certainly knew we had agreed to move it to stock

15  in '13.  But you just don't remember when we had that

16  conversation.

17  Q    Did you ever inform Mr. Greebel that it was a

18  10,000-dollar loan?

19  A    I didn't personally, but Mr. Greebel was usually on copy

20  of nearly all the transactions.

21  Q    Well, let me ask you that.  Let's put up Government

22  Exhibit 236 in evidence.  Put that up on the board.

23        This is an email exchange between you and

24  Mr. Shkreli, March 14th, 2013.  Do you remember, about your

25  reconciliation?

RICHARDSON - CROSS - BRODSKY                    2235

1    A    The one you just showed me earlier.

2    Q    The one right up here on the screen.

3    A    Yes.

4    Q    236 in evidence.  That's the one we discussed last week.

5         Well, actually, we didn't discuss it, you discussed

6    with the Government on direct examination.  We're going to get

7    do it later today.

8    A    Okay.

9    Q    Mr. Greebel is not copied on this email exchange about

10   your verbal arrangement regarding your understanding of how

11   many shares Mr. Shkreli committed to giving you, and the

12   company committed to giving you?

13   A    No, not on the March email, no.

14   Q    Okay.  And this March email actually refers to the

15   10,000-dollar loan; doesn't it?

16   A    Sorry, I don't have a copy.

17   Q    Let's go to page 2?

18        THE COURT:  Give him a copy, please.

19        MR. BRODSKY:  Oh, sure.  I'll give him my copy.

20        I've highlighted it, Mr. Richardson, so you have

21   that.

22        THE WITNESS:  Thank you.

23   Q    SR1504, it's your email to Mr. Shkreli on March 14th,

24   2013 at 10:57 a.m.

25        Do you see that?

RICHARDSON - CROSS - BRODSKY                    2236

1    A    Yes.

2    Q    And you were saying, Martin, here are the facts that I

3    have on file, correct?

4    A    Yes.

5    Q    And then under my additional investments into Retrophin,

6    you have 12/17/2012, correct?

7    A    Yes, I do.

8    Q    And it says $10,000, right?

9    A    Yeah.

10   Q    With your parenthetical that says, quote, being treated

11   as a loan pending repayment, end quote.

12   A    Yes.

13   Q    Now, can you point to a single public filing by Retrophin

14   where that 10,000-dollar loan is disclosed to the public?

15   A    I can't personally, no.

16   Q    And you personally never told Mr. Greebel that there was

17   a 10,000-dollar loan, correct?

18   A    I didn't personally, but I know Mr. Shkreli had copied

19   Mr. Greebel on the March exchange of information.

20   Q    All right.  Before we get to 104-99.  Did you know that

21   on February 7th, 2013, Mr. Shkreli told Mr. Greebel --

22              MS. SMITH:  Objection, Your Honor.

23   Q    -- that the $10,000 note --

24              THE COURT:  Hang on.  Hang on.

25              Are you objecting to the leading question?

1          MS. SMITH:  I'm objecting to the question about what

2     Mr. Shkreli told Mr. Greebel.

3          THE COURT:  All right, you'll have to rephrase it.

4          MR. BRODSKY:  Your Honor, I'm not offering it for

5     the truth.

6          THE COURT:  Offering it for what?

7          MR. BRODSKY:  Offer it for its lack of truth.  Offer

8     it for its -- a statement made by Mr. Shkreli.

9          THE COURT:  What's the basis of the admissibility

10    under the rules?  Do you have want to have a sidebar?

11         MR. BRODSKY:  I'll put it this way.

12         THE COURT:  Can you rephrase the question?

13         MR. BRODSKY:  Sure, Your Honor.  Sure.

14         Let me show you a document to try to refresh your

15    recollection.

16         I'm showing you what's marked as DX104-99.  If you

17    would take a moment to review that.

18              (Whereupon, the witness is reviewing the document.)

19         MS. SMITH:  Your Honor, can we have a sidebar on

20    this document?

21         THE COURT:  Yes.

22              (Continued on the next page.)

23              (Sidebar conference.)

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              2239

1        THE COURT:  All right.

2        MS. SMITH:  Your Honor, the witness is not on this

3   document.  Mr. Brodsky himself said just this morning he can't

4   ask a witness about something someone else did.  He's asking

5   about a conversation between two people that are not on this

6   email.

7        Mr. Brodsky also said prior to trial he wasn't going

8   to be making propensity arguments, and I'm not sure what the

9   relevance of this exchange is to the charged crimes.

10       MR. BRODSKY:  Several, Your Honor.  First, I'll

11  address the document.

12       This document is admissible in evidence for multiple

13  reasons.

14       First of all, it's relevant because Mr. Richardson

15  has testified and has represented in documents that the

16  $10,000 he gave was a loan.  And this is a lie by Mr. Shkreli

17  to Mr. Greebel that impacts the financial statements and the

18  public filings.

19       So here's a direct example as clear as day that

20  Mr. Greebel is being lied to by Mr. Shkreli about the nature

21  of Mr. Richardson's loan to the company.

22       Second --

23       THE COURT:  The basis of the admissibility, is what,

24  rules based?

25       MR. BRODSKY:  Under Rule 401 we believe it's

SIDEBAR CONFERENCE                              2240

1    relevant.  We don't believe there's any prejudice --

2              THE COURT:  Hearsay.

3              MR. BRODSKY:  It's not hearsay because under

4    Rule 801, 802 we're not offering it for its truth.  In fact,

5    we're offering it for falsity.  We are not offering it for its

6    truth.

7              Second, Your Honor, it is a business record of

8    Katten.  All of these statements we have, Katten keeps records

9    relating to their work in connection with the public filing.

10             As you can see, these are email communications

11   relating to what's included in the notes payable section of

12   public filing.  The fact that Katten is keeping it as a

13   business record is a separate basis.

14             But I don't want it in for the truth of

15   Mr. Shkreli's statements, it's obviously false.  I want it in

16   to show a few things, and it goes to Mr. Richardson's

17   credibility.  Why is this relevant?  Why is a 10,000-dollar

18   loan relevant?

19             It's relevant because Mr. Richardson's credibility

20   is on the line here.  There's been a lot of statements, he

21   just said this morning, that Mr. Greebel was copied on things

22   and aware of things.  Here's a direct example --

23             THE COURT:  He said a specific March exchange, which

24   I'm not sure what he's referring to.  He didn't say

25   Mr. Greebel was copied on everything.  What he referenced this

SIDEBAR CONFERENCE                    2241

1    morning was the March exchange of emails.  And I believe

2    regarding Mr. Richardson's, what he thought was his, you know,

3    his standing as an investor, I think that reconciliation

4    issue.  That's what I think he was referring to.

5              MR. BRODSKY:  Yes, Your Honor.

6              THE COURT:  General issue.

7              MR. BRODSKY:  We'll get to this later today, but

8    first the email between Mr. Shkreli and Mr. Greebel relating

9    to such reconciliation is December 6th, to September 13th,

10   2017.

11             And that particular email, as Your Honor saw from

12   the evidence, is quite narrow, unspecific, and doesn't talk

13   about the reconciliation.  There's a lot missing there.  We're

14   going to get to that with Mr. Richardson.

15             But this is an admissible document, Your Honor,

16   104-99.  And the Government does not the question its

17   authenticity.  The reason I want to show it and I'm happy to

18   offer it subject to connection, Your Honor, but it's really

19   important that I show it to this witness and display it to the

20   jury to show exactly that the 10,000-dollar loan is being --

21   there's a lie to Mr. Greebel.

22             This entire case the Government has, and they said

23   it, was based on the betrayal of trust.  Here is a betrayal of

24   trust by Mr. Shkreli because he's not telling the truth to

25   Mr. Greebel about this loan.

SIDEBAR CONFERENCE                          2242

1          And, Your Honor, what Mr. Greebel says here is that

2     this -- any loan needs to be disclosed, and he also says any

3     loan needs to be approved by the board.  Mr. Shkreli then says

4     it's an equity investment.  And we would from the March 2013

5     email that it's not.

6                THE COURT:  Okay.  Go ahead.

7                MS. SMITH:  Your Honor, this is the exact propensity

8     argument that Mr. Brodsky said he wasn't going to make.  This

9     isn't related to the charged conduct, it's related to the

10    settlement agreements, the consulting agreements with the

11    backdated interest.  It is a separate quote/unquote lie that

12    they are attempting to prove up.

13         This witness is not on this document.  This witness

14    has no personal knowledge of conversations between Mr. Shkreli

15    and Mr. Greebel.  He wants to ask him whether he ever had a

16    conversation with Mr. Shkreli or Mr. Greebel about the loan,

17    which he's already done.  He certainly can, but there's no

18    basis for this document to come into evidence.

19         The idea that an email is a business record, I mean

20    I think we just need to put that aside because otherwise it

21    would be every email in this case would come in as a business

22    record and we wouldn't have to have sidebars.  So it's clearly

23    not a business record.

24         But more importantly it is purely to show this

25    propensity evidence and with a witness who is not on this

SIDEBAR CONFERENCE                    2243

1   email.  So he's using Mr. Richardson to prove up something

2   that he is unaware of.  If this document was admissible,

3   defense has said a million times that they're putting on a

4   case, they can put on a case.  They don't need to do it in the

5   middle of our case with a witness who has never seen this

6   document.

7            MR. BRODSKY:  We don't want to call Mr. Richardson

8   again.

9            MS. SMITH:  It's not from Mr. Richardson.

10           THE COURT:  You wouldn't be able to put this in

11  through Mr. Richardson because, again, he knows nothing about

12  this.

13           You find someone who can establish that, A, this is

14  a business record; B, that this within records of the

15  regularly kept documents; C, you know, if you can show that

16  it's admissible and relevant, but he's not the right witness.

17           I'm not saying it's never going to be admissible,

18  just not through this witness.

19           MR. BRODSKY:  I understand, Your Honor.  But what I

20  don't want to do, and we may have to do it, and I just want to

21  make sure that Your Honor is going to be okay with it.  If we

22  put on our case, and we put this document in evidence, we may

23  have to recall Mr. Richardson once it's in evidence to

24  question him about this document.  That we would be allowed to

25  do.  I'm trying to avoid having Mr. Richardson come back.

SIDEBAR CONFERENCE                                     2244

1          THE COURT:  That's fine.  You can -- if you put on a

2     case and if you are able to get this admitted through some

3     other witness, other than Mr. Richardson, on an appropriate

4     evidentiary ground, you call Mr. Richardson to confront him

5     about this document.  But I think it would be somewhat useless

6     because he's never seen it.  He has no idea.

7          He did testify that it started as a loan and was

8     converted to an equity investment.  We don't know when that

9     happened.  He seems to be unable to recall precisely when that

10    happened.  I don't know how he can possibly should any light

11    on the discussions he's not a party to.

12         MR. BRODSKY:  The Government exhibit that's just in

13    evidence, 236, is a March 2013 email which reflects that he

14    believes as a factor it's still a loan.  And this is early in

15    time which reflects that Mr. Shkreli is lying to Mr. Greebel

16    about it.

17         Your Honor, we're not offering it for its truth.

18    The authenticity is without questioning, we should be allowed

19    to do it, Your Honor, and I, you know, just respectfully

20    request to allow this into evidence, even subject to

21    connection.

22         MS. SMITH:  Your Honor, I think Your Honor has

23    already ruled.  If he wants to put it in in our case, if they

24    want to recall Mr. Richardson if they can, which we disagree

25    that they can, but we're going to have this problem --

SIDEBAR CONFERENCE                    2245

1           THE COURT:  Why couldn't they recall Mr. Richardson

2      in their case?

3           MS. SMITH:  No, they could.  I'm not sure that it's

4      appropriate to discuss this document.

5           THE COURT:  Okay, thank you.

6           (End of sidebar conference.)

7           (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                   2246

1   BY MR. BRODSKY:

2   Q    Mr. Richardson, I'm not offering 104-99 for

3   identification.  I was offering it, your Honor, but you've

4   ruled, your Honor.

5              104-99 for identification, Mr. Richardson, does that

6   document refresh your recollection refresh your recollection

7   that Mr. Shkreli told you that he was going to tell

8   Mr. Greebel that the $10,000 was not a loan but an equity

9   investment?

10  A    Mr. Shkreli had that conversation with me but he never

11  referenced a conversation with Mr. Greebel.

12  Q    If we put back up 236 in evidence.

13             THE COURT:  Can we just have some clarity.  The

14  witness said, Mr. Shkreli had that conversation with me, that

15  conversation meaning what conversation?  Then he said he never

16  had that conversation with Mr. Greebel.  I'm not sure what

17  that conversation is.

18  BY MR. BRODSKY:

19  Q    Mr. Richardson, when you just testified you had a

20  conversation with Mr. Shkreli, you're testifying that

21  Mr. Shkreli told you they are treating the $10,000 as a loan

22  but not an equity investment, right?

23  A    No, counsel.  I thought the question was the opposite.

24  He had come to me and said we're treating it as equity, is

25  that right; and he said, yes.  So I had the conversation with

SIDEBAR CONFERENCE                                    2247

1   Martin Shkreli, as I said earlier in my testimony, at some

2   point earlier in this time window.

3   Q    Let's put up --

4            THE WITNESS:  He never referenced, Judge,

5   Mr. Shkreli never referenced having that conversation to me

6   with Mr. Greebel.

7   Q    Let's put up 236 in evidence.  Again, do you have that in

8   front of you, Mr. Richardson?  As of this date, March 14,

9   2013, pursuant to your own words, Mr. Richardson, as of

10  March 14, 2013 that $10,000 was being treated as a loan,

11  correct?

12  A    Yes, that's per my e-mail on March 14.

13  Q    Right.  So at some point after March 14, 2013, you're

14  representing that Mr. Shkreli told you, we're going to switch

15  it from a loan to an equity investment, right?

16  A    I don't recall when that conversation happened.

17  Q    You don't recall when it happened but it had to be after

18  March 14, 2013, correct?

19  A    Logically, based on what I said here, yes logically.

20  Q    And you don't see Mr. Greebel on this e-mail exchange,

21  correct, about your reconciliation, right?

22  A    No, but there's related e-mails about the conversation

23  where Mr. Greebel is copied and also writes to me.

24  Q    On September 7, 2013, correct?

25  A    No, there are e-mails in March.

SIDEBAR CONFERENCE                                    2248

1   Q     There are e-mails in March?

2   A     Yes.

3   Q     There is an e-mail in March.  You're testifying on direct

4   examination you were shown an e-mail in March 2013 regarding

5   your holdings, regarding the reconciliation or your shares in

6   Retrophin, and Mr. Greebel was copied on that; is that your

7   testimony?

8   A     No.  I'm saying there were e-mails from Mr. Greebel about

9   the filings related to my shares.

10  Q     And the e-mails from Mr. Greebel about the filing of your

11  shares talks about 99,000, roughly, under 100,000 shares,

12  correct?

13  A     No.  I believe one of the e-mails said, following my

14  conversation with Mr. Shkreli, I understand the company is

15  going to award you, there was something about the findings of

16  Mr. Greebel to confirm to me that he had spoken with

17  Mr. Shkreli.

18  Q     You believe this happened in March?

19  A     Again, I don't remember exact dates, but it was around

20  the time of my exchange with Mr. Shkreli, around all the

21  reconciliation, it was around that time window.

22  Q     Let's put up some of the Government's Exhibits that they

23  put in evidence.

24        Government's Exhibit 234 in evidence.  March 8,

25  2013, e-mail exchange -- I apologize, I don't have a paper

SIDEBAR CONFERENCE                                    2249

1   copy for you, Mr. Richardson.  If you want one, I can get one.

2                    THE WITNESS:  Can I ask if I can have access on my

3   screen?  Is that possible?

4                    THE COURT:  I'm going to give him a copy.

5                    THE WITNESS:  My apologies.

6                    THE COURT:  I'll give him a copy from mine.  I think

7   he needs copies.  He really can't see the document.  Counsel,

8   don't you have copies.

9                    MR. BRODSKY:  Yes.

10                    THE COURT:  I'll give him my copy.  I'll go without

11   it.

12                    MS. SMITH:  I can give the Government's Exhibits

13   back.

14                    THE COURT:  All right.  Because the witness can't

15   see.  He doesn't have it on his screen.  He needs the hard

16   copy as least.  I can give him my copy, it's easier.  Let's

17   keep it moving.

18   BY MR. BRODSKY:

19   Q    You were shown that e-mail exchange with respect to your

20   conversation with Mr. Shkreli about his, your verbal

21   arrangement with him to receive five-plus percent of the

22   shares, correct?

23   A    Yes, on the top of the page, yes.  Thank you.

24   Q    Isn't this -- Mr. Greebel is not copied on this e-mail,

25   correct?

SIDEBAR CONFERENCE                    2250

1    A    On this e-mail exchange, no.

2    Q    Okay.  At the bottom, Mr. Richardson, don't you say on

3    March 7 -- can we blowup the bottom -- March 7, 2013, don't

4    you say to Mr. Shkreli, "Evan's team sent me back the Form 4

5    saying I hold 99,055 shares"?

6    A    Yes, from one of the Katten associates.

7    Q    Not 300,000 shares, correct, not 200,000 shares, correct?

8    A    No.  But this is March 7.  Later in the month after the

9    discussions around, I believe there was subsequently an e-mail

10   from Mr. Greebel that says, I've spoken to Mr. Shkreli and I

11   understand we're now putting to the board.

12   Q    Great.  Let's go to Government's Exhibit 236.  The one I

13   just showed you, Mr. Greebel is not copied on this e-mail

14   exchange, correct?

15   A    That's correct.

16   Q    Okay.  Let's go to the next one the Government put in,

17   I'll get back to this a little later, Mr. Richardson, but I

18   feel compelled to do this now.

19        Let's put up the next Government's Exhibit, 244 in

20   evidence, at the bottom?

21             THE COURT:  The witness needs a copy.

22             THE WITNESS:  Thank you, counsel.

23   Q    244 in evidence.  Mr. Richardson, wasn't that the first

24   e-mail you were shown on direct examination by the Government

25   where Mr. Greebel is on an e-mail regarding your shares?

SIDEBAR CONFERENCE                                    2251

1  A    This is certainly one of them, but I still believe there

2  was an exchange, an e-mail, from Mr. Greebel earlier in the

3  year around the March time frame.

4  Q    What is the date?  Tell us the date, sir?

5            MS. SMITH:  Objection, your Honor.

6            THE COURT:  Sustained.

7  Q    Do you know the date, Mr. Richardson?

8  A    I know it was subsequent to my exchange with Mr. Shkreli

9  from Government's Exhibit 236.  Sometime in the later March

10  window, to my recollection.

11  Q    Mr. Richardson, are you representing to this jury, are

12  you telling this jury and testifying here today, that you were

13  shown a document, before September 7, 2013, on your direct

14  examination, where Mr. Greebel is copied on an e-mail --

15            MS. SMITH:  Objection.

16  Q    -- relating to your share ownership?

17            MS. SMITH:  Objection, your Honor.

18            THE COURT:  Sustained as to form.

19  Q    Mr. Richardson, are you testifying that during your

20  direct examination you were shown an e-mail prior to

21  September 7, 2013, dated in or about March 2013, where

22  Mr. Greebel was copied on it reflecting your ownership your

23  arrangement with Mr. Shkreli?

24            MS. SMITH:  Objection, your Honor.

25            THE COURT:  It's sustained.  Form.  Do you want just

1   to talk quickly at sidebar I'll tell you why I'm sustaining.

2   Q    Mr. Richardson, isn't it true there is no e-mail prior to

3   September 7, 2013, where Mr. Greebel is on an e-mail with you

4   and Mr. Shkreli relating to your verbal arrangement, your

5   verbal agreement, owning five-plus percent of Retrophin?

6   A    My recollection, counsel, as I've said, it was an e-mail

7   from Mr. Greebel to me confirming that he had spoken to

8   Mr. Shkreli about the overall discussions.  And there was one

9   piece of it, I don't recall if it was in this big binder or

10  not from the Government, I do recall in March there was an

11  e-mail from Mr. Greebel to me and I'm assuming Mr. Shkreli was

12  copied.

13  Q    Could it be true your memory is mistaken, sir --

14  withdrawn.

15          This is a time when you think Mr. Aselage is still

16  the CEO of the company, correct?

17  A    No.  And to clarify my recall on that when you asked me

18  that on Wednesday, what confused me about that was there was

19  an exchange between Mr. Shkreli and Mr. Aselage in February of

20  2013 where they were debating how to proceed or whether to

21  proceed again on the Valeant drug deals.  That's what confused

22  my recollection.  It wasn't clear to me if Mr. Aselage was

23  still acting as an executive.  That is what confused me when

24  you asked me that, counsel, last question.

25  Q    Might your recollection about Mr. Greebel being aware of

SIDEBAR CONFERENCE                              2253

1   this verbal understanding you had with Mr. Shkreli about

2   getting five-plus percent of Retrophin stock be mistaken

3   regarding this recollection you have of March 2013?

4   A    I have a high recollection of an e-mail, because it

5   referenced specifically that it would need to go to the Board

6   for approval, which is why I think Mr. Greebel was reaching

7   out to me to ask me what the due process was, that's why it

8   stuck.  Wouldn't have been a verbal conversation with Mr.

9   Greebel, it would have in an e-mail.

10  Q    You believe you saw that e-mail on direct examination by

11  the Government?

12           MS. SMITH:  Objection, your Honor.

13           THE COURT:  Sustained.

14  Q    Now, you understand that the Board, from your experience

15  and oversight, that the Board of directors of Retrophin had to

16  approve of a loan, any loan, being given by a Board member to

17  the company?

18  A    At that point at time, no, I didn't recall that.

19  Q    I'm not asking you, Mr. Richardson, when you recall it.

20  As a Board member, was it your understanding that any loan

21  made by any Board member to the company, had to be approved by

22  the Board of Directors?

23  A    No, I didn't recall that.

24  Q    Let's go to DX104-97, which is in evidence now.

25  Mr. Richardson, you recognizance it as an SEC filing, right?

SIDEBAR CONFERENCE                                   2254

1   A    Yes, the form 8K.

2   Q    This was an exciting time?

3   A    Yes.

4   Q    Retrophin is now a public company?

5   A    Yes, once we completed the reverse merger.

6   Q    And Katten Muchin provided advice with respect to the

7   disclosures of risk factors that should be included in this

8   public filing?

9   A    I would assume that's the case, yes.

10  Q    Let's go to the risk factors, sir.  Let's go to page 25

11  of 81.  Do you see that there, Mr. Richardson?

12  A    Yes, I have page 25.

13  Q    Does it not say -- this is publicly filed, correct?

14  A    Yes, the 8K is publicly filed.

15  Q    Anybody interested in, potentially interested in

16  purchasing shares of Retrophin stock could access this

17  document and learn about the company?

18  A    Yes.

19  Q    And under the risk factors does it not say, The company

20  is still in the development stage and has not generated any

21  revenue.  You see that on page 25 of 81 in bold.  I think,

22  Mr. Carter, you have to go to upper, right-hand corner where

23  it says 25 -- my numbers don't coordinate with yours.  I'm

24  sorry, it does, I just folded down the page.

25          23 of 81, I'm sorry to confuse you, Mr. Richardson.

SIDEBAR CONFERENCE                                    2255

1   A    It's okay.

2   Q    Do you see where it says in bold, The company is still in

3   the development stage and has not generated any revenues?

4   A    Yes.

5   Q    Do you see where it says under the next bolded category,

6   Risks related to our financial position and need for

7   additional capital, it states, We have incurred operating

8   losses since our inception?

9   A    Yes.

10  Q    You understand that is telling the public we've only lost

11  money since inception?

12  A    Which is typical for a start-up situation like this.

13  Q    The next page, if we go to page 24 of 81, says, No

14  operating history, does it not?

15  A    Yes.

16  Q    It warns the public as a risk factor as of the date of

17  this filing Retrophin has not generated any revenues.

18  A    That's correct.

19  Q    And under future profitability uncertain, do you see that

20  there?

21  A    Yes.

22  Q    Does it not say, Retrophin is an early-stage corporation?

23  A    Yes, it does.

24  Q    Does it not say, There can be no assurance that the

25  revenues from product sales or licensing arrangements will

SIDEBAR CONFERENCE                          2256

1   ever be achieved?

2   A      Absolutely.

3   Q      Then it goes on to say, in the fourth sentence or fifth,

4   Retrophin may incur significant operating losses over the next

5   several years?

6   A      Yes.

7   Q      There is a next section on the next page, page 25 of 81,

8   that describes the legal risks, correct?

9   A      Yes.

10  Q      Legal risks, for example, where it says, The

11  pharmaceutical industry historically has generated substantial

12  litigation, do you see that on the third paragraph?

13  A      Yes, I do.

14  Q      Concerning the manufacture, use and sale of products and

15  we expect this litigation activity to continue?

16  A      Yes.

17  Q      Litigation means higher costs for the company?

18  A      Potentially, yes.

19  Q      Higher costs for legal counsel, correct?

20  A      Potentially, yes.

21  Q      And then on page 27 of 81, does it not say in bold, Our

22  short operating history may make it difficult for you to

23  valuate the success of business to date and to assess our

24  future viability?

25  A      Yes, it does.

SIDEBAR CONFERENCE                                    2257

1   Q      It goes on in the next paragraph to talk about the

2   material weakness and internal control over financial

3   reporting?

4   A      Yes.

5   Q      Doesn't it state in that first full paragraph, In

6   connection with the preparation of Retrophin's audited

7   financial statements for the period March 11, 2011, inception,

8   through December 31, 2011, our independent auditors advised

9   management that a material weakness existed in internal

10  control over financial reporting?

11  A      Yes, it does.

12  Q      Meaning, Retrophin was an organizational mess, correct?

13  A      It was setting up.  Again, because the change of strategy

14  we now knew we had to build out our own finance department.

15  Q      You understood, as you were on the Board of managers

16  during this period of time when it was a mess, that this is

17  typical of start-up companies?

18  A      A large part of what is covered here is typical for

19  start-up situations until they get to revenue-producing

20  products.

21  Q      A lot of that is they don't have the documents in order,

22  correct?

23  A      That could well be part of it.

24  Q      Now, down on the bottom it says in bold, Retrophin's

25  auditors have expressed doubt about our ability to continue as

SIDEBAR CONFERENCE                                    2258

1    a going concern, do you see that?

2    A    Yes, I do.

3    Q    It explains it on the next page where it says, out

4    independent accountants report issued in connection with our

5    audited financial statements for the period of March 11, 2011,

6    inception, through December 31, 2011, stated that the company

7    as a development stage enterprise is subject to risks and

8    uncertainties as to whether it will be able to raise capital

9    and commence its planned operations.  Do you see that?

10   A    Yes.

11   Q    It goes on to say, These conditions raise substantial

12   doubt about the company's ability to continue as a going

13   concern, correct?

14   A    Yes.

15   Q    Going concern, means a live company, correct?

16   A    Yes.

17   Q    If we go to page 59 of 81, if you blowup the operating

18   expenses, let's just take for the nine months ended

19   September 30, 2012.  What were the operating expenses for the

20   nine months, nine-month period starting January 2012 through

21   the end of September 30, 2012, what were they?

22   A    You want me to read from here?

23   Q    Sure.

24   A    Operating expenses were approximately 16.76 million for

25   the nine months ended September 30, 2012.

SIDEBAR CONFERENCE                                    2259

1   Q    And these are costs regarding -- what is the described

2   here, they include consultant fees, correct?

3   A    Yes.

4   Q    Professional fees, I see.

5   A    Yes.

6   Q    Research and development fees?

7   A    Yes.  Research and development is a big cost line for any

8   of these start-up entities.

9   Q    Part C, Legal expenses related to production acquisition

10  employment and consulting agreements and general corporate

11  work, right?

12  A    Yes.

13  Q    Consulting fees, correct?

14  A    Yes.

15  Q    Accounting fees, under E?

16  A    Yes.

17  Q    And again your description of your background here is on

18  page 70.  If we go to page 69 first, management and directors.

19  Does it say, Effective December 17, 2012, Mr. Shkreli,

20  Aselage, and Richardson became directors of the company?

21  A    That's what it says here, yes.

22  Q    Then it gives a description of Mr. Shkreli, who was 29 at

23  the time?

24  A    Yes.

25  Q    And they say, He's the founder of Retrophin LLC.

SIDEBAR CONFERENCE                                    2260

1    A    Yes, it does.

2    Q    Then it talks about, Also the founder and managing

3    partner MSMB Capital?

4    A    Yes.

5    Q    A New York hedge fund founded in 2006 that manages a

6    variety of partnerships, right?

7    A    Yes.

8    Q    This is declaring to the public in a Retrophin filing,

9    where you're a member of the Board of Directors, that MSMB

10   Capital, as management, is still in existence, correct?

11   A    I'm not sure where it says it's still in existence.

12   Q    Does it not say "founded 2016 that manages a variety of

13   partnerships," as opposed to managed?

14   A    I didn't register that nuance.

15   Q    The next page, sir, where it talks about Mr. Aselage it

16   has his background, right?

17   A    Yes.

18   Q    Then it has your background, correct?

19   A    Yes, it does.

20   Q    Then down on the bottom, employment agreements with

21   executives.  We do not have any employment agreements.  Do you

22   see that?

23   A    Yes, I do.

24   Q    You didn't have any employment agreements because you

25   were operating on a shoe-string budget; is that right?

SIDEBAR CONFERENCE                    2261

1    A    Yes, while we were privately held.

2    Q    Privately held companies don't have employment

3    agreements?

4    A    Some do and some don't.  Again, because remember, the

5    strategy before now is that we were looking to merger, we were

6    looking to merger so we weren't building internal structure.

7    Now we're moving this direction, we're now registering.  We

8    need to build our own infrastructure and get our own financing

9    sources.

10   Q    Let's turn to you and Mr. Greebel, if we can put that

11   document aside.

12            Do I have this correct, between 2011 through

13   September 2014, you met in person Mr. Greebel on two

14   occasions?

15   A    No, before September '14, I would have met him on more

16   occasions than that.

17   Q    Before September '14?

18   A    You said September '14.

19   Q    I'm sorry.  The first occasion you met Mr. Greebel was

20   September 2013.

21   A    That's my recollection, I met him briefly in the

22   Retrophin office.

23   Q    How briefly?  How many minutes was the exchange?

24   A    A quick lunch meeting.

25   Q    Who was present for the lunch meeting?

SIDEBAR CONFERENCE                          2262

1   A    Mr. Shkreli, it was Mr. Aselage who was in town, which is

2   why it was an impromptu lunch.

3   Q    Who else was present?

4   A    One or two the employees probably sat in for part of it.

5   Mr. Panoff I believe.  It was an informal lunch, four or five

6   people.

7   Q    The second occasion you met Mr. Greebel in person was at

8   the February 2014 Board meeting in person, correct?

9   A    Yes, that's correct.

10  Q    Then there were other occasions between February 2014 and

11  September 2014 where you met Mr. Greebel in person?

12  A    Yes, we had face-to-face Board meetings, I believe in

13  May, where we had them at Katten office.

14  Q    That's the third time you met Mr. Greebel?

15  A    Then there was an August meeting too with a Board dinner

16  as a recall.

17  Q    The fourth time you met Mr. Greebel in person.

18  A    Yes.

19  Q    Any in September 2014?

20  A    We had Board meetings, but Mr. Greebel wasn't invited as

21  a recall.

22  Q    You sat next to him at the dinner table in the

23  February 2014 Board meeting?

24  A    That's correct.

25  Q    Was this informal dinner before or after the Board

SIDEBAR CONFERENCE                                    2263

1    meetings was held?

2    A    The night before, as a recall.

3    Q    Mr. Shkreli was not at your table, right?

4    A    Yes, it was one continuous table.

5    Q    You were not, you and Mr. Greebel were not seated near

6    Mr. Shkreli?

7    A    He was, I think Mr. Shkreli was opposite us.  It was a

8    long table.

9    Q    You testified that you talked a little socially, you

10   know, a little bit about, you know, family dynamic and what

11   have you with Mr. Greebel?

12   A    Yes.  When we sat down at the table it was the first time

13   I really had a chance to talk with him one on one.

14   Q    What did you say when you meant family dynamic?  What did

15   you say to him and he say to you about the family dynamic?

16   A    I was asking about his family to understand did he have

17   children, those sort of conversations.  The polite cocktail

18   conversations type things when you're meeting someone,

19   effectively, for the first time.

20   Q    Since you testified about it on direct examination, tell

21   us, what did you say to him about family dynamic and what did

22   he say to you?

23          MS. SMITH:  Objection, your Honor.

24          THE COURT:  I'll overrule the objection.

25   A    I believe he said he had two or three children.  And I

*Rivka Teich CSR, RPR, RMR*
*Official Court Reporter*

SIDEBAR CONFERENCE                                    2264

1    reaffirmed, I think I talked about my gay partner.  That part

2    was fairly quick as we sat down.  It was something along those

3    lines, just a quick headline or two about who were as

4    individuals.

5    Q    You obviously between 2009 and 2014, September 2014,

6    you've obviously gone out to the dinner with Mr. Shkreli,

7    correct?

8    A    Yes, in that time, yes.

9    Q    You have also in that time gone to dinner with

10   Mr. Shkreli and at least one of his girlfriends, right?

11   A    Yes.

12   Q    You've gone out to dinner during of that period of time

13   2013 through September 2014 with Mr. Panoff and his wife,

14   right?

15   A    At an outside function, I believe I met Mr. Panoff's

16   wife.

17   Q    You never met Mr. Greebel's wife?

18   A    I don't believe I did.

19   Q    You never spent any social time with Mr. Greebel?

20   A    No, I did not.

21   Q    As far as you know, based on your personal knowledge,

22   Mr. Shkreli never spent any social time with Mr. Greebel and

23   his wife, correct?

24             MS. SMITH:  Objection, your Honor.

25             THE COURT:  Sustained.

SIDEBAR CONFERENCE                              2265

1    Q    Did you ever observe Mr. Shkreli meeting Mr. Greebel and

2    Mr. Greebel's family?

3    A    No, not the family, no.

4    Q    As far as you know, Mr. Shkreli never spent time

5    socializing with Mr. Greebel, correct?

6    A    Not separate to the Board dinners, the Board dinners

7    Mr. Greebel will be there with the rest of us, not outside of

8    those to my knowledge.

9    Q    Now, you talked about expectations during your

10   conversation with Mr. Greebel in February 2014.  You described

11   that you talked about the expectation you and the Board had of

12   him, because at that point he was, quote, "our counsel," do

13   you remember that testimony?

14   A    Yes, I do.

15   Q    You know Mr. Greebel was a partner at Katten Muchin,

16   right?

17   A    Yes, I do.

18   Q    And you know Katten Muchin was Retrophin's client, right?

19   A    Yes.

20   Q    Now, let me do this, we were talking about the bylaws, do

21   you remember that when we left off on Friday we started the

22   conversation?

23   A    Yes, I do.

24   Q    Not Friday --

25   A    Yes.

SIDEBAR CONFERENCE                           2266

1    Q    -- Wednesday, it's all the same.

2            THE COURT:  Mr. Brodsky, I don't mean to interrupt

3    but I wanted to correct something you said.  You said

4    something to the effect that Katten Muchin was Retrophin's

5    client.

6            MR. BRODSKY:  I apologize.  Thank you, your Honor.

7    Q    Retrophin was Katten Muchin's client.

8    A    Thank you.

9    Q    Let's turn to DX104-79.  You're familiar with the amended

10   and restated bylaws of Retrophin, correct?

11   A    I recall they were issued.  I don't recall if I reviewed

12   the revised ones.

13           THE COURT:  Is 104-79 in evidence?

14           MS. SMITH:  No.

15           THE COURT:  Turning to it, do you want to give a

16   copy to the witness?  Do you have it?

17           THE WITNESS:  I don't have it in front of me.

18           MR. BRODSKY:  We're looking for it right now.

19   MR. BRODSKY:

20   Q    Let me ask you some background questions before we

21   provide that to you, Mr. Richardson.  You understand that

22   bylaws of the corporation control the roles and the authority

23   of the Board and the officers, correct?

24   A    Yes, it does amongst other things it does include that.

25           MR. BRODSKY:  May a approach, your Honor.

SIDEBAR CONFERENCE                    2267

1          THE COURT:  Yes.

2    BY MR. BRODSKY:

3    Q    Fair to say the bylaws are what the Board looks too in

4    terms of the powers that the Board has, correct?

5    A    It certainly confirms it to the shareholders and to the

6    public.

7    Q    Let's me show you DX104-79.

8    A    Thank you.

9    Q    Take a moment to look at the document.  For the record,

10   it's a document entitled Retrophin Inc. Form 8K filed on

11   January 7, 2014 with the SEC.

12          Directing your attention, Mr. Richardson, as you

13   look through the document, there is a portion of the document

14   that's titled, amended and restated bylaws of Retrophin Inc.It

15   has the articles.  Mr. Richardson, do you recognize that?

16   A    I don't recognize this version.  I recall the one you

17   shared last Wednesday, the Gateway's ones which we adopted

18   after the merger.

19   Q    We offer it --

20          MS. SMITH:  Your Honor, our objection is only it has

21   some cover pages on it that I'm not sure what they are.  It

22   also looks like excerpts instead of the whole document.

23          MR. BRODSKY:  It's the complete filing, you Honor,

24   as we pulled it down from the SEC website on January 7, 2014.

25   It's a Form 8K that was filed.  And we pulled it down actually

SIDEBAR CONFERENCE                              2268

1    from Lexus Nexus whatever the complete document was.

2              THE COURT:  In July -- January 7.

3              MR. BRODSKY:  2014.  There were --

4              THE COURT:  Why does it say July 7, 2017 on the

5    front?

6              MR. BRODSKY:  That's the date that we printed it.

7              THE COURT:  So this was from Lexus not the SEC.

8              MR. BRODSKY:  Yes, Lexus keeps a copy of all the

9    records of the SEC.  We're happy to put in the one from the

10   SEC website, your Honor, but it's the exact same.

11             THE COURT:  All right.  Do you have a copy of that

12   handy can we just use the actual document from the SEC?

13             MR. BRODSKY:  At lunch time we can do it.  I would

14   like to go through it.  I represent to your Honor, it's a

15   duplicate of what is filed on the SEC website.

16             THE COURT:  Does the Government have a copy that

17   they could provide to we can move this forward?

18             MS. SMITH:  Not this particular 8K.  We can admit it

19   if as represented as the full document.  We can admit the

20   original from the SEC website and we can move forward now.

21             THE COURT:  All right.  So to be clear, you will

22   substitute the original or the document that you will obtain

23   from the SEC website.

24             MR. BRODSKY:  Yes.

25             THE COURT:  And substitute that as Defendant's

SIDEBAR CONFERENCE                              2269

1    Exhibit 104-79, but you may in the meantime question him on

2    this document that is pulled out of the Lexus in July of this

3    year.

4            MR. BRODSKY:  Thank you.  Do you want to label it

5    104-79B?

6            THE COURT:  Just call it A.

7    BY MR. BRODSKY:

8    Q    Let's turn to the second page of the document, just so we

9    can see what is.  That's the -- you recognize that as a

10   standard form or document a Form 8K?

11   A    A standard form.  I don't believe this was circulated to

12   the Board, I don't recall receiving this.  To your question,

13   yes, this is standard format.

14   Q    And you don't recall it being circulated to you, but is

15   that because you don't recall it or you are definitive it

16   wasn't circulated to you, Mr. Richardson?

17   A    I can't be definitive, but I don't recall this being

18   circulated.

19   Q    You remember talking about amending it to expand the

20   indemnification, the director and officer insurance?

21   A    I remember there was a discussion about one of the

22   content elements, yes.  But if it was the final document, I'm

23   not sure it was circulated.

24   Q    You remember Board discussions in 2013, where the Board

25   was very focused on expanding the insurance coverage for Board

SIDEBAR CONFERENCE                                     2270

1    members and executive officers in case of any litigation or

2    claims against the Board or its executive officers, correct?

3    A    That was one of the subjects being covered during one of

4    the meetings.

5    Q    That was something that was important to you.

6    A    Yes, yes.  As we said D&O insurance is very important.

7    Q    Directors and Officers --

8    A    Directors and Officers insurance.

9    Q    Very important because if a lawsuit is filed against the

10   Board members or the officers, the Directors and Officers

11   insurance provides that for the directors, Board members, and

12   for those executive officers, they get to have their

13   reasonable legal fees and expenses paid for.

14   A    That's correct.

15   Q    This is important because legal fees and expenses, legal

16   fees and costs, can be extraordinarily high in connection with

17   potential lawsuits.

18   A    That's correct.

19   Q    That was a concern of the Board members, correct?

20   A    That was the concern, yes.  We are in a high-risk set up

21   in this period of time here.

22   Q    High risk because you were a start-up company and the

23   stock price was going up?

24   A    Overtime it was.

25   Q    As the stock price was going up, there was success, you

1    were vulnerable to potential lawsuits?

2    A    Not just because of the success, but certainly we were

3    gaining more attention as we grew and became more successful.

4    Q    As you gain more attention, more successful, you're more

5    vulnerable to a lawsuit?

6    A    It can happen.  The classic spotlight issue, when the

7    spotlight is on you you can attract some of those things.

8    Q    Let's go to the second page of the document.  The second

9    page of the document just describes agreements that were

10   entered into, correct?

11   A    Entry into a material definitive agreement, on that page,

12   counsel?

13   Q    Yes.  There were material definitive agreements that were

14   entered into by the company?

15   A    Yes.

16   Q    That's one of the reasons the company was making this

17   filing, correct?

18   A    That's right.

19   Q    Then where it says, item 5.03, Amends to the articles of

20   corporation or bylaws change in fiscal year, do you see that?

21   A    Change of fiscal year, I recall that.

22   Q    On January 6, 2013, the Board of Directors of the company

23   approved and adopted amended and restated bylaws of the

24   company, correct?

25   A    Yes, it does.

SIDEBAR CONFERENCE                           2272

1    Q    And it goes on to explain the reason for this was to,

2    quote, "Facilitate direct share registration of the common

3    stock," do you see that?

4    A    Yes.

5    Q    What did that mean?

6    A    Again, now this is a window where we established

7    ourselves after the reverse merger, establishing the stock

8    profiles.

9    Q    This is in early 2014, Mr. Richardson.

10   A    Oh, I thought you said '13.

11   Q    I'm sorry.  Withdrawn.  You're right, in January 6 the

12   company approved and adopted.  You're right.

13        Do you remember approving and adopting those amended

14   and restated bylaws of the company in January?

15   A    I don't recall those dates.  But I know we had a series

16   of unanimous written consents approving certain things in that

17   time window.

18   Q    On the next page it has an attachment that says 3.1,

19   amended and restated bylaws of Retrophin Inc. effective as of

20   January 6, 2014, right?

21   A    Yes, it does.

22   Q    That is an attachment to the filing with the SEC?

23   A    Yes, these are exhibits on the back.

24   Q    Who signs this on behalf of the company?

25   A    I believe it's Mr. Shkreli or Mr. Panoff the CFO.

SIDEBAR CONFERENCE                                    2273

1   Q    Next page we'll see Mr. Panoff, the CFO, correct?

2   A    That's correct, he signed this one.

3   Q    Let's turn to the exhibit 3.1, which are the bylaws, the

4   amended and restated bylaws.  Do you see that there?  If we go

5   to, Mr. Carter, you'll see it has no page number, but you'll

6   see it if scroll a little bit it says amended and restated

7   bylaws.  Thank you.

8            It describes offices, correct, Article I what

9   offices Retrophin has, registered office, correct?

10  A    Yes, it does.

11  Q    Talks about how the principal office of the corporation

12  in the State of Delaware should be located in a place as the

13  Board of Directors may determine from time to time?

14  A    Yes.

15  Q    Then Article II talks about meetings of stockholders,

16  correct?

17  A    Yes, it does.

18  Q    It has the rules governing when stockholders can meet and

19  how they can meet.

20  A    Yes.  I believe this is the one that we reviewed last

21  Wednesday, you shared last Wednesday, from Desert Gateway.

22  Q    If we scroll to Article III, you see where it says

23  directors, page four, if we blow that section up so we see it.

24  Thank you.

25            It says, 3.1, authorized directors.  The number of

SIDEBAR CONFERENCE                    2274

1    directors that shall constitute the whole Board of Directors

2    shall be determined by a resolution of the Board of Directors

3    or by the stockholders at the annual meeting of the

4    stockholders, correct?

5    A    That's right.

6    Q    Then it goes on to say, each director elected shall hold

7    office until his successor is elected and qualified.

8    A    Yes.

9    Q    Directors need not be stockholders.

10   A    Yes.

11   Q    A provision there about vacancies?

12   A    Yes.

13   Q    Page five, 3.3 Board authority.  Read that.

14   A    "The business of the corporation shall be managed by or

15   under the direction of its Board of Directors, which may

16   exercise all such powers of the corporation and do all such

17   lawful and things as are not by statute or by the certificate

18   of incorporation or by these bylaws directed or required to be

19   executed or done by the stockholders."

20   Q    If we scroll to the next page, page six, it talks about

21   actions without a meeting of the Board, correct?

22   A    Yes, 3.9.

23   Q    That's when the Board wants to take an action but they

24   are not meeting, correct?

25   A    That's right.

SIDEBAR CONFERENCE                                2275

1   Q    3.10 authorizes the Board to conduct Board meetings by

2   telephone, correct.

3   A    When necessary, yes.

4   Q    3.11 talks about the committees that the Board may

5   designate?

6   A    Yes, it does.

7   Q    3.12, sir, let me read it, "Minutes of meetings," do you

8   see that there?

9   A    Yes.

10  Q    Am I reading this correctly, "Minutes of meetings.  Each

11  committee shall keep regular minutes of its meetings and

12  report the same to the Board of Directors when required," do

13  you see that?

14  A    Yes, I do.

15  Q    Then let's go to the next page, talks about removal of

16  directors, do you see that?

17  A    Yes, 3.14.

18  Q    Unless otherwise provided by certificate of incorporation

19  or these bylaws, any director or the entire Board of Directors

20  may be removed with or without cause by the holders of the

21  majority of shares entitled to vote in an election of

22  directors, do you see that?

23  A    Yes.

24  Q    To remove a member of the Board of Directors, you need a

25  majority of the stockholders.

SIDEBAR CONFERENCE                              2276

1   A     Yes.

2   Q     There is nothing in here, correct, regarding the minutes

3   that requires, under the bylaws, the Board members to approve

4   the minutes of the Board that occurred at the prior meeting.

5   Let's say there was a meeting of the Board of Directors on a

6   Monday, and there were minutes taken, notes taken.  Then on

7   Friday the Board meets again.  There is nothing that requires

8   on Friday the Board to approve the minutes that were taken on

9   Monday, correct?

10  A     Nothing in the bylaws.  But again, it's normal practice

11  or established practice for that to happen.  And something

12  that I verbally discussed with Mr. Greebel.

13  Q     Verbally discussed in February of 2014.

14  A     That's correct.

15  Q     Okay.  Nothing in the bylaws -- this is a yes or no,

16  Mr. Richardson -- nothing in the bylaws required that more

17  minutes be approved for the prior meeting at the second

18  meeting, correct?

19  A     Not in the bylaws, no.

20  Q     Okay.  And at each Board meeting, sir, where you were

21  there, so there is a Board meeting on a Monday, then a Board

22  meeting a month later, nothing prevented any Board member,

23  including you, from saying, I'm not going forward with the

24  Board meeting until we approve the minutes of the prior Board

25  meeting.

SIDEBAR CONFERENCE                                      2277

1    A     We had the opportunity to do that, yes.

2    Q     Let's go to Article V, officers, page eight.  You see

3    under 5.1 required and permitted officers?

4    A     Yes, I do.

5    Q     It says, "The officers of the corporation shall be chosen

6    by the Board of Directors and shall be a president, treasurer,

7    and a secretary."  Do you see that?

8    A     Yes.

9    Q     The Board of Directors may elect from among its members a

10   Chairman of the Board and a vice chairman of the Board.

11   A     Yes.

12   Q     The Board decided, in 2013, not to have a Chairman of the

13   Board, right?  It's not in the bylaws, but you remember in

14   2013 there was no chairman.

15   A     In 2013 there was no chairman.

16   Q     Eventually in 2014 after the up-listing, you became the

17   chairman?

18   A     In the middle of the year, yes.

19              THE COURT:  So mid 2014?

20              THE WITNESS:  June 2014.

21   BY MR. BRODSKY:

22   Q     It says, 5.4, officer compensation, see that?  The

23   salaries of all officers and agents of the corporation shall

24   be fixed by the Board of Directors.

25   A     Yes.

SIDEBAR CONFERENCE                                  2278

1   Q    Sir, you knew Mr. Shkreli had an employment agreement at

2   some point.

3   A    At some point, yes, during '13.

4   Q    Mr. Panoff had an employment agreement, executive

5   officer?

6   A    Yes.

7   Q    You approved, you had to approve it and review it?

8   A    Yes.

9   Q    You didn't approve the employment agreements of every

10  employee, just the ones with the executive officers, right?

11  A    That's correct.

12  Q    That is standard practice, right?

13  A    Yes.

14  Q    You didn't review and approve every consulting agreement,

15  correct?

16  A    No, not over the year.

17  Q    Okay.  Mark Lapolla was a consultant of the company,

18  right?

19  A    Yes, I understand he was.

20  Q    You know he was, you observed him there?

21  A    I hadn't met him in person, but I had an e-mail exchange

22  from him.

23  Q    You understood from e-mail exchanges and communications

24  with Mr. Shkreli, he was serving a consultant?

25  A    Yes.

SIDEBAR CONFERENCE                           2279

1   Q    You understood that Mr. Lapolla had a consulting

2   agreement with the company in writing?

3   A    Some sort of agreement with the company.

4   Q    Did you know it was early 2014?

5   A    No, I didn't know the timing.

6   Q    The Board never approved it?

7   A    I believe he predated the up-listing.

8              THE COURT:  What do you mean the up-listing?

9              THE WITNESS:  NASDAQ, 2014.

10  Q    By predating the up-listing, the consulting agreement

11  didn't have to be approved by the Board?

12  A    Well, no, by then we're getting summaries of what we're

13  seeing in terms of some these consultant arrangements.

14  Q    Do you know whether Mr. Lapolla had a written consulting

15  agreement signed with the company in January 2014?

16  A    No, I do not.

17  Q    Is your testimony you had to approve Mr. Lapolla's

18  consulting agreement before he could work at the company?

19  A    Again, I don't know if the one he had was a multi-year

20  one previously.

21  Q    Mr. Lapolla had a new agreement in early January, 2014.

22  Going forward, is it your testimony you had to approve that

23  agreement?

24  A    If it was a new agreement, yes.

25  Q    So it's your testimony that Board members had to approve

SIDEBAR CONFERENCE                          2280

1   all consulting agreements?

2   A    That was certainly my understanding.

3   Q    You knew at Retrophin that there were multiple

4   consultants, correct?

5   A    Yes, historically.

6   Q    In 2014 you saw, didn't you go to the offices of

7   Retrophin?

8   A    Yes.

9   Q    Didn't you know that in the public filings that you, some

10  of them you signed, they disclosed there were multiple

11  consultants for the company?

12  A    Yes.

13            (Continued following page.)

RICHARDSON - CROSS - BRODSKY                    2281

1    CROSS-EXAMINATION (Continued)

2    BY MR. BRODSKY:

3    Q    And when you saw that, did you ask for the consulting

4    agreements?

5    A    No.  Because I understood they might come up with new

6    ones.

7    Q    Where the public filings were disclosed to you, right,

8    they disclosed it?

9    A    Yes.

10   Q    Did you then ask to see the consulting agreement?

11   A    No, I didn't.

12   Q    Now, it says here, sir, officer compensation, right?  We

13   just talked about that.

14             THE COURT:  Where are we?

15             MR. BRODSKY:  Oh, I'm sorry.  5.4 Officer

16   Compensation.

17             THE COURT:  Okay.

18   Q    Mr. Richardson, we're talking about Mr. Panoff and

19   Mr. Shkreli, they had an agreement?

20   A    Yes.

21   Q    Okay.

22   A    Yes, and Mr. Plotkin.

23   Q    And Mr. Plotkin?

24   A    And some other senior executives.

25   Q    One person who did not have an employment agreement with

RICHARDSON – CROSS – BRODSKY                    2282

1    Retrophin was Mr. Greebel, right?

2    A    Yes, he wasn't an employee.

3    Q    And Retrophin did not pay a single dime, not a dime, to

4    Mr. Greebel's bank account, correct?

5    A    To him personally, no.  Through his employer.

6    Q    Through his employer?

7    A    Katten, yes.

8    Q    Did you understand Mr. Greebel was not an equity partner

9    in Katten?

10   A    I didn't understand anything on his employment agreement,

11   so I had no information on that.

12   Q    Now, it goes on to say -- and employees like Mr. Panoff

13   and Mr. Shkreli had offices at -- at Retrophin, right?

14   A    At Retrophin, yes.

15   Q    Mr. Greebel didn't have an office at Retrophin, right?

16   A    As far as I know, no, he didn't.

17   Q    And Mr. Greebel didn't receive stock from Retrophin,

18   right?

19   A    No.

20   Q    Mr. Panoff did, correct.

21   A    Yes, as an employee.

22   Q    Mr. Shkreli did, correct?

23   A    Yes, he did as an employee.

24   Q    You did as a member of the board?

25   A    Eventually, yes.

1    Q    And you also received stock options, right?

2    A    Yes.

3    Q    And Mr. Shkreli received stock options?

4    A    Yes, he did, right.

5    Q    Mr. Panoff, right?

6    A    Yes, he did.

7    Q    Mr. Greebel did not, correct?

8    A    That's correct.

9    Q    Now, Mr. Shkreli and Mr. Panoff had the authority to hire

10   people and fire people at Retrophin, right?

11   A    Yes, they did.

12   Q    So did you, right?

13   A    As a board member, yes, we collectively could decide.

14   Q    And Mr. Greebel did not have the authority to hire or

15   fire anyone at Retrophin, correct?

16   A    No.  He wasn't an employee with that status.

17   Q    Nobody at Katten, not a single lawyer there, not a single

18   partner nor associate had the power to fire or hire anybody at

19   Retrophin, correct?

20   A    That's correct, they were outside counsel.  They were the

21   external counsel, and he was acting as counsel to the company.

22   Q    Now, as chairman of the board it says under 5.6, "The

23   chairman of the board, if any, shall preside at all meetings

24   of the directors and of the stockholders in which he or she --

25   he or she shall be present.  He or she shall have and may

RICHARDSON - CROSS - BRODSKY                          2284

1    exercise such powers as from time to time assigned to him by

2    the board of directors as my be provided by law."

3              Correct?

4    A    Yes.

5    Q    And then it talks about in 5.7 the Absence?

6    A    Yes.

7    Q    And then let's go to the next page, Page 9.  Let's talk

8    about the Powers of the President.  It's under 5.8.

9              Now, during the period of time from Retrophin's

10   founding through when Retrophin became public, through the

11   time of September of 2014, September of -- September 30, 2014,

12   Mr. Shkreli was the president and the chief executive officer,

13   yes?

14   A    He was the chief -- yes.  In terms public terms, he was

15   chief executive officer, founder and chief executive officer.

16   Q    All right.  5.8, does it not say the Powers of the

17   President, quote, "The President shall be the chief executive

18   officer of the corporation.  In the absence of the chairman

19   and vice chairman of the board, he shall..."  He or she -- it

20   was a he, correct, Mr. Shkreli?

21   A    Yes, it was.

22   Q    -- "...shall preside at all meetings of the stockholders

23   and the board of directors."

24              Fair?

25   A    Yes.

RICHARDSON - CROSS - BRODSKY                    2285

1   Q    So Mr. Shkreli presided in 2013 over all the meetings

2   because there was no chairman, there was no vice chairman,

3   right?

4   A    For 2013, yes.

5   Q    All right.  And then Mr. Shkreli, quote, "...shall have

6   general and active management of the business of the

7   corporation..." -- correct?

8   A    Yes.

9   Q    -- "...and shall see that all orders and resolutions of

10  to board are carrying into effect."  End quote.

11  A    Yes.

12  Q    Mr. Shkreli, as president is embodied with the authority

13  at Retrophin to, quote, "...have general and active management

14  of the business."  End quote, correct?

15  A    Yes.

16  Q    As long as the board of directors give him that power,

17  Mr. Shkreli had that power, correct?

18  A    Yes.

19  Q    And so Mr. Shkreli could direct employees to do certain

20  things, right?

21  A    Yes, he could.

22  Q    And he can hire people, right?

23  A    Yes, he could.

24  Q    And he could go off and decide that he wanted to purchase

25  this drug or that drug, right?

RICHARDSON - CROSS - BRODSKY                    2286

1   A    Yes.  Again, but in terms of coming back on the strategy,

2   reporting back to the board on many of those decisions.

3   Q    5.9, and outside counsel, outside counsel for the company

4   does not have any general and active management of the

5   business, right?

6   A    I'm sorry, counsel, which point are you looking at?

7   Q    I'm looking at 5.8, Powers of the President.

8   A    Oh, yes.  Okay.

9   Q    Let me ask you something.  Do you agree -- before I get

10  to my next question, do you agree that outside counsel doesn't

11  have any authority to have general and active management of

12  the business of Retrophin?

13  A    No.  They actually have to bring the advice into the

14  executive, into the management of the board.

15  Q    To bring the advice, correct?

16  A    Yes.

17  Q    Of management?

18  A    Yes.

19  Q    And management could look at them and say, I'm not taking

20  your advice, correct?

21  A    It could be possible, yes.

22  Q    I'm going in a different direction than your legal

23  advice, right?

24  A    It could happen, yes.

25  Q    You're being too conservative, Mr. Counsel.  I want to

RICHARDSON - CROSS - BRODSKY                2287

1   move in a different direction.  That can happen, correct?

2   A    That can happen.

3   Q    And that's perfectly permissible for the president, the

4   CEO of the company to reject legal advice coming from outside

5   counsel, correct?

6              MS. SMITH:  Objection, Your Honor.

7              THE COURT:  Can you rephrase, sir?

8   BY MR. BRODSKY:

9   Q    It's perfectly appropriate under the bylaws of the

10  company for the president of a company to reject outside

11  counsel?

12             MS. SMITH:  Objection, Your Honor.

13             THE COURT:  Rephrase again.

14

15  Q    Mr. Richardson, is there any reference to outside counsel

16  in the bylaws?  Would you look at it and tell me if there's a

17  single reference to any authority, any power, any

18  responsibilities of outside counsel?

19  A    Do you mean against the whole of this document, Counsel,

20  or --

21  Q    In the amended and restated bylaws.  You see the

22  president and vice president on Page 9, right?

23  A    Yes.

24  Q    We agree Mr. Greebel and nobody at Katten was the

25  president or vice president, right?

RICHARDSON – CROSS – BRODSKY                2288

1    A    (No audible response.)

2    Q    We can agree on that, right?

3    A    Oh, yes.

4    Q    And then it talks about the secretary and assistant

5    secretary.  Do you see that?

6    A    Yes, I do.

7    Q    Let's look at 5.11, Duties of the Secretary.  Do you see

8    that?

9    A    Yes.

10   Q    Now, the secretary here is a secretary who's being paid

11   by the company, right?

12   A    That's certainly the intent.  But, of course, we did have

13   Mr. Greebel as acting company secretary until we had our own

14   internal employee.

15   Q    The acting company secretary who had no office; is that

16   right?

17   A    No.

18   Q    Who acted as outside counsel, right?

19   A    Yes.

20   Q    Who had no employment agreement, right?

21   A    No employment agreement.

22   Q    Who participated in board calls where he had to take

23   notes of what was occurring at the meeting, correct?

24   A    That's one of the roles, yes.

25   Q    And when somebody asked him questions, he had to answer

RICHARDSON - CROSS - BRODSKY                    2289

1    them, right?

2    A     Yes.

3    Q     Now, was there ever a board meeting that you were

4    involved in -- putting aside litigation update for a moment --

5    was there ever -- we'll get to that -- was there ever a board

6    meeting where Mr. Greebel or anyone from Katten was making

7    management determinations?

8    A     He was probably -- I think he was participating in

9    management discussions with his advice as part of the

10   dialogue.

11   Q     And were there times when Mr. Shkreli rejected his

12   advice?

13   A     I can't talk specifically of that scenario.  That's a

14   discussion between Mr. Shkreli and Mr. Greebel, but...

15   Q     Didn't you tell the prosecution and the FBI in October

16   of 2015 that there was an occasion when you told Mr. Shkreli

17   that Mr. Shkreli better get aligned with Mr. Greebel before

18   board meetings because dissension was in the ranks?

19   A     There was one meeting where there was a difference

20   between -- difference of opinion between Mr. Panoff and

21   Mr. Greebel.

22   Q     And there was dissent, correct?

23   A     And it was confusing to the board.  That was the

24   reference where I asked Mr. Shkreli to make sure that he was

25   aligning with his -- with the counsel and with the CFO so the

RICHARDSON - CROSS - BRODSKY                    2290

1    that board could see a more cohesive stance of what the

2    company stance was on a particular issue.

3    Q    And last week you testified that you thought, am I

4    correct, that there was a healthy discussion in September

5    of 2013 related to certain matters, right, at a board meeting?

6    A    That was the meeting where the officers were presenting

7    their letter, and Mr. Shkreli jumped in very aggressively and

8    Mr. Panoff stood his ground to defend the officers.  That's

9    what I was referring to, there was a healthy dialogue, when

10   Mr. Panoff, you know, made it clear the officers had the right

11   and the obligation to share their independent advice and

12   input.

13   Q    Mr. Panoff during that meeting was opposing what

14   Mr. Shkreli had to say?

15   A    No.  He was just saying -- he was defending the

16   officers --

17   Q    Defending the officers.

18   A    -- to say -- you know, because Mr. Shkreli was sort of

19   quite mouthy talking down, and Mr. Panoff had said, There are

20   external orders and they have the right and the obligation to

21   share their letter.

22   Q    We're going to get back to Mr. Panoff and his role in the

23   company in a moment.

24        But under the secretary and assistant secretary it

25   says the Duties of the Secretary, do you see part, 5.11?  It

RICHARDSON - CROSS - BRODSKY                    2291

1    says, "The secretary shall attend all meetings of the board of

2    directors and all meetings of the stockholders and record all

3    the proceedings of the meetings of the corporation and of the

4    board of directors in a book..." --

5              Do you see that Mr. Richardson, in a book?

6    A    (No audible response.)

7    Q    Mr. Richardson, are you with me?

8    A    Yes, I'm following you.  It's just in very fine print.

9    Q    -- "...to be kept for that purpose and shall perform like

10   duties to the standings when required."

11             Did I read that correctly?

12   A    Yes, you did.

13   Q    Quote, "He or she shall give or cause to be given notice

14   of all meetings of the stockholders..." --

15             Correct?

16   A    Yes.

17   Q    -- "...and special meetings of the board of directors."

18             Correct?

19   A    Yes.

20   Q    And, quote, "Shall perform such other duties as may be

21   described by the board of directors or president..." --

22             Correct?

23   A    Yes.

24   Q    Quote -- "...under whose supervision he or she shall be."

25   End quote.

RICHARDSON - CROSS - BRODSKY                    2292

1   A    Yes.

2   Q    Quote, "He or she shall have custody of the corporate

3   seal of the corporation."

4              Right?

5   A    Yes.

6   Q    Mr. Greebel never had custody of the corporate seal,

7   right?

8   A    I don't know that answer.

9   Q    You don't know the answer?

10  A    No.

11  Q    You were a member of the board of directors, do you know

12  who had custody of the corporate seal for 2013 to 2014 through

13  September?

14  A    I assumed it was Katten.  I assumed it was Katten.

15  Q    And then it says, "He or she..." -- quote -- "...or an

16  assistant secretary shall have authority to affix the same to

17  any instrument requiring it, and when so affixed may be

18  attested by his signature or by the signature of such

19  assistance secretary."  End quote.

20  A    Yes.

21  Q    Okay.  You didn't have an assistant secretary, I take it?

22  A    No.

23  Q    All right.

24  A    Just the one acting company secretary.

25  Q    Page 10, nobody at Katten was the treasurer or the

RICHARDSON – CROSS – BRODSKY                    2293

1    assistant treasurer, right, where the duties are described

2    there?

3    A    No.  That would be the CFO as of when Mr. Panoff was on

4    board.

5    Q    All right.

6            Let's turn to Page 12.  It has 7.6 on it,

7    Authorization of Indemnification.  Does this refresh your

8    recollection that you had reviewed this provision prior to the

9    adoption of these amended and restated bylaws, Mr. Richardson?

10   A    I recall Mr. Panoff, you know, I believe verbally

11   speaking to it.  I don't recall the actual clause.

12   Q    And you certainly understood that the bylaws were being

13   amended and restated for the purpose of indemnification?

14   A    Yes.

15   Q    Now, the indemnification provisions were being amended to

16   protect the board of directors and the executive officers,

17   right?

18   A    That's correct.

19   Q    Nobody at Katten was entitled to get the indemnification

20   from the company, correct?

21   A    That's correct.

22   Q    Now, you understand, sir, that there are occasions when

23   the board of directors hires their own counsel; is that

24   correct?

25   A    That's an opportunity we could have for the board of

1    directors if we chose.

2    Q    And there was a time in 2014 that you as the head of the

3    compensation committee decided to hire an outside compensation

4    consultant, correct?

5              MS. SMITH:  Objection, Your Honor.  The question

6    before is about counsel.

7              MR. BRODSKY:  Yes, the question before was about

8    counsel.

9              THE COURT:  Rephrase.

10   Q    You had the opportunity, Mr. Richardson, as a member of

11   the board of directors to hire outside counsel?

12   A    If we so chose.

13   Q    Right.  So in connection, for example, the company's

14   going to engage in certain transactions, the chief executive

15   officer wants to engage in that transaction, right.  Are you

16   with me so far?

17   A    Yes, yes.

18   Q    The board of the directors independent oversight decides

19   to hire outside counsel to evaluate these transactions.  You

20   had that authority, correct?

21             MS. SMITH:  Objection, Your Honor.

22             THE COURT:  Overruled.

23   A    We certainly had the authority.  We didn't actually act

24   on it, but we had the authority if we so chose.

25   Q    Right.  And there was an occasion in 2014 with respect to

RICHARDSON - CROSS - BRODSKY                    2295

1   compensation, do you remember this?

2   A    Yes.

3   Q    You were on the board of directors --

4   A    Yes.

5   Q    -- and you were the head of the compensation committee?

6   A    That's correct.

7   Q    A really important role, right?

8   A    Yes, indeed.

9   Q    And you didn't accept what Mr. Shkreli and Mr. Panoff,

10  their advice with respect to what Mr. Shkreli's compensation

11  should be, right?

12  A    No.  It's normal practice to bring in an outside

13  compensation consultant who brings the objectivity of what the

14  market data is.

15  Q    And --

16  A    It's good practice.  The compensation committee accesses

17  that as an unbiased third party.

18  Q    And the agreement, this compensation -- this consulting

19  agreement by this compensation expert is between the board of

20  directors and the compensation consultant, right?

21  A    It's between the company, the company rather.

22          THE COURT:  Is now a good time for a break?

23          MR. BRODSKY:  Perfect.

24          THE COURT:  Would you like a break, ladies and

25  gentlemen?

RICHARDSON - CROSS - BRODSKY                    2296

1             MR. BRODSKY:  Yes.

2             THE COURT:  All right.  Please don't discuss the

3    case, and we will get you back as soon as we can.  Thank you.

4             (Jury exits the courtroom.)

5             (The following matters occurred outside the presence

6    of the jury.)

7             THE COURT:  All right.  Let's take ten minutes.  I

8    think we're going to try to get technical support.

9             MR. BRODSKY:  Right.

10            THE COURT:  The system might need to be rebooted, so

11   it might start fresh.  See you at a quarter after.

12            Thank you.

13            (Recess taken.)

14            THE COURT:  Okay.  Is everybody ready for the jury?

15            MR. BRODSKY:  We're ready, Your Honor.

16            (Jury enters the courtroom.)

17            (Jury present.)

18            THE COURT:  All the jurors are present.

19            Mr. Richardson is returning and everyone have a

20   seat.

21            You may resume your cross, Mr. Brodsky.

22            MR. BRODSKY:  Thank you so much, Your Honor.

23            May I approach?

24            THE COURT:  Yes.

25   BY MR. BRODSKY:

```
                    RICHARDSON - CROSS - BRODSKY                2297
```

1   Q    Showing you, Mr. Richardson, once you sit down --

2   A    Thank you.

3   Q    -- DX 99-16 for identification.

4             THE COURT:   Thank you.

5   Q    And take a moment and let us know if you recognize

6   DX 99-16?

7   A    Yes.

8   Q    This is the agreement with the outside consulting --

9   consultation firm -- could you pull the microphone just a

10  little bit closer?

11  A    Okay.  Is that better?

12  Q    And is this an agreement directed towards you, as the

13  chairman of the compensation committee and of the board of

14  directors?

15  A    Yes, it is.

16  Q    This is the engagement letter for the compensation

17  consultant?

18  A    That's correct.

19  Q    And you signed it?

20  A    Yes, I believe I did.

21  Q    Or did you -- your signature's there, but this -- this

22  just has the compensation consultant's -- or I'm sorry --

23  signature, but not yours?

24  A    No.  It has me as the committee chair, and then as the

25  company, I think I -- I believe the panel signed on behalf of

```
                   RICHARDSON - CROSS - BRODSKY                2298
```

1    the company.

2              MR. BRODSKY:  Your Honor, we offer it.

3              MS. SMITH:  No objection, Your Honor.

4              THE COURT:  We will receive Exhibit 99-16.

5              (Defense Exhibit 99-16, was received in evidence.)

6    Q    So, Mr. Richardson, just on the front page this is dated

7    February 19, 2014, right?

8    A    February 10th.

9    Q    I'm sorry, February 10th.  My eyesight.

10             And this is -- the subject is Engagement Letter with

11   the Compensation Advisory Partners, LLC?

12   A    Yes.  That's the name of the company that the consults

13   worked for.

14   Q    Thank you.

15             And it's addressed to you.  You're -- it is the --

16   on the first paragraph, it says, "Dear, Steve..." -- that's

17   you, correct?

18   A    Yes, indeed.

19   Q    "...we appreciate this opportunity to work with the

20   compensation committee of the board of director of Retrophin,

21   Inc."

22             Right?

23   A    That's correct.

24   Q    So this is an engagement letter between the compensation

25   committee of the board of directors and the Compensation

                    RICHARDSON - CROSS - BRODSKY                2299

 1    Advisory Partners?

 2                 MS. SMITH:  Objection, Your Honor.

 3                 THE COURT:  Please rephrase.

 4    Q    This is an engagement letter, correct?

 5    A    Yes, it is an engagement letter.

 6    Q    And the engagement letter is directed to you?

 7    A    Yes, it is.

 8    Q    And the Compensation Advisory Partners are going to

 9    report to the committee, correct?

10    A    Yes.  The committee of the company, yes.

11    Q    And you wanted a Compensation Advisory Partners group to

12    report directly to you to get independent advice?

13    A    That's the -- yes, independent.

14                 THE COURT:  Are you using the term "you" directly or

15    as set forth in the document?

16                 MR. BRODSKY:  I meant you, the board of directors as

17    set forth in the document.

18    BY MR. BRODSKY:

19    Q    You, the committee?

20    A    Yes, the compensation committee.

21    Q    The compensation committee?

22    A    Yes.

23    Q    And in the scope of services, could you please read what

24    it says in the first paragraph?

25    A    We will serve as compensation consultants of the

RICHARDSON – CROSS – BRODSKY                    2300

1    committee advising on compensation and benefit matters related

2    to the company's executive management team.

3    Q    And then under relationships with committee and

4    management on the second page?

5          MR. BRODSKY:  If we can blow up relationship with

6    committee and management?

7    Q    Does it not say CAP, and that's the Compensation Advisory

8    Partners, correct?

9    A    That's correct.

10   Q    "CAP is being retained by the committee to provide

11   compensation advice as described above under scope of

12   services.  In our capacity as consultants to the committee, we

13   will report directly to the committee chair and the committee

14   will approve the scope of the services and our fees."  End

15   quote.

16   A    Correct.

17   Q    That's an example of how the board of directors can

18   retain an independent outside advisor within their authority

19   at Retrophin?

20   A    That's correct.  And the compensation is the typical area

21   where this happens.

22   Q    All right.

23         Now, let's turn to a different subject matter,

24   slightly different subject matter, Mr. Richardson.  You've

25   testified last week there were two things that caused you,

RICHARDSON - CROSS - BRODSKY                2301

1   these are your words, to doubt your view that Mr. Greebel

2   should have, quote, an independent voice.

3              Do you remember testifying to that?

4   A    I remember -- I don't remember the two things being -- I

5   remember the broad context.

6   Q    On the transcript 19 -- just for reference, 1982, Page 4

7   to 5 -- Lines 4 to 5.

8              The first -- do you remember expressing the first

9   related to Mr. Shkreli's employment agreement?

10  A    Yes.

11  Q    And then the second related to the SEC inquiry and your

12  interview with the SEC?

13  A    Yes.

14  Q    Let's take each in turn.  Now, let's talk about

15  Mr. Shkreli's employment agreement.  With your human resources

16  background, I believe this is how you testified on direct

17  examination, you've seen, quote, "lots of employment

18  agreements," end quote?

19  A    Certainly -- certainly quite a few.

20  Q    And do you remember testifying using those terms, quote,

21  "With my human resources background, I've seen lots of

22  employment agreements."  End quote?

23  A    That sounds familiar.

24  Q    Okay.  And you know the most significant sections of an

25  employment agreement, correct?

```
                    RICHARDSON - CROSS - BRODSKY              2302
```

1    A    Yes.

2    Q    Is compensation and benefits would be one, right?

3    A    Yes.

4    Q    And termination provisions would be another, correct?

5    A    Again, compensation is the most volatile in terms of

6    CEO's.

7    Q    Uh-huh.

8         Termination provisions vary between the employment

9    agreement, right?

10   A    They can vary, but it's normally -- normally it's

11   boilerplate.  "Normally boilerplate" meaning it's the standard

12   kind of reference.

13   Q    Are you suggesting that Mr. Panoff and Mr. Plotkin had

14   very similar boilerplate terminations?

15   A    The heart of it is usually similar.

16   Q    The heart?

17   A    The heart of it's usually similar.

18   Q    Okay.

19         MR. BRODSKY:  Let's put in Government's Exhibit 250

20   in evidence.  Let's go to Exhibit C.

21   Q    This is what you testified to, and we're going to give

22   you a copy just so you have a copy.

23   A    Thank you.

24         MR. BRODSKY:  I need 250 in evidence -- oh, it's

25   251.  My apologies.

RICHARDSON - CROSS - BRODSKY                2303

1   THE COURT:  Are you talking about

2   Government's Exhibit 251?

3   MR. BRODSKY:  Yes, 251.

4   Q    I'm showing you --

5   MR. BRODSKY:  May I approach, Your Honor?

6   THE COURT:  Yes.

7   Q    I'm showing you Government's Exhibit 251 in evidence.

8   Here's a hard copy.

9   A    Thank you.

10  Q    We will show you -- this is also on the screen.

11       And let's go directly to -- this is Mr. Panoff's

12  e-mail November 6th, 2013, to Neal Golding, correct?  Do you

13  see the e-mail at the top?

14  A    Yes.  To myself and Mr. Aselage and Mr. Shkreli.

15  Q    All right.  And it just says Neal, but that's Neal

16  Golding, right?

17  A    Neal Golding, yes.

18  Q    All right.  Who just joined --

19  A    Who just joined the board.

20  Q    Mr. Richardson, he just joined the board, Mr. Golding,

21  correct?

22  A    Yes, he had in October.

23  Q    And then it's to you, Mr. Aselage, and Mr. Shkreli,

24  right?

25  A    That's correct.

RICHARDSON - CROSS - BRODSKY                    2304

1   Q    Okay.  Mr. Paley hadn't joined the board yet?

2   A    No, he joined a little after this.

3   Q    And then he's copying Evan Greebel, correct?

4   A    Yes.

5   Q    And Mr. Ed Hackert from Marcum?

6   A    That's correct.

7   Q    Mr. Sunil Jain from Marcum?

8   A    Correct.

9   Q    And then it says Subject:  Board of agenda, and then it

10  includes a number of attendees, right?

11  A    Yes, it does.

12  Q    And this is for the November 8th board meeting, November

13  8, 2013?

14  A    Yes, it is.

15  Q    Okay.  One of the attachments is Exhibit C, right?

16  A    Exhibit C, yes.

17  Q    Shkreli employment agreement --

18  A    Yes.

19  Q    -- right?

20  A    Yes.

21  Q    And then Mr. Panoff says, "All attached please find the

22  agenda for Friday's meeting along with supporting documents."

23  Right?

24  A    Yes.

25  Q    You're getting this within a few days of the November 8th

RICHARDSON - CROSS - BRODSKY                    2305

1   meeting?

2   A    Yes.  That's happening, it looks like, a day and a half

3   later.

4   Q    Right.  And fair to say, this is sufficiently in advance

5   for you to have reviewed the document, correct?

6   A    Yes.  We set 48 hours is the norm that we wanted to

7   achieve, so this is close.

8   Q    You say 48 hours is the norm in the next year, 2014; do

9   you remember that?

10  A    In writing I put that, but I verbally said at each of the

11  board meetings verbally during -- during '13.

12  Q    Right.

13  A    As the appropriate -- I felt it was the appropriate

14  minimum time.

15  Q    Okay.  But the first time you say it in writing after

16  48 hours was in February of 2014?

17  A    Yes.  Because I had become a bit frustrated by them that

18  they weren't adhering to it, so hence, putting it in writing.

19  Q    Okay.  So you were shown -- and on direct examination you

20  were asked whether you reviewed the employment agreement at

21  the time.  You said, quote, "I did review the agreement among

22  all various materials that were sent to us."  Transcript 1940,

23  Lines 15 and 16.

24        Do you remember that testimony?

25  A    Yes, I do.

RICHARDSON - CROSS - BRODSKY                    2306

1    Q    All right.  And you mean the other exhibits you looked at

2    were the other exhibits to this -- the other attachment?

3    A    Yes.  I believe there might have been a second e-mail of

4    items as well.

5    Q    Relating to the board meeting?

6    A    Relating to the board meeting.  Quite often Mr. Panoff

7    did it in two, because otherwise, they'd just be overwhelming

8    on e-mail.

9    Q    And you know when reviewing the agreement and prior to

10   the board call, in your notes, in your handwriting,

11   Mr. Richardson -- I'm not showing you your handwriting yet --

12   A    Okay.

13   Q    -- but do you recall in your handwriting in preparation

14   for the board meetings, you noted that in connection with the

15   agenda, Shkreli employment agreement, you noted that the

16   company might need, quote, "keyman insurance," end quote, for

17   Mr. Shkreli?

18   A    That's correct.

19   Q    All right.  So you recall preparing for the board meeting

20   and in connection with Mr. Shkreli's employment agreement

21   noting that keyman insurance might be something that the

22   company needs?

23   A    Yes, a subject we should get to.

24   Q    Keyman insurance essentially is insurance that the

25   company gets for somebody who is so critical to the company

RICHARDSON - CROSS - BRODSKY                    2307

1    that if something bad happened to him, an accident or some

2    unfortunate circumstance, the company would suffer potential

3    adverse consequences, negative consequences?

4    A    Definitely in the stock market, clearly how the stock

5    market might react to it, exactly.

6    Q    Okay.  And so you could actually go out and buy insurance

7    for key figures, key men or key women at the company who were

8    so important, that if something bad happened to them, the

9    company has insurance to cover the loses from the consequences

10   of that?

11   A    Yes.

12   Q    Okay.  Now, you testified that you, quote, "missed the

13   termination clause" in your first review, right?

14   A    At this point, yes.

15   Q    Okay.

16   A    In November, yes, I did miss it.

17   Q    And then you testified the first time that you saw --

18   well, quote, "When I saw the document for the second time, is

19   when I saw this clause."  End quote.

20        Do you remember that?

21   A    That's correct.

22   Q    Transcript Page 1940, Lines 21 to 22.

23        Now, so you -- you saw the agreement in advance of

24   the board call and you testified that there was -- there was

25   no discussion during the board call for Mr. Shkreli's

RICHARDSON - CROSS - BRODSKY                2308

1   employment agreement, or was there discussion?

2   A    It was -- it was voted on, so there had to be a brief

3   discussion.

4   Q    You remember the voting?

5   A    I do believe, yes, it was approved.

6   Q    And you testified, quote -- 1941 -- Page 1941 of the

7   transcript, Line 23, you just testified, "We had approved it

8   at the November meeting."

9            Right?

10  A    That's correct.

11  Q    Okay.  And then you remember reviewing it again in

12  February of 2014?

13  A    Yes.  When I was doing the work on -- on the CEO

14  compensation, I asked for a copy.

15  Q    Isn't it a fact, Mr. Richardson, that this is an example

16  of your recollection being mistaken?

17           MS. SMITH:  Objection, Your Honor.

18           THE COURT:  I will ask the attorney to rephrase the

19  question.

20  Q    Isn't it a fact, Mr. Richardson, that the board did not

21  vote on November 8th, 2013 in connection with Mr. Shkreli's

22  agreement?

23  A    I believe we voted on it either at the meeting or

24  subsequently Mr. Panoff had followed up with it, the vote, I

25  believe.  I can't remember, but I believe it was approved in

RICHARDSON - CROSS - BRODSKY                2309

1   November.

2   Q    A few minutes ago you were saying you voted on it, you

3   had a discussion and you voted on it in November.  Are you now

4   saying that you're not certain whether or not there was a vote

5   and a discussion -- whether or not there was a vote and

6   approval at the November 8th meeting?

7   A    No.  My recollection is I believe there was a vote at the

8   meeting, but this is a time, as I say, where lots of things

9   are getting ready for the up listing, and I don't remember

10  exactly when every -- every decision point was locked.

11  Q    It was a vote at the November 8th meeting, you remember

12  that?

13  A    I believe.  That -- that's certainly my recollection and

14  I believe we voted on it at the meeting.

15  Q    And you remember it being approved?

16  A    That's my -- that's my recollection.

17  Q    All right.

18          Now, the board approved -- did the board approve the

19  royalty agreement for Biestek, Marek Biestek?

20  A    No.  I believe more work had to be done on that as part

21  of the dialogue in the meeting.

22  Q    What was the royalty agreement for Mr. Biestek?

23  A    This was for Mr. Vaino to Mr. Biestek.  It was part of

24  the fact that they were part of the invention of the PKAN drug

25  solution coming forward.

RICHARDSON - CROSS - BRODSKY                2310

1   Q    Would you just back up and tell us what the PKAN is and

2   what the solution is?

3   A    PKAN is one of these orphan diseases, very, very bad that

4   usually impacts young children or teenaged children, and it

5   slowly at the time destroys their whole neuro -- neuro

6   workings.  It really is a devastating disease.  And through

7   the work that we'd been doing on the orphan disease that we'd

8   been focusing on, and Mr. Biestek to Mr. Vaino had been sent

9   away quite awhile earlier to see if they had a new approach to

10  how we could tackle this terrible disease.

11  Q    And they found one?

12  A    They fund one, but obviously it's now in trial or in

13  trials at the moment as we speak.  So this is --

14  Q    And this was -- withdrawn.

15       There was great promise with respect to what they

16  intended?

17  A    Great promise with it.  Great promise if it does get

18  approved by the federal authorities.  So this -- this royalty

19  is recognition that they were part of the invention, if you

20  like, of this potential cure.

21  Q    What year?  You said it was a little bit earlier.  What

22  years did Mr. Biestek and Vaino uncover the potential solution

23  or a potential solution to this horrible disease?

24  A    I believe it must have been late 2011, early 2012, that

25  kind of timeframe.

RICHARDSON - CROSS - BRODSKY                    2311

1   Q     Okay.  Isn't it a fact, sir, that you received a another

2   copy of the draft agreement of Mr. Shkreli's employment from

3   Mr. Greebel weeks after November 6th and November 8th, 2013?

4   A     I don't recall another draft, but I do recall asking for

5   one in February as I'm doing the compensation work.

6   Q     Isn't it a fact that Mr. Greebel sent you and the other

7   board members a request in writing for unanimous written

8   consent and authorization to approve Mr. Shkreli's employment

9   agreement?

10  A     I don't recall -- I don't recall that particular

11  transaction.

12  Q     Isn't it a fact that Mr. Greebel didn't want a voice vote

13  but rather asked each board member to put their signature on a

14  document for unanimous, not majority, but unanimous approval

15  by all board members for Mr. Shkreli's employment agreement?

16  A     I don't recall that.  And as I mentioned, I do recall

17  that we -- we had discussed it and I believe approved it

18  during the board meeting in November.

19  Q     You understand that Mr. Panoff's agreement wasn't

20  approved by unanimous or written consent, right?

21  A     With Mr. Panoff's there been an error on it, so there had

22  to be some rework on Mr. Panoff's agreement.  There was an

23  error on some of the stock.

24  Q     You know that Mr. Greebel is not a labor and employment

25  lawyer, right?

RICHARDSON - CROSS - BRODSKY                     2312

```
1   A    I don't know the specific portfolio or the degrees.

2   Q    Well, wait a minute, you know he's a corporate attorney,

3   right?

4   A    Corporate attorney, right.

5           MS. SMITH:  Objection.

6           THE COURT:  Rephrase the question.

7   Q    Do you know Mr. Greebel's legal expertise?

8   A    I do know he is corporate attorney.

9   Q    And do you know that he's not a labor and employment

10  attorney?

11  A    I assume he isn't, but sometimes there are fields of

12  expertise that corporate lawyers have as well.

13  Q    I'm sorry, you would assume he isn't?

14  A    I assume he is not.

15  Q    Do you know that Katten has labor and employment people

16  just -- at the firm for labor -- withdrawn.

17          Do you know that there are labor employment

18  specialists who just focus on that area?

19  A    Yes, in most legal firms there are.

20  Q    Let me show you DX 104-71 for identification.

21          MR. BRODSKY:  May I approach, Your Honor?

22          THE COURT:  Yes.

23  Q    I'm showing you, Mr. Richardson, DX 104-71 --

24  A    Thank you.

25  Q    -- for identification.
```

RICHARDSON - CROSS - BRODSKY                    2313

1          Take a moment, if you would, to review that, see if

2    you recognize it.

3          Mr. Richardson, do you recognize you received this

4    document on November 22, 2013 from Mr. Greebel?

5    A    I'm uncertain of the distribution of it.

6    Q    You don't remember it?

7    A    I don't remember this specific e-mail, no.

8    Q    And you're on the distribution for this November 22nd

9    e-mail, along with Mr. Aselage; Mr. Golding; Mr. Paley, who

10   just joined the board --

11   A    Yes.

12   Q    -- and Mr. Shkreli, correct?

13   A    Yes.

14   Q    With a copy to Marc Panoff?

15   A    Correct.

16   Q    And it includes the attachment of Mr. Shkreli's

17   employment agreement?

18   A    Yes, it does, as an attachment.

19          MR. BRODSKY:  Your Honor, we offer 104-71.

20          MS. SMITH:  Your Honor, can we just have a brief

21   sidebar?

22          THE COURT:  Excuse me.

23          (Continued on next page.)

24          (Continued on the next page.)

25          (Sidebar conference.)

SIDEBAR CONFERENCE                    2314

1            (The following occurred at sidebar.)

2            MS. SMITH:  So I see written consent attached on the

3  same page.

4            MR. BRODSKY:   Yeah, sure.

5            MS. SMITH:  And they also have a header that's added

6  by the defendant that says "to be marked."

7            MR. BRODSKY:  Oh, that's probably a paralegal trying

8  to get it organized.  I apologize for that header.  We can

9  explain that to the jury.

10           MS. SMITH:  Well, I'd rather not explain it.  I

11 would rather just have a version that does not have that on

12 it.

13           And again, Mr. Brodsky's made a big deal out of

14 attachments and he's referring to written consent and it's not

15 attached.

16           MR. BRODSKY:  Let me take a look, Your Honor.  I

17 think this is a document we received but --

18           THE COURT:  From Retrophin?

19           MR. BRODSKY:  From Retrophin, yes -- oh, no.

20 From -- I think it might have been either Retrophin or Katten.

21           MS. SMITH:  From Katten.

22           MR. BRODSKY:  There's three Bates numbers on it.

23           MS. SMITH:  We originally got it from Katten and

24 also from -- let's see, this is the Retrophin document they

25 got in December of 2016.

SIDEBAR CONFERENCE                              2315

1            THE COURT:  All right.  So do you want to look for

2    the complete transmission?

3            MR. BRODSKY:  I tell you what, Your Honor, I will --

4    I will do this in --

5            THE COURT:  So we won't admit it now.  Just move

6    forward and whatever --

7            MS. SMITH:  And if it's in --

8            MR. BRODSKY:  Sure.  I will use it to refresh his

9    recollection, and I will -- if I have the complete document,

10   we will get it.  I will show it to the jury.

11           THE COURT:  Well, are you going to touch on the

12   written unanimous consent?

13           MR. BRODSKY:  Yes.

14           THE COURT:  Well, it's not attached.

15           MR. BRODSKY:  I understand.  I am just going to ask

16   some questions about it.

17           I have another -- I have another way of doing it.

18           THE COURT:  Okay.

19           MR. BRODSKY:  Thank you, Your Honor.

20           THE COURT:  Thank you.

21

22

23

24

25

1                (Continued on next page.)

2    CROSS-EXAMINATION (Continued)

3                (Sidebar ends; in open court.)

4                MR. BRODSKY:  May I have DX 901-6?

5                May I approach, Your Honor?

6                (Continue on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON - CROSS - BRODSKY                    2317

1   CROSS-EXAMINATION (Continued)

2   BY MR. BRODSKY:

3   Q    DX9016 for identification.

4             I'm showing you, Mr. Richardson, document entitled

5   "Unanimous Written Consent of the Board of Directors of

6   Retrophin, Inc," November 26th, 2013.

7             Would you take a moment to look at that, please.

8             And to move things along, I'll direct your attention

9   to the Bates numbers at the bottom 14190, which I believe has

10  your signature.

11  A    Yes, that's my signature.

12            MR. BRODSKY:  Your Honor, we offer DX9016.

13            MS. SMITH:  No objection, Your Honor.

14            THE COURT:  We receive DX9016.

15            (Defense Exhibit DX9016, was received in evidence.)

16  BY MR. BRODSKY:

17  Q    So, Mr. Richardson, you don't recall receiving from

18  Mr. Greebel on November 22nd, 2017, weeks after the

19  November 8th board meeting, this unanimous written consent

20  without signatures?

21  A    I didn't have recall of it, no.

22  Q    Okay.  And when's the last time you saw this unanimous

23  consent with your signature?

24  A    The one you just handed to me?

25  Q    Yeah.  When's the last time?

RICHARDSON - CROSS - BRODSKY                    2318

1    A     Um, when I signed it, I imagine.

2    Q     Okay.

3              And so we'll gladly refresh your recollection.

4              MS. SMITH:  Objection, Your Honor.

5              MR. BRODSKY:  Withdrawn.

6    Q     Mr. Richardson, the date on this is November 26th, 2013,

7    right?

8    A     Yes, it is.

9    Q     And does it not say at the beginning, the undersigned,

10   meaning all the directors of Retrophin, Inc., a Delaware

11   corporation, the corporation, acting by written consent in

12   lieu of a meeting, pursuant to Section 141F of the general

13   corporation laws of the state of Delaware do hereby approve

14   and adopt the following recital and resolutions.

15             Do you see those resolutions and recitals?

16   A     I do see them.

17   Q     And going down towards the bottom, the whereas clause,

18   which is the second to the last whereas clause, does it not

19   say:  Whereas, the board believes to be in the best interest

20   of the corporation and its stockholders for the corporation

21   too enter into an employment agreement with Martin Shkreli,

22   the corporation's chief executive officer, over the

23   parenthetical, the Shkreli employment agreement, close

24   parenthetical, pursuant to which Martin Shkreli continues to

25   serves as the corporation's chief executive officer.

1    Do you see that?

2    A    Yes.

3    Q    And then it says:  Whereas, a party to the Shkreli

4    employment agreement, Martin Shkreli has recused himself from

5    participating in any decision of its approval.

6         What does that mean -- well, withdrawn.

7         It means Martin Shkreli took himself out from being

8    a board member, a presiding board member in 2013, of any

9    discussion regarding the approval of this employment

10   agreement, right?

11   A    That's correct.  Because it related to him.  He should be

12   recused from any vote.

13   Q    He should be recused because he has a conflict of

14   interest, right?

15   A    It involves him, so, yes.  It involves him.

16        I'm not sure the conflict of interest is the correct

17   title.

18   Q    When his personal interest is involved, he should step

19   away and remove himself, and allow the other board members to

20   decide whether or not to approve his employment agreement?

21   A    In the case of -- this is a legal agreement with him,

22   yes.

23   Q    Okay.  And then if you go to the next page, the very

24   middle the page it says:  Resolved, that the corporation --

25   Resolved, that the corporation entered into the Shkreli

RICHARDSON – CROSS – BRODSKY                    2320

1    employment agreement in or substantially in the form, and

2    contains substantially the terms and provisions of the Shkreli

3    employment agreement attached hereto as Exhibit B, and that

4    the form, terms, and provisions of the Shkreli employment be,

5    and they are hereby ratified, affirmed, approved, and adopted

6    in all respects, correct?

7    A    Yes, that's what it says.

8    Q    And then it has your -- page 14189.  Do you see that?

9         Does it have Mr. Aselage's signature?

10   A    Yes.

11   Q    Does it have your signature, sir?

12   A    Yes, on the next page.

13   Q    And does it have Mr. Golding's signature on the next

14   page?

15   A    Yes, it does.

16   Q    And then on the final page, does it have Mr. Jeffrey

17   Palay's signature?

18   A    Yes, it does.

19   Q    Now, prior to this, a few days before this, do you

20   remember that you -- November 25th, 2013, do you remember

21   providing written comments on the agreement?

22   A    On?

23   Q    Well, let's do this.  I'd like to do something else

24   before I get to this.

25        Go back to 251 in evidence and pull up Exhibit C,

RICHARDSON - CROSS - BRODSKY                    2321

1   Shkreli employment agreement on the screen.

2               Do you have that, Mr. Carter?  Is it up?  All right.

3               Now, would you agree with me, sir, that there are a

4   number of sections to this employment agreement that are

5   boilerplate, right?

6   A    Yes.  Yes, the normal format.

7   Q    All right.  We can agree on that, sir, right?

8   A    Yes.

9   Q    Can we agree, sir, that if you look at first page, and we

10  scroll through, Mr. Carter:

11              One, terms of employment.  Boilerplate, right, it

12  doesn't have terms, it just says it accepts the terms and

13  conditions herein, right?  It doesn't say anything other than

14  that?

15  A    Correct.

16  Q    Okay.  Duties and functions.  Do you agree with me that

17  that's boilerplate language?

18              MS. SMITH:  Objection, Your Honor.

19              THE COURT:  Is there a way to just clarify your

20  question, Mr. Brodsky.

21              MR. BRODSKY:  Yes, I'll rephrase it.

22  Q    Would you agree with me that's standard language?

23  A    There's a lot of standard language in agreements like

24  this.

25  Q    Would you agree that duties and functions is a standard

1  language in an agreement like this for a CEO?

2  A     Often, yes.  Often it can be standard.

3           MR. BRODSKY:  Okay, let's keep scrolling.

4           THE COURT:  Can I just inquire?  Are you asking him

5  about this specific language, or whether these terms are

6  standard in an employment agreement?

7  Q     Generally, duties functions are standard terms?

8  A     Yes, under the heading of duties and functions, it's

9  usually a lot of standard language.

10  Q     And then the next section says compensation and benefits.

11          That's often not standard, right?

12  A     That tends to be, particularly to the shareholders, one

13  of the most important elements.

14  Q     All right.  And then let's keep scrolling.

15          That covers about a page and a little bit, right, of

16  compensation?

17  A     Yes.

18  Q     And then the next section has term, termination, right?

19          Do you see that?

20  A     Yes.

21  Q     And obviously the term for how long you're going to have

22  this agreement is kind of an important provision.  You can

23  have a one-year agreement with the CEO, you can have two-year,

24  three years, five years.

25  A     Yes.

RICHARDSON - CROSS - BRODSKY                    2323

1   Q    How long you enter into an employment agreement.  That's

2   fair?

3   A    Yes, that usually is a variable.

4   Q    Okay.  And then termination.  How this agreement is going

5   to be terminated:  Incapacity, dead, you know, other

6   conditions is variable, correct?

7   A    The headings I view as -- the headings death, incapacity,

8   termination for cause, those all tend to be standard to me.

9   Q    Standard to you.

10  A    Yes.  Often they're standard.

11  Q    Okay.  You don't think they vary much?

12  A    Not -- not the CEO agreements normally.

13  Q    How many CEO agreements have you seen?

14  A    Probably two or three.

15  Q    Which ones?

16  A    Probably the nonprofit organizations.

17  Q    Which ones?

18  A    United Way.

19  Q    Which CEO of United Way employment agreement did you see?

20  A    United Way international, you know, Chris, obviously I

21  forget her name at the moment.

22  Q    What year was it?

23  A    2000 and -- probably 2008 or 2009.

24  Q    And the second one that you say you saw?

25  A    Would have been to do with the Off-Off-Broadway theater

RICHARDSON - CROSS - BRODSKY                    2324

1    organization.

2    Q    The Off-Broadway organization that Retrophin contributed

3    money to?

4    A    Yes.

5    Q    You want a record that they contributed money to this

6    Off-Broadway organization?

7    A    It was one of the employee entertainment decisions that

8    Mr. Shkreli had made at a Christmas party and to attend the

9    theater company that I was on the board of.

10   Q    Is that MCC?

11   A    Yes, Counselor, that's correct.  Yes, MCC Theater.

12        So I had seen CEO in the context of not for profit.

13   Q    Okay.  And the third one was this one.

14   A    Correct.

15   Q    Okay.  And if we can scroll to the next page.

16        Notice of termination.  Keep scrolling.

17        Then we get to page 5, it says company property.

18        Would you agree with me that company property where

19   the agreements say that everything, you know, in Mr. Shkreli's

20   possession at Retrophin is the company's property, that's

21   standard language?

22   A    Often, yes.

23   Q    And then the paragraph 6, non-competition,

24   non-solicitation.  Standard language, correct?

25   A    Sometimes they can be specific depending on the industry

RICHARDSON – CROSS – BRODSKY                2325

1   or they can be specific.  It's standard normally.

2   Q    Keep scrolling.

3        Then we have protection of confidential information.

4   Standard language in an employment agreement?

5   A    Yes.

6   Q    Okay, keep scrolling, Section 7.

7        Section 8 says it's a binding agreement.  Standard

8   language?

9   A    Yes.

10  Q    Okay.  Section 9 says it's the entire agreement.

11  Standard language?

12  A    Often, yes.

13  Q    Section 10 severability.  Standard language?

14  A    Yes.

15  Q    Section 11, the governing law, arbitration.  Standard?

16  A    Depending on the state, obviously, that it's been enacted

17  in.

18  Q    And you are very experienced with respect to lots of

19  employment agreements.  Arbitration provisions are the norm,

20  correct?

21  A    In this time period, yes.

22  Q    And arbitration is a proceeding that is confidential,

23  correct?

24  A    Yes.

25  Q    One of the advantages of an arbitration proceeding is

RICHARDSON - CROSS - BRODSKY                2326

1   that the costs are reduced, the legal costs?

2   A    Potentially, yes.

3           THE COURT:  All right.  I'm going to overrule that

4   objection in any event.

5   Q    Mr. Richardson, one of the advantages of an arbitration

6   proceeding is that the costs are reduced?

7   A    Potentially, yes.

8   Q    And it can be quicker than a lawsuit in courts?

9   A    Yes.  Potentially, yes.

10  Q    And the confidentiality of it, because it's not publicly

11  filed the way a lawsuit would be in this court, correct?

12  A    Correct.

13  Q    All right.  And then we keep scrolling.  That's

14  paragraph 11.  Skip to paragraph 12.  Notices.  Who gets

15  notices of developments.  That's standard, correct?

16  A    Yes.

17  Q    Okay, let's scroll through.  And it says written copy

18  goes to, let's just go back over that.  It says Retrophin,

19  Inc.  If to the company, goes to Retrophin, Inc., and then

20  with a copy to Katten Muchin, right?

21  A    Yes.

22  Q    Okay.  And then attention Evan Greebel at the bottom?

23  A    Yes.

24  Q    And then if to executive, it goes to Mr. Shkreli at the

25  company address.

```
                    RICHARDSON - CROSS - BRODSKY              2327
 1    A     Yes.

 2    Q     Okay.  Keep scrolling.  Indemnification.  Standard

 3    language?

 4    A     Often, yes.

 5    Q     Okay.  Paragraph 13.  Section 13.  Miscellaneous.

 6    Standard language?

 7    A     Clearly by definition miscellaneous may have some other

 8    loose ends specific to an industry.  Generally standard.

 9    Q     Okay.  Section 14.  Let's keep scrolling.

10          And then finally the signatures page.  Right?

11    A     Yes.

12    Q     All right.  So isn't it true that you told Mr. Greebel

13    that in response to receiving this document on November 25th,

14    don't you remember emailing Mr. Greebel and the other board

15    members copying Marc Panoff and saying that you reviewed the

16    documents?  Do you remember that?

17    A     Yes, I do.

18    Q     And do you remember saying that with regard to the CEO

19    agreement, you had a number of points you wanted to make.

20    A     Yes, I do.

21    Q     Did you that in writing, right?

22    A     Yes, via email.

23    Q     And one of those points you made was you said you

24    realized that the company needed to lock in Martin Shkreli

25    agreement, right?
```

RICHARDSON - CROSS - BRODSKY                           2328

1    A     Right.

2    Q     And you said you thought it would be preferable to have

3    the board engage an outside consultant to prepare the

4    compensation strategy and plan for the company, right?

5    A     That's correct.

6    Q     And that leads you to eventually hire this -- view the

7    board of directors' compensation committee to hire this

8    Compensation Advisory Partners group.

9    A     That's correct.

10   Q     You also made a specific change in the language under

11   Section 3B, correct?

12   A     I have to see what 3B is.

13   Q     You remember considering the terms in Section 3B vague

14   regarding compensation?

15   A     Under the compensation section, Counselor, yes, I do

16   remember my input was largely on the compensation section.

17   Q     And largely on the compensation, but not solely, correct?

18   A     No, I believe I made another reference about political

19   activity.

20   Q     Yes, don't you remember saying that you reviewed the

21   agreement looking -- looking for any reference to political

22   activity?

23   A     As it is quite often -- in my experience now, it's quite

24   often a heading.

25   Q     Mr. Richardson, I appreciate that.  My question is yes or

RICHARDSON - CROSS - BRODSKY                    2329

1    no.

2              Did you review the agreement looking for whether or

3    not there was any commentary or any statement referencing

4    political commentary, correct?  Yes?

5    A    Per my prior testimony, I said I looked at all the

6    headings and I didn't see -- in this case, I didn't see that

7    particular heading.

8    Q    And you wanted to look for that information in the

9    employment agreement, right?

10   A    I wanted to make sure it was inserted.

11   Q    Now you had sufficient time, you first received this

12   agreement on November 6th, 2013, right?  We saw that in

13   Mr. Panoff's email, Government Exhibit 251?

14   A    Yes.

15   Q    Okay.  That was in advance of board meeting, right?

16   A    Yes, on November 8th.

17   Q    On November 8th, where you say it was discussed, right?

18   A    My recollection was we discussed and voted there.

19   Q    Would you agree based on the unanimous consent your

20   recollection is mistaken regarding the approval of

21   Mr. Shkreli's employment agreement at the November 8th

22   meeting?

23   A    It may have been, but I still don't recall why it was

24   carried forward.

25   Q    You're saying it may have been approved by November 8th

RICHARDSON - CROSS - BRODSKY                    2330

1    but carried forward?

2    A    No, I said I don't understand why it was -- it came back

3    to us a second time.  That's the thing I'm confused about now

4    as I look at these documents.

5    Q    You thought it was approved on November 8th but here you

6    are on November 25th giving commentary about changes that

7    should be made?

8    A    Yes.

9    Q    And November 26th, there's a unanimous written consent,

10   right?

11   A    Yes.

12   Q    So you first see it on November 6th.  You agree with me?

13   A    Yes.  It was sent to us first on the 6th.

14   Q    Would you agree that you received it again before you

15   make comments on November 25th?

16   A    Yes, it came on the 22nd.

17   Q    And let's show you for identification 8983 and 8983R.

18             I show you two documents.

19             Your Honor, we have may I approach the witness?

20             THE COURT:  Yes.

21             MR. BRODSKY:  We have 8983A and 8983R.

22             Thank you, Your Honor.

23   Q    And going to direct your attention to 8983R.

24   A    Okay.

25   Q    And ask you if you recognize the email exchange between

RICHARDSON – CROSS – BRODSKY                     2331

1   Mr. Greebel on November 22nd, and then your response on

2   November 25th, 2013.

3            (Whereupon, the witness is reviewing the document.)

4   A    Yes, this is my email to Mr. Greebel.

5            MR. BRODSKY:  Your Honor, we offer 83893R for

6   identification.

7            MS. SMITH:  No objection.

8            THE COURT:  Received.  Defense Exhibit 8983R.

9            (Defense Exhibit 8983R, was received in evidence.)

10           MR. BRODSKY:  And, Your Honor, we have, just for the

11  record, redacted above -- 8983A for identification contains

12  the email above but since Mr. Richardson is not on it, we have

13  redacted.  Just so the record is clear, we're not offering it,

14  but we're just providing it.

15           THE COURT:  You're not offering the document --

16  you're not offering the redactions.

17           MR. BRODSKY:  Yes.

18           THE COURT:  You're just make clear to the extent

19  that it was redacted.

20           MR. BRODSKY:  Correct.

21           THE COURT:  And you're admitting only the version

22  with the redaction.

23           MR. BRODSKY:  Only the version Mr. Richardson has.

24           THE COURT:  Okay.

25           MR. BRODSKY:  We happy to offer the whole thing.

 1          THE COURT:  I have no idea what it says.  Let's just

 2    deal with 8983R.  And then if you want to offer the whole

 3    thing, we can talk about it.

 4          MR. BRODSKY:  All right.  Thank you.

 5    BY MR. BRODSKY:

 6    Q    So, Mr. Richardson, let's take a look at 8983R.  Let's

 7    start with the first email, Mr. Carter, and then we can --

 8          Do you remember, does this refresh your

 9    recollection, Mr. Richardson, that on November 22nd, 2013,

10    Mr. Greebel said to you, Mr. Aselage, Mr. Golding, Mr. Paley,

11    Mr. Shkreli copies to Marc Panoff the Retrophin, the RTRX

12    written consent?

13    A    Yes.

14    Q    And he said, Gentlemen, attached is a written consent for

15    Retrophin, Inc. for the approval of Martin's employment

16    agreement and a repurchase agreement to be entered into with

17    Ladenburg Thalmann.

18          Do you see that?

19    A    Yes.

20    Q    And just so we get this out of the way.  The repurchase

21    agreement with Ladenburg Thalmann, that's what's known as a

22    stock buyback, right?

23    A    I don't recall again the particular attachment.

24    Q    Do you know what a repurchase agreement is, though?

25    A    Yes, I know what a repurchase agreement is.

1    Q    And you understand that there are rules with respect to a

2    company buying back its own stock?

3    A    Yes.

4    Q    And this was the purchase agreement with Ladenburg

5    Thalmann was in connection with the company entering into a

6    buyback program, a repurchase program --

7    A    Yes.

8    Q    -- to buyback its own stock?

9    A    Yes.

10   Q    And that's publicly disclosed when a company enters into

11   a buyback program?

12   A    That's correct.

13   Q    Now it then says, quote, also attached for review are

14   copies of Martin's employment agreement and agreement with

15   Ladenburg, right?

16   A    Yes.

17   Q    And then Mr. Greebel says, please sign unanimous written

18   consent and PDF it to me, if it is easier to fax, and my fax

19   number is, and he provides it, right?

20   A    Yes.

21   Q    And he says, if you have any questions or comments,

22   please call me.

23   A    Yes.

24   Q    Did you call Mr. Greebel between November 22nd and your

25   email on November 25th?

RICHARDSON - CROSS - BRODSKY                    2334

1   A    No, I did not.

2   Q    Had you had any discussion with the other board members,

3   Mr. Aselage, Mr. Golding, Mr. Paley, relating to the

4   employment agreement between November 22nd and November 25th?

5   A    Not to my recollection.

6   Q    Did you have any conversations with Mr. Aselage between

7   November 8th, the board meeting on November 8th, where there

8   was this discussion of Mr. Shkreli's agreement, and

9   November 22nd when you received this email?

10  A    Not that I recall.

11  Q    Any conversations with Mr. Paley?

12  A    No.

13  Q    Any conversations with Mr. Golding?

14  A    Not that I recall.

15  Q    And then you respond, correct?  Let's go through your

16  response.  A few days later, right, Mr. Richardson?

17  A    Yes.  Monday the 25th.

18  Q    You had sufficient time between November 22nd, you would

19  agree with me more than 48 hours?

20  A    Yes.

21  Q    And going through it says, Evan, I hope you have a good

22  Thanksgiving planned this weekend -- this week, correct?

23  A    Yes.

24  Q    Quote, I did review the documents and offer the following

25  input, end quote.

RICHARDSON – CROSS – BRODSKY                    2335

1           Do you see that?

2    A     Yes.

3    Q     There's no qualification to reviewing the documents.  You

4    didn't say I briefly reviewed it, correct?

5    A     Not in this email, no.

6    Q     You didn't say I didn't have enough time, I need more

7    time to review?

8    A     Not from this email, no.

9    Q     And your response is to every member of board of

10   directors, not just to Mr. Greebel, right?

11   A     That's correct.

12   Q     Any member of board of the directors could jump in and

13   make comments, or they can call you up or have a discussion

14   about it, right?

15   A     That's correct.

16   Q     All right.  And then you're commenting on the repurchase

17   agreement saying I am okay with the repurchase agreement,

18   right.  Number one?

19   A     Point one, yes.

20   Q     So that one you had no changes; no suggestions, no

21   recommendations.

22   A     No.

23   Q     Perfectly fine for you, right?

24   A     Yes, that's what this is saying.

25   Q     All right.  And the second one says with regard to the

RICHARDSON - CROSS - BRODSKY                    2336

1    CEO agreement, a few points, right.

2    A    Right.

3    Q    Point one, quote, it would have been preferable to have

4    the board engage with the outside consultant, preparing the

5    compensation strategy, backslash plan for the company, right?

6    A    Yes.

7    Q    So we could see the alignment of thinking with the CEO

8    compensation too, end quote.

9    A    Yes.

10   Q    So you wanted the outside consultant to provide some

11   advise about compensation.

12   A    Yes.  We didn't have an overall compensation plan for the

13   whole company yet.  It would have been good to do, too, in

14   unison.

15   Q    And then you say, I realize we need to lock Martin's

16   agreement, but we should accelerate the work Marc is doing

17   with the compensation consultant and get the board engaged.

18            Do you see that?

19   A    Yes.

20   Q    Now you say I realize we need to lock martin's agreement

21   Martin Shkreli didn't have an employment agreement for 2013.

22   Is that what you're saying.

23   A    No, I understood this was part of getting ready for the

24   up-listing.  It was one of the requirements of the up-listing

25   to NASDAQ.

RICHARDSON - CROSS - BRODSKY                    2337

1   Q    That employment agreement?

2   A    Yes.

3   Q    And so with respect to the up-listing and those

4   requirements, you were paying attention to them?

5   A    Yes.

6   Q    You wanted to comply with them?

7   A    Yes.

8   Q    It goes on to say, we should accelerate the work Marc is

9   doing.  Is that Marc Panoff?

10  A    Yes, it is.

11  Q    And so you had the CFO of the company doing work with the

12  compensation consultant that was reporting to the committee of

13  the board of directors in charge of compensation?

14  A    At this point in time, the CFO had human resources as

15  part of his portfolio.  He was taking some of the

16  administrative task.

17  Q    I see.  Compensation Advisory Partners had hadn't been

18  hired yet; is that the fair?

19  A    Even going forward, Mr. Panoff has human resources as

20  part of his portfolio accountability.

21  Q    Then you say, quote, one specific change in language I

22  call for, under 3B.  At present, the bonus is left in a very

23  vague form albeit at the board's discretion.  I would like to

24  see something along these lines added, at the discretion of

25  board, based upon specific goals and performance metrics

RICHARDSON – CROSS – BRODSKY                    2338

1   agreed from time to time with the CEO.  Right?

2   A    Yes.

3   Q    And you wanted that placed in there, because although you

4   had discretion, you wanted that specific language.

5   A    I thought it was important to shareholders that we had

6   more measurability of how we would reward and recognize the

7   CEO.

8   Q    And Mr. Greebel included that language?

9   A    I believe that was put into the final version.

10  Q    And then you say, quote, I don't see any reference in the

11  agreement to ensuring the CEO does not engage in any political

12  commentary backslash activities which could be construed as

13  relating to his roll at Retrophin.  Is that covered under the

14  code of conduct, end quote.

15       So you were -- you were looking for a provision

16  regarding political commentary in the employment agreement,

17  right?

18  A    Yes, I saw that something emerging in new agreements at

19  this point in time.

20  Q    And then on the next page you say, quote, once you hear

21  from the other board members, I would appreciate input on the

22  above and then I'm ready to sign the consent, right?

23  A    Yes.

24  Q    Do you know whether or not any of the other board members

25  responded in writing to this exchange and provided their own

RICHARDSON - CROSS - BRODSKY                2339

1   comments?

2   A    I don't believe I was copied on any that they did.

3   Q    Do you know whether or not they did at all?

4   A    I don't know if they did or not.

5   Q    Do you know whether or not some of those board members

6   were looking to you as somebody who had expertise in

7   employment agreements to review this one?

8   A    I'm sure they were to some extent.

9   Q    Okay.  And from this email, I take it that is it fair to

10  say the other board members, Mr. Aselage, Mr. Golding,

11  Mr. Paley, would understand from this email that you had

12  reviewed the agreement and had comments about it?

13  A    Yes.  Because I had them on copy.  Yes, I did.

14  Q    And then Mr. Golding, Mr. Aselage and Mr. Paley couldn't

15  divine whether had you skimmed it or studied it.

16  A    From not this email, no.

17  Q    From this email they understand you reviewed it, correct?

18            MS. SMITH:  Objection, Your Honor.

19            THE COURT:  Sustained.

20  Q    From this email, Mr. Richardson, they would understand

21  that, quote, I did review the documents, right?

22  A    Yes, they certainly reading my email.

23  Q    And you're not testifying here today, Mr. Richardson,

24  that when you received the draft employment agreement on

25  November 6th, 2013, from Mr. Panoff, anything was concealed to

RICHARDSON - CROSS - BRODSKY                    2340

1    you relating to the agreement?

2    A    No.  It was a hard copy attached -- it was an attachment

3    to the email.

4    Q    And you're not saying that at the November 8th, 2013

5    board meeting when there was a discussion about the agreement,

6    anybody concealed anything from you, right?

7              MS. SMITH:  Objection.

8              THE COURT:  Rephrase, Mr. Brodsky.

9    BY MR. BRODSKY:

10   Q    You're not saying at the November 8th, 2013 board meeting

11   that anybody had hidden anything from you?

12   A    Not as far as I'm aware.

13   Q    And you're not saying on November 22nd when Mr. Greebel

14   sent the unanimous consent with the draft employment agreement

15   of Mr. Shkreli anybody was concealing the terms of the draft

16   employment agreement from you?

17   A    Not concealing.

18   Q    And you understand, sir, that the employment agreement

19   gets filed publicly, correct?

20   A    Yes.  From the CEO.

21   Q    So let's show you DX104-152.

22             MR. BRODSKY:  Your Honor, we'll obtain the SEC copy,

23   although this is the exact same copy from LexisNexis of the

24   exhibit, DX104-152.

25   Q    I ask you, Mr. Richardson, to let me know if you look at

RICHARDSON - CROSS - BRODSKY                    2341

1    this form 8-K that was filed on or about December 18th, 2013

2    whether you recognize it?

3                (Whereupon, the witness is reviewing the document.)

4                THE COURT:  Did you mean to say December 12th?

5                MR. BRODSKY:  December 18th, 2013.

6    A    The front page of the report, again, Counselor, says

7    December 12th, so I'm likewise confused.

8    Q    My front page has -- oh, I see what you're saying.

9    A    The actual 8-K itself.  Yes, not the cover, fax or

10   whatever it is.

11   Q    Let me see if I can direct your attention.  If you look

12   at the second page of the document under the form 8-K it

13   describes an event that took place on December 12th, 2013.

14               Do you see that?

15   A    Yes.  The Novartis agreement.

16   Q    Right.

17               Does that explain to you the November 12th date?  At

18   least on filed until December 18th?

19               THE COURT:  Do you mean to say December 12th not

20   November.

21               MR. BRODSKY:  It's filed December 18th, 2013.

22   There's a reference to an event of December 12th on the front

23   of the page.

24               THE WITNESS:  Okay.  Thank you for the

25   clarification.

```
 1          MR. BRODSKY:  Your Honor, we offer --
 2   Q    This is not, Mr. Richardson, attached, and I can direct
 3   your attention to where this is.  Is this attached,
 4   Mr. Shkreli's employment agreement, and if you look at the
 5   page 3 of the document, it references Shkreli employment
 6   agreement, and it references that it's attached.
 7          Page 3 of the -- including the cover page it's the
 8   fourth page.
 9   A    Yes, it references the employment agreement.
10   Q    Okay.
11          MR. BRODSKY:  Your Honor, we offer 104-152.
12          MS. SMITH:  No objection without of this cover page.
13          THE COURT:  You're going to substitute the actual
14   document retrieved from the SEC in lieu of Defense
15   Exhibit 104-152 at some other time.
16          MR. BRODSKY:  Yes, Your Honor.  We're happy to.
17          THE COURT:  Thank you.  We will then accept and
18   admit 104-152.
19          (Defense Exhibit 104-152, was received in evidence.)
20   BY MR. BRODSKY:
21   Q    And so I'd like to ask you -- you know, what I'm going to
22   do is hand you a copy we can just quickly find that.  Here,
23   Mr. Richardson, this is easier.
24          Fair to say, sir, that Mr. Shkreli's employment
25   agreement publicly filed for everybody to see on or about
```

RICHARDSON - CROSS - BRODSKY                    2343

1    December 18th, 2013?

2    A    Yes.

3    Q    And the provision you wanted to change in Section 3B, if

4    we can go to 3B, does it not include the language that you

5    requested that Mr. Greebel include regarding bonus?

6    A    Yes, it does.

7    Q    The exact language you wanted, right?

8    A    Yes, it appears to be.

9    Q    Now, the up-listing takes place, correct?

10   A    Now in 2014, yes.

11   Q    And there came a moment when you and the other board

12   members approved of compensation for Mr. Shkreli?

13   A    That's correct.  In February of 2014.

14            MR. BRODSKY:  May I approach, Your Honor.

15            THE COURT:  Yes.

16   BY MR. BRODSKY:

17   Q    Showing you the DX104-23.

18            Do you recognize it?

19   A    Yes, I do.

20   Q    And that's the compensation to approve for Mr. Shkreli?

21   A    That's correct.

22   Q    In on or about February 24th, 2014?

23   A    That's correct.

24            MR. BRODSKY:  We offer 104-23.

25            MS. SMITH:  No objection.

Case 1:15-cr-00637-KAM   Document 554   Filed 03/12/18   Page 137 of 318 PageID #: 16781

1    THE COURT:  We will receive DX104-23.

2         (Defense Exhibit 104-23, was received in evidence.)

3    Q    Now, this takes place after the board dinner at the board

4    meeting where you met Mr. Greebel at that dinner?

5    A    Yes.

6    Q    And it says under Martin Shkreli -- it says at the top

7    CEO compensation for performance year 2013, right?

8    A    That's correct.

9    Q    And it says approved by the board, February 24, 2014.

10   A    That's correct.

11   Q    Under Martin Shkreli, CEO and founder, it says, quote, in

12   recognition of the exceptional performance Martin delivered in

13   setting Retrophin into a dynamic and broad-based track for

14   growth and marketing path, and for starting to build a world

15   class team that shares our vision, the board approved the

16   following compensation.  Right?

17   A    Yes.

18   Q    And you approved the 2013 base salary of $250,000.

19   A    Yes.

20   Q    And then a bonus for 2013 of over 100 percent of the

21   salary.

22   A    Yes.

23   Q    And gave him 120 percent.

24   A    Yes.

25   Q    Which was an additional 300,000 for total cash payment of

RICHARDSON – CROSS – BRODSKY                2345

1   $550,000, right?

2   A     Yes.

3   Q     You increased his base salary for the employment

4   agreement to $300,000.

5   A     Yes.

6   Q     And you gave him some long-term stock compensation.

7   A     Yes, geared to performance.

8   Q     The first one was a grant of 200,000 stock options that

9   vests quarterly across a three-year period.

10  A     Yes.

11  Q     The second one was 100,000 stock options which were

12  vested when revenues reached $50 million based on four

13  quarters?

14  A     Yes.

15  Q     Four quarters being a year.

16  A     Yes.

17  Q     And then you gave 100,000 stock options with vesting

18  triggered on some formula that's described.

19  A     Yes, to do a stock share price.

20  Q     If the stock price goes up, he would get more shares?

21  A     Yes.

22  Q     And then at the bottom it says, with recognition for your

23  vision, drive and courage, many thanks and congratulations for

24  a year of measurable achievements on behalf of the board,

25  correct?

```
                    RICHARDSON - CROSS - BRODSKY            2346
```

 1    A     Yes.

 2    Q     Now Mr. Greebel had no role in determining whether

 3    Mr. Shkreli was getting this additional compensation, right?

 4    A     No, this was from the board.

 5    Q     Nobody at Katten had any role in making any decision with

 6    respect to compensation for Mr. Shkreli?

 7    A     With respect to compensation, that's correct.

 8    Q     Now, let's turn briefly to the SEC investigation before

 9    we break.

10          You testified you weren't aware in 2013 of the SEC

11    investigation, right?

12    A     That's correct.

13    Q     And that you never met with Mr. Michael Rosensaft in

14    2013?

15    A     Not that I recall.

16    Q     You never spoke with Mr. Rosensaft?

17    A     I don't believe so.

18    Q     Now, when law firms did work on behalf of Retrophin, and

19    there were multiple law firms, right?

20    A     Not that I was aware of.

21          MR. BRODSKY:  Can we put up -- let's put up

22    Government Exhibit 239 in evidence.

23    Q     You were shown this to you in your direct examination,

24    we're going to get back to it a little bit later, but this is

25    the cash flow and that summary that you received on or about

RICHARDSON – CROSS – BRODSKY                    2347

1    July 2nd, 2013?

2    A    Yes.

3    Q    And this is when -- this is during the summer, right?

4    A    Yes.

5    Q    Okay.  If you turn to the second page under the summary

6    cash flow and you look at operating expenses -- can you we

7    blow that up?  And we look -- blow up legal -- can we scroll

8    that so you can see the word legal, make it little smaller

9    maybe.

10            Okay.  Do you see Katten there?

11   A    Yes, I do.

12   Q    Heskett, another law firm.  Do you know what Heskett is?

13   A    No, not names I register.

14   Q    Did you know what Heskett was doing for the company?

15   A    No.

16   Q    The law firm of Blank Rome.  You've heard of Blank Rome,

17   right?

18   A    I've heard Blank Rome.

19   Q    You know they're a large law firm, right?

20   A    Yes.

21   Q    Do you know what they were doing for the company?

22   A    No.

23   Q    EAPD.  You've of them, right?

24            Edwards Angle at the top?

25            MS. SMITH:  Objection, Your Honor.

```
                   RICHARDSON - CROSS - BRODSKY              2348
 1              THE COURT:  Sustained.  Rephrase it.
 2    Q    Did you hear of EAPD?
 3              THE COURT:  At all or?
 4              MR. BRODSKY:  EAPD is what's written there and is
 5    stands for --
 6              MS. SMITH:  Objection, Your Honor.
 7    Q    Mr. Richardson, do you understand EAPD to stand for
 8    Edwards Angle, the law firm?
 9    A    No, I didn't.
10    Q    You never heard of them?
11    A    No.
12    Q    Did you know what they were doing for Retrophin?
13    A    No.
14    Q    The next one says Hyman Phelps.
15              Another law firm, right?
16    A    Yes.
17    Q    Do you know what they were doing for Retrophin at the
18    time?
19    A    No.
20    Q    And you got this in July of 2013 were you asking about
21    what these various law firms were doing for the company?
22    A    Well, this is in the very period where we have the
23    overlap issue with MSMB.
24              Mr. Panoff is explaining to me he is now the CFO, he
25    is now looking at any of these overlap expenses between the
```

RICHARDSON - CROSS - BRODSKY                    2349

1    entities.  So I don't know what's working on Retrophin and

2    what's working on MSMB.

3    Q    Okay, let's scroll down to the second quarter.  You know,

4    the second quarter is the period of April, May and June,

5    right?  Of 2013.

6    A    Yes.

7    Q    And the second quarter has legal, the same names, Katten,

8    Heskett, Blank Rome, EAPD, and Hyman Phelps, right?

9    A    Yes, it does.

10   Q    Okay.  But other than Katten, you aren't aware that other

11   law firms were doing legal work for Retrophin?

12   A    Again, at this point in time, what is focused on MSMB

13   versed what's focused on Retrophin, Katten is the only legal

14   firm that I had any interface with in my role as a board

15   member, that I recall.

16   Q    So do you have knowledge, one way if other law firms were

17   being paid by Retrophin in 2013 to engage in legal working on

18   other matters?

19   A    Only to do with the financing.  If there's any

20   specifically to do with the pipes in the financing.  Sometimes

21   in a legal representation was brought in for those.  That's

22   the only thing I would have recall any separate discussion on.

23   Q    And in connection the legal work being done by outside

24   law firm like Katten, the invoices for that legal work didn't

25   go to the board, correct?

RICHARDSON – CROSS – BRODSKY                 2350

1    A    No, they did not.

2    Q    Invoices for any vendor or provider don't go to the

3    board, right?

4    A    That's correct.

5    Q    They go to either the CEO or the CFO, right?

6    A    That would be normal practice.

7    Q    And there's not a single instance, not a single instance

8    during December of 2012 through September 2013 -- through 2014

9    where the board reviewed invoices of the company?

10   A    Through September of '14.  September of '14 is when we

11   started to be made aware of the invoices.

12   Q    All right.

13   A    In September of 2014.

14   Q    And you knew there were lawyers doing work for the

15   company, correct?

16   A    As I said, the only ones I had any interface with were

17   Katten.

18   Q    All right.  Now, you first learned, you said -- testified

19   about the SEC investigation in February 2014, correct?

20   A    That's my recollection when Mr. Shkreli raised it with

21   me.

22   Q    And you testified last week on direct examination he told

23   you during an update that there were, quote, there were one or

24   two disgruntled employees that had filed a complaint with the

25   SEC, end quote.

RICHARDSON - CROSS - BRODSKY                    2351

1    A    That's correct.

2    Q    Now you testified in a prior proceeding, do you remember,

3    that Mr. Shkreli had told you that one disgruntled employee

4    had filed a complaint.

5    A    I don't recall one or two.  It's...

6    Q    Okay.  And you testified last week on direct examination

7    that Mr. Shkreli wanted you to speak with the SEC staff when

8    he spoke to you in February of 2014.

9    A    That's correct.

10   Q    And Mr. Shkreli encouraged to go talk to them?

11   A    Yes, he did.

12   Q    And Mr. Shkreli told you that it was, quote, related to

13   MSMB, end quote.

14   A    That's correct.

15   Q    And Mr. Shkreli said that, quote, it would be very

16   valuable if one or two of the MSMB investors would be

17   voluntarily willing to go and be interviewed by the SEC, end

18   quote.

19   A    That's correct.

20   Q    Now, after Mr. Shkreli asked you to speak with the SEC

21   staff, the next thing that followed is you got a letter from

22   the SEC inviting you to an interview, correct?

23   A    I don't remember the exact dates but, yes, I got a letter

24   after I acknowledged with Mr. Shkreli that I was willing to

25   go.

RICHARDSON - CROSS - BRODSKY                    2352

1   Q    And Mr. Shkreli in other words told you about it before

2   you learned about it from the SEC?

3   A    That's correct.

4   Q    And Eric Schmidt of the SEC staff is the one who

5   contacted you and invited you to come to the SEC.

6   A    Yes.

7   Q    And he said you come to their office or speak to them by

8   phone.

9   A    That's correct.

10  Q    So you scheduled the interview for March 26th, 2014.

11  A    Yes, I had been traveling, so it was scheduled for later

12  in the month.

13  Q    The day before your interview, March 25th, 2014, you

14  spoke with Mr. Shkreli, correct?

15  A    Yes.

16  Q    And you spoke with Mr. Greebel, correct.

17  A    That's correct.

18  Q    And that's the first time, the day before your interview

19  you spoke with Mr. Greebel about the SEC inquiry.

20  A    I believe so.

21  Q    And when you spoke with Mr. Shkreli the day before your

22  interview, you, quote, check in with them to -- well,

23  withdrawn.

24        When you spoke with Mr. Shkreli the day before your

25  interview with the SEC, and checked in with him to make sure

1   you had all the facts you need.

2   A     Yes.

3   Q     When you spoke with the SEC staff, did you tell them you

4   had spoken Mr. Shkreli the day before the talk about the facts

5   of the case or the investigation?

6   A     I don't recall if that specific point was made.

7   Q     And Mr. Shkreli told you the day before your interview

8   with the SEC staff that there were a couple of periods in the

9   fund, in the MSMB fund?

10  A     Yes.

11  Q     Where they weren't doing so well, but he said he covered

12  it.

13  A     That's correct.

14  Q     That's what he told you.

15  A     That was the -- that was the briefing he gave me ahead of

16  the interview.

17  Q     And Mr. Shkreli told you just to be aware of that.  He

18  wanted to give you that information.

19  A     Yes.

20  Q     And this is a conversation you're having between you and

21  Mr. Shkreli.

22  A     That's correct.

23  Q     The day before the interview?

24  A     That's correct.

25  Q     Did you tell the SEC when they were talking to you that

1    the day before Mr. Shkreli had told you that there were a

2    couple of periods the MSMB fund wasn't doing so well?

3    A    I know -- I had told the SEC that I had spoken with

4    Mr. Shkreli.  I don't know if I said the time frame when I

5    spoke to him.

6    Q    You know -- you told the SEC you had spoken to

7    Mr. Shkreli, right?

8    A    Yes.

9    Q    And you told them, correct, that at some point when you

10   had money invested in MSMB, Mr. Shkreli had told you that the

11   fund had suffered a sizeable loss.

12              Do you remember that?

13   A    I don't remember -- I don't remember again the sequence

14   of those points.

15   Q    Okay.  We'll try to refresh your memory.

16              And you didn't ask Mr. Shkreli questions about what

17   he meant when he said the MSMB fund wasn't doing so well

18   during certain periods?

19   A    We had a little dialogue around it.

20   Q    What did Mr. Shkreli tell you about that dialogue around

21   the fact there were some periods the MSMB fund wasn't do so

22   well?

23   A    Again, that the fund may have gone a little out of

24   balance and that he corrected it.

25   Q    Did you ask him, you know, what specifically got out of

RICHARDSON - CROSS - BRODSKY                          2355

1    balance?  When did it get out of balance?

2    A    You know, the -- no, I don't recall the specific

3    dialogue.  I don't recall the specific dialogue.

4    Q    And did you ask him, you know, about the performance

5    updates you received, remember the emails we saw last week?

6    You got emails of performance updates --

7    A    Yes.

8    Q    -- in connection with MSMB?

9         Did you tell -- ask Mr. Shkreli in connection with

10   those performance updates whether they were accurate or

11   inaccurate?  Did you ask him those questions?

12   A    I certainly asked the general question about are the

13   performance indicators still valid.

14   Q    And what did Mr. Shkreli say?

15   A    He said yes.

16   Q    And then you spoke to Mr. Greebel, right?

17   A    Yes.

18   Q    And that was the day before.

19   A    Yes, I believe.

20   Q    And you decided to go down to meet with the SEC but not

21   do a telephone call?

22   A    I decided to do it in person.

23   Q    And you asked Mr. Greebel whether the SEC investigation

24   was specific to MSMB, right?

25   A    Yes, because as a board member for Retrophin I wanted to

RICHARDSON - CROSS - BRODSKY                     2356

1   be clear there were no disclosure obligations on the company.

2   Q    When you spoke to the SEC, and I know we're coming up on

3   a break so I'm just going to jump right to what I want to ask

4   you.

5          During the SEC interview, is it not the case that

6   the SEC staff told you that the scope of their review wasn't

7   Retrophin, but they referenced it.

8          MS. SMITH:  Objection.  Hearsay.

9          THE COURT:  Can you rephrase the question,

10  Mr. Brodsky.

11  BY MR. BRODSKY:

12  Q    In a prior proceeding, Mr. Richardson, did you not

13  testify that when you spoke to the SEC staff, when you went to

14  the interview, and this is prior proceeding 2950, page 6 to 9

15  of the transcript.

16         And when you spoke to them, the one that surprised

17  me was, first of all this is you, I said the SEC referenced

18  Retrophin.  They did say the scope of their review wasn't

19  Retrophin, end quote.  Well, it says but they referenced it.

20         Do you remember the SEC staff asking you during the

21  interview that the scope of their review was not Retrophin?

22  A    Yeah, I believe as the interview was closing I

23  specifically asked them the question.

24  Q    And you specifically asked, is the scope of their review

25  Retrophin and they say no?

RICHARDSON - CROSS - BRODSKY                    2357

1    A    That's my recollection.

2    Q    Now, let's go back to when you spoke to Mr. Greebel.  The

3    day before the interview, you spoke to Mr. Greebel and

4    Mr. Greebel told you that this was just purely an MSMB matter,

5    correct?

6    A    That's correct.

7    Q    In essence, Mr. Greebel is telling you the scope of the

8    SEC review was not Retrophin.

9              MS. SMITH:  Objection.

10             THE COURT:  Sustained.

11   Q    You understood, when Mr. Greebel told you that, when

12   Mr. Greebel told you this was purely MSMB, you understood he

13   was telling you the scope of the SEC review was not Retrophin?

14             MS. SMITH:  Objection.

15             THE COURT:  Sustained.

16   Q    You understood, when Mr. Greebel told you this was purely

17   an MSMB matter was that it related to MSMB, not Retrophin?

18   A    That was my understanding of my dialogue with

19   Mr. Greebel.

20   Q    And Mr. Greebel told you -- Mr. Greebel encouraged you to

21   speak with the SEC staff, right?

22   A    I'm not sure encouraged is the right word, but certainly

23   had no objection.

24   Q    And he said to you he felt it would be very useful for

25   you and one or two other MSMB investors to speak with the SEC.

RICHARDSON - CROSS - BRODSKY                    2358

1   You testified that way, correct?

2   A     Yes, I do recall that.

3   Q     And when he said that he felt it would be very useful for

4   you to speak with the SEC staff, you understood him to been

5   encouraging you to go speak to the staff?

6              MS. SMITH:  Objection.

7              THE COURT:  Sustained.

8   Q     You understood when he said he felt it would be useful,

9   that it would be a good idea for you to speak to the staff?

10  A     I left the discussion with Mr. Greebel believing it would

11  be helpful to close the investigation down.

12  Q     And Mr. Greebel didn't try to say -- didn't suggest to

13  that Katten should go with you to the interview, right?

14  A     No.

15  Q     He didn't tell you not to go, right?

16  A     No, he didn't.

17  Q     He didn't say what you should tell them, right?

18  A     That's correct.

19  Q     And when Mr. Shkreli told you the investigation related

20  to MSMB in February 2014, you did not report that to the

21  board, right?

22  A     At that point, no, I had checked that with Mr. Greebel.

23  Q     And you didn't, after you went to the SEC interview, you

24  went to the SEC interview, spoke with the SEC.  How long was

25  the interview?

RICHARDSON - CROSS - BRODSKY                2359

1    A    Maybe one -- one or quarter hours.

2    Q    One and a quarter hours.  An hour and 15 minutes?

3    A    Yes, in that range.

4    Q    In that range.

5              And after you had that interview, did you call the

6    board members right away?

7    A    No, I called Mr. Greebel.

8    Q    And after you spoke to Mr. Greebel, did you call the

9    board members right away?

10   A    No, because, again, Mr. Greebel said it was not a matter

11   relating to Retrophin.

12   Q    And what you learned from the SEC, and I think it's

13   probably a good time for a break, what you learned from the

14   SEC staff in their own words to you was their scope of their

15   review was not Retrophin?

16              MS. SMITH:  Objection, Your Honor.

17              THE COURT:  Sustained.  Rephrase.

18   Q    The SEC staff told you during your interview on

19   March 26th, 2014, that the scope of their review was not

20   Retrophin.

21   A    That was my understanding when I left the interview with

22   them.

23   Q    Because that's what they told you.

24   A    In answer to my question, yes.

25              MR. BRODSKY:  Your Honor, this is a good time for a

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                          2360

1    break for lunch.

2              THE COURT:  Are the jurors ready to have lunch?  All

3    right, please leave your notebooks face down.

4              Is an hour going to be sufficient today?  Yes?

5              THE JURY:  Yes.

6              THE COURT:  Okay, good.  So please return to the

7    jury room at 1:40.

8              Thank you.  Don't discuss the case.

9              (Jury exits the courtroom.)

10             THE COURT:  So please return at 1:40.

11             Is there anything we need to address now prior to

12   lunch?

13             MS. SMITH:  No.

14             THE COURT:  No?  Thank you.

15             So if I understand correctly, the parties are

16   requesting a Daubert hearing next week?

17             THE JURY:  That's fine by us.

18             THE COURT:  Thank you.

19             (Whereupon, a recess was taken at 12:42 p.m.)

20

21

22

23

24

25

PROCEEDINGS                                    2361

1              A F T E R N O O N   S E S S I O N

2              (Time noted:  1:40 p.m.)

3              (In open court; Jury not present.)

4              THE COURT:  I think we're thinking about November 7

5    as a date for the Daubert hearing in the evening.

6              MR. CHAN:  My client asked to do it on Thursday.

7              THE COURT:  I'm changing doctor's appointments,

8    trial dates, everything to try to account for this long trial,

9    so November 9 will be very tough.  I have a final pretrial

10   conference scheduled that evening.  We can try.  Is there a

11   reason we have to do it on the ninth?

12             MR. CHAN:  The client would like to do his

13   post-court obligations on the rest of the week.

14             THE COURT:  I'm sorry, what is it?

15             MR. CHAN:  His obligations following court on the

16   other days of the week.

17             THE COURT:  I'll have to call and see.  We made a

18   lot of arrangements with the parties to move things around.

19   Any other days that I can't schedule this?

20             MR. CHAN:  That's for next week.  If you want to do

21   it the next, the week after, we can do it the week after.

22             THE COURT:  Give me the days, write them down,

23   please so I know what they are.  You confer with each other

24   and give me dates, please?  It does take a lot of time to call

25   lawyers, reschedule court reporters, everything else.  What is

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                              2362

1   not available?

2            MR. BRODSKY:  We have to confer, your Honor.

3            THE COURT:  I'd like to know.  There are so many

4   moving parts.  You have to realize we have a lot of things to

5   move, a lot of people to contact.

6            MR. KESSLER:  Any day after court is fine with us.

7            MR. CHAN:  I think, your Honor, if you can't move

8   things around we can make Tuesday of next week work, if you

9   prefer.

10            THE COURT:  No, I'll have to -- I'm not going to --

11   I've just now called and ask her to move things off the

12   seventh and we'll get a new date.  I need to know the dates,

13   please.

14            MR. CHAN:  I think if it can't be the ninth, then it

15   doesn't matter what other dates.  The conflict is the same for

16   the other days.

17            THE COURT:  I'll tell you, I've already moved a lot

18   of things off the ninth.  I do have a final pretrial

19   conference that day that is supposed to start at 5:30.

20            MR. CHAN:  Then on the seventh.

21            THE COURT:  If it's the following week I'll do it

22   the following week.  Tell me what days that week are not

23   feasible, please.

24            MR. CHAN:  Any day that week is feasible.

25            THE COURT:  I'll let me case manager know.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                2363

1          MR. BRODSKY:  May I made an application to the

2    Court?

3          THE COURT:  Yes.

4          MR. BRODSKY:  We were just informed, during

5    Mr. Richardson's cross-examination, Mr. Richardson testified

6    that there were some communications from March of 2013 that he

7    thought occurred related to a topic of the reconciliation.  He

8    thought that Mr. Greebel could have been on it.

9          We've received in discovery, based on Retrophin's

10   waiver of the privilege documents, Cooley representing

11   Retrophin during the cross-examination, the Government went to

12   Cooley representing Retrophin and asked them if there was any

13   communication in March of 2013 and if Retrophin would be

14   willing to waive the privilege to that communication.

15   Retrophin apparently has agreed to waive the communication to

16   the privilege to provide the document, but solely to that

17   communication.

18         Your Honor, this is very troubling development.

19   Because, one, it appears that Retrophin has selectively waived

20   the privilege to make determinations to what they are

21   disclosing and not disclosing relating to evidence and issues

22   at the heart of this case.  This appears to be an example

23   where Retrophin, which has its own interests, having

24   discharged Mr. Shkreli and having their own lawsuit with

25   respect to Mr. Shkreli, is now selectively deciding which

PROCEEDINGS                                        2364

1    documents they are going to produce in order to help the

2    Government.

3              Now, the Government, I anticipate in response will

4    say, well, we had an e-mail communication produced to us in

5    discovery on November 25, 2013, where Mr. Richardson was

6    providing edits to an e-mail that we introduced this morning

7    relating to the employment agreement of Mr. Shkreli.  That

8    document was produced to us.  We're all aware of it.  But

9    there are certain portions that had been redacted.  Portions

10   specifically that related to Section 3B, and specifically that

11   related to the political commentary.  Those were specifically

12   redacted about changes to the agreement.  We felt that was,

13   again, an example of selectively deciding what to designate as

14   privilege.

15             We all had notice of this document.  But part of it

16   was privileged, and so we asked Retrophin to waive the

17   privilege or we'd make an application of the Court.

18             THE COURT:  When did you ask them to do that?

19             MR. BRODSKY:  Last week Wednesday.  They did it that

20   day, last Wednesday.

21             MS. SMITH:  During Mr. Richardson's

22   cross-examination.

23             THE COURT:  How long has the Government --

24             MR. BRODSKY:  We had the following document, your

25   Honor, I'll hand it you.

PROCEEDINGS                                    2365

1          THE COURT:  When did you get it?

2          MR. BRODSKY:  This document we had for months, but

3     it was redacted.

4          THE COURT:  So did you try to get Retrophin's --

5          MR. BRODSKY:  And they did.  They waived the

6     privilege.  My concern is the following, your Honor.

7     Everybody had notice of that document that existed.  Everybody

8     had notice that a portion is privileged.  That's not my

9     concern or worry at all.

10         The portion that they designated as privilege

11    concerns us, that is selective destination of what is

12    privileged or not relating to Mr. Shkreli's agreement.  That

13    does bother us, that does concern us.  It suggests that

14    Retrophin is selectively deciding what to waive and what not

15    to waive.  That's one issue.

16         THE COURT:  So what are you asking me to do?

17    Articulate your request for relief.

18         MR. BRODSKY:  My question for relief is that

19    apparently Retrophin has, going to produce today, because they

20    heard Mr. Richardson's reference of an e-mail, they are going

21    to produce today an e-mail from March 2013 that nobody has

22    ever seen, that they had previously decided was privileged for

23    whatever reason.

24         THE COURT:  Was it on a privileged log?

25         MR. BRODSKY:  We never received privilege logs from

PROCEEDINGS                                    2366

1    Retrophin.  The Government didn't produce privilege logs.

2              THE COURT:  I had a whole three-month period where I

3    asked the parties --

4              MR. BRODSKY:  This was not.

5              THE COURT:  -- to communicate with Retrophin, both

6    Mr. Greebel's counsel and Mr. Shkreli's counsel, to try to

7    work out privileges, and if there were issues to bring it to

8    my attention.

9              MR. BRODSKY:  I understand, your Honor.

10             THE COURT:  What efforts did you make and when to

11   obtain documents that Retrophin was withholding under some

12   sort of a privilege?

13             MR. BRODSKY:  I'm unaware, your Honor, as I sit here

14   right now.  It's a good question.  I'm unaware of whether or

15   not the document they are going to produce, I don't know what

16   it is, if it's on some log.  I'm just unaware of it, your

17   Honor.

18             We did communicate in dialogue with Retrophin to

19   obtain other documents.  But my concern is the following:

20   Cooley on behalf of Retrophin is selectively deciding what to

21   waive in cooperation with the Government without subpoenas to

22   produce documents.  And our application should be that that,

23   that Retrophin should not be selectively waiving the privilege

24   to help the Government's case.

25             THE COURT:  Well, have you asked them for a

PROCEEDINGS                               2367

1   privilege log or have you gotten one?  So that you know what

2   they are withholding?  You're asking me for relief, that is so

3   vague.  I don't know, and you apparently don't know, what

4   documents are at issue.  You're making a broad allegation of

5   some sort of collusion between the Government and Retrophin,

6   that they are selectively withholding.  What is being withheld

7   that you want, that you feel is the subject of that selective

8   withholding?

9            MR. BRODSKY:  I feel that right now, during

10  cross-examination, we're going to see a document that we've

11  never seen before that relates to other documents that we have

12  received.  And therefore, this document was selectively

13  decided by Retrophin to withhold and keep from us.

14           Obviously without having knowledge of the document

15  impacts our ability to conduct cross-examinations, impacts our

16  defenses.  And we had no notice of its existence.

17           As I understand it, the privilege log is based on

18  KAT and BA Bates numbers, but not Retrophin or RTX numbers.

19  I'm unaware of whether or not -- we don't have the document,

20  yet -- I'm unaware of whether or not this document will appear

21  on any previous log.

22           THE COURT:  Do you recall that this whole dispute

23  came to light when I thought there was a request to Katten to

24  produce documents?  And Katten said, look, we think we might

25  have an obligation under the attorney-client privilege to

PROCEEDINGS                                    2368

1    withhold certain documents.  And then Retrophin got into the

2    picture and there was a long period of time, months, where the

3    parties were supposed to work out what was being withheld,

4    what was needed, and I believe Retrophin or Katten was going

5    to provide a privilege log of what was being withheld.

6               MR. BRODSKY:  There was a privilege log.

7               THE COURT:  And this document whatever it is should

8    have been on it.  And any issues that you had with withholding

9    and the proprietary of the assertion of the privilege should

10   have been brought to my attention months ago, if not at some

11   of point last year before the first trial in this case.  I'm

12   just wondering why we're hearing about it, if you've known

13   they were withholding a document that you want.

14               MR. BRODSKY:  I haven't known that he was --

15               THE COURT:  You didn't have a privilege log?

16               MR. BRODSKY:  I didn't request this document.  The

17   Government just requested it this afternoon.

18               THE COURT:  It wasn't on the privilege log?

19               MR. BRODSKY:  We don't have the document, I don't

20   know the answer to that.

21               I want your Honor to know that at some point this

22   document will come up.  Cooley on behalf of Retrophin is going

23   to get this document.  Neither of us have it in our

24   possession.  We don't know what it looks like, we don't know

25   what it addresses, we don't know the subject matter.  But once

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    2369

1    we get the document we certainly would like to look at the

2    privilege log to see if it was on it and to decide if we have

3    an application that Retrophin has selectively decided that for

4    some documents they are going to waive privilege but others on

5    the same subject matter they are not.  We think there are

6    some --

7            THE COURT:  They produced documents subject to a

8    stipulation that the production for use at the trial would not

9    be construed as a general waiver.  Every lawyer, I think for

10   both individuals charged, signed this document and the

11   Government signed it.  I think that was the understanding and

12   agreement.  Am I misremembering?

13           MS. SMITH:  The Government did not receive the

14   original dump of documents.  It's our understanding that the

15   defendant received all documents from Katten to from the CCing

16   Mr. Greebel, which would include this e-mail that we asked

17   about now.

18           We've had a number of situations, because the

19   defense has every e-mail unredacted, whether or not it's on

20   the privilege log.  The defense knows what e-mails it wants to

21   ask to have the privilege waived for or not.  That is what

22   they've been doing for the past couple of months.  They did it

23   during the cross-examination of Mr. Richardson.  So they asked

24   for a document to be unredacted.  They knew what was

25   underneath the redaction because they received the unredacted

PROCEEDINGS                                    2370

1    version from Katten.

2          Mr. Richardson testified about a specific e-mail

3    today that for us seemed like it would be within the current

4    waivers, particularly as the defendant has pushed boundaries

5    of those waivers in the last few weeks, including in two

6    subpoenas that they served over the weekend.  And so we asked

7    Retrophin if that e-mail existed.  And if so, would it still

8    be within, would there be privilege over that document.  They

9    said no.  And I said, please produce it now so during

10   cross-examination, unlike the defense, I didn't wait until the

11   witness was finished with their examination.  Mr. Brodsky had

12   a document unredacted after I was finished with my direct

13   examination while he was on cross.  I asked them if the

14   document existed, if there was no longer privilege over it

15   given the way the waivers had been negotiated between the

16   defendant and Retrophin, that if they could produce those

17   documents to us.  They said that they would.  I asked it be

18   produced to both parties.

19         MR. BRODSKY:  Your Honor, once we get the document

20   we'll be able to have more information as to whether the

21   document is on any privilege log.

22         I would say this, your Honor, it was a few weeks ago

23   we received -- the document she's talking about that we

24   subpoenaed, was a document they had in their position which

25   said redacted.  We did not know what was behind the redaction.

PROCEEDINGS                                2371

1    But we know based on the nature of the document, it was good

2    for us.  It was about edits to the agreement.  So we asked for

3    the edits.

4             Second, you Honor, I certainly have never seen the

5    unredacted version, all right.  So I wanted to get the

6    unredacted version.

7             Your Honor, the reality is that we had received from

8    Retrophin a June 2014 document that was Mr. Richardson's notes

9    that said "Evan:"  With all redacted.  For weeks we asked

10   Retrophin if they would produce the document.  And eventually

11   they did, and to our way of thinking, it was exculpatory,

12   information about conversation between Mr. Greebel and

13   Retrophin.

14            Third, your Honor, we are troubled that Retrophin is

15   selectively waiving when it's in their interest to do so.  We

16   definitely agreed that when Retrophin would produce a

17   particular document, it wouldn't be a general waiver.  But

18   we're trying to seek documents pursuant to 17(c), which is our

19   only power, and as narrow and specific as possible.

20            By contrast, the Government goes to Retrophin, with

21   a general request and says any e-mails at all in March of 2013

22   that are consistent with Mr. Richardson's testimony.  And they

23   don't have to use this rule 17(c) subpoena.  And Cooley then

24   goes, on behalf of Retrophin, and waives whatever privilege

25   they selectively waive and decides to give it to the

PROCEEDINGS                          2372

1    Government.

2              The history of this case, your Honor, is that there

3    has been a decision by Retrophin to selectively produce

4    documents and we are concerned about that.  I don't want to

5    waste court time now and the jury's time, because they

6    probably are back and we can continue with the cross.  I did

7    want to apprise your Honor, and should we get the document I

8    would like the opportunity to take a little break to review

9    the document at that time and check whether it's on a

10   privilege log, then make an application.

11             MS. SMITH:  Your Honor, I just want to put on the

12   record, it's our understanding again that as to the defendant

13   and Retrophin, Retrophin has done some waivers our request was

14   whether this document was within that waiver, but not searched

15   for or found previously.  I want to note that Mr. Brodsky said

16   that he never had the unredacted --

17             MR. BRODSKY:  Me, personally.

18             MS. SMITH:  The defense had the unredacted version

19   of the document.  They asked for privilege to be waived under

20   the Bates KAT_000736738.  It was produced again directly from

21   Katten to the defense unredacted.

22             In fact, the document that's marked as exhibit

23   DX8983A is the unredacted version, which was never produced to

24   the Government by the defense.  So the idea that the defense

25   doesn't have these unredacted versions, is just not true.

1           MR. BRODSKY:  We will see what this document is,

2     your Honor.  We will see whether it's on the privilege log.

3     We will see whether we got any notice of it.  If we didn't get

4     notice and it wasn't on any privilege log, then we will make

5     an application to the Court relating to it.

6           THE COURT:  All right.  So I would suggest, sir,

7     that before asking for a broad-stroke application that I order

8     Retrophin to produce any documents over which it has

9     selectively waived privilege --

10          MR. BRODSKY:  Yes, your Honor.

11          THE COURT:  -- that you have better knowledge about

12    what it is you had, what it is you were given by Retrophin or

13    Katten with respect to that request, whether they asserted a

14    privilege, whether it appeared on a privilege log, and whether

15    you could have, but didn't timely, move to address any issues

16    you had with the assertion of privilege.

17          MR. BRODSKY:  Understood, your Honor.

18          THE COURT:  Because this frankly, it the doesn't

19    accomplish anything.

20          MR. BRODSKY:  I just wanted to apprise, your Honor,

21    of the issue as it was coming up.

22          THE COURT:  I don't think it is just coming up.  I

23    think this is brewing for months and months ago.  We had a

24    long period of time where I postponed the trial numerous times

25    to allow the parties to seek and obtain documents over which

PROCEEDINGS                                    2374

1  Retrophin was going to assert a privilege, and to negotiate

2  and to obtain documents, and that was why we are here in

3  October of 2017 having a trial long after the date of the

4  Indictment.  I feel that this could have and should have been

5  addressed.  But why don't we first figure out what the facts

6  are.  If, as the Government contends, that the defense has

7  been given documents directly from Katten and the privilege

8  has been waived by Retrophin and you've had this document, I'm

9  not sure there is any relief I can offer.

10             MR. BRODSKY:  Understood.

11             THE COURT:  Please just be sure about what you're

12  asking, know what your facts are.

13             MR. BRODSKY:  Understood.  I wanted to apprise you.

14  I don't have the document yet.  I don't have any facts yet.

15             THE COURT:  Thank you.  Is November 14 going to be

16  all right for the Daubert hearing?  We could also maybe do it

17  on the 16th at five.

18             MR. CHAN:  14th will work.

19             MR. BRODSKY:  That's fine.

20             THE COURT:  November 14, at 5:00, we'll have to

21  excuse the jury early.

22             If we are trying to schedule something and some

23  dates don't work, let me know before we rearrange matters.  We

24  would appreciate the courtesy going forward.

25             (Jury enters the courtroom. Time 2:00 p.m.)

1          THE COURT:  All the jurors are back.  Have a seat

2     everybody.

3          Sir, you're still under oath.  And Mr. Brodsky, you

4     may resume.

5     CROSS-EXAMINATION

6     MR. BRODSKY:

7     Q     Good afternoon, Mr. Richardson.

8     A     Good afternoon.

9     Q     You testified you didn't remember the sequence of when

10    Mr. Shkreli told you about MSMB suffering from a sizeable

11    loss, right?

12    A     That's correct.

13          MR. BRODSKY:  Let me see if you can refresh your

14    memory.  May I approach your Honor?

15          THE COURT:  Yes.

16    Q     Showing you what is marked 3500SR1-1 for identification,

17    which I'm not going to be offering into evidence, but I'm just

18    showing it to you to see if it would refresh your

19    recollection.  I'm going to direct your attention to the third

20    page of the document underneath the top, the first full

21    paragraph -- the second, the first and second sentence really,

22    the second sentence there, it's the first and second.

23          If would you read that silently to yourself then set

24    aside the document so I can ask you some questions.

25    A     Counsel, was that page three?

S. RICHARDSON – CROSS – MR. BRODSKY          2376

1   Q    Yes, page three at the top.

2   A    Yes.

3   Q    Putting that document aside, Mr. Richardson, does it

4   refresh your recollection that you told the SEC staff on

5   March 26, 2014, when you met with them, that you remember in

6   or about February 2011 Mr. Shkreli mentioning a sizeable short

7   loss but it was not quantified?

8   A    I don't remember these exact words.  This is the first

9   time I've seen these particular notes, so I don't remember

10  these, that was actually how I expressed it.

11  Q    Putting aside those exact words, do you remember telling

12  the SEC staff on March 26, 2014, that Mr. Shkreli had told you

13  in early 2011 that MSMB had suffered a sizeable loss from a

14  short sale?

15  A    My recollection was I said there had been a couple of

16  periods of bad performance that he covered.  That was my

17  recollection.

18  Q    And you remember the SEC mentioning the Merrill Lynch

19  arbitration.

20  A    Yes, I do.

21  Q    And the SEC, is it fair to say, they didn't tell you the

22  amount of losses relating to that MSMB Merrill Lynch

23  arbitration?

24  A    I don't believe they did.

25  Q    And let me ask you something else, you told the SEC staff

```
               S. RICHARDSON - CROSS - MR. BRODSKY          2377
```

1   that Mr. Shkreli had never given you a gift of stock, correct?

2   A    Yes, they used the word gift.

3   Q    And you told them that Mr. Shkreli told you he wanted to

4   give you another 200,000 shares for your service to the

5   company?

6   A    I don't remember those exact words, but I did say that he

7   was, yes, he was going to be increasing my stock.

8   Q    Did you say that you had an arrangement -- did you tell

9   the SEC staff that you had a verbal arrangement, an

10  understanding, with Mr. Shkreli with respect to getting an

11  additional 200,000 shares of stock?

12  A    I don't remember again exactly how I phrased it.  I was

13  very transparent with them that he and I had a discussion

14  about that fact.

15  Q    Let's look at, to see if it refreshes your memory of what

16  you said, page four, second full paragraph, last sentence.  If

17  you would read that, see if it refreshes your recollection

18  that you did not tell the SEC staff that you had a verbal

19  arrangement in place to receive additional shares.

20            MS. SMITH:  Objection, your Honor.

21            THE COURT:  Rephrase the question, please.

22  A    Could you just direct me to where you were referring?

23  Apologies.

24  Q    The second paragraph, page four, last sentence.

25  A    Excuse me.  Okay.

1    THE COURT:  Rephrase your question, Mr. Brodsky,

2    after he has a chance to read it.

3    MR. BRODSKY:  Yes, your Honor.

4  Q    So if you set that document aside, Mr. Richardson, do you

5  remember telling the SEC staff that Mr. Shkreli wanted to get

6  you additional shares?

7  A    Yes.

8  Q    And do you remember that in reality you had an

9  arrangement, an understanding, with him that you were going to

10  get 5 percent plus of the outstanding shares at the time that

11  Retrophin went public?

12  A    Yes.  Back to, and that dates back to the capitalization

13  table of -- November 2012.  We confirmed by Mr. Shkreli in

14  March 2013 that, yes, I will be getting 300,000 extra shares.

15  Q    You told the SEC that Mr. Shkreli wanted to do it, but

16  you left out, correct, that you already had an understanding

17  with Mr. Shkreli that he was going to do it.

18    MS. SMITH:  Objection, your Honor, to the left out.

19    THE COURT:  Sustained.  Rephrase.

20  Q    You told the SEC that Mr. Shkreli wanted to get you the

21  shares, right?

22  A    Again, counsel, I don't remember the exact words of the

23  interview.  But I was transparent about the fact that shares

24  were coming to me.

25  Q    You were transparent about the fact the shares were

S. RICHARDSON - CROSS - MR. BRODSKY          2379

1   definitely going to come to you?

2   A    That was my understanding at the time, yes.

3   Q    So you did not tell the SEC that Mr. Shkreli wanted to

4   get you shares?

5   A    I don't remember the exact words, again, but I don't

6   believe I would had said wanted.

7   Q    All right.  Fair to say that you also told the SEC staff

8   that you described him as having a big ego but also integrity?

9   A    That was certainly my belief at that point.

10  Q    You looked at last week a number of documents with

11  respect to receiving Board materials, do you remember seeing a

12  lot of those documents?

13  A    All these big binders?

14  Q    Yes.

15  A    I'm surrounded by binders, yes.

16  Q    You remember receiving some e-mails where you received

17  e-mails from Mr. Panoff about Board materials in advance of

18  Board meetings and calls?

19  A    Yes, I do.

20  Q    And the time stamp date, do you agree that the time stamp

21  that appears on the last e-mail that's in the chain can be,

22  was often inaccurate?

23  A    It certainly, when I was eyeballing them, it certainly

24  seemed some were inaccurate, yes.

25  Q    Let's put up Government's Exhibit 303 in evidence.  We

S. RICHARDSON - CROSS - MR. BRODSKY                    2380

1   have a copy for you, but we're not going to go through the

2   pages.  If you look at your screen and we blowup the first

3   part of the e-mail.  You see that it's, directing your

4   attention to the e-mail from Mr. Greebel, it says, February 7,

5   2013, at 2:02 p.m.?

6   A    Yes.

7   Q    You know that's inaccurate as a time stamp, correct?

8   A    I believe this was for a 1:00 o'clock meeting, so yes, I

9   believe it was inaccurate.

10  Q    You testified, the Government had asked you on your

11  direct examination, "Do you know with respect to this

12  document," transcript 1847 pages two to three, "Do you know

13  whether or not that time, the top of the e-mail, is Eastern

14  Standard Time or another time?"  You testified, "I do not, but

15  I assume it attaches to Mr. Greebel's office, so I assume not

16  identifier, so I assume EST, Eastern Standard Time."  Do you

17  remember that?

18  A    Yes.

19  Q    Now that's inaccurate, right?

20  A    Yes.  I was confused when I was looking at the timing.

21  Q    Right.  You know it's inaccurate because the first

22  sentence says we are confirming Board meeting at 1:00 p.m. EST

23  today?

24  A    Yes.

25  Q    You can't get a document at 2:02 telling you you're about

S. RICHARDSON - CROSS - MR. BRODSKY                    2381

1    to have a call at 1:00 p.m.

2    A    No, absolutely.

3    Q    All right.  Then you saw Government's Exhibit 245 in

4    evidence.  Let's put that up, September 9, 2013, e-mail again,

5    if we blowup the top, it says -- I'm looking for 245 in

6    evidence.

7              We'll just use the old fashioned way, the hard copy.

8              Mr. Richardson, Government's Exhibit 2245 Bates

9    labeled on the bottom RO19298 to 19331, what is the time on

10   this e-mail that Mr. Panoff sent to Mr. Richardson, Mr.

11   Aselage, Mr. Shkreli copied to Mr. Greebel on September 9,

12   2013?

13             THE COURT:  Excuse me, the Bates numbers that you

14   read off don't conform with the copy of the exhibit that I

15   have marked Government's Exhibit 245.

16             MR. BRODSKY:  You have a different Government's

17   Exhibit 245?

18             THE COURT:  The Bates number on the bottom of the

19   page are different.

20             MR. BRODSKY:  I'll put that aside until we can fix

21   it up.

22   Q    Do you understand, Mr. Richardson, that some of the

23   e-mails sent out by Retrophin, when Retrophin is the last

24   e-mail in the chain, was often GMT time?

25   A    Some of the timings seemed to change, even the ones I

S. RICHARDSON - CROSS - MR. BRODSKY            2382

1   noticed on my own copies were the different.  So something was

2   lost in translation on some of the times.

3   Q    You know there is a difference between GMT and Eastern

4   Standard Time?

5   A    Yes.

6   Q    It could be four or five hours difference?

7   A    Yes, depends on the time of the year.

8   Q    So when it's, if the time is GMT and the actual time is

9   10:00 o'clock, the Eastern Standard Time would the earlier?

10  A    Four or five hours earlier.

11  Q    Let me turn to the topic that -- one other e-mail with

12  respect to timing for Board materials.  Let me show you

13  104-156.  May I approach, your Honor?

14           THE COURT:  Yes.

15  Q    I'm showing you 104-156 for identification.  Do you

16  recognize, Mr. Richardson, this e-mail exchange?

17  A    Yes, I do.

18  Q    The e-mail that you sent on January 6, 2014, starting

19  there, was an e-mail introduced by the Government during your

20  direct examination, right?

21  A    Yes, it is.

22  Q    And there is a response from Mr. Greebel, correct?

23  A    Yes, there is.

24  Q    That did you not see during your direct examination,

25  correct?

1    A    I don't believe it was during direct but, it was

2    addressed to me.

3              MR. BRODSKY:  We offer 104-156.

4              MS. SMITH:  No objection.

5              THE COURT:  We will receive 104-156.

6              (Defendant's Exhibit 104-156, was received in

7    evidence.)

8    MR. BRODSKY:

9    Q    Just orientating ourselves, if you scroll down that's the

10   e-mail, Mr. Richardson, where you described during direct

11   examination that you landed in New York City 50 minutes ago,

12   you wanted to set a standard, you suggested 48 hours of a

13   minimum to get materials.

14   A    Yes.

15   Q    And Mr. Greebel responded, correct?

16   A    Yes.

17   Q    His response, "I apologize for the delay as we were

18   waiting to hear back from the underwriters counsel on various

19   documents that we sent to you."

20   A    Yes.

21   Q    Did have you an understanding that the people at Katten

22   were waiting for underwriters counsel to provide them with

23   documents before they can provide them to the Board?

24   A    Once Mr. Greebel had told me, yes.

25   Q    Then he said, 48 hours makes sense.

S. RICHARDSON - CROSS - MR. BRODSKY          2384

1    A    Yes, going forward.

2    Q    Let me ask you, and directing your attention to the

3    settlements and what was disclosed regarding the settlements.

4    Mr. Shkreli started to brief you in March of 2013 about other

5    investors who had moved their funds from MSMB to Retrophin,

6    correct?

7    A    That's correct.

8    Q    And this was a conversation between you and Mr. Shkreli?

9    A    Yes, it was.

10   Q    And Mr. Shkreli told you that these investors had

11   voluntarily moved their funds over from MSMB to Retrophin?

12   A    Yes.

13   Q    Just the way you had exchanged, in a similar way, you had

14   exchanged your MSMB from into Retrophin?

15   A    Yes, redeemed from MSMB, then invested in Retrophin.

16   Q    You saw that exchange agreement, right?

17   A    Yes.

18   Q    It was an exchange of whatever your interest was in MSMB

19   would be exchanged for 14,000-plus units of Retrophin?

20   A    Retrophin units, yes.

21   Q    Retrophin units.  And your understanding was your

22   investment that was being converted to Retrophin was money

23   being used to help grow Retrophin?

24   A    Yes, it was.

25   Q    And you understood Mr. Shkreli when he told you that MSMB

S. RICHARDSON - CROSS - MR. BRODSKY                2385

1    investors had voluntarily decided to convert their shares from

2    MSMB investment into Retrophin shares, that their money was

3    being used to build Retrophin?

4    A    Yes.

5    Q    We saw how expensive it was for the first nine months in

6    2012 to build Retrophin before it became a public company,

7    right?

8    A    Yes.

9    Q    It was over $16 million being spent?

10   A    Just in one period of time, yes.

11   Q    So, you understood also that the MSMB investors, as far

12   as you knew -- withdrawn.

13        Mr. Shkreli didn't tell you in the first quarter of

14   2013 that the MSMB, any MSMB investors were threatening to sue

15   Retrophin?

16   A    No, he did not.

17   Q    You know the name Dr. Lindsay Rosenwald?

18   A    No.

19   Q    Mr. Shkreli didn't mention his name to you?

20   A    Not a name I have recall of.

21   Q    Mr. Shkreli didn't mention the name Sarah Hassan?

22   A    Not that I recall.

23   Q    Or Spencer Spielberg.  Now after March 2013 --

24             THE COURT:  Was there a response to that question?

25             THE WITNESS:  Not that I recall.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

S. RICHARDSON - CROSS - MR. BRODSKY                2386

1  Q    Mr. Richardson, between March of 2013 and the end of

2  June 2013, did you have another conversation with Mr. Shkreli

3  relating to the MSMB investors who wanted to true up their

4  shares of Retrophin?

5  A    I think in passing there might have been a quick update,

6  one of my dinner updates with him.

7  Q    You were interested because the sooner those true ups

8  could happen, the sooner your arrangement could be executed?

9  A    Well, he had asked me to go to the back of the line, as

10  the phrase is I think, in terms of, because it was coming out

11  of his only personal stockholding he asked me to go to the

12  back of the line.  So yes, I was interested to know how timing

13  would play out.

14          THE COURT:  Could you explain to the jury the term

15  true up, as it's being used in the Q and A here, what is true

16  up.  You asked the question using the term true up.

17          MR. BRODSKY:  Yes, your Honor.

18  Q    Your understanding, Mr. Richardson, in your conversations

19  with Mr. Shkreli was a true up was from, as a result of the

20  conversion of MSMB shares into Retrophin shares.  You believed

21  your value of your Retrophin shares or the amount of Retrophin

22  shares should have been higher.

23  A    Correct.

24  Q    And that's trueing up your value, your conversion, of

25  MSMB investment into Retrophin, you're trueing up to what you

S. RICHARDSON - CROSS - MR. BRODSKY                2387

1    believe was the true value of your Retrophin ownership?

2    A    Yes.

3    Q    And the other MSMB investors, as far as you understood,

4    were doing the same thing, trying to true up the value of

5    their, what they understood to be their investment in

6    Retrophin into what the real value should be?

7    A    That was my understanding.  And the true up was the

8    phrase Mr. Shkreli used.

9    Q    Do you remember there was a Board call on June 11, 2013?

10   A    June 11, I remember there was one in June, yes.

11   Q    And present for that call were you, Mr. Aselage and

12   Mr. Shkreli?

13   A    Yes, we were the three Board members.

14   Q    And Mr. Panoff was present as well having now joined the

15   company in May?

16   A    Yes, he had just joined a week or two earlier.

17   Q    Mr. Hackert from Marcum and Sunil Jain were there as

18   well?

19   A    I believe so.

20   Q    For part of the call, not all.

21   A    Part of the call, they came on second.

22   Q    The Board was addressing the annual report for the

23   year-ending December 2012?

24   A    There were a number of subjects being discussed.  I know

25   we had urgent business about the drug acquisitions as well,

S. RICHARDSON - CROSS - MR. BRODSKY            2388

1   and financing were the two subjects in June.

2   Q    Fair to say the issue of trueing up the MSMB investors

3   came up during the discussion?

4   A    I'm not sure whether it came up during the discussion or

5   not.

6   Q    You don't remember -- withdrawn.

7            Let me show you 104-19.  May I approach, your Honor?

8            THE COURT:  Yes.

9   Q    Showing you DX104-19 for identification and asking you,

10  Mr. Richardson, if you recognize those notes?

11  A    Yes.  These are my notes in preparation, both in

12  preparation for the Board call and then some follow up notes

13  from the Board meeting itself.

14  Q    This is from the Board call in June 11, 2013?

15  A    June 11, 2013.

16           MR. BRODSKY:  We offer it, your Honor.

17           MS. SMITH:  Objection, your Honor.  Hearsay.

18           THE COURT:  Does the defense wish to offer a basis

19  to admit this document which the Government claims is hearsay?

20           MR. BRODSKY:  Multiple, your Honor.

21           THE COURT:  Should we do it at sidebar or excuse me,

22  I'm sorry, to the ladies and gentlemen, but we probably should

23  have this discussion --

24           MR. BRODSKY:  A few foundational questions, your

25  Honor?

S. RICHARDSON - CROSS - MR. BRODSKY                    2389

1          THE COURT:  Sure.

2    MR. BRODSKY:

3    Q    Mr. Richardson, did you take these notes at or about the

4    time of the Board meeting, either shortly before the Board

5    meeting or before the Board meeting?

6    A    Yes, some of the notes were made before the Board call

7    and some I made during the call.

8    Q    When you took notes, was it your practice and custom to

9    take notes before the Board call and then during a Board call?

10   A    Yes, to do both.

11   Q    Did you keep these notes and these documents of your

12   notes of what happened during the Board meetings as part of

13   your ordinary course of your business as a member of the Board

14   of Directors of Retrophin?

15   A    Yes, I would keep copies of my notes.

16          MR. BRODSKY:  Your Honor, I'd offer them under Rule

17   803 for business records.

18          MS. SMITH:  Objection, your Honor.

19          THE COURT:  Sidebar.

20          (Continued on the next page.)

21          (Sidebar conference.)

22

23

24

25

SIDEBAR CONFERENCE                    2390

1        THE COURT:  I think he's offering it under 803.6.

2        MS. SMITH:  So Mr. Richardson, as he testified, some

3   of these notes were taken before the Board meeting and some

4   were during.  They are not all concurrent records of what

5   happened at the Board meeting, it's mixed in, is my

6   understanding.

7        MR. BRODSKY:  Your Honor, what I was eliciting is

8   that he took notes before and he took notes during.  His notes

9   before and during are both records of, made at or near the

10  time that he is getting information.  So he receives Board

11  materials, he takes notes.  Then during the Board call he is

12  actually taking notes, so that's someone with knowledge.  He

13  just testified to that.  It was his practice to keep these in

14  the course of a regular conducted business activity as the

15  Board member, and that was a regular practice of his.

16        It's all the elements of a regularly conducted

17  business activity.  It matters not whether someone is at a

18  computer typing or whether or not they are making handwritten

19  notes.  This is a classic business record.

20        THE COURT:  I think what her concern is, if I'm

21  hearing correctly, is not that some of this might be

22  admissible and some might not.  She's, I think, not able to

23  discern what is a recording of the meeting, his recollection

24  of what was recorded, what he observed in the meeting, or a

25  description from notes that he made.

SIDEBAR CONFERENCE                    2391

1          MR. BRODSKY:  I'll ask him.  I think the notes

2     before him are part of the regular conducted business.  So if

3     you go to a Board meeting and it is your practice to take

4     notes on materials you received --

5          THE COURT:  It had to be a record of an act, event

6     condition, opinion or diagnosis.  If you're saying that the

7     act is receipt of the documents and his silent interpretation

8     of them?

9          MR. BRODSKY:  In preparation for a Board meeting.

10    If your practice as a Board member is to receive materials and

11    note what you want is important from them or questions that

12    you have, that is an act in furtherance of conducting a

13    regular course of business activity.

14          Then there is a second part, which is during the

15    Board meeting, taking the notes pursuant to your Board

16    position.

17          THE COURT:  So the question is, did your notes prior

18    to the meeting make it into the discussion at the Board

19    meetings; can you determine and delineate that?

20          MR. BRODSKY:  I don't think it goes to the

21    admissibility of the document.  I think it can.  He took notes

22    before the Board meeting.  He identified what he thought was

23    important.  That's admissible as a business record.

24          Separately, if you took minutes after a Board

25    meeting as a practice, that's admissible.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                           2392

1         So I think both parts are admissible, so the

2    document is admissible.  Then the question becomes, can you

3    question him, which I will, which ones were before the Board

4    meeting and which were after.

5         MS. SMITH:  I'm not sure Mr. Brodsky established

6    notes taken before the Board meeting were necessarily in

7    response to documents he received in connection with the Board

8    meeting.

9         THE COURT:  Lay that foundation.  Say, what prompted

10   him or what was the basis was for his note taking before the

11   Board meeting.  I would assume it was the e-mails that he

12   received from Panoff or somebody about the Board.

13        MS. SMITH:  I think it's worth asking the question.

14   I think the answer to some of this is no.

15        MR. BRODSKY:  All right.

16        THE COURT:  You need to the discern, distinguish,

17   ask the questions.

18        MR. BRODSKY:  I will.

19        THE COURT:  Was that in response to something you

20   received, an act record or something.

21             (End of sidebar conference.)

22             (Continued on the next page.)

23

24

25

SIDEBAR CONFERENCE                            2393

1          (In open court.)

2    EXAMINATION BY

3    MR. BRODSKY: (Continuing.)

4    Q    So, Mr. Richardson, at the top of the document, it

5    references Retrophin board call June 11, 2013?

6    A    Yes.

7    Q    And the notes taken on this piece of paper are notes in

8    two categories; correct?

9          The first category being notes you took about items

10   you wanted to either raise during the board call or address,

11   or items that -- or commence you had during the board call?

12   A    That's correct, it's a blend of the two.

13   Q    All right.

14         MR. BRODSKY:  Your Honor, we offer DX104-19.

15         THE COURT:  We will.

16         MS. SMITH:  Your Honor, we continue to object.

17         THE COURT:  I will admit DX104-19 subject to the

18   sidebar we had.

19         (Defense Exhibit DX104-19, was received in

20   evidence.)

21         MR. BRODSKY:  Thank you, your Honor.

22   Q    So if we can put that up Mr. Carter.

23         MR. BRODSKY:  May we publish?

24         THE COURT:  Yes.

25         MR. BRODSKY:  Yes.  Thank you.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                              2394

1    EXAMINATION BY

2    MR. BRODSKY: (Continuing.)

3    Q    The top, obviously, says, "Retrophin board call, June 11,

4    2013."  Right?

5    A    Yes.

6    Q    Then it has "open items"; correct?

7    A    Yes.

8    Q    Did you write "open items" before the board call or

9    during the board call?

10   A    Before the board call.

11   Q    Down below, I'm just going to focus your attention on the

12   third item.  It says right above three, "audit Ed."

13        Did you write the words "audit Ed" before the board

14   call or during the board call?

15   A    I believe I wrote "audit" before the call, and "Ed"

16   probably during the call.

17   Q    About by "audit," you meant that this was the external

18   auditors from Markham attending the meeting and you

19   anticipated them talking?

20   A    Yes, I did.

21   Q    And "Ed" refers to Ed Hackert from Markham from Markham?

22   A    From Markham.

23   Q    Yes.  And they're independent auditors; right?

24   A    Yes.

25   Q    And number three, it says, "True-ups to MSMB investors

SIDEBAR CONFERENCE                                    2395

1  holdings?"

2              Did you write that question before the board meeting

3  or during the meeting?

4  A    I believe I wrote it before the board meeting.

5  Q    And you wrote it before the board meeting because that's

6  one the items you want wanted to address, one of the open

7  items you wanted to address, during the board call?

8  A    I wanted to be, again, back to transparency because I was

9  one of the people to be true-upped.  I wanted to make sure

10 there was -- that I raised this subject.

11 Q    And the underneath it it says, "dash complete."  Right?

12 A    Yes.  Which I think I wrote during the call.

13 Q    And you wrote during the call because it was your

14 understanding, based on the discussion during this meeting,

15 that the true-ups to MSMB investors holdings were completed?

16 A    I'm not sure complete relates to that point.

17 Q    Complete appears directly underneath true-ups to "MSMB

18 investors holdings?"

19 A    I believe it's under audit, though.  I don't know what

20 else -- I can't recall what else was covered.  What else is

21 covered during the audit discussion.

22 Q    So, you, sitting here right now, you don't remember one

23 way or the other whether true-ups to "MSMB investors

24 holdings?"  The answer "complete" refers to that or refers to

25 something else?

SIDEBAR CONFERENCE                                    2396

1    A    That's correct.  I can't recall.

2    Q    And fair to say that you did raise -- it was your --

3              MR. BRODSKY:  Well withdrawn.

4    Q    Before this call, it was your intent to raise the

5    true-ups to MSMB investors during the board call?

6    A    Yes, it was.

7    Q    And you do you remember following through with that and

8    raising the issue during the board call?

9    A    I don't recall whether it was raise the during the board

10   call.

11   Q    Now, let me turn to July 2013.

12             MR. BRODSKY:  If we can put up GX-239 in evidence

13   just on the screen and then I'm going to show you a separate

14   document.

15   Q    Do you remember seeing this one this is the July 2, 2013,

16   GX-239 in evidence which is Mr. Panoff's July 2nd e-mail with

17   the Attachments A, B, and E but not Attachment C and not

18   Attachment D; right?

19   A    Yes.

20   Q    Do you remember seeing this during your direct

21   examination?

22   A    Yes.

23   Q    All right.  Let me show you DX104-158 for identification.

24             DX104-158, do you recognize this as being the same

25   document, but it also contains Attachments C and D?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                          2397

1    A    Yes, it appears the same.

2    Q    Okay.  This is the document you received, correct, in

3    advance of the board meeting?

4    A    Yes, in July.

5    Q    And then you received this document and the attachments,

6    approximately, two -- a day before the board meeting; correct?

7              The board meeting was on July 3, 2013,

8    Mr. Richardson?

9    A    Yeah, I just think there was a timing issue.  I think was

10   an error on the agenda, but I believe it was 10:00 a.m. and

11   not 10:00 p.m. if I recall correctly.

12   Q    And --

13   A    It's confusing because of the --

14   Q    Putting aside the agenda on the back saying "10:00 p.m.,"

15   does the e-mail itself on the first page, DX104-158 on the

16   front page, say, "I look forward to speaking with you all at

17   10:00 a.m."?

18   A    Yes, it does.

19   Q    Okay.  That 6:47 time at the top July 2nd --

20             MR. BRODSKY:  Your Honor, we offer it, sorry,

21   104-158.

22             MS. SMITH:  Your Honor, it's missing an attachment.

23   Just says, "Filed provided natively."  We can admit it as long

24   as the defense adds that.

25             THE COURT:  DX104-158?

SIDEBAR CONFERENCE                              2398

1          MS. SMITH:  Yes, the third page says, "File

2    provided natively."

3          MR. BRODSKY:  I apologize, your Honor.  We'll print

4    it.  It says, "File provided natively."  I'm not sure what

5    that means.  I think we just have to print whatever is there.

6          THE COURT:  Well, you're going to correct it again.

7          MR. BRODSKY:  Yes.

8          THE COURT:  This copy was a complete copy; right?

9    So we'll admit it subject to that stipulation.

10          MR. BRODSKY:  I'm told, your Honor, it's an Excel

11    spreadsheet which we will print and replace with 6862.

12    EXAMINATION BY

13    MR. BRODSKY: (Continuing.)

14    Q    Mr. Richardson --

15          MR. BRODSKY:  And we offer, your Honor, with that

16    understanding that we will produce the file provided natively.

17          MS. SMITH:  No objection, your Honor.

18          THE COURT:  We will receive Defense Exhibit 104-158.

19          (Defense Exhibit 104-158, was received in evidence.)

20    EXAMINATION BY

21    MR. BRODSKY: (Continuing.)

22    Q    Mr. Richardson, there's a time that says "6:47 p.m."

23          Do you understand whether that's 6:47 p.m. GMT time,

24    so the actual receipt of this e-mail happens to be much

25    earlier in the day, 2:47 p.m. Eastern Time.

SIDEBAR CONFERENCE                          2399

1          Do you know that one way or the other?

2    A    Sitting here today, I don't recall that.

3    Q    The purpose of this board call, sir, was to focus on the

4    company's current financial condition; right?

5    A    Yes, and the financing discussion and an acquisition of a

6    drug.

7    Q    And if we go over to the page that says Exhibit A, the

8    Summary Cash Flow statement that we saw, and it's Bates

9    numbered, well, it doesn't have a Bates number, Mr. Carter,

10   but it's the one, two, three, fourth page of the document.

11          Yes, that right there.

12          This is a document you reviewed, the Summary Cash

13   Flow, before the board meeting; right?

14   A    That's correct.

15   Q    And, in fact, before the board meeting, you took notes or

16   some notes on the document?

17   A    I marked a couple of items, yes.

18   Q    Let's show you DX104-65.

19          (Approaching the witness.)

20          (Handing to the witness.)

21   Q    I'm showing you Defense Exhibit 104-65 for

22   identification, Mr. Richardson.

23   A    Thank you.

24   Q    As you look at it, we agree that these are your notes in

25   connection with before the board call on July 3, 2013, or some

SIDEBAR CONFERENCE                          2400

1   of them are in connection with before the board call?

2   A     Some are before.  And, again, like before, some of them

3   during the call.

4   Q     You have a practice, again, this document reflects your

5   practice of taking notes in preparation for the board meeting,

6   receiving the materials, taking notes in anticipation of the

7   board meeting; correct?

8   A     Yes.

9   Q     And then taking notes during the board meeting?

10  A     That's correct.

11  Q     And all the statements that you make before the board

12  meeting and during the board meeting are at or near the time

13  of the board meeting?

14  A     All around that time, yes.

15  Q     And this was your regular course of practice to do this;

16  correct.

17  A     My normal practice wherever I could.

18           MR. BRODSKY:  Your Honor, we offer 104-56.

19           MS. SMITH:  And we're just going to keep our prior

20  objection from before.

21           THE COURT:  All right.  I will admit 104-65 with the

22  understanding and discussion that we had at sidebar with

23  regard to a similar document.

24           MR. BRODSKY:  Thank you, your Honor.

25           (Defense Exhibit 104-65, was received in evidence.)

SIDEBAR CONFERENCE                              2401

1          Evidence as of this date.)

2    EXAMINATION BY

3    MR. BRODSKY: (Continuing.)

4    Q    Just looking at the first page and we publish it.

5          The review and approve amendment to Panoff

6    Employment Agreement at the bottom where it says "No. 6."

7          Do you see that?

8    A    Yes.

9    Q    Are those notes you took during the board call or after

10   the board call?

11          I mean, before the board call or during the board

12   call?

13   A    Was there an attachment to Mr. Panoff's agreement or not?

14   Q    If you look at our Exhibit 104-158, there was an

15   attachment Exhibit E of an amendment to the Panoff Employment

16   Agreement.  It would have been Bates Numbered under DX104-158

17   R. Greebel, 6895 to 6896?

18   A    I just can't recall if my note on here I took having read

19   the attachment.  The agreement is an attachment.

20   Q    Let's turn to the next page, the Summary Cash Flow.

21          How many arrows appear on the page?  Those are your

22   arrows on the bottom part of the page?

23   A    Yes.

24   Q    The one arrow is to R&D.  Do you see that?  Where it says

25   "low"?

SIDEBAR CONFERENCE                                    2402

1   A    Yes.

2   Q    And another arrow goes to MSMB Settlements; correct?

3   A    That's correct.

4   Q    The first arrow that you put "R&D low" with the arrow,

5   was that something you wrote before the board meeting?

6   A    Yes.

7   Q    Was that an issue -- that was an issue that you wanted to

8   raise during the board call that there it appeared to you, or

9   seemed to you, that the research and development expenses were

10  too low, that there should have been more money spent on

11  research and development?

12  A    Yes, I wanted to have a discussion to satisfy myself.

13  Q    And then you put an arrow from across MSMB Settlements

14  (Spencer Spielberg, Sarah Hassan, Trachtenberg & Rodes Q2)

15  meaning second quarter; right?

16  A    Yes.

17  Q    Quarter ending June 30, 2013?

18  A    Yes, Q2, June 30th.

19  Q    Covering the months of April, May, and June?

20  A    Yes.

21  Q    You put the arrow in front of the $548,711?

22  A    Yes.

23  Q    Was that during the board call, or was that before the

24  board call?

25  A    I put that there before the board call.

SIDEBAR CONFERENCE                                    2403

1   Q    So that was another item that you wanted to discuss

2   during the board call explaining your arrow there; correct?

3   A    Yes, in the context because, Counsel, after the June

4   meeting, per the earlier note you took me through, I had sat

5   down with Marc Panoff, our new CFO, to talk about where we

6   stood as a company.  And he gave me context about the overlap

7   periods, and it was in that context I was flagging this

8   waiting for him to come back with the analysis.

9   Q    Understood.

10       And you knew from Mr. Shkreli -- you understand from

11  Mr. Shkreli that he was "trueing up" MSMB investors; right?"

12  A    Yes.

13  Q    And you had believed that he was trueing them up based on

14  his own personal?

15  A    From his own stock holding.

16  Q    But you agree with me, sir, that what appears here is a

17  liability of MSMB Settlements on Retrophin's books; right?

18  A    Yes, something is coming out of the Retrophin cash flow

19  on this page.

20  Q    There's no confusion about that; right?

21  A    There's no confusion here.  But as I said earlier, I'm

22  still waiting for Mr. Panoff who is doing the full analysis of

23  MSMB Retrophin overlaps.

24  Q    I take it during this board call, you didn't discuss your

25  own personal arrangement or agreement with Mr. Shkreli

SIDEBAR CONFERENCE                          2404

1   regarding your own true-up no?

2   A     No.  Ahead of this call, Mr. Aselage was aware of the

3   five percent.  I met with Mr. Panoff to talk him through and

4   Mr. Shkreli was aware.

5   Q     Mr. Aselage knew because he had received the foundation

6   of the cap table back in November of 2012; right?

7   A     The cap table, the five percent, yes.

8   Q     Right.  So when he saw the November 2012 capitalization

9   table, it's your understanding Mr. Aselage knew that you were

10  going to receive five percent of the outstanding shares of

11  Retrophin stock at that time?

12  A     The intent was to get me to the five percent, yes.

13  Q     Okay.

14  A     So ahead of this call, I believed all the principals were

15  aware of that aspect.

16  Q     Understood.  And if you turn to the next page, there are

17  notes there where it talks, "Autism, billion dollar."

18        Are these notes during the call or are these notes?

19  A     This is during the call.  This is about, as I said, a big

20  part of the call was taken up with regard to a new acquisition

21  that was being considered.  So a big part of this call was on

22  that subject.

23  Q     And the next page of the notes, Bates numbered in

24  DX104-65, RO20831, where it says, "Retrophin call, 5:00 p.m.

25  Wednesday."

SIDEBAR CONFERENCE                                      2405

1            There is a reference to Code of Ethics and insider

2    trades.

3            Do you see that?

4    A    Yes.

5    Q    Are those notes you took before the board call?

6    A    I believe they are.

7    Q    And the bottom where it says, "Insider trading to cover

8    contractors, temp employees, too."

9            Do you see that?

10   A    Yes, that's was my notes, yes.

11   Q    And you raised during the board call that you wanted

12   insider trading policies to cover contractors and temporary

13   employees; correct?

14   A    I believe so.  These are my notes, I can't confirm

15   exactly what we got to during the call because these are my

16   notes in preparation for it.

17   Q    Okay.  And then during, turning to the next page, that's

18   the reference to the MCC Theater, if we keep scrolling,

19   there's a reference to the MCC Theater.  That's what we are

20   talking about earlier with respect to a donation from the

21   company?

22   A    Yes, as an employee entertainment opportunity.

23   Q    Okay.  Did you have an understanding that Trachtenberg &

24   Rodes reflected in the Summary Cash Flow was a law firm

25   representing an individual name the Mr. Coker?

SIDEBAR CONFERENCE                                    2406

1    A    No, I did not.

2    Q    Did you -- the name Sarah Hassan on Summary Cash Flow,

3    looking at the Summary Cash Flow, which was RO20829.

4                Do you see that?

5                Can we blow up MSMB Settlements, Mr. Carter, where

6    it says, "Spencer Spielberg, Sarah Hassan, Trachtenberg &

7    Rodes.

8                You had seen the name Sarah Hassan before; correct?

9    A    See, again confusing.  Of course, I'd see Fred Hassan

10   before.  So whether I had scene Sarah's name before I don't

11   know.

12   Q    Let me turn to moving it along GX-245.

13               So before I turn to GX-245, which is in evidence,

14   that's board materials for September 9, 2013; right?

15   A    Yes, it is.

16   Q    So between July, the July 3, 2013, board call and

17   September 9, 2013, there was a board call on July 24, 2013.

18               Do you have an understanding of that?

19   A    I don't recall July 24th.

20   Q    Do you remember you weren't able to attend the board

21   call?

22   A    I was on vacation, yes.  That was probably the one I

23   missed while I was on vacation.

24   Q    During that board call for July 24, 2013, you understood

25   that the board was discussing Mr. Hackert Mr. Jane were giving

SIDEBAR CONFERENCE                    2407

1   an audit update; correct?

2   A    I don't recall without seeing the agenda.

3   Q    Okay.  Having not attended, you don't know what was

4   discussed during that meeting?

5   A    No, I do not.

6   Q    All right.

7          Now, moving forward to September 9, 2013.  This was

8   sent by the Chief Financial Officer Marc Panoff on

9   September 9, 12:32, p.m.; correct?

10  A    Yes.

11  Q    These were a series of board materials that you received;

12  correct?

13  A    Yes, I did.

14  Q    And you wish you had received them earlier; right?

15  A    Yes, again, because they're very tight not fulfilling our

16  48-hour guideline.

17  Q    But there's no question, sir, that you did review these

18  board materials prior to the call?

19  A    I review again what I could in the short period of time

20  available.  And, again, this was the meeting, as I said in

21  direct, that, again, the opening of the meeting, again, shared

22  my frustration that we're getting material so late and we

23  couldn't do justice to some of the subjects.

24  Q    Okay.  Part of this included the Code of Ethics which was

25  Exhibit H.  Code of Business Conduct and Ethics if we could

SIDEBAR CONFERENCE                      2408

1    turn to that which is Bates number KAT_69012.

2            Do you have a physical copy, Mr. Richardson?  Would

3    you like a physical copy?

4    A    That would be easier, thank you, just for my eyeballs

5    here.

6            THE COURT:  What exhibit number?

7            MR. BRODSKY:  I apologize, your Honor, we're having

8    an exhibit issue.

9    Q    Let me turn to your --

10           Do you know whether or not Mr. Greebel commented on

11   the board agenda on this call five days earlier?

12   A    I don't recall.

13   Q    The responsibility for putting the agenda together was

14   Mr. Panoff's?

15   A    He had taken the lead working with Mr. Greebel and

16   others.

17   Q    Okay.  There came a time when you were involved in

18   preparing board agendas; right?

19   A    Only specifically the offsite agenda, the main offsite

20   agenda.

21   Q    All right.

22           MR. BRODSKY:  If I could ask my colleague to get me

23   8281, DX-8281 for me.

24           THE COURT:  Can I ask you, Mr. Brodsky.

25           MR. BRODSKY:  Yes.

SIDEBAR CONFERENCE                          2409

1       THE COURT:  You had mentioned a board meeting on

2   September 9, 2013.

3       MR. BRODSKY:  Yes.

4       THE COURT:  Did you refer to an exhibit in

5   connection with that board meeting?

6       MR. BRODSKY:  I referred to Government Exhibit 245.

7       THE COURT:  Thank you.

8       MR. BRODSKY:  May I approach?

9       THE COURT:  Yes.

10  EXAMINATION BY

11  MR. BRODSKY: (Continuing.)

12  Q    I'm showing you, Mr. Richardson, DX-8281 for

13  identification.  Take a moment and see if you recognize that.

14  A    Yes, I do.

15  Q    And these are your notes taken on the board agenda for

16  September 9, 2013, either before the call in preparation for

17  the board call or during the call?

18  A    Correct.

19      MR. BRODSKY:  Your Honor, we offer 8281.

20      MS. SMITH:  Same objection as before.

21      THE COURT:  All right.  We will admit with the

22  understanding of what we discussed at sidebar.

23      (Defense Exhibit 8281, was received in evidence.)

24  Q    Now, let's go through this is the agenda; correct?

25  A    Yes, it is the agenda.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                                    2410

1   Q    And you testified on direct examination that you

2   believed, you said, "We did items two through seven, I

3   believe.  Yeah, two through seven I believe we got to during

4   the board call plus the management update."

5          Do you remember testifying to that?

6   A    I believe that's what I said yes.

7   Q    And so, two through seven because the management update

8   would be No. 12; right?

9   A    That's correct.

10  Q    Didn't you tell the prosecution about two years ago

11  during an interview that you covered more than two through

12  seven and No. 12?

13  A    I don't recall the specific numbers.

14  Q    Isn't it a case that you told the prosecution team that

15  the board did discuss Item No. 10, Review and Approve

16  Indemnification Business for Directors and Officers?

17  A    Well, there is a comment written on here, so that could

18  have been the case.  I don't know if I wrote that one before

19  or after.

20  Q    Let me see if I can refresh your recollection?

21          MR. BRODSKY:  May I approach, your Honor.

22          THE COURT:  Yes.

23          (Approaching the witness.)

24          THE COURT:  What are you showing him?

25          MR. BRODSKY:  I'm showing you 3500-SR1-4 for

SIDEBAR CONFERENCE                                  2411

1  identification only to refresh your recollection.  Thank you.

2  Q    And let me direct your attention to a specific page,

3  Page 7, and if you look at the top paragraph and silently read

4  it yourself, Mr. Richardson, the lower portion of the top

5  paragraph, the last two sentences.

6  A    (Complying).  Yes.  I think, again, what I said at the

7  start of the call.

8  Q    Before I ask you, let me ask you a question before you

9  talk.

10            Did you have a chance to review it?

11 A    Yes, I did.

12 Q    All right.  Here's the question, Mr. Richardson.

13            Do you remember telling the prosecution team does

14 this -- you could put that down, Mr. Richardson.

15            Does this now refresh your recollection that about

16 two years ago, you told the prosecution team, the FBI, the

17 prosecutors, that you did discuss items No. 10 during the

18 board meeting?

19 A    That's certainly what they recorded there based on the

20 fact that I had written augments D&O, the fact that I had

21 written the note.  But I don't recall if I wrote that before

22 or during.

23 Q    Are you referring to "augments D&O"; right?

24 A    Yes.

25 Q    Sitting here today, putting aside the document you just

SIDEBAR CONFERENCE                                    2412

1    read, reflecting statements there, you still don't remember

2    whether or not right here today, you don't remember whether or

3    not the review and approval of the indemnification agreement

4    for directors and officers was discussed during the

5    September 9th board meeting?

6    A    What we'd agreed at the start, if I got some of the

7    numbers wrong, let's focus on the ones that are time

8    sensitive.

9    Q    Mr. Richardson, I just want to -- it will move it along

10   faster --

11              MS. SMITH:   Objection, your Honor.

12              THE COURT:  Sustained.

13              MR. BRODSKY:  Your Honor, I'm trying -- I have a

14   very specific question.  It's a yes or no.

15              THE COURT:  All right.  Then ask it in that form,

16   please.

17   Q    Mr. Richardson, do you remember on September 9, 2013,

18   discussing during the board call Item No. 10, the Review and

19   Approval the Indemnification Agreement For Directors and

20   Officers, yes or no?

21   A    I can't be a hundred percent sure on that one.

22   Q    And below to where it says "Augments D&O."  Do you see

23   that?

24   A    Yes.

25   Q    That's your handwritten note?

```
                        SIDEBAR CONFERENCE                    2413
```

 1   A     It's my handwritten note.

 2   Q     Sitting here today, you don't know whether you said,

 3   "Augments D&O" before the board call or during the board call?

 4   A     As of today that's may recollection I can't give you a

 5   you definitive answer.

 6   Q     Let me ask you to look at 3500-SR1-4 and look at the last

 7   sentence on Page 7 of 11 and see if that sentence refreshes

 8   your recollection, once you read it then you can put it down.

 9   Does it refresh your recollection that you told the

10   prosecution that you do remember that "Augments D&O" was a

11   note you said during the board call?

12              MS. SMITH:  Asked and answered, your Honor.

13              THE COURT:  Well, you have asked and it has been

14   answered.  I'll let the witness answer one more time and then

15   you are to move on.

16              MR. BRODSKY:   Thank you, your Honor.

17   A     I still, sitting here today, don't recall whether that

18   discussion happened.

19   Q     All right.  Let me ask you.

20              In connection with Government Exhibit 245, the

21   September 9th, you can look in one of your binders,

22   September 9, 2013, board meeting.

23              Do you remember that there was an attachment of the

24   consulting agreement of Alan Geller?

25   A     Yes, that was one of the attachments.

SIDEBAR CONFERENCE                           2414

1    Q    And do you remember that the attachment to it was

2    entitled "Consulting Agreement and Release"?

3    A    Sorry, Counsel, I'm just trying to find it.

4    Q    Do you want me to help you, Mr. Richardson?

5              THE COURT:  Give him a Bates number, that might

6    help.

7              Do you have the Bates Number?

8              (A brief pause in the proceedings was held.)

9              THE COURT:   We showed him what's in evidence as

10   245.

11             MR. BRODSKY:  Understood, your Honor.

12   Q    Let me take that one from you.

13   A    That's okay.

14             MR. BRODSKY:  This is one in evidence; right?

15   Q    Let me show it to you.

16             This is the Bates Number KAT_69030, Consulting

17   Agreement and Release, and I ask you to take a look at that,

18   if you don't mind.

19             When you were reviewing the agreement, you saw that

20   it was entitled Consulting Agreement and Release?

21   A    I didn't register it at the time.  As I said at the

22   start, we received all these materials, I think, 40 minutes

23   before the call started.  So all I was had been able to do is

24   flick through a few pages ahead of the call.

25   Q    Okay.

SIDEBAR CONFERENCE                                    2415

1   A     So I hadn't registered any specific language and its

2   magnitude.

3   Q     One of the things you noted prior to the board call was

4   that you felt the consultants, Mr. Geller and Mr. Banta, there

5   should be some standard set so that they were only limited to

6   working, approximately, 20 percent of their total time?

7               MS. SMITH:  Objection, your Honor.

8               THE COURT:  I'll ask you to rephrase the question.

9               But as a point of clarification, Mr. Brodsky.

10              MR. BRODSKY:  Yes.

11              THE COURT:  You referred to I thought Bates Number

12  69030; is that correct?  Is that what you were referring to

13  earlier?

14              MR. BRODSKY:  I was referring to the Bates number

15  that appears on the document I handed to Mr. Richardson.

16              THE COURT:  All right.  I think that anyway for some

17  reason my copy doesn't have to.

18              THE WITNESS:  I think this is the one.

19              THE COURT:  Okay.  I think the parties have to

20  clarify which version of Government Exhibit 245 is in evidence

21  because if the Government could just bear with me, it appears

22  that there are several versions of Government's 245, some of

23  which have certain pages and some of which don't.  I think

24  what we need is a complete copy of the exhibit.  I will say

25  that my copy in my binder is not complete.

SIDEBAR CONFERENCE                          2416

1          So please just make sure you have the right,

2    complete version.  And I'm hoping the witness has the complete

3    version since he's being asked questions about it.

4          MS. SMITH:  The version that's up on the screen is

5    the correct copy of the Government Exhibit.

6          MR. BRODSKY:  We can use the one on the screen.

7          THE COURT:  Right.

8          THE WITNESS:  That is the one I have, I believe.

9    EXAMINATION BY

10   MR. BRODSKY: (Continuing.)

11   Q    All right.  So asking you the -- am I correct, sir, that

12   prior to the board meeting, you wanted to ensure that the

13   consultants, Mr. Geller and Mr. Banta, that there was some

14   change to the agreement that ensured that there was a

15   provision requiring them to only spend 20 percent or less of

16   their total available time for consulting?

17         MS. SMITH:  Objection, your Honor.

18         THE WITNESS:  Rephrase, please.

19   Q    Did you make a note prior to the board meeting about the

20   consulting agreements of Mr. Banta and Mr. Geller?

21   A    I made notes without having read the documents.  I think

22   the language I used was minimum time expectation.  I made no

23   reference to 20 percent or changing any language.  It was just

24   a question around is the company going to get value out of

25   these consulting agreements was the genesis of what I had

SIDEBAR CONFERENCE                              2417

1   written.

2   Q    And that's because, if we pull up 8281, DX-8281, in your

3   notes from the board presentation, next to Number 9, Approve

4   Retaining Al Geller and Ken Banta as consultants," you wrote,

5   "Minimum time expectations"?

6   A    Yes, I did and "cost structures."

7   Q    And "cost structures"?

8   A    Which I wrote before and, as I said, because we didn't

9   get to the subject anyway.

10  Q    You understood now, of course, that Mr. Banta had been

11  providing consulting services to Mr. Shkreli before --

12  relating to let Retrophin before Retrophin went public?

13  A    He had been working with Mr. Shkreli for many years is my

14  understanding.

15  Q    And you knew Mr. Banta had office space at Retrophin?

16  A    At some point in 2014 or I did I -- or late '13.

17  Q    And you understood that Mr. Banta wasn't working for

18  free; correct?

19  A    I believe, yes, he had a prior agreement.

20  Q    And you understood that Mr. Geller, you understood, was

21  someone who had invested in the past with Mr. Shkreli?

22       MS. SMITH:  Objection, your Honor.

23       THE COURT:  Sustained.  Rephrase, me.

24  Q    He had invested in the past with MSMB?

25  A    No, I wasn't aware of that.

SIDEBAR CONFERENCE                                    2418

1    Q    You understood that Mr. Geller was somebody who was

2    providing services to Mr. Shkreli?

3    A    Mr. Shkreli had said that Mr. Geller was someone that

4    could be useful to find new investors for the company.

5    Q    And isn't it true that you also knew that Mr. Shkreli was

6    somebody who -- Mr. Shkreli described Mr. Geller as somebody

7    who coached him about being a better business leader?

8    A    I don't recall that reference.

9    Q    Do you remember telling the prosecution about two years

10   ago that Mr. Geller according do Mr. Shkreli, as you

11   understood it, "an important door opener and sounding board

12   for Mr. Shkreli"?

13   A    I certainly remember the door opener, which is the point

14   about new investors.

15   Q    Let me show you or try to refresh your recollection

16   SR101-3 and ask you to look at Page 5 of 8.

17           Showing you 3500-SR1-3.  If you turn to Page 5, let

18   me direct your attention to the paragraph that discusses

19   Mr. Geller.  It's the one, two, three, four, fifth paragraph.

20   It's the fourth paragraph, I apologize.  It's the shorter one.

21           Do you see that, Mr. Richardson?

22   A    Yes.

23   Q    And during, if you put, that aside, do you remember

24   telling the prosecution?

25   A    It says, "RICHARDSON had very limited knowledge of

1    Geller."  It also says in the other paragraph you took me to.

2    Q    Understood you have limited knowledge.  If you just put

3    that aside because it's not in evidence.  And I wish I could

4    ask you what's in there but I can't.

5              MS. SMITH:  Objection, your Honor.

6              THE COURT:  Sustained.

7              The jury should disregard any statements by lawyers.

8    It's not evidence and hit the erase button, please.

9    Q    Mr. Richardson, isn't that true that you told the

10   prosecution team that Mr. Geller was an important door opener

11   and sounding board for Mr. Shkreli?

12   A    That's certainly what they recorded.

13   Q    And by sounding board, is it fair to say that that

14   somebody who -- what you meant by that when you told the

15   prosecution team?

16             MS. SMITH:  Objection, your Honor.

17             THE COURT:  Well, let him finish the question.

18             You're asking Mr. Richardson about his comments;

19   correct?

20             MS. SMITH:  Yes.

21             THE COURT:  Not about someone else's comments?

22             MS. SMITH:  Correct.

23   Q    What you understood when Mr. Shkreli said to you,

24   "Mr. Geller is a sounding board for him."  You understood it

25   to be somebody who was somebody listening to a business leader

SIDEBAR CONFERENCE                              2420

1    providing general business leadership advice or executive

2    advice?

3                MS. SMITH:  Objection, your Honor.

4                THE COURT:  All right.  Sustained.

5    Q    By sounding board, you understand Mr. Shkreli to be

6    saying that he provided informing to Mr. Geller and heard

7    Mr. Geller's comments and thoughts?

8                MS. SMITH:  Objection, your Honor.

9                THE COURT:  I'm going to sustain the objection.

10   Q    What did you understand Mr. Geller to mean by "sounding

11   board"?

12   A    Mr. Shkreli.

13   Q    I apologize.  Mr. Shkreli.

14   A    Again, my recollection is the whole discussion, the

15   limited discussion I had with Mr. Shkreli about Mr. Geller,

16   was in terms of investment opportunities for the future.

17          So, the sounding board, I take it in the context of

18   ideas about where to find new investors.  So a sounding board

19   in that context is my recollection.

20   Q    You know he was -- let's turn to 247 in evidence.  We

21   have a hard copy of this.

22          It's in evidence, but I'll give you a hard copy

23   anyway Mr. Richardson.

24   A    Thank you.

25                MR. BRODSKY:  Make it easier for you so you don't

SIDEBAR CONFERENCE                           2421

1   have to find it in the binders.

2              THE COURT:  I have it.

3   Q    Mr. Richardson, the time on this is incorrect; right?  It

4   says September 9, 2013, at 9:09 p.m.

5              That's not the right time?

6   A    Not if this was issued for the meeting itself.

7   Q    Okay.  Impossible; right?

8   A    One would assume, yes, definitely.

9   Q    And attached to this are a series of documents; correct?

10  A    Yes.

11  Q    And one of those is Attachment C; right?

12             The draft.  It's called "The draft of AS16

13  Communication Letter"; right?

14  A    Yes.

15             MR. BRODSKY:  And can we go to that, Mr. Carter.  I

16  have Bates Number RO193917.  And we can scroll up a little bit

17  to the first page.  Let's go to the first page.  Yes, thank

18  you?

19  Q    This is a draft letter by Markham; correct?

20  A    Yes, the external auditors draft letter.

21  Q    Mr. Greebel didn't draft this; right?  The letter; right?

22  A    No, the external auditors.

23  Q    And Retrophin's officers didn't draft this letter; right?

24  A    That's correct.

25  Q    And, at the top, it's addressed to Retrophin, Inc. and

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                           2422

1    subsidiary; right?

2    A     Yes.

3    Q     An important letter from the auditors; correct?

4    A     Yes.

5    Q     One that you paid attention to; correct?

6    A     Yes.

7    Q     One that you read?

8    A     Yes.

9    Q     And certainly, one that Mr. Hackert and Mr. Jane

10   discussed at the board meeting; right?

11   A     Yes, they did.

12   Q     And if you follow me with the letter, at the first page,

13   it's a letter in connection with the period ending June 30,

14   2013, right, on the first paragraph.

15           It's in connection with their audit for the --

16   A     Yes, for the quarterly period, excuse me, ending June 30,

17   2013, I see it now.

18   Q     Down at the bottom number one, Significant Accounting

19   Policies and Practices?

20   A     Yes.

21   Q     If you look at the last sentence, it says, "The

22   accountant should also communicate the results of the

23   accountant's evaluation and conclusions about the qualitative

24   aspects of the company's significant accounting policies and

25   practices including situations in which the accountant

SIDEBAR CONFERENCE                              2423

1   identified bias in management's judgments about the amounts

2   and disclosures in the condensed consolidated financial

3   statement."

4            Right?

5   A    Yes.

6   Q    And then, the next page, it has in italics Markham's

7   statement that, "There have been no new accounting policies

8   adopted or changes in significant accounting policies in their

9   application noted."

10           Correct?

11  A    Yes.

12  Q    And number two for critical accounting policies and

13  practices, do you see that in italics, this is the Markham

14  statement that, "There are no specific matters that we believe

15  should be communicated to you.  However, we would be pleased

16  to meet with you at your convenience to discuss these matters

17  in detail."

18           Do you see that?

19  A    Yes.

20  Q    Do you agree with that statement?

21  A    That they definitely wrote this, yes.

22  Q    And they were available to meet with you if you wanted?

23  A    Yes.

24  Q    And the next page, number four, Significant Unusual

25  Transactions.

SIDEBAR CONFERENCE                          2424

1        Do you see that?

2  A    Yes.

3  Q    It lists first the pipe that ended in the first quarter;

4  right?

5        The investment by number of investors in Retrophin?

6  A    Yes.

7  Q    And that was something that you were very well aware of;

8  correct?

9  A    Yes.

10  Q    And then it lists below that number two, "During the

11  second quarter of 2013, the company, its chief executive

12  officer at MSMB Capital became parties to a series of

13  agreements to settle up to $2,286,511 in liabilities."

14        Do you see that?

15  A    Yes.

16  Q    It says, "Which company management believes are the

17  primary obligation of MSMB."

18        Right?

19  A    Yes.

20  Q    It doesn't say "sole obligation," it says "primary"?

21  A    Primary.

22  Q    And then it goes on to say, "The company and MSMB have

23  entered into indemnification agreements."

24        Right?

25  A    Yes.

SIDEBAR CONFERENCE                              2425

1   Q    "Where MSMB has agreed to defend and hold the company

2   harmless against all such obligations and amounts whether paid

3   or unpaid arising from these agreements."

4           Correct?

5   A    Yes.

6   Q    Now, you were asked some questions during the direct

7   examination about whether this discloses the names of parties

8   to the settlement agreements.

9           Did anything prevent you from asking who the names

10  of the parties are?

11  A    Nothing prevented me, but they weren't raised or noted.

12  Q    And copies of the settlement agreements weren't

13  distributed; right?

14  A    They weren't distributed, no.

15  Q    But you could have asked at any time either to the

16  auditors or to management, give us copies of the settlement

17  agreements?

18  A    We could have done but, again, the counsel of course

19  we've got our external auditors have reviewed all this.  This

20  is being positioned to the board as now recording or

21  accounting for history something that's happened.  So the

22  auditors reviewed it, the CFO has reviewed it, and counsel has

23  reviewed it.

24  Q    Okay.

25  A    So that's certainly where the -- that's where we felt we

1   were as a board in terms of believing this is the appropriate

2   way to handle the situation and that, indeed, there was

3   indemnification to protect the company.

4   Q    And nothing stopped you, though, from your oversight

5   role, Mr. Richardson?

6            You agree you had an oversight role?

7   A    I had an oversight role and I had been discussing

8   throughout with you, Mr. Panoff staying on top of where he was

9   with the whole MSMB overlap situation.

10  Q    And you were discussing with Mr. Shkreli your own

11  personal true-up; correct?

12  A    It was further dialogue throughout.  This is, yes, 2013,

13  yes.

14  Q    Did you tell the auditors in connection with their letter

15  that you had an arrangement with Mr. Shkreli with respect to

16  your true-up?

17  A    No, but I had told Mr. Panoff, the CFO.

18  Q    Okay.  And the -- you didn't think the external auditors

19  wanted to know this or needed to know that?

20  A    Again, I believe Mr. Panoff had spoken to then.

21  Q    And then?

22  A    All the way back to June, if you remember, is when I

23  first raised it in my very first meeting with Mr. Panoff very

24  transparently.

25  Q    And then, the next page, where it says "MSMB," it goes on

SIDEBAR CONFERENCE                                    2427

1    to give details, right, about the calculation of the 2.2

2    million; correct?

3    A    Yes.

4    Q    And then the next page it says, "Concurrent with the

5    execution of such settlement agreements, the company received

6    promissory notes from MSMB whereby MSMB paid the company the

7    principal amount of $593,111 plus interest at an annualized

8    rate of five percent?

9    A    Yes.

10   Q    The next paragraph, doesn't it say MSMB is currently in

11   the process of dissolving its operations?

12   A    Yes.

13   Q    And it goes on to say the company has recorded the full

14   amount of the settlements as a charge to its operations;

15   right?

16   A    Yes.

17   Q    And it says, "Due do uncertainty as to whether the

18   affiliate will have sufficient liquidity to repay the company

19   or fund the indemnification agreements should it become

20   necessary."

21            Correct?

22   A    Correct.  And as I said in my direct, it was at this

23   point of the discussion Mr. Shkreli had jumped in verbally

24   very forcefully.

25   Q    And said he would back it?

SIDEBAR CONFERENCE                                    2428

1   A     And said, he, I, Martin Shkreli, and MSMB, I'm standing

2   by this.   Why is this being raised again?

3            (Continued on the next page.)

1  CROSS-EXAMINATION (Continued)

2  BY MR. BRODSKY:

3  Q    And he was standing behind it and you accepted his

4  representation?

5  A    I accepted his representation.

6  Q    And then the next page it says subsequent -- you see at

7  the top of page 5, it says subsequent to identifying the

8  settlement agreement, the company became party of, during the

9  second quarter the company adopted FASB-issued accounting

10  standards updated, ASU2013-04 obligations resulting from the

11  joint and severally liability arrangements for which the

12  amount at the reporting date is fixed.

13          Do you see that?

14  A    Yes.

15  Q    Did you review that accounting statement?

16  A    No, I did not.

17  Q    Down below number eight, does it not say in italises,

18  during the current quarter review, there were no uncorrected

19  or corrected misstatements noted?

20  A    Yes, the auditors are writing that.

21  Q    If we go to number nine.  And we blow up number nine,

22  disagreement with management.

23          Would you read that paragraph and then what is in

24  italises?

25  A    The accountant should communicate to the audit committee

RICHARDSON - CROSS - BRODSKY                    2430

1    any disagreements with management about matters, whether or

2    not satisfactorily resolved, that individually or in the

3    aggregate could be significant to the company's financial

4    statements.  Disagreements with management do not include

5    differences of opinion based on incomplete facts or

6    preliminary information that are later resolved by the

7    accountant obtaining additional relevant facts or information

8    prior to the completion of their review procedures.

9    Q    And Martin wrote?

10   A    There were no such disagreements.

11   Q    Going to the next page, down at the bottom, number 12

12   says, difficulties encountered in performing review.

13        Do you see that?

14   A    Yes.

15   Q    And it says significant difficulties encountered in

16   dealing with management that related to the performance of the

17   review are required to be brought to the attention of the

18   audit committee, including matters that are contentious for

19   which the accountant consulted outside the engagement team and

20   accountant reasonably determined are relevant to the audit

21   committee's oversight of the financial reporting process,

22   right?

23   A    Yes.

24   Q    And then what's stated in there italises by Martin?

25   A    We have not experienced any significant difficulties in

RICHARDSON - CROSS - BRODSKY                    2431

1  performing the review or matters that are a contentious for

2  which the accountant consulted outside the engagement team.

3  Q    And number 13, fraud and illegal acts, does it not say,

4  quote, the audit committee should be adequately informed of

5  fraud and illegal acts coming to accountant's attention during

6  the course of the review.

7            No fraud or illegal acts were noted, end quote.

8  A    Right.

9  Q    That's what it says, correct?

10 A    That's right.

11 Q    Then there were a series of attachments, right, and the

12 attachments were amended and restated company files.

13 A    Yes.

14 Q    So there was an attachment for an amendment to the filing

15 of -- of the quarterly filing ending for the period of

16 June 30, 2013, right?

17 A    The 10-Q, yes.

18 Q    And is it not correct that the entire 10-Q is not

19 attached here but just excerpts, right?

20 A    I don't recall without looking at it again, Counsel.

21 Q    And do you see it there in front of you?

22 A    Yes, it looks slim.  It looks slim, so...

23 Q    These quarterly filings are a hundred plus pages?

24 A    Yes, very trick.

25 Q    And this is just an excerpt, right?

RICHARDSON - CROSS - BRODSKY                    2432

1    A    It appears to be.

2    Q    And this is drawing your attention to certain matters

3    within the larger filing, correct?

4    A    I would assume so, yes.  I -- I don't know what's

5    included and what's not -- and what is excluded.

6    Q    Did you ever count the number of times the settlements

7    are mentioned and discussed in the attachments to Government

8    Exhibit 247, the September 9th, 2013 email from Mr. Panoff to

9    you and the other board members?

10   A    In the 10-Q or?

11   Q    In the 10-Q for 2013, in the Marcum statement letter in

12   the amended, in all the attachments?

13   A    It was in I think in each document specifically at least

14   twice as I recall.

15   Q    And there are a number of documents, correct?

16   A    Yes.  Yes.

17   Q    So this is was not something that was hidden from you,

18   correct?

19   A    No, it wasn't hidden.  And, again, certainly from my

20   point of view, I felt it had been fully resolved and had been

21   fully signed off.

22   Q    Okay.  And let me, in the interest of time, move to --

23   move forward.

24        Do you remember that this meeting started at or

25   about 5:30 p.m. on September 9th?

RICHARDSON - CROSS - BRODSKY                    2433

1           Does that have any recollection about that?

2   A    I don't remember.  I --

3   Q    And let me ask you --

4   A    I know we were have tight on time, yes.

5   Q    How long did the meeting go, to the best of your

6   recollection?

7   A    I honestly can't recall sitting here today.

8   Q    No idea whether -- if you turn to 8281.

9           Put up 8281, and just blow up the top, the time.

10          Do you see that, 5:30 p.m.?

11          Does that refresh your recollection that it was a

12  meeting starting at 5:30 p.m.?

13  A    Oh, yes.  And I recall we got the materials after 4:30.

14  That's why it stuck in my mind, yes.

15  Q    And you remember this meeting went to about 6:45?

16  A    I don't recall.  I don't recall the timing again.

17  Q    Now, do you remember emailing Mr. Panoff immediately

18  after the meeting?

19  A    I did email him after the meeting.

20  Q    And do you remember telling him that it was a good

21  meeting?

22  A    Yes.

23  Q    Do you remember telling him that it was well prepared?

24  A    Well prepared and I think I was -- as I spoke to him, I

25  minute him a day or two later.  I wanted to congratulate him

RICHARDSON – CROSS – BRODSKY                    2434

1    for standing up to the auditors when Mr. Shkreli jumped in

2    quite forcibly.  So I wanted to endorse the behavior

3    Mr. Panoff showed.

4    Q    In 2014, Mr. Panoff stood up against Mr. Shkreli again,

5    correct?

6    A    The context, I'm sorry?

7    Q    Mr. Panoff stood up against Mr. Shkreli with respect to

8    the business development group?

9    A    Oh, yes.  Yes, the trading activity, yes.

10   Q    He went over Mr. Shkreli head to report to the board, to

11   you?

12   A    Yes.

13   Q    That Mr. Shkreli was violating the understanding with the

14   board about the limits on the trading activities that

15   Mr. Shkreli's business development group had engaged in?

16   A    Yes, Mr. Panoff did that.

17   Q    And Mr. Panoff also went over Mr. Shkreli's head in 2014

18   and reported to you that he didn't like how the expenses --

19   that the lack of control over operating expenses?

20   A    Yes, that was another discussion.

21   Q    Let's turn to Government Exhibit 250 in evidence.

22        This is another email you received, sir, on

23   October 25th, 2013, right, relating to the S-1?

24   A    Yes.

25   Q    And you understood that on the receipt of this S-1, that

RICHARDSON - CROSS - BRODSKY                    2435

1    this S-1 wasn't going to be filed for many days, correct?

2    Twenty-one days to be exact.

3    A    Okay.

4    Q    So you received this document 21 days in advance of the

5    filing of the S-1 on November 15th, 2013.

6    A    I don't recall the exact timing, but certainly according

7    to this email.

8            MR. BRODSKY:  Do we have a hard copy?

9    Q    And fair to say that 21 days is certainly sufficient time

10   to have reviewed it, discussed it and make any comments?

11   A    Yes.

12   Q    And you remember that they actually black lined this for

13   you or red lined this for you with highlighted changes?

14   A    It certainly is one of the things we asked Mr. Panoff to

15   do with these very big documents is to redline changes from

16   draft to draft.

17   Q    And you remember they actually did that, correct?

18   A    I recall some documents.  I don't have that one in front

19   of me at the moment to confirm.

20   Q    Okay.  You have it up there already.  Let's turn on the

21   screen, and before we turn on the screen, you see the email

22   from Mr. Panoff and maybe --

23            THE COURT:  I'll give him my hard copy.

24            MR. BRODSKY:  Oh, yes, Your Honor.  Your Honor,

25   perhaps this a good time for --

PROCEEDINGS

2436

1           THE COURT:  The jurors don't want a break.  They're

2      shaking their heads no.

3           Right, jurors?

4           We want to keep the jurors happy.

5           MR. BRODSKY:  Okay.

6           THE COURT:  If you want a break, raise your hand.

7           One would like a break.  Is it urgent?  Okay.

8      Pardon me.  She's asking for a bathroom break, so let's

9      accommodate that, please.

10           As soon as you're all back and ready, we're going to

11      get started.  This will be a very quick break.  We'll be in

12      touch.

13           (Jury exits the courtroom.)

14           THE COURT:  Will the defense please give the witness

15      a copy of this lengthy Government Exhibit 250?  It's hard for

16      the witness to deal with takes on the screen.  Sometimes we

17      are getting copies of things we don't really need, but then we

18      need a copy we get it, so we're yanking things out of our

19      binders.  It just becomes very cumbersome.

20           I think my clerk gave the witness my copy.  And we

21      don't have any discrepancy what's in evidence and what's not?

22           (Whereupon, a recess was taken at 3:30 p.m.)

23           THE COURT:  Before we bring the jury back, can I

24      just have a clear date for the submissions regarding the

25      Daubert hearing so that I have sufficient time to review any

PROCEEDINGS                           2437

1   additional submissions on the issues before me.  I'd like to

2   know what the points of contention are.  What the objections

3   are.  And what the responses to the expert's testimony is,

4   please.

5              MR. KESSLER:  Your Honor, there are currently before

6   the Court the Government's supplemental filing and the

7   defense's supplemental filing.  I don't think we anticipate

8   any further filings.

9              THE COURT:  All right.  Is that the latest statement

10  of the disagreement between the parties?

11             MR. CHEN:  I think so.

12             THE COURT:  So I should have two submissions from

13  each party; is that right?

14             MR. KESSLER:  The most recent submission from the

15  Government, which is about a week ago, and then the most

16  recent submission from the defense, which is up to date.

17             THE COURT:  And there's no replies.

18             MS. SMITH:  I think they were filed on Monday and

19  Thursday of last week.

20             THE COURT:  Okay.  Good.

21             MS. SMITH:  Just witness-wise, Mr. Brodsky has at

22  least an hour, an hour and a half left, and then there'll

23  obviously be some redirect.  So just so the Court knows, we've

24  had a witness waiting all day, another witness, we're going to

25  will let that person go.

RICHARDSON – CROSS – BRODSKY                2438

1        THE COURT:  All right.  Mr. Brodsky, that's all

2   right with you?

3        MR. BRODSKY:  Yes, Your Honor.

4        THE COURT:  All right, that's fine.  Thank you.

5        MS. SMITH:  And we may have to switch our order of

6   witnesses as a result, so we'll let defense know tonight, but

7   it will be one of the witnesses that we noticed for tomorrow.

8        MR. MASTRO:  It is Mr. Geller who is here now and he

9   apparently won't go in the morning.

10        MR. KESSLER:  We just don't know.

11        THE COURT:  I meant the whole issue is being

12   resolved, correct?

13        MR. KESSLER:  The one that there was a letter filing

14   about?

15        MR. MASTRO:  We put it in our letter yesterday.

16        THE COURT:  All right.  Good.

17        MR. PITLUCK:  Thank you, Your Honor.

18        (Pause.)

19        (Jury enters the courtroom.)

20        THE COURT:  All jurors are present.  Please have a

21   seat.

22        You may resume Mr. Brodsky.

23        MR. BRODSKY:  Thank you, Your Honor.

24   CROSS-EXAMINATION (Continued)

25   BY MR. BRODSKY:

RICHARDSON - CROSS - BRODSKY                    2439

1   Q    We last left off, Mr. Richardson, we were looking at

2   Government Exhibit 250 in evidence.

3            If we can just put it up on the screen.

4            Do you remember receiving this document and learning

5   from Mr. Panoff that there would be comments coming from the

6   SEC that they were expecting?

7   A    Yes, this was a response to the first comment left I

8   believe and they were expecting a second comment later.

9   Q    And do you remember Mr. Paley had not joined the board as

10  of this time?

11  A    That's correct, he joined in November.

12  Q    And if we look at the signature page, which is 110 of

13  112, and the Bates number on the bottom right-hand corner it's

14  R168973.

15           I'm getting -- I'm sorry, Your Honor, I'm getting to

16  the point where you get to the age where your eyesight does

17  funny things.

18           R168973.  Do you see that, Mr. Carter?

19           THE COURT:  These numbers are not getting smaller.

20           THE WITNESS:  There's a group of us.

21  BY MR. BRODSKY:

22  Q    And do you see -- this is the signature page and you

23  don't see Mr. Paley on it, correct?

24  A    No, I don't believe he had been elected to the board at

25  that point.

RICHARDSON - CROSS - BRODSKY                    2440

1   Q    And if you go to the very last page of the document,

2   that's easy enough to know the number.

3            It's the extreme last page, Mr. Carter.

4            Yes.  And we have some signatures there, correct,

5   for Mr. Shkreli, Mr. Panoff.

6            Do you see that?

7   A    Yes.

8   Q    Mr. Paley is not there, correct?

9   A    No, he's not.

10  Q    So before Mr. Paley -- Mr. Paley ends up signing the

11  November 15th, 2013 registration statement?

12  A    He would have joined the board at that point.

13  Q    Yes.

14  A    Yes, I can't recall if he was asked to sign it or not.

15  Q    Well, let me turn to Government Exhibit 978 in evidence.

16  And if we go to -- it might be easier just to find it here

17  than on the board.

18           May I approach, Your Honor?

19           THE COURT:  Yes.  Just give me the Bates number.

20           MR. BRODSKY:  Unfortunately, Your Honor, this

21  Government exhibit doesn't have Bates numbers on the bottom,

22  and thus I'm not going to be able to read the Bates numbers.

23  But I will try to orient ourselves to where it is.

24           There are a total of 87 numbered pages, and then

25  after that there are a number of spreadsheets, and then there

RICHARDSON - CROSS - BRODSKY                    2441

1     are notes that run through F.

2              THE COURT:  Twenty-one?

3              MR. BRODSKY:  Yes.

4              F43, and there are a series of additional pages.

5              And then there's a list of exhibits, and then

6     there's a signature page after the exhibits.

7     BY MR. BRODSKY:

8     Q    So, Mr. Richardson, does this refresh your recollection

9     Government Exhibit 978 in evidence, the November 15th, 2013,

10    S-1 filed with the SEC, and Mr. Paley did sign the document?

11    A    Yes, it appears he has.

12    Q    And fair to say that before signing the document,

13    Mr. Paley received a copy?

14             MS. SMITH:  Objection, Your Honor.

15             THE COURT:  Sustained.

16    Q    Before you signed such a document, you received a copy of

17    the document with Mr. Paley's name on it, correct?

18    A    I can't recall.  I know there were two or three different

19    versions of this document issued, so I can't recall.

20    Q    And do you have an understanding from appearing at the

21    board meetings with Mr. Paley in or about after he joined the

22    board in -- in or before November 15th, 2013 that Mr. Paley

23    based on your personal knowledge received a copy of the S-1?

24    A    I can't specifically confirm that Mr. Paley received it

25    or not.  I assume so if this is saying the signatures on here.

1    Q    Okay.

2    A    But I have just nothing in evidence in front of me to

3    show me Mr. Pelay on distribution.

4    Q    And then Government Exhibit 250 in evidence, correct?

5         Mr. Paley never told you after the S-1 was filed

6    with his electronic signature that he never read it, correct?

7    A    I don't recall him raising that subject with me.

8         THE COURT:  May I just admonish the witness not to

9    assume, he should just be testifying about what he recalls.

10        MR. BRODSKY:  Yes, Your Honor.

11        THE WITNESS:  Understand, Your Honor.  Understand.

12   Q    Government Exhibit 250, back to that.  There were

13   redlined edits to this exhibit, right?

14        Let me direct your attention to refresh your

15   recollection with respect to some.

16        Take the one on R, it's 18 of 112, Mr. Carter,

17   R168876.  R168876.  Yes, that one right there.  If we can blow

18   that up, look at red line the one that's black lined.

19   Redlined as they say.  If you can blow that up.

20        The underlined symbolizes changes that are being

21   made, correct?

22   A    Yes.  Tracking the changes.

23   Q    And this is a change that they're asking -- they're

24   drawing your attention to, correct?

25   A    Yes.  But, again, to clarify, because I think this

RICHARDSON - CROSS - BRODSKY                2443

1    document, as I recall, is one they've already submitted.  I

2    don't believe they are sending -- this is not being sent to us

3    to review and approve at this point, it's purely to inform

4    that they've submitted the response.

5    Q    And they're highlighting the changes that were made in

6    the response that were submitted?

7    A    Yes, but it's already submitted is the point -- this --

8    the response has already been submitted to the SEC.

9    Q    And here they're highlighting that they want to add, we

10   are highly dependent principal members of our management and

11   scientific staff.  And they include there Horacio Plotkin,

12   marc Panoff, and one of our directors, correct?

13   A    Mr. Shkreli is CEO, yes.

14   Q    And Mr. Shkreli is CEO.

15   A    Yes.

16   Q    They say, quote, has significant experience in investing

17   in biopharmaceutical companies, right?

18   A    Yes.

19   Q    All right.  Let me direct you to another portion of where

20   they're highlighting changes that were made.  Turning to, for

21   example, F11, which the Bates number is R168942.  R168942.

22        It's under note nine, it's page 82 of 112,

23   Mr. Carter.  And if you blow up number nine, related-party

24   transactions, and the third paragraph in the second quarter of

25   2013.

RICHARDSON - CROSS - BRODSKY                    2444

1      Make it a little more readable with regard to the

2  paragraph.  There we go.  Thank you, Mr. Carter.

3      Are they highlighting there a change that they

4  submitted which says, in the second quarter of 2013, the

5  company, its chief executive officer and a related party with

6  the new underlining, the new words, which is a former investor

7  in the company that was previously managed by the company's

8  chief executive officer, end quote.

9  A    Yes.

10 Q    And that's referring to MSMB?

11     THE COURT:  What is referring to MSMB?

12 Q    The former investor in the company that was previously

13 managed by company's chief executive officer.

14     MS. SMITH:  Objection, Your Honor.

15     THE COURT:  All right, I'm sustaining.

16 Q    You understand that where it says a former investor in

17 the company that was previously managed by the company's chief

18 executive officer?  You understand who they mean by that?

19 A    Yes, I understand it would -- it would mean MSMB.  But a

20 prior version of this paragraph listed MSMB as a related party

21 so that's why I'm a little confused on the language.

22 Q    Okay.  And then if we turn to Government Exhibit 251 in

23 evidence.  This is a November 6, 2013 document, correct?

24 A    Yes.

25 Q    And you're getting this before the Friday meeting, right?

RICHARDSON – CROSS – BRODSKY                    2445

1   A    Yes, for the Friday board meeting.

2   Q    We talked about this earlier today with respect to

3   Mr. Shkreli's employment agreement?

4   A    Oh, yes.

5   Q    And Exhibit 8 to this was Marcum's November 8th, 2013

6   letter, right?

7   A    Yes.

8   Q    And certainly you read that between the time you received

9   this November 6th and the time of Friday the 8th?

10  A    Yes.

11  Q    And the time entry on this, that's inaccurate, correct,

12  that time says 4:10 p.m., but that should be 11:10 a.m.

13  Eastern time.

14  A    I believe so, yes, the meeting is set for 1:30.

15  Q    The meets is set for 1:30 on Friday.

16  A    Yes.

17  Q    At which -- and this is Wednesday?

18  A    Yes.

19  Q    Correct?  Mr. Richardson?

20  A    Yes, the call is set for Friday at 1:30.

21  Q    All right.  Let's turn to the Exhibit A which is the

22  Marcum's audit communication letter.  This, again, is Marcum's

23  letter, correct?

24  A    Yes, it is.

25  Q    And let's turn to -- this is for the period ending

1   September 30th, 2013?

2   A      Yes, it is.

3   Q      And once again if we go to number two in the letter, it

4   says critical accounting policies and practices.  Does it not

5   say in italises by Marcum, there are no specific matters that

6   we believe should be communicated to you?

7   A      That's correct.

8   Q      All right.  Next page.  There's a disclosure of critical

9   accounting estimates at the top.  The following are the

10  critical accounting estimates made by the management.

11          Do you see that?

12  A      I do now, yes.

13  Q      And these are estimates being made by management,

14  correct?

15  A      That's correct.

16  Q      Management is responsible for the financials, correct?

17  A      Yes.

18  Q      And management is chief executive officer, the CFO, other

19  executive officers of the company, correct?

20  A      That's correct.

21  Q      It does not include Mr. Greebel, correct?

22  A      He's not an employee.

23  Q      So the answer is, yes, it does not include -- I'm

24  correct, that management does not include Mr. Greebel?

25  A      Not as management, but to the extent his advice is being

RICHARDSON - CROSS - BRODSKY                    2447

1   given to management, that's what I want to clarify.

2   Q    My question is, it says here, the following are the

3   critical accounting estimates made by management.

4          By management there, you understand it includes the

5   management of the company of Retrophin, correct?

6   A    That's right.

7   Q    Not the outside advisers, correct?

8   A    No, but he was acting as the company's secretary.

9   Q    You believe that the reference there to management

10  includes an acting secretary?

11  A    Only in the advisory capacity as I mentioned.

12  Q    I'm asking you whether the reference here was, the

13  following are the critical estimates made by management.  The

14  reference to management there is a reference to the outside

15  law firm of Katten?  Anybody there?  Is that what your

16  testimony is?

17  A    No, my testimony is to the extent management referred to

18  here were relying on the advice from Mr. Greebel as part of

19  their decision making on these points.

20  Q    That wasn't my question, Mr. Richardson.  My question is,

21  not who management was seeking advice from, accepting it or

22  rejecting or whatever they were doing, my question is to you

23  is with respect to management that's referred to there, that

24  does not include Mr. Greebel, correct?

25  A    Well, I'm conscious of the earlier discussion we had

RICHARDSON - CROSS - BRODSKY                    2448

1    about titles so, again, Mr. Greebel was company counsel.

2    Q    Outside counsel.

3            MS. SMITH:  Objection, Your Honor.

4    A    We had agreed company counsel was the earlier title.

5            THE COURT:  Okay.  Just let's try to stay --

6    rephrase the question.

7            MR. BRODSKY:  Thank you, Your Honor.

8            THE COURT:  All right.  The jury, I don't know that

9    exchange came in a little bit of a jumble.

10           MR. BRODSKY:  Understood.

11           THE COURT:  So rephrase.

12           MR. BRODSKY:  Understood.

13           And we'll leave time for the Government if they an

14   objection to make an objection, and to entertain the

15   objection.

16           THE WITNESS:  I apologize.

17   BY MR. BRODSKY:

18   Q    Mr. Richardson, it says on this page, accounting for full

19   exposure of settlement agreements.

20           Do you see that?

21           Is this yet another disclosure by Marcum's auditors

22   to the board of directors about MSMB settlements?

23   A    Yes, it is.

24   Q    And it says that, among other things, the company

25   estimated that its range of exposure to be up to the full

RICHARDSON - CROSS - BRODSKY                    2449

1   amount of liabilities stipulated under these agreements,

2   right?

3   A    That's right.

4   Q    And it talks about in August of 2013, the company entered

5   an additional settlement agreement for $300,000 and made

6   payment on August 29, 2013 to settle such agreement, right?

7   A    Yes.

8   Q    Rolling forward a few more pages, page 5, R168719, number

9   two, there's yet more information about the MSMB settlements,

10  correct?

11  A    Yes.

12  Q    And then there's that same disclosure under number two,

13  we were advised by the company's management that MSMB is

14  currently in the process of dissolving its operations, right?

15  A    Yes.

16  Q    And then if we scroll through to page 7, Bates number

17  R168721 in Exhibit A to the Government Exhibit 251.

18          Marcum is informing with respect to number eight,

19  correct -- Marcum is saying with respect to number eight,

20  uncorrected and corrected misstatements, quote, in italises,

21  during the current quarter review there were no uncorrected or

22  corrected misstatements noted, right?

23  A    Yes.

24  Q    Next page, number nine. Once again, under disagreements

25  with management, does it say whether or not there were

RICHARDSON - CROSS - BRODSKY                    2450

1    disagreements with management?

2    A    No, there were no such disagreements.

3    Q    If we go to the next page, number 12 that rolls over,

4    entitled "Difficulties Encountered In Performing the Review,"

5    does it not say, quote, during the quarter ended September 30,

6    2013, we have not experienced any in significant difficulties

7    in performing the review for matters that are contentious for

8    which the accountant consultant outside the engagement team,

9    end quote?

10   A    Yes, it does.

11   Q    And then under fraud and illegal acts, does it not say,

12   quote, the audit committee should be adequately informed of

13   fraud and illegal acts coming to the accountant's attention

14   during the course of the review.  And in italises Marcum

15   wrote, no fraud or illegal acts were noted?

16   A    Yes.

17   Q    And then on the bottom of page 10, R168724.  I'm going to

18   read what it says, and you tell me if I'm reading it

19   correctly.

20          As discussed elsewhere herein, the company

21   specifically experienced difficulty in applying various

22   complex accounting standards, including those relating to

23   specifically to financial instruments and related valuation

24   issues, income taxes, joint and servable liability

25   arrangements, and the implications of related-party

RICHARDSON - CROSS - BRODSKY                    2451

1   transactions and related disclosure requirements under GAAP

2   and applicable SEC pronouncements.

3           Did I read that correctly?

4   A    Yes.

5   Q    We propose and the company recorded material adjustments

6   to the financial statements.  As described elsewhere herein,

7   management determined that previously-issued financial

8   statements require restatement as a result of accounting

9   errors, end quote.

10          Do you see that?

11  A    Yes.

12  Q    All right.  And there are attachments to this document,

13  we won't go through it, but there are other attachments to

14  this document that reflect the settlements, correct?

15  A    Yes.  In this document, yes.

16  Q    For example, on Exhibit F the board presentation on

17  financial strategy.  Do you see that document?  Maybe we can

18  put it up, Mr. Carter, to make it easier.  Is it easy to find

19  Exhibit F?  It's R168791.

20          That's it.

21          It's sideways, but do you see that, Mr. Richardson?

22  A    Yes, I do.

23  Q    If you go to the sideways of R168793 -- there we go,

24  thank you.  Does it not highlight or does it not say Q3 cash

25  balance, and it has settlement payments?  Correct?

RICHARDSON - CROSS - BRODSKY                    2452

1   A    Settlement payments, yes.  1,955,000.

2   Q    And then the next page talks about a comment letter that

3   the SEC is expected to send?

4   A    Yes.

5   Q    All right.  May we have 104-45 and 104-46.

6              So on or about November 14th, Mr. Richardson, you

7   signed the signature page of Retrophin's S-1?

8   A    I don't recall the exact date, but that sounds familiar.

9   Q    Let me see if I can show you the document to refresh your

10  memory.

11             May I approach, Your Honor?

12             THE COURT:  Yes.

13  Q    I'm showing you DX104-45 for identification and 46 for

14  identification.

15             Do you recognize those emails?

16             (Whereupon, the witness is reviewing the document.)

17  A    Yes, I do.

18             MR. BRODSKY:  We offer it, Your Honor.

19             MS. SMITH:  No objection, Your Honor.

20             THE COURT:  All right, we will receive 104-45 and

21  104-46.

22             (Defense Exhibit 104-45, was received in evidence.)

23             (Defense Exhibit 104-46, was received in evidence.)

24  Q    Mr. Richardson, 104-45 -- and, Mr. Carter, please move it

25  over.

RICHARDSON - CROSS - BRODSKY                    2453

1          This is where Mr. Panoff emails the members of the

2    board, correct?

3    A     Yes.

4    Q     And Mr. Greebel's not on this email?

5    A     No, he is not.

6    Q     Do you know whether or not Mr. Greebel is in Switzerland

7    at this time?

8    A     No, I did not.

9    Q     It says, members of the board, we plan on submitting an

10   updated S-1 publicly tomorrow incorporating our responses to

11   the SEC comment letter.  Marcum needs to he review the amended

12   documents prior to our submitting to the SEC.

13          Do you see that?

14   A     Yes, I do.

15   Q     And you say in response, Marc, okay, by my, I just landed

16   back from Taiwan, hence my slow response, right?

17   A     Yes.

18   Q     And then the next document, Ms. Griswold, on

19   November 12th, 2013 had sent you a signature page for

20   Retrophin's S-1.  Correct?

21   A     Yes.

22   Q     It says Michelle Griswold is an attorney that worked at

23   Katten?

24   A     Yes, that's my understanding.

25   Q     And that's an email she sent to all the board members,

1    correct?

2    A    Yes.

3    Q    And in response a few days later you say, hi, Michelle,

4    here is my signed page?

5    A    Yes.

6    Q    And the signed page is attached, correct?

7    A    Yes, it is.

8    Q    Now, Mr. Richardson, I want to go over -- so what we

9    looked at, Mr. Richardson, were numerous documents just now

10   talking about the MSMB settlements, correct?

11   A    Yes, in this November time frame and the September time

12   frame.

13   Q    And at the same time that all these documents have the

14   MSMB settlements and discussing MSMB settlements, you're still

15   negotiating -- withdrawn.

16        You're still expecting Mr. Shkreli to make good on

17   the arrangement you have for your shares.

18   A    Yes.  The 5 percent that we agreed in 2012.

19   Q    And let's go to that now.  Let's talk about that.

20        We put up Government Exhibit 227 in evidence.  This

21   was the November 19, 2012 capitalization table that reflected

22   your verbal arrangement with Mr. Shkreli.

23   A    That's right.  It reflected the 5 percent.

24   Q    And this is the founders cap table, correct?

25   A    Yes.

RICHARDSON - CROSS - BRODSKY                    2455

1   Q    And the cap table lists out the owner's of the shares of

2   the company, correct?

3   A    As it stood at that point in time.

4   Q    This one doesn't include the full list, it just includes

5   the founders?

6   A    Yes.

7   Q    And do you see the Hassan name, Dynagroup Capital, Fred

8   Hassan?

9   A    Yes.

10  Q    Do you see Ken Banta there?

11  A    Yes, I do.

12  Q    And you recognize those names, correct?

13  A    Yes.

14  Q    Do you see Brent Saunders?

15  A    Yes.

16  Q    Andrew Vaino, correct?

17  A    Yes.

18  Q    And you understood from this that these are some of the

19  individuals who were the founders of Retrophin?

20  A    Yes.

21  Q    And Mr. Shkreli here -- Mr. Greebel's not copied on this

22  email, right?

23  A    No, he's not.

24  Q    And am I correct in reviewing this document that it says

25  in the first column "stockholder," right?

```
                    RICHARDSON - CROSS - BRODSKY                    2456
```

 1  A    Yes.

 2  Q    Second column is the class of stock and all of it is

 3  common?

 4  A    Yes.

 5  Q    The third column is the amount of outstanding shares

 6  where it says "new total founder stock"?

 7  A    Yes.

 8  Q    And that number jumps from amount to new amount from

 9  820,000 to 5,254,390, right?

10  A    Yes.

11  Q    And that's because when going public, there was expected

12  to be -- for every common share, it was expected to be six or

13  sometimes -- every common share would become six or some

14  amount?

15  A    Some multiplier.

16  Q    Some multiplier?

17  A    Yes.  Yes.

18  Q    And so what's written here under your name is

19  Mr. Richardson having 14,361 common shares?

20  A    Yes.

21  Q    Would multiply to 5 percent of the company, 264,361

22  shares.

23  A    Yes.

24  Q    And you understood that Mr. Aselage would be going from

25  6 percent of the company to 20 percent of the company.

RICHARDSON - CROSS - BRODSKY                    2457

1    A    Yes.

2    Q    Mr. Shkreli you understood would be going from 55 percent

3    of the company to 65.7 percent.

4    A    Yes.

5    Q    All right.  And you understood that as of November 19th,

6    with respect to this founder's list, that changes --

7    Mr. Shkreli had the authority to make changes to the cap

8    table.

9    A    No, the way he introduced is this is the proposed table,

10   he needed to speak to Mr. Greebel to find out what's feasible

11   and what wasn't.

12   Q    And you don't know whether or not he actually -- you

13   weren't present for any conversation Mr. Shkreli had with

14   Mr. Greebel, correct?

15   A    Not relating to the cap table as a whole.

16   Q    You don't know whether or not he actually spoke to

17   Mr. Greebel regarding this founder's cap table?

18   A    No, I don't know directly.

19   Q    And you can't point to any email that you remember where

20   Mr. Greebel gets a list of this cap table as reflected here?

21   A    Not the full cap table, no.

22   Q    The founders -- I'm talking about the founder's cap table

23   that's being proposed by Mr. Shkreli.

24   A    I have no confirmation that this was sent to Mr. Greebel,

25   no.

RICHARDSON - CROSS - BRODSKY                    2458

1   Q     You understood that your ownership in Retrophin was going

2   to be 5 percent or more based on your prior contributions to

3   Retrophin, correct?

4   A     That plus, of course, the investments that I had moved in

5   from MSMB and added to subsequently.

6   Q     It was going to be based on your service on the board of

7   managers?

8   A     Part of it, yes.

9   Q     And the other -- so one part was service to the board of

10  managers?

11  A     Yes.

12  Q     One part was based on your investment in MSMB?

13  A     Yes, which -- and that second part was the one that

14  Mr. Shkreli was going to top-up or true-up.

15  Q     And the part based on your service on the board of

16  managers was going to be the other part.

17  A     Yes.

18  Q     The part that Retrophin was going to provide the shares

19  for.

20  A     Yes.

21  Q     And fair to say you didn't have a consulting agreement

22  with the company, right?

23  A     No, I did not.

24  Q     You weren't a consultant for the company, right?

25  A     No, I was not.

RICHARDSON - CROSS - BRODSKY                2459

1   Q    You were on the board of managers.

2   A    That's right.

3   Q    And that had some responsibilities, correct?

4   A    Yes.

5   Q    And unlike the other board managers -- well, withdrawn.

6            Did you feel as a board of managers on Retrophin

7   that you spent significant amount of time in that role, in

8   that oversight role in 2012?

9   A    There were periods it was quite intense.  Especially

10  around like the vivo venture discussions and what have you.

11  Q    And approximately how much time in 2012 did you spend as

12  a board of managers?

13  A    Probably maybe a day, a day and a half a month.

14  Q    And Mr. Shkreli -- you trusted Mr. Shkreli would follow

15  through with his commitment, correct?

16  A    Yes.

17  Q    And then -- one moment, Your Honor.  I'm just trying

18  to...

19            At one point you thought your investment was worth

20  $700,000 in MSMB, correct?

21  A    In terms of the money that I was moving from MSMB into

22  Retrophin, yes.

23  Q    And if we put up Government Exhibit 234.  You went

24  through this on direct examination.  Remember going through

25  this exhibit?

RICHARDSON - CROSS - BRODSKY                    2460

1    A    Yes.

2    Q    And there was a reference to Evan's team sending you back

3    a Form 4 saying I hold 99,000 shares?

4    A    Yes.

5    Q    And Evan's team is that a reference to Keun Dong Kim who

6    was a lawyer working at Katten?

7    A    I believe that's one of the names of one of the

8    associates.

9    Q    And he was filling out a Form 4 for you?

10   A    I think he was assisting me with completing it.

11   Q    And there came a time, did there not, we'll get to in a

12   minute.

13            Mr. Greebel's not on this email communication in

14   Government Exhibit 234, right?

15   A    No, he is not.

16   Q    So you don't know the extent to which he discussed any of

17   these matters about a promise of having north of 5 percent

18   shares with Mr. Greebel, other than what Mr. Shkreli told you.

19   A    At this point in time?  7th of March?

20   Q    Correct.

21   A    As of the 7th of March, no, I believe -- I believe this

22   is -- I don't believe Mr. Greebel's copied at this point.

23   Q    Okay.  And then if we look at -- let's go to Government

24   Exhibit -- Katten had sent you, correct, a Form 4 that had

25   99,000 shares at some point?

RICHARDSON - CROSS - BRODSKY                    2461

1   A    Yes, they had.

2   Q    And that's when you raised the question with Mr. Greebel

3   and those at Katten it should say more than 99,000?

4   A    That's correct.  I felt the number was incorrect based on

5   my understanding of the cap table.

6   Q    Okay.  Government Exhibit 236 in evidence.  The

7   Government showed you this one, correct?  Which is dated

8   March 14th of 2013.

9   A    Yes.

10  Q    And, again, the timestamp at the top is 11:53 p.m., but

11  you don't know whether that's 7:53 p.m. Eastern, or whether

12  that's GMT time, you don't know?

13  A    I can't confirm.

14  Q    Okay.  And this is an extensive email communication

15  regarding what you understand your ownership should be in

16  Retrophin, correct?

17  A    That's correct.

18  Q    And you tell him, "him" being Mr. Shkreli, that his

19  accounting is wrong, correct?

20  A    That's correct.

21  Q    And you take him through it, correct?

22  A    Yes.

23  Q    And your math.  And Mr. Shkreli responds --

24            THE COURT:  What did you say?

25            MR. BRODSKY:  And you take him through it, the math.

RICHARDSON – CROSS – BRODSKY                    2462

1           THE COURT:   The math.

2   Q    And Mr. Shkreli responds March 14th, 2013, bottom of the

3   first page at 6:23 p.m. correct?

4   A    Yes.

5   Q    And he states -- he provides his explanation of what

6   happened.

7   A    Yes.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON - CROSS - BRODSKY                    2463

1   BY MR. BRODSKY:

2   Q    He says his accounting was accurate, right?

3   A    On my investment, the MSMB investment move over.

4   Q    He says also that there were some miscommunications on

5   his part, right?

6   A    Yes.

7   Q    You disagree with that, of course?

8   A    I do.

9   Q    He says he is going to have a call with Evan and he's

10  pushing Evan for a stock grant, do you see that?

11  A    Yes.

12  Q    You don't know whether -- what he said to Evan, correct?

13  A    No, I don't know what he said to him.

14  Q    You don't know whether or not -- when he says, he pushed

15  Evan for a stock grant, Evan Greebel doesn't make the decision

16  as to whether or not a grant of stock is going to be given out

17  by the company, correct?

18            MS. SMITH:  Objection, your Honor.

19            THE COURT:  I would ask to rephrase the question

20  please.

21  Q    Management is in charge of recommending to the Board of

22  Directors whether any stock grant is to be issued, correct?

23  A    Yes, normally that would be the case.  But Mr. Greebel

24  had brought forward a compensation analysis for the management

25  to consider.

RICHARDSON - CROSS - BRODSKY                    2464

1    Q    For the Board of Directors?

2    A    Yes.

3    Q    All right.  And to consider the determination of whether

4    or not to issue a stock grant?

5    A    The final decision was with management.

6    Q    The determination of whether or not to inform the Board

7    and provide the Board with the option of issuing a grant is up

8    to management, correct?

9              MS. SMITH:  Objection, your Honor.

10             THE COURT:  Rephrase, please.

11   Q    Mr. Shkreli was in charge about whether or not to provide

12   a grant of stock to anyone, correct?

13   A    Yes, he would have to come to the Board, obviously at

14   some point, in terms of the overrule grants; but, yes.

15   Q    All right.  In one of Mr. Shkreli's e-mails, there is an

16   email communication, let's see if I can orient you,

17   Mr. Richardson.  Between March, between your e-mail in March,

18   on the second page, March 14, 2013, at 10:57 a.m., and

19   Mr. Shkreli's response at 6:23 p.m., there are some other

20   e-mail communications between you and Mr. Shkreli, correct?

21   A    I don't recall off the top of my head.

22   Q    Let me see if I can show you 104-72.  As we get it out,

23   Mr. Richardson, you remember Mr. Shkreli explaining to you

24   that he might be able to transfer some stock from Marek

25   Biestek and himself to you?

RICHARDSON - CROSS - BRODSKY                    2465

1    A    That's correct.

2    Q    And he also explained to you that they could have, you

3    could have done these things closer to the merger but, quote,

4    "the Tim thing did not happen," end quote.  Do you remember

5    him telling you that?  It's not on the e-mail that you're

6    looking at.  Let me show it to you?

7    A    I see it on this e-mail, counsel.

8    Q    104-72, do you see it on that e-mail?

9    A    Yes.

10   Q    Let me show you this one.  Yes, the one on your screen is

11   not in evidence yet.

12   A    Excuse me, okay.

13   Q    Do you recognize 104-72?

14   A    Yes, I do.

15   Q    Is this another e-mail exchange that comes between the

16   prior document that we were looking at?

17   A    Yes, because I clearly wasn't satisfied with his first

18   response.

19            MR. BRODSKY:  We offer 104-72.

20            MS. SMITH:  No objection.

21            THE COURT:  We will receive 104- 72.  You may

22   publish.

23            (Defendant's Exhibit 104-72, was received in

24   evidence.)

25   BY MR. BRODSKY:

RICHARDSON - CROSS - BRODSKY                    2466

1   Q    So this email exchange, 104-72, on the first page, from

2   March 13, at 8:45 p.m. to Mr. Shkreli's response, comes in

3   between the other e-mails we just looked at in Government's

4   Exhibit 236, correct?

5   A    Yes.

6   Q    So looking at your response, Mr. Greebel is not copied on

7   any of these e-mails, correct?

8   A    No, he is not.

9   Q    And you tell Mr. Shkreli that his summary is well off the

10  mark, right?

11  A    Yes, I do.

12  Q    You tell him that at a factual level that's pushing the

13  verbal and written commitments to the side for a moment,

14  correct?

15  A    Yes.

16  Q    And you further tell him that his numbers, if his numbers

17  are to be believed, that Mr. Shkreli was asking you to accept

18  an actual loss on his investments since MSMB?

19  A    Yes.

20  Q    And then you go on to say, and then have that news

21  compounded with zero upside from getting into Retrophin from

22  day one, where I signed papers telling me we had preferential

23  stock pricing before we went public, right?

24  A    Yes.

25  Q    On the bottom, As a founding investor how can there be no

RICHARDSON - CROSS - BRODSKY                    2467

1   accurate record of my accumulated investments, right?

2   A    Yes.

3   Q    You're quite upset with Mr. Shkreli at this point?

4   A    Yes, I am.

5   Q    You say to him on the paragraph below last paragraph

6   before you sign off "S," This is a huge disappointment to me

7   and a lesson in letting friendship drive blind faith?

8   A    Yes.

9   Q    In response Mr. Shkreli says to you, Retrophin has not

10  been a good investment in the last six months, right?

11  A    Yes.

12  Q    And he says, There is some good news.  We should be able

13  to transfer some stock from Marek and myself to make sure

14  everyone ends up a winner, right?

15  A    Yes.

16  Q    Then, We should have done this closer to the merger, the

17  Tim thing did not happen.

18  A    Yes.

19  Q    You understood that's Tim Pierotti?

20  A    I know it was Mr. Pierotti at this point.

21  Q    Because Mr. Shkreli described those issues to you?

22  A    Yes.

23  Q    This e-mail exchange happens, if you we go back to

24  Government's Exhibit 236, there is a continuation of the

25  dialogue between you and he, correct?

```
                    RICHARDSON - CROSS - BRODSKY                2468
```

1    A    Yes.

2    Q    During that continuing dialogue, Mr. Shkreli essentially

3    tells you, The S1 needs to be filed with the SEC by tomorrow

4    night, that's March 15?

5    A    Yes.

6    Q    And he's asking you to assign, correct?

7    A    Yes.

8    Q    And you're essentially saying, a change should be made to

9    the agreement, correct?

10   A    Yes.

11   Q    The S1.  In connection with what Mr. Shkreli is informing

12   Mr. Greebel about this arrangement, do you remember

13   Mr. Greebel expressing to you that he had spoken to

14   Mr. Shkreli and he understood Retrophin would be issuing you

15   100,000 shares and such issuance would occur at the next Board

16   meeting?

17   A    That's correct.  I do recall a response from Mr. Greebel.

18   Q    Do you understand Mr. Greebel said, "As the Board needs

19   to approve the issuance for the work you did as a consultant,"

20   end quote?

21   A    I don't remember the word consultant, I remember the

22   word, I remember the communication from Mr. Greebel.

23   Q    Mr. Greebel was telling you you need Board authorization,

24   correct?

25   A    Yes.

1    Q    Board approval?

2    A    Yes.

3    Q    The consultant would be false, correct?

4    A    Unfortunately, Mr. Greebel was misinformed.

5    Q    Let's mark this as Exhibit DX104-252.  Mr. Richardson,

6    this is an e-mail exchange that goes on for a little bit, so

7    take a moment to look at it and see if you recognize it?

8    A    Yes this is the exchange regarding the Edgar code and the

9    Form 4.

10             MR. BRODSKY:  We offer DX104-252.

11             MS. SMITH:  No objection, your Honor.

12             THE COURT:  We will receive 104-252.

13             (Defendant's Exhibit 104-252, was received in

14    evidence.)

15    BY MR. BRODSKY:

16    Q    If we scroll to the very last page just to get the first

17    e-mail in this long chain, this is Michelle Griswold,

18    February 13, asking you if you have SEC Edgar access codes for

19    your Form 4.  What is your Form 4, Mr. Richardson --

20    withdrawn.

21             The Form 4, is an SEC filing that will reflect your

22    holdings?

23    A    Yes.  And if I make any further acquisitions, any stock

24    acquisitions.

25    Q    You respond you don't have an Edgar code.  Ms. Griswold

RICHARDSON - CROSS - BRODSKY                    2470

1   telling you she's going through the SEC website, right?

2   A    Yes.

3   Q    And then there is a discussion relating to that.  Go to

4   the next, keep scrolling up, you tell on a private exchange

5   without Mr. Greebel you have a series of e-mails back and

6   forth about Edgar and how it's not working?

7   A    Yes.  I was having logistical problems getting it to give

8   me access.

9   Q    The next page is continued dialogue between you and

10  Ms. Griswold, right?

11  A    Yes.

12  Q    Ms. Griswold apologizes that the process so difficult?

13  A    Yes.

14  Q    The second to last -- the second page of the -- third

15  page of the document, continued dialogue between you and

16  Ms. Griswold about access codes?

17  A    Yes.

18  Q    Then Ms. Griswold asks you, or you say to Ms. Griswold,

19  bottom of page two, March 17, 2013, 11:07 a.m., you say to

20  her, "I believe we should now show 199,055 shares," correct?

21  A    Yes.

22  Q    Ms. Griswold copies Mr. Greebel and says, "Just to

23  confirm, had there been anymore transactions or did you start

24  with 198,055 shares," right?

25  A    That's right.

RICHARDSON – CROSS – BRODSKY                    2471

1    Q    So Ms. Griswold is trying to get an accurate number,

2    correct?

3    A    Yes.

4    Q    And then in response you say, They are correcting a prior

5    error in allocation.  There are have been no new transactions.

6    A    I purchased 1,000 was the only addition.

7    Q    Then the next page, Mr. Greebel states -- this is on

8    March 18, 2013, to you, right?

9    A    Yes.

10   Q    And Ms. Griswold is on the e-mail.  "Hi Steve.  Following

11   up on your conversation with Michelle.  I spoke to Martin he

12   said Retrophin will issue 100,000 shares."

13   A    Yes.

14   Q    "Such issuance will occur following the next Board

15   meeting."

16   A    Yes.

17   Q    "As the Board needs to approve the assurance for the work

18   you did as a consultant," end quote, right?

19   A    Yes.

20   Q    And you agree that Mr. Shkreli misinformed -- misinformed

21   is your word, misinformed Mr. Greebel about why you were

22   receiving the 100,000 shares.

23            MS. SMITH:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q    You said misinformed, correct, that was your testimony?

RICHARDSON - CROSS - BRODSKY                    2472

1   A    Yes, based on the word consultant.  It was a

2   miscommunication somewhere there.

3   Q    You were not a consultant, correct?

4   A    I was not a consultant.

5   Q    Did you respond to Mr. Greebel in your response,

6   Mr. Greebel I'm not a consultant, you have the facts wrong?

7   A    No, because I believed he was in communications with

8   Mr. Shkreli.

9   Q    Understood.  If we put up DX7948.  At the next Board

10  meeting Mr. Shkreli does not put on the agenda, Mr. Panoff --

11  withdrawn.

12       At the Board meeting nobody puts on the agenda your

13  issuance of 100,000 shares, right?

14  A    That's right.

15  Q    You don't raise it with anyone during the Board meeting

16  that it should be on there?

17  A    No.

18  Q    At some point in August of 2013, Mr. Shkreli asks you to

19  participate in the pipe?

20  A    Yes.

21  Q    You give some money, along with other potential

22  investors, to support the company?

23  A    Yes.

24  Q    And you do do that, correct?

25  A    Yes, I contributed for each of the pipes I believe.

RICHARDSON - CROSS - BRODSKY                    2473

1    Q    You also remind him that you'd like to have dinner so

2    that you could get your stock position cleared up as soon as

3    possible?

4    A    That's August of 2013.

5    Q    Correct?

6    A    Sounds right.

7    Q    And you tell him, thanks for your support in making this

8    happen.

9    A    Yes.

10   Q    Then in September on September 7 -- if we go back to

11   DX104-252 in evidence, put that on the screen, blow-up the

12   paragraph of Mr. Greebel's e-mail to you, Mr. Richardson, and

13   Ms. Griswold.

14          The first part about the consultant we discussed,

15   correct?

16   A    Yes, we did.

17   Q    The second part, In addition Martin is going to give you

18   an option to buy 125,000 shares from him, correct?

19   A    Correct.

20   Q    No mention of Marek Biestek?

21   A    Not in this e-mail, no.

22   Q    Your understanding was you were going to get shares from

23   Marek Biestek and him?

24   A    Yes, that was my earlier understanding from Mr. Shkreli.

25   Q    And your understanding from Mr. Shkreli, there was no

RICHARDSON - CROSS - BRODSKY                    2474

1    option to buy, you were going to be given 100 and some odd

2    thousand from Mr. Shkreli?

3    A    In the original, yes, in this March window, yes.

4    Q    So Mr. Greebel is being misinformed, correct?

5                MS. SMITH:  Objection, your Honor.

6                THE COURT:  Sustained.

7    Q    Mr. Greebel's information is inaccurate, correct?

8    A    Yes.  It's a little point later that Mr. Shkreli asked me

9    to go to the back of the line; that hasn't happened at this

10   point.

11   Q    But at this point the information that Mr. Greebel is

12   reporting here about what Martin is going to give you, based

13   on your communications with Mr. Shkreli, is inaccurate,

14   correct?

15   A    I believe so.

16   Q    You don't respond here and say that's incorrect, correct?

17   A    No.  I looked to Mr. Shkreli as having the agreement as

18   to when we are going to move forward.

19   Q    Based on what Mr. Greebel is told he says, quote, "Martin

20   is going give you an option to buy 125,000 shares from him.

21   Under the SEC's rules you're not required to report the stock

22   underlying the option until 60 days prior to the option

23   exercise date," end quote.  Do you see that?

24   A    Yes.

25   Q    Do you understand that's what the SEC rules are?  You

```
                    RICHARDSON - CROSS - BRODSKY              2475
```

1    don't know one way or the other?

2    A    No, I believe that was what Mr. Greebel had expressed.

3    Q    Let's go to Government's Exhibit 8253 -- let's go to

4    Government's Exhibit 244 in evidence.  We can put that on the

5    screen.

6            This is the e-mail you were shown during your direct

7    examination, correct?

8    A    Yes, from September of 2013.

9    Q    Mr. Shkreli is sending it to Mr. Greebel and to you,

10   Steve Richardson, stock transfer, right?

11   A    Yes.

12   Q    He says, "Can we do a contract with Steve Richardson

13   where I sell him 100,000 of my shares 12 months from now for 1

14   dollar," correct?

15   A    Yes.

16   Q    This is different than what Mr. Greebel was told in

17   March?

18   A    Yes, Mr. Shkreli had moved the amount and the timing.

19   Q    And the manner?

20   A    Yes.  I think later on he came back to saying Mr. Biestek

21   is also contributing.  He moved around on that piece a couple

22   of times.

23   Q    Then we look at, there is no Board meeting at this time

24   where a stock issuance from you is coming for your prior

25   service to Retrophin as a Board manager, right?

RICHARDSON - CROSS - BRODSKY                    2476

1    A     What I discussed with Mr. Shkreli on that piece, was all

2    the Board members should get it simultaneously, whatever the

3    amount.  I might get extra recognition, but we should do all

4    the recognition for all the Board members.

5    Q     You discussed that with Mr. Aselage too?

6    A     I believe so, I don't know at what point.

7    Q     In 2013?

8    A     Whenever Mr. Greebel sent around some compensation for

9    the Board, at that point it was some limited discussion around

10   Board compensation.

11   Q     Then Government's Exhibit 248 in evidence, fair to say

12   that this is the first time that you've seen an e-mail or

13   document where Mr. Greebel is informed that some of your

14   stock, some of the stock that you're going to be getting will

15   be coming from Marek Biestek?

16   A     Yes.  This is now October and it's a slightly different

17   story than the September 1 we just looked at.

18   Q     This story now for your stock is that it's an accounting

19   mistakes, correct?

20   A     Yes, that's what Mr. Shkreli is saying in this note.

21   Q     You don't respond and explain the background, correct?

22   A     No, this is related to the MSMB funds and the whole

23   discussion back in March.

24   Q     In fact --

25   A     The reconciliation in March.

RICHARDSON - CROSS - BRODSKY                2477

1   Q      -- in fact, don't you respond to this e-mail,

2   Mr. Richardson, but you drop Mr. Greebel off of it?

3   A      I don't recall.

4   Q      Do you respond with details about the arrangements but

5   leave Mr. Greebel out?

6   A      I don't recall.

7   Q      Let me show you 104-43 for identification,

8   Mr. Richardson, see if that refreshes your recollection that

9   you responded but left Mr. Greebel out?

10  A      Yes, I refer to him communicating with Mr. Greebel as

11  part of my communication with him.

12  Q      Fair to say you constantly relied on Mr. Shkreli to

13  communicate information to Mr. Greebel?

14  A      Certainly a number of times that was the case.  I can't

15  say constantly, but certainly a number of times.

16  Q      You don't know what Mr. Shkreli told Mr. Greebel,

17  correct?

18  A      No, I wasn't party to those one-on-one conversations.

19  Q      In fact, you know based on the e-mail that we showed you

20  from March of 2013, that Mr. Greebel was under, was

21  misinformed that you were a consultant, right?

22          MS. SMITH:  Objection, your Honor.

23          THE COURT:  Sustained.  Rephrase.

24  Q      Didn't you testify that Mr. Greebel's statement to you

25  that you were a consultant, getting stock as a result of being

RICHARDSON - CROSS - BRODSKY                    2478

1   a consultant, was inaccurate?

2   A    Yes, I did.

3   Q    And didn't you say -- those were your words -- he was

4   misinformed?

5   A    Yes.

6   Q    So here the e-mail that you send to Mr. Shkreli in

7   response, you were expecting Mr. Shkreli to provide that

8   information to Mr. Greebel.  Do I have that, right?

9   A    Yes.  Hopefully this aligns to your notes so I can guide

10  Evan to complete the right acts, is what I'm saying in the

11  note.

12  Q    You wanted to communicate the details to Mr. Shkreli,

13  dropping off Mr. Greebel, so that Mr. Shkreli could then give

14  it to Mr. Greebel --

15           MS. SMITH:  Objection, your Honor.

16  Q    -- that's what you're saying?

17           THE COURT:  You can answer the question.  Overruled.

18  A    Yes.  As you see in the note, I'm referencing a personal

19  situation with my partner's father, which is probably why I

20  dropped Mr. Greebel.  I'm talking about something personal

21  that Mr. Shkreli is aware of, that is personal to me, that's

22  probably why I dropped Mr. Greebel from my response.

23  Q    You didn't want to send two people an e-mail, a personal

24  and another e-mail, not dropping Mr. Greebel regarding the

25  information that you thought Mr. Greebel should have in

RICHARDSON – CROSS – BRODSKY                    2479

1   connection with your arrangement with Mr. Shkreli?

2   A    No, I -- whatever was quickest path forward I followed on

3   this day.

4            MS. SMITH:  Your Honor, is this -- this is not yet

5   in evidence?

6            MR. BRODSKY:  I'm sorry.  We offer 104-43.

7            MS. SMITH:  No objection.

8            THE COURT:  All right.  We will accept 104-43.

9            (Defendant's Exhibit 104-43, was received in

10  evidence.)

11  BY MR. BRODSKY:

12  Q    Directing your attention to the paragraph after the first

13  paragraph.  The first paragraph you talk about a personal

14  matter relating to Kirk's family, correct?

15  A    Correct.

16  Q    Then you say, "Are you free for dinner next Friday,

17  October 25," right?

18  A    Yes.

19  Q    "Lots to catch up on"?

20  A    Yes.

21  Q    Then you say with respect to your stockholdings, you

22  thank him for getting this locked?

23  A    Yes.

24  Q    Then you describe going back over your notes what the

25  agreement was?

RICHARDSON - CROSS - BRODSKY                    2480

1    A    Yes.

2    Q    Coming into Retrophin you would get 5 percent of the

3    stock, right?

4    A    That's correct.

5    Q    And you expected that information to go from Mr. Shkreli

6    to Mr. Greebel, correct?

7    A    Yes, I did.

8    Q    Then you say, "We sized my correct holding at 400,000

9    shares.  I hold 100,000, which leaves a gap of 300,000"?

10   A    Yes, 300 was the number we talked about on numerous

11   occasions.

12   Q    You expected Mr. Shkreli to pass that information along

13   to Mr. Greebel?

14   A    Yes.

15   Q    Then you say, "You" -- Mr. Shkreli -- "would let me buy

16   shares from you and Marek, then the balance would be a grant

17   from the company for the strategic impact I had at critical

18   stages at its birth and set up"?

19   A    Which refers to my role as Board member.

20   Q    Board managers?

21   A    Yes.

22   Q    Before going public?

23   A    Correct.

24   Q    You expected, again, Mr. Shkreli to pass that information

25   along to Mr. Greebel?

RICHARDSON - CROSS - BRODSKY                2481

1    A    Yes, I did.

2    Q    Then you say, "We need to be cognizant of any undue tax

3    implications as we complete the correction"?

4    A    Yes.

5    Q    Then you say, "Hopefully this aligns to your notes so you

6    can guide Evan to complete the right actions," right?

7    A    Yes.

8    Q    So you're recognizing there that information has to be

9    provided to Mr. Greebel so he could complete some actions?

10   A    Yes.

11   Q    Now, your conversation regarding your shares continues

12   all the way through April of 2014, correct?

13   A    That's correct.

14   Q    You met with -- fair to say, Mr. Richardson, 300,000

15   shares at that point in time late 2013, was a lot of money,

16   correct?

17   A    Yes, it is.

18   Q    I think you had testified last week that you thought the

19   stock was trading around three or $4 during that period of

20   time?

21   A    During the March period when I first did the

22   reconciliation with Mr. Shkreli.

23   Q    My question last week was during the fall period,

24   September, October, November, what is your best recollection

25   today about what the stock was trading at then?  It was more

RICHARDSON - CROSS - BRODSKY                2482

1   than $3, right, Mr. Richardson?

2   A    By September/October it was more, yes.

3   Q    Significantly more?

4   A    Probably eight or nine, I would imagine.

5   Q    Eight or $9?

6   A    I would imagine.

7   Q    $300,000 at $8, Mr. Richardson, would be what?

8   A    2.4 million.

9   Q    So you were expecting Mr. Shkreli to make sure, ensure,

10  that you would get $2.4 million worth of stock?

11  A    Yes, but at this point when the company is growing.  Of

12  course, originally when the discussion started it was less

13  than that.

14  Q    Originally when the discussion started it was $900,000,

15  right?

16  A    Closer to that kind of number.

17  Q    Now we're talking about 2.4 million?

18  A    Yes.

19  Q    Then by April of 2014 when you're continuing this

20  discussion, what is the stock at then?

21  A    April 14 probably 17 or 18.

22  Q    Seventeen or $18 a share?

23  A    Yes.

24  Q    So now we're talking nearly $4 million?

25  A    Yes.

RICHARDSON - CROSS - BRODSKY                2483

1    EXAMINATION BY

2    MR. BRODSKY:  (Continuing.)

3    Q    So when you met with the FBI and the prosecution team in

4    October of 2010, you signed a proffer agreement; right?

5              MS. SMITH:  Objection, your Honor, just to the date.

6              THE COURT:  Just correct the date, please.

7    Q    Oh, I apologize.  October 5, 2015?

8    A    '15 would be correct.

9    Q    You signed a proffer agreement; right?

10   A    Yes, I did.

11   Q    The proffer agreement gave you protection; right?

12   A    Yes.

13   Q    You couldn't be prosecuted for any statements you made as

14   long as you told the truth; right?

15   A    Yes.

16   Q    And when you met with them, you told them that

17   Mr. Shkreli was going to gift you a hundred thousand shares of

18   stock; right?

19   A    From his personal holdings.

20   Q    It's more than a hundred thousand shares; right?

21   A    I remember some of it as coming from the company, some of

22   it was coming from Mr. Shkreli.

23   Q    And you told them that you put the hundred thousand

24   shares -- did you mention to them that you were expecting to

25   get 200,000 shares more?

RICHARDSON - CROSS - BRODSKY                    2484

1    A    Throughout my whole discussion with Mr. Shkreli, the gap

2    was always 300,000.  The number was -- the gap was always

3    300,000.

4    Q    My question is, on October 5, 2015, when you met with the

5    prosecution and the FBI.

6              Did you tell them it was not just a hundred

7    thousand, you were expecting 300,000?

8    A    I believe I described both of the sources, meaning,

9    Mr. Shkreli personally and the company for my recognition as a

10   board member.

11   Q    Did you tell them that you put the hundred thousand

12   shares on the back burner because this was an the time of your

13   interview with the SEC.

14   A    I put the -- as we got to the middle of 2014, when I was

15   having concerns and the board was having concerns with

16   Mr. Shkreli, I put my self-interest of these discussions

17   around these shares on the back burner.

18   Q    Mr. Richardson, my question is more precise on this.

19              My question, sir, is whether or not you told the

20   prosecution that you put these hundred thousand shares on the

21   back burner because this was around the time of your interview

22   with the SEC.

23              At the interview with the SEC, was the reason you

24   put it on the back burner?

25   A    No.  I think the concerns, the growing concerns I was

RICHARDSON – CROSS – BRODSKY                    2485

1   having with the company, with Mr. Shkreli at the company, was

2   the issue I was referring to there of which the SEC was one of

3   the concerns, excuse me.

4   Q    Let me show you SR1-2, 3500-SR1-2 for identification.

5   Let me direct your attention to Page 5 of 5.

6              Let me ask you to look at the last paragraph of

7   Page 5 of 5.  Read that silently to yourself and then I'll ask

8   you to put it aside.

9   A    (Complying).  Yes.

10  Q    So, Mr. Richardson, does that refresh your recollection

11  that you told the FBI that you put the hundred thousand shares

12  on the back burner because this was around the time of your

13  interview with the SEC and you started to look at Mr. Shkreli

14  in a different light?

15  A    Yes, which was the point I made earlier in terms of I was

16  starting to have concerns about Mr. Shkreli in his role as

17  CEO.

18  Q    And that interview with the SEC -- you could set that

19  aside, Mr. Richardson -- that interview with the SEC took

20  place on March 26, 2014; right?

21  A    That's correct.

22  Q    We talked about that earlier?

23  A    Yes, we did.

24  Q    Isn't it the case on April 10, 2014, weeks after the SEC

25  interview, you once again brought up with Mr. Shkreli the

RICHARDSON - CROSS - BRODSKY                    2486

1   stock gift?

2   A    I don't know where he triggered it or whether I

3   triggered.

4   Q    Let me show you a document and see if that'll refresh

5   your recollection.

6             (Approaching the witness.)

7             (Handing to the witness.)

8   Q    Showing you DX106-94 for identification which is a

9   two-page handwritten document and I ask you if you recognize

10  those handwritten notes?

11  A    Yes, they're my notes.

12  Q    And did you take this, these notes as part of your

13  regular practice when meeting with Mr. Shkreli as a member of

14  the board of directors?

15  A    Certainly in 2014 I did.

16  Q    And this document was kept in the regular course of your

17  business as a board member?

18  A    Yes.

19  Q    And the notes that you took reflect your -- the issues

20  you wanted to raise and discuss with Mr. Shkreli at or near

21  the time that you took the handwritten notes?

22  A    Yes.

23             MR. BRODSKY:  Your Honor, we offer DX106-49.

24             MS. SMITH:  Objection, your Honor.  Can we have a

25  sidebar on this?

RICHARDSON – CROSS – BRODSKY                    2487

1          THE COURT:  Yes.

RICHARDSON – CROSS – BRODSKY                    2488

1          (Continued on the next page.)

2          (Continued on the next page.)

3          (Sidebar conference.)

SIDEBAR CONFERENCE                          2489

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          MS. SMITH:  Your Honor, first of all, this is two

5     pages, and the second page has someone named "Cameron D." with

6     some additional notes.  I don't know who that is, but it's

7     certainly not reflective of the meeting with Mr. Shkreli.

8          Secondly, you know, we objected to Mr. Richardson's

9     board notes.  I continue to believe they don't qualify as

10    business records.  This certainly does not.  It includes a

11    section on personal, a personal discussion that Mr. Richardson

12    determined to have with Mr. Shkreli which is obviously not

13    related to his business as a board member.  It includes May

14    trip.  It includes other things.

15         And I don't know with keeping in the ordinary

16    course, my understanding either there are sometimes notes,

17    sometimes there are no notes of meetings with Mr. Shkreli.  As

18    Mr. Brodsky as himself pointed out, sometimes do you have

19    anything written down, do you not?

20         And so, there is no way that this is qualifies as a

21    business record.  If he wants to ask the witness questions

22    about it to refresh your recollection to see what they

23    discussed at the meeting that's fine, but it is not a business

24    record.

25         MR. BRODSKY:  Your Honor, as a board member, he's

SIDEBAR CONFERENCE

2490

1  already testified that this was in connection with his work as

2  a board member.  Although it's labeled personal, it's

3  certainly related to his job.  Schmidt refers to Eric Schmidt

4  of the SEC.  That was not related to something personal.  That

5  was under personal.  It says, "uncensored,' I don't know what

6  that means.  Schmidt relates to Eric Schmidt of the SEC.  The

7  May trip is a business trip, it's not a personal trip.  The

8  stock gift as we've seen over and over again is related to his

9  holdings and what's on his mind.

10        So although he labels it personal, it's certainly

11  interrelated with his job.  As I understand, Cameron D.

12  Cameron D. was a candidate for an executive position at

13  Retrophin.  This is Mr. Richardson's notes on his view of

14  Cameron D. and whether or not he would be a good executive and

15  it's also it's connected to the this document.

16        What's significant for us is the first page.  We're

17  happy to redact the second page or exclude it.  As

18  completeness, we leave it there.  But it's certainly a

19  business record of Mr. Richardson in his capacity as a board

20  member taking contemporaneous notes and it's related to a

21  regular part of his business.

22        THE COURT:  Is this contemporaneous notes of what?

23        MR. BRODSKY:  I asked him.

24        THE COURT:  This is about a meeting.

25        MR. BRODSKY:  It's a meeting with Mr. Shkreli.

SIDEBAR CONFERENCE                              2491

1              MS. SMITH:  Is it before the meeting or during the

2      meeting?  Is Mr. Brodsky conceding that Mr. Richardson was

3      asked to go to the SEC investigation in his capacity as a

4      director of Retrophin?

5              MR. BRODSKY:  No.

6              MS. SMITH:  Okay.  This section is personal which is

7      separated.

8              MR. BRODSKY:  It's the Government's position, not

9      ours, that somehow this SEC investigation is relevant.

10             MS. SMITH:  Because it's --

11             MR. BRODSKY:  We actually think that it has nothing

12     to do with the case.  But since the SEC investigation is

13     coming into evidence, and this is a contemporaneous note of A

14     meeting with Mr. Shkreli where he is -- I will definitely

15     elicit whether he took these statements down before the

16     meeting or during the meeting, and which ones are before or

17     during.  But this is all related to his job as a board member.

18             THE COURT:  Well, no, he was very clear that the SEC

19     testimony he gave was an MSMB investor.  He kept wanting to

20     assure himself through discussions with Mr. Shkreli.

21             MR. BRODSKY:  And Mr. Greebel.

22             THE COURT:  Mr. Greebel that, look, this has to be

23     purely in that capacity as MSMB investor.  It has nothing

24     whatsoever to do with my capacity as a board member for

25     Retrophin.  So I don't think you could say that this was a

SIDEBAR CONFERENCE                          2492

1   note that he has made in his capacity as a member of

2   Retrophin.

3           MS. SMITH:  The same thing with the stock gift was

4   supposed to be to compensate him for the difference in his

5   MSMB holdings, not in connection with his work for Retrophin.

6   These are two different pieces that we discussed.

7           MR. BRODSKY:  Your Honor, with we've had multiple

8   e-mails in evidence now that the stock is related directly to

9   the five percent that he's owed and arranged in connection

10  with Retrophin.  It has everything to do with his Retrophin

11  position as board manager.

12          THE COURT:  I think the stock is comprised of what

13  he believes is the value of his liquidation of MSMB and his

14  investment in Retrophin, and there's a separate piece of it

15  that has to do with his contributions.

16          MR. BRODSKY:  As a board manager.

17          THE COURT:  To Retrophin before it goes public to

18  get it off the ground and to give guidance on bringing it, you

19  know, the reverse merger and going public.  So there's a

20  combination of that stock.

21          Now, the gifts that I think, look, my understanding

22  about it is there is an offer by Mr. Shkreli to either gift or

23  to sell at a much discounted price of his own personal shares

24  for Mr. Biastec's personal shares.

25          MR. BRODSKY:  Your Honor, I'm happy to lay more

SIDEBAR CONFERENCE                          2493

1   foundation as a business record that he took these notes in

2   his capacity which I think he already testified as a board

3   member that his meeting with Mr. Shkreli in connection with

4   his board membership they kept as a regular practice these

5   handwritten notes in meets all the tests of a business record.

6   It's also admissible, your Honor, because it's admissible for

7   a variety of purposes but I think it's admissible as a

8   business record?

9              MS. SMITH:  Your Honor, we could voir dire.

10             THE COURT:  Voir dire now?

11             MS. SMITH:  Sure.

12             MR. BRODSKY:  I would like to lay more foundation

13  before we voir dire.

14             MS. SMITH:  Okay.  Well, I'm taking it personally

15  again.  I don't think position Mr. Brodsky is taking that

16  anyone who he writes anything down in connection with their

17  job that becomes a business, records, number one.  And number

18  two, I think the bottom section --

19             THE COURT:  It would have to be a business record of

20  Retrophin, is that what you're arguing, not of Mr. Richardson.

21             You're staying that Retrophin produced this note.

22             MR. BRODSKY:  Yes.  They produced note and he's

23  acting in the capacity as a board member of Retrophin.  So

24  he's the highest authority at Retrophin as a board member.

25             MS. SMITH:  I'm not sure whether Retrophin produced

SIDEBAR CONFERENCE                              2494

1   this because Mr. Richardson gave it to them, or they had it in

2   their files.  They certainly think this bottom section, number

3   four, is not part of his business as a board of directors.

4              THE COURT:  Can you offer this with the redaction of

5   Section 4?

6              MR. BRODSKY:  The whole point I'm going to ask him

7   is in connection with the stock gift.  That is the

8   significance.

9              MS. SMITH:  Then he can ask him and I'm sure he'll

10  answer.  But the document doesn't come in as a business

11  record.

12             THE COURT:  Is this all you want to get in is this

13  business about a stock gift.

14             MR. BRODSKY:  We want to get in.  We think it's

15  important they met with Mr. Shkreli we think it's important

16  that the date is 4/10/2014.  We think it's important that this

17  portion of stock gift, holding, details, date, price, split,

18  gift, price tax, then comes into evidence.

19             MS. SMITH:  There is no relevance to the document.

20  He can ask all the questions he wants but this is not a

21  business record.  He can redact the bottom part.  He can ask

22  if they discussed it.  The document just should not come in.

23             MR. BRODSKY:  Your Honor, it also goes to his

24  credibility.  It's also admissible.

25             MS. SMITH:  He hasn't been impeached with anything

SIDEBAR CONFERENCE                               2495

1    yet.  You can ask him about the conversation, and if it

2    disagrees with this then you could offer it potentially as

3    impeachment.  But I said he remembered the conversation, and

4    so you can ask him questions about it the document is just not

5    a business record.

6              MR. BRODSKY:  Your Honor, he told the Government

7    standing before us in October of 2015 that the reason why he

8    stopped asking for the hundred thousand shares was because of

9    the SEC interview.  And here he is direct, contrary evidence

10   that he didn't put it on the back burner for more than a week

11   and a half because after March 26th, just less than two weeks

12   later, he's meeting with Mr. Shkreli and asking about those

13   very shares.

14             And so, at a minimum, he's already agreed that he

15   told the Government about the hundred thousand shares and he

16   stopped as a result of the SEC interview.  This should come in

17   to impeach the credibility of his -- of his testimony.

18             MS. SMITH:  I don't think he said anything

19   inconsistent yet and Mr. Brodsky's characterization of the

20   3500 was not adopted by Mr. Richardson.

21             THE COURT:  All right.  So why don't we do this

22   before we clarify.  There can be voir dire by the Government.

23   You can lay more foundation, but I think at this point do you

24   want him to proceed first?

25             MS. SMITH:  Sure.

SIDEBAR CONFERENCE                    2496

1          THE COURT:  With his attempt to lay more foundation.

2          MS. SMITH:  He can do that but our objection would

3   be to the bottom piece we do not think is a business record.

4          THE COURT:  All right.  Let's take care of that

5   then.

6          MR. BRODSKY:  Thank you.

7          (Sidebar discussion concludes.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    2497

1          (Continued on the next page.)

2          (In open court.)

3    EXAMINATION BY

4    MR. BRODSKY: (Continuing.)

5    Q    Mr. Richardson, there was a meeting that you had with

6    Mr. Shkreli maybe a week and a half after your interview with

7    the SEC; right?

8    A    Yes, it is.

9    Q    This reflected notes that you took in preparation, part

10   of it reflects notes you took in preparation for that meeting?

11   A    That's correct.

12   Q    And part of it includes -- does part of it include on

13   this first page notes that you took during your meeting with

14   Mr. Shkreli?

15   A    No, I believe this all appears.  This all appears to be

16   notes I took beforehand.

17   Q    And down at the bottom where it says, "No. 4, personal."

18   Do you see that?

19   A    Yes.

20   Q    The reference to "May trip," was that a reference to a

21   business trip relating to Retrophin?

22   A    Yes, it was.

23   Q    And what specific business trip related to Retrophin does

24   this concern?

25   A    It was the idea of me as a board member meeting some of

SIDEBAR CONFERENCE                               2498

1   the new employees I hadn't had a chance to meet.

2   Q     Visit Boston, San Diego.  Boston, there was an office of

3   Retrophin?

4   A     That's correct.

5   Q     San Diego was where Mr. Aselage located?

6   A     That's correct.

7   Q     And where it says, "Stock gift," that refers to your

8   understanding with respect to Mr. Shkreli regarding what you

9   expected to receive as a result of being on the Board of

10  Managers of Retrophin?

11  A     Yes, Mr. Shkreli reached out to me now, the value of the

12  300,000 shares had increased significantly as you pointed out

13  earlier that there was significant gift tax implications.  So

14  this was following up on him raising with me the fact that

15  there was going to be gift tax implications for that

16  transaction.

17  Q     And these notes that you took, you kept them in the

18  ordinary course of your duties and responsibilities as a board

19  member of Retrophin?

20  A     Yes, I did.

21  Q     Including the note about the May trip and the stock gift?

22  A     Yes, I did.  It's all on the same page here.

23  Q     You took these notes at or about the time that you met

24  with Mr. Shkreli in April of 2014?

25        MS. SMITH:  Objection, your Honor.

SIDEBAR CONFERENCE                                      2499

1          THE COURT:  Sustained.

2    Q    You took these notes shortly before your meeting with

3    Mr. Shkreli on April 10, 2014?

4    A    Yes.

5    Q    Approximately how long before?

6    A    Probably the day before.  Maybe two days before.  I don't

7    recall.

8    Q    And on the next page, does that reflect a candidate for

9    an executive position and your notes relating to this

10   individual?

11   A    Yes, this was that was Mr. Shkreli's preferred candidate

12   for COO.

13   Q    For chief operating officer?

14   A    Yes.

15   Q    You met with the candidate, you were giving your feedback

16   on the candidate?

17   A    Yes.  I didn't believe he would be a good fit and

18   Mr. Aselage was the way I wanted us to proceed.

19          MR. BRODSKY:  Your Honor, we offer DX-1069.

20          MS. SMITH:  Objection.  Again, under 803(6) it's not

21   a record of an act or event.  It's taken before the meeting.

22          THE COURT:  Did you want to voir dire this witness,

23   or are you just objecting?

24          MS. SMITH:  I don't think we need to.  I don't think

25   the foundation has been laid.

SIDEBAR CONFERENCE                              2500

1          THE COURT:  On this particular document the

2    objection will be sustained.

3    EXAMINATION BY

4    MR. BRODSKY: (Continuing.)

5    Q    On April 10, 2014, you met with Mr. Shkreli and discussed

6    the stock gift; correct?

7    A    Yes, one of the subjects covered.

8    Q    And that particular subject was, again, a reminder to him

9    that you wanted to complete the arrangement for your 300,000

10   shares?

11   A    He had reached out to me ahead of this meeting with the

12   gift tax implications.  It was me following back with him.

13          THE COURT:  So did this issue come up during your

14   April 2014 meeting because you initiated it, or Mr. Shkreli

15   initiated it?

16          THE WITNESS:  Mr. Shkreli had reached out to me

17   ahead of the 10th about the gift tax implications of anything

18   to do with the share transfer from him.

19          MR. BRODSKY:  Can we have DX-104?

20          May I approach, your Honor.

21          THE COURT:  Yes.

22   Q    Showing you DX104-48 for identification which is on the

23   front page Schedule 14A, the proxy statement for Retrophin,

24   Inc.

25          Would you take a look at that, Mr. Richardson, and

SIDEBAR CONFERENCE                                2501

1   tell us if you recognize the proxy statement?

2   A     Yes, it is the Retrophin proxy.

3   Q     And this is for the period in anticipation of the May 9,

4   2014, stockholders meeting?

5   A     Yes, it is.

6              MR. BRODSKY:  Your Honor, we offer it.

7              MS. SMITH:  Your Honor, I have no objection.

8              THE COURT:  We will admit Defense.

9   Exhibit 104-84.

10             (Defense Exhibit 104-84, was received in evidence.)

11  Q     And, again, just the front page that's official SEC form

12  Schedule 14A?

13  A     Yes.

14  Q     Before any stockholders meeting relating to the election

15  of the board of directors, there is a form that's filed

16  describing the directors and their responsibilities; right?

17  A     Yes, there is.

18  Q     This was that form filed for Retrophin in anticipation of

19  the May 2014 stockholders meeting; right?

20  A     Yes.

21  Q     And it has a lot of information about the each of the

22  proposed board members; right?

23  A     Yes, it does.

24  Q     Including you; right?

25  A     Yes, it does.

SIDEBAR CONFERENCE                                    2502

1   Q    And it also has information about your -- about the

2   various duties and responsibilities of board members; right?

3   A    Yes.

4   Q    And it has various statements there about the duties and

5   responsibilities of management; correct?

6   A    Yes, it does.

7   Q    Let me direct your attention to a few parts.

8          If I ask you to take a look at R001220 that's the

9   Bates Number on the bottom right there are also Pages 7 and 8.

10         Do you see that?

11  A    220?

12  Q    220.

13         Do you have that?

14  A    Yes, I do.

15  Q    Does it not say that under "Director Independence," that

16  the standards for director independence are set forth in the

17  NASDAQ market rules; right?

18  A    Yes, it does.

19  Q    A director is not considered to be independent if he or

20  she is also an executive officer, employee?

21  A    Yes.

22  Q    So you were considered independent; right?

23  A    Yes, I was.

24  Q    And if you look at the paragraph below that where it

25  describes independence, to says, "Under NASDAQ listing

SIDEBAR CONFERENCE                                    2503

1   Rule 560582, a director will only qualify as an independent

2   director if, in the opinion of a board of directors, that

3   person does not have a relationship that would procedure with

4   the exercise of independent judgment in carrying out the

5   responsibilities of a director."

6   A    Yes.

7   Q    And you don't quibble with that.  That's a hundred

8   percent right?

9   A    That's definitely one of the rules.

10  Q    And then down below where it describes in December of

11  2013.

12        Do you see that paragraph where it says, "In

13  December 2013, our board of directors undertook a review of

14  the composition of our board of directors, the independence of

15  each director."

16  A    Yes.

17  Q    Right.  And then it says, "Our board of directors

18  determined that none of Masseurs Aselage, Golden, Poulet,

19  Richardson has a relationship that would interfere with the

20  exercise of independent judgment in carrying out the

21  responsibilities of a director."

22  A    Yes.

23  Q    And before that determination is made, there's a director

24  and officer questionnaire; right?

25  A    Yes.

SIDEBAR CONFERENCE                              2504

1   Q    And you received to in January 2014 or thereabouts;

2   right?

3   A    Thereabouts.  I don't remember the exact timing.

4   Q    And you received it from the Law Firm of Katten?

5   A    Yes, I did.

6   Q    And you filled it out?

7   A    Yes, I had.

8   Q    And it was your responsibility to fill it out correctly;

9   right?

10  A    Yes.

11  Q    And your responsibility, not anybody else's, not

12  Mr. Greebel's, not the law firm?

13  A    No.

14  Q    Not Mr. Aselage, not Mr. Panoff, not Mr. Shkreli but you;

15  correct?

16  A    Yeah, I should fill it out.  I assume the law firm would

17  review them all, but I should definitely fill it out

18  accurately and honestly.

19  Q    In connection with that director and officer

20  questionnaire, didn't you have a question on that form,

21  Question No. 18 that asks you, "Please describe any contract,

22  arrangement, understanding, or relationship, whether or not

23  legally enforceable, not already disclosed in response to

24  another question in this questionnaire between you or any of

25  your associates or affiliates on the one hand, and any other

SIDEBAR CONFERENCE                    2505

1   person on the other hand with respect to any securities of the

2   company."

3   A    Yes.

4   Q    Isn't your arrangement and understanding with Mr. Shkreli

5   to get 300,000 shares of stock which, at this point in time,

6   is worth north of $3 million, an arrangement or understanding

7   that should have been disclosed on the director and officer

8   questionnaire?

9   A    I understood because I had -- because I had been

10  declared, back in November of 2012, under the five percent

11  that it was already accorded.

12  Q    Didn't you check the box, "There is no such contract

13  arrangement, understanding, or relationship"?

14  A    I did check that box.

15  Q    You checked that box?

16  A    You said "there is no."

17  Q    "There is no."

18  A    Yes, I did check that box.

19  Q    And you yet you had an arrangement and an understanding

20  with Mr. Shkreli that you were going to get over a hundred

21  thousand shares of stock from Mr. Shkreli and Mr. Biastec

22  about 200,000 shares of stock from the company in the near

23  future?

24  A    Yes, but as part of the five percent that Mr. Shkreli

25  knew about, that Mr. Aselage knew about.  And I understood

SIDEBAR CONFERENCE                    2506

1    Mr. Shkreli had briefed Mr. Greebel.  And that as soon as

2    Mr. Panoff was on board, I shared that with him as well.  So I

3    felt that I had been totally open with all the principals.

4    Q    Why not fill it out on the D&O questionnaire?

5              MR. BRODSKY:  Withdrawn.

6    Q    You didn't put it on out D&O questionnaire for --

7              MS. SMITH:   Objection, your Honor.

8              THE COURT:  Sustained.

9    Q    Now, that D&O questionnaire form, the answers are used to

10   describe the roles and independence of board members in this

11   proxy statement that goes out to all stockholders; right?

12   A    Yes.

13   Q    You have that statement before you.  Is there anything in

14   there, anything in the proxy statement that refers to,

15   describes, alludes to, or references your arrangement with

16   Mr. Shkreli to receive from Mr. Shkreli and Mr. Biastec over a

17   hundred thousand shares of stock and from the company itself

18   approximately 200,000 shares?

19   A    No, there is not.  But, again, if there was an issue with

20   it, I would have expected either Katten or the CFO to alert me

21   of their interpretation of my belief that it's already

22   declared.  No one came to me to let me know that was not the

23   issue.

24   Q    Let me turn to the chart that's -- let's turn to a couple

25   of portions of it where what's declared here is declared.

SIDEBAR CONFERENCE                        2507

1           Let's go to the chart on ROO1225.  If you keep

2    scrolling, R001225 is a chart.

3           That references the name of the beneficial owner;

4    correct?

5           Lists the executive officers and directors of the

6    company; correct?

7    A     Yes.

8    Q     Mr. Greebel is not there; right?

9    A     No.

10   Q     Mr. Greebel doesn't appear as an executive or officer or

11   member of board; right?

12   A     That he does not.

13   Q     And your name is listed there; correct?

14   A     Yes, it is.

15   Q     And what does it say with respect to your stock holding?

16   A     It says 117,620.

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

1   BY MR. BRODSKY:

2   Q    And that references a footnote, correct, number five.

3            And it says, your 117,620 shares, quote, includes

4   15,000 shares of common stock issued upon exercise of stock

5   options which have vested or will vest within 60 days of the

6   date hereof, right?

7   A    Yes.

8   Q    And then it says it includes 555 shares of common stock

9   issuable upon exercise of warrants to purchase common stock,

10  end quote.

11  A    Yes.

12  Q    There's no reference to the 300,000 shares of stock

13  you're going to get; is there?

14  A    No, there is not.

15  Q    And then if we turn the page, there's a description of

16  certain relationships and related transactions and your name

17  appears there, right, down on the bottom.  And if we blow that

18  up, does it not say, Mr. Richardson, that prior to the merger,

19  the 2012 merger, Mr. Richardson, one of our directors, is a

20  director of our predecessor and held 14,361 vested and

21  unvested shares, or approximately 1.53 percent of the

22  then-outstanding shares of common stock.

23  A    Yes.

24  Q    That's false, according to your arrangement with

25  Mr. Shkreli, correct?

SIDEBAR CONFERENCE                                    2509

1          MS. SMITH:  Objection, Your Honor.

2          THE COURT:  Rephrase.

3   Q    That's inaccurate, correct?

4          MS. SMITH:  Objection, Your Honor.

5          THE COURT:  Try to rephrase it, Mr. Brodsky, please.

6   Q    The last part, Mr. Richardson, it says, Mr. Richardson

7   became the holder of 98,055 shares of our common stock.

8          Do you see that?

9   A    Yes.

10  Q    There's no reference in there at all to the 300,000

11  shares you're going to get, correct?

12  A    No.  There's nothing in action on those at this point in

13  time.

14  Q    There's an arrangement in place, but nothing has been

15  executed, correct?

16  A    It's an arrangement going back to 2012 and nothing has

17  been executed on it.

18  Q    Now, Mr. Richardson, putting aside the 300,000 shares you

19  were expecting to get, approximately what is the total

20  value -- you still have your Retrophin shares?

21  A    Yes, I do.

22  Q    As of this time period, May, 2015, what was the

23  approximate value of your shares of Retrophin?

24  A    The shares that came from my -- my continued investments

25  or?

SIDEBAR CONFERENCE                                    2510

1   Q    The shares just reflecting here, putting aside the

2   300,000, the 117,620 shares.

3   A    That would now, based on the present market value,

4   probably about $2.8 million.

5   Q    And how much did you actually invest of your money in

6   MSMB and Retrophin?

7   A    The initial investment was 500,000.

8   Q    So you're sitting on a -- putting aside the 300,000

9   shares you wanted and expected you were owed, correct?

10  A    Yes.

11  Q    You're sitting on a profit of 2.5 million shares.

12  $2.5 million approximately.

13  A    Profit about 2 million.

14  Q    2 million?

15  A    2 million profit.

16          But, of course, the value of the company, which was

17  in success of the journey, it's close a billion dollars to

18  that.

19          THE COURT:  The company is or.

20          THE WITNESS:  Retrophin is worth, which is part of

21  why my stock, of course, has accumulated beautifully in that

22  period as well.

23          THE COURT:  Is this a good stopping point for the

24  evening, or do you choose to finish to close this line?

25          MR. BRODSKY:  This is a fine stopping point.

SIDEBAR CONFERENCE                    2511

1          THE COURT:  Is this the last question in this area?

2          MR. BRODSKY:  Yes.

3          THE COURT:  Okay, all right.

4          So, ladies and gentlemen, we will excuse you at this

5    time.  Thank you for your attention.

6          Please, again, don't discuss the case or conduct any

7    research.  And please no commentary or talking about the case.

8          Have a safe trip home, and I'll see you tomorrow

9    morning.  Thank you very much.

10          (Jury exits the courtroom.)

11          THE COURT:  All right, is there anything we should

12   address right now?

13          Come forward, please.

14          MS. SMITH:  For tomorrow, we now have to --

15          THE COURT:  All right.  Why don't you do that first.

16          Mr. Brodsky, when are you going to finish?

17          MR. BRODSKY:  I would say about 30 minutes.

18          THE COURT:  Thirty minutes?

19          MR. BRODSKY:  I would say about 30 minutes.

20          THE COURT:  Okay, 30 minutes it is.

21          MR. DUBIN:  Sorry.  I said we have one brief matter.

22          Your Honor, we're just looking for a little bit of

23   clarity on some of Your Honor's rulings because I think it

24   helps inform our preparation for other witnesses.

25          There's been several instances in which Mr. Brodsky,

PROCEEDINGS                                      2512

1   and it happened to me when I was crossing Ms. Hassan, where

2   we're asking questions that, frankly, with respect to the

3   Court scratching at head why some of these objections are

4   getting sustained.

5            So, for instance, when Mr. Brodsky asked, that was a

6   false statement or that was inaccurate or incorrect, that

7   seems to be perfectly permissible on cross.  And we have other

8   witnesses coming up who we know have either lied or provided

9   false information, and we feel like it's perfectly permissible

10  for us to ask those question being cross-examinations.

11           THE COURT:  Well, was he referring to the use of

12  C filings?

13           MR. MASTRO:  Yes.  And he said that is inaccurate,

14  correct?  And the Government objects and Your Honor sustained

15  it and we're just searching for a reason why that is not a

16  permissible question and why those objections are getting

17  sustained.

18           MS. SMITH:  Your Honor, the objection was the 2012

19  merger, which described the shares that he had held at the

20  time of the 2012 as reflected on the cap table.  So it wasn't

21  clear what he was asking was inaccurate.

22           THE COURT:  The best I can glean from the

23  objections, since they aren't speaking objection, which I

24  appreciate, is that the question is improper as to form, and

25  so I think Mr. Brodsky did make corrections and adjustments to

PROCEEDINGS                                    2513

1   his questions.

2            MR. DUBIN:  And the only reason that I'm asking is

3   so we're not doing any to run afoul of Your Honor's --

4            THE COURT:  Well, I think each question comes up,

5   sometimes there are objections and sometimes there aren't.  If

6   there's an objection, I'll make a ruling.  If there is no

7   objection, the question will be answered.

8            All right, so I'm not -- to say I'm making a ruling

9   in a uniform, you know, blanket way as to certain topics is

10  not accurate.  What I'm trying to do is to hear the questions,

11  and if there is an objection lodged, I make a ruling.

12           MR. DUBIN:  Okay, so --

13           THE COURT:  So if there's a specific issues that you

14  have, certainly it would have been a good idea when it came up

15  to discuss it at sidebar or wherever we were discussing it, I

16  don't know that reaching back and saying I didn't understand

17  certain rulings.

18           MR. DUBIN:  So let me give you example, because I

19  plan to ask this questions to the next several witnesses.

20           I asked Ms. Hassan if she was represented by Paul

21  Weiss and she said "yes".

22           I said, That's one of the biggest law firms in the

23  world; isn't it?  And sua sponte Your Honor said I'm going to

24  strike that.  Now by any metric --

25           THE COURT:  There was an objection, and she said I

PROCEEDINGS                              2514

1   don't even know the size.

2            MR. DUBIN:  There was no objection, Your Honor.

3            THE COURT:  Well, I disagree.  I think there was a

4   objection, whether the transcript reflects it.  There was an

5   objection that she didn't know anything is about Paul Weiss'

6   size.

7            MR. DUBIN:  Okay.

8            THE COURT:  Okay?

9            MR. DUBIN:  I just seems to me, though, it's

10  perfectly fair game and permissible for us to try to draw out

11  that, for instance --

12           THE COURT:  You can take large law firms, I think

13  when you superlatives like the biggest firm in the world.

14           MR. DUBIN:  No, it is.

15           THE COURT:  I don't know that.  She obviously didn't

16  know that.  And so, you know, the biggest firm in the world,

17  this witness said I don't know, so.

18           MR. DUBIN:  Okay.  It just seems to be --

19           THE COURT:  I didn't strike -- what did I strike?

20           MR. DUBIN:  You struck my question.  It just seems

21  to --

22           THE COURT:  Well, because you can't testify, and I'm

23  trying to remind the jurors the questions are not evidence.

24           So if you say if one of the biggest firms in the

25  world, I don't know want the jury, based on your statement,

PROCEEDINGS                              2515

1   which is not admissible, to assume Paul Weiss is one of the

2   biggest firms in the world when the witness said I don't know

3   the answer to that.

4           Do you understand?

5           MR. DUBIN:  Yes, I understand.

6           THE COURT:  So I have instructed the jury, and I

7   will instruct the jury again, if there's an objection that's

8   sustained, they are to disregard the question.  If the

9   objection is overruled, they can listen to the answer in the

10  context of the question.

11          That's Trial Practice 101.  I don't think it's so

12  difficult.

13          MR. DUBIN:  And it was my understanding that it's

14  also cross-examination 101 with all respect, Your Honor, to be

15  able to say to a witness and draw out their bias or their

16  level of sophistication.

17          THE COURT:  But you don't get to make a statement,

18  an evidentiary statement that Paul Weiss is one of the largest

19  firms in the world.

20          You ask her if she knows how large it is.  You can

21  ask her whether she's familiar with the size and how Paul

22  Weiss stands vis-a-vis other firms.  But if she doesn't know

23  and the objection is sustained, your question stands as

24  evidence that the jury should consider.

25          MR. DUBIN:  That's why I'm asking for a little

PROCEEDINGS                                    2516

1    guidance, because by any measure they are one of the biggest

2    firms in the world.

3           THE COURT:  But the witness cannot confirm that.

4    The objection was sustained, and the jury doesn't get to be

5    left with a statement by counsel.

6           The questions are not evidence.  That's what I'm

7    trying to tell.

8           MR. DUBIN:  Understood, Your Honor.  I'll try to

9    figure out a way to ask.

10          MR. BRODSKY:  Your Honor, I do want to report back

11   about the two documents that were produced today by Retrophin.

12   I have copies here for, Your Honor, if want Your Honor wants

13   to see it.  We admitted one, DX104-252.  The other one we've

14   marked as DX104-251 for identification.

15          The Bates number of the one we admitted is R169040

16   to 046.  The Bates number of the other is 169038 to 039.

17   Neither document appears on any privilege log produced by

18   Retrophin in the case.  They produced three privilege logs in

19   January, on January 20th, 2017.  One was for redactions, one

20   was for withheld documents, and one was categorical entries.

21   No documents with these dates or these subject lines were

22   included on the logs.

23          And, you know, while the document today, DX104-252

24   helped us, that's not our, you know, our point.  We are

25   concerned, and we don't have any application before Your Honor

```
1    now because we don't -- we want to inform you.  We're not sure

2    what we can do or what can be done, but we just want to

3    apprise, Your Honor, that it is an unusual development when

4    without a Rule 17 subpoena the documents are appearing during

5    the course of the trial because Retrophin's counsel is

6    observing the trial and they can, through any witness, just

7    start deciding to waive privilege to documents that don't even

8    appear on privilege logs.

9              MS. SMITH:  Your Honor --

10             THE COURT:  Is Retrophin's counsel --

11             MS. SMITH:  -- it's our understanding that it was

12   not, in fact, privileged.  And then Mr. Brodsky referenced

13   whether or not the Government has shown it, given that

14   Mr. Gibson received this document from Katten and the

15   Government did not, all the Government did was ask, we have

16   outstanding grand jury subpoena to Retrophin.  All the

17   Government did was ask whether that document there was still

18   privileged over it, because we had never seen it.

19             MR. BRODSKY:  We've never received it.

20             MS. SMITH:  You never received it from Katten,

21   because we will check?

22             MR. BRODSKY:  Our team tells us, and our team

23   checked, and I'm looking at my team for confirmation.

24             MS. RUBIN:  If you're able to provide us with

25   corresponding numbers we would love to have that conversation
```

PROCEEDINGS                                    2518

1    with you.  To our knowledge, that document is not available to

2    us in discovery.

3              MS. SMITH:  And we -- it's our understanding that

4    from Katten, originally this enormous dump in December, they

5    received everything Ms. Rubin cc'd on, and so --

6              THE COURT:  Katten produced.

7              MS. SMITH:  Katten produced to the defendant.  The

8    Government never got that production.

9              So we will check with Katten and try to figure out

10   whether or not they produced it.  It is a document that

11   Mr. Greebel was cc'd on.  But in any event, Mr. Brodsky, it

12   came up on cross and as Mr. Brodsky had done with the another

13   document that had come up on direct, we made a similar

14   inquiry.

15             If Mr. Brodsky is not making any further inquiries

16   about documents moving forward, we understand that, but it

17   doesn't sound like that's the case.

18             MR. BRODSKY:  Your Honor, I we just wanted to inform

19   Your Honor, apprise you, from the prior development today, it

20   doesn't appear on the privilege logs.  We will check to see

21   and confirm that we never received it.  We don't have an

22   application at this time, we are just keep you updated, Your

23   Honor.  We are concerned about it, but we're not certain what

24   to do about it and we will, obviously, make an application.

25   We're not shy.  If we feel that we have the ability to make an

PROCEEDINGS                                    2519

1   application that's relevant and if, Your Honor --

2              THE COURT:  Well, if I understand you're complaining

3   about documents that Katten produced to you previously?

4              MR. BRODSKY:  No, Your Honor.

5              THE COURT:  Who did they produce it to?

6              MS. RUBIN:  Your Honor, I think "production" is

7   perhaps the wrong here, if I may.

8              Katten provided these documents, as Your Honor will

9   remember, to various parties as part of the privilege review

10  that was conducted after it received a subpoena.  In order to

11  sort out all the privileges issues between MSMB and Retrophin.

12  It is possible we provided -- we received that document during

13  that privilege review.  But it was our understanding that any

14  document during that review that did not come back to us as a

15  produced document was not fair game.  We did not understand

16  those to be production documents in the typical sense of word,

17  Your Honor.

18             THE COURT:  Well, what kind of agreement did you

19  with Katten or Retrophin regarding those documents?  Was there

20  an agreement?

21             MR. BRODSKY:  We know we did not receive this

22  document, because the only documents that were provided to us

23  were communications between Mr. Shkreli and Mr. Greebel.

24  Mr. Shkreli's not on this document, so Katten never produced

25  it to us.  Retrophin never produced it to us as part of the

1    privilege review.

2              THE COURT:  So how did it come to be marked as a

3    defense exhibit?

4              MR. BRODSKY:  Today the Government, during the

5    cross-examination of Mr. Richardson, asked Cooley, which

6    represents Retrophin, whether Mr. Richardson's email that he

7    referenced in March existed.

8              As we understand it, Cooley looked into their

9    database of available documents, took the document, the

10   Government told us that Cooley was waiving the privilege,

11   Retrophin was --

12             MS. SMITH:  We understood that there was no

13   privilege over the document, not say that they were waiving

14   it.  I said they checked to see whether it was within the

15   privilege waiver.

16             THE COURT:  So why wasn't this produced earlier?

17             MS. SMITH:  I don't know.  This is the same thing

18   that the defense has been doing on a regular basis.  There

19   were two subpoenas served this weekend for documents.  And if

20   they didn't understand that the documents from Katten can

21   used.  They marked the document from Katten.  And they made

22   specific requests to Retrophin bases on the Katten production.

23             So they, in fact, have documents that are

24   unredacted, and they've been going to Retrophin ask them for

25   documents and using them in this case instead of producing

1    them in.  So that is just the state of play right now.

2              MR. BRODSKY:  What I'm addressing is these two

3    documents, DX104-252 and DX104-251.

4              They were provided today at approximately maybe

5    3 p.m. to us from Retrophin through Cooley.  And because the

6    Government had requested them.  And we had never seen these

7    documents before.  We had not known about these documents.

8    And we are troubled.  And there is no question that we have

9    served targeted Rule 17C subpoenas to Retrophin, which

10   obviously is well represented by counsel that if they had an

11   objection, and they have objected to some our requests under

12   *Nixon*, they would do it.  But that -- when we send a subpoena,

13   we are following Your Honor 's guidance.

14             THE COURT:  So why don't we get them in here and

15   we'll have a hearing.  If they want to quash parts of it, or

16   they are just giving up everything.  We can understand that

17   because I don't know what they've done.

18             I didn't know until recently what subpoenas had been

19   served.  As I said in the past, if counsel had asked me to

20   serve an order for a subpoena request, as I know last week

21   that, in fact, that hasn't been done, I haven't had an

22   opportunity to review.  There's have been a number of

23   subpoenas that have been served, but I don't know what

24   anyone's response has been to any of these.

25             So if you want to tell me what Retrophin's view is,

PROCEEDINGS                                      2522

1    or Cooley's view is regarding any objections or quashes,

2    that's why we should have a hearing.  I've been asking you

3    with regard to the SEC, the same question.  I still don't have

4    anything from the SEC.

5              MR. BRODSKY:  Oh, they filed a motion to withdraw.

6              THE COURT:  Okay.  What about Retrophin, what have

7    they said in response?

8              MR. BRODSKY:  In some instances, Retrophin has said

9    to us that they believe it's outside the scope of the *United*

10   *States v Nixon*, and they have declined to produce and we've

11   just accepted that.  In other instances they said, okay, we

12   will produce the document.

13             These particular documents that I'm talking about

14   today, 104-251 and 104-252 were not produced in response to

15   any subpoena we issued.  They were voluntarily produced by

16   Retrophin at the request of the Government during the

17   cross-examination of Mr. Richardson.  And why they were never

18   produced before is an excellent question, and one that we're

19   going to think about, what application we can make.

20             THE COURT:  Well, we'll ask Retrophin's counsel to

21   come in here and explain what's going on and that way we --

22             MR. BRODSKY:  All right, Your Honor.

23             THE COURT:  Do you want --

24             MR. BRODSKY:  Understood.

25             THE COURT:  So why don't you call them up and tell

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    2523

1    them they can come to court, maybe we ask discuss it during

2    the lunch break tomorrow.

3              MR. BRODSKY:  Your Honor, we'll call them.  We'll

4    meet and confer with them.  And then we'll propose a time.

5              I know Ian Shapiro is the principal lawyer, so I'm

6    sure he will want to appear.  Why don't we get his schedule

7    and we'll propose something to Your Honor, if you want.  I'm

8    just suggesting that we confer.

9              THE COURTROOM DEPUTY:  I'm sorry.

10             THE COURT:  All right, but during the lunch hour

11   tomorrow we can have some time.  He can come in by phone, if

12   he wants.

13             MR. BRODSKY:  I'm just suggesting that we contact

14   him and propose a time to you because it may be that

15   Mr. Shapiro is in California.  I don't know.  It may be he's

16   on a trip.  He maybe has client meetings.  He maybe in trial.

17   He maybe in court.  And we should meet and confer with them,

18   meet and confer with the Government and then propose a time.

19             THE COURT:  So if there's an issue, I think it's

20   appropriate.

21             MR. BRODSKY:  Yes, Your Honor.

22             THE COURT:  If there's not an issue and you can work

23   it out by having discussions with Retrophin's counsel, that

24   would be best.  Because, again, I think all of these issues

25   should have been resolved a long time ago if there was some,

PROCEEDINGS                              2524

1    you know, problem with Retrophin withholding documents, that

2    they weren't asserting a privilege over, that are relevant to

3    the issues in this case that they should have and you should

4    have, and the Government should have had those discussions and

5    then brought it to my attention.  I'm just very reluctant now

6    that the trial is going --

7              MR. BRODSKY:  Understood.

8              THE COURT:  -- to be dealing with documents that I

9    don't know why Retrophin would produce something today unless

10   it's something that wasn't on anyone's radar until today.  I

11   don't know what the explanation is.

12             Mr. Richardson, talked about a document and seemed

13   to have a pretty clear recollection about emails in the

14   March 2014 time frame.

15             MR. BRODSKY:  Correct.  2013.

16             THE COURT:  2013 time frame.  And so, you know, I

17   think it was important to find out whether, in fact, this

18   document exists.  Whether that request came from you on the

19   defense team or the Government.  If it's relevant to the

20   witness' testimony, it's not in his possession, then I think

21   it was appropriate for somebody to make that inquiry.

22             So now you have it.  The Government has it.  We

23   don't have an explanation as to why it was withheld.  It was

24   not privileged.  But they're certainly welcome to explain

25   themselves.

```
                                                          2525
1            I just don't want to make a lot of time discussing

2    matters that could be resolved or there could be explanations

3    if you have an adequate meet and confer.

4            MR. BRODSKY:  Okay, Your Honor.

5            THE COURT:  All right, I'll see you tomorrow.

6

7                    *    *    *    *    *

8

9            (Proceedings adjourned at 5:40 p.m. to resume on

10   October 31, 2017 at 9:00 a.m.)

11                      I N D E X

12   WITNESS                              PAGE

13   CROSS-EXAMINATION    BY MR. BRODSKY    2223

14                    E X H I B I T S

15   DEFENSE                   PAGE
     DX5592                    2228
16   104-96                    2231
     104-97                    2233
17   99-16                     2298
     DX9016                    2317
18   8983R                     2331
     104-152                   2342
19   104-23                    2344
     104-156                   2383
20   DX104-19                  2393
     104-158                   2398
21   104-65                    2400
     8281                      2409
22   104-45                    2452
     104-46                    2452
23   104-72                    2465
     104-252                   2469
24   104-43                    2479
     104-84                    2501
25
```

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*