2526

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                      15-CR-637(KAM)
3   UNITED STATES OF AMERICA,
                                      United States Courthouse
4            Plaintiff,              Brooklyn, New York

5            -against-               October 31, 2017
                                      9:00 a.m.
6   EVAN GREEBEL,

7            Defendant.
    ------------------------------x
8
              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
9          BEFORE THE HONORABLE KIYO A. MATSUMOTO
               UNITED STATES DISTRICT JUDGE
10                    BEFORE A JURY

11  APPEARANCES

12  For the Government:      BRIDGET M. ROHDE, ESQ.
                             Acting United States Attorney
13                           Eastern District of New York
                             271 Cadman Plaza East
14                           Brooklyn, New York 11201
                             BY:  ALIXANDRA ELEIS SMITH
15                                DAVID PITLUCK
                                  DAVID KESSLER
16                           Assistant United States Attorneys

17  For the Defendant:       GIBSON, DUNN & CRUTCHER LLP
                             200 Park Avenue
18                           48th Floor
                             New York, New York 10166-0193
19                           BY:  REED M. BRODSKY, ESQ.
                                  RANDY MASTRO, ESQ.
20                                WINSTON Y. CHAN, ESQ.
                                  MYLAN LEE DENERSTEIN, ESQ.
21                                JOSHUA EVAN DUBIN, ESQ.
                                  GRACE TSOU, ESQ.
22
    Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, OCR
23                           Phone:  718-613-2330
                             Fax:    718-804-2712
24                           Email:  LindaDan226@gmail.com

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                              2527

1          (In open court; Jury not present.)

2          THE COURT:  All right have a seat, please.

3          Are there any issues we need to resolve?

4          MS. SMITH:  No.

5          THE COURT:  I just wanted to further follow up on

6  Mr. Dubin's question at the end of the trial day yesterday

7  regarding his question about on my rulings on objections.

8          So let me explain a little further.  The question

9  about, you know, the lawyers say --

10          MR. PITLUCK:  Judge, I'm sorry, the microphone is

11  not on.

12          THE COURT:  The question about, you know, whether a

13  witness knew that a law firm was the largest in the world

14  assumes a fact not in evidence and in fact is not true.  Paul

15  Weiss is ranked 26 on any ranking I've looked at, and my

16  concern was that we can't have lawyers putting facts before

17  the jury that are not properly before it.

18          The other questions, some of which Mr. Brodsky drew

19  objections for included misstatements of direct testimony; you

20  know, didn't you testify on direct that X, Y and Z and, in

21  fact, he hadn't testified on direct in that manner or there

22  were factual errors about dates or parties, and so it was just

23  sustaining the objection based on the question as posed and

24  that's why I was encouraging Mr. Brodsky to rephrase the

25  question and correct the form of the question and the facts

PROCEEDINGS                                2528

1   contained therein.

2          So if the parties do have issues with my objections,

3   certainly you can ask for a sidebar, but otherwise we will

4   assume that the parties understand and Mr. Brodsky seemed to

5   have understood and carried on with his questioning.  But

6   certainly if a sidebar needs to be had, despite the jury's

7   dislike of sidebars and then certainly we can address

8   objections and rulings in further detail.

9          MR. MASTRO:  Your Honor, we're, of course, loath to

10  asker sidebars because we want to be sensitive to the jury,

11  number one.

12         Number two, let's leave the Paul Weiss question

13  aside.  Mr. Brodsky asked a series of questions, a statement

14  from a document or a statement the witness had made and then

15  he confronted him with that was not true or that was false.

16  That's classic cross-examination.  And Your Honor sustained

17  objection after objection, and the prosecution may not like

18  the witness confronted with what you said or what the company

19  said was not true or false, but that is classic

20  cross-examination.  And if any of us on the defense side think

21  a witness has said something that is false, it is classic

22  cross-examination to then say that's false.  Okay, and --

23         THE COURT:  My understanding of the testimony the

24  witness was giving and a question drew an objection and

25  probably because I'm just telling you what I was understanding

1    to be the basis of the objection was that in some instances

2    mischaracterized what the testimony was on direct.  In fact,

3    the witness for several sets of questions hadn't testified on

4    a subject on direct or hadn't said what the cross-examination

5    question was, you know, saying, it just wasn't accurate.

6              MR. MASTRO:  So let me just break one down.

7              THE COURT:  I mean what we should do is perhaps look

8    at the transcript, and if you have questions about the ruling,

9    and you can ask for the sidebar, I'm not saying it's a good

10   idea and I'm not saying the jury likes it, but if the parties

11   are clear about the rulings and they need to discuss it more,

12   you know, in a more fulsome way, then certainly that's what

13   sidebars are for.

14             MR. MASTRO:  I understand, Your Honor, I'm just

15   saying --

16             THE COURT:  I'm not trying to argue with you.  I'm

17   just trying to explain my thoughts.

18             MR. MASTRO:  I understand.  And I don't want to say

19   things in a vacuum either.

20             If a witness says something, or a document of the

21   witness' or the company's says something, I have a right to

22   say -- Mr. Brodsky at one point read a sentence from a public

23   filing of Retrophin, and then said that's false isn't it, sir.

24   And an objection was sustained.  And the explanation I heard

25   was that she didn't think it was false.

PROCEEDINGS                                    2530

1          Well, that's up to the witness to say whether it was

2     false or not.  I'm allowed to confront him and say, I think

3     that statement was false.  Look the jury in the eye and tell

4     me that it was false.

5          THE COURT:  What statement?

6          MR. MASTRO:  It was a quote from a Retrophin filing

7     about how many shares he had in November 2012.  And he

8     testified I had an arrangement to get 300,000 shares but it

9     only reported a certain number of shares much less than that.

10          THE COURT:  Because he was told by somebody, it

11     might be Mr. Greebel, that options may not be declared until

12     60 days before they're exercised.

13          MR. MASTRO:  Your Honor, I'm allowed to confront him

14     about whether that's a false statement, and then he gives his

15     explanation yes or no.  I'm allowed to confront him.  I don't

16     have to accept -- he didn't tell Mr. Greebel that ever.  That

17     was a lie.  And I'm allowed to confront him on whether he's

18     lying or not.

19          THE COURT:  I think it was that Mr. Greebel advised

20     Mr. Shkreli, or Mr. Richardson, or maybe together, I don't

21     even remember, but there was a document where it said we need

22     not declare this until -- oh, wait -- Defense Exhibit 104-252,

23     email from Mr. Greebel dated March 18th, at 11:24 to

24     Ms. Griswold and Mr. Richardson.

25          MR. MASTRO:  That had to do with his options, Your

1    Honor.  It doesn't account for the other hundred thousand

2    shares he was supposed to get besides the options.

3           I'm allowed to confront the witness when I think

4    there's a false statement, and then he can explain.  I don't

5    have to accept his self-serving characterization of his

6    testimony earlier when I believe it's not true.  I have a

7    right to confront him in front of that jury and have him

8    explain and look that jury in the eye whether he was telling

9    the truth or not.  That's classic cross-examination.

10          THE COURT:  You interrupted me.

11          MR. MASTRO:  I'm sorry, Your Honor.  I'm sorry.

12          THE COURT:  The email says, Hi, Steve -- to Steve

13   Richardson from Mr. Greebel -- following up on your

14   conversation with Michelle, I spoke with Martin and he said

15   that Retrophin will be issuing you 100,000 shares and such

16   issuance will occur following the next board meeting as the

17   board meets to approve the issuance for the work you did as a

18   consultant.  In addition, Martin is going to give you an

19   option to buy 125,000 shares from him.  Under the SEC's rules

20   you are not required to report the stock underlying the option

21   until 60 days prior to the option exercise date.  Based on

22   that, we recommend holding off on filing the Form 4 until

23   after the next board meeting.  I believe the next board

24   meeting will be next week and Martin will follow up on

25   scheduling.

PROCEEDINGS                                2532

1          So I mean I just, you know, to the extent you want

2     to parse this email and what was being told to the witness,

3     that's fine.  But I think if you can point to the specific

4     matter in the SEC filing that Mr. Brodsky wanted to confront

5     the witness with and have him admit it was false, we can look

6     at that, but...

7          MR. MASTRO:  Your Honor --

8          THE COURT:  If I made an erroneous ruling based on

9     my understanding of what the evidence was thus far we can

10    revisit it.  But to have somebody stand up at the end of a

11    trial and say I don't understand objections, please give me

12    some guidance, here's an example, why was the Paul Weiss

13    question yet sustained.  It's a classic

14    when-did-you-stop-beating-your-wife type question.

15         MR. MASTRO:  Your Honor, I'm trying to point out a

16    different example.

17         THE COURT:  All right, so give me the example.  Show

18    me the SEC filing and the question and we can address it.  You

19    want to revisit it, we'll do it.

20         MR. MASTRO:  Mr. Brodsky decided to go on.  It's not

21    my examination.

22         THE COURT:  So why don't you let him speak for

23    himself then?  Did you want to talk about what part of the SEC

24    filing you thought was important and should not have been --

25    the objection should not have been sustained?

1          MR. BRODSKY:  Well, Your Honor, I don't know if the

2     jury's here.

3          THE COURT:  Are they here?  Check.

4          I'm just saying that, you know, it's not helpful to

5     me at the end of a trial day to ask these general questions.

6     I mean the time to address the objection and any disagreement

7     about it is at the time, not days late .

8          MR. BRODSKY:  Understood.

9          MR. DUBIN:  Your Honor, if it comes up during

10    another one of my examinations, I will, if I think it's an

11    important one, I'll certainly ask for a sidebar.  I did not

12    mean to upset, Your Honor.

13         THE COURT:  I'm not upset, I'm just trying to

14    explain what I meant about your example, Mr. Dubin.  It just

15    wasn't accurate.  It was a statement of fact and that's why I

16    told the jury to strike it.  I mean --

17         MR. DUBIN:  Your Honor, it was not my fault.  There

18    are different rankings for the law firm.

19         THE COURT:  They never come out in even in the top

20    ten, though.

21         MR. DUBIN:  Your Honor, I found one that had a

22    different metric.

23         THE COURT:  Okay, what is the ranking, I'll look it

24    up.

25         MR. DUBIN:  My question was one of the largest in

1    the world.  I was just trying to establish with the witness in

2    that instance that she didn't go to a sole practitioner, she

3    went to a big prestigious law firm to represent her.  Perhaps

4    I inarticulately asked the question, and I'll make sure that I

5    do a better job.

6                THE COURT:  Just another point that I wanted to

7    share.

8                Last evening one juror asked Ms. Jackson whether we

9    would be finished by this Friday, and then another jury said,

10   No, not this Friday, next Friday.  So FYI, in their minds

11   they're thinking that this case is going to end after five

12   weeks more, so please just be aware.

13               I have a jury by a civil multi-week trial that was

14   to start December 4th until December 11th.  I'm going to be

15   working through the holidays.  But I wanted to make sure we

16   have this case tried, I would just please ask both sides to

17   think about ways to streamline.  And oftentimes once a case

18   gets started, the parties start to move more quickly, but

19   just...

20               MS. DENERSTEIN:  Your Honor, the mic's not on.

21               THE COURT:  Once the trial starts, very oftentimes

22   the pace picks up.  So maybe that will happen.  Maybe we will

23   come to a conclusion within five weeks, but in the event we do

24   go to December 4th, which is something the parties have

25   suggested, I did adjourn, with great reluctance, three trials

```
                    RICHARDSON - CROSS - BRODSKY              2535
```

1    and we will be able to go through December 4th.

2            All right, so everybody ready to start?  Good.

3    We'll bring the jury back in minute.

4            (Pause.)

5            (Whereupon, the witness resumes the stand.)

6            THE COURT:  Mr. Brodsky, the exhibits we entered

7    yesterday, are those concluded, can we put them aside or do

8    you think you'll be going back to them?

9            MR. BRODSKY:  Yes.  Yes, Your Honor, okay.  Yes.

10           THE COURT:  I'm just wondering.

11           MR. BRODSKY:  Thank you.

12           (Jury enters the courtroom.)

13           THE COURT:  Good morning.  All right, all jurors are

14   present.  Please have a seat.

15           Mr. Richardson, you're still under oath.

16           And, Mr. Brodsky, you may continue your cross.

17           MR. BRODSKY:  Thank you, Your Honor.

18   CROSS-EXAMINATION (Continued)

19   BY MR. BRODSKY:

20   Q    Good morning, Mr. Richardson.

21   A    Good morning, Counsel.

22           MR. BRODSKY:  Can we put up 10457, please.  And I

23   have in order a number of the documents that I'm going to talk

24   to you, Mr. Richardson, this morning.

25   A    Okay, thank you.

RICHARDSON - CROSS - BRODSKY                    2536

1    Q    If you start with that first document.

2              MR. BRODSKY:  Mr. Carter, would you mind bringing up

3    104-57.

4              THE COURTROOM DEPUTY:  Is it in evidence?

5              MS. SMITH:  No, it's not.

6              MR. BRODSKY:  The Government exhibit is in evidence.

7    One moment, Your Honor.

8              It's the same exact exhibit, may I use this because

9    it's the same one?  We'll get the number in a moment.

10             May I continue, Your Honor, and just use it?

11   Q    Mr. Richardson, we'll get the Government exhibit number

12   which is the equivalent of DX104-77 for identification.

13             Yes, 221.

14             MS. SMITH:  221.

15             THE COURT:  Okay, Government's 221 in evidence.

16             MR. BRODSKY:  Would you put up Exhibit 221, please.

17   Thank you.

18   Q    Mr. Richardson, this is the exchange agreement you had

19   with -- I'm going to be very short this morning,

20   Mr. Richardson.

21             There was an exchange agreement you had in June of

22   2012 where in June of 2012 you exchanged all of your interests

23   in MSMB into Retrophin units, right?

24   A    Yes, I redeemed the MSMB investments and moved it over.

25   Q    And you moved it over.

RICHARDSON - CROSS - BRODSKY                    2537

1          So at this point by the end of this agreement, which

2    is dated June 14th, 2012, you no longer have any MSMB

3    interests.

4    A    That certainly was my understanding.

5    Q    And then turn to, if you wouldn't mind, Section 9, which

6    is on page 6 of your agreement, RO23019, Bates number on

7    DX221, you see where it says at the top "release by seller?"

8    A    Yes, I do.

9    Q    And in this circumstance, you are releasing, it says

10   seller and his affiliates.  I assume the seller is you,

11   correct?  You're selling your MSMB interests --

12   A    Yes, I am, the MSMB interests.

13   Q    -- to Martin Shkreli who's giving you some of his units

14   in Retrophin.

15   A    In Retrophin units.

16   Q    And it says, seller, meaning you, Mr. Richardson, and

17   your affiliates, heirs, successors, and assigns, the releasing

18   parties, hereby forever and irrevocably release and discharge

19   and hold harmless the buyer in all capacities, as well as the

20   buyer's affiliates, heirs, successors, and assigns, and that's

21   as to all related parties?

22   A    Yes, in this agreement.

23   Q    In this agreement.

24          Sir, you are releasing, it goes on to say, any and

25   all liability, claims, charges, complaints, grievances, suits,

RICHARDSON – CROSS – BRODSKY                    2538

1    demands and causes of action of whatsoever nature, known or

2    unknown, against, or assertible against for anything and

3    everything whatsoever, electively claims.

4              Do you see that?

5    A    Yes, I do.

6    Q    So this is a very broad release that releases you from --

7    releases Mr. Shkreli and any of his affiliates, including

8    MSMB, correct?

9    A    Yes.

10   Q    From any and all claims known and unknown.

11   A    Yes.

12   Q    And that's a standard clause.  Have you seen this clause

13   before in other agreements?

14   A    Variations on this, yes.

15   Q    And your understanding of why this -- this clause is in

16   this agreement you have is because it provides protection

17   against any potential future lawsuit?

18   A    Yes, it would.

19   Q    And against claims, both known and unknown.

20             What does "unknown claims" mean?

21   A    In this capacity, again, because it's just moving into a

22   new entity, a new startup entity.

23   Q    So even if at the time this agreement the claim is

24   unknown, it would be released.  You wouldn't be able to bring

25   a claim at this time, in June 2012, you didn't know about but

1   six months later you learned about, you would release it

2   forever?

3            MS. SMITH:  Objection.  It's a legal conclusion.

4            THE COURT:  I'll overrule it to the extent the

5   witness can testify to his understanding of this language.

6   A    Again, I saw it as unknown in the context of the arrival

7   of the new company.

8   Q    So claims in the arrival of the new company that you

9   didn't know about at the time of this agreement but you learn

10  about later, you would be releasing any potential claim

11  against Mr. Shkreli and his entities?

12  A    Not open ended, no.  I saw it in the time period as the

13  company's starting.

14  Q    As the company's starting.

15  A    As the company's starting.

16  Q    In Retrophin?

17  A    In Retrophin, yes.

18  Q    And after -- it is after you had this exchange agreement

19  signed in June of 2012, I just want to get the timeline right,

20  between June and November of 2012, after this agreement, and

21  before Retrophin goes public, that's when you have a verbal

22  agreement with Mr. Shkreli where he's going to give you five

23  plus percent interest in Retrophin.

24  A    That's right.  It's later in 2012.

25  Q    And fair to say, then, that the interest you're expecting

RICHARDSON - CROSS - BRODSKY                    2540

1   to receive, the approximately 300,000 shares at some point in

2   2013 that you're expecting to receive, is not related to your

3   investment in MSMB, because you've converted your investment

4   in MSMB into a Retrophin interest, right?

5   A     That's correct.

6   Q     Your interest, your expectation and agreement to get

7   300,000 shares of Retrophin stock, in or about 2013, is based

8   on the agreement you developed with Mr. Shkreli after this

9   exchange agreement and before Retrophin goes public.

10  A     That's correct.

11  Q     Now, you made a number of attempts, we went over them,

12  I'm not going to review them again this morning.  You went

13  over a number of attempts, you made a number of attempts to

14  get Mr. Shkreli to make good on your arrangement that he would

15  true-up your investment in Retrophin.

16  A     Yes, that piece of the 300,000.

17  Q     You never threatened litigation against Retrophin.

18  A     No, I did not.

19  Q     And you, of course, were a board member of Retrophin.

20  A     That's correct.

21  Q     And part of your legacy is Retrophin.

22  A     My personal legacy.

23  Q     Your personal legacy.

24  A     Yes, very important to me.

25  Q     And you would never do anything to hurt Retrophin,

1    correct?

2    A    It's certainly not intentional.

3    Q    And the MSMB investors who you, from your conversations

4    with Mr. Shkreli, the MSMB investors who converted their

5    shares into Retrophin shares were in the very same position as

6    you, correct?  As from what you understand?

7    A    On the true-up piece.

8    Q    On the true-up piece.

9    A    Not to do with the contribution to the company.

10   Q    On the true-up piece.

11   A    Yes.

12   Q    And the MSMB investors who settled with Retrophin were

13   able to true-up their shares.

14   A    That's my understanding.

15   Q    No different than what you wanted to do, correct?

16   A    That's correct.

17   Q    Now, let me talk a little bit about the insider trading

18   policy briefly.

19        Prior to the board call, and I have it in front of

20   you, the July -- DX104-65 in evidence, which is the next

21   document; is that correct?  Do I have that right?

22   A    104-65, yes, Counsel.

23   Q    Yes, that's in evidence.

24        We talked about these are your notes prior to and

25   during, depending on the note, the July 3rd, 2013 board

RICHARDSON - CROSS - BRODSKY                    2542

1    meeting.

2    A    Yes.

3    Q    And I'd like to turn your attention to the page that has

4    your note relating to the insider trading policy.  It's page 4

5    of the document and the Bates number is RO20831.

6                  (Exhibit published.)

7                  And down at the bottom, that's your note, insider

8    trading to cover contractors, temp employees, too, question

9    mark, right?

10   A    Yes.

11   Q    And fair to say you don't remember whether that was

12   covered during the call, correct?

13   A    No, I do not recall.

14   Q    Now, keeping in mind your words, contractors, temp

15   employees, too, right, those are your words, so keep it in

16   mind.  Let's put up one Defense Exhibit 104-42, which I also

17   have in front of you, Mr. Richardson, as the next document.

18                  (Exhibit published.)

19                  And this is the September 9th, so we're rolling

20   forward from July 2013, a few months to September.  It should

21   be the large document.

22   A    Yes, I have it.  This one, yes.

23   Q    Perfect.

24                  And this is Mr. Panoff sending to you on

25   September 9th, 2013 at 12:32 p.m., and two of the other board

RICHARDSON – CROSS – BRODSKY                    2543

1   members, and Mr. Greebel is copied on it, the board agenda and

2   some exhibits, right?

3   A     Yes.

4   Q     One of those exhibits, Exhibit G is the Retrophin insider

5   trading policy, correct?

6   A     Yes, it is.

7   Q     So I would ask you to turn to the Bates number, if you

8   use the bottom right-hand corner Bates number, if you go to

9   R116072 of that document, that is the -- let me know when you

10  get it.

11  A     Zero seven-two, Counselor?

12  Q     Zero seven-two.

13  A     Okay, thank you.

14        (Exhibit published.)

15  Q     This is the Retrophin, Inc. policy on insider trader,

16  correct?

17  A     Yes.

18  Q     And you see highlighted and underlined, temporary

19  employees, contractors.

20  A     Yes, I do.  Yes.

21  Q     So does this refresh your memory that on September 9th,

22  2013, the board members are being presented with a revised

23  insider trading policy containing your recommendation that you

24  wrote in your handwritten notes prior to the July 3rd meeting.

25  A     Again, Counsel, I don't remember the sequence of drafts,

RICHARDSON - CROSS - BRODSKY                    2544

1    the drafts of the document.

2    Q    Fair to say that the language that appears here,

3    temporary employees, contractors, on September 9th, 2013, and

4    the attachment comes from you?

5    A    It certainly is the same language I put forth.

6    Q    Was there anybody else, other than you, suggesting that

7    temporary employees and contractors be included and covered by

8    the insider trading policy?

9    A    I don't know if others did.  But it certainly is the same

10   language that I had written.

11   Q    And fair to say that is the language that ends up being

12   in Retrophin's insider trading policy.

13   A    Yes, the version at this point in time; yes.

14   Q    And fair to say that starting in or about the fall/winter

15   2013, did you know that people were signing the insider

16   trading policy of Retrophin containing those words, "temporary

17   employees and contractors"?

18   A    Yes, I think it was a requirement for new employees.

19   Q    And one of the reasons you wanted to include temporary

20   employees and contractors, as well as the other language of

21   directors, officers, employees, and consultants, is that you

22   understood Retrophin was hiring lots of different temporary

23   people, consultants, contractors of all types?

24   A    Yes, I wanted to make sure that the company was protected

25   from them as well.

RICHARDSON - CROSS - BRODSKY                    2545

1   Q     You signed the insider trading policy in May -- in or

2   about May of 2014.

3             Do you remember that?

4   A     I know there were revisions made in 2014, so I don't know

5   which version I actually signed.

6   Q     Do you recall signing the same version that is adopted --

7   withdrawn.

8             Do you recall signing the same version that other

9   employees signed in the fall/winter of 2013?  The version you

10  signed may be the exact same.

11  A     I don't recall the timing again, Counsel.

12  Q     Okay.  Do you remember the document you signed, the

13  insider trading policy you signed in May of 2014, had the date

14  on it of September 9th, 2013.

15  A     I don't recall that.

16  Q     Now, let me turn a little bit to board minutes for a

17  moment.

18            In January of 2014, Retrophin offered nearly

19  5 million shares of its common stock for public offering,

20  right?

21  A     Which date, sorry again, Counsel.

22  Q     In January 2014.

23  A     Yes, January 2014.

24  Q     And in connection with an anticipation of the up-listing

25  on the NASDAQ.

RICHARDSON – CROSS – BRODSKY                    2546

1   A    Correct.

2   Q    A very big development in the life of Retrophin.

3   A    Yes, the $40 million raise.

4   Q    And Retrophin expected to raise $40 million, correct?

5   A    Yes.

6   Q    Now in connection with the transaction, Marc Panoff filed

7   a sworn declaration, a certification, stating that the board

8   minutes of the company were true, correct, and complete,

9   right?

10  A    I don't remember that reference.

11  Q    You understand that in connection with the public

12  offering, the CFO of the company had to swear a certification

13  to the counsel for the underwriters for underwriting the deal

14  that the board minutes were available, complete, accurate, and

15  true?

16  A    I don't recall that document.

17  Q    You understand that the board minutes were available in

18  connection with the public offering to the underwriter's

19  counsel, the people who are underwriting the 40 million-dollar

20  offering to the public?

21  A    No, I wasn't aware.

22  Q    Now we looked at a number of documents.  We talked a

23  little bit about the questionnaire.  Let me ask you to turn to

24  another document in GX245 in evidence.

25       And if we can just put it up on the screen.

```
 1              (Exhibit published.)

 2    Q    Mr. Richardson, this one contains the legal and ethical

 3    code, correct, of the company?

 4    A    The code of conduct?

 5    Q    The code of conduct.

 6    A    Yes.

 7    Q    And if I could ask you to turn to the page, scroll to the

 8    page where it says "additional legal and ethical

 9    responsibilities, conflicts of interest."

10              Mr. Carter, I think it's about -- I'll tell you how

11    many pages, nine pages in.

12              (Exhibit published.)

13              MS. SMITH:  Your Honor, just for the record, this

14    document is not in evidence.

15              MR. BRODSKY:  Oh.

16              MS. SMITH:  Government Exhibit 245 is.

17              MR. BRODSKY:  That's what we used.  That's what

18    we're using.

19              MS. SMITH:  You originally started DX104-42.

20              MR. BRODSKY:  Up on the board is 245.

21    Q    If we blow up the conflict of interest provision right

22    here.  And we just look at the last paragraph, this applies to

23    the board of directors, right?  This applies to members of the

24    board?

25    A    Yes, it does.
```

RICHARDSON - CROSS - BRODSKY                    2548

1   Q    And it says, you must be sensitive in any activities,

2   interests, or relationships that might conflict or even appear

3   to conflict with your ability to act in the best interests of

4   the company.  Right?

5   A    Yes.

6   Q    So it's not -- the policy doesn't just apply to actual

7   conflicts of interest, but anything that has an appearance of

8   a conflict of interest.

9   A    Yes.

10  Q    And we talked about it on your cross-examination a little

11  bit, but isn't it fair to say, Mr. Richardson, that your

12  arrangement with Mr. Shkreli creates an appearance of a

13  conflict of interest in 2013?

14  A    Again, it was an agreement that I believe was

15  transparently shared in December of '12.

16  Q    In November of '12?

17  A    Excuse me, November of '12.

18  Q    In November 2013, it was shared with Mr. Aselage.

19  A    Yes, through the capitalization table Mr. Shkreli knew.

20  And then by March of '13, Mr. Greebel knew.  And then as soon

21  as the CFO joined, I shared the news with him in June.

22        So I felt I had been very open with each of the

23  principals to remove any issue of conflict.

24  Q    So just to be clear, your sharing it with Mr. Aselage is

25  based on the November 2012 email?

RICHARDSON - CROSS - BRODSKY                    2549

1   A    At that point, yes.

2   Q    Yes.  And you're sharing it with Mr. Greebel is based on

3   the DX104-52.  Can we put that up?

4             And that's in front of you, too, Mr. Richardson.

5             (Exhibit published.)

6   Q    Sorry, that's 252.  104-252.

7             This is the email that it's your understanding where

8   that -- your understanding and Mr. Greebel's informed, right?

9   A    Yes, he's had the discussion with Mr. Shkreli.

10  Q    Your words, Mr. Richardson, is "misinformed," correct?

11  He's misinformed about the fact that you were a consultant.

12  A    Yes, the word "consultant," yes.  It was confirmation

13  that we had the discussion with Mr. Shkreli.

14  Q    The confirmation you had a discussion with Mr. Shkreli

15  where Mr. Shkreli misinformed him that he was -- you were

16  going to get 100,000 shares because your work as a consultant,

17  right?

18             MS. SMITH:  Objection, Your Honor.

19             THE COURT:  Sustained.  Rephrase.

20  Q    This is confirmation, sir, that Mr. Shkreli had a

21  conversation with Mr. Greebel, right?

22  A    Yes.

23  Q    Confirmation to you or -- withdrawn.

24             From this, your testimony Mr. Greebel is

25  misinformed, correct?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

RICHARDSON - CROSS - BRODSKY                2550

1   A    I was not --

2   Q    Not a consultant?

3   A    I clearly wasn't a party to the discussion between

4   Mr. Greebel and Mr. Shkreli.

5   Q    Understood.

6   A    So I think somewhere in there there was a

7   miscommunication is what I said, and I think you used the word

8   "misinformed," and I said, yes, at the end of the day he was

9   misinformed.

10  Q    Actually, Mr. Richardson, I can take out the transcript.

11  Don't you remember using the word "misinformed" when you saw

12  that he was -- that you were referred to as a consultant?

13  A    On the word "consultant," yes.

14  Q    Yes.

15       And you would agree with me, Mr. Richardson, that

16  the details of your arrangement getting 300,000 shares,

17  approximately, that's not in the email, right?

18  A    No, but the rest of the March emails covered the fact

19  that there was the top-up coming, which was the stuff coming

20  from Mr. Shkreli.

21       What Mr. Greebel's referring to is the 100,000

22  coming from the company.

23  Q    Tell me where it says there's going to be a true-up or a

24  top-up from the company.

25  A    What I'm saying is my belief, having Mr. Greebel has now

RICHARDSON - CROSS - BRODSKY                    2551

1    spoken to Mr. Shkreli, that he is now aware of both elements.

2    That's what I'm saying.

3    Q    I got it, Mr. Richardson.  I'm asking you to look at this

4    email.  The language that Mr. Greebel writes to you and

5    Mr. Shkreli -- well, withdrawn.  Just to you and another

6    attorney, Michelle Griswold, and points to the language where

7    it says that there's an understanding anywhere in that email

8    that your 100,000 shares is coming from your prior board

9    membership as a board of managers.

10   A    The first 100 says the board needs to approve.  And then

11   he also goes on to say, Martin is going to give you an option

12   to buy 120,000 from him.

13               So the two elements of the 300,000 are referenced in

14   here.

15   Q    Where is the reference to the fact that this is --

16   there's a reconciliation coming with respect to anything to do

17   with MSMB?  Is there anything in there?

18   A    Well, the option to buy 135,000 shares follows on from

19   the emails that had 100,000 coming from Mr. Shkreli, and

20   25,000 coming from Mr. Biestek.

21   Q    Where does it say Mr. Biestek's name?

22   A    It doesn't say it in here.  But what I'm saying, Counsel,

23   is the other emails had all that information, so I'm reading

24   this believing Mr. Greebel is now fully informed.

25   Q    And you understand, sir, that you believe it's your

RICHARDSON - CROSS - BRODSKY                    2552

1   perception at this time that Mr. Greebel's fully informed

2   based on emails, exchanges you had with Mr. Shkreli, right?

3   A    Yes.  And the fact that Mr. Greebel's confirmed he's

4   spoken to Mr. Shkreli.  So I was left with the impression that

5   Mr. Greebel had been fully informed.

6   Q    Fair to say that Mr. Shkreli -- based on your knowledge

7   prior to September 2014, is it fair to say that Mr. Shkreli

8   has left with you impressions that were inaccurate?

9   A    Throughout the years?

10  Q    From 2009 through September of 2014, is it fair to say

11  that Mr. Shkreli made statements to you which you then learned

12  were inaccurate?

13  A    Subsequently, yes.

14  Q    Based on your knowledge through September of 2014?

15         MS. SMITH:  Objection.  Asked and answered.

16         THE COURT:  You can answer it again.

17  Q    Let me --

18  A    Sorry, I'm just confused on the time line, Counsel.

19  Q    I'm just asking you, based on your knowledge from 2009

20  through September of 2014, end it at September 2014, forget

21  what you learned about post-September 2014.

22  A    Yes.

23  Q    Between that time period, is it fair to say that

24  Mr. Shkreli made statements to you which you then subsequently

25  learned during that time period are inaccurate?

RICHARDSON – CROSS – BRODSKY                    2553

1    A    Yes.

2    Q    And it didn't just happen once, it happened more than

3    once?

4    A    By September of '14, that's true.

5             MR. BRODSKY:  If we put up DX8253.

6    Q    You should have that in front of you, too.

7    A    Yes, Counsel.

8    Q    That's an example of -- in evidence.

9             MS. SMITH:  It's not in evidence.

10   Q    Do you recognize 8253, Mr. Richardson?

11   A    The email exchange?  Yes, I do.

12   Q    And is that between you and Mr. Shkreli on September 7,

13   2013?

14   A    Yes.

15             MR. BRODSKY:  We offer it, Your Honor.

16             THE COURT:  I don't have it.

17             MR. BRODSKY:  Oh.  I thought it was in evidence,

18   Your Honor.  I apologize.

19             (Continued on next page.)

20

21

22

23

24

25

RICHARDSON - CROSS - BRODSKY                    2554

1

2              MS. SMITH:  No objection.

3              THE COURT:  We will receive Defendant 8253.

4              (Defendant's Exhibit 8253, was received in

5    evidence.)

6              THE COURT:  Would you like to have it back,

7    Mr. Brodsky?

8              MR. BRODSKY:  No, you can have it.  I have other

9    copies.

10   BY MR. BRODSKY:

11   Q    Mr. Richardson, this is an example of an e-mail exchange

12   between you and Mr. Shkreli relating to your true up where

13   Mr. Greebel is not on the e-mail, right, we saw a number of

14   them?

15   A    Yes, Mr. Greebel is not copied on this e-mail.

16   Q    Then if we put up DX104-96, blow that up, this is in

17   evidence, this is an example of an e-mail from September --

18   December 17, 2012, about the loan that you made to Retrophin,

19   correct?

20   A    Yes.

21   Q    And an example, fair to say, Mr. Richardson, of your

22   expectation that Mr. Shkreli would inform Mr. Greebel that it

23   was a loan?

24             MS. SMITH:  Your Honor, asked and answered.

25             THE COURT:  With regard to this specific document?

RICHARDSON - CROSS - BRODSKY                    2555

1          MS. SMITH:  Yes, and this line of questioning.

2          THE COURT:  This was previously covered,

3    Mr. Brodsky.

4          MR. BRODSKY:  Yes, but I don't believe I asked that

5    question, your Honor.

6          THE COURT:  You may answer it then and keep moving.

7          THE WITNESS:  Sorry, counsel, you're asking did I

8    expect Mr. Shkreli to bring Mr. Greebel up to date?

9    Q    About this being booked as a loan?

10   A    Yes, I would expect that.

11   Q    Because my math is so bad I want to go over one final

12   thing with you, Mr. Richardson.  When I went over with you

13   yesterday you testified that your investment of approximately

14   $500,000 was worth about 2.9 million?

15   A    Yes, as of today's present stock price.

16   Q    You also testified that you expected to receive about

17   300,000 shares of stock as of late or mid-April 2014, on

18   April 2014, April 10, 2014 you had an expectation of meeting

19   with Mr. Shkreli and you were going to talk to him about the

20   gift of stock?

21   A    At that point in time, yes, the same 300,000 of shares.

22   Q    The same 300,000 shares.  As of that date, Retrophin

23   stock was worth approximately $18 a share?

24   A    Yes.

25   Q    And so that would have been worth $5.4 million for the

S. RICHARDSON - REDIRECT - MS. SMITH          2556

1    300,000 shares?

2    A    Yes.

3    Q    And so in total had you received those shares, the value

4    of your investment would have been about $8 million-plus?

5    A    Yes.

6    Q    It upsets you to this day, Mr. Richardson, that

7    Mr. Shkreli did not follow through on your arrangement to get

8    the 300,000 shares, correct?

9    A    I certainly would have liked it to have happened.

10          MR. BRODSKY:  No further questions, your Honor.

11          THE COURT:  Redirect?

12          MS. SMITH:  Yes, your Honor.

13   REDIRECT EXAMINATION

14   BY MS. SMITH:

15   Q    Good morning, Mr. Richardson.

16   A    Good morning.

17   Q    Mr. Brodsky asked you a lot of questions on

18   cross-examination about your ownership of Retrophin stock and

19   your discussions with Mr. Shkreli about the reconciliation

20   between what you believed that you owned based on your various

21   investments and the amount of stock you actually received

22   after the reverse merger.  He talked a lot about the 5 percent

23   stake and the 300,000 shares.  Let's just break that down.

24          You invested $400,000 into MSMB Capital in 2009 and

25   2010?

```
1    A    Yes.

2    Q    By June 2012 when we were just looking at Government's

3    Exhibit 221, you voluntarily redeemed that investment and

4    transferred it over to Retrophin.  And at that time it was

5    your understanding that it was worth approximately $583,000,

6    right?

7    A    Yes.

8    Q    You also separately invested about $100,000 into

9    Retrophin directly, right?

10   A    Yes.

11   Q    And so when we get to November 2012, before the reverse

12   merger, you had invested approximately $700,000 into Retrophin

13   both directly, and then the MSMB interest that got transferred

14   over, right?

15   A    Yes.

16   Q    Mr. Shkreli represented to you at that point that you,

17   like the other Board members, would receive payment for your

18   Board service, right?

19            MR. BRODSKY:  Objection to the leading question.

20            THE COURT:  I think she's just trying to expedite.

21   But try to rephrase if you can.

22   Q    What was your understanding in terms of what you would

23   receive for your Board service?

24   A    Mr. Shkreli said that himself and Mr. Aselage and myself,

25   Board members, would be getting some recognition for our duty
```

S. RICHARDSON - REDIRECT - MS. SMITH          2558

1    as Board members.

2    Q    That's a common practice for Board members to receive

3    payment either in the form of shares or stock; is that right?

4              MR. BRODSKY:  Objection, your Honor.

5              THE COURT:  Try not to lead him.  I think that's, if

6    I'm understanding the objection, it's to leading.

7              MR. BRODSKY:  Yes, your Honor.

8              MS. SMITH:  I'm trying to move more quickly.

9              THE COURT:  I know you are; I appreciate that.

10             MS. SMITH:  I can do it without leading.

11             THE COURT:  Ask him if it's common or rephrase it.

12   Q    What is your understanding whether it's common for Board

13   members to receive payment for their work in shares or in

14   stock?

15   A    Yes, that is it is common practice for Board members to

16   get both a mix of cash or stock.

17   Q    You testified that the discussion was that all the Board

18   members would receive that, right?

19   A    That was my understanding from Mr. Shkreli.

20   Q    So let's look at Government's Exhibit 227, which

21   Mr. Brodsky showed you this morning or yesterday I believe,

22   the cap table.  You testified both --

23   A    In the folders or just on the screen?

24   Q    On the screen, I think for the Government's Exhibit it

25   will move more quickly.

S. RICHARDSON - REDIRECT - MS. SMITH          2559

1       So you testified both on direct and cross that this

2  was your understanding from Mr. Shkreli, November of 2012, of

3  what the cap table actually was, which is on the left; and

4  then on the right what he kind of wanted it to be; is that

5  right?

6  A    That's correct.

7  Q    And the percentage, the numbers on the left, represented

8  what you actually owned at that point in time?

9  A    Yes.

10  Q    And the 5 percent that you and Mr. Shkreli discussed, was

11  based on your $700,000 investment in Retrophin and what you

12  expected that would have translated to at this point in time?

13          MR. BRODSKY:  Your Honor, I'm sorry.  Objection to

14  leading.

15          THE COURT:  Got it.

16  Q    What, if anything, was your understanding of the

17  investment that you had from the $700,000 that you had

18  invested between MSMB Capital and directly into Retrophin?

19  A    That was a component of the 5 percent, but the balance of

20  the 5 percent was the recognition for me as a Board member.

21  Q    So the 5 percent that you discussed with Mr. Shkreli

22  wasn't a random number, but in fact based on the 700,000 that

23  you invested as well as the whatever recognition you received

24  as a Board member?

25  A    Yes.

```
                S. RICHARDSON - REDIRECT - MS. SMITH        2560
```

1          THE COURT:  Ms. Smith, Mr. Brodsky is going to -- he

2     did object.

3          MR. BRODSKY:  Yes, it was a gesture.

4          THE COURT:  Stand up and say objection.  He doesn't

5     want you to lead.

6          MS. SMITH:  I will slow it down.

7          THE COURT:  All right.  I'm sorry, we have to comply

8     with the rules.

9     Q    When you -- in March of 2013, when you received the S1

10    filing, at that point did you have 5 percent of the shares in

11    Retrophin?

12    A    No, I did not.

13    Q    Was it the first time that you realized that you did not

14    in fact have 5 percent of the shares in Retrophin?

15    A    That's correct.

16    Q    Was that in connection with your receipt of the S1 filing

17    and the Form 4 prepared by Mr. Greebel?

18    A    That's correct, when I first saw the stockholding number.

19    Q    Was this the first time that you confronted Mr. Shkreli

20    and asked for an accounting of what had happened with your

21    objections?

22         MR. BRODSKY:  Objection.  Leading.

23         THE COURT:  Did you say leading?

24         MR. BRODSKY:  Yes, your Honor.

25         THE COURT:  That one is overruled.

S. RICHARDSON - REDIRECT - MS. SMITH          2561

1   A    Yes, it was the first time I saw the, my actual stock

2   value with the stock number and how it was trading.

3   Q    So let's look at Government's Exhibit 236, which

4   Mr. Brodsky showed you.  Let's turn to the third page of the

5   document and start with the bottom e-mail.

6            If you remember this, you testified that this is

7   when you met Marc Panoff for the first time and interviewed

8   him.  Then if we can look at the e-mail above that, what is

9   the date on this e-mail?

10  A    This is dated March 13, 2013.

11  Q    Is this an e-mail from Mr. Shkreli to yourself?

12  A    Yes, it is.

13  Q    What is Mr. Shkreli laying out here for you?

14  A    He's laying out what he sees as the investments I've made

15  to the aggregate to this point in time both in MSMB that I

16  moved over and then subsequent to that.

17  Q    Was this the first time that you got from Mr. Shkreli

18  that accounting?

19  A    Yes.

20  Q    Was this the first time that Mr. Shkreli said that he

21  personally needed to make up to you the difference between

22  this accounting and your understanding of your investments?

23            MR. BRODSKY:  Objection to the leading.

24            THE COURT:  Overruled.

25  A    Yes, both.  I was having now verbal meetings with him in

S. RICHARDSON - REDIRECT - MS. SMITH          2562

1   addition to the e-mail exchange.

2   Q    And if we can look at your response, which is in the

3   middle of the page here, the page before, what is the date on

4   your response listing out your accounting of those

5   investments?

6   A    March 14, 2013.

7   Q    On cross-examination, Mr. Brodsky questioned you

8   extensively about when you informed Mr. Greebel that

9   Mr. Shkreli was going to personally give you additional

10  shares, right?

11  A    I missed that, when I informed Mr. Greebel?

12  Q    Yes.  Mr. Brodsky asked you when you informed Mr. Greebel

13  that Mr. Shkreli was personally going to give you shares,

14  right?

15          MR. BRODSKY:  Objection.  Misstates what I asked.

16  Q    Did Mr. Brodsky ask you on cross-examination --

17          THE COURT:  Just ask him whether he ever informed

18  Mr. Greebel rather than trying to characterize what the prior

19  testimony was, since Mr. Brodsky is not in agreement that

20  you're characterizing it properly.

21  Q    Why don't I show you what is marked for identification

22  Government's Exhibit 305.  Mr. Richardson, this is in the

23  small binder in front of you.

24  A    Thank you.

25  Q    There is a tab towards the back.

S. RICHARDSON – REDIRECT – MS. SMITH          2563

1    A    Give me the code, Ms. Smith.

2    Q    GX305 on the tabs.  Do you recognize this document?

3    A    Yes, an exchange between myself and Mr. Greebel.

4    Q    Is it dated in March of 2013?

5    A    March 13.

6    Q    Is this in response to the S1 that you received?

7    A    Yes, because I had been in dialogue with one or two of

8    his societies at Katten, Mr. Greebel became involved in that

9    set of discussions.

10            MR. BRODSKY:  No objection.

11            THE COURT:  We will admit Government's Exhibit 305.

12   You are offering it, right, Ms. Smith?

13            MS. SMITH:  Yes, your Honor.

14            (Government Exhibit 305, was received in evidence.)

15   BY MS. SMITH:

16   Q    We can start on the bottom of the document.  If you look

17   at bottom of the document, this is an e-mail from a person

18   named Keun Kim at Katten to Mr. Mr. Shkreli, Mr. Aselage and

19   yourself copying Mr. Greebel; is that right?

20   A    To the Board members copying Mr. Greebel.

21   Q    What is the subject line?

22   A    Retrophin Board S1.

23   Q    Is this the S1 that you received that triggered your

24   understanding that you had not received the shares in

25   Retrophin that you expected?

1   A    Yes.

2   Q    If you look at the response there in the middle, it's a

3   little smooshed together, but it's dated March 13, 2013, you

4   see that?

5   A    Yes.

6   Q    And it's to Mr. Kim and also Mr. Greebel?

7   A    Yes.

8   Q    Can you read what you wrote there?

9   A    "Keun Kim, the details of my share ownership are not

10  accurate.  Martin S is looking into it.  I assume that needs

11  to be corrected before we can submit."

12  Q    The date on that e-mail, again, is March 13, 2013?

13  A    Yes.

14  Q    Is that the same date as the date in Government's Exhibit

15  236 where Mr. Shkreli first provides you with an accounting?

16  A    Yes, it was the same day.

17  Q    Then if we look up to the top of the e-mail, in response

18  on March 13, Mr. Greebel writes, "Steve, we are trying to file

19  today.  Is there a question I can help you with on your share

20  ownership?"

21  A    Yes.

22  Q    You respond the same day, if you can read your e-mail?

23  A    "Hi Evan, Martin has owed me for sometime now a clear

24  reconciliation of my investments in Retrophin and how that now

25  stands in share ownership.  The numbers you're filing and

                    S. RICHARDSON - REDIRECT - MS. SMITH          2565

1   records show significantly understates my share ownership.  I

2   clearly can't sign a filing while there is such a clear

3   discrepancy/error.  I'm urgently awaiting the correct

4   information.  Thanks."

5   Q    So this is, again, the exact same day that you realized

6   that your ownership is not what you expected and had the

7   discussions with Mr. Shkreli; is that right?

8   A    That's correct, because of the urgency of the S1 filing.

9   Q    I'm going to have you take a look at what Mr. Brodsky

10  showed you marked Government's Exhibit 104-252.  It's in the

11  binder in front of you, if you'd like.  If we can focus on the

12  e-mail in the middle of the page.  This is the one that

13  Mr. Brodsky just showed you, what is the date on this e-mail?

14  A    This is dated March 18, 2013.

15  Q    Can you just read again what Mr. Greebel wrote in this

16  e-mail?

17  A    "Hi Steve.  Following up on your conversation with

18  Michelle.  I spoke to Martin, he said that Retrophin will

19  issue you 100,000 shares and such issuance will occur

20  following the next Board meeting, as the Board needs to

21  approve the issuance of the work you did as a consultant.  In

22  addition, Martin is going to give you an option to buy 125,000

23  shares from him.  Under the SEC's rules you are not required

24  to report the stock underlying the option until 60 days prior

25  to the option exercise date.  Based on that we recommend

S. RICHARDSON - REDIRECT - MS. SMITH          2566

1   holding off on filing the Form 4 until after the next Board

2   meeting.  I believe the next Board meeting may be next week

3   and Martin will follow up on scheduling.  If you have any

4   questions, please call me."

5   Q     There is a reference in there to the work you did as a

6   consultant.  Mr. Brodsky asked you about that language.

7            Did you -- were you present for any discussions

8   between Mr. Greebel and Mr. Shkreli regarding the conversation

9   about your getting reimbursed from Mr. Shkreli?

10  A     No, I wasn't party to those discussions.

11  Q     Do you know who suggested the word consultant or

12  consulting, that you would be considered a consultant for this

13  purpose?

14  A     No, I do not know where that came from.

15  Q     It says here that the Board needs to approve the issuance

16  of 100,000 shares for your work as a Board member, right?

17  A     Yes.

18            MR. BRODSKY:  Objection, your Honor.  Misstates the

19  document.

20  Q     It says, The Board needs to approve the issuance for the

21  work you did as a consultant, but it's 100,000 shares coming

22  from the company, right?

23  A     Coming from the company, correct.

24  Q     When shares are coming from the company the Board needs

25  to approve them, right?

S. RICHARDSON - REDIRECT - MS. SMITH          2567

1    A    That's correct.

2    Q    Then if we look at the option, those were the shares that

3    Mr. Shkreli was going to provide to you personally?

4    A    Yes.

5    Q    Mr. Greebel says, "Under the SEC's rules you are not

6    required to report this stock underlying the option until 60

7    days prior to the option exercise date," right?

8    A    That's correct, which is why I believed I did not have

9    any disclosure requirements, that Mr. Greebel had given me

10   that guidance.

11   Q    Clearly says this option agreement is coming, is going to

12   be between you and Mr. Shkreli; is that right?

13              MR. BRODSKY:  Objection to the leading.

14   Q    Does the document say that the option agreement is going

15   to be between you and Mr. Shkreli?

16   A    Yes, it does.

17   Q    At this point, Mr. Greebel what is his role at Retrophin?

18   A    He is company counsel.

19   Q    Is he company counsel during the entire period of 2013?

20   A    Yes, he is.

21   Q    We saw other e-mails in 2013 with Mr. Greebel where you

22   discussed Mr. Shkreli giving you shares personally; is that

23   right?

24   A    There were subsequent, I believe around September and

25   October 2013.

S. RICHARDSON – REDIRECT – MS. SMITH        2568

1   Q    In connection with this March 2013 e-mail, the

2   September 2013 e-mail, or the October 2013 e-mail, did

3   Mr. Greebel ever say that you needed to make a disclosure

4   related to Mr. Shkreli giving you shares personally?

5             MR. BRODSKY:  Objection.  Leading.

6             THE COURT:  Overruled.

7   A    No, he did not.

8   Q    Was there any discussion of a conflict of interest

9   related to that arrangement?

10  A    No, there was not.

11  Q    If there is a need to disclose that arrangement, would

12  you have expected to Mr. Greebel to advise you of that?

13            MR. BRODSKY:  Objection, your Honor.

14  Q    What, if anything, would you have expected Mr. Greebel to

15  tell you about the need for disclosure?

16            MR. BRODSKY:  Objection, your Honor.

17            THE COURT:  Overruled.

18  Q    Related to shares?

19            MR. BRODSKY:  Can we have sidebar?

20            THE COURT:  Yes.  Sidebar.

21            (Continued on the next page.)

22            (Sidebar conference.)

23

24

25

SIDEBAR CONFERENCE                    2569

1          MR. BRODSKY:  Your Honor, the question assumes a

2    legal duty by Mr. Greebel as outside counsel to Retrophin to

3    provide legal advice to a Board member regarding his own

4    duties or reporting his own personal arrangement.  First, it

5    assumes a number of facts that are not in evidence and that

6    are actually contrary to the record.  Those facts are that --

7          THE COURT:  It's what expectation do you have.  She

8    hasn't assumed any facts.

9          MR. BRODSKY:  His personal expectation.  As your

10   Honor ruled before, his personal belief and expectation of

11   what Mr. Greebel should have done as outside counsel to

12   Retrophin is not relevant to this case.  He should not be

13   testifying as to what he believes what Mr. Greebel should have

14   done.  It should be based on the bylaws of the company.  It

15   should be based on your legal instructions as to the duty an

16   outside counsel has.  The evidence in this case should not be

17   based on personal belief by a Board member, who obviously, has

18   some issues with respect to the facts about what he thought

19   Mr. Greebel should believe.

20          And the Government is planting this idea for the

21   jury that if there is this legal duty and obligation,

22   Mr. Greebel should have said something.  Extremely

23   prejudicial, your Honor.  Suggests to the jury that this is an

24   expectation that is real.  Because the whole question assumes

25   that Mr. Greebel should have said something or should have

SIDEBAR CONFERENCE                    2570

1    done something, and the law should come from your Honor.  The

2    facts can speak for themselves.  What he expected or

3    personally wanted is not a relevant fact and extremely

4    prejudicial.

5         MS. SMITH:  Mr. Brodsky on cross made an entire

6    argument that there was in fact a duty to disclose.  The

7    reason that Mr. Richardson thought there wasn't is because

8    Mr. Greebel didn't tell him that.

9         In multiple discussions where Mr. Greebel is aware

10   and in fact potentially facilitating Mr. Shkreli, providing

11   him shares.  Personally he never said, we're going to do this,

12   talk about what the 60-day disclosure would look like.  He

13   didn't say we need to make a disclosure in the filings.  He

14   didn't say there is a conflict of interest.  He's company

15   counsel.  He's talking about his responsibilities as a Board

16   member.

17        Mr. Brodsky opened the door to all of this.  And

18   there is no way for Mr. Richardson to explain why he didn't

19   disclose, which Mr. Brodsky spent hours on yesterday, without

20   saying that Mr. Greebel was aware and he would have expected

21   if there was, if there was a responsibility to disclose, which

22   I don't even think that necessarily we agree there was, that

23   Mr. Greebel would have said something, especially since he's

24   the one drawing up the documents for it.

25        THE COURT:  Could you frame the question in a manner

1   of saying to Mr. Richardson, why didn't did you disclose -- on

2   cross Mr. Brodsky asked you whether you should have disclosed

3   X, Y, Z, why didn't you disclose X, Y, Z?

4           MS. SMITH:  Yes, I can definitely ask that.

5           THE COURT:  That might cover it without an

6   objection.

7           MS. SMITH:  He also asked Mr. Richardson to testify

8   about what he expected about the legal language in documents,

9   what does the release mean, what does this mean to you.  And

10  part of his understanding of all of this is coded by the fact

11  that Mr. Greebel is serving as counsel for the company during

12  this time period, getting information from Mr. Greebel and

13  getting documents from Mr. Greebel.  And Mr. Greebel is

14  attending the Board meetings and has an expectation that

15  Mr. Greebel, if he's doing something that Mr. Brodsky is

16  suggesting is improper, will say something especially when

17  he's having a dialogue with Mr. Greebel about that very

18  subject.

19          THE COURT:  The jury will decide what the facts are.

20  I will instruct them on the law.  If you have opened the door

21  to what Mr. Richardson should have done, why he didn't do

22  certain things, or communications he had with Mr. Shkreli and

23  Mr. Greebel with disclosure obligations, what documents he

24  received, whether he could have picked up the phone to talk to

25  Mr. Greebel and ask him questions or discuss certain issues

SIDEBAR CONFERENCE                    2572

1   with him, so I mean it is fair ground on redirect for the

2   Government to explore those conversations or actions that he

3   took or didn't take because of his understanding that

4   documents were coming from the corporation's outside counsel.

5           MR. BRODSKY:  Yes, your Honor.

6           THE COURT:  I'll instruct the jury on the law.  And

7   they will apply the facts as they find them.  But they are

8   entitled to hear it on redirect.

9           MR. BRODSKY:  One, she can ask a non-leading why

10  questions, which is why didn't you do X, that's appropriate.

11  But to ask the question what was your expectation is an

12  inappropriate question.

13          THE COURT:  It's not leading, though.

14          MR. BRODSKY:  It's not leading, your Honor, but --

15          THE COURT:  What, if any, expectations did you have?

16          I'll instruct them on the duty.

17          MR. BRODSKY:  I don't think they can ask the same

18  question without assuming the duty.  I believe it's improper

19  question --

20          THE COURT:  She didn't use the word duty.

21          MR. BRODSKY:  She used expectation.  It implies a

22  duty, your Honor.  They can ask the why questions.

23          MS. SMITH:  Are you saying there is no duty, that

24  Mr. Greebel had no duty to provide?

25          THE COURT:  They are going to get instructions.

SIDEBAR CONFERENCE                               2573

1    It's fair game given the scope of the cross that she can ask

2    what his understandings were, why he did or did not take

3    certain actions based on communications from the company's

4    counsel.

5              MR. BRODSKY:  I understand the why question, your

6    Honor.  I don't believe any question that says -- I will

7    object, I'm going to object, that any question with what is

8    your expectation.

9              Because his expectation is not relevant, on Rule 401

10   not relevant; and 403, highly prejudicial.

11             Second, your Honor, we did not open the door to the

12   notion that Mr. Greebel had this obligation to correct him.

13             THE COURT:  You opened the door to his actions

14   without regard to -- you touched a lot on his actions whether

15   he should have disclosed, why this SEC filed document did not

16   contain certain things that you claim he should have exposed.

17             MR. BRODSKY:  They can ask him why, they can't ask

18   what the expectation.  That's extremely prejudicial, Rule 401

19   is irrelevant; 403, prejudicial.  We stated our objection.

20             THE COURT:  All right.  Thank you.  Just to avoid

21   all these discretions, try to formulate your --

22             MS. SMITH:  I know.  I'm trying to as quickly as

23   possible but Mr. Brodsky does not want me to lead so I'll stop

24   that.

25             THE COURT:  Ask the who, what, why.

1            MS. SMITH:  Mr. Brodsky doesn't know it's common

2    here to question with leading on, but if he doesn't want me

3    to.

4            MR. BRODSKY:  Your Honor, respectfully, I believe

5    the Government should always comply with the rules.  If they

6    don't comply with the rules, it's my duty to object.

7            THE COURT:  Some of questions are leading and I've

8    sustained the objection.  Simply because the question seeks a

9    yes or no answer is not leading.  What makes it leading is

10   putting words in the witness's mouth and then ask to affirm or

11   deny.  You know the difference, that's why I had rulings.

12            (End of sidebar conference.)

13            (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court.)

2    BY MS. SMITH:

3    Q    If we can put Defendant's Exhibit 104-252 back up.

4    Mr. Richardson, in the middle here, March 18, 2013, there is a

5    discussion about Martin is going to give you an option to buy

6    125,000 shares from him and under the SEC's rules you are not

7    required to report this stock underlying the option until 60

8    days prior to the option exercise date.  We discussed, were

9    there other e-mails later in 2013 that also discussed you

10   personally purchasing shares from Mr. Shkreli?

11   A    Yes, there were.

12   Q    Why did you not disclose at that time publicly that you

13   and Mr. Shkreli had discussed you purchasing shares from him?

14   A    Because I understood from Mr. Greebel's advice here that

15   it was only required within a 60-day window of the exercise of

16   the stock move itself.  At that point no stock had moved.

17   Q    Did Mr. Greebel ever subsequently suggest that you should

18   disclose this potential purchase of stock from Mr. Shkreli?

19   A    No.

20   Q    Did Mr. Greebel ever subsequently discuss the purchase of

21   stock from Mr. Shkreli being a conflict of interest?

22   A    No.

23   Q    What, if anything, was your expectation about what

24   Mr. Greebel would tell you if there was a need to disclose

25   something?

S. RICHARDSON - REDIRECT - MS. SMITH          2576

1   A    Again, because Mr. Greebel was being copied in those

2   various communications I understood he would give guidance as

3   to what the appropriate disclosure aspects would be at that

4   time.

5   Q    Mr. Brodsky also asked you if you told Mr. Panoff about

6   this possibility of purchasing shares from Mr. Shkreli.  Did

7   you tell Mr. Panoff?

8   A    Yes, I informed Mr. Panoff with the true up that I was

9   one of the people in the queue when he first joined the

10  company in June of 2013.

11  Q    Did Mr. Panoff ever discuss with you the need to disclose

12  that potential purchase of shares from Mr. Shkreli?

13  A    No, he did not.

14  Q    Ultimately did you get paid for your service as a Board

15  member?

16  A    Not for this period of time, no.

17  Q    Ultimately what period of time did you get paid for being

18  a Board member?

19  A    The first payment I got was for, from the end of December

20  of 2013 forward into 2014.

21  Q    Were you the only Board member who received payment for

22  your services?

23  A    No, all the Board members.  The new Board compensation

24  was put in place for all Board members at that time, at the

25  end of 2013.

S. RICHARDSON - REDIRECT - MS. SMITH          2577

1    Q    Was that compensation approved by the Board?

2    A    Yes, it was.

3    Q    Changing topics, you were also asked by Mr. Brodsky about

4    freely traded shares; is that right?

5    A    Yes.

6    Q    You were first asked about your testimony on direct then

7    shown a document.  I just want to read your testimony on

8    direct, first at page 1792 of the transcript.

9         "Question:  Did you have any understanding as to

10   whether the Desert Gateway shell that Retrophin purchased for

11   the reverse merger came with any free trading shares?"

12        Your answer was, "No, I wasn't aware."

13        Mr. Brodsky then showed you Defendant's Exhibit

14   104-14, which is your binder, and can you take that out.

15        THE COURT:  For the record, this is in evidence?

16        MS. SMITH:  Yes, your Honor.

17   Q    This is an e-mail from Mr. Shkreli to yourself dated

18   December 14, 2012; is that right?

19   A    That's correct.

20   Q    Does this e-mail say that the Desert Gateway shell that

21   Retrophin purchased came with freely traded shares?

22   A    No, this e-mail does not.

23   Q    Does it e-mail discuss the distribution of freely traded

24   shares from the Desert Gateway shell to other people?

25   A    No, the e-mail does not.

S. RICHARDSON - REDIRECT - MS. SMITH          2578

1   Q    Does the e-mail explain what Mr. Shkreli meant here by

2   freely tradeable stock?

3   A    No, it does not.

4   Q    If you look at the e-mail itself, can you read the first

5   line?

6   A    "Here is a Retrophin purchase agreement should you be

7   interested, includes wire instructs."

8   Q    Does the e-mail attach a document?

9   A    Yes, it does.

10  Q    Is it a purchase agreement for regular Retrophin stock?

11  A    For Retrophin stock, yes.

12  Q    If you can read the second line?

13  A    Of the e-mail?

14  Q    Yes.

15  A    "Also if you want freely tradeable stock you can buy

16  that, we draw up an individual agreement."

17  Q    Is it your understanding there would be a different

18  agreement if you wanted freely tradeable stock?

19  A    Yes, from this stock.

20  Q    Mr. Shkreli is saying he can make freely stock available,

21  right?

22             MR. BRODSKY:  Objection to the leading.

23             THE COURT:  Sustained.

24  Q    Who did you understand could make freely tradeable stock

25  to you, based on this e-mail?

*Rivka Teich CSR, RPR, RMR*
*Official Court Reporter*

1    A    The only source I have here is Mr. Shkreli.

2    Q    Mr. Brodsky asked you questions on cross-examination

3    about the bylaws for Retrophin, right?

4    A    Yes.

5    Q    If we can look at those which are Defendant's Exhibit

6    104-79.  The bylaws start on page ten, there aren't page

7    numbers, but towards the middle.

8    A    Thank you.

9    Q    These were the bylaws that you looked at, right?

10   A    Yes.

11   Q    I actually want to start on page 21, which is page 12 of

12   the bylaws if you're looking at the numbers on the bottom, the

13   section indemnification?

14   A    Page 12, yes.

15   Q    Mr. Brodsky asked you if there was discussion in

16   December 2013 about indemnification before the bylaws were

17   approved.  Do you remember that discussion?

18   A    Yes.

19   Q    Mr. Greebel was present for that discussion, correct?

20   A    What was the date again?

21   Q    The bylaws are from the 2014, and do you remember if

22   there was a discussion prior to the bylaws?

23   A    If it was at a Board meeting?

24   Q    Yes.

25   A    Yes.

S. RICHARDSON - REDIRECT - MS. SMITH          2580

1    Q    Was Mr. Greebel present at that Board meeting?

2              MR. BRODSKY:  Can we have a date, your Honor?

3    Q    So the bylaws are the end of 2014, I believe Mr. Brodsky

4    asked you if there was a discussion in December of 2013.

5              THE COURT:  About the bylaws?

6              MS. SMITH:  About the bylaws before they were

7    enacted.

8              THE COURT:  At a Board meeting.

9              MR. BRODSKY:  The bylaws are not in the end of 2014.

10   BY MS. SMITH:

11   Q    The bylaws are January 2014, Mr. Brodsky asked about a

12   discussion at a Board meeting in December 2013.

13   A    Yes, I believe a Board call.

14   Q    Was Mr. Greebel present on the Board call?

15   A    I believe he was.

16   Q    During that discussion of the indemnification in December

17   2013, did Mr. Greebel ever say that he had recently prevented

18   Retrophin or Mr. Shkreli from being sued by MSMB investors?

19             MR. BRODSKY:  Objection to the leading, your Honor.

20             THE COURT:  Try to rephrase the question, Ms. Smith.

21   Q    Can you explain again what the purpose of the

22   indemnification is?

23   A    Again, it is to protect either the individuals or an

24   organization against potential litigation effectively.

25   Q    And during the Board discussion about potential

S. RICHARDSON - REDIRECT - MS. SMITH          2581

1   litigation, and the need for the indemnification to protect

2   against it, did any potential litigation present at that time

3   come up?

4   A    Not at that time.

5   Q    Was Mr. Greebel on that call?

6   A    Yes, I believe he was.

7   Q    Did any discussion of any investigation come up during

8   that December 2013 call?

9   A    Not at that time frame.

10  Q    Again was Mr. Greebel on the call?

11  A    Yes.

12  Q    Let's also look at page nine of the document, the section

13  about the Secretary and Assistant Secretary?

14  A    Yes.

15  Q    Who served as Secretary for Retrophin in 2013?

16  A    Mr. Greebel was the Acting Secretary.

17  Q    What about in 2014?

18  A    He continued as the Acting Secretary through I believe

19  September of 2014.

20  Q    Can you read the first sentence of the duties of the

21  Secretary?

22  A    "The Secretary shall attend all meetings of the Board of

23  Directors and all meetings of the stockholders and record all

24  the proceedings of the meetings of the corporation and of the

25  Board of Directors in a book to be kept for that purpose and

S. RICHARDSON - REDIRECT - MS. SMITH          2582

1   shall perform like duties for the standing committees when

2   required."

3   Q    This sentence says that the Secretary is responsible to

4   record all proceedings of the meetings of the corporation; is

5   that right, and of the Board of Directors?

6   A    It says, all meetings and record -- yes, record all the

7   proceedings of the meeting.

8   Q    Does it also say that the record will be kept in a book?

9   A    Yes.

10  Q    Mr. Brodsky asked you questions about Mr. Greebel

11  providing the minutes to you?

12  A    Yes.

13  Q    When you asked Mr. Greebel to produce the minutes of the

14  meetings of the Board of Directors of Retrophin, did he

15  provide you with a book of minutes?

16  A    No.

17  Q    Did he ever express to you that it wasn't his

18  responsibility to keep minutes at the meeting?

19  A    Not that I raised it with him, no.

20  Q    Did you or the other Board members ever receive copies of

21  minutes from Board minutes drafted by Mr. Greebel to review?

22  A    I believe we received them in September of 2014 as a

23  batch.

24  Q    Did you ever receive them before then?

25  A    No, we did not as a Board.

S. RICHARDSON – REDIRECT – MS. SMITH          2583

1   Q    Were you ever able to verify whether the information in

2   the minutes of draft meeting minutes from Mr. Greebel was

3   accurate?

4   A    Not until we received them in September of 2014.

5   Q    At that time, did you believe that all of the information

6   in the Board minutes was accurate?

7              MR. BRODSKY:  Objection, your Honor.

8              THE COURT:  Sustained.  Rephrase.

9   Q    Did you review the Board minutes at the time that you

10  received them in 2014?

11  A    Yes, we did.

12             MR. BRODSKY:  Objection, your Honor.

13             THE COURT:  Overruled.

14             MR. BRODSKY:  This is beyond the scope.  And there

15  is no document in evidence, your Honor.  I can do it at

16  sidebar, your Honor.

17             THE COURT:  All right.  Sorry, ladies and gentlemen.

18             (Continued on the next page.)

19             (Sidebar conference.)

20

21

22

23

24

25

SIDEBAR CONFERENCE                          2584

1      MR. BRODSKY:  We were prevented from putting in Marc

2  Panoff, an e-mail from Marc Panoff containing the draft

3  minutes in December 2013, completely shut us down.  Now they

4  are asking questions about unknown minutes from an unknown

5  document in September of 2014 with a general question, without

6  any specificity as to a Board meeting or what specific meeting

7  or what specific minutes.  None of this came out on direct

8  examination.  We had no chance to cross on it.  Now they are

9  introducing this concept after shutting us down from

10  introducing the actual minutes.  And so, it's beyond the scope

11  of the cross after shutting us down.  And it's impermissible

12  line of questioning.

13      THE COURT:  I think that e-mail that you were

14  offering that wasn't admitted, was an e-mail only to

15  Mr. Panoff with Board minutes.  It didn't go to the entire

16  Board.

17      MR. BRODSKY:  I understand.

18      THE COURT:  As I recall and the questions that I'm

19  hearing here regarding when he as a Board member, received

20  minutes as the Board.  He said as the Board we received the

21  minutes for the first time in September of 2014.  There is no

22  reason that --

23      MR. BRODSKY:  We don't have any document for that.

24  This is beyond the scope of the cross, because I wasn't

25  permitted to go into the receipt of Board minutes, and because

SIDEBAR CONFERENCE                          2585

1    they shut that down.  And he is generally testifying about

2    some inaccuracies without us looking at a document or seeing a

3    document.

4              If they are going to go into this area, your Honor,

5    I need to be able to go into the Marc Panoff e-mail.  There

6    are other e-mails of Board minutes that Mr. Greebel sent to

7    Mr. Panoff throughout 2014.  And there are notes that were

8    taken by another person.  So starting in October of 2013 David

9    Kravitz attended Board meetings.  He's an attorney at Katten,

10   other than Mr. Greebel.  He was silently on the phone taking

11   his own notes, producing minutes too and producing the notes.

12   And so I'm going to have to go into that as well.

13             THE COURT:  So Mr. Kravitz was on the phone but

14   nobody knew it?

15             MR. BRODSKY:  Mr. Greebel knew it, but.

16             THE COURT:  They doesn't disclose it to anybody.

17             MS. SMITH:  It's not in the written Board minutes.

18             MR. BRODSKY:  He was -- they didn't want to bill for

19   time because of the additional time of having another lawyer

20   on the phone listening.

21             THE COURT:  Mr. Kravitz and Mr. Greebel were on, or

22   Mr. Greebel asked Mr. Kravitz to stand on?

23             MR. BRODSKY:  Mr. Kravitz was on the phone and

24   Mr. Greebel was on the phone.  Mr. Kravitz would sometimes

25   take the notes, sometimes Mr. Greebel.

SIDEBAR CONFERENCE                        2586

1        THE COURT:  His presence was not disclosed to

2   anybody?

3        MR. BRODSKY:  His presence was on the phone.

4        THE COURT:  The minutes don't record?

5        MR. BRODSKY:  The minutes don't reflect that.

6        THE COURT:  Are you going to have Mr. Kravitz

7   testify?

8        MR. BRODSKY:  We may.

9        MS. SMITH:  Then that's fine.  Your Honor, I'm

10  asking this in part because Mr. Brodsky, he asked today about

11  this disclosure without a document that Mr. Panoff allegedly

12  made that he had certified that the minutes of the Board of

13  Directors was true, accurate and correct in January of 2014, I

14  believe.  It was both to, I guess, publicly, or he didn't --

15  I'm not sure what document specifically he's referring to, as

16  wells to the underwriters.  I need to establish that whatever

17  minutes, and I'll get to those questions about Mr. Panoff in a

18  minute, but whatever minutes he eventually received he didn't

19  have the opportunity to confirm were accurate.  I don't need

20  to go into the specifics of the inaccuracies.  I believe that

21  foundation is laid.  But if he's going to say that

22  Mr. Panoff -- and ask him about it -- certified the minutes

23  that he had never seen were true, accurate and correct, then I

24  have a right to ask him what he did say whatever the minutes

25  were if they were in fact accurate.

SIDEBAR CONFERENCE                    2587

1          MR. BRODSKY:  I mean, this is a broad question

2    without specifying what particular.

3          THE COURT:  She asked whether he was able to, not

4    whether specifics minutes were or were not accurate.  She

5    said, were you able to verify on your own whether the minutes

6    were accurate, so it's a general question.

7          MR. BRODSKY:  Understood.

8          THE COURT:  Whether he had that opportunity.  I

9    think that what you're getting into, you're not going into in

10   a granular way into the minutes.

11         MS. SMITH:  No.  I think at this point I can move

12   forward.  But that is the line that Mr. Brodsky asking about,

13   some unspecified filing about some unspecified Board minutes

14   in January of 2014.

15         MR. BRODSKY:  All right.  They will have to wait and

16   see for the evidence.

17         MS. SMITH:  Okay.

18         THE COURT:  Okay.

19         (End of sidebar conference.)

20         (Continued on the next page.)

21

22

23

24

25

1          (In open court.)

2    BY MS. SMITH:

3    Q    Mr. Richardson, I was asking you about the Board minutes

4    that you ultimately received in September of 2014.  Prior to

5    that time, had you had the opportunity to review those Board

6    minutes for accuracy?

7    A    Not prior to that time.

8    Q    And when you did receive those Board minutes, were they

9    an accurate reflection of your memory of what had happened at

10   those Board meetings?

11   A    I recall there were some discrepancies.

12   Q    Mr. Brodsky also asked you about whether you were aware

13   of a declaration that Mr. Panoff had made in January of 2014

14   about some Board minutes, do you remember those questions?

15   A    I remember the questions.

16   Q    Did Mr. Panoff check with the Board before certifying any

17   minutes?  Did Mr. Panoff ever check with the Board to certify

18   whether any minutes were accurate?

19   A    No, he did not.

20   Q    Was Mr. Panoff present at all Board meetings in 2013?

21   A    From the point that he joined the company, yes, I believe

22   he was.

23   Q    What was the point that he joined the company?

24   A    June 2013.

25   Q    Was he present for any Board meeting prior to June of

1   2013?

2   A    I don't believe he was, no, because he only joined the

3   company late, in May is my recollection 2013.

4   Q    Would he have been capable of certifying that Board

5   minutes prior to June 2013 were accurate?

6   A    No, he would not have been.

7   Q    Mr. Brodsky also asked you questions on cross-examination

8   about purchasing shares as a Board member.  He showed you

9   Defendant's Exhibit 5756, which is in evidence.  If we turn to

10  the second page and look at the bottom e-mail.  If you can

11  read the second paragraph that Mr. Shkreli said with, "The

12  good thing"?

13  A    "The good thing about insider buying, in my opinion, is

14  that the stock market usually loves to see directors and

15  management buy on the open market.  So even buying 100 shares

16  goes a very long way for RTRX.  Let me know what you think.  I

17  will be filing some Form 4s shortly."

18  Q    What is a Form 4 again?

19  A    A confirmation of shares purchased or shares owned.

20  Q    What do you do with a Form 4?

21  A    It has to be filed with the SEC.

22  Q    Is it important to properly disclose the amount of stock

23  that insiders, like a member of the Board of Directors,

24  purchased or held?

25  A    Yes, it is important.

1  Q    Mr. Brodsky also asked you some questions about someone

2  named Timothy Pierotti on cross-examination.  He showed you

3  what is marked Defendant's Exhibit 104-72.  If we can just

4  look at the top e-mail.

5         Mr. Brodsky specifically asked you, in the middle

6  here, if you knew what Mr. Shkreli was talking about when he

7  talked about, "The Tim thing did not help."

8  A    Yes.

9  Q    If you understood that to be a reference to Mr. Pierotti?

10 A    Yes, Mr. Tim Pierotti.

11 Q    On direct you testified in transcript 1991 that

12 Mr. Shkreli told you that he had given Mr. Pierotti shares

13 because, quote, "Mr. Pierotti and his family were in strife

14 having some tough times.  When Mr. Shkreli tried to get the

15 shares, back Mr. Pierotti refused give them back."  Do you

16 remember giving that testimony?

17 A    Yes.

18 Q    Were those the issues with Mr. Pierotti that Mr. Shkreli

19 was referencing here?

20 A    Yes, I believe they were.

21 Q    Mr. Brodsky also asked you some additional questions

22 about Mr. Pierotti's work on MSMB Consumer.  Did you meet

23 Mr. Pierotti in connection with MSMB Consumer?

24 A    Yes, I did, before I chose to invest in it.

25 Q    When was that?

S. RICHARDSON - REDIRECT - MS. SMITH          2591

1    A    I think it was late 2012.

2    Q    For MSMB Consumer?

3    A    Consumer, no, must have been -- my apologies, I'm

4    confused on all the dates on that now.

5    Q    Do you remember your testimony on direct examination that

6    it was in late 2011?

7    A    Excuse me, it was further back, yes.

8    Q    Does late 2011 sound correct?

9    A    Yes.  I'm getting my years confused.  My apologies.

10   Q    You did invest with MSMB Consumer?

11   A    Yes, $50,000.

12   Q    What happened with MSMB Consumer?

13   A    It operated for about nine or ten months, at that point I

14   decided to redeem.

15   Q    When MSMB consumer wound-down, did you have an

16   understanding that Mr. Pierotti was working on a venture with

17   Mr. Biestek?

18   A    Yes, he did.

19   Q    Were you pitched in investing in that venture?

20   A    They raised the subject with me, it didn't get to a

21   formal pitch, but raised the idea of potentially investing.

22   Q    Was it your understanding that that venture was related

23   to a company in Arkansas?

24   A    I know that, yes, I didn't remember the state, but yes.

25   Q    Was that company, do you have memory of Dental Gypsum?

S. RICHARDSON – REDIRECT – MS. SMITH          2592

1    MR. BRODSKY:  Objection to the lead.

2    THE COURT:  Yes.  Sustained.

3  Q    Do you have an understanding of what that company was

4  related to?

5  A    No, I do not.

6  Q    Mr. Brodsky asked you a lot of questions about

7  Retrophin's financial state in December of 2012 and early

8  2013.  Whether there was a danger in that time frame of

9  Retrophin no longer being a going concern, do you remember the

10  question?

11  A    Yes.

12  Q    How much money was raised in the February 2013 pipe?

13  A    In 2013 there were two pipes, one for 10 million and one

14  for 25 million.

15  Q    Prior to that February 2013 pipe, what was Retrophin's

16  financial state?

17  A    It was very low on funds coming into that year.

18  Q    So in that early 2013 time period, was $2 million a lot

19  of money for Retrophin?

20  A    Yes, it was.

21  Q    What could Retrophin have done with approximately

22  $2 million in that time period with respect to research and

23  development?

24  A    $2 million for a start-up company is substantial.  At

25  that point in time your research and development into a new

S. RICHARDSON - REDIRECT - MS. SMITH          2593

1    drug could have been progressed.

2    Q    Mr. Brodsky also asked you questions on cross-examination

3    about what he called Retrophin's books and records, correct?

4    A    Yes.

5    Q    He also asked about your ability as a Board member to

6    inspect the books and records?

7    A    Yes.

8    Q    During the period of time that you were a Board member,

9    did Retrophin have an attorney?

10   A    During the time I was a Board member --

11   Q    Who was what the attorney for Retrophin during the time

12   you were a Board member?

13   A    The attorney on counsel was Mr. Greebel.

14   Q    Who was the Chief Financial Officer during the time you

15   that you Board member?

16   A    From 2013 mid 2013 on was Mr. Panoff.

17   Q    In 2013 did you receive information from Mr. Greebel and

18   Mr. Panoff at Board meetings about Retrophin's financial

19   condition and its operations?

20            MR. BRODSKY:  Objection, your Honor.  Misstates,

21   mischaracterizes the evidence, your Honor.  It's leading.

22            THE COURT:  Try to rephrase the question.

23   Q    What information did Mr. Panoff and Mr. Greebel bring to

24   your attention in 2013 when Retrophin's?

25            MR. BRODSKY:  Objection to form, your Honor.

S. RICHARDSON – REDIRECT – MS. SMITH          2594

1          THE COURT:  You might have to just ask individual by

2     individual.

3     Q    Starting with Mr. Greebel, did Mr. Greebel bring legal

4     documents to your attention in 2013?

5          MR. BRODSKY:  Objection to the form.

6          THE COURT:  Try to rephrase.

7     Q    Did Mr. Greebel bring information about legal issues to

8     your attention in 2013?

9     A    Yes, all the respective required company filings, et

10    cetera.

11    Q    Did you have any reason to believe that Mr. Greebel did

12    not bring information to your attention, that you had to go

13    ask for it separately?

14         MR. BRODSKY:  Objection.

15         THE COURT:  Overruled.

16    A    No, I did not.

17    Q    With respect to Mr. Panoff, what information did

18    Mr. Panoff bring to Board meetings?

19    A    Again all the financial performance data and the

20    financial filings.

21    Q    Did you have any reason to believe that Mr. Panoff did

22    not bring to your attention information at Board meetings,

23    that you would need to go and look for yourself?

24    A    No, I did not.

25    Q    Mr. Brodsky also asked you about the settlement

1    agreements?

2    A     Yes.

3    Q     At one point he asked you whether the settlements were,

4    quote, "hidden from the Board," do you remember that?

5    A     I don't recall the exact words, but.

6              MR. BRODSKY:  Objection, your Honor.  Mistates my

7    question.

8    Q     Let's look at Government's Exhibit 245, these are the

9    documents that you received in connection with the

10   September 9, 2013, Board meeting, or some of the documents?

11   A     Yes, September 9, 2013.

12   Q     In these materials and also in the materials in

13   Government's Exhibit 247 there were mentions of settlement

14   agreements, correct?

15   A     Yes, from the external auditors and the revised 10Q.

16   Q     Were the parties to the settlement agreements disclosed

17   in documents?

18   A     No, they were not.

19   Q     Was the purpose of the settlement agreements disclosed in

20   those documents?

21   A     No, it was not.

22   Q     Was it explained to you by Mr. Greebel that the

23   agreements were used to give money and shares from Retrophin

24   to MSMB investors?

25   A     No, it was not.

S. RICHARDSON - REDIRECT - MS. SMITH          2596

1   Q    So while the fact that the settlement agreements existed

2   was told to the Board, the Board was not told about the

3   function of the settlement agreements?

4            MR. BRODSKY:  Leading.

5            THE COURT:  Try to rephrase.

6   Q    Was the Board told about the function of the settlement

7   agreements?

8   A    No, it was not.

9   Q    Mr. Brodsky asked you on cross about Defendant's Exhibit

10  2821, which is in your binder, those were your notes related

11  to September 9, 2013, Board meeting?

12  A    8281?

13  Q    8281, the last document.

14  A    Thank you.

15  Q    That's again for the record Defense Exhibit 8281 in

16  evidence.

17            (Continued following page.)

18

19

20

21

22

23

24

25

```
                    Richardson - Redirect/Smith              2597
```

1              (In open court.)

2    REDIRECT EXAMINATION

3    BY MS. SMITH (continuing):

4    Q    So that's, again, for the record, Defense Exhibit 8281 in

5    evidence.

6              There is a notation next to line item ten, that

7    says, Augments D and O.

8    A    Yes.

9    Q    Which Mr. Brodsky asked you about.

10   A    Yes.

11   Q    As you sit here today, do you remember whether or not

12   this line item was discussed at the board meeting?

13   A    No, I did not recall it being discussed at the meeting.

14   Q    With respect to line item nine, did the board discuss or

15   approve the consulting agreements mentioned in line item nine?

16   A    Not item nine, no.

17   Q    We talked about your notes for the board meetings.

18              Were the notes on this document written at the time

19   of the board meeting or before the board meeting?

20   A    The majority of them were written -- the majority were

21   written before.

22   Q    The items related to item number nine, it says minimum

23   time expectations and cost structures, were those written

24   before the meeting or during the meeting?

25   A    I written them to myself ahead of the meeting, hence the

Richardson — Redirect/Smith                     2598

1   question marks.

2   Q     What were those comments based on?

3   A     Those comments were based on the fact that, again, for

4   any consultant agreements we would look at, to understand what

5   is the minimum time expectation we have with that potential

6   consultant and also to understand any other costs related to

7   any agreement.

8   Q     Let's take a quick look at the draft consulting agreement

9   that you received in connection with that board meeting, which

10  is Government Exhibit 245.  Then, it's page 38 of the pdf.

11          Again, in the top right-hand corner, what's written

12  in?

13  A     Katten draft, 20th of August '13.

14  Q     Based on your review of this draft consulting agreement,

15  does it indicate that Mr. Geller was an investor in MSMB

16  Healthcare?

17  A     Again, I never reviewed these in detail.  I never

18  reviewed this agreement in detail.  So I don't know if it was

19  referenced or not.

20  Q     Did Mr. Greebel ever inform you that Mr. Geller was an

21  investor in MSMB Healthcare?

22  A     No, he did not.

23  Q     Were you ever informed of the purpose of the consulting

24  agreement?

25  A     No.

1    Q    Mr. Brodsky also asked you on cross-examination whether

2    Mr. Panoff ever brought to the board's attention any concerns

3    he had with Mr. Shkreli; and I believe he asked you about --

4    you said there were two instance where Mr. Panoff raised

5    concerns; is that right?

6    A    I believe in the context of the business development

7    trading and stock issue.

8    Q    Did Mr. Panoff ever express any concerns to you about the

9    settlement agreement?

10   A    No, he did not.

11   Q    If Mr. Panoff, as the chief financial officer, had

12   concerns about the settlement agreement or consulting

13   agreement, would you have expected him to raise those with the

14   board?

15              MR. BRODSKY:  Objection, Your Honor.  Assumes and

16   form.

17              THE COURT:  Try to rephrase, Ms. Smith.

18   Q    What was your expectation for Mr. Panoff about raising

19   concerns with the board?

20              MR. BRODSKY:  Objection, Your Honor.

21              THE COURT:  Well, why don't we wait until she

22   finishes the question.  I think she was midway through it.

23              Try to rephrase based on our sidebar, if you could,

24   please.

25              MS. SMITH:  Sure.

Richardson - Redirect/Smith                    2600

1    Q    What, if anything, did you believe were Mr. Panoff's

2    responsibilities as the chief financial officer at board

3    meetings?

4    A    Certainly one of them was to be an independent voice and

5    to speak out if there were any concerns.

6    Q    Mr. Brodsky also asked you on cross-examination about

7    Mr. Shkreli's employment agreement, correct?

8    A    Yes.

9    Q    And you were also shown an e-mail, which is Defense

10   Exhibit 8983R.

11   A    Yes.

12   Q    So before we get to the document, who did you receive the

13   draft of Mr. Shkreli's employment agreement from?

14   A    From Mr. Greebel.

15   Q    Who did you provide comments to about the employment

16   agreement?

17   A    Back to Mr. Greebel.

18   Q    Did you communicate with any other attorney regarding the

19   employment agreement?

20   A    No, I did not.

21   Q    And on direct, I believe, you testified that you focused

22   on the compensation sections of the employment agreement.

23   A    Yes, and the omission of any political activity was the

24   second subject.

25   Q    That's reflected in this e-mail here, which is Defense

Richardson - Redirect/Smith                    2601

1    Exhibit 8983R?

2    A    Yes.  That's my e-mail to Mr. Greebel.

3    Q    For the political activities, what made you ask about

4    that?

5    A    Again, Mr. Shkreli had been active on Twitter and forums,

6    social media forums; and I felt it was appropriate --

7    important that we had some rules, if you like, about what was

8    appropriate for a CEO.

9    Q    Was there a heading in the employment agreement about

10   political activity?

11   A    No, which is why I flagged it.  It was a heading that I

12   wanted to see.

13   Q    Was one of the comments you provided here the specific

14   comment about bonus related to compensation?

15   A    Yes, it is.

16   Q    And on cross, Mr. Brodsky walked you through the language

17   of the employment agreement, asked you if it was standard or

18   boilerplate.

19   A    Yes.

20   Q    And what was your understanding of whether the majority

21   of the language in the employment agreement was standard or

22   boilerplate?

23   A    When I first reviewed it, just looking at the headings, I

24   believed most of it was boilerplate and standard.

25   Q    Did Mr. Greebel highlight for you any language that was

Richardson - Redirect/Smith                    2602

1   not boilerplate or standard?

2   A    No, he did not.

3   Q    And the termination provision that we have discussed, did

4   Mr. Greebel ever highlight for you or the other board members

5   that that provision stated that Mr. Shkreli could only be

6   terminated if he was convicted of a felony?

7   A    No, he did not draw attention to it.

8   Q    In all of your years of experience in human resources,

9   have you ever seen or heard of such a provision?

10              MR. BRODSKY:  Objection.

11              THE COURT:  Overruled.

12  A    No, I have not.

13  Q    Mr. Brodsky also asked you about the SEC investigation,

14  on cross-examination.

15  A    Yes.

16  Q    And you had a conversation with Mr. Greebel in March of

17  2014, before you went into the SEC interview; is that right?

18  A    That's correct.

19  Q    What did Mr. Greebel tell you during that conversation

20  about the nature of the SEC investigation?

21  A    He had said that he believed it was based on a

22  disgruntled employee, but it related solely to MSMB.

23  Q    When you met with the SEC, you testified that there were

24  references to Retrophin, correct?

25  A    Yes.  There were a couple of references to Retrophin.

Richardson - Redirect/Smith                    2603

1    Q    Were you asked questions about Retrophin?

2    A    No.

3    Q    Do you remember all of the topics related to Retrophin

4    that you were asked about during that meeting?

5    A    No, I do not remember the detail at this point.

6    Q    Okay.  If I can show you what's been marked as Government

7    Exhibit 3500-SR-1-1, which is in your binder, if you can just

8    take a moment and read, there is a section called Retrophin,

9    pages 3 and 4, briefly.

10   A    Yes.

11   Q    Putting that document aside, does that refresh your

12   recollection that during the SEC interview you were asked

13   about your work as a catalyst for Retrophin?

14   A    Yes.  I recall talking about how Retrophin was set up and

15   how I played a role in that.

16   Q    Does that refresh your recollection that during the SEC

17   interview you were asked about the Valeant deal at Retrophin?

18   A    Yes, I do, yes.

19   Q    Does it refresh your recollection that during the SEC

20   interview you were asked about the valuation of Retrophin?

21   A    Yes.  That piece I did recall, how the pricing had been

22   set.

23   Q    When you spoke to Mr. Greebel in the conversation before

24   the interview, did he tell you that the SEC had previously

25   asked questions about Retrophin?

Richardson - Redirect/Smith                    2604

1    MR. BRODSKY:  Objection, Your Honor.

2    THE COURT:  Try to rephrase the question, please.

3  Q    When you spoke to Mr. Greebel in the SEC -- in the

4  meeting you had with him or the call you had with him before

5  the SEC interview, what, if anything, did he mention regarding

6  Retrophin?

7  A    No.  My understanding from that conversation, that it

8  didn't involve Retrophin whatsoever.

9  Q    Did Mr. Greebel tell you that Retrophin had ever come up

10  in the context of the SEC investigation previously?

11    MR. BRODSKY:  Objection to the leading.

12    THE COURT:  Overruled.  You may answer.

13  A    No, he did not.

14  Q    Way back at the very beginning of your cross-examination,

15  last Wednesday, you were asked whether Mr. Shkreli was removed

16  as CEO in September of 2014 because of the settlement and

17  consulting agreements.

18    At the time that Mr. Shkreli was removed as CEO in

19  September of 2014, had Mr. Greebel told you that investors in

20  Mr. Shkreli's hedge funds had complained about their

21  investments being converted into Retrophin shares?

22    MR. BRODSKY:  Objection, objection.

23    THE COURT:  Just rephrase the question, what if

24  anything.

25  Q    What, if anything, had Mr. Greebel told you about the

KOCHER – RECROSS – BRODSKY                    2605
Richardson – Recross/Brodsky

1   settlement and consulting agreements at the time that

2   Mr. Shkreli was removed as CEO in September of 2014?

3   A    There was no further information supplied by Mr. Greebel.

4   Q    So at the time that Mr. Shkreli was removed as CEO in

5   September of 2013, were you aware of any issues with the

6   settlement or consulting agreement?

7   A    September '14.

8   Q    September of 2014.

9   A    No, I wasn't aware.

10            MS. SMITH:  Just one moment.

11            (Pause.)

12            MS. SMITH:  Your Honor, no further questions.

13            THE COURT:  All right.  Some recross?

14            MR. BRODSKY:  Yes, Your Honor.

15   RECROSS-EXAMINATION

16   BY MR. BRODSKY:

17   Q    Mr. Richardson, might you be mistaken regarding when you

18   first learned there was an SEC filing that had your incorrect,

19   according to you, stock ownership?

20            You testified on redirect examination that you first

21   learned about it in connection with a document from

22   Mr. Greebel relating to a Form S-1.  Might you be mistaken

23   that you learned about a filing that you made to the SEC in

24   December of 2012 that contained your ownership of Retrophin

25   stock?

1    A    I believe it was the stock transfer.  The stock transfer,

2    which was immediately ahead.  When I got the stock -- excuse

3    me -- the stock certificate, I should say.  The stock

4    certificate, when that was issued.

5    Q    You saw the government show you an exhibit from March of

6    2013 relating to a Form S-1, correct?

7    A    Yes.

8    Q    And you testified just a few minutes ago that that's what

9    prompted you to realize that the amount of stock reported --

10   to be reported was inaccurate, right?

11   A    That -- I believe that was triggered by the stock

12   certificate.

13   Q    When was the stock certificate given to you?

14   A    I don't recall.

15   Q    It was triggered by a stock certificate that you received

16   in the mail?

17   A    No.  Notification from Mr. Shkreli that the stock

18   certificate was available to look at or access.

19   Q    Shortly before March of 2013?

20   A    I believe, yes.  I believe.

21           MR. BRODSKY:  Well, may I approach, Your Honor?

22           THE COURT:  Yes.

23   Q    Let's see if we can refresh your recollection,

24   Mr. Richardson.  I'm showing you Defense Exhibit 104-107 for

25   identification.  If you would take a moment to look at this

KOCHER - RECROSS - BRODSKY                    2607
Richardson - Recross/Brodsky

1   SEC Form 3 filing, dated in the bottom right December 30,

2   2013.

3              This was filed in December 2013, correct?

4   A    Yes, 30th of December.

5   Q    Do you not, in connection with December of 2012, see the

6   Form 8-K?  Do you know what I mean by the Form 8-K?

7   A    The Form 8-K submission?

8   Q    In connection with reverse merger.

9   A    Yes.

10             MR. BRODSKY:  I believe that's in evidence.  Can we

11  have that in evidence.  It's DX 104-97.  I just want to check

12  if it's in evidence before we show it to you.  Yes.  Can we

13  put up DX 104-97.

14  Q    So I just showed you a Form 3 filed in December of 2013,

15  correct, Mr. Richardson?

16  A    Yes.

17  Q    Okay.  One year prior -- let me show you what we are

18  putting up on the board.

19             One year prior there is a Form 8-K, from DX 104-97.

20  This was filed in December of 2012, correct?

21             Are you aware of this filing?

22  A    This is the one on the screen, counsel?

23  Q    Yes.  Are you familiar with this?

24  A    Again, I'm not familiar with the detail of it at this

25  point, but I know what it is, yes.  It is the 8-K submission.

*MICHELE NARDONE, CSR -- Official Court Reporter*

KOCHER – RECROSS – BRODSKY                    2608
Richardson – Recross/Brodsky

1   Q    You know it was filed in December of 2012?

2   A    2012, yes.

3   Q    You received a copy of it.

4          It's the first public filing relating to Retrophin

5   as a public company?

6   A    I believe I received a copy.  I'm not sure, but I believe

7   I would have done.

8   Q    You were on the board of directors of Retrophin when

9   Retrophin went public.

10         Wouldn't you have received a public copy?

11  A    I would have thought so, yes.

12  Q    Of course.  There is a description of your background in

13  there, right?

14  A    In this one, yes.

15  Q    Let me show you page 68 of 81, and I will give you the

16  hard copy.

17         If we can go to page 68 of 81 on this December 2012

18  filing, does it not have, if we scroll, Mr. Richardson's name,

19  your stock ownership of 98,055 shares?

20  A    Yes.

21  Q    A one percent ownership of the company?

22  A    Yes.

23  Q    So by December 18, 2012 you knew your stock ownership

24  publicly filed was, according to you, inaccurate?

25  A    No.  At this point, of course, we weren't publicly

KOCHER – RECROSS – BRODSKY                    2609
Richardson – Recross/Brodsky

1   trading.  So I didn't have the stock price to see the

2   valuation.

3   Q    When you went public on December 12, 2012 through a

4   reverse merger you became a public company, correct?

5   A    Yes.

6   Q    And you went public, your stock was available for sale,

7   correct?

8   A    Yes.

9   Q    So December 18, when this is filed with the SEC, for all

10  the world to see, your stock ownership, according to you, was

11  inaccurate?

12  A    I don't recall at what point I did the multiply to see

13  what the stock value was.  It wasn't immediately there.

14  Q    But you testified a few minutes ago that you first

15  learned about it from a Form S-1, correct?

16  A    Yes.

17  Q    Isn't your recollection mistaken?

18  A    No.  I could have at this point done the calculation, but

19  I don't know at what point through the year end -- I don't

20  know at what point I did the calculation.

21  Q    You could have seen this?

22  A    No.  I couldn't have done the calculation of what this

23  equated to in terms of dollars.

24  Q    It says --

25  A    It's in terms of shares.

KOCHER - RECROSS - BRODSKY                    2610
Richardson - Recross/Brodsky

1    Q    It's telling you it's a one percent ownership with 99,000

2    shares -- 98,000.

3    A    Yes.

4    Q    There is confusion about the amount of shares there?

5    A    No, no; but, again, in my discussions with Mr. Shkreli,

6    he has taken me the five percent at some point.  It wasn't

7    immediate at this point.

8    Q    Your testimony now is that after going public at some

9    point, but not right away, you were going to get the five-plus

10   percent; is that what you are saying now?

11   A    No, the original discussion with Mr. Shkreli, back to the

12   capitalization table.

13   Q    The original discussion about the cap table was in

14   November of 2012, sir.

15   A    Yes.  This is December.  So in November he said I will

16   get you the five percent over time.

17   Q    Now it's over time?

18   A    Yes.

19   Q    So all the e-mails that you had in January, March, and

20   continuously in 2013, was you asking for the shares over time,

21   not for anything right away?

22   A    Two separate pieces, remember, a piece coming from the

23   company and then the second piece, which is the true-ups,

24   which Mr. Shkreli asked me during March to go to the back of

25   the line.

KOCHER – RECROSS – BRODSKY                    2611
Richardson – Recross/Brodsky

1    Q    I will move on, Mr. Richardson.

2              Let's put up Government Exhibit 305.  That was just

3    shown to you this morning.

4              MR. BRODSKY:  Can we have that?  We don't have it?

5    Would the government put up Government Exhibit 305?  Do you

6    have an extra copy of 305?

7              MS. SMITH:  Yes.

8              MR. BRODSKY:  Thank you.  Now, well, we will do it

9    without the ELMO.  Here we go.  My kids tell me I'm

10   electronically incapable.

11   BY MR. BRODSKY:

12   Q    This is the document you were shown where March 12, 2013,

13   Mr. Keun Dong Kim sends you an e-mail saying this is your S-1,

14   right, Form S-1 going to be filed?

15   A    Yes.

16   Q    Then you respond and say, Keun Kim, the details of my

17   share ownership are not accurate.  Mark S. is looking into it.

18   I assume that needs to be corrected, right?

19   A    Yes.

20   Q    Did you think of copying and pasting all the details that

21   you wrote out in the e-mail to Mr. Shkreli and putting it in

22   this e-mail?

23   A    Not at this point I didn't.

24   Q    Did you provide anywhere in this document an explanation

25   of the details relating to your reconciliation?

1   A    Well, I believe there were two tracks of communication

2   here, the tracks I had with Mr. Shkreli and the tracks that we

3   are looking at here with associates, initially associates at

4   Katten.

5   Q    Let's look at the track with the Katten people,

6   Mr. Greebel, and Keun Kim.  That's the track I want to talk

7   about right now.

8   A    Right.

9   Q    Where in here does it say anything with respect to your

10  outline of the reconciliation that you gave to Mr. Shkreli?

11  A    I didn't attach anything to this gentleman here until --

12  I didn't know this associate, Mr. Keun Kim.

13  Q    I understand, but in the e-mail at the top, where it says

14  8:31 p.m., Martin has owed me for some time now a clear

15  reconciliation of my investment.  The numbers in your filing

16  significantly understates my share ownership.

17        Mr. Greebel is on the e-mail.  Why didn't you just

18  copy -- you didn't copy and paste your detailed reconciliation

19  and your arrangement with Mr. Shkreli into this e-mail, right?

20  A    No, because this is where the second stream is important,

21  because Mr. Shkreli has said I'm discussing this with

22  Mr. Greebel.

23  Q    You relied on Mr. Shkreli to pass along the information

24  about your arrangement to Mr. Greebel, correct?

25  A    Certainly at this point in the communication, yes.

1  Q    Correct.  And it doesn't say anything here about MSMB,

2  right, no mention?

3  A    Not in this communication.

4  Q    It doesn't say anything in this communication that the

5  government showed you, Government Exhibit 305 in evidence,

6  about your November 2012 founder's cap table, right?

7  A    No, there is no reference to that here.

8  Q    There is no reference to the amount of shares that you

9  are expecting to get from Mr. Shkreli and the company,

10  correct?

11           MS. SMITH:  Your Honor, asked and answered.

12           THE COURT:  Okay.  Move on, Mr. Brodsky.

13           MR. BRODSKY:  Sure.  I think the point has been

14  made.  Thank you, Your Honor.

15  Q    Let me ask you with respect to Defense Exhibit 104-252.

16           MR. BRODSKY:  If we can put that on the board.  I

17  can't shut it down.  Are you able to put it on without

18  shutting it down?

19           THE CLERK:  Are you --

20           THE COURT:  Which one are you using?

21           MR. BRODSKY:  I'm just going to use the board now.

22           THE COURT:  The computer?  Yes, okay.  We just got

23  confused.

24           MR. BRODSKY:  Okay.  I thought it was me.

25

KOCHER – RECROSS – BRODSKY                2614
Richardson – Recross/Brodsky

1    BY MR. BRODSKY:

2    Q    In this e-mail exchange -- let's go back to it -- you

3    were asked some questions on redirect with respect to this

4    e-mail exchange.  I just want to ask you a few questions.

5              When Mr. -- when Mr. Greebel says, Martin is going

6    to give you an option to buy 125,000 shares from him, do you

7    see that?

8    A    Yes.

9    Q    That's a purchase, correct?

10   A    Yes.

11   Q    That would require a purchase agreement, right?

12   A    Yes.

13   Q    And the idea there would be that Mr. Shkreli would give

14   you a purchase agreement where you would be buying at some

15   price, right?

16   A    Yes.

17   Q    125,000 shares?

18   A    Yes.

19   Q    And that would require board approval, of course,

20   correct?

21             MS. SMITH:  Objection, Your Honor.

22             THE COURT:  Sustained.

23   Q    Put aside whether it would require board approval.

24             It would require a purchase agreement, correct?

25   A    Between myself and Mr. Shkreli.

1  Q    Was there a purchase agreement at this time in March 18,

2  2013?

3  A    At this time it wasn't.  It was asked for later.

4  Q    Understood, but at this time in your track of

5  communications, which just involved Mr. Shkreli -- remember

6  the two tracks just with Mr. Shkreli and then with Mr. Greebel

7  and Keun Kim at Katten?

8  A    Yes.

9  Q    I'm talking about the track with Mr. Shkreli.

10         You weren't talking about a purchase agreement with

11 Mr. Shkreli, correct; you were talking about getting

12 approximately 100 to 125,000 shares gifted to you from

13 Mr. Shkreli and Marek Biestek, right?

14 A    I don't recall.  The phraseology was never captured as to

15 how the transfer would be handled.

16 Q    It certainly was never referred to as a purchase, right?

17 A    I don't remember the language, the exact language.  It

18 moved a number of times from Mr. Shkreli.

19         MR. BRODSKY:  Well, let's put up Government

20 Exhibit 236.

21 Q    Let's scroll down to your reconciliation, March 14, 2013,

22 10:57 a.m.  Scroll down a little bit more.

23         That's your reconciliation, right?

24 A    Yes, it is.

25 Q    I will give you my copy.

KOCHER - RECROSS - BRODSKY                    2616
Richardson - Recross/Brodsky

1    A    No, I can see it on here.

2    Q    I'm going to give you the whole copy.

3         Point to any language in here that says purchase.

4    Anything that refers to purchase, references purchase, alludes

5    to a purchase.

6    A    No, but again, remember, the communication had said I

7    need to speak to Mr. Greebel about how this can be handled.

8    Q    Understood.

9    A    So I'm understanding that that's going to be resolved and

10   come back to me.

11   Q    Understood.  Let me move on, Mr. Richardson.

12        We were looking at -- the government asked you a few

13   questions on the bylaws, correct?

14   A    Yes.

15   Q    And then they asked you, in sum and substance, whether or

16   not in December of 2013 when there was a board call relating

17   to indemnification, do you remember those questions and giving

18   the answers?

19   A    Yes.

20   Q    Now, if the MSMB investors who had converted their shares

21   into Retrophin stock had settled their cases -- withdrawn.

22        You learned about settlements, correct?

23        MS. SMITH:  Objection, Your Honor.

24        THE COURT:  Sustained.  Rephrase.

25        MR. BRODSKY:  Got it.

KOCHER - RECROSS - BRODSKY                    2617
Richardson - Recross/Brodsky

1   Q    By -- in July 2nd, 2000 -- July 3rd, 2013, in the summary

2   cash flow, with your arrow drawn to it, it said MSMB

3   settlements, right?

4   A    Yes.  The heading was MSMB settlements in July.  I didn't

5   understand settlement agreements until the auditor's letter of

6   September.

7            MS. SMITH:  I'm objecting to beyond the scope of

8   redirect.

9            THE COURT:  All right.

10            MR. BRODSKY:  This is squarely within the scope,

11   Your Honor.  I'm leading up to December of 2013 and asking

12   him.

13            THE COURT:  Move on to December of 2013, please.

14            MR. BRODSKY:  Yes, but I need to lay the foundation

15   for it first.  They were asked whether Mr. Greebel said

16   anything about settlements.

17            THE COURT:  At the board meeting in December 2013?

18            MR. BRODSKY:  In December 2013.  So I have to lay

19   the foundation.

20            THE COURT:  All right.  Let's go.

21   BY MR. BRODSKY:

22   Q    Mr. Richardson, you learned there were settlements from

23   Marcum at least by September 9, 2013, right?

24   A    September 9, yes, that board meeting.

25   Q    These are settlements that have taken place already,

KOCHER - RECROSS - BRODSKY                    2618
Richardson - Recross/Brodsky

1    correct?

2    A    Yes, already booked.

3    Q    And your understanding of settlements is that the parties

4    have resolved their potential dispute, correct?

5    A    Yeah.

6    Q    That's the concept of a settlement?

7    A    Yes.

8            MS. SMITH:  Objection, Your Honor.

9            THE COURT:  So, rephrase.

10   Q    The concept of a settlement is where parties in a dispute

11   settle their dispute, correct?

12   A    Yes, that's the intent.

13   Q    When there is a settlement there is no longer a dispute

14   between them, right?

15   A    That would be the -- that would certainly be the

16   expectation.

17   Q    So in December of 2013, during a board meeting about

18   indemnification, you certainly didn't expect Mr. Greebel or

19   anyone from Katten to raise with you matters that were

20   resolved already, correct?

21   A    If there were no open issues, no.

22   Q    Now, you were asked about Marc Panoff and you were asked

23   about minutes.  You were also asked about a discrepancy in

24   your recollection relating to minutes.

25            Do you remember that?

KOCHER - RECROSS - BRODSKY                    2619
Richardson - Recross/Brodsky

1    A    Yes.

2    Q    With respect to September 2014?

3    A    Yes.

4    Q    Is it fair to say, based upon your direct examination and

5    cross-examination, that your recollection of what took place

6    at the board meetings is not perfect?

7    A    I can't claim it's perfect.

8    Q    In fact, you don't recall certain things that did happen,

9    correct?

10            MS. SMITH:  Objection, Your Honor.

11            THE COURT:  Sustained.  Rephrase.

12   Q    Do you recall during cross-examination being refreshed

13   about things that took place during board meetings that you

14   had forgotten?

15            MS. SMITH:  Objection, Your Honor.

16            THE COURT:  Sustained.

17   Q    Do you recall in the last few days remembering things

18   that you had forgotten relating to board meetings?

19   A    There was certainly one or two instances.

20   Q    Now, you testified that you believed Mr. Panoff joined in

21   May 2015.

22   A    '13.

23   Q    2013.  Is your recollection a little mistaken?  Could it

24   have been earlier in May and not late May 2013?

25   A    I don't remember the exact date that he did, but I know

KOCHER - RECROSS - BRODSKY                    2620
Richardson - Recross/Brodsky

1    it was in May.  The official announcement was sometime in May.

2    Q    You testified about acting secretary, right, do you

3    remember?

4    A    Yes, Mr. Greebel.

5    Q    You saw the Form 14, the proxy statement, that went out

6    to all stockholders of the company prior to the stockholder

7    meeting in May of 2014?

8    A    Yes.

9    Q    We talked about it, we saw it on the board, correct?

10   A    Yes.

11   Q    Was Mr. Greebel mentioned anywhere in there as acting

12   secretary?

13   A    No, because he was not an employee.

14   Q    Because he was not an officer, correct?

15   A    Not an officer.

16   Q    And he was not a director?

17   A    No, he wasn't a director.

18   Q    You were asked some questions about Tim Pierotti on

19   redirect, redirect examination; and I just want to talk about

20   that.

21          You, given your close friendship with Mr. Shkreli,

22   you learned about the dispute between Mr. Shkreli and

23   Mr. Pierotti by late 2012, correct?

24          MS. SMITH:  Objection, Your Honor.

25          THE COURT:  Please rephrase.

KOCHER - RECROSS - BRODSKY                    2621
Richardson - Recross/Brodsky

1   Q     You learned about a dispute between Mr. Shkreli and

2   Mr. Pierotti, correct?

3   A     I learned about a dispute, but the details didn't come

4   out until 2014.

5   Q     You had multiple dinners with Mr. Shkreli between late

6   2012 through 2013, right?

7   A     Yes.

8   Q     And, in fact, in December of 2013 doesn't Mr. Shkreli

9   e-mail you and talk about how Mr. Pierotti was saying bad

10  things to a newspaper reporter about him?

11  A     I do remember, yeah, there was certainly a dispute going

12  on.  I knew earlier, but we didn't get the details until the

13  board meeting in 2014.

14  Q     But you had multiple dinners, correct, with Mr. Shkreli

15  from late 2012 through late 2013, right?

16  A     Yes.

17  Q     And you saw him, he trusted you, correct?

18  A     Yes.

19  Q     And you trusted him, right?

20  A     Yes.

21  Q     And isn't it a fact that he discussed with you his

22  dispute with Mr. Pierotti during those dinners?

23  A     I certainly don't recall a detailed discussion.  I

24  remember him referencing he was in dispute on some issues, but

25  he never shared the details until 2014.

KOCHER - RECROSS - BRODSKY                     2622
Richardson - Recross/Brodsky

1    Q    Did you ever get a copy of the complaint that Retrophin

2    filed -- Retrophin, not Mr. Shkreli -- that Retrophin filed

3    against Mr. Pierotti in 2013?

4    A    I only remember the detail coming when Mr. Greebel gave

5    us litigation updates.  I don't remember it before that.

6    Q    Let me see if I can refresh your recollection.  Let me

7    show you Defense Exhibit 104-217 for identification.

8              If you would take a moment to look at that and see

9    if it refreshes your recollection of a complaint that

10   Retrophin filed against Mr. Pierotti in 2013.

11   A    No, I don't recall seeing this document.

12   Q    Did you know in 2013 that Retrophin filed a public

13   complaint in New York Supreme Court of the State of New York,

14   County of New York, against Mr. Pierotti?

15   A    I don't recall it being flagged in any of our board

16   updates in '13.

17   Q    And you understood that complaints filed in the Supreme

18   Court of the State of New York are public, correct?

19             MS. SMITH:  Objection, Your Honor.  Beyond the

20   scope.

21             THE COURT:  Sustained.

22   Q    Now, can you take a look at the first paragraph and read

23   it silently to yourself.

24             MS. SMITH:  Objection, Your Honor.

25             THE COURT:  Sir, the complaint is beyond the scope

KOCHER - RECROSS - BRODSKY                    2623
Richardson - Recross/Brodsky

 1   of redirect.

 2           MS. SMITH:  He says he doesn't remember it.

 3           THE COURT:  What has he stated he doesn't remember

 4   in order to allow you to refresh?

 5           MR. BRODSKY:  He doesn't remember updates in 2013

 6   with respect to the complaint.  So I'm showing him the

 7   complaint, to try to refresh his recollection.

 8           MS. SMITH:  Asked and answered, Your Honor.

 9           MR. BRODSKY:  I can show a witness any document to

10   refresh their recollection.

11           THE COURT:  Does this refresh your recollection

12   about Mr. Brodsky's question regarding the dispute or a

13   dispute with Mr. Pierotti?

14           THE WITNESS:  No, judge.  I don't believe I ever

15   received or saw this document.

16   BY MR. BRODSKY:

17   Q    Even though, Mr. Richardson, you haven't seen it or you

18   haven't seen it before, I would like you to read silently to

19   yourself -- it's not in evidence; it's just to refresh your

20   recollection -- I would like you to read the first paragraph

21   to yourself.  You can put it down now.

22           Does it refresh your recollection, Mr. Richardson,

23   that you actually received an update at a board meeting in

24   2014?

25           MS. SMITH:  Objection, Your Honor.  He already said

1    that he received an update.

2              THE COURT:  Sustained.  The dates, I don't know if

3    you are mistaken about dates.

4              MR. BRODSKY:  Oh, I apologize.  I will ask about

5    2013 and then I will ask about 2014.

6              THE COURT:  So ask the date that you really mean.

7              MR. BRODSKY:  I won't ask about 2014, but I will now

8    drop to 2013.

9    Q    2013, does this refresh your recollection, sir, that in

10   connection with a dispute with Mr. Pierotti, Mr. Shkreli

11   shared with you information about the nature of the dispute?

12   A    No, I do not recall this detail until Mr. Greebel's

13   update in 2014.

14   Q    And Mr. Greebel's update, didn't the update from

15   Mr. Greebel -- and Mr. Greebel was there with a partner from

16   Katten, a colleague, correct?

17   A    Yes, in May of 2014, if I recall.

18   Q    Can I ask you if it refreshes your recollection to look

19   at the signature page of the people who filed this complaint,

20   in DX 104-217, page 19 of the complaint.  The Bates number is

21   Pierotti 191.

22              Do you see the names there?

23   A    Yes.

24   Q    And just read the names silently to yourself.  Okay.

25   A    Yes.

1   Q     Does it refresh your recollection that the colleague who

2   was with Mr. Greebel at the board meeting in 2014 was Michael

3   Gordon?

4              MS. SMITH:  Objection, Your Honor.

5              THE COURT:  Overruled.  Does it refresh your

6   recollection?

7              THE WITNESS:  So I'm just confused.  This says

8   Mr. -- oh, I see here.  There are two names here.  I just saw

9   Mr. Cotton.  No, it doesn't refresh the name.  I know there

10  was another partner or associate with Mr. Greebel.  I don't

11  remember the name.

12  Q     Okay.  And you could put down the complaint,

13  Mr. Richardson.

14             So you did come to learn that two litigation

15  partners at Katten, Howard Cotton and Michael Gordon, not

16  Mr. Greebel, were handling the litigation against

17  Mr. Pierotti, correct?

18  A     Mr. Greebel had referenced that, but I think most updates

19  came only from Mr. Greebel in the May meeting in the Katten

20  offices, where this other colleague was with him.

21             THE COURT:  May of what year?

22             THE WITNESS:  May of 2014, judge.

23  Q     During that May 2014, did you have an understanding that

24  the colleague who was sitting next to Mr. Greebel during that

25  board meeting was the litigation partner at Katten who was

1    handling the litigation?

2              MS. SMITH:  Objection, Your Honor.  It's beyond the

3    scope.

4              THE COURT:  All right.

5              MR. BRODSKY:  This witness --

6              THE COURT:  I will allow the answer, and then we are

7    going to move on because we are touching on matters that

8    weren't touched on in redirect.  This is the last question on

9    the subject.

10   A    Yes.  I did know that there was a litigation partner

11   working with him.  I didn't know the scope of their respective

12   work.

13   Q    And during that meeting, because this did come out during

14   redirect -- redirect, you made some statements about what

15   information you received at that board meeting, right?

16   Weren't you asked about what information you received at that

17   board meeting during redirect about Mr. Pierotti?

18   A    About Mr. Pierotti, yes, yes.

19   Q    Yes.  All right.  I want to ask you about that.

20             Might your recollection be mistaken about what

21   information Mr. Greebel updated you relating to the litigation

22   against Mr. Pierotti?

23             MS. SMITH:  Objection, Your Honor.

24             THE COURT:  Sustained.

25   Q    Isn't it a fact that Mr. Greebel, sitting next to another

KOCHER - RECROSS - BRODSKY                2627
Richardson - Recross/Brodsky

1   partner at Katten, provided you with an update that it wasn't

2   Martin Shkreli who had given shares to Mr. Pierotti, but

3   rather Mr. Pierotti had purchased shares at a discounted price

4   and then refused to go to Retrophin and work and help build

5   Retrophin?

6             MS. SMITH:  Objection, Your Honor.

7             THE COURT:  Sustained.

8   Q    Isn't it the case that Mr. Greebel informed the board in

9   May of 2014 that the Pierotti litigation was about

10  Mr. Pierotti having purchased shares in exchange for a

11  commitment to work for the company?

12  A    No, I do not remember the reference to purchase.

13  Q    And it's your testimony that the partner who was sitting

14  with Mr. Greebel didn't say anything during the board meeting,

15  correct?

16  A    No.  I believe he talked -- on this -- during the

17  litigation update Mr. Greebel spoke, the other colleague spoke

18  on some subjects, and then Mr. Shkreli spoke on some subjects

19  as well.

20  Q    Thank you.  Now, let's turn to, for a moment, to your

21  testimony that Mr. Greebel was the attorney for the company.

22  A    Counsel.

23  Q    Do you understand there were other partners at Katten who

24  did work for the company, right?

25  A    Yes.

1    Q    You understand, for example, that Michael Gordon --

2    withdrawn -- Michael Rosensaft represented -- well, withdrawn.

3              You understand that Howard Cotton represented

4    Retrophin in connection with litigation against Mr. Pierotti?

5              MS. SMITH:  Objection, Your Honor.

6              THE COURT:  You know what, maybe what we should do

7    at this point is you can rephrase your question.  We will give

8    the jurors a break.  I think they would like one now.

9              Please don't talk about the case.  When we resume

10   you can present your question.  Thank you.

11              (Jury exits.)

12              THE COURT:  All right.  Ten minutes.

13              (Recess.)

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON – CROSS – BRODSKY                2629

1          THE COURT:  All right, have a seat.

2          Is everybody ready to resume?

3          MR. BRODSKY:  Yes.

4          THE COURT:  All right, let's get Mr. Richardson in

5    and we'll get the jury.

6          (Whereupon, the witness resumes the stand.)

7          (Jury enters the courtroom.)

8          THE COURT:  All right.  Now, all the jurors are

9    back.  Thank you.

10          Mr. Brodsky, you can continue with your cross.

11          MR. BRODSKY:  Thank you, Your Honor.

12   CROSS-EXAMINATION (Continued)

13   BY MR. BRODSKY:

14   Q    Mr. Richardson, just briefly where we left off.  You knew

15   there were other partners in Katten working on legal matters

16   for Retrophin, correct?

17   A    Yes.

18   Q    And did you know some of those partners had seniority to

19   Mr. Greebel at Katten, the law firm?

20   A    I didn't know that with respect to the titles.

21   Q    You were asked some questions on redirect examination

22   about the settlements, correct?

23   A    Yes.

24   Q    You were asked questions about whether or not anybody

25   identified the parties to the settlements, right, or the

RICHARDSON - CROSS - BRODSKY                    2630

1    purpose of the settlements, correct?

2    A     Yes.

3    Q     You knew MSMB investors were seeking true-ups for their

4    Retrophin shares, right?

5    A     Yes, I did.

6    Q     You knew some of them were the ones who had reached

7    settlements with the company, correct?

8                 MS. SMITH:   Objection, Your Honor.

9                 THE COURT:   Sustained.

10   Q     You knew --

11                THE COURT:   Well, I'll overrule it.

12                You can answer it, if you know.

13   A     Sorry, can you reask the question, Counsel.

14                MR. BRODSKY:   Could you ask that question back,

15   Miss reporter.

16                (Whereupon, the record was read.)

17   BY MR. BRODSKY:

18   Q     You also knew that some of the investors who had settled

19   with Retrophin were these MSMB investors seeking true-ups for

20   their Retrophin shares, correct?

21   A     Yes.

22                THE COURT:   Overruled.   It's all right.

23                THE WITNESS:   I just couldn't quite hear the

24   objection.

25                MR. BRODSKY:   Would you now restate the question

RICHARDSON - CROSS - BRODSKY                   2631

1    that I just asked and then the answer.

2                (Whereupon, the record was read.)

3    A    Yes.

4    Q    And you shared with Mr. Aselage that MSMB investors were

5    seeking true-ups for their Retrophin shares, correct?

6    A    At some point I did, yes.

7    Q    And you shared that with Mr. Panoff, correct?

8    A    Yes, I did.

9    Q    And you believed the board understood this in 2013,

10   correct?

11   A    Yes.  At different points.  Mr. Panoff only joined

12   mid-'13.

13   Q    And you understood that -- a few questions with respect

14   to -- you were asked about Mr. Geller, Mr. Al Geller.

15   A    Mr. Al Geller, yes.

16   Q    Now, if we put up Defense Exhibit 104 -- I believe it's

17   either a defense exhibit or a Government exhibit that's in

18   evidence.

19                Is Defense Exhibit 104-42 in evidence?

20                Yes, Exhibit 245, if you can put that up.

21                (Exhibit published.)

22   Q    And you were shown the Geller consulting agreement.  Do

23   you remember being shown that exhibit on redirect?

24   A    Yes, it's one of the attachments.

25   Q    Okay, instead of scrolling through it, there was a

RICHARDSON – CROSS – BRODSKY                2632

1  provision in there that said the consulting agreement and

2  release, right, it was a title, Consulting Agreement and

3  Release.

4            Maybe, Mr. Carter, you can find it.

5            (Exhibit published.)

6  Q    Do you remember being shown this on your redirect

7  examination?

8  A    Yes, it was one of the attachments that I didn't have the

9  chance to peruse fully.

10 Q    You didn't have a chance to peruse fully before the board

11 meeting?

12 A    That's correct.

13 Q    I take it you had time after the board meeting to peruse

14 it?

15 A    No.  Because, again, Mr. Shkreli said he'd bring them

16 back to the board.  So I just put it in my file waiting for it

17 re-referenced.

18 Q    So when the board meeting ended, you decided not to look

19 at those materials again?

20 A    Yes.  If I had been told that they would be brought back

21 to us.

22 Q    And if we scroll -- well, that first page.  Thank you,

23 Mr. Carter.

24            It says under the description of services, the

25 consultant will serve as an adviser to the company and provide

RICHARDSON - CROSS - BRODSKY                    2633

1   consulting services on strategic and corporate governance

2   matters to the management the company.

3           A very general statement, correct, Mr. Richardson?

4   A    Yes.

5   Q    Common in your experience with respect to consulting

6   agreements at Retrophin, that the consulting agreement is a

7   very general language?

8           MS. SMITH:  Objection, Your Honor.

9           THE COURT:  Sustained.

10  Q    At Retrophin, you've seen other consulting agreements,

11  correct?

12          THE COURT:  Before this one?

13  Q    During 2013 -- between December 12, 2012 and

14  September 1st, 2014, you saw other consulting agreements at

15  Retrophin, correct?

16  A    I think one or two had been shared.  Believe one or two

17  had been shared.

18  Q    And they used general language with respect to the

19  description of services, correct?

20  A    I don't recall.  And as I said, I never read the detail

21  of this one, so, I can't give you a comparison, Counsel.

22  Q    Do you see there's nothing in there with respect -- in

23  this agreement, in this description of services, there's no

24  statement in there with respect to whether or not there was a

25  restriction on the amount of time or a minimum time

RICHARDSON - CROSS - BRODSKY                    2634

1    expectation within that --

2             MS. SMITH:  Objection, Your Honor.

3    Q    -- that description of services, correct?

4    A    Again, as I --

5             THE COURT:  Excuse me.  Wait.  Wait.

6             THE WITNESS:  I'm sorry.

7             THE COURT:  Are you asking about what knows now or

8    what he saw then?

9             MR. BRODSKY:  This document right now in evidence

10   whether or not this paragraph, description of services, makes

11   any reference to minimum time expectations or any reference to

12   restrictions about cost structures.

13   A    No, I do not see those references in the document as I

14   look at it now.

15   Q    Understood.

16            And if we can put up -- if we scroll to release

17   where it says, "release" and I believe that's going to be on

18   paragraph 9 of the agreement -- 10 of the agreement on page 4.

19            MR. BRODSKY:  If we can blow up where it says

20   "release".

21            (Exhibit published.)

22   Q    In perusing the document, Mr. Richardson, prior to the

23   board meeting, did you notice in paragraph 10, the release,

24   included in a release that unconditionally release, acquits

25   and forever discharge Martin Shkreli, the company MSMB Capital

RICHARDSON - CROSS - BRODSKY                    2635

1   Management, LLP, a Delaware limited partnership, MSMB Capital

2   Management, LLC, a Delaware limited liability company, MSMB

3   Healthcare, LP, a Delaware limited partnership, MSMB

4   Healthcare Investors, LLC, a Delaware limited liability

5   company, MSMB Capital Management, LLC; and each of their

6   respective officers, directors, shareholders, partners,

7   members, managers, et cetera.

8   A    No, I did not see any of that through my quick perusal.

9   Q    You agree this release as proposed here would cover you,

10  correct?

11              MS. SMITH:  Objection, Your Honor.

12              THE COURT:  I'll overrule the objection.

13  A    Reading it for the first time here, Counsel, I just have

14  to reread it to discharges the company...

15              (Whereupon, the witness is reviewing the document.)

16              I don't see Retrophin listed as a company, which

17  would cover me as board member.

18  Q    Okay.  So it says "the company," correct?

19  A    It says "the company, MSMB Capital Management."

20  Q    You don't believe that's referring to the company,

21  Retrophin?

22  A    No, I -- I read it as the company, MSMB Capital

23  Management.

24              MR. BRODSKY:  Let's scroll to the top of the page,

25  first paragraph of this document.  Yes.  Where it says "this

1  agreement".  Yes, the very, very top, the agreement.

2  Q    Does it not define the company as Retrophin, Inc., a

3  Delaware corporation?

4  A    It does in the opening.

5  Q    And then if you look at description of services, is there

6  not "consultant will serve as an adviser to the company" with

7  capital C?

8  A    Yes.

9  Q    And your understanding the reference to "company" is to

10 Retrophin?

11 A    Yes.  Certainly that's established at the top of the

12 agreement.

13 Q    All right.  And the release does release any of its -- of

14 all these entities, the respective officers, directors,

15 correct?

16 A    The paragraph you showed me earlier.

17 Q    Yes.

18 A    Yes, it does.  If indeed Retrophin is included in that

19 language.

20 Q    And if Retrophin is included in that language and you're

21 the director of Retrophin, fair to say the release would cover

22 you?

23 A    Yes, if that language did include Retrophin, it would

24 cover me as a director.

25          MR. BRODSKY:  Let's put up DX8281.  And if we can

RICHARDSON - CROSS - BRODSKY                    2637

1    blow up --

2    Q    This is the September 9th, 2013 board agenda with your

3    notes?

4    A    Yes.

5    Q    And number eight -- number nine, if we can just blow that

6    up.  It says "approve retaining Al Geller as consultant,"

7    correct?

8    A    Yes.

9    Q    And it references "min time, expectations, question

10   mark?"

11   A    Yes.

12   Q    Cost structures, correct?

13   A    Yes.

14   Q    Those are notes you took yourself before the board

15   meeting?

16   A    Yes, they are.

17   Q    And did you know that the signed consulting agreement and

18   release with Mr. Geller included language that, under

19   description of services, that said the consultant shall

20   perform the services as and when requested by the company, but

21   in no event shall the performance of such services account for

22   more than 20 percent of consultant's time?

23           MS. SMITH:  Objection, Your Honor.  It's beyond the

24   scope conducted on this.

25           THE COURT:  All right.  I'll sustain that objection.

```
                    RICHARDSON - CROSS - BRODSKY              2638
```

1   Q    Did you know that the Geller consulting agreement, the

2   draft that you saw on September 9th, was amended to account

3   for comments you made regarding costs -- minimum time,

4   expectations?

5            MS. SMITH:  Objection, Your Honor.

6            MR. BRODSKY:  This is cross-examination.

7            MS. SMITH:  Can we have a sidebar?

8            THE COURT:  Okay.

9            (Continued on the next page.)

10           (Sidebar conference.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                    2639

1          MS. SMITH:  Your Honor, the witness has very clearly

2     testified that those notes were notes that he wrote before the

3     board meeting, and that from his testimony, he doesn't

4     remember any discussion of the consulting agreement at the

5     board meeting.

6          So Mr. Brodsky has leaped from his comments that he

7     wrote on his own page to somehow that being incorporated into

8     a consulting agreement that was never discussed at the board

9     meeting, there's a logical break, and assuming that the final

10    draft is actually edited based on his comments, which the

11    testimony has established he never gave, he just wrote them

12    down as something he would raise if the discussion happened.

13         MR. BRODSKY:  I think it's clear from his testimony,

14    Your Honor, that he doesn't have a good recollection of many

15    of the events that took place at board meetings.

16         I think it's clear that his notes provide a

17    expectation that he would discuss minimum time expectations.

18    His lack of recollection does not preclude us from

19    demonstrating to the jury, through this and other documents,

20    that the language added to the Geller consulting agreement,

21    which is -- and this language was added, it was the result of

22    comments that Mr. Richardson made at a board meeting.

23         In fact, Your Honor, you will see contemporaneous

24    emails, shortly after the board meeting, in which Mr. Greebel

25    will say, to people like Mr. Geller, per the board, we have to

SIDEBAR CONFERENCE                              2640

1   change the agreement to include a minimum time.

2           MS. SMITH:  No, the email say "no more than

3   20 percent."

4           MR. BRODSKY:  Right.

5           MS. SMITH:  That is not a minimum time, that is a

6   maximum time.

7           MR. BRODSKY:  Well, we're now disputing and

8   quibbling over the comments made at the board meeting as

9   opposed to my -- I have a good faith basis to ask the question

10  whether he knows language was added to the consulting

11  agreement based on comments made at the board meeting.

12          MS. SMITH:  Comments generally, but not his

13  comments.  And he already said that he didn't -- that it

14  wasn't discussed at the board meeting.

15          He's just smooshing things together.  First of all,

16  this is way beyond the scope.

17          THE COURT:  But I thought that was the basis of your

18  objection.

19          MS. SMITH:  Well also, because there's no

20  evidentiary basis that he actually gave comments.  So this

21  question is now assuming that he gave comments and they were

22  incorporated.

23          THE COURT:  There is a gap between the witness'

24  testimony that he made those -- that issue number nine was

25  tabled and supposed to be brought up at some other time.  And

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                          2641

1    then there could have -- I don't know what happened after

2    that, but I think to show him a document and ask the jury

3    to --

4              MR. BRODSKY:  I'm not showing him this document,

5    Your Honor.

6              THE COURT:  You're showing him --

7              MR. BRODSKY:  No, I'm not, I'm asking him a

8    question.

9              THE COURT:  The draft as of September 10th, 2013

10   and --

11             MR. BRODSKY:  Yes, September 9th.

12             THE COURT:  So you're telling him that these

13   comments did exist in a September 2013 version?

14             MR. BRODSKY:  This is the note, September 9, 2013

15   meeting, did not have those comments on the board agenda, but

16   there was no mention in the description of services about a

17   time expectation.

18             THE COURT:  But what agreement are you showing

19   him --

20             MR. BRODSKY:  I'm not showing him.

21             THE COURT:  Well, are you talking about ultimately?

22             MR. BRODSKY:  The signed agreement.

23             THE COURT:  So what date is that?

24             MR. BRODSKY:  The signed agreement is an as of date

25   of September 20th, 2013, I believe.

SIDEBAR CONFERENCE                          2642

1           MS. SMITH:  And the witness has never seen the final

2    signed version.

3           MR. BRODSKY:  I'm not showing it to him.

4           THE COURT:  But you're asking him to comment on --

5    you're stating that the final agreement did contain this

6    language.

7           He doesn't know that personally, right?  He hasn't

8    said I know that, I saw it, I discussed it, it was something

9    that I knew was going to be -- it's a bit of an unfair

10   question because you're asking the witness to testify about

11   something he has no personal knowledge of and hasn't seen

12   before.

13          MR. BRODSKY:  All right, I'll ask a better question.

14          THE COURT:  Okay, okay.

15          MR. BRODSKY:  Thank you.

16          (End of sidebar conference.)

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

RICHARDSON - CROSS - BRODSKY                    2643

1              (In open court; Jury present.)

2     BY MR. BRODSKY:

3     Q    Mr. Richardson, with respect to min time expectation.

4              Do you see that?

5     A    Yes, I do.

6     Q    It was your desire to include a provision that the

7     performance of the services of the consultants constitute no

8     more than 20 percent of their time, correct?

9     A    No.

10    Q    And you don't have any recollection at the board meeting

11    of discussing -- you yourself, the minimum or maximum time

12    expectations of using a consultant?

13    A    No, I believe I had met with Mr. Shkreli a day or two

14    after this meeting and advised him of my position saying when

15    you bring these back to the board, these are the factors I'm

16    going to wanting to see.

17    Q    Understood.  And you have an understanding that

18    Mr. Shkreli then spoke to Mr. Greebel regarding the consulting

19    agreement?

20    A    No, I have no -- no knowledge of what then happened at

21    that point because I never saw the agreements again.

22    Q    You were shown 8983R in evidence.

23              MR. BRODSKY:  If we can put that up on the board.

24              (Exhibit published.)

25    Q    This was the employment agreement of Mr. Shkreli that you

RICHARDSON – CROSS – BRODSKY                    2644

1   were commenting on on November 25th, 2013, right?

2   A     Yes, Counsel.

3   Q     And in this particular instance it was Mr. Greebel who

4   circulated the draft employment agreement for the second --

5   this was the second time you were seeing the draft employment

6   agreement, correct?

7   A     Yes.  Once at the board and then it was issued a second

8   time, correct.

9   Q     And were you asked on redirect where you got the draft

10  employment agreement from, correct?  In connection with this

11  email?

12  A     Yes.

13  Q     On November 6th, you got the draft employment agreement

14  from Mr. Panoff circulating the board materials prior to the

15  November 8th board meeting.

16  A     Yes, the first time it was part of a package from

17  Mr. Panoff.

18  Q     Understood.

19            And one of the provisions -- is it fair to say that

20  when you were focused on political commentary and activities,

21  you would have been focused on whether or not somebody could

22  be terminated for extensive political commentary and

23  activities outside the scope of their responsibilities as a

24  board member?

25  A     No, not necessarily on the termination.  But just on

RICHARDSON - CROSS - BRODSKY                     2645

1    their behavior.

2    Q    On their behavior in general?

3    A    Yes.

4    Q    And political commentaries you said could be a separate

5    provision, but is it fair to say that it could also be

6    incorporated in other provisions, correct?

7    A    It could be incorporated elsewhere.  But I was starting

8    to see it as a standalone heading.

9    Q    Understood.  And you were asked whether or not

10   Mr. Greebel highlighted things to you.

11        Do you remember that question whether he highlighted

12   things to you in the agreement?

13   A    Yes.

14   Q    Okay.  Where in your -- did you highlight for Mr. Greebel

15   or any of the board members in this email that you only

16   skimmed the document?

17   A    No, I didn't.

18   Q    One final question, just one question.  You were asked

19   about the SEC investigation.  This it will be my last

20   question, Mr. Richardson, I promise.

21        When you went to the SEC interview in March 26th,

22   2014, it is the SEC staff itself, correct, who told you the

23   scope of their review did not include Retrophin, right?

24   A    Yes.  In response to one of my final questions.

25        MR. BRODSKY:  No further questions.

RICHARDSON - CROSS - BRODSKY                    2646

1           Thank you, sir.

2           MS. SMITH:  I have no more questions.

3           THE COURT:  All right, Mr. Richardson, you're

4    excused.  Have a nice day.

5           (Whereupon, the witness was excused.)

6           MR. KESSLER:  Next witness?

7           THE COURT:  We're ready.

8           MR. KESSLER:  The Government calls Richard Kocher.

9           THE COURT:  Good afternoon.

10          Please raise your right hand.

11          (Witness takes the witness stand.)

12   RICHARD KOCHER, called as a witness, having been first duly

13   sworn/affirmed, was examined and testified as follows:

14          THE WITNESS:  Yes, I do.

15          THE COURTROOM DEPUTY:  Please state and spell your

16   full name, please, for the record.

17          MR. KESSLER:  My name is Richard Kocher.

18          THE COURT:  Please spell it.

19          MR. KESSLER:  It's K-O-C-H-E-R.

20          THE COURT:  All right.  Just before you start, I

21   think that water there is for you.

22          THE WITNESS:  Yes.  Okay.  Thank you.

23          THE COURT:  You may go.

24          MR. KESSLER:  Thank you.

25   DIRECT EXAMINATION

KOCHER – DIRECT – KESSLER                    2647

1    BY MR. BRODSKY:

2    Q    Good afternoon, Mr. Kocher.

3    A    Hi.

4    Q    Hi.

5         Did you invest in a hedge found called MSMB

6    Healthcare, LP?

7    A    Yes, I did.

8    Q    Did you ultimately sign a settlement agreement in

9    connection with your investment in that fund?

10   A    Yes, I did.

11   Q    Okay.  Where do you live?

12   A    I live in Hoboken, New Jersey.

13   Q    How long have you lived in Hoboken?

14   A    Well, recently about three years.  But before that, I had

15   lived in Hoboken from probably another 18 years, from, let's

16   say I guess it was 1978, when I moved there originally.

17   Q    Do you have any children?

18   A    Yes, I have one.

19   Q    And are you married?

20   A    Yes, I am.

21   Q    Can you briefly describe your educational background.

22   A    I graduated high school in 1969 from Saratoga High School

23   in California, and then I went to Stanford and I graduated

24   from Stanford in 1974.

25   Q    Can you describe your professional experiences after you

KOCHER – DIRECT – KESSLER                     2648

1   graduated?

2   A    I -- well, I traveled across the United States and ended

3   up with my wife, and we -- we -- well, I -- if you want -- as

4   far as professional goes, I started out just doing odds and

5   ends in Boston, and then I started actually buying property

6   and building in Hoboken.

7   Q    Where do you work now?

8   A    I work in Hoboken.  Mostly.

9   Q    What kind of work do you do?

10  A    I'm a contractor and builder.

11  Q    How do you finance your business operations?

12  A    Well, I do it through both personal loans and bank loans,

13  and obviously put my own money in as well.

14  Q    Is having a source of cash or liquidity important to your

15  business?

16  A    Yes, very important.

17  Q    You invest in real estate?

18  A    Yes.  Almost entirely.

19  Q    Do you make any other kind of investments?

20  A    Very rarely.

21  Q    What other kinds of investments do you make?

22  A    Well, for a period of time after I settled on -- where I

23  got money from a settlement on a property that I had owned, I

24  invested briefly with stocks.  And that was with Smith Barney.

25  And then subsequent to that, I invested with MSMB.

KOCHER – DIRECT – KESSLER                2649

1   Q    Is Smith Barney a welt management firm?

2   A    Yes.

3   Q    In late 2011, did a hedge fund called MSMB Healthcare, LP

4   come to your attention?

5   A    Yes.

6   Q    What was your understanding of MSMB Healthcare, LP?

7   A    Well, my understanding was that it was a hedge fund that

8   was -- a medical hedge fund that had great potential.

9   Q    What's a hedge fund?

10  A    A hedge fund basically owns some kind of stocks, bonds

11  and, you know, basically I'm not sure of the exact definition

12  of a "hedge fund."

13  Q    Some sort of investment fund that gets money from

14  investors and then makes investments?

15  A    That's correct.

16  Q    Who brought MSMB Healthcare, LP to your attention?

17  A    Kevin Mulleady.

18  Q    Who is Kevin Mulleady?

19  A    Well, Kevin Mulleady was actually a financial adviser for

20  me at Smith Barney originally and he was actually someone that

21  I had met through my son at an event that my son had hosted in

22  Hoboken.

23  Q    How did he bring MSMB Healthcare, LP to your attention?

24  A    Well, he -- he called me about it and told me that he was

25  now working for MSMB and that he felt like it was, you know,

KOCHER - DIRECT - KESSLER                    2650

1  that the hedge fund was going to take off basically and become

2  more valuable.

3  Q    Did you come to learn who was the manager of MSMB

4  Healthcare, LP?

5  A    Yes.

6  Q    Who was that?

7  A    Well aside from Kevin, it was Martin Shkreli.

8  Q    Did you understand the relationship between Martin

9  Shkreli and Kevin Mulleady with respect to that hedge fund?

10 A    Yes.  Kevin worked for Martin.

11 Q    Did you invest in MSMB Healthcare, LP in early 2012?

12 A    Yes, I did.

13 Q    Did you talk with Mr. Shkreli before you invested?

14 A    No, I did not.

15 Q    Did you talk with Kevin Mulleady before you invested?

16 A    Yes.

17 Q    Did you read a private placement memorandum for MSMB

18 Healthcare, LP before you invested?

19 A    I might have briefly glanced at it, but I don't really

20 remember specifically reading it in detail.

21 Q    Why did you decide to invest in MSMB Healthcare, LP?

22 A    I invested really on Kevin's recommendation.

23 Q    Did you have an understanding about whether the fund

24 would be liquid or illiquid?

25 A    It was supposed to be liquid.

KOCHER - DIRECT - KESSLER                    2651

1    Q    What does it mean for a fund to be liquid?

2    A    That if you want to take your money out, that they would

3    give -- give you your money back that you invested.  And in

4    this case, the original agreement I believe said you can get

5    your money back within a month.

6    Q    Was that important to you?

7    A    Yes.

8    Q    Why?

9    A    Well, because I had real estate investments that I was

10   actually actively seeking and I knew I was going to need money

11   to be able to close on those properties.

12   Q    Did you have an understanding of the kinds of investments

13   MSMB Healthcare, LP would make?

14   A    I did not really specifically.  I knew that they were in

15   the medical field.

16   Q    Did you have an understanding -- well, let me ask it this

17   way:

18          Do you understand what "diversification" means?

19   A    Well, I know what diversification means.  It means that

20   you're diversified into different companies.

21   Q    And based on your conversation with Kevin Mulleady before

22   you invested, did you understand whether MSMB Healthcare, LP

23   would be investing in a diversified set of investments?

24   A    Yes, I was -- that was my impression that it was going to

25   be diversified.

KOCHER - DIRECT - KESSLER                          2652

1    Q    Okay.  So when you made your original investment in MSMB

2    Healthcare, LP, did you sign something called a subscription

3    agreement?

4    A    Yes, I did.

5    Q    Okay.  If we can show the witness Government Exhibit 33.

6              And, Mr. Kocher, there should be a binder in front

7    of you with some documents.  The first tab should be

8    Government Exhibit 33.

9              Do you see that?

10   A    Yes, I do.

11   Q    All right.  If you look at the first page and then look

12   at the very last page.  Take a minute to do that.

13   A    Okay.

14   Q    Is this the subscription agreement that you signed for

15   your first investment in MSMB Healthcare, LP?

16   A    Yes.

17             MR. KESSLER:  I offer Government Exhibit 33.

18             MR. DUBIN:  No objection.

19             THE COURT:  We receive Government Exhibit 33.

20             (Government Exhibit 33, was received in evidence.)

21   BY MR. KESSLER:

22   Q    So, Mr. Kocher, we're looking at the first page of

23   Government Exhibit 33.

24             Do you see right in center it says MSMB Healthcare,

25   LP?

KOCHER - DIRECT - KESSLER                    2653

1    A     Yes.

2    Q     Is that the name of the fund in which you invested?

3    A     Yes, I believe so.

4    Q     And then below it says "subscription agreement"?

5    A     Yes.

6    Q     So if we go to the second page of the document now.  The

7    top, again, says MSMB Healthcare, LP.

8               And then below that there's a line that says "to

9    MSMB Healthcare Investors, LLC."

10   A     I don't follow where we are.

11   Q     So if you look at the second page of the document that's

12   behind Tab 1.

13   A     Okay.

14   Q     The top says MSMB Healthcare, LP and then subscription

15   agreement?

16   A     Yeah, I don't see that.  Maybe I'm already on that page.

17   Q     So there right below that there should be a "to", T-O,

18   colon?

19   A     Yes, okay.  I'm sorry.

20   Q     You see it's "to" meaning T-O, colon, MSMB Healthcare

21   Investors, LLC?

22   A     Yes.

23   Q     Did you understand that that was the general partner of

24   the fund?

25   A     No.

KOCHER - DIRECT - KESSLER                        2654

1   Q    All right.  If you look down at the next paragraph.

2   A    Yes.

3   Q    All right.  Do you see the first sentence there it says,

4   You have informed the undersigned, the subscriber, that MSMB

5   Healthcare, LP has been organized as a Delaware limited

6   partnership, the partnership of which MSMB Healthcare

7   Investors, LLC is the general partner, the partnership is to

8   be operated in accordance with the limited partnership

9   agreement of the partnership.  And then it continues.

10  A    Yes.

11  Q    So does that indicate to you that MSMB Healthcare

12  Investors, LLC is the managing -- the general partner of the

13  hedge fund?

14  A    Yes.

15  Q    Okay.  And then if we scroll down a little bit in the

16  document, on this page there's an item number one, it says

17  "subscription".

18  A    Uh-huh.

19  Q    Then you see there's a number "100,000" written in.

20  A    Yes.

21  Q    Was that the size of your investment?

22  A    Yes.

23  Q    Now, if we go to last page of the document, it ends Bates

24  stamp 11888.

25            Is that your signature on the top of the page?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

KOCHER – DIRECT – KESSLER                    2655

1    A    Yes.

2    Q    And then if you go one page backward, so the second to

3    the last page.

4    A    Uh-huh.

5    Q    There's item F for the sender of the wiring instructions

6    for MSMB Healthcare, LP?  And then there's a bank account.

7              Do you see that?

8    A    Yes.

9    Q    Was that the bank account for MSMB Healthcare, LP?

10   A    Yes.

11   Q    Is that where you wired your investment of $100,000?

12   A    I would assume, yes, that that's the case.  But I don't

13   remember specifically.

14   Q    Well, did you knowingly wire money to any bank account

15   not associated with MSMB Healthcare, LP?

16   A    No.  No.

17             What I'm saying is I assume that's where I sent it.

18   Q    All right.

19             MR. DUBIN:  I object to what he assumed.

20             THE COURT:  Sir, you can testify to the best of your

21   recollection.  What you know.  What you observed.  What you

22   heard.  What you read.  And don't assume anything.  So if it's

23   your best recollection, you may say so.  If you don't

24   remember, you should say so, and the questions will be asked.

25             THE WITNESS:  Okay.  I don't clearly remember if

1    that was the exact bank account.

2              MR. KESSLER:  Understood.

3    Q    When you made this investment, did you expect that the

4    money you invested would be used to pay expenses or for other

5    companies?

6    A    No.

7    Q    Did you authorize that any money you invested be used to

8    pay expenses for any other companies?

9    A    No.

10             MR. DUBIN:  Objection.

11             THE COURT:  Overruled.

12   Q    No?

13   A    No.

14   Q    All right.  Now, in May 2012, did you make a second

15   investment in MSMB Healthcare, LP?

16   A    Yes, I did.

17   Q    Why did you do that?

18   A    Kevin Mulleady called me and said that MSMB needed money

19   and that, you know, that they needed it that week.

20             And he didn't say specifically what it was for, but

21   he said that, you know, again, he felt like the company was

22   going to do very well and -- and I think originally I said I

23   wasn't going to be able to do it because I was very short on

24   cash, but then I figured out a way to do it so I did invest

25   another 100,000.  With the caveat that if I invested that

KOCHER – DIRECT – KESSLER                      2657

1   quickly, that they would also be able to return my money

2   quickly to me if I needed it.

3   Q    And in connection with your second investment, did you

4   sign another subscription agreement of some sort?

5   A    Yes.

6           MR. KESSLER:  Can we show the witness Government

7   Exhibit 34.

8   Q    Mr. Kocher, that should be Tab 2.

9           Do you see this document?

10  A    Yes.

11  Q    Is this the agreement you signed in connection with your

12  second investment in MSMB Healthcare, LP?

13  A    Yes.

14  Q    And, in fact, this document contains a signed agreement

15  on the first page, and then there's a second letter as part of

16  the same exhibit.

17          Do you see that?

18  A    Yes.

19  Q    Did you also sign this second letter?

20  A    Yes.

21  Q    Was that a side agreement in connection with your

22  investment?

23  A    Yes, it is.

24          MR. KESSLER:  I offer Government Exhibit 34.

25          MR. DUBIN:  No objection.

KOCHER – DIRECT – KESSLER                    2658

1    THE COURT:  We receive Government Exhibit 34.

2    (Government Exhibit 34, was received in evidence.)

3    (Exhibit published.)

4    Q    Mr. Kocher, we're looking at the first page of Government

5    Exhibit 34.  At the top there's "subscription for additional

6    interests."

7         Do you see that?  The very top of the page.

8    A    Is this -- sorry.

9    Q    So if you look behind Tab 2, it should be the very first

10   page.

11   A    Oh, the first page.  Okay, I'm sorry.

12   Q    It says "subscription for additional interests"?

13   A    Yes.

14   Q    All right.  And then there's a date, May 1st, 2012.

15        Is that approximately when you made the second

16   investment?

17   A    Yes.

18   Q    And then there's an address for MSMB Healthcare, LP.

19   A    Yes.

20   Q    And then if you look at the first paragraph of the

21   letter, it says, the undersigned hereby subscribes for an

22   additional investment in the amount of $100,000.

23        Is that the size of your second investment?

24   A    Is this on the next page?

25   Q    The first page.  It's on the first page.  You can also

1   follow along on the screen.

2   A     All right, yes, I see it.

3   Q     So your second investment was also for $100,000?

4   A     Yes, it was.

5   Q     You signed this letter?

6   A     Yes.

7   Q     Now, if we go to the second page of the document, ending

8   Bates stamp 378.

9          Is this the other letter you signed in connection

10  with your investment?

11  A     Yes.

12  Q     What was the purpose of this letter?

13  A     Well, the main purpose of this letter was to basically

14  have it spelled out that I would be able to get my money back

15  within a week's notice so that -- because I knew I was going

16  to be tight for money.

17  Q     All right.  If you look at the paragraph that has the

18  number two in front of it.  Sort of the middle of the page.

19  A     Yes.

20  Q     There's an item called liquidity?

21  A     Yes.

22  Q     It says, notwithstanding anything to the contrary set

23  forth in the memorandum, you will be permitted to redeem your

24  exempt interest as of the final business day of each calendar

25  week instead of the final business day of each calendar month.

1          Do you see that?

2     A    Yes.

3     Q    Is that the agreement about liquidity you just mentioned?

4     A    Yes.

5     Q    Did you also sign this agreement?

6     A    Yes.

7     Q    Now, if you look at the last page of this document, do

8     you see there's a signature area for Martin Shkreli, managing

9     member?

10    A    Yes, uh-huh.

11    Q    It's not signed, correct?

12    A    That's correct.

13    Q    Were these documents ultimately signed by Martin Shkreli?

14    A    I don't remember.

15    Q    All right.  So then let me show you, just for the

16    witness, Government Exhibit 34A.  It's the next tab.

17    A    Yes.

18    Q    Do you see that?

19    A    Uh-huh.

20    Q    If you flip through this, is this the same additional

21    subscription agreement and letter that we just looked at?

22    A    Yes.  Yes.

23    Q    All right.  And are these versions signed by Martin

24    Shkreli.

25    A    Yes.

KOCHER – DIRECT – KESSLER                2661

1          MR. KESSLER:  So I offer Government Exhibit 34A.

2          MR. DUBIN:  Just one moment, Your Honor.

3          I have no objection.

4          THE COURT:  All right, we will receive Government

5    Exhibit 34A.

6          (Government Exhibit 34A, was received in evidence.)

7          (Exhibit published.)

8    Q    If you take a look at the first page, this is the same

9    letter we were just looking at --

10   A    Yes.

11   Q    -- with the subscription for additional interest, except

12   Mr. Shkreli has signed at the bottom left; is that right?

13   A    Yes.

14   Q    Okay.  And if we go to the last page, this is the

15   signature page of the other letter we just looked at that

16   Mr. Shkreli has signed?

17   A    Yes.

18   Q    Is that correct?

19   A    Yes, that's correct.

20   Q    Okay.  All right.

21          So after you invested this second $100,000 for a

22   total of $200,000, did you receive periodic performance

23   updates about your investments?

24   A    I was supposed to.  But I did get a few updates, but I

25   don't remember the exact -- I think over a six- or seven-month

KOCHER - DIRECT - KESSLER                    2662

1    period, I might have gotten a couple of updates, but they were

2    at the very end.

3    Q    All right.  If I can ask you to take a look at Tabs 4, 5,

4    6 and 7 in your binder.

5    A    Uh-huh.

6    Q    Which corresponds with Government Exhibits 83-1, 83-2,

7    83-3, and 83-4.  Just ask you to confirm that these are the

8    performance statements that you did receive in connection with

9    your investment.

10            (Whereupon, the witness is reviewing documents.)

11   A    Yes.

12   Q    And did you receive each of these from either Mr. Shkreli

13   or from an account management company that was working with

14   MSMB Healthcare, LP?

15   A    Yes.

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

KOCHER - DIRECT - KESSLER                    2663

1          MR. KESSLER:  So I offer Government's Exhibit 83-1,

2    83-2, 83-3, and 83-4.

3          MR. DUBIN:  No objection.

4          THE COURT:  Exhibits 83-1, 83-2, 83-3 and 83-4 we

5    will receive.

6               (Government Exhibit 83-1, was received in evidence.)

7               (Government Exhibit 83-2, was received in evidence.)

8               (Government Exhibit 83-3, was received in evidence.)

9               (Government Exhibit 83-4, was received in evidence.)

10   BY MR. KESSLER:

11   Q    We're going to look at the first and the last, so behind

12   tab four in your binder is Government's Exhibit 83-1.  Do you

13   see that?

14   A    Yes.

15   Q    This is an April 17 e-mail from

16   InvestorRelations@NavConsulting.net to

17   Rich@KocherConstruction.com?

18   A    Uh-huh.

19   Q    An e-mail from the account management company to you?

20   A    Uh-huh.

21   Q    Is that right?

22   A    Yes.

23   Q    "Please see attached statement for the month of

24   February 2012 for your investment in MSMB Healthcare LP," do

25   you see that?

KOCHER – DIRECT – KESSLER                    2664

1   A    Yes.

2   Q    Go to the second page of the document, is this the

3   statement you received?

4   A    Yes.

5   Q    If we look a third of the way down the page, there is

6   something that says, beginning balance, then additions.  If

7   you read across three there is $100,000, do you see that?

8   A    Yes.

9   Q    That reflects your initial investment?

10  A    Yes.

11  Q    If you look down, most of the way to the bottom of the

12  page, there is something that says ending balance?

13  A    Yes.

14  Q    $98,000 and change?

15  A    Yes.

16  Q    Does this reflect the performance of your investment in

17  February of 2012?

18  A    Yes.

19  Q    If we scroll a little bit further down you see there a

20  break down of ending balance?

21  A    Yes.

22  Q    There is a description of a number of different ways in

23  which your money has been allocated?

24  A    Yes.

25  Q    One of the entries under investment in private affiliate

KOCHER – DIRECT – KESSLER                    2665

1   funds is Retrophin LLC, do you see that?

2   A    Yes.

3   Q    When you received this performance statement, which you

4   received in April 2012, did you have an understanding of what

5   Retrophin LLC was?

6   A    I'm not sure if I did at that time.

7   Q    Did you come to have an understanding of Retrophin LLC?

8   A    Yes.

9   Q    What was that?

10              MR. DUBIN:  Time frame.

11              THE COURT:  At the time of the statement.  Is that

12   what your question is targeted to?

13              MR. KESSLER:  He said he didn't have an

14   understanding at this time.

15   Q    When do you recall becoming aware of what Retrophin LLC

16   was?

17   A    Well, I heard that Retrophin was, and this is mostly I

18   think through Kevin Mulleady, it was a medical company that, I

19   don't remember the exact, what exactly what they did, but you

20   know, that they, that they were a company that was going to

21   become very successful.  But I didn't, you know, I didn't, I

22   didn't follow most of this stuff very carefully, or you know.

23   My whole orientation is towards construction, building and

24   development.  And so this is just something that I parked my

25   money into with the understanding that it was going to

KOCHER – DIRECT – KESSLER                    2666

1   increase in value.

2   Q    Sure.  So fair to say you didn't invest directly in

3   Retrophin LLC?

4   A    No.

5   Q    So this is the February 2012 performance statement.  If

6   you go to tab --

7            THE COURT:  And that was Government's Exhibit 83-1.

8   Q    If we fast forward in time to tab seven, Government's

9   Exhibit 83-4, do you see that?

10  A    Yes.

11  Q    So this is an e-mail in September, September 9, 2012,

12  from Martin Shkreli to you?

13  A    Yes.

14  Q    Copies Kevin Mulleady?

15  A    Yes.

16  Q    And he attaches the July 2012 investor statement?

17  A    Right.

18  Q    Text says, "Please see the attached statement for the

19  month of July 2012 for your investment in MSMB Healthcare"?

20  A    Yes.

21  Q    The second page there is a different account statement

22  reflecting the status of your investment in MSMB Healthcare;

23  is that fair?

24  A    Yes.

25  Q    This shows that as of July 31, 2012, your investment of

KOCHER – DIRECT – KESSLER                2667

1    $200,000 had become $231,000?

2    A     That's correct.

3    Q     Taking the investor statements –– strike that.

4          Taking the performance statements you received in

5    total, the four that are now in evidence, did you rely on

6    these statements?

7    A     Not very much.  I basically was still relying on what

8    Kevin Mulleady was saying.  And part of the thing was, was

9    that, you know, we didn't get monthly statements.  When we did

10   get the statements, they came late.  So I assumed, yes, this

11   was at that time the account value.  But you know, I relied on

12   it to a certain extent.  Let's put it that way.

13   Q     Did you believe they were false?

14   A     No.

15   Q     As of the time you received the performance statement in

16   September 2012, did you have any understanding of the

17   different investments the MSMB Healthcare LP fund had been

18   making?

19   A     No.

20   Q     As of this time had anyone told you that the MSMB

21   Healthcare LP fund was invested entirely in Retrophin LLC?

22   A     No.

23   Q     Had anyone told you whether MSMB Healthcare LP had made

24   any loans to any other companies as of the date you received

25   this e-mail?

KOCHER – DIRECT – KESSLER                    2668

1   A      No.

2   Q      Had you authorized any such loans?

3   A      No.

4   Q      Did there come a time after you received these

5   performance statements that you learned that the MSMB

6   Healthcare LP fund would be shutting down?

7   A      Well, I received a statement that basically said that

8   from Martin.

9   Q      Statement meaning an account statement or a letter?

10  A      A letter.

11  Q      If we can show the witness Government's Exhibit 104-1,

12  which is behind tab eight.  Take a minute to look at this,

13  Mr. Kocher.

14              Is this and e-mail from Martin Shkreli to an

15  unidentified group of recipients?

16  A      Yes.

17  Q      December 9, 2012?

18  A      Yes.

19  Q      Is that the same day that you received that performance

20  statement we just looked at?

21  A      Yes.

22  Q      Is this the e-mail you were referring to when you said

23  that you learned that that hedge fund would be shutting down

24  its operations?

25  A      Yes.

KOCHER – DIRECT – KESSLER                    2669

1          MR. KESSLER:  I offer 104-1.

2          MR. DUBIN:  No objection.

3          THE COURT:  We will receive Government 104-1.

4          (Government Exhibit 104-1, was received in

5     evidence.)

6     BY MR. KESSLER:

7     Q    If we can focus on the first paragraph.  Mr. Shkreli

8     writes, "I decided to wind down our hedge fund partnership

9     with the goal of completing the liquidation of the funds by

10    November, December 1st, 2012."  Do you see that?

11    A    Yes.

12    Q    Did you understand that Mr. Shkreli was writing to

13    investors in one fund or more than one fund?

14    A    I thought it was one fund.

15    Q    This letter here refers to partnerships and the funds

16    plural; is that right?

17    A    Yes.

18    Q    Mr. Shkreli writes, "As you know, MSMB has found

19    increasing opportunities in private equity," do you see that?

20    A    Yes.

21    Q    Next paragraph, "We have decided the best structure for

22    such an entity is a public company or private corporation.

23    Retrophin LLC, our MSMB founded this biotechnology operation,

24    will be that company.  Retrophin has made a lot of progress

25    since its inception in 2011.  Today the company has a full

KOCHER – DIRECT – KESSLER                    2670

1    pipeline and several marketed cash generating products."  Do

2    you see that?

3    A    Yes.

4    Q    Did you have any reason to doubt any of this when you

5    received the letter?

6    A    No.

7    Q    If we scroll down some more to the next paragraph.  So

8    Mr. Shkreli begins describing the progress in the fund and he

9    identifies a number of individuals so I'm going to walk

10   through those with you.

11          So first he writes, "We have tripled the size of our

12   fund if you have not been in the office lately."  Had you ever

13   been in the office?

14   A    No.

15   Q    "The most senior hire we have made is that of Tom

16   Fernandez who joins after ten-plus years with the Galleon

17   Group."  Had you ever met Mr. Fernandez?

18   A    No.

19   Q    If we move a couple of sentences forward, there is a

20   sentence, "Many of you have met Jackson Su, our current COO."

21   Do you see that?

22          COO is Chief Operating Officer?

23   A    Yes.

24   Q    Had you met Mr. Su at this point?

25   A    No.

1   Q    Mr. Shkreli goes on to describe Mr. Su's background, do

2   you see that?

3   A    Yes.

4   Q    About three lines up in this paragraph he writes, "Marek

5   Biestek, my co-founder and partner and I, round out MSMB's,

6   quote, "executive committee," unquote.  This four-person team

7   will manage MSMB's operations going forward.  And even though

8   we will not be running, quote, "outside money," unquote, we

9   will still have activities independent of Retrophin."  Do you

10  see that?

11  A    Yes.

12  Q    Did you have an understanding about whether there would

13  still be activities in the MSMB funds and then separate

14  activities in Retrophin at the point you got this letter?

15  A    No.

16  Q    You didn't have an understanding one way or the other?

17  A    No.

18  Q    Did you have any reason to doubt the statement in the

19  letter?

20         MR. DUBIN:  Objection, your Honor.

21         THE COURT:  Overruled.

22  A    No.  I didn't really, I didn't have any reason to doubt

23  it, no.

24  Q    So if we go to the next paragraph, "Another key hire at

25  MSMB is that of George Huang, Ph.D, who comes to us from the

KOCHER - DIRECT - KESSLER                    2672

1   recently shuttered, quote, "Tiger Cub," unquote, Sabertooth.

2   We have very high hopes for George.  He and a new hire,

3   Dr. Christopher James, an actual brain surgeon, joined the

4   biotechnology group with Andrew Vaino, who has been with MSMB

5   for sometime."  Do you see that?

6   A    Yes.

7   Q    Did you know any of those people at the point you

8   received the letter?

9   A    No.

10  Q    If we go to the next paragraph, "Tim Pierotti, who

11  manages MSMB's Consumer investing efforts is broadening his

12  roll and teaming up with Marek Biestek in looking at medical

13  technology assets."  Do you see that?

14          Did you know who of Mr. Pierotti was?

15  A    No.

16  Q    "Kevin Mulleady, our original CEO and investor relations

17  head, is doing well.  He expanded his role in the business

18  development, hospitality structure and continues to manage

19  client relationships."  Do you see that?

20  A    Yes.

21  Q    You knew Mr. Mulleady.

22  A    Yes.

23  Q    Beginning the next paragraph, Mr. Shkreli writes,

24  "Retrophin has hired Steve Aselage as CEO."  Do you see?

25  A    Yes.

1    Q    Did you know Mr. Aselage?

2    A    No.

3    Q    So let's go to the next page, a few more questions.  If

4    we look at first full paragraph, Mr. Shkreli says he can't

5    thank the partners enough, talks about redemption requests.

6    In the middle he writes, "Original MSMB investors, 2009, have

7    just about doubled their money net of fees."  Do you see that?

8    A    Yes.

9    Q    In the final paragraph, beginning, Mr. Shkreli writes, "A

10   few operational notes, investors will have their limited

11   partnership interests redeemed by the fund for cash.

12   Alternatively, investors may ask for redemption of Retrophin

13   shares or a combination of Retrophin shares and cash."  Do you

14   see that?

15   A    Yes.

16   Q    Did have you an understanding of what you could do with

17   the money that you believed was invested in MSMB Healthcare

18   LP?

19   A    Would you ask that question again?

20   Q    Sure.  Let me ask a better question.

21        When you received this letter and you read it, did

22   you believe you could withdraw your money in cash, your

23   investment in cash?

24   A    Yes.  He says it in this letter.

25   Q    Did you have any reason to doubt it?

KOCHER – DIRECT – KESSLER                                    2674

1    A      No.

2    Q      Did you have the option to redeem your investment for

3    Retrophin shares?

4    A      Yes.

5    Q      Did you make a decision to redeem your investment?

6    A      Yes.

7    Q      Did you choose to redeem your investment in cash or stock

8    or combination of cash and stock?

9    A      Well, I wanted cash to start with.

10   Q      I'll show you -- strike that.

11          Did you engage in a series of e-mail communications

12   with Martin Shkreli, and in some cases with an individual

13   named Evan Greebel, about your request to redeem your funds

14   from the MSMB Healthcare LP fund?

15   A      Yes.

16   Q      So let's show the witness Government's Exhibit 104-5-A,

17   which is behind tab nine in your binder, Mr. Kocher.  Take a

18   minute to look at this document.  Have you reviewed that?

19   A      Yes.

20   Q      Is this a series of e-mails between you, Martin Shkreli,

21   Evan Greebel and a few other individuals about your request to

22   redeem your investment in the MSMB Healthcare LP fund?

23   A      Yes.

24   Q      Did these e-mails take place between March 11 and

25   March 12, 2013?

KOCHER - DIRECT - KESSLER                    2675

1    A    Yes.

2              MR. KESSLER:  I offer 104-5-A.

3              MR. DUBIN:  No objection.

4              THE COURT:  We will receive 104-5-A.

5              (Government Exhibit 104-5-A, was received in

6    evidence.)

7    BY MR. KESSLER:

8    Q    Mr. Kocher, the way this is laid out is the earliest

9    e-mail is at the bottom; is that correct?

10   A    Yes.

11   Q    If we look at the bottom of the first page, there is an

12   email on March 11 from you to Martin Shkreli, do you see that?

13   A    Yes.

14   Q    You copy EvanGreebel@Kattenlaw.com?

15   A    Yes.

16   Q    At the point you sent this e-mail, did you have a

17   understanding who Evan Greebel was?

18   A    It was my understanding he was the attorney for Martin.

19   Q    For Martin Shkreli?

20   A    Yes.

21   Q    What was that understanding based on?

22   A    Well, for one, I know that Kevin told me that.  But it

23   was also, you know --

24             MR. DUBIN:  Objection, your Honor.  What he was --

25   move to strike that, your Honor.

1          THE COURT:  Well, we can address this if you want at

2     sidebar.

3          MR. KESSLER:  I'm happy to move on.

4          MR. DUBIN:  I would still move to strike.

5          THE COURT:  He wants to move to strike the response

6     of the witness regarding what Mr. Mulleady told him about

7     Mr. Greebel.  Are you objecting or do you consent?

8          MR. KESSLER:  It's not offered for the truth.  I'm

9     happy to have the answer stricken.

10         MR. DUBIN:  There is no exception regardless of --

11         THE COURT:  If you're not objecting to the strike,

12    we'll strike it.

13         MR. KESSLER:  Maybe what we should do is a quick

14    sidebar.

15         THE COURT:  We're going to have a quick sidebar,

16    ladies and gentlemen of the jury.

17              (Continued on the next page.)

18              (Sidebar conference.)

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                    2677

1        MR. KESSLER:  The witness put Evan Greebel on an

2   e-mail, I'm asking why he put Evan Greebel on an e-mail.  I'm

3   not offering anything he told for the truth, that whatever he

4   was told about Evan Greebel is accurate.  But he should be

5   able to explain why he put Evan Greebel on the e-mail.

6        THE COURT:  They are disputing whether Mr. Greebel

7   is Mr. Shkreli's lawyer, that's what the witness said.

8        MR. KESSLER:  That's his understanding from

9   Mr. Mulleady.  He's free to cross-examine.

10        THE COURT:  The concern is you're offering for the

11   truth.

12        MR. KESSLER:  I'm not offering for the truth.  I'm

13   offering to explain why he put Evan Greebel on an e-mail.

14        MR. DUBIN:  Your Honor --

15        MR. KESSLER:  That was his understanding.  They are

16   free to cross-examine him and make clear that he did or didn't

17   know what the relationship between Mr. Greebel and Mr. Shkreli

18   was, or how he knew about that, and what weight of whatever he

19   was told should be given.

20        THE COURT:  All right.  So if --

21        MR. DUBIN:  If you're going to rule in my favor, I

22   don't want to snatch the feet from the jaws of victory.

23        THE COURT:  If you don't have an objection to

24   striking that reference as to how he understood, or why he

25   brought -- he said he testified -- strike that.

SIDEBAR CONFERENCE                          2678

1        He testified that he put Mr. Greebel on the e-mail

2   because he understood that Mr. Greebel represented

3   Mr. Shkreli.

4        MR. KESSLER:  That's why he did it.

5        THE COURT:  Whether or not he heard that from

6   Mr. Mulleady is what Mr. Dubin is objecting to.  We'll strike

7   the reference as to how Mr. Kocher learned about Mr. Greebel's

8   role as attorney.

9        MR. KESSLER:  Assuming they will not on cross ask

10  why Mr. Kocher believed he did what he did.

11       THE COURT:  If they open the door, it's fair on

12  redirect.  I don't think Mr. Dubin is going to do that.

13       Is Mr. Mulleady a co-conspirator?

14       MR. KESSLER:  Absolutely.

15       MR. DUBIN:  This is way before, your Honor.

16       MR. KESSLER:  It's directly in the middle of.

17       THE COURT:  It's in the middle of charged conduct.

18  My recollection from the last trial is that Mr. Mulleady was

19  identified as an unindicted co-conspirator, so it would be

20  admissible as a --

21       MR. KESSLER:  Admissible for that reason too.  But

22  frankly, it shouldn't have to get there.

23       MR. DUBIN:  This is news to us, that all of a sudden

24  there has been no evidence proffered at this trial that Kevin

25  Mulleady is a co-conspirator of Mr. Greebel, number one.

SIDEBAR CONFERENCE                          2679

1          Number two, there is no reason for -- if it's been

2    struck, it's struck.  But I'm going to ask him if he knows one

3    way or another on cross -- can I finish, please?  I am going

4    to ask him if he knows one way or another if Evan Greebel is

5    the attorney for MSMB or for Martin Shkreli personally.  And

6    the only reason that that answer can be -- the only reason

7    that I objected is because there is no hearsay objection.  He

8    was clearly answering for the truth or being offered for the

9    truth that Evan Greebel was Martin Shkreli's attorney.  And

10   then Mr. Kessler asked him again.

11        MR. KESSLER:  I asked him, why did you put Evan

12   Greebel on the e-mail, what was your understanding of the

13   relationship, and how did you come to that understanding.

14        THE COURT:  So how did you come to the

15   understanding, will be stricken.  Okay.

16        MR. KESSLER:  Here's the thing, if it's going to be

17   stricken there can't be cross-examination about what he

18   understands the relationship between Greebel and Shkreli to

19   be.  Because the answer --

20        MR. DUBIN:  I'm not going to ask him why he

21   understands it.

22        MR. KESSLER:  His truthful answer is Kevin Mulleady

23   told me.

24        MR. DUBIN:  I will be careful as to how I construct

25   the question not to elicit that testimony.

1            THE COURT:  If it comes out in cross, it comes out

2    in cross.  I think he'll be careful.

3            I'll instruct the jury that they will disregard the

4    witness's testimony regarding how he came to understand

5    Mr. Greebel's role or relationship or whatever word you want

6    me to use.

7            MR. KESSLER:  That's fine.  I want the record to be

8    clear, I will move on from that particular one, but the idea

9    that Kevin Mulleady is not a co-conspirator or these

10   statements are not made in furtherance of the conspiracy, is

11   obviously, that is going to come up again and again in the

12   trial.  We can address that in some other statement.

13           THE COURT:  Understood.  I think since they were

14   closely observing the trial, that was made clear.

15           MR. KESSLER:  I have about five more minutes.

16           (End of sidebar conference.)

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

2681

R. KOCHER – DIRECT – MR. KESSLER

1          (In open court.)

2    BY MR. KESSLER:

3    Q    I think you just said why you put Mr. Greebel on the

4    e-mail.  Can you tell who the other people on this e-mail are?

5          MR. DUBIN:  Your Honor.

6          THE COURT:  Let me instruct the jury.  Ladies and

7    gentlemen of the jury, there was a question and answer as to

8    how Mr. Kocher formed the understanding that Mr. Greebel

9    represented Mr. Shkreli.  And that question and the answer are

10   stricken, and you should disregard both.

11   Q    So we talked about Evan Greebel, who are the other three

12   people you put on this e-mail.

13   A    First off, the original one from Martin where it says

14   Monday, March 11, 2013, it's to me and the CC is to Evan

15   Greebel at KattenLaw.com.  So I think that's how I got his

16   e-mail originally.

17          So which one are you asking me for?

18   Q    The bottom of the first page of Government's Exhibit

19   104-5-A, the e-mail from you to Mr. Shkreli, Mr. Greebel and

20   Jim@AttorneyBurke.com?

21   A    Yes.

22   Q    Who is he?

23   A    He is actually my real estate attorney.

24   Q    Kevin@StoneCornerGroup.com, is that Kevin Mulleady?

25   A    Yes.  But he's I don't think any longer with or tied to

2682

R. KOCHER - DIRECT - MR. KESSLER

1    Martin at this point.

2    Q    And then the last e-mail is your wife?

3    A    Yes, that's correct.

4    Q    The subject is LP Kocher, do you see that?

5    A    Yes.

6    Q    LP is that references to limited partnership?

7    A    Yes.

8    Q    You write, "Hello, Martin.  I've repeatedly attempted to

9    contact you via phone over the past two days.  I know that you

10   are busy but I have given over two months' notice that I was

11   going to need to liquidate my account by the 15th of this

12   month, which is the end of this week."  Do you see that?

13   A    Yes.

14   Q    Is that true?

15   A    Yes.

16   Q    Then you say, "I've been in contact with Kevin Mulleady

17   who has been my account manager, but he now tells me I have to

18   contact you directly."

19   A    Yes.

20   Q    Is that communication from Kevin Mulleady why you were

21   e-mailing Mr. Shkreli directly?

22   A    Yes.

23   Q    So then the next paragraph you write, "As I hope you are

24   aware, I'm an LP in the MSMB Healthcare fund.  I was actually

25   the client that wired in money on a days' notice when your

2683

R. KOCHER – DIRECT – MR. KESSLER

1   organization was in a tight spot.  Per my conversation with

2   Kevin Mulleady, my account value was approximately $280,000,

3   which was toward the end of last year."  Do you see that?

4   A    Yes.

5   Q    All of that is true?

6   A    Yes.

7   Q    Do you recall when this most recent conversation with

8   Kevin Mulleady about the $280,000 was?

9   A    I don't remember when I spoke to him directly, no.

10  Q    Then you go on to write, "Retrophin has gone up in value

11  substantially since then.  I'm aware that our hedge fund,

12  which funded Retrophin directly, should benefit directly

13  because of this."  Do you see that?

14  A    Yes.

15  Q    What did you mean?

16  A    Well, it was my understanding through Kevin that my

17  account balance, the 280,000, was from the year before towards

18  the end of 2012.  And now we were into 2013 and that I had

19  assumed that, mostly through Martin's e-mail, that you know

20  Retrophin was doing well and that a lot of the money that was

21  MSMB had gone to Retrophin.  But at any rate, I didn't know

22  the exact, I didn't have an exact understanding of where the

23  money was.  But I just knew that from what Martin was saying

24  mostly was that everything was going very well.

25  Q    Then you write, "I'm also aware that you manage both

2684

R. KOCHER – DIRECT – MR. KESSLER

1  companies, which seems to me to be a conflict of interest, if

2  our hedge fund doesn't benefit directly from Retrophin when it

3  helps fund it."  Do you see that?

4  A    Yes.

5  Q    What do you mean by conflict of interest?

6  A    Well, he was the CEO of both, both companies.

7  Q    Then you wrote, "My position in MSMB was supposed to be

8  transitioned into shares of Retrophin but I can never get a

9  straight answer as to how or when this is supposed to happen."

10  Do you see that?

11  A    Yes.

12  Q    So when you wrote that your position at MSMB was supposed

13  to be transitioned into shares of Retrophin, where did that

14  understanding come from?

15  A    Well, the understanding came from, I don't remember

16  exactly, but in speaking with Kevin Mulleady and it was my

17  understanding that the easiest way to get my money out was

18  through stock in Retrophin.  But what I originally wanted was

19  cash.  But it sounded like I wasn't going to be able to get

20  cash at this point.

21  Q    Had you agreed at any point to transition your investment

22  at MSMB into Retrophin shares?

23  A    No.

24  Q    Did anyone ever offer you any sort of exchange agreement

25  or document to exchange your MSMB investment into Retrophin?

2685

R. KOCHER - DIRECT - MR. KESSLER

1    A    No.

2    Q    Then in the last paragraph you write, "Based on this

3    information I potentially will exercise my rights to weekly

4    redemption, side letter, signed by you."  Do you see that?

5    A    Yes.

6    Q    Is that the side letter we looked at earlier?

7    A    Yes.

8    Q    The May 1st, 2012, letter?

9    A    Yes.

10   Q    Then you write, "As this is a formal request, I have CCed

11   your attorney Evan Greebel and my attorney Jim Burke."  Do you

12   see that?

13   A    Yes.

14   Q    Is that why you had CCed Evan Greebel and Jim Burke?

15   A    Yes.

16   Q    If we go back to the first page, we'll read Mr. Shkreli's

17   response.  So this is about a third of the way down the page.

18   There is an e-mail from Martin Shkreli, March 11, 2013, to

19   Richard Kocher, CC Evan Greebel, do you see that?

20   A    Yes.

21   Q    Martin writes, "Hi, Richard.  We're just acknowledging

22   receipt.  We'll get back to you within 24 hours.  I need your

23   mailing address if you have that handy."  Do you see that?

24   A    Yes.

25   Q    Did Mr. Shkreli ever tell you that you were wrong and

2686

R. KOCHER – DIRECT – MR. KESSLER

1   that Evan Greebel was not his attorney?

2           MR. DUBIN:  Objection, your Honor.

3           THE COURT:  I'm going to sustain the objection.

4   Q    In the previous e-mail you had written that you were

5   CCing Evan Greebel, and you referred to him as "your attorney"

6   to Mr. Shkreli?

7   A    Yes.

8   Q    Did Mr. Shkreli ever tell that you Evan Greebel was not

9   his attorney?

10          MR. DUBIN:  Objection, your Honor.

11          THE COURT:  Overruled.

12          MR. KESSLER:  Can I have the reporter read back the

13   last question?

14          (Whereupon, the record was read.)

15   A    No.

16   Q    If we move up one e-mail, this is now March 12, an e-mail

17   from you to Mr. Shkreli copying the people who are copied in

18   the first e-mail, you wrote, "Hi, Martin.  Well, it's been

19   over 24 hours since you said you would get back to me.  I

20   called again without a response.  I've already sent you my

21   address, but asking for wiring instructions would be more

22   appropriate."

23   A    Yes.

24   Q    Why did you say that asking for wiring instructions would

25   be more appropriate?

2687

R. KOCHER - DIRECT - MR. KESSLER

1   A    Well, what I'm saying here is, you know, that it had been

2   way overdue for me to get back, and that I was hoping they

3   were going to wire cash to me.

4   Q    Mr. Shkreli writes back in the next e-mail, "We are

5   distributing the funds holdings to you.  You should receive a

6   stock certificate this week."  Do you see that?

7   A    Yes.

8   Q    So what did you understand would be the portion of the

9   funds holding that was distributed to you?

10  A    Well, at that time I was hoping that, you know, my

11  200,000 had become, you know, what he had said earlier, almost

12  double.  But I had expected, like I had said previously, that

13  it to be in cash not in the stock.  But at this point that's

14  what they are offering me.

15  Q    Then if we look at the top e-mail, March 12, 2013, from

16  you; is that right?

17  A    Yes.

18  Q    You write, "My last account value was $280,000 and it was

19  in a diversified health care portfolio MSMB, which was net

20  neutral."  Do you see that?

21  A    Yes.

22  Q    What did you mean by that?

23  A    Well, that it was supposed be a diversified health care

24  portfolio.  And that meant that, you know, that's where my

25  money had been.  And I expected there to be, you know, a value

2688
R. KOCHER – DIRECT – MR. KESSLER

1   in that.  And, you know, hopefully I was going to get paid

2   back the value.

3   Q    What did you mean by net neutral?

4   A    Well, it was really a phrase that I picked up from, you

5   know, somewhere where MSMB said they were net neutral.

6   Q    In the next sentence you wrote, "If my redemption is in

7   Retrophin shares, which are thinly traded, then I would assume

8   my account value would be higher to compensate for

9   illiquidity."  Do you see that?

10  A    Yes.

11  Q    Why did you believe that Retrophin shares were thinly

12  traded and your account should be higher?

13  A    If you have a thinly traded stock, it means that there is

14  not much stock on the market.  If you put a lot of stock into

15  the market to sell -- if there is only a few thousand shares

16  sold each day and you put in four or 5,000 shares, then all of

17  a sudden if the share value is $5 it can go down to $3 because

18  you don't have buyers.

19  Q    So if you sell a lot of thinly traded of stock at once it

20  lowers the pricer?

21  A    It lowers the price because there are no buyers, yes.

22  It's basically if there is no demand then your value goes

23  down.

24  Q    From your own experience can you give us an example of

25  what would not be a thinly traded stock?

R. KOCHER – DIRECT – MR. KESSLER

1    A    Well, Apple, IBM.

2    Q    So you're comparing Retrophin stock to something like

3    Apple or IBM stock?

4    A    Well, there is a big difference.

5    Q    In this e-mail where you write that your last account

6    value was $280,000 in a diversified healthcare portfolio, did

7    you copy Mr. Greebel?

8    A    Yes, I did.

9             MR. KESSLER:  Your Honor, is now a good time for

10   lunch?

11            THE COURT:  Yes.  Why don't we take a break.  Would

12   the jurors have any difficulty returning at 2:10 from lunch,

13   say little over an hour?

14            Please don't discuss the case and keep an open mind.

15   Thank you.

16            (Jury exits the courtroom. 1:10 p.m.)

17            (Whereupon, the witness steps down.)

18            THE COURT:  Okay is there anything I need to do or

19   should resolve during the lunch break?

20            MR. BRODSKY:  One question, one application with

21   respect to the elicitation from Mr. Kocher that expenses were

22   used.  They asked Mr. Kocher whether he expected his money to

23   be used in a certain way.

24            If the Government is going to elicit evidence that

25   Martin Shkreli misused MSMB investor money for Starbucks and

2690

R. KOCHER – DIRECT – MR. KESSLER

1    for other things, that's beyond the scope of even background

2    to the alleged charged conspiracy in Count Seven and Eight,

3    that is really Counts One through Six.  And we just wanted to

4    make sure that there is not going to be evidence being

5    elicited about Martin Shkreli's use of MSMB money on all sorts

6    of things.

7              MR. KESSLER:  Absolutely not through this witness.

8    And in general, we do not intend to elicit evidence about if

9    Martin Shkreli was using his bank account to buy tickets or

10   something or pay his rent.

11             MR. BRODSKY:  Thank you.

12             THE COURT:  Okay.  May I just bring to the party's

13   attention one other issue.  I mentioned this yesterday, I'm

14   hoping this won't become an issue but on the 29th, 30, 1st of

15   December -- the 29th of November and 30th of November and 1st

16   of December I have a judicial counsel meeting out of state.

17   I'm not going to be able to sit those three days.

18             I haven't raised this yet with the jury, because

19   they really think they will be finished before Thanksgiving.

20   We can cross that bridge at some point.

21             We had also a number of jurors, as you may recall

22   during voir dire, who said they are not available at various

23   points around the Thanksgiving holiday, some said not after.

24   Just please bear that in mind.

25             MR. KESSLER:  Thank you.

2691

R. KOCHER – DIRECT – MR. KESSLER

1        THE COURT:  All right.

2        (Continued following page.)

1            A F T E R N O O N   S E S S I O N

2              (In open court.)

3              THE COURT:  Are there any issues that I should

4    resolve before we bring the jury back?

5              MR. KESSLER:  No.

6              THE COURT:  Okay.

7              MR. KESSLER:  Should we put the witness back on the

8    stand?

9              THE COURT:  Sure.  Thank you.

10             (Pause.)

11             (Jury enters.)

12             THE COURT:  All right.  All our jurors are present.

13   Please have a seat, everybody.

14             Mr. Kocher, you are still under oath, sir.

15             THE WITNESS:  Yes.

16             THE COURT:  You may resume your direct, Mr. Kessler.

17   DIRECT EXAMINATION

18             MR. KESSLER:  Thank you.

19   BY MR. KESSLER (continuing):

20   Q    Mr. Kocher, before the break we were talking about

21   Government Exhibit 104-5A, the March 12 e-mail chain from you

22   to Martin Shkreli and Evan Greebel and others.

23   A    Yes.

24   Q    After March 12, 2013, did you receive stock from

25   Mr. Shkreli?

Kocher - Direct/Kessler                    2693

1    A    Did I receive a document?

2    Q    Stock, shares.

3    A    Oh, stock.  Yes, I did.

4    Q    Okay.  Were those shares in Retrophin?

5    A    Yes, they were.

6    Q    Okay.  If you take a look at the next tab in your binder,

7    which is tab ten of Government Exhibit 104-7.

8              MR. KESSLER:  Show that to the witness.

9    A    Yes.

10   Q    This is an e-mail from Martin Shkreli to you on Thursday,

11   March 14, 2013?

12   A    Yes.

13   Q    It's a day or two after the e-mail chain we just looked

14   at; is that right?

15   A    Yes.

16   Q    Does this e-mail discuss the shares of stock that you

17   were to receive?

18   A    Yes.

19             MR. KESSLER:  I offer Government Exhibit 104-7.

20             MR. BRODSKY:  No objection, Your Honor.

21             THE COURT:  We receive 104-7.

22             (Government Exhibit 104-7, was received in

23   evidence.)

24   Q    Mr. Kocher, in the bottom e-mail -- I'm sorry.  Strike

25   that.

Kocher - Direct/Kessler                    2694

1          Let's talk about the top e-mail.  In the top e-mail

2     Mr. Shkreli informs you that you are going to receive 23,654

3     shares; is that correct?

4     A     That's correct.

5     Q     Did you, in fact, receive a certificate for that many

6     shares?

7     A     After this, yes.

8     Q     Were those shares restricted or unrestricted?

9     A     They were restricted.

10    Q     Do you understand the difference between restricted and

11    unrestricted stock?

12    A     I found out pretty quickly then.

13    Q     What's the difference?

14    A     Restricted stock you can't sell or do anything with.

15    Q     Were you satisfied at that point that your investment in

16    MSMB Healthcare LP had been fully redeemed?

17    A     No, not at all.

18    Q     Did you continue e-mail communications with Mr. Shkreli?

19    A     Yes.

20    Q     So take a look at the next tab in your binder.

21          MR. KESSLER:  And if we can show just the witness

22    Government Exhibit 104-9.

23    Q     So, Mr. Kocher, is this an e-mail chain from Martin

24    Shkreli to you and others on March 15, 2013?

25    A     Yes.

```
 1              MR. DUBIN:  He might have misread that, who it's

 2    from.

 3              MR. KESSLER:  From Mr. Shkreli to Mr. Kocher and

 4    others.

 5    Q    Do you know, the e-mail below it --

 6              THE COURT:  I'm sorry.  I didn't hear anything

 7    that -- what was going on there?  What was the problem?

 8              MR. DUBIN:  Go ahead.

 9              MR. KESSLER:  I will just rephrase the question so

10    everyone is on the same page.

11    BY MR. KESSLER:

12    Q    So, Mr. Kocher, is this an e-mail chain from Martin

13    Shkreli to you and others dated March 15, 2013?

14    A    Yes.

15    Q    Does this e-mail chain reflect your further efforts to

16    receive a redemption for your MSMB Healthcare LP investment?

17    A    Yes.

18    Q    Is this the day after that e-mail we just looked at about

19    your shares of restricted stock?

20    A    Yes.

21              MR. KESSLER:  I offer Government Exhibit 104-9.

22              MR. DUBIN:  No objection.

23              THE COURT:  We will receive 104-9.

24              (Government Exhibit 104-9, was received in

25    evidence.)
```

Kocher - Direct/Kessler                    2696

1   Q    So, Mr. Kocher, I was talking about the top e-mail, which

2   is from Martin Shkreli to you; and then Evan Greebel and some

3   other people.

4            Do you see that?

5   A    Yes.

6   Q    We will come back to that, but let's start with the

7   bottom e-mail.

8            This bottom e-mail is from you to Mr. Shkreli,

9   right?

10  A    Yes.

11  Q    All right.  And you copied Jim@attorneyburke.com, your

12  wife, and Kevin Mulleady; is that correct?

13  A    That's correct.

14  Q    So I want to read some parts of this, the top paragraph

15  in this e-mail.  In the middle, starting on the second

16  sentence, you write to Martin, or to Mr. Shkreli, I have

17  counted on what your memo back in September said, that we

18  would be taken care of before the end of the year and that we

19  would be able to be taken out in cash or in stock, our choice.

20  For some reason you are giving me Retrophin stock that is not

21  tradeable and is worth around a quarter of what I am owed, and

22  now you are going to somehow compensate for it later.

23            Do you see those sentences?

24  A    Yes.

25  Q    Is that a reference to the restricted stock you

Kocher – Direct/Kessler                2697

1    previously received?

2    A     That's correct.

3    Q     All right.  Then, two sentences later, you write, I

4    expect to get, in addition to this insulting untradable stock,

5    at least $200,000, which you owe me in cash, wired to my

6    account by early next week.  I have already been in touch with

7    counsel that is versed in this type of litigation.

8              Do you see that?

9    A     Yes.

10   Q     Had you been in touch with an attorney at this point?

11   A     I believe so.  I don't remember specifically when, but I

12   got a hold of David Trachtenberg, who is attorney in the city.

13   Q     Is that David Trachtenberg?

14   A     Trachtenberg, yes.  Sorry.

15   Q     Had you got in touch with him at around the time of this

16   e-mail?

17   A     Yes.

18   Q     One sentence later, you said, I have damages that have

19   occurred because I have been relying on what you represented

20   as the manager of MSMB.

21             Do you see that?

22   A     Yes.

23   Q     What were your damages?

24   A     Well, I had been in contract on two properties.  By this

25   time I believe I closed on one of them, but I had to basically

Kocher – Direct/Kessler                    2698

1    secure funds from other places.  In other words, I had to

2    borrow money from other people and raise money in other ways

3    than using my own money; and so, it, you know, caused me to

4    dilute my stake in some real estate.

5    Q    In the next sentence you write, I also believe that as a

6    manager of MSMB and CEO of Retrophin that you have not lived

7    up to your fiduciary responsibilities to me as an LP and that

8    I will require a full accounting of both MSMB, Retrophin, and

9    your financial involvement.  Do you see that?

10   A    Yes.

11   Q    What did you mean by "require a full accounting"?

12   A    Well, I never seen really much accounting of where my

13   money had gone to start with.  It was never really clear, and

14   it was pretty sketchy in terms of the reports that I got from

15   MSMB.  They came late and they were -- only covered certain

16   months.

17           So, you know, essentially, I was in the dark with

18   what the funds' holdings were, what my account balance was,

19   et cetera.

20   Q    All right.  Then in the next sentence you say, also, I

21   will make sure that this does go public and will also go to

22   the appropriate agencies.

23           Do you see that?

24   A    Yes.

25   Q    Why did you write that?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Kocher – Direct/Kessler                    2699

1    A    Well, I wanted him to settle, and I was basically

2    threatening him with going public because I felt like it was

3    kind of obvious that there wasn't any regular accounting that

4    had been done, at least that I had seen.

5    Q    Right.  And then, the rest of this page, the text is

6    pushed up against the paragraph that we just have been looking

7    at; but is the rest of this page and the next page that same

8    September 2012 e-mail we previously looked at, where

9    Mr. Shkreli discusses his plans to wind down the hedge funds?

10   A    Yes.

11   Q    The e-mail in which he said that Retrophin has a full

12   pipeline and several marketed cash-generating products?

13   A    Yes.

14   Q    And the e-mail in which he said you could get your cash

15   investment back in cash or stock?

16   A    Yes, and he is also saying Retrophin is modestly valued;

17   and, you know, he is, you know, bragging about how good the

18   company is and the companies that he has invested in.

19   Q    All right.  So then if we go to the top e-mail,

20   Mr. Shkreli responds to your e-mail, which is included in his

21   response.

22        Do you see that?

23   A    Yes.

24   Q    So all the text on this page is Mr. Shkreli's response to

25   you, correct?

Kocher – Direct/Kessler                          2700

1    A     Yes.

2    Q     So Mr. Shkreli writes back to you, Jim@attorneyburke.com,

3    your wife, Evan Greebel, and then somebody named Howard

4    Cotton.

5              Do you see that?

6    A     Yes.

7    Q     Do you know who Howard Cotton is?

8    A     No.

9    Q     Mr. Shkreli writes, I called your office.  You can call

10   me with or without counsel, at your convenience; and then a

11   little bit later he says, cc'ing my attorney.

12             Do you see that?

13   A     Yes.

14   Q     All right.  Did you then engage in a series of e-mails

15   with Mr. Shkreli where you continued to ask for a greater

16   redemption from your investment?

17   A     Yes.

18   Q     So if you turn to tab 12 in your binder.

19             MR. KESSLER:  And I'm showing the witness Government

20   104-16.

21   Q     Do you see that, Mr. Kocher?

22   A     Yes.

23   Q     This is a series of e-mails between March 21, 2013 at the

24   beginning and March 28, 2013 at the end, between you and

25   Mr. Shkreli.

Kocher – Direct/Kessler                    2701

1    A    Yes.

2    Q    Are these e-mails about your efforts to redeem your

3    investment in MSMB Healthcare?

4    A    Yes.

5              MR. KESSLER:  I offer Government Exhibit 104-16.

6              MR. DUBIN:  No objection.

7              THE COURT:  Received 104-16.

8              (Government Exhibit 104-16, was received in

9    evidence.)

10   Q    So I want to start with the second page of the document,

11   the Bates stamp ending 993.

12   A    Okay.

13   Q    So this is a March 26 e-mail from you to Mr. Shkreli, and

14   you have copied David G. Trachtenberg.

15             Do you see that?

16   A    Yes.

17   Q    Is that the lawyer you mentioned to us before?

18   A    Yes.

19   Q    And in the second sentence in this e-mail you write, I

20   appreciate that you apologize for not being professional about

21   how I have been treated.

22             Do you see that?

23   A    Yes.

24   Q    Was that in reference to an e-mail communication or a

25   phone conversation you had with Mr. Shkreli?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Kocher – Direct/Kessler                          2702

1    A    That was a phone conversation.

2    Q    All right.  Then, about halfway down the page, you write,

3    because I have not been able to get my redemption from you, I

4    have had to get out of other lucrative investments, and I'm

5    now risking not being able to live up to my contractual

6    obligations because I have not been able to get my account

7    with you.

8         Do you see that?

9    A    Yes.

10   Q    Is that the same financial obligation you described to us

11   before?

12   A    Yes.

13   Q    The next e-mail up Mr. Shkreli writes back to you, and he

14   writes, definitely nice to talk to you finally.

15        Do you see that?

16   A    Yes.

17   Q    Had you had a phone conversation with Mr. Shkreli about

18   your MSMB Healthcare investment before approximately March 26,

19   2013?

20   A    Not that I remember.

21   Q    Had you had an in-person conversation with him about your

22   MSMB Healthcare investment before approximately March 26,

23   2013?

24   A    No.

25   Q    Who had you talked to about your MSMB Healthcare

1    investment, who worked at or worked for that fund?

2    A    Almost exclusively Kevin Mulleady.

3    Q    Then one sentence later, in this e-mail on March 26,

4    Mr. Shkreli writes, Evan Greebel, who is an attorney, will be

5    helpful to speak with, if I'm not available.

6              Do you see that?

7    A    Yes.

8    Q    Then, if we follow the chain up to the next page, some

9    back and forth, so if we go to the first page of the

10   document --

11   A    I'm sorry.  Where is this?

12   Q    So go to the first page of the document.

13   A    Okay.

14   Q    The second e-mail from the bottom, March 27, 2013,

15   Mr. Shkreli and you write, hi, Martin.  Please find -- I don't

16   want to go --

17              THE COURT:  Start over.

18   Q    This is a March 27 e-mail from you to Mr. Shkreli; is

19   that right?

20   A    Yes.

21   Q    You write, hi, Martin.  Please finalize this deal

22   tomorrow.  I don't want to get my attorney involved, but I

23   won't have a choice if you don't get back to me.  All we have

24   to do is agree on the terms and how we are going to finalize

25   them.

1              Do you see that?

2    A    Yes.

3    Q    So had you gotten an attorney involved at this point?

4    A    I don't remember the exact time when I retained David

5    Trachtenberg, but it was sometime around that time.

6    Q    All right.  Then if we move up to the second e-mail from

7    the top.  It's a March 27, 2013 e-mail at 9:02 p.m.

8              Do you see that?

9    A    Yes, uh-huh.

10   Q    Mr. Shkreli says, let's do a call with my attorney.

11             Do you see that?

12   A    Yes.

13   Q    Did you have an understanding of who he meant when he

14   said "my attorney"?

15   A    I thought it was Evan Greebel, because he was the only

16   attorney that I knew Martin had at the time.

17   Q    Did you in fact have a call with Evan Greebel on

18   approximately March 27, 2013?

19   A    I don't specifically remember that.  He might have been

20   on the phone when I talked to Martin, but I don't remember.

21   Q    All right.  So if you can put this e-mail away.

22             You can turn your binder to tab 13.

23             MR. KESSLER:  Show the witness Government

24   Exhibit 104-18.

25   Q    Is this another e-mail chain between you and Mr. Shkreli

1    about your efforts to redeem your investment?

2    A    Yes.

3    Q    It's a chain between March 31 and April 3rd, 2013?

4    A    Yes.

5              MR. KESSLER:  I offer Government Exhibit 104-18?

6              MR. DUBIN:  No objection.

7              THE COURT:  We receive 104-18.

8              (Government Exhibit 104-18, was received in

9    evidence.)

10   Q    So, Mr. Kocher, if we look at the e-mail that's second

11   from the top, with the most text, this is a Wednesday,

12   April 3, e-mail from you to Mr. Shkreli?

13   A    Uh-huh.

14   Q    You write, Martin, now we are going on another two weeks

15   and again you are putting me in a bad situation.  If I don't

16   see an agreement from you by tomorrow then the deal we have

17   agreed to will be off and I will be forced to have you deal

18   with my lawyer.

19              Do you see that?

20   A    Yes.

21   Q    What did you mean when you wrote "I will be forced to

22   have you deal with my lawyer"?

23   A    Well, what I meant was that I was going to have him have

24   to deal with my lawyer directly in terms of reaching any

25   agreement and that I would let my lawyer handle it, so that I

1    would no longer be maybe the person negotiating it.

2    Q    Mr. Shkreli writes back in the top e-mail, is he running

3    the company?  I will send today.  I don't know what Kevin told

4    you, but it's not happening.

5              Do you see that?

6    A    Yes.

7    Q    Do you recall whether Mr. Shkreli in fact sent you an

8    agreement that day, on April 3rd?

9    A    I don't think he did, but he might have; but I know he

10   sent me one -- the first agreement he sent me didn't seem like

11   it was going to work at all for me.

12   Q    All right.  If you turn to tab 14 in your binder.

13             MR. KESSLER:  We can show the witness Government

14   Exhibit 104-19.

15   Q    Mr. Kocher, is this an e-mail from Martin Shkreli to you

16   on April 3rd, 2013, the same day as that previous e-mail?

17   A    Yes.

18   Q    The subject is forward settlement and release agreement.

19             Do you see that?

20   A    Yes.

21   Q    There is an attachment called form settlement and release

22   agreement?

23   A    Yes.

24             MR. KESSLER:  I offer Government Exhibit 104-19?

25             MR. DUBIN:  No objection.

Kocher - Direct/Kessler                    2707

1      THE COURT:  We receive 104-19.

2          (Government Exhibit 104-19, was received in

3  evidence.)

4          MR. KESSLER:  You can just blow up the top of that

5  first page.

6  Q    So, Mr. Kocher, the attachment, as I just said, has some

7  numbers and letters; and then the title is form settlement and

8  release agreement dot-doc.

9          Do you see that?

10  A    Yes.

11  Q    Did you have any understanding of what form settlement

12  and release agreement meant?

13  A    No.

14  Q    Mr. Shkreli writes, this is the first draft of the

15  settlement.

16          Do you see that?

17  A    Yes.

18  Q    So if you turn the page, we will look at the attachment.

19  This is a document entitled settlement and release agreement.

20          Do you see that?

21  A    Yes.

22  Q    In the upper right-hand corner, can you read what's

23  written above the title?

24  A    Katten draft, 4/2/13.

25  Q    Katten draft, 4/2/13?

Kocher - Direct/Kessler                                    2708

1   A     Yes.

2   Q     Did you have an understanding what Katten was?

3   A     No.

4   Q     Then, in the first paragraph, there is a description of a

5   number of parties to the agreement.

6              Do you see that?

7   A     Yes.

8   Q     There are also some blank spaces to be filled in?

9   A     Yes.

10  Q     One of the parties in the third line is MSMB Capital

11  Management LP.

12             Do you see that?

13  A     Yes.

14  Q     Then there is MSMB Capital Management LLC?

15  A     Yes.

16  Q     Then MSMB Healthcare LP and MSMB Healthcare Investors

17  LLC?

18  A     Uh-huh.

19  Q     Did you have any idea what MSMB Capital Management LP or

20  Capital Management LLC were?

21  A     No.  No.  I really thought MSMB was one company.  I

22  didn't really realize until I got this that there was all

23  these different companies.

24  Q     All right.  If we scroll down, there are a number of -- I

25  will call them paragraphs that begin with whereas.

Kocher - Direct/Kessler                    2709

1           Do you see those?

2    A    Yes.

3    Q    In the middle of the page.

4           Do any of these whereas clauses describe your

5    investment in MSMB Healthcare LP?

6    A    I don't believe so.  The thing was they had all these

7    different companies; and I wasn't really clear as to, you

8    know, where -- where my investment actually laid, lie, you

9    know.

10   Q    All right.  So after you received this draft settlement

11   agreement did you ask your lawyer to review it?

12   A    Yes.

13   Q    And did he have communications with Mr. Shkreli or an

14   attorney for Mr. Shkreli?

15   A    Yes.

16   Q    So if you turn to tab 15 in your binder --

17           MR. KESSLER:  Which is Government Exhibit 104-20 for

18   the witness.

19   Q    Mr. Kocher, is this an e-mail chain or an e-mail you sent

20   to Martin Shkreli on April 9 about the settlement agreement?

21   A    Yes.

22           MR. KESSLER:  I offer Government Exhibit 104-20?

23           MR. DUBIN:  No objection.

24           THE COURT:  We receive 104-20.

25           (Government Exhibit 104-20, was received in

Kocher – Direct/Kessler                2710

1    evidence.)

2    Q    Mr. Kocher, on April 9 you wrote, Hi, Martin.  The

3    settlement agreement needs to be changed to fit both of our

4    needs, but my attorney has been in contact with your attorney

5    about the details.

6              Do you see that?

7    A    Yes.

8    Q    What needed to be changed about the settlement agreement?

9    A    I don't remember specifically, but I know that the way it

10   was written was not really protecting me, and the terms

11   weren't clear either.

12   Q    All right.  Did you expect that your attorney would

13   communicate with Mr. Shkreli or his attorney about those

14   terms?

15   A    Yes.

16   Q    Okay.  Were you aware that there were additional drafts

17   of this agreement that were circulated?

18   A    Yes.

19   Q    So if we -- if you can turn in your binder to tab 16 --

20             MR. KESSLER:  Which is for the witness, Government

21   Exhibit 104-21.

22   Q    Mr. Kocher, you see this is an e-mail from Evan Greebel,

23   David Trachtenberg, copy to Martin Shkreli?

24   A    Yes.

25   Q    It's also bcc'd to Evan Greebel?

Kocher – Direct/Kessler                    2711

1    A    Yes.

2    Q    Subject is draft settlement agreement, and there is a

3    draft edited settlement agreement that's attached?

4    A    Yes.

5              MR. KESSLER:  I offer Government Exhibit 104-21.

6              MR. PITLUCK:  No objection.

7              THE COURT:  We receive 104-21.

8              (Government Exhibit 104-21, was received in

9    evidence.)

10   Q    All right.  Mr. Kocher, so in this cover e-mail

11   Mr. Greebel writes, Hi, David.  Attached is a draft of the

12   settlement agreement.  I am simultaneously sending it to my

13   client, and it is subject to his review and comment.

14             Do you see that?

15   A    Yes.

16   Q    So let's turn the page and look at the draft.

17             Does this appear to be similar in format to the

18   draft we looked at before?

19   A    Yes.

20   Q    In the upper right-hand corner there is, Katten draft

21   5/8/13?

22   A    Yes.

23   Q    If we scroll down to the bottom, there are payment terms?

24   A    Yes.

25   Q    The payment terms have been filled in here; is that

Kocher - Direct/Kessler                    2712

1   right?

2   A     That's correct.

3   Q     And the first sentence of the payment terms reads, The

4   MSMB entities, or Retrophin, individually or collectively, the

5   payor, agree to deliver or cause to be delivered to releasor

6   the total amount of $123,711, to be cash payment, and Shkreli

7   agrees to deliver or cause to be delivered to the releasor the

8   total amount of 47,128 shares of common stock.

9         Do you see that?

10  A     Yes.

11  Q     So does this reflect that your payment for your

12  investment would have two components?

13  A     Yes.

14  Q     Who was supposed to pay the cash portion of the

15  component?

16  A     Well, I believed it to be MSMB.  I mean, it was Martin,

17  but, you know, he was representing so many different entities

18  that I wasn't really sure.

19  Q     Well, had you invested any money directly in Retrophin?

20  A     No.

21  Q     Did you believe Retrophin owed you any money?

22  A     No.

23  Q     And who in this agreement was supposed to give you stock?

24  A     Again, Martin.

25  Q     Now, if you turn to the second-to-last page of the

Kocher – Direct/Kessler                    2713

1   agreement, there is a signature area.  So this is the page --

2   the very bottom Bates stamp ends R128324.

3           Do you see that?

4   A    Yes.

5   Q    On the right side there are a number of places for

6   signatures from different entities.

7           Do you see that?

8   A    Yes.

9   Q    Retrophin, MSMB Capital, in a couple of forms, MSMB

10  Healthcare in a couple of forms.

11          Do you see that?

12  A    Yes.

13  Q    On the left side there is a signature block for Michael

14  Lavelle.

15          Do you see that?

16  A    Yes.

17  Q    Do you know who Michael Lavelle is?

18  A    No.

19  Q    Do you know why Michael Lavelle is in a draft settlement

20  agreement that Evan Greebel sent to your lawyer?

21  A    No.

22  Q    Now, did you ultimately sign a version of this

23  settlement?

24  A    Yes.

25  Q    Was this after some additional revisions between your

Kocher - Direct/Kessler                    2714

1    lawyer and Mr. Shkreli or attorneys working with him?

2    A     Yes.

3    Q     Turn to tab 18 in your binder?

4              MR. KESSLER:  For the witness, Government

5    Exhibit 54.

6    Q     So, Mr. Kocher, is this an e-mail from Mr. Greebel to

7    your attorney on May 14?

8    A     Yes.

9    Q     It's attaching an executed settlement agreement.

10             Do you see that?

11   A     Yes.

12   Q     Executed means signed?

13   A     Yes.

14             MR. KESSLER:  All right.  I offer Government

15   Exhibit 54.

16             MR. DUBIN:  No objection.

17             THE COURT:  All right.  This is standalone

18   government 54 not 104-dash, correct?

19             MR. KESSLER:  That is correct.  This is simply

20   Government Exhibit 54.

21             THE COURT:  All right.  Thank you.  We will receive

22   Government Exhibit 54 in evidence.

23             (Government Exhibit 54, was received in evidence.)

24   Q     So, Mr. Kocher, if you turn to the second page.

25             Is this the settlement agreement that you did

Kocher – Direct/Kessler                    2715

1    ultimately sign?

2    A    Yes.

3    Q    Again, it's similar in form to the drafts that we have

4    looked at; is that right?

5    A    Yes.

6    Q    In the first sentence there is now a date of May 13,

7    2013.

8            Do you see that?

9    A    Yes.

10   Q    Is that approximately when you signed the settlement

11   agreement?

12   A    Yes.

13   Q    All right.  There is the same array of different parties

14   to the agreement in the first paragraph?

15   A    Yes.

16   Q    There are the same whereas clauses that we looked at

17   before?

18   A    Yes.

19   Q    Is there a whereas clause that describes your investment

20   in MSMB Healthcare LP?

21   A    Not specifically.

22   Q    If we look at the payment terms, are those the same

23   payment terms we looked at before?

24   A    Yes.

25   Q    If you turn to the second page of the settlement

Kocher – Direct/Kessler                    2716

1  agreement, the third page of the document, at the bottom there

2  is a section called release.

3          Do you see that?

4  A    Yes.

5  Q    It's a long sentence, but, in the middle, the releasor,

6  is that you?

7  A    Yes.

8  Q    The releasor fully and expressly, knowingly, voluntarily,

9  and unconditionally releases, acquits, and forever discharges

10 Shkreli, Retrophin, each MSMB entity, and each of their

11 officers, directors, shareholders, partners, members,

12 managers, owner, employees, representatives, consultants,

13 contractors, subcontractors, suppliers, attorneys, insurers,

14 affiliates, and affiliated corporations, and so on.

15          Do you see that?

16 A    Yes.

17 Q    So among the other entities you were releasing in this

18 release was Retrophin; is that right?

19 A    Yes.

20 Q    Did you have a claim against Retrophin?

21 A    No.

22          MR. DUBIN:  Objection, Your Honor.

23          THE COURT:  Overruled.

24 A    No.

25 Q    I will ask again:  Did you have a claim against

Kocher - Direct/Kessler                    2717

1    Retrophin?

2    A     No.

3    Q     Had you ever threatened to sue Retrophin?

4    A     No.

5    Q     Had you ever directed your lawyer to sue Retrophin?

6    A     No.

7              MR. DUBIN:  Objection.

8              THE COURT:  Overruled.

9    Q     Go to the next page, page 3 of the document.  In the

10   middle of the page there is a section seven that says

11   authority.  It reads, The individuals signing below, on the

12   part of the parties, warrant and represent that they are

13   legally competent and have full authority to enter into this

14   agreement and to bind the parties.

15             Do you see that?

16   A     Yes.

17   Q     Did you have any reason to believe that wasn't true with

18   respect to any of the parties to this agreement?

19   A     No.

20   Q     Then if we go to the second-to-last page.  It ends in

21   Bates stamp 1261.  There are two signatures there for MSMB

22   Healthcare Investors LLC and MSMB Healthcare management LLC.

23   A     Yes.

24   Q     Who has signed on behalf of each of those entities?

25   A     Martin Shkreli.

Kocher – Direct/Kessler                          2718

1    Q     If you go to the next page, a number of additional

2    signatures on the right-hand side.

3          Do you see that?

4    A     Yes.

5    Q     Are those all Martin Shkreli?

6    A     Yes.

7    Q     Martin Shkreli individually?

8    A     Yes.

9    Q     Then Martin Shkreli for Retrophin, MSMB Capital

10   Management LLC, MSMB Capital Management LP, and MSMB

11   Healthcare LP?

12   A     Yes.

13   Q     On the left side, is that your signature?

14   A     Yes.

15   Q     So Michael Lavelle has been removed from this agreement?

16   A     Yes.

17   Q     Now, after you signed this settlement agreement did you

18   get the $120,000 that the agreement said you would get?

19   A     Yes.

20   Q     Did you also receive the 47,128 shares of stock?

21   A     Yes.

22   Q     Were those restricted or unrestricted shares?

23   A     Unrestricted.

24   Q     Did you know where they came from?

25   A     No, not specifically.  I knew it was Retrophin stock.

Kocher – Direct/Kessler                    2719

1   Q    Did you know how the Retrophin stock had been obtained so

2   that it could be given to you?

3   A    No.

4   Q    Now, did you sell your 47,000 Retrophin shares?

5   A    Yes.

6   Q    How did you do that?

7   A    Very slowly.

8   Q    Why did you do it very slowly?

9   A    Because it was very thinly traded.  So basically you

10  couldn't sell more than a couple thousand shares a week or

11  every two weeks without affecting the stock price and having

12  it go down.

13  Q    Sitting here today, do you know how much money you made

14  in selling all of those 47,000 shares?

15  A    I don't know the exact number; but, I think, roughly, if

16  you include the cash that I was given, I probably ended up

17  with roughly 350,000 from my original 200,000.

18  Q    Now, did there come a time after the settlement

19  agreements were signed that Mr. Shkreli communicated with you

20  again about Retrophin stock?

21  A    Yes.  He, I think, e-mailed me at one point towards the

22  end of the year, if I remember correctly, and asked me if I

23  had any stock.

24  Q    So if you look at tab 20 in your binder?

25            MR. KESSLER:  For the witness, Government

Kocher – Direct/Kessler                    2720

1   Exhibit 104-25.

2   Q    Take a minute to look at that.

3   A    Yes.

4   Q    Is this an e-mail from Martin Shkreli to you on

5   December 4, 2013?

6   A    Yes.

7   Q    The subject is RTRX.

8            Do you see that?

9   A    Yes.

10  Q    Is that the ticker symbol for Retrophin?

11  A    Yes.

12           MR. KESSLER:  I offer Government Exhibit 104-25.

13           MR. DUBIN:  No objection.

14           THE COURT:  We'll receive 104-25.

15           (Government Exhibit 104-25, was received in

16  evidence.)

17  Q    So in this e-mail Mr. Shkreli writes to you, Hi, Rich.  I

18  hope you are well.  I just wanted to see if you were

19  completely out of Retrophin stock or if you had some left.  If

20  you have some left, I would love to buy it from you.

21           Do you see that?

22  A    Yes.

23  Q    Now, on December 4, 2013, was Retrophin a public company?

24  A    I assume it was.

25  Q    Were its shares trading in the market?

Kocher – Cross/Dubin                         2721

1   A    Yes.

2   Q    Do you know why Mr. Shkreli wanted to buy shares from you

3   instead of from the market?

4              MR. DUBIN:  Objection.

5   A    No.

6              THE COURT:  Overruled.

7   Q    You don't know?

8   A    No.

9              MR. KESSLER:  Okay.  I have no further questions.

10  Thank you, Mr. Kocher.

11             THE COURT:  All right.  Mr. Dubin?

12  CROSS-EXAMINATION

13  Q    Good afternoon, Mr. Kocher.  How are you?

14  A    Good.  Thank you.

15  Q    Can you identify Evan Greebel in this courtroom today?

16  A    No.

17  Q    You have never met him before?

18  A    No.

19  Q    Never seen him, have you?

20  A    No.

21  Q    Did you ever on a single occasion say that this man, on

22  an e-mail or on the telephone, by the way, I'm not going to

23  sue Retrophin?  You never did that, did you?

24  A    No.

25  Q    In fact, you never said that to Mr. Shkreli, did you?

Kocher – Cross/Dubin                              2722

1   A     No.

2            MR. PITLUCK:  Your Honor, if I may approach the

3   witness and Your Honor and hand you a binder, so I don't have

4   to run back and forth.

5            THE COURT:  All right.  Good idea.

6            MR. DUBIN:  I will give one to the government.

7   Q   Mr. Kocher, we will get back to it, but when you released

8   Retrophin, MSMB Healthcare, and the other entities in that

9   settlement agreement you signed, you were in essence giving

10  them your word that you -- and by your signature on that

11  document, that you wouldn't sue them, right?

12           MR. KESSLER:  Objection.

13           THE COURT:  Yes.  Why don't you rephrase the

14  question, Mr. Dubin.

15  Q   Sir, you understood that when you signed the settlement

16  agreement and released Retrophin that you, after signing it,

17  could no longer sue them, correct?

18  A     Yes.

19  Q   Okay.  Now, we heard that while you never invested in the

20  stock market before, or not that much.

21           Do I have that right, prior to investing --

22  A     That's correct.

23  Q   Your a sophisticated businessman nonetheless, are you

24  not, sir?

25  A     In some ways.

Kocher – Cross/Dubin                    2723

1   Q     Okay.  Own multiple properties throughout New Jersey,

2   correct?

3   A     Well, I own some properties.

4   Q     Some very substantial properties, yes?

5   A     Well, that depends on what you call substantial.

6   Q     Let's talk about the one that you sold overlooking the

7   Hudson River.

8   A     Okay.

9   Q     You know the one I'm talking about?

10  A     Yes.

11  Q     Beautiful views, right?

12  A     Yes.

13  Q     Okay.  You sold that for upwards of $14 million, correct?

14  A     No.

15  Q     What did you sell it for?

16  A     I didn't sell it.  It was taken from me my by eminent

17  domain.

18  Q     When you bought it, do you remember what you bought it

19  for?

20  A     Somewhere in excess of $3 million.

21  Q     And can you explain what an eminent domain proceeding is,

22  for the ladies and gentlemen of the jury?

23  A     Eminent domain is when a city or a town or an entity

24  that's a public entity takes private property.

25  Q     They don't just take it, they pay you for it, right?

Kocher — Cross/Dubin                    2724

1   A    Yeah, if you -- after about ten years of litigation.

2   Q    Okay.  Did they pay you for it?

3   A    Yes.

4   Q    What did they pay you?

5   A    Well, they didn't pay just me because by then I had -- I

6   had -- I had to bring -- without going into bankruptcy, I had

7   to bring in additional partners.  So I ended up getting about

8   $4 million.

9   Q    Okay.  So and you have a business called Kocher

10  Construction, correct?

11  A    Yes.

12  Q    And you build and develop both condos and commercial real

13  estate, correct?

14  A    Yes.

15  Q    And you are a member of various different corporate

16  entities, correct?

17  A    Yes.

18  Q    And you went to Stanford, correct?

19  A    Yes.

20  Q    And when Mr. Mulleady recommended Martin Shkreli to you,

21  you trusted Mr. Mulleady's word, right?

22  A    That's correct.

23  Q    And he was, by all appearances, an impressive guy,

24  Mr. Mulleady?

25  A    That's correct.

Kocher – Cross/Dubin                    2725

1    Q    A buyer at Smith Barney?

2    A    You are talking about Kevin Mulleady?

3    Q    Yes.

4    A    Yes.

5         MR. PITLUCK:  Excuse me for one minute.  I'm going

6    to grab some water.

7    Q    He was someone who your son trusted, correct?

8    A    I don't think my son knew him that well.

9    Q    Okay.  Nonetheless, you trusted him?

10   A    Yes.

11   Q    Trusted his judgment, correct?

12   A    Yes.

13   Q    What he communicated to you about Martin Shkreli was that

14   Martin Shkreli was a genius, correct?

15   A    Yes.

16   Q    And you took Mr. Mulleady at his word about that, right?

17   A    Yes.

18   Q    And you certainly, though you didn't meet Mr. Shkreli,

19   you certainly had the opportunity, if you wanted, to do as

20   much research as you wanted about him, right?

21   A    I was a passive investor so I really didn't do any

22   research.

23   Q    I understand that.  You didn't do any research, but

24   nothing prevented you from doing research, correct?

25   A    That's correct.

Kocher – Cross/Dubin                          2726

1   Q    And you knew that lawsuits are publicly filed for the

2   most part, correct?

3   A    Yes.

4   Q    And you yourself have filed lawsuits in the past, haven't

5   you?

6   A    Yes.

7   Q    And prior to entering these settlement discussions with

8   Mr. Shkreli, and then Mr. Greebel is copied on some of the

9   e-mails, you had already filed a lawsuit in the past, hadn't

10  you, prior to that time?

11  A    Yes.

12  Q    And that lawsuit wasn't sealed or anything like that, it

13  was there for the world to see, correct?

14  A    Yes.

15  Q    And you have no idea, do you, sir, sitting here today

16  whether or not my client, Mr. Greebel, was aware that you had

17  filed lawsuits in the past?

18  A    Could you ask -- just say that question again?

19  Q    Absolutely.  At the time you entered into the settlement

20  negotiations with Mr. Shkreli and Mr. Greebel, do you remember

21  what time period that was, the year?

22  A    2013.

23  Q    All right.  Prior to 2013 you had already filed at least

24  one lawsuit, correct?

25  A    Yes.

Kocher – Cross/Dubin                              2727

1    Q     You had no idea whether or not Mr. Greebel had an

2    awareness that you had filed lawsuits in the past, did you?

3    A     No.

4    Q     So for all you knew, from where Mr. Greebel sat you are a

5    disgruntled investor, correct?

6                MR. KESSLER:  Objection.

7    A     Why would you call me disgruntled?

8                MR. PITLUCK:  I will rephrase it.

9                THE COURT:  Okay.

10   Q     For all you knew, from where Mr. Greebel sat, you were an

11   investor in MSMB that was not too happy, correct?

12               MR. KESSLER:  Objection to what Mr. Greebel thought.

13               THE COURT:  You are asking him to comment on what

14   Mr. Greebel knew or what he sat -- how he sat at the time?

15               MR. DUBIN:  I will withdraw it and rephrase it.

16               THE COURT:  Okay.

17               (Continued on the next page.)

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION (Continued)

2    BY MR. DUBIN:

3    Q    Mr. Kocher, at the time you began negotiating with

4    Mr. Shkreli and then Mr. Greebel at some point is copied on

5    some of the communications, right?

6    A    Yes.

7    Q    You were not a happy camper; were you?

8    A    I just wanted to get my settlement.

9    Q    Right.

10   A    Yes.

11   Q    And you expressed over and over again that your -- in

12   words or substance -- it was apparent from the face of those

13   emails as far as you were concerned, that your patience was

14   wearing thin, right?

15   A    That's correct.

16   Q    And you felt like Mr. Shkreli was giving you the

17   runaround, right?

18   A    That's correct.

19   Q    And you wanted money, right?

20   A    I wanted to get my investment paid back, yes.

21   Q    And at some point you said something to the effect -- and

22   we're going to go into it on the email -- that you're the

23   manager of MSMB and manager of Retrophin, and that seemed like

24   a conflict of interest to me.

25            Do you recall saying that?

KOCHER - CROSS - DUBIN                                2729

1    A     Yes.

2    Q     So here you are, someone that wanted his money, someone

3    that was getting continually frustrated with the process and

4    you were raising Retrophin in these emails, correct?

5              MR. KESSLER:  Objection to the form.

6              THE COURT:  Sustained.  Rephrase, please.

7    Q     Were you raising Retrophin in some of the emails when

8    were you going back and forth and having these settlement

9    discussions about Mr. Shkreli?

10             Did you, in fact, raise Retrophin?

11   A     What do you mean by "raise Retrophin"?

12   Q     Did you include in one of your emails that Mr. Shkreli

13   seems to be involved in Retrophin, and involved in MSMB, and

14   that, to you, was a conflict of interest, right?

15   A     Yes.

16   Q     All right.  Now, at the risk of stating the obvious, you

17   and I have never met, correct?

18   A     That's correct.

19   Q     Never spoken before; right?

20   A     I'm not sure.

21   Q     As far as you know, and as far as I knew, we've never

22   spoken, correct?

23   A     I did speak on the phone.

24   Q     To one of my colleagues?

25   A     Yes.

KOCHER - CROSS - DUBIN                    2730

1    Q    Do you remember him identifying himself as Mr. Halperin?

2    A    No.

3    Q    And isn't it a fact that he called you and asked you if

4    you would speak it either him or a member of the defense team?

5    A    Yes.

6    Q    And you told him you wouldn't, right?

7    A    That I wouldn't?

8    Q    That you would not.  You did not want to meet with us?

9    A    Oh, that I didn't want to meet with you.

10   Q    Right.

11   A    No, but I was willing to talk.

12   Q    Right.  You spoke --

13   A    I don't think you asked for -- I don't believe -- I don't

14   remember being asked for a meeting.

15   Q    You don't remember being asked for a meeting?

16   A    That's correct.

17   Q    Okay.  Do you -- though you don't remember, are you

18   saying that he definitely did not ask you to meet?

19   A    I don't remember.

20   Q    Okay.  So is it possible that he did ask you to meet and

21   you just can't recall?

22   A    I suppose.

23   Q    Nonetheless, you met with members of the Government,

24   correct?

25   A    Yes.

1    Q    Some of the prosecutors sitting at this table?

2    A    Yes.

3    Q    Which ones?

4    A    David.

5    Q    Well, that narrows it down to two.

6         Do you know which David?  The handsome one or the

7    handsome one?

8    A    The one that's been cross examining -- or actually --

9    Q    Mr. Kessler, correct.

10   A    Mr. Kessler, yes.

11   Q    And were either of these special agents from the FBI at

12   meeting?

13   A    One was; yes.

14   Q    The one closer to me, or was it Mr. Sweeney or

15   Mr. Mulleady?

16   A    Matt.

17   Q    Matt, okay.  That would be the second from the left?

18   A    Yes.

19   Q    Okay.

20   A    That's correct.

21   Q    And how many times did you meet with them to prepare for

22   your testimony today?

23   A    Once.

24   Q    Okay.  Once in connection with this proceeding, but one

25   other time in connection with another proceeding, correct?

KOCHER - CROSS - DUBIN                    2732

1   A    I didn't -- no.

2   Q    So what was your testimony, sir --

3   A    I didn't meet with David at -- for another.

4   Q    You met with other prosecutors, correct?

5   A    Yes, I did.

6   Q    And other members of the FBI?

7   A    Yes.

8   Q    And they asked you questions, correct?

9   A    Yes.

10  Q    They showed you documents, right?

11  A    Yes.

12  Q    And you did your best to explain those documents to them,

13  right?

14  A    Yes.

15  Q    And you asked and answered any question they had,

16  correct?

17  A    Pretty much.

18  Q    Do you recall how long those meetings lasted?

19  A    Maybe an hour and a half.

20  Q    Okay.  And did you tell my colleague, Mr. Halperin, that

21  you had already spent too much time in this case and didn't

22  want to meet with anyone else?

23  A    I may have.

24  Q    Okay.  But, in fact, after you spoke to him, you met with

25  the prosecutors and the FBI again, correct?

KOCHER - CROSS - DUBIN                    2733

1   A    Yes, that's correct.

2   Q    Okay.  And do you recall that you met with them just a

3   couple weeks ago on October 14th, correct?

4   A    Yes.

5   Q    So today's the first time, face-to-face, that someone on

6   Mr. Greebel's behalf was able to ask you questions and show

7   you some documents, correct?

8   A    Yes.

9   Q    And do you recall that your first meeting with the

10  prosecutors in connection with another proceeding was back in

11  May?

12  A    I don't recall the exact time.

13  Q    Let me see if I can refresh your recollection.

14           If you go into your binder -- I was ready to walk

15  up.

16           If you go into your binder to the very first tab

17  that's 35-RK-1, and if you just read to yourself that first

18  sentence.

19           (Whereupon, the witness is reviewing the document.)

20           Let me know when you're ready.

21  A    Yes.

22  Q    Does that refresh your recollection, sir, that the first

23  time you met with the Government was in May of this year?

24  A    Yes.

25  Q    Okay.  And do you remember telling the Government during

KOCHER - CROSS - DUBIN                    2734

1    that meeting that you were having trouble remembering the

2    events at issue here?

3    A    Yes.

4    Q    Okay.  And during that interview the Government said,

5    well, why, in words or substance, why are you having trouble

6    remembering?

7              Do you recall that?

8    A    No, not specifically.

9    Q    Do you recall telling them that the events at issue were

10   just not of particular interest to you?

11   A    I -- I probably did say that.

12   Q    Okay.  And when you met with the Government on

13   October 14th, just a fee weeks ago, your memory improved on

14   some of these events, correct?

15   A    Why do you say that?

16   Q    Well, I'm asking you.  Do you have better recollection of

17   it?

18             I'm going to show you why I say it in a minute.

19   A    Okay.

20   Q    But did your memory improve?

21   A    Not that I know of.

22             I don't know what you're getting at.

23   Q    Okay.  You seem to have better recollection of some of

24   the events at issue because, by that point, by two and a half

25   weeks ago, you had been shown a number of documents that had

KOCHER - CROSS - DUBIN                          2735

1    these discussions with the prosecutors on two occasions, and

2    with the FBI on two occasions, correct?

3              MR. KESSLER:  Objection to the form.

4              THE COURT:  Try to restate it, if you can.

5    Q    Okay.  Is it fair to say, Mr. Kocher, that your memory

6    got a little bit better about the events at issue, because you

7    had had your memory refreshed with various documents and

8    conversations?  That's what I'm getting at.

9    A    Yes.

10   Q    Okay.  Now, do you recall that when you signed -- you

11   were shown -- withdrawn.

12             Do you recall Mr. Kessler showing you that signed

13   letter he referred to as a subscription agreement?

14             Do you recall that; just today?

15   A    Yes.

16   Q    All right.  But do you recall that when you initially

17   invested in MSMB, you signed a subscription agreement?

18   A    Yes.

19   Q    Okay.  So I'd like you to go to Tab 2 in your binder.

20   And it's already in evidence as Government Exhibit 33.

21             MR. DUBIN:  So if you could put that up on the

22   screen.

23             (Exhibit published.)

24   Q    Okay.  Now, you signed this agreement; correct?

25             MR. DUBIN:  If you go to the last page.

KOCHER - CROSS - DUBIN                           2736

1   A    Yes.

2   Q    You see your signature up there on the left?

3   A    Yes.

4   Q    All right.  And that and Barbara Kocher is your wife,

5   correct?

6   A    Yes.

7   Q    And by the way, did you have -- without telling me the

8   substance of what you discussed, did you discuss this

9   investment with your wife?

10  A    Yes.

11  Q    Okay.  And when you signed the subscription agreement,

12  you read it first, I assume, correct?

13  A    I don't remember how thoroughly I read it, but my guess

14  is that I might have skimmed it.

15  Q    Okay.  Now, 600 Palisade Avenue.  Is that the property

16  that we were just talking about in Union City?

17  A    Yes.

18  Q    That was the eminent domain?

19  A    That's correct.

20  Q    All right.  So you no longer have it, correct?

21  A    I still have my office in it.

22  Q    Still have suite 202, right?

23  A    Yes.

24  Q    All right.  Now, take a look at page 2 of the agreement

25  in paragraph 3.

1          (Whereupon, the witness is reviewing the document.)

2          MR. DUBIN:  If you can just blow up -- you were

3   there.  Paragraph 3.

4   A    I'm not following you.  Sorry.  Tell me where it is

5   exactly.

6   Q    You see on your screen right in front of you.

7   A    Okay.

8   Q    Do you see that?

9   A    Yes.

10          MR. DUBIN:  Would you blow it up, Mr. Carter.  There

11  you go.  Thank you.

12  Q    And do you see it says, Representation of warranties of

13  the subscriber.  The subscriber hereby represents and warrants

14  to the general partner and the partnership as follows.

15          And then it says, accredited investor qualification,

16  and you checked that box, correct?

17  A    Uh-huh.

18  Q    And why don't you take a moment and just read that to

19  yourself.

20          (Whereupon, the witness is reviewing the document.)

21  A    Okay.

22  Q    All right.  That was all -- all applied to you, correct?

23  That's why you checked the box; isn't that so?

24  A    Well, this says one thing, but in another part of this it

25  says you will be able to redeem your money back within a

KOCHER – CROSS – DUBIN                            2738

1    month.

2    Q    Where does it say that, sir?

3    A    I'm -- I'm saying not in this paragraph, but in the

4    subscription agreement.

5    Q    You have the entire subscription agreement in front of

6    you in that tab, in your binder.

7    A    Which the tab.

8    Q    The tab, sir, is, Tab 20 -- hold on one moment.  Tab 2,

9    sir.

10   A    Tab 2 of the one you gave me?

11   Q    Yes, sir.  The white one.

12   A    Okay.

13        Well, what I remember was that they said that I

14   could get my money back within a month.

15   Q    Okay.  Is it possible, Mr. Kocher -- just asking you if

16   it's possible -- that you're confusing that subscription

17   agreement that you signed when you invested the additional

18   money with the original subscription agreement you signed?  Is

19   that possible?

20   A    It's possible.

21   Q    Okay.  Because it appears that if you are leafing through

22   it -- and I'll give you all the time you need, sir -- that it

23   says nowhere in that subscription agreement that you could get

24   your money back within 30 days, correct?

25   A    Well, it was my understanding that this was something

KOCHER - CROSS - DUBIN                          2739

1   that I would be able to do.

2   Q     Okay.

3   A     And I think in the additional subscription agreement that

4   was entered into later after the subsequent 100,000 that I

5   invested, that it said in that one that it would change it

6   from a monthly redemption to a weekly redemption.  And I

7   remember specifically talking to Kevin Mulleady about it.

8   Q     Okay.  We'll get to that.  We'll get to that some.

9              MR. KESSLER:  Let the witness answer.  Give his

10  answer.

11             MR. DUBIN:  Oh, I thought he was done.

12  Q     I apologize.  Did I step on your words?

13  A     Well --

14  Q     If I cut you off, you let me know, please.

15  A     Yeah.  I -- my from the beginning, it was represented to

16  me from Kevin Mulleady who was handling my half, that I would

17  be able to get back my money within a month period when -- if

18  I asked for it in a month in advance.

19  Q     Okay.  Well, Kevin Mulleady may have told that you, okay.

20  It certainly doesn't appear to be anywhere in that

21  subscription agreement, the initial one that you signed, which

22  is GX33, correct?

23             MR. KESSLER:  Objection to the form.

24  A     Yes.

25             THE COURT:  Yes.  Why don't we try to stick with the

1    appropriate cross examination.

2    Q    It does not appear, this 30-day redemption that you speak

3    of, does not appear in the GX33, correct?

4    A    I guess not.

5    Q    And certainly Mr. Evan Greebel never told you any such

6    thing; did he?

7    A    No.

8    Q    In fact, Evan Greebel had nothing whatsoever to do with

9    your decision to invest in MSMB, isn't that a fact, sir?

10   A    That's true.

11   Q    All right.

12              MR. DUBIN:  And if you go to the next page of the

13   subscription agreement, Mr. Carter, and you look at E, and

14   I'll have that pulled up on the screen.

15   Q    Do you see that, Mr. Kocher, on your screen?

16   A    Yes.

17              (Exhibit published.)

18   Q    And it says here, The subscriber has knowledge and

19   experience in financial matters; that it is capable of

20   evaluating the relative risks and merits of an investment in

21   the partnership interest.

22              That was accurate about you, correct, sir?

23   A    Yes.

24   Q    And right under that at F, The subscriber has received

25   and read, and is familiar with the partnership agreement, the

KOCHER - CROSS - DUBIN                    2741

1   memorandum and the subscription agreement, and confirms that

2   all documents, records and books pertaining to the investment

3   of the partnership, and required by it, has been made

4   available or delivered to it.

5           Do you see that, sir?

6   A    Yes.

7   Q    That was accurate as well; right?

8   A    Again, I -- the reason I invested with MSMB was because I

9   trusted Kevin Mulleady.

10  Q    Understood, sir.

11          But you have no reason to dispute that you received

12  and read and were familiar with the documents listed in F,

13  correct?

14  A    Well, you're saying I -- I did receive it.

15  Q    Okay.

16  A    Whether I read it or not is another, you know, question.

17  Q    We'll get to that.  But it certainly was your

18  responsibility to read it if you were signing this document,

19  right?

20  A    Well, if I was -- you know, smarter, yes.

21  Q    The top of the next page, G, The subscriber had an

22  opportunity to ask questions of and receive answers from the

23  general partner concerning the terms and conditions of this

24  subscription.

25  A    Yeah, it never happened.

KOCHER - CROSS - DUBIN                    2742

1   Q     Okay.  But that's because you didn't ask, right?

2   A     That's correct.

3   Q     Okay.  And if you look toward the bottom of page 5, and

4   it's K.

5           Do you see here, sir, it says, The subscriber

6   acknowledges and is aware of the following.  Romanette i, the

7   partnership is a newly-formed entity with little or no

8   operating history; the speculative nature and the degree of

9   risk involved in the partnership's investment activities; that

10  there are substantial restrictions on the transferability of

11  partnership interests; the partner interests will not be, and

12  partners of the partnership have no rights, to require that

13  the partnership interest be registered under the Securities

14  Act.

15          And it goes on and on and on, correct?

16  A     Yes.

17  Q     And do you see there in VI it says, Except for its right

18  to withdraw from the partnership, subject to the terms and

19  conditions described in this memorandum and set forth in the

20  partnership agreement, it may not be possible for the

21  subscriber to liquidate its investment in the partnership, and

22  other times, unless the general partner consents and it is

23  under no obligation to do so.

24          Do you see that?

25  A     Yes.

KOCHER - CROSS - DUBIN                    2743

1   Q    And then it goes on to say, The general partner intends,

2   in general, to reinvest partnership earnings, if any, rather

3   than make cash distributions.  And that The subscriber does

4   not expect or require cash distributions from the partnership.

5           Sir, doesn't it appear that this 30-day right of

6   which you speak is directly contradicted by K?

7   A    Well, how come they gave me the additional agreement

8   where they said they would be willing to take me out within a

9   week in cash?

10          MR. DUBIN:  Your Honor, I move to strike and ask him

11  to answer the question that I asked.

12          THE COURT:  Well --

13          MR. KESSLER:  He just explained --

14          MR. DUBIN:  I'm going to get to that, but I'm asking

15  specially with regard -- I'll withdraw and ask it again.

16          THE COURT:  Whether it's inconsistent or not, that

17  was your question?

18          MR. DUBIN:  I said that a right to withdraw within

19  30 days seems to be directly contradicted by this paragraph.

20          THE COURT:  Okay.  He answered the question.

21          MR. DUBIN:  Okay.  I'll withdraw it and move on.

22          THE COURT:  Okay.

23          MR. DUBIN:  All right.

24  BY MR. DUBIN

25  Q    Do you agree, sir, that it doesn't say anywhere in K that

KOCHER - CROSS - DUBIN                              2744

1   you could redeem it in 30 days, correct?

2   A     Not in K.  No.

3   Q     Okay.  In fact, what it says is that -- that you don't

4   expect or require cash distributions from the partnership.

5            That's what it says, correct?

6   A     That's what did says here, but then they gave me a letter

7   that said that they, in fact, would redeem me within one week.

8   And in that it said that they would change it from a month to

9   one week.

10  Q     I'm going to get to that, I promise.

11  A     Okay.

12  Q     But here it says no such thing, correct?

13  A     That's correct.

14  Q     And this is the initial subscription agreement that you

15  signed, correct?

16  A     It was the initial one, yes.

17  Q     All right.  And isn't it clear to you, sir, from the

18  provisions that we just went through, that this was a risky

19  investment?

20  A     It wasn't clear, no.  Not then, to me.

21  Q     Okay.  It wasn't clear to you because you didn't read

22  this very closely, correct?

23  A     No, because I trusted Kevin, and he said it was a good

24  investment.

25  Q     Okay.  And so you trusted Kevin, right?

KOCHER - CROSS - DUBIN                          2745

1    A    Yes.

2    Q    There's nothing wrong with that, sir, is there; trusting

3    someone?

4    A    No.

5    Q    And accepting their representations as true?

6    A    Well, I had a history with him so...

7    Q    Okay.  Did you ask to see trading records when he told

8    you that he made money for you?

9    A    No.

10   Q    You accepted him at his word; didn't you?

11   A    Yes.

12        Well, when I was with Smith Barney, there actually

13   were records.

14   Q    Right.

15   A    That's the difference.

16   Q    Right.  You got records, right?

17        And when were you getting the record -- when were

18   you getting performance updates from Mr. Shkreli, you accepted

19   them as true, correct?

20   A    Well, from Martin Shkreli, he basically, you know, gave

21   me three months out of -- practically out of the year, and it

22   was all -- all in September so...

23   Q    When you got it in September, and it was three months out

24   of year, you never picked up the phone or emailed him and said

25   I don't believe this, did you?

KOCHER - CROSS - DUBIN                    2746

1   A    No.

2   Q    Okay.  You accepted that, notwithstanding the fact that

3   he was behind and wasn't giving you regular performance

4   updates, you accepted those updates as true, correct?

5   A    Well, I hoped they would be.

6   Q    All right.  Now, let's talk about this subsequent

7   subscription agreement that you signed in May of 2012, and I

8   believe it's in evidence already as Government Exhibit 34.

9   Okay?

10            MR. DUBIN:  You can put that up.

11            (Exhibit published.)

12            MR. DUBIN:  So can you just blow up.  There you go.

13   Thanks.

14   Q    So you see the date is May 1st, 2012, right?

15   A    Yes.

16   Q    And prior to this you had previously invested $100,000,

17   right?

18   A    That's correct.

19   Q    And you invested in an additional 100 grand pursuant to

20   this agreement, correct?

21   A    Yes.

22   Q    So you see here where it says -- Government showed that

23   you paragraph in the middle there, right?

24            Maybe they didn't, but I'll show it to you.

25            MR. DUBIN:  Would you blow that up.

KOCHER - CROSS - DUBIN                    2747

1   Q    In connection with such investment, the undersigned

2   further acknowledges and agrees that, one, the undersigned has

3   carefully read the funds confidential, private offering

4   memorandum and subscription agreement in effect as of the date

5   hereof and understand all of their terms.

6            You signed your name, basically saying -- at the

7   bottom of this documents, basically saying that you did that,

8   right?

9   A    Yes.

10  Q    So I'd like to show you that agreement.

11           MR. DUBIN:  And it's -- I'll mark it as a defense

12  exhibit.

13           I'll hand you what I will mark for identification as

14  DX103-22.

15           THE COURT:  Is that dash 22, sir?

16           MR. DUBIN:  Yes, Your Honor.

17           THE COURT:  Thank you.

18  Q    Mr. Kocher, that is the confidential private offering

19  memorandum referenced in GX34, correct?

20  A    I guess so.

21  Q    Okay.  And you see it says, Private offering memorandum

22  offering the limited partner interest in MSMB Healthcare, LP?

23  A    Yes.

24  Q    Okay.

25           MR. DUBIN:  I'll offer it, Your Honor.

KOCHER - CROSS - DUBIN                    2748

1          MR. KESSLER:  Can I ask one voir dire question?

2          THE COURT:  Yes.

3     VOIR DIRE EXAMINATION

4     BY MR. KESSLER

5     Q    Mr. Kocher, have you ever seen that document before?

6          THE WITNESS:  I don't remember seeing it.

7          MR. KESSLER:  There's no objection.

8          MR. DUBIN:  Thank you.

9          THE COURT:  No objection?

10         MR. KESSLER:  No objection.

11         THE COURT:  All right.  We will admit Defense

12    Exhibit 103-22.

13              (Defense Exhibit 103-22, was received in evidence.)

14    CROSS-EXAMINATION (Continued)

15    BY MR. DUBIN:

16    Q    You don't remember seeing it, but you certainly signed a

17    document on May 1st, 2012, saying that -- acknowledged and

18    agreed that you carefully read it, correct?

19    A    That doesn't mean I -- I ever received it.

20    Q    Okay.  Well, how can you carefully read it if you never

21    received it?

22    A    You couldn't.

23    Q    Okay.

24    A    You wouldn't be able to.

25    Q    Right.  So my point is that, before signing this, had you

1   not got it and weren't able to read it, you could have said,

2   hey, I'm not signing this saying I carefully read something

3   that I never received, right?

4   A    That's not why I invested.  I invested because I felt

5   like the fund was going to be good because it was recommended

6   to me by someone I trusted.

7   Q    Understood.

8           MR. DUBIN:  And I move to strike the answer, Your

9   Honor, and I would ask for an answer to the question that I

10  just asked please.

11          THE COURT:  All right.  So why don't we strike

12  Mr. Kocher's response, and can you reread the question that

13  was asked by Mr. Dubin, and I'll ask Mr. Kocher to answer it.

14          MR. KESSLER:  Okay.

15          (Whereupon, the record was read.)

16          MR. DUBIN:  Can you answer that yes or no, sir?

17  A    No, I can't.

18  Q    Okay.

19  A    Maybe you could rephrase it.

20  Q    Well, you certainly had the option before you signed --

21          MR. DUBIN:  Would you put back up, please, GX34.

22  Q    Before you signed your name to this document saying that

23  you read, carefully read the offering memorandum, you could

24  have said I am not signing this document because I'm agreeing

25  that I read something when I never received it.

KOCHER - CROSS - DUBIN                          2750

1              You could have done that; right?

2    A    That's correct.  Yes.  I -- I did not.

3    Q    All right.  So I want to show you what you are attesting

4    that you read.  Okay?

5              Now, if we go back to GX103-22, and if you take a

6    look at the third page of the document, and paragraph -- third

7    from the bottom starting with Limited partnerships offered.

8              Do you see it says, The limited partnership interest

9    offered hereby are illiquid.

10             Do you see that?

11             MR. KESSLER:  Objection.

12   Q    Okay.

13   A    Uh-huh.

14             THE COURT:  Overruled.  Just to the extent he's

15   asking whether he sees it.

16   Q    And you testified what, about an hour ago, you testified

17   an hour ago that the fund was supposed to be liquid.

18   A    Yes, that was my understanding.

19   Q    Right.  That was your understanding from who;

20   Mr. Mulleady?

21   A    Yeah.  And in general.

22   Q    In general, but never from Mr. Greebel; correct?

23   A    No, not from Mr. Greebel.  I never spoken to Mr. Greebel

24   at this point.

25   Q    Okay.

KOCHER - CROSS - DUBIN                    2751

1    A    When I first entered into the contract.

2    Q    Why don't we go to page 2 of the document.  Not page 2 of

3    the exhibit, but page 2 of the document, Bates stamped end 1-9

4    please?

5              THE COURT:  This is Exhibit 103-22?

6              MR. DUBIN:  Yes, Your Honor.

7              THE COURT:  Page 2 of that document?

8              MR. DUBIN:  Yes, Your Honor.

9    Q    And you see it's the third paragraph from the bottom

10   starting --

11             THE COURT:  Sorry.  What the Bates number on the

12   bottom?

13             MR. DUBIN:  1-9, Your Honor.

14             THE COURT:  Oh, 1-9.

15             MR. DUBIN:  Yes.

16             THE COURT:  Thank you.

17   BY MR. DUBIN:

18   Q    Do you see that on your screen, Mr. Kocher?

19   A    Yes.

20   Q    It say there in the middle, The partnerships investments

21   may also include securities that are thinly traded and

22   non-publicly traded or restricted securities, right?

23   A    Yes.

24   Q    Do you recall when you told the jury a little bit earlier

25   that when you learned about restricted securities, when you

KOCHER - CROSS - DUBIN                    2752

1   were going through the settlement discussion, it certainly is

2   mentioned in this document?

3           MR. KESSLER:  Objection to the form of the question.

4           THE COURT:  Try to rephrase, Mr. Dubin.

5   Q   Do you remember testifying a little while ago and I think

6   there was some lapse when you said you quickly learned what a

7   restricted security was?

8   A   That's correct.

9   Q   Okay.  Well, you would agree, sir, that the private

10  offering memorandum that you received months and months

11  earlier talked about restricted securities --

12  A   You're --

13          MR. KESSLER:  Objection.

14          THE COURT:  Sustained.  Sustained.  Sustained.

15          You don't need to answer it.

16  Q   Sir, your testimony is not that you didn't receive this

17  document, it's that you just don't recall, right?

18  A   I don't remember seeing this document.

19  Q   Do you remember testifying in a prior proceeding about

20  whether or not you received that document?

21  A   No.

22  Q   No?  Let me -- bear with me one moment.

23          Well, you know what, I'll get to it when I get to it

24  in order.

25          But in any event, let me just show you one or two

1    more of these and I'll move on.

2              Go to page 12 of the documents Bates stamp ending 29

3    please.

4              (Exhibit published.)

5    BY MR. DUBIN:

6    Q    Do you see the on page 12 -- there you go.

7              At the bottom, there's -- about the last paragraph

8    says, Investment in restricted securities.

9              Do you see that?

10   A    Yes.

11   Q    And it says, The partnership may invest up 10 percent of

12   its assets in restricted securities.

13             Do you see that?

14   A    Yes.

15   Q    And it tells you what they are, right, which are

16   securities subject to significant legal and contractual

17   restrictions under public resale, correct?

18   A    Yes.

19   Q    All right.

20             Now, you probably read this; didn't you?

21   A    No.

22   Q    All right.  Why don't you go to page -- why don't you go

23   to your -- see where it says trial TR, on your binder, third

24   tab?

25   A    Sorry.  In the binder that you gave me?

KOCHER - CROSS - DUBIN                    2754

1    Q    Yes.  Yes, sir.

2    A    And which tab; 3?

3    Q    Trial TR.  It's the third tab, not tab number 3, but the

4    is tab that is marked trial, TR.

5              MR. KESSLER:  It is marked 3500RK.

6              MR. DUBIN:  Might be.

7    Q    3500RK?

8    A    Yes.  Yes.

9    Q    And if you can go to page 2401.

10   A    Yes.

11   Q    Okay.  Do you recall being asked this question on line 1

12   and giving these answers in a prior proceeding?

13             "QUESTION:  Do you know what that is?

14             "ANSWER:  The private offering memorandum.

15             "QUESTION:  Right.

16             "ANSWER:  It was probably an MSMB part of the

17   paperwork.

18             "QUESTION:  Did you read it?

19             "ANSWER:  Probably, yes.  I don't remember

20   specifically -- I read a lot of stuff.  This is about MSMB.  I

21   did read stuff originally, but that was, you know, now 2012.

22   So that's five years ago.

23             "QUESTION:  Now, you did read MSMB

24   Healthcare, LP private offering memorandum before you

25   invested?  And just to be clear, that's DX" --

KOCHER - CROSS - DUBIN                              2755

1          THE COURT:  103-22?

2          MR. KESSLER:  Your Honor, was that a question?

3          MR. DUBIN:  Yes, I'm asking the question.

4          "QUESTION:  Now, did you read the MSMB

5    Healthcare, LP private offering memorandum before you

6    invested?

7          "ANSWER:  I assume I did.

8          "QUESTION:  Can you recall as you're sitting here

9    today whether you read it or not?

10         "ANSWER:  I read paperwork on MSMB.  I don't

11   remember specifically what I read."

12   Q    Is that testimony that you gave at a prior proceeding in

13   this matter?

14   A    Yes.

15   Q    Okay.  So I want to go back now to GX -- so, sir --

16   actually, when I asked you a minute ago if you probably read

17   it and you said no, that wasn't correct; was it?

18   A    No, it probably was correct.

19         I don't remember reading this, okay?

20   Q    Okay.  But you remembered reading a lot of stuff about

21   MSMB when you testified in a prior proceeding?

22   A    I briefly skimmed some of the stuff they sent me.

23   Q    Okay.  In the --

24   A    That was a long time ago and I don't know if it was this.

25   Q    Okay.  In the --

KOCHER - CROSS - DUBIN                    2756

1  A    I definitely didn't read this; the specific things that

2  you've been pointing out.  I don't remember any of it.

3  Q    Okay.  And then the question and answer that I just asked

4  you, you never said you briefly skimmed did; did you?

5  A    No, I didn't because when I said I briefly skimmed, I

6  briefly skimmed some things that were sent to me.  But I don't

7  remember this specifically.

8             THE COURT:  This being DX103-22?

9             THE WITNESS:  Yes.

10             THE COURT:  All right.

11 Q    Okay.  Now, I want to put back up --

12             MR. DUBIN:  I want to put back up GX 34, please.

13             (Exhibit published.)

14 Q    So where it says here, In connection with such

15 investment, the undersigned further acknowledges and agrees

16 that it's carefully read the fund's confidential private

17 offing memorandum.

18             We went through you will of that, right?

19 A    Yes.

20 Q    I wanting to go to the next page, which is what you

21 referred to a few times, I believe.

22             MR. DUBIN:  And if you go to the -- let's go to

23 number two please.

24             (Exhibit published.)

25 Q    Now, it says -- and you remember being shown this during

1    your direct examination, right?

2    A    Yes.

3    Q    And it says, Notwithstanding anything to the contrary,

4    set forth in the memorandum, and the memorandum is defined in

5    this letter, in the first paragraph, as the confidential

6    private offering memorandum, which we went through a little

7    while ago; right?

8    A    Yes.

9    Q    It says, You will be permitted to redeem your exempt

10   interest.  Your exempt interest.

11        Do you know what your exempt interest was?

12   A    No, I don't know what it is specifically.

13   Q    Okay.  But it says, You will be permitted to redeem your

14   exempt interest as of the final business day of each calendar

15   week, instead of the final business day of each calendar

16   month, right?

17   A    Yes.

18   Q    It doesn't say you will be able to redeem your entire

19   investment that you ever made in MSMB; does it?

20   A    No.

21   Q    Okay.  It just says your exempt interest and sitting here

22   today, you don't know what that means, right?

23   A    That's correct.  It's not clear.

24   Q    Okay.  Regardless of what it says, and what it is you

25   think you agreed to, or did, in fact, agree to, Mr. Greebel

KOCHER – CROSS – DUBIN                    2758

1   had nothing to do with your signing this document; did he?

2   A    Not that I know of.

3   Q    Okay.  Now, by the way, you have no knowledge, sir, of

4   who prepared that private offering memorandum; correct?

5   A    That's correct.

6   Q    Okay.  And you certainly are not saying that Mr. Greebel

7   had any hand in preparing that document; are you?

8   A    No.

9   Q    All right.  Now, you talked a little bit about the -- on

10  your direct examination about how much money you made.

11  A    Yes.

12  Q    All right.  Now, you know that in any financial

13  investment, be it a risky one, a hedge fund, whatever it is,

14  you can lose money, right?

15  A    That's correct.

16  Q    In fact, you know, lose at your money, no guarantees,

17  right?

18  A    That's correct.

19  Q    Here, ultimately, you made a substantial profit on your

20  investment, right?

21  A    Yes.

22  Q    You invested a total of $200,000, right?

23  A    That's correct.

24  Q    And as part of the settlement agreement, you got some

25  cash and some Retrophin, right?

KOCHER - CROSS - DUBIN                    2759

1    A    Yes.

2    Q    Cash portion was, what, 122,700, right?

3    A    Something like that, yes.

4    Q    All right.  And that cash was, in fact, wired to your

5    account, right?

6    A    Yes.

7    Q    And you remember you were sent some wiring instructions

8    and it didn't come right away, but it eventually came, right?

9    A    That's correct.

10   Q    In fact, it took you a little over two months from the

11   time you said I want my cash for you to get some cash, right?

12   A    It was longer than that.  But that's, you know,

13   technically you can say it was two months.

14   Q    Okay.

15   A    But I started trying to get the money back way before

16   that.

17   Q    All right.  In any event, you also got 47,128 shares of

18   Retrophin, right?

19   A    That's correct.

20   Q    And those, sir, were freely tradeable shares, right?

21   A    Yes.

22   Q    And you sold those Retrophin shares, right?

23   A    Yes.

24   Q    And you know that after you sold those shares the stock

25   went up in value quite a bit, right?

KOCHER - CROSS - DUBIN                    2760

1    A    Yes.

2    Q    So if you had held on to those shares, and sold them when

3    they were higher, you would have made even more money, right?

4    A    That's correct.

5    Q    All right.  Even in 2015 -- or excuse me.  Strike that.

6              Even in 2013, when you ultimately sold them, you

7    made, what, over $350,000, right?

8    A    The 350,000 included the original investment and included

9    the cash.

10   Q    Okay.  It included the original investment and the cash.

11             That is a pretty nice return on your money, right?

12   A    Yes.

13   Q    Had you ever, outside of real estate deals, had you ever

14   made that kind of return on an investment in stock?

15   A    No.

16   Q    Now, are you aware, sir, that -- what the prosecution is

17   claiming in this case --

18             MR. KESSLER:  Objection.

19             THE COURT:  Sustained.

20   Q    Are you aware, sir, that the allegation in this case --

21             MR. KESSLER:  Objection.

22             THE COURT:  Wait.  Wait.  Sustained.  Let's have a

23   sidebar.

24             (Continued on the next page.)

25             (Sidebar conference.)

SIDEBAR CONFERENCE                          2761

1      THE COURT:  What is the question going to be?

2      MR. DUBIN:  The question is going to be if he's

3  aware that the allegation in this case against Mr. Greebel is

4  that a settlement agreement that entered into is alleged to

5  have been fraudulent.

6      MR. KESSLER:  It's irrelevant.

7      MR. DUBIN:  It's very relevant.

8      MR. KESSLER:  What's the relevance?

9      THE COURT:  Is he aware that the Government's

10 charging -- you're saying that his awareness of the Government

11 charges is relevant to the proof that the Government has to

12 submit as a defense?

13     MR. DUBIN:  Absolutely.

14     THE COURT:  How?

15     MR. DUBIN:  Because the next question -- I asked

16 this question, by the way, to Ms. Hasson and there was no

17 issue with it.  I asked the same exact question.  That's

18 first.

19     Second, the next question I'm going to ask him is if

20 he's given the money back.  Because the Government's claim in

21 this case is that the money was of ill-gotten gains that

22 belong to Retrophin.

23     THE COURT:  No, I don't think they're saying that

24 ill-gotten gains to the investors.  They're saying it was --

25 they are alleging that it was unlawfully and fraudulently

SIDEBAR CONFERENCE                              2762

1    obtained from the Retrophin.

2              They're not saying that the investors engaged in any

3    illegal activity or received ill-gotten gains.

4              MR. DUBIN:  I'm not going to suggest that.

5              THE COURT:  They're alleging that charged

6    individuals had defrauded Retrophin.

7              MR. DUBIN:  Understood, Your Honor.

8              THE COURT:  You need to be careful how you phrase

9    your question.

10             MR. DUBIN:  Can I finish, please?  Thank you.

11             I am going to phrase it very similar to how I did

12   with Ms. Hassan.  And Your Honor allow the question, and the

13   Government had nothing to say anything about it.

14             And what I'm going to ask if he's giving any money

15   back.  I won't ask if it's ill-gotten gains or if he's in

16   possession of stolen goods or stolen funds or anything like

17   that.

18             What I intend to ask him is that if the Government's

19   claim in this case that money that he was given rightfully

20   belonged to Retrophin, and then I'm going to ask him how much

21   he's given back.

22             That is very relevant, because if they're claiming

23   that the money somehow was taken from the Retrophin --

24             THE COURT:  You're asking an alleged victim of a

25   fraud, i.e., Counts 1 through 6, whether he should have an

SIDEBAR CONFERENCE                    2763

1   obligation to return the money?

2           MR. DUBIN:  I'm going --

3           THE COURT:  When the charges are that Retrophin

4   assets were used to pay him?

5           MR. DUBIN:  Yes.  I'm not going to ask him if he has

6   an obligation --

7           THE COURT:  Well, the question suggests that he has

8   some sort of an obligation as a victim of the fraud charged in

9   Counts 1 through 6 has an obligation to pay the other alleged

10  victim of the -- in Charges Seven and Eight.

11          MR. DUBIN:  I'm not going to ask him if he has an

12  obligation.

13          THE COURT:  No, but the implication by asking if he

14  should have paid it back or whether he did pay it back, the

15  implication that you're leaving is that somehow an alleged

16  victim of Counts One through six should have an obligation to

17  compensate the alleged victim of Counts Seven and Eight.

18          That's having a precedent.

19          MR. DUBIN:  And you know what I'm going to do?  I'm

20  go to ask him if Retrophin ever asked him for the money back.

21  That is certainly relevant.

22          MR. KESSLER:  None of that is relevant to his

23  personal knowledges of the events in the case.

24          Furthermore, they're going to ask him about

25  Retrophin getting the money back, and then we are going to get

SIDEBAR CONFERENCE                                    2764

1    into the civil lawsuit where Retrophin is seeking all of the

2    money from Mr. Shkreki.  And we'd also like the Court to

3    inform the jury about the forfeiture allegations against

4    Mr. Shkreki and Mr. Greebel with respect to the ill-gotten

5    funds.

6              The point is none of this is relevant.  Whether or

7    not, in 2015, the Government asked Mr. Kocher for money,

8    Mr. Kocher somehow decided to give money back, of charges he

9    has no knowledge of, does not make it more or less likely that

10   any of the charged conduct occurred or did not.  It just

11   doesn't.

12             THE COURT:  I think you're running a risk infecting

13   the trial with matters that are is not relevant.

14             His understanding of the charge and whether he

15   should have given money back to Retrophin based on the charged

16   conduct is not relevant.  You're going to end up opening a lot

17   of doors that you don't want to open.

18             MR. DUBIN:  Your Honor, I understand.

19             THE COURT:  I mean I think you should go talk your

20   colleagues and your client is running a big risk if the door's

21   is going to be open.

22             MR. DUBIN:  The door is going to be open for what?

23             THE COURT:  He said he's going to ask questions

24   about the civil lawsuit, the forfeiture, and other matters

25   where people are trying to get money back.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                                   2765

1          MR. DUBIN:  Your Honor, the Government has

2     charged -- he comes here to testify today, it's not relevant

3     whether he even knows what Mr. Greebel's been charged with?

4          MR. KESSLER:  It's absolutely not.

5          THE COURT:  No, it's not relevant because Ms. Hassan

6     was also ignorant of the charges.  She didn't know what the

7     case was about.  She doesn't know intimately.  She's not

8     intimately familiar with the charges.

9          I told the jury what the charges are.  I will

10    instruct them further on the element of each charges.

11         What this witness knows or doesn't know about the

12    charges is not relevant.  The jury has to decide whether the

13    Government has proven beyond a reasonable doubt the charges in

14    Seven and Eight.  To try to shift the onus on to the alleged

15    victim of charges Counts One through Six is just not

16    appropriate.

17         MR. DUBIN:  Your Honor --

18         THE COURT:  And I'm telling you, it's just not

19    relevant.  It's not proper.

20         MR. DUBIN:  Your Honor, we feel that it's very

21    relevant, and we feel that the fact that the Government has

22    not asked any of these alleged victims to give money back when

23    out of one side of their mouth saying that Retrophin was

24    defrauded is very relevant.

25         MR. KESSLER:  Defrauded by the victims.  We have

SIDEBAR CONFERENCE                    2766

1  asked for the money back from the people we have accused doing

2  the fraud through the forfeiture allegations.

3          Retrophin has sued Mr. Shkreki for the money back.

4  No one has sued the victims.

5          MR. DUBIN:  Just so I'm clear, so I'm very clear, I

6  am not suggesting for a moment, nor will I involve a jury and

7  I'm not doing it now, that Mr. Kocher did anything wrong or

8  has any obligation to --

9          THE COURT:  Why did you ask him whether he gave the

10  money back then?

11          MR. DUBIN:  Because I want to know whether or not he

12  has knowledge of the fact that the Government has claimed that

13  the money that he received was taken from someone that it

14  shouldn't have been.

15          And possessed with that knowledge, I think that it's

16  fair to say a lot of people might say, well, I don't want it.

17  Then give it back.  And I think that that's completely

18  relevant.

19          THE COURT:  He wanted his back from Mr. Shkreki and

20  his MSMB investment --

21          MR. DUBIN:  Even if it was wrongly taken?

22          THE COURT:  -- but instead, allegedly, money was

23  taken from Retrophin to make him whole, as with the other

24  victims.  Right, it doesn't make them perpetrators or holders

25  of ill-gotten gains.  They are alleged victims in Counts One

SIDEBAR CONFERENCE                                    2767

1    through Six.

2              So to ask one victim whether they should have paid

3    back another alleged victim is inappropriate.  It's irrelevant

4    and it's confusing and prejudicial to everybody, including

5    your client, because then they're going to be able to, or will

6    want to push hard to get information before the jury about the

7    attempts to retrieve money by Retrophin and the SEC on the

8    alleged, you know, misconduct.

9              MR. BRODSKY:  Your Honor, is it appropriate for us

10   to ask whether he has returned any of the money to Retrophin?

11             The reason for why it's relevant is the agreement

12   that he signs, that Mr. Kocher signs, the Government says it's

13   a fraud.  The fraud, generally, poses the agreement invalid,

14   the agreement itself is invalid, and the money has to be

15   returned, and then everybody figures out what's the result.

16             So, for example --

17             THE COURT:  He had a settlement agreement.

18             MR. BRODSKY:  He had a settlement agreement, so we

19   think it's a relevant fact.

20             THE COURT:  I think the aspect, if I understand the

21   Government's allegation of what is fraudulent about the

22   settlement or consulting agreements, the common thread is that

23   assets of Retrophin were used to compensate investors and MSMB

24   Capital and MSMB Healthcare.

25             He's testified he has no idea Retrophin had anything

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                                    2768

1    whatsoever to do with his investment in MSMB Healthcare.

2             The additional alleged fraud, as I understand from

3    the Government's theory on consulting agreements, is that some

4    of the folks had no consulting whatsoever for Retrophin.

5             So I think that it's really what his knowledge is

6    regarding the charges is really not relevant to be proven

7    whether or not the Government is going able to prove beyond a

8    reasonable doubt that Mr. Greebel is guilty of Count Seven and

9    Eight.

10            MR. DUBIN:  Your Honor, perhaps I can lay a further

11   foundation.

12            THE COURT:  I'm going them give them a break.

13            I'm going to give the members of jury a break at

14   this time.

15            Please don't talk about the case.  Thank you.

16            (Jury exits the courtroom.)

17            THE COURT:  Let's just stay here for a minute.

18   Let's just get this resolved before we take our break.  All

19   right.

20            MR. DUBIN:  Can I continue real quick?

21            What I'm going to do in the next section, or in a

22   section coming sometime soon, is he testified at the Shkreki

23   trial that he thought MSMB and Retrophin were the same.  He

24   testified to that.  But he couldn't even -- essentially what

25   he says is it that he couldn't distinguish between the

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                    2769

1    entities and he thought Retrophin was part of MSMB.

2              So the fact that he thinks --

3              THE COURT:  If your confronted with prior

4    inconsistent statements, that's fine.  If he said that.  I

5    don't recall exactly what he said.  But if he said something

6    different today than he said back then, yes.

7              MR. DUBIN:  Here's my point.

8              MR. KESSLER:  Your Honor, just so we're clear on the

9    Court's ruling, that is about a prior inconsistent statement.

10   That is about a prior inconsistent statement and not the

11   relationship between MSMB and Retrophin, not this issue

12   about --

13             THE COURT:  Repaying.

14             MR. KESSLER:  The forfeiture or the repaying.

15             Obviously if there's a prior inconsistent statement

16   and it's otherwise relevant to bring to his attention, that's

17   fine.

18             THE COURT:  Right.

19             MR. DUBIN:  I want to be perfectly clear about what

20   my intent is.

21             My intent is not to somehow say that an alleged

22   victim somehow has an obligation to give it back.

23             But as Mr. Brodsky stated, the Government's

24   allegation -- I won't state it as the Government's allegation,

25   but one of the main contentions in the case is that the

SIDEBAR CONFERENCE                                    2770

1    settlement agreement was a fraud.  Because the money that was

2    used and listed in that settlement agreement, the cash that

3    was used, and the shares, shouldn't have been used, period, to

4    settle that agreement.

5           So typically when that happens, the agreement, they

6    are saying, is a fraud.

7           MR. KESSLER:  Which criminal trials result in the

8    allegedly fraudulently agreement being dissolved and having

9    the victim return the money before the trial.

10          MR. BRODSKY:  Ponzi schemes all the time.

11          MR. KESSLER:  This isn't a Ponzi scheme.

12          MR. BRODSKY:  The government actually in the press

13   release said it was a Ponzi scheme.

14          Your Honor, I think it's perfectly fair for us to

15   elicit from everybody who the Government alleges

16   misappropriated -- they don't allege they misappropriated, I

17   apologize, Your Honor.  They alleged that the money received

18   by the settlement party was misappropriated from Retrophin.

19          It's perfectly permissible for us to elicit they've

20   kept the money.  They haven't given it back.

21          MR. KESSLER:  What fact of consequence with respect

22   to any charge does that make more or less likely to be true?

23          MR. DUBIN:  It makes it more likely that it's a real

24   agreement and it's not a fraudulent agreement.

25          MR. KESSLER:  But they don't know.

2771

1              THE COURT:  But you're saying that because an

2      alleged victim of the Counts One through Six lost money and

3      was compensated through an alleged fraud committed in Counts

4      Seven and Eight that somehow they have an obligation to give

5      money back.  And the fact that they didn't makes more valid

6      the alleged fraud or negates the allegation of fraud in Counts

7      Seven and Eight.

8              MR. BRODSKY:  No, Your Honor.  No, Your Honor.

9      First we're not charged in one through six.

10             THE COURT:  Exactly.  So that's why that's --

11             MR. BRODSKY:  But in seven and eight --

12             THE COURT:  Let me just finish.

13             Counts One through Six is what happened that led to

14     the agreements in Count Seven, right?

15             So having not been victims of the misstatements or

16     fraud of Mr. Shkreki charged in Counts One through Six, we

17     would not have any agreements whatsoever with MSMB Capital or

18     MSMB Healthcare.

19             MR. BRODSKY:  We have a different view of that, Your

20     Honor.

21             THE COURT:  I'm just looking at the allegations.  I

22     don't know any more what the facts are, you know.

23             MR. BRODSKY:  With he respect to Count Seven, we

24     have a different view of facts than the Government does.  The

25     Government says this was misappropriated assets from

SIDEBAR CONFERENCE                    2772

1   Retrophin.  It makes it less likely it's misappropriated if

2   the people who received the assets keep them.

3          And a good perfect example is stolen property.  In a

4   classic case when the Government says you, innocent victim,

5   have possession of stolen property, it doesn't matter whether

6   you're an innocent victim or not, you can't keep the stolen

7   property, just because you've been defrauded in another place.

8          THE COURT:  But what you're doing is you're

9   suggesting a rule of law that somehow the victims who received

10  settlement or consent agreements has some legal obligation

11  based on the charged frauds in seven and eight to give money

12  back.

13         And that's just not accurate.  It's just -- it's an

14  irrelevant distraction.  It's going to confuse the jury.  It's

15  going to open doors that I don't think you want to open.  And

16  his understanding of the charges in this case and whether he

17  gave money back from his settlement agreement is irrelevant.

18  I just --

19         MR. BRODSKY:  If the money was really

20  inappropriately taken from Retrophin, it is a relevant fact

21  that people who have perceived the allegedly misappropriated

22  money have kept it.

23         THE COURT:  If they knew and conspired with

24  Mr. Greebel and Mr. Shkreli to rob Retrophin of assets that

25  they knew Retrophin shouldn't have paid them, yes, I would

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                    2773

1  agree with you.  But that's not the allegation.

2           MR. DUBIN:  I understand, Your Honor, and just so

3  it's clear because it seems like my intent in asking the

4  question is getting somehow lost here or Your Honor thinks I'm

5  trying to put --

6           THE COURT:  When you ask a question, when you say

7  did you give the money back suggests that there's an

8  obligation they're done so.  Like somehow they should have.

9           MR. DUBIN:  The reason why I asked him if he knows

10  what the charges are is specifically for the reason that Your

11  Honor was just outlining.

12           I want to know if he's aware, if he does have an

13  awareness that this settlement agreement was the proceeds that

14  he was received was fraudulent, if he does possess that, I can

15  frame it in a different way and he's decided to keep it

16  nonetheless.  That's highly relevant.

17           MR. KESSLER:  To what?

18           MR. DUBIN:  For all the reasons that Mr. Brodsky

19  stated.  Because it -- I'll tell you what it's relevant to.

20  It's relevant because it goes to show that in his estimation

21  he finds nothing wrong with them.

22           And the reason why I brought Your Honor's

23  attention -- excuse me, please.  The reason why I brought Your

24  Honor's attention to where I'm going next is because in his

25  mind, okay, similar to what was in Mr. Greebel's mind, we will

SIDEBAR CONFERENCE                                    2774

1    argue, that MSMB and Retrophin were the same and that he

2    couldn't distinguish one from another.  In his mind there's

3    nothing fraudulent about these agreements.  Just because the

4    Government says it, doesn't make it so.  They're claiming that

5    they're fraudulent, we're claiming they weren't.

6              THE COURT:  How is this knowledge or his -- the

7    payment that he received from Retrophin and Mr. Shkreki, or

8    whomever, relevant to proving the Government's burden of prove

9    against Mr. Greebel?

10             MR. DUBIN:  I'll tell you.  Because if there's

11   another individual that was a party to the agreement.  If Your

12   Honor will just hear me out.  If there was another individual

13   that was a party to these agreements who had sophisticated

14   counsel representing him, who disagrees with the proposition

15   that these were somehow fraudulent, that's yet another person

16   who says I didn't think this was a fraud.  I still don't think

17   it's a fraud.  That's why I didn't give the money back.

18             That couldn't be more in the wheelhouse of what

19   Mr. Greebel is charged with.  They are saying that it's a

20   fraud and it's a fraudulent agreement.  We say it isn't so.

21   Just because they say so doesn't make it more likely.

22             THE COURT:  But Mr. Kocher, I thought when he was

23   reviewing the terms of the settlement agreement, I thought

24   that he was saying that cash was going to come, he was just

25   reading from the terms of the agreement, either from

SIDEBAR CONFERENCE                    2775

1   Mr. Shkreki or Retrophin -- no, I'm sorry, MSMB or Retrophin

2   and he said that he was saying he didn't know where it came

3   from.

4             MR. DUBIN:  That's not what he said, Your Honor.  In

5   the settlement agreement, it says that the cash comes from

6   Retrophin.

7             MR. KESSLER:  From MSMB.

8             THE COURT:  And/or; did he?

9             MR. DUBIN:  When he's asked, you know, did you

10  distinguish between the two, I'm going to show him his prior

11  testimony where he says he thought they were the same.

12            MR. KESSLER:  And that's potentially a prior

13  inconsistent statement, which has nothing do with -- if the

14  point is if Mr. Kocher had full information, then as the Court

15  said, it is possible that his retention of the funds might be

16  probative of something, but he doesn't.

17            MR. DUBIN:  He doesn't know, I haven't asked the

18  question.

19            MR. KESSLER:  Then why don't we lay the foundation?

20  Let's ask if he knows that the board approved various things?

21  Let's ask him if he knows what Mr. Greebel knew at various

22  points?

23            And then on redirect, I will go through the entire

24  agreement and we will go through all the acts that we've

25  alleged to see if Mr. Kocher knows.  Because that is the basis

SIDEBAR CONFERENCE                                    2776

1    for knowing whether or not he believes there's a fraud.

2         The point is —

3         THE COURT:  Did he know at the time the acts

4    alleged — did he know at the time he accepted the settlement

5    agreement the acts alleged in the indictment?

6         MR. KESSLER:  Sure.  Let Mr. Dubin read all the acts

7    alleged in the indictment to find out if Mr. Kocher knew.

8    That's the basis.

9         MR. DUBIN:  I'm going to conduct the examination the

10   way I think is appropriate for my client.  And I do not need

11   to do any of those things, nor is the Government permitted to

12   start, as much as they want to, make this the Martin Shkreli

13   trial, nor are they permitted to do.  I am permitted to ask,

14   Your Honor, whether if was aware at the time —

15        THE COURTROOM DEPUTY:  Judge.

16        THE COURT:  Oh, I'm sorry.  We will put the noise on

17   just for a minute.  We'll put the noise on, it's okay.

18        MR. DUBIN:  I am permitted to ask him — the

19   Government is telling you, making a representation of what he

20   knew or didn't know?  That's very well.  They made other

21   representations about witnesses that when we asked them turn

22   out not to be so.

23        So we're entitled to ask him if at the time he knew

24   that this is some sort of fraudulent —

25        THE COURT:  It wasn't alleged at the time because at

SIDEBAR CONFERENCE                              2777

1   the time the settlement agreement the Government hadn't

2   indicted Mr. Greebel.  Okay, how can one know that?

3           MR. DUBIN:  Well, you just asked him if you knew at

4   the time.

5           THE COURT:  I'm just saying he could not have known

6   at the time.  That's why I'm asking Mr. Kocher what he knew at

7   the time regarding whether there is fraud, alleged fraud on

8   Retrophin --

9           MR. DUBIN:  I'm not going to ask him that.

10          THE COURT:  -- or that the transaction was somehow

11  unlawful and whether because of that he gave the money back.

12  I just think --

13          MR. DUBIN:  I'm not asking --

14          THE COURT:  You were going to ask him whether he

15  gave the money back --

16          THE COURT REPORTER:  I'm sorry.

17          THE COURT:  I'm used to it with him, unfortunately,

18  it happens all the time, so.

19          MR. DUBIN:  Your Honor, I'm sorry.

20          THE COURT:  No, it happens all the time.  And I've

21  tried to be understanding of your zealousness but it is

22  wearing me down, as I say, frankly.

23          I'm trying -- you know, I've made -- I don't think

24  it's relevant respectfully.  It's just not relevant.

25          MR. KESSLER:  Your Honor, there is one other thing,

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    which is not a problem now, but it's potential.

2              When Mr. Dubin pointed Mr. Kocher to a prior

3    transcript that he testified to and Mr. Dubin directed him to

4    a tab called "trial transcript", I assume it's labeled

5    "trial", you know, this is going to happen at some point, but

6    I just want to sensitize everyone to the fact that we are

7    being extremely careful not to use the word "trial" to refer

8    to anything that's happened in the past.  And so to the extent

9    there are other tabs or other documents have "trial" on them

10   or are labeled in that way, I just flag that hopefully there's

11   another way --

12             THE COURT:  We've all been saying "the prior

13   proceeding," which I think is appropriate.

14             I was looking for that tab, too, in my book and it

15   says 3500.

16             I'm just saying we're trying to avoid the word

17   "trial," because we don't want the jury to know about the

18   prior trial.  We're trying very hard to keep the two separate.

19             MR. KESSLER:  Thank you.

20             MR. DUBIN:  May I just ask one question?

21             THE COURT:  Yes.

22             MR. DUBIN:  I would like to ask him, including

23   anything about the charges or knowledge or anything else, I

24   want to ask him if he's given any money back.  That's

25   appropriate.

SIDEBAR CONFERENCE                              2779

1          MR. KESSLER:  That's the entire thing we've just

2    been arguing about for 15 minutes.

3          What is the relevance?

4          THE COURT:  Why would he give the money back, what's

5    the relevance?

6          MR. BRODSKY:  Your Honor, again, if you have --

7    we're saying the agreement -- we're saying that Retrophin had

8    an interest in making sure it wasn't sued.  We're saying that

9    Retrophin had an interest in making a payment.  We're not

10   saying that it was in the best interest of Retrophin to settle

11   it.

12         Despite other things going on, the fact that he

13   still has the money and he's kept the profits is relevant.

14   For our perspective to says it's a valid agreement, and

15   Retrophin has gotten the benefit of the bargain.  It's one of

16   our defenses that we put in our motion.  It's one of classic

17   defenses to wire fraud.

18         And what happened in Judge Preska recently dismissed

19   the wire fraud allegation in the Southern District of New York

20   because what she found in connection with an agreement that

21   one of the parties got the benefit of the bargain.

22         And so if we're going to argue to the jury, which

23   we're allowed to as I understand it is a perfect defense and

24   it's in your consideration of Rule 29, or at the end of the

25   trial, if you get the benefit of the bargain, then under wire

SIDEBAR CONFERENCE                                     2780

1    fraud, based on Judge Preska and the precedent, and the

2    precedent she cites, that is a valid, a legal defense.

3          And so the benefit of the bargain is Retrophin has

4    accepted, these people have received the money, and in

5    exchange, they have avoided lawsuits.  They've avoided legal

6    expenses, and we will show that to the jury.

7          MR. KESSLER:  So, Your Honor, the benefit of the

8    bargain is relevant in a right to control theory, which was

9    litigated extensively in a motion in limine and motion to

10   dismiss context.  That's not the theory we're advancing here.

11   The benefit of the bargain is not a defense to a straight up

12   fraud.

13         Second of all, if they want to show that Retrophin

14   got the benefit of the bargain, then the question is,

15   Mr. Kocher, have you sued Retrophin, which he has not.  So

16   that doesn't -- nothing else would show that Retrophin got the

17   benefit of any, you know, hypothetical bargain.

18         THE COURT:  Retrophin got a release from Mr. Kocher.

19         MR. KESSLER:  And the fact that they got the release

20   is in the record.  That's been established.

21         The point is that the argument that Mr. Brodsky laid

22   out is exactly the same argument that we've been talking about

23   for 15 minutes.  The Government hasn't asked for the money

24   back for a number of reasons, including that there's a

25   forfeiture allegation against the defendants.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                2781

1          Second of all, he doesn't know that the agreement is

2     a fraud.  And in order -- well, if you want to know if he

3     knows the agreement is a fraud, then they should lay a proper

4     foundation for whether he knows all of the facts that are at

5     issue here.

6          MR. BRODSKY:  Your Honor, in Judge Preska's case and

7     the other cases under wire fraud theory, for benefit of the

8     bargain, the benefit of the bargain was a defense.  In each of

9     those case the Government said it was a fraud.  They didn't

10    argue that one party got the benefit of the bargain or the

11    other.

12         What happened was, as Your Honor knows, the defense

13    said the other side got the benefit of bargain.  Under the

14    wire fraud charges, the Government said the agreement's a

15    sham.  The agreement was the result of a misrepresentation

16    that induced one party to enter into the contract with the

17    Government, with the other party.

18         We're trying to argue that I know the Government

19    says it's fraud.  We're arguing that both parties got the

20    benefit of the bargain, and we're allowed to elicit the facts

21    to allow us to make that defense.

22         THE COURT:  And that no material misstatements or

23    omissions were made to the Retrophin board to gain Retrophin's

24    payment.

25         MR. BRODSKY:  It's part of our defense.

SIDEBAR CONFERENCE                                          2782

1          I mean their argument is, and we'll get to this when

2     it comes to the jury instructions, that somehow outside

3     counsel had a duty to do certain things to the board and say

4     certain things without make any statements.

5          In other words, in the absence of any affirmative

6     statements they're saying somebody should have had a duty to

7     speak.  That's an argument for a different day.

8          We certainly are saying that there were no

9     affirmative misrepresentations made.  We're certainly saying

10    the board, like Mr. Richardson said, had access to the

11    information.  We're certainly saying that Marcum had copies of

12    the settlements.  They reviewed the settlements and they

13    actually had access to them.

14         We're saying that the chief financial officer,

15    Panoff, had access to them and was well aware of them and that

16    the board, as we've shown through Mr. Richardson, had constant

17    information relating to the settlements.

18         It is hard, Your Honor, that the board members are

19    saying they have the duty of oversight under the bylaws.  It

20    is odd to us that they're the ones saying, well, people should

21    have pointed things out to us in the materials that we

22    received.

23         THE COURT:  I think with regard to legal exposure

24    that what I got from the Mr. Richardson's testimony was to the

25    extent the corporation could be exposed legally and what the

SIDEBAR CONFERENCE                                    2783

1    ground work looked like in deciding whether or not, and I

2    think by the time he learned of it he said it was a fait

3    accompli.  So I don't know that -- I mean that's what I'm

4    understanding.  Maybe another board member will say something

5    different.

6              But for now, asking Mr. Kocher whether he gave the

7    money back implies that he was somehow implicated in some

8    wrongdoing, vis-a-vis Retrophin, and owes them money, which is

9    not relevant to the charges against Mr. Greebel.

10             Whether he gave the money back, whether he knows

11   about the charges, it's a diversion and a confusing piece that

12   has nothing whatsoever to do with the charge against

13   Mr. Greebel.  Whether the Government can prove it beyond a

14   reasonable doubt.

15             I am just having -- I think it's a huge stretch, and

16   it's leaping over many points of logic, and it risks opening

17   the door to exploring Mr. Kocher's knowledge about attempts by

18   Retrophin to get its money back, regulators looking at what

19   happened to Retrophin.  I just think that we ought to focus on

20   what this witness knows from his own experience.

21             And even if he knew what the charges are, his

22   charges or impressions about those charges has nothing to do

23   with the Government's proof against Mr. Greebel.  He still has

24   the burden.  The fact that he knows or doesn't know has no

25   bearing on whether they're going to be able to prove beyond a

SIDEBAR CONFERENCE                         2784

1  reasonable doubt Mr. Greebel's culpability.

2              MR. BRODSKY:  We won't, Your Honor, go into the

3  witness knowledge of the charges.  We will not.  We will put

4  that aside.

5              MR. KESSLER:  But we will --

6              MR. BRODSKY:  We won't go into that.

7              What we want to do is continue with one of our

8  defenses, which is the benefit of the bargain theory under

9  wire fraud.  It's a well-established defense when it comes to

10  contract fraud.

11             In order to do that, we need to show that each party

12  got the benefit.  Retrophin got a benefit, and we're going to

13  show that through the release.  And the other side got the

14  benefit by receiving their money and they kept it.

15             If they had given it back, the Government would be

16  eliciting, as they did during the Shkreki trial, that

17  Mr. Yaffe was forced to give back money.  And if they had

18  required anybody to give back the money, you would have the

19  Government here saying that that's a relevant fact that they

20  had to give it back.

21             We are saying that if we're going to do a defense of

22  benefit of the bargain under a contract, which the Government

23  calls a fraud, we need to show that the parties to the

24  contract received the benefit.  We can't do that here if we're

25  not able to elicit that one party of the contract got the

SIDEBAR CONFERENCE                    2785

1   proceeds, got to keep the stock, he got to keep the money.

2           We're not going allege that Mr. Kocher took stolen

3   money, we're saying that Retrophin got the benefit of the

4   bargain and so did Mr. Kocher.

5           MR. DUBIN:  In fact to the contrary I was going to

6   ask him, Your Honor, he didn't feel he did anything wrong or

7   anything like that.  And he certainly didn't have an

8   obligation to give it back.  I can make that clear.

9           MR. KESSLER:  So just to be clear.  First of all,

10  the benefits of the bargain argument relates to a right to

11  control theory under wire fraud, which is what we litigated in

12  the context of the motion to dismiss.  It has nothing to do

13  with the core fraud charged here.  That's point one.

14          Point two, they want to show benefit of the bargain,

15  the record clearly shows that Retrophin got a release, and

16  Mr. Kocher got a bunch of money.  That's what the record

17  shows.  There's no evidence in the record that he gave it

18  back.  They are free to argue he still has the money.

19          If that somehow when we get to our jury instructions

20  in the Rule 29 stage, that's a valid argument.  The record

21  already presents that.

22          But asking him if he gave the money back opens the

23  door to all the reasons why we haven't asked for the money

24  back.  And we have to be able to explain to him why he didn't

25  give the money back.  And that is going to go to his knowledge

SIDEBAR CONFERENCE                                    2786

1   of specific facts that I am going to elicit on redirect, and

2   we will elicit from every single investor to explain why they

3   haven't given the money back and what they know has happened.

4            Is that a enormous distraction under Rule 403, and

5   none of this is relevant to the charged conduct.  The

6   contracts were entered into in 2013, 2014.  It's what people

7   were thinking then that matters.  Were doing then that

8   matters.

9        Mr. Kocher is a fact witness.  I mean, frankly, I

10  don't know why this wasn't litigated in a motion in limine.

11  This is an extremely unorthodox and novel argument.

12       And the final thing I want to say with respect to

13  Mr. Yaffe in the Shkreli trial, Mr. Yaffe was a coconspirator.

14       So that's why he gave the money back.  Unlike

15  Mr. Kocher, Ms. Hassan and the other investors here.

16       MR. BRODSKY:  But, Your Honor, respectfully in

17  response, one, we do have the benefit of the bargain defense,

18  whatever the prosecution, whatever their theories are, we are

19  defending a contract they say is fraud.  Well established case

20  law.  And if Your Honor rules that we can't elicit the both

21  benefits on both sides, that is cutting --

22       THE COURT:  It's already in the record.  He got

23  money and shared in exchange for the release.

24       MR. BRODSKY:  We just want to raise that he still

25  has it, otherwise the jury is left with the speculation.  And

SIDEBAR CONFERENCE                               2787

1   as Mr. Kessler said, we could argue it in summation, whatever

2   we want to make of it, that he still has the money.

3           Well, we could do that.  But we want to take the

4   next step and say do you still have the money.

5           MR. DUBIN:  Your Honor, I'll just ask him if he

6   still has the money.  I can just ask him.  I was actually

7   still speaking when I was cut off before.

8           And, Your Honor, I am not trying to cut you off.  I

9   am sorry if it keeps happening.  But I don't understand,

10  almost every time I open my mouth, I am cut off by the

11  Government.  And there's talking and whispering and shaking

12  their heads and they're doing it in front of the jury.  And

13  not a word is said.  And I'm trying really hard, Your Honor,

14  not to cut you off, but, yes, I am a zealous advocate for my

15  client.  But it seems like it's raining down on me.  In the

16  manner of three different instances, getting cut off

17  repeatedly.  Shaking their head at me.  This is ridiculous.

18  And I know you can hear it because it's in --

19          THE COURT:  Don't tell me what I can hear and

20  perceive, no.  I'm listening to the witness.

21          I mean if you think I'm conducting this trial in

22  some unfair way, just make your record, all right?

23          MR. DUBIN:  I'm making it now.

24          THE COURT:  Okay.  What have I done?

25          MR. DUBIN:  I think that you are being harsh on us.

SIDEBAR CONFERENCE                              2788

1    I really do.

2              THE COURT:  You are the only lawyer on the defense

3    team who has done things to clutter the record with needless

4    comments, objections, problems that you then retreat and walk

5    away from.  You've turned your back on me.  You've been rude

6    and disrespectful.  And I've tolerated it because I care about

7    Mr. Greebel getting a good trial, and I would never visit your

8    conduct on Mr. Greebel.  The other lawyers have not acted in

9    any manner that I think is inappropriate.  Any kind of

10   inappropriate behavior has come from you.

11             And yesterday, the example when you challenged me

12   and my rulings in a sort of nebulous way about I don't

13   understand your rulings kind of in a very condescending way

14   tone toward me in trying to give me examples of this large law

15   firm question.

16             I explained to you it's because it's a misleading

17   fact not in evidence.  There was no evidence anywhere that

18   Paul Weiss is the largest law firm in the world, which was the

19   context of your question.

20             In order to make sure that I wasn't incorrect, I

21   went and looked on numerous other websites trying to find out

22   where Paul Weiss stood in the rankings.  I didn't find

23   anything where they're ranked higher than 20.  And so I tried

24   to come back and explain to you, Mr. Dubin, look, it's because

25   it was bordering on a way did-you-stop-beating-your-wife type

SIDEBAR CONFERENCE                    2789

1    of question, and that was why I sustained that objection.

2              The other things you didn't give me examples of.  I

3    can't address I don't what else.

4              MR. DUBIN:  Your Honor, you know what, I misspoke in

5    my question, and I wasn't even going to bring it up.  The

6    National Law Journal ranked Paul Weiss number one as the

7    biggest law firm in New York.  So I misspoke when I said the

8    world.  I can show Your Honor the cite.

9              THE COURT:  Okay.

10             MR. DUBIN:  Number one in New York.  The most

11   lawyers out of any other law firm, the biggest law firm in New

12   York.

13             There's almost a suggestion that I'm trying to, you

14   know, did-you-beat-your-wife question.  That wasn't it.

15             THE COURT:  The question was the world, okay, and it

16   was repeated.

17             MR. DUBIN:  They are one of the biggest in the

18   world.  They're number 26.  They are.

19             MR. BRODSKY:  But, Your Honor, would you consider us

20   eliciting the question of how much you kept of the proceeds.

21   We're not going to go into the allegations.  Mr. Dubin wasn't

22   going to go into the allegations.  That's not what he was

23   arguing.  He wanted to argue the benefit of the bargain.

24             MR. KESSLER:  Your Honor, if this is critical to the

25   defense, when get past the Rule 29 stage, when we get past

1    jury instructions and somehow this issue is still live and

2    this is still an argument that's permissible, we are not going

3    to dispute that the investors have not returned their money.

4              MR. BRODSKY:  If they're willing to stipulate, if

5    they are willing to stipulate and agree to a stipulation that

6    each and every one of these investors did not return any of

7    the money or any of the stock, then we won't have to elicit

8    this.

9              MR. DUBIN:  The point is it's not relevant at all.

10   They don't need a stipulation to make the arrangement.  We're

11   not making the contrary argument.  But to sit in front of the

12   jury and read a stipulation is exactly the same thing we're

13   trying to avoid, because then we have to explain all of this.

14             MS. SMITH:  The only reason they want the testimony

15   is to make the argument in closing that because the investors

16   didn't return their money this is not, in fact, a fraud.

17             And whether or not he's allowed to make that

18   argument, again, this is not right to control case.  The

19   benefit of bargaining doesn't apply.  We've already briefed

20   this.  We probably have to brief it again.  But the question

21   is highly prejudicial.

22             And if the information he wants is that the witness

23   received money and shares, he received money and shares.  And

24   we're not going to dispute.  If he's allowed to argue in

25   closing somehow that if they didn't give it back.  Asking that

SIDEBAR CONFERENCE                    2791

1   question in a manner that's been proposed suggests to the

2   jury, which is what Mr. Biestek told you, that there was no

3   fraud because the Government hasn't asked when, in fact, the

4   Government will be going after that money and against the

5   parties who caused it, which is Mr. Shkreki and Mr. Greebel.

6   And the SEC is going after that money in a separate case.

7           So, you know, that's the point of the question, and

8   if it's the point of the question is that, as Mr. Brodsky has

9   said, and he doesn't have the right to argue, as we've said,

10  and he'll have the opportunity to make his argument at

11  closing, if he wants to, then there's no reason to ask the

12  question.

13          MR. BRODSKY:  In every wire fraud and conspiracy

14  theory, there's substantive count where the Government alleged

15  there's agreement, the agreement was a fraud, the argument is

16  who controls that money.  Is the money and assets Retrophin's,

17  or is it the person who received it on the other end?

18          They are alleging that the money was taken from

19  Retrophin, misappropriated.  They use that language in the

20  indictment.  It was misappropriated.  Well, that is about who

21  controls that money, who controls the stock.  And that is a

22  benefit of the bargain defense we have to make.  It's in the

23  indictment.  They can try to run away from it, but they argue

24  it in the indictment as charged that it was misappropriated

25  from Retrophin.  We are arguing in response it was not

SIDEBAR CONFERENCE                                    2792

1    misappropriated.  Retrophin received the benefit of the

2    bargain, and so did Mr. Kocher and the other settlement

3    parties.

4              That is part of the our defense.  We moved to

5    dismiss, as Your Honor remembers, pretrial, and Your Honor

6    said it's going depend on the facts.  We have to see what the

7    facts are.  But we have to be allowed to establish the facts

8    that enable us to argue the assets were not misappropriated.

9              And one of the relevant factors is these people kept

10   the money.  Another relevant factor is Retrophin was not sued

11   by them.  And that's why we're establishing that there's a

12   release, that they threatened to sue.  We're going to

13   establish that the legal costs rising therefrom would have

14   been substantial.  That's all relevant.

15             THE COURT:  Mr. Kocher is identifying Mr. Shkreki or

16   MSMB, he was very clear not to sue Retrophin.

17             MR. BRODSKY:  We are trying to establish, Your

18   Honor, as you'll probably see on cross-examination, that he

19   hired a lawyer, and we will establish, as we will from the

20   facts argued, you can't sue MSMB because of the private

21   placement memorandum restrictions.  Any good lawyer would know

22   that.  MSMB had shut down and the logical --

23             MS. SMITH:  Your Honor --

24             MR. BRODSKY:  -- for everybody to go is the deep

25   pockets.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                              2793

1      THE COURT:  There's language in the PPM saying that

2  both Mr. Shkreki and MSMB could be sued in the event of fraud

3  or malfeasance.

4      MR. BRODSKY:  Correct.

5      THE COURT:  I'm not so sure Mr. Kocher's lawyer

6  would have concluded that he could not sue Mr. Shkreki or

7  MSMB, okay?  And he said he had no intention of suing

8  Retrophin.

9      MR. BRODSKY:  Well, we were going to establish on

10  cross-examination, I think Mr. Dubin will, that I think may

11  not be true.

12      THE COURT:  Okay.  That's fine.  That's fair.

13      But I really don't think that this question about

14  giving money back, to the extent implies that somehow he is

15  not entitled to have the money, and that somehow the fact that

16  he has the money negates the Government's, you know, ability

17  to prove its case against Mr. Greebel, I think it's too far of

18  a leap.  It's not relevant to the charges against Mr. Greebel,

19  and you're saying if they had given it back?

20      MR. BRODSKY:  The Government would be eliciting it.

21  That's a classic case --

22      THE COURT:  No, if he had given it back, I think it

23  would be a fight about whether that comes in and whether it

24  can be used to imply that Mr. Greebel is guilty.  It's just

25  not relevant.

SIDEBAR CONFERENCE                                    2794

1           MR. BRODSKY:  Mr. Geller testified during

2    Mr. Shkreki's trial that he gave the money back.  And that's

3    not -- that was, under the Government's stated theory today,

4    that would not be relevant because he gave it back for a

5    variety of reasons.  He happened to have lied to the FBI when

6    the FBI came to him to speak to him.  And so he's giving it

7    back for all sorts of reasons, and yet they were allowed to

8    elicit it during the trial.

9           MS. SMITH:  We were told it would be elicited on

10   cross.

11          THE COURT:  But it wasn't used to argue that

12   Mr. Shkreki, that is in evidence of Mr. Shkreki's guilt that

13   the fact that he had some sort of an agreement with the

14   Government whereby he gave money back was evidence of guilt

15   against Mr. Shkreki.  I just think it's not --

16          MR. BRODSKY:  Okay.

17          THE COURT:  -- fair or appropriate to Mr. Greebel's

18   presumption of innocence to inject this whole thing into the

19   trial when the Government would then have to put in evidence

20   that it is, in fact, trying to get money back from certain

21   individuals alleged to be wrongdoers in this whole thing.

22          MR. DUBIN:  Sorry.  So I'm not going to ask him if

23   he's given any money back or that he's kept it.

24          THE COURT:  I'm just trying to think of some way

25   that you can establish --

SIDEBAR CONFERENCE                    2795

1      MS. SMITH:  He had the money and the shares.  He

2  already testify that he received them.  Did you get the wire?

3  I assume it's in evidence.  Did you receive the shares?  When

4  Martin tried to buy them back later.

5      MR. DUBIN:  I could ask it that way.

6      MS. SMITH:  Sure.

7      MR. DUBIN:  I offer my sincere apologies to the

8  Court.

9      THE COURT:  Well, I'm not trying to --

10      MR. DUBIN:  No, understood.

11      THE COURT:  I'm not trying to get into any fights

12  with you.

13      MR. DUBIN:  If I turn my back, there have been times

14  where I've walked away from the sidebar because I think there

15  are too many attorneys.  I meant no disrespect to Your Honor.

16  I have extraordinary respect for Your Honor, and maybe perhaps

17  my overzealousness has caused me to get frustrated.  And I

18  offer my sincere apologies to Your Honor and the court.

19      THE COURT:  I'm not -- you know, I'm not taking it

20  personally, it's just -- that, you know --

21      MR. DUBIN:  I get it.

22      THE COURT:  -- you've raised things and I try to

23  address them in a certain way.  I don't have these issue with

24  any other lawyer in this room.  I don't generally have issues

25  with lawyers, but I just had a sense that there's something in

1    our interactions that have been not entirely positive.

2              MR. DUBIN:  Hopefully I can start with a clean

3    slate.

4              THE COURT:  You do.  And these guys are just as

5    zealous as you are.

6              MR. BRODSKY:  Just for the record, Your Honor,

7    Mr. Dubin's probably the most experienced defense lawyer in

8    criminal cases, and he's been invaluable to us on this case.

9    He's one of the leaders on our team, and I just think he does

10   it get, as I do, and, you know, we believe in our client's

11   innocence so much, Your Honor, that sometimes --

12             THE COURT:  No, I understand, but, you know, there's

13   certain rules of engagement that I think most people

14   understand.  All right.

15             MR. DUBIN:  All right.

16             Thank you, Your Honor.

17             THE COURT:  So five minutes for a break?

18             MR. DUBIN:  Yes, thank you.

19             (End of sidebar conference.)

20             (Continued on the next page.)

21

22

23

24

25

SIDEBAR CONFERENCE                                    2797

1          (In open court; Jury not present.)

2          (Whereupon, a recess was taken at 4:30 p.m.)

SIDEBAR CONFERENCE                    2798

1          (Jury enters the courtroom. Time 4:38 p.m.)

2          THE COURT:  All the jurors are back.  Please have a

3    seat.

4          Sir, you're still under oath.

5          You may resume, Mr. Dubin.

6          MR. DUBIN:  Thank you, your Honor.

7    CROSS EXAMINATION (Continued)

8    BY MR. DUBIN:

9    Q    Mr. Kocher, you recall being shown an e-mail in which

10   Mr. Shkreli notified you that the fund was winding down?

11   A    Yes.

12   Q    Can we put that up, please, it's GX104-1 already in

13   evidence.

14          You recall receiving this e-mail, sir?

15   A    Yes.

16   Q    When you received this e-mail, you immediately sent --

17   well, strike that.

18          You received this e-mail back in September, correct?

19   A    That's correct.

20   Q    And you didn't send Mr. Shkreli an e-mail asking to

21   redeem your interest until March, correct?

22   A    That's correct, in writing.

23   Q    And you ultimately signed the settlement agreement, I

24   think we saw that already in evidence, we'll get to that in a

25   moment.  Do you see in this e-mail where it says in the second

SIDEBAR CONFERENCE                                      2799

1    paragraph, "We have decided the best structure for such an

2    entity is a public company or private corporation, Retrophin

3    LLC our MSMB founded biotechnology operation will be that

4    company."  Do you see that, sir?

5    A    Yes.

6    Q    You had no reason to dispute that, did you?

7    A    No.

8    Q    As far as you knew, that in fact was the case, that

9    Retrophin was founded by MSMB, correct?

10   A    Yes.

11   Q    And Mr. Greebel is not on this e-mail, is he, sir?

12   A    No.

13   Q    Now, you testified earlier that you were in a situation

14   where you needed to get cash because of a project that you had

15   going on, correct?

16   A    Yes, I had two projects.

17   Q    And you would agree with, me sir, that it's often the

18   case that -- strike that.

19        In your experience, even large successful companies

20   get into a situation where they are in a cash crunch, right?

21   A    Yes.

22   Q    And they need a loan from time to time, correct?

23   A    Yes.

24   Q    And you could have a situation where you might not have a

25   lot of cash but you have projects that you think are going to

SIDEBAR CONFERENCE                               2800

1  realize potential down the road, correct?

2  A    Yes.

3  Q    Now, we talked a little bit earlier about Mr. Mulleady

4  and you relied on him 100 percent for your financial

5  investments, right?

6  A    Well, I relied on him with MSMB 100 percent, not with

7  financial investments in general.

8  Q    He seemed like a straight shooter to you, correct?

9  A    Yes.

10 Q    Actually, do you mind going in your binder to -- do you

11 recall ever telling the prosecutors that you relied on

12 Mr. Mulleady 100 percent for your financial investment, do you

13 recall saying that to them?

14 A    No.

15 Q    Could you go to your binder, the one I gave you, the

16 first tab, and look at first page, it's the fifth paragraph,

17 the paragraph beginning, "In or around 2008," do you see that?

18 A    Uh-huh.

19 Q    Could you read that paragraph to yourself and let me know

20 when you're ready.

21 A    Okay.

22 Q    Does that refresh your recollection that you told the

23 prosecutors that you relied on him, that being Mr. Mulleady,

24 100 percent for your financial investment?

25 A    That's what it says here.  But, no, I don't remember it.

SIDEBAR CONFERENCE                    2801

1   Q    Do you recall when you met with the prosecutors that they

2   were taking notes?

3   A    Yes.

4   Q    You were ever provided with a copy of those notes?

5   A    No.

6   Q    Now, at some point Mr. Mulleady goes from Smith Barney,

7   he was your investment adviser at Smith Barney, correct?

8   A    Yes.

9   Q    He notifies you he was moving over to MSMB Capital?

10  A    Yes.

11  Q    I want to show you what I'll mark for identification as

12  DX103-9, that would be at tab six in your binder.  If you flip

13  to the third page of that, halfway down on the left side,

14  you'll see your e-mail.

15  A    I must be in the wrong place.

16  Q    Are you at tab six?

17  A    This is tab six in the white binder.

18          MR. DUBIN:  May I approach, your Honor?

19          THE COURT:  Yes.

20  Q    And Mr. Kocher, that's an e-mail that was sent to you by

21  Mr. Mulleady on March 25, 2011, correct?

22  A    Okay.

23  Q    And you, and seems like a whole lot of other people,

24  received this e-mail, right?

25  A    Yes.

SIDEBAR CONFERENCE                    2802

1          MR. DUBIN:  I would move DX103-9 into evidence.

2          MR. KESSLER:  No objection.

3          THE COURT:  We will receive DX103-9.

4          (Defendant's Exhibit 103-9, was received in

5   evidence.)

6   BY MR. DUBIN:

7   Q    If we go to the second page -- a lot of e-mail addresses,

8   third page, I won't bore the jury with it, but your e-mail

9   address is in that massive list of e-mails, right?

10  A    Yes.

11  Q    On the last page, if you can blow that up, when

12  Mr. Mulleady says to you, "I am excited and pleased to

13  announce that I have accepted a new role as Chief Executive

14  Officer of MSMB Capital Management," you knew that to mean he

15  was going to be the CEO, right?

16  A    Yes.

17  Q    "Over the past year or so I met some extremely talented

18  individuals who work at MSMB.  So when the opportunity

19  presented itself I decided it was time to make a change.  I

20  look forward to embracing the challenges ahead and working

21  with a team of highly motivated individuals."

22          Then it says, "MSMB is a long/short equity

23  healthcare hedge fund located in New York City.  If you would

24  like more information about the fund, please reach out to me

25  individually.  One of the things I've learned in this

SIDEBAR CONFERENCE                                    2803

1    transition is the importance of staying in touch with others;

2    therefore, I wanted to give you my new address and telephone

3    number in the hope that at some point in the future I will

4    have the opportunity to be of assistance to you."  He signs it

5    Kevin Mulleady CEO, MSMB Capital Management, and lists the

6    address 330 Madison Avenue, Sixth floor.

7            Sir, he wasn't going there in a sales position or

8    anything like that, he was going there as the head guy,

9    correct?

10   A    Well, at that point that's what it looks like.

11   Q    And you invested in MSMB because someone that you knew

12   and trusted was the CEO of the company, that was one of the

13   reasons, right?

14   A    One of the reasons.

15   Q    And you were ultimately introduced to Mr. Shkreli through

16   Mr. Mulleady, correct?

17   A    Yes.

18   Q    And did you ever meet him in person?

19   A    Yes.

20   Q    When was that?

21   A    At the last proceeding.

22   Q    Prior to that, had you met him before?

23   A    Only on the phone.

24   Q    You certainly never, after speaking to him on the phone

25   said -- well, did you speak to him on the phone prior to

1   having a back and forth about settling?

2   A     Say that again?

3   Q     Did you ever have an occasion to speak to Mr. Shkreli

4   prior to getting on the phone with him to go through settling

5   your dispute?

6   A     No, I don't believe so.

7   Q     By the way, when Mr. Mulleady was telling you about MSMB

8   did he ever mention to you a company called Elea Capital,

9   E-L-E-A?

10  A     No, not that I remember.

11  Q     Did Mr. Mulleady ever tell you that Mr. Shkreli had lost

12  a lot of money in other hedge funds in the past?

13  A     No, he didn't.

14  Q     There came a point in time that Mr. Mulleady was fired

15  from MSMB, correct?

16  A     Yes, I believe so.

17  Q     And it was after Mr. Mulleady was fired from MSMB that

18  you wanted to get your money out, right?

19  A     Yes.

20  Q     Did you ever threaten to sue Mr. Mulleady?

21  A     No.

22  Q     He was the CEO of MSMB, right?

23  A     Well, I always thought of Martin as the head guy.

24  Q     Mr. Mulleady took some responsibility for what happened,

25  right?

SIDEBAR CONFERENCE                              2805

1    A    In what way?

2    Q    He paid some of your legal fees, didn't he?

3    A    I think, I forget, he did pay I think 5,000, maybe, or I

4    don't know the amount, but it was a small amount.

5    Q    Did he ever express to you why he paid some of your legal

6    fees?

7    A    He felt bad that I wasn't able to get my money back out.

8    Q    And do you still have a friendship with Mr. Mulleady?

9    A    I haven't spoken to him recently, but we're on good

10   terms.

11   Q    Now, at some point you came to understand that Retrophin

12   was a medical company that Mr. Shkreli and MSMB were

13   interested in investing in, right?

14   A    Yes.

15   Q    And in fact, we just went through it, that liquidation

16   e-mail you received certainly notes that, correct?

17   A    The liquidation e-mail?  I'm not sure which one your

18   referring to.

19   Q    The one that was just up on the screen, the one that you

20   received that the fund was going to wind down?

21   A    Yes.

22   Q    You knew that -- so as early -- just so we're oriented in

23   time, as early as September 2012 when you got that e-mail you

24   knew that Retrophin was funded by MSMB, correct?

25   A    I knew that MSMB had owned a portion of Retrophin, but I

SIDEBAR CONFERENCE                              2806

1    was never really clear on the relationship.  But, yes, my

2    recollection was that they had invested in Retrophin.

3    Q    Okay.  And I'd like to show you what I'll mark for

4    identification as DX103-10, that's in tab nine of your binder.

5    You see on the bottom it says, that's an e-mail, by the way,

6    from you to Mr. Shkreli, Mr. Greebel, and some others,

7    correct?

8    A    Yes.

9    Q    You received that on March 11, 2013?

10   A    Yes.

11              MR. DUBIN:  I'll move DX103-10 into evidence.

12              MR. KESSLER:  No objection.

13              THE COURT:  We will receive 103-10.

14              (Defendant's Exhibit 103-10, was received in

15   evidence.)

16   BY MR. DUBIN:

17   Q    In this e-mail you wrote in the middle paragraph, "Per my

18   conversation with Kevin Mulleady, my account value was

19   approximately 280,000, which was toward the end of last year.

20   Retrophin has gone up in value substantially since then, and I

21   am aware that our hedge fund which funded Retrophin directly

22   should benefit directly because of this.  I am also aware that

23   you manage both companies, which seems to me, to be a conflict

24   of interest.  If our hedge fund doesn't benefit directly from

25   Retrophin, when it has helped fund it."

SIDEBAR CONFERENCE                    2807

1          So here it's clear that you understood that MSMB

2     funded Retrophin, right?

3     A     Yes, at least partially funded, I didn't know how much.

4     Q     Okay.  And you are aware, as this e-mail makes clear,

5     that Mr. Shkreli managed both MSMB and Retrophin, right?

6     A     That's correct.

7     Q     And you understood that MSMB, although you didn't know

8     how much funding went into Retrophin, you certainly understood

9     that MSMB had made a substantial investment in Retrophin,

10    correct?

11    A     Yes.

12    Q     And it was your understanding that MSMB had invested

13    something like $10 million into Retrophin, right?

14    A     Well, apparently that was erroneous, but yes, that's what

15    I thought.

16    Q     You weren't sure whether or not it was a loan, right?

17    A     No, I didn't know.  I didn't know the relationship at

18    all.

19    Q     If it was a loan, you would agree, sir, wouldn't you,

20    that Retrophin would owe MSMB $10 million, right?

21    A     If it was a loan?

22    Q     Yes.

23    A     Yes.

24    Q     Because in that case Retrophin would be holding

25    $10 million of MSMB's money, right?

SIDEBAR CONFERENCE                    2808

1   A    If it was a loan.

2   Q    And arguably some of that could have been your money,

3   right?

4   A    That's possible.

5   Q    And showing you under tab 18 of your binder what I'll

6   mark for identification DX103-15.  I'd like to focus your

7   attention on the second page of that e-mail, then you can look

8   at the third page as well.

9        These are e-mails that you received, that went back

10  and forth between you and Mr. Shkreli and Mr. Trachtenberg,

11  correct?

12  A    Yes.

13  Q    And this was in March of 2013, correct?

14  A    Yes.

15       MR. DUBIN:  And I move DX103-15 into evidence.

16       MR. KESSLER:  No objection.

17       THE COURT:  We will receive 103-15.

18       (Defendant's Exhibit 103-15, was received in

19  evidence.)

20  BY MR. DUBIN:

21  Q    Let's go to the second page, please.  Right in that

22  middle paragraph, where it says, "I'd like to remind you, that

23  there was a point when it looked like we would be paid back at

24  3.5 times our account balance before our fund helped finance

25  Retrophin and brought Retrophin public.  Again we were

1    supposed to be redeemed before the end of the last year in

2    either cash or Retrophin stock.  I'm getting past the point of

3    being patient."

4              In this e-mail you're acknowledging that MSMB helped

5    fund Retrophin and brought it public, that was consistent with

6    your understanding at the time, right?

7    A    Yes.

8    Q    In fact, sir, you believed that Retrophin was becoming a

9    part of MSMB, correct?

10   A    I thought MSMB owned part of Retrophin.

11   Q    Could you go to, in that first tab in your binder again,

12   35-RK1, and the third page please, the fifth paragraph from

13   the bottom, where it references RK366, could you read that

14   paragraph to yourself?

15   A    Yes.

16   Q    Does that refresh your recollection that you told the

17   Government when you met with them back in May of this year

18   that you believed Retrophin was going to become part of MSMB?

19   A    I don't remember it, no.

20   Q    Okay.  Again, you didn't look at the notes that the

21   Government was taking?

22   A    No.

23   Q    Is it your testimony, sir, that you may have said that

24   and that may have been your understanding at the time, you

25   just don't recall?

SIDEBAR CONFERENCE                                   2810

1      MR. KESSLER:  Objection to the form.

2      THE COURT:  Try to rephrase it.

3      MR. DUBIN:  Sure, your Honor.

4  Q    Is it your testimony that that very well, as of May of

5  2017, your understanding very well may have been that

6  Retrophin was going to become a part of MSMB, correct?

7  A    No, I don't think so.

8  Q    Okay.

9  A    I don't remember it that way now.

10 Q    So now your memory is a little bit different.  Your

11 memory is MSMB would own a part of Retrophin?

12     MR. KESSLER:  Objection to the form.

13     THE COURT:  Try to rephrase the question if you

14 could, Mr. Dubin.

15 Q    Regardless of which entity would own which, putting that

16 aside, certainly your memory now, or excuse me, your

17 understanding now is that MSMB was going to own part of

18 Retrophin, right?

19 A    Well, I remember specifically that one of the statements

20 showed that MSMB owned or was putting money into Retrophin.

21 Q    Okay.  Now, I want to go to the time period where you

22 were entering into discussions with Mr. Shkreli about settling

23 your dispute, okay?

24 A    Okay.

25 Q    So at some point in February or March of 2013 I believe

SIDEBAR CONFERENCE                            2811

1    it was March, you tried calling Mr. Shkreli on the phone,

2    correct?

3    A    Yes.

4    Q    And then you got Mr. Shkreli's e-mail from Kevin

5    Mulleady, correct?

6    A    I got -- say it again?

7    Q    You got Mr. Shkreli's e-mail address from Kevin Mulleady,

8    correct?

9    A    Well, I think I had it from before, but yes.

10   Q    Okay.  Well, do you remember being asked questions about

11   how you came to know about or get in contact with my client,

12   Mr. Greebel, do you remember?

13   A    Yes.

14   Q    And isn't it a fact that the way you got my client's

15   email address was from Kevin Mulleady, he gave it to you,

16   right?

17   A    Actually I'm not sure that that was the case.  Whether I

18   got it from him or whether or not Martin had CC'd Evan; in

19   other words, on an e-mail to me and CC'd Evan.

20   Q    So let me see if I can refresh your recollection.

21           Look at tab 19, I'll have you look at DX1032 for

22   identification.  You need to look on the screen or your

23   binder.  That's an e-mail that you received from Kevin

24   Mulleady on March 8, 2013, correct?

25   A    Yes, uh-huh.

SIDEBAR CONFERENCE                    2812

1          MR. DUBIN:  I move DX103-2 into evidence.

2          MR. KESSLER:  No objection.

3          THE COURT:  We will receive DX103-2.

4          (Defendant's Exhibit 103-2, was received in

5     evidence.)

6     BY MR. DUBIN:

7     Q    So you see that Mr. Mulleady is instructing you where to

8     send a draft letter or a draft e-mail to and he gives you

9     Mr. Shkreli's address and Mr. Greebel's address?

10    A    Yes.

11    Q    And you see where it says Evan.Greebel@KattenLaw.com?

12    A    Yes.

13    Q    Did you understand, sir, that Mr. Greebel was at a law

14    firm that had many lawyers and not just him?

15    A    No.

16    Q    Did you look up KattenLaw.com?

17    A    No, I didn't.

18    Q    Does this refresh your recollection that this is how you

19    got Mr. Greebel's e-mail address and not that he was CC'd on

20    an e-mail?

21    A    Yes.

22    Q    In early 2013 you had an attorney representing you by the

23    name of Jim Burke, correct?

24    A    Yes.

25    Q    And on March 11, 2013, you sent Mr. Shkreli an e-mail,

SIDEBAR CONFERENCE                    2813

1    correct?  Let me show you under tab nine again, DX103-10,

2    that's in evidence already, correct?  And this was your first

3    written request to redeem your interest in MSMB, correct?

4    A    Yes.  I think it's the first written one, yes.

5    Q    You CC'd Mr. Burke and you also CC'd Mr. Greebel,

6    correct?

7    A    Yes.

8    Q    Now, isn't it a fact, Mr. Kocher, that the reason that

9    you included attorneys on the e-mail is because you're trying

10   to get Mr. Shkreli's attention and send him a message, look,

11   I'm going to get lawyers involved, you got to take this more

12   seriously, correct?

13             MR. KESSLER:  Object to the form.

14             THE COURT:  Overruled.  If you can answer the

15   question.

16   A    Yes.  I was, what I wanted was to get to a settlement

17   agreement.

18   Q    You wanted him to take you seriously and know that if

19   necessary I'll get a lawyer, right?

20   A    Yes.

21   Q    Now, let's go to GX104-9, already in evidence.  Do you

22   remember when you were shown this document during your direct

23   examination, you see the name Howard Cotton on the right-hand

24   corner?

25   A    Yes.

SIDEBAR CONFERENCE                                    2814

1   Q    Sitting here today do you know that he is Mr. Greebel's

2   law partner at Katten?

3   A    No.

4   Q    When you responded to Mr. Shkreli, you see if you go to,

5   if you go down to the second page, an e-mail from Mr. Shkreli

6   to you, second page, an e-mail from Mr. Shkreli to you on

7   March 14, right?

8   A    Okay.

9   Q    And you then respond to Mr. Shkreli in that e-mail that

10  we're seeing on the screen now?

11  A    Uh-huh.

12  Q    2:38 p.m.  You don't include Mr. Greebel on that e-mail,

13  correct?

14  A    That's correct.

15  Q    In this e-mail, though, you say that you have already

16  been in touch with counsel that is versed in this kind of

17  litigation, right, and you should be hearing from them soon.

18  A    Yes.

19  Q    Who were you referring to, Mr. Trachtenberg?

20  A    Yes.

21  Q    And you say that because you wanted Mr. Shkreli to know

22  that you were considering filing a lawsuit, right?

23  A    Well, I wanted to at least get to the point where we

24  could negotiate a settlement, but yes.

25  Q    You go on to say that you have damages that have

SIDEBAR CONFERENCE                          2815

1   incurred, because you've been relying on what Mr. Shkreli

2   represented to you as the manager of MSMB, right?

3   A    Yes.

4   Q    And you wrote that because you wanted him to know that if

5   you filed a lawsuit you had actual monetary damages, right?

6   A    Yes.

7   Q    Now, you also wrote, "I believe that as manager of MSMB

8   and CEO of Retrophin that you have not lived up to your

9   fiduciary responsibilities to me as LP."  Do you see that?

10  A    Yes.

11  Q    Who told you the words "fiduciary responsibility," was

12  that you or your lawyer?

13  A    No, I didn't get it from my lawyer.

14  Q    You go on to say, "I will require a full accounting not

15  just of MSMB but of Retrophin as well," correct?

16  A    Yes.

17  Q    You're basically putting him on notice that I'm going to

18  ask for financial records in a lawsuit that I might file from

19  both MSMB and from Retrophin, correct?

20          MR. KESSLER:  Objection to the form.

21          THE COURT:  Can you rephrase, Mr. Dubin?

22  Q    You are telling Mr. Shkreli here that you are going to

23  ask for financial records not just from MSMB, correct?

24  A    Correct.

25  Q    But also from Retrophin, correct?

SIDEBAR CONFERENCE                                    2816

1   A     Yes.

2   Q     And by the way, you never said anything in this e-mail or

3   any other e-mail that exists anywhere in this world that would

4   have told Mr. Shkreli or indicated to him, by the way

5   Mr. Shkreli, I'm not going to sue Retrophin?

6              MR. KESSLER:  Objection to the form.

7              THE COURT:  Why don't you rephrase that, Mr. Dubin.

8   Q     You never in this e-mail or any other e-mail ever limited

9   the scope of who you might sue, correct?

10  A     Well, I don't like to say never; but I'm not saying I'm

11  going to sue anybody here.

12  Q     You don't say it directly, but you would agree, sir,

13  would you not, that by telling him you have a lawyer and also

14  saying that you are going to get financial records, you were

15  trying to send a clear message that you might file a lawsuit,

16  right?

17  A     Well, what I really wanted was an accounting of what my

18  investment was.  I never knew what my investment, where the

19  money went, or you know, there was no real records of any of

20  that.  So that's really what I was getting at.

21  Q     Understood.  But in mentioning your attorney, copying

22  attorneys, telling them what you were going to ask for --

23  mentioning conflicts of interest, you also never said at the

24  same time, by the way, even though I'm getting an attorney and

25  asking for financial records potentially and everything else,

SIDEBAR CONFERENCE                                    2817

1    don't worry, I'm not going to sue, you never said that?

2              MR. KESSLER:  Objection to form.

3              THE COURT:  In this e-mail or ever?

4    Q    In this e-mail, you certainly did not say that in this

5    e-mail.

6    A    What was the question again, sorry?

7    Q    You certainly never said in this e-mail, even though I've

8    already been in touch with counsel that's versed in this kind

9    of litigation --

10             Let me ask you this, Mr. Kocher, if you're writing

11   in an e-mail, I've already been in touch with counsel that is

12   versed in this kind of litigation, aren't you writing that as

13   a way to send a message to Mr. Shkreli that you might hire an

14   attorney that will file a lawsuit?

15   A    Yes, absolutely.

16   Q    All right.  And you didn't limit who the lawsuit would be

17   against.

18   A    No, it's not limited -- what I said there doesn't mean

19   that that was my intent.

20   Q    Understood.  But you never made your intent clear other

21   than what was written on this page?

22   A    Right.

23   Q    And you said, "I also believe as manager of MSMB and CEO

24   of Retrophin," right?

25   A    Yes.

SIDEBAR CONFERENCE                               2818

1   Q     So in other words, you never made it clear here, right

2   two sentences after when you're talking about the litigation

3   that your attorney is well versed in this, you never made

4   clear but you shouldn't worry I'm not going to sue MSMB or

5   Retrophin.  You never said of that, right?

6   A     No.

7   Q     Now, the parties to the settlement agreement that you

8   ultimately signed, you're familiar with that document?

9   A     Yes.

10  Q     The parties that gave you a release were -- among the

11  parties that gave you the release, were MSMB and Retrophin,

12  right?

13  A     That's correct.

14  Q     And you go on to say that, "At the end I will make sure

15  that this does go public and will also go to the appropriate

16  agencies."  You were getting to your wits end here, correct,

17  sir?

18  A     Yes.

19  Q     And you were telling them, look, in words or substance,

20  look, pal, I'm going to go public with this if we don't get

21  this settled, right?

22  A     Yes.

23  Q     Who were the appropriate agencies in your mind, the SEC?

24  A     Well, that was one.

25  Q     You realized that Retrophin was a publically traded

SIDEBAR CONFERENCE                              2819

1    company, right?

2    A    Yes.

3    Q    And if you go up to the reply that you got, you see that

4    Mr. Shkreli responded to you and CC'd your lawyer, Mr. Burke,

5    and also Mr. Greebel and Howard Cotton, correct?

6    A    Yes.

7    Q    Mr. Shkreli told you he was CCing not my attorney

8    singular, my attorneys plural, right, if you want to start a

9    dialogue with them?

10   A    Yes.

11   Q    And after that you hired David Trachtenberg, correct?

12   A    That's correct.

13   Q    Couldn't you deduce, sir, that there is a new name that

14   comes up on the e-mail, Mr. Cotton, and Mr. Shkreli tells you

15   I'm CCing my attorneys, plural, that Mr. Cotton was a lawyer?

16              MR. KESSLER:  Objection.

17              THE COURT:  Overruled.

18   A    I knew who Evan Greebel was.  I didn't know Howard Cotton

19   at all, so it wasn't on my radar.

20   Q    Let me ask you, I think you said earlier during your

21   direct examination that you never gave money personally to

22   Martin Shkreli, correct?

23   A    That I never gave money?

24   Q    You never invested money with Martin Shkreli as the

25   person, you invested in MSMB, correct?

1    A    Yes.

2    Q    So you never threatened to sue him personally, did you?

3    A    No.

4    Q    So you had no understanding, did you, sir, if when he

5    colloquially referred to "my attorneys" if he meant it as his

6    personal attorneys or the attorneys for the various entities?

7    A    No.

8    Q    You had no understanding one way or another, right?

9    A    No.

10   Q    Mr. Trachtenberg was an attorney that Mr. Mulleady

11   recommended to you, correct?

12   A    Well, apparently it was -- I think that he had his lawyer

13   recommend somebody.  But yes, basically it came through Kevin

14   Mulleady.

15   Q    And you wanted litigation counsel to take things up the

16   line, in your words, if necessary, correct?

17   A    Well, essentially I wanted to try to force a settlement

18   so I could get my money back, yes.

19   Q    But you also understood that litigation could be

20   expensive, right, you wanted to be practical?

21   A    Yes.

22   Q    Settlement would have been the best possible outcome for

23   you, why waste money or legal fees, correct?

24   A    That's correct.

25   Q    On March 18, you sent another e-mail to Mr. Shkreli, and

SIDEBAR CONFERENCE                              2821

1   I will direct you to tab 14 and I'll have it marked for

2   identification DX103-13, you see that e-mail at the bottom of

3   the page?

4   A    Yes.

5   Q    It is an e-mail that Mr. Kocher sends to -- that you send

6   to Mr. Shkreli and it copies your attorney, correct?

7   A    Yes.

8            MR. DUBIN:  This is another form of the same e-mail

9   that we've seen before, but I'll move this into evidence as

10  103-13.

11           MR. KESSLER:  No objection.

12           THE COURT:  We will receive 103-13.

13           (Defendant's Exhibit 103-13, was received in

14  evidence.)

15  Q    At the top when you respond to Mr. Shkreli, you copy your

16  new attorney on there, correct?

17  A    Yes.

18  Q    Then you send it to Mr. Shkreli, correct?

19  A    Yes.

20  Q    But you don't copy Mr. Greebel or Mr. Cotton?

21  A    No.

22  Q    By the way, at this point you certainly knew that

23  Mr. Cotton was another attorney at the law firm that

24  Mr. Greebel worked at representing MSMB, correct?

25  A    No.

SIDEBAR CONFERENCE                          2822

1          MR. KESSLER:  Objection.

2   Q    Look at the middle e-mail.

3   A    I'm telling you I didn't pay any attention to it.

4   Q    You see HowardCotton@KattenLaw.com?

5   A    Yes.

6   Q    In any event, taking you now to tab 18 -- well, actually,

7   let's do it this way and skip some of these documents.

8          There were various e-mails that you wrote to

9   Mr. Shkreli in which you told him your patience was wearing

10  thin and you were getting annoyed and you did not mince words

11  about that?

12  A    That's correct.

13  Q    There were several of those e-mails that you just sent

14  directly to him and didn't copy Mr. Greebel on, for one reason

15  or another, correct?

16  A    Yes.

17  Q    Now, so you would agree, sir, that whatever information

18  Mr. Greebel was getting about your communications with

19  Mr. Shkreli and your attorney, certainly didn't come from you

20  on e-mails he was left off of, correct?

21  A    Well, once my attorney stepped in he dealt directly with

22  Evan, as far as I know.

23  Q    So when you were sending e-mails, though, and leaving him

24  off, no one ever said to you, Mr. Kocher, by the way I

25  conveyed everything in this e-mail to Mr. Greebel, correct?

SIDEBAR CONFERENCE                    2823

1    A     That's correct.

2    Q     And the only reason, I mean -- withdrawn.

3          You never heard of Mr. Greebel prior to getting the

4    e-mail from Mr. Mulleady, correct?

5    A     I don't remember.

6    Q     You agree, sir, that you negotiated directly with

7    Mr. Shkreli on some portions of the settlement agreement,

8    correct?

9    A     It started out that way.

10   Q     Now, you have no idea as you sit here today what

11   information Mr. Shkreli conveyed to Mr. Greebel about assets

12   under management in MSMB, how much Retrophin was worth or any

13   other matter regarding MSMB or Retrophin, correct?

14   A     That's correct.

15   Q     So I'm going to skip ahead and go right to the settlement

16   agreement, it's in evidence as GX54.

17          Do you recall giving testimony about this?  You can

18   go to the next page.  Actually, that first page that was the

19   duly executed settlement agreement, right?

20   A     Yes.

21   Q     And, you will also be receiving the wire.  You went

22   through this settlement agreement on your direct, and you were

23   asked some questions about the entities on that first page, do

24   you see that?

25   A     Yes.

SIDEBAR CONFERENCE                         2824

1   Q    And I think you testified that you didn't know who some

2   of those entities were, correct?

3   A    That's correct.

4   Q    You didn't ask, though, did you?

5   A    I didn't, no.  I've, I just knew that I was in MSMB.  I

6   didn't know if it was Capital LP or Healthcare or what it was

7   exactly.  I didn't know there were many entities.

8   Q    And you saw, though, at the end on the last page that

9   Mr. Shkreli was signing on behalf of all of them, correct?

10  A    Yes.

11  Q    And you believed that Mr. Shkreli had that authority,

12  correct?

13  A    Yes.

14  Q    And you own your own business?

15  A    Yes.

16  Q    As the owner you have the authority to enter into certain

17  agreements, nothing unusual about that, right?

18  A    That's correct.

19  Q    And on pages one and two there is paragraph says payment

20  terms, do you see that?

21  A    Yes.

22  Q    It says that, I'm not going to read through all of it I

23  think it's been gone over on your direct, but you would get

24  $123,711 in cash, right?

25  A    Yes.

SIDEBAR CONFERENCE                              2825

1   Q     Then the 47,138 shares of common stock free trading,

2   right?

3   A     Yes.

4   Q     You have to give back 23-some-odd-thousand shares of

5   restricted stock you got that?

6   A     That's correct.

7   Q     Then you got the stock certificate that you received for

8   the Retrophin stock, right?

9   A     Yes.

10  Q     Now, on page -- it has the payment terms in here.  It

11  says that you will get 123,711.  It says that the MSMB

12  entities or Retrophin individually or collectively, the payor,

13  agree to deliver or cause to be delivered to releasor, you're

14  the releasor, right?

15  A     Yes.

16  Q     The total amount of $123,711.  You never said to your

17  lawyer or anyone else, why is Retrophin paying me.  You never

18  said that, right?

19  A     No.

20  Q     In fact, that made total sense to you, correct?

21  A     No.

22  Q     But you were just happy to be getting the money, right?

23  A     That's correct.

24  Q     You had no reason to doubt or disagree with the fact that

25  Retrophin was going be the one paying you, correct?

1    A    Well, that money was actually in lieu of the shares that

2    were given me originally.

3    Q    Right.  So my point is, you never disputed or had an

4    issue with Retrophin potentially being the one paying you,

5    correct, because you just wanted your money back?

6    A    Right.  At this point it was very unclear as to the

7    relationship with MSMB entities or Retrophin.  So you know, to

8    me it was all mixed up.

9    Q    Okay.  On page three of the settlement agreement you see

10   where it says voluntary act?

11   A    Yes.

12   Q    Did you read this document closely and in its entirety?

13   You consulted your attorney, correct?

14   A    Yes.

15   Q    You signed this, that's a true statement there, right,

16   paragraph six?

17   A    Yes.

18   Q    If we can go to page two, paragraph five, this is the

19   paragraph where the releases are contained, correct?

20   A    Yes.

21   Q    If we can blow-up the bottom portion of it as well.  Now

22   these releases that you both gave and received, you understand

23   as an initial matter without even looking at the document,

24   that when you agree to release a party that you were agreeing

25   that you will not sue them, right?

```
                    SIDEBAR CONFERENCE                    2827
```

1   A    Yes.

2   Q    And because the MSMB entities and Retrophin was all mixed

3   up, you had no issue as long as you were getting your money

4   and stock to your liking with saying I'm not going to sue any

5   of them, correct?

6   A    That's correct.

7              (Continued following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    2828

1           (In open court.)

2    CROSS-EXAMINATION

3    BY MR. DUBIN (continuing):

4    Q    You certainly never said to anybody, look, I will give

5    MSMB a release, I will give Retrophin a release, but I'm not

6    going to give other MSMB entities a release, right?

7    A    Right.

8    Q    And it made sense to you that you would walk away saying

9    I won't sue any of these entities, correct?

10   A    Yes.

11   Q    And they won't sue me, right?

12   A    Yes.

13   Q    You would agree, sir, that it's a benefit to have an

14   agreement with a party that could be involved in litigation

15   with you, that they would agree that they are not going to sue

16   you as well, correct?

17   A    That's correct.

18   Q    That was something you bargained for, right?

19   A    Or my lawyer did, yes.

20   Q    Or your lawyer did?

21   A    Yeah.

22   Q    That was, as far as you are concerned, an act of

23   protection?

24   A    Yes.

25   Q    Right.  And no different than on the other side, the

SIDEBAR CONFERENCE                           2829

1   lawyers that are representing Retrophin and MSMB protecting

2   them when they make sure that they get a lease from you,

3   correct?

4              MR. KESSLER:  Objection.

5              THE COURT:  You will have to rephrase that question.

6   Q    You understood, Mr. Kocher, that whether be it

7   Mr. Greebel, Mr. Cotton, or whoever it was that represented

8   Mr. -- the entities in this settlement agreement, that when

9   they got releases and got your agreement to release them, they

10  were doing their job, from your understanding, in protecting

11  their client, correct?

12             MR. KESSLER:  Objection, "doing their job."

13             THE COURT:  All right.  Try to rephrase.

14             MR. DUBIN:  No problem, Your Honor.

15  Q    Mr. Kocher, isn't it fair to say that from your

16  understanding that Retrophin, MSMB, and all of the MSMB

17  entities were being protected in that agreement by getting an

18  agreement from you not to sue them?

19  A    Yes.

20  Q    And you had no quarrel with the lawyers representing them

21  protecting them in the manner that they did, did you?

22  A    No.

23  Q    All right.  Now --

24             MR. DUBIN:  Bear with me one minute.  I'm just

25  trying to skip ahead, if you will bear with me one minute,

```
                          USA v. Greebel                    2830
```

1    Your Honor.

2              (Pause.)

3    Q    Were you happy with the terms of the settlement agreement

4    ultimately?

5    A    Yes and no.  I was happy to get at least my money back,

6    but it took much longer for me to actually get my money

7    because I -- instead of getting paid in money I got paid in

8    stock.

9    Q    But once you ultimately sold the stock -- and I know that

10   it took you some time, but once you ultimately sold it you

11   made a hell of a profit, didn't you, sir?

12   A    I did, but it cost me money.

13   Q    But even if you subtract the money it cost you, you still

14   made a profit, right?

15   A    It depends on your point of view, but I had to pull in

16   partners on properties because I didn't have that money; and

17   so, because of that, if you looked at it from that standpoint,

18   then I probably didn't make money.

19   Q    You invested 200,000.  You walked away with upwards of

20   350 at the end of the day, right?

21   A    That's true.

22              MR. DUBIN:  No further questions.

23              MR. KESSLER:  No redirect.

24              THE COURT:  All right.  Sir, you are excused.  Have

25   a nice evening.

1          THE WITNESS:  Thank you.

2          THE COURT:  I'm prepared to dismiss the members of

3     the jury at this time.

4          Sir, you can step down, and have a safe trip home.

5          THE WITNESS:  Thank you.  You too.

6          (Jury exits.)

7          THE COURT:  All right.  So tomorrow we will start at

8     9:00.

9          Are there any issues I need to address now or before

10    we start tomorrow?

11         MR. PITLUCK:  We are happy do it tomorrow, judge.

12    The only issue we would want to raise is the pace, especially

13    in light of the court's comments this morning about jurors

14    expecting to be done.

15         Obviously, we are watching the calendar and the

16    clock; and, knowing what witnesses are coming up, when you put

17    in the length it was going to take, certainly with Mr. Kocher,

18    who was, in our view, one of the shorter witnesses, who

19    started around noon today and we just finished with him.  So

20    we are communicating.  We are trying to move, but it is --

21    it's taking a long time, judge; and I think we just want to

22    put that on the court's radar.  We know it's already there,

23    but we are very conscious of the pace and how long things are

24    taking, and we are certainly not going to be done by next

25    Friday.

1          THE COURT:  No.  We told the jurors from day one it

2     was a five-week trial, which would be November 17.  I do think

3     the jurors have an expectation that they will not still be

4     going at this during the week of Thanksgiving or thereafter or

5     even as late as December 4, as the parties projected.

6          So I'm just saying keep it in mind.  Hopefully we

7     have enough in store.  I have adjourned my other trials.  I

8     would hate to lose jurors, though.

9          MR. PITLUCK:  So would we, judge.  We are trying to

10    be transparent in the message of how we see things progressing

11    vis-a-vis our original estimate, and it is certainly much

12    slower.

13         THE COURT:  No.  There is no doubt this is going

14    very slowly.  So, you know, I think everybody needs to keep it

15    in mind.  I'm not encouraging anyone to go to December 4.  I

16    would like to encourage everybody to stay within the five

17    weeks that we set aside for this trial.  I think we owe it to

18    the jurors, since we told them that was the outside length of

19    the trial, and I would just urge the parties to try to be

20    mindful as they prepare their directs and crosses.  All right.

21    Thank you.

22         The more you can stipulate, the better.  Thank you.

23         MR. PITLUCK:  Thank you, judge.

24         (Trial adjourned to Wednesday, November 1, 2017, at

25    9:00 a.m.)

2833

I N D E X

WITNESS                                    PAGE

CROSS-EXAMINATION      BY MR. BRODSKY      2535

REDIRECT EXAMINATION   BY MS. SMITH        2556
RECROSS-EXAMINATION    BY MR. BRODSKY      2605
CROSS-EXAMINATION      BY MR. BRODSKY      2629

RICHARD KOCHER

DIRECT EXAMINATION     BY MR. KESSLER      2647
DIRECT EXAMINATION     BY MR. KESSLER      2692
CROSS-EXAMINATION      BY MR. DUBIN        2721
VOIR DIRE EXAMINATION  BY MR. KESSLER      2748
CROSS-EXAMINATION      BY MR. DUBIN        2748

EXHIBITS

GOVERNMENT                  PAGE
305                         2563
33                          2652
34                          2658
34A                         2661
83-1                        2663
83-2                        2663
83-3                        2663
83-4                        2663
104-1                       2669
104-5-A                     2675
104-7                       2693
104-9                       2695
104-16                      2701
104-18                      2705
104-19                      2707
104-20                      2709
104-21                      2711
54                          2714
104-25                      2720

DEFENSE                     PAGE
8253                        2554
103-22                      2748
103-9                       2802
103-10                      2806
103-15                      2808
103-2                       2812
103-13                      2821

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*