2834

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                      15-CR-637(KAM)
 3   UNITED STATES OF AMERICA,
                                      United States Courthouse
 4            Plaintiff,             Brooklyn, New York

 5            -against-              November 1, 2017
                                     9:00 a.m.
 6   EVAN GREEBEL,

 7            Defendant.
     ------------------------------x
 8
                 TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 9            BEFORE THE HONORABLE KIYO A. MATSUMOTO
                   UNITED STATES DISTRICT JUDGE
10                     BEFORE A JURY

11   APPEARANCES

12   For the Government:        BRIDGET M. ROHDE, ESQ.
                                Acting United States Attorney
13                              Eastern District of New York
                                271 Cadman Plaza East
14                              Brooklyn, New York 11201
                                BY:  ALIXANDRA ELEIS SMITH
15                                   DAVID PITLUCK
                                     DAVID KESSLER
16                              Assistant United States Attorneys

17   For the Defendant:         GIBSON, DUNN & CRUTCHER LLP
                                200 Park Avenue
18                              48th Floor
                                New York, New York 10166-0193
19                              BY:  REED M. BRODSKY, ESQ.
                                     RANDY MASTRO, ESQ.
20                                   WINSTON Y. CHAN, ESQ.
                                     MYLAN LEE DENERSTEIN, ESQ.
21                                   JOSHUA EVAN DUBIN, ESQ.
                                     GRACE TSOU, ESQ.
22
     Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, OCR
23                              Phone:  718-613-2330
                                Fax:    718-804-2712
24                              Email:  LindaDan226@gmail.com

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

GELLER – DIRECT – PITLUCK                    2835

1          (In open court; Jury not present.)

2          THE COURT:  Do we have everyone here?

3          We have one juror stuck in the tunnel.

4          (Jury enters the courtroom.)

5          THE COURT:  All right, we have all jurors present.

6    Please have a seat.

7          Is the Government ready to call its next witness?

8          MR. DUBIN:  Yes, thank you, Your Honor.

9          The Government calls David Geller.

10         THE WITNESS:  Good morning.

11         THE COURT:  Please raise your right hand.

12         (Witness takes the witness stand.)

13   DAVID GELLER, called as a witness, having been first duly

14   sworn/affirmed, was examined and testified as follows:

15         THE COURT:  Please have a seat and state and spell

16   your full name for the record.  Thank you.

17         THE WITNESS:  David Geller.  D-A-V-I-D.

18   G-E-L-L-E-R.

19         THE COURT:  Please proceed.

20         MR. DUBIN:  Thank you, Judge.

21   DIRECT EXAMINATION

22   BY MR. PITLUCK:

23   Q    Hold old are you, Mr. Geller?

24   A    Fifty-five.

25   Q    Where do you currently live?

1   A    Manhattan.

2   Q    How long have you lived in Manhattan?

3   A    About twenty years.

4   Q    Are you married, sir?

5   A    Yes.

6   Q    Do you have any kids?

7   A    I do.  I have a 13-year-old boy.

8   Q    Did you graduate from college?

9   A    I did.

10  Q    What year did you graduate from college?

11  A    Syracuse, 1984.

12  Q    And can you just briefly describe for the jury your

13  employment history?

14  A    Yes.  I was always in the finance industry.  Most of the

15  time being an equities trader.

16  Q    And what firms did you trade at in your career?

17  A    I traded at Shearson Lehman, which is no longer around.

18  I traded at some -- some firms Generic Trading for the last --

19  on and off the last seven years.

20  Q    And are you currently retired?

21  A    I would say semiretired.

22  Q    What do you when you're -- for work to keep your busy

23  while you're semiretired?

24  A    I do trade but on a small-time basis right now.  More of

25  a hobby, actually, pretty much.

GELLER – DIRECT – PITLUCK                    2837

1   Q    Okay.  And do you know an individual named Martin

2   Shkreli?

3   A    I do.

4   Q    How did you meet Martin Shkreli?

5   A    I was -- my brother introduced me to him.

6   Q    What's your brother's name?

7   A    Alan.

8   Q    Approximately when was your first contact with

9   Mr. Shkreli?

10  A    May -- May, maybe, 2012.

11  Q    Do you see a binder there in front of you?

12  A    Yes.

13  Q    Can you flip to -- I'll refresh your recollection, can

14  you flip to Tab 3, please.  Just labeled Government

15  Exhibit 106-2 just for identification.

16  A    Okay.  I'm here.

17  Q    Do you see an email on the top page?

18  A    Yes.

19  Q    And who is that from and to?

20  A    From Alan Geller.

21  Q    To whom?

22  A    To me.

23  Q    And what's the date of that email?

24  A    April 6th, 2011.  So when I said "2012," I meant 2011

25  before.

GELLER - DIRECT - PITLUCK                    2838

1    Q    So you think you met Mr. Shkreli in the spring of 2011?

2    A    Yes.

3    Q    And did you -- what was the first contact you actually

4    had with Mr. Shkreli?  Was it in person or over the phone?

5    A    It was over the phone.

6    Q    And why did you speak to Mr. Shkreli?

7    A    I just wanted to feel him out and see what -- see what he

8    had to offer me.  I mean, I know he was running the fund,

9    so...

10   Q    When you say "the fund," how did you learn about what you

11   call "the fund"?

12   A    My brother told me that he had invested in it and I

13   should look into it and, um, speak to the -- speak to the

14   general partner.

15   Q    And that was Martin Shkreli?

16   A    Yes.

17   Q    And did you learn the name of the fund that Martin

18   Shkreli ran?

19   A    Yes.

20   Q    What was it?

21   A    MSMB Healthcare.

22   Q    And what, if anything, did Martin Shkreli tell you about

23   MSMB Healthcare in that first call?

24   A    He told me that it was a biotech fund with -- it was a

25   long/short biotech fund.

GELLER - DIRECT - PITLUCK                    2839

1    Q     What's that mean?  Long/short?

2    A     That means that, um, for positions -- well that means

3    positions in the fund, you know, you can be long or short.

4    Long being obviously you want it to go up.  You're speculating

5    it's going to go up.

6           But to balance it off, it had to have some short

7    positions, which you're betting it to go down.  Reason being

8    if the general market has a crisis or a just a bad week, you

9    know, you won't get all -- you won't get all hurt on the long

10   side.

11   Q     And did he tell you anything about the liquidity of MSMB

12   Healthcare?  And by "he" I mean Mr. Shkreli?

13   A     Yes.

14   Q     What did he tell you?

15   A     Very, very liquid funds.

16   Q     What does that mean, just in laymen's terms?

17   A     That means if you want -- if you change your mind, you

18   want to exit the fund, you can cash out within the month.

19   Q     And then your conversation with Mr. Shkreli make an

20   impression on whether you wanted to invest in MSMB Healthcare?

21   A     Yes, it did.

22   Q     What impression was that?

23   A     Good impression.  Because from what I heard it all

24   sounded like it met the objective I was seeking at the time.

25   Q     What was your objective at the time?

GELLER – DIRECT – PITLUCK                    2840

1   A     I wanted something that was a liquid -- a liquid-type of

2   fund.

3   Q     Had you invested in a hedge fund like this before?

4   A     Yes.

5   Q     Approximately how much before your conversation with

6   Martin Shkreli in 2011.

7   A     Five, six years.

8   Q     And what was your -- how was your experience investing in

9   the hedge fund five or six year before that?

10  A     Not too good.

11  Q     What happened.

12  A     Well, a lot of my investments started in 2003 to 2006,

13  and then as we all know, in 2007, 2008, 2009 when the -- when

14  the crash -- not to say the crash, but when the economic

15  crisis, came a lot of these so-called funds that had absolute

16  returns, which meant that no matter what the market did, it

17  could still seek superior returns through everything else.

18              But most of them did not.  Most of them still had

19  really bad, bad returns.  I was disappointed with the whole

20  idea, you know, the hedge fund setup.

21  Q     And did that affect that experience affect how you

22  thought about hedge funds investing going forward?

23  A     Absolutely.

24  Q     In what way?

25  A     I said to myself I'm never -- next time I make an

1   investment, I'm going to do my due diligence on it.

2   Q    Now, when you were considering -- and after your meeting

3   with Shkreli Martin Shkreli, did you consider whether to

4   invest in MSMB Healthcare?

5   A    Yes.

6   Q    When you were evaluating that consideration, did you

7   receive documents about MSMB Healthcare?

8   A    Yes.

9   Q    Who did you receive those documents from?

10  A    My brother sent them to me, and then Kevin Mulleady sent

11  them to me.

12  Q    And who is Kevin Mulleady?

13  A    He was at the time from what I -- what I understood, he

14  was the salesman, the head salesman for MSMB Healthcare.

15  Q    And do you know if in this time in 2011 whether Kevin

16  Mulleady had a relationship with your brother Alan?

17  A    Yes, he did.

18  Q    And did you have a relationship with Kevin Mulleady at

19  that time?

20  A    I did not.

21  Q    And when Kevin Mulleady sent you the documents --

22  withdrawn.

23          When your brother -- you just testified a moment ago

24  that your brother was the first one that sent you the MSMB

25  Healthcare documents, correct?

GELLER – DIRECT – PITLUCK                    2842

1   A    Yes.

2   Q    Did you review them when your brother sent them to you?

3   A    I skimmed them briefly.

4   Q    What about when Kevin Mulleady sent them to you, did you

5   review them then?

6   A    I reviewed them.

7   Q    In detail or did you skim them like the first time?

8   A    Not in detail, I skimmed them.

9   Q    Okay.  I'm going to show you what's been marked for

10  identification as Government Exhibit 106-3.  And it's Tab 4 in

11  your binder.

12        Do you recognize this document, Mr. Geller?  The

13  top, the cover page?

14  A    Yes.

15  Q    And generally what it is on the cover page that we're

16  looking at?

17  A    It's an investor package.  It's what you get sent before

18  you make an investment.  You have to fill out forms and

19  questionnaires and so on.

20  Q    And just taking a step back, is this an email attaching

21  that investor package?

22  A    Yes.

23  Q    And the top email, who's it from and who's it to?

24  A    It's from Kevin Mulleady and it's to me.

25  Q    And is this the email with the documents that you

GELLER – DIRECT – PITLUCK                    2843

1   testified a moment ago about MSMB Healthcare?

2   A      Yes.

3          MR. PITLUCK:  Your Honor, at this time the

4   Government would move to admit Government Exhibit 106-3 in

5   evidence.

6          MR. MASTRO:  No objection, Your Honor.

7          THE COURT:  We will receive 106-3.

8          (Government Exhibit 106-3, was received in

9   evidence.)

10         (Exhibit published.)

11  Q      Looking at the top two emails, Mr. Geller, what's the

12  date on those emails?

13  A      June 22nd, 2011.

14  Q      And then your email and -- can you read your email of

15  June 22nd, 2011, please?

16  A      Sure.

17         The one that I -- the one that I sent out?

18  Q      Yes.

19  A      The one in the middle?

20  Q      Yes, please.

21  A      Kevin.  Well it looks like the offering memorandum has a

22  10-K on the back pages too.  Please send another one.  Sorry.

23  Q      And what did Mr. Mulleady respond?

24  A      Hey, David.  Thank you for the opportunity to work with

25  you.

GELLER - DIRECT - PITLUCK                    2844

1    Q    Actually, can you read that, please.  This is just the

2    first email, the bottom one.

3    A    Thank you for the opportunity to work with you.  I

4    believe this document is the only one you need.  Let me know

5    if you need a hand with it and when you want to meet up.  Even

6    if you don't have time for a beer.  Happy to come by and grab

7    it.

8    Q    And are there attachments to this email chain,

9    Mr. Geller?

10   A    Yes.

11   Q    Can you just, under attachments, can you just read what

12   it says there?

13   A    MSMB Healthcare Limited Partners Private Placement

14   Memorandum.  MSMB Healthcare Limited Partners subscription

15   agreement.  MSMB Healthcare individual questionnaire.

16   Q    Okay.  So let's look to the third page of that document,

17   which has got Bates stamp at bottom R036371.

18        Just briefly, Mr. Geller, what does it say at the

19   top under "confidential"?

20   A    Private offering memorandum.

21   Q    It says offering of limited partner interest.  And what's

22   the name that's listed right underneath that?

23   A    MSMB Healthcare Limited Partner.

24   Q    And what's the general partner that's listed there, and

25   the address, please?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

GELLER - DIRECT - PITLUCK                    2845

1   A    MSMB Healthcare Investors Limited Liability Corporation,

2   330 Madison, New York, New York.

3   Q    And who's the managing partner of that fund?

4   A    Martin Shkreli.

5   Q    What's the date on that document?

6   A    January 1st, 2011.

7   Q    Mr. Geller, at this point keep your thumb there, I'm

8   going to have you flip to Tab 1 in your binder, which is

9   Government Exhibit 11A for identification.

10          And is this the same document, the MSMB Healthcare,

11  LP private offering memorandum?

12  A    Yes.

13  Q    Dated January 1st, 2011?

14  A    Uh-huh.

15  Q    So this is the same one we just saw in Government

16  Exhibit 106-3?

17  A    Yes.

18          MR. PITLUCK:  Your Honor, at this time we'd also

19  move Government Exhibit 11A into evidence.

20          MR. MASTRO:  No objection, Your Honor.  It's the

21  same document that just came into evidence.

22          THE COURT:  That's what he said.

23          All right, we'll receive Government Exhibit 11A.

24          MR. PITLUCK:  Thank you, Judge.

25          (Government Exhibit 11A, was received in evidence.)

GELLER - DIRECT - PITLUCK                        2846

1              (Exhibit published.)

2    Q    Let's go back to where your hand was, Mr. Geller, and

3    Tab 4.

4              Let's go to the next page, which is Bates-stamped

5    R036372.

6              Can you zoom in on the second paragraph there,

7    please.

8              Mr. Geller, can you just read the first sentence of

9    that paragraph?  The one that starts "the partnership's

10   investment".

11   A    Sure.

12             The partnership's investment objective will be to

13   seek superior absolute returns while attempting to minimize

14   portfolio volatility primarily through long and short equity

15   investments in healthcare companies located in the US and

16   throughout the world.

17   Q    Can you just read the sentence, too, I'm sorry.

18   A    The adviser intends to primarily focus on short-term

19   trading opportunities in highly liquid marketplaces.

20   Q    Mr. Geller, does that language match up with what your

21   investment objective was at that time?

22   A    It did, yes.

23   Q    And was this information important to you?

24   A    Absolutely.

25   Q    At the time you invested?

1   A    Yes.

2   Q    Now, let's go to the 11th page of the exhibit, which is

3   Bates-stamped R0306381.

4        Do you see the section there, capital withdrawal?

5   A    Yes.

6   Q    Withdrawals.

7        And can you read the first sentence there, please?

8   A    Limited partners may withdraw any or all of their capital

9   accounts subject to certain reserves which may be established

10  by the general partner to cover contingent liabilities of the

11  partnership monthly at the last calendar day of each month

12  commencing one full month after the date of their initial

13  investment in the partnership upon not less than 30 days prior

14  to written notice to the general partner.

15  Q    And, Mr. Geller, did this match what Mr. Shkreli told you

16  about the liquidity of the fund at the time you invested?

17  A    It did.

18  Q    Was that important to you in making an investment

19  decision?

20  A    Yes.

21  Q    For the reasons you testified to before?

22  A    Yes.

23  Q    Mr. Geller, did you, in fact, invest in MSMB Healthcare?

24  A    I did.

25  Q    How much did you invest?

GELLER - DIRECT - PITLUCK                    2848

1    A    200,000.

2    Q    And did you sign any documents in connection with your

3    investment in MSMB Healthcare?

4    A    I did.

5              MR. PITLUCK:  At this point, Judge, I'd like to show

6    the witness Government Exhibit 28 for identification.

7    Q    And, Mr. Geller, it's Tab 5 in your binder.

8              Mr. Geller, what document are we looking at here?

9    A    The subscription agreement.

10   Q    And I'd like to ask you to flip to what's marked as

11   page 11.  It's the second to the last page of the document.

12   R011939.  It's also on the screen for you.

13             Is that your signature up on the top left?

14   A    Yes.

15   Q    Is this the subscription agreement you signed for MSMB

16   Healthcare.

17   A    Yes.

18             MR. PITLUCK:  Judge, at this time we move Government

19   Exhibit 28 into evidence, please.

20             MR. MASTRO:  No objection, Your Honor.

21             THE COURT:  We received Government's 28.

22             (Government Exhibit 28, was received in evidence.)

23             (Exhibit published.)

24   Q    So the cover page on the screen and if you can go back to

25   the 11th page of the document.

GELLER - DIRECT - PITLUCK                    2849

1        What date did you sign this document, sir?

2   A    I signed it on June 29th, 2011.

3   Q    And Mr. Mulleady, as we saw in Government Exhibit 106-3,

4   sent you these -- the private placement memorandum on

5   June 22nd, 2011, correct?

6   A    If it was the 22nd, then that's what it was.

7        Oh, yeah, it was the 22nd.

8   Q    About a week after you received the private placement

9   memorandum, you invested a hundred thousand dollars?  I'm

10  sorry, $200,000?

11  A    Yes.

12  Q    Now, at the time that you invested, did you know if

13  Martin Shkreli had any other hedge funds?

14  A    I did not.

15  Q    Now, after you invested, Mr. Geller, did you receive

16  information about the performance of your investment in MSMB

17  Healthcare?

18  A    I did.

19  Q    How did you receive information about the performance of

20  your investment?

21  A    They were monthly statements.

22  Q    And how did you receive those monthly statements?  Did

23  they come in mail?

24  A    It came through email.

25  Q    Mr. Geller, there's a small binder there.  Do you see it?

GELLER - DIRECT - PITLUCK                    2850

1    It says "investor statements"?

2    A    Yes.

3    Q    Can you just flip through -- there's tabs in it.

4              And for the record, Judge, they're marked Government

5    Exhibits 91- through 91-10.

6              THE COURT:  Thank you.

7    Q    Let me know when you've had a chance to take a look,

8    Mr. Geller.

9    A    Okay, I'm here.

10   Q    Are these the investor statements you received for MSMB

11   Healthcare?

12   A    Yes.

13   Q    And they were received by you via email?

14   A    Yes.

15             MR. PITLUCK:  Your Honor, at this point the

16   Government would move to admit Exhibits 91-1 through 91-10

17   into evidence.

18             MR. MASTRO:  No objection, Your Honor.

19             THE COURT:  All right, we will receive Government's

20   99-1 through 99-10.

21             MR. PITLUCK:  Thank you.

22             (Government Exhibit 99-1, was received in evidence.)

23             (Government Exhibit 99-2, was received in evidence.)

24             (Government Exhibit 99-3, was received in evidence.)

25             (Government Exhibit 99-4, was received in evidence.)

GELLER - DIRECT - PITLUCK                2851

1          (Government Exhibit 99-5, was received in evidence.)

2          (Government Exhibit 99-6, was received in evidence.)

3          (Government Exhibit 99-7, was received in evidence.)

4          (Government Exhibit 99-8, was received in evidence.)

5          (Government Exhibit 99-9, was received in evidence.)

6          (Government Exhibit 99-10, was received in

7    evidence.)

8          (Exhibit published.)

9    Q    Mr. Geller, can you, in that small binder, can you flip

10   to Tab 1, which is Government Exhibit 99-1.

11         Do you see the email at the bottom August 9th at

12   11 -- August 9th, 2011 at 11:15 a.m.?

13   A    Yes.

14   Q    Who sent this email to you?  And did you receive this

15   email?

16   A    I did.

17   Q    And who sent this email to you?

18   A    Investor relations at NAV Consulting.

19   Q    And what, if anything, did you understand NAV Consulting

20   to be?

21   A    At the time I believed they were the administrator of the

22   fund.

23   Q    And just generally in your experience what is a "fund

24   administrator"?

25   A    The administrator pretty much is there for checks and

GELLER – DIRECT – PITLUCK                2852

1  balances.  They sometimes help with the bookkeeping and

2  they're –– I think one of their main objectives is to send out

3  the monthly statements.  And to make sure that they're

4  accurate.

5  Q    Now, this email was sent on August 9th, 2011; is that

6  right?

7  A    Yes.

8  Q    What month is this statement for?

9  A    This is for July.  July 2011.

10 Q    Can you flip to the next page, please.

11       This is the first statement you received from MSMB

12 Healthcare, correct?

13 A    Yes.

14 Q    What's your investment worth, your 200,000-dollar

15 investment worth at this point in time?

16 A    $205,139.

17 Q    Do you believe the statement was accurate?

18 A    I did.

19 Q    Did you rely on this and the other monthly statements to

20 keep track of your investments in MSMB Healthcare?

21 A    I did.

22 Q    And did these statement have an influence on whether or

23 not you chose to keep your money in MSMB Healthcare?

24 A    They –– they do.

25       I understand maybe that from my prior experience and

GELLER - DIRECT - PITLUCK                    2853

1   from doing it myself, at times that, you know, a fund can have

2   a bad month or two.  And so, you know, I don't -- and if it

3   had one or two bad months, I'm not going to withdraw my money.

4   Q    Even if it had a bad month, you believe that the bad

5   performance is accurately reflected in the statement?

6   A    I did.

7   Q    So can you go over to Tab 2, which is the next tab over

8   Government Exhibit 91-2.

9        And is this the September 11th, 2000 statement sent

10  by NAV Consulting?

11       (Exhibit published.)

12  A    Yes.

13  Q    And what date was this sent to you?

14  A    October 27th, 2011.

15  Q    Let's just go to the next page.  Which is the actual

16  statement.  That's R13300.

17       And it looks like your investment is worth about

18  $210,000 at this point, correct?

19  A    That's correct.

20  Q    And can we focus in on the language at the bottom, the

21  small fine print.  Can you just read the first -- the first

22  two sentences of this, please?

23  A    MSMB Healthcare Limited Partner has accepted the transfer

24  of 30,000 investment units consisting of Class A common units

25  of Retrophin, LLC from Martin Shkreli at no consideration as a

GELLER - DIRECT - PITLUCK                    2854

1   gift.  These units are illiquid in nature and prices are not

2   ready available in the market.

3   Q    Sorry, can you read the next, please.

4   A    Valuations of this investment have been provided by the

5   general partner.  NAV Consulting is not involved in the

6   calculation, verification or dissemination of such values and

7   disclaims any responsibility for the accuracy or completeness

8   thereof.

9   Q    And then finally the next sentence, please.

10  A    As of the date in this statement, we are valuing the

11  units at $10 per unit or $300,000.  Retrophin has sold these

12  units at $20 per unit in connection with Series A financing.

13  The value --

14  Q    Thank you, Mr. Geller, I appreciate it.

15           At the time that you received this statement in

16  October of 2011, did you pay attention to this footnote?

17  A    No, I did not.

18  Q    Now, let's go -- and did there come a time when you paid

19  attention to similar language in one of your MSMB Healthcare

20  statements?

21  A    Yes.

22  Q    Let's go to Tab 3, which is Government Exhibit 91-3.

23           (Exhibit published.)

24           Mr. Geller, is this a November 30th, 2011 email from

25  NAV Consulting?

GELLER - DIRECT - PITLUCK                    2855

1   A    Yes.

2   Q    Is this attaching your October 2011 statement?

3   A    Yes.

4   Q    Let's go to the actual statement on the next page.

5        Do you see a similar footnote at the bottom there?

6   A    I do.

7   Q    Did you pay attention to this footnote at the time that

8   you received your MSMB Healthcare investor statements?

9   A    No, I did not.  Not at this time.

10  Q    When did you notice that footnote?

11  A    Well, I noticed it the month after I think the fund had a

12  possible drawdown and my brother, who initially introduced me

13  to Martin, mentioned it to me that there was this whole, ah,

14  footnote at the bottom, and that's when I read it.

15  Q    And at that point in time, did you have any understanding

16  of what Retrophin was?

17  A    No, not at all.

18  Q    What, if anything, did you believe was the relationship

19  between Retrophin and MSMB Healthcare?

20  A    Separate.  Separate.  I -- totally separate entities.

21       I thought MSMB was the actual fund, and I believed

22  at the time Retrophin was a -- it said actually something

23  about a gift.  Yeah.  No consideration, as a gift.

24       So I thought Retrophin might have been a company

25  that Martin Shkreli -- I don't know if it was a public company

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER – DIRECT – PITLUCK                2856

1   or a private company, but I didn't pay too much attention

2   because it said it was a gift and there were supposedly many

3   positions in the fund, so one position wasn't gonna, you know,

4   really get my attention.

5   Q    And did this time frame concern you at all, the reference

6   to Retrophin?

7   A    No.

8   Q    Did you believe that MSMB Healthcare had paid to invest

9   in Retrophin at this point?

10  A    No.

11  Q    I think you mentioned this a moment ago, but did you

12  believe that MSMB Healthcare had other investments outside of

13  Retrophin at this time?

14  A    Yes.

15  Q    And did you have any understanding of the size of MSMB

16  Healthcare's position in Retrophin at this point in time?

17  A    I did not.

18  Q    So let's go back to the large binder there, and I'd like

19  to show you a document what's been marked for identification

20  as Government Exhibit 106-6, which is Tab 9 in your binder.

21       Do you recognize this document, Mr. Geller?

22  A    Yes.

23  Q    And what are we looking at here on the first page of

24  106-6?

25  A    Okay, so let's see.  This was -- looks like an investor

GELLER – DIRECT – PITLUCK                    2857

1  letter with a bunch of attachments on it.

2  Q    It is an investor letter from MSMB Healthcare, LP?  If

3  you look at the subject.

4  A    The subject is -- yes.

5  Q    And did you --

6  A    MSMB.

7  Q    Is this an email that you received?

8  A    It is.

9  Q    And are there attachments to that email?

10  A    Yes.

11  Q    And did you receive those?

12  A    Yes.

13         MR. PITLUCK:  Your Honor, at this time the

14  Government would move to admit Exhibit 106-6 into evidence.

15         MR. MASTRO:  No objection, Your Honor.

16         THE COURT:  We will receive Government's

17  Exhibit 106-6.

18         (Government Exhibit 106-6, was received in

19  evidence.)

20         (Exhibit published.)

21  Q    Mr. Geller, can you tell the jury who this email is from

22  and the date of the email?

23  A    From investor relations at NAV Consulting.

24  Q    And who is copied on the email?

25  A    Allison Russo and Martin Shkreli.

GELLER – DIRECT – PITLUCK                    2858

1    Q    The date of the email?

2    A    October 31st, 2011.

3    Q    And do you see where it says "dear investor"?

4    A    Yes.

5    Q    Can you just read the language in the email.

6    A    Dear Investor, please find attached an important notice

7    from the fund, along with a materially revised PPM dated

8    October 28th.  These are critical notices for your information

9    and they may require response action on your part, if you have

10   any objection to the changes to the PPM.  For this reason, we

11   urge you to carefully review both documents and exercise due

12   care in your investment decision.

13   Q    Do you see at the top there it says one of the

14   attachments is MSMB Healthcare letter to investors?

15   A    Yes.

16   Q    Can we flip to the next page, which is Bates-stamped DG8.

17             (Exhibit published.)

18             And can you read for the jury the first two

19   paragraphs?

20   A    Yes.  Okay.

21             So Dear Limited Partner, MSMB Healthcare has updated

22   its private placement memorandum to reflect new disclosures

23   regarding the fund.  Specifically, MSMB Healthcare has

24   expanded its disclosure regarding its ability and intent to

25   invest in illiquid securities, including venture capital

GELLER - DIRECT - PITLUCK                    2859

1    private equity, limited partnerships, and other hedge funds.

2    If you disagree with these changes, we will facilitate your

3    redemption within our standards parameters.

4              MR. PITLUCK:  There's a bottle of water there, sir,

5    if you need it.

6              THE WITNESS:  Okay.

7    A    Read the next paragraph.

8    Q    Next paragraph, please.

9    A    Okay.

10             MSMB Healthcare has and will continue to invest in

11   MSMB affiliated entities which are controlled by the MSMB

12   Capital umbrella.  These entities may or may not be

13   administered and audited and the fund will rely heavily on our

14   impressions of value of these assets.  These investments are

15   expected to be a material portion of the fund's assets.

16   Q    Just stopping you there, Mr. Geller.

17             Do you see a reference to MSMB affiliated entities

18   that are controlled by the MSMB Capital umbrella?

19   A    Yes.

20   Q    At this time did you know what that was a reference to?

21   A    I did not.

22   Q    Did you know of an entity called MSMB Capital?

23   A    I did not.

24   Q    Can you just read the third paragraph, please.

25   A    MSMB Healthcare may invest in private equity, directly or

GELLER - DIRECT - PITLUCK                    2860

1    indirectly.  MSMB affiliated partnerships are most likely to

2    carry out these private equity investments.  There is no

3    assurance that these investments will be profitable and any

4    equity invested may not be able to be returned in kind for a

5    redemption.

6    Q    Okay.  And going over, flipping two pages to DG10.

7            Is this another private offering memorandum?

8    A    Yes.

9    Q    For which entity?

10   A    MSMB Healthcare.

11   Q    And is the general partner MSMB Healthcare Investors,

12   LLC?

13   A    Yes, it is.

14   Q    And who's listed as the investment manager here?

15   A    MSMB Healthcare Management, LLC.

16   Q    What's the date of this document?

17   A    October 28th, 2011.

18   Q    And just humoring me for a second, Mr. Geller, can you

19   keep your thumb there and go to Tab 8, which is marked as

20   Government Exhibit 11B for identification.

21   A    Okay.

22   Q    Is that the same MSMB Healthcare private offering

23   memorandum that we saw within Government Exhibit 106-6?

24   A    Yes.

25           MR. PITLUCK:  At this time, Judge, we move to admit

GELLER - DIRECT - PITLUCK                    2861

1    Government Exhibit 11B into evidence.

2            MR. MASTRO:  No objection, Your Honor.  It's already

3    attached.

4            THE COURT:  We will receive Government's Exhibit 11B

5    you said?

6            MR. PITLUCK:  11B, as in boy.

7            Thank you, Your Honor.

8            (Government Exhibit 11B, was received in evidence.)

9    Q    Did you review this new amended private placement

10   memorandum after you received it in October of 2011?

11   A    Yes, I reviewed it.

12   Q    In detail or did you skim it like you did the other

13   documents?

14           MR. MASTRO:  Your Honor, I haven't objected but

15   here's leading the witness.  And he's done it before.

16           THE COURT:  All right.  Well, try to rephrase your

17   question, Mr. Pitluck.

18   BY MR. PITLUCK:

19   Q    Did you skim this document, sir, or did you read it in

20   detail?

21   A    I skimmed it.

22   Q    Now, what was your -- what about the letter.  Did you

23   review the letter in detail or did you skim that?

24   A    I reviewed the letter in detail.

25   Q    What was your reaction to receiving the letter?

GELLER - DIRECT - PITLUCK                    2862

1        THE COURT:  You mean the 106-6 letter?

2        MR. PITLUCK:  Yes, Your Honor.  Sorry, we're back on

3    106-6.

4    Q    The letter that's on page 2 of Government Exhibit 106-6.

5        (Exhibit published.)

6        What was your reaction to that?

7    A    It didn't sit well with me.

8    Q    Why not?

9    A    Because the description of a letter said they were pretty

10   much going to change the core of the fund into illiquid

11   private placements.  Hard to redeem securities.  And that

12   wasn't my original objective when I invested in the fund.

13       And this happened, you know, like within -- within

14   the year, right?  Since I invested, originally invested.

15   Q    And what, if anything, did you do after receiving this

16   information from MSMB Healthcare?

17   A    I -- I digested it.  I spoke to my brother.  You know, a

18   few times about it.  Um, and I also -- because I've been

19   dealing with Kevin Mulleady a lot, being that was the salesman

20   and the person that got me -- he was my, um, you know, go-to

21   liaison with the fund.  I spoke to him about it.

22   Q    Can I show you what's been marked as Government

23   Exhibit 106-35 for identification.  That's Tab 10 in your

24   binder.

25       What are we looking at here, sir?

GELLER - DIRECT - PITLUCK                    2863

1    A    This is an email that I sent to Kevin Mulleady.

2    Q    What's the date of that email?

3    A    November 2nd.

4    Q    Of 2011?

5    A    Yes.

6              MR. PITLUCK:  Your Honor, at this time we move to

7    admit Government Exhibit 106-35 into evidence.

8              MR. MASTRO:  No objection, Your Honor.

9              THE COURT:  We will receive 106-35.

10             (Government Exhibit 106-35, was received in

11   evidence.)

12             (Exhibit published.)

13   Q    So the date of the email was November 6th, 2011?

14             I'm sorry, November 2nd, 2011?

15   A    Yes.

16   Q    And just back to 106-6.

17             You testified that that was sent on October 31st,

18   2011?

19   A    Yes.

20   Q    Approximately how many days later did you send this email

21   to Kevin Mulleady?

22   A    Two or three days.

23   Q    Can you just read for the jury what you wrote to Kevin

24   Mulleady that's in Government Exhibit 106-35?

25   A    Kevin, I looked over the PPM memo.  Please contact me as

GELLER - DIRECT - PITLUCK                    2864

1    I have a couple of questions that need to be addressed.

2    Q    Did you speak to Kevin Mulleady after you sent him this

3    email?

4    A    Yes.

5    Q    And what, if anything, did you discuss with him on that

6    call?

7    A    I -- I was concerned.  I told him what I just told you

8    about two minutes ago about my -- the objectives of the fund

9    changing.  And he told me not to worry.

10            MR. MASTRO:  Objection, Your Honor.  Hearsay.

11            THE COURT:  All right.

12            Sir, you can't state what someone else told you.

13            You want to rephrase the question?

14            MR. PITLUCK:  I can rephrase the question, Judge,

15   but we'll keep going.

16            THE COURT:  Okay.

17   Q    After you spoke to Kevin Mulleady, did you decide to

18   redeem your investment in MSMB Healthcare?

19   A    Yes.

20   Q    What reasons did you give for redeeming?

21   A    I gave the reason like we -- well, what I just said

22   before, that it wasn't part of my original objective or reason

23   that I invested in the fund.

24   Q    Okay.  I'd like to show you what's been marked for

25   identification as Government Exhibit 106-7, which is Tab 11 in

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER – DIRECT – PITLUCK                    2865

1    your binder.

2                And what are we looking at here, Mr. Geller?

3    A    This is an email that I sent to Kevin Mulleady and Martin

4    Shkreli.

5    Q    What's the date of that email?

6    A    January 24th.

7    Q    Of what year?

8    A    2012.

9                MR. PITLUCK:  Your Honor, at this time the

10   Government would move to admit Exhibit 106-7 into evidence.

11               MR. MASTRO:  No objection, Your Honor.

12               THE COURT:  So we will admit 106-7.

13               (Government Exhibit 106-7, was received in

14   evidence.)

15               (Exhibit published.)

16   Q    Mr. Geller, what's the subject line of this email?

17   A    Redemption.

18   Q    And what did you write?  Can you read that for the jury,

19   please.

20   A    Sure.

21               Kevin and Martin, after careful thought, I have

22   decided to put in for redemption.  This is my own personal

23   decision as the investment objective of the fund no longer

24   matches my personal objective.  I believe we have talked about

25   this in the past.  Basically my portfolio already has too much

GELLER – DIRECT – PITLUCK                    2866

1  private equity and illiquid components in it.  Let's try and

2  chat later.

3  Q    And when you wrote that the investment objective of the

4  fund no longer matches my personal objectives, what did you

5  mean?

6  A    I –– I meant that that the letter and the revised PPM

7  told me that they were moving into illiquid and private

8  placement type of things.  And I didn't –– I didn't want to

9  have any more investments in that.

10 Q    So after you sent this email to Kevin Mulleady and Martin

11 Shkreli on January 24th, 2012 did you, in fact, redeem your

12 invest in MSMB Healthcare?

13 A    I put in for redemption with the official papers but then

14 I withdrew it.

15 Q    Why did you withdraw it?

16 A    I withdrew it because I had some more conversations with

17 Kevin and I actually spoke to Martin Shkreli directly on the

18 phone.

19 Q    What was it about those conversations that caused you to

20 withdraw your redemption request?

21 A    They expressed to me that the reason why they had to

22 write those letters because just to cover their –– their oral

23 basis, but the illiquid part would be a very small, very small

24 part of the fund.

25 Q    And that was told you by both Kevin Mulleady and Martin

GELLER - DIRECT - PITLUCK                    2867

1    Shkreli?

2    A    Yes.

3    Q    And based on that representation that the illiquid would

4    be a small part of the fund, did you in fact cancel your

5    redemption request?

6    A    I did.

7    Q    Now, Mr. Geller, we saw some investor statements from

8    MSMB Healthcare in that small binder.

9         Do you recall that?

10   A    Yes.

11   Q    Did there come a point in time when those investor

12   statements started getting delayed?

13   A    Yes.

14   Q    Can you go back to that binder and go to Tab 8, which is

15   Government Exhibit 91-8 in evidence.

16        (Exhibit published.)

17        Sir, what date was this investor statement sent?

18   A    This is the May 2012 investor statement.  And it was sent

19   September 9th 2012.

20   Q    And who is it from?

21   A    Martin Shkreli.

22   Q    Now, the statements that we looked at in evidence

23   earlier, you testified that they were sent by NAV Consulting,

24   correct?

25   A    Uh-huh.  Correct.

GELLER - DIRECT - PITLUCK                    2868

1   Q    Did there come a point when you learned the statements

2   would no longer be sent by NAV Consulting?

3   A    Well, this one is not sent by NAV Consulting.

4   Q    Did you learn that during the course of your investment

5   with MSMB Healthcare that there was going to be that shift?

6   A    No.

7   Q    Do you have any understanding of why NAV Consulting was

8   no longer sending you statements?

9   A    I did not.

10  Q    All right, let's move quickly to Tab 9.  91-9 in

11  evidence.

12           (Exhibit published.)

13           What statement is this for your MSMB Healthcare

14  account?

15  A    This is the June 2012 statement.

16  Q    And what day was it sent to you?

17  A    September 9th, 2012.

18  Q    Is that the same day that you received the May 2012

19  statement?

20  A    Yes.

21  Q    And who sent this statement to you?

22  A    Martin Shkreli.

23  Q    Finally, let's go to Tab 10, which is Government

24  Exhibit 91-10.

25           (Exhibit published.)

GELLER - DIRECT - PITLUCK                    2869

1       What month is this statement for?

2   A    September 2012.

3   Q    I'm sorry, the date that it was sent.  What date was it

4   sent?

5   A    September 10th, 2012.

6   Q    The next day that you received the other two?

7   A    Yes.

8   Q    And what statement -- what month is this accounting for

9   MSMB Healthcare?

10  A    So this is July 2012.

11  Q    Now, in your experience as an investor, is it common to

12  receive three months of statements all around the same day?

13  A    No.

14  Q    And what was your reaction to receiving these three

15  statements around the same time?

16  A    Well, um, I mean the statements were delayed.  I'm glad I

17  got something, but I was, you know, it was a big red flag when

18  I -- when they came six months or what five months, six months

19  after they were originally due.

20  Q    Nonetheless, did you rely on these statements?

21  A    I did.

22  Q    Let's go to the second page of 91-10.

23       What was the ending balance of the value of your

24  investment as of July 31st, 2012?

25  A    299,343.

GELLER - DIRECT - PITLUCK                    2870

1   Q    On your original 200,000-dollar investment?

2   A    Yes.

3   Q    Do you see any reference to NAV Consulting on this

4   document?

5   A    I do not.

6   Q    Did there come a point in time, Mr. Geller, that you

7   learned MSMB Healthcare would be shutting down?

8   A    Yes.

9   Q    How did you first learn that MSMB Healthcare would be

10  shutting down?

11  A    There was a investor letter sent out to everyone.

12  Q    And prior to the investment letter being sent out, did

13  you learn from anybody that this investment letter would be

14  coming out?

15  A    We -- I had some discussions with Kevin.  And I think

16  Martin was involved in one of them.

17  Q    And where did those discussions take place?

18  A    Some were on the phone.  Some --

19  Q    Did you have an in-person meeting with them prior to MSMB

20  Healthcare shutting down?

21  A    Yes.

22  Q    Where was that?

23  A    It was -- it was at Bryant Park.  We had drinks after

24  work.

25  Q    The Bryant Park in Manhattan?

1   A     Yes.

2   Q     And approximately when was that?

3   A     Sometime in the summer.

4   Q     Of what year?

5   A     2012.

6   Q     And what, if anything, did Martin Shkreli and Kevin

7   Mulleady tell you about MSMB Healthcare shutting down?

8   A     They said that they were shutting down and they were

9   going to give investors the option of, um, taking -- cashing

10  out.  They could either take money, the cash, or they can get

11  Retrophin, whatever Retrophin was at that time, or they can do

12  a combination of both.

13  Q     You mentioned Retrophin, or Ret-rophin.

14          Did you know what it was at that time?

15  A     I did not know what it was.

16  Q     And what, if anything, did they tell you about Retrophin

17  during that meeting in Bryant Park?

18  A     They didn't really tell me too much about it.  I always

19  thought that Retrophin was going -- you know, it represented a

20  small part of the fund, whatever it was.  But one of my

21  understandings was that they were going to name the next fund

22  Retrophin.

23  Q     Did you tell Martin Shkreli and Kevin Mulleady what you

24  were thinking of doing with your investment in MSMB Healthcare

25  at that time?

GELLER - DIRECT - PITLUCK                    2872

1    A    I did.

2    Q    What did you tell them?

3    A    I said I was thinking of taking my original $2,000 out in

4    cash.

5    Q    You said "2,000," Mr. Geller.

6    A    200,000.

7    Q    I'm sorry, you were taking your original 200,000 out in

8    cash?

9    A    Yes.

10   Q    What did you intend to do with the profits?

11   A    Let it ride in their new venture.

12   Q    You mentioned -- you testified a moment ago that there

13   was a letter related to MSMB Healthcare shutting down,

14   correct?

15   A    Yes.

16   Q    I'd like to show you Government Exhibit 106-10, which is

17   Tab 14 in your binder for identification.

18        Do you see what you're looking at, Mr. Geller?

19   A    Yes.

20   Q    What is this that you're looking at in 106-10?

21   A    Okay, so this was -- this was an investor letter to the

22   partners of the fund explaining the -- the wind down of the

23   fund.

24   Q    Did you receive this email, sir?

25   A    I did.

GELLER - DIRECT - PITLUCK                    2873

1          MR. PITLUCK:  Your Honor, at this time the

2   Government moves to admit Government Exhibit 106-10 into

3   evidence.

4          MR. MASTRO:  No objection, Your Honor.

5          THE COURT:  We will receive Government

6   Exhibit 106-10.

7          (Government Exhibit 106-10, was received in

8   evidence.)

9          (Exhibit published.)

10  Q    Just focusing up at the top, Mr. Geller, who is this

11  email from?

12  A    Martin Shkreli.

13  Q    What was the date of the email?

14  A    September 10, 2012.

15  Q    The subject line.

16  A    Subject was message from MSMB Capital.

17  Q    Again, at this point in time, did you know what

18  MSMB Capital was?

19  A    No.

20  Q    Can you just read the first two sentences of this letter,

21  please?

22  A    Sure.

23         I have decided to wind down our hedge fund

24  partnerships with the goal of completing the liquidation of

25  our funds by November or December 1st, 2012.  As you know,

```
                    GELLER - DIRECT - PITLUCK                    2874
```

1   MSMB has found increasingly compelling opportunities in

2   private equity.

3   Q    Okay.  And can you read the first sentence of the second

4   paragraph.

5   A    We have decided the best structure for such an entity is

6   a public company or private corporation.

7   Q    And the next sentence, please.

8   A    Retrophin, LLC, MSMB founded biotech operation will be

9   that company.  Retrophin has made a lot of progress since its

10  inception in 2011.

11  Q    And, Mr. Geller, did this wind down letter provide you

12  with any more detail on what exactly Retrophin was?

13  A    A little.  It says right it in front of me.

14  Q    And I'd like to direct your attention to the second page,

15  which is stamped R012275.

16          Do you see the paragraph that says "I cannot thank

17  you"?

18  A    Yes.

19  Q    Can you read that paragraph, please.

20  A    I can't thank you, the partners, enough.  I have the most

21  loyal investors in the world.  We had received two redemptions

22  since inception and are thankful for your patience and

23  tolerance.  While we went through operational mishaps and

24  switched strategies several times.  Sorry.

25  Q    You can keep going, please.  Thank you.

```
                GELLER - DIRECT - PITLUCK                    2875
 1   A     Original MSMB investors in 2009 have just about doubled
 2   their money net of fees.  I regret terminating the fund, but I
 3   feel tremendous private equity opportunities are abundant at
 4   the moment and we need the latitude to explore them.
 5   Q     Now, can you read the first two -- three sentences of the
 6   last paragraph.
 7   A     A few operational notes.  Investors will have their
 8   limited partnership interests redeemed by the fund or cash.
 9   Alternatively, investors may ask for a redemption of Retrophin
10   shares or a combination of Retrophin shares and cash.  Keep in
11   mind Retrophin shares are illiquid and no liquid market may
12   develop.
13   Q     And finally can you read the sentence that starts "I
14   think it will prove"?
15   A     I think it will prove to be a successful public company
16   and investment, however different from a hedge fund it may be.
17   Q     Keep going and read.
18              (Continued on next page.)
19
20
21
22
23
24
25
```

DIRECT - GELLER - PITLUCK                           2876

1   DIRECT EXAMINATION (Continued)

2   BY MR. PITLUCK:

3   Q    You can keep going and read to the end.

4   A    MSMB will all reporting at September 30th, 2012 period

5   and begin offering cash to purchase limited partnership

6   interests shortly thereafter.  If all goes according to plan,

7   you will either be a Retrophin LLC unitholder or have cashed

8   out by September 31st 2012 -- October 31st, 2012.

9   Q    What did you understand this last paragraph to mean, your

10  options were with regard to your investment in MSMB

11  Healthcare?

12  A    So by late in that year, which is I guess November,

13  whatever decision you made you would be made whole whether you

14  wanted cash or the new Retrophin or both.

15  Q    And what was your intended approach to what you were

16  going to do with your investment in MSMB Healthcare?

17  A    Well, I was going to take out the original investment,

18  200,000, and let -- and put the rest in Retrophin.

19  Q    Is that what you communicated to Martin Shkreli and Kevin

20  Mulleady at your meeting?

21  A    Yes.

22  Q    What, if anything, did you do in response to this email?

23  A    I was actually waiting for the instructions.

24  Q    On how to redeem your investment?

25  A    Yes.

DIRECT - GELLER - PITLUCK                    2877

1   Q     And did you receive any communications from MSMB

2   Healthcare regarding how to redeem your investment?

3   A     No.

4   Q     Did you try to contact anyone at MSMB Healthcare during

5   that time period?

6   A     After a certain amount of time I -- yes, I was trying to

7   contact whoever I can get ahold of.

8   Q     Who did you try to contact?

9   A     Kevin Mulleady, Martin Shkreli.

10  Q     Did you get ever get in contact with anybody at MSMB

11  Healthcare during that time period?

12  A     I got in contact with Kevin Mulleady, I believe it was in

13  November, late November.

14  Q     What about Martin Shkreli, were you able to get in

15  contact with him during this time period?

16  A     No.

17  Q     What, if anything, did Kevin Mulleady tell you about your

18  investments --

19              MR. MASTRO:  Objection, hearsay.

20              MR. PITLUCK:  Your Honor, can we approach, please?

21              THE COURT:  Yes.

22              (Sidebar conference.)

23              (Continued on the next page.)

24

25

SIDEBAR CONFERENCE                                2878

1          MR. PITLUCK:  Your Honor, this is not hearsay.  This

2    is a statement in furtherance in the co-conspirator, by the

3    identified co-conspirator, Kevin Mulleady.  I let the last one

4    slide even though I believe that was also a statement of in

5    furtherance of this conspiracy.  We are now squarely in the

6    period of the charged conduct of Count Seven.  Kevin Mulleady

7    is making representation about what is happening vis-a-vis

8    Mr. Geller's investment in MSMB and his redemption options,

9    which is squarely within the charged conduct.

10          THE COURT:  The Count Seven conduct?

11          MR. PITLUCK:  Count Seven.  He is a co-conspirator.

12    At this point he's lying to Richard Kocher, which is the

13    evidence we had before.  He's been identified as a

14    co-conspirator.  The Court is familiar with the evidence

15    proffered at the last trial and the evidence that will come in

16    here.

17          Judge, this is in furtherance and this is an attempt

18    to limit the conspiracy and it is totally inappropriate.  We

19    should be allowed to elicit this evidence.

20          MR. BRODSKY:  Your Honor, this is certainly in

21    furtherance of a conspiracy, but not the conspiracy in Count

22    Seven.  This is a conspiracy with respect to

23    misrepresentations in the assets under management of MSMB

24    Healthcare and Count Seven is a conspiracy with three charged

25    alleged schemes.  Backdating is the first one.  They allege it

SIDEBAR CONFERENCE                                    2879

1    starts -- the backdating documents, as Your Honor knows, the

2    facts are -- I'm not going to repeat them, but this statement

3    by Mr. Mulleady relating to his assets under management or

4    their plans for MSMB has nothing to do with the actual

5    backdating and so it is not in furtherance of the charged

6    conspiracy in Count Seven.

7               MR. PITLUCK:  Judge, first of all, we briefed this

8    issue extensively.  And while they would like to cap the

9    concept the fact of the conspiracy, this is related to the

10   settlement agreement that was advanced to Mr. Geller within

11   months of this.  This is related to why his investment in MSMB

12   was liquidated and transferred to Retrophin in the way he did

13   not want.  This is directly relevant to the reason for the

14   settlement agreement, why it was advanced and shows Kevin

15   Mulleady's knowledge of the conversion.  This isn't just

16   related to assets under management, this is related to the

17   conversion, which is a direct correlation to the settlement

18   agreement.

19              THE COURT:  The conversion of his interests in MSMB

20   Healthcare.

21              MR. PITLUCK:  To Retrophin.

22              THE COURT:  To Retrophin.

23              MR. MASTRO:  Actually, Your Honor, the reality is

24   he's put this time at November 2012.  There is not a shred of

25   documentary evidence until April of 2013 of any discussions

SIDEBAR CONFERENCE                                2880

1    about some kind of settlement agreement.  This has nothing to

2    do with the settlement agreement.  This has everything to do

3    with discussions about his MSMB conversion and whether to put

4    it into Retrophin or try to get some cash out.  It has nothing

5    to do with the conspiracy to defraud Retrophin charged in

6    Count Seven, and this is just improper hearsay.

7            This is not in furtherance of a conspiracy to

8    defraud Retrophin through settlement agreements because the

9    subject of settlement -- and there isn't a shred of

10   documentary evidence he'll be able to point you to any until

11   September 2013 -- I'm sorry, April 2013 where settlement is

12   discussed at all.

13           THE COURT:  Okay.

14           MR. PITLUCK:  Judge, this is the beginning of

15   conversations, the next thing he's going to testify to is

16   getting Retrophin shares to the misrepresentation made by

17   Kevin Mulleady.  It shows his involvement with Martin Shkreli

18   and the conspiracy that leads to the settlement agreement

19   three months later.  Judge, this is the predicate, laying the

20   foundation of the conspiracy.  This is essential, it has to

21   come in.

22           MR. MASTRO:  It is not, Your Honor.

23           THE COURT:  Excuse me, excuse me.  I heard from you

24   and I heard from you.  I think as we discussed and have looked

25   into the case law, the conspiracy can start and different

SIDEBAR CONFERENCE                                2881

1   co-conspirators can join at various points in time.  I

2   originally sustained the objection because I needed to have

3   something on the record about whether, again, Mr. Mulleady was

4   a co-conspirator.  I know that you had argued that in your

5   briefs, I believe that there has been evidence in this trial

6   establishing Mr. Mulleady's role as co-conspirator in the

7   predicate acts or the historical evolution of the conspiracy

8   that is charged in Count Seven.

9            Mr. Mulleady and Mr. Shkreli are telling this

10  investor about -- making certain representations about the

11  interest they have and the expectations they should have about

12  the valuation of their MSMB Healthcare investment and the

13  conversion of their investment into Retrophin shares.  That is

14  ultimately manifested in a settlement agreement and the

15  negotiations between the investor and the parties, the charged

16  parties are based in large part on understanding and

17  expectations that developed due to the representations that

18  were set forth in the performance reports and the

19  conversations between the investors and Mr. Shkreli and/or

20  Mr. Mulleady.  So I do think at this point, yes, this is an

21  admissible statement by a co-conspirator in furtherance.

22            MR. MASTRO:  Your Honor, just one thing, this is six

23  months before there's any discussion of Retrophin giving this

24  witness any amount of money.  This is only about the question

25  of whether he's going to take Retrophin shares or get money or

SIDEBAR CONFERENCE                         2882

1   some combination of the two.  How is that in furtherance of

2   any conspiracy?  It's just a discussion of whether he's going

3   to sit status quo with Retrophin shares or get some money or

4   some combination of both.  There's nothing wrong with that and

5   that's not in furtherance of any conspiracy of Retrophin --

6             THE COURT:  Well --

7             MR. MASTRO:  -- to defraud Retrophin, which is the

8   application in Count Seven.  So how six months earlier of

9   discussions with Kevin Mulleady about whether he should stay

10  in Retrophin shares or he should get money out now from MSMB,

11  it's all about what MSMB is going to do.  MSMB is merging into

12  Retrophin.  That's what he just testified to.

13            So it's about what MSMB is going to do.  Either he's

14  going to get money or shares.  It has nothing to do with

15  defrauding Retrophin.

16            THE COURT:  Okay, so I understand your point, but

17  what I've said is that Mr. Geller had in his mind made an

18  investment in MSMB Healthcare, he receives information that

19  Retrophin -- that MSMB Healthcare or MSMB, unclear which

20  entity may have invested or founded Retrophin, and he is in

21  the process now of trying to decide how to structure his

22  redemption.  He wants to redeem $200,000 which represents his

23  initial investment and he wants to put the rest, which as of

24  the last statement I think is an additional 80 or 90,000.

25            MR. PITLUCK:  $99,000, Judge.

SIDEBAR CONFERENCE                           2883

1        THE COURT:  $99,000 into Retrophin.  This is how --

2   he's been given representations by co-conspirators, Mulleady,

3   about how the shares are going to be valued and what he is

4   going to get, when he's going to get it, and how he may

5   convert or redeem all or part of his investment.  So I do

6   think it's relevant, I think it's admissible and that is my

7   ruling.

8        MR. PITLUCK:  Thank you, Judge.

9        Just so I know, Judge, how long would you like me to

10  go or what time would you like me to take a break?  I've been

11  going for an hour.

12       THE COURT:  I should ask the jurors now, but I think

13  let's keep going unless they signal for a break.

14       MR. PITLUCK:  Okay.  I'll go for 20 minutes or so.

15       THE COURT:  They'll let us know.  They usually give

16  us a signal.

17            (End of sidebar conference.)

18            (Continued on the next page.)

19

20

21

22

23

24

25

1             (In open court.)

2    BY MR. PITLUCK:

3    Q    So, Mr. Geller, you testified a moment ago that after you

4    didn't hear anything you reached out to Kevin Mulleady,

5    correct?

6    A    Correct.

7    Q    What, if anything, did Kevin Mulleady tell you about

8    redeeming your investment in MSMB Healthcare?

9             MR. MASTRO:  Time, Your Honor?

10            THE COURT:  Put a time frame, please.

11   BY MR. PITLUCK:

12   Q    In November of 2012, Mr. Geller, after you received the

13   wind-down email.

14   A    He really didn't provide too many answers for me because

15   he didn't -- he didn't really know.  He was pretty much

16   telling me that he -- you know, he tried to speak to get some

17   answers from Martin he couldn't go get any answers.

18   Q    Okay.  Now did there come a time you received shares of

19   Retrophin?

20   A    Yes.

21   Q    Prior to receiving those shares, did you know that you

22   would -- that they would be coming?

23   A    No.

24   Q    I'd like to show you what's marked as Government

25   Exhibit 106-11 for identification.  It's Tab 15 in your

DIRECT - GELLER - PITLUCK                              2885

1    binder, Mr. Geller.

2              What are we looking at, Mr. Geller?

3    A    This is a FedEx overnight delivery envelope.

4    Q    And was it addressed to you?

5    A    Yes.

6    Q    And did you receive this FedEx delivery envelope?

7    A    I did.

8              MR. PITLUCK:  Your Honor, at this point we'd move

9    Government Exhibit 106-11 into evidence.

10             MR. MASTRO:  No objection, Your Honor.

11             THE COURT:  We will receive 106-11.

12             (Government Exhibit 106-11, was received in

13   evidence.)

14   BY MR. PITLUCK:

15   Q    Mr. Geller, going to the left side of this document, you

16   see the ship to?

17   A    Yes.

18   Q    And who is it shipped to?

19   A    David Geller, me.

20   Q    And who was it shipped from?  Just above that.  It's kind

21   of small.

22   A    Leonora Izerne.

23   Q    From what address was it shipped?

24   A    777 Third Avenue, New York, New York.

25   Q    Did you know who Leonora Izerne is?

1    A    I never heard the name before.

2    Q    Now going to the right a little bit you see where it

3    says, ship date, right above the bar code in the middle?

4    A    Ship date, March 13th, 2013.

5    Q    And going to the second page of this document, was this

6    what was contained in that FedEx envelope?

7    A    Yes.

8    Q    And what is this?

9    A    This is a stock certificate to Retrophin.

10   Q    Is it the stock certificate for you?

11   A    Yes.

12   Q    What does it say under -- right above your name?

13   A    Restricted securities.

14   Q    Do you know what that language means?

15   A    Of course.

16   Q    What does it mean?

17   A    It means that there's no -- restricted securities that

18   means there's no open market if you want to try to sell

19   them -- or buy them actually.

20   Q    And how many shares did you receive on this certificate?

21   A    30,514.

22   Q    What was your reaction -- was there anything else

23   contained in the envelope?

24   A    No.

25   Q    What was your reaction to receiving restricted securities

DIRECT - GELLER - PITLUCK                    2887

1    in Retrophin?

2    A    First I was bewildered.  I'm, like, what the hell is

3    this.  And then -- yeah.

4    Q    And then after?

5    A    Then my mind speculated over and over again, like, you

6    know, I was trying to think about all the scenarios that why I

7    got this in the mail.  And then, you know, I started looking

8    for answers pretty much.  I didn't want to really assume

9    anything, but there was some, you know, negative thoughts in

10   my mind.

11   Q    And did you expect to receive this stock certificate in

12   the mail?

13   A    No.

14   Q    And at this point did you have any idea why you were sent

15   these certificates?

16   A    Did not know.

17              THE COURT:  May I ask a question?

18              MR. PITLUCK:  Yes, Judge.

19              THE COURT:  As of this point had you informed MSMB

20   Healthcare what you wanted to do with your investment?

21              THE WITNESS:  I did not inform them because I was

22   never given the chance to inform them.  I never got

23   instructions about what -- about how to proceed.

24              THE COURT:  You earlier stated your intention to

25   redeem your original investment and invest the balance into

DIRECT - GELLER - PITLUCK                2888

1  Retrophin, did you ever convey that to MSMB Healthcare?

2          THE WITNESS:  No, I never conveyed it.

3  BY MR. PITLUCK:

4  Q    Did you convey that intention at the meeting that you had

5  with Martin Shkreli and Kevin Mulleady?

6  A    At my -- yes, verbally I did.

7  Q    Now at the point that you received the stock certificate

8  in the mail, what did you believe happened to your investment

9  in MSMB Healthcare?

10 A    Well, my -- my thought, my negative thought was that they

11 turned my investment in and they -- they switched it --

12 switched it out and they gave me restricted shares in

13 Retrophin.

14 Q    Did that concern you?

15 A    Very much.

16 Q    What did you think, based on the share certificate, your

17 investment in Retrophin was worth?

18 A    About 300,000, restricted.

19 Q    And how did you -- how did you figure out that value?

20 A    Well, I didn't -- I had two thoughts.  My first thought

21 was I looked at the last statement that I received and it was

22 valued at 299,000.  And the other way was when those footnotes

23 came out that we discussed before, they said they're valuing

24 each Retrophin at $10.  So I, you know, just took the 30,000

25 that they sent me, times it by 10 and I got that same number,

DIRECT - GELLER - PITLUCK                    2889

1    300,000.

2    Q    What, if anything, did you do after you received this

3    package?

4    A    I started sending emails to Martin directly.

5    Q    And did you also make phone calls?

6    A    Yes.

7    Q    Did you also reach out to Kevin Mulleady at this time?

8    A    Yes.

9    Q    Were you able to get in touch with either of those

10   individuals?

11   A    Kevin Mulleady I was able to get in touch with, but he

12   really didn't have any answers for me.  And with Martin, they

13   were emails.  The initial -- the initial communications were

14   emails.

15   Q    So I'd like to direct your attention to what's been

16   labeled as Government Exhibit 106-12 for identification.  It's

17   behind Tab 16.

18            What are we looking at here, Mr. Geller?

19   A    So this was the first email I sent to Martin.

20   Q    Is this document an email exchange between yourself and

21   Martin Shkreli?

22   A    Yes.

23            MR. PITLUCK:  Your Honor, at this time we move to

24   admit Government Exhibit 106-12 into evidence.

25            THE COURT:  Mr. Mastro?

1              MR. MASTRO:  No objection, Your Honor.

2              THE COURT:  We will receive Government's

3    Exhibit 106-12.

4                 (Government Exhibit 106-12, was received in

5    evidence.)

6    BY MR. PITLUCK:

7    Q    Mr. Geller, can we focus on the bottom email on that

8    page.  Is this an email that you sent to Martin Shkreli?

9    A    Yes.

10   Q    What date?

11   A    March 17th.

12   Q    I'm sorry, can you look right at the top there on the --

13   under where it says sent from my iPad?

14   A    Oh.

15   Q    It's also on the screen if that helps.

16   A    I'm sorry, what are you looking at?

17   Q    I'm asking what date you sent this email, Mr. Geller?

18   A    Sorry, March 25th.

19   Q    The very bottom email, sir, the first email.

20   A    March 16th.

21   Q    And is that approximately three days -- two days after

22   you received the share certificate?

23   A    Yes.

24   Q    Can you read the first paragraph there.

25   A    I hope this email finds you well.  It has been a while

DIRECT - GELLER - PITLUCK                    2891

1   since I last spoke to you.  I have been trying to keep up with

2   current events on Retrophin by reading articles, press

3   releases and talking to my brother.  I am excited about our

4   future prospects.  However, I am in the dark on the status of

5   my investment as a whole.  The last statement I received was

6   in July 2012 (attached.)  I spoke to Kevin late December but

7   the status was unknown then too.  I received a letter in

8   September which said the fund would have a goal of completing

9   liquidation by 2012.

10  Q    And the last paragraph?

11  A    I did receive a certificate in the mail a couple of days

12  ago for a total of 30,514 Retrophin.  I guess the most basic

13  answer I'm looking for is how much of my original investment

14  is in the fund and how much is in Retrophin.  Also, what is

15  the status of the fund, is it liquidated?  Can you or one of

16  your partners spend a little time with me to explain some of

17  these items?

18  Q    What did you mean when you wrote, I'm looking -- the most

19  basic answer I'm looking for is how much of my original

20  investment is in the fund and how much is in Retrophin?

21  A    I meant that, as gullible as it may sound, like how much

22  of my funds of MSMB Healthcare, the one I originally invested

23  in, how much was it worth.

24  Q    Were you considering the possibility that 30,000 shares

25  was not your entire investment?

1    A    Yes.

2              MR. MASTRO:  Objection.

3              THE COURT:  Overruled.

4    BY MR. PITLUCK:

5    Q    And you wrote that you are excited about our future

6    prospects, in the top paragraph.  What did you mean by that,

7    Mr. Geller?

8    A    Well, these were basic pleasantries that I felt like I

9    needed to write just to start the conversation off.

10   Q    And did Mr. Shkreli respond to your email?

11   A    Yes.

12   Q    And what date did he respond?

13   A    March 17th, the day after.

14   Q    Okay.  And what did he write?

15   A    He wrote:  Hi, David, en route to California for a few

16   days.  Will be able to give you a comprehensive and

17   satisfactory answer soon.  Hope you are well.  May see Al

18   while I'm out here.

19   Q    What's the subject line of this email?

20   A    My valuation.

21   Q    And Al, is that a reference to your brother?

22   A    Yes.

23   Q    And what was your response to Mr. Shkreli's email?

24   A    I wrote back:  Martin, were you able to research the

25   valuation issue.  I am starting to get a little anxiety.

DIRECT - GELLER - PITLUCK                    2893

1    Please help on this one.

2    Q    What date did you write that email?

3    A    I wrote that on March 25th, March 25th.

4    Q    So eight days after Martin Shkreli responded to you?

5    A    Yes.

6    Q    And in the time period between March 17th and March 25th

7    had you heard from Martin Shkreli?

8    A    No.

9    Q    So why did you write that email about researching the

10   valuation issues?

11   A    I wrote it because I wanted to find out what my

12   investment was worth and if I could -- what were the issues,

13   what was going on and how can I sell it and how much money

14   would I get back.

15   Q    At this point, what was your mindset related to your

16   investment in MSMB Healthcare?

17   A    I felt like it was scammy.

18   Q    I'm sorry?

19   A    I felt it was scammy, like maybe the whole thing was a

20   scam.

21   Q    So you were concerned?

22   A    I was concerned, yes.

23   Q    Did you eventually hear from Martin Shkreli?

24   A    Yes.

25   Q    I'd like to show you what's been marked as Government

DIRECT - GELLER - PITLUCK                    2894

1   Exhibit 106-13 for identification.  This is Tab 17.

2              What are we looking at here, Mr. Geller?

3   A    Emails.

4   Q    Emails between you and Martin Shkreli?

5   A    Yes.

6   Q    Did you send and receive these emails?

7   A    Yes.

8              MR. PITLUCK:  Your Honor, at this point we would

9   move to admit Government Exhibit 106-13.

10             MR. MASTRO:  No objection, Your Honor.

11             THE COURT:  We will receive 106-13.

12             (Government Exhibit 106-13, was received in

13   evidence.)

14   BY MR. PITLUCK:

15   Q    Let's start with the very bottom email on this chain.

16   Who is that from and to, Mr. Geller?

17   A    From me to Martin.

18   Q    I'm sorry, can you just take a look at that again, I

19   think you might have them reversed.  Who is it from?

20   A    I'm sorry, 106-13?

21   Q    Okay.  I'm at the very bottom email, sir.

22   A    From Martin to me.

23   Q    What is the date of that email?

24   A    March 26.

25   Q    Is that the day after you sent him the email we saw on

DIRECT - GELLER - PITLUCK                    2895

1    the previous exhibit?

2    A     Yes.

3    Q     What's the subject line of the email?

4    A     Got your email and call.  Will call you shortly.

5    Q     And going up to the next email, did you respond to

6    Mr. Shkreli?

7    A     Yes.

8    Q     What's the date you responded to him?

9    A     April 4th.

10   Q     Can you just read your response, please.

11   A     Martin, hi.  Alan told me you had a nice long

12   conversation with him.  From what I gathered over the last few

13   months it seems you put all my fund money in Retrophin stock

14   at a high valuation.  From our conversation last year I

15   informed you guys I needed diversification and you told me

16   Retrophin stock would only be a small part of my portfolio.

17   Please tell me where I stand so I can try to mentally move on

18   somehow.  You told me you would get back to me with a

19   comprehensive and satisfactory answer.  It's really not fair

20   to leave me on a cliff.  I am a better person than that.

21   Q     You wrote that it seems you put all my fund money into

22   Retrophin stock at the high valuation.  What did you mean by

23   that, Mr. Geller?

24   A     I meant that MSMB Healthcare, the fund that I invested

25   in, whatever it was worth he switched it into this Retrophin

DIRECT - GELLER - PITLUCK                    2896

1    stock.  And when I say high valuation I was talking about the

2    value of the 300,000 that we talked about before.

3    Q    You also wrote that -- you wrote, I informed you guys I

4    needed diversification.  What is that a reference to,

5    Mr. Geller?

6    A    That was in reference to my original objective when I

7    first made the investment in MSMB Healthcare.

8    Q    And what did you mean when you said, please tell me where

9    I stand so I can try to move -- mentally move on somehow?

10   A    I wanted him to tell me the truth, what was really going

11   on like.

12   Q    Did Martin Shkreli respond to you?

13   A    He did.

14   Q    What was his response?

15   A    I will call.  Absolutely, David.  Things are nuts here.

16   Zero disrespect.

17              MR. PITLUCK:  Your Honor, I think this might be a

18   good point for the mid-morning break.

19              THE COURT:  All right.  Will the jurors kindly take

20   the mid-morning break now.  Leave your notebooks face down.

21   Don't discuss the case.

22              Have some coffee and relax and we'll get you in a

23   few minutes.  Thank you.

24              (Jury exits courtroom.)

25              THE COURT:  All right.  Let's take 10 minutes.

DIRECT - GELLER - PITLUCK                    2897

1          MR. PITLUCK:  Thank you, Judge.

2          (Recess.)

3          THE COURT:  Is everyone ready?

4          MR. MASTRO:  Mr. Pitluck tells me he has an hour,

5   hopefully less.

6          THE COURT:  An hour less?

7          MR. MASTRO:  An hour or hopefully less.

8          MR. PITLUCK:  Hopefully less.

9          MR. MASTRO:  Hopefully less.  So I just wanted to

10  say that if Your Honor and the jury permits, I want to start

11  my cross right away even if I only get a few minutes in before

12  lunch.  I have a few things I wanted to cover right away.

13         THE COURT:  Well, we'll see how they're doing.

14         MR. MASTRO:  Okay.  Thank you, very much, Your

15  Honor.

16         MR. PITLUCK:  Judge, I'm trying to proceed as

17  efficiently, as expeditiously as possible but there's --

18         THE COURT:  Okay.  I was going to caution you about

19  leading questions, just think about that.  There was one I

20  probable should have sustained --

21         MR. PITLUCK:  I know Your Honor.

22         THE COURT:  -- but he drew it with direct questions

23  and open-ended questions.

24         MR. PITLUCK:  I'm trying, Your Honor.

25         MR. MASTRO:  As you can see I'm objecting very, very

DIRECT - GELLER - PITLUCK                              2898

1    sparingly and asked for no sidebars.  There's been a heck of a

2    lot of leading going on.

3              THE COURT:  Well, that one I overruled.

4              MR. PITLUCK:  Judge, I take the point, Judge.  I'm

5    trying not to lead, I'm trying to proceed.

6              THE COURT:  No, I understand.

7              MR. PITLUCK:  That's it.

8              (Jury enters courtroom.)

9              THE COURT:  All the jurors are present.  Please have

10   a seat.

11             You may resume your direct of Mr. Geller's.

12             MR. PITLUCK:  Thank you, Judge.

13   Q   Mr. Geller, just to reorient ourselves before the break

14   on the screen is Government Exhibit 106-13 that we were

15   looking at before.  What's the date of the top email where

16   Martin Shkreli says things are nuts here?

17   A   April 4th, 2013.

18   Q   Did you speak to Martin Shkreli in the days that followed

19   that email?

20   A   Yes.

21   Q   I'd like to direct your attention to Government

22   Exhibit 106-14 for identification, which is Tab 18.

23             What is this document, Mr. Geller?

24   A   An email exchange between Martin and me.

25             MR. PITLUCK:  Your Honor, at this point we'd move to

*GEORGETTE K. BETTS, RPR, CSR*
*Official Court Reporter*

DIRECT - GELLER - PITLUCK                    2899

1    admit Government Exhibit 106-14.

2              MR. MASTRO:  No objection, Your Honor.

3              THE COURT:  We will receive 106-14.

4              (Government Exhibit 106-14, was received in

5    evidence.)

6    BY MR. PITLUCK:

7    Q    Just focusing on the top email in that chain, Mr. Geller,

8    is that an email you sent to Martin Shkreli?

9    A    Yes.

10   Q    What's the date of that email?

11   A    April 5th.

12   Q    Can you just read the content of that email.

13   A    What time will you call?  I need to keep that time slot

14   open.  I can speak now, by the way.

15   Q    Did you speak to Martin Shkreli on that date, April 5th,

16   2013?

17   A    Yes.

18   Q    What, if anything, did you discuss with Martin Shkreli on

19   that phone call?

20   A    We discussed pretty much how he was going to -- to, I

21   guess, cash me out.

22   Q    What do you mean by cash me out, Mr. Geller?

23   A    Find out a fast solution that -- for both of us and, you

24   know, pay me pretty much.

25   Q    And what, if anything, did you tell Martin Shkreli about

DIRECT - GELLER - PITLUCK                2900

1   why he needed to pay you?

2   A    Because I went into the fund, I invested with good

3   intention and he, from what happened it was not -- it turned

4   into something that -- that I didn't -- I had no clue what it

5   was and it looked like there was no money left and I wanted my

6   money back pretty much.

7   Q    And on that call did you and Martin Shkreli discuss any

8   terms of how much he would pay you back?

9   A    Yes.

10  Q    What did you discuss?

11  A    We -- he pretty much offered me or actually mentioned

12  that he'll be able to give me back $300,000 in cash plus

13  some -- some Retrophin shares.

14  Q    Who brought up those numbers?

15  A    He brought them up.

16  Q    And during that call with Martin Shkreli, did you

17  threaten him in any way?

18  A    No.

19  Q    Threaten to sue him?

20  A    No.

21  Q    Go to the press?

22  A    No.

23  Q    Now following that conversation on April 5th, 2013, did

24  you continue to communicate with Martin Shkreli?

25  A    Yes.

DIRECT - GELLER - PITLUCK                          2901

1    Q    By email, by phone, or both?

2    A    Pretty much by -- 95 percent was done by email.

3    Q    And why, why were you communicating with Martin Shkreli

4    by email in that time period?

5    A    Because I -- every time I called him he never returned my

6    call.  It was very hard to get ahold of him.

7    Q    What were you discussing on those emails generally?

8    A    How facilitating payment.

9    Q    And how would you describe the tone of your conversations

10   with Martin Shkreli during that time period?

11   A    Cordial.

12   Q    At any point in those conversations did you threaten him?

13   A    No.

14   Q    Threaten to sue him?

15   A    No.

16            MR. MASTRO:  Time frame please, Your Honor.

17            MR. PITLUCK:  Your Honor, it's clear we're talking

18   post April 5th, 2013.

19            MR. MASTRO:  April 5th to April 26th, which I assume

20   he's going to next.

21            THE COURT:  Well, let's try to put a time frame

22   since there's been a request and it will help the jury's

23   understanding.

24   BY MR. PITLUCK:

25   Q    Okay, Mr. Geller, in the time period following April 5th,

```
              DIRECT - GELLER - PITLUCK                2902
```

1   2013, how would you describe your communications with Martin

2   Shkreli?

3   A    They were cordial.

4   Q    And in those the weeks following April 5th, 2013, did you

5   threaten him in any way?

6   A    No.

7              MR. MASTRO:  Objection to form, Your Honor.

8              THE COURT:  Try to rephrase your question,

9   Mr. Pitluck.

10  BY MR. PITLUCK:

11  Q    During those conversations, did you threaten Martin

12  Shkreli?

13  A    I did not.

14             MR. MASTRO:  What time frame, Your Honor?

15             THE COURT:  After April 5th, 2013.

16             MR. MASTRO:  Up to April 25th?

17             MR. PITLUCK:  Judge, can I ask questions, please?

18             THE COURT:  Yes.  This is his examination.

19             MR. MASTRO:  I understand, Your Honor.

20             THE COURT:  All right.  You'll have to chance to

21  cross, sir.

22             MR. MASTRO:  I understand, Your Honor.

23  BY MR. PITLUCK:

24  Q    In the weeks following April 5th, 2013, did you threaten

25  to sue Martin Shkreli?

DIRECT - GELLER - PITLUCK                               2903

1   A    I did not.

2   Q    Did you threaten him with anything?

3   A    I did not.

4   Q    I'd like to show you what's been marked as Government

5   Exhibit 106-20 for identification.  And that's at Tab 24,

6   Mr. Geller, I'm sorry.

7             Are you with me?

8   A    Yes.

9   Q    What are we looking at here?

10  A    Email chain between Martin Shkreli and me.

11  Q    And the bottom email in the chain what's the date of that

12  email?

13  A    Thursday, April 25th.

14            MR. PITLUCK:  Your Honor, at this point I would move

15  to admit Government Exhibit 106-20 into evidence.

16            MR. MASTRO:  No objection, Your Honor.

17            THE COURT:  All right.  We will receive Government

18  Exhibit 106-20.

19            (Government Exhibit 106-20, was received in

20  evidence.)

21  BY MR. PITLUCK:

22  Q    Now, Mr. Geller, let's start at the bottom two emails,

23  please.  What's the date of the first email in this chain, the

24  bottom email?

25  A    The bottom, April 25th.

DIRECT - GELLER - PITLUCK                    2904

1   Q    Is that an email you sent to Martin Shkreli?

2   A    Yes.

3   Q    Can you read the contents of that email.

4   A    I am upset but more sad with my investment situation in

5   MSMB.  I have acted with class and been a true gentleman in

6   light of the current situation.  As per our conversation two

7   weeks ago, you led me to believe you were going to remedy the

8   situation.  Then you made yourself unavailable, as you have

9   done many times in the past.  I really don't understand your

10  actions; I would never act like this.  Please don't force me

11  to go to the next level.  I expect something to be worked out

12  in the next few days.  Please do the right thing.

13  Q    Sincerely, David Geller?

14  A    Yes.  Yes.

15  Q    What did you mean when you wrote -- withdrawn.  Why did

16  you send this email, Mr. Geller?

17  A    Because he stopped -- he stopped communicating with me.

18  He wasn't answering me.

19  Q    What did you mean when you wrote, please don't force me

20  to the next level?

21  A    I meant -- I didn't -- I was trying to be cordial with

22  him and keep it on a professional level.  I didn't want to

23  start getting aggressive 'cause this was -- I was just trying

24  to keep professional.

25  Q    Did you threaten to take any action against Martin

DIRECT - GELLER - PITLUCK                    2905

1    Shkreli at this time?

2    A     No.

3    Q     What did Martin Shkreli respond to this email?

4    A     He responded, I'm sorry to hear that.  Have you been in

5    contact with our attorney, Evan Greebel?  He can expedite this

6    process significantly.

7    Q     What date did he send that email?

8    A     April 26.

9    Q     And who's copied on that email, Mr. Geller?

10   A     Evan Greebel.

11   Q     As of April 26th, 2014, did you know who Evan Greebel

12   was?

13   A     No.

14   Q     Did you try to call or get in contact with Evan Greebel

15   after getting this email?

16   A     Yes.

17   Q     Did you speak with him as of April 26th, 2013?

18   A     No.

19   Q     Did you deal with Evan Greebel alongside Martin Shkreli

20   when you were trying to deal with your investment at MSMB

21   Healthcare?

22   A     Yes.

23   Q     Mr. Geller, could you turn to Tab 23, which is Government

24   Exhibit 106-19 for identification.

25   A     Okay.

DIRECT - GELLER - PITLUCK                                2906

1  Q    What are we looking at here, Mr. Geller?

2  A    These are email chains between Martin Shkreli and me.

3         MR. PITLUCK:  Your Honor, we'd move to admit

4  Government Exhibit 10619 in evidence.

5         MR. MASTRO:  No objection, Your Honor.

6         THE COURT:  We will receive 106-19.

7         (Government Exhibit 106-19, was received in

8  evidence.)

9  BY MR. PITLUCK:

10 Q    Let's start at the bottom, Mr. Geller.  Who is that email

11 from, who is it to, and when was it written?

12 A    From Martin to me on April 26th.

13 Q    Is that the same day that Martin asked you to contact

14 Evan Greebel?

15 A    Yes.

16 Q    What's the subject of the email?

17 A    Settlement.

18 Q    Can you just read what Mr. Shkreli wrote?

19 A    David, one of the delays has been I forgot what we agreed

20 to.  Do you remember?

21 Q    Did you respond to Mr. Shkreli?

22 A    Yes.

23 Q    What did you respond?

24 A    I wrote, we agreed upon $300,000 in cash, which you would

25 give me part by buying back my shares.  In addition you would

DIRECT - GELLER - PITLUCK                    2907

1    leave me with 20,000 shares but don't remember if free or

2    restricted.  I tried to get in touch with Evan, as you

3    suggested, but he was not in today.

4    Q    You see the part where you write, 300,000 in cash and in

5    addition you would leave with me 20,000 shares, what is that a

6    reference to, Mr. Geller?

7    A    We agreed to 300,000 cash which he would pay me and I

8    would also get 20,000 Retrophin shares.

9    Q    When did you agree to that with Martin Shkreli?

10   A    We agreed to that on -- well, we agreed to the 300 the

11   day before or whatever day that was that I spoke to him on the

12   phone.

13   Q    And what did Martin Shkreli respond -- did Martin Shkreli

14   respond to you?

15   A    He did.

16   Q    What did he write?

17   A    Okay.  As you can imagine he writes these up.  That

18   sounds like a deal to me.

19   Q    Who is copied on that email?

20   A    Evan Greebel.

21   Q    At this point in time, as of April 26th, 2013, did you

22   have any idea how Mr. Shkreli was going to get you the

23   $300,000 and the 20,000 shares?

24   A    No, I did not.

25   Q    Did you respond to Mr. Shkreli's email?

DIRECT - GELLER - PITLUCK                    2908

1    A    I did.

2    Q    What did you write?

3    A    So how do we proceed without it getting sidetracked.

4    Should I speak with him?

5    Q    Is Mr. Greebel copied on that email?

6    A    Yes.

7    Q    I'm sorry, on your email?

8    A    Yes.

9    Q    Can you just take a look at the email one more time, the

10   April 26th, 2013 2:26 p.m.  Is Mr. Greebel copied?

11   A    No.  He's not.  I'm sorry.

12   Q    Do you, sitting here today, have any recollection as to

13   why you didn't include Mr. Greebel on that email?

14   A    I don't know.

15   Q    What did Martin Shkreli respond to you?

16   A    He gave me a phone number, which I assumed was Evan

17   Greebel's number.

18   Q    And those emails all took place on April 26th, 2013?

19   A    Yes.

20   Q    Let's go back to Government Exhibit 106-20, Tab 24 which

21   is in evidence.

22        Let's look at the top email.  What's the date of

23   that email?

24   A    May 2nd.

25   Q    And who -- did you send that email?

1    A    It was from me to Martin Shkreli.

2    Q    Can you just read the contents of that May 2nd email,

3    please.

4    A    Martin, I have talked to Evan a couple of times.  He said

5    you are working on something in my particular case and he is

6    waiting for you.  Can you please try to stay on it.  Thanks

7    and have a great day.

8    Q    Now between April 26th and May 2nd, 2013, did you speak

9    to Evan Greebel a couple of times?

10   A    I did, yes.

11   Q    What was the purpose of those calls?

12   A    To make the payment an official thing with a contract.

13   Q    Did you tell Mr. Greebel that you were an investor in

14   MSMB Healthcare?

15   A    I did.

16   Q    And that your stock had been converted to Retrophin?

17   A    I did.

18   Q    Did you tell Mr. Greebel that Martin Shkreli had agreed

19   to pay you for your investment in MSMB Healthcare?

20   A    I did.

21   Q    Do you recall if you told him the particular terms that

22   you and Mr. Shkreli had agreed to?

23   A    I did tell him the terms.

24   Q    During this call with Mr. Greebel, did you threaten to

25   sue Martin Shkreli?

1    A    I did not, no.

2    Q    Or MSMB?

3    A    No.

4    Q    Did you threaten to sue Retrophin?

5    A    No.

6    Q    Did you tell Mr. Greebel your concern that you had been

7    scammed by Mr. Shkreli?

8    A    I did.

9              MR. MASTRO:  Objection to form.

10             THE COURT:  All right.

11             MR. PITLUCK:  I can rephrase, Judge.

12   A    Yes.

13   Q    Mr. Geller, did you tell Mr. Greebel about how you felt

14   your investment in MSMB Healthcare had been treated?

15             MR. MASTRO:  Same, Your Honor, leading.

16             THE COURT:  No.  Overruled.  Excuse me.  You may

17   answer.

18   A    I did.

19   Q    What did you tell him?

20   A    I told him that it was -- I thought, you know, I thought

21   that I said it before that I was -- I was scammed.

22   Q    What, if anything, did Mr. Greebel say to you when you

23   said that?

24   A    He said -- he told me I wasn't and Martin was working on

25   a payment plan with me.

DIRECT - GELLER - PITLUCK                    2911

1    Q    During that call did you discuss how you would get paid

2    by Martin Shkreli?

3    A    We did not.

4    Q    Did you discuss any kind of agreement with Mr. Greebel on

5    that call -- on those calls?

6    A    We didn't, but we -- we actually might have, because he

7    had to try to, you know, work something out with a contract.

8    Q    And how would you characterize your conversations with

9    Mr. Greebel?

10   A    Very professional, cordial.

11   Q    Did you learn anything about Mr. Greebel on that call?

12   A    No.

13   Q    Did you come to learn what -- if Mr. Greebel worked at a

14   large law firm?

15   A    Well, I knew -- I mean, when I found out the name of the

16   law firm I did some research on it and it was -- seemed like a

17   very reputable law firm.  And also my brother, Alan, mentioned

18   to me that he works at a really good firm.

19   Q    How did that make you feel about your investment in MSMB

20   following your conversation with Mr. Greebel?

21   A    It made me feel a little more secure.

22   Q    Now did you come to learn what kind of agreement would

23   facilitate the payment from MSMB to you?

24   A    I did, yes.

25   Q    What kind of agreement was it?

DIRECT - GELLER - PITLUCK                    2912

1    A    It was going to be a settlement type of agreement.

2    Q    Whose idea was it to use a settlement type agreement to

3    pay you?

4    A    It was not my idea.  So it was Evan and Martin's idea.

5    Q    Did you discuss using a settlement agreement with anyone

6    else?

7    A    No.

8    Q    I'd like to show you what's been marked for

9    identification as Government Exhibit 106-21, which is Tab 25

10   in your binder, Mr. Geller.

11   A    Okay.

12   Q    What are we looking at here, Mr. Geller?

13   A    Email chains between Martin Shkreli and me.

14            MR. PITLUCK:  , Your Honor, at this time the

15   government would move to admit Exhibit 106-21 into evidence.

16            MR. MASTRO:  No objection, Your Honor.

17            THE COURT:  We will receive 106-21.

18            (Government Exhibit 106-21, was received in

19   evidence.)

20   BY MR. PITLUCK:

21   Q    So let's start at the bottom email, who's the email from

22   and who is it to?

23   A    It's from Martin to me.

24   Q    And what's the date of that email?

25   A    May 3rd.

DIRECT - GELLER - PITLUCK                2913

1    Q    2013?

2    A    Yes.

3    Q    Is that the day after you sent the email that we see in

4    Government Exhibit 106-20?

5    A    Yes.

6    Q    Can you read what Mr. Shkreli wrote.

7    A    He wrote:  Correction, Evan understands the agreement to

8    be 300,000 but neither of us seem to know how much stock, if

9    any, there was to be issued.

10   Q    What's the subject line of that email?

11   A    Evan.

12   Q    Is this a reference to the deal that you and Mr. Shkreli

13   had discussed?

14   A    Yes.

15   Q    Did you respond to Mr. Shkreli's email?

16   A    I did.

17   Q    What did you respond?

18   A    Not sure if it was 20,000 or 30,000 but I will be happy

19   with 20,000.  Cash is what is important.

20   Q    When you were referencing 20,000 and 30,000, what were

21   you talking about?

22   A    The amount of shares that I was going to get.

23   Q    And why did you write cash is what is important?

24   A    Because that's what I wanted and I didn't know if the

25   20,000 or 30,000 would be worth anything.  At that time I

1   didn't think it was worth anything.

2   Q    And did you respond to Mr. Shkreli -- I'm sorry, did

3   Mr. Shkreli respond to your email?

4   A    Yes.

5   Q    What did he write?

6   A    He wrote:  Okay, let's close this on Monday then, should

7   be easy.

8   Q    And the date of that email was Friday, May 3rd, 2013?

9   A    Yes.

10  Q    Can you go up to the next email in the line.

11  A    Uh-huh.

12  Q    Is that an email from you to Martin?

13  A    Yes.

14  Q    What's date of that email?

15  A    May 6th, 2013.

16  Q    The following Monday?

17  A    Yes.

18  Q    What did you write?

19  A    I heard you guys had a great dinner on Monday.  Sorry I

20  did not attend.  I look forward to hearing from you today

21  about closing this deal as your last email indicated.

22  Q    Do you remember what the reference was to the great

23  dinner on Monday?

24  A    I do.  I know that my brother Alan was in town because he

25  lives in Florida and they -- they all went out to dinner

```
                    DIRECT - GELLER - PITLUCK                    2915
```

1   Monday night.

2          THE COURT:  They meaning -- I'm sorry.  "They"

3   meaning who?  You said they all went out to dinner.

4          THE WITNESS:  When I say they I mean Martin, Kevin

5   Mulleady and maybe a couple of partners in the company.

6   BY MR. PITLUCK:

7   Q    Okay.  And did Mr. Shkreli respond to your email about

8   the great dinner?

9   A    He did.

10  Q    Is that on the same day, Monday, May 6th?

11  A    Yes.

12  Q    What did he write?

13  A    Yes, it was fun.  You were missed.  We will close it up

14  all today.

15  Q    And did you respond to Mr. Shkreli's email?

16  A    I did.

17  Q    What did you write?

18  A    I wrote:  Not to bother you but Monday came and went

19  without me hearing anything.

20  Q    What day did you send that email?

21  A    I sent it on May 7th, I'm sorry.

22  Q    The following day?

23  A    Yes.

24  Q    And did Mr. Shkreli respond to you?

25  A    He did.

DIRECT - GELLER - PITLUCK                    2916

1    Q    What did he write?

2    A    Sorry to hear that.  Can you call Evan.

3    Q    Did you call Mr. Greebel after receiving that email from

4    Martin Shkreli?

5    A    Of course.

6               (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIRECT - GELLER - PITLUCK                    2917

1   BY MR. PITLUCK:

2   Q    Showing you what is marked for identification as

3   Government's Exhibit 106-23, which is tab 27 for

4   identification.

5           Generally, Mr. Geller, what are we looking at here?

6   A    E-mails between Martin and me.

7           MR. PITLUCK:  Your Honor, at this time I move to

8   admit Government's Exhibit 106-23.

9           MR. MASTRO:  No objection, your Honor.

10          THE COURT:  We will receive 106-23.

11          (Government Exhibit 104-23, was received in

12   evidence.)

13   BY MR. PITLUCK:

14   Q    Mr. Geller, can we start with the bottom e-mail in the

15   chain on the second page, EG86.  If it's easier for you, it's

16   on the screen.  Do you see that?

17   A    I see it.

18   Q    Who is that from and to, and what is the date?

19   A    From me to Martin and Evan.

20   Q    On what day?

21   A    May 13.

22   Q    What is the subject?

23   A    Agreement.

24   Q    Can you read what you wrote, please?

25   A    "On Friday night I found the paper where I wrote down the

DIRECT - GELLER - PITLUCK                    2918

1   deal Martin and I originally agreed to.  Seems I misplaced it.

2   It was for 300,000, and 30,000 shares not 20,000.  I do feel

3   that under all the past circumstances we should go with the

4   300,000 and the 30,000.  I feel this is really right and it

5   would make us whole.  Since I already have 30,514 shares, it

6   would be best if it just stays with me and you just do the

7   cash pay out.  Please let's wrap this thing up today or

8   tomorrow."

9   Q    And you see there is a reference where it says, "I found

10  the paper where I wrote down the deal"?

11  A    Yes.

12  Q    What did you mean by that?

13  A    Well, Martin and I had that phone conversation and on

14  April -- whatever it was, 25th -- he when we started talking

15  about the amount, which was 300,000, I had a wrote it down,

16  and I wrote down whatever it was 20 or 30, I guess it was 30

17  now, but I misplaced it.  And so I found it.  And I just

18  wanted to be upright what I knew it was to be.

19  Q    Let's go up to the next e-mail, who sent that e-mail and

20  was it sent to?

21  A    From me to Martin.

22  Q    Is Evan Greebel copied on this e-mail?

23  A    No.

24  Q    What is the date of this e-mail?

25  A    May 15.

1   Q    Two days after you sent the e-mail we just looked at it?

2   A    Yes.

3   Q    Can you read what you said?

4   A    "Martin, I sent this out on Monday morning.  For your

5   information, Evan had told me twice he would get the contract

6   to me by a certain deadline.  These deadlines have came and

7   went, I have not seen anything yet.  I really thought we had

8   got past these delay situations with what went on in the past.

9   Once again I'm disappointed and sad."

10  Q    Did you speak to, before sending this e-mail, did you

11  speak to Evan about the contract that you reference there?

12  A    Evan and I, we had ongoing conversations, so I'm, I don't

13  remember exactly what time or what day in this period I spoke

14  to him.

15  Q    But did you speak to Evan during that period?

16  A    Yes.

17           THE COURT:  May I ask, what is the contract you're

18  referring to?

19           THE WITNESS:  The settlement agreement.

20  Q    In your conversations with Mr. Greebel, did you discuss

21  the terms of your settlement agreement.

22  A    We did.

23  Q    Did you have a lawyer representing you at this point,

24  Mr. Geller?

25  A    I did not.

DIRECT - GELLER - PITLUCK                          2920

1    Q    Let's go up one more e-mail.  Who is this from and who

2    are the recipients?

3    A    From me to Martin and Evan Greebel.

4    Q    What is the date on that e-mail?

5    A    May 17.

6    Q    Friday, May 17?

7    A    Yes.

8    Q    Can you read it?

9    A    "Martin and Evan, this is my third e-mail this week as it

10   relates to the settlement we were supposed to have completed.

11   I feel entitled to get some type of response on this."

12   Q    Let's go up to the next e-mail in the chain, which I

13   think carries over two pages.  Who is this e-mail from and who

14   is it to and what is the date?

15   A    This is from Evan to me.

16   Q    And just looking at the page before, is anybody else

17   included as a recipient?

18   A    It was made out to me and Martin.

19   Q    What is the date of that e-mail on the next page?

20   A    May 17.

21   Q    What did Mr. Greebel write?

22   A    He wrote, "David, I have not had a chance to touch base

23   with Martin on your request from earlier this week.  I am tied

24   up today and will try to speak with him over the weekend or

25   next week.  I apologize that we have not been able to speak

DIRECT - GELLER - PITLUCK                    2921

1   and I hope to get back to you next week."

2   Q    Did you respond to Mr. Greebel's e-mail?

3   A    Yes.

4   Q    Was that the same day, Friday, May 17?

5   A    Yes.

6   Q    What did you write?

7   A    "Evan and Martin, while I appreciate your prompt response

8   to this e-mail, asking for a small change to my deal should

9   not delay it for a week or more.  These are poor business

10  dealings.  I expect the contract agreement to be signed and

11  monies to be transferred by the end of next week, Memorial Day

12  weekend.  I don't think I'm asking for much.  Martin, we made

13  a verbal deal on April 5.  Evan, we started talking on

14  April 26 and you told me twice the contract will be done.

15  Today is May 17.  Have a great weekend."

16  Q    During the conversations that you just testified that you

17  had with Evan Greebel, did you threaten to sue Martin Shkreli?

18  A    I did not.

19  Q    Or MSMB?

20  A    No.

21  Q    Or Retrophin?

22  A    No.

23  Q    How would you characterize your conversations with Evan

24  Greebel?

25  A    Still professional, a little more aggressive than I was

1    before.

2    Q    Now, did Mr. Shkreli respond to your e-mail from Friday,

3    May 17?

4    A    He did, yes.

5    Q    When did he respond to it?

6    A    May 22.

7    Q    Is Mr. Greebel put on that e-mail as well?

8    A    Yes, he is.

9    Q    What did Mr. Shkreli write?

10   A    He wrote, "Where do we stand?  I'm ready to execute and

11   send funds.  What exactly is the deal that you want, David?  I

12   think part of the confusion is you may want some more in the

13   settlement and we will probably accommodate you, but if you

14   can clearly just state your terms I can give you a yes or a no

15   or a counter proposal."

16   Q    What was your reaction to receiving this e-mail from

17   Mr. Shkreli?

18   A    I was not happy.

19   Q    Why not?

20   A    Because they were, it was the stalling terms.  I kept

21   saying how much, what we should have, and he kept saying well

22   how much is it, how much is it.

23   Q    Did you respond to Mr. Shkreli's e-mail with the terms of

24   the deal that you had discussed?

25   A    I'm sure I did.

DIRECT - GELLER - PITLUCK                2923

1    Q    Look up at the next e-mail.

2    A    "Hi Martin, here are the terms or proposal $300,000 in

3    cash, 30,000 shares.  Now since I already have a total of

4    30,514 shares, I thought it would make sense to just leave me

5    with those 30,514 shares to make things simple."

6    Q    What was Mr. Shkreli's response to your e-mail here?

7    A    "Okay, great" --

8    Q    One e-mail below that, from Mr. Shkreli dated May 22,

9    2013.  Do you see that one?

10   A    Yes.

11   Q    What did Mr. Shkreli write?

12   A    "Agreed."

13   Q    Who is copied there?

14   A    Evan Greebel.

15   Q    What did you write after Mr. Shkreli wrote agreed?

16   A    "Okay.  Great.  Let's sign the agreement and transfer

17   funds by Friday's close.  I will be waiting on the agreement.

18   I will be available 24/7.

19   Q    Is Mr. Greebel included on this e-mail?

20   A    Yes.

21   Q    Finally, what is the top e-mail in the chain?

22   A    "Here is my bank wire information."

23   Q    Why did you send your bank wire information to

24   Mr. Shkreli and Mr. Greebel?

25   A    To try to push them a little more.  And so in case

DIRECT - GELLER - PITLUCK                    2924

1   they -- I didn't want them to ask me what is your bank wire

2   information.

3   Q    So they could transfer the funds to you?

4   A    Yes.

5   Q    Did you receive a settlement agreement related to your

6   investment in MSMB Healthcare?

7   A    I did.

8   Q    At this point I'd like to show the witness what is marked

9   for identification as Government's Exhibit 106-24, tab 28,

10  Mr. Geller.  What are we looking at here, Mr. Geller?

11  A    This is the settlement agreement.

12  Q    Is this an e-mail?

13  A    Yes, with an attachment.

14  Q    Did you receive this e-mail?

15  A    I did.

16          MR. PITLUCK:  Your Honor, at this point we admit

17  106-24 in evidence.

18          MR. MASTRO:  No objection, your Honor.

19          THE COURT:  We receive Exhibit 106-24.

20          (Government Exhibit 106-24, was received in

21  evidence.)

22  BY MR. PITLUCK:

23  Q    Just looking at the e-mail, Mr. Geller, who sent this

24  e-mail?

25  A    Evan Greebel.

DIRECT - GELLER - PITLUCK                    2925

1   Q    What day did Mr. Greebel send this e-mail?

2   A    May 22.

3   Q    The same day that you had sent your wire information in

4   the prior exhibit?

5   A    Yes.

6   Q    Who is copied on the e-mail?

7   A    Martin Shkreli.

8   Q    Could you read the contents of the e-mail briefly?

9   A    "Hi David.  Attached is the settlement agreement.  Please

10  advise if it is acceptable or if you have any comments.  I'm

11  simultaneously sending to my client and it is subject to his

12  review and comment.  If you have any questions please call me

13  at."

14  Q    Did you review this document -- flipping to the next

15  page, is this the attachment?

16  A    Yes.

17  Q    What is it on the top paragraph, what is this document?

18  A    Settlement and release agreement.

19  Q    Did you review this document after you received it from

20  Mr. Greebel?

21  A    Yes.

22  Q    Did you have a lawyer review it?

23  A    I didn't have -- I have a friend who's wife was a lawyer.

24  And I e-mailed it to him and I asked, I said, can your wife

25  just look at it, and if she sees anything out of line, let me

DIRECT - GELLER - PITLUCK                    2926

1    know.  She said it seemed okay.

2    Q    Did you sign this document?

3    A    I did.

4    Q    What did you do after you signed it?

5    A    I walked it down to Evan Greebel's office.

6    Q    Why did you walk it to Mr. Greebel's office?

7    A    I wanted to speed up the process.

8    Q    Did you ever receive any signed, an executed version of

9    this agreement?

10   A    I did.

11   Q    Staying with this agreement for a second, you see how

12   where it says, "This agreement is made and entered into as of

13   May, blank, 2013 by and among David Geller, the releasor"?

14   A    Yes.

15   Q    You see the entities afterwards Martin Shkreli, MSMB

16   Capital Management LP, MSMB Capital Management LLC, a few more

17   and down all the way to Retrophin?

18   A    Yes.

19   Q    Did you have any understanding at the time why all those

20   entities were included in your settlement and release

21   agreement?

22   A    No.

23   Q    Did it concern you?

24            MR. MASTRO:  Objection, your Honor.

25            THE COURT:  Rephrase.

DIRECT - GELLER - PITLUCK                2927

1    Q     Were you concerned by those agreements being in the

2    settlement release agreement you received?

3              MR. MASTRO:  Objection, your Honor.

4              THE COURT:  Overruled.

5    A     At the time I was just happy to get the settlement and

6    release agreement, so I wasn't concerned.

7    Q     Why you were happy to get the settlement and release

8    agreement?

9    A     Because things were finally moving along.  I wasn't going

10   to get paid without the agreement.

11   Q     And you testified a moment ago that you did receive a

12   signed executed version of this agreement, correct?

13   A     Yes.

14   Q     Can I direct your attention to Government's Exhibit 55,

15   tab 30 in your binder.  Do you see that?

16   A     Yes.

17   Q     Is this an e-mail from Mr. Greebel to yourself?

18   A     Yes.

19   Q     Does it have an attachment?

20   A     Yes.

21             MR. PITLUCK:  We would move Government's Exhibit 55

22   into evidence.

23             MR. MASTRO:  No objection, your Honor.

24             THE COURT:  We will receive Government's Exhibit 55.

25             (Government Exhibit 55, was received in evidence.)

DIRECT - GELLER - PITLUCK                    2928

1    BY MR. PITLUCK:

2    Q    Is this an e-mail from Mr. Greebel to you on May 30,

3    2013?

4    A    Yes.

5    Q    What did he write in this e-mail?

6    A    "Hi David, attached is the mutually executed settlement

7    agreement."

8    Q    This is one week after you received the draft version

9    from Mr. Greebel?

10   A    Yes.

11   Q    Let's go to the first page of this and go down to the

12   section that says payment terms, what were the payment terms

13   that were set forth here?

14   A    Payment terms were $300,000, and previously received

15   30,514 shares of the Retrophin stock.

16   Q    From the MSMB entities?

17   A    Yes.

18   Q    You see where it says claims below that?

19   A    Yes.

20   Q    Did you understand what you were releasing as part of

21   this agreement?

22   A    Yes.  I was -- I understood that I couldn't, once I got

23   the money I couldn't ask for more or any litigation.

24   Q    Let's go to the last page -- I'm sorry, the second to

25   last page of this exhibit, GR1295.  Is that your signature on

1    the left?

2    A    Yes.

3    Q    You see all the signatures for the MSMB entities and

4    Retrophin?

5    A    Yes.

6    Q    Who signed all of those?

7    A    Martin Shkreli.

8    Q    Did you have any understanding of whether Retrophin's

9    Board of Directors had approved the agreement at the time you

10   signed it?

11   A    I didn't know.

12   Q    Now, following the signing of this settlement agreement

13   did you receive your $300,000 that was owed to you right away?

14   A    No.

15   Q    Was there a delay receiving that?

16   A    There was a delay.

17   Q    I'd like to show you what is marked as for identification

18   as Government's Exhibit 106-26 at tab 31.  Do you recognize

19   this document?

20   A    I do.

21   Q    What does this document consist of?

22   A    This is an e-mail from chain between Martin Shkreli and

23   me.

24            MR. PITLUCK:  Your Honor, at this point we move to

25   admit 106-26 into evidence.

DIRECT - GELLER - PITLUCK                    2930

1          MR. MASTRO:  No objection, your Honor.

2          THE COURT:  We receive Government's Exhibit 106-26

3   in evidence.

4          (Government Exhibit 106-26, was received in

5   evidence.)

6   BY MR. PITLUCK:

7   Q    Let's start in the first page, this is June 3rd, 2013,

8   e-mail from you to Mr. Shkreli?

9   A    Yes.

10  Q    Can you just read for the jury what you wrote in that

11  first e-mail?

12  A    "Martin, hope you had a good weekend.  Please wire the

13  funds within the next couple of days.  Let's complete this

14  thing.  I'm including my wiring instructions again."

15  Q    Is this soon after you received the executed settlement

16  agreement?

17  A    Yes.

18  Q    Why did you include your wire instructions again?

19  A    Just trying to be a little more aggressive.  I didn't

20  want anyone to come back to me and say can we have your wiring

21  instructions.

22  Q    Did Mr. Shkreli respond to your e-mail?

23  A    Yes.

24  Q    What did he write?

25  A    He wrote, "Hi David, we will send the funds on Monday the

1    tenth."

2    Q    Did he respond on June 3rd the same day you sent the

3    e-mail?

4    A    Yes.

5    Q    Is Mr. Greebel copied on this?

6    A    No.

7    Q    Did you respond to Mr. Shkreli's e-mail?

8    A    I did.

9    Q    What day did you respond?

10   A    June 10.

11   Q    The day he said he would send the funds?

12   A    Yes.

13   Q    What time?

14   A    8:19 p.m.

15   Q    What did you write to Mr. Shkreli?

16   A    I wrote, "Did not receive funds.  Maybe you guys got

17   busy.  I'll be looking for the incoming wire tomorrow."

18   Q    Did Mr. Shkreli respond to your e-mail of June 10?

19   A    He did, yes, on June 11.

20   Q    What did he write?

21   A    "We are going to be unable to send the funds on the

22   timeline requested.  I am available to do a call today to

23   discuss."

24   Q    And what was your reaction to getting that e-mail?

25   A    One of disappointment.

1  Q    What, if anything, did you do after receiving that

2  e-mail?

3  A    I wrote back to him, "When can we do the call."

4  Q    Did you -- following receiving that e-mail from

5  Mr. Shkreli, did you have a meeting with him?

6  A    We did.

7  Q    Where did that meeting take place?

8  A    In his office.

9  Q    So in person?

10  A    Yes.

11  Q    What did you discuss with Mr. Shkreli during that

12  meeting?

13  A    We discussed why I didn't, what happened and why he did

14  not send the funds.

15  Q    Did he explain why he wasn't able to send the funds?

16  A    He did.

17  Q    Was Mr. Greebel present at that meeting?

18  A    No.

19  Q    When you were in Mr. Shkreli's office that day, did you

20  speak with anybody else who worked at the company?

21  A    I didn't have any conversations with anyone else.  I

22  did --

23  Q    During this conversation -- which office did you meet

24  Martin at after you received this e-mail?

25  A    The one on Third Avenue.

1    Q    Did you know which company's offices those were?

2    A    No.

3    Q    Did Mr. Shkreli say anything to you about where the money

4    was going to come from to pay your settlement?

5    A    He did.

6    Q    What did he say?

7    A    He said that they had a proposed deal on the table, but

8    they were out-bid by another company.  So they thought if they

9    had the deal done they would, they can take the funds out of

10   the escrow account and do the deal, they would have money to

11   pay me.

12            THE COURT:  Can we definite fine who "they" is?

13   "They" had a deal; "they" would use the funds.

14   Q    Did you know who Mr. Shkreli was talking about when he

15   said they?

16   A    I'm sorry.  When he talked about they, I mean his company

17   Retrophin.

18   Q    Following your meeting with Mr. Shkreli in his office,

19   did you send him an e-mail?

20   A    I did.

21   Q    Is this the e-mail that's up on the screen of June 11,

22   2013, from Government's Exhibit 106-26?

23   A    Yes.

24   Q    What did you write?

25   A    I wrote, "It was nice speaking to you today.  I'm sorry

DIRECT - GELLER - PITLUCK                    2934

1    the deal didn't go our way but greater things lie ahead.  As I

2    was walking home a little reality set in, you really need to

3    show some good faith at this point.  I really need you to wire

4    me the 150,000 tomorrow.  Please make it happen."

5    Q    Did you get the 150,000 the following day?

6    A    No.

7    Q    Next e-mail in the chain, what date was this e-mail

8    written?

9    A    June 12.

10   Q    Did you write this e-mail?

11   A    I did.

12   Q    Can you read what you wrote, please?

13   A    "Once again, I am deeply disappointed and sad that you

14   did not honor your statement of sending me $150,000 today.

15   Also you said you would contact me if there were any glitches;

16   I never heard from you.  You have left me with no other choice

17   but to sue all means to fulfill the settlement agreement we

18   signed.  Believe me, I'll make it my full-time job.  There are

19   plenty of lawyers who will take this case on a contingency

20   basis.  I will contact all enforcement agencies and media

21   outlets.  You have taken months off my life.  I have done

22   nothing but be a gentleman and cooperate as a team player.  I

23   have my own financial responsibilities.  You really crossed

24   the line.  I will give you until tomorrow to make this right."

25   Q    What did you mean when you wrote, "there are plenty of

DIRECT - GELLER - PITLUCK                    2935

1  lawyers who will take this case on a contingency basis"?

2  A    I meant I wouldn't -- I wrote that because this way I

3  wouldn't have to pay a lawyer out of my own pockets.  So

4  whatever settlement he was able to get from me, he would get

5  part of it.  But I wouldn't have to pay out of my own pocket

6  for a lawyer.

7  Q    Did you hire a lawyer at this point?

8  A    No.

9  Q    Is this the first time that you threatened to contact or

10 engage a lawyer?

11 A    Yes.

12 Q    Is the first time you threatened to contact enforcement

13 agencies and media outlets?

14 A    Yes.

15 Q    At this point you had a signed settlement agreement?

16 A    I did.

17 Q    What, if anything, was Martin Shkreli's response to this,

18 can we go to the next e-mail?

19 A    "Trying to handle it."

20 Q    What day and time did he write that?

21 A    June 12, 6:46 p.m.

22 Q    Same day the as the e-mail you had sent him about

23 engaging a lawyer on a contingency basis?

24 A    Yes.

25 Q    You see the top e-mail, who is AGTrading5?

1    A    My brother, Alan.

2    Q    Why did you forward the e-mail to your brother?

3    A    I was letting him know the situation that was going on.

4    Q    I'd like to direct your attention to Government's Exhibit

5    106-27, tab 32, for identification.  Is this an e-mail chain

6    that you're put on, Mr. Geller?

7    A    Yes.

8         MR. PITLUCK:  Your Honor, at this time the

9    Government would admit 106-27 in evidence.

10        MR. MASTRO:  No objection, your Honor.

11        THE COURT:  We will receive 106-27.

12        (Government Exhibit 106-27, was received in

13   evidence.)

14   BY MR. PITLUCK:

15   Q    Mr. Geller, do you see the e-mail, the second e-mail from

16   the bottom, dated June 12, 2013, at 6:46 p.m. that reads,

17   "Martin, once again I'm so deeply disappointed"?

18   A    Yes.

19   Q    Is that the same chain, part of the same chain from

20   before in 106-26?

21   A    Yes.

22   Q    Is that the chain where Mr. Shkreli responded "trying to

23   handle it"?

24   A    Yes.

25   Q    What did Mr. Shkreli write in this exhibit 106-27 on the

1    top e-mail?

2    A    He wrote, "I want to make sure you have my counsel's

3    information.  Please don't contact me directly anymore.  We

4    have an explicit way to deal with threats, and this is that

5    way.  Sorry for that."

6    Q    What day did Mr. Shkreli sign this e-mail?

7    A    June 13.

8    Q    Is anybody copied?

9    A    Evan Greebel is CC'd.

10   Q    Did you speak to Martin Shkreli between his e-mail on

11   June 12 saying trying to handle it and this e-mail?

12   A    No.

13   Q    Do you know why he wrote this e-mail to you?

14   A    I don't know, I guess he didn't want to deal with any

15   threats.

16   Q    What did you do after you received this e-mail?

17   A    I probably just had to digest what is going on for a

18   while.

19   Q    Did you eventually reach out to Mr. Greebel?

20   A    I did.

21   Q    I'm going to show you Government's Exhibit 106-28 for

22   identification, it's at tab 33.  What is the date of this

23   e-mail, sir?

24   A    July 11, 2013.

25   Q    An e-mail that you sent?

```
                   DIRECT - GELLER - PITLUCK                 2938
```

1   A    Yes.

2             MR. PITLUCK:  Your Honor, at this point we move to

3   admit 106-28 into evidence.

4             MR. MASTRO:  Can I just approach Mr. Pitluck?  I

5   need to make sure, I don't have a copy of it.

6             MR. PITLUCK:  We have a copy.

7             MR. MASTRO:  No objection, your Honor.

8             THE COURT:  We will receive 106-28.

9             (Government Exhibit 106-28, was received in

10  evidence.)

11  BY MR. PITLUCK:

12  Q    You just testified a moment ago, this is a July 11, 2013

13  e-mail that you sent, who did you send it to?

14  A    Evan.

15  Q    What is the subject?

16  A    Settlement agreement.

17  Q    Why did you -- can you read the e-mail, please?

18  A    "As per Martin's instructions I will be contacting you

19  with all correspondence going forward.  I have retained

20  counsel to start legal action.  As I stated before, I will be

21  contacting the SEC and certain media outlets.  This has

22  nothing to do with my brother.  I have received broken deals

23  and broken promises over the last few months.  Furthermore, no

24  good faith has been shown concerning settlement.  I am giving

25  you until Monday evening to make good on our agreement.  After

1   that, I will start my actions.  I wish it didn't come to this

2   but I see no other way."

3   Q    Why did you wait until July 11, 2013 to send this e-mail

4   to Mr. Greebel?

5   A    Well, I'm a person that I don't do anything like right

6   away.  I like to think about my options and let everyone calm

7   down.  So not that I exactly remember what I did, but I know I

8   spoke to my brother about it, and just try to weigh my

9   options.

10  Q    Had you actually retained a lawyer at this point in time?

11  A    I did not, no.

12  Q    At this point you have a signed settlement agreement with

13  Mr. Shkreli?

14  A    And going back, I was also waiting for someone, maybe

15  someone would come around to me and make good on the contract.

16  Q    At this point you did have a signed settlement agreement?

17  A    I did.

18  Q    Did you speak to Mr. Greebel after sending this e-mail on

19  July 11, 2013?

20  A    Yes.

21  Q    Is that in person or over-the-phone?

22  A    Over-the-phone.

23  Q    What, if anything, did you discuss with Mr. Greebel after

24  you sent this e-mail on July 11, 2013?

25  A    Pretty much how I'm going to get paid.  I think he made

DIRECT - GELLER - PITLUCK                    2940

1   some assurances to me that everything would work out, have

2   some patience, we'll get you paid.

3   Q    Did Mr. Greebel offer you anything in your phone call

4   with him following this e-mail?

5   A    I don't know the exact date, but he did offer me, he said

6   my client is prepared to offer you additional shares if you're

7   patient.

8   Q    Now after you sent this July 11, 2013, e-mail to

9   Mr. Greebel did you speak to anybody else connected to MSMB?

10  A    No.

11  Q    At any point following this e-mail on July 11, 2013, did

12  you speak to Kevin Mulleady?

13  A    I did.

14  Q    Was Kevin Mulleady working at Retrophin at this point?

15  A    I'm not sure.

16  Q    What, if anything, did you discuss with Kevin Mulleady?

17            MR. MASTRO:  Objection.  Hearsay, your Honor.

18            THE COURT:  If it's the same basis that we discussed

19  at sidebar, I'll overrule.

20            MR. MASTRO:  It's not.  I'll be very brief at

21  sidebar.

22            THE COURT:  All right.  We'll have a sidebar.

23            (Continued on the next page.)

24            (Sidebar conference.)

25

SIDEBAR CONFERENCE                              2941

1          MR. MASTRO:  The fact of the matter is the

2    Government knows that Kevin Mulleady by this point in time no

3    longer worked, was no longer in the good graces of the folks

4    there.  This could not possibly have been in furtherance of

5    the conspiracy.  He's not working with them anymore.  We heard

6    testimony about how he funded some people's legal fees because

7    the falling out afterwards.  So this is not in furtherance of

8    the conspiracy whatever this conversation is.

9          MR. BRODSKY:  Your Honor, at this time Kevin

10   Mulleady and Martin Shkreli are basically at war with each

11   other and there is a threatening litigation between the two of

12   them.  So statements made by Mr. Mulleady do not appear to be

13   in any furtherance of conspiracy given the relationship is

14   adversarial at this point.

15         MR. MASTRO:  He said it better than I could.

16         MR. PITLUCK:  Your Honor, when you hear the

17   statement you will know why it's in furtherance of the

18   conspiracy.

19         MR. BRODSKY:  Your Honor, they should proffer.

20         MS. SMITH:  Well, Mr. Mulleady is no longer working

21   at Retrophin.  I have five minutes of questions.  Mr. Mulleady

22   is still in contact with the everybody at Retrophin, MSMB.  He

23   tells Mr. Geller, don't go to the SEC because you'll screw it

24   up for everybody else trying to get paid, everyone else with

25   settlement agreements.  He's trying to make sure the payment

SIDEBAR CONFERENCE                                     2942

1   of those agreements is not disrupted by Mr. Geller's threat of

2   going to the SEC, that's in furtherance of the conspiracy.

3   He's still in contact with all the people in the settlement.

4   This is furtherance.  This shows Kevin Mulleady participation

5   in Count Seven.  I don't want to belabor the point.

6            MR. MASTRO:  The language in the 302 handwritten

7   notes, "don't go to the SEC it will screw it up for

8   everybody."  That's the language in the 302 not for people

9   settling, not for this one, not for that one.

10           THE COURT:  It's something he can elaborate on

11  through further questioning.  He can explain what he meant by,

12  he will screwed it up, or what the understanding of

13  conversations were.  All right.  Okay.  So I think given that

14  fact, the fact that he's not any longer employed doesn't

15  necessarily signal the end of the conspiracy.  If he's

16  still -- Mr. Mulleady is still, as the Government proffers, in

17  touch with MSMB and Retrophin and making, assuring, that these

18  settlements get executed and there aren't any bumps in the

19  road.

20           MR. BRODSKY:  Your Honor, respectfully, right now,

21  this period of time, Kevin Mulleady and Martin Shkreli are at

22  war with each other, that's one.  So adversarial posture.

23  There is contemporaneous documents to that effect.

24           Two, what he's doing is actually contrary to Martin

25  Shkreli's interests.  Kevin Mulleady is in contact at this

SIDEBAR CONFERENCE                                    2943

1   time with investors and he's trying to help the investors

2   contrary to the interest of Shkreli.  So there is actually

3   adversity between --

4              THE COURT:  The object of the conspiracy is to move

5   Retrophin's assets to the MSMB investors to, quote,

6   misappropriate the Retrophin assets to compensate those

7   investors.

8              Mulleady's comment, you'll screw up the settlements

9   of everyone else, which included moving assets from Retrophin

10  to those MSMB investors is consistent with the ongoing

11  conspiracy and consistent with acting in furtherance of the

12  conspiracy.  The fact that he's at war with Mr. Shkreli is not

13  really the issue.  It's whether he still wants to move those

14  assets over to compensate MSMB.

15             MR. BRODSKY:  Mr. Mulleady is threatening to sue

16  Retrophin.  He's threatening to make a lawsuit against

17  Mr. Shkreli.  He's in the same position of the investors.

18  He's thinking of his own interests contrary to the alleged

19  conspiracy.  I don't believe it's in furtherance of the

20  conspiracy.  I think all evidence will show to the contrary.

21             THE COURT:  I made my ruling based on the proffer.

22             MR. PITLUCK:  I have five to seven more minutes,

23  then I'm done.

24             (End of sidebar conference.)

25             (Continued on the next page.)

```
 1              (In open court.)

 2              THE COURT:  The objection is overruled.  You may

 3    proceed.

 4    BY MR. PITLUCK:

 5    Q    So Mr. Geller, what did you discuss with Kevin Mulleady

 6    after you sent that e-mail in the time period after you sent

 7    that e-mail to Mr. Greebel on July 11, 2013?

 8    A    We discussed, he was giving me his reasons why I should

 9    not try to sue or alert any enforcement agencies.

10    Q    Did he tell you why he didn't want you to alert any

11    enforcement agencies?

12    A    Pretty much.  A natural reason that if I bring attention

13    to anything going on we're not going to, me and my brother,

14    maybe him, we're not going to get the funds, get our money

15    back.

16    Q    Now, I'd like to direct your attention to Government's

17    Exhibit 106-29, at tab 34 in your binder.  Going to the bottom

18    e-mail in this chain, which is the first e-mail, an e-mail

19    that you sent to Mr. Greebel?

20    A    Okay.

21    Q    Is that an e-mail that you sent to Mr. Greebel?

22    A    Yes.

23    Q    Is this e-mail chain between you and Mr. Greebel?

24    A    Yes.

25              MR. PITLUCK:  Government would move to admit 106-29.
```

D. GELLER - DIRECT - MR. PITLUCK                    2945

1           MR. MASTRO:  No objection.

2           THE COURT:  We will receive 106-29.

3           (Government Exhibit 106-29, was received in

4    evidence.)

5    BY MR. PITLUCK:

6    Q    Start on the bottom e-mail, is that from you to

7    Mr. Greebel?

8    A    Yes.

9    Q    What is the date of that e-mail?

10   A    August 20.

11   Q    About a little over a month after you sent the e-mail on

12   July 11?

13   A    Yes.

14   Q    What did you write to Mr. Greebel?

15   A    "Evan, I hope you are having a good summer.  Can you call

16   me when you get a moment."

17   Q    Why did you send that e-mail to Mr. Greebel in August of

18   2013?

19   A    I just wanted to continue trying to recoup my funds.

20   Q    Why did you wait over a month to reach out to him again?

21   A    Because, in the interim I was told just let things happen

22   and then you will get paid.

23   Q    What did you -- did have you a call with Mr. Greebel

24   following this e-mail?

25   A    Yes.

D. GELLER - DIRECT - MR. PITLUCK                    2946

1   Q    What did you discuss with Mr. Greebel on that call?

2   A    I don't remember exactly, but it had to do with when are

3   you going to pay me.

4   Q    I'd like to show you Government's Exhibit 106-32, at tab

5   37 for identification.  Is this an e-mail exchange between you

6   and Mr. Greebel -- at tab 37, Mr. Geller.

7   A    Yes.

8         MR. PITLUCK:  At this time the Government would move

9   to admit 106-32 in evidence.

10        MR. MASTRO:  No objection.

11        THE COURT:  We will receive 106-32.

12        (Government Exhibit 106-32, was received in

13  evidence.)

14  BY MR. PITLUCK:

15  Q    Start with the bottom e-mail, what is the date of that

16  e-mail?

17  A    August 28.

18  Q    Is it from you?

19  A    Yes.

20  Q    Who did you send it you?

21  A    To Evan and Martin.

22  Q    What is the subject?

23  A    Subject is follow up.

24  Q    Can you just read what you wrote?

25  A    "Martin and Evan, I'm writing to follow up from our

1    conversation on Friday.  We agreed that a solution would be

2    formed within three days.  What are the next steps, please?"

3    Q    Does that refresh your recollection that you had a

4    conversation with Martin Shkreli and Evan Greebel on the

5    Friday before this e-mail?

6    A    Yes, it does.  I think there was a solution coming down

7    the pipe.

8    Q    During that conversation, did you ever receive an

9    explanation for why you hadn't been paid?

10   A    I did.

11   Q    What explanation did you receive?

12   A    They didn't have the money to pay me.  And they were

13   waiting for something to happen.

14   Q    How do you know they were waiting for something to

15   happen?

16   A    Because it was told to me numerous times.

17   Q    Did they refer you to anything when they were telling you

18   this?

19   A    Another deal.  And it was --

20   Q    Go ahead.

21   A    Another deal had to be completed.  And also there was a

22   the 10Q had to come out.  It had a footnote in it that said

23   that we have to, we have prior obligations that we have to

24   make up to our shareholders, something to that extent.

25   Q    Who pointed that footnote out to you in the filing?

D. GELLER - DIRECT - MR. PITLUCK                    2948

1    A    Evan Greebel.

2    Q    Did you continue your dialogue with Mr. Greebel through

3    August and September?

4    A    Yes.

5    Q    Is that dialogue part of that dialogue contained in this

6    exhibit in the other e-mails?

7    A    Okay.  It was all included in the e-mails we were going

8    back and forth on.

9    Q    Did you ultimately get the $300,000 that you had agreed

10   to in the settlement agreement?

11   A    I did.

12   Q    Approximately when did you receive those funds?

13   A    Early October.

14   Q    Of 2013?

15   A    Yes.

16   Q    Mr. Geller, did you sell the Retrophin shares that you

17   had received in March of 2013?

18   A    I did.

19   Q    Did you sell them all?

20   A    I did.

21   Q    Approximately how much did you sell them for?

22   A    $315,000.

23   Q    After you received the $300,000 in October 2013, did you

24   receive any further disbursements from MSMB Healthcare?

25   A    No.

D. GELLER - CROSS - MR. MASTRO                    2949

1   Q    Did you ever contact the SEC or any regulatory agency?

2   A    I did not.

3   Q    Did you ever contact the media?

4   A    I did not.

5   Q    Did you ever contact an attorney?

6   A    I did not.

7          MR. PITLUCK:  One moment, your Honor.  Nothing

8   further at this point.

9          THE COURT:  Did you want to get started, Mr. Mastro?

10         MR. MASTRO:  Yes, to start.

11  CROSS-EXAMINATION

12  BY MR. MASTRO:

13  Q    My name is Randy Mastro.  I represent Evan Greebel.  Sir,

14  thank you for your patience.  Thank you for being here after

15  the tragedy of yesterday.

16         I'm going to try to ask you a series of questions,

17  just answer yes or no.  If you don't understand, tell me I'll

18  be happy to rephrase the question.  Okay?

19  A    Uh-huh.

20  Q    Thank you.  Sir, you're here today and in the first hour

21  and 45 minutes of your testimony I didn't hear you mention

22  Evan Greebel's name once?

23         MR. PITLUCK:  Objection.

24         THE COURT:  Sustained.

25  Q    Had you ever met Evan Greebel in person, ever?

D. GELLER - CROSS - MR. MASTRO                    2950

1    A    I met him one time.

2    Q    When was that?  When you dropped off the settlement

3    agreement?

4    A    Around then, I don't know exactly what day, what time.

5    Q    Am I correct, sir, that you only talked to him a handful

6    of times in your life?

7    A    What is a handful?  I don't know what that means.

8    Q    About five times?

9    A    More than that.

10   Q    Less than ten?

11   A    Could have been ten.

12   Q    Am I correct, sir, that the first time you ever met --

13   strike that.

14          Am I correct, that the first time you ever spoke

15   with Evan Greebel was on April 26, 2013, correct?

16   A    I don't know the date.  You're giving me a date, I can't

17   go back and recall a date.

18   Q    Let's put up 106-23, you see there the first mention of

19   Mr. Greebel, Friday, April 26, 2013.  Do you see that, sir?

20   A    Yes.

21   Q    "Had you been in contact with our attorney, Evan Greebel?

22   He can expedite this process significantly."  Do you see that,

23   sir?

24   A    Yes.

25   Q    That's Martin Shkreli writing to you and copying Evan

D. GELLER - CROSS - MR. MASTRO                    2951

1   Greebel?

2   A    Okay.

3   Q    Am I correct that's the first time you ever heard Evan

4   Greebel's name?

5   A    I would say so, yes.

6   Q    And the first time you actually communicated with him is

7   after you get this e-mail on April 26, 2013, from Martin

8   Shkreli, correct?

9   A    Yes.

10  Q    Now let's go down to the e-mail just below.  Sir, this is

11  the one that you sent on Thursday, April 25, 2013, do you see

12  that, sir?

13  A    Yes.

14  Q    I want to refer you, specifically I want to focus in on

15  this, sir, I want you to focus on the sentence that says, your

16  e-mail to Martin Shkreli, "Please don't force me to go to the

17  next level."  Your words, correct?

18  A    Yes.

19  Q    I believe you said on direct you were trying to be

20  cordial and professional when you wrote to Martin Shkreli,

21  "please don't force me to go to the next level," correct?

22  A    Yes.

23  Q    Now, sir, am I also correct that you met with the FBI on

24  January 27, 2016, do you recall that?

25  A    I mean, I met with the FBI.  I don't know if it's the

D. GELLER - CROSS - MR. MASTRO                    2952

1    date you gave me.  I'm not sure if that's the date or not.

2    Q    Am I also correct, sir, that you told the FBI when you

3    met with the FBI that you began speaking with Evan Greebel

4    once you threatened Shkreli with a lawsuit?  Didn't you tell

5    that to the FBI when you met with the FBI in January 2016, yes

6    or no?

7    A    I don't remember.

8    Q    All right.  I'm going to show you, we'll see if this

9    refreshes your recollection.

10              May I approach, your Honor?

11              THE COURT:  Yes.

12              What are you showing the witness, please?

13              MR. MASTRO:  3500DG2, 3500DG3, 3500DG6A.

14   Q    I'm referring you specifically, sir, to page four of

15   3500DG2.  I'm referring you, sir, specifically to the first

16   full paragraph on page four where it says, quote, "Geller

17   began speaking with Evan Greebel."

18              MR. PITLUCK:  Objection.

19              THE COURT:  This is refreshing.  You don't read it

20   into the record, you ask him to read it.

21   Q    Please read that first full paragraph on page four and

22   tell me if that refreshes your recollection that that's what

23   you told the FBI on January 25, 2016, yes or no, sir?

24   A    You're talking about the first sentence?

25   Q    Starting, "Geller began speaking."

D. GELLER - CROSS - MR. MASTRO                    2953

```
1    A    I don't remember.

2              MR. MASTRO:  Your Honor I offer this statement into

3    the record.  It's a prior inconsistent statement with the

4    testimony he gave today.

5              MR. PITLUCK:  Objection, your Honor.  This is not

6    the defendant's statement.

7              MR. MASTRO:  The FBI 302.

8              THE COURT:  We'll have a sidebar.

9              MR. MASTRO:  Certainly, your Honor.

10             THE COURT:  Is now a good time for the jury to have

11   a lunch?

12             MR. MASTRO:  Yes, it is.

13             THE COURT:  Please don't discuss the case and keep

14   an open mind.  Why don't you come back at five after two --

15   I'll give you until ten after two, we got started late.

16             Thank you.

17             (Jury exits the courtroom. 1:08 p.m.)

18             (Whereupon, the witness steps down.)

19             (Continued on the next page.)

20             (Sidebar conference.)

21

22

23

24

25
```

SIDEBAR CONFERENCE                    2954

1    MR. PITLUCK:  I'm a little perplexed as to how this

2    comes in as a prior inconsistent statement.  I think, as the

3    Judge is aware, Mr. Geller said he didn't recall saying it.

4    The proper procedure, if the defense wishes to take that

5    route, is to call the FBI agents of the 302 to say did you

6    write that down, and the agent would say.  I'm familiar with

7    no case law, no statutory law, period, that allows 302 report

8    memorializing what they interpreted to be a witness's

9    statements as a prior inconsistent statement of the defendant.

10   I'm perhaps missing something.  I think it's good we're

11   flushing this out now.  I've never once seen a 302 admitted

12   into evidence for any purpose including as prior inconsistent

13   statement.

14        MR. MASTRO:  Actually I have, your Honor.  This is a

15   statement attributed to Mr. Geller.  The fact that it's not in

16   quotes in the 302, it's the memorialization of a prior

17   inconsistent statement that he made to the FBI and then

18   testimony was elicited from him contradicting it.  So I think

19   the jury has a right to know that.  I can call the FBI agent;

20   and if I have to we probably will.  But this is --

21        MR. PITLUCK:  Judge, can I see who the agent was?

22   Okay.

23        MR. MASTRO:  We can call Ms. Smith, but I don't

24   think so.  She's on the 302 too.

25        MR. BRODSKY:  For the record, that was a joke, your

SIDEBAR CONFERENCE                                2955

1   Honor.

2              MS. SMITH:  We can make Mr. Delzotto available.

3   That's the standard procedure.

4              THE COURT:  Look, these don't usually come in, okay.

5   Because it's not like a transcript of the statement at a

6   deposition or at a trial.  This is the agent's best

7   recollection of what is being said.

8              I'm sure you have been in a proffer before or an

9   interview where an agent is there, there is a conversation

10  going on between the witness or the person and the Government,

11  and notes are being taken by the agent, and it's ultimately

12  memorialized in a 302.  But it doesn't mean that this is a

13  verbatim statement as one we find in a trial transcript or a

14  deposition transcript.  I'll look it up over lunch.  You can

15  do the same thing, as can the Government.

16             MR. MASTRO:  We have the handwritten notes, exactly

17  the same words that are contemporaneously taken down while

18  they were talking to the witness.  I can ask him about that

19  too, if that refreshes his --

20             MR. PITLUCK:  It's written by somebody else.

21             MR. MASTRO:  I want to know whether it refreshes his

22  recollection.  But I also think that -- your Honor, we will

23  both look at it at lunch.

24             THE COURT:  I'll tell you, I've never admitted a 302

25  before, but if you can convince me there is authority that I

SIDEBAR CONFERENCE                            2956

1    have to, I will.

2              MR. MASTRO:  I will try.  Thank you, your Honor.

3              THE COURT:  Anything else?

4              (End of sidebar conference.)

5              (Continued on the next page.)

6              (Whereupon, a recess was taken at 1:08 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                     2957

1              A F T E R N O O N   S E S S I O N

2              (Time noted:  2:10 p.m.)

3              (In open court; Jury not present.)

4              THE COURT:  All right.  Have a seat.

5              Is everybody here?  Who is missing?

6              MR. BRODSKY:  Mr. Mastro.

7              THE COURT:  All right, I'm happy to hear from the

8    parties regarding the defense proffer of the FBI 302.

9              MR. MASTRO:  Your Honor, I was able to locate the

10   case that I identified as one where I got a 302 in.  But my

11   colleagues have explained to me that that was in the context

12   of a civil case where a witness had passed away, and while it

13   was a civil RICO case, it was nevertheless a case where the

14   witness passed away.

15             So I understood the circumstances are different

16   here.  I've confronted the witness.  I will probably confront

17   the FBI notes of that interview as well later in the

18   examination see if that refreshes his recollection on

19   something so he clearly said.

20             But I understand the actual portion of the 302

21   doesn't come into evidence.

22             THE COURT:  All right.  I just wanted to bring to

23   your attention, Mr. Mastro, the case *United States versus*

24   *Almonte*.  A Second Circuit case reported at 956 F.2d 27

25   decided in 1992, in which the Second Circuit held that a third

PROCEEDINGS                              2958

1   party's characterization of a witness' statement does not

2   constitute a prior statement of that witness unless the

3   witness has subscribed to that characterization.

4           And they conclude that in the absence of an

5   endorsement by the witness, a third party's notes of a

6   witness' statement may not be admitted as a prior inconsistent

7   statement unless they are woven in the transcript of the

8   witness' own words.

9           The problem, in essence, is one of relevancy.  If

10  the third party's notes reflect only that note taker's summary

11  characterization of a witness' prior statement, then the notes

12  are irrelevant as an impeaching prior inconsistent statement

13  and thus invisible.

14          And I think that that is what we have here.  I mean

15  there's a use of a word "threat".  It's not clear.

16          MR. DUBIN:  Your Honor, I just wanted to make clear

17  the witness is in the courtroom.

18          THE COURT:  Oh, sorry.

19          You need to wait just a few minutes.  Sorry about

20  that.

21          Thanks.

22          MR. DUBIN:  You're welcome.

23          THE COURT:  I mean it is possible that at some point

24  during the interview with Mr. Geller, the agent perceived that

25  Mr. Geller had made a threat of some sort.  It's not clear

1    what that threat was.  But the 302 does indicate a

2    characterization by a third party FBI agent of what Mr. Geller

3    said and the use of the word -- the agent used the word

4    "threat".  Quote, Geller began speaking with Evan Greebel once

5    he threatened Shkreli with a lawsuit.

6           So we have in the record so far a statement by

7    Mr. Geller to Mr. Shkreli saying, you know, I don't want to

8    take it to the next level.  They continue to have

9    conversations back and forth, and at some point then

10   Mr. Geller says, not only am I going to lawyer up, but I'm

11   going to go to the media and I'm going to the authorities, or

12   the regulators or whatever he said.

13          At that point Mr. Shkreli says, We know how to

14   deal -- we have a protocol for dealing with these types of

15   threats.  Speak to my lawyer or communicate only with my

16   lawyer, Mr. Greebel.  So it's at that point at least

17   Mr. Shkreli perceives this as a threat, the comment.

18          What Mr. Geller said on direct -- I'm sorry, yes, on

19   direct is that he did not threaten anybody up until that

20   point, April 26 or 25th, 2013 was it in that email.  And

21   that's when Mr. Shkreli perceived a threat as well and that

22   speak only to my lawyer from here on out.

23          So this really is a distraction and somewhat

24   irrelevant, because whether Mr. Geller said this, we don't

25   have any sense of that.  He's denied under oath that he

1   recalls saying that he threatened Mr. Shkreli with a lawsuit.

2   I think it is reasonable that somebody hearing I'm lawyer up,

3   I'm going to the regulators and I'm going to media be

4   perceived as a threat.  But this, again, is a third party

5   writing down what he is perceiving, and I don't know what this

6   agent would say that he used the word "threat" as a shorthand.

7           It's just not a reliable statement to attribute to

8   this witness as a prior inconsistent statement.  And the

9   Second Circuit says we can't admit it.  So I'm not going to

10  admit it.

11          MR. MASTRO:  Your Honor, I'm prepared to move on.

12          THE COURT:  Okay.

13          MR. MASTRO:  So I appreciate Your Honor's ruling, I

14  do, and I don't -- we don't need to have colloquy now on how I

15  interpret the witness' testimony differently and what

16  credibility I think you should attach to that testimony under

17  these circumstances, but why don't we just move on.  I'm ready

18  to continue.

19          Thank you, Your Honor.

20          THE COURT:  All right.  So Mr. Geller can come in.

21          Thank you, Agent.

22          (Whereupon, the witness resumes the stand.)

23          (Jury enters the courtroom.)

24          THE COURT:  Okay.  All the jurors are present.

25  Thank you.  Please have a seat.

1              Mr. Geller, you're still under oath.

2              And, Mr. Mastro, you may continue your cross.

3              MR. MASTRO:  Thank you very much, Your Honor.

4              Thank you.

5    CROSS-EXAMINATION (Continued)

6    BY MR. MASTRO:

7    Q    Mr. Geller, you understood that Evan Greebel was the

8    attorney for Retrophin, correct?

9    A    I understood that Evan Greebel was the attorney for

10   Martin Shkreli.

11   Q    Mr. Geller, do you recall testifying at a prior

12   proceeding?

13   A    I do.

14              MR. MASTRO:  Your Honor, may I approach?

15              THE COURT:  Yes.

16   Q    Do you recall, sir, being asked on your direct

17   examination, Mr. Geller, who is --

18              THE COURT:  Page and line, please.

19              MR. MASTRO:  Yes, 3152, line 6 and 7.

20   Q    Mr. Geller, who is Evan Greebel?  Your answer:  He was

21   the attorney for Retrophin.

22              Do you recall being asked that question and giving

23   that answer in a prior proceeding, sir?

24   A    I don't recall, but if that's the answer you have written

25   down, then that's the answer I gave.

GELLER - CROSS - MASTRO                    2962

1    Q    Would you like me show it to you, sir?

2    A    You don't have to show it me.

3    Q    And you were under oath in that prior proceeding,

4    correct, sir?

5    A    That's correct.

6    Q    You were obligated to tell the truth, correct?

7    A    Yes.

8    Q    And you told the truth when you answered that Mr. Greebel

9    was the attorney for Retrophin, correct, sir?  Yes or no?

10   A    Yes.

11   Q    Thank you.

12        Now, sir, let's talk about where you ended your

13   examination with the Government, about the money you made on

14   this investment in MSMB Healthcare and you invested 200,000 in

15   late June 2011, correct?

16   A    That's correct.

17   Q    In MSMB Healthcare, correct?

18   A    Correct.

19   Q    And at some point by early 2013, because you received

20   share certificates.  Your MSMB Healthcare investment had been

21   converted into Retrophin shares, correct?

22   A    Correct.

23   Q    In fact, 30,514 Retrophin shares, correct?

24   A    Correct.

25   Q    And your money was used to pay for those shares, correct?

1   A    I didn't know at the time but now I do.

2   Q    Okay.  And then you entered into a settlement

3   negotiations with Mr. Shkreli, correct?

4   A    Correct.

5   Q    And the deal you cut is with Mr. Shkreli, correct?

6   A    Correct.

7   Q    And, in fact, you thought you had a verbal agreement with

8   Mr. Shkreli on a settlement deal on or about August -- on or

9   about -- I'll rephrase, Your Honor.

10          You thought you had a verbal agreement with

11  Mr. Shkreli on a settlement deal on April the 5th, 2013,

12  correct?

13  A    I thought I had a verbal agreement.  If that's the date

14  you say, then...

15  Q    That's the date you talked to him on the phone, correct,

16  sir?

17  A    Yeah, if that's the date, then I did have a verbal

18  settlement agreement.

19  Q    And whatever tweaks to that settlement agreement were

20  done were between you and Mr. Shkreli on how to change that

21  deal, correct?

22  A    That's correct.

23  Q    Now, sir, the deal you eventually entered into, the

24  settlement deal, was for 300,000 in cash, correct?

25  A    Correct.

GELLER - CROSS - MASTRO                    2964

1    Q    And you got to keep the 30,514 Retrophin shares, correct?

2    A    Correct.

3    Q    And that made sense to you because your money from MSMB

4    Healthcare had been converted into the Retrophin shares.  You

5    already had them in hand, correct?

6    A    Yes.

7    Q    And you got to keep those shares that you already had

8    through your MSMB Healthcare investment, correct?

9    A    Correct.

10   Q    And you got $300,000 more, correct?

11   A    The 300,000 was the basis of my settlement.  The

12   Retrophin shares were the more.

13   Q    Let me just clarify that for the jury's sake.

14         The 300,000 that you received as part of that

15   settlement in addition to the Retrophin shares, you thought

16   that was reasonable because the last statement you had

17   received from MSMB Healthcare showed that your MSMB Healthcare

18   investment hadn't appreciated up to almost $300,000, correct?

19         MR. PITLUCK:  Objection to form.

20         THE COURT:  I'll overrule it.

21         You can answer that question.

22   A    No, I didn't feel that way because the 300,000 on the

23   statement, I don't know if that was misleading or not.

24   Q    I believe you testified on your direct that you came up

25   with the 300,000 as a settlement number for two reasons.  And

GELLER - CROSS - MASTRO                          2965

1    correct me if I'm wrong.

2           One was because your last MSMB Healthcare statement

3    had showed you at almost 300,000 in value.  And the another

4    was because an earlier MSMB settlement had valued the 30,000

5    or show Retrophin shares at approximately $10 a share worth

6    300,000, correct?

7           MR. PITLUCK:  Objection.  Misstates testimony.

8           THE COURT:  Sustained.

9    Q    Let me break it down.

10          Do you recall testifying on direct, you know, in

11   your own mind how you came up with the 300,000?

12   A    In my own mind, that's what I came up with.  But that's

13   what I thought that they were -- on the Martin Shkreli was

14   speculating --

15   Q    You thought --

16   A    -- what my shares were worth.

17   Q    Understood.

18          You thought that settlement was fair to all parties,

19   correct, 300,000, and you got to keep your 30,514.

20   A    Yes, I thought it was fair to all the parties at the

21   time.

22   Q    Now, sir, eventually you sold those Retrophin shares,

23   correct?

24   A    Yes.

25   Q    You sold those Retrophin shares when, late 2013?

1    A    Say it again?

2    Q    Late 2013?

3    A    No, I had sold them in early 2014.

4    Q    And when you sold them, you are were able to sell them

5    for more than $10 a share; weren't you?

6    A    A little more than $10 a share.

7    Q    So in total, you got 300,000 in cash, you got to keep the

8    Retrophin shares, which you then sold by early 2014 for

9    315,000, correct?

10   A    Correct.

11   Q    Now, sir, that's a total of $615,000 that you got at the

12   end of the day as a result of your MSMB Healthcare investment,

13   correct?

14   A    Correct.

15   Q    You started at 200,000 invested, correct?

16   A    Say it again?

17   Q    You started with the $200,000 investment?

18   A    Yes.

19   Q    And you ended up with $650,000, correct?

20   A    Correct.

21   Q    That's more than triple your original investment,

22   correct?

23   A    Correct.

24   Q    Am I correct that during that period of time when you

25   made this investment until you realized the gain, you didn't

GELLER - CROSS - MASTRO                    2967

1    have any other investment that you made that made anywhere

2    close to that much money, correct?

3    A    That's correct.

4    Q    Am I also correct, sir, that your portfolio is around

5    $4 million?

6    A    Can you -- I'm having a hard time hearing you.

7              THE COURT:  Stay by the microphone, okay,

8    Mr. Mastro.

9              MR. MASTRO:  Certainly, Your Honor.  I'm beat.  I'm

10   not usually so soft spoken.

11             THE COURT:  Well, we all have to hear you.  I'm

12   having a problem, too.

13             MR. MASTRO:  I understand.

14   Q    Am I correct that during the period of time between your

15   MSMB Healthcare investment -- strike that.

16             Am I correct that your portfolio at the time you

17   made that MSMB Healthcare investment was worth around

18   $4 million?

19   A    You could say that, yes.

20   Q    So this was about 5 percent of your portfolio that you

21   invested in MSMB Healthcare, correct?

22   A    Correct.

23   Q    By the time you were done and you realized that gain, you

24   improved the overall value of your portfolio by more than

25   15 percent, correct?

GELLER - CROSS - MASTRO                    2968

1   A    Correct.

2   Q    Pretty good investment, wouldn't you say, sir?  It worked

3   out pretty well for you, correct?

4   A    If you take from the beginning to the end, I guess so.

5   But in between it wasn't such a good investment.

6   Q    And you're saying that because it took you a while to get

7   your money, correct?

8   A    Um, it's not that it took me a while it's the stress that

9   was involved.

10  Q    You said earlier -- strike that.

11       Have you ever had an investment in your life where

12  you made more than three times profit on the investment?

13  A    Not a hedge-fund type of investment, no.

14  Q    Thank you, sir.

15       Now, you talked a little bit about your career.  Is

16  it fair to say that you're a sophisticated investor, sir?

17  A    Fairly sophisticated, as the law describes it.

18  Q    Fairly sophisticated.

19  A    Yes.

20  Q    You've been a trader, equities trader for more than 30

21  years, correct, sir?

22  A    That's correct.

23  Q    You're a licensed trader, Series 7 and Series 63,

24  securities licensed trader, correct?

25  A    I don't know if I'm still licensed, but I was at one

GELLER – CROSS – MASTRO                    2969

1    time.

2    Q    And first worked as an assistant trader at Shearson

3    Lehman Brothers?

4    A    Correct.

5    Q    Very large brokerage firm, correct?

6    A    Uh-huh.

7    Q    How many years did you work there?

8    A    Five years.

9    Q    And then you worked at a company called Generic Trading,

10   correct?

11   A    Yes.

12   Q    And then Schonfeld Securities, correct?

13   A    Yes.

14   Q    And you traded the company's money.  You needed to make

15   money on the trades for you to make commissions, correct?

16   A    Yes.

17   Q    And is it through these trading businesses that you

18   accumulated your portfolio of $4 million, your personal

19   portfolio?

20   A    Yes.

21   Q    Am I correct that you had brokerage accounts at many

22   large trading firms, like UBS, Ladenburg Thalmann, and Charles

23   Schwab?

24   A    That's correct.

25   Q    Even at Bank of America and Merrill Lynch?

GELLER – CROSS – MASTRO                    2970

1    A    Yes.

2    Q    And you testified earlier that you had experience, in

3    fact, in investing in a hedge fund, right?

4    A    Yes.

5    Q    Is it fair to say that a hedge fund is where a group

6    private investors pool their money as limited partners and

7    agree to get a general partner make investment decisions on

8    their behalf?

9    A    Yes.

10   Q    And that's what this was, a hedge fund, correct?

11   A    Correct.

12   Q    And you understand that a limited partner, that's what

13   you were a limited partner, right, in the MSMB Healthcare

14   fund, correct?

15   A    Yes.

16   Q    Did you understand that as a limited partner you were

17   agreeing that the general partner can made investment

18   decisions on your behalf, right?

19   A    Yes.

20   Q    And that the general partner did not have to come back to

21   you every time the general partner decided to make an

22   investment decision, correct?

23   A    Correct.

24   Q    Now, sir, am I correct that you assumed the 300,000,

25   which you were going to be paid, was going to come from

1    Retrophin, correct?

2    A    I didn't know where it was going to come from.  And I

3    didn't really care, to tell you the truth.  I just wanted the

4    300,000.

5    Q    Sir, let me refer you to another one of those FBI

6    reports, 3500DG3.  That's the one-pager dated June 23, 2017.

7         Does that refresh your recollection, sir, that you

8    told the --

9    A    I'm sorry, where are we looking?

10   Q    A one-pager, 3500DG3, one pager, dated June 23, 2017.

11        THE COURT:  Talk into the microphone just to

12   escalate --

13   Q    You see the last sentence there?  Does that refresh your

14   recollection that you told the FBI that you assumed the money

15   was coming from Retrophin?

16        MR. PITLUCK:  Objection, Your Honor.

17   A    Okay, I see it.

18        THE COURT:  I'll take it.

19   Q    Does it refresh your recollection, sir?

20        THE COURT:  Just a minute.

21   A    It doesn't refresh my recollection because it was so long

22   ago.

23        But if I may say something, like during this process

24   of names of Retrophin and MSMB Healthcare, they kind of became

25   interchangeable because there were just so many names being

GELLER – CROSS – MASTRO                    2972

1   thrown around.  So, you know, to be fair, with me, it was all

2   kind of one entity, you know, by the end because -- how can

3   one person really like keep track of what's going on.

4   Q    In fact, you were aware, sir, that MSMB Healthcare merged

5   in Retrophin, correct?

6              MR. PITLUCK:  Objection, Your Honor.

7              THE COURT:  Sustained.  Rephrase.  Rephrase.

8   Q    Sir, you came to understand by early 2013 that MSMB

9   Healthcare had been liquidated and merged into Retrophin,

10  correct?

11  A    In March, yes.

12  Q    Now, sir, let me ask you some questions about your

13  brother, Alan Geller.  You said that you invested in MSMB

14  Healthcare on a recommendation of your brother, Al Geller,

15  correct?

16  A    Correct.

17  Q    You trust your brother, right?

18  A    He refer -- yeah, my brother referred me to him.

19  Q    And your brother urged you to invest.

20  A    Yes.

21  Q    And he urged you to invest because he told you Martin

22  Shkreli was brilliant, correct?

23  A    Correct.

24  Q    He told you, your brother Alan, at the time you were

25  considering investing, that Martin Shkreli was a genius,

GELLER - CROSS - MASTRO                              2973

1  correct?

2  A    That's correct.

3  Q    Now, you believe your brother is a very good reader of

4  people, correct?

5  A    That's correct.

6  Q    You also knew at the time you invested that your brother

7  had, in fact, invested in MSMB Healthcare a million dollars,

8  correct?

9  A    I knew that, yes.

10 Q    And that when the opportunity presented itself shortly

11 thereafter, he invested a half million dollars directly in

12 Retrophin, correct?

13 A    I know -- I know he invested another half million

14 dollars, but I didn't know where he thought he was investing

15 it.  Into the entity.

16 Q    You also knew, from your brother, that Martin Shkreli

17 walked to the beat of his own drum.

18       Isn't that the way your brother described him?

19 A    Yes.

20 Q    And your brother also told you that he had become a

21 consultant to Martin Shkreli and his companies, correct?

22 A    He -- he didn't he tell me, he -- at the end when these

23 agreements were being produced, that's when he said that the

24 agreement that he made was a consulting agreement.

25 Q    And you knew that he advised Martin Shkreli regularly as

1   a life coach, correct?

2   A    I know he had conversations with him, yes.

3   Q    On a regular basis.  Dozens of conversations, correct?

4   A    He had some conversations, yes.

5   Q    And he often meet in person with Martin Shkreli.

6   A    They did.  Uh-huh.

7   Q    As a life coach to Martin Shkreli and a business adviser

8   to Martin Shkreli, correct?

9   A    I don't -- I know my brother likes to give people advise.

10  Gives me advise all the time but...

11  Q    So that also was a comfort to you to know that your

12  brother, Al, was a consultant and adviser to Martin Shkreli

13  and his companies, correct?

14  A    Officially or unofficially?

15  Q    Unofficially that was a comfort to you to know your that

16  brother was an adviser and consultant to Martin Shkreli?

17  A    Yes, it was because I -- it made me feel a little closer

18  to the situation.  Absolutely.

19  Q    Thank you, sir.

20        Sir, I want to take you back to some areas that the

21  Government was asking you about during your direct.

22        I believe you testified that you were hesitant at

23  first about making an investment in another hedge fund, right?

24  A    Hesitant about -- say it again?

25  Q    Making another investment in another hedge fund after a

1    bad experience.

2    A     Yes.

3    Q     So I think the words you used was that you really did

4    your due diligence.  Correct?

5    A     Did I say that?

6    Q     Tell the jury if you can recall saying it.

7    A     I don't --

8    Q     You did your due diligence.

9    A     I don't recall.

10   Q     Sir, let me refer you to -- strike that.

11         Am I correct that you testified you reviewed the

12   private placement memorandum that Kevin Mulleady sent you in

13   June 2011.

14   A     I withdraw it.  Is that what you're saying?

15   Q     No, you reviewed.

16   A     Reviewed it, yes.

17   Q     So you're aware that in that private placement memorandum

18   it warned you of significant risks investing in MSMB

19   Healthcare?

20   A     So what you're saying is that the private placement

21   which -- I was always a trader, I wasn't, you know, like I

22   wasn't a broker, I wasn't an investor, but I seen some -- I

23   seen a handful of these private placement memorandums, and a

24   lot of them have the same language in the 10, the 11, and 12

25   pages they start like thinning out and saying there is risk in

GELLER - CROSS - MASTRO                          2976

1    the risk section of the private placement memorandum.

2    Q     So, sir --

3    A     I mean if you looked at five or six or seven or eight,

4    they all said the same thing.

5    Q     Sir, I'm asking you a simple question, yes or not.

6             You were aware from reading this private placement

7    memo that there was significant risk to this investment,

8    correct?

9    A     I'm not -- I'm not going to say, yes, because from the

10   verbal discussions that we had, which I don't know how much

11   that holds up, but I was told that, you know, there was a

12   liquid, long/short fund, and on the first couple of pages it

13   implied that on the PPM.

14   Q     Sir, I'm asking you a simple yes or no question.

15   A     Okay, I'll answer yes or no.  Go ahead.

16   Q     Were you aware that the private placement memorandum

17   warned you of significant risk in the investment; yes or no?

18   A     Yes.

19   Q     Were you aware that the private placement memorandum

20   warned you that there were, quote, no assurances the

21   partnership will achieve its intended objectives?

22   A     Yes.

23   Q     Were you aware that the private placement memo warned you

24   that the partnership could, quote, invest in illiquid assets,

25   end quote; yes or no?

GELLER - CROSS - MASTRO                    2977

1    A    I wasn't aware of that.  Maybe I, you know, just didn't

2    catch my eye.

3    Q    Sir, were you aware the private placement memo warned you

4    that the limited partnership interest offered are illiquid and

5    subject to significant restrictions, end quote.  Were you

6    aware of that?

7    A    I wasn't totally aware of that, no.

8    Q    Were you aware that the private placement memorandum

9    warned you that the general partner had the right to suspend

10   redemptions under certain circumstances, end quote?  Were you

11   aware of that?

12   A    That I was aware of, yes.

13   Q    And the private -- the general partner refers to MSMB

14   Healthcare, whose managing member was Martin Shkreli, correct?

15   A    Yes.

16   Q    Sir, you then at the same time received the subscription

17   agreement, correct?

18   A    Yes.

19   Q    And you read the subscription agreement, correct?

20   A    I briefed it, yes.

21   Q    You signed it.

22   A    I did.

23   Q    And didn't you warrant in signing it that you had read

24   it?

25   A    I skimmed through it.  I briefed it.

GELLER – CROSS – MASTRO                    2978

1   Q    So --

2   A    I can't read every single 20-, 30-page document that I

3   receive.

4   Q    Sir -- strike that.

5        So you were aware from skimming the subscription

6   agreement that there were, quote, substantial restrictions on

7   transfer of your limited partnership interest, end quote?

8   A    Was I aware?  Yeah, I was aware.

9   Q    And were you also aware from reading the subscription

10  agreement that, quote, it may not be possible to liquidate

11  your limited partnership interest?

12  A    Yes.

13  Q    Were you aware that there may not be any, quote, public

14  market, end quote, for your limited partnership interest?

15  A    Yes.

16  Q    Were you aware from reading the subscription agreement

17  that, quote, it may not be possible to liquidate without the

18  general partner's consent, end quote?  Were you aware of that?

19  A    Like I said, I briefed through the back part of it, and

20  they all say the same thing.

21  Q    Sir, were you aware that in reading the subscription

22  agreement that the subscriber, quote, may not expect to

23  acquire cash distributions in the partnership?  Strike that.

24       Were you aware, sir, that the subscription agreement

25  provided that the subscriber, quote, may not expect to acquire

GELLER - CROSS - MASTRO                                    2979

1   cash distributions from the partnership?

2   A    Yes, I was aware.

3   Q    I believe you said, sir, that you did not know or heard

4   of MSMB Capital by the time you made these investments in

5   June 2011.

6            Is that your testimony, sir?

7   A    Can you speak into the mic?  I can't hear you.  I'm

8   sorry.

9   Q    Am I correct that you testified on direct that you did

10  not know and hadn't heard of MSMB Capital at the time you made

11  your investment in June of 2011?

12  A    I -- I invested in MSMB Healthcare.

13  Q    Had you known or heard of MSMB Capital at that time?

14  A    I don't really -- I can't really make the distinction.

15  It doesn't really stick in my mind.  To me it's, you know,

16  it's MSMB.

17           I don't know if it's my job to really, you know, to

18  sit there and say, oh, one says Capital and one says

19  Healthcare.

20  Q    So that wasn't really relevant to you?

21  A    It wasn't relevant to me, no.

22  Q    Sir, you said that on October 31, 2011, you received a

23  revised private placement memorandum and cover letter from

24  Kevin Mulleady and MSMB, right?

25  A    Yes.

GELLER - CROSS - MASTRO                    2980

1   Q    And I believe that you testified that that didn't sit

2   well with you when you read it.

3          Do you recall that testimony?

4   A    Yes.

5   Q    Am I correct that at the time you received that revised

6   private placement memorandum, you understood from that private

7   placement memorandum that MSMB Healthcare has and will

8   continue to meet -- sorry.

9          Am I correct that from that October 2011 private

10  placement memorandum, you understood that MSMB Healthcare,

11  quote, has and will continue to invest in MSMB affiliated

12  entities, which are controlled by the MSMB Capital umbrella,

13  end quote?

14         Am I correct that you understood that from private

15  placement memo?

16  A    I didn't understand it.  It was -- it was just language

17  to me.

18  Q    Did you understand -- strike that.

19         By this time you had already received a monthly

20  statement that reported the name of Retrophin at 30,000

21  shares, correct?

22  A    What date was that?

23  Q    October 31, 2011.  You already received a statement from

24  MSMB Healthcare --

25  A    Okay.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER - CROSS - MASTRO                    2981

1   Q    -- that reported Retrophin at 30,000 shares, correct?

2             THE COURT:  Reported what?

3   Q    Reported Retrophin as a name and 30,000 shares that

4   Retrophin had given to MSMB Healthcare?

5             MR. PITLUCK:  Objection, Your Honor.

6             THE COURT:  Sustained.

7   Q    Can me put up on the board GX192.

8             (Exhibit published.)

9             Go to the second page towards the bottom.  All the

10  down the footnote.  The first sentence.

11            So the date on this particular report is

12  October 2011, reporting on September 2011 performance,

13  correct, sir?

14  A    Okay.

15  Q    And you were aware by October 31, 2011 that MSMB

16  Healthcare had accepted the transfer of 30,000 investments

17  units of Retrophin from Martin Shkreli at no consideration as

18  a gift, correct?

19  A    I -- I mean I the first couple of months it came out, I

20  didn't catch it.  But then when I was informed about it, I did

21  know about it.

22  Q    You came to understand, did you not --

23  A    I came to understand.  I did, yes.

24  Q    You came to understand around this time that one of the

25  MSMB affiliated entities in which MSMB Healthcare was

GELLER - CROSS - MASTRO                    2982

1   investing was Retrophin, correct?

2            MR. PITLUCK:  Objection, Your Honor.

3            THE COURT:  Sustained.

4   A    I understood that.

5            THE COURT:  Sustained.

6            MR. MASTRO:  I'll rephrase.

7            THE COURT:  Sustained.  That means you don't have to

8   answer.

9            THE WITNESS:  Sorry.

10  Q    Sir, am I correct that one of the MSMB affiliated

11  entities which you became aware MSMB Healthcare was investing

12  in was Retrophin, correct?

13           MR. PITLUCK:  Objection, Your Honor.

14           THE COURT:  Sustained.

15  Q    Sir --

16           THE COURT:  Do you want to the try to rephrase that

17  question?  I think there are some words that are problematic,

18  and that's why I am sustaining the objection.

19           MR. MASTRO:  Of course, Your Honor.

20  Q    Am I correct that you came to understand that MSMB

21  Healthcare was investing in Retrophin?

22           MR. PITLUCK:  Objection, Your Honor.

23           THE COURT:  Sustained.

24  Q    Sir, did there come a time when you understood MSMB

25  Healthcare was investing in Retrophin?

GELLER - CROSS - MASTRO                2983

1          MR. PITLUCK:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          Do you want to have a sidebar?

4          MR. MASTRO:  No, no, Your Honor, I'll move on.

5   Q   Sir, when, if ever, did you became aware that MSMB

6   Healthcare was investing in Retrophin?

7          MR. PITLUCK:  Objection, Your Honor.

8          THE COURT:  Sustained.

9          MR. MASTRO:  I'll move on, Your Honor.

10  Q   Sir, did you understand Retrophin to be an MSMB

11  affiliated entity?

12         MR. PITLUCK:  Objection, Your Honor.

13         MR. MASTRO:  Your Honor, I think it's perfectly --

14         THE COURT:  Do you want to define that term as you

15  are asking the witness about his understanding.

16  Q   You received this private placement memo on October 31,

17  2011, correct?

18  A   Yes.

19  Q   And you're aware that it reported that MSMB Healthcare as

20  and will continue to invest in MSMB affiliated entities,

21  correct?

22         MR. PITLUCK:  Objection, Your Honor.  Calls for a

23  legal conclusion.

24         MR. MASTRO:  No, I just read from the document, Your

25  Honor, that's all.

1        THE COURT:  Fine.

2   Q    Are you aware that the document said that, sir?

3        THE COURT:  The document that is up is not the

4   private placement memo that you referred to.  This is a

5   different exhibit, 91-2, which I think is a performance

6   report.

7        MR. MASTRO:  Your Honor, let's put up 106-6.

8        THE COURT:  I think it would be less confusing for

9   everybody if you're reading from a document.

10       MR. MASTRO:  Sorry, ladies and gentlemen.  Sorry.

11  Q    106-6.  And let's go to the next page.

12       This is a letter from Martin Shkreli to you as a

13  limited partner, correct, sir?

14  A    That's correct.

15  Q    And you see handwritten at the top it says October 31,

16  2011?

17  A    Yes.

18  Q    That's your handwriting, right?

19  A    Yes.

20  Q    And now I'm going to refer you to the second paragraph

21  where it says MSMB Healthcare LP has and will continue to

22  invest in MSMB affiliated entities which are controlled by the

23  MSMB Capital umbrella.

24       Do you see that, sir?

25  A    Yes.

GELLER - CROSS - MASTRO                    2985

1    Q    Did you have an understanding from reading that that

2    Retrophin was among the MSMB affiliated entities being

3    referred to?

4    A    I did not.

5    Q    Did there come a time after this date that you became

6    aware that Retrophin was one of the MSMB affiliated entities

7    being referred to here?

8    A    I did not come -- there never came a time because I'll --

9    you know, I said this before, but I always thought Retrophin

10   was -- it was a security or a private placement security.  I

11   didn't think it was a company or an affiliate.  I never did.

12   And the only time I did was late in the game when I got those

13   stock certificates and I started putting two and two together.

14   Q    So you understood by the time you got the stock

15   certificates that Retrophin was an affiliated entity, correct?

16   A    No.  I didn't think it was affiliated entity.  I thought

17   it what private placement of shares.

18   Q    You understood that your MSMB Healthcare investment had

19   been invested into Retrophin shares, correct?  Yes or no?

20   A    That's fair to say, yes.

21   Q    Thank you.

22        Now, sir, after you got this revised private

23   placement memorandum, am I correct that it took you more than

24   three months before you communicated to anyone at MSMB

25   Healthcare that you were considering rescinding your

GELLER – CROSS – MASTRO                    2986

1   redemption?  I mean, strike that.

2            Am I correct that after you got this private

3   placement memorandum, it took you more than three months

4   before you communicated to MSMB Healthcare that you wanted a

5   redemption of your investment?

6            MR. PITLUCK:  Objection, Your Honor.

7            THE COURT:  Can you try to rephrase it, Mr. Mastro

8   please.

9   Q    Sir, am I correct that in January, late January 2012 you

10  put in for a redemption of your MSMB Healthcare investment?

11  A    If that's the date you have, because I can't remember

12  every date then, yes.

13  Q    And am I also correct that approximately two weeks later,

14  in February 2012, you rescinded your redemption?

15  A    Yes.

16  Q    Sir, I'd like to show you what going we're marking as

17  DX105-5.

18            THE COURT:  Thank you.

19  Q    Mr. Geller, am I correct that DX105-5 is an exchange of

20  text messages that you had with Kevin Mulleady in or about

21  mid-February 2012?

22  A    Yes.

23            MR. MASTRO:  And, Your Honor, I ask that it be

24  received in evidence.

25            MR. PITLUCK:  No, objection, Your Honor.

GELLER - CROSS - MASTRO                      2987

1          THE COURT:  All right, we will receive Defense

2     Exhibit 105-5.

3               (Defense Exhibit 105-5, was received in evidence.)

4               (Exhibit published.)

5     Q    Can we go down on the first page, in bold, I am

6     rescinding my redemption.

7               Do you see that, sir?

8     A    Yes, I see it.

9     Q    And you went on to explain why you were rescinding your

10    redemption; didn't you, sir?

11    A    Okay.

12    Q    Because you knew this is a possible great opportunity so

13    you decided to stay and keep your money in, correct?

14    A    Yes.

15    Q    Now, sir, you talked earlier on your direct testimony

16    about a dinner you had in 2012, the summer of 2012 with Martin

17    Shkreli and Kevin Mulleady at Bryant Park Grill.

18              Do you recall that?

19    A    Yes.

20    Q    Am I correct that you discussed at that dinner -- strike

21    that.

22              Am I correct that Mr. Shkreli described to you at

23    that dinner that he was starting a new company called

24    Retrophin, a new drug company?

25    A    He didn't -- he didn't say he was starting a new company.

GELLER - CROSS - MASTRO                    2988

1   They were discussing what to name the company.

2               He said they are -- he said he's going to do another

3   venture.

4   Q     And the venture was a new drug company, correct?

5   A     A new -- yeah, a new drug company.

6   Q     And that the plan was to eventually take that new drug

7   company public, correct?

8   A     Eventually.

9   Q     And that drug company he was describing on that occasion

10  turned out to be Retrophin, correct?

11  A     At the time, I still didn't -- I thought Retrophin was

12  still a private vehicle investment.  And one of the scenarios

13  I thought was maybe he was just going to name the new company

14  Retrophin and put the Retrophin shares in that.  And that

15  would be -- that would be the new entity.

16  Q     You expressed interest in investing in Retrophin that

17  dinner; didn't you?

18  A     Yes.

19  Q     And you, in fact, pitched to Mr. Shkreli that perhaps he

20  would consider investing in something called Diamond Funding.

21  A     Yes.

22  Q     A company with which you were involved, correct?

23  A     Yes.

24  Q     And am I correct, sir, that in September 2012 you

25  received a wind down letter from Mr. Shkreli that explained

GELLER - CROSS - MASTRO                    2989

1    that MSMB Healthcare fund would be winding down and there

2    would be a new structure Retrophin.  Correct?

3    A    If that's what -- if that's what the letter said.  Did it

4    say Retrophin was the new structure?  I don't recall.

5              MR. MASTRO:  DX106-10, please.

6              (Exhibit published.)

7    Q    Sir, this is in evidence.  This is letter you received

8    from Martin Shkreli on September 10th, 2012, correct?

9    A    Yes.

10             MR. MASTRO:  Let's go up a little, Mr. Carter,

11   please.  Go down in the body here.  Okay.

12             Let's bring up the first sentence of the second

13   paragraph.

14   Q    You see there where Mr. Shkreli is informing you, we've

15   decided the best structure for such an entity is a public

16   company or private corporation.  Retrophin, LLC, our MSMB

17   founded biotechnology operation will be that company.

18   A    Okay.

19   Q    Do you see that, sir?

20   A    Yes.

21   Q    And the very first paragraph -- Mr. Carter, let's bring

22   that up -- Mr. Shkreli is telling you that, quote, I have

23   decided to wind down our hedge fund partnerships with a goal

24   of completing the liquidations by November or December 1,

25   2012.

GELLER - CROSS - MASTRO                    2990

1         And it goes on to say, in the last sentence there,

2    We are going to focus our efforts on managing money in a

3    hybrid public private structure one is that is not generally

4    amendable to an open-ended private hedge fund's partnership

5    structure.

6         Do you see that, sir?

7    A    Yes.

8    Q    So certainly by in this point in time you were aware that

9    MSMB Healthcare was one of the liquidating and the focus was

10   going to be on Retrophin, correct?

11        MR. PITLUCK:  Objection, Your Honor.

12        THE COURT:  Sustained.  Rephrase.

13   Q    Certainly by this point in time, you were aware that

14   Mr. Shkreli intended to liquidate MSMB Healthcare and to focus

15   on Retrophin, correct?

16   A    At this time I thought that he was going to liquidate

17   MSMB Healthcare, whatever was in it, all the companies that

18   were in it, and take that restricted Retrophin, whatever --

19   you know, whatever it was, if it was a drug company or a

20   private restricted drug company and put it in to a new venture

21   and name it Retrophin.

22   Q    Didn't Mr. Shkreli tell you that Retrophin would embody

23   all of his investment and activities?  Didn't he tell you

24   that?  Yes or no, sir?

25   A    I don't recall.

GELLER - CROSS - MASTRO                    2991

1   Q    Let's go down further in the letter please.

2             Last paragraph.  Sentence starting, "however".

3   A    Uh-huh.  Okay.  I recall now.

4   Q    However, if you feel a desperate need to keep investing,

5   Retrophin will embody all of my investment activities and

6   attention, correct, sir?

7   A    Correct.

8   Q    And you continued to remain invested with Mr. Shkreli,

9   correct?

10  A    That's correct.

11  Q    Sir, let's turn your attention now to March 2013.  And

12  mid-March 2013, you received 30,514 Retrophin shares, correct?

13  A    Correct.

14  Q    I believe you testified earlier that about conversations

15  you said that you had with Kevin Mulleady and Martin Shkreli

16  starting in August 2012 and continuing through early 2013

17  about what you wanted done with your investment.

18            Do you recall that testimony?

19  A    You're talking about after that dinner that we had at

20  Bryant Park?  I mean after the letter, the wind down letter

21  came?

22  Q    Yes, sir.

23  A    Okay, so after the letter came --

24  Q    I just asked you whether you testified on direct about

25  conversations you had with Mr. Shkreli and Mr. Mulleady about

GELLER – CROSS – MASTRO                    2992

1    what you wanted done with your MSMB investment.

2    A    At that dinner I did.

3    Q    And after that you testified about other conversations

4    you had before March 2013 about what you wanted done with your

5    MSMB investment.

6    A    No, there weren't any other conversations.

7    Q    Sir, during turn your attention to Government's

8    Exhibit 106-12.  This is an email exchange you had with

9    Mr. Shkreli on March 16th, 2013.

10            Am I correct, sir, that the question you asked in

11   this email was for how much my original investment is in the

12   fund and how much is in Retrophin.

13            That's the question you were asking in the last

14   paragraph, correct?

15   A    That's what I asked, yes.

16   Q    You didn't say anything there about redeeming your

17   interests, correct?

18   A    I did not.

19   Q    You didn't say anything there about asking for your money

20   back, correct?

21   A    No, but if I may --

22   Q    Sir, yes or no, please.

23   A    Repeat the question, the last one?

24   Q    You didn't say anything there about asking for your money

25   back, correct?

GELLER – CROSS – MASTRO                    2993

1   A    No.

2   Q    Now, sir, let's go to April 4th, 2013.

3        Am I correct that by that point in time, you

4   gathered over the past few months that all of your fund money

5   had been put into Retrophin stock at a high valuation.

6   A    Yes.

7   Q    Am I correct that you raised then in an email, April 4th

8   of 2013, that that concerned you and you felt that you were

9   being left on a cliff.  Your words, correct?

10  A    Yes.

11  Q    You didn't mean literally left on a cliff, you meant

12  figuratively, right?

13  A    Figuratively, yes.

14  Q    Now, sir, directing your attention to April 5, 2013.  A

15  conversation with Martin Shkreli, correct, you get together

16  with him, right?

17  A    Yes.

18  Q    And you strike a verbal deal that would give you money

19  and allow you to keep a certain amount of Retrophin shares

20  that you already had, correct?

21  A    Yes.

22  Q    Am I correct that you leave it to Mr. Shkreli what, if

23  anything, to do next about memorializing the deal, correct?

24  A    I'm sorry, repeat that.

25  Q    You didn't write the deal down then on April 5, 2013,

GELLER - CROSS - MASTRO                    2994

1   correct, you didn't write it down?

2   A    I did.  I just misplaced the paper where I wrote down the

3   amount of shares that we discussed.

4   Q    You didn't have any kind of written agreement?

5   A    Oh, no, it was just a verbal over-the-phone agreement.

6   Q    And you felt that the verbal deal you had struck with

7   Mr. Shkreli on April 5 was fair to all sides, correct?

8   A    Yes.

9   Q    Then you hear nothing for the next couple of weeks,

10  right?

11  A    Yeah.

12  Q    April 25, 2013, and you emailed Martin Shkreli on

13  April 25, 2013, correct?

14  A    Uh-huh.

15          MR. MASTRO:  Let's put that up on the board, that's

16  DX106-20, please.

17          (Exhibit published.)

18  Q    Bring it to the email that you sent to Mr. Shkreli.  He's

19  the only one on the email, right, you send it to him, correct?

20  A    Yes.

21  Q    You send that at 8:32 p.m. at night, correct?

22  A    Yes.

23  Q    You write to him, you led me to believe you were going to

24  remedy the situation.

25          You see that, sir?

GELLER - CROSS - MASTRO                    2995

1   A    Yes.

2   Q    And you made yourself unavailable as you have done many

3   times in the past, correct?

4   A    Yes.

5   Q    And then you go on to write, after you say you don't

6   understand his actions, quote, please don't force me to go to

7   the next level.

8           Do you see that, sir?

9   A    Yes.

10  Q    And Mr. Shkreli responds to you writing, please don't

11  force me to go to the next level.  That you should be in

12  contact with his attorney Evan Greebel, correct?

13  A    Yes.

14  Q    He actually says "our", O-U-R, "our attorney," Evan

15  Greebel, correct?

16  A    Yes.

17  Q    The "our" being the company's attorney, correct?

18          MR. PITLUCK:  Objection.

19          THE COURT:  Sustained.

20  Q    What was your understanding what he meant by "our

21  attorney," sir, if you know?

22  A    I don't know.  The attorney that represents the company

23  and Martin Shkreli and --

24  Q    So --

25  A    -- all the things, the entities that, you know.

GELLER - CROSS - MASTRO                    2996

1    Q     Including Retrophin?

2    A     Including Retrophin, yes.

3          It's including the -- I mean at the time I still

4    thought Retrophin was just a drug, so I didn't know it was a

5    company, so I'm going to take that back.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. GELLER - CROSS - MASTRO                          2997

1    CROSS-EXAMINATION (Continued)

2    BY MR. MASTRO (Continued):

3    Q     Including Retrophin?

4    A     Including Retrophin, yes.  Including the -- I mean, at

5    the time I still thought Retrophin was just a drug, so I

6    didn't know it was company.  So I'm going to take that back.

7    Q     Sir, let me restate that question.  Mr. Shkreli was

8    responding to you writing to him, Please don't force me to go

9    to the next level, about you being in contact with our

10   attorney Evan Greebel, correct?

11   A     Yes.

12   Q     And you don't know what was in Martin Shkreli's mind when

13   he read, Please don't force me to go to the next level, the

14   words you wrote to him, correct?

15   A     How would I know what he was thinking?

16   Q     But you do know that he responded to you by saying, You

17   should be in contact with our attorney, Evan Greebel, correct?

18   A     Yes.

19   Q     Now, sir, am I correct that up to this point in time

20   April 26, 2013, at 8:19 a.m. you've never had any contact

21   whatsoever with Evan Greebel, correct?

22   A     Correct.

23   Q     And the first time you ever had any contact with Evan

24   Greebel is sometime later on April 26th after you had just

25   written to Mr. Shkreli the day before, quote, Please don't

D. GELLER – CROSS – MASTRO                    2998

1    force me to go to the next level, end quote?

2    A    Yes.

3    Q    On the same e-mail trail -- let's go to the top one, you

4    say -- strike that.

5              MR. MASTRO:  Go down a little bit more, please.  The

6    second to the top one.

7    BY MR. MASTRO:

8    Q    Martin Shkreli responds to you on April 26th, 2013.  He

9    copies Evan Greebel, correct?

10   A    Yes.

11   Q    And you don't know what is in Evan Greebel's mind when he

12   reads that you have just written the day before to Martin

13   Shkreli, quote, Please don't force me to go to the next level,

14   end quote.  Do you, sir?

15   A    I don't know what's in anyone's mind.  How would I know?

16   Q    Thank you, sir.

17             Now, am I correct that the next communication that

18   you have is later in the day on April 26th, 2013, an e-mail

19   exchange with Martin Shkreli about the terms of your verbal

20   agreement that you reached on August 5th?

21   A    I'm sorry.  Repeat that.  I got lost.

22   Q    On April 26th, later in the day --

23   A    Right.

24   Q    -- you have a further exchange with Martin Shkreli about

25   the terms of the verbal agreement you reached on April the 5th

D. GELLER - CROSS - MASTRO                          2999

1    of 2013?  Not on this e-mail trail, sir.  I'm not referring to

2    this one.

3              I'll refresh your recollection.

4    A    Okay.

5              MR. MASTRO:  Let's go to GX 106-19.

6    Q    This is an exchange you have on April 26th with Martin

7    Shkreli; correct?

8    A    Yes.

9    Q    Now, you write to Martin Shkreli what you understood to

10   be your verbal agreement on April the 5th, correct?

11   A    Yes.

12   Q    You say, We agreed on 300 in cash and 20,000 shares,

13   correct?

14   A    Yes.

15   Q    That means Retrophin shares, correct?

16   A    Yes.

17   Q    And you say you tried to get in touch with Evan, correct?

18   A    Uh-huh.

19   Q    And Mr. Shkreli responds to you by sending you Evan's

20   phone number, correct, after you say you haven't been able to

21   get ahold of him, correct?

22   A    Can you show me what -- So I haven't received --

23   Q    The top.

24   A    -- is that what you're talking about?

25   Q    The top e-mail that's Mr. Greebel.

D. GELLER - CROSS - MASTRO                    3000

1    A    Oh, that?   Yes, he put the telephone.

2    Q    And Mr. Shkreli informs you in the middle e-mail that, as

3    you can image, he writes these up, meaning Mr. Greebel writes

4    up settlement agreements, correct?

5    A    Correct.

6    Q    And just to be crystal clear, all of your negotiations

7    about the terms of the settlement were directly with

8    Mr. Shkreli, correct?

9    A    Correct.

10   Q    And Mr. Greebel's role in effectuating any kind of

11   settlement deal was to write it up in the form of a written

12   agreement, correct?

13   A    Correct.

14   Q    And there were even points in time in late April and May

15   where Mr. Greebel informs you he wasn't able to get ahold of

16   Martin Shkreli to confirm certain terms; is that correct?

17   A    Yes.

18   Q    And there were even times in late April and in May when

19   Mr. Greebel informed you that he was, quote, Waiting on Martin

20   Shkreli to confirm the terms, correct?

21   A    Yes.

22   Q    Throughout this period, April 26th, the first time you

23   had ever had any communication in your life with Evan Greebel

24   and the end of May when you receive an executed settlement

25   agreement, Evan Greebel's role was simply to write up the

1   settlement agreement, correct?

2   A     Correct.

3   Q     After the settlement agreement is fully executed at the

4   end of May 2013, you have communication with Mr. Greebel a

5   couple more times?

6   A     More than a couple.

7   Q     And on each occasion when you had communications with

8   Mr. Greebel after the settlement was executed, it was for you

9   to inquire about, When am I going to get paid, correct?

10  A     Yes.

11  Q     And Mr. Greebel explained to you that Mr. Shkreli would

12  have to answer those questions, correct?

13  A     He just -- he didn't know the answers.

14  Q     He would have to go to his client?

15  A     Yes.  But -- yes.

16  Q     And he would have go back to the company and Mr. Shkreli

17  to get the answers on when you get paid, correct?

18  A     Yes.

19  Q     And he did, in fact, go back to Mr. Shkreli and the

20  company to inquire about when you get paid, correct?

21  A     I don't know.  Did he?  I mean, that's his job.  I would

22  think he did.

23  Q     You wouldn't expect Mr. Greebel or his law firm to pay

24  you money, did you, sir?

25  A     No.

D. GELLER - CROSS - MASTRO                    3002

1    Q    You knew that the money was going to be coming from

2    Mr. Shkreli's companies, including Retrophin, correct?

3    A    One of Shkreli's companies, yes.

4    Q    Now, sir, am I correct that one of the calls after the

5    settlement was executed, Mr. Greebel explained to you that the

6    holdup was that SEC disclosure filings were being amended in

7    some way to disclose multiple settlements including your own,

8    correct?

9    A    I believe so, yes.

10   Q    And that, in fact, did happen in September of 2013,

11   didn't it, just before you got paid, correct?

12   A    I believe so, yes.

13   Q    And am I also correct that Mr. Greebel explained to you

14   that one of the delays was, I think your words on direct, that

15   the company was working on a deal, Retrophin was working on a

16   deal; he told you that, correct?

17   A    I believe so, yes.

18   Q    And the deal that Retrophin was working on that he told

19   you about was called a pipe, getting a pipe, private funding

20   into the company of Retrophin so that there would be money

21   available to pay off settlements such as yours, correct?

22   A    Can you repeat what you just said?

23   Q    Sure.  I'll break it down.

24   A    Okay.  I mean I understand what you say, but --

25   Q    You know what a pipe is, right?

D. GELLER - CROSS - MASTRO                     3003

1    A    Of course.

2    Q    Okay.  A pipe is getting private investment money into a

3    company, correct?

4    A    Yes.

5    Q    And Mr. Greebel told you during this period of time the

6    deal that Retrophin was working on in the summer and early

7    fall 2013 was a pipe to get more money into Retrophin,

8    correct?

9    A    I -- I don't exactly remember, so I'm not going to say

10   yes to you.  But I know they -- the reason why I got paid

11   because another deal was done, and they did get money into

12   Retrophin.  So maybe that answers your question.

13   Q    I just want to make sure I got this completely straight.

14   The conversations you had with Mr. Greebel, he explained to

15   you he had to go back to the companies and Mr. Shkreli to get

16   answers on when you get paid, correct?

17   A    Yes.

18   Q    That was accurate as far as you know, correct?

19   A    Yes.

20   Q    He told you that there was going to be an amendment to

21   the SEC financial disclosures of Retrophin that had to happen

22   before you got paid, correct?

23   A    Correct.

24   Q    And that turned out to be true, correct?

25   A    Correct.

1   Q    And he told you that Retrophin was working on a deal to

2   get money into the company so that you could get paid,

3   correct?

4   A    That's somewhat correct.  I don't exactly remember that

5   part, but I know --

6   Q    But --

7   A    -- but I now it did happen.  I don't know if Evan Greebel

8   explained it to me or it just happened.  I don't -- I don't

9   remember him telling me that.  I'm just being honest.

10  Q    I believe you --

11  A    It did happen.

12  Q    I believe you testified on direct that --

13  A    Because that's private information.  I don't know if he's

14  allowed to tell me that.

15  Q    I understand.

16       Well, Mr. Geller, let me just break it down for you.

17  On direct do you remember testifying that Mr. Greebel told you

18  that Retrophin was working on a deal and that was part of the

19  holdup?  Don't you remember testifying to that to this jury?

20  You told them that, didn't you?

21  A    Then if I did, I did.  I'm just -- you know --

22  Q    Well, sir --

23  A    -- you're bringing -- there's so many things you're

24  bringing stuff up.

25  Q    And sir --

D. GELLER - CROSS - MASTRO                    3005

1    A    It that's what I had testified to, then yes.

2    Q    And, sir, didn't that also turn out to be true?

3    A    Yes.

4    Q    Thank you.

5              Now, sir, I want to come to the settlement.  You

6    went through the settlement agreement before on your direct

7    examination; do you recall that, sir?

8    A    Yes.

9    Q    So I have a few questions for you.

10   A    Sure.

11   Q    You said the settlement agreement was with multiple

12   companies and with Retrophin, correct?

13   A    Yes.

14   Q    And you said you didn't care if it was on the settlement,

15   you just wanted to get your money, right?

16   A    Pretty much.

17   Q    Am I correct that you understood your MSMB Health Care

18   investment had been converted into Retrophin, right?

19   A    I got stocks, yes.

20   Q    So the place where your money ended up, your investment

21   money, was Retrophin, correct?

22   A    Yes.

23   Q    So if you were going to sue, you would sue where your

24   money went, wouldn't you?

25              MR. PITLUCK:  Objection, Your Honor.

D. GELLER - CROSS - MASTRO                    3006

1        MR. MASTRO:  I'll withdraw it, Your Honor.

2   Q    Sir, you said you didn't consult a lawyer when you first

3   used the language with Mr. Shkreli, quote, Please don't force

4   me to go to the next level, end quote.  That was your

5   testimony on direct, correct?

6   A    Right.

7   Q    But you did consult with a family friend lawyer who

8   reviewed the settlement agreement before you signed it,

9   correct?

10  A    Yes.

11  Q    Sir, I'm going to direct your attention now to June 12

12  and 13, 2013.

13       MR. MASTRO:  And let's bring up GX 106-27.

14  Q    Okay, sir, now we're in June and this is -- this is from

15  you to Martin Shkreli.  Do you recall testifying about this,

16  sir?

17  A    Yes.

18       THE COURT:  Can we just, for the record's clarity

19  rather than say "this," just identify it for the record as the

20  June 12th --

21       MR. MASTRO:  Certainly.

22       THE COURT:  -- 2013 --

23  Q    It's June 11, 12, and 13 e-mail exchanges all the ones at

24  the bottom between you and Martin Shkreli and the one at the

25  top also copying Evan Greebel, correct, sir?

D. GELLER - CROSS - MASTRO                     3007

1    A    Yes.

2    Q    Do you remember testifying on direct that when you sent

3    this e-mail to Martin Shkreli alone on June 12th, 2013 that

4    you were not threatening litigation?  Do you remember giving

5    that testimony, sir?

6    A    Yes.

7    Q    That's what you told this jury, right?

8              MR. MASTRO:  Objection, Your Honor.

9    A    No.

10             THE COURT:  Sustained.

11   A    I never --

12   BY MR. MASTRO:

13   Q    Do you see there, sir, the phrase, okay, I just want to

14   go through the language, okay?  Quote, You have left me no

15   other choice but to pursue all means to fulfill the settlement

16   agreement we signed, end quote.

17             Do you see that, sir?

18   A    Yes.

19   Q    All means would include bringing a lawsuit, wouldn't it,

20   sir?

21   A    It could be that, yes.

22   Q    So you were threatening a lawsuit, correct?

23   A    But I don't -- on -- on direct examination you -- this

24   was...

25   Q    This was what, sir?

D. GELLER – CROSS – MASTRO                    3008

1  A    This was -- okay, yes, I was threatening some type of

2  action --

3  Q    Thank you.

4  A    -- here.  I was.

5  Q    You wrote, quote, There are plenty of lawyers who are --

6  A    Right.

7  Q    -- willing take this case on a contingency basis, right?

8  A    Yes.

9  Q    And you also threatened, I will also contact all

10 enforcement agencies and media outlets, correct?

11 A    Yes.

12 Q    Now, you knew at this point in time that Retrophin was a

13 start-up company, correct; a start-up company, right?

14 A    I knew it was a new company that was forming, yes.

15 Q    And you knew how damaging it would be reputationally to a

16 new company and its CEO to have negative press about lawsuits

17 and potential investigation, didn't you, sir --

18 A    Not --

19 Q    -- yes or no?

20 A    Not to a new company, to any company.

21 Q    And, sir, you knew as a sophisticated investor, you knew

22 that particularly for a new company lawsuits and potential

23 investigations could be particularly damaging to finding

24 funding, to getting business partners, to getting a business

25 off the ground; you knew that as a sophisticated officer,

D. GELLER - CROSS - MASTRO                3009

1   didn't you, sir?

2            MR. PITLUCK:  Objection.  Compound.

3            THE COURT:   Break that down.

4            MR. MASTRO:  It's fair cross-examination,

5   Your Honor.

6            THE COURT:  His objection to the form of the

7   question is a compound question.

8            MR. MASTRO:  Okay.

9   Q    I'm going to break it down for you.  I think we all want

10  to know the answer to this question.

11           MR. PITLUCK:  Objection, Your Honor.

12  Q    Sir, am I correct -- am I correct that you knew as a

13  sophisticated investor that for a new company adverse

14  publicity was potentially damaging to obtaining new investors,

15  correct?

16  A    I would say correct, yes.

17  Q    And you knew that to -- as a sophisticated investor, that

18  adverse publicity -- strike that.

19           You knew as a sophisticated investor that potential

20  investigations of a new company would have an adverse effect

21  on obtaining new investors, correct?

22  A    Yes.

23  Q    You knew as a sophisticated investor that the adverse

24  publicity for a new company would potentially hurt their

25  business reputation, correct?

D. GELLER - CROSS - MASTRO                3010

1  A     Yes.

2  Q     And you knew as a sophisticated investor that potential

3  investigations of a new company would have an adverse effect

4  upon the company's business reputation, correct?

5  A     Yes.

6  Q     And you knew as a sophisticated investor that adverse

7  publicity from for a new company could be damaging to its

8  business prospects, correct?

9  A     To the business prospects?  Yes.

10 Q     You knew as a sophisticated investor that had -- that a

11 potential investigation for a new company would have adverse

12 impact on their business relations, right?

13 A     Yes.

14 Q     Now, sir, you then go on to say, You have taken months

15 off my life.  Do you see that?

16 A     Uh-huh.

17 Q     Once again --

18         THE COURT:  Come back to the microphone, please.

19         MR. MASTRO:  Sorry, Your Honor.

20 Q     One again, sir, when you used that phrase, you were

21 speaking figuratively?

22 A     Yes.

23 Q     Thank you.

24         MR. MASTRO:  Let's go on please.  Let's go to GX

25 106-28.

D. GELLER - CROSS - MASTRO                3011

1   BY MR. MASTRO:

2   Q    That's your July 2013 e-mail.

3        Now, this time you make more threatening lawsuits,

4   right?

5   A    I had it -- yeah.  I wrote I was saying, yes.

6   Q    Thank you.

7        And you now say, I've retained counsel to start

8   legal action.  Do you see that, sir?

9   A    Yes.

10  Q    Had you actually retained legal counsel?

11  A    I did not.

12  Q    So you were not telling the truth --

13  A    No.  No --

14  Q    -- on --

15  A    -- it was a bluff.

16  Q    -- threatening counsel to start legal action, correct?

17  A    It was a bluff.

18  Q    Are you in the habit of sending e-mails to lawyer where

19  you don't tell the truth?

20       MR. PITLUCK:  Objection, Your Honor.

21       THE COURT:  Sustained.

22       MR. MASTRO:  All right.  I'll skip that.  I'll skip

23  over that.

24  Q    You said, As I stated before, I will be contacting SEC

25  and certain media outlets.  Do you see that, sir?

D. GELLER - CROSS - MASTRO                3012

1    A    Yes.

2    Q    Okay.  For the same reasons you just testified, you knew

3    that a lawsuit could be potentially damaging to a new company,

4    correct?

5    A    Yes.

6    Q    And you knew that contacting investigators and media

7    outlets could be damaging to a new company, correct?

8    A    Correct.

9    Q    Then you write something curious here.  You write --

10             MR. PITLUCK:  Objection, Your Honor.

11             MR. MASTRO:  Sorry --

12             THE COURT:  Excuse me --

13             MR. MASTRO:  Sorry, sorry.  Your Honor.

14             THE COURT:  Yes, strike that.

15             Lawyers' comments are not evidence.

16             MR. MASTRO:  I'm sorry.

17   Q    You wrote, This has nothing to do with my brother.

18   A    Okay.

19   Q    Why don't you tell the jury what you mean by that.

20   A    My brother, he had -- he was in a -- you know, a big

21   investor, as we discussed before, and I didn't want him to

22   suffer because of what I was thinking or bluffing of doing.

23   Q    Your brother --

24   A    I was separating him from me.

25   Q    Your brother, in fact, didn't suffer, did he, sir?

D. GELLER - CROSS - MASTRO                      3013

1   A    Say it again.

2   Q    Your brother, in fact, didn't suffer in any way, did he?

3   A    He didn't, no.  He only suffered, you know, the stress of

4   getting --

5   Q    Sir --

6   A    -- the recouped investment.

7   Q    Sir, am I correct that your brother -- am I correct that

8   your brother continued to be an investor in Retrophin after

9   this date?

10  A    Yes.

11  Q    Am I correct that your brother continued to be an advisor

12  and consultant to Martin Shkreli and his companies after this

13  date?

14             MR. PITLUCK:  Objection, Your Honor.

15             MR. MASTRO:  Your Honor, I think that's fair given

16  the statement he made which wasn't responsive to my earlier

17  question.

18             THE COURT:  Well, we can resolve it at a sidebar if

19  you have a difference of opinion.

20             MR. MASTRO:  All right.  Your Honor, this is a good

21  moment for a short break.  I'm going to try to wrap up pretty

22  quickly.  I appreciate the jury's patience, and I'm going to

23  wrap up quickly.

24             THE COURT:  All right.  So why don't we take our

25  afternoon break, and we'll come back as quickly as we can.

D. GELLER - CROSS - MASTRO                    3014

1          Please don't speak about the case and keep an open

2    mind.

3          (Jury exits the courtroom.)

4          (The following matters occurred outside the presence

5    of the jury.)

6          THE COURT:  Let's just resolve this issue around the

7    objection.

8          MR. MASTRO:  Yeah, Your Honor, I just -- when he

9    made the comment about he wanted to make sure that his brother

10   wasn't going to be adversely affected and the stress of that,

11   I'm simply reinforcing that there was nothing bad that

12   happened to his brother after that, okay, and he remained an

13   advisor and consultant to the company.  He remained an

14   investor in the company.  I think that's perfectly fair to

15   bring out after he threw that in to his answer about his

16   brother and worried about his brother.

17         THE COURT:  Well, you asked the question.

18         MR. MASTRO:  Well, I did ask him what he meant, you

19   know, and at first he said it had nothing to do with his

20   brother, and then he went on to say he just wanted to make

21   sure it didn't have an adverse consequence on his brother.

22   And I'm just clarifying that it didn't have any adverse

23   consequence on his brothers.

24         MR. PITLUCK:  He testified that there was a lack of

25   foundation to the second question.

D. GELLER - CROSS - MASTRO                    3015

1          Asking a question, getting an answer you don't want

2     doesn't mean you can follow up with an improper question.

3          MR. MASTRO:  It's actually a question, Your Honor,

4     similar to one I asked earlier about his brother being an

5     advisor to Martin Shkreli.  Now I asked he continued to be an

6     advisor and consultant to Shkreli after this moment.  So he

7     didn't suffer an adverse consequence.  I think that is

8     perfectly fair.

9          Thank you, Your Honor.

10         THE COURT:  So I am not sure whether what

11    particularly the Government thought was inappropriate about

12    the witness's response that drew an inappropriate follow-up

13    question?

14         MR. PITLUCK:  I just didn't think there was a

15    foundation for follow-up.

16         THE COURT:  That his brother continued to do well or

17    something to that effect?

18         MR. PITLUCK:  Yes.

19         MR. MASTRO:  Your Honor, he already testified his

20    brother was an advisor and consultant, and I wanted to make

21    sure that people knew that at that moment in time that he

22    continued to be an advisor and consultant and had not suffered

23    any adverse consequences.  So there's plenty of foundation.

24         THE COURT:  All right, that's fine.  I will overrule

25    that objection.

D. GELLER - CROSS - MASTRO                    3016

1          MR. MASTRO:  Thank you.

2          THE COURT:  Didn't he answer that question?

3          MR. MASTRO:  He only answered it generally that he

4     was an advisor and consultant.

5          THE COURT:  Generally.

6          MR. MASTRO:  I wanted to make sure that after he was

7     concerned his brother would have an adverse consequence to

8     what he was doing, that he didn't; that he remained an advisor

9     and a consultant.

10         THE COURT:  Once we get the realtime back up, we

11    will see where you left off.  It may be enough to just move

12    forward.

13         MR. MASTRO:  Great.  Thank you, Your Honor.

14         MR. PITLUCK:  Judge, I will just request, there's

15    been a lot of testifying both to the jury and commenting on

16    the veracity --

17         THE COURT:  Yes --

18         MR. MASTRO:  Your Honor --

19         THE COURT:  -- that's highly inappropriate.

20         MR. MASTRO:  -- I know.

21         THE COURT:  That is highly inappropriate.  You know

22    it, so don't do it.

23         MR. PITLUCK:  If I ever said --

24         MR. MASTRO:  Thank you.

25         MR. PITLUCK:  If I ever said "thank you" to a

D. GELLER - CROSS - MASTRO                    3017

1   witness's answer, I would rightly be chastised by the Court as

2   affirming the veracity of the witness's --

3              THE COURT:  You are making little editorial

4   comments.  You are bleeding into attorney testimony or

5   commentary.  The jury will be admonish over and over that

6   lawyers' statements are not evidence, they may not consider

7   it.  But you are making gratuitous comments --

8              MR. MASTRO:  I understand, Your Honor.

9              THE COURT:  -- so just stop.

10             MR. MASTRO:   And you did tell the jury that at one

11  point.

12             THE COURT:  Right.

13             MR. MASTRO:  So I will be very careful.

14             THE COURT:  All right.  Thank you.

15             (Recess taken.)

16             (Jury enters the courtroom.)

17             (Jury present.)

18             THE COURT:  All the jurors are present.  Please have

19  a seat.

20             Mr. Mastro, you may continue.

21             I am going to suggest the following:  There was a

22  question that was propounding before the break.  We will have

23  it read back.  If you want to rephrase it or clarify it, you

24  may; otherwise, we will direct the witness to answer it.

25             MR. MASTRO:  Thank you, Your Honor.

D. GELLER – CROSS – MASTRO                    3018

```
 1              (Requested portion read back.)

 2              THE COURT:  Would you like the witness to answer

 3   that question?

 4              MR. MASTRO:  Yes, Your Honor.

 5              THE COURT:  If you could answer it, please do.

 6              THE WITNESS:  As of this date?  I'm not sure.

 7              THE COURT:  He said "after" this date.

 8              THE WITNESS:   "After"?

 9              THE COURT:  "After" this date.

10              THE WITNESS:  Oh, as far as I know, no.

11   BY MR. MASTRO:

12   Q    Okay.  Sir, let me just can clarify:  The day you were

13   talking about is July 11, 2013, and you wrote in GX 107 --

14   A    Oh, after that.  Right.

15   Q    You wrote, This has nothing to do with my brother --

16   A    Right.

17   Q    -- right?

18              And am I correct that your brother continued to be

19   an advisor and consultant to Martin Shkreli and the companies

20   after July 11, 2013?

21              MR. PITLUCK:  Objection, Your Honor.  Asked and

22   answered.

23              THE COURT:  Well, we're trying to clarify.

24   Overruled.

25              Can you answer that question?
```

D. GELLER - CROSS - MASTRO                    3019

1   A    I don't know if he's like you said, a personal advisor or

2   consultant.  I know they -- they had a relationship.  As to

3   what capacity?  I'm not 100 percent sure.

4   Q    And they continued to have that relationship after

5   July 11, 2013, correct?

6   A    Yes.

7   Q    Thank you.  I have only got five more minutes.

8           MR. MASTRO:  So, Mr. Carter, can you please put back

9   up on the screen GX 106-27, please?

10          THE COURT:  Okay.

11  Q    This is the e-mail exchange between you, Mr. Geller, and

12  Mr. Shkreli.  I'm referring specifically to the exchange you

13  had just with Mr. Shkreli on the 12th where you wrote, There

14  are plenty of lawyers who will take this case on a contingency

15  basis.

16          Do you see that, sir?

17  A    Yes.

18  Q    And Mr. Shkreli responded to you, copying Evan Greebel, I

19  will make sure you have my counsel's information.

20          Do you see that, sir?

21  A    Yes.

22  Q    Okay.

23          MR. MASTRO:  Can we please go to GX 106-23?

24  Q    Just one other question in that regard.  Isn't that what

25  Mr. Shkreli also did on April 26th, 2013 after you wrote to

D. GELLER – CROSS – MASTRO                    3020

1   him, quote, Please don't force me to go to the next level, end

2   quote, he referred you to Evan Greebel, didn't he; yes or no,

3   sir?

4   A     Could I see it, please?

5   Q     Sure.

6   A     I'm sorry.  I just --

7   Q     That's all right.

8               MR. MASTRO:  106-20, please, Mr. Carter.

9   Q     Do you see the bottom e-mail, just you and Mr. Shkreli?

10  Please don't force me to go to the next level, do you see

11  that, sir?

12  A     Yes.

13  Q     April 25, 2013, correct?

14  A     Uh-huh.

15  Q     And now --

16  A     Okay.  I see it now.  Yes, you're -- that's the first

17  time.

18  Q     Okay.  Yes, referring to Mr. Greebel, correct?

19  A     Yes.

20  Q     Thank you.

21              And the last questions I have, sir, are on

22  GX 106-23.

23              MR. MASTRO:  Let's go to the start of the chain on

24  the second page.

25  Q     Sir, this is where you are communicating with Mr. Shkreli

D. GELLER – CROSS – MASTRO                    3021

1    on May 13, 2013 about the terms of your settlement agreement,

2    correct?

3    A    Uh-huh.

4              THE COURT:  Sir, try to say "yes" or "no."

5    A    Yes.

6    Q    In this e-mail trail you and Mr. Shkreli eventually agree

7    that it will be $300,000, and you will keep the 30,514

8    Retrophin shares, correct?

9    A    Yes.

10   Q    And you tell Mr. Shkreli, quote, I feel this is really

11   right and it would make us whole.

12             Do you see that, sir?

13   A    Yes.

14   Q    And as you sit here today, you believe that the

15   settlement agreement you reached, quote, made us whole,

16   correct?

17   A    Yes.

18   Q    You believe it was fair, correct?

19   A    Yes.

20   Q    You believe it was the right thing for all parties to do,

21   correct?

22   A    Yes.

23             MR. MASTRO:  No further questions, Your Honor.

24             THE COURT:  All right.  Redirect?

25             THE WITNESS:  Okay?  I'm good?

D. GELLER - REDIRECT - PITLUCK                    3022

1           MR. PITLUCK:  Judge --

2           THE COURT:  No, no, no.

3           MR. PITLUCK:  Sorry.

4           THE COURT:  Redirect.

5           MR. PITLUCK:  Briefly, Your Honor.

6    REDIRECT EXAMINATION

7    BY MR. PITLUCK:

8    Q    Mr. Geller, you testified on cross-examination about the

9    relationship with your brother; is that right?

10   A    Yes.

11   Q    And is your brother Alan Geller older than you or younger

12   than you?

13   A    He's younger than me by three years.

14   Q    And what does your brother Alan do for a living?

15   A    He's -- has a couple of thrift shops in Florida.

16   Q    Does he also trade stocks like you do?

17   A    Yes.  But he's not doing it right now.

18   Q    As far as you know is your brother a professional life

19   coach?

20   A    No.

21   Q    Does he like to provide people with advice?

22   A    Yeah, he's been known to do that.

23   Q    And you testified on, I think both direct and

24   cross-examination, that your brother referred you to Martin

25   Shkreli, correct?

D. GELLER - REDIRECT - PITLUCK                    3023

1   A    Correct.

2   Q    Do you know if prior to your investment at

3   MSMB Healthcare whether Mr. Shkreli and your brother, Alan,

4   had a relationship, a social relationship?

5   A    They didn't have a social relationship at that time.

6   Q    Did they ever go to dinner together?

7   A    I don't believe so.

8   Q    Now, you testified also on cross-examination that your

9   brother was invested in entities associated with Martin

10  Shkreli, correct?

11  A    Yes.

12  Q    And did you learn that he had disputes with Mr. Shkreli

13  over the valuation of his investment?

14  A    No.

15  Q    You didn't know that he had any disputes over the

16  valuation of his investments with Mr. Shkreli?

17  A    No.

18  Q    And you testified a little bit about your brother as a

19  consultant, correct?

20  A    Yes.

21  Q    Do you know why your brother was signed up as a

22  consultant for Retrophin?

23  A    To my --

24            MR. MASTRO:  Objection, Your Honor.

25            MR. PITLUCK:  Judge --

SIDEBAR CONFERENCE                          3024

1              THE COURT:  Overruled.

2              You may go ahead.

3    A    Okay.  So to the best of my knowledge he --

4              MR. MASTRO:  Your Honor, may I please be heard very

5    briefly?

6              THE COURT:  Do you want to get a sidebar?

7              MR. MASTRO:  Well, I just -- Your Honor, it's

8    hearsay.

9              THE COURT:  Well, no speaking objections.

10             No, the question was, Do you know why.

11             MR. MASTRO:  The basis --

12             THE COURT:  It's not --

13             MR. PITLUCK:  Judge, may we have two seconds?

14             MR. MASTRO:  Sorry.

15             (Continued on the next page.)

16             (Sidebar conference.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                     3025

1            (The following occurred at sidebar.)

2            MR. MASTRO:  I mean, Your Honor, it's basically

3    hearsay and foundation.  The only way he knows that is hearsay

4    from his brother, who is not accused of being a

5    co-conspirator.  It's hearsay with his brother.  All right.

6    So that's totally inappropriate to say, Do you know whether --

7    there's no foundation.  And when he asked a foundation

8    question, I'm happy to do it, okay, it's only from my brother

9    telling me --

10           THE COURT:  What is lacking is foundation because

11   you established, or at least he's testified, his brother was

12   signed up as a consultant, a life coach for Mr. Shkreli, and

13   he gave Mr. Shkreli life-coach advice and investment advice.

14   That's what the testimony has been so far --

15           MR. MASTRO:  But, Your Honor --

16           THE COURT:  -- so --

17           MR. PITLUCK:  This hearsay door has been blown wide

18   open on cross-examination.  I'm allowed to ask a question --

19           MR. MASTRO:  If -- if me asks how he knows that,

20   he's going to say because my brother told me, and that is

21   hearsay.

22           MR. PITLUCK:  Then, Your Honor, we ask that

23   everything he answered about his conversation related to his

24   brother be stricken from the record as hearsay.

25           MR. MASTRO:  First, they didn't object, number one.

SIDEBAR CONFERENCE                                3026

1   And number two, it goes to intent and motive, his state of

2   mind in making investments.  That's why I asked him those

3   questions, because he made the impression with his brother who

4   recommended because Shkreli was a genius.  That all comes in

5   nonhearsay, hearsay exception.

6           This is classic hearsay that he's trying to put in

7   through the back door.  They're going to call Al Geller, and

8   ask Al Geller this question.  They can't match through this

9   witness, hearsay on Al Geller.  Al Geller's not alleged to be

10  a conspirator.

11          THE COURT:  Okay.  I don't know whether his

12  knowledge about Mr. Geller's agreement was derived from

13  conversations with Mr. Shkreli, Mr. Geller, Al, or

14  Mr. Greebel.  I just don't know the answer to that.

15          MR. PITLUCK:  Judge, these are all of them.

16  Mr. Geller, he testified -- he was asked, You had

17  conversations with your brother, that was the basis for the

18  cross.

19          MR. MASTRO:  All of it goes as to his state of mind

20  about the investing, which is perfectly appropriate to do,

21  Your Honor.

22          THE COURT:  But you did ask him a lot about the

23  nature of his brother's agreement with his settlement

24  agreement.

25          MR. MASTRO:  I actually didn't ask about an

SIDEBAR CONFERENCE                           3027

1   agreement.  I asked him whether his brother --

2              THE COURT:  Was an advisor?

3              MR. MASTRO:  -- was a consultant, was a part of the

4   reason why he stayed in the investment, state of mind.  It's

5   not hearsay.  Every question I asked was perfectly

6   appropriate, not hearsay.

7              This is classic hearsay.

8              MR. PITLUCK:  So, Judge, then the answers that he

9   gave related to his brother's relationship as a consultant are

10  not offered for the truth and cannot be used for the truth,

11  and I'll move on.  Because what I just heard, these questions

12  were not elicited for the truth, they were elicited for the

13  nonhearsay purpose of state of mind, and we're going to place

14  this very carefully throughout.  He cannot refer to

15  Mr. Geller's testimony that his brother was a consultant.

16             MR. MASTRO:  Fascinating.  Fascinating.  And I will

17  sit down in two more questions if that's -- Your Honor, they

18  didn't object to any of the questions, so there's no need for,

19  you know, an instruction.  But the fact of the matter is, I've

20  explained to you the nonhearsay and hearsay exception basis

21  that clearly responds to every question I asked, but it

22  doesn't require an instruction.  This is improper.

23             THE COURT:  I believe the question was, What was the

24  nature of your brother's agreement?

25             MR. BRODSKY:  But, Your Honor, the basis for his

SIDEBAR CONFERENCE                                    3028

1   knowledge, as the Government has acknowledged a few minutes

2   ago for the nature of his brother's agreement, comes from his

3   conversations with Al Geller.  He does not know other than the

4   conversations with Al Geller.

5           THE COURT:  Well, that's not what I heard.  I think

6   they said --

7           MR. PITLUCK:  Your Honor, based on my knowledge,

8   his conversation -- we'll lay clear standing he has of his

9   brother's consulting relationship with Martin Shkreli is

10  through his brother, therefore.  And I did object during the

11  consultancy questions.  All of that has been elicited -- it's

12  overruled.  All of that has been elicited for the nonhearsay

13  purposes of his state of mind while making an investment, and

14  I want it to be offered for the truth.  We have litigated

15  this, and virtually every witness at trial, if that's the

16  Court's ruling, if you're going to give an instruction to the

17  jury that he consulted or not, give an instruction.  But just

18  policing the argument as to what Mr. Geller -- the basis of

19  Mr. Geller's consulting agreement was, or whether it was

20  legitimate or not is not based on what he said here, because

21  that was either an admission elicited for the state of mind of

22  Mr. Geller's state of mind.  And finally, I will ask two more

23  questions and sit down, Your Honor.

24          MR. BRODSKY:  If the Government --

25          MR. PITLUCK:  And all -- I'm sorry.

SIDEBAR CONFERENCE                          3029

1              MR. BRODSKY:  If the Government is asking Your Honor

2       how do we intend to use the information relating to the

3       consulting agreement that came out during David Geller's

4       testimony, it's for the purpose of arguing that David Geller

5       was comforted by to invest and to stay with Retrophin because

6       his brother was a consultant.  It was part of the reason, his

7       motive that --

8              THE COURT:  At what point --

9              MR. MASTRO:  He was an advisor and entered into a

10      formal consulting agreement.  Your Honor, that -- that

11      continued before and after.  I think that's the testimony the

12      Government will ultimately elicit, that he was advising Martin

13      Shkreli even before he entered into a consulting agreement.

14             MR. PITLUCK:  That testimony is very disputed.  The

15      Court is aware of the basis of Mr. Geller's consulting

16      agreement at issue in this trial.  And I'm entitled to

17      question as to the basis of why he believes that his brother

18      has this consulting relationship with Martin Shkreli.

19             MS. SMITH:  The other thing, Mr. Mastro was saying

20      the relationship about, you know, Your brother was giving

21      Martin Shkreli advice, and I believe he said Martin Shkreli

22      and his companies.  So it was focused on Martin Shkreli to

23      keep him in the investment.  That would only go up until the

24      point at which he actually was comforted by being in the

25      investment.  At some point in March of 2013, he tried to get

SIDEBAR CONFERENCE                                    3030

1   his money back.  So at that point, he's no longer looking to

2   be comforted that he's in the investment.  So it's also

3   sounding like it's caverned to the beginning of the point at

4   which Mr. Geller is virtually putting his money in and

5   exceeding his initial statements and not at the point which

6   he's at now.

7               MR. MASTRO:  Your Honor, that's actually extremely

8   misleading, because he doesn't go into it until after.  So the

9   fact that he stayed in, you know, into October instead of

10  suing, it matters that he thought his brother was an advisor

11  and a consultant throughout that period.  It goes to his state

12  of mind.

13              And Your Honor will remember --

14              THE COURT:  I think it's unfair to state that he

15  stayed in the investment until October because he wanted to

16  get out at least as of March.

17              MR. MASTRO:  Which he stayed in the deal and didn't

18  sue, Your Honor, and I -- I made it very clear in the

19  questions when I asked him if that was a comfort to him, that

20  his brother was an advisor and consultant.  So I didn't say

21  agreement.  I didn't ask him about agreement, and this is

22  classic hearsay.  We're not offering it for the truth of the

23  matter asserted.  So if that's what Your Honor wants to

24  instruct the jury, that's fine, but it's totally improper for

25  them to give an instruction.  I don't think an instruction is

SIDEBAR CONFERENCE                                3031

1   warranted because they didn't even object.

2           MR. KESSLER:  We did object.  Just to be clear, it

3   sounds like what Mr. Mastro is saying is that at no point

4   anyone on the defense will argue that Mr. Geller was a

5   consultant based on that -- that Alan Geller was a consultant

6   based on David Geller's testimony, and if that's the record,

7   that's fine.  That would be not offering it for the truth,

8   which is what Mr. Mastro just said, then that's fine.

9           THE COURT:  But are you going to argue that Mr. Alan

10  Geller was a consultant --

11          MR. MASTRO:  Of course.

12          THE COURT:  -- and point to the -- point to the

13  evidence that came in through Mr. David Geller's testimony?

14          MR. BRODSKY:  Your Honor, all our understanding is

15  the Government's going to be calling Al Geller.  If they don't

16  call Al Geller, then just as in the Martin Shkreli trial,

17  we'll move to preclude the Government from admitting evidence

18  and trying to argue from paper alone that Al Geller was not a

19  consultant.  So we fully expect Al Geller to take the stand.

20  If he takes the stand, then we will be able to do -- that he

21  did provided advice and we will be doing that through

22  cross-examination.

23          MR. KESSLER:  But the point is, we need a yes or no.

24  They can argue that Al Geller was a consultant based on Al

25  Geller, but it sounds to me Mr. Brodsky and Mr. Mastro are

SIDEBAR CONFERENCE                                    3032

1   saying that they will not argue that Al Geller was a

2   consultant based on anything David Geller said.  And if that

3   is what they are saying, then we can move on.  If that's not

4   what they're saying, then we're entitled to get into it.

5            MR. BRODSKY:  Correct.  We're going to be arguing

6   that David Geller believed in certain things that affected his

7   state of mind and his --

8            MR. PITLUCK:  And that's not relevant to the

9   question of whether --

10            MR. BRODSKY:  Well, the other --

11            THE COURT:  Look, you are all talking at the same

12   time.  We need a better record.

13            MR. BRODSKY:  We elicited -- there's some facts in

14   dispute relating to David Geller.  One of the facts is that

15   whether or not David Geller was serious about threatening a

16   lawsuit or not and when he threatened, you saw the e-mails,

17   some of them were not that clear of a threat.  We believe that

18   they were an implied threat or a direct threat.  The

19   Government says it wasn't a real threat, and then eventually

20   it morphs into a direct threat.

21            One of the reasons we're going to argue is that it

22   wasn't a direct, clear threat is because David Geller knew his

23   brother was an advisor and his brother was an investor and he

24   didn't want to hurt his brother.  And so we have to be able to

25   argue both of those things, that this goes to David Geller and

SIDEBAR CONFERENCE                           3033

1    David Geller's motives.  We're not going to argue that, you

2    know, Al Geller -- we're not going to argue that the jury

3    knows Al Geller was a real consultant because of David

4    Geller's testimony.

5                 (Pause in proceedings.)

6                 MR. KESSLER:  So, Your Honor, if that's the

7    argument, we should be able to explore whether David Geller

8    actually was comforted in some way based on some purported

9    consulting relationship with his brother.  He wasn't --

10                MS. SMITH:  And our objection was overruled.  And so

11   this -- that hearsay was allowed and so we should be allowed

12   to explore on redirect what that hearsay that was elicited

13   over our objection actually meant.  Otherwise, they're going

14   to be making correction and he's one person to corroborate the

15   other without the proper basis, and we have the right on

16   redirect to explore that.

17                MR. BRODSKY:  Your Honor, it's impermissible hearsay

18   for them to elicit the view.  We elicited his understanding

19   that he was an advisor and a consultant, or whatever you

20   thought he was, based on his state of mind.  That's an

21   exception.  They cannot --

22                THE COURT:  It wasn't based on his state of mind.

23   It was based on what he learned from either Al Geller or

24   Martin Shkreli.  I don't know what -- you know, he had

25   conversations with Martin Shkreli.

SIDEBAR CONFERENCE                          3034

1      MR. BRODSKY:  And when they were negotiating

2  settlements, I don't -- and that goes, Your Honor, to David

3  Geller's state of mind.  But they cannot elicit -- the

4  Government cannot elicit hearsay testimony from this witness

5  about what he learned from Alan Geller regarding the

6  consulting agreement.  That's pure hearsay.  There's no

7  exception.

8      The reason is, Your Honor, is they didn't want to

9  call Al Geller.  They put Al Geller on the list during the

10 Shkreli trial and then they didn't call him.  And they should

11 not be able to argue that Al Geller's consulting agreement

12 isn't real from David Geller's testimony.  They should be

13 required to call Al Geller to the witness stand so we have the

14 opportunity to cross-examine him.  They have the burden of

15 proof, Your Honor, to pierce out the elements --

16     MR. PITLUCK:  Judge, I'm sorry to interpret, but

17 what I just heard, they're not allowed to argue based on

18 hearsay.  As to David Geller, I will go right now and say, Mr.

19 Geller, how did you learn of any consulting relationship that

20 your brother may have had with Martin Shkreli, and he's going

21 to say, From my brother.  That means it's all hearsay.  That

22 means they elicited hearsay, which we objected to which is now

23 being offered for the truth.

24     MR. MASTRO:  Your Honor, it's irrelevant whether or

25 not we're going to call Al Geller.  We can't argue things

SIDEBAR CONFERENCE                                    3035

1    based on what David Geller said.  They can't argue what --

2              THE COURT:  I think their argument is, though, it

3    wasn't hearsay because it was being elicited to demonstrate

4    David Geller's state of mind and what he was thinking when he

5    made the investment into --

6              MR. MASTRO:  Correct, Your Honor.

7              MR. PITLUCK:  He made it in 2011 or 2012, so if

8    again, the testimony is limited to when he made the

9    investment, that's fine.

10             MR. MASTRO:  Your Honor -- Your Honor --

11             MR. PITLUCK:  Right?  I mean, so let's be clear

12   about that.

13             MR. MASTRO:  I am trying to cut through it, okay,

14   because it's also his state of mind in 2013 when he decided

15   not to sue.

16             But, Your Honor, we're not offering the testimony

17   of David -- about his brother being an advisor and a

18   consultant.  I brought out it was a comfort to you --

19             THE COURT:  Excuse me.  You know what?  You need to

20   listen to what he's saying --

21             MR. PITLUCK:  I apologize, Judge.

22             THE COURT:  -- because I want you to address it,

23   really, because otherwise, we're just going to be here all

24   afternoon.

25             MR. MASTRO:  I have no problem -- we have no with

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

1  Your Honor giving an instruction to the jury that his

2  testimony about his brother being a consultant, you know, was

3  not offered for the truth, okay?  And, you know, they can't

4  elicit hearsay from this witness about, you know, that issue

5  because we're only offering it for state of mind, okay?

6  That's all relevant --

7            MR. PITLUCK:  Judge, the issue of -- I'm sorry if

8  you weren't done.  I didn't mean to cut you off.

9            MR. MASTRO:  Yes.

10            MR. PITLUCK:  If you are willing to issue an

11  instruction that says any testimony that David Geller gave

12  about the consultancy arrangement that his brother may have

13  had with Martin Shkreli is not being offered for the truth, I

14  will move on and ask two more questions and we're done.

15            THE COURT:  All right.  Are we good?

16            MR. BRODSKY:  Your Honor, would you mind adding,

17  it's being offered for the purpose of the state of mind of

18  David Geller?

19            MR. PITLUCK:  We haven't offered -- we've offered

20  the basis -- not for the purpose of being offered, I think we

21  asked for that instruction once and the Court declined to give

22  it.

23            MR. MASTRO:  And it's offered for his state of mind.

24            THE COURT:  All right.  So I will instruct the

25  jury --

SIDEBAR CONFERENCE                              3037

1            MR. PITLUCK:  Huh?

2            THE COURT:  I will instruct the jury that the

3     testimony that Mr. David Geller gave --

4            MR. PITLUCK:  He believed about his brother's

5     consultant --

6            THE COURT:  He believed about his brother's

7     consulting agreement was not being offered for the truth.

8            MR. PITLUCK:  I would say, as a result of the

9     relationship between --

10           THE COURT:  As a result of the relationship.

11           MR. PITLUCK:  Based on the knowledge it was an

12    agreement.

13           MR. BRODSKY:  And, Your Honor, if you use consulting

14    relationship, that's fine.  We would just ask you not to add

15    who the relationship was with or, you know, physically with.

16           MR. MASTRO:  Thank you, Your Honor.

17           MR. BRODSKY:  Thank you, Your Honor.

18

19           (In open court, sidebar ends.)

20

21

22

23

24

25

```
 1              (In open court.)

 2              THE COURT:  Members of the jury, you are instructed

 3   that Mr. David Geller's testimony about his understanding

 4   regarding his brother Al Geller's consulting agreement or

 5   consulting relationship is not being offered for the truth.

 6              MR. PITLUCK:  Thank you, Judge.  I'll move on.

 7   BY MR. PITLUCK:

 8   Q    Can we have Government's Exhibit 1068, please?

 9              You were asked some questions about a text message

10   exchange you had with Kevin Mulleady in February of 2012, do

11   you recall that?

12   A    Yes.

13   Q    I'd like to direct your attention to this exchange

14   2:05 p.m. with Kevin Mulleady.  Can you review that?  Can you

15   read that for me?

16              THE COURT:  Can you give us a date?

17              MR. PITLUCK:  Yes, appears to be February 16, 2012.

18              THE COURT:  Thank you.

19   A    So, okay.

20   Q    You see where Kevin Mulleady writes?

21   A    Yes, "No problem.  It was a good evening.  Are you

22   rescinding your redemption?"

23   Q    What was your response at 2:08?

24   A    Laugh out loud, "Very direct question, I like that.  Let

25   me think about for couple more days.  I'm going through a
```

SIDEBAR CONFERENCE                                    3039

1    psychological battle with myself.  I have until the end of

2    February, right."

3    Q    What did Mr. Mulleady respond?

4    A    "Yeah, but Martin would like to know what you are doing

5    for accounting purposes.  We would rather not leave it to the

6    end of the month."

7    Q    Did that happen as you rescinded your redemption?

8    A    Yes.

9    Q    You testified on direct examination -- did you rescind

10   your redemption after conversations as well with Kevin

11   Mulleady and Martin Shkreli?

12   A    Yes.

13   Q    During those conversations did they tell you about the

14   role of illiquid investments in the MSMB portfolio?

15   A    Yes.

16   Q    What did they tell you about that?

17   A    Very, very small portion.

18   Q    Was that the basis for your rescinding your redemption?

19   A    Yes.

20   Q    You were asked questions about the negotiations you had

21   with Mr. Shkreli leading up to the signing of your settlement

22   agreement, do you recall that?

23   A    Yes.

24   Q    That Mr. Shkreli proposed the terms of that settlement

25   agreement, do you recall that testimony?

DAVID GELLER - RECROSS - MR. MASTRO                 3040

1   A    Yes.

2   Q    Did you advise Mr. Greebel of the terms of the settlement

3   agreement that Mr. Shkreli had raised?

4   A    Yes.

5   Q    Did you tell him why you needed a settlement agreement?

6   A    I needed a contract to get paid.

7   Q    Did you tell him why you needed to get paid?  Why Martin

8   Shkreli needed to pay you?

9   A    Yes.

10  Q    Finally, can I have Government's Exhibit 106-26 and

11  106-27?  I can do without the documents.

12          Do you recall the June and July e-mails in which you

13  threatened to engage a lawyer?

14  A    Yes.

15  Q    At that point in time, Mr. Geller, did you have a signed

16  settlement agreement with Martin Shkreli in June and July of

17  2011?

18  A    Yes.

19          MR. PITLUCK:  Nothing else, Judge.  Thank you.

20          MR. MASTRO:  Judge, one question.

21          THE COURT:  Okay.

22          MR. MASTRO:  Thank you.  It may be two.

23  RECROSS-EXAMINATION

24  BY MR. MASTRO: *

25  Q    Mr. Geller in terms of the settlement you eventually

1  entered into, am I correct that really you just wanted your

2  money back and you thought the 300,000 was fair, correct?

3  A     Correct.

4              MR. PITLUCK:  Objection, your Honor.  Beyond the

5  scope.

6              MR. MASTRO:  He asked about the settlement.  And one

7  last question.

8  Q    Am I correct, in your assessment of the settlement at the

9  time, that you considered the Retrophin shares to be worthless

10 at that point in time?

11 A     Yes.

12             MR. MASTRO:  Thank you.  No further questions, your

13 Honor.

14             MR. PITLUCK:  Nothing further.

15             THE COURT:  All right.  You are excused, Mr. Geller.

16 Have a nice evening.

17             THE WITNESS:  Thank you.

18             (Whereupon, the witness was excused.)

19             THE COURT:  Is the Government prepared to call its

20 next witness?

21             MR. KESSLER:  Yes, your Honor.  The Government calls

22 Schuyler Marshall.

23             (Witness takes the witness stand.)

24 SCHUYLER MARSHALL, called as a witness, having been first duly

25 sworn/affirmed, was examined and testified as follows:

S. MARSHALL - DIRECT - MR. KESSLER                3042

1          THE WITNESS:  I do.

2          COURTROOM DEPUTY:  State and spell your whole name.

3          THE WITNESS:  Schuyler Marshall, S-C-H-U-Y-L-E-R,

4    M-A-R-S-H-A-L-L.

5          THE COURT:  Thank you.  Please proceed.

6    DIRECT EXAMINATION

7    BY MR. KESSLER: *

8    Q    Good afternoon, Mr. Marshall.

9    A    Good afternoon.

10   Q    Did you invest in a hedge fund MSMB Capital Management

11   LP?

12   A    Yes, I did.

13   Q    Did you ultimately reach a settlement related to your

14   investment?

15   A    Yes, I did.

16   Q    How old are you?

17   A    Seventy-two.

18   Q    Are you married?

19   A    Yes.

20   Q    Do you have any children?

21   A    Three children.

22   Q    Where do you live?

23   A    Dallas, Texas.

24   Q    How long have you lived there?

25   A    Since 1970.

S. MARSHALL - DIRECT - MR. KESSLER                    3043

1    Q    Can you describe your educational background for the

2    jury?

3    A    I went to the University of Texas undergraduate and law

4    school.  And graduated from law school in '70 and moved to

5    Dallas at that point.

6    Q    Can you describe your employment background after you

7    graduated from law school?

8    A    I was employed at a law firm Thompson & Knight for

9    25-and-a-half years.  Then left the law practice to go to work

10   for a company called the Rosewood Corporation, where initially

11   I was Senior VP and general counsel, and after three years

12   became CEO.

13   Q    What is the Rosewood Corporation?

14   A    A privately held corporation that is involved in various

15   investments, principal ones being oil and gas drilling in the

16   U.S. and abroad, ranching, property development, and private

17   equity investments.

18   Q    Do you still work at the Rosewood Corporation?

19   A    Yes, I do.

20   Q    In late 2011 and early 2012 did you invest in a hedge

21   fund called MSMB Capital Management LP?

22   A    I did, except I believe I invested in January of 2011.

23   Q    All right.  So when you invested in -- strike that.

24        When did you first hear about MSMB Capital

25   Management LP?

1   A     I would say it was early fall of 2010, perhaps September

2   of that time frame.

3   Q     How did you come to hear of that hedge fund?

4   A     We had built an office building and one of our principal

5   tenants was an investor, knew the principal of MSMB, and

6   highly recommended that we consider investing in this hedge

7   fund that was involved in both long and short positions in

8   small pharmaceutical stocks.  We agreed to take a meeting, in

9   fact had a meeting, and the end result of the meeting is we

10  felt it was too new for the Rosewood Corporation to invest but

11  I decided to follow it because I was sort of impressed with

12  the principal of MSMB.

13          I did follow it for a matter of months and was

14  impressed with his, that his opinions on stocks turned out to

15  be right throughout that whole period.  Ultimately, I decided

16  to invest some of my own funds.

17  Q     You said you were impressed with "his" opinions, who is

18  he?

19  A     Martin Shkreli.

20  Q     You mentioned an initial meeting with the principal of

21  MSMB Capital Management LP, who was at that meeting?

22  A     Martin Shkreli and two other Rosewood employees.

23  Q     Who was the investor who brought the MSMB Capital

24  Management LP fund to your attention?

25  A     Darren Blanton.

S. MARSHALL - DIRECT - MR. KESSLER                    3045

1   Q    After you met with Martin Shkreli you learned of the

2   hedge fund and then subsequently you decided to invest?

3   A    Yes, that's right.

4   Q    What were the reasons you decided to invest in the MSMB

5   Capital Management LP hedge fund?

6   A    Well, there were two reasons.  One, I thought it was a

7   reasonable investment because I was impressed that he seemed

8   to know so much about these small stocks.  And also, he

9   indicated he was making more money betting against the stocks;

10  in other words, shorting, than he was on the long side, but it

11  was approximately 50/50, maybe slightly more on the short

12  side.  I thought that would limit risks somewhat.

13        The other reason was that I thought it would be good

14  to get to know and follow the fund, and if it was successful

15  and had more of a track record, then maybe Rosewood would

16  decide to invest substantially more money in it than I could.

17  Q    Again, who is the "he"?  Who's opinions were you

18  impressed with?

19  A    Martin Shkreli.

20  Q    Did you have an understanding about the liquidity of the

21  fund?

22  A    Yes.  That was a good selling point, that if you wanted

23  out of the fund, he would provide monthly liquidity.

24  Q    Before you invested did you receive a private placement

25  memorandum?

S. MARSHALL - DIRECT - MR. KESSLER                3046

1    A    I did.

2    Q    Can we show the witness Government's Exhibit six, we'll

3    use the Elmo.

4              Mr. Marshall, I'm showing you what is marked for

5    identification as Government's Exhibit 6.

6    A    I have it.

7    Q    There is also a small binder in front of you, so behind

8    tab one of your binder.  Is Government's Exhibit 6 the private

9    placement memorandum you received before you invested in MSMB

10   Capital Management LP?

11   A    Yes, it is.

12   Q    If you look at the first page, the very first page, does

13   the PPM or the private placement memorandum identify the name

14   of the fund on it?

15   A    Yes, MSMB Capital Management LP.

16             MR. KESSLER:  I offer Government's Exhibit 6.

17             MR. CHAN:  No objection.

18             THE COURT:  We will receive Government's Exhibit

19   six.

20             (Government Exhibit 6, was received in evidence.)

21   BY MR. KESSLER:

22   Q    Mr. Marshall, I'm just pointing here on the first page

23   there is the name of fund MSMB Capital Management LP?

24   A    Yes.

25   Q    Then the general partner is MSMB Investors LLC?

S. MARSHALL - DIRECT - MR. KESSLER                    3047

1    A    Yes.

2    Q    And what is a general partner of a hedge fund?

3    A    It was my understanding the general partner would manage

4    the hedge fund.

5    Q    Turning to page bearing Bates stamp SM137?

6    A    Yes.

7    Q    You see this page, there is a bold set of words, capital

8    withdrawals, on the left side in the center of the page?

9    A    Yes.

10   Q    Can you just read the first sentence in that paragraph?

11   A    "Limited partners may withdraw any or all of their

12   capital accounts subject to certain terms established by the

13   general partner to cover continue contingent liabilities of

14   the partnership monthly at the last calendar day of each

15   month, commencing one full month after the date of their

16   initial investment in the partnership.  Upon not less than 30

17   days prior written notice to general partner."

18   Q    Did that mean could you withdraw your money with 30 days'

19   notice?

20   A    That was my understanding, yes.

21   Q    Had you reviewed this provision before you invested in

22   MSMB Capital Management LP?

23   A    Yes.

24   Q    In connection with your investment in that hedge fund,

25   did you also sign a subscription agreement?

S. MARSHALL – DIRECT – MR. KESSLER          3048

1    A    I did.

2    Q    Mr. Marshall showing you Government's Exhibit 25, tab two

3    in your binder?

4    A    I have it.

5    Q    Is this a purchaser questionnaire that you filled out in

6    connection with your investment and is that a signature page

7    related to your subscription agreement then an additional

8    document related to your investment?

9    A    Yes.

10              MR. KESSLER:  I offer Government's Exhibit 25.

11              MR. CHAN:  No objection.

12              THE COURT:  We will receive Government's Exhibit 25.

13              (Government Exhibit 25, was received in evidence.)

14   BY MR. KESSLER:

15   Q    Mr. Marshall, we're looking at the first page of this

16   document, which is the purchaser questionnaire, do you see

17   that?

18   A    Yes.

19   Q    I'm going to turn to the document with the Bates number

20   SM000077?

21   A    Yes.

22   Q    This is the signature page for the subscription

23   agreement?

24   A    Yes.

25   Q    Is that your signature on the bottom left?

S. MARSHALL - DIRECT - MR. KESSLER                3049

1   A    It is.

2   Q    You corrected me before, did you signed this agreement in

3   January 2011?

4   A    That's right.

5   Q    How much did you invest in MSMB Capital Management LP?

6   A    200,000.

7   Q    After you invested $200,000 in MSMB Capital Management

8   LP, did you receive periodic performance statements from

9   Mr. Shkreli about your investment?

10  A    Yes.

11  Q    If you take a look at tabs three through ten in your

12  binder, those correspond to Government's Exhibit 81-1 to 81-8.

13  Do you see that?

14  A    Yes.

15  Q    Are those the performance statements you received from

16  Mr. Shkreli relating to your investment in that hedge fund?

17  A    Yes, I believe this is all of them.

18            MR. KESSLER:  I offer Government's Exhibit 81-1,

19  81-2, 81-3, 81-4, 81-5, 81-6, 81-7 and 81-8.

20            MR. CHAN:  No objection.

21            THE COURT:  Exhibits 81-1 through 81-8 are received.

22            (Government Exhibit 81-1, was received in evidence.)

23            (Government Exhibit 81-2, was received in evidence.)

24            (Government Exhibit 81-3, was received in evidence.)

25            (Government Exhibit 81-4, was received in evidence.)

S. MARSHALL - DIRECT - MR. KESSLER          3050

1          (Government Exhibit 81-5, was received in evidence.)

2          (Government Exhibit 81-6, was received in evidence.)

3          (Government Exhibit 81-7, was received in evidence.)

4          (Government Exhibit 81-8, was received in evidence.)

5    BY MR. KESSLER:

6    Q    Mr. Marshall, we're only going to look at the last one,

7    but confirm for me that the first performance statement that

8    you got was March 2, 2011, Government's Exhibit 81-1?

9    A    Yes.

10   Q    And then Government's Exhibit 81-8 is the last or most

11   recent performance statement that you received, tab ten?

12   A    Yes.

13   Q    This was September 10, 2012?

14   A    Yes.

15   Q    An e-mail from Mr. Shkreli to you with a June 2012

16   performance update?

17   A    Yes.

18   Q    And what did Mr. Shkreli tell you the value of your

19   investment of $200,000 had grown to?

20   A    Well, in this document he states it was $282,237.

21   Q    Did you rely on this document to be accurate?

22   A    Yes.

23   Q    Did you rely on the other performance statements?

24   A    Yes.

25   Q    As of September 10 -- as of September 9, 2012, had

S. MARSHALL - DIRECT - MR. KESSLER          3051

1   Mr. Shkreli told you whether MSMB Capital Management LP had

2   invested in a company called Retrophin?

3   A    He had not.

4   Q    Had you heard of a company called Retrophin as of

5   September 9, 2012?

6   A    You know, it's possible that I heard of that, that they

7   were thinking of making a separate investment.  I'm not

8   absolutely clear about that.  I think it's possible that I

9   heard.  But certainly not as an investment in the hedge fund.

10  Q    So you heard about, possibly heard about, Retrophin but

11  not that MSMB Capital Management LP had or had not invested in

12  Retrophin?

13  A    Right.  And if I had heard of it, it was only as an idea

14  of an investment.

15  Q    In September 2012, did Mr. Shkreli tell you that he was

16  going to wind down the hedge funds he was managing?

17  A    Well, he told me via an e-mail that was sent out to the

18  limited partners.

19  Q    Let me show you, just for the witness, Government's

20  Exhibit 102-2, which is tab 11 in your binder.  Is this the

21  email you were referring to that Mr. Shkreli decided to tell

22  you he was winding down the hedge fund?

23  A    Yes.

24            MR. KESSLER:  I offer 102-2.

25            MR. CHAN:  No objection.

S. MARSHALL - DIRECT - MR. KESSLER                3052

1    THE COURT:  We will receive 102-2.

2    (Government Exhibit 102-2, was received in

3    evidence.)

4    BY MR. KESSLER:

5    Q    This is Government's Exhibit 102-2, and let me just ask

6    you about the first two sentences in the second paragraph.

7    Mr. Shkreli wrote, "We have decided the best structure for

8    such an entity is a public company or private corporation.

9    Retrophin LLC, our MSMB founded this biotechnology operation,

10   will be that company."  Do you see that?

11   A    I do.

12   Q    So is this the first time you recall Mr. Shkreli speaking

13   to you or writing explicitly about Retrophin?

14   A    Yes.

15   Q    Did you have an understanding at this point about whether

16   MSMB Capital Management LP had invested in Retrophin?

17   A    Well, it was my understanding that they had made an

18   investment, that was one of the MSMB investments.

19   Q    So it's your understanding that money you had put into

20   MSMB Capital Management LP had been used to invest in

21   Retrophin?

22   A    Yes, this was the first time that I was told that.

23   Q    And you had -- did you learn later in 2012 that Retrophin

24   was going to become a public company?

25   A    Yes, at some point I learned that they had bought an

S. MARSHALL - DIRECT - MR. KESSLER                    3053

1    existing public company, which was essentially a shell, and

2    merged into that.  I think the company was named Desert

3    Gateway.

4    Q    You're referring to a process called a reverse merger?

5    A    Yes.

6    Q    I'm showing you what is marked for identification

7    Government's Exhibit 102-3?

8    A    Yes, I have that.

9    Q    Is this an e-mail chain involving you and Mr. Shkreli

10   related to the reverse merger of Retrophin?

11   A    Yes, it is.

12            MR. KESSLER:  I offer Government's Exhibit 102-3.

13            MR. CHAN:  No objection.

14            THE COURT:  We will receive Government's Exhibit

15   102-3.

16            (Government Exhibit 102-3, was received in

17   evidence.)

18   BY MR. KESSLER:

19   Q    Focusing on the bottom two-thirds of the page, is this a

20   December 18, 2012, e-mail from Mr. Shkreli to a group of

21   people, including yourself?

22   A    I assume it went to other people besides me, but I

23   received it.

24   Q    At least to you.

25   A    Yes.

S. MARSHALL - DIRECT - MR. KESSLER                3054

1    Q    And the bottom e-mail includes some text from

2    Mr. Shkreli, then a press release about Retrophin completing a

3    reversion merger with Desert Gateway Inc.  Do you see that?

4    A    Yes.

5    Q    After you received this press release you wrote,

6    "Congratulations, Martin.  Sounds promising.  Does Retrophin

7    have enough cash to get through phase two and/or start phase

8    three?"  Do you see that?

9    A    Yes.

10   Q    What were you referring to phase two and phase three?

11   A    Well, when you develop a drug, it's my understanding that

12   the initial phase is phase one, for feasibility.  Then phase

13   two is a limited trial with patients.  And phase three is a

14   trial that would be acceptable to the FDA, which if the

15   results were positive they could well approve the drug.

16   Q    So these are references to a drug development company?

17   A    Yes.

18   Q    Then about a sentence later you write, "Approximately

19   what percent of the fund value is represented by Retrophin and

20   when do you plan to close it down and distribute?"  Do you see

21   that?

22   A    Yes.

23   Q    When you wrote "fund" were you referring to MSMB Capital

24   Management LP?

25   A    Yes.

3055

1   Q    After the comma you write, "And am I correct in assuming

2   the distribution will consist of cash and Retrophin shares,"

3   do you see that?

4   A    Yes.

5   Q    Why did you assume that the distribution would consist of

6   cash and Retrophin shares?

7   A    I think he had earlier said it would be up to the

8   investors to, you could have all shares, all cash or some

9   combination thereof.  I was just trying to confirm that that

10  was still the case.

11  Q    So at this point did you have an understanding of what

12  percentage of MSMB Capital Management LP had been invested in

13  Retrophin?

14  A    I did not.

15  Q    Now, after you received -- you sent this e-mail in

16  December 19, 2012, did you ask to redeem your investment in

17  MSMB Capital Management LP?

18  A    Yes, I did.

19  Q    When you asked to redeem your investment, what did you

20  ask to get back?

21  A    Well, this was an investment that I made through my IRA.

22  I wanted, in effect, to be cashed out and have the value of my

23  investment paid out in cash so I could return it to the IRA.

24  Q    Meaning a retirement account?

25  A    Yes, individual retirement account.

S. MARSHALL - DIRECT - MR. KESSLER                3056

1   Q    So these were funds you were investing for your

2   retirement?

3   A    That's right.

4   Q    When you made that request, did you receive cash?

5   A    Well, I made the request several times.  And let's take

6   it in the order that it happened.

7   Q    Let me break it down.

8   A    I didn't receive cash right away, I'll stop there.

9   Q    As of February 2013, had you received any cash?

10  A    I had not.

11  Q    Did you receive any shares or stock?

12  A    I did.

13  Q    What did you receive?

14  A    I received a share certificate for about 200 -- about

15  37,000 shares, maybe 37,208, I'm not certain of the exact

16  amount.  It's in these documents somewhere.  Which just showed

17  up with no advanced notice that they were coming.  And I

18  honestly don't think there was a cover letter, they just

19  arrived.

20  Q    So you just received about 37,000 shares in Retrophin?

21  A    Yes, one certificate for 337,000 (sic) plus shares.

22  Q    And no cash.

23  A    Correct.

24  Q    Were the shares restricted or unrestricted?

25  A    They were restricted, which meant they are not tradeable.

S. MARSHALL - DIRECT - MR. KESSLER                3057

1    Q    Did you then engage in a series of e-mails with

2    Mr. Shkreli about your efforts to redeem your investment?

3    A    Yes.

4    Q    When you received the 37,000 shares, were you satisfied

5    with that redemption?

6    A    No.  I had asked for cash.  And my effort was to get him

7    to redeem me for cash.  I offered to return the shares if I

8    could get a cash payment.

9    Q    I'm going to show you what is marked for identification

10   as Government's Exhibit 102-4.  This is an e-mail chain

11   involving you and Mr. Shkreli that begins on February 27, 2013

12   and ends April 8, 2013?

13   A    Yes.

14   Q    This is about redeeming your investment?

15   A    Yes, I see it.

16             MR. KESSLER:  I offer 102-4.

17             MR. CHAN:  No objection.

18             THE COURT:  We will receive 102-4 in evidence.

19             (Government Exhibit 102-4, was received in

20   evidence.)

21   BY MR. KESSLER:

22   Q    Mr. Marshall, I'll start with the second page at the

23   bottom.  So in the February 27 e-mail, you write to

24   Mr. Shkreli, copy Mr. Blanton, "I received the Retrophin

25   shares certificate with the restricted legend on the back.

S. MARSHALL – DIRECT – MR. KESSLER                    3058

1    When does the company plan to register these shares or

2    otherwise make them tradeable?"

3              What did you mean when you referred to the company

4    registering the shares?

5    A    It was my understanding that with the legend on the back,

6    the shares were not freely tradeable, that it would take

7    action by the company to make them tradeable.

8    Q    Mr. Shkreli writes back in the first paragraph of the

9    e-mail in March 4, 2013, "There is no specific registration

10   plan other than we intend to register shares as soon as

11   possible.  You may be familiar with Rule 144, which allows for

12   the sale of any unregistered security of held for over one

13   year."

14   A    Yes.

15   Q    Were you familiar with Rule 144?

16   A    Yes.

17   Q    What is it?

18   A    It's a securities rule that if you hold unregistered

19   shares for more than a year, you can go through a process with

20   the, I guess the SEC, and the company registering those shares

21   so they do become tradeable.

22   Q    Next paragraph, "The fund focused primarily on growing

23   Retrophin and as such this is the only remaining asset."  Do

24   you see that?

25   A    Yes.

S. MARSHALL - DIRECT - MR. KESSLER                3059

1    Q    Is that the first time you learned, that according to

2    Mr. Shkreli, the only asset in the MSMB Capital Management LP

3    fund was Retrophin shares?

4    A    Yes.

5    Q    What was your reaction when you learned that?

6    A    Well, I was very surprised.

7    Q    Why was that?

8    A    Well, I had understood that there were a number of

9    positions, some long and some short, which would need to be

10   liquidated.  And so up until that point I had assumed there

11   were these Retrophin shares, plus everything else that the

12   fund held would be liquidated and I would receive my portion

13   in cash.

14   Q    Then Mr. Shkreli wrote, "I would be willing to buy back

15   your shares of the most recent quoted value of your fund if

16   that is of use to you, or give you more shares of my personal

17   shares to true up your account value."  Do you see that?

18   A    Yes.

19   Q    Did you understand this to be a personal offer from

20   Mr. Shkreli to buy your shares or give you more shares?

21             MR. CHAN:  Objection.  Leading.

22             THE COURT:  Try to rephrase the question.

23   Q    Who did you think was going to give you the money for the

24   shares, based on Mr. Shkreli's offer?

25   A    I really wasn't sure.  But the way I interpreted his

S. MARSHALL - DIRECT - MR. KESSLER                3060

1   language, was that he would personally -- he had shares that

2   he owned himself, that he would add to these if I wanted to go

3   that route.

4   Q    So then if we go to the first page of the e-mail chain,

5   the bottom, a March 7 e-mail, see that?

6   A    Yes.

7   Q    You write in the second sentence, "As my investment was

8   with an IRA fund, I appreciate your offer to buy back the

9   shares in exchange 265K please let me know the best way

10  logistically to do that"?

11  A    Yes, I wrote that.

12  Q    Did you expect that offer to be expected?

13  A    I hoped it would.

14  Q    Then about two weeks later in the next e-mail you wrote

15  to Mr. Shkreli Martin, "It has been two weeks since the last

16  of our March 4 e-mail exchange, I would like to exchange the

17  share certificate for the check you offered."  Do you see

18  that?

19  A    Yes.

20  Q    Did Mr. Shkreli send you a check?

21  A    Not at that point.

22  Q    If we go to the very top e-mail, April 8, do you see

23  that?

24  A    Yes.

25  Q    About a month and a half after you first e-mailed him?

S. MARSHALL - DIRECT - MR. KESSLER                    3061

1    A    Yes.

2    Q    "Hi, Schuyler.  Sorry this is taking so long.  I'm going

3    to send you an agreement that will finalize the transaction."

4    Do you see that?

5    A    Yes.

6    Q    After he sent you that e-mail, did he send you an

7    agreement?

8    A    There was one thing that happened before he sent the

9    agreement, and somewhere along there he said that actually my

10   fund balance had been worth more than 300,000 when they agreed

11   to liquidate or decided to liquidate.  And so he didn't send

12   me an agreement as such, he actually sent an e-mail, which I

13   believe the e-mail was to his attorney with a copy to me, just

14   saying this is what we're going to do.

15   Q    So he didn't send you an agreement to buy your shares, he

16   just sent you a description of what he was going to do?

17   A    Yes, that's right.

18   Q    If you take a look at what is marked for identification

19   as Government's Exhibit 102-6, that is tab 14?

20   A    Yes.

21   Q    Is this the e-mail you were every referring to from

22   Mr. Shkreli?

23   A    Yes.

24   Q    Dated May 31, 2013?

25   A    Yes.

S. MARSHALL - DIRECT - MR. KESSLER                3062

1   Q     Mr. Shkreli copied Evan Greebel, do you see that?

2   A     Yes.

3               MR. KESSLER:  I offer 102-6.

4               MR. CHAN:  No objection.

5               THE COURT:  We will receive 102-6.

6               (Government Exhibit 102-6, was received in

7   evidence.)

8   BY MR. KESSLER:

9   Q     Mr. Marshall, as of May 31, 2013, did you have an

10  understanding of who Evan Greebel was?

11  A     I believe somewhere in these conversations with Martin he

12  told me that was his attorney with the Katten firm in New

13  York.

14  Q     So Mr. Shkreli told you that Evan Greebel was his

15  attorney with the Katten firm in New York?

16  A     Well, I don't know how important the word "his" is, but I

17  think he was the attorney who had handled this, let's put it

18  that way.

19  Q     Had you heard of the Katten law firm before?

20  A     Yes.

21  Q     What had you heard about it?

22  A     When I saw the original prospectus, it was drafted by

23  them.  I remembered knowing that they were a prominent firm in

24  New York with a good reputation.

25  Q     The subject the e-mail is settlement, do you see that?

S. MARSHALL - DIRECT - MR. KESSLER                3063

1    A    Yes.

2    Q    There is some phrases, 300K cash, 300K stock, he has some

3    amount of stock now 37,809 or so, so we would issue 6300

4    shares of stock and wire 300K in cash?

5    A    Yes.

6    Q    Is this the settlement offer Mr. Shkreli was making for

7    you?

8    A    Yes, that's the way I understood it.

9    Q    What did you understand the offer to be?

10   A    That I would receive a cash payment and some additional

11   shares, 6300 shares, in addition to the shares that I already

12   had been sent.

13   Q    When Mr. Shkreli wrote, "We would issue 6300 shares," do

14   you see that?

15   A    Yes.

16   Q    Who did you believe would issue 6300 shares?

17   A    You know, I didn't really focus on who it would be at the

18   time.

19   Q    The title of the e-mail is settlement, do you see that?

20   A    Yes.

21   Q    Had you threatened any legal action as of May 31, 2013?

22   A    I had not.

23   Q    Had you made any kind of threat at all?

24   A    Well, other than just request to get my funds redeemed.

25   I wouldn't call that a threat of litigation.  I thought it

```
                    S. MARSHALL - DIRECT - MR. KESSLER            3064
```

1   would be worked out in my agreement.

2   Q    Now after this e-mail entitled settlement was sent to

3   you, did you in fact receive a settlement agreement?

4   A    I did.

5   Q    I can show you what is marked for identification 102-7

6   seven, an e-mail from Evan Greebel to you attaching a

7   settlement agreement?

8   A    Yes.

9   Q    Did you receive this on June 18, 2013?

10  A    Yes.

11           MR. KESSLER:  I offer 102-7.

12           MR. CHAN:  No objection.

13           THE COURT:  We will receive 102-7.

14           (Government Exhibit 102-7, was received in

15  evidence.)

16  BY MR. KESSLER:

17  Q    In this e-mail Evan Greebel writes, "Schuyler as

18  discussed attached is a draft settlement agreement."  Do you

19  see that?

20  A    Yes.

21  Q    There is an attachment, "Marshall settlement and release

22  agreement"?

23  A    Yes.

24  Q    Let's turn the page and look at the document, the second

25  page of Government's Exhibit 102-7 in the upper, right-hand

```
            S. MARSHALL - DIRECT - MR. KESSLER            3065
```

1    corner.  Can you read those words?

2    A      Katten draft 6/17/13.

3    Q      In the first paragraph there are a number of entities

4    listed, do you see that?

5    A      Yes.

6    Q      Schuyler Marshall is listed and Martin Shkreli is listed,

7    do you see that?

8    A      Yes.

9    Q      There are a number of entities, I won't read them all

10   now, but they start with the word MSMB, do you see that?

11   A      And also Retrophin.

12   Q      That's right.  And with respect to all of the entities

13   that start with MSMB, when you received the settlement

14   agreement did you know what those entities were?

15   A      Well, I know what MSMB Capital was.  The others I assumed

16   were related corporations.  And the way I interpreted it was

17   that they expected that they wanted to get everybody possible

18   released in exchange for settling this.

19                (Continued following page.)

20

21

22

23

24

25

MARSHALL – DIRECT – KESSLER                    3066

1    DIRECT EXAMINATION (Continued)

2    BY MR. KESSLER:

3    Q    All right.  And then there are some whereas clauses?

4    A    Yes.

5    Q    And there's a whereas clause in the middle that says,

6    release or previously received 37,809 shares of common stock.

7    A    Yes.

8    Q    Of Retrophin?

9    A    Yes.

10   Q    This draft agreement doesn't say why you received the

11   shares; does it?

12   A    No.

13   Q    Then at the bottom here there are payment terms.

14   A    Yes.

15   Q    And the terms are that the MSMB entities were Retrophin

16   would pay, or caused to be paid $300,000, and that Mr. Shkreli

17   would deliver or cause to be delivered 6300 shares?

18   A    Yes.

19   Q    Did you have an understanding of why certain entities

20   were going to pay money and Mr. Shkreli was going to get

21   stock?

22   A    No, I did not.

23   Q    Go to page 2 of the settlement document which is page 3

24   of the exhibit.  There's a clause at the bottom it says

25   "release".

MARSHALL – DIRECT – KESSLER                    3067

1          Do you see that?

2   A    Yes.

3   Q    And in the release you, for shorthand, release

4   Mr. Shkreli, Retrophin, and each of the MSMB entities?

5   A    Yes.

6   Q    As of June 13th, 2013, had you threatened to sue any of

7   those entities?

8   A    This is dated June 18th, '17.

9          I had not.

10  Q    All right.  On page 3 of the document there's a clause

11  that beings with number seven "authority".

12          Do you see that?

13  A    Yes.

14  Q    It says, The individuals signing below and the parties

15  warrant and represent they're legally competent they have full

16  authority to enter into this agreement.

17          Do you see that?

18  A    Yes.

19  Q    Did you have any reason to doubt that was true for any of

20  the signatories?

21  A    No.

22  Q    All right.  Now, after you received the settlement

23  agreement, did you sign it?

24  A    You know, I can't remember if I signed this draft or not,

25  but I certainly indicated it was acceptable.

MARSHALL – DIRECT – KESSLER                    3068

1   Q     And did this settlement agreement that you received on

2   June 18th get executed?

3   A     It did not.

4   Q     Right.  If I could have you look at Government

5   Exhibit 102-8 for identification.  It's Tab 16.

6   A     Yes.

7   Q     Is this an email chain between you and Mr. Greebel about

8   a week after you received the settlement agreement?

9   A     Yes.  My email's June 24th.

10              MR. KESSLER:  I offer Government Exhibit 102-8.

11              MR. CHAN:  No objection.

12              THE COURT:  We receive 102-8.

13              (Government Exhibit 102-8, was received in

14  evidence.)

15              (Exhibit published.)

16  Q     So, Mr. Marshall, looking at your email on the bottom,

17  your June 24th one, you write, Evan I am disappointed, no one

18  is responding to calls or emails concerning getting the

19  release executed and our agreement performed.

20              Do you see that?

21  A     Yes.

22  Q     Why did you write Mr. Greebel to say that?

23  A     When I got the May 31st email from Martin, my -- I was

24  frankly surprised because we hadn't discussed it.  He just

25  laid out what they would do.  My first thought was, well, you

MARSHALL – DIRECT – KESSLER                3069

1    always negotiate these things and I might be able to include

2    the terms.  But after I thought about it, not very long, I

3    decided that I would accept the terms in exchange for getting

4    this thing done.  You know, I felt a little mad that I was

5    spending a lot of time on this when my main job was trying to

6    run a company and I just wanted to get this over with.  And so

7    in effect I said, yes, I'll accept these terms if we can just

8    get this done immediately or promptly.  And so that was the

9    basis that we had proceeded.

10          And then when I got the draft settlement agreement

11   from Katten and Mr. Greebel and I said this is acceptable, I

12   may or may not have signed it but at least I said I will sign

13   it.  I didn't try to negotiate any of those terms.  Let's get

14   it done.

15   Q    So after you said you would sign the agreement or accept

16   the agreement, did you accept that Mr. Shkreli would accept

17   the agreement also?

18   A    Yes.

19   Q    In your email to Mr. Greebel starting at the third

20   sentence, you wrote, However, in order to ensure preservation

21   of documents in case they are needed, this confirms my request

22   to be provided the following:  All documents concerning or

23   related to my account value at all times.  All documents

24   concerning or related to the fund's and Martin's investment in

25   Desert Gateway, slash, Retrophin.  All documents concerning or

1    relating to Martin's acquisition of the shares of Retrophin,

2    including the consideration for such shares, and relation or

3    referring to the shares issued to other fund shareholders.

4    All documents relating to Martin's decision to convert a

5    long/short fund into a single investment in one company,

6    including the efforts, if any, to obtain approval for such

7    conversion or any limited partners in the fund.  All documents

8    relating to or concerning disposition of any fund investment.

9          Do you see all of that?

10   A    Yes, I do.

11   Q    So why did you write that sentence with this long list of

12   things you were requesting to be provided?

13   A    Well, I had several reasons.

14         One, I was very frustrated.  I felt that I accepted

15   an agreement and expected it to be performed forthwith that,

16   frankly, we agreed that it would be.  And then when the

17   agreement was sent, I thought that it took a long time for the

18   agreement to be sent.  I accepted it I think the same day I

19   that got it did and read it.  And then it was radio silence

20   for about a week.

21         And I just -- I felt like I didn't understand the

22   reason for the delay.  Maybe I was just being put off, maybe

23   they didn't have the money.  And I thought I should add

24   pressure.

25         So I thought by writing this I could add pressure in

MARSHALL - DIRECT - KESSLER                    3071

1   your two ways.  One, what I expected, when a lawyer gets

2   notice like this, in some places they call it a "litigation

3   hold."  The expectation would be that they would notify all

4   the parties that possessed these documents to retain them and

5   not destroy them because they might be needed in case there's

6   litigation.

7           And that's a hassle, quite honestly, and I thought

8   rather than go through that, they just go ahead and perform

9   the agreement.

10          And the other reason was that I wanted to go on

11  record so that if this agreement didn't get performed, they

12  would have been notified that these documents should be

13  retained.  So in that sense I was trying to ratch up the

14  pressure.

15  Q    All right.

16          And then you wrote, Evan, my position is that no

17  privilege would apply to communications with attorneys

18  representing MSMB and Retrophin as those attorneys owe a duty

19  to entities and their owners including limited partners and

20  minority shareholders.

21          Do you see that?

22  A    I see that.

23  Q    So why did you write that sentence?

24  A    Well, just to make the point that I expect all the

25  document and not a bunch of claims of privilege, and also --

MARSHALL - DIRECT - KESSLER                3072

1   that's my understanding of the law in Texas.  I didn't frankly

2   know whether it was in same law in New York, but I wanted to,

3   in effect, make it a demand that would get their attention.

4   Q    So if we go back to the first page.  Mr. Greebel wrote

5   back to your email, Schuyler, I've been out of the country and

6   just returned.  We will revert regarding our conversation from

7   last week.

8            Do you see that?

9   A    Yes.

10  Q    Did Mr. Greebel ask you any questions about any of the

11  things you put in your email?

12  A    I don't recall that he did.

13  Q    And then you wrote back at the top, still June 24th, I'll

14  be out of the country starting by 1 p.m. tomorrow for ten

15  days.  If you wish, I can sign the release and deliver it to a

16  trusted third party such as Darren Blanton or a local

17  attorney.

18           Do you see that?

19  A    Yes.

20  Q    Did you get an explanation for why this agreement wasn't

21  being signed?

22  A    No.

23  Q    Now, after June 24th --

24  A    Let me go back.

25           To be fair, I think it may be that I was told that

MARSHALL – DIRECT – KESSLER                    3073

1    Martin was really busy and hard to reach.  I think there was

2    something like that said, but that's the best I can answer

3    that question.

4    Q    Said to you by Mr. Greebel?

5    A    Yes.

6    Q    And that was the reason given that this agreement wasn't

7    being signed?

8    A    I think that's right.

9    Q    So after you sent this litigation hold email on

10   June 24th, did you continue to correspond with Mr. Shkreli and

11   Mr. Greebel about redeeming your investment?

12   A    Yes.

13   Q    I'm going to show you what's been marked for

14   identification as Government Exhibit 102-12.

15            Do you see this is an email chain between you,

16   Mr. Shkreli, and ultimately Mr. Greebel that begins on

17   August 12th 2013 and ends on August 28th, 2013?

18   A    Yes.

19            MR. KESSLER:  I offer Government Exhibit 102-12.

20            MR. CHAN:  No objection.

21            THE COURT:  We receive Government's Exhibit 102-12.

22            (Government Exhibit 102-12, was received in

23   evidence.)

24            (Exhibit published.)

25   Q    So we're going to start at the back.  The third page of

MARSHALL - DIRECT - KESSLER                    3074

1    Government Exhibit 102-12, has Bates-stamp ending 759.

2              Do you see that?

3    A    Yes, I do.

4    Q    All right.  So on August 12th, you write Mr. Greebel and

5    Mr. Shkreli and you write, Are we now in a position to

6    finalize the agreement we made regarding my IRA's MSMB

7    investment?

8    A    Yes.

9    Q    So as of August 12th, 2013, you still had not received

10   your redemption?

11   A    That's right.

12   Q    And you still did not have a signed agreement?

13   A    That's right.

14   Q    Then almost ten days later, on August 21st, you write, In

15   light your successful pipe placement on August 16th of

16   $25 million, may we now consummate our settlement agreement?

17   A    Yes, I did.

18   Q    Okay.  And Mr. Shkreli writes, Yes, but as discussed, and

19   then you exchange a few more emails about coordinating.

20             Do you see that?

21   A    Yes.

22   Q    Then the next email I want to focus on actually begins on

23   the bottom of the second page, the very bottom, August 23rd,

24   2013.

25             Do you see that?

MARSHALL – DIRECT – KESSLER                    3075

1    A     Yes.

2    Q     And it's from you to Mr. Shkreli and you write, Am here

3    looking forward your call.  You give your phone number.  There

4    should not be much to discuss, though I'm interested in

5    Retrophin's progress, you settled for your email of 5/31 and

6    it's documented by Evan in the release dated 6/17.  You also

7    said you would remove the legend from the stock.  If you wire

8    the 300K to my account at Morgan Stanley, I will FedEx you the

9    signed release and trust you to issue the additional 6300

10   shares and remove the legend from both certificates.

11              Do you see that?

12   A     Yes.

13   Q     So as of August 23rd, had you received an explanation or

14   an additional explanation for why this agreement had not been

15   signed?

16   A     Had not.

17   Q     If you go up the chain, on Tuesday, August 27th, a few

18   days later again you write to Mr. Shkreli, Where do we stand,

19   Martin, is there any issue other than recasting the form of

20   releases as you described on Friday.

21              Do you see that?

22   A     Yes.

23   Q     So what's that a reference to?

24   A     I banked on the previous Friday he had said that the

25   release needed to be revised to be recast into two separate

MARSHALL - DIRECT - KESSLER                    3076

1    releases is the best I recall.

2    Q    He told you the original single document had to be split

3    into two documents?

4    A    Yes, generally that's what I was told.

5    Q    Do you remember an explanation for why the original

6    document had to be split into two?

7    A    There was not one.

8    Q    And Mr. Shkreli writes back, My understanding is we will

9    not be recasting it, we will be wiring the funds shortly.

10   A    Yes.

11   Q    That's August 27th?

12   A    Yes.

13   Q    All right.

14        And on Wednesday, August 28th, you still haven't

15   received your money; is that right?

16   A    Correct.

17   Q    You write, Friday it was Monday, yesterday today, now

18   question mark I really don't understand these delays, the

19   release form is okay.

20        Do you see that?

21   A    Yes.

22   Q    Mr. Shkreli responds, I understand, I'm cc'ing my

23   attorney again and pressing on the urgency of this.

24        Do you see that?

25   A    Yes.

MARSHALL – DIRECT – KESSLER                3077

```
 1   Q    And then you write back and ultimately at the top of the
 2   chain Mr. Shkreli writes you copying Mr. Greebel on
 3   August 28th that we are wiring it today.  The agreement has to
 4   be compliant.  You'd be surprised how intricate this is.
 5            Do you see that?
 6   A    Yes.
 7   Q    Did you know what he meant when he said the agreement has
 8   to be compliant?
 9   A    I did not.
10   Q    All right.  And did Mr. Shkreli, in fact, wire the money
11   on August 28th?
12   A    The money was wired.  I'm not sure it was that day or a
13   day or two after.
14   Q    Well, was it wired before or after you signed the
15   agreement?
16   A    I think it was done on the same -- same day that I signed
17   it.
18   Q    All right.  So if I can show you Government
19   Exhibit 102-13 for identification.
20   A    Yes.
21   Q    So these are emails between, you, Mr. Shkreli and
22   Mr. Greebel on August 28th and August 29th?
23   A    Yes.
24   Q    That's the day after -- the same day, the day after the
25   email chain we just looked at?
```

MARSHALL – DIRECT – KESSLER                3078

1    A    Yes.

2              MR. KESSLER:  I offer Government Exhibit 102-13.

3              MR. CHAN:  No objections.

4              THE COURT:  We receive Government's Exhibit 102-13.

5              (Government Exhibit 102-13, was received in

6    evidence.)

7              (Exhibit published.)

8    Q    Mr. Marshall, the bottom email on Government

9    Exhibit 102-13 is an email from Mr. Shkreli to you copying

10   Mr. Greebel with the subject "revision".

11             Do you see that?

12   A    Yes.

13   Q    Mr. Shkreli writes, After exhaustive talks with our

14   attorneys, there will be a revision to the agreement.  You

15   will get this in about 7 p.m. EST.  The revision is simple.

16   It merely removes MSMB as an obligor, and references Retrophin

17   alone.  This is crucial for a number of reasons that are

18   beyond my ability to explain.  Evan is cc'd if you have any

19   questions.

20             Do you see that?

21   A    Yes.

22   Q    Did you ever get an explanation for why it was crucial

23   for a number of reasons to remove MSMB as an obligor?

24   A    No, I did not.

25   Q    Obligor is someone who has to pay the settlement; is that

1   right?

2   A     Yes.

3   Q     And then at the top of the chain there's an email from

4   Mr. Greebel to Mr. Shkreli and you.  Mr. Greebel writes, Hi,

5   Schuyler, I apologize for the delay, but I had some

6   connectivity issues.  As discussed, attached are two

7   settlement, slash, release agreements.  One between you and a

8   Retrophin contemplating the payment of money, and the second

9   between you and Martin and MSMB relating to the delivery of

10  the shares.  In the interest of time, I am simultaneously

11  sending it to Martin.

12          Do you see that?

13  A     Yes.

14  Q     And then Mr. Greebel wrote, The difference between these

15  two agreements and the prior version is that we divided the

16  prior version to separated Retrophin's payment obligation and

17  release from the delivery obligation and release to Martin and

18  MSMB.

19          Do you see that?

20  A     Yes.

21  Q     Did you have an understanding why those divisions had

22  been made?

23  A     I did not.

24  Q     Now, Mr. Greebel's email attaches two different

25  documents; is that correct?

MARSHALL – DIRECT – KESSLER                    3080

1   A    Yes.

2   Q    All right.  And go to page 3 of Government

3   Exhibit 102-13.  Sorry, yes, page 3.

4            This is a document entitled "Settlement and Release

5   Agreement."

6            Do you see that?

7   A    Yes.

8   Q    There's Katten draft, August 28th '13, in the upper

9   right?

10  A    Yes.

11  Q    Who are the parties to this agreement?

12  A    According to the agreement, it's between me and

13  Retrophin.

14  Q    And no other MSMB entities or Mr. Shkreli?

15  A    These are the only two parties stated in the agreement.

16  Q    All right.  Now that first whereas clause, do you

17  remember we previously looked at a whereas clause that said

18  whereas you received 37,000 and some odd shares?

19  A    Yes.

20  Q    So this whereas clause now reads, whereas releasor,

21  that's you, previously invested in Retrophin.

22            Do you see that?

23  A    Yes.

24  Q    Had you previously invested in Retrophin?

25  A    Well, not knowingly.  I had invested in MSMB.  And by

MARSHALL – DIRECT – KESSLER                              3081

1   this time I surmised that the money had gone into Retrophin.

2   Q    But you never directly invested in Retrophin?

3   A    No, I did not.

4   Q    By MSMB you mean MSMB Capital Management, LP?

5   A    Yes.

6   Q    And does this agreement say you why you received 37,809

7   shares?

8   A    It does not.

9   Q    And if we look at the payment terms, Retrophin agrees to

10  deliver or caused to be delivered to releasor the total amount

11  of $300,000.

12         Do you see that?

13  A    Yes.

14  Q    So in the original draft we looked at, the MSMB entities

15  or Retrophin were going to pay the 300,000, but now it's just

16  Retrophin; is that right?

17  A    Yes.

18  Q    Again, if we go to paragraph 4, which is on the next

19  page, there's a release clause.

20         Do you see that?

21  A    Yes.

22  Q    And the release involved you releasing Retrophin and its

23  officers, directors, et cetera.

24         Do you see that?

25  A    Yes.

MARSHALL - DIRECT - KESSLER                    3082

1    Q    So this release doesn't cover the MSMB entities or

2    Mr. Shkreli; is that right?

3    A    Yeah, it might have covered Mr. Shkreli since it

4    discharged Retrophin and its officers and owners, et cetera.

5    But he wasn't a named party.

6    Q    It doesn't cover Mr. Shkreli in his personal capacity.

7    A    That's right.

8    Q    Okay.  All right.  Now, if we go to the document -- or to

9    the page that ends in Bates-stamp 203.

10   A    I have it.

11   Q    You have it.  So this is -- we're still on Government

12   Exhibit 102-13.  We're now looking at a second settlement and

13   release agreement.

14            Do you see that?

15   A    I do.

16   Q    This one's also Katten draft 8/28/13.

17            And in this agreement, who are the parties?

18   A    Well, it lists only MSMB entities and Martin Shkreli.

19   Q    Martin Shkreli in his personal capacity.

20   A    Yes.

21   Q    And you.

22   A    Yes.

23   Q    It doesn't list Retrophin?

24   A    No.

25   Q    Does it have that whereas clause about you investing in

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

MARSHALL – DIRECT – KESSLER                    3083

1    Retrophin or receiving shares of Retrophin?

2    A    It does not.

3    Q    Could you read just the first clause of the payment terms

4    under item number one?

5    A    Shkreli agrees to deliver or cause to be delivered to the

6    releasor, the total amount of 6,300 shares of common stock par

7    value .0001 per share of Retrophin as full and final

8    satisfaction for all claims, obligations, et cetera.

9    Q    Thank you.  If you turn to page 2 of this document,

10   paragraph 5 there's a release.

11   A    Yes.

12   Q    And the release applies to Mr. Shkreli in his personal

13   capacity and the MSMB entities and affiliates and officers,

14   right?

15   A    Yes.  Well it speaks for itself, but it says Shkreli,

16   each MSMB entity, and each of their respective officers,

17   directors, shareholders, partners, members, managers, owners,

18   employees, representatives, consultants, contractors, et

19   cetera, et cetera, attorneys.

20            In other words, I was releasing everybody connected

21   with them.

22   Q    Does the release refer to Retrophin?

23   A    No, it does not.

24   Q    Mr. Marshall, did you sign these agreements?

25   A    Yes, I did.  In fact, I think I signed the ones still

MARSHALL – DIRECT – KESSLER                    3084

1    marked draft.

2    Q    And were they counter signed by Mr. Shkreli?

3    A    Yes.

4    Q    If you take a look at Government Exhibits 57A and 57B.

5    That's Tabs 19 and 20 in your binder?

6    A    Yes, I have them.

7    Q    You have them.

8         Are these the versions you signed?

9    A    Yes.

10   Q    With the Katten draft still on them?

11   A    Yes.

12   Q    Other than bearing signatures, are these the same

13   versions that we just looked at in Government Exhibit 102-13?

14   A    Well, the second one does have Martin Shkreli signature,

15   the first one does not.  But, yes, I believe they're the same

16   documents.

17   Q    That's a good point.

18        So the first one, Government Exhibit 57A, is the

19   settlement and release agreement that relates to Mr. Shkreli

20   and the MSMB entities?  And you're saying that is not signed

21   by Mr. Shkreli.

22   A    This one right here is not.

23   Q    Okay.  And then Government Exhibit 57B, which is the

24   settlement and release agreement related to Retrophin, that is

25   signed by Mr. Shkreli and by you?

MARSHALL – DIRECT – KESSLER                    3085

1   A    Yes.  And I believe the other one was signed.  This

2   particular one is not signed.

3              MR. KESSLER:  All right.  So I offer Government

4   Exhibit 57A and 57B.

5              MR. CHAN:  No objection.

6              THE COURT:  We receive 57A and 57B.

7              (Government Exhibit 57A, was received in evidence.)

8              (Government Exhibit 57B, was received in evidence.)

9              (Exhibits published.)

10  Q    And, Mr. Marshall, just to confirm.  Other than the

11  presence of signatures, these are the same as the draft

12  documents?

13  A    Yes.

14  Q    Now, after you signed the settlement and release

15  agreements, did you receive $300,000.

16  A    I did, although it could have been before I signed it.

17  Q    Around the time you signed --

18  A    About the time, yes, I received 300,000 wired to my

19  account in Morgan Stanley.

20  Q    All right.  Did you ever receive your 6300 shares?

21  A    I did not.

22  Q    Now, you originally received 37,809 restricted shares in

23  Retrophin in addition.

24              Do you remember that?

25  A    Yes.

MARSHALL - DIRECT - KESSLER                    3086

1    Q    Did you ultimately sell those?

2    A    Yes.

3    Q    Do you remember for how much you ended up selling them at

4    the end of the day?

5    A    I sold them -- I had my broker at Morgan Stanley get them

6    freed up, which was quite a process, and then left it to him

7    to sell 'em.  And I have -- I received I believe about

8    $480,000 from the sale of the shares over a period of time.

9    Q    After you had signed these agreements and received the

10   $300,000, were you contacted by the SEC at some point?

11   A    Yes.

12   Q    SEC is Securities and Exchange Commission?

13   A    Yes.

14   Q    What did the SEC convey to you when they contacted you?

15           MR. CHAN:  Objection.  Hearsay.

16           THE COURT:  Sustained.

17   Q    Did you ultimately attend an interview with the SEC?

18   A    They had requested an interview and, quite honestly, I

19   don't recall at this time whether I attended an interview or

20   just spoke to them on the telephone.  I did notify Martin

21   Shkreli that I had been contacted.

22   Q    You notified Martin Shkreli that you had been contacted

23   by SEC?

24   A    Yes.

25   Q    Did you do that in email?

MARSHALL - DIRECT - KESSLER                    3087

1    A    Yes.

2    Q    Could you take a look at Government Exhibit 102-16?

3    A    I see it.

4    Q    Is this an email chain in which you notified Mr. Shkreli

5    you've been contacted by the SEC?

6    A    Yes.

7    Q    And these emails are sent on March 12th and March 13th,

8    2014?

9    A    Yes.

10   Q    And they come on top of a series of other emails related

11   to different investment opportunity; is that right?

12   A    Yes.

13            MR. KESSLER:  So I offer Government Exhibit 102-60.

14            MR. CHAN:  No objection.

15            THE COURT:  We receive 102-16.

16            (Government Exhibit 102-16, was received in

17   evidence.)

18            (Exhibit published.)

19   Q    So, Mr. Marshall, I'm focusing you on the Wednesday,

20   March 12th 2014 from you to Mr. Shkreli.

21            Do you see that?

22   A    Yes.

23   Q    You say you just received an letter from Eric Schmidt of

24   the SEC seeking a voluntary interview in the matter of MSMB

25   Capital Management, LLC valuation.

MARSHALL - DIRECT - KESSLER                    3088

1           Do you see that?

2    A    Yes.

3    Q    And you wrote, I'm not inclined to submit to a voluntary

4    interview, but I thought you should know as a courtesy.

5           Do you see that?

6    A    Yes.

7    Q    Did you also contact Mr. Greebel about this request?

8    A    I don't recall doing so.

9    Q    And Mr. Shkreli writes back, Hey, Schuyler, we've been

10   happy to cooperate fully with the SEC and are providing the

11   information they need to resolve their review.  We would

12   encourage you to cooperate as well in answering any questions

13   they have your about your experience as a limited partner.

14   While we candidly acknowledge any mistakes we made, we believe

15   that we ultimately were able to present very exciting

16   opportunities for our limited partners, which have been a

17   great success.

18           Do you see that?

19   A    Yes.

20   Q    Now, your response to Mr. Shkreli is, Would you prefer

21   that I respond to them then?  I think the picture is

22   essentially a number of active rule violations followed by

23   your effort to treat LP's fairly, and the end result being

24   LP's were happy.  This is likely when they would -- I'm sorry,

25   what they would conclude from the discussion.  However, does

MARSHALL - DIRECT - KESSLER                    3089

1    the SEC understand the -- excuse me, the no harm/no foul

2    concept.

3              Do you see that?

4    A    Yes.

5    Q    So what did you mean by "no harm/no foul concept"?

6    A    We I assumed that other -- that they had settled on a

7    fair basis with the other limited partners, and so I, in

8    effect, was saying that I assumed that they weren't trying to

9    address harm to limited partners but were concerned about the

10   securities law violations.

11   Q    "They" meaning -- you say "they had settled."  You mean

12   MSMB Capital Management, LP?

13   A    Yes.

14             MR. CHAN:  Objection.  Leading.

15             THE COURT:  I'm sorry.

16   A    What I mean is that whether it was MSMB, whoever got --

17   successful settlements were made similar to the ones that I

18   had entered into, and that the SEC -- I was basically trying

19   to be cordial and nice to Martin in saying that I presumed

20   that there after the SEC violations and not concerned about

21   the investors who had suffered significant losses.

22   Q    And when you wrote "a number of active rule violations,"

23   what did you mean?

24   A    Well, by that I was referring to securities act and rules

25   that are issued under the securities acts.

1          MR. KESSLER:  One minute, Your Honor.

2          Thank you, Mr. Marshall.  No further questions.

3          THE COURT:  Okay, Mr. Chan, would you like to begin

4    your cross?

5          MR. CHAN:  Thank you, Your Honor.

6    CROSS-EXAMINATION

7    BY MR. CHAN:

8    Q    Good afternoon.

9    A    Good afternoon.

10   Q    My name is Winston Chan and I represent Evan Greebel.

11         We haven't met before; have we?

12   A    We have not.

13   Q    I appreciate your time today.  I think I want to start

14   out with a few items of clarification.

15         A couple of times the Government asked you about

16   references in emails where Martin Shkreli refers to

17   Mr. Greebel "as my attorney."

18         Do you remember those questions?

19   A    Yes.

20   Q    And there were a couple of emails when Mr. Shkreli refers

21   to Mr. Greebel as "our attorney."

22         Do you remember some of those emails.

23   A    Yes.

24   Q    And I think in response to one of the questions about the

25   language there, you responded that you weren't too focused on

MARSHALL - CROSS - CHAN                3091

1     the significance of use of the word "my".

2              Did I get that right?

3     A    You did.

4     Q    And that's because, as you know from being a lawyer,

5     sometimes people speak colloquially about lawyers, correct?

6              MR. PITLUCK:  Objection.

7              THE COURT:  Sustained.  Rephrase.

8     Q    When you said that you weren't so concerned about the

9     significance of the use of word "my lawyer" in those emails,

10    that's because you don't -- you didn't ascribe any legal

11    significance to the term "my lawyer" in that email, right?

12    A    The best answer I can give you is I didn't really focus

13    on it that at all.  I came to believe that he represented all

14    the parties.

15             But -- but where along the line I got that

16    understanding, I can't say right now.

17    Q    All the parties meaning the entities?

18    A    Well, when he sent out -- certainly by the time when I

19    got the draft settlement agreement, he was sending it out on

20    behalf of Martin individually and all the MSMB entities and

21    Retrophin.  And I assumed he represented them all.  And I may

22    have had that understanding before, but specifically to your

23    question, I don't know when I got that understanding.

24    Q    Well, let me ask you, in your experience, you were a

25    practicing attorney for a while, right?

MARSHALL – CROSS – CHAN                    3092

1    A    Twenty-five years.

2    Q    Twenty-five years.  And in that in context, you had

3    clients, correct?

4    A    Yes, sir.

5    Q    Clients that were entities, correct?

6    A    Yes.

7    Q    But in dealing with those entity clients, you had to deal

8    with a person, right?

9    A    Sure.

10   Q    Generally the general counsel of the company?

11   A    It varied.

12   Q    Sometimes an officer of the company?

13   A    Yes.

14   Q    And from time to time they would call you "my attorney,"

15   even though you represented the entity, right?

16   A    They may have, but I don't recall that happening.

17   Q    What about your understanding of general counsel at

18   Roseland?  In those days, were there times when the CEO of the

19   company colloquially referred to you as "my attorney," even

20   though you weren't his personal attorney?

21   A    I don't believe so.

22   Q    Now, you said just now that you understood somehow that

23   Mr. Greebel came to represent all of the parties involved in

24   the settlement negotiations, right?

25   A    Yes.

MARSHALL – CROSS – CHAN                          3093

1   Q    And the Government put up the various drafts of the

2   settlement agreement up.

3            Can we put up actually Government Exhibit 57B.

4            (Exhibit published.)

5            And you recognize this as the executed settlement

6   agreement between Retrophin and you.

7   A    If that's the same one that's already in evidence, yes,

8   sir.

9   Q    We can flip to the last --

10  A    Yes, sir.

11  Q    -- last page so that would he can see the signature page,

12  please.

13            (Exhibit published.)

14  A    Yes.

15  Q    Now, the Government asked you a couple of questions about

16  this document.  Let's start with the release language that is

17  at paragraph 4.

18  A    I see it.

19  Q    Do you remember the Government asked you some questions

20  about who is contained within this release?

21            Do you remember that?

22  A    Yes.

23  Q    You would agree with me that this is a broad general

24  release, right?

25  A    Yes.  Yes.

MARSHALL - CROSS - CHAN                3094

1  Q    And that it means a whole bunch of individuals and

2  entities connected to the release party, correct?

3              MR. KESSLER:  Objection.

4              THE COURT:  Sustained.

5  Q    Let's look at language.  Doesn't the release language

6  here say that what is discharged is Retrophin, and its

7  officers, directors, shareholders, partners, owners,

8  employees, representatives, consultants, contractors,

9  subcontractors, suppliers, attorneys, insurers, affiliates,

10 and affiliated corporations, and it goes on and on.

11             But if MSMB was an affiliate of Retrophin, would it

12 not be covered by this release?

13             MR. KESSLER:  Objection to the form and for legal

14 conclusion.

15             THE COURT:  Sustained.

16 Q    Weren't you asked questions about who was covered under

17 this release by the Government?

18 A    No, I think I simply read the language.

19             At this point what I understood was that both the

20 releases were extremely broad releases.  There was one release

21 that was specific as to Retrophin, and one that was specific

22 as to all the other entities.  And in both case the language

23 was very broad.

24 Q    So in your opinion, sorry.  In your interpretation of

25 this agreement that you signed, this release is broad enough

MARSHALL – CROSS – CHAN                    3095

1   to cover entities other than Retrophin?

2              MR. KESSLER:  Objection.

3              THE COURT:  Sustained.

4   Q    Well, you are the person releasing your claims in this

5   agreement, right?

6   A    Yes.

7   Q    And so you need to know who you can and can't sue as a

8   result of this agreement, right?

9   A    Yes.

10  Q    So in order to know that, when you signed this agreement,

11  did you think that you were releasing all affiliates of

12  Retrophin by virtue of signing this agreement?

13  A    Well, what I thought when I signed both of the agreements

14  at the same time, and I taking both agreements together, there

15  was no doubt that I was releasing Retrophin, Martin Shkreli,

16  all the MSMB entities, and all of these, you know, employees,

17  affiliates, representative, et cetera.  So I was releasing

18  everybody.

19  Q    So then you agree that the language of the agreement

20  speaks for itself?

21  A    Yes, sure.

22  Q    And when the Government asked you question as to whether

23  or not Martin Shkreli as an individual was covered or not

24  covered in these two settlement agreements, you would agree

25  that the language speaks for itself?

1   A    Yes, I'm not -- if I made a careless statement, I did not

2   intend to vary the language of the agreements.  The

3   agreements, I think the language does speak for itself.

4   Q    And can you look at 57A.

5         Can we have that up, please.

6         (Exhibit published.)

7         Do you recognize this as the agreement between the

8   MSMB entities, Martin Shkreli, and you, right?

9   A    Yes.

10  Q    And, again, the Government asked you questions about

11  whether or not you interpreted the release references to

12  Martin Shkreli as a reference to him as an officer first in

13  his personal capacity.

14        Do you remember those questions?

15        MR. KESSLER:  Objection to the form.

16  A    Well, I --

17        THE COURT:  Overruled.

18        You can answer.

19  A    I really don't remember the questions, but if I can just

20  get to the bottom.

21  Q    Yes, please.

22  A    I didn't intend to vary the language of the agreement.

23  If I didn't catch some subtlety in the question, the agreement

24  speaks for itself.

25  Q    Thank you.

MARSHALL - CROSS - CHAN                    3097

1          Now, with respect to this agreement, the Government

2     pointed your attention to the preamble paragraph that lists

3     all the MSMB entities.

4          Do you remember that?

5     A    Yes.

6     Q    And you remember that you were asked what your

7     understanding was as to why all those various entities were

8     included.

9          Do you remember that?

10    A    Yes.

11    Q    And I think your testimony was that you assumed that the

12    other side of the settlement negotiations wanted to get

13    releases for every affiliated entity.

14         Do you remember that?

15    A    I think I said they just wanted to get everybody involved

16    and released, which is not uncommon when you're doing a

17    severance.

18    Q    Right.  That's because in the context of the negotiations

19    at this time, the execution of this final agreement, you had

20    already threatened litigation, right?

21    A    I wouldn't say that I had.  The closest that I had come

22    was sending that email where I was, in effect, asking for a

23    litigation hold, which I hoped would prompt us to close the

24    settlement within a day or two after that.

25    Q    Well, the intent you had in writing that language was to

MARSHALL - CROSS - CHAN                    3098

1   send a message; was it not?

2   A    Yes.

3   Q    And that message was one that you had special experience

4   in crafting based on your experience as a litigator, right?

5              MR. KESSLER:  Objection to the form.

6              THE COURT:  Sustained.

7   Q    In crafting the message that you were trying to send in

8   that email, when you referenced the litigation hold, you drew

9   upon your experience as a litigator, correct?

10  A    At the time I wrote this, it probably had been 20 years

11  since I had practiced law, but I had I remembered that if you

12  requested somebody to withhold documents, a lawyer, then they

13  would -- at least in Texas -- it was incumbent on them to

14  notify all the parties involved to preserve those documents.

15             And in effect what I was trying to do was say I'm

16  serious, let's get this settlement done.

17  Q    What you were trying to do is send a message that you

18  were serious about what you would do if there was no

19  settlement, right?

20  A    Well, the most immediate thing I was wanting to do was

21  let them know I was serious about getting the settlement

22  completed.

23             And the main thing I thought if I wrote that and

24  rather than go through the hassle of having to collect all

25  those documents, the path of least resistance would be just to

MARSHALL - CROSS - CHAN                              3099

1   go ahead and perform the agreement we already had.

2   Q     Right.  You were giving them a sort of risk-based

3   decision to make, right?

4   A     I'd rather just put it in my own words that I thought it

5   was radio silence and the agreement was -- that I made with

6   Martin was we finish this promptly and I -- it wasn't

7   happening promptly.  And I thought by writing this I'd focus

8   their attention on it.  And rather than them going to the

9   trouble of trying to collect and preserve all those documents

10  they just perform the settlement.

11          So, you know, if that's a risk to go through that

12  hassle, then I thought you want to call that a risk, I thought

13  they rather avoid the hassle and just perform the agreement.

14  Q     Well, they would rather avoid the hassle of all of the

15  consequences that might flow from a failure to reach a

16  settlement with you.

17          You were hoping to take advantage of that, right?

18  A     Well, my immediate thought was the consequences of having

19  to go through and preserve all those documents.

20          But I would say there was also a veiled threat here

21  that these document might be needed in the future if they

22  didn't perform the settlement agreement.

23  Q     And the specific need in question was, one, that refers

24  to no other context but for litigation, right?  In other

25  words -- I'll make the question more simple.

1          A litigation hold request is only necessary in the

2    context of litigation, right?

3    A    Or possible litigation, yeah.

4    Q    Possible or actual litigation, correct?

5    A    Yes.

6    Q    And you were hoping that they would come to see for

7    themselves that it was less expensive, less of a hassle to

8    proceed down litigation path than to just honor their -- the

9    oral agreement that had been reached with your already,

10   correct?

11             MR. KESSLER:  Objection to form.

12             THE COURT:  Sustained.  Rephrase it.

13   Q    Will you put up Government Exhibit 102-8, please.

14             (Exhibit published.)

15             And focusing on the bottom section.

16   A    Yes, I see it.

17   Q    This is the email we've been discussing.  It is a lengthy

18   email, you would agree?

19   A    Well, it's about ten lines.

20   Q    But the request that you were requesting has, you know, a

21   dozen phrases separated by commas and semicolons, correct?

22   A    Yes, it sure does.

23   Q    It is a very legalistic sentence, right?

24   A    Well, I hope it was somewhat legalistic.  I was trying to

25   get their attention.

MARSHALL – CROSS – CHAN                3101

```
1    Q    And you were trying to get their attention because your

2    interest in this is to get someone to pay attention and honor

3    the oral agreement that been reached?

4              MR. KESSLER:  Objection to oral agreement.

5              THE COURT:  Try to just rephrase the question,

6    Mr. Chan.

7    A    Well, can I just tell you that we made an agreement that

8    was partially written in Martin's email to me, which I orally

9    accepted.  And then -- and then Evan sent out a draft, which

10   we already talked about, which I orally accepted and I just --

11   I wanted them to perform it.

12   Q    That's my -- I forget about the draft.

13   A    That's right.

14   Q    Your intent was to, I think you used the words "ratch up

15   the pressure," right?

16   A    Yes.

17   Q    And this was pressure you knew you could instill based on

18   your familiarity with the American litigation system.

19   A    I hoped that it would have that effect.

20   Q    And, in fact, the language that you used referred to both

21   MSMB -- well, it referred to Retrophin; didn't it?

22   A    Yes, it did.

23   Q    And it also referred to MSMB, right?

24   A    Yes.

25   Q    You specifically requested that records of Retrophin be
```

1   retained as part of this litigation hold, right?

2   A    Yes, I did.

3   Q    You then followed up this email with additional veiled

4   threats about litigation, correct?

5              MR. KESSLER:  Objection.

6              THE COURT:  What are you going to show him?  I'm

7   going to sustain it subject to connection.

8              MR. CHAN:  Sure.

9   Q    I'm going to show you what's been marked for

10  identification as Defense Exhibit 112-8.

11             May I approach, Your Honor?

12             THE COURT:  Yes.

13  Q    Let me know when you're done.

14             Do you see that this is a continuation of the same

15  email chain that we were just looking at?

16  A    Yes.

17  Q    And it's between -- it's a continued discussion between

18  you and Mr. Greebel and Martin Shkreli?

19  A    I think it's primely between me and Greebel with copies

20  to Shkreli.

21             MR. CHAN:  Your Honor, I offer it.

22             MR. KESSLER:  No objection.

23             THE COURT:  We receive Defense Exhibit 112-8.

24             (Defense Exhibit 112-8, was received in evidence.)

25             (Exhibit published.)

MARSHALL - CROSS - CHAN                    3103

1    Q    Right, so -- publish it, Your Honor?

2            So scrolling down to the bottom, that's the same

3    email that we just discussing, the long email with the

4    litigation hold demand, right?

5    A    Yes.

6    Q    And then the response is involving people being out of

7    the country, right?

8    A    Yes.

9    Q    And then focusing in on your email at July 10th at

10   3:52 p.m.

11           Can you read that to the jury, please?

12   A    Evan, you said you had sent the settlement agreement to

13   your client on 6/17 for comment, and your email suggests you

14   still didn't catch up with Martin.  It's not that complicated.

15   Does he intend to perform the agreement, you may or not?  I

16   like Martin and was glad we could resolve this by agreement

17   but the long delay is beginning to feel like a stall.

18           Please confirm promptly whether he plans to honor

19   the agreement he made with me, and assuming so, when and how

20   we will complete.  As I'm sure you are aware, his legal

21   position is not a pretty one.  Other LPs have confirmed their

22   lack of awareness or consent to a conversion of a long/short

23   hedge fund with multiple holdings to the single investment in

24   a microcap startup, as well as have how Martin acquired his

25   25 million share position.  I certainly would not have

MARSHALL - CROSS - CHAN                    3104

1   invested retirement funds in such a high-risk venture and

2   Martin was aware from our discussion that what he represented

3   concerning the hedge nature of MSMB's investments and that it

4   was appropriate from a risk standpoint for retirement funds.

5   I hope we can conclude this settlement -- we can conclude this

6   without the expense of litigation, but if not I would expect

7   to recover those expenses, in any event for my IRA.  Also

8   please confirm that you have directed him individually and the

9   fund and RTRX to maintain the records referred to you in my

10  6/24 email and other records potentially relevant to this

11  matter.  Schuyler.

12  Q    But, sir, when earlier you said that you had made veiled

13  litigation threats, you would agree that this particular email

14  was an express litigation threat; wouldn't you?

15  A    Well, I think the language speaks for itself.  But what

16  it says is without the -- without the expense of litigation.

17  So I was -- I'd say I was implying that unless they perform

18  the agreement, litigation was possible.

19  Q    So you would agree, then, as a former attorney, that in

20  light of the way your communications read about the potential

21  for litigation, getting a release from you was the right thing

22  to do?

23              MR. KESSLER:  Objection.

24              THE COURT:  Sustained.

25  Q    You were the attorney in the situation --

MARSHALL – CROSS – CHAN                    3105

1        THE COURT:  Sustained.

2   Q    Did it make sense to you to sign the settlement agreement

3   that you did?

4   A    Yes, it did.

5   Q    From your perspective?

6   A    Yes.

7   Q    From the other side's perspective?

8        MR. KESSLER:  Objection.

9        THE COURT:  Sustained.

10  Q    Did you think there was anything unusual about the

11  settlement agreements that you signed?

12  A    There were aspects maybe that were unusual, but the thing

13  that you're interested in where they asked to get everybody

14  and their brother-in-law released, it didn't surprise me, and

15  I was willing to agree to it.

16  Q    Everybody and every entity, right?

17  A    Yes.

18       MR. CHAN:  Your Honor, this is a breaking point for

19  me, if you want to stop here for the day.

20       THE COURT:  All right, I'm sure the jurors would

21  appreciate being released for the evening.

22       Thank you for your ongoing attention.  Keep an open

23  mind and please don't talk about this case.

24       I'll see you tomorrow at 9:00.  Have a safe trip

25  home and a smooth commute in tomorrow.

MARSHALL - CROSS - CHAN                    3106

1          Night.  Thank you.

2               (Jury exits the courtroom.)

3          THE COURT:  All right.  So tomorrow morning at 9:00.

4     We will resume with Mr. Marshall.

5          MR. KESSLER:  Your Honor, just for the record,

6     because Mr. Marshall was planning on flying back tonight.  I

7     will need to confer with him about logistics on staying over.

8     I realize that we're in the middle of cross-examination, so,

9     but that is a conversation I will need to have with him.

10          THE COURT:  All right.

11          MR. KESSLER:  I'll be happy to do it in the presence

12     of defense counsel if they prefer, but that is the nature of

13     the communication I need to have with him.

14          THE COURT:  All right.  Go ahead and have at that.

15     And hopefully we can resolve it.

16          MR. MASTRO:  And can we have just clarification on

17     who else is coming after Mr. Marshall?

18          MR. PITLUCK:  We'll let Mr. Marshall go out of the

19     room.

20          MS. SMITH:  It depends on how long the crosses are.

21     We have other people tomorrow but we had people on staff

22     scheduling and travel issues.

23          We had tentative Wendy Spaulding, Corey Massella,

24     and Jackson Su.  But the order of those three is going to

25     depend on who we can fit it because we have some issues with

1   people carrying over to Monday who are unavailable to do that

2   and we have some issues in the morning, so it depends how long

3   Mr. Marshall's cross is and then how long we expect those

4   three witnesses cross is then and then we're going to kind of

5   figure out and do travel arrangements.  But it will from that

6   pool of three.

7           MR. BRODSKY:  Your Honor, it is important for us to

8   know whether or not -- which of the two out of the three are

9   going to be testifying, because we have one night tonight to

10  prepare and I know Mr. Su is unavailable at 11 a.m. tomorrow

11  so he's certainly not testifying in the morning.  We probably

12  have another 30 minutes of Mr. Marshall, at least.

13          MR. CHAN:  Thirty to one hour.

14          THE COURT:  One hour so until 10, and then redirect

15  and possibly recross.  So hopefully he's finished by 11.

16          MS. SMITH:  So that's the point.  And you have our

17  witness list since last Friday.  And so we would just ask if

18  the defense can give us an estimate for how long they think

19  the cross of each those three are, we can then caucus and give

20  them an answer probably half hour to an hour.

21          But I have to work with our travel people.  We

22  didn't expect Mr. Marshall to go over tonight subject to how

23  long his cross was going to be, and then we can -- we will get

24  some answers as soon as we can.

25          MR. BRODSKY:  Your Honor if we give them the

MARSHALL – CROSS – CHAN                    3108

1   information on the cross estimation within the next 30

2   minutes, will they commit to giving us who will be there by

3   7 p.m. tonight.

4           MS. SMITH:  We're not trying -- we just need to talk

5   to our travel people and get everything arranged.

6           So, yes, that's no problem.

7           THE COURT:  All right.  So give them the information

8   they need, and they'll tell you who they've got on next.

9           MR. BRODSKY:  Thank you, Your Honor.

10          THE COURT:  All right.  Have a good night.

11                  *    *    *    *    *

12          (Proceedings adjourned at 6:45 p.m. to resume on

13  November 2, 2017 at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

3109

```
 1                    I N D E X

 2   WITNESS                                  PAGE

 3   DAVID GELLER

 4   DIRECT EXAMINATION     BY MR. PITLUCK    2835
     CROSS-EXAMINATION      BY MR. MASTRO     2949
 5   REDIRECT EXAMINATION   BY MR. PITLUCK    3022
     RECROSS-EXAMINATION    BY MR. MASTRO     3040
 6
     SCHUYLER MARSHALL
 7
     DIRECT EXAMINATION     BY MR. KESSLER    3042
 8   CROSS-EXAMINATION      BY MR. CHAN       3090

 9                    I N D E X

10                    EXHIBITS

11   GOVERNMENT               PAGE
     106-3                    2843
12   11A                      2845
     28                       2848
13   99-1                     2850
     99-2                     2850
14   99-3                     2850
     99-4                     2850
15   99-5                     2851
     99-6                     2851
16   99-7                     2851
     99-8                     2851
17   99-9                     2851
     99-10                    2851
18   106-6                    2857
     11B                      2861
19   106-35                   2863
     106-7                    2865
20   106-10                   2873
     104-23                   2917
21   106-24                   2924
     55                       2927
22   106-26                   2930
     106-27                   2936
23   106-28                   2938
     106-29                   2945
24   106-32                   2946
     6                        3046
25   25                       3048
     81-1                     3049
```

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

3110

I N D E X

EXHIBITS

| GOVERNMENT | PAGE |
|---|---|
| 81-2 | 3049 |
| 81-3 | 3049 |
| 81-4 | 3049 |
| 81-5 | 3050 |
| 81-6 | 3050 |
| 81-7 | 3050 |
| 81-8 | 3050 |
| 102-2 | 3052 |
| 102-3 | 3053 |
| 102-4 | 3057 |
| 102-6 | 3062 |
| 102-7 | 3064 |
| 102-8 | 3068 |
| 102-12 | 3073 |
| 102-13 | 3078 |
| 57A | 3085 |
| 57B | 3085 |
| 102-16 | 3087 |

E X H I B I T S

| DEFENSE | PAGE |
|---|---|
| 106-11 | 2885 |
| 106-13 | 2894 |
| 106-14 | 2899 |
| 106-20 | 2903 |
| 106-19 | 2906 |
| 106-21 | 2912 |
| 105-5 | 2987 |
| 112-8 | 3102 |
| 106-12 | 2890 |