3111

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                         15-CR-637(KAM)
3    UNITED STATES OF AMERICA,
                                         United States Courthouse
4              Plaintiff,               Brooklyn, New York

5              -against-                November 2, 2017
                                         9:00 a.m.
6    EVAN GREEBEL,

7              Defendant.
     ------------------------------x
8
                   TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
9              BEFORE THE HONORABLE KIYO A. MATSUMOTO
                    UNITED STATES DISTRICT JUDGE
10                       BEFORE A JURY

11   APPEARANCES

12   For the Government:        BRIDGET M. ROHDE, ESQ.
                                Acting United States Attorney
13                              Eastern District of New York
                                271 Cadman Plaza East
14                              Brooklyn, New York 11201
                                BY:  ALIXANDRA ELEIS SMITH
15                                   DAVID PITLUCK
                                     DAVID KESSLER
16                              Assistant United States Attorneys

17   For the Defendant:         GIBSON, DUNN & CRUTCHER LLP
                                200 Park Avenue
18                              48th Floor
                                New York, New York 10166-0193
19                              BY:  REED M. BRODSKY, ESQ.
                                     RANDY MASTRO, ESQ.
20                                   WINSTON Y. CHAN, ESQ.
                                     MYLAN LEE DENERSTEIN, ESQ.
21                                   JOSHUA EVAN DUBIN, ESQ.
                                     GRACE TSOU, ESQ.
22
     Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, OCR
23                              Phone:  718-613-2330
                                Fax:    718-804-2712
24                              Email:  LindaDan226@gmail.com

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    3112

1

2              (In open court; outside the presence of the jury.)

3              THE COURT:  So we are going to go on the record now.

4       All parties are present.  Mr. Greebel is present.

5   So I understand the parties had a scheduling issue?

6              MR. PITLUCK:  Yes, Judge.  And I just want to raise

7   this with the Court, because as you now, we are juggling

8   scheduling and logistics and we're also desperately trying to

9   move this forward and fair to say that we're very cognitive

10  and concerned about the scheduling going forward.

11             Yesterday at the end of court, we caucused and we

12  had a plan going forward where we would finish Mr. Marshall

13  today.  We would call Wendy Spaulding, who is here from the

14  West Coast, to testify about bank records; and then we would

15  call Corey Massella.  And in the event that Corey Massella

16  didn't finish, the defense initially agreed that we could

17  carry him over to Tuesday and take a witness out of order

18  because Mr. Massella is, unfortunately, totally unavailable on

19  Monday; Has advised us of this, and it's a professional

20  commitment.  As the judge knows, some of these witnesses are

21  testifying for the second time.  They raised these issues in

22  advance, and we're trying to accommodate them.

23             We made travel arrangements based on that agreement,

24  that representation.  We got a cross-estimate a little bit

25  later that kind of fit all this together.  And then

PROCEEDINGS                                3113

1    afterwards, the defense said that they were unable to agreed

2    to take Mr. Massella out of order.  So now we are confronted

3    with the issue where we're going to finish Mr. Marshall.  We

4    have to get Mr. Massella on and off today.  We can't carry him

5    over, because if we don't put him on starting today, there's a

6    real risk that, you know, he could go into the third week of

7    November.  And based on the estimate, if we started this

8    morning, we'll finish this morning.  That's not even close.

9    But our concern is if he finishes at 3:30, we don't have

10   another witness.  We had planned on this.  We have been

11   trying, we're trying to fill the day, but we can't ask people

12   to stay on the West Coast throughout the day.

13           So I guess what we're asking for is if the Court is

14   inclined to grant us relief and put Mr. Massella out of order

15   and put him on Tuesday morning; we will finish Mr. Marshall.

16   We'll call Ms. Spaulding and put her on.  We will start, and

17   depending on how long things take, we can start and finish

18   Mr. Massella.  But if we don't and the Court okays this, and

19   if it's in the Court's discretion, we will call Mr. Massella a

20   little out of order.

21           THE COURT:  Who do you have for Monday?

22           MR. PITLUCK:  For Monday, I believe we're calling --

23   we have to call Lindsay Rosenwald.

24           THE COURT:  Okay.

25           MR. PITLUCK:  That is -- is Monday --

PROCEEDINGS                                              3114

1            MR. KESSLER:  Yes.

2            MR. PITLUCK:  That is the only time he's available

3    and in town.

4            THE COURT:  Okay.

5            MR. PITLUCK:  And that will fill the day with

6    somebody else, depending on how things go today, but he will

7    be the first thing, the first witness Monday morning.

8            THE COURT:  So you will finish Mr. Massella, and

9    then the question is whether the cross will be broken up over

10   Friday to Tuesday; is that correct?

11           MR. PITLUCK:  If we call Mr. Massella as soon as

12   Mr. Marshall is done, Mr. Massella's got to finish today.  If

13   he doesn't, then we have no other choice.  But we're calling

14   him today based on the representations of -- even if

15   Mr. Marshall goes an hour, we have a full day, and our direct

16   is not -- is not going to be done -- is not going to go past

17   lunch, so...

18           THE COURT:   All right.  Well, does the defense

19   anticipate a lengthy cross with Mr. Massella?

20           MR. BRODSKY:   Well, since we don't know exactly the

21   scope of his direct, Your Honor, we gave them an estimate of

22   three hours.  Of course, we'll try to do it shorter than three

23   hours.

24           With respect to the scheduling, Your Honor,

25   Mr. Pitluck is correct, that after court yesterday, I told

1   them I didn't think it was going to be an issue splitting them

2   up.  We caucused with our client and there was an issue, and

3   what we told them --

4              THE COURT:  What is the issue?

5              MR. BRODSKY:  Well, what we ask him was this:  We

6   said, Look --

7              THE COURT:  Without revealing attorney/client

8   confidence --

9              MR. BRODSKY:   Understood, Your Honor.  Our

10  strong --

11             THE COURT:  I'm just trying to figure out the

12  basis --

13             MR. BRODSKY:  Understood.

14             THE COURT:  -- for the objection to something that

15  was previously agreed to.

16             MR. BRODSKY:  Understood, Your Honor.

17             After speaking with our client what we asked the

18  Government to do, we said, Look, our strong preference, of

19  course, is for us to continue the cross-examination through

20  the cross-examination, and it does affect the effectiveness of

21  the cross-examination to split it up, it just does.  But what

22  we said to them was, Okay.  We can live with it, but if your

23  case carries over to November 17th -- and we're hopeful that

24  it won't -- but if you case goes to November 17th, we may --

25  and, again, Your Honor, we're not committing to putting on a

PROCEEDINGS                                    3116

1    case in chief, although we are planning for it.  You never --

2    you know, you plan for it as much as you can, and so we're

3    planning for it.  And there may be a possibly -- I'm not

4    saying it's concrete, but there may be a possibility that a

5    witness because of scheduling issues, can only have

6    availability on November 17th.  And so we asked the Government

7    that, you know, We'll accommodate you for splitting your cross

8    if you would allow us -- you would consent to our application

9    to the Court that if you're in your case in chief and for some

10   reason that we cannot -- if we have a witness that has no

11   other day other than November 17th, would you accept the

12   application that we make to the Court that that witness go on

13   on that particular day?

14            THE COURT:  All right.  Well, this is the question I

15   have for you, Mr. Brodsky.

16            MR. BRODSKY:  Yes, ma'am.

17            THE COURT:  Are you representing as an officer of

18   the court that this witness is not going to be available the

19   20th, 21st, 22nd, or the 27th through December 1st?

20            MR. BRODSKY:  I am told, unfortunately, Your Honor,

21   that -- I am going to tell you this as an officer of the

22   court, the day the person is available is November 7th, 8th,

23   and 9th, which is obviously not even remotely likely, we had

24   thought that was a possibility; or November 17th; or then

25   starting on December 13th, December 13th.  And so given

PROCEEDINGS                                    3117

1    that --

2              THE COURT:  Is this person going abroad or

3    something?

4              MR. BRODSKY:  Without getting into it, that it --

5    you know, we're happy to tell you in camera the reasons for

6    the absence on the other days, but the other day is just an

7    impossibility.  And what we -- another possibility is, you

8    know, if again, Your Honor, if we do is this, another

9    possibility and I've seen it before in other cases, is you

10   take a videotape of the witness.  So in one of my trials, for

11   example, that I had when I was with the Government, there was

12   a particular witness that the defense wanted to call in a

13   particular case that because of traveling and scheduling

14   reasons was unavailable except for a particular period of time

15   that would accommodate the Government's case.  And so

16   the Government agreed to a videotaped deposition, that the

17   videotaped would be played during the defense case in chief if

18   the defense put it on.  So I am just offering that as another

19   alternative.

20              But what we ask for, it is ineffective to split

21   cross-examination and it does hurt the presentation of our

22   evidence through cross.  If we're going -- we just ask for

23   some accommodation in return.

24              MR. PITLUCK:  Your Honor, can I be heard briefly?

25              I would like to make three points.  One is that

1   every witness we have had has split cross-examination between

2   days.  It has just happened to be one day to the next.  That

3   is the run of this court.  We have long witnesses and long

4   crosses, it is going to happen.  So the ineffectiveness,

5   Your Honor, I think it kind of rings hollow.

6            Second of all, they presented a basic request, a

7   general request to take a witness out of order during our

8   direct case.  We responded that we would be happy to extend

9   the same courtesy on the defense's case of taking witnesses

10  out of order.  However, we are concerned about putting on a

11  defense witness in a Government case before a Rule 29 motion

12  has been made without knowing who the witness is, what they

13  are going to say, how it's going to affect our presentation of

14  the case to the jury.  That was just too much for us to agree

15  to on this request, particularly since we see these two issues

16  as totally disconnected.

17  We are just asking for a --

18            THE COURT:  What two issues?  I'm sorry.

19            MR. PITLUCK:  Whether or not a defense witness can

20  go in the Government's case, as opposed to just simply

21  carrying another witness over for a day.

22            THE COURT:  Right.

23            MR. PITLUCK:  I mean, I said, We are happy to extend

24  you the same courtesy.  But in your if you want to take a

25  witness out of order, you need to put somebody on just for a

PROCEEDINGS                                    3119

1   day because they are not available?  Like I said, we are

2   reasonable, and we want to move things along.  But, Judge, to

3   link these two things, seems like an inappropriate proposal.

4          We are trying to amenable.  We are trying to raise

5   things in advance.  We have been clear about the issues we're

6   having, and we're trying to move them forward.  And quite,

7   frankly, Judge, just not wanting to carry a witness over a

8   weekend for the cross-examination?  Mr. Richardson was carried

9   over four days for cross-examination.  No complaint about

10  that.

11         We are similarly asking for leave to call somebody

12  on Tuesday so that we can fill today for 5:30.  And, Judge, I

13  am going to be perfectly honest at this point, we don't think

14  our case at this stage can be done by November 17th.  It's a

15  virtual impossibility, and we're trying.  So that is what

16  we're asking for.  We want to fill the day.  We want to have a

17  witness who has been here from the West Coast for three days

18  testify.  We want to have Mr. Massella start and possibly

19  finish, but if not, to carry over Tuesday out of order.  It's

20  not complicated, Judge.  I'm sorry.

21         THE COURT:  I mean, I do not know what your view is

22  about the videotaped examination that Mr. Brodsky has proposed

23  in order to accommodate this witness who is going to be

24  unavailable after November 17th?

25         MR. PITLUCK:  Judge, I think if we are going to

PROCEEDINGS                                           3120

1    consider that request, I think we are entitled to more

2    information as to who the witness is.  Is it an expert.  Is it

3    a lay witness?  You know, what was the arrangement is?  As the

4    Court is familiar on Rule 17 taped depositions, there is a

5    procedure.  We need to have -- to be able to cross-examine

6    that person on videotape.  I'm not saying no, Judge.  But I am

7    say it is awful tough for us to agree, particularly when we're

8    bringing it up now and this has never raised.

9              THE COURT:  All right.  Well --

10             MR. PITLUCK:  This issue was not raised.  And I

11   understand the defense has no obligation whatsoever to put on

12   a case, but if we are being asked to go out of order to do a

13   videotaped deposition of a witness who has not been

14   identified, I think we are entitled to a lot more information

15   before we agree to that.

16             MR. BRODSKY:  Your Honor, respectfully, there is no

17   question of carrying over from a weekday to weekend.  It

18   happens.  The difference here, of course, is that witnesses

19   will be in between, and that does matter to us.

20   The Government may say, Well, that is not a big deal, but to

21   us, it is a big deal.

22             THE COURT:  I do not think it would be the type of

23   situation that would affect a fundamental trial right.  I

24   think the jury could be reminded of where the witness left off

25   when he or she was testifying, and I would give some latitude

PROCEEDINGS                                    3121

1    to refresh the jury a little bit about the last line of

2    questioning.

3                MR. BRODSKY:  Sure.

4                THE COURT:  And I do not think it's a significant or

5    even a fundamental trial right to avoid having a witness whose

6    cross-examination extend to another day, if due to scheduling

7    issues beyond anyone's control, the witness would not

8    otherwise be able to come.

9                MR. BRODSKY:  Understood.

10               THE COURT:  Monday is not a day when this witness is

11   available.  So maybe the witness will be finished today.

12               MR. BRODSKY:  We do hope, Your Honor.

13               THE COURT:  Optimistically.

14               MR. BRODSKY:  We do hope.

15               THE COURT:  But if he or she —— Mr. Massella is not

16   fished and the cross begins, he will have to have his

17   cross-examination continued until Tuesday because there is

18   just no other way.

19               MR. BRODSKY:  Quite understood, Your Honor.

20               THE COURT:  So whatever you choose to do with your

21   witness, your undisclosed witness, is up to you.  I think that

22   at this point, I am somewhat dumbfounded myself about why.

23   The parties initially represented this was a three-week trial

24   and then it became a five-week trial, and now I'm told we may

25   be going into December 4th.  I have no idea why this happened,

1   what the issues are.  We have been trying to squeeze in as

2   much time as we can.

3           I will have to tell the jury that I am not available

4   between November 29th through December 1st, because this was

5   unintended -- intended that this would even be an issue.  It's

6   a longstanding commitment I have to the judicial conference.

7   So, you know, I understand there are going to be scheduling

8   issues.  But many times many judges do allow parties to take

9   Fridays off, so I do not think that that should have been

10   necessarily a huge factor.  I would just hope that we could

11   get everything finished and finished Mr. Marshall and get

12   Mr. Massella started.

13           MR. BRODSKY:  Yes, Your Honor.

14           THE COURT:  Okay.

15           MR. BRODSKY:  And I do apologize.

16           THE COURT:  And if you want to disclose more

17   information to the Government --

18           MR. BRODSKY:  Sure.

19           THE COURT:  -- to find out whether they would

20   accommodate deposition --

21           MR. BRODSKY:  Sure.

22           THE COURT:  -- or video examination request?  It's

23   not really a deposition, but rather --

24           MR. BRODSKY:  A video tape.

25           THE COURT:  -- a video presentation.

PROCEEDINGS                                    3123

1          MR. BRODSKY:  What I remember is -- in the case that

2     I had, Your Honor -- I'm sorry to interrupt.

3          THE COURT:  You were.

4          MR. BRODSKY:  No, no, no, that's why I stopped,

5     Your Honor.  I apologize.

6          THE COURT:  Go ahead.

7          MR. BRODSKY:  I do remember what Judge Rakoff had

8     said to the Government.  In this particular case Judge Rakoff

9     said, Look, the Government has a choice.  Interrupt your case

10    and allow this -- you know, we proffer, we provide Your Honor

11    with proof that this person would be unavailable on any other

12    day, and Your Honor's satisfied by that, I do remember very

13    clearly what Judge Rakoff said, which he said, Look,

14    accommodate the defense either with a videotape, or, you know,

15    I'm going to interpret the Government's case in chief.  And

16    we're just providing that case.  Now, obviously --

17         THE COURT:   Were you in the dark about who the

18    witness was?

19         MR. BRODSKY:  At that point, Your Honor, we were

20    not, but that was later, later in time.  We will, of course --

21    before this witness would have taken the stand, if we had put

22    on our case in chief, the Government would know about who the

23    witness is the prior Friday before, that's what they're

24    telling with respect to their witnesses.  Of course, we would

25    give them more advanced notice than that.  So if we had a

PROCEEDINGS                                    3124

1   videotaping deposition, it would be on their schedule on one

2   of the Fridays Your Honor is off.  Or it would be a day that

3   Your Honor is not sitting or a weekend.  In the case before

4   Judge Rakoff, we had a weekend.

5              THE COURT:  Well, did you know before you agreed to

6   the video deposition, who the witness was?

7              MR. BRODSKY:  Yes, we did.

8              THE COURT:   All right.  Well, tell them and they

9   will make a -- they will tell you whether they agree, okay?

10             MR. BRODSKY:  Okay, Your Honor.

11             THE COURT:  And I would urge them to agree, and I

12   think they are willing to agree.

13             MR. BRODSKY:  Understood.

14             THE COURT:  But they are not going to make a

15   decision in the dark.

16             MR. BRODSKY:  Understood, Your Honor.

17             THE COURT:  Nor would any responsible attorney do

18   that.

19             MR. BRODSKY:  Understood.

20             THE COURT:  Okay.

21             MR. PITLUCK:   So, Your Honor, just to be clear,

22   because we need to make sure the witness is here for when

23   Mr. Chan summons Mr. Marshall.  Do we have the Court's okay to

24   call Ms. Spaulding and the put Mr. Massella on with the

25   possibility of carrying him over?  Because if that is the

PROCEEDINGS                                   3125

1    case, we need to call Ms. Spaulding now and make sure she is

2    here in the next 20 minutes.

3              THE COURT:  Where is she?

4              MR. PITLUCK:  She's just at the hotel.

5              THE COURT:  Oh, okay.

6              MR. PITLUCK:  We just want to call her before the

7    Court comes to sure she is here and ready and everything like

8    that.

9              THE COURT:  All right.  And you can't keep her here

10   or bring her next week, if you have Mr. Massella finish today?

11   You have to have --

12             MR. PITLUCK:  We can, Judge.  She would fly back to

13   the West Coast and back here.  But our point is, Judge, if

14   Mr. Massella finishes at 3:30, we don't anybody to fill the

15   day.  We are desperately trying to go for 5:30, later if the

16   Court wants --

17             THE COURT:  Well, why don't you put Mr. Massella on

18   first and put Ms. Spaulding on later in the day, if you have

19   time?  If don't finish her, fly her back to the West Coast and

20   either bring her back Monday or put her on for Tuesday?

21             MR. PITLUCK:  Judge, we can't do that.  Her flight

22   is the last flight out at 6:00 p.m. out of JFK to Arizona.

23   She has to leave at 4:00 o'clock.  We simply can't keep her

24   over for another day.

25             MR. BRODSKY:  Your Honor, we will accommodate them,

1  Your Honor.  If Your Honor keeps it in mind and the defense

2  keeps it in mind with respect to our request --

3          MR. PITLUCK:  The Government.

4          MR. BRODSKY:  The Government, I'm sorry.

5          MR. PITLUCK:  Old habits dry hard, Mr. Brodsky.

6          MR. BRODSKY:  In this case, I'm not so sure who's

7  the defense or the Government.

8          If they keep it in mind, Your Honor, and Your Honor

9  keeps it in mind, we will accommodate them.

10          MR. PITLUCK:  We are, of course, keeping in mind to

11  being reasonable, but the Court knows that, and we are

12  considering it, we just need the information.

13          So it sounds like what I hearing is Ms. Spaulding

14  goes on and off, she gets to go back to the West Coast; we

15  call Mr. Massella.  If he is not finished, he will go back on

16  Tuesday; is that all right?

17          MR. BRODSKY:  Yes, Your Honor.

18          THE COURT:  Yes.

19          MR. PITLUCK:  All right.

20          THE COURT:  Unless there is some way you could

21  persuade Mr. Spaulding to go on today and finish and then have

22  Mr. Massella next week.  But whatever you -- I mean, I think

23  if Mr. Massella's cross-examination has to begin today and

24  finish on Tuesday, that is just unfortunately sometimes what

25  happens.

PROCEEDINGS                                    3127

```
 1              MR. PITLUCK:  Judge, maybe we can finish everything

 2    today.

 3              THE COURT:  All right.

 4              MR. PITLUCK:  We are willing to stay later

 5    if Your Honor --

 6              THE COURT:  Let's be hopeful.  I think Mr. Marshall

 7    is just waiting to get started.

 8    Do we have all our jurors?

 9              THE COURTROOM DEPUTY:   Yes, Judge.

10              THE COURT:   Okay.  Well, we will bring the jurors

11    in and Mr. Marshall can resume the stand.

12              MR. PITLUCK:   Okay.

13              THE COURT:  Okay?

14              MR. KESSLER:  And Your Honor, just so the record is

15    clear -- I already told Mr. Chan this.  We -- Mr. Chan and I

16    and Mr. Marshall all had a conversation together about this I

17    scheduling last night, so I didn't talk to him during his

18    cross, and then Mr. Marshall had a brief phone conversation

19    with Special Agent Mahaffey and he relayed what flight

20    information that he needed for today.

21              THE COURT:  Okay.

22              MR. KESSLER:  So as far as I am aware that was the

23    only contact the Government had with him after court.

24              THE COURT:   Okay.  Thank you.

25              (Pause in proceedings.)
```

1          THE COURT:  Good morning, sir.

2          THE WITNESS:  Good morning.

3          (Witness resumes the stand.)

4          (Pause in proceedings.)

5          (Jury enters the courtroom.)

6          (Jury present.)

7          THE COURT:  All jurors are present.

8  Good morning, members of the jury.

9          THE JURY:  Good morning.

10          THE COURT:  Please have a seat everybody.

11  And Mr. Marshall, you are still under oath, sir.

12          THE WITNESS:  Yes.

13          THE COURT:  And, Mr. Chan, you may resume your

14  cross.

15          MR. CHAN:   Thank you, Your Honor.

16          (Whereupon, the witness resumes the stand.)

17  CROSS-EXAMINATION (Continued)

18  BY MR. CHAN:

19  Q    Good morning, Mr. Marshall.

20  A    Good morning.

21  Q    Sorry to keep you overnight.

22          Yesterday where we left off, if you'll remember,

23  you -- the last series of questions and answers that we had,

24  you said that it did not surprise you, in your words, to be

25  asked to release everybody and their brother-in-law, were your

1    words, in connection with the settlement agreement that you

2    signed, right?

3    A    I did say that.

4    Q    And the context of the settlement agreements were a

5    series of discussions over the course of the e-mails that we

6    looked at and talked about yesterday, right?

7    A    Well, the settlement agreement that was ultimately signed

8    was essentially unchanged from the draft that was sent out in

9    about June 18th, except that it was split into two parts.

10   Q    Right.  Meaning that the discussions that we were talking

11   about were your attempts to make the settlement agreement get

12   executed, right?

13   A    Well, yes.  After -- the discussions after June 18th had

14   to do with that, but I wanted the settlement agreement

15   executed and performed.

16   Q    They hadn't been signed yet, you thought there was a

17   delay, and you wanted to get that going?

18   A    That's right.

19             MR. CHAN:  Can we put up Defense Exhibit 112-8?

20             THE COURTROOM DEPUTY:   Is it in evidence?

21             THE COURT:  Yes.

22             MR. CHAN:   It is in evidence.  Thank you.

23   BY MR. CHAN:

24   Q    And the words that you used yesterday were, You were

25   looking to ratchet up the pressure?  Those are your words,

1    right?

2    A    I believe I said that, yes.

3    Q    You wanted to show that you were serious --

4    A    Yes.

5    Q    -- is that right?

6    A    Yes.

7    Q    And so as part of that effort as reflected in this e-mail

8    at the bottom --

9              MR. CHAN:  Right there.

10   Q    And we spent some time on this yesterday.  This is the

11   e-mail on June 24th, 2013 where you communicate what you

12   labeled a litigation hold, right?

13   A    Yes.

14   Q    And it's called a litigation hold, as you know, because

15   it is a precursor to potential litigation, correct?

16   A    I would say it's a -- I wouldn't call it necessarily a

17   precursor.  It's an effort to maintain the security of

18   documents in the event litigation ensues.

19   Q    Right.  It's a called a litigation hold, correct?

20   A    I believe it is, yes.

21   Q    And in the same e-mail, referencing the litigation hold

22   request by you, at the bottom you write, Evan, my position is

23   that no privilege would apply to communications with attorneys

24   representing MSMB and RTRX.  RTRX is Retrophin, correct?

25   A    Yes.

MARSHALL - CROSS - CHAN                    3131

1  Q    So in addition to making the requests to preserve

2  evidence for potential litigation, you were also saying that

3  you expected that that litigation all would apply to arguably

4  privileged communications, correct?

5  A    Yes.

6  Q    So the e-mail chain then continues up to July 10th, 2013.

7  And you continue in your effort to, quote, ratchet up the

8  pressure, and in this e-mail you wrote, As I am sure you are

9  aware -- in the middle -- his legal position is not a pretty

10 one.

11 And by "his," you were referring to Martin Shkreli, correct?

12 A    Yes.

13 Q    And towards the bottom, I hope we can conclude this

14 without the expense of litigation; you wrote that, right?

15 A    Yes.

16 Q    And you end by saying, Referring back to litigation

17 hold -- by saying -- also please confirm you have directed

18 him -- meaning Martin Shkreli -- individually and the fund --

19 meaning MSMB -- and RTRX -- meaning Retrophin -- to maintain

20 the record referred to in my 6/24 e-mail and any other records

21 potentially relevant to that matter.

22 Correct?

23 A    Yes.

24 Q    You were reiterating what you were saying in this, in the

25 below, right?

MARSHALL - CROSS - CHAN                                    3132

1    A    The June 24th e-mail, yes.

2    Q    And you testified as to your background yesterday, you've

3    been a lawyer all your life, correct?

4    A    Yes -- well, since I got admitted to the Bar in 1970.  It

5    seems like all my life.

6    Q    Fair enough.

7                And before you joined Rosewood Corporation, you were

8    a practicing attorney at a big law firm in Texas, right?

9    A    That's right.

10   Q    For 25 years, I think you said?

11   A    Yes.

12   Q    And your specific focus area was litigation, right?

13   A    Yes, it was.

14   Q    You brought cases on behalf of clients, right?

15   A    Yes.

16   Q    You sued people on behalf of the clients?

17   A    I did.

18   Q    When you were a practicing attorney, you were Board

19   Certified in civil trial law by the Texas Board of Legal

20   Specialization, right?

21   A    Yes.

22   Q    And you were also a fellow of the Texas Bar Foundation?

23   A    Yes.

24   Q    And also of the American College of Trial Lawyers?

25   A    Yes.

1    Q    These are -- these are -- I don't mean to toot your horn

2    for you, but these are big honors in the litigation world,

3    correct?

4    A    Well, really the only one that's an honor is American

5    College of Trial Lawyers because it's limited to 1 percent of

6    the lawyers.  The others you just kind of join and by virtue

7    of writing a check.

8    Q    So the context of you sending this lawyer -- I'm sorry,

9    you sending this e-mail that we just looked at, DX 112-8, was

10   that you were seeking to ratchet up the pressure and you sent

11   this e-mail, and we went through the exchanges; and then this

12   e-mail was followed by the Government's Exhibit 102-12?

13            MR. CHAN:   Can we put that up, please.

14   Q    And do you remember we discussed -- well, the Government

15   discussed this e-mail with you on direct examination?

16   A    (No audible response.)

17            MR. CHAN:  Let's start at the bottom of the e-mail.

18   Q    The prior e-mail that we looked at was in June and July.

19   Now we're into August?

20   A    Yes.

21   Q    And at the bottom, you know, you write again, Are we now

22   in a position to finalize this agreement, right?

23   A    Yes, I did.

24   Q    And you e-mail again, because it appears that no one

25   responded to you, correct?

MARSHALL - CROSS - CHAN                                3134

1    A    I believe that's correct.

2    Q    So you were referring again to the agreement, and you

3    reference specifically the fact that the Retrophin had raised

4    $25 million on August 16th, correct?

5    A    Yes.

6    Q    So to your mind now they have $25 million, they should

7    have the money to honor your -- to sign and honor your

8    agreement, right?

9    A    Yes.  I was wondering if the delay was due to them not

10   having the cash to perform the agreement, and I noticed that

11   they raised this much money and I wanted to point that out,

12   saying let's get it finalized.

13   Q    And in your years of litigating, have you heard the term

14   "deep pocket"?

15   A    Yes.

16   Q    What does the term "deep pocket" mean in the context of

17   litigation?

18   A    Well, deep pocket in general means that someone has the

19   financial wherewithal to pay a settlement or if you have to

20   sue them, presumably pay the judgment.

21   Q    And here you're referencing the specific fact that

22   Retrophin is now newly in possession of $25 million; is that

23   right?

24   A    That's correct.

25   Q    And you also note at this time that the MSMB funds had

MARSHALL - CROSS - CHAN                                    3135

1   been liquidated and wound down, right?

2   A    You know, I would say the best answer I could give to

3   that is I assume that's right, but I was still rather pretty

4   much in the dark as to what was happened with the MSMB funds.

5   Q    You were in the dark because you weren't getting

6   information from Martin Shkreli --

7   A    That's right.

8   Q    -- correct?

9   A    That's right.

10  Q    Despite asking over and over, correct?

11  A    Yes.  I asked several times and got no response -- no

12  satisfactory answer.

13  Q    Now, moving up the e-mail chain going to August 21st,

14  Mr. Shkreli responds, Yeah, let's discuss.  Are you around on

15  Friday?

16  Right?

17  A    Yes.

18  Q    Then you respond to that that you're in North Carolina --

19  I'm sorry.  That you're here al day tomorrow, also this

20  afternoon if you wish to call.

21  Right?

22  A    Yes.

23  Q    By the way, do you feel as if Mr. Shkreli was stringing

24  you along?

25  A    Yes.

MARSHALL - CROSS - CHAN                3136

1    Q    Now, he responds to you, Even good ol' North Carolina

2    meeting with JFK -- do you understand JFK to be a drug

3    company?

4    A    I think that's GlaxoSmithKline.

5    Q    And some psychiatrists, he continues, for the company,

6    not my disturbed psyche.

7         Now when he refers to his disturbed psyche, what did

8    you understand that to mean?

9         MR. PITLUCK:  Objection.

10        THE COURT:  Sustained.

11   BY MR. CHAN:

12   Q    Well, let me put it this way:  You didn't take that

13   literally, right?

14   A    I took it as an effort to interject a little humor into

15   the discussion.

16   Q    That's because you knew him?

17   A    I didn't know him very well, but...

18   Q    But you didn't read those word in the e-mail literally,

19   correct?

20   A    That's correct.

21   Q    Now, moving up this e-mail now to -- you know, this

22   continued back and forth about communication.  And then on

23   August 28th, which is on to first page, at 1:39 p.m. -- do you

24   see that, that e-mail?

25   A    Yes.

MARSHALL - CROSS - CHAN                    3137

1   Q    -- you are writing between yourself and Martin Shkreli,

2   right?

3   A    Yes.

4   Q    Friday, it was Monday, yesterday, today, now I really

5   don't understand these delays if release form is okay.  I

6   don't want us to get close to a year from all the activity in

7   question with my further delay may force me into different

8   directions.

9         The different directions you were referring to there

10  was litigation, right?

11  A    I would say it was a veil threat of litigation.  It was

12  either perform the settlement agreement or possibly litigate,

13  yes.

14  Q    A little bit more than a veil, wouldn't you agree,

15  because you actually -- it will force me into a different

16  direction, you're saying that expressly, correct?

17  A    Yes, I did say that.

18  Q    And then above that Martin Shkreli responds, I

19  understand.  I'm cc'ing my attorney again and pressing on the

20  urgency of this.  We're in the midst of acquiring a company.

21  Our CFO is on -- and our CFO is on vacation.  I'm doing have

22  my very best.  I think my team understands what is at stake.

23  He wrote that, right?

24  A    He did.

25  Q    And at this time Retrophin had been a public company for

MARSHALL – CROSS – CHAN                    3138

1    less than a year, right?

2    A    I believe that's correct from what I had read.

3    Q    And you understood that it had had fund-raising

4    difficulties up until just recently, correct?

5    A    No.  No, I didn't.  I didn't know that, but I -- and

6    I knew that they recently had raised $25 million.

7    Q    And when Martin Shkreli wrote he thinks his team

8    understands what is at stake, that's precisely the reaction

9    you were hoping to get from him, to understand that a lot was

10   at stake for him, correct?

11   A    In general I would say I -- I was -- I wanted him to take

12   it seriously, and I viewed that that statement as if they were

13   starting to take it seriously.

14   Q    And indeed within a day of this e-mail exchange the

15   agreements were, in fact, executed, correct?

16   A    I think that's correct.

17   Q    You got the agreement that you would get $300,000,

18   correct?

19   A    I got that agreement signed and -- and the money, yes,

20   within about a day.

21   Q    You also got an agreement to get additional shares

22   signed, correct?

23   A    Yes.

24   Q    But as you've testified, you never actually got those

25   shares?

MARSHALL - CROSS - CHAN                                    3139

1   A    That's right.

2   Q    And in respect of this agreement relating to the

3   $300,000, per the agreement what Retrophin got was a release

4   from you from litigation, correct?

5   A    Yes.

6   Q    And so all of -- as a result of that release, the various

7   threats, veiled or otherwise that you had made, you could no

8   longer act upon, correct?

9   A    Yes.  After signing that release releasing Retrophin,

10  that is correct.

11  Q    Now, the other thing that we left off with yesterday was

12  that you sort of mentioned quickly that your words were, There

13  were aspects of this settlement agreement maybe that were

14  unusual.

15  Do you remember that?

16  A    Yes.

17  Q    And I take it what you were thinking of when you said

18  that was the fact that rather than have a single agreement,

19  basically a three-way agreement between you, the MSMB

20  entities, Martin Shkreli and Retrophin, you signed two

21  separate agreements, correct?

22  A    There was that, and there was a typo in the original

23  draft that I never corrected and it carried forward to the

24  scent drafts.  And that had to do with -- it was $300,000, but

25  they -- when they put the parenthesis there was a typo.  They

MARSHALL - CROSS - CHAN                    3140

1    left off one zero.

2    Q    But in the end you got the amount that you believed you

3    were supposed to get in the agreement, right?

4    A    Yes, that's right.

5    Q    And as to the fact there were two agreements, the way it

6    ended up was you had one agreement between you and Retrophin,

7    correct?

8    A    Yes.

9    Q    And that had to do with the money you were supposed to

10   get paid, correct?

11   A    Yes.

12   Q    And that money came from Retrophin, correct?

13   A    I do not know who it came from.

14   Q    You don't remember -- well, you got a wire, I suppose?

15   A    Yes.

16   Q    Do you remember where the wire came from?

17   A    I do not.  It went directly to Morgan Stanley Smith

18   Barney.

19   Q    Well, and that agreement governed the terms of the deal

20   between you and Retrophin, correct?

21   A    You said that agreement governed, I'm not sure -- let me

22   put it this way:  The release that I signed required Retrophin

23   to send $300,000, and I can't testify, but who sent the money?

24   I guess I assumed it was Retrophin.

25   Q    Okay.  In any event, so when you said that there were

1   unusual aspects of the agreement, you were referred to the

2   fact that there were two agreements rather than one, correct?

3   A    Yes, I think so.

4   Q    And you testified also I think that you didn't know the

5   reason why the agreement was two versus one, correct?

6   A    Yes.

7              MR. CHAN:   Can we put up Government Exhibit 102-12

8   again?

9   Q    Turning to the second page towards the top at 3:45 p.m.,

10  you remember that you testified on direct examination that

11  when you wrote this at 3:45 p.m. on August 27th, Where do we

12  stand, Martin?  Is there any issue other than recasting the

13  form of release as described on Friday?  I think you testified

14  that this followed a phone discussion you had the prior week

15  with Mr. Shkreli where this issue was discussed with you,

16  correct?

17  A    Yes.

18  Q    And that was the first time that this the -- issue of the

19  form of the release was raised to you as you recall, correct?

20  A    Yes.

21  Q    Okay.

22  A    I had accepted the form of the release on June 18 and was

23  ready to sign it, and that this was -- the next time the

24  release was discussed, I think, was that Friday, which Martin

25  said it needed to be recast and -- and maybe he said it needs

MARSHALL - CROSS - CHAN                         3142

1   to be divided into two parts, two separate documents.

2   Q    And he told you that.  But other than that, do you have

3   any idea as to why?

4   A    No.

5   Q    Did you inquire further?

6   A    No.

7   Q    You have no idea what was going on behind the scenes with

8   them as to that issue, correct?

9   A    That's right.

10  Q    Now, continuing up the e-mail chain on the first page,

11  Martin Shkreli writes at the bottom at 12:25 p.m., Hi.  Still

12  waiting on approval from my auditor and CFO.  As you can

13  imagine, there's some complexity here.

14           Do you know whether or not the waiting for approval

15  from auditors and the CFO had anything to do with the issue of

16  the recasting of the release?

17  A    I do not.

18  Q    And at the very top, Martin Shkreli again says, We're

19  wiring today the agreement.  The agreement has to be

20  compliant.  You'd be surprised how intricate this is.  I thank

21  you for your patience.

22           Do you know whether or not the reference to the

23  agreement being compliant and intricate had anything to do

24  with the issue of recasting the lease or not?

25  A    No.  Honestly, I didn't know what was happening on the

MARSHALL – CROSS – CHAN                    3143

1   other side.  I just wanted the money to get paid.

2              MR. CHAN:  Can we put up Government Exhibit 102-13,

3   please.

4   Q    And this is the e-mail where you got the settlement

5   agreement -- the two settlement agreements that you ultimately

6   signed, correct?

7   A    It is.

8   Q    And here at the bottom on August 28th at 3:32 Martin

9   Shkreli writes, After exhaustive talks with our attorneys,

10  there will be a revision to the agreement.  We will get this

11  at about 7:00 p.m. Eastern Standard Time.  The revision is

12  simple, but it merely removes MSMB and references Retrophin

13  alone.  This is crucial for a number of reasons that are

14  beyond my ability to explain.  Evan is cc'd if you have any

15  questions.

16  Do you see that?

17  A    Yes.

18  Q    So when Martin Shkreli offers up Evan Greebel to answer

19  any questions you have about this revision, did you take up

20  that offer?

21  A    If you're asking did I take up the offer to call him and

22  get him to explain to me?  No -- the answer is no.

23  Q    You didn't do that because it wasn't important to you,

24  correct?

25  A    I would say really the next thing that happened was I got

1   Evan Greebel's email the next day sending the two agreements

2   and saying the only difference was splitting them in two, and

3   I didn't inquire as to why they did it.  That was up to them.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION (Continued)

2    BY MR. CHAN:

3    Q    And you didn't do that because it wasn't to you, correct?

4    A    I would say really the next thing that happened was I got

5    Greebel's email the next date sending the two agreements and

6    saying the only difference was splitting them in two, and I

7    didn't inquire as to why they did it.  That was up to them.

8    Q    That wouldn't have affected your decision to sign it off?

9    A    That's right.

10   Q    The fact that there were two agreements versus one, in

11   your mind didn't change the substance of what agreed to and

12   what you were expecting, correct?

13            MR. KESSLER:  Objection.  Asked and answered on this

14   line of questioning.

15            THE COURT:  Sustained.

16   Q    By the way, if we turn to the third page of the email

17   which has the settlement agreement draft that you ultimately

18   signed.

19            THE COURT:  The exhibit number, please?  102-2013.

20            MR. CHAN:  It's Government Exhibit 102-13 at Bates

21   R020197.

22   Q    And at the first whereas clause where it says "whereas

23   releasor previously invested in Retrophin."

24            Do you see that?

25   A    Yes.

1  Q    And you had indirectly invested in Retrophin through

2  MSMB, correct?

3  A    As I explained yesterday, I believe that happened because

4  I put my money in MSMB, and then all sudden in February with

5  no explanation, Martin sent me a share certificate for 37,000

6  plus shares.

7            So I don't know whether I invested in Retrophin

8  or -- from my point of view, I invested in MSMB.  So it's

9  possible that what -- and I guess likely that what happened is

10  MSMB put some of the money that I invested in Retrophin.

11  That's why I can't answer that.

12  Q    And that's what happens all the time when you invest in a

13  fund and it itself invests in other investments that you are

14  an indirect investor in whatever the fund invests in, correct?

15            MR. KESSLER:  Objection to the form.

16            THE COURT:  Try to rephrase it, Mr. Chan.

17  Q    Putting aside what you were aware of or not aware of at

18  the time, the fact of the matter was you were indirectly

19  invested in Retrophin via the fund, correct?

20            MR. KESSLER:  Objection.  Assumes facts not in

21  evidence.

22            THE COURT:  Sustained.

23  Q    If, sir, you made an investment in a hedge fund and that

24  investment -- fund, sorry, and that hedge fund invests in an

25  investment, you are now an indirect investor into that

1    investment of the hedge fund, correct?

2    A    I suppose you can characterize it that way.

3    Q    And, in fact, at the time of this settlement agreement,

4    you were a shareholder of Retrophin, right?

5    A    That is right.

6    Q    So apart from what this agreement says, you actually were

7    physically holding restricted shares, right?

8    A    That's right.

9    Q    More than 30,000 shares, correct?

10   A    Yes.

11   Q    Now, I want to go backwards in time now and go to your

12   decision to invest and I'm happy to spend the bulk of the time

13   focusing on the end of your investment at the time.

14          I think you testified that you were initially

15   introduced to Mr. Shkreli through someone named Darren

16   Blanton, correct?

17   A    Yes.

18   Q    And you testified that you met Darren Blanton by virtue

19   of the fact that he happened to rent an office in a property

20   owned by Rosewood, correct?

21   A    Yes.  In fact, we -- it's our building and we officed in

22   that same building.

23   Q    What was Mr. Blanton's profession at the time?

24   A    I think he was a investor doing business under Colt

25   Ventures.

MARSHALL - CROSS - CHAN                    3148

1   Q    So did he have his own investment fund?

2   A    I don't know for sure.

3   Q    But when you say "investor," you understood he made

4   investments professionally?

5   A    Well, he made a lot of investments.  Profession is a

6   characterization.  He would probably think he was.

7   Q    Okay.  But the fact that it was Mr. Blanton who

8   recommended MSMB to you was a factor in your decision,

9   correct?

10  A    That was a factor in our decision to take the meeting.

11  Q    But not a factor to actually make the ultimate investment

12  by you?

13  A    I would say it was a small factor.  He was very high on

14  Martin Shkreli, but we tried to make our own independent

15  decision on whether or not he was reliable.

16  Q    Mr. Shkreli?

17  A    Yes.

18  Q    And it was a fact an independent decision you performed

19  due diligence, correct?

20  A    Well, I'll tell what you I did and then you can tell --

21  I'm not sure whether you consider this due diligence in the

22  normal sense, but I spent, along with two other Rosewood

23  employees, probably about two hours talking to Martin

24  initially.  And he had discussed a number of small

25  pharmaceutical companies with us that showed that he had a

1    very detailed knowledge of that area, and he suggested -- he

2    even said I'll give you some ideas after this meeting of ones

3    that I think will do well and ones that I think will do

4    poorly.

5              And there were several of those that I followed to

6    see if he was right.  And I would say over a period of three

7    or four months, he was right every time.  So to that extent, I

8    followed what he had said and also, of course, I read the PPM

9    that I was given.

10   Q    Mr. Blanton told you that Mr. Shkreli was a genius,

11   right?

12   A    I think he did, yeah.

13   Q    And Mr. Blanton said that he had thus far made a good

14   deal of money with Mr. Shkreli, correct?

15   A    I believe he did, yes.

16   Q    Didn't he say more than a million dollars?

17   A    I think he did.

18   Q    And you had these meetings with -- well, you said one

19   meeting with Mr. Shkreli, or more than one meeting.

20   A    Just one.

21   Q    But after the meeting you had two conversations with him,

22   correct?

23   A    Yes.

24   Q    And when you interacted with Mr. Shkreli, you did what

25   you could to size him up, right?

MARSHALL - CROSS - CHAN                    3150

1   A     Yes.

2   Q     And after doing that you found him to be credible,

3   correct?

4   A     Yes.

5   Q     You took him at his word, right?

6   A     Well, mainly I was trying to determine whether his

7   recommendation on stocks made sense and panned out.  And the

8   answer there is, yes.

9         And in terms of taking him at his word, I suppose I

10  would say, yes, I had no -- no reason to believe that anything

11  said was not accurate.

12  Q     Well, and we looked at some of the emails.

13        Let's put up 81-8, please.

14        (Exhibit published.)

15        In fact, Mr. Shkreli sent you to tell you the

16  performance of your investment.

17        Do you remember those?

18  A     Yes.

19  Q     And he's telling you, you know, what your investment has

20  grown to and the performance of the funds, correct?

21  A     Yes.

22  Q     You took him at his word when he sent you these emails,

23  right?

24  A     Yes, I sure did.

25  Q     You had no reason to think he was being untruthful to you

MARSHALL - CROSS - CHAN                              3151

1    at the time, correct?

2    A     That's right.

3    Q     By the way, you know, we've spent some time talking about

4    the settlement agreements.

5          Your decision to invest in MSMB had nothing to do

6    with Evan Greebel, right?

7    A     That's right.

8    Q     You never even knew him at that time, correct?

9    A     That's right.

10   Q     And during the time of your investment before the wind

11   down, during the time of the investment as you're getting

12   these investment returns, Mr. Greebel had nothing to do with

13   that, correct?

14   A     That's right.

15   Q     The only time that you started to interact with

16   Mr. Greebel was after you had reached an oral agreement with

17   Mr. Shkreli, correct?

18   A     I think that's right.

19   Q     He was brought in to do what lawyers do, which is to

20   paper up the agreement, correct?

21   A     From what I saw and I expected, yes, that's right.

22   Q     Something that you've seen a lot in the course of your

23   litigation career?

24   A     Sure.

25   Q     And as a lawyer, there were times when you were brought

MARSHALL - CROSS - CHAN                    3152

1    in in order to write and document an agreement that the

2    parties had themselves reached, correct?

3              MR. KESSLER:  Objection.

4              THE COURT:  Try to rephrase your question --

5    actually, I think you can rephrase the question and maybe

6    we'll withdraw the objection.

7    Q    But what I was getting at, Mr. Marshall, was that in your

8    experience as a lawyer, were there times when you were asked

9    on behalf of a client to document an agreement that the

10   parties had reached outside of you?

11   A    Yes.

12   Q    And in those situations, you rely on what the parties

13   tell you in terms of their agreement offered, correct?

14   A    Yes.

15   Q    Now, going back to the time of your decision to invest,

16   do you recall that Mr. Shkreli also told you that he had a

17   hundred million dollars of assets under management?

18   A    He may have said that.  Or I may have heard that through

19   Darren Blanton.  But somehow I got the impression that MSMB

20   was quite large.

21   Q    And he also told you, prior to your investment, that he

22   was getting 48 percent returns?

23   A    He may have.  But as I sit here today, I can't say

24   whether he did or didn't.  It wouldn't surprise me if that

25   statement was made.

MARSHALL - CROSS - CHAN                3153

1   Q    You referenced the offering documents.

2                Will you put up Government Exhibit 6.

3                (Exhibit published.)

4                Remember you were asked questions about the private

5   offering memorandum on direct yesterday?

6   A    Yes, sure.

7   Q    One of the things that you said yesterday was that you

8   understood this to have been drafted by Katten, the law firm.

9                Do you remember that?

10  A    Yes.

11  Q    Could you be mistaken in that?  Can you through the PPM

12  to see where, if at all, it mentioned anything about Katten?

13  A    If it -- I thought that it said that their outside

14  counsel were Katten.  If it doesn't say that, I think Martin

15  told me that, because that's something like I clearly

16  understood at the time I made the investment.

17  Q    But in terms of who wrote the offering memorandum, if

18  there's not something written in here about who wrote it,

19  would there be any other basis for you to think that Katten

20  wrote this offering memorandum?

21  A    At the time I had the impression that Katten wrote it.

22  If that's -- it's possible that I got that impression from

23  Martin and it's not the case than I had a mistaken impression.

24  Q    But that was a reference to a comment that they were

25  counsel, correct?

MARSHALL - CROSS - CHAN                    3154

1    A    Yes.  Yes.

2    Q    Generally, correct?

3    A    Yes.

4    Q    And so that doesn't necessarily refer to who wrote this

5    offering memorandum, correct?

6    A    That would be true.  I guess I assumed that they had and

7    maybe that was mistaken.

8    Q    And you also assumed that they only had one counsel, one

9    law firm working for them, as opposed to more than one,

10   correct?  Correct?

11   A    The best way I can answer you is that I was either told

12   or read, and I assume from your questioning now that I was

13   told, that Katten was their law firm and I made the assumption

14   that Katten had written this document.

15   Q    Even on the conversation that you seem to recall about

16   being told that Katten was the law firm for MSMB, do you

17   know -- what's the time period of that conversation that

18   you're recalling?

19   A    It would have been fall of 2010, approximately.

20   Q    Is it possible that you're confusing the conversations

21   you had about Katten in connection with the settlement

22   agreements with conversations with respect to your decision to

23   invest?

24   A    I don't think that's right because I remember at the time

25   I invested I was impressed that they had Rothstein Kass as

MARSHALL - CROSS - CHAN                    3155

1    auditors.  They were a reputable firm and I had the impression

2    that their legal counsel was Katten and that they were a

3    reputable firm.  It's possible that the latter impression was

4    an erroneous assumption on my part.

5    Q    Can you turn to page 27 of the offering memorandum, which

6    is Bates SM161.

7              (Exhibit published.)

8    A    Yes, I have it.

9    Q    And it has paragraph labeled "auditors," correct?

10   A    Yes.

11   Q    And it says -- and it identifies in that provision that

12   Rothstein Kass, as you just testified, was the auditor,

13   correct?

14   A    Yes.

15   Q    But isn't there no provision in this offering memorandum

16   that identifies Katten as an outside lawyer?

17             MR. KESSLER:  Objection as asked and answered.

18             THE COURT:  Sustained.

19   Q    Turning to Government Exhibit 25.

20             (Exhibit published.)

21             Which is the subscription agreement which you signed

22   to initiate your investment, correct?

23   A    Yes.

24   Q    And turning to page 4 of that, question 3.5, where it

25   says, Please provide in the space below any additional

MARSHALL - CROSS - CHAN                          3156

1    information which would indicate that you have sufficient

2    knowledge and experience in financial and business matters so

3    that you are capable of evaluating the merits and risks of

4    investing in restricted securities of a private enterprise

5    such as the partnership.

6             Do you see that?

7    A    Yes.

8    Q    And can you read what your handwritten answer was?

9    A    I evaluate such investments for Rosewood.

10   Q    So the process of deciding whether or not to invest in

11   something like MSMB was something that you had professional

12   experience with at that time, correct?

13   A    Yes.  Yes.

14   Q    That's the kind of thing you were doing for Rosewood,

15   correct?

16   A    In part, yes.

17   Q    And applying your experience, you evaluate information

18   you had and decided to make that investment, right?

19   A    That's right.

20   Q    And at the end of the day, through the settlement

21   agreements, you ended up, after making a 200,000-dollar

22   investment, you ended up with $300,000 in cash plus I think

23   you testified about $500,000 after you sold the stock, right?

24   A    Well, at the time settlement agreement, I had the stock

25   and got 300,000 cash.  My best memory is that the stock was

MARSHALL - CROSS - CHAN                    3157

1    trading around three.

2              So you used "at the time of the settlement

3    agreement."  So that would have been -- it was worth maybe a

4    hundred thousand then.  By the time I got it freed up a year

5    after it was issued to me, the stock had gone up

6    substantially, and so I got substantially more money when it

7    sold.

8    Q    You got substantially more money being $500,000, correct?

9    A    I believe it was about 480.

10   Q    480.

11   A    Yes.

12   Q    So 480,000, plus 300,000 in cash adds up to $780,000?

13   A    Yes.

14   Q    From your original investment of 200,000?

15   A    That's right.

16   Q    That's a pretty good deal, right?

17   A    It turned out that way.

18   Q    And in fact, I think the words that you used described

19   the ultimate result was "no harm no foul," right?

20   A    Yes, I wasn't -- that was part of what I was referring to

21   in that regard, yes.

22   Q    And let's put up Government Exhibit 102-16.

23              (Exhibit published.)

24              This is the March 13, 2014 email chain.  And as you

25   testified on direct, this is in the context of you letting

1    Mr. Shkreli know about a request of you for an interview by

2    the SEC, right?

3    A    Yes.

4    Q    And actually scrolling down a bill first, yes, 4:56 p.m.

5    email.

6            You write, Martin I just received a letter from Eric

7    Schmidt at SEC seeking a voluntary interview.

8            And, sir, that interview was in connection in the

9    matter of MSMB Capital Management, LLC valuation, right?

10   A    Yes.

11   Q    Inquiring into your past investment into MSMB, right?

12   A    Yes.

13   Q    And when you raised that to Mr. Shkreli, going up, he

14   responds that they have been cooperating fully, right?

15   A    It says that, yes.

16   Q    And he said that they were providing information needed

17   to resolve the review, right?

18   A    Yes.

19   Q    And he encouraged you to cooperate yourself and answer

20   any questions, correct?

21   A    Yes.

22   Q    He noted that the SEC is reaching out to other former

23   limited partners, correct?

24   A    Yes.

25   Q    And then when you respond to that, that's when you

1    referenced the no harm no foul concept, right?

2    A    Yes.

3    Q    But you say, In addition to it being no harm no foul, you

4    referred to, I think the picture is essentially number of act

5    and rule violations, correct?

6    A    I did say that.

7    Q    And by that you were referring to civil matters, correct?

8    A    I never really drew that distinction at the time.  What I

9    was referring to was Securities Act and rules under the

10   Securities Act and that's -- that's what I was referring to.

11   Q    But those were issues with respect only to MSMB, correct?

12   A    That was my understanding at that time.

13   Q    With your investment in MSMB, correct?

14   A    Yes.

15   Q    But in the end you thought that there was no harm no

16   foul, right?

17   A    As far as the investors were concerned, yes.

18   Q    Because as you've testified, you got a good deal in the

19   end, right?

20   A    Yes.

21   Q    And in connection with the SEC, you told them everything

22   you knew, right?

23   A    No.  I don't at this point have an independent memory of

24   whether the SEC had followed up with me.  There may have been

25   a telephone interview.  It may have been an in-person

MARSHALL - CROSS - CHAN                    3160

1  interview but it was minimal, if at all, because otherwise I

2  would remember it.

3          But let me say this:  I was not restricted to tell

4  them whatever I knew about this matter.

5  Q    Right.  And, in fact, there was no one told you, hey,

6  don't tell anything about these settlements agreements, right?

7  A    That's right.

8  Q    And actually in this email chain, after you reached the

9  settlements and you have obtained your payout and the shares,

10 at the very bottom this email chain began with Martin Shkreli

11 presenting you with a new investment opportunity, correct?

12         He says, Hi, everyone.  As you know, my friend Ethan

13 Perlstein has started a biotech company called Perlstein labs.

14 I and Retrophin have agreed to lead the Series A.

15         Do you remember this?

16 A    Yes, I remember getting that.

17 Q    And scrolling up to the next email.  You write, Hi,

18 Martin, I will invest $50,000 in Perlstein Labs.  What is the

19 size of the series, A round, and will you be on its board.

20 Correct?

21 A    That's what it says.  I'm a little surprised at the next

22 thing which says, Schuyler raiding sent from my iPad.

23 Q    But the point is, when presented with an additional

24 investment opportunities after you had the experience of MSMB

25 and entered into the settlement agreements, you still were

MARSHALL - REDIRECT - KESSLER                    3161

1    willing to invest again with Mr. Shkreli, correct?

2    A    I was willing to consider it.  I didn't -- this was not

3    what I would consider a commitment.  It was an indication of

4    interest to consider an investment of that size.

5    Q    Well, you certainly didn't say heck, no, having had gone

6    through with what I just went through with you, right?

7    A    That's right.

8              MR. CHAN:  One moment please.

9              (Pause.)

10             MR. CHAN:  No further questions.

11             THE COURT:  All right, sir, any redirect?

12             MR. KESSLER:  Very, very briefly.

13             Does the Court mind if I do it from here?

14             THE COURT:  You know, we have to be able to hear

15   you, so...

16   REDIRECT EXAMINATION

17   BY MR. KESSLER:

18   Q    Mr. Marshall, you were just asked about that no harm no

19   foul email in March 2014.

20             Do you remember that?

21   A    Yes.

22   Q    And when you wrote "no harm no foul," was that based on

23   the information you had in March 2014?

24   A    Yes.

25   Q    You were also asked about a number of communications in

MARSHALL - REDIRECT - CHAN                    3162

1    July and August 2013.

2              Do you recall that?

3    A    Yes.

4    Q    Those were the communications where the defense counsel

5    asked you about litigation holds, veiled threats of

6    litigation, deep pockets?

7              Do you remember that?

8    A    Yes.

9    Q    Were all of those communications after you had received a

10   written settlement agreement from the defendant Evan Greebel?

11   A    Yes.

12             MR. KESSLER:  Nothing further.

13             MR. CHAN:  Just one question, Your Honor.

14   REDIRECT EXAMINATION

15   BY MR. CHAN:

16   Q    Even after you got the written draft settlement

17   agreement, you still could have sued if you wanted, right?

18   A    Yes, if it were not performed.

19   Q    Or signed?

20   A    Or signed.

21             MR. CHAN:  No further questions.  Sorry.

22   BY MR. CHAN:

23   Q    And, sir, you don't need to threat a lawsuit to go ahead

24   and file a lawsuit, right?

25   A    In general, that's right.

PROCEEDINGS                                  3163

1          MR. CHAN:  Okay.  Thank you.

2          MR. KESSLER:  Nothing further.  Thank you.

3          THE COURT:  All right, Mr. Marshall, have a safe

4    strip back to Texas.  Nice to see you.

5          THE WITNESS:  Thank you.

6          (Whereupon, the witness was excused.)

7          MS. SMITH:  Your Honor, the Government's ready for

8    its next witness, but we just need to do a little bit of setup

9    and finalize the stipulation.  So if we can take a five-minute

10   break and then we'll move right ahead with the next witness.

11         THE COURT:  All right.

12         Members of the jury, we'll give you a quick break at

13   this time.  Please don't discuss the case.  Keep an open mind.

14   And we will come and retrieve you as soon as we can.

15         (Jury exits the courtroom.)

16         THE COURT:  All right.  Thank you.

17         MR. DUBIN:  Your Honor, if we can have one moment.

18   I just wanted to make Your Honor aware that we're working hard

19   to get it done and we plan to file a submission for Court's

20   consideration regarding the issue that we discussed at length

21   at sidebar about investors and whether or not they return the

22   money.

23         We have done some further research on it, and we

24   think that, you know, it's a critical issue.  And I just want

25   the Court to know that because our other investor witnesses

PROCEEDINGS                                    3164

1   that are set to testify, and we just wanted -- we didn't want

2   to catch the Court by surprise with a weekend submission or

3   anything like that.  So we're going to submit it for the

4   Court's consideration tomorrow, hopefully by the end of the

5   day tomorrow.

6                THE COURT:  Well, that is into the weekend, so...

7                MR. DUBIN:  All right, by 10 a.m. in the workday.

8                THE COURT:  All right, and then the Government's

9   going to have to respond, obviously, after the weekend.

10               MR. BRODSKY:  We will try to file it tonight, Your

11  Honor.

12               MR. PITLUCK:  Your Honor, this issue's been raised

13  and addressed to be considered.  If we're going to come back

14  on everything, we're in the middle of the trial we're trying

15  to move it along and now we're getting weekend submission on

16  an issue when we've already had three investors testify.

17               MR. DUBIN:  We understand.  We took a look, Your

18  Honor, back at the record of some -- of not only the prior

19  trial but Ms. Hassan' testimony.  We did not think that this

20  was a crucial, crucial issue to the defense.  I assure, Your

21  Honor, we would not raise it.  We have been working on it

22  since we've had the sidebar.

23               I will work as late as I have to this evening to get

24  it to the Court, you know, by either late this evening or

25  first thing in the morning.  We feel that it is critical to

1   Mr. Greebel's defense.  I just wanted to make sure that we

2   gave both the Court and the Government notice that we're going

3   to make the submission.

4           MR. PITLUCK:  Judge, this is the first we've heard

5   of this.  We are now working through the weekend, preparing

6   witnesses, trying to meet deadlines, trying to move this trial

7   along, and to just file something late tonight it's an

8   inconvenience to us and the Court.  We need time to respond.

9   We need time to do the legal research.

10          THE COURT:  Well assuming I do grant your request,

11  what would you do, recall all these witnesses?

12          MR. DUBIN:  No, we would not, Your Honor.  It would

13  just be that we have a little bit more latitude on the

14  questions for some of the investors going forward.

15          I am --

16          THE COURT:  If I understand your argument, it is

17  that if the investors did not give the proceeds of settlements

18  and consulting agreements back to Retrophin, that's evidence

19  that there wasn't a fraud on Retrophin.

20          MR. DUBIN:  That's part of it.  That's only part of

21  it.

22          The other part of it is Retrophin, and I don't want

23  to preview too much because we are still doing legal research

24  on a portion of it, but the other part of it, Your Honor, is

25  that Retrophin at some point, as this is happening in

PROCEEDINGS                                    3166

1    realtime, makes the business decision, makes a critical

2    business decision when they make those SEC disclosures, that

3    they decide then and there we're going to take a charge, their

4    auditors know about it, other board members know about it.

5    They all know about it.

6            I know that there's a dispute about when they knew

7    about it who proved it, but ultimately they did find out about

8    it, they did know about it before the end of the charging

9    period of the indictment.  And they decided, consciously made

10   the decision we are moving on.  We're not going to ask for the

11   money back we're not going to go after it.  And that is

12   critical to our defense to bring that out and to make sure

13   that the jury knows that these investors, and we think that

14   the law supports our position.  And I don't want to do it -- I

15   don't want it give short shrift on behalf of Mr. Greebel.  And

16   I am I think very sensitive to not wasting the Court's time or

17   the Government's time, but issues arise during trials and

18   something as critical as this --

19           THE COURT:  But this is an issue that did not just

20   come out of the blue as a surprise.  This is an issue that,

21   especially based on the prior trial you knew existed.

22           I guess my concern is all the other evidence that is

23   in the case about what Retrophin did in its SEC filings and

24   decisions it made to, you know, go forward and disclose and

25   take charge, that's in the record.

PROCEEDINGS                                    3167

1            But when you are trying to argue to the jury that

2      they should infer, because victims of a prior fraud, who were

3      paid and compensated were not being asked to give the money

4      back to another alleged victim; i.e. Retrophin, is not, you

5      know, really relevant to the issues.

6            I think you have enough evidence in the record

7      regarding Retrophin's conduct, its board members' conduct,

8      what they claim they knew or didn't know, and I'm just not

9      sure that one can draw an inference that Retrophin should have

10     gone after folks that allegedly Mr. Shkreli victimized,

11     right --

12            MR. DUBIN:  Yes, Your Honor.

13            THE COURT:  -- and compensate them.

14            Obligations that Retrophin itself said are

15     obligations of either Mr. Shkreli or MSMB.

16            We have a lot of evidence that the investors thought

17     that, especially these last two investors, Mr. Kocher and

18     Mr. Marshall, that, yeah, they were serious about about suing.

19     And Retrophin had some exposure, at least it was reasonable

20     for Retrophin and its counsel to think, oh, we have some

21     exposure here so, therefore, we're going to demand a release.

22     There's nothing wrong with demanding a release.

23            But to go on this tangent that an alleged victims of

24     a financial fraud have to now give the money back to another

25     alleged victim is really, I think, opening the door, because

PROCEEDINGS                                      3168

1   the Government has made very clear that they're going to open

2   doors to other investigations about this whole thing, the

3   situation.

4           MR. DUBIN:  Understood, your Honor.

5           And just so I just -- I think it's important that

6   you keep this in mind prior to our submission.

7           I understand the Court's thinking on this as it

8   exists now.  What was a little bit surprising to us is we did

9   study the prior trial very closely, and the questions that

10  were asked and allowed at that trial on this subject were --

11  the Court's ruling in that trial were that these investor

12  witnesses were asked if Retrophin asked you for the money

13  back.  And those questions they weren't objected to.

14          THE COURT:  Right, they weren't.  And there were, in

15  fact, there were two separate trials.  Just as you don't want

16  to be bound by rulings or objections made or not made in the

17  first trial --

18          MR. DUBIN:  Agreed, yes.

19          THE COURT:  -- right?

20          MR. DUBIN:  Agreed, yes.

21          THE COURT:  You are, you know, there's a very good

22  defense team.  There's a new line of prosectors.  There may

23  have been reasons to object or not object to certain lines of

24  questioning in the first trial vis-a-vis Mr. Shkreli, and so I

25  think we need to separate the two.  No one's bound.

PROCEEDINGS                                    3169

1          MR. DUBIN:  The only reason I was raising that, Your

2     Honor -- the only reason I was raising that is because I

3     didn't want Your Honor to think that this is an issue we

4     looked at before and then have shifted.

5          We looked at it before and we thought we would be --

6     you know, we would be within our right and within the bounds

7     of what we thought were proper questions in this trial based

8     on that.

9          We understand that there been different rulings,

10    different trial, that's why we had dug a level deeper and are

11    doing the research.

12         If we didn't think that it was just a crucial,

13    crucial point, and we think that the law supports us.  I just

14    wanted to make sure I gave the court the courtesy of knowing

15    we were going to file the submission and raise it, because if

16    we didn't take a look at it and think that the law supported

17    it and it wasn't so critical to Mr. Greebel's defense, we

18    would not waste the Court's time with a filing.

19         THE COURT:  So you're saying that if Retrophin had

20    demanding the money back and all these allegedly defrauded

21    investors of Mr. Shkreli, who were victims of Mr. Shkreli's

22    fraud, gave the money back, that that would show that

23    Mr. Greebel was guilty?

24         I mean, you can't have it -- it's just irrelevant in

25    that direction as it is in the direction you're posing.  We

PROCEEDINGS                                                3170

1    wouldn't allow that kind of inference to be drawn.

2           If those investors had to give the money back to

3    Retrophin would not have relevance to whether or not

4    Mr. Greebel is guilty of Count Seven.

5           MR. BRODSKY:  Your Honor, look, our submission won't

6    be that long.  If it doesn't persuade Your Honor, if you look

7    at case law and it doesn't persuade you, then we are where we

8    are.

9           We do feel compelled.  We looked at the case law.

10   We looked at the benefit of the bargain case law as well under

11   wire fraud, and we do feel like the Government is making a

12   mistake here in precluding it and asking for a preclusion.  We

13   think that's a fatal mistake for the Government to do it.

14          And they should look at the case law that we're

15   going to cite as well.  It is in their interest, just as much

16   as in our interest, that they get the law right.

17          And I understand that the Government is taking the

18   position now, without seeing our cases that we're citing, and

19   without looking at our submission that we're wrong.  We may

20   persuade them with the cases that we cite.  We may persuade

21   Your Honor that we're right.  And if are right on the law, and

22   there should be a change, then there's no reason why it

23   shouldn't happen now.  And so we feel compelled to make the

24   submission.  It won't be long.  And the Government has a deep

25   team with many resources, as we know, and they are hard

PROCEEDINGS                                    3171

1   working, extremely bright team, and I'm sure they'll take a

2   look.

3            MR. DUBIN:  Sorry, just to finish a point.

4            MR. PITLUCK:  No we're trying to --

5            MR. DUBIN:  Yes, I understand.

6            We will not seek to recall witnesses that have

7   already been called.  I think one of them has already

8   testified to this, as Your Honor will see in our submission,

9   and, you know, we will simply establish it with the investor

10  witnesses going forward.

11           MR. MASTRO:  Yes, Your Honor, Mr. Rosenwald is

12  coming on Monday morning, I would like to ask him that.

13           I didn't ask Mr. Geller because of Your Honor's

14  ruling.  Mr. Geller had also threatened a lawsuit.

15           But, Your Honor, I would have asked him, but for

16  Your Honor's ruling.  And I know he would have said he kept

17  the money.  And, in fact, he implied in his testimony, of

18  course I kept the money.

19           THE COURT:  So if he had given the money back, what

20  would your view be?  How would that have any bearing on the

21  issues about Mr. Greebel?

22           If every investor gave the money back, so tell me.

23  Answer the question.

24           MR. MASTRO:  I am, Your Honor.

25           It speaks to whether Retrophin made a conscious

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                              3172

1    decision that, in fact, it got a benefit of a bargain, it

2    altered its financial statements and it wasn't the victim of a

3    fraud.  Directly contrary to the Government's theory.  Because

4    it didn't ask for the money back.

5             We'll explain all this in our submission.  But of

6    course it's relevant, Your Honor, to that.  Retrophin's not

7    here claiming it was a victim of a fraud.  It amended its

8    filings.  It got the benefit of its bargain in those suits.

9    It decided to go forward.  It was better to have peace and it

10   disclosed it in its filing, Your Honor.

11            THE COURT:  The Government's indemnification

12   agreement from Mr. Shkreli, which everybody thought was...

13            Can I hear from the Government a second?

14            I'm familiar with all this evidence, but I'm just

15   saying that your argument that you want to make and the

16   inference you want the jury to draw would be inappropriate to

17   draw in the circumstance where as you posit that Retrophin

18   demanded and got the money back and made the litigation

19   decision, there's no way that MSMB Capital and MSMB Healthcare

20   investors could possibly sue us for anything that predates our

21   existence.

22            MR. BRODSKY:  And just to supplement what Mr. Mastro

23   said.  We're just talking about the charge period.  We're just

24   talking about the period through September 2014.  We're not

25   talking about a period beyond that.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    3173

1            MR. MASTRO:  Correct, Your Honor.

2            MR. PITLUCK:  Judge, I'm not going to take the bait

3       on resources.  I think that's obvious to the Court.  But I

4       will say we are cognizant on preserving resources and making

5       sure we're moving the trial forward.

6            But, Judge, first of all, this has been briefed.

7       Second of all, they are, as the Court pointed out, going into

8       an area about what Retrophin did after it discovered this

9       conduct:  The investigation, who they sued, why they sued, why

10      they restated.  It is impossible to cabin this line of

11      argument to pre-September 2014.

12           Your Honor, that would require opening the door to a

13      lot of evidence that would not only extend the length of this

14      trial, but be highly prejudicial to the defense, which we, as

15      the Court just said, it is well familiar with, we would be

16      required to do, and I think permitted to do.

17           So if Your Honor is inclined to let them file this

18      document --

19           THE COURT:  Of course, I'm not going to preclude

20      anyone.

21           MR. PITLUCK:  If Your Honor wants us to respond, we

22      will.  But, Judge, this is just -- this is such a late hour.

23      Three investors have already gone on.  There's not that many

24      investors left.

25           THE COURT:  I mean when you respond, do you want to

1    set forth so they can make a risk of -- an assessment of the

2    risk that they are taking by pushing this as to what evidence

3    you would have to proffer to counter.

4              MR. PITLUCK:  And, of course, as Your Honor's

5    pointed out a number of times, the relevance to the charged

6    conduct and the opposite inference.  If anybody did give money

7    back, what would we be allowed to argue based on that.

8              MR. DUBIN:  We will -- I think, Your Honor, we will

9    set out the relevance argument as well.  We feel duty bound on

10   behalf of Mr. Greebel to file this.  If I didn't, we wouldn't.

11   So we understand that, you know, we have to be judicious about

12   how we're using the Court's time and Government's time.

13             THE COURT:  It's not that, I think you have to look

14   at what the downside risk may be, because the Government is

15   going to be able to explain what Retrophin did and there might

16   be --

17             MR. DUBIN:  Understood, Your Honor.

18             THE COURT:  -- concern about what evidence the

19   Government would proffer about Retrophin's stated conduct

20   involving Mr. Shkreli in Counts Seven and Eight.

21             MR. DUBIN:  Thank you.

22             MR. PITLUCK:  Judge, just so we're clearing on the

23   timing.  They said they would file at some hour tonight.

24   We're trying -- we will try desperately to give the Court as

25   much time as possible with the understanding that we have

1   scheduled commitments tomorrow.

2              THE COURT:  Can you do this by Saturday night?

3   We'll work on this Sunday.

4              MR. DUBIN:  We will try.

5              MR. PITLUCK:  We will do that.

6              MR. KESSLER:  If the fact in dispute is whether the

7   investors gave the money back, if that is the fact in dispute,

8   then this motion simply needs to be resolved at some point

9   before Rule 29 motions, and there can be a stipulation one way

10  or another.  That's a possibility, so...

11             THE COURT:  Well, do you want to stipulate?

12             MR. KESSLER:  No, no, I'm just saying if it's even

13  possible we can resolve it that way.  But we'll file something

14  on Saturday, and we can go from there.

15             MR. DUBIN:  If we can agree to a stipulation.

16             MR. KESSLER:  We cannot agree.

17             MR. DUBIN:  Oh, okay.

18             THE COURT:  So what time Saturday night?

19             MR. KESSLER:  We'll try to do it as early -- Your

20  Honor, we'll try to do it as early as we can, but the defense

21  is putting us in a position where they've litigated the

22  benefit of the bargain months ago.  They clearly knew this

23  issue was coming if it was critical to their defense.  They

24  thought about it and they are now filing something late on a

25  Thursday and, you know, we'll try to respond as early as we

PROCEEDINGS                                        3176

1    can on Saturday, but, you know, that's giving us two days to

2    respond to something that's been cooking for months.  So we'll

3    do everything we can, and we'll get it in as early as we can.

4              MR. PITLUCK:  And, Your Honor, we really do want to

5    put on witnesses today.  We're trying to move this.

6              THE COURT:  All right, so we'll get started.  Five

7    minutes?  Ready to go?  All right, no more than five minutes.

8              MR. BRODSKY:  Yes, Your Honor.

9              (Whereupon, a recess was taken at 10:34 a.m.)

10             MS. SMITH:  And, Your Honor, just before we swear in

11   the witness, I'm just going to put in Government Exhibit 1000,

12   which is a stipulation, and then we'll start with

13   Ms. Spaulding.

14             THE COURT:  Thank you.

15             (Jury enters the courtroom.)

16             THE COURT:  All the jurors are present.  Please have

17   a seat.

18             Please have a seat, everybody.

19             Are you ready to proceed, Ms. Smith?

20             MS. SMITH:  Yes, Your Honor.

21             Before we call our next witness, we're just going to

22   move to admit a stipulation between the parties, which is

23   Government Exhibit 1000.

24             MR. CHAN:  No objection.

25             THE COURT:  All right, you may read the stipulation.

PROCEEDINGS                                    3177

1          MS. SMITH:  It's actually on the Elmo.

2          THE COURTROOM DEPUTY:  Oh.

3          THE COURT:  This is an agreement between the parties

4    that will be read into the record.

5          MS. SMITH:  Your Honor, we're actually not going to

6    read the entire stipulation, we're just going to summarize it,

7    and then with Ms. Spaulding we'll walk through it.

8          So Government Exhibit 1000, It is hereby stipulated

9    and agreed by and between the understand signed parties.  And

10   there's a list of various bank records.  Government

11   Exhibits 901, 902, 902-1, 902-2, 903, 904, 905, 906, 906-1,

12   907, 908, 909, 910, 911, 912, 913, 914, and 915.

13         And pursuant to the stipulation, Government

14   Exhibits 901 through 915 are business records pursuant to the

15   Federal Rule of Evidence 8036 and admissible in evidence at

16   trial.

17         And then the stipulation itself is marked Government

18   Exhibit 1000, and it is admissible in evidence at trial.  And

19   the stipulation's been signed by the attorneys for both

20   parties.

21         So we're moving to -- with the stipulation we admit

22   Government Exhibit 1000 and then the list of the 900 records

23   that I just read.

24         THE COURT:  All right, the Court will admit those

25   exhibits as stated and as set forth in the stipulation.

SPAULDING – DIRECT – SMITH                    3178

1            And we'll also admit the stipulation, which is

2    Government Exhibit 1000.

3            (Government Exhibit "900" records, were received in

4    evidence.)

5            (Government Exhibit 1000, was received in evidence.)

6            THE COURT:  So at this pint we will swear the

7    witness.

8            THE COURTROOM DEPUTY:  Please raise your right hand.

9            (Witness takes the witness stand.)

10   WENDY SPAULDING, called as a witness, having been first duly

11   sworn/affirmed, was examined and testified as follows:

12           THE WITNESS:  Yes.

13           THE COURTROOM DEPUTY:  Please have a seat.

14           State and spell your name for the record.

15           THE WITNESS:  Wendy Spaulding.  S-P-A-U-L-D-I-N-G.

16           THE COURT:  Please proceed.

17   DIRECT EXAMINATION

18   BY MS. SMITH:

19   Q    Good morning, Ms. Spaulding.

20   A    Good morning.

21   Q    Where do you work?

22   A    I'm self-employed.

23   Q    And what do you do?

24   A    I'm a financial analyst.

25   Q    Do you have your own company?

SPAULDING – DIRECT – SMITH                    3179

1    A    Yes, I do.

2    Q    What does your company do?

3    A    My company provides financial analysis primarily to

4    federal law enforcement agencies.

5    Q    What is the name of your company?

6    A    Wendy Spaulding CPA, PLC.

7    Q    How long has your company been in operation?

8    A    Oh, approximately 11 years.

9    Q    And how long have you been doing analysis for federal law

10   enforcement agencies?

11   A    Since 1989.

12   Q    What do you do as a financial analyst as for law

13   enforcement agencies?

14   A    We review and analyze and summarize various financial

15   records that are provided.

16   Q    Who provides you with the underlying financial documents

17   for your analysis?

18   A    The Government.

19   Q    Can you please briefly describe your educational

20   background for the jury?

21   A    I have a bachelor's of business administration with a

22   public accounting major, and I have a master's of education.

23   Q    Where did you go for your bachelors?

24   A    The University of Wisconsin in Eau Claire, Wisconsin.

25   Q    And where did you go for your master's?

SPAULDING - DIRECT - SMITH                    3180

1    A    Northern Arizona University.

2    Q    Do you hold any professional licenses?

3    A    Yes.  I'm certified public accountant, a CPA.

4    Q    When did you get your CPA license?

5    A    In 1983.

6    Q    Have you had held any other accounting-related positions?

7    A    Yes.

8    Q    What were those?

9    A    I've worked as a chief financial officer controlling-type

10   positions for several companies and Government entities.  And

11   prior to that, I also worked for several accounting firms.

12   Q    Were you retained by the Government in connection with

13   the criminal case involving the defendant, Evan Greebel?

14   A    Yes.

15   Q    Were you paid for the work that you performed in

16   connection with that case in a prior proceeding?

17   A    Yes.

18   Q    Approximately how many hours has your company worked on

19   this case and a prior proceeding?

20   A    Approximately 240 hours.

21   Q    And in total approximately how much has your company

22   either billed or expects to bill for the work done for this

23   case and the prior proceeding?

24   A    Approximately $17,000.

25   Q    Have you been paid for all the hours you've worked so

SPAULDING – DIRECT – SMITH                    3181

1   far?

2   A     Yes.

3   Q     What tasks were you asked to perform by the Government?

4   A     I was asked to review and analyze bank records and

5   provide summaries of the information contained in the bank

6   records.

7   Q     Were you also asked to review and summarize some

8   investment brokerage accounts?

9   A     Yes.

10  Q     Approximately how many bank accounts and investment

11  accounts were you asked to review and summarize?

12  A     Fifteen.

13  Q     What types of bank records were you asked to review?

14  A     Bank statements, deposits, deposit tickets, canceled

15  checks, wire transfer records, and other credit and debit

16  information.

17  Q     What types of investment records were you asked to

18  review?

19  A     Also the investment statements and the underlying deposit

20  and withdrawal documents.

21  Q     What general time frame did the records you reviewed

22  cover?

23  A     From 2009 to 2015.

24  Q     Who at your company worked on the case?

25  A     Myself and two other analysts.

SPAULDING – DIRECT – SMITH                3182

1   Q    What was your role in connection with the analysis?

2   A    My role was to manage and supervise the analysis and to

3   provide the summary reports and documents that summarize the

4   analysis.

5   Q    Did you review all of the work completed on this case and

6   the prior proceeding by your company?

7   A    Yes.

8   Q    And in connection with your work on this case and the

9   prior proceeding, did you review any of the evidence other

10  than the bank and investment records you were provided by the

11  Government?

12  A    No.

13          MS. SMITH:  Your Honor, may I approach the witness.

14          THE COURT:  Yes.

15  Q    Ms. Spaulding, I'm going to he show you what's been

16  marked for identification as Government Exhibit 900.  It's a

17  DVD.

18          Ms. Spaulding, do you recognize that DVD?

19  A    Yes.

20  Q    How do you recognize it?

21  A    It has my initials and the date on it.

22  Q    What are the contents of the DVD?

23  A    The bank records that I analyzed.

24  Q    And those are the bank records that are Government

25  Exhibits 901 to 915 and the list I read for the stipulation?

SPAULDING – DIRECT – SMITH                          3183

1    A     Yes.

2    Q     Approximately -- how many different accounts are the

3    records for on the DVD?

4    A     Fifteen.

5    Q     Are the records for these 15 bank and investment accounts

6    voluminous?

7    A     Yes.

8    Q     Did you prepare summary reports in connection with your

9    review of the 15 bank and investment accounts on the DVD?

10   A     Yes.

11   Q     What are the types of summary reports you prepared as a

12   result of your review?

13   A     I prepared summary deposit reports, deposit detail

14   reports, summary withdrawals reports, withdrawal detail

15   reports, in and out reports, and also schedules of the ending

16   balances of the bank accounts and investment accounts.

17   Q     What was the process that you used to create these

18   summary reports from the bank and investment records?

19   A     We reviewed all of the bank records.  All of the

20   transactions were input into a database.  All of the

21   underlying documents were also reviewed, and the additional

22   information from the underlying documents was also entered

23   into a database.  The records were then checked and balanced

24   to the statements, and then the summary reports were created.

25   Q     Ms. Spaulding, do you have five exhibit binders with you

SPAULDING - DIRECT - SMITH                    3184

1    on the witness stand?

2    A    Yes.

3    Q    And do those exhibit binders contain the summary reports

4    and charts that you prepared from reviewing the bank and

5    brokerage records on the DVD?

6    A    Yes.

7         MS. SMITH:  I'm going to read a list of the summary

8    reports by exhibit number for the 15 accounts that are in your

9    binders.

10        So those are Government Exhibit 901-A to 901-E.  So

11   it includes the range that is 901-B, dash C, and dash E as

12   well.  902A to 902D.  903A to 903E.  904A to 904E.  905A to

13   905E.  906A to 906E.  907A to 907D.  908A to 908E.  909A to

14   909E.  910A to 910.  911E.  912A to 912E.  913A to 913E.  914A

15   to 914E.  915A to 915E.  916 and 916A.  917, 917A, and 917B.

16   918 and 918A.  And 919A and 919B.

17        THE COURT:  Did you say B or E?

18        MS. SMITH:  B, as in boy.

19        And we'll also provide the court reporter a list

20   that I just read.

21   Q    Do these summary reports fairly and accurately represent

22   the information that was provided to you in Government

23   Exhibits 901 to 915, the bank records and the brokerage

24   records?

25   A    Yes.

1          MS. SMITH:  Your Honor, the Government moves to

2    admitted the list of exhibits that I just read into evidence.

3          MR. BRODSKY:  No objection.

4          THE COURT:  All right, we will receive the exhibits

5    that were outlined by the Government.

6          (Government Exhibit summary reports, were received

7    in evidence.)

8    BY MS. SMITH:

9    Q    So I'd like to start by just showing you the stipulation

10   again on the Elmo, which is in evidence, Government

11   Exhibit 1000.

12         So you can see paragraphs 1 and 2.  So paragraph 1

13   says that Government Exhibit 901 consists of true and accurate

14   copies of JPMorgan Chase records for MSMB Capital Management,

15   LP, account number ending in 9453.  The authorized signatories

16   are Marek Biestek and Martin Shkreli.  And then there's

17   address there.

18         And paragraph 2 says that Government Exhibits 902,

19   902-1 and 902-2 are true and accurate copies of interactive

20   brokerage records for MSMB Capital Management, LP, account

21   number ending in 1231.  And the authorized signatory on the

22   account was Mr. Biestek.  Mr. Shkreli and others were

23   authorized to trade for the account.

24         Are the records that are Government Exhibit 901, and

25   Government Exhibits 902, 902-1 and 902-2 from the two accounts

SPAULDING - DIRECT - SMITH                    3186

1   related MSMB Capital that you analyzed for this case?

2   A    Yes.

3   Q    I'm going to start with Government Exhibit 901.

4            If we have the prosecution laptop, which is already

5   in evidence pursuant to the stipulation.

6            (Exhibit published.)

7            Are these the bank records that you analyzed in

8   Government Exhibit 901?

9   A    Yes.

10  Q    If we can turn to page 3 of the records, which is the

11  Bates ending in 4223.  And we can just zoom in on the top

12  portion.

13           And what is this document?

14  A    This is the business depository resolution for the Chase

15  account for MSMB Capital Management, LP, the account number

16  ending in 9453.

17  Q    And if you look towards the bottom section of what's

18  visible there, it says that it's a -- what kind of business

19  does it say that it is with the checkmark?

20  A    A limited partnership.

21  Q    And then if we can look at the middle of the page.

22           And whose name is listed there under depository and

23  withdrawal authorization?

24  A    Marek Biestek.

25  Q    And if we can look at bottom of the page.

1           And what is the date of the signature?

2    A    August 14th, 2009.

3    Q    And if we can goes turn back to page 1 of the document.

4           And looking at this document, is it part of the

5    records for the same account?

6    A    Yes.

7    Q    And in the middle of the page there there's a section

8    that says "name and signer to add"?

9    A    Yes.

10   Q    What's the name listed there?

11   A    Martin Shkreli.

12   Q    And what's the date of that signature?

13   A    November 17th, 2010.

14   Q    And so other than these initial depository forms, what

15   other kinds of documents are in Government Exhibit 901?

16   A    The bank statements, the deposit tickets and items

17   deposited, and the canceled checks and other documentation for

18   the account.

19   Q    And now I'm going to show you what's been marked and is

20   already in evidence as Government Exhibit 901A.

21           (Exhibit published.)

22           And so what is this document?

23   A    This document is the summary deposit report that was

24   prepared for MSMB Capital Management, LP, account number

25   ending in 9453.

SPAULDING – DIRECT – SMITH                    3188

1    Q    And this is one of reports that you prepared?

2    A    Yes.

3    Q    And that's based on bank records that we just looked at

4    in Government Exhibit 901?

5    A    Yes.

6    Q    So since this is the first time we've seen a summary

7    deposit report, can you just let us know what information this

8    report reflect?

9    A    Yes.

10              On the left side of the report under payor, you'll

11   see a list of the individuals and businesses that money was

12   deposited into this bank account from.  So these are the

13   sources of the deposits into the bank account.

14              This is a summary report.  So on the right side of

15   the report where it says the total for the payor, the numbers

16   that are shown in that column are the totals of the deposit

17   into this bank account for each of the individuals or entities

18   listed on the left side of the report.

19              And then the bottom, the grand total is the total of

20   all of the deposits into this bank account for the time period

21   covered by the report.

22   Q    And so if we can just look at some of the totals for

23   deposits into this account.  And look first at MSMB Capital

24   Management, LP.

25              What was the total amount deposited from

1    MSMB Capital Management, LP?

2    A     $525,434.28.

3    Q     And is that MSMB Capital Management, LP an account that

4    you also analyzed for this case?

5    A     Yes.

6    Q     And was that Government Exhibit 902?

7    A     Yes.

8    Q     The brokerage account for MSMB Capital?

9    A     Yes.

10   Q     And if you can look at the two entries beneath that for

11   Steven Richardson.

12            What is the total that was deposited into this

13   account from Steven Richardson?

14   A     $200,000.

15   Q     And then there's an entry below that for one name Brent

16   Saunders.

17            How much did Brent Saunders deposit into this

18   account?

19   A     $150,000.

20   Q     And the entry below that is someone named Edmund

21   Sullivan.

22            How much is Edmund Sullivan deposit?

23   A     $7,000.

24   Q     And then there's a line that says "unidentified

25   deposits."

SPAULDING – DIRECT – SMITH                    3190

1          What does that mean?

2     A     Unidentified deposits generally are deposits that the

3     bank did not provide documentation or enough documentation to

4     identify the source of the funds.

5     Q     And were any transfers from the 15 accounts you reviewed

6     ever come under the category of unidentified deposits?

7     A     No.

8     Q     I'm going to show you what's been marked and is already

9     in evidence as Government Exhibit 901-B.

10          (Exhibit published.)

11          So we were just looking at 901A, which was the

12    summary deposit report.  What is this report?

13    A     This report is the detail deposit report.  It shows the

14    detail for the individual deposits that were summarized in the

15    previous exhibit.

16    Q     And, again, it's for the same account number 9453?

17    A     Yes.

18    Q     And so what information is in a deposit detail summary

19    report like this one?

20    A     The deposit detail report shows each individual deposit.

21    It shows the source of the deposit.  The date of the deposit.

22    Either the check number or the type of a deposit, such as a

23    wire transfer.  It shows the amount.  And then there would be

24    additional information shown over in the comments section.

25    Q     Where does the additional information in the comment

SPAULDING – DIRECT – SMITH                    3191

1    section come from?

2    A    Also from the underlying bank records.

3    Q    If we can go down to the bottom of the same page, and

4    look an entry for MSMB Capital Management, LP.

5         There's an account number there, U801231.

6         Is that the account that you analyzed as Government

7    Exhibit 902?

8    A    Yes.

9    Q    So that's the brokerage account for MSMB Capital LP?

10   A    Yes.

11   Q    And if we can just look at detail here, what does this

12   deposit detail reflect for this deposit?

13   A    This shows that a 2,000-dollar wire was deposited into

14   this account from the MSMB Capital Management, LP interactive

15   brokers LLC, account number ending in 1231.

16   Q    If we can go to page 17 of the document.  And just focus

17   on the section for Steven Richardson at the top.

18        So are these listing two $100,000 deposits we looked

19   at for Government Exhibit 901A?

20   A    Yes.

21   Q    And does this have additional information about the date

22   of the deposits?

23   A    Yes.

24   Q    So what were the date of these two deposits into this

25   account?

SPAULDING - DIRECT - SMITH                    3192

1   A    February 19th, 2010 and February 22nd, 2010.

2   Q    I'm going to show you what's been marked and already in

3   evidence as Government Exhibit 901C.

4              (Exhibit published.)

5              And if we can focus in on the top half.

6              So what does this summary chart reflect?

7   A    This is a summary withdrawal report.  It summarizes all

8   of the withdrawals on the MSMB Capital Management, LP, account

9   number ending in 9453.  It's set up in the same format as we

10  saw on the deposit side.

11             So on the left-hand side the individuals and

12  companies that are listed are the recipients or whoever

13  received the money from the bank account.  And on the

14  right-hand side where it says "total for payee," that shows

15  the total that each of the entities listed on the left

16  received from this bank account.

17  Q    So if 901A is the summary of all the money put into the

18  account, is 901C a summary of the money that's withdrawn from

19  the account?

20  A    Yes.

21  Q    And they all cover the same time period?

22  A    Yes.

23  Q    If we can just look at a couple of the withdrawals in

24  detail.  There's one towards the middle page for Katten

25  Muchin.

SPAULDING - DIRECT - SMITH                    3193

1          Do you see that?

2    A    Yes.

3    Q    And what's the amount of that withdrawal from this

4    account?

5    A    $10,000.

6    Q    If we can look at some of the withdrawals in detail.  If

7    we can look at Government Exhibit 901D.

8               (Exhibit published.)

9               And just zooming in on the top part.

10              And again, so it this additional withdrawal detail

11   for withdrawals we just saw in 901C?

12   A    Yes.

13   Q    So if we can turn to page 81 and focus in at the top

14   portion.  There's an entry there for Katten Muchin.

15              Is that the same withdrawal that we looked at in

16   901C?

17   A    Yes.

18   Q    And what is the date of that withdrawal?

19   A    July 11, 2011.

20   Q    And then the last summary chart I want to look at for

21   Government Exhibit 901 is 901E.

22              And so what does this summary report reflect?

23   A    This report is the same information that we've looked at

24   in the other reports, but it's set up in a different format.

25              It's set up by date, so that the deposits and the

SPAULDING - DIRECT - SMITH                3194

1   withdrawals are shown in date order similar to a checkbook.

2   And it also has the ending balance for each day computed on

3   this report.

4   Q    So if we look at say the first two entries, what do those

5   two entries reflect?

6   A    September 14th of 2009, there's a 100-dollar deposit, and

7   then the balance at the end of that day was a hundred dollars.

8   Q    And then what do you see for the next entry on

9   October 5th, 2009?

10  A    There's a 10-dollar card purchase out of the account.

11  Q    And then what's the remaining balance?

12  A    Ninety dollars.

13  Q    And is information of the card purchase on the right-hand

14  side under comments?

15  A    Yes.

16  Q    If we can just look at one or two entries in detail

17  starting with page 19.  Focusing on the top half of the

18  document.

19        So if we look at the entry on February 22nd, 2010

20  for $100,000, who is the payor or payee for that deposit --

21  for that deposit?

22  A    Steven and Kim Richardson.

23  Q    And is that one of the deposits we looked at earlier?

24  A    Yes.

25  Q    And then what does the entry just below it reflect?

SPAULDING – DIRECT – SMITH                    3195

1   A      $98,000 was wire transferred to the MSMB Capital

2   Management interactive brokers account.

3   Q     And if we can just turn to page 178.

4              Is this the last page of the summary report?

5   A     Yes.

6   Q     If we can just look at the last entry on July 29th, 2011.

7              What happens in the last entry of this report?

8   A     $8,755.89 was withdrawn from the account.

9   Q     And after that date are there any further deposit or

10  withdrawals from the account?

11  A     No.

12  Q     So if we can look at the records for the other

13  MSMB Capital Management, LP account that you reviewed, which

14  are Government Exhibit 902.

15             (Exhibit published.)

16             Can you just zoom in on the top part here?

17             And so what is this document?

18  A     This is a customer summary for the MSMB Capital

19  Management, LP account.

20  Q     And is that the account with interactive brokers?

21  A     Yes.

22  Q     So are these the underlying records that you reviewed for

23  the summary charts in connection with Government Exhibit 902?

24  A     Yes.

25  Q     So if we can look at Government Exhibit 902A.

SPAULDING – DIRECT – SMITH                  3196

1           (Exhibit published.)

2           So what is this document?

3  A    This is the summary deposit report for the MSMB Capital

4  Management, LP interactive brokers LC account that ends in

5  1231.

6  Q    So is this a summary of all the money that's deposited

7  into the MSMB Capital Management, LP brokerage account?

8  A    Yes.

9  Q    And, again, what's the date range for that report?

10 A    September 1st, 2009 through July 31st, 2011.

11 Q    And that will be the same date range for all of the

12 summary reports for the interactive brokers account?

13 A    Yes.

14 Q    If we can just look at some of the deposits into this

15 account starting with Darren Blanton.

16          How much did Darren Blanton deposit into this

17 account?

18 A    $1 million.

19 Q    There's an entry below that for Sarah Hassan.

20          How much did Sarah Hassan deposit into the account?

21 A    $300,000.

22 Q    There's an entry for IRA Plus Southwest.

23          How much was that deposit?

24 A    $200,014.41.

25 Q    The one underneath for Jeb S Property, LP?

SPAULDING – DIRECT – SMITH                    3197

1    A    $250,000.

2    Q    There's an entry below for Steven Richardson.

3         How much was deposited from Steven Richardson?

4    A    $200,000.

5    Q    For Lindsay Rosenwald?

6    A    $100,000.

7    Q    For Brent Saunders?  Brenton Saunders?

8    A    $100,000.

9    Q    And for Edmund Sullivan?

10   A    $30,000.

11   Q    If you look back at the -- once again, there's an entry

12   for Jeb S Property, LP.

13        Did interactive brokers provide any additional

14   information about the wire transfers related to this account?

15   A    Yes.

16        MS. SMITH:  If we can show the jury Government

17   Exhibit 902-2, part of the interactive brokers records in

18   evidence.

19        (Exhibit published.)

20   Q    So what information is contained in these records from

21   the interactive brokerage account?

22   A    Can you make it -- zoom in a little bit on that?

23        MS. SMITH:  You can cut it in half maybe for now.

24        And maybe the second half or the first half is fine.

25   Sorry.

SPAULDING - DIRECT - SMITH                    3198

1    Q    So what is the information contained here?

2    A    This is additional information regarding the wire

3    transfers.

4    Q    And if we can go to the right-hand side of the document?

5         And if you can look here, if this is the -- we just

6    looked at the wire transfer for Jeb S Property, LP.

7    A    Yes.

8    Q    And if you look in the information to the left there, in

9    the column R, there's the name "by order of Darren Blanton" in

10   the middle of that wire transfer information.

11   A    Yes.

12   Q    And so is that related to the Jeb S Property, LP wire?

13   A    Yes.

14   Q    And if we can go to the next page of 902-2.

15        And same thing, is this additional wire information

16   for wires in and out of the interactive brokerage account?

17   A    Yes.

18   Q    And there was another entry for IRA Southwest, which we

19   just saw.  And if you go into the information that's provided,

20   is there an entry for S. Marshall?

21   A    Yes.

22   Q    If we can now look at Government Exhibit 902-B.

23        (Exhibit published.)

24        And so is this more information about the deposits

25   into the account?

SPAULDING – DIRECT – SMITH                    3199

1   A     Yes.

2   Q     And does it include the date of those deposits?

3   A     Yes.

4   Q     And so just as an example, if we can look down the page a

5   little bit, there's an entry for Sarah Hassan.

6             And so what information is provided about the

7   deposit into the account for Sarah Hassan?

8   A     The date of the deposit.  The amount of the deposit.

9   Underneath her name where it says "TD Ameritrade," and the

10  account number ending in 1731, that is the institution and the

11  account number that the wire transfer came from.  And it shows

12  the amount of the wire transfer.

13  Q     And so does this reflect the deposit into the account on

14  January 18th, 2011 of $300,000?

15  A     Yes.

16  Q     And if we can look at the next page.  There's an entry

17  again for Steven Richardson.

18            And what is the -- what are the two deposits into

19  this account for Steven Richardson?

20  A     There are two deposits of $100,000, each on October 29th,

21  2009.

22  Q     And if you look at the memo section all the way on the

23  right, what does it say with the first wire?

24  A     Initial investment from Steve Richardson.

25  Q     And if we can just briefly at Government Exhibit 902C.

SPAULDING – DIRECT – SMITH                                3200

1          (Exhibit published.)

2          And what is this document?

3   A    This is the summary withdrawal report for the interactive

4   brokers accounted number ending in 1231.

5   Q    And so this is money that was withdrawn out of the

6   brokers account; is that right?

7   A    Yes.

8   Q    I also like you to look at Government Exhibit 916.

9          (Exhibit published.)

10          So what information is contained in this chart that

11   you compiled?

12   A    This chart shows the ending balances in each of the two

13   MSMB Capital Management, LP accounts.  And then it shows the

14   combined total ending balance for each month for both

15   accounts.

16   Q    And are those the two accounts that were Government

17   Exhibits 901 and 902?

18   A    Yes.

19   Q    So in terms of what it reflects for each month, does it

20   reflect the balance at a certain point in each month?

21   A    Yes, it's at the end of the month as reflected on the

22   bank statement.

23   Q    And in and out for each account is reported in the

24   E Series, 901E, for example, that you created; is that right?

25          The in and out for these accounts would be 901E?

SPAULDING – DIRECT – SMITH                    3201

1   A    Yes.

2   Q    And then for 902 you have the other summary reports?

3   A    Yes.

4   Q    And this just shows the total at the end of each month as

5   reflected in the statements for those two accounts combined?

6   A    Yes.

7   Q    If we can just look at a couple of dates.

8              What's the combined total for the bank and brokerage

9   accounts for MSMB Capital Management, LP in the

10  September 2009?

11  A    $100.

12  Q    And March of 2010?

13  A    Can you move it over a little bit?

14             $636,856.

15  Q    And then if we can go to November of 2010.

16  A    $330.

17  Q    And in February of 2011?

18  A    $58,502.

19  Q    And how much money is the bank and brokerage accounts for

20  MSMB Capital Management, LP in July of 2011?

21  A    A negative 33 cents.

22  Q    If we can look the Government Exhibit 916A.

23             (Exhibit published.)

24             And what information is contained in this chart?

25  A    This chart shows the ending balances in the bank accounts

SPAULDING – DIRECT – SMITH                  3202

1   that we just saw on the spreadsheet.  Just in a graph format.

2   Q    And in terms of month ending balances, does this show

3   that the combined accounts, the bank and brokerage accounts

4   for MSMB Capital Management never had more than $1.2 million

5   at the end of any month?

6   A    Correct.

7          MS. SMITH:  And finally I'd like to put Government

8   Exhibit 901C and 902C next to each other.

9          (Exhibit published.)

10  Q    If you look at these two summary withdrawal reports.

11         And if we can do the whole report on the left I'm

12  sorry.

13         Do you see any money coming out of either account

14  and going into an account for an entity named Retrophin?

15  A    No.  Can you make the left one a little bit larger?

16         No.

17  Q    And do you see any money coming out of either account and

18  going into an account for an entity named MSMB Healthcare?

19  A    No.

20  Q    And if we can go back to the one on the left for a

21  minute.  And focus on the Katten Muchin withdrawal.

22         What's the total amount that came out of this

23  account, which is 901C, is the summary withdrawal report to

24  Katten Muchin?

25  A    $10,000.

SPAULDING - DIRECT - SMITH                3203

1          MS. SMITH:  So I'd like to shift and discuss the

2    accounts that you analyzed related to MSMB Healthcare.

3          And so we're going to look again at the stipulation

4    that's Government Exhibit 1000.

5          And, Ms. Jackson, can we have the Elmo again?

6          (Exhibit published.)

7    Q    So Government Exhibit 903 consists of true and accurate

8    Copies of JPMorgan Chase records for MSMB Healthcare

9    Management, LLC, account number ending in 1768.

10         Government Exhibit 904 consists of bank records for

11   JPMorgan Chase for MSMB Healthcare Investors, LLC, account

12   number ending in 3319.

13         Government Exhibit 905 consists of JPMorgan Chase

14   records MSMB Healthcare, LP, account number ending in 7700.

15         Government Exhibits 906 and 906-1 consists of bank

16   records for Bank of America records for MSMB Healthcare, LP,

17   account number ending in 9143.

18         And then Government Exhibit 907 consists of records

19   for Merlin Securities for MSMB Healthcare, LP account, number

20   ending in 2983.

21         Are these five accounts the accounts related to MSMB

22   Healthcare that you analyzed for this case?

23   A    Yes.

24   Q    And how many of the accounts are bank accounts and how

25   many of them are brokerage accounts?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

SPAULDING – DIRECT – SMITH                          3204

1    A     There was one brokerage account.

2    Q     And is that Government Exhibit 907?

3    A     Yes.

4    Q     So let's start with the records for Government

5    Exhibit 904, which are the records for JPMorgan Chase account

6    for MSMB Healthcare Investors, LLC, account number ending in

7    3319.

8              And if we can switch back to the laptop.  If we can

9    just start with Government Exhibit 904E.

10             And so what account is this the summary chart for?

11   A     The MSMB Healthcare Investors, LLC Chase, account number

12   ending in 3319.

13   Q     And what's the date range?

14   A     June 17th, 2011 through March 30th 2012.

15   Q     And what's the initial deposit into the account?

16   A     It was $100 deposit from Martin Shkreli.

17   Q     And then what was the next deposit?

18   A     It was a deposit of $2,361.33 from MSMB Healthcare, LP,

19   account number ending in 7700.

20   Q     And is that 7700 account another account you reviewed for

21   the case?

22   A     Yes.

23   Q     If we can turn to page 2 of the report.

24             And what's the last transaction last the here?

25   A     A withdrawal of $2,353.33 on March 12th, 2012.

SPAULDING - DIRECT - SMITH                3205

1  Q    Is that the only activity for this bank account?

2  A    Yes.

3  Q    So let's look at Government Exhibit 903-A.

4       And so what is the time period and account for this

5  summary report?

6  A    This is the MSMB Healthcare Management, LLC Chase,

7  account number ending in 1768.  And it covers the time period

8  from August 2011 through April 2012.

9  Q    And what two entities deposited money in this account?

10 A    MSMB Healthcare, LP and Retrophin, Inc.

11 Q    And if we can look at Government Exhibit 903C.

12       (Exhibit published.)

13       Are these the withdrawals from the account?

14 A    Yes.

15 Q    And what's the first listed payee here?

16 A    Colt Ventures, LTD for $200,000.

17 Q    If we can look at Government Exhibit 903E, just the in

18 and out for the account.

19       How many pages is the in and out report for this

20 account?

21 A    Three pages.

22 Q    So does that reflect all of the activity on this account?

23 A    Yes.  For this time period, yes.

24 Q    And if we look at the first deposit on August 2nd, 2011.

25 A    On August 2nd, 2011, there was a deposit of $3,581.08

SPAULDING – DIRECT – SMITH                    3206

1   from the MSMB Healthcare, LP Chase, account number ending in

2   7700.

3   Q    And if we can look at the second page of the in and out

4   report.  And the bottom portion.

5        So what's the balance in the account as of

6   January 18th, 2012?

7   A    $2,470.07.

8   Q    And there are two transactions listed on February 3rd,

9   2012.

10       What are those two transactions?

11  A    There was a deposit of $200,000 from Retrophin, Inc., and

12  there was a wire transfer out of the account for $100,000 to

13  Colt Ventures LTD.

14  Q    And then if we can look at the next page.  And focus on

15  the top the next transaction.

16       What is the next transaction on February 6th, 2012?

17  A    A $100,000 wire transfer out to Colt Ventures LTD.

18  Q    And what's the balance in the account after that

19  transfer's made?

20  A    $2,407.07.

21  Q    And then just to step back and look at the last account.

22  The last transaction for the account on March 12th, 2012.

23  A    On March 12th, 2012, there's a withdrawal of $9,207.17.

24  Q    So for the records related to accounts for MSMB

25  Healthcare, Government Exhibit 903, the summary reports we

SPAULDING – DIRECT – SMITH                3207

1    just looked at, had the very small number of transactions as

2    did Government Exhibit 904, so I'd like to shift now and look

3    at Government Exhibit 905, 906, 907, the remaining accounts

4    related to MSMB Healthcare.

5            So it we can start with Government Exhibit 905A.

6    Actually, we'll start with 905 here.

7            (Exhibit published.)

8            And if you can just zoom in on this section.

9            So are these the underlying bank records for

10   Government Exhibit 905?

11   A    Yes.

12   Q    And what's the account title?

13   A    MSMB Healthcare, LP.

14   Q    And what's the -- if you look down there, there's a

15   managing director name.

16   A    Martin Shkreli.

17   Q    And then if you can zoom out a little bit.

18           There's a second managing director listed, who's is

19   that?

20   A    Marek Biestek.

21   Q    And then if we can just scroll down a little bit more to

22   see the dates.

23           What are the dates on this initial document at this

24   time?

25   A    April 29th, 2011.

SPAULDING - DIRECT - SMITH                    3208

1   Q     So if we can go to Government Exhibit 905A, which is the

2   summary deposit report for this account.  And I just want to

3   highlight a few of deposits.

4           Again, the account number ends in 7700; is that

5   right?

6   A     Yes.

7   Q     And so we can look there's a payor named David Geller.

8           How much did David Geller deposit into this account?

9   A     $200,000.

10  Q     There's a payor maimed Richard Kocher.

11          How much did Richard Kocher deposit into the

12  account?

13  A     $100,000.

14  Q     There's deposit for a Michael Lavelle.

15          How much did Michael Lavelle deposit into the

16  account?

17  A     $850,000.

18  Q     And towards the bottom there's an envy for Spencer

19  Spielberg.

20          How much did Spencer Spielberg deposit into the

21  account?

22  A     $25,000.

23  Q     There's also an entry there for a Sweep Repurchase

24  agreement.  And what is the total amount of money related to

25  Sweep Repurchase agreement that was deposited?

SPAULDING - DIRECT - SMITH                    3209

1    A    $12,486,666.

2    Q    And taking that money out of the total, without the Sweep

3    Repurchase agreement amount, how much is in the account?

4    A    Approximately $3,200,000 was deposited.

5    Q    So if we can put Government Exhibit 905A and Government

6    Exhibit 905C next to each other.

7              (Exhibit published.)

8              So these are the summaries of the withdrawals and

9    the deposits from the accounts next to each other.

10             And if you can see for both there's the Sweep

11   Repurchase agreement entry.

12             Do the two amounts deposited pursuant to the Sweep

13   Repurchase agreement and the amounts withdrawn related to the

14   Sweep Repurchase agreement match each other?

15   A    Yes.

16   Q    Was any information provided with the records for the

17   account about the Sweep Repurchase agreement?

18   A    No.

19   Q    And, again, how much would have been left in the account,

20   setting aside the Sweep Repurchase deposits and withdrawals?

21   A    Approximately $3,200,000.

22   Q    If we can focus on Government Exhibit 905C, which are the

23   withdrawals from the account.

24             And, again, what's the time period for this account

25   for MSMB Healthcare, LP?

SPAULDING – DIRECT – SMITH                    3210

1  A    From February 16th, 2011 through April 30th, 2012.

2  Q    And I just want to highlight a couple of entries.

3  There's an entry for Katten Muchin.

4           How much is that for?

5  A    $20,000.

6  Q    There's also an entry for Kevin Mulleady farther down the

7  page.

8           How much is that withdrawal for?

9  A    $13,950.

10 Q    There's an entry for Retrophin, Incorporated.

11          How much money was withdrawn from MSMB Healthcare,

12 LP to that Retrophin, Incorporated account?

13 A    $1,420,000.

14 Q    And then finally at bottom, there's an entry for Andrew

15 Vaino.

16          How much is withdrawn for Andrew Vaino?

17 A    $25,000.

18 Q    If we can then go to the in and out report for this

19 account, which is Government Exhibit 905E.

20          (Exhibit published.)

21          And focusing on -- if we can just scroll down just a

22 little bit.  If we can focus on then entry for June 17th, 2011

23 at the top for Patrick McGowen.

24          How much does Patrick McGowan deposit into this

25 account?

SPAULDING – DIRECT – SMITH                    3211

1    A    $100,000.

2    Q    And if we look you can see two transactions on June 17th,

3    2011 and then June 20th, 2011 for this Sweep Repurchase

4    agreement.

5            And actually, Ms. Balbin, if you can highlight the

6    number directly next to...

7            And so if you look at the Sweep Repurchase amounts

8    on June 17th, 2011 and June 20th, 2011, is the same amount

9    that's taken out of the account put back into the account?

10   A    Yes.

11   Q    And one is called Sweep II Investment Repurchase

12   agreement one is called return of principal; is that right?

13   A    Yes.

14   Q    And so is this basically money being taken out and put

15   back in the exact same amount?

16   A    Yes.

17   Q    And that's the 12 million approximate number we looked at

18   we had the two summaries side by side?

19   A    Yes.

20   Q    And so that just reflects money that went out and came

21   back in?

22   A    Yes.

23   Q    If we can look at page 3 of the report.  And just focus

24   in on the entry at the top.

25            So this is more information about the deposits into

SPAULDING – DIRECT – SMITH                    3212

1    the account.  There's a deposit from David Geller at the top

2    there.

3              What's the date of the deposit?

4    A    June 28th, 2011.

5    Q    And how much is it for?

6    A    $200,000.

7    Q    And if we can also look at page 26 of the document.

8              (Exhibit published.)

9              And there's an entry in the second entry down for

10   Richard Kocher.

11             What's the date of the deposit by Richard Kocher

12   into this account?

13   A    February 1st, 2012.

14   Q    And then if we can go to the last page, which is page 33

15   of the report.  And focus on the last entry there.

16             What's the date of the last withdrawal?

17   A    March 20th, 2012.

18   Q    And how much is it for?

19   A    $209,228.96.

20   Q    And where does that deposit go to, or the withdrawal go

21   to?

22   A    To the MSMB Healthcare, LP Bank of America, account

23   number ending in 9143.

24   Q    And is that also an account that you analyzed for this

25   case?

SPAULDING − DIRECT − SMITH                    3213

1   A     Yes.

2   Q     And is that Government Exhibit 906?

3   A     Yes.

4   Q     So if we can go to Government Exhibit 906.

5         (Exhibit published.)

6         Are these the underlying bank records for the

7   account that we just saw the money withdrawn from for

8   Government Exhibit 905?

9   A     Yes.

10  Q     And who is the name in the middle of the page for this

11  account?

12  A     Martin Shkreli.

13  Q     And if we can go to Government Exhibit 906A, which is a

14  summary report for this account.  And just focus in on the top

15  half.

16        So what is the time period for this account?

17  A     March 23rd, 2012 through November 30th, 2015.

18  Q     And just looking at a few of the deposits for this

19  account ending in 9143, there's an entry for Richard Kocher.

20        How much was deposited into this account for Richard

21  Kocher?

22  A     $100,000.

23  Q     And then there's also and entry for Retrophin,

24  Incorporated.

25        How much was deposited into this account or

SPAULDING – DIRECT – SMITH                    3214

1    Retrophin?

2    A     $1,008,000.

3    Q     If we can just look at Government Exhibit 906C, which are

4    some of the withdrawals from this account.

5              (Exhibit published.)

6              And if you look in the middle, there's an entry for

7    Katten Muchin.

8              How much is withdrawn from this account for Katten

9    Muchin?

10   A     $100,000.

11   Q     And if we can look at what's marked as Government

12   Exhibit 906E.  This is the in an out report for this account.

13   If we can focus on the top entry.

14             What's the date on the top entry, the opening entry

15   here?

16   A     March 23rd, 2012.

17   Q     And what's the amount?

18   A     $209,228.96.

19   Q     And what account does that come from?

20   A     From MSMB Healthcare, LP, account number ending in 7700.

21   Q     And so that's the deposit -- the withdrawal that we saw

22   from Government Exhibit 905 into this bank account; is that

23   right?

24   A     Yes.

25   Q     And if we can look at a couple of specific entries

SPAULDING – DIRECT – SMITH                    3215

1    starting with page 3.  And focus on the middle section on

2    May 3rd, 2012.

3              And what was the date on which the deposit was made

4    from Richard Kocher into this account?

5    A    May 3rd, 2012.

6    Q    And what was the amount?

7    A    $100,000.

8    Q    If we can look at page 12 of the account.  And focus in

9    on the entries on September 13th, 2012.

10             So on September 13th, 2012, how much is withdrawn

11   from the account to go into an account for Retrophin,

12   Incorporated?

13   A    $10,800.

14   Q    And is there a separate bank charge underneath that?

15   A    Yes.

16   Q    What's the balance in this bank account for MSMB

17   Healthcare on September 13th, 2012?

18   A    $632.16.

19   Q    And if we can zoom out and look at the next page.  And

20   then kind of flip through to the bottom section.

21             Does the account generally stay below $600 between

22   that point and then January 18th, 2013.

23   A    Yes.

24   Q    So if we can look at transactions on January 18th, 2013.

25   There's a -- what is the if we scroll up just a tiny bit,

SPAULDING – DIRECT – SMITH                    3216

1    Ms. Balbin.

2              What's the account balance on January 8th, 2013?

3    A    $500.16.

4    Q    And then on January 18th, 2013, what's the first deposit

5    that's made?

6    A    $150,000 from Retrophin, Inc.

7    Q    So that's $150,000 coming into the MSMB Healthcare

8    account from Retrophin, Inc.; is that right?

9    A    Yes.

10   Q    And then what's the next transaction on that page?

11   A    On the same date, $125,000 was wired to MLPFS Global

12   Markets.

13   Q    If we can look at page 16 of the account.  And focusing

14   in on the top transactions.

15             The one on March 3rd, 2013, what's the deposit

16   amount?

17   A    On March 4th, 2013, there's a deposit of $773,000 from

18   Retrophin, Inc.

19   Q    And what is the next transaction after that deposit?

20   A    A wire transfer of $775,000 to MLPFS Global Markets.

21   Q    And what's the balance after those transfers are

22   completed?

23   A    $3,823.25.

24   Q    If we can zoom out again.  And just go through the next

25   several pages.  And I want you to see if there are any other

SPAULDING - DIRECT - SMITH                    3217

1    deposits into the account between this time in 2013 and until

2    2015.

3              (Whereupon, the witness is reviewing documents.)

4              So looking at those pages between the transactions

5    we saw on March 4th, 2013 and this transaction on May 18th,

6    2015, were there any other deposits into the account?

7    A    No.

8    Q    And, again, we're looking at account for MSMB Healthcare,

9    LP ending in 9143, right?

10   A    Yes.

11   Q    If you can just look at the top of the page on May 18th,

12   2015.

13             What's the amount of the deposit there?

14   A    $770,000.

15   Q    And who is the depositing that money into the account?

16   A    Martin Shkreli.

17   Q    And is that from an account from Martin Shkreli that you

18   looked at in connection with this case?

19   A    Yes.

20   Q    And is it the account ending in 6097.

21   A    Yes.

22   Q    And i just want to look at the last MSMB Healthcare

23   account that you looked at, which is Government Exhibit 907.

24   And can we just start with 907A and 907B side by side, the

25   withdrawals and deposits.

SPAULDING – DIRECT – SMITH                3218

1            (Exhibit published.)

2            And just to refresh your recollection, Government

3    Exhibit 907 was the brokerage account at Merlin Securities for

4    MSMB Healthcare, LP?

5    A    Yes.

6    Q    So this is one brokerage account and we also did four

7    bank accounts, right?

8    A    Yes.

9    Q    And so what's the time period on these two reports?

10   A    April 2011 through April 2012.

11   Q    And if we can look on the page on the left of the screen

12   is Government Exhibit 907A, the deposits, there's an entry for

13   Alan Geller.

14            How much does Alan Geller deposit into this

15   brokerage account?

16   A    $1 million.

17   Q    And there's also an entry for Michael Lavelle.

18            How much is deposited by Michael Lavelle into this

19   brokerage account?

20   A    $200,000.

21   Q    And if we can turn to the summary chart that's Government

22   Exhibit 917.

23            And so what does Government Exhibit 917 reflect?

24   A    This schedule shows the ending balances in the MSMB

25   Healthcare, LP accounts that have the largest amount of dollar

SPAULDING - DIRECT - SMITH                    3219

1   activity between accounts.

2   Q    And so that was the two bank accounts ending in 7700 and

3   9143 where we saw the money was transferred from one to the

4   other; is that right?

5   A    Yes.

6   Q    And the Merlin Securities account which is the brokerage

7   account?

8   A    Yes.

9   Q    And so looking at this page, what is the total in all

10  three accounts in February 2011?

11  A     dollars.

12  Q    And then if we can look in July of 2011.

13  A    $1,545,830.

14  Q    We can turn to page 2 of the chart.

15       In January of 2012, what's the total amount that was

16  in those three accounts?

17  A    $216,616.

18  Q    And in July of 2012, what's the total amount?

19  A    $111,939.

20  Q    In September of 2012, what's the total amount in the

21  three accounts?

22  A    $614.

23  Q    And then in December of 2012, what's the total amount in

24  those three accounts?

25  A    $515.

SPAULDING – DIRECT – SMITH                3220

1    Q    If we can look at the next page, page 3.  And just
2    looking at 2013.
3             Does the account ever get above $1,000 as the
4    account ends in 2013?
5    A    No.
6    Q    If we can look at the next page of the document.
7             Is the same true in 2014?
8    A    Yes.
9    Q    And then if we can look at page 5 of the document.  And
10   then looking at May 2015.
11            How much is in the account at the end of May 2015 of
12   the three accounts?
13   A    $772,935.
14   Q    And is that at the time of the deposit we saw into the
15   9143 account of the $770,000 for Mr. Shkreli?
16   A    Yes.
17   Q    If we can also take a look at Government Exhibit 917A.
18            So what does this chart reflect?
19   A    This chart is a graph of the ending account balances that
20   we just looked at for the three MSMB Healthcare, LP bank and
21   brokerage accounts.
22   Q    And what's the time period for this chart?
23   A    This is from February of 2011 through December of 2012.
24   Q    And then finally, can we look at Government Exhibit 917B.
25            And what is this chart?  What's the time period for

SPAULDING - DIRECT - SMITH                    3221

1   this chart?

2   A    January 2013 through November of 2015.

3   Q    And what's reflected in this chart?

4   A    The ending balances of the three MSMB Healthcare, LP bank

5   and brokerage accounts.

6   Q    And, again, in the May 2015 time period, does it reflect

7   that final deposit of $770,000 that we say for Mr. Shkreli?

8   A    Yes.

9   Q    So turning back to the stipulation that's Government

10  Exhibit 1000.

11         Did you also look at bank accounts related to

12  entities known as Retrophin?

13  A    Yes.

14  Q    And did you look at a total of six bank accounts?

15  A    Yes.

16  Q    And are they marked Government Exhibit 908 to 913?

17  A    Yes.

18  Q    And I'm just going to read briefly from the stipulation

19  what each one is.

20         908 is records from JPMorgan Chase for Retrophin,

21  LLC, account number ending in 2444.

22         Government Exhibit 909 is records from JPMorgan

23  Chase for Retrophin, LLC, account number ending in 2527.

24         Government Exhibit 910 are records from JPMorgan

25  Chase for Retrophin, Incorporated, account number ending in

1    3600.

2              Government Exhibit 911 are records for JPMorgan

3    Chase for Retrophin, Incorporated, account number ending in

4    3830.

5              Government Exhibit 912 are records from JPMorgan

6    Chase for Retrophin, LLC, account number ending in 8845.

7              And Government Exhibit 913 are records for JPMorgan

8    Chase for Retrophin Therapeutic International, account number

9    ending in 9768.

10             Were some of these accounts more active than others?

11   A    Yes.

12   Q    So let's briefly look at some of the less active accounts

13   starting with Government Exhibit 908A and 908C, Ms. Balbin.

14             So 908A on the left and 908C on the right.

15             Oh, sorry, Ms. Jackson, if we can go back to the lap

16   ton.

17             (Exhibit published.)

18             And so are these the summary of withdrawals and

19   deposits for the account ending in 2444 for Retrophin, LLC?

20   A    Yes.

21   Q    And is the total activity withdrawals and deposits

22   approximately 325 -- $326,000 for this account?

23   A    Yes.

24   Q    If we can also look at Government Exhibit 912A and

25   Government Exhibit 912C side by side.

SPAULDING – DIRECT – SMITH                    3223

1           (Exhibit published.)

2           And what's the time frame for this account?

3    A    April 2011 through November 2012.

4    Q    And what's the total amount of money deposited or

5    withdrawn from this amount?

6    A    It's approximately $200,000.

7    Q    If we can also look at Government Exhibit 911E.

8           (Exhibit published.)

9           And so is this the summary chart for the bank

10   account ending in 3830?

11   A    Yes.

12   Q    And what's the total amount of money deposited and

13   withdrawn for this account?

14   A    $100.

15   Q    And finally I just want to look briefly at Government

16   Exhibit 913E.

17           (Exhibit published.)

18           What's the time frame for this account?

19   A    March 26 -- March 26th, 2014 through July 31st, 2015.

20   Q    And what is the only deposit into this account?

21   A    A deposit from Retrophin, Inc. for $3,250,000.  It's from

22   the Retrophin account number ending 3600.

23   Q    And what's the only deposit for this account?

24           Sorry, withdrawal for this account?

25   A    3,200,000 to Manchester Pharmaceuticals, LLC.

SPAULDING - DIRECT - SMITH                    3224

1   Q    And then there is a second unidentified withdrawal form

2   $50,000?

3   A    Yes.

4   Q    And is that all the activity in this account?

5   A    Yes.

6   Q    So if you looked at six Retrophin accounts, and we just

7   looked at four with not a lot of activity.  I want to focus on

8   the two Retrophin accounts with the most activity, which are

9   Government Exhibits 909 and 910.  So if we can start with

10  Government Exhibit 909, page 1.

11           (Exhibit published.)

12           And is this the signature card for this account?

13  A    Yes.

14  Q    If we can scroll just to see the account number.

15           The last two -- last four numbers, 2527?

16  A    Yes.

17  Q    And then scrolling down again, who is the person listed

18  here?

19  A    Martin Shkreli.

20  Q    What's the date of the signature?

21  A    March 28th 2011.

22  Q    So let's start with the deposit into this account, which

23  are Government Exhibit 909A.

24           (Exhibit published.)

25           And, again, this is the account ending in 2527 for

SPAULDING - DIRECT - SMITH                3225

1   Retrophin at JPMorgan Chase.  And just looking down the page a

2   little bit, there's an entry for Dynagrow Capital.

3           What's the amount of that deposit?

4   A    $150,000.

5   Q    Also a deposit for Alan Geller.

6           What's the amount of that deposit?

7   A    $300,000.

8   Q    Farther down the page there's an entry for MSMB

9   Healthcare, LP.

10          How much is deposited in this Retrophin account from

11  MSMB Healthcare, LP?

12  A    $2,320,800.

13  Q    And then there's also two entries for Steven Richardson.

14          How much is deposited in total into this account for

15  Steven Richardson?

16  A    $95,000.

17  Q    If we can look at Government Exhibit 909C, which are the

18  withdrawals for the account.

19          And this is the same time period March of 2011 to

20  November of 2014?

21  A    Yes.

22  Q    Focusing on page 1, there's a withdrawal for -- scroll

23  down a little bit -- for Marek Biestek.

24          How much is withdrawn from Marek Biestek from this

25  account?

SPAULDING – DIRECT – SMITH                              3226

1   A    $37,666.64.

2   Q    And there's also withdrawal for Croft Capital LLC.

3        How much is that withdrawal for?

4   A    $5,000.

5   Q    And then there's a withdrawal for Thomas Fernandez.

6        How much is that withdrawal for?

7   A    $16,666.66.

8   Q    If we look at the second page of the summary withdrawals,

9   just highlight a few others.  There's an entry for Kevin

10  Mulleady.

11       How much did Kevin Mulleady receive from this

12  Retrophin account?

13  A    $128,999.96.

14  Q    And if we can scroll down just a little, there's an entry

15  for Timothy Pierotti.

16       How much did Timothy Pierotti receive from this

17  account?

18  A    $32,166.67.

19  Q    And then if we look at page 3.  There are a couple entry

20  for Jackson Su.

21       What are the two entries for Jackson Su?

22  A    $37,500 and $87,500.

23  Q    There's an entry for Ron Tilles.

24       How much is that for?

25  A    $2,000.

SPAULDING – DIRECT – SMITH                     3227

1    Q    And then there's an entry for Andrew Vaino.

2              How much is that withdrawal for?

3    A    $125,539.13.

4    Q    So let's look at the last Retrophin account, which is

5    Government Exhibit 910, and for that let's just go to -- this

6    the cover business signature card for this account.

7              (Exhibit published.)

8              And, again, if we look at the account title in the

9    top left, it's for Retrophin, Incorporated; is that right?

10   A    Yes.

11   Q    And the account number ends in 3600?

12   A    Yes.

13   Q    Who's the signatory on this account?

14   A    Martin Shkreli.

15   Q    If we can look at Government Exhibit 510E and focus on a

16   few specific withdrawals and deposits.  So starting on page 9.

17             THE COURT:  I think you said 510?

18             MS. SMITH:  Sorry, I meant 910E.  I apologize.

19   Q    So starting on page 9 there's a withdrawal on

20   December 13th, 2012 for $100,000.

21             And who is that payment made to?

22   A    To Heskett & Heskett.

23   Q    And if we look down to page 10.  And focus on -- there's

24   an entry for December 17th, 2012.  And there's a bunch of

25   entries but there's one in the middle for $1500.  If we can

SPAULDING – DIRECT – SMITH                    3228

1    highlight that one.

2              And so what additional information is included with

3    this withdrawn of $1500 on December 17th, 2012?

4    A    There's information over in the comment section that

5    refers to MLPFS.

6    Q    If we can look at page 11.  And on December 18th, 2012,

7    if we can scroll down.

8              What's the balance in the account on December 18th,

9    2012?

10   A    $44,318.98.

11   Q    If we can look at page 15.  And focusing on January 16th,

12   2013.

13             What's the balance in the account on January 16th,

14   2013?

15   A    $5.13.

16   Q    And then if we can blow up just a little bit and scroll

17   down and look at what happens next.

18             On January 17th, 2013, there's a $450,000 deposit;

19   is that right?

20   A    Yes.

21   Q    And if you look at the bottom there, there are a number

22   of bank credits.  There's a withdrawal of $150,000 near the

23   bottom.

24             Where does that deposit from this Retrophin account

25   go to?

SPAULDING - DIRECT - SMITH                    3229

1    A    To MSMB Healthcare, LP Bank of America, account number

2    9143.

3    Q    And is that one of the accounts that we looked at

4    earlier?

5    A    Yes.

6    Q    Is this the other portion of that transaction?

7    A    Yes.

8    Q    If we can turn to the next page, page 16, and look at

9    what happens next on January 18th, 2013.

10            How much is taken out of the Retrophin account in

11   that first entry?

12   A    $100,000.

13   Q    And where does that money go?

14   A    To Katten Muchin Rosenman LLP.

15   Q    And then if we can look at page 39.  On February 26th,

16   2013, there's a $100,000 withdrawal.

17            Where does that withdrawal go to?

18   A    To Heskett & Heskett.

19   Q    We can turn to page 42.  On March 1st, 2013, there's a

20   withdrawal to MSMB Healthcare, LP.

21            How much is that withdrawal for?

22   A    $35,000.

23   Q    And then if we turn to page 44.  910E.

24            (Exhibit published.)

25            So on page 44, if we can look at the entries at the

SPAULDING – DIRECT – SMITH                    3230

1    top on March 4th, 2013.

2            And so the first entry on March 4th, 2013.  What's

3    the withdrawal amount from the Retrophin account on March 4th,

4    2013?

5    A    $773,000.

6    Q    And where does that withdrawal go to?

7    A    To MSMB Healthcare, LP, account number 9143.

8    Q    And is that the MSMB Healthcare account we looked at

9    earlier?

10   A    Yes.

11   Q    And then on March 4th, 2013, there's a second entry for

12   $575,000.

13   A    Yes.

14   Q    And where does that withdrawal from the Retrophin account

15   go to?

16   A    To Martin Shkreli.

17   Q    And is that the 6097 account that you analyzed?

18   A    Yes.

19   Q    There are just a couple other transactions I want to look

20   at for this account.  If we can turn to page 100.  And focus

21   on the transaction on May 2nd, 2013.

22            How much money is withdrawn from the Retrophin

23   account on May 2nd, 2013 and that goes to Sarah Hassan?

24   A    $400,000.

25   Q    If we can look at page 112.  And then towards the middle

SPAULDING – DIRECT – SMITH                    3231

1    there, there's an entry on May 14th, 2013 for Trachtenberg &

2    Rodes.

3             How much money goes out of the account on May 14th,

4    2013 to Trachtenberg & Rodes?

5    A    $123,711.

6    Q    If we can look at page 153.  And focus on the entry for

7    August 29th, 2013 towards the top.  And, again, is this is

8    from the Retrophin account.

9             How much is in the Retrophin account on August 29th,

10   2013 in that first entry.

11   A    $300,000.

12   Q    And where does that money go to?

13   A    It goes to Marshall Schuyler IRA.

14   Q    And finally if we can look at page 161.  And focus on the

15   entries for October 2nd, 2017 at the bottom.  The first

16   withdrawal from the Retrophin account is for $1,355,000.

17            If you go over to the comment section, what's the

18   name for that withdrawal?

19   A    Michael Lavelle.

20   Q    And then the entry just below that, what is the amount

21   withdrawn from the Retrophin account on October 2nd, 2013 for

22   David Geller?

23   A    $300,000.

24   Q    I want look at the summary chart you created for

25   Retrophin that's Government Exhibit 918.

SPAULDING – DIRECT – SMITH                    3232

1          (Exhibit published.)

2          And so which two accounts are included in this

3   summary chart?

4   A    Account number ending in 2527, and account number ending

5   in 3600.

6   Q    And were those the two accounts with the most activity

7   for Retrophin?

8   A    Yes.

9   Q    And those are Government Exhibits 909 and 910?

10  A    Yes.

11  Q    So looking at this chart, how much money is in those two

12  accounts combined in February of 2011?

13  A    Zero.

14  Q    And what about December of 2011?

15  A    $9,884.

16  Q    If we look at page 2, what's the combined total for

17  January of 2012?

18  A    $14,697.

19  Q    And what's the combined total for December of 2012?

20  A    $7,675.

21  Q    And finally if we can just look at Government

22  Exhibit 918A.

23          What does this chart represent?

24  A    This is a graph of the ending balances that we just

25  looked at in the other chart.

SPAULDING - DIRECT - SMITH                    3233

1   Q    And those are for the two Retrophin accounts with the

2   most activity?

3   A    Yes.

4   Q    What's the date range for this chart?

5   A    February 2011 through December 2012.

6        MS. SMITH:  Your Honor, I have about 15 minutes

7   left, so I don't know if you want to take a break or you want

8   me to push through.

9        THE COURT:  Well, I think this probably would be at

10  least worthy of a break, because there's a lot of information.

11       Would the jurors mind taking a quick break now and

12  then just resuming for the end of this line of questioning?

13       Is this it for this witness on your direct?

14       MS. SMITH:  Yes, Your Honor.

15       THE COURT:  Okay.  That might be best way to proceed

16  and then allow the jurors to take a lunch break.  And then

17  you'll have the cross of this witness.  So take a quick break,

18  ten minutes.

19            (Jury exits the courtroom.)

20       THE COURT:  Please take ten.

21       MR. CHAN:  I think I'll only be 10 or 15 minutes.

22  So if you want to get it in all before the lunch break, I

23  think that's fine.

24       THE COURT:  All right, perfect.

25       So you have someone else ready to go?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SPAULDING – DIRECT – SMITH                    3234

1          MS. SMITH:  Yes, Your Honor.

2          THE COURT:  Let's take the ten minutes and we'll be

3     done hopefully by 1.

4          MS. SMITH:  Thank you.

5          (Whereupon, a recess was taken at 12:08 p.m.)

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SPAULDING - DIRECT - SMITH                    3235

1          (In open court; outside the presence of the jury.)

2          THE COURT:  All right.  Good.  We're going to get

3     the jury in here.  They're lining up.

4          (This will be direct examination continued by

5     Ms. Smith.)

6          (Jury enters the courtroom.)

7          (Jury present.)

8          THE COURT:  We have all the jurors present.  Please

9     have a seat.  You may continue, Ms. Smith.

10          MS. SMITH:   Ms. Jackson, can you want to put the

11     Elmo back on.

12          THE COURTROOM DEPUTY:   Okay.

13     DIRECT EXAMINATION (Continued)

14     BY MS. SMITH:

15     Q    And, Ms. Spaulding, I just want to take a very quick look

16     at the last two bank accounts you analyzed for this sheet.

17     The first is Government's Exhibit 914, which are record from

18     JPMorgan Chase for the account for Mr. Shkreli, account number

19     ending in 6097.  And then the final account that you analyzed

20     is Government's Exhibit 915 which are JPMorgan Chase records

21     for Desert Gateway, account number ending in 8730.

22          And I want to turn your attention to

23     Government's Exhibit 914E, which is your in-and-out report

24     from Mr. Shkreli's personal account.

25          MS. SMITH:  And if we could just have the laptop one

SPAULDING – DIRECT – SMITH                3236

1   more time, please.

2   BY MS. SMITH:

3   Q    And so again, this is the in-and-out report for

4   Mr. Shkreli's account ending in 6097; is that right?

5   A    Yes.

6   Q    And I just want to focus on two transactions.  The first

7   is on Page 71.  And looking at December 17th, 2012, in the

8   middle, there is an entry, a withdrawal from the personal

9   account for $25,000.  And where does that withdrawal go to?

10  A    To MLPFS.

11  Q    And if we can just zoom up and scroll up the page a

12  little bit.

13           On December 17th, 2012, is there a deposit into the

14  record from Richardson?

15  A    Yes.

16  Q    And then also I just want to look at Page 82 and focus in

17  on the transaction in the middle of the page on March 4th,

18  2013.  What's the deposit into the account on March 4th, 2013?

19  A    $575,000 from Retrophin, Inc.

20  Q    And is that the account with the last four digits 3600?

21  A    Yes.

22  Q    Okay.  And then what happens once that money is deposited

23  into Mr. Shkreli's personal account on March 4, 2013?

24  A    Then there is a 575,000-dollar withdrawal to MLPFS Global

25  Market.

SPAULDING - DIRECT - SMITH                    3237

1   Q    And the last two charts I want to look at are

2   Government's Exhibit 919A and 919B, starting with 919A.  And

3   so what is the chart that's Government's Exhibit 919A?

4   A    This chart shows all of the payments to the Katten,

5   Muchin, Rosenman, LLP.

6   Q    And how is it organized?

7   A    By account name and account number.

8   Q    What's the date range for all of the accounts in this

9   report?

10  A    July 11, 2011 through July 28, 2014.

11  Q    So if we can start with MSMB Capital, which is on Page 2

12  of the document.  And so which account does this reflect?

13  A    This is a withdrawal from MSMB Capital Management, LP,

14  the account number ending in 9453.

15  Q    And just to take a step back for

16  Government's Exhibit 919A, did you look at payments to Katten

17  across all 15 accounts that you reviewed?

18  A    Yes.

19  Q    And if there was no payment to Katten from one of the

20  accounts, is that an account included in this report?

21  A    No.

22  Q    So this only shows accounts from which payments were made

23  to Katten; is that right?

24  A    Yes.

25  Q    So looking back at the account for MSMB Capital

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

SPAULDING - DIRECT - SMITH                          3238

1    Management, LP, what was the payment that was made to Katten

2    to this account?

3    A    $10,000 on July 11, 2011.

4    Q    So if we could look at MSMB Health Care, which is on

5    Page 3.

6              And so which MSMB Health Care, LP, account is shown

7    here.

8    A    Account number ending in 7700.

9    Q    And how many payments are made to Katten from this

10   account?

11   A    Two payments.

12   Q    And what are the dates of the payments?

13   A    August 5, 2011 and August 10, 2011.

14   Q    And what is the total from MSMB Health Care?

15   A    $20,000.

16   Q    If we can look at the other MSMB Health Care account on

17   Page 4.  And which MSMB Health Care account is this?

18   A    This is Account Number 9143.

19   Q    And what are the payments made to Katten from this

20   account?

21   A    There are three payments June 18th, 2012, for $25,000;

22   June 27, 2012, for $25,000; and June 29th, 2012, for 50,000.

23   Q    And what's the total from this MSMB Health Care account?

24   A    $100,000.

25   Q    And between the two MSMB Health Care, LP, accounts this

SPAULDING - DIRECT - SMITH                3239

1   is $100,000 and the other one was $20,000, is that $120,000 in

2   total?

3   A     Yes.

4   Q     And were any payments made from MSMB Health Care, LP

5   accounts after June 29, 2012?

6              THE COURT:  To Katten?

7   BY MS. SMITH:

8   Q     To Katten.

9   A     No.

10  Q     If we can look at Retrophin account, which is 2527,

11  starting on Page 7.  I'm sorry, Ms. Sullivan, Page 7 first.

12  And so which Retrophin account does this chart reflect?

13  A     Account Number 2527.

14  Q     And are the payments to Katten reflected in this chart

15  between November, 2011 and October of 2012?

16  A     Yes.

17  Q     If we can look at the first the payment on November 8th,

18  2011, for $10,000, in the comment section, if we just focus on

19  the comment section, there's a reference there to Project

20  Plasma?

21  A     Yes.

22  Q     It says SBO Project Plasma.  Do you see that?

23  A     Yes.

24  Q     If we can just zoom out a little bit.

25              Is that reference also in a number of the other

SPAULDING – DIRECT – SMITH                    3240

1    wires to Katten?

2    A    Yes.

3    Q    And what's the total amount of the wire transfers from

4    the Retrophin 2527 account to Katten, Muchin?

5    A    $698,300.

6    Q    If we can turn to the other Retrophin account, which is

7    on Page 5.

8              And is this the Retrophin account ending in 3600?

9    A    Yes.

10   Q    And what is the first payment listed here?

11   A    On October 22, 2012, there's a payment of $14,000.

12   Q    And if we can zoom out again, I apologize, and look at

13   the comment section.  Is there a reference of Project Plasma

14   there as well?

15   A    Yes.

16   Q    And is that reference also in a number of the other wires

17   on this page?

18   A    Yes.

19   Q    If we can zoom out again, just look at the whole

20   document.

21             For the wires that are made between October 22,

22   2012, and May 13, 2013, are those all round numbers?

23   A    Yes.

24   Q    And is the Project Plasma in the notation for all of

25   those wires?

SPAULDING – DIRECT – SMITH                    3241

1    A    Yes.

2    Q    If you can look at the entry for August 21st, 2013, how

3    much is that wire transfer for?

4    A    $181,073.13.

5    Q    And then if you look at the comment section, is there a

6    reference to specific invoice numbers?

7    A    Yes.

8    Q    And the payments after October 21st, 2013, are those

9    round numbers or do they end in different cents?

10   A    After August 21st, 2013, yes.

11   Q    They end in -- they have cents at the end, they're not

12   round numbers?

13   A    Correct.

14   Q    And is there references to invoices on the right-hand

15   side in the comment section of those?

16   A    Yes.

17   Q    If we can just turn to the next page, which is a

18   continuation.  What's the date of the last wire transfer on

19   the page?

20   A    July 28th, 2014.

21   Q    And what's the total amount paid from this Retrophin

22   account to Katten, Muchin?

23   A    $5,362,448.25.

24   Q    I also just want to look back the Page 1 of the

25   Desert Gateway account.  And focusing here, this the

SPAULDING - DIRECT - SMITH                3242

1    Desert Gateway account ending in 8730?

2              THE COURT:  Just identify the exhibit for the

3    record.

4              MS. SMITH:  Oh, sure.  We're still on Exhibit 919A.

5    I apologize.

6              THE COURT:  Thank you.

7              MS. SMITH:  That's Page 1.

8    BY MS. SMITH:

9    Q    And so is this the information on payments made to Katten

10   from this other Gateway account?

11   A    Yes.

12   Q    What are the dates of the two payments made to Katten

13   from this account?

14   A    February 13, 2013.

15   Q    And what's the total of the two payments again?

16   A    $200,000.

17   Q    And in the comment section is there a reference to

18   Project Plasma?

19   A    Yes.

20   Q    And the last one, I just want to show you

21   Government's Exhibit 919B.

22              And so what information is contained in

23   Government's Exhibit 919B?

24   A    This is basically the same information as the exhibit we

25   just looked at.  These are payments to Katten, Muchin,

SPAULDING - CROSS - CHAN                     3243

1   Rosenman, LLP, but they're sorted by date.

2   Q    And then if you look -- if we just look at the top

3   portion here, it's shows the date of the wire and then the

4   amount, the comments that we saw before and then what's the

5   account withdrawn from information?

6   A    That shows which account the payment came from.

7   Q    And again, what's the time period for this report?

8   A    July 11th, 2011 through July 28, 2014.

9   Q    And if we can just look at the last page of this summary.

10  What's the total amount that was paid to Katten in that time

11  period you just referenced from all of the accounts that you

12  analyzed?

13  A    $6,390,748.25.

14         MS. SMITH:  Your Honor, I have no further questions

15  for the witness.

16         THE COURT:  All right.  Thank you.  Would you like

17  to cross the witness?

18         MR. CHAN:  Yes, Your Honor, please.

19         THE COURT:  Thank you.

20  CROSS-EXAMINATION

21  BY MR. CHAN:

22  Q    Good afternoon.

23  A    Good afternoon.

24  Q    Ms. Spaulding, for the past two hours you've testified

25  about over a dozen bank records, correct?

1   A     Yes.

2   Q     None of those bank records are in the name of Evan

3   Greebel, correct?

4   A     Correct.

5   Q     They were either MSMB, Retrophin, or Martin Shkreli,

6   right?

7   A     Yes.

8   Q     And of the various withdrawal reports that you put into

9   evidence today, there's not a single withdrawal listed in the

10  name of Evan Greebel, correct?

11  A     Correct.

12  Q     And by contrast in those in-and-out reports you saw money

13  going back and forth between MSMB entities and Retrophin,

14  correct?

15  A     Yes.

16  Q     And as indicated in the stipulation that you read into

17  the record today, some of the Retrophin bank accounts had in

18  their account opening the contact information as care of MSMB,

19  correct?

20  A     Yes.

21  Q     At the end here we -- you highlighted some payments from

22  Retrophin or MSMB to Katten; do you remember that?

23  A     Yes.

24  Q     Now, Katten wasn't the only law firm for which there were

25  payments made in these bank records, correct?

1    A    I believe that's correct.

2              MR. CHAN:  For example, let's put up, please,

3    Randall Government's Exhibit 901-C.

4    BY MR. CHAN:

5    Q    And the entry for Kleinberg, Kaplan, Wolff & Cohen, PC,

6    do you recognize that to be a law firm?

7    A    No.

8    Q    What about McCormick & O'Brien?

9    A    No.

10   Q    Well, let's go to the underlying detail for the payment

11   to Kleinberg, Kaplan, for example, which would be

12   Government's Exhibit 901-D.  And then of that, let's go to

13   Page 81.  Can you read what -- for the Kleinberg, Kaplan

14   entry, the detail of it, can you read what the comment section

15   says?

16   A    Yes.  Memo:  Legal.

17   Q    And by the way, when you were just -- you left off with

18   the Government on direct focused on some wire transfers to

19   Katten, Muchin.  Do you remember that?  To Katten, Muchin?

20   A    Yes.  I'm not sure what your question is, though.

21   Q    Well, I was just directing your attention to that topic.

22   A    Okay.

23   Q    And in that connection your attention was drawn to

24   comments that reference Project Plasma?

25   A    Yes.

SPAULDING - CROSS - CHAN                    3246

1    Q    Do you remember that?

2    A    Yes.

3    Q    Now the comment section, where did that come from?

4    A    It comes from the bank records.  It comes from either the

5    bank statements or memos on the checks.

6    Q    And that's information that's filled out by the sender of

7    the wire, correct?

8    A    Yes, I believe that's true.

9    Q    Can we also put up Government's Exhibit 910-C.

10            Focusing your attention to Akin Gump Strauss Hauer &

11   Feld, LLP, do you recognize that as a law firm?

12   A    No.

13   Q    What about on Page 2, Blank, Rome, LLP, do you recognize

14   that as a law firm?

15   A    No.

16   Q    What about on Page 3, Cooley, LLP, a payment of 152,000

17   plus, do you recognize that as a law firm?

18   A    No.

19   Q    How about underneath that Covington & Burling, LLP, do

20   you recognize that as a law firm?

21   A    No.

22   Q    Continuing down Ellennoff, Grossman & Schole, LLP, do you

23   recognize that as a law firm?

24   A    No.

25   Q    Page 4 Fenwick & West, LLP, $170,000 plus, do you

SPAULDING - CROSS - CHAN                    3247

1   recognize that as a law firm?

2   A    No.

3   Q    At the bottom of this same page, Hogan Lovells, do you

4   recognize that as a law firm?

5   A    No.

6   Q    Page 6, Mintz Levin Cohn Ferris Glovsk, do you recognize

7   that as a law firm?

8   A    No.

9   Q    On the next page, Page 7, the Morris, Nichols, Arsht &

10  Tunnell, LLP, do you recognize that as a law firm?

11  A    No.

12  Q    Page 9, Sheppard Mullin Richter & Hamp, do you recognize

13  that as a law firm?

14  A    No.

15  Q    Now, if we go to the detail at least for the Blank Rome

16  payment on Page 9 -- Government's Exhibit 910-D, Page 12 of

17  910-D, please, under Blank Rome, can you read what the comment

18  says to the first payment?

19  A    Yes.  It says Memo:  Legal strategy for WB, et cetera,

20  and the number 1039041.

21  Q    How about the detail for Hyman Phelps on Page 93?

22  A    For the first check the memo says Invoices, with the

23  invoice numbers then it says, Legal fees.

24  Q    And the second one refers to PKAN legal fees, correct?

25  A    Yes.

1            MR. CHAN:  One moment, Your Honor.

2            No further questions.  Thank you.

3            THE COURT:  All right.  Any redirect?

4            MS. SMITH:  No, Your Honor.

5            THE COURT:  All right.  Ms. Spaulding, you're

6    excused.  Have a nice trip back to Colorado.

7            THE WITNESS:  Arizona.

8            THE COURT:  Arizona.  I'm sorry, Arizona.

9            THE WITNESS:  Thank you.

10           THE COURT:  Did the Government want to try to start

11   a witness between now and 1:00 o'clock?

12           MS. SMITH:  Your Honor, we'll prefer to wait to come

13   back from lunch.

14           THE COURT:  What time is the witness coming back?

15           MS. SMITH:  The witness will be here at 1:15, so

16   anytime you want to start before that.

17           THE COURT:  Well, I want to give the jurors like an

18   hour, maybe an hour and 15 today.

19           So if you were to come back at 10 of 2:00 that would

20   give you an hour and 15 minutes.

21           Thank you for your attention this morning.  Don't

22   talk about the case, please.

23           (Jury exits the courtroom.)

24           (The following matters occurred outside the presence

25   of the jury.)

1          THE COURT:  All right.  Is there anything we need to

2    deal with right now?

3          MR. BRODSKY:  Well, in anticipation of Corey

4    Massella, Your Honor.  There were two pieces that I did want

5    to raise.

6          THE COURT:  Have a seat everybody, if you would.

7          MR. BRODSKY:  Objections to, if the Government was

8    goings go into this area.

9          One, if you recall during Mr. Shkreli's trial,

10   Mr. Shkreli -- I think it's fair to characterize it this way,

11   he was abusive towards Ms. Susan Chew who was an accountant

12   working for SEC Solutions working for Corey Massella on his

13   team and Mr. Shkreli's...

14          It's our view that Mr. Shkreli's abusive

15   communications with Ms. Chew are not relevant under 401 and

16   certainly if there's any relevance, which we can't see, would

17   be outweighed by the substantial prejudice under 403.  So that

18   would be issue Number 1.

19          Issue Number 2 was raised by the focus this morning

20   on Katten's payment -- or excuse me -- Retrophin's payment

21   during a period of time for MSMB bills.  So as Your Honor may

22   remember from Ms. Davida's testimony, Ms. Davida was the

23   relationship partner when MSMB became a client.  And for the

24   period of time that MSMB was a client, any connection with

25   that work under -- or corporate transactions, including

SPAULDING - CROSS - CHAN                3250

1    Project Plasma, Ms. Davida received the credit for that work.

2    Mr. Greebel was tasked at times to help the law firm of Katten

3    get Mr. Shkreli to pay his bills on time.  He had a problem

4    paying his bills on time for all vendors.

5            At some point, during the period of time in 2012

6    through mid-2013, as I understand it, SEC Solutions,

7    Mr. Massella's team, and Marcum, were trying to figure out

8    payments of the fees between MSMB and Retrophin over a variety

9    of issues.

10           They become aware or there is -- when they're

11   vetting the records, that MSMB -- Retrophin paid in the

12   neighborhood of about $500,000 in legal fees of MSMB expenses.

13   It was publicly disclosed in a filing in the form 10-K SEC

14   filing that MSMB and affiliated entity -- it didn't use the

15   name MSMB -- but an affiliated entity -- Retrophin had paid

16   the legal fees of an affiliated entity.

17           We don't see how the fact that Retrophin had paid

18   MSMB legal expenses provides any information that's of

19   relevance to Count 7 or Count 8.  The fact that it's disclosed

20   in a public filing is there.  But we are troubled that if this

21   is being elicited to suggest propensity that there's some kind

22   of propensity because there's something improper about this,

23   we certainly didn't get for 404(B) notice.  We don't see it as

24   an act.  There's no mention of it in the indictment and we

25   don't see it as an act in furtherance of any charge of

1    conspiracy and so we're trouble under 401.  We don't see the

2    relevance and, two --

3              THE COURT:  You're troubled by the --

4              MR. BRODSKY:  Relevance.

5              THE COURT:  In the 10-K.

6              MR. BRODSKY:  Not by that.

7              THE COURT:  What are you troubled by, then?

8              MR. BRODSKY:  Any attempt to elicit from

9    Mr. Massella, who was there at Citrin and SEC Solutions to

10   elicit evidence from him that Retrophin was paying the bills

11   for MSMB.  As Your Honor knows from Ms. Davida's testimony Ms.

12   Davida got the credit for payment on MSMB bills, and so we

13   don't see the relevance of the fact that Retrophin was paying

14   the bills of MSMB has anything to do with this trial.

15             And we think that's eliciting that evidence from

16   Mr. Massella or any other witness should be precluded.

17             THE COURT:  Who is going to respond?

18             MS. SMITH:  I will just very briefly and I

19   apologize, I was just dealing with travel issues from the

20   witness.  So Mr. Pitluck I think heard the whole thing, but

21   for the piece about Mr. Shkreli being abusive, we were going

22   to do it kind of the same way we did in the last trial and, in

23   fact, I wasn't going to use a document, but just to elicit the

24   reason why the engagement ended was that there were

25   difficulties with Mr. Shkreli getting information and then he

SPAULDING - CROSS - CHAN                    3252

1    was verbally abusive.  I was not going to get into the details

2    or any of the slurs that he used or anything like that.  But

3    we do need to provide the jury with some understanding of why

4    Mister --

5                 MR. BRODSKY:  That's fine.

6                 MS. SMITH:  That's fine.

7                 They may be in there, but we're not going to

8    actually use the document.

9                 THE COURT:  The e-mails.

10                MS. SMITH:  The e-mails.  I was going to just do it

11   very high level.

12                MR. BRODSKY:  That's fine, Your Honor.

13                MS. SMITH:  There's no suggestion that Mr. Greebel

14   was responsible for that.

15                THE COURT:  Okay.

16                And what's the other issue, the issue about

17   soliciting information that Retrophin paid for MSMB bills.

18                MR. PITLUCK:  Well, Your Honor, it's our position --

19   and it's our position is that that information is directly

20   relevant to both Count 7 and Count 8 as it relates to this

21   trial.

22                The Court has heard eight days of evidence related

23   to commingling, the knowledge or lack of knowledge of

24   commingling, using one firm's assets to pay for an others.

25   This isn't propensity, this is showing knowledge that's

1   directly refuting this information that Mr. Greebel didn't

2   know which entity was being used to pay which bill.  I don't

3   see how Ms. Davida's testimony that she got credit from MSMB

4   is at all relevant to this.

5            THE COURT:  Well, that was during a discrete period

6   or it was about the relationship?

7            MR. PITLUCK:   It's very discrete period.  She also

8   testified, I think, on the stand that she had no idea that

9   Retrophin was brought in and she didn't even know she was

10  getting 10 percent credit for Retrophin.  I just don't see how

11  that's germane.

12           What is germane is the fact that Retrophin is being

13  used, the assets of Retrophin are being used to pay MSMB bills

14  to Katten and it shows with the defendant's knowledge and the

15  issue is raised by their auditors.  That's not only relevant,

16  it's central to both raised defenses and the charged crime.

17           THE COURT:  Well, why do you say Mr. Greebel knew

18  about this, because aren't most of these bills being paid via

19  wire and they would -- they would reference an invoice number,

20  correct, from Katten.  But what evidence do you have that

21  Mr. Greebel was aware about, you know, the payments and he

22  knew they were being sourced, which account they were being

23  sourced from?

24           MS. SMITH:  Well, so there is a discussion in the

25  spring of 2013 and as Mr. Massella will testify, there was a

SPAULDING - CROSS - CHAN                    3254

1    lot of work being done by Citrin related to Retrophin's

2    financials and Mr. Greebel was involved in these discussions

3    and copied on those e-mails and one of the areas they

4    identified in that time period was that Retrophin had paid

5    bills -- had paid to Katten in excess of the invoices that had

6    been provided for Retrophin.  So basically Retrophin had

7    repeat invoices from Katten for work done for Retrophin and

8    the payment out of Retrophin's account were larger than the

9    invoices reflected.  And the accountants were trying to

10   rectify why were payments made to Katten in excess of the

11   invoices that we actually had documentation for.  So there was

12   a discrepancy between the documentation and the amount that

13   actually was paid and there were a number of discussions with

14   Mr. Greebel to understand why there was that discrepancy.

15            So that is where his knowledge is because he was,

16   you know, on the legal side doing the SEC filings, involved in

17   the reconciliation of various expenses for various different

18   things related to Retrophin and one of them was the legal

19   bills to Katten.  So he actually was, you know, directly aware

20   and had a direct conversation with Mr. Massella on this issue

21   on a number of occasions.

22            There are also a number of e-mails that reflect that

23   Citrin is trying to figure out why this discrepancy exists.

24            MR. PITLUCK:  And, Your Honor, one more point

25   related to this.  The Court heard testimony throughout the

1    trial and again as recently as this morning about MSMB's

2    ability or inability to pay liabilities and why that is

3    irrelevant to Retrophin's adoption or payment of the

4    settlement agreements.  And this point of MSMB's ability or

5    inability to pay legal fees and Mr. Greebel's knowledge of

6    that is directly relevant to a series of testimony that's been

7    elicited by the defense as to whether or not Mr. Greebel knew

8    whether they could pay those.

9          This shows his direct knowledge of the assets or

10   lack of assets at MSMB during this time -- this period of the

11   charged conspiracy.  So we've just given the Court about four

12   reasons why this is both relevant to the charged crime and to

13   the defenses, and we think that this testimony should

14   absolutely be elicited.

15         MR. BRODSKY:  Your Honor.

16         MR. PITLUCK:  And we would also note that there was

17   no motion raised about this at any point.

18         MR. BRODSKY:  Your Honor, it's hard to raise a

19   motion when they don't tell us what their evidence is going to

20   be and how they're going to form their evidence.

21         THE COURT:  This was all in the first trial --

22         MR. BRODSKY:  It's different.

23         THE COURT:  -- which I observed at length.

24         MR. BRODSKY:  This part, Your Honor, was not in the

25   first trial.  I read Mr. Massella's testimony this morning and

SPAULDING - CROSS - CHAN                    3256

```
 1    I did not hear testimony about how Retrophin was paying

 2    MSMB -- Katten's bills for MSMB.  So I did not hear that

 3    testimony.

 4              THE COURT:  But the bank records and the summary by

 5    Ms. Spaulding.

 6              MS. SMITH:  We marked --

 7              MR. BRODSKY:  Can I say something?

 8              MS. SMITH:   I just wanted to let you know we marked

 9    a number of exhibits.

10              MR. BRODSKY:  May I finish?

11              You know, Your Honor, first they're putting Mr.

12    Greebel's knowledge of this in the spring of 2013.  The

13    reality from the records they just showed is these wires are

14    being made in 2012 unbeknownst to Mr. Greebel.  So wires are

15    going out from Retrophin in 2012 into Katten's bank account

16    saying Project Plasma.  And so they're trying to suggest

17    somehow that Mr. Greebel would be aware that these payments

18    are going in through wires in the spring of 2013.  That is

19    first.

20              So it's not relevant in the spring of 2013 when

21    people are trying to figure out the books and records that are

22    a mess between MSMB and Katten.

23              Second, Your Honor.

24              THE COURT:  The fall -- well, starting in 2012 and

25    continuing through the fall or late summer of 2013.
```

1           MR. BRODSKY:  Well, Your Honor, that's a mistake.

2           So what happens is Mr. Shkreli puts Project Plasma

3     on the wire transfer.  If you look at the invoice for Project

4     Plasma, it's not that large.  So we are -- it's our view that

5     when he's sending out wires or whoever's doing it on his

6     behalf leaves in Project Plasma because there's no way all

7     that money is going for just Project Plasma, which is a very

8     discrete potential corporate transaction.  So it's a mistake

9     and they are suggesting to the jury that somehow all that

10    relates to Project Plasma.  It does not.

11          THE COURT:  No, I think those are shown to the jury

12    that shows direct evidence of Mr. Shkreli's use of an

13    intermingling of different assets and using Retrophin assets

14    to pay MSMB related bills.

15          MR. BRODSKY:  No question, Your Honor.

16          And we think the commingling, you know, we moved in

17    limine to introduce the evidence that the Government said

18    there was commingling.  So we welcome the commingling because

19    we think it goes to a potential lawsuit when the investors

20    come and they say I'm going to sue commingling, as Your Honor

21    knows is one giant factor in the ability to pierce the

22    corporate veil and to go after the related party.

23          But the reality is, Your Honor, that what they're

24    trying to suggest to the jury is somehow there was a motive by

25    Mr. Greebel to do some wrongful conduct in the spring of 2013

1   or thereafter because Retrophin a year earlier paid the legal

2   bills of MSMB, the credit to which goes to Ms. Davida.  And so

3   what we are really worried about, even if you assume there's

4   some minimal probative value because there's commingling, what

5   we are very worried about is the incredible prejudice from the

6   suggestion that somehow the payment of legal fees by Retrophin

7   a year earlier to Mr. Greebel's knowledge before the charged

8   conspiracy -- before Mr. Greebel is even alleged to have

9   jumped in or been involved in any conspiracy because as

10  Your Honor knows the alleged backdating occurs in the fall of

11  2012, is somehow a factor in his decision to join an alleged

12  conspiracy.  It is extremely prejudicial and really,

13  Your Honor, clouds the issues in the case, which are the three

14  charged schemes which we seem to be forgetting about.

15          The backdating scheme which Mr. Massella will try to

16  testify about bring out his evidence, which is certainly

17  relevant.

18          The settlements and the consulting agreements.  So I

19  do think there's substantial prejudice.  They can say it's

20  relevant a number of times, but if you look at the facts, his

21  knowledge in the spring of 2013 that there's this payment by

22  Retrophin for fees a year earlier, before Mr. Greebel ever

23  even allegedly joins a conspiracy, credit to which is being

24  given to Ms. Davida and not him, is a real problem for us.

25          MR. PITLUCK:  Judge, I now heard a pivot to it's

SPAULDING - CROSS - CHAN                    3259

1    relevant but it's prejudicial and no response to all the other

2    reasons as to why it's relevant, which is Count 7, Count 8,

3    knowledge of where the assets are and the money is or where

4    it's not.

5          And but now the prejudice because bills are being

6    paid and the credit is going to some partner who does not know

7    Retrophin exists.  It's bewildering a little bit, Judge.  This

8    is direct evidence of the core issues of this case that is

9    attempted to be diminished by some assertion that there is

10   some undisclosed bad act because he's doing exactly what is

11   charged in the indictment.

12         THE COURT:  Well, I don't think you're going to

13   argue that Mr. Greebel manipulated the payment of the Katten

14   legal fees from the Retrophin account but rather just that he

15   was aware that the Citrin Cooperman account had detected

16   problems and they were trying to reconcile which bills were

17   properly attributable to which entity and where the money came

18   from.  Correct?

19         MR. PITLUCK:  Your Honor.

20         THE COURT:  And you're going to argue that

21   Greebel --

22         MR. PITLUCK:  And of course his knowledge at the

23   time the issue was being raised and his response, if any, to

24   Citrin Cooperman.

25         THE COURT:  All right.  I do think --

SPAULDING - CROSS - CHAN                    3260

1          MR. BRODSKY:  They're suggesting, Your Honor, if I

2     may.

3               They're suggesting that somehow and we'd like a

4     proffer of what Mr. Massella's going to say.  If they just

5     suggested that somehow Mr. Massella's going to testify that

6     Mr. Greebel's reaction to the news that Retrophin was paying

7     MSMB bills is somehow relevant to this trial.  And when

8     they're trying to reconcile fees and when it's obvious that he

9     used MSMB and Retrophin interchangeably, and he commingled

10    everything.  I mean the bank accounts themselves, Your Honor,

11    as Your Honor knows says Retrophin care of MSMB.  So it's

12    obvious he's commingled everything and he's used the bank

13    account free for all for both MSMB and Retrophin and back and

14    forth.  That's undisputed.  We'll stipulate to that.  We'll

15    stipulate to the awareness of that because that's part of our

16    case.

17              But this notion that Mr. Massella's going to take

18    the stand and say that somehow Mr. Greebel's reaction to

19    learning the news is relevant is troubling.

20              MR. PITLUCK:  Judge, it's relevant to his knowledge

21    of what they have just asserted of the commingling of the

22    accounts and use of the account and they're now disclaiming

23    that Mr. Greebel knew anything about that.  It's directly

24    relevant to that.

25              MR. BRODSKY:  Your Honor, we are not disclaiming

SPAULDING - CROSS - CHAN                    3261

1    that Mr. Greebel knew about -- didn't know about the

2    commingling, of course he knew about the commingling which is

3    what created -- we moved to include and try to have the

4    Government statement that there was commingling admitted into

5    evidence.

6              THE COURT:  Well, the concern I have with your

7    argument, Mr. Brodsky, is you are trying to deprive

8    the Government of direct relevant evidence, which on balance

9    under 403 is unduly or unfairly prejudicial.  It is -- it is

10   directly relevant to the idea charged in Count 7 that

11   Retrophin assets were misappropriated to satisfy debts

12   incurred by the MSMB entities or Mr. Shkreli.

13             There's money moving from Retrophin accounts to pay

14   for bills, legal bills that were incurred by MSMB.  And it

15   seems to me that -- I mean, I don't doubt and I don't think

16   you could -- well, reasonably argue that this is not relevant

17   to the charged --

18             MR. BRODSKY:  Your Honor.

19             THE COURT:  It's direct evidence of the charged

20   conduct.

21             MR. BRODSKY:  Your Honor, the charged conduct

22   relates to backdating settlement and consulting agreements it

23   has nothing to do with the payment by --

24             THE COURT:  The charged conduct is a conspiracy to

25   commit wire fraud that involved misappropriating Retrophin

SPAULDING – CROSS – CHAN                    3262

1  assets.

2            MR. BRODSKY:  Under three schemes, Your Honor.  And,

3  respectfully, if they had evidence in 2012 when these payments

4  were made, Mr. Greebel was aware of them and knew about them,

5  that would be relevant knowledge.  But finding out about it

6  after the fact, long after it occurred when he's not getting

7  any credit at the law firm for the fact these payments were

8  being made to MSMB.

9            THE COURT:  At some point he does get credit.  I

10  mean, I know that Ms. Davida got credit for bringing the

11  business in, the accounts in.  She shares credit with

12  Mr. Greebel and she --

13            MR. BRODSKY:  10 percent.

14            THE COURT:   -- continues to get -- as the years go

15  by she gets a smaller percentage of the credit if the

16  business, as I recall.

17            MR. BRODSKY:  Well, what happens is she leaves.

18  She leaves in 2012 and Retrophin becomes the client and that's

19  doing a reverse merger MSMB is not doing any work because

20  they're shutting down, basically.  All there is, as Your Honor

21  knows from the testimony --

22            THE COURT:  When does she leave, I'm sorry.

23            MR. BRODSKY:  She leaves about mid, as I understand

24  it, mid-2012.  I could be off.

25            But all of MSMB essentially is, as reflected in

SPAULDING - CROSS - CHAN                    3263

1   Mr. Shkreli's September 10th shutdown e-mail, all his energies

2   are going into Retrophin.

3              THE COURT:  Well --

4              MR. PITLUCK:  Your Honor, Mr. Greebel's compensation

5   committee memo dated February, 2013 for the fiscal year ending

6   January 31, 2013, touts the collection of $546,000 from

7   MSMB Capital during the physical year, therefore my total

8   collection was approximately 1.41 million because following

9   Bernadette Davida departure, I retained the client and played

10  a significant role in collecting the money owed for the

11  matters of which I was the senior partner.

12             THE COURT:  The client being MSMB in that memo?

13             MR. PITLUCK:  Yes.  MSMB Capital.

14             THE COURT:  All right.  You know, Mr. Brodsky,

15  respectfully I'm going to overrule your objection.

16             MR. BRODSKY:  All right, Your Honor.

17             THE COURT:  All right.  Thank you.

18             MR. PITLUCK:  Judge, what time would you like us

19  back?

20             THE COURT:  Well, I told the jurors 10 until 2:00

21  so could you try to be back.

22             MR. PITLUCK:  1:40, 1:45.

23             THE COURT:  Well, hopefully we don't have any more

24  issues, do we?  I mean, honestly I think by the time the

25  jurors all trickle back in is going to be about 2:00.

1            MR. PITLUCK:  Okay.  We'll be ready to go at 1:45.

2            THE COURT:  All right.

3            (Recess taken.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MASSELLA - DIRECT - SMITH                     3265

1                     AFTERNOON SESSION

2               (In open court.)

3               (Parties present.)

4               (Jury enters courtroom.)

5          THE COURT:  All the jurors are present.  He's have a

6     seat.  Would you like to call your next witness, Ms. Smith.

7               MS. SMITH:  Yes, your Honor, the Government calls

8     Corey Massella.

9               (Witness takes the witness stand.)

10              COURTROOM DEPUTY:  Raise your right hand.

11              (Witness takes the witness stand.)

12    COREY MASSELLA, called by the Government, having been first

13    duly sworn, was examined and testified as follows:

14              THE WITNESS:  Yes.

15              COURTROOM DEPUTY:  Please have a state.  State and

16    spell your full anymore for the record.

17              THE WITNESS:  Corey L. Massella.

18              THE COURT:  Would you spell Massella, please.

19              THE WITNESS:  M-a-s-s-e-l-l-a.

20              THE COURT:  And Corey is with an r-e-y.

21              THE WITNESS:  R-e-y.

22              THE COURT:  Please proceed.

23    DIRECT EXAMINATION

24    BY MS. SMITH:

25    Q    Good afternoon, Mr. Massella.

MASSELLA – DIRECT – SMITH                    3266

1               How old are you?

2    A    57.

3    Q    Where do you currently live?

4    A    Long Island, New York.

5    Q    What is your highest level of education.

6    A    B.S. in Accounting.

7    Q    What college did you go to?

8    A    University of Buffalo at Buffalo.

9    Q    When did you graduate?

10   A    1982.

11   Q    In addition to your college degree in accounting, do you

12   have any professional certifications?

13   A    I'm a Certified Public Accountant.

14   Q    What does it mean to be a Certified Public Accountant?

15   A    It means I took a three-day exam, passed that exam, and

16   then I have two years' working experience at a public

17   accounting firm.

18   Q    When did you earn your CPA?

19   A    1984.

20   Q    Where did you work after you graduated from college?

21   A    I worked at a small accounting firm and eventually landed

22   in an international, they were a big eight at that time,

23   international accounting firm.

24            After that, I was then a partner at a small firm and

25   then ran my own firm for a number of years and then merged

MASSELLA - DIRECT - SMITH                3267

1   them into a national firm.

2   Q     What was the firm that you had on your own called?

3   A     It was called Massella & Associates.

4   Q     And what was SEC Solutions?

5   A     SEC Solutions was a separate division and a separate

6   entity, actually, that we formed in -- that I formed any think

7   2005.

8   Q     What kind of work did SEC Solutions perform for

9   companies?

10  A     We worked on companies that wanted to go public, so we

11  worked on having them comply with SEC financial reporting and

12  Generally Accepted Accounting Principles and prepared the

13  supporting work papers so that then auditors can then audit

14  it.  In addition, we also supported them on their SEC filings,

15  on their annual and their quarterly filings.

16  Q     What do you mean by supported them on their SEC filings?

17  A     We supported them strictly on accounting and Generally

18  Accepted Accounting Principles, SEC financial reporting and

19  guidance on managing their work with the auditors.

20  Q     What was your role at SEC Solutions?

21  A     I was the partner-in-charge.

22  Q     How many people worked at SEC Solutions?

23  A     Six.

24  Q     What is Citrin Cooperman?

25  A     Citrin Cooperman is the accounting firm that I merged in

MASSELLA – DIRECT – SMITH                    3268

1    in 2009.

2              THE COURT:  Emerged or merged?

3              THE WITNESS:  Merged.

4              THE COURT:  Merged?

5              THE WITNESS:  Merged.  Merged.

6    EXAMINATION BY

7    MS. SMITH:(Continuing.)

8    Q    And what was the nature of that merger?

9    A    The merger was I joined the firm, and in addition to my

10   accounting firm being brought into Citrin Cooperman,

11   SEC Solutions was also brought in and acquired by Citrin

12   Cooperman.

13   Q    What, if anything, changed about how your work that you

14   did at SEC Solutions operated when you became a partner at

15   Citrin Cooperman?

16   A    It gave me larger resources and personnel.

17   Q    Substantively, did anything change about the work that

18   you performed?

19   A    Not at all.

20   Q    During your time working for SEC Solutions, both before

21   and after it became part of Citrin Cooperman, how many

22   companies did you work with that were in the process of

23   transitioning from private to public companies?

24   A    About 50.

25   Q    Mr. Massella, are you familiar with the company called

MASSELLA - DIRECT - SMITH                    3269

1    Retrophin?

2    A    Yes.

3    Q    How did you first hear of Retrophin?

4    A    I was introduced to Retrophin from Evan Greebel and David

5    Bucks, a partner at Markham.

6    Q    Who is Evan Greebel?

7    A    Evan Greebel is the defendant.

8    Q    When did you first meet him?

9    A    I met Evan at a Katten Muchin Christmas party.  I was

10   introduced by Mike Bartels from Citrin Cooperman.

11   Q    What, if any, was Evan Greebel's connection to Citrin

12   Cooperman?

13   A    He was the son-in-law of Niles Citrin.

14   Q    Did you and Mr. Greebel discuss Retrophin at that

15   Christmas party?

16   A    No, not at all.

17   Q    You mentioned a second individual who also told you about

18   Retrophin.  Who is that individual?

19   A    That individual is David Buckson, and he is a partner at

20   Markham.

21   Q    And what is Markham?

22   A    Markham is a national accounting firm.  They're ranked in

23   the teens right now, they're pretty large.

24   Q    When did you first discuss Retrophin with Mr. Greebel?

25   A    I don't know the exact date, but it was much later than

MASSELLA - DIRECT - SMITH                    3270

1    the Christmas party.  Could have been months.  It was months

2    afterwards.

3    Q    What was your understanding about what kind of company

4    Retrophin was?

5    A    Retrophin was a company that wanted to go public.  It

6    was -- they were going to be a life sciences company and

7    acquire some licenses.  But eventually, they were looking to

8    go public.

9    Q    Did there come a time when you met with anyone who worked

10   for Retrophin?

11   A    Yes, I met with Martin Shkreli.

12   Q    Who arranged that meeting?

13   A    I'm not sure it was David Buckson or Evan.  It was

14   either/or, I'm not sure which one.

15   Q    What was your understanding of Mr. Greebel's connection

16   to Retrophin?

17   A    He was counsel for Retrophin.  They were his client.

18   Q    And, approximately, when did that meeting take place with

19   Mr. Shkreli?

20   A    I don't remember the exact date.  If you can refresh me.

21   Q    You look at Tab A, which is the very first tab in the

22   binder, which is Government Exhibit 113-28 for identification.

23   A    It was, yeah.  You want me to answer this?

24   Q    Does that refresh your recollection about --

25   A    It would have been somewhere in January of 2012.

MASSELLA - DIRECT - SMITH                    3271

1    Q    That's when you first met Martin Shkreli?

2    A    Yes.

3    Q    Where did that meeting take place?

4    A    It took place at Martin's office.

5    Q    Who was at the meeting?

6    A    I'm not sure if it was Martin -- Martin, Jackson Su,

7    yeah, I believe the first meeting was Martin and Jackson Su.

8    Q    Who was Jackson Su?

9    A    He was the Chief Operating Officer.

10   Q    Who was he the chief operating officer for?

11   A    For Retrophin.

12   Q    What was the purpose of the meeting?

13   A    They interviewed me to see if I was qualified.  And they

14   also told me what their plans were for the company.

15   Q    And what did you learn about the company in that meeting?

16   A    I learned that Martin had previously been successful in

17   investing in life science companies, and that he was going to

18   take those successes and build a pharmaceutical company which

19   was Retrophin and go out and seek capital from the public

20   markets.

21   Q    And what did you understand you were interviewing to do

22   for Retrophin?

23   A    What SEC Solutions does, we were going to help him with

24   getting their books together and preparing them to be able to

25   put together financial statements.  Those financial statements

MASSELLA - DIRECT - SMITH                3272

1    would have included a balance sheet, an income statement of

2    cash flow, and then also to produce the footnotes that support

3    that along with the supporting work papers that an auditor can

4    audit.

5    Q    I'm going to ask you to look again at

6    Government Exhibit 113-28 for identification.

7         Do you recognize this document?

8    A    Yes.

9    Q    And what is this document?

10   A    This is an e-mail from Jackson Su to me.  He said that

11   he --

12   Q    Sorry.

13        Does the e-mail attach an engagement letter for

14   SEC Solutions?

15   A    Yes.

16        MS. SMITH:  Your Honor, the Government moves to

17   admit Government Exhibit 113-28 in evidence.

18        MR. BRODSKY:  No objection.

19        THE COURT:  We will receive 113-28.

20        (Government Exhibit 113-28, was received in

21   evidence.)

22   Q    And so, if we can focus on the e-mail in the middle of

23   the page from you.

24        And what's the date of this e-mail?

25   A    January 24, 2012.

MASSELLA - DIRECT - SMITH                    3273

1   Q    And who is the e-mail to?

2   A    Jackson Su.

3   Q    And what are you letting Jackson know in this e-mail?

4   A    Looking at the bank statement, there appears to be many

5   deposits and wire transfers.  Just identifying what his books

6   are, and we needed him to code and identify what the -- what

7   the transactions were in the bank statement.  Until we receive

8   these items, we cannot begin to set up their Quickbooks files

9   which meant that we were going to be setting up an accounting

10  software for them and then we were going to hand it off to

11  them.

12  Q    And what do you mean by you were going to set it up for

13  them and then hand it off?

14  A    We were going to organize what's called the Chart of

15  Accounts and put in a few transactions so that they can take

16  it from there and input the rest of the year so they can move

17  forward with it.

18  Q    And then at the top in response, Mr. Su writes that

19  there's an engagement letter, see attached; original was

20  mailed as well.

21        So we can turn to page, the page that ends in 70,

22  which is the first page of the engagement letter?

23        So what's the date on the engagement letter here?

24  A    January 19, 2012.

25  Q    And who is it addressed to?

1  A     Martin Shkreli.

2  Q     And what's his title listed as?

3  A     Chief Executive Officer.

4  Q     And what's the company?

5  A     Retrophin, LLC.

6  Q     Was Retrophin a limited liability company at that point

7  in time?

8  A     Yes.

9  Q     Did it stay as a limited liability company through the

10 entire time of your engagement?

11 A     No, they converted to a C Corp., an Inc.

12 Q     What's the difference between a limited liability company

13 and a corporation?

14 A     This limited liability -- the ownership in the limited --

15 well, it's a totally different form, but this limited

16 liability company was if someone invested in it, they would

17 get what's called units.

18         The operating agreement is different in a

19 corporation.  So the ownership and the legal documents are

20 different between the two.  And the LLC was also treated for

21 tax purposes as a partnership.

22 Q     And if we can look at this section in the middle of this

23 page that that says, "SSG will perform the following

24 services."  If you can just read the services that

25 SEC Solutions agreed to provide?

MASSELLA - DIRECT - SMITH                     3275

1    A    Assisting, compiling, from information you provide the

2    unaudited financial statements for the year ended December 31,

3    2011.

4    Q    And what is the word "unaudited" mean?

5    A    It means that we are -- it's not going to be audited, and

6    we are not going -- there's no certification, there's no

7    additional procedures performed.  Simply.

8    Q    And if you look a little bit farther down the page,

9    there's a section that says, "Our engagement is limited."

10             Can you just read that paragraph?

11   A    "Our engagement is the limited to assisting the company

12   in presenting the form of financial statements, information,

13   and representation of management.  We will not audit or review

14   the financial statements, and accordingly, will not express an

15   opinion or any other form of assurance on them.  The financial

16   statements will not be accompanied by a report."

17   Q    What does this paragraph mean?

18   A    It means that we are compiling the information, that we

19   will put them together.  We are not giving any opinion or a

20   report that would normally be accompanied with -- if we were

21   the accountants doing the assurance, and it's based on the

22   representations of management.

23   Q    What's the difference between what SEC Solutions would do

24   for a company and what an auditor would do?

25   A    An auditor would do additional procedures under what's

MASSELLA - DIRECT - SMITH                    3276

1   called Generally Accepted Auditing Standards which is pretty

2   comprehensive.  They would send out confirmations to outside

3   parties, they would test transactions, they would test

4   controls.  There's a slew of -- a tremendous amount of

5   additional procedures that were gone.

6   Q    Did Retrophin have auditors at the time that you were

7   engaged with them?

8   A    Yes.  Markham were the auditors.  And just one other

9   additional, there would also be a report issued with the

10  financials.

11  Q    If we can turn to Page 4 which is the page ending in 71.

12            There's a section on that page that says, "Our

13  engagement cannot be relied upon."

14            Sorry, it's Page 2 of the letter, Page 4 of the PDF.

15  So there's a second paragraph there.

16  A    Here?  "Our engagement cannot be relied upon to disclose

17  errors, fraud, or illegal acts that may exist; however, we

18  will inform the appropriate level of management of any

19  material errors and any evidence or information that comes to

20  our attention during the performance of our engagement that

21  fraud may have occurred.  In addition, we will report to you

22  any evidence or information that comes to our attention during

23  the performance of our engagement regarding illegal acts that

24  may have occurred unless they are clearly inconsequential."

25  Q    What does that language mean?

MASSELLA – DIRECT – SMITH                    3277

1    A    Going back to what I said.  We were not performing an

2    audit or additional procedures, and so our engagement can't be

3    relied upon to discover these items that I said before.

4    Q    And then, finally, if you can look down the page there's

5    a section titled "What the Company Will Be Responsible For."

6    And if you can just read that section.

7    A    "Keeping the commitments that are made with regard to

8    implementation of ideas and actions that have been agreed to,

9    although we may advise you about appropriate accounting

10   principles and their application and selection of the

11   accounting principles used by the company, and the method of

12   application are the final responsibilities solely of

13   management.

14            This final responsibility includes the establishment

15   and the maintenance of adequate records and related internal

16   controls, the selection and application of accounting

17   principles, and the safeguarding of assets.

18            In the course of providing our services we may

19   provide to management proposed adjusted journal entries to the

20   company's books and records.  However, the final decision to

21   whether or not accept such rent are sole that of management."

22   Q    What does that mean?

23   A    It means that all decisions are management's decisions.

24   We will bring them to their attention, but the final decisions

25   in the financial statements are their responsibility.

MASSELLA – DIRECT – SMITH                              3278

1   Q    And is the determination of how expenses are classified

2   one of the decisions that ultimately rest with management?

3   A    Yes.

4   Q    If we can look at the final page of the document.

5         And just the signatures there, is that your

6   signature on the top left?

7   A    Yes.

8   Q    And then who is signing on behalf of Retrophin, LLC?

9   A    Martin Shkreli.

10  Q    So what was your role with respect to the Retrophin

11  engagement?

12  A    I was the lead person, but I did have a team working on

13  it.

14  Q    How large was the team that worked on the Retrophin

15  engagement?

16  A    Two people, two personnel.

17  Q    Who was your main point of contact when you first started

18  doing work for Retrophin?

19  A    Jackson Su.

20  Q    What was role at Retrophin?

21  A    He was the chief operating officer.

22  Q    What is Jackson Su your main point of contact for the

23  entire time that SEC Solutions did work for Retrophin?

24  A    No, but Jackson left at a certain point.  But we also did

25  engage in certain conversations with Martin.

MASSELLA - DIRECT - SMITH                    3279

1    Q    And when Jackson left, who filled that role for

2    Retrophin?

3    A    Ron Tilles was the first one.  And the second one, I

4    believe, was Marek, I forgot his last name.

5    Q    And what did you do at the beginning of your work for

6    Retrophin in early 2012?

7    A    We spent a lot of time assembling their records, but

8    their records were -- there were a tremendous amount of de

9    minimus transactions, a lot of which wasn't identified.  So we

10   had to set up the books and get them into accounting records.

11   It was actually almost bookkeeping and reconciling the bank

12   accounts to begin with.

13   Q    What was your impression of the state of the financials

14   at Retrophin at the beginning of your engagement?

15   A    A little bit chaotic, unorganized.  And it was a

16   significant amount, like I said, of de minimus transactions.

17   And as we dug in, we found many that were somewhat personal in

18   nature to Martin.

19   Q    During that initial period of work for Retrophin, what

20   interactions did you have with Mr. Shkreli?

21   A    It was very limited.  Most discussions were through

22   Jackson.

23   Q    And what interactions did you have with Mr. Greebel

24   during that time period?

25   A    Limited discussions until we got to the equity, the

MASSELLA - DIRECT - SMITH                    3280

1    equity section or cap table.

2    Q     What do you know by equity section?

3    A     The ownership, the ownership of the LLC.

4    Q     So what interactions did you have with Mr. Greebel

5    related to the equity section or the ownership in Retrophin?

6    A     It mainly was related to what was put together as, you

7    know, when you have ownership, there's categories of ownership

8    and you detail dates and what percentage they own, and there

9    is different levels of ownership.

10            So there was a cap table and, you know, there were

11   some correspondence related to what we were receiving.  And

12   then, for us, we would then, based on the amount they

13   invested, we would then tie that back to the bank statements

14   and make sure that everything is reconciling.  And there were

15   a lot of discrepancies that we were trying to work through.

16   Q     So I'm going to show you what's been marked as

17   Government Exhibit 111-4, which is Tab 1 in the binder in

18   front of you.

19            Do you recognize this document?

20   A     Yes.

21   Q     And is this an e-mail you received in February of 2012

22   from Jackson Su?

23   A     Yes.

24   Q     Does it attach a capitalization table for Retrophin?

25   A     Yes.

MASSELLA – DIRECT – SMITH                    3281

1        MS. SMITH:  Your Honor, the Government moves to

2  admit Government Exhibit 111-4.

3        MR. BRODSKY:  No objection, your Honor.

4        THE COURT:  Thank you.  We are admitting 111-4.

5        (Government Exhibit 111-4, was received in

6  evidence.)

7  EXAMINATION BY

8  MS. SMITH:  (Continuing.)

9  Q    If we can focus on the bottom e-mail to start with.

10       And who is this an e-mail from?

11  A    This is from Evan Greebel to Jackson Su.

12  Q    And who is copied on the e-mail?

13  A    Martin and David Kravitz.

14  Q    And who is David Kravitz?

15  A    I believe an associate of Evan's.

16  Q    What's the subject line of e-mail?

17  A    "Retrophin capitalization and related vesting schedule."

18  Q    And there's a line there that says, "The December 31,

19  2011, capitalization table is attached."

20  A    Yes.

21  Q    And if you can move up the chain of the e-mail chain.

22  Sorry, just up on the first page.

23       And what is Jackson Su's response?

24  A    "Evan, thank you.  Please send over the most recent cap

25  table as well."

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

MASSELLA - DIRECT - SMITH                    3282

1    Q    And then if we can scroll up to the next e-mail as well.

2    And what does Mr. Kravitz write in response?

3    A    "Jackson, the most recent cap table is attached."

4    Q    And then if we can look at the top e-mail.

5         And what does Jackson do with the capitalization

6    table he received?

7    A    He forwards the e-mail to myself and Susan Chu who is my

8    associate.

9    Q    And what was her role in the Retrophin engagement?

10   A    She was assembling and doing most of the work, putting it

11   together.

12   Q    How long had she worked at SEC Solutions?

13   A    At that time, probably about five to six years.

14   Q    And what was the quality of her work product?

15   A    It was very good.  It's excellent.

16   Q    And if we can look at the top e-mail, what's the

17   attachment called?

18   A    "Retrophin Capitalization Table, Revised February 16,

19   2012," with a parenthesis two.  And it's an Excel file.

20   Q    If we can go ahead and take a look at the attachment and

21   focus on the top half for now.

22        The so the title here is "Retrophin, LLC

23   Capitalization as of February 16, 2012."

24        What is the capitalization table?

25   A    It identifies the ownership by classes.

MASSELLA - DIRECT - SMITH                    3283

1    Q    And so, how is the ownership reflected on this table?

2    A    It's Class A Common Investment Units and Class B Common

3    Incentive Units showing the total for the incentive units,

4    there's a column that says "vested" which is when they're

5    vested, they're owned.  The total is what was given out as

6    incentive units at the time, but that doesn't indicate the

7    ownership piece.

8    Q    And just to break it down a little bit.  It says that

9    the -- it lists here units.

10            Why are they called units?

11   A    Because it's an LLC.

12   Q    If it was a corporation, what would they be called?

13   A    Shares.

14   Q    And you were talking about the Class B Common Incentive

15   Unit.

16            What's an incentive unit?

17   A    An incentive unit is -- it's similar, not exactly the

18   same, but similar to a stock option.  It's an incentive to

19   employees or consultants for their services.

20   Q    What does it mean for a unit to vest?

21   A    When it vests that means you own it at that time.

22   Q    And why are incentive units -- why do they vest?  Why

23   aren't they just available immediately?

24   A    Generally, because you want the employee to stick around,

25   and you're also -- these units, as they vest, it's another

1   form of compensation rather than paying them dollars.  So

2   you're giving them ownership rather than paying them.

3   Q    If you can look down to the section that says Series A

4   Preferred Units.

5        What does that section represent?

6   A    These are preferred -- Series A Preferred Units that

7   represents individuals that invest in the company and receive

8   preferred units.

9   Q    And if we can just look at some of the entries.  The

10  first one is on April 20, 2011.

11       And what's the name of the first investor?

12  A    Steve Richardson.

13  Q    And if you look down the chart a little bit, there's an

14  entry on April 28, 2011.

15       Can you read that investor?

16  A    Dynagrow, Sarah and Fred Hassan.

17  Q    And then if you look down the table a little bit more,

18  there's an entry on October 27, 2011.

19       And what is the name of that investor?

20  A    MSMB Healthcare, LP.

21  Q    What was MSMB Healthcare?

22  A    It was a fund that Martin was previously, well, Martin

23  was the fund manager.

24  Q    And when an entity like a fund is on a capitalization

25  table, what does that mean?

MASSELLA – DIRECT – SMITH                    3285

1   A     It means that they invested the money.

2   Q     The fund invested the money?

3   A     Yes.

4   Q     Into Retrophin?

5   A     Yes.

6   Q     Are there any other entities on this capitalization table

7   with MSMB in the name of the entity?

8   A     On this one, no, there's only MSMB Healthcare.

9   Q     Did you have an understanding of how many MSMB entities

10  there were?

11  A     Not at that time.

12  Q     Did you have any understanding of the relationship, if

13  any, between MSMB entities and Retrophin?

14  A     Other than that was Martin's previous fund that he had

15  been successful in.

16  Q     If we can just look at the last entry on there.

17          One of the last ones on February 1, 2012.  The

18  investor is MSMB Healthcare, LP.

19          And can you look at the amount?

20  A     It was $900,000.

21  Q     And does that represent an investment into Retrophin?

22  A     Yes.  They received 22,500 units.

23  Q     If we can just zoom out one more time.

24          And just look at the Class A Common Investment Unit.

25          And what was the number of units that Mr. Shkreli

MASSELLA - DIRECT - SMITH                3286

1   had at this point?

2   A    290,660.

3   Q    Did you ever have any access to the bank or brokerage

4   records for any MSMB entity?

5   A    No.

6   Q    Did you ever request those documents?

7   A    No.

8   Q    And what was the relationship in terms of with Retrophin

9   in terms of the legal entities, were they separate or the same

10  with Retrophin?

11  A    They were separate as far as I knew, yes.

12  Q    What is a related party?

13  A    A related party would be where there's common ownership.

14  Q    And what do you mean by common ownership?

15  A    In this circumstance, MSMB since -- well there's two

16  things.  There's common ownership and control it would be --

17  they would be considered related parties.

18           So if two parties transact with each other, whether

19  it's a corporation or an individual, and in that entity

20  there's a similar individual controlling it, or an officer

21  owning it, that controls the direction of that company, then

22  the two entities would be related to each other.

23  Q    And so, were the MSMB entities related parties to

24  Retrophin?

25  A    Yes.

MASSELLA - DIRECT - SMITH                    3287

1   Q    And why is it important to understand whether an entity

2   or individual is a related party?

3   A    There were required disclosures in the financial

4   statements and you're supposed to identify them.

5   Q    Why are there required disclosures for related parties?

6   A    Because they may -- you need to disclose them because

7   they may not be considered arm's length so that the readers

8   can understand how they were transacted and make their own

9   judgment.

10  Q    And what do you mean by arm's length?

11  A    Transactions between related parties may not be the same

12  as if you become -- if the company had done these transactions

13  with outside parties.

14  Q    I'm going to show you what's been marked as

15  Government Exhibit 113-26, which is Tab 4 in your binder.

16         Do you recognize this document?

17  A    Yes.

18  Q    And so, is this e-mail that you received from Jackson Su

19  in March of 2012?

20  A    Yes.

21  Q    And is it in connection with your work for SEC Solutions

22  for Retrophin?

23  A    Yes.

24         MS. SMITH:  Your Honor, the Government offers

25  Government Exhibit 113-26 into evidence.

MASSELLA - DIRECT - SMITH                    3288

```
1          MR. BRODSKY:  No objection, your Honor.

2          THE COURT:  We receive 113-26.

3          (Government Exhibit 113-26, was received in

4     evidence.)

5     Q    If we can just start with the bottom e-mail.

6          Is this an e-mail from Jackson Su to Mr. Greebel and

7     Mr. Kravitz?

8     A    Yes.

9     Q    What's the subject line?

10    A    "Ken Banta Investment."

11    Q    Can you read the e-mail itself?

12    A    Quick question on the vesting for Mr. Ken Banta.  On the

13    14,000 units that were vested under milestone achieved, which

14    milestone would be under his -- in his contract and what was

15    the price?

16    Q    And what is that, what is Jackson asking in that

17    question?

18    A    In order for him to vest, there had to be some milestone

19    achievement that he had to -- that had to be achieved in order

20    for him to actually gain the ownership and vest in the shares

21    in the units.  And then he was asking, and when he vested what

22    was the price at that time?

23    Q    And if the units had vested, what did that mean?

24    A    That meant that he would own the units.

25    Q    If we can just scroll up to the middle e-mail.  And can
```

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

MASSELLA - DIRECT - SMITH                    3289

1   you just read Mr. Kravitz's response?

2   A    "Jackson, the 14,000 units vested when the company closed

3   its 20 million funding round last fall."

4   Q    And if you can go up a little bit further, there's a

5   response from Mr. Greebel.

6        And what is Mr. Greebel's response?

7   A    And that is reflected on the cap table.

8   Q    And if we can look at the top e-mail.

9        And is this Mr. Su forwarding that e-mail to you and

10  Susan Chu?

11  A    Yes.

12  Q    And he says, "See below on the 14,000 units."

13       Why was Mr. Su providing you with this information?

14  A    Because we probably were requesting it.

15  Q    Why would you have been requesting this sort of

16  information?

17  A    We need to support as to why they vested, or we may not

18  have had the document or the document wasn't clear.

19  Q    Sorry.  Go ahead.

20  A    As to when he vested.

21  Q    Were there other occasions where Mr. Greebel or others at

22  Katten were the source of information for the work that you

23  were doing at SEC Solutions?

24  A    Yes.

25  Q    What kind of information?

MASSELLA - DIRECT - SMITH                    3290

1    A    Legal documents.

2    Q    Earlier, you mentioned that Markham, LLP were the

3    auditors for Retrophin?

4    A    Yes.

5    Q    Who at Markham worked for Retrophin?

6    A    Mr. Hackert was the partner-in-charge.

7    Q    And had you worked with Markham previously?

8    A    Yes.

9    Q    What was the role of SEC Solutions versus Markham during

10   this time period?

11   A    We were the intermediary for the company.

12   Q    And what do you mean by intermediary?

13   A    We were assisting.  When Markham would make a request, we

14   would assist the company in responding to the requests.  And,

15   in addition, we were also helping to put together the

16   financial information.

17   Q    So we saw earlier that you were initially engaged in

18   January of 2012.  How long after that initial engagement to

19   SEC Solutions did work for Retrophin after that point?

20   A    I believe, I don't remember the exact period, but there

21   was a period where we were -- we stopped doing work.

22   Q    And why did you stop doing work for Retrophin?

23   A    I believe they paused on their offering.  And, in

24   addition, we weren't paid at that point I think, too.

25   Q    Was there a time that SEC Solutions started doing work

MASSELLA – DIRECT – SMITH                    3291

1    for Retrophin again?

2    A    Yes.

3    Q    I'm going to show you what's been marked as

4    Government Exhibit 113-1, which is Tab 7 in the binder.

5         Do you recognize this document?

6    A    Yes.

7    Q    What's the date on this document?

8    A    November 1, 2012.

9    Q    And is it another engagement letter for your work for

10   Retrophin?

11   A    Yes.

12        MS. SMITH:  Your Honor, the Government moves to

13   admit Government Exhibit 113-1.

14        MR. BRODSKY:  No objection, your Honor.

15        THE COURT:  We receive Government Exhibit 113-1.

16        (Government Exhibit 113-1, was received in

17   evidence.)

18   Q    If you can zoom in on the top half.

19        So what is the date on this engagement letter?

20   A    November 1, 2012.

21   Q    And who is it addressed to?

22   A    Martin Shkreli.

23   Q    And it says that it's addressed to Retrophin, LLC.

24        Was Retrophin still an LLC or had it converted to a

25   corporation?

MASSELLA - DIRECT - SMITH                    3292

1   A    I believe it had converted to a corporation.

2   Q    And if you can look down the page a little bit at the

3   section that says, "SSG will perform the following services."

4        Is this the same kind of section that you saw on the

5   last engagement letter?

6   A    Yes, except for different period.

7   Q    What are the services that this engagement letter covers?

8   A    "Assisting, compiling, from information you provide, the

9   unaudited financial statements for the nine months ending

10  September 30, 2012."

11  Q    And in order to restart work with SEC Solutions on this

12  new time period, did Retrophin make any payments?

13  A    I believe so.

14  Q    Is the language in this engagement letter the same as the

15  language in the engagement letter that we looked at

16  previously?

17  A    Yes.

18  Q    When SEC Solutions restarted work for Retrophin, was

19  there a timeline for Retrophin to go public?

20  A    Yes.

21  Q    And what was that timeline?

22  A    I think the deadline would have been 135 days from that.

23  So that would be February 5th, somewhere around February 15th.

24  Could be within a few days of that.

25  Q    And when you said it's 135 days from a particular date,

MASSELLA - DIRECT - SMITH                    3293

1    did you mean from September 30, 2012?

2    A     Yes.

3    Q     And why -- what's the significance of the 135 days?

4    A     There's an SEC rule that when you file the financial

5    information, especially near the end of the year, well, for

6    quarters, it can't be -- if you have to go effective, which

7    means you have to go public and be granted to go public, and

8    it cannot be less than 135 days old.

9    Q     And, at this point, you sent the engagement letter in

10   November 1, 2012.  Was there some urgency to the work for

11   Retrophin given that time period?

12   A     Yes, it was a very short timeframe.

13   Q     How is Retrophin going to become a public company?

14   A     Originally, they were going to file, like, a Form 10, but

15   I think, at this time, they changed it to doing what's called

16   a reverse merger.

17   Q     And what is a reverse merger?

18   A     It is a private company merging into what's called a

19   public shell which is basically a non-operating public

20   company.

21   Q     And how far in advance of the deadline for the company

22   going public did the work that you were doing get completed?

23   A     Repeat the question.

24   Q     I'll take that question back.

25         Were there any challenges to getting the work done

MASSELLA – DIRECT – SMITH                    3294

1    in the timeframe that you were given when you started your

2    work for Retrophin?

3    A    Yes.  Starting in November and trying to make a February

4    deadline was going to be very tough because it had -- we had

5    to create and get the package, the financial statements in the

6    package ready, the auditors had to audit it, and they would

7    have to get it filed with the Government and then there's a

8    process from that point on.

9    Q    And were there any particular challenges that you

10   encountered during that period?

11   A    Similar to what I had before where it was difficult

12   obtaining, you know, the information on and categorizing items

13   and also, I believe, the cap table.

14   Q    And what do you mean when you said that there were

15   challenges with the cap table?

16   A    There were just -- we kept getting different versions of

17   it.

18   Q    Who is responsible for maintaining a company's cap table?

19   A    The company is.  But the counsel also has the stock

20   ledger.  So they would be involved with it, too.

21   Q    And how did the process of working on the financials for

22   Retrophin as it went public compared to the process for other

23   start-up companies that you've worked with?

24   A    It was a little more -- it was more difficult.

25   Q    I'm going to show you what's been marked as

MASSELLA - DIRECT - SMITH                    3295

```
1    Government Exhibit 111-12, which is Tab 9 in your binder.

2              Do you recognize this document?

3    A    Yes.

4    Q    And what is this document?

5    A    This is an e-mail from Jackson Su to myself, Evan, and

6    another associate that was working with me at the time.

7    Q    And is this from November of 2012?

8    A    November 8, 2012.

9    Q    And did you receive it in connection with your work for

10   Retrophin?

11   A    Yes.

12             MS. SMITH:  Your Honor, the Government offers

13   Government Exhibit 111-12.

14             MR. BRODSKY:  No objection.

15             THE COURT:  We will receive 111-12.

16             (Government Exhibit 111-12, was received in

17   evidence.)

18   Q    And so, again, this is an e-mail from Jackson Su to

19   yourself, Mr. Greebel, and then you said Ms. Lane was another

20   associate that you worked at Citrin Cooperman.

21   A    Yes.

22   Q    And what is the subject of the e-mail?

23   A    "The Retrophin Owes Conversion Cap Tables Stock Ledger."

24   Q    And can you read what Mr. Su wrote in the e-mail.

25   A    "Attached is an updated cap table.  We're changing the
```

MASSELLA – DIRECT – SMITH                    3296

1    price for investors who came in at 80 and selling to them at

2    25.  Assigning all new subdocuments at 25, and I will send

3    them to you once I get them all back.'

4    Q    How often was the capitalization table for Retrophin

5    changing during this time period?

6    A    Pretty often.

7    Q    What was the result of changes that were made to the cap

8    table?

9    A    However time the cap table changes, it takes us days to

10   redo our financial statements and the supporting documents.

11   Q    Why is that?

12   A    Because we have to note -- we have to note it.  We have

13   to put through the entries, change what's called the balance

14   sheet.  We have to then, if it could affect the income

15   statement, it definitely affects the cash flow, and then we

16   have to describe it in the notes for the changes that happen,

17   and then we have to get the supporting work papers

18   reorganized.

19   Q    And when you say, "The supporting work papers," what do

20   you mean?

21   A    Well, the cap table itself and then references back to

22   supporting documents.

23   Q    So if we can take a look at Page 2 of the document.

24          So what does that table reflect here?

25   A    It reflects the cap table at this given them, I think,

MASSELLA - DIRECT - SMITH                    3297

1    September 30th.

2    Q    And does it reflect a conversion?  Is it before or after

3    the conversion from the LLC to the corporation?

4    A    This is reflecting a conversion of the units into common

5    stock or classes of stock.  So there's a Class A converted, a

6    Class B vesting converted, and then it just -- it shows the

7    vested versus the unvested Class B.

8    Q    So is this a representation of the ownership in Retrophin

9    objects to became a corporation?

10   A    Yes.

11   Q    If you can look at the kind of bottom-left section there.

12        There's a section that says, "Martin Shkreli votes."

13   And then there's a, "Martin Shkreli voting percentage."

14        What's the voting percentage?

15   A    Martin Shkreli's voting percentage is 46.49.

16   Q    Then there's a second, two lines below that.  One says,

17   "Martin Shkreli plus MSMB votes."  And the other one says,

18   "Martin Shkreli plus MSMB voting percentage."

19        What's that combined voting percentage?

20   A    52.40.

21   Q    And why are those voting percentages being combined?

22   A    Because he controls MSMB.

23   Q    And if we look back up at the cap table, is there an MSMB

24   entity on the cap table at this point?

25   A    MSMB Healthcare.

MASSELLA - DIRECT - SMITH                           3298

1   Q     Is there any other MSMB entity on the cap table?

2   A     No.

3   Q     Is there any reference to MSMB Capital on the cap table?

4   A     No, I don't see it.

5   Q     If we can turn to the next page of the document.  And

6   what does this document reflect?

7   A     This reflects what -- the previous document just

8   reflected the shares, this reflects the investments by the

9   investors and at what price.

10  Q     And so, does this reflect what individuals or entities

11  purchased shares in Retrophin and at what price?

12  A     Yes.

13  Q     And I'm just going to ask you to look at a couple of

14  these again.

15        So the first one on April 20, 2011, is for Steven

16  Richardson.

17        What's the amount of that investment?

18  A     $50,000.

19  Q     And then if you can turn, go farther down the page,

20  there's an entry on September 1, 2012, for MSMB Healthcare,

21  LP.

22        And what's the amount of that investment into

23  Retrophin?

24  A     $900,000.

25  Q     And, as a result of that investment, how many shares did

MASSELLA - DIRECT - SMITH                          3299

1    MSMB Healthcare, LP receive?

2    A     22,500.

3    Q     I'm going to show you now what's been marked as

4    Government Exhibit 111-14, which is Tab 11.

5              Do you recognize this document?

6    A     Yes.

7    Q     And is there an e-mail chain with you and Ms. Chu and

8    Mr. Su?

9    A     Yes.

10   Q     And is this in connection with your work for Retrophin

11   related to the reverse merger?

12   A     Yes.

13             MS. SMITH:  The Government moves to admit

14   Government Exhibit 111-14.

15             MR. BRODSKY:  No objection.

16             THE COURT:  We'll see 111-14.

17             (Government Exhibit 111-14, was received in

18   evidence.)

19   Q     We can start with the second page in the bottom e-mail.

20             So if we just look at the date here, it's

21   November 15, 2012.

22             In this time period, how busy was the work in

23   preparation for the reverse merger?

24   A     We were working really hard to try and get it done as

25   quickly as possible.

MASSELLA - DIRECT - SMITH                    3300

1    Q    And there is an e-mail from Mrs. Chu to Mr. Su copying

2    yourself and can you just read her e-mail?

3    A    "Jackson, I'm looking at the Quickbooks file.  I'm unable

4    to locate the $30,000 loan from Chun Yee George Wang and

5    $900,000 loan from MSMB Healthcare, LP.  Which bank account

6    was the money wired into?"

7    Q    And so what is Ms. Chu asking in this e-mail?

8    A    She's trying to look into where the $30,000 loan is and

9    where the $900,000 loan from MSMB Healthcare is because she

10   can't find it in the Quickbooks file.

11   Q    Does QB mean Quickbooks?

12   A    Yes.

13   Q    Is she asking for supporting documentation for these

14   loans?

15   A    Yes.

16   Q    If you can look, if you can go to the first page further

17   up the chain in the bottom e-mail, it just goes over two

18   pages.

19        From Jackson Su to yourself and Ms. Chu on

20   November 16th.  And then if you can look at the second part of

21   the e-mail, which is at the top of the next page.  And what

22   does Mr. Su say there?

23   A    "Also, the 900,000 was wired into 2527 on February 3,

24   2012."

25        2527 must be a bank account.

MASSELLA - DIRECT - SMITH                    3301

1   Q    If we can look back to the first page.

2         And just look at Ms. Chu's response at the top of

3   the page.

4         What does she say there?

5   A    "Jackson there was only one, $900,000 transaction that

6   came in the month of February.  On February 1, 2012,

7   MSMB Healthcare purchased 22,500 preferred 80 units at $48 per

8   unit for 900,000.  Also, on February 1, 2012, MSMB Healthcare

9   had a promissory note of 900,000.  Please let me know what

10  happened."

11  Q    Is that referenced to the MSMB Healthcare, LP purchased

12  22,500 shares.  If you remember, we were looking at the cap

13  table.  Does that match that entry that is on the cap table?

14  A    Yes.

15  Q    What is Ms. Chu asking in this e-mail?

16  A    She see the 900,000 on the cap table for 900,000.  And

17  then she also sees a promissory note on the books for 900,000,

18  but she can't capture two, $900,000 transactions.  She can

19  only capture one.

20  Q    So if MSMB Healthcare had a promissory note to Retrophin,

21  what would that mean?

22  A    That would mean money would have come into the company.

23  They would have issued a promissory note that they owed the

24  money -- Retrophin owed the money back to MSMB.

25  Q    So that would be a loan from MSMB Healthcare, LP to

MASSELLA – DIRECT – SMITH                    3302

1   Retrophin?

2   A     Correct.

3   Q     And so, if there was both of a $900,000 investment into

4   Retrophin, and a $900,000 loan to Retrophin, what would

5   Ms. Chu have expected to see in terms of the amount of money

6   being transferred into Retrophin?

7   A     She.

8           MR. BRODSKY:  Objection, your Honor.

9           THE COURT:  You'll have to rephrase the question.

10  Q     Ms. Chu says that she only sees one, $900,000

11  transaction.

12          Is that what she says in her e-mail here?

13  A     Yes.

14  Q     If both of these things had happened, the $900,000

15  investment and the note, what would she have seen in the

16  records?

17          MR. BRODSKY:  Same objection.  Calls for

18  speculation.

19          THE COURT:  She can ask what should be there, or

20  what I think we're trying to get to why Ms. Chu was asking the

21  question.

22          MR. BRODSKY:  Your Honor, my only objection is the

23  witness testifying about another person's state of mind.

24          THE COURT:  Right.

25          I mean, just based on your accounting background and

1   Ms. Chu's work under your direction, you can you explain to us

2   why she was asking or what prompted the question to Mr. Su.

3            THE WITNESS:  Yes, I can.

4            MR. BRODSKY:  It's all right, your Honor.  It's

5   okay.

6            THE COURT:  I'm trying to understand.

7            MR. BRODSKY:  That's fine.

8            THE WITNESS:  In our preparation of the documents,

9   we always we try to support the significant transactions.  So

10  two, $900,000 transactions in the books.  One for equity, one

11  for a loan, we would have looked for the -- when we do -- we

12  do look at the cash transactions that went through the bank

13  statements which also should tie to the books and make sure

14  that all the equity investments agree to what we saw go

15  through the bank or the books.  That would be the first step.

16           The second step is then the $900,000 promissory

17  note, along with us trying to identify the note, we would then

18  go back into the books and then try and find the transaction

19  for the $900,000 showing up in the books.  So the cash in this

20  case, we were missing $900,000 just looking at the cash

21  accounts and seeing what transacted.

22           THE COURT:  Thank you.

23  EXAMINATION BY

24  MS. SMITH:  (Continuing.)

25  Q    I'm going to show you what's been marked as

MASSELLA - DIRECT - SMITH                    3304

1    Government Exhibit 113-4 and 111-20 which are tabs 14 and 15

2    in your binder.

3              Do you recognize these two documents?

4    A    Yes.

5    Q    Are they both e-mails that you received in connection

6    with your work for Retrophin?

7    A    Yes.

8    Q    And are they both from November of 2012?

9    A    Yes.

10             MS. SMITH:  Your Honor, the Government moves to

11   admit Government Exhibit 113-4 and 111-20.

12             MR. BRODSKY:  No objection, your Honor.

13             THE COURT:  We will receive 111-20 and 113-4.

14             (Government Exhibit 111-14, was received in

15   evidence.)

16             (Government Exhibit 111-20, was received in

17   evidence.)

18   Q    So starting with Government Exhibit 113-4.

19             And just starting with the bottom e-mail from Susan

20   Chu.  She asks, "Jackson on February 3, 2012, I see a check

21   cut out to MSMB Healthcare Management, LLC for $200,000,

22   miscellaneous expense.  What was the wire for?"

23             And then what is Mr. Shkreli's response?

24   A    "I'm looking into the February 3rd payment and will have

25   an answer shortly."

MASSELLA - DIRECT - SMITH                    3305

1   Q    And then, what is Ms. Chu write in response the next day?

2   A    She said, "Please advise on the $200,000."

3   Q    And then, what is Martin response at the top?

4   A    "The payment was the subject of a loan, promissory note.

5   Jackson will scan and send."

6   Q    And so, is Mr. Shkreli saying that the check for $200,000

7   that Ms. Chu is asking about was related to a loan for a note?

8   A    Sounds like it's a repayment of a loan or a note.

9   Q    If we can look at Government Exhibit 111-20.  And if we

10  look at the second-to-top e-mail in that chain.

11          Is that the same e-mail that we just looked at from

12  Mr. Shkreli?

13  A    Yes.

14  Q    And then in response, Mr. Su responds and then attaches a

15  document; is that right?

16  A    Yes.

17  Q    If we can take a look at the document which is on the

18  last page of that.

19          And so, what is this document?

20  A    It's a promissory note from Retrophin is loaned

21  MSMB Healthcare Management.

22  Q    And how much is the promissory note for?

23  A    200,000.

24  Q    And what's the date on the promissory note?

25  A    February 3, 2013.

MASSELLA - DIRECT - SMITH                3306

```
1    Q    And who --
2    A    No, I'm sorry.  Wrong.  February 3, 2012.
3    Q    And who signed on behalf of Retrophin?
4    A    Martin Shkreli.
5    Q    And who signed on behalf of MSMB Healthcare Management,
6    LLC?
7    A    Martin Shkreli.
8    Q    And you mentioned that there were changes in the cap
9    table for Retrophin in this time period?
10   A    Yes.
11   Q    What kinds of things would cause changes in the cap
12   table?
13   A    Movement of money, movement of shares sold, changes in
14   investment units.  Could be a multitude of things.
15   Q    I'm going to ask you to take a look at
16   Government Exhibit 111-15 and also Government Exhibit 113-3,
17   which are Tabs 12 and 13 in your binder.
18   A    (Complying).
19   Q    Do you recognize these documents?
20   A    Yes.
21   Q    And are they e-mail correspondence that you either
22   received or sent in connection with your work for Retrophin in
23   the fall of 2012?
24   A    Yes.
25        MS. SMITH:  Your Honor, the Government moves to
```

MASSELLA - DIRECT - SMITH                    3307

1    admit Government Exhibit 111-15 and 113-3.

2              MR. BRODSKY:  No objection, your Honor.

3              THE COURT:  We receive 111-15 and 113-3.

4              (Government Exhibit 111-15, was received in

5    evidence.)

6              (Government Exhibit 113-3, was received in

7    evidence.)

8              MS. SMITH:  111-15.  Sorry, your Honor, just one

9    moment.

10             Just so I said those for the record clearly.  It's

11   111-15 and 113-3.

12   Q    So if we can start with Government Exhibit 111-15 and

13   focus on the cover e-mail.

14             This is a e-mail from Jackson Su to Mr. Greebel,

15   yourself, and Ms. Chu on November 29, 2012.

16             What's the subject line?

17   A    Transfer from Marek Biestek, 4,167 shares.

18   Q    And actually, I'm looking a little bit above that.

19   A    Updated cap tables.  Sorry.

20   Q    Are there two attachments to the e-mail?

21   A    Transfer from Biestek, 4,167.  Retrophin post-conversion

22   cap table stock ledger.

23   Q    And what does Mr. Su write in this e-mail?

24   A    "Marek Biestek transfer to Martin Shkreli attached."

25   Q    And who is Marek Biestek?

MASSELLA - DIRECT - SMITH                3308

1    A    I think he was one of the officers of the company.  If

2    not an officer, an employee.

3    Q    And what interactions did you have with Mr. Biestek?

4    A    He was -- he had been in some meetings.

5    Q    And at some point, what role did Mr. Biestek assume at

6    Retrophin?

7              MR. BRODSKY:  Your Honor, objection to time period,

8    please.

9              THE COURT:  Sure.

10   Q    Earlier, you testified at some point Jackson Su left

11   Retrophin; is that right?

12   A    Yes.

13   Q    And you testified that Mr. Biestek filled the role that

14   Mr. Su had been handling at Retrophin?

15   A    I used the word Marek, Marek Biestek, this is the

16   gentleman I was referring to as the person who assumed the

17   role.

18   Q    I believe you said that somebody assumed the role in

19   between.

20             Who is that individual?

21   A    Ron Tilles.

22   Q    And so, approximately when did Mr. Biestek assume the

23   role that Mr. Su had been filling?

24   A    I would say whatever the last date that Jackson left, Ron

25   Tilles only filled it probably for a month.  Marek would have

MASSELLA - DIRECT - SMITH                    3309

1    assumed it thereafter.

2    Q    So turning back to this document, can you just read what

3    Mr. Su wrote in the e-mail?

4    A    Marek Biestek transferred to Martin Shkreli attached.

5    Q    And then, if we can look at the first page of the first

6    attachment.

7              And what's the title of this document?

8    A    "Transfer and Donee Representation Letter."

9    Q    What is the first kind of sentence here up until,

10   "Retrophin, LLC," say?

11   A    "For value received, Marek Biestek, transfer does hereby

12   grant, sell, assign, transfer and convey to Martin Shkreli,

13   the transferee, successors and assigns all of his rights,

14   title, and interest to 4,167 Class B Common Stock Units of

15   Retrophin, LLC."

16   Q    And if we can turn to the Page 4, which is the last page

17   of this agreement.

18              And if we look at the upper right-hand corner.  Who

19   is listed as the transferor?

20   A    Marek.

21   Q    And if we what's the address that's written there?

22   A    59 Denton Avenue east Rockaway.

23   Q    And who is listed as the transferee?

24   A    Martin Shkreli, 330 Madison Avenue, New York, New York.

25   Q    What is the date that's written there?

MASSELLA - DIRECT - SMITH                    3310

1    A    November 29, 2012.

2    Q    And then, in the bottom right-hand corner of this page,

3    who has agreed and accepted on behalf of Retrophin, LLC?

4    A    Martin Shkreli.

5    Q    And if we can now look at Government Exhibit 113-3.

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MASELLA – DIRECT – SMITH                    3311

1          MS. SMITH:  Zooming in on the bottom e-mail.

2     DIRECT EXAMINATION (Continued)

3     BY MS. SMITH:

4     Q    Is this e-mail the same one that you had received in some

5     of the forwarded attachments that we just looked at in

6     Government's Exhibit 111-15?

7     A    Yes.

8          MS. SMITH:  And if we could scroll up to your

9     response.

10    Q    And what did you write in response?

11    A    WTF.

12    Q    And is that an acronym?

13    A    Yes.

14    Q    Okay.  And what were you trying to convey with this

15    response?

16    A    What the heck is going on?

17    Q    And why did you have that reaction?

18    A    Because it was unusual for a CEO, an employee to transfer

19    shares to the CEO who controls the company.  And it also sets

20    the value and it -- I couldn't figure out what this was about.

21    Q    And why is it that you say it would be unusual for an

22    employee to transfer shares to a CEO?

23    A    It usually goes in the other direction, but -- but that

24    was the reason.  And I need it to determine how to -- how to

25    record this transaction and disclose it.

1    Q    And what was the impact of a transfer like that on a cap

2    table?

3    A    It would change the cap table.  It would increase the

4    ownership of Martin Shkreli, but at the same time, I would

5    have to determine and disclose how -- how to record the

6    transaction.

7    Q    And you said something about the value for the --

8    A    It says it said for value received.  And so, you know, we

9    were -- we were trying to figure out, you know, how you record

10   this.  And, you know, we had our own assumptions at the time.

11   We were thinking that it could be a contribution to the

12   company, and that way we would then have to record

13   compensation to Martin for it, and then we would determine how

14   to record that, so...

15   Q    And if we can just go back to the share transfer of

16   shares, which is Government Exhibit 111-15 for a moment?

17         And at the top -- I'm sorry, at the top cover

18   e-mail, what's the date on the e-mail that Jackson Su sends

19   this to you?

20   A    November 29th, 2012.

21   Q    And then if we could look at the last page, the

22   attachment again?  What is the date on the signature at the

23   attachment?

24   A    November the 29th, 2012.

25   Q    And did you have any discussions with Mr. Greebel about

MASELLA - DIRECT - SMITH                3313

1    how you should account for this transaction?

2    A    I don't recall.

3    Q    Did you have any discussions with Mr. Shkreli about how

4    you should account for this transaction?

5    A    I think my initial discussions were with Jackson Su to

6    begin with.  They did -- they did move along, but my initial

7    discussions in what I just described was with Jackson Su.

8    Q    And what additional discussions did you have related to

9    this transfer?

10          MR. BRODSKY:  Objection, Your Honor.  That's calling

11   for hearsay among Mr. Su.

12          MS. SMITH:   I was actually asking if there were

13   just some discussions with other people.  So let me ask that

14   better.

15   BY MS. SMITH:

16   Q    Who else, if anyone, did you discuss this transfer with?

17   A    At some point I did discuss it with Evan.

18   Q    Okay.  And what did Mr. Greebel tell you about this

19   transfer?

20   A    That it was outside the company, and that it was -- it

21   was a gift.

22   Q    And what does that mean, for it to be a gift?

23   A    It would -- well, it was -- it was -- if it was a gift

24   between two individuals, two individuals outside the company,

25   which would then -- which then would not be disclosed because

MASELLA - DIRECT - SMITH                3314

1   it's between two individuals and it would not affect the --

2   it's not a transaction related to the company.

3   Q    Okay.  Can I show you what's been mark in discovery as

4   Government's Exhibit 111-26, which is Tab 16 for

5   identification?  And then I'm also going to show you

6   Government's Exhibit 113-5 and Government's Exhibit 111-27.

7   Those are going to be Tabs 16, 17, and 18 in your binder.

8           So for Government's Exhibit 111-26, 113-5, and

9   111-27 are these all e-mails that you either received or sent

10  in connection with your work for Retrophin in December

11  of 2012?

12  A    Yes.

13          MS. SMITH:  Your Honor, the Government moves to

14  admit Government Exhibits 111-26, 113-5, and 111-27.

15          MR. BRODSKY:  Your Honor, we assume they are

16  admitting it under 803.6.

17  Is that correct?

18          THE COURT:  Are you moving it under 803.6,

19  Ms. Smith?

20          MS. SMITH:  Your Honor, can we have a sidebar?

21          THE COURT:  Yes.

22          (Pause in proceedings.)

23          THE COURT:  Why don't we give the jurors a

24  mid-afternoon break at this time.  Please don't talk about the

25  case.  Just take a quick break.  And Mr. Massella, you may

PROCEEDINGS                                         3315

1    step down.

2              (Jury exits the courtroom.)

3              (The following matters occurred outside the presence

4    of the jury.)

5              THE COURT:  All right.  Ms. Smith?

6              MS. SMITH:  Yes.  I'm just confused.  I am not sure

7    what the defense's basis is to suggest that these are business

8    records, which would be 803.6.

9              MR. BRODSKY:   And that's the basis for

10   the Government offering it, Your Honor?

11             MS. SMITH:  Well, Mr. Su is attaching documents that

12   are signed by Mr. Shkreli that were made in furtherance of the

13   conspiracy charged in Count 7.  And then the following two

14   e-mails are, pursuant to Rule 106, background information

15   discussions reflecting Mr. Massella's understanding and

16   discussions of the documents that Mr. Martin Shkreli signed.

17             This is a backdating evidence, Your Honor.  I'm

18   really not sure what we're doing here.

19             MR. BRODSKY:  Your Honor, the backdating document

20   that they claim is backdated, that's fine.  That I understand.

21             The next one that they call a background, again, I

22   never heard an exception to the Hearsay Rules for background.

23             MS. SMITH:  I said Rule 106.

24             MR. BRODSKY:  And 106 is not a basis to admit

25   hearsay either.  It's not an exception under the Hearsay Rule.

PROCEEDINGS                                          3316

1              They've been admitting documents, which I have not

2     objected to, but I want to make sure it was clear as to why we

3     believe it is admissible.  So when Mr. Massella is

4     communicating to Mr. Jackson Su, for example, related to the

5     cap table, we believe that that is a business record.  E-mail

6     communications between two parties relating to a cap table is

7     classic business records.  And they fit all the exceptions to

8     a business record under 803.6.  They haven't laid the

9     foundation, but I'm not going to object to it.  It's a record

10    made at or near the time the information is transmitted by

11    someone with knowledge.  These cap tables are being kept in

12    the regular course of business activity by Retrophin and by

13    SEC Solutions.  And they're making the record of a regular

14    practice of that activity.

15             The Government seems to be resisting the notion that

16    e-mail communications can be business records.  And

17    respectfully, Your Honor, the world today works by e-mail

18    communications, and e-mail communications in the case, as

19    Your Honor knows, there's no exception to business

20    communications being considered e-mails.  The reason why I am

21    raising it is because I'm sitting there while communications

22    are coming in between Mr. Massella and Mr. Su, and I want the

23    Court to understand why I don't object to them, and that is

24    because I believe they're business records under the cap --

25    you know, with respect to the cap table.  And I don't believe

1    there's an exception to the Hearsay Rule under 106 or some

2    other exception.

3            MR. KESSLER:  Your Honor, so without getting into

4    whether all e-mails are business records, which they are not,

5    and I don't think we can go there, the two e-mails which

6    Mr. Brodsky is objecting or calling business records, 113-5

7    and the next one, are not.  They don't need to be business

8    records.  They're not being offered for their truth.  There is

9    no truth in an e-mail from Corey Massella to Jackson Su

10   saying, Jackson, Every time we receive these changes, it

11   change everything we created already.  Are these final

12   transfers?  That's -- I don't even know what it means to offer

13   that sentence for its truth.  It's being offered to show the

14   communications that went on and to explain what happened next,

15   the effect essentially on Mr. Massella and what Mr. Massella

16   was doing.

17           MR. BRODSKY:  It is absolutely being offered for its

18   truth.  I have no objection for it being offered to the truth,

19   Your Honor.  But it is being offered for its truth.

20           MR. KESSLER:  Which truth?  The truth of what?

21           THE COURT:  The truth of the?

22           MR. BRODSKY:  The statement.

23           THE COURT:  The transfer?  The transfer, is that

24   what we're talking about?

25           MR. BRODSKY:  No, Your Honor.

PROCEEDINGS                                    3318

```
 1              THE COURT:  The cover e-mail?

 2              MS. SMITH:   No.  Mr. Brodsky has agreed that the

 3   cover e-mail attaching the transfers, which are connected to

 4   backdating portion of Count 7 --

 5              MR. BRODSKY:  Alleged backdating.

 6              MS. SMITH:  Alleged backdating portion of Count 7,

 7   that's not an issue anymore.  So we've moved on.  That is no

 8   longer being discuss apparently?

 9              THE COURT:  So what is at issue, the cover e-mail or

10   the attached --

11              MS. SMITH:  No.

12              MR. KESSLER:  No, we're --

13              THE COURT:   -- share transfers?

14              MR. KESSLER:  It's a different e-mail.  Mr. Brodsky

15   is now talking about Government's Exhibit 113-5, which is a --

16              THE COURT:  113-5.

17              MR. BRODSKY:  I didn't --

18              MR. KESSLER:   -- which is a separate e-mail from

19   Corey Massella to Jackson Su in which Corey write's, Every

20   time we receive these it changes everything we created

21   already.  Are these final transfers?

22              MR. BRODSKY:  And respectfully, Your Honor, I

23   believe that is being offered for the truth of Mr. Massella's

24   statement, that every time he gets these new share transfer

25   agreements, it changes everything they've already done.  That
```

1    is a statement that is being offered for the truth that, yes,

2    they received share transfers; and yes, it then -- they have

3    to -- they've already listed from him that he has to change

4    the financial statements every time it happens.  And so it is

5    being offered for its truth, and there is no problem with it.

6    I just want to make sure that it is a business record.

7                MR. KESSLER:  It is not a business record.

8                THE COURT:  Whose business record, though?  This

9    is --

10               MS. SMITH:  This an e-mail from Corey Massella.  How

11   could that be a business record of Retrophin?

12               MR. BRODSKY:   It's is both the business record,

13   Your Honor, respectfully --

14               THE COURT:   Of which entity?

15               MR. BRODSKY:   Of both.

16               So if two businesses are communicating with each

17   other and SEC Solutions is in the business right now pursuant

18   to the engagement letter of preparing the books and records of

19   Retrophin, that's their job, and so communicating this

20   information is pursuant to -- within the four squares of their

21   engagement letter.  Jackson Su is just receiving the

22   information.  So the bottom is a different question, Attached

23   are more share transfers, I believe they are putting that in

24   for a different basis.  But the top is Mr. Massella's business

25   record at SEC Solutions.  I'm happy to voir dire and establish

PROCEEDINGS                                    3320

1    the foundation through Mr. Massella that each of the elements

2    of the business records exception would be met.

3            MR. KESSLER:  Your Honor, this is an argument that

4    is about other documents that Mr. Brodsky is going to want to

5    introduce at some other point of the business records.  This

6    document is not a business record.  Mr. Massella is on the

7    stand.  The e-mail can be offered not for its truth, and we

8    can ask Mr. Massella if this statement was true.  Then there

9    is no hearsay issue.  Mr. Brodsky can cross-examine him for 45

10   minutes about the truth of this statement.  There is no

11   hearsay issue here.  We do not need to get into whether e-mail

12   communications in this case are generally business records.

13   It's just not --

14           THE COURT:  So the basis for your offering this

15   particular e-mail, the top e-mail only where Corey Massella on

16   December 5th tells Mr. Jackson Su, Every time we receive

17   these, it changes everything we've created.  Are these the

18   final transfers?  What's the basis for you to offer them?

19           MR. KESSLER:  It's to explain what Mr. Massella does

20   next, to continue the story for the effect on Mr. Massella.

21           THE COURT:  So this relevant to his state of mind

22   that he was receiving these excessive transfers?

23           MR. KESSLER:  Yes.  And he's asking the question,

24   Are these final transfers?  I mean, a question can never be

25   offered for its truth or the truth of the question.  But

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                3321

1   frankly --

2           MR. BRODSKY:  Your Honor --

3           MR. KESSLER:   -- I mean, the question here is, What

4   is the difficulty with admitting this e-mail not for the

5   truth?  Mr. Massella is on the stand.  He can be asked

6   literally whether this statement is true.  The concern about

7   hearsay is whether the statement being offered is an

8   out-of-court statement for its truth.  The witness is here.

9   We can ask him if it's true.  The e-mail itself, to the extent

10  that one sentence Mr. Brodsky is concerned as being offered

11  for its truth, the witness can say, Yes, it's true.

12          MS. SMITH:  And we can raise -- you know, we can

13  look into this issue further.  This has come up a couple of

14  times during different direct, derailing the direct we're

15  trying to move through documents.  These are noncontroversial

16  and we're not going to agree that random e-mails while

17  questions are being asked, are business records.

18          THE COURT:  Well, is there a fight about the bottom

19  e-mail with Mr. Su?

20          MR. BRODSKY:  No.  No, that's not the one --

21          THE COURT:  Okay.

22          MR. BRODSKY:  -- that's in question.

23          THE COURT:  So why don't you ask Mr. Massella what

24  his response was?

25          MR. BRODSKY:  Your Honor, they can ask -- they can

1   put in the bottom e-mail, which they have separately, and they

2   can ask the witness on the stand, What was your reaction at

3   the time, and he can answer.  But to put in this document,

4   it's hearsay.  It is an out-of-court statement.  They can say

5   it's not being offered for the truth, but the statement in

6   itself they want to ask him to wreck the truth, that every

7   time he receives these, it changes everything.  So the fact

8   that they say, We just want to ask him that question to elicit

9   the truth, it demonstrates that they want this statement for

10  the truth.

11          If they don't want -- if they have a problem with

12  putting this document in as a business record, then they

13  shouldn't offer it.  If they want to draw the exception, which

14  we are happy to go down the road on, which is anytime there's

15  a witness on the stand who makes a statement in an e-mail and

16  that e-mail can be offered for the state of mind of the

17  witness who's on the witness stand -- I have never heard that

18  applied before -- but if you can offer in an e-mail for the

19  state of mind of the witness who is on the witness stand, then

20  that sounds like what they're offering.

21          MS. SMITH:   Your Honor, in order to just move this

22  along, so we will just not offer this e-mail.  This is

23  ridiculous.

24          And here, we're going to go -- if Mr. Brodsky wants

25  to give us a case that says any e-mail from a business

1    accountant in the course of not conducting business, we are

2    more than happy to look into.  This has come up a number of

3    times.  It is not true.  You have to qualify for all of the

4    elements of business records, and this one absolutely does

5    not.  And so if there is a case that we should be looking at,

6    we are happy to do that.  In the interest of expediting this,

7    which again we're trying to move this along, this e-mail came

8    in without any issues for these purposes in the last trial.  I

9    recognize this is a different proceeding.  Mr. Brodsky has a

10   different approach.  Then we'll just ask a different question

11   and we will move along.

12              THE COURT:  Let's do that.

13              MS. SMITH:   But if this is going to come up with

14   every --

15              THE COURT:  Let's do that.

16              MS. SMITH:  -- document then we are going to be here

17   for ten --

18              THE COURT:  We are not going to have fights about

19   every single document that happens to be an e-mail and whether

20   it's a business record.  You know, you can ask the witness

21   what he or she did in response to receiving additional share

22   of transfers.

23              If this part, this bottom part is not an issue -- is

24   there a redacted --

25              MR. BRODSKY:  They have a separate document,

1    Your Honor, with the bottom e-mail.

2              THE COURT:  All right.  So that's in with no

3    objection.

4              MR. BRODSKY:  Correct.

5              THE COURT:  And then they'll ask Mr. Massella what

6    he did, and we'll admit the --

7              MR. BRODSKY:  Your Honor, I just want to stay,

8    respectfully, that as you instruct the jury --

9              THE COURT:   No, they're agreeing with you --

10             MR. BRODSKY:  No, I know, Your Honor.

11             THE COURT:  They are agreeing to move it along.

12             MR. BRODSKY:  I do feel like I should explain myself

13   and not --

14             THE COURT:  But you have.

15             MR. BRODSKY:  Okay, Your Honor, I just feel like --

16             THE COURT:   They're going to -- they're going to --

17   they are not going to offer --

18             MR. BRODSKY:  All right.

19             THE COURT:  -- this document.

20             MR. BRODSKY:  All right.

21             THE COURT:  There seems to be a controversy about

22   that.  They want to move this along.

23             MR. BRODSKY:  Understood, Your Honor.

24             THE COURT:  They're not going to concede that every

25   email they want to proffer is a business record just because

PROCEEDINGS                               3325

1    it comes from the business, all right?

2              MR. BRODSKY:  And I don't believe that either.

3              THE COURT:  So each document will have to be

4    separately, you know, proffered and its admissibility will

5    have to be established before it comes in.

6              MR. BRODSKY:  Correct.

7              THE COURT:  All right.  So they are now in the

8    process of withdrawing their application to admit the top half

9    of 113-5.

10             MR. BRODSKY:  Understood, Your Honor.

11             MS. SMITH:  And, Your Honor, this is going to be an

12   issue with every document, and as Your Honor knows, there

13   are -- we have organized our exhibit list by witnesses.  It's

14   pretty clear that Mr. Massella's documents are in the 113

15   series.  Mr. Su's documents are in the 111 series.  I believe

16   they both -- all of the documents come from those two series.

17   If we are going to have this issue going forward with every

18   document, then I think maybe there should be -- you know, we

19   should just consider whether there is another approach,

20   because this is going to take hours if we are going to have

21   this fight with every document.

22             MR. BRODSKY:   Well, respectfully, Your Honor, we

23   have a duty to look at each document.  I believe this is a

24   business record.  The Government is resisting to saying that a

25   communication between two businesses, one person who is

PROCEEDINGS                          3326

1   engaged by the other, in providing and sending each other cap

2   tables is a business record.  I respectfully submit that that

3   is a classic business record.  I will establish the foundation

4   for business records during my directs and crosses.

5            THE COURT:  Why are you interpreting the direct; why

6   don't we just keep moving?

7            MR. BRODSKY:  Because, Your Honor, we're duty bound

8   to make sure --

9            THE COURT:  There's no fight about it.

10           MR. BRODSKY:  All right, Your Honor.

11           THE COURT:  All right.  Am I right, you're not

12  going to go on this way?

13           MS. SMITH:  Your Honor --

14           MR. KESSLER:  Judge, it's just putting a pin in

15  something that's going to come up in four minutes.  I mean, I

16  think -- I think that's what we're getting at.  We don't want

17  to have to spend --

18           THE COURT:  Why don't we adjourn the trial?  You can

19  brief it by 5:00 o'clock, both of you.

20           MR. BRODSKY:  Your Honor --

21           THE COURT:  I've had enough already.  We're

22  adjourned.  I will let them go if that's how you want to

23  proceed.  I mean --

24           MR. BRODSKY:  Your Honor, I don't to adjourn.

25           THE COURT:  -- I am tired of this, really.

PROCEEDINGS                                3327

```
1              MR. BRODSKY:  I want to proceed.

2              THE COURT:  We need to get this case -- I am going

3     to tell the jury they can leave and you can brief it.  Give me

4     a brief by 5:00, both side --

5              MR. BRODSKY:   Your Honor --

6              THE COURT:  -- all right?

7              MR. BRODSKY:  -- respectfully, we'll continue.

8     We'll continue.

9              THE COURT:  No, I -- if you have an objection to

10    evidence and there is a disagreement, I can get briefing from

11    both sides.  I will make the best decision I can.  But if we

12    are going to go document by document having a fight over every

13    single document, let's just get it all resolved now, all

14    right?  So I will let the jury go --

15             MR. BRODSKY:  Your Honor, can we --

16             THE COURT:  -- if that's where we go.

17             MR. BRODSKY:  Your Honor, would you allow me to have

18    five with my colleagues to confer?  Because I don't -- I don't

19    want to -- I am just trying to establish a record with

20    respect --

21             THE COURT:  I understand that, but this is an issue

22    that is going to come up, so let's just get it resolved.  I am

23    not blaming you.  I am not blaming the Government.  I just --

24    if this is going to be a document-by-document problem through

25    these hundreds of other exhibits that are going to come in and
```

PROCEEDINGS                                    3328

1   the same fight is going to be brought up, you should just get

2   it resolved.  Please.

3              MR. PITLUCK:  Your Honor --

4              THE COURT:  We cannot afford to have the jury in and

5   out --

6              MS. SMITH:  No, we can't.

7              THE COURT:  -- sidebars every time a document comes

8   up.  It is either a business record or it isn't, or there is

9   an independent evidentiary basis to admit a document, and that

10  is it.  But I am not going to have it.  This is not how I am

11  going to conduct a trial.  This has become a circus.

12  Frankly --

13             MR. KESSLER:  Your Honor, I think --

14             THE COURT:  -- I'm done with it.

15             MR. KESSLER:  I think --

16             THE COURT:  We are not doing this.

17             MR. KESSLER:  I think what we can do is confer with

18  defense counsel over whatever the remaining exhibits are for

19  the next 30 minutes of the direct, which I think is --

20             THE COURT:  All right.  Take five minutes.  Do that,

21  please.

22             (Recess taken.)

23             THE COURT:  This is back on the record.

24             MR. KESSLER:  So we will proceed today with the

25  direct as was have you been doing.  And to the extent that

PROCEEDINGS                                    3329

1    there are documents that Mr. Brodsky or the defense believes

2    should come in as a business record and we have a different

3    theory for why they should come in, we can address that

4    tomorrow either by further conferring or by briefing, if we

5    need to whatever the basis for the few documents we disagree

6    about.  But I think everyone agrees we should keep the trial

7    moving.  While we have a jury, we should proceed.  And I think

8    there is no fundamental disagreement that the documents we are

9    talking about should come in.

10              THE COURT:  All right.  Well, do you want to do some

11   briefing tonight on it?

12              MR. BRODSKY:  Yes.

13              THE COURT:  What time can you make your submissions?

14   I can't promise you I am going to have an answer for you by

15   the morning.

16              MR. BRODSKY:  Well, there's no --

17              THE COURT:  We're adjourning at 5:30.

18              MR. BRODSKY:  There is no court tomorrow, Your

19   Honor, so...

20              THE COURT:  I know, but I have something I have to

21   do tomorrow.

22              MR. BRODSKY:  Understood.

23              THE COURT:  I am taking the day off.

24              MR. BRODSKY:  I understand.

25              MR. KESSLER:  And I think as a practical matter,

PROCEEDINGS                                    3330

1    it's not something the Court has to resolve, you know,

2    tomorrow.

3              THE COURT:  I mean, there really should be a

4    document-by-document -- you all know what is on each other's

5    exhibit list, all right?  So why the heck has no one brought

6    this to my attention before?  This could have been briefed

7    well in advance of the trial.  This has come up again and

8    again, and each time indulge the fact that things being

9    brought to my attention that could have, should have been

10   brought up months ago and are only being brought up now in the

11   middle of the trial when we have a jury who is getting anxious

12   about the length of this going on and on forever.  But, you

13   know, I am just -- this is not the way we conduct trials, not

14   in this direct, not in any direct that anyone has ever

15   litigated in.

16             So if you want to brief this, if is such a big issue

17   for the parties, we can get briefing and I will deal with it

18   as soon as I can.  But really, there is no excuse for this, no

19   excuse for this being unresolved.  You all should have been

20   talking about this.  You know each other's exhibits.  You

21   should have worked out what the basis is.  I am not even

22   hearing an objections to the admissibility.  I'm just hearing

23   a fight about the basis -- I don't understand it, quite

24   frankly.  What might be appropriate for one document might not

25   necessarily be appropriate for another document.  What may be

PROCEEDINGS                                3331

1   a business record from one entity, another document in that

2   entity's file may not be a business record.  You know, the

3   case law is pretty clear.

4           MR. KESSLER:  And, frankly, we may be able to agree

5   that all the documents should come in and simply disagree on

6   the basis, and then there may be nothing to resolve yet.

7           THE COURT:  All right.  Well, I think both sides

8   want to get documents in.  So really, I mean, most parties

9   when they have issues, fundamental issues like this, they have

10  the courtesy of briefing it before the trial.  And, in fact, I

11  had numerous court orders where I gave more time and more time

12  and more time to -- and it's basically compressed our time to

13  try to resolve the issues before the trial, and even during

14  trial, on the day of trial, on the day before trial.  Sunday

15  night at midnight before the trial, I get more motions.  This

16  has happened again and again.  I am really telling you, this

17  is, you know, completely unacceptable.  It's unprofessional,

18  and it's not helping anybody.

19          So if you want to agree, you know each other's

20  exhibits.  Make an agreement, whatever it may be.  But I mean,

21  I -- I just don't see interrupting the trial for this

22  repeatedly.

23          MR. KESSLER:  I think we agree on that.  And we will

24  do everything we can to work it out.

25          THE COURT:  All right.  Good.

1          Let's bring the jury back, please.

2          (Pause in proceedings.)

3          THE COURT:  All right.  The parties will make

4    submissions by 8:00 o'clock tonight on this issue so we can

5    avoid it going forward.

6          (Pause in proceedings.)

7          THE COURT:  Ms. Smith, your exhibits have not been

8    moved in.

9          MS. SMITH:   No, there is -- that is what the

10   objection was.

11         THE COURT:  You have them identified --

12         MS. SMITH:  Yes.

13         THE COURT:  -- and we haven't yet admitted them.  So

14   if you want to just start that part over?

15         MS. SMITH:  Okay.

16         THE COURT:  Okay?

17         MS. SMITH:  Yes.

18         THE COURT:  So 8:00 o'clock tonight.

19         I want cases, not arguments, I want cases,

20   controlling cases that discuss the 803.6 business record

21   exception.

22         (Jury enters the courtroom.)

23         (Jury present.)

24         THE COURT:  All right.  All jurors are present.

25   Thank you.

1    You may resume your direct.

2              MS. SMITH:  Thank you, Your Honor.

3    DIRECT EXAMINATION (Continued)

4    BY MS. SMITH:

5    Q    So, Mr. Massella, before the break we were looking at

6    Government Exhibits 111-26, 111-27, and 113-5, which were Tabs

7    16, 17, and 18 in your binder.  And, again, are these all

8    e-mails that you either sent or received in connection with

9    your work with Retrophin in December of 2012?

10   A    Yes.

11             MS. SMITH:  Your Honor, the Government moves to

12   admit Government Exhibits 111-26, 111-27, and 113-5.

13             MR. BRODSKY:  One moment, Your Honor.

14             (Pause in proceedings.)

15             MR. BRODSKY:  Pursuant to the conversation we had,

16   Your Honor, no objection.

17             THE COURT:  All right.  We will receive 111-26oh

18   111-27, and 113-5 of the Government's Exhibits.

19             (Government Exhibit 111-26, was received in

20   evidence.)

21             (Government Exhibit 111-27, was received in

22   evidence.)

23             (Government Exhibit 111-28, was received in

24   evidence.)

25   BY MS. SMITH:

MASELLA - DIRECT - SMITH                        3334

1   Q    So let's start with Government's Exhibit 111-26 which is

2   now in evidence.  It's an e-mail from Mr. Su to yourself or

3   Monday, December 3rd, 2012.  And what is the subject line?

4   A    Share transfers docs.

5   Q    And what does Mr. Su write in the e-mail?

6   A    Attach more share transfers.

7   Q    And?

8   A    Do you want me to go on?

9   Q    Yes.  Can you just read the transfer?

10  A    Kevin Mulleady to Martin Shregle [phonetic], Tom

11  Fernandez to Martin Shregle, Martin Shregle to

12  MSMB Health Care, Marek Biestek to Martin Shregle -- I think

13  you have this already.

14  Q    Who are we --

15            THE COURT:  Can we just for the record agree that

16  the name is --

17            THE WITNESS:  Shkreli.

18            THE COURT:  -- Martin Shkreli.

19            MS. SMITH:  Yes, Your Honor.

20            THE WITNESS:  Sorry.  Thank you.

21  Q    Who is Kevin Mulleady?

22  A    I don't recall.

23  Q    Who is Tom Fernandez?

24  A    I think you showed me before he was an investor, I'm not

25  sure.  I don't remember.  Sorry.

MASELLA - DIRECT - SMITH                    3335

1   Q    And what was your reaction to receiving these additional

2   share transfers?

3   A    Frustration.  But I had -- it had been explained that

4   these were additional gifts.

5   Q    And if you look at the last line there it says, Marek

6   Biestek to Martin Shkreli.  I think you have this already.

7   And so let's look at the last share transfer agreement

8   attached to this document which is at Page 12 of the document.

9   The Bates Number ends in 850 on the bottom right-hand corner.

10  And if we can actually put this up next to what we had been

11  looking at before, Government Exhibit 115 -- oh, 111-15,

12  Page 1.

13  And look at the --

14          MS. SMITH:  For 111-15, can we go to first page --

15  there we go.

16  Q    So were these two share transfer documents the same, the

17  one that was attached to this e-mail, 111-26, and also the one

18  attached to the document that we were looking at before,

19  111-15?

20  A    Yes.

21  Q    And if we can go to the last page of each document?

22          THE COURT:  Can you tell me what exhibit, please.

23          MS. SMITH:  Yes.  So just for the record, the

24  document on the left-hand side of the screen is

25  Government's Exhibit 111-26.  And the document on the

MASELLA - DIRECT - SMITH                    3336

1   right-hand side of the screen is Government's Exhibit 111-15.

2                THE COURT:  Thank you.

3   Q    So just to be clear, the document on the left-hand side,

4   111-26, is dated December the 3rd of 2012, this cover e-mail;

5   and the cover e-mail for Government's Exhibit 111-15 is

6   November 29th of 2012.  And so if we can actually look at the

7   signature pages for both of those two transfers?  So the

8   document on the right, which is Government's Exhibit 111-15,

9   is the one we looked at earlier with the signature's kind of

10  sideways; and the Government's Exhibit 111-26 is the one from

11  December 3rd.  And so again, the document on the right, what

12  is the address -- I'm sorry -- what is the date of the

13  document on the right?

14  A    November 29, 2012.

15  Q    And what is the date on the document on the left, which

16  is Government's Exhibit 111-26?

17  A    June 1st, 2012.

18  Q    At the time that you received this second version of the

19  transfer agreement between Mr. Shkreli and Mr. Biestek, did

20  you notice the change in the date?

21  A    No.

22  Q    Would you have you been concerned if you did notice that

23  there was a different date --

24                MR. BRODSKY:  Objection, Your Honor.

25  Q    -- on the document you received on December 3rd?

```
 1              MR. BRODSKY:  Calls for speculation.

 2              THE COURT:  Try to rephrase the question.

 3   Q    What is your reaction to seeing that the date on the

 4   document was received on December 20 --

 5              MR. BRODSKY:  Objection --

 6   Q    -- December 3rd is --

 7              MR. BRODSKY:  Objection, Your Honor.  Form of the

 8   question.

 9              THE COURT:  All right.  Try to rephrase again,

10   Ms. Smith.

11   Q    So again, at the time that you received this second

12   version, did you notice the difference in the date?

13   A    No.

14   Q    Is the date of the document important?

15   A    Yes.

16   Q    Why is it important?

17   A    It documents when the agreement was signed.

18   Q    If you have two different dates for the same document, as

19   to you and your job, how do you deal with that?

20   A    I would go back to the client and say that you have given

21   me two different dates.  Which is -- which is the correct.

22   Q    And why --

23   A    -- version?

24   Q    Okay.  And why is it important to have the correct

25   version?
```

SIDEBAR CONFERENCE                        3338

1   A     Because that -- you would record it on that date.  If

2   it's recorded on June 1st, there's a different valuation; and

3   if there's -- potentially, depending on what, you know, we see

4   in terms of the -- the value of the stock during those dates

5   and -- and for November there may be a different valuation,

6   too.

7   Q     And are you permitted to put an earlier date on a

8   document?

9             MR. BRODSKY:  Objection, Your Honor.

10            THE COURT:   Was that an incomplete question.

11            MS. SMITH:  I saw him pop up, so...

12            THE COURT:   Oh, okay.

13            MR. BRODSKY:  That was stricken, Your Honor, at the

14  last proceeding.

15            MS. SMITH:  Your Honor, can we have a very brief

16  sidebar?

17            THE COURT:  Yes.

18            (Continued on the next page.)

19            (Sidebar conference.)

20

21

22

23

24

25

SIDEBAR CONFERENCE                              3339

1            (The following occurred at sidebar.)

2            MR. BRODSKY:  Your Honor, I'm directing your

3    attention to the last trial, Pages 3919 to 3920.  Mr. Massella

4    testifies that backdating was not allowed because, quote, It's

5    not allowed and you are not allowed to go back retroactively

6    change documents.

7            Question from the Government:  What is the effect of

8    backdated a document like this?

9            Answer:  There are SEC rules that just -- just do

10   not allow it legally.

11           Mr. Agnifilo:  Judge, I am objecting to all of this.

12           The Court:  All right.  We will strike that last

13   response.

14           His basis of knowledge, Your Honor, his foundation

15   for his word backdating is not allowed is based on what he

16   believed is there are SEC rules precluding it.  There are no

17   SEC rules that preclude it, and Your Honor determines what the

18   law should be.  This is a very critical issue regarding

19   backdating.

20           We are going to call an expert witness who is going

21   to testify that -- and Your Honor is going to hear that

22   testimony, that when people reach verbal agreements like Mr.

23   Richardson reached with Mr. Shkreli when he joined the board

24   in June -- or April of 2011, he didn't sign documentation with

25   respect to his board members -- board or manager position

SIDEBAR CONFERENCE                                    3340

1    until later.  There are people who enter agreements all the

2    time that don't actually sign the document until later.

3            MS. SMITH:  Your Honor, setting that aside, we

4    litigated this ahead of time.  If you can go back to the page

5    before, up here:

6            Would you have been concerned if you did notice the

7    date had been changed to a later date?

8            I asked the question exactly the same, and I'm

9    sorry, I should have come over sooner.  I was just trying to

10   see if Mr. Brodsky had some sort of other issue, but

11   apparently, we litigated this.

12           This is, you know, United States versus Queley.

13   What if you had known your accountants are allowed to ask if

14   they had seen that, would they have been concerned and explain

15   why.  And I know we are not allowed to ask a legal question,

16   and he has been instructed not to say that there's an SEC

17   rule.  We've gone through that.  But this is exactly the same

18   question and answer.  It's in the motion in limine.  It's been

19   decided.  I don't know what we're doing.

20           MR. BRODSKY:  Respectfully, Your Honor, asking a

21   question as Your Honor knows.  Would you have been, that kind

22   of question, Your Honor, "would you have been," is

23   inadmissible.  It's speculation.  The Could case, Your Honor,

24   went to accountants who had undisputed accounting literature,

25   it was undisputed accounting literature, and they were

SIDEBAR CONFERENCE                              3341

1    testifying on undisputed law.  This is a -- this is a snippy

2    legal issue in dispute as to whether backdating is permissible

3    or not permissible.

4              THE COURT:  I think he can testify about the art as

5    an accountant trying to get the books and records together for

6    the corporation at the critical time before they go public

7    what he would have done had he noted this discrepancy.

8              MS. SMITH:  Okay.

9              THE COURT:  And why.

10             MS. SMITH:  Okay.

11             THE COURT:  And based on his experience as to the

12   law.

13             MS. SMITH:  Yes.  I mean, that's --

14             THE COURT:  He's talking about his mission.  He was

15   hired to try to get the Retrophin books and records in a way

16   and form acceptable to the regulators that would survive

17   scrutiny that was necessary in order for the company to go

18   public.  And so I think it's fair to ask him, you know, as to

19   the person who is being charged with and hired to do this what

20   his response would be had he noticed it without touching on

21   the law.

22             MR. BRODSKY:  Understood, Your Honor.  And just for

23   the record --

24             MS. SMITH:  And this, again, was decided in the last

25   trial.

SIDEBAR CONFERENCE                                    3342

1          MR. BRODSKY:  Your Honor, just for the record, to

2    preserve our objection, which we always have do:  One, the

3    basis of the challenge is incorrect legal knowledge.  So he

4    was saying what he would have done based on the incorrect

5    application of the law.  And we're now letting a witness,

6    based on an incorrect understanding of the law, testify so

7    the --

8          THE COURT:  Well, he's not testifying about the law.

9          MR. BRODSKY:  But he's testifying what he would have

10   been concerned about based on his understanding of the law.

11   Which is incorrect.

12         THE COURT:  No.  He's saying it from an accounting

13   perspective that the effect could affect the findings, the

14   balance of --

15         MR. BRODSKY:  Understood, Your Honor.

16         THE COURT:  Okay?  It's an accounting issue.  He's

17   not -- I haven't heard him say anything about law.  He's

18   talking about his job to try to get the -- to reconcile the

19   books and record to see what effects the finances have on the

20   company.  He's not -- you know, if you told him that he cannot

21   talk about --

22         MS. SMITH:  I have.

23         THE COURT:  -- the law, then he won't.  He will talk

24   about it from his perspective.

25         MS. SMITH:  Or SEC rules or anything along those

SIDEBAR CONFERENCE                              3343

1    lines.

2              MR. BRODSKY:  I'm just preserving our objection,

3    Your Honor.

4              THE COURT:  All right.  Fine.

5              (End of sidebar conference.)

6              (Continued on the next page.)

MASELLA - DIRECT - SMITH                          3344

1              (In open court; sidebar ends.)

2    BY MS. SMITH:

3    Q    Mr. Massella, just to get back to the two documents you

4    were looking at, and again the document on the right was sent

5    on November 29th, 2012; and the document on the left was sent

6    on June -- was sent on December 3rd, 2012, the cover e-mail

7    it's the same attachment.  The first one that was received has

8    the date of November 29th, 2012; and the second one, which was

9    received later, has the date of June 1st, 2012.  Again, had

10   you noticed this difference in the date at the time?

11   A    No.

12   Q    And would you have been concerned in your capacity as an

13   accountant focusing on the books and records for Retrophin

14   during this time period, if you had received -- if you had

15   noticed this discrepancy in the date at the time?

16   A    Yes.

17             MR. BRODSKY:  Just object for preservation,

18   Your Honor.

19             THE COURT:  All right.  We have already made the

20   record.

21             MR. BRODSKY:  Thank you, Your Honor.

22   A    The answer was yes.

23   BY MS. SMITH:

24   Q    And why would you have been concern?

25   A    Because the first one was dated December 29th, and why

MASELLA - DIRECT - SMITH                          3345

1   was it re-dated to June 1st going backwards?

2   Q    And what would have been the impact, again, of the

3   changes in dates?

4   A    The impact would have been how you valued this --

5   the value of the transfers at that time.  So it would have

6   changed -- it would have changed from a financial standing --

7   from finance -- from -- if we had been reporting it, depending

8   upon the value, they would have been increased or decreased

9   and we would have been valuing around the separate dates, and

10  it would have an impact.

11  Q    Let's look at what is marked for identification as

12  Government Exhibits 113-5 and 111-27 -- actually, those are

13  both moved in.

14          If we can look at Government's Exhibit 113-5, and if

15  we just look at the bottom e-mail, and again, is that the same

16  e-mail from Mr. Su and yourself that we just looked at as

17  having the share transfers?

18  A    Yes.

19  Q    And is that the memo that has the share transfer with the

20  date that now had the earlier date on the same document?

21  A    Yes.

22  Q    Can we look at the e-mail in response?  And what did you

23  write in response to receiving that?

24  A    Jackson, every time we receive these, it changes

25  everything we created already.  Are these final transcripts?

MASELLA - DIRECT - SMITH                    3346

1   Q    And why are you asking this question?

2   A    Because every time we -- in order for us to book the

3   entries, at the time we probably didn't settle up that it was

4   going to be outside the company, it was going to be a gift.

5   But at that time, we thought we were booking -- we -- we had

6   something to book into the financial statements, so...

7   Q    And, again, the understanding that you had that these

8   share transfers were going to be a gift outside the company,

9   that came from Mr. Greebel?

10  A    Yes.

11  Q    If we can look at the next document, which is Government

12  Exhibit 111-27.  And again, it's the bottom e-mail.  Is that

13  again the same chain that we looked at earlier that attached

14  the share transfers?

15  A    Yes.

16  Q    And what does Ms. Chew write in response?

17  A    What was the nature of the share transfer for?  And with

18  questions and then services.

19  Q    And what is Ms. Chew asking here?

20  A    Going back to what I said, that at that time we thought

21  the share transfers were a form of -- because to us it said

22  for value, that it was for some form of services.  So how were

23  we to record this?

24  Q    And ultimately, again, you said that Mr. Greebel advised

25  you that this would be a gift outside of the company?

MASELLA – DIRECT – SMITH                    3347

1          MR. BRODSKY:  Objection.  Leading again, Your Honor.

2          THE COURT:  All right.

3          MR. BRODSKY:  And asked and answered.

4          THE COURT:  What I am not clear about is with regard

5   to the December 3rd share transfers and the four other

6   individuals listed there, did you get an explanation about

7   what these particular share transfers were for, and if so,

8   from whom?

9          THE WITNESS:  Apparently, based on this e-mail on

10  December 3rd, we hadn't gotten an explanation at that time.

11         THE COURT:  All right.  So ultimately did you get an

12  explanation, and if, so what was it; and was it for all of

13  these share transfers?

14         THE WITNESS:  For all of these share transfers,

15  our -- the explanation we received is that these were -- these

16  were gifts outside the company between individuals.  So it had

17  no affect upon the company's financial statements.

18         THE COURT:  And who told you that?

19         THE WITNESS:  Evan Greebel.

20  BY MS. SMITH:

21  Q    I'm going to show you what has been marked for

22  identification as Government Exhibit 113-7, which is Tab 20 in

23  your binder.

24  Do you recognize this document?

25  A    Yes.

MASELLA - DIRECT - SMITH                    3348

1   Q    And is it an e-mail from Mr. Shkreli to Jackson Su,

2   yourself, and others on December 11, 2012 related to your work

3   in connection with the reverse merger?

4   A    Yes.

5            MS. SMITH:  Your Honor, the Government moves into

6   evidence Government Exhibit 113-7.

7            MR. BRODSKY:  Pursuant to sidebar, we have no

8   objection, Your Honor.

9            THE COURT:  Thank you.  We will admit

10  Government 113-7.

11           (Government Exhibit 113-7, was received in

12  evidence.)

13  Q    And if would could, sir, start on the second page of the

14  document.  And is this an e-mail from Ms. Chew?

15  A    Yes.

16  Q    And if you could turn to -- I'm sorry -- going back to

17  the first page at the very bottom there's an e-mail header.

18  This is a December 10, 2012 e-mail that you sent and it's to

19  Mr. Su, George@MSMBCapital.com, and I guess another e-mail

20  address and yourself.  Did you know who George@MSMBCapital.com

21  was?

22  A    No, I don't recall -- George Howland, whatever --

23  whatever that name was earlier?  That was that name that came

24  up with George, but no.

25  Q    And did you know who George Wong was?

MASELLA - DIRECT - SMITH                    3349

1    A    I don't remember, don't recall.

2    Q    All right.  So this e-mail was sent on December 10th.  If

3    we can just look at Page 2 and see the contents.

4    And what do you write in this e-mail?

5    A    Need to know if Martin or related party will repay or the

6    company writes up the receivables as a loss.  Need to decide

7    tomorrow early.  Thanks.

8           And I think George -- did George come in as the CEO

9    or as the COO?

10           MR. BRODSKY:  Objection.

11           THE WITNESS:  I'm sorry.

12           THE COURT:  Okay.  Just -- you can't ask questions.

13   Sorry.  The lawyers to the witness.  You're only going to be

14   able to testify to the best of your recollection --

15           THE WITNESS:  Yeah, all right.

16           THE COURT:  -- based on what you knew, heard,

17   observed.

18           THE WITNESS:  Okay.

19   A    I could not recall.

20   BY MS. SMITH:

21   Q    So if you could just read your e-mail again?

22   A    Need to decide if Martin or related company will repay or

23   the company writes up the receivables as a loss.  Need to

24   decide tomorrow early.  Thanks.

25   Q    And then if we can move back to the first page to see the

MASELLA - DIRECT - SMITH                    3350

1   next e-mail in the chain.

2   What does Mr. Shkreli write to Mr. Su?

3   A    These companies will pay what they owe Retrophin.

4   Q    Actually on the screen we're looking at the middle e-mail

5   from Mr. Shkreli.

6   A    Oh.  Let me know what I can do on this.

7   Q    And if you just scroll up to the next e-mail from Mr. Su?

8   A    Okay.

9   Q    And what does he write here?

10  A    Martin see below in relation to Corey's questions.

11  Q    And then there are a number of receives and MSMB

12  entities, and if you look at the one on March 31, 2012 for

13  MSMB Capital Management, there's a notation there that says

14  rent payment and a dollar amount and there another -- a bunch

15  of other dollar amounts and notations next to these MSMB

16  entities.

17  What was this a listing of?

18  A    These were a listing of related party transactions.

19  Q    And what does that mean?

20  A    These were -- these were a listing of all the MSMB

21  entities that we saw payments going out for.

22  Q    And when you say payments go out, do you mean payments

23  from Retrophin?

24  A    Yes.

25  Q    And then if we look up at the top in response.  What does

MASELLA - DIRECT - SMITH                    3351

1    Mr. Shkreli write in response?

2    A    These companies will pay what they owe Retrophin.

3    Q    Why is that information important from an accounting

4    prospective?

5    A    Because if they -- if these companies didn't exist or

6    they weren't able to pay it, we would have taken the expense

7    and written it off.

8    Q    And what do you mean written it off?

9    A    Written it off as an expense on Retrophin.

10   Q    So if the companies were unable to pay it, then it would

11   be an expense that Retrophin would have to carry; is that

12   right?

13   A    Correct.

14   Q    I'm going to show you what has been marked as Government

15   Exhibit 113-6 for identification.

16   Do you recognize this document?

17   A    Yes.

18   Q    And is it an e-mail from Mr. Su to others on December 10,

19   2012?

20   A    Correct.

21   Q    And did you receive it in connection with your work on

22   the reverse merger?

23   A    Yes.

24        MS. SMITH:  Your Honor, the Government offers

25   Government Exhibit 113-6 into evidence.

MASELLA - DIRECT - SMITH                    3352

1          MR. BRODSKY:  No objection, Your Honor.

2          THE COURT:  We receive 113-6 into evidence.

3          (Government Exhibit 113-6, was received in

4    evidence.)

5    BY MS. SMITH:

6    Q    And, sir, this is an e-mail from Mr. Su to yourself,

7    Edward Hackert, Susan Chew, someone named Mariel Schlecht,

8    with a cc to Martin Shkreli, Evan Greebel, and George Wong and

9    the subject is Timetable.

10   And can you just read Jackson's e-mail?

11   A    I want to make sure we're on the track to deliver from

12   Corey tonight and Ed on Friday.  Susan, Corey, Evan, George,

13   and I worked late throughout the weekend to get each piece

14   together.  There are still outstanding issues from the company

15   per Evan.

16   Please let us know and we'll respond.

17   Q    And what were you working towards here, December 10,

18   2012?

19   A    We were trying to file the SEC document.

20   Q    And what do you mean by the SEC document?

21   A    We were try to complete the order for inclusion into the

22   document that was necessary for the reverse merger.

23   Q    And how much work were you putting in at this point; how

24   much time were you devoting to this?

25   A    Significant, seven days a week.

MASELLA - DIRECT - SMITH                    3353

1    Q    And how often were you dealing with Mr. Su in connection

2    with getting these final documents ready?

3    A    Daily, daily throughout the process.

4    Q    And how often were you dealing with Mr. Greebel?

5    A    Probably not much.

6    Q    In what capacity were you dealing with Mr. Greebel at

7    this point?

8    A    Probably focused on anything that had to do with the

9    legal documents or the -- or the equity schedule.

10   Q    And did you work with Mr. Greebel in connection with the

11   SEC filing for Retrophin?

12   A    Yes.

13   Q    What was the workload like for those SEC filings?

14   A    There was a -- I believe the draft of the legal -- I

15   believe it was an EK or Form-10.  I'm not sure which one it

16   was.  But there -- it was the -- the counsel had put that

17   together, and there were financial sections that were --

18   needed to be completed, so that would be derived from the --

19   from the -- part of it from the financial statements, but at

20   the same time some of it related back to the cap table we were

21   working with and some pro form.

22   Q    And what was your role with respect to the SEC filings?

23   A    Making sure -- you know, completing -- hoping to

24   complete -- get the financial statement submitted to the

25   auditors, help with addressing their questions, and then

1    assist management in some of the documents -- some of the

2    financial tables that go into the SEC filing.

3              (Continued on next page.)

MASSELLA – DIRECT – SMITH                    3355

1    DIRECT EXAMINATION (Continued)

2    BY MS. SMITH:

3    Q    And, again, where did the information for the financials

4    that you compiled come from?

5    A    They came from the company, and then anything that was of

6    the legal nature or equity or notes or anything would come

7    from, you know, sometimes from counsel.

8    Q    And what was the role of Mr. Greebel and Katten with

9    respect to the SEC filings?

10   A    He was the lead counsel.

11   Q    What does that mean to be lead counsel?

12   A    He was in charge of the filing.

13   Q    You had testified earlier that there came a time that

14   Jackson Su no longer worked for Retrophin.

15   A    Yes.

16   Q    Was that close in time to the reverse merger?

17   A    I don't recall.

18   Q    And who did you say took over for Jackson Su when he

19   left?

20   A    Initially Ron Tilles.

21   Q    What work were you doing for Retrophin after the reverse

22   merger?

23   A    I believe we were working on a quarterly filings for the

24   company that they merged with was delinquent and then I think

25   we began to work on the first quarter.  Potentially year-end

MASSELLA - DIRECT - SMITH                              3356

1    and then the first quarter of their fiscal year.

2    Q    I want to show you what's been marked as Government

3    Exhibit 113-10, which is Tab 24 in your binder.

4              Do you recognize this document?

5    A    Yes.

6    Q    And this an email you received from Mr. Greebel?

7    A    Yes.

8    Q    And is it in connection with the work you did in the

9    spring of 2013 for Retrophin?

10   A    Yes.

11             MS. SMITH:  Your Honor, the Government moves to

12   admit Government Exhibit 113-10 into evidence.

13             MR. BRODSKY:  No objection.

14             THE COURT:  We received 113-10.

15             (Government Exhibit 113-10, was received in

16   evidence.)

17             (Exhibit published.)

18   Q    Now, that this is in evidence, is this an email if

19   Mr. Greebel?

20   A    Yes.

21   Q    And who it is addressed to?

22   A    Ed Hackert of Marcum.  Sunil Jain from Marcum.  Myself.

23   And Gleb Mikhailov, who is on my team.

24   Q    And Mr. Shkreli's cc'd?

25   A    Yes.

1    Q    What's the subject line?

2    A    Revised 10-Q.

3    Q    And why is Mr. Greebel circulating this document?

4    A    There is -- there is a drafted -- well, a clean and

5    marked-up version of the 10-Q showing the changes he's

6    providing.  Please confirm you accept them.

7    Q    And in the second line, you said, We are sending to Ed

8    Hackert the file tomorrow?

9    A    Correct.

10   Q    What does to mean?

11   A    It means they are going to be filing the document with

12   the SEC the next day.

13   Q    And if we can look at the attachment, the first page of

14   the attachment.

15        Is this one of the SEC filings for Retrophin?

16   A    Yes.

17   Q    How easy or difficult was it to get information about

18   Retrophin's financials in the spring of 2013?

19   A    It was definitely difficult.

20   Q    What was the source of the difficulty?

21   A    Um, the transactions that occurred post-merger.  There

22   was a significant amount of money that flowed out there where

23   there was no identification as to what they were for.

24   Q    I'm going to show you what's been marked as Government

25   Exhibit 113-17 and 113-18 for identification, which are Tabs

MASSELLA - DIRECT - SMITH                    3358

1    31 and 32 in your binder.

2              Do you recognize these two documents?

3    A    Yes.

4    Q    Are they both emails from Mr. Shkreli in March and April

5    of 2013?

6    A    Yes.

7    Q    And did you receive them in connection with your work for

8    Retrophin in that time period?

9    A    Yes.

10             MS. SMITH:  Your Honor, the Government moves to

11   admit Government Exhibits 113-17 and 113-18 into evidence.

12             MR. BRODSKY:  No objection, Your Honor.

13             THE COURT:  We received 113-17 and dash 18.

14             (Government Exhibit 113-17, was received in

15   evidence.)

16             (Government Exhibit 113-18, was received in

17   evidence.)

18             (Exhibit published.)

19   Q    So for 113-17, if we can start with Ms. Chew's email in

20   the middle of the page.

21             What's the date on this email?

22   A    March 29th, 2013.

23   Q    And it's to someone named Lenora Izerne.

24             Who is Lenora Izerne?

25   A    It's Martin's sister.

MASSELLA - DIRECT - SMITH                    3359

1    Q    What was Ms. Izerne's role at Retrophin?

2    A    Administrator.  Administrative assistance.

3    Q    Who is cc'd on this email?

4    A    Evan Greebel, myself, Ron Tilles and Martin Shkreli.

5    Q    And the subject line is to follow up to Gleb list.

6              And who is Gleb again?

7    A    Gleb was part of our team.

8    Q    And can you read what Ms. Chew wrote in the email?

9    A    Hi, Lenora, attached is an additional followup questions

10   to Gleb's list of cash transactions.  Please note that there

11   are three tabs.  Two of the three tabs relates to cash

12   transactions.  Gleb's list and the last tab relates to

13   incentive shares and general requests.  Please give Corey and

14   I a call if the request is unclear.

15   Q    And then if can with look up to the top email from

16   Mr. Shkreli.

17              And what does he write in this email?

18   A    Here are my comments on the list.

19   Q    And what's the attachment to this email?

20   A    Martin comments of open item followup questions to bank

21   activity March 29th.

22   Q    And what document is attached to this email?

23   A    Martin comments of open items list, Glib, followup

24   questions of bank activity.

25   Q    And if we can take a look at the attachment.  And if we

MASSELLA - DIRECT - SMITH                    3360

1   can try and focus in on the top part, including the top left

2   corner.

3             What is this document?

4   A    This was the list of cash transactions that we were

5   trying to identify at the time.  It gives the bank

6   description, the amount, company comment, followup questions

7   and then Martin's comments are all the way to the right.

8   Q    In the last column all the way on the right?

9   A    Yes.

10  Q    It says on the top left, open items list.  And then it

11  says, Activity from bank account number 3600.

12            Was that a Retrophin bank account?

13  A    Yes.

14  Q    And is this common practice to send a file out of

15  transactions you have questions about and get feedback from

16  management?

17  A    Yes, but not of this scale.

18  Q    So if we can just take a look at a couple of these

19  entries on the first page.  There's an entry that says -- the

20  fourth entry down says, January 24, 2013.  And it says on line

21  "wire transfer."  Via Citibank and it says "AT Kevin

22  Mulleady."  And the amount is $3,000.  And there's a column

23  that says "company comments" which says salary.

24            And then if we can zoom out and scroll over to what

25  Mr. Shkreli's comment is on that.

MASSELLA - DIRECT - SMITH                    3361

1          And -- sorry I'm speaking so fast.

2          There's a list of followup questions.

3          And what are the followup questions in that

4   category?

5   A    Is there an employment agreement?  Why are salaries not

6   getting paid through Paychex?  Was the payroll cycle every two

7   weeks?  What period does this payment pertain to?  Please

8   provide a start date of employment.

9   Q    And what is Paychex?

10  A    Paychex is the payroll service that would reported pay

11  and report to the federal government.

12  Q    And what is Mr. Shkreli's comment in the far right-hand

13  corner?

14  A    No EA.

15  Q    And what does that mean, "no EA"?

16  A    No employment agreement.

17  Q    And if we can go back to the chart again for one moment.

18  And just focusing the top section that is the blue.

19          And under the transfer to Kevin Mulleady on

20  January 24th, 2013, there's also a transfer to Marek Biestek.

21  And then a transfer to Cross Capital.

22          And what are those two identified email on the

23  right?

24  A    Both are identified as salary.

25  Q    If we can just turn to the second page of the

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

MASSELLA – DIRECT – SMITH                          3362

1    spreadsheet.  I want to focus on a few entries towards the

2    bottom.  Starting with an entry on February 26th, 2013.

3              I'm sorry, there's an entry on February 26th, 2013

4    in the middle there it says "AC Heskett & Heskett."

5              Do you see that?  Do you see that transfer?

6    A    Yes.

7    Q    And it's dated February 26th, 2013.  And if we can try

8    and move on and see what Mr. Shkreli's comment is on that.

9              And it says –– in the far right corner, do you see

10   where it says consultant related to our reverse merger?

11   A    Yes.

12   Q    And actually, I want it look at the next entry on the

13   list.  Which we have to go backward.

14             There's an entry on January 18th, 2013.  Do you see

15   that?  And it's a wire transfer to MSMB Healthcare, LP, New

16   York, New York.  And it's for $150,000.

17             And if we zoom out again and look at Mr. Shkreli's

18   comments on that transfer.

19             And there's an entry for this says "debt repayment"?

20   Right under the consultant related to a reverse merger.

21   A    Yes.

22   Q    So is that Mr. Shkreli's Comment on the 150,000-dollar

23   transfer from Retrophin to MSMB Healthcare?

24   A    Yes.

25   Q    There's two more entries to look at here.

MASSELLA - DIRECT - SMITH                    3363

```
 1              If we can go to next entry down.  On March 4th,

 2    2013, there's a transfer of $773,000 from Retrophin to MSMB

 3    Healthcare.

 4              Do you see that one?

 5    A    Yes.

 6              THE COURT:  March 4?

 7              MS. SMITH:  On March 4, 2013.

 8    Q    And then there's a second transfer on March 4, 2013 to

 9    checking 6097.

10              Do you see that?  And that's for $575,000.

11    A    Yes.

12    Q    Those two are right next to each other.  We can zoom out

13    and look at the comments for those two.

14              And so for the $773,000 transfer to MSMB Healthcare,

15    what is the -- do you see where it says "debt repayment"?

16    A    Yes.

17    Q    And then for the $575,000 transfer it says, Shkreli

18    writes Shkreli compensation.

19              Do you see that?

20    A    Yes.

21    Q    And then if we can actually look at -- there's one other

22    spreadsheet, the last document.  This is another list of open

23    items.

24              Do you see this?

25    A    Yes.
```

MASSELLA - DIRECT - SMITH                    3364

1   Q     The top says, Please indicate the termination date of the

2   individuals listed below.  We need this information in order

3   to update the vesting schedule.  And it lists a number of

4   incentive holders.

5         And what are the comment under termination date?

6   A     Ask Evan.

7   Q     There's also a question there, can you please provide a

8   detailed list of consultants with the following information.

9              THE COURT:  I'm sorry, what is the date there?

10             MS. SMITH:  This is still Government Exhibit 113-12.

11             THE COURT:  Thank you.

12             MS. SMITH:  I'm sorry.  I'm in the wrong spot.

13             Government Exhibit 113-17.  I apologize.

14  Q     And what's the comment under "provide a detailed list of

15  consultants with the following information"?

16  A     Do you have an agreement?  If yes, please provide a copy.

17             What type of service is rendered?  And then it says

18  "ask Evan."

19  Q     And now I'm going to move to Government Exhibit 113-18,

20  which we also put in evidence.

21             (Exhibit published.)

22             And if we zoom in on Ms. Chew's email on April 3rd,

23  2013.

24             And can you read what these wrote there?

25  A     Kevin/Martin, we have a couple of followup questions in

MASSELLA - DIRECT - SMITH                3365

1   relation to a $575,000 wire on March 4th, 2013 to Martin for

2   compensation.

3           Why was it not paid to Paychex.  Employment

4   agreement states annual base salary $250,000.  Please provide

5   explanation for the difference.  Which payroll period is the

6   payment related to.  Can anyone shed some light on this

7   matter.

8   Q    And is that 575,000-dollar wire on March 4th, 2013, the

9   one we just looked at in the spreadsheet?

10  A    Yes.

11  Q    If we can look up at the top email.

12          And who's the top email from?

13  A    Martin.

14  Q    And it's to Ms. Chew and who's copied?

15  A    Kevin and myself.

16  Q    And what is Mr. Shkreli's response?

17  A    We do not always use Paychex.  I will send a breakdown.

18  It includes back pay and bonus pay.  Will send.

19  Q    And do you remember whether you received a breakdown of

20  Mr. Shkreli's compensation?

21  A    No, we didn't.  We -- this was deemed a bonus.

22  Q    And there's a reference in Ms. Chew's email.  If we can

23  pull out a little bit.  It says employment agreement states

24  annual base salary of $250,000.

25          Had there been any discussions previously about

MASSELLA - DIRECT - SMITH                    3366

1    Mr. Shkreli's employment agreement?

2    A    Only as disclosed in the financial statements.

3    Q    Let me show you what's been marked as Government

4    Exhibit 113-12, which is Tab 26 in your binder.

5              Do you recognize this document?

6    A    Yes.

7    Q    Is this an email chain between you and Mr. Greebel?

8    A    Yes.

9    Q    And is it in connection with your work for Retrophin in

10   the spring of 2013?

11   A    Yes.

12             MS. SMITH:  Your Honor, the Government moves to

13   admit Government Exhibit 113-12.

14             MR. BRODSKY:  No objection, Your Honor.

15             THE COURT:  We receive 113-12.

16             (Government Exhibit 113-12, was received in

17   evidence.)

18   Q    And if we can go to the second page first.

19             So this is an email from you to Mr. Greebel on

20   March 8th, 2013.

21             And what's the subject line?

22   A    Martin's employment agreement for 250,000.  See attached.

23   Q    And what do you write in that email?

24   A    Evan this is the only employment agreement I have for

25   Martin.

MASSELLA - DIRECT - SMITH                    3367

1   Q    And why were you sending Mr. Greebel this email?

2   A    We must have been discussing the base salary.

3   Q    And can we turn to the first page of the document.  And

4   look at the bottom email from Mr. Greebel.

5        And what does Mr. Greebel write in response?

6   A    Martin has advised us -- has advised that there was a

7   misprint typo in the agreement and his compensation is 350,000

8   per annum.

9   Q    And if you can scroll up to your response.

10       And what did you say in response to Mr. Greebel?

11  A    After two sets of financial statements were issued with

12  the same disclosure that he signed off with representation

13  letters.  So we used 250,000 based on the facts presented

14  previously.  You want to restate both sets of financial

15  statements?

16  Q    And what are you expressing in this email?

17  A    That we produced financial statements with the disclosure

18  of the $250,000 salary for Martin that went into SEC

19  documents.  And if it wasn't supposed to be $250,000, we're

20  gonna have to restate and resubmit new filings.

21  Q    And to your knowledge, did Retrophin, in fact, restate

22  its financials based on Mr. Greebel's representation that

23  there was a misprint/typo?

24  A    No.

25       MR. BRODSKY:  Your Honor, it misstates the email.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

MASSELLA - DIRECT - SMITH                          3368

1    The question.  It's lines --

2              MS. SMITH:  I will reask the question.

3              THE COURT:  Okay.

4              MR. BRODSKY:  Just move to strike to the question

5    and the answer.

6              THE COURT:  Why don't you strike it and start over.

7              MS. SMITH:  Okay.

8    Q    Did Retrophin, in fact, restate its financials based on

9    Mr. Greebel's statement that Martin had advised that there was

10   a misprint/typo in his employment agreement?

11   A    I'm not aware of any restatements related to the

12   misstatement of his compensation.

13   Q    In the spring of 2013, was there a discussion with

14   Mr. Shkreli and Mr. Greebel about what individuals were

15   serving as employees of Retrophin?

16   A    Yes.

17   Q    What do you remember about that conversation?

18   A    The conversation related to the payments and that there

19   was a lacking of employment agreements of what we went through

20   before.

21   Q    And was that a conversation that occurred in person or

22   over email?

23   A    Partially over email, but mostly in person.

24   Q    What was the discussion that took place in person?

25   A    What the payments were for.  The reason why the net --

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

MASSELLA – DIRECT – SMITH                    3369

1   why they needed to be necessary documents.  And what was

2   necessary for us in order to record it properly.  What periods

3   were the payments and expenses for.

4            And then if they are employees, there was payroll

5   reporting that had to be done with the government.  And there

6   would be related payroll taxes that had to be paid in.

7            If they were consultants, the same would go, except

8   they wouldn't be subject to payroll taxes and filings of

9   payroll reports.

10  Q    What was Mr. Shkreli demeanor during the conversation?

11  A    His demeanor was annoyance and why do we need this.

12  Q    And what interactions, if any, did you observe between

13  Mr. Shkreli and Mr. Greebel during the conversation?

14  A    Evan was trying to explain why it was necessary and that

15  it needed to get done and what the importance was.

16  Q    I'm going to show you what's been marked as Government

17  Exhibit 113-20 for identification.  And that's at Tab 34 in

18  your binder.

19            And do you recognize this email?

20  A    Yes.

21  Q    And is this an email you received in the course of your

22  work for Retrophin in the spring of 2013?

23  A    Yes.

24  Q    And is it from Mr. Biestek?

25  A    Yes.

MASSELLA - DIRECT - SMITH                    3370

1    MS. SMITH:  Your Honor, the Government moves to

2    admits Government Exhibit 113-20 in evidence.

3         MR. BRODSKY:  Objection, Your Honor.

4    Q    Is this an example of information you sought on employees

5    from Retrophin in connection with your discussion that you had

6    with Mr. Greebel and Mr. Shkreli?

7    A    Yes.

8    Q    And what information -- do you remember requesting

9    information for the termination dates of different Retrophin

10   employees?

11        MR. BRODSKY:  Objection.  Leading.

12        THE COURT:  Overruled.

13   A    Yes.  We did ask those questions.

14   Q    And if you can look at the document and see if it

15   refreshes your recollection as to what the termination date

16   was for the Retrophin employee Kevin Mulleady?

17   A    That's the information we were provided.

18   Q    And what was the termination date you were provided with?

19   A    January 30th, 2013.

20        MR. BRODSKY:  Your Honor, I move to strike that this

21   is based on a document, not based on memory.

22        THE COURT:  Did this refresh your recollection about

23   what date Mr. Mulleady was terminated?

24        THE WITNESS:  Yes.

25   Q    I'm now going to show you what's been marked as

MASSELLA - DIRECT - SMITH                    3371

1   Government Exhibit 113-15, which is Tab 29.

2           Do you recognize this email?

3   A    Yes.

4   Q    Is it an email from Mr. Greebel in March of 2013?

5   A    Yes.

6   Q    And was it -- did you receive it in connection with your

7   work for Retrophin in that time period?

8   A    Yes.

9           MS. SMITH:  Your Honor, the Government moves to

10  admit Government Exhibit 113-15 into evidence.

11          MR. BRODSKY:  No objection.

12          THE COURT:  We will receive 113-15 into evidence.

13          (Government Exhibit 113-15, was received in

14  evidence.)

15  Q    I'm going to start on the third page with the very first

16  email in the chain.

17          This is an email from Mr. Greebel to Mr. Mikhailov

18  with a cc to Ms. Izerne, and the subject line is

19  Katten/Retrophin customer ledger.

20          And what does Mr. Greebel write in this email?

21  A    Please confirm this is what you want.

22  Q    And, again, what's the subject line?

23  A    Katten/Retrophin customer ledger.

24  Q    And if we can turn to the second page of the document and

25  Mr. Mikhailov's response?

MASSELLA – DIRECT – SMITH                    3372

1      Who was this email sent to?

2    A    To Evan and Lenora.

3    Q    And what does Mr. Mikhailov write in this email?

4    A    Evan, that is a good start, but I will need additional

5    information.  I know that the payments were made often with

6    delay and they were round amounts.

7         Is it possible to generate a report that will show a

8    $100,000 payment on February 28th, for instance, applied

9    against invoices X, Y, Z.

10        I need to match actual cash payments made to you as

11   reflected in Retrophin's bank against your invoices.  For all

12   such payment made from January 1st, 2012 to today.

13        Your accounting system should be able to produce

14   that.  By doing this exercise with your firm, that will cover

15   at least 60 percent of the company's expenses, and the report

16   will save hours of work for me and the auditors; obviously

17   money for Retrophin.

18   Q    Who was your understanding of what Mr. Mikhailov meant

19   by, "I need to match actual cash payments made to you as

20   reflected in Retrophin's bank against your invoices"?

21   A    We were trying to reconcile whether -- since the payments

22   were rounded, we wanted to match them against the invoices so

23   we can properly categorize the expenses.  And to also see if

24   there's also a payable related to what could be owed to

25   Katten.  But mainly we were trying to categorize the payments

1  into categories.

2  Q    So the cash payments that are being referred to are

3  payments from Retrophin; is that right?

4  A    Yes.  And all payments made Retrophin to Katten.

5  Q    And the invoices that are here referencing are Katten

6  invoices?

7  A    Yes.  We're asking for the Katten invoices, yes.

8  Q    If we can turn to the first page of the document and the

9  email at the bottom in response.

10          What does Mr. Greebel write in response?

11  A    I cannot do that now.  Can discuss with accounting

12  tomorrow.

13  Q    And if we can scroll up to the next email in the chain.

14          What does Mr. Mikhailov write in response?

15  A    That is fine.  But in the morning if possible we are

16  spending the whole day at Retrophin tomorrow.  If you would

17  like me to discuss with someone in accounting directly, I will

18  be happy to do so this way I can explain exactly the detail,

19  name the reports.  That even may be beneficial and simplify

20  the process.

21  Q    And then if we can scroll up to the next email in the

22  chain.

23          And who is this email from?

24  A    Lenora.

25  Q    And who is it sent to?

MASSELLA - DIRECT - SMITH                3374

1   A    To even Evan, myself, Gleb, Martin, and Martin.

2   Q    And can you read what Ms. Izerne said in the email?

3   A    Evan, Katten is aware the majority of our money goes

4   right.  So Citrin has a lot of work do on just your account.

5            I can't see to the right.  That right there.

6            You have to understand that you are holding us back.

7   Had you responded to this request in a more timely manner in

8   respect to Citrin's numerous requests for specific

9   information, this may have been done correctly the first time

10  or finished today.

11           Please bear this in mind for the remainder of this

12  process, most especially because Retrophin has no acting CFO,

13  COO, or controller, yet we must complete the 10-K filing

14  immediately one way or another.

15  Q    And then if we can just look at the top email in the

16  chain.

17           And what does Mr. Greebel write in response?

18  A    Sounds good.  We will work with Gleb tomorrow to get this

19  squared away.

20  Q    During the course of your work in the spring of 2014 for

21  Retrophin, was Citrin, in fact, able to match up the payments

22  made by Retrophin to Katten with invoices from Katten?

23  A    No.

24  Q    And approximately how much of a discrepancy between what

25  was paid and what the Katten invoices reflected?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

MASSELLA - DIRECT - SMITH                    3375

1    A    Approximately 600,000.

2    Q    And what was the discrepancy?

3    A    We couldn't -- we did get the ledger and when we matched

4    the ledger to the payments with Retrophin, we were off by

5    600,000 -- 600,000 more in payments from Retrophin to Katten.

6    Q    There was $600,000 more in payments from Retrophin to

7    Katten than there were invoices that you had for work for

8    Retrophin?

9    A    Correct.

10   Q    Did you raise the issue of this discrepancy with

11   Mr. Greebel directly?

12   A    Yes.

13   Q    Did you raise it on one occasion or more than one

14   occasion?

15   A    More than one occasion.

16   Q    And what, if anything, did Mr. Greebel say about the

17   discrepancy?

18   A    He wasn't -- we didn't get into the details.  He wasn't

19   able to provide it.

20   Q    Did you ask him for documentation regarding the

21   discrepancy?

22   A    I brought the discrepancy to his attention and that we

23   would need the support.

24   Q    And did you receive additional documentation insofar as

25   to the $600,000?

MASSELLA - DIRECT - SMITH                3376

1    A    No.

2    Q    And what was your reaction to Mr. Greebel's response?

3    A    Disappointed.

4    Q    How was the issue resolved by Citrin in that time period?

5    A    We were -- in order to move forward, we recorded that as

6    a related-party transaction.

7    Q    During the spring of 2013, how would you describe the

8    working relationship between your team at Citrin and

9    Mr. Shkreli?

10   A    Contentious.

11   Q    Why would you describe it that way?

12   A    Because we were having difficulty trying to get the --

13   the challenges of the information we were discussing before in

14   the time frame to get the SEC filings done.  And we kept

15   asking for a lot of information from Martin, and he was

16   frustrated and he was getting -- he was not pleased.

17   Q    And did there come a point in time when the relationship

18   between Citrin and Mr. Shkreli broke down?

19   A    Yes, when he sent in -- a couple of times he sent abusive

20   emails to my staff and we -- we -- we resigned.

21   Q    What do you mean you "resigned"?

22   A    We told him it's unacceptable and that we -- we would not

23   be working with him going forward, and that he would have to

24   apologize to our staff.

25   Q    And did SEC Solutions, in fact, resign from its

1   engagement with Retrophin?

2   A    We settled on trying to complete the engagement to get

3   him through it, but we made an agreement that we would get

4   paid and we would take it to a certain point, and that would

5   be the end of our relationship.

6   Q    So was there a period during which you were transitioning

7   out of your work for Retrophin?

8   A    Yes.

9   Q    Around the time that you transitioned out, did Retrophin

10  hire anyone to handle the financials internally at the

11  company?

12  A    Yes, they hired a CFO.

13  Q    What was the name of the CFO?

14  A    I just -- I'm drawing a blank.

15  Q    I'm going to show you what's been marked for

16  identification only as Government Exhibit 113-24.

17  A    Oh, Marc Panoff.  Thank you.

18  Q    And so is Marc Panoff the name of the CFO that was hired?

19  A    Yes.

20  Q    Did you have an meeting with Mr. Panoff in connection

21  with transitioning off the engagement?

22  A    Yes.

23  Q    What, if anything, did you convey to Mr. Panoff during

24  that meeting?

25  A    We conveyed that he had to be -- he had to be cognitive

MASSELLA - CROSS - BRODSKY                    3378

1    of focusing in on the related-party transactions, the personal

2    transactions of Martin, and that we hadn't resolved the legal

3    bill issue.

4    Q    When you say the "legal bill issue," do you mean the

5    discrepancy with the Katten bills we were talking about?

6    A    Yes.

7    Q    Following Citrin's decision to resign from the

8    engagement, did you have any further contact with Mr. Shkreli?

9    A    No.

10   Q    And did you have any further contact with Mr. Greebel?

11   A    Not related to Retrophin.

12          MS. SMITH:  Just one moment, Your Honor.

13          Your Honor, we have no further questions.

14          THE COURT:  Thank you.

15          MR. BRODSKY:  May I proceed, Your Honor?

16          THE COURT:  Yes.

17   CROSS-EXAMINATION

18   BY MR. BRODSKY:

19   Q    Mr. Massella, Evan Greebel is not Retrophin management,

20   correct?

21   A    Correct.

22   Q    You testified a few minutes ago and told this jury you

23   had a conversation with Evan Greebel about the Marek Biestek

24   transfer of 4,167 shares to Martin Shkreli on or about

25   November 29th, 2012, and that Mr. Greebel told you that

MASSELLA - CROSS - BRODSKY                    3379

1   transfer was outside the company and a gift; is that right?

2   A    I think I clarified that it was after November 29th and

3   it was after the four subsequent documents came through.

4   Q    That conversation never happened, sir, correct?

5   A    Excuse me?

6   Q    That conversation that you testified to a few minutes ago

7   never happened, correct?

8   A    On November 29th?

9   Q    It never happened period, correct?

10  A    I didn't say that.  I said that I had a conversation

11  subsequent to November 29th.

12  Q    Subsequent to November 29th, 2012, that conversation

13  where you say Evan Greebel told you it was a gift and outside

14  the company did not happen, sir.

15  A    Is that a statement or a question?

16  Q    That's a question, sir.

17  A    It did happen.

18  Q    Now in a prior proceeding, were you not asked the very

19  same question and told -- were you not sworn under oath at a

20  prior proceeding, sir?

21  A    Yes.

22  Q    And were you not asked that very same question and did

23  you not say that the person who told you it was a gift and

24  outside the company was Martin Shkreli?  Correct?

25  A    I don't recall that.

MASSELLA - CROSS - BRODSKY                    3380

1   Q     Well, let me show you, sir.

2   A     Sure.

3   Q     I'm handing up to you a transcript of the prior

4   proceeding.  And I'll direct your attention directly to the

5   transcript the page and the line.  I'd like you to turn to

6   page 3915.  And I'd like you to turn to line 4.

7               Are you there, sir?

8   A     Yes.

9   Q     Were you not asked this question and did you not give

10  these responses?  Again, 3915, line 4.

11              "QUESTION:  Did you have the discussion with Martin

12  Shkreli?"

13              MS. SMITH:  Objection, Your Honor.

14              THE COURT:  Read the question accurately, please.

15              MS. SMITH:  Just to the reading into the record.

16              THE COURT:  I just want to make sure it's read

17  accurately.  You misread the question.  You misread it.

18              MR. BRODSKY:  I can't use that word, Your Honor,

19  because it's a prior proceeding and if you want me to use that

20  word then it will...

21              THE COURT:  All right, use the name.

22              MR. BRODSKY:  Thank you, Your Honor.

23              "QUESTION:  And did you have a discussion with

24  Martin Shkreli or anyone else at Retrophin about how you would

25  account for the share transfers?

MASSELLA - CROSS - BRODSKY                3381

```
 1          "ANSWER:  Yeah, we did.  We did have a

 2   discussion.

 3          "QUESTION:  And what was the result of that

 4   discussion?

 5          "ANSWER:  It was supposed to be accounted for as a

 6   gift.

 7          "QUESTION:  And who?

 8          "ANSWER:  Outside the company.

 9          "QUESTION:  What does it mean that it's accounted

10   for as a gift outside the company?

11          "ANSWER:  That it was a gift between two individual

12   parties outside the company in just a transfer of ownership."

13   Q    Sir, did you not say the next page, page 3916, lines 2

14   through 11.

15          Did I read that correctly, Mr. Massella?

16   A    Yes.

17   Q    You were sworn under oath at the time, correct?

18   A    Yes.

19   Q    Just the oath you're taking today.

20          Now, did I ask -- let's me ask you if I'm reading

21   this correctly.  Transcript 3916 lines 2 through 11.

22          "QUESTION:  Was your understanding of the

23   classification of this transfer as a gift based on your

24   discussions with the management the Retrophin?

25          "ANSWER:  Yes.
```

MASSELLA - CROSS - BRODSKY                    3382

1        "QUESTION:  And as a result of the transfer being a

2   gift, did it need to be disclosed?

3        "ANSWER:  No.

4        "QUESTION:  And was the decision to classify it as a

5   gift the decision of the management of Retrophin?

6        "ANSWER:  Yes."

7   Q    Did I read that correctly?

8   A    Yes, you did.

9   Q    Now, sir, do you depart Citrin Cooperman as a partner?

10  A    Yes.

11  Q    Did you depart -- do you understand that Mr. Greebel is

12  the son-in-law of the Citrin of Citrin Cooperman?

13  A    Yes.

14  Q    Isn't it not true that you were forced to leave Citrin

15  Cooperman because of your misconduct?

16            MS. SMITH:  Objection, Your Honor.

17            Can we have a sidebar.

18            (Continued on the next page.)

19            (Sidebar conference.)

20

21

22

23

24

25

SIDEBAR CONFERENCE                          3383

1          MS. SMITH:  Okay, what's the basis of question?  You

2    can take me just through the question.

3          MR. BRODSKY:  Your Honor, I'm going to proffer to

4    you the facts of what happened to his departure.

5          MS. SMITH:  And the basis for where you got the

6    information of those facts?

7          MR. BRODSKY:  Your Honor --

8          MS. SMITH:  Because it's my understanding that he

9    left Citrin Cooperman because of a disagreement there's a

10   confidentiality provision in the clause.  And so I would like

11   know what the source of Mr. Brodsky's information is.

12         MR. BRODSKY:  Your Honor, I'm not under oath and I'm

13   not being cross-examined, but I have a good faith basis

14   because he filed a lawsuit.

15         THE COURT:  Who did?

16         MR. BRODSKY:  Mr. Massella.  And it's public.  In

17   New York Supreme Court where he filed a lawsuit publicly

18   because one of his clients, a client of Citrin Cooperman, he

19   had given a loan to where he was the engagement partner and

20   the relationship partner.  He gave him a loan of $200,000.

21   And then he gave him a loan of $20,000.  He did not report it

22   to anybody.

23         What happened was, this client went into fell into

24   bankruptcy, fell into financial trouble.  And the client owed

25   a lot of money to Citrin Cooperman, the firm.

SIDEBAR CONFERENCE                          3384

1        Mr. Massella did not tell anybody and disclose the

2   fact that he obtained -- he gave these loans to the client

3   behind everybody's back at Citrin Cooperman.

4        He filed a lawsuit, not telling anybody.  Obtained a

5   judgment --

6            THE COURT:  Wait.  He filed lawsuit at that time?

7            MR. BRODSKY:  Against the company, the client.

8            MS. SMITH:  Who filed the lawsuit?

9            MR. BRODSKY:  Mr. Massella filed lieutenant in New

10  York State?

11           THE COURT:  And didn't tell who about the lawsuit?

12           MR. BRODSKY:  He didn't sell anybody at Citrin

13  Cooperman that he had given a loan to the client.  He didn't

14  tell anybody he field a lawsuit against the client to obtain a

15  judgment.

16       He has successfully obtained the judgment.  He

17  successfully obtained a settlement with this client.  After

18  that, it was uncovered, when the accounting firm went to

19  Mr. -- to the client and said you need to pay what you owed?

20  The client said, well, this has been resolved.  I resolved it

21  with Mr. Massella.

22       After that, the firm went to Mr. Massella and said

23  you don't -- you've never disclosed the loan.  You never --

24  you've forced us to try to obtain money -- you put your own

25  interests of obtaining a judgment above our firm's interests.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                              3385

1    And as a result of that he had to depart.

2              This goes directly to credibility, and it goes to

3    bias.  He is biased against Mr. Greebel because Niles Citrin,

4    among other people at Citrin Cooperman who sit on the

5    executive committee, the board, or whatever the management of

6    the firm, made a decision that he had to leave as a result of

7    his misconduct.

8              And that goes directly to bias.

9              THE COURT:  Is there a document where he was

10   terminated that gives the reason for his departure?

11             MR. BRODSKY:  We don't have subpoena power, Your

12   Honor, so what we have is -- we didn't subpoena the

13   information from Citrin Cooperman, so --

14             MS. SMITH:  How do you know the basis for him being

15   fired?  Because again my understanding is that there was a

16   confidentiality agreement.

17             MR. BRODSKY:  I don't know why the Government is

18   depending a witness --

19             MS. SMITH:  I'm not.

20             MR. BRODSKY:  -- under these circumstances we have

21   clear evidence of bias.  And they don't know the circumstances

22   under which their own witness has departed Citrin Cooperman.

23             This is a public lawsuit that he filed and he

24   obtained a judgment from without telling anybody at the

25   accounting firm.

SIDEBAR CONFERENCE                          3386

1          This goes classic bias.  We have investigators.  We

2     have our own people who are looking into evidence.  We have

3     our own sources of information.  All that is privileged, it's

4     confidential and it's attorney/work product.

5          THE COURT:  Did the judge issue a confidentiality

6     order?

7          MR. BRODSKY:  I don't know.  I just have --

8          THE COURT:  All right.  Because if there's a

9     violation of the court order, I think you need to know that.

10         MR. BRODSKY:  I understand, Your Honor.

11         I don't believe there's any court order with respect

12    to the settlement agreement.  I don't know the terms of the

13    settlement agreement.

14         MS. SMITH:  He received the terms -- I understand

15    the public lawsuit.  I understand the bias point.  But I don't

16    know, you know, what kind of details we're going to get into

17    here and, you know, I just I feel this need to be cabined.  I

18    do understand the bias argument, but I don't understand this,

19    you know, misconduct.  I understood that it was a dispute, so

20    I don't know where Mr. Brodsky has the underlying information

21    from.

22         But I just don't understand the contours of this.

23    We're not going to spent 25 minutes on relaying the lawsuit

24    and the whole background.  That's inappropriate for any

25    witness.  Even a cooperator who has a crime that they're

1   committing.  This is not a cooperator, it's a lay witness.  I

2   understand the bias argument, but it should be cabined.

3            MR. BRODSKY:  Your Honor, this is classic bias.

4   We'll go question by question.  We'll see what he answers.  He

5   may deny the whole thing.  He may admit the whole thing.

6            He's obviously the source of the Government's

7   information about what happened, which is clearly -- which is

8   clearly not the truth.

9            THE COURT:  So the Government's information about

10  what happened --

11           MR. BRODSKY:  The Government just said there was a

12  dispute and he left over a dispute.  We believe he left

13  because of misconduct, not because of a dispute.

14           We think it's very clear that a partner at Citrin

15  Cooperman has a fiduciary duty to the partnership and not to

16  his own self-interest in not hiding the fact that he a loan to

17  a client, and then going out behind everybody's back at the

18  company and going out and filing a lawsuit for his own

19  interests to obtain a judgment so he could collect on it while

20  the firm had an outstanding accounting bill that was owed by

21  the client.  And so he put his interests well above the

22  interests of the firm.  That goes to bias.

23           THE COURT:  How do you know that that's the reason

24  he was fired?

25           MR. BRODSKY:  I can ask him.  I can ask him.  Let's

1   see what he says.  And if, Your Honor --

2           MS. SMITH:  But there's a confidentiality clause, I

3   don't want him to be in a position where he is violating it.

4           MR. BRODSKY:  The bias of somebody -- if he a

5   confidentiality clause, it's a civil matter.  It's -- this

6   criminal case trumps any confidentiality order.  If any of

7   these documents, for example, were subject to civil

8   confidential agreement, it would not -- it would be trumped by

9   the fact that witness' bias and a witness' prejudice and a

10  witness' motives completely trump.

11          THE COURT:  I need to make sure there's not a

12  violation of a court order.  If this is a court order --

13          MR. BRODSKY:  It was not a court --

14          THE COURT:  -- confidential agreement or settlement,

15  I'm not going to -- I'm not interested in having --

16          MR. BRODSKY:  There as no court order.  As

17  understand it --

18          THE COURT:  You just said you didn't know.

19          MR. BRODSKY:  I know -- well, there's two different

20  things.  I don't believe there's a court order with respect to

21  his settlement with the private company.

22          THE COURT:  But orders are either subject to

23  confidentiality agreements or they're not.  And sometimes

24  they're court ordered and sometimes they're not.  That is my

25  question.  Did the court so order a confidentiality aspect of

SIDEBAR CONFERENCE                           3389

1   this?

2            MR. BRODSKY:  There are different questions.

3            THE COURT:  Do you have an answer?

4            MR. BRODSKY:  Yes, Your Honor.  If you're -- I just

5   don't want to be confused.

6            If you're asking whether there's a court order

7   between Mr. Massella and Citrin Cooperman, the answer is no.

8   There is no court order.

9            If you're asking whether or not there's a court

10  order with respect to Mr. Massella's lawsuit against the

11  company that he hid that lawsuit, and that he loaned money to,

12  I don't know the answer to that.

13           But the relevant court order and whether or not

14  there's a court order preventing him from answering questions

15  with respect to his departure from Citrin Cooperman, and I

16  know of no such court order.

17           MS. SMITH:  And can you explain to me what proffered

18  Mr. Citrin's involvement?  Because they moved in limine to

19  keep that out altogether.

20           THE COURT:  Keep what out?

21           MS. SMITH:  Like any reference -- I'm just trying to

22  understand what's Mr. Citrin involvement in Mr. Massella's

23  departure from the company.

24           MR. BRODSKY:  Your Honor, we did fight to bring it

25  back to in limine, but they brought it out.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE                              3390

1          THE COURT:  Let's talk about your theory is that he

2     is biased against Mr. Greebel because Mr. Citrin's

3     father-in-law --

4          MR. BRODSKY:  Is partly responsible for the firing.

5          MS. SMITH:  Is he responsible?  I don't know who is

6     responsible for --

7          THE COURT:  How did he get fired?

8          MR. BRODSKY:  Your Honor, I can ask him.

9          MS. SMITH:  But I need to know that ahead of time,

10    because if it's not related to Mr. Citrin, then it can't go to

11    bias.

12         MR. BRODSKY:  Mr. Citrin, along all with other

13    partners of Citrin Cooperman, made a decision to fire him.

14         THE COURT:  And you know that because?

15         MR. BRODSKY:  I know that because I've investigated

16    the matter.

17         THE COURT:  So all the partners -- how many partners

18    are there at Citrin?

19         MR. BRODSKY:  I don't know the number of partners.

20         THE COURT:  How do you know the partners at Citrin

21    then made a decision collectively to fire him?

22         MR. BRODSKY:  Your Honor.

23         THE COURT:  Was there a partnership meeting?

24         MR. BRODSKY:  I don't know that -- I don't know

25    whether it was partner --

SIDEBAR CONFERENCE                     3391

1          THE COURT:  How can you represent to me you know

2   information if you don't know the answers about how they --

3   I'm just having a concern.

4          MS. SMITH:  Mr. Citrin was in the courtroom.  So I

5   don't know --

6          MR. BRODSKY:  Mr. Citrin has attended the trial on

7   multiple days.  He's the father-in-law --

8          MR. KESSLER:  He left.

9          MR. DUBIN:  Your Honor, I just wanted to say we have

10  a been careful about whether or not Citrin was waived and

11  we've been tracking his testimony in this proceeding.

12         MS. SMITH:  No, I'm sorry.

13         MR. DUBIN:  We've been tracking his testimony in

14  this proceeding versus the last proceeding and --

15         MR. BRODSKY:  And it's changed.

16         MR. DUBIN:  And it's our -- and as we're sitting

17  there listening to his testimony today, he is inserting Evan

18  Greebel in a way that he didn't -- he is inserting Mr. Greebel

19  in wild inconsistencies which has raised this issue even more

20  persistently for us, which is that he has a clear bias here

21  against Mr. Greebel for some reason, we do think it has to do

22  with his firing.

23         THE COURT:  These questions you had him review,

24  nobody asked him did you have discussions about this with

25  Mr. Greebel.  The question was:  Did you have discussions with

SIDEBAR CONFERENCE                          3392

1    Mr. Shkreli or anyone else at Retrophin?  Did you talk about

2    this with Retrophin management?  And, you know --

3              MR. BRODSKY:  But they asked.

4              THE COURT:  There was no question here as far as I

5    can tell did you discuss this with Greebel?

6              MR. DUBIN:  There was a subsequent question where

7    Mr. Brodsky asked --

8              THE COURT:  Which one is that?

9              MR. DUBIN:  -- final classification --

10             MR. BRODSKY:  It was:  And the discussion to

11   classify it as gift was a decision of management of Retrophin?

12   Yes.  He said it was Evan Greebel who said it should be a

13   give.

14             MS. SMITH:  He could have had a discussion with Evan

15   Greebel about it being a gift.

16             This was a different trial.  We elicited different

17   evidence.  There were multiple discussions on this.  Of

18   course, it would be management's final decision how to

19   classify it.  That's the question I asked at the beginning.

20   And he also had a conversation with Mr. Greebel.  It's not

21   inconsistent.

22             THE COURT:  It's not inconsistent.

23             MS. SMITH:  It's the reason I objected to it being

24   read into the record.

25             MR. BRODSKY:  Your Honor, there's another

SIDEBAR CONFERENCE                                          3393

1    inconsistency --

2                THE COURT:  Okay, let's address one thing at a time.

3            This line of questioning does not ask about

4    Mr. Greebel at all, it just asks with Mr. Shkreli and

5    Retrophin management.  Okay?

6            So there's no question here -- if had he said -- if

7    the question had been, did you discuss this with Mr. Greebel

8    and if he said no, and then came here and said he did discuss

9    it with Mr. Greebel, that's being inconsistent.

10               MR. BRODSKY:  I'm going to bring out that a little

11   bit later in the transcript.  He was asked do you ever rely on

12   Mr. Greebel for anything related to legal matters?  And he

13   said "No, that would be the auditor's responsibility."

14           Your Honor, he didn't volunteer any information.

15               MS. SMITH:  He wasn't asked.

16               MR. BRODSKY:  He didn't say that Evan Greebel had

17   this conversation.  And he squarely, the only person he put it

18   on today was not management, not Mr. Shkreli, but was on Evan

19   Greebel.  And we have evidence of bias.  We have every right

20   to -- that's classic cross-examination.

21           The Government doesn't know the circumstances of his

22   departure.  That's the Government's issue.  We should be

23   allowed to ask the questions on bias.  We should allow to

24   proceed with our cross-examination, Your Honor.

25               MR. DUBIN:  Your Honor, we just looked at the

SIDEBAR CONFERENCE                                    3394

1   transcript, what he testified to on direct was that his

2   understanding of the classification came from Mr. Greebel.

3   That directly contradicts his testimony, page 209 in the rough

4   transcript of today, line 7 through 10.  It directly

5   contradicts what he said.

6            THE COURT:  You're looking at today's live feed?

7            MS. SMITH:  We don't have it.

8            THE COURT:  All right.

9            Did you all print it out already?  Do you have it?

10           MR. DUBIN:  This is what Your Honor has.  I was

11  going to ask, Your Honor --

12           THE COURT:  Well, we can get -- do you want to see

13  this?

14           MR. DUBIN:  No, that's why I got it one.

15           MR. BRODSKY:  I can go on to -- the bias is

16  important.  We would like to get to the bias, Your Honor.  He

17  can deny it.  He can deny it.  And then I'll move on to the

18  other areas.

19           THE COURT:  I mean I'm just wondering how far into

20  this you're going to go, because I feel like there are

21  unanswered questions before we allow too much of this in.

22           I think it's okay to ask him whether he was -- if

23  Mr. Citrin, the defendant's father-in-law, was responsible or

24  whether he was aware whether he made a decision to terminate

25  him.  That would be clearly biased.

SIDEBAR CONFERENCE                           3395

1       But we don't have any information about who and how

2   and for what reason he was let go, right?

3       MR. BRODSKY:  Even if it's Citrin Cooperman with

4   Citrin as the lead partner, if he is forced out of that firm,

5   regardless of whether he knows Niles Citrin was involved

6   specifically in his departure, that's clear evidence of bias,

7   and we should be allowed to cross-examine on it, particularly

8   because he's changed his testimony, in our view.  And I'm

9   going to go into other areas in which he changed his

10  testimony.

11      I'm about to show Your Honor, for example, that his

12  testimony about cap tables and that he wasn't -- he was

13  relying on others.  I'm going to show Your Honor the evidence

14  very shortly, that on December 16th of 2012, this is after,

15  Your Honor, after the public reverse merger, Mr. Massella and

16  Jackson Su together continued to change the cap table without

17  Evan Greebel's knowledge or anybody else's knowledge.

18      This is a person who has an extreme bias, who's done

19  things behind everyone's back, and I'm going to bring that out

20  on cross-examination.

21      THE COURT:  You're saying Mr. Shkreli had no hand in

22  the cap table changes?

23      MS. SMITH:  Mr. Greebel.

24      THE COURT:  No, but like Mr. Su reported to

25  Mr. Shkreli and there were changes to the cap table.  I'm not

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                         3396

1   saying --

2            MR. BRODSKY:  I would suggest that Mr. Su was

3   reporting to Mr. Shkreli the changes made on December 16th

4   between Mr. Massella and Mr. Su were the result -- I'm just of

5   inferring this -- of Mr. Shkreli.

6            THE COURT:  But he hasn't said that Mr. Greebel was

7   involved in changing cap tables?

8            MR. BRODSKY:  Your Honor, I'm --

9            THE COURT:  There were a few -- he hasn't said that.

10            Let's get back to the issue because you're bouncing

11   all around.

12            MR. BRODSKY:  I'm sorry, Your Honor.

13            THE COURT:  Let's just stick with the issue at hand

14   which is the circumstances of --

15            MR. BRODSKY:  We'll ask a few more questions --

16            THE COURT:  -- the truth you need because he was --

17            MR. BRODSKY:  He was forced out.

18            THE COURT:  He was forced out.

19            MS. SMITH:  You said he was fired.  So which one is

20   it?

21            MR. BRODSKY:  Let's find out.

22            MS. SMITH:  But I guess my question is it just needs

23   to be cabined and it should go to bias not get into all the

24   circumstances --

25            MR. BRODSKY:  I believe he was fired.  And I don't

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                                    3397

1    believe I should be cabined on bias.

2              The Government doesn't get to cabin us on bias, Your

3    Honor.  We are allowed and bring out the most important thing

4    about somebody's testimony, which is whether they're biased.

5    Whether he's a cooperating witness or a non-cooperating

6    witness.  The bias of a witness' core --

7              THE COURT:  Nobody's disputing that.

8              MR. BRODSKY:  The Government --

9              MS. SMITH:  No, I said you can ask questions.  I

10   just don't think you should go into this enormous back and

11   forth and confidentiality and the underlying circumstances.

12             MR. BRODSKY:  They are interrupting my

13   cross-examination.  May I return --

14             MS. SMITH:  We just need to know what the scope is.

15             THE COURT:  There's an objection so we have to get

16   this resolved.  We can we go back --

17             MR. BRODSKY:  Yes, Your Honor.

18             THE COURT:  So the objection was that you are using

19   information that may or may be subject to a confidential

20   agreement in order for the defendant to explain himself and it

21   may --

22             MR. DUBIN:  The witness, Your Honor.

23             THE COURT:  Sorry, the witness.  It may pull him

24   into the revealing information that's subject to the

25   confidential agreement.

SIDEBAR CONFERENCE                                         3398

1          MR. BRODSKY:  Your Honor, even --

2          THE COURT:  I don't know what that confidentiality

3    agreement --

4          MR. BRODSKY:  If there's --

5          THE COURT:  -- requires?  Does it preclude the fact

6    that he left?  That he was fired?

7          MR. BRODSKY:  I don't know.  I don't know.  But,

8    Your Honor, even if there were -- let's say hypothetically

9    there were confidentiality agreements between him and Citrin

10   on his departure, it is trumped by Your Honor's oversight of a

11   criminal trial where the bias of a witness is at issue.

12         THE COURT:  So he can be relieved by my court

13   order --

14         MR. BRODSKY:  Correct.

15         THE COURT:  -- when he comes back from redirect to

16   say whatever he needs to say --

17         MR. BRODSKY:  Correct.

18         THE COURT:  -- to explain the circumstances of the

19   departure.

20         MR. BRODSKY:  Correct.

21         THE COURT:  Even if it's a violation.

22         I wish I knew -- you had answers for me about what

23   the court order.

24         MR. BRODSKY:  I do have an answer for you.  I do not

25   believe there's a court order with respect to his departure

SIDEBAR CONFERENCE                                    3399

1   with Citrin.  They didn't sue each other.  So the courts were

2   not involved in his departure.

3           I don't know -- what I don't know is he did file a

4   lawsuit against the other company.

5           THE COURT:  Not against Citrin?

6           MR. BRODSKY:  Not against Citrin, against the

7   company, the debtor.

8           THE COURT:  Oh, okay.

9           MR. BRODSKY:  And there was a judgment in case and I

10  don't know whether they had any settlement.  I know that he

11  got a judgment.  I know it was a lot of money but, I don't

12  know whether --

13          THE COURT:  So you're saying that the lawsuit was

14  about the loan that he made?

15          MR. BRODSKY:  Correct.

16          THE COURT:  And when Citrin went to try to collect

17  its fees, separate and apart from the loan, the position of

18  the debtor, the client, was that my settlement with

19  Mr. Massella --

20          MR. BRODSKY:  Resolved this.

21          THE COURT:  -- for the loan includes the releasing

22  Citrin from the fees that I owe them?

23          MR. BRODSKY:  That's my understanding.

24          THE COURT:  I mean it seems so unrelated.

25          MR. BRODSKY:  Your Honor --

SIDEBAR CONFERENCE                          3400

1          THE COURT:  And unlikely -- it seems unlikely that a

2     paying client would be able to, you know, use a release or a

3     settlement for a separate private debt.

4          MR. BRODSKY:  As I understand it, it can cause -- as

5     you can understand, Mr. Massella's breach of fiduciary duty to

6     his partnership, not disclosing the fact that he gave a client

7     over which he had the engagement and the relationship, not

8     disclosing that he sued them, and not disclosing that he won a

9     judgment, and then when it all came out, let's just say that

10    he had to leave.

11         MR. MASTRO:  Your Honor, we are not allowed as

12    lawyers and accountants typically allowed to enter into loan

13    transactions with clients that compromise our fiduciary

14    obligations to our firm and our accountant firm.  Okay, that

15    is what he did.  That's why he got fired.  And that's got

16    clear fiduciary breach.  So we're just --

17         MS. SMITH:  This doesn't sounds like bias, it sounds

18    like you're trying to make him out as somebody who breached

19    his fiduciary duty.

20         MR. MASTRO:  No, he got fired and he's biased --

21         THE COURT:  One at a time.

22         MS. SMITH:  I understand the bias point.  There

23    was -- whatever the disagreement was and he left.

24         But this idea that you're going to make this person

25    out to have breached a fiduciary duty against a client, when

SIDEBAR CONFERENCE                              3401

1    we don't know all the facts and obviously can't prove this up

2    by extrinsic evidence just feels like character assassination.

3              MR. MASTRO:  It'll take a handful of questions to

4    get to the heart of this.

5              MR. BRODSKY:  Bias is perfectly permissible.

6              THE COURT:  You're not listening to each other.

7    Stop it.  All right.  Really.  Listen to each other.

8              MR. BRODSKY:  The second point is if there were

9    evidence that he breached this fiduciary duty to a client,

10   that is perfectly permissible on cross-examination.

11             He has been testifying as an accountant, holding

12   himself to this high standard of how an accountant is supposed

13   to behave.  And how Mr. Greebel is supposed to behave as the

14   outside lawyer.

15             He has testified repeatedly about his opinion of

16   backdating and his opinion about how things are supposed to

17   transpire as if he's a model of purity.

18             His breach his fiduciary duty goes directly to his

19   credibility on that issue.

20             THE COURT:  I think the question was not asked as to

21   moral judgment, really, as someone who's accounting and trying

22   to get a company's books and records or financial statements

23   in order when he received documents with two different dates

24   and what do you as an accountant make of that.

25             I don't think it was done in the context of trying

SIDEBAR CONFERENCE                           3402

1   to portray himself as someone who's got moral high ground.

2           MR. BRODSKY:  I'm not saying moral, Your Honor, I'm

3   saying as an accountant, the expertise as an accountant and

4   how you're supposed to behave.

5           THE COURT:  All right.  Well, let's see how you do

6   with the bias.  Focusing on bias.  Bias.  Bias.

7           MR. BRODSKY:  I will.  Thank you.

8           MR. MASTRO:  Thank you.

9           (End of sidebar conference.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MASSELLA - CROSS - BRODSKY                    3403

1              (In open court; Jury present.)

2              MR. BRODSKY:  Would you mind reading the last

3    question back please.

4              (Whereupon, the record was read.)

5              THE COURT:  You may answer the question,

6    Mr. Massella.

7    A    I had a settlement agreement.  There is a settlement

8    agreement and that was what is abided by.  I was not forced

9    out.

10   BY MR. BRODSKY:

11   Q    Did you not, sir, behind the back of all the partners at

12   Citrin Cooperman loan money to a client without telling

13   anybody in the partnership?

14             MS. SMITH:  Objection, Your Honor.

15             THE COURT:  Rephrase.

16   Q    Sir, did you not loan money to a client without telling

17   anybody who is in the partnership at Citrin Cooperman?

18   A    It was not required and, yes, I did.

19   Q    And is it not true, sir, that when you loaned -- it was

20   hundreds of thousands of dollars, correct?

21   A    It wasn't hundreds of thousands.

22   Q    It was over $200,000?

23   A    Approximately.

24   Q    And was it not the case that after this client failed,

25   could not pay the money back, you filed a public lawsuit

MASSELLA – CROSS – BRODSKY                    3404

1    without telling anybody in the partnership at Citrin Cooperman

2    that you were doing so against the company?

3            MS. SMITH:  Objection.

4            THE COURT:  Mr. Brodsky --

5            MR. BRODSKY:  I can break it down.

6            THE COURT:  All right.

7            MR. BRODSKY:  I'll break it down.

8    Q    Mr. Massella, after loaning this client money, you filed

9    a lawsuit against this client to collect the money that was

10   owed plus interest, right?

11   A    Correct.

12   Q    And you didn't tell anybody in the partnership at Citrin

13   Cooperman that you were filing this lawsuit, correct?

14   A    I told the firm to file a lawsuit, too.

15   Q    Sir, my question is --

16           MR. BRODSKY:  Your Honor, I move to strike because

17   that's not answering my question.

18           MS. SMITH:  Objection, Your Honor.

19           THE COURT:  Try to listen to the question he asked

20   whether you told anyone at the partnership about your lawsuit.

21           THE WITNESS:  There were no longer our client.

22           THE COURT:  The question is whether you told

23   anyone --

24           THE WITNESS:  No, I did not.

25   BY MR. BRODSKY:

MASSELLA - CROSS - BRODSKY                    3405

1    Q    And you knew, sir, that at the time you filed your

2    lawsuit, this client owed Citrin Cooperman money, correct?

3    A    That is correct.

4    Q    And you knew, sir, after obtaining a judgment against

5    this former client, that you were putting your interests above

6    everyone else in the firm, correct?

7    A    Absolutely incorrect.

8    Q    And, sir, after you obtained the judgment against this

9    former client, you did not disclose it to the partnership that

10   you obtained this judgment, correct?

11   A    Correct.

12   Q    And you knew based on the internal rules at Citrin

13   Cooperman that you were supposed to disclose -- withdrawn.

14         Were you not the engagement the partner assigned the

15   responsibility of overseeing the relationship with this client

16   to whom you loaned money?

17         MS. SMITH:  Objection, Your Honor.

18         THE COURT:  Overruled.

19   A    They were no longer a client.

20   Q    At the time you loaned the money, sir, were you not the

21   engagement partner in that matter?

22   A    It was a non-attest client.

23   Q    Sir, I'm going to ask you for a yes or no.

24         Were you not the engagement partner for this client

25   at the time you loaned this money to the client?

MASSELLA – CROSS – BRODSKY                3406

1   A     Yes.

2   Q     And is it not true that as the engagement partner, you

3   put your own personal interests above the firm and above the

4   client loaning that client the money without disclosing it to

5   the Citrin Cooperman?

6               MS. SMITH:  Objection, Your Honor.

7               THE COURT:  Sustained.

8   Q     And when Citrin Cooperman went to collect the amount owed

9   from this former client -- that happened, correct?

10  Mr. Massella?

11  A     Over the years, yes.

12  Q     That is when they discovered that you had obtained a

13  judgment against this former client, right?

14  A     Yes.

15  Q     And as a result of this conduct of yours, you had to

16  leave Citrin Cooperman, correct?

17  A     It was a settlement.

18              MR. BRODSKY:  That's not my question.  I move it

19  strike, Your Honor.

20  Q     As a result of this conduct, not disclosing the loan --

21  making a loan to a client, not disclosing it, obtaining a

22  judgment and not disclosing that judgment to the firm, you

23  were forced to leave Citrin Cooperman, correct?

24              MS. SMITH:  Objection.  Compound.

25              THE COURT:  I'll allow the question.  It is

MASSELLA - CROSS - BRODSKY                    3407

1   compound.

2            Were you forced to leave as a result of the

3   situation with the money and the client of the firm?

4            THE WITNESS:  There was a settlement agreement and

5   we came upon a settlement that I would leave, yes.

6   BY MR. BRODSKY:

7   Q    Your departure was not voluntarily, sir, correct?

8   A    I didn't breach the partnership agreement.

9   Q    There was a vote, sir, to require you to leave the firm,

10  correct?

11           MS. SMITH:  Objection, Your Honor.

12           THE COURT:  If the witness can answer it.  If you

13  know, you can answer the question.

14           THE WITNESS:  No, I don't know.

15  Q    Let's go back to your testimony earlier today.  You were

16  asked on direct examination -- if we can put up Government

17  Exhibit 1133 please in evidence.

18           (Exhibit published.)

19           THE COURT:  113 dash what?

20           MR. BRODSKY:  113-3.

21  Q    Mr. Massella, you remember you testified just a few

22  minutes ago about what that meant "WTF"?

23  A    Yes, sir.

24  Q    Isn't that the case, sir, that your testimony as to the

25  reason you wrote WTF contradicts what you said in the prior

MASSELLA - CROSS - BRODSKY                3408

1   proceeding?

2   A     No.

3   Q     Is it not the case, sir, that you said today that the

4   reason why you said WTF was because were concerned about a

5   transaction between an employee and a CEO, right?  Correct?

6   A     It was one piece of it, yes.

7   Q     Sir, your testimony today was about what you -- did you

8   not testify -- we can get the record out.  Did you not testify

9   to this jury minutes ago that the reason you wrote WTF after

10  receiving Marek Biestek transfer agreement of 4,167 shares to

11  Martin Shkreli on November 29th, 2012 was because you thought

12  there was something concerning about a CEO and employee

13  engaged in a stock transfer?

14        MS. SMITH:  Objection, Your Honor.  Misstates the

15  testimony.

16        THE COURT:  Sustained.

17  Q     Did you not say, sir, WTF, because of your concern about

18  an agreement between an employee and a CEO?

19  A     The nature of it, yes.

20  Q     And is it not true in the prior proceeding, sir, you were

21  asked that very same question as to why you reacted with WTF.

22        Do you remember that?

23  A     Okay.

24  Q     Do you remember, sir?

25  A     Yes.

MASSELLA - CROSS - BRODSKY                    3409

1   Q    Were you not asked, and I ask to turn, sir, to page 3913,

2   starting at page line 16 -- actually, let's start with line 11

3   going through 25.

4            I'd like you to listen as I read these questions and

5   tell me if I'm reading the question correctly and reading the

6   answer.

7            Sir, you were sworn under oath at that prior

8   proceeding, correct?  Correct?

9   A    Yes.

10  Q    Question -- and if we can scroll up to your response --

11           MS. SMITH:  Objection Your Honor.

12           Can we have a sidebar?

13           (Continued on the next page.)

14           (Sidebar conference.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                          3410

1          THE COURT:  Okay.

2          MS. SMITH:  Look, this is the complication with

3     this.  We had similar testimony in the last trial.  He was

4     asked about this document on a number of occasions.  The first

5     time he was asked about the document, which is prior to your

6     transcript at 3911, why were you -- what was your reaction toe

7     receiving the document and he talked about how there was -- it

8     was unusual that an employee would be giving a CEO --

9          MR. BRODSKY:  No, Your Honor, you have to go before

10    that, it's line --

11         THE COURT:  Don't interrupt, please.  We're trying

12    to make a good record here.

13         MR. BRODSKY:  Thank you, Your Honor.

14         THE COURT:  Page 3911.  What was it?

15         MS. SMITH:  My only point is he testified previously

16    that he found the document concerning because it was, in fact,

17    a transfer of an employee giving it to the CEO.

18              Now, I recognize what Mr. Brodsky is doing that he

19    is saying your WTF answer is different to that particular

20    question, you answered that particular question differently.

21              But the testimony as taken a whole is entirely

22    consistent.  His reaction to WTF there was because the order

23    in which I asked him about documents was slightly different.

24    He had already testified -- he had not yet testified to being

25    frustrated with changes.  But he did testify that he was upset

SIDEBAR CONFERENCE                                    3411

1   when he got to the document originally about is the transfer

2   between the CEO.

3           So I am just suggesting to using the prior

4   transcript as kind of -- I mean, look, I'll have to clean it

5   up on redirect, but it's not inconsistent, and I'm objecting

6   to all of these as a prior inconsistent statements for that

7   reason, and am making that record.

8           THE COURT:  Okay.

9           MR. BRODSKY:  Thank you, Your Honor.

10          MR. MASTRO:  Thank you, Your Honor.

11          (End of sidebar conference.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

MASSELLA - CROSS - BRODSKY                    3412

```
 1                  (In open court; Jury present.)
 2                  MR. BRODSKY:  Let's put up again that exhibit.
 3       Sorry.
 4       BY MR. BRODSKY:
 5       Q    Are you at 3913, sir?
 6       A    Yes.
 7       Q    Line 11.
 8                  "And if we could scroll up to your response, and
 9       what did you write?
10                  "ANSWER:  WTF.
11                  "QUESTION:  And is that an acronym?
12                  "ANSWER:  Yes.
13                  "QUESTION:  What were you trying to convey with this
14       response?
15                  "ANSWER:  What the heck.
16                  "QUESTION:  Why did you have that reaction?
17                  "ANSWER:  Out of frustration that everything kept
18       changing and what type of document is this.  And where did it
19       come from.  And you saw how it came through with now date, you
20       know, part of it's missing.  And so we understand a time
21       frame, so to keep changing -- to keep change the thing, the --
22       every time you changed the cap table, it takes us days to
23       change the financial statements when these things occurred."
24       Q    That's what your sworn testimony was.  Did I read
25       correctly?
```

MASSELLA - CROSS - BRODSKY                    3413

1   A     Absolutely.

2   Q     And, sir, is it not the case that the WTF had directly to

3   do with the fact that you were frustrated the cap table kept

4   changing, correct?

5   A     Yes.

6   Q     And you yourself, sir, were involved in making changes to

7   the cap table; were you not?

8   A     Yes.

9   Q     And were you not responsible for some of the cap table

10  changes; you yourself, sir?

11  A     I don't recall, but it's possible.  I'm human, but I

12  don't think so.  It's possible, yes.

13  Q     The reverse mortgage occurred on December 12th, 2012; did

14  it not?

15  A     Okay.

16  Q     After the reverse merger, after, did you not make changes

17  to the cap table yourself?

18  A     I must have.  I don't recall.

19  Q     Did you not make changes to the cap table with Jackson Su

20  without any involvement from Evan Greebel?

21          MS. SMITH:  Objection.  Asked and answered.

22          THE COURT:  Overruled.

23  Q     Sir?

24  A     Oh, it's possible.  Yeah, it's possible.

25  Q     Did you not change around the numbers of some of the

MASSELLA - CROSS - BRODSKY                    3414

1   recipients who were supposed to own shares of the company

2   without talking to any of the recipients, these stockholders?

3   A    That would be under the direction of Jackson Su or

4   somebody else.  I would not make changes without direction

5   from somebody else.

6   Q    So you, sir, decided with Jackson Su to make changes to

7   the cap table based on verbal -- verbal, not written -- but

8   verbal communication from Mr. Su as to what certain people

9   should own under the cap table, correct?

10  A    As I said, I don't recall, and I don't know if it was

11  verbal or written.

12         And if I did do it, those are management's financial

13  statements and it's -- and I'm following the direction of

14  management -- what management wants for their changes.

15         THE COURT:  When you say "management," you mean of

16  Retrophin?

17         THE WITNESS:  Yes, of Retrophin.

18  BY MR. BRODSKY:

19  Q    Let's put up Government Exhibit 111-15.

20         (Exhibit published.)

21         Remember you were shown this document, sir?  Marek

22  Biestek transfer of 4,167 shares, correct, to Martin Shkreli?

23  A    Yes.

24  Q    You know, sir, that at the time of the reverse merger on

25  December 12th, 2016, Marek Biestek still had 4,167 shares,

MASSELLA – CROSS – BRODSKY                    3415

1    correct?

2    A     I don't know that right now.

3    Q     Sir, you testified that this stock transfer you thought

4    was unusual, correct?

5    A     Yes.

6    Q     Is it not the case that you were well aware that this is

7    4,167 shares that Mr. Shkreli received here were transferred

8    back to Marek Biestek by the time of the reverse merger?

9    A     I did not recall, clearly.

10   Q     On direct examination were you shown a single document

11   relating to at the time the reverse merger, whether these

12   4,167 shares were in Marek Biestek's position, or

13   Mr. Shkreli's or somebody else's?

14   A     Repeat the question?

15   Q     Were you shown a single cap table, a capitalization

16   table, at the time of the reverse merger showing whether or

17   not Marek Biestek had possession of those 4,167 shares at the

18   time of the reverse merger, or whether it was in Mr. Shkreli's

19   possession or somebody else's?

20   A     They weren't in the cap table, the shares could have

21   combined with other shares, and at this time I cannot recall.

22   Q     Now, is it not the case, sir, that you met the

23   prosecution on or about November 24th, 2015, correct?

24   A     November?

25   Q     Thanksgiving 2015, sir.

MASSELLA - CROSS - BRODSKY                     3416

1   A    2015?

2   Q    Yes.  You met with the prosecution.

3   A    Okay.  Potentially.  I don't recall.  I said I met with

4   them after -- after Retrophin.

5   Q    Do you remember meeting with them in November of 2015?

6   A    No, I don't.

7           But I know I've had conversations with them

8   subsequent to Retrophin.

9   Q    So since -- in the last six months, how many times --

10  well, withdrawn.

11          Since November of 2015, how many times have you met

12  with the prosecution?

13  A    I would estimate six.

14  Q    And at each meeting, sir, isn't the case that we

15  requested the opportunity to meet with you and you turned us

16  down, correct?

17  A    And you spoke to my attorney, through my attorney.

18  Q    And you turned us down, correct?  You refused to meet

19  with us?

20  A    No, I spoke my legal counsel and went with his

21  recommendations.  I didn't refuse anything.

22  Q    So you went with your attorney's recommendation, and

23  based on that recommendation, turned us down for a meeting,

24  correct?

25          MS. SMITH:  Objection, Your Honor.

MASSELLA - CROSS - BRODSKY                3417

1          THE COURT:  I will overrule that objection.

2          You can answer the question.

3          THE WITNESS:  Repeat the question?  Sorry.

4          MR. BRODSKY:  Would you mind reading that back?

5          (Whereupon, the record was read.)

6     A    Correct.

7     Q    When you met with the prosecution, there was a meeting in

8     which the FBI was taking notes.

9          Do you recall that meeting?

10    A    There was -- yes.

11    Q    It was about three years ago, correct?

12    A    The initial meeting?

13    Q    Yes.

14    A    Okay, yes.

15    Q    Is it not the case that you did not tell the FBI at all

16    about any conversation at that meeting over two years ago --

17    withdrawn.

18         Two years ago when you met with the FBI, you

19    discussed this stock transfer -- can we put it up again,

20    Mr. Carter -- from Marek Biestek to Mr. Shkreli?

21         Do you remember that?

22    A    Not directly, but it's potentially -- a lot of documents

23    were coming in front of me.

24    Q    You agree that you didn't say a single thing in that

25    meeting with the FBI about having a conversation with Evan

MASSELLA - CROSS - BRODSKY                    3418

1   Greebel relating to this stock transfer?

2   A    Definitely possible.

3   Q    And isn't it the case, sir, that it's only within the

4   last few months that you have come up with this conversation?

5           MS. SMITH:  Objection.

6           THE COURT:  Sustained.  Rephrase.

7   Q    Sir, isn't it the case that it's only been in the last

8   few months that you have remembered this conversation?

9   A    I don't remember if it's in the last few months, but it

10  was not just this one, it was the group of transfers at that

11  time.  Not this one specifically.

12  Q    So in the last few months is the first time you've ever

13  described conversations with Evan Greebel relating to these

14  transfers, these transfers being the ones on November 29th,

15  2012 that were emailed on November 29th, 2012 and emailed on

16  December 3rd, 2012, correct?

17          MS. SMITH:  Objection.

18          THE COURT:  Rephrase.

19  Q    Just in the last few months it's the first time you ever

20  revealed to the FBI that you had conversations with Evan

21  Greebel relating to the stock transfer that was emailed on

22  November 29th, 2012 by Jackson Su, and the stock transfers

23  that were emailed on December 3rd, 2012 by Jackson Su; is that

24  right?

25  A    That's possible.  Yes.

1   Q    Let me go through a few examples, sir, of some of the

2   changes that you made.  Let's take 1110-22 for identification

3   and 1110-23 for identification.

4            THE COURT:  Mr. Brodsky, I'm thinking this might be

5   a good time, since you're going into a new set of exhibits and

6   a new line of questioning.

7            MR. BRODSKY:  Your Honor, this will take five

8   minutes, and then I think we're good.

9            THE COURT:  All right, Government's Exhibit 110-22

10  and 110-23.

11           MS. SMITH:  Defense.

12           THE COURT:  Oh, I'm sorry.  Defense.

13  BY MR. BRODSKY:

14  Q    I'm showing you two exhibits, Defense Exhibit 1110-22 for

15  identification.

16           Mr. Massella, it's dated December 16th, 2012 from

17  Jackson Su to Corey Massella at 1:19 p.m.

18           And then DX1110-23 from Corey Massella to Jackson

19  Su, the same date, approximately an hour and a few minutes

20  later, at 3:33 p.m.

21           Take a minute and let me know if you recognize it.

22  A    Yes, that looks like an email from me.

23  Q    Do you remember this date, December 16th, 2012,

24  exchanging multiple communications with Mr. Su?

25  A    Not specifically, but I'm sure I did.

MASELLA - CROSS - BRODSKY                    3420

1   CROSS-EXAMINATION (Continued)

2            MR. BRODSKY:  Your Honor we offer 110-22 and 110-23.

3            MS. SMITH:   No objection, Your Honor.

4            THE COURT:  We receive 110-22 and 110-23.

5            (Government Exhibit 110-22, was received in

6   evidence.)

7            (Government Exhibit 110-23, was received in

8   evidence.)

9   Q    So now, sir, you agree with me, sir, that this cap table

10  that you are -- that Jackson Su is sending to you, the first

11  110-22, occurs after the reverse merger is over, correct?

12  A    If you say that's the date, yeah, sure.

13  Q    And then attached to it, do you not see if we put it up,

14  that Andrew Vaino, under the common stock, free money vested

15  and unvested at 18,333 shares; do you see that?

16  A    Yes.  Yes, I do.

17  Q    And do you see George Wong, Number 6, having 24,896

18  shares?

19  A    Yes.

20  Q    When you e-mail back the cap table to Mr. Su, you changed

21  those numbers, sir, didn't you?  If you go to Defense

22  Exhibit 122-23, tell me, sir, are those numbers different?

23  A    Yes, they are.

24  Q    Does it refresh your recollection that after the reverse

25  merger you and Jackson Su decided to change numbers on the cap

MASELLA - CROSS - BRODSKY                    3421

1   table?

2   A    No.   That's when Su instructing me to change the numbers.

3   I would not electively change the numbers.

4   Q    Sir, is Evan Greebel on either one of those communication

5   communications?

6   A    Absolutely not.

7   Q    Let me draw your attention to where it says Marek

8   Biestek, sir.  Do you see that line, Number 17?

9            THE COURT:  Is this 110-22?

10           MR. BRODSKY:  Yes.

11  BY MR. BRODSKY:

12  Q    And if you scroll over to Column D, Vested, how many

13  shares are listed there, sir?

14  A    4,167.

15  Q    Is that exactly the same number that Marek Biestek

16  purportedly, allegedly transferred to Mr. Shkreli on

17  November 29th, 2012?

18  A    It's the same number.

19  Q    And what is vested mean?  It means actually owned,

20  correct?

21  A    Correct.

22  Q    So do you not agree, sir, that whatever occurred on

23  November 29th, or whatever was transferred from Marek Biestek

24  to Mr. Shkreli on November 29th, did not take place by the

25  time of the reverse merger, correct?

PROCEEDINGS                                    3422

1           MS. SMITH:  Objection, Your Honor.

2           THE COURT:  You will have to rephrase that question.

3    I'm sorry.

4    Q    Do you think it's a coincidence, Mr. Massella, that after

5    the reverse merger on December 16th, 2012, Marek Biestek under

6    the cap table that you're exchanging with Jackson Su has the

7    exact number, 4,167 vested shares that are in the stock

8    transfer agreement on November the 29th, 2012?

9    A    It's a -- it's coincidence, yes.

10          MR. BRODSKY:  Your Honor, this is good breaking

11   point.

12          THE COURT:  All right.  Members of the jury, please

13   don't discuss the case.  Tomorrow is a court nontrial date.

14   We would like you back on Monday.  Please do not do any

15   research or discuss the case.  Please keep on open mind.

16   Thank you for your attention.  Have a nice weekend.

17          THE JURY:  Thank you.

18          THE COURT:  Good night.  Please step down, sir.

19          (The witness exits the stand.)

20          (Pause in proceedings.)

21          THE COURT:  Should I ask Mr. Massella to step out?

22   He's excused, right?

23          MS. SMITH:  Yes, come back on Tuesday morning.

24          THE COURT:  Tuesday, yes.  You are to be back on

25   Tuesday, I'm sorry.

PROCEEDINGS                                          3423

1              All right.  So if the parties are going to pursue

2    this battle about business records again, I need submissions

3    by 8:00 o'clock from both sides tonight, and if I need

4    replies, I will let you know.  You should probably describe

5    with some particularity the documents or the type of documents

6    that are in dispute about business records because I think

7    some may be and some may not be.  But I do not want to decide

8    these piecemeal.  And if you want to work something out given

9    that you have had each other's exhibit lists for quite some

10   time, I welcome that.  But if you can't do it, then I will

11   hear from you all at 8:00.

12              Is there anything else I should address?

13              (No audible response.)

14              THE COURT:  No?  All right.  Thank you.

15              (Matter adjourned to Tuesday, November 7, 2017 at

16   9:00 a.m.)

17

18

19

20

21

22

23

24

25

3424

```
1                          I N D E X

2    WITNESS                                      PAGE

3    SCHUYLER MARSHALL

4    CROSS-EXAMINATION     BY MR. CHAN        3128
     CROSS-EXAMINATION     BY MR. CHAN        3145
5    REDIRECT EXAMINATION  BY MR. KESSLER     3161
     REDIRECT EXAMINATION  BY MR. CHAN        3162
6
     WENDY SPAULDING
7
     DIRECT EXAMINATION    BY MS. SMITH       3178
8    CROSS-EXAMINATION     BY MR. CHAN        3243

9    COREY MASSELLA

10   DIRECT EXAMINATION    BY MS. SMITH       3265
     CROSS-EXAMINATION     BY MR. BRODSKY     3378
11
                          I N D E X
12                        EXHIBITS

13   GOVERNMENT                  PAGE
     "900" records              3178
14   1000                       3178
     summary reports            3185
15   113-28                     3272
     111-4                      3281
16   113-26                     3288
     113-1                      3291
17   111-12                     3295
     111-14                     3299
18   111-14                     3304
     111-20                     3304
19   111-15                     3307
     113-3                      3307
20   111-26                     3333
     111-27                     3333
21   111-28                     3333
     113-7                      3348
22   113-6                      3352
     113-10                     3356
23   113-17                     3358
     113-18                     3358
24   113-12                     3366
     113-15                     3371
25   110-22                     3420
     110-23                     3420
```

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*