JMK:AES/DCP/DKK
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                    15 CR 637 (KAM)

EVAN GREEBEL,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS FOR
JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL</u>

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ALIXANDRA E. SMITH
DAVID C. PITLUCK
DAVID K. KESSLER
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

I.  The Defendant's Rule 29 Motion Should Be Denied IN ITS ENTIRETY ........................ 3

    A.  Applicable Law ................................................................................................ 3

    B.  The Defendant's Rule 29 Motion Should Be Denied with Respect
        to Count Seven ................................................................................................ 5

        1.  There Was Sufficient Evidence That the Settlement Agreements Were in
            Furtherance of the Conspiracy Charged in Count Seven ................................. 5

        2.  There Was Sufficient Evidence That The Consulting Agreements Were In
            Furtherance of the Conspiracy Charged in Count Seven ............................... 19

        3.  There Was Sufficient Evidence That the Defendant Acted With Intent to
            Defraud Retrophin In Connection with Count Seven..................................... 29

        4.  The Government Introduced Evidence of Other Co-Conspirators Although
            Not Required to Do So ................................................................................. 34

        5.  There Was Extensive Evidence of a Criminal Agreement between the
            Defendant, Shkreli, and Others.................................................................... 36

    C.  The Defendant's Rule 29 Motion Should Be Denied With Respect
        to Count Eight................................................................................................ 40

        1.  Existence of the Conspiracy ........................................................................ 40

        2.  The Defendant's Participation in the Conspiracy........................................... 46

II.  The Defendant's Rule 33 Motion Should Be Denied ........................................... 53

    A.  The Jury Instructions Were not Erroneous........................................................ 53

    B.  The Government Complied with its *Brady* and *Giglio* Obligations...................... 57

        1.  Applicable Law............................................................................................ 58

        2.  Argument .................................................................................................... 58

    C.  The Court Properly Precluded Rosenfeld's Fabricated Testimony...................... 72

    D.  The Superseding Indictment Was Not Constructively Amended ........................ 75

        1.  Applicable Law............................................................................................ 75

        2.  Argument .................................................................................................... 76

E.   The Defendant's Allegations of Juror Misconduct Are Baseless.......................... 79

   1.   Relevant Background...................................................................... 80

   2.   Mr. Sankar's Affidavit Should Be Viewed Skeptically .................................. 83

   3.   Jurors' Alleged Statements During Trial Do Not Provide A Basis To Vacate the Trial Verdict.................................................................... 85

   4.   Jurors' Alleged Statements To Mr. Sankar During Jury Deliberations Do Not Provide A Basis To Vacate the Trial Verdict ..................................... 87

F.   The Court Did Not Err in Admitting Statements from Panoff ............................. 91

   1.   The Identified Exhibits Were Not Admitted Pursuant to FRE 801(d)(2)(E) .. 92

   2.   The Court's Ruling That Panoff Was a Co-Conspirator Is Supported by the Trial Record ...................................................................... 95

G.   The Court's Evidentiary Rulings Were Not Erroneous....................................... 103

   1.   "Consciousness of Innocence" ...................................................... 104

   2.   Threats Related to Pierotti ........................................................... 105

   3.   Evidence Related to MSMB Capital and MSMB Healthcare ...................... 107

H.   Jackson Su's Testimony .................................................................... 108

I.   The Government Proved Venue by a Preponderance of the Evidence for Both Counts .................................................................................. 110

CONCLUSION.................................................................................... 112

<u>PRELIMINARY STATEMENT</u>

As the jury found, the evidence presented at the eleven-week trial in this case proved beyond a reasonable doubt that the defendant Evan Greebel is guilty of both Counts Seven and Eight of the superseding indictment.  The defendant now asks this Court to overturn that verdict pursuant to Rule 29 of the Federal Rules of Criminal Procedure, on the grounds that the government's case was insufficient as a matter of law to prove the defendant's guilt, and pursuant to Rule 33, on the grounds that the trial was "unfair."  These arguments are meritless.  The defendant sought a separate trial from his co-defendant Martin Shkreli.  He got one.  He litigated vigorously, as was his absolute right to do.  And he was convicted.  There was nothing insufficient about the evidence, and nothing "unfair" about the trial.  The defendant's motions should be denied.

<u>First</u>, the defendant contends that there is insufficient evidence in the government's case to support the jury's verdict as to both Counts Seven and Eight.  His arguments ignore the majority of the evidence offered at trial in the government's case that established his guilt, and focus instead on a narrow selection of evidence that the defendant strains to construe in his favor.  But on a Rule 29 motion, a court is obliged to view the evidence in its totality and in the light most favorable to the prosecution.  As the evidence taken as a whole clearly establishes that there was sufficient evidence to convict the defendant of both conspiracies, the defendant cannot meet his heavy burden.

<u>Second</u>, the defendant complains that the trial was "unfair" because of a series of evidentiary and other legal rulings made by this Court.  But a Rule 33 motion—which is meant to address a "manifest injustice" such as the conviction of an innocent man—is not the vehicle to seek reconsideration of these discretionary decisions that the defendant believes to have been "unfair."  And even if it were, the defendant offers no reason to reconsider anything—no new facts, no new

1

legal developments.  Even the defendant's allegation about newly discovered juror misconduct simply ignores the relevant law and a previous hearing on the matter.

The defendant's Rule 29 and Rule 33 motions suffer from the same basic flaws: They largely ignore what happened at the trial, they fail to acknowledge prior adverse rulings, and they choose not to grapple with the extensive evidence showing the defendant's guilt.  Certainly they provide no basis for overturning the jury's verdict.

<u>ARGUMENT</u>

I.    <u>THE DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED IN ITS ENTIRETY</u>

The defendant raises various challenges to his conviction on both Count Seven and Count Eight.  These arguments are made largely by ignoring the evidence offered at trial in the government's case that established his guilt.[1]  As discussed below, that evidence was more than sufficient to allow a reasonable jury to find him guilty beyond a reasonable doubt on both counts.

A.    <u>Applicable Law</u>

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  <u>See</u> Fed. R. Crim. P. 29(c).  As the Second Circuit has observed, to upset a jury verdict, the defendant bears a heavy burden:

> In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden.  In considering such a challenge, we must credit every inference that could have been drawn in the government's favor and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt.  We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.  Pieces of evidence must be viewed not in isolation but in conjunction, and the conviction must be

---

[1] At various points in his Rule 29 motion, the defendant relies upon evidence introduced during his case.  (<u>See, e.g.</u>, Def. Br. at 13 (discussing testimony of defense witness Alan Johnson); <u>id.</u> at 26-27 (discussing testimony of defense witness Craig Lewis)).  However, the Federal Rules of Criminal Procedure specifically contemplate that, if a district court reserves judgment on a Rule 29 Motion, that motion should be decided based only on evidence entered at the time the ruling was reserved.  <u>See</u> Fed. R. Crim. P. 29(b); <u>see also</u> <u>United States v. Moore</u>, 504 F.3d 1345, 1346 (11th Cir. 2007) (noting that Rule 29(b) "provides that if the district court reserves ruling on a motion for judgment of acquittal, the court must decide the motion on the basis of the evidence at the time the ruling was reserved.").  Accordingly, the government is not relying on evidence presented during the defense case for purposes of responding to the Rule 29 motion.  To the extent that the government cites defense exhibits (denoted as "DX") in support of its argument, such exhibits were introduced during the government's case-in-chief.

> upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

United States v. Reifler, 446 F.3d 65, 94-95 (2d Cir. 2006) (citations and quotation marks omitted); United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) ("It is well established that a defendant challenging the sufficiency of the evidence underlying a conviction bears a very heavy burden.") (internal citations omitted).  In assessing sufficiency, a court is "obliged to view the evidence in its totality and in the light most favorable to the prosecution."  United States v. Florez, 447 F.3d 145, 154-55 (2d Cir. 2006).

In resolving a Rule 29 motion, a court "must be careful to avoid usurping the role of the jury."  United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal citation omitted); see also Florez, 447 F.3d at 154-55 (in evaluating evidence in connection with a Rule 29 motion, courts must be "mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court"); United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments."); United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 3229291, at *16 (E.D.N.Y. Aug. 6, 2012).  The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."  United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).

In addition, as the Second Circuit has made clear, trial courts may grant a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (district court

may grant a Rule 29 motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" Guadagna, 183 F.3d at 129.

Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir.2004)); see also United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) ("A jury may convict on circumstantial evidence alone."); accord United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003); United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995). When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); see also Rosenthal, 9 F.3d at 1024 ("The government need not eliminate every theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction."); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).

B.   The Defendant's Rule 29 Motion Should Be Denied with Respect to Count Seven

1.   There Was Sufficient Evidence That the Settlement Agreements Were in Furtherance of the Conspiracy Charged in Count Seven

The defendant contends that there was not sufficient evidence for any reasonable juror to find that the settlement agreements between Retrophin and defrauded MSMB investors "were executed in furtherance" of the wire fraud conspiracy in Count Seven. (Def. Br. at 7). Specifically, the defendant contends that because "the assets of [the] MSMB [entities] and Retrophin were commingled, and that several MSMB investors threatened to sue [the] MSMB

5

[entities], Retrophin or [] Shkreli, no reasonable jury could rely on the agreements as evidence" of the defendant's guilt on Count Seven.  (Id.).  In advancing this argument, the defendant reprises the primary argument his counsel made during summation regarding the settlement agreements:

> Because if Evan Greebel is outside corporate attorney to Retrophin reasonably believed that these people are going to file lawsuits at Retrophin at a time that Retrophin -- yes, it raised $10 million, yes, [on] it's way its to potential success in February 2013 -- but in March, April, May of 2013 when people threatened lawsuits, if any of those lawsuits or collectively those lawsuits had been filed and destroyed Retrophin, it wouldn't possibly exist today.
>
> That's a reasonable thing for an outside lawyer to say. We better settle this. We better settle these now and quickly. That makes sense. If you believe that, if you come to that determination then Mr. Greebel is not guilty, because he acted in the best interest of Retrophin. All of that is true. There is a mountain evidence that Retrophin was vulnerable to a lawsuit.

(Tr. 10472-73).

In returning a guilty verdict on Count Seven, the jury clearly rejected the inferences that the defendant sought to have them draw and instead found—as clearly supported by the trial record—that the settlement agreements were utilized by Shkreli, Greebel and others to steal money from Retrophin for Shkreli's personal benefit.  Moreover, even if the defendant's alternate explanation for his actions was plausible—and for the reasons set forth below, it is not—when the evidence is viewed in its totality and in the light most favorable to the prosecution as required by law, see Florez, 447 F.3d at 154-55, it is plainly sufficient for the jury to find that the settlement agreements were in furtherance of the wire fraud conspiracy charged in Count Seven.

As an initial matter, the settlement agreements should be viewed in the context of all of the evidence relevant to the defendant's involvement in the conspiracy, and not just the narrow subset of evidence the defendant choose to focus on in advancing his argument, which was limited to the terms of the settlement agreements, the defrauded MSMB investors' purported litigation

6

threats and evidence of "commingling."  (Def. Br. at 7-11).  The totality of the relevant evidence

starts with the information that was known to the defendant, and the actions he took to further the

conspiracy, <u>prior</u> to the negotiation of the settlement agreements.  That includes the defendant's:

- knowledge of the fact that MSMB Capital never appeared on any of the Retrophin capitalization tables that he either maintained or received prior to December 2012, and had not in fact invested in Retrophin (<u>see, e.g.</u>, GXs 111-4, 111-12, 445);

- role in the creation of the backdated interest in Retrophin for MSMB Capital in November and December of 2012 (GXs 111-15, 111-17, 111-18, 111-19, 111-26-A; Tr. 3313, 3347);

- role in filing a Form 13-D with the U.S. Securities and Exchange Commission ("SEC") that he knew falsely stated that MSMB Capital had invested in Retrophin when it had not (GXs 503, 695 962);

- knowledge of Shkreli's attempts to recruit new investors to Retrophin in order to get money that Shkreli could then use to pay the Merrill Lynch settlement, which was the obligation of Shkreli and MSMB Capital (GXs 510, 513, 687);

- knowledge of the investigation by SEC into Shkreli's fraud at the MSMB entities (<u>see, e.g.</u>, GXs 685, 111-45);

- knowledge that the MSMB entities had no money, as they were unable to pay approximately $600,000 in outstanding bills to the defendant's law firm, Katten Muchin Rosenman LLP ("Katten"), so that the money for those bills had to be taken from Retrophin (GXs 113-43, 113-44, 114-16, 510); and

- discussions with Shkreli about how Shkreli could pull additional money out of Retrophin by telling Retrophin's accountants that Shkreli's salary in his employment agreement was a "misprint" and was in fact much higher than stated.  (GXs 113-11, 113-12, 535, 537).

    In addition, it is crucial to consider the evidence that, at the time that the defendant

participated in drafting, negotiating and finalizing the settlement agreements,[2] the defendant was

_____

    [2] The defendant contends that the details of the settlement agreements were negotiated by the investors "and <u>Mr. Shkreli alone</u>."  (Def. Br. at 11).  Even if true, that would not undermine the evidence of the defendant's guilt.  Moreover, although Shkreli appears to have set the ultimate terms of those agreements, the defendant was deeply involved in negotiations with many MSMB investors, often acting as a go-between for Shkreli.  For example, the defendant took it upon himself to edit the draft the settlement agreement with Lindsay Rosenwald to remove references to Shkreli's

aware that Shkreli had defrauded the investors in MSMB Capital and MSMB Healthcare.  For example, as of February 19, 2013, the defendant knew from MSMB Capital investor Lindsay Rosenwald that Shkreli was accused of "recently liquidat[ing] and convert[ing] Dr. Rosenwald's investment in MSMB Capital into shares of Retrophin stock without Dr. Rosenwald's authority or consent." (GXs 100-16, 520).  When he received that information, as detailed above, the defendant already knew that MSMB Capital had never invested in Retrophin; that the shares that MSMB Capital investors received in Retrophin were limited to the shares created by the backdated interest; and that he had helped Shkreli draft a Form 13-D filing that falsely stated that the MSMB Capital interest in Retrophin had been purchased with "working capital."  Consequently, the defendant knew <u>both</u> that Rosenwald was accusing Shkreli of converting his interest in MSMB Capital without his permission, <u>and</u> that what had in fact happened was that Rosenwald received shares of MSMB Capital only because of the backdated interest, because MSMB Capital had no money.

Similarly, the defendant knew that MSMB Healthcare investors had been defrauded, because those investors explained how Shkreli had provided them with stock instead of cash, and in an amount far less than promised based on his prior representations about their hedge fund investments.  For example, Richard Kocher advised that he received Retrophin stock that "is not tradable and is worth a quarter of what I am owed," and attached a copy of the wind-down email from September 2012; Michael Lavelle advised that he was "not given an option to debate transfer from MSMB and want to understand it"; and David Geller told the defendant directly on a series of

---

misconduct (GX 100-23); the defendant spoke on multiple occasions with David Geller about the timing of when his settlement would get paid, including giving Geller explanations for why payment was delayed, "talk[ing] him off the ledge" at Shkreli's direction and offering an additional "sweetener" on Shkreli's behalf (GX 106-28, 599); and the defendant discussed various options for settlement terms with Richard Kocher's attorney and then relayed them to Shkreli (GX 575).

phone calls that he was to receive a settlement agreement based on the conversion of his investment in MSMB Healthcare to Retrophin stock, and that he was concerned he was getting "scammed" by Shkreli.  (GXs 533, 108-10; Tr. 2909-11).

Against this evidentiary background, largely ignored in the Rule 29 motion, the defendant's actions in forcing Retrophin to enter into the settlement agreements in order to repay the defrauded MSMB investors, and then taking steps to conceal those actions, were clearly part of (and evidence of) the conspiracy charged in Count Seven.

First, the defendant knew that Shkreli had the ability to repay the defrauded MSMB investors if he chose to do so.  The evidence showed that Shkreli had 2,577,755 restricted shares of Retrophin stock as of the time of the reverse merger in December 2012, and continued to hold all of those shares in January 2014.  (GX 115-1).  However, despite the fact that Shkreli's frauds caused the investors' losses and were the reason why they sought settlement agreements, Shkreli and the defendant decided to use none of Shkreli's own shares or other personal assets to repay the investors, choosing instead to steal those money and shares from Retrophin.[3]  An attorney acting in Retrophin's best interests, as the defendant was duty-bound to do, would never have permitted Retrophin to repay debts for which Retrophin was not responsible while knowing that the responsible person—here, Shkreli—had the ability to do so.

Second, the defendant's behavior during the conspiracy was entirely inconsistent with the idea that he and Shkreli entered into the settlement agreements in order to "help" Retrophin by protecting it from litigation.  While there is no dispute that one investor, Rosenwald, did

---

[3] With respect to other assets, for example, the trial evidence showed that the defendant knew Shkreli had transferred hundreds of thousands of dollars from Retrophin to  himself and MSMB Healthcare in the spring of 2013 to pay other debts (GX 113-17)).

9

explicitly threaten to sue Retrophin (GX 100-16), or that certain other MSMB investors suggested that they might pursue legal action against Shkreli and/or the MSMB entities if Shkreli continued to stonewall them,[4] the defendant's actions make it clear that he did not cause Retrophin to enter into the settlement agreements to ensure that Retrophin was protected from anticipated legal threats.[5] As an initial matter, despite ostensibly serving as Retrophin's counsel, the defendant did

---

[4] The defendant's list of MSMB investors who ostensibly "threatened severe consequences—litigation and otherwise" as a result of their losses is misleading. (Def. Br. at 9-10). First, the list claims to name "only a few" of the investors who allegedly made such threats, but in fact includes all of the investors who received settlement agreements. There is no evidence that other investors made such threats. Second, the list suggests that MSMB Capital investor Sarah Hassan threatened to sue in connection with her MSMB Capital investment. To the contrary, Hassan testified that she never threatened to sue Shkreli, the MSMB entities or Retrophin in connection with her MSMB Capital investment, that no discussion of such a lawsuit was raised in any conversation with Shkreli and/or the defendant, and that she was surprised to receive a settlement agreement at all as opposed to a simple return of her investment as she had requested. (Tr. 1504, 1519, 1627). Third, the list suggests that MSMB Healthcare investor David Geller threatened to sue prior to receiving a settlement agreement. While David Geller did say in an email he would "take it to the next level" to Shkreli prior to signing a settlement agreement (GX 106-20), he did not threaten to sue anyone during pre-settlement discussions with both Shkreli and the defendant. (Tr. 2909-10). He only made such a threat to the defendant in July 2013 (GX 106-28), more than a month after his settlement agreement was signed. (GX 55). Moreover, that July 2013 email was not his "first direct communication" with the defendant (Def. Br. at 10)—to the contrary, David Geller and the defendant had spoken by phone about David Geller's concerns that Shkreli had "scammed" him with respect to MSMB Healthcare in April 2013, prior to signing the settlement agreement. (Tr. 2909-10). Finally, the list includes an email that Shkreli sent to Marc Panoff (Retrophin's CFO and not an investor) in August 2013 in which Shkreli stated that "investors are ready to sue Retrophin for reasonable claims." (GX 621). But Shkreli's email was written as a post-hoc justification for the already-finalized settlement agreements after Panoff expressed concerns about the pressure he was getting from the defendant and Shkreli to use Retrophin assets to pay for those agreements.

[5] The defendant argues that it was reasonable for him to believe that the MSMB investors might sue Retrophin because the assets of the MSMB entities and Retrophin were "commingled." (Def. Br. at 8). There is no dispute that MSMB Healthcare invested money into Retrophin, that the entities shared office space, or that certain individuals were simultaneously employed at Retrophin and one or more of the MSMB entities; there is also no dispute that investors, due largely to Shkreli's lies, may have been confused about the relationship between the entities. However, whether the defrauded MSMB investors might have or could have sued Retrophin is not dispositive of the question of the defendant's intent.

10

not negotiate with the MSMB investors on behalf of Retrophin in order to get the "best deal" for Retrophin, nor did he always ensure that Retrophin was in fact protected from litigation.  As the defendant himself concedes, the terms of the settlement agreements were dictated by Shkreli's prior promises to investors in connection with the MSMB funds.  (See Def. Br. at 11 (noting that the terms were agreed-upon between Shkreli and the investors)).  And in the case of the settlement with MSMB Healthcare investor Spencer Spielberg, $25,000 was wired from Retrophin to repay Spielberg for his MSMB Healthcare investment a month and a half before any agreement protecting Retrophin from litigation was entered into.  (Compare GX 910-E (payment on March 14, 2013), with GX 53 (agreement signed on April 30, 2013)).  In addition, the defendant did not institute any kind of litigation hold at Retrophin related to the investors' alleged litigation threats (Tr. 1853), although he had done so previously in connection with his work at Retrophin (Tr. 1259).  Nor was there any evidence that the defendant conducted any legal analysis to justify Retrophin's payment of the settlement agreements.[6]

        More significantly, had the defendant's intention been to help Retrophin by protecting it from costly litigation, he would have immediately alerted the company's Board of Directors and its auditors (Marcum LLP) to such allegedly serious, imminent threats of litigation, as well as the manner in which those threats had been resolved in the company's favor.  Instead, prior to the discovery of the settlement agreements by Marcum in July 2013, the defendant actively

---

[6] The Katten witnesses who were called by the defendant during his case testified that the defendant did not even tell them that Retrophin had entered into settlement agreements with MSMB investors.  Those Katten witnesses included Howard Cotton, a litigation partner who billed significant time to Retrophin matters (Tr. 8694); Michael Rosensaft, a white collar partner who was working at the same time as the settlement agreements were being negotiated to defend Shkreli from an SEC probe looking into his frauds at the MSMB entities (Tr. 8730); and Howard Jacobs, a litigation partner who served as a mentor to the defendant (Tr. 8345).

concealed the settlement agreements from Marcum, Retrophin's Board of Directors and the investing public: he never told anyone that Retrophin had been threatened with litigation by MSMB investors, or that he and Shkreli had resolved those litigation threats and protected the company via the settlement agreements.  To the contrary, in a May 31, 2013 letter to Marcum, the defendant represented that Katten had not been engaged with respect to overtly threatened or pending litigation that existed either at the Audit Date (December 31, 2012), or any time between that date and May 31, 2013.  (GX 124-2).

With respect to Retrophin's Board, the defendant did not provide litigation updates regarding either threatened or settled litigation with MSMB investors at Retrophin Board meetings in 2013.  (Tr. 1852-53, 1867, 4418-19, 4529).  Despite a mention of "MSMB settlements" in the cash flow sheet distributed to Retrophin's Board of Directors on July 2, 2013—after all but one of the settlement agreements had been finalized—those agreements were not disclosed to, described to or discussed with the Board members.  (GX 239; Tr. 1866-67, Tr. 4412).  The defendant and Shkreli admitted as much in an email conversation in August 2013.  (See GX 618 ("There were serious faults with the agreements including lack of board approval.")).  Nor was the investing public made aware of the settlement agreements, because none of the agreements were disclosed in the "subsequent events" section of Retrophin's 2012 10-K filed on June 13, 2013.  (DX 110-14).[7]

---

[7] The defendant took other steps to conceal the actual settlement agreement documents as well.  For example, in connection with providing Shkreli with a signed copy of the Rosenwald settlement agreement, the defendant told Shkreli that he "wasn't sure who else knows about it so I did not cc your assistants."  (GX 550).  In connection with providing payment information about money sent from Retrophin to Spielberg—again, before Spielberg's settlement agreement was signed—Shkreli's sister told the defendant that "no one else needed this information, as far as I know," and the defendant responded "Correct."  (GX 567).

Third, in the context of discussing the settlement agreements with the MSMB investors, the defendant helped Shkreli provide false information to the investors and was aware that Shkreli was providing false information and failed to correct it. For example, the defendant falsely told Spielberg that "the company has no way to give you unrestricted stock" on April 30, 2013, at the same time that he and Shkreli had recently given unrestricted Fearnow shares to Rosenwald and were planning to give some to Kocher. (GXs 572, 578). The defendant also falsely told David Geller that Shkreli had not "scammed" him with respect to his MSMB Healthcare investment, and that "[Shkreli] was working on a payment plan with him," despite knowing that the representations Shkreli had made to David Geller regarding MSMB Healthcare were false, and that payments were being made from Retrophin, not from Shkreli. (Tr. 2910-11). And the defendant said nothing when Shkreli told Lavelle on March 31, 2013, that he was "virtually the only investor I am forwarding to our counsel," when in fact multiple defrauded MSMB investors had been referred by Shkreli to the defendant at that time. (GX 108-10).

All of this conduct—which alone constitutes sufficient evidence that the defendant worked with Shkreli and others to carry out the conspiracy charged in Count Seven—took place before the settlement agreements were discovered by Marcum in July 2013. (Tr. 5381-82). The defendant's conduct after the discovery of the settlement agreements similarly demonstrates the defendant's participation in that conspiracy.

First, the defendant and Shkreli's initial reaction to Marcum's discovery is telling. Instead of acknowledging that the agreements had not been disclosed (or approved) and agreeing to do so, as one might have expected him to do if the failure had been inadvertent, both the defendant and Shkreli strenuously resisted making public disclosure or getting Board approval. For example, when the issue of disclosure was raised, Shkreli told the defendant and CFO Marc Panoff: "FIX

13

THE FUCKING ISSUE.  THERE IS NO FUCKING ISSUE.  HOW MANY TIMES DO WE HAVE TO TALK ABOUT THIS."  (GX 608).  The defendant himself pushed back against disclosure of the agreements on a telephone call with Marcum.  (Tr. 5403-04).  And, in discussions where Panoff expressed some initial hesitation in going along with Shkreli and the defendant regarding the settlement agreements, Panoff indicated that, if they were going to "force him to pay [the settlement agreements] through Retrophin," he was "going to have to go to the Board or resign." (GX 621).  That is evidence that of an effort not bring the issue to the Board.  (That Panoff never in fact went to the Board and yet the settlement agreements were in fact paid "through Retrophin" is further evidence of Panoff's involvement in the conspiracy).

Second, once it became clear that Marcum was going to require some sort of disclosure, the defendant drafted a memorandum (the "Control Memo") at Marcum's request.  (GX 609-A).  In the Control Memo, the defendant was forced to admit what he had known all along— that the obligation to repay the MSMB investors was solely Shkreli's and/or the MSMB entities' responsibility—and promised that controls would be put into place to prevent a recurrence of the issue, including that Panoff would have to sign off on any further agreements that included the MSMB entities.  (Id.).  But the defendant's Control Memo contained both material misrepresentations and omissions.  He failed to disclose that the settlements with MSMB investors were the result of Shkreli's frauds at the MSMB entities—specifically, his conversion of their hedge fund interests to Retrophin stock without permission, after promising to make redemptions available in cash—and instead misleadingly suggested that the MSMB investors merely "objected to the number and/or values of the shares of common stock … they received as a distribution from such funds." (Id.).  The defendant also affirmatively (and falsely) stated that Shkreli would repay the money and shares that Retrophin had paid via the settlement agreements (id.), and then

simultaneously drafted indemnification agreements and promissory notes to "paper" those promises (see GXs 612, 641).

The defendant knew that Shkreli's promises to repay Retrophin were lies because he knew both that the MSMB entities had no money to repay the settlements, and that Shkreli had already determined not to use his own assets to do so—that was the purpose of the fraud on Retrophin via the settlement agreements in the first place.  In fact, the defendant explicitly admitted to the lie in the Control Memo in an email with Shkreli, in which he explained:  "The current thinking is let RTRX pay, get a note from the fund and if the fund cant fulfill the note RTRX will write it off as bad debt.  It is easier than the road you are referring to.  Also marcum would get very spooked with what you are talking about."  (GX 618).  The defendant and Shkreli were confident this plan would work because they had done it before with the Katten bills that Retrophin paid on behalf of Shkreli:  when Shkreli and the MSMB entities refused to repay Retrophin for those bills, that debt was subsequently written off.  (GXs 113-43, 113-44, 114-16, 510).  The defendant doubled-down on the misrepresentations in the Control Memo by falsely telling Marcum that Shkreli had promised he would "have the resources to pay the obligations set forth in the notes and the indemnification agreements … [and] provided documentation demonstrating that [Shkreli] owns securities with an estimated value in excess of $8 million."  (GX 627).

In the end, Shkreli never used any of his personal Retrophin stock to either pay the MSMB investors directly, or to repay Retrophin for the money and shares it had expended in connection with the settlement agreements.  Most brazenly, approximately 5,000 restricted Retrophin shares were transferred to Lavelle in satisfaction of his settlement agreement in October 2013, after the Control Memo and the defendant's representations to Marcum.  (GXs 56, 56-A, 115-

15

34).  These restricted shares were taken from Retrophin and given to Lavelle to satisfy an obligation that the defendant, Shkreli and Panoff all knew was not Retrophin's responsibility.

Third, after the Control Memo was finalized—and in direct contravention of it—the defendant, Shkreli and Panoff forced Retrophin pay $300,000 directly to Marshall as part of yet another settlement agreement finalized in August 2013.  Following a discussion that acknowledged the need to circumvent the Control Memo, the defendant and Shkreli decided to divide the agreement into two parts.  One portion would be between Marshall and Retrophin (for $300,000), and a second between Marshall, Shkreli and the MSMB entities (for 6,000 shares).  Thus there would be no need for Retrophin to approve the first agreement pursuant to the Control Memo.  (GXs 57-A, 57-B, 611, 910-E).  At this point, however, the defendant and Shkreli could not even pretend that there was a legitimate basis for Retrophin to make a cash payment to Marshall, as they had admitted to Marcum and in the Control Memo that the obligation to repay Marshall lay solely with Shkreli and the MSMB entities.  The defendant and Shkreli's use of a settlement agreement to force Retrophin to pay money to Marshall clearly defrauded the company, and therefore is powerful evidence of their conspiracy to do just that.

Fourth, and most significantly, the true purpose of the settlement agreements was never disclosed by the defendant or others to Retrophin's Board, to Marcum or to the investing public.  At the September 2013 Board meeting, the settlement agreements were presented as a mere accounting issue that had been resolved (Tr. 1915-19, 4416-17), and Shkreli again repeated the falsehood (earlier peddled by the defendant) that the promissory notes would be repaid.  (Tr. 1916).  There was no disclosure that the settlements were with MSMB investors who claimed Shkreli defrauded them by converting their interests to Retrophin stock without their permission, or that the purpose of the settlement agreements was to repay MSMB investors with money and/or shares

16

taken from Retrophin.  (Tr. 1761, 1920, 4417, 4533-34; GX 970; DX 116-52).  In fact, language in certain later public filings contained underlined false information about the settlement agreements.  Specifically: (1) the disclosure stated that MSMB investors were dissatisfied with the number of shares that they received as redemptions for their investments, while the truth was that the investors were upset that Shkreli had converted their interests in the MSMB entities to Retrophin shares without their permission after promising to give them the option of redeeming those investments for cash; and (2) the disclosure suggested that MSMB Capital invested in Retrophin, which had not occurred.  (DX 116-52).

Finally, in addition to all of the evidence detailed above regarding the defendant's use of the settlement agreements to take money and shares from Retrophin in furtherance of the conspiracy charged in Count Seven (along with two consulting agreements, discussed below), there was also evidence at trial of the defendant's financial motive to participate in that conspiracy and of the other steps he took to benefit Shkreli to the detriment of Retrophin, his client and the entity to which he owed a fiduciary duty.  With respect to motive, Retrophin was the most significant driver of the defendant's salary; the increase in his salary from $355,000 to $900,000 in Fiscal Year ("FY") 2014, as well as the decrease in his salary from $900,000 to $423,751 in FY 2015, were due primarily to the increase in business to Katten from Retrophin in FY 2014 and the fact that Retrophin fired Katten in FY 2015.  (Tr. 6614, 6618).  In addition, the defendant's rank among approximately 130-150 income partners nationwide jumped from somewhere in the middle in FY 2013 to the top paid income partner in the entire firm in FY 2014, as a result of millions of dollars of business the defendant brought in from Retrophin.  (Tr. 6611-12, 6615).  In total, Retrophin and other Shkreli-related entities—for which the defendant served as the relationship partner—billed more than $5 million to Katten during the pendency of the conspiracies charged in Counts Seven

17

and Eight.  A reasonable jury could have inferred from these facts that the defendant had a motive to participate in those conspiracies.

In addition, the defendant repeatedly placed the interests of Shkreli over those of Retrophin in connection with the SEC investigation into Shkreli's frauds at the MSMB entities.  For example, the defendant falsely told Retrophin Board member Steven Richardson that the SEC investigation of the MSMB entities was related to a "disgruntled employee that had filed a complaint," when the defendant knew that the investigation instead focused on Shkreli's frauds at the MSMB entities.  (Tr. 1978).  The defendant also falsely told Richardson that he did not expect Retrophin to be "mentioned at all" during Richardson's SEC interview, when the defendant knew that the SEC had asked questions about Retrophin and had even requested documents from the company in connection with the investigation.  (GX 857-A (Katten bills show defendant gathering documents at Retrophin to respond to SEC subpoena); Tr. 1980).  The defendant also sought to conceal Katten's work in representing Shkreli individually in the SEC investigation.  He never sought permission from the Board to have Katten represent both Shkreli and Retrophin in that matter, did not tell the Board that he was billing work for that matter to Retrophin on a theory that the company would indemnify Shkreli, and held back the bill for Katten's work for over a year, only sending it to Shkreli for payment by Retrophin at the end of September 2014, after the defendant expected that Shkreli would take control of the Board.  (See Tr. 1979, GXs 127-1, 127-2, 125-1-H, 126-1-I, DX 106-41).  And, when a rift developed between Shkreli and the rest of the Board members, the defendant worked to help orchestrate a coup to remove those Board members, and subsequently lied to Board member Steven Aselage about doing so.  (See GXs 676 (the defendant drafts document for shareholders to remove Board); 686 (the defendant advises Shkreli on his employment agreement); 290 (the defendant falsely tells Aselage that "I have not advised

18

Martin of anything.").  A reasonable jury could have inferred from these facts that the defendant was trying to avoid the discovery of his role in the conspiracy to defraud Retrophin by keeping Shkreli in power.

For all of these reasons, the evidence set forth in this section was far more than sufficient to allow a reasonable jury to find the defendant's guilty beyond a reasonable doubt.

2. <u>There Was Sufficient Evidence That The Consulting Agreements Were In Furtherance of the Conspiracy Charged in Count Seven</u>

The defendant similarly contends that there is also not sufficient evidence to show that the consulting agreements at issue in Count Seven—the two sham consulting agreements Retrophin executed with MSMB Healthcare investor Alan Geller and MSMB Capital investor Darren Blanton—were "executed in furtherance of the alleged conspiracy" charged in Count Seven. (Def. Br. at 11).  Specifically, the defendant contends that the Alan Geller and Blanton consulting agreements were not "shams," but were instead for the benefit of Retrophin because Retrophin in fact received "legitimate and valuable consulting services" in return for both agreements, as well as releases of liability.  (Id.).[8]

---

[8] The defendant cites <u>United States v. Delossantos</u>, 536 F.3d 155 (2d Cir. 2008) for the proposition that an "'innocent explanation for a defendant's conduct,' when plausible, can be 'enough to engender reasonable doubts about the defendant's guilt.'"  (Def. Br. at 11). There are two problems with the defendant's reliance on this case.  First, in <u>Delossantos</u>, the question at issue was whether probable cause existed for an arrest in the context of a suppression motion; that is a very different context from the Rule 29 motion at issue here, where all inferences must be drawn in the government's favor.  <u>Guadagna</u>, 183 F.3d at 129 ("[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'").  Second, even in <u>Delossantos</u>, the Second Circuit found that the facts supporting the "innocent explanation" proffered by the defendant could not be viewed in isolation, but needed to be considered within the "totality of the circumstances."  536 F.3d at 161 (noting that the Supreme Court has rejected the findings of courts who employ a "divide-and-conquer" analysis and look at such explanations in isolation, and further noting that "The fact that an innocent explanation may be consistent with the facts alleged … does not negate probable cause") (quotation marks and citations omitted).  As detailed herein, when the evidence cited by the defendant in

As with the defendant's arguments related to the settlement agreements, this argument is a retread of the argument defense counsel made to the jury, in which counsel stated that the defendant "believed Mr. Geller and Mr. Blanton were performing real services or were available to perform real services" (Tr. 10584) and that "Mr. Geller and Mr. Blanton had prior connections to Retrophin and could provide as an advisor to Mr. Shkreli" (Tr. 10587). And once again, the jurors squarely rejected the inferences that the defense urged them to draw from the trial record, instead finding, as clearly supported by sufficient evidence, that the consulting agreements were also part of the conspiracy charged in Count Seven to steal money from Retrophin for Shkreli's personal benefit. Moreover, even if the inferences the defendant urges this Court to draw from the evidence were possible, when the evidence is viewed in its totality and in the light most favorable to the prosecution, it is plainly sufficient for the jury to find that the consulting agreements were in furtherance of the wire fraud conspiracy charged in Count Seven, and certainly evidence of it. See Florez, 447 F.3d at 154-55.

With respect to the consulting agreements, the totality of the evidence encompasses all of the evidence set forth above in Section I.B.—the defendant's involvement in and/or knowledge of the backdated MSMB Capital interest; the false statements in the Form 13-D regarding MSMB Capital's investment in Retrophin; Shkreli's theft of funds from Retrophin to pay the Merrill Lynch settlement and the MSMB entities' Katten bills; the SEC investigation into Shkreli's frauds at the MSMB entities; the specific details of Shkreli's frauds, as relayed by the MSMB investors; Shkreli and the defendant's false statements to investors; the defendant's financial motive to join the conspiracy and other steps he took to aid Shkreli to the detriment of

---

support of his explanation for the consulting agreements is considered against the totality of the evidence at trial, such evidence does not support that explanation.

Retrophin; and the defendant's role in drafting, executing and concealing the settlement agreements that were used to take money and shares from Retrophin.  Notably, the defendant's brief grapples with <u>none</u> of this evidence in discussing the consulting agreements.[9]

The evidence at trial related to the consulting agreements plainly demonstrated that such agreements were just another way that the defendant and Shkreli defrauded Retrophin. Specifically, the consulting agreements were the perfect vehicle to steal enormous numbers of restricted shares from the company—331,500 for Alan Geller and 200,000 for Blanton (GXs 59-A, 61)— without anyone suspecting the shares were being paid to defrauded MSMB investors to repay debts owed by Shkreli, not to individuals who would do legitimate work for Retrophin.[10]  Both

---

[9] The defendant does cite the testimony of defense expert witness Alan Johnson in support of his arguments that the consulting agreements at issue in this case were not in furtherance of the conspiracy.  (Def. Br. at 13).  Both Johnson's area of expertise and his expert opinions, however, were clearly limited by the Court to agreements between a company and "departing executives, Board members and founders who had a role in the company before they departed."  (Tr. 9010). As neither Alan Geller nor Blanton was a departing Retrophin executive, Board member or founder who had a role in the company and entered into the consulting agreement to "depart" from the company, Johnson's opinions and his expertise categorically did not apply to the consulting agreements with those individuals.  In addition, Johnson's opinion that the Alan Geller and Blanton consulting agreements were "similar to the agreements that you would find [] in other companies" was based on a deeply flawed methodology which consisted solely of a comparison of the <u>language</u> in those agreements to the <u>language</u> in other consulting agreements Johnson had seen previously. (Tr. 9066-67).  Such opinion was irrelevant, as Johnson had no understanding of the circumstances underlying the Alan Geller and Blanton consulting agreements and thus no way to know if the agreements had been used to perpetrate a fraud.

[10] In addition to the evidence detailed below on the Alan Geller and Blanton consulting agreements, an email exchange between the defendant and Shkreli in December 2013 makes it clear that the co-conspirators saw consulting agreements as a way to accomplish this goal.  After noting that Shkreli had personally promised defrauded MSMB Capital investor Schuyler Marshall an additional 15,000 Retrophin shares in December 2013, the defendant asks Shkreli:  "[w]as that meant to come from you or should we do a consulting agreement?" (GX 655).  In response, Shkreli tells the defendant:  "Ask him if he will tolerate a consulting agreement."  (<u>Id.</u>).  In other words, a consulting agreement was the mechanism by which the defendant and Shkreli could get Retrophin to pay for shares owed by Shkreli to Marshall.

consulting agreements were finalized and paid <u>after</u> the Control Memo was written in August 2013, at which time the defendant and Shkreli had explicitly conceded that the obligations related to the MSMB investors Retrophin's responsibility, and when the defendant and Shkreli had also agreed to internal controls to ensure that Retrophin would no longer foot the bill for Shkreli's personal obligations. (GX 609-A). Nevertheless, as with the settlement agreements, the defendant and Shkreli forced Retrophin to enter into these consulting agreements and provide shares taken from the company to Alan Geller and Blanton, even though the defendant knew that (1) the obligations were not Retrophin's responsibility, and (2) Shkreli himself had more than 2.5 million shares of Retrophin and could have easily used his personal assets to make the payments. (GX 115-1).

As set forth below, the specific evidence introduced with respect to each sham consulting agreement further proves that such agreements were used by the defendant and others as a vehicle to steal shares from Retrophin to further the goals of the conspiracy.

a.      <u>Alan Geller</u>

Alan Geller had invested $1 million in MSMB Healthcare. (Tr. 6671). He contacted Shkreli and the defendant after receiving the initial Retrophin share distribution in early 2013 because the value of the distribution did not match what Shkreli had falsely told him his MSMB Healthcare investment was worth; as a result, he sought to have Shkreli provide him with additional Retrophin shares to make up for the difference. (Tr. 6712, 6722). Alan Geller testified that he never threatened to sue Shkreli, MSMB Healthcare or Retrophin during the course of those conversations. (Tr. 6734-35).

Following those conversations, the defendant and Shkreli determined in early April 2013 that the easiest way to take shares from Retrophin to pay Alan Geller for Shkreli's lies—as opposed to having Shkreli pay himself—was through a consulting agreement. To that end, the defendant drafted an email for Shkreli to send to Alan Geller to ask if he would be "willing to sign

a consultant agreement" because "[it] would be the quickest way to get the stock issued to you and satisfies any requests that the transfer agent may have." (GX 560). In other words, the easiest way for Alan Geller to receive shares from Retrophin was via a consulting agreement, which would satisfy the transfer agent that the shares were being transferred legitimately.

Alan Geller was surprised at that email, stating "[w]hat does that mean?" (GX 105-7), as he had never discussed providing consulting services to Retrophin with the defendant, Shkreli or anyone at Retrophin, had never considered serving as a consultant to Retrophin, and did not know anything about biotechnology or pharmaceutical companies. (Tr. 6737, 6743-44). On a phone call following the email exchange, the defendant reassured Alan Geller that he had not been "scammed" by Shkreli in connection with MSMB Healthcare, and that a consulting agreement could legitimately be used to resolve his dispute with Shkreli. (Tr. 6742). Following the phone call, Alan Geller never discussed serving as a consultant to Retrophin with the defendant, Shkreli, or anyone else, nor did he ever discuss any specific tasks that he would perform pursuant to the agreement. (Tr. 6744).

When the defendant and Shkreli came up with the idea of repaying Alan Geller via a consulting agreement, they knew that the Retrophin Board needed to approve any issuance of stock from Retrophin. (Tr. 2566-67). As a result, at the same time that the defendant encouraged Alan Geller to agree to a consulting agreement, the defendant also told Shkreli that they should get "blanket approval from the board … to retain consultants." (GX 565). However, the Retrophin Board members testified that they never agreed to provide blanket approval to retain consultants.

(Tr. 1862, 4405).[11]   Instead, the defendant simply included language in the April 2013 Board meeting minutes—which were never provided to the Board for review or approval (Tr. 1861-62, 4405)—that would have permitted Shkreli to enter into any agreements, including consulting agreements, that did not require payment of a material amount of cash.  (DX 118-26A).

While a draft of Alan Geller's consulting agreement was included with the materials circulated to the Retrophin Board members in advance of the September 2013 Board meeting, both Richardson and Aselage testified that the agreement itself was neither discussed nor approved by the Board at the meeting.  (Tr. 1928-31, 4432).  Nor were the Board members ever told that Alan Geller was a MSMB Healthcare investor who was seeking repayment of his hedge fund investment through the consulting agreement.  (Tr. 2417, 4432).  In fact, the Board members never discussed or approved the use of consulting agreements to repay any MSMB Capital or Healthcare investors. (Tr. 4433).

However, despite the fact that Alan Geller's consulting agreement was neither discussed nor approved at the meeting, the defendant falsely told Alan Geller that the Board had in fact approved his consulting agreement, so long as Alan Geller did not work in excess of 20 percent of his time for Retrophin.  (GX 105-48).[12]  Subsequently, the consulting agreement between Alan

---

[11] In an email introduced during the defendant's case, the defendant admitted that he sought blanket approval for equity grants, including to consultants, but had not received such approval from the Board.  (GX 1385).

[12] The defendant suggested multiple times during trial that his statement to Alan Geller that the Board discussed the maximum time that he could spend as a consultant for Retrophin is corroborated by Richardson's notes on an agenda for the September 2013 meeting.  However, Richardson's notes—which were taken based on the Board materials before the meeting, and do not reflect any discussion during the meeting—actually reflect that Richardson's concern with the agreement had been what the "minimum time expectations" would be for a consultant, not on setting a maximum limit for a consultant's work at Retrophin.  (Tr. 2416; DX 8281 (emphasis added)).

24

Geller and Retrophin was executed in September 2013, in which Alan Geller agreed to provide "consulting on strategic and corporate governance matters." (GX 59-A). Alan Geller ultimately received 331,500 shares of stock pursuant to that agreement worth approximately $2.1 million. (GX 955).

Alan Geller testified that he did not perform consulting services for Retrophin. (Tr. 6820). The defendant argues that Alan Geller did provide "professional executive coaching to Mr. Shkreli," which consisted of "life tips" and "coaching on how to be a better manager" that "inevitably inured to Retrophin's benefit since the company clearly stood to gain from a more professional, mature and efficient CEO." (Def. Br. at 12). However, these sorts of "life tips" were not provided by Alan Geller to Shkreli in exchange for the 331,500 shares he received pursuant to the agreement. To the contrary, Alan Geller testified that he gave "life tips" to Shkreli before and after signing the agreement, and that the purpose of the agreement was to repay him for his MSMB Healthcare investment. (Tr. 6742, 6842-43). Alan Geller also testified that, when he was originally interviewed by agents from the Federal Bureau of Investigation ("FBI") about the consulting agreement, he lied and said that he had performed consulting services pursuant to that agreement although he had not. (Tr. 6825). As a result of those lies, Alan Geller entered into a non-prosecution agreement. (Tr. 6834).

b. <u>Darren Blanton</u>

Blanton invested $1.25 million in MSMB Capital in December 2010 and January 2011. (Tr. 3570). Although Blanton had provided Shkreli with the initial idea for Retrophin—to develop a drug to treat Duchenne Muscular Dystrophy, which afflicted the son of an acquaintance (Tr. 3585)—and Shkreli had promised him percentage of the company in return, Blanton never served as a Board member or employee of Retrophin, and never invested any money in Retrophin. (Tr. 3587-88, 3593-94). By the end of 2011, Blanton had become suspicious of Shkreli's

25

management of MSMB Capital, and sought a redemption of his MSMB Capital investment.  (GX 103-9; Tr. 3593-95).  Subsequently, the defendant advised Blanton in February 2012 that Shkreli would not provide him with a percentage ownership in Retrophin.  (Tr. 3677).  Blanton never gave Shkreli permission to convert his MSMB Capital investment into Retrophin, and despite multiple requests, Shkreli returned only $200,000 of Blanton's initial investment in MSMB Capital (which, unbeknownst to Blanton, Shkreli stole from an MSMB Healthcare investor) before telling Blanton that no more redemptions from the MSMB Capital fund would be permitted.  (GXs 103-22, 903-E, 905-E, 909-E; Tr. 3603, 3627).  Blanton reported Shkreli's fraud to the SEC in the summer of 2012 (Tr. 3621), and then continued to seek to resolve his dispute over the return of his MSMB Capital investment in 2013 and 2014.  (Tr. 3657).  During that entire period, Blanton never threatened to sue MSMB Capital, Shkreli or Retrophin.  (Tr. 3646, 3702).

In August 2013, after Blanton had been trying for almost two years to have his MSMB Capital investment returned, Shkreli agreed to provide Blanton with 100,000 of Shkreli's own Retrophin shares.  (GX 606).  After that agreement, the defendant sent Blanton an option agreement for those shares. (GX 103-42).  At the same time, however, the defendant also sent Blanton a consulting agreement for 300,000 shares, which would be paid by Retrophin.  (GX 103-44).  Blanton, like Alan Geller, was surprised to receive the consulting agreement, as he had never discussed providing consulting services to Retrophin with either Shkreli or the defendant.  (Tr. 3647, 3649-51).  Blanton never subsequently discussed providing consulting services to Retrophin with the defendant, Shkreli or anyone at Retrophin.  (Tr. 3649-51).  In fact, the consulting agreement stated that Blanton, like Alan Geller, would provide consulting services on "strategic and corporate governance matter," but Blanton did not know what that meant.  (Tr. 3651).

26

In separate email conversations with Shkreli in the fall of 2013, the defendant himself suggested that a consulting agreement be used to take shares from the company and give them to Blanton.  Specifically, the defendant stated, "Where would the 100K come from?  If its from the company it would need to be in a consulting agreement."  (GX 643).  When Shkreli suggested that the transaction be completed via a settlement agreement, the defendant reminded Shkreli why that was not a viable option:  "We can call it a settlement agreement, but given Marcum's recent behavior they may require it to be disclosed in the financials.  I was trying to prevent that issue."  (GX 643).

Following additional negotiations in the fall of 2013, the defendant repeatedly suggested to Shkreli that the dispute with Blanton should be resolved using a consulting agreement, which would allow the shares to be issued from Retrophin instead of Shkreli.  In January 2014, the defendant suggested that "RTRX could issue the restricted stock to [Blanton] under a consulting agreement."  (GX 660).  And again in February 2014, the defendant asked Shkreli, "can I do this via a consulting agreement?"  (GX 663).  Ultimately, the consulting agreement between Retrophin and Blanton was executed in March 2014.  (GX 61).  Blanton subsequently received a total of 200,000 shares from Retrophin pursuant to the agreement, worth approximately $3.75 million.  (GX 955).

Blanton, like Alan Geller, testified that the purpose of the consulting agreement was to repay him for his MSMB Capital interest, as well as Shkreli's original promise to provide him with a percentage of the company.  (Tr. 3663).  Blanton further testified that he never performed any consulting services for Retrophin.  (Tr. 3664, 3688-89, 3913).  The defendant contends that Blanton performed consulting services because he "offered valuable relationships with new investors in the cash-starved startup."  (Def. Br. at 12).  However, Blanton testified that to the extent

27

that he introduced Shkreli (and by extension, Retrophin) to various individuals who might be interested in making an investment in Retrophin, such introductions were no different than introductions Blanton regularly makes in connection with many of his other investments.[13]  (Tr. 3670, 3913-15).  In fact, Blanton made such introductions for Shkreli before and after he signed the consulting agreement.  (Tr. 3589, 3608-09, 3671-72, 3913-15).  Moreover, the defendant was well aware that Blanton was not going to provide consulting services to Retrophin and that the agreement was simply a mechanism to repay his MSMB Capital investment.  Over the course of several months, Blanton was offered various agreements with different names, all designed to repay him for Shkreli's fraud.  Only one of those variations was a consulting agreement, and it was the defendant who explained to Shkreli that it was the best variation because it would not require disclosure.  (GXs 103-42 ("Option Agreement"); 103-44 ("Consulting Agreement"); 103-46 ("Settlement Agreement"), 643).

\*     \*     \*

Based on all of the above, there is sufficient evidence from which a jury could conclude that the defendant and Shkreli used the sham consulting agreements with Alan Geller and Blanton in furtherance of the conspiracy charged in Count Seven—namely, to steal money and shares from Retrophin to repay Shkreli's debts to Alan Geller and Blanton for their MSMB investments, without Board authorization or any disclosure of the true purpose of the agreements.

---

[13] The defendant states that the "Court recognized that Mr. Blanton provided legitimate consulting services" (Def. Br. at 12) and cites for support a colloquy between the Court and the government during the Rule 29 argument at the close of the government's case.  (Tr. 8125).  The government does not understand the Court's statements to the parties during oral argument to constitute findings of fact.

28

Finally, to the extent that the defendant claims that Retrophin was only a "supposed victim" because it "received [a] benefit" from the consulting agreements (Def. Br. at 13), this is contradicted by the evidence.  Aselage, a Retrophin Board member and currently the Retrophin CEO, testified quite clearly that the company had concluded that Retrophin had not received a benefit from the consulting agreements, and that such agreements were "not fair and reasonable" because "millions of dollars of company resources, stock and cash, were used to pay those individuals for services that were never provided."  (Tr. 4487-88).[14]

3.   There Was Sufficient Evidence That the Defendant Acted With Intent to Defraud Retrophin In Connection with Count Seven

The defendant contends that there was insufficient evidence to prove that he acted with the specific intent to defraud Retrophin in connection with the conspiracy charged in Count Seven, because there is no evidence that he acted with "the knowledge of at least some of the purposes or objectives of the conspiracy" and with the "intention of aiding in the accomplishment of those unlawful ends."  (Def. Br. at 14-15).  The defendant reiterates the same unpersuasive arguments he made in connection with the settlement and consulting agreements above—that the agreements were entered into to "help" Retrophin by eliminating potential litigation risk (addressed at length above in Sections I.B.1. and I.B.2.)—and also asserts that he could not have the intent to defraud because he did not engage in any "acts of deception, concealment or misrepresentation" but rather "willingly disclosed these agreements not only to Retrophin's newly hired Chief Financial Officer, board of directors . . . external auditor, [and] in multiple public SEC filings,

---

[14]   Aselage similarly testified that Retrophin received no benefit from the settlement agreements, and that such agreements were "not fair and reasonable" because the company "spent considerable resources, millions of dollars of cash and stock, to reach settlement for liabilities that were not related to the company.  They were liabilities of Martin Shkreli, not Retrophin[]."  (Tr. 4487).

providing Retrophin shareholders and the investing public with <u>full transparency</u> as to the details of the consulting and settlement agreements at issue in Count Seven." (<u>Id.</u> at 16).

The defendant is correct that the legal standard is that the jury must have found him to have acted with the specific intent to defraud Retrophin. However, "direct proof of defendant's fraudulent intent is not necessary but may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." <u>Guadagna</u>, 183 F.3d at 129-30 (citing <u>United States v. Smith</u>, 133 F.3d 737, 743 (10th Cir. 1997)). "When the 'necessary result' of the ... scheme is to injure others, fraudulent intent may be inferred from the scheme itself." <u>Id.</u> (quoting <u>United States v. D'Amato</u>, 39 F.3d 1249, 1257 (2d Cir. 1997)). As a result, "a jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated." <u>Id.</u>[15]

---

[15] In urging the Court to find that the defendant acted without specific intent, the defendant cites two district court cases, neither of which supports his argument. (Def. Br. at 14-15). In <u>United States v. Valle</u>, a case involving an alleged conspiracy to kidnap and eat various women, the district court held that the government had failed to prove that the defendant and others had actually agreed to commit a kidnapping because, although the group discussed kidnappings, "no one is ever kidnapped, and no concrete steps are ever taken to actually kidnap one or more of the allegedly targeted women." 301 F.R.D. 53, 89 (S.D.N.Y. 2014), aff'd in relevant part by <u>United States v. Valle</u>, 807 F.3d 508, 513 (2d Cir. 2015). According to the court, "the only reasonable inference that can be drawn from the proof concerning the conduct and statements of Valle and his alleged co-conspirators after the date for a scheduled kidnapping had come and gone, is that they understood that no actual kidnapping would take place" and that the discussions were just fantasies. <u>Id.</u> at 90. To describe these facts is to show that <u>Valle</u> and this case have nothing in common other than each involves a conspiracy. There is no possible argument that the defendant and Shkreli merely fantasized about defrauding Retrophin, or that concrete steps were not taken to further the conspiracy to defraud Retrophin. Also inapplicable is <u>United States v. Bryant</u>, a case involving a bench trial rather than a Rule 29 motion, and so applying different legal standards. 885 F. Supp. 2d 749, 765 (D.N.J. 2012). Moreover, unlike in <u>Bryant</u>, the explanation offered by the defendant for his actions is not "more likely" than the one advanced by the government (and ultimately found by the jury). <u>Id.</u>

As an initial matter, the defendant's assertions that he "willfully disclosed" the settlement and consulting agreements, and that such alleged disclosure provided "full transparency," are directly contradicted by the evidence at trial. As detailed above in Section I.B.1., the defendant did not "willfully disclose" the settlement agreements to Retrophin's auditors or to the Board of Directors; to the contrary, the defendant and Shkreli caused Retrophin to enter into the majority of the settlement agreements (for Rosenwald, Hassan, Lavelle, Kocher, Spielberg and David Geller) prior to advising either the Board of Directors or Marcum of the existence of the agreements. And not only did the defendant fail to disclose the agreements, he took active steps to conceal them—he advised Marcum that Retrophin had not been threatened with any litigation or engaged to resolve such litigation threats (GX 124-2) and in his role as attorney for Retrophin, he never described, discussed or disclosed the settlement agreements to the Board (Tr. 1866-67, 4412), and did not provide any litigation updates describing litigation threatened by or resolved with MSMB investors. (Tr. 1852-53, 1867, 4418-19, 4529). The defendant also failed to disclose the settlement agreements to the investing public, as they were not disclosed in the "subsequent events" section of Retrophin's 2012 10-K filed on June 13, 2013. (DX 110-14). The defendant also took steps to make sure others at Retrophin did not learn of the settlement agreements. [16] (GXs 550, 567).

After Marcum discovered the existence of the settlement agreements—which was the result of a variance analysis that caused them to try and find out why there was so much cash being spent by the company, and not because of a disclosure by the defendant—the defendant

---

[16] The defendant's argument that he "willfully disclosed" the settlement agreements to Panoff is unavailing. (Def. Br. at 16). As detailed at length in Section II.F., Panoff was a co-conspirator with respect to the conspiracy charged in Count Seven, and despite expressing concerns about the settlement agreements at one point, similarly failed to disclose the true nature of those agreements to the Board, to Marcum or to the investing public.

continued to engage in acts of deception regarding those agreements.  For example, the Control

Memo drafted by the defendant failed to state that the settlement agreements were necessary

because Shkreli had defrauded the MSMB investors (instead suggesting, falsely, that the investors

were simply unhappy with the distribution of Retrophin shares they received from the funds), and

affirmatively—and falsely—pledged that Shkreli would repay those obligations, when the

defendant knew he would not.  (GX 609-A).  Subsequently, as detailed in Section I.B.2., the

defendant took steps in direct contravention of the Control Memo—he forced Retrophin to pay

money to Marshall, even though the Control Memo detailed how such a payment was not the

obligation of Retrophin, and then transferred money and shares from Retrophin to make additional

payments of money and shares to Lavelle and David Geller in October 2013 instead of requiring

Shkreli to do so, despite the fact that the defendant knew that Shkreli had the assets to make those

payments and had promised to repay Retrophin for those obligations.

Moreover, the defendant's attempt to blame the Retrophin Board members for his

own misrepresentations and omissions is unavailing.  The defendant claims he did not have specific

intent because he "could not have possibly known" that Retrophin's Board members were unaware

of the true nature of the settlement and consulting agreements because they "only skimmed through

the documents" provided by the defendant related to those agreements.  (Def. Br. at 16).  To the

contrary, the Board members were unaware of the true purpose of the settlement agreements

because the defendant actively concealed it from them.  The Board members never received any

materials explaining that the settlement agreements were with MSMB investors who had been

defrauded by Shkreli, nor were they told that purpose of the settlement agreements was to repay

MSMB investors with money and/or shares taken from Retrophin.  The public disclosures also did

not contain this information.  In fact, language in certain public Retrophin filings contained <u>false</u>

32

information about the settlement agreements, including that MSMB investors were simply dissatisfied with the number of shares that they received as redemptions for their investments and that MSMB Capital had in fact invested in Retrophin.  (DX 116-52).  In addition, the defendant failed to tell the Board members that Shkreli had the personal resources to repay the MSMB investors and had simply chosen not to do so, using Retrophin as his personal piggy bank instead; he then stood by and said nothing at the September 2013 Board meeting when Shkreli lied and insisted that he would repay the promissory notes.

Finally, as detailed at length in Section I.B.2., the defendant also acted with the intent to defraud Retrophin in connection with the sham consulting agreements.  The defendant never advised the Board that the consulting agreements for Alan Geller and Blanton were being used to repay defrauded MSMB investors; in fact, neither agreement was ever discussed or approved at a Board meeting.[17]  The defendant, knowing that the Board needed to approve grants of shares (and particularly, large grants such as the ones given to Blanton and Alan Geller), advised Shkreli that it would be easier if they could get "blanket approval" for Shkreli to enter into agreements, and then added language to the Board minutes suggesting the Board had provided such approval, when in fact the Board never discussed or approved any such "blanket approval" for Shkreli.  The defendant also forced Retrophin to enter into and then pay out on the Alan Geller and Blanton consulting agreements after the Control Memo, knowing full well (1) that the purpose of such agreements was to repay Alan Geller and Blanton for Shkreli's obligations to them in connection with the MSMB

---

[17] There is no dispute about the Blanton agreement.  Although the defendant has suggested Richardson's and Aselage's testimony about the Geller agreement should not be credited, witness credibility is for the jury to determine and, at the Rule 29 stage, credibility determinations should be drawn in favor of the government.

frauds, and (2) that Shkreli had more than enough of his own shares to make the payments to Alan Geller and Blanton under those agreements.

Taken together, there is sufficient evidence to support the jury's finding that the defendant acted with specific intent with respect to Count Seven.

### 4.   The Government Introduced Evidence of Other Co-Conspirators Although Not Required to Do So

The defendant continues to argue, with no basis in the law, that Second Circuit "precedent requires the government to prove a conspiracy between Mr. Greebel and someone other than Mr. Shkreli" because Shkreli was acquitted of Count Seven at the Shkreli trial. (Def. Br. at 17).  As litigated before and during this trial, Shkreli's acquittal is irrelevant because it is not evidence that he did not participate in the conspiracy charged in that count. (E.g., Govt.'s Opp. to Def.'s Mot. to Dismiss, Dkt. No. 345 at 4-8 (describing law related to acquittal of co-conspirator)); see United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994) (holding that a defendant's conspiracy conviction "does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators").  Indeed, this Court recognized that the defendant's theory is "squarely at odds with Acosta" and that Second Circuit precedent would allow the government to "proceed on the theory that Mr. Shkreli was Mr. Greebel's only co-conspirator." (Order on MTD, Dkt. No. 404 at 4, 8).  The defendant has still failed to identify any contradictory Second Circuit precedent.[18]  The defendant's argument about other conspirators should therefore be rejected out of hand.

--------------------------------------------------------------------------------

[18]  The defendant relies entirely on a district court case, United States v. Batista, No. 06 Cr. 265 (S-5), 2010 WL 1193314, at *10–12 (E.D.N.Y. Mar. 24, 2010).  This Court has specifically rejected the defendant's "interpretation" of Batista as "squarely at odds with Acosta." (Order on MTD, Dkt. No. 404 at 8).  The defendant's reliance on Shkreli's acquittal is also further undermined now that this Court has held that the government proved by a preponderance of the evidence that Shkreli did conspire with the defendant, as charged in Count Seven. (Mem. and Order, Dkt. No. 535 at 89 ("The court concludes that the government did prove, at least by a preponderance of the

But, even if the government had been required to prove that the defendant conspired with individuals other than Shkreli, the evidence presented at trial was sufficient for a jury to reach that conclusion beyond a reasonable doubt.  For example, there was evidence that Marek Biestek and Kevin Mulleady participated in efforts to create a backdated interest in order to make it appear as if MSMB Capital had invested in Retrophin, a phantom interest later used in part to justify transferring Retrophin assets to those investors.[19]  (See, e.g., Tr. 10231-38 (discussing evidence)). Mulleady also made misrepresentations to David Geller and Alan Geller in furtherance of the defendant's and Shkreli's efforts to placate those investors until they could be repaid with misappropriated Retrophin assets.  (See Tr. 6744 (Mulleady statement to Alan Geller that consulting agreement was "normal")).  Moreover, the defendant and Shkreli arranged for hundreds of thousands of dollars of Fearnow Shares to be transferred from Biestek and co-conspirator Thomas Fernandez to defrauded MSMB investors.  (See, e.g., GX 542; Tr. 10361-62).  Finally, the defendant worked with Panoff to further the conspiracy charged in Count Seven.  The evidence presented in the government's case showed Panoff knew and was at times uncomfortable with the defendant's and Shkreli's efforts to misappropriate Retrophin assets, yet he assisted in some of those efforts and failed to disclose them to the Board of Directors.  (See, e.g., 10287-90, 10767, 10789-90; see also infra discussion of Panoff's role as a co-conspirator at Section II.F).

---

evidence, that Mr. Shkreli conspired with Mr. Greebel to engage in the conduct charged in Count Seven.")).

[19] The defendant argues that Biestek and Mulleady were "were primarily involved in the alleged backdating 'scheme' that the Court dismissed during the trial."  (Def. Br. at 19).  As discussed elsewhere, the conspirators' actions related to backdating an interest by MSMB Capital in Retrophin was relevant evidence for Count Seven, and was never charged as a separate conspiracy or object of a conspiracy.  As a result, although the government explained that it would not argue that backdating alone defrauded Retrophin, it is meaningless to state that the "scheme" was "dismissed."

In sum, the government was not required to, but nevertheless did, present sufficient evidence from which a reasonable jury could find that he conspired with others beyond Shkreli.

5.    There Was Extensive Evidence of a Criminal Agreement between the Defendant, Shkreli, and Others

The defendant contends that the government "failed to prove the existence of a criminal conspiracy or that Mr. Greebel joined such a conspiracy." (Def. Br. at 20). According to the defendant, "the evidence shows only that Mr. Greebel, relying on representations made by the CEO of his client Retrophin, merely did the fairly ordinary work of external counsel." (Def. Br. at 21). But that argument reflects an effort to discount damning evidence and to draw all reasonable interests in favor of the <u>defendant</u>, not the government, flipping the Rule 29 standard on its head. <u>See, e.g.</u>, <u>Guadagna</u>, 183 F.3d at 129 ("All permissible inferences must be drawn in the government's favor"). The record amply supports a finding that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt." <u>Id.</u>

There is no question that the defendant actually took steps to use Retrophin assets to repay defrauded MSMB investors. The issue here is only whether the defendant participated knowingly in the effort to defraud Retrophin. The evidence proving the defendant's illegal agreement to help defraud Retrophin was extensively discussed in the government's summation and rebuttal. (<u>See</u> Tr. 10216-10382, 10744-10821). The government reviews some of the most significant of that evidence here.

First, the defendant knew the individuals being repaid with Retrophin assets were defrauded investors in Shkreli's failed hedge funds.[20] The defendant also knew that many of those

_____

[20] For example, the defendant: (1) knew in November 2012 that MSMB Capital had not invested in Retrophin; (2) knew in December 2012 about Shkreli's payments to Merrill Lynch as a result of the OREX trade (<u>e.g.</u>, GX 510, 687) and that the MSMB funds had no money (GX 510); (3) was told in February 2013 that Rosenwald's lawyers had "serious concerns that [Shkreli's]

36

investors had not, in fact, threatened to sue Retrophin at all (or until after a settlement agreement had already been offered) and instead focused their anger at Shkreli and the MSMB funds.  (See, e.g., Tr. 10755-756 (discussing evidence of lack of litigation threats)).

Second, as discussed at trial and above (see supra Sections I.B.1. and I.B.2.), the defendant's conduct was completely inconsistent with an attorney trying diligently to represent his corporate client and consistent with someone who agreed to help Shkreli misappropriate Retrophin assets to repay those defrauded investors.  For example:

- Failure to disclose to Retrophin.  The defendant did not disclose the settlement agreements (or supposed litigation threats) to Retrophin's Board before they were made or paid, and sat through multiple Board meetings in which he remained silent, allowing the fraud to stay hidden or, eventually, characterized as an accounting issue that had been resolved.  (See Tr. 1852-1853, 1867, 1918-19, 4418-19, 4529).  This is not the "ordinary" action of a dedicated corporate lawyer.  A jury was entitled to draw the inference that, if the defendant had believed the agreements to be above board, he would have discussed—if not boasted—of them to Retrophin's Board, for example.

- Failure to disclose to auditors.  Despite his argument that the settlement agreements were aimed to quash litigation threats against Retrophin (Def. Br. at 21), the defendant never reported any such litigation threats to the auditors (see, e.g., GX 124-2).  That behavior is completely inconsistent with the argument that the defendant genuinely believed he was helping Retrophin avoid litigation and consistent with his belief that the settlement agreements were a vehicle for improperly taking Retrophin assets.[21]

---

unauthorized conversion of Dr. Rosenwald's investment violates federal and state securities laws . . . and may also constitute fraud" (GX 100-16); (4) saw in March 2013 that Kocher had "damages that have occurred because I have been relying on what you have represented as the manager of MSMB" (GX 533); (5) saw in March 2013 that Shkreli had promised his investors large returns on their investments (GX 533 (attaching wind-down email)); (6) was told in March 2013 by Jackson Su that Shkreli had misrepresented the assets under management (GX 111-45) and provided documents showing misrepresentations to the SEC (GX 684); and (7) was asked by Alan Geller in April 2013 whether Shkreli is "a real scam artist" (Tr. 6741-43) and was told by David Geller that he was concerned he had been "scammed by Mr. Shkreli" (Tr. 2910).

[21] Other evidence includes the fact that Spencer Spielberg was repaid before any settlement agreement was reached and that Shkreli told Greebel to "[i]gnore" David Geller, actions that do not reflect the work of an "ordinary" lawyer working on behalf Retrophin.  (See GXs 567, 585).

- Schuyler Marshall settlement agreement.  The defendant arranged to have the Marshall agreement split in two pieces in order to avoid further scrutiny of that repayment.  (See, e.g., GX 611).  Although the defendant knew Marshall was a defrauded MSMB investor and although he had already declared in the Control Memo that Retrophin was not obligated to repay these investors (GX 609-A), the defendant still arranged for Retrophin to pay Marshall $300,000 in cash and did not discuss it with the Board of Directors.  (See GX 57-B).  The defendant has never offered a plausibly innocent explanation for this conduct, which is direct evidence of his agreement to take and role in taking Retrophin assets to repay Shkreli's investors.

- Consulting agreements.  The evidence shows that the defendant knew the "consulting" agreements used to repay Blanton and Alan Geller were shams. The defendant never discussed those consulting agreements with Retrophin's Board, let alone told the Board that consulting agreements were given to defrauded MSMB investors, even though these investors received millions of dollars in Retrophin stock.  Nor was there evidence the defendant believed either individual would actually serve as a consultant.  To the contrary, Blanton was offered various agreements with different names, all designed to repay him for Shkreli's fraud.  (GXs 103-42, 103-44, 103-46).  And the defendant himself proposed that Alan Geller receive a "consulting" agreement not so that he could consult but rather because it was the "quickest way to get stock issued to [him] and satisfies any requests that the transfer agent my have."  (GX 560).  Most blatant of all, when it came time to address Schuyler Marshall's request for 15,000 more Retrophin shares, the defendant himself made it clear that he viewed "consulting" agreements merely as a pretextual way of funneling Retrophin assets to defrauded MSMB investors.  (See GX 655).

- Sham indemnification agreements.  After the fraudulent settlement agreements were discovered, the defendant proposed a scam in which the MSMB entities would promise to repay Retrophin, although the defendant knew those funds had no money.  (See, e.g., GX 618).  Moreover, in the course of arranging for the settlement agreements, the defendant never suggested that Shkreli pay back the defrauded investors, which would have been in Retrophin's interest.  A jury could have drawn the reasonable inference from these facts that the defendant was not acting to protect Retrophin but instead to help Shkreli keep his own money and take Retrophin's instead.

- The defendant's false statements.  The defendant himself made multiple false statements to MSMB investors.  For example, the defendant told Spencer Spielberg that Retrophin could not provide free-trading shares (see GX 572), told David Geller he had not been scammed (Tr. 2910-11), and told Alan Geller that a consulting agreement was an appropriate way to resolve his dispute (Tr. 6742).  A reasonable jury could have inferred from these lies—which the defendant does not address and which are wholly inconsistent with the idea that

all he did was "ordinary" legal work for his corporate client—that the defendant had agreed to help Shkreli take Retrophin assets to repay the defrauded investors.

- The SEC indemnification bill and the Board coup.  The defendant concealed Katten's work in representing Shkreli in the SEC probe of the MSMB funds, and then sent the bill for that work as Shkreli was being removed.  (See, e.g., DX 106-41).  The defendant also helped Shkreli orchestrate a coup against the Retrophin Board.  (See GXs 676, 686).  A reasonable jury could have inferred from these facts that the defendant was trying to keep hidden his role in the conspiracy to defraud Retrophin by keeping Shkreli in control of the company.

A reasonable jury easily could have inferred from this entire course of conduct that the defendant had agreed to help Shkreli steal from Retrophin.

The defendant ignores all of this evidence, instead largely relying on quotations from Sunil Jain to the effect that Jain believed no one had tried to conceal something from him.  (Def. Br. at 21-22).  But Jain's involvement took place after the conspiracy had largely been successful with respect to settlement agreements—which he had to discover on his own (Tr. 5381-82)—and Jain had nothing to do with auditing the consulting agreements.  The defendant ignores these facts as well.  That the defendant did not overtly lie to the auditors after they had caught on to the settlement agreements proves only that his legal skills allowed the looting of Retrophin effectively to be hidden behind those so-called agreements.  The defendant's reliance on a handful of emails that he presents as exculpatory fares no better; that argument draws inferences in favor of the defendant rather than the government.[22]

---

[22] For example, the defendant cites an August 2013 email in which he recommends against "annulling" a settlement agreement because it would "open up some very big issues."  (GX 618). According to the defendant, this email shows that he "encouraged Mr. Shkreli, instead, to disclose the agreements in Retrophin's SEC filings."  (Def. Br. at 23).  The email says no such thing, and the defendant never gave any such advice.  But even if one possible reading of GX 618 is the one advanced by the defendant—and it is not—another more reasonable reading, drawing inferences in favor of the government, is that the defendant is trying to avoid the fraudulent settlement agreements being exposed to further scrutiny.

*       *       *

At its core, the defendant's Rule 29 motion proves, at the very most, that some evidence presented by the government may be susceptible to two different interpretations. Therefore, according to the defendant, the government's evidence does not "rebut the perfectly plausible innocent explanation of Mr. Greebel's actions."  (Def. Br. at 23).  But the standard for evaluating the government's evidence for purposes of a Rule 29 motion is not whether the government has "rebutted" a "plausible innocent explanation"—the question is whether a jury, drawing inferences in favor of the government, could have found guilt beyond a reasonable doubt. That standard is more than met here.  See Guadagna, 183 F.3d at 129 ("[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'").

C.      The Defendant's Rule 29 Motion Should Be Denied With Respect to Count Eight

The defendant also claims that, even under the demanding legal standard, there is insufficient evidence to support the jury's verdict with respect to the scheme to control the price and trading volume of Retrophin stock charged in Count Eight.  The defendant claims that there was "no evidence" of the existence of the criminal scheme or that he knowingly and intentionally participated in it.  The defendant is wrong on both accounts.  As the Court recognized in deciding Shkreli's motion for acquittal, there is voluminous evidence of the existence of the conspiracy and of the defendant's involvement in that conspiracy.  The defendant's motion misinterprets the cherry-picked evidence he advances and utterly ignores other important evidence the jury considered in convicting him.

1.      Existence of the Conspiracy

Despite the fact that two separate juries found the existence of the conspiracy charged in Count Eight, the defendant raises two separate arguments that the government did not

40

present evidence of the existence of that conspiracy.  (See Def. Br. at 24-27).   First, the defendant argues that the government failed to demonstrate that the scheme to control the price and trading volume of Retrophin stock is itself unlawful.  The defendant again persists in his convoluted theory that just because one could, under completely different circumstances, theoretically engage in a legal agreement to hold stock, his conduct was not unlawful.  Second, the defendant argues that the trading behavior of the Fearnow share recipients is inconsistent with the existence of the conspiracy.  As set forth below, the scenarios the defendant raises are irrelevant here and, moreover, the government has provided more than sufficient evidence of the existence of the conspiracy charged in Count Eight.

> a.     The Factual Scenarios Advanced by the Defendant are Inapplicable

The defendant argues that because it can sometimes be legal to restrict trading in a stock when insiders have material, non-public information or shareholders have entered into a lock-up agreement, the government failed to prove that the conspiracy had a criminal objective.  (Def. Br. at 24-26).  The defendant's theory is rooted in the fantasy that those scenarios are somehow applicable to this case, and it should be rejected.

There was absolutely no evidence in this case of a lock-up agreement being contemplated, discussed or executed.   The defendant cannot claim that the charged conspiracy did not exist based on the mere fact that similar conduct may not be a crime in different circumstances.  That is analogous to arguing that a defendant cannot be guilty of robbing a house because someone else would have been permitted to take something from it by the owner.

Moreover, even if there had been a lockup, there is no evidence that one was ever disclosed to the public.  This is critical because it shows that the failure to disclose the conspiracy's agreement not to sell Retrophin stock constitutes criminal conduct.  As explained in the very SEC publication the defendant cites in his motion, lock-up agreements are regulated by the SEC and

41

must be disclosed to the public.  See Sec. & Exch. Comm'n Fast Answers – Initial Public Offerings: Lockup Agreements (Sept. 16, 2011) (hereinafter "SEC Fast Answers"), available at https://www.sec.gov/fast-answers/answerslockuphtm.html ("U.S. securities laws require a company using a lockup to disclose the terms in its registration documents, including its prospectus.").  This disclosure requirement exists to alert potential investors as to who will own stock after an initial public offering and how much of that stock can actually be sold in the market. See SEC Fast Answers ("if you are considering investing in a company that has recently conducted an initial public offering, you should determine whether the company has a lockup and when it expires.  This is important information because a company's stock price may drop in anticipation that locked up shares will be sold into the market when the lockup ends.").  Yet in this case, not only was any lock-up agreement not disclosed, the defendant filed a false Form 13-D for Shkreli, hiding his control of the shares.  As discussed below, the whole purpose of the scheme was to make it appear that Retrophin's free-trading stock was in the market, could be traded, and was not controlled by Shkreli.[23]

Similarly perplexing is the defendant's claim that a restriction on insiders controlling the stock in other situations renders this conspiracy lawful.  The whole purpose of the scheme in Count Eight was that the individuals who were allocated Retrophin shares by Shkreli and the defendant were portrayed not to be insiders and were thus not restricted from trading the stock. This was necessary to give the market the false impression that the free-trading stock could actually

---

[23] Deborah Oremland from the Financial Industry Regulatory Authority ("FINRA") testified at trial that this is the precise reason for the importance of an accurate disclosure in the Form 13-D: "[Major investors] are people who can have an affect on the company, either by their, what's called their voting power, their power to vote and control the company's corporate actions or what's called their investing power, their power to sell shares and affect the market of that stock."  (Tr. 5733).

be freely traded.  There was no evidence that the insiders were restricted to prevent them from trading on inside information.  Just the opposite.  The defendant, Shkreli and others purposely concealed the true ownership and control of the stock to mislead the market into thinking that the people who owned the stock were not barred from trading it.

> b. There Was Ample Evidence of the Criminal Purpose of the Conspiracy

There was voluminous evidence that the conspiracy was designed to conceal from the market that all of the free-trading shares of Retrophin stock were controlled by Shkreli in order to restrict trading and prevent the price of the stock from collapsing.  For instance, the defendant asked the Fearnow share recipients to certify that they were not "affiliates" of Retrophin, a step that he and Shkreli knew was essential to conceal the defendant's de facto control of Retrophin's free-trading shares and to maintain the unrestricted status of those shares.  As Pierotti testified, it was Shkreli who decided who received the Fearnow shares.  (Tr. 5948).  Moreover, as both Pierotti and Jackson Su testified, Shkreli's plan for the Fearnow share recipients, which Shkreli repeatedly vocalized to them, was for them to buy and sell the stock repeatedly.  (Tr. 5944 (Pierotti), 4788 (Su)).[24]  Additionally, before the Fearnow shares were distributed to the recipients, Shkreli directed the recipients to give him a "summary of their holdings every morning."  (GX 112-12; Tr. 5951 (Pierotti)).  He also told certain Fearnow recipients (and other shareholders of Retrophin) that one

_____

[24] The defendant later acknowledges that both Pierotti and Su testified about the conspiracy to control the price and trading volume of the Fearnow shares, but argues that the defendant was not part of the events they described.  Even assuming he is correct, the defendant ignores that the law does not require a co-conspirator to be present for every meeting where the conspiracy is discussed.  See United States v. DeSimone, No. 11-CR-264, 2013 WL 2309692, at *3 (N.D.N.Y. Mar. 13, 2013) (holding that a defendant "need not have been present at all meetings of the co-conspirators to sustain a finding that he was himself a co-conspirator") (citing United States v. Falcone, 109 F.2d 579, 582 (2d Cir. 1940)).

of his "priorities for the future is increasing the trading volume in [Retrophin] stock – anything anyone can do to help in this regard is welcome." (GX 112-21). Moreover, when Retrophin did not have enough money to pay for the Desert Gateway shell, it was Shkreli and Greebel alone who determined the re-allocation of Fearnow shares among the recipients—that is, how many Fearnow shares should be held in escrow for each recipient. (GX 479). Finally, as discussed in more detail below, when Pierotti refused to restrict trading in Retrophin stock consistent with the conspiracy, the defendant and Shkreli took a number of steps to restrict Pierotti's ability to trade the shares and remove them from his control.

c.   The Trading Activity Further Demonstrates the Existence of the Conspiracy

The defendant also argues that there was no evidence establishing a conspiracy because "the Fearnow recipients' trading behavior was entirely inconsistent with the existence of the conspiracy alleged in Count Eight." (Def. Br. at 26). The defendant is wrong for a number of reasons. As an initial matter, the defendant ignores the legal framework for a conspiracy. As the Court instructed the jury, "[a] defendant may be found guilty of conspiracy to commit securities fraud even if he was incapable of committing the underlying substantive crime of securities fraud. Consequently, for a defendant to be guilty of conspiracy, there is no need for the government to prove that he or any other conspirator actually succeeded in their criminal goals or even that they could have succeed[ed]." (Tr. 10907). "Although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, it must prove that the intended future conduct they agreed upon includes all the elements of the substantive crime." See, e.g., United States v. Pinero, No. 12-CR-695 (ENV), 2014 WL 12681905, at *2 (E.D.N.Y. Apr. 20, 2014).

44

Moreover, it is well established that Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 prohibit the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. United States v. Royer, 549 F.3d 886, 899-900 (2d Cir. 2008). This language applies to manipulation of all kinds, including "forms of misconduct that have the same practical effect as a conventional fraud" without any "specific oral or written statement." Id. at 900. Indeed, "[m]anipulation is 'virtually a term of art when used in connection with securities markets.'" Santa Fe Indus, Inc. v. Green, 430 U.S. 462, 476-77 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)); see also Dietrich v. Bauer, 76 F. Supp. 2d 312, 338 (S.D.N.Y. 1999)). Although practices such as wash sales or matched orders have been cited by courts as examples of manipulative activity, see id., such practices have not been held to define the limits of the securities laws' prohibition on manipulative conduct. Indeed, "[n]o doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." Green, 430 U.S. at 477.

Finally, the defendant ignores that the actual trading behavior does demonstrate the existence of the conspiracy. Three of the Fearnow share recipients did not trade a single share of stock between December 12, 2012 (the day following the reverse merger) and February 28, 2013 (the day of the first PIPE). (Tr. 5753). And, as the exhibit prepared by Oremland made plain, Pierotti's trading in that time period made up the majority of trading in Retrophin stock and was just a fraction of the 2.5 million shares owned by the Fearnow share recipients and Fearnow himself.[25] (See GX 995). The end result of this trading activity was to prop up the price of

_____

[25] The defendant argues that Pierotti's trading activity demonstrates that the conspiracy did not exist. (See Def. Br. at 26). That argument completely misses the point. Pierotti testified regarding the existence of the conspiracy, but then refused to go along with it. That does not demonstrate that the conspiracy did not exist. Rather, when his trading activity is compared to the

45

Retrophin's stock.  By limiting the amount of shares that were available to be traded in the public market, the defendant's conspiracy had the net effect of stabilizing the price of the stock.[26]

2.     The Defendant's Participation in the Conspiracy

The defendant also contends that a "reasonable jury could not find that Mr. Greebel entered into the conspiracy charged in Count Eight."  (Def. Br. at 27).  The defendant's argument both misinterprets and ignores critical pieces of evidence, and it should be rejected.

First, the defendant argues that the government did not present witnesses that placed the defendant in the conspiracy.  (Def. Br. at 27-28).  But there was testimony that helped establish the defendant's participation in the conspiracy.  For example, Pierotti testified that the defendant played a critical role in attempting to get Pierotti to return the Fearnow shares to Shkreli, despite the fact that the defendant knew that Pierotti had purchased the shares directly.  (Tr. 6006).  Amy Merrill also detailed the defendant's involvement in allocating the Fearnow shares before the reverse merger.

---

defendant and Shkreli's conduct after Pierotti started selling Retrophin stock, it further demonstrates the existence of the conspiracy.

[26]  The defendant cites the testimony of defense expert witness Craig Lewis in support of the argument that there was no conspiracy.  (See Def. Br. at 26-27).  But Lewis's testimony actually provided evidence establishing the existence of the conspiracy.  Specifically, Lewis stated that if a group of investors wanted to prevent the price of a stock from dropping, he would "expect them to buy the stock or hold it.") (Tr. 8490) (emphasis added).  He also stated that if investors wanted to keep the price stable, he would expect them "not sell the stock. Or not buy the stock. Just not transact at all."  (Id.).  Lewis accurately described precisely what the defendant's co-conspirators did to keep the price of Retrophin stock propped up.  They held the stock and, as he testified, for the vast majority of the free-trading Retrophin stock they controlled, did not transact at all.  (See Tr. 8568 (confirming that 90% of all the free-trading shares in Retrophin were not traded between December 17, 2012 and February 28, 2013)).

Second, the defendant argues that the government's documentary evidence is also insufficient for the jury to find his guilt. But there is ample evidence that, from the very beginning, the defendant was involved in the scheme set forth in Count Eight, including the following conduct:

- Setting up the Shell Company. As the Court noted in its ruling dismissing Shkreli's motion for acquittal, there was ample evidence that the defendant joined with Shkreli in setting up the shell company that included the 2.5 million free-trading shares of Retrophin. (Mem. and Order, Dkt. No. 535 at 68; see also, e.g., GX 458).

- Allocating the Fearnow Shares. The defendant worked with Shkreli to distribute the Fearnow shares to Shkreli's designated purchasers. As the Court recognized, the defendant was instrumental in distributing the shares so that none of the shareholders were required to disclosure ownership under Rule 13-D, but still gave Shkreli aggregate control over the company. (Mem. and Order, Dkt. No. 535 at 70; see also GX 472).

- Controlling the Fearnow Shares. Although the Fearnow Share purchasers had direct contracts with Troy Fearnow, the defendant and Shkreli nevertheless agreed that Fearnow would withhold certain shares when the reverse merger occurred because Retrophin could not pay Fearnow the full purchase price of the shell company. The documentary evidence is clear that the defendant and Shkreli did this without consulting the Fearnow shareholders. In fact, Pierotti testified he did not know why the shares were being held back (Tr. 5949-50). Such conduct demonstrates the defendant's and Shkreli's control of the Fearnow shares.

- Filing the False Form 13-D. Critical to the fraud was the false representation in Shkreli's Form 13-D filed with the SEC that did not disclose the defendant's control over the Fearnow shares. Despite orchestrating the purchase contracts for the Fearnow shareholders, the defendant completed the Form 13-D for Shkreli and did not include that information. (GX 503).

The defendant ignores also ignores other significant evidence of his participation in the conspiracy to control the price and trading volume of the Retrophin shares: the reaction to Pierotti's sale of large amounts of Retrophin shares in late December 2012. Pierotti's sales triggered deep concern by the defendant and Shkreli, who had not authorized the sales, because it jeopardized the success of the conspiracy. Shkreli took drastic action, and the defendant was involved in the response, demonstrating his involvement in the scheme. On December 28, 2012, Shkreli wrote to the defendant: "The stock is trading like crazy – someone is selling the shit out of

47

it." (GX 510).  The defendant wrote back: "I don't know-there is no freely trading stock other than you guys and the 500k that Fearnow has." (Id.).  The same day, the defendant received an e-mail from Amy Merrill of Standard Registrar, the transfer agent, with the subject line "Totals." (See GX 115-51).  That e-mail included a shareholder summary compiled by Standard Registrar, including, inter alia, the total number of common shares outstanding and the total number of restricted shares outstanding.  Underneath that, Merrill testified that she wrote "Float" followed by the number 2,519,859.  Merrill testified that float was the number of free-trading shares and that she calculated it by finding the difference between the restricted shares and the common shares.  (Tr. 5589). Within 20 minutes of receiving that e-mail from Merrill, the defendant sent it to Shkreli with the comment "fyi." (See GX 504).  Shkreli responded "[a]mazing, someone shorted 60k in the last two days." (Id.).  The defendant's immediate response was "how will they cover?"  Finally, Shkreli responded, "I think it might be tim [Pierotti] selling." (Id.).

This exchange establishes key evidence of the defendant's involvement in the scheme for several reasons.  First, it shows that, in response to the sale of Retrophin shares that could deflate the price of Retrophin stock, the defendant tried to confirm that the co-conspirators did, in fact, control all the free-trading shares.  The December 28 e-mail from Amy Merrill to the defendant is clearly in response to a request from the defendant for information about the number of free-trading Retrophin shares.  That e-mail immediately followed the defendant's exchange with Shkreli regarding the available float.  Second, the defendant's statement, "how will they cover?" the short sales, shows his knowledge that there should not be 60,000 shares of Retrophin stock available to cover a short sale because virtually all of the free-trading shares were controlled by Shkreli.  As Oremland explained, a short sale requires the person engaging in the trade to have sufficient shares available to "cover" the sale, or buy back the shares that were subject of the short

sale.  (See Tr. 5720-21).  The defendant's comment makes plain that he knows there should not be that many shares out in the market.  Put differently, if he believed there were actually 2.5 million free-trading shares not under Shkreli's control, the defendant should not have had any questions about whether such a short sale could have been covered.  Third, Shkreli's comments that "it might be tim selling" demonstrates the defendant's understanding that Pierotti selling shares of stock into the market is inconsistent with the stated goals of the conspiracy.

Relatedly, the defendant's participation in the conspiracy is further supported by his conduct immediately after Shkreli stated his belief that Pierotti was selling Retrophin shares.  The very next day, December 29, 2012, Shkreli tried to contact Pierotti, who then asked Shkreli to communicate with him through Biestek.  (GX 505).  Shkreli forwarded his email exchange with Pierotti to the defendant, who responded: "leave it alone-you are an affiliate and it will only create problems."  (Id.).  Despite this, the very next day—December 30—the defendant and Shkreli discussed how to bring Pierotti "over the wall," that is, put him in possession of material non-public information, in order to halt his trading of Fearnow shares.  (GX 507).  To accomplish this, Shkreli sent the defendant a draft e-mail containing purported inside information with a subject line beginning "OVER-THE-WALL and CONFIDENTIAL."  (Id.).   The defendant responded: "I like it…although i do not like the subject line."  (Id.).   After Shkreli asked the defendant what was wrong with the subject line, the defendant responded, "[h]e will not open it once he sees it." (Id.).  Shkreli responded that "[t]he subject line is enough to put everyone [over the wall]," to which the defendant responded, "[i]nteresting idea – i don't know what happens if he deletes and doesnt read." (Id.).  This e-mail exchange demonstrates the defendant's knowledge and participation in efforts to further the conspiracy by preventing Pierotti from selling a large number of shares, which would have depressed the price of Retrophin's stock.  Indeed, the defendant tried to advise Shkreli on how

49

to surreptitiously bring Pierotti over the wall by exposing him to purported inside information when Pierotti had absolutely nothing to do with Retrophin.

Then, on January 2, 2013, Shkreli e-mailed the defendant a proposed message to Pierotti in which Shkreli asked Pierotti to "honor the agreement we made in our office on December 10th" and gave Pierotti the choice of returning the remaining Fearnow shares or of being sued in federal court. (GX 112-25). When Shkreli notified the defendant of this communication to Pierotti, the defendant responded in a way that shows his knowledge of, and ongoing participation in, the conspiracy: "Very risky given what you (sic) agreement was-could be opening a much bigger can of worms." (Id.). This is particularly noteworthy because the defendant had drafted the share purchase agreement between Pierotti and Fearnow, and knew that Pierotti had purchased the shares directly from Fearnow such that neither Shkreli nor Retrophin had a legal right to those shares. Shkreli then sent a version of the email later that day to Pierotti and copied the defendant. In mid-January 2013, when Pierotti refused to return the shares, Shkreli began a campaign of harassment against Pierotti and his family that demonstrated the degree to which Shkreli believed he controlled the Fearnow shares. Despite learning of Shkreli's harassment, the defendant not only continued with his efforts to get the shares returned to Shkreli, he did not inform anyone—neither Retrophin nor his colleagues at Katten—of the harassment. When that campaign of harassment was not successful, Shkreli and the defendant ultimately caused Retrophin to sue Pierotti in a further attempt to restrict his ability to sell the Retrophin shares. (Tr. 6007).

The defendant's active participation in trying to get Pierotti to return his Retrophin shares was also extremely probative of his guilt. If the shares were truly Pierotti's, and if market forces set the trading volume and price of Retrophin stock, then there would have been no basis for the defendant and Shkreli to demand their return to Shkreli under blatantly false pretenses. It is

only because the defendant believed that the Fearnow shares belonged to Shkreli, and that Shkreli controlled their trading, that he actively worked to get Pierotti to return the shares to Shkreli.

Finally, the defendant fails to acknowledge the dozens of e-mails entered into evidence at trial demonstrating that, starting in March 2013, the defendant and Shkreli utilized the escrowed Fearnow shares to pay back jilted MSMB investors. One of the concerns that the defendant raised with Shkreli when they were contemplating how to structure payouts to the MSMB investors was avoiding a "Pierotti problem," i.e., a Fearnow share recipient refusing to do what he was told with the shares. (See GX 542). The defendant and Shkreli were also concerned with structuring the share transfers so that the actual owners of the shares would not know where the shares were being sent. (Id.) Thus Shkreli stated that the defendant's proposal of how to transfer the Fearnow shares is "the best - so its anonymous and the 5 people doing it don't know exactly where its going." (Id.).

The defendant ignores all of this evidence. Instead, he cites a single e-mail that was introduced during the defendant's case that he claims demonstrates that he did not join the conspiracy. In that December 2012 e-mail, the defendant tells Biestek, that Biestek was free to sell the stock however and to whomever he wants. (See Def. Br. at 28 (citing DX 1283)). The defendant's argument is not persuasive for a number of reasons. First, the defendant's e-mail fits squarely within the conspiracy because Shkreli and others told the Fearnow shareholders they should trade some stock in order to generate trading volume so it would appear to the market the stock was being actively traded. (Tr. 5944, 5988). Moreover, assuming that the e-mail stands for the proposition that the defendant told Biestek that he could sell stock that he owned, it says absolutely nothing other than that the defendant did not admit to fraud in an e-mail. Most

51

importantly, that single e-mail does not offset the detailed and extensive evidence, set forth above, establishing his participation in the conspiracy.

For the reasons set forth above, there was more than sufficient evidence from which a reasonable jury could find the existence of the conspiracy charged in Count Eight and the defendant's participation in that conspiracy.  The defendant does not even attempt to address most of this evidence.  Accordingly, the defendant's motion for a judgment of acquittal on Count Eight should be denied.

II.    THE DEFENDANT'S RULE 33 MOTION SHOULD BE DENIED

In deciding whether to grant a Rule 33 motion, "[t]he test is whether it would be a manifest injustice to let the guilty verdict stand."  E.g., United States v. James, 712 F.3d 79, 107 (2d Cir. 2013) (citing United States v. Lin Guang, 511 F.3d 110, 119 (2d Cir. 2007) (internal quotation marks omitted)).  "For a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted."  James, 712 F.3d at 107 (internal quotation marks omitted); accord United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009).  A trial court therefore "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances" and generally defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.  United States v. Ferguson, 246 F.3d 129, 131, 133-34 (2d Cir. 2001) (internal quotation marks omitted).  The defendant bears the burden of showing that a new trial is warranted.  E.g., United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).

The defendant here has failed to meet Rule 33's high standard for a new trial.  Indeed, as discussed in detail below, most of the defendant's arguments simply reflect disagreements with rulings the Court made during the trial.  And none of them show "manifest injustice," suggest the defendant was innocent, or otherwise support the Rule 33 motion.

A.    The Jury Instructions Were not Erroneous

The defendant argues that a new trial is warranted because the Court declined to give several jury instructions the defendant requested.  (Def. Br. at 30-34).  The defendant's requests for these instructions were the subject of extensive argument before and during the trial, and the defendant's Rule 33 motion adds nothing new to the arguments already made.  Moreover, the defendant cites no case in which a Rule 33 motion was granted on the grounds that a Court declined to give a jury instruction requested by the defendant.  For these reasons and the specific reasons below, the defendant's arguments related to jury instructions are meritless.

First, the defendant argues that the jury should have been instructed about various aspects of corporate law related to the concepts of "alter ego" and "veil-piercing." (Def. Br. at 31-32). As the defendant acknowledges, the Court has already rejected this exact argument. (E.g., Tr. 8808-8815).[27] The defendant identifies no changes in circumstances or law that could conceivably support a request for reconsideration of the Court's ruling during the trial.

Setting aside this procedural bar, the defendant's argument is no more persuasive now than it was during the trial. A defendant is not entitled to any jury instruction he requests. Instead, he is entitled only to an instruction regarding a defense theory that is legally correct and "for which a foundation existed in the record" and, even then, "not necessarily . . . in the language of his choice." United States v. Coplan, 703 F.3d 46, 87 (2d Cir. 2012). The Second Circuit will vacate a conviction on the grounds of a missing and requested instruction only if "(1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." Id. None of these legal requirements are met.

The defendant argues that the jury should have been instructed about "alter ego" and "veil piercing" because those concepts were relevant to evaluating his state of mind during the events at issue. In other words, the defendant contends that his own supposed understanding of these legal concepts was a fact that the jury should have considered. (See Def. Br. a 32-33 ("The evidence clearly showed that there was substantial commingling . . . The same is true with respect

---

[27] Moreover, after the Court declined to include the instruction, defense counsel stated that they "would like to talk to [the defendant] about [the instruction] over the weekend" (Tr. 8815), but did not subsequently raise the issue again, despite additional litigation related to the jury instructions, see, e.g., Dkt. Nos. 482, 494.

to . . . litigation threats . . . . Yet the jury was left to judge Mr. Greebel's state of mind without the final, crucial piece [of evidence about Mr. Greebel's knowledge of corporate law].")).

But the Court did instruct the jury extensively about the requirements that the government prove with respect to the defendant's state of mind and also instructed the jury about the defendant's "good faith" defense. (See, e.g., Tr. 10897 ("Additionally, however misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith."); Tr. 10919 ("Good faith is a complete defense to the charges in this case.")). Those were the only jury instructions to which the defendant was entitled with respect to his state of mind, and the defense does not argue that they were improper.

Moreover, the defendant's proposed instructions about "alter ego" and "veil piercing" do not represent a legal "theory" of the defense "with basis in the record that would lead to acquittal"—they represented information that the defendant believes was relevant to his defenses that he lacked a criminal state of mind and acted in good faith. See Coplan, 703 F.3d at 87. But a jury instruction is not the proper vehicle for providing the jury with facts about what a defendant might have known or been thinking—that is the role of evidence, including documents and witness testimony. Although the defendant was under no obligation to present any evidence, he could have tried to introduce the evidence about corporate law before the jury, but he chose not to do so.[28] It would have been no more proper for the Court to instruct the jury on these doctrines than it would

---

[28] Defense counsel promised that the defense "will establish to our defense case more of the relevance in the mind of Mr. Greebel relating to commingling and piercing the corporate veil and this alter ego concept." (Tr. 8812). Yet the defense did not do so. No fact witness testified about "alter ego" liability or "veil piercing" generally, let alone that those issues were relevant to the defendant's mindset. And the defendant noticed an expert witness, Gail Klein, to discuss these concepts, told the Court he intended to call Klein, and then chose not to call her even though the Court would have permitted her testimony. (See, e.g., Tr. 7358 (defense counsel confirms intent to call Gail Klein)).

have been for the Court to instruct the jury about the state of Retrophin's finances or about whether Shkreli commingled funds.  The defendant provides no authority to support the suggestion that the <u>Court</u> should have provided the jury with facts—in this case, information about corporate law—that the defendant would then argue should be considered.

   <u>Second</u>, the defendant revisits—again—his baseless contention that the jury should have been "instructed" that Shkreli was acquitted of Count Seven during his severed trial.  (Def. Br. at 34-35).  The defendant relies solely on <u>United States v. Rodriguez</u>, 983 F.2d 455 (2d Cir. 1993), a case that involved neither a Rule 33 motion nor the kind of instruction the defendant seeks. Moreover, <u>Rodriguez</u> stands solely for the proposition that a conspiracy conviction should not stand where the district judge held that there was insufficient evidence as a matter of law to convict the defendant's alleged co-conspirator.  Those facts do not fit this case.  Unlike in <u>Rodriguez</u>, the Court held in the Shkreli trial that the government <u>had</u> proven Shkreli's guilt for Count Seven by a preponderance of the evidence, which is more than enough to survive a Rule 29 challenge.  <u>See, e.g.</u>, <u>Guadagna</u>, 183 F.3d at 129 ("[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'").

   The defendant also argues that this Court intended to contravene binding Second Circuit precedent—including <u>United States v. Acosta</u>, 17 F.3d 538, 545 (2d Cir. 1994) (the defendant's conspiracy conviction "does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators")—by holding that the government has the "burden of offering new evidence" that a defendant conspired with someone other than an acquitted co-conspirator in the context of a subsequent jury trial.  (Def. Br. at 34; <u>see, e.g.</u>, Govt.'s Opp. to Def.'s Mot. to Dismiss, Dkt. No. 345 at 4-8 (describing law related to acquittal of co-conspirator)).  That is not the law, as this Court recognized (<u>see</u> Order on Mot. to Dismiss, Dkt. No. 404 at 4, 8), and

the government does not understand the Court's statements cited by the defendant to be creating such a new legal requirement.

In any event, as is clear from a comparison of the records of the Shkreli trial and this trial, the government presented ample additional evidence of the role both Shkreli and others played in the conspiracy with the defendant. To the extent there is any legal relevance to the question whether some of that evidence was not introduced in the Shkreli trial, it is clear that some of the evidence related to Count Seven was not introduced in the Shkreli trial. For example, such evidence includes numerous emails sent between Shkreli and the defendant; evidence about the defendant's motive; testimony about false statements the defendant made to David Geller, Alan Geller, and Richardson; testimony about statements made by the defendant to Marcum; evidence that Alan Geller did not perform any consulting services in connection with his consulting agreement with Retrophin; evidence about the defendant's false litigation updates to Marcum; and evidence about false statements by Mr. Mulleady.

## B. The Government Complied with its *Brady* and *Giglio* Obligations

The defendant argues that his conviction should be overturned because the "government failed to disclose information within the purview of <u>Brady</u> and <u>Giglio</u>." (Def. Br. at 37). In support of that baseless claim, the defendant offered a so-called "sampling"[29] of alleged evidence he believes support his claim. <u>Id.</u> Greebel's argument should be rejected because he has failed to show any <u>Brady</u> violation, let alone one that merits a new trial under Rule 33.

---

[29] The defendant's efforts to imply that there are other purported violations he has not raised should be disregarded as they were not described or advanced in the defendant's motion.

1.    Applicable Law

In order to collaterally attack a conviction based on a putative <u>Brady</u> violation, the defendant must show:  (1) the allegedly suppressed evidence is "favorable to the accused" either "because it is exculpatory, or because it is impeaching"; (2) the evidence was "suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." <u>E.g.</u>, <u>United States v. Gil</u>, 297 F.3d 93, 101 (2d Cir. 2002).  In addition, the allegedly suppressed evidence must have been "material," meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).

2.    Argument

The defendant has identified five instances in which he maintains that, through a nearly three-month trial, the government failed to comply with its <u>Brady</u> and <u>Giglio</u> obligations. As set forth below, none of these instances individually amounts to such a violation.  Indeed, the record establishes that much of the alleged <u>Brady</u> material was neither potentially exculpatory nor potentially impeaching (or simply does not exist).  Moreover, the government promptly turned over all potential <u>Brady</u> or <u>Giglio</u> material with ample time for its use at trial.  And, in virtually every instance the defendant identifies, he already possessed the very information he claims was not disclosed.  The defendant chooses to ignore this.  Finally, in any event, the defendant does not and cannot argue that any individual allegation constitutes a violation sufficient to warrant a new trial. Additionally, the defendant claims that the cumulative effect of the alleged violations violated the defendant's right to a fair trial.  (Def. Br. at 37).  The defendant is wrong.  The cumulative effect of nothing is nothing.

a.      Bernadette Davida

The defendant alleges that Davida's general opinions and observations about him constitute Brady material and should have been disclosed.  The defendant was wrong when he argued this at trial, and he is wrong now.  Davida's opinions and observations are not "exculpatory," and, even if they were, the defendant was not prejudiced by any non-disclosure.

As an initial matter, Davida's general opinion that the defendant was "respected" at Katten is not "exculpatory" evidence.  "Exculpatory" evidence is "favorable to [the] accused" and "material either to guilt or to punishment."  Dist. Att'y's Office for the Third Jud. Dist. v. Osborne, 557 U.S. 52, 95 (2009) (quoting Brady, 373 U.S. at 87).  Even assuming Davida's statements were favorable, her opinion that the defendant was "respected" at Katten is simply not material to whether or not the defendant committed the charged conduct.  Just as it would not be probative of guilt that some people did not like the defendant, the inverse is also not probative.

Moreover, Davida's testimony simply relayed her general opinion of the defendant's reputation at the law firm.   That opinion says nothing about whether the defendant would betray his client's trust.  Davida specifically did not vouch for his reputation for honesty, as the defendant claims.  (See Def. Br. at 38).  In fact, Davida would not have been able to do so.  She testified that the extent of her interaction with the defendant was that they "practiced at the same firm" and "knew who each other were and we were in some business development programs that the firm put on together so we knew enough to say hi and hello."  (Tr. 1191).

Similarly, Davida's testimony that she never observed the defendant "doing anything wrong" or "lying" is not exculpatory.  Davida, a real estate partner who brought Martin Shkreli on as a client after meeting Kevin Mulleady socially, had minimal interaction with the defendant on matters for Martin Shkreli or otherwise.  Davida did only limited work related to the MSMB funds and had no involvement in Retrophin; she did not even learn that Retrophin had been

59

brought in as a client until she saw a new matter memorandum filed by the defendant.[30]  (Tr. 1212,

1220-22).  That Davida did not see the defendant commit a crime or betray a trust during these

limited interactions is no more probative than would be the testimony of a bank robber's neighbor

that he did not see his neighbor robbing a bank.  See Shakur v. United States, 32 F.Supp.2d 651,

672 (S.D.N.Y. 1999) (finding it "impossible to conclude" that a jury would have acquitted had the

government disclosed a witness statement that he had not seen the defendant commit criminal acts

because those acts were "at other times and in other places.").  Far more relevant than Davida's

testimony were the repeated statements by the defendant's own witnesses, such as Howard Jacobs,

Michael Rosensaft and Howard Cotton, that the defendant withheld key pieces of information from

the lawyers at Katten who worked closely with him.  Accordingly, Davida's observations based on

her limited exposure to the defendant were not "exculpatory information."

Finally, even assuming that Davida's opinion was "exculpatory," the defendant

cannot demonstrate a reasonable probability that earlier disclosure of these statements would have

led to a different result.  The statements were presented to the jury at trial,[31] were elicited on cross-

examination, and could have been utilized by the defense in its nine-hour closing.  The defense

chose not to do so.  Faced with this reality, the defendant has resorted to arguing that he was

prejudiced because he did not refer to Davida's opinions in his opening statement.  That argument

---

[30] For example, Davida explained that the defendant did most of the work on the MSMB
transactions and that, after she made sure the first MSMB matter was staffed properly, she "just
reviewed press releases and things like that to see if there was anything related to real estate."  (Tr.
1212).  Davida also testified that it was "not very often" that she observed the defendant working
with Shkreli and other than the initial meeting, did not attend any other meetings with the defendant
and Shkreli.  (Tr. 1220-21).

[31] In fact, the government elicited from Davida on direct examination that she never had
problems working with the defendant and never saw him do anything that made her uncomfortable.
(Tr. 1221).

is simply too attenuated to be credited, both because defense counsel <u>did</u> speak extensively about the defendant's reputation in the opening and also because he <u>did not</u> use this supposedly exculpatory material in summation.   Accordingly, the defendant cannot demonstrate that not disclosing Davida's testimony about the defendant constitutes a <u>Brady</u> violation.

> b.   <u>Corey Massella</u>

The defendant argues that the government failed to disclose information regarding the circumstances of Corey Massella's departure from Citrin Cooperman, the accounting firm founded by Niles Citrin, the defendant's father-in-law.   While at Citrin Cooperman, Massella advised Retrophin on getting its books together and preparing financial statements so that Retrophin could raise money in the public capital markets.   (Tr. 3271).   During cross-examination, defense counsel confronted Massella with its belief that Massella was "forced to leave Citrin Cooperman" because of some sort of alleged misconduct in relation to a former client.   (Tr. 3382).   Massella departed from Citrin Cooperman pursuant to a purportedly confidential "Exit Agreement and Mutual General Release."   (<u>See</u> GX 113-45).   As part of that agreement, Massella was permitted to retain specific clients and certain receivables related to those clients and others that stayed at Citrin Cooperman.   (<u>Id.</u>).   Although the actual circumstances of Massella's departure were disputed at trial, the salient issue here is the defendant's allegation that the government failed to disclose potential impeachment material related to that departure.   As explained below, there was no such <u>Giglio</u> violation.

<u>First</u>, the government did not possess the information that the defendant claimed was not disclosed.   As the government explained, it knew only that Massella left Citrin Cooperman because of a disagreement and that there was a confidentiality agreement in place preventing Massella from disclosing the details.   (Tr. 3383, 3385).   Accordingly, the government had no reason to believe that Massella had a reason to be biased against the defendant or Niles Citrin.   In order to

suggest that the government did know more, that defendant mischaracterizes Massella's testimony. But a review of pages 4194 through 4207 of the transcript makes it clear that the only thing Massella told the government <u>prior</u> to cross-examination was that he had left Citrin Cooperman under "difficult circumstances." (Tr. 4204). The defense citations are not to the contrary. For example, Masella made clear that he told the government some details about a client loan only <u>after</u> cross-examination had begun and <u>after</u> the government had received permission from the Court to speak to Massella and his attorney about his departure. (<u>See</u> Tr. 4194 (conversation with the government was "after the recent – when I was cross-examined"); 4195 (conversation was "recent, recent.")). It also is clear that the defense questioning was difficult to follow and that Massella was trying carefully to differentiate between earlier conversations (when he was abiding by the confidentiality agreement) and later conversations (after he was free to discuss the issue).

   <u>Second</u>, the defendant possessed the very information that he now complains the government did not disclose. That alone means he cannot establish a <u>Brady</u> or <u>Giglio</u> violation. <u>See</u> <u>United States v. Guerrero</u>, 959 F.Supp.2d 523, 531 (S.D.N.Y. 2013) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (quoting <u>United States v. Zackson</u>, 6 F.3d. 911, 918 (2d Cir. 1993)). Indeed, it is clear from the transcript that the defendant was in possession of significant details regarding the circumstances of Mr. Massella's departure from Citrin Cooperman, including details of Mr. Massella's loan to the client, his communications (or lack of communications) with Citrin Cooperman about the loan, and Citrin Cooperman's purported decision to "fire" Massella. (<u>See</u> Tr. 3383-3384, 3391).[32]

---

[32] The level of detail that the defendant possessed before cross-examination regarding the circumstances of the departure is not consistent with the terms of the confidentiality agreement.

Finally, even assuming the government could have disclosed more than it did, the defendant cannot demonstrate any prejudice.   The Court agreed to permit defense counsel to extensively cross-examine Massella about the circumstances of his departure from Citrin Cooperman in order to establish any bias against the defendant or his father-in-law.  See Tr. 3402 ("All right. Well, let's see how you do with the bias. Focusing on bias. Bias. Bias.").  But defense counsel never actually tried to do that.[33]  And, on redirect, Massella adamantly denied any bias against the defendant or Niles Citrin.  (Tr. 4209).  Furthermore, despite urging a focus on "bias," the Court gave the defense significant latitude to question Massella about the circumstances of his departure from Citrin Cooperman and about whether a client loan compromised Massella's ability to act objectively, areas of inquiry that went far beyond bias.  (See Tr. 4194-4202).

c.      Timothy Pierotti

The defendant contends that the government's conduct with regard to Timothy Pierotti's prior interactions with the United States Attorney's Office for the Southern District of New York (the "SDNY") raises "grave concerns regarding the government's compliance with its Brady and Giglio obligations."  (Def. Br. at 40).  Far from it.  Not only was the government

---

Those details could have been known only by the parties to the agreement, Citrin Cooperman and Massella.  Massella did not provide the details of the agreement to the defense, leaving only Citrin Cooperman as a source.  When pressed as to how it obtained detailed, confidential information about Massella's dispute, defense counsel did not explain, stating: "I'm not under oath and I'm not being cross-examined, but I have a good faith basis because he filed a lawsuit." (Tr. 3383).  Perhaps aware that the lawsuit filed by Massella did not have the detail that defense counsel possessed, counsel then stated: "We have investigators. We have our own people who are looking into evidence. We have our own sources of information. All that is privileged, it's confidential and it's attorney/work product."  (Tr. 3386).  Without resolving the issue of whether facts provided to a defendant in violation of a confidentiality agreement constitute attorney "work product," the manner in which the defendant appears to have obtained this information from his father-in-law's firm does nothing to strengthen his claim of any Brady violation.

[33] The closest the defendant came to bias was to ask Massella whether his departure from Citrin Cooperman put a "stain" on his career or hurt his career.  (Tr. 4202).  Massella denied that.

transparent about the information it had (and did not have), but the information about which the defendant complains was known to the defendant months, if not years, earlier and was provided to the defendant with ample time to use it at trial.

On July 17, 2017, the government sent Shkreli's counsel a letter (with a copy to the Court), providing background on Pierotti's interactions with the SDNY.  That letter explained that SDNY prosecutors had offered Pierotti a non-prosecution agreement ("NPA") in the context of another case,[34] and that:

> Mr. Pierotti does not have a signed copy of the NPA in his files. The government has checked with the SDNY, and prosecutors there similarly have been unable to locate a signed copy of the NPA.  However, SDNY prosecutors have been able to confirm the scope of the NPA provided to Mr. Pierotti prior to his anticipated testimony

(July 17, 2017 letter, attached hereto as Exhibit A (emphasis added)).  The government provided a copy of that letter to defense counsel on August 15, 2017, following a meet-and-confer about Pierotti.  On October 3, 2017, defense counsel requested, for the first time, Pierotti's NPA and any FBI reports of meetings between Pierotti and the SDNY.  The government promptly replied the same evening that it did not possess either the NPA or any requested FBI reports.  The government had already made efforts to locate a signed copy of the NPA[35] but had not tried to obtain the FBI reports.  The government reiterated its position that the material was in the possession of a different U.S. Attorney's Office and, even assuming it constituted Brady or Giglio material for this case, was not in the possession, custody and control of the EDNY prosecutors.  The government's position

---

[34] As the Court and defense counsel are aware, one defense attorney, Mr. Brodsky, was one of the prosecutors working on the case involving Pierotti, was familiar with the existence of the NPA, and was also familiar with Pierotti's statements to SDNY prosecutors.  Indeed, Mr. Brodsky was present for the two substantive SDNY interviews with Pierotti where an AUSA was present.

[35] As the Court recognized, an unsigned copy of the NPA was not admissible at trial.  (See Tr. 5825-26).

was in line with Second Circuit precedent that specifically rejected imposing "an unlimited duty on

a prosecutor to inquire of other offices [for Brady material] not working with the prosecutor's office

on the case in question" because it would "inappropriately require us to adopt 'a monolithic view

of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'"

United States v. Avellino, 135 F.3d 249, 255 (2d Cir. 1998) (citing United States v. Gambino, 835

F.Supp. 74, 95 (E.D.N.Y. 1993)).

The issue was next raised at the pre-trial conference on October 6, 2017, at which

the government reiterated that it: (1) had provided the required Giglio disclosure for Pierotti, (2)

did not possess a copy of the NPA (either signed or unsigned) or the 302s, and (3) was not required

to obtain those materials because they were from another case and held by another office.  (See Tr.

88, 91).  The government also made plain that it had never represented that it could not find the

302s.[36]  (See Tr. 91).  After the Court ordered the government to obtain the FBI 302s and the NPA,

the government obtained the 302s and an unsigned copy of the NPA, and produced them to the

defendant on October 12, 2017.

Notwithstanding efforts to distort the record, the government's actions with regard

to the Pierotti documents at issue do not constitute a violation of Brady or Giglio for a number of

reasons.

First, the government did not possess or control the documents about which the

defendant complains until the Court ordered the government to obtain them.  The statements in the

---

[36] The defendant's piecemeal citation to the pre-trial conference is excerpted to suggest, misleadingly, that the government somehow misrepresented what it possessed and that it had tried to obtain the FBI 302s and the unsigned NPA, but had been unable to do so until the Court ordered it to produce them.  The lengthy record shows that the government was completely transparent about what steps it had taken.

302s were, and remain, tangential to the charged conduct and were from an unrelated investigation, and Pierotti did not have a cooperation or non-prosecution agreement with the EDNY.  To suggest that the EDNY "possessed" documents from the SDNY case imposes the monolithic view of government that the Second Circuit has cautioned against.[37]

Second, the information contained in the FBI 302s and the NPA was neither Brady or Giglio.  As an initial matter, the defense does not even suggest this material was actually exculpatory under Brady.  Moreover, despite the defendant's assertion that these materials constituted Giglio, he has failed to identify any alleged inconsistencies between the FBI 302s and Pierotti's prior statements in this case or his testimony at either trial.  Notably, Pierotti denied committing insider trading at both trials (and was subjected to extensive cross-examination on that point), and took the same position in his interactions with the SDNY.  (Compare Tr. 6103:16-18 with GREEBEL000025 ("[t]here was a discussion that the deal was expected to be accretive to SMUCKER's earnings by a few pennies.")).  Indeed, despite a number of attempts, the defendant was not able to impeach Pierotti on anything contained in the FBI 302s.[38]

Third, even assuming the information constituted Giglio material, the defendant had that information well before trial even began.  As discussed above, Mr. Brodsky was present for

---

[37] Despite complaining that the government did not find a signed copy of Pierotti's NPA, defense counsel ignores that Mr. Mastro had at least one discussion with a defense counsel in the SDNY prosecution who may have had a signed copy of the NPA, yet never asked the Court for a subpoena for that document, despite issuing dozens of pre-trial subpoenas.  See (Tr. 95) (stating that Mr. Mastro spoke to defense counsel in the SDNY prosecution, who was "under a protective order in that case.  If Your Honor were to direct something, that might be a different issue.").

[38] For example, defense counsel's attempt to impeach Pierotti with the FBI 302 dated November 21, 2011 because the FBI agent wrote "Other than SMUCKERS, PIEROTTI did not trade on insider information at Galleon or any other company," see GREEBEL000022, was unsuccessful.  That language in the 302, which was a summary written by the FBI agent, was also entirely consistent with Pierotti's repeated testimony that he traded using inside information but did not commit insider trading because the information was not material.  (See Tr. 5846, 6041, 6103).

the two significant proffers with Pierotti.  He did not just know of this information—he had firsthand knowledge of it.  United States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982) ("The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.") (emphasis added); see also United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987) (holding disclosure is not required where "the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence.").

Finally, even assuming these documents constituted Giglio material and that the defendant (and his own attorney) somehow did not have knowledge of the information in them, the defendant was not prejudiced by the timing of disclosure because he had ample time to, and in fact did, utilize the materials at trial.  In opening statements, defense counsel cited Pierotti's statements to the FBI (memorialized in the 302s) in an attempt to discredit Pierotti.  (See Tr. 1168-69).  The defendant also attempted to use the materials to impeach Pierotti on multiple occasions.  (See, e.g., Tr. 6062).  And, during its summation, the defense attempted to use Pierotti's statements in the SDNY investigation to portray him as a liar.  (See Tr. 10388).  Thus, the defendant had ample opportunity to use Pierotti's statements, and it is impossible for the defendant to claim any prejudice stemming from their disclosure on October 12.[39]  See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001) ("we reiterate the longstanding constitutional principle that as long as a defendant

---

[39] Defense counsel had the FBI 302s and Draft NPA more than a week before opening statements and for over a month before Pierotti testified.  While this is ample time under any circumstances, the defendant never even asked for more time to prepare for Pierotti's cross-examination.

possesses <u>Brady</u> evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.").

        d.     <u>Steven Rosenfeld</u>

The defendant accuses the government of multiple <u>Brady</u> violations in connection with MSMB Healthcare investor Steven Rosenfeld. Again, these accusations are meritless.

Perplexingly, the defendant continues to argue that the government should have turned over information about a supposed conversation between an Assistant United States Attorney ("AUSA") and Rosenfeld that the government adamantly denies took place.[40] The government could not possibly be required to disclose the contents of a conversation that did not happen. <u>Cf.</u> <u>United States v. Miranda</u>, 526 F.2d 1319, 1324 (2d Cir. 1975) ("In a criminal case, the Government plainly has the obligation to make available to the defense evidentiary material <u>in its possession</u> which is disclosable under the due process safeguards of <u>Brady</u>.") (emphasis added).

The defendant's assertion that the government failed to turn over evidence that "Dr. Rosenfeld consistently maintained that he did, in fact, provide legitimate consulting services" is simply false. (<u>See</u> Def. Br. at 41). Prior to both the Shkreli trial and this trial, the government disclosed 3500 material for Rosenfeld.[41] That disclosure consisted of 10 documents related to

---

[40] Rosenfeld's allegations about this communication make absolutely no sense and are directly contradicted by the other testimonial evidence. Nevertheless, defense counsel inexplicably vouched for the credibility of Rosenfeld by seeking to elicit this testimony. (<u>See</u>, <u>e.g.</u>, Tr. 9421, 9423). It is surprising and disappointing that experienced defense counsel, being fully informed of all of Rosenfeld's testimony and beliefs, would ever have credited that testimony, let alone vouched for it. It is even more surprising and distressing that defense counsel <u>continues</u> to vouch for Rosenfeld. It is ludicrous, for example, to suggest that an AUSA would have contacted a represented witness and, among other things, demanded a payment to a third-party company. Regardless of what defense counsel asserts, the Court, the parties, the jury, and the public heard Rosenfeld's testimony in full, and the record about his veracity is clear.

[41] Over the course of trial, it became clear that the defendant received 3500 material from Shkreli's attorneys well in advance of his trial. Most notably, defense counsel in this case claimed

Rosenfeld's two meetings with the government and his testimony in the arbitration proceeding he brought against Retrophin.   Each piece of 3500 material made plain that Rosenfeld had—incredibly—asserted that he performed consulting work for Retrophin pursuant to his consulting agreement.[42]  (See 3500-SR2-1 at 2 (stating that in a July 21, 2015 interview Rosenfeld stated that "he definitely provided consulting services"); see also 3500-SR2-2 at 3 (stating that in a September 24, 2015 interview, Rosenfeld stated that he "performed consulting services to RTRX")).. Moreover, on July 13, 2016, the government sent counsel for both Shkreli and Greebel a letter disclosing, "in an abundance of caution," potentially exculpatory material related to three consulting agreements, including Rosenfeld's.  (See July 13, 2016 letter, attached hereto as Exhibit B).  That letter stated:

> The materials Bates numbered R024568-R026471, which were produced to the defendants on April 28, 2016, contain statements made by and/or on behalf of Mr. Rosenfeld that he performed services as a consultant for Retrophin in connection with his consulting agreement with the company. Mr. Rosenfeld is currently represented by Andrew St. Laurent, Esq., who can be reached at [telephone number].

(See id.).

---

that one particular piece of 3500 material was incomplete.  However, the piece of 3500 material that defense counsel complained of was only incomplete because it was provided in that manner by the government to Shkreli's counsel initially; subsequently, that piece of 3500 material was updated and the complete version was provided to Shkreli's counsel prior to trial.  When that piece of 3500 material was produced to defense counsel in this case, it was similarly produced in full.  Notably, defense counsel has never denied having access to all of the 3500 material provided to Shkreli's counsel.

[42] Both his testimony before the arbitration proceeding and his testimony at trial made clear that any consulting work Rosenfeld claimed to have performed for Retrophin was exclusively related to his other ventures and mischaracterized as having been performed for Retrophin, after Retrophin refused to pay him.  Indeed, Rosenfeld admitted that his consulting agreement was a way resolve the dispute over his MSMB investment.  (See Tr. 9864 (Q: Isn't it true that in April 2013, you agreed to enter into a consulting agreement to resolve the open issues surrounding your MSMB Healthcare investment?  THE WITNESS: Yes.")).

Furthermore, in addition to these disclosures, any information that Rosenfeld possessed regarding the consulting agreement was already in the possession of defense counsel well before trial.  As Rosenfeld admitted in the arbitration proceeding and at trial, defense counsel paid for the arbitration transcript, and Rosenfeld had authorized his attorneys to communicate with counsel for the defendant.  (Tr. 9921).  The defendant then met with Rosenfeld a number of times before and during the trial.  (Tr. 9827-9830).  Unless Rosenfeld repeatedly lied to defense counsel, the information about which the defendant now complains was in his possession before the trial and its supposed non-disclosure could not possibly constitute a <u>Brady</u> violation.  <u>See</u> <u>LeRoy</u>, 687 F.2d at 619; <u>Gaggi</u>, 811 F.2d at 59.

Finally, even assuming that the information was not provided by the government, the defendant cannot demonstrate any prejudice.  He called Rosenfeld as a witness at trial and presented Rosenfeld's purported "consulting" work to the jury.  (<u>See, e.g.</u>, Tr.  9327-9334).  The defendant also argued in summation that Rosenfeld's purported consulting work demonstrated the validity of the consulting agreements entered into by Retrophin and the defendant's knowledge of the true purpose behind those agreements.  (<u>See</u> Tr. 10606-10607; 10627-10628).  Thus, the very evidence the defendant inaccurately claims was withheld from him was presented to the jury.  That the jury rejected such evidence after hearing from and observing Rosenfeld is not a ground for a new trial.







\*       \*       \*

In sum, the defendant has failed to demonstrate a single violation of <u>Brady</u> or <u>Giglio</u>, let alone a pattern of violations.  The defendant's claim for a new trial on this basis should be denied.

C.      The Court Properly Precluded Rosenfeld's Fabricated Testimony

Not content with asserting baseless claims that the government improperly failed to disclose an alleged conversation between an AUSA and Rosenfeld that never took place, the defendant also asserts that the Court improperly precluded him from presenting evidence of that non-existent conversation.  (Def. Br. at 44-45).  The Court precluded that evidence in a carefully reasoned decision issued after the defendant chose to ambush the government and the Court with Rosenfeld's fabricated testimony in the middle of his direct examination, despite learning of it, at a minimum, weeks earlier.  After noting this inexplicable delay, the Court held that there was little probative value to the evidence and that it was highly prejudicial.  (<u>See</u> Tr. 9584-97).

Nevertheless, the defendant persists in arguing that the evidence was improperly precluded because it was "highly relevant" to the defendant's so-called "rush-to-judgment" defense. (Def. Br. at 44).  The defendant argues that the government's alleged actions somehow relate to the "prosecution's ever changing and ill-founded theory regarding the consulting agreements at issue

---

[44] As set forth in the government's motion at trial, to which the defendant chose not to respond, there were ample legal reasons for the Court to preclude cross-examination on the proffered potential <u>Giglio</u> materials.  Accordingly, it is unlikely that the defendant could have used the information at trial, even if he had wanted to.

in Count Seven" and are relevant to show "how desperate the government was for corroborative evidence. (Id. at 44-45). This argument fails for any number of reasons.

As a threshold matter, the defendant's argument is not appropriate under Rule 33. It has nothing to do with whether the defendant is actually innocent or shows a gross miscarriage of justice, and the defense cites no case to say that this is a relevant consideration for a Rule 33 motion. But, even assuming that this argument is appropriate to consider, it is meritless.

First, the evidence is not "highly relevant"—it is simply and obviously both false and irrelevant. As should not be surprising given its fabricated nature, Rosenfeld's account simply makes no sense. It is unbelievable that an experienced federal prosecutor would call a represented witness and demand money on behalf of a third party. It is even less believable that, if such a threat took place, neither Rosenfeld nor his attorneys would remember the AUSA's name, or that they would have voluntarily attended subsequent meetings with law enforcement, including AUSAs, and never raised the issue. Moreover, the fictitious threat never came up in a hotly contested and lengthy arbitration proceeding, where such a conversation would have been highly relevant to the arbitrator's decision and would certainly have been raised by Rosenfeld's attorneys.[45] The record is clear that the only people who have heard Rosenfeld's statements on this matter and say they believe him are defense counsel in this case.

Second, even assuming such a conversation did take place, it is not relevant to a "rush-to-judgment defense" or otherwise. The defendant does not explain how Rosenfeld's made-

---

[45] Defense counsel's portrayal of Rosenfeld as an unbiased and "highly respected and accomplished doctor and investor" is certainly curious. (Def. Br. at 44). Aside from the fact that Rosenfeld has never treated a patient, he certainly has a demonstrable bias in this case. His representatives have been working with the defendant's attorneys for years, and the defendant paid for the transcript at his arbitration proceeding. Rosenfeld clearly has disputes with Retrophin—the victim in this case—and has complained about how the government treated him.

up testimony about a call from an AUSA relates to his "rush-to-judgment" defense, which is basically the argument that the government prejudged the defendant's guilt and then failed to gather specific evidence that would have created reasonable doubt.  Nor could he, given that the Court properly prevented the defendant from asserting such a defense.   Instead, the defendant shifts his argument and contends that the government's purported "threats" somehow reveal the government's lack of evidence.  Thus, the defendant complains that he was not permitted to inject testimony about a tangential conversation that was not about guilt or innocence precisely for the jury to disregard the actual evidence of guilt or innocence.  They do not and cannot cite any authority for this argument.  The purported evidence does not cast doubt, or relate in any way, to the sufficiency or probative value of the government's evidence at trial.

This evidence should have been precluded for exactly the reasons given by the Court's analysis under FRE 401 and 403.  There was little probative value for this evidence.  The evidence was on a collateral matter, as the government did not argue that Rosenfeld's consulting agreement was a sham.  (Tr. 9595).  At most, the evidence showed that Rosenfeld was consistent in his assertions that he performed consulting work, information already presented to the jury through Rosenfeld's testimony.  (Id.).  The jury did not credit that testimony, likely because Rosenfeld was a wholly incredible witness.  Moreover, as the Court noted, the evidence was highly prejudicial under FRE 403.[46]  Not only would it have led to an improper delay and created an

---

[46] It bears mention that the Court could have, but chose not to, precluded the testimony because of the defendant's inexplicable delay in disclosing the information.  Not only did the defendant not file a motion in limine as soon as they learned of the information, they did not raise the issue to the Court or the government prior to Rosenfeld's testimony.  See Tr. 9589.  The defendant's claims that he first learned of the alleged testimony only two weeks prior rings hollow; but, if true, it further supports the conclusion that the testimony is patently incredible.  It defies logic and common sense that Rosenfeld did not tell anyone connected to the case about the purported conversation until he met with defense counsel in the middle of trial.

unnecessary and confusing trial-within-a-trial about Rosenfeld's allegations, it was highly prejudicial to the government. Indeed, as the Court recognized, the defendant's attempts to introduce this testimony was simply an impermissible effort to shift the focus away from relevant evidence of the defendant's conduct to purported misdeeds of one government agent. (Tr. 9596 (citing <u>United States v. Malpeso</u>, 115 F.3d 155 (2d Cir. 1997))).

  D. <u>The Superseding Indictment Was Not Constructively Amended</u>

    The defendant also argues that a new trial is warranted because the Superseding Indictment ("Indictment") was constructively amended. (Def. Br. at 45-50). The defendant's argument misconstrues the Indictment, the trial record and the law on constructive amendment. It also ignores the Court's ruling on the defendant's constructive amendment motion filed the day before trial began. For these reasons, and those set forth below, the defendant's arguments related to constructive amendment are meritless and should be denied.

    1. <u>Applicable Law</u>

    A constructive amendment to an indictment can arise when the government's proof at trial and the trial court's jury instructions "modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." <u>United States v. Vebeliunas</u>, 76 F.3d 1283, 1290 (2d Cir. 1996) (internal quotations omitted). However, a court will not find constructive amendment where "a generally framed indictment encompasses the specific legal theory or evidence used at trial." <u>United States v. Salmonese</u>, 352 F.3d 608, 620 (2d Cir. 2003) (citing <u>United States v. Wallace</u>, 59 F.3d 333, 337 (2d Cir. 1995)); <u>see also</u> <u>Stirone v. United States</u>, 361 U.S. 212, 218 (1960) (noting that an indictment written in general terms may support conviction on an alternative bases). "A constructive amendment occurs either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered."

75

United States v. Dove, ---F.3d.---, 2018 WL 1161664, at \*4 (2d Cir. Mar. 6, 2018) (internal citations omitted); see also United States v. Weiss, 752 F.2d 777, 787 (2d Cir. 1985) (finding that an impermissible alteration of the government's proof or the court's charge must affect an essential element of the offense); United States v. LaSpina, 299 F.3d 165, 181 (2d Cir 2002) (same).

Because the evidence at trial is not required to be a precise replica of the charges contained in the indictment, courts in this Circuit permit "significant flexibility" in the government's proof at trial, so long as the defendant was provided notice of the "core of criminality to be proven at trial."  See, e.g., United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992) (citing United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983)).  Furthermore, "[t]he core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012).  In the context of wire fraud, the "core of criminality" is the nature of the scheme.  See, e.g. United States v. Dupre, 462 F.3d 131,140-41 (2d Cir. 2006) (no constructive amendment where evidence "concerned the same elaborate scheme to defraud"); United States v. Stitsky, 536 F. App'x 98, 102-03 (2d Cir. 2013) (summary order).

2.    Argument

The defendant argues that the Indictment was constructively amended in three ways. As set forth below, each of the defendant's argument is meritless.

First, the defendant argues that the government constructively amended the Indictment by arguing that a purpose of the backdating was to use Retrophin funds to pay off MSMB investors.  (Def. Br. at 46-47).  This is the same argument the defendant made in a motion filed the day before trial began.  (Dkt. No. 408).  The government filed a response (Dkt. No. 412),

and, on October 19, 2017, the Court denied the defendant's motion.   (Tr. 935-40).[47]   The defendant's argument fails for all of the reasons set forth in the government's response to the defendant's pre-trial motion on constructive amendment and the Court's decision on that motion – none of which the defendant acknowledges, let alone addresses.[48]

Second, the defendant argues that the government constructively amended the Indictment by declining to argue to the jury that the defendant could be convicted of wire fraud conspiracy solely on account of the backdating.  The defendant does not attempt to argue, as he must, that the government's proof or the Court's jury instructions modified an "essential element of the offense." Weiss, 752 F.2d at 787.  Nor could he: under the defendant's theory, an indictment would be constructively amended every time the government narrows the possible bases for conviction during trial – either by dismissing a count or by not advancing a particular theory of criminal liability.  That is not the law.  Rather, as the Second Circuit recently explained, "a defendant alleging a constructive amendment must establish that the evidence or the jury charge on which he was tried broadens the possible bases for conviction beyond the indictment voted on by the grand jury." Dove, 2018 WL 1161664, at *7 (emphasis added).  The argument is particularly unpersuasive in this case, where the defendant actively sought to have the backdating theory "dismissed"—meaning to prevent the government from arguing it to the jury.  In other words, having gotten what he wanted, the defendant now complains he got what he wanted.

---

[47]  In ruling on the defendant's pre-trial constructive amendment motion, the Court stated: "[I]n terms of the prohibitions against modifications or amending or constructively amending an indictment, I do not see how this description of the backdated share transfers modifies the essential elements of the offense charges, which is conspiracy to commit wire fraud."  (Tr. 940).

[48]  The defendant's argument also fails for the reasons set forth in the Court's October 13, 2017 decision denying the defendant's motion to dismiss.  (Dkt. No. 402).

In any event, the defendant's argument is wholly without merit because (i) backdating was alleged in the Indictment (not constructively amended to it); (ii) as the Court has repeatedly held, the backdating evidence was admissible evidence of the conspiracies charged in the Indictment[49]; (iii) the "specific means" used by a defendant to effect his crime—here, backdating—does not constitute an "essential element" for purposes of constructive amendment (see D'Amelio, 683 F.3d at 421; United States v. Abdallah, 528 Fed. Appx. 79, 84 (2d Cir. June 26, 2013) (summary order)); and (iv) the Court's jury instructions specifically stated that "[t]he government does not allege that the [backdated share transfers] defrauded Retrophin, and you cannot find Mr. Greebel guilty of Count One solely on the basis of evidence about these transfers and the dates these transfers occurred."  (Court Ex. 6. at 49).  Against this backdrop, there is no plausible argument that the defendant was convicted of an "offense other than the one charged by the grand jury" – let alone the "substantial likelihood" of such a conviction that is required. Vebeliunas, 76 F.3d at 1290.

Third, taking another tack, the defendant argues that the government constructively amended the Indictment by arguing that Marc Panoff was a co-conspirator and stating, in a pre-trial letter, that Lee Yaffe was a co-conspirator.  (Def. Br. at 48-49).  The defendant's arguments have nothing to do with constructive amendment and are meritless in any event.  The Indictment alleged that Greebel and Shkreli conspired "together with others."  (Indictment ¶ 56).  The government did not amend (let alone constructively amend) the Indictment by identifying certain unindicted co-

---

[49] After the government advised that it would not argue that that defendant could be convicted of the wire fraud conspiracy solely on account of the backdating, the Court reiterated its pretrial ruling that the backdating evidence was relevant and admissible.  (Tr. 9612:2-20).  The defendant does not address the Court's prior rulings, but instead argues, without explanation or citation, that the backdating evidence "amounted to improper propensity evidence in circumvention of Rule 404(b)." (Def. Br. at 47).  For the reasons stated by the Court, the defendant is incorrect.

conspirators.  See, e.g., Slevin v. United States, 98-CV-0904 (PKL), 1999 WL 549010, at *8

(S.D.N.Y. July 28, 1999) ("That the Government provided an identity for its original 'known and

unknown' description [of co-conspirators] does not constitute an amendment or variance"); see

also, e.g., Dove, 2018 WL 1161664, at *5 ("[R]emoval of four of the five names [of co-conspirators

from the indictment] . . . did not constructively amend the indictment because the government did

not have to prove the identities of those named in order to secure a conviction of [the defendant]

for participating in the conspiracy alleged in the indictment.").[50]

       For these reasons, there was no constructive amendment and the defendant's

arguments should be denied.

       E.      The Defendant's Allegations of Juror Misconduct Are Baseless

       The defendant seeks to have this Court vacate the verdict because of alleged "juror

misconduct" during the trial.  (Def. Br. at 50-52).  Based on the statements of a single juror,

Desmond Sankar,[51] the defendant broadly asserts that (1) "the jury clearly disregarded the Court's

instructions" during trial, and (2) that juror was subject to "threats" during jury deliberations that

constituted improper coercion.  (Id. at 50).  Even taking all of the allegations in the defendant's

_____

       [50] The defendant's arguments about Lee Yaffe underscore why his constructive amendment
theory is meritless.  Lee Yaffe's name was mentioned twice during a twelve-week trial, and he was
not mentioned to the jury as a co-conspirator.  (See, e.g., Tr. 9349:24-25 (THE COURT: "Yaffe is
not – there's no evidence about him in this trial, so you are not going to be bring anything out about
Mr. Yaffe.")).  It is inconceivable that the jury nevertheless convicted the defendant of conspiring
with Yaffe, let alone solely with Yaffe.

       [51] As detailed in the government's February 27, 2017 filing (see Dkt. No. 537), the Court
and the parties went to great lengths to shield Mr. Sankar's identity during post-trial proceedings,
including by sealing portions of the record.  Yet the defendant inexplicably and publicly filed an
affidavit signed by Mr. Sankar in connection with his Rule 33 motion and referred to Mr. Sankar
by name in its supporting memorandum.  As a result, the government moved to have the record
unsealed, and the Court granted the motion.  The government therefore refers to Mr. Sankar by his
name in this response.

motion and Mr. Sankar's accompanying affidavit as true—and for the reasons set forth below, there is significant reason not to—the allegations provide no basis to vacate the jury's verdict.

1.    Relevant Background

Trial began with jury selection on October 16, 2017.  (Tr. 32).  The jury was sworn and the presentment of evidence commenced on October 20, 2017.  (Tr. 1065, 1183).  Trial continued until the completion of summations on December 22, 2017, at which point the jury was charged and began deliberations.  (Tr. 10927).

During jury deliberations, the jury sent several notes to the Court seeking information and/or asking questions; none of the notes expressed any concern about the nature or tenor of the deliberations, and none were from Mr. Sankar.  (See Dkt. No. 504 (Jury notes and Court's responses)).[52]  In the afternoon on December 27, 2017, following almost two days of deliberations, the jury indicated it had reached a verdict on both counts.  (Tr. 10990).  The foreperson provided the Court with a signed and dated verdict sheet, which indicated that the jury had found the defendant guilty of both counts.  (Tr. 10993).  The Court read the verdict sheet into the record, and proceeded to poll the jury.  (Tr. 10993-95).  All of the jurors, including Mr. Sankar (who is referred to in certain filings as "Juror No. 6"), stated affirmatively that they agreed with the verdict.  No juror expressed hesitation or concern.  (Id.).  After deliberations, the members of the jury told the Court that they wanted to go as a group to the clerk's office to be discharged.  (12/29/2017 Status Tr. 15-16).

On December 29, 2017, the Court advised the parties that it had received a phone call from Mr. Sankar on December 28.  As explained by the Court, Mr. Sankar spoke to one of the

---

[52] The jury was also present before the Court on multiple occasions during deliberations and, Mr. Sankar never said anything to the Court.

Court's law clerks and conveyed the following, in sum and substance:  Mr. Sankar's preference had

been to continue to review evidence, but he felt pressured by other jurors to vote, and his fellow

jurors told him that if he did not vote, they would tell the Court of his refusal to vote and seek to

have him removed.  (12/29/2017 Status Tr. 3).  The defendant moved to have the Court hold a

hearing to inquire further of Mr. Sankar. (See Dkt. Nos. 506 and 508).  The government opposed

the motion because such an inquiry was prohibited by the express terms of Federal Rule of Evidence

("FRE" or "Rule") 606(b) and irreconcilable with Supreme Court and Second Circuit precedent.

(See Dkt. Nos. 505 and 507).

On January 5, 2017, the Court held oral argument on the matter, and ultimately

decided to ask Mr. Sankar a limited number of questions specifically designed to "determine

whether or not an impropriety of the sort enumerated in [FRE] 606(b) [rule barring improper outside

influences on jurors], Peña [a Supreme Court case finding impropriety where jurors voted in part

based on the defendant's race] or Anderson [a Second Circuit case suggesting in dicta that threats

of physical violence among jurors might constitute a basis for overturning a verdict] occurred

during deliberations]."  (1/5/2018 Tr. 9).  The Court subsequently placed Mr. Sankar under oath

and had the following colloquy with him:

> THE COURT: There are a couple of ground rules. First of all, you
> should not disclose what any juror said to you or said at all to
> anybody during deliberations and you should not disclose any
> incident that occurred in the jury room unless I ask you to tell me.
> Do not disclose any juror's name or seat number.
>
> MR. SANKAR: Okay.
>
> THE COURT: I will ask questions that will ask you to answer "yes"
> or "no," unless I instruct you otherwise or unless you tell me that
> you need to explain further.  And I ask that you not tell me what you
> were thinking or if you have a view of what other jurors were
> thinking, you should not
> disclose that either --

Mr. SANKAR: Okay.

THE COURT: -- unless I instruct you otherwise. All right, sir?
So, first of all, was physical violence or any threat of physical force
or harm made against you in order to compel you to vote?

MR. SANKAR: No.

THE COURT: Was there any material from outside like media
reports or juror research or any matters like that that was beyond the
evidence at trial considered by the jury?

MR. SANKAR: No.

THE COURT: Were you prevented by actual or threatened force or
violence or threats of force or violence from contacting the Court
with a note during jury deliberations?

MR. SANKAR: No.

THE COURT: Did any juror make any statements indicating that he
or she was motivated to convict Mr. Greebel based on Mr. Greebel's
race, sex or religion?

MR. SANKAR: No.

THE COURT: All right. Let me just then thank you for your time
and I appreciate your service and I will, again, just say to you, on a
cold winter day, you came out to meet with us again and I am
grateful for your service.

MR. SANKAR: I'm happy to meet with everyone here and
everything was fine and good.

(1/5/2018 Tr. 30-32).

Following that colloquy, defense counsel advised the Court that they would contact

Mr. Sankar, as well as other jurors, in an attempt to further discuss jury deliberations.  (Id. at 35).

In response, the Court advised that it would

prefer that the inquiry be done in a manner that is available to both
sides and under the Court's supervision … The jurors were advised
at the end of the case that you may get inquiries from the media or

82

> lawyers, it is up to you if you speak with them, and the consensus
> seemed to be we want to leave together with a CSO, go to the clerk's
> office and leave. So, I have stated my strong preference that there
> not be further ex parte contact.

(Id. at 36).  The Court nevertheless stated that, despite this "strong preference," it would not bar

defense counsel from contacting jurors, and defense counsel reiterated that it would do so.  (Id.).

Subsequently, in connection with his motion, the defendant filed an affidavit from

Mr. Sankar that purports to detail, inter alia, Mr. Sankar's feelings about the evidence and jury

deliberations, statements allegedly made by other jurors prior to jury deliberations, and statements

allegedly made by other jurors during jury deliberations.  (See Dkt. No. 533).  The affidavit is

typewritten, with each page initialed by Mr. Sankar, and the final page is both signed by Mr. Sankar

and notarized.  The affidavit also attaches a single heavily-redacted text message, but there is no

explanation in the defendant's brief as to why portions of the message were redacted, nor does the

defendant furnish any legal basis as to why those portions of the message should remain under seal.

(See id. Exhibit A).  The affidavit does not describe the circumstances of its creation, including

how, when, and in what context the defense communicated with Mr. Sankar, or who wrote the

affidavit.  There were no other juror affidavits filed with the motion.

2.    Mr. Sankar's Affidavit Should Be Viewed Skeptically

For the purposes of responding to the defendant's motion, the government will

assume that the statements in the affidavit upon which the defendant relies are true—specifically,

those statements detailing comments allegedly made by other jurors prior to the verdict, as well as

comments specifically directed to Mr. Sankar during jury deliberations.  (See Def. Br. at 50-51).

However, there are several reasons to be skeptical of the contents of the affidavit.

As the Court recognized at the hearing on January 5, 2018, there is a real risk that

an inquiry conducted of a juror by a single party without Court supervision will result in statements

83

that are skewed towards the party conducting the inquiry.  (See 1/5/2018 Tr. 36).  This risk has similarly been identified by the Second Circuit, which has found that "a serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts."[53] United States v. Moten, 582 F.2d 654, 665-66 (2d Cir. 1978).

Nothing in the affidavit or motion should reassure the Court about these reasons to be skeptical.  Most notably, there is absolutely no information provided in the motion or affidavit as to the nature of the contact between defense counsel and Mr. Sankar that led to the affidavit.  For example, there is no information about:  who contacted Mr. Sankar, how many times he was contacted before he agreed to speak with defense counsel, what Mr. Sankar was told in those attempts to contact him, the circumstances under which Mr. Sankar and defense counsel discussed the case (in person or over the phone, and in what setting), what questions or statements were made to Mr. Sankar, and whether Mr. Sankar or defense counsel drafted the contents of the affidavit.

In addition, at the hearing on January 5, 2018, the Court gave Mr. Sankar the opportunity to provide additional information if he felt like he needed to explain any of his "yes" or "no" answers to the questions that the Court asked in more detail.  (1/5/2018 Tr. 30).  Mr. Sankar did not take that opportunity to provide the Court with any of the additional information that now appears in the affidavit, particularly with respect to the nature of the threats he claims were made

---

[53] For this reason, sanctions for improper post-verdict contact with jurors without the input of the court include exclusion of the fruits of any such contact.  See Tanner v. United States, 483 U.S. 107, 126 (1987); Cuevas v. United States, 317 F.3d 751, 753 (7th Cir. 2003); United States v. Venske, 296 F.3d 1284, 1291-92 (11th Cir. 2002).

against him.[54]  In fact, at the end of the colloquy with the Court, Mr. Sankar said that he was "happy to meet with everyone here and everything was fine and good." (Id. at 32).  That sworn statement seems to directly contradict the contents of the affidavit.

Finally, the affidavit also includes certain statements that are entirely unrelated to the defendant's alleged bases for a new trial.  For example, Mr. Sankar not only states that he now believes that the defendant was not guilty, but it is his apparent determination that the defendant "should not have been charged." (See Dkt. No. 533 ¶ 6) (emphasis added).  There is no explanation as to how Mr. Sankar made a determination about whether the grand jury properly weighed the evidence presented to that body at the time of indictment.  Similarly, the affidavit states that "Mr. Shkreli alone is to blame for the wrongdoing." (Id.).

3.   Jurors' Alleged Statements During Trial Do Not Provide A Basis To Vacate the Trial Verdict

In a single sentence of argument, and without citation to any law, the defendant contends that the Court should "vacate the verdict on the grounds that the jury clearly disregarded the Court's instructions throughout trial and during deliberations."  (Def. Br. at 50).  The only factual support the defendant offers are the statements allegedly made by other jurors to Mr. Sankar prior to jury deliberations, in which the other jurors either stated that they believed the defendant to be innocent or predicted that there might be a hung jury.  (Id. at 50-51).  The defendant's request should be denied as it is both legally and factually baseless.

---

[54] The affidavit states that the Court only asked about threats of physical violence, which Mr. Sankar now says he interpreted not to include the alleged threat that another juror made to remove him from the jury, because that threat was not a physical threat.  (See Dkt. No. 533).  As set forth below, threats of physical force are the only threats that are even arguably relevant under the law.

As an initial matter, the defendant points to no caselaw in support of his request because there is no caselaw to suggest that the jurors' alleged one-off statements about the defendant's guilt or innocence during trial constitute a basis to vacate the verdict.  To the contrary, courts have "consistently held that discussions between jurors and the expression of opinion as to guilt or innocence, while not condoned and in violation of court instructions, is not grounds for leave to interview jurors or for a new trial because the activity—as it is alleged here—lacks an extrinsic influence" as required under FRE 606(b).  United States v. Camacho, 865 F. Supp. 1527, 1534 (S.D. Fla. 1994), aff'd sub nom. United States v. Veal, 153 F.3d 1233 (11th Cir. 1998); see also United States v. Sabhnani, 529 F. Supp. 2d 384, 393 (E.D.N.Y. 2008), aff'd, 599 F.3d 215 (2d Cir. 2010) (denying a request for a new trial based on allegations that a juror was overheard saying "guilty, guilty" prior to jury deliberations); United States v. Abcasis, 811 F. Supp. 828, 834 (E.D.N.Y. 1992) (allegations that jury conducted polls prior to jury deliberations as to the defendant's guilt or innocence did not warrant either a new trial or further inquiry); United States v. Piccarreto, 718 F. Supp. 1088, 1092-93 (W.D.N.Y. 1989) (denying a new trial or further inquiry based on allegations that juror made comments about the case during trial, and noting "there is no evidence that these preliminary discussions shaped the final deliberations or that they improperly influenced any of the jurors or prejudiced the defendants").  Courts have held that even evidence that jurors have discussed the facts (as opposed to merely guilt or innocence) prior to deliberations does not constitute a basis for a new trial.  See, e.g., United States v. Carmona, 858 F.2d 66 (2d Cir. 1988); United States v. Williams–Davis, 90 F.3d 490, 505 (D.C. Cir. 1996) (rejecting a motion for a hearing based on allegations of pre-deliberation discussions and noting that "when there are premature deliberations among jurors with no allegations of external influence on the jury … there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented

at trial") (quoting United States v. Resko, 3 F.3d 684, 690 (3d Cir. 1993)); United States v. Cuthel, 903 F.2d 1381, 1382–83 (11th Cir.1990) (evidence of premature deliberation could not be subject of post-verdict inquiry because "there was no allegation of extraneous prejudicial information being brought to the jury's attention; nor was there evidence of improper outside influence sufficient to warrant an inquiry").

Here, a few scattered comments over the course of an 11-week trial that several jurors thought that the defendant was innocent or that the jury might hang—conduct which is far less extensive than in Abcasis, for example, where the jury took polls of the defendant's guilt or innocence throughout the trial, or in any of the cases where jurors engaged in substantive discussions about the case prior to deliberations—do not constitute the consideration by those jurors of "extrinsic evidence" that would warrant either further inquiry or a new trial.[55]  Moreover, it is not clear how the defendant could possibly have been prejudiced by any of the alleged statements relayed by Mr. Sankar, which indicate that several jurors firmly believed the defendant to be innocent early in the trial.  If anything, those comments show that the jury carefully and completely weighed the evidence that came in over the course of the entire trial during the course of their deliberations, and came to a reasoned determination of the defendant's guilt.

### 4.   Jurors' Alleged Statements To Mr. Sankar During Jury Deliberations Do Not Provide A Basis To Vacate the Trial Verdict

The defendant also argues that Mr. Sankar "clearly voted to convict Mr. Greebel based on repeated threats by his fellow jurors."  (Def. Br. at 51).  Specifically, the defendant asserts that these threats were as follows:  (1) several jurors told Mr. Sankar he could "never be fair and

---

[55] Indeed, as set forth above, Mr. Sankar expressly testified that there was no outside influence on the jury's deliberation.

vote to convict" because he was Catholic, (2) Mr. Sankar was pressured to vote "guilty" during deliberations after he requested to see more evidence related to the charges, and told by other jurors that he would be reported to the judge and removed from the jury if he did not so vote.  (Id.).  In support of his argument that these alleged threats warrant vacatur of the verdict, the defendant cites only to <u>Anderson v. Miller</u>, 206 F. Supp. 2d 352, 360 (E.D.N.Y. 2002).  (Id.).

The defendant is wrong.  The conduct described by Mr. Sankar does not, under the law, constitute a basis for a new trial.  The government set forth that relevant law at great length in its pre-hearing filings in January (<u>see</u> Dkt Nos. 505 and 507) and incorporates that law by reference here.  To summarize, as the Honorable John G. Koeltl explained in rejecting both a request for a hearing and a motion for a new trial based on allegations by a juror that her "verdict came about only as a result of the fear and intimidation I was made to feel for my life during the course of deliberations," courts "have refused to upset a jury's verdict over more specific and serious allegations than those alleged here."  <u>United States v. Sattar</u>, 395 F. Supp. 2d 66, 77 (S.D.N.Y. 2005), <u>aff'd sub nom.</u> <u>United States v. Stewart</u>, 590 F.3d 93 (2d Cir. 2009) (affirming district court's decision and agreeing that the juror's allegations were merely "post hoc efforts caused by dissatisfaction that do not require further post-verdict inquiry").[56]

Circumstances where courts have refused to vacate the jury's verdict based on alleged "pressure" or "threats" made towards a juror during the jury deliberations that far exceed any alleged conduct described by Mr. Sankar.  For example, courts have refused to vacate a jury's

---

[56] Mr. Sankar's allegations regarding statements jurors made about <u>his</u> religion are irrelevant.  Mr. Sankar does not and cannot claim that these statements constituted a "threat."  Moreover, even <u>Pena</u> does not hold that a jury's consideration of a <u>defendant's</u> religion is sufficient to overturn a conviction, let alone that a juror's view about another <u>juror's</u> religion is grounds for such action.

verdict in the following situations:  allegations that jurors yelled and screamed at two complaining

jurors, with one alleging that "[o]ne juror was in my face trying to fight me [and] I was afraid," to

the point that court officers had to escort that juror out, and that she "was in fear.  Excuse my

language, excuse me, they said they would fuck me up, physically hurt me.  I can't say to you they

physically touched me, but they threatened my life" (Anderson v. Miller, 346 F.3d 315 (2d Cir.

2003)); allegations of "screaming, hysterical crying, fist banging, name calling, and the use of

obscene language" and chair throwing during deliberations (Jacobson v. Henderson, 765 F.2d 12,

15 (2d Cir. 1985) (affirming denial of habeas relief); allegations that a juror "kept yelling all the

time," "wouldn't let [the complaining juror] talk" and told her that she had "no commonsense," to

the point that she "had chills" and was "sick," "upset" and "practically in a daze" and that she now

wished to retract her verdict (United States v. Grieco, 261 F.2d 414, 415 n. 1 (2d Cir. 1958) (per

curiam)); allegations that a juror had been "threatened" and "reproached" by fellow jurors; that

fellow jurors informed a juror that "they had lives to get on with and jobs to return to and that if she

did not change her vote they would be forced to remain overnight" and that the juror was "fearful

for her safety" (Goode v. Mazzuca, 00-CV-7932 (PKC), 2004 WL 1794508, at *7 (S.D.N.Y. Aug.

11, 2004)); see also United States v. Stoppelman, 406 F.2d 127, 133 (1st Cir. 1969) ("The fact that

some jurors have weaker wills than others—or that one individual may bow to the pressure of

eleven—cannot be a cause for reopening a case.").[57]

---

[57] The potential bases for vacatur that have been recognized by the Supreme Court and/or
are codified in FRE 606(b)— namely, "whether extraneous prejudicial information was improperly
brought to the jury's attention, [or] whether any outside influence was improperly brought to bear
upon any juror, [or] whether any mistake was made in entering the verdict on the verdict form," see
FRE 606(b), or evidence of racial animus towards the defendant, see Pena-Rodriguez v. Colorado,
137 S. Ct. 855, 863 (2017)—are not implicated by Mr. Sankar's allegations and were not raised by
the defendant, and are therefore not addressed herein.

In addition, consistent with common sense, courts presume that, if a juror has a chance to bring a deliberative impropriety to the court's attention, he or she will do so before rendering a verdict.  See Tanner v. United States, 483 U.S. 107, 117 (1987) ("jurors are observable by each other, and may report inappropriate juror behavior to the court before they render a verdict") (emphasis in original); Stewart, 590 F.3d at 133 (district court properly considered in rejecting an evidentiary hearing that the juror had "several opportunities to communicate directly with the court" regarding any potential improprieties, but failed to do so); Jacobson, 765 F.2d at 15 (denying in a habeas appeal a motion for a new trial based on juror misconduct, noting "the absence of any complaints while [the jury was being polled]."); Anderson, 346 F.3d at 329 (allegations of juror misconduct "fell short in particular because 'the complaining jurors had several opportunities to communicate directly with the court if any of them felt unfairly coerced, harassed, intimidated, or felt themselves to be in physical danger,' but none did so").

These cases make clear that, even in the face of an allegation that some jurors threatened, pressured, or coerced another juror, a court may not overturn the jury's verdict.[58]  This is plainly not such a case.  Mr. Sankar did not advise the Court of any concerns during the trial, the deliberations, or when he was polled (at which point he stated that his vote was "guilty"), as courts

---

[58] Anderson—the only case upon which the defendant relies—is clearly in accord.  While suggesting in dicta that actual physical violence or, possibly, objectively credible threats of physical violence within the jury room "might be sufficient to overturn a verdict," 346 F.3d at 329, the Second Circuit made clear that it was referring to true physical violence, not pressure or threats or anger, even where a juror subjectively felt fear.  As detailed above, the Second Circuit refused to overturn a verdict despite allegations that jurors were subjected to verbal threats of physical violence that made them fear for their lives.  Id.  Moreover, in considering whether a threat of physical violence during deliberations could ever support overturning a jury verdict, the Second Circuit reasoned that the hypothetical circumstances involving violence would have to be truly extraordinary, because "possible internal abnormalities in a jury will not be inquired into except in the gravest and most important cases." Id. at 327 (emphasis in original; internal quotations omitted).

presume a juror will do if he or she has such concerns. See, e.g., Stewart, 590 F.3d at 133; Jacobson, 765 F.2d at 15.  Mr. Sankar then stated under oath during the hearing conducted by this Court that neither was his vote compelled by "physical violence or any threat of physical force or harm," nor was he "prevented by actual or threatened force or violence or threats of force or violence from contacting the Court with a note during jury deliberations." (1/5/2018 Tr. 30-32).  Mr. Sankar also did not volunteer any other concerns during the hearing, despite being told that he could elaborate on his answers if he needed to so do.  (Id.).  To the contrary, Mr. Sankar concluded by saying "I'm happy to meet with everyone here and everything was fine and good."  (Id.).

Thus the record is clear that Mr. Sankar was not subjected to any threats of physical violence—either actual or perceived—and that he chose not to alert the Court to any concerns he had about jury deliberations either during the process itself, or during the post-trial hearing.  Mr. Sankar's subsequent allegations that certain jurors told him that he could not render a fair verdict during jury deliberations, and that certain other jurors exerted pressure on him to vote on a verdict by, in part, stating that they would advise the judge of his unwillingness to vote and have him removed from the jury, fall far short of the kind of credible threats of actual physical violence that the law requires evidence of prior to any reconsideration of the jury's verdict.  See, e.g., Anderson, 346 F.3d at 329; Jacobson, 765 F.2d at 14; Grieco, 261 F.2d at 414.

*       *       *

For these reasons, Mr. Sankar's allegations do not create a basis for overturning the jury's verdict, and the defendant's motion must be denied.

F.    The Court Did Not Err in Admitting Statements from Panoff

The defendant contends that the Court's admission of certain out-of-court statements of Marc Panoff was "improper" because those statements, taken together with previously admitted evidence, were not sufficient for the Court to find that the government had established by a

91

preponderance of the evidence that Panoff was a co-conspirator.  (Def. Br. at 52-55).  As a result, the defendant argues that the "verdict is thus based on evidence that should have been stricken from the record," and the defendant is entitled to a new trial.  (Id. at 55).

The defendant's arguments related to the admission of Panoff's statements are unavailing for two reasons.  First, none of the specific documents the defendant contends were admitted "improperly"—which are attached as Exhibits F-Q to the Defendant's Motion (collectively, the "Identified Exhibits")—were admitted as co-conspirator statements pursuant to FRE 801(d)(2)(e), but were rather admitted on other bases.  Moreover, the defendant did not object to the admission of any of these documents because they contained Panoff's statements.  Second, although the defendant does not challenge the two Panoff-related documents that were admitted pursuant to FRE 801(d)(2)(e), there was sufficient evidence in the trial record to support the admission of those statements on that basis.

As a result, the defendant has not met, and cannot meet, his very high burden to show that "manifest injustice" requires that a new trial be granted due to the admission of evidence related to Panoff.  James, 712 F.3d at 107.

1.    The Identified Exhibits Were Not Admitted Pursuant to FRE 801(d)(2)(E)

As the defendant notes in his motion, the Court ruled on November 28, 2017, following briefing by the parties (see Dkt. Nos. 455, 456), that the government could seek to provisionally admit Panoff's statements as co-conspirator statements during the testimony of Special Agent Christopher Delzotto, and the Court would later assess whether the government had met its burden to show by a preponderance that Panoff was in fact a co-conspirator.  (See Tr. 7063; Def. Br. at 53).  The Court subsequently ruled on December 4 that the government had in fact met its burden to show that Panoff was a co-conspirator, such that Panoff's statements could definitively be introduced as co-conspirator statements going forward.  (See Tr. 7408).

What the defendant fails to acknowledge, however, is that at the time the Court made its initial ruling on November 28, the government had made clear that the bases for the admission of the majority of the documents related to Panoff that it would seek to introduce through Special Agent Delzotto was <u>not</u> FRE 801(d)(2)(E):

> MR. KESSLER:  Your Honor, just to be clear, what we're talking about is some number of documents that relate to Mr. Panoff.  Most of them are not being offered pursuant to 801(d)(2)(E).
>
> THE COURT: Yes.
>
> MR. KESSLER: So our [] view [is] those would come in for their – they're also relevant to Mr. Shkreli and Mr. Greebel. They would come in no matter what, because they're not coming in pursuant to 801(d)(2)(E).  And so what we're really talking about is the handful of documents -- and I really think it's at most a handful -- that would be offered pursuant to 801(d)(2)(E). So I just don't want to give the Court the impression that all the new evidence would be 801(d)(2)(E).
>
> THE COURT: No, I understand.
>
> MR. KESSLER: Most of it isn't.
>
> THE COURT: Most of it isn't, yes. Okay.

(Tr. 7063-64).  Thus, the government explained that, although the record at that point supported admitting Panoff's statements as co-conspirator statements, the government would seek to admit the majority of the documents related to Panoff for other evidentiary reasons.

And, in fact, of the twelve government exhibits that referenced Panoff and that were admitted in the time between the Court's two rulings—the Identified Exhibits—<u>none</u> were offered into evidence pursuant to FRE 801(d)(2)(E).  The government has compiled a chart of the Identified Exhibits, attached hereto as Exhibit C, which details the bases for which the exhibits were offered.

Specifically, GX 601 and GX 608[59] contained statements by Panoff that were specifically not offered for their truth (and the jury was so instructed); GXs 609A, 610, 612, 614 and 627 were statements of the defendant (where the defendant sent either the only email in the document or the final email in an email chain); GXs 691 and 692 were statements by co-conspirator Shkreli (where Shkreli sent the top email in the email chain) and in some cases continuations of other admitted email conversations that were admissible pursuant to FRE 611; and GX 609 was a continuation of GX 609A (and subsumed within GX 692, which was subsequently admitted).  Finally, although Panoff sent the top email in the chain in GX 690, the remainder of the email chain contains statements of the defendant.  If the defendant had objected to this exhibit at trial—and he did not—the government would have agreed that Panoff's response to the defendant's question in the top email was not being offered for the truth of that answer, but simply to show that he in fact discussed the matter with the defendant and answered his question.

More significantly, the defendant himself did not object to the admission of <u>any</u> of the Identified Exhibits on the basis that the exhibits contained Panoff's statements and were being offered as co-conspirator statements.   To the contrary, the defendant's responses to the government's proffer of the Identified Exhibits fell into three main categories:  (1) no objection (GXs 609, 609A, 610, 691, 612, 641); (2) an objection to the admission of Panoff's statements for their truth, after which the government agreed those statements were <u>not</u> offered for their truth and the jury was so instructed (GXs 601 and 608); and (3) an objection only to <u>other</u> hearsay portions of the exhibits, after which the Court ruled that such hearsay portions were admissible on other

---

[59] The government refers to the government exhibit numbers for these documents, as that is the way they are referenced in the official trial record.  The attached chart matches up the letters that the defendant assigned to these exhibits in connection with his filing to the official exhibit numbers; for example, GX 601 corresponds to Def. Br. Exhibit F.  <u>See</u> Exhibit C.

grounds (GXs 627 (hearsay statements of Edward Hackert admitted to provide context) and 690 (hearsay statements of Amy Merrill admitted to provide context)).  It is clear that the defendant specifically chose not to object to the Identified Exhibits on the ground that the government was seeking to admit Panoff's statements as co-conspirator statements, because the defendant <u>did</u> object to the admission of GX 619, which was proffered after the Identified Exhibits.  That objection led to the sidebar discussion that ultimately resulted in the Court's ruling that the government had proven Panoff's status as a co-conspirator by a preponderance.  (<u>See</u> Tr. 7401-7408; <u>see also</u> Section II.F.2 below).

In sum, as the Identified Exhibits were not admitted as co-conspirator statements of Panoff, and the defendant chose not to object to the admission of the Identified Exhibits on that basis, there was nothing "improper" about the admission of the Identified Exhibits.

2. <u>The Court's Ruling That Panoff Was a Co-Conspirator Is Supported by the Trial Record</u>

The defendant also contends that the trial record was not sufficient to allow the government to establish by a preponderance of the evidence that Panoff was a co-conspirator, and that as a result any of his statements that were admitted pursuant to FRE 801(d)(2)(E) were admitted improperly and should have been stricken from the record.  (Def. Br. at 55).  Specifically, the defendant seems to complain that the Court did not definitively conclude that the government had proven that Panoff was a co-conspirator by a preponderance of the evidence as of November 28, 2017 (when the Court ruled that such statements could be introduced provisionally), and that the evidence related to Panoff that was introduced between that date and the Court's ultimate ruling that the government <u>had</u> proven that Panoff was a co-conspirator by a preponderance was not sufficient for the Court to reach that conclusion.  (Def. Br. at 55 (stating that the Identified Exhibits

"are insufficient as a matter of law to overcome the Court's initial finding that there was not enough evidence to satisfy <u>Bourjaily</u>" as to Panoff)).

As an initial matter, despite suggesting that some exist, the defendant himself failed to identify any statement of Panoff that was admitted pursuant to FRE 801(d)(2)(E) before December 4, 2017.  (Def. Br. at 55).  The government's review of the record similarly has identified no such statements.   Moreover, the government has found only <u>two</u> documents containing statements of Panoff that were admitted pursuant to FRE 801(d)(2)(E) after December 4.[60]  First, GX 619 contains a single statement from Panoff that was admitted pursuant to FRE 801(d)(2)(E). (<u>See</u> Tr. 7401-09).  In response to a query from Shkreli as to where the defendant and Panoff are on getting Schuyler Marshall's settlement agreement finalized, Panoff states:  "Waiting to hear back from marcum this morning.  The fact that we keep changing our story to them doesn't help." Second, GX 621 is a continuation of the same email as GX 619, and contains two statements from Panoff that were admitted pursuant to FRE 801(d)(2)(E).  (<u>See</u> Tr. 7410).  In that document, Panoff writes to Shkreli as follows:

> Guys I think this is a little too much for my risk tolerance. I was told that MSMB was going to handle these outstanding settlements prior to the financing and we are changing our story.  If you're going to force me to pay for Retrophin, I'm going to have to ask the board for guidance or resign. This is not something I'm comfortable deciding on an island.  This issue has caused me a tremendous amount of stress and sleepless nights. It is affecting my personal life and it is not worth it for me to continue to operate that way.  You may think I'm overreacting but it is how I genuinely feel. If you think it is worth further discussion, I will make myself available to speak. Mark.

---

[60] Additional exhibits containing statements of Panoff were admitted, but none were admitted pursuant to FRE 801(d)(2)(E), and the defense did not object to the admission of those documents on any ground.  <u>See, e.g.</u>, GXs 623 and 624.

GX 621.  Farther up the email chain, Panoff also states the following:  "This issue ties into all of this. We keep changing our story with Marcum. First, MSMB was going to pay Geller directly and now we are saying something different."  (Id.).

Consequently, the defendant's argument that he is entitled to a new trial because statements of Panoff were improperly admitted is based entirely on those two documents, which are part of a single email conversation.  That narrow complaint fails for two reasons.  The trial record clearly supports the Court's finding that Panoff was a co-conspirator, and, even if it did not, the admission of Panoff's statements in GX 619 and GX 621 did not constitute "manifest injustice" such that a new trial is warranted.

### a.    Panoff Was a Co-Conspirator

The law "is well settled … that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances."  United States of America v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979); see also United States v. Watts, 934 F. Supp. 2d 451, 477 (E.D.N.Y. 2013).  "If the government succeeds in persuading the court that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy . . . the statements are allowed to go to the jury."  Cambindo Valencia, 609 F.2d at 630.

The trial record clearly supports the Court's finding that the government proved by a preponderance of the evidence that Panoff was a co-conspirator in the wire fraud conspiracy charged in Count Seven.  When Panoff first joined Retrophin in the spring of 2013, he was warned by Corey Massella—who had been working with others at Citrin Cooperman as Retrophin's accountants, and whose work was ultimately transitioned to Panoff—of concerns that Shkreli had

been improperly using the company to pay both personal expenses and expenses for the MSMB entities.  Not only did Massella tell Panoff to be vigilant about related party transactions involving Shkreli and the MSMB entities, he specifically told Panoff that Retrophin had paid approximately $600,000 to Katten Muchin for legal bills, which Massella suspected were actually the responsibility of either Shkreli in his personal capacity or the MSMB entities, and not Retrophin. (Tr. 3377-78).  Massella further testified that when he had previously confronted the defendant about Retrophin's payment of those legal bills, the defendant refused to give him an explanation as to why Retrophin had paid the bills.  (Tr. 3375-76; GX 113-44).

Despite these warnings, Panoff—in consultation with the defendant—approved Retrophin's payment of close to $600,000 in legal bills on behalf of the MSMB entities, and determined to write those payments off as "bad debt" because the MSMB entities could not repay Retrophin.  (GX 114-16, Tr. 5370-74).  Moreover, when Panoff learned that Retrophin was funding settlement agreements with former MSMB investors on behalf of Shkreli and the MSMB entities, he did not discuss the settlements with anyone else in Retrophin's internal accounting division (including the company's comptroller (Tr. 5383-83)) or raise any alarm to Retrophin's Board or its auditors, even though such agreements were the cause of significant cash payments far in excess of the expenses Retrophin had incurred in prior quarters.  Instead—despite subsequent attempts by Panoff, Shkreli and the defendant to justify the payment of the settlement agreements by Retrophin as a step taken to avoid significant impending litigation—Panoff aided the defendant in conveying to the auditors in July 2013 that there had been no "material litigation events" since the last update to the auditors, despite the negotiation and payment of several settlement agreements, and despite ongoing negotiations on the settlement agreement with Schuyler Marshall.  (GX 124-3).

In fact, Panoff provided the settlement agreements to Retrophin's auditors only <u>after</u>

they themselves discovered the drastic change in cash flow, and even then, as Marcum auditor Sunil

Jain testified, with a delay:

> Q. So, what happened after that got brought to your attention?
>
> A. So, he brought to my attention, and from the inquiry point of view
> we called the company's then controller Mike Harrison that we need
> to know why these significant variances are there. He said he's not
> aware of this, you need to speak to Marc Panoff, then CFO of the
> company. We inquired with Marc Panoff about it, and he mentioned,
> This has something to do with certain settlement
> agreements and I don't know much details about it. But then I said,
> Send me those though settlement agreement. I can look into those
> settlement agreements and then we can discuss further about it.
>
> Q. Did Mr. Panoff send you settlement agreements?
>
> A. It took him maybe a couple of days to send it back to me, the
> settlement agreements, but he did, yes.

(Tr. 5382-83).

After Retrophin's auditors discovered the settlement agreements and insisted that

Retrophin should never have been responsible for making payments pursuant to such agreements,

Panoff worked hand-in-hand with Shkreli and the defendant to prepare (1) the Control Memo,

which clearly stated that the settlement agreements were not the responsibility of Retrophin and

that any future agreements would need to be approved by Panoff (GXs 609, 609-A, 601, 691) and

(2) the indemnification agreements and notes that stated that Shkreli and/or the MSMB entities

would repay Retrophin for the settlement agreements, which were backed up by Shkreli's assertion

that he owned $8 million in Retrophin securities that could be used to make those repayments.

(GXs 612, 641, 627, 694).  But there is clear evidence that Panoff—who, per the Control Memo,

was supposed to be acting as a check on Shkreli and strengthening Retrophin's internal controls—

knew Shkreli had no intention of repaying Retrophin and did not seek to protect Retrophin from similar settlement agreements in the future.

For example, the agreements with MSMB investors David Geller and Michael Lavelle were signed by June 2013 (GXs 55, 56, 56-A), but had not yet been paid as of the time of the Control Memo in August 2013.  Instead, $1.655 million was paid from Retrophin's bank account pursuant to those settlement agreements on October 2, 2013 (GX 910-E)—payments approved by Panoff (GX 910).  In addition, Panoff specifically directed Standard Registrar to issue 5,000 Retrophin shares to Lavelle in connection with his settlement agreement on October 22, 2013.  (GX 115-34).  Thus, because the payments were made after the Control Memo, Panoff could not have believed these payments were Retrophin obligations.  Moreover, although Panoff requested that the defendant draft additional indemnification notes for Shkreli to "cover" the monetary transfers, Panoff could not have believed that Shkreli was going to repay Retrophin given that, if Shkreli actually had the money to indemnify Retrophin, he would have paid these personal obligations directly.  (Panoff failed even to request a note to cover the share transfer).

Similarly, the defendant and Shkreli were in negotiations with Marshall regarding his settlement agreement at the same time that the Control Memo was finalized.  (GXs 611, 616).  Subsequently, the defendant and Shkreli, with Panoff's assistance, took steps to circumvent the new internal controls set forth in the Control Memo by dividing the Marshall settlement agreement into two agreements—one between Retrophin and Marshall for $300,000, and one between the MSMB entities and Marshall for 6,000 shares (GXs 57-A, 57-B)—so that there would not be a single agreement where Retrophin and the MSMB entities jointly agreed to pay an MSMB investor.  Panoff then authorized Retrophin to pay $300,000 for the cash portion of the Marshall settlement

on August 29, 2013, even though Panoff knew based on the Control Memo that the payment was not for an obligation owed by Retrophin.  (GX 910-E).

Moreover, Panoff provided false information to Retrophin's Board about the settlement agreements.  In the summer of 2013, Richardson asked Panoff directly about the state of Retrophin's finances, and Panoff explained that he was working to determine which entity (Retrophin or the MSMB entities) was responsible for paying any remaining expenses but failed to disclose that Retrophin was in fact paying for expenses incurred by MSMB, including with respect to the settlement agreements and Katten legal bills.  (Tr. 1874-75).  Nor did Panoff advise the Board members of any concerns he may have had about the settlement and consulting agreements.  (See, e.g., Tr. 2599-600 (Q. Did Mr. Panoff ever express any concerns to you about the settlement agreement? A [Richardson]. No, he did not . . . Q. What, if anything, did you believe were Mr. Panoff's responsibilities as the chief financial officer at board meetings? A. [Richardson] Certainly one of them was to be an independent voice and to speak out if there were any concerns).; Tr. 4433 (Q. Did Mr. Panoff ever bring to your attention that consulting agreements were being used to repay MSMB investors? . . . A. [Asselage] No.")).

Panoff also took steps to hide the true nature of the settlement agreements from Retrophin's Board.  For example, when Panoff circulated the draft November 2013 Retrophin S-1 filing (GX 250) to the Board, he specifically did not include as attachments to that draft the form Indemnification Note and/or form Settlement Agreement. Those forms were, however, attached to the final version of the S-1 filed with the SEC. (See GX 978).

Taken together, all of this evidence—admitted before the two documents containing Panoff's co-conspirator statements—was sufficient to prove by a preponderance that Panoff was a co-conspirator.

And even if it were not, the government is permitted to offer hearsay statements of a co-conspirator even before a final finding that such individual is a co-conspirator, Cambindo Valencia, 609 F.2d at 630, and those hearsay statements can be considered as part of the evidence showing that the individual is part of the conspiracy.  Id.; see also United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)  Thus for purposes of this motion, all that matters is that by the end of the government's case, there was sufficient evidence that Panoff was a co-conspirator.  GX 619 and GX 621 provided further evidence that Panoff was a co-conspirator—they show he knew it was a serious problem to have Retrophin, rather than the MSMB entities, pay settlement agreements, and yet he agreed with the defendant and Shkreli to allow Retrophin to pay and to conceal the true nature of the settlement agreements to the Board.  (See GXs 619, 621).[61]  And subsequent evidence that was introduced during the government's case further showed that Panoff was well aware of how the Marshall agreement was restructured to avoid the need to have it comply with the Control Memo and make it appear as if payment of the agreement from Retrophin was legitimate (GX 623), and that Panoff and the defendant agreed to delete the disclosure of Marshall's settlement agreement as a related party transaction in the amended filings that were sent to the Board due to the nature of the restructured agreement (GX 624).   Taken together, it is evident that the government

---

[61] A disagreement along the way towards communications and actions in furtherance of the conspiracy is not a bar to admission and does not disprove the existence of a conspiracy.  See, e.g., United States v. James, 712 F.3d 79, 106 (2d Cir. 2013) ("That members of a conspiracy have had a disagreement or a falling out is not, however, sufficient to establish withdrawal from the conspiracy."); United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994) ("An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it.").  Thus even if Panoff's statements in GXs 619 and 621 can be characterized as expressing concern with the actions of his co-conspirators, his concern did not constitute withdrawal.  Instead, it was "compelling evidence" of the ongoing conspiracy in light of Panoff's ultimate decision to help the defendant and Shkreli continue to defraud Retrophin.

demonstrated Panoff's role as a co-conspirator in the wire fraud conspiracy charged in Count Seven by a preponderance of the evidence.

b.    The Defendant Has Failed to Show Any Prejudice

Even if the trial record did not support a finding by a preponderance that Panoff was a co-conspirator—and for the reasons above, it clearly does—the admission of Panoff's statements as co-conspirator statements would not require a new trial.  There are were only three statements in two documents that would have been stricken, all of which relate to Schuyler Marshall's settlement agreement.  The defendant has not and cannot show that the allegedly improper admission of those three statements—given the massive volume of other evidence that the jury considered over the course of the 11-week trial—constitutes the kind of "manifest injustice" necessary to succeed in a Rule 33 motion, nor would consideration of the totality of the evidence without these three statements raise a real concern that an innocent person was convicted.  See, e.g., United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (finding no "manifest injustice" where a trial court determines that certain admitted testimony should have been disregarded, so long as "competent, satisfactory and sufficient evidence in [the] record supports the jury's finding that this defendant is guilty beyond a reasonable doubt," and noting that such determination must be made on the "totality of the case" and that a Rule 33 motion may still only be granted if "a real concern that an innocent person may have been convicted").

G.    The Court's Evidentiary Rulings Were Not Erroneous

The defendant also challenges the Court's rulings during the trial related to three categories of evidence.  (Def. Br. at 56-69).  Although the defendant does not acknowledge it, all of these evidentiary issues were litigated before and during the trial.  What the defendant now asks for in the guise of a Rule 33 motion is reconsideration based on largely the same arguments he already made and on which the Court already ruled.  The defendant cites no authority showing that

103

any of these evidentiary issues could serve as the basis for a Rule 33 motion, and the arguments should therefore be dismissed out of hand.  And, in any event, each of the issues was decided correctly during the trial.

      1.   "Consciousness of Innocence"

The defendant argues that he should have been allowed to "present[] to the jury" evidence that he spoke with FBI agents after his arrest on the theory that such a discussion showed his "consciousness of innocence."  (Def. Br. at 56).  Although the defendant chose not to raise this issue in a motion in limine, this issue was litigated extensively during the trial.  (See, e.g., Dkt. No. 472 (government letter about "consciousness of innocence" evidence); Dkt. No. 476 (defense letter about same); Tr. 7849-7899, 7918-27, 7978-8005).  The Court allowed the defendant to attempt to "impeach" Special Agent Delzotto by eliciting that the defendant spoke to law enforcement after he was arrested (Tr. 8020), but the Court precluded additional evidence and argument on the issue.

Specifically, after carefully considering the parties' arguments, the Court precluded additional evidence pursuant to FRE 403:

> With regard to consciousness of innocence, I believe that, again, the parties have been fully heard and what we have in the record now is the fact that Mr. Greebel spoke to the FBI at length. What is not appropriate I believe is to allow testimony about a statement being made as evidence of consciousness of innocence because I believe it will confuse the jury. They will wonder what Mr. Greebel actually said, they will wonder whether those statements were truthful and exculpatory or not and I think that it's sufficient that he did speak to the FBI.
>
> I continue to be concerned that there could be extreme prejudice to Mr. Greebel and the government, A, if the government cannot cross-examine appropriately and, B, the jury draws an inference that if Mr. Greebel doesn't testify at trial, it's consciousness of guilt. So, I'm not going to allow extensive evidence about his post-arrest sessions with the FBI. As I said, we have a record that clearly indicates that he did speak to the FBI and that I think Agent Delzotto testified that during the course of time he was interviewing Mr. Shkreli he would walk by and see that Mr. Greebel was speaking to the agents.

104

> Also, it would probably open up evidence collateral to this case
> which is that many times people do speak to law enforcement
> following their arrest and then may or may not always be truthful
> with the law enforcement after an arrest. The jury has enough
> evidence that is relevant, probative and non-prejudicial under Rule
> 403 to make a determination of the disputed facts and about Mr.
> Greebel's state of mind and it does seem to me that we would be
> treading into very dangerous waters if we allowed testimony on Mr.
> Greebel's post-arrest statements.

(Tr. 8828-29). The defendant does not even cite, let alone address the Court's analysis. (Def. Br.
at 56). The Court's ruling was correct for the reasons the Court gave, and the defendant's motion
should be denied.

    2.   <u>Threats Related to Pierotti</u>

The defendant seeks reconsideration of the Court's <u>in limine</u> ruling that the
government would be permitted to introduce evidence related to Shkreli's threats against Pierotti's
family. (Def. Br. at 57). This issue was briefed before trial, addressed during oral argument, and
resolved by the Court pursuant to FRE 403 because its probative value outweighed the risk of any
unfair prejudice:

> My point is that the evidence that the Government wishes to proffer
> is among a series of steps and communications and plans and
> agreements to wrest those shares back from Mr. Pierotti. And I
> believe there is not evidence, as the Government admits, that Mr.
> Greebel did not know about it in advance, but once he did learn
> about it, all he said to Mr. Shkreli was his response. He did not say
> this is going to make it very difficult to litigate, I'm not going to
> bring this lawsuit to my partners to bring, I think that you might have
> put yourself in danger or crossed the line. . . . So I think that in
> context this is the Government's evidence of the conspiracy and I
> do not find that this alone is particularly so outrageous or so
> shocking that it certainly was not enough to deter the law firm from
> taking on the lawsuit or even -- I mean, they did not know about it.
> So it did not deter Mr. Greebel from recommending that the suit be
> filed and I think that is evidence of, as the Government says . . .

(10/6/2018 Tr. 138-39; see id. at 118-139).[62]  This analysis was correct.

The defendant refers to an "audible gasp" he recalls hearing from the jury when the evidence was presented as the sole basis for reconsideration of the Court's ruling.  Gasp or no gasp, what the defendant never addressed during the trial—and continues to ignore now—is the actual relevance of these threats:  The defendant became aware of the threats approximately at the time they were made, and he did nothing to inform his client—Retrophin—that its employee, Shkreli, was engaged in outrageous conduct.  As the government explained during its summation and rebuttal, that fact is relevant to show the defendant's state of mind, as a co-conspirator with Shkreli rather than as faithful attorney to Retrophin.[63]  This evidence may have been prejudicial to the defendant, but it was not unfairly so, and its probative value was not substantially outweighed by an unfair prejudice.  See Fed. R. Evid. 403.

Moreover, a new trial is warranted on the basis of "inadmissible evidence" only if its admission "was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial" that a court is "'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  Phillips v. Bowen, 278 F.3d 103, 111 (2d Cir. 2002).  As

---

[62] The defendant had no burden to prove that he did or did not tell anyone about Shkreli's threats, but the government notes that, at the pre-trial conference, defense counsel stated: "we will introduce evidence, through either testimony or otherwise, that Mr. Greebel informs people" about the threats.  (10/6/2018 Tr. 126).  Notwithstanding that representation, however, the defendant presented no such evidence at trial.  To the contrary, Cotton testified that he did not learn about them until months, and likely nearly a year, after the defendant learned of the threats. (See Tr. 8895, 8900).

[63] See, e.g., Tr. 10812 ("Not to try to ascribe to Mr. Shkreli's bad conduct [in threatening Pierotti's family] to the defendant. Never said he wrote it. It's a horrific letter.  But it shows that the defendant learned about this shocking accusation for the company that he represented the CEO. He doesn't tell anyone about it.  Look at Howard Cotton's testimony. He didn't find out about it until a year later. He didn't tell Michael Rosensaft. He didn't tell Retrophin.  He didn't tell the board. This is really shocking conduct.  He's protecting Mr. Shkreli.").

discussed, the admission of the Pierotti evidence was not error, let alone an abuse of discretion. And, in any event, the defendant has not come close to showing that the jury "has reached a seriously erroneous result" or that there has been a "miscarriage of justice."

### 3. Evidence Related to MSMB Capital and MSMB Healthcare

The defendant challenges the admission of evidence related to Shkreli's operation of the MSMB hedge funds pursuant to FRE 404(b) and argues that such evidence should have been "precluded."[64]  (Def. Br. at 58-59).  There are a number of reasons for rejecting this argument. First, the defendant does not attempt to explain how the argument relates to Rule 33 or provide any authority to support a Rule 33 motion based upon Rule 404.  Second, the defendant did not move to preclude in advance of trial the very evidence he now argues should have been precluded.[65]  And there is no reason he could not have made the same (flawed) argument he makes now before trial.

Third, the defense introduced extensive evidence of Shkreli's deception related to investors—the evidence the defense now argues should have been precluded.  Indeed, it was one of the defendant's core arguments that Shkreli lied to everyone.  (See Tr. 10460-61 (Defense summation: "This is a fundamental problem with the prosecution's case, you know that [Shkreli]

---

[64] The defendant does not identify which exhibits or sections of testimony he challenges. For example, he contends that the government spent "several weeks at trial eliciting testimony and admitting documents" on various subjects related to Shkreli without pointing to a single document or portion of testimony he believes to have been improper.  Nor is it the case that the government spent "weeks" eliciting such evidence.  As a result, it is difficult for the government fully to address the defendant's complaint given that even the defendant does not argue that all evidence related to Shkreli's operation of the MSMB funds should have been precluded.

[65] The defendant's motion in limine to dismiss Count Seven sought alternative relief, specifically that "[i]n the alternative, with respect to the government's legal theories relating to the transfer of Retrophin Shares to MSMB Capital and to the settlement and consulting agreements, which fail as a matter of law, we move in limine to strike those theories from the government's case."  (Dkt. No. 327 at 4).  This motion did not, however, seek to preclude the evidence the defendant now challenges pursuant to FRE 404(b).

lied time after time after time to sophisticated investors, to sophisticated business people. . . . Martin Shkreli lied to and deceived the very best. Shkreli is lying to everyone.")).  And, before the trial, the defendant promised to focus as much as he could on Mr. Shkreli's deception.  (See, e.g., Def.'s Mot. to Sever, Dkt. No. 163 at 1 ("We will also demonstrate through the evidence obtained during discovery that Mr. Shkreli is seeking to have Mr. Greebel found responsible for his misconduct in the same way that, over the years, he has repeatedly shifted the blame from himself to anyone and everyone around him."); Tr. 1089 (Defense opening: "There's no question that Mr. Shkreli duped sophisticated and wealthy investors. You'll see some of them take the stand. Business leaders and sophisticated people, extremely wealthy people who make lots of investments; Mr. Shkreli duped them, he lied to them, he omitted significant information from them.  You'll learn not one of those investors lost any money, not a dime. You'll learn they made a lot of money.  You'll learn and see direct evidence that Martin Shkreli knowingly, willfully, intentionally deceived them.").  Thus, the defendant's Rule 33 motion directly contradicts with the defense theory of the case and the arguments the defense made at trial.

Finally, FRE 404 does not apply here because the evidence of which the defendant complains is not evidence of a prior "bad" act unrelated to the case at hand, nor was the evidence being offered to "prove a [Shkreli's] character in order to show that on a particular occasion [he] acted in accordance with the character."  See FRE 404(b)(1).  Instead, the evidence was clearly admissible to provide the background and context to the conspiracy, as well as of the individual victims of the MSMB schemes with whom the defendant interacted as part of the conspiracy to defraud Retrophin.

H.  Jackson Su's Testimony

The defendant argues that he should have been allowed to cross-examine Jackson Su about whether Su's alleged hacking "constituted a crime."  (Def. Br. 59-60).  This argument

simply asks the Court to reconsider—with no additional facts or law—its rulings during the trial related to Su's testimony.  The defendant cites no authority for the proposition that a Court's discretionary decision to limit one specific line of cross-examination could possibly provide the basis for granting a Rule 33 motion.

But even on its merits, the argument should be rejected.  The defendant asserts in conclusory fashion that the "jury was thus prevented from thoroughly assessing Mr. Su's credibility," but he fails to explain how that is the case.  (Def. Br. at 59).  Defense counsel asserts that questions about Su's alleged "hacking" clearly "go[] directly to his character for truthfulness," but defense counsel does not cite any authority that a "hacking" crime—as opposed to some form of fraud or lying—reflects on an individual's character for truthfulness.

And, in any event, there was extensive cross-examination of Su about exactly the issues defense counsel now complains.  The defendant does not dispute that defense counsel cross-examined Su extensively about the <u>conduct</u> that the defendant believes to have been a crime, or that defense asked Su whether Su believed he had committed a crime by accessing the Global Relay system.  (<u>E.g.</u>, Tr. 5029 ("Q. You believe that you had the right, it was not a crime, sir, to go into the Global Relay system after you were terminated, let's say after March of 2013, to access documents from Retrophin?  A. I didn't think it was a crime.")).  Nor does he dispute that, during summations, defense counsel accused Su of hacking and claimed (incorrectly) the government had agreed not to "prosecute him for that."  (Tr. 1409-10).  Against this record, there is no reason to believe that the Court's minor limitation on the cross-examination of Su created any prejudice, let alone shows a "manifest injustice."[66]

---

[66] Defense counsel's unsupported assertion about what further cross-examination would have revealed is particularly unconvincing given that defense counsel represented to the Court that

I.     The Government Proved Venue by a Preponderance of the Evidence for Both Counts

The defendant asserts in conclusory fashion—with no citation to law and one citation to the record—that the government failed to prove by a preponderance of the evidence that an overt act in furtherance of each conspiracy was committed in the EDNY.[67]  (Def. Br. at 60-61).  The defendant did not attempt to argue to the Court or to the jury that the government had failed to establish venue, and the record does not support this claim.

First, with respect to the wire fraud conspiracy charged in Count Seven, the government proved by a preponderance that some of Shkreli's and/or the defendant's communications with Rosenwald related to the negotiation of his fraudulent settlement agreement were sent to Lawrence, New York, in the EDNY.  See, e.g., United States v. Martin, 411 F. Supp. 2d 370, 376 (S.D.N.Y. 2006) ("[V]enue for the [wire fraud] conspiracy count lies in the [SDNY] based on the government's representation that Martin's alleged coconspirator and principal . . . made telephone calls transmitted either to or from the [SDNY].").  Moreover, Spencer Spielberg, another individual who received a fraudulent settlement agreement after communications with Shkreli and the defendant, lived in Brooklyn.  In addition, the Fearnow Shares allocated to Marek Biestek and Edmund Sullivan were sent to the EDNY and then used to fund settlement agreements with defrauded MSMB investors.  Finally, Alan Geller traveled through the EDNY on his way from Florida to discuss settling his disputes related to MSMB Healthcare in person with Shkreli.  It certainly was foreseeable to Shkreli that Alan Geller would fly through a New York airport in the

---

"we do have evidence that [Su] accessed the Global Relay system beyond [June 30] . . . and intend to confront him with it," but defense counsel never identified any such evidence and did not use it during cross-examination.  (Tr. 5040).

[67] The government is "not restricted to the overt acts charged in the indictment in justifying its choice" of venue.  United States v. Nguyen, 507 F. App'x 64, 67 (2d Cir. 2013).

EDNY on the way to that meeting.  See, e.g., United States v. Royer, 549 F.3d 886, 896 (2d Cir. 2008) (venue may be shown through "acts that the conspirators caused others to take that materially furthered the ends of the conspiracy").

Second, with respect to the securities fraud conspiracy charged in Count Eight, the first phase of the conspiracy involved allocating Fearnow Shares to co-conspirators.  The government proved by a preponderance that two co-conspirators, Biestek and Sullivan, received their physical Fearnow Shares in the EDNY.  (See Tr. 10368-69; GX 115-4).  The act of mailing those shares to the EDNY, arranged by the defendant, was clearly in furtherance of the conspiracy.

*       *       *

As discussed throughout this section, the defendant has utterly failed to establish the kind of "manifest injustice" or "real concern that an innocent person may have been convicted" that could support granting a new trial pursuant to Rule 33.  See James, 712 F.3d at 107 (internal quotation marks omitted).[68]

---

[68] This is particularly true given the evidence introduced through the defense witnesses, which is not relevant in considering the Rule 29 motion but is part of the record to be reviewed under Rule 33.  For example, the defense witnesses established that: (1) the defendant never told his partner Howard Cotton, an experienced litigator, about the alleged litigation threats, and (2) withheld information from another partner, Michael Rosensaft, including information about the OREX trade, the Merrill Lynch arbitration, and the settlement agreements (Tr. 10239-243, 10262 (summarizing testimony)).

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendant's

Rule 29 and Rule 33 motions should be denied in their entirety.


Dated: Brooklyn, New York
       March 20, 2018

                                    Respectfully submitted,

                                    RICHARD P. DONOGHUE
                                    United States Attorney
                                    Eastern District of New York

                        By:    ___/s/_____
                                    Alixandra E. Smith
                                    David C. Pitluck
                                    David K. Kessler
                                    Assistant U.S. Attorneys
                                    (718) 254-7000


cc:    Clerk of the Court (KAM)
       Defense Counsel (By ECF and Email)