

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JMK:AES/DCP/DKK
F.#2014R00501

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 29, 2018

<u>By Hand and ECF</u>

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Evan Greebel
     <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

  The government respectfully submits this letter in support of its post-trial motion for forfeiture from the defendant Evan Greebel.  For the reasons set forth below, the Court should hold Greebel financially accountable for his criminal conduct by entering a forfeiture money judgment in the amount of $476,249, which represents a conservative computation of the monies Greebel personally acquired as a result of his crimes of conviction.  For the Court's convenience, a proposed preliminary Order of Forfeiture is also included with this submission, which the government respectfully requests be entered by the Court, pronounced as part of Greebel's sentencing, and attached to his Judgment and Conviction pursuant to Federal Rule of Criminal Procedure 32.2.

I.  Procedural Background

  On October 16, 2017, before the jury deliberated on the substantive criminal charges, Greebel affirmatively waived any right to a jury as to forfeiture, and agreed to have the forfeiture allegations determined by the Court.  (<u>See</u> Trial Transcript ("Tr.") 22-23).  On December 27, 2017, following an 11-week trial, Greebel was convicted of Counts Seven and Eight of the Superseding Indictment, the two counts of the indictment in which he was charged.  (Verdict Sheet, Dkt. No. 305).

II.     Applicable Law

   A.     The Criminal Forfeiture Rules and Statutes

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought by the government in this case. See, e.g., United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007) (Sotomayor, J.) (quoting Fed. R. Crim. P. 32.2(b)(1)), aff'd after remand, 2010 WL 4942213 (summary order) (2d Cir. Dec. 7, 2010). In this regard, Rule 32.2(b)(1)(A) provides, in pertinent part:

> As soon as practicable after a verdict . . . of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Fed. R. Crim. P. 32.2(b)(1)(A). See United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783360, at * 11 (E.D.N.Y. 2008) (finding that where the government seeks forfeiture of only a personal money judgment, no nexus determination need be made; defendant has no right to a jury and there is no need for pre-trial disclosures). Further, Rule 32.2(b)(1)(B) provides, in pertinent part:

> The court's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.

See Capoccia, 503 F.3d at 109; United States v. Roberts, 660 F.3d 149,166 (2d Cir. 2011) (holding that "district courts may 'use general points of reference as a starting point' for forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence.").

Here, the government seeks forfeiture under the applicable forfeiture statutes as applied to wire fraud and securities fraud, specifically: 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p). See Superseding Indictment at ¶¶ 60-61 (Dkt. Nos. 60, 296-1).

   B.     Criminal Forfeiture Based on Wire and Securities Fraud Convictions

Title 18, United States Code, Section 981(a)(1)(C) specifically provides for forfeiture of:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

2

Both wire fraud conspiracy (Count Seven) and securities fraud conspiracy (Count Eight) are unlawful activities as defined in 18 U.S.C. §1956(c)(7)(A). See 18 U.S.C. § 1961(1)(D) (offenses include wire fraud and "fraud in the sale of securities"). As this Court previously held in connection with the forfeiture imposed against co-defendant Shkreli, the applicable definition for "proceeds" is set forth in 18 U.S.C. § 981(a)(2)(B). See Dkt. No. 541; see also United States v. Contorinis, 692 F.3d 136, 145 n. 2 (2d Cir. 2012).

In addition, as the Second Circuit has expressly held, criminal forfeiture "serves no remedial purpose, [and] is designed to punish the offender. . . ." United States v. Contorinis, 692 F.3d at 146. Furthermore, criminal forfeiture is mandatory, and a creature of statute. See United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory" in cases where the relevant forfeiture statute provides that the court "shall order" forfeiture).

      C.      Burden of Proof

In contrast to the guilt phase of the criminal trial, the government bears the burden of establishing the amount of money subject to forfeiture only by a preponderance of the evidence. See United States v. Finazzo, 682 Fed. Appx. 6, 14-15 (2d Cir. 2017) (summary order); Capoccia, 503 F.3d at 116 (sentencing courts determine forfeiture amounts by a preponderance of the evidence); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing). The Second Circuit has expressly held, "where the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus' to that scheme, conspiracy or enterprise by a preponderance of the evidence." Capoccia, 503 F.3d at 117-18.

The government is not required to provide a precise calculation of the amount of money a defendant must forfeit. United States v. Basciano, No. 03-CR-929 (NGG), 2007 WL 29439 at *2 (E.D.N.Y. Jan. 4, 2007). Instead, the money judgment amount can be conservatively estimated, but such estimates may not be based upon evidence that is overly speculative. Id. Sentencing courts may consider trial evidence, hearsay, as well as evidence or information submitted by the parties and accepted by the court as relevant and reliable, in determining forfeiture. Capoccia, 503 F.3d at 109-110 (citing United States v. Gaskin, 364 F.3d 438, 462-63 (2d Cir. 2004)); Fed. R. Crim. P. 32.2(b)(1)(A) and (B). After determining the amount of the forfeiture money judgment, pursuant to Rule 32.2(b)(2)(A), the Court must promptly enter an order forfeiting this amount. United States v. Petrie, 302 F.3d 1280, 1284 (11th Cir. 2002) (vacating order of forfeiture not entered by district court until six months after sentencing).

III.      Forfeiture Should Be Ordered in the Amount of $476,249

Greebel's forfeiture money judgment liability should be based upon the benefit he received through increased compensation from his law firm, Katten Muchin Rosenman LLP ("Katten"), as he would not have received that benefit but for the frauds of which he was convicted in Counts Seven and Eight. Specifically, Greebel's criminal conduct in connection

with Count Eight prevented Retrophin from going out of business at a time when Greebel desperately needed the company to pay hundreds of thousands of dollars in outstanding legal bills, and his criminal conduct in connection with Count Seven allowed Greebel and Shkreli to conceal Shkreli's hedge fund frauds (as well as Greebel's allegiance to Shkreli at Retrophin's expense) so that Shkreli could retain control of the company and continue to direct new work for Retrophin to Katten. In other words, but for Greebel's criminal conduct, Shkreli would neither have had the ability to pay Retrophin's outstanding legal bills nor direct significant additional work to Katten—the two factors that caused a significant increase in Greebel's salary in Fiscal Year ("FY")[1] 2014. A defendant must forfeit those funds he would not have had but for his criminal offenses. See, e.g., United States v. Torres, 703 F.3d 194, 199-200 (2d Cir. 2012) (finding that "[s]o long as there is a causal nexus between the wrong-doer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense," and rejecting defendant's argument that she only received an intangible benefit from her offense); United States v. Nicolo, 597 F. Supp. 342, 346 (W.D.N.Y. 2009) ("To put it another way, 'proceeds are property a person would not have but for the criminal offense…'") (citations omitted). Greebel should not and cannot be permitted to retain the proceeds of his frauds.[2]

### A. Greebel's Salary is the Appropriate Measure of Forfeiture

The evidence at trial established a causal nexus between Greebel's frauds and the salary he earned as a partner at Katten. Due to these frauds, Shkreli was able to direct Retrophin to pay Katten's outstanding bills and to steer significant additional business to Katten, culminating in the payment by Retrophin of millions of dollars in fees in FY 2014. Greebel benefitted from the payment of these fees to Katten, as the collection of those fees was the primary driver of a significant increase in his salary between FY 2014 and FY 2015. Because the increased income Greebel received was a direct result of his criminal conduct, he is required to forfeit that income. See Contorinis, 692 F.3d at 147-48 (defendant is liable for proceeds he receives indirectly such as bonuses or other benefits from his employer based on the proceeds the employer received from the illegal activity); Torres, 703 F.3d at 199-200.

---

[1] At Katten, the fiscal year ran from February to January. For example, FY 2013 ran from February 1, 2012 to January 31, 2013.

[2] On March 5, 2018, the Court found that Shkreli was liable for $960,000 in forfeiture on Count Eight, as that amount represented the benefit Shkreli received from certain Fearnow shares that Shkreli and Greebel transferred (to both others and to Shkreli himself) in connection with the conspiracy to control the price and trading volume of Retrophin. (Order on Forfeiture, Dkt. No. 541 at 10-13). The Court correctly acknowledged that Greebel played an integral in role in the transfer of those shares. (Id.). However, the government cannot demonstrate that Greebel received a direct benefit from his work to help distribute those shares beyond his retention of Shkreli-related entities as clients of Katten, and as a result has not included the value of those shares in its calculation of forfeiture for Count Eight.

4

1.     There Was a Causal Nexus Between Greebel's Frauds and His Salary

The evidence of Greebel's roles in the frauds for which he was convicted in Counts Seven and Eight is detailed at length in the government's response to Greebel's Rule 29 motion. (See Dkt. No. 563 at p. 5-46). With respect to Count Eight, that evidence showed that Greebel, Shkreli and others conspired to manipulate the price and trading volume of Retrophin stock in order in order to make Retrophin appear as if it had a particular value, even though it had no assets, and to stabilize its share price at that value until the company could raise additional funds through PIPEs in early 2013. With respect to Count Seven, that evidence showed that Greebel, Shkreli and others caused Retrophin to enter into a series of settlement and sham consulting agreements with defrauded MSMB investors that functioned to steal money and shares from the company to repay liabilities owed by Shkreli and the MSMB entities as a result of Shkreli's hedge fund frauds (charged in Counts One to Six of the Superseding Indcitment). As a direct result of the frauds in Counts Seven and Eight, Retrophin was able to continue as a going concern and raise sufficient funds to pay off its outstanding bills, including hundreds of thousands of dollars owed to Katten, and Shkreli was able to maintain control of Retrophin and steer significant Retrophin business to Katten going forward. These frauds thus culminated in the payment by Retrophin of millions of dollars in fees to Katten in 2013 and 2014.

a.     Repayment of Outstanding Katten Bills

By the end of 2012, Retrophin had incurred hundreds of thousands of dollars in outstanding bills to Katten. For example, as of December 10, 2012, Retrophin owed Katten over $667,000 in unpaid bills. (GX 836). Greebel was desperate to collect the money owed to Katten, and made it clear that Shkreli's failure to pay those bills had the potential to cause him serious professional problems. For example, in December 2012, Greebel wrote to Shkreli, "i called you—i seriously need money on Monday. This is a real problem for me. Pleas[]e confirm that you are sending the 100+ that we discussed." (GX 510). When Shkreli indicated that he would not be able to pay that Monday, Greebel wrote "im out of time and when we discussed 2 weeks ago you assured m[]e that you would ge[t] me 100+ by yr end." (Id.). Moreover, in January 2013, Greebel asked Shkreli to pay him $200,000 and wrote that "the patience I have shown you [regarding billing] is putting me at grave risk. I need to get that second 100k." (GX 514) (emphasis added). There are also additional emails from this time period where Greebel is imploring Shkreli to pay his bills. (See, e.g., GX 513).

At the same time, Greebel was aware of a far greater risk: Retrophin's collapse. Shkreli informed Greebel of this possibility in November 2012 as they were discussing the shell company that would be used in the reverse merger, which was a desperate attempt to get financing for Retrophin. Shkreli told Greebel that it was "[Desert Gateway] or bust – I have very little time before valeant sues me." (GX 458). By December 2012, Greebel was aware that Retrophin had virtually no money in its bank account. (See GXs 479 (Fearnow shares held in escrow because Retrophin unable to make full $200,000 payment for Desert Gateway shell); 960 (Desert Gateway SEC Form 8-K)). And in late December 2012, after the reverse merger had taken place, Shkreli sent Greebel a press release announcing the liquidation of the firm. (See GX 506-A). When Greebel asked if he "miss[ed] something," Shkreli wrote that there was "[t]oo much stress, too many liabilities." (Id.). Clearly, Greebel understood that if Retrophin went out of business, the money that the company owed to Katten would never be paid and

5

Greebel's most significant client would disappear.  In short, his career at Katten would be severely set back and his compensation would decrease.

Against this backdrop, Greebel worked with Shkreli and others to manipulate the price and trading volume of Retrophin stock and keep the company afloat.  Immediately after Retrophin was able to raise additional capital via the PIPEs, Shkreli directed Retrophin to use a significant portion of that capital to pay off Retrophin's outstanding bills to Katten from 2012.  For example, following the PIPE in January 2013, Retrophin paid $160,000 to Katten. (GX 919-B).  In February 2013—in a period of just 9 days directly following the PIPE—Retrophin made a series of payments totaling of $550,000, including $200,000 that was paid from a Desert Gateway bank account that was used to handle the February PIPE proceeds.  (Id.).

          b.      <u>Shkreli Directs Significant Additional Business to Katten</u>

Due to the market manipulation conspiracy detailed above, Retrophin existed as a going concern in 2013 and 2014, and Shkreli was able to direct significant additional Retrophin business to Katten during that period.  While some of that business was directly related to the market manipulation conspiracy—for example, Greebel billed Retrophin for his work to transfer Fearnow shares that Shkreli secretly controlled at Shkreli's direction and for his benefit, and Greebel and others billed Retrophin for the lawsuit that Shkreli and Greebel caused Retrophin to bring against Timothy Pierotti for failing to join the conspiracy (see, e.g., GXs 844 (noting a balance of over $200,000 for work on the Pierotti litigation))—Shkreli would not have been able to direct any additional Retrophin business to Katten, let alone make payments for that work, had the conspiracy to control the price and trading volume of Retrophin's shares not succeeded.  Similarly, following the February 2013 PIPE, between approximately February 2013 and March 2014, Shkreli and Greebel engaged in series of negotiations with defrauded MSMB investors and ultimately forced Retrophin to enter into a series of settlement and sham consulting agreements that effectively stole millions of dollars of Retrophin capital and stock to pay off those investors.  This course of conduct served to conceal Shkreli's prior hedge fund frauds from Retrophin's Board of Directors and ensured that Shkreli would retain control of Retrophin.  Greebel billed Retrophin directly for his work in connection with drafting, executing and directing Retrophin to pay the settlement and sham consulting agreements, as well as his work to hide the true nature of the agreements from Retrophin's Board) (see, e.g., GXs 841 at 13, 14 (Greebel bills time to work on settlement and sham consulting agreements, including conversations with defrauded MSMB Healthcare investors Alan Geller and David Geller); 842 at 17 (Greebel bills time to work on settlement agreements, including conversations with Shkreli, the attorney for defrauded MSMB Healthcare investor Richard Kocher, and Alan Geller)).  In addition, the fraud protected Shkreli and enabled him to retain a position of power from which he could direct additional Retrophin business to Katten.

Between March 2013 and September 2014, after outstanding bills owed by Retrophin from 2012 were paid off (as detailed above, Retrophin made more than $700,000 in payments to Katten directly following the PIPEs), Shkreli continued to direct millions of dollars of business to Katten (see, e.g., GX 856 (August 2014 Katten bill to Retrophin detailing recent billable work totaling more than $2.1 million)), and Retrophin made payments totaling more than $4.7 million to Katten for Katten's work on additional business.  (GX 919-A).

6

### 2. Retrophin's Value as a Client to Katten Was the Primary Driver of Greebel's Salary Fluctuations During the Pendency of the Frauds

Greebel was an income partner at Katten, which meant that he did not receive a portion of the firm's profits in exchange for his work, but rather received a salary that was set by a compensation committee at the firm. (Tr. 6594-95). As a general matter, the salary of an income partner was not set by a mathematical formula, but by consideration of a series of factors. (Tr. 6596-97). Two important factors were (1) the total amount of revenue the partner generated for the firm, and (2) his or her realization rate, or the percentage of a client's bills for which money was actually collected. (Id.; see also Tr. 1225). If an income partner was the Principal Attorney for a particular client, he or she got "credit" for—or was held accountable for a failure to collect on—both the hours he or she billed for that client, as well as the hours billed by others for that client. (Tr. 1201-02, 1209-10).

By the fall of 2012, Greebel was the Principal Attorney for all Shkreli-related clients at Katten, including Retrophin. (GXs 121-5, 122-3). As a result, Greebel was poised to get credit at the time that his income was calculated for any new business brought in from Retrophin, as well as for the generation of revenue from existing projects; at the same time, he would also be held responsible for an unpaid or outstanding bills for Retrophin. And because Retrophin was far and away Greebel's most significant client as of FY 2013 and continuing through FY 2015 (in total, covering the time period from February 2012 to January 2015)—both in terms of the total number of hours billed and the amount of revenue generated for the firm (see, e.g., GX 122-3 (Retrophin represented 63% of the billable hours attributable to Greebel as a principal timekeeper in FY 2013))—if all other factors remained the same, an increase in the hours billed to and paid by Retrophin would result in an increase in Greebel's salary; conversely, if Retrophin did not pay its bills or direct business to Retrophin, Greebel's salary would decline.

The evidence at trial bears this out: the number of billable hours attributable to Retrophin and the realization rate for those billable hours was the predominant driver of Greebel's salary in the period FY 2013 to FY 2015. For example, in FY 2013, Greebel's total salary was $355,000, and Greebel actually owed Katten money at the end of the year.[3] (See GX 121-6). Greebel's memorandum to Katten's Compensation Committee ("Comp. Memo") for FY 2013 touted that that his revenue for clients where he was the Principal Attorney generated $864,000, although Greebel took credit for the $546,000 collected from MSMB Capital following the departure of former relationship partner Bernadette Davida, and claimed a total collection of $1.41 million. (See GX 121-5). Notably, Greebel's FY 2013 Comp. Memo did not include a discussion of his realization rate. (Id.). This is likely because Greebel's overall realization rate that year was 72.25% which, as then-Chairman of the Compensation Committee Ross Silverman testified, is far below the industry standard of a percentage in the mid-80s. (See GX 122-3; Tr. 6611). Indeed, Greebel's realization rate for Retrophin that year, which

---

[3] In fact, Greebel's salary for FY 2013 actually <u>decreased</u> from the prior year, when it had been $380,000. (See GX 121-4). According to Silverman, this decrease was "primarily attributable to [Greebel's] low realization rate" for FY 2013. (See Tr. 6610).

7

accounted for nearly 60% of Greebel's billed time as the principal timekeeper, was even lower, at 65%. (GX 122-3).

The following year, Greebel's salary nearly tripled, to $900,000. (GX 121-8). As a result, Greebel was the single highest-paid income partner at Katten in FY 2014, out of between 130 and 140 income partners. (See Tr. 6611, 6615). In his Comp. Memo, Greebel touted that his Principal Attorney revenue increased more than 300% to $3.5 million, and that he had a total realization rate of 95.8%. (GX 121-7). Retrophin accounted for more than $2 million of the $3.5 million in fees collected from Greebel's clients, and the realization rate for Retrophin was 101.65%. (GX 122-4). As Silverman testified, the exponential increase in the Greebel's salary from FY 2013 to FY 2014 was driven by that dramatic increase in revenue and realization rates. (See Tr. 6614; see also Tr. 1225-26 (testimony of Davida describing the importance of the realization rate, including as a "major factor" in the determination of compensation)). Silverman also testified that although Greebel's work with other clients (particularly in the virtual currency space) also played a role in his salary increase, that increase was due "primarily" to Retrophin, encompassing both the increased business from Retrophin and the high realization rate for its bills. (Tr. 6615).

Not surprisingly, then, when Retrophin's realization rate plunged and Retrophin fired Katten as a client (so that no new business was forthcoming) in FY 2015, Greebel's salary similarly suffered. In FY 2015, Greebel's salary was cut by more than half, from $900,000 to $423,751. (See GX 121-10). This reduction was imposed despite Greebel's assertions in his Comp. Memo that he should "receive a significantly higher bonus than last year." (GX 121-9 (emphasis in original)). In support of that assertion, Greebel argued that his revenue as the Principal Attorney had increased by more than 70% to $5.2 million. (Id.). Greebel also touted the offshoot work his representation of Retrophin had produced and his work on virtual currencies. (Id.). However, while Greebel claimed his total realization rate should be "deemed" to be 87.9%, in reality his total realization rate was just over 50%, and the realization rate for Retrophin was less than 35%, as Katten had to write off over $3.7 million in billable hours after Retrophin fired the firm in late 2014. (GX 122-5). Silverman testified that Greebel's dramatic decrease in salary between FY 2014 and FY 2015—similar to his dramatic increase in salary between FY 2013 and FY 2014—was driven "primarily" by the realization rate of the uncollected bills for Retrophin. (Tr. 6618).

From the evidence set forth above, it is clear that Greebel's compensation during the period FY 2013 to FY 2015 was primarily based on the volume of business Retrophin generated for Katten and the portion of Retrophin's bills for which Katten was actually paid. In FY 2013, less than two-thirds of the billable hours from Retrophin were actually paid, which drove down Greebel's realization rate and he was paid $355,000, a decrease from the prior year. By contrast, in FY 2014, not only did the number of billable hours for Retrophin increase dramatically to over $2 million, but Greebel collected every one of those billable dollars (as well as back pay from prior outstanding bills)—and his pay nearly tripled. In FY 2015, however, despite an enormous increase in billable hours from Retrophin, Katten had to write off over $3.7 million in Retrophin's billable hours and knew it would receive no further business from the company, and Greebel's pay was cut in half. These incontrovertible facts support the testimony

of Silverman, who led the compensation committee, that the realization rate and Retrophin were the main drivers of Greebel's compensation.[4]

\* \* \*

Taken together, the above-detailed evidence proves the existence of a causal nexus between Greebel's criminal conduct and Retrophin's repayment of Katten's outstanding legal bills, as well as Shkreli's direction of Retrophin's business to Katten, which directly benefitted Greebel by resulting in a dramatic increase in Greebel's salary between FY 2013 and FY 2014.

      B.      Forfeiture Calculation

The government is not required to provide a precise calculation of the amount of money Greebel must forfeit; rather, it only need make a conservative estimate based on the record before the Court. Basciano, 2007 WL 29439 at \*2. Here, a legally appropriate yet conservative calculation of Greebel's ill-gotten gains is the difference between Greebel's salary at Katten for FY 2014 and for FY 2015, which is approximately $476,249.

As set forth above in Section II.A.2, the $900,000 salary Greebel received for FY 2014 was dramatically higher than his FY 2013 salary due to his criminal conduct, which led directly to the repayment of Retrophin's outstanding bills to Katten, as well as additional business that Shkreli directed to Katten during the period that he retained control over the company (including payment for work that Greebel did on the settlement and sham consulting agreements themselves). As a result, the appropriate measure of forfeiture is the difference between his salary in FY 2014 and another year where his criminal conduct did not succeed in inflating his salary. Although it would also be appropriate and accurate to use the difference between his FY 2013 salary and his FY 2014 salary as a measure of forfeiture, the difference between his FY 2014 salary and his FY 2015 salary provides a more conservative estimate and, as a result, the government proposes using that estimate here. A comparison of those two years accurately isolates the predominant effect that the Retrophin realization rate and the amount of Retrophin business brought to Katten had on Greebel's income, and thus the direct benefit that Greebel received as a result of his criminal conduct.

---

[4] At trial, Greebel attempted to argue that Retrophin was not the primary driver of his salary. For instance, Greebel argued that his "Bitcoin" related business efforts in FY 2014 had a significant effect on his compensation. That assertion is simply not borne out by the evidence. While Bitcoin-related matters did account for approximately 25% of Greebel's fees in FY 2014, and in FY 2015 it accounted for a high percentage of Greebel's billable hours and brought in nearly $1.8 million in fees, Greebel's income was still cut in half from FY 2014 to FY 2015. (Compare GX 122-4 with GX 122-5). Moreover, Greebel's explanation of his non-client Bitcoin-related work is substantively identical in his 2014 and 2015 Comp. Memos. (Compare GX 121-7 with GX 121-9).

IV.     Conclusion

        For the reasons set forth above, the Court should impose against Greebel a forfeiture money judgment in the amount of $476,249, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and Rule 32.2.  The government respectfully requests that the enclosed proposed preliminary Order of Forfeiture be entered against Greebel as part of his sentence and attached to his Judgment and Conviction pursuant to Rule 32.2(b).

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:    /s/_____
        Alixandra E. Smith
        David C. Pitluck
        David K. Kessler
        Laura D. Mantell
        Claire S. Kedeshian
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     All counsel of record (via ECF)