UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -against-

EVAN GREEBEL,

               *Defendant.*

ECF Case

No. 15-cr-00637 (KAM)

<u>ORAL ARGUMENT REQUESTED</u>

**MR. GREEBEL'S REPLY IN SUPPORT OF HIS MOTION FOR JUDGMENT**
**<u>OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL</u>**

## TABLE OF CONTENTS

I.   The Evidence Proffered on Counts Seven and Eight Remains Insufficient to
Satisfy Rule 29. ....................................................................................................... 4

A.   The Government's Misleading Arguments Are Unavailing and Cannot Save
Count Seven. ........................................................................................................... 5

   1.   The Government's Arguments on Settlement Agreements Are Based on
        Speculation and Strained Interpretations of Ambiguous Evidence. ............... 6

   2.   The Government's Arguments Regarding The Two Consulting Agreements at
        Issue Mischaracterize The Timing of These Agreements and Do Not Address
        Mr. Blanton's and Mr. Geller's Legitimate Consulting Services. ................ 21

B.   The Government's Arguments as to the Sufficiency of the Evidence on Count
Eight Are Similarly Unpersuasive. ..................................................................... 23

   1.   The Government Continues to Offer No Proof that Evan Greebel Knowingly
        Joined a Criminal Conspiracy Alleged in Count Eight. ................................ 23

   2.   The Government Does Not Address the Innocent Explanations for Mr.
        Greebel's Conduct and Misconstrues Second Circuit Law. .......................... 29

II.   The Court Should Grant Mr. Greebel's Rule 33 Motion for a New Trial. .................. 31

A.   The *Alter Ego,* Veil-Piercing Instruction Was Important and Necessary on
Count Seven, and the Government's Arguments to the Contrary Are
Unresponsive and Unpersuasive. ........................................................................ 31

   1.   Because the Jury Was Not Informed Regarding Relevant Law That Was
        Critical to Mr. Greebel's State of Mind on Count Seven, His Conviction on
        That Count Constitutes a Manifest Injustice. ............................................... 31

   2.   The Government's Argument that Mr. Greebel's Requested Jury Instruction
        Should Have Been Presented Through the Testimony of a Fact Witness Fails to
        Recognize the Government's Prior Objection to Such Testimony and Ignores
        the Fundamentally Different Roles of the Parties and the Court. ................. 38

B.   The Belated Disclosures Throughout Trial of *Brady* and *Giglio* Material
Impaired Mr. Greebel's Ability to Examine Witnesses and His Right to a Fair
Trial. ..................................................................................................................... 39

C.   The Precluded Testimony of Dr. Steven Rosenfeld Was Highly Relevant to Mr.
Greebel's State of Mind on Count Seven. .......................................................... 46

D.   Rule 33 Is Appropriate to Raise Issues of Serious Juror Misconduct, and the
Evidence of Those Issues Casts Significant Doubt on the Viability of the Jury's
Verdict. ................................................................................................................. 48

E.   The Introduction of Hearsay Statements by Marc Panoff Violated *Bourjaily*,
and the Government Did Not Offer Evidence Sufficient to Label Him a Co-
Conspirator for that Purpose. .............................................................................. 54

**F.   Evidentiary Rulings During Trial Caused the Jury to Receive a Skewed, Incomplete Picture of Certain Facts and Witnesses and Prevented Mr. Greebel's Trial from Being Fair.** ........................................................................ **56**

**III.   Conclusion** ............................................................................................................ **61**

## Preliminary Statement

For the reasons in our initial brief and in the pages set forth below, we respectfully submit that this Court should grant our Rule 29 motion, or in the alternative, should grant Mr. Greebel's motion for a new trial.

In reply to the government's opposition to Mr. Greebel's motions under Criminal Rules of Federal Procedure 29 and 33, we focus on those issues we believe require a response in light of the arguments made in the government's brief.

***First***, Rule 29 should be granted because, as we argued in our opening brief, there is insufficient evidence for Mr. Greebel's convictions on Counts Seven and Eight.[1]  Both at trial and in its briefing, the government presented partial and ambiguous evidence that significantly overstates the proof of the allegations against Mr. Greebel.  The government's arguments are based on (i) widespread speculation and (ii) theoretical constructs about this vague and ambiguous evidence.  Further, the government still fails to acknowledge that, regardless of its narrow and unrealistic interpretation of the severity and legitimacy of MSMB investors' litigation threats, the only question that matters is whether Mr. Greebel had a valid basis to think the threats were legitimate—and based on the government's evidence, and testimony of the witnesses who either made the threats or on whose behalf the threats were made, he did.  The same is true as to the consulting agreements, the government's theory of which is not borne out by its evidence.  To the contrary, it is clear that Messrs. Geller and Blanton intended to perform (and actually did perform) legitimate consulting services, and there is woefully insufficient

---

[1]  All references to Count Seven correspond to the charge of wire fraud conspiracy, which in the final verdict sheet was referenced as Count One; references to Count Eight correspond to the charge of securities fraud conspiracy, cited in the final verdict sheet as Count Two. *See* Dkt. 502.

1

evidence that Mr. Greebel had any reason to believe they would not provide such services.  In addition, the Chief Executive Officer of Mr. Greebel's client instructed Mr. Greebel (and other partners at Katten) to prepare the settlement agreements, and it is not the job of an outside corporate attorney to second-guess the motivation or basis of a request from a client (or client representative) which on its face appears to benefit the client.

Nor is the government's evidence sufficient to support its allegations under Count Eight, where there is hardly proof that Mr. Greebel "knowingly joined a criminal conspiracy."  Instead, what the evidence shows is that Martin Shkreli consistently kept Mr. Greebel in the dark, and speculation to the contrary does not overcome this fatal flaw in the conviction.  Indeed, neither of the two fact witnesses who testified regarding Count Eight (Timothy Pierotti and Jackson Su) testified that Mr. Greebel was at the key meeting or on any phone call where the supposed conspiracy was hatched and designed.  As to the "Fearnow" shares, the evidence shows that the shares were certainly freely tradable, despite the government's misinterpretation to the contrary, and that the effect of the trading activity was precisely the opposite of the alleged scheme. Ultimately, the majority of the government's evidence at least equally supports an innocent explanation as it does a guilty one, and it is this innocent interpretation that should prevail under Rule 29.

**_Second_**, alternatively, granting a new trial under Rule 33 is particularly appropriate here, where Mr. Greebel's convictions are based on incomplete jury instructions, and where the flaws in the government's case were enough for a juror to raise serious doubts about the verdict. Critically, the jury's verdict was reached without the benefit of an *alter ego* or veil-piercing jury instruction, which would have provided crucial context as to Mr. Greebel's state of mind. Further, the failure to meet the requirements under *Brady* and *Giglio* hamstrung Mr. Greebel's

2

ability to adequately prepare for trial.  Finally, the jury's verdict was based on such a flawed process—including jurors who blatantly disregarded the Court's rules and discussed the evidence and the defendant's guilt or innocence well before deliberations—that a juror felt compelled to alert the Court about his grave concerns only one day after the trial ended.  This alone is enough to undermine confidence in the verdict and support a new trial.  Because the government's arguments are unpersuasive or unresponsive, and in light of the other grounds set forth below, granting Mr. Greebel a new trial under Rule 33 is more than justified here.[2]

---

[2]  In the interest of preserving the Court's and the parties' resources, we do not respond to all of the government's arguments.  For the avoidance of doubt, we incorporate by reference our arguments in our opening brief and focus our reply on issues we believe require additional response.

## I.     The Evidence Proffered on Counts Seven and Eight Remains Insufficient to Satisfy Rule 29.

No one disputes, for purposes of a motion under Federal Rule of Criminal Procedure 29, that the evidence must be "viewed in the light most favorable to the prosecution." *E.g., United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). Nevertheless, when the evidence viewed in such light "gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury [would have] necessarily entertain[ed] a reasonable doubt,'" and the Court must enter a judgment of acquittal. *Id.* (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). That is, because Rule 29 requires that the government "introduce[d] sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged ha[d] been proven beyond a reasonable doubt," *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994), a conviction cannot be sustained when the government introduces evidence "'at least as consistent with innocence as with guilt,'" *id.* (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)). That was certainly the case at the trial of Evan Greebel.

The government did not present evidence sufficient to support a reasonable inference of guilt beyond a reasonable doubt.[3] Instead, the evidence the government presented at best equally supports innocence and guilt, and in many cases affirmatively contradicts the government's theories of Mr. Greebel's guilt. On Count Seven, the government cherry-picked ambiguous emails in an attempt to show Mr. Greebel manipulating capitalization tables; speculated as to the seriousness of threats made by investors; speculated as to the level of liability of Retrophin;

---

[3] The government correctly cites the standard for Rule 29 that where a district court reserves its decision on a motion for judgment of acquittal, the court must decide the motion on the basis of the evidence at the time the ruling was reserved. The Rule 29 arguments herein thus cite only to evidence from the government's case-in-chief.

speculated as to the validity of settlement agreements with MSMB investors and Mr. Greebel's level of involvement therewith; and presented a misleading picture on the evidence of the consulting agreements with Messrs. Geller and Blanton. The government fares no better on Count Eight, where it frequently attempts to ascribe to Mr. Greebel perfect knowledge at the time at issue of things that only became clear in retrospect, and where contemporaneous evidence is inconsistent with the very existence of the conspiracy alleged in Count Eight.

### A.   The Government's Misleading Arguments Are Unavailing and Cannot Save Count Seven.

We note at the outset that Mr. Greebel does not stand before a bar grievance committee; he faces two felony convictions for what the government essentially believes was imperfect lawyering.[4]  That the government thinks Retrophin could have received more advantageous terms from the settlement or consulting agreements is a far cry from proof beyond a reasonable doubt that Mr. Greebel "participate[d] in the conspiracy *with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective*[.]"  Final Jury Instructions, Dkt. 498 at 36 (emphasis added); *see id.* ("[A] person acts knowingly and intentionally if he acts voluntarily, deliberately, and purposefully, and not because of ignorance, mistake, accident, negligence or carelessness.").

On Count Seven, as with the government's other theories, the government cannot point to a single piece of documentary or testimonial evidence that Mr. Greebel lied to or misrepresented anything with respect to the allegations in Count Seven, and the government's arguments are based on a narrow interpretation of vague and ambiguous evidence; are dangerously speculative

---

[4]  Indeed, and although it is not at issue in this case, it bears noting that it is not at all clear that Mr. Greebel's actions would even rise to the level of satisfying the requirements for a successful malpractice suit, let alone criminal convictions.

and unrealistic; and are, at most, "as consistent with innocence as with guilt." *D'Amato*, 39 F.3d at 1256.

**1.    The Government's Arguments on Settlement Agreements Are Based on Speculation and Strained Interpretations of Ambiguous Evidence.**

The government criticizes the defense for supposedly "ignoring the evidence offered at trial," Gov't Br. at 3, and for relying on a "narrow subset of evidence" from trial," *id.* 6. Ironically, however, the government details what it purports is "the totality of the relevant evidence" regarding "information that was known" and "actions [Mr. Greebel] took to further the conspiracy[] *prior* to the negotiation of the settlement agreements," Gov't Br. at 7, and then proceeds to ignore highly relevant exculpatory evidence relating to Mr. Greebel's actions and his state of mind.

***First*** (and critically in a criminal fraud trial), the government did not present a single witness who testified that Mr. Greebel lied to or deceived them or anyone else about the nature of the settlement agreements with MSMB investors. Indeed, even the government recognizes that evidence at trial showed that any lie or misrepresentation came *not* from Mr. Greebel but from Mr. Shkreli. *See, e.g.*, Gov't Br. at 10 n.5 (MSMB investors "confused" due "largely to [Mr.] Shkreli's lies"). This is because Mr. Greebel did not lie to or deceive anyone—investors, the Board, or his colleagues—about the settlement agreements that Retrophin executed. In fact, Mr. Greebel went out of his way to tell Mr. Panoff about the settlement agreements within days of his being hired as Chief Financial Officer, notifying him immediately of the names and dates of agreements and advising him that Retrophin had the signed versions.

***Second***, the government's interpretation of investors' litigation threats is narrow, misleading, extremely unrealistic, and very telling. Even the Court recognized that litigation threats were obvious, *See, e.g.*, Tr. 3436:24–3437:2 (the Court: "[T]here's no doubt that as an

6

attorney [Mr. Greebel] and Mr. Shkreli perceived the investor statements as threats that could involve litigation not just against Mr. Shkreli and MSMB but against Retrophin."), yet the government argues that only "one investor" threatened to sue Retrophin and that the remaining investors only "suggested that they might pursue legal action against [Mr.] Shkreli and/or the MSMB entities[.]"  Gov't Br. at 9-10.

According to the government, Sarah Hassan's settlement agreement was improper because Sarah Hassan "testified that she never threatened to sue[,] . . . that no discussion of such a lawsuit was raised in any conversation with [Mr.] Shkreli and/or [Mr. Greebel], and that she was surprised to receive a settlement agreement at all."  Gov't Br. at 10 n.4.  But the government ignores that what matters is *not* Ms. Hassan's subjective belief as to whether she explicitly threatened a lawsuit or her "surprise" after receiving a settlement; rather, what matters for the purposes of judging Mr. Greebel's participation in the alleged conspiracy is *his* state of mind— *i.e.*, the fundamental question is what Mr. Greebel believed regarding legitimate legal risks for his client Retrophin.  *See United States v. Gole*, 158 F.3d 166, 167-68 (2d Cir. 1998) ("Fraudulent intent is established when some actual harm or injury *was contemplated* by the schemer.") (internal quotation marks and citation omitted); *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2d Cir. 1970) (finding that the government may not "escape the burden of showing that some actual harm or injury was contemplated by the schemer").

As the evidence showed at trial, Mr. Shkreli explicitly told Mr. Greebel that Ms. Hassan was "the same situation as Lindsay [*sic*]."  GX 525.  In other words, Mr. Greebel was led to believe that Ms. Hassan was taking the same aggressive approach taken by Dr. Rosenwald.  (And as the government concedes, "there is no dispute that . . . [Dr.] Rosenwald *explicitly threaten[ed] to sue Retrophin*," Gov't Br. at 9-10 (emphasis added).)  Mr. Greebel was thus clearly under the

impression that Ms. Hassan, like several other investors,[5] was contemplating and threatening legal action against Retrophin.  The government's argument that "[t]here is no evidence that . . . investors made [litigation] threats" is therefore unpersuasive.

As with its other arguments, the government's characterization of investors' litigation threats raises dangerous policy implications regarding the appropriate behavior of a corporate lawyer.  The government argues, for example, that despite David Geller's threats to "take it to the next level"—including going to media outlets and enforcement agencies—Mr. Geller never explicitly threatened a lawsuit and thus posed absolutely no risk whatsoever to fledgling Retrophin.  Gov't Br. at 10 n.4.  But the tone of Mr. Geller's emails is patently obvious, and Mr. Greebel—like any good lawyer—was duty-bound to prevent legitimate risks *before* they materialized into real lawsuits, not after.  Indeed, there are no "magic words" required to threaten a lawsuit.  *See, e.g.*, Tr. 3137:4–13 (Mr. Marshall referring to an email to Mr. Shkreli where he wrote that "further delay may force me into different directions," and testifying that "it was a veil [*sic*] threat of litigation. It was either perform the settlement agreement or possibly litigate[.]").  And the very expectation of a good attorney is that he or she *anticipate* and solve legal problems.

The policy consequences of the government's apparent position are dire.  On the one hand, Mr. Greebel faces criminal prosecution as an alleged co-conspirator for his actions aimed at preventing legal risks to his client Retrophin.  On the other hand, one can imagine Retrophin's viable malpractice claim against an outside attorney who ignored potential and legitimate litigation threats.  A lawyer should not be encouraged to wait as long as possible—presumably until potential legal risks mature into formal complaints—before doing anything about those

---

[5] *See* Dkt. 530 at 9-10 (detailing litigation threats from multiple MSMB investors).

risks.  But taking the government's approach to its logical conclusion, lawyers now must wait until a threat becomes a full-fledged crisis before encouraging their clients to protect themselves.[6]

The government's narrow interpretation of the extensive litigation threats is telling. Indeed, the government is aware that *if* Mr. Greebel perceived a legitimate legal risk to his client Retrophin, Mr. Greebel's actions were not only appropriate but also necessary to protect Retrophin from potential litigation.  Mr. Greebel's actions would thus *not* have been in furtherance of a criminal conspiracy to defraud Retrophin but would demonstrate Mr. Greebel's good-faith attempt to serve his client.  Most importantly, this would be fatal to Mr. Greebel's conviction on Count Seven.  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (acquittal appropriate where evidence gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence") (citation omitted).

**_Third_**, the ambiguous evidence that the government did present is equally consistent with an inference of innocence as guilt, and therefore does not survive Rule 29.  The government cites, for example, GXs 111-4, 111-12, and 445 for the proposition that Mr. Greebel knew "that MSMB Capital never appeared on any of the Retrophin capitalization tables that he either

---

[6] The government argues that "the explanation offered by [Mr. Greebel] for his actions is not 'more likely' than the one advanced by the government," Gov't Br. at 30 n.15 (citing *United States v. Bryant*, 885 F. Supp. 2d 749, 765 (D.N.J. 2012).  But this ignores governing case law that a verdict should not stand where the evidence is "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," and thus a "more likely" explanation is not required.  *Glenn*, 312 F.3d at 70.   And in any event, it is, in fact, a significantly more likely explanation that a lawyer who is aware of extensive litigation threats need not (indeed *should* not) wait to receive threats as precise and explicit as the one made by Dr. Rosenwald before taking steps to protect his client from potential litigation.

maintained or received prior to December 2012" and that MSMB Capital "had not in fact invested in Retrophin[.]"[7]  But the government treats its hand-selected pre-December time period as if it bears some significance.  The crucial fact is that Mr. Greebel *did learn* of MSMB Capital's investment *in November and December 2012* prior to the reverse merger.  *See, e.g.,* DX 111-148 (Dec. 3, 2012 email from Mr. Shkreli to Mr. Greebel and Mr. Su noting "what the final cap table will look like" and attaching a Retrophin capitalization table that showed MSMB with 225,000 shares).  Moreover, the government artificially treats Retrophin's pre-merger cap table as if it were static, but testimony and documents at trial proved just the opposite.  Indeed, emails among Mr. Shkreli, Mr. Greebel, Mr. Massella, and Retrophin employees showed that Retrophin's financial records were incomplete, unorganized, or both.  *See, e.g.*, Tr. 3954:16–18.  That MSMB Capital was omitted from certain versions of the pre-merger cap table is woefully insufficient to prove that MSMB Capital "had not in fact invested in Retrophin[.]"  Gov't Br. at 7.

---

[7]   The government uses this same argument later in its brief in support of its statement that Mr. Greebel "knew the individuals being repaid [through settlement agreements] with Retrophin assets were defrauded investors in Shkreli's failed hedge funds."  Gov't Br. at 36.  Specifically, the government recites its evidence from trial as to what it claims Mr. Greebel allegedly "knew" at certain points in his relationship with Mr. Shkreli and Retrophin.  *Id.* n.20.  But the government's arguments as to what Mr. Greebel knew are not only speculative; they also miss the point.  The settlement agreements at issue in Count Seven were executed to protect Retrophin from widespread, legitimate risk of legal action from certain MSMB investors.  Mr. Greebel was aware of these litigation threats, as well as the significant commingling between the MSMB Entities and Retrophin *and* the well-established Delaware veil-piercing and *alter ego* case law allowing civil plaintiffs to pursue corporate assets even where the alleged wrongdoing is unrelated to the corporation and was perpetrated by an individual in control of that entity.  The settlement agreements were thus executed in a good-faith attempt to avoid litigation, and this fact is not changed by the government's recitation of emails sent or received by Mr. Greebel during the course of his dealings with Retrophin and Mr. Shkreli.

The government's arguments as to Mr. Greebel's "role in the creation of the backdated interest in Retrophin for MSMB Capital," *id.* at 7, are both irrelevant and unpersuasive.  Indeed, as we noted in our opening brief, the Court explicitly dismissed the government's backdating allegations as a standalone theory of liability.  Specifically, the Court ruled that "[t]hat part of Count Seven will be dismissed, the part that charges the backdated scheme is an offense, which if proven beyond a reasonable doubt would render Mr. Greebel guilty of Count Seven."  Tr. 9608:2–5.[8]  That the government relies on backdating evidence—where Mr. Greebel maintains that any and all evidence relating to the alleged backdating is irrelevant and should have been stricken from the record, and where the Court affirmatively dismissed the government's backdating theory—only confirms that the evidence on Count Seven is insufficient to survive Rule 29.

In any event, the evidence that the government does cite relating to MSMB Capital's interest in Retrophin includes a string of ambiguous emails relating to a transfer of shares from Marek Biestek to Mr. Shkreli, GXs 111-15, 111-17, 111-18, 111-19, and one email relating to additional transfers from certain additional individuals to Mr. Shkreli, GX 111-26-A.  These emails were the subject of extensive testimony from Jackson Su and Corey Massella, and a close review of exactly what they say reveals that they show nothing whatsoever as to Mr. Greebel's involvement in the conspiracy alleged in Count Seven.

---

[8]  It is also worth noting that, only after the Court expressed considerable doubts as to the viability of the government's backdating allegations, *see, e.g.,* Tr. 9212:13–18; 9215:12–18, the government conceded it would not pursue this theory of liability.  Tr. 9600:7–9. Nonetheless, the government spends seven pages in its opposition brief laying out its theory on the alleged backdating of MSMB Capital's interest in Retrophin.  This is yet-another example of the government's attempt to piece together evidence of alleged criminal activity where no such evidence exists.

On November 29, 2012, Retrophin's Chief Operating Officer Jackson Su sent transfer documentation to Mr. Greebel and others, including Retrophin accountant Corey Massella. GX 111-15. Mr. Greebel responds, noting that the documents must be mistaken because they reference the wrong Retrophin entity. GX 111-17. Mr. Greebel is then told by the CEO and founder of his client Retrophin that the Biestek-to-Shkreli "agreement was signed in [J]une." *Id.* These emails show nothing more than Mr. Greebel's effort to understand—as outside counsel with limited information—the current state of Retrophin's books and finances. If anything, the documents cited by the government prove only that Mr. Greebel was, as we argued at trial, entirely dependent on Mr. Shkreli and others at Retrophin for information relating to the company. That Mr. Greebel received incomplete and misleading information and then relied on that information to perform fairly ordinary legal work demonstrates, at most, his innocence rather than his guilt. Indeed, these documents show *Jackson Su's* role in amending the documents for Mr. Biestek's transfer in response to his boss's representation as to the date of that transfer. GX 111-19; *see* Tr. 5113:17–22 (Mr. Su testifying that he changed the date because he "thought [he] made the mistake.").

Relying on its tenuous characterization of ambiguous emails described above, the government next applies its flawed logic to suggest that Mr. Greebel's "role in filing a Form 13-D with the U.S. Securities and Exchange Commission ("SEC") was improper because "he knew [the 13-D] falsely stated that MSMB Capital had invested in Retrophin when it had not[.]" Gov't Br. at 7. But the proffered evidence again demonstrates nothing more than Mr. Greebel's innocent involvement in SEC filings in his role as outside counsel. This argument ignores the fact that Mr. Greebel possessed a good-faith belief based on representations made by Messrs. Su and Shkreli, both of whom Mr. Greebel relied on for accurate and thorough information

12

regarding Retrophin's finances.  Critically, Mr. Greebel certainly would have known and relied on the fact that Mr. Shkreli—the CEO of Mr. Greebel's client Retrophin—signed the company's Form 13-D and swore to its accuracy.  GX 103-30, at R012887.

Mr. Greebel—having received from Retrophin's Chief Operating Officer a signed and executed transfer agreement that showed MSMB Capital receiving 75,000 Retrophin shares on July 7, 2012, GX 111-26-A at R020403-05—merely sent to Mr. Shkreli a filled-out Form 13-D reflecting the information contained in the transfer documents.[9]  *See* GX 503. As outside counsel to a fledgling company with admittedly sloppy records, Mr. Greebel had the only two pieces of information reasonably available:  (1) the representations of Retrophin's CEO and (2) validly executed legal transfer documents corroborating those representations.  Armed only with this information, Mr. Greebel merely sent to Mr. Shkreli a Form 13-D based on what he believed to be a true and accurate summary of Retrophin's books.  This is exactly what a corporate attorney is expected to do.[10]

---

[9]  The government offers no evidence, because none exists, that Mr. Greebel even drafted Retrophin's 13-D.  Indeed, the government fails to recognize that the totality of Mr. Greebel's involvement with Retrophin's Form 13-D was that he *sent an email* with a form prepared by one of his associates at Katten.  Notably, evidence at trial showed that Mr. Greebel's colleague Michelle Griswold drafted, finalized, and filed the Form 13-D, and the government has not offered evidence to the contrary or proffered any analysis suggesting any impropriety as to Ms. Griswold's work.  *See, e.g.*, GX 837 (Katten's invoice showing Michelle Griswold's work preparing and filing Form 13-D).

[10]  The government makes arguments that appear to ignore the fundamental nature of the attorney-client relationship.  The government argues, for example, that Mr. Shkreli's instruction to Mr. Greebel to "[i]gnore" David Geller (and presumably Mr. Greebel's adherence to that instruction) does "not reflect the work of an 'ordinary' lawyer working on behalf of Retrophin."  Gov't Br. 37 n.21.  But attorneys are allowed to listen to their clients (or client representatives) as to the timing of communications with third parties, especially where such communications are extremely sensitive in light of ongoing settlement negotiations.  A corporate attorney would not contact a financier if her client requested that

The government's theory ultimately has lasting consequences for the dynamic between attorneys and their clients.  Indeed, in the end, Mr. Greebel trusted Mr. Shkreli to be truthful and performed legal work under the assumption that this trust would not be violated.  Mr. Greebel joins the company of dozens of other sophisticated individuals who have learned, only with the benefit of hindsight, that this trust was misplaced.  But the government would prefer that Mr. Greebel proceed with utmost suspicion when dealing with the CEO (Mr. Shkreli) and COO (Mr. Su) of his corporate client.  One can only imagine the damage rendered to attorney-client relationships if corporate attorneys cannot, to a reasonable degree, trust the representations *and* documentation supplied to them by their clients, senior management of their clients, or their clients' representatives.  The government's theory is even more troubling since, in this case, it is based on its interpretation of vague and ambiguous emails that demonstrate Mr. Greebel's innocence rather than his guilt.  *D'Amato*, 39 F.3d at 1256.  Indeed, as explained above, the documents and testimony cited by the government show nothing more than that Mr. Greebel performed ordinary legal work based on information supplied by Messrs. Shkreli and Su.  Far from proving that Mr. Greebel took "actions . . . to further the conspiracy," Gov't Br. at 7,  this "totality of . . . relevant evidence" only corroborates Mr. Greebel's defense that he was lied to by Mr. Shkreli.

**Fourth**, the government's argument on Count Seven is based on pure speculation, and a conviction cannot stand "where little more than conjecture supports the hypothesis of guilt." *United States v. Marti*, 294 Fed. App'x 439, 444 (11th Cir. 2008).  The government argues that,

---

she wait a few days due to ongoing negotiations; nor would an attorney contact an adversary (or a counter-party) if her client instructed her to wait in light of ongoing settlement negotiations between the parties.

while assisting Mr. Shkreli in finalizing settlement agreements with MSMB investors, Mr. Greebel was "aware that [Mr.] Shkreli had defrauded the investors in MSMB Capital and MSMB Healthcare." Gov't Br. at 8. This "awareness," according to the government, is based on the fact that (i) Lindsey Rosenwald "accused" Mr. Shkreli of liquidating and converting his investment; (ii) Richard Kocher "advised" Mr. Greebel that his "Retrophin . . . is not tradable"; (iii) Michael Lavelle "want[ed] to understand" how his MSMB investment was converted to Retrophin; and (iv) David Geller told Mr. Greebel he had been "'scammed' by [Mr.] Shkreli." *Id.* 8-9.

With the benefit of hindsight, the Court, the government, and indeed Mr. Greebel himself can view Mr. Shkreli's treatment of MSMB investors with perfect information. But at the time Mr. Greebel assisted Retrophin and Mr. Shkreli in executing the settlement agreements at issue in this case, Mr. Greebel only knew what Mr. Shkreli told him and what little he learned from investors' angry emails. To be sure, Mr. Greebel could have surmised from Mr. Kocher that investors wanted more money, GX 104-9 ("I expect to get in addition to this (insulting) untradeable stock at least $200,000.00 which you owe me in cash wired to my account by early next week."); from Mr. Lavelle that investors preferred more flexibility and transparency with their investments, GX 108-10 ("The redemption procedure remains unclear to me. . . . I do not understand what exactly was in MSMB. . . ."); and from Messrs. Rosenwald and Geller that *they believed* Mr. Shkreli had "scammed" them or had acted "without [their] authority or consent," Tr. 2910:13–21.

But the fact that certain investors felt that they were owed more money, or that they disliked the illiquidity of their Retrophin shares, or that *they believed* they were "scammed" is hardly sufficient for Mr. Greebel to be on notice that Mr. Shkreli had in fact defrauded these individuals. Unfortunately, many clients are accused of wrongdoing (and occasionally fraud) by

15

counterparties.  Neither the Canon of Ethics nor federal or state law requires an attorney to presume their client committed wrong-doing or fraud, solely because they have been accused by counterparties (or even the government).  More is required for an attorney to make fraud accusations against the CEO, member of a three-person Board of Directors, founder, and largest shareholder of his client.  Again, the government advocates for a theory of *criminal liability* that would turn the attorney-client relationship upside down by replacing the candor and trust that underlies this relationship with outright suspicion.

We also note that the government's argument with respect to emails from MSMB investors demonstrates an unrealistic and inconsistent understanding of the degree to which Mr. Greebel should draw conclusions based on investors' emails to Mr. Shkreli.  On the one hand, the government suggests that Mr. Greebel should have gleaned perfect knowledge with respect to underlying facts and Mr. Shkreli's alleged fraud from a mere sampling of emails (all of which contained slightly different language and allegations regarding Mr. Shkreli's treatment of MSMB investors).  On the other hand, according to the government, Mr. Greebel was ***not*** to draw any conclusions from investors whose clear intention was to threaten legal action.  If anything, that Mr. Greebel received emails cited by the government only corroborate Mr. Greebel's innocent and good-faith belief that there was a very real chance these incoming threats could materialize into potentially viable claims.  As with the other evidence proffered by the government, these emails are, at most, "as consistent with innocence as with guilt."  *D'Amato*, 39 F.3d at 1256.

The government's argument is also highly speculative with respect to the indemnification agreements between the MSMB Entities and Retrophin.  The government claims, for example, that Mr. Greebel's role in executing those agreements was improper because Mr. Shkreli "had *already* determined not to use his own assets" to repay Retrophin and that Mr. Greebel

16

"explicitly admitted to the lie in the Control Memo in an email with [Mr.] Shkreli[.]" Gov't Br. at 15. First, the government does not offer any evidence as to how *Mr. Greebel* knew what *Mr. Shkreli* "had already determined[.]" Gov't Br. at 15. Indeed, the government cites no document or testimony proving anything relating to this "determination" by Mr. Shkreli, let alone Mr. Greebel's knowledge of that fact. At no point did (i) Mr. Greebel advise Mr. Shkreli to tell the Board that Mr. Shkreli would "back-stop" MSMB's obligations to Retrophin nor (ii) did Mr. Shkreli tell Mr. Greebel that Mr. Shkreli had no intention of paying Retrophin for the indemnification agreement. This allegation again assumes omniscience on the part of Mr. Greebel and ignores the fact that Mr. Shkreli omitted numerous critical pieces of information from Mr. Greebel throughout Mr. Greebel's representation of Retrophin.

Furthermore, what the government claims is an "explicit admi[ssion]" from Mr. Greebel is merely a statement regarding how Retrophin would treat these indemnification agreements if the MSMB Entities were ultimately unable to repay their debts: "The current thinking is let RTRX pay, get a note from the fund and *if the fund cant (sic) fulfill the note* RTRX will write it off as bad debt. . . ." GX 618 (emphasis added). But Mr. Greebel's statement as to *his understanding* of how Retrophin might handle the bookkeeping of MSMB's debt if the hedge funds were unable to repay it is wholly insufficient to prove, as the government contends, "that [Mr.] Shkreli's promises to repay Retrophin were lies" and that Mr. Greebel "explicitly admitted to th[is] lie . . . in an email with [Mr.] Shkreli[.]" Gov't Br. at 15. The government's speculative conclusion requires a leap in logic, especially where bookkeeping and maintaining Retrophin's financial statements were outside the purview of Mr. Greebel's role as external counsel. The evidence relied on by the government thus proves nothing more than Mr. Greebel's communication with his client as to how a particular contingency might be handled. Again,

responsible lawyering—*i.e.*, planning for multiple potential outcomes at a time of great uncertainty—should not be mistaken for membership in a criminal conspiracy.

Additionally, the government's argument that Mr. Greebel "helped [Mr.] Shkreli provide false information to the investors" is based on mere speculation.  Gov't Br. at 13.  The government argues, for example, that Mr. Greebel "falsely told [MSMB investor Spencer Spielberg] that 'the company has no way to give [Spielberg] unrestricted stock'"; that Mr. Greebel's statement informing David Geller that Mr. Shkreli's was "working on a payment plan with him"; and that Mr. Greebel "said nothing when [Mr.] Shkreli told [investor Michael] Lavelle . . . that he was 'virtually the only investor" Mr. Shkreli forwarded to counsel "when in fact multiple defrauded MSMB investors had been referred by [Mr.] Shkreli to [Mr. Greebel] at that time." *Id.*  None of these statements constitute false statements, and the government's argument to the contrary are both speculative and, again, unrealistic with respect to the work of an outside lawyer.  Mr. Greebel's statements to Messrs. Spielberg and Geller are, for example, the ordinary work of a lawyer negotiating on behalf of a client.  It is a bridge too far to assign inculpatory and incriminating motives to every lawyer who tells her counterparty in a negotiation that the client will dislike a particular request or that a particular proposition is unworkable for the client even though it might not be technically and literally "unworkable."[11]

---

[11]  The government makes this argument a second time, citing again Messrs. Greebel's statement to Mr. Spielberg and Geller.  Gov't Br. at 38.  The government also cites Alan Geller's testimony that Mr. Greebel told him  "that a consulting agreement was an appropriate way to resolve his dispute."  *Id.*  These mere recitations are no more convincing the second time, and the leaps of logic required to find Mr. Greebel guilty of criminal conduct are highly speculative and reveal the government's lack of evidence as to Mr. Greebel's intent and his involvement in the alleged conduct.  As with the other statements cited by the government, Mr. Greebel's statement to Alan Geller show only Mr. Greebel's then-existing good-faith belief that a consulting agreement could contain a liability release, an entirely appropriate and common clause in a consultant's engagement agreement.

The government's allegation regarding Mr. Shkreli's email to Mr. Lavelle is particularly unrealistic.  The government argues that because Mr. Greebel did not respond to a group email, which included Mr. Shkreli and a third party, for the purpose of specifically correcting Mr. Shkreli on a factual issue, Mr. Greebel was complicit in a criminal conspiracy.  Mr. Greebel would certainly have been aware of the sensitive nature of these negotiations given the widespread concerns among some of Mr. Shkreli's investors.  He was also aware that Mr. Lavelle is an extremely prominent businessman within the financial community.  That Mr. Greebel did not interrupt an email chain to correct the then-CEO of his client Retrophin at a time when tensions were high is proof, the government contends, that Mr. Greebel "helped Shkreli provide false information" to MSMB investors.  Basing Mr. Greebel's guilt on such unrealistic speculation should give the Court serious pause.

*__Fifth__*, the government's speculation as to what it believes would have been Mr. Greebel's best-case course of action is irrelevant to Mr. Greebel's *criminal liability*.  The government contends, without offering any specifics, that Mr. Greebel (i) did not "get the 'best deal' for Retrophin"; (ii) did not "institute any kind of litigation hold at Retrophin"; and (iii) did not "conduct[] any legal analysis to justify Retrophin's payment of the settlement agreements." Gov't Br. at 11.  The government further argues that, "had [Mr. Greebel] intend[ded] . . . to help Retrophin . . . he *would have* immediately alerted the company's Board of Directors and its auditors[.]" *Id.* (emphasis added).  Mere speculation as to what the government perceives to be best practices for corporate attorneys is not only an insufficient theory for criminal liability, it is also incorrect.  The government cites no authority for the proposition that an outside attorney is required to (or even should) update (i) a company's board of directors or (ii) its outside auditors regarding litigation threats, especially where it is patently clear that the company's CEO is fully

19

aware of those threats.  The same is true with respect to the government's speculation that Mr. Greebel should have instituted a litigation hold.  The failure to issue a litigation hold in the face of the overwhelming evidence that many of the investors intended to sue Retrophin is meaningless as it relates to Mr. Greebel's criminal liability.

That the government contends Mr. Greebel did not get the "*best deal*" for Retrophin is not evidence of criminal liability.  The government is arguing that had Mr. Greebel negotiated some type of deal in which Retrophin either paid less or Mr. Shkreli (or MSMB) paid more, then Mr. Greebel would not have committed a crime.  That argument requires lawyers to act as decision makers (not advisors) for their clients and also allows an attorney to supplant his/her business judgment for the business judgment of the client.  Neither concept is accurate as a matter of law.  *See generally* Restatement (Third) of the Law Governing Lawyers § 21(3) (Am. Law Inst. 2000) ("[A] lawyer may take any lawful measure within the scope of representation that is *reasonably calculated to advance a client's objectives as defined by the client*, consulting with the client as required by § 20.") (emphasis added).

That the government thinks Retrophin could have received more advantageous terms from the settlement agreements is a far cry from proof beyond a reasonable doubt that Mr. Greebel "participate[d] in the conspiracy *with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective*[.]"  Final Jury Instructions, Dkt. 498 at 36 (emphasis added); *see id.* ("[A] person acts knowingly and intentionally if he acts voluntarily, deliberately, and purposefully, and not because of ignorance, mistake, accident, negligence or carelessness.").  Indeed, failing to negotiate the *best deal* is not the equivalent of defrauding a client and is not evidence of criminal conduct.  Mr. Greebel acted in accordance with what he believed in his professional judgment was in the best interest of his client, Retrophin.  *See*

Restatement (Third) of the Law Governing Lawyers § 21; *id.* Comment (e) ("[A] lawyer thus remains free to exercise restraint . . . and generally to conduct the representation in the same manner that the lawyer would recommend to other professional colleagues.").  And the government's speculation to the contrary amounts to nothing more than Monday-morning-quarterbacking; presents a dangerous precedent for the attorney-client relationship; and is insufficient for Mr. Greebel's conviction of the *criminal conspiracy* alleged in Count Seven to survive Rule 29.

> **2.** **The Government's Arguments Regarding The Two Consulting Agreements at Issue Mischaracterize The Timing of These Agreements and Do Not Address Mr. Blanton's and Mr. Geller's Legitimate Consulting Services.**

The government argues that the evidence it presented at trial "plainly demonstrated" that the consulting agreements were "just another way that the defendant and [Mr.] Shkreli defrauded Retrophin."  Gov't Br. at 21.  But the government's attempt to suggest impropriety through cherry-picking evidence is insufficient to support a guilty verdict.

***First***, the government's characterization of the timing of the two consulting agreements is misleading.  The government is careful to state that Mr. Blanton's and Mr. Geller's consulting agreements were "*finalized and paid* after . . . [Mr. Greebel] and [Mr.] Shkreli had . . . agreed to internal controls to ensure that Retrophin would no longer foot the bill for [Mr.] Shkreli's personal obligations."  Gov't Br. at 22 (emphasis added).  But the government fails to address the fact that not only did Mr. Greebel and Mr. Shkreli discuss consulting agreements long before Marcum ever raised any concerns regarding the settlement agreements, Mr. Greebel provided draft consulting agreements to Mr. Geller and Dr. Rosenfeld at the request of Mr. Shkreli, and others who reported to him, months before Marcum raised any objections to settlement agreements.  Indeed, Mr. Shkreli began negotiating the terms of Mr. Geller's consulting

21

agreement as early as April 2013, four months before Marcum's questions regarding settlement agreements and the August 2013 control memo.

**_Second_**, the government's argument regarding the legitimate services provided by Messrs. Blanton and Geller at least equally suggests Mr. Greebel's innocence. The government concedes, for example, that Mr. Blanton undertook efforts to "introduce[] Shkreli (and by extension, Retrophin) to various individuals who might be interested in making an investment in Retrophin[.]" Gov't Br. at 28. The government contends, however, that because these "introductions were no different than introductions Blanton regularly makes in connection with many of his other investments," Mr. Blanton's efforts must not have been pursuant to any legitimate consulting agreement. *Id.* But that is quite an odd standard, effectively rendering moot any agreement between a company and a consultant who might have performed certain services prior to signing her retainer. Under the government's logic, a consultant should be careful not to offer any services before executing an agreement with her would-be client; otherwise, her *post hoc* services can be deemed favors, rather than legitimate consulting services offered pursuant to an agreement. It is common sense that consultants—like many businesses— should be allowed to prove their value *before* executing a formal agreement without casting doubt as to the validity of their retention agreements. Thus, the fact that Messrs. Blanton and Geller may have offered Mr. Shkreli (and, in turn, Retrophin) certain services prior to executing their agreements does not mean their post-agreement actions were not legitimate.[12] And, indeed,

---

[12] The government also ignores that Messrs. Blanton and Geller pre-agreement services actually corroborate Mr. Greebel's good-faith belief with respect to the legitimacy of their consulting agreements. Indeed, the very fact that both men had already shown their value to Retrophin makes it all the more likely that Mr. Greebel had a genuine and good-faith belief that their consulting agreements were executed with the expectation that each consultant would continue to provide significant benefits to Retrophin and/or Mr. Shkreli.

even the Court recognized this legitimacy.  *See* Tr. 8125:17–20 (The Court: "But Blanton

actually did do work for Retrophin by introducing him to investors and . . . trying to get money

for the company.").

The government failed to present sufficient evidence to find Mr. Greebel guilty beyond a

reasonable doubt as to Count Seven, conspiracy to commit wire fraud against his client

Retrophin,  For this reason and as shown above, Mr. Greebel's conviction cannot survive Rule

29.

### B. The Government's Arguments as to the Sufficiency of the Evidence on Count Eight Are Similarly Unpersuasive.

#### 1. The Government Continues to Offer No Proof that Evan Greebel Knowingly Joined a Criminal Conspiracy Alleged in Count Eight.

The government insists that "there is voluminous evidence of the existence of the

conspiracy" on Count Eight, including that two juries so found.[13]  Gov't Br. at 40.  Apart from

being both circular and conclusory, this argument fails to acknowledge that, to the extent

evidence of such a conspiracy exists, it exists *as to Martin Shkreli*, and not as to Mr. Greebel,

who had at most tangential involvement with the Fearnow shares.  And the evidence of the

Fearnow trading activity itself contradicts the alleged conspiracy, since it had precisely the

opposite result from what the government asserts.

*__First__*, the totality of evidence relating to Count Eight shows, at most, that Mr. Greebel

---

[13]  The government's inconsistency as to the relevance of Mr. Shkreli's verdict is noteworthy.
The government, having argued that Mr. Shkreli's acquittal on Count Seven has no bearing
whatsoever on Mr. Greebel's case, Gov't Br. at 34, seems to place considerable weight on
"the fact that two separate juries found the existence of the conspiracy charged in Count
Eight[.]"  *Id.* 40.

was kept in the dark as to Mr. Shkreli's dealings and that there is no proof whatsoever that Mr.

Greebel "joined the conspiracy charged with an awareness of at least some of the basic aims and

purposes of the unlawful agreement and with the intent to help it succeed."[14]  Final Jury

Instructions, Dkt. 498 at 38.  As detailed in our opening brief, neither of the only two

government witnesses to testify to the conspiracy alleged in Count Eight had any knowledge that

Mr. Greebel knowingly and willingly joined a conspiracy to control the Fearnow shares or that

Mr. Greebel was even aware of Mr. Shkreli's intent to control the price.  In fact, the government

did not present any emails or other evidence that Mr. Greebel was aware of Mr. Shkreli's

intention or objective.  Indeed, even the Court describes the testimony of Mr. Pierotti—one of

only two fact witnesses to testify to the events surrounding Count Eight—and notes only one

innocuous description of Mr. Greebel's conversation with Mr. Pierotti regarding non-public

information.  Dkt. 535, at 48.[15]  The Court also explained that Mr. Pierotti "recalled a phone call

from Mr. Shkreli, involving '[a] lot of screaming and yelling' in which Mr. Shkreli 'demanded'

that Mr. Pierotti sell back his shares for $400."  *Id.*  Notably, however, Mr. Greebel was not on

that phone call, and the government has not pointed to any evidence that Mr. Greebel was aware

---

[14]  The government mistakenly contends that Mr. Greebel "acknowledges that both [Messrs.] and Su testified about the conspiracy to control the price and trading volume of the Fearnow shares[.]"  Gov't Br. at 43 n.24.  Our argument has remained the same throughout trial. Messrs. Pierotti and Su did not testify to any personal knowledge that Mr. Greebel joined the alleged conspiracy.  Mr. Pierotti testified as to what he believes about a particular meeting of certain Fearnow recipients, which he attended and which he stated Mr. Greebel did not attend.  That we also argued that, regardless of what happened at that meeting, Mr. Greebel was not there and no evidence shows otherwise is not "acknowledging" the existence of any conspiracy alleged in Count Eight.

[15]  Because we filed our post-trial brief February 17, 2018, *see* Dkt. 530, and the Court's order as to Mr. Shkreli's Rule 29 motion was not issued until February 26, 2018, this is our first opportunity to respond to the Court's findings, many of which reference Mr. Greebel's involvement in the conspiracy alleged in Count Eight.

this call even took place.  Critically, neither Mr. Pierotti nor Mr. Su testified that Mr. Greebel

was present during the meeting in late 2012 at Retrophin's offices at which Mr. Shkreli and the

Fearnow recipients allegedly agreed to control the shares.

With all respect to the Court and with a little trepidation that we do not wish to offend the

Court with criticism of an opinion and order issued in connection with Mr. Shkreli's post-trial

motions, the Court's opinion and order inadvertently ascribes actions to Mr. Greebel without

support in the record.  The Court explained, for example, that the Fearnow shares were sold, "for

a nominal amount, to the seven individuals and entities *chosen by Mr. Shkreli and Mr. Greebel*."

Dkt. 535 at 68.  At Mr. Shkreli's sentencing, the Court also stated that Messrs. Greebel and

Shkreli "carefully orchestrated the distribution of the Retrophin shares," Tr. 71:24-25 (Mar. 9,

2018), and the Court ultimately found that "[t]he evidence at trial supported the government's

arguments" that "Mr. Shkreli conspired with Mr. Greebel to *hand-pick the[] Fearnow*

*shareholders*[.]"  *Id.* (emphasis added).  But there is no probative evidence and there has been no

showing that Mr. Greebel played any role in selecting who, if anyone, would receive freely-

trading Retrophin shares as a result of the reverse merger.  Indeed, even the government

concedes that, "[a]s [Mr.] Pierotti testified, *it was Shkreli who decided who received the*

*Fearnow shares*."  Gov't Br. at 43 (citing Tr. 5948) (emphasis added)).  Indeed, every list of

Fearnow recipients and their respective allocations was provided by Mr. Shkreli.

The Court also explains that on December 7, 2012, Mr. Greebel emailed to "*explain[] his*

*plan*" that "2.5 million free trading Desert Gateway shares . . . would be sold to 'certain buyers'

. . . prior to the closing of the reverse merger."  Dkt. 535, at 69 n. 15 (referencing GX 468 (cited

as Shkreli GX 228)) (emphasis added).  But the email cited by the Court shows Mr. Greebel

merely corresponding with Mr. Fearnow's counsel and asking him to "confirm the . . . process"

25

as to the pre- and post-merger treatment of the Fearnow shares.  GX 468.  If anything, this shows Mr. Greebel's taking steps to ensure that everything will be in compliance with Rule 4(1) of the Securities Act of 1933, *see generally* 15 U.S.C. § 77d; 15 U.S.C. § 77d-1; 17 C.F.R. § 230.506, and that the transfer agreements would be properly executed.  This does not nearly rise to the level of showing that Mr. Greebel hatched a "plan" with respect to the Fearnow shares.  Rather, it demonstrates that Mr. Greebel was discussing a mechanical process required by law with another attorney—an attorney who, notably, ultimately agreed with Mr. Greebel's understanding of the law.  As with Count Seven, the evidence shows merely that Mr. Greebel, at the direction of Mr. Shkreli,[16] assisted with legal work relating to the transfer of these shares to the seven Fearnow recipients.

The government again points to ambiguous and vague emails that are insufficient to show, beyond a reasonable doubt, that Mr. Greebel knowingly conspired with Mr. Shkreli with the specific intent to defraud Retrophin by exercising improper control of outstanding shares of common stock of Retrophin.  The government argues, for example, that "*[Mr.] Shkreli* directed the recipients to give him a 'summary of their holdings every morning,'" Gov't Br. at 43 (citing GX 112-12; Tr. 5951(Pierotti)), and that *Mr. Shkreli* "told certain Fearnow recipients (and other

---

[16]  In denying Mr. Shkreli's Rule 29 motion, the Court stated that "Mr. Greebel, far from offering professional advice to Retrophin, operated to assist Mr. Shkreli personally and often took direction from Mr. Shkreli."  Dkt. 535 at 78.  Respectfully, finding that "[taking] direction" from your client constitutes willingly and knowingly participating in a criminal conspiracy will set a dangerous precedent for attorneys and will have lasting repercussions on attorney-client dynamic.  After all, the attorney-client relationship is but one form of a principal-agent relationship.  Not only is an agent expected to follow the principal's directions, she is, in fact, prohibited from acting beyond the authority with which she has been vested.

shareholders of Retrophin) that one of his 'priorities for the future is increasing the trading volume in [Retrophin] stock – anything anyone can do to help in this regard is welcome,'" *id.* 43-44 (citing GX 112-21).  Not only is the government's interpretation of these emails highly speculative; nothing in these emails shows *Mr. Greebel's* involvement requesting summaries of the Fearnow recipients' holdings or encouraging them to increase trading volume.  Indeed, the government offered no evidence that Mr. Greebel even knew that Mr. Shkreli (or anyone on his behalf) asked Fearnow recipients to provide a summary of their holdings.[17]

Mr. Greebel's convictions should not stand where the government's theory as to Mr. Greebel's guilt is based on such speculative leaps, and where the Court's findings mistakenly ascribe to Mr. Greebel actions only traceable to Mr. Shkreli.  Thus the jury's verdict on Count Eight cannot survive Rule 29.

**_Second_**, the government misunderstands the market signals that resulted from the filing of Mr. Shkreli's 13-D.  The government claims that the purpose of the scheme alleged in Count Eight was "to give the market the false impression that the free-trading stock could actually be freely traded."  Gov't Br. at 42–43.  But the government overlooks that whatever "impression" the market was under as to the tradability of the Fearnow shares was not "false" at all.  Rather, evidence showed that Mr. Greebel's only understanding was that the Fearnow recipients remained free to exercise full control over their shares and that they intended to do so.  *See, e.g.,* DX 1283, at R023497 (Mr. Greebel telling Mr. Biestek that he can "sell the stock however and to whomever you want except to affiliates of the company[.]")

---

[17]  The government's speculation as to Mr. Greebel's direction to transfer agent Amy Merrill "allocating the Fearnow shares before the reverse merger" relates, again, to ordinary and common work for a corporate attorney involved in a merger and does not come close to criminal conduct.  Gov't Br. at 46.

Furthermore, as reviewed extensively at trial, the trading behavior of the Fearnow recipients clearly demonstrated not only that those shares "could actually be freely traded" but that those shares actually were the subject of thousands of trades in the period at issue.  Tr. 5755:11-17.  The government recognizes that Fearnow recipient Timothy Pierotti traded 60,000 shares of Retrophin stock at the very time these shares were allegedly under Shkreli's control. The trading activity of Mr. Pierotti and other Fearnow recipients is proof that these shares were, in fact, freely tradable.  Thus, the government's argument that Messrs. Greebel and Shkreli attempted to "mislead the market into thinking that the people who owned the stock were not barred from trading it" makes no sense.  Gov't Br. at 43.  Indeed, real-time market activity demonstrates that the Fearnow recipients (*i.e.*, the "people who owned the stock") were actually "*not barred from trading*" these shares at all.  Far from being "misled," the market was thus perfectly informed as to the free-trading nature of the Retrophin shares.

*__Third__*, the government's own argument reveals that the cumulative effect of the Fearnow recipients' trading activity is wholly inconsistent with the scheme alleged in Count Eight. Indeed, the government concedes that "*selling shares of stock into the market is inconsistent with the stated goals of the conspiracy*,"  Gov't Br. at 49 (emphasis added), but the government elides the inconvenient fact that several of these alleged Count Eight co-conspirators actually *did* sell significant portions of their Retrophin holdings.  As the government's expert testified, the Fearnow shareholders were "net sellers," Tr. 5834:20–21, and that they "sold more than they bought," Tr. 5835:2–3.  The government thus concedes that this behavior is "inconsistent with the stated goals of the conspiracy."  Gov't Br. at 49.  To be sure, conspiracy does not require that the conspiracy was ultimately successful.  Dkt. 498 at 62.  But just as the government points to *post-hoc* conduct with respect to Mr. Shkreli's harassment of Mr. Pierotti, Gov't Br. at 50–51,

the fact that the aggregate effect of the Fearnow recipients' trading was a *net sell-off—i.e.*, that their trading was entirely "inconsistent with the stated goals of the conspiracy"—undermines the very existence of the conspiracy alleged in Count Eight.

> ### 2.    The Government Does Not Address the Innocent Explanations for Mr. Greebel's Conduct and Misconstrues Second Circuit Law.

As trial courts have recognized, "if the evidence in the case can be viewed as reasonably permitting either of two conclusions—one of innocence and the other of guilt—[the court] must adopt the conclusion of innocence." *See United States v. Bryant*, 885 F. Supp. 2d 749, 759 (D.N.J. 2012) (citing *Thompson v. Kelchner*, 46 Fed. App'x 75, 82 (3d Cir. 2002)).

Respectfully, the Court's findings as to Mr. Shkreli's Rule 29 motion on Count Eight impute to Mr. Greebel a malicious intent for fairly unremarkable, ordinary work of an external corporate attorney. Specifically, the Court cites an email from Mr. Greebel informing Mr. Shkreli that "[u]nder the securities laws, stockholders can act by written consent (ie not have a meeting) as long as no more than 6 stockholders represent 50% of the outstanding equity." Dkt. 535 at 70 (citing GX 229). Mr. Greebel then asked Mr. Shkreli to "confirm that the numbers work so that" Mr. Shkreli could meet this threshold, thus allowing Retrophin to take advantage of this rule and act by written consent. *Id.* But these emails demonstrate only that Mr. Greebel advised his client of the legal ramifications with respect to a particular allotment of shares. Far from showing Mr. Greebel's willful participation in a criminal scheme, the more likely explanation for these emails is that Mr. Greebel—unaware and uninformed as to what was in Mr. Shkreli's mind—wanted to allow the company to benefit from existing SEC regulations.

The same is true with respect to the Court's statements in the opinion and order relating to Mr. Shkreli that "the nominal prices paid for the free trading Fearnow shares by the select group, and *Mr. Greebel's involvement in receiving and distributing the share certificates*, show

that Mr. Greebel, Mr. Shkreli and others acted in concert to distribute 80% of the free-trading

shares in the company to select recipients, and then took steps to conceal the relationship

between the Fearnow shareholders, Retrophin, and Mr. Shkreli." Dkt. 535 at 71 (emphasis

added). But Mr. Greebel's role—"receiving and distributing share certificates"—fits squarely

within the expected involvement of an outside lawyer "papering the deal" for a corporate client.

Similarly, the evidence is insufficient to rebut the innocent explanation with respect to

Mr. Greebel's involvement in asking Mr. Pierotti to return shares he received as part of his

employment at Retrophin. "[T]here would have been no basis," the government argues, "for the

defendant and Shkreli to demand [the] return [of Mr. Pierotti's Retrophin shares] to [Mr.] Shkreli

under blatantly false pretenses." Gov't Br. at 50. But the government fails to address the

evidence adduced at trial that these shares were made available to Mr. Pierotti contingent on his

continuing to serve as an employee at Retrophin. The transfer of these shares was thus null and

void once Mr. Pierotti left Retrophin and failed to fulfill his end of the agreement. The

circumstances under which Mr. Greebel assisted Mr. Shkreli in pursuing Mr. Pierotti's shares

were thus not "false pretenses" at all; rather, Mr. Greebel—together with two litigation partners

(including a senior partner) from Katten Muchin Rosenman LLP, a top flight, international law

firm—acted under the good-faith belief that Mr. Pierotti, having failed to fulfill his obligations to

Retrophin, should not be allowed to keep his shares. Where such a reasonable exculpatory

explanation exists, especially when the government's theory of guilt is premised on speculative

assumptions based on the interpretation of ambiguous emails, the jury's verdict should not

survive Rule 29.

## II.    The Court Should Grant Mr. Greebel's Rule 33 Motion for a New Trial.

Rule 33 grants a trial court broad discretion to order a new trial in the interests of justice where "letting a guilty verdict stand would be a manifest injustice. To grant the motion, '[t]here must be a real concern that an innocent person may have been convicted.'" *United States v. Aguiar,* 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir. 2001)).  This is precisely the case that raises such a "real concern."  Throughout trial, Mr. Greebel was hampered—through (1) a jury charge that was missing key context as to Mr. Greebel's state of mind; (2) the government's insufficient disclosure; (3) erroneously precluded evidence; and (4) jury misconduct—in his ability to present a complete picture to the jury. Accordingly, the convictions against Mr. Greebel should raise significant doubt sufficient to warrant a new trial.[18]

### A.    The *Alter Ego,* Veil-Piercing Instruction Was Important and Necessary on Count Seven, and the Government's Arguments to the Contrary Are Unresponsive and Unpersuasive.

#### 1.    Because the Jury Was Not Informed Regarding Relevant Law That Was Critical to Mr. Greebel's State of Mind on Count Seven, His Conviction on That Count Constitutes a Manifest Injustice.

The government argues that an *alter ego* instruction was unnecessary because the jury was instructed "extensively about the requirements that the government prove with respect to the defendant's state of mind," and because the jury was instructed about Mr. Greebel's "good faith" defense.  Gov't Br. at 55.  The government further argues that "[t]hose were the only jury

---

[18]   Mr. Greebel raised several issues in his opening brief in support of granting a new trial, and the government's opposition responds to those issues at length.  With the goal of preserving the resources of the Court and the parties, we will rely on the briefing to date as to our constructive amendment and venue arguments, and focus herein on the remaining Rule 33 grounds.

instructions to which [Mr. Greebel] was entitled with respect to his state of mind, and the defense does not argue that they were improper." *Id.* But this does not address the arguments made in our opening brief, which deal *not* with the as-given intent and good-faith instructions but contend instead that the *alter ego* instruction that was *not given* was necessary to apprise the jury of highly relevant and critical law relating to the charges against Mr. Greebel.[19]

The Second Circuit will vacate a conviction on the grounds of a missing and requested instruction where "(1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (citation omitted). When a conviction is challenged on the ground of incomplete or erroneous instructions, the Supreme Court has instructed that the conviction may stand *only* where it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). Courts must therefore "conduct a thorough examination of the record." *Id.* at 19. Critically, "[i]f at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, *where the defendant contested the omitted element and*

---

[19]  We also argued in our opening brief that the failure to instruct the jury that, in accordance with *United States v. Rodriguez*, 983 F.2d 455 (2d Cir. 1993) and *United States v. Batista*, No. 06 Cr. 265 (S-5), 2010 WL 1193314, *1 (E.D.N.Y. Mar. 24, 2010), to convict Mr. Greebel on Count Seven the jury must find that he conspired with anyone *other than* Mr. Shkreli. Dkt. 530, at 33-35. As the government notes, this issue has been the subject of extensive briefing and, pursuant to our statement above, we therefore only address the government's argument regarding the court's failure to instruct the jury as to *alter ego* and veil-piercing  and we rely on our earlier briefing on the failure to instruct in accordance with *Rodriguez* and *Batista*.

*raised evidence sufficient to support a contrary finding—it should not find the error harmless*."
*Id.* (emphasis added); *United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) (citing *Neder* favorably and vacating a conviction for failure to give a requested jury charge).[20]

    *United States v. Quattrone* addresses circumstances remarkably similar to the circumstances here.  Defendant Frank Quattrone was charged with obstruction of justice and witness tampering for his alleged involvement destroying documents with the intent of interfering with ongoing grand jury and SEC investigations.  *Id.* at 161.  Quattrone argued the "jury instructions on the elements of the crimes charged" (under 18 U.S.C. §§ 1503, 1505, 1512), *id.*, were "deficient because they misled the jury into concluding that the nexus requirement [for obstruction of justice] was satisfied even if [he] was unaware that his conduct would affect the relevant proceedings," *id.* at 176.  Notably, the government argued that the "general . . . instructions were appropriate" and that "the general sections of each charge correctly explained the [law.]"  *Id.* at 179.

    Despite finding that the "evidence [was] sufficient to support [the defendant's] conviction on each count," *id.* at 170, the Second Circuit nonetheless vacated the conviction because of the court's failure to give a complete jury instruction.  The Second Circuit ultimately held the district

---

[20] The government suggests that Mr. Greebel is effectively making "a request for reconsideration of the Court's ruling during the trial."  Gov't Br. at 54.  Reconsideration of prior rulings does not fall outside the ambit of Rule 33 motions, and this Court would be well within its discretion to reverse course, as courts in this Circuit and others have done before.  *See, e.g., U.S. v. Ferguson*, 49 F. Supp. 2d 321, 330 (S.D.N.Y. May 25, 1999) (granting defendant's Rule 33 motion for a new trial on the grounds that his "trial was fundamentally unfair" for a number of reasons and noting that "even my decision refusing to sever [the defendant's] trial from that of the core members of [a gang] supports a new trial."); *see also United States v. Holmes*, 672 F. Supp. 2d 739, 740 (E.D. Va. 2009) (reversing an earlier ruling on a motion to dismiss for lack of venue in a criminal trial, and noting that "[w]hen the Court errs, it feels it should promptly correct itself when it can.").

court's instruction was "not a correct formulation of the law" because, as Quattrone had argued, it meant "any defendant who urges the destruction of documents might run afoul of [the statute criminalizing obstruction of justice] without any proof that the defendant knew the documents were subject to a subpoena (or document request)." *Id.* at 178.  For a conviction to stand, "[m]ore is required; a defendant *must know that his corrupt actions are likely to affect the . . . proceedings*." *Id.* at 178-79 (internal quotation marks, citation, and ellipses omitted).  But the district court's instruction contained a "glaring deficiency" because it "removed the defendant's *specific knowledge* of the investigatory proceedings and the subpoenas/document requests from the obstruction equation." *Id.* at 179 (emphasis added).  The jury's verdict was thus based on "a bare-bones strict liability crime" where "all that need be proven was that an investigation had called for certain documents and that the defendant had ordered the destruction of those documents." *Id.*  Notably, the court explicitly rejected the government's arguments as to the sufficiency of the general and generic instructions relating to Quattrone's charges:  "Although wrongful intent, corrupt intent, and the nexus requirement were correctly defined, the charge, as a whole, relieved the jury of having to make those findings in assessing criminal liability." *Id.*

The Second Circuit reiterated the Supreme Court's recitation in *Neder*:  "If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless." *Id.* (quoting *Neder*, 527 U.S. at 18).  The court then noted that "Quattrone's theory of the case relied on several innocent explanations for his conduct and each ha[d] some basis in the record." *Id.*  Specifically, part of Quattrone's defense was that he "had no wrongful intent" and "was not aware that the investigations were focusing on [the subject documents he

34

destroyed]." *Id.* at 179–80.  And although "the government did offer proof that Quattrone knew that the grand jury and SEC sought" certain documents, the court held that it "cannot say that the proof convince[d] [it] beyond a reasonable doubt that the error was harmless." *Id.* at 180.  Thus, because "[u]nder the charge, the jury was allowed to convict Quattrone of obstruction *regardless of whether he intended such*," and because "Quattrone's defense of lack of knowledge of the specific focus of the [ongoing SEC] investigation . . . was eliminated from the jury's consideration," Quattrone's convictions were "vacated and . . remanded for retrial." *Id.*

As in *Quattrone*, the failure to inform the jury regarding the elements and requirements of *alter ego* and veil-piercing liability meant that "any defendant" who settles a lawsuit on behalf of a corporation could "run afoul of [the statute criminalizing wire fraud conspiracy] without any proof that the defendant" believed there is legitimate veil-piercing risk.  *Id.* at 178.  *Quattrone* essentially stands for the proposition—particularly relevant here—that where three critical pieces of information are necessary for a conviction to stand, the jury must be adequately informed as to all three of those requirements.  Quattrone could be found guilty of obstruction if the jury found *not only* that (1) he was involved in the destruction of documents and (2) those documents were subject to subpoenas or document requests; the jury must also find that (3) Quattrone *knew* that the destroyed documents were the subject of those subpoenas or document requests.  *Id.*

As we argued in our opening brief, to find that Mr. Greebel specifically intended to defraud Retrophin through settlement and consulting agreements, the jury's knowledge of (1) extensive litigation threats and (2) commingling between the MSMB Entities and Retrophin is not enough.  Indeed, to understand Mr. Greebel's intentions (and assess criminal liability), the jury should have been instructed on a vital issue that would have existed in a lawyer's mind— *i.e.*, the third piece of Mr. Greebel's analysis, specifically that a well-established body of

35

Delaware and New York law allows for lawsuits to reach corporate assets where overlapping
employees, financial commingling, and a general disregard for and abuse of the corporate
structure has led to an erosion of the division between individual and entity (or between two
separate entities).[21]

The absence of the requested *alter ego* instruction resulted in, as in *Quattrone*, a "bare
bones strict liability crime" where "all that need be proven" was that Mr. Greebel "called for"
settlement agreements and that Retrophin ultimately paid those settlements.  While the jury
received extensive evidence on litigation threats and commingling between the MSMB Entities,
the jury had absolutely no way of connecting these two phenomena and was thus ill-equipped
and unable to evaluate Mr. Greebel's true intentions.  Indeed, without knowledge of the relevant
veil-piercing and *alter ego* law, those two phenomena mean nothing.  Because the jury was
unaware of the very legal doctrine that, in Mr. Greebel's mind, made the agreements and releases
necessary in the first place, the jury was, as in *Quattrone*, "relieved" from "having to make . . .
findings" as to what exactly was in Mr. Greebel's mind.  *Id*. at 179.

---

[21] *See* Dkt. 530 at 30-31; *see. e.g.*, *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104
(D. Del. 1988), *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d
Cir. 1989), and *aff'd sub nom. Appeal of J.L. Capano, Inc.*, 879 F.2d 857 (3d Cir. 1989), and
*aff'd* 879 F.2d 860 (3d Cir. 1989) ("'[A]n alter ego analysis must start with an examination of
factors which reveal how the corporation operates and the particular defendant's relationship
to that operation.  These factors include whether the corporation was adequately capitalized .
. . whether the corporation was solvent; whether . . . corporate records [were] kept, officers
and directors functioned properly, and other corporate formalities were observed; whether the
dominant shareholder siphoned corporate funds; and whether, in general, the corporation
simply functioned as a facade for the dominant shareholder.'") (emphasis added); *see also
NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (citing
*Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)) ("[T]he distinction
between the entity and its owner 'may be disregarded' to require an owner to answer for the
entity's debts.)"; *id.* ("To prevail under the alter-ego theory of piercing the veil, a plaintiff
need not prove that there was actual fraud but must show a mingling of the operations of the
entity and its owner plus an overall element of injustice or unfairness.") (citation omitted).

The government cannot show that its omission was harmless. *Id.* at 181 ("The burden of establishing harmlessness is on the government.") (citing *Gutierrez v. McGinnis*, 389 F.3d 300, 303 (2d Cir. 2004)). Like Quattrone, Mr. Greebel has offered "several innocent explanations for his conduct and each has some basis in the record." *Id.* at 179. Indeed, as we noted in our opening brief, the evidence as to commingling between the MSMB Entities and Retrophin was extensive, *see* Dkt. 530 Section I.B.1, at 8–10, and even the Court recognized this fact, Tr. 8070:8–9. Critically, the government actually concedes that "there is . . . no dispute that investors"—*i.e.*, the *very people threatening litigation against Mr. Shkreli*—"may have been confused about the relationship between the [Retrophin and MSMB] entities." Gov't Br. at 10 n.5. Mr. Greebel, aware of this confusion, negotiated these settlements for the innocent and appropriate purpose of resolving litigation threats. *Neder*, 527 U.S. at 19 ("[W]here the defendant contest[s] the omitted element" and where he "raised evidence sufficient to support a contrary finding," a court "should not find the error harmless.").

The government's references to the "good faith" and general intent instructions miss the mark. The government does not point to one jury instruction that would have put the jury on notice that corporations and individuals can be found liable for the others' actions where certain criteria are met, particularly that a company can be itself liable (and financially responsible) for the actions of an individual (or another entity) that abuses the corporate structure that would ordinarily protect that company from liability. The jury's verdict is thus premised on an incomplete understanding of the relevant law, and allowing Mr. Greebel's conviction on Count Seven to stand would constitute a "manifest injustice." *See Aguiar,* 737 F.3d at 264.

Accordingly, the conviction on this count should be vacated so that a jury can assess Mr. Greebel's criminal liability with a fulsome understanding of the facts as they then existed in Mr. Greebel's mind.

> **2.**    **The Government's Argument that Mr. Greebel's Requested Jury Instruction Should Have Been Presented Through the Testimony of a Fact Witness Fails to Recognize the Government's Prior Objection to Such Testimony and Ignores the Fundamentally Different Roles of the Parties and the Court.**

The government criticizes Mr. Greebel, who bears absolutely no burden, for not calling a witness to explain *alter ego* liability, arguing that Mr. Greebel "could have tried to introduce the evidence about corporate law before the jury, but he chose not to do so."  Gov't Br. at 55.  But the government specifically challenged one of our proffered experts, Gayle Klein, on the grounds that her testimony would "risk . . . delay and juror confusion" because it "would require the jury to hear direct and cross-examination about numerous laws they will not need to consider in deliberating (various tort, contract, and corporate legal frameworks in two states), as well as the application of those laws to facts about [Mr.] Shkreli's actions that are not the focus on this case."  Dkt. 329, at 47.  The government further challenged Ms. Klein's proposed testimony with respect to whether she "conducted . . . an analysis of fitting facts to claims."  Dkt. 383 at 5.

The government's argument reveals the problem with substituting witness testimony for a jury charge.  While a witness could have testified to her experience or personal knowledge relating to *alter ego* and veil-piercing litigation, it is beyond dispute that the task of informing the jury as to relevant pieces of law is purely within the purview of the *Court*, not the parties. Indeed, testimony as to a *particular lawyer's* understanding of "numerous laws," that lawyer's interpretation of "corporate legal frameworks," and her "application of those laws to facts about [Mr.] Shkreli's actions" would not take the place of a properly given jury instruction.  *See* Dkt. 383-1, at 21.  A jury instruction, unlike witness testimony, would present to the jury the objective

and neutral understanding of the then-existing legal framework relevant to the charged conduct. The jury, as the factfinder, would then have been free to assess whether the evidence at trial was sufficient such that *it believed* Mr. Greebel executed the agreements in question in response to legitimate risk of *alter ego* and veil-piercing claims.  Even the Court ruled that Ms. Klein's testimony would be allowed subject to a specific caveat, explaining that her testimony was proper "so long as she doesn't opine about any laws." Tr. 8321:5–11.  Indeed, the Court surely would have precluded any testimony that improperly sought to instruct the jury on the relevant law, since this tasks rests solely within the province of the Court.  The government's argument thus ignores the difference between witness testimony, on the one hand, and jury instructions, on the other, and improperly suggests that a defense witness could have been a sufficient substitute for the requested *alter ego* jury instruction.

**B.      The Belated Disclosures Throughout Trial of *Brady* and *Giglio* Material Impaired Mr. Greebel's Ability to Examine Witnesses and His Right to a Fair Trial.**

Belated disclosure of *Brady* and *Giglio* is sufficient to render Mr. Greebel's trial unfair and the verdict against him infirm.  The government's disclosure obligations under *Brady* and *Giglio* are well-settled:  to the extent that the government "knows of material evidence favorable to the defendant in a criminal prosecution," it has a "due process obligation . . . to disclose that evidence to the defendant."  *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2011) (citation omitted).  This encompasses "evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness."  *Id.* (citation omitted).  The government's brief correctly recites the applicable test for finding a violation, and Mr. Greebel does not dispute their characterization: to prove a *Brady* obligation

sufficient to attack a defendant's conviction, a defendant must show that the evidence is

"favorable to the accused"; that it was "suppressed by the State, either willfully or

inadvertently"; and that the defendant was prejudiced.  *See, e.g., United States v. Gil*, 297 F.3d

93, 101 (2d Cir. 2002).  The government fails, however, to address the material and negative

affects its non-disclosure on Mr. Greebel's ability to adequately prepare his defense.

      The government asserts that "none" of the instances of non-disclosure alleged by Mr.

Greebel "individually amounts to such a [*Brady*] violation," and criticizes Mr. Greebel for not so

arguing.  Gov't Br. at 58 ("[I]n any event, the defendant does not and cannot argue that any

individual allegation constitutes a violation sufficient to warrant a new trial.").  This fixation on

individual instances ignores well-settled Second Circuit precedent.  The operative question when

considering multiple alleged *Brady* violations is not whether any one individual problematic

disclosure violated the defendant's right to a fair trial, but whether the instances of suppressed

evidence *viewed as a whole* in the context of all the evidence presented at trial violated the

defendant's rights. *See Hernandez v. Larkin,* 2013 WL 4453316, at *17 (S.D.N.Y. Aug. 19,

2013) (citing *Kyles v. Whitley*, 514 U.S. 419, 421, 436 (1995)) ("A court must consider the net

effect of suppressed evidence, not simply its item by item effect:  cumulative materiality is the

touchstone of the *Brady* analysis."); *see also Ranta v. Bennett*, 2000 WL 1100082, at *14

(E.D.N.Y. May 23, 2000), *aff'd*, 189 F. App'x 54 (2d Cir. 2006) (internal citations omitted)

("[E]ven if [the court] find[s] that none of these alleged nondisclosures or belated disclosures

was sufficiently prejudicial by itself to be considered 'material' under *Brady*, their collective

impact on the overall fairness of petitioner's trial nonetheless was sufficient to establish the

requisite 'reasonable probability' of a different verdict.").

The violations alleged here are certainly more than "nothing."  As laid out thoroughly in Mr. Greebel's opening brief, the government failed to meet its disclosure obligations as to at least five of its witnesses.  For many of these witnesses—even though a cumulative effect analysis remains appropriate, *see, e.g.*, *United States v. Walsh*, 2017 WL 3736747, at *3 (E.D.N.Y. Aug. 29, 2017) ("Although the Government's memorandum addresses each of the above witnesses individually, the Court must consider the allegedly suppressed evidence as a whole.")—the government takes what amounts to a "no harm, no foul" position that goes well beyond the prejudice analysis contemplated by the relevant case law.

***First***, as to Corey Massella, the government claims "it knew only that [Mr.] Massella left Citrin Cooperman because of a disagreement" and that there was a confidentiality agreement in place preventing Mr. Massella from disclosing the details.  (Tr. 3383, 3385).  Accordingly, the government had no reason to believe that Mr. Massella had a reason to be biased against the defendant or Niles Citrin."  Gov't Br. at 61.  But Mr. Massella was forced out of Citrin Cooperman—a company founded by Mr. Greebel's father-in-law.

The government's further argument that, "even assuming the government could have disclosed more than it did, the defendant cannot demonstrate any prejudice" because the Court "agreed to permit defense counsel to extensively cross-examine [Mr.] Massella," Gov't Br. at 63, does not withstand scrutiny.  The Court's rulings on cross-examination do not cure the defect of the failure to disclose the circumstances of Corey Massella's departure from Citrin Cooperman.  Indeed, this is a scenario specifically contemplated by the courts, which have held that timeliness of disclosure does matter, even when a defendant receives the information in time to make some use of it.  The distinction is whether the defendant has been able to simply use the information or whether, "in light of all the circumstances, able defense counsel had a reasoned opportunity to

put the exculpatory material to work." *St. Germain v. United States*, 2004 WL 1171403, at \*12 (S.D.N.Y. May 11, 2004) (emphasis added).

Affording Mr. Greebel "permi[ssion] . . . to extensively cross-examine [Mr.] Massella" does not amount to a reasoned opportunity to use the information.  As the Second Circuit has recognized, limited disclosures made on the eve of trial or when it is already underway can "impair" the opportunity to use the disclosed material, not least because new "developments tend to throw existing strategies and preparation into disarray," and "the defense may be unable to assimilate the information into its case." *Leka*, 257 F.3d at 101.  Where, as here, the undisclosed material casts significant doubt on the credibility of a witness against the defendant, the ability to so assimilate the information into cross-examination preparations would have been crucial to adequately and thoroughly use this information to (i) prepare for Mr. Massella's testimony (preparation that begins months before trial); (ii) explore Mr. Massella's credibility; and (iii) if necessary, impeach him in front of the jury.

**_Second_**, and similarly, the government mistakenly contends that "the defendant cannot demonstrate a reasonable probability that earlier disclosure" of exculpatory statements by Bernadette Davida "would have led to a different result," Gov't Br. at 60, because the statements were presented to the jury and elicited on cross-examination, and the defense "could have" used them in its closing.  Again, it is not enough to point to the use defense counsel was able to make of the exculpatory material as evidence that Mr. Greebel was not harmed by its being withheld. The question is what use Mr. Greebel *could have* made of these statements had he received them in time to fully take advantage of them through months-long trial preparation, for example, by meeting with Mr. Greebel's other former colleagues or dispatching investigators to ask Ms. Davida if she was aware of other attorneys who shared her glowing views of Mr. Greebel.  *See,*

*e.g., Leka,* 257 F.3d at 101 ("The limited *Brady* material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way . . . . [t]he defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing."). Notably, the government met with Ms. Davida as early as October 12, *see* 3500-BD-1-A, before opening statements in Mr. Greebel's trial. But the 3500 material the government produced from that meeting does not include any of the relevant statements by Ms. Davida, despite her testimony that the government was taking notes during the meeting. Tr. 1268:24–1269:5. Had the government disclosed Ms. Davida's exculpatory statements (as it was required to do), Mr. Greebel would have had significantly more time to conduct follow-up work and incorporate the statements of Ms. Davida (and potentially others) into a more fulsome defense.

Separately, the government claims that "[Ms.] Davida specifically did not vouch for [Mr. Greebel's] reputation for honesty[.]" Gov't Br. at 59. But the record of Ms. Davida's testimony belies that interpretation: she not only confirmed that Mr. Greebel had a "good reputation" at the firm, Tr. 1239:5–6, but also testified that she never observed Mr. Greebel "doing anything wrong" at the firm or for a client, Tr. 1239:11–19, and that she never observed Mr. Greebel "lying to anyone at the firm" or "any client." Tr. 1239:20–24. And she testified that she never saw Mr. Greebel "deceive" a client during his time at Katten Muchin. Tr. 1241:10–12. Even if Ms. Davida did not actually utter the word, it is hard to see how such testimony that Mr. Greebel never lied to or deceived colleagues or clients does not amount to vouching for his honesty.

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████



*Fourth*, for the same reasons outlined above, and as addressed fully in Mr. Greebel's opening brief, the government's failure to (timely or otherwise) disclose exculpatory and relevant information related to Dr. Steven Rosenfeld and Timothy Pierotti contributed to the cumulative effect of the government's *Brady* violations on Mr. Greebel's chance at a fair trial.

---

22

44

Evidence that Dr. Rosenfeld consistently maintained that the consulting services he provided

Retrophin were legitimate, even when approached by the government in an effort to convince

him to recant his statements and drop his arbitration claim against Retrophin,[23] directly undercuts

the government's theory on Count Seven; highlights the paucity of evidence against Mr. Greebel;

and supports his rush to judgment defense.  Yet the government did not disclose that information

despite its obligations; it was only by happenstance that the defendant learned of the information

at all.

Similarly, it was only after requests by the defendant and an order of the Court that the

government disclosed the significant impeachment material related to Timothy Pierotti and his

non-prosecution agreement with the government in a different criminal case.  This directly

defeats the purpose of the government's obligations under *Brady*, which are intended to compel

the government to disclose such information *without the defendant needing to request it himself*.

---

[23]  The government continues to deny that any such conversation took place.  Gov't Br. at 72.
The government also, without any support, disputes when the defense first learned of Dr.
Rosenfeld's conversation with the former prosecutor.  Gov't Br. at 74 n.46.  (Government's
arguing that our representation to the Court—*i.e.*, that we "learned of the alleged testimony
only two weeks prior" to Dr. Rosenfeld's testimony—"rings hollow" and that it "defies logic
and common sense that Rosenfeld did not tell anyone connected to the case about the
purported conversation until he met with defense counsel in the middle of trial.").  First, we
reaffirm our representation about when we learned about this issue.  Second, the government
also seems to argue that the defense bore an affirmative duty to disclose this information
before eliciting it from Dr. Rosenfeld, on the grounds that we did not "file a motion *in limine*
as soon as [we] learned of the information" and that we "did not raise the issue to the Court
or the government prior to Rosenfeld's testimony."  *Id.*  But the government points to no
authority, because none exists, establishing a duty for a criminal defendant to put the
government or the Court on notice as to what it intends to elicit from a defense witness.
Lastly, just because the government denies that the statements Dr. Rosenfeld claims were
made to him on this call with a former member of the government were made to him, does
not mean that the government is correct.

As addressed above, while any one of these flawed disclosure instances is at the very least cause for concern as to the government's adherence to its obligations, taken together they amount to a significant hindrance of Mr. Greebel's ability to actually prepare for and use evidence that could have exculpated him, which raises serious doubts about his convictions.

### C.   The Precluded Testimony of Dr. Steven Rosenfeld Was Highly Relevant to Mr. Greebel's State of Mind on Count Seven.

The government suggests that argument regarding the erroneous preclusion of Dr. Rosenfeld's testimony should not be allowed under Rule 33 because it "has nothing to do with whether the defendant is actually innocent." Gov't Br. at 73.  Claims that the jury should have had the benefit of evidence that likely would have sowed reasonable doubt in the jury's mind are perfectly appropriate on Rule 33 under Second Circuit law.  *See, e.g., U.S. v. Litvak*, 808 F.3d 160, 182–83 (2d Cir. 2015) (reversing a denial of Rule 33 and remanding for a new trial on the grounds that the district court exceeded its discretion in precluding testimony, noting that the "full context and circumstances [that would have been provided through the proffered testimony] were undoubtedly relevant to the jury's determination of materiality").  Separately, though, Dr. Rosenfeld's evidence directly implicates Mr. Greebel's state of mind, and its preclusion warrants a new trial.

*__First__*, much of the government's response goes to Dr. Rosenfeld's credibility, which goes to the testimony's weight, not its admissibility.  The question of whether Dr. Rosenfeld's testimony is "believable" is for the jury.  If Dr. Rosenfeld's testimony is so "simply and obviously . . . false," "fabricated," "fictitious," and "made-up," or if it "makes no sense," or if "[Dr.] Rosenfeld was a wholly incredible witness," as the government claims, *id.* 73–74, the government would have been free to make this seemingly easy case to the jury.  The same is true with respect to the government's argument that Dr. Rosenfeld "has a demonstrable bias in this

case" because he "has disputes with Retrophin—the victim in this case[.]" *Id.* 73. n.45.  The

government's argument on this point is thus unresponsive and irrelevant to the question of

whether Dr. Rosenfeld's testimony should have been presented to the jury.

**_Second_**, as to the relevance of Dr. Rosenfeld's testimony, the government contradicts

itself.  The government argues that Dr. Rosenfeld's testimony has "nothing to do with whether

[Mr. Greebel] is actually innocent[.]"  Gov't Br. at 73.  It is therefore curious that the

government goes on to argue that this very testimony—regarding statements made by a former

member of the government—would have been "highly relevant to the arbitrator's decision" in

Dr. Rosenfeld's "hotly contested and lengthy arbitration proceeding" with Retrophin.  *Id.*  While

the specific issues at Dr. Rosenfeld's arbitration were not identical to those at Mr. Greebel's trial,

surely the validity of Dr. Rosenfeld's consulting agreement—and the legitimacy of the services

provided thereunder—was a highly relevant question in both proceedings, especially where the

government's primary contention with respect to the consulting agreements at issue in Count

Seven is that they were "shams" that rendered no benefit to Retrophin.

That the government ultimately made a strategic decision to remove Dr. Rosenfeld's

agreement from its theory on Count Seven (having initially identified Dr. Rosenfeld's agreement

as one of the allegedly "sham" agreements) does not affect its relevance to the fundamental

question of Mr. Greebel's state of mind and then-existing understanding of the consulting

agreements at issue.  Indeed, in its opposition brief, now even the government seems to revert

back to its initial allegation that Dr. Rosenfeld's agreement was a "sham," arguing that Dr.

Rosenfeld's "assert[ions] that he performed consulting work for Retrophin pursuant to his

consulting agreement" are "incredibl[e]."  Gov't Br. at 69.  Once again, this flip-flopping by the

government—wherein the Indictment deemed Dr. Rosensfeld's agreement as a "sham", but then

not so alleging at trial, only now to once again revert back to calling it a "sham"—underscores yet again the government's inconsistent theories in this prosecution and thus demonstrates why the Court should grant our motion.

The government's arguments ultimately reveal that the precluded testimony was "highly relevant" to the question of whether Dr. Rosenfeld's consulting agreement was a legitimate, beneficial engagement for Retrophin. Accordingly, his testimony is highly relevant to the fundamental issue of Mr. Greebel's then-existing belief as to the legitimacy of consulting agreements for his client.

> **D.**   **Rule 33 Is Appropriate to Raise Issues of Serious Juror Misconduct, and the Evidence of Those Issues Casts Significant Doubt on the Viability of the Jury's Verdict.**

As an initial matter, a Rule 33 motion is precisely the appropriate vehicle to raise issues of juror misconduct such as these. Newly discovered facts about which the defense could not have learned earlier are a paradigm reason for granting a new trial when there is no way Mr. Greebel could have discovered these issues prior to the verdict. *See, e.g., United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) ("A new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'") (citations omitted). Indeed, Mr. Greebel learned of the misconduct only when Mr. Sankar,[24] of his own accord, called the Court the day after the verdict to voice his profound concerns. We did not ask Mr. Sankar to

---

[24] The government mistakenly criticizes the public filing of Mr. Sankar's signed affidavit. *See* Gov't Br. at 79 n.51. Mr. Sankar consented to his signed affidavit being publicly filed. It is unclear why the government believes the public should not know what Mr. Sankar had to say.

raise his hand, call the Court, and cast doubt on the legitimacy of the verdict, but once he did, Mr. Greebel could not have been expected to allow these issues to go uninvestigated.

Mr. Sankar made several concerning assertions.

__*First*__, he stated, for example, that members of the jury engaged in discussions of Mr. Greebel's fate well before deliberations began.  These discussions fly in the face of both the Court's express direction to not discuss the trial and Mr. Greebel's well-established Sixth Amendment rights.  Consistent with those rights, the Second Circuit has said that "jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *United States v. Cox*, 324 F.3d 77, 86  (2d Cir. 2003) (citing *United States v. Resko*, 3 F.3d 684, 688 (3d Cir. 1993)).  "[W]here the district court instructs a jury to refrain from premature deliberation . . . and the jury nonetheless discusses the case before the close of trial, that premature deliberation may constitute juror misconduct." *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004) (citation omitted).

The government disputes the severity of these discussions, but ultimately opposes the necessity of a new trial on the grounds that, "[i]f anything, those comments show that the jury carefully and completely weighed the evidence that came in over the course of the entire trial during the course of their deliberations, and came to a reasoned determination of the defendant's guilt." Gov't Br. at 87.  We disagree, and the law mandates that Mr. Greebel's convictions be vacated.[25]  When, as here, jurors discuss the case prematurely in defiance of the Court's

---

[25]  The government also criticizes that Mr. Sankar's text message has been redacted. Gov't Br. at 83. But Mr. Sankar's communications with fellow jurors were redacted out of an

instructions, the Court has "broad flexibility" in undertaking the "delicate and complex task" of addressing such misconduct.  *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011) (citations omitted).  This discretion is particularly broad "when the alleged prejudice results from statements by the jurors themselves, and not from media publicity or other outside influences." *Peterson*, 385 F.3d 127, 134 (2d Cir. 2004) (citation omitted); *see also United States v. Siegel*, 271 F. App'x 115, 118 (2d Cir. 2008).

As the caselaw has long established, this discretion includes—and, often, compels— granting a new trial.  In *United States v. Resko*, for example, the court vacated the defendant's drug conviction and remanded for a new trial, based on the discovery that all of the jurors had engaged in premature deliberations of the case.  3 F.3d at 684.  Highlighting "the importance of the Sixth Amendment rights at stake," the court reasoned that "it would be unfair to penalize the defendants" under these circumstances, and concluded that a new trial was the necessary remedy.  *Id.* at 694.  The court reached the same decision in  *United States v. Brown*, 913 F. Supp. 1324 (D. Minn. 1996), *aff'd*, 108 F.3d 863 (8th Cir. 1997), where it granted defendant's motion for a new trial because, despite the court's repeated instructions not to base their verdict on any information beyond the evidence received in that case, several jurors discussed information concerning the case among themselves, and communicated that information to other members of the jury at the outset of the deliberations.  *See id.* at 1333 (this blatant "disregard of the court's repeated instructions" evinced the jurors' "lack of impartiality" and warranted a new trial.).

---

awareness of the sensitivity with which courts view any disclosure of a jury's deliberation and with the goal of revealing as little as possible of those communications while still affording the Court the benefit of corroborative evidence regarding threats aimed at Mr. Sankar. We have no objection to the disclosure of the complete text message exchanges.

These cases are instructive.  Despite this Court's consistent, daily admonishments to the jury that they should not discuss the case, Mr. Sankar conveyed that the jurors did just that.  *See, e.g.,* Dkt. 433 ¶¶ 14–16 (relaying pre-deliberation discussions between jurors).  Mr. Sankar's account of such misconduct makes clear the jury's disregard for the Court's instructions, raising questions about other instructions they might have disregarded and calling into question the deliberative process and, ultimately, the verdict.

The government's response on this point does little to reassure, and buckles under the weight of the plainly inapposite cases that it relies on.  For one, the government cites to *United States v. Abcasis*, 811 F. Supp. 828 (E.D.N.Y. 1992)—a case in which the court found it to be dispositive that defense counsel knew of the allegations of juror misconduct at the outset of, if not prior to, the deliberations, yet chose not to inform the court at that point.  The court noted that "if a defendant knows of an incident of juror misconduct prior to deliberations or even during deliberations, but nevertheless stands mute, gambling on an acquittal while holding the issue in reserve, the defendant will be held to have waived any claim for a new trial based on the alleged misconduct," *Id.* at 831.  But Mr. Greebel and defense counsel in this case learned of the misconduct at the same time as the Court and government.  The government's reliance on *United States v. Sabhnani*, 529 F. Supp. 2d 384 (E.D.N.Y. 2008), aff'd, 599 F.3d 215 (2d Cir. 2010) is similarly misguided.  There, the juror misconduct involved "*one* juror's alleged comment"—an isolated instance that "provide[d] no reason to suspect that the entire jury" had engaged in the same conduct.  *Id.*  But the misconduct relayed by Mr. Sankar was hardly cabined to a single juror; rather, it was a pervasive issue, ensnaring multiple members of the jury.

The government's reliance on *United States v. Piccarreto*, 718 F. Supp. 1088 (W.D.N.Y. 1989) is likewise unavailing, on multiple fronts.  First, the court there noted that the first hint of

juror misconduct was made *two months* after the verdict by an alternate juror who did not even participate in the deliberations.  Here, Mr. Sankar called chambers a day after the verdict.  Furthermore, the juror who reported the alleged misconduct in *Piccarreto* was found to have fundamental credibility issues in the eyes of the court:  having raised alleged-misconduct issues with the court on two prior occasions, the court reasoned that if the misconduct "occurred as alleged by [that juror], and were as noteworthy as now charged, it seems strange to say the least that these matters were not brought to my attention sooner."  *Id*. at 718 F. Supp. at 1092.  Further to that point, that same juror had personal problems with other jurors on the court, harboring particular animosity towards the very other juror whose alleged misbehavior was at the center of that juror's allegations of juror misconduct.  Indeed, the *Piccarreto* court made a point of observing that,  "it is . . . clear . . .  that the juror does not especially like [that other juror]," owing to certain derogatory comments that the other juror allegedly made to him.  The court found this factor relevant "in determining what happened and whether the jury's deliberations were affected."  *Id*.  Mr. Sankar, on the other hand, has had no issues with the Court or his fellow jurors, and the government does not contend otherwise.

      The government points to Mr. Sankar's statement that "everything was fine and good" as "directly contradict[ing] the contents of the affidavit."  Gov't Br. at 85.  But the government ignores that Mr. Sankar was talking about answers to narrow questions, and Mr. Sankar's vague and ambiguous comment did not address the statements that he made in his affidavit.  The government also seems to place a duty on Mr. Sankar himself, seemingly faulting Mr. Sankar for not "tak[ing] the opportunity to provide the Court with any of the additional information that now appears in the affidavit[.]"  Gov't Br. at 84. The government references a "previous hearing on the matter," Gov't Br. at 2, but on January 5 this "hearing" constituted no more than three

very specific, narrow, and leading questions as to the threats made during deliberations, in line with the government's request before the colloquy.  *See* Jan. 3, 2018 Letter from B. Rohde to Hon. Kiyo Matsumoto (noting that "there is no basis to ask Juror #6 any open-ended questions at all or to conduct a general examination of the manner in which jury deliberations took place, or to ask anything other than whether Juror #6 was subjected to physical violence or a threat of physical violence"); *see also* Tr. 10–11 (Jan. 5, 2018) (Government stating its position that "any questions that don't go to the issues that were raised by the juror on the call are inappropriate").  Surely Mr. Sankar, without any professional training in the law and without experience testifying to a federal judge, should not be faulted for obeying the Court's explicit instructions directing him to "answer 'yes' or 'no' unless [] instruct[ed] . . . otherwise" or unless he felt the "need to explain further."  Tr. 30–32 (Jan. 5, 2018).

**<u>Second</u>**, the government spends significant time downplaying the threats Mr. Sankar's fellow jurors made against him, going so far as to call Mr. Sankar's "allegations regarding statements jurors made about <u>his</u> religion . . . irrelevant." Gov't Br. at 88.  But, as we argued in our opening brief, those statements contributed to the pressure Mr. Sankar felt to vote before he was ready and despite the fact that, as conveyed to other jurors, he wanted to continue reviewing evidence.  That pressure was only exacerbated by the more explicit threats Mr. Sankar received—that if he did not vote guilty, the other jurors would have him removed.  Though the government would characterize these as falling "<u>far</u> short" of credible, Gov't Br. at 91, the threats directly affected Mr. Sankar's vote, and thus should raise serious concerns about the jury's verdict.

Accordingly, these marked flaws in the jury's conduct should raise grave concerns as to the propriety of the jury's ultimate findings.

**E.** **The Introduction of Hearsay Statements by Marc Panoff Violated *Bourjaily*, and the Government Did Not Offer Evidence Sufficient to Label Him a Co-Conspirator for that Purpose.**

In responding to our argument about the admission of evidence related to Mr. Panoff, the government misunderstands our position.  As noted in our opening brief, only 12 Panoff-related documents came into evidence between the Court's initial finding that Mr. Panoff was *not* a co-conspirator on November 29 and the Court's finding to the contrary on December 4, the next day of trial.  We do not argue, as the government contends, that only the 12 Panoff-related documents were necessarily admitted in violation of Rule 801(d)(2)(E); rather, we contend that those documents—as the only Panoff-related intervening evidence—are insufficient to justify the Court's ultimate decision as to whether the government had satisfied its burden under *Bourjaily*. Because those documents do not show beyond a preponderance of the evidence that Mr. Panoff was a co-conspirator in the alleged schemes, evidence admitted ***after*** the Court's decision runs afoul of Rule 801(d)(2)(E) and thus should have been precluded.

The government argues that "all that matters is that by the end of the government's case, there was sufficient evidence that [Mr.] Panoff was a co-conspirator[.]"  Gov't Br. at 102.  But that was not the basis of the Court's decision on December 4, 2017.  It was in light of the Court's December 4 decision that the defense, in an effort to avoid disruption and having already preserved its objections under Rule 801(d)(2)(E), stopped objecting on this ground.  But Mr. Panoff's statements were thus presented to the jury based on a finding by the Court that was unsupported by the proffered evidence.

The government also makes other arguments that are based on its pure speculation as to what Mr. Panoff "could . . . have believed" based on what Mr. Shkreli "would have" done with respect to the his indemnification agreements with Retrophin.  Gov't Br. at 100.  But speculation is not enough.  The government offers no evidence that Mr. Panoff specifically entered any

alleged conspiracy with knowing intent to further the scheme alleged in Count Seven.  To the contrary, the government recognizes that Panoff "expressed some . . . hesitation" with respect to the settlement agreements at issue in Count Seven.  Gov't Br. at 14.  The government further speculates by claiming at several turns that Mr. Shkreli and/or Mr. Greebel acted "with [Mr.] Panoff's assistance," Gov't Br. at 100, or that Mr. Panoff "worked hand-in-hand" with Messrs. Shkreli and Greebel, *id.* 99.  But, Mr. Panoff "assisted" Mr. Shkreli because Mr. Shkreli was his boss, and Mr. Panoff coordinated with Mr. Greebel because it is entirely unremarkable and appropriate for a company's CFO to correspond with the company's outside counsel in connection with legal filings

According to the government's bizarre theory, Retrophin's CEO, its brand-new CFO, and its outside counsel were engaged in a secret criminal scheme to defraud Retrophin.  But Mr. Panoff was never mentioned in the Indictment, has not been charged with any crimes, and of course has not faced criminal prosecution for the very same charges faced by Mr. Greebel.  This should raise serious concerns as to the government's claims that Mr. Panoff knowingly and intentionally joined the conspiracy alleged in Count Seven.  This is particularly true where the government was allowed to expand the scope of the conspiracy alleged in Count Seven by claiming Mr. Panoff was involved in any alleged wrongdoing and thus broadening the theories of liability as to Mr. Greebel.  *Cf. United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (improper to "broaden [] the possible bases for conviction") (internal quotation marks and citation omitted).  Because (i) the jury was allowed to find Mr. Greebel guilty based partially on a flawed and improperly expanded scope of the facts surrounding Count Seven; (ii) the government's arguments to the contrary do not address the issues raised in our opening brief; and

(iii) the government's response is based on widespread speculation as to Mr. Panoff's

involvement in the alleged conspiracy, Mr. Greebel's conviction on Count Seven was improper.

### F. Evidentiary Rulings During Trial Caused the Jury to Receive a Skewed, Incomplete Picture of Certain Facts and Witnesses and Prevented Mr. Greebel's Trial from Being Fair.

The government suggests that it would be inappropriate to grant Mr. Greebel a new trial

on the basis of evidentiary rulings.  But courts in this Circuit will grant a motion for a new trial

when, "looking at the totality of the evidence, the verdict constituted a manifest injustice."

*United States v. Olazabal*, 2014 WL 11460470, at *6 (E.D.N.Y. June 10, 2014).  As addressed

above, it is by no means unheard of for a judge, in the course of granting a Rule 33 motion, to

reconsider earlier rulings, and the government should not suggest that it is beyond the reach of

this Court to do so here.  *See, e.g., United States v. Ferguson*, 49 F. Supp. 2d 321, 323, 330

(S.D.N.Y. 1999) (granting defendant's Rule 33 motion for a new trial on the grounds that his

"trial was fundamentally unfair" for a number of reasons and noting that "even my decision

refusing to sever [the defendant's] trial from that of the core members of [a gang] supports a new

trial.").  For the reasons addressed in our opening brief, we believe any number of evidentiary

rulings referenced therein support a new trial; however, for purposes of this reply, we will focus

our response to the government on their objection to rulings related to Mr. Pierotti and Mr. Su.

*__First__*, the government continues to assert the relevance of threats made *by Martin Shkreli*

against Timothy Pierotti and his family because Mr. Greebel "became aware of the threats" and

"did nothing to inform his client."  Gov't Br. at 106.  But it is not clear how threats that Mr.

Greebel himself did not make—and, indeed, played no role in—are relevant to his own guilt,

other than as an attempt by the government to color the jury's view and make Mr. Greebel seem

guilty by association.  And the government's vague claim that Mr. Greebel learned of the threats

against Pierotti "*approximately at the time they were made*" is simply not supported by the

56

record.  Gov't Br. at 106.  The government is playing fast and loose with critical facts.  Their failure to cite any evidence in support of this claim confirms that fact.

This is therefore not an acceptable use of such highly prejudicial and blatantly inflammatory evidence.  *See United States v. Morgan*, 786 F.3d 227, 234 (2d Cir. 2015) (abuse of discretion to admit "graphic and profane" threat letter because such "highly charged" evidence was "unrelated to the charged offenses" and was "toxic" to the jury's perception of the defendant).  The government itself describes Mr. Shkreli's conduct as "outrageous" while simultaneously arguing that, even so, admitting it was not unduly prejudicial to Mr. Greebel.  The government also seems to impose a heightened burden on corporate attorneys, who according to the government's logic must "inform [their] client[s]" anytime "its employee . . . [is] engaged in outrageous conduct."  Gov't Br. at 106.  This is not only an unworkable standard and irrelevant to Mr. Greebel's *criminal liability*, it is against well-established rules of professional conduct for attorneys representing corporations or other entities.  *See, e.g.,* Restatement (Third) of the Law Governing Lawyers § 96(2) (Am. Law Inst. 2000) (imposing no blanket disclosure requirement, but noting that "[i]f a lawyer representing an organization knows of circumstances indicating that a constituent of the organization has engaged in action or intends to act *in a way that violates a legal obligation* to the organization that will likely cause substantial injury to it, or that reasonably can be foreseen to be imputable to the organization and likely to result in substantial injury to it, the lawyer must proceed in what the lawyer reasonably believes to be the best interests of the organization.") (emphasis added).

Mr. Greebel maintains that no part of this evidence is relevant to the question of his own innocence, particularly given that he was not involved in making the threats and did not learn of them until after the fact.  But even accepting the government's position that there is some

57

circumstantial relevance, it is insufficient to cure the significant prejudice that arises from such toxic, highly charged evidence.  This Court has recognized that, while evidence of threats may be probative, "the potential for inflaming the jury may be great."  *United States v. Khan*, 591 F. Supp. 2d 202, 206 (E.D.N.Y. 2008) (citation omitted).  At the very least, there was no justification for the threats to come in wholesale.  The Court could have excised the most toxic and inflammatory language—*e.g.*, "I hope to see you and your four children homeless and will do whatever I can do to assure this," GX 112-27 at PIEROTTI000116—from Mr. Shkreli's letter to Mr. Pierotti's wife such that the jury would not run the risk of undue prejudice against Mr. Greebel.  (Indeed, even the government has never argued that this discrete threat bears any relevance to Mr. Greebel's innocence or guilt.)

**_Second_**, Mr. Greebel was prevented from fully cross-examining Jackson Su about his hacking into Retrophin's computer system, an activity that the government claims does not "reflect[] on [his] character for truthfulness."  Gov't Br. at 109.  The language of the federal criminal statutes that address hacking and computer crimes suggest otherwise.  Indeed, even their titles, like the Computer Fraud and Abuse Act, show clearly that those crimes reflect on truthfulness.  *See, e.g.,* 18 U.S.C. § 1030 (1986).  Under that statute, a person can be charged with "fraud and related activity in connection with computers" when he "knowingly and with intent to *defraud*" accesses a protected computer without authorization.  *Id.* § 1030(a)(4) (emphasis added).  Fraud, by its nature and definition, has its basis in lies and deceit.  It should not be a controversial position that so-called "hacking" has the same basis, given that "access[ing] a protected computer without authorization"—in other words, hacking—is a component of computer fraud under the statute.  *Id.*  In this regard, the conduct is akin to taking

something that is not yours, or stealing, particularly when Mr. Su was trying to access proprietary digital information that did not belong to him.[26]

Where, as here, the underlying crime is one of fraud and deceit, it directly reflects on the witness's credibility.  Mr. Greebel should have been allowed to explore that credibility in front of the jury—particularly given that Mr. Su's conduct likely amounted to an uncharged federal crime.  Instead, Mr. Greebel was limited in his inquiry as to that topic, and his cross-examination was significantly hampered (notwithstanding the government's assertions that it was "extensive," Gov't Br. at 109).  Notably, even the government recognized that we had additional information with respect to Mr. Su's hacking, but we were never afforded the benefit of presenting that evidence to the jury.  This left the jury with an incomplete picture of the credibility of one of the government's key witnesses—indeed, one of its only two fact witnesses for Count Eight.  Any verdict based on that incomplete picture is necessarily flawed and raises serious questions about the fairness of Mr. Greebel's trial and subsequent conviction.

*       *       *

In short, the jury's verdict—far from a "reasoned determination," Gov't Br. at 87—is ultimately death-by-a-million-paper-cuts and constitutes the very sort of manifest injustice that Rule 33 seeks to prevent.  *See, e.g., U.S. v. D'Angelo*, 2004 WL 315237, at *16 (E.D.N.Y. Feb.

---

[26] The government argues that "[d]efense counsel's unsupported assertion about what further cross-examination would have revealed is particularly unconvincing given that defense counsel represented to the Court that 'we do have evidence that [Su] accessed the Global Relay system beyond [June 30] . . . and intend to confront him with it.'"  Gov't Br. at 109–10 n.66.  But this argument ignores the fact that we were precluded from fully exploring or testing Mr. Su's credibility with respect to his hacking.  We maintain that there exists clear documentary evidence of Mr. Su's improper access of the Global Relay system, and had we been allowed to thoroughly cross-examine Mr. Su, that fact could have been presented to the jury.

18, 2004) (granting Rule 33 motion—in addition to Rule 29—because "[a] review of the government's theory, the evidence it adduced at trial in support of that theory, the grievous credibility defects in its key witnesses, and the newly discovered evidence that elevates those defects to the highest level, mandate that the motion be granted."); *see also Olazabal*, 2014 WL 11460470, \*6 (denying Rule 29 motion but granting Rule 33 on the grounds that, "looking at the totality of the evidence, the verdict constituted a manifest injustice.").  Because the jury's verdict is premised on (i) an incomplete understanding of the law, (ii) the government's improper disregard for its disclosure obligations, (iii) concerning and fatal jury misconduct, and (iv) erroneous and prejudicial evidentiary rulings, Mr. Greebel's convictions should be vacated and he should receive a new trial in accordance with Rule 33.

### III.     Conclusion

For the foregoing reasons, Mr. Greebel's convictions should be vacated pursuant to Rule

29 or, in the alternative, he should receive a new trial under Rule 33.

Dated:  New York, New York
        April 3, 2018

/s/ *Reed Brodsky*
Reed Brodsky
Winston Y. Chan
Mylan D. Denerstein
Randy M. Mastro

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
rbrodsky@gibsondunn.com
*Counsel for Defendant Evan Greebel*

62