**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

April 9, 2018

VIA ECF

The Honorable Kiyo A. Matsumoto
United States District Judge for the East District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.)

Dear Judge Matsumoto:

On behalf of Evan Greebel, we write to oppose the government's motion seeking criminal forfeiture of $476,249 from Mr. Greebel and, to the extent that the Court does not reject the government's motion based on the evidence currently in the record, request a hearing to present further evidence.[1]  The witness testimony and documents presented at trial regarding the compensation practice for income partners at Katten Muchin Rosenman LLP ("Katten") presented compelling evidence that the applicable law and facts preclude the government's request for forfeiture and outweigh the government's speculation about how compensation was calculated for income partners.  Under any evidentiary standard, the government has failed to prove: (1) the money sought by the government is "traceable to the violation" in Counts Seven and Eight; or (2) the money that Retrophin paid for outstanding bills with Katten was "received by" or "controlled by" Mr. Greebel given that Retrophin paid the money to Katten and an independent non-equity partner compensation committee determined Mr. Greebel's compensation; or (3) the amount of money sought by the government is based on something other than a highly speculative theory.[2]  In addition, the government's arguments as to Mr.

---

[1] We respectfully note that nothing in today's submission should be considered a waiver of Mr. Greebel's appellate rights, including the right to challenge the convictions based on sufficiency of the evidence or otherwise.

[2] We respectfully submit that the Court should reject the government's request for forfeiture on the papers alone.  Should the Court decide otherwise, we request the right to present evidence at a hearing and request the Court's authorization to potentially subpoena relevant documents and witnesses relating to the matter.  At such a hearing, the government would be free to introduce any evidence as the moving party, and then we would be able to cross-examine the government's witnesses and challenge the

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 2


Greebel's motives are inherently contradictory and further undercut the government's theory of criminal forfeiture. Finally, the forfeiture amount sought by the government here would violate the Eighth Amendment.

I.  **Applicable Legal Standard To Criminal Forfeiture**

Pursuant to Title 18, United States Code Section 981(a)(1)(C), a court shall order the forfeiture of "[a]ny property . . . which constitutes or is derived from proceeds" of criminal securities fraud. In *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012), the Second Circuit reversed the district court's forfeiture order and set forth what the government must prove to obtain criminal forfeiture. Under *Contorinis*, the government must prove that (1) the property (real or personal) sought was "traceable to the violation," (2) the money that Retrophin paid was money that Mr. Greebel "received or had the ability to control," and (3) the illicit proceeds sought by the government must have been "received by him" and not other individuals. *United States v. Contorinis*, 692 F.3d 136, 145–47 (2d Cir. 2012). Indeed, in a footnote, the government concedes that it could not seek forfeiture of any of the money that it sought from Mr. Shkreli because such money was not a "direct benefit" to Mr. Greebel, Gov't Ltr. at 4 n.2, meaning that such money was not "traceable to", received by, and/or controlled by Mr. Greebel.

The government suggests using the amorphous "but for" standard of proof in reliance on *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009), that is, "but for" the conduct in Counts Seven and/or Eight, Mr. Greebel would not have been paid an increase in compensation. Gov't Ltr. at 3–4. However, there are many problems with using a "but for" test in the circumstances of this case. The criminal forfeiture statute does not use the words "but for" but rather the word "traceable."[3] 18 U.S.C. 981(a)(1)(C) (property subject to forfeiture includes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of the securities laws). One significant problem with the "but for" test is that it sweeps into its orbit entirely untraceable conduct; under an expansive reading of the "but for" test, nearly anyone could be held liable for nearly any amount of money in forfeiture. Another significant problem with the "but for" test is that its application

---

government's evidence. If the government decided not to introduce any evidence at a hearing, we would proceed to present further evidence.

[3] The only cases in which the Second Circuit has applied a "but for" analysis to determine forfeiture are ones in which the court is assessing forfeiture for RICO offenses. *See, e.g., United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989). There are no instances where the Second Circuit applied that formulation in cases arising from other crimes, including conspiracy to commit wire fraud or securities fraud.

in this case is improper, as the link between the conduct in Counts Seven and/or Eight and the determination of Mr. Greebel's compensation by the non-equity partner compensation committee at Katten—a committee that never sought the input of Mr. Shkreli and was not aware of the conduct in Counts Seven and Eight—is tenuous and interrupted by independent, intervening events.

Notably, the government acknowledges that it bears the burden of proving criminal forfeiture. And the government must demonstrate each element of criminal forfeiture by a preponderance of evidence. *United States v. Finazzo*, 682 F. App'x 6, 14 (2d Cir. 2017) (citing *United States v. Daudergas*, 837 F.3d 212, 231 (2d Cir. 2016)); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (citing *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005)). This Court has "independent duty to ensure that the required nexus exists," *United States v. Beltramea*, 785 F.3d 287, 290-91 (8th Cir. 2015), and forfeiture must be denied where "the government's evidence is legally insufficient to establish a proper nexus between the defendant and the alleged proceeds of the conspiracy," *United States v. Barajas*, 200 F. Supp. 2d 575, 576 (E.D.N.C. 2002).

In summary, the government has the burden of proving that Mr. Greebel's compensation in FY 2014 was "traceable to the violation," that the money that Retrophin paid was received by Mr. Greebel and/or controlled by Mr. Greebel, and that the illicit proceeds were received by Mr. Greebel and not others.

**II.   The Government Has Not And Cannot Prove That Mr. Greebel's Compensation Was "Traceable To The Violation"; That The Money Retrophin Paid Was Received By Mr. Greebel And/Or Controlled By Mr. Greebel; Or That Illicit Proceeds Were Received By Mr. Greebel.**

The government has not and cannot prove the requirements set forth in *United States v. Contorinis* to obtain criminal forfeiture against Mr. Greebel.

The government tries to draw a direct line between Retrophin's payment of legal fees to Katten during fiscal year 2014 and a "significant increase" in Mr. Greebel's compensation following that fiscal year. Specifically, the government argues that Mr. Greebel's "forfeiture money judgment liability should be based upon the benefit he received through increased compensation from his law firm, Katten Muchin Rosenman LLP ('Katten'), *as he would not have received that benefit **but for** the frauds of which he was convicted in Counts Seven and Eight*." Gov't Ltr. at 3 (emphasis added). The government further argues that "[b]ecause the increased income Greebel received was a *direct result* of his criminal conduct, he is required to forfeit that income." *Id.* 4 (emphasis added).

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 4

Because Retrophin's payment to Katten is not traceable to the proceeds of Counts Seven and Eight, Katten's compensation to Mr. Greebel is not traceable to the proceeds of Counts Seven and Eight, and any money that Retrophin paid to Katten was never received by Mr. Greebel or controlled by Mr. Greebel, the government cannot show the necessary nexus under governing Second Circuit law. Far from being a "direct result of" the alleged criminal conduct, Mr. Greebel's compensation was the result of two intervening causes entirely unrelated to the conduct in Counts Seven and Eight. First, the government overlooks the stubborn but undeniable fact that its "but for" causation argument hinges on the question of whether Retrophin paid its legal bills to Katten—an issue entirely outside of Mr. Greebel's control. Second, the government overlooks the critical fact that an independent, non-equity partner compensation committee at Katten determined Mr. Greebel's compensation. Third, the government overlooks that the non-equity partner compensation committee at Katten determined Mr. Greebel's compensation based on a number of diverse factors. The government's attempt to narrowly focus on only two of these factors is unfair, unbalanced, and inconsistent with the facts and testimony presented by the government during the trial. *See, e.g.*, Tr. 6596:7–6597:6 (Ross Silverman testimony regarding factors used by Katten's non-equity partner compensation committee); Tr. 1272:2–1276:10 (Bernadette Davida testimony describing compensation process).

> **A. Retrophin's Payments to Katten and Mr. Greebel's Pay Increase are Not Traceable To Counts Seven And Eight, And the Money Received By Katten From Retrophin Was Never Received By Or Controlled By Mr. Greebel.**

The government's claim that "but for" Mr. Greebel's conduct in Counts Seven and Eight, Retrophin would not have paid money to Katten and Katten, in turn, would not have paid Mr. Greebel is exactly the kind of logic that the Second Circuit squarely rejected in *Contorinis*.

In *Contorinis*, Joseph Contorinis, a co-portfolio manager of an investment fund who "made investment decisions but *did not control disbursement of profits*" was found guilty of conspiracy to commit securities fraud and insider trading. *United States v. Contorinis*, 692 F.3d 136, 139 (2d Cir. 2012) (emphasis added). At trial, the government proved that an investment banker had illegally tipped Contorinis about the sale of a publicly traded company repeatedly, that Contorinis traded investor money in the fund based on those illegal tips, and that the fund made illegal profits and avoided losses based on those illegal tips. Following trial, in connection with sentencing, the district court ordered the criminal forfeiture of more than $12 million at the government's request—"the total amount of profits made, and losses avoided, by the Fund in [illegal] trades." *Id.* at 145. On appeal, the Second Circuit reversed and vacated the district court's forfeiture order. The Second Circuit stated that Contorinis himself was only an "employee and small equity owner of the Fund," and therefore profits earned by the fund were not "received or possessed" by

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 5

Contorinis. Because "the 'proceeds' sought by the government here were 'acquired' by the Fund over which appellant lacks control," the Second Circuit found that he could not be required to forfeit that amount. *Id.* at 146. The Second Circuit further explained that forfeiture does not extend to "a situation where the proceeds [of alleged crimes] go directly to an innocent third party and are never possessed by the defendant." *Id.* at 147.

Here, the government's attempt to obtain money based on what Katten received from Retrophin is directly analogous to the government's unsuccessful attempt to obtain money that Mr. Contorinis's hedge fund investors received from the illegal insider trading by Contorinis. Indeed, there has been no showing, nor could there be, that Mr. Greebel ever "received," "possessed," "acquired," or "controlled" the payments from Retrophin to Katten. Like the payments in *Contorinis*, Retrophin's payments to Katten went "directly to an innocent third party and [were] never possessed by the defendant." *Id.* at 147.

Notably, the government points to no evidence that Mr. Shkreli ever made any payments or gifts of any kind to Mr. Greebel in his personal capacity. Had the government demonstrated that Mr. Shkreli gifted Retrophin shares or money to Mr. Greebel or to a person or entity whom Mr. Greebel controlled, the government would be in a different position. However, Retrophin made all of its payments of real legal fees and expenses directly to Katten, and Katten controlled all of that money. Mr. Greebel never received any of Retrophin's payments to Katten, and Katten did not have any method of compensating its non-equity partnership with any percentage of any kind of attorneys' fees. Unlike equity partners, Mr. Greebel's compensation was ***not*** tied in any formulaic way to the amount of time that he billed and/or the amount of fees generated from clients. The government's nexus argument here is thus even more attenuated than the one at issue in *Contorinis*, since Mr. Greebel (i) never stood to actually receive direct profits from Katten's clients; (ii) as an income partner was not an owner of Katten; (iii) never shared in Katten's profits; and (iv) was subject to a thorough compensation review process that removed any "control" from Mr. Greebel altogether as to his year-end salary.

As explained above, proceeds subject to forfeiture must be "traceable" to Mr. Greebel's conduct in Counts Seven and Eight, must be money received by and/or controlled by Mr. Greebel, and must not have been sent to innocent third-parties. Here, the government cannot trace Mr. Greebel's pay increase to the settlement and consulting agreements at issue in Count Seven or the alleged Fearnow conspiracy in Count Eight. With absolutely no say whatsoever as to his year-end compensation, Mr. Greebel received an increase in his salary from Katten's income partner compensation committee. This pay increase was the result ***not*** of criminal conduct but of innocent, third-party decision makers with no stake whatsoever in the alleged conspiracies.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 6

Because Retrophin paid money to Katten, not Mr. Greebel, and because the government cannot show that Retrophin money went to Mr. Greebel or was controlled by Mr. Greebel, Mr. Greebel's salary did not constitute "proceeds" of illegal conduct but was legitimately granted as part of Katten's non-equity partner review process and thus cannot be subject to forfeiture. *United States v. Odom*, 2007 WL 2433957, at *7 (S.D. Miss. Aug. 22, 2007) (rejecting request of forfeiture where the assets sought had been "legitimately obtained" and thus were not proceeds from alleged crimes); *see also United States v. Juluke*, 426 F.3d 323, 327-28 (5th Cir. 2005) ("[I]t is inconsistent with the purpose of the statute to permit forfeiture not tied to the specific criminal acts of which the defendant was convicted."); *United States v. Nicolo*, 597 F. Supp. 2d 342, 356-57 (W.D.N.Y. 2009) (rejecting forfeiture where alleged "connection . . . between [the] properties and [the defendant's] money laundering . . . was simply too incidental and insubstantial to support the forfeiture"); *United States v. Rodriguez*, 2005 WL 4163786, at *2-3 (D.N.J. June 6, 2005) (rejecting part of the government's forfeiture request because the government only proved by a preponderance that "most, but not all, bank deposits" were part of the illegal transaction-structuring scheme); *id.* (because "certain days . . . did not constitute a pattern of illegal structuring activity," forfeiture of assets deposited on those days was inappropriate).

    **B. Even If The Court Applies The Impermissibly Expansive "But For" Standard, The Government Has Failed To Show A Sufficient Nexus Between The Amount Sought For Forfeiture And Mr. Greebel's Conduct.**

As explained above, the government has failed to meet the requirements set forth in *Contorinis* to obtain criminal forfeiture from Mr. Greebel. Nonetheless, the government suggests that the Court should apply a "but-for" standard. *See* Gov't Ltr. at 3 ("forfeiture should be based upon the benefit he received through increased compensation from his law firm, Katten Muchin Rosenman LLP ('Katten'), as he would not have received that benefit but for the frauds of which he was convicted in Counts Seven and Eight"). But even applying this impermissibly expansive test, which sweeps into the causation analysis any number of spurious and incidental events that do not relate to the conduct in question, the government's nexus argument is fatally flawed and its request for forfeiture must be denied.

    1) **The Government's Nexus Argument Is Extremely Attenuated And Based On Speculation.**

The government's argument that "[b]ecause the increased income Greebel received was a *direct result* of his criminal conduct, he is required to forfeit that income," Gov't Ltr. at 4, misses the mark. Its conclusory assertion is based on speculation about Mr. Greebel's law firm compensation and the effect on that compensation, if any, of the conduct alleged in Counts Seven and Eight. And the government does not offer sufficient proof that the entirety

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 7

of Mr. Greebel's pay increase can somehow be connected to the wide-ranging work performed for Retrophin by Mr. Greebel and his colleagues at Katten. The government does not address the fact that salary calculations at Katten were based on a variety of tangible and intangible factors. Indeed, while the government correctly states that "the salary of an income partner was not set by a mathematical formula" but by "a series of factors," the government then cherry-picks "[t]wo important factors": "(1) the total amount of revenue the partner generated for the firm[] and (2) his or her realization rate, or the percentage of a client's bills for which money was actually collected." Gov't Ltr. at 7.

Multiple witnesses who testified to the factors affecting Katten attorneys' compensation confirmed that the process is, at best, vague and complex. A sampling of this witness testimony confirms that the two factors focused on by the government are only pieces of the complex and opaque calculations as to an income partner's compensation

The former Chairman of Katten's Income Partner Compensation Committee Ross Silverman testified that there was no "magic formula" for salary, but that Katten's compensation committee considered "tangible and intangible" factors and took a "holistic approach" when determining an income partner's compensation. Tr. 6596:7–12; 6619:22–6620:3. That holistic approach was designed specifically to "reward people who are actually contributing in many different ways." Tr. 6620:17–23. While data and numbers played a role, "the numbers were just one piece of a much broader analysis." Tr. 6648:7–8.

Notably, the government's letter overlooks all of Mr. Silverman's testimony. *See* Gov't Ltr. at 8. The government mistakenly suggests that "the exponential increase" in Mr. Greebel's salary was "driven by that dramatic increase in [Retrophin] revenue and realization rates." *Id*. (citing Tr. 6614). But Mr. Silverman made it clear that Mr. Greebel's additional compensation was not due to Retrophin alone but a host of factors including that Mr. Greebel's virtual currency work "played a material role in the increase," Tr. 6614:21–23, and that several other factors, like holding firm roundtables to introduce potential clients, which Mr. Silverman acknowledged is "something that Evan Greebel did year after year," would have influenced Mr. Greebel's compensation as well. Tr. 6622:9–12.

Another of Mr. Greebel's former partners, Bernadette Davida, confirmed the holistic nature of Katten's compensation process. She noted that income partners' bonus each year was based on a "whole variety of factors," including everything from: (1) billable hours, to (2) "bring[ing] in business," to (3) "quality of work," to (4) "pro bono work," and to (5) "non-billable factors, activities, like training [and] mentoring associates." Tr. 1272:2–1276:10 (describing factors that went into compensation calculation for income partners).

Thus, Mr. Greebel's income was affected by any number of factors unrelated to his Retrophin work, including his involvement on firm committees (specifically, he was one of the National Assigning Partners for the Corporate Department), his involvement in training associates, origination credit attributable to new clients, his total number of billable hours, his assistance on firm administrative matters, his non-billable work, including articles he wrote, and even whether he was collaborative and a "good partner."  Tr. 6596:7–6597:6; *see also* GX 121-5 & 121-7 (Mr. Greebel's compensation memoranda, noting non-billable work and firm involvement).  The government's attempt to isolate only two factors that affected Mr. Greebel's compensation is, in short, "too much of a stretch" and does not constitute a sufficient showing to meet the nexus requirement under the relevant statute.  *United States v. King*, 231 F. Supp. 3d 872, 905, 910, 913, 982–83, 1006 (W.D. Okla. 2017).

To highlight one specific example, Mr. Greebel's work for other clients, particularly the virtual currency work, "*played a material role*" in his increased salary, *including in FY 2014*.  Tr. 6614:21–23 (testimony of Ross Silverman) (emphasis added).  As shown at trial, Katten "had no virtual currency practice in 2013, until [Mr. Greebel] found that the . . . the Bitcoin currency[] was going to be immense.  And he studied up on it, read up on it, met people on it, discussed it, and he *was* the virtual currency practice in the firm."  Tr. 8379:10–14 (testimony of Howard Jacobs) (emphasis added).  The very year Mr. Greebel performed work for Retrophin relating to Counts Seven and Eight, Mr. Greebel also "became an expert [in virtual currency] way before anyone was talking a lot about Bitcoin[.] . . . This was a nondescript currency in 2013, and it is amazing how much of an expert he became in a short period of time."  *Id.* 8379:14–18 (same).  Specifically, Mr. Greebel was being quoted in various publications relating to the virtual currency work that he was doing.[4]

---

[4]   The government suggests that because Mr. Greebel's compensation *decreased* in FY 2015 despite the continued strength of his virtual currency practice, this decrease must have been due to the fact that "Retrophin's realization rate plunged and Retrophin fired Katten as a client[.]"  Gov't Ltr. at 8.  But the government again places too narrow a focus on but one factor that affects Mr. Greebel's compensation.  To be sure, we do not argue that realization rate is entirely unrelated to Mr. Greebel's compensation, but the government offers no evidence—other than conclusory assertions—that Retrophin's realization rate alone is to blame for a $476,249 pay differential in Mr. Greebel's salary.  Perhaps more importantly, the government ignores the fact that Retrophin's decision as to whether or not it paid its bills to Katten was wholly removed from Mr. Greebel's control.  As explained more fully below, Mr. Greebel had absolutely no say whatsoever as to whether Retrophin paid outstanding fees to Katten, and any link between that decision and Mr. Greebel's conduct relating to Counts Seven and Eight is "too much of a stretch" and far too attenuated to satisfy the nexus requirement under relevant law.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 9

That same year, Mr. Greebel's virtual currency work garnered a large amount of beneficial publicity for Katten, including a "major article" in a "financial newsletter." Tr. 8380:7-27 (testimony of Howard Jacobs). Mr. Greebel's virtual currency work was thus extremely important to his work and to Katten Muchin—so much so that Howard Jacobs, another former partner, described it as a "major accomplishment in the firm," and Mr. Greebel's work with such high-profile clients constituted "a major coup for Evan and the firm." Tr. 8382:14–8383:4. This major accomplishment was quantified in revenue generated, as Mr. Greebel's virtual currency practice (that neither previously existed nor generated revenue) generated approximately $1 million in its first 6–7 months of existence.

The government's argument also focuses solely on (1) Retrophin-generated revenue and (2) Mr. Greebel's realization rate. But the connection between these two factors and Mr. Greebel's salary fluctuations (from $355,000 in FY 2013, to $900,000 in FY 2014, to $423,751 in FY 2015) is far too attenuated to show the requisite "nexus." Indeed, as confirmed by documentary and testimonial evidence, Mr. Greebel's compensation was affected by a number of factors, which Mr. Greebel understood to be, and Mr. Silverman testified to represent, a "holistic approach," Tr. 6619:22-6620:3. The government does not meet its burden of proof by isolating two factors of many in determining Mr. Greebel's compensation and thus its theory of criminal forfeiture is based on speculation and not supported by the evidence

### 2) The Government Overlooks Two Critical Intervening Events That Disrupt Its Causation Argument.

In addition to basing its nexus argument on attenuated chain of events and speculation, the government overlooks two critical events that disrupt any causal connection between Mr. Greebel's pay increase and the conduct at issue in Counts Seven and Eight.

*First*, the government mistakenly omits from its argument a crucial step in the causal link between Mr. Greebel's relationship with Retrophin and his compensation at Katten: *Retrophin ultimately had to pay its bills*. As laid out in the government's letter and above, one factor that affected Mr. Greebel's compensation was his realization rate—*i.e.*, the percentage of outstanding bills collected from a particular client. Gov't Ltr. at 7. Notably, however, the realization rate for Retrophin's outstanding bills was entirely outside of Mr. Greebel's control. Indeed, as confirmed by Mr. Greebel's many requests to Mr. Shkreli, Mr. Greebel had absolutely no say as to when, or by how much, Retrophin paid down its

---

*United States v. King*, 231 F. Supp. 3d 872, 905, 910, 913, 982–83, 1006 (W.D. Okla. 2017).

GIBSON DUNN

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 10

outstanding bills with Katten.  *See, e.g.*, GX 510, 513, 514 (emails from Mr. Greebel to Mr. Shkreli seeking payment).  Surely there is no link—direct or otherwise—between Counts Seven and Eight, on the one hand, and whether Retrophin paid Katten's bills, on the other, particularly where Mr. Greebel had no influence of Retrophin's decision to pay.  The government's own argument—premised largely on Retrophin's realization rate—thus undermines any causal connection between the criminal conduct and Mr. Greebel's compensation.

***Second***, while Retrophin's decision to pay its bills disrupts the causal connection on the front end of the government's analysis, the government also overlooks another intervening event on the back end—*i.e.*, whether, and by how much, Mr. Greebel would receive a year-over-year pay increase in his salary.  As noted above, Mr. Greebel, like all income partners, had no control whatsoever as to the ultimate amount of his compensation.  Indeed, Mr. Greebel was subject to annual review by a compensation committee of equity partners at Katten.  A select group of equity partners on the non-equity compensation committee reviewed Mr. Greebel's compensation memorandum, and endeavored to understand the full context of Mr. Greebel's year of performance by, among other things, reviewing the nature of his practice, reviewing the direction of his practice, reviewing his billable hours, evaluating his involvement in administrative activities for the firm, and assessing whether he had promising business development leads.  Ultimately, this independent compensation committee came to a decision on Mr. Greebel's compensation, which certainly depended on, above all, Katten's profitability as a firm and the performance of other partners across the globe.  The compensation committee's decision was independent from, and unrelated to, any conduct attributable to Counts Seven or Eight.  The decision to give Mr. Greebel a pay increase (or to not give such an increase, as was entirely in the committee's discretion) was therefore an intervening event that disrupts the government's causation theory and renders its request for forfeiture infirm.

**III.   The Government's Arguments As To Mr. Greebel's Motives Are Logically Inconsistent And Unsupported by The Record.**

***First***, the government's arguments are premised on two logically inconsistent theories as to Mr. Greebel's motives on Counts Seven and Eight.  The government claims that Mr. Greebel conspired to "manipulate the price and trading volume of Retrophin stock" in order to "keep the company afloat" ***and*** that he *simultaneously* conspired to "force[] Retrophin to enter into a series of settlement and sham consulting agreements that *effectively stole millions of dollars of Retrophin capital and stock*[.]" Gov't Ltr. at 6 (emphasis added).  But these two arguments are fundamentally incompatible.  It does not stand to reason that a person intent on preserving a company's financial existence would also actively work to loot it and deplete its resources.

With respect to Count Eight, the government claims that Mr. Greebel "prevented Retrophin from going out of business at a time when [Mr.] Greebel desperately needed the company to pay hundreds of thousands of dollars in outstanding legal bills[.]" *Id.* at 4.  But the government's letter offers no support for this conclusory statement; in fact, Retrophin's existence was not dependent on the trading price of its publicly available shares.  Nor did the government provide any evidence during trial (or in its forfeiture motion) indicating that investors were willing to invest in Retrophin at $3 a share, but not at $2 a share.  In fact, evidence showed that, if anything, Mr. Greebel was not under the impression that Retrophin was at risk of going out of business and even responded to Mr. Shkreli's liquidation email that, as far as he could tell, the company would be able to meet its obligations to creditors.  GX 506-B ("[L]igand said theyd *[sic]* extend, [R]oth is ready to do a raise—[I] dont *[sic]* hear anyone breathing down your neck[.]").

With respect to Count Seven, the government argues that Mr. Greebel's "conduct . . . allowed [Mr.] Greebel and [Mr.] Shkreli to conceal [Mr.] Shkreli's hedge fund frauds . . . so that [Mr.] Shkreli could retain control of the company and continue to direct new work for Retrophin to Katten." *Id.*  But if Mr. Greebel were "desperately" in need of "hundreds of thousands of dollars in outstanding legal bills," it would be quite odd for him to facilitate the looting of Retrophin—especially where the agreements at issue in Count Seven often called for cash payments worth hundreds of thousands dollars—thus depriving Retrophin of the ability to pay the very bills owed to Katten.  Furthermore, the government's evidence proves the inaccuracy of their argument.  As of February 20, 2013, Retrophin had paid in full all of the money it owed to Katten and did not have an outstanding balance.  *See* DX 110-16.  However, the first time Mr. Greebel learned of a dispute with a former MSMB investor was when he received a letter from Dr. Rosenwald's attorney on February 19, 2013.  GX 520.  As such, there is no correlation between the settlement agreements and the outstanding amount owed to Katten prior to February 15, 2013.

Thus, the government's disconnected arguments as to Mr. Greebel's motives are logically inconsistent, and the government's arguments as to the "requisite nexus"—largely premised on the incompatible motives ascribed to Mr. Greebel—are insufficient under the applicable criminal forfeiture law.

**Second**, and relatedly, the government's arguments are unsupported by the record, and because the government's forfeiture argument is premised on unsubstantiated arguments as to Mr. Greebel's motives, the government's request for forfeiture should be rejected.

Indeed, there has been no showing, by a preponderance or otherwise, that Mr. Greebel was motivated to "keep the company afloat," Ltr. at 6, so that he could continue to receive legal

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 12

fees.  This is pure speculation.  *United States v. Barajas*, 200 F. Supp. 2d 575, 576 (E.D.N.C. 2002) (denying government's motion for forfeiture where the alleged "connection between the defendant and property or proceeds of the conspiracy was entirely speculative").  The government cites emails wherein Mr. Greebel presses Mr. Shkreli to pay Retrophin's outstanding legal bills to Katten.  *See* Gov't Ltr. at 5 (citing GXs 510, 513, 514).  The government notes, for example, that Mr. Greebel wrote to Mr. Shkreli that he "seriously need[ed] money on Monday" and that his patience regarding billing was "putting [him] at grave risk," Ltr. at 5.  They also cite to an email in which Mr. Greebel reminds Mr. Shkreli of his promise to "ge[t] [Mr. Greebel] 100+ by y[ea]r end."  *Id.*  According to the government, these emails prove that Mr. Greebel was "desperate" for payment and thus demonstrate his motive for the conduct at issue in Count Eight.  *Id.* at 5.  But this is far too speculative, especially when based on such vague and ambiguous emails.

Mr. Greebel's efforts to collect bills show the unfortunately all-too-common phenomenon of lawyers having to chase some clients to pay their bills.  Such practice does not suffice to show a sufficient nexus between Mr. Greebel's alleged conduct and the government's request for forfeiture.  Clients are expected to pay for the services they receive.  To ensure that they receive payment—and, by extension, earn revenue—law firm partners are sometimes required by their law firms to chase clients for monies owed.  In fact, both Mr. Silverman and Mr. Jacobs testified that Katten insists that partners follow up with clients and ensure that their clients pay outstanding bills to Katten prior to the end of each fiscal year.  Yet the government's interpretation of routine, ordinary emails between an attorney and the CEO of a client constitute nothing more than speculation.  The government's forfeiture request should be denied when based on such a thin reed of evidence.  *See, e.g., United States v. Basciano*, 2007 WL 29439, at *4 (E.D.N.Y. Jan. 4, 2007) (denying requested forfeiture "[b]ecause the nature of the evidence relied upon by the Government in making a forfeiture calculation is overly speculative").

The government also argues that since Retrophin did not have any cash, prior to or following the Desert Gateway merger, it did not have any assets.  However, this theory is inaccurate because cash is only one component of a company's assets.  In fact, a review of Retrophin's filings with the Securities and Exchange Commission before and after the February 2013 financing indicate that Retrophin had other assets, specifically the license agreement with Ligand for *Sparsentan* as well as intellectual property relating to a drug to treat Pantothenate kinase-associated neurodegeneration [PKAN].  Other than an email in which Mr. Shkreli contemplated liquidation (and in which Mr. Greebel reminded him that there were no creditor-related disputes), there is no evidence that Retrophin was in danger of going out of business.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 13

The same is true with respect to the government's alleged motive of Mr. Greebel's regarding Count Seven. The government contends that Mr. Greebel assisted Mr. Shkreli in executing the settlement and consulting agreements at issue in Count Seven so that Mr. Shkreli would "maintain control of Retrophin and steer significant Retrophin business to Katten[.]" Gov't Ltr. at 5. But the government does not cite any documentary or testimonial evidence in support of this theory.

In fact, beyond repeated generalizations about "additional business," Gov't Ltr. at 6, the government's letter does not specify what, exactly, constituted this directed work, or how it is connected to Mr. Greebel's assistance in executing the settlement and consulting agreements. The extent of the government's proffer of this vast scheme to steer business to Katten is that "Shkreli continued to direct millions of dollars of business to Katten (*see, e.g.*, GX 856 (August 2014 Katten bill to Retrophin detailing recent billable work totaling more than $2.1 million)), and Retrophin made payments totaling more than $4.7 million to Katten for Katten's work on additional business. (GX 919-A)." Gov't Ltr. at 6.

But what the government has described here is, again, the basic structure of an engagement between a company and its outside counsel. Such a presumption devalues the work of approximately 100 people at Katten who diligently worked on Retrophin's behalf for years. Specifically, it implies that work performed by litigation partners, tax partners, financing partners, intellectual property partners, other corporate partners, anti-trust partners, employment law partners, and all of their associates and support staff was nothing more than a mirage. To find that this proves the requisite nexus for the purposes of forfeiture would require that years of work performed by Katten, which in part contributed to Retrophin's substantial growth (currently with a market capitalization of almost $1 billion) was worthless. The government never offered evidence that (i) Katten was not qualified to perform the work for which it billed Retrophin, (ii) Mr. Shkreli only gave Katten work because of Mr. Greebel's actions or (iii) that any transaction or litigation in which Katten advised or represented Retrophin was not performed with the utmost diligence.

### IV. The Government's Requested Amount Is Unconstitutional And In Violation Of The Eighth Amendment.

Courts routinely reject requested forfeiture amounts where there is "no inherent proportionality" between the amount sought and the conduct at issue. *United States v. Bajakajian*, 524 U.S. 321, 339-40 (1998) ("Comparing the gravity of respondent's crime with the $357,144 forfeiture the Government seeks, we conclude that such a forfeiture would be grossly disproportional to the gravity of his offense."). Indeed, under the Excessive Fines Clause of the Eighth Amendment, "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id*. at 334. Here, the

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 14

government requests an amount in gross excess of any proceeds received by Mr. Greebel traceable to Counts Seven and Eight and illicit proceeds that Mr. Greebel received and/or controlled.

Given the government's inability to satisfy the nexus requirement altogether, and because of the rare circumstances of this case, the amount sought is grossly and unconstitutionally disproportionate to the crimes charged.[5] This is particularly true where Mr. Greebel "was clearly a secondary figure in the crimes" and where he "reaped little benefit: while the scheme earned [other participants in the scheme] millions of dollars, [defendant] received no direct share of the proceeds." *United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997) (vacating a district court's forfeiture order as "grossly disproportionate" and where the defendant's "motive appears to have been a misguided loyalty to [co-defendant], rather than a direct interest in the success of the scheme" ). Indeed, it bears repeating that Mr. Greebel did not receive any direct payments from Retrophin or Mr. Shkreli, let alone any profits from Mr. Shkreli's frauds alleged in Counts One through Six with which Mr. Greebel was not charged.

The amount sought would therefore be grossly disproportionate to the conduct attributable to Mr. Greebel and would thus constitute an unfair and improper punishment under relevant law. *United States v. King*, 231 F. Supp. 3d 872, 905, 910, 913, 982–83, 1006 (W.D. Okla. 2017) (rejecting requested forfeiture as "grossly disproportional to the gravity of under the Eight Amendment).

### V.     Conclusion

The government has failed to demonstrate the requirements established by the Second Circuit in *United States v. Contorinis*. Mr. Greebel's salary is in no way traceable to Counts Seven and Eight, and there is no evidence that Mr. Greebel received or controlled the proceeds of the alleged crimes. For the reasons stated herein, Mr. Greebel respectfully requests that the Court deny the government's motion for forfeiture.

---

[5] In Mr. Greebel's case, there are no victims requiring restitution, and Mr. Greebel himself has not enjoyed any fruits of his crimes. Instead, Mr. Greebel has effectively lost all income since his arrest more than two years ago; he lives far from an opulent lifestyle; and, indeed, he currently has significantly more liabilities than he does assets.

GIBSON DUNN

The Honorable Kiyo A. Matsumoto
April 9, 2018
Page 15


Respectfully submitted,

***/s/ Reed Brodsky***

Reed Brodsky