

U.S. Department of Justice

United States Attorney
Eastern District of New York

JMK:AES/DCP/DKK
F.#2014R00501

271 Cadman Plaza East
Brooklyn, New York 11201

April 12, 2018

<u>By Hand and ECF</u>

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:   United States v. Evan Greebel
              Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in further support of its post-trial motion for forfeiture from the defendant Evan Greebel ("Gov't. Mot." (see Dkt. No. 573)), and in response to the defendant's letter brief regarding forfeiture dated April 9, 2018 ("Def. Let." (see Dkt. No. 576)). For the reasons set forth below, the defendant's arguments in his response are unavailing, and the Court should enter a forfeiture money judgment in the amount of $476,249, which represents a conservative computation of the monies the defendant personally acquired as a result of his crimes of conviction.

I.    The Criminal Proceeds Ultimately Received By the Defendant In the Form of Compensation Are Properly Subject to Criminal Forfeiture

      The defendant asserts that forfeiture is unwarranted because the government cannot demonstrate that "the money that Retrophin paid was received by and/or controlled by Mr. Greebel, and that the illicit proceeds were received by Mr. Greebel and not others." (Def. Let. at 3). Specifically, the defendant contends that the government cannot show that the defendant "received" or "controlled" the criminal proceeds at issue in this case because they went directly to the defendant's employer, Katten Muchin Rosenman LP ("Katten"). (Id. at 4-5). Put another way, the defendant argues that criminal forfeiture is not permitted in any case where the proceeds of a crime do not immediately go to the defendant or his/her co-conspirators, but rather pass through an intermediate entity or individual before the defendant receives those proceeds. (Id.). This is not the law. To the contrary, so long as criminal proceeds from a scheme are ultimately received by the defendant—even if they pass through other individuals or entities with no criminal culpability—such proceeds can be said to have been "controlled" or "received" by the defendant and are subject to forfeiture.

The Second Circuit case that most clearly illustrates this legal principle is the very case that the defendant attempts to rely on in support of his improper argument: United States v. Contorinis, 692 F.3d 136 (2d Cir. 2012). In Contorinis, the defendant was a trader who was convicted of trading on inside information; those improper trades resulted in more than $12 million in profits for the fund that employed the defendant as its portfolio manager. Id. at 138-42. The Court initially ordered the defendant to forfeit the full $12 million in profits that the fund had received as a result of his criminal behavior. Id. However, the Second Circuit found that the defendant could not be required to forfeit criminal proceeds that "go directly to an innocent third party and are never possessed by the defendant." Id. at 147 (emphasis added). Crucially, the Second Circuit remanded the issue of forfeiture to the district court "to determine the proper forfeiture amount" and noted that to "what extent [the defendant's] interest in salaries, bonuses, dividends, or enhanced value of equity in the Fund can be said to be money 'acquired' by the defendant 'through the illegal transactions resulting in forfeiture'" was an issue that the district court should "decide on remand in a manner not inconsistent with this opinion." Id. at 148 & n. 4. After the case was remanded, the government and the defendant agreed that the defendant would forfeit approximately $427,000, which the parties agreed constituted "proceeds traceable to the offense of conviction." United States v. Contorinis, 09-CR-1083 (S.D.N.Y.), Dkt. No. 111.

Contorinis thus stands for the proposition that if a defendant's fraudulent scheme results in profits for an entirely innocent third party, and none of those criminal proceeds ever flow to the defendant or his/her co-conspirators, those proceeds cannot be subject to criminal forfeiture because it is an in personam proceeding designed to punish the defendant by disgorging his or her ill-gotten gains—in other words, if a defendant or his/her co-conspirators never received any ill-gotten gains, the defendant can't be forced to disgorge them. However, Contorinis itself states that if criminal proceeds flow through a third party but ultimately wind up in the control of the defendant or his/her co-conspirators, such proceeds can be the subject of criminal forfeiture. If the defendant's argument was correct, the Second Circuit would simply have found in Contorinis that no forfeiture was appropriate because all of the criminal proceeds went initially to the fund and not directly by the defendant. But that is not what happened—to the contrary, the Second Circuit remanded the issue to the district court to determine whether any of the criminal proceeds that initially went to the fund were ultimately "received" or "controlled" by the defendant, and explicitly directed the district court to consider "salaries, bonuses, dividends or enhanced value of equity in the fund" as potential sources of such proceeds.

In cases subsequent to Contorinis, the Second Circuit has reiterated this principle. For example, in United States v. Torres, 703 F.3d 194 (2d Cir. 2012), the Second Circuit noted that it had made clear in Contorinis that the defendant's "own portion of those proceeds could eventually be subject to forfeiture, despite its payment first to an innocent party." Id. at 202. And in United States v. Goffer, 529 Fed. Appx. 17 (2d Cir. 2013), the Second Circuit vacated and remanded a forfeiture order that had "account[ed] for gains realized by [the defendant's] employers"—which included the hedge fund management Galleon Group—for a determination on remand of how much of the defendant's "interest in salaries, bonuses, dividends or enhanced value of equity" were attributable to his criminal actions that had resulted in profits for those employers. Id. at 20. Courts in the Second Circuit and elsewhere have also routinely ordered that defendants forfeit criminal proceeds that initially went to the defendant's employer, and then subsequently were "received" by the defendant in the form of compensation that was in some way "attributable" to the defendant's criminal activity. See, e.g., United States v.

Daugerdas, 837 F.3d 212, 231 (2d Cir. 2016) (finding that the district court did not err when it required defendant attorney to forfeit compensation that he had received from his law firm's account, into which fees that the defendant had earned as a result of his criminal activity were placed); United States v. Shabudin, 701 Fed. Appx. 599 (9th Cir. 2017) (finding that the district court did not err when it ordered the defendant, a former officer of a failed bank, to forfeit a year of his salary in connection with his work to falsely inflate the bank's financial statements in order obtain federal funds for the bank); see also United States v. Mahaffey, 693 F.3d 113, 138 (2d Cir. 2012) (noting that the proper measure of forfeiture for a defendant that committed securities fraud would be the net commissions the defendant earned off of profits generated as a result of the fraud; United States v. Martoma, 48 F. Supp. 3d. 555, n.12 (S.D.N.Y. 2014) (noting that defendant's bonus, which he received from his employer after making profits for the employer as a result of an insider trading scheme, constituted personal profits to the defendant from his criminal activity).[1]

Consequently, the law is clear that any criminal proceeds that resulted from the defendant's criminal activity—here, the legal fees that Retrophin paid to Katten as a result of the defendant's participation in the conspiracies charged in Counts Seven and Eight—that went initially to Katten are deemed to have been "received" or "controlled" by the defendant to the extent that the defendant's subsequent compensation from Katten was attributable to his criminal activity. The reasons why (1) the legal fees paid by Retrophin to Katten constitute criminal proceeds of the crimes of conviction, and (2) the defendant's compensation is attributable to his criminal activity, are set forth more fully in the government's opening brief and in Section III below, but the mere fact that those criminal proceeds went first to Katten and only later to the defendant is not a legal bar to criminal forfeiture.

II.     No Tracing Analysis Is Required for the Proposed Forfeiture Money Judgment

As set forth in the government's opening brief, forfeiture is required of "any property, real or personal, which constitutes or is derived from proceeds traceable to … 'any offense constituting specified unlawful activity' or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C).

On several occasions, the defendant appears to suggest that because the forfeiture statute contains the word "traceable" to describe the required connection between the criminal activity and the defendant's ill-gotten gains, the government is required to conduct the sort of "tracing analysis" that accompanies the forfeiture of property as opposed to money. (Def. Let. at 3-6). Where the government seeks, as it does here, an in personam forfeiture money judgment

---

[1] The defendant states that the government "concedes that it could not seek forfeiture of any of the money that it sought from Mr. Shkreli because such money was not "traceable to, received by and/or controlled by Mr. Greebel." (Def. Let. at 2). This is incorrect. The shares are clearly traceable to the criminal actions of the defendant and Shkreli, as the Court has already recognized. (Dkt. No. 541 at 10-13). However, the government has determined not to seek forfeiture from the defendant of the value of the shares as it has already sought and received forfeiture of those funds from Shkreli, who most directly benefitted from the transfer of those shares.

3

against a defendant based on his ill-gotten gains as a result of his crimes of conviction, the Second Circuit has held that no particular tracing analysis is required. See, e.g., United States v. Awad, 598 F.3d 76, 78-79 (2d Cir. 2010) (holding that forfeiture is mandatory punishment, concerned with how much a defendant received in connection with his crimes, and need not be traced to identifiable assets in a defendant's possession) (cases cited therein omitted); Daugerdas, 837 F.3d at 231 (in mail and tax fraud case, rejecting defendant's argument that tracing of fees paid by clients into attorney's bank account from which defendant was paid was necessary); United States v. Diallo, 461 Fed. Appx. 27, 31 (2d Cir. 2012) (holding that tracing is not an issue when in personam forfeiture money judgment is sought). Further, courts that have had an opportunity to address the application of 18 U.S.C. § 981(a)(1)(C) in the context of a criminal forfeiture case (incorporated by reference by 28 U.S.C. § 2461(c)) have distinguished it from in rem civil forfeiture cases and held that no tracing is required. See e.g., United States v. Capoccia, 2009 WL 273301 at * 2-3 (D. Vt. 2009)(once forfeiture is incorporated into a criminal case via § 2461(c) it is a criminal forfeiture for all purposes; the tracing requirements that apply in in rem civil actions do not apply, even though the authorizing forfeiture statute is § 981(a)(1)(C)), aff'd, United States v. Capoccia, 402 Fed. Appx. 639, 640 (2d Cir. 2010); United States v. Padron, 527 F.3d 1156, 1161-1162, n. 6 (11th Cir. 2008) (when a civil forfeiture statute is incorporated into a criminal case via § 2461(c), it becomes an in personam criminal forfeiture statute under which the defendant is liable for a money judgment and finding, in dicta, that the government need not trace the forfeit property to the underlying offense). There is therefore no requirement that the government trace each specific dollar of ill-gotten gains from Retrophin to Katten to the defendant.

Moreover, to the extent the defendant argues that this court should outright reject the "but for" test as a basis for determining the defendant's forfeiture liability in this case (Def. Let. at 2), such a position is unwarranted. See, e.g., United States v. Nicolo, 597 F. Supp. 342, 346 (W.D.N.Y. 2009) (applying the "but for" test where defendants were charged with mail fraud and wire fraud); see also In Re 650 Fifth Ave, 777 F. Supp. 2d 529, 550 (S.D.N.Y. 2011) (recognizing the "but for" test as a generally accepted principle when assessing criminal forfeiture liability even though those words are not in the statutory definition of "proceeds") (cases cited therein omitted). While the government has incorporated the "but for" test in its forfeiture analysis and calculation, it has also specifically cited and applied the applicable "proceeds" statute, 18 U.S.C. § 981(a)(2)(B), and demonstrated by a preponderance of the evidence that Greebel acquired money (i.e. $ 476,249) through his illegal criminal conduct that should be forfeited.

III. The Defendant's Salary Represents Ill-Gotten Gains Acquired From His Criminal Conduct, and The Proposed Forfeiture Is Properly Calculated

As set forth at length in the government's opening brief, in connection with the defendant's participation in the conspiracies of which he was convicted, Shkreli directed to Katten significant payments both for outstanding legal bills and for additional business, culminating in the payment by Retrophin of millions of dollars in fees in FY 2014. These payments from Retrophin directly resulted in a significant increase in the defendant's salary in FY 2014—from $355,000 to $900,000—and a portion of that increased salary is subject to forfeiture as ill-gotten gains the defendant received as a result of his criminal conduct. The cases cited in Section I above—including Contorinis, Shabudin, Daugerdas, and Mahaffey—all make clear that

4

when a defendant's criminal conduct results in criminal proceeds (in the form of direct payments or in the form of increased profits) flowing to an employer, any corresponding benefit to the defendant from those proceeds, such as increased or retained compensation in the form of salary, commissions or bonuses, is available for forfeiture.

In his opposition to the government's motion for forfeiture, the defendant makes a number of factual arguments as to why the legal fees to Katten do not constitute criminal proceeds, and why even if those fees do constitute criminal proceeds, the government's proposed forfeiture is not properly calculated. These arguments are all unavailing.

First, the defendant argues that whether Retrophin paid its outstanding bills was "entirely outside of [the defendant's] control" because the defendant had "no say as to when Retrophin paid its bills," the funds that were ultimately paid by Retrophin to Katten cannot be considered proceeds of the defendant's criminal activity. (Def. Let. at 9-10). As an initial matter, there is evidence that the defendant did have the ability to influence Shkreli and/or Retrophin's payments to Katten. The record shows that the defendant insisted that Shkreli pay Katten before other parties to whom Retrophin owed money and strategized with Shkreli how to prioritize payments that Retrophin needed to make to ensure that Katten would be paid. (See, e.g., GX 513 (Shkreli lists various payments he plans to make on behalf of Retrophin from money raised from a new Retrophin investor, including to Merrill Lynch, and then the defendant states that Katten must be prioritized over certain other payments)). These discussions led Shkreli to pay hundreds of thousands of dollars to Katten for outstanding bills during a period (December 2012-February 2013) when Retrophin had virtually no assets and many other outstanding debts. The defendant also orchestrated the payment by Retrophin of MSMB's outstanding bills to Katten and worked to conceal those payments from Retrophin's outside accountants and ultimately to have them written off by Retrophin's auditors as bad debt. However, even if the defendant did not control exactly when Shkreli made specific payments to Retrophin, it was the defendant's criminal conduct that caused those payments to be made. See, e.g., Daugerdas, 837 F.3d at 231 (defendant was required to forfeit compensation he had received from fees paid by clients that were generated from his criminal conduct, even though there is no evidence to suggest that he had any "control" over whether those fees would be paid); Shabudin, 701 Fed. Appx. at 600-02 (defendant was required to forfeit his salary because his fraud resulted in the bank that employed him receiving funds under false pretenses, even though there is no evidence to suggest the defendant had "control" over whether his bank would in fact receive those funds).

Second, the defendant contends that the nexus between his criminal conduct and the portion of his salary that the government seeks to forfeit is "extremely tenuous" because the process of determining the defendant's compensation was "vague and complex," relied on multiple factors, and was ultimately set by the compensation committee and not by the defendant himself. (Def. Let at 6-10). Specifically, the defendant contends that the connection between the amount of money Retrophin paid to Katten and the fluctuations in his salary is "far too attenuated" because his compensation was affected by a number of factors, not just Retrophin's realization rate. (Id.). The defendant goes on to cite his work for virtual currency clients as an example of another factor that contributed to an increase in his salary. (Id.).

The government has never disagreed that the calculation of the defendant's annual salary was not set according to a rigid formula, nor has it disagreed that the defendant's

salary was based in part on business that the defendant brought in and completed for other clients as well as certain intangible factors. However, as the government detailed at length in its opening brief, it is clear—from evidence including the testimony of Ross Silverman and Retrophin's billing records—that the primary driver of the defendant's salary in FY 2014 was in fact the business that the defendant generated for Katten from Retrophin, as well as Retrophin's high realization rate. In other words, while the process of determining income partner compensation was generally based on a "holistic" analysis by the income committee, in FYs 2013, 2014 and 2015, the evidence showed that committee actually based its calculation of the defendant's salary primarily on the profits (or lack of profits) that Retrophin generated for Katten. Moreover, the government's proposed forfeiture money judgement takes into account the fact that the defendant's entire salary was not based on the business that Retrophin generated. Rather, it represents a conservative estimate by the government of the portion of the defendant's salary that was attributable to the profits to Katten that flowed from the defendant's criminal conduct. See United States v. Basciano, No. 03-CR-929 (NGG), 2007 WL 29439 at *2 (E.D.N.Y. Jan. 4, 2007).

Finally, the defendant contends that that "the government's arguments are based on two logically inconsistent theories of [the defendant's] motives" and therefore the "requisite nexus" is "insufficient." (Def. Let. at 10-11). The defendant further argues at length that there is no evidence to support the defendant's motives. (Def. Let. at 11-13).

To the extent that the defendant seeks to collaterally attack his conviction in the forfeiture phase by claiming he did not have the motive to commit the conspiracies of which he was convicted in Counts Seven and Eight, such argument should be summarily rejected. See United States v. Warshak, 631 F.3d 206, 331 (6th Cir. 2010) (affirming district court's refusal to let defendant introduce evidence tending to show his conduct was not illegal; in the forfeiture phase the legality of the conduct is "no longer a live issue;" the only question is the nexus between the conduct and the offense). The defendant has been found guilty of both conspiracies, so his motive for committing those crimes is now irrelevant. Rather, the only remaining question is what criminal proceeds flowed as a result of that criminal conduct to Katten, and whether the defendant himself received any of those proceeds.

The defendant further contends that the government's evidence regarding the nexus between the defendant's criminal conduct and the payments made by Retrophin to Katten is "overly speculative." (Def. Let. at 12). In support of this argument, the defendant cites to Basciano, 2007 WL 29439, at *4, and United States v. Barajas, 200 F.Supp.2d 575, 576 (E.D.N.C. 2002). Neither is persuasive.

First, in Basciano, the district court analyzed six different categories of forfeiture sought by the government, and found that in five of the six cases the government had both demonstrated a clear nexus between the criminal conduct and the proceeds it sought to forfeit, and had properly estimated the appropriate amount of forfeiture. 2007 WL 29439 at *3-*6. For the remaining category of forfeiture—related to profits earned by a defendant's illegal gambling schemes from poker machines—the Court found that while it was clear that the defendant "profited immensely from th[e] illegal business," there was only a single witness who testified to the amount of money generated by that business, and all such testimony was based on uncorroborated hearsay statements. Id. at *4. Consequently, the Court agreed that there was a

6

nexus between the criminal conduct and the profits received, but rejected the government's forfeiture calculation related to the poker machines as "too speculative." Id. In other words, the district court in Basciano did not find a lack of nexus between the criminal conduct and the proposed forfeiture, but simply rejected the government's calculation of that forfeiture as overly speculative because it was based entirely on statements from a single witness who himself testified to uncorroborated hearsay. Here, by contrast, the government has put in substantial evidence supporting its proposed calculation of the portion of the defendant's salary that was a direct result of the proceeds to Katten from the defendant's criminal activities.

In Barajas, the district court did find a lack of a nexus between the criminal conduct and the proposed forfeiture. However, in that case—where the defendant was convicted of participation in a wide-ranging marijuana conspiracy with more than a dozen members—the government broadly sought to forfeit "any and all property derived from [the defendant's] conspiracy to distribute marijuana" but failed to articulate what specific property or proceeds it was seeking, arguing instead that it was entitled to forfeiture based solely on the defendant's participation in the conspiracy even if the property to be forfeited was "unknown or unascertainable." Barajas, 200 F.Supp.2d at 576. The district court stated that because the government had not linked the defendant to any proceeds from the conspiracy—for example, there appears to be no evidence that the defendant earned any money from his involvement in the conspiracy—it could not enter an order of forfeiture. Id. at 577-58. Here, by contrast, the government has demonstrated that the defendant's participation in the conspiracies generated proceeds for Katten, some percentage of which ultimately accrued to the defendant.

IV. The Proposed Forfeiture Is Not Unconstitutionally Excessive

Finally, the defendant contends that the $476,249 forfeiture money judgment sought by the government is "grossly and unconstitutionally disproportionate to the crimes charged" and is thus in violation of the Eighth Amendment. (Def. Let. at 13-14). In making this broad assertion, the defendant neither articulates nor applies the relevant legal test. As set forth below, the defendant cannot meet his burden to show that the proposed forfeiture is constitutionally excessive.

As set forth in the Supreme Court's decision in United States v. Bajakajian, 424 U.S. 321 (1998), a forfeiture is deemed excessive only if it is grossly disproportionate to the gravity of the offense. In accordance with Bajakajian, the Second Circuit has identified the following factors as relevant to the proportionality assessment of a challenged criminal forfeiture:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the [defendant's] conduct.

Castello, 611 F.3d 116, 120 (2d Cir. 2010) (citations, internal quotation marks and alterations omitted); United States v. George, 779 F.3d 113, 122-123 (2d Cir. 2015). The burden rests on the

7

defendant to show that the forfeiture is unconstitutionally excessive.  See Castello, 611 F.3d at 120.  Here, each of the four Bajakajian factors weighs in favor of the proposed forfeiture.[2]

First, with respect to "the essence of [the defendant's] crime and its relation to other criminal activity," the defendant engaged in two wide-ranging multi-year conspiracies to commit wire fraud and securities fraud, and he participated in those crimes at the same very time that he ostensibly served as Retrophin's outside counsel.  While the defendant contends that he was "clearly a secondary figure in the crimes" and "reaped little benefit" from them (Def. Let. at 14), the defendant's "willful participation" in those conspiracies is in and of itself sufficient to "support the forfeiture."  United States v. Viloski, 814 F.3d 104, 113-14 (2d Cir. 2016) (finding that this Castello factor weighed in favor of forfeiture based on the defendant's "willful participation" in a "multi-year conspiracy" despite the fact that the defendant—an attorney who participated in a kickback scheme, passed the majority of the profits from the scheme to a co-defendant, and was convicted of inter alia, wire fraud and money laundering—claimed he was less culpable than his co-defendants); see also United States v. Jalaram, Inc., 599 F.3d 347, 356 (4th Cir. 2010) (finding, in concluding that the analogous Bajakajian factor weighed in favor of forfeiture, "that [the defendant] may have received only a small share of the proceeds, in and of itself, does not demonstrate that it played a minor role in the conspiracy. That fact establishes only that [the defendant's] participation in the conspiracy was not lucrative....").

Second, with respect to whether the defendant "fits into the class of persons for whom the statute[s] [under which he was punished were] principally designed, the defendant fits squarely within the class of persons for whom the federal wire fraud and securities fraud statutes were designed—namely, those who engage in fraudulent schemes to obtain money or property by fraud, or to deceive or defraud investors by engaging in market manipulation.  See, e.g., Viloski, 814 F.3d at 114.

Third, with respect to the "maximum sentence and fine that could [be] imposed," the statutory maximum sentence and fine that could be imposed for Count Seven is not more than 20 years' imprisonment and a $250,000 fine, and for Count Eight is not more than 5 years' imprisonment and $250,000 fine.  Furthermore, the government anticipates that the applicable advisory sentencing range under the Sentencing Guidelines for these offenses will be 108 to 135 months' imprisonment, with an advisory fine range from $15,000 to $150,000.  Because the proposed forfeiture is less than the statutory maximum fine (even though it is above the advisory

---

[2] Recently, the Second Circuit has stated that consideration of a fifth factor—whether the forfeiture itself would deprive a defendant of his livelihood—is also permissible when conducting an Eighth Amendment analysis regarding forfeiture.  United States v. Viloski, 814 F.3d 104, 111-12 (2d Cir. 2016).  However, the Second Circuit cautioned both that a "a forfeiture that deprives a defendant of his livelihood might nonetheless be constitutional" depending on how it is weighed with the remaining Castello factors, and that a defendant's present personal circumstances, such as age, health and financial circumstances, may not be considered as a discrete factor in the analysis.  Id.  Here, the defendant has not requested that the Court consider this fifth factor.  More significantly, as the defendant has not presented any evidence that the forfeiture itself would prevent him from earning a living upon his release from prison, this factor would also weigh in favor of the proposed forfeiture.

Guidelines range), this factor weighs in favor of the forfeiture's constitutionality.  See George, 779 F.3d at 123–24 (finding the third Bajakajian factor "points to no disproportionality" even where the challenged forfeiture exceeded the advisory Guidelines fine, because the forfeiture did not exceed the statutory maximum); Viloski, 814 F.3d at 114 (same).

Fourth, with respect to the "nature of the harm caused by [the defendant's] conduct," the defendant's crimes resulted in significant financial harm to both the public company that the defendant purported to represent, and resulted in the deception of the investing public. Specifically, the conspiracy of which the defendant was convicted in Count Seven resulted in more than $10 million in losses to Retrophin (in cash and stock),[3] and the conspiracy of which the defendant was convicted in Count Eight resulted in the manipulation of the price and trading volume of Retrophin's stock so that the public did not have accurate information on which to base its investing decisions.  As a result, this factor also weighs in favor of finding the proposed forfeiture constitutional.  See, e.g., Viloski, 814 F.3d at 114.

Thus, consideration of each of the four Bajakajian factors shows that the proposed forfeiture is not constitutionally excessive.

V.   Conclusion

For the reasons set forth above, the Court should impose against the defendant a forfeiture money judgment in the amount of $476,249, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and Rule 32.2.  The government respectfully requests that the proposed Order of Forfeiture filed with the government's initial motion (see Dkt. No. , Exhibit 1) be entered

---

[3] In a footnote, the defendant states that his criminal conducted resulted in "no victims requiring restitution." (Def. Let. at 14, n.1).  To the contrary, Retrophin is the victim of the conspiracy of which the defendant was convicted in Count Seven, and suffered more than $10 million in losses.  The government was unable to seek restitution for these losses from Shkreli, as he was acquitted of Count Seven.  However, as the defendant was convicted of Count Seven, restitution for those losses is mandatory pursuant to the Mandatory Victim Restitution Act.

Guidelines range), this factor weighs in favor of the forfeiture's constitutionality.  See George, 779 F.3d at 123–24 (finding the third Bajakajian factor "points to no disproportionality" even where the challenged forfeiture exceeded the advisory Guidelines fine, because the forfeiture did not exceed the statutory maximum); Viloski, 814 F.3d at 114 (same).

Fourth, with respect to the "nature of the harm caused by [the defendant's] conduct," the defendant's crimes resulted in significant financial harm to both the public company that the defendant purported to represent, and resulted in the deception of the investing public. Specifically, the conspiracy of which the defendant was convicted in Count Seven resulted in more than $10 million in losses to Retrophin (in cash and stock),[3] and the conspiracy of which the defendant was convicted in Count Eight resulted in the manipulation of the price and trading volume of Retrophin's stock so that the public did not have accurate information on which to base its investing decisions.  As a result, this factor also weighs in favor of finding the proposed forfeiture constitutional.  See, e.g., Viloski, 814 F.3d at 114.

Thus, consideration of each of the four Bajakajian factors shows that the proposed forfeiture is not constitutionally excessive.

V.   Conclusion

For the reasons set forth above, the Court should impose against the defendant a forfeiture money judgment in the amount of $476,249, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and Rule 32.2.  The government respectfully requests that the proposed Order of Forfeiture filed with the government's initial motion (see Dkt. No. , Exhibit 1) be entered

---

[3] In a footnote, the defendant states that his criminal conducted resulted in "no victims requiring restitution." (Def. Let. at 14, n.1).  To the contrary, Retrophin is the victim of the conspiracy of which the defendant was convicted in Count Seven, and suffered more than $10 million in losses.  The government was unable to seek restitution for these losses from Shkreli, as he was acquitted of Count Seven.  However, as the defendant was convicted of Count Seven, restitution for those losses is mandatory pursuant to the Mandatory Victim Restitution Act.

against the defendant as part of his sentence and attached to his Judgment and Conviction pursuant to Rule 32.2(b).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  /s/_____
Alixandra E. Smith
David C. Pitluck
David K. Kessler
Laura D. Mantell
Claire S. Kedeshian
Assistant U.S. Attorneys
(718) 254-7000

cc:     All counsel of record (via ECF)