**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

April 17, 2018

<u>VIA ECF</u>

The Honorable Kiyo A. Matsumoto
United States District Judge for the East District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    <u>United States v. Greebel</u>, S1 15 Cr. 637 (E.D.N.Y.)

Dear Judge Matsumoto:

On behalf of Evan Greebel, and pursuant to the Court's order at the April 13, 2018 forfeiture hearing, we respectfully submit this supplemental letter regarding forfeiture. As the Court recognized during the hearing, the forfeiture approach laid out by the government in its Motion and Reply is "overbroad[.]" Forfeiture Hrg. Tr. 144:2. Putting aside our arguments that this Court should reject the government's request for forfeiture entirely, should the Court impose forfeiture on Mr. Greebel, we submit that the amount should be limited to time attributable to Mr. Greebel relating to the discrete conduct at issue in Counts Seven and Eight.[1] Our calculation set forth herein reflects, as the Court so instructed, a "more granular

---

[1] The government's newly minted argument during the forfeiture hearing—one that did not appear in their papers prior to hearing—that Mr. Greebel may not have billed all of his time in connection with Katten's representation of Retrophin, Forfeiture Hrg. Tr. 143:15–19, contradicts the very theory advanced by the government that Mr. Greebel was motivated primarily by his revenue generation with respect to Katten's Retrophin-related work. If Mr. Greebel was trying to maximize the amount of revenue Katten received, Mr. Greebel would have billed all of his time. As multiple witnesses testified, and as is the norm in law firms across the country, Katten generated revenue by billing time; if Mr. Greebel did not bill time for work, then Retrophin did not make any payments to Katten for that money and none of that time and/or money would have been a factor in the non-equity partner compensation committee's determination of Mr. Greebel's compensation. Furthermore, we base our calculation on Mr. Greebel's billable time because the government's theory on the way to measure Mr. Greebel's punishable conduct is to look at the connection (however attenuated) between the payments that Katten received from Retrophin, the payments that Mr. Greebel received from Katten, and the conduct at issue in Counts Seven and Eight. The government's attempt to argue that the Court should

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 17, 2018
Page 2

way" to account for the narrow conduct at issue in this case. *Id.* 138:12; *see* Defendants' Forfeiture Hearing Ex. 7, included herewith as Exhibit A (laying out our proposed calculation and attaching relevant time sheets).

We therefore request that should the Court grant the government's motion for forfeiture and reject our position on why forfeiture is not appropriate, the Court limit such forfeiture to the amount of $10,477.48, *id.*, which is the sum total of the discrete conduct relating to Count Seven and Count Eight reflected in the time entries for Retrophin work. Our calculation constitutes a reasonable attempt to quantify the actual time Mr. Greebel (and other attorneys who worked on the settlement and consulting agreements at issue) spent on allegedly criminal conduct and thus represents an appropriate measure of the punishable behavior. *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) ("Requiring the government to link assets to specific crimes of conviction is not only consistent with the punitive purposes of criminal forfeiture, but also implements Congress's intent[.]" (citation omitted)).

To the extent possible and to avoid unnecessary disputes as to the assumptions underlying our calculation, our proposed calculation is based on our accepting (for the sole limited purpose of this letter) the government's representations made in its forfeiture briefing. This includes, for example, the time period during which the Count Seven and Eight conduct took place and the amount Mr. Greebel's compensation increase was attributable to the Retrophin-related work performed by Mr. Greebel and his colleagues.

*First*, based on the government's arguments in its forfeiture motion and the evidence at trial, with respect to Count Seven the relevant behavior occurred between February 2013 and March 2014, as evidenced by the following government claim that "between approximately February 2013 and March 2014, Shkreli and Greebel engaged in a series of negotiations with defrauded MSMB investors and ultimately forced Retrophin to enter into a series of settlement and sham consulting agreements." Dkt. 573 at 6. With respect to Count Eight, the evidence showed that the alleged conduct began in approximately November 2012 and concluded in or about February 2013 (following the closing of the February 2013 "PIPE").[2]

---

consider time that Mr. Greebel did not bill further demonstrates our initial concerns as to the stretched and attenuated connection advanced in the government's motion for forfeiture.

[2] It is undisputed that the Retrophin-Desert Gateway reverse merger occurred in December 2012. Evidence shows, however, that Katten's work on this transaction began at least as early as November 2012, if not sooner. We have chosen to use November as a

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 17, 2018
Page 3

Thus for the purposes of this letter, the outer bounds for the appropriate period over which his conduct should be judged ranges from November 2012 (the beginning of Mr. Greebel's Count Eight conduct) to March 2014 (the end of Mr. Greebel's Count Seven conduct).[3]

**Second**, with respect to Count Seven, the government states that Mr. Greebel "billed Retrophin directly for his work in connection with drafting, executing and directing Retrophin to pay the settlement and sham consulting agreements[.]" Dkt. 573 at 6. The government overlooks, however, that the amount of fees collected by Retrophin *relating to the settlement and consulting agreements at issue in Count Seven* is a very small fraction of the total Retrophin-related fees collected in the relevant time period. Specifically, between February 2013 and March 2014, all Katten attorneys (including Mr. Greebel and any attorneys working with him) billed a grand total of 96.1 hours in connection with the settlement or consulting agreements. *See* Defendant's Forfeiture Hearing Ex. 7.[4] The time entries included in this calculation (i) all entries that directly reference any of MSMB investors Lindsey Rosenwald, Sarah Hassan, David Geller, Spencer Spielberg, Richard Kocher, and Michael Lavelle, as well as consultants Darren Blanton and Alan Geller (or any of the attorneys or representatives for the foregoing investors). Of the 7,101.9 Retrophin-related billable hours between November 2012 and March 2014, this Count Seven conduct constitutes only 1.4 percent of the Retrophin-related work performed by Mr. Greebel or those attorneys who worked on such agreements.

Similarly, with respect to Count Eight, an appropriate forfeiture amount should correspond to the discrete conduct attributable to Mr. Greebel or those attorneys who worked on the

---

reasonable interpretation of the time over which the Count Eight conduct occurred. If we included a broader date range, it would result in a lower proposed forfeiture calculation.

[3] We note that, to the extent the government alleges that Mr. Greebel's actions ranged beyond the date range articulated above, we have chosen this period in an effort to reasonably calculate a forfeiture amount based on the evidence cited in the government's motion and elicited at trial. As a broader date range would result in an even lower proposed forfeiture calculation, this date range is a conservative but reasonable calculation with respect to the period of time at issue, assuming that the Court does not deny the government's motion entirely.

[4] We attempted to be as over-inclusive as possible and thus include time entries by any Katten timekeeper relating to the specific consulting and settlement agreements at issue in this case. In addition, rather than attempting to parse individual time entries that cover multiple tasks, we attempted to include the full time attributed to any entry that includes relevant conduct.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 17, 2018
Page 4

issuance or trading of Fearnow shares, filings with the Securities and Exchange Commission relating thereto (including Mr. Shkreli's Form 13D filing), and other related activity and emails related to the foregoing.[5]  As noted above, Katten began working on the Desert Gateway transaction in November 2012, and that work continued through approximately

---

[5]  The government seemed to inquire as to whether the litigation between Mr. Shkreli, Retrophin, and Timothy Pierotti should be included among the Retrophin-related matters attributable to Count Eight.  As with the government's general forfeiture arguments, however, the connection between the Pierotti litigation and the Count Eight conduct is far too attenuated to be properly included in a reasonable forfeiture calculation.  The government argues that this litigation was "directly related to the market manipulation conspiracy," Dkt. 573 at 6, but—as with many of the other matters excluded from our calculation—the Pierotti litigation was legitimate legal work that took place independent from the discrete acts charged in Count Eight.  The attorneys who worked on this litigation, none of whom are implicated in the charges against Mr. Greebel, also conducted their own due diligence as to the matter.  Indeed, Mr. Howard Cotton, a senior litigation partner at Katten, testified at trial that it was a good litigation and he and his litigation partner (Michael Gordon) took all appropriate action prior to commencing the litigation (including "review[ing] documents and conduct[ing] witness interviews").  Tr. 8874:13–8875:4.

Mr. Cotton also testified that the "steps [those attorneys] took in connection with the Pierotti litigation were no different, and entirely consistent with[,] the steps that [were] outlined before in any other litigation."  *Id.*  8874:13–15.  Mr. Cotton and his team undertook "due diligence to determine whether or not the claim that [they] were considering bringing was a solid claim that would stand up in court, and that the allegations that [they] were hearing about from Mr. Shkreli were supportable."  *Id.*  Mr. Cotton also testified that Mr. Greebel was not involved in the due diligence phase before the litigation was filed and neither gave direction regarding the litigation nor attended any hearings.  Tr. 8894:6–8895:5.  It is too large a leap to turn such unrelated and legitimate legal work into criminal conduct for the purposes of calculating forfeiture.

Moreover, Mr. Greebel was not charged with filing a false lawsuit; the lawsuit against Mr. Pierotti was filed well after Retrophin's February 2013 PIPE (which the government claims was directly related to Mr. Shkreli and Mr. Greebel's alleged motive on Count Eight); and the lawsuit took place long after the period relied on in Deborah Oremland's testimony as indicative of Mr. Shkreli's attempt to maintain control over the Fearnow shares.  For all of these reasons, the connection between Count Eight and the Pierotti litigation is too attenuated to be included in the Count Eight forfeiture calculation.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 17, 2018
Page 5

March 2013.  In total, Mr. Greebel and his colleagues billed 57.1 hours in connection with the issuance or trading of Fearnow shares, and any filings required under the securities laws related thereto (including Mr. Shkreli's Form 13D filing).  This Count Eight conduct represents only 0.8 percent the total 7,101.9 Retrophin-related billable hours during the relevant time period.

Accordingly, ***the total number of billable hours relating to Counts Seven and Eight amounts to 2.2 percent of the total Retrophin-related billable work performed by Katten in the relevant time period***.  At most, therefore, even assuming *arguendo* that the Court applies the government's strained (and unwarranted, in our view) causation argument, only 2.2 percent of Mr. Greebel's $476,249 pay increase is attributable to Mr. Greebel's conduct connected to Counts Seven and Eight.[6]  The remainder of his salary increase, whether resulting from Retrophin-related work or otherwise, was "legitimately obtained"; does not constitute "proceeds" arising from the alleged crimes; and thus is not subject to forfeiture.  *United States v. Odom*, 2007 WL 2433957, at *7 (S.D. Miss. Aug. 22, 2007) (rejecting request of forfeiture where the assets sought had been "legitimately obtained" and thus were not proceeds from alleged crimes); *see also United States v. Juluke*, 426 F.3d 323, 327-28 (5th Cir. 2005) ("[I]t is inconsistent with the purpose of the statute to permit forfeiture not tied to the specific criminal acts of which the defendant was convicted."); *United States v. Nicolo*, 597 F. Supp. 2d 342, 356-57 (W.D.N.Y. 2009) (rejecting forfeiture where alleged "connection . . . between [the] properties and [the defendant's] money laundering . . . was

---

[6]  Even if the court found that some forfeiture was appropriate but wanted to use a calculation other than what we propose above, the government's estimate of $476,249 is grossly inflated for many of the reasons articulated in our previous forfeiture submission and at the hearing.  Indeed, as testimony and documents demonstrated, Mr. Greebel's year-over-year pay increase is attributable to many factors.  As multiple people testified at trial, compensation at Katten is determined in a "holistic" manner, *see, e.g.*, Tr. 6596:7–12 & 6619:22–6620:3 (testimony of Ross Silverman); Tr. 1272:2–1276:10 (testimony of Bernadette Davida), and many factors were considered for Mr. Greebel, including, for example, his significant involvement in founding Katten's virtual currency practice, his related work generating significant revenue from high-profile clients in the Bitcoin space, his work for other clients, Mr. Greebel's total billable hours, and his service on firm committees.  *See, e.g.*, GX 121-7; Tr. 6614:21–23;  Tr. 8379.  Thus while we adopt the government's estimate for the purposes of making a reasonable calculation, the government's estimate vastly overstates the amount of Mr. Greebel's pay increases that is marginally related to Retrophin and improperly attributes that increase in full to Mr. Greebel's Retrophin-related work.

**GIBSON DUNN**

The Honorable Kiyo A. Matsumoto
April 17, 2018
Page 6

simply too incidental and insubstantial to support the forfeiture"); *United States v. Rodriguez*, 2005 WL 4163786, at *2-3 (D.N.J. June 6, 2005) (rejecting part of the government's forfeiture request because the government only proved by a preponderance that "most, but not all, bank deposits" were part of the illegal transaction-structuring scheme); *id.* (because "certain days . . . did not constitute a pattern of illegal structuring activity," forfeiture of assets deposited on those days was inappropriate).

Accordingly, while we maintain that forfeiture is inappropriate in light of the speculative and attenuated leaps necessary to sustain the government's argument, if the Court were to grant the government's motion the appropriate forfeiture amount is $10,477.48.[7]  This is particularly true where Mr. Greebel "was clearly a secondary figure in the crimes" and where Mr. Greebel "reaped little benefit: while the scheme earned [other participants in the scheme] millions of dollars, [defendant] received no direct share of the proceeds."[8] *United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997) (vacating a district court's forfeiture order as "grossly disproportionate" and where the defendant's "motive appears to have been a misguided loyalty to [co-defendant], rather than a direct interest in the success of the scheme" ).

We appreciate the Court's consideration of our submission.

Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky

---

[7]  For the removal of doubt, this amount represents 2.2 percent of $476,249.

[8]  Indeed, it bears repeating that Mr. Greebel did not receive any direct payments from Retrophin or Mr. Shkreli and did not receive any shares from Retrophin or Mr. Shkreli, let alone any profits from Mr. Shkreli or the frauds alleged against him (including Counts One through Six with which Mr. Greebel was not charged).