# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

April 19, 2018

VIA ECF

The Honorable Kiyo Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brookly, NY 11201

Re:   *United States v. Greebel*, S1 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

On behalf of Evan Greebel, in response to the Court's request at the hearing on Friday, April 13, 2018, we respectfully submit this supplemental response regarding evidence at trial relating to the significant commingling between Retrophin Inc. and the MSMB Entities and of Mr. Greebel's knowledge thereof. With respect to our motion under Federal Rule of Criminal Procedure 33 related to the Court's denial of our requested veil-piercing and *alter ego* jury instruction, the Court expressed its "concern . . . that I didn't feel there was evidence in the record that would support it." Hearing Tr. 75:18–19 (Apr. 13, 2018). Your Honor thus "invite[d] [Mr. Greebel] now to tell [the Court] where it was, what specific evidence there was that Mr. Greebel considered veil piercing and *alter ego*." *Id.* 75:19–22. Accordingly, we submit this sampling of evidence relating to Mr. Greebel's knowledge of the commingling between the MSMB Entities and Retrophin and Mr. Greebel's consideration of potential veil-piercing and *alter ego* risk.

*First*, we briefly review the relevant facts with respect to our request for a veil-piercing and *alter ego* jury instruction. At the December 8, 2017 charging conference, the Court stated that our proposed jury instruction would "muddle up the record and confuse the jury," on the grounds that the jury would "wonder what evidence there is that Mr. Greebel was even aware" of potential *alter ego* and veil-piercing liability. The Court explained that the "strongest bit of evidence" regarding Mr. Greebel's defense on Count Seven was that "Mr. Greebel was aware that people were suing" and that "it [did not] really matter whether it was under an *alter ego* theory . . . or whether it is torts or conversion or unjust enrichment." Tr. 8814 (Dec. 8, 2017). The Court continued that because (at the time of the settlement agreements) Mr. Greebel "knows there are threats[,] . . . the other details or the possible theories" of potential investor lawsuits would confuse the jury and the requested instruction

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
April 19, 2018
Page 2

was thus unnecessary. *Id.* 8814:5–24. In short, because "the cleanest, most basic, most compelling evidence . . . in the record" was "that these threats were made by lawyers and by investors," introducing the concept of *alter ego* and veil-piercing liability was unnecessary. *Id.* 8815–17.

**Second**, at the April 13, 2018 hearing, the Court raised its concern that an *alter ego* and veil-piercing instruction would have confused the jury in the event there was insufficient evidence to support the charge. The Court specifically requested brief citations to relevant evidence as to Mr. Greebel's knowledge of the commingling between the MSMB Entities and Retrophin. We note respectfully that the Court focused primarily on the commingling of money among these entities, and while ample evidence exists to show that the entities shared overlapping bank accounts (*e.g.*, GX 908 at JPMC-001281 (Chase account statement addressed to "Retrophin LLC ATTN MSMB)) and often paid each other's bills (*see infra* GX 510), it should be noted that the viability of a veil-piercing or *alter ego* claim is based on a number of related factors.

Indeed, as we noted in our post-trial brief, *see* Dkt. 530 at II.B.1, "an *alter ego* analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized . . . whether the corporation was solvent; whether . . . corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." *See, e.g.*, *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988), *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989), and *aff'd sub nom. Appeal of J.L. Capano, Inc.*, 879 F.2d 857 (3d Cir. 1989), and *aff'd* 879 F.2d 860 (3d Cir. 1989). Thus, this multi-factor analysis attempts to evaluate, at some general level, the degree to which there has been a disregard for the requisite formalities that would ordinarily allow for separate and distinct corporate entities.

Accordingly, the following pieces of documentary and testimonial evidence constitute a sampling of the evidence at trial relating to the substantial commingling between the MSMB Entities and Retrophin.[1]

---

[1] As noted, the above citations are a sampling of the evidence relating to the commingling between the MSMB Entities and Retrophin, and nothing about this selection of evidence constitutes a waiver of Mr. Greebel's rights with respect to the record evidence as it existed during and after trial.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
April 19, 2018
Page 3

1. GX 111-1 (Jan. 12, 2012) (Jackson Su's Employment Agreement, which lists "Martin Shkreli, MSMB Capital Management LLC, MSMB Healthcare Management LLC, MSMB Isotope LLC, SurePoint Fund Management LLC, Retrophin LLC, and its affiliated entities" as the companies employing Mr. Su).

2. DX 111-21 (June 21, 2012) (email chain regarding Retrophin business in which Mr. Su was using his MSMB Capital email address).

3. GX 445 (Sept. 5, 2012) (Mr. Kravitz sending an updated "Retrophin capitalization table" to Mr. Shkreli at the email address martin@msmbcapital.com; Mr. Greebel is copied on the email).

4. DX 104-51 (Sept. 10, 2012) (Retrophin press release announcing Stephen Aselage as CEO and listing Tom Fernandez, President of MSMB Capital, *as the Retrophin contact*) (emphasis added).

5. GX 510, at R049754 (Dec. 31, 2012) (Mr. Greebel reminding Mr. Shkreli that "*[R]retrophin paid a portion of msmb [sic] bills at your direction*"; telling Mr. Shkreli that "msmb *[sic]* could pay its own bill (which *[R]retrophin had previously paid*"; and Mr. Shkreli responding that "Msmb *[sic]* cannot pay [R]etrophin's bills *any further*") (emphasis added).

6. GX 114-16 (Dec. 31, 2012) (memorandum reflecting the fact that "[d]uring the year 2012, Retrophin paid on behalf of MSMB . . . an aggregate amount of approximately $563,000 to Katten Muchin Rosenman LLP[.]").

7. DX 110-14 at F-12 (Dec. 31, 2012) (Retrophin Form 10-K, publicly disclosing to the public and the Securities and Exchange Commission that Retrophin had (i) engaged in several related-party transactions; (ii) received $7,500 and $30,000 advances in October and November 2011 from a company "related through common ownership"; (iii) paid a $137,547 security deposit "on behalf of an affiliate" in August 2012; assumed that affiliate's lease in April 2013; and (iv) paid an "aggregate amount of $563,380 in legal fees on behalf of the same affiliate" in 2012.).

8. GX 100-16 (Feb. 19, 2013) (litigation threat letter from counsel for Dr. Lindsey Rosenwald explaining its "effort to resolve . . . claims against you MSMB Capital Management LP ('MSMB Capital') *and Retrophin, Inc. ('Retrophin')* prior to Dr. Rosenwald commencing litigation. . . . If you reject Dr. Rosenwald's settlement offer, Dr. Rosenwald will pursue all available remedies . . . against *you, MSMB Capital and Retrophin*.") (emphasis added).

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
April 19, 2018
Page 4

9. GX 104-5A (Mar. 12, 2013) (email exchange between Mr. Shkreli and Richard Kocher, with Mr. Greebel cc'd, in which Mr. Kocher writes to Mr. Shkreli that he is "aware that you manage both companies" and that "our hedge fund [MSMB] . . . funded Retrophin directly").

10. DX 1902 (Mar. 25, 2013) (Mr. Greebel instructing Mr. Shkreli's sister to "not refer to Retrophin and MSMB Capital as the same personnel of the same company" because "there are *significant legal implications which we want to avoid*") (emphasis added).

11. GX 113-17 (Mar. 31, 2013) (Mr. Shkreli emailing with Citrin Cooperman audit team, cc'ing Mr. Greebel, regarding "Open Items" relating to Retrophin's "bank activity"; statement shows account activity *not* limited to Retrophin and, in addition to multiple "[d]ebt repayment[s]" and "wire transfer[s]," shows bill payments for MSMB vendors (including Bloomberg, IMS Health, Inc., Thomson Reuters, and Kinexum) in connection with "MSMB Healthcare LP" (1/18/2013, 1/31/2013, 2/1/2013, 2/4/2013, 3/1/2013, 3/4/2013) and "MSMB Capital" (1/22/2013).[2]

12. GX 563 (Apr. 17, 2013) (Mr. Shkreli explaining to Mr. Greebel that "*Retrophin will be making the payment*" for Sarah Hassan's settlement agreement; directing Mr. Greebel to revise that agreement to "releas[e] any liability from Retrophin"; and noting that the release is "one of the reasons or benefits of the exchange") (emphasis added).

13. GX 844, at R048630 (Aug. 23, 2013) (Katten invoice dated August 23, 2013 showing discussions of "alter-ego allegations"); *id.* at R048637 (Michael Gordon's July 15, 2013 time entry for "confer[ring] with E. Greebel re: alter ego allegations").

14. DX 120-34 (Mar. 31, 2014) (Settlement Agreement with Timothy Pierotti in which both "Retrophin and MSMB Capital Management LLC" and all current and future owners, parents, subsidiaries, and related entities are released and discharged Mr. Pierotti.).

---

[2] We note that while GX 113-17 shows an email to Mr. Shkreli, Mr. Greebel received this list on March 29, long before Retrophin paid any settlement agreements, and thus, at a minimum, the examples cited above show Mr. Greebel was well aware that Retrophin was frequently paying bills for MSMB obligations and that the services provided were being utilized by either or both entities.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
April 19, 2018
Page 5

15. Tr. 4262:22–4263:4 (Mr. Massella testifying as to Retrophin's payment of MSMB bills).

16. Tr. 2077:24-2078:7 (Steven Richardson admitting that Retrophin and MSMB Capital "were using the same office space," "sharing resources," and "sharing staff").

17. Tr. 4089:18-4099:1 (Corey Massella agreeing that "leases and rent were being split between MSMB Capital and Retrophin" and that there was "[m]oney going both ways" between MSMB Entities and Retrophin).

18. Tr. 4639:2-10 (Stephen Aselage admitting that "Retrophin's original office space was actually where MSMB existed" and that "employees of MSMB were being . . . transferred to become employees of Retrophin").

19. Tr. 4736:20–4737:3 (Jackson Su testifying that Retrophin paid the rent at 777 Third Avenue despite the fact that MSMB Capital was the entity listed on the lease).

20. Tr. 5220:18-21 (Jackson Su admitting that "there were commingled monies" and that "the money of Retrophin was mixed in with the money of MSMB").

21. Tr. 5245:14–16 (Jackson Su testifying that when he worked there, "both MSMB and Retrophin shared office space").

22. Tr. 5878:21-24 (Timothy Pierotti explaining that, as between the MSMB Entities and Retrophin, "they were all interchangeable to me").

In addition to the examples cited above, the government has itself admitted that there was significant commingling between the MSMB Entities and Retrophin. In its brief opposing Mr. Shkreli's Motion to Suppress certain documents, for example, the government argued that "Shkreli [c]ommingled [b]usiness [r]elated to the MSMB Entities and to Retrophin[.] . . . The three entities were run by Shkreli out of the same physical space. . . . The MSMB entities and Retrophin also shared many of the same employees, and Shkreli caused MSMB Healthcare to invest millions of dollars in Retrophin." Dkt. 189 at 12. The government further argued at oral argument on that motion that Mr. Shkreli "commingled funds" and "commingled documents" between MSMB and Retrophin, Hearing Tr. 25:18-20 (Apr. 26, 2017), and that "MSMB [email] addresses were being used to conduct Retrophin business so the [MSMB and Retrophin] documents were commingled for a very long time." *Id*. 15:21-23; *see also id*. 25:18-25 ("Like I said, [Mr. Shkreli] commingled funds, he commingled documents, he—the idea that he paid for the servers, again, we have no affidavit. In fact he

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
April 19, 2018
Page 6

caused Retrophin to pay for the servers, for everything.") (emphasis added); Dkt. 189, at 13 ("Shkreli continued to use an MSMB Capital email address to conduct business on behalf of Retrophin until at least September 2014.").

***Third***, the Court noted at the April 13, 2018 hearing that the *alter ego* and veil-piercing charge was ultimately not included in the final jury instructions and suggested that Mr. Greebel should have re-raised the issue with the Court after the Court essentially denied our request for an *alter ego* instruction at the charging conference. *See* Hearing Tr. 74:7–13. But as explained above, at the December 8, 2017 charging conference, the Court made clear its considerable doubts as to the relevance of an *alter ego* and/or veil-piercing instruction. *See, e.g.*, Tr. 8808:2-10 ("Then we have alter ego. . . I was getting a little wind of this, I guess, in Ms. Klein's proposed disclosures where she talked about piercing the corporate veil, which has absolutely no relationship or relevance or application in this case. . . . The defense is proposing alter ego. I am not going to give a veil piercing. How is veil piercing even relevant?"). The Court expressed these doubts despite its prior recognition that (i) there was "no doubt that as an attorney [Mr. Greebel] and Mr. Shkreli perceived the investor statements as threats that could involve litigation not just against Mr. Shkreli and MSMB but against Retrophin," Tr. 3436:24–3437:2; and (ii) "Mr. Greebel was aware of the commingling of funds" between Retrophin and the MSMB Entities, *id.* 8070:8–9.[3]

Keeping in mind the Court's statements, we told the Court that "our client ha[d] heard [the Court]" and that "we would like to think about it. We'd like to think about [the Court's] comments, and we will talk to [Mr. Greebel] this weekend in light of Your Honor's comments." Tr. 8814:25-8815:3. We feel the Court had rejected our request and we decided not to raise it again. We believe we preserved the issue and would ask the Court to reconsider in light of the above-referenced evidence, along with the complete trial record.[4]

---

[3] In order for Mr. Greebel to have entered into the settlement agreements in good faith, he need not have determined that a plaintiff would *win* litigation based on *alter ego* or veil-piercing claims. Instead, as with the litigation threats, it is enough that he was aware that certain factors—*e.g.*, shared ownership, management, office space, email addresses, and potentially commingled finances—militated in favor of such claims and thus posed legitimate legal risk.

[4] We do not address here the consequences of the failure to give an *alter ego* and veil-piercing instruction. Those issues are outlined in our opening and reply briefs in support of our motions under Federal Rules of Criminal Procedure 29 and 33. *See* Dkt. 530 at II.B.1; Dkt. 574 II.A.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
April 19, 2018
Page 7

We thank the Court for its consideration of this submission.

Respectfully submitted,

***/s/ Reed Brodsky***

Reed Brodsky