

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES/DCP/DKK                        *271 Cadman Plaza East*
F.#2014R00501                       *Brooklyn, New York 11201*

May 14, 2018

<u>By Hand and ECF</u>

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:   United States v. Evan Greebel
            <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

       The government respectfully submits this letter pursuant to the Court's order dated April 18, 2018 that the parties should, "[w]ithin one week of receiving the Pre-Sentence Report … file simultaneous submissions regarding the loss amount in this case."[1]

       Pursuant the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the appropriate calculation of the loss amount caused by the defendant Evan Greebel is approximately $14.4 million.  Specifically, the defendant caused a loss of approximately $10,447,979.00 to Retrophin as a result of his participation in the conspiracy to steal money and shares from Retrophin via the settlement and sham consulting agreements (Count Seven), and the defendant caused approximately $4 million in intended losses as a result of his participation in the conspiracy to control the price and trading volume of Retrophin stock (Count Eight).  This amount falls within the $9.5 million to $25 million offense level bracket in Section 2B1.1(b)(1), and results in a 20-level increase in the applicable offense level.  <u>See</u> U.S.S.G. § 2B1.1(b)(1)(k).

       As set forth herein, these loss amounts are based on the evidence presented at the eleven-week trial in this case, at which Greebel was convicted of wire fraud conspiracy with respect to Count Seven and securities fraud conspiracy with respect to Count Eight.  Such evidence is already detailed exhaustively in PSR and in the government's response to the defendant's Rule 29 and 33 motions (<u>see</u> Dkt. No. 563).  Probation has also adopted these loss amounts as the legally correct loss amounts for Guidelines purposes.  (<u>See</u> PSR ¶¶ 49-51). The

---

[1] The Pre-Sentence Investigative Report ("PSR") was disclosed to the parties by the Probation Department ("Probation") on May 7, 2018.

loss calculation for Count Eight advanced by the government and Probation here also is identical to the loss calculation that this Court previously adopted in sentencing the defendant's co-conspirator Martin Shkreli, who was also convicted on Count Eight. (See Dkt. No. 535 at 90-95).

## I.     Applicable Law

A defendant who commits an offense involving fraud or deceit will be held accountable for the greater of their actual or intended loss.  U.S.S.G. § 2B1.1, comment. (n.3(A)) (emphasis added).  Actual loss "refers to the reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss means the "pecuniary harm that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur."  Id.  The Guidelines further define "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and "reasonably foreseeable pecuniary harm" as that harm that the "defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id.

The amount of loss attributable to a particular defendant at sentencing includes all relevant conduct for which that defendant is responsible.  According to U.S.S.G. § 1B1.3(a), relevant conduct for sentencing purposes is assessed on the basis of:

(1)     (A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)     in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a), comment. (n.2).

After the scope of the defendant's relevant conduct is determined, a court must make a "reasonable estimate" of the loss amount for the defendant's offense or offenses.  U.S.S.G. § 2B1.1, comment. (n.3(C)).  A "court need only make a reasonable estimate of the loss resulting from the defendant's crime[s]."  United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008).  "The sentencing court is not required to calculate the amount of loss with certainty or precision."  United States v. Norman, 776 F.3d 67, 79 (2d Cir. 2015).  "In keeping with this philosophy, it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown."  United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997); see also U.S.S.G. § 2B1.1, comment (n.3(C)) (a court may consider, among other things, the "approximate number of victims multiplied by the average loss to each victim," and "general factors, such as the scope and duration of the offense").  In fact, in applying the Guidelines to cases involving large-scale or complex fraud, the Second Circuit has repeatedly recognized the inherent imprecision of loss

2

computations and emphasized the discretion accorded sentencing judges in estimating loss based on the available facts. See, e.g., United States v. Sutton, 13 F.3d 595 (2d Cir. 1994) (rejecting a challenge to the district court's use of estimates and assumptions derived from the available facts to approximate loss, noting that amount of loss "need not be determined with precision" and that the loss figure may "be based on the approximate number of victims and an estimate of the average loss to each victim") (quoting former language of U.S.S.G. § 2F1.1, comment. (n. 8)); United States v. Lohan, 945 F.2d 1214 (2d Cir. 1991) (upholding the district court's loss computation as reasonable where it was based on the number of investors called and the amount solicited from each as a measure of intended loss); United States v. Burns, 104 F.3d 529 (2d Cir. 1997) (upholding district court's loss computation based on estimates).

Finally, like all facts pertinent to sentencing, a sentencing court need only determine the loss amount by a preponderance of the evidence. See, e.g., United States v. Coppola, 671 F.3d 220, 250 (2d Cir. 2012). This determination is reviewed for clear error and is entitled to deference, particularly where "the sentencing judge also presided over a weeks-long trial and heard a great deal of live testimony." United States v. Lacey, 699 F.3d 710, 720 (2d Cir. 2012).

## II.    The Total Loss for Greebel's Two Fraud Schemes is Approximately $14.4 million

### A.    Loss Calculation for Count Seven

With respect to Count Seven, the defendant was convicted of a conspiracy to steal money and shares from Retrophin via a series of settlement agreements and sham consulting agreements in order to repay hedge fund investors that had been defrauded by Shkreli. (See Dkt. No. 563 at 5-40). The actual loss to Retrophin—that is, the "reasonably foreseeable pecuniary harm" that resulted from the offense"—that resulted from the settlement agreements, as well as sham consulting agreements with defrauded MSMB Healthcare investor Alan Geller and defrauded MSMB Capital investor Darren Blanton,[2] is approximately $10,447.979. (PSR ¶¶ 39-40, 50). That loss amount is the sum of: the amount of money taken directly from Retrophin's bank accounts to satisfy the settlement and sham consulting agreements; the value of Retrophin shares that were transferred directly from Retrophin to satisfy the settlement and sham consulting

---

[2] At the trial of the defendant, the government introduced evidence demonstrating that the sham consulting agreements between Retrophin and defrauded Alan Geller, and between Retrophin and Blanton, were part of the charged wire fraud conspiracy. (See Dkt. No. 563 at 19-29). During the trial of co-defendant Shkreli, the government also introduced evidence of a third sham consulting agreement between Retrophin and an entity called EFAY (a partnership related to investor George Yaffe, who was defrauded by Shkreli in connection with the Elea Capital hedge fund), which resulted in an actual loss to Retrophin of $489,200. (See PSR ¶ 39; see also Shkreli Tr. 4360-4562; Shkreli Gov't Exs. 60, 116-4, 116-5, 116-8, 116-10, 116-11, 116-14, 116-16, 116-18, 116-19, 116-20, 116-22). While the loss to Retrophin from the EFAY sham consulting agreement was "reasonably foreseeable pecuniary harm" that resulted from the conspiracy charged in Count Seven, the government is not seeking to include this amount in the loss calculation.

agreements; and the value of escrowed Fearnow shares whose allocation was directed by the defendant and Shkreli to satisfy certain settlement agreements.  (Id.).[3]

In order to estimate the value of the Retrophin shares used to satisfy the settlement and sham consulting agreements, Probation multiplied the number of shares by the value of those shares on the date that they were transferred to the defrauded investor in question.  (Id.).  For example, the defendant and Shkreli caused Retrophin to transfer 6,000 shares to defrauded MSMB Healthcare investor Spencer Spielberg on May 28, 2013 pursuant to a settlement agreement.  As Retrophin's share price on May 28, 2013 was $5.25—pursuant to GX 955, the daily closing price for RTRX as publicly reported by Bloomberg—the estimated value of the shares stolen from Retrophin and transferred to Spencer Spielberg was $43,500.  (PSR ¶ 39).  Probation's method produces a conservative estimate of the value of those shares on the date that they were stolen from Retrophin by the defendant and his co-conspirators.[4]

Finally, the majority of the money and shares that were used to satisfy the settlement and sham consulting agreements were stolen directly from Retrophin.  In the case of cash payments, the money was transferred directly from Retrophin's bank account (GX 910-E), while the shares were taken from Retrophin and transferred by Standard Registrar to the defrauded investors, often at the defendant's direction (GXs 115-22, 115-30, 115-33, 115-34, 115-38, 115-42, 115-44, 115-54).  In addition, on two occasions, the defendant directed the transfer of escrowed Fearnow shares to satisfy settlement agreements:  80,000 escrowed Fearnow shares were transferred to defrauded MSMB Capital investor Lindsay Rosenwald to satisfy his settlement agreement (GXs 115-23, 115-24), and 47,128 escrowed Fearnow shares were transferred to defrauded MSMB Healthcare investor Richard Kocher to satisfy a portion of his settlement agreement (GX 115-28).  These shares were effectively taken from Retrophin as well.

Specifically, as the evidence demonstrated at trial, it was Retrophin that made the payments to purchase the Desert Gateway shell (GX 910-E), and when Retrophin was unable to pay the full amount for the shell in December 2012, the defendant and Shkreli arranged to hold some of the Fearnow shares in escrow as collateral for that additional payment.  (GX 479).  Following the February PIPE, Retrophin made a second and final payment of $100,000 for the shell on February 26, 2013 (GX 910-E), which allowed the escrowed Fearnow shares to be released.  Although these escrowed Fearnow shares had initially been assigned to one of the seven individuals that the defendant and Shkreli arranged to have "purchase" those shares, the

---

[3] As Retrophin was the victim who suffered this actual loss, the appropriate restitution to Retrophin for Count Seven is similarly $10,447.979.  See 18 U.S.C. 3663A; see also PSR ¶¶ 52-53, 128-129.

[4] As all of the shares stolen directly from Retrophin were restricted at the time they were transferred to the defrauded investors, those shares were ultimately worth a good deal more than this conservative estimate.  For example, Alan Geller received 331,500 restricted Retrophin shares as a result of his sham consulting agreement.  Based on the value of the shares on the date of transfer, those shares were valued at approximately $3.4 million; however, by the time Geller sold those shares, he made a profit of approximately $7.5 million. (Tr. 6885).

defendant and Shkreli entirely controlled the distribution of those shares (see, e.g., GXs 540, 541, 542), including in connection with the Rosenwald and Kocher settlement agreements. Because the escrowed Fearnow shares would not have been released but for that payment by Retrophin, those shares were rightfully Retrophin's to control.  By using the shares for their own purposes instead, the co-conspirators caused Retrophin an actual loss.

### B.     Loss Calculation for Count Eight

With respect to Count Eight, the defendant was convicted of securities fraud conspiracy for seeking—and in some cases succeeding—in controlling the price and trading volume of Retrophin shares through Shkreli's beneficial ownership of almost all of the free-trading shares of Retrophin, also known as the "Fearnow" shares.  (See Dkt. No. 563 at 40-52). The intended loss from this fraud scheme was approximately $4 million, based on an estimate of the differential between the actual valuation of the Retrophin shares and the price that Shkreli and his co-conspirators attempted to set in the market for Retrophin shares through their control of the price and trading volume of the free-trading shares during the critical time period for Retrophin's survival between December 2012 and February 2013.  (PSR ¶ 51). This differential represents the loss the defendant and his co-conspirators intended to cause the market by artificially propping up the price of Retrophin shares. (Id.).

For all of the reasons set forth in the government's prior written submission regarding the appropriate calculation of loss for Count Eight (see Dkt. No. 532 at 13-17), as well as the reasoning in the Court's order and opinion adopting that calculation of loss for Count Eight (see Dkt. No. 535 at 90-95), this method of calculating the intended loss is both legally permissible and amply supported by the record.  The government will respond to any new arguments raised by the defendant regarding the appropriate calculation of loss for Count Eight in its responsive brief due May 17, 2018.

## III.    Conclusion

For the reasons set forth above, the government submits that the total loss amount for Guidelines purposes that resulted from the defendant's criminal conduct in connection with the two fraud schemes of which he was convicted—stealing money and shares from Retrophin and manipulating the price and trading volume of Retrophin stock—is more than $14.4 million,

and that, when determining the final offense level calculation for Guidelines purposes, the Court should increase the defendant's offense level by 20 levels.  See U.S.S.G. § 2B1.1(b)(1)(k).

<div style="margin-left:40%;">

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    _/s/_____
Alixandra E. Smith
David C. Pitluck
David K. Kessler
Assistant U.S. Attorneys
(718) 254-7000

</div>

cc:    All counsel (via ECF)