# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

May 14, 2018

VIA ECF

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

Due to the *Fatico* hearing scheduled on June 1, we respectfully submit that it is premature to make final submissions regarding potential loss amounts for guideline purposes. Nevertheless, we make this submission in advance of the *Fatico* hearing per the Court's April 18, 2018 Order requiring simultaneous loss amount submissions within one week of receiving the Pre-Sentence Report. We respectfully note that we reserve the right to submit evidence during the *Fatico* hearing and in any briefing thereafter regarding loss that further demonstrates and elaborates on why no loss should be attributed to Mr. Greebel.

## I.     The Loss Amount for Count 7 Is Overstated in the Probation Department's Report

Count 7 charged Mr. Shkreli and Mr. Greebel with conspiring to defraud Retrophin by paying money to disgruntled MSMB investors. The payments were allegedly made through settlement agreements and consulting agreements. The Superseding Indictment in this case alleged that the scheme in Count 7 caused $7.6 million in loss. The Presentence Investigation Report, however, puts that number at $10,447,979, as with Mr. Shkreli.[1] Presentence Investigation Report at 17.

*First*, a fundamental problem with determining loss for Count 7 is that the jury was not asked to identify which of the settlement or consulting agreements were fraudulent. As the

---

[1] Since Mr. Shkreli was acquitted of Count 7, the Court determined that, in its discretion, it would not include Mr. Shkreli's acquitted conduct in calculating his total loss amount. See Feb. 26, 2018 Order at 88.

GIBSON DUNN

The Honorable Kiyo Matsumoto
May 14, 2018
Page 2

government repeatedly argued during its summation, the jury was able to convict Mr. Greebel on Count 7 if it found that only a single settlement or consulting agreement was fraudulent. *See* Tr. 10767 (Pitluck: "You can convict on Schuyler Marshall's settlement agreement alone."); Tr. 10792–93 (Pitluck: "We submit the settlement and consulting agreements are both fraudulent, but you only need one.").[2] For that reason, we submit that the Court cannot simply rely on the jury's verdict on Count 7 to conclude that all of the settlement and consulting agreements were fraudulent.

**_Second_**, a $10 million loss amount for Count 7 is overstated. At worst—assuming that the jury concluded that all settlement and consulting agreements presented at trial were fraudulent—the loss amount could not be "more than $10 million in cash and Retrophin stock," and would be much less. We will never know which settlement or consulting agreements the jury relied on to convict Mr. Greebel of Count 7, and we do not agree that there was sufficient evidence to support a finding of loss for all of the agreements, even by a preponderance of the evidence.

**_Third_**, each of the settlement agreements was fact-specific and the result of extensive negotiations between Mr. Shkreli and the counter-party. At no point was Mr. Greebel determining the business terms of these arrangement. And Mr. Greebel believed that each of the individuals who entered into a settlement agreement with Retrophin had a colorable legal claim. For example, Lindsay Rosenwald made an undeniable and unequivocal threat to sue Retrophin, and Mr. Shkreli told Mr. Greebel that Sarah Hassan's threat was the same as Mr. Rosenwald's. Others—including Mr. Kocher and David Geller—had also made litigation threats; Mr. Marshall had sent a litigation hold letter; and Mr. Greebel was aware that several—including Mr. Kocher and Mr. Lavelle—were represented by counsel.

Further, all parties to the settlement agreements had previously received MSMB stock on distribution. At the time of the agreements, Retrophin was the deep pocket and, from what Mr. Greebel observed, the MSMB entities had distributed all assets. Indeed, Mr. Panoff received both versions of Schuyler Marshall's agreement—one including MSMB entities and one including only Retrophin—and signed the Retrophin-only version.

**_Fourth_**, under each of the settlement agreements Retrophin received a release from each of the investors named therein. This has a definite value for Retrophin. To this day, no investor has sued Retrophin in connection with any of the actions contemplated in the settlement agreement. Correspondingly, Retrophin has not terminated any of the settlement agreements or taken any action to cancel them.

---

[2] The loss amount for Schuyler Marshall would be $300,000, which would also be a reasonable estimate of loss for Count 7.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 14, 2018
Page 3

**Fifth**, as to the consulting agreements, there has already been extensive briefing regarding the two that were at issue at trial. Rather than repeat those arguments here, we refer the Court to the arguments made by Mr. Greebel in his February 27, 2018 Memorandum in Support of His Motion for Judgment of Acquittal, Dkt. 530 at 11–14, and April 3, 2018 Reply Memorandum, Dkt. 574 at 21–23, the government's response to which may be found in its March 23, 2018 Opposition to the Defendant's Motions for Judgement of Acquittal, or, in the Alternative, for a New Trial, Dkt. 563 at 19–29.

In short, the consulting agreements with Darren Blanton and Alan Geller were real agreements through which Retrophin received significant benefits. Both Blanton and Geller testified that they provided legitimate services to Retrophin and Mr. Shkreli. Mr. Geller provided professional executive coaching to Mr. Shkreli, and Mr. Blanton—who gave Mr. Shkreli the initial idea for Retrophin—offered valuable relationships with new investors. From Mr. Greebel's vantage point, these were real agreements for real consulting services that benefitted Retrophin. Even the Court noted that Mr. Blanton provided legitimate consulting services. *See* Tr. 8125:17–20 (The Court: "But Blanton actually did do work for Retrophin by introducing him to investors and…trying to get money for the company.").[3] In addition, Mr. Shkreli personally transferred Mr. Geller 300,000 shares of Retrophin stock, and Mr. Greebel prepared the agreements for the transfer. As such, Mr. Greebel had a further reason to believe that Mr. Geller intended to perform services for Retrophin pursuant to his Consulting Agreement.

**Sixth**, assuming *arguendo* that Mr. Geller and Mr. Blanton did not perform legitimate consulting services for Retrophin, that was not something that Mr. Greebel knew. In fact, Mr. Greebel encouraged Mr. Shkreli to get sign-off from Retrophin's Board of Directors for Mr. Blanton's consulting agreement (*see* GX 664), and evidence proved that Mr. Geller's consulting agreement was presented to the Board; that there was discussion of the agreement at the Board meeting; that Mr. Panoff had signed the agreement; and that it was disclosed in public filings. Therefore, we submit that the payments Retrophin made to Geller and Blanton for consulting work should not be included in the loss amount for Count 7.

**Seventh**, even if the Court were to include the amount paid by Retrophin in those consulting agreements, the value of the stock paid to both Mr. Blanton and Mr. Geller has been overvalued by the government. Although the government has argued that the value of the 200,000 Retrophin shares paid to Mr. Blanton was $3.75 million (which works out to $18.75 per share), the shares should be priced at or around the time that the consulting agreement

---

[3] Mr. Blanton had a strong motive to lie and a vested financial interest to claim his consulting agreement was fraudulent, because he was an SEC whistleblower against Mr. Shkreli and was hoping for a whistleblower reward.

The Honorable Kiyo Matsumoto
May 14, 2018
Page 4

was agreed to, which was late 2013 (around $6 or $7), <u>not</u> when it was signed, which was March 2014.  Valuing the Retrophin shares in that manner would result in a loss of $1.2 million to $1.4 million for the 200,000 shares that Mr. Blanton received for consulting services.  Similarly, Mr. Geller's agreement was agreed to during the summer of 2013, prior to when it was presented to the Board; the stock price at that time was also lower than the value assigned by the government.

## II. No Loss Should be Attributed to Mr. Greebel for Count 8

At Mr. Shkreli's sentencing, the Court adopted the position of the government and the Probation Department that the intended loss for Count 8 was $4,000,000, which amount the Probation Department also asserts as to Mr. Greebel.  *See* Feb. 26, 2018 Memorandum and Order at 96; May 7, 2018 Presentence Investigation Report at 17–18.  But just because the Court made that finding with respect to Mr. Shkreli, the same finding is not required as to Mr. Greebel, whose knowledge of the alleged Fearnow share scheme was very different. In particular, there is no evidence that Mr. Greebel had any knowledge of Retrophin's daily share price during the relevant period, December 28, 2012 to February 12, 2013.

We may introduce other evidence during the *Fatico* hearing to rebut the government's arguments with respect to intended loss.  In the alternative, should the Court decide to impute an intended loss amount to Mr. Greebel, we submit that the $4,000,000 loss amount that was calculated for Mr. Shkreli was miscalculated and vastly inflated as to Mr. Greebel.

For Mr. Shkreli's sentencing and as indicated in the Presentence Investigation Report, the alleged intended loss for Count 8 was the difference between the average alleged artificial high value of Retrophin stock between December 17, 2012 and February 28, 2013 ($5 per share) and the price that private placement investors paid for the stock ($3 per share).  This $2 difference in price was then multiplied by the 2,000,000 free-trading Fearnow shares for a total intended loss of $4,000,000.  Presentence Investigation Report at 18.

This calculation of intended loss is erroneous as to Mr. Greebel for several reasons.

<u>*First*</u>, there was no evidence that $5 per share was a price targeted by Mr. Greebel, or that Mr. Greebel knew that Mr. Shkreli had targeted such a price. While it might be logical that Mr. Shkreli wanted to keep the price above $3, there is no evidence that Mr. Shkreli wanted the price to be $5.00 per share or that Mr. Greebel knew this was Mr. Shkreli's goal.

<u>*Second*</u>, the price was irrelevant to the PIPE investors because they received a discount off of whatever Retrophin was trading at when they invested.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 14, 2018
Page 5

**Third**, the relevant evidence shows that no one tried to maintain a price at or near $5 per share.  If there was an effort to maintain a price target at or near $5 per share, then some or all of the members of the conspiracy would be buying the stock after it fell below $5 per share.  However, as testified by both government expert witness Deborah Oremland and defense expert witness Craig Lewis, no one was trying to maintain a price at or near $5 a share because there was no buying after the price fell below that.  Also, the "over-the-wall" email was not sent by Mr. Shkreli until the price of Retrophin fell below $3, not $5.

**Fourth**, rather than "pump" the price of Retrophin, the government has repeatedly argued that Mr. Shkreli's goal was to "stabilize" the price of Retrophin and prevent it from sinking, not to increase the price.  The alleged Fearnow scheme was not a classic stock pump, designed to pump the price of the stock so insiders could dump their shares ahead of unsuspecting investors.  Instead, the government has repeatedly argued that Mr. Shkreli and others tried to ensure that the price did not fall below $3 a share.  Mr. Shkreli allegedly wanted to hide his control over a large number of shares while preventing those shares from being sold to prevent the price of Retrophin stock from falling.  As the government argued (emphasis added throughout):

- "Shkreli and his co-conspirators desperately needed Retrophin's share price **to remain stable** through the early part of 2013 so that they could attract investors to the company through a series of private placements (PIPEs"), which ultimately took place in January and February 2013." February 16, 2018 Government Letter Regarding Loss, p.13 (Dkt. 532);

- "on multiple occasions between December 2012 and February 2013, Shkreli sought to and/or did prevent the sale of the free-trading shares **in order to prevent the price of Retrophin from falling**." *Id*. at p.14;

- "During this period, Shkreli also **shored up the share price** of Retrophin by seeking to have the recipients of the free-trading shares make those shares 'unshortable' --" *Id*.;

- "And that is where the scheme to control the Fearnow shares and to make sure that the price of Retrophin **does not bottom out and the company does not go under** is taking place." Tr. 10244, Gov't Summation;

- "And that is kind of at the heart of the reason why Mr. Shkreli and the defendant and others want to be able to control the price and volume of Retrophin stock, **to make sure that it doesn't collapse** and then the whole company goes under." Tr. 10329, Gov't Summation;

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 14, 2018
Page 6

- "Because this is the reason, this is the driving reason behind the desire **to make sure that the price doesn't crater** for Retrophin." Tr. 10331, Gov't Summation;

- "And in the email Mr. Shkreli says exactly what his concerns are: I must admit to you all I've been extremely stressed about Retrophin, **the declining stock price is particularly alarming**." Tr. 10351-52, Gov't Summation;

- "So this the key time period where it's important **to make sure that the price of Retrophin stay stable**." Tr. 10366, Gov't Summation;

- "And we heard from Ms. Oremland that the effect on price if there are fewer shares available to trade, it that there's more of a chance that **the price would remain stable**." Tr. 10366-67, Gov't Summation;

- "And she explained that because then you have a **less likelihood that the share price can decline** if there's too much stock on the market." Tr. 10367, Gov't Summation;

- "And then finally you heard from the defendant's expert, Mr. Lewis, saying that if a group of investors wanted **to prevent the price of a stock from dropping**, what would you expect them to do? I would expect them to buy the stock or hold it." Tr. 10367, Gov't Summation;

- "And Mr. Lewis also testified that **if they wanted to keep the price stable**, they wouldn't sell the stock or not buy it and it might not transact at all." Tr. 10367, Gov't Summation;

- "The price of the stock **stabilized**." Tr. 10804, Gov't Rebuttal;

- "He needed to make sure the price and volume stayed the same, **otherwise, the company would collapse**." Tr. 10808, Gov't Rebuttal;

- "This is making sure the stock doesn't fall. As Andrew Vaino testified, when you control shares of stock you can constrict volume, **you can prevent it from dropping**." Tr. 10818, Gov't Rebuttal;

- "But, remember, Craig Lewis confirmed this. **If you want the price to stay stable**, Ms. Smith told you about that, you either hold or buy; they held. **And look what happened to the price of the stock. It remained absolutely the same.**" Tr. 10818, Gov't Rebuttal.

Mr. Shkreli was apparently concerned with ensuring that price did not fall below $3 per share, not that it went to $5. As the government argued, the goal of the Fearnow share conspiracy was to prevent the price of Retrophin from "cratering"—as long as the price did not fall below $3 per share, the February 2013 PIPE would likely be successful.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 14, 2018
Page 7

*Fifth*, there was no evidence that Mr. Greebel knew the share price of Retrophin on any date. There was no evidence provided that Mr. Greebel and Mr. Shkreli discussed the share price or that Mr. Greebel asked anyone else about share price. So, even assuming *arguendo* the government could show that Mr. Greebel understood that the goal of the Fearnow share scheme was to "stabilize" the price of Retrophin, he did not know what that "stabilized" price was.

*Sixth*, there is no evidence that Mr. Greebel was aware of Mr. Shkreli's alleged attempt to control the price of Retrophin stock until, allegedly, the "over-the-wall" email sent by Mr. Shkreli to Fearnow recipients after the December 27, 2012 close, when the price of Retrophin fell below $3.00 to $2.90. Such occurrence was alarming to Mr. Shkreli and prompted him to take action, which was consistent with his alleged goal of maintaining at least $3.00 price. For that reason, assuming the Court found there was intended loss attributable to Mr. Greebel, he should only be held accountable for the Retrophin trading activity that occurred after the over-the-wall email was sent.

### III. Conclusion

Based on the evidence described herein, as well as any evidence adduced at the upcoming *Fatico* hearing, we respectfully submit that, because it is impossible to determine which settlement or consulting agreements the jury found to be fraudulent, there is no way to accurately calculate loss for Count 7. Should the Court find that there is loss attributable to Mr. Greebel on Count 7, however, it should be significantly less than the $10 million asserted by the Probation Department, and at a minimum should exclude the amounts paid to Retrophin consultants Blanton and Geller. Further, we respectfully urge the Court to find that the loss amount attributable to Mr. Greebel is zero for Count 8.

Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky