

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AES/DCP/DKK                                            *271 Cadman Plaza East*
F.#2014R00501                                          *Brooklyn, New York 11201*

May 17, 2018

<u>By Hand and ECF</u>

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

                 Re:    United States v. Evan Greebel
                            <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

           The government respectfully submits this letter in response to the defendant's May 14, 2018 submission regarding the applicable loss calculation for purposes of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") (<u>see</u> Dkt. No. 602 ("Def. Loss Mem.")), and in further support of its initial submission on the same subject (<u>see</u> Dkt. No. 601 ("Gov't. Loss Mem.").

           As detailed at length in the government's initial filing, the defendant caused an actual loss of approximately $10,447,979.00 to Retrophin as a result of his participation in the conspiracy to steal money and shares from Retrophin via the settlement and sham consulting agreements (Count Seven), and caused approximately $4 million in intended losses as a result of his participation in the conspiracy to control the price and trading volume of Retrophin stock (Count Eight). (<u>See</u> Gov't Loss Mem. at 3-6). These loss amounts are based on the evidence presented at the eleven-week trial in this case, and the Probation Department ("Probation") has adopted these loss amounts as legally correct for Guidelines purposes. (<u>See</u> Pre-Sentence Investigative Report dated May 7, 2018 ("PSR") ¶¶ 49-51). Consequently, a 20-level increase in the defendant's applicable offense level is appropriate. <u>See</u> U.S.S.G. § 2B1.1(b)(1)(k).

           The arguments advanced in the defendant's submission should be rejected by this Court. The defendant advances no alternative loss calculation for Count Seven, and broadly asserts that his criminal conduct in connection with Count Eight resulted in no losses for Guidelines purposes. However, many of the defendant's arguments simply seek to relitigate not only issues of fact that were squarely established during his trial, but also the jury's verdict that the defendant was guilty of participating in two separate criminal conspiracies. Moreover, not only do the defendant's arguments lack <u>any</u> legal basis—there is not a single citation to relevant

Guidelines provisions or Second Circuit case law—but application of those basic legal principles demonstrates that the defendant's assertions about loss are wrong.[1] For these reasons, and for the reasons set forth below, the government submits that the loss calculations detailed above, and set forth in the PSR, should be adopted by the Court.

I.  **The Appropriate Loss Calculation for Count Seven Is Approximately $10.4 Million**

While the defendant does not deny that his participation in the conspiracy of which he was convicted in Count Seven caused an actual loss to Retrophin, he asserts that Probation's calculation of that loss as approximately $14.4 million—a calculation that the government adopts—is "overstated." (Def. Loss Mem. at 2). But the defendant fails to provide any alternative method for calculating the loss to Retrophin. Instead, the defendant suggests in a footnote, without any explanation, that a "reasonable estimate of loss for Count 7" is $300,000, the amount of money stolen by the defendant and his co-conspirators from Retrophin in connection with the Schuyler Marshall settlement. (Id. at n.2.) The defendant contends that, with respect to the other agreements, he is not guilty of participating in a conspiracy to defraud Retrophin; there is not sufficient evidence to support a finding of loss on all of the agreements by a preponderance of the evidence; the method employed by Probation to calculate the loss amount is incorrect as to certain agreements; and Retrophin received a benefit from the agreements. These arguments are unsupported by law and contrary to the facts established at trial, and they should be rejected.

  A.  **The Trial Evidence Proves That All of the Settlement and Sham Consulting Agreements Are Relevant Conduct for The Loss Calculation**

The defendant asserts that, because the jury could have convicted him on Count Seven based on a unanimous finding that he was guilty in connection with any one of the settlement and sham consulting agreements, the Court cannot "simply rely on the jury's verdict on Count [Seven] to conclude that all of the settlement and consulting agreements were fraudulent." (Def. Loss Mem. at 2). Setting aside that the defendant ignores the jury's determination that at least one of those agreements was fraudulent, the defendant's argument misses the point.[2] The question here is simply whether the loss used by Probation has been proven by a preponderance of the evidence. It has been. The facts established at trial, and detailed in the government's post-trial submissions, prove by a preponderance that each of the

---

[1] The government set forth those basic legal principles in its initial filing (see Gov't Loss Mem. at 2-3), and incorporates them by reference here, as well as providing further legal support for its response as necessary.

[2] Indeed, one element of the wire fraud conspiracy for which the defendant was found guilty is that there was a scheme or artifice to defraud, which is defined as a "plan to deprive another of money or property by trick, deceit, deception or swindle, or overreaching." (See Court Exhibit 6 (Final Jury Instructions) at 43). In other words, in finding the defendant guilty of wire fraud conspiracy, the jury found that the defendant had the intent to cause a loss. As a result, the "intended loss" for the wire fraud conspiracy for which the defendant was convicted cannot be zero, meaning that the loss amount for purposes of the Guidelines is not zero.

settlement and sham consulting agreements that underlie the loss calculation were fraudulent and part of a scheme to defraud Retrophin. As a result, the loss caused by each such agreement should be included in the calculation of "loss" associated with Count Seven.

In the face of this record, the defendant offers a wholly unpersuasive response. Specifically, he argues that he did not know that the settlement agreements were fraudulent for a variety of reasons, including that he "believed" that the individuals who entered into settlement agreements had "colorable legal claim[s]"; that he knew that several of the individuals who received settlement agreements "were represented by counsel"; and that from what the defendant "observed," the MSMB entities had "distributed all assets." (Def. Loss Mem. at 1-3). The defendant also reiterates his position from his Rule 29 motion that the sham consulting agreements with Blanton and Geller were "real agreements through which Retrophin received significant benefits," and thus were not fraudulent. (Id. at 3).

These arguments fail for two reasons. First, the trial record clearly establishes by a preponderance of the evidence that each of the agreements included in the loss calculation functioned to defraud Retrophin. (See Dkt. No. 563 (Gov't Response to Defendant's Post-Trial Motions) at 5-40 (detailing the evidence showing the defendant's knowing participation in the entirety of the conspiracy charged in Count Seven, as well as the evidence that all of the settlement and sham consulting agreements defrauded Retrophin)). The defendant does not refute the record evidence related to any specific agreement, nor does he address the preponderance standard, except to say: "we do not agree that there was sufficient evidence to support a finding of loss for all of the agreements, even by a preponderance of the evidence." (Id. at 2).

Second, even if the defendant alleges that he did not know that certain agreements were frauds, the loss caused by that agreement is still "relevant conduct" for purposes of loss calculation. As the Guidelines make clear, "in the case of a jointly undertaken criminal activity," such as the one for which the defendant was convicted in Count Seven, "relevant conduct" includes: "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a), comment. (n.2). Here, each of the settlement and sham consulting agreements was plainly within the scope of the conspiracy to defraud Retrophin, in furtherance of it, and reasonably foreseeable to the co-conspirators. See, e.g., United States v. Eisner, 431 Fed. Appx. 23, 25-26 (2d Cir. 2011) (affirming district court's finding that the scope of a defendant's jointly undertaken criminal activity extended to the entirety of the Ponzi scheme that the defendant devised and executed with his co-defendant, and thus to all losses attributable to that scheme). The defendant does not even cite this Guidelines provision, let alone refute its application.

### B. Probation's Loss Calculation Methodology Is Reasonable

The defendant also complains that Probation's calculation of loss is "overstated" because the loss "would be much less" than $10 million. (Def. Loss Mem. at 2). However, the defendant offers neither an alternative method for calculating loss to Retrophin from the conspiracy to steal money and shares from Retrophin, nor an alternate loss amount (other than to

a stray, unsupported reference in a footnote that $300,000 from the Marshall agreement would be a "reasonable estimate").

For the reasons set forth in the government's submission, Probation made a "reasonable estimate" of the loss suffered by Retrophin as a result of the settlement and sham consulting agreements, and that estimate should be adopted by the Court. See U.S.S.G. § 2B1.1, comment. (n.3(C)); United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008); see also United States v. Norman, 776 F.3d 67, 79 (2d Cir. 2015) ("The sentencing court is not required to calculate the amount of loss with certainty or precision."). As set forth in the PSR (and also in the charts attached to this filing as Exhibit A), Probation calculated the loss amount for Count Seven by adding (1) the cash stolen directly from Retrophin's bank accounts to satisfy the settlement agreements and (2) the value of the Retrophin shares stolen from Retrophin to satisfy the settlement and sham consulting agreements. To determine the value of the Retrophin shares, Probation multiplied the number of shares in connection with a given agreement by the share price of those shares on the date(s) that they were actually transferred to the defrauded investors.

The only specific critique the defendant offers of this methodology is in connection with the Blanton and Alan Geller consulting agreements. The defendant suggests that the value of the Retrophin shares used to pay those agreements should be "priced at or around the time that the consulting agreement was agreed to" by Shkreli in each instance, which the defendant claims was "late 2013" for the Blanton consulting agreement, and "the summer of 2013" for the Alan Geller consulting agreement. (Def. Loss Mem. at 3-4). The defendant provides no reason for why this "agreed-upon" date should be used only for the consulting agreements, other than the fact that doing so would lower the loss amount (for example, from about $3.75 million for the Blanton agreement to "approximately $1.2 to $1.4 million"). (Id.).

This alternative approach should be rejected. Regardless of when the parties "agreed" to the final terms of the sham consulting agreements, the actual losses to Retrophin occurred on the dates that the shares were stolen from Retrophin and transferred to the defrauded investors.[3] It is the share price on those dates that establish Retrophin's loss.

Moreover, the defendant's attempts to utilize the "agreed upon" approach to his benefit reveal that this approach results in a factually inaccurate estimate of loss because it seeks to rely on arbitrary dates. For example, the defendant's assertions that the Blanton consulting agreement was agreed to in "late 2013" and that the Alan Geller consulting agreement was approved in the "summer of 2013" are wrong. With regard to Blanton, in a December 28, 2013 email, Shkreli told the defendant and a colleague at Katten that he wanted to discuss "having the main complainer, Darren Blanton, recant his complaint. I have to give him some stock ASAP." (GX 653). Subsequently, on January 15, 2014, the defendant related to Shkreli that "Blanton would accept 100k shares of restricted stock and 100k of freely-tradable RTRX stock" and that while the defendant could arrange for the restricted stock to be given to Blanton "under a consulting agreement," the freely-tradeable stock could come from Marek Biestek. (GX 660).

---

[3] As noted in the government's initial filing, this amount actually underestimates the loss to Retrophin, because the shares used for the settlement and sham consulting agreements were restricted at the time they were transferred; by the time they were sold, their value had increased.

Shkreli directed the defendant to reject Blanton's proposal and instead offer 200,000 shares of restricted Retrophin stock. (Id.). The defendant re-confirmed that figure on February 17, 2014 (GX 663), before circulating an initial draft of a consulting agreement for 200,000 Retrophin shares on that same date (GX 103-52); additional changes were made to the agreement before a final version was agreed to and signed on March 6, 2014. (GX 61). As for Alan Geller, revised drafts of the option and consulting agreement were circulated to Alan Geller on August 20, 2013. (GX 105-35). The defendant himself further modified the terms of the consulting agreement on September 10, 2013, at which point Alan Geller agreed to that change in writing. (GX 105-48). The price on that date was $7.15, which is actually higher than the price of $6.50 on October 1, 2013, the date of the transfer of 181,500 Retrophin shares to Alan Geller pursuant to the consulting agreement. (GX 955).

      C.      **Settlement and Sham Consulting Agreements Were Not Entered Into for Retrophin's Benefit**

Finally, the defendant alleges that because Retrophin received a release from each investor who signed a settlement agreement, the settlement agreements had "definite value to Retrophin." (Def. Loss Mem. at 2). The defendant further alleges the Court should take note that Retrophin has not terminated the settlement agreements or taken any action to cancel them. (Id.). However, the defendant fails to explain how these allegations impact the loss calculation for Count Seven.[4]

Moreover, the defendant's suggestion that the settlement agreements were not fraudulent because they were undertaken for Retrophin's benefit is not supported by the record and were rejected by the jury at trial. To the contrary, Stephen Aselage, Retrophin Chief Executive Officer, testified at trial that the company had concluded that the settlement agreements were not "fair and reasonable" to Retrophin because the company "spent considerable resources, millions of dollars of cash and stock, to reach settlement for liabilities that were not related to the company. They were liabilities of Martin Shkreli, not Retrophin." (Trial Tr. 4487). The same was true of the sham consulting agreements, explained Aselage: "millions of dollars of company resources, stock and cash, were used to pay those individuals for services that were never provided." (Id. at 4488). These conclusions are supported by the facts developed at trial, which demonstrated—as the defendant himself admitted in the Control Memo—that the liabilities at issue in the settlement agreements were the sole responsibility of Shkreli and not Retrophin, and that Shkreli and the defendant determined to steal the money and shares used to pay the settlement agreements from Retrophin even though Shkreli had sufficient resources to repay the defrauded investors himself.

Finally, the fact that Retrophin has not "terminated the settlement agreements or taken any action to cancel them" is irrelevant. The fraud was perpetrated by the defendant and Shkreli on the company; there is no evidence that the defrauded investors knew that the

---

[4] The defendant does not, for example, make any argument or evidence to show by a preponderance that the losses to Retrophin caused by the settlement agreements should be reduced by "credits against loss," or how any such credits should be calculated. See U.S.S.G. 2B1.1(b)(1), comment. (n.3(E)).

5

defendant and Shkreli were engaged in this fraud. Given that, Retrophin did not seek to cancel the settlement agreements, instead filing a federal civil lawsuit against Shkreli in the fall of 2015 in order to recover the losses it suffered as a result of, inter alia, the settlement agreements.

## II. The Appropriate Loss Calculation for Count Eight Is Approximately $4 Million

As set forth in the government's opening brief, the appropriate loss calculation for Count Eight is $4 million. The calculation is based on the difference between the $3.00 per share price used for the PIPE, and the $5.00 per share price, which was the artificially high value of Retrophin stock between December 17, 2012 and February 14, 2013.[5] (PSR ¶ 51). This issue was briefed extensively in connection with Shkreli's sentencing and the Court held there that Probation's estimate of intended loss was "reasonable and appropriate." (Dkt. No. 535 at 92 (citing U.S.S.G. § 2B1.1, comment n.3(C))). Faced with this reality, the defendant now attempts to distinguish the Court's holding with regard to himself, claiming that it is erroneous and that the loss is zero. These arguments not only misinterpret the trial evidence and ignore the jury's verdict, they are legally and factually incorrect, and the loss calculation for Count Eight set forth in the PSR should be adopted.

The defendant summarily claims that the calculation of loss for Count Eight that was adopted for Shkreli should not apply to him because his knowledge of the Fearnow share scheme was different than Shkreli's knowledge. (See Def. Loss Mem. at 4). In so doing, the defendant appears to be making an actual innocence claim that he did not participate in the scheme. Relatedly, he also argues that there is no evidence that anyone tried to maintain a price of $5.00 or that the defendant knew of Shkreli's desire to maintain a higher stock price.[6] Both of these arguments should be rejected.

As the jury found in this case, and as the Court noted in its order and opinion in Shkreli's case, the defendant was actively involved in the scheme to control the price and trading volume of Retrophin stock, and his knowledge of the Fearnow share scheme was in line with Shkreli's knowledge. The defendant allocated the Fearnow shares to Shkreli's friends and associates and took steps to restrict trading in the stock, including supporting Shkreli's efforts to

---

[5] As the Court pointed out in its order and opinion, the second PIPE took place on February 14, 2013 and not February 28, 2013. (Dkt. No. 535 at 92, n.24). The government will note that correction to Probation in its objections and response to the PSR.

[6] The defendant's second point, that the price was "irrelevant" to the PIPE investors because they received a discount off Retrophin's stock price at the time that they invested, is baffling. (Def. Loss Mem. at 4). As his assertion to the investors' purported discount is not cited, it is unclear what portion of the trial testimony the defendant is referencing in support of that claim. But even assuming it is accurate, the defendant's assertion makes no sense. Even if the PIPE investors received a discount, Retrophin's stock price was clearly important to those investors because it set a baseline to the appropriate value of the stock (and the relative discount from that price) and informed them of the stock's performance. It defies logic that a former corporate lawyer would actually argue that the stock price of a publicly-traded company would be irrelevant to a PIPE investor.

restrict Tim Pierotti's trading in the stock. (See Dkt. No. 563 at 46-51). Notwithstanding this, the defendant appears to believe that there is a requirement that he and Shkreli had a specific, stated agreement to artificially set the stock price at a particular point or that the defendant had knowledge of that specific price. This is not the case. What Probation undertook, and the Court adopted, was a reasonable, conservative estimate of the intended loss, based on the trading of the stock and the conduct of the defendant, Shkreli and their co-conspirators when the share price fell below a specific point. Moreover, the defendant's assertion that he had no knowledge of Retrophin's stock price at any specific point is implausible, given that Retrophin was his primary client; such assertion is certainly not supported by the record. To the contrary, there was ample evidence that the defendant was not only aware of Shkreli's panic over the falling share price, but that he was directly involved in analyzing why the share price was precipitously dropping on increased trading volume.[7] (See GX 510). Even if the defendant somehow did not in fact know the specific stock price, the result would be no different. Although, as a corporate lawyer, it would have been directly foreseeable to the defendant that the conspiracy's efforts to control price by restricting the trading volume of Retrophin stock would tend artificially to inflate the stock price, the government does not need to prove the defendant's personal knowledge of the stock price. It only needs to prove, by a preponderance of the evidence, that the loss caused is "relevant conduct" for purposes of the defendant. It clearly is.

        The crux of the defendant's remaining arguments is that the evidence at trial proved only that the defendant, Shkreli and their co-conspirators stabilized the price of Retrophin stock, and not that they tried to or did increase the price. This argument ignores the applicable law and instead relies on a self-serving misinterpretation of the evidence. The defendant claims that the "government has repeatedly argued that Mr. Shkreli and others tried to ensure that the price did not fall below $3 per share." (Def. Loss Mem. at 5). Although the government did argue that the defendant, Shkreli and others conspired to keep Retrophin's share price from dropping, and presented voluminous evidence to support that argument, the defendant appears incorrectly to assume—without evidence in the record—that the government was required to have <u>argued</u> that the defendant "pumped" up the price of the stock or that the defendant and his co-conspirators were trying to keep the price at $3.00 per share. The question here is what the evidence <u>showed</u>. As the government established at trial, Shkreli artificially increased the price of Retrophin stock to $7.69 on the first day of trading following the reverse merger—an increase of nearly $5.00 per share from the trading day preceding the reverse merger. (See Trial Tr. 5753-54 (Testimony of Deborah Oremland)). Thus, the government established that the price of Retrophin's trading shares was artificially inflated. Relatedly, the defendant continues to purposefully misconstrue his criminal conduct in this conspiracy. As the government proved, the defendant conspired to manipulate Retrophin stock through price <u>and</u> trading volume. The

---

[7] Similarly unavailing are the defendant's efforts to restrict the loss calculation, by ten days, to shares traded after December 27, 2012. The trial record establishes by at least a preponderance of the evidence that the defendant was involved in the conspiracy to manipulate the price and volume from the very beginning, including through the acquisition of the Fearnow shares and the allocation of those shares to Shkreli's friends to hide the true ownership. There is no legal basis for the defendant's made-up requirement that co-conspirators must specifically discuss a stock price in order to be accountable for the loss stemming from a conspiracy to control the price and trading volume of a stock.

evidence at trial overwhelmingly established that the defendant, Shkreli and others conspired to control the price by controlling and restricting the trading volume of Retrophin's free-trading shares. That had the effect of preventing the stock from dropping so the company would not go bankrupt. At no point was this ever linked to the specific $3.00 per share stock price, and there is nothing in this argument that conflicts with the Court's holding that $5.00 per share is a reasonable calculation of the stock price had the conspiracy's efforts succeeded.

Finally, it is important to note that the loss calculation the Court applied for Count Eight in the Shkreli case, based solely on the two million Fearnow shares allocated initially to seven associates of Shkreli, is not just supported by the record here—it is actually conservative. First, the $3.00 floor is a low point from which to calculate loss. (See Dkt. No. 535 at 94 ("the court notes that the $3.00 per share price is itself a relatively high basis from which to calculate intended loss.")). Second, the loss calculation does not include the 400,000 Fearnow shares held in escrow, which could not be traded and were therefore also used to maintain the higher share price. (Id. at 94-95). Nor did the Court include the remaining Retrophin shares in the market. (Id. at 95). Accordingly, the defendant's sole focus on the $5.00 share price to arrive at his calculation of loss is erroneous and should be rejected.

### III. To the Extent the Defendant Still Seeks a <u>Fatico</u> Hearing, He Should Identify Any Evidence He May Seek to Introduce

At oral argument for the defendant's Rule 29 and 33 motions on April 13, 2018, the defendant indicated that he would likely introduce additional evidence at a Fatico hearing to determine the appropriate loss calculation. The Court set a Fatico hearing for June 1, 2018. In his initial submission on loss, however, the defendant does not discuss introducing any new evidence regarding the loss calculation for Count Seven, and states only that he "may introduce other evidence" with respect to Count Eight. (Def. Loss Mem. at 4). The defendant does not identify any specific evidence or testimony he might seek to adduce in support of his arguments.

Consequently, the government requests that the Court order the defendant to advise the Court and the government no later than May 25, 2018 if he intends to present any new evidence at the Fatico hearing scheduled for June 1, 2018. If he does not, then there should be no hearing and the issue of loss may be determined based on the parties' written submissions and the existing trial record. If the defendant does intend to present evidence at the hearing, the government further requests that the defendant be ordered to identify the following information no later than May 25, 2018, so that the government may adequately prepare for that hearing: (1) a list of any witnesses the defendant may seek to call, including all relevant disclosures for any expert witnesses, including qualifications, opinions and bases for such opinions; (2) any Rule 26.2 material for its witnesses; and (3) copies of any exhibits (documents, charts, etc.) that the defendant may seek to introduce at the hearing.

### III. Conclusion

For the reasons set forth above and in the government's initial filing, the total loss amount for Guidelines purposes is more than $14.4 million, and the Court should increase the

defendant's offense level by 20 levels when determining the final offense level calculation for Guidelines purposes. See U.S.S.G. § 2B1.1(b)(1)(k).

          Respectfully submitted,

          RICHARD P. DONOGHUE
          United States Attorney

By:   /s/
          Alixandra E. Smith
          David C. Pitluck
          David K. Kessler
          Assistant U.S. Attorneys
          (718) 254-7000

cc:     All counsel (via ECF)