**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

May 28, 2018

VIA ECF

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter in response to the Court's May 23, 2018 Order requiring the parties to "submit any evidence bearing on loss amount related to Counts 7 and 8 no later than May 28, 2018." As disclosed below, Mr. Greebel intends to present both testimonial and documentary evidence during the *Fatico* hearing scheduled for June 1 to support his position as to appropriate loss amounts for Counts 7 and 8.

### I. Evidence as to Count 7 Loss Amount

Probation and the government have advanced the argument that Mr. Greebel should be held accountable for $10,447,979.00 in alleged actual losses to Retrophin on Count 7, an amount allegedly equivalent to the total monetary value of the shares and cash payments given by Retrophin to MSMB Capital and MSMB Healthcare investors via certain settlement and consulting agreements. *See* Presentence Investigation Report at 13–14; Dkt. 601 (gov't initial loss submission); Dkt. 606 (gov't loss response).

The government has indicated that, should they prove that these were actual losses suffered by Retrophin and attributable to Mr. Greebel, it intends to seek a restitution judgment against Mr. Greebel in that same amount—an amount that, as reflected in the Probation Report, Mr. Greebel cannot afford to pay in the least, and that will saddle Mr. Greebel and his family with a multi-million dollar, uncollectible judgment that will forever impoverish his family and leave Mr. Greebel with no financial prospects in life whatsoever. We cannot understand how this can possibly be in the interests of justice, but we shall leave that argument for another day. The amount of actual losses to Retrophin significantly overstates the alleged actual losses attributable to Mr. Greebel, and he will present the following evidence during the *Fatico* hearing to so illustrate.

GIBSON DUNN

The Honorable Kiyo Matsumoto
May 28, 2018
Page 2

***First***, Mr. Greebel anticipates presenting expert testimony of Gayle Klein.[1] Ms. Klein is a shareholder in McKool Smith, P.C., and has co-led the firm's nationally acclaimed financial-litigation practice since 2008. The firm's banking and financial litigation practice is ranked "Tier 1" both nationally and in New York City by *U.S. News – Best Lawyers* in the 2016 edition of *Best Law Firms*. Ms. Klein herself is recognized for commercial litigation in New York by *Chambers USA*. At her previous firm, Weil, Gotshal & Manges LLP, she was the youngest woman elected litigation partner in 2005. She is an accomplished trial lawyer with twenty-one years of experience representing plaintiffs and defendants in complex commercial and securities actions. In particular, Ms. Klein specializes in representing investors. She has settled hundreds of cases, and she has recovered hundreds of millions of dollars for investors, including but not limited to institutional investors.

Based on her many years' experience as a lawyer representing investors, and successfully litigating and settling claims totaling hundreds of millions of dollars on their behalf, we expect Ms. Klein to testify, in sum and substance that: (1) A reasonable plaintiff's attorney would have been able to bring a variety of claims against Retrophin on behalf of MSMB investors; (2) Such claims likely would have resulted in litigation with large amounts of legal fees and costs; (3) Such claims had a likelihood of success in bringing liability to Retrophin, reputational damage, and potentially other collateral consequences; (4) As a result of the potential legal costs and liability, settling those claims with a release provision in these agreements should not be viewed in a vacuum as actual loss to Retrophin, given that Retrophin has not annulled the agreements and the settling and consulting parties at issue have been able to keep the money and the shares that they received and thus must honor the release provision in the settling and consulting agreements. Retrophin, in fact, sought to enforce—and succeeded in so doing—promissory notes against several MSMB Capital and Healthcare entities in an action in state court. Mr. Greebel plans to introduce pleadings from that case[2] as proof that Retrophin sought to enforce and enforced the promissory notes. (While Retrophin sued Mr. Shkreli in federal court for the amounts relating to these settling and consulting agreements, Retrophin did not sue any of the individual settling and

---

[1] Mr. Greebel disclosed Ms. Klein as an expert witness during the course of trial, although she did not testify. *See* Dkt. 389-1 at 19–20; Dkt. 401 at 2–4. While the scope of Ms. Klein's proffered testimony is narrower here than at trial, any previous representations as to her qualifications and background remain unchanged and are incorporated by reference herein.

[2] The case is *Retrophin, Inc. v. MSMB Capital Management LLC, et al.*, Index No. 650813-2016 (Sup. Ct. N.Y. Cty.). None of the relevant pleadings—including the judgment, NYSCEF Doc. No. 35—were marked as exhibits during trial.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 28, 2018
Page 3

consulting parties.  We understand that Retrophin's case against Mr. Shkreli was removed to arbitration and is currently pending in arbitration.)

As discussed in Mr. Greebel's previous loss submissions, pursuant to the Court's instructions to the jury and basic conspiracy law, the jury did not have to decide that any of the agreements at issue was, in fact, fraudulent.  Accordingly, the jury verdict is not proof that the government has demonstrated that each or any of the agreements is fraudulent.  There is also no evidence that the jury determined that Mr. Greebel subjectively believed each or any of these agreements was fraudulent.  The government has failed to meet its burden of proof demonstrating Mr. Greebel's subjective knowledge that each or every agreement was fraudulent.  The government was not required to do so at trial, and it has not done so to date.

Moreover, even assuming *arguendo* for the purposes of this hearing that the government has proven that the agreements at issue were fraudulent and that Mr. Greebel had subjective knowledge that each of the agreements was fraudulent, the Company did not seek to nullify them at any point, and thus the Company continues to receive the benefit of the agreements. Notably, neither the government nor Retrophin has asked or forced any of the settling parties and consulting parties to give back any of the shares, money, or profits, even the amounts that are in excess of the losses they suffered from their investments in the MSMB funds. Furthermore, the government did not claim that any person that entered into a settlement agreement or a consulting agreement was an unindicted co-conspirator despite the fact that such people were paid by Retrophin, yet the government claims that Retrophin had no liability to them.

Ms. Klein's testimony will thus support and advance the argument that, for purposes of Mr. Greebel's loss calculation, the agreements represented a benefit to the Company that should count against the value of the money and shares transferred as a result.  In the course of her testimony, Ms. Klein may rely on documentary evidence, including but not limited to[3]:

- **DX-7770**:  Marked as an exhibit, but not offered into evidence during trial, this is the First Amended Complaint in *Catalyst Advisors LLC v. MSMB Capital Management, LLC, Martin Shkreli and Retrophin, Inc.*  Catalyst had sued MSMB Capital and Mr. Shkreli for damages arising from unpaid services to MSMB, not Retrophin.  In July

---

[3]  Mr. Greebel reserves the right to introduce other previously marked or admitted evidence that may come up in the course of the testimony of Ms. Klein or our other witnesses.  As we prepare for the hearing during the next few days prior to June 1, we will, of course, notify the Court and the government right away if we identify additional exhibits or evidence for presentation at the hearing.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 28, 2018
Page 4

2013—during the time period relevant to the settlement and consulting agreements—Catalyst added Retrophin as a party, alleging that "Retrophin is Shkreli's Alter Ego."

- **DX-2158, 2164–65, 2217, 2219**: Marked as exhibits, but not offered into evidence at trial, these are copies of Mr. Greebel's handwritten notes of Retrophin board meetings.

- **DX-9151**: Admitted into evidence at trial, this is an email sent by Mr. Greebel to Marc Panoff in December 2013, attaching draft minutes of all 2013 Retrophin Board meetings.

- **GX-100-16, 107-7, 108-10, 525; DX-102-8, 104-9, 106-28, 124-118:** Admitted into evidence at trial, these exhibits prove—by, at a minimum, a preponderance of evidence—that the settling parties had threatened litigation against Retrophin, and Mr. Greebel knew about these threats.

- **DX-1902**: Admitted into evidence during trial, this document proves by, at a minimum, a preponderance of evidence that Mr. Greebel understood the legal risks of commingling and advised Retrophin against commingling the Retrophin's and MSMB's assets and documents.

*Second*, Mr. Greebel anticipates presenting expert testimony by Dean Stephen Ferruolo.[4] Since 2011 and through the present, Dean Ferruolo has been Dean of the University of San Diego Law School where, among other things, he teaches a course about counseling corporations. Prior to joining the Law School, Dean Ferruolo spent approximately twenty years in private practice, including ten years as a partner at Heller Ehrman LLP in its Palo Alto and San Diego offices. From in or about 1997 through in or about 2005, Dean Ferruolo was the co-chair of the Life Sciences Practice. From in or about 2005 through in or about 2007, Dean Ferruolo served as the co-chair of the Corporate Practice. He also worked on the Policy and Compensation Committees at Heller Ehrman. Following his time at Heller Ehrman, from in or about 2007 through in or about 2011, Dean Ferruolo was a partner in the San Diego office of Goodwin Procter LLP. During that period of time, he also served on the firm's Management Committee.

In the course of his career, Dean Ferruolo represented hundreds of private and public companies (including companies that transitioned from private to public). His law practice focused on serving as outside counsel to early-stage life sciences, biotech, and technology companies. In that role, he prepared and reviewed thousands of agreements on behalf of his

---

[4] Like Ms. Klein, Dean Ferruolo was noticed as an expert during Mr. Greebel's trial. *See* Dkt. 389-1 at 2–6; Dkt. 401 at 1–2; Dkt. 405 at 4; Dkt. 466. The scope of his proffered testimony here has similarly narrowed, but his qualifications and background likewise remain unchanged and are incorporated by reference herein.

The Honorable Kiyo Matsumoto
May 28, 2018
Page 5

clients. Those agreements included stock transfer agreements, stock purchase agreements, settlement agreements, consulting agreements, and employment agreements. Moreover, as outside counsel to companies, Dean Ferruolo served as Corporate Secretary and Acting Corporate Secretary; attended board meetings; he prepared SEC filings; and he worked on major financing events, including private equity and venture capital investments, reverse mergers, initial public offerings, shelf offerings, and private investment in public entities (PIPEs).

On the basis of his significant experience, Dean Ferruolo will testify in sum and substance that companies, particularly early-stage companies, frequently settle potential lawsuits even if the claims appear to be frivolous, in part to avoid costly litigation and to prevent any disruption or delays during crucial periods for the company (e.g., financing). Dean Ferruolo would further testify as to certain related practices of a company's board of directors, including that it is not typically the responsibility of outside corporate counsel to set the agenda for board meetings or ensure approval of minutes and that Board members are required to sign certain SEC filings and are responsible for the disclosures therein. Like Ms. Klein, Dean Ferruolo's expected testimony will tend to show that the agreements at issue represent a benefit to the company that should offset the government's proposed loss amount.

In addition, we expect Dean Ferruolo to testify that the releases contained in the agreements here represent real value to Retrophin. As such, and given that Retrophin has not nullified the agreements or releases, at minimum the alleged loss amount should be reduced by the value of those releases. Specifically, Dean Ferruolo would testify that broad general releases are a common provision in agreements seeking to resolve potential litigation, as they constitute consideration for a company or settling party. He would also testify that outside corporate counsel may be involved in settlement agreements even if they are not litigators, including in the negotiation and formalization of the agreement, but that outside corporate counsel take direction from management of their clients with regards to the material terms of the agreement. It is not appropriate for an outside counsel to substitute its business judgment for management of the client's, including as to the value paid pursuant to a settlement agreement or the valuation of a release.

During his testimony, Dean Ferruolo may discuss documentary evidence. In addition to the evidence listed above, his testimony may include, but is not limited to, the following:

- **GX-563**: Admitted during trial, this evidence reflects the benefit of a release for Retrophin.

- **GX-565**: Admitted during trial, this evidence showing Mr. Greebel sought board approval of agreements.

The Honorable Kiyo Matsumoto
May 28, 2018
Page 6

- **DX-118-26A**: Admitted during trial, this evidence reflected board approval of agreements.

***Third***, Mr. Greebel will present additional arguments that he will support with some combination of documentary evidence and the testimony of either or both Ms. Klein and/or Dean Ferruolo.  Specifically, as to the consulting agreements, Mr. Greebel's position is that the government did not prove by a preponderance of the evidence that the two agreements at issue constituted a loss to Retrophin that should be attributed to Mr. Greebel.  Instead, these agreements represent a benefit to Retrophin in the form of legitimate consulting services, which the Court recognized in regard to Darren Blanton's agreement.  *See, e.g.*, Tr. 8125:17–20 (The Court: "But Blanton actually did do work for Retrophin by introducing him to investors and . . . trying to get money for the company.").  Similarly, Mr. Greebel had no reason to question the validity of Mr. Geller's agreement, particularly given that the agreement made between Mr. Shkreli and Mr. Geller was for 300,000 shares, and the stock was trading at $5 per share at the time.  As Mr. Geller wrote to Mr. Greebel in an email during the time his agreement was being decided, that amount ($1.5 million) would "equal [his] whole investment."  **GX-105-12** (email chain between Mr. Geller and Mr. Greebel; admitted).  Because the evidence at trial—including **DX-1106** (Darren Blanton's consulting agreement; admitted); **DX-7917** (evidence showing intent to have Mr. Blanton perform services; admitted); **GX-245** (email from Marc Panoff forwarding materials for Board meeting, including Geller consulting agreement; admitted); **GX-105-48** (email from Mr. Greebel to Mr. Geller noting Board approval in relation to Mr. Geller's performance of services; admitted)—showed that the consulting work contemplated in these agreements constituted real consideration in exchange for the shares and money received, the value of those should not be factored into any loss amount attributable to Mr. Greebel.

## II. Evidence as to Count 8 Loss Amount

The government incorrectly asserts that the Court should adopt as to Mr. Greebel the same loss amount—$4 million—that it found as to Mr. Shkreli on Count 8.  *See* Dkt. 601; Dkt. 606.  Probation first calculated that amount by multiplying the 2 million freely trading Fearnow shares (assuming *arguendo* for purposes of loss calculation to be in Mr. Shkreli's control) by the $2 differential in stock price between the $3 price used in the February 2013 PIPE transaction and the $5 high price reached during the relevant period.

***First***, as addressed in his earlier loss submissions, Mr. Greebel's initial position is that the Court based the allocation of $4 million of intended loss by Mr. Shkreli on the evidence of Mr. Shkreli's "subjective intent" to keep the stock price of Retrophin above $3 and as high as $5.  We respectfully submit that the government has not identified any such evidence of Mr. Greebel's "subjective" intent to do the same thing, or evidence that Mr. Greebel understood

The Honorable Kiyo Matsumoto
May 28, 2018
Page 7

and/or supported Mr. Shkreli's attempt to do the same thing.  Based on our review of the evidence both admitted and marked but not admitted at trial, Mr. Greebel does not appear on any email with Mr. Shkreli where they discuss any goal of trying to obtain a certain stock price on or after the date of the reverse merger with Desert Gateway and in connection with the Fearnow shares or the February 2013 PIPE.  While Mr. Greebel was aware that the February 2013 PIPE shares were being offered to investors at $3 per share, that is not the same as evidence that Mr. Greebel subjectively knew that Mr. Shkreli intended to cause investor losses of at least $4 million by keeping the market price of shares at or above $3.  The government has not identified such evidence to date with respect to proof against Mr. Greebel because we respectfully submit there is no such evidence.  To the extent the government will rely on a series of emails in which Mr. Shkreli writes to Mr. Greebel about "need[ing]" to keep the share price at $5, which the Court noted but did not rely on for good reasons in its Order as to Mr. Shkreli, Dkt. 535 at 93 n.25, this exchange occurred in early November 2012, a time that predates the conduct at issue for Count 8 loss and does not have anything to do with the alleged scheme to intentionally raise the share price through or related to a control over Fearnow shares following the reverse merger.  Moreover, without any testimony about the meaning of the words in these email exchanges, the government has not been able to explain such meaning nor demonstrate by any level of proof that Mr. Greebel had a subjective intent to agree to engage in an illegal conspiracy to control the price of Retrophin shares following the reverse merger.

**_Second_**, Mr. Greebel intends to call as an expert witness Zachary Prensky.  Mr. Prensky is an active and successful investor with nearly two decades of experience managing wealth and making sophisticated investments.  Mr. Prensky is currently the CEO of LB Pharmaceuticals, Inc., and has worked previously as both a lead investor and investment banker in emerging high-growth companies, particularly early-stage pharmaceutical companies.  In his time as an investor, Mr. Prensky has invested in more than fifteen PIPE transactions.  Indeed, while Mr. Prensky did not participate in the February 2013 PIPE for Retrophin, he did participate in the August 2013 PIPE for Retrophin, demonstrating his familiarity with Retrophin itself, with the PIPE documents, and with the parties who participated in the initial PIPE in February 2013.  He has significant experience evaluating these types of deals and special knowledge of the details of such transactions and the types of investors who typically participate.

Based on his many years of professional experience, we expect Mr. Prensky to testify that, respectfully, the foundation upon which Probation based its Count 8 loss amount does not accurately reflect the nature of PIPE transactions and their investors.  Specifically, Mr. Prensky will testify, in sum and substance, that if the share price fell below $3, PIPE investors would not have purchased the shares in the open market.  PIPE investors, in fact, would have gained an advantage had the price dropped below $3 in their negotiations with Retrophin on the terms and/or price of the PIPE.  Mr. Prensky will testify about the many

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
May 28, 2018
Page 8

reasons that PIPE investors would rather engage in a PIPE than buy shares in the open market even if the stock price had fallen below $3 per share. For example, Mr. Prensky will testify that PIPE investors know that, if they buy thousands to tens of thousands to hundreds of thousands of shares on the open market in a company trading on the over-the-counter market, they would drive up the price of the stock of Retrophin significantly, undercutting their ability to buy shares and putting them significantly at risk. Indeed, a purchase on the open market of just a few thousand shares—let alone the volume that PIPE investors would have bought—had an impact on the stock price.

Mr. Prensky will also discuss the myriad other benefits PIPE investors receive. PIPE investors, unlike investors in the general market, have access to the company's management, including the ability to speak with management directly about the company's publicly available information and what it means. PIPE investors, unlike the general market, buy the shares at a discount to the market price. PIPE investors, unlike the general market, also obtain warrants, which represent a huge benefit. Indeed, Mr. Prensky will explain the significant warrants PIPE investors received in the February 2013 PIPE and discuss the warrants' value to those investors. Moreover, he will discuss how those warrants can be used to hedge the investment in the PIPE should the market price of the company's stock fall, and he will explain that this is a hedging benefit that no ordinary market participant receives. Mr. Prensky will further testify about the meaning and significance of the full-ratchet anti-dilution protection that PIPE investors, unlike the general market, received. In this context, we will ask Mr. Prensky about the terms of the February 2013 PIPE and discuss how the PIPE works and why Probation's proffered theory of loss does not make sense, particularly as to Mr. Greebel.

Additionally, we anticipate asking Mr. Prensky about whether and the extent to which investors were aware or unaware that Retrophin was a company on the brink of financial disaster and thus would have valued the company lower. *See* Dkt. 535 at 94. We expect Mr. Prensky to testify that, in the course of deciding to invest in a PIPE, a reasonable investor would review a company's relevant SEC filings. Here, Retrophin's Form 8-K filed in late December 2012 and other SEC filings during the relevant period—immediately preceding the February PIPE—disclosed the financial position of the company, and any investor (PIPE or general public) would have been aware of the fact that it had no revenues and significant liabilities, and that the auditors had determined that Retrophin had a risk as a going concern.

***Third***, Mr. Greebel intends to offer documentary evidence to support his position as to Count 8 loss. The evidence we have identified to date (and we will notify the Court and the government should we identify additional evidence as we meet with our witnesses this week and prepare for the hearing) consists of the following:

GIBSON DUNN

The Honorable Kiyo Matsumoto
May 28, 2018
Page 9

- **GX-303**:  Admitted during trial, this evidence shows the material terms of the PIPE transaction in February 2013, which Mr. Greebel emailed to the members of the Board of Directors of Retrophin prior to the Board's approval of the PIPE.

- **DX-116-80**:  Admitted during trial, this is Retrophin's as-filed 10-Q for the period ending March 31, 2013, which includes the PIPE.

- **DX-104-97A**:  Admitted during trial, this is Retrophin's 8-K filed December 18, 2012, less than two months before the PIPE, which disclosed Retrophin's financial position and serves as evidence of the investing public's knowledge thereof.

- **DX-6170 & DX-6172**:  Marked as exhibits, but not admitted during trial, these contain a list of investors in the February 2013 PIPE, establishing proof of the actual participants in the PIPE, the transaction terms, and the numbers of shares and warrants they received.

*Finally*, depending on the course of the hearing and our other evidence, we may present expert testimony generally about PIPEs from Dean Ferruolo.

Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky