# ATTACHMENT A

| | |
|---|---|
| **From:** | **sgrichardson2@aol.com** |
| **Sent:** | **Monday, September 10, 2012 10:10 PM** |
| **To:** | **Martin Shkreli** |
| **Subject:** | **Re: Retrophin Names Stephen Aselage as Chief Executive Officer** |

M, great. Do u have Steve's email address so I can send him a welcome note, S
Sent via BlackBerry by AT&T

**From:** Martin Shkreli <Martin@retrophin.com>
**Date:** Mon, 10 Sep 2012 14:29:29 +0000
**To:** Martin Shkreli<Martin@retrophin.com>
**Subject:** Retrophin Names Stephen Aselage as Chief Executive Officer

**Contacts:**

| | |
|---|---|
| Retrophin, LLC | 6 Degrees |
| Tom Fernandez, President (MSMB Capital) | Tony Plohoros, Principal |
| (646) 837-5861 | (908) 591-2839 |
| tom@msmbcapital.com | tplohoros@6degreespr.com |

## Retrophin Names Stephen Aselage as Chief Executive Officer

### *Industry veteran brings more than 30 years of pharmaceutical expertise*

### *Strong track record in rare diseases and global markets*

### *Company moves headquarters to San Diego*

**New York, NY (September 10, 2012)** – Retrophin, LLC, a privately held biotechnology company focused on discovering and developing treatments for rare and life-threatening diseases, today announced that it has named Stephen Aselage as its new Chief Executive Officer, effective October 16. Aselage was named to the Board on September 6. The company also announced that it is moving its headquarters from New York City to San Diego, CA, where it already has an office.

Aselage brings more than 30 years of pharmaceutical/biotechnology expertise to Retrophin. He joins the company from BioMarin Pharmaceutical Inc., where he was Executive Vice President and Chief Business Officer. During his seven years with BioMarin, he built the commercial and medical affairs functions that launched three commercial products and developed commercial business in more than 45 countries.

"We welcome Steve's global pharmaceutical experience across multiple disciplines, expertise in rare diseases, and leadership acumen to Retrophin," said Martin Shkreli, President and Founder of Retrophin. "Steve shares my vision and passion for finding treatments to help people with rare, life-threatening diseases, which make him an ideal candidate for CEO. His experience in enabling patients access to critical medications around the globe is particularly useful, as we want to ensure that every patient who might benefit from our treatments has the opportunity to do so."

"I'm excited to be leading the Retrophin team at a time when the company has so many opportunities for growth and promising treatments for rare diseases in the pipeline," said Aselage. "I look forward to drawing from my experience in rare diseases as I work to contribute to Retrophin's bright future."

E. GREEBEL

DX-104-51

Aselage also held leadership roles with Cell Therapeutics, Sangstat Medical Corporation, Advanced Tissue Sciences and Genentech. He worked briefly for Genzyme, as well, assisting in the transition following its acquisition of Sangstat. Earlier in his career, he held a variety of sales and sales management positions at companies including Rhone-Poulenc Rorer Pharmaceuticals (now Sanofi-Aventis) and Bristol Laboratories. Aselage received his B.S. in Biology from the University of Notre Dame.

**About Retrophin, LLC**

Retrophin, LLC is a privately held biotechnology company focused on discovering and developing treatments for rare and life-threatening diseases. Retrophin is currently developing treatments for focal segmental glomerulosclerosis (FSGS), Pantothenate Kinase-Associated Neurodegeneration (PKAN), Duchenne Muscular Dystrophy and other catastrophic diseases. The company's lead compound, RE-021, formerly known as DARA, is scheduled to begin enrollment in a Phase II clinical trial for FSGS in the near future. Retrophin's Series A financing was led by MSMB Capital and several current and former senior executives at global pharmaceutical and healthcare companies.

# # #

http://www.businesswire.com/news/home/20120910006157/en

SR000150

8-K 1 e610298_8k-desert.htm

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, DC  20549

## FORM 8-K

**CURRENT REPORT**
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **December 12, 2012**

# DESERT GATEWAY, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 000-53293 | 26-2383102 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File No.) | (I.R.S. Employer Identification No.) |

**777 Third Avenue, 22nd Floor, New York, NY 10017**
**(Address of Principal Executive Offices)**

**(212) 983-1310**
**(Registrant's telephone number, including area code)**

**501 South Johnstone, Suite 501, Bartlesville OK 74003**
**(Former Name or Former Address if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2 below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).
☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR.14d-2(b))
☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

1 | Page

E. GREEBEL

DX-104-97A

## EXPLANATORY NOTE

This Current Report on Form 8-K is being filed in connection with a series of transactions consummated by Desert Gateway, Inc. (the "Company"), and with certain events and actions taken by the Company.

This Current Report on Form 8-K includes the following items on Form 8-K:

| | |
|---|---|
| Item 1.01 | Entry into a Material Definitive Agreement |
| Item 2.01 | Completion of Acquisition or Disposition of Assets |
| Item 3.02 | Unregistered Sales of Equity Securities |
| Item 5.01 | Changes in Control of Registrant |
| Item 5.02 | Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers; Compensatory Arrangements of Certain Officers |
| Item 5.06 | Change in Shell Company Status |
| Item 9.01 | Financial Statements and Exhibits |

When used in this Current Report on Form 8-K, the terms "we," "us," "our" and similar terminology reference to the Company.

**Item 1.01. Entry into a Material Definitive Agreement.**

The disclosures set forth in Item 2.01 hereof are hereby incorporated by reference into this Item 1.01.

**Item 2.01. Completion of Acquisition or Disposition of Assets.**

Pursuant to an Agreement and Plan of Merger dated December 12, 2012, or the Merger Agreement, by and among Desert Gateway, Inc., a Delaware corporation which is referred to herein as the Company, Desert Gateway Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of the Company, or Merger Sub, and Retrophin, Inc., a Delaware corporation, which is referred to hereinafter as Retrophin, Merger Sub merged with and into Retrophin, with Retrophin remaining as the surviving entity and a wholly-owned operating subsidiary of the Company. This transaction is referred to throughout this report as the "Merger." The Merger was effective as of December 12, 2012, upon the filing of a certificate of merger with the Secretary of State of the State of Delaware.

2 | Page

At the effective time of the Merger, or the Effective Time, the legal existence of Merger Sub ceased and (i) 869,179 shares of common stock, par value $0.001 per share, or the Retrophin Common Stock, which represents all of the issued and outstanding Retrophin Common Stock and (ii) 155,461 shares of Series A Preferred Stock, par value $0.001 per share, or the Retrophin Preferred Stock, which represents all of the issued and outstanding Retrophin Preferred Stock, that was outstanding immediately prior to the Effective Time were cancelled. Simultaneously, the Company issued to the former holders of Retrophin Common Stock and Retrophin Preferred Stock, in consideration of their capital stock of Retrophin, an aggregate of 5,434,120 shares of the Company's common stock, par value $0.0001 per share.

Upon completion of the Merger, the former stockholders of Retrophin held 68.9% of the outstanding shares of capital stock of the Company. Accordingly, the Merger represents a change in control of the Company. As of the date of this report, there are 8,338,837 shares of the Company's common stock outstanding and no shares of the Company's preferred stock outstanding.

The Merger will be accounted for as a capital transaction. Upon effectiveness of the Merger, Retrophin's business plan became the business plan of the Company. Upon completion of the Merger, all management of the Company resigned and the management of Retrophin became the management of the Company.

The foregoing description of the Merger Agreement and the transactions contemplated thereby do not purport to be complete and are qualified in their entireties by reference to the Merger Agreement a copy of which is filed as Exhibit 2.1, hereto and is hereby incorporated by reference herein.

## CAUTIONARY NOTE ON FORWARD LOOKING STATEMENTS

Certain information contained in this Current Report on Form 8-K include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. The statements herein which are not historical reflect our current expectations and projections about the Company's future results, performance, liquidity, financial condition, prospects and opportunities and are based upon information currently available to the Company and their management and their interpretation of what is believed to be significant factors affecting the businesses, including many assumptions regarding future events. Such forward-looking statements include statements regarding, among other things:

- our ability to produce, market and generate sales of our products;

- our ability to develop, acquire and/or introduce new products;

- our projected future sales, profitability and other financial metrics;

- our future financing plans;

- our plans for expansion of our facilities;

- our anticipated needs for working capital;

- the anticipated trends in our industry;

3 | Page

- our ability to expand our sales and marketing capability;

- acquisitions of other companies or assets that we might undertake in the future; and

- competition existing today or that will likely arise in the future.

Forward-looking statements, which involve assumptions and describe our future plans, strategies and expectations, are generally identifiable by use of the words "may," "should," "expect," "anticipate," "estimate," "believe," "intend," "seek," or "project" or the negative of these words or other variations on these words or comparable terminology. Actual results, performance, liquidity, financial condition and results of operations, prospects and opportunities could differ materially from those expressed in, or implied by, these forward-looking statements as a result of various risks, uncertainties and other factors, including the ability to raise sufficient capital to continue the Company's operations. Actual events or results may differ materially from those discussed in forward-looking statements as a result of various factors, including, without limitation, the risks outlined under "Risk Factors" and matters described in this Current Report on Form 8-K generally. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained in this Current Report on Form 8-K will in fact occur. Potential investors should not place undue reliance on any forward-looking statements. Except as expressly required by the federal securities laws, there is no undertaking to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances or any other reason.

Potential investors should not place undue reliance on any forward-looking statements. Except as expressly required by the federal securities laws, there is no undertaking to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances or any other reason.

The specific discussions herein about the Company include financial projections and future estimates and expectations about the Company's business. The projections, estimates and expectations are presented in this Current Report on Form 8-K only as a guide about future possibilities and do not represent actual amounts or assured events. All the projections and estimates are based exclusively on the Company management's own assessment of its business, the industry in which it works and the economy at large and other operational factors, including capital resources and liquidity, financial condition, fulfillment of contracts and opportunities. The actual results may differ significantly from the projections.

Potential investors should not make an investment decision based solely on the Company's projections, estimates or expectations.

**Business**

Those statements in the following discussion that are not historical in nature should be considered to be forward looking statements that are inherently uncertain. Actual results and the timing of the events may differ materially from those contained in these forward looking statements due to a number of factors, including the disclosures set forth in this Item 2.01 to this Current Report on Form 8-K, under the headings "Cautionary Note on Forward Looking Statements" and "Risk Factors", which disclosures are incorporated herein by reference. As a result of the Merger, the Company, assumed management of the business activities of Retrophin and the stockholders of the Company have the right to appoint all of the members of the board of directors of the Company. As used in this section, the terms "we", "our", "us" and the "Company" refer to the Company, our direct and indirect subsidiary and Retrophin, our principal operating business.

4 | Page

## Company Background

We were incorporated on February 8, 2008, as a subsidiary of American Merchant Data Services, Inc. Our former parent company, American Merchant Data Services, Inc. (American Merchant) was originally incorporated on January 27, 2000, in Florida as Boats.com, Inc. On September 25, 2002 Boats.com, Inc. changed its name to American Merchant Data Services, Inc. American Merchant later re-domiciled to Oklahoma in October, 2007, under the name American Merchant Data Merger, Inc. ("AMDM").

During the fiscal period ended February 29, 2008, we consummated a reorganization which we refer to collectively as the "2008 Reorganization" pursuant to Section 1081(a) of the Oklahoma General Corporation Law, as a tax-free organization. On February 8, 2008, AMDM caused Desert Gateway, Inc. ("Desert Gateway") to be incorporated in the State of Oklahoma, as a direct, wholly-owned subsidiary of AMDM and caused American Merchant Data Services, Inc. ("AMDS") to also be incorporated in the State of Oklahoma, as a direct wholly-owned subsidiary of Desert Gateway. Under the terms of the Reorganization, AMDM was merged with and into AMDS pursuant to Section 1081(g) of the General Corporation Law of the State of Oklahoma ("OGCL"). Upon consummation of the Reorganization, each issued and outstanding share of AMDM Common Stock was converted into and exchanged for a share of common stock of Desert Gateway (on a share-for-share basis) having the same designations, rights, powers and preferences, and qualifications, limitations and restrictions as the shares of AMDM being converted. There was no spin-off and AMDM's corporate existence ceased. Under the 2008 Reorganization all American Merchant shareholders became shareholders of Desert Gateway in the same proportion. In conjunction with the 2008 Reorganization, AMDM concluded a downstream merger into the second subsidiary AMDS. All of AMDM's losses and net operating losses carried forward to AMDS. Following the Reorganization the Company was re-domiciled to Delaware. Since 2004 and prior to consummation of the domiciliary merger in 2008, neither American Merchant nor Desert Gateway had any existing operations.

To date and as of the date hereof, the Company can be defined as a "shell" company, an entity which is generally described as having no or nominal operations and with no or nominal assets or assets consisting solely of cash and cash equivalents. As a shell company, our sole purpose at this time is to locate and consummate a merger or acquisition with a private entity.

Our common stock is currently traded on the OTC.QB under our symbol of RTRX.

## General

Retrophin is a developmental stage biopharmaceutical company focused on the discovery, development and commercialization of novel molecules for the treatment of a range of human genetic disorders. Our lead product in development is RE-021, a small molecule intended to treat focal segmental glomerulosclerosis (FSGS). Retrophin focuses on developing treatments for serious, unmet and rare diseases. In addition to FSGS, we are currently focusing on developing treatments for pantothenate kinase-associated neurodegeneration (PKAN) and Duchenne muscular dystrophy (DMD). The diseases on which Retrophin focuses are considered "orphan" diseases because they affect fewer than 200,000 patients in the United States. However, such diseases have a profound impact on those that suffer from them and their families.

5 | Page

Currently, we believe that we are the only company that is focusing on developing treatments for these rare and ultra-rare diseases.

## Overview

Retrophin is a developmental stage biopharmaceutical company focused on the discovery, development and commercialization of novel molecules for the treatment of a range of human genetic disorders. Our lead product in development is RE-021, a small molecule intended to treat FSGS. We expect that a phase 2 clinical study of RE-021 to treat FSGS could begin in H1 2013. Our second development program is RE-024, a series of molecules designed to treat PKAN. Our preclinical development of RE-024 is being carried out in collaboration with St. Jude Children's Research Hospital. We expect to file an IND for a lead compound in the RE-024 program by 2014. Our third product in development is RE-001, a modified protein intended to treat DMD. We are planning to initiate first-in-human enabling studies of RE-001. Preclinical studies to date, in mice, have suggested that RE-001 improves muscles function and improves mortality. We expect to file for approval to begin human clinical trials of RE-001, to treat DMD, by the end of 2014.

Retrophin's focus is to seek treatment for serious, unmet, rare diseases. FSGS, PKAN and others are orphan diseases affecting fewer than 200,000 patients in the United States and have profound impacts on sufferers. We believe that worldwide sales potential for Retrophin's development stage products could exceed $1 billion per year.

We are initially focused on developing RE-021 for patients with FSGS. We have licensed the exclusive worldwide rights to RE-021 from Ligand Pharmaceuticals, Inc., which had previously been responsible for the development efforts.

During the next 12 to 18 months, we plan to:

- Initiate a placebo-controlled phase II clinical trial in FSGS; and

- Initiate an open-labeled phase II clinical trial in other nephropathies .

## Our Strategy

Retrophin's goal is to become a leading biopharmaceutical company specializing in the development and commercialization of therapies for catastrophic diseases. Our commercialization strategy is to acquire pharmaceutical products for serious diseases and greatly increase patient and physician awareness to increase market penetration. Our development strategy is to focus on product opportunities which can take advantage of the shorter regulatory cycles that can be achieved with treatments for rare, life-threatening diseases. Beyond PKAN, FSGS, and DMD, Retrophin has plans to discover and develop drug candidates for other orphan diseases, which may include cystic fibrosis and spinal muscular atrophy.

To achieve this goal, we intend to:

- **Expand our product pipeline by pursuing additional acquisitions of niche orphan drugs.** We believe that there are multiple drugs for treating life-threatening diseases that may be neglected by other pharmaceutical companies. We believe that we can acquire certain of these niche products and build upon our commercial infrastructure in orphan disease to achieve increased sales.

- **Focus on developing innovative orphan drugs.** We focus on novel, life-saving orphan drug candidates in order to take advantage of our competitive strengths. We believe that drug development for orphan drug markets is particularly attractive because relatively small clinical trials can provide meaningful information regarding patient response and safety. Furthermore, the path to regulatory approval and commercial success for orphan drugs is less risky for an effective therapy, as compared to non-orphan drugs. Finally, we believe that our capabilities are well suited to the orphan drug market and represent distinct competitive advantages.

- **Build a sustainable pipeline by employing disciplined decision criteria.** We seek to build a sustainable product pipeline by employing multiple therapeutic approaches and by developing or acquiring orphan drug candidates. We employ disciplined decision criteria to assess drug candidates, favoring drug candidates that have undergone at least some clinical study. Our decision to license a drug candidate will also depend on the scientific merits of the technology; the costs of the transaction and other economic terms of the proposed license; the amount of capital required to develop the technology; and the economic potential of the drug candidate, should it be commercialized. We believe this strategy minimizes our clinical development risk and allows us to accelerate the development and potential commercialization of current and future drug candidates. We intend to pursue regulatory approval for a majority of our drug candidates in multiple indications.

- **Evaluate the commercialization strategies on a product-by-product basis to maximize the value of each.** As we move our drug candidates through development toward regulatory approval, we will evaluate several options for each drug candidate's commercialization strategy. These options include building our own internal sales force; entering into joint marketing partnerships with other pharmaceutical or biotechnology companies, whereby we jointly sell and market the product; and out-licensing our products, whereby other pharmaceutical or biotechnology companies sell and market our product and pay us a royalty on sales. Our decision will be made separately for each product and will be based on a number of factors including capital necessary to execute on each option, size of the market and terms of potential offers from other pharmaceutical and biotechnology companies.

7 | Page

**Industry Analysis**

The pharmaceutical industry in which Retrophin seeks to compete is highly competitive, strictly regulated, and rapidly changing. In the U.S. and abroad, governments regulate how drugs are approved, manufactured, sold, and paid for. The cost to get a drug to market can be substantial, oftentimes approaching $1 billion, and the pharmaceutical industry is characterized by long (often 7-10 years) time periods between the time an idea for a drug is conceived and the time that sale of said drug can legally begin. Despite the time required to discover and develop drugs, the pharmaceutical industry can afford substantial profit (global pharmaceutical sales are expected to reach $ 1 trillion in the next few years) if drug development is carried out correctly. While the challenge of creating drugs can be daunting, the industry can afford advantages by giving pharmaceutical companies near monopolistic exclusivity. For example, Retrophin is seeking to develop drugs to treat orphan diseases which can afford freedom from competition (in the U.S. for 7 years) if the F.D.A. grants "orphan drug status". Additionally, pharmaceuticals can enjoy strong freedom from competition based on the awarding of patents by the U.S. Patent and Trademark Office, which provides 20 years of intellectual protection.

In addition to government regulations, the pharmaceutical industry has elements of monopsony from managed care and government payers for drugs. Going forward, global efforts toward health care cost containment efforts are expected to continue to exert pressure on product pricing and market access. Further, the United States enacted major health care reform legislation in 2010, which began to be implemented in 2011. This new law is expected to expand access to health care to millions Americans by the end of the decade who did not previously have regular access to health care. The effect that this legislation will have on the pharmaceutical industry is uncertain.

Given the potential profits in the pharmaceutical industry, there is intense competition to succeed. Other large pharmaceutical and biotechnology companies, academic institutions, governmental agencies and other public and private research organizations are similarly pursuing the development of novel drugs that target the same diseases that we are seeking to treat. Retrophin faces, and expects to continue to face, intense and increasing competition as new products enter the market and advanced technologies become available. Despite the challenges and uncertainties of the pharmaceutical industry, Retrophin believes that it is well-positioned to compete in this potentially lucrative field.

**Competitive strengths**

Retrophin seeks to discover, develop and deliver to patients first-in-class or best-in-class medicines for the treatment of rare, life-threatening, diseases. A first-in-class drug refers to the first approved or marketed drug within a class of drug candidates that operate through a particular target or molecular mechanism in the body to affect a specific disease. A best-in-class drug refers to a drug, among all drugs within a class of drugs which operate through a particular target or molecular mechanism in the body to affect a particular disease, that is superior to all other such drugs in the class by virtue of its superior efficacy, superior safety, ease of administration, or some combination of the foregoing. We believe that RE-024, a drug for the treatment of PKAN, has the potential to be a first-in-class drug, because no drug currently uses the particular molecules of RE-024 in the treatment of PKA. We believe that RE-021, a drug for the treatment of FSGS, has the potential to be a best-in-class drug due to its superior efficacy and ease of administration.

8 | Page

Retrophin has acquired/built a pipeline of innovative product candidates for multiple rare disease indications, all of which represent proprietary applications of Retrophin's expertise in drug technologies. Historically and going forward, Retrophin's product candidates were/will result from a mixture of discoveries by in-house scientists and through judicious in-licensing of assets from other organizations, for example, other biotech/pharmaceutical companies, universities, or research institutes. Retrophin believes that its small molecule technologies, team of experienced management and scientists, and its corporate culture form the basis of its potential long-term competitive advantage in seeking to deliver first-in-class and best-in-class medicines.

Retrophin's lead product candidate (RE-021) has completed Phase 1 clinical studies demonstrating safety and efficacy, and we expect to initiate a Phase 2 clinical trial in 2013.  Additionally, Retrophin's second most developed program (RE-024) is in preclinical testing, and we will seek to initiate clinical trials of this product candidate as soon as is practical.

**Research and Product Development Pipeline**

**RE-021**

RE-021 is our lead development stage compound. RE-021 is an investigational therapeutic agent which acts as both a potent angiotensin receptor blocker (ARB) as well as a selective endothelin receptor antagonist (ERA) preferential for endothelin receptor type A. Retrophin has secured a license to RE-021 from Ligand and Bristol-Myers Squibb. We are developing RE-021 as a treatment for focal segmental glomerulosclerosis (FSGS) and other nephropathies. We also intend to develop RE-021 for resistant hypertension and in other therapeutic areas.

ARBs and ERAs have a rich history of clinical development.  ARBs have a relatively narrow mechanistic purview: they are known to be anti-hypertensive agents with positive downstream effects on proteinuria and end-organ (kidney and heart) prognosis. ERAs represent a less well-understood clinical mechanism. Over a dozen ERAs have been trialed clinically, for a diverse array of diseases including the successfully approved Tracleer (bosentan) and Letairis (ambrisentan) for pulmonary arterial hypertension (PAH), the unsuccessful darusentan for resistant hypertension and heart failure, the withdrawn-from-market Thelin (sitaxsentan) for PAH, the failed avosentan for diabetic nephropathy, the failed zibotentan in prostate cancer, the failed clazosentan in subarachnoid hemorrhage, the failed tezosentan in heart failure, the failed atrasentan in prostate cancer, the failed enrasentan in heart failure and the continuing trials of macitentan.

*RE-021 in FSGS*

Retrophin intends to develop RE-021 as a treatment for focal segmental glomerulosclerosis (FSGS). FSGS is a leading cause of end stage renal disease (ESRD) and nephrotic syndrome. There are no FDA-approved treatments for FSGS and the off-label armamentarium is limited to ARBs, steroids, and immunosuppressant agents which are only effective for some patients. We estimate that there are at least 40,000 FSGS patients in the United States, which we believe could result in potential annual revenue of greater than $1 billion/year for RE-021.

We believe that FSGS as an indication would be eligible to receive orphan drug status from both the FDA and the EMEA. FSGS is similar to over a dozen other rare, but severe, nephropathies and glomerulopathies for which RE-021 could serve a critical role. Retrophin believes that a drop in proteinuria could serve as a primary endpoint in a pivotal clinical study and that FDA approval could be received on the basis of a  single, small pivotal trial.

9 | Page

*RE-021 in other indications*

In addition to developing RE-021 as a potential treatment for FSGS, Retrophin intends to seek to begin clinical development of RE-021 in, IgA nephropathy, diabetic nephropathy, resistant hypertension, and other rare nephropathies as soon as possible.

*IgA Nephropathy*

IgA nephropathy is a form of glomerulonephritis with high proteinuria as its key symptom. There is no FDA approved therapy for IgA nephropathy. The prognosis of this disease is directly related to proteinuria level, with roughly one-third to one-fifth of patients losing their kidney within 10 years, with risk continuing linearly as age progresses. Most patients are diagnosed young, so dialysis, transplant and death are inevitable in these patients. There is a range of estimated patients from 40,000 to 150,000 in the United States. Assuming 35% of these patients have very severe proteinuria, and a $25,000 per-patient per-year price, peak global sales of RE-021 in IgA nephropathy can exceed over $1 billion.

There has never been a large clinical trial in IgA nephropathy. We believe that it is widely accepted and evidence-based that proteinuria is an appropriate endpoint for measuring the progress of this disease. Following completion of a small, open-label study, we would seek to begin a pivotal trial evaluating RE-021 in IgA nephropathy patients having proteinuria >1g/day. We believe that an acceptable primary endpoint for such a trial would be change in proteinuria at three months. Based on other IgA nephropathy studies, we believe that approximately 150 patients could be enrolled in about one year. Retrophin could be in a position to start a pivotal clinical study in IgA nephropathy in 2014.

*Resistant Hypertension*

Retrophin intends to mirror a previous darusentan phase 2 trial seeking to treat resistant hypertension with RE-021. We believe that the potential potency of RE-021 and an increased sample size compared to a previous study could allow for improvement in the expected primary endpoint of systolic blood pressure change at 10 weeks. In this population, trial design is a key concern. Because resistant hypertension is a complex clinical "situation," it requires exponentially more clinical trial programming and design. Twenty-four hour ambulatory blood pressure automated monitoring is a more accurate assay for blood pressure than sitting blood pressure. We estimate that this study could begin enrolling in 2014. If results of this study are positive, Retrophin would target a partnership with a major pharmaceutical company to continue development.

**RE-024**

Retrophin is developing RE-024, a novel small molecule, as a potential treatment for pantothenate kinase-associated neurodegeneration (PKAN). PKAN is the most common form of neurodegeneration with brain iron accumulation (NBIA). Classic PKAN is a genetic disorder that is typically diagnosed in the first decade of life. Consequences of PKAN include dystonia, dysarthria, rigidity, retinal degeneration, and severe digestive problems. PKAN is estimated to affect 1 to 3 per million people. The devastating effects of PKAN—most sufferers end up wheelchair bound, as well as suffering from dementia and other psychiatric problems, and typically don't live past age 20—are clear. There are currently no viable treatment options for patients with PKAN: the opportunity with RE-024 is to transform treatment of PKAN with a potentially life changing and life-extending impact on patients.

10 | Page

PKAN is caused by a genetic downregulation of the enzyme pantothenate kinase (PANK), via a mutation in the pantothenate kinase-2 gene. PANK is responsible for the conversion of pantothenic acid to 4′-phosphopantothenic acid, a precursor to Coenzyme A (CoA) in the brain. CoA is involved in a range of important biochemical functions, including the citric acid cycle, steroid biosynthesis, and histone and tubulin acetylation. Retrophin's approach seeks to improve neurological outcomes by directly replacing in the brain a molecule missing from PKAN sufferers.

RE-024 is a preclinical investigational program. Retrophin is in the process of synthesizing a focused library of pantothenate phosphate prodrugs. *In vitro* testing of these molecules is underway, and we expect that *in vivo* evaluation will begin in early 2013. Phase 1 clinical studies are expected to begin early in 2014, and, with strong Phase 1/2 data, an NDA filing could occur as early as 2016.

*Pantothenic acid pro-phosphates, a potential solution*

PKAN is caused by a misregulation in a single protein responsible for neurological function, namely, pantothenate kinase-2 (PANK2). PANK is the first enzyme responsible for the synthesis of Coenzyme A (CoA), and specifically phosphorylates pantothenic acid (vitamin B5).

*Retrophin's Approach to Treating PKAN: RE-024*

PKAN is caused by dysregulation of the pantothenate kinase (PANK) enzyme, which converts pantothenic acid to phosphopantothenic acid. The reaction catalyzed by PANK is depicted in Figure 1.



Figure 1: Reaction catalyzed by PANK.

RE-024 is a small molecule "prophosphate" designed to circumvent the need for PANK, the dysfunctional enzyme responsible for PKAN, that is, to directly supply cells with the product of the reaction, namely phosphopantothenic acid. A simple approach to this could be to use the product of the enzymatic reaction, namely, 4′-phosphopantothenic acid. This approach has been mentioned in the literature, but it has been recognized that the highly charged molecule would not be able to permeate the lipohilic cell membrane. The approach taken with RE-024 is to follow the lead of nucleotide chemistry, and to generate prodrugs of phosphates ("pro-phosphates") to mask the charge of the dianion. The approach described has been successfully used in improving the bioavailability of nucleotides.

11 | Page

Retrophin is in the process of synthesizing a library of derivatives of RE-024, via a CRO.  The library is designed to define the optimal characteristics of molecule, specifically, with a view to striking a balance between extra and intracellular stability and lipophilicity.  A similar idea, in the nucleoside case, has been described for potential HCV treatments, for example, GS-7977.

## RE-001

RE-001 is a recombinant, modified form of utrophin, a protein similar to the dystrophin protein that is missing in the muscles of Duchenne muscular dystrophy (DMD) patients.  In RE-001, micro-utrophin is fused to a cell-penetrating peptide known as TAT, which is believed to allow for delivery of the modified form of utrophin into muscle cells, where it is needed for structural support.

### Duchenne Muscular Dystrophy

Duchenne muscular dystrophy is a severe recessive X-linked form of muscular dystrophy characterized by rapid progression of muscle degeneration, eventually leading to loss of ambulation and death.  This affliction affects one in 3,500 males, making it the most prevalent of muscular dystrophies. In general, only males are affected, though females can be carriers. Females may be afflicted if the father is afflicted and the mother is also a carrier/affected. The disorder is caused by a mutation in the dystrophin gene, located in humans on the X chromosome.

Symptoms of DMD usually appear in male children before age five and may be visible in early infancy.  Progressive proximal muscle weakness of the legs and pelvis associated with a loss of muscle mass is observed first.  Eventually this weakness spreads to the arms, neck, and other areas.  As the condition progresses, muscle tissue experiences wasting and is eventually replaced by fat and fibrotic tissue.  By age 10, braces may be required to aid in walking but most patients are wheelchair dependent by age 12.  Later symptoms may include abnormal bone development that lead to skeletal deformities, including curvature of the spine.  Due to progressive deterioration of muscle, loss of movement occurs, eventually leading to paralysis.  The average life expectancy for patients afflicted with DMD varies from late teens to early to mid-twenties. There have been reports of a few DMD patients surviving to the age of 40, but this is extremely rare.

12 | Page

*No Existing Treatment for DMD*

There is no known cure for DMD.  Treatment is generally aimed at controlling the onset of symptoms to maximize quality of life.  Corticosteroids such as prednisolene and deflazacort are commonly used for DMD to increase energy and strength and defer severity of some symptoms.  However, the benefits are temporary, modest and are accompanied by detrimental side effects including muscle wasting, fat deposition and bone loss.  Physical therapy is also used to help maintain muscle strength, flexibility and function.  Orthopedic appliances such as braces and wheelchairs help to provide structural support and improve mobility, and respirators and ventilators assist with managing breathing.  There are new treatments in development to potentially restore the functionality of a gene containing a mutation resulting in DMD by a process called "exon skipping."  The goal of exon-skipping is to realign the translation of genetic information in the dystrophin gene and promote synthesis of a shortened, but functional, version of the protein.  Exon-skipping drugs are still in development stage, and if successful it is expected that they could slow the course of DMD and reduce the severity of the muscle disease.  It is also possible that these exon-skipping therapies, if successful, may be appropriate only for those patients with very specific mutations in the dystrophin gene.

*RE-001*

RE-001 is a novel compound that is being developed to replace dystrophin, the missing protein that has been identified as causing DMD.  Protein replacement therapy is a well-known tool for many diseases such as insulin for diabetes, erythropoietin (EPO) for anemia resulting from chronic kidney disease and myelodysplasia, and human growth hormone (HGH) for short stature, chronic renal failure, and Prader-Willi syndrome, among other conditions.

Figure 2 demonstrates the role of dystrophin in cell stability, that is, to bind the muscle cell membrane to the actin filaments required for the mechanical function of muscle cells.

13 | Page



Figure 2:  Role of dystrophin in muscle cell stabilization.  RE-001 is designed to replace dystrophin in DMD boys.

RE-001 is designed to replace dystrophin by providing a recombinant supply of a modified form of a very similar protein, utrophin, fused to a cell-penetrating peptide (TAT) which allows for delivery of the utrophin protein into the cell where it is needed for structural support and integrity.

In pre-clinical studies, treatment with RE-001 in "mdx" mice (a strain of mice that lack the muscle protein dystrophin), an animal model for DMD, resulted in reduced creatine kinase excretion, a marker of muscle damage.  Retrophin will seek to replicate this result in humans, with creatine kinase as a possible primary endpoint or co-primary endpoint for a Phase 2 trial.

*RE-001 Development Activities*

Two papers on use of TAT-μ-UTR have been published. In the first study (Ervasti *et al., PLoS*, **2009**), the treated mice in the above study showed markedly less muscle degradation, as measured by muscle fiber diameter than those treated with placebo. Additionally, TAT-μ-UTR treated mice exhibited better physical muscle strength, as measured by muscle force assays.  In a second study with a more severe muscle impairment (Ervasti *et al., J. Appl. Physiol.*, **2011**), mice with DMD treated with TAT-μ-UTR had a median overall survival of 43.5 days $\pm$ 2.0 days, compared to 30 days $\pm$ 1.8 days for PBS treated mice.

14 | Page

Direct protein replacement as a potential therapy for Duchenne muscular dystrophy has, to the best of our knowledge, not been attempted to date.

*Planned Phase I Clinical Trial*

We expect to initiate a Phase 1 clinical study of RE-001 in DMD patients by the end of 2014. We can provide no assurances that Retrophin can successfully start this study. The Phase 1 clinical study will initially explore the tolerability and pharmacokinetic behavior of RE-001. Dose amount and frequency will be informed by Retrophin's initial animal studies.

**Licenses and Royalties**

*Ligand License*

In February 2012, we entered into an agreement pursuant to which Ligand agreed to grant us a worldwide license for the development, manufacture and commercialization of RE-021 (DARA). Under the license agreement, Ligand is obligated to transfer to Retrophin certain information, records, regulatory filings, materials and inventory controlled by Ligand and relating to or useful for developing RE-021. We must use commercially reasonable efforts to develop and commercialize RE-021 in specified major market countries and other countries in which we believe it is commercially reasonable to develop and commercialize such products.

As consideration for the license, we are required to make substantial payments upon the achievement of certain milestones totaling up to $106.7 million, if all such milestones are achieved. Should we commercialize RE-021 or any products containing any of these compounds, we will be obligated to pay to Ligand an escalating annual royalty based on net sales of all such products. The license agreement contains other customary clauses and terms as are common in similar agreements in the industry.

**Intellectual Property**

We hold a worldwide exclusive license under our license agreement with Ligand for RE-021 to three granted U.S. patents as well as foreign counterparts thereof and other patent applications and patents claiming priority therefrom.

In the United States, we have a license to issued patents for RE-021, our lead compound, which will currently expire in 2020-2023 before any patent term extension. In jurisdictions which permit such, we will seek patent term extensions, for example as provided for in the Hatch-Waxman Act in the United States, where possible for certain of our patents. We plan to pursue additional patents in and outside of the United States covering additional therapeutic uses of RE-021 from these existing applications. In addition, we will pursue patent protection for any new discoveries or inventions made in the course of our development of RE-021.

15 | Page

If we obtain marketing approval for RE-021 or other drug candidates in the United States or in certain jurisdictions outside of the United States, we may be eligible for regulatory protection, such as five years of new chemical entity exclusivity, seven years of orphan drug exclusivity and as mentioned below, up to five years of patent term extension potentially available in the United States under the Hatch-Waxman Act, 8 to 11 years of data and marketing exclusivity potentially available for new drugs in the European Union, up to five years of patent extension in Europe (Supplemental Protection Certificate), and eight years of data exclusivity potentially available in Japan. There can be no assurance that we will qualify for any such regulatory exclusivity, or that any such exclusivity will prevent competitors from seeking approval solely on the basis of their own studies. See "Government Regulation" below.

Our goal is to obtain, maintain and enforce patent protection for our products, formulations, processes, methods and other proprietary technologies, preserve our trade secrets, and operate without infringing on the proprietary rights of other parties, both in the United States and in other countries. Our policy is to actively seek to obtain, where appropriate, the broadest intellectual property protection possible for our current product candidates and any future product candidates, proprietary information and proprietary technology through a combination of contractual arrangements and patents, both in the United States and abroad. However, even patent protection may not always afford us with complete protection against competitors who may seek to circumvent our patents. Our proprietary rights may not adequately protect our intellectual property and potential products, and if we cannot obtain adequate protection of our intellectual property and potential products, we may not be able to successfully market our potential products.

We will depend upon the skills, knowledge and experience of our scientific and technical personnel, as well as that of our advisors, consultants and other contractors, none of which is patentable. To help protect our proprietary know-how, which is not patentable, and inventions for which patents may be difficult to obtain or enforce, we will in the future rely on trade secret protection and confidentiality agreements to protect our interests. To this end, we plan to require all of our employees, consultants, advisors and other contractors to enter into confidentiality agreements that prohibit the disclosure of confidential information and, where applicable, require disclosure and assignment to us of the ideas, developments, discoveries and inventions important to our business.

**Manufacturing**

We intend to continue to use our financial resources to accelerate development of our drug candidates rather than diverting resources to establish our own manufacturing facilities. We intend to meet our pre-clinical and clinical trial manufacturing requirements by establishing relationships with third-party manufacturers and other service providers to perform these services for us. We do not have any long-term agreements or commitments for these services.

Should any of our drug candidates obtain marketing approval, we anticipate establishing relationships with third-party manufacturers and other service providers in connection with the commercial production of our products. We have some flexibility in securing other manufacturers to produce our drug candidates; however, our alternatives may be limited due to proprietary technologies or methods used in the manufacture of some of our drug candidates.

16 | Page

**Sales and Marketing**

We currently have no commercial infrastructure. In order to commercialize our clinical drug candidates if and when they are approved for sale in the United States or elsewhere, we will need to build marketing, sales and distribution capabilities.

We may be subject to various federal and state laws pertaining to health care "fraud and abuse," including anti-kickback laws and false claims laws. Anti-kickback laws make it illegal for a prescription drug manufacturer to solicit, offer, receive, or pay any remuneration in exchange for, or to induce, the referral of business, including the purchase or prescription of a particular drug. Due to the breadth of the statutory provisions and the absence of guidance in the form of regulations and very few court decisions addressing industry practices, it is possible that our practices might be challenged under anti-kickback or similar laws. False claims laws prohibit anyone from knowingly and willingly presenting, or causing to be presented for payment to third-party payors (including Medicare and Medicaid) claims for reimbursed drugs or services that are false or fraudulent, claims for items or services not provided as claimed, or claims for medically unnecessary items or services. Our activities relating to the sale and marketing of our products may be subject to scrutiny under these laws.

*Pricing and Reimbursement*

A portion of our future end-user demand for our drugs is for patients covered under Medicaid, Medicare and other government-related programs such as TRICARE and the Veterans Administration, or VA. As required by Federal regulations, we will need to provide rebates and discounts in connection with these programs. As a result of Medicaid rebates, we may not generate any net sales with respect to Medicaid sales, but we do generate net sales with respect to Medicare sales, TRICARE sales and sales made to the VA.

In addition, it is possible that future legislation in the United States and other jurisdictions could be enacted which could potentially impact the reimbursement rates for the products we are developing and may develop in the future and also could further impact the levels of discounts and rebates paid to federal and state government entities. Any legislation that impacts these areas could impact, in a significant way, our ability to generate revenues from sales of products that, if successfully developed, we bring to market.

*Competition*

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Most of our competitors are larger than us and have substantially greater financial, marketing and technical resources than we have. If our business strategy is successful, we likely will attract additional competition.

The development and commercialization of new products to treat orphan diseases is highly competitive, and we expect considerable competition from major pharmaceutical, biotechnology and specialty pharmaceutical companies. As a result, there are, and will likely continue to be, extensive research and substantial financial resources invested in the discovery and development of new orphan drug products. Our potential competitors include, but are not limited to, Genentech, GlaxoSmithKline, Roche, Novartis, Pfizer, Boehringer Ingelheim, Sanofi, BioMarin, Sarepta, Vertex, and Jazz Pharmaceuticals.

17 | Page

We are an early stage company with no history of operations. Many of our competitors have substantially more resources than we do, including both financial and technical. In addition, many of our competitors have more experience than us in pre-clinical and clinical development, manufacturing, regulatory and global commercialization. We are also competing with academic institutions, governmental agencies and private organizations that are conducting research in the field of orphan diseases.

Our competition will be determined in part by the potential indications for which drugs are developed and ultimately approved by regulatory authorities. Additionally, the timing of market introduction of some of our potential products or our competitors' products may be an important competitive factor. Accordingly, the speed with which we can develop products, complete pre-clinical testing, clinical trials, approval processes, and supply commercial quantities to market are expected to be important competitive factors. We expect that competition among products approved for sale will be based on various factors, including product efficacy, safety, reliability, availability, price, reimbursement, and patent position.

**Clinical Testing of Our Products in Development**

Each of our products in development, and likely all future drug candidates we develop, will require extensive pre-clinical and clinical testing to determine the safety and efficacy of the product applications prior to seeking and obtaining regulatory approval. This process is expensive and time consuming. In completing these trials, we are dependent upon third-party consultants, consisting mainly of investigators and collaborators, who will conduct such trials.

We and our third-party consultants conduct pre-clinical testing in accordance with Good Laboratory Practices, or GLP, and clinical testing in accordance with Good Clinical Practice standards, or GCP, which are international ethical and scientific quality standards utilized for pre- clinical and clinical testing, respectively. GCP is the standard for the design, conduct, performance, monitoring, auditing, recording, analysis and reporting of clinical trials, and is required by the U.S. Food and Drug Administration, or FDA, to be followed in conducting clinical trials.

**Government Regulation of Marketed Products**

In the United States, FDA regulations govern the research, development, testing, manufacture, quality control, labeling, storage, record-keeping, approval, sale, distribution, advertising and promotion of our products.

The FDA may withdraw product approval for non-compliance with regulatory requirements or if safety or efficacy problems occur after the product reaches the market. The FDA also has the power to require changes in labeling or to prevent further marketing of a product based on the results of post-marketing programs.

18 | Page

The facilities, procedures, and operations of our contract manufacturers must be determined to be adequate by the FDA before a new drug application (NDA) or supplemental new drug application (sNDA) is approved. Additionally, manufacturing facilities are subject to inspections by the FDA for compliance with current good manufacturing practices (cGMP), licensing specifications, and other FDA regulations on an on-going basis. Vendors that supply our finished products or components used to manufacture, package and label products are subject to similar regulations and periodic inspections.

Following such inspections, the FDA may issue notices on Form 483 and issue Warning Letters that could cause us to modify certain activities identified during the inspection. The FDA generally issues a Form 483 notice at the conclusion of an FDA inspection and lists conditions the FDA investigators believe may violate cGMP or other FDA regulations. FDA guidelines specify that a Warning Letter be issued only for violations of "regulatory significance" for which the failure to adequately and promptly achieve correction may be expected to result in an enforcement action.

In addition, the FDA imposes a number of complex regulatory requirements on entities that advertise and promote pharmaceuticals, including but not limited to, standards and regulations for direct-to-consumer advertising, payments to physicians, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet.

Failure to comply with FDA and governmental regulations can result in fines, unanticipated compliance expenditures, recall or seizure of products, total or partial suspension of production and/or distribution, suspension of the FDA's review of NDAs or sNDAs, injunctions, disqualification from participation in government reimbursement programs and criminal prosecution. Any of these actions or events could have a material adverse effect on us both financially and reputationally.

## Government Regulation of Drug Candidates

### United States—FDA Process

The research, development, testing, manufacture, labeling, promotion, advertising, distribution and marketing, among other things, of drug products are extensively regulated by governmental authorities in the United States and other countries. In the United States, the FDA regulates drugs under the Federal Food, Drug, and Cosmetic Act, or the FDCA, and its implementing regulations. Failure to comply with the applicable U.S. requirements may subject us to administrative or judicial sanctions, such as FDA refusal to approve pending New Drug Applications, or NDAs, warning letters, fines, civil penalties, product recalls, product seizures, total or partial suspension of production or distribution, injunctions and/or criminal prosecution.

### Drug Approval Process.

None of our drug product candidates may be marketed in the United States until the drug has received FDA approval. The steps required before a drug may be marketed in the United States generally include the following:

- Completion of extensive pre-clinical laboratory tests, animal studies, and formulation studies in accordance with the FDA's GLP regulations.

19 | Page

- Submission to the FDA of an IND for human clinical testing, which must become effective before human clinical trials may begin.

- Performance of adequate and well-controlled human clinical trials to establish the safety and efficacy of the drug for each proposed indication.

- Submission to the FDA of an NDA after completion of all pivotal clinical trials.

- Satisfactory completion of an FDA pre-approval inspection of the manufacturing facility or facilities at which the active pharmaceutical ingredient, or API, and finished drug product are produced and tested to assess compliance with current good manufacturing practices, or cGMPs.

- FDA review and approval of the NDA prior to any commercial marketing or sale of the drug in the United States.

The development and approval process requires substantial time, effort and financial resources, and we cannot be certain that any approvals for our product candidates will be granted on a timely basis, if at all.

*Expedited Review and Approval.*

The FDA has various programs, including Fast Track, priority review and accelerated approval, which are intended to expedite or simplify the process for reviewing drugs, and/or to provide for approval on the basis of surrogate endpoints. Even if a drug qualifies for one or more of these programs, the FDA may later decide that the drug no longer meets the conditions for qualification or that the time period for FDA review or approval will be shortened. Generally, drugs that may be eligible for these programs are those for serious or life-threatening conditions, those with the potential to address unmet medical needs, and those that offer meaningful benefits over existing treatments. For example, Fast Track is a process designed to facilitate the development, and expedite the review of drugs to treat serious diseases and fill an unmet medical need. Priority review is designed to give drugs that offer major advances in treatment or provide a treatment where no adequate therapy exists an initial review within 6 months as compared to a standard review time of 12 months. Although Fast Track and priority review do not affect the standards for approval, the FDA will attempt to facilitate early and frequent meetings with a sponsor of a Fast Track designated drug and expedite review of the application for a drug designated for priority review. Accelerated approval provides an earlier approval of drugs to treat serious diseases, and that fill an unmet medical need based on a surrogate endpoint, which is a laboratory measurement or physical sign used as an indirect or substitute measurement representing a clinically meaningful outcome. As a condition of approval, the FDA may require that a sponsor of a drug receiving accelerated approval perform post-marketing clinical trials.

20 | Page

*Patent Term Restoration and Marketing Exclusivity.*

Depending upon the timing, duration and specifics of FDA approval of the use of our drugs, some of our U.S. patents may be eligible for limited patent term extension under the Drug Price Competition and Patent Term Restoration Act of 1984, referred to as the Hatch-Waxman Amendments. The Hatch-Waxman Amendments permit a patent restoration term of up to five years as compensation for patent term lost during product development and the FDA regulatory review process. However, patent term restoration cannot extend the remaining term of a patent beyond a total of 14 years from the product's approval date. The patent term restoration period is generally one-half the time between the effective date of an IND, and the submission date of an NDA, plus the time between the submission date of an NDA and the approval of that application. Only one patent applicable to an approved drug is eligible for the extension and the extension must be applied for prior to expiration of the patent. The U.S. Patent and Trademark Office, or the USPTO, in consultation with the FDA, reviews and approves the application for any patent term extension or restoration. In the future, we intend to apply for restorations of patent term for some of our currently owned or licensed patents to add patent life beyond their current expiration date, depending on the expected length of clinical trials and other factors involved in the submission of the relevant NDA.

Data and market exclusivity provisions under the FDCA also can delay the submission or the approval of certain applications. The FDCA provides a five-year period of non-patent exclusivity within the United States to the first applicant to gain approval of an NDA for a new chemical entity. A drug is a new chemical entity if the FDA has not previously approved any other new drug containing the same active moiety, which is the molecule or ion responsible for the action of the drug substance. During the exclusivity period, the FDA may not accept for review an abbreviated new drug application, or ANDA, or a 505(b)(2) NDA submitted by another company for another version of such drug where the applicant does not own or have a legal right of reference to all the data required for approval. However, an application may be submitted after four years if it contains a certification of patent invalidity or non-infringement. The FDCA also provides three years of marketing exclusivity for an NDA, 505(b)(2) NDA or supplement to an existing NDA if new clinical investigations, other than bioavailability studies, that were conducted or sponsored by the applicant are deemed by the FDA to be essential to the approval of the application, for example, for new indications, dosages or strengths of an existing drug. This three-year exclusivity covers only the conditions associated with the new clinical investigations and does not prohibit the FDA from approving ANDAs or 505(b)(2) NDAs for drugs containing the original active agent. Five-year and three-year exclusivity will not delay the submission or approval of a full NDA; however, an applicant submitting a full NDA would be required to conduct or obtain a right of reference to all of the pre-clinical studies and adequate and well-controlled clinical trials necessary to demonstrate safety and effectiveness.

*Foreign Regulation*

In addition to regulations in the United States, we will be subject to a variety of foreign regulations governing clinical trials and commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain approval by the comparable regulatory authorities of foreign countries before we can commence clinical trials and approval of foreign countries or economic areas, such as the EU, before we may market products in those countries or areas. The approval process and requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from place to place, and the time may be longer or shorter than that required for FDA approval.

21 | Page

*Other Laws and Regulatory Processes*

We are subject to a variety of financial disclosure and securities trading regulations as a public company in the United States, including laws relating to the oversight activities of the Securities and Exchange Commission, or SEC, and, if our capital stock becomes listed on a national securities exchange, we will be subject to the regulations of such exchange on which our shares are traded. In addition, the Financial Accounting Standards Board, or FASB, the SEC, and other bodies that have jurisdiction over the form and content of our accounts, our financial statements and other public disclosure are constantly discussing and interpreting proposals and existing pronouncements designed to ensure that companies best display relevant and transparent information relating to their respective businesses.

Our present and future business has been and will continue to be subject to various other laws and regulations. Various laws, regulations and recommendations relating to safe working conditions, laboratory practices, the experimental use of animals, and the purchase, storage, movement, import and export and use and disposal of hazardous or potentially hazardous substances used in connection with our research work are or may be applicable to our activities. Certain agreements entered into by us involving exclusive license rights or acquisitions may be subject to national or supranational antitrust regulatory control, the effect of which cannot be predicted. The extent of government regulation, which might result from future legislation or administrative action, cannot accurately be predicted.

### Employees

As of the date of this report, we employed four employees, each of whom is full-time and five consultants provide significant assistance to us. To successfully develop our drug candidates, we must be able to attract and retain highly skilled personnel. We anticipate hiring up to 15 additional full-time employees devoted to development activities and up to 5 additional full-time employees for general and administrative activities over the next few years. In addition, we intend to use clinical research organizations and third parties to perform our clinical studies and manufacturing.

### Organization and Consolidated Subsidiaries.

We do not have any active subsidiaries and all of our assets and operations are maintained by Retrophin.

### Properties

Our principal executive offices are located at 777 Third Avenue, Suite 22nd Floor, New York, NY 10017.

### Legal Proceedings

We are not currently involved in any material legal proceedings.

22 | Page

## RISK FACTORS

Our business, as well as our shares of Common Stock, are highly speculative and involve a high degree of risk.  Investing in our common stock involves a high degree of risk. Our securities should be purchased only by persons who can afford to lose their entire investment.  You should carefully consider the risks and uncertainties described below together with all of the other information included herein, including the financial statements and related notes, before deciding to invest in our Common Stock. If any of the following risks actually occur, they would materially harm our business, prospects, financial condition and results of operations. In this event, the market price of our common stock could decline and you could lose part or all of your investment.

### The Company is Still in the Development Stage and Has Not Generated any Revenues.

From inception through September 30, 2012, we have incurred net losses of approximately $20.1 million and negative cash flows from operating activities of approximately $2.9 million. Because it takes years to develop, test and obtain regulatory approval for our treatments before they can be sold, the Company likely will continue to incur significant losses and cash flow deficiencies for the foreseeable future. Accordingly, it may never be profitable and, if it does become profitable, it may be unable to sustain profitability.

### Risks Related to Our Financial Position and Need for Additional Capital

We have incurred operating losses since our inception. We expect to incur operating losses for the foreseeable future and may never achieve or maintain profitability.

Since inception, we have incurred significant operating losses. Our net loss attributable to common stockholders was $3,268,256 for the year ended December 31, 2011. As of September 30, 2012 we had an accumulated deficit of $20,080,925. To date, we have financed our operations primarily by raising capital through private placements of Retrophin Preferred Stock. We have devoted substantially all of our efforts to research and development, specifically our preclinical development activities. We have not completed development of any drugs. We expect to continue to incur significant and increasing operating losses for at least the next several quarters and we are unable to predict the extent of any future losses. We anticipate that our expenses will increase substantially as we:

- Begin phase 2 clinical development of RE-021 for the treatment of FSGS.

- Continue our ongoing preclinical development of RE-024 for the treatment of PKAN, and potentially begin clinical trials of RE-024.

- Continue our ongoing preclinical development activities of RE-001 for the treatment of DMD, and potentially begin clinical trials of RE-001.

- Continue the research and development of additional product candidates.

- Seek regulatory approval of RE-021, RE-024, RE-001 and additional product candidates.

23 | Page

- Establish a sales and marketing infrastructure to commercialize products for which we may obtain regulatory approval.

- Add operational, financial, and management information systems and personnel, including personnel to support of product development efforts and our obligations as a public company.

To become and remain profitable, we must succeed in developing and commercializing drugs with significant market potential. This will require us to be successful in a range of challenging activities, including the discovery of product candidates, successful completion of preclinical testing and clinical trials of our product candidates, obtaining regulatory approval for these product candidates and manufacturing, marketing and selling those products for which we may obtain regulatory approval. We are only in the preliminary stages of these activities. We may never succeed in these activities and may never generate revenues that are large enough to achieve profitability. Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become or remain profitable could depress the market price of our common stock and could impair our ability to raise capital, expand our business, diversify our product offerings or continue our operations. A decline in the market price of our common stock would also cause you to lose a part or all of your investment.

### No Operating History

As of the date of this filing, Retrophin has not generated any revenues. Retrophin faces the problems, expenses, difficulties, complications and delays, many of which are beyond Retrophin's control, associated with any business in its early stages and has no operating history on which an evaluation of its prospects can be made. Such prospects should be considered in light of the risks, expenses and difficulties frequently encountered in the establishment of a business in a new industry, characterized by a number of market entrants and intense competition, and in the shift from development to commercialization of new products based on innovative technologies. There can be no assurance that Retrophin will ever generate revenues from operations.

### Future Profitability Uncertain

Retrophin is an early stage corporation. There can be no assurance that revenues from product sales or licensing arrangements will ever be achieved. Moreover, even if Retrophin generates revenues from product sales arrangements, Retrophin may incur significant operating losses over the next several years. Retrophin's ability to achieve profitable operations in the future will depend in large part upon successful in-licensing FDA approved products, selling and manufacturing these products, completing development of its products, obtaining regulatory approvals for these products, and bringing these products to market. The likelihood of the long-term success of Retrophin must be considered in light of the expenses, difficulties and delays frequently encountered in the development and commercialization of new drug products, competitive factors in the marketplace, as well as the regulatory environment in which Retrophin operates.

24 | Page

**Legal Risks**

We face an inherent business risk of exposure to significant product liability and other claims in the event that the use of our products caused, or is alleged to have caused, adverse effects. Furthermore, our products may cause, or may appear to have caused, adverse side effects (including death) or potentially dangerous drug interactions that we may not learn about or understand fully until the drug has been administered to patients for some time. The withdrawal of a product following complaints and/or incurring significant costs, including the requirement to pay substantial damages in personal injury cases or product liability cases, could have a material adverse effect on our business, financial condition and results of operations and could cause the market value of our common stock to decline. Our product liability insurance coverage may not be sufficient to cover our claims and we may not be able to obtain sufficient coverage at a reasonable cost in the future.

We may become involved in infringement actions which are uncertain, costly and time-consuming and could have a material adverse effect on our business, financial condition and results of operations and could cause the market value of our common stock to decline.

The pharmaceutical industry historically has generated substantial litigation concerning the manufacture, use and sale of products and we expect this litigation activity to continue. As a result, we expect that patents related to our products will be routinely challenged, and our patents may not be upheld. In order to protect or enforce patent rights, we may initiate litigation against third parties. If we are not successful in defending an attack on our patents and maintaining exclusive rights to market one or more of our major products still under patent protection, we could lose a significant portion of sales in a very short period. We may also become subject to infringement claims by third parties and may have to defend against charges that we violated patents or the proprietary rights of third parties. If we infringe the intellectual property rights of others, we could lose our right to develop, manufacture or sell products, including our generic products, or could be required to pay monetary damages or royalties to license proprietary rights from third parties. The outcomes of infringement action are uncertain and infringement actions are costly and divert technical and management personnel from their normal responsibilities.

*"Fraud and Abuse" Laws*

We are subject to various laws and regulations, including "fraud and abuse" laws and anti-bribery laws, and a failure to comply with such laws and regulations or prevail in any litigation related to noncompliance could have a material adverse impact on our business, financial condition and results of operations and could cause the market value of our common stock to decline.

Pharmaceutical and biotechnology companies have faced lawsuits and investigations pertaining to violations of health care "fraud and abuse" laws, such as the federal False Claims Act, the federal Anti-Kickback Statute, the U.S. Foreign Corrupt Practices Act ("FCPA") and other state and federal laws and regulations. We also face increasingly strict data privacy and security laws in the U.S. and in other countries, the violation of which could result in fines and other sanctions. The United States Department of Health and Human Services Office of Inspector General recommends and, increasingly states, require pharmaceutical companies to have comprehensive compliance programs and to disclose certain payments made to healthcare providers or funds spent on marketing and promotion of drug products. If we are in violation of any of these requirements or any such actions are instituted against us, and we are not successful in defending ourselves or asserting our rights, those actions could have a significant impact on our business, including the imposition of significant fines, exclusion from federal healthcare programs or other sanctions.

25 | Page

The FCPA and similar worldwide anti-bribery laws generally prohibit companies and their intermediaries from making improper payments to officials for the purpose of obtaining or retaining business. Our policies mandate compliance with these anti-bribery laws. We operate in many parts of the world that have experienced governmental corruption to some degree and in certain circumstances, strict compliance with antibribery laws may conflict with local customs and practices or may require us to interact with doctors and hospitals, some of which may be state controlled, in a manner that is different than in the U.S. and Canada. We cannot assure you that our internal control policies and procedures will protect us from reckless or criminal acts committed by our employees or agents. Violations of these laws, or allegations of such violations, could disrupt our business and result in criminal or civil penalties or remedial measures, any of which could have a material adverse effect on our business, financial condition and results of operations and could cause the market value of our common stock to decline.

## Future Capital Requirements

We will need substantial additional funding and may be unable to raise capital when needed, which would force us to delay, reduce or eliminate our product development programs or commercialization efforts.

We expect our general, research and development expenses to increase in connection with our ongoing activities, particularly as we begin phase 2 clinical study of RE-021, and as we continue toward Phase 1 clinical studies of RE-001 and RE-024, and for any later-stage clinical trials of our product candidates. In addition, subject to obtaining regulatory approval of any of our product candidates, we expect to incur significant commercialization expenses for product sales and marketing, securing commercial quantities of product from our manufacturers, and product distribution. We currently have no additional commitments or arrangements for any additional financing to fund the research and development and commercial launch of our product candidates.

We believe that our existing cash and cash equivalents and marketable securities, will be sufficient to enable us to fund our operating expenses and capital expenditure requirements until at least the second quarter of 2013. Additional funds may not be available to Retrophin when we need them on terms that are acceptable to us, or at all. If adequate funds are not available to us on a timely basis, we may be required to reduce or eliminate research development programs or commercial efforts.

Our future capital requirements will depend on many factors, including:

- The progress and results of our pre-clinical and clinical studies of RE-021, RE-001, RE-024, and other drug candidates.

26 | Page

- The costs, timing and outcome of regulatory review of our product candidates.

- The number and development requirements of other product candidates that we pursue.

- The costs of commercialization activities, including product marketing, sales and distribution.

- The emergence of competing technologies and other adverse market developments.

- The costs of preparing, filing and prosecuting patent applications and maintaining, enforcing and defending intellectual property related claims.

- The extent to which we acquire or invest in businesses, products and technologies.

- Our ability to establish collaborations and obtain milestone, royalty or other payments from any such collaborators.

**Any additional funds that we obtain may not be on terms favorable to us or our stockholders or may require us to relinquish valuable rights.**

Until such time, if ever, as we generate stable product revenue to finance our operations, we expect to finance our cash needs through public or private equity offerings and debt financings, corporate collaboration and licensing arrangements and grants from patient advocacy groups, foundations and government agencies. If we raise additional funds by issuing equity securities, our stockholders will experience dilution. Debt financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends, and may include rights that are senior to the holders of our common stock. Any debt financing or additional equity that we raise may contain terms, such as liquidation and other preferences, which are not favorable to us or our stockholders. If we raise additional funds through collaboration and licensing arrangements with third parties, it may be necessary to relinquish valuable rights to our technologies, future revenue streams, research programs or product candidates or to grant licenses on terms that may not be favorable to us or our stockholders.

**Our short operating history may make it difficult for you to evaluate the success of our business to date and to assess our future viability.**

We are a new company. We commenced operations in 2011. Our operations to date have been limited to organizing and staffing our company, licensing and developing our technology, planning for clinical studies of RE-021, developing a viable manufacturing route for RE-001, planning pre-clinical studies and limited clinical studies of RE-001 and RE-024. We have not yet demonstrated our ability to successfully begin or complete clinical trials, obtain regulatory approvals, manufacture a commercial-scale product or arrange for a third party to do so on our behalf, or conduct sales and marketing activities necessary for successful product commercialization. Consequently, any predictions you make about our future success or viability may not be as accurate as they would be if we had a longer operating history.

In addition, as a new business, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown factors.

**Material weakness in internal control over financial reporting.**

In connection with the preparation of Retrophin's audited financial statements for the period from March 11, 2011 (inception) through December 31, 2011, our independent auditors advised management that a material weakness existed in internal control over financial reporting.

Although we are committed to continuing to improve our internal control processes, and although we will continue to diligently and vigorously review our internal control over financial reporting, any control system, regardless of how well designed, operated and evaluated, can provide only reasonable, not absolute, assurance that its objectives will be met. Therefore, we cannot be certain that, in the future, additional material weaknesses or significant deficiencies will not exist or otherwise be discovered. If our efforts to address the weakness identified are not successful, or if other deficiencies occur, these weaknesses or deficiencies could result in misstatements of our results of operations, restatements of our financial statements, a decline in our stock price and investor confidence or other material effects on our business, reputation, results of operations, financial condition or liquidity.

**Retrophin's auditors have expressed doubt about our ability to continue as a going concern.**

Our Independent Accountant's Report issued in connection with our audited financial statements for the period from March 11, 2011 (inception) through December 31, 2011, stated that "the Company, as a development stage enterprise, is subject to risks and uncertainties as to whether it will be able to raise capital and commence its planned operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern." Because Retrophin has been issued an opinion by its auditors that substantial doubt exists as to whether it can continue as a going concern it may be more difficult to attract investors.

27 | Page

**Risks Related to Our Intellectual Property**

If we are unable to obtain and maintain protection for the intellectual property relating to our technology and products, the value of our technology and products will be adversely affected.

Our success will depend in large part on our ability to obtain and maintain protection in the United States and other countries for the intellectual property covering, or incorporated into, our technology and products. The patent situation in the field of biotechnology and pharmaceuticals generally is highly uncertain and involves complex legal, technical, scientific and factual questions. We may not be able to obtain additional issued patents relating to our technology or products. Even if issued, patents issued to us or our licensors may be challenged, narrowed, invalidated, held to be unenforceable or circumvented, which could limit our ability to stop competitors from marketing similar products or reduce the term of patent protection we may have for our products. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection.  Currently we have no patent protection on RE-001.  We have composition of matter patents on RE-021 that were filed in July 1999, and we have filed a patent application on RE-024 in April 2012. We expect that in addition to the protection afforded by our patent filings that we will be able to extend our intellectual protection, by up to five years, via the provisions of the Hatch-Waxman Act.

 The degree of future protection for our proprietary rights is uncertain, and we cannot ensure that:

- We or our licensors were the first to make the inventions covered by each of our pending patent applications.

- We or our licensors were the first to file patent applications for these inventions.

-  Others will not independently develop similar or alternative technologies or duplicate any of our technologies.

-  Any patents issued to us or our licensors that provide a basis for commercially viable products will provide us with any competitive advantages or will not be challenged by third parties.

- We will develop additional proprietary technologies that are patentable.

- We will file patent applications for new proprietary technologies promptly or at all.

- The claims we make in our patents will be upheld by patent offices in the United States and elsewhere.

- Our patents will not expire prior to or shortly after commencing commercialization of a product.

- The patents of others will not have a negative effect on our ability to do business.

In addition, we cannot assure you that any of our pending patent applications will result in issued patents.

We have negotiated a license agreement for the rights to RE-021 (PS433540) from Ligand Pharmaceuticals. We cannot be certain that we will be successful in maintaining the covenants required in this license agreement, and we cannot be certain that we will be able to maintain these rights with beneficial terms. Composition of matter patents for RE-021, are set to expire in 2019. We cannot be certain when or if we will file for patent protection for different indications, and we cannot be certain if we would be successful in obtaining these patents, or if we will be able to enforce these patents. If we are unsuccessful in obtaining patents for different uses of RE-021 we may not be able to stop competitors from marketing similar products.

We have filed a provisional patent application in the United States on the composition of RE-024 as a treatment for pantothenate kinase associated neurodegeneration. We cannot be certain that we will have completed sufficient experimental work to enable this patent application by the one year anniversary of the application: this may result in our losing our priority date. We cannot be certain that this application will be granted, or that the claims we have made will be allowed by the patent office. Further, we have not filed for patent protection outside of the United States for RE-024. We cannot be certain that we will filed for patent protection outside the United States, or that even if we do any patents(s) will be granted.

We are in the process of licensing patents and patent applications on the core technology of RE-001 from both the University of Minnesota and the University of Wisconsin. We cannot be certain that we will be successful in securing these rights and we cannot be certain that we will be able to obtain these rights with beneficial terms. We also cannot be certain that a competing organization will obtain rights to these patents and applications. To the best of our knowledge, patent protection for the technology on which our lead compound, RE-001 is based have not been filed outside of the United States. We cannot be certain when or if we will file for patent protection outside of the United States, and we cannot be certain if we would be successful in obtaining these patents or if we will be able to enforce these patents. If patents are not issued in respect of our pending patent applications, we may not be able to stop competitors from marketing similar products in Europe and other countries in which we do not have issued patents.

We currently have no issued patents or pending applications covering methods of using or composition of RE-001 outside of the United States. We intend to seek orphan medicinal product designation and to rely on statutory data exclusivity provisions in jurisdictions outside the United States where such protections are available, including Europe. The patent rights that we are seeking to license relating to our product candidates are limited in ways that may affect our ability to exclude third parties from competing against us if we obtain regulatory approval to market these product candidates.

29 | Page

Our patents also may not afford us protection against competitors with similar technology. Because patent applications in the United States and many other jurisdictions are typically not published until 18 months after filing, or in some cases not at all, and because publications of discoveries in the scientific literature often lag behind the actual discoveries, neither we nor our licensors can be certain that we or they were the first to make the inventions claimed in our or their issued patents or pending patent applications, or that we or they were the first to file for protection of the inventions set forth in these patent applications. If a third party has also filed a United States patent application covering our product candidates or a similar invention, we may have to participate in an adversarial proceeding, known as an interference, declared by the United States Patent and Trademark Office to determine priority of invention in the United States. The costs of these proceedings could be substantial and it is possible that our efforts could be unsuccessful, resulting in a loss of our United States patent position.

If we fail to comply with our obligations in our intellectual property licenses with third parties or if we are delinquent in our payments to third parties, we may lose license rights that are important to our business.

If we are unable to protect the confidentiality of our proprietary information and know-how, the value of our technology and products could be adversely affected.

We seek to protect our know-how and confidential information, in part, by confidentiality agreements with our employees, corporate partners, outside scientific collaborators, sponsored researchers, consultants and other advisors. We also have confidentiality and invention or patent assignment agreements with our employees and our consultants. If our employees or consultants breach these agreements, we may not have adequate remedies for any of these breaches. In addition, our trade secrets may otherwise become known to or be independently developed by others. Enforcing a claim that a party illegally obtained and is using our trade secrets is difficult, expensive and time consuming, and the outcome is unpredictable. In addition, courts outside the United States may be less willing to protect trade secrets. Costly and time consuming litigation could be necessary to seek to enforce and determine the scope of our proprietary rights, and failure to obtain or maintain trade secret protection could adversely affect our competitive business position.

If we infringe or are alleged to infringe the intellectual property rights of third parties, it will adversely affect our business.

Our research, development and commercialization activities, as well as any product candidates or products resulting from these activities, may infringe or be accused of infringing one or more claims of an issued patent or may fall within the scope of one or more claims in a published patent application that may subsequently issue and to which we do not hold a license or other rights. Third parties may own or control these patents or patent applications in the United States and abroad. These third parties could bring claims against us that would cause us to incur substantial expenses and, if successful against us, could cause us to pay substantial damages. Further, if a patent infringement suit were brought against us, we or they could be forced to stop or delay research, development, manufacturing or sales of the product or product candidate that is the subject of the suit.

30 | Page

No assurance can be given that patents do not exist, have not been filed, or could not be filed or issued, which contain claims covering our products, technology or methods. Because of the number of patents issued and patent applications filed in our field, we believe there is a risk that third parties may allege they have patent rights encompassing our products, technology or methods.

We are aware, for example, of United States patents, and corresponding international counterparts, owned by third parties that contain claims related to treating DMD using a direct protein replacement strategy. If any third party patents were to be asserted against us we do not believe that our proposed products would be found to infringe any valid claim of these patents. If we were to challenge the validity of any issued United States patent in court, we would need to overcome a presumption of validity that attaches to every patent. This burden is high and would require us to present clear and convincing evidence as to the invalidity of the patent's claims. There is no assurance that a court would find in our favor on infringement or validity.

In order to avoid or settle potential claims with respect to any of the patent rights described above or any other patent rights of third parties, we may choose or be required to seek a license from a third party and be required to pay license fees or royalties or both. These licenses may not be available on acceptable terms, or at all. Even if we or our future collaborators were able to obtain a license, the rights may be nonexclusive, which could result in our competitors gaining access to the same intellectual property. Ultimately, we could be prevented from commercializing a product, or be forced to cease some aspect of our business operations, if, as a result of actual or threatened patent infringement claims, we are unable to enter into licenses on acceptable terms. This could harm our business significantly.

Others may sue us for infringing their patent rights or file nullity, opposition or interference proceedings against our patents, even if such claims are without merit, which would similarly harm our business. Furthermore, during the course of litigation, confidential information may be disclosed in the form of documents or testimony in connection with discovery requests, depositions or trial testimony. Disclosure of our confidential information and our involvement in intellectual property litigation could materially adversely affect our business.

There has been substantial litigation and other proceedings regarding patent and other intellectual property rights in the pharmaceutical and biotechnology industries. In addition to infringement claims against us, we may become a party to other patent litigation and other proceedings, including interference proceedings declared by the United States Patent and Trademark Office and opposition proceedings in the European Patent Office, regarding intellectual property rights with respect to our products and technology. Even if we prevail, the cost to us of any patent litigation or other proceeding could be substantial.

Some of our competitors may be able to sustain the costs of complex patent litigation more effectively than we can because they have substantially greater resources. In addition, any uncertainties resulting from any litigation could significantly limit our ability to continue our operations. Patent litigation and other proceedings may also absorb significant management time.

Many of our employees were previously employed at universities or other biotechnology or pharmaceutical companies, including our competitors or potential competitors. We try to ensure that our employees do not use the proprietary information or know-how of others in their work for us. However, we may be subject to claims that we or these employees have inadvertently or otherwise used or disclosed intellectual property, trade secrets or other proprietary information of any such employee's former employer. Litigation may be necessary to defend against these claims and, even if we are successful in defending ourselves, could result in substantial costs to us or be distracting to our management. If we fail to defend any such claims, in addition to paying monetary damages, we may jeopardize valuable intellectual property rights, disclose confidential information or lose personnel.

## Competition

Retrophin faces competition from pharmaceutical companies in the FSGS and DMD indication and will likely face similar competition in other indications, including PKAN, because competition in the area of pharmaceutical products is intense. There are many companies, both public and private, including well-known pharmaceutical companies, which are engaged in the development of products for certain of the applications being pursued by Retrophin, such as DMD, PKAN, and FSGS.

The following biotechnology and pharmaceutical companies are working on developing potential treatments for DMD and have products which are currently in or have completed the following clinical stages:  GlaxoSmithKline/Prosensa and Santhera/Takeda (Phase 3); Acceleron Pharma/Shire, Sarepta Therapeutics, Phrixus, Prosensa and PTC Therapeutics (Phase 2); and Sarepta Therapeutics and Tivorsan Pharmaceuticals and possibly others (Preclinical).  Additionally, several FDA approved drugs for other indications are being tested in clinical trials for DMD, including prednisone, sildenafil citrate (sold under the trademark Viagra, among others) and IGF-1.  There are also clinical studies underway evaluating possible treatments for FSGS.  For example, Sanofi (Genzyme) is engaged in a phase 2 clinical study of Fresolimumab to treat FSGS, and Sunnybrook Medical Center has announced plans for a phase 2 clinical study of Rituxan to treat FSGS.  Also, Fibrogen is developing an anti-Connective Tissue Growth Factor (CTGF) antibody as a possible treatment for FSGS.

A clinical study of Deferiprone as a potential treatment for PKAN has been reported.  Additionally, we believe that an organization called TIRCON is working on a possible treatment for PKAN using pantethine derivatives.

Several of Retrophin's competitors have substantially greater financial, research and development, distribution, manufacturing and marketing experience and resources than Retrophin and represent substantial long-term competition for Retrophin.  Other companies may succeed in developing and marketing products that are more effective and/or less costly than any products that may be developed and marketed by Retrophin, or that are commercially accepted before any Retrophin product.  Factors affecting competition in the pharmaceutical and drug industries vary, depending on the extent to which a competitor is able to achieve a competitive advantage based on its proprietary technology and ability to market and sell drugs. If Retrophin is able to establish and maintain a significant proprietary position with respect to its products, competition likely will depend primarily on the effectiveness and ease of administration and product compliance as compared to alternative products.  The industry in which Retrophin competes is characterized by extensive research and development efforts and rapid technological progress.  Although Retrophin believes that its proprietary position may give it a competitive advantage with respect to its proposed products, new developments are expected to continue and there can be no assurance that discoveries by others will not render Retrophin's potential products noncompetitive.

32 | Page

Retrophin's competitive position also depends on its ability to enter into strategic alliances with one or more large pharmaceutical and contract manufacturing companies, attract and retain qualified personnel, develop effective proprietary products, implement development and marketing plans, obtain patent protection , secure adequate capital resources and successfully sell and market our approve d products.  There can be no assurance that Retrophin will be able to successfully achieve all of the foregoing objectives.

**Risks Related to Our Dependence on Third Parties**

Use of third parties to manufacture and distribute our product candidates may increase the risk that we will not have sufficient quantities of our product candidates or such quantities at an acceptable cost, and clinical development and commercialization of our product candidates could be delayed, prevented or impaired.

We do not own or operate manufacturing facilities for clinical or commercial production of our products. We have limited personnel with experience in drug manufacturing and we lack the resources and the capabilities to manufacture any of our product candidates on a clinical or commercial scale. We outsource all manufacturing and packaging of our preclinical, clinical, and commercial products and products to third parties. The manufacture of pharmaceutical products requires significant expertise and capital investment, including the development of advanced manufacturing techniques and process controls. Manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up initial production and in maintaining required quality control. These problems include difficulties with production costs and yields and quality control, including stability of the product candidate.

We do not currently have any agreements with third party manufacturers for the long-term commercial supply of any of our development stage product candidates. We may be unable to enter into agreements for commercial supply with third party manufacturers, or may be unable to do so on acceptable terms. Even if we enter into these agreements, the manufacturers of each product candidate will be single source suppliers to us for a significant period of time.

Reliance on third party manufacturers entails risks to which we may not be subject if we manufactured our product candidates or products ourselves, including:

- Reliance on the third party for regulatory compliance and quality assurance.

- Limitations on supply availability resulting from capacity and scheduling constraints of the third parties.

- Impact on our reputation in the marketplace if manufacturers of our products fail to meet the demands of our customers.

33 | Page

- The possible breach of the manufacturing agreement by the third party because of factors beyond our control.

- The possible termination or nonrenewal of the agreement by the third party, based on its own business priorities, at a time that is costly or inconvenient for us.

The failure of any of our contract manufacturers to maintain high manufacturing standards could result in injury or death of clinical trial participants or patients using products. Such failure could also result in product liability claims, product recalls, product seizures or withdrawals, delays or failures in testing or delivery, cost overruns or other problems that could seriously harm our business or profitability.

Our contract manufacturers will be required to adhere to FDA regulations setting forth current good manufacturing processes, or cGMP. These regulations cover all aspects of the manufacturing, testing, quality control and recordkeeping relating to our product candidates and any products that we may commercialize. Our manufacturers may not be able to comply with cGMP regulations or similar regulatory requirements outside the United States. Our manufacturers are subject to unannounced inspections by the FDA, state regulators and similar regulators outside the United States. Our failure, or the failure of our third party manufacturers, to comply with applicable regulations could result in sanctions being imposed on us, including fines, injunctions, civil penalties, failure of regulatory authorities to grant marketing approval of our product candidates, delays, suspension or withdrawal of approvals, license revocation, seizures or recalls of product candidates or products, operating restrictions and criminal prosecutions, any of which could significantly and adversely affect regulatory approval and supplies of our product candidates.

Our product and any products that we may develop may compete with other product candidates and products for access to manufacturing facilities. There are a limited number of manufacturers that operate under cGMP regulations and that are both capable of manufacturing for us and willing to do so. If the third parties that we engage to manufacture products for our developmental or commercial products should cease to continue to do so for any reason, we likely would experience interruptions in cash flows and/or delays in advancing our clinical trials while we identify and qualify replacement suppliers, and we may be unable to obtain replacement supplies on terms that are favorable to us. Later relocation to another manufacturer will also require notification, review and other regulatory approvals from the FDA and other regulators and will subject our production to further cost and instability in the availability of our product candidates. In addition, if we are not able to obtain adequate supplies of our products candidates, product candidates, or the drug substances used to manufacture them, it will be more difficult for us to sell our products and to develop our product candidates.  This could greatly reduce our competiveness.

Our current and anticipated future dependence upon others for the manufacture of our product candidates may adversely affect our future profit margins and our ability to develop product candidates and commercialize any products that obtain regulatory approval on a timely and competitive basis.

34 | Page

Materials necessary to manufacture our product candidates may not be available on commercially reasonable terms, or at all, which may delay the development and commercialization of our product candidates.

We rely on the manufacturers of our product candidates to purchase from third party suppliers the materials necessary to produce the compounds for our preclinical and clinical studies and will rely on these other manufacturers for commercial distribution if we obtain marketing approval for any of our product candidates. Suppliers may not sell these materials to our manufacturers at the time we need them or on commercially reasonable terms and all such prices are susceptible to fluctuations in price and availability due to transportation costs, government regulations, price controls, changes in economic climate or other foreseen circumstances. We do not have any control over the process or timing of the acquisition of these materials by our manufacturers. Moreover, we currently do not have any agreements for the commercial production of these materials. If our manufacturers are unable to obtain these materials for our preclinical and clinical studies, product testing and potential regulatory approval of our product candidates would be delayed, significantly impacting our ability to develop our product candidates. If our manufacturers or we are unable to purchase these materials after regulatory approval has been obtained for our product candidates, the commercial launch of our product candidates would be delayed or there would be a shortage in supply, which would materially affect our ability to generate revenues from the sale of our product candidates.

We rely on third parties to conduct certain preclinical development activities and our clinical trials and those third parties may not perform satisfactorily, including failing to meet established deadlines for the completion of such activities and trials.

We do not currently operate any laboratory facilities.   We do not independently conduct any physical preclinical development activities of our product candidates, such as efficacy and safety studies in animals, or clinical trials for our product candidates. We rely on, or work in conjunction with, third parties, such as contract research organizations, medical institutions and clinical investigators, to perform these functions. Our reliance on these third parties for preclinical and clinical development activities reduces our control over these activities. We are responsible for ensuring that each of our pre-clinical development activities and our clinical trials is conducted in accordance with the applicable general investigational plan and protocols and in compliance with appropriate government regulations, however, we have no direct control over these researchers or contractors (except by contract), as they are not our employees. Moreover, the FDA requires us to comply with standards, commonly referred to as Good Clinical Practices, or GCP, for conducting, recording and reporting the results of our preclinical development activities and our clinical trials to assure that data and reported results are credible and accurate and that the rights, safety and confidentiality of trial participants are protected. For our commercial products, we are required to comply with cGMP (Good Manufacturing Processes).  Our reliance on third parties that we do not control does not relieve us of these responsibilities and requirements. Furthermore, these third parties may also have relationships with other entities, some of which may be our competitors. If these third parties do not successfully carry out their contractual duties, meet expected deadlines, comply with cGMPs, conduct our preclinical development activities or our clinical trials in accordance with regulatory requirements or our stated protocols, we may not be able to obtain, or may be delayed in obtaining, regulatory approvals for our product candidates and will not be able to, or may be delayed in our efforts to, successfully commercialize our product candidates. Moreover, these third parties may be bought by other entities or they may go out of business, thereby preventing them from meeting their contractual obligations.

35 | Page

We may co-promote our product candidates in various markets with pharmaceutical and biotechnology companies in instances where we believe that a larger sales and marketing presence could expand the market or accelerate penetration. If we do enter into arrangements with third parties to perform sales and marketing services, our product revenues may be lower than if we directly sold and marketed our products and any revenues received under such arrangements will depend on the skills and efforts of others.

We may not be successful in entering into distribution arrangements and marketing alliances with third parties. Our failure to enter into these arrangements on favorable terms could delay or impair our ability to commercialize our product candidates and could increase our costs of commercialization. Dependence on distribution arrangements and marketing alliances to commercialize our product candidates will subject us to a number of risks, including:

- We may not be able to control the amount and timing of resources that our distributors may devote to the commercialization of our product candidates.

- Our distributors may experience financial difficulties.

- Business combinations or significant changes in a distributor's business strategy may also adversely affect a distributor's willingness or ability to complete its obligations under any arrangement.

- These arrangements are often terminated or allowed to expire, which could interrupt the marketing and sales of a product and decrease our revenue.

If we are unable to establish adequate sales, marketing and distribution capabilities, whether independently or with third parties, we may not be able to generate product revenue and may not become profitable.

We rely on other third parties to store and distribute drug supplies for our preclinical development activities and our clinical trials. Any performance failure on the part of our existing or future distributors could delay clinical development or regulatory approval of our product candidates or commercialization of our products, producing additional losses and depriving us of potential product revenue.

Extensions, delays, suspensions or terminations of our preclinical development activities and our clinical trials as a result of the performance of our independent clinical investigators and contract research organizations will delay, and make more costly, regulatory approval for any product candidates that we may develop. Any change in a contract research organization during an ongoing preclinical development activity or clinical trial could seriously delay that trial and potentially compromise the results of the activity or trial.

We may not be successful in maintaining or establishing collaborations, which could adversely affect our ability to develop and, particularly in international markets, commercialize products.

36 | Page

For each of our product candidates, we are collaborating with physicians, patient advocacy groups, foundations and government agencies in order to assist with the marketing and development of our products. We plan to pursue similar activities in future programs and plan to evaluate the merits of retaining commercialization rights for ourselves or entering into selective collaboration arrangements with leading pharmaceutical or biotechnology companies. We also may seek to establish collaborations for the sales, marketing and distribution of our products outside the United States. If we elect to seek collaborators in the future but are unable to reach agreements with suitable collaborators, we may fail to meet our business objectives for the affected product or program. We face, and will continue to face, significant competition in seeking appropriate collaborators. Moreover, collaboration arrangements are complex and time consuming to negotiate, document and implement. We may not be successful in our efforts, if any, to establish and implement collaborations or other alternative arrangements. The terms of any collaborations or other arrangements that we establish, if any, may not be favorable to us.

Any collaboration that we enter into may not be successful. The success of our collaboration arrangements, if any, will depend heavily on the efforts and activities of our collaborators. It is likely that any collaborators of ours will have significant discretion in determining the efforts and resources that they will apply to these collaborations. The risks that we may be subject to in possible future collaborations include the following:

- Our collaboration agreements are likely to be for fixed terms and subject to termination by our collaborators in the event of a material breach or lack of scientific progress by us.

- Our collaborators are likely to have the first right to maintain or defend our intellectual property rights and, although we would likely have the right to assume the maintenance and defense of our intellectual property rights if our collaborators do not, our ability to do so may be compromised by our collaborators' acts or omissions.

- Our collaborators may utilize our intellectual property rights in such a way as to invite litigation that could jeopardize or invalidate our intellectual property rights or expose us to potential liability.

Collaborations with pharmaceutical companies and other third parties often are terminated or allowed to expire by the other party. Such terminations or expirations may adversely affect us financially and could harm our business reputation in the event we elect to pursue collaborations that ultimately expire or are terminated.

**Risks Related to Employee Matters and Managing Growth**

Our future success depends on our ability to retain our chief executive officer and other key executives and to attract, retain and motivate qualified personnel.

We are highly dependent on principal members of our management team and scientific staff. These executives each have significant pharmaceutical industry experience, including our Chairman of the Board, Stephen Aselage and Martin Shkreli, one our Chief Executive Officer and one of our Directors. We do not maintain "key person" insurance on Mr. Aselage or Mr. Shkreli or on any of our other executive officers.

Recruiting and retaining qualified scientific personnel, clinical personnel and sales and marketing personnel will also be critical to our success. Our industry has experienced a high rate of turnover in recent years. We may not be able to attract and retain these personnel on acceptable terms given the competition among numerous pharmaceutical and biotechnology companies for similar personnel. Although we believe we offer competitive salaries and benefits, we may have to increase spending in order to retain personnel.

We also experience competition for the hiring of scientific and clinical personnel from universities and research institutions. In addition, we rely on consultants and advisors, including scientific and clinical advisors, to assist us in formulating our research and development and commercialization strategy. Our consultants and advisors may be employed by employers other than us and may have commitments under consulting or advisory contracts with other entities that may limit their availability to us.

We expect to expand our development, regulatory and sales and marketing capabilities, and as a result, we may encounter difficulties in managing our growth, which could disrupt our operations.

We are a development stage company with four full-time employees and five consultants that provide significant support and assistance to us as of the date of the Merger. Of these employees and consultants, four work primarily in research and development and one provides administrative services. We expect to experience significant growth in the number of our employees and the scope of our operations, particularly in the areas of drug development and regulatory affairs. Assuming our plans and business conditions progress consistent with our current projections, we plan to grow to a total of 25 employees by the end of 2013. To manage our anticipated future growth, we must continue to implement and improve our managerial, operational and financial systems, expand our facilities and continue to recruit and train additional qualified personnel. Due to our limited resources, we may not be able to effectively manage the expansion of our operations or recruit and train additional qualified personnel. The physical expansion of our operations may lead to significant costs and may divert our management and business development resources. Any inability on the part of our management to manage growth could delay the execution of our business plans or disrupt our operations.

In the event that we attempt to acquire or develop our own in-house sales, marketing and distribution capabilities, factors that may inhibit our efforts to commercialize our products without strategic partners or licensees include:

- Our inability to recruit and retain adequate numbers of effective sales and marketing personnel.

- The inability of sales personnel to obtain access to or persuade adequate numbers of physicians to prescribe our products.

- The lack of complementary products to be offered by our sales personnel, which may put us at a competitive disadvantage against companies with broader product lines.

- Unforeseen costs associated with creating our own sales and marketing team or with entering into a partnering agreement with an independent sales and marketing organization.

38 | Page

- Efforts by our competitors to commercialize products at or about the time when our product candidates would be coming to market.

## Risks Related to Our Stock

Our executive officers, directors and principal stockholders have the ability to strongly influence all matters submitted to our stockholders for approval.

Our largest stockholder owns approximately 30% of the outstanding stock.  If he were to choose to act with other large stockholder, they would be able to control all matters submitted to our stockholders for approval, as well as our management and affairs. For example, these persons, if they choose to act together, will control the election of directors and approval of any merger, consolidation, sale of all or substantially all of our assets or other business combination or reorganization. This concentration of voting power could delay or prevent an acquisition of us on terms that other stockholders may desire. The interests of this group of stockholders may not always coincide with your interests or the interests of other stockholders, and they may act, whether by meeting or written consent of stockholders, in a manner that advances their best interests and not necessarily those of other stockholders, including obtaining a premium value for their common stock, and might affect the prevailing market price for our common stock.

## An active trading market for our common stock may never develop.

If an active market for our common stock does not develop, it may be difficult for you to sell shares without depressing the market price for our common stock.

## The designation of our common stock as a "penny stock" would limit the liquidity of our common stock.

Our common stock may be deemed a "penny stock" (as that term is defined under Rule 3a51-1 of the Exchange Act) in any market that may develop in the future. Generally, a "penny stock" is a common stock that is not listed on a securities exchange and trades for less than $5.00 a share. Prices often are not available to buyers and sellers and the market may be very limited. Penny stocks in start-up companies are among the riskiest equity investments. Broker-dealers who sell penny stocks must provide purchasers of these stocks with a standardized risk-disclosure document prepared by the SEC. The document provides information about penny stocks and the nature and level of risks involved in investing in the penny stock market. A broker must also provide purchasers with bid and offer quotations and information regarding broker and salesperson compensation and make a written determination that the penny stock is a suitable investment for the purchaser and obtain the purchaser's written agreement to the purchase. Many brokers choose not to participate in penny stock transactions. Because of the penny stock rules, there may be less trading activity in penny stocks in any market that develops for our common stock in the future and stockholders are likely to have difficulty selling their shares.

39 | Page

**If the price of our stock is likely to be volatile, purchasers of our common stock could incur substantial losses.**

The price of our stock is likely to be volatile. The stock market in general, and the market for biotechnology companies in particular, have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. The market price for our common stock may be influenced by many factors, including:

- Results of clinical trials of our product candidates or those of our competitors.

- Our entry into or the loss of a significant collaboration.

- Regulatory or legal developments in the United States and other countries, including changes in the health care payment systems.

- Variations in our financial results or those of companies that are perceived to be similar to us.

- Changes in the structure of healthcare payment systems.

- Market conditions in the pharmaceutical and biotechnology sectors and issuance of new or changed securities analysts' reports or recommendations.

- General economic, industry and market conditions.

- Results of clinical trials conducted by others on drugs that would compete with our product candidates.

- Developments or disputes concerning patents or other proprietary rights.

- Public concern over our product candidates or any products approved in the future.

- Litigation.

- Future sales or anticipated sales of our common stock by us or our stockholders.

- The other factors described in this "Risk Factors" section.

For these reasons and others you should consider an investment in our common stock as risky and invest only if you can withstand a significant loss and wide fluctuations in the marked value of your investment.

We have never paid cash dividends on our capital stock and we do not anticipate paying any cash dividends in the foreseeable future. You should not invest in us if you require dividend income. Any income from an investment in us would only come from a rise in the market price of our common stock, which is uncertain and unpredictable.

We have paid no cash dividends on our capital stock to date. We currently intend to retain our future earnings, if any, to fund the development and growth of our business and do not foresee payment of a dividend in any upcoming fiscal period. In addition, the terms of existing or any future debt agreements may preclude us from paying dividends. As a result, capital appreciation, if any, of our common stock will be your sole source of gain for the foreseeable future.

A significant portion of our total outstanding shares of common stock is restricted from immediate resale but may be sold into the market in the near future. This could cause the market price of our common stock to drop significantly, even if our business is doing well.

Sales of a substantial number of shares of our common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares of common stock intend to sell shares, could reduce the market price of our common stock. Currently, approximately 2.5 million shares of our common stock may be resold in the public market and the remaining 6.1 million shares are currently restricted under securities laws.

If securities or industry analysts do not publish research or reports or publish unfavorable research about our business, the price of our common stock and trading volume could decline.

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. We do not currently have and may never obtain research coverage by securities and industry analysts. If no securities or industry analysts commence coverage of us the trading price for our common stock would be negatively affected. In the event we obtain securities or industry analyst coverage, if one or more of the analysts who covers us downgrades our common stock, the price of our common stock would likely decline. If one or more of these analysts ceases to cover us or fails to publish regular reports on us, interest in the purchase of our common stock could decrease, which could cause the price of our common stock or trading volume to decline.

**We will incur increased costs as a result of being a public company.**

As a public company, we will incur significant legal, accounting, reporting and other expenses that we did not incur as a private company, including costs related to compliance with the regulations of the Sarbanes-Oxley Act of 2002. We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more time-consuming and costly. We also expect these new rules and regulations may make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, we may experience more difficulty attracting and retaining qualified individuals to serve on our board of directors or as executive officers. We cannot predict or estimate the amount of additional costs we may incur as a result of these requirements or the timing of such costs.

If we fail to maintain proper and effective internal controls, our ability to produce accurate and timely financial statements could be impaired, which could harm our operating results, our ability to operate our business and investors' views of us.

41 | Page

We will be required to comply with Section 404 of the Sarbanes-Oxley Act. Section 404 of the Sarbanes-Oxley Act requires public companies to conduct an annual review and evaluation of their internal controls and attestations of the effectiveness of internal controls by independent auditors. Ensuring that we have adequate internal financial and accounting controls and procedures in place so that we can produce accurate financial statements on a timely basis is a costly and time-consuming effort that will need to be evaluated frequently. Our failure to maintain the effectiveness of our internal controls in accordance with the requirements of the Sarbanes-Oxley Act could have a material adverse effect on our business. We could lose investor confidence in the accuracy and completeness of our financial reports, which could have an adverse effect on the price of our common stock. In addition, if our efforts to comply with new or changed laws, regulations, and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, regulatory authorities may initiate legal proceedings against us and our business may be harmed.

**The shares of common stock issued in the Merger are "restricted securities" and, as such, may not be sold except in limited circumstances.**

None of the shares of common stock issued in the Merger have been registered under the Securities Act of 1933, as amended, or the Securities Act, or registered or qualified under any state securities laws. The shares of common stock issued in the Merger were sold and/or issued pursuant to exemptions contained in and under those laws. Accordingly, such shares of common stock are "restricted securities" as defined in Rule 144 under the Securities Act and must, therefore, be held indefinitely unless registered under applicable federal and state securities laws, or an exemption is available from the registration requirements of those laws. The certificates representing the shares of common stock issued in the Merger reflect their restricted status.

Rule 144 under the Securities Act, which permits the resale, subject to various terms and conditions, of limited amounts of restricted securities after they have been held for six months will not immediately apply to our common stock because we were at one time designated as a "shell company" under SEC regulations. Pursuant to Rule 144(i), securities issued by a current or former shell company that otherwise meet the holding period and other requirements of Rule 144 nevertheless cannot be sold in reliance on Rule 144 until one year after the date on which the issuer filed current "Form 10 information" (as defined in Rule 144(i)) with the SEC reflecting that it ceased being a shell company, and provided that at the time of a proposed sale pursuant to Rule 144, the issuer has satisfied certain reporting requirements under the Exchange Act. We believe this requirement to file Form 10 information has been satisfied by the filing of this report on Form 8-K. Because, as a former shell company, the reporting requirements of Rule 144(i) will apply regardless of holding period, the restrictive legends on certificates for the shares of common stock issued in the Merger cannot be removed except in connection with an actual sale that is subject to an effective registration statement under, or an applicable exemption from the registration requirements of, the Securities Act.

Additional risks may exist as a result of our becoming a public reporting company through a "reverse merger." Certain SEC rules are more restrictive when applied to reverse merger companies, such as the ability of stockholders to re-sell their shares of common stock pursuant to Rule 144. In addition, securities analysts of major brokerage firms may not provide coverage of our capital stock or business. Because we became a public reporting operating company through a reverse merger, there is no incentive to brokerage firms to recommend the purchase of our common stock. We cannot assure you that brokerage firms will want to provide analyst coverage of our capital stock or business in the future.

The sale, or availability for sale, of our common stock in the public market may adversely affect the prevailing market price of our common stock and may impair our ability to raise additional capital by selling equity or equity-linked securities.

**Risks Related to the Development and Commercialization of Our Product Candidates**

Retrophin is engaged in the licensing and marketing of drugs for rare diseases.  Specifically, Retrophin has licensed rights to RE-021 from Ligand Pharmaceuticals, and will be required to make future milestone and royalty payments to Ligand and Bristol Myers Squibb.

Retrophin is engaged in the development of new drugs, which is characterized by extensive research efforts and rapid technological progress.  There can be no assurance that research and discoveries by others will not render Retrophin's discovery programs noncompetitive or obsolete.

We will also depend on the success of our early product candidates RE-001, RE-021, and RE-024.  RE-021 has not completed any clinical studies for the treatment of FSGS, and RE-001 and RE-024 are still in pre-clinical development. Clinical trials of our RE-001, RE-021, or RE-024 or subsequent product candidates may not be successful. If we are unable to commercialize RE-001 RE-021, or RE-024, or experience significant delays in doing so, our business may be materially harmed.

We have invested a significant portion of our efforts and financial resources in the development of our most advanced product candidates, RE-001 RE-021, and RE-024. Our ability to generate product revenue from these development stage compounds, which we do not expect will occur for at least the next several years, if ever, may depend heavily on the successful development and commercialization of these product candidates. The successful commercialization of our future product candidates will depend on several factors, including the following:

- Obtaining supplies of RE-001, RE-021, RE-024, and subsequent product candidates for completion of our clinical trials on a timely basis.

- Successful completion of pre-clinical and clinical studies.

- Obtaining marketing approvals from the United States Food and Drug Administration, or FDA, and similar regulatory authorities outside the United States.

- Establishing commercial-scale manufacturing arrangements with third party manufacturers whose manufacturing facilities are operated in compliance with current good manufacturing practice, or cGMP, regulations.

- Launching commercial sales of the product, whether alone or in collaboration with others.

43 | Page

- Acceptance of the product by patients, the medical community and third party payors.

- Competition from other companies.

- Successful protection of our intellectual property rights from competing products in the United States and abroad.

- A continued acceptable safety and efficacy profile of our product candidates following approval.

Companies may not promote drugs for "off-label" uses — that is, uses that are not described in the product's labeling and that differ from those approved by the FDA, TPD or other applicable regulatory agencies. A company that is found to have improperly promoted off-label uses may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

**If the market opportunities for our product candidates are smaller than we believe they are, then our revenues may be adversely affected and our business may suffer.**

Each of the diseases that our current and future product candidates are being developed to address is relatively rare. Our projections of both the number of people who have these diseases, as well as the subset of people with these diseases who have the potential to benefit from treatment with our product candidates, and our assumptions on pricing are based on estimates.

Currently, most reported estimates of the prevalence of DMD, PKAN, and FSGS are based on studies of small subsets of the population of specific geographic areas, which are then extrapolated to estimate the prevalence of the diseases in the broader world population. As new studies are performed the estimated prevalence of these diseases may change. There can be no assurance that the prevalence of DMD, PKAN, or FSGS in the study populations accurately reflect the prevalence of these diseases in the broader world population. If our estimates of the prevalence of DMD, PKAN, or FSGS or of the number of patients who may benefit from treatment with RE-001, RE-021, and RE-024 prove to be incorrect, the market opportunities for our product candidates may be smaller than we believe they are, our prospects for generating revenue may be adversely affected and our business may suffer.

**Our products may not achieve or maintain expected levels of market acceptance.**

Even if we are able to obtain and maintain regulatory approvals for our new pharmaceutical products, generic or branded, the success of these products is dependent upon achieving and maintaining market acceptance. Commercializing products is time consuming, expensive and unpredictable. There can be no assurance that we will be able to, either by ourselves or in collaboration with our partners or through our licensees, successfully commercialize new products or gain market acceptance for such products. New product candidates that appear promising in development may fail to reach the market or may have only limited or no commercial success.

44 | Page

Further, the discovery of significant problems with a product similar to one of our products that implicate (or are perceived to implicate) an entire class of products could have an adverse effect on sales of the affected products. Accordingly, new data about our products, or products similar to our products, could negatively impact demand for our products due to real or perceived side effects or uncertainty regarding efficacy and, in some cases, could result in product withdrawal.

Any products that we bring to the market, including RE-001, RE-021, and RE-024---if they receive marketing approval ---may not gain market acceptance by physicians, patients, third party payors, and others in the medical community. If these products do not achieve an adequate level of acceptance, we may not generate significant product revenue and we may not become profitable. The degree of market acceptance of our product candidates, if approved for commercial sale, will depend on a number of factors, including:

- The prevalence and severity of any side effects, including any limitations or warnings contained in a product's approved labeling.

- The efficacy and potential advantages over alternative treatments.

- The pricing of our product candidates.

- Relative convenience and ease of administration.

- The willingness of the target patient population to try new therapies and of physicians to prescribe these therapies.

- The strength of marketing and distribution support and timing of market introduction of competitive products.

- Publicity concerning our products or competing products and treatments.

- Sufficient third party insurance coverage or reimbursement.

Even if a potential product displays a favorable efficacy and safety profile in preclinical and clinical trials, market acceptance of the product will not be known until after it is launched. Our efforts to educate patients, the medical community, and third party payors on the benefits of our product candidates may require significant resources and may never be successful. Such efforts to educate the marketplace may require more resources than are required by the conventional technologies marketed by our competitors.

**Initial results from pre-clinical and clinical studies do not ensure that future clinical trials will be successful.**

We will only obtain regulatory approval to commercialize product candidates if we can demonstrate to the satisfaction of the FDA, or applicable non-United States regulatory authorities, in well-designed and conducted clinical trials, that our product candidates are safe and effective and otherwise meets the appropriate standards required for approval for a particular indication. Clinical trials can be lengthy, complex and extremely expensive processes with uncertain results. A failure of one or more of our clinical trials may occur at any stage of testing. We have limited experience in conducting and managing the clinical trials necessary to obtain regulatory approvals, including approval by the FDA.

45 | Page

Our efforts to develop all of our product candidates are at an early stage. Success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and initial results from a clinical trial do not necessarily predict final results. For example, we have not begun pre-clinical evaluation of RE-001, and rely on external pre-clinical data for a closely related molecule. We cannot assure you that the pre-clinical data generated to date on TAT-$\mu$-UTR will be representative of data for RE-001. Further, we have not identified a lead molecule in our RE-024 series of compounds, and we cannot be certain that a candidate suitable for a clinical study will ever be identified. We cannot assure you that any future clinical trials of RE-001, RE-021, or RE-024 will ultimately be successful.

Patients may not be compliant with their dosing regimen or trial protocols or they may withdraw from the study at any time for any reason. Even if our early stage clinical trials are successful, we will need to conduct additional clinical trials with larger numbers of patients receiving the drug for longer periods for all of our product candidates before we are able to seek approvals to market and sell these product candidates from the FDA and regulatory authorities outside the United States. To date, we are not aware of any product to treat DMD, PKAN, or FSGS that has been approved by the FDA. As a result, we cannot be sure what endpoints the FDA will require us to measure in later-stage clinical trials of our product candidates. If we are not successful in commercializing any of our development stage products, or are significantly delayed in doing so, our business may be materially harmed.

We have limited experience in conducting and managing the preclinical development activities and clinical trials necessary to obtain regulatory approvals, including approval by the FDA.

We have limited experience in conducting and managing the preclinical development activities and clinical trials necessary to obtain regulatory approvals, including approval by the FDA. We have not obtained regulatory approval nor commercialized this or any other product candidates. We are currently planning pre-clinical and eventual clinical studies for RE-001, RE-021 and RE-024. We have filed and received FDA clearance to begin a clinical study of RE-021 in FSGS, but have not filed INDs for RE-001 or RE-024. We cannot be certain that we will ever file INDs for either RE-001 or RE-024. Our limited experience might prevent us from successfully designing or implementing any clinical trials. We have limited experience in conducting and managing the application process necessary to obtain regulatory approvals and we might not be able to demonstrate that our product candidates meet the appropriate standards for regulatory approval. If we are not successful in conducting and managing our pre-clinical development activities or clinical trials or obtaining regulatory approvals, we might not be able to commercialize our developmental product candidates, or might be significantly delayed in doing so, which may materially harm our business.

46 | Page

**We may find it difficult to enroll patients in our clinical trials.**

Our lead development product candidates are intended to treat DMD, PKAN, and FSGS, which are rare diseases. Given that our lead development candidates are in the early stages of required testing, we may not be able to initiate or continue clinical trials if we are unable to locate a sufficient number of eligible patients willing and able to participate in the clinical trials required by the FDA or other non-United States regulatory agencies. Our inability to enroll a sufficient number of patients for any of our current or future clinical trials would result in significant delays or may require us to abandon one or more clinical trials altogether.

If our preclinical studies do not produce positive results, if our clinical trials are delayed, or if serious side effects are identified during drug development, we may experience delays, incur additional costs and ultimately be unable to commercialize our product candidates.

Before obtaining regulatory approval for the sale of our product candidates, we must conduct, at our own expense, extensive preclinical and clinical tests to demonstrate the safety of our product candidates in animals in humans. Preclinical and clinical testing is expensive, difficult to design and implement, and can take many years to complete. A failure of one or more of our preclinical studies or clinical trials can occur at any stage of testing. We may experience numerous unforeseen events during, or as a result of, preclinical testing and the clinical trial process that could delay or prevent our ability to obtain regulatory approval or commercialize our product candidates, including:

- Our preclinical tests or clinical trials may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional preclinical testing or clinical trials or we may abandon projects that we expect to be promising.

- Regulators or institutional review boards may not authorize us to commence a clinical trial or conduct a clinical trial at a prospective trial site.

- Conditions imposed on us by the FDA or any non-United States regulatory authority regarding the scope or design of our clinical trials or may require us to resubmit our clinical trial protocols to institutional review boards for re-inspection due to changes in the regulatory environment.

- The number of patients required for our clinical trials may be larger than we anticipate or participants may drop out of our clinical trials at a higher rate than we anticipate.

- Our third party contractors or clinical investigators may fail to comply with regulatory requirements or fail to meet their contractual obligations to us in a timely manner.

- We might have to suspend or terminate one or more of our clinical trials if we, regulators or institutional review boards determine that the participants are being exposed to unacceptable health risks.

- Regulators or institutional review boards may require that we hold, suspend or terminate clinical research for various reasons, including noncompliance with regulatory requirements.

- The cost of our clinical trials may be greater than we anticipate.

47 | Page

- The supply or quality of our product candidates or other materials necessary to conduct our clinical trials may be insufficient or inadequate or we may not be able to reach agreements on acceptable terms with prospective clinical research organizations.

- The effects of our product candidates may not be the desired effects or may include undesirable side effects or the product candidates may have other unexpected characteristics

If we are required to conduct additional clinical trials or other testing of our product candidates beyond those that we currently contemplate, if we are unable to successfully complete our clinical trials or other testing, if the results of these trials or tests are not positive or are only modestly positive or if there are safety concerns, we may:

- Be delayed in obtaining, or may not be able to obtain, marketing approval for one or more of our product candidates.

- Obtain approval for indications that are not as broad as intended or entirely different than those indications for which we sought approval.

- Have the product removed from the market after obtaining marketing approval.

Our product development costs will also increase if we experience delays in testing or approvals. We do not know whether any preclinical tests or clinical trials will be initiated as planned, will need to be restructured or will be completed on schedule, if at all. Significant preclinical or clinical trial delays also could shorten the patent protection period during which we may have the exclusive right to commercialize our product candidates. Such delays could allow our competitors to bring products to market before we do and impair our ability to commercialize our products or product candidates.

**Product liability lawsuits against us could cause us to incur substantial liabilities and to limit commercialization of any products that we may develop.**

We face an inherent risk of product liability exposure related the testing of our product candidates in human clinical trials. We will face an even greater risk if we obtain new products for sales or win approval for any of our drugs in development. We may be exposed to product liability claims and product recalls, including those which may arise from misuse or malfunction of, or design flaws in, such products, whether or not such problems directly relate to the products and services we have provided. If we cannot successfully defend ourselves against claims that our product candidates or products caused injuries, we will incur substantial liabilities. Regardless of merit or eventual outcome, liability claims may result in:

- Decreased demand for any product candidates or products that we may develop.

- Damage to our reputation.

- Regulatory investigations that could require costly recalls or product modifications.

48 | Page

- Withdrawal of clinical trial participants.

- Costs to defend the related litigation.

- Substantial monetary awards to trial participants or patients, including awards that substantially exceed our product liability insurance, which we would then be required to pay from other sources, if available, and would damage our ability to obtain liability insurance at reasonable costs, or at all, in the future.

- Loss of revenue.

- The diversion of management's attention from managing our business.

- The inability to commercialize any products that we may develop.

We have liability insurance policies for our clinical trials in the geographies in which we are conducting trials. The aggregate annual limit of coverage amount under these policies expressed in United States dollars is approximately $5.0 million, and these policies are also subject to per claim deductibles. The amount of insurance that we currently hold may not be adequate to cover all liabilities that we may incur. Insurance coverage is increasingly expensive. We may not be able to maintain insurance coverage at a reasonable cost and we may not be able to obtain insurance coverage that will be adequate to satisfy any liability that may arise. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated side effects. A successful product liability claim or a series of claims brought against us could cause our stock price to fall and, if judgments exceed our insurance coverage, could decrease our available cash and adversely affect our business.

Our business activities involve the use of hazardous materials, which require compliance with environmental and occupational safety laws regulating the use of such materials. If we violate these laws, we could be subject to significant fines, liabilities or other adverse consequences.

Our research and development programs involve the controlled use of hazardous materials, including microbial agents, corrosive, explosive and flammable chemicals and other hazardous compounds in addition to certain biological hazardous waste. Ultimately, the activities of our third party product manufacturers when a product candidate reaches commercialization will also require the use of hazardous materials. Accordingly, we are subject to federal, state and local laws governing the use, handling and disposal of these materials. Although we believe that our safety procedures for handling and disposing of these materials comply in all material respects with the standards prescribed by local, state and federal regulations, we cannot completely eliminate the risk of accidental contamination or injury from these materials. In addition, our collaborators may not comply with these laws. In the event of an accident or failure to comply with environmental laws, we could be held liable for damages that result, and any such liability could exceed our assets and resources or we could be subject to limitations or stoppages related to our use of these materials which may lead to an interruption of our business operations or those of our third party contractors. While we believe that our existing insurance coverage is generally adequate for our normal handling of these hazardous materials, it may not be sufficient to cover pollution conditions or other extraordinary or unanticipated events. Furthermore, an accident could damage or force us to shut down our operations. Changes in environmental laws may impose costly compliance requirements on us or otherwise subject us to future liabilities and additional laws relating to the management, handling, generation, manufacture, transportation, storage, use and disposal of materials used in or generated by the manufacture of our products or related to our clinical trials. In addition, we cannot predict the effect that these potential requirements may have on us, our suppliers and contractors or our customers.

49 | Page

**We may be unable to identify, acquire, close or integrate acquisition targets successfully.**

Part of our business strategy includes acquiring and integrating complementary businesses, products, technologies or other assets, and forming strategic alliances, joint ventures and other business combinations, to help drive future growth. We may also in-license new products or compounds. Acquisitions or similar arrangements may be complex, time consuming and expensive. We may not consummate some negotiations for acquisitions or other arrangements, which could result in significant diversion of management and other employee time, as well as substantial out-of-pocket costs. In addition, there are a number of risks and uncertainties relating to our closing transactions. If such transactions are not completed for any reason, we will be subject to several risks, including the following: (i) the market price of our common shares may reflect a market assumption that such transactions will occur, and a failure to complete such transactions could result in a negative perception by the market of us generally and a decline in the market price of our common shares; and (ii) many costs relating to the such transactions may be payable by us whether or not such transactions are completed.

If an acquisition is consummated, the integration of the acquired business, product or other assets into our company may be also be complex and time-consuming and, if such businesses, products and assets are not successfully integrated, we may not achieve the anticipated benefits, cost-savings or growth opportunities. Potential difficulties that may be encountered in the integration process include the following:

- Integrating personnel, operations and systems, while maintaining focus on producing and delivering consistent, high quality products.

- Coordinating geographically dispersed organizations.

- Distracting employees from operations.

- Retaining existing customers and attracting new customers.

- Managing inefficiencies associated with integrating the operations of the Company.

Furthermore, these acquisitions and other arrangements, even if successfully integrated, may fail to further our business strategy as anticipated, expose us to increased competition or challenges with respect to our products or geographic markets, and expose us to additional liabilities associated with an acquired business, product, technology or other asset or arrangement. Any one of these challenges or risks could impair our ability to realize any benefit from our acquisition or arrangement after we have expended resources on them.

50 | Page

**Risks Related to Regulatory Approval of Our Product Candidates**

If we are not able to obtain and maintain required regulatory approvals, we will not be able to commercialize our product candidates, and our ability to generate revenue will be materially impaired.

Our commercial products and the activities associated with their manufacture, marketing, distribution, and sales are subject to extensive regulation by the FDA and other regulatory agencies in the United States and by comparable authorities in other countries. Failure to adhere to regulations set out by these bodies for one or more of our commercial products could prevent us from commercializing the product candidate in the jurisdiction of the regulatory authority. We have only limited experience in meeting the regulatory requirements incumbent on the sale of drugs in the United States and elsewhere, and expect to rely on third party contract research organizations to assist us in these processes. If our third party contract research organizations fail to adequately adhere to the regulation on drug sales we may be unable to sell our products, which could have a material effect on our ability to generate revenue.

Our product candidate and the activities associated with its development and commercialization, including testing, manufacture, safety, efficacy, recordkeeping, labeling, storage, approval, advertising, promotion, sale and distribution, are subject to comprehensive regulation by the FDA and other regulatory agencies in the United States and by comparable authorities in other countries. Failure to obtain regulatory approval for a product candidate will prevent us from commercializing the product candidate in the jurisdiction of the regulatory authority. We have not obtained regulatory approval to market any of our product candidates in any jurisdiction. We have only limited experience in filing and prosecuting the applications necessary to obtain regulatory approvals and expect to rely on third party contract research organizations to assist us in this process.

Securing FDA approval requires the submission of extensive preclinical and clinical data and supporting information to the FDA for each therapeutic indication to establish the product candidate's safety and efficacy. Securing FDA approval also requires the submission of information about the product manufacturing process to, and inspection of manufacturing facilities by, the FDA. Our future products may not be effective, may be only moderately effective or may prove to have undesirable or unintended side effects, toxicities or other characteristics that may preclude our obtaining regulatory approval or prevent or limit commercial use.

**Our product candidates may fail to obtain regulatory approval for many reasons, including:**

- Our failure to demonstrate to the satisfaction of the FDA or comparable regulatory authorities that a product candidate is safe and effective for a particular indication.

- The results of clinical trials may not meet the level of statistical significance required by the FDA or comparable regulatory authorities for approval.

- Our inability to demonstrate that a product candidate's benefits outweigh its risks.

- Our inability to demonstrate that the product candidate presents an advantage over existing therapies.

51 | Page

- The FDA's or comparable regulatory authorities' disagreement with the manner in which we interpret the data from preclinical studies or clinical trials.

- The FDA's or comparable regulatory authorities' failure to approve the manufacturing processes, quality procedures or manufacturing facilities of third party manufacturers with which we contract for clinical or commercial supplies.

- A change in the approval policies or regulations of the FDA or comparable regulatory authorities or a change in the laws governing the approval process.

The process of obtaining regulatory approvals is expensive, often takes many years, if approval is obtained at all, and can vary substantially based upon a variety of factors, including the type, complexity and novelty of the product candidates involved. Changes in regulatory approval policies during the development period, changes in or the enactment of additional statutes or regulations, or changes in regulatory review for each submitted product application may cause delays in the approval or rejection of an application. The FDA and non-United States regulatory authorities have substantial discretion in the approval process and may refuse to accept any application or may decide that our data is insufficient for approval and require additional preclinical, clinical or other studies. In addition, varying interpretations of the data obtained from preclinical and clinical testing could delay, limit or prevent regulatory approval of a product candidate. Any regulatory approval we ultimately obtain may be limited or subject to restrictions or post approval commitments that render the approved product not commercially viable. Any FDA or other regulatory approval of our product candidates, once obtained, may be withdrawn, including for failure to comply with regulatory requirements or if clinical or manufacturing problems follow initial marketing.

**Our product candidates may cause undesirable side effects or have other properties that could delay or prevent their regulatory approval or commercialization.**

Undesirable side effects caused by our product candidates could interrupt, delay or halt clinical trials and could result in the denial of regulatory approval by the FDA or other regulatory authorities for any or all targeted indications, and in turn prevent us from commercializing our product candidates and generating revenues from their sale.

In addition, if any of our product candidates receive marketing approval and we or others later identify undesirable side effects caused by the product:

- Regulatory authorities may require the addition of restrictive labeling statements.

- Regulatory authorities may withdraw their approval of the product.

- We may be required to change the way the product is administered or conduct additional clinical trials.

52 | Page

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or could substantially increase the costs and expenses of commercializing the product candidate, which in turn could delay or prevent us from generating significant revenues from its sale or adversely affect our reputation.

**Obtaining orphan status**

We may not be able to obtain orphan drug exclusivity for our product candidates. If our competitors are able to obtain orphan drug exclusivity for their products that are the same drug as our product candidates, we may not be able to have competing products approved by the applicable regulatory authority for a significant period of time.

Regulatory authorities in some jurisdictions, including the United States and Europe, may designate drugs for relatively small patient populations as orphan drugs. We expect to seek orphan drug designations from the FDA for RE-001, RE-021, and RE-024 though there can be no assurance that the FDA will grant orphan status. We also expect to seek drug designation from the European Medicines Agency, or EMEA, for RE-001, RE-021, and RE-024, and there can be no assurance that we will be successful. If we are unable to secure orphan status is either Europe or the United States it may have a material negative effect on our share price.

Generally, if a product with an orphan drug designation subsequently receives the first marketing approval for the indication for which it has such designation, that product is entitled to a period of marketing exclusivity, which precludes the applicable regulatory authority from approving another marketing application for the same drug for that time period. The applicable period is seven years in the United States and ten years in Europe. Obtaining orphan drug exclusivity for RE-001, RE-021, and RE-024 may be important to the product candidate's success. Even if we obtain orphan drug exclusivity for RE-001 for DMD, RE-021 for FSGS, and Re-024 for PKAN we may not be able to maintain it. For example, if a competitive product that treats same disease as our product candidate is shown to be clinically superior to our product candidate, any orphan drug exclusivity we have obtained will not block the approval of such competitive product and we may effectively lose what had previously been orphan drug exclusivity.

**Other regulatory risks**

Any product for which we obtain marketing approval could be subject to restrictions or withdrawal from the market and we may be subject to penalties if we fail to comply with regulatory requirements or if we experience unanticipated problems with our products, when and if any of them are approved.

Any product for which we obtain marketing approval, along with the manufacturing processes, post approval clinical data, labeling, advertising and promotional activities for such product, will be subject to continual requirements of and review by the FDA and comparable regulatory authorities. These requirements include submissions of safety and other post marketing information and reports, registration requirements, cGMP requirements relating to quality control, quality assurance and corresponding maintenance of records and documents, requirements regarding the distribution of samples to physicians and recordkeeping. Even if we obtain regulatory approval of a product, the approval may be subject to limitations on the indicated uses for which the product may be marketed or to the conditions of approval, or contain requirements for costly post marketing testing and surveillance to monitor the safety or efficacy of the product. We also may be subject to state laws and registration requirements covering the distribution of our products. Later discovery of previously unknown problems with our products, manufacturers or manufacturing processes, or failure to comply with regulatory requirements, may result in actions such as:

53 | Page

- Restrictions on such products, manufacturers or manufacturing processes.

- Warning letters.

- Withdrawal of the products from the market.

- Refusal to approve pending applications or supplements to approved applications that we submit.

- Voluntary or mandatory recall.

- Fines.

- Suspension or withdrawal of regulatory approvals or refusal to approve pending applications or supplements to approved applications that we submit.

- Refusal to permit the import or export of our products.

- Product seizure or detentions.

- Injunctions or the imposition of civil or criminal penalties.

- Adverse publicity.

If we, or our suppliers, third party contractors, clinical investigators or collaborators are slow to adapt, or are unable to adapt, to changes in existing regulatory requirements or adoption of new regulatory requirements or policies, we or our collaborators may lose marketing approval for our products when and if any of them are approved, resulting in decreased revenue from milestones, product sales or royalties.

**Uncertainty of Healthcare Reform Measures and Third Party Reimbursement**

The business and financial condition of healthcare related businesses will continue to be affected by efforts of governments and third party payors to contain or reduce the cost of healthcare through various means. In the United States and some foreign jurisdictions, there have been a number of legislative and regulatory changes and proposed changes regarding the healthcare system that could prevent or delay marketing approval for RE-001, RE-021, RE-024 or any other product candidate that Retrophin develops, restrict or regulate post-approval activities and affect Retrophin's ability to profitably sell RE-001, RE-021, RE-024 or any other product candidate for which it obtains marketing approval.

54 | Page

Legislative and regulatory proposals have been made to expand post-approval requirements and restrict sales and promotional activities for pharmaceutical products. It is not clear whether additional legislative changes will be enacted, or whether the FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on the marketing approvals of any Retrophin products, if any, may be. In addition, increased scrutiny by the U.S. Congress of the FDA's approval process may significantly delay or prevent marketing approval, as well as subject Retrophin to more stringent product labeling and post-marketing testing and other requirements.

In the United States, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, or the MMA, changed the way Medicare covers and pays for pharmaceutical products. As a result of this legislation and the expansion of federal coverage of drug products, Retrophin expects that there will be additional pressure to contain and reduce costs. These cost reduction initiatives and other provisions of this legislation could decrease the coverage and price that is received for any approved products and could seriously harm Retrophin's business. While the MMA applies only to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policy and payment limitations in setting their own reimbursement rates, and any reduction in reimbursement that results from the MMA may result in a similar reduction in payments from private payors.

More recently, in March 2010, President Obama signed into law the Health Care Reform Law, a sweeping law intended to broaden access to health insurance, reduce or constrain the growth of healthcare spending, enhance remedies against fraud and abuse, add new transparency requirements for healthcare and health insurance industries, impose new taxes and fees on the health industry and impose additional health policy reforms. Effective October 1, 2010, the Health Care Reform Law revises the definition of "average manufacturer price" for reporting purposes, which could increase the amount of Medicaid drug rebates to states once the provision is effective. Further, beginning in 2011, the new law imposes a significant annual fee on companies that manufacture or import branded prescription drug products. The full effects of the Health Care Reform Law will not be known until applicable federal and state agencies issue regulations or guidance under the new law. Although it is too early to determine the effect of the Health Care Reform Law, the new law appears likely to continue the pressure on pharmaceutical pricing, especially under the Medicare program, and may also increase regulatory burdens and operating costs.

If we are unable to obtain adequate reimbursement from governments or third party payors for any products that we may develop or if we are unable to obtain acceptable prices for those products, our prospects for generating revenue and achieving profitability will suffer.

Our prospects for generating revenue and achieving profitability will depend heavily upon the availability of adequate reimbursement for the use of our approved product candidates from governmental and other third party payors, both in the United States and in other markets. Reimbursement by a third party payor may depend upon a number of factors, including the third party payors determination that use of a product is:

- A covered benefit under its health plan.

- Safe, effective and medically necessary.

55 | Page

- Appropriate for the specific patient.

- Cost-effective.

- Neither experimental nor investigational.

Obtaining reimbursement approval for a product from each government or other third party payor is a time consuming and costly process that could require us to provide supporting scientific, clinical and cost effectiveness data for the use of our products to each payor. We may not be able to provide data sufficient to gain acceptance with respect to reimbursement or we might need to conduct post-marketing studies in order to demonstrate the cost-effectiveness of any future products to such payors' satisfaction. Such studies might require us to commit a significant amount of management time and financial and other resources. Even when a payor determines that a product is eligible for reimbursement, the payor may impose coverage limitations that preclude payment for some uses that are approved by the FDA or non-United States regulatory authorities. In addition, there is a risk that full reimbursement may not be available for high priced products. Moreover, eligibility for coverage does not imply that any product will be reimbursed in all cases or at a rate that allows us to make a profit or even cover our costs. Interim payments for new products, if applicable, may also not be sufficient to cover our costs and may not be made permanent. A primary trend in the United States healthcare industry and elsewhere is toward cost containment. We expect recent changes in the Medicare program and increasing emphasis on managed care to continue to put pressure on pharmaceutical product pricing. For example, the Medicare Prescription Drug Improvement and Modernization Act of 2003 provides a new Medicare prescription drug benefit that began in 2006 and mandates other reforms. While we cannot predict the full outcome of the implementation of this legislation, it is possible that the new Medicare prescription drug benefit, which will be managed by private health insurers and other managed care organizations, will result in additional government reimbursement for prescription drugs, which may make some prescription drugs more affordable but may further exacerbate industry wide pressure to reduce prescription drug prices. If one or more of our product candidates reaches commercialization, such changes may have a significant impact on our ability to set a price we believe is fair for our products and may affect our ability to generate revenue and achieve or maintain profitability.

Governments outside the United States tend to impose strict price controls and reimbursement approval policies, which may adversely affect our prospects for generating revenue.

In some countries, particularly European Union countries, the pricing of prescription pharmaceuticals is subject to governmental control. In these countries, pricing negotiations with governmental authorities can take considerable time (6 to 12 months or longer) after the receipt of marketing approval for a product. To obtain reimbursement or pricing approval in some countries, we may be required to conduct a clinical trial that compares the cost effectiveness of our product candidate to other available therapies. If reimbursement of our products is unavailable or limited in scope or amount, or if pricing is set at unsatisfactory levels, our prospects for generating revenue, if any, could be adversely affected and our business may suffer.

If we are unable to establish sales and marketing capabilities or enter into agreements with third parties to market and sell our product candidates, we may be unable to generate product revenue.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis of the results of operations and financial condition of Retrophin, our principal operating business, for the nine months ended September 30, 2012 and 2011 and for the fiscal years ended December 31, 2011 should be read in conjunction with the financial statements, and the notes to those financial statements, that are included in Item 9.01 of this Current Report on Form 8-K. Those statements in the following discussion that are not historical in nature should be considered to be forward looking statements that are inherently uncertain. Actual results and the timing of the events may differ materially from those contained in these forward looking statements due to a number of factors, including the disclosures set forth in this Item 2.01 to this Current Report on Form 8-K under the headings "Cautionary Note on Forward Looking Statements" and "Risk Factors", which are incorporated herein by reference. As used in this section, the terms "we", "our", "us" and the "Company" refer to the Company, our direct and indirect subsidiaries and Retrophin, our principal operating business.

### Overview

We were incorporated February 8, 2008, as a subsidiary of American Merchant, our former parent company, American Merchant was originally incorporated on January 27, 2000, in Florida as Boats.com, Inc. On September 25, 2002 Boats.com, Inc. changed its name to AMDM.

During the fiscal period ended February 29, 2008, we consummated a reorganization which we refer to collectively as the "2008 Reorganization" pursuant to Section 1081(a) of the Oklahoma General Corporation Law, as a tax-free organization. On February 8, 2008, AMDM caused Desert Gateway to be incorporated in the State of Oklahoma, as a direct, wholly-owned subsidiary of AMDM and caused AMDS to also be incorporated in the State of Oklahoma, as a direct wholly-owned subsidiary of Desert Gateway. Under the terms of the Reorganization, AMDM was merged with and into AMDS pursuant to Section 1081(g) of the OGCL. Upon consummation of the Reorganization, each issued and outstanding share of AMDM Common Stock was converted into and exchanged for a share of common stock of Desert Gateway (on a share-for-share basis) having the same designations, rights, powers and preferences, and qualifications, limitations and restrictions as the shares of AMDM being converted. There was no spin-off and AMDM's corporate existence ceased. Under the 2008 Reorganization all American Merchant shareholders became shareholders of Desert Gateway in the same proportion. In conjunction with the 2008 Reorganization, AMDM concluded a downstream merger into the second subsidiary AMDS. All of AMDM's losses and net operating losses carried forward to AMDS. Following the Reorganization the Company was re-domiciled to Delaware. Since 2004 and prior to consummation of the domiciliary merger in 2008, neither American Merchant nor Desert Gateway had any existing operations.

To date and as of the date hereof, the Company can be defined as a "shell" company, an entity which is generally described as having no or nominal operations and with no or nominal assets or assets consisting solely of cash and cash equivalents. As a shell company, our sole purpose at this time is to locate and consummate a merger or acquisition with a private entity.

57 | Page

Since inception, Retrophin efforts and resources have been focused primarily on raising capital, acquiring and developing pharmaceutical products and recruiting personnel. Our lead product in development is RE-021, a small molecule intended to treat FSGS. We expect that a phase 2 clinical study of RE-021 to treat FSGS could begin in first half of 2013. We have a number of programs in preclinical development. Retrophin's focus is to seek treatment for serious, unmet, rare disease. FSGS, and others are orphan diseases affecting fewer than 200,000 patients in the United States and have profound impacts on sufferers.

The merger of a private operating company into a non-operating public shell corporation with nominal net assets is considered to be a capital transaction, in substance, rather than a business combination, for accounting purposes. Accordingly, the Company treated this transaction as a capital transaction without recording goodwill or adjusting any of its other assets or liabilities. The consideration in the amount of $200,000 paid to our former stockholders will be recorded as an "other expense" item and included in our net loss for the period ending December 31, 2012.

### Our Company

Our results of operations discussed below reflect our operations during the period in which we are in development stage and  starting up our operations. As a result, these results should not be considered indicative of our anticipated
results of operations on a going forward basis.

### Results of Operations

The following discussion summarizes the key factors our management believes are necessary for an understanding of our financial statements.

### Operating Expenses

#### For the period March 11, 2011 (inception) through December 31, 2011

Operating expenses were approximately $3.27 million for the period from March 11, 2011 through December 30, 2011, which consisted of (i) compensation and related costs of approximately $2.23 million which included approximately 86,000 shares of vested incentive shares granted to members and employees amounting to approximately $1.7 million, (ii) professional fees of approximately $0.91 million which included (a) approximately 12,000 shares of vested incentive shares granted to consultants amounting to approximately $0.26 million for services rendered; (b) research and development fees of approximately $0.35 million related to Retrophin's drug (RE-001) candidate for the treatment of Duchenne Muscular Dystrophy; (c) legal expense of approximately $0.10 million related to formation of the company, employment and consulting agreements and general corporate work; and (d) consulting fees of approximately $0.20 million related to outsourcing management roles, (iii) nine months rent expense of approximately $0.06 million,  and  (iv) the remaining balance of $0.07 million is related to travel and entertainment, depreciation, advertising and other operating expenses.

#### For the nine months ended September 30, 2012

Operating expenses were approximately $16.76 million for the nine months ended September 30, 2012, which consisted of (i) compensation and related costs of approximately $8.37 million which included approximately 293,000 shares of vested incentive shares granted to members and employees amounting to approximately $7.72 million, (ii)  professional fees of approximately $8.05 million which included (a) approximately 142,000 shares of vested incentive shares granted to consultants amounting to approximately $6.3 million for services rendered; (b) research and development fees of approximately $0.27 million related to Retrophin's drug (RE-021 and RE-024) candidate for the treatment of FSGS and PKAN and evaluation of potential new technologies; (c) legal expense of approximately $0.80 million related to licensing an production acquisition, employment and consulting agreements and general corporate work; (d) consulting fees of approximately $0.60 million related to outsourcing management roles, and (e) accounting fees of approximately $0.08 million related to general accounting and audit work, (iii) nine months rent expense of approximately $0.06 million,  and  (iv) depreciation and amortization expense of approximately $0.07 million related to the Ligand licensing agreement and (v) the remaining balance of $0.20 million is related to travel and entertainment, advertising and other operating expenses.

58 | Page

*For the period March 11, 2011 (inception) through September 30, 2011*

Operating expenses were approximately $2.24 million for the period from March 11, 2011 through September 30, 2011, which consisted of (i) compensation and related costs of approximately $1.60 million which included approximately 58,000 shares of vested incentive shares granted to members and employees amounting to approximately $1.16 million, (ii) professional fees of approximately $0.55 million which included (a) approximately 6,000 shares of vested incentive shares granted to consultants amounting to approximately $0.13 million for services rendered; (b) research and development fees of approximately $0.24 million related to Retrophin's drug (RE-001) candidate for the treatment of Duchenne Muscular Dystrophy; (c) legal expense of approximately $0.09 million related to formation of the company, employment and consulting agreements and general corporate work; and (d) consulting fees of approximately $0.09 million related to outsourcing management roles, (iii) six months rent expense of approximately $0.05 million, and (iv) the remaining balance of $0.04 million is related to travel and entertainment, depreciation, advertising and other operating expenses.

*For the period March 11, 2011 (inception) through September 30, 2012*

Operating expenses were approximately $20.0 million during the period from March 11, 2011 through September 30, 2012. The largest factors impacting our operating expenses during the period related compensation and related costs of approximately $10.6 million and $9.0 million in professional fees which included stock base compensation of approximately $16.0 million, consisting of approximately 379,000 shares of vested incentive shares granted to members and employees amounting to approximately $9.4 million and approximately 155,000 shares of vested incentive shares granted to consultants amounting to approximately $6.5 million for services rendered. Operating expenses also included rent expenses of approximately $0.1 million, travel and entertainment of approximately $0.1million, depreciation and amortization expenses of approximately $0.1 million, and other expenses and advertising fees of approximately $0.1 million.

*Other Operating Expenses*

Other operating expenses for the period March 11, 2011 (inception) through December 31, 2011, for the nine months ended September 30, 2012, for the period March 11, 2011 (inception) through September 30, 2011 and for the period March 11, 2011 (inception) through September 30, 2012 were as follows: (i) approximately $5,000 which is related to a loss in foreign exchange in a vendor payment, (ii) approximately $55,000 of which approximately $16,000 of interest income related to $200,000 note receivable with an interest rate of 12% per annum offset by approximately $71,000 of interest expense relate to a $900,000 note payable with an interest rate of 12% per annum, (iii) approximately $5,000 which is related to a loss in foreign exchange in a vendor payment and (iv) approximately $59,000 of which approximately $5,000 related to a loss in foreign exchange in a vendor payment, approximately $16,000 of interest income related to $200,000 note receivable with an interest rate of 12% per annum offset by approximately $71,000 of interest expense relate to a $900,000 note payable with an interest rate of 12% per annum.

*Income Taxes*

As a limited liability company, we were treated as a partnership for the purposes of U.S. federal and most applicable state and local income tax during the start-up period from March 11, 2011 through September 21, 2012. Accordingly, no provision was been made for U.S. federal and state income taxes in the accompanying financial statements, since all items of income or loss were required to be reported on the income tax returns of the members, who are responsible for any taxes thereon.

*Impact of Inflation*

The impact of inflation upon our revenue and income/(loss) from continuing operations during each of the past two fiscal years has not been material to our financial position or results of operations for those years because we have no products for sale and do not maintain any inventories whose costs are affected by inflation.

*Net Loss*

For the period March 11, 2011 (inception) through December 31, 2011, for the nine months ended September 30, 2012, for the period March 11, 2011 (inception) through September 30, 2011 and for the period March 11, 2011 (inception) through September 30, 2012, our net loss from operation were approximately $3.27 million, $16.81 million, $2.25 million and $20.08 million, respectively.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements.

**Liquidity and Capital Resources**

Management believes that we will continue to incur losses for the foreseeable future. Therefore we will either need additional equity or debt financing, or by entering into strategic alliances on products in development to sustain our operations until we can achieve profitability and positive cash flows from operating activities, if ever.

Our continued operations will depend on whether we can successfully or raise additional funds through equity and/or debt financing. Such additional funds may not become available on acceptable terms, if at all, and we cannot assure you that any additional funding we do obtain will be sufficient to meet our needs in the long term. Through September 2012, we raised approximately $4.6 million through capital contributions and notes payable from Retrophin shareholders and related parties.

Since our inception in 2011, we have generated losses from operations and we anticipate that we will continue to generate losses from operations for the foreseeable future. As of September 30, 2012 and December 31, 2011, our stockholders' deficit was approximately $969,000 and $536,000, respectively. Our net loss from operations for the period March 11, 2011 (inception) through December 31, 2011, for the nine months ended September 30, 2012, for the period March 11, 2011 (inception) through September 30, 2011 and for the period March 11, 2011 (inception) through September 30, 2012 were approximately $3.27 million, $16.81 million, $2.25 million and $20.08 million, respectively. Net cash used in operating activities were $785,747, $2,088,811 and $$2,874,558 for the period March 11, 2011 (inception) through December 31, 2011, for the nine months ended September 30, 2012,  and for the period March 11, 2011 (inception) through September 30, 2012, respectively. Operations since inception have been funded with the proceeds from equity and debt financings and limited sales activity. As of September 30, 2012, we had cash, cash equivalents of approximately $2,189. We anticipate that our existing capital resources will not be sufficient for us to continue operations beyond December 2012 without additional funding. We will continue to fund operations from cash on hand and through the similar sources of capital previously described. We can give no assurance that such capital will be available to us on favorable terms or at all. If we are unable to raise additional funds in the future on acceptable terms, or at all, we may be forced to curtail our desired development. In addition we could be forced to delay or discontinue product development, and forego attractive business opportunities. Any additional sources of financing will likely involve the sale of our equity securities, which will have a dilutive effect on our stockholders.

### Cash Flows from Operating Activities

Operating activities used approximately $2.1 million of cash during the nine months ended September 30, 2012 compared to $0.8 million from the period March 11, 2011 through December 31, 2011, the increase of approximately $1.3 million was primarily the result of the increase in net loss of approximately $13.5 million due to the significant expenses we incurred mainly for stock base compensation, compensation expense, and professional fees, offset by non-cash charges of $12.0 million as well as a net change of approximately $0.7 million in our accounts payable and accrued expenses. Non-cash charges consisted of stock base compensation granted to employees and consultants for services render in the amount of $6.0 million and $6.0 million, respectively.  The net change in our operating assets and liabilities was primarily the result of approximately $0.4 million of accrued compensation expense.

### Cash Flows from Investing Activities

Cash used in investing activities for the nine months ended September 30, 2012 was approximately $1.6 million, compared to approximately $0.13 million from the period March 11, 2011  through December 31, 2011, the increase of  approximately $1.6 million was primarily the result of $1.2 million to purchase intangible assets, primarily related to RE-021 sublicense from Ligand.

### Cash Flows from Financing Activities

For the nine months ended September 30, 2012, financing activities provided approximately $3.6 million, compared to proceeds of approximately $0.8 million from the period March 11, 2011 through December 31, 2011, increase of approximately $2.8 million was  primarily as a result approximately $2.0 million of proceeds from the private sale of our equity securities and approximately $0.9 million of proceeds from related parties' notes payable.

### Plan of Operation

Our plan of operation for the years ending December 31, 2011 and 2012 is to continue implementing our business strategy, including the clinical development of our three drug candidates, focusing primarily on the development of RE-021 for the treatment of FSGS. We also intend to expand our drug product portfolio by acquiring additional drugs for marketing or development. We expect our principal expenditures during the next 12 months to include:

- Operating expenses, including expanded research and development and general and administrative expenses.

- Product development expenses, including the costs incurred with respect to applications to conduct clinical trials in the United States for our three products and the costs of ongoing and planned clinical trials.

60 | Page

As part of our planned expansion, we anticipate hiring up to fifteen additional full-time employees for research and development activities and up to five additional full-time employees for general and administrative activities. In addition, we intend to use clinical research organizations and third parties to perform our clinical studies and manufacturing. At our current and desired pace of commercialization and clinical development of our drugs, during the remaining weeks of 2012 through 2013, we expect to spend approximately $5 million on clinical development and research and development activities, approximately $2 million on general and administrative expenses and approximately $0.5 million on facilities rent. Additionally, we expect to spend approximately $250,000 on capital expenditures. We cannot assure you these amounts will be sufficient to fund our operations over the course of the next two years and we may need to expend significantly greater amounts to accomplish our goals.

## Research and Development Projects

RE-021. We plan to conduct a phase II clinical trial of RE-021 in patients with focal segmental glomerulosclerosis (FSGS) over the next 12-18 months, with reduction in proteinuria as the primary endpoint. We expect it will take at least three years to complete development and obtain FDA approval of RE-021 for any indication, and we may never obtain such approval. Currently, we anticipate that we will need to expend approximately an additional $6 to $8 million in development costs through yearend 2013 and at least an aggregate of approximately $25 to $35 million before we receive FDA approval for RE-021 for treatment of patients with FSGS.

RE-024. We intend to develop RE-024 as a potential treatment for pantothenate kinase-associated neurodegeneration (PKAN). RE-024 is a preclinical investigational program.  In vitro testing of these molecules is underway, and we expect that in vivo evaluation will begin in early 2013. We plan to file the IND for RE-024 by 2014. We expect that it will take an additional five to seven years to complete development and obtain FDA approval of RE-024, if ever. Currently, we anticipate that we will need to expend approximately an additional $2 to $4 million in development costs on through yearend 2013 and at least an aggregate of approximately $30 to $50 million until we receive FDA approval for RE-024 should we choose to continue development.

RE-001. RE-001 is a recombinant, modified form of utrophin, a protein similar to the dystrophin protein that is missing in the muscles of DMD patients.  RE-001 is a preclinical investigational program.  Production scale-up the molecule is underway, and we expect that in vivo evaluation of clinical trial quality material may begin in 2013. Currently, we anticipate that we will need to expend approximately an additional $2 to $4 million in development costs through yearend 2013. We expect to initiate a Phase 1 clinical study of RE-001 in DMD patients by the end of 2014.  We can provide no assurances that Retrophin can successfully start this study.

## License Agreement Obligations

### Ligand License

In February 2012, we entered into an agreement pursuant to which Ligand agreed to grant us a worldwide license for the development, manufacture and commercialization of RE-021 (DARA). Under the license agreement, Ligand is obligated to transfer to Retrophin certain information, records, regulatory filings, materials and inventory controlled by Ligand and relating to or useful for developing RE-021. We must use commercially reasonable efforts to develop and commercialize RE-021 in specified major market countries and other countries in which we believe it is commercially reasonable to develop and commercialize such products.

As consideration for the license, we are required to make substantial payments upon the achievement of certain milestones totaling up to $106.7 million, payable upon the achievement of certain milestones.  Should we commercialize RE-021 or any products containing any of these compounds, we will be obligated to pay to Ligand an escalating annual royalty based on net sales of all such products. In the event that we sublicense any of these compounds to a third party, Retrophin shall pay to ligand a percentage of the financial consideration in addition to the milestone and royalty payments required. The license agreement contains other customary clauses and terms as are common in similar agreements in the industry.

## Critical Accounting Policies

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect reported amounts of assets and liabilities as of the date of the balance sheet and reported amounts of expenses for the periods presented. Judgments must also be made about the disclosure of contingent liabilities. Accordingly, actual results could differ significantly from those estimates. We believe the following discussion addresses the accounting policies that are necessary to understand and evaluate our reported financial results.

**Share-Based Payments**

We adopted authoritative accounting guidance which establishes standards for share-based transactions in which we receive consultants or employee's services in exchange for equity instruments, such as stock incentive awards. These authoritative accounting standards require that we expense the fair value of stock awards, as measured on the awards' grant date.

If factors change and we employ different assumptions in the application of the relevant accounting guidance in future periods, the compensation expense that we record may differ significantly from what we have recorded in the current period. There is a high degree of subjectivity involved when using fair value to estimate share-based compensation. Consequently, there is a risk that our estimates of the fair values of our share-based compensation awards on the grant dates may bear little resemblance to the actual values realized upon the vesting, expiration, early termination or forfeiture of those share-based payments. Stock incentive awards options may expire worthless or otherwise result in zero value as compared to the fair values originally estimated on the grant date and reported in our financial statements. Alternatively, value may be realized from these instruments that are significantly in excess of the fair values originally estimated on the grant date and reported in our financial statements.

**Income Taxes**

We follow FASB ASC 740, Income Taxes, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax assets and liabilities are based on the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Deferred tax assets are reduced by a valuation allowance to the extent management concludes it is more likely than not that the asset will not be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.

The standard addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FASB ASC 740, we may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the tax authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FASB ASC 740 also provides guidance on de-recognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. At the date of adoption, and as of September 30, 2012 and December 31, 2011, the Company does not have a liability for unrecognized tax uncertainties.

Our policy is to record interest and penalties on uncertain tax positions as income tax expense. As of September 30, 2012 and for fiscal year end December 31, 2011, we had no accrued interest or penalties related to uncertain tax positions.

**Net loss per share**

Basic net loss per common share is computed by dividing net loss applicable to common stockholders by the weighted average number of common shares outstanding during the periods presented as required by FASB ASC 260, Earnings Per Share.

62 | Page

## Recently Issued Accounting Pronouncements

FASB issued the following accounting amendments:

In April 2010, the FASB issued amendments related to the revenue recognition method for milestone payments in research and development agreements. Under these amendments, entities can make an accounting policy election to recognize a payment that is contingent upon the achievement of a substantive milestone in its entirety in the period in which the milestone is achieved. The amendments are effective on a prospective basis for milestones achieved in fiscal years, and interim periods within those years, beginning on or after June 15, 2010, which means such amendments will take effect beginning with the fiscal year starting on January 1, 2011. The adoption of this standard has not had a material impact on our financial position, cash flow or results of operations.

In October 2009, the FASB issued authoritative guidance for arrangements with multiple deliveries. The guidance will allow companies to allocate consideration from contractual arrangements in multiple deliverables arrangements in a manner that better reflects the economics of the transaction. The new guidance requires expanded qualitative and quantitative disclosures and is effective for fiscal years beginning on or after June 15, 2010. The adoption of this standard has not had a material impact on our financial position, cash flow or results of operations.

## Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

In connection with the closing of the merger, Marcum LLP Certified Public Accountants, the independent registered public accounting firm for Retrophin prior to the merger, became the independent registered public accounting firm for us.  On October 12, 2012, we filed a form 8-K with the Securities and Exchange Commission acknowledging the dismissal of Michael F. Cronin CPA as our independent registered public accounting firm due to the requirements of the Securities and Exchange Commission and the Public Company Accounting Oversight Board that lead and concurring reviewer partners cannot audit the same company for more than five consecutive years.  Required disclosures relating to our dismissal of the former accountant as required under item 4.01, including the former accountants' letter of response to such dismissal, is incorporated herein by reference.  The decision to appoint Marcum LLP was recommended, and subsequently approved, by our board of directors in connection with the Merger.

## Quantitative and Qualitative Disclosures about Market Risk

Our primary exposure to market risk is related to changes in interest rates. As of December 4, 2012, we had cash, cash equivalents and short- term investments of approximately $0.2 million, consisting of money market funds, U.S. treasuries, certificates of deposit and cash equivalents. This exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, particularly because our investments are in short-term marketable securities. Our short-term investments are subject to interest rate risk and will fall in value if market interest rates increase. Due to the short-term duration of our investment portfolio and the low risk profile of our investments, an immediate 10 percent change in interest rates would not have a material effect on the fair market value of our portfolio. We have the ability to hold our short-term investments until maturity, and therefore we would not expect our operations results or cash flows to be affected by any significant degree by the effect of a change in market interest rates on our investments. We carry our investments based on publicly available information. We do not currently have any hard to value investment securities or securities for which a market is not readily available or active.

63 | Page

**We are not subject to significant credit risk as this risk does not have the potential to materially impact the value of our assets and liabilities.**

**Properties**

Our principal executive offices are located at 777 Third Avenue, Suite 22nd Floor, New York, NY10017.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth the number of shares of our common stock beneficially owned as of December 7, 2012 by (i) each person known by us to be the beneficial owner of more than 5% of the outstanding shares of our common stock, (ii) each of our directors and executive officers and (iii) all officers and directors as a group. Unless otherwise indicated in the table, the persons and entities named in the table have sole voting and sole investment power with respect to the shares set forth opposite the stockholder's name, subject to community property laws, where applicable. Unless otherwise noted below, the address of each stockholder below is c/o Retrophin, Inc., 777 Third Avenue, 22nd Floor, New York, NY 10017

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership [1] | Percentage of Class [2] |
|---|---|---|
| | | % |
| Martin Shkreli[3]<br>c/o Retrophin, Inc.<br>777 Third Avenue<br>22nd Floor<br>New York, NY 10017 | 3,380,607 | 40.54% |
| Mr. Stephen Aselage [4]<br>c/o Retrophin, Inc.<br>777 Third Avenue<br>22nd Floor<br>New York, NY 10017 | 261,200 | 3.13% |
| Steve Richardson [5]<br>c/o Retrophin, Inc.<br>777 Third Avenue<br>22nd Floor<br>New York, NY 10017 | 98,055 | 1.18% |
| Robert Wilson | 0 | 0% |
| **All Current Officers and Directors as a Group [2]** | 3,739,862 | 44.85% |

64 | Page

(1)   Beneficial Ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. For each beneficial owner above, any options exercisable within 60 days have been included in the denominator.

(2)   Based on 8,338,836 shares of Common Stock issued and outstanding at the Effective Time.

(3)   Consists of 2,531,920 shares of Common Stock held directly by Mr. Shkreli and an aggregate of 848,687 shares of Common Stock held by MSMB Healthcare LP, MSMB Healthcare Investors LLC and MSMB Capital Management LP.  Mr. Shkreli is the managing member of MSMB Healthcare Investors LLC, which is the general partner of MSMB Healthcare LP, and is the managing member of the general partner of MSMB Capital Management LP.  Mr. Shkreli disclaims beneficial ownership of the shares held by MSMB Healthcare LP, MSMB Healthcare Investors LLC and MSMB Capital Management LP.  As of the Effective Date, Mr. Shkreli serves as the Chief Executive Officer and a director of the Company.

(4)   As of the Effective Date, Mr. Aselage serves as a director of the Company.

(5)   As of the Effective Date, Mr. Richardson serves as a director of the Company.

<div align="center">

**MANAGEMENT AND DIRECTORS**

</div>

**EXECUTIVE OFFICERS AND DIRECTORS FOLLOWING THE MERGER**

Effective December 17, 2012 Messrs. Shkreli, Aselage and Richardson became directors of the Company.

**MARTIN SHKRELI, 29** was the founder of Retrophin, LLC (the predecessor of Retrophin, Inc.) and has been the President of Retrophin, Inc. since its formation and will become the Chief Executive Officer of the Company as of the Effective Date. Mr. Shkreli is also the founder and managing partner of MSMB Capital Management, a New York hedge fund firm founded in 2006 that manages a variety of partnerships. Prior to MSMB, Mr. Shkreli was employed at Intrepid Capital Management from 2004 to 2006 and previously at Cramer Berkowitz & Co, both of which are hedge fund firms based in New York. Mr. Shkreli is an experienced biotechnology and pharmaceutical industry investor, particularly in businesses with orphan drugs. Mr. Shkreli received his BBA from Baruch College.  Mr. Shkreli was selected as a director because of his business and professional experience, including but not limited to his leadership of Retrophin in the early stages, private and public financings and a successful track record of identifying drug assets.

65 | Page

**STEPHEN ASELAGE, 61** was the Chairman of the Board of Retrophin, Inc. since October 16, 2012 and will become the Chairman of the Board of the Company as of the Effective Date. Prior to joining Retrophin, Mr. Aselage served as the Executive Vice President and Chief Business Officer at BioMarin, a biotechnology company, from December 2009 through September 2012. And from June 2005 to December 2009, Mr. Aselage served as BioMarin's Senior Vice President of Global Commercial Development. From February 2004 to June 2005, Mr. Aselage served as Executive Vice President of Global Commercial Operations at Cell Therapeutics, a biotechnology company focused on cancer therapeutics. From September 2003 to January 2004, Mr. Aselage served as Senior Vice President of North American Sales and Marketing for Genzyme Corporation, a biotechnology company, following Genzyme's acquisition of Sangstat Medical Corporation where he had worked since February 1999. While at Sangstat, Mr. Aselage restructured the company's sales, marketing and medical affairs groups. From 1996 through 1999, Mr. Aselage served as Director of Sales and Marketing at Advanced Tissue Sciences, a biotechnology company. Earlier in his career, Mr. Aselage held a variety of sales and sales management positions at biotechnology and pharmaceutical companies including Rhône-Poulenc Rorer Pharmaceuticals (now Sanofi-Aventis), Genentech, Inc., and Bristol Laboratories, a biopharmaceutical company. Mr. Aselage holds a B.S. in biology from the University of Notre Dame. Mr. Aselage was selected as a director because of his business and professional experience, including but not limited to his leadership of BioMarin in drug commercialization, private and public financings and a successful turnaround of multiple businesses.

**STEVE RICHARDSON, 58** was elected  Manager of Retrophin, LLC (the predecessor of Retrophin, Inc.) in June 2011. Mr. Richardson is a Senior Advisor to The Boston Consulting Group, a global management consulting firm, a position he has held since early 2009. Previously Mr. Richardson spent over 30 years with American Express, most recently as Senior Vice President of Human Resources and Chief Talent Officer, where he served as a key advisor for major business transformation and enterprise-wide organizational change and restructuring. Mr. Richardson served as a Board member of United Way Worldwide from 2008 to 2010 and is currently a Senior Advisor to the Hidden Brain Drain Task Force, a task force focused on identifying, developing and promoting a second generation of corporate policies and practices that support the ambition, work and life needs of highly qualified talent across the divides of gender, generation and culture. Mr. Richardson was selected as a director due to his extensive experience in overseeing and advising growing companies and substantial experience in business transformation, global general management and recruiting talented management.

On December 17, in connection with the completion of the merger Robert Wilson and Gary Lyons resigned as directors of the Company. Neither Mr. Wilson nor Mr. Lyons served on any committees of the Company and there was no disagreement with either Mr. Wilson or Mr. Lyons prior to the resignation from the Board of Directors of the Company.

**Compensation of Directors**

We have not established a policy to provide compensation to our directors for their services in such capacity. Our board will consider developing such a policy in the future.

**Employment Agreements with Executives**

We do not have any Employment Agreements.

**Compensation Committee Interlocks and Insider Participation**

We do not have a compensation committee or a committee performing similar functions. All compensation matters are determined by our board of directors. We plan to have a compensation committee when we elect additional independent persons to our board of directors.

66 | Page

**Terms of Office**

Our directors and officers have been appointed for a one-year term or until their respective successors are duly elected and qualified or until their earlier resignation or removal in accordance with our bylaws.

**Certain Relationships & Transactions**

*Officers*

As described above, Martin Shkreli, our Chief Executive Officer, was the President of Retrophin prior to the Merger.

*Significant Employees*

As of the date hereof, we have no significant employees, other than our named executive officers.

*Family Relationships*

There are no family relationships among our directors or executive officers.

*Involvement in Certain Legal Proceedings*

To our knowledge, there have been no events under any bankruptcy act, no criminal proceedings and no federal or state judicial or administrative orders, judgments or decrees or findings, no violations of any federal or state securities law, and no violations of any federal commodities law material to the evaluation of the ability and integrity of any director (existing or proposed) or executive officer (existing or proposed) of the Company during the past ten (10) years.

**Policies and Procedures for Review, Approval or Ratification of Transactions with Related Persons**

We do not have any special committee, policy or procedure related to the review, approval or ratification of transactions with related persons that are required to be disclosed pursuant to Item 404(a) of Regulation S-K, other than as required by the Delaware General Corporation Law.

**Director Independence**

Our securities are not listed on a national securities exchange or on any inter-dealer quotation system which has a requirement that a majority of directors be independent. We evaluate independence by the standards for director independence set forth in the NASDAQ Marketplace Rules.

Under these rules, a director is not considered to be independent if he or she is also an executive officer or employee of the corporation. As a result, Messrs. Aselage and Shkreli would not be considered independent because they serve as executive officers of the Company. Our other director, Messrs Lyons and Richardson, would be considered independent under these rules.

67 | Page

**Board of Directors' Meetings**

During the fiscal year ended December 31, 2011, our board of directors did not meet and we did not hold an annual meeting. Our board conducted all of its business and approved all corporate action during the fiscal year ended December 31, 2011 by the unanimous written consent of its members, in the absence of formal board meetings.

**Committees of the Board of Directors**

Our board of directors performs the functions of the audit committee. We do not have a qualified financial expert at this time because we have not been able to hire a qualified candidate. Further, we believe that we have inadequate financial resources at this time to hire such an expert. We intend to continue to search for a qualified individual for hire.

Due to our small size and limited operations to date, we do not presently have a nominating committee, compensation committee or other committee performing similar functions. We have not adopted any procedures by which security holders may recommend nominees to our board, and we do not have a diversity policy.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires our directors and officers, and persons who beneficially own more than ten percent (10%) of our common stock, who are hereinafter collectively referred to as Reporting Persons, to file reports with the SEC of beneficial ownership and reports of changes in beneficial ownership of our common stock on Forms 3, 4 and 5. Reporting Persons are required by applicable SEC rules to furnish us with copies of all such forms filed with the SEC pursuant to Section 16(a) of the Exchange Act. To our knowledge, based solely on our review of the copies of the Forms 3, 4 and 5 received by us during the fiscal year ended December 31, 2011 and written representations that no other reports were required, we believe that all reports required to be filed by such persons with respect to the Company's fiscal year ended December 31, 2011 were timely filed.

**Code of Ethics**

We are reviewing a Code of Ethics and will provide it once it has been approved by our Board of Directors.

**Board Leadership Structure and Role on Risk Oversight**

Martin Shkreli currently serves as our Chief Executive Officer. Our board of directors is comprised of Messrs. Aselage, Shkreli and, Richardson  with Mr. Aselage serving as Chairman. At present, we have determined this leadership structure is appropriate due to our small size and limited operations and resources.

68 | Page

We have no policy requiring the combination or separation of the Principal Executive Officer and Chairman roles and our governing documents do not mandate a particular structure. Our directors recognize that the leadership structure and the combination or separation of these leadership roles is driven by our needs at any point in time.

Our directors are exclusively involved in the general oversight of risks that could affect our business and they will continue to evaluate our leadership structure and modify such structure as appropriate based on our size, resources and operations.

### Legal Proceedings

We are not aware of any material proceedings in which any of our directors, executive officers or affiliates, any owner of record or beneficially of more than 5% of our common stock, or any associate of any such director, officer, affiliate or security holder is a party adverse to us or any of our subsidiaries or has a material interest adverse to us.

### Stockholder Communication with the Board of Directors

Stockholders may send communications to our board of directors by writing to Retrophin, Inc., 777 Third Avenue, 22nd Floor, New York, New York, 10017, Attention: Board of Directors.

### Other Information

We are required to file periodic reports, proxy statements and other information with the SEC. You may read and copy this information at the Public Reference Room of the SEC, 100 F. Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. You may also obtain a copy of these reports by accessing the SEC's website at http://www.sec.gov. You may also send communications to our board of directors at:  Retrophin Inc., 777 Third Avenue, New York, New York 10017, Attention: Board of Directors.

### Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matters

We are a reporting company under the Exchange Act, and our public filings can be accessed at www.sec.gov.  Our Common Stock is listed for quotation on the OTC Market (OTC.QB) under the trading symbol "RTRX.QB".  There has been limited trading in our shares since they became eligible for trading on the OTC.QB during the third quarter of 2008.

The common stock is traded on the OTC QB under the symbol "RTRX"; however it is very limited Public Market for the common stock.  As of December 17, 2012, 8,338,837 shares of common stock were outstanding. There is a limited trading market for our Common Stock at present and, according to the best information available to management, there has been no active trading activity for approximately three years.

**Common Stock Market Prices**

The following table sets forth, for the periods indicated, the high and the low closing sales price per share of our common stock as reported on the OTC.QB.  For all periods prior to December 17, 2012, our stock traded under the symbol "DGTE.OB".

| Price Range | High | | Low | |
|---|---|---|---|---|
| **Fiscal year ended February 29, 2012** | $ | .10 | | |
| First Quarter | $ | .08 | $ | .04 |
| Second Quarter | $ | .15 | $ | .04 |
| Third Quarter | $ | .15 | $ | .10 |
| **Fiscal year ended February 28, 2013** | | | | |
| First Quarter | | N/A | | N/A |
| Second Quarter | | N/A | | N/A |
| Third Quarter | | 2.01 | | 1.50 |
| Fourth Quarter (through December 17, 2012) | | 7.69 | | 1.50 |

**Holders of Our Common Stock**

As of December 1, 2012, there were 179  holders of record of the Company's common stock.

Since inception we have not paid any dividends on our Common Stock.  We currently do not anticipate paying any cash dividends in the foreseeable future on our Common Stock. Although we intend to retain our earnings, if any, to finance the exploration and growth of our business, our Board of Directors will have the discretion to declare and pay dividends in the future.  Payment of dividends in the future will depend upon our earnings, capital requirements, and other factors, which our Board of Directors may deem relevant.

**Description of Securities**

The following statements are qualified in their entirety by reference to the detailed provisions of our certificate of incorporation and bylaws.

*Capital Structure*

We currently have authorized capital stock of 100,000,000 shares, of which 80,000,000 are designated as common stock, par value $0.0001 per share, and 20,000,000 shares are designated as preferred stock, par value $0.0001 per share. As of the closing of the Merger, 8,338,837 shares of our common stock and 0 shares of our preferred stock were issued and outstanding. As of December 1, 2012, there were 179 holders of record of our common stock.

*Common Stock*

70 | Page

The holders of our common stock are entitled to one vote per share on matters on which our stockholders vote. There are no cumulative voting rights. Subject to any preferential dividend rights of any outstanding shares of preferred stock, holders of our common stock are entitled to receive dividends, if declared by our board of directors, out of funds that we may legally use to pay dividends. Generally, all matters to be voted on by stockholders must be approved by a majority (or, in the case of election of directors, by a plurality) of the votes entitled to be cast by all shares of our Common Stock that are present in person or represented by proxy.  Holders representing 50 percent (50%) of our Common Stock issued, outstanding and entitled to vote, represented in person or by proxy, are necessary to constitute a quorum at any meeting of our stockholders. A vote by the holders of a majority of our outstanding shares is required to effectuate certain fundamental corporate changes such as liquidation, merger or an amendment to our Articles of Incorporation.  If we liquidate or dissolve, holders of our common stock are entitled to share ratably in our assets once our debts and any liquidation preference owed to any then-outstanding preferred stockholders are paid. Our certificate of incorporation does not provide our common stock with any redemption, conversion or preemptive rights.

*Preferred Stock*

The Board of Directors of the Company has the authority to designate one or more series of preferred stock with such voting powers, if any, and with such rights, preferences and privileges as the Board of Directors shall determine.

**Dividend Policy**

In the past, we have not distributed earnings to stockholders. Any future decisions regarding dividends will be made by our board of directors. We currently intend to retain and use any future earnings for the development and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future. Our board of directors has complete discretion on whether to pay dividends. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant.

*Administration*

Our board of directors does not currently have a compensation committee and, in the absence of such a committee, the board will administer the Plan. Subject to the terms of the Plan, the board will have complete authority and discretion to determine the terms of awards under the Plan.

*Eligible Recipients*

Any officer or other employee of the Company or its affiliates, or an individual that the Company or an affiliate has engaged to become an officer or employee, or a consultant or advisor who provides services to the Company or its affiliates, including a non-employee director of the Board, is eligible to receive awards under the Plan.

*Grants*

The Plan authorizes the grant to eligible recipients non-qualified stock options, incentive stock options, restricted stock awards, restricted stock units, performance grants intended to comply with Section 162(m) of the Internal Revenue Code of 1986, as amended, dividend equivalent awards, deferred stock awards, stock payment awards and stock appreciation rights.

71 | Page

*Duration, Amendment, and Termination*

The Board may amend, suspend or terminate the Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of common stock reserved for issuance pursuant to incentive awards, unless such change is authorized by our stockholders within one year.

## Recent Sales of Unregistered Securities

The following summarizes all sales of unregistered securities by us and Retrophin within the past three years:

On March 2011, in connection with Retrophin's formation, Retrophin issued an aggregate of 321,660 shares of its common stock to Martin Shkreli, our Founder and CEO, for aggregate consideration of $25,000.

As of December 10, 2012 Retrophin has issued 155,461 shares of its preferred stock to 28 investors in a private placement for aggregate consideration of approximately $4.4 million. All preferred stock that was sold to investors was converted into the Company's Common Stock in connection with the merger.

The sales of the securities identified above were made pursuant to privately negotiated transactions that did not involve a public offering of securities and, accordingly, we believe that these transactions were exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof and the rules promulgated thereunder. Each of the above-referenced investors in Retrophin's stock represented to Retrophin in connection with their investment that they were "accredited investors" (as defined by Rule 501 under the Securities Act) and were acquiring the shares for investment and not distribution, that they could bear the risks of the investment and could hold the securities for an indefinite period of time. The investors received written disclosures that the securities had not been registered under the Securities Act and that any resale must be made pursuant to a registration or an available exemption from such registration. All of the foregoing securities are deemed restricted securities for purposes of the Securities Act.

On December 10, 2012, in connection with the conversion of a Convertible Promissory Note, the Company issued 2,500,000 shares to the holder of such note.

## Shares Eligible for Future Sale

As of December 17, 2012, we had outstanding 8,338,837 shares of common stock. Of these shares 5,838,837 are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering.

## Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies

Rule 144 is not available for the resale of securities initially issued by companies that are, or previously were, blank check companies like us, to their promoters or affiliates despite technical compliance with the requirements of Rule 144. Rule 144 also is not available for resale of securities issued by any shell companies (other than business combination-related shell companies) or any issuer that has been at any time previously a shell company. The SEC has provided an exception to this prohibition, however, if the following conditions are met:

72 | Page

- The issuer of the securities that was formerly a shell company has ceased to be a shell company.

- The issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

- The issuer of the securities has filed all Exchange Act reports and materials required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports.

- At least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, none of our stockholders is currently able to sell shares of our common stock in reliance on Rule 144. Assuming we continue to meet the requirements set forth above, Rule 144 will become available to our stockholders one year after the date of this report. Our stockholders may currently resell their shares of our common stock only pursuant to a registration statement that has been declared effective under the Securities Act or pursuant to another exemption from registration.

**Indemnification of Directors and Officers**

Section 145 of the Delaware General Corporation Law authorizes a corporation to grant, and authorizes a court to award, indemnity to officers, directors and other corporate agents. As permitted by Section 102(b)(7) of the Delaware General Corporation Law, the Company's certificate of incorporation includes a provision that eliminates the personal liability of its directors for breach of their fiduciary duty as directors, except that a director shall be liable to the extent provided by applicable law (i) for breach of the director's duty of loyalty to the Company or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. These indemnification provisions may be sufficiently broad to permit indemnification of the Company's officers and directors for liabilities (including reimbursement of expenses incurred) arising under the Securities Act.

To the extent that indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our Company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. If a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of our company in the successful defense of any action, suit or proceeding) is asserted by any of our directors, officers or controlling persons in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of that issue.

73 | Page

**Delaware Anti-Takeover Statute**

We are subject to Section 203 of the Delaware General Corporation Law. This statute regulating corporate takeovers prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for three years following the date that the stockholder became an interested stockholder, unless:

- Prior to the date of the transaction, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder.

- Upon completion of the transaction that resulted in the interested stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding (a) shares owned by persons who are directors and also officers, and (b) shares owned by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer.

- On or subsequent to the date of the transaction, the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. An interested stockholder is any person who, together with such person's affiliates and associates (i) owns 15% or more of a corporation's voting securities or (ii) is an affiliate or associate of a corporation and was the owner of 15% or more of the corporation's voting securities at any time within the three year period immediately preceding a business combination of the corporation governed by Section 203. We expect the existence of this provision to have an anti-takeover effect with respect to transactions our board of directors does not approve in advance. We also anticipate that Section 203 may discourage takeover attempts that might result in a premium over the market price, once a market exists, for the shares of common stock held by our stockholders. In connection with the Merger, our board of directors determined that neither Martin Shkreli nor any stockholder of Retrophin would be deemed to be an interested stockholder.

**Item 3.02. Unregistered Sales of Equity Securities.**

The disclosures set forth in Item 2.01 above are hereby incorporated by reference into this Item 3.02.

74 | Page

**Item 5.01. Changes in Control of Registrant.**

The disclosures set forth in Item 2.01 above are hereby incorporated by reference into this Item 5.01.

**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

On December 17, 2012, our board of directors was reconstituted by the appointment of Stephen Aselage, Martin Shkreli and Steven Richardson with Mr. Aselage serving as Chairman of the Board, and the resignations of Robert Wilson from his role as Director, Chief Executive Officer and President and Gary Lyons from his role as Director.

At the closing of the Merger, our executive management team was also reconstituted and Mr. Wilson resigned from his position as the Company's President, Treasurer and Secretary. Upon the Effective Time, the following individuals (all of whom were officers of Retrophin prior to the Merger) took the positions set after their names: Martin Shkreli (Chief Executive Officer). Biographical and other information regarding these individuals is provided under the caption "Management and Directors" in Item 2.01 above, which is incorporated by reference into this Item 5.02.

**Item 5.06. Change in Shell Company Status.**

As described in Item 2.01 above, which are incorporated by reference into this Item 5.06, we ceased being a shell company (as defined in Rule 12b-2 under the Exchange Act) upon completion of the Merger.

**Item 9.01. Financial Statements and Exhibits.**

(a) As a result of its acquisition of Retrophin as described in Item 2.01, the registrant is filing herewith Retrophin's audited financial statements as of and for the fiscal year ended December 31, 2011 and its unaudited condensed financial statements as of and for the three and Nine months ended September 30, 2012 as Exhibit 99.1 to this current report.

(b) Unaudited pro forma condensed combined financial information as of and for the fiscal year ended December 31, 2011 and as of and for the nine months ended September 30, 2012 is attached as Exhibit 99.2 to this current report.

(c) Exhibits.

| Exhibit | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated December 12, 2012, by and among Desert Gateway, Inc., a Delaware corporation, Desert Gateway Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of the Company, and Retrophin Inc., a Delaware corporation |
| 10.1 | Sublicense Agreement, dated February 16, 2012, by and among Ligand Pharmaceuticals Incorporated, a Delaware corporation, Pharmacopeia, Inc., a Delaware limited liability company, and Retrophin, LLC, a Delaware limited liability company * |

75 | Page

99.1      Audited financial statements of Retrophin Inc. as of and for the fiscal year ended December 31, 2011 and unaudited condensed financial statements of Retrophin Inc. as of and for the three and nine months ended September 30, 2012

99.2      Unaudited Pro Forma Condensed Combined Financial Statements as of and for the fiscal year ended December 31, 2011 and as of and for the nine months ended September 30, 2012

99.3      Press Release dated December 18, 2012

*          Confidential Treatment Requested by Registrant. Redacted Portion Filed Separately with Commission.

76 | Page

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**DESERT GATEWAY, INC.**

Date:   December 18, 2012                                    /s/ Martin Shkreli

Name: Martin Shkreli
Title:  Chief Executive Officer

77 | Page

# PLAN AND AGREEMENT OF MERGER

This **PLAN AND AGREEMENT OF MERGER** (the "Agreement"), is entered into on this 12th day of December, 2012, by and among Desert Gateway, Inc., a Delaware corporation ("DGTE"), Retrophin, Inc., a Delaware corporation ("Retrophin"), and Desert Gateway Acquisition Corp., a Delaware corporation ("Newco"), a wholly-owned subsidiary of DGTE.

**WHEREAS,** Newco is a corporation duly organized and validly existing under the laws of the State of Delaware, having been incorporated on the 10th day of December, 2012, and is a wholly owned subsidiary of DGTE, a corporation duly organized and validly existing under the laws of the State of Delaware, having been incorporated on the 7th day of February, 2008, and Retrophin is a corporation organized and validly existing under the laws of the State of Delaware, having been incorporated in September, 2012; and

**WHEREAS**, the respective Boards of Directors of DGTE, Retrophin, and Newco deem it advisable and in the best interests of DGTE, Retrophin, and Newco and their respective stockholders that Newco merge with and into Retrophin pursuant to this Agreement and the applicable provisions of the law of the State of Delaware (the "**Merger**"); and

**WHEREAS**, the Boards of Directors of DGTE, Retrophin, and Newco, respectively, have approved and adopted this Agreement as a plan of reorganization within the provisions of Section 368(a)(l)(A) and 368(a)(2)(E) of the Internal Revenue Code of 1986, as amended; and

**NOW, THEREFORE** in consideration of the premises and of the mutual agreements, representations, warranties, provisions, and covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I
## THE MERGER

Section 1.01. <u>Delivery and Filing of Certificate of Merger; Effective Time of Merger.</u> Newco and Retrophin will cause a Certificate of Merger in substantially the same form as Exhibit A attached hereto (the "Certificate of Merger") to be signed, verified and delivered to the Secretary of State of the State of Delaware as provided in Section 251 of the General Corporation Law of Delaware on the second business day (no Saturday, Sunday or legal holiday in Delaware being deemed to be a business day) following the day on which the last of the approvals required by each respective board of directors shall have been obtained, or such earlier or later date as may be mutually agreed to by Retrophin and DGTE. The time of the delivery to the Secretary of State referred to in the preceding sentence is herein referred to as the Time of Filing. The effective time of the Merger shall be the close of business on the day the Certificate of Merger shall have been filed by the Secretary of State of the State of Delaware. At the effective time of the Merger, the separate existence of Newco shall cease and Newco shall be merged with and into Retrophin. Newco and Retrophin are hereinafter sometimes referred to as the Constituent Corporations and Retrophin, the party to the Merger surviving the Merger, is hereinafter sometimes referred to as the Surviving Corporation.

Section 1.02.  Certificate of Incorporation, Bylaws and Board of Directors of Surviving Corporation.

(a)        At the effective time of the Merger, the Certificate of Incorporation of Retrophin shall become the Certificate of Incorporation of the Surviving Corporation and DGTE shall file a new Certificate of Incorporation in form and substance acceptable to Retrophin. Subsequent to the effective time of the Merger, the Certificate of Incorporation of Retrophin shall be the Certificate of Incorporation of the Surviving Corporation until changed as provided by law.

(b)        At the effective time of the Merger the Bylaws of Retrophin shall become the Bylaws of the Surviving Corporation and DGTE shall approve new Bylaws in form and substance acceptable to Retrophin. Subsequent to the effective time of the Merger, the Bylaws of Retrophin shall be the Bylaws of the Surviving Corporation until they shall thereafter be duly amended.

(c)        The names and addresses of the persons who shall constitute the Board of Directors of the Surviving Corporation and DGTE at the effective time of the Merger are as follows:

| Name | Office |
|------|--------|
| Stephen Aselage | Director |
| Martin Shkreli | Chief Executive Officer and Director" |
| Steven Richardson | Director |
| Gary Lyons | Director |

all c/o Retrophin, Inc., 777 Third Avenue, 22nd Floor, New York NY 10017

2

unless, prior to the effective time of the Merger, any one or more of the persons named above shall refuse or become unable to serve, in which event the remaining persons named above shall be the directors of the Surviving Corporation and DGTE at the effective time of the Merger, and any vacancy occurring by reason of death, refusal or inability to serve shall be filled after the effective time of the Merger as provided in the Bylaws of the Surviving Corporation. The Directors of the Surviving Corporation and DGTE shall hold office subject to the provisions of the law of the State of Delaware and of the Certificate of Incorporation and Bylaws of the Surviving Corporation.

Section 1.03. <u>Conversion and Exchange of Stock</u>. The manner of converting the shares of common stock, par value $0.0001 per share, of Newco ("Newco Common Stock") issued and outstanding immediately prior to the effective time of the Merger into shares of common stock, par value $0.001 per share, of Retrophin ("Retrophin Common Stock"), the manner of converting the shares of Retrophin Common Stock issued and outstanding immediately prior to the effective time of the Merger into shares of common stock, par value $0.0001 per share (the "DGTE Common Stock"), of DGTE, and the manner of converting the shares of Series A Preferred Stock, par value $0.001 per share, of Retrophin ("Retrophin Series A Stock") issued and outstanding immediately prior to the effective time of the Merger into shares of DGTE Common Stock shall be as follows:

(a)     At the effective time of the Merger:

(1)     Each share of Retrophin Common Stock issued and outstanding immediately prior to the effective time of the Merger shall, by virtue of the Merger and without any action on the part of the holder thereof, automatically be converted into five (5) fully paid and nonassessable shares of DGTE Common Stock. Any share of Retrophin Common Stock held in the treasury of Retrophin immediately prior to the effective time of the Merger shall not be converted into DGTE Common Stock but shall automatically be cancelled at the effective time of the Merger.

(2)     Each share of Retrophin Series A Stock issued and outstanding immediately prior to the effective time of the Merger shall, by virtue of the Merger and without any action on the part of the holder thereof, automatically be converted into seven (7) fully paid and nonassessable shares of DGTE Common Stock. Any share of Retrophin Series A Stock held in the treasury of Retrophin immediately prior to the effective time of the Merger shall not be converted into DGTE Common Stock but shall automatically be cancelled at the effective time of the Merger.

3

(3)     Each share of Newco Common Stock issued and outstanding immediately prior to the effective date of the Merger shall, by virtue of the Merger and without any action on the part of the holder thereof, automatically be converted into one fully paid and nonassessable share of Retrophin Common Stock. Each share of Newco Common Stock held in the treasury of Newco at the effective time of the Merger shall automatically be cancelled.

Section 1.04. <u>Certain Information with Respect to Capital Stock of Retrophin and Newco</u>. The respective designations and numbers of outstanding shares and voting rights of each class of outstanding capital stock of Retrophin and Newco are as follows:

(a)     As of the date of this Agreement, the authorized capital stock of Retrophin consisted of (1) eight million (8,000,000) shares of Retrophin Common Stock, of which 825,119 shares of Retrophin Common Stock are issued and outstanding and 111,283 shares of Retrophin Common Stock are subject to vesting, and (2) three million (3,000,000) shares of preferred stock, par value $0.001 per share (the "Retrophin Series A Stock"), of which 151,461 shares are issued and outstanding. No shares of such capital stock are held in the treasury of Retrophin. The number of outstanding shares of capital stock of Retrophin may not be changed prior to the effective time of the Merger. The holders of Retrophin Common Stock and Retrophin Series A Stock are entitled to vote as one class upon this Agreement.

(b)     As of the date of this Agreement, the authorized capital stock of Newco consisted of 1,000 shares, par value $0.0001 per share, of Newco Common Stock, all of which were issued and outstanding. The holder of Newco Common Stock is entitled to vote upon this Agreement.

Section 1.05.<u>Effect of Merger</u>. Except as herein specifically set forth, the identity, existence, purposes, powers, objects, franchises, privileges, rights, and immunities of Retrophin shall continue unaffected and unimpaired by the Merger and the corporate franchises, existence and rights of Newco shall be merged into Retrophin and Retrophin shall, as the Surviving Corporation and as a wholly owned subsidiary of DGTE, be fully vested therewith. At the effective time of the Merger, the separate existence of Newco shall cease, and in accordance with the terms of this Agreement the Surviving Corporation shall possess all the rights, privileges, powers, and franchises, as well of a public as of a private nature, and be subject to all the restrictions, disabilities, and duties, of each of the Constituent Corporations, and all and singular, the rights, powers, and franchises and all property, real, personal, and mixed, and all debts due on whatever account, including stock subscriptions, and all other things in action and all and every other interest of or belonging to or due to each of the Constituent Corporations shall be taken and deemed to be transferred to and vested in the Surviving Corporation without further act or deed; and all property, rights, privileges, powers, and franchises and all and every other interest shall be thereafter as effectually the property of the Surviving Corporation as they were of the respective Constituent Corporations; and the title to any real estate, or interest therein, whether by deed or otherwise, under the laws of Delaware vested in either of said corporations, shall not revert or be in any way impaired by reason of the Merger. The Surviving Corporation shall thenceforth be responsible and liable for all the liabilities and obligations of the Constituent Corporations, and any claim existing or action or proceeding pending by or against either of said Constituent Corporations may be prosecuted as if the Merger had not taken place, or the Surviving Corporation may be substituted in its place. Neither the rights of creditors nor any liens upon the property of either of the Constituent Corporations shall be impaired by the Merger, and all debts, liabilities, and duties of each of said Constituent Corporations shall attach to the Surviving Corporation, and may be enforced against it to the same extent as if said debts, liabilities, and duties had been incurred or contracted by it.

4

## ARTICLE II
## REPRESENTATIONS, COVENANTS, AND WARRANTIES OF NEWCO

As an inducement to, and to obtain the reliance of Retrophin, except as set forth in the Schedules of Newco attached hereto (the "**Newco Disclosure Schedules**"), Newco hereby represents and warrants to Retrophin as of the Closing Date (as defined below) as follows. As used herein, the term "**knowledge of Newco**" or similar language refers to the actual knowledge of the executive officers of Newco.

Section 2.01. <u>Incorporation</u>. Newco is organized under the laws of the jurisdiction set forth in Schedule 2.01 to the Newco Disclosure Schedules, is duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of organization and has the requisite power and authority to own, lease and operate its assets and properties and to carry on a business. Newco is in possession of all governmental or third party approvals necessary to own, lease and operate the properties it purports to own, operate or lease, to carry on its business as it is now being conducted, to consummate the transactions contemplated by this Agreement. Newco is not in violation of any of the provisions of its charter or organizational documents. The ownership records (which have been delivered to Retrophin) of Newco's registered capital are true, complete and accurate records of such ownership as of the date of such records and contain all transfers of such registered capital since the time of Newco's organization. Newco is not required to qualify to do business as a foreign corporation in any other jurisdiction, except where the failure to so qualify would not have a material adverse effect on: (i) the assets, liabilities, results of operations, condition (financial or otherwise) or business of Newco taken as a whole; or (ii) the ability of Newco to perform its obligations hereunder, but, to the extent applicable, shall exclude any circumstance, change or effect to the extent resulting or arising from: (A) any change in general economic conditions in the industries or markets in which Newco operates so long as Newco is not disproportionately (in a material manner) affected by such changes; (B) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack so long as Newco is not disproportionately (in a material manner) affected by such changes; (C) changes in United States generally accepted accounting principles, or the interpretation thereof; or (D) the entry into or announcement of this Agreement, actions contemplated by this Agreement, or the consummation of the transactions contemplated hereby (a "**Material Adverse Effect**").

5

Section 2.02.  Capitalization.  The authorized shares of Newco consists of 10,000,000 shares of Newco Common Stock.  There are 1,000 shares of Newco Common Stock currently issued and outstanding.  The issued and outstanding shares of Newco Common Stock are validly issued, fully paid and non-assessable and not issued in violation of the preemptive or other rights of any person.

Section 2.03.  Subsidiaries.  Except as set forth on Schedule 2.03 to the Newco Disclosure Schedules, Newco does not have any subsidiaries, and does not own, beneficially or of record, any shares of any other entity.

Section 2.04.  Financial Statements.  There are no financial statements of Newco having been prepared since its inception to date. Newco has transacted no business, nor incurred any debt or conducted any operations.

Section 2.05.  Information.  The information concerning Newco set forth in this Agreement and the Newco Disclosure Schedules is complete and accurate in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact required to make the statements made, in light of the circumstances under which they were made, not misleading.

6

Section 2.06.  <u>Options or Warrants</u>.  There are no existing options, warrants, calls, or commitments of any character relating to the authorized and unissued stock of Newco.

Section 2.07.  <u>Absence of Certain Changes or Events</u>.  Except as disclosed in the Newco Disclosure Schedules since inception:

(a)  There has not been any material adverse change in the business, operations, properties, assets, or condition (financial or otherwise) of Newco;

(b)  Newco has not: (i) amended its certificate of incorporation, charter, bylaws or other organizational documents; (ii) declared or made, or agreed to declare or make, any payment of dividends or distributions of any assets of any kind whatsoever to stockholders or purchased or redeemed, or agreed to purchase or redeem, any of its shares; (iii) made any material change in its method of management, operation or accounting, (iv) entered into any other material transaction other than sales in the ordinary course of its business; or (v) made any increase in or adoption of any profit sharing, bonus, deferred compensation, insurance, pension, retirement, or other employee benefit plan, payment, or arrangement made to, for, or with its officers, directors, or employees; and

(c)  Newco has not: (i) granted or agreed to grant any options, warrants or other rights for its stocks, bonds or other corporate securities calling for the issuance thereof, (ii) borrowed or agreed to borrow any funds or incurred, or become subject to, any material obligation or liability (absolute or contingent) except as disclosed herein and except liabilities incurred in the ordinary course of business; (iii) sold or transferred, or agreed to sell or transfer, any of its assets, properties, or rights or canceled, or agreed to cancel, any debts or claims; or (iv) issued, delivered, or agreed to issue or deliver any stock, bonds or other corporate securities including debentures (whether authorized and unissued or held as treasury stock) except in connection with this Agreement and the transaction contemplated hereby.

Section 2.08.  <u>Litigation and Proceedings</u>.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of Newco after reasonable investigation, threatened by or against Newco or affecting Newco or their respective properties, at law or in equity, before any court or other governmental agency or instrumentality, domestic or foreign, or before any arbitrator of any kind.  Newco has no knowledge of any material default on its part with respect to any judgment, order, injunction, decree, award, rule, or regulation of any court, arbitrator, or governmental agency or instrumentality or of any circumstances which, after reasonable investigation, would result in the discovery of such a default.

Section 2.09.  <u>Contracts</u>.  Newco is not a party to, and not of its assets or properties are bound by, any contracts, agreements, franchises, license agreements, debt instruments or other commitments, whether oral or written.

Section 2.10.  <u>No Conflict With Other Instruments</u>.  The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in a violation of, breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of (i) Newco's certificate of incorporation, charter, bylaws or other organizational documents, (ii) any provision of a federal or state statute, rule or regulation applicable to Newco or (iii) any Material Contract to which Newco is a party or to which any of its assets, properties or operations are subject.

Section 2.11.  <u>Compliance With Laws and Regulations</u>.  To the best of its knowledge, Newco has complied with all applicable statutes and regulations of any federal, state, local, or other governmental entity or agency thereof, except to the extent that noncompliance would not have a Material Adverse Effect.

Section 2.12.  <u>Approval of Agreement</u>.  The Board of Directors of Newco has authorized the execution and delivery of this Agreement by Newco and has approved this Agreement and the transactions contemplated hereby.

Section 2.13.  <u>Valid Obligation</u>.  All corporate action on the part of Newco, its officers, directors and holders of capital stock necessary for the authorization, execution and delivery of this Agreement and the performance of all obligations of Newco hereunder have been taken.  This Agreement and all agreements and other documents executed by Newco in connection herewith constitute the valid and binding obligation of Newco, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

### ARTICLE III
### REPRESENTATIONS, COVENANTS, AND WARRANTIES OF DGTE

As an inducement to, and to obtain the reliance of Retrophin, except as set forth in the Schedules of DGTE attached hereto (the "**DGTE Schedules**"), DGTE hereby represents and warrants to Retrophin, as of the date hereof and as of the Closing Date, as follows.  As used herein, the term "**knowledge of DGTE**" or similar language refers to the actual knowledge of the executive officers of DGTE after due investigation or inquiry.

8

Section 3.01. <u>Organization</u>. DGTE is a corporation duly organized, validly existing, and in good standing under the laws of Delaware and has the corporate power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. Attached as <u>Schedule 3.01</u> to DGTE Schedules are complete and correct copies of the certificate of incorporation and bylaws of DGTE as in effect on the date hereof. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of DGTE's certificate of incorporation, bylaws, contracts, agreements or commitments. DGTE has taken all action required by law, its certificate of incorporation, its bylaws, or otherwise to authorize the execution and delivery of this Agreement, and DGTE has full power, authority, and legal right and has taken all action required by law, its certificate of incorporation, bylaws, or otherwise to consummate the transactions herein contemplated.

Section 3.02. <u>Capitalization</u>.

(a)     DGTE's authorized capitalization consists of (a) 100,000,000 shares of DGTE Common Stock, of which 2,606,681 shares are issued and outstanding prior to the Merger, and (b) 20,000,000 shares of preferred stock, of which 501 shares of Class A, par value $0.001 per share (the "DGTE Preferred Stock") are issued and outstanding, but will be canceled by separate agreement with the holder concurrent with the Closing. All issued and outstanding shares of DGTE Common Stock are legally issued, fully paid, and non-assessable and not issued in violation of the preemptive or other rights of any person or entity. As of the date hereof and the Closing Date, no shares of DGTE Common Stock were reserved for issuance upon the exercise of outstanding options or warrants to purchase the DGTE Common Stock or other equity-linked securities of DGTE. All outstanding shares of DGTE Common Stock have been issued and granted in compliance with: (i) all applicable securities laws and (in all material respects) other applicable laws and regulations, and (ii) all requirements set forth in any material contracts, agreements, franchises, license agreements, debt instruments or other commitments to which DGTE is a party or by which it or any of its assets or properties are bound, all of which are set forth on <u>Schedule 3.02</u> to DGTE Disclosure Schedules (the "**Company Material Contracts**").

9

(b)       There are no equity securities, partnership interests or similar ownership interests of any class of any equity security of DGTE, or any securities exchangeable or convertible into or exercisable for such equity securities, partnership interests or similar ownership interests, issued, reserved for issuance or outstanding.  There are no subscriptions, options, warrants, equity securities, partnership  interests or similar  ownership interests,  calls, rights (including preemptive rights),  commitments  or agreements of any character to which DGTE is a party or by which it is bound obligating DGTE to issue, deliver or sell, or cause to be issued, delivered or sold, or repurchase, redeem or otherwise acquire, or cause the repurchase, redemption or acquisition of, any shares of capital stock, partnership interests or similar ownership interests of DGTE or obligating DGTE to grant, extend, accelerate the vesting of or enter into any such subscription, option, warrant, equity security, call, right, commitment or agreement.  There is no plan or arrangement to issue DGTE Common Stock or preferred stock of DGTE except as set forth in this Agreement.  DGTE has delivered evidence in form and substance acceptable to Retrophin that all securities convertible into or exchangeable for shares of DGTE Common Stock have been converted and/or exchanged, as applicable, prior to the Closing Date.

(c)       Except as contemplated by this Agreement and except as set forth in <u>Schedule 3.02</u> to DGTE Disclosure Schedules, there are no registration rights, and there is no voting trust, proxy, rights plan, anti-takeover plan or other agreement or understanding to which DGTE is a party or by which it is bound with respect to any equity security of any class of DGTE, and there are no agreements to which DGTE is a party, or which DGTE has knowledge of, which conflict with this Agreement or the transactions contemplated herein or otherwise prohibit the consummation of the transactions contemplated hereunder.

Section 3.03.  <u>Subsidiaries and Predecessor Corporations</u>.  Except for DGTE'S ownership of Newco as a wholly owned subsidiary in contemplation of this Agreement, DGTE does not have any other predecessor corporation(s) or subsidiaries, is not considered a successor in interest or by operation of law and does not own, beneficially or of record, any shares of any other entity.

10

Section 3.04.  <u>SEC Filings; Financial Statements</u>.

(a)        DGTE has made available to Retrophin a correct and complete copy, or there has been available on the EDGAR system maintained by the U.S. Securities and Exchange Commission (the "**SEC**"), copies of each report, registration statement and definitive proxy statement filed by DGTE with the SEC for the 36 months prior to the date of this Agreement ( "**DGTE SEC Reports**"), which are all the forms, reports and documents filed by DGTE with the SEC for the 36 months prior to the date of this Agreement.  As of their respective dates, to DGTE's knowledge, DGTE SEC Reports: (i) were prepared in accordance and complied in all material respects with the requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), as the case may be, and the rules and regulations of the SEC thereunder applicable to such DGTE SEC Reports, and (ii) did not at the time they were filed (and if amended or superseded by a filing prior to the date of this Agreement then on the date of such filing and as so amended or superseded) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)        Each set of financial statements (including, in each case, any related notes thereto) contained in DGTE SEC Reports comply as to form in all material respects with the published rules and regulations of the SEC with respect thereto, were prepared in accordance with U.S. generally accepted accounting principles, applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or, in the case of unaudited statements, do not contain footnotes as permitted by Form 10-Q promulgated under the Exchange Act) and each fairly presents in all material respects the financial position of DGTE at the respective dates thereof and the results of its operations and cash flows for the periods indicated, except that the unaudited interim financial statements were or are subject to normal adjustments which were not or are not expected to have a material adverse effect on: (i) the assets, liabilities, results of operations, condition (financial or otherwise) or business of DGTE; or (ii) the ability of DGTE to perform its obligations hereunder, but, to the extent applicable, shall exclude any circumstance, change or effect to the extent resulting or arising from: (A) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack so long as DGTE is not disproportionately (in a material manner) affected by such changes; (<u>B</u>) changes in United States generally accepted accounting principles, or the interpretation thereof; or (<u>C</u>) the entry into or announcement of this Agreement, actions contemplated by this Agreement, or the consummation of the transactions contemplated hereby (a "**DGTE Material Adverse Effect**").

11

(c)     As of the date of all balance sheets included in DGTE SEC Reports, except as and to the extent reflected or reserved against therein, DGTE had no liabilities or obligations (absolute or contingent) which should be reflected in the balance sheets or the notes thereto prepared in accordance with U.S. generally accepted accounting principles, and all assets reflected therein are properly reported and present fairly the value of the assets of DGTE, in accordance with U.S. generally accepted accounting principles. All statements of operations, stockholders' equity and cash flows included in DGTE SEC Reports reflect fairly the information required to be set forth therein by U.S. generally accepted accounting principles.

(d)     Since inception, DGTE has maintained a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. generally accepted accounting principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(e)     DGTE has no liabilities with respect to the payment of any federal, state, county, local or other taxes (including any deficiencies, interest or penalties), except for taxes accrued but not yet due and payable.

(f)     DGTE has timely filed all state, federal or local income and/or franchise tax returns required to be filed by it from inception to the date hereof. Each of such income tax returns reflects the taxes due for the period covered thereby, except for amounts which, in the aggregate, are immaterial.

(g)     The books and records, financial and otherwise, of DGTE are in all material aspects complete and correct and have been maintained in accordance with good business and accounting practices.

Section 3.05.  Exchange Act Compliance.  DGTE is in compliance with, and current in, all of the reporting, filing and other requirements under the Exchange Act, the Common Stock is registered under Section 12(g) of the Exchange Act, and DGTE is in compliance with all of the requirements under, and imposed by, Section 12(g) of the Exchange Act. All of DGTE's SEC reports have been filed on a timely basis or have received a valid extension of such time of filing and have filed any such Company's SEC reports prior to the expiration of any such extension.

12

Section 3.06. <u>Information</u>. The information concerning DGTE set forth in this Agreement, DGTE Schedules and DGTE SEC Reports is complete and accurate in all material respects and does not contain any untrue statements of a material fact or omit to state a material fact required to make the statements made, in light of the circumstances under which they were made, not misleading. In addition, DGTE has fully disclosed in writing to Retrophin (through this Agreement or DGTE Schedules) all information relating to matters involving DGTE or its assets or its present or past operations or activities which: (i) indicated or may indicate, in the aggregate, the existence of a greater than $10,000 liability, (ii) have led or may lead to a competitive disadvantage on the part of DGTE or (iii) either alone or in aggregation with other information covered by this Section, otherwise have led or may lead to a DGTE Material Adverse Effect, including, but not limited to, information relating to governmental, employee, environmental, litigation and securities matters or proceedings and transactions with affiliates.

Section 3.07. <u>Absence of Certain Changes or Events</u>. Since the date of the most recent Company balance sheet included in DGTE SEC Reports:

(a) There has not been: (i) any material adverse change in the business, operations, properties, assets or condition of DGTE or (ii) any damage, destruction or loss to DGTE (whether or not covered by insurance) materially and adversely affecting the business, operations, properties, assets or condition DGTE;

(b) DGTE has not: (i) amended its certificate of incorporation or bylaws except as required by this Agreement; (ii) declared or made, or agreed to declare or make any payment of dividends or distributions of any assets of any kind whatsoever to stockholders or purchased or redeemed, or agreed to purchase or redeem, any of its capital stock; (iii) waived any rights of value which in the aggregate are outside of the ordinary course of business or material considering the business of DGTE; (iv) made any material change in its method of management, operation, or accounting; (v) entered into any transactions or agreements of any kind or nature; (vi) made any accrual or arrangement for or payment of bonuses or special compensation of any kind or any severance or termination pay to any present or former officer or employee; (vii) increased the rate of compensation payable or to become payable by it to any of its officers or directors or any of its salaried employees whose monthly compensation exceed $5,000; or (viii) made any increase in any profit sharing, bonus, deferred compensation, insurance, pension, retirement, or other employee benefit plan, payment, or arrangement, made to, for or with its officers, directors, or employees;

13

(c)      DGTE has not: (i) granted or agreed to grant any options, warrants, or other rights for its stock, bonds, or other corporate securities calling for the issuance thereof; (ii) borrowed or agreed to borrow any funds or incurred, or become subject to, any material obligation or liability (absolute or contingent); (iii) paid or agreed to pay any material obligations or liabilities (absolute or contingent) other than current liabilities reflected in or shown on the most recent Company balance sheet and current liabilities incurred since that date in the ordinary course of business and professional and other fees and expenses in connection with the preparation of this Agreement and the consummation of the transaction contemplated hereby; (iv) sold or transferred, or agreed to sell or transfer, any of its assets, properties, or rights, or canceled, or agreed to cancel, any debts or claims; (v) made or permitted any amendment or termination of any contract, agreement, or license to which it is a party if such amendment or termination is material, considering the business of DGTE; or (vi) issued, delivered or agreed to issue or deliver, any stock, bonds or other corporate securities including debentures (whether authorized and unissued or held as treasury stock), except in connection with this Agreement; and

(d)      To its knowledge, DGTE has not become subject to any law or regulation which materially and adversely affects, or in the future, may adversely affect, the business, operations, properties, assets or condition of DGTE.

Section 3.08.  Litigation and Proceedings.  There are no actions, suits, proceedings or investigations pending or, to the knowledge of DGTE after reasonable investigation, threatened by or against DGTE or any of its past or present officers, directors or employees or affecting DGTE or its properties, at law or in equity, before any court or other governmental agency or instrumentality, domestic or foreign, or before any arbitrator of any kind except as disclosed in the Schedule 3.08 to DGTE Schedules.  DGTE has no knowledge of any default on its part with respect to any judgment, order, writ, injunction, decree, award, rule or regulation of any court, arbitrator, or governmental agency or instrumentality or any circumstance which after reasonable investigation would result in the discovery of such default.

Section 3.09.  Contracts.  Except for DGTE Material Contracts:

14

(a)    DGTE is not a party to, and its assets or properties are not bound by, any contract, franchise, agreement, debt instrument or other commitments whether such agreement is in writing or oral;

(b)    DGTE is not a party to or bound by, and the properties of DGTE are not subject to any contract, agreement, other commitment or instrument; any charter or other corporate restriction; or any judgment, order, writ, injunction, decree, or award; and

(c)    DGTE is not a party to any oral or written: (i) contract for the employment of any officer or employee; (ii) profit sharing, bonus, deferred compensation, stock option, severance pay, pension benefit or retirement plan, (iii) agreement, contract, or indenture relating to the borrowing of money, (iv) guaranty of any obligation, (vi) collective bargaining agreement; or (vii) agreement with any present or former officer or director of DGTE.

Section 3.10.  No Conflict With Other Instruments.  The execution of this Agreement and the consummation of the transactions contemplated hereby will not result in a violation of, breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of (i) DGTE's certificate of incorporation, bylaws or other organizational documents, (ii) any provision of a federal or state statute, rule or regulation applicable to DGTE or (iii) any DGTE Material Contract to which DGTE is a party or to which any of its assets, properties or operations are subject, or otherwise have a DGTE Material Adverse Effect.

Section 3.11.  Filings, Consents and Approvals.  DGTE is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other foreign, federal, state, local or other governmental authority or other person or entity in connection with the execution, delivery and performance by DGTE of this Agreement, or any document or instrument contemplated hereby.

Section 3.12.  Compliance With Laws and Regulations.  To the best of its knowledge, DGTE has complied with all applicable statutes and regulations of any federal, state, or other applicable governmental entity or agency thereof.  This compliance includes, but is not limited to, the filing of all reports to date with federal and state securities authorities.

Section 3.13.  Approval of Agreements.  The Board of Directors of DGTE have duly authorized the execution and delivery of this Agreement by DGTE and the transactions contemplated hereby and the transactions contemplated each of the aforesaid agreements and instruments.

15

Section 3.14. Material Transactions or Affiliations. Except as disclosed in DGTE SEC Reports or on Schedule 3.14 to DGTE Schedules, there exists no contract, agreement or arrangement between DGTE and any predecessor and any person or entity who was at the time of such contract, agreement or arrangement an officer, director, or person owning of record or known by DGTE to own beneficially, 5% or more of the issued and outstanding Common Stock of DGTE and which is to be performed in whole or in part after the date hereof or was entered into since the inception of DGTE. Neither any officer, director, nor 5% stockholders of DGTE has, or has had since inception of DGTE, any known interest, direct or indirect, in any such transaction with DGTE which was material to the business of DGTE. DGTE has no commitment, whether written or oral, to lend any funds to, borrow any money from, or enter into any other transaction with, any such affiliated person.

Section 3.15. Bank Accounts; Power of Attorney. Set forth on Schedule 3.15 to DGTE Schedules is a true and complete list of: (a) all accounts with banks, money market mutual funds or securities or other financial institutions maintained by DGTE within the past twelve (12) months, the account numbers thereof, and all persons authorized to sign or act on behalf of DGTE, (b) all safe deposit boxes and other similar custodial arrangements maintained by DGTE within the past twelve (12) months, (c) the check ledger for the last 12 months, and (d) the names of all persons holding powers of attorney from DGTE or who are otherwise authorized to act on behalf of DGTE with respect to any matter, other than its officers and directors, and a summary of the terms of such powers or authorizations.

Section 3.16. Valid Obligation. All corporate action on the part of DGTE, its officers, directors and holders of capital stock necessary for the authorization, execution and delivery of this Agreement and the performance of all obligations of DGTE hereunder and thereunder have been taken. This Agreement and all agreements and other documents executed by DGTE in connection herewith and therewith constitute the valid and binding obligation of DGTE, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

Section 3.17. Title to Property. DGTE does not own or lease any real property or personal property. There are no options or other contracts under which DGTE has a right or obligation to acquire or lease any interest in real property or personal property.

16

Section 3.18. <u>Foreign Corrupt Practices Act</u>. None of DGTE, nor to the knowledge of DGTE, any agent or other person acting on behalf of DGTE, has, directly or indirectly: (a) used any funds, or will use any proceeds from the sale of the Units, for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) failed to disclose fully any contribution made by DGTE (or made by any person acting on their behalf of which DGTE is aware) or any members of their respective management which is in violation of any Legal Requirement, or (d) has violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder which was applicable to DGTE.

Section 3.19. <u>Solvency</u>. DGTE has not: (a) made a general assignment for the benefit of creditors; (b) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by its creditors; (c) suffered the appointment of a receiver to take possession of all, or substantially all, of its assets; (d) suffered the attachment or other judicial seizure of all, or substantially all, of its assets; (e) admitted in writing its inability to pay its debts as they come due; or (f) made an offer of settlement, extension or composition to its creditors generally.

Section 3.20. <u>OFAC</u>. None of DGTE nor, to the knowledge of DGTE, any director, officer, agent, employee, affiliate or person acting on behalf of DGTE, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); and DGTE has not heretofore engaged in any transaction to lend, contribute or otherwise make available it funds or the funds of any joint venture partner or other person or entity towards any sales or operations in Cuba, Iran, Syria, Sudan, Myanmar or any other country sanctioned by OFAC or for the purpose of financing the activities of any person or entity currently subject to any U.S. sanctions administered by OFAC.

Section 3.21. <u>Intellectual Property</u>. DGTE does not own, license or otherwise have any right, title or interest in any intellectual property.

Section 3.22. <u>Employees; Consultants, etc.</u>. Except as disclosed in DGTE SEC Reports, DGTE has no employees, officers, directors, agents or consultants. DGTE maintains no employee benefit plans or programs of any kind or nature.

17

Section 3.23.  Insurance.  DGTE does not hold or maintain, nor is DGTE obligated to hold or maintain, any insurance on behalf for itself or its assets or for any officer, director, employee or stockholder of DGTE.

Section 3.24.  Full Disclosure.  No representation or warranty by DGTE in this Agreement and no statement contained in the DGTE Schedules or any certificate or other document furnished or to be furnished to Retrophin pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.  On or prior to the Closing Date, DGTE has received a release from any person or entity to whom it owes money and as of the Closing, DGTE will not have any outstanding liabilities, obligations, liens or encumbrances.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES
## OF RETROPHIN

As an inducement to, and to obtain the reliance of DGTE, except as set forth in the Schedules of Retrophin attached hereto (the "**Retrophin Disclosure Schedules**"), Retrophin hereby represents and warrants to DGTE as of the Closing Date (as defined below) as follows.  As used herein, the term "**knowledge of Retrophin**" or similar language refers to the actual knowledge of the executive officers of Retrophin.

Section 4.01.  Incorporation.  Retrophin is organized under the laws of the State of Delaware, is duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of organization and has the requisite power and authority to own, lease and operate its assets and properties and to carry on its business as it is now being or currently planned to be conducted.  Retrophin is in possession of all governmental or third party approvals necessary to own, lease and operate the properties it purports to own, operate or lease, to carry on its business as it is now being conducted and to consummate the transactions contemplated by this Agreement.  Retrophin is not in violation of any of the provisions of its charter or organizational documents.  The ownership records (which have been delivered to DGTE) of Retrophin registered capital are true, complete and accurate records of such ownership as of the date of such records and contain all transfers of such registered capital since the time of Retrophin's organization. Retrophin is not required to qualify to do business as a foreign corporation in any other jurisdiction, except where the failure to so qualify would not have a material adverse effect on: (i) the assets, liabilities, results of operations, condition (financial or otherwise) or business of Retrophin taken as a whole; or (ii) the ability of Retrophin to perform its obligations hereunder, but, to the extent applicable, shall exclude any circumstance, change or effect to the extent resulting or arising from: (A) any change in general economic conditions in the industries or markets in which Retrophin operates so long as Retrophin is not disproportionately (in a material manner) affected by such changes; (B) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack so long as Retrophin is not disproportionately (in a material manner) affected by such changes; (C) changes in United States generally accepted accounting principles, or the interpretation thereof; or (D) the entry into or announcement of this Agreement, actions contemplated by this Agreement, or the consummation of the transactions contemplated hereby (a "**Retrophin Material Adverse Effect**").

18

Section 4.02. <u>Capitalization.</u>

(a)        Retrophin's authorized capitalization consists of (a) eight million (8,000,000) shares of Retrophin Common Stock, of which 825,119 shares of Retrophin Common Stock are issued and outstanding and 111,283 shares of Retrophin Common Stock are subject to vesting, and (b) three million (3,000,000) shares of Retrophin Series A Stock, of which 151,461 shares are issued and outstanding.  All issued and outstanding shares of Retrophin Common Stock and Retrohpin Preferred Stock are legally issued, fully paid, and non-assessable and not issued in violation of the preemptive or other rights of any person or entity.  As of the Closing Date, 111,283 shares of Retrophin Common Stock is subject to vesting and no shares of Retrophin Common Stock are otherwise reserved for issuance upon the exercise of outstanding options or warrants to purchase Retrophin Common Stock or other equity-linked securities of Retrophin.    All outstanding Retrophin Common Stock and Retrophin Series A Stock has been issued and granted in compliance with: (i) all applicable securities laws and (in all material respects) other applicable laws and regulations, and (ii) all requirements set forth in any Retrophin Material Contracts (as defined below).

(b)        Except as set forth above, there are no equity securities, partnership interests or similar ownership interests of any class of any equity security of Retrophin, or any securities exchangeable or convertible into or exercisable for such equity securities, partnership interests or similar ownership interests, issued, reserved for issuance or outstanding.   Except as contemplated by this Agreement or as set forth in Schedule 4.02 to Retrophin Disclosure Schedules, there are no subscriptions, options, warrants, equity securities, partnership  interests or similar ownership interests, calls, rights (including preemptive rights), commitments   or agreements of any character to which Retrophin is a party or by which it is bound obligating Retrophin to issue, deliver or sell, or cause to be issued, delivered or sold, or repurchase, redeem or otherwise acquire, or cause the repurchase, redemption or acquisition of, any shares of capital stock, partnership interests or similar ownership interests of Retrophin or obligating Retrophin to grant, extend, accelerate the vesting of or enter into any such subscription, option, warrant, equity security, call, right, commitment or agreement.  There is no plan or arrangement to issue Retrophin Common Stock or preferred stock of Retrophin except as set forth in this Agreement.

19

(c)      Except as contemplated by this Agreement and except as set forth in Schedule 4.02 to Retrophin Disclosure Schedules, there are no registration rights, and there is no voting trust, proxy, rights plan, anti-takeover plan or other agreement or understanding to which Retrophin is a party or by which it is bound with respect to any equity security of any class of Retrophin, and there are no agreements to which Retrophin is a party, or which Retrophin has knowledge of, which conflict with this Agreement or the transactions contemplated herein or otherwise prohibit the consummation of the transactions contemplated hereunder.

Section 4.03.  Subsidiaries.  Except as set forth on Schedule 4.03 to the Retrophin Disclosure Schedules, Retrophin does not have any subsidiaries, and does not own, beneficially or of record, any shares of any other entity.

Section 4.04.  Financial Statements.

(a)      (i) The audited balance sheets of Retrophin as of December 31, 2011 and the related audited statements of operations, stockholders' equity and cash flows for the fiscal year ended December 31, 2011 together with the notes to such statements and the opinion of Marcum LLP, independent certified public accountants, (ii) the unaudited financial statements of Retrophin for the quarter ended September 30, 2012 and (iii)  the unaudited pro forma consolidated financial statements of Retrophin for the nine months ended September 30, 2012 (collectively the "**Retrophin Financial Statements**") have been made available to DGTE.

(b)      The Retrophin Financial Statements have been prepared in accordance with generally accepted accounting principles of the United States consistently applied throughout the periods involved.  The Retrophin balance sheets included as part of the Retrophin Financial Statements are true and accurate and present fairly as of their respective dates the financial condition of Retrophin.  As of the date of such balance sheets, except as and to the extent reflected or reserved against therein, Retrophin had no liabilities or obligations (absolute or contingent) which should be reflected in the balance sheets or the notes thereto prepared in accordance with generally accepted accounting principles, and all assets reflected therein are properly reported and present fairly the value of the assets of Retrophin, in accordance with generally accepted accounting principles.  The statements of operations, stockholders' equity and cash flows included as part of the Retrophin Financial Statements reflect fairly the information required to be set forth therein by generally accepted accounting principles.

20

Section 4.05.  Information.  The information concerning Retrophin set forth in this Agreement and the Retrophin Disclosure Schedules is complete and accurate in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact required to make the statements made, in light of the circumstances under which they were made, not misleading.

Section 4.06.  Options or Warrants.  Except as set forth in Schedule 4.06 to the Retrophin Disclosure Schedules, there are no existing options, warrants, calls, or commitments of any character relating to the authorized and unissued stock of Retrophin.

Section 4.07.  Absence of Certain Changes or Events.  Except as disclosed in the Retrophin Disclosure Schedules since inception;:

(a)     There has not been any material adverse change in the business, operations, properties, assets, or condition (financial or otherwise) of Retrophin;

(b)     Retrophin has not: (i) amended its certificate of incorporation, charter or other organizational documents; (ii) declared or made, or agreed to declare or make, any payment of dividends or distributions of any assets of any kind whatsoever to stockholders or purchased or redeemed, or agreed to purchase or redeem, any of its shares; (iii) made any material change in its method of management, operation or accounting, (iv) entered into any other material transaction other than sales in the ordinary course of its business; or (v) made any increase in or adoption of any profit sharing, bonus, deferred compensation, insurance, pension, retirement, or other employee benefit plan, payment, or arrangement made to, for, or with its officers, directors, or employees; and

(c)     Retrophin has not: (i) granted or agreed to grant any options, warrants or other rights for its stock, bonds or other corporate securities calling for the issuance thereof, (ii) borrowed or agreed to borrow any funds or incurred, or become subject to, any material obligation or liability (absolute or contingent) except as disclosed herein and except liabilities incurred in the ordinary course of business; (iii) sold or transferred, or agreed to sell or transfer, any of its assets, properties, or rights or canceled, or agreed to cancel, any debts or claims; or (iv) issued, delivered, or agreed to issue or deliver any stock, bonds or other corporate securities including debentures (whether authorized and unissued or held as treasury stock) except in connection with this Agreement and the transaction contemplated hereby.

21

Section 4.08.  <u>Litigation and Proceedings</u>.  Except as disclosed on <u>Schedule 4.08</u> to the Retrophin Disclosure Schedules, there are no material actions, suits, proceedings, or investigations pending or, to the knowledge of Retrophin after reasonable investigation, threatened by or against Retrophin or affecting Retrophin or its properties, at law or in equity, before any court or other governmental agency or instrumentality, domestic or foreign, or before any arbitrator of any kind.  Retrophin has no knowledge of any material default on its part with respect to any judgment, order, injunction, decree, award, rule, or regulation of any court, arbitrator, or governmental agency or instrumentality or of any circumstances which, after reasonable investigation, would result in the discovery of such a default.

Section 4.09.  <u>Contracts</u>.  All "material" contracts, agreements, franchises, license agreements, debt instruments or other commitments to which Retrophin is a party or by which it or any of its assets, products, technology, or properties are bound, other than those incurred in the ordinary course of business, are set forth on <u>Schedule 4.09</u> to the Retrophin Disclosure Schedules (the "**Retrophin Material Contracts**").  Such schedule contains any oral or written: (i) contract for the employment of any officer or employee; (ii) profit sharing, bonus, deferred compensation, stock option, severance pay, pension benefit or retirement plan, (iii) agreement, contract, or indenture relating to the borrowing of money, (iv) guaranty of any obligation; (v) collective bargaining agreement; or (vi) agreement with any present or former officer or director of Retrophin.

Section 4.10.  <u>No Conflict With Other Instruments</u>.  The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in a violation of, breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of (i) Retrophin's certificate of incorporation, charter, bylaws or other organizational documents, (ii) any provision of a federal or state statute, rule or regulation applicable to Retrophin or (iii) any Retrophin Material Contract to which Retrophin is a party or to which any of its assets, properties or operations are subject.

Section 4.11.  <u>Compliance With Laws and Regulations</u>.  To the best of its knowledge, Retrophin has complied with all applicable statutes and regulations of any federal, state, local, or other governmental entity or agency thereof, except to the extent that noncompliance would not have a Retrophin Material Adverse Effect.

Section 4.12.  <u>Approval of Agreement</u>.  The Board of Directors of Retrophin has authorized the execution and delivery of this Agreement by Retrophin and has approved this Agreement and the transactions contemplated hereby.

22

## ARTICLE V
## CLOSING

Section 5.01.  Closing.  Subject to the terms and conditions herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, NY 10022 on or before December 12, 2012 (the "Closing Date") or at such other place or date and time as may be agreed to in  writing  by the parties hereto at the earliest practicable time after satisfaction or waiver of the conditions set forth in Articles VII and VIII, but in no event later than fifteen (15) days after such conditions have been satisfied or waived.  The Merger shall be effective at Closing or such later time that the parties specify (the "Effective Time" or "Effective Date").

Section 5.02.  Closing Events.  The following conditions are a part of this Agreement and must be completed on or as of the Closing Date, or such other date specified by the parties:

(a)       At the Effective Time, the events and conditions set forth in Article I of this Agreement will be completed by the respective officers and Board of Directors of Newco, DGTE and Retrophin.  Immediately after the Effective Time, Robert Wilson, the sole director of DGTE will appoint Martin Shkreli as member of the Board of Directors of DGTE.  Following the appointment of Martin Shkreli to the Board of Directors, Robert Wilson will resign as a member of the Board of Directors of DGTE to be effective upon the effectiveness of a 14F Information Statement to be filed with the U.S. Securities and Exchange Commission immediately upon closing of the transactions contemplated by this Agreement.

23

(b)     Immediately after the Effective Time, Robert Wilson, the sole officer of DGTE, will resign as an officer of DGTE and Martin Shkreli will be appointed Chief Executive Officer of DGTE.

(c)     At the Closing, DGTE, Newco and Retrophin shall execute, acknowledge, and deliver (or shall ensure to be executed, acknowledged, and delivered), any and all certificates, opinions, financial statements, schedules, agreements, resolutions, rulings or other instruments required by this Agreement to be so delivered at or prior to the Closing, together with such other items as may be reasonably requested by the parties hereto and their respective legal counsel in order to effectuate or evidence the transactions contemplated hereby.

Section 5.03.  Termination.  This Agreement may be terminated by the parties only in the event that the parties do not meet the conditions precedent set forth in Articles VII and VIII.  If this Agreement is terminated pursuant to this section, this Agreement shall be of no further force or effect, and no obligation, right or liability shall arise hereunder.

## ARTICLE VI
## OTHER AGREEMENTS AND COVENANTS

Section 6.01.  Legends.  Retrophin acknowledges and agrees that each certificate representing the shares of DGTE Common Stock issuable pursuant to this Agreement shall be endorsed with the following legends, in addition to any other legend required to be placed thereon by applicable federal or state securities laws:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS.  THE SHARES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED UNLESS THE SHARES ARE REGISTERED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR SUCH SALES, PLEDGES AND TRANSFERS ARE MADE PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS.

Section 6.02.  Delivery of Books and Records.  At the Closing, DGTE shall deliver to Retrophin or its representatives the originals of the corporate minute books, books of account, contracts, records, and all other books or documents of DGTE which is now in the possession of DGTE or its representatives.

24

Section 6.03.  Third Party Consents and Certificates.  DGTE and Retrophin agree to cooperate with each other in order to obtain any required third party consents to this Agreement and the transactions herein contemplated.

Section 6.04.  Sales of Securities Under Rule 144, If Applicable.

(a)        DGTE will use its best efforts to at all times satisfy the current public information requirements of Rule 144 promulgated under the Securities Act so that its shareholders can sell restricted securities that have been held for the applicable restricted period as required by Rule 144 as it is from time to time amended.

(b)        Upon being informed in writing by any person holding restricted stock of DGTE that such person intends to sell any shares under rule 144 promulgated under the Securities Act (including any rule adopted in substitution or replacement thereof), DGTE will certify in writing to such person that it is compliance with Rule 144 current public information requirement to enable such person to sell such person's restricted stock under Rule 144, as may be applicable under the circumstances.

(c)        If any certificate representing any such restricted stock is presented to DGTE's transfer agent for registration or transfer in connection with any sales theretofore made under Rule 144, provided such certificate is duly endorsed for transfer by the appropriate person(s) or accompanied by a separate stock power duly executed by the appropriate person(s) in each case with reasonable assurances that such endorsements are genuine and effective, and is accompanied by a legal opinion that such transfer has complied with the requirements of Rule 144, as the case may be, DGTE will promptly instruct its transfer agent to register such transfer and to issue one or more new certificates representing such shares to the transferee and, if appropriate under the provisions of Rule 144, as the case may be, free of any stop transfer order or restrictive legend.

Section 6.05.  Assistance with Post-Closing SEC Reports and Inquiries  Upon the reasonable request of Retrophin, after the Closing Date, DGTE shall cause John Heskett, Esq., to use his reasonable best efforts to provide such information available to him, including information, filings, reports, financial statements or other circumstances of DGTE occurring, reported or filed prior to the Closing, as may be necessary or required by DGTE for the preparation of the reports that DGTE is required to file after Closing with the SEC to remain in compliance and current with its reporting requirements under the Exchange Act.

25

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF DGTE AND NEWCO

The obligations of DGTE and Newco under this Agreement are subject to the satisfaction, at or before the Closing Date, of the following conditions:

Section 7.01.  Accuracy of Representations and Performance of Covenants.  The representations and warranties made by Retrophin in this Agreement were true when made and shall be true at the Closing Date.  Retrophin shall have performed or complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

Section 7.02.  Good Standing.  DGTE shall have received a certificate of good standing from the Secretary of State of Delaware, dated as of no less than fifteen (15) business days prior the Closing Date, certifying that Retrophin is in good standing as a corporation incorporated in Delaware.

Section 7.03.  No Governmental Prohibition.  No order, statute, rule, regulation, executive order, injunction, stay, decree, judgment or restraining order shall have been enacted, entered, promulgated or enforced by any court or governmental or regulatory authority or instrumentality which prohibits the consummation of the transactions contemplated hereby.

Section 7.04.  Consents.  All consents, approvals, waivers or amendments pursuant to all contracts, licenses, permits, trademarks and other intangibles in connection with the transactions contemplated herein, or for the continued operation of Retrophin after the Closing Date on the basis as presently operated shall have been obtained.

26

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF RETROPHIN**

The obligations of Retrophin under this Agreement are subject to the satisfaction, at or before the Closing Date, of the following conditions:

Section 8.01.  Accuracy of Representations and Performance of Covenants.  The representations and warranties made by DGTE and Newco in this Agreement were true when made and shall be true as of the Closing Date with the same force and effect as if such representations and warranties were made at and as of the Closing Date.  Additionally, DGTE and Newco shall have performed and complied with all covenants and conditions required by this Agreement to be performed or complied with by DGTE and Newco.

Section 8.02.  Closing Certificate.  Retrophin shall have been furnished with certificates dated the Closing Date and signed by duly authorized executive officers of each of DGTE and Newco, to the effect that no litigation, proceeding, investigation or inquiry is pending, or to the knowledge of DGTE or Newco, as applicable, threatened, which might result in an action to enjoin or prevent the consummation of the transactions contemplated by this Agreement or, to the extent not disclosed in the DGTE Schedules or the Newco Schedules, by or against DGTE and/or Newco, as applicable, which might result in any material adverse change in any of the assets, properties or operations of DGTE or Newco.

Section 8.03.  Officer's Certificate.  Retrophin shall have been furnished with certificates dated the Closing Date and signed by duly authorized executive officers of each of DGTE and Newco, certifying that there are no existing liabilities as of the Closing Date and that all representations and warranties of DGTE and Newco contained in this Agreement shall be true and correct on and as of the Closing Date.

Section 8.04.  Secretary's Certificate. Retrophin shall have been furnished with certificates dated the Closing Date and signed by the secretary of each of DGTE and Newco, certifying to Retrophin the resolutions adopted by the shareholders and Board of Directors of DGTE and Newco, respectively, approving the transactions contemplated by this Agreement, certifying the current versions of their respective certificates of incorporation and bylaws or other organizational documents and certifying as to the signatures and authority of persons signing this Agreement and related documents on each of DGTE's and Newco's behalf.

27

Section 8.05. Good Standing. Retrophin shall have received certificates of good standing from the Secretary of State Delaware , dated as of a date within ten days prior to the Closing Date, certifying that each of DGTE and Newco is in good standing as a corporation in the State of Delaware and has filed all tax returns required to have been filed by it to date and has paid all taxes reported as due thereon.

Section 8.06. No Governmental Prohibition. No order, statute, rule, regulation, executive order, injunction, stay, decree, judgment or restraining order shall have been enacted, entered, promulgated or enforced by any court or governmental or regulatory authority or instrumentality which prohibits the consummation of the transactions contemplated hereby.

Section 8.07. Consents. All consents, approvals, waivers or amendments pursuant to all contracts, licenses, permits, trademarks and other intangibles in connection with the transactions contemplated herein, or for the continued operation of DGTE and Newco after the Closing Date on the basis as presently operated shall have been obtained.

Section 8.08. Retrophin Shareholder Approval. The approval of a majority of the outstanding shares of Retrophin Common Stock to the transactions contemplated hereby shall have been obtained.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01. Brokers. The parties agree that, there were no finders or brokers involved in bringing the parties together or who were instrumental in the negotiation, execution or consummation of this Agreement. DGTE and Retrophin each agree to indemnify the other against any claim by any third person other than those described herein for any commission, brokerage, or finder's fee arising from the transactions contemplated hereby based on any alleged agreement or understanding between the indemnifying party and such third person, whether express or implied from the actions of the indemnifying party.

28

Section 9.02.  Governing Law; Venue.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the County of New York, New York.  Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the County of New York, New York for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper.  Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.  EACH PARTY HERETO (INCLUDING ITS AFFILIATES, AGENTS, OFFICERS, DIRECTORS AND EMPLOYEES) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.03.  Notices.  All notices, requests, demands and other communications provided in connection with this Agreement shall be in writing and shall be deemed to have been duly given at the time when hand delivered, delivered by express courier, or sent by facsimile (with receipt confirmed by the sender's transmitting device) in accordance with the contact information provided below or such other contact information as the parties may have duly provided by notice.

**If to DGTE:**

Desert Gateway, Inc.
501 South Johnstone Ave., Suite 501
Bartlesville, Oklahoma 74003
Fax Number: 918.336.3152

**with a copy (which shall not constitute notice) to:**

John Heskett
HESKETT & HESKETT
Attorneys at Law
501 South Johnstone Ave., Suite 501
Bartlesville, Oklahoma 74003
Fax Number: 918.336.3152

29

**If to Newco, to:**

Desert Gateway Acquisition Corp.
501 South Johnstone Ave., Suite 501
Bartlesville, Oklahoma 74003
Fax Number: 918.336.3152

**with a copy (which shall not constitute notice) to:**

John Heskett
HESKETT & HESKETT
Attorneys at Law
501 South Johnstone Ave., Suite 501
Bartlesville, Oklahoma 74003
Fax Number: 918.336.3152

**If to Retrophin, to:**

Retrophin, Inc.
777 Third Avenue, 22nd Floor
New York, NY 10017
Attention: Chief Executive Officer

**with a copy (which shall not constitute notice) to:**

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
Attention: Evan L. Greebel, Esq.
Fax Number: 212.940.8776

Any such notice or communication shall be deemed to have been given: (i) upon receipt, if personally delivered, (ii) on the day after dispatch, if sent by overnight courier, (iii) upon dispatch, if transmitted by facsimile and receipt is confirmed by printed receipt and (iv) three (3) days after mailing, if sent by registered or certified mail.

30

Section 9.04. <u>Confidentiality</u>. Each party hereto agrees with the other that, unless and until the transactions contemplated by this Agreement have been consummated, it and its representatives will hold in strict confidence all data and information obtained with respect to another party or any subsidiary thereof from any representative, officer, director or employee, or from any books or records or from personal inspection, of such other party, and shall not use such data or information or disclose the same to others, except: (i) to the extent such data or information is published, is a matter of public knowledge, or is required by law to be published; or (ii) to the extent that such data or information must be used or disclosed in order to consummate the transactions contemplated by this Agreement. In the event of the termination of this Agreement, each party shall return to the other party all documents and other materials obtained by it or on its behalf and shall destroy all copies, digests, work papers, abstracts or other materials relating thereto, and each party will continue to comply with the confidentiality provisions set forth herein.

Section 9.05. <u>Schedules; Knowledge</u>. Each party is presumed to have full knowledge of all information set forth in the other party's schedules delivered pursuant to this Agreement.

Section 9.06. <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person or entity.

Section 9.07. <u>Expenses</u>. Whether or not the Merger is consummated, each of the parties hereto will bear their own respective expenses, including legal, accounting and professional fees, incurred in connection with the Merger or any of the other transactions contemplated hereby.

Section 9.08. <u>Entire Agreement</u>. This Agreement represents the entire agreement between the parties relating to the subject matter thereof and supersedes all prior agreements, understandings and negotiations, written or oral, with respect to such subject matter.

Section 9.09. <u>Survival; Termination</u>. The representations, warranties, and covenants of the respective parties shall survive the Closing Date and the consummation of the transactions herein contemplated for a period of two years.

Section 9.10. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile signature page were an original thereof.

31

Section 9.11.  Amendment or Waiver.  Every right and remedy provided herein shall be cumulative with every other right and remedy, whether conferred herein, at law, or in equity, and may be enforced concurrently herewith, and no waiver by any party of the performance of any obligation by the other shall be construed as a waiver of the same or any other default then, theretofore, or thereafter occurring or existing.  At any time prior to the Closing Date, this Agreement may by amended by a writing signed by all parties hereto, with respect to any of the terms contained herein, and any term or condition of this Agreement may be waived or the time for performance may be extended by a writing signed by the party or parties for whose benefit the provision is intended.

Section 9.12.  Best Efforts.  Subject to the terms and conditions herein provided, each party shall use its best efforts to perform or fulfill all conditions and obligations to be performed or fulfilled by it under this Agreement so that the transactions contemplated hereby shall be consummated as soon as practicable.  Each party also agrees that it shall use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective this Agreement and the transactions contemplated herein, both prioand following the Closing.

[ signature page to follow ]

32

   **IN WITNESS WHEREOF**, the corporate parties hereto have caused this Agreement to be executed by their respective officers, hereunto duly authorized, as of the date first-above written.

**DESERT GATEWAY, INC.**

By:   /s/ Robert Wilson
      Name: Robert Wilson
      Title: President

**DESERT GATEWAY ACQUISITION CORP.**

By:   /s/ Robert Wilson
      Name: Robert Wilson
      Title: President

**RETROPHIN, INC.**

By:   /s/ Martin Shkreli
      Name:  Martin Shkreli
      Title:  President

33

EX-10.1 3 e610298_ex10-1.htm

**Exhibit 10.1**

CERTAIN MATERIAL (INDICATED BY ASTERISKS) HAS BEEN OMITTED FROM THIS DOCUMENT PURSUANT TO A REQUEST FOR CONFIDENTIAL TREATMENT. THE OMITTED MATERIAL HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

## SUBLICENSE AGREEMENT

**THIS SUBLICENSE AGREEMENT** (the "Agreement") is made and entered into effective as of February 16, 2012 (the "Effective Date") by and between Ligand Pharmaceuticals Incorporated, a corporation organized under the laws of Delaware and having a place of business at 11085 North Torrey Pines Road, Suite 300, La Jolla, CA, 92037 and its wholly owned subsidiary, Pharmacopeia, Inc. (as successor in interest to Pharmacopeia Drug Discovery Inc.) ("PCOP"), a limited liability company organized under the laws of Delaware and having a place of business at 11085 North Torrey Pines Road, Suite 300, La Jolla, CA, 92037 (collectively, Ligand Pharmaceuticals Incorporated and PCOP shall be known as "Ligand") and Retrophin, LLC, a limited liability company organized under the laws of Delaware and having a place of business at 330 Madison Avenue, 6th Floor, New York, NY, 10017 ("Retrophin"). Ligand and Retrophin are each referred to herein by name or individually as a "Party" or collectively as the "Parties."

## RECITALS

**WHEREAS**, Ligand has in-licensed certain patent rights and know-how rights with respect to the Licensed Compounds (as defined below) and has the right to sublicense the same;

**WHEREAS**, Retrophin desires to obtain from Ligand sublicenses relating to the Licensed Compounds and Ligand desires to grant such sublicenses to Retrophin, all on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements set forth below, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS

The terms in this Agreement with initial letters capitalized shall have the meaning set forth below or, if not listed below, the meaning designated in places throughout this Agreement.

1.1 "AAA" has the meaning set forth in Section 14.3.1.

1.2 "Act" means the United States Food, Drug and Cosmetic Act, as amended.

1.3 "Active Compound" has the meaning set forth in Appendix 2 hereto.

1.4 “Affiliate” of a Person means any other Person which (directly or indirectly) is controlled by, controls or is under common control with such Person. For the purposes of this definition, the term “control” (including, with correlative meanings, the terms “controlled by” and “under common control with”) as used with respect to a Person means (i) in the case of a corporate entity, direct or indirect ownership of voting securities entitled to cast at least [***]*** of the votes in the election of directors or (ii) in the case of a non-corporate entity, direct or indirect ownership of at least [***] of the voting securities with the power to direct the management and policies of such entity.

1.5 “Agreement” has the meaning set forth in the initial paragraph herein and includes all Appendices attached hereto, as the same may be amended or supplemented from time to time.

1.6 “Approval” means, with respect to any Licensed Product in any regulatory jurisdiction, approval from the applicable Regulatory Authority sufficient for the manufacture, distribution, use and sale of the Licensed Product in such jurisdiction in accordance with applicable Laws.

1.7 “BMS” means Bristol-Myers Squibb Company, a Delaware corporation headquartered at 345 Park Avenue, New York, New York 10154.

1.8 “BMS Know-How” means [***]. BMS Know-How shall not include [***].

1.9 “Business Day” or “business day” means a day other than Saturday, Sunday or any day on which commercial banks located in New York, New York are authorized or obligated by applicable Laws to close.

1.10 [***].

1.11 [***].

1.12 “Combination Product” means [***].

1.13 “Commercialization” or “Commercialize” means activities directed to commercially manufacturing, obtaining pricing and reimbursement approvals, carrying out Phase 4 Trials for, marketing, promoting, distributing, importing or selling a pharmaceutical product.

1.14 “Commercially Reasonable Efforts” means, with respect to Licensed Compounds and Licensed Products, the carrying out of Development or Commercialization activities in a [***]. Without limiting the foregoing, Commercially Reasonable Efforts requires that a Party: (i) [***] (ii) [***] (iii) [***] (iv) [***] (v) [***].

1.15 “Competitive Compound” means any [***] that is [***] unless Ligand has[***]. Ligand shall not [***].

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

1.16 "Confidential Information" means all trade secrets, processes, formulae, data, know-how, improvements, inventions, chemical or biological materials, assays, techniques, marketing plans, strategies, customer lists, or other information that has been created, discovered, or developed by a Party, or has otherwise become known to a Party, or to which rights have been assigned to a Party, as well as any other information, agreements and materials that are deemed confidential or proprietary to or by a Party (including all information and materials of a Party's customers and any other Third Party and their consultants), in each case that are disclosed by such Party to the other Party, regardless of whether any of the foregoing are marked "confidential" or "proprietary" or communicated to the other by the disclosing Party in oral, written, graphic, or electronic form.

1.17 "Controlled" or "Controls", when used in reference to intellectual property, means the legal authority or right of a Party hereto (or any of its Affiliates) to grant a license or sublicense of intellectual property rights to another Party, or to otherwise disclose proprietary or trade secret information to such other Party, without breaching the terms of any agreement with a Third Party, or misappropriating the proprietary or trade secret information of a Third Party.

1.18 "Core Patent Rights" means the patents and patent applications that are listed in Appendix 1 hereto and (a) **[***]*** that [***]** listed in Appendix 1 hereto **[***]** and **[***]** (but in each case, only with respect to **[***]** listed in Appendix 1 hereto), (b) all **[***]** foregoing**[***]**, together with all **[***]** thereof (but in each case, only with respect to **[***]** in Appendix 1 hereto).

1.19 "Cover," "Covered" or "Covering" means, with respect to patent rights, that the making, using, importation, offer for sale or sale of an invention claimed in such patent rights or the conducting of an activity that, in the absence of a license under such patent rights, would infringe at least one Valid Claim of such patent rights whether present in an issued patent or in a patent application if it issued as a patent containing such claim.

1.20 "Development" means non-clinical and clinical drug development activities reasonably related to the development and submission of information to a Regulatory Authority, including toxicology, pharmacology and other discovery and pre-clinical efforts, test method development and stability testing, manufacturing process development, formulation development, delivery system development, quality assurance and quality control development, statistical analysis, clinical studies (including, pre- and post-approval studies and specifically excluding regulatory activities directed to obtaining pricing and reimbursement approvals). When used as a verb, "Develop" means to engage in Development.

1.21 "Development Plan" means, with respect to any Licensed Product, a comprehensive, multi-year plan specifying the anticipated timing and technical details of Development activities for such Licensed Product, including the indications to be targeted, line of therapy, timelines for completing key activities, phasing of development, primary endpoints,

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

criteria for continuing activities, study size, comparator drugs, combination drugs, timelines for data preparation and filing of regulatory submissions, toxicology and pharmacology studies and manufacturing process development and scale up. An outline of the initial Development Plan as of the Effective Date is attached hereto as Appendix 3.

1.22 "Dollar" or "$" means the lawful currency of the United States.

1.23 "Effective Date" has the meaning set forth in the initial paragraph of this Agreement.

1.24 "EMEA" means the European Agency for the Evaluation of Medicinal Products, or any successor agency thereto.

1.25 "Excluded Claim" means a Dispute that concerns (a) the validity or infringement of a patent, trademark or copyright or (b) any antitrust, anti-monopoly or competition law or regulation, whether or not statutory.

1.26 "Executive" means for Ligand, the Chief Executive Officer of Ligand (or such individual's designee) and for Retrophin, the Chief Executive Officer of Retrophin (or such individual's designee). If either position is vacant or either position does not exist, then the person having the most nearly equivalent position (or such individual's designee) shall be deemed to be the Executive of the relevant Party.

1.27 "Exit Transaction" means: (i) [***]***

1.28 "FDA" means the U.S. Food and Drug Administration, or any successor agency thereto.

1.29 "Field" means the diagnosis, prevention, treatment or control of any human or animal disease, disorder or condition.

1.30 "First Commercial Sale" means, with respect to any Licensed Product, the first sale for use or consumption by the general public of such Licensed Product in any country in the Territory after Approval of such Licensed Product has been granted, or such marketing and sale is otherwise permitted, by the Regulatory Authority of such country.

1.31 "GAAP" means generally accepted accounting principles in the United States.

1.32 "IND" means an Investigational New Drug Application, as defined in the Act, filed with the FDA or its foreign counterparts.

1.33 "Indemnification Claim" has the meaning set forth in Section 12.3.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

1.34 "Indemnitee" has the meaning set forth in Section 12.3.

1.35 "Indemnitor" has the meaning set forth in Section 12.3.

1.36 "JNDA" means a New Drug Application filed with the Koseisho required for marketing approval for the applicable Licensed Product in Japan.

1.37 "JNDA Approval" means the approval of a JNDA by the Koseisho for the applicable Licensed Product in Japan.

1.38 "JNDA Filing" means the submission to the Koseisho of a JNDA for the applicable Licensed Product in Japan.

1.39 "Know-How" means **[***]*****.

1.40 "Koseisho" means the Japanese Ministry of Health and Welfare, or any successor agency thereto.

1.41 "Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of any federal, national, multinational, state, provincial, county, city or other political subdivision, agency or other body, domestic or foreign.

1.42 "License" means any agreement transferring rights with respect to any Licensed Compound or any Licensed Product by Retrophin (or an Affiliate of Retrophin) to any Third Party licensee, including any license, sublicense, co-development, co-promotion, distribution, joint venture, development and commercialization collaboration or similar transaction involving a transfer of rights with respect to a Licensed Compound or Licensed Product. "License" shall also include any further transfer of such rights by a Third Party licensee to any other Third Party. "License" also refers to the corresponding arrangement for the grant by Retrophin of rights back to BMS and Ligand with respect to one or more Licensed Compound(s) and Licensed Product(s) pursuant to Article 3.

1.43 "Licensed Compounds" means:

(a) the **[***]**;

(b) any **[***]**;

(c) any **[***]**; and

(d) any **[***]**.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

1.44 "Licensed Product" means any pharmaceutical product containing a Licensed Compound (alone or with other active ingredients), in all forms, presentations, formulations and dosage forms.

1.45 "Listed Compounds" means those compounds identified in Appendix 4.

1.46 "Losses and Claims" has the meaning set forth in Section 12.1.

1.47 "MAA Approval" means approval by the EMEA of a marketing authorization application ("MAA") filed with the EMEA for the applicable Licensed Product under the centralized European procedure. If the centralized EMEA filing procedure is not used, MAA Approval shall be achieved upon the first Approval for the applicable Licensed Product in any two of the following countries: France, Germany, Italy, Spain or the United Kingdom.

1.48 "MAA Filing" means the submission to the EMEA of a MAA for the applicable Licensed Product under the centralized European procedure. If the centralized EMEA filing procedure is not used, MAA Filing shall be achieved upon the first filing of a marketing authorization application for the applicable Licensed Product in any two of the following countries: France, Germany, Italy, Spain or the United Kingdom.

1.49 "Major Market Countries" means the**[***]*****. "Major Market Country" **[***]**.

1.50 "NDA" means a New Drug Application filed with the FDA required for marketing approval for the applicable Licensed Product in the U.S.

1.51 "NDA Approval" means the approval of a NDA by the FDA for the applicable Licensed Product in the U.S.

1.52 "NDA Filing" means the submission to the FDA of a NDA for the applicable Licensed Product.

1.53 "Net Sales" means, with respect to any **[***]**:

(a) **[***]**; *provided, however*, that where any such **[***]**;

(b) **[***]**;

(c) **[***]**; and

(d) **[***]**.

Net Sales shall be determined **[***]**. In the case of any Combination Product sold in the Territory, Net Sales for such Combination Product shall be calculated by **[***]**.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Net Sales shall not include any [***].

1.54 "Orphan Licensed Product" means a Licensed Product that receives orphan drug designation from the FDA pursuant to 21 C.F.R. Part 316, or from a Regulatory Authority pursuant to a comparable rule or regulation in a foreign jurisdiction, including the orphan indications set forth in the Development Plan.

1.55 "Other Patent Rights" means (i) [***]*** (a) [***] or (b) [***] and (ii) [***].

1.56 "Patent Rights" means the Core Patent Rights and the Other Patent Rights.

1.57 "Person" means any individual, firm, corporation, partnership, limited liability company, trust, business trust, joint venture company, governmental authority, association or other entity.

1.58 "Phase 2 Trial" means a human clinical trial of a Licensed Product, the principal purpose of which is a determination of safety and efficacy in the target patient population, as described in 21 C.F.R. 312.21(b), or a similar clinical study prescribed by the Regulatory Authorities in a foreign country. For purposes of this Agreement, "initiation of a Phase 2 Trial" for a Licensed Product means the first dosing of such Licensed Product in a human patient in a Phase 2 Trial.

1.59 "Phase 3 Trial" means a human clinical trial of a Licensed Product on a sufficient number of subjects that is designed to establish that a pharmaceutical product is safe and efficacious for its intended use, and to determine warnings, precautions, and adverse reactions that are associated with such pharmaceutical product in the dosage range to be prescribed, which trial is intended to support Approval of a Licensed Product, as described in 21 C.F.R. 312.21(c), or a similar clinical study prescribed by the Regulatory Authorities in a foreign country. For clarity, any human clinical trial may qualify as a Phase 3 Trial if it supports Approval of a Licensed Product without the need to conduct a Phase 3 Trial. For purposes of this Agreement, "initiation of a Phase 3 Trial" for a Licensed Product means the first dosing of such Licensed Product in a human patient in a Phase 3 Trial.

1.60 "Phase 4 Trial" means a human clinical trial for a Licensed Product commenced after receipt of Approval in the country for which such trial is being conducted and that is conducted within the parameters of the Approval for the Licensed Product. Phase 4 Trials may include epidemiological studies, modeling and pharmacoeconomic studies, investigator sponsored clinical trials of the Licensed Product and post-marketing surveillance studies.

1.61 "Proprietary Compound of BMS or Ligand" means any compound or other agent being developed or sold, (a) as of the March 27, 2006 or at any time thereafter, by BMS or its Affiliates, or their contractors or collaborators, or (b) as of the Effective Date or any time thereafter, by Ligand or its Affiliates, or their contractors or collaborators.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

1.62 "Regulatory Authority" means any national or supranational governmental authority, including the FDA, EMEA or Koseisho (i.e., the Japanese Ministry of Health and Welfare, or any successor agency thereto), that has responsibility in countries in the Territory over the Development and/or Commercialization of Licensed Compounds and Licensed Products.

1.63 "Sublicensee" means any Third Party to whom rights are transferred with respect to any Licensed Compound or Licensed Product, including through any license, sublicense, co-development, co-discovery, co-promotion, distribution, joint venture, Development and Commercialization collaboration or similar transaction between a Party (or an Affiliate of a Party) and a Third Party. "Sublicensee" shall also include any Third Party to whom such rights are transferred through further sublicense by a Sublicensee. "Sublicensee" shall include any Third Party that is a party to a License agreement.

1.64 "Territory" means any country in the world.

1.65 "Third Party" means any Person other than Retrophin, Ligand and their respective Affiliates.

1.66 "Title 11" has the meaning set forth in Section 13.7.

1.67 "United States" or "U.S." means the United States of America and its territories and possessions (including Puerto Rico).

1.68 [***]***.

1.69 "Valid Claim" means a claim of (i) an issued and unexpired patent or a supplementary protection certificate, which claim has not been held invalid or unenforceable by a court or other government agency of competent jurisdiction from which no appeal can be or has been taken and has not been held or admitted to be invalid or unenforceable through re-examination or disclaimer, opposition procedure, nullity suit or otherwise or (ii) a pending patent application; *provided*, *however*, that if a claim of a pending patent application shall not have issued within [***]*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.** after the earliest filing date from which such claim takes priority, such claim shall not constitute a Valid Claim for the purposes of this Agreement unless and until a patent issues with such claim.

**ARTICLE 2.**
**LICENSE GRANTS**

2.1 Patent Rights and Know-How.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

2.1.1 <u>Core Patent Rights and Know-How</u>. Subject to the terms and conditions set forth in this Agreement (including the reservation of rights in Section 2.5), Ligand hereby grants to Retrophin a non-transferable (except in accordance with Section 15.4), exclusive sublicense, with the right to further sublicense in accordance with Section 2.2, under the Core Patent Rights and Know-How solely to the extent reasonably necessary to, make, use (including in activities directed at the research and Development of Licensed Compounds), have made, sell, have sold, offer to sell, export, import and otherwise exploit or Commercialize Licensed Compounds and Licensed Products in the Field in the Territory.

2.1.2 <u>Other Patent Rights</u>. Subject to the terms and conditions set forth in this Agreement (including the reservation of rights in Section 2.5), Ligand hereby grants to Retrophin a non-transferable (except in accordance with Section 15.4), non-exclusive sublicense, with the right to further sublicense in accordance with Section 2.2, under the Other Patent Rights solely to the extent reasonably necessary or useful to make, use (including in activities directed at the research and Development of Licensed Compounds), have made, sell, offer to sell, export and import and otherwise exploit or Commercialize Licensed Compounds and Licensed Products in the Field in the Territory, *provided, however,* that no rights are granted under this Section 2.1.2 (or otherwise under this Agreement) with respect to any Proprietary Compound of BMS or Ligand. For clarification, no rights are granted under this Section 2.1.2 (or otherwise under this Agreement) to co-formulate or use in combination a Licensed Compound with any Proprietary Compound of BMS or Ligand. The rights granted by Ligand to Retrophin under this Section 2.1.2 include the right to make, have made, use (including in activities directed at the research and Development of Licensed Compounds), export and import intermediates and starting materials reasonably necessary for the manufacture of Licensed Compounds, and to practice methods reasonably necessary for the manufacture of Licensed Compounds, and to practice methods reasonably necessary for manufacturing such intermediates and starting materials, but only for the purposes of manufacturing, using, importing or exporting Licensed Compounds in the Field in the Territory. For clarification, no rights are granted to sell or offer to sell any such intermediates or starting materials, or use such intermediates or starting materials for any purpose other than for the purposes of manufacturing Licensed Compounds.

2.2 <u>Sublicenses</u>.

2.2.1 Retrophin shall have the right to grant sublicenses with respect to the rights licensed to Retrophin under Sections 2.1.1 and 2.1.2 to any Affiliate of Retrophin for so long as such Affiliate remains an Affiliate of Retrophin; *provided, however,* that (i) such Affiliate shall agree in writing to be bound by and subject to the terms and conditions of this Agreement in the same manner and to the same extent as Retrophin and (ii) Retrophin shall remain responsible for the performance of this Agreement and shall cause such Affiliate to comply with the terms and conditions of this Agreement. In addition, Retrophin shall have the right to grant sublicenses with respect to the rights licensed to Retrophin under Sections 2.1.1 and 2.1.2 to Third Parties.

9

2.2.2 Retrophin shall have the right to enter into a License agreement with a Third Party; *provided, however,* to the extent any such License agreement grants rights with respect to any Licensed Compound:

(i) such License agreement shall be consistent with the terms and conditions of this Agreement, and shall not limit (A) Retrophin's ability to perform its obligations under this Agreement, (B) Ligand's rights under this Agreement, (C) [***] or (D) [***]***.

(ii) in such License agreement, the Sublicensee shall agree in writing to be bound to Retrophin by terms and conditions that are substantially similar to, or less favorable to the Sublicensee than, or otherwise allow Retrophin to fully perform the corresponding terms and conditions of this Agreement;

(iii) such License agreement shall comply with Section 8.10.2 hereof regarding minimum royalty payments;

(iv) promptly after the execution of such License agreement, Retrophin shall provide a copy of such License agreement to Ligand, with financial and other confidential or proprietary commercial terms redacted consistent with the public filing of such license agreement with the Securities and Exchange Commission ("SEC"), or, if not filed with the SEC, then with financial and other confidential or proprietary commercial terms redacted (to the extent that such other commercial terms are not reasonably necessary for Ligand to determine Retrophin's compliance with this Agreement). [***];

(v) Retrophin shall remain responsible for the performance of this Agreement (including its obligations under Sections 5.1.1 and 6.1), the payment of all payments due, making reports and keeping books and records and shall use commercially reasonable efforts to monitor such Sublicensee's compliance with the terms of such License;

(vi) any sublicense rights granted by Retrophin in a License (to the extent such sublicensed rights are granted to Retrophin in this Agreement) shall terminate on a country-by-country and Licensed Product-by-Licensed Product basis effective upon (i) the termination under Section 13.2 of the license from Ligand to Retrophin with respect to such sublicensed rights or (ii) the termination under Section 13.2 of the license from BMS to Ligand with respect to such sublicensed rights; *provided, however,* that such sublicensed rights shall not terminate if, as of the effective date of such termination by Ligand under Section 13.2 of this Agreement or BMS under Section 13.2 of the Upstream License Agreement, the Sublicensee is not in material breach of its obligations to Retrophin under its License agreement, and within [***] days of such termination the Sublicensee agrees in writing to be bound directly to BMS or Ligand, as the case may be, under a license agreement substantially similar to this Agreement [***], as the case may be, with respect to the rights sublicensed hereunder, substituting such Sublicensee for Retrophin or Ligand, as the case may be; and

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

(vii) such Sublicensees shall have the right to grant further sublicenses with respect to the Development or Commercialization of Licensed Products, provided that such further sublicenses shall be in accordance with and subject to all of the terms and conditions of this Section 2.2.

For purposes of clarification, the preceding provisions of this Section 2.2.2 shall not apply to Licensed Compounds with respect to which Retrophin **[***]** Ligand a License.

2.2.3 In accordance with the foregoing, unless Ligand agrees otherwise in writing, any License shall **[***]**.

2.2.4 It shall be a **[***]**.

2.3 No Trademark License. No right or license, express or implied, is granted to Retrophin to use any trademark, trade name, trade dress or service mark owned or Controlled by BMS, Ligand or any of their respective Affiliates. Retrophin, at its sole cost and expense, shall be responsible for the selection, registration and maintenance of all trademarks which it employs in connection with its activities conducted pursuant to this Agreement, if any, and shall own and control such trademarks.

2.4 No Implied Licenses. No license or other right is or shall be created or granted hereunder by implication, estoppel or otherwise. All such licenses and rights are or shall be granted only as expressly provided in this Agreement.

2.5 Retained Rights.

2.5.1 Retrophin understands and agrees that BMS shall retain the rights specified in Section 2.5 of the Upstream License Agreement.

2.5.2 Subject to the Upstream License Agreement, all rights not expressly granted under Section 2.1 are reserved by Ligand and may be used by Ligand for any purpose. Ligand expressly reserves and retains the right (i) to make, have made and use Licensed Compounds for any internal research purposes (including but not limited to for purposes of screening in support of Ligand's internal research programs), (ii) to support the filing and prosecution of patent applications, and (iii) to make, have made and use any Licensed Compound solely for use as an intermediate or starting material in the manufacture of any compound which is not a Licensed Compound.

2.5.3 Subject to the exclusive rights granted to Retrophin under this Article 2 and subject to the restrictions on use of Retrophin's Confidential Information under Article 11, [***]***. For purposes of clarity, nothing in the foregoing shall be construed to reserve to Ligand the right to engage in the discovery, Development and/or Commercialization of Active Compounds Covered by the Core Patent Rights exclusively licensed to Retrophin hereunder.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

2.6 Upstream License Agreement. Notwithstanding anything to the contrary in this Agreement, Retrophin understands and agrees (i) that this Agreement is subordinate to the Upstream License Agreement and the sublicense granted to Retrophin under this Agreement is limited in scope to the rights granted to Ligand in the Upstream License Agreement; (ii) this Agreement may be terminated if the Upstream License Agreement is terminated (iii) it will comply with all provisions of the Upstream License Agreement relevant to its activities as a Sublicensee (as defined in the Upstream License Agreement); (iv) BMS' exercise of its rights under the Upstream License Agreement shall not constitute a breach hereunder; (v) it will not take any action that would result in a breach of the Upstream License Agreement; and (vi) it will cooperate with and assist Ligand to meet its obligations under the Upstream License Agreement. Retrophin acknowledges that it has been provided with a copy of the Upstream License Agreement.

**ARTICLE 3.**
**LIGAND RIGHT OF FIRST NEGOTIATION**

3.1 BMS Right of First Negotiation. In the event that Retrophin desires to enter into a License arrangement with respect to any Licensed Compound ("Business Opportunity"), BMS shall be granted the Right of First Negotiation set forth in Article 3 of the Upstream License Agreement. Retrophin shall comply with the terms set forth in Sections 3.1.1 and 3.1.3-3.1.6 of the Upstream License Agreement. For the purposes of this Section 3.1, "Pharmacopeia" shall be replaced with "Retrophin" in Sections 3.1.1 and 3,1.3-3.1.6 of the Upstream License Agreement.

3.2 Ligand Right of Second Negotiation.

3.2.1 In the event that Retrophin desires to enter into a Business Opportunity, before entering into negotiations with any Third Party and after following the procedure set forth in Section 3.1 above, with respect to such License, Retrophin shall notify Ligand and provide Ligand with information necessary or useful to Ligand to evaluate the proposed License arrangement ("Evaluation Information"). The Parties shall negotiate in good faith the terms pursuant to which Ligand may obtain such Business Opportunity for a period of **[***]** days following the date of such notice (such period referred to as the "Ligand Negotiation Period").

3.2.2 Unless otherwise agreed between the Parties, **[***]***.**

3.2.3 Any License agreement entered into by Retrophin with a Third Party shall be consistent with the terms and conditions of this Agreement and shall fully enable Retrophin to fully perform all of its obligations under the Agreement which will continue in effect. As set forth in Section 2.2, any Sublicensee shall be bound by the terms and conditions of this Agreement in the same manner as Retrophin.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

**ARTICLE 4.**
**TRANSFER OF KNOW-HOW**

4.1 Documentation. Prior to the Effective Date, Ligand has provided to Retrophin one (1) electronic or paper copy of all documents, data or other information Controlled by Ligand as of the Effective Date to the extent that such documents, data and information are (i) reasonably necessary or useful for the manufacture, Development or Commercialization of the Listed Compounds (including SAR information) and subject to the Know-How license under Section 2.1 and (ii) are reasonably available to Ligand without undue searching; *provided however,* that subject to the last sentence of this Section 4.1, the foregoing shall in no event require Ligand to provide copies of manufacturing run records or laboratory notebook records; *further provided* that if Retrophin determines it needs additional documents, data or information for the manufacture, Development or Commercialization of the Licensed Compounds (including SAR information), Ligand shall use commercially reasonable efforts (at Retrophin's cost and expense) to determine whether it has such additional information and if Ligand has such information, it shall provide such information to Retrophin at Retrophin's cost and expense. Such documentation shall be deemed to be the Confidential Information of Ligand and shall not be used by Retrophin for any purpose other than Development, manufacture or Commercialization of Licensed Compounds and Licensed Products in accordance with this Agreement. Retrophin acknowledges that it has received from Ligand such documents, data and information prior to the Effective Date through access to the electronic data room established by Ligand for the Listed Compound and that Ligand has allowed Retrophin to print such documents. Ligand shall have no obligation to reformat or otherwise alter or modify any such materials, or to create materials in electronic form, in order to provide them to Retrophin; provided, that such information is readable by Retrophin in its current form. Any and all such materials delivered to Retrophin pursuant to this Section 4.1 are and shall remain, as between the Parties, the sole property of Ligand. Notwithstanding the foregoing, if at any time during the term of this Agreement Retrophin identifies particular documents, data or information (including laboratory notebook records) that are within the Know-How, but were not previously delivered to Retrophin, and that are reasonably necessary or useful for the continued manufacture, Development or Commercialization of a Licensed Compound or Licensed Product (including materials requested in connection with an audit or other inquiry by a Regulatory Authority), or are reasonably necessary or useful to support the filing and/or prosecution of patent rights Covering the Licensed Compounds or Licensed Products, Ligand shall promptly provide such material to Retrophin upon request to the extent that such items are in Ligand's possession and are available without undue searching.

4.2 Materials. Ligand shall have no obligation to provide Retrophin with samples of any compounds or other materials (other than the information provided under Section 4.1) under this Agreement, *provided* that upon written request by Retrophin, Ligand will authorize in writing the transfer by [***]*** to Retrophin of all existing clinical supplies of Licensed Product and all existing supplies of the active pharmaceutical ingredient of Licensed

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Product (including other materials that may be provided by or for Ligand to Retrophin pursuant to this Agreement, the "Transferred Materials"). Retrophin shall be responsible for any and all fees charged by [***]*** in connection with the transfer of the Transferred Materials to Retrophin. Any Transferred Materials are provided "AS IS". Retrophin shall be fully responsible for its and its Affiliates', Sublicensees' and contractors' use, storage, handling and disposition of the Transferred Materials. Under no circumstances shall Ligand be liable or responsible for Retrophin's or its Affiliates', Sublicensees' and contractors' use, storage, handling or disposition of the Transferred Materials, and Retrophin assumes sole responsibility for any claims, liabilities, damages and losses that might arise as a result of Retrophin's and its Affiliates', Sublicensees' and contractors' use, storage, handling or disposition of any Transferred Material. Retrophin shall indemnify, defend and hold harmless Ligand and its Affiliates, and their respective officers, directors, employees, agents, licensors, and their respective successors, heirs and assigns and representatives, from and against any and all damages, liabilities, losses, costs and expenses (including, without limitation, reasonable legal expenses, costs of litigation and reasonable attorney's fees) arising in connection with any claims, suits, proceedings, whether for money damages or equitable relief, of any kind, arising out of or relating, directly or indirectly, to Retrophin's, or any of its Affiliates', Sublicensees' or contractors' use, storage, handling or disposition of any Transferred Material. Transferred Materials may only be provided to Retrophin, its Affiliates, Sublicensees and contractors. The Transferred Materials shall be used by Retrophin solely for purposes of supporting the Development of the Licensed Compounds and Licensed Products.

## ARTICLE 5.
## DEVELOPMENT

5.1 Development and Development Plan.

5.1.1 Commercially Reasonable Efforts. Retrophin (or its Sublicensees, as applicable) shall use sustained Commercially Reasonable Efforts to Develop at least one Licensed Compound and Licensed Product, including using Commercially Reasonable Efforts to expeditiously carry out the clinical development for the Licensed Compounds and Licensed Products (including expeditiously pursuing regulatory filings and Approvals and marketing authorizations for at least one Licensed Compound and Licensed Product) in accordance with the Development Plan.

5.1.2 Development Plan. The initial Development Plan is attached hereto as Appendix 3 to the Agreement.

5.2 Development Reports. Retrophin will provide Ligand with (a) semi-annual written development reports within **[***]** days following June and December of each **[***]** and (b) quarterly telephonic development reports within **[***]** days following March and September of each **[***]**, in each case presenting a summary of the Development activities

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

accomplished by Retrophin during the applicable period, including as applicable updates to the Development Plan, and significant results, information and data generated with respect to Licensed Compounds and Licensed Products. Upon reasonable request by Ligand, Retrophin shall also meet in-person with Ligand to review Retrophin's Development activities for the Licensed Compounds and Licensed Products. In addition, prior to Retrophin entering into a License agreement with a Third Party, upon reasonable request by Ligand, but no more than once per [***], Retrophin shall present to Ligand, at Retrophin's facilities, summaries of (and, at the request of Ligand, with copies of) clinical protocols, investigator brochures, regulatory submissions and correspondence from regulatory agencies with respect to Licensed Compound and Licensed Product that have been prepared or received by Retrophin as of the date of such request by Ligand.

5.3 Records. Retrophin shall maintain complete and accurate records of all work conducted in furtherance of the Development and Commercialization of the Licensed Compounds and Licensed Products and all material results, data and developments made in conducting such activities. Such records shall be maintained sufficient detail and in good scientific manner appropriate for patent and regulatory purposes. If Ligand believes in good faith that Retrophin may not be complying with its obligations under this Section 5.3, Ligand shall provide written notice thereof to Retrophin identifying the basis for Ligand's belief, and Retrophin shall allow an independent Third Party that has expertise in reviewing the books and records and financial information, obligations and agreements of pre-clinical and clinical stage bio-technology companies, as to which Retrophin has no reasonable objection, to review such records on behalf of Ligand to verify that Retrophin is complying with this Section 5.3. Such review shall be conducted no more frequently than once per any twelve (12) month period, at Ligand's cost and upon reasonable advance notice at mutually agreed upon times during normal business hours; *provided, however,* if the independent Third Party determines that Retrophin is not in compliance with this Section 5.3 and Retrophin would owe Ligand at least 10% more in royalties or other payments, Retrophin shall reimburse Ligand for all costs and expenses related to the independent Third Party's review.

5.4 Development Responsibilities and Costs. Retrophin shall have sole responsibility for, and shall bear the cost of conducting, all Development with respect to the Licensed Compounds and Licensed Products.

5.5 Regulatory Responsibilities and Costs. Retrophin [***]***. Retrophin shall be responsible for meeting the requirements of all pre-approval inspections required by any Regulatory Authorities. Except as set forth in Section 13.4, Retrophin or its Affiliate or Sublicensee shall own all INDs, NDAs, Approvals and submissions in connection therewith and all Approvals shall be obtained by and in the name of Retrophin or its Affiliate or Sublicensee.

5.6 Subcontracting. Subject to and without limiting Section 2.2, Retrophin may perform any activities in support of its Development or Commercialization of Licensed

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Compounds and Licensed Products through subcontracting to a Third Party contractor or contract service organization; *provided, however*: (a) Retrophin shall enter into an appropriate written agreement with any such Third Party subcontractor such that the subcontractor shall be bound by all applicable provisions of this Agreement to the same extent as Retrophin and such that Ligand's rights under this Agreement and BMS' rights under the Upstream License Agreement are not adversely affected; (b) any such Third Party subcontractor to whom Retrophin discloses Confidential Information of Ligand shall enter into an appropriate written agreement obligating such Third Party to be bound by obligations of confidentiality and restrictions on use of such Confidential Information that are no less restrictive than the obligations in this Agreement; (c) Retrophin will obligate such Third Party to agree in writing to assign or license (with the right to grant sublicenses) to Retrophin any inventions (and any patent rights covering such inventions) made by such Third Party in performing such services for Retrophin; and (d) Retrophin shall at all times be responsible for the performance of such subcontractor.

**ARTICLE 6.**
**COMMERCIALIZATION**

6.1 Retrophin Obligations. Retrophin (or its Sublicensees, as applicable) shall use sustained Commercially Reasonable Efforts to Commercialize at least **[***]** Licensed Product in the Territory, including the Major Market Countries. Without limiting the foregoing, Retrophin shall:

6.1.1 use Commercially Reasonable Efforts to obtain Approvals in a Major Market Country with respect to at least **[***]*** ** Licensed Product and to effect the First Commercial Sale thereof in such country as soon as reasonably practicable after receipt of such Approvals;

6.1.2 Initiation of a Phase 2 Trial for at least **[***]** Licensed Compound no later than **[***]**;

6.1.3 File for Approval for at least **[***]** Orphan Licensed Product no later than **[***]**; and

6.1.4 File for Approval for at least **[***]** Licensed Product other than the first Orphan Licensed Product no later than **[***]**.

6.2 Continued Availability. Following the First Commercial Sale of a Licensed Product in a Major Market Country in the Territory and until the expiration or termination of this Agreement, Retrophin shall use Commercially Reasonable Efforts to supply and keep such Licensed Product reasonably available to the public in such country.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

6.3 Marking. Each Licensed Product Commercialized by Retrophin under this Agreement shall be marked (to the extent not prohibited by applicable Laws): (i) with a notice that such Licensed Product is sold under a license from BMS and Ligand and (ii) with applicable patent and other intellectual property notices relating to the Core Patent Rights in such a manner as may be required by applicable Law.

6.4 Reports. Retrophin shall provide Ligand with semi-annual written reports within [***]*** days following the end of June and December of each **[***]** summarizing significant commercial activities and events with respect to Licensed Products during the just ended six month period.

**ARTICLE 7.**
**MANUFACTURE AND SUPPLY**

7.1 Manufacture and Supply. Retrophin shall be solely responsible at its expense for making or having made all of its requirements of the Licensed Compounds and Licensed Products.

**ARTICLE 8.**
**FINANCIAL TERMS**

8.1 Consideration. In partial consideration of the rights granted by Ligand to Retrophin pursuant to this Agreement, Retrophin shall make the payments to Ligand as provided for in this Article 8.

8.2 Development Milestone Payments.

8.2.1 Development Milestone Payments. Retrophin shall make milestone payments to Ligand upon achievement of each of the milestone events in the amounts set forth below in Table 1. The first milestone payment shall be payable by Retrophin to Ligand within **[***]** days of execution of the Agreement. Notwithstanding Section 15.4 or any other provision herein, the last milestone payment shall be payable by Retrophin to Ligand upon the Closing of Retrophin's Exit Transaction. Subject to Section 8.2.2, the remainder of the milestone payments set forth below will be payable by Retrophin to Ligand within **[***]** days of the achievement of the specified milestone event with respect to each Licensed Compound. The milestone payments shall not be refundable or returnable in any event, nor shall they be creditable against royalties or other payments.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

**Table 1**

| **Milestone Event** | **Milestone Payment** |
|---|---|
| Execution of Agreement | $1.15 million |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |
| [***] | $[***] |

In the event that a milestone event is achieved that triggers a development milestone payment as set forth above, if the [***]. For example, [***].

8.2.2 [***].

8.2.3 [***]***.

8.3 Royalty Payments.

8.3.1 Retrophin shall pay to Ligand in cash the following royalty payments on the total aggregate annual Net Sales in the Territory of all Licensed Products in a particular [***] by Retrophin, its Affiliates, and Sublicensees in the Territory:

| Aggregate Annual Worldwide Net Sales of All Licensed Products in a [***] | Royalty Rate for Licensed Products in a [***] |
|---|---|
| Up to [***] Dollars ($[***]) | [***] % |
| More than [***] Dollars ($[***]) | [***] % |

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

By way of example, in a given [***], if the aggregate annual worldwide Net Sales for all Licensed Products is $[***], the royalty payment under this Section 8.3.1 would be calculated in accordance with the following formula: [***] Million Dollars.

8.3.2 Royalty Term. Royalties shall be payable on a [***] of (i) [***] or (ii) [***] or (iii) [***].

8.3.3 [***]. [***]. Prior to Retrophin or its Sublicensee exercising its [***] under this Section 8.3.3, Retrophin shall provide Ligand with [***]. The Parties shall discuss the best course of action to resolve such potential [***], provided that such discussions shall not limit or delay Retrophin's or its Sublicensee's right to [***].

Except as set forth above, [***].

8.3.4 Royalty Conditions. The royalties under Section 8.3.1 shall be subject to the following conditions:

a) that only one royalty shall be due with respect to the same unit of Licensed Product;

b) that no royalties shall be due upon the sale or other transfer among Retrophin, its Affiliates, or Sublicensees, but in such cases the royalty shall be due and calculated upon Retrophin's or its Affiliate's or Sublicensee's Net Sales of Licensed Product to the first independent Third Party; and

c) no royalties shall accrue on the disposition of Licensed Product in reasonable quantities by Retrophin, its Affiliates or Sublicensees as part of an expanded access program, as *bona fide* samples, as part of Phase 4 Trials or as donations to non-profit institutions or government agencies for non-commercial purposes; *provided, however,* in each case, that neither Retrophin, its Affiliate or Sublicensees receives any payment for such Licensed Product.

8.4 Manner of Payment. All payments to be made by Retrophin hereunder shall be made in Dollars by wire transfer of immediately available funds to such United States bank account as shall be designated by Ligand. Late payments shall bear interest at the rate provided in Section 8.9.

8.5 Sales Reports and Royalty Payments. After the First Commercial Sale of a Licensed Product and during the term of this Agreement, Retrophin shall furnish to Ligand a written report, within [***]*** days after the end of each [***] (or portion thereof, if this Agreement terminates during a [***]), showing the amount of royalty due for such [***] (or portion

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

thereof). Royalty payments for each **[***]** shall be due at the same time as such written report for the **[***]**. With each **[***]**, Retrophin shall deliver to Ligand a full and accurate accounting to include at least the following information:

**[***]**

**[***]**

**[***]**

**[***]**

**[***]**

If no royalty or payment is due for any royalty period hereunder, Retrophin shall so report.

8.6 Sales Record Audit. Retrophin shall keep, and shall cause each of its Affiliates, and Sublicensees, if any, to keep, full and accurate books of accounting in accordance with GAAP as may be reasonably necessary for the purpose of calculating the royalties payable to Ligand. Such books of accounting (including those of Retrophin's Affiliates, and Sublicensees, if any) shall be kept at their principal place of business and, with all necessary supporting data, shall during all reasonable times for the **[***]** years next following the end of the **[***]** to which each shall pertain, be open for inspection at reasonable times upon written notice by Ligand and at Ligand's sole cost, no more than once per any **[***]** month period, by an independent nationally recognized certified public accounting firm selected by Ligand as to which Retrophin has no reasonable objection, for the purpose of verifying royalty statements for compliance with this Agreement. Such accountant must have agreed in writing to maintain all information learned in confidence, except as necessary to disclose to Ligand such compliance or noncompliance by Retrophin. The results of each inspection, if any, shall be**[***]**. Ligand shall pay for such inspections, except that in the event there is any upward adjustment in aggregate royalties payable for the [***]***** period of such inspection of more than **[***]** of the amount paid, Retrophin shall pay for the reasonable out-of-pocket costs of such inspection. Any underpayments shall be paid by Retrophin within **[***]** of notification of the results of such inspection. Any overpayments shall be fully creditable against amounts payable in subsequent payment periods or, if no such amounts become payable within **[***]** days after notification of such results, shall be refunded.

8.7 Currency Exchange. With respect to Net Sales invoiced in Dollars, the Net Sales and the amounts due to Ligand hereunder shall be expressed in Dollars. With respect to Net Sales invoiced in a currency other than Dollars, the Net Sales shall be expressed in the domestic currency of the entity making the sale, together with the Dollar equivalent, calculated using the arithmetic average of the spot rates on the close of business on the last Business Day of

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

[***] in which the Net Sales were made. The "closing mid-point rates" found in the "dollar spot forward against the dollar" table published by The Financial Times, or any other publication as may be agreed to by the Parties in writing, shall be used as the source of spot rates to calculate the average as defined in the preceding sentence. All payments shall be made in Dollars.

8.8 Tax Withholding. In the event that any withholding taxes or similar charges are levied or assessed by any taxing authority in the Territory with respect to payments made by Retrophin to Ligand under this Agreement, Retrophin shall pay such taxes or similar charges to the proper taxing authority. Retrophin may deduct the amount of such taxes or similar charges paid by Retrophin to such taxing authority from the applicable royalties or other payment otherwise payable to Ligand, subject to the following. Retrophin shall promptly provide Ligand with evidence of such tax payment obligation together with an original receipt for such tax payments (or a certified copy, if the original is not available) and other documentation as Ligand reasonably determines is required for the purpose of Ligand's tax returns. Retrophin, its Affiliates and Sublicensees shall cooperate with Ligand to enable the claiming of a reduction or exemption from withholding taxes on payments under any applicable convention on the avoidance of double taxation or similar agreement in force and shall provide to Ligand proper evidence of payments of withholding tax and assist Ligand by obtaining or providing in as far as possible the required documentation for the purpose of Ligand's tax returns. Retrophin's obligation vis-a-vis the tax authorities shall remain unaffected by the provisions of this Section 8.8.

8.9 Interest Due. Without limiting any other rights or remedies available to Ligand, Retrophin shall pay Ligand interest on any payments that are not paid on or before the date [***] days after the date such payments are due under this Agreement at a rate of one and [***] per month or the maximum applicable legal rate, if less, calculated on the total number of days payment is delinquent.

8.10 [***]***.

8.10.1 In addition to the above milestone and royalty payments, Retrophin shall pay to Ligand the following [***]:

a) [***]; and

b) [***].

8.10.2 [***]:

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

| | |
|---|---|
| **[***]** | **[***]** |
| **[***]** | |
| | **[***]** |
| **[***]** | **[***]** |

8.10.3 Such **[***]**. Such **[***]** to Ligand shall be due within **[***]** days following **[***]**.

8.10.4 For purposes of this Section 8.10, **[***]**, but does not include (i) **[***]** or (ii) **[***]*****.

**ARTICLE 9.**
**REPRESENTATIONS AND WARRANTIES; DISCLAIMER;**
**LIMITATION OF LIABILITY**

9.1 Mutual Representations and Warranties. Each Party represents and warrants to the other Party that (i) it has all requisite corporate power and authority to enter into this Agreement and to perform its obligations under this Agreement, (ii) execution of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized, (iii) this Agreement is legally binding and enforceable on such Party in accordance with its terms and (iv) the performance of this Agreement by it does not create a material breach or material default under any other agreement to which it is a Party.

9.2 Representations, Warranties and Covenants of Ligand. Ligand represents, warrants and covenants that as of the Effective Date: (i) there is no litigation pending, or to the knowledge of Ligand threatened, which alleges, or any written communication alleging, that Ligand's activities with respect to the Patent Rights or the Licensed Compounds have infringed or misappropriated any of the intellectual property rights of any Third Party, (ii) all fees (including legal fees) required to be paid by Ligand in order to maintain the Patent Rights have been paid to date, (iii) it has not previously granted, assigned, transferred, conveyed, encumbered, mortgaged, pledged, hypothesized or licensed (or granted an option to assign, transfer, convey, encumber, mortgage, pledge, hypothesize or license) its right, title and interest in the Patent Rights or the Know-How, (iv) all of its actions related to its use of the Patent Rights and Know-How and the Development and Commercialization of the Licensed Compounds and Licensed Products complied with all applicable legal requirements and complied in all material respects with all regulatory requirements (except for the actions of Ligand's clinical research organization, Cetero Research, as to which no representations or warranties are made hereunder), (v) to the knowledge of Ligand (A) the Patent Rights and Know-How are subsisting, valid and enforceable and Ligand has not received any notice of a claim alleging that any of the Patent Rights infringes or otherwise violates any intellectual property or proprietary right of any Third Party, (B) the manufacture, Development and Commercialization of the Listed Compound by Ligand did not interfere with the intellectual property rights of Third Parties, (C) it has not received any notice that any Person is infringing the Patent Rights and (D) it has not received any notice that a patent application within the Patent Rights is the subject of any pending interference, opposition, cancellation, protest or other challenge or adversarial proceeding, (vi) it has complied with the terms and conditions of the Upstream License Agreement in all material

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

respects and has the necessary right, title and power to sublicense the Patent Rights or the Know-How, (vii) it has discontinued its internal drug discovery and development programs for the Listed Compound and that it has no active internal programs for the discovery or development of the Listed Compound and (vii) other than the Core Patent Rights, Ligand does not Control any patent(s) or patent application(s) that are reasonably necessary or useful for the Development or Commercialization of any Listed Compound or that claims the composition of matter of any Listed Compound or a method of manufacture or use of any Listed Compound.

### 9.3 Representations, Warranties and Covenants of Retrophin.

9.3.1 Retrophin covenants that (i) all of its activities related to its use of the Patent Rights and Know-How, and the Development and Commercialization of the Licensed Compounds and Licensed Products, pursuant to this Agreement shall comply with all applicable legal and regulatory requirements and (ii) it shall not knowingly engage in any activities (A) that use the Patent Rights and/or Know-How in a manner that is outside the scope of the license rights granted to it hereunder or (B) that infringe the intellectual property rights of any Third Party.

9.3.2 Retrophin has not, directly or indirectly, offered, promised, paid, authorized or given, and will not in the future, offer, promise, pay, authorize or give, money or anything of value, directly or indirectly, to any Government Official (as defined below) or Other Covered Party (as defined below) for the purpose of: (i) influencing any act or decision of the Government Official or Other Covered Party; (ii) inducing the Government Official or Other Covered Party to do or omit to do an act in violation of a lawful duty; (iii) securing any improper advantage; or (iv) inducing the Government Official or Other Covered Party to influence the act or decision of a government or government instrumentality, in order to obtain or retain business, or direct business to, any person or entity, in any way related to this Agreement. For purposes of this Agreement: (i) "Government Official" means any official, officer, employee or representative of: (A) any federal, state, provincial, county or municipal government or any department or agency thereof; (B) any public international organization or any department or agency thereof; or (C) any company or other entity owned or controlled by any government; and (ii) "Other Covered Party" means any political party or party official, or any candidate for political office.

9.3.3 Retrophin maintains and shall maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets, including records of payments to any third parties, Government Officials and Other Covered Parties; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

9.3.4 Anti-Corruption Compliance.

23

9.3.4.1 In performing under this Agreement, Retrophin and its Affiliates agree to comply with all applicable anti-corruption laws, including Foreign Corrupt Practices Act of 1977, as amended ("FCPA") and all laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

9.3.4.2 Any third party who represents Retrophin or its Affiliates in connection with, or who will be involved in performing, this Agreement or any related activity, shall certify to compliance with all applicable anti-corruption laws and the obligations set forth in this Section 9.3.5 prior to any involvement in this Agreement or any related activity.

9.3.4.3 Retrophin is not aware of any Government Official or Other Covered Party having any financial interest in the subject matter of this Agreement or in any way personally benefiting, directly or indirectly, from this Agreement.

9.3.4.4 No political contributions or charitable donations shall be given, offered, promised or paid at the request of any Government Official or Other Covered Party that is in any way related to this Agreement or any related activity, without Ligand's prior written approval.

9.3.4.5 In the event that Retrophin violates the FCPA or any applicable anti-corruption law or breaches any provision in this Section 9.3, Ligand shall have the right to unilaterally terminate this Agreement.

9.4 Disclaimer. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY PATENT RIGHTS, CONFIDENTIAL INFORMATION OR KNOW-HOW OF SUCH PARTY OR ANY LICENSE GRANTED BY SUCH PARTY HEREUNDER, OR WITH RESPECT TO ANY COMPOUNDS, INCLUDING BUT NOT LIMITED TO THE TRANSFERRED MATERIALS, OR PRODUCTS. FURTHERMORE, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES THAT ANY PATENT, PATENT APPLICATION, OR OTHER PROPRIETARY RIGHTS INCLUDED IN PATENT RIGHTS, CONFIDENTIAL INFORMATION OR KNOW-HOW LICENSED BY SUCH PARTY TO THE OTHER PARTY HEREUNDER ARE VALID OR ENFORCEABLE OR THAT USE OF SUCH PATENT RIGHTS, CONFIDENTIAL INFORMATION OR KNOW-HOW CONTEMPLATED HEREUNDER DOES NOT INFRINGE ANY PATENT RIGHTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY.

9.5 Limitation of Liability. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR OTHERWISE, NEITHER PARTY SHALL BE LIABLE TO THE OTHER WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT, WHETHER UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, MULTIPLE, OR CONSEQUENTIAL DAMAGES (INCLUDING

24

CONSEQUENTIAL DAMAGES CONSISTING OF LOST PROFITS, LOSS OF USE, DAMAGE TO GOODWILL, OR LOSS OF BUSINESS) AND, IN ANY CASE, LIGAND SHALL NOT BE LIABLE IN AN AMOUNT GREATER THAN THE AMOUNTS PAID BY RETROPHIN TO LIGAND UNDER ARTICLE 8 OF THIS AGREEMENT; *PROVIDED, HOWEVER,* THAT THE FOREGOING SHALL NOT APPLY TO ANY BREACH BY RETROPHIN OF THE LICENSES GRANTED TO IT UNDER THIS AGREEMENT THAT IS AN INFRINGEMENT OF PATENT RIGHTS NOT INCLUDED IN THE PATENT RIGHTS LICENSED TO RETROPHIN HEREUNDER, OR ANY BREACH BY EITHER PARTY OF THIS ARTICLE 9 OR ARTICLE 11 HEREOF.

## ARTICLE 10.
## OWNERSHIP; PATENT MAINTENANCE; INFRINGEMENT; EXTENSIONS

10.1 <u>Ownership of Inventions</u>. Inventorship of inventions conceived or reduced to practice in the course of activities performed under or contemplated by this Agreement shall be determined by application of United States patent Laws pertaining to inventorship. If such inventions are jointly invented by one or more employees, consultants or contractors of each Party, such inventions shall be jointly owned ("<u>Joint Invention</u>"), and if one or more claims included in an issued patent or pending patent application which is filed in a patent office in the Territory claim such Joint Invention, such claims shall be jointly owned ("<u>Joint Patent Rights</u>"). If such an invention is solely invented by an employee, consultant or contractor of a Party, such invention shall be owned by such Party, and any patent filed claiming such solely owned invention shall also be owned by such Party. Subject to Section 5.6 with respect to contractors, each Party shall enter into binding agreements obligating all employees, consultants and contractors performing activities under or contemplated by this Agreement, including activities related to the Patent Rights, Licensed Compounds or Licensed Products, to assign his/her interest in any invention conceived or reduced to practice in the course of such activities to the Party for which such employee, consultant or contractor is providing its services. This Agreement shall be understood to be a joint research agreement in accordance with 35 U.S.C. § 103(c)(3) to develop the Licensed Compounds and Licensed Products. The filing, prosecution, maintenance and enforcement of Joint Patent Rights which are Core Patent Rights shall be handled in accordance with this Article 10.

10.2 <u>Filing, Prosecution and Maintenance of Core Patent Rights</u>. Retrophin shall be responsible, using outside patent counsel selected by Retrophin and acceptable to Ligand, such acceptance not to be unreasonably withheld or delayed, for the preparation, prosecution (including, without limitation, any interferences, reissue proceedings and reexaminations) and maintenance of Core Patent Rights. Promptly following the Effective Date, the Parties shall cooperate to expeditiously transfer such responsibility for the further preparation, prosecution and maintenance of Core Patent Rights to such outside patent counsel. Retrophin shall be responsible for all costs incurred by Retrophin with respect to such preparation, prosecution and maintenance of Core Patent Rights so long as Retrophin remains responsible for such preparation, prosecution and maintenance. Upon request by Ligand, Retrophin (or its patent counsel) shall provide Ligand with an update of the filing, prosecution and maintenance status for each of the Core Patent Rights. Each Party shall reasonably consult with and cooperate with the other Party with respect to the preparation, prosecution and

25

maintenance of the Core Patent Rights reasonably prior to any deadline or action with the U.S. Patent & Trademark Office or any foreign patent office, and Retrophin (or its patent counsel) shall furnish to Ligand copies of all relevant documents reasonably in advance of such consultation. Retrophin (or its patent counsel) shall provide to Ligand copies of any papers relating to the filing, prosecution or maintenance of the Core Patent Rights promptly upon their being filed or received. Retrophin shall not knowingly take any action during prosecution and maintenance of the Core Patent Rights that would materially adversely affect them (including any reduction in claim scope), without Ligand's prior consent, such consent not to be unreasonably withheld, conditioned or delayed.

10.3 Patent Abandonment.

10.3.1 Generally. In no event will Retrophin knowingly permit any of the Core Patent Rights to be abandoned in any country in the Territory or elect not to file a new patent application claiming priority to a patent application within the Core Patent Rights either before such patent application's issuance or within the time period required for the filing of an international (i.e., Patent Cooperation Treaty), regional (including European Patent Office) or national application, without Ligand first being given an opportunity to assume full responsibility for the continued prosecution and maintenance of such Core Patent Rights, or the filing of such new patent application. Accordingly, Retrophin (or its patent counsel) shall provide Ligand with notice of the allowance and expected issuance date of any patent within the Core Patent Rights, or any of the aforementioned filing deadlines, and Ligand shall provide Retrophin with prompt notice as to whether Ligand desires Retrophin to file such new patent application. In the event that Retrophin decides either (i) not to continue the prosecution or maintenance of a patent application or patent within Core Patent Rights in any country or (ii) not to file such new patent application requested to be filed by Ligand, Retrophin shall provide Ligand with notice of this decision at least **[***]*** days prior to any pending lapse or abandonment thereof.

10.3.2 Ligand Option to Assume Responsibility. Ligand shall thereupon have the right, but not the obligation, to assume responsibility for all reasonably documented external costs (subject to Section 10.3.3) thereafter incurred associated with the filing and/or further prosecution and maintenance of such patents and patent applications, on a patent-by-patent and country-by-country basis. The outside patent counsel selected by Retrophin shall proceed with such filing and/or further prosecution and maintenance promptly upon receipt of written notice from Ligand of its election to assume such responsibility, with such filing to occur prior to the issuance of the patent to which the application claims priority or expiration of the applicable filing deadline, as set forth above. In the event that Ligand assumes such responsibility for such filing, prosecution and maintenance costs (subject to Section 10.3.3), upon the reasonable request by Ligand, Retrophin shall transfer the responsibility for such filing, prosecution and maintenance of such patent applications and patents to outside patent counsel selected by Ligand; *provided, however,* Retrophin shall (i) provide sufficient written

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

notice to Ligand of any such election such that the relevant transfer shall not prejudice the filing, prosecution and/or maintenance of patent rights (where possible, such notice shall be provided at least [***]*** days prior to any pending lapse or abandonment thereof);
(ii) transfer or cause to be transferred to Ligand or its patent counsel the complete prosecution file for the relevant patents and patent applications, including all correspondence and filings with patent authorities with respect thereto; and (iii) at the reasonable request of Ligand and without demanding any further consideration therefore, do all things necessary, proper or advisable, including without limitation the execution, acknowledgment and recordation of specific assignments, oaths, declarations and other documents on a country-by-country basis, to assist Ligand in obtaining, perfecting, sustaining and/or enforcing such patent(s). Such patent applications and patents shall otherwise continue to be subject to all of the terms and conditions of the Agreement in the same way as the other Core Patent Rights, as applicable.

10.3.3 Retrophin Responsibility for Patent Costs. Notwithstanding anything to the contrary under this Article 10, unless the Parties otherwise agree in writing, Retrophin shall remain responsible for all costs incurred after the Effective Date with respect to preparation, prosecution and maintenance of the Core Patent Rights covering Licensed Compounds.

10.4 Enforcement of Core Patent Rights Against Infringers.

10.4.1 Enforcement by Retrophin.

a) In the event that Ligand or Retrophin becomes aware of a suspected infringement of any Core Patent Right exclusively licensed to Retrophin under this Agreement, such Party shall notify the other Party promptly, and following such notification, the Parties shall confer. Retrophin shall have the right, but shall not be obligated, to bring an infringement action with respect to such infringement at its own expense, in its own name and entirely under its own direction and control, subject to the following. Ligand shall reasonably assist Retrophin (at Retrophin's expense) in any action or proceeding being prosecuted if so requested, and shall lend its name to and join as a nominal party in such actions or proceedings if reasonably requested by Retrophin or required by applicable Laws. Ligand shall have the right to participate and be represented in any such suit by its own counsel at its own expense. No settlement of any such action or proceeding which restricts the scope, or adversely affects the enforceability, of a Core Patent Right may be entered into by Retrophin without the prior written consent of Ligand, which consent shall not be unreasonably withheld, delayed or conditioned.

b) Ligand shall have the right at its discretion to grant to Retrophin such rights (including assignment of the applicable Core Patent Rights) as may be necessary for Retrophin to exercise its rights under this Section 10.4 (including defending or enforcing any Core Patent Rights) without Ligand's involvement. In the event of such grant of rights

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

(including assignment) with respect to any Core Patent Rights, such Core Patent Rights shall continue to be treated as Core Patent Rights and shall otherwise continue to be subject to all of the terms and conditions of the Agreement in the same way as the other applicable Core Patent Rights. For purposes of clarity, election or non-election by Ligand to grant or assign rights to Retrophin under this Section 10.4.1(b) shall not limit Ligand's obligations under Section 10.4.1(a) to reasonably assist Retrophin in any action or proceeding, or to join in such action or proceeding upon request by Retrophin if such joinder is necessary under applicable Laws for Retrophin to exercise its rights under this Section 10.4.

10.4.2 Enforcement by Ligand. If Retrophin elects not to bring any action for infringement described in Section 10.4.1 and so notifies Ligand, then Ligand may bring such action at its own expense, in its own name and entirely under its own direction and control, subject to the following. Retrophin shall reasonably assist Ligand (at Ligand's expense) in any action or proceeding being prosecuted if so requested, and shall lend its name to such actions or proceedings if requested by Ligand or required by applicable Laws. Retrophin shall have the right to participate and be represented in any such suit by its own counsel at its own expense. No settlement of any such action or proceeding which restricts the scope, or adversely affects the enforceability, of a Core Patent Right may be entered into by Ligand without the prior written consent of Retrophin, which consent shall not be unreasonably withheld, delayed or conditioned.

10.4.3 Withdrawal. If either Party brings an action or proceeding under this Section 10.4 and subsequently ceases to pursue or withdraws from such action or proceeding, it shall promptly notify the other Party and the other Party may substitute itself for the withdrawing Party under the terms of this Section 10.4.

10.4.4 Damages. In the event that either Party exercises the rights conferred in this Section 10.4 and recovers any damages or other sums in such action, suit or proceeding or in settlement thereof, such damages or other sums recovered shall [***]. If such recovery is insufficient [***]***. **If after such [***] any funds shall remain from such damages or other sums recovered, such funds shall be [***] under this** Section 10.4; *provided*, *however*, that if [***].

10.5 Patent Term Extension. Ligand and Retrophin shall each cooperate with one another and shall use commercially reasonable efforts in obtaining patent term extension (including without limitation, any pediatric exclusivity extensions as may be available) or supplemental protection certificates or their equivalents in any country with respect to patent rights covering the Licensed Products. If elections with respect to obtaining such patent term extensions are to be made, Retrophin shall have the right to make the election to seek patent term extension or supplemental protection; *provided*, *however,* such election will be made so as to maximize the period of marketing exclusivity for the Licensed Product. For such purpose, for all Approvals Retrophin shall provide Ligand with written notice of any expected Approval at least

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

[***] days prior to the expected date of Approval, as well as notice within [***] business days of receiving each Approval confirming the date of such Approval. Notification of the receipt of an Approval shall be in accordance with Section 15.2.

10.6 Data Exclusivity and Orange Book Listings.

10.6.1 With respect to data exclusivity periods (such as those periods listed in the FDA's Orange Book (including without limitation any available pediatric extensions) or periods under national implementations of Article 10.1(a)(iii) of Directive 2001/EC/83, and all international equivalents), Retrophin shall use commercially reasonable efforts consistent with its obligations under applicable Law to seek, maintain and enforce all such data exclusivity periods available for the Licensed Products. With respect to filings in the FDA Orange Book (and foreign equivalents) for issued patents for a Licensed Product, Retrophin shall, consistent with its obligations under applicable Law, list in a timely manner and maintain all applicable Core Patent Rights and other patents Controlled by Retrophin required to be filed by it, or that it is permitted to file, under applicable Law. At least [***]*** days prior to an anticipated deadline for the filing of patent listing information for Core Patent Rights, Retrophin will consult with Ligand regarding the content of such filing. In the event of a dispute between the Parties as to whether a Core Patent Right can be filed and/or the content of such filing, the Parties will take expedited steps to resolve the dispute as promptly as possible, including seeking advice of an independent legal counsel to guide their decision. Ligand shall use commercially reasonable efforts consistent with its obligations under applicable Law to provide reasonable cooperation to Retrophin in filing and maintaining such Orange Book (and foreign equivalent) listings.

10.6.2 Without limiting the foregoing, Ligand shall have the right at its discretion to grant to Retrophin such rights (including assignment of the applicable Core Patent Rights) as may be necessary for Retrophin to exercise its rights under this Section 10.6 (including seeking, maintaining and enforcing all data exclusivity periods) without Ligand's involvement. In the event of such grant of rights (including assignment) with respect to any Core Patent Rights, such Core Patent Rights shall continue to be treated as Core Patent Rights and shall otherwise continue to be subject to all of the terms and conditions of the Agreement in the same way as the other applicable Core Patent Rights. For purposes of clarity, election by Ligand to grant or assign rights to Retrophin under this Section 10.6.2 shall not limit Ligand's obligation under Section 10.6.1 to provide reasonable cooperation to Retrophin to the extent such cooperation is reasonably necessary for Retrophin in filing and maintaining such Orange Book (and foreign equivalent) listings.

10.7 Notification of Patent Certification. Each Party shall notify and provide the other Party with copies of any allegations of alleged patent invalidity, enforceability or non-infringement of a Core Patent Right pursuant to a Paragraph IV Patent Certification by a Third Party filing an Abbreviated NDA, an application under §505(b)(2) or other similar patent

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

certification by a Third Party, and any foreign equivalent thereof. Such notification and copies shall be provided to the other Party within [***] days after such Party receives such certification, and shall be sent to the address set forth in Section 15.2. In addition, upon request by Ligand, Retrophin shall provide reasonable assistance and cooperation (including, without limitation, making available to Ligand documents possessed by Retrophin that are reasonably required by Ligand and making available personnel for interviews and testimony) in any actions reasonably undertaken by Ligand to contest any such patent certification.

## ARTICLE 11.
## NONDISCLOSURE OF CONFIDENTIAL INFORMATION

11.1 Nondisclosure. Each Party agrees that, for so long as this Agreement is in effect and for a period of [***]*** years thereafter, a Party (the "Receiving Party") receiving or possessing Confidential Information of the other Party (the "Disclosing Party") (or that has received any such Confidential Information from the other Party prior to the Effective Date) shall (i) maintain in confidence such Confidential Information using not less than the efforts such Receiving Party uses to maintain in confidence its own proprietary information of similar kind and value, but in no event shall the Receiving Party use less than a reasonable standard of care, (ii) not disclose such Confidential Information to any Third Party without the prior written consent of the Disclosing Party, except for disclosures expressly permitted below, and (iii) not use such Confidential Information for any purpose except those permitted by this Agreement (it being understood that this clause (iii) shall not create or imply any rights or licenses not expressly granted hereunder).

11.1.1 Confidentiality of Know-How for Disclosure Purposes. During such time as the license to the Know-How granted under Section 2.1 is in effect, solely for disclosure purposes to Third Parties, the Know-How shall be deemed to be Confidential Information of Ligand and Retrophin under Article 11, Ligand and Retrophin shall be deemed to be a Disclosing Party of the Know-How under Article 11, and Ligand and its respective Affiliates shall be deemed not to have known such Know-How prior to disclosure for the purposes of Section 11.1.2(b). Other than for disclosure purposes to Third Parties, the Know-How shall solely be the Confidential Information of Ligand.

11.1.2 Exceptions. The obligations in Section 11.1 shall not apply with respect to any portion of the Confidential Information that the Receiving Party can show by competent proof:

a) is publicly disclosed by the Disclosing Party, either before or after it is disclosed to the Receiving Party hereunder;

b) was known to the Receiving Party or any of its Affiliates, without any obligation to keep it confidential or any restriction on its use, prior to disclosure by the Disclosing Party;

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

c) is subsequently disclosed to the Receiving Party or any of its Affiliates by a Third Party lawfully in possession thereof and without any obligation to keep it confidential or any restriction on its use;

d) is published by a Third Party or otherwise becomes publicly available or enters the public domain, either before or after it is disclosed to the Receiving Party; or

e) has been independently developed after disclosure by the Disclosing Party by employees or contractors of the Receiving Party or any of its Affiliates without the aid, application or use of Confidential Information of the Disclosing Party.

11.2 <u>Authorized Disclosure</u>. The Receiving Party may disclose Confidential Information belonging to the Disclosing Party to the extent (and only to the extent) such disclosure is reasonably necessary in the following instances:

a) filing or prosecuting patents;

b) regulatory filings;

c) prosecuting or defending litigation;

d) subject to Section 11.4, complying with applicable governmental Laws and regulations (including the rules and regulations of the Securities and Exchange Commission or any national securities exchange) and with judicial process, if in the reasonable opinion of the Receiving Party's counsel, such disclosure is necessary for such compliance; and

e) disclosure (i) in connection with the performance of this Agreement and solely on a "need to know basis" to Affiliates, potential or actual collaborators (including potential Sublicensees) or employees, contractors or agents; or (ii) solely on a "need to know basis" to potential or actual investment bankers, investors, lenders, or acquirers; each of whom in the case of clause (i) or (ii) prior to disclosure must be bound by written obligations of confidentiality and non-use no less restrictive than the obligations set forth in this Article 11; *provided*, *however*, that the Receiving Party shall remain responsible for any failure by any Person who receives Confidential Information pursuant to this Article 11 to treat such Confidential Information as required under this Article 11.

If and whenever any Confidential Information is disclosed in accordance with this Section 11.2, such disclosure shall not cause any such information to cease to be Confidential Information except to the extent that such disclosure results in a public disclosure of such information (otherwise than by breach of this Agreement). Where reasonably possible and subject to Section 11.4, the Receiving Party shall notify the Disclosing Party of the Receiving Party's intent to make such disclosure pursuant to paragraphs (r) through (v) of this Section 11.2 sufficiently prior to making such disclosure so as to allow the Disclosing Party adequate time to take whatever action it may deem appropriate to protect the confidentiality of the information.

11.3 <u>Terms of this Agreement</u>. The Parties acknowledge that the terms of this Agreement shall be treated as Confidential Information of both Parties.

31

11.4 Securities Filings. In the event either Party proposes to file with the Securities and Exchange Commission or the securities regulators of any state or other jurisdiction a registration statement or any other disclosure document which describes or refers to this Agreement under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, or any other applicable Laws, the Party shall notify the other Party of such intention and shall provide such other Party with a copy of relevant portions of the proposed filing not less than [***]*** business days prior to such filing (and any revisions to such portions of the proposed filing a reasonable time prior to the filing thereof), including any exhibits thereto relating to this Agreement and shall use reasonable efforts to obtain confidential treatment of any information concerning this Agreement that such other Party requests be kept confidential and shall only disclose Confidential Information which it is advised by counsel is legally required to be disclosed. No such notice shall be required under this Section 11.4 if the substance of the description of or reference to this Agreement contained in the proposed filing has been included in any previous filing made by the other Party hereunder or otherwise approved by the other Party.

11.5 Publication.

11.5.1 Publication by Ligand. Ligand may publish or present data and/or results relating to a Licensed Compound or Licensed Product in scientific journals and/or at scientific conferences, subject to the prior review, comment and approval by Retrophin as follows. Ligand shall provide Retrophin with the opportunity to review any proposed abstract, manuscript or presentation which discloses information relating to a Licensed Compound or Licensed Product by delivering a copy thereof to Retrophin no less than [***] days before its intended submission for publication or presentation. Retrophin shall have twenty (20) days from its receipt of any such abstract, manuscript or presentation in which to notify Ligand in writing of any specific objections to the disclosure. In the event Retrophin objects to the disclosure in writing within such [***] day period, Ligand agrees not to submit the publication or abstract or make the presentation containing the objected-to information until the Parties have agreed to the content of the proposed disclosure and Ligand shall delete from the proposed disclosure any Retrophin Confidential Information or Know-How or the identity of any Licensed Compound or Licensed Product, or any information relating to the Licensed Compound or its improvements that could limit or jeopardize any rights of Retrophin, upon reasonable request by Retrophin. Failure to object to the disclosure in writing within such [***] day period shall be deemed approval. Once any such abstract or manuscript is accepted for publication, Ligand will provide Retrophin with a copy of the final version of the manuscript or abstract. For clarification, this Section 11.5.1 shall not limit or restrict Ligand's ability to publish or present publicly information on compounds which are not Licensed Compounds or Licensed Products, provided such publication or presentation does not contain Retrophin Confidential Information or identify any Licensed Compound or Licensed Product. Retrophin acknowledges BMS' right to publish or otherwise publicly disclose any licensed BMS Know-How at any time.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

11.5.2 Publication by Retrophin. Retrophin may publish or present data and/or results relating to a Licensed Compound or Licensed Product in scientific journals and/or at scientific conferences, subject to attribution to Ligand of any data generated by or on behalf of Ligand prior to the Effective Date as well as the prior review and comment by Ligand as follows. Retrophin shall provide Ligand with the opportunity to review any proposed abstract, manuscript or presentation which discloses information relating to a Licensed Compound or Licensed Product by delivering a copy thereof to Ligand no less than [***]*** days before its intended submission for publication or presentation. Ligand shall have [***] days from its receipt of any such abstract, manuscript or presentation in which to notify Retrophin in writing of any specific objections to the disclosure, such objections to be limited to matters involving the disclosure of Ligand Confidential Information, or a good faith and documented concern by Ligand that such publication would otherwise result in material commercial harm to Ligand. In the event Ligand objects to the disclosure in writing within such [***] day period, Retrophin agrees not to submit the publication or abstract or make the presentation containing the objected-to information until the Parties have agreed to the content of the proposed disclosure, and Retrophin shall delete from the proposed disclosure any Ligand Confidential Information upon the reasonable request by Ligand. The Parties agree to take all reasonable steps to address and resolve a notice of objection by Ligand within [***] days of receipt of such notice. Once any such abstract or manuscript is accepted for publication, Retrophin will provide Ligand with a copy of the final version of the manuscript or abstract, a copy of which may be provided to BMS by Ligand.

## ARTICLE 12.
## INDEMNITY

12.1 Retrophin Indemnity. Retrophin shall indemnify, defend and hold harmless Ligand and its Affiliates, and their respective officers, directors, employees, agents, licensors, and their respective successors, heirs and assigns and representatives, from and against any and all claims, damages, losses, suits, proceedings, liabilities, costs (including reasonable legal expenses, costs of litigation and reasonable attorney's fees) or judgments, whether for money or equitable relief, of any kind, arising out of any claim, action, lawsuit or other proceeding brought by a Third Party ("Losses and Claims") arising out of or relating, directly or indirectly, (i) to the research, Development, Commercialization (including promotion, advertising, offering for sale, sale or other disposition), transfer, importation or exportation, manufacture, labeling, handling or storage, or use of, or exposure to, any Licensed Compound and/or any Licensed Product by or for Retrophin or any of its Affiliates, Sublicensees, agents and/or contractors, (ii) to Retrophin's (or its Affiliates' and/or Sublicensees') use and practice otherwise of the Patent Rights or Know-How, including claims based on (A) product liability, bodily injury, risk of bodily injury, death or property damage, (B) infringement or misappropriation of Third Party patents, copyrights, trademarks or other intellectual property rights or (C) the failure to comply with applicable Laws related to the matters referred to in the foregoing clauses (i) and (ii) with respect to any Licensed Compound and/or any Licensed

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Product, or (iii) Retrophin's gross negligence, recklessness or willful misconduct or Retrophin's material breach of any representation, warranty or covenant set forth in this Agreement; except in any such case for Losses and Claims to the extent reasonably attributable to Ligand having committed an act or acts of gross negligence, recklessness or willful misconduct or having materially breached any representation or warranty set forth in this Agreement.

12.2 <u>Ligand Indemnity</u>. Ligand shall indemnify, defend and hold harmless Retrophin and its Affiliates, and their respective officers, directors, employees, agents, licensors, and their respective successors, heirs and assigns and representatives, from and against any and all Losses and Claims arising out of or relating, directly or indirectly to (i) Ligand's gross negligence, recklessness or willful misconduct or (ii) Ligand's material breach of any representation, warranty or covenant set forth in this Agreement; except in any such case for Losses and Claims to the extent reasonably attributable to Retrophin having committed an act or acts of gross negligence, recklessness or willful misconduct or having materially breached any representation or warranty set forth in this Agreement. For the avoidance of doubt, "Ligand's gross negligence, recklessness or willful misconduct" shall not include any acts or omissions on the part of any Third Parties, including Ligand's clinical research organization, Cetero Research.

12.3 <u>Indemnification Procedure</u>. A claim to which indemnification applies under Section 12.1 or Section 12.2 shall be referred to herein as an "<u>Indemnification Claim</u>". If any Person or Persons (collectively, the "<u>Indemnitee</u>") intends to claim indemnification under this Article 12, the Indemnitee shall notify the other Party (the "<u>Indemnitor</u>") in writing promptly upon becoming aware of any claim that may be an Indemnification Claim (it being understood and agreed, however, that the failure by an Indemnitee to give such notice shall not relieve the Indemnitor of its indemnification obligation under this Agreement except and only to the extent that the Indemnitor is actually prejudiced as a result of such failure to give notice). The Indemnitor shall have the right to assume and control the defense of the Indemnification Claim at its own expense with counsel selected by the Indemnitor and reasonably acceptable to the Indemnitee; *provided*, *however*, that an Indemnitee shall have the right to retain its own counsel, with the fees and expenses to be paid by the Indemnitee, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings. If the Indemnitor does not assume the defense of the Indemnification Claim as aforesaid, the Indemnitee may defend the Indemnification Claim but shall have no obligation to do so. The Indemnitee shall not settle or compromise the Indemnification Claim without the prior written consent of the Indemnitor, and the Indemnitor shall not settle or compromise the Indemnification Claim in any manner which would have an adverse effect on the Indemnitee's interests (including any rights under this Agreement or the scope or enforceability of the Patents Rights or Know-How), without the prior written consent of the Indemnitee, which consent, in each case, shall not be unreasonably withheld or delayed. The Indemnitee shall reasonably cooperate with the Indemnitor at the Indemnitor's expense and shall make available to the Indemnitor all pertinent information under the control of the Indemnitee, which information shall be subject to Article 11.

12.4 <u>Insurance</u>. Retrophin shall, beginning with the initiation of the first clinical trial for a Licensed Product, maintain at all times thereafter during the term of the

34

Agreement, and until the later of (i) [***]*** or (ii) the date [***], comprehensive general liability insurance from a recognized, creditworthy insurance company, on a claims-made basis, with endorsements for contractual liability and product liability, and with coverage limits of not less than [***]. The minimum level of insurance set forth herein shall not be construed to create a limit on Retrophin's liability hereunder. Within [***] days following written request from Ligand, Retrophin shall furnish to Ligand a certificate of insurance evidencing such coverage as of the date. Retrophin shall use commercially reasonable efforts to cause such certificate of insurance, as well as any certificates evidencing new coverages of Retrophin, to include a provision whereby [***] written notice shall be received by Ligand prior to coverage cancellation by either Retrophin or the insurer and of any new coverage. In the case of a cancellation of such coverage, Retrophin shall promptly provide Ligand with a new certificate of insurance evidencing that Retrophin's coverage meets the requirements in the first sentence of this Section 12.4.

## ARTICLE 13.
## TERM AND TERMINATION

13.1 Term. This Agreement shall commence as of the Effective Date and, unless sooner terminated in accordance with the terms hereof or by mutual written consent, shall continue until neither Party has any obligation under this Agreement to make payments to the other Party.

13.2 Termination By Ligand.

13.2.1 Insolvency. Ligand shall have the right to terminate this Agreement with respect to any or all licenses granted to Retrophin pursuant to Article 2 of this Agreement, at Ligand's sole discretion, upon delivery of written notice to Retrophin upon the filing by Retrophin in any court or agency pursuant to any statute or regulation of the United States or any other jurisdiction a petition in bankruptcy or insolvency or for reorganization or similar arrangement for the benefit of creditors or for the appointment of a receiver or trustee of Retrophin or its assets, or if Retrophin is served with an involuntary petition against it in any insolvency proceeding, upon the [***] day after such service if such involuntary petition has not previously been stayed or dismissed, or upon the making by Retrophin of an assignment of substantially all of its assets for the benefit of its creditors.

13.2.2 Breach. Subject to Section 13.2.4 below, Ligand shall have the right to terminate this Agreement with respect to any or all licenses granted to Retrophin pursuant to Article 2 of this Agreement, at Ligand's sole discretion, upon delivery of written notice to Retrophin in the event of any material breach by Retrophin of any terms and conditions of this Agreement (other than failure to use Commercially Reasonable Efforts to Develop or Commercialize the Licensed Compounds and a Licensed Product, which breach is covered under Section 13.2.3); *provided, however,* such breach has not been cured within

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

forty-five (45) days after written notice thereof is given by Ligand to Retrophin specifying the nature of the alleged breach; *provided*, *however*, that to the extent such material breach involves the failure to make a payment when due, such breach must be cured within twenty (20) days after written notice thereof is given by Ligand to Retrophin.

13.2.3 Failure to Use Commercially Reasonable Efforts. Subject to Section 13.2.4 below, Ligand shall have the right to terminate this Agreement with respect to any or all licenses granted to Retrophin pursuant to Article 2 of this Agreement on a country-by-country basis (except as otherwise set forth in this Section 13.2.3), at Ligand's sole discretion, in the event that Retrophin (a) fails to use Commercially Reasonable Efforts (by itself or through its Affiliates or Sublicensees) to Develop and Commercialize at least one (1) Licensed Compound and Licensed Product or (b) fails to comply with the specific diligence obligations set forth in Sections 6.1.2 and 6.1.3 of this Agreement; *provided, however,* that Retrophin has not exercised such Commercially Reasonable Efforts or complied with such specific diligence obligations in the applicable country or countries within sixty (60) days following written notice by Ligand. For clarity, it is understood and acknowledged that Commercially Reasonable Efforts in the Development of a Licensed Compound or Licensed Product in a particular country may include sequential implementation of clinical trials and/or intervals between clinical trials for data interpretation and clinical program planning and any period associated with such program, to the extent such implementation is consistent with the scientific, technical and commercial factors relevant to Development of such Licensed Compound or Licensed Product in such country.

13.2.4 Disputed Breach. If Retrophin disputes in good faith the existence or materiality of a breach specified in a notice provided by Ligand pursuant to Section 13.2.2, or a failure to use Commercially Reasonable Efforts specified in a notice provided by Ligand pursuant to Section 13.2.3, and Retrophin provides notice to Ligand of such dispute within the applicable forty-five (45) day or sixty (60) day period, Ligand shall not have the right to terminate this Agreement unless and until the existence of such material breach or failure by Retrophin has been determined in accordance with Article 14 and Retrophin fails to cure such breach within sixty (60) days following such determination (except to the extent such breach involves the failure to make a payment when due, which breach must be cured within five (5) Business Days following such determination). It is understood and acknowledged that during the pendency of such a dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder. The Parties further agree that any payments that are made by one Party to the other Party pursuant to this Agreement pending resolution of the dispute shall be promptly refunded if an arbitrator or court determines pursuant to Article 14 that such payments are to be refunded by one Party to the other Party.

13.2.5 Termination for [***]***. Subject to the terms of this Section 13.2.5, Ligand shall have the right to terminate this Agreement (on a country-by-country or worldwide

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

basis, as Ligand may elect), [***], in the event that (a) [***] or (b) [***]. In the event the Parties are unable to reach agreement regarding whether or not a compound is a [***], and the Parties have not resolved such dispute through good faith discussions, such dispute will be resolved through performance of the relevant scientific determination by an independent Third Party testing provider or other scientific expert who shall be mutually and reasonably selected by both Parties. The findings of such Third Party scientific expert with respect to such dispute shall be binding on the Parties, and the costs of such testing shall be borne by the Party whom the independent determination does not favor.

13.2.6 Termination of Upstream License Agreement. Subject to Section 13.5.1, if the Upstream License Agreement, in whole or in part, is terminated for any reason, the corresponding rights granted to Retrophin shall be terminated effective upon termination of the Upstream License Agreement.

13.3 Termination by Retrophin. Retrophin may terminate this Agreement in the event of material breach by Ligand; *provided, however,* that such breach has not been cured within sixty (60) days after written notice thereof is given by Retrophin to Ligand. Notwithstanding the foregoing, if Ligand disputes in good faith the existence or materiality of such breach and provides notice to Retrophin of such dispute within such sixty (60) day period, Retrophin shall not have the right to terminate this Agreement in accordance with this Section 13.3 unless and until it has been determined in accordance with Article 14 that this Agreement was materially breached by Ligand and Ligand fails to cure such breach within sixty (60) days following such determination. It is understood and acknowledged that during the pendency of such a dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder. The Parties further agree that any payments that are made by one Party to the other Party pursuant to this Agreement pending resolution of the dispute shall be promptly refunded if an arbitrator or court determines pursuant to Article 14 that such payments are to be refunded by one Party to the other Party.

13.4 Effect of Termination. Upon termination of this Agreement or any right or license pursuant to Section 13.2.1, 13.2.2, 13.2.3 or 13.2.5, the rights and obligations of the Parties shall be as set forth in this Section 13.4.

13.4.1 Upon termination of this Agreement, either in its entirety or with respect to one or more applicable countries (each, a "Terminated Country") pursuant to Section 13.2.1, 13.2.2, 13.2.3 or 13.2.5 hereof (the rights and obligations of the Parties as to the remaining countries of the Territory in which termination under Section 13.2.3 or 13.2.5 has not occurred, being unaffected by such termination), the following shall apply:

a) [***].

b) [***]***.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

c) All amounts due or payable to **[***]** shall remain due and payable.

d) Should Retrophin have **[***]**, Retrophin shall **[***]**.

e) Should Retrophin have **[***]**.

f) Retrophin shall **[***]**.

g) If Retrophin has the **[***]**.

h) Retrophin shall **[***]**.

i) Retrophin shall **[***]**.

j) Retrophin hereby**[***]**.

k) Neither Party shall be relieved of any obligation that accrued prior to the effective date of such termination or expiration.

l) Each Party shall have the right to retain all amounts previously paid to it by the other Party, subject to any applicable determination of an arbitrator or court pursuant to Article 14.

m) It is understood and agreed that Ligand shall be entitled to **[***]** as a remedy to enforce the provisions of this Section 13.4, in addition to any other remedy to which it may be entitled by applicable Law.

13.5 Termination by BMS.

13.5.1 Any rights granted by Ligand pursuant to this Agreement shall terminate on a country-by-country and Licensed Product-by-Licensed Product basis effective upon termination under Section 13.2 of the Upstream License Agreement with respect to such sublicensed rights; *provided, however,* that such sublicensed rights shall not terminate if, as of the effective date of such termination by BMS under Section 13.2 of the Upstream License Agreement, Retrophin is not in material breach of its obligations to Ligand under this Agreement, and within sixty (60) days of such termination Retrophin agrees in writing to be bound directly to BMS under a license agreement substantially similar to this Agreement with respect to the rights sublicensed hereunder, substituting Retrophin for Ligand.

13.5.2 BMS may terminate the Upstream License Agreement where (a) Retrophin or its Affiliate (alone or in collaboration with a Third Party) undertakes the clinical development of a product that contains a **[***]*** prior to the first U.S. NDA Approval being obtained for a Licensed Compound or (b) Retrophin or its Affiliate (alone or in collaboration with a Third

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Party) markets a product that contains a [***] within [***] years following the first U.S. NDA Approval for a Licensed Product.

13.6 Scope of Termination. Except as otherwise expressly provided herein, termination of this Agreement shall be as to all countries in the Territory and all Licensed Compounds and Licensed Products.

(i) Survival. The following provisions shall survive termination or expiration of this Agreement, as well as any other provision which by its terms or by the context thereof, is intended to survive such termination: Article 1 (as applicable), Article 5 (with respect to obligations arising prior to expiration or termination of this Agreement), Article 8 (with respect to obligations arising prior to expiration or termination of this Agreement), Section 9.4, Section 9.5, Section 10.1, 10.4.4 (with respect to an action, suit or proceeding commenced prior to termination), Section 10.7, Article 11, Article 12 (with respect to Losses and Claims arising from activities and breaches that take place prior to expiration or termination of this Agreement), this Section 13.6(i), Section 13.7, Article 14 and Article 15. Termination or expiration of this Agreement shall not relieve the Parties of any liability or obligation which accrued hereunder prior to the effective date of such termination or expiration nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity, subject to Article 14, with respect to any breach of this Agreement nor prejudice either Party's right to obtain performance of any obligation. All other obligations shall terminate upon expiration of this Agreement.

13.7 Bankruptcy. The Parties agree that in the event a Party becomes a debtor under Title 11 of the U.S. Code ("Title 11"), this Agreement shall be deemed to be, for purposes of Section 365(n) of Title 11, a license to rights to "intellectual property" as defined therein. Each Party as a licensee hereunder shall have the rights and elections as specified in Title 11. Any agreements supplemental hereto shall be deemed to be "agreements supplementary to" this Agreement for purposes of Section 365(n) of Title 11.

## ARTICLE 14.
## DISPUTE RESOLUTION; ARBITRATION

14.1 Dispute Resolution. The Parties agree that the procedures set forth in this Section 14.1 shall be the exclusive mechanism for resolving any bona fide disputes, controversies or claims (collectively, "Disputes") between the Parties that arise from time to time pursuant to this Agreement relating to any Party's rights and/or obligations hereunder that cannot be resolved through good faith negotiation between the Parties.

14.2 Executive Mediation. Any Dispute shall first be referred to an Executive from each Party for attempted resolution by good faith negotiations. Any such Dispute shall be submitted to such Executives no later than [***]*** days following such request by either Party.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Such Executives shall attempt in good faith to resolve any such Dispute within [***] days after submission of the Dispute. In the event the Executives are unable to resolve the Dispute, the Parties shall otherwise negotiate in good faith and use reasonable efforts to settle.

14.3 Arbitration.

14.3.1 If the Parties are not able to fully settle a Dispute pursuant to Section 14.2 above, and a Party wishes to pursue the matter, each such Dispute that is not an Excluded Claim or subject to expedited arbitration in accordance with Section 14.4 below, shall be finally resolved by binding arbitration in accordance with the Commercial Arbitration Rules and Supplementary Procedures for Large Complex Disputes of the American Arbitration Association ("AAA"), and judgment on the arbitration award may be entered in any court having jurisdiction thereof; provided, however, that the Federal Rules of Evidence shall apply with regard to the admissibility of evidence in such hearing.

14.3.2 The arbitration shall be conducted by a panel of three persons experienced in the pre-clinical and clinical stage pharmaceutical business. Within [***] days after initiation of arbitration, each Party shall select one person to act as arbitrator and the two Party-selected arbitrators shall select a third arbitrator within [***]*** days of their appointment. If the arbitrators selected by the Parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be appointed by the AAA. In any case the arbitrator shall not be an Affiliate, employee, consultant, officer, director or stockholder of either Party, or otherwise have any current or previous relationship with either Party or their respective Affiliates. The Parties shall have the right to be represented by counsel. The place of arbitration shall be New York, NY. All proceedings and communications shall be in English.

14.3.3 Either Party may apply to the arbitrators for interim injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either Party also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any injunctive or provisional relief necessary to protect the rights or property of that Party pending the arbitration award. The arbitrators shall have no authority to award punitive or any other type of damages not measured by a Party's compensatory damages. Each Party shall bear its own costs and expenses and attorneys' fees and an equal share of the arbitrators' fees and any administrative fees of arbitration.

14.3.4 Except to the extent necessary to confirm an award or as may be required by Law, neither a Party nor an arbitrator may disclose the existence, content, or results of an arbitration without the prior written consent of both Parties. In no event shall an arbitration be initiated after the date when commencement of a legal or equitable proceeding based on the dispute, controversy or claim would be barred by the applicable New York statute of limitations.

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

14.3.5 The arbitrators shall use their commercially reasonable efforts to rule on each disputed issue within days after completion of the hearing described in Section 14.3. The determination of the arbitrators as to the resolution of any dispute shall be binding and conclusive upon all Parties. All rulings of the arbitrator shall be in writing and shall be delivered to the Parties except to the extent that the Commercial Arbitration Rules of the AAA provide otherwise. Nothing contained herein shall be construed to permit the arbitrator to award punitive, exemplary or any similar damages.

14.3.6 The (i) attorneys' fees of the Parties in any arbitration, (ii) fees of the arbitrator and (iii) costs and expenses of the arbitration shall be borne by the Parties in a proportion determined by the arbitrator.

14.3.7 For all Excluded Claims, the Parties hereby submit to the exclusive jurisdiction of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York. For clarity, each party may seek injunctive or other equitable relief for Excluded Claims in accordance with this Section 14.3.7. Each Party agrees that service of any process, summons, notice or document by personal delivery, by registered mail, or by a recognized international express delivery service to such Party's respective address set forth in Section 15.2 shall be effective service of process for any action, suit or proceeding in the district court or state court with respect to any matters to which it has submitted to jurisdiction in this Section 14.3.7. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the district court or state court, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each Party hereto also hereby waives to the fullest extent permitted by applicable Laws, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each Party hereto (i) certifies that no representative, agent or attorney of the other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce that foregoing waiver and (ii) acknowledges that it and the other Party hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 14.3.7.

14.4 Expedited Arbitration. The Parties agree that it is important to be able to clarify any disputes regarding **[***]***** quickly. Accordingly, if: (i) Ligand **[***]**; (ii) **[***]**; or (iii) **[***]**; then the Parties shall resolve such dispute in accordance with this Section 14.4. Arbitration under this Section 14.4 shall be conducted in the same manner and subject to the same terms and conditions as arbitration under Section 14.3, provided that: (i) the Parties shall designate in writing a single arbitrator within fifteen (15) days of written notice of the dispute; (ii) the arbitrator and the Parties shall meet, and each Party shall provide to the arbitrator a written summary of all disputed issues, such Party's position on such disputed issues and such

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Party's proposed ruling on the merits of each such issue within fifteen (15) days after the designation of the arbitrator; (iii) the arbitrator shall use his or her commercially reasonable efforts to rule on each disputed issue within fifteen (15) days after completion of the hearing described in Section 14.3; (d) the arbitrator shall select one of the requested positions as his decision, and shall not have the authority to render any substantive decision other than to so select the position of either Ligand or Retrophin; and (e) the Parties shall use good faith efforts to complete any expedited arbitration pursuant to this Section 14.4 promptly.

## ARTICLE 15.
### MISCELLANEOUS

15.1 <u>Severability</u>. If any one or more of the provisions of this Agreement is held to be invalid or unenforceable, the provision shall be considered severed from this Agreement and shall not serve to invalidate any remaining provisions hereof. The Parties shall make a good faith effort to replace any invalid or unenforceable provision with a valid and enforceable one such that the objectives contemplated by the Parties when entering this Agreement may be realized.

15.2 <u>Notices</u>. Any notice required or permitted to be given by this Agreement shall be in writing and shall be delivered by hand or overnight courier with tracking capabilities or mailed postage prepaid by first class, registered or certified mail addressed as set forth below unless changed by notice so given:

       If to Ligand:

       Ligand Pharmaceuticals Incorporated
       11085 North Torrey Pines Road, Suite 300
       La Jolla, CA 92037
       Attention: General Counsel

       With a copy to (which shall not constitute notice hereunder):

       Latham & Watkins LLP
       12636 High Bluff Drive, Suite 400
       San Diego, CA 92130
       Attention: Faye H. Russell, Esq.

       If to Retrophin:

       Retrophin LLC
       330 Madison Avenue, 6th Floor
       New York, NY 10017
       Attention: Martin Shkreli

       With a copy to (which shall not constitute notice hereunder):

       Katten Muchin Rosenman LLP

42

575 Madison Avenue
New York, NY 10022
Attention: Evan L. Greebel, Esq.

Any such notice shall be deemed given on the date received. A Party may add, delete, or change the person or address to whom notices should be sent at any time upon written notice delivered to the Party's notices in accordance with this Section 15.2.

15.3 <u>Force Majeure</u>. Neither Party shall be liable for delay or failure in the performance of any of its obligations hereunder (including, without limitation Sections 6.1.2 and 6.1.3 of this Agreement) if such delay or failure is due to causes beyond its reasonable control, including acts of God, fires, earthquakes, strikes and labor disputes, acts of war, terrorism, civil unrest or intervention of any governmental authority ("<u>Force Majeure</u>"); *provided, however*, that the affected Party promptly notifies the other Party and further provided that the affected Party shall use its commercially reasonable efforts to avoid or remove such causes of non-performance and to mitigate the effect of such occurrence and shall continue performance with the utmost dispatch whenever such causes are removed. When such circumstances arise, the Parties shall negotiate in good faith any modifications of the terms of this Agreement that may be necessary or appropriate in order to arrive at an equitable solution.

15.4 <u>Assignment</u>.

15.4.1 Ligand may, without Retrophin's consent, assign or transfer all of its rights and obligations hereunder, in connection with any transfer of all of the Patent Rights and Know-How, to any Affiliate of Ligand or to any Third Party (including a successor in interest); *provided, however*, that such assignee or transferee agrees in writing to be bound by the terms of this Agreement.

15.4.2 Retrophin may assign or transfer all of its rights and obligations hereunder without consent to an Affiliate of Retrophin or to a successor in interest by reason of merger, consolidation or sale of all or substantially all of the assets of Retrophin; *provided however*, that (i) Retrophin's rights and obligations under this Agreement shall be assumed by its successor in interest and shall not be transferred separate from all or substantially all of its other business assets, (ii) such assignment includes all Approvals and all rights and obligations under this Agreement, (iii) such successor in interest or Affiliate shall have agreed prior to such assignment or transfer to be bound by the terms of this Agreement in writing and (iv) where this Agreement is assigned or transferred to an Affiliate, Retrophin remains responsible for the performance of this Agreement.

15.4.3 Subject to the foregoing, this Agreement shall inure to the benefit of and be binding on the Parties' successors and assigns. Any assignment or transfer in violation of the foregoing shall be null and void and wholly invalid, the assignee or transferee in any such assignment or transfer shall acquire no rights whatsoever, and the non-assigning non-transferring Party shall not recognize, nor shall it be required to recognize, such assignment or transfer.

43

15.5 <u>Further Assurances</u>. Each Party agrees to do and perform all such further acts and things and shall execute and deliver such other agreements, certificates, instruments and documents necessary or that the other Party may deem advisable in order to carry out the intent and accomplish the purposes of this Agreement and to evidence, perfect or otherwise confirm its rights hereunder.

15.6 <u>Waivers and Modifications</u>. The failure of any Party to insist on the performance of any obligation hereunder shall not be deemed to be a waiver of such obligation. Waiver of any breach of any provision hereof shall not be deemed to be a waiver of any other breach of such provision or any other provision on such occasion or any succeeding occasion. No waiver, modification, release or amendment of any obligation under or provision of this Agreement shall be valid or effective unless in writing and signed by all Parties hereto.

15.7 <u>Choice of Law</u>. This Agreement shall be governed by, enforced, and shall be construed in accordance with the laws of the State of New York without regard to its conflicts of law provisions.

15.8 <u>Publicity</u>. The Parties agree to issue a press release regarding the execution of this Agreement, in a form to be mutually agreed upon by the Parties. Subject to the provisions of Sections 11.2, 11.4 and 11.5, each Party agrees not to issue any other press release or public statement disclosing the existence of this Agreement or any other information relating to this Agreement, the other Party, or the transactions contemplated hereby without the prior written consent of the other Party; *provided*, *however*, that any disclosure which is required by applicable Laws or the rules of a securities exchange, as reasonably advised by the disclosing Party's counsel, may be made subject to the following. The Parties agree that any such required disclosure will not contain confidential business or technical information and, if disclosure of confidential business or technical information is required by applicable Laws, the Parties will use appropriate diligent efforts to minimize such disclosure and obtain confidential treatment for any such information which is disclosed to a governmental agency. Each Party agrees to provide to the other Party a copy of any public announcement regarding this Agreement or the subject matter thereof as soon as reasonably practicable under the circumstances prior to its scheduled release. Except under extraordinary circumstances, or as otherwise required under applicable Laws or the rules of a securities exchange, each Party shall provide the other with an advance copy of any such announcement at least forty eight (48) hours prior to its scheduled release. Each Party shall have the right to expeditiously review and recommend changes to any such announcement and, except as otherwise required by applicable Laws or the rules of a securities exchange, the Party whose announcement has been reviewed shall remove any Confidential Information of the reviewing Party that the reviewing Party reasonably deems to be inappropriate for disclosure. The contents of any announcement or similar publicity which has been reviewed and approved by the reviewing Party can be re-released by either Party without a requirement for re-approval. Nothing in this Section 15.8 shall be construed to prohibit Retrophin or its Affiliates or Sublicensees from making a public announcement or disclosure regarding the stage of development of Licensed Products in Retrophin's (or its Affiliates' or Sublicensees') product pipeline or disclosing clinical trial results regarding such Licensed Products, as may be required by applicable Laws or the rules of a securities exchange, as reasonably advised by Retrophin's (or its Affiliates' or Sublicensees') counsel.

44

15.9 <u>Relationship of the Parties</u>. Each Party is an independent contractor under this Agreement. Nothing contained herein is intended or is to be construed so as to constitute Ligand and Retrophin as partners, agents or joint venturers. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any Third Party.

15.10 <u>Headings</u>. Headings and captions are for convenience only and are not be used in the interpretation of this Agreement.

15.11 <u>Entire Agreement</u>. This Agreement (including all Appendices attached hereto, which are incorporated herein by reference) (i) sets forth all of the covenants, promises, agreements, warranties, representations, conditions and understandings between the Parties hereto, (ii) constitutes and contains the complete, final and exclusive understanding and agreement of the Parties with respect to the subject matter herein and (iii) cancels, supersedes and terminates all prior agreements and understanding between the Parties with respect to the subject matter hereof. For the avoidance of doubt, the confidentiality agreement entered into by Ligand and Retrophin effective as of December 11, 2011 (the "Confidentiality Agreement") shall remain in effect with respect to all Confidential Information (as that term is defined in the Confidentiality Agreement) disclosed by the Parties that does not pertain to the subject matter of this Agreement. All Confidential Information (as that term is defined in the Confidentiality Agreement) pertaining to the subject matter of this Agreement disclosed to Ligand by Retrophin under the Confidentiality Agreement shall be considered Confidential Information (as that term is defined in this Agreement) of Retrophin disclosed under this Agreement and shall be subject to the terms and conditions of this Agreement; and all Confidential Information (as that term is defined in the Confidentiality Agreement) pertaining to the subject matter of this Agreement disclosed to Retrophin by Ligand under the Confidentiality Agreement shall be considered Confidential Information (as that term is defined in this Agreement) of Ligand disclosed under this Agreement and shall be subject to the terms and conditions of this Agreement. There are no covenants, promises, agreements, warranties, representations, conditions or understandings, whether oral or written, between the Parties other than as set forth herein. No subsequent alteration, amendment, change or addition to this Agreement shall be binding upon the Parties hereto unless reduced to writing and signed by the respective authorized officers of the Parties.

15.12 <u>Counterparts</u>. This Agreement may be executed in counter-parts with the same effect as if both Parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument.

15.13 <u>Exports</u>. Retrophin agrees not to export or re-export, directly or indirectly, any information, technical data, the direct product of such data, samples or equipment received or generated under this Agreement in violation of any applicable export control Laws.

15.14 <u>Interpretation</u>.

15.14.1 Each of the Parties acknowledges and agrees that this Agreement has been diligently reviewed by and negotiated by and between them, that in such negotiations each of them has been represented by competent counsel and that the final agreement contained

45

herein, including the language whereby it has been expressed, represents the joint efforts of the Parties hereto and their counsel. Accordingly, in interpreting this Agreement or any provision hereof, no presumption shall apply against any Party hereto as being responsible for the wording or drafting of this Agreement or any such provision, and ambiguities, if any, in this Agreement shall not be construed against any Party, irrespective of which Party may be deemed to have authored the ambiguous provision.

15.14.2 The definitions of the terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "any" shall mean "any and all" unless otherwise clearly indicated by context.

15.14.3 Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein), (b) any reference to any Laws herein shall be construed as referring to such Laws as from time to time enacted, repealed or amended, (c) any reference herein to any person shall be construed to include the person's successors and assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (e) all references herein to Articles, Sections or Appendices, unless otherwise specifically provided, shall be construed to refer to Articles, Sections and Appendices of this Agreement.

* * *

[signature page follows]

46

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first set forth above.

| **LIGAND PHARMACEUTICALS INCORPORATED** ("Ligand") | **RETROPHIN, LLC** ("Retrophin") |
|---|---|
| By: /s/ Charles Berkman | By: /s/ Martin Shkreli |
| Name: Charles Berkman | Name: Martin Shkreli |
| Title: Vice President, General Counsel and Secretary | Title: Chief Executive Officer |

47

**Appendix 1**
**Core Patent Rights**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***]*** | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | | [***] | [***] | | [***] | [***] | |

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***] | [***] | | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***]*** | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | | | |
| [***] | [***] | [***] | [***] | [***] | | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***] | [***] | [***] | [***] | [***] | | | [***] | |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***] | [***] | [***] | [***] | [***] | [***] | | | |
| [***] | [***] | [***] | [***] | | | | | |
| [***] | [***] | | [***] | [***] | | | | |
| [***] | [***] | [***] | [***] | [***] | | | | |
| [***] | [***] | [***] | [***] | [***] | [***] | | | |

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

**Appendix 2**

**Active Compound**

"Active Compound" means a compound that [***]***.

"[***]" means [***].

"[***]" means the [***].

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

## Appendix 3

## Development Plan

(attached hereto)

51

**[***]*****

**[***]**

**[***]**

**[***]**

**[***]**

**[***]**

**[***]**

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

**[***]*** – EIGHT PAGES REDACTED**

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

**Appendix 4**
**Listed Compounds**

**[***]*****

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

EX-99.1 4 e610298_ex99-1.htm

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**

**INDEX TO FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Independent Accountants' Report | 2 |
| Financial Statements | |
| Consolidated Balance Sheets at September 30, 2012 (unaudited) and December 31, 2011 | 3 |
| Consolidated Statements of Operations for the period from March 11, 2011 (inception) through December 31, 2011, for the nine months ended September 30, 2012 (unaudited), for the period from March 11, 2011 (inception) through September 30, 2011 (unaudited), and for the period from March 11, 2011 (inception) through September 30, 2012 (unaudited). | 4 |
| Consolidated Statement of Stockholders' Deficit for the period from March 11, 2011 (inception) to December 31, 2011 and for the nine months ended September 30, 2012 (unaudited). | 5 |
| Consolidated Statements of Cash Flows for the period from March 11, 2011 (inception) through December 31, 2011, for the nine months ended September 30, 2012 (unaudited), for the period from March 11, 2011 (inception) through September 30, 2011(unauditied) for the period from March 11, 2011 (inception) through September 30, 2012 (unaudited). | 6 |
| Notes to Consolidated Financial Statements | 7-17 |

1

## INDEPENDENT ACCOUNTANTS' REPORT

To the Stockholders of
**Retrophin, LLC**

We have audited the accompanying balance sheet of Retrophin, Inc. (a development stage company) (the "Company") as of December 31, 2011 and the related statements of operations, changes in stockholder's deficiency and cash flows for the period from March 11, 2011 (inception) through December 31, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted accounting standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Retrophin, Inc (a development stage company) as of December 31, 2011, and the results of its operations and its cash flows for the period from March 11, 2011 (inception) through December 31, 2011, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company is a development stage enterprise with no revenues, historical losses and limited capital resources. The Company, as a development stage enterprise, is subject to risks and uncertainties as to whether it will be able to raise capital and commence its planned operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans regarding these matters also are described in Note 1. The financial statements do not include any adjustments relating to the recovery of assets or classification of liabilities might be necessary should the Company be unable to continue as a going concern.

/s/ Marcum LLP

New York, NY
December 18, 2012

2

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**CONSOLIDATED BALANCE SHEET**

|  | September 30, 2012 (unaudited) | December 31, 2011 |
|---|---:|---:|
| **Assets** | | |
| Current assets | | |
| Cash | $ 2,189 | $ 10,053 |
| Due from related parties | 3,300 | - |
| Prepaid expenses | 30,431 | - |
| Other current assets | 15,781 | 7,000 |
| Total current assets | 51,701 | 17,053 |
| | | |
| Property and equipment, net | 9,037 | 2,517 |
| Technology license, net | 2,386,952 | - |
| Total assets | $ 2,447,690 | $ 19,570 |
| | | |
| **Liabilities and Stockholders' Deficit** | | |
| | | |
| Liabilities | | |
| Technology license liability | $ 1,300,000 | $ - |
| Accounts payable | 368,488 | 340,134 |
| Accrued compensation | 525,372 | 169,721 |
| Accrued expenses | 230,452 | - |
| Accrued interest | 60,794 | - |
| Due to related parties | 16,500 | 46,000 |
| Notes payable - related parties | 914,764 | - |
| Total liabilities | 3,416,370 | 555,855 |
| | | |
| Stockholders' Deficit | | |
| Preferred stock $0.001 par value; 3,000,000 shares authorized, currently designated in the following class: | | |
| Series A 700,000 authorized; 127,041 and 41,500 issued and outstanding at September 30, 2012 and December 31, 2011, respectively (aggregate liquidation value of $7,338,320 and $1,660,000, respectively) | 127 | 41 |
| Common stock $0.001 par value; 8,000,000 authorized; 754,576 and 429,875 issued and outstanding at September 30, 2012 and December 31, 2011, respectively | 754 | 430 |
| Additional paid in capital | 19,545,693 | 2,766,500 |
| Receivables due from stockholder | (434,329) | (35,000) |
| Deficit accumulated during the development stage | (20,080,925) | (3,268,256) |
| Total stockholders' deficit | (968,680) | (536,285) |
| Total liabilities and stockholders' deficit | $ 2,447,690 | $ 19,570 |

*The accompanying notes are an integral part of these consolidated financial statements.*

3

**RETROPHIN, INC.**
*(A DEVELOPMENT STAGE COMPANY)*
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the period March 11, 2011 (inception) through December 31, 2011 | For the nine months ended September 30, 2012 (unaudited) | For the period from March 11, 2011 (inception) through September 30, 2011 (unaudited) | For the period from March 11, 2011 (inception) through September 30, 2012 (unaudited) |
|---|---|---|---|---|
| Operating expenses | | | | |
| Compensation and related costs - inclusive of share based compensation $1,724,967, $7,724,150, $1,155,533, and $9,449,117 | $ 2,227,203 | $ 8,371,481 | $ 1,602,937 | $ 10,598,684 |
| Professional fees - inclusive of share based compensation $254,332, $6,290,252, $127,333 and $6,544,584 | 909,681 | 8,048,788 | 547,270 | 8,958,469 |
| Selling, general and administrative | 63,812 | 274,622 | 45,375 | 338,434 |
| Rent expense | 63,000 | 63,000 | 49,000 | 126,000 |
| Total operating expenses | 3,263,696 | 16,757,891 | 2,244,582 | 20,021,587 |
| | | | | |
| Other income (expense) | | | | |
| Interest income | 75 | 15,781 | 75 | 15,856 |
| Loss on foreign exchange transactions | (4,635) | - | (4,635) | (4,635) |
| Interest expense | - | (70,559) | - | (70,559) |
| Total other expense | (4,560) | (54,778) | (4,560) | (59,338) |
| | | | | |
| Net loss | $ (3,268,256) | $ (16,812,669) | $ (2,249,142) | $ (20,080,925) |

*The accompanying notes are an integral part of these consolidated financial statements.*

4

# RETROPHIN, INC.
## (A DEVELOPMENT STAGE COMPANY)
## CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' DEFICIT

| | Series A Preferred Stock | | Common Stock | | Additional paid-in capital | Receivables due from stockholder | Accumulated (Deficit) | Total Stockholder's (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance - March 11, 2011 (inception) | - | $ - | - | $ - | $ - | $ - | $ - | $ - |
| Issuance of common shares ($.08 per share) | - | - | 321,660 | 322 | 24,678 | (25,000) | | - |
| Issuance of common shares to founders in connection with the initial capital contribution ($.01 per share) | - | - | 10,000 | 10 | 90 | - | - | 100 |
| Share based compensation - employees | - | - | 90,848 | 90 | 1,815,877 | - | - | 1,815,967 |
| Share based compensation - non employees | - | - | 8,167 | 8 | 163,324 | - | - | 163,332 |
| Issuance of shares in connection with March 2011 private placement, net of fees of $66,061 ($20 per share) | - | - | 36,250 | 36 | 658,903 | - | - | 658,939 |
| Exchange of Series A preferred for common shares | 36,250 | 36 | (36,250) | (36) | - | - | - | - |
| Issuance of Series A preferred in connection with March 2011 private placement, net of fees of $1,367 ($20 per share) | 5,250 | 5 | - | - | 103,628 | - | - | 103,633 |
| Loan made to stockholder | - | - | - | - | - | (10,000) | | (10,000) |
| Net loss | - | - | - | - | - | - | (3,268,256) | (3,268,256) |
| Balance - December 31, 2011 (audited) | 41,500 | $ 41 | 429,875 | $ 430 | $ 2,766,500 | $ (35,000) | $ (3,268,256) | $ (536,285) |
| Issuance of Series A preferred in connection with January 2012 private placement, net of fees of $60,442 ($40 per share) | 46,709 | 47 | - | - | 1,806,629 | - | - | 1,806,676 |
| Issuance of Series A preferred in connection with May 2012 private placement, net of fees of $12,275 ($25 per share) | 38,832 | 39 | - | - | 958,486 | - | - | 958,525 |
| Share issued to consultants by founder for services | - | - | - | - | 4,400,000 | - | - | 4,400,000 |
| Share based compensation - employees | - | - | 293,108 | 293 | 7,723,857 | - | - | 7,790,150 |
| Share based compensation - non employees | - | - | 31,593 | 31 | 1,890,221 | - | - | 1,890,252 |
| Loans made to stockholder | - | - | - | - | - | (399,329) | | (399,329) |
| Net loss | - | - | - | - | - | - | (16,812,669) | (16,812,669) |
| Balance - September 30, 2012 (unaudited) | 127,041 | $ 127 | 754,576 | $ 754 | $ 19,545,693 | $ (434,329) | $ (20,080,925) | $ (968,680) |

*The accompanying notes are an integral part of these consolidated financial statements.*

5

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

| | For the period from March 11, 2011 (inception) through December 31, 2011 | For the nine months ended September 30, 2012 (unaudited) | For the period from March 11, 2011 (inception) through September 31, 2011 | For the period from March 11, 2011 (inception) through September 30, 2012 (unaudited) |
|---|---|---|---|---|
| **Cash Flows From Operating Activities** | | | | |
| Net loss | $ (3,268,256) | $ (16,812,669) | $ (2,249,142) | $ (20,080,925) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | - |
| Depreciation and amortization | 355 | 73,417 | 156 | 73,772 |
| Share based compensation - employees | 1,724,967 | 7,724,150 | 1,155,533 | 9,449,117 |
| Share based compensation - non-employees | 254,322 | 6,290,252 | 127,333 | 6,544,584 |
| **Changes in operating assets and liabilities** | | | | |
| Prepaid license expense | - | (30,431) | - | (30,431) |
| Other assets | (7,000) | (8,781) | - | (15,781) |
| Accounts payable | 340,134 | 28,354 | 219,501 | 368,488 |
| Accrued expenses | 169,721 | 646,897 | 65,851 | 816,618 |
| Net cash (used) in operating activities | (785,747) | (2,088,811) | (680,768) | (2,874,558) |
| | | | | |
| **Cash Flows From Investing Activities** | | | | |
| Purchase of fixed assets | (2,872) | (8,471) | (2,186) | (11,343) |
| Purchase of intangible assets | - | (1,158,418) | - | (1,158,418) |
| Due from related parties | - | (2,800) | (9,000) | (2,800) |
| Loans made to stockholder | (10,000) | (399,329) | - | (409,329) |
| Net cash (used) in investing activities | (12,872) | (1,569,018) | (11,186) | (1,581,890) |
| | | | | |
| **Cash Flows From Financing Activities** | | | | |
| Proceeds from advances from related parties | 46,000 | - | - | 46,000 |
| Repayment of advances receivable from related parties | - | (30,000) | - | (30,000) |
| Proceeds from note payable - related party | - | 930,000 | - | 930,000 |
| Repayment of note payable - related party | - | (15,236) | - | (15,236) |
| Proceeds received from issuances of preferred stock, net | 762,572 | 2,765,201 | 708,306 | 3,527,773 |
| Proceeds received from issuances of common stock | 100 | - | 100 | 100 |
| Net cash provided in financing activities | 808,672 | 3,649,965 | 708,406 | 4,458,637 |
| | | | | |
| Net decrease in cash | 10,053 | (7,864) | 16,452 | 2,189 |
| Cash, beginning of period | - | 10,053 | - | - |
| | | | | |
| Cash, end of period | $ 10,053 | $ 2,189 | $ 16,452 | $ 2,189 |
| | | | | |
| Supplemental Disclosure of Cash Flow Information | | | | |
| Cash paid for interest | $ - | $ 9,764 | $ - | $ 9,764 |
| Issuance of common stock for subscription receivable | $ 25,000 | $ - | $ 25,000 | $ 25,000 |
| Reclassification of due from related parties | $ - | $ 500 | $ - | $ 500 |
| Technology license liability | $ - | $ 1,300,000 | $ - | $ 1,300,000 |

*The accompanying notes are an integral part of these consolidated financial statements.*

6

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

## NOTE 1.  DESCRIPTION OF BUSINESS AND LIQUIDITY MATTERS

*Business*

Retrophin, Inc. (the "Company") (previously Retrophin, LLC) is an emerging biotechnology company dedicated to developing drugs for rare and life-threatening diseases. The Company's primary business objective is to develop and commercialize therapies for orphan diseases, such as Duchenne muscular dystrophy, or DMD.  The Company is considered to be a development stage company and, as such, the Company's financial statements are prepared in accordance with the Accounting Standards Codification ("ASC") 915 "Development Stage Entities." The Company is subject to all of the risks associated with development stage companies.

The Company was organized as a Delaware limited liability company, Retrophin, LLC, on March 11, 2011 ("Inception"). On September 20, 2012, the Company filed a Certificate of Conversion to change its legal form of organization from a limited liability company to a corporation in the State of Delaware. This conversion (as more fully described in Note 5) is considered a recapitalization of the equity structure of the Company. The financial statements have been presented to retroactively reflect this change as if it had occurred at the inception of the Company.

On September 13, 2012, the Company formed a new entity, Retrophin Pharmaceutical, Inc., a Delaware corporation and a wholly-owned subsidiary of Retrophin, Inc.

The Company has no significant operating history and from March 11, 2011 ("inception") to September 30, 2012, the Company has generated no revenues.

*Liquidity and Financial Condition and Management's Plans*

The Company incurred a net loss of approximately $20.1 million for the period from March 11, 2011 (inception) to September 30, 2012.  At September 30, 2012 and December 31, 2011, the Company had $2,189 and $10,053, respectively, of cash and working capital deficiency of approximately $3,365,000 and $539,000, respectively. The Company's accumulated deficit amounted to approximately $20,080,925 and $3,268,000 at September 30, 2012 and December 31, 2011, respectively.

The Company has principally financed its operations from inception using proceeds from sales of its equity securities in a series of private placement transactions (see Note 6). The Company to date has no revenues, significantly limited capital resources and is subject to all of the risks and uncertainties that are typical of a development stage enterprise. Significant uncertainties include, among others, whether it will be able to raise the capital it needs to finance the start of its planned operations and whether such operations, if launched, will enable the Company to become a profitable enterprise.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. These financial statements do not include any adjustments relating to the recovery of assets or the classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

Management believes the Company's ability to continue its operations depend on its ability to raise capital.  The Company entered into a licensing agreement providing it with the use of certain patented technology.  The Company is currently developing pre-clinical and clinical studies of potential drug candidates to be derived from these technologies.  The licensing agreement described in Note 3 also enables the Company to sell the licensed technology as a research product or sublicense the technology to other third parties in addition to, or as alternative sources of revenue to its own product development efforts.  The Company's future depends on the costs, timing, and outcome of regulatory reviews of its product candidates and the costs of commercialization activities, including product marketing, sales and distribution.  The Company expects to finance its needs for liquidity through private equity offerings and debt financings, corporate collaboration and licensing arrangements and grants from patient advocacy groups, foundations and government agencies. Although management believes that the Company has access to capital resources, there are no commitments for financing in place at this time, nor can management provide any assurance that such financing will be available on commercially acceptable terms, if at all.

## NOTE 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

A summary of the significant accounting policies applied in the preparation of the accompanying unaudited financial statements follows:

*Principles of Consolidation*

---

7

---

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

The consolidated financial statements represent the consolidation of the accounts of the Company and its subsidiaries in conformity with U.S. GAAP. All intercompany accounts and transactions have been eliminated in consolidation. Investments in unconsolidated companies (generally 20 to 50 percent ownership), in which the Company has the ability to exercise significant influence, but neither has a controlling interest nor is the primary beneficiary, are accounted for under the equity method. Investments in entities in which the Company does not have the ability to exercise significant influence are accounted for under the cost method. Under certain criteria indicated in Financial Accounting Standards Board ("FASB")—Accounting Standards Codification ("ASC") Topic 810—*Consolidation*, a partially-owned affiliate would be consolidated when it has less than a 50% ownership if the Company was the primary beneficiary of that entity. At the present time, the Company has no interests in variable interest entities.

*Unaudited Interim Results*

The accompanying unaudited condensed consolidated financial statements as of September 30, 2012 and for the nine month period then ended and for the period of March 11, 2011 (inception) through September 30, 2011 have been prepared in accordance with U.S. GAAP for interim financial information. In the opinion of management, all adjustments (consisting of normal accruals) considered for a fair presentation have been included in the unaudited interim financial statements. Operating results for the nine months ended September 30, 2012 are not necessarily indicative of the results that may be expected for the year ended December 31, 2012. The interim financial statements should be read in conjunction with the Company's audited financial statements for the period March 11, 2011 (inception) through December 31, 2011 included herein.

*Cash and Cash Equivalents*

For purposes of the statement of cash flows, the Company considers cash instruments with maturities of less than three months when purchased to be cash equivalents.  There are no cash equivalents as of the balance sheet date.

*Property and Equipment*

Property and equipment are stated at cost.  Depreciation is provided for using the straight-line method over the estimated useful life of the assets.  At September 30, 2012 and December 31, 2011, property and equipment consisted of computers with an estimated useful life of three years and leasehold improvements with an estimated life of four years.

*Employee Stock-Based Compensation*

The Company accounts for stock-based compensation in accordance with ASC 718 Compensation — Stock Compensation ("ASC 718"). ASC 718 addresses all forms of share-based payment ("SBP") awards including units issued under employee unit purchase plans and stock incentive units. Under ASC 718 awards result in a cost that is measured at fair value on the awards' grant date, based on the estimated number of awards that are expected to vest and will result in a charge to operations.

*Non-Employee Stock-Based Compensation*

The Company accounts for equity instruments issued to non-employees in accordance with the provisions of ASC 505, Share Based Payments to Non-Employees, and ASC 718 which requires that such equity instruments are recorded at their fair value on the measurement date. The measurement of stock-based compensation is subject to periodic adjustment as the underlying equity instruments vest. Non-employee stock-based compensation charges are being amortized over their respective contractual vesting periods.

*Income Taxes*

The Company accounts for income taxes under ASC 740 Income Taxes ("ASC 740"). ASC 740 requires the recognition of deferred tax assets and liabilities for both the expected impact of differences between the financial statements and tax basis of assets and liabilities and for the expected future tax benefit to be derived from tax loss and tax credit carry forwards. ASC 740 additionally requires a valuation allowance to be established when it is more likely than not that all or a portion of deferred tax assets will not be realized.

8

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

ASC 740 also clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements and prescribes a recognition threshold and measurement process for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. ASC 740 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. Based on the Company's evaluation, it has been concluded that there are no significant uncertain tax positions requiring recognition in the Company's unaudited financial statements. Since the Company was incorporated on March 11, 2011, all of its years of operations will be subject to examination. The Company believes that its income tax positions and deductions would be sustained on audit and does not anticipate any adjustments that would result in a material changes to its financial position.

The Company's policy for recording interest and penalties associated with audits is to record such expense as a component of income tax expense. There were no amounts accrued for penalties or interest as of or during the period from March 11, 2011 (inception) through September 30, 2012. Management is currently unaware of any issues under review that could result in significant payments, accruals or material deviations from its position.

Prior to conversion into a corporation on September 20, 2012, as a limited liability company, the Company is treated as a partnership for Federal and state income tax purposes. Accordingly, no provision has been made for Federal and state income taxes in the accompanying financial statements, since all items of income or loss are required to be reported on the income tax returns of the members, who are responsible for any taxes thereon. Profits and losses are allocated based upon capital in accordance with the permissible methods under Internal Revenue Code Section 706.

The Company is subject to the New York City Unincorporated Business Tax through September 19, 2012. Subsequent to Company's conversion to a corporation from a limited liability company on September 20, 2012, the Company will report and pay taxes based on its income or loss.

*Use of Estimates*

In preparing financial statements in conformity with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Foreign Currency Translation and Remeasurement*

Under ASC 830 Foreign Currency Matters, functional currency assets and liabilities are translated into the reporting currency, US Dollars, using period end rates of exchange and the related translation adjustments are recorded as a separate component of accumulated other comprehensive income. Functional statements of operations amounts expressed in functional currencies are translated using average exchange rates for the respective periods. Remeasurement adjustments and gains or losses resulting from foreign currency transactions are recorded as foreign exchange gains or losses in the unaudited statement of operations.

*Research and Development Costs:*

Research and development costs are charged to operations as incurred and consist primarily of consulting services. For the nine months ended September 30, 2012, for the period from March 11, 2011 (inception) through September 30 , 2011,  for the period from March 11, 2011 (inception) through December 31, 2012 and for the period from March 11, 2011 (inception) through September 30, 2012, the Company incurred approximately $269,000, $238,000, $353,000, and $622,000, respectively, relating to research and development costs that are included in professional fees in the accompanying unaudited statement of operations.

*Recently Issued Accounting Pronouncements*

Management does not believe that any recently issued, but not yet effective accounting pronouncements, if adopted, would have a significant effect on the accompanying financial statements.

9

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

## NOTE 3.  LICENSE AGREEEMNT

On February 16, 2012 the Company entered into an agreement pursuant to which a biotech company ('the Sublicensor') with license rights to certain drug technologies agreed to grant us a worldwide sublicense for the development, manufacture and commercialization of RE-021 (DARA). The licensing agreement also enables the Company to sell the licensed technology as a research product or sublicense the technology to other third parties as potential sources of revenue. Under the license agreement, Sublicensor is obligated to transfer to the Company  certain information, records, regulatory filings, materials and inventory controlled by Sublicensor and relating to or useful for developing RE-021. The Company must use commercially reasonable efforts to develop and commercialize RE-021 in specified major market countries and other countries in which the Company believes it is commercially reasonable to develop and commercialize such products. The agreement shall continue until neither party has any obligations under the agreement to make payments to the other party.

In accordance with the agreement, the Company is obligated to make two equal non-refundable payments totaling $2,300,000, with the first payment due upon execution and the second payment by August 30, 2012. As of September 20, 2012, the Company has recognized $2,450,000 as a License Agreement which is presented in the accompanying consolidated balance sheet as an intangible and is being amortized on a straight line basis over the period from when the payments are due through the term of the License Agreement which is September 30, 2023. As of September 30, 2012 payments of $1,150,000 were made and the remaining balance which was due on September 30, 2012 was extended to December 21, 2012 by the Sublicensor with the condition that the payment was increased to $1,300,000. The Company has recorded the second payment obligation of $1,300,000 is presented as a liability in the accompanying consolidated balance sheet at September 30, 2012.  For the nine months ended September 30, 2012, the Company recognized amortization expense of the license related to this agreement totaling $71,466.

In addition, the Company is obligated to make series of milestone payments upon the achievement of each development milestone events set forth in the sublicense agreement which could amount to an aggregate of up to $104.4 million.  Milestone payments as they become due, will be recognized as license expense, pro-rata over the period through September 2023.

Per the sublicense agreement, starting from the first commercial sale of any licensed product (as defined in the agreement), the Company is obligated to pay the Sublicensor royalty payments equal to 15% of annual worldwide net sales of licensed product up to $300,000. For worldwide net sales of licensed product exceeding $300,000, a royalty percentage of 17% is applied. Royalties are payable on a quarterly basis, and are payable on a product-by-product and country-by country basis on the net sales of licensed products. Royalties terms will be in effect until the later of (i) ten years after the first commercial sale of any licensed product in such country or (ii) the expiration of any patent rights licensed under the license agreement (iii) the expiration of all periods of market exclusivity. Currently, the last to expire issued patent covered by such arrangement expires in September 2023; however, the Company expects such date may be extended by patent-term extensions. The sublicense agreement contains other customary clauses and terms as are common in similar agreements in the industry.

In the event the Company's Exit Transaction defined in the agreement as (i) sale of all or substantially all of the Company's assets or business or (ii) a merger, reorganization or consolidation involving the Company in which the stockholders or members of the Company immediately prior to such transaction cease to own collectively a majority of the voting equity securities or membership interests of a successor entity or (iii) a registered public offering of Company's common stock under the Securities Act of 1933 or (iv) a reverse merger of Company into an existing public company), the Company is obligated to pay the Sublicensor $1,500,000 no later than fifteen business days prior to the closing of the Exit Transaction. The Company has an option to issue capital stock in lieu of a cash payment to the Sublicensor. Should the Company choose to issue capital stocks, the number of shares of capital stock issue shall be equal to $1,500,000 divided by the per share price of the capital stock to be agreed upon between the Company and the Sublicensor on the date such election is made.

## NOTE 4.  NOTES PAYABLE

*Note Payable - related party*

On February 1, 2012, the Company entered into a secured promissory note with a related party in the amount of $900,000, with an interest rate of 12% per annum, compounded annually.  The note plus accrued unpaid interest shall become due i) on or prior to December 31, 2012 or ii) upon consummation of a Sale of the Company (a) acquire a majority of the outstanding equity securities or (b) all or substantially all of the Company's assets on a consolidated basis.

10

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

In addition, the Company has the right to repay a portion of the outstanding obligation without penalty or premium. The repayment amount shall be applied in the following order: (i) any expenses to be reimbursed to the related party, (ii) all unpaid interest through the date of repayment and (iii) against the principal amount. On March 5, 2012, an aggregate payment of $25,000 was made by the Company, of which $9,764 was applied to accrued interest and the remaining balance of $15,236 was applied to the principal balance. The remaining principle balance of this note amounts to $884,764 as of September 30, 2012.

*Note Payable - employee*

On September 30 2012, the Company received an advance of $30,000 from a related party in the form of a promissory note, with an interest rate of 15% per annum, compounded annually. The note expires on the earlier of i) December 31, 2012 or ii) upon a significant change in the Company's ownership (as defined in the promissory note). Payments of $35,000 plus any unpaid interest shall become due on the expiration date.

The accrued interest at September 31, 2012, and December 31, 2011 was $60,794, and $0, respectively.

Interest expense recognized for the nine months ended September 31, 2012, for the period from March 11, 2011 (inception) through September 30 , 2011, for the period from March 11, 2011 (inception) through December 31, 2011 and for the period from March 11, 2011 (inception) through September 30, 2012, and 2011 was $70,559, $0, $0 and $70,559, respectively.

**NOTE 5.   RELATED PARTY TRANSACTIONS**

During March 2011, the Company began subleasing office space from a company related through common ownership, see Note 6.

In October and November 2011, the Company was advanced $7,500, from a company related through common ownership. The advance is due on demand.

In November 2011, the Company was advanced $30,000 from a company related through common ownership. The advances were repaid in February 2012.

On December 8, 2011, the Company received advances of funds aggregating $8,500 from entities related through common ownership. The advances are due on demand. Balance remaining at September 30, 2012 was $5,700.

**NOTE 6.   STOCKHOLDERS DEFICIT**

*Capital Structure*

At Inception, the limited liability company agreement authorized that the initial number of total Units available are 27,000,000, of which 2,000,000 Units are Class A Common Units and 25,000,000 Units are Class B Common Units. Class B Common Units shall have reserved for issuance 5,000,000 Incentive Units and the remainder may be issued as Investment units. On June 30, 2011, this agreement was amended to decrease the authorized Class B Common Units from 25,000,000 to 10,000,000 Units, of which 5,000,000 shall continue to be reserved as Incentive Units. In addition, a new class of units was authorized allowing 15,000,000 Preferred Units, of which 100,000 Units shall be designed as Series A Preferred.

On September 20, 2012, the Company filed a Certificate of Conversion to change the Company's form of legal organization from a limited liability company to a corporation. Concurrently, the Company amended its Certificate of Incorporation to authorize the issuance of 11,000,000 shares, of which 8,000,000 shares have been designated as Common Stock and 3,000,000 shares have been designated as Preferred Stock, with both classes having a par value of $0.001 per share. For the Preferred Stock 700,000 shares shall be designated as Series A Preferred Stock. The holders of Preferred Stock and Common Stock are entitled to one vote per share. The Company effectuated the conversions of Class A Common Units to Common Stock and Series A Preferred Units to Preferred Stock, both at ratios of 1 to 1. Additionally the amendment called for the Company to convert each issued, outstanding and vested class B Common Unit into a number of shares of Common Stock equal to the number of vested Class B Common Units multiplied by i) the difference of (a) $60 minus (b) the Distribution Threshold Amount for such Incentive Units divided by ii) $60 per share. As a result of the conversion, the Company issued

432,915 of common stock for 479,835 of vested Class B common units and shall issue 186,516 of common stock for 261,838 of unvested Class B common units as they become vested.

11

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

*Common Stock*

The holders of our common stock are entitled to one vote per share on matters on which our stockholders vote. There are no cumulative voting rights. Subject to any preferential dividend rights of any outstanding shares of preferred stock, holders of our common stock are entitled to receive dividends, if declared by our board of directors, out of funds that we may legally use to pay dividends. If we liquidate or dissolve, holders of our common stock are entitled to share ratably in our assets once our debts and any liquidation preference owed to any then- outstanding preferred stockholders are paid. Our certificate of incorporation does not provide our common stock with any redemption, conversion or preemptive rights.

*Preferred Stock*

The holders of our preferred stock are entitled to one vote per share on matters on which our common stockholders vote. Holders of our preferred stock have a liquidation, redemption, conversion and preemptive rights. If we liquidate or dissolve, holders of our preferred stock are entitled liquidation preference owed to them and are able to share ratably in our assets on a as converted basis.

***Issuances***

*Common Stock*

On March 30, 2011, the Company issued to its founder 321,660 shares of Common Stock for a $25,000 capital contribution.

On March 31, 2011, the Company issued to a member 10,000 shares of Common Stock for a $100 capital contribution.

*Private Placement Offering - March 2011*

On March 31, 2011, the Company offered for sale, pursuant to a Private Placement Memorandum ("PPM"), up to 100,000 of the Company's Common Stock at $20 per share, for an aggregate offering price of $2,000,000. The Common Stock was entitled to one (1) vote per each unit outstanding. The termination date of this offer was originally May 3, 2011. On June 15, 2011, the PPM was restated to extend the termination date to August 31, 2011.

In April, May and June 2011, the Company sold 36,250 Shares of Common Stock in a private placement for $20 per share, yielding aggregate proceeds of $725,000. In addition, the Company incurred aggregate fees of $66,061 in connection with the private placement. These common shares were subsequently exchanged for Series A Preferred shares.

*Incentive Stock Awards*

Since Inception, the Company entered into various incentive unit agreements for issuances of Incentive Common Shares with certain individuals for future services (see note 7).

*Preferred Stock*

On June 30, 2011, the Company amended its PPM to sell a new series of units of membership interest known as the "Series A Preferred Stock," instead of common stock. The Series A Preferred Shares have a liquidation priority over the Common Shares with a preference equal to two (2) times the amount originally invested in such shares (including any prior cash distributions of any operating profits) before any amounts are paid with respect to any Common Stock. In conjunction with the amended PPM, the Company amended the subscription agreements of the prior Common Stockholders and changed the Stock ownership to the newly issued Series A Preferred Stocks.

In July, October and December 2011, the Company sold 5,250 shares of Series A Preferred Stock related to the amended private placement for $20 per share, yielding aggregate proceeds of $105,000 of which 1,500 shares sold and $30,000 proceeds were from a related party through common ownership. In addition, the Company incurred aggregate fees of $1,367 in connection with the private placement.

On January 25, 2012, the Company, in connection with a January 2012 private placement offered for sale up to 125,000 shares of the Company's Series A Preferred Shares at $40 per share with similar terms and conditions as the amended PPM.

From January 1, 2012 through May 14, 2012, the Company sold 46,709 shares of Series A Preferred Stock related to the January 2012 private placement at $40 per Share, yielding aggregate proceeds of $1,868,353 of which 18,309 shares sold and $732,353 proceeds were from a related party through common ownership. In addition, the Company incurred aggregate fees of $61,677 in connection with the private placement.

12

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

On May 18, 2012, the Company, in connection with the May 2012 private placement, offered for sale up to 125,000 shares of the Company's Series A Preferred Stock at $80 per share with similar terms and conditions as the amended PPM.

On September 20, 2012, the Company amended its May 2012 private placement selling price of the Preferred Shares from $80 per share to $25 per share as a result of a resolution of the Company's board. This resolution was determined as a result of market conditions.

From May 31, 2012 through September 25, 2012, the Company sold 38,832 shares of the Series A Preferred Stock related to May 2012 private placement at $25 per share, yielding aggregate proceeds of $970,800 of which 26,432 shares sold and $660,800 proceeds were from a related party through common ownership. In addition, the Company incurred aggregate fees of $12,275 in connection with the private placement.

*Capital Contributions of Common Shares by Founder*

In April 2012, the Company's founding stockholder personally transferred 60,000 shares of his common stock to third party consultant for advisory services provided to the company. In September 2012, the company's founder personally transferred 50,000 shares of his common stock to a newly hired executive (Note 8) in exchange for his acceptance of a position as Chairman of the Board of Directors, effective immediately, and Chief Executive Officer. The shares which have an aggregate value of $4,400,000 are fully vested and non-forfeitable.

Liquidation Preference

Upon liquidation, Series A Preferred Stock have a liquidation priority over Preferred Stock and Common Stock and a liquidation preference equal to two (2) times the amount originally invested by the holder of Series A Preferred Stock in Retrophin, LLC the predecessor of Retrophin, Inc. before any amounts are paid with respect to any Preferred Stock and Common Shares.

*Receivables from Shareholders*

In November of 2011, the Company advanced $10,000 to a related party, with an interest rate of 0.001% and a five year term. The advance is classified as a note receivable from related party on the balance sheet at December 31, 2011 and is due on November 3, 2016. The note is classified as a reduction of stockholders' equity in the accompanying consolidated balance sheet.

On February 3, 2012, the Company entered into a note receivable with a related party in the amount of $200,000. The note receivable is unsecured, bearing an interest rate of 12% per annum and due to mature on February 3, 2013. The note is classified as a reduction of stockholders' equity in the accompanying consolidated balance sheet.

During the nine months ended September 30, 2012, the Company advanced one of the Shareholders whom the Company sublets its office space $199,329 of payments. (See Note 8)

**NOTE 7.  INCENTIVE SHARES**

On March 31, 2011, the Company granted 369,860 incentive shares to several executive and non-executive employees, and certain consultants, with an aggregate fair value of $7,397,200 or $20 per share. The incentive shares vested on the final day of each calendar quarter over three years, commencing on June 30, 2011. On September 11, 2012, the Company accelerated the vesting of 187,635 shares issued to its founder and Chief Executive Officer, which resulted in a charge of $3,216,600 included in compensation and related costs in the accompanying unaudited statement of operations.

In August and November 2011, the Company granted an aggregate of 58,000 incentive shares to two consultants, with an aggregate fair value of $1,160,000 or $20 per share, for consulting services. The incentive shares vested on the final day of each calendar quarter over three years, commencing on June 30, 2011 and December 31, 2011.

In January 2012, the Company granted 165,320 incentive shares to the Chief Executive Officer an employee and a consultant, with an aggregate fair value of $9,919,200 or $60 per share. The incentive shares vested on the final day of each calendar quarter over three years,

commencing on March 31, 2012. On September 11, 2012, the Company immediately vested the Chief Executive Officer unvested incentive shares totaling 5,637 for continuing services.

13

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

On March 7, 2012, the Company granted 16,667 incentive shares to a third party consultant, with an aggregate fair value of $2,000,000 or approximately $120 per share, for consulting services. The incentive shares vested (i) 50% immediately and (ii) on the final day of each calendar quarter over two years, commencing on March 31, 2012.

On July 7, 2012, the Company granted 8,750 incentive shares to an employee, with an aggregate fair value of 375,000 or approximately $43 per share. The incentive shares vested on the final day of each calendar quarter over three years, commencing on September 31, 2012.

For the nine months ended September 30, 2012, for the period from March 11, 2011 (inception) through September 30, 2011, for the period from March 11, 2011 (inception) through December 31, 2011 and for the period from March 11, 2011 (inception) through September 30, 2012, the Company recognized $9,614,402, $1,282,867, $1,979,299 and $11,593,702 as compensation expense in the consolidated statements of operations, respectively. Share compensation for non-employee awards subject to vesting is being accrued at current fair value as of September 30, 2012, there was approximately $9,085,950 of unrecognized compensation cost related to incentive shares issued.

|  | Shares | Weighted Average Fair Value |
|---|---|---|
| Unvested March 11, 2011 ("inception") | - | $ - |
| Granted | 427,860 | 20.00 |
| Vested | (98,215) | 20.00 |
| Forfeited | 9,167 | |
| Unvested December 31, 2011 | 320,478 | $ 20.00 |
| Granted | 190,737 | 39.31 |
| Vested | (324,701) | 23.91 |
| Forfeited | - | - |
| Unvested September 30, 2012 | 186,514 | 34.05 |

All of the Company's share based payments were originally issued as Retrophin LLC Class B incentive units that represent a profits interest up through the date of the Company's conversion to a C Corporation, which was structured as a tax free exchange transaction.

Shares granted as incentive shares were originally subject to certain conditions at the time of grant. Such condiions specified that the occurrence of a Termination Event, as defined in the amended operating agreement the Company shall have the right, but not the obligation, to repurchase, all, but not less than all, of the vested incentive shares owned by such incentive shareholder, at a purchase price based on the fair market value of the incentive shares determined in good faith by the Board of Directors. The aforementioned repurchase option was rescinded upon the Company's conversion to a corporation.

## NOTE 8.  COMMITMENTS AND CONTINGENCIES

*Sublease*

During March 2011, the Company began subleasing offices on a month -to-month basis for $7,000 per month.  On June 31, 2011, the Company entered into a sublease agreement with a company affiliated by common ownership, where the Company will pay $7,000 a month or 75% of the space used, pro-rated, according to the aggregate cost of the shared offices with the affiliated entities of the related party leasing company, whichever is greater.  According to the agreement, the Company is responsible for incidental costs and for rent or lease of office furniture and equipment.  The sublease is on a six month rolling basis and termination of the agreement can be made by a mutual agreement of both parties or by the related party leasing company. The month-to-month lease was terminated in September 2012.

*Consulting Agreements*

On August 15, 2011, the Company entered into an agreement with a consultant to serve as a senior advisor of strategy assisting in leading the general direction of the Company

14

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

The agreement's initial term is for one year and automatically renews on an annual basis. Pursuant to this agreement the compensation to the consultant is comprised of (a) a fee of $37,500 per calendar quarter, payable commencing September 30, 2011, (b) 5,000 shares of the Company Common Stock, which vest over twelve (12) quarters for as long as the agreement remains in effect, and (c) receive 5,000 additional common stock, (i) upon the Company's completion of its initial financing at a pre-financing value of $20 million, and (ii) which vest in accordance with certain schedules of milestones as described in the consulting agreement. At September 30, 2012, the financing and milestones have not yet occurred or been achieved. For the nine months ended September 30, 2012, for the period from March 11, 2011 (inception) through September 30, 2011, for the period from March 11, 2011 (inception) through December 31, 2011, and for the period from March 11, 2011 (inception) through September 30, 2012, the Company recognized professional expense related to this agreement in the amounts of $37,500, $16,667, $25,000 and $62,500, respectively, of which amounts comprised of fee payable of $117,500 and $75,000 at September 30, 2012 and December 31, 2011, respectively.

On November 1, 2011, the Company granted to the consultant an additional 24,000 shares of common stock, which vest in over twelve (12) calendar quarters commencing December 31, 2011. For the nine months ended September 30, 2012, for the period from March 11, 2011 (inception) through September 30, 2011, for the period from March 11, 2011 (inception) through September 30, 2011, for the period from March 11, 2011 (inception) through December 31, 2011, and for the period from March 11, 2011 (inception) through September 30, 2012, the Company recognized professional expense related to this share based compensation of $180,000, $0, $40,000 and $220,000.

On August 25, 2011, the Company entered into an agreement with a consultant to serve as chief scientific officer of the Company.

The agreement's initial term is for one year and automatically renews on an annual basis. Pursuant to this agreement the compensation to the consultant is comprised of (a) a fee of $50,000 per calendar quarter, (b) 15,000 incentive shares, which vest over twelve (12) quarters so long as the agreement remains in effect, and (c) receive 14,000 additional incentive shares, (i) upon the Company's completion of its initial financing at a pre-financing value of $20 million, and (ii) which vest in accordance with certain schedules of milestones as described in the consulting agreement. At September 30, 2012, the financing and milestones have not yet occurred or been achieved. For the nine months ended September 30, 2012, September 30, for the period from March 11, 2011 (inception) through September 30, 2011, for the period from March 11, 2011 (inception) through December 31, 2011, and for the period from March 11, 2011 (inception) through September 30, 2012, the Company recognized professional expense related to this agreement in amounts of $112,500, $50,000, $75,000 and $187,500, respectively, of which amounts comprise of fee payable of $150,000 and $100,000 at September 30, 2012 and December 31, 2011, respectively.

On November 1, 2011, the Company granted to the consultant an additional 14,000 incentive shares, which vest in over twelve (12) calendar quarters commencing December 31, 2011. For the nine months ended September 30, 2012, for the period from March 11, 2011 (inception) through September 30, 2011, for the period from March 11, 2011 (inception) through December 31, 2011, and for the period from March 11, 2011 (inception) through September 30, 2012, the Company recognized professional expense related to this share based compensation of $105,000, $0, $23,333 and $128,333.

*Sponsored Research Agreement*

On July 1, 2012, the Company entered into a Sponsored Research Agreement with an organization that expires on July 1, 2013, unless extended by written agreement between the parties. The Company has agreed to pay a sponsor fee of $203,169 to the organization to perform the research program stated in the Sponsored Research Agreement. The sponsor fee payments are as follows: $101,855 within 30 days of the execution of the agreement and the remaining $101,854 will be due on January 1, 2013. As of September 30, 2012, the Company included the first payment of $101,854 in accounts payable and accrued expenses, as no payment have been made by the Company.

Sponsor fee totaling $203,169 will be recognized as professional expense, pro-rata over the one year term of the Sponsored Research Agreement. Total professional expense recorded related to the Sponsored Research Agreement totaled $50,788 for the nine months ended September 30, 2012.

*Employment agreement*

Effective March 1, 2011, the Company entered into a three-year employment agreement with Martin Shkreli, served as the Company's Chief Executive Officer. The agreement was automatically renewed for an additional three-year period. The Agreement provides for (a) a

base salary of $250,000 per year, (b) annual cash bonus award at the discretion of the Board equal to one month salary, (c) three weeks' vacation paid per calendar year, (d) accelerated vesting of options in the event of (i) a merger or consolidation, (ii) a sale of all or substantially all of the assets or (iii) any other change in control of the Company, and (e) all group insurance plans and other benefit plans and programs made available to the Company's management employees.

15

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

Effective January 1, 2012, the Company and its affiliated companies thru common control entered into a 18 month employment agreement with Jackson Su, served as the Chief Operating Officer of the Company and its affiliated companies. The Agreement provides for (a) a base salary of $150,000 per year, (b) three weeks' vacation paid per calendar year, (c) 2,500 Incentive Units of Retrophin, LLC predecessor of Retrophin, Inc (equivalent to 1,667 share of the Company's common stock), 1/12 shall be vest on the last day of each calendar quarter commencing on March 31, 2012 and (d) shall be reimbursed for all healthcare expenses incurred including COBRA payments.

Effective October 16, 2012, the Company and its affiliated companies thru common control entered into a 18 month employment agreement with Steve Aselage, shall served as the Chief Executive Officer of the Company. The Agreement provides for (a) a base salary of $500,000 per year, (b) eligible each fiscal year from the effective date to earn an annual bonus of up to 50% of annual salary or pro rata portions for any partial fiscal years, subject to the sole discretion of the Board (c) four weeks' vacation paid per calendar year, and (d) all group insurance plans and other benefit plans and programs made available to the Company's management employees. The Agreement was terminated in connection with the Merger.

## NOTE 9.   INCOME TAXES

Deferred income taxes reflect temporary differences in the reconciliation of revenue and expenses for tax reporting and financing statement purposes. Temporary differences that give rise to a significant portion of deferred tax assets and liabilities are as follows:

|  |  | December 31, 2011 |
|---|---|---|
| New York City UBT net operating loss carryovers | $ | 19,266 |
| Accrual of costs adjustment for accounts payable and accrued expenses |  | 20,394 |
| Organizational costs |  | 3,738 |
| Total deferred tax assets |  | 43,398 |
| Valuation allowance |  | (43,398) |
| Deferred tax asset, net of valuation allowance | $ | - |

The income tax provision (benefit) consisted of the following for the period from March 11, 2011 (commencement of operations) to December 31, 2011:

| New York City UBT |  |  |
|---|---|---|
| Current | $ | - |
| Deferred |  | (43,398) |
| Change in valuation allowance |  | 43,398 |
| Income tax provision (benefit) | $ | - |

Expected tax expenses (benefit) based on the statutory rate is reconciled with actual tax expense (benefit) as follows:

|  | December 31, 2011 |
|---|---|
| U.S. Federal statutory rate | (34.0)% |
| New York City UBT rate | (4.0)% |
| Partnership income not subject to federal tax at entity level | 34.0% |
| Change in valuation allowance | 1.3% |
| Other permanent differences | 2.7% |
| Income tax provision (benefit) | 0.0% |

16

**RETROPHIN, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Information with respect to the period from March 11, 2011 (inception) through September 30, 2011 is unaudited.**

As limited liability company, the Company is treated as a partnership for federal and state income tax purposes. Accordingly, no provision has been made for deferral and state income taxes in the accompanying financial statements, since all items of income or loss are required to be reported on the income tax returns of the members, who are responsible for any taxes thereon.

The Company however is subject to the New York City Unincorporated Business Tax (UBT). As of December 31, 2011, the Company has a New York City net operating loss carryover ("NOL") of approximately $481,658. This NOL will expire in year 2032.

The Company has considered all positive and negative factors in determining if the deferred tax asset is realizable. Based on these factors, management could not conclude that it is more likely than not that the net deferred tax asset will be realized and has established a valuation allowance for the full amount of the deferred tax asset at December 31, 2011. The change in valuation allowance for the period ended December 31, 2011, was $43,398. The Company will maintain the valuation allowance until sufficient evidence exists to support its reversal.

**NOTE 9.  SUBSEQUENT EVENTS**

During October 2012, the Company entered into a sublease agreement with a company ("Sublessor") affiliated by common ownership that expires on November 29, 2016. The sublease agreement calls for rent escalations and requires the Company to pay for 50% of utilities incurred by Sublessor.

From October 1, 2012 through December 11, 2012, the Company sold 28,420 shares of the Series A Preferred Stock related to May 2012 private placement at $25 per Unit, yielding aggregate proceeds of $710,500.

The Company has evaluated subsequent events to determine if events or transactions occurring through December 17, 2012, the date of the financial statements were available to be issued, required adjustment to or disclosure in the financial statements.

17

EX-99.2 5 e610298_ex99-2.htm

**Desert Gateway, Inc**
**Introduction to Pro-forma Condensed**
**Combined Financial Statements**
**(Unaudited)**

The following unaudited pro-forma condensed combined financial statements give effect to the merger between Desert Gateway, Inc  ("Desert") and Retrophin, Inc. ("Retrophin") and certain other transactions that Desert and Retrophin completed as of December 12, 2012.

On December 12, 2012, Retrophin consummated a merger transaction (the "Merger") with Desert whereby 100% of the issued and outstanding shares of common and preferred stock of Retrophin were exchanged for 5,434,122  shares of common stock of Desert, a publicly traded company with no operations. As a result of the Merger, the former stockholders of Retrophin became the controlling stockholders of Desert owning 68.9% of Desert's outstanding common shares upon completion of the Merger. Accordingly, the Merger of Retrophin and Gateway is a reverse merger that has been accounted for as a recapitalization of Retrophin. The historical financial statements of Retrophin, which is the business that survived the merger, will be presented as the historical financial statements of the combined reporting entity. The unaudited pro-forma information is presented for illustration purposes only in accordance with the assumptions set forth below and in the notes to the unaudited pro-forma condensed combined financial statements.

The unaudited pro-forma condensed combined balance sheet of Desert as of August 31, 2012 and  Retrophin  as of September 30, 2012 gives pro-forma effect to (i) the reverse merger and recapitalization of Retrophin, (ii) the issuance of 2,500,000 shares of Desert common stock  upon the conversion of Desert convertible notes with an aggregate principal balance of $25,000, (iii) the issuance of 319,149 shares of Desert common stock in settlement of a $1,500,000 contingent liability that  was triggered when the Merger was consummated as stipulated under an agreement that licenses certain technology to Retrophin, and (iv) certain other transactions completed at the time of the Merger as if Desert and Retrophin completed such transactions as of September 30, 2012.

The unaudited pro-forma condensed combined statements of operations of Retrophin and Desert for their combined (i) fiscal reporting years, and (ii) most recent combined interim reporting period give, effect to the Merger as if it had occurred as of the beginning of the periods presented.

The unaudited pro-forma financial information is presented for illustrative purposes only in accordance with the assumptions set forth below and in the notes to the unaudited pro-forma condensed combined financial statements. The unaudited pro-forma condensed combined balance sheet and condensed combined statements of operations should be read in conjunction with the separate historical financial statements of Desert Gateway, as filed with the Securities and Exchange Commission and issued in the Form 10-K for the year ended February 29, 2012 and the historical financial statements of Retrophin, appearing elsewhere herein.  These unaudited pro-forma condensed combined financial statements may not be indicative of what would have occurred had the Merger been consummated on the indicated dates and should not be relied upon as an indication of future results of operations.

**Desert Gateway, Inc and Subsidiaries**
**Unaudited Pro Forma Condensed Combined Balance Sheet**

| | Historical | | Pro Forma Adjustments | | Pro Forma As Adjusted |
|---|---|---|---|---|---|
| | Desert Gateway, Inc August 31, 2012 | Retrophin, Inc. September 30, 2012 | Retrophin, Inc. | Desert Gateway, Inc. | |
| | (a) | (b) | | | |
| **Assets** | | | | | |
| **Current assets** | | | | | |
| Cash | $ 3,900 | $ 2,189 | $ 710,500 **k** | $ | $ 716,589 |
| Due from related parties | | 3,300 | | | 3,300 |
| Prepaid expenses | | 30,431 | | | 30,431 |
| Other current assets | - | 15,781 | | | 15,781 |
| Total current assets | 3,900 | 51,701 | 710,500 | | 766,101 |
| | | | | | |
| Property and equipment, net | - | 9,037 | | | 9,037 |
| Technology license | | 2,386,952 | | | 2,386,952 |
| Total assets | $ 3,900 | $ 2,447,690 | $ 710,500 | $ - | $ 3,162,090 |
| | | | | | |
| **Liabilities and Stockholders' Deficit** | | | | | |
| | | | | | |
| **Liabilities** | | | | | |
| Technology license liability | $ | $ 1,300,000 | $ | $ | $ 1,300,000 |
| Account payable and accrued expenses | 33,417 | 1,185,106 | 200,000 **h** 150,000 **g** | | 1,568,523 |
| Due to related parties | 9,572 | 16,500 | | (9,572) **j** | 16,500 |
| Notes payable - related parties | | 914,764 | | | 914,764 |
| Convertible debt due within one year | 25,000 | - | | (25,000) **e** | - |
| Total liabilities | 67,989 | 3,416,370 | 350,000 | (34,572) | 3,799,787 |
| | | | | | |
| **Stockholders' Deficit** | | | | | |
| Preferred stock Series A, $0.001 par value | - | 127 | (127) **d** 28 **k** (28) **l** | | - |
| Preferred stock $.001 par value | 1 | - | | (1) **j** | - |
| Common stock, $0.001 par value | | 754 | (754) **c** | | - |
| Common stock, $0.0001 par value | 11 | - | 31 **i** | 377 **c** 89 **d** 250 **e** 20 **l** 57 **m** (2) **n** | 833 |
| Additional paid-in capital | 78,989 | 19,545,693 | 754 **c** 127 **d** (3,900) **h** 1,499,969 **i** 710,472 **k** 28 **l** | (377) **c** (89) **d** 24,750 **e** (143,090) **f** 9,573 **j** (20) **l** 6,876,143 **m** 2 **n** | 28,599,024 |
| Receivables due from stockholder | - | (434,329) | | | (434,329) |

| | | | | | |
|---|---|---|---|---|---|
| Deficit accumulated during the development stage | (143,090) | (20,080,925) | (150,000) **g** | 143,090 **f** | (28,803,225) |
| | | | (196,100) **h** (1,500,000) **i** | (6,876,200) **m** | |
| Total stockholders' deficit | (64,089) | (968,680) | 360,500 | 34,572 | (637,697) |
| Total liabilities and stockholders' deficit | $ 3,900 | $ 2,447,690 | $ 710,500 | $ 0 | $ 3,162,090 |

Notes to Unaudited Pro-forma Balance Sheet of Desert as of August 31, 2012 and for Retrophin as of September 30, 2012

a. Derived from the unaudited balance sheet of Desert as of August 31, 2012.

b. Derived from the unaudited balance sheet of Retrophin as of September 30, 2012.

c. Reflects the issuance of 3,772,880 shares of Desert common stock in exchange for 754,576 shares of Retrophin common stock based upon a 1 for 5 exchange ratio.

d. Reflects the issuance of 889,287 shares of Desert common stock in exchange for the conversion of 127,041 shares of Retrophin preferred stock based upon a 1 to 7 conversion ratio.

e. Reflects the conversion of $25,000 in principal of Desert convertible debt into 2,500,000 shares of Desert common stock prior to the Merger.

f. Reflects the elimination of Desert's accumulated deficit in connection with the recapitalization (reverse merger) of Retrophin.

g. Reflects the accrual of $150,000 of professional and other transaction fees incurred by Retrophin in connection with the Merger.

h. Reflects the accrual of a $200,000 fee incurred by Retrophin with respect to its identification of Desert as a merger candidate.

i. Reflects Retrophin's a $1,500,000 contingent liability settled in 319,149 shares of Desert common stock. The liability was stipulated under an agreement providing for the licensure of certain technology to Retrophin and is being treated as a charge to operations. .

j. Reflects the cancellation of (i) all 501 shares of Desert Preferred stock outstanding at the time of the Merger, (ii) a $9,572 obligation due to related parties per the Merger agreement

k. Reflects the issuances of Retrophin's  preferred stock which occurred subsequent to September 30, 2012 through December 12, 2012 (the Merger Date) as if they occurred on September 30, 2012. Retrophin sold 28,420 shares of Preferred Stock, yielding aggregate proceeds of $710,500 subsequent to September 30, 2012 but prior to the Merger.

l. Reflects the issuance of 198,940 shares of Desert common stock in exchange for the conversion of 28,420 shares of Retrophin preferred stock based upon a 1 to 7 conversion ratio for the subsequent issuances.

m. Reflects the acceleration of the vesting of Retrophin's CEO's unvested incentive shares upon the merger with Desert. There were 114,603 Retrophin shares exchanged for 573,015 shares of Desert common stock based on a 1 for 5 exchange ratio that resulted in a charge to compensation expense of $6,876,200 based on the unvested incentive shares fair value.

n. Reflects the cancellation of 21,112 shares of Desert common stock by a Desert shareholder as a contribution of capital in December 2012

**Desert Gateway, Inc and Subsidiaries**
**Unaudited Pro Forma Condensed Combined Sheet of Operations**

| | Historical | | Pro Forma Adjustments | | |
| --- | --- | --- | --- | --- | --- |
| | Desert Gateway, Inc- year ending February 29, 2012 | Retrophin, Inc- period ending December 31, 2011 | Desert Gateway, Inc | Retrophin, Inc. | Pro Forma Combined |
| | **(b)** | **(a)** | | | |
| Operating expenses | | | | | |
| Compensation and related costs | $ - | $ 2,227,203 | $ | $ | $ 2,227,203 |
| Professional fees | - | 909,681 | - | | 909,681 |
| Rent expense | - | 63,813 | | | 63,813 |
| Selling, general and administrative | 12,825 | 62,999 | (12,825) c | | 62,999 |
| Total operating expenses | 12,825 | 3,263,696 | (12,825) | - | 3,263,696 |
| | | | | | |
| Other income (expense) | | | | | |
| Interest income | - | 75 | | | 75 |
| Loss on foreign exchange transactions | - | (4,635) | | | (4,635) |
| Interest and amortization of debt discount | (2,000) | - | 2,000 c | | - |
| Total other expense | (2,000) | (4,560) | 2,000 | - | (4,560) |
| | | | | | |
| Net loss | $ (14,825) | $ (3,268,256) | $ 14,825 | $ - | $ (3,268,256) |
| | | | | | |
| Net loss per common shares - basic and diluted | $ (0.14) | $ | | | $ (0.39) |
| | | | | | |
| Weighted average number of common shares, outstanding during the period - basic and diluted | 106,681 | | | | 8,338,837 |

Notes to Unaudited Pro-forma Statement of Operations of Desert for the year ended February 29, 2012 and Retrophin for the period from March 11, 2011 (inception) through December 31, 2011

   a. Derived from unaudited statement of operation of Desert for the year ended February 29, 2012

   b. Derived from unaudited statement of operation of Retrophin for the period from March 11, 2011 (inception) through December 31, 2011

   c. Reflect elimination of operations of Desert. These operations were discontinued as of the effective date of the Merger.

   d. .The pro-forma combined weighted average number of common shares outstanding was calculated as follows:

Historical weighted average number of common shares, Retrophin effectuated for the merger

| | |
|---|---:|
| 1. Desert shares outstanding prior to the Merger | 106,680 |
| 2. Shares of Desert stock issued to stockholders of Retrophin in exchange for Desert common shares | 5,434,120 |
| 3. Shares of Desert issued for Retrophin contingent liability | 319,149 |
| 4. Shares issued for conversion of Desert debt | 2,500,000 |
| 5. Shares of Desert cancelled as a contribution from a shareholder | (21,112) |
| Total weighted average number of common shares outstanding | 8,338,837 |

**Desert Gateway, Inc and Subsidiaries**
**Unaudited Pro Forma Condensed Combined Sheet of Operations**

| | Historical | | Pro Forma Adjustments | | Pro Forma |
| --- | --- | --- | --- | --- | --- |
| | Desert Gateway, Inc | Retrophin, Inc | Desert Gateway, Inc | Retrophin, Inc. | Combined |
| | (a) | (b) | | | |
| Operating expenses | | | | | |
| Compensation and related costs | $          - | $   8,371,481 | $ | $          - | $   8,371,481 |
| Professional fees | - | 8,048,788 | | | 8,048,788 |
| Selling, general and administrative | 6,783 | 274,622 | (6,783) c | | 274,622 |
| Rent expense | - | 63,000 | | | 63,000 |
| Total operating expenses | 6,783 | 16,757,891 | (6,783) | - | 16,757,891 |
| | | | | | |
| Other income (expense) | | | | | - |
| Interest income | - | 15,781 | | | 15,781 |
| Interest expense | | (70,559) | | | (70,559) |
| Interest and amortization of debt discount | (1,000) | - | 1,000 c | | - |
| Total other expense | (1,000) | (54,778) | 1,000 | - | $   (54,778) |
| | | | | | |
| Net loss | $   (7,783) | $ (16,812,669) | 7,783 | - | $ (16,812,669) |
| | | | | | |
| Net loss per common shares - basic and diluted | (0.07) | $          - | | | $   (2.02) |
| | | | | | |
| Weighted average number of common shares, outstanding during the period - basic and diluted | 106,695 | | | | 8,338,837 |

<u>Notes to Unaudited Pro-forma Statement of Operations of Desert for the nine months ended August 31, 2012 and Retrophin for the nine months ended September 30, 2012</u>

    a.  Derived from unaudited statement of operations of Desert for the nine months ended August 31, 2012.

    b.  Derived from unaudited statement of operations of Retrophin for the nine months ended September 30, 2012.

    c.  Reflect the elimination of Desert's historical operating results as Retrophin is the business entity that survives the Merger.

    d.  The pro-forma combined weighted average number of common shares outstanding was calculated as follows:

        Historical weighted average number of common shares, Retrophin effectuated for the merger

| | |
|---|---:|
| 1.  Desert shares outstanding prior to the Merger | 106,680 |
| Shares of Desert stock issued to stockholders of Retrophin in exchange for Desert | |
| 2.  common shares | 5,434,120 |
| 3.  Shares of Desert issued for Retrophin contingent liability | 319,149 |
| 4.  Shares issued for conversion of Desert debt | 2,500,000 |
| 5.  Shares of Desert cancelled as a contribution from a shareholder | (21,112) |
| Total weighted average number of common shares outstanding | 8,338,837 |

**Contacts:**

| | |
|---|---|
| Retrophin, Inc. | 6 Degrees |
| Martin Shkreli, Chief Executive Officer | Tony Plohoros, Principal |
| (212) 983-1310 | (908) 591-283 |
| martin.shkreli@retrophin.com | tplohoros@6degreespr.com |

### Retrophin Completes Reverse Merger With Desert Gateway, Inc.

#### Creates publicly traded biotechnology company

**New York, NY (December 18, 2012)** – Retrophin, Inc., a biotechnology company focused on discovering and developing treatments for rare and life-threatening diseases, today announced the successful completion of its merger with Desert Gateway, Inc. (OTCQB: RTRX) and its transition to a publicly-traded company.  The combined company, currently trades as an over-the-counter (OTC) stock under the symbol RTRX.QB.

As a result of the transaction, the Company has 8,338,837 shares outstanding.  Martin Shkreli has resumed the role of Chief Executive Officer. "Becoming a publicly traded company represents an important milestone in our growth strategy, as doing so provides us with access to capital and liquidity, as well as creates additional possibilities for us to grow and advance our pipeline," said Shkreli, also the Founder of Retrophin.

Retrophin will continue to focus on developing its lead compound, RE-021 (formerly known as DARA).  Retrophin is developing RE-021 for the treatment of focal segmental glomerulosclerosis (FSGS), a rare disease that attacks the kidney's filtering system (glomeruli), causing serious scarring, progressive kidney function line and rapid loss of the kidneys.  FSGS is one of the causes of a serious condition known as Nephrotic Syndrome.  An estimated 50,000 patients in the United States suffer from FSGS, most of whom are diagnosed as pediatrics or young adults.  The company expects to begin enrollment in its potentially pivotal Phase II clinical trial "FONT-3" during the first half of 2013.

Retrophin estimates that its 2013 operating expense will be $5 to $7 million.  "We expect that this relatively modest expense will allow us to complete the historic FONT-3 study, with top-line results available in the second half of 2013," Shkreli added.  "We also expect this operating plan to progress our RE-024 PKAN program to the goal of an IND in late 2013 or early 2014."

### About Retrophin

Retrophin is a biotechnology company focused on discovering and developing treatments for rare and life-threatening diseases.  Retrophin is currently developing treatments for focal segmental glomerulosclerosis (FSGS), Pantothenate Kinase-Associated Neurodegeneration (PKAN), Duchenne Muscular Dystrophy and other catastrophic diseases.  The company's lead compound, RE-021, formerly known as DARA, is scheduled to begin enrollment in a potentially pivotal Phase II clinical trial for FSGS in the first half of 2013.

**Retrophin Forward-Looking Statements**

This press release contains "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995, regarding the research, development and commercialization of pharmaceutical products. Such forward-looking statements are based on current expectations and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause actual outcomes and results to differ materially from current expectations. No forward-looking statement can be guaranteed. Forward-looking statements in the press release should be evaluated together with the many uncertainties that affect Retrophin's business Retrophin undertakes no obligation to publicly update any forward-looking statement, whether as a result of new information, future events, or otherwise.

<div align="center"># # #</div>

enzyme.jpg %d×%d pixels

Pantothenic acid

PANK

4'-Phosphopantothenic acid

Missing enzyme in PKAN



Dystrophin anchors the cell membrane (known as the sarcolemma in muscle cells) to actin filaments. This provides vital cell stability.

| | |
|---|---|
| **From:** | Greebel, Evan L. |
| **Sent:** | Tuesday, September 30, 2014 10:28 AM |
| **To:** | Martin Shkreli (martinshkreli@aol.com) |
| **Subject:** | Inquiry Invoice |
| **Attachments:** | scan - 2014-09-30 09.23.37A.pdf |

As we discussed with Mike Rosensaft, attached is the invoice for the SEC inquiry. As per your indemnification agreement with RTRX, you may request that RTRX pay the invoice on your behalf.

Please let me know if you have any questions or comments.


EVAN L. GREEBEL
Partner
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

E. GREEBEL

DX-106-41

CONFIDENTIAL

KMR_RTRX_135701
R169009

**Katten**

KattenMuchinRosenman LLP

575 Madison Avenue
New York, NY 10022-2585
212.940.8800 tel
212.940.8776 fax

EVAN L. GREEBEL
evan.greebel@kattenlaw.com
212.940.6383 direct
212.894.5883 fax

September 30, 2014

**Via Email**

Martin Shkreli
Retrophin, Inc.
777 Third Avenue
22nd Floor
New York, New York 10017

Dear Martin:

Enclosed is our invoice for services rendered through August 31, 2014 in connection with the SEC inquiry. For our work on the inquiry, there is a current charge of $224,324.67.

For your convenience, wiring instructions are enclosed.

If you have any questions, please contact me.

Sincerely,

Evan L. Greebel

ELG:pt
Enclosure

AUSTIN    CENTURY CITY    CHARLOTTE    CHICAGO    HOUSTON    IRVING    LOS ANGELES
NEW YORK    ORANGE COUNTY    SAN FRANCISCO BAY AREA    SHANGHAI    WASHINGTON, DC
LONDON: KATTEN MUCHIN ROSENMAN UK LLP
A limited liability partnership including professional corporations

101378082v1

CONFIDENTIAL

KMR_RTRX_135702
R169010



# Katten

### Katten Muchin Rosenman LLP

Direct Billing Inquiries to:
**Lisa Henry**
212-940-6636
lisa.henry@kattenlaw.com

575 Madison Avenue
New York, NY 10022-2585

September 30, 2014

Retrophin, Inc.
Attn: Martin Shkreli
777 Third Avenue
22nd Floor
New York, NY 10017

Invoice No. 1301145676
Client No. 381676
Matter No. 00012

FEIN: 36-2796532

**Re: Indemnification** (381676.00012)

For legal services rendered through August 31, 2014 ........................................................ $208,886.00

Disbursements and other charges ............................................................................. $15,438.67

**CURRENT INVOICE TOTAL:**    **$224,324.67**

Disbursements and other charges incurred which have not yet been posted as of the above date will be billed at a later date.

Katten Muchin Rosenman LLP is an Illinois limited liability partnership including professional corporations that has elected
to be governed by the Illinois Uniform Partnership Act (1997).
Katten Muchin Rosenman UK LLP is a limited liability partnership of solicitors and Registered Foreign Lawyers registered in England and Wales.

**CONFIDENTIAL**

KMR_RTRX_135703
**R169011**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

**PROFESSIONAL SERVICES**
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 04 Jun 13 | Rosensaft, Michael M. | Meeting with M. Shkreli and E. Greebel to discuss investigation; research on SEC actions regarding short locate and close-out requirements. | 3.40 |
| 05 Jun 13 | Rosensaft, Michael M. | Review SEC actions and statements regarding borrowing / failing to locate. | 0.30 |
| 11 Jun 13 | Rosensaft, Michael M. | Review recent SEC cases. | 0.20 |
| 20 Jun 13 | Rosensaft, Michael M. | Gather documents responsive to SEC request. | 1.10 |
| 21 Jun 13 | Mochizuki, Tenley | Communications with M. Rosensaft re: document review; search emails to identify limited partners and any communications with them. | 1.80 |
| 21 Jun 13 | Rosensaft, Michael M. | Gather and analyze documents responsive to SEC request. | 0.40 |
| 24 Jun 13 | Mochizuki, Tenley | Communications with M. Rosensaft re: documents provided by client; review emails to determine whether further documents need to be requested to respond to SEC subpoena. | 2.70 |
| 24 Jun 13 | Rosensaft, Michael M. | Compile documents for SEC production. | 1.00 |
| 25 Jun 13 | Mochizuki, Tenley | Communications with M. Rosensaft and Marek Biestek re: completeness of documents received; search emails for copies of MSMB Capital private placement memorandum; coordinate and receive delivery of further documents from Marek Biestek; copy documents to system. | 0.70 |
| 25 Jun 13 | Rosensaft, Michael M. | Compile documents for SEC production. | 0.40 |
| 26 Jun 13 | Mochizuki, Tenley | Communications with M. Rosensaft re: documents received from client; review and index emails. | 4.80 |
| 26 Jun 13 | Rosensaft, Michael M. | Prepare document production for SEC. | 0.20 |
| 27 Jun 13 | Mochizuki, Tenley | Search emails produced by client for documents re: OREX trade on February 1, 2011. | 1.70 |
| 27 Jun 13 | Rosensaft, Michael M. | Coordinate document production to SEC. | 0.10 |
| 28 Jun 13 | Mochizuki, Tenley | Review documents for communications with limited partners and Rothstein Kass; communications with M. Rosensaft and R. Brady re: status of document review; print and organize documents for M. Rosensaft. | 7.20 |
| 28 Jun 13 | Rosensaft, Michael M. | Coordinate document production to SEC and review key documents. | 0.40 |
| 01 Jul 13 | Mochizuki, Tenley | Review documents copied from M. Gordon's Outlook; communications with M. Rosensaft re: documents responsive to SEC subpoena. | 6.30 |
| 01 Jul 13 | Rosensaft, Michael M. | Review documents for production to SEC. | 3.30 |
| 02 Jul 13 | Mochizuki, Tenley | Communications with M. Rosensaft and M. Gordon re: most recent set of documents received from client; coordinate production efforts with R. Brady. | 0.90 |
| 02 Jul 13 | Rosensaft, Michael M. | Review and ready documents for production to SEC. | 0.70 |
| 03 Jul 13 | Brady, Rick | Preparation of PST for Loading to vendor FTP site; send data to vendor FTP site. | 1.50 |
| 03 Jul 13 | Rosensaft, Michael M. | Prepare SEC production; prepare for and attend meeting with M. Shkreli and Marek Biestek. | 3.90 |
| 05 Jul 13 | Mochizuki, Tenley | Communications with M. Rosensaft and R. Brady re: | 0.20 |

2

KMR_RTRX_135704
R169012

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | status of database for document review. | |
| 05 Jul 13 | Brady, Rick | Download processed data from vendor FTP site; unzip and copy data to network drive; modify load files, create Concordance database and load data into Concordance; attach images; create hyper-links to native files and index database. | 3.50 |
| 05 Jul 13 | Rosensaft, Michael M. | Ready SEC production. | 0.70 |
| 06 Jul 13 | Mochizuki, Tenley | Review and tag documents; email M. Rosensaft and R. Brady re: technical issues with database. | 2.10 |
| 06 Jul 13 | Brady, Rick | Create zip file of Native files for processing by vendor; post zip file to vendor FTP site. | 2.00 |
| 07 Jul 13 | Brady, Rick | Download processed native files from vendor FTP site; create new Concordance database for editing data and entering cross reference data; edit and enter data. | 3.50 |
| 08 Jul 13 | Mochizuki, Tenley | Review documents to finalize production database; communications with M. Rosensaft and R. Brady re: production; review and revise letter to SEC enclosing production and FOIA request; coordinate mailing. | 5.30 |
| 08 Jul 13 | Rosensaft, Michael M. | Prepare and send out SEC production. | 1.70 |
| 08 Jul 13 | Rosensaft, Michael M. | Review language for FCPA paragraphs in code of ethics. | 0.50 |
| 09 Jul 13 | Rosensaft, Michael M. | Prepare and finalize SEC production. | 0.40 |
| 16 Jul 13 | Rosensaft, Michael M. | Discuss production and upcoming testimony with E. Schmidt at SEC. | 0.20 |
| 17 Jul 13 | Rosensaft, Michael M. | Email with SEC attorney regarding production. | 0.10 |
| 22 Jul 13 | Mochizuki, Tenley | Review account statements sent to limited partners and update spreadsheets; review comparative spreadsheet and discuss with M. Rosensaft. | 0.90 |
| 22 Jul 13 | Rosensaft, Michael M. | Review and analyze limited partner reports and prepare for SEC testimony. | 3.10 |
| 23 Jul 13 | Rosensaft, Michael M. | Review email production and prepare for SEC testimony. | 1.40 |
| 24 Jul 13 | Rosensaft, Michael M. | Prepare for meeting with SEC; email with SEC attorney. | 0.30 |
| 25 Jul 13 | Rosensaft, Michael M. | Meeting with M. Shkreli and prepare for SEC testimony. | 3.50 |
| 29 Jul 13 | Rosensaft, Michael M. | Prepare for and attend meeting with M. Shkreli to prepare for SEC testimony; research and review historical OREX information. | 3.40 |
| 30 Jul 13 | Rosensaft, Michael M. | Prepare for and attend meeting with SEC attorneys. | 1.90 |
| 31 Jul 13 | Rosensaft, Michael M. | Review and finalize background questionnaire; correspond with M. Shkreli regarding testimony and previous deposition. | 0.70 |
| 01 Aug 13 | Mochizuki, Tenley | Review emails produced by client to determine name and case number of FINRA arbitration; communications with M. Rosensaft re: same; call court reporting agencies to determine whether they have records of Martin Shkreli's testimony in the FINRA arbitration; draft letter to send to Veritext confirming representation of Martin Shkreli; communications with | 2.10 |

3

**CONFIDENTIAL**

KMR_RTRX_135705
**R169013**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | M. Rosensaft re: same. | |
| 01 Aug 13 | Rosensaft, Michael M. | Prepare for SEC testimony; multiple calls/emails with Gusrae Kaplan regarding arbitration files; review court dockets to identify court reporter and contact to try to obtain transcript. | 3.40 |
| 02 Aug 13 | Mochizuki, Tenley | Communications with Veritext representative to obtain a copy of Martin Shkreli's testimony from the FINRA arbitration; communications with M. Rosensaft re: same. | 0.30 |
| 02 Aug 13 | Rosensaft, Michael M. | Follow up with court reporters regarding transcript. | 0.20 |
| 05 Aug 13 | Mochizuki, Tenley | Communications with M. Rosensaft and Veritext representative re: obtaining a copy of Martin Shkreli's testimony in the FINRA arbitration. | 0.10 |
| 05 Aug 13 | Rosensaft, Michael M. | Calls and emails with Gusrae Kapln regarding obtaining file and transcript; emails with court reporter regarding same; email with E. Schmidt regarding testimony; review arbitration deposition. | 4.00 |
| 06 Aug 13 | Rosensaft, Michael M. | Prepare for SEC testimony; meeting with M. Shkreli regarding same; finalize background questionnaire and send to E. Schmidt. | 4.10 |
| 07 Aug 13 | Rosensaft, Michael M. | Prepare for and attend SEC testimony. | 9.70 |
| 12 Aug 13 | Rosensaft, Michael M. | Review new SEC subpoena. | 0.20 |
| 20 Aug 13 | Mochizuki, Tenley | Meet with M. Rosensaft to discuss further production of documents; review latest subpoena and instructions for production. | 0.40 |
| 20 Aug 13 | Rosensaft, Michael M. | Email with M. Shkreli and meeting with T. Mochizuki regarding document production. | 0.30 |
| 23 Aug 13 | Mochizuki, Tenley | Review subpoena and instructions for production from SEC; draft cover letter to SEC and FOIA request letter and email to M. Rosensaft. | 0.60 |
| 23 Aug 13 | Rosensaft, Michael M. | Call with M. Shkreli regarding response to production; email to SEC regarding same. | 0.20 |
| 26 Aug 13 | Mochizuki, Tenley | Communications with M. Rosensaft re: document production; review email from Eric Schmidt (SEC) re: extension. | 0.10 |
| 26 Aug 13 | Rosensaft, Michael M. | Email with SEC regarding extension; review documents in response to supplemental subpoena. | 0.40 |
| 27 Aug 13 | Mochizuki, Tenley | Review documents sent from client to determine whether wire transfers are consistent with representations of payment. | 0.50 |
| 27 Aug 13 | Rosensaft, Michael M. | Review documents in response to supplemental subpoena. | 0.30 |
| 03 Sep 13 | Rosensaft, Michael M. | Email with M. Shkreli regarding production; review account statements. | 0.30 |
| 04 Sep 13 | Rosensaft, Michael M. | Review materials for production; call to M. Shkreli regarding same. | 0.10 |
| 06 Sep 13 | Rosensaft, Michael M. | Review documents regarding valuation of fund and payment of settlement for production. | 1.50 |
| 09 Sep 13 | Mochizuki, Tenley | Review documents sent by client; communications with M. Rosensaft re: which documents to produce; | 5.60 |

4

KMR_RTRX_135706
**R169014**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | coordinate processing, redaction, and production of documents to SEC; review and revise cover letter enclosing production. | |
| 09 Sep 13 | Brady, Rick | Convert to PDFs to TIFF, OCR and create data load files; Create Concordance database, load processed data, attach images and index database; create production, burn and label CDs. | 4.00 |
| 09 Sep 13 | Rosensaft, Michael M. | Review documents and redactions for production, draft cover letter, and submit production to SEC. | 3.10 |
| 10 Sep 13 | Mochizuki, Tenley | Call to FedEx to discuss delivery exception; revise FOIA request letter and coordinate mailing. | 0.50 |
| 10 Sep 13 | Rosensaft, Michael M. | Review productions to date and prepare for call with SEC. | 0.40 |
| 12 Sep 13 | Rosensaft, Michael M. | Meeting with E. Greebel to discuss pending matters. | 0.20 |
| 13 Sep 13 | Rosensaft, Michael M. | Meeting with M. Shkreli to discuss case; review BofA payment information. | 1.70 |
| 20 Sep 13 | Rosensaft, Michael M. | Calls with M. Biestek regarding pending issues and documents. | 0.30 |
| 23 Sep 13 | Mochizuki, Tenley | Review emails and documents to track timing and amount of settlement payments; draft summary for M. Rosensaft. | 0.70 |
| 23 Sep 13 | Rosensaft, Michael M. | Email with M. Biestek and review documents regarding extension payments. | 0.20 |
| 24 Sep 13 | Rosensaft, Michael M. | Review MSMB Healthcare PPM. | 0.50 |
| 26 Sep 13 | Rosensaft, Michael M. | Review subpoena; call with E. Schmidt regarding status of case; call with M. Shkreli regarding same. | 0.60 |
| 08 Oct 13 | Rosensaft, Michael M. | Email with M. Shkreli regarding new production. | 0.10 |
| 21 Oct 13 | Rosensaft, Michael M. | Prepare response to SEC subpoena. | 0.20 |
| 22 Oct 13 | Rosensaft, Michael M. | Emails with SEC and client regarding subpoena. | 0.20 |
| 28 Oct 13 | Mochizuki, Tenley | Review of documents for production to SEC; communications with M. Rosensaft re: contents of documents; redact documents and coordinate production to SEC. | 2.90 |
| 28 Oct 13 | Rosensaft, Michael M. | Call with SEC; review documents and finalize production. | 3.70 |
| 03 Dec 13 | Mochizuki, Tenley | Review and analyze new subpoenas issued by SEC; review emails from E. Greebel, M. Rosensaft, and D. Kravitz re: document collection. | 0.50 |
| 04 Dec 13 | Mochizuki, Tenley | Search for publicly-filed documents responsive to latest subpoenas from SEC; draft email to M. Rosensaft re: collection of documents. | 1.00 |
| 04 Dec 13 | Rosensaft, Michael M. | Obtain documents responsive to SEC subpoena. | 0.20 |
| 05 Dec 13 | Mochizuki, Tenley | Search emails provided by client to identify documents responsive to latest subpoenas and compare to documents previously produced. | 0.50 |
| 06 Dec 13 | Mochizuki, Tenley | Identify and organize responsive documents downloaded from SEC website; search documents provided by client for responsive email messages and organize for production; draft memorandum to M. Rosensaft discussing collection of responsive | 2.00 |

5

CONFIDENTIAL

KMR_RTRX_135707
R169015

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | documents and next steps for production. | |
| 07 Dec 13 | Mochizuki, Tenley | Review and analyze Retrophin LLC Agreement, Amendment to Agreement, and documents relating to conversion from LLC to corporation. | 0.70 |
| 08 Dec 13 | Mochizuki, Tenley | Review and analyze corporate documents for Retrophin LLC and Retrophin Inc. in anticipation of production to SEC. | 1.20 |
| 09 Dec 13 | Mochizuki, Tenley | Communications with E. Greebel, M. Rosensaft, D. Kravitz, and R. Brady re: collection of documents for production to SEC; oversee creation of document database; review publicly-filed documents for Retrophin Inc.; draft cover letter enclosing production and FOIA request letter and send to M. Rosensaft for comments. | 6.30 |
| 09 Dec 13 | Brady, Rick | Upload data to vendor FTP site for processing;Download processed data from vendor FTP site; unzip and copy to network; create new Concordance database; load data, attach images, create hyper-links to native files and index database.Add 1 additional PDF to database. | 2.00 |
| 09 Dec 13 | Rosensaft, Michael M. | Review Documents for SEC production. | 0.50 |
| 10 Dec 13 | Mochizuki, Tenley | Review and analyze publicly filed documents for Retrophin Inc. and Desert Gateway for production to SEC; communications with M. Rosensaft and E. Greebel re: cover letter and FOIA request letter; coordinate with R. Brady to process database; spot-check database and production discs; oversee mailing of production to SEC and FOIA request letter. | 5.30 |
| 10 Dec 13 | Brady, Rick | Create production from Concordance database; burn and label 2 CDs. | 1.50 |
| 10 Dec 13 | Rosensaft, Michael M. | Review documents for SEC production. | 0.60 |
| 11 Dec 13 | Mochizuki, Tenley | Review documents forwarded by E. Greebel (Retrophin LLC subscription documents); search documents previously provided by client for further responsive items; communications with M. Rosensaft and M. Biestek re: further document collection. | 2.40 |
| 11 Dec 13 | Rosensaft, Michael M. | Review documents for SEC production. | 0.20 |
| 16 Dec 13 | Mochizuki, Tenley | Communications with M. Rosensaft re: document collection and production. | 0.20 |
| 16 Dec 13 | Brady, Rick | Perform searches in "Responsive tagged items"; create new tag for final production review. | 1.00 |
| 16 Dec 13 | Rosensaft, Michael M. | Prepare document production for SEC. | 0.90 |
| 17 Dec 13 | Mochizuki, Tenley | Search and review documents provided by client for conversion of Retrophin interests; communications with M. Rosensaft re: same; review and analyze documents forwarded by E. Greebel re: Retrophin bank accounts, valuation, and other financial information. | 0.80 |
| 17 Dec 13 | Brady, Rick | Load data onto vendor FTP site for processing.Load additional data to vendor FTP site. | 1.00 |
| 17 Dec 13 | Rosensaft, Michael M. | Gather documents for SEC subpoena and prepare for | 1.70 |

6

**CONFIDENTIAL**

KMR_RTRX_135708

**R169016**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | production. | |
| 18 Dec 13 | Mochizuki, Tenley | Review and analyze bank statements, transfer agreements, and other documents for production to SEC; communications with M. Rosensaft and R. Brady re: same. | 6.40 |
| 18 Dec 13 | Brady, Rick | Upload data to vendor FTP site; download processed data, load into Concordance, attach images, create hyper-links to native files and index database.Burn and label CDs for production. | 2.50 |
| 18 Dec 13 | Rosensaft, Michael M. | Prepare production for SEC. | 0.20 |
| 19 Dec 13 | Brady, Rick | Prepare Concordance database for production. | 2.00 |
| 19 Dec 13 | Rosensaft, Michael M. | Prepare production for SEC. | 0.40 |
| 20 Dec 13 | Mochizuki, Tenley | Review and finalize production of documents to SEC; revise cover letter and FOIA request letter; communications with M. Rosensaft re: same. | 1.50 |
| 20 Dec 13 | Rosensaft, Michael M. | Prepare SEC production and letter to SEC. | 1.20 |
| 29 Dec 13 | Rosensaft, Michael M. | Call with M. Shkreli to discuss subpoena; call with E. Greebel to discuss settlement with LP. | 0.90 |
| 30 Dec 13 | Mochizuki, Tenley | Communications with E. Greebel re: further document collection for response to latest SEC subpoenas; review emails from M. Rosensaft, R. Brady, and SEC re: technical issues with last production to SEC. | 0.20 |
| 31 Dec 13 | Brady, Rick | Perform searches and tag results in Concordance database | 1.00 |
| 31 Dec 13 | Rosensaft, Michael M. | Meeting with R. Brady to discuss load files in SEC production. | 0.20 |
| 02 Jan 14 | Greebel, Evan L. | Conversation w/ M. Shkreli, M. Rosensaft, M. Gordon, review and addressing hacking situation | 2.90 |
| 02 Jan 14 | Mochizuki, Tenley | Communications with E. Greebel and M. Harrison (Retrophin controller) re: document collection to supplement response to latest SEC subpoenas; review and analyze bank statements and subscription agreements; draft summary of documents and send to M. Rosensaft. | 3.40 |
| 03 Jan 14 | Greebel, Evan L. | Conversation w/ M. Shkreli and M. Rosensaft | 0.80 |
| 06 Jan 14 | Mochizuki, Tenley | Communications with M. Rosensaft and R. Brady re: latest database and schedule of upcoming production. | 0.10 |
| 06 Jan 14 | Brady, Rick | Copy data to vendor FTP site for processing.Download processed data from vendor FTP site; create Concordance database, load processed data, attach images, create hyper-links for native files and index database. | 1.50 |
| 07 Jan 14 | Mochizuki, Tenley | Meet with M. Rosensaft to review and analyze bank statements, document collection, and other items to respond to latest SEC subpoenas; email M. Harrison (Protropin controller) re: valuation reports; communications with M. Rosensaft re: same; review and tag bank statements for further analysis. | 1.60 |
| 07 Jan 14 | Rosensaft, Michael M. | Email with SEC and prepare final production. | 1.00 |
| 08 Jan 14 | Mochizuki, Tenley | Meet with M. Brick to discuss review of bank | 1.20 |

7

**CONFIDENTIAL**

KMR_RTRX_135709
**R169017**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | statements and creation of spreadsheet of flagged entries; communications with M. Rosensaft and R. Brady re: global MSMB document database; review and analyze subscription agreements sent by M. Harrison (Retrophin controller) and add to production spreadsheet. | |
| 09 Jan 14 | Mochizuki, Tenley | Communications with R. Brady re: status of global MSMB database; communications with M. Brick re: spreadsheet of flagged items from Retrophin bank statements; review and analyze latest subscription agreements received from M. Harrison (Retrophin controller) and compare to bank statements; review and organize spreadsheet of flagged transactions from M. Brick; draft summary and send to M. Rosensaft. | 1.90 |
| 09 Jan 14 | Brick, Michael | Tabulate flagged transactions from bank statements for prospective production. | 4.40 |
| 10 Jan 14 | Mochizuki, Tenley | Coordinate with R. Brady re: global document database. | 0.10 |
| 18 Jan 14 | Mochizuki, Tenley | Review and finalize Retrophin documents to be produced to SEC; identify public filings to include with latest production; draft cover letter enclosing production; email R. Brady re: production database. | 0.90 |
| 21 Jan 14 | Mochizuki, Tenley | Communications with R. Brady re: production database; review and revise draft of cover letter to SEC enclosing production; email M. Rosensaft with status update and draft of cover letter. | 0.50 |
| 21 Jan 14 | Brady, Rick | Convert PDFs to TIFF, create load files and load data into Concordance, attach images and index database | 1.00 |
| 22 Jan 14 | Mochizuki, Tenley | Communications with R. Brady re: database; review production database to verify all necessary documents have been included; draft FOIA request letter. | 0.50 |
| 23 Jan 14 | Mochizuki, Tenley | Review and finalize production database; communications with R. Brady re: same; finalize cover letter and FOIA request letter. | 1.90 |
| 23 Jan 14 | Brady, Rick | Create production from Concordance database, endorse images and create load files; burn and label 2 CDs. | 2.50 |
| 23 Jan 14 | Rosensaft, Michael M. | Prepare production for SEC. | 0.30 |
| 24 Jan 14 | Mochizuki, Tenley | Review and revise cover letters enclosing production to SEC and FOIA request letters; locate and process production of documents based on comments from M. Rosensaft; finalize all letters and coordinate mailings. | 3.80 |
| 24 Jan 14 | Brady, Rick | Upload 6 PSTs to vendor FTP site for processing.Convert PDF to TIFF and OCR; load data into Concordance and endorse for production.Download and unzip processed data from vendor FTP site. | 6.00 |
| 24 Jan 14 | Rosensaft, Michael M. | Prepare production for SEC. | 0.60 |
| 25 Jan 14 | Brady, Rick | Load Concordance databases with processed data, attach images, create hyper-links and index databases. | 2.50 |
| 26 Jan 14 | Brady, Rick | Continue to load Concordance databases with | 3.50 |

8

**CONFIDENTIAL**

KMR_RTRX_135710
R169018

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| | | processed data, attach images, create hyper-links and index databases. | |
| 28 Jan 14 | Brady, Rick | Meet to discuss document repository and legal hold. | 0.50 |
| 29 Jan 14 | Brady, Rick | Download processed data from vendor FTP site; unzip and copy data to network; modify load files, load data into Concordance, attach images, create hyper-links for native files and index database. | 6.50 |
| 30 Jan 14 | Mochizuki, Tenley | Review and analyze most recent subpoena from SEC; review documents and locate responsive items; communications with M. Rosensaft and R. Brady re: documents to be produced; draft cover letter and FOIA request letter. | 0.70 |
| 30 Jan 14 | Brady, Rick | Continue loading data into Concordance database.Create small doc production for Limited Partnership Agreement. | 3.00 |
| 30 Jan 14 | Rosensaft, Michael M. | Prepare SEC production; emails with SEC regarding testimony. | 0.90 |
| 31 Jan 14 | Mochizuki, Tenley | Finalize letters and oversee production to SEC. | 0.30 |
| 31 Jan 14 | Mochizuki, Tenley | Westlaw research re: (i) statutory basis for federal and state private right of action for insider trading, and (ii) jurisdiction over federal securities claims in state court; draft summary of research and send to M. Rosensaft. | 3.70 |
| 11 Feb 14 | Rosensaft, Michael M. | Call to SEC re testimony. | 0.10 |
| 19 Feb 14 | Rosensaft, Michael M. | Prepare for SEC Testimony. | 0.40 |
| 20 Feb 14 | Greer, Steven M. | Electronically filed a cross-motion for sanctions, affirmation in support with exhibits and affirmation of good faith; Paid filing fee ($45.00), Supreme Court NY CountyCase: Huang v. MSMB | 0.50 |
| 21 Feb 14 | Greebel, Evan L. | Meeting w/ M. Shkreli and M. Rosensaft | 1.80 |
| 21 Feb 14 | Mochizuki, Tenley | Review and analyze all SEC productions to prepare for testimony; draft memorandum summarizing documents reflecting expenditures and send to M. Rosensaft. | 1.00 |
| 21 Feb 14 | Rosensaft, Michael M. | Review documents in preparation for SEC testimony; meeting with M. Shkreli to prepare for SEC testimony. | 4.40 |
| 24 Feb 14 | Greebel, Evan L. | Meeting w/ M. Shkreli and M. Rosensaft | 1.80 |
| 24 Feb 14 | Mochizuki, Tenley | Review and respond to emails from M. Rosensaft re: documents produced to assist with representation during SEC testimony. | 2.00 |
| 24 Feb 14 | Rosensaft, Michael M. | Prepare for and attend SEC for testimony; review previous productions and gather documents requested at testimony. | 9.80 |
| 26 Feb 14 | Greer, Steven M. | Electronically filed a reply affirmation in further support of defendants' cross-motion, Supreme Court NY County | 0.30 |
| 26 Feb 14 | Rosensaft, Michael M. | Prepare materials for SEC requests. | 0.70 |
| 27 Feb 14 | Greer, Steven M. | Answered efile calendar MSOC 130; Submit working copies of cross-moiton, Supreme Court NY County | 1.50 |
| 27 Feb 14 | Rosensaft, Michael M. | Meeting re SEC matter; prepare documents for SEC; research on trading question. | 1.00 |
| 03 Mar 14 | Brady, Rick | Reset Custodian field in Concordance to be blank. | 0.50 |

9

**CONFIDENTIAL**

KMR_RTRX_135711
**R169019**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 04 Mar 14 | Brady, Rick | Create new tag for Concordance database; send email advising location with hyper-link to database. | 0.50 |
| 05 Mar 14 | Brady, Rick | Create links and new tag for review of database. | 0.50 |
| 06 Mar 14 | Mochizuki, Tenley | Search through document database in Discovery Accelerator to locate account numbers for Interactive Brokers to facilitate auditors' recreation of MSMB Capital valuations. | 0.60 |
| 12 Mar 14 | Mochizuki, Tenley | Review and analyze latest SEC subpoena; search through electronic database for responsive documents; draft memorandum summarizing anticipated response to subpoena and send to M. Rosensaft. | 1.30 |
| 12 Mar 14 | Rosensaft, Michael M. | Collect documents for SEC production; email to client regarding same; call with E. Greebel regarding Valeant documents; review and edit FINRA timeline; draft email to investors regarding SEC contact; calls regarding investors. | 3.40 |
| 13 Mar 14 | Mochizuki, Tenley | Search through emails and electronic database for MSMB Capital bank account information to assist with preparation of audit of valuations; draft email forwarding relevant materials to M. Rosensaft; respond to inquiries from M. Rosensaft re: latest subpoena from SEC. | 0.80 |
| 13 Mar 14 | Rosensaft, Michael M. | Draft email to MSMB investors; email with SEC regarding same; prepare and gather documents for SEC production. | 1.20 |
| 18 Mar 14 | Rosensaft, Michael M. | Gather documents for SEC Subpoena. | 0.50 |
| 19 Mar 14 | Mochizuki, Tenley | Review and analyze documents in electronic database for production to SEC in response to latest subpoena; communications with M. Rosensaft re: same; begin drafting cover letter enclosing production and FOIA request letter. | 1.30 |
| 20 Mar 14 | Mochizuki, Tenley | Meet with M. Rosensaft to discuss progress and next steps; review and analyze Valeant documents in electronic database in preparation for production to SEC. | 4.90 |
| 20 Mar 14 | Brady, Rick | Convert documents to TIFF, OCR and create Concordance database; load data into database; attach images and index database.Create production from Concordance database; burn and label 3 CDs. | 3.50 |
| 21 Mar 14 | Mochizuki, Tenley | Review and analyze documents in electronic database to locate items reflecting settlement extension payments; search for documents indicating investors in MSMB Healthcare; draft memorandum summarizing findings and progress and send to M. Rosensaft. | 1.90 |
| 21 Mar 14 | Brady, Rick | Run Discovery Accelerator exports; upload PSTs to vendor FTP site for processing. | 2.50 |
| 21 Mar 14 | Rosensaft, Michael M. | Prepare documents for SEC production; call with M. Shrkreli regarding status of case; call with M. Biestek regarding SEC subpoena. | 2.20 |
| 24 Mar 14 | Brady, Rick | Download processed data from vendor FTP site; unzip | 2.50 |

10

CONFIDENTIAL

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|---|---|---|---|
| | | and copy to network; modify load files; create Concordance database; load processed data, attach images, create hyper-links for native files and index database. | |
| 25 Mar 14 | Mochizuki, Tenley | Review and analyze Valeant documents in response to latest SEC subpoena. | 1.60 |
| 27 Mar 14 | Mochizuki, Tenley | Review and analyze Valeant documents in preparation for production in response to SEC's latest subpoena. | 1.10 |
| 27 Mar 14 | Mason, Michael L. | Complete review of all records in data room and summarize all records under the following folders: Clozaril Folders, Additional Agreements, Clozaril & Fanapt 2013 Sales, Fanapt additional commercial A1 2014, Tech Ops Clozaril and Fanapt additional documents, Fanapt Addl Tech Ops Clinical Q1 2014 and CMC Documentation. | 7.40 |
| 28 Mar 14 | Mochizuki, Tenley | Review and analyze Valeant documents. | 1.50 |
| 29 Mar 14 | Mochizuki, Tenley | Review and analyze Valeant documents for production to SEC in response to latest subpoena. | 5.00 |
| 30 Mar 14 | Mochizuki, Tenley | Review and analyze Valeant documents for production in response to latest SEC subpoena. | 6.30 |
| 31 Mar 14 | Mochizuki, Tenley | Review and summarize selected documents from Valeant database for discussion with M. Rosensaft in expectation of production to SEC. | 1.70 |
| 01 Apr 14 | Mochizuki, Tenley | Meet with M. Rosensaft to discuss status update and key issues identified in Valeant database. | 0.40 |
| 02 Apr 14 | Mochizuki, Tenley | Draft summary of all outstanding issues with proposed Valeant production to SEC and send to M. Rosensaft. | 1.30 |
| 02 Apr 14 | Rosensaft, Michael M. | Review emails and prepare documents for SEC submission. | 0.80 |
| 03 Apr 14 | Mochizuki, Tenley | Review and tag documents to/from Valeant employees in electronic database to narrow production set to SEC; communications with M. Rosensaft re: same. | 0.50 |
| 04 Apr 14 | Mochizuki, Tenley | Review and revise Valeant tags. | 0.10 |
| 07 Apr 14 | Rosensaft, Michael M. | Prepare SEC production; meeting with M. Biestek and G. McGorty to summarize SEC investigation; prepare joint defense agreement. | 4.00 |
| 08 Apr 14 | Mochizuki, Tenley | Review and analyze MSMB Healthcare monthly packages forwarded by M. Shkreli; meet with M. Rosensaft to discuss latest production to SEC; search electronic database for investor activity statements. | 2.30 |
| 08 Apr 14 | Brick, Michael | Tabulate information gathered from investor statements for M. Rosensaft. | 1.00 |
| 09 Apr 14 | Brady, Rick | Download data from vendor FTP site; unzip and copy processed data to network; modify load files; Create database and load data; attach images, create hyper-links and index database. | 3.00 |
| 09 Apr 14 | Rosensaft, Michael M. | Review Nav investor statements for SEC production. | 1.00 |
| 10 Apr 14 | Mochizuki, Tenley | Review and tag new documents in database (healthcare investors); communications with M. Rosensaft re documents to produce to SEC; revise tags. | 3.70 |

11

KMR_RTRX_135713
R169021

Client. 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 10 Apr 14 | Rosensaft, Michael M. | Review MSMB Healthcare investor list, records, and emails; prepare joint defense agreement. | 1.00 |
| 11 Apr 14 | Mochizuki, Tenley | Meet with M. Rosensaft to discuss documents and upcoming production to SEC; revise tags and cover letter enclosing production. | 0.60 |
| 11 Apr 14 | Rosensaft, Michael M. | Prepare SEC production and cover letter. | 0.90 |
| 14 Apr 14 | Mochizuki, Tenley | Review and finalize database for production to SEC; meet with M. Rosensaft to discuss settlement extension payments; revise cover letter; discussions with R. Brady re: production logistics; oversee mailing of production and FOIA request. | 3.50 |
| 14 Apr 14 | Brady, Rick | Create production from Concordance database; export tagged documents; endorse images; create load files and burn CDs. | 3.50 |
| 14 Apr 14 | Rosensaft, Michael M. | Review cover letter and finalize SEC production. | 0.50 |
| 17 Apr 14 | Brady, Rick | Compress data for copy set and place on Thumb Drive. | 2.50 |
| 18 Apr 14 | Rosensaft, Michael M. | Research materiality and other trading issues; email with M. Biestek to confirm representation. | 3.00 |
| 29 Apr 14 | Mochizuki, Tenley | Review and analyze SEC subpoenas, correspondence, and production to determine which documents to provide as a courtesy to counsel for M. Biestek. | 0.30 |
| 29 Apr 14 | Rosensaft, Michael M. | Review joint defense agreement and send to client; email with M. Biestek's attorney regarding SEC investigation. | 0.40 |
| 05 May 14 | Mochizuki, Tenley | Meet with M. Rosensaft to discuss documents to share with counsel for M. Biestek; prepare and organize same. | 1.00 |
| 05 May 14 | Rosensaft, Michael M. | Prepare for meeting with Marek's counsel. | 0.30 |
| 06 May 14 | Mochizuki, Tenley | Finalize documents for M. Biestek's counsel; oversee creation of binders; communications with M. Rosensaft re: same. | 1.50 |
| 06 May 14 | Rosensaft, Michael M. | Prepare documents for M. Biestek counsel. | 0.40 |
| 07 May 14 | Rosensaft, Michael M. | Meeting with counsel for M. Biestek; compile documents for same. | 1.40 |
| 08 May 14 | Mochizuki, Tenley | Review and analyze MSMB Capital bank statements; discuss findings with M. Rosensaft; oversee mailing of statements to counsel for M. Biestek. | 0.70 |
| 08 May 14 | Rosensaft, Michael M. | Review MSMB bank records. | 0.30 |
| 12 May 14 | Rosensaft, Michael M. | Prepare documents for meeting with Glen McGorty. | 0.50 |
| 13 May 14 | Rosensaft, Michael M. | Prepare for meeting with Glen McGorty; prepare FINRA response. | 2.10 |
| 14 May 14 | Rosensaft, Michael M. | Meeting with G. McGorty to discuss Biestek testimony; calls with FBI and Assistant US Attorney regarding subpoena; calls with Biestek and Panoff. | 3.70 |
| 15 May 14 | Brady, Rick | Endorse PDF; convert to tiff and load data into Concordance database. | 0.50 |
| 15 May 14 | Rosensaft, Michael M. | Call with Assistant US Attorney regarding subpoena; call with G. McGorty regarding same; review subpoena and meeting with T. Mochizuki to gather documents. | 1.30 |

12

KMR_RTRX_135714
R169022

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 16 May 14 | Rosensaft, Michael M. | Gather documents responsive to US Attorney subpoena and prepare response. | 1.20 |
| 19 May 14 | Rosensaft, Michael M. | Review and prepare letter responding to FINRA request; call with A. Solomon regarding representation of M. Panoff and USAO subpoena; prepare documents in response to USAO subpoena. | 2.00 |
| 20 May 14 | Rosensaft, Michael M. | Calls with lawyers for M. Panoff and M. Biestek regarding subpoena; call with Assistant US Attorney regarding same; prepare production for US Attorney; review and finalize FINRA letter. | 2.00 |
| 21 May 14 | Rosensaft, Michael M. | Prepare response to US Attorney's Office subpoena; prepare joint defense agreement. | 1.70 |
| 22 May 14 | Mochizuki, Tenley | Communications with M. Rosensaft re: production status and courtesy copies of documents for M. Biestek's counsel; review and analyze documents to assist with same. | 0.60 |
| 28 May 14 | Rosensaft, Michael M. | Prepare materials for counsel for M. Panoff and M. Biestek; review trading records and SEC filings; call with AUSA regarding production. | 2.90 |
| 29 May 14 | Brady, Rick | Upload data to vendor FTP site for processing. | 1.00 |
| 29 May 14 | Denver, Zachary D. | Preparing voluntary production. | 0.50 |
| 29 May 14 | Chou, Tzutai | Went to client's office to transfer PST files to the thumb drive. | 4.00 |
| 29 May 14 | Rosensaft, Michael M. | Meeting with counsel for M. Panoff; review emails regarding preclearance of trades; review insider trading policy. | 3.20 |
| 30 May 14 | Mochizuki, Tenley | Coordinate production of courtesy copies of M. Biestek emails. | 0.30 |
| 30 May 14 | Brady, Rick | Download processed data from vendor FTP site; unzip and copy to network. | 1.50 |
| 30 May 14 | Rosensaft, Michael M. | Call with G. McGorty regarding conversation with US Attorney's Office; prepare SEC production. | 0.70 |
| 01 Jun 14 | Brady, Rick | Create Concordance database; modify load files; load processed data, attach images, create hyper-links for native files and index database. | 2.50 |
| 02 Jun 14 | Brady, Rick | Convert PDFs to TIFF, OCR and load into Concordance, re-index database. | 1.00 |
| 02 Jun 14 | Rosensaft, Michael M. | Prepare SEC and US Attorney productions; call with Glen McGorty regarding US Attorney subpoena. | 1.20 |
| 03 Jun 14 | Rosensaft, Michael M. | Prepare SEC and US Attorney productions; call with Panoff attorneys. | 0.80 |
| 04 Jun 14 | Rosensaft, Michael M. | Prepare emails for Marek's attorney. | 0.20 |
| 05 Jun 14 | Rosensaft, Michael M. | Meeting to review summary of email production. | 0.60 |
| 06 Jun 14 | Rosensaft, Michael M. | Review Manchester, preclearance, and blackout emails; call with Marc Panoff regarding meeting with US Attorney's office. | 2.30 |
| 09 Jun 14 | Rosensaft, Michael M. | Prepare US Attorney production. | 0.20 |
| 10 Jun 14 | Greer, John | Speak with Bannnon,J part clerk and confirm 6/11 Argument on Motion and cross-motion, have part clerk add to motion argument calendar for 6/11. | 0.30 |

13

**CONFIDENTIAL**

KMR_RTRX_135715

**R169023**

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 10 Jun 14 | Rosensaft, Michael M. | Call with Panoff lawyers to discuss meeting with Assistant US Attorney; prepare SEC production. | 3.00 |
| 11 Jun 14 | Rosensaft, Michael M. | Call with P. Summit to discuss Panoff meeting at US Attorney's Office; call with E. Greebel regarding same; review trading records for Manchester production. | 2.60 |
| 12 Jun 14 | Rosensaft, Michael M. | Review emails for SEC production, US Attorney Office production, and in preparation for meetings with M. Biestek; review trading records for productions; emails with counsel for M. Biestek regarding meeting and preparation for SEC testimony. | 5.00 |
| 13 Jun 14 | Mochizuki, Tenley | Review and analyze documents to assist with preparation for meeting with counsel for M. Biestek; discussions with M. Rosensaft re: same. | 0.60 |
| 13 Jun 14 | Rosensaft, Michael M. | Prepare for and attend meeting with M. Biestek and counsel to prepare for SEC testimony and review issues relating to Manchester Pharmaceuticals; review emails of M. Biestek in preparation for same. | 4.80 |
| 16 Jun 14 | Rosensaft, Michael M. | Review trading accounts and compare to filings; email with E. Schmidt regarding production; review Manchester emails. | 1.90 |
| 17 Jun 14 | Rosensaft, Michael M. | Prepare for and attend meeting with M. Biestek's counsel to prepare for SEC testimony; review trading records and emails for production and to prepare for SEC testimony. | 4.20 |
| 19 Jun 14 | Rosensaft, Michael M. | Communications with counsel for M. Biestek regarding testimony; review documents for US Attorney production. | 0.90 |
| 20 Jun 14 | Brady, Rick | Create production from Concordance database; burn and label 2 CDs. | 1.50 |
| 20 Jun 14 | Rosensaft, Michael M. | Call with counsel for M. Biestek to go through SEC testimony; review emails for US Attorney production; review SEC production and cover letters; meeting with E. Greebel to discuss issues in US Attorney emails. | 3.10 |
| 23 Jun 14 | Rosensaft, Michael M. | Prepare production for SEC and US Attorney's Office. | 0.30 |
| 24 Jun 14 | Mochizuki, Tenley | Review and annotate MSMB bank statements to create spreadsheet of expenses; meet with M. Brick to discuss creation of spreadsheet. | 2.40 |
| 24 Jun 14 | Rosensaft, Michael M. | Review privilege and relevancy determinations for USAO production. | 0.30 |
| 25 Jun 14 | Brick, Michael | Prepare spreadsheet of MSMB expenditures as per Chase account statements. | 1.00 |
| 26 Jun 14 | Rosensaft, Michael M. | Meeting with G. McGorty regarding SEC testimony and response to USAO subpoena. | 2.10 |
| 26 Jun 14 | Brick, Michael | Prepare spreadsheet of MSMB expenditures as per Chase account statements. | 2.80 |
| 27 Jun 14 | Rosensaft, Michael M. | Communications with M. Biestek counsel regarding case. | 0.10 |
| 27 Jun 14 | Brick, Michael | Prepare spreadsheet of MSMB expenditures as per Chase account statements. | 0.80 |
| 29 Jun 14 | Rosensaft, Michael M. | Review documents for privilege. | 0.10 |

14

**CONFIDENTIAL**

KMR_RTRX_135716
R169024

Client: 381676 – Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## PROFESSIONAL SERVICES
Matter 00012: Indemnification

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 30 Jun 14 | Brady, Rick | Create tag for "Produced to FTC" in Concordance database; apply tag to all "Produced" documents to date. Add previously produced (paper docs) to Concordance database. | 1.00 |
| 30 Jun 14 | Rosensaft, Michael M. | Review privileged documents for production. | 0.20 |
| 01 Jul 14 | Brick, Michael | Review and organize Concordance database in preparation for production of Shkreli and Biestek emails. | 4.00 |
| 01 Jul 14 | Brick, Michael | Prepare spreadsheet of MSMB expenditures as per Chase account statements. | 3.00 |
| 02 Jul 14 | Mochizuki, Tenley | Meet with M. Rosensaft to discuss production tags; review and search for documents concerning board meeting and executive compensation. | 0.50 |
| 02 Jul 14 | Rosensaft, Michael M. | Meeting with T. Mochizuki regarding production. | 0.10 |
| 02 Jul 14 | Brick, Michael | Prepare spreadsheet of MSMB expenditures as per Chase account statements. | 5.50 |
| 03 Jul 14 | Brick, Michael | Prepare spreadsheet of MSMB expenditures as per Chase account statements. | 5.10 |
| 05 Jul 14 | Rosensaft, Michael M. | Review possible privileged and non-relevant emails for production to USAO. | 0.30 |
| 07 Jul 14 | Greer, John | Speak with Bannon,J part clerk w/r/t O/S/C and Stay of Action and to delete 7/10 Conference from court calendar due to stay cited in Order | 0.30 |
| 07 Jul 14 | Mochizuki, Tenley | Review and analyze spreadsheet of MSMB expenses; summarize findings and send to M. Rosensaft. | 0.70 |
| 08 Jul 14 | Rosensaft, Michael M. | Meeting with T. Mochizuki regarding status of document production. | 0.20 |
| | | **TOTALS:** | **452.70** |

## SUMMARY OF PROFESSIONAL SERVICES
Matter 00012: Indemnification

| | Attorney or Assistant | Hours | Rate | Amount |
|---|----------------------|-------|------|--------|
| 42817 | Brady, Rick | 55.00 | 225.00 | $12,375.00 |
| 42817 | Brady, Rick | 25.50 | 220.00 | $5,610.00 |
| 43198 | Brick, Michael | 27.60 | 185.00 | $5,106.00 |
| 43127 | Chou, Tzutai | 4.00 | 195.00 | $780.00 |
| 43086 | Denver, Zachary D. | 0.50 | 360.00 | $180.00 |
| 20222 | Greebel, Evan L. | 7.30 | 710.00 | $5,183.00 |
| 01195 | Greer, John | 0.60 | 230.00 | $138.00 |
| 04419 | Greer, Steven M. | 2.30 | 175.00 | $402.50 |
| 43073 | Mason, Michael L. | 7.40 | 350.00 | $2,590.00 |
| 42770 | Mochizuki, Tenley | 72.60 | 420.00 | $30,492.00 |
| 42770 | Mochizuki, Tenley | 77.40 | 345.00 | $26,703.00 |
| 43195 | Rosensaft, Michael M. | 96.30 | 705.00 | $67,891.50 |
| 43195 | Rosensaft, Michael M. | 76.20 | 675.00 | $51,435.00 |
| | **TOTAL:** | **452.70** | | **$208,886.00** |

15

**CONFIDENTIAL**

KMR_RTRX_135717
R169025

Client: 381676 -- Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## DISBURSEMENTS

Matter 00012: Indemnification

| Date | Description | Amount |
|------|-------------|--------|
| 18 Jun 13 | VENDOR: Federal Express Corp. INVOICE#: 229872631 DATE: 6/10/2013 | 12.49 |
| | From: Evan Greebel To: David G. Trachtenberg, Esq. Trachtenberg Rodes & Friedberg 545 Fifth Avenue, Suite 640,NEW YORK NY,10017 US: On: 6/6/2013; Tracking ID: 799935306342 | |
| 25 Jul 13 | VENDOR: Federal Express Corp. INVOICE#: 234317361 DATE: 7/22/2013 | 8.41 |
| | From: Michael Rosensaft To: Eric M. Schmidt U.S. Securities and Exchange C ENF-CPU,WASHINGTON DC,20549 US: On: 7/18/2013; Tracking ID: 796265380276 | |
| 07 Aug 13 | VENDOR: Rosensaft, Michael M.; INVOICE#: 073013; DATE: 7/30/2013  -  Expense Reimbursement dated 7/30/13; Expense: 7/30/13 Taxi from Meeting at SEC back to office. | 27.00 |
| 09 Aug 13 | VENDOR: Planet Data Solutions, Inc.; INVOICE#: 6211; DATE: 7/31/2013 ESI gross GB processing, OCR of native files without extractable text | 426.78 |
| 22 Nov 13 | VENDOR: Thomson West; INVOICE#: 827902481; DATE: 9/1/2013 - Westlaw Business 8/01/13-8/31/13; Jonathan Milgrom 8/30/13 | 15.61 |
| 02 Dec 13 | Photocopies for 12/02/2013 | 15.00 |
| 09 Dec 13 | VENDOR: Planet Data Solutions, Inc.; INVOICE#: 6735; DATE: 11/30/2013 OCR of native files without extractable text (per page) , ESI net GB processing | 4,274.76 |
| 18 Dec 13 | VENDOR: Federal Express Corp. INVOICE#: 249682044 DATE: 12/16/2013 | 17.92 |
| | From: Tenley Mochizuki To: Eric M. Schmidt U.S. Securities and Exchange C 100 F St NE,WASHINGTON DC,20002 US: On: 12/10/2013; Tracking ID: 797357074972 | |
| 18 Dec 13 | VENDOR: Federal Express Corp. INVOICE#: 249682044 DATE: 12/16/2013 | 5.92 |
| | From: Tenley Mochizuki To:  Securities and Exchange Commis 100 F St NE,WASHINGTON DC,20549 US: On: 12/10/2013; Tracking ID: 797357148408 | |
| 20 Dec 13 | Postage for USPS 1ST CL LTR   TENLEY MOZICKI 575 MADISON AVENUE  ENTERED BY LN | 0.46 |
| 14 Jan 14 | VENDOR: Planet Data Solutions, Inc.; INVOICE#: 6878; DATE: 12/31/2013 Planet data 122013 (project # KMR0014) OCR of native files without extractable text (per page) , ESI net GB processing | 25.20 |
| 21 Jan 14 | VENDOR: SeamlessWeb Professional Solutions, Inc. INVOICE#: 1626146 DATE: 1/12/2014   Food service ordered on 01/07/2014 by Rosensaft, Michael M., OrderID: 440686662 | 17.89 |
| 31 Jan 14 | Westlaw Legal Research MOCHIZUKI,TENLEY on 01/31/2014 | 249.87 |
| 16 Feb 14 | Photocopies for 02/16/2014 | 1.80 |
| 11 Mar 14 | VENDOR: Planet Data Solutions, Inc.; INVOICE#: 7144; DATE: 2/28/2014 Planet Data 022014 (project # KMR0017) , OCR of native files without extractable text (per page) | 457.60 |
| 14 Mar 14 | VENDOR: Complete Discovery Source, Inc.; INVOICE#: 055901; DATE: 2/28/2014 OCR, Full data processing w/Tiff (MB) | 144.06 |
| 18 Mar 14 | VENDOR: Greebel, Evan L.; INVOICE#: 030414; DATE: 3/4/2014  - Expense Reimbursement 2/04/14 - late night taxi on 2/24/14 | 8.75 |

16

CONFIDENTIAL

KMR_RTRX_135718
R169026

Client: 381676 -- Retrophin, Inc.

Invoice No. 1301145676
Invoice Date: September 30, 2014

## DISBURSEMENTS
Matter 00012: Indemnification

| Date | Description | Amount |
|------|-------------|--------|
| 08 May 14 | VENDOR: Planet Data Solutions, Inc.; INVOICE#: 7370; DATE: 4/30/2014 Planet Data 042014 (project # KMR0021) , OCR of native files without extractable text (per page), ESI net GB processing | 350.03 |
| 06 Jun 14 | VENDOR: Planet Data Solutions, Inc.; INVOICE#: 7519; DATE: 5/31/2014 - Planet Data 052014 (PROJECT #KMR0025)  OCR of NAtive Files Without Extractable Text (per page) | 9,349.80 |
| 03 Jul 14 | VENDOR: Federal Express Corp. INVOICE#: 270140068 DATE: 6/30/2014 From: Tenley Mochizuki To: Eric M. Schmidt ENF-CPU 100 F ST NE,WASHINGTON DC,20549 US: On: 6/20/2014; Tracking ID: 770368819960 | 14.66 |
| 03 Jul 14 | VENDOR: Federal Express Corp. INVOICE#: 270140068 DATE: 6/30/2014 From: Tenley Mochizuki To: Office of FOIA Services Securities & Exchange Commissi 100 F ST NE,WASHINGTON DC,20549 US: On: 6/20/2014; Tracking ID: 770368829413 | 14.66 |
| | **TOTAL:** | **$15,438.67** |

## SUMMARY OF DISBURSEMENTS
Matter 00012: Indemnification

| | |
|---|---|
| After Hours Meals Expense | $17.89 |
| Courier | $74.06 |
| Postage | $0.46 |
| Photocopy Costs | $16.80 |
| Service Fees | $5,251.65 |
| Legal Research | $249.87 |
| Legal Research | $15.61 |
| Local Transportation | $35.75 |
| Planet Data Solutions, Inc. | $9,776.58 |
| **TOTAL:** | **$15,438.67** |

| **MATTER TOTAL:** | **$224,324.67** |
|---|---|

17

**CONFIDENTIAL**

KMR_RTRX_135719
R169027



**Katten**
KattenMuchinRosenman LLP

575 Madison Avenue
New York, NY 10022-2585

## REMITTANCE
Please include this remittance advice with your payment to ensure proper account crediting

| | | | |
|---|---|---|---|
| **Attorney:** | 20222 - Evan L. Greebel | **Invoice No.:** | 1301145676 |
| **Client:** | 381676 - Retrophin, Inc. | **Invoice Date:** | 30 Sep 14 |
| **Matter:** | 00012 - Indemnification | | |

**Current Invoice Charges:**  $224,324.67

**TOTAL BALANCE DUE:**  $224,324.67

**Wire Instructions:**
Reference: 381676.00012

JP Morgan Chase Bank
1211 Avenue of the Americas, 39th Floor
New York, New York 10036
Attn: Brian Phile
Phone: 866-325-5939
ABA #021000021
Swift Code: CHASUS33

For Credit To: Katten Muchin Rosenman LLP
Operating Account
Account #967343933

When wiring a payment please fax a copy of the Remittance to Jean Monteforte at 212-940-7175

Please direct any billing inquiries to Lisa Henry at 212-940-6636 or e-mail lisa.henry@kattenlaw.com

**CONFIDENTIAL**

KMR_RTRX_135720
R169028

10-Q/A 1 e611284_10qa-retrophin.htm



E. GREEBEL

DX-116-80

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM 10-Q/A
### (Amendment No. 1)

---

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2013

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

# RETROPHIN, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 000-53293 | 27-4842691 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File No.)** | **(I.R.S. Employer Identification No.)** |

**777 Third Avenue, 22nd Floor, New York, NY, 100017**
**(Address of Principal Executive Offices)**

---

**(646) 837-5863**
**(Issuer Telephone number)**

---

**(Former Name or Former Address if Changed Since Last Report)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐ No ☒

The number of shares of outstanding common stock, par value $0.0001 per share, of the Registrant as of September 13, 2013 was 18,150,837.

# EXPLANATORY NOTE

This Amendment No. 1 on Form 10-Q/A (this "Amendment") amends our Quarterly Report on Form 10-Q for the period ended March 31, 2013, as filed with the Securities and Exchange Commission (the "SEC") on July 24, 2013 (the "Original Filing"), solely for the purpose of amending Part I, Item 1. Financial Statements and Part I, Item 2. Management's Dicussion and Analysis of Financial Condition and Results of Operations to include a footnote to our financial statements and disclosure relating to events that occurred after the conclusion of the period covered by the Original Filing. The Company also made an accounting adjustment related to the allocation of proceeds it received in a financing transaction it completed in February 2013. The adjustment affects the Company's March 31, 2013 condensed consolidated balance sheet and condensed consolidated statement of stockholders' deficit. This Amendment is not intended to update any other information presented in the Original Filing.  The Original Filing continues to speak as of the dates described therein, and we have not updated the disclosures contained therein to reflect any events that occurred subsequent to such dates.  Accordingly, this Amendment should be read in conjunction with our filings made with the SEC subsequent to the Original Filing, as information in such filings may update or supersede certain information contained in the Original Filing and in this Amendment.

2

**TABLE OF CONTENTS**

**Page No.**

**PART I – FINANCIAL INFORMATION**

Item 1. Financial Statements

Condensed Consolidated Balance Sheets as of March 31, 2013 (unaudited) and December 31, 2012    4

Unaudited Condensed Consolidated Statements of Operations for the three months ended March 31, 2013 and 2012, and for the period from March 11, 2011 (inception) through March 31, 2013    5

Condensed Consolidated Statement of Changes in Stockholders' Deficit for the period from March 11, 2011 (inception) through March 31, 2013    6

Unaudited Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2013 and 2012, and for the period from March 11, 2011 (inception) through March 31, 2013    7

Notes to Unaudited Condensed Consolidated Financial Statements    8

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations    17

**PART II – OTHER INFORMATION**

Item 6. Exhibits    23

3

# PART I – FINANCIAL INFORMATION

## Item 1. Financial Statements

<div align="center">

**RETROPHIN, INC. AND SUBSIDIARY**
**(A DEVELOPMENT STAGE COMPANY)**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

</div>

|  | March 31, 2013 (Restated) (unaudited) |  | December 31, 2012 |  |
|---|---:|---|---:|---|
| **Assets** |  |  |  |  |
|  |  |  |  |  |
| Current assets: |  |  |  |  |
| Cash | $ | 2,503,463 | $ | 11,388 |
| Prepaid expenses and other current assets |  | 134,457 |  | 21,830 |
| Total current assets |  | 2,637,920 |  | 33,218 |
|  |  |  |  |  |
| Property and equipment, net |  | 28,419 |  | 23,790 |
| Patents pending |  | 18,093 |  | 18,093 |
| Due from affiliate |  | 137,547 |  | 137,547 |
| Technology license, net |  | 2,128,662 |  | 2,178,617 |
| Total assets | $ | 4,950,641 | $ | 2,391,265 |
|  |  |  |  |  |
| **Liabilities and Stockholders' Deficit** |  |  |  |  |
|  |  |  |  |  |
| Current liabilities: |  |  |  |  |
| Technology license liability | $ | - | $ | 1,300,000 |
| Accounts payable |  | 484,719 |  | 1,023,320 |
| Accrued expenses |  | 720,330 |  | 2,467,796 |
| Registration payment obligation |  | 360,000 |  | - |
| Note payable - related party |  | - |  | 884,764 |
| Investors' deposits |  | - |  | 100,000 |
| Due to related parties |  | 10,000 |  | 23,200 |
|  |  |  |  |  |
| Total current liabilities |  | 1,575,049 |  | 5,799,080 |
|  |  |  |  |  |
| Derivative financial instruments, at estimated fair value - warrants |  | 6,957,264 |  | - |
|  |  |  |  |  |
| Total liabilities |  | 8,532,313 |  | 5,799,080 |
|  |  |  |  |  |
| Stockholders' Deficit: |  |  |  |  |
| Preferred stock Series A $0.001 par value; 20,000,000 shares authorized; 0 issued and outstanding |  | - |  | - |
| Common stock $0.0001 par value; 100,000,000 shares authorized; 12,190,640 and 8,952,905 issued and outstanding, respectively |  | 1,219 |  | 895 |
| Additional paid-in capital |  | 34,772,143 |  | 30,203,402 |
| Deficit accumulated during the development stage |  | (38,355,034) |  | (33,612,112) |
| Total stockholders' deficit |  | (3,581,672) |  | (3,407,815) |
| Total liabilities and stockholders' deficit | $ | 4,950,641 | $ | 2,391,265 |

<div align="center">4</div>

**RETROPHIN, INC. AND SUBSIDIARY**
**(A DEVELOPMENT STAGE COMPANY)**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the three months ended March 31, | | For the period from March 11, 2011 (inception) through March 31, 2013 |
|---|---|---|---|
| | 2013 | 2012 | |
| Operating expenses: | | | |
| Compensation and related costs - inclusive of share base compensation $20,833, $1,535,267 and $17,758,650 | $ 1,045,287 | $ 1,769,831 | $ 21,406,040 |
| Professional fees - inclusive of share based compensation $138,372, $1,003,124, and $6,790,076 | 692,577 | 1,708,429 | 10,796,429 |
| Selling, general and administrative | 412,620 | 80,194 | 1,768,728 |
| Technology license contingent fee | 100,000 | - | 1,800,000 |
| Total operating expenses | 2,250,484 | 3,558,454 | 35,771,197 |
| | | | |
| Operating loss | (2,250,484) | (3,558,454) | (35,771,197) |
| | | | |
| Other income (expense): | | | |
| Interest income | - | 3,748 | 21,905 |
| Interest expense | (41,563) | (17,327) | (147,480) |
| Change in estimated fair value of derivative financial instruments - warrants | (2,451,659) | - | (2,451,659) |
| Gain (loss) on transactions denominated in foreign currencies | 784 | - | (6,603) |
| Total other expense, net | (2,492,438) | (13,579) | (2,583,837) |
| | | | |
| Net loss | $ (4,742,922) | $ (3,572,033) | $ (38,355,034) |
| | | | |
| Net loss per common share, basic and diluted | $ (0.44) | $ (1.43) | |
| | | | |
| Weighted average common shares outstanding, basic and diluted | 10,697,129 | 2,502,327 | |

5

**RETROPHIN, INC. AND SUBSIDIARY**
**(A DEVELOPMENT STAGE COMPANY)**
**CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' DEFICIT**

| | Common stock | | Additional paid in capital | Receivables due from stockholder | Accumulated deficit | Total Stockholders' deficit |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance - March 11, 2011 (inception) | - | $ - | $ - | $ | $ - | $ - |
| Issuance of common shares | 1,608,300 | 161 | 24,839 | (25,000) | - | |
| Issuance of common shares to founders inconnection with the initial capital contribution | 50,000 | 5 | 95 | | - | 100 |
| Incentive shares granted- employees | 1,758,300 | 176 | (176) | - | - | |
| Incentive shares granted- non employees | 381,000 | 38 | (38) | - | - | |
| Incentive shares forfeited - employees | (45,835) | (5) | 5 | - | - | |
| Share based compensation - employees | - | - | 1,724,967 | - | - | 1,724,967 |
| Share based compensation - non employees | - | - | 254,332 | - | - | 254,332 |
| Issuance of shares in connection with March 2011 private placement, net of fess of $66,061 | 253,750 | 25 | 658,914 | - | - | 658,939 |
| Issuance of Series A preferred in connection with March 2011 private placement, net of feees of $1,367, recapitalization to common stock | 36,750 | 4 | 103,629 | - | - | 103,633 |
| Loan made to stockholder | - | - | - | (10,000) | - | (10,000) |
| Net loss | - | - | - | - | (3,268,256) | (3,268,256) |
| Balance - December 31, 2011 | 4,042,265 | 404 | 2,766,567 | (35,000) | (3,268,256) | (536,285) |
| Prior Issuance of Series A preferred in connection with January 2012 private placement, net of feees of $61,677, exchanged to common stock | 326,963 | 33 | 1,806,644 | - | - | 1,806,677 |
| Prior Issuance of Series A preferred in connection with May 2012 private placement, net of feees of $12,275, exchanged to common stock | 470,764 | 47 | 1,668,979 | - | - | 1,669,026 |
| Shares transferred to consultants by founder for services | - | - | 4,400,000 | - | - | 4,400,000 |
| Shares transferred to employees by founders for services | - | - | 1,375,000 | | | 1,375,000 |
| Shares issued in accordance with license agreement | 620,000 | 62 | 1,549,938 | - | - | 1,550,000 |
| Shares outstanding at time of reverse merger date December 12, 2012 | 2,585,583 | 259 | 1,142 | - | - | 1,401 |
| Incentive shares granted- employees | 866,180 | 86 | (86) | - | - | - |
| Incentive shares granted - non employees | 87,503 | 9 | (9) | - | - | - |
| Incentive shares forfeited - employees | (46,353) | (5) | 5 | - | - | - |
| Share based compensation - employees | - | - | 14,637,850 | - | - | 14,637,850 |
| Share based compensation - non employees | - | - | 1,997,372 | - | - | 1,997,372 |
| Receivable due from stockholder charged to compensation | - | - | - | 407,900 | - | 407,900 |
| Loan made to stockholder | - | - | - | (372,900) | - | (372,900) |
| Net loss | - | - | - | - | (30,343,856) | (30,343,856) |
| Balance - December 31, 2012 | 8,952,905 | 895 | 30,203,402 | - | (33,612,112) | (3,407,815) |
| Incentive shares granted - non employees | 12,500 | 1 | (1) | - | - | - |
| Share based compensation - employees (unaudited) | - | - | 20,833 | - | - | 20,833 |
| Share based compensation - non | - | - | 138,372 | - | - | 138,372 |

| | | | | | | |
|---|---|---|---|---|---|---|
| employees (unaudited) | | | | | | |
| Incentive shares forfeited - employees (unaudited) | (20,833) | (2) | 2 | - | - | - |
| Incentive shares forfeited - non employees (unaudited) | (72,082) | (7) | 7 | - | - | - |
| Issuance of common stock in connection with January 2013 private placement at $3.00 per share, net of fees of $0 (unaudited) | 272,221 | 27 | 816,637 | - | - | 816,664 |
| Issuance of common stock in connection with February 2013 private placement at $3.00 per share, net of fees of $678,986 and registration payment obligation of $360,000 (unaudited) | 3,045,929 | 305 | 3,592,891 | - | - | 3,593,196 |
| Net loss (unaudited) | - | - | - | - | (4,742,922) | (4,742,922) |
| Balance - March 31, 2013-Restated (unaudited) | 12,190,640 | $ 1,219 | $ 34,772,143 | $ - | $ (38,355,034) | $ (3,581,672) |

6

**RETROPHIN, INC. AND SUBSIDIARY**
**(A DEVELOPMENT STAGE COMPANY)**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the three months ended March 31, | | For the period from March 11, 2011 (inception) through March 31, 2013 |
|---|---|---|---|
| | 2013 | 2012 | |
| **Cash Flows From Operating Activities:** | | | |
| Net loss | $ (4,742,922) | $ (3,572,033) | $ (38,355,034) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 52,168 | 313 | 177,408 |
| Compensation in lieu of receivable | - | - | 407,900 |
| Share based compensation - employees | 20,833 | 1,535,267 | 17,758,650 |
| Share based compensation - non-employees | 138,372 | 1,003,124 | 6,790,076 |
| Share based payment - Technology license contingent fee | - | - | 1,550,000 |
| Change in estimated fair value of derivative financial instruments - warrants | 2,451,659 | - | 2,451,659 |
| **Changes in operating assets and liabilities:** | | | |
| Prepaid expenses | (112,627) | (78,392) | (134,457) |
| Accounts payable and accrued expenses | (2,386,067) | (110,865) | 1,102,728 |
| Net cash used in operating activities | (4,578,584) | (1,222,586) | (8,251,070) |
| | | | |
| **Cash Flows From Investing Activities:** | | | |
| Purchase of fixed assets | (6,842) | (2,508) | (34,488) |
| Purchase of intangible assets | - | - | (1,168,093) |
| Repayment of technology license liability | (1,300,000) | - | (1,150,000) |
| Cash received in merger transaction | - | - | 3,721 |
| Payments made on behalf of affiliate | - | - | (137,547) |
| Loans made to stockholder | - | - | (382,900) |
| Increase in note receivable - related party | - | (198,248) | - |
| Net cash used in investing activities | (1,306,842) | (200,756) | (2,869,307) |
| | | | |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds from related parties | - | - | 56,500 |
| Repayment of net amounts due to related parties | (13,200) | - | (46,500) |
| Proceeds from note payable - related party | - | 838,764 | 930,000 |
| Repayment of note payable - related party | (884,764) | - | (930,000) |
| Investors' deposits | - | - | 100,000 |
| Proceeds received from issuance of common stock, net of fees of $678,986, $51,307, and $820,367, respectively | 9,275,465 | 540,811 | 13,513,840 |
| Repayment of stock subscription receivable | - | 35,000 | - |
| Net cash provided by financing activities | 8,377,501 | 1,414,575 | 13,623,840 |
| | | | |
| Net increase (decrease) in cash | 2,492,075 | (8,767) | 2,503,463 |
| Cash, beginning of period | 11,388 | 10,053 | - |
| | | | |
| Cash, end of period | $ 2,503,463 | $ 1,286 | $ 2,503,463 |
| | | | |
| Supplemental Disclosure of Cash Flow Information: | | | |
| Cash paid for interest | $ 28,263 | $ - | $ 43,027 |
| Non-cash investing and financing activities: | | | |
| Issuance of stock for subscription receivable | $ - | $ - | $ 25,000 |
| Allocation of proceeds from issuance of common stock to registration payment obligation | $ 360,000 | $ - | $ 360,000 |

7

**RETROPHIN, INC. AND SUBSIDIARY**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1. DESCRIPTION OF BUSINESS

*Organization and Description of Business*

Retrophin, Inc. (the "Company") was incorporated as Desert Gateway, Inc. ("Desert Gateway") in the State of Oklahoma on February 8, 2008. Desert Gateway was originally a wholly-owned subsidiary of American Merchant Data Services, Inc. ("American Merchant"). In a 2008 reorganization of American Merchant, each share of outstanding common stock of American Merchant was converted into one share of Desert Gateway, while all of American Merchant's operating assets, liabilities and tax attributes (including accumulated losses and net operating losses) carried forward to another subsidiary of American Merchant in a downstream merger with such other subsidiary. Accordingly, American Merchant is not considered a predecessor company of the Desert Gateway for accounting or legal purposes. Following the 2008 reorganization, Desert Gateway re-domiciled to Delaware. Since inception and until Desert Gateway's merger with Retrophin, Inc., a private company ("Former Retrophin") in December 2012 (as described below), Desert Gateway had no existing operations, and its sole purpose was to locate and consummate a merger or acquisition with a private entity.

Former Retrophin was originally organized as a Delaware limited liability company, named Retrophin, LLC, on March 11, 2011 ("Inception"). On September 20, 2012, Retrophin filed a Certificate of Conversion to change its legal form of organization from a limited liability company to a corporation in the State of Delaware. This conversion into a corporation, which preceded the Merger on December 12, 2012, resulted in no change of ownership and was therefore considered a recapitalization of the LLC's equity.

On September 13, 2012, Former Retrophin formed a new entity, Retrophin Pharmaceutical, Inc., a Delaware corporation and a wholly-owned subsidiary of Retrophin, Inc.

On December 12, 2012, Desert Gateway completed the transactions contemplated under the Agreement and Plan of Merger, dated as of December 12, 2012 (the "Merger Agreement"), by and among Desert Gateway, Desert Gateway Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of Desert Gateway, and Former Retrophin, our predecessor, in which Former Retrophin became a wholly-owned subsidiary and the principal operating subsidiary of the Company. The transactions contemplated by the Merger Agreement are collectively referred to herein as the "Merger". The Merger became effective on December 12, 2012, upon the filing of a certificate of merger with the Secretary of State of the State of Delaware. Accordingly, the Merger resulted in a change in control of Desert Gateway. Desert Gateway's net assets amounted to $1,401 at the time of the merger, including $3,721 of cash and $2,320 of trade liabilities. The merger is being accounted for as a reverse merger and recapitalization of Former Retrophin into Desert Gateway, whereby Desert Gateway is the legal acquirer and Former Retrophin is the legal acquiree and the accounting acquirer in this transaction.

Upon the consummation of the Merger all of the issued and outstanding Class A Preferred shares of Former Retrophin were exchanged into the Company's common shares at the rate of 1 to 7 (each Class A Preferred stockholder received 7 shares of the Company's common stock) and all of the issued and outstanding share of common stock of Former Retrophin were exchanged for shares of the Company's common stock on exchange ratio of 1 to 5 (each common stockholder of Former Retrophin received 5 shares of the Company's common stock).

The consolidated financial statements give retroactive effect to these changes as if the merger occurred at the inception of the Company.

On February 14, 2013, the Company changed its name to "Retrophin, Inc." through a short-form merger pursuant to Section 253 of the Delaware General Corporation Law, with its then wholly owned subsidiary, and our predecessor, Former Retrophin, with the Company continuing as the surviving corporation following the merger.

On April 1, 2013, the Company changed its fiscal year end from the last of February to a fiscal year end of December 31 in order to confirm its reporting cycle to that of Former Retrophin.

The Company is an emerging biotechnology company dedicated to developing drugs for rare and life-threatening diseases. The Company's primary business objective is to develop and commercialize therapies for orphan diseases, such as Duchenne muscular dystrophy, or DMD, focal segmental glomerulosclerosis, and pantothenate kinase-associated neurodegeneration. The Company is considered to be a development stage company and, as such, the Company's financial statements are prepared in accordance with the Accounting Standards Codification ("ASC") 915 "Development Stage Entities." The Company is subject to all of the risks and uncertainties associated with development stage companies.

# NOTE 2. <u>BASIS OF PRESENTATION</u>

*Interim Financial Statements*

The accompanying unaudited condensed consolidated financial statements of the Company should be read in conjunction with the audited consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K/A for the year ended December 31, 2012 (the "2012 10-K/A") filed with the Securities and Exchange Commission (the "SEC") on September 13, 2013. The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information, the instructions to Form 10-Q and the rules and regulations of the SEC. Accordingly, since they are interim statements, the accompanying condensed consolidated financial statements do not include all of the information and notes required by GAAP for annual financial statements, but reflect all adjustments consisting of normal, recurring adjustments, that are necessary for a fair presentation of the financial position, results of operations and cash flows for the interim periods presented. Interim results are not necessarily indicative of results for a full year. The December 31, 2012 balance sheet information was derived from the audited financial statements as of that date.

# NOTE 3. <u>LIQUIDITY, FINANCIAL CONDITION AND MANAGEMENT PLANS</u>

The Company incurred a net loss of approximately $38 million, including stock-based compensation charge of $25 million for the period from March 11, 2011 (inception) to March 31, 2013. At March 31, 2013, the Company had a cash balance of approximately $2.5 million and working capital of approximately $1.1 million. The Company's accumulated deficit amounted to approximately $38,355,034 at March 31, 2013.

The Company has principally financed its operations from inception using proceeds from sales of its equity securities in a series of private placement transactions (see Note 11). The Company to date has no revenues, significantly limited capital resources and is subject to all of the risks and uncertainties that are typical of a development stage enterprise. Significant uncertainties include, among others, whether it will be able to raise the capital it needs to finance the start of its planned operations and whether such operations, if launched, will enable the Company to become a profitable enterprise.

On February 14, 2013, in connection with the closing of a private placement, we issued and sold an aggregate of 3,045,929 shares of common stock, for an aggregate purchase price of $9,137,787 in cash, and warrants to purchase up to an aggregate of 1,522,969 shares of common stock (Note 11).

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became party to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company and the related party have entered into indemnification agreements whereby the related party has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. The Company paid $593,111 of the total settlement liabilities in the second quarter of 2013 and had $1,691,400 in outstanding settlement liabilities, $1,013,900 of which is past due and $677,500 of which was due in August 2013. The counter parties to these agreements reserve the right to demand payment at any time. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock in the Company to one of the counter parties as a separate component of one of the agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the second quarter ended June 30, 2013.

There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.

Concurrent with the execution of such settlement agreements, the Company received promissory notes from the related party whereby the related party agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. These condensed consolidated financial statements do not include any adjustments relating to the recovery of assets or the classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

Management believes the Company's ability to continue its operations depends on its ability to raise capital. The Company entered into a licensing agreement providing it with the use of certain technology. The Company is currently developing pre-clinical and clinical studies of drug candidates. The licensing agreement (described in Note 8) also enables the Company to sell the licensed technology as a research product or sublicense the technology to other third parties as alternative sources of revenue to its own product development efforts. The Company's future depends on the costs, timing, and outcome of regulatory reviews of its product candidates and the costs of commercialization activities, including product marketing, sales and distribution. During the first quarter of 2013, the Company raised an

aggregate of approximately $9.95 million in certain private placement transactions. The Company expects to continue to finance its cash needs through additional private equity offerings and debt financings, corporate collaboration and licensing arrangements and grants from patient advocacy groups, foundations and government agencies. Although management believes that the Company has access to capital resources, there are no commitments for financing in place at this time, nor can management provide any assurance that such financing will be available on commercially acceptable terms, if at all.

## NOTE 4.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

A summary of the significant accounting policies applied in the preparation of the accompanying condensed consolidated financial statements follows:

*Principles of Consolidation*

The condensed consolidated financial statements represent the consolidation of the accounts of the Company and its subsidiary in conformity with U.S. GAAP. All intercompany accounts and transactions have been eliminated in consolidation.

*Restatement of Previously Issued Financial Statements*

The Company, while undergoing a review of its condensed consolidated financial statements for the three and six months periods ended June 30, 2013, commenced an evaluation of its accounting for a series of settlement agreements that the Company, along with certain of its related parties, entered into between April 2013 and June 2013. These agreements, which Company management originally deemed to be the primary obligation of a related party, are more fully described in Notes 3 and 13.  On September 13, 2013, Company management, under the authority of the board of directors, determined that these agreements should have been disclosed in the footnotes to these condensed consolidated financial statements.  Accordingly, the Company has restated these condensed consolidated financial statements to include the required disclosures.

The Company also determined that its obligation to pay liquidated damages under a registration payment arrangement that it entered into in connection with a financing transaction it completed on February 14, 2013, which required the Company to cause a registration statement to be declared effective by the Securities and Exchange Commission by May 15, 2013, should have been recorded as a liability at the date in which this financing transaction was completed.  Accordingly, the Company is correcting this error by restating these condensed consolidated financial statements to allocate approximately $360,000 of the proceeds received in this financing transaction to a registration payment obligation that was deemed probable at the date that the financing transaction was completed.

The following table illustrates the effects of the adjustment on the March 31, 2013 condensed consolidated balance sheet:

|  | March 31, 2013 | | |
|  | As Reported | Adjustment | As Restated |
|---|---|---|---|
| Total current liabilities | $ 1,215,049 | $ 360,000 | $ 1,575,049 |
| Total liabilities | $ 8,172,313 | $ 360,000 | $ 8,532,313 |
| Additional paid-in capital | $ 35,132,143 | $ (360,000) | $ 34,772,143 |
| Stockholders' deficit | $ (3,221,672) | $ (360,000) | $ (3,581,672) |

*Cash and Cash Equivalents*

For purposes of the statement of cash flows, the Company considers cash instruments with maturities of less than three months when purchased to be cash equivalents.  There are no cash equivalents as of the balance sheet date.

9

*Property and Equipment*

Property and equipment are stated at cost.  Depreciation is provided for using the straight-line method over the estimated useful lives of the assets.  At March 31, 2013 and 2012, property and equipment consisted of computers with an estimated useful life of three years and leasehold improvements with an estimated life of four years.

*Employee Stock-Based Compensation*

The Company accounts for stock-based compensation in accordance with ASC 718 Compensation — Stock Compensation ("ASC 718"). ASC 718 addresses all forms of share-based payment ("SBP") awards including shares issued under employee stock purchase plans and stock incentive shares.  Under ASC 718 awards result in a cost that is measured at fair value on the awards' grant date, based on the estimated number of awards that are expected to vest and will result in a charge to operations.

*Non-Employee Stock-Based Compensation*

The Company accounts for equity instruments issued to non-employees in accordance with the provisions of ASC 505, "Equity Based Payments to Non-Employees" ("ASC 505"), Share Based Payments to Non-Employees, and ASC 718 which requires that such equity instruments are recorded at their fair value on the measurement date. The measurement of stock-based compensation is subject to periodic adjustment as the underlying equity instruments vest. Non-employee stock-based compensation charges are being amortized over their respective contractual vesting periods.

*Use of Estimates*

In preparing financial statements in conformity with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of expenses during the reporting period.  Due to inherent uncertainty involved in making estimates, actual results reported in future periods may be affected by changes in these estimates. On an ongoing basis, the Company evaluates its estimates and assumptions. These estimates and assumptions include valuing equity securities in share-based payments, estimating fair value of equity instruments recorded as derivative liabilities, estimating the useful lives of depreciable and amortizable assets and estimating the fair value of long-lived assets to assets whether impairment charges may apply.

*Research and Development Costs:*

Research and development costs are charged to operations as incurred and consist primarily of consulting costs, contract research and development costs, and compensation costs. For the period ended March 31, 2013 and 2012, and for the period from March 11, 2011 (inception) through March 31, 2013, the Company recognized $108,735, $34,271, and $1,003,248, respectively, of research and development costs.

*Patents*

The Company capitalized external cost, such as filing fees and associated attorney fees, incurred to obtain issued patents and patent applications pending. The Company expense cost associated with maintaining and defending patents subsequent to their issuance in the period incurred. The Company amortizes patent cost once issued on a straight-line basis over the estimate useful lives of the patents. The Company assess the potential impairment to all capitalized patent cost when events or changes in circumstances indicate that the carrying amount of our patent may not be recoverable.

*Basic and diluted Net Loss Per Share*

Basic and diluted net loss per share has been computed by dividing net loss by the weighted average number of common shares outstanding during the period. All potentially dilutive common shares have been excluded since their inclusion would be anti-dilutive.

An aggregate of 1,597,969 and 0 warrants were excluded from the computation of diluted net loss per common share for the three months ended March 31, 2013 and 2012 because to do so would have an anti-dilutive effect for the periods presented.

An aggregate of 140,673 and 2,218,705 common stock equivalents (incentive shares) were excluded from the computation of diluted net loss per common share for the three months ended March 31, 2013 and 2012, because they were contingent shares subject to recall.

*Derivative Instruments*

The Company does not use derivative instruments to hedge exposures to cash flow, market or foreign currency risks. The Company evaluates all of its financial instruments to determine if such instruments are derivatives or contain features that qualify as embedded derivatives. For derivative financial instruments that are accounted for as liabilities, the derivative instrument is initially recorded at its fair value and is then revalued at each reporting date, with changes in the fair value reported in the statements of operations. For stock-based derivative financial instruments, the Company calculates the fair value of the financial instruments using a probability-weighted Black-Scholes option pricing model, which is comparable to the Binomial Lattice options pricing model at inception and on each subsequent valuation date. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is evaluated at the end of each reporting period. Derivative liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement of the instrument could be required within 12 months of the balance sheet date. (See Note 5 and Note 6).

*Financial Instruments and Fair Value*

ASC Topic 820, "Fair Value Measurements and Disclosures," ("ASC Topic 820") establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). The three levels of the fair value hierarchy under ASC Topic 820 are described below:

*Level 1* – Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities;

*Level 2* – Quoted prices in markets that are not active or financial instruments for which all significant inputs are observable, either directly or indirectly; and

*Level 3* – Prices or valuations that require inputs that are both significant to the fair value measurement and unobservable.

In estimating the fair value of the Company's derivative liabilities, the Company used a probability-weighted Black-Scholes option pricing model. (See Note 5 and Note 6).

Financial assets with carrying values approximating fair value include cash and cash equivalents as well as prepaid expenses and other current assets. Financial liabilities with carrying values approximating fair value include accounts payable and other accrued liabilities.

*Registration Payment Arrangement*

The Company accounted for registration rights agreements in accordance with ASC 825-20, "Registration Payment Arrangements." ASC 825-20 addresses an issuer's accounting for registration payment arrangements. This pronouncement specifies that the contingent obligation to make future payments or otherwise transfer consideration under a registration payment arrangement, whether issued as a separate agreement or included as a provision of a financial instrument, should be separately recognized and accounted for as a contingency in accordance with ASC 450-20 "Loss Contingencies".

*Subsequent Events*

The Company follows the provisions of ASC Topic 855-10, "Subsequent Events," relating to subsequent events. This guidance establishes principles and requirements for subsequent events. This guidance defines the period after the balance sheet date during which events or transactions that may occur would be required to be disclosed in a company's financial statements. The Company has evaluated subsequent events up to the date of issuance of this report.

*Recently Issued Accounting Pronouncements*

In February 2013, the FASB issued Accounting Standards Updated ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed") ("ASU 2013-04"). The guidance in this update is effective for fiscal years beginning after December 15, 2013 with early adoption permitted. The guidance in this update requires companies to measure obligations resulting from joint and several liability arrangements as the sum of the amount the entity has (a) contractually agreed to pay, and (b) any additional amounts that the entity expects to pay on behalf of its co-obligors. The Company early adopted this guidance in the second quarter of 2013 (Note 13).

Excepted as noted above, management does not believe that any recently issued, but not yet effective accounting pronouncements, if adopted, would have a significant effect on the accompanying condensed consolidated financial statements.

## NOTE 5. DERIVATIVE FINANCIAL INSTRUMENTS

In accordance with ASC Topic 815-40, "Derivative and Hedging – Contracts in Entity's Own Equity" ("ASC Topic 815-40"), instruments which do not have fixed settlement provisions are deemed to be derivative instruments. Based upon the Company's analysis of the criteria contained in ASC Topic 815-40, the warrants issued in connection with the sale of the common stock during the quarter ended March 31, 2013 that do not have fixed settlement provisions, are not indexed to Company's own stock. The fair value of the warrants are classified as derivative liabilities due to a ratchet provision that allows for a favorable adjustment to the exercise price if the Company issues additional equity instruments in the future at an effective price per share less than the exercise price then in effect.

11

The warrants are re-measured at each balance sheet date based on estimated fair value. Changes in estimated fair value are recorded as non-cash valuation adjustments within other income (expense) in the Company's results of operations. The Company recorded a loss on a change in the estimated fair value of warrants of $2,451,659 for the three months ended March 31, 2013.

The Company calculated the fair value of the warrants using a probability-weighted Black-Scholes option pricing model which is comparable to the Binomial Lattice pricing model. The assumptions used at the date of issuance and at March 31, 2013 are noted in the following table:

|  | As of | |
|---|---|---|
|  | Date of issuance February 14, 2013 | March 31, 2013 |
| Fair market price of common stock | $3.75 | $5.50 |
| Expected option term | 5 years | 4.88 years |
| Risk-free interest rate | 0.86% | 0.77% |
| Expected volatility | 101% | 101% |

Expected volatility is based on historical stock volatilities of several comparable publicly-traded companies over a period equal to the expected terms of the warrants, as the Company does not have a long trading history estimate the volatility of its own common stock. The warrants have a transferability provision. Based on the guidance provided in SEC Staff Accounting Bulletin No. 107 ("SAB 107") for options issued with such a provision, the Company used the full contractual term as the initial expected term of the warrants. The risk free interest rate is based on the U.S. Treasury security rates for the remaining term of the warrants at the measurement date.

## NOTE 6.  FAIR VALUE MEASUREMENTS

The following table presents the Company's liability that is measured and recognized at fair value on a recurring basis classified under the appropriate level of the fair value hierarchy as of March 31, 2013:

|  | Total carrying value at March 31, 2013 | Fair Value Measurements at March 31, 2013 | | |
|---|---|---|---|---|
|  |  | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| Derivative liabilities related to warrants | $ 6,957,264 | $ - | $ - | $ 6,957,264 |

The following table sets forth a summary of changes in the estimated fair value of the Company's Level 3 liability for the three months ended March 31, 2013:

|  | Fair Value Measurements of Common Stock Warrants Using Significant Unobservable Inputs (Level 3) |
|---|---|
| Balance at December 31, 2012 | $ - |
| Issuance of common stock warrants | 4,505,605 |
| Change in fair value of common stock warrant liability | 2,451,659 |
| Balance at March 31, 2013 | $ 6,957,264 |

A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. At each reporting period, the Company performs a detailed analysis of the assets and liabilities that are subject to ASC Topic 820. At each reporting period, all assets and liabilities for which the fair value measurement is based on significant unobservable inputs or instruments which trade infrequently and therefore have little or no price transparency are classified as Level 3.

12

## NOTE 7.  ACCRUED EXPENSES

Accrued expenses consist of the following at March 31, 2013 and December 31, 2012:

|  | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Compensation related costs | $  388,465 | $  1,022,716 |
| Consulting fees | 331,865 | 679,800 |
| Legal fees | - | 563,380 |
| Finders' fee liability | - | 100,000 |
| Interest | - | 90,650 |
| Other | - | 11,250 |
|  | $  720,330 | $  2,467,796 |

## NOTE 8.  LICENSE AGREEMENT

On February 16, 2012 the Company entered into an agreement pursuant to which a biotech company (the "Sublicensor") with license rights to certain drug technologies agreed to grant us a worldwide sublicense for the development, manufacture and commercialization of RE-021 (DARA). The licensing agreement also enables the Company to sell the licensed technology as a research product or sublicense the technology to other third parties as potential sources of revenue. Under the license agreement, Sublicensor is obligated to transfer to the Company certain information, records, regulatory filings, materials and inventory controlled by Sublicensor and relating to or useful for developing RE-021. The Company must use commercially reasonable efforts to develop and commercialize RE-021 in specified major market countries and other countries in which the Company believes it is commercially reasonable to develop and commercialize such products. The agreement shall continue until neither party has any obligations under the agreement to make payments to the other party.

In accordance with the agreement as amended most recently as of January 7, 2013, the Company made two non-refundable payments totaling $2,450,000, the first payment of $1,150,000 made upon execution and the second payment of $1,400,000 made in February 2013, which includes a $250,000 fee payable to the sublicensee in exchange for extended due date of this payment from October 1, 2012 to February 2013.  As of March 31, 2013, the Company has recognized $2,300,000 for the cost of the License Agreement which is presented in the accompanying consolidated balance sheet as an intangible asset that is being amortized on a straight-line basis over the term of the License Agreement which expires on September 30, 2023.  The $250,000 of extension fees were expensed to operations in February 2013. In addition, the Company issued 620,000 common shares to Ligand valued at $1,550,000 as a result of the merger transaction. For the three months ended March 31, 2013 and 2012, the Company recognized amortization expense of the license related to this agreement of $49,955 and $0, respectively.

## NOTE 9.  NOTES PAYABLE

*Note Payable - related party*

On February 1, 2012, the Company entered into a secured promissory note with a related party in the amount of $900,000, with an interest rate of 12% per annum, compounded monthly.  The remaining $884,764 principal balance of this note and accrued interest of $90,650 was repaid during the three months ended March 31, 2013.

Total interest expense recognized for the three months ended March 31, 2013 and 2012, and for the period from March 11, 2011 (inception) through March 31, 2013 were aggregated to $19,733, $17,327 and $147,480, respectively.

## NOTE 10.  RELATED PARTY TRANSACTIONS

On December 8, 2011, the Company received advances of funds aggregating $8,500 from entities related through common ownership. Such advances were repaid during the three months ended March 31, 2013.

In August 2012, the Company paid a security deposit on behalf of an affiliate of $137,547 in connection with a building lease entered into by such affiliate.  The Company assumed the lease from its affiliate in April 2013, whereby the security deposit was assigned to the Company.

Subsequent to March 31, 2013, the Company became a party to certain settlement agreements, which management believes are the primary obligation of an affiliate (Note 13).

## NOTE 11.  STOCKHOLDERS' DEFICIT

*Issuances*

*Common Stock*

In January 2013, the Company sold an aggregate of 272,221 shares of common stock, at a purchase price of $3.00 per share in certain private placement transactions, for an aggregate purchase price of $816,664 in cash.  The issuance of such shares of common stock was not registered under the Securities Act as such issuance was exempt from registration under Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

On February 14, 2013, the Company closed a private placement (the "Private Placement") of 3,045,929 shares of common stock, at a purchase price of $3.00 per share, or $9,137,787 in the aggregate, and warrants (the "Warrants") to purchase up to an aggregate of 1,597,969 shares of common stock with an exercise price of $3.60 per such share underlying any Warrant. The Warrants are deemed to be derivative instruments due to a ratchet provision that adjusts the exercise price if the Company issues additional equity instruments in the future at an effective price per share less than the exercise price then in effect. Upon issuance, the Company recorded $4,505,605 to additional paid in capital in relation to the Warrants.

The Company concurrently entered into a registration payment arrangement requiring it to file a Form S-1 with the Securities and Exchange Commission within 30 days of the closing date of this transaction and cause it be declared effective by no later than 90 days of the closing date of this transaction. The registration payment arrangement provided for the Company to pay liquidated damages in the amount of 2% of the proceeds received in this transaction per month for each month that the Company is not in compliance with this requirement, not to exceed 10% in the aggregate. The Company determined that it was probable that it would not be in a position to comply with these requirements and therefore allocated approximately $360,000 of the proceeds received in this transaction to a registration payment obligation.

Pursuant to the Registration Rights Agreement, the Company has agreed to file a Registration Statement on Form S-1 (the "Registration Statement") with the SEC within 30 days of the date of the Private Placement registering the total number of shares of common stock purchased in the Private Placement and shares of common stock issuable upon exercise of the Warrants. The Company has agreed to use its reasonable efforts to have the Registration Statement declared effective within 60 days after the date of the Registration Rights Agreement (or, in the event of a "full review" by the SEC, within 90 days after the date of the Registration Rights Agreement). The Company has also agreed to use reasonable efforts to maintain the effectiveness of the Registration Statement until all of the securities covered by the Registration Statement have or may be sold by investors under Rule 144 of the Securities Act, without volume or manner-of-sale restrictions.

The Registration Rights Agreement provides that in the event the Registration Statement has not been filed or declared effective within the prescribed time period or if the Company has failed to maintain the effectiveness of the Registration Statement as required for specified time periods, the Company shall pay to the holders of registrable securities, on the date of each such event and on each monthly anniversary thereof until the applicable event is cured, partial liquidated damages equal to 2.0% of the aggregate purchase price paid by such Purchaser in the Private Placement, up to a maximum of 10.0% of such aggregate purchase price. If the Company fails to pay any partial liquidated damages pursuant to this Section in full within seven days after the date payable, the Company will pay interest thereon at a rate of 18% per annum (or such lesser maximum amount that is permitted to be paid by applicable law) to the Purchaser, accruing daily from the date such partial liquidated damages are due until such amounts, plus all such interest thereon, are paid in full.

The foregoing description of the Registration Rights Agreement does not purport to describe all of the terms and provisions thereof and is qualified in its entirety by reference to the Registration Rights Agreement, which is filed as Exhibit 10.2 to the Form 8-K filed by the Company on February 19, 2013 and is incorporated herein by reference.

14

## NOTE 12.  INCENTIVE SHARES

At March 31, 2013, the Company did not have any active share-based compensation plans available for grants to employees, non-employee directors and consultants. Since its inception, the Company has granted incentive shares.

For the period ended March 31, 2013 and 2012, and for the period from March 11, 2011 (inception) through March 31, 2013, the Company recognized $159,205, $2,538,391, and $24,548,726 as compensation expense related to incentive shares granted in the consolidated statements of operations, respectively. Share compensation for non-employee awards subject to vesting is being accrued at current fair value. As of March 31, 2013 and December 31, 2012, there was approximately $522,023 and $844,973, respectively, of unrecognized compensation cost related to incentive shares issued.  This amount is expected to be recognized over a weighted average of 1.52 years.

| | Employee - number of shares | Non Employee - number of shares | Total number of shares | Weighted Average Fair Value |
|---|---|---|---|---|
| Unvested December 31, 2011 | 1,281,225 | 321,165 | 1,602,390 | $ 4.00 |
| Granted | 866,180 | 87,503 | 953,683 | 12.89 |
| Vested | (2,048,280) | (193,672) | (2,241,952) | 7.34 |
| Forfeited | (46,353) | - | (46,353) ) | 9.06 |
| Unvested December 31, 2012 | 52,772 | 214,996 | 267,768 | 5.79 |
| Granted | - | 12,500 | 12,500 | 4.20 |
| Vested | (5,556) | (41,124) | (46,680) | 3.41 |
| Forfeited | (20,833) | (72,082) | (92,915) | 4.00 |
| Unvested March 31, 2013 | 26,383 | 114,290 | 140,673 | $ 3.12 |

All of the Company's share base payments were originally issued as Retrophin LLC Class B incentive units that represent a profits interest up through the date of Retrophin LLC's conversation to a C Corporation, which was structured as a tax free exchange transaction.

Shares granted as incentive shares were originally subject to certain conditions at the time of grant.  Such conditions specified that the occurrence of a Termination Event, as defined in the amended operating agreement the Company shall have the right, but not the obligation, to repurchase, all, of the vested incentive shares owned by such incentive shareholder, at a purchase price based on the fair market value of the incentive shares determined in good faith by the Board of Directors.  The aforementioned repurchase option was rescinded upon the Company's conversion to a corporation.

## NOTE 13. SUBSEQUENT EVENTS

*Operating Lease Agreements*

In October 2012, the Company entered into a sublease with a company ("Sublessor") affiliated by common ownership that expires on November 29, 2016. The sublease agreement required the Company to pay 50% of the rent and related escalations and for the Company to pay for 50% of the utilities incurred by the Sublessor.

On April 11, 2013, the lease was assigned to the Company by the Sublessor inclusive of a $137,547 security deposit held.  Unless sooner terminated, the Company will incur annualized rent expense of approximately $283,000 through the term of the lease.

*Employment Agreements*

Effective May 13, 2013, the Company entered into an employment agreement with Horacio Plotkin, M.D. (the "Plotkin Employment Agreement") pursuant to which Dr. Plotkin was appointed as Chief Medical Officer of the Company.

In accordance with the terms of the Plotkin Employment Agreement, Dr. Plotkin's initial base salary is $350,000 and he is eligible to receive a discretionary annual bonus of up to 50% of his then applicable base salary. Additionally, Dr. Plotkin received $20,000 in connection with signing the Plotkin Employment Agreement.  Dr. Plotkin will also be awarded options to purchase 120,000 shares of restricted common stock of the Company at an exercise price of $8.70 per share, a pro rata portion of which will vest quarterly during the 3 years following the effective date.

15

Effective May 20, 2013, the Company entered into an employment agreement with Marc L. Panoff (the "Panoff Employment Agreement") pursuant to which Mr. Panoff was appointed as Chief Financial Officer and Chief Accounting Officer of the Company.

In accordance with the terms of the Panoff Employment Agreement, Mr. Panoff's initial base salary is $230,000 and he is eligible to receive a discretionary annual bonus of up to 50% of his then applicable base salary. Mr. Panoff will also be granted 120,000 units of restricted common stock of the Company, a pro rata portion of which will vest quarterly beginning on December 31, 2013 during the 3 years following the effective date.

*Liquidated Damages under Registration Rights Agreement*

The Company was required to have the Registration Statement on Form S-1 declared effective within 90 days after the offering closed. The closing date of the offering was February 14, 2013; therefore the 90th day was May 15, 2013. As of the date of this filing, the Registration Statement on form S-1 has not been declared effective. The Company has evaluated the provisions of the Registration Rights Agreement and is obligated to pay liquidated damages beginning in the second quarter of the fiscal year ending December 31, 2013.

*Settlement Agreements*

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became party to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company and the related party have entered into indemnification agreements whereby the related party has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. Notwithstanding the indemnification, the Company recorded a $2,286,511 charge to operations during the quarter ended June 30, 2013 that was offset by a corresponding liability of $1,691,400 for the difference between (a) the aggregate amount of all such settlements, and (b) $593,111 of cash and non-cash consideration that the Company paid to immediately settle a portion of the agreement on behalf of the related party. The $1,691,400 settlement liability, $1,013,900 of which is past due and $677,500 of which was due in August 2013. The counter parties to these agreements reserve the right to demand payment at any time. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock in the Company to one of the counter parties as a separate component of one of the agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the second quarter ended June 30, 2013.

There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.

Concurrent with the execution of such settlement agreements, the Company received promissory notes from the related party whereby the related party agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.

The Company applied the accounting guidance provided in ASU 2013-04. The guidance in this update is effective for fiscal years beginning after December 15, 2013 with early adoption permitted. The guidance in this update requires companies to measure obligations resulting from joint and several liability arrangements as the sum of the amount that the entity has (a) contractually agreed to pay, and (b) any additional amounts that the entity expects to pay on behalf of its co-obligors. The Company has recorded the full amount of the settlements as a charge to its operations due to uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary. Any amounts that the Company may recover under the note due from the related party or under the terms of the indemnification agreement, if in fact any amounts are recovered at all, would be characterized as a capital contribution at the date such payments are received.

16

### Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis is intended as a review of significant factors affecting our financial condition and results of operations for the periods indicated.  The discussion should be read in conjunction with our condensed consolidated financial statements and the notes presented herein.  In addition to historical information, the following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that involve risks and uncertainties. Our actual results could differ significantly from those anticipated in these forward-looking statements as a result of certain factors discussed in this Form 10-Q.*

### Cautionary Note Regarding Forward-Looking Statements

Certain information contained in this Quarterly Report on Form 10-Q of Retrophin, Inc., a Delaware corporation ("we", "us", the "Company" or "Retrophin") include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  The statements herein which are not historical reflect our current expectations and projections about the Company's future results, performance, liquidity, financial condition, prospects and opportunities and are based upon information currently available to the Company and our management and their interpretation of what is believed to be significant factors affecting the businesses, including many assumptions regarding future events.  Such forward-looking statements include statements regarding, among other things:

- our ability to produce, market and generate sales of our products;

- our ability to develop, acquire and/or introduce new products;

- our projected future sales, profitability and other financial metrics;

- our future financing plans;

- our plans for expansion of our facilities;

- our anticipated needs for working capital;

- the anticipated trends in our industry;

- our ability to expand our sales and marketing capability;

- acquisitions of other companies or assets that we might undertake in the future;

- our operations in the United States and abroad, and the domestic and foreign regulatory, economic and political conditions; and

- competition existing today or that will likely arise in the future.

Forward-looking statements, which involve assumptions and describe our future plans, strategies and expectations, are generally identifiable by use of the words "may," "should," "expect," "anticipate," "estimate," "believe," "intend," "seek," or "project" or the negative of these words or other variations on these words or comparable terminology.  Actual results, performance, liquidity, financial condition and results of operations, prospects and opportunities could differ materially from those expressed in, or implied by, these forward-looking statements as a result of various risks, uncertainties and other factors, including the ability to raise sufficient capital to continue the Company's operations.  Actual events or results may differ materially from those discussed in forward-looking statements as a result of various factors, including, without limitation, the risks outlined under "Risk Factors" on our Form 10-K filed with the Securities and Exchange Commission (the "SEC") on June 13, 2013 and matters described in this Form 10-Q generally.  In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained in this Form 10-Q will in fact occur.  Potential investors should not place undue reliance on any forward-looking statements. Except as expressly required by the federal securities laws, there is no undertaking to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances or any other reason.

17

The specific discussions in this Form 10-Q about the Company include financial projections and future estimates and expectations about the Company's business. The projections, estimates and expectations are presented in this Form 10-Q only as a guide about future possibilities and do not represent actual amounts or assured events. All the projections and estimates are based exclusively on the Company management's own assessment of our business, the industry in which it works and the economy at large and other operational factors, including capital resources and liquidity, financial condition, fulfillment of contracts and opportunities. The actual results may differ significantly from the projections.

Potential investors should not make an investment decision based solely on the Company's projections, estimates or expectations.

**Overview**

Our results of operations discussed below reflect our operations during the period in which we are in development stage and starting up our operations. As a result, these results should not be considered indicative of our anticipated results of operations on a going forward basis.

*Business*

We were organized as Desert Gateway, Inc. ("Desert Gateway"), a corporation whose sole purpose was to locate and consummate a merger or acquisition with a private entity and, prior to the merger described below, had no existing operations.

On December 12, 2012, Desert Gateway completed the transactions contemplated under the Agreement and Plan of Merger, dated as of December 12, 2012 (the "Merger Agreement"), by and among Desert Gateway, Desert Gateway Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of Desert Gateway, and former Retrophin, our predecessor, in which former Retrophin became a wholly-owned subsidiary and the principal operating subsidiary of the Company. The transactions contemplated by the Merger Agreement are collectively referred to herein as the "Merger".

On February 14, 2013, we changed our name to "Retrophin, Inc." through a short-form merger pursuant to Section 253 of the Delaware General Corporation Law, with its then wholly owned subsidiary, and our predecessor, former Retrophin, with the Company continuing as the surviving corporation following the merger. On April 1, 2013, the Board of Directors of the Company determined to change the Company's fiscal year from a fiscal year ending in February of each year to a fiscal year ending on December 31 of each year.

We are a development stage company focused on developing pharmaceutical products primarily for the treatment of rare diseases. Our lead product in development, RE-021, a small molecule intended to treat focal segmental glomerulosclerosis, has completed Phase 2 clinical studies demonstrating safety and efficacy, and we expect to initiate a Phase 2 clinical study in 2013. We also have a number of programs in preclinical development. Our second most developed program (RE-024) for the treatment of pantothenate kinase-associated neurodegeneration is in preclinical testing, and we will seek to initiate clinical trials of this product candidate as soon as is practical. We are also developing a treatment for Duchenne muscular dystrophy. Our focus is to seek treatment for serious, unmet, rare diseases. The diseases on which we focus are considered "orphan" diseases because they affect fewer than 200,000 patients in the United States. However, such diseases have a profound impact on those that suffer from them and on their families. Currently, we believe that we are the only company that is focusing on developing treatments for these rare and ultra-rare diseases.

**Plan of Operation**

Our plan of operation for the years ending December 31, 2013 and 2014 is to continue implementing our business strategy, includingthe clinical development of our three drug candidates, focusing primarily on the development of RE-021 for the treatment of focal segmental glomerulosclerosis (FSGS). We also intend to expand our drug product portfolio by acquiring additional drugs for marketing or development. We expect our principal expenditures during the next 12 months to include:

- operating expenses, including expanded research and development and general and administrative expenses; and
- product development expenses, including the costs incurred with respect to applications to conduct clinical trials in the United States for our three products and the costs of ongoing and planned clinical trials.

As part of our planned expansion, we anticipate hiring additional full-time employees for research and development activities and for general and administrative activities. In addition, we intend to use clinical research organizations and third parties to perform our clinical studies and manufacturing. At our current and desired pace of commercialization and clinical development of our drugs, for the next 12 months, we expect to spend approximately $7 to $8 million on clinical development and research and development activities and approximately $5 to $6 million on general and administrative expenses. We cannot assure you these amounts will be sufficient to fund our operations over the course of the next two years and we may need to expend significantly greater amounts to accomplish our goals.

18

**Research and Development Projects**

*RE-021.* We plan to initiate a Phase 2 clinical trial of RE-021 in patients with FSGS in 2013, with reduction in proteinuria as the primary endpoint. We expect it will take at least three years to complete development and obtain FDA approval of RE-021 for any indication, and we may never obtain such approval. Currently, we anticipate that we will need to expend approximately an additional $4 to $5 million in development over the next 12 months and at least an aggregate of approximately $25 to $35 million before we receive FDA approval for RE-021 for treatment of patients with FSGS.

*RE-024.* We intend to develop RE-024 as a potential treatment for pantothenate kinase-associated neurodegeneration (PKAN). RE-024 is a preclinical investigational program. In vivo animal testing of these molecules is underway, and we plan to file the Investigational New Drug Application (the "IND") for RE-024 by 2014. We expect that it will take an additional five to seven years to complete development and obtain FDA approval of RE-024, if ever. Currently, we anticipate that we will need to expend approximately an additional $1 to $2 million in development costs over the next 12 months and at least an aggregate of approximately $30 to $50 million until we receive FDA approval for RE-024 should we choose to continue development.

*RE-001.* RE-001 is a recombinant, modified form of utrophin, a protein similar to the dystrophin protein that is missing in the muscles of DMD patients. RE-001 is a preclinical investigational program. Production scale-up the molecule is underway, and we expect that in vivo evaluation of clinical trial quality material may begin in 2013. Currently, we anticipate that we will need to expend approximately an additional $3 million in development costs over the next 12 months.

**Results of Operations for the Three Month Period Ended March 31, 2013 compared to the Three Month Period Ended March 31, 2012**

*Operating Expenses*

We had no revenues during the three month period ended March 31, 2013 and 2012. Our operating expenses for the three month period ended March 31, 2013 were $2,250,484 compared to $3,558,454 for the three month period ended March 31, 2012. Our operating expenses for the three month period ended March 31, 2013 consisted of (i) compensation and related costs of approximately $1,045,287 which included (a) approximately $1,024,454 in salaries, bonuses and benefits to Company executives and employees and (b) approximately 5,556 shares of vested incentive shares granted to members and employees amounting to approximately $20,833, (ii) professional fees of approximately $692,577 which included (a) approximately 42,374 shares of vested incentive shares granted to consultants and direct transfers of shares to consultants by members amounting to approximately $138,372 for services rendered; (b) research and development fees of approximately $108,735 related to Retrophin's drug (RE-021 and RE-024) candidates for the treatment of FSGS and PKAN and evaluation of potential new technologies; (c) legal expense of approximately $138,243 related to licensing and production acquisition, employment and consulting agreements and general corporate work; (d) consulting fees of approximately $97,893 related to outsourcing management roles; (e) accounting fees of approximately $125,254 related to general accounting and audit work and (f) $84,075 in fees related to public and investor relations, (iii) rent expense of approximately $35,112, (iv) license fees of approximately $100,000, (v) depreciation and amortization expense of approximately $52,168 related to the Ligand licensing agreement and (vi) the remaining balance of $325,340 is related to travel and entertainment, business developments, advertising and other operating expenses.

*Other Income (Expense)*

Other operating expenses for the three month period ended March 31, 2013 were as follows: (i) approximately $784, which is related to income from foreign exchange in a vendor payment, (ii) approximately 2,451,659, which is related to a loss on the change in fair value of common stock warrant liability and (iii) approximately $19,733, which is related to interest expense on a $900,000 note which was repaid during the three month period ended March 31, 2013, and a $21,830 write off of interest receivable.

*Operating Loss*

For the three month period ended March 31, 2013, our net loss from operation was approximately $2,250,484, compared to a net loss from operation of approximately $3,558,454 for the three month period ended March 31, 2012.

**Liquidity and Capital Resources**

Management believes that we will continue to incur losses for the foreseeable future. Therefore we will either need additional equity or debt financing, or by entering into strategic alliances on products in development to sustain our operations until we can achieve profitability and positive cash flows from operating activities, if ever.

Our continued operations will depend on whether we can successfully raise additional funds through equity and/or debt financing. Such additional funds may not become available on acceptable terms, if at all, and we cannot assure you that any additional funding we do obtain will be sufficient to meet our needs in the long term. Through March 31, 2013, we had raised approximately $13.5 million through capital contributions and notes payable from Retrophin shareholders and related parties.

In January 2013, we sold an aggregate of 272,221 shares of common stock at $3.00 per share in certain private placement transactions, for an aggregate purchase price of $816,664 in cash.

On February 14, 2013, in connection with the closing of a private placement, we issued and sold an aggregate of 3,045,929 shares of common stock at $3.00 per share, for an aggregate purchase price of $9,137,787 in cash, and warrants to purchase up to an aggregate of 1,597,969 shares of common stock.

The Company concurrently entered into a registration payment arrangement requiring it to file a Form S-1 with the Securities and Exchange Commission within 30 days of the closing date of this transaction and cause it to be declared effective by no later than 90 days of the closing date of this transaction. The registration payment arrangement provided for the Company to pay liquidated damages in the amount of 2% of the proceeds received in this transaction per month for each month that the Company is not in compliance with this requirement, not to exceed 10% in the aggregate. The Company determined that it was probable that it would not be in a position to comply with these requirements and therefore allocated approximately $360,000 of the proceeds received in this transaction to a registration payment obligation.

Since our inception in 2011, we have generated losses from operations and we anticipate that we will continue to generate losses from operations for the foreseeable future. As of March 31, 2013 and December 31, 2012, our stockholders' deficit was $3,581,672 and $3,407,815, respectively. Our net loss from operations for the three month period ended March 31, 2013 was $2,250,484 compared to $3,558,454 for the three month period ended March 31, 2012. Net cash used in operating activities was $4,578,584 for the three month period ended March 31, 2013 compared to $1,222,586 for the three month period ended March 31, 2012. Operations since inception have been funded entirely with the proceeds from equity and debt financings. As of March 31, 2013, we had cash equivalents of $2,503,463. We anticipate that our existing capital resources will not be sufficient for us to continue operations beyond September 2013 without additional funding. We will continue to fund operations from cash on hand and through the similar sources of capital previously described. We can give no assurance that such capital will be available to us on favorable terms or at all. If we are unable to raise additional funds in the future on acceptable terms, or at all, we may be forced to curtail our desired development. In addition we could be forced to delay or discontinue product development, and forego attractive business opportunities. Any additional sources of financing will likely involve the sale of our equity securities, which will have a dilutive effect on our stockholders.

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became party to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company and the related party have entered into indemnification agreements whereby the related party has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. The Company paid $593,111 of the total settlement liabilities in the second quarter of 2013 and had $1,691,400 in outstanding settlement liabilities, $1,013,900 of which is past due and $677,500 of which was due in August 2013. The counter parties to these agreements reserve the right to demand payment at any time. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock in the Company to one of the counter parties as a separate component of one of the agreements. There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.

Concurrent with the execution of such settlement agreements, the Company received promissory notes from the related party whereby the related party agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. These condensed consolidated financial statements do not include any adjustments relating to the recovery of assets or the classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

*Cash Flows from Operating Activities*

Operating activities used approximately $4,578,584 of cash during the three month period ended March 31, 2013 compared $1,222,586 for the three month period ended March 31, 2012. The increase of $3,355,998 was the result of an increase in net loss of $1,170,889, a decrease in non-cash charges of $124,328 and a net change in operating assets and liabilities of $2,498,694.

*Cash Flows from Investing Activities*

Cash used in investing activities for the three month period ended March 31, 2013 was $1,306,842, compared to $200,756 for the three month period ended March 31, 2012. The increase of $1,106,086 was primarily the result of a decrease in a related party note receivable in the amount of $198,248 and repayment of technology lease liability in the amount of $1,300,000.

*Cash Flows from Financing Activities*

For three month period ended March 31, 2013, cash provided by financing activities was $8,377,501, compared to $1,414,575 during the three month period ended March 31, 2012. The increase of $6,962,926 was primarily a result of an increase of $8,734,654 in proceeds received from the private sale of our equity securities, offset by a decrease in activities associated with related party notes payable of $1,723,528.

In January 2013, we sold an aggregate of 272,221 shares of common stock at $3.00 per share in certain private placement transactions, for an aggregate purchase price of $816,664 in cash. The issuance of such shares of common stock was not registered under the Securities Act as such issuance was exempt from registration under Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

On February 14, 2013, we closed a private placement of 3,045,929 shares of our common stock, at a purchase price of $3.00 per share, or $9,137,787 in the aggregate, and Warrants to purchase up to an aggregate of 1,597,969 shares of common stock with an exercise price of $3.60 per such share underlying any warrant. The issuance of the shares of common stock in such private placement was not registered under the Securities Act as such issuance was exempt from registration under Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

The Company concurrently entered into a registration rights agreement requiring it to file a registration statement on Form S-1 within 30 days of the closing date of the transaction and cause such registration statement to be declared effective within 60 days thereafter. The registration rights agreement provides for the payment of certain liquidated damages at the rate of 2% of the gross proceeds per month for eachin which the Company is not in compliance with the agreement, not exceeding 10% of gross proceeds in the aggregate.

20

**Critical Accounting Policies**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect reported amounts of assets and liabilities as of the date of the balance sheet and reported amounts of expenses for the periods presented. Judgments must also be made about the disclosure of contingent liabilities. Accordingly, actual results could differ significantly from those estimates. We believe the following discussion addresses the accounting policies that are necessary to understand and evaluate our reported financial results.

*Share-Based Payments*

We adopted authoritative accounting guidance which establishes standards for share-based transactions in which we receive consultants or employee's services in exchange for equity instruments, such as stock incentive awards. These authoritative accounting standards require that we expense the fair value of stock awards, as measured on the awards' grant date.

If factors change and we employ different assumptions in the application of the relevant accounting guidance in future periods, the compensation expense that we record may differ significantly from what we have recorded in the current period. There is a high degree of subjectivity involved when using fair value to estimate share-based compensation. Consequently, there is a risk that our estimates of the fair values of our share-based compensation awards on the grant dates may bear little resemblance to the actual values realized upon the vesting, expiration, early termination or forfeiture of those share-based payments. Stock incentive awards options may expire worthless or otherwise result in zero value as compared to the fair values originally estimated on the grant date and reported in our financial statements. Alternatively, value may be realized from these instruments that are significantly in excess of the fair values originally estimated on the grant date and reported in our financial statements.

*Income Taxes*

We follow FASB ASC 740, Income Taxes, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax assets and liabilities are based on the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Deferred tax assets are reduced by a valuation allowance to the extent management concludes it is more likely than not that the asset will not be realized. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.

The standard addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FASB ASC 740, we may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the tax authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FASB ASC 740 also provides guidance on de-recognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. At the date of adoption, and as of March 31, 2013 and March 31, 2012, the Company does not have a liability for unrecognized tax uncertainties.

Our policy is to record interest and penalties on uncertain tax positions as income tax expense. As of and for the three month periods ended March 31, 2013 and March 31, 2012, we had no accrued interest or penalties related to uncertain tax positions.

*Net loss per share*

Basic net loss per common share is computed by dividing net loss applicable to common stockholders by the weighted average number of common shares outstanding during the periods presented as required by FASB ASC 260, Earnings Per Share.

*Registration Payment Arrangement*

The Company accounted for registration rights agreements in accordance with ASC 825-20, "Registration Payment Arrangements." ASC 825-20 addresses an issuer's accounting for registration payment arrangements. This pronouncement specifies that the contingent obligation to make future payments or otherwise transfer consideration under a registration payment arrangement, whether issued as a separate agreement or included as a provision of a financial instrument, should be separately recognized and accounted for as a contingency in accordance with ASC 450-20 "Loss Contingencies".

**Recently Issued Accounting Pronouncements**

In February 2013, the FASB issued Accounting Standards Updated ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed"). The guidance in this update is effective for fiscal years beginning after December 15, 2013 with early adoption permitted.  The guidance in this update requires companies to measure obligations resulting from joint and several liability arrangements as the sum of the amount the entity has (a) contractually agreed to pay, and (b) any additional amounts that the entity expects to pay on behalf of its co-obligors. The Company early adopted this guidance in the second quarter of 2013 (Note 13).

The Company has evaluated recent accounting pronouncements and except as noted above, their adoption has not had or is not expected to have a material impact on the Company's financial position or operations.

21

*Emerging Growth Company Critical Accounting Policy Disclosure*

We qualify as an "emerging growth company" under the 2012 JOBS Act. Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. As an emerging growth company, we can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period.

**Off Balance Sheet Transactions**

None.

**Item 3.  Quantitative and Qualitative Disclosures About Market Risk**

We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and are not required to provide the information under this item.

**Item 4.  Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Management, with the participation of our Principal Executive Officer and Principal Financial Officer, carried out an evaluation of the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Quarterly Report on Form 10-Q (the "Evaluation Date"). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of the Evaluation Date, our disclosure controls are not effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms and (ii) is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Change In Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting that occurred during the three months ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

22

**PART II - OTHER INFORMATION**

**Item 6. Exhibits**

(a) Exhibits

| | |
|---|---|
| 31.1 | Chief Executive Officer's Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 * |
| 31.2 | Chief Financial Officer's Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 * |
| 32.1 | Chief Executive Officer's Certification pursuant to Section 906 of Sarbanes Oxley Act of 2002 * |
| 32.2 | Chief Financial Officer's Certification pursuant to Section 906 of Sarbanes Oxley Act of 2002 * |
| 101.INS | XBRL Instance Document ** |
| 101.SCH | XBRL Taxonomy Extension Schema Document ** |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document ** |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document ** |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document ** |
| 101.PRE | Taxonomy Extension Presentation Linkbase Document ** |

* Filed herewith.

** Pursuant to Rule 406T of Regulation S-T, these interactive data files are deemed furnished and not filed for purposes of Sections 11 and 12 of the Securities Act of 1933, as amended, or Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise are not subject to liability.

23

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: September 13, 2013

RETROPHIN, INC.

By: /s/ Martin Shkreli
     Name: Martin Shkreli
     Title: Chief Executive Officer

By: /s/ Marc Panoff
     Name: Marc Panoff
     Title: Chief Financial Officer

EX-31.1 2 e611284_ex31-1.htm

<div align="right">**EXHIBIT 31.1**</div>

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER
## PURSUANT TO EXCHANGE ACT RULE 13a-14(a) OR 15d-14(a)

I, Martin Shkreli, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q/A of Retrophin, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  September 13, 2013

/s/ Martin Shkreli
_____
Martin Shkreli
Chief Executive Officer
(Principal Executive Officer)

**EXHIBIT 31.2**

## CERTIFICATION OF CHIEF FINANCIAL OFFICER
## PURSUANT TO EXCHANGE ACT RULE 13a-14(a) OR 15d-14(a)

I, Marc Panoff, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q/A of Retrophin, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  September 13, 2013

/s/ Marc Panoff
Marc Panoff
Chief Financial Officer
(Principal Financial Officer)

EX-32.1 4 e611284_ex32-1.htm

EXHIBIT 32.1

**CERTIFICATION OF
CHIEF EXECUTIVE OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Quarterly Report on Form 10-Q/A of Retrophin, Inc. (the "Company"), for the period ending March 31, 2013 (the "Report"), the undersigned officer of the Company hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

      1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      2.      The information contained in the Report, fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  September 13, 2013

/s/ Martin Shkreli
————————————————————
Martin Shkreli
Chief Executive Officer
(Principal Executive Officer)

EX-32.2 5 e611284_ex32-2.htm

**EXHIBIT 32.2**

**CERTIFICATION OF
CHIEF FINANCIAL OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Quarterly Report on Form 10-Q/A of Retrophin, Inc. (the "Company"), for the period ending March 31, 2013 (the "Report"), the undersigned officer of the Company hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

      1.     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      2.     The information contained in the Report, fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  September 13, 2013

                          /s/ Marc Panoff
                          Marc Panoff
                          Chief Financial Officer
                          (Principal Financial Officer)

| | |
|---|---|
| **From:** | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
| **Sent:** | Thursday, December 12, 2013 5:49 PM |
| **To:** | Jain, Sunil; Hackert, Edward |
| **Cc:** | Marc@retrophin.com |
| **Subject:** | RE: Excerpt from 12/6 Meeting |
| **Attachments:** | BOARD MINUTES.04.22.2013.pdf; BOARD MINUTES.06.11.2013.PDF; BOARD MINUTES.07.03.2013.PDF; BOARD MINUTES.07.24.2013.PDF; BOARD MINUTES.08.09.2013.PDF; BOARD MINUTES.09.09.2013.PDF; BOARD MINUTES.09.12.2013.PDF; BOARD MINUTES.09.17.2013.PDF; BOARD MINUTES.11.08.2013 (2).PDF |

Please see the requested executed minutes


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Jain, Sunil [mailto:Sunil.Jain@marcumllp.com]
**Sent:** Thursday, December 12, 2013 12:40 PM
**To:** Greebel, Evan L.; Hackert, Edward
**Cc:** Marc@retrophin.com
**Subject:** RE: Excerpt from 12/6 Meeting

Even,

Prior to December 6, 2013, we have following minutes or agenda of meeting of BOD held in year 2013:

1. Unanimous consent of the Board – 1/28/13 – We have signed document
2. Special meeting of BOD – 2/7/13 – We have signed minutes
3. Telephonic Board meeting agenda – 7/3/13 – We don't have signed minutes
4. Telephonic Board meeting agenda – 7/24/13 – We don't have signed minutes
5. Telephonic Board meeting agenda – 8/9/13 – We don't have signed minutes
6. Telephonic Board meeting agenda – 9/9/13 – We don't have signed minutes

Please provide me the executed minutes relating to (item 3-6 discussions) and if there are any other meeting held other than mentioned above, we need minutes of such meetings.

Thank you,



*Sunil Jain*
*Senior Manager*
Marcum LLP
750 Third Avenue
New York, NY 10017
P: (212) 485-5547
F: (212) 485-5501

E. GREEBEL

DX-118-26A

1

Sunil.Jain@marcumllp.com



**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Thursday, December 12, 2013 12:32 PM
**To:** Jain, Sunil; Hackert, Edward
**Cc:** Marc@retrophin.com
**Subject:** RE: Excerpt from 12/6 Meeting

What minutes do you need?


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Jain, Sunil [mailto:Sunil.Jain@marcumllp.com]
**Sent:** Thursday, December 12, 2013 12:30 PM
**To:** Hackert, Edward; Greebel, Evan L.
**Cc:** Marc@retrophin.com
**Subject:** FW: Excerpt from 12/6 Meeting



**From:** Jain, Sunil
**Sent:** Thursday, December 12, 2013 12:28 PM
**To:** Marc@retrophin.com
**Subject:** FW: Excerpt from 12/6 Meeting

Following is the only e-mail with December 6, 2013 excerpts of minutes I have received, we also need minutes of prior to December 6, 2013.



*Sunil Jain*
*Senior Manager*
Marcum LLP
750 Third Avenue
New York, NY 10017
P: (212) 485-5547
F: (212) 485-5501
Sunil.Jain@marcumllp.com



**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Thursday, December 12, 2013 9:33 AM
**To:** Hackert, Edward; Jain, Sunil
**Cc:** Marc Panoff
**Subject:** Excerpt from 12/6 Meeting

CONFIDENTIAL
R057673

Guys, attached are the excerpts from Retrophin's Board meeting on 12/6 at which the Board approved the engagement of Jefferies, the commencement of the underwritten offering and the preparation and filing of the Registration Statement with the SEC.

Please advise if you have any questions or comments.

Evan


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

=========================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
=========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
=========================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
=========================================================

CONFIDENTIALITY NOTICE:
This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of the message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (631) 414-4000 or (212) 485-5500 and destroy this message.

IRS CIRCULAR 230 DISCLOSURE NOTICE:
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this email and/or its attachments , unless otherwise specifically stated, is not intended or written to

R057674

be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any transaction or matter that is contained in or accompanying this document

CONFIDENTIALITY NOTICE:
This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of the message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (631) 414-4000 or (212) 485-5500 and destroy this message.

IRS CIRCULAR 230 DISCLOSURE NOTICE:
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this email and/or its attachments , unless otherwise specifically stated, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any transaction or matter that is contained in or accompanying this document

CONFIDENTIAL

R057675

**MINUTES OF A SPECIAL MEETING**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**RETROPHIN, INC.**

**April 22, 2013**

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Monday, April 22, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, was also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 4:40 p.m.

Mr. Shkreli updated the Board on the status of the Company and its products.  Mr. Shkreli explained that the Company anticipates commencing Phase 2 clinical trials for RE-021 for the treatment of focal segmental glomerulosclerosis in the first half of 2013.  Mr. Shkreli also explained that researchers with St. Judes conducted animal studies for RE-024 for the treatment of pantothenate kinase-associated neurodegeneration and that such studies yielded positive results.  Mr. Shkreli further explained that based on the outcome of such studies the Company anticipates initiating toxicology studies for RE-024 during the second half of 2013.

Mr. Shkreli advised the Board that Company has been in on-going discussions with Novartis regarding the Company licensing Synacthen.  Mr. Shkreli further advised the Board that Synacthen is sold in Europe, Asia and South America and is not currently approved for sale or sold in the US.  Mr. Shkreli explained that the proposed term sheet, which was previously provide to the Board and is attached hereto as <u>Exhibit A</u>, contemplates that the Company will make an upfront payment of $12 million to Novartis and the Company would receive the exclusive license to develop, manufacture and sell Synacthen in the United States.  Mr. Shkreli also said that Novartis is upgrading its manufacturing technology which will take approximately 12 months and following the completion of the upgrade the Company would receive the exclusive worldwide right to manufacture, distribute and sell Synacthen for $4 million (other than in certain countries in Europe that were previously licensed to Sigma Tau).  Mr. Shkreli said he believes that such a business annually produces $7 million in revenue.  Mr. Shkreli explained that based on the information supplied in the data room and prior meetings with Novartis, he believes that Synacthen can be used to treat Nephrotic Syndrome and would initially seek FDA approval for that purpose.

Mr. Shkreli advised the Board that in connection with the acquisition of Synacthen the Company would commence an equity financing to raise $30-40 million from new and existing

CONFIDENTIAL

institutional investors. Mr. Shkreli explained that the Company has retained Stifel, Nicolaus and Company, Incorporated, pursuant to the engagement letter which was previously provided to the Board and is attached hereto as Exhibit B. Mr. Shkreli also explained that based upon his initial discussions with such investors, he believes that the Company will sell common stock and warrants at a discount to the current market value and a premium to the price that Company sold common stock and warrants in February 2013.

Mr. Shkreli advised the Board that he believes that the Company needs to retain a Chief Medical Officer and a Chief Financial Officer in order to achieve the Company's identified objectives. Mr. Shkreli explained that he believes that Horacio Plotkin, MD and Marc Panoff, as Chief Medical Officer and Chief Financial Officer, respectively, are the most qualified candidates that he met. Mr. Shkreli further explained that he discussed with Dr. Plotkin that he would receive a base salary of $350,000, a discretionary annual bonus of up to 50% of his base salary, a signing bonus of $20,000 and options to purchase 120,000 shares of restricted common stock which would vest quarterly over a three-year period. Mr. Shkreli further explained that he discussed with Mr. Panoff that he would receive a base salary of $230,000, a discretionary annual bonus of up to 50% of his base salary and be granted 120,000 shares of restricted common stock which would vest quarterly over a three-year period.

Mr. Shkreli asked Mr. Greebel to discuss the option summaries that were previously provided to the Board. Mr. Greebel explained to the Board that at the request of the Company he prepared a summary of equity and bonus awards paid by comparable companies to management as well as compensation for non-employee directors. Mr. Richardson said that he would discuss bonus and compensation with independent third party advisors and report back at a future board meeting.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the engagement letter with Stifel, Nicolaus and Company, Incorporated, attached hereto as Exhibit B, be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that compensation to be paid to each of Dr. Plotkin and Mr. Panoff, in connection with their employment as Chief Medical Officer and Chief Financial Officer, respectively, be, and it hereby is approved in all material respects;

**FURTHER RESOLVED**, that the Chief Executive Officer be, and he hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver any and all employment and consultant agreements for employees and consultants to the Company, provided that such employees or consultants are not material to the Company and that their agreements would not be required to be disclosed in a current or periodic report filed with the Securities and Exchange Commission;

2

R057677

**FURTHER RESOLVED,** that the Chief Executive Officer be and he hereby is authorized, empowered and directed, in the name and on behalf of the Company, to execute and delivery any and all agreements that do not require payments of a material amount of cash or equity and which are not required to be disclosed in a current or periodic report filed with the Securities and Exchange Commission;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 5:300 p.m.

Evan Greebel, acting Secretary

CONFIDENTIAL

R057678

**EXHIBIT A**
**FORM OF SYNACTHEN TERM SHEET**

CONFIDENTIAL

R057679

**EXHIBIT B**
**ENGAGEMENT LETTER WITH STIFEL, NICOLAUS AND COMPANY,**
**INCORPORATED**

CONFIDENTIAL

R057680

**MINUTES OF A SPECIAL MEETING**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**RETROPHIN, INC.**

**June 11, 2013**

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Tuesday, June 11, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson. Also present were Marc Panoff, the Company's Chief Financial Officer, Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Sunil Jain, of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 3:00 p.m.

Mr. Shkreli advised the Board that the Company will not be licensing Synacthen from Novartis Pharma AG and Novartis AG as Novartis consummated a license agreement with Questcor Pharmaceuticals, Inc. Accordingly the proposed equity financing for which Stifel, Nicholaus & Company Incorporated was acting as placement agent was also terminated.

Mr. Shkreli asked Mr. Hackert to advise the Board on the status of the audit for the year ended December 31, 2012. Mr. Hackert advised the Board that the audit for the year ended December 31, 2012 was completed.

Next, the Board reviewed and discussed a draft of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"), including the following issues with management and Marcum:

- The audited financial statements;

- Management's discussion and analysis;

- Critical accounting and auditing principles and practices; and

- The adequacy of internal controls

Management advised the Board that they evaluated the Company's controls and procedures and determined that as of December 31, 2012, the Company's disclosure controls are not effective to ensure that information required to be disclosed by the Company in reports that it

CONFIDENTIAL

files or submits under the Exchange Act (i) is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms and (ii) is accumulated and communicated to the Company's management, as appropriate to allow timely decisions regarding required disclosure.  Management also determined that as of December 31, 2012, internal controls over financial reporting were not effective as of December 31, 2012.  As of December 31, 2012, management  identified certain matters that constituted material weaknesses in the Company's internal controls over financial reporting, specific material weaknesses including the fact that the Company (i) experienced difficulty in generating data in a form and format that facilitates the timely analysis of information needed to produce accurate financial reports, (ii) experienced difficulty in applying complex accounting and financial reporting and disclosure rules required under GAAP and the SEC reporting regulations, and (iii) has limited segregation of duties.

Next, the Company's external auditors, Marcum LLP gave a report on the following issues:

- Matters required to be discussed by SAS No. 61 relating to the conduct of the audit;

- The Company's accounting principles and disclosure practices;

- The outside auditor's relationships with the Company in order to evaluate its continued independence;

- Reports required to be submitted to the Board under Section 10A of the Securities Exchange Act of 1934, as amended; and

- Any disagreement or difficulties with management, with none reported.

Next, the Board reviewed the CEO and CFO certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.

Mr. Shkreli updated the Board on the status of the Company and its products.  Mr. Shkreli explained that the Company anticipates commencing Phase 2 clinical trials for RE-021 for the treatment of focal segmental glomerulosclerosis in the first half of 2013.  Mr. Shkreli also explained that researchers with St. Judes conducted animal studies for RE-024 for the treatment of pantothenate kinase-associated neurodegeneration and that such studies yielded positive results.  Mr. Shkreli further explained that based on the outcome of such studies the Company anticipates initiating toxicology studies for RE-024 during the second half of 2013.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

2

R057682

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the 2012 10-K be, and hereby is, approved in all material respects for filing with the SEC, subject to editorial comments and other minor changes deemed necessary or desirable by the officers of the Company filing such report and the mailing of same to the Company's stockholders.

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 4:00 p.m.

_____
Evan Greebel, acting Secretary

CONFIDENTIAL                                                                 R057683

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### July 3, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Wednesday, July 3, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Also present were Marc Panoff, the Company's Chief Financial Officer and Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 10:00 a.m.

Mr. Shkreli reviewed with the Board the nature of the proposed Synacthen deal with Novartis Pharma AG and Novartis AG.  Mr. Shkreli discussed with the Board that it would be possible for the Company to make a product that would compete with Synacthen and that the Company had procured 10 grams of ACTH, which is the API in Synacthen.  Mr. Shkreli also advised that the 10 grams would make 10,000 vials of the product and he believed that the Company could formulate the product within six (6) months. He said that the Company hoped to start clinical trials in the first quarter of 2014 and that it would cost approximately $2 million to make the product.

Mr. Shkreli also advised the Board on his conversations with Novartis regarding Syntocinon. Mr. Shkreli and the Board discussed the nature and uses of Syntocinon. Mr. Shkreli advised the Board that the Company anticipates negotiating a term sheet with Novartis which he will subsequently discuss with the Board.  Mr. Shkreli updated the Board on his conversations with Stifel Nicholaus & Company regarding an equity financing.

Mr. Shkreli asked Messrs. Panoff and Greebel to update the Board on the status of the registration statement from the financing that the Company completed in February 2013. Messrs. Panoff and Greebel advised the Board that the Company was not compliant with its obligations under the Registration Rights Agreement that the Company entered into with the investors in February 2013.  Mr. Panoff also advised the Board, that the Company may owe liquidated damages to the investors due to its failure to timely file.

Mr. Shkreli asked Mr. Greebel to review the draft Insider Trading Policy and Code of Ethics that were previously provided to the Board. The Board asked Messrs. Panoff and Greebel questions about such policies and agreed to review them at a subsequent date.

CONFIDENTIAL

Mr. Shkreli asked Mr. Panoff to review with the Board compensation and bonuses paid or proposed to be paid to officers, management and employees of the Company for the year ended December 31, 2012.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED,** that the bonuses and compensation paid to the officers, management and employees of the Company for the year ended December 31, 2012, be and they hereby approved in all respects.

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 11:00 a.m.

Evan Greebel, acting Secretary

2

CONFIDENTIAL

R057685

# MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### July 24, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Wednesday, July 24, 2013, where all members in attendance could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli and Stephen Aselage. Steven Richardson advised that he would not be able to attend the meeting and he sent a written authorization approving the resolutions below. Also present were Marc Panoff, the Company's Chief Financial Officer, Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Sunil Jain, of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 12:00 p.m.

Mr. Shkreli asked Mr. Panoff to review the draft of the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2013 (the "First Quarter 2013 10-Q"), previously provided to the Board and attached hereto as Exhibit A.

Mr. Shkreli asked Marcum to update the Board on the First Quarter 2013 10-Q. Mr. Hackert advised the Board that the First Quarter 2013 10-Q was late. Mr. Hackert also advised the Board that once the First Quarter 2013 10-Q was filed the Company would be a timely filer. Further Marcum delivered a report on the following issues:

- matters required by SAS No. 100;

- the Company's accounting principles & disclosure practices;

- reports required to be submitted under Section 10A of the Securities Exchange Act of 1934;

- any problems or difficulties with management, none reported;  and

- continuation of auditors' independence.

Included in this discussion was the accounting treatment of the warrants issued in connection with the equity financing in February 2013. Also, Marcum and management of the

Company discussed that the Company is working to correct the material weaknesses that were disclosed in the 2012 Form 10-K and previously discussed with the Board.

Next, the Board reviewed and discussed the engagement of Marcum, LLP for the 2013 quarterly financial reviews and fiscal year end audit, the scope of which was included in a draft engagement letter (the "Marcum Engagement Letter"), and previously provided to the Board and attached hereto as Exhibit B.

Next, the Board reviewed the CEO and CFO certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 to be included in the First Quarter 2013 10-Q.

Mr. Shkreli asked Mr. Panoff to discuss the retention of Compensation Advisory Partners LLC to advise the Board on compensation for executive employees  and non-executive members of the Board.  The Board and management discussed the proposal from Compensation Advisory Partners LLC.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED,** that the First Quarter 2013 10-Q be, and hereby is, approved in all material respects for filing with the SEC, subject to editorial comments and other minor changes deemed necessary or desirable by the officers of the Company filing such report and the mailing of same to the Company's stockholders.

**FURTHER RESOLVED,** that the Marcum Engagement Letter, in the form previously distributed to the Board, be and hereby is, approved in all material respects.

**FURTHER RESOLVED,** that the Company engage Compensation Advisory Partners LLC to in accordance with the material terms of the proposed engagement letter previously distributed to the Board and attached hereto as Exhibit C;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such

2

CONFIDENTIAL

R057687

officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 12:40 p.m.

Evan Greebel, acting Secretary

3

CONFIDENTIAL

R057688

**MINUTES OF A SPECIAL MEETING**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**RETROPHIN, INC.**

**August 9, 2013**

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Friday, August 9, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson. Marc Panoff, the Company's Chief Financial Officer, and Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, were also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 3:00 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's efforts to license Syntocinon from Novartis Pharma AG ("Novartis"). Mr. Shkreli discussed the terms of a draft letter agreement (the "Letter Agreement") with Novartis, a form of which is attached hereto as Exhibit A, which Letter Agreement, among other things, (i) contained a term sheet setting forth the basic financial terms of a definitive license agreement between the parties for a U.S. license to Syntocinon, a synthetic oxytocin owned by Novartis, and (ii) provided the Company with 120 days of negotiating exclusivity to license Syntocinon in the United States. Mr. Shkreli noted that the terms of the Letter Agreement required the Company to pay $2 million to Novartis upon its execution, regardless of whether a definitive license agreement was ever executed.

Mr. Shkreli also updated the Board on the status of a proposed private placement offering (collectively, the "Proposed Offering") of stock and warrants to purchase common stock of the Company. Mr. Shkreli indicated that that the Company's financial advisor for the transaction had confirmed investor interest of approximately $15 million to $30 million of securities, and that he was optimistic that the Company would raise more than $25 million in the Proposed Offering.

Mr. Shkreli noted that the agreements and other documents in connection with the Proposed Offering included a Securities Purchase Agreement, a form of which is attached hereto as Exhibit B (the "Purchase Agreement"), Warrants to purchase common stock, a form of which is attached hereto as Exhibit C (the "Warrant"), and a Registration Rights Agreement with the Purchasers, a form of which is attached hereto as Exhibit D (the "Registration Rights Agreement", and together with the Purchase Agreement, the Warrant and all exhibits and schedules thereto and any other documents or agreements executed in connection with the

CONFIDENTIAL

Proposed Offering (including, without limitation, the Amendments (as defined below)), collectively, the "Transaction Documents").

Mr. Shkreli advised the Board that the Proposed Offering price was approximately $4.00-$5.00 per share of common stock of the Company (the "Shares"). Mr. Shkreli also explained that each investor in the Proposed Offering would receive Warrants to acquire 50% of the number of Shares acquired by such investor (the "Warrant Shares"), with a proposed exercise price equal to approximately 130% of the purchase price for the Shares. Furthermore, the Warrants would be exercisable at any time from the date of issuance until the fifth anniversary of the date of issuance and contain customary weighted-average anti-dilution protections, which would result in a decrease in the exercise price of the Warrant Shares if the Company successfully sold stock at a per share price lower than such exercise price. The Company would also agree to register the Shares and Warrant Shares following the closing of the Proposed Offering.

Next, in order to permit the Proposed Offering, Mr. Shkreli discussed an amendment, a form of which is attached hereto as Exhibit E, (the "February SPA Amendment") to the Company's Securities Purchase Agreement, dated as of February 12, 2013 (the "February SPA"), and an amendment, a form of which is attached hereto as Exhibit F, (the "February RRA Amendment" and, together with the February SPA Amendment, the "Amendments") to the Company's Registration Rights Agreement, dated as of February 14, 2013. Mr. Shkreli explained that the Amendments were necessary in order for the Company to proceed with the Proposed Offering. Mr. Shkreli noted that the Amendments provided, among other things, that purchasers of the Company's securities under the February SPA would receive $1,835,000 in cash and 73,710 Shares and that such purchasers would have the option to elect to receive additional Shares in lieu of such cash.

Mr. Shkreli then discussed the nomination of Cornelius Golding to the Board, including Mr. Golding's professional background and accomplishments. The Board then discussed Mr. Golding's qualifications and the benefits that his experience would bring to the Board.

Next, Messrs. Shkreli and Panoff provided a management update and an update on the financial condition of the Company. In particular, Messrs. Shkreli and Panoff noted that RE-021, the Company's proposed treatment for focal segmental glomerulosclerosis (FSGS), was set to commence Phase 2 clinical trials in the fourth fiscal quarter of the Company's 2013 fiscal year. They also noted that the Company had received positive survival results from pre-clinical tests of RE-024, the Company's treatment for pantothenate kinase-associated neurodegeneration (PKAN). Mr. Shkreli noted that he was encouraged by these results.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the Letter Agreement in, or substantially in, the form, and containing substantially the terms and provisions of, the Letter Agreement attached hereto be, and it hereby is, ratified, affirmed, approved and adopted in all respects, and that, subject to the execution of the Transaction Documents, the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "Authorized

CONFIDENTIAL

R057690

Officer") be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Letter Agreement, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the Board has determined that the Proposed Offering is advisable and in the best interest of the Company, and that the Proposed Offering be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that each of the Purchase Agreement, Warrant, Registration Rights Agreement and each of the Amendments, in each case in, or substantially in, the form, and containing substantially the terms and provisions of, said agreements attached hereto, and the other Transaction Documents, be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, subject to the satisfaction or waiver of the other conditions as set forth in the Purchase Agreement at or prior to the closing of the Proposed Offering, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver all the Transaction Documents, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that Section 203 of the Delaware General Corporation Law ("DGCL"), shall not apply to Business Combinations (as that term is defined in section 203(c)(3) of the DGCL), between the Company and the investors in the Proposed Offering;

**FURTHER RESOLVED**, that, subject to the satisfaction or waiver of the conditions as set forth in the Purchase Agreement at or prior to the closing of the Proposed Offering, the performance by the Company of its obligations under the Transaction Documents and the consummation of the Proposed Offering be, and they hereby are, approved and adopted in all respects;

**FURTHER RESOLVED**, that the execution, delivery and performance by the Company of any other agreements, instruments, certificates or documents necessary or appropriate to consummate the Proposed Offering be, and hereby are, authorized, and the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, at the appropriate time or times, as provided for or contemplated by the Transaction Documents, to execute, make oath to, acknowledge and deliver, from time to time, in the name and on behalf of the Company, such other agreements, instruments, certificates or documents and do, or cause to be done, any or all other things as such Authorized Officer may, in his discretion, deem necessary, appropriate or advisable to consummate the Transactions and to carry out the intent of the foregoing resolutions, the taking of such actions to be conclusive evidence that the same have been authorized and approved by the Board;

**FURTHER RESOLVED**, that the Board hereby determines and declares that, subject to the payment by or on behalf of each investor in the Proposed Offering (each, a "Purchaser" and collectively, the "Purchasers") of the purchase price for the Shares subscribed by such Purchaser and the satisfaction or waiver of the other conditions to the Company's obligation to

CONFIDENTIAL                                                                                                           R057691

consummate the closing of the Proposed Offering under the Purchase Agreement, the issuance of the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares by the Company to the Purchasers is advisable and fair to and in the best interests of the Company and its stockholders;

**FURTHER RESOLVED**, that, subject to the payment by or on behalf of the Purchasers of the purchase price for the Shares and the satisfaction or waiver of the other conditions to the Company's obligation to consummate the closing of the Proposed Offering under the Purchase Agreement, the Company be, and it hereby is, authorized to issue and sell to the Purchasers the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares, and that the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares, when so issued, shall be duly authorized, validly issued, fully paid and non-assessable;

**FURTHER RESOLVED**, that, following the closing of the Proposed Offering, each Authorized Officer, and any person or persons designated and authorized by such Authorized Officer to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed to (1) take all such actions as shall be necessary under the Registration Rights Agreement to prepare and file with the United States Securities and Exchange Commission (the "Commission"), in the name and on behalf of the Company, a registration statement (the "Registration Statement"), under the Securities Act of 1933, as amended, covering the resale of the Shares, the Warrant Shares and all other Registrable Securities (as such term is defined in the Registration Rights Agreement), in accordance with the terms of the Registration Rights Agreement; (2) cause to be prepared and filed, in the name and on behalf of the Company, any amendment or amendments to the Registration Statement and any supplement or supplements thereto as such officer or officers shall deem necessary or desirable or as shall be required by the Commission; and (3) execute the Registration Statement and any amendment or amendments thereto and any supplement or supplements thereof, in the name and on behalf of the Company, such execution to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the officers of the Company be, and each of them hereby is, authorized, empowered and directed to promptly pay or cause to be paid, in the name and on behalf of the Company, all financial, accounting, brokerage, legal, printing, public relations and other fees and expenses incurred by the Company in connection with the Proposed Offering and the registration of the Shares, the Warrant Shares and other Registrable Securities pursuant to the Registration Rights Agreement;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to

4

R057692

execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 3:45 p.m.

Evan Greebel, acting Secretary

CONFIDENTIAL

R057693

# EXHIBIT A

## LETTER AGREEMENT

CONFIDENTIAL

R057694

## EXHIBIT B

## FORM OF PURCHASE AGREEMENT

R057695

**EXHIBIT C**

**FORM OF WARRANT**

CONFIDENTIAL

**EXHIBIT D**

**FORM OF REGISTRATION RIGHTS AGREEMENT**

R057697

**EXHIBIT E**

**FORM OF AMENDMENT TO SECURITIES PURCHASE AGREEMENT**

CONFIDENTIAL

**EXHIBIT F**

**FORM OF AMENDMENT TO REGISTRATION RIGHTS AGREEMENT**

CONFIDENTIAL

R057699

**MINUTES OF A SPECIAL MEETING**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**RETROPHIN, INC.**

**September 9, 2013**

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Monday, September 9, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Also present were Marc Panoff, the Company's Chief Financial Officer, Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Sunil Jain, of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 5:30 p.m.

Mr. Shkreli asked Mr. Panoff to advise the Board on the financial condition of the Company and recent accounting determinations.  Mr. Panoff advised the Board that management of the Company determined that it is appropriate to restate the audited financials for the year ended December 31, 2012 and the three months ended March 31, 2013, as set forth in the Company's Annual Report on From 10-K for the year ended December 31, 2012 (the "2012 10-K") and the Company's Quarterly Report on Form 10-Q for three months ended March 31, 2013 (the "First Quarter 2013 10-Q"), respectively.  Mr. Panoff explained that it would necessary to restate the Subsequent Event and Liquidity footnotes in the audited financials for 2012 and the financial statements for the three months ended March 30, 2012 as well as amend Management's Discussion and Analysis of Financial Condition and Results of Operation in the 2012 10-K and the First Quarter 2013 10-Q, a draft of which was previously provided to the Board.  Mr. Panoff also explained that such restatements and amendments were due to non-cash changes required by the accounting rules as a result of various settlement agreements entered into by the Company.

Mr. Shkreli asked Mr. Hackert to advise the Board on recent changes to GAAP.  Mr. Panoff advised the Board that management believes that the Company should be an early adopter of Accounting Standards Update ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed").  Mr. Panoff further explained the guidance is effective for fiscal years beginning after December 15, 2013, with early adoption permitted.

Next, the Board reviewed and discussed a draft of the amendments to the 2012 10-K, the audited financial statements for the year ended December 31, 2012, the First Quarter 2013 10-Q

and the financial statements for the three months ended March 31, 2013. The Board also discussed the following issues with management and Marcum:

- Critical accounting and auditing principles and practices;

- The adequacy of internal controls;

- Reports required to be submitted to the Board under Section 10A of the Securities Exchange Act of 1934, as amended; and

- Any disagreement or difficulties with management, with none reported.

Next, the Board reviewed the CEO and CFO certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.

Mr. Shkreli asked Mr. Panoff to advise the Board on employment matters. Mr. Panoff discussed with the Board that management recommends issuing options to acquire 15,000 shares to Michael Harrison, options to acquire 75,000 shares to Steven Eby and options to acquire 15,000 shares to Christine Giordano. Mr. Panoff also mentioned that all options would vest quarterly over a 3 year period. Mr. Panoff also reviewed the terms of the Consulting Agreements offered to Al Geller and Ken Banta.

Next, Mr. Shkreli discussed the status of Cornelius Golding's nomination to join the Board, noting Mr. Golding's background, experience being a member of other biotechnology companies and experience as a Chair of an Audit Committee. Messrs. Aselage and Richardson reported to the Board that they had each interviewed Mr. Golding over the phone and believed that Mr. Golding would be an excellent addition to the Board.

Mr. Shkreli asked Mr. Panoff to review the Board's prior discussion about compensation for non-executive directors. Mr. Shkreli also explained that he believes it is appropriate for the interests of directors to be aligned with the interest of the stockholders. The Board agreed to continue discussions about compensation and consider such compensation at a subsequent meeting.

Mr. Shkreli asked Mr. Greebel to review the current drafts of the Code of Ethics, Insider Trading Policies and Indemnification Agreement which were previously distributed to the Board. The Board subsequently reviewed and discussed the proposed policies.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the restatement of the audited financials for the year ended December 31, 2012 and the financial statements for the quarter ended March 31, 2013 be, and hereby is, approved in all material respects;

2

CONFIDENTIAL

R057701

**FURTHER RESOLVED**, that the amendments to the 2012 10-K and the First Quarter 2013 10-Q, be and they hereby are approved for filing with the SEC, subject to final review by members of the Board and other editorial comments and other minor changes deemed necessary or desirable by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "Authorized Officer"), filing such report and the mailing of same to the Company's stockholders;

**FURTHER RESOLVED**, that confirmation of the acceptance to files the 2012 10-K and the First Quarter 2013 10-Q with the SEC may be submitted via email;

**FURTHER RESOLVED**, that early adoption of Accounting Standards Update ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed") be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that the options granted to Michael Harrison, Steven Eby and Christine Giordano, be and they hereby are, adopted and approved and subject to the terms of the option grant the issuance of the shares of common stock for which the option is exercisable that the shares of common stock for which the option is exercisable, when so issued, shall be duly authorized, validly issued, fully paid and non-assessable;

**FURTHER RESOLVED**, that the Consulting Agreements for Al Geller and Ken Banta in, or substantially in, the form, and containing substantially the terms and provisions of, the Consulting Agreements attached hereto be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, subject to the execution of such Consulting Agreements, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Consulting Agreements, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that in accordance with Section 3.1 of the Company's Bylaws (the "Bylaws"), the number of directors constituting the Board is increased from three (3) to four (4) directors effective as of October 1, 2013;

**RESOLVED**, that in accordance with Section 3.2 of the Bylaws, that Cornelius Golding is hereby elected as a director of the Corporation effective as of October 1, 2013, to serve until his successor is elected and qualified;

**FURTHER RESOLVED**, that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED**, that the Code of Ethics, Insider Trading Policy and Indemnification Agreement in, or substantially in, the form, and containing substantially the terms and provisions of, such policies or agreements attached hereto be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, the Authorized Officers be, and

3

R057702

each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver such policies or agreements, with such changes or modifications thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that all directors, officers, employees and consultants of the Company shall be required to executed the Code of Ethics and Insider Trading Policy;

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 6:45 p.m.

Evan Greebel, acting Secretary

4

R057703

# MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### September 12, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Thursday, September 12, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Marc Panoff, the Company's Chief Financial Officer, and Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, were also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 12:15 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's discussions with GlaxoSmithKline LLC ("GSK") regarding GSK's 5HT6 program ("5HT6"). Mr. Shkreli noted that 5HT6 had potential applications consistent with other products that the Company was researching or developing. GSK had requested $2-5 million as an upfront fee in connection with the execution of any license agreement.  Mr. Shkreli also described the potential Food and Drug Administration approval process of 5HT6.

Mr. Shkreli then discussed with the Board the Company's September 10, 2013 unsolicited letter to Transcept Pharmaceuticals, Inc. ("Transcept"), a pharmaceutical company traded on the NASDAQ Global Market, in which the Company made a non-binding proposal to acquire all of the issued and outstanding shares of Transcept's common stock at a price of $3.50 per share.   Mr. Shkreli described Transcept's poor management, noting that its market capitalization was approximately $60 million despite having $77 million in cash, no indebtedness and an FDA-approved product, Intermezzo.  Mr. Shkreli also noted that he had discussed the Company's interest in acquiring Transcept with two of Transcept's largest stockholders.   Each of those stockholders indicated to Mr. Shkreli that they believed that Transcept should be sold.

The Board then discussed and asked management questions about the above matters.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 1:00 p.m.

Evan Greebel, acting Secretary

2

CONFIDENTIAL

R057705

<div align="center">

**MINUTES OF A SPECIAL MEETING**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**RETROPHIN, INC.**

**September 17, 2013**

</div>

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Tuesday, September 17, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson. Marc Panoff, the Company's Chief Financial Officer, and Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, were also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 2:30 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's discussions with Stuart Weg, M.D. regarding the Company licensing the rights to intranasal ketamine for any indication from Dr. Weg. Mr. Shkreli described the provisions of a term sheet that had been previously distributed to the Board and a copy of which is attached hereto as Exhibit A (the "Term Sheet"), pursuant to which, among other things, the Company would pay Dr. Weg $250,000 in exchange for negotiating exclusivity with Dr. Weg with respect to ketamine through December 31, 2013. Additionally, Mr. Shkreli noted that at least one large pharmaceutical company was investigating using ketamine as the active pharmaceutical ingredient in one or more of its treatments.

Mr. Shkreli continued by discussing the status of the Company's unsolicited proposal to acquire all of the issued and outstanding common stock Transcept Pharmaceuticals, Inc. ("Transcept"), a pharmaceutical company traded on the NASDAQ Global Market, at a price of $3.50 per share. Mr. Shkreli noted that Transcept's board of directors had rejected the Company's initial proposal and instituted a Tax Benefit Preservation Plan (the "Tax Plan") that limited the Company's ability to acquire more than 4.99% of Transcept's common stock. Mr. Shkreli suggested delivering a second letter to Transcept in which the Company would increase its offer to $4.00 per share (the "Revised Proposal"). Mr. Shkreli also noted that the Company, together with two of Transcept's other large stockholders, held a sufficient number of shares of Transcept's common stock such that they could call a special meeting of Transcept's stockholders (the "Special Meeting") to consider precatory proposals to eliminate the Tax Plan and to remove certain of Transcept's directors (together, the "Proposals").

Next, Mr. Shkreli discussed the Company's relationship with Dr. Susan Hayflick of Oregon Health & Science University ("OHSU"). Mr. Shkreli noted that Dr. Hayflick is one of

the world's foremost experts in patothenate kinase-associated neurgeneration ("PKAN"), the disease for which the Company's product RE-024 is being developed. Dr. Hayflick requested a $500,000 grant from the Company's in order to conduct a natural history study of PKAN patients. Mr. Shkreli explained that the data from such a study would be invaluable to, and be shared with, the Company. However, due to OHSU constraints, Dr. Hayflick requested that such grant be structured as a gift to OHSU (the "Gift"). Mr. Shkreli stated that he believed that although such a structure was unusual, he trusted Dr. Hayflick and believed that she and her work would be vital to the development of RE-024. He accordingly recommended to the Board that the Company make such a gift to OHSU.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the Term Sheet in, or substantially in, the form, and containing substantially the terms and provisions of, the Term Sheet attached hereto be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "Authorized Officer") be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Term Sheet, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is authorized, empowered and directed, on behalf of the Company, to deliver the Revised Proposal to Transcept through a letter, press release, or both;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to deliver a letter with certain of Transcept's other stockholders to the board of directors of Transcept demanding the Special Meeting at which the Proposals will be considered by the stockholders of Transcept;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of the Company, to make the Gift to OHSU in an amount equal to $500,000 upon the terms and conditions as the Authorized Officer delivering the same shall approve, the delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED**, that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to

2

R057707

execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 3:15 p.m.

Evan Greebel, acting Secretary

3

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### November 8, 2013

A meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Friday, November 8, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage, Steven Richardson and Cornelius Golding.  Also present were Marc Panoff, the Company's Chief Financial Officer, Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Ginger Pagulo of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 1:30 p.m.

Mr. Shkreli began the meeting by asking Mr. Panoff to review the draft of the Company's Quarterly Report on Form 10-Q for the period ended November 30, 2013 (the "Third Quarter 2013 10-Q").  Mr. Shkreli then asked Marcum to update the Board on the Third Quarter 2013 10-Q.  Marcum delivered a report on the following issues:

- matters required by SAS No. 100;

- the Company's accounting principles & disclosure practices;

- reports required to be submitted under Section 10A of the Securities Exchange Act of 1934;

- any problems or difficulties with management, none reported;  and

- continuation of auditors' independence.

Next, Marcum and management of the Company discussed the remaining open issues with respect to the Third Quarter 2013 10-Q.  Following such discussion, the representatives of Marcum left the meeting at approximately 2:05 p.m.

Next, Mr. Shkreli discussed the status of Jeffrey Paley's nomination to join the Board, noting Dr. Paley's clinical and business background.  Messrs. Aselage and Richardson reported to the Board that they had each interviewed Dr. Paley over the phone and believed that Dr. Paley would be an excellent addition to the Board.

CONFIDENTIAL

The Board then discussed the need for the Company to establish a stock option plan with which the Company could incentivize its employees. Messrs. Panoff and Greebel noted that the securities laws require that any stock option plan be approved by the Company's stockholders.

Mr. Shkreli then reviewed the status of the Company's proposed royalty agreements with Marek Biestek, a copy of which is attached hereto as Exhibit A (the "Biestek Royalty Agreement") and Andrew Vaino, a copy of which is attached hereto as Exhibit B (the "Vaino Royalty Agreement" and, together with the Biestek Royalty Agreement, the "Royalty Agreements"). Mr. Shkreli noted the contributions that Messrs. Biestek and Vaino had made in the development of RE-024 and that the Royalty Agreements would require the Company to make royalty payments to one or both of Messrs. Biestek and Vaino under certain circumstances. The Board then discussed the terms of the Royalty Agreements and asked management questions about the roles of Messrs. Biestek and Vaino in the creation of RE-024.

Next, Mr. Panoff provided a management update and an update on the financial condition of the Company, noting the Company's cash position and its current liquidity needs. Mr. Panoff also discussed the status of the Securities and Exchange Commission's review of the Company's registration statement on Form S-1 with respect to the resale of securities sold by the Company in private placement transactions during 2013. Mr. Panoff then provided an update regarding the Company's plan to proceed with an underwritten public offering of the Company's common stock. Mr. Panoff noted that he had spoken with several investment banks interested in underwriting such a transaction. The Board then discussed the merits of such an underwritten offering and the benefits of a listing on the NYSE or NASDAQ.

Mr. Shkreli then provided the Board with an update on the development of the Company's product pipeline, noting among other things that he expected the Company's RE-024 study to commence shortly and that he and Mr. Greebel would be traveling the following week to Switzerland to meet with representatives of Novartis Pharma AG to finalize the Company's license of Syntocinon. Mr. Shkreli also updated the Board on the status of the Company's efforts to acquire Transcept Pharmaceuticals, Inc. ("Transcept"). Mr. Shkreli stated that he did not think that other large stockholders of Transcept would be willing to sell their shares of Transcept common stock to the Company for $4.00 per share. Given Transcept's performance, Mr. Shkreli did not believe that the Company should increase its offer above $4.00 per share. Finally, Mr. Shkreli stated that he was confident that the Company could complete an underwritten public offering of the Company's common stock.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR IT IS HEREBY RESOLVED,** that in accordance with Section 3.1 of the Company's Bylaws (the "Bylaws"), the number of directors constituting the Board is increased from four (4) to five (5) directors effective as of November 15, 2013;

**RESOLVED,** that in accordance with Section 3.2 of the Bylaws, that Jeffrey Paley, M.D. is hereby elected as a director of the Corporation effective as of November 15, 2013, to serve until his successor is elected and qualified;

2

CONFIDENTIAL

R057710

**FURTHER RESOLVED**, that the Royalty Agreements, in each case in, or substantially in, the form, and containing substantially the terms and provisions of, said agreements attached hereto, be, and they hereby are, ratified, affirmed, approved and adopted in all respects; provided, that the Company's adoption of any future royalty agreement shall be subject to the approval of the Board, and that the Chief Executive Officer and Chief Financial Officer of the Company (each, an "Authorized Officer") be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Royalty Agreements, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED**, that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 3:15 p.m.

Evan Greebel, acting Secretary

3

R057711

# EXHIBIT A

## BIESTEK ROYALTY AGREEMENT

CONFIDENTIAL

**EXHIBIT B**

**VAINO ROYALTY AGREEMENT**

CONFIDENTIAL

R057713

| | |
|---|---|
| **From:** | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
| **Sent:** | Monday, April 08, 2013 6:31 PM |
| **To:** | Martin Shkreli |
| **Subject:** | RE: |

**E. GREEBEL**

**DX-124-118**

I got a call from your office at 1245 and when I answered it he was on the line.


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** Monday, April 08, 2013 2:29 PM
**To:** Greebel, Evan L.
**Subject:** RE:

When did you speak with him?


**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Monday, April 8, 2013 1:07 PM
**To:** Martin Shkreli
**Subject:**

I cannot answer Lavelle's questions as I do not know a lot of the information. We need to speak to discuss the answers so I can prep a response for you. Based on the tenor of my conversation with I him I think he is very serious about pursuing this.


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)
==========================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
==========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable

1

CONFIDENTIAL

R050168

law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying,
disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please
notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the
original
message without making any copies.
================================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership
that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
================================================================

2

CONFIDENTIAL                                                         R050169

| From: | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
|---|---|
| Sent: | Thursday, March 06, 2014 10:01 PM |
| To: | Martin Shkreli |
| Cc: | Marc Panoff; Rosensaft, Michael M. |
| Subject: | Fwd: Executed Consulting Agreement |
| Attachments: | Consulting Agreement & Release Executed 3-6-14.pdf; ATT00001.htm |

Blanton is done


Begin forwarded message:

From: Sam Lieberman <slieberman@sglawyers.com<mailto:slieberman@sglawyers.com>>
Date: March 6, 2014 at 4:59:27 PM EST
To: "Greebel, Evan L." <evan.greebel@kattenlaw.com<mailto:evan.greebel@kattenlaw.com>>
Subject: RE: Executed Consulting Agreement

Evan:   Attached is the fully executed version of the consulting & release agreement.   The
agreement reflects March 6 as the execution date.   That makes April 3 the deadline for
sending the shares to Mr. Blanton.  Please note that the agreement calls for the shares to be
in the name of Colt Ventures, Ltd.

Finally, the agreement calls for Mr. Blanton to review and sign Retrophin's code of ethics
and insider trading policy.  Please send those along so Mr. Blanton can address that, as
called for by the agreement.

Best,
Samuel J. Lieberman
Partner
Sadis & Goldberg, LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
T: 212-573-8164
slieberman@sglawyers.com<mailto:slieberman@sglawyers.com>

From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Wednesday, March 05, 2014 5:48 PM
To: Sam Lieberman
Subject: Executed Consulting Agreement

Sam, as discussed, attached is an executed version of the Consulting Agreement. Please have
Darren sign it and send it back to me.

Thanks,
Evan


EVAN L. GREEBEL
Partner
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

E. GREEBEL

DX-1106

exhibitsticker.com

============================================================

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue

Service, any tax advice contained herein is not intended or written to be used and cannot be used

by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

============================================================

CONFIDENTIALITY NOTICE:

This electronic mail message and any attached files contain information intended for the exclusive

use of the individual or entity to whom it is addressed and may contain information that is

proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you

are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or

distribution of this information may be subject to legal restriction or sanction.  Please notify

the sender, by electronic mail or telephone, of any unintended recipients and delete the original

message without making any copies.

============================================================

NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has

elected to be governed by the Illinois Uniform Partnership Act (1997).

============================================================

<u>CONSULTING AGREEMENT AND RELEASE</u>

THIS AGREEMENT ("Agreement") is made as of *March 6*, 2014 between Retrophin, Inc., a Delaware corporation ("Company"), and Darren Blanton, an individual ("Consultant"). The Company and Consultant are at times referred to collectively as the "Parties" or as "Party" in this Agreement. The Parties, intending to be mutually bound, hereby agree as follows:

1.      <u>Description of Services</u>.  Consultant will serve as an advisor to the Company and provide consulting services (the "Services") on strategic and corporate governance matters to the management of the Company, as requested upon reasonable notice. Consultant shall be permitted to undertake other employment or activities provided that such employment and activities are not in violation of the terms of this Agreement or compete with the business or activities of the Company.

2.      <u>Compensation</u>.  In exchange for the Services, the Company shall issue to Consultant an aggregate of 200,000 shares (the "Shares") of common stock, par value $0.0001 per share (the "Common Stock"), of the Company on the date hereof. Such Shares shall be evidenced by one or more physical stock certificates issued by Company's transfer agent bearing ownership in the name of Colt Ventures, Ltd., which shall be sent within 20 business days following the execution of this Agreement.

3.      <u>Term</u>.  This initial term under this Agreement shall be for the period beginning on the date of this Agreement (the "Effective Date") and ending on December 31, 2014.

4.      <u>Representation and Warranty</u>.

      (a)      Consultant represents and warrants to Company that:

           (i)      Services provided under this Agreement will be performed in a diligent and professional manner.

           (ii)      Consultant has full power to enter into and fully perform this Agreement without conflict with any other agreement or obligation. To the knowledge of Consultant, no service furnished under this Agreement will infringe upon or violate any rights of any third person, including intellectual property rights.

           (iii)      Consultant has no employees or subcontractors.

           (iv)      This Agreement is a valid and legally binding obligation of Consultant.

           (v)      Consultant has not been debarred pursuant to the Federal Food, Drug and Cosmetic Act. The Consultant will not knowingly use, or work with, in any capacity the services of any individual, corporation, partnership or association which has been debarred under 21 U.S.C. 335a (a) or (b) or disqualified as a clinical investigator under the provisions of 21 C.F.R. 312.70. In the event Consultant becomes aware of the debarment or disqualification of any such individual, corporation, partnership or association Consultant shall promptly notify Company.

           (vi)      Consultant is not under any legal obligation, including any obligation of confidentiality or non-competition, which prevents the Consultant from executing or fully performing this Agreement, or which would render such execution or performance a breach of contract with any third party.

           (vii)      The Shares are being acquired solely for investment for Consultant's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof.

<div align="center">1</div>

100027470

R049364

(viii)   Consultant has no present intention of selling, granting a participation in, or otherwise distributing the Shares.

(ix)   Consultant understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Consultant's representations set forth in Section 4(a)(vii)-(xi) herein.

(x)   Consultant understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Consultant must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.

(xi)   Consultant is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(b)   The Company represents, warrants and covenants that:

(i)   The Company has the requisite corporate power and authority to enter into and to consummate the transactions set forth in this Agreement.

(ii)   The Shares are duly authorized and, when issued on the date hereof, will be duly and validly issued, fully paid and non-assessable, free and clear of all liens imposed by the Company other than the restrictions on transfer identified in Section 4(a)(x) above;

(iii)   The Company will fully cooperate in a timely manner to provide the necessary consent if Consultant seeks to remove the restrictive legend on the certificated Shares pursuant to an exemption provided under the Securities Act.

(iii)   The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware, and has the requisite corporate power and authority to own its properties and to carry on its business in all material respects as now being conducted.

(iv)   This Agreement has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company enforceable in accordance with its terms subject to bankruptcy, insolvency, reorganization or similar laws of general applicability affecting the rights and remedies of creditors and to general equity principles.

5.   Confidentiality.   Consultant acknowledges that this Agreement creates a confidential relationship between Consultant and Company that is the basis on which Company will allow Consultant to have access to Company's commercially valuable, proprietary, and confidential information. Consultant will hold such information in strict confidence and will not disclose such information to any third party or use such information in any way except as provided for in this Agreement or with Company's prior consent. The confidentiality obligation in this paragraph 5 will apply to the existence of this Agreement and survive for three years from the termination of this Agreement.

The confidentiality obligations in this paragraph 5 do not apply to information that: (i) was in the public domain at the time it was disclosed to Consultant, or later becomes part of the public domain other than through Consultant's disclosure of that information; (ii) becomes known to Consultant without restriction from a source other than Company, provided that such source is not known by Consultant after due inquiry to be bound by a confidentiality agreement with the Company or by contractual, legal or fiduciary obligations; (iii) must be disclosed pursuant to an order or requirement of a court, administrative agency or other governmental body, provided that, if permitted, Consultant

2

100027470

CONFIDENTIAL

R049365

will give Company prompt notice of any such order or requirement or (iv) is or was independently developed by Consultant without reliance on the information disclosed hereunder.

6.      Independent Contractor Status.  Services performed by Consultant for Company under this Agreement will be in Consultant's capacity as an independent contractor and not as agent or representative of Company.  Consultant is not authorized to enter into any contract or commitment on behalf of Company.  Consultant shall not make any representation, warranty or guaranty on behalf of Company in the performance of the services.  The Parties acknowledge that the Consultant is not intended to serve as an "Affiliate" of the Company, as that term is defined under the securities laws. As an independent contractor, the Consultant agrees to comply with all applicable tax reporting and/or payment obligations arising from any payments made to Consultant or on Consultant's behalf. Company will provide the Consultant with Internal Revenue Form 1099 as required. Consultant will assume all responsibility for payment of taxes or other amounts which may be due as the result of payments made by Company under this Agreement.

7.      Indemnification.  During the Term and thereafter, the Company  shall indemnify and hold Consultant harmless to the fullest extent permitted by law against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from any acts of Consultant in performance of the Services under this Agreement, except for actions involving gross negligence, misconduct, bad faith or breach of this Agreement by the Consultant.  This provision shall survive any termination of the Agreement.

8.      Non-Disparagement/Media.

(a)      The Parties agree not to make, publish, or communicate to any person or entity, any Disparaging remarks, comments, writings, or statements concerning the Consultant or the Company or any of its affiliates, officers, directors, clients, employees, consultants, or agents. "Disparaging" remarks, comments, writings, and/or statements are those that impugn, criticize, or denigrate (a) the Company or any of its affiliates, officers, directors, clients, investigators, employees, consultants, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or any of its affiliates, officers, directors, clients, employees, consultants, or agents.  This section does not apply to any discussions that Consultant has been advised by counsel is required by law or otherwise required pursuant to the United States securities laws.

(b)      The parties further agree that they will not make any statement whatsoever to the press or media (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, or radio or television station) any matter related to the Company, the Services, or any of the Company's affiliates, officers, directors, clients,, employees, consultants, or agents. If at any time Consultant receives a request for any statement or information from the press or other media, the Consultant will direct that request to the Chief Executive Officer of the Company and will say nothing further.

9.      Company Property.  All correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which come into Consultant's possession by, through or in the course of his employment, regardless of the source and whether created by Consultant, are the sole and exclusive property of the Company, and immediately upon the termination of this Agreement, or any time at the Company's reasonable request, Consultant shall return to the Company all such property of the Company.

3

100027470

CONFIDENTIAL                                                                                                        R049366

10. <u>Release.</u>

   (a) Based upon the mutual promises contained herein and other good and valuable consideration, Consultant, on his behalf and on behalf of all of his heirs, successors, assigns, agents, legal representatives and personal representatives (collectively, the "<u>Releasor Parties</u>"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges the Company, and each of its or their respective affiliates and affiliated corporations, parents, subsidiaries, predecessors, successors, heirs, assigns, officers, directors, representatives, agents, legal representatives and personal representatives as well as Martin Shkreli, MSMB CAPITAL MANAGEMENT, LP, a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC, a Delaware limited liability company, MSMB HEALTHCARE LP, a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC, a Delaware limited liability company, MSMB HEALTHCARE MANAGEMENT LLC, and their respective affiliates, officers, directors, members, partners, managers, and representatives (collectively, the "<u>Releasees</u>"), of any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "<u>Claims</u>"), including all costs, expenses and attorneys' fees related thereto that Consultant now has, or which he may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses; <u>provided, however</u>, that the Releasor Parties do not hereby release any Claims for breach of this Agreement, or Claims that otherwise seek to enforce the terms of this Agreement. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Section 10. If the Shares are not sent to the Consultant within twenty (20) business days of the date hereof, this Release and the remainder of the Agreement shall be *void ab initio* and of no further force or effect, except for the Confidentiality provisions in Section 5 as to information provided prior to the breach of the obligation to send the Shares.

   (b) Based upon the mutual promises contained herein and other good and valuable consideration, the Releasees hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharge the Releasor Parties, of any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "<u>Claims</u>"), including all costs, expenses and attorneys' fees related thereto that the Releasor Parties now have, or which they may have against the Releasees from the beginning of time up to the date of this Agreement; <u>provided, however</u>, that the Releasees do not hereby release any Claims for breach of this Agreement, or Claims that otherwise seek to enforce the terms of this Agreement. The Releasor Parties shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Section 10.

11. <u>Miscellaneous.</u> The Services to be provided by Consultant hereunder are of a personal nature and this Agreement will not be assigned by Consultant or Company without the written consent of the other party. This Agreement, including all attachments hereto, is the entire Agreement between the parties regarding the subject matter hereof, superseding all prior agreements, and cannot be amended or modified except in writing signed by both parties.

100027470

4

R049367

In accordance with the Company's policies, Consultant shall sign and agree to be bound by the Company's Code of Ethics and Insider Trading Policy.

Given the nature of the obligations set forth in Sections 5, 8 and 10 of this Agreement, Consultant acknowledges and agrees that Company may be irreparably damaged by Consultant's alleged breach or violation of such sections. Without prejudice to the rights and remedies otherwise available to Company, it shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of Sections 5, 8 or 10 of this Agreement.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York, administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party. Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as in the preceding paragraph of this Section 11. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. Each party irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the courts referred to in this Section 11.

*[Signature Page to Follow]*

100027470

5

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

RETROPHIN, INC.

By: _____
     Name: MArtin shkreli
     Title: CEO


Consultant

_____
Darren Blanton

100027470

6

CONFIDENTIAL

R049369

**From:**          Leonora Izerne <Leonora@retrophin.com>
**Sent:**          Monday, March 25, 2013 3:31 PM
**To:**            Greebel, Evan L.
**Subject:**       RE: assignment
**Attachments:**   Sage Realty 777 Third Avenue Lease.pdf

Hi, Evan.
Hope all is well.

Okay, got it – and thank you for clarifying, since she often just gives me legal/real estate jargon and expects
me to know or understand what she means, without the least bit of detail...
That said, I can still credit her for sending the lease (after I practically begged for it, b/c they do not apparently provide
them to tenants?! , maybe b/c it is 95-pages long, I do not know...)

I have attached it for your convenience, so please let me know if this is sufficient.

Thanks a lot,
Nora

---

**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Monday, March 25, 2013 11:24 AM
**To:** Leonora Izerne
**Subject:** assignment

Hi Nora, I hope you had a good weekend.  If you have a moment, please ask Linda for a copy of the executed lease and
we will prepare the assignment. Also, in the future please do not refer to Retrophin and MSMB Capital  as the same
personnel or the same company.                                                    but there are significant
legal implications which we want to avoid.

I am happy to discuss if you have any questions.

Evan


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)



=========================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal
Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot
be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the
taxpayer.
=========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the
exclusive
use of the individual or entity to whom it is addressed and may contain information that

is
proprietary, privileged, confidential and/or exempt from disclosure under applicable
law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying,
disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please
notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the
original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership
that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================

R-Greebel0000008077

NUMBER *1* OF
*5* EXECUTED
COUNTERPARTS

SAGE REALTY CORPORATION, AGENT

LANDLORD

and

MSMB CAPITAL MANAGEMENT, LLC

TENANT

INDENTURE OF LEASE

PREMISES: Part of the 22nd Floor at
777 Third Avenue
New York, New York 10017

13973734.7

## TABLE OF CONTENTS

Article        Page

ARTICLE 1. DEFINITIONS, TERM................................... 1

ARTICLE 2. COMMENCEMENT OF TERM............................... 3

ARTICLE 3. FIXED RENT, ADDITIONAL RENTS AND RENT ADJUSTMENTS... 4

ARTICLE 4. ELECTRICITY........................................ 9

ARTICLE 5. USE............................................... 14

ARTICLE 6. REPAIRS, ALTERATIONS AND LIENS.................... 15

ARTICLE 7. FLOOR LOAD, NOISE, WINDOW CLEANING................ 21

ARTICLE 8. LAWS, ORDINANCES, REQUIREMENTS OF PUBLIC AUTHORITIES
           ................................................. 22

ARTICLE 9. INSURANCE, PROPERTY LOSS, REIMBURSEMENT........... 23

ARTICLE 10. DAMAGE OR DESTRUCTION BY FIRE OR OTHER CAUSE...... 27

ARTICLE 11. ASSIGNMENT, SUBLETTING, MORTGAGING............... 29

ARTICLE 12. NO LIABILITY ON LANDLORD......................... 36

ARTICLE 13. MOVING OF HEAVY EQUIPMENT........................ 36

ARTICLE 14. CONDEMNATION..................................... 37

ARTICLE 15. ENTRY, RIGHT TO CHANGE PUBLIC PORTIONS OF THE
            BUILDING ........................................ 38

ARTICLE 16. BANKRUPTCY....................................... 39

ARTICLE 17. DEFAULTS AND REMEDIES AND WAIVER OF REDEMPTION.... 40

ARTICLE 18. LANDLORD'S RIGHT TO PERFORM TENANT'S OBLIGATIONS.. 44

ARTICLE 19. COVENANT OF QUIET ENJOYMENT...................... 44

ARTICLE 20. EXCAVATION....................................... 44

ARTICLE 21. SERVICES AND EQUIPMENT........................... 45

ARTICLE 22. DEFINITION OF LANDLORD........................... 49

ARTICLE 23. INVALIDITY OF ANY PROVISION...................... 49

ARTICLE 24. BROKER........................................... 50

ARTICLE 25. SUBORDINATION.................................... 50

ARTICLE 26. ESTOPPEL CERTIFICATE............................. 53

ARTICLE 27. LEGAL PROCEEDINGS, WAIVER OF JURY TRIAL.......... 54

ARTICLE 28. SURRENDER OF PREMISES/HOLDOVER................... 54

ARTICLE 29. RULES AND REGULATIONS............................ 55

CONFIDENTIAL                                    R-Greebel0000008079

ARTICLE 30. NOTICES........................................... 56

ARTICLE 31. NO WAIVER:  ENTIRE AGREEMENT...................... 56

ARTICLE 32. CAPTIONS.......................................... 57

ARTICLE 33. INABILITY TO PERFORM............................. 57

ARTICLE 34. NO REPRESENTATION BY LANDLORD.................... 58

ARTICLE 35. **NAME OF BUILDING**................................ 58

ARTICLE 36. SUCCESSORS AND ASSIGNS........................... 58

ARTICLE 37. DEFERRED COLLECTIONS............................. 59

ARTICLE 38. FEES/INTEREST/LATE CHARGES....................... 59

ARTICLE 39. LANDLORD'S WORK.................................. 60

ARTICLE 40. ABATEMENT OF RENT................................ 61

ARTICLE 41. SECURITY DEPOSIT................................. 61


Schedule A   Floor Plan

Schedule B   Plans and Specifications for Landlord's Work

Schedule C   Rules and Regulations

Schedule D   Cleaning Specifications

Schedule E   Form of Letter of Credit

CONFIDENTIAL

R-Greebel0000008080

INDENTURE OF LEASE made as of this 3rd day of ~~July~~ AUGUST 2012, between SAGE REALTY CORPORATION, a New York corporation having its principal office at 777 Third Avenue, New York, New York 10017, Agent for the owner of the Building hereinafter mentioned (herein "Landlord"), and MSMB CAPITAL MANAGEMENT, LLC, a Delaware limited liability company authorized to do business in New York State, having its office at 330 MADISON AVE. NY, NY 10017 (herein "Tenant").

<p style="text-align:center">W I T N E S S E T H:</p>

<p style="text-align:center">ARTICLE 1.</p>

<p style="text-align:center">DEFINITIONS, TERM</p>

SECTION 1.01   The terms defined in this Article shall, for all purposes of this Lease and all agreements supplemental thereto, have the meanings herein specified unless the context otherwise requires.

(a)   "Building" shall mean the office building known as 777 Third Avenue, in the Borough of Manhattan, City and State of New York.  The plot of land on which the Building is erected is hereinafter called the "Land."

(b)   "Business Days" shall mean all days excluding Saturdays, Sundays and days observed by the State of New York or Federal Government as legal holidays, and further excluding holidays established by any union contract applicable to employees at the Building.

(c)   "Commencement Date" shall have the meaning set forth in Section 2.02.

(d)   "default" as used in this Lease shall mean and refer to a failure by Tenant to pay (including for this purpose any late payment of) any Fixed Rent and/or any additional rent payable under Section 3.04 or otherwise of the Lease and/or to perform any obligation on Tenant's part to be performed under this Lease as and within the time expressly required by this Lease (no matter how consequential or inconsequential or frequent or infrequent), and without regard to any action or inaction on the part of Landlord, including, without limitation, if Landlord's conduct shall be deemed to be a waiver of or acquiescence in Tenant's act or omission or any other matter or thing which would act as a bar, in law or at equity, to Landlord's enforcing its rights and remedies following a default

13973734.7

CONFIDENTIAL

R-Greebel0000008081

by Tenant and/or Landlord's failure (timely or otherwise) to pursue any rights or remedies available to Landlord arising therefrom; provided, however, that the foregoing shall not invalidate or shorten any grace and/or notice period otherwise provided for in the Lease.

(e)    "Demised Premises" shall mean a portion of the twenty-second (22nd) floor of the Building, as shown on the Floor Plan annexed hereto as Schedule A and made a part of this Lease, including all fixtures and equipment which at the Commencement Date or during the Term of this Lease are attached thereto and which become a part thereof.

(f)    "Expiration Date" shall mean the last day of the month in which occurs the date which immediately precedes the fourth (4th) anniversary of the Rent Commencement Date, or any sooner date of termination pursuant to the provisions hereof.

(g)    "Fixed Rent" shall mean the annual rental payable by Tenant for the Demised Premises in equal monthly installments as provided for in Article 3 of this Lease.

(h)    "Interest Rate" shall mean the lesser of (i) 3% above the prime commercial lending rate of Citibank, N.A. in effect from time to time or (ii) the maximum applicable legal rate, if any.

(i)    "Landlord's Work" shall mean the work agreed to be done by Landlord in the Demised Premises as provided for in Article 39 hereof.

(j)    "Lease" shall mean this Indenture of Lease and any and all Schedules annexed hereto.

(k)    "Rent Commencement Date" shall mean the date that is two (2) months from and after the Commencement Date.

(l)    "Term of this Lease" and "Term" shall mean the term of years commencing on the Commencement Date and expiring on the Expiration Date, subject to the terms and conditions hereinafter set forth.

SECTION 1.02    Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, the Demised Premises, subject to the provisions hereinafter set forth, together with appurtenances, including the right to use in common with others the lobbies, elevators and other public portions of the Building.

CONFIDENTIAL                                                    R-Greebel0000008082

TO HAVE AND TO HOLD unto Tenant, its successors and permitted assigns, for the Term of this Lease or until the Term of this Lease sooner terminates as hereinafter provided.

ARTICLE 2.

COMMENCEMENT OF TERM

SECTION 2.01   Tenant acknowledges that it has examined the Demised Premises and is taking same vacant and "as is" as of the Commencement Date, provided that Landlord shall have completed Landlord's Work as set forth in Article 39 hereof.  Tenant acknowledges that Landlord is not required to do any work with respect thereto (subject to Landlord's continuing repair and maintenance obligations as set explicitly set forth in this Lease), except as set forth in Article 39 hereof.

SECTION 2.02   The Term of this Lease and the payment of rent shall commence on the date that the Demised Premises shall be "substantially completed" as defined in Article 39 hereof (herein the "Commencement Date").  Landlord agrees that it shall deliver a notice to Tenant at least five (5) Business Days prior to the date of Substantial Completion of Landlord's Work. Promptly after the Commencement Date, Landlord and Tenant agree to execute an agreement ("Commencement Date Agreement") in form and substance satisfactory to Landlord setting forth, among other things, the Commencement Date and the Expiration Date of this Lease.

The taking of possession by Tenant of the Demised Premises shall be presumptively deemed an acceptance of same by Tenant and shall be deemed Substantial Completion (as defined in Article 39 hereof) of Landlord's Work.  Such taking of possession shall also be presumptive evidence, as against Tenant, that the Demised Premises and the Building of which the same form a part were in good and satisfactory condition at the time of such occupancy and that the Demised Premises were substantially as shown on Schedule A, except for any latent defects in Landlord's Work.  Landlord shall, however, thereafter complete any "punchlist" items required for completion of Landlord's Work (i.e., insubstantial details of construction, mechanical adjustment or decoration which remain to be performed in connection with Landlord's Work which shall be completed with reasonable promptness after the Commencement Date).

SECTION 2.03   If Landlord shall be unable to give possession of the Demised Premises on the date anticipated for the commencement of the Term hereof for any reason whatsoever,

13973734.7                        - 3 -

CONFIDENTIAL                                                      R-Greebel0000008083

Landlord shall not be subject to any liability, nor shall the validity of this Lease nor the obligations of Tenant hereunder be thereby affected. Without limiting the foregoing, the parties hereto expressly negate the provisions of Section 223-a of the Real Property Law and agree that such Section shall be inapplicable hereto. Tenant agrees that the provisions of this Article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a. If by reason of such delay, the Term of this Lease shall commence subsequent to such anticipated date, the Term of this Lease shall be deemed extended for the same period. Landlord represents to Tenant that the Demised Premises is currently vacant and that Landlord shall use commercially reasonable, diligent efforts to substantially complete Landlord's Work on or prior to the date that is one hundred twenty (180) days from the date hereof (without being required to incur any overtime charges), subject to any delays beyond the reasonable control of Landlord (i.e., force majeure [set forth immediately below]). Notwithstanding the foregoing, in the event that Landlord shall be unable to give possession of the Demised Premises on or prior to a date that is one hundred eighty (180) days from the date hereof (the "Completion Date") (subject to extension for a period of six (6) months in the aggregate by reason of force majeure [set forth immediately below]), Tenant shall be granted an abatement of Fixed Rent hereunder in an amount equal to one (1) day of Fixed Rent for each one (1) day after the Completion Date that Tenant is unable to (and does not) occupy the Demised Premises (which abatement shall be in addition to the abatement of Fixed Rent set forth in Article 40 hereof). Force majeure shall mean any delay in Landlord's substantial completion of Landlord's Work caused by labor trouble, governmental controls, acts of God, or any other cause, in each case, beyond Landlord's reasonable control shall extend such time period for Landlord to substantially complete Landlord's Work and give possession of the Demised Premises to Tenant.

ARTICLE 3.

FIXED RENT, ADDITIONAL RENTS AND RENT ADJUSTMENTS

SECTION 3.01   During the Term of this Lease, Tenant shall pay, at Landlord's address as herein set forth, or at such other address that Landlord may from time to time designate, a Fixed Rent payable in lawful money of the United States of America (by check of Tenant drawn on a bank that is a member of the New York Clearinghouse Association) in equal monthly installments in advance on the first day of each calendar month, without notice

13973734.7

CONFIDENTIAL

R-Greebel0000008084

or demand, and without setoff or deduction whatsoever (subject to the provisions Section 40.01 hereof) at an annual rates follows (subject to adjustment pursuant to Article 4 hereof):

(a) $275,094.00 during the period beginning on the Commencement Date and continuing through the last day of the month in which occurs the date which immediately precedes the first (1st) anniversary of the Rent Commencement Date;

(b) $280,321.84 during the period beginning on the first day of the month immediately following the month in which occurs the date which immediately precedes the first (1st) anniversary of the Rent Commencement Date and continuing through the last day of the month in which occurs the date which immediately precedes the second (2nd) anniversary of the Rent Commencement Date;

(c) $285,654.24 during the period beginning on the first day of the month immediately following the month in which occurs the date which immediately precedes the second (2nd) anniversary of the Rent Commencement Date and continuing through the last day of the month in which occurs the date which immediately precedes the third (3rd) anniversary of the Rent Commencement Date; and

(d) $291,093.28 during the period beginning on the first day of the month immediately following the month in which occurs the date which immediately precedes the third (3rd) anniversary of the Rent Commencement Date and continuing through the Expiration Date.

If Tenant's obligation to pay Fixed Rent shall commence on a date other than the first day of a calendar month, the first installment of Fixed Rent shall be in an amount equal to that required to cover the period up to and including the last day of the month wherein the obligation to pay Fixed Rent occurs, computed on a per diem basis.

SECTION 3.02  The Fixed Rent does not take into account increases of real estate taxes and/or expenses during the Term of this Lease or other adjustments in rent, or other payments to be made by Tenant (other than the payment for electricity in accordance with the provisions of Article 4 hereof), during the Term of this Lease.  Provision therefor is hereinafter made. Notwithstanding the foregoing, Landlord and Tenant hereby agree that the increases in Fixed Rent set forth in Section 3.01 above are paid by Tenant in lieu of an annual increase in operating expense or an annual increase in porter's wage.

CONFIDENTIAL                                        R-Greebel0000008085

SECTION 3.03    All costs, expenses, adjustments and payments which Tenant is obligated to pay to Landlord pursuant to this Lease and/or its Schedules shall be deemed additional rent whether or not denominated as such and, in the event of nonpayment thereof, Landlord shall have all rights and remedies with respect thereto as herein provided for in case of nonpayment of Fixed Rent.

Tenant covenants and agrees to pay the Fixed Rent and additional rent as in this Lease provided, when due.

SECTION 3.04    A.    For the purposes of this Section 3.04, the following definitions shall apply:

(a)    The term "Base Tax Year" as hereinafter set forth for the determination of real estate tax escalation shall mean calendar year 2012 (i.e., Real Estate Taxes, as hereinafter defined, for the Base Tax Year shall be the average of Real Estate Taxes for the period commencing on July 1, 2011 and ending on June 30, 2012 and Real Estate Taxes for the period commencing on July 1, 2012 and ending on June 30, 2013).

(b)    The term "the Percentage" shall mean 0.74%.  For purposes of this Lease, the Demised Premises shall be deemed to contain 4,216 square feet of rentable area and the Building shall be deemed to contain 575,985 square feet of rentable area.

(c)    The term "Real Estate Taxes" shall mean all real estate taxes, assessments, water and sewer rents, governmental levies, county taxes or any other governmental charges, general or special, ordinary or extraordinary, unforeseen as well as foreseen, of any kind or nature whatsoever, which are or may be assessed or imposed upon the Land, the Building and the sidewalks, plazas or streets in front of or adjacent thereto, including any tax, excise or fee measured by or payable with respect to any rent, and levied against Landlord and/or the Land and/or Building, under the laws of the United States, the State of New York, or any political subdivision thereof, or by the City of New York, or any political subdivision thereof.  Except as provided for in the following sentence, Real Estate Taxes shall not include income, estate, succession, capital stock, franchise, mortgage, transfer or inheritance taxes.  If, due to a future change in the method of taxation or in the taxing authority, a franchise, income, transit, profit or other tax or governmental imposition, however designated, shall be levied against Landlord, and/or the Land and/or the Building, in substitution in whole or in part for said Real Estate Taxes, or in lieu of additional real estate taxes, then such franchise,

13973734.7                           — 6 —

CONFIDENTIAL                                            R-Greebel0000008086

income, transit, profit or other tax or governmental imposition shall be deemed to be included within the definition of "Real Estate Taxes" for the purposes hereof. In the event that the Real Estate Taxes for the Base Tax Year shall include any charge with respect to any so called "Business Improvement District" or similar charge (a "Bid Charge"), and if any such Bid Charge is subsequently discontinued or eliminated, then, as of the date of such discontinuance or elimination, the Real Estate Taxes for the Base Tax Year shall be recalculated as if the Bid Charge had not originally been included therein.

(d)   The term "Tax Year" shall mean every twelve-month consecutive period commencing each July 1st during the Term of this Lease.

B.   Real Estate Tax Adjustment

In the event that the Real Estate Taxes payable for any Tax Year shall exceed the amount of such Real Estate Taxes, as finally determined, payable with respect to the Base Tax Year, Tenant shall pay to Landlord, as additional rent ("Tenant's Tax Payment") for such Tax Year, an amount equal to the Percentage of the excess. By or after the start of the Tax Year following the Base Tax Year, and by or after the start of each Tax Year thereafter, Landlord shall furnish to Tenant a statement of the Real Estate Taxes payable with respect to such Tax Year, and a statement of the Real Estate Taxes payable during the Base Tax Year.

Within thirty (30) days after the issuance by the governmental authority having jurisdiction thereover of tax bills for Real Estate Taxes assessed, levied and/or imposed upon the Land and Building for any Tax Year, Landlord shall submit to Tenant a photostatic copy of such bill and/or bills and thereafter on or about each respective anniversary date shall submit a copy of the tax bill and/or bills for the Real Estate Taxes assessed, levied or imposed upon the Land and Building for such Tax Year, together with a statement which shall indicate the amount, if any, of Tenant's Tax Payment. Landlord's failure to submit copies of bills as aforesaid shall not be considered a default by Landlord or a defense by Tenant to such tax payment.

Within thirty (30) days after the issuance of the statement, Tenant shall pay Tenant's Tax Payment in the amount set forth on such statement. Such statement shall be conclusively deemed binding upon Tenant unless Tenant shall have objected thereto in writing within sixty (60) days of receipt thereof.

13973734.7

- 7 -

CONFIDENTIAL

R-Greebel0000008087

In the event Landlord shall receive a final reduction or refund of Real Estate Taxes for any Tax Year for which Tenant is obligated to pay any additional rent under the provisions of this subsection B of Section 3.04, the amount or the proceeds of such reduction or refund, less legal fees and other expenses incurred in collecting the same or achieving such reduction, shall be applied and allocated to the periods for which such final reduction or refund was obtained, and proper adjustment shall be made between Landlord and Tenant.  Tenant has been advised that proceedings to protest the Real Estate Tax Assessment for the Base Tax Year may have been filed and may result in a reduction of Real Estate Taxes for the Base Tax Year.

Any payments or refunds due hereunder for any period of less than a full Tax Year at the commencement or end of the Term of this Lease shall be equitably prorated to reflect such event.

In addition to Tenant's obligation to pay Tenant's Tax Payment as aforesaid, Tenant shall pay to Landlord as additional rent payable upon demand, any occupancy tax or rent tax now in effect or hereafter enacted, if payable by Landlord in the first instance or hereafter required to be paid by Landlord.

SECTION 3.05   Upon the date of the expiration or any sooner termination of this Lease, whether the same be the date hereinabove set forth as the expiration of the Term of this Lease or any prior or subsequent date, a proportionate share of the Fixed Rent, adjustments and additional rents for the year (calendar or fiscal) in which such expiration or termination occurs, shall immediately become due and payable by Tenant to Landlord as hereinafter provided, if not theretofore already billed and paid.  Such proportionate share shall be based upon the length of time that this Lease shall have been in existence during such year.  Promptly after any such expiration or termination, Landlord shall compute the amounts due from Tenant, as aforesaid, which computations shall either be based on that year's actual figures or be an estimate based on the most recent statements theretofore prepared by Landlord and furnished to Tenant pursuant to this Lease.  If an estimate is used, then Landlord shall promptly cause statements to be prepared on the basis of the Tax Year's actual figures as soon as they are available, and within ten (10) days after such statement or statements are prepared by Landlord and furnished to Tenant, Landlord and Tenant shall make appropriate adjustments of any estimated payments theretofore made.

13973734.7                    -- 8 --

CONFIDENTIAL                                                    R-Greebel0000008088

Tenant's obligation to pay any and all rents, adjustments and additional rents under this Lease shall continue and shall cover all periods up to the Expiration Date. Landlord's and Tenant's obligations to make the adjustments hereinabove referred to shall survive any expiration or termination of this Lease. Any delay or failure of Landlord in billing any Fixed Rent or additional rent herein provided for shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such rent adjustments hereunder. Notwithstanding the foregoing, whether during the Term of this Lease or following its expiration, Tenant shall have no obligation to make payments in adjustment of a statement of Taxes which demand for adjustment is made after the fourth (4th) anniversary of the rendering of the statement for Real Estate Taxes for the Tax Year in question.

ARTICLE 4.

ELECTRICITY

SECTION 4.01   The Fixed Rent reserved in this Lease includes the agreed sum of $13,702.00 per annum in consideration of which Landlord, as an additional service, will supply Tenant with electricity for normal use in the Demised Premises between the hours 9:00 A.M. and 5:30 P.M. on Business Days. If Landlord's electric rates (i.e., the public utility rate schedule at the time in question, including all surcharges, taxes, fuel adjustments, taxes regularly passed on to consumers by the public utility, and other sums payable in respect thereof for the supply of electric energy to Landlord for the Building) are increased, the Fixed Rent reserved in this Lease shall be adjusted by applying to the sum specified above, the same percentage as such rate increase, and such adjusted Fixed Rent shall be billed by Landlord to Tenant, with effect as of the date of the increase of Landlord's electric rate. If Tenant disputes the amount, Tenant shall nevertheless pay the same as billed, and the amount shall be determined by an independent utility consultant to be selected by Landlord and paid by Tenant. The determination of the consultant shall be binding upon the parties. Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished to the Demised Premises by reason of any requirement, act or omission of the public utility serving the Building with electricity or for any other reason not attributable to the Landlord. At Landlord's option, Tenant shall purchase from the Landlord or Landlord's agent all lighting tubes, lamps, bulbs and ballasts used in the Demised

13973734.7

– 9 –

R-Greebel0000008089

Premises and Tenant shall pay Landlord's reasonable charges for providing and installing same on demand, as additional rent.

SECTION 4.02   Tenant's use of electric energy in the Demised Premises shall not at any time exceed the capacity of any of the electrical conductors, machinery and equipment in or otherwise serving the Demised Premises. In order to insure that such capacity is not exceeded and to avert possible adverse effect upon the Building electric service, Tenant shall not, without Landlord's prior written consent in each instance, connect any fixtures, machinery, appliances or equipment (other than ordinary small office equipment) to the electric system or make any alteration to the electric system of the Building or the Demised Premises as the same exist on the Commencement Date, other than lamps, typewriters, copiers, computer terminals, copying machines, communications equipment such as telephones, fax machines, appliances, and other small or typical office machines that consume comparable or less electricity. Should Landlord grant such consent, all additional risers or other equipment required therefor shall be provided by Landlord, and the cost thereof shall be paid by Tenant upon Landlord's demand. As a condition to granting such consent, Landlord may require Tenant to agree to an increase in the Fixed Rent by an amount which will reflect the value to Tenant of the additional service to be furnished by Landlord, that is, the potential additional electrical energy to be made available to Tenant based upon the estimated additional capacity of such additional risers or other equipment. If Landlord and Tenant cannot agree thereon, Tenant shall nevertheless pay the same as billed until such amount shall be determined by an independent utility consultant to be selected by Landlord and paid by Tenant. The determination of the consultant shall be binding upon the parties. When the amount of such increase is so determined, the parties shall execute an agreement supplementary hereto to reflect such increase in the amount of the Fixed Rent stated in this Lease and in the amount set forth in Section 4.01, effective from the date such additional service is made available to Tenant, but such increase shall be effective from such date even if such supplementary agreement is not executed.

SECTION 4.03   If there shall be an increase in the space constituting the Demised Premises, or if Tenant's failure to maintain its machinery and equipment in good order and repair causes greater consumption of electrical current, or if Tenant uses electricity on days or hours other than those specified in Section 4.01, or if Tenant adds any machinery, appliances or equipment requiring additional electrical current, the Fixed

13973734.7

CONFIDENTIAL

R-Greebel0000008090

Rent herein reserved shall be increased accordingly.  The amount
thereof shall be billed by Landlord to Tenant, effective as of
the date of the increased usage.  Such sum shall be due, and
shall be paid by Tenant, as additional rent hereunder at the
time billed.  If Tenant disputes the amount, Tenant shall
nevertheless pay the same as billed, and the amount shall be
determined by an independent utility consultant to be selected
by Landlord and paid by Tenant.  The determination of the
consultant shall be binding upon the parties.

SECTION 4.04   Landlord reserves the right to discontinue
furnishing electric energy to Tenant in the Demised Premises at
any time upon not less than thirty (30) days' notice to Tenant,
provided, however, that Landlord shall have made such election
as to the majority of all tenants occupying the Building and
further provided that electrical service is available directly
from the public utility or alternate provider servicing the
Building (Landlord hereby agreeing, unless otherwise required by
law, not to discontinue furnishing electricity to Tenant until
such time as Tenant is able to obtain same directly from the
public utility or alternate provider).  If Landlord exercises
such right of termination, this Lease shall continue in full
force and effect and shall be unaffected thereby, except only
that, from and after the effective date of such termination,
Landlord shall not be obligated to furnish electric energy to
Tenant and the Fixed Rent under this Lease shall be reduced by
the amount set forth in Section 4.01, plus or minus the amount
of any change pursuant to Sections 4.01, 4.02, 4.03 and 4.05.
If Landlord so discontinues furnishing electric energy to
Tenant, Tenant shall arrange to obtain electric energy directly
from the public utility company furnishing electric service to
the Building.  Such electric energy may be furnished to Tenant
by means of the then existing building system feeders, risers
and wiring to the extent that the same are available, suitable
and safe for such purposes.  All meters and additional panel
boards, feeders, risers, wiring and other conductors and
equipment which may be required to obtain electric energy
directly from such public utility company shall be installed and
maintained by Tenant at its expense.

SECTION 4.05   Tenant covenants and agrees that at no time
will the demand electrical load serving the Demised Premises
exceed six (6) watts per rentable square foot of demand load,
exclusive of electricity used for base Building heating,
ventilating and air-conditioning.  Landlord represents that no
less than six (6) watts per rentable square foot of demand load
electric service, exclusive of electricity used for base

CONFIDENTIAL                                              R-Greebel0000008091

Building heating, ventilating and air-conditioning, is presently, and shall continue to be during the Term of this Lease, available to the Demised Premises.  Should Landlord consent to an increase in the connected electrical load, as a condition to granting such consent, Landlord may require Tenant to agree to an increase in the Fixed Rent by an amount which will reflect the value to Tenant of the additional connected electrical load.  If Tenant disputes the amount, Tenant shall nevertheless pay the same as billed, and the amount shall be determined by an independent utility consultant to be selected by Landlord and paid by Tenant.  The determination of the consultant shall be binding upon the parties.

SECTION 4.06   If any tax is imposed upon Landlord with respect to electrical energy furnished as a service to Tenant by any Federal, State or Municipal Authority, Tenant covenants and agrees that where permitted by law or applicable regulations, Tenant's pro rata share of such taxes shall be  reimbursed by Tenant to Landlord.

SECTION 4.07   (A) Landlord shall have the right to procure periodic surveys made by an independent utility consultant selected by Landlord and if such utility consultant determines that there has been (i) an increase in Tenant's use of electrical current or (ii) the amount set forth in Section 4.01 is insufficient, then, the amount set forth in Section 4.01 shall be adjusted and in addition to the other requirements and obligations imposed on Tenant in this Article, Tenant shall pay the fees of the utility consultant making such survey.  The findings of such utility consultant shall be binding and conclusive upon the parties.

(B)  If Tenant wishes to dispute any determination of the additional rental value of electricity service to the Demised Premises (i.e. any increase above the sum set forth on the second line of Section 4.01 hereof), on the basis of any survey made pursuant to Section 4.07(A) or as otherwise determined pursuant to Sections 4.01, 4.02, 4.03 and 4.05 hereof, it shall notify Landlord to such effect within sixty (60) days after receipt of written notice of such determination.  Unless and until such dispute is determined in Tenant's favor, Tenant shall pay the Fixed Rent as computed in accordance with such determination.  The dispute shall be determined in the following manner: Tenant shall retain a reputable independent electrical engineer or consultant ("Tenant's Consultant") to review Landlord's survey or other basis of Landlord for such determination, as the case may be, and, if deemed advisable, to make an independent survey.  Not later than thirty (30) days

CONFIDENTIAL                                                    R-Greebel0000008092

after Tenant shall have given Landlord the notice of dispute, Tenant shall deliver to Landlord (i) Tenant's Consultant's comments on Landlord's survey or on Landlord's other basis for such determination, and/or (ii) Tenant's Consultant's survey. Landlord shall refer such comments and/or survey to the consultant who prepared the original survey or to its electrical consultant ("Landlord's Consultant") who shall meet with Tenant's Consultant for the purpose of reaching agreement upon the additional rental value of the electricity service to the Demised Premises.  If they are unable to reach such agreement within thirty (30) days after the delivery of such comments or report, Landlord's Consultant and Tenant's Consultant shall appoint a disinterested third electrical consultant, who shall, within twenty (20) days thereafter, resolve whatever differences may remain between Landlord's Consultant and Tenant's Consultant and on the basis of such resolution determine the additional rental value of the electricity service to the Demised Premises. If Landlord's Consultant and Tenant's Consultant are unable to agree upon a disinterested third electrical consultant within the thirty (30) day period above specified for agreement between Landlord's Consultant and Tenant's Consultant, and if the parties are unable to agree upon such a third electrical consultant within ten (10) days thereafter, either party, upon written notice to the other, may apply for the appointment of such a third electrical consultant to the President of the Real Estate Board of New York, Inc. or any organization successor thereto, or in his absence or refusal or failure to act, to the Supreme Court of the State of New York in the County of New York.  The fees and expenses of Landlord's Consultant shall be borne entirely by Landlord.  The fees and expenses of Tenant's Consultant shall be borne entirely by Tenant.  The fees and expenses of the disinterested third electrical consultant shall be shared equally by Landlord and Tenant.  If and to the extent that the additional rental value of the electricity service to the Demised Premises shall be so determined to be less than the value originally determined by Landlord's Consultant, the amount of the resulting overpayment of the Fixed Rent shall be refunded by Landlord to Tenant on Tenant's demand therefor.

SECTION 4.08   Notwithstanding the aforesaid provisions of this Article, if, pursuant to an action of the Public Service Commission of the State of New York, or otherwise, submetering of electricity is permitted at the Building, then Landlord shall have the option, at Landlord's sole cost and expense, of installing submeters to measure Tenant's electricity consumption.  Upon installation of the submeters, Tenant's electricity consumption and demand shall be measured by said

13973734.7

CONFIDENTIAL

R-Greebel0000008093

submeters, and Tenant agrees to purchase such electricity from Landlord or Landlord's designated agent at Landlord's electric rates, plus eight (8%) percent thereof to reimburse Landlord for administrative services in connection with supplying and billing such electricity and for line loss.  All such sums shall be paid by Tenant to Landlord as additional rent hereunder.  If more than one meter measures the electricity consumption and demand of Tenant in the Building, the service rendered through each meter shall be aggregated and billed in accordance with the above rate classification, unless Landlord shall elect separate billing on a per-meter basis.  Landlord may at any time render bills for Tenant's consumption and demand and Tenant shall pay the same within thirty (30) days following the date the same are rendered.  If Landlord exercises such right of submetering, this Lease shall continue in full force and effect and shall be unaffected thereby, except only that, from and after the effective date of such submetering, Landlord shall not be obligated to furnish electric energy to Tenant and the Fixed Rent under this Lease shall be reduced by the amount set forth in Section 4.01, plus or minus the amount of any change pursuant to Sections 4.01, 4.02, 4.03 and 4.05.

<div align="center">ARTICLE 5.</div>

<div align="center">USE</div>

SECTION 5.01   Tenant shall use and occupy the Demised Premises for administrative, executive and general business office purposes only and for no other purposes.

SECTION 5.02    Tenant shall not suffer or permit the Demised Premises or any part thereof to be used in any manner, or suffer or permit anything to be done therein, or suffer or permit anything to be brought into or kept in the Demised Premises which would in any way (i) violate any law or requirement of public authorities, (ii) cause structural injury to the Building or any part thereof, (iii) interfere with the normal operation of the heating, air-conditioning, ventilating, plumbing or other mechanical or electrical systems of the Building or the elevators installed therein, (iv) constitute a public or private nuisance, or (v) alter the appearance of the exterior of the Building or of any portion of the interior thereof other than the Demised Premises.

SECTION 5.03    Tenant shall not, without the prior written consent of Landlord (which shall not be unreasonably withheld or delayed), allow a "Servicing Company" (defined below) to install any telephone, data, information or other communications

13973734.7                          - 14 -

CONFIDENTIAL                                                      R-Greebel0000008094

equipment in the Demised Premises to service premises occupied
by persons other than Tenant and/or its affiliates.  For
example, the Demised Premises may not be used as a so-called
"switching" or "relay" station serving third parties (that is,
parties other than Tenant and its affiliates) without such
consent by Landlord.  In granting such consent, Landlord may
require that the Servicing Company enter into a license
agreement with Landlord confirming that the Servicing Company
shall have no independent rights in the Demised Premises and
that upon termination of this Lease, for whatever reason, the
Servicing Company will have no right to leave its equipment in
the Demised Premises.  Landlord may make a reasonable charge to
the Servicing Company for allowing it to install its equipment
in the Demised Premises.  A "Servicing Company" shall mean a
person, firm, corporation or other entity other than Tenant
whose equipment services not only the Demised Premises, but
other premises or parties as well.

ARTICLE 6.

REPAIRS, ALTERATIONS AND LIENS

SECTION 6.01   Tenant shall take good care of the Demised
Premises and the fixtures and appurtenances and equipment
therein and, at its sole cost and expense, make all repairs
thereto as and when needed to preserve the aforesaid in good
working order and condition.  All damage or injury to the
Demised Premises and to its fixtures, appurtenances and
equipment or to the Building of which the same form a part, or
to its fixtures, appurtenances and equipment caused by Tenant
moving property, or resulting from any air-conditioning unit or
system, any short circuit, flow or leakage of water, steam,
illuminating gas, sewer gas, sewerage or odors, or by frost or
by bursting or leaking of pipes or plumbing works or gas, or
from any other cause of any other kind or nature whatsoever due
to carelessness, omission, neglect, improper conduct or other
fault of Tenant, its servants, employees, agents, visitors or
licensees, shall be repaired, restored or replaced promptly by
Tenant, at its sole cost and expense, to the satisfaction of
Landlord.  If Tenant fails to make such repairs, restorations or
replacements, same may be made by Landlord at the expense of
Tenant and any costs therefor shall be collectible as additional
rent or otherwise, and shall be paid by Tenant within ten (10)
Business Days after rendition of a bill or statement therefor.

SECTION 6.02   Landlord shall, at its expense, make all
repairs and replacements, structural and otherwise, necessary in
order to keep in good order and repair the exterior of the

13973734.7                    - 15 -

CONFIDENTIAL                                    R-Greebel0000008095

Building, the public portions of the Building and the Building systems, the need for which Landlord shall have knowledge (including the public halls and stairways, plumbing, wiring and other Building equipment for the general supply of water, heat, air-conditioning, gas and electricity) except repairs hereinabove provided to be made by Tenant and repairs, the need for which has not been reported to Landlord.

SECTION 6.03   All repairs, restorations or replacements by either party shall be of first-class quality and done in good and workmanlike manner. Tenant shall, and shall include in all contracts, subcontracts and purchase orders, a requirement that such contractors, subcontractors or materialmen, as the case may be, shall, cause all workers at the Demised Premises to work harmoniously with each other and with Building personnel and in a manner which will not disrupt access to or use of the common areas of the Building, cause inconvenience to the other tenants in the Building or interfere with the conduct of other tenants' business. Tenant agrees that should Tenant, its agents and/or contractors, enter upon the Demised Premises for the purpose of performing any work, the labor employed by Tenant or anyone performing such work, for or on behalf of Tenant, shall always be harmonious and compatible with the labor employed by Landlord or any contractors or subcontractors of Landlord. Should such labor be unharmonious or incompatible, Landlord may require Tenant to withdraw such labor from the Demised Premises. In the event Tenant or Tenant's contractor shall enter upon the Demised Premises or any other part of the Building, Tenant agrees to indemnify and save Landlord free and harmless, from and against any and all claims whatsoever arising out of said entry or such work. Tenant's agents and contractors and their employees shall comply with the special rules, regulations and requirements of Building management with respect to the performance and coordination of said agents, contractors and their employees so as to avoid intrusion into the operation of the Building and to avoid disturbing the quiet enjoyment of other tenants.

SECTION 6.04   Tenant shall not store or place any materials or other obstructions in the lobby or other public portions of the Building, or on the sidewalk adjacent to the Building.

SECTION 6.05   Tenant shall do no work and shall make no alterations, decorations, installations, additions or improvements in or to the Demised Premises, including, but not limited to, installation of a water cooler, an air-conditioning or cooling system unit or part thereof, or other apparatus of like or other nature without Landlord's prior written consent

13973734.7                         ~ 16 ~

which consent shall not be unreasonably withheld or delayed in
the case of alterations, decorations, installations, additions
or improvements in the Demised Premises which are non-structural
in nature and do not affect the structure, exterior or common
areas of the Building or adversely affect the functioning of the
heating, ventilating and air-conditioning, electrical,
mechanical, plumbing or elevator systems of the Building or
other tenants' use thereof, and then only by engineers,
contractors or mechanics approved by Landlord.  Such approval
must be obtained prior to any bidding for said work.  For
purposes hereof, Landlord agrees that the term "decorations"
shall not include moving furniture within the Demised Premises
or in and out of the Demised Premises, the hanging of paintings,
pictures or artwork in the Demised Premises which are capable of
being removed from the Demised Premises without damage to the
pictures or artwork and without damage, except to a de minimus
extent, to the Demised Premises.  All such work, alterations,
decorations, installations, additions or improvements shall be
done at Tenant's sole expense and at such times and in such
manner as Landlord may from time to time designate and in full
compliance with all governmental bodies having jurisdiction
thereover.  Tenant's work, alterations, decorations,
installations, additions or improvements shall be completed free
of all liens and encumbrances and, as a condition subsequent to
Landlord's consent to the making by Tenant of alterations,
decorations, installations, additions or improvements to the
Demised Premises, Tenant agrees to obtain, and deliver to
Landlord, written and unconditional waivers of mechanics' liens
upon the real property in which the Demised Premises are
located, for all work, labor and services performed and
materials furnished by them in connection with such work, signed
by all contractors, subcontractors, materialmen and laborers to
become involved in such work.  As a condition to Landlord's
permission to Tenant to make any of Tenant's installations in
the Demised Premises, Landlord may require that Tenant agree
with Landlord to fixing the Commencement Date of this Lease.

      Landlord shall not be liable for any failure of the
air-conditioning and ventilating equipment in the Demised
Premises installed by Landlord caused by any work, alterations,
decorations, installations, additions or improvements by Tenant,
and Tenant shall correct any such condition causing such failure
promptly upon notice from Landlord of the need therefor.  If
Tenant shall fail to correct same, Landlord may make such
correction and charge Tenant for the cost thereof.  Such sum due
Landlord shall be deemed additional rent and shall be paid by
Tenant promptly upon being billed therefor.

{39737347}

~ 17 ~

R-Greebel0000008097

SECTION 6.06    Prior to commencing any work pursuant to the provisions of Section 6.05, Tenant shall furnish to Landlord:

(i)    Copies of all governmental permits and authorizations which may be required in connection with such work.

(ii)    A certificate evidencing that Tenant (or Tenant's contractors) has (have) procured workers' compensation insurance covering all persons employed in connection with the work who might assert claims for death or bodily injury against Landlord, "Overlandlord" (as hereinafter defined), Tenant or the Building.

(iii)    Such additional personal injury and property damage insurance (over and above the insurance required to be carried by Tenant pursuant to the provisions of Article 9) as Landlord may reasonably require because of the nature of the work to be performed by Tenant.

SECTION 6.07    All work, alterations, decorations, installations, additions or improvements upon the Demised Premises made by either party, including all paneling, decorations, partitions, railings, mezzanine floors, galleries and the like, affixed to the realty or for which Tenant shall have received a credit or contribution shall, unless Landlord elects otherwise (which election shall be made only for items that are Atypical Alterations by giving a notice pursuant to the provisions of Article 30 not less than thirty (30) days prior to the expiration or other termination of this Lease or any renewal or extension thereof) become the property of Landlord and shall remain upon, and be surrendered with the Demised Premises as a part thereof at the end of the Term or renewal or extension term, as the case may be.  At the same time Tenant submits to Landlord its request for approval of any alterations, decorations, installations, additions or improvements and the plans and specifications therefore, Tenant may request, in writing, that Landlord specify any Atypical Alterations which Tenant shall be required to remove on or before the expiration of the Term of this Lease.  Provided Tenant has so requested in writing, Landlord shall notify Tenant at the time of the approval of the alterations, decorations, installations, additions or improvements and the plans and specifications in question, of those Atypical Alterations which Tenant is required to remove before the expiration or earlier termination of the Term of this Lease in accordance with the terms of this Section 6.07, and Tenant shall, upon the expiration or earlier termination of the Term of this Lease, remove, at Tenant's sole

13973734 7                                    - 18 -

CONFIDENTIAL

R-Greebel0000008098

cost and expense, such Atypical Alterations specified in Landlord's notice, and restore those portions of the Demised Premises which have been affected by the Atypical Alterations required to be removed to the condition existing prior to the Atypical Alteration(s) (normal wear and tear excepted), but Tenant shall not be required to restore those portions of the Demised Premises affected by alterations which are not themselves Atypical Alterations. Failure by Landlord to designate Atypical Alterations at the time Landlord approves such alterations, decorations, installations, additions and improvements shall be deemed designation of such alterations, decorations, installations, additions and improvements as other than Atypical Alterations, provided that Tenant has requested in writing that Landlord so designate at the time such plans are submitted to Landlord for Landlord's approval. "Atypical Alterations" are defined as follows: alterations, decorations, installations, additions or improvements made by Tenant upon the Demised Premises which (i) are atypical of then ordinary office installations (atypical shall be deemed to include, but not to be limited to, raised floors, louvered windows, kitchen facilities [in contradistinction to a so-called warming pantry], vaults, audio or video wiring, penetrations of the floor slab, staircases, supplemental air conditioning units), and (ii) would cause Landlord to incur other than ordinary and typical demolition costs if such items were to be demolished by Landlord. Landlord hereby agrees that Tenant shall not be required to remove any of the alterations installed within the Demised Premises as a part of Landlord's Work.

Where furnished by or at the expense of Tenant (except where same is a replacement of an item theretofore furnished and paid for by Landlord or against which Tenant has received a credit or contribution from Landlord), all movable property, furniture, furnishings and trade fixtures other than those affixed to the realty so that they cannot be removed without material damage shall remain the property of Tenant and shall be removed from the Demised Premises on or before the Expiration Date. In the event of damage to the Demised Premises or the Building by reason of such removal, Tenant shall restore the same to good order and condition (normal wear and tear excepted). If Tenant should desire to leave any part of such property in the Demised Premises upon the expiration of the Term, it shall so notify Landlord in writing not less than sixty (60) days prior to the expiration of the Term, specifying the items of property which it desires to so leave. If within thirty (30) days after the service of such notice Landlord shall request Tenant to remove any of the said property, Tenant shall,

13973734.7

CONFIDENTIAL

R-Greebel0000008099

at its expense, at or before the expiration of the Term, remove said property and, in case of damage to the Demised Premises or the Building by reason of such removal, restore the Demised Premises to good order and condition (normal wear and tear excepted).

SECTION 6.08    Landlord shall not be responsible for supervision and/or coordination in respect to Tenant's activities pursuant to this Lease.  Landlord's managing agent shall perform such supervision and coordination and, with respect to any work, alteration, decoration, addition or improvement costing more than $15,000, and Tenant agrees to pay such managing agent, promptly upon being billed therefor, a sum $2,500 for indirect costs, field supervision and coordination in connection therewith.  Tenant agrees to keep records of Tenant's work, alterations, decorations, additions and improvements costing in excess of $15,000 and of the cost thereof.  Tenant agrees to furnish to Landlord's managing agent copies of such records certified as correct by Tenant within forty-five (45) days after Landlord's managing agent's request therefor.  Landlord hereby agrees that the foregoing supervisory fee shall not apply to Landlord's Work or any of Tenant's initial alterations performed in the Demised Premises during the first six (6) months of the Term.

SECTION 6.09    Tenant will not do any act or suffer any act to be done which will in any way encumber the title of Landlord or Tenant in and to the Demised Premises or the Building or the Land, nor will the interest or estate of Landlord or Tenant in the Demised Premises or the Building or the Land be in any way subject to any claim by way of lien or encumbrance, whether by operation of law or by virtue of any express or implied contract by Tenant.

SECTION 6.10    Tenant will not suffer or permit any liens to stand against the Demised Premises, the Building or the Land or any part thereof, by reason of any work, labor, services or materials done for, or supplied to, or claimed to have been done for, or supplied to, Tenant, or anyone holding the Demised Premises or any part thereof through or under Tenant.  If any such lien is at any time filed against the Demised Premises or the Building or the Land, Tenant will cause the same to be discharged of record within thirty (30) days after the date of filing of the same, by either payment, deposit or bonding (and the failure of Tenant to do so shall be a material default hereunder entitling Landlord to give a notice to Tenant pursuant to the provisions of Section 17.01(1) hereof).  In addition to any other right or remedy of Landlord, Landlord may, but will

13973734.7                          - 20 -

CONFIDENTIAL                                                    R-Greebel0000008100

not be obligated to, procure the discharge of such lien either by paying the amount claimed to be due by deposit in court or bonding, and/or Landlord will be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment, if any, in favor of the lienor with interest computed at the Interest Rate, costs and allowances. Any amount paid or deposited by Landlord for any of the aforesaid purposes, and all legal and other expenses of Landlord, including, without limitation, attorneys' fees incurred in defending such action or in procuring the discharge of such lien, with all necessary disbursements in connection therewith, will become due and payable on the date of payment or deposit, as additional rent.

SECTION 6.11   Nothing in this Lease will be deemed to be, or construed in any way as constituting, the consent or request of Landlord, express or implied by inference or otherwise, to any person, firm or corporation for the performance of any labor or the furnishing of any materials for any construction, rebuilding, alteration or repair of or to the Demised Premises, the Building or the Land or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials which might in any way give rise to the right to file any lien against Landlord's interest in the Demised Premises, the Building or the Land.

ARTICLE 7.

FLOOR LOAD, NOISE, WINDOW CLEANING

SECTION 7.01   Tenant shall not place a load upon any floor of the Demised Premises which exceeds the load per square foot which such floor was designed to carry and which is allowed by law.

SECTION 7.02   Business machines and mechanical equipment belonging to Tenant which cause noise or vibration that may be transmitted to the structure of the Building or the Demised Premises to such a degree as to be objectionable to Landlord shall be placed and maintained by the party owning the machines or equipment, at such party's expense, in settings of cork, rubber or spring type vibration eliminators sufficient to eliminate noise or vibration.

SECTION 7.03   Tenant will not clean, nor require, permit, suffer or allow any window in the Demised Premises to be cleaned from the outside in violation of Section 202 of the Labor Law or

CONFIDENTIAL

R-Greebel0000008101

of the rules of the Board of Standards and Appeals or of any other board or body having or asserting jurisdiction.

ARTICLE 8.

LAWS, ORDINANCES, REQUIREMENTS OF PUBLIC AUTHORITIES

SECTION 8.01   Tenant shall, at its expense, comply with all laws, orders, ordinances and regulations or any direction made pursuant to any law, ordinance, rule, regulation or order of any public office or officer which or who shall, with respect to the particular occupancy, use or manner of use of the Demised Premises or to any abatement of nuisance, impose any violation, order or duty upon Landlord or Tenant arising from Tenant's particular occupancy, use or manner of use of the Demised Premises (as opposed to ordinary office use), or as a result of any installations made therein (whether or not in compliance with the work article hereof) by Tenant or at Tenant's request, or required by reason of a breach of any of Tenant's covenants or agreements hereunder.

SECTION 8.02   If Tenant should desire to contest the validity of any such law, ordinance, rule, regulation or order with which Tenant is obligated to comply, it may, at its expense, carry on such contest and non-compliance by it during such contest (so long as Tenant proceeds with due diligence) shall not constitute a breach of this Lease provided that it shall, to the satisfaction of Landlord, indemnify and hold Landlord harmless from and against all liability for any loss, damages and expenses (including, without limitation, attorneys' fees) which might result from or be incurred in connection with such contest or non-compliance.  Notwithstanding the foregoing, non-compliance as aforesaid shall not commence or continue if it might subject Landlord to any fine or penalty or to prosecution for a crime, or if it would constitute a default by Landlord under any mortgage or lease affecting the Building and/or the Land.

SECTION 8.03   If Tenant receives written notice of any violation of law, ordinance, rule, regulation or order applicable to the Demised Premises, it shall give prompt notice thereof to Landlord.

SECTION 8.04   Except as aforesaid, Landlord shall, at its expense, comply with or cause to be complied with, all laws, ordinances, rules, regulations and orders of federal, state, county and municipal authorities and any direction made pursuant to law of any public officer or officers which shall, with

13973734.7

- 22 -

CONFIDENTIAL

R-Greebel0000008102

respect to the public portions of the Building, impose any violation, order or duty upon Landlord or Tenant and with respect to which Tenant is not obligated by Section 8.01 to comply.  Except as aforesaid, Landlord shall further, at its expense, comply with or cause to be complied with, all laws, ordinances, rules, regulations and orders of federal, state, county and municipal authorities and any direction made pursuant to law of any public officer or officers which affect Tenant's use or enjoyment of, or access to, the Demised Premises and with respect to which Tenant is not obligated by Section 8.01 to comply.  Landlord may, at its expense, contest the validity of any such law, ordinance, rule, order or regulation.

SECTION 8.05    Tenant shall not cause or knowingly permit, as a result of any intentional or unintentional act or omission on the part of Tenant or any of its subtenants, occupants or licensees, the installation or placement of any Hazardous Materials (hereinafter defined) in or on the Demised Premises or the Building or suffer or knowingly permit the presence of Hazardous Materials in the Demised Premises or the Building (provided, however, that the foregoing covenant shall not be deemed to prohibit the presence of Hazardous Materials used in connection with the maintenance and operation of the Demised Premises by Tenant and the conduct by Tenant of its ordinary business in each instance in customary quantities and in full compliance with all applicable laws).  For purposes of this Section 8.05, "Hazardous Materials" shall mean, without limitation, gasoline, petroleum products, explosives, radioactive materials, polychlorinated biphenyls, lead and lead containing materials, or related or similar materials, or any other substance or material defined as a hazardous or toxic substance or material by any Regulation.

ARTICLE 9.

INSURANCE, PROPERTY LOSS, REIMBURSEMENT

SECTION 9.01    Tenant shall not do or permit to be done any act or thing upon the Demised Premises which will invalidate or be in conflict with the Certificate of Occupancy or the terms of the New York State standard form of fire, boiler, sprinkler, water damage or other insurance policies covering the Building and the fixtures and property therein and Tenant shall, at its own expense, comply with all rules, orders, regulations or requirements of the New York Board of Fire Underwriters or any other similar body having jurisdiction and shall not knowingly do or permit anything to be done in or upon the Demised Premises in a manner which increases the rate of fire insurance upon the

13973734.7                          - 23 -

CONFIDENTIAL

R-Greebel0000008103

Building or on any property or equipment located therein over the rate in effect at the commencement of the Term of this Lease.

SECTION 9.02   If, by reason of any failure of Tenant to comply with the provisions of this Lease, the rate of fire, boiler, sprinkler, water damage or other insurance (with extended coverage) on the Building or on the property and equipment of Landlord or any other tenant or subtenant in the Building shall be higher than it otherwise would be, Tenant shall reimburse Landlord and the other tenants in the Building for that part of the fire, boiler, sprinkler, water damage or other insurance premiums thereafter paid by Landlord or by the other tenants in the Building which shall have been charged because of such failure by Tenant, and Tenant shall make the reimbursement on the first day of the month following such payment by Landlord or such other tenants.  In any action or proceeding wherein Landlord and Tenant are parties, a Schedule or "make up" of any insurance rate for the Building or Demised Premises issued by the New York Fire Insurance Exchange, or other body establishing fire insurance rates for the Building, shall be conclusive evidence of the facts therein stated and of the several items and charges in the insurance rates then applicable to the Building or Demised Premises.

SECTION 9.03   Tenant, at Tenant's own cost and expense, shall maintain insurance covering Tenant as named insured and naming Landlord, and its agents, and Tenant (and at Landlord's request, the landlord under any ground or underlying lease [herein "Overlandlord"], as well as the holder of any mortgage affecting the Land, the Building or both) as additional insureds as their interests may appear with respect to any and all claims for injury or damage to persons or property for the loss of life or of property occurring upon, in or about the Demised Premises and the public portions of the Building used by Tenant, its employees, agents, contractors, customers and invitees arising out of the negligent act or omission of any of the foregoing, such insurance to afford minimum protection during the Term of this Lease of not less than $3,000,000 in respect of liability for bodily injury or death to any one person or in respect of any one occurrence, accident or damage to person or property. Landlord may from time to time require that the amount of liability insurance to be maintained by Tenant under this Article be increased so that Landlord shall be adequately protected giving due consideration to all relevant circumstances and conditions.

CONFIDENTIAL                    R-Greebel0000008104

All such insurance shall be effected under valid and enforceable policies (which may cover the Demised Premises and other locations), shall be issued by insurers of recognized responsibility and shall contain a provision whereby the insurer agrees not to cancel the insurance without ten (10) days' prior written notice to Landlord.

On or before the Commencement Date of this Lease, Tenant shall furnish Landlord with a certificate evidencing the aforesaid insurance coverage and renewal certificates shall be furnished to Landlord at least thirty (30) days prior to the expiration date of each policy for which a certificate was theretofore required to be furnished.

SECTION 9.04   Tenant shall give Landlord immediate notice in case of a fire or accident in the Demised Premises or the Building, or of defects therein or in any fixtures or equipment promptly after Tenant becomes aware of the same.

SECTION 9.05   Tenant shall indemnify and hold Landlord harmless from and against all liabilities, suits, claims, demands and actions, and costs and expenses of any kind or nature, due to or arising out of any injury to person or property, including death resulting at any time therefrom, occurring in or about the Demised Premises.  To the extent of any valid and collectible insurance furnished by Tenant for the protection of Landlord, Tenant's obligation to indemnify and hold Landlord harmless against liability which is covered by such insurance shall be deemed, to the extent thereof, to be satisfied.

SECTION 9.06   Landlord and Tenant shall each endeavor to secure an appropriate clause in, or an endorsement upon, each fire or extended coverage or rent insurance policy obtained by it and covering the Building, the Demised Premises or the personal property, fixtures and equipment located therein or thereon, pursuant to which the respective insurance companies waive subrogation or permit the insured, prior to any loss, to agree with a third party to waive any claim it might have against said third party.  The parties hereto shall give prompt notice to the other in the event such clause is or becomes unavailable.  The waiver of subrogation or permission for waiver of any claim shall extend to the agents of each party and the employees of each party and its respective agents and, in the case of Tenant, shall also extend to all other persons and entities occupying or using the Demised Premises.  If and to the extent that such waiver or permission can be obtained only upon payment of an additional charge, then the party benefiting from

139737347

– 25 –

CONFIDENTIAL

R-Greebel0000008105

the waiver or permission shall pay such charge upon written demand, or shall be deemed to have agreed that the party obtaining the insurance coverage in question shall be free of any further obligations under the provisions hereof relating to such waiver or permission.

Subject to the foregoing provisions of this Section 9.06, each party hereby releases the other with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damages or destruction with respect to its property by fire or other casualty (including rental value or business interest, as the case may be) occurring during the Term of this Lease.

SECTION 9.07   Tenant agrees to look solely to Landlord's estate and interest in the Land and Building, or the lease of the Building, or of the Land and Building, and the Demised Premises (and the unencumbered proceeds from the sale thereof), for the satisfaction of any right or remedy of Tenant for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord, in the event of any liability by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, attachment, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Demised Premises, or any other liability of Landlord to Tenant.

SECTION 9.08   Tenant's failure to obtain or maintain all insurance required under this Article 9 shall be a material breach of this Lease for which Landlord shall be entitled to full and complete indemnity for all liability, costs and expenses, including any incurred in any action or proceeding by Landlord or its insurance carrier as a result of Tenant's breach. Tenant's obligation to provide full and complete indemnity under this Section 9.08 shall be absolute and without regard to fault in the underlying incident and shall be triggered solely by Tenant's failure to procure such insurance for the protection of Landlord and any of the other insured parties required under this Article 9.  In the event that Tenant fails to obtain and maintain the insurance required under this Article 9, Landlord shall have the option (but shall not be required) to purchase any such insurance and to charge Tenant for the cost of substitute insurance in the form of additional rent. The purchase by Landlord of any such insurance shall not be or be deemed to be a waiver by Landlord or a cure of the default by Tenant to obtain and maintain insurance. Tenant shall reimburse Landlord for any such costs, together with

13973734.7                            ~ 26 ~

CONFIDENTIAL                              R-Greebel0000008106

interest at the Interest Rate until so reimbursed, within ten (10) days after written demand therefor.  The rights and remedies provided for in this Section 9.08 shall not limit or impair any other rights, remedies or damages available to Landlord under this Lease or otherwise.

ARTICLE 10.

DAMAGE OR DESTRUCTION BY FIRE OR OTHER CAUSE

SECTION 10.01  If the Building or the Demised Premises shall be partially or totally damaged or destroyed by fire or other cause, then whether or not the damage or destruction shall have resulted from the fault or neglect of Tenant, or its employees, agents or visitors (and if this Lease shall not have been terminated as in this Article 10 hereinafter provided), Landlord shall to the extent permitted by available insurance proceeds, repair the damage and restore and rebuild the Building and/or the Demised Premises (without limiting the rights of any insurance company, subrogated to Landlord's rights hereunder pursuant to the terms of any insurance policy as to which Landlord shall have been unable to obtain a waiver of subrogation in accordance with Section 9.06 hereof to seek recovery from Tenant, and any rights of Landlord under any other provisions of this Lease or at law or in equity), with reasonable dispatch after notice to it of the damage or destruction; provided, however, that Landlord shall not be required to repair or replace any of Tenant's property. Notwithstanding anything contained herein to the contrary, in no event shall Tenant be relieved of liability or responsibility for damage or destruction resulting from the fault or neglect of Tenant if the insurance policies carried by Landlord on the Building do not contain a waiver of the right of subrogation.

SECTION 10.02  If the Building or the Demised Premises shall be partially destroyed by fire or other cause, the rents payable hereunder shall be abated to the extent that the Demised Premises shall have been rendered untenantable and for the period from the date of such damage or destruction to the date the damage shall be repaired or restored.  If the Demised Premises or a major part thereof shall be totally (which shall be deemed to include substantially completely) untenantable on account of fire or other cause, the rent shall abate as of the date of the damage or destruction and until Landlord shall repair, restore and rebuild the Building and the Demised Premises, provided, however, that should Tenant occupy or reoccupy a portion of the Demised Premises during the period the Demised Premises are made completely untenantable, rents

13973734.7                          - 27 -

allocable to such portion shall be payable by Tenant from the date of such occupancy.

SECTION 10.03  If the Building or Demised Premises shall be totally damaged or destroyed by fire or other cause, or if the Building shall be so damaged or destroyed by fire or other cause that Landlord shall decide not to restore or rebuild it, then in either such case Landlord may terminate this Lease by giving Tenant notice to such effect within one hundred eighty (180) days after the date of the casualty.  In case of any damage or destruction mentioned in this Article 10, Tenant may terminate this Lease by notice to Landlord, if Landlord has not completed the making of the required repairs and restored and rebuilt the Building and the Demised Premises within eighteen (18) months from the date of such damage or destruction, or within such period after such date (not exceeding six (6) months) as shall equal the aggregate period Landlord may have been delayed in doing so by adjustment of insurance, labor trouble, governmental controls, act of God, or any other cause beyond Landlord's reasonable control, and such termination shall be effective upon the expiration of thirty (30) days after the date of such notice.  Notwithstanding the foregoing, if the Demised Premises shall be substantially damaged or destroyed or shall be deemed to be inaccessible due to damage to the Building during the final year of the Term, each of Landlord and Tenant shall have the option, to be exercised by giving written notice to the other, within thirty (30) days of the occurrence of such damage, to terminate this Lease and the Term and estate hereby granted as of the date of such damage or destruction.

SECTION 10.04  No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Demised Premises or of the Building pursuant to this Article 10.  Landlord shall endeavor to effect such repair or restoration promptly and in such manner as not unreasonably to interfere with Tenant's business, provided no additional costs, for labor at overtime or premium rates, or otherwise, are incurred thereby.

SECTION 10.05  Notwithstanding any of the foregoing provisions of this Article 10, if Landlord or Overlandlord or the holder of any superior mortgage shall be unable to collect all of the insurance proceeds (including rent insurance proceeds) applicable to damage or destruction of the Demised Premises or the Building by fire or other cause by reason of some action or inaction on the part of Tenant or any of its employees, agents or contractors, then, without prejudice to any

13973734.7

- 28 -

other remedies which may be available against Tenant, there shall be no abatement of Tenant's rent until the total amount of such rent not abated which would otherwise have been abated equals the amount of uncollected insurance proceeds.

SECTION 10.06  Landlord will not carry separate insurance of any kind on Tenant's property and Landlord shall not be obligated to repair any damage thereto or replace the same.

SECTION 10.07  In the event of the termination of this Lease pursuant to any of the provisions of this Article 10, this Lease and the Term and estate hereby granted shall expire as of the date of such termination with the same effect as if that were the Expiration Date, and the Fixed Rent and additional rent payable hereunder shall be apportioned as of such date.

SECTION 10.08  The provisions of this Article 10 shall be considered an express agreement governing any case of damage or destruction of the Demised Premises by fire or other casualty, and Section 227 of the Real Property Law of the State of New York providing for a contingency in the absence of an express agreement, and any other law of like import, now or hereafter in force, shall have no application to the Demised Premises and this Lease.

ARTICLE 11.

ASSIGNMENT, SUBLETTING, MORTGAGING

SECTION 11.01  (a)  Tenant will not by operation of law or otherwise, assign, mortgage or otherwise encumber this Lease, nor the estate and Term hereby granted, nor sublet or permit the Demised Premises or any part thereof to be used by others, without Landlord's prior written consent in each instance.  The consent by Landlord to any assignment or subletting shall not in any manner be construed to relieve Tenant from obtaining Landlord's express written consent to any other or further assignment or subletting.

Upon obtaining a proposed assignee or sublessee, upon terms satisfactory to Tenant, Tenant shall submit to Landlord in writing (1) the name of the proposed assignee or subtenant; (2) the terms and conditions of the proposed assignment or subletting; (3) the nature and character of the business of the proposed assignee or subtenant and any other information reasonably requested by Landlord.

CONFIDENTIAL                                         R-Greebel0000008109

Upon receipt of the foregoing submission from Tenant Landlord shall have the following options to be exercised within thirty (30) business days from the date of such receipt:

1.   If an assignment shall be proposed or if a proposed subletting shall be for all or substantially all of the Demised Premises, Landlord shall have the option to terminate this Lease effective as of the date proposed by Tenant for such assignment or subletting.

2.   If a proposed sublease shall be for less than all or substantially all of the Demised Premises or if it shall be for less than the balance of the Term of this Lease, Landlord shall have the option to terminate this Lease as to the portion of the Demised Premises proposed to be sublet for such portion of the Term as is included in such proposed sublease, effective as of the effective date of such proposed sublease.  In the event of the exercise of such option under this subparagraph 2, the rent and all other charges payable hereunder shall be equitably apportioned, and Tenant shall be responsible for the cost of constructing any necessary demising walls.

3.   Landlord shall have the option to require Tenant to execute an assignment or sublease to Landlord, or to any party designated by Landlord, upon the same terms and conditions as contemplated with the proposed assignee or subtenant, except that (A) Landlord (or Landlord's designee) as assignee or sublessee shall have an express unlimited right to further assign or sublease to others and to make any alterations required in connection therewith, and (B) the rent or consideration payable under such assignment or sublease to Landlord (or Landlord's designee) shall be the lower of (i) the rental payable by Tenant to Landlord under this Lease, or (ii) the rental payable by the proposed assignee or subtenant pursuant to the assignment or sublease originally proposed by Tenant.  If Landlord exercises the foregoing option, Tenant shall not be liable for any failure of Landlord or its designee to pay rent or to comply with this Lease with respect to the space covered by the option exercised.

(b)   If Landlord shall not exercise any of its foregoing options within the time set forth above, provided Tenant shall not then be in default hereunder, Landlord's consent to any such proposed assignment or subletting shall not be "unreasonably" withheld, as described in paragraph (c) of this Section 11.01.

CONFIDENTIAL

R-Greebel0000008110

If Landlord shall not exercise any of the options described in paragraph (a) above and Tenant shall thereupon assign this Lease or sublet all or any portion of the Demised Premises, then and in that event Tenant shall pay to Landlord as additional rent fifty (50%) percent of the excess, if any, of the Fixed Rent plus additional rent paid by the assignee or sublessee over the Fixed Rent plus additional rent allocable to that part of the Demised Premises affected by such assignment or sublease pursuant to the provisions of this Lease, such excess, if any, to be reduced by the actual reasonable expenses incurred by Tenant in connection with such assignment or subletting, including a standard brokerage commission (if applicable), the cost of physically separating the sublet area (if applicable) from the rest of the Demised Premises and other related construction expenses actually incurred in connection with preparing the space for occupancy by the sublessee, free rent and reasonable legal expenses, all such costs and expenses to be amortized over the term of the sublease or assignment. Such additional rent payments shall be made monthly within five (5) days after receipt of the same by Tenant. Fifty (50%) percent of any cash or other consideration payable to Tenant in connection with such assignment or sublease or the sale of Tenant's property in connection therewith (less in the case of the sale thereof the fair market value of such personal property, as reasonably determined by Landlord), shall be similarly paid over to Landlord when and as received by Tenant.

If Tenant fails to consummate any proposed assignment or subletting to which Landlord shall have consented within sixty (60) days after granting such consent, paragraph (a) shall again apply to said proposed assignment or subletting.

No option exercised by Landlord pursuant to the above provisions of paragraph (a), and no assignment or sublease made to Landlord under the above provisions of paragraph (a), shall be binding upon any purchaser of any ground or underlying lease who acquires such ground or underlying lease by reason of the foreclosure of any mortgage to which this Lease is subordinate, nor upon any assignee of any ground or underlying lease who takes such assignment in lieu of such foreclosure, it being understood, however, that such purchaser or assignee may, at its option, elect to enforce such option, assignment or sublease.

(c) In determining reasonableness with respect to its consent to a proposed assignment or sublease by Tenant, Landlord may take into consideration all relevant factors surrounding the proposed assignment or sublease, including, without limitation, the following:

13973734.7

- 31 -

R-Greebel0000008111

(i)     the financial stability and business reputation of the proposed assignee or subtenant;

(ii)    the nature of the business and the proposed use of the Demised Premises by the proposed assignee or subtenant in relation to the majority of other tenants in the Building;

(iii)   that the proposed assignee or subtenant shall not be a tenant of other space in the Building or a party which has dealt with Landlord or Landlord's agent (directly or through a broker) with respect to space in the Building during the six (6) months immediately preceding Tenant's request for Landlord's consent, provided Landlord has space in the Building for such proposed assignee or subtenant;

(iv)    restrictions contained in leases of other tenants of the Building;

(v)     the effect that the proposed assignee's or subtenant's occupancy or use of the Demised Premises would have upon the operation and maintenance of the Building and Landlord's investment therein;

(vi)    that not more than one entity (exclusive of Tenant and its Related Entities (hereinafter defined)) shall occupy the Demised Premises at any time.

(d)   In addition to the foregoing, Tenant shall not list nor publicly advertise the Demised Premises for subletting, whether through a broker, agent, representative, or otherwise, at a rental rate less than the then going market rental rate (including Fixed Rent and additional rent) for comparable space in the Building; but the provisions of this Section 11.01(d) shall not be deemed to prohibit Tenant from negotiating a sublease at a lesser rate of rent and consummating the same insofar as it may be permitted under the provisions of this Article.

SECTION 11.02  If this Lease shall be assigned, or if the Demised Premises or any part thereof be sublet or occupied by any person or persons other than Tenant, Landlord may after default by Tenant, collect rent from the assignee, subtenant or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of the covenants in this Article, nor shall it be deemed acceptance of the assignee, subtenant or occupant as a tenant, or a release of Tenant from

CONFIDENTIAL                                      R-Greebel0000008112

the full performance by Tenant of all the terms, conditions and covenants of this Lease.

SECTION 11.03  Each assignee or transferee shall assume and be deemed to have assumed this Lease and shall be and remain liable jointly and severally with Tenant for the payment of the rent, additional rent and adjustments of rent, and for the due performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the Term of this Lease.  No assignment shall be binding on Landlord unless such assignee or Tenant shall deliver to Landlord a duplicate original of the instrument of assignment which contains a covenant of assumption by the assignee of all of the obligations aforesaid and shall obtain from Landlord the aforesaid written consent prior thereto.

SECTION 11.04  For the purposes of this Lease, any sale, transfer or assignment of any of the stock of a corporate Tenant or any transfer in the control of Tenant by operation of law or otherwise shall be deemed an assignment.

SECTION 11.05  The listing of any name other than that of Tenant, whether on the doors of the Demised Premises, on the Building directory or otherwise, shall not operate to vest any right or interest in this Lease or the Demised Premises.  It is expressly understood that any such listing is a privilege extended by Landlord that is revocable at will by written notice to Tenant.

SECTION 11.06  Tenant shall reimburse Landlord for any costs incurred by Landlord to review the requested consent provided in Article 11, including attorneys' fees.

SECTION 11.07  If Landlord shall recover or come into possession of the Demised Premises before the Expiration Date, Landlord shall have the right to take over any sublease made by Tenant and to succeed to all rights of Tenant thereunder, Tenant hereby assigning (effective as of the date of Landlord's succession of Tenant's estate in the Demised Premises) such subleases as Landlord may elect to take over.  Every subletting hereunder shall be subject to the condition that, from and after the termination of this Lease or re-entry by Landlord hereunder or other succession by Landlord to Tenant's estate in the Demised Premises, the subtenant under such sublease shall waive any right to surrender possession or to terminate the sublease and, at Landlord's election, shall be bound to Landlord for the balance of the term thereof and shall attorn to and recognize Landlord, as its landlord, under all of the then executory terms

13973734.7                  - 33 -

CONFIDENTIAL                                        R-Greebel0000008113

of such sublease, except that Landlord shall not be (a) liable
for any previous act, omission or negligence of Tenant under
such sublease, (b) subject to any counterclaim, defense or
offset theretofore accruing to such subtenant against Tenant,
(c) bound by any previous modification or amendment of such
sublease made without Landlord's consent or by any previous
prepayment of more than one month's rent and additional rent
unless paid as provided in the sublease, or (d) obligated to
perform any repairs or other work in the subleased space or the
Building beyond Landlord's obligations under this Lease, and
each subtenant shall execute and deliver such instruments as
Landlord may reasonably request to evidence and confirm such
attornment.

SECTION 11.08  Notwithstanding anything to the contrary
elsewhere contained herein (including Section 11.01, which shall
not be applicable to an assignment or transfer pursuant to this
Section 11.08), Tenant may, upon not less than ten (10) days
prior written notice to Landlord (unless Tenant is prohibited by
law from giving advance notice, in which case notice shall be
given as soon as reasonably practicable), assign or transfer its
entire interest in this Lease and the leasehold estate hereby
created to a "Successor Corporation" (as such term is
hereinafter defined) of Tenant, provided that Tenant shall not
be in default in any of the terms of this Lease beyond notice
and the expiration of any applicable grace period.  A "Successor
Corporation", as used in this Section, shall mean (a) a
corporation, partnership or other business entity into which or
with which Tenant, its successors or permitted assigns, is
merged or consolidated, in accordance with applicable statutory
provisions for the merger or consolidation of a corporation,
partnership or other business entity, provided that by operation
of law or by effective provisions contained in the instruments
of merger or consolidation, the liabilities of the corporations,
partnerships or other business entity participating in such
merger or consolidation are assumed by the corporation,
partnership or other business entity surviving such merger or
consolidation, or (b) a corporation, partnership or other
business entity acquiring this Lease and the Term and the estate
hereby granted, the goodwill and all or substantially all of the
other property and assets of Tenant, its successors or permitted
assigns, and assuming all or substantially all of the
liabilities of Tenant, its successors or permitted assigns, or
(c) any successor to a Successor Corporation becoming such by
either of the methods described in subdivisions (a) and (b)
above, provided that, (x) immediately after giving effect to any
such merger or consolidation, or such acquisition and

13973734.7                        - 34 -

CONFIDENTIAL                                    R-Greebel0000008114

assumption, as the case may be, the corporation, partnership or other business entity surviving such merger or created by such consolidation or acquiring such assets and assuming such liabilities, as the case may be, shall have a net worth, as determined in accordance with generally accepted accounting principles, at least equal to the greater of (i) the net worth, similarly determined, of Tenant, immediately prior to such merger or consolidation or such acquisition and assumption, as the case may be, or (ii) the net worth, similarly determined, of Tenant as of the date of this Lease, and (y) proof of such net worth, as evidenced by a statement from a certified public accounting firm reasonably satisfactory to Landlord shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such merger or consolidation, or acquisition and assumption, as the case may be (unless Tenant is prohibited by law from giving advance notice, in which case notice shall be given as soon as reasonably practicable). Upon the compliance with the foregoing provisions of this Section 11.08, and the delivery to Landlord of the agreement of the Successor Corporation, in form and substance satisfactory to Landlord, to assume all the terms of this Lease to be performed by Tenant, and to be bound thereby, the corporation, partnership or other business entity so assigning or transferring this Lease shall thereafter be released and discharged from any obligations thereafter arising under this Lease.

SECTION 11.09  Notwithstanding anything to the contrary elsewhere contained herein (including Section 11.01 hereof), provided that Tenant shall not be in default in any of the terms of this Lease beyond notice and the expiration of any applicable grace period, Tenant may, without Landlord's consent and free of recapture but upon not less than ten (10) days' prior written notice to Landlord, (x) assign this Lease, (y) sublet all or part of the Demised Premises or (z) permit occupancy of the same for any of the purposes permitted to Tenant, in each case to any corporations or other business entities which control, are controlled by, or are under common control with Tenant (herein referred to as a "Related Entity"), subject however to compliance with Tenant's obligations under this Lease.  Such subletting or occupancy shall not be deemed to vest in any such Related Entity any right or interest in this Lease nor shall such subletting or occupancy relieve, release, impair or discharge any of Tenant's obligations hereunder.  Tenant shall deliver to Landlord a copy of any such sublease or occupancy agreement for all or any portion of the Demised Premises.

CONFIDENTIAL

R-Greebel0000008115

## ARTICLE 12.

### NO LIABILITY ON LANDLORD

SECTION 12.01   Landlord or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Tenant by theft or otherwise.   Landlord or its agents shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow, leaks from any part of the Building or from the pipes, appliances or plumbing works or from the roof, street or sub-surface or from any other place or by dampness or by any other cause of whatsoever nature, unless caused by or due to the negligence of Landlord, its agents, servants or employees; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in the Building or caused by operations in construction of any private, public or quasi-public work; nor shall Landlord be liable for any latent defect in the Demised Premises or in the Building of which they form a part.   If at any time any windows of the Demised Premises are temporarily or permanently closed, darkened or bricked up for any reason whatsoever (other than by reason of Landlord's own arbitrary, unjustified acts), Landlord shall not be liable for any damage Tenant may sustain thereby, and Tenant shall not be entitled to any compensation therefor nor abatement of rent, nor shall the same release Tenant from its obligations hereunder nor constitute an eviction.

## ARTICLE 13.

### MOVING OF HEAVY EQUIPMENT

SECTION 13.01   Tenant shall not move any safe, heavy equipment or bulky matter in or out of the Building without Landlord's written consent, which consent Landlord agrees not to unreasonably withhold or delay.   If the movement of such items requires special handling, Tenant agrees to employ only persons holding a Master Rigger's License to do said work and all such work shall be done in full compliance with the Administrative Code of the City of New York and other municipal requirements. All such movements shall be made during hours which will least interfere with the normal operations of the Building, and all damage caused by such movement shall be promptly repaired by Tenant at Tenant's expense.

CONFIDENTIAL                                        R-Greebel0000008116

ARTICLE 14.

CONDEMNATION

SECTION 14.01  In the event that the whole of the Demised Premises shall be lawfully condemned or taken in any manner for any public or quasi-public use, this Lease and the Term and estate hereby granted shall forthwith cease and terminate as of the date of vesting of title.  In the event that only a part of the Demised Premises shall be so condemned or taken, then, effective as of the date of vesting of title, the rent hereunder for such part shall be abated.  In the event that only a part of the Building shall be so condemned or taken, then (a) if substantial structural alteration or reconstruction of the Building shall in the reasonable opinion of Landlord be necessary or appropriate as a result of such condemnation or taking (whether or not the Demised Premises be affected), Landlord may, at its option, terminate this Lease and the Term and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within sixty (60) days following the date on which Landlord shall have received notice of vesting of title, or (b) if Landlord does not elect to terminate this Lease, as aforesaid, this Lease shall be and remain unaffected by such condemnation or taking, except that the Fixed Rent and additional rent shall be abated to the extent, if any, hereinbefore provided in this Article 14.  In the event that only a part of the Demised Premises shall be so condemned or taken and this Lease and the Term and estate hereby granted are not terminated as hereinbefore provided, Landlord will, at its expense, restore with reasonable diligence the remaining structural portions of the Demised Premises as nearly as practicable to the same condition as it was prior to such condemnation or taking.

In the event of termination in any of the cases hereinabove provided in this Article 14, this Lease and the Term and estate hereby granted shall expire as of the date of such termination with the same effect as if that were the date hereinbefore set for the expiration of the Term of this Lease, and the rent hereunder shall be apportioned as of such date.

In the event of any condemnation or taking hereinabove mentioned of all or a part of the Building, Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby expressly assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any

13973734 7

- 37 -

CONFIDENTIAL

R-Greebel0000008117

part thereof, and Tenant shall be entitled to receive no part of such award.

ARTICLE 15.

ENTRY, RIGHT TO CHANGE PUBLIC PORTIONS OF THE BUILDING

SECTION 15.01   Tenant shall permit Landlord to erect, use and maintain pipes and conduits in and through the Demised Premises.  In the event the construction deprives the Tenant of the use of a material or substantial portion of the usable area of the Demised Premises (other than on a temporary basis), the Tenant shall be entitled to a pro rata abatement of rent for the space so permanently taken.  Landlord or its agents or designees shall have the right, but only upon reasonable notice (except in emergencies, in which event no notice shall be required) given to Tenant or any authorized employee of Tenant at the Demised Premises, to enter the Demised Premises at reasonable times during business hours, for the purpose of making such repairs or alterations as shall be required or as Landlord shall have the right to make by the provisions of this Lease.  Landlord shall be allowed to take all material into and upon the Demised Premises that may be required for the repairs and alterations above mentioned without the same constituting an eviction of Tenant in whole or in part, and the rent reserved hereunder shall in no wise abate, except as otherwise provided in this Lease, while said repairs or alterations are being made, by reason of loss or interruption of the business of Tenant because of the prosecution of any such work, or otherwise.  Landlord agrees to do any work pursuant to this Article in such a manner so as not to unreasonably interfere with Tenant's business, provided no additional costs, for labor at overtime or premium rates, or otherwise, are incurred thereby.  Any damage to the Demised Premises caused by Landlord's entry and access thereto shall be repaired by Landlord.

SECTION 15.02   During the twelve (12) months prior to the expiration of the Term of this Lease, Landlord may Exhibit the Demised Premises to prospective tenants.  Landlord shall also have the right to enter the Demised Premises for the purpose of inspecting the same or exhibiting the same to prospective purchasers or lessees of the entire Building or to prospective mortgagees of the property of which the Demised Premises forms a part.  The holders of any mortgage of Landlord's interest in the property, or such holders' agents or designees, shall also have such right of inspection for itself and for any prospective assignees of any such mortgagees.

13973734.7

- 38 -

                                      R-Greebel0000008118

SECTION 15.03  Landlord shall have the right at any time without thereby creating an actual or constructive eviction or incurring liability to Tenant therefor, to change the arrangement or location of such of the following as are not contained within the Demised Premises or any part thereof: entrances, passageways, elevators, doors and doorways, corridors, stairs, toilets and other like public service portions of the Building, provided any such changes do not unreasonably interfere with Tenant's access to and use of the Demised Premises.

ARTICLE 16.

BANKRUPTCY

SECTION 16.01  (a)  Anything elsewhere in this Lease to the contrary notwithstanding, this Lease may be cancelled by Landlord by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events:  (i) Tenant shall (A) have applied for or consented to the appointment of a receiver, trustee, liquidator, or other custodian of Tenant or any of its properties or assets, (B) be unable to pay its debts generally as they become due or shall have taken any other action which could result in it becoming the subject of an insolvency or bankruptcy proceeding, (C) have made a general assignment for the benefit of creditors, (D) have commenced a voluntary case for relief as a debtor under the United States Bankruptcy Code or filed a petition to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debts, dissolution or liquidation law or statute or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or (E) be adjudicated a bankrupt or insolvent; or (ii) Without the acquiescence or consent of Tenant an order, judgment or decree shall have been entered by any court of competent jurisdiction approving as properly filed a petition seeking relief under the United States Bankruptcy Code or any bankruptcy, reorganization, insolvency, readjustment of debts, dissolution or liquidation law or statute with respect to Tenant or appointing a receiver, trustee, liquidator or other custodian of all or a substantial part of its properties or assets, and such order, judgment or decree shall have continued unstayed and in effect for any period of not less than sixty (60) days.  Neither Tenant, nor any person claiming through or under Tenant or by reason of any statute or order of court, shall thereafter be entitled to possession of the Demised Premises, but shall forthwith quit and surrender the Demised Premises.  If this Lease shall be assigned

13973734.7

- 39 -

CONFIDENTIAL

R-Greebel0000008119

in accordance with its terms, the provisions of this Article shall be applicable only to the party then owning Tenant's interest in this Lease.

(b)   It is stipulated and agreed that in the event of the termination of this Lease pursuant to paragraph (a) hereof, Landlord shall forthwith, notwithstanding any other provisions of this Lease to the contrary, be entitled to recover from Tenant as and for liquidated damages an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the Term demised and the then fair and reasonable rental value of the Demised Premises for the same period.   In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the Demised Premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four percent (4%) per annum.   If the Demised Premises or any part thereof be re-let by Landlord for the unexpired Term of this Lease, or any part thereof, before the presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall be prima facie evidence as to the fair and reasonable rental value for the part or the whole of the Demised Premises so re-let during the term of the re-letting.   Nothing herein contained shall limit or prejudice the right of Landlord to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule in effect at the time when, and governing the proceedings in which, such damages are to be approved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

ARTICLE 17.

DEFAULTS AND REMEDIES AND WAIVER OF REDEMPTION

SECTION 17.01   (1)   If (A) Tenant defaults in fulfilling any of the covenants of this Lease, including the covenants for the payment of Fixed Rent or additional rent, or if the Demised Premises become vacant or deserted, or if the Demised Premises are damaged by reason of negligence or carelessness of Tenant, its agents, employees or invitees, and if such default or omission shall continue for fifteen (15) days after notice thereof to Tenant, or (B) in the case of the happening of a default or omission (other than in the payment of Fixed Rent, additional rent or other charges hereunder and other than the failure to cause a lien against the Demised Premises, the

CONFIDENTIAL                                              R-Greebel0000008120

Building or the Land to be discharged of record) which cannot with due diligence be completely cured or remedied within the period heretofore provided, if Tenant shall not have diligently commenced curing such default within such fifteen (15) day period, and shall not thereafter with reasonable diligence and in good faith be proceeding to remedy or cure such default, then, in any such case, Landlord may give to Tenant a notice of intention to terminate this Lease upon the expiration of three (3) days from the service of such notice of intention, and upon the expiration of said three (3) days, this Lease and the Term hereof shall terminate and expire as fully and completely as if that day were the Expiration Date, and Tenant shall then quit and surrender the Demised Premises to Landlord, but Tenant shall remain liable as hereinafter provided.

(2)  If (A) the notice provided for in (1) hereof shall have been given, and the Term shall expire as aforesaid; or (B) if Tenant shall make any default in the payment of Fixed Rent or additional rent herein reserved, or any part of either, or in making any other payment herein provided; or (C) if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the Demised Premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant; or (D) if Tenant shall make default with respect to any other lease between Landlord and Tenant; or (E) if Tenant shall fail to move into or take possession of the Demised Premises within fifteen (15) days after commencement of the Term of this Lease, of which facts Landlord shall be the sole judge; then in any of such events Landlord may, without notice, re-enter the Demised Premises either by force or otherwise, and dispossess Tenant and the legal representatives of Tenant or any other occupants of the Demised Premises by summary proceedings or otherwise and remove their effects and hold the Demised Premises as if this Lease had not been made. Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to the aforesaid end. If Tenant shall make default hereunder prior to the date fixed as the commencement of any renewal or extension of this Lease, Landlord may cancel and terminate such renewal or extension agreement by written notice, but Tenant shall remain liable as hereinafter provided.

SECTION 17.02  In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (i) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration together with such costs as Landlord may incur for legal

CONFIDENTIAL                                                    R-Greebel0000008121

expenses, reasonable attorneys' fees, brokerage commissions and/or putting the Demised Premises in good order, or for preparing the same for re-rental; (ii) Landlord may re-let the Demised Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms, which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the Term of this Lease and may grant concessions or free rent; and/or (iii) Tenant or the legal representatives of Tenant shall also pay Landlord as liquidated damages for the failure of Tenant to observe and perform Tenant's covenants herein contained, at the election of Landlord, either:

(a)  a sum which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of (1) the aggregate of the installments of Fixed Rent and the additional rent (if any) which would have been payable hereunder by Tenant, had this Lease not so terminated, for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the date hereinbefore set for the expiration of the full term hereby granted pursuant to Articles 1 and 2 hereof, over (2) the aggregate rental value of the Demised Premises for the same period, said lump sum to be discounted to the Expiration Date of this Lease at the then prevailing prime rate of interest; or

(b)  sums equal to the aggregate of the installments of Fixed Rent and additional rent (if any) which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the Demised Premises, payable upon the due dates therefor specified herein following such termination or such re-entry and until the date hereinbefore set for the expiration of the full Term hereby granted; provided, however, that if Landlord shall re-let the Demised Premises during said period, Landlord shall credit Tenant with the net rents received by Landlord for such re-letting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such re-letting the expenses incurred or paid by Landlord terminating this Lease or of re-entering the Demised Premises and of securing possession thereof, including, without limitation, reasonable attorneys' fees and costs of removal and storage of Tenant's property, as well as the expenses of re-letting, including repairing, restoring, altering, decorating and preparing the Demised Premises for new tenants, brokers' commissions, advertising

CONFIDENTIAL                                                    R-Greebel0000008122

costs, reasonable attorneys' fees, and all other similar or
dissimilar expenses chargeable against the Demised Premises and
the rental therefrom in connection with such re-letting, it
being understood that any such re-letting may be for a period
equal to or shorter or longer than the remaining Term of this
Lease; provided, further, that (1) in no event shall Tenant be
entitled to receive any excess of such net rents over the sums
payable by Tenant to Landlord hereunder, (2) in no event shall
Tenant be entitled in any suit for the collection of damages
pursuant to this paragraph (b) to a credit in respect of any net
rents from a re-letting except to the extent that such net rents
are actually received by Landlord prior to the commencement of
such suit, and (3) if the Demised Premises or any part thereof
should be re-let in combination with other space, then proper
apportionment on a square foot area basis shall be made of the
rent received from such re-letting and of the expenses of re-
letting.

For the purpose of paragraph (a) of this
Section 17.02, the amount of additional rent which would have
been payable by Tenant under Article 3 hereof for each year, as
therein provided, ending after such termination of this Lease or
such re-entry, shall be deemed to be an amount equal to the
amount of such additional rent payable by Tenant for the
calendar year and Tax Year ending immediately preceding such
termination of this Lease or such re-entry.  Suit or suits for
the recovery of such damages, or any installments thereof, may
be brought by Landlord from time to time at its election, and
nothing contained herein shall be deemed to require Landlord to
postpone suit until the date when the Term of this Lease would
have expired if it had not been terminated under the provisions
of Articles 16 or 17 hereof, or under any provision of law, or
had Landlord not re-entered the Demised Premises.

Landlord, at Landlord's option, may make such
alterations, repairs, replacements and/or decorations in the
Demised Premises as Landlord in Landlord's sole judgment
considers advisable and necessary for the purpose of re-letting
the Demised Premises; and the making of such alterations and/or
decorations shall not operate or be construed to release Tenant
from any liability hereunder as aforesaid.  Landlord shall in no
event be liable in any way whatsoever for failure to re-let the
Demised Premises, or in the event that the Demised Premises are
re-let, for failure to collect the rent thereof under such re-
letting.  In the event of a breach or threatened breach by
Tenant of any of the covenants or provisions hereof, Landlord
shall have the right of injunction and the right to invoke any

CONFIDENTIAL                                    R-Greebel0000008123

remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Landlord obtaining possession of the Demised Premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease, or otherwise.

ARTICLE 18.

LANDLORD'S RIGHT TO PERFORM TENANT'S OBLIGATIONS

SECTION 18.01  If Tenant shall default in the observance or performance of any term or covenant on its part to be observed or performed under or by virtue of any of the terms or provisions in any Article of this Lease beyond any applicable notice and cure period, Landlord, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of Tenant.  If Landlord makes any expenditures or incurs any obligations for the payment of money in connection therewith, including, but not limited to, reasonable attorneys' fees in instituting, prosecuting or defending any action or proceedings, such sums paid or obligations incurred with interest computed at the Interest Rate and costs shall be deemed to be additional rent hereunder and shall be paid to it by Tenant on demand.

ARTICLE 19.

COVENANT OF QUIET ENJOYMENT

SECTION 19.01  Landlord covenants that upon Tenant paying the rent and additional rents and observing and performing all the terms, covenants and provisions of this Lease on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the Demised Premises, subject nevertheless to the terms and conditions of this Lease.

ARTICLE 20.

EXCAVATION

SECTION 20.01  In the event that an excavation should be made for building or other purposes upon land adjacent to the Building, or should be authorized to be made, Tenant shall, if

13973734.7

- 44 -

R-Greebel0000008124

necessary, afford to the person or persons causing or authorized to cause such excavation, license to enter upon the Demised Premises for the purpose of doing such work as shall reasonably be necessary to protect or preserve the wall or walls of the Building, or the Building, from injury or damage and to support them by proper foundations, pinning and/or underpinning.

ARTICLE 21.

SERVICES AND EQUIPMENT

SECTION 21.01  So long as Tenant is not in default under any of the covenants of this Lease, Landlord shall, at its cost and expense:

(a)  Provide necessary elevator facilities on Business Days from 8:00 A.M. to 8:00 P.M. and shall have sufficient elevators available at all other times.  At Landlord's option, the elevators shall be operated by automatic control or by manual control, or by a combination of both of such methods. Subject to Landlord's reasonable security regulations, Tenant shall have access to the Demised Premises twenty-four (24) hours per day, seven (7) days per week.

(b)  Maintain and keep in good order and repair the heat, ventilating and air-conditioning systems installed by Landlord.  The aforesaid systems will be operated by Landlord as and when seasonably required on Business Days, and shall be effective from 8:00 A.M. to 8:00 P.M.  Landlord shall have no responsibility or liability for the ventilating conditions and/or temperature of the Demised Premises during the hours or days Landlord is not required to furnish heat, ventilation or air-conditioning pursuant to this paragraph.  Landlord has informed Tenant that the windows of the Demised Premises and the Building may be sealed, and that the Demised Premises may become uninhabitable and the air therein may become unbreathable during the hours or days when Landlord is not required pursuant to this paragraph to furnish heat, ventilation or air-conditioning.  Any use or occupancy of the Demised Premises during the hours or days Landlord is not so required to furnish heat, ventilation or air-conditioning to the Demised Premises shall be at the sole risk, responsibility and hazard of Tenant.  Such condition of the Demised Premises shall not constitute nor be deemed to be a breach or a violation of this Lease or of any provision thereof, nor shall it be deemed an eviction nor shall Tenant claim or be entitled to claim any abatement of rent nor make any claim for any damages or compensation by reason of such condition of the Demised Premises.  Tenant shall in any event cause all of the

13973734.7

– 45 –

windows in the Demised Premises to be kept closed and shall cause and keep entirely unobstructed all of the vents, intakes, outlets and grilles at all times and shall comply with and observe all regulations and requirements prescribed by Landlord for the proper functioning of the heating, ventilating and air-conditioning systems. In the event that Tenant shall require air-conditioning, heating or ventilation at such times as same are not furnished by Landlord, Tenant shall give Landlord at least twenty-four (24) hours advance notice of such requirement and, if same is furnished by Landlord, Tenant agrees to pay Landlord's charges therefor as additional rent.

(c) Provide cleaning and janitorial services on Business Days as described in Schedule D annexed hereto.

(d) Furnish hot and cold water for lavatory, pantry, drinking and office cleaning purposes. If Tenant requires, uses or consumes water for any other purposes, Tenant agrees to Landlord installing a meter or meters or other means to measure Tenant's water consumption, and Tenant further agrees to reimburse Landlord for the cost of the meter or meters and the installation thereof, and to pay for the maintenance of said meter equipment and/or to pay Landlord's cost of other means of measuring such water consumption by Tenant. Tenant shall reimburse Landlord the cost of all water consumed, as measured by said meter or meters or as otherwise measured, including sewer rents.

SECTION 21.02  (A)  Landlord reserves the right to interrupt, curtail or suspend the services required to be furnished by Landlord under this Article 21 when the necessity therefor arises by reason of accident, emergency, mechanical breakdown, or when required by any law, order or regulation of any federal, state, county or municipal authority, or for any other cause beyond the reasonable control of Landlord. Landlord shall do any work pursuant to this Article in such a manner so as to minimize interference with Tenant's business, provided no additional costs, for labor at overtime or premium rates, or otherwise, are incurred thereby. No diminution or abatement of rent or other compensation shall or will be claimed by Tenant as a result of any interruption, curtailment or suspension of services, nor shall this Lease or any of the obligations of Tenant be affected or reduced by reason of such interruption, curtailment or suspension.

(B)  Notwithstanding anything to the contrary contained in this Lease, in the event that as a result of such interruption, curtailment or suspension of services not necessitated by

CONFIDENTIAL                                              R-Greebel0000008126

Tenant's acts and not occurring as a result of a requirement of law or a situation beyond Landlord's reasonable control, Tenant shall be denied access to the Demised Premises or unable to conduct and shall actually discontinue conducting its normal business operations in the Demised Premises for a period of ten (10) consecutive days or longer and shall notify Landlord of such discontinuance at the inception of such period (the "Inception Notice"), then Tenant shall be entitled to an abatement of the Fixed Rent and additional rent payable with respect to the Demised Premises for the period beginning on the eleventh (11th) day following the day the Demised Premises were so rendered unusable for the conduct of Tenant's normal business operations (and such Inception Notice was given) and ending on the earlier of the date on which (a) Tenant resumes occupancy of the Demised Premises for the conduct of its business or (b) the Demised Premises are rendered usable for the conduct of Tenant's business operations (regardless of any delay by Tenant in thereafter resuming such business operations).

SECTION 21.03  Tenant shall reimburse Landlord for the cost to Landlord of removal from the Demised Premises and the Building of so much of any refuse and rubbish of Tenant as shall exceed that ordinarily accumulated daily in the routine of business office occupancy or by any use of the Demised Premises after customary business hours.

SECTION 21.04  It is expressly agreed that only Landlord or any one or more persons, firms or corporations authorized in writing by Landlord will be permitted to furnish laundry, linen, towels, drinking water, ice and other similar supplies and services to tenants and licensees in the Building.  Landlord may fix, in its sole and absolute discretion, at any time and from time to time, the hours during which and the regulations under which such supplies and services are to be furnished.  Landlord expressly reserves the right to act as or to designate, at any time and from time to time, an exclusive supplier of all or any one or more of the said supplies and services, provided that the quality thereof and the charges therefor are reasonably comparable to that of other suppliers and Landlord furthermore expressly reserves the right to exclude from the Building any person, firm or corporation attempting to furnish any of said supplies or services but not so designated by Landlord.

SECTION 21.05  It is expressly agreed that only Landlord or any one or more persons, firms or corporations authorized in writing by Landlord will be permitted to sell, deliver or furnish any food or beverages, either personally or through the use of vending machines, for consumption within the Demised

13973734.7                          - 47 -

CONFIDENTIAL                                                    R-Greebel0000008127

Premises or elsewhere in the Building.  Landlord expressly
reserves the right to act as or to designate at any time, or
from time to time, an exclusive supplier or suppliers of such
food and beverages sold in the Building and Landlord further
expressly reserves the right to exclude from the Building any
person, firm or corporation attempting to purvey any such food
or beverages but not so designated by Landlord.  It is
understood, however, that Tenant or regular office employees of
Tenant who are not employed by any supplier of such food or
beverages or by any person, firm or corporation engaged in the
business of purveying such food or beverages, may personally
bring or have delivered into the Building food or beverages for
consumption within the Demised Premises by employees of Tenant,
but not for resale to or for consumption by any other tenant.
Landlord may fix in its absolute discretion, at any time and
from time to time, the hours during which and the regulations
under which foods and beverages may be brought or delivered into
the Building by or for regular employees of Tenant.

SECTION 21.06  Tenant agrees to employ such office
maintenance contractor as Landlord may from time to time
designate, for all waxing, polishing, lamp replacement, cleaning
(other than those cleaning services Landlord is obligated to
furnish) and the maintenance work in the Demised Premises,
provided that the quality thereof and the charges therefor are
reasonably comparable to that of other contractors.  Tenant
shall not employ any other contractor without Landlord's prior
written consent, which shall not be unreasonably withheld.

SECTION 21.07  Landlord will not be required to furnish any
other services, except as otherwise provided in this Lease.

SECTION 21.08  (a)  Tenant, at its sole cost and expense,
shall cause the Demised Premises to be exterminated on a monthly
basis to the satisfaction of Landlord and shall for such
purposes employ exterminators designated by Landlord.

(b)  If Tenant shall have facilities on the Demised
Premises for cooking, drinking, eating, washing and/or storage
of food, or similar items, Tenant shall, on a weekly basis,
cause the portion of the Demised Premises on which such
facilities are located to be exterminated to the satisfaction of
Landlord by exterminators designated by Landlord.  The foregoing
shall not, however, constitute any approval or consent to the
use of the Demised Premises for such purposes.

(c)  If Tenant fails to comply with the provisions of
this Section 21.08, Landlord, in addition to any other remedies

13973734.2

- 48 -

R-Greebel0000008128

available to it under this Lease or pursuant to law, may perform such service, and the cost therefor shall be paid by Tenant on demand as additional rent hereunder.

SECTION 21.09  Subject to the approval of Landlord as to size, color and style, Tenant, at its sole cost and expense, shall be permitted to install signage on the front door of the Demised Premises.

ARTICLE 22.

DEFINITION OF LANDLORD

SECTION 22.01  The term "Landlord" wherever used in this Lease shall be limited to mean and include only the owner or owners at the time in question of the Land and the Building or the Building or the tenant under a ground or underlying lease affecting the Land and the Building or the Building, or both, to whom this Lease may be assigned, or a mortgagee in possession, so that in the event of any sale, assignment or transfer of the Land and the Building or the Building, or of such ground or underlying lease, such owner, tenant under a ground lease or mortgagee in possession shall thereupon be released and discharged from all covenants, conditions and agreements of Landlord thereafter accruing hereunder; but such covenants, conditions and agreements shall be binding upon each new owner, tenant under a ground or underlying lease, or mortgagee in possession for the time being of the Land and the Building, until sold, assigned or transferred.

ARTICLE 23.

INVALIDITY OF ANY PROVISION

SECTION 23.01  If any term, covenant, condition or provision of this Lease or the application thereof to any circumstance or to any person, firm or corporation shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Lease, or the application thereof to any circumstances or to any person, firm or corporation other than those as to which any term, covenant, condition or provision is held invalid or unenforceable, shall not be affected thereby and each remaining term, covenant, condition and provision of this Lease shall be valid and shall be enforceable to the fullest extent permitted by law.

CONFIDENTIAL                                      R-Greebel0000008129

ARTICLE 24.

<u>BROKER</u>

SECTION 24.01   The parties hereto agree that Colliers International, Jones Lang LaSalle and Sage Realty Corporation (collectively, the "Brokers") were the only brokers who negotiated and brought about this transaction, and Landlord agrees to pay the Brokers a commission therefor as per separate agreements.  Tenant represents and warrants that it has not dealt with any broker other than the Brokers, and Tenant agrees to indemnify and save Landlord harmless from any claims made by other brokers claiming to have dealt with Tenant.  Landlord represents that it has not dealt with any broker other than the Brokers, and Landlord agrees to indemnify and save Tenant harmless from any claims made by the Brokers and other brokers claiming to have dealt with Landlord.

ARTICLE 25.

<u>SUBORDINATION</u>

SECTION 25.01   (a) This Lease is subject and subordinate to all ground or underlying leases and to all mortgages (a "Mortgage") which may now or hereafter affect such leases or the Building of which the Demised Premises forms a part, and to all renewals, modifications, consolidations, replacements and extensions thereof.  This clause shall be self-operative, and no further instrument of subordination shall be required by any landlord under any ground or underlying lease or mortgagee.  In confirmation of such subordination, Tenant shall execute promptly any certificate that Landlord may request.  Tenant hereby constitutes and appoints Landlord the Tenant's attorney-in-fact to execute any such certificate or certificates for and on behalf of Tenant.

(b)   The holder of any such Mortgage shall have the right (but shall not be obligated), at any time before such mortgagee conducts a foreclosure sale of the Mortgage held by it, to subordinate the lien of such Mortgage to this Lease by filing a notice of such subordination or other instrument in the Office of the City Register of New York County (or elsewhere if so required by applicable law to effectuate such subordination).

SECTION 25.02   At the option of Landlord or any successor landlord or the holder of any such Mortgage, Tenant agrees that neither the cancellation nor termination of any ground or underlying lease to which this Lease is now or may hereafter

13073734.7

- 50 -

CONFIDENTIAL

R-Greebel0000008130

become subject or subordinate, nor any foreclosure of any Mortgage affecting said premises (including, without, limitation, such Mortgage which has been subordinated to this Lease under Subsection 25.01(b)), nor the institution of any suit, action, summary or other proceeding against Landlord herein or any successor landlord, or any foreclosure proceeding brought by the holder of any such Mortgage to recover possession of such property, shall by operation of law or otherwise result in cancellation or termination of this Lease or the obligations of Tenant hereunder, and upon the request of any such landlord, successor landlord, or the holder of any such Mortgage, Tenant covenants and agrees to attorn to Landlord or to any successor to Landlord's interest in the Demised Premises, or to such holder of any such Mortgage or to the purchaser of the mortgaged premises in foreclosure or to the grantee of an assignment given in lieu of foreclosure of any such Mortgage.

SECTION 25.03   In the event of any act or omission by Landlord which would give Tenant the right to terminate this Lease or to claim a partial or total eviction, pursuant to the terms of this Lease, if any, Tenant will not exercise any such right until:

(a)   it has given written notice of such act or omission to the following (whose names and addresses shall previously have been furnished to Tenant) by delivering such notice of such act or omission addressed to such holders at the last address so furnished:

(i)    the holder of any first Mortgage, and

(ii)   the landlord under any ground or underlying lease to which this Lease is subject and subordinate; and

(b)   a reasonable period for remedying such act or omission shall have elapsed following such giving of notice during which such parties, or any of the parties, with reasonable diligence, following the giving of such notice, has not commenced and continued to remedy such act or omission or to cause the same to be remedied.

SECTION 25.04   In the event that a purchaser at foreclosure of any such Mortgage shall become the successor landlord under this Lease, whether such purchaser is the holder of any such Mortgage (or its designee) or a third party, or the grantee of an assignment given in lieu of foreclosure of any such Mortgage (herein a "New Owner"), then Tenant agrees to the following:

13973734 7

CONFIDENTIAL

R-Greebel0000008131

(i)     the New Owner shall not be responsible for, and shall be relieved of, all liabilities of Landlord under the terms of this Lease accrued prior to the date (the "Succession Date") the New Owner becomes such successor landlord;

(ii)    the New Owner shall not be responsible for, and shall be relieved of, the obligation to cure Landlord's defaults under this Lease occurring prior to the Succession Date other than defaults of a continuing nature of which the holder of such a first Mortgage has received notice and a reasonable cure period following such notice as provided for in Section 25.03;

(iii)   the New Owner shall not be responsible to return any security deposit not actually received by the holder of such a Mortgage or any other New Owner;

(iv)    the New Owner shall not be bound by any Fixed Rent paid more than one (1) month in advance or any Additional Rent paid for more than one (1) regularly scheduled payment period (other than any security deposits, subject, however to clause (iii) above);

(v)     the New Owner shall not be bound by any amendment to this Lease unless made with the consent of the holder of any such Mortgage where such consent is required thereof under any such Mortgage (or other loan document);

(vi)    Tenant shall only be entitled to file a claim for, and to any condemnation proceeds, in any condemnation proceeding affecting the Demised Premises or the Building of which the Demised Premises forms a part in respect of the lost value of Tenant's leasehold interest, Tenant's leasehold improvements and Tenant's moving expenses only if Tenant may file a separate claim in any such condemnation proceeding and so long as, in any event, any such award to Tenant does not reduce, directly or indirectly, the award to Landlord;

(vii)   Tenant shall repair any damages incidental to or caused by the removal of trade fixtures, office furniture or office equipment owned by Tenant (it being agreed that the foregoing agreement is independent of and in addition to any other obligations of Tenant under this Lease to repair any damages); and

(viii)  Tenant shall pay all Fixed Rent and Additional Rent to the holder of any such first Mortgage upon notice from such mortgagee to do so and that Landlord's license

13973734.7

CONFIDENTIAL

R-Greebel0000008132

to collect such Fixed Rent and Additional Rent has been revoked by such mortgagee.

SECTION 25.05  If, in connection with obtaining financing, a banking, insurance or other recognized institutional lender shall request reasonable modifications in this Lease as a condition to such financing, Tenant will not unreasonably withhold, delay or defer its consent thereto, provided that such modifications do not, in Tenant's reasonable opinion, increase the obligations of Tenant hereunder or materially adversely affect the leasehold interest hereby created or Tenant's use and enjoyment of the Demised Premises.

SECTION 25.06  To the best of Landlord's knowledge, as of the date hereof (x) Landlord is not currently in default beyond any applicable notice and cure periods under its existing mortgage and (y) there are no current pending foreclosure or receivership proceedings against the Landlord or the Building.

ARTICLE 26.

ESTOPPEL CERTIFICATE

SECTION 26.01  Tenant agrees, at any time, and from time to time, upon not less than seven (7) days prior notice from Landlord, to execute, acknowledge and deliver to Landlord a statement in writing addressed to Landlord certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates to which the Fixed Rent, additional rental and other charges have been paid, and stating whether or not to the best knowledge of the signer of such certificate, there exists any default in the performance of any covenant, agreement, term, provision or condition contained in this Lease, and any claim or offset in favor of Tenant, and, if any, specifying each such default, claim or offset in favor of Tenant, and, if any, specifying each such default, claim or offset of which signer may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by Landlord and by any purchaser or prospective purchaser of the Building and/or the Land and by any mortgagee or prospective mortgagee of any mortgage affecting the Building and/or the Land, and by any landlord under a ground or underlying lease affecting the Land or the Building.

CONFIDENTIAL                                    R-Greebel0000008133

ARTICLE 27.

LEGAL PROCEEDINGS, WAIVER OF JURY TRIAL

SECTION 27.01  Landlord and Tenant hereby waive, to the extent such waiver is not prohibited by law, the right to a jury trial in any action, summary proceeding or legal proceeding between or among the parties hereto or their successors arising out of this Lease or Tenant's occupancy of the Demised Premises or Tenant's right to occupy the Demised Premises.

SECTION 27.02  Tenant hereby waives the right to interpose a counterclaim in any summary proceeding instituted by Landlord against Tenant or in any action instituted by Landlord for unpaid rent or additional rent under this Lease, except for any mandatory or compulsory counterclaims.

SECTION 27.03  Tenant hereby agrees that the existence of any legal proceeding arising under this Lease, or any judgment resulting therefrom, shall remain confidential and to that end shall not discuss with, or make public disclosure of, the same to the press, other tenants of the Building, or otherwise.  The parties hereto understand and agree that the papers filed in the course of any such legal proceeding may be available to the public but this Section 27.03 is understood by Tenant as a prohibition against any public discussion or disclosure of the same, including any response to any query from the press, other tenants of the Building or otherwise.

SECTION 27.04  In the event Tenant claims or asserts that Landlord has violated or failed to perform a covenant of Landlord not to unreasonably withhold or delay Landlord's consent or approval, or in any case where Landlord's reasonableness in exercising its judgment is in issue, Tenant's sole remedy shall be an action for specific performance, declaratory judgment or injunction, and in no event shall Tenant be entitled to any money damages for a breach of such covenant, and in no event shall Tenant claim or assert any claims in any money damages in any action or by way of set-off, defense or counterclaim, and Tenant hereby specifically waives the right to any money damages or other remedies.

ARTICLE 28.

SURRENDER OF PREMISES/HOLDOVER

SECTION 28.01  Upon the expiration or other termination of the Term of this Lease, Tenant shall quit and surrender the

13973734.7

~ 54 ~

CONFIDENTIAL

R-Greebel0000008134

Demised Premises in good order and condition, ordinary wear and tear and damage by fire or other casualty, the elements and any cause beyond Tenant's reasonable control excepted, and shall remove all its property therefrom, except as otherwise provided in this Lease.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the Term of this Lease.

SECTION 28.02  If at any time during the last month of the Term of this Lease, Tenant shall have removed all or substantially all of Tenant's property from the Demised Premises, Landlord may, and Tenant irrevocably grants to Landlord a license to, immediately enter and alter, renovate and redecorate the Demised Premises, without diminution or abatement of rent, or incurring liability to Tenant for any compensation, and such acts shall have no effect on this Lease.

SECTION 28.03  Tenant agrees it shall indemnify and save Landlord harmless against all costs, claims, loss or liability resulting from delay by Tenant in surrendering the Demised Premises upon expiration or sooner termination of the term of this Lease, including, without limitation, any claims made by any succeeding tenant founded on such delay.  The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant timely to surrender the Demised Premises will be substantial, will exceed the amount of monthly rent theretofore payable hereunder, and will be impossible of accurate measurement.  Tenant therefore agrees that if possession of the Demised Premises is not surrendered to Landlord within two (2) days after the date of the expiration or sooner termination of the Term of this Lease, then Tenant will pay Landlord as liquidated damages for each month and for each portion of any month during which Tenant holds over in the Demised Premises after expiration or sooner termination of the Term of this Lease, a sum equal to two (2) times the average rent and additional rent which was payable per month under this Lease during the six (6) month period preceding such expiration or termination of the Term of this Lease.  The aforesaid obligations shall survive the expiration of sooner termination of the Term of this Lease.

ARTICLE 29.

RULES AND REGULATIONS

SECTION 29.01  Tenant, its servants, employees, agents, visitors, and licensees shall observe faithfully and comply strictly with the rules and regulations set forth in Schedule C

CONFIDENTIAL                                                    R-Greebel0000008135

attached hereto and made a part hereof.  Landlord shall have the right from time to time during the Term of this Lease to make reasonable changes in and additions to the rules thus set forth.

SECTION 29.02  Any failure by Landlord to enforce any rules and regulations now or hereafter in effect, either against Tenant or any other tenant in the Building, shall not constitute a waiver of any such rules and regulations.

ARTICLE 30.

NOTICES

SECTION 30.01  Any notice, request or demand permitted or required to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by Landlord to Tenant or by Tenant to Landlord, shall be in writing.  Unless otherwise required by such law or regulation, such notice, request or demand shall be given, and shall be deemed to have been served and given by Landlord and received by Tenant, when Landlord (1) shall have deposited such notice, request or demand by registered or certified mail enclosed in a securely closed postpaid wrapper, in a United States Government general or branch post office, addressed to Tenant at the Demised Premises, and (2) until Tenant has moved its offices to the Demised Premises, shall have deposited such notice, request or demand by registered or certified mail enclosed in a securely closed postpaid wrapper in such a post office addressed to Tenant at its address as stated on the first page of this Lease.  Such notice, request or demand shall be given, and shall be deemed to have been served and given by Tenant and received by Landlord, when Tenant shall have deposited such notice, request or demand by registered or certified mail enclosed in a securely closed postpaid wrapper in such a post office addressed to Landlord at 777 Third Avenue, New York, New York 10017.  Either party may, by notice as aforesaid, designate a different address or addresses for notices, requests or demands to it.

ARTICLE 31.

NO WAIVER:  ENTIRE AGREEMENT

SECTION 31.01  The failure of Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations set forth or hereafter adopted by Landlord shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original

13973734.7

~ 56 ~

CONFIDENTIAL

R-Greebel0000008136

violation.  The receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.  The failure of Landlord to enforce any of the Rules and Regulations set forth, or hereafter adopted, against Tenant and/or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations.  No provision of this Lease shall be deemed to have been waived by Landlord, unless such waiver be in writing signed by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

SECTION 31.02  This Lease with the Schedules annexed hereto, if any, contains the entire agreement between Landlord and Tenant, and any executory agreement hereafter made between Landlord and Tenant shall be ineffective to change, modify, waive, release, discharge, terminate, or effect an abandonment of this Lease, in whole or in part, unless such executory agreement is in writing and signed by the party against which enforcement of the change, modification, waiver, release, discharge, termination or the effecting of the abandonment is sought.

ARTICLE 32.

CAPTIONS

SECTION 32.01  The captions of Articles in this Lease are inserted only as a matter of convenience and for reference, and they in no way define, limit or describe the scope of this Lease or the intent of any provision thereof.

ARTICLE 33.

INABILITY TO PERFORM

SECTION 33.01  This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall in no way be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in

CONFIDENTIAL                                                    R-Greebel0000008137

making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of strike or labor troubles or any outside cause whatsoever including but not limited to, governmental preemption in connection with a National Emergency or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

ARTICLE 34.

NO REPRESENTATION BY LANDLORD

SECTION 34.01   Landlord or Landlord's agents have made no representations or promises with respect to the Building, the Land or the Demised Premises except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this Lease.   The taking of possession of the Demised Premises by Tenant shall be presumptive evidence, as against Tenant, that Tenant accepts said premises and that the Demised Premises and the Building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except for any latent defects in Landlord's Work.

ARTICLE 35.

NAME OF BUILDING

SECTION 35.01   The Building may be known as or by such name as Landlord, in its sole discretion, may elect, and Landlord shall have the right from time to time to change such designation or name without Tenant's consent.

ARTICLE 36.

SUCCESSORS AND ASSIGNS

SECTION 36.01   The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and, except as otherwise provided herein, their assigns.

13973734.7

- 58 -

R-Greebel0000008138

ARTICLE 37.

## DEFERRED COLLECTIONS

SECTION 37.01  If all or any part of the Fixed Rent or additional rents, as above defined, shall at any time become uncollectible, reduced or required to be refunded by virtue of any rules, regulations, orders, laws and ordinances (including, without limitation, rent control or stabilization laws), or governmental or quasi-governmental authorities having jurisdiction ("Laws and Ordinances"), then for the period prescribed by said Laws and Ordinances, Tenant shall pay to Landlord the maximum amounts permitted pursuant to said Laws and Ordinances.  Upon the expiration of the applicable period of time during which such amounts shall be uncollectible, reduced or refunded, Tenant shall pay to Landlord as additional rent, within fifteen (15) days after demand, all such uncollected, reduced or refunded amounts that would have been payable for the period absent such Laws and Ordinances; provided, however, that the retroactive collection thereof shall then be lawful.

ARTICLE 38.

## FEES/INTEREST/LATE CHARGES

SECTION 38.01  Whenever any default by Tenant causes Landlord to incur attorneys' fees and/or any other costs or expenses, Tenant agrees that it shall pay and/or reimburse Landlord for such fees, costs or expenses promptly upon being billed therefor.

SECTION 38.02  If any monies owing by Tenant under this Lease are paid more than five (5) days after the date such monies are payable pursuant to the provisions of this Lease, Tenant shall pay Landlord interest thereon, at the Interest Rate, for the period from the date such monies were originally payable to the date such monies are paid.  In the event that twice in any twelve (12) month period Tenant shall have defaulted beyond any applicable notice and cure period in the payment of Fixed Rent or additional rent, or any part of either, then any further default by Tenant within such twelve (12) month period shall permit Landlord to collect from Tenant, upon demand, in addition to any interest payable pursuant to this Article 38, or elsewhere in this Lease, a late charge equal to the Interest Rate multiplied by the amount of Fixed Rent and additional rent so due as compensation to Landlord for the costs incurred by it as a result of such defaults, Landlord and Tenant

13973734.7

- 59 -

CONFIDENTIAL

R-Greebel0000008139

acknowledging that the actual amount of such costs would be impossible to ascertain.

ARTICLE 39.

LANDLORD'S WORK

SECTION 39.01  With reasonable promptness after the execution and delivery of this Lease, Landlord agrees to perform that certain work in the Demised Premises set forth in those certain plans and specifications (the "Plans") attached hereto as Schedule B ("Landlord's Work") in accordance with the Building standard.  Landlord agrees that it shall deliver the Demised Premises to Tenant in compliance with all applicable laws in effect as of the Commencement Date.  Notwithstanding the foregoing, Tenant hereby agrees that any items designated as "ABS" or "Above Building Standard" in the Plans (the "ABS Items") shall be performed by Landlord at the sole cost and expense of Tenant.  Landlord hereby agrees that it will notify Tenant of the cost of the ABS Items of Landlord's Work promptly upon obtaining prices for those items from contractors.  Upon notification to Tenant of the cost of the ABS Items, Tenant shall notify Landlord within five (5) days of the date of such notice whether Tenant desires Landlord to perform such ABS Items of Landlord's Work.  Failure of Tenant to respond within such five (5) day period shall be deemed to be Tenant's decision not to consent to such ABS Items of Landlord's Work and Landlord shall not be obligated to perform such ABS Items.  Tenant hereby agrees that it shall reimburse Landlord within ten (10) days of written demand for the cost of any such ABS Items of Landlord's Work (if performed by Landlord) performed in the Demised Premises.  If Tenant elects not to have any ABS Item performed or is deemed to have decided not have such ABS Items performed, such ABS Item shall be deemed to be deleted from the definition of Landlord's Work and shall not be performed by Landlord as a part of Landlord's Work.  Tenant hereby acknowledges and agrees that Landlord's Work shall include as part of such work, installation of a sprinkler system in the Demised Premises that complies with all applicable laws. Notwithstanding the foregoing, Tenant hereby acknowledges that Landlord shall not be responsible for (i) installation of Tenant's voice, data or cables in the Demised Premises (ii) Tenant's moving costs, or (iii) the cost of Tenant's furnishings, fixtures or equipment installed in the Demised Premises, all of which shall be installed or performed at Tenant's sole cost and expense.

13973734.7

- 60 -

R-Greebel0000008140

SECTION 39.02   For purposes of this Lease, the Demised Premises shall be deemed substantially completed (hereinafter, "Substantial Completion" or "Substantially Completed") on the date when Landlord's Work has been substantially completed, notwithstanding the fact that minor changes or insubstantial details of construction, mechanical adjustment or decoration remain to be completed, provided Tenant's use of the Demised Premises is not thereby materially affected.

SECTION 39.03   If Substantial Completion is delayed by reason of any act or omission of Tenant or any of its employees, architects, agents or contractors (a "Tenant Delay") the Demised Premises shall be deemed Substantially Completed but for such Tenant Delay.  Landlord agrees to give Tenant notice of any claimed Tenant Delay.  In addition, Tenant shall, promptly upon demand, reimburse Landlord for all damages resulting from such Tenant Delay.

SECTION 39.04   Landlord warrants until twelve (12) months after Substantial Completion of Landlord's Work ("Landlord's Warranty Period") that (i) Landlord's Work has been constructed in a good and workmanlike manner, and (ii) all materials used in Landlord's Work were consistent with those used in the build out of similar space in other Class A buildings in the New York City midtown market.

ARTICLE 40.

ABATEMENT OF RENT

SECTION 40.01   Anything herein to the contrary notwithstanding, provided this Lease shall be in full force and effect and Tenant shall not be in default hereunder beyond any applicable notice and grace periods, the Fixed Rent shall abate at the rate of $21,782.67 per month for a period of two (2) months from and after the Commencement Date.

ARTICLE 41.

SECURITY DEPOSIT

SECTION 41.01   Upon execution of this Lease, Tenant shall deliver to Landlord either (i) an irrevocable letter of credit (the "Letter of Credit") in the amount of $137,547.00 issued by a New York City commercial bank acceptable to Landlord in its discretion, and in the form of the letter of credit annexed hereto as Schedule E, or (ii) a check (subject to collection) in the amount of $137,547.00, to be held by Landlord as security

13973734.7                        – 61 –

CONFIDENTIAL                                           R-Greebel0000008141

("Security Deposit") for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease. Any Letter of Credit shall state that if the Letter of Credit requires presentment outside of New York City, that Letter of Credit must allow presentment and delivery of the Letter of Credit via nationally recognized courier.  It is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this Lease beyond any applicable notice and cure period, including, but not limited to, the payment of Fixed Rent or additional rent, Landlord may draw down upon the Security Deposit and use, apply or retain the whole or any part of the proceeds thereof to the extent required for the payment of any Fixed Rent and additional rent or any other sum as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including, but not limited to, any damages or deficiency in the re-letting of the Demised Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord.  In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Security Deposit shall be returned to Tenant after the date fixed as the Expiration Date hereof and after delivery of entire possession of the Demised Premises to Landlord.  In the event of an assignment by Landlord of its interest in the Lease, Landlord shall have the right to transfer the Security Deposit to the assignee and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit and Tenant agrees to look to the assignee solely for the return of said Security Deposit, and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new assignee.  Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the Security Deposit and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, or attempted assignment or attempted encumbrance.  Provided Tenant shall not have been in default under the terms of this Lease beyond any applicable notice and cure periods, and subject to the terms and conditions of the next sentences, the amount of the Security Deposit shall be reduced to $114,622.50 upon the date which is twenty-four (24) months after the Rent Commencement Date, at which time there shall be no further reduction hereunder.  Notwithstanding the foregoing reduction, Tenant hereby agrees that any Letter of Credit delivered as the Security Deposit hereunder shall be for the full amount required herein and shall not refer to such reduction in any manner

13973734.7

- 62 -

R-Greebel0000008142

whatsoever or otherwise provide for any automatic reduction in amount.  Such reduction shall only be effective provided Tenant has not been in default beyond any applicable notice and cure periods under the terms and conditions of this Lease at any time prior to the scheduled reduction date (and if any such default shall have occurred, there shall be no reduction), and further provided Tenant delivers an amendment to the existing Letter of Credit or a substitute Letter of Credit (in each case in a form and issued by a bank meeting the criteria above specified and otherwise reasonably acceptable to Landlord) on or after the date of such reduction.  Landlord shall give its consent promptly following a request therefor, to any such amendment provided same is consistent with the terms and conditions specified herein and Landlord shall, at no expense to Landlord, promptly execute any document reasonably required to effectuate such transfer.

SECTION 41.02  Tenant shall pay to Landlord on demand and as additional rent hereunder, all fees and charges paid by Landlord to the bank issuing the Letter of Credit or any portion thereof in connection with the transfer of same to any future assignee of Landlord's interest in the Lease.  In the event of a default by Tenant in any of the terms, provisions and conditions of this Lease beyond any applicable notice and cure period, Landlord shall be permitted to draw down the entire amount of the Security Deposit (or a portion thereof) and apply the proceeds (or a portion thereof) in accordance with Section 41.01 of this Article and retain the balance for the Security Deposit required hereunder.

SECTION 41.03  If Landlord shall apply all or any portion of the Security Deposit (by way of a draw on the Letter of Credit or otherwise), then Tenant shall deposit with Landlord, upon demand, a sufficient amount of cash or a replacement Letter of Credit to bring the balance of cash held by Landlord hereunder to the amount of the Security Deposit.  Any use by Landlord of all or any portion of the Security Deposit pursuant to the provisions hereof shall be deemed an involuntary payment by Tenant and shall not be deemed a waiver by Landlord of Tenant's default or Landlord's right to terminate the Lease pursuant to the provisions of this Lease.

[Signatures on following page.]

CONFIDENTIAL                                      R-Greebel0000008143

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the day and year first above written.

SAGE REALTY CORPORATION, AGENT

By: *C F McClafferty*

~~Robert Kraft~~
~~President~~          CHARLES McCLAFFERTY
                        C FO

MSMB CAPITAL MANAGEMENT, LLC

By: *Martin Shkreli*
    Name: Martin Shkreli
    Tile: CEO

CONFIDENTIAL                                      R-Greebel0000008144

ACKNOWLEDGMENTS

STATE OF _New York_ )
                     ) ss:
COUNTY OF _New York_ )


On the 3 day of August in the year 2012 before me, the undersigned, a notary public in and for said State, personally appeared Charles McCafferty personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PETER J. LAUTH
Notary Public, State of New York
No. 01LA5071443
Qualified in Queens County
Commission Expires Jan. 13, 2015


STATE OF _New York_ )
                     ) ss:
COUNTY OF _Nassau_ )


On the 25th day of July in the year 2012 before me, the undersigned, a notary public in and for said State, personally appeared Martin Shkreli personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

LAZO MOLINA YASMIN
NOTARY PUBLIC, State of New York
No. 01LA6174922
Qualified in Nassau County
Commission Expires Oct. 1, 2015

13973734.7

- 65 -

CONFIDENTIAL

R-Greebel0000008145

SCHEDULE "A"

FLOOR PLAN

See attached.

13973734.7

CONFIDENTIAL

R-Greebel0000008146



CONFIDENTIAL

R-Greebel0000008147

SCHEDULE "B"

PLANS AND SPECIFICATIONS FOR LANDLORD'S WORK

See attached.

13973734.7

B-1

# 777 THIRD AVENUE
## Space 22B - MSMB Capital Management
## Construction Documents



**sage**

Agent for the Building
Sage Realty Corporation
777 Third Avenue
New York, New York 10017
Telephone: 212 750-0437

## 777 Third Avenue
Office of the Building Manager
Telephone: 212 750-2960

PROJECT ARCHITECT:
**Roy Gee Associates LLC**

444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@novad.net

06.28.12 ISSUED FOR FILING

**MSMB Capital Management Space 22B**

PROJECT LOCATION:
**777 Third Avenue New York, NY 10017 22nd Floor**

TOTAL AREA:

SHEET TITLE:
Index Of Drawings
Plot Plan
Zoning Information
DOB & Safety Notes
Occupancy Information
General Legend
NYC ECC Statement

ARCHITECT'S SEAL    PROJECT NO: 737.870
                     DATE:      06.28.12
                     DRAWN:     RGG
                     CHECKED:   RGG
                     SHEET NUMBER:
                     **A-001.00**
                                    1 OF 9

## GENERAL LEGEND



AREA OF WORK

22ND FLOOR LOCATION IN BUILDING

EXISTING CONDITIONS PLAN 1/32"=1'-0"        PLOT PLAN 1/32"=1'-0"

### NYCECC STATEMENT:

TO THE BEST OF MY KNOWLEDGE, BELIEF AND PROFESSIONAL JUDGMENT, THESE PLANS AND SPECIFICATIONS ARE IN COMPLIANCE WITH "NEW YORK CITY ENERGY CONSERVATION CODE"

### BUILDING DEPT. NOTES

1. NO CHANGES IN USE, EGRESS AND OCCUPANCY.
2. ALL NEW DOORS TO BE 3'-0" UNLESS OTHERWISE NOTED. (ADA)
3. ALL NEW & RELOCATED DOORS TO HAVE LEVER HANDLES. (ADA)
4. CLOSET SHELVES & RODS: 54" ABOVE FINISHED FLOOR. (ADA)
5. COUNTER TOPS: 34" ABOVE FINISHED FLOOR. (ADA)
6. ALL ELECTRICAL WORK TO BE FILED UNDER SEPARATE APPLICATION AT THE B.E.C

### SAFETY NOTES:
1. CONTRACTOR WILL BE RESPONSIBLE FOR THE SAFE WORKING CONDITIONS AT THE SITE AT ALL TIMES
2. NEITHER THE ARCHITECT NOR THE OWNER WILL BE DEEMED TO HAVE ANY RESPONSIBILITY OR LIABILITY IN CONNECTION HEREWITH.

### KEY & COMPARTMENTATION NOTES

22ND FLOOR - MULTI-TENANT FLOOR
THIS FLOOR IS PROTECTED BY MEANS OF FIRE ALARM AND SMOKE DETECTION AND SPRINKLER SYSTEM.
NO CHANGES IN OCCUPANCY, USE OR EGRESS
OCCUPIED FLOOR AREA: 9,065 SF
NO COMPARTMENTATION REQUIRED: AC FAN ROOM ROOMS ARE ON THIS FLOOR

### LOCAL LAWS
ALL WORK TO COMPLY WITH LOCAL LAW # 58/87
ALL WORK TO COMPLY WITH LOCAL LAW#85 - NYC ECC

### ZONING & CODE NOTES

MANHATTAN BLOCK: 1322 LOT: 1
ZONING DISTRICT: C5-3  MAP: 8d
OCCUPANCY CLASS: EXISTING "E"
CONSTRUCTION CLASS: EXISTING:
                    NON-COMBUSTIBLE, 1-B
NUMBER OF STORIES: 38
BUILDING HEIGHT: 496 FT.

### DRAWING INDEX

A-001.00  INDEX, PLOT & KEY/COMPARTMENTATION PLANS, ZONING & BUILDING DEPT NOTES
A-002.00  GENERAL NOTES
A-003.00  LOCAL LAW 58-87 STANDARDS' ADA CABINET SECTIONS & PLUMBING DIAGRAM
A-004.00  DEMOLITION, CONSTRUCTION; REFLECTED CEILING; POWER & SIGNAL NOTES
          BUILDING STANDARD SPECIFICATIONS
A-005.00  DEMOLITION PLAN & NOTES
A-006.00  CONSTRUCTION PLAN, DOOR SCHEDULE & NOTES
A-007.00  REFLECTED CEILING & NOTES AND HUNG CEILING DETAIL
A-008.00  WALL SECTIONS & CEILING SECTIONS
A-009.00  POWER & SIGNAL PLAN & NOTES (INCLUDED IN FILING SET FOR REFERENCE ONLY)

CONFIDENTIAL

R-Greebel0000008149

# GENERAL NOTES

1. The "General Conditions Of The Contract For Construction" AIA Document A201, Latest edition, and these notes and specifications are part of the contract.

2. The Contractor will furnish all labor, material, equipment, permits, taxes and insurance necessary to complete the work indicated in the construction documents unless specifically noted otherwise and will coordinate the work responsibilities of all subcontractors.

3. All work will conform to the New York City Building Code, New York City Electric Code, the National Board of Fire Underwriters and applicable New York City Codes, Local Laws and Authorities having jurisdiction. Codes, standards and publications of private and public bodies mentioned within the specifications or on the drawings, and their standards and specifications so mentioned, will be considered to be those in force at the time of the Contract Award.

4. The Contractor will be responsible for all Controlled Inspections and any technical testing required for Controlled Inspections.

Items subject to Controlled Inspection are:
Fire[illegible] Directive [illegible]

No change to use, egress or occupancy.
All electrical work to be filed under the O.E.C. [illegible] by the Electrical Contractor.

5. All equipment must be NYC MEA/BSA Reference Standard Approved.

6. Manufactured articles, materials and equipment will be supplied, installed, connected, erected, used, cleaned and conditioned as directed by the respective manufacturers, unless otherwise specified.

7. The Contractor will notify the Architect of any errors, omissions, conflicts or ambiguities in and between the drawings and specifications prior to proceeding with the work. If such notice is not furnished to the Architect, the Contractor will be deemed to have inspected the drawings and specifications and to have found them in proper form for execution.

8. The Contractor will fully acquaint himself with all existing conditions, will visit and inspect the work area and adjacent areas, will take all field measurements as required for the proper execution of the work, and will satisfy himself as to the nature of the equipment and materials required for the proper execution of the work in every particular which might in any way affect the cost and time schedule of the job. The Contractor will verify all dimensions by measurements at the job site, and will take any and all other measurements necessary to verify the drawings and to properly lay out his work. Any discrepancy affecting the layout of the work will be called to the Architect's attention by the Contractor. No work will proceed until such discrepancy is rectified.

9. The Contractor represents that he has had adequate access to the job site and building areas in which the work is to be performed, that he has satisfied himself as to the nature and location of the work, including any obstructions, location of work, actual levels, the equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this Contract, and that he has studied the Contract Documents and all other documents pertaining to the installation of other trades which may affect his work.

10. Computed dimensions will take precedence over scale dimensions, large scale details and plans over smaller scale details, the written word over detailed symbol and arrangement.

11. The Contractor will assume full responsibility, including responsibility for all related costs, for any and all work done without the approval of the Architect if such work is in conflict with the Contract, Drawings or Specifications.

12. The Owner will establish the limits of the construction site in addition to any contract limit lines shown in the drawings. The Contractor will confine his operations within these limits unless upon written request and reply, a variance is agreed to by the Owner. The Contractor will be responsible for trespass on and/or damage to other property by any of his employees or his Subcontractor's employees.

13. The Contractor will be responsible for the safe working conditions at the site. The Architect and Owner will not be deemed to have any responsibility or liability in connection therewith.

14. Access to the site for the delivery of materials and the Contractor's personnel will be restricted to areas designated by the Owner. Construction operations will be confined to working hours to be designated by the building manager.

15. Construction operations will not involve interruption of heating, water, electrical or other services to any portion of the building outside of the limits of the construction site described in note 14.

16. The Contractor will be responsible for correcting deficiencies any caused by defective or ill-timed work, at no cost to the Owner.

17. The Contractor will be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly. The Contractor will not cut, patch, damage or alter installed work without consent from the Architect.

18. The Contractor will clean the site, buildings and/or specific portions of work as required, of rubbish, dirt and other debris created by his work and remove same from the site on a regular basis. Surfaces will be left clean of paint spots and the like. The Contractor will leave each in a condition approved by the Architect.

19. Substitutions: No substitutions are permitted except where the term "approved equal" appears. Wherever the term "approved Equal" appears, this approval must be in writing by the Architect.

20. The Contractor will maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders, and other modifications in good order and marked currently to record changes and selections made during construction, and in addition, approved Shop Drawings, Product Data, Samples and similar required submittals. These will be available to the Architect and will be delivered to the Architect for submittal to the Owner upon completion of the work.

21. The Contractor will be responsible for distributing adequate copies of the Contract Documents to all subcontractors and to provide all subcontractors with copies of all revisions of the Contract Documents. The Contractor will be responsible to pay any and all costs incurred as a result of the Contractor's failure to properly distribute such information.

22. The Contractor will consult with the Building Superintendent and adhere to regulations of the Building pertaining to the time and method of delivery, debris removal, use of Building elevators, hours of demolition and noisy construction. The Contractor will make arrangements with the Building Superintendent for Construction Personnel to enter the building.

23. The Contractor, promptly after being awarded the Contract, will prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The Schedule will not exceed the time limits current under the Contract Documents, and will provide for expeditious and practical execution of the Work. The Schedule will incorporate all items of labor and material.

24. The Contractor, promptly after being awarded the Contract, will prepare and submit for the Architect's information, coordination drawings which will describe in detail the size & location of all work concealed in the floor and ceiling, including but limited to lighting, electrical, mechanical, telecommunications, sprinkler work, etc.

25. The Contractor, prior to commencing construction, will obtain all the required permits.

26. The Contractor will produce As-Built drawings of the Mechanical, Plumbing, Sprinkler and Electrical Work, which will be delivered to the Architect for submission to the Owner upon completion of the Work.

27. The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor will repair and/or replace such defective work to the Architect's satisfaction. The Contractor will, if required by the Architect, furnish satisfactory evidence as to the kind and quality of materials and

from the date of Substantial Completion. This guarantee will require the Contractor to replace and/or repair any portion of the Work that is determined to be defective, and is in addition to any Guarantee or Warranty provided by product or material manufacturers or fabricators. The Contractor will deliver such manufacturer guarantees, warranties, owner's manuals and product maintenance literature to the Architect for submission to the Owner upon completion of the Work.

28. The Contractor will be required to deliver to the Architect for submission to the Owner releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract to the extent and in such form as may be designated by the Owner. Neither final payment for the Work, nor any remaining retained percentage will become due until the Contractor has submitted such releases to the Architect.

29. WORK INCLUDED

All work will be governed by the Contract Documents. Provide materials, labor, equipment and services necessary to provide all work as shown on the drawings, as specified herein and/or as required by the job conditions.

30. COORDINATION

The Contractor will coordinate the work of all trades and subcontracts.

31. SUBMITTALS

Submittals will be delivered to the Architect as described below for all components of the Work, including all shop and pre-fabricated assemblies, manufactured components, hardware and finishes.

1. Shop Drawings: Submit 1 sepia print each, 3 black line prints each.
2. Samples: Submit three samples of each component material showing finishes, colors, surface textures and qualities of manufacture.
3. Product Literature: Submit three copies of product literature for each product or piece of equipment.

32. The Contractor will notify the Architect four (4) days prior to striking lines for partitions, furniture systems, etc., to inspect the layout for the erection of these portions of the Work. The Architect can make changes in partition and furniture system locations at this time at no additional cost.

33. All dimensions given for partitions are to finished surfaces unless otherwise noted.

34. The Contractor will paint-mark on the floor slab the locations of all electrical, telecommunications and data cable outlets and accesses prior to drilling and installation. The Architect will review these locations and can make changes at this time at no additional cost.

35. The Contractor will fill and patch level all voids, holes, dips and cracks in the existing floor slab. The Contractor will flash patch or, if required, pour a self leveling underlayment in order to provide a smooth and level surface to accept the proposed floor finishes. Should any unevenness of surface telegraph through the finished floor, the Contractor will remove the finished floor, flash patch as required, and replace the floor finish at no additional cost.

36. Fire Stops: fire stops will be provided as required by the NYC Building Code and will include but not be limited to the stopping of hollow partitions and furred spaces, ceilings, at duct and pipe chases, and at rated wall and floor penetrations.

37. The space around rated wall and floor penetrations will not exceed 1/2" and will be packed solid with mineral wool, or approved equal, and be closed off by close fitting metal escutcheons on both side of the construction.

38. The Contractor will provide and install tape deadening stopping materials as manufactured by "Firestop" or approved equal.

39. The word "align" referring to gypsum drywall construction will define new construction that is in alignment with the face of existing partitions or soffits. Where required, and where partitions align with existing columns, etc., laminate a single layer of gypsum wall board over the existing construction in order to provide a smooth and crack free surface.

40. Peripheral wall surfaces or existing columns or partition surfaces exhibiting crazing, water damage or irregular to non planar surfaces, any of which is likely to cause uneven appearance in the final finish are to receive a single layer of gypsum wall board, laminated to the surface or furring as required, and taped finished and primed to receive the wall finish indicated in the Contract Documents.

41. The Contractor will patch, repair or replace any rated partition, enclosure or fireproofing to maintain the integrity of rated construction. All such patching, repair or replacement will comply with all applicable codes.

42. Where metal stud framing adjoins metal ducts or pipes, or where two metals are affixed to each other, the Contractor will provide insulating material between so that no vibration or noise will be transmitted.

43. Where partitions abut the convector enclosures and window mullions, the Contractor will provide and install sound insulating materials to in [illegible] the [illegible] of the partition that will have a sound transmission performance greater than or equal to that of the partition, in order to [illegible] sound separation of the spaces divided by the partition.

44. At all rated partitions and partitions or soffits extending to the floor structure above will be sealed to that structure, to perimeter walls, and around any penetrations such as pipes or ducts. Where a duct or other construction runs parallel and coincident with a rated partition, offset the partition above the ceiling around the construction to maintain the fire rating. All such conditions should be identified on the coordination drawings and submitted to the Architect for approval.

45. The Contractor will double up metal studs at all doors and window openings unless otherwise noted.

46. At all partitions not extending to floor structure above, metal studs will extend and be secured to that structure at all doors, partition corners and at all partitions at 10'-0" o.c. maximum.

47. The location, design and finish of any and all required access panels must be submitted to the Architect prior to installation for approval.

48. All rough and finished carpentry, including wood blocking, wood doors, door and window frames will be fire retardant treated as required to comply with the requirements of the NYC Building Code [27-528] and other applicable codes for combustibility, flame spread rating and smoke developed rating.

49. All gypsum wall board used will be 5/8" firecode "C" by USG unless otherwise noted.

50. All column and core wall surfaces will be laminated with G.W.B. to 6 feet above the finished ceiling unless otherwise noted. All extending pipes or other similar construction will be boxed/furred out and receive one layer of G.W.B.

51. All corners, cased openings or reveals are to receive metal corner beads, "L" beads or reveal beads as appropriate and as approved by the Architect.

52. All G.W.B. surfaces, and all metal trim, are to be taped and finished with three (3) coats minimum of wallboard compound, sanded after each coat to achieve a smooth and blemish-free surface for priming.

Agent for the Building
**Sage Realty Corporation**
**777 Third Avenue**
**New York, New York 10017**
**Telephone: 212 758-0437**

## 777 Third Avenue

Office of the Building Manager
Telephone: 212 759-2960

PROJECT ARCHITECT:

Roy Gee Associates LLC

444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@covad.net

06.28.12 ISSUED FOR FILING

## MSMB Capital Management Space 22B

PROJECT LOCATION:

777 Third Avenue
New York, NY 10017
22nd Floor

TOTAL AREA:

SHEET TITLE:

General Notes

| ARCHITECT'S SEAL | |
|---|---|
| | PROJECT NO: 737.670 |
| | DATE: 06.28.12 |
| | DRAWN: RSG |
| | CHECKED: RSG |
| | SHEET NUMBER |
| | A-002.00 |

2 OF 9



ADA Compliant Cabinets Section @ Lavatory

ADA Compliant Cabinets Typical Section

SHOWER STALL CLEARANCES-PLAN & SEAT WALL

GRAB BARS AT TOILETS

BASE HEIGHT @ SINKS & LAVATORIES

SHOWER STALL CLEARANCES- REAR & CONTROL WALLS

CABINET HEIGHTS

LAVATORY CLEARANCES - SECTION

TWO HINGED DOORS IN SERIES

APPROACHES - SWINGING DOORS

WHEELCHAIR TURNING SPACE

VERTICAL/HORIZONTAL REACHES - MINIMUMS & MAXIMUMS

HINGE-SIDE APPROACHES - SWINGING DOORS

ADA REQUIREMENTS - LOCAL LAW #58/87 - Not To Scale

Agent for the Building
Sage Realty Corporation
777 Third Avenue
New York, New York 10017
Telephone: 212 758-0437

# 777 Third Avenue

Office of the Building Manager
Telephone: 212 759-2860

PROJECT ARCHITECT:
Roy Gee Associates LLC
444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@covad.net

06.28.12 ISSUED FOR FILING

MSMB Capital Management
Space 22B

PROJECT LOCATION:
777 Third Avenue
New York, NY 10017
22nd Floor

TOTAL AREA:

SHEET TITLE:
ADA Standards:
Local Law #58/87
Cabinet Sections

| ARCHITECT'S SEAL | |
|---|---|
| PROJECT NO. | 737.870 |
| DATE: | 06.25.12 |
| DRAWN: | RSG |
| CHECKED: | RSG |
| SHEET NUMBER | A-003.00 |

3 OF 9

777 THIRD AVENUE BUILDING STANDARD SPECIFICATIONS - NOT ALL APPLY TO THIS PROJECT

## DEMOLITION NOTES

1. GENERAL CONTRACTOR SHALL VERIFY JOB CONDITIONS PRIOR TO DEMOLITION AND SHALL REPORT ANY DISCREPANCIES TO ROY GEE ASSOCIATES PRIOR TO WORK COMMENCING.

2. ALL DEMOLITION WORK SHALL BE PERFORMED IN ACCORDANCE WITH THE BUILDING MANAGEMENT RULES & REGULATIONS.

3. CONTRACTOR TO REMOVE ALL CARPETING & BASE IN WORK & WHERE DEMOLITION AREAS.

4. EXISTING DOORS & FRAMES ON SITE ARE TO BE PROTECTED DURING DEMOLITION & CONSTRUCTION.

5. ALL EXISTING ITEMS TO REMAIN SHALL BE PROTECTED DURING DEMOLITION. ANY DAMAGE TO THESE ITEMS SHALL BE REPAIRED BY THE CONTRACTOR AT NO ADDITIONAL COST TO THE TENANT.

6. CONTRACTOR SHALL DEMOLISH ALL ITEMS AS INDICATED ON THE PLAN. CONTRACTOR SHALL COORDINATE WITH ROY GEE ASSOCIATES ALL ITEMS OF DEMOLITION NOT IMPLIED ON SPECIFIED ON THE PLAN

7. CONTRACTOR SHALL TAKE ALL PRECAUTIONS TO MAINTAIN FREE ACCESS TO ALL TENANTS, SERVICE FIXTURES AND THE PUBLIC THROUGH THE AREA INVOLVED

8. CONTRACTOR SHALL REMOVE EXISTING CEILING AS NOTED ON THE PLAN AND HAVE MAIN AREA FOR A DESIGNATION THROUGHOUT. WILL HAVE TO BE MODIFIED AS REQUIRED FOR NEW INSTALLATION

9. CONTRACTOR SHALL BE SAVE ALL EXISTING ELECTRIC TO NEAREST JUNCTION. ALL SHALL TO BE DEMOLISHED AS PER NEW WORK FOR BUILDING CODE

10. CONTRACTOR SHALL REMOVE AND STORE IN BUILDING STOCK ANY EXISTING LIGHT FIXTURES LOCATED IN THE AREAS OF DEMOLITION WORK & NEW CONSTRUCTION

## CONSTRUCTION NOTES

1. ALL WORK TO BE DE IN COMMON CONSTRUCTION AS REQUIRED BY THE N.Y.C BUILDING CODE.

2. INTERIOR PARTITION SHALL INCLUDE ALL WALLS & BLOCKING GROUNDS, ETC., AS REQUIRED FOR THE WORK OF OTHER TRADES.

3. ALL DOORS TO BE 6" FROM ADJACENT WALL AS MADE SIDE 100 UNLESS OTHERWISE NOTED

4. FIXED OUT ALL PERIMETER WALLS, EXISTING SURFACES AND COLUMNS WITH GYPSUM BOARD AND METAL STUDS

5. ALL METAL STUDS ARE TO BE SECURED FROM FLOOR TO SLAB

6. OFFSET PARTITIONS AT BUTTS AS REQUIRED AND CONTINUE TO SLAB ABOVE, MAINTAINING PARTITION TYPE AND RATING WHERE REQUIRED

7. CONTRACTOR IS RESPONSIBLE TO OBTAIN AND MAINTAIN ALL BUILDING STANDARDS

8. CONTRACTOR TO PROVIDE PLASTIC LAMINATE COUNTER WITH UPPER AND LOWER CABINETS IN PANTRY

9. WHERE EXISTING PARTITIONS HAVE BEEN REMOVED, ADJOINING WALLS, FLOORING AND CEILING, ETC. ARE TO BE PATCHED FLUSH AND ARE READY TO RECEIVE NEW FINISHES. ALL REMAINING EXISTING WALLS ARE TO BE CHECKED FOR CRACKS, HOLES AND IMPERFECTIONS AND ARE TO BE SCRATCHED AS NECESSARY

10. DRYWALL PARTITIONS SHALL BE TAPED AND SPACKLED FLUSH, READY FOR DECORATION FINAL. ALL EXPOSED CORNERS ARE TO BE FITTED WITH METAL CORNER BEADS

11. EXISTING DRYWALL PARTITIONS WHERE WILL COORDINATE FAN BODY REMOVED SHALL PROVIDE SKIM COAT AND BACK READY FOR EXPOSED FINISH.

12. ALL PARTITIONS BEHIND WINDOW WALL TO BE CENTERED ON MULLION WITH BUILDING STANDARD DETAIL AND ARE TO BE SCHEDULED IN DRAWINGS

13. OFFSET PARTITIONS AT BUTTS AS REQUIRED AND CONTINUE TO SLAB ABOVE, MAINTAINING PARTITION TYPE AND RATING

14. CONTRACTOR SHALL PROVIDE MINOR ALLOWED FOR RETURN AIR

15. CONTRACTOR TO PROVIDE SHOP DRAWINGS TO ROY GEE ASSOCIATES FOR APPROVAL OF ALL MILLWORK.

## REFLECTED CEILING NOTES

1. ALL CEILING HEIGHTS TO BE 8'-6" THROUGHOUT FROM FINISH FLOOR TO UNDERSIDE HUNG CEILING. ALL LIGHT FIXTURES ARE TO LOCATED AS INDICATED ON THE PLAN

2. CONTRACTOR TO RELOCATE ALL AIR SUPPLY AND RETURN AIR DIFFUSERS AND SWITCHING AS REQUIRED BY DEMOLITION AND/OR CONSTRUCTION

3. INSTALL LIGHT FIXTURES IN STRICT ACCORDANCE WITH MANUFACTURERS SPECS AND INSTRUCTIONS

4. LIGHT FIXTURES SHALL BE CONTROLLED BY LIGHT SWITCH LOCATED IN SAME ROOM UNLESS OTHERWISE NOTED

5. CONTRACTOR SHALL PROTECT EXISTING CEILING TO REMAIN DURING DEMOLITION. ANY DAMAGE TO LIGHTS & CEILING SHALL BE REPAIRED BY THE CONTRACTOR AT NO ADDITIONAL COST TO THE TENANT

6. CONTRACTOR SHALL REMOVE EXISTING CEILING AS NOTED ON THE PLAN AND SAVE ALL BLACK IRON & CROSSBORDER THROUGHOUT. WILL HAVE TO BE MODIFIED AS REQUIRED FOR NEW INSTALLATION

7. CONTRACTOR SHALL REMOVE AND STORE IN BUILDING STOCK ANY EXISTING LIGHT FIXTURES LOCATED IN THE AREAS OF DEMOLITION WORK & NEW CONSTRUCTION OF

8. CONTRACTOR SHALL SAVE ALL EXISTING ELECTRIC TO NEAREST AREA. IS ALL SHALL TO BE DESIGNATED, AS PER NEW YORK CITY BUILDING CODE

## POWER & SIGNAL NOTES

1. ALL ELECTRICAL AND TELEPHONE OUTLETS SHALL BE MOUNTED +12" A.F.F. UNLESS OTHERWISE NOTED

2. ALL CABLE INSTALLED IN CEILING AND UNDER FLOOR TO BE TEFLON COATED.

3. ALL ELECTRICAL & TELEPHONE SERVICE TO BE PER GROUND INSTALLATIONS UNLESS OTHERWISE NOTED

4. ALL SEPARATE CIRCUITS & DEDICATED ELECTRICAL OUTLETS TO HAVE COLOR CODED DEVICES

5. ROY GEE ASSOCIATES DRAWINGS SHALL BE USED FOR DIMENSIONED LOCATIONS AND HEIGHT OF ALL ELECTRICAL FIXTURES AND RECEPTACLES

6. ALL TELEPHONE & COMMUNICATION CABLING TO BE SUPPLIED AND INSTALLED BY THE TENANT CONTRACTOR.

7. ENGINEER TO VERIFY AMPERAGE AND OUTLET REQUIREMENTS FOR ALL SEPARATE CIRCUITS AND DEDICATED OUTLETS.

8. ALL ELECTRICAL PANELS WILL BE COORDINATED BETWEEN ENGINEER AND ROY GEE ASSOCIATES FOR SUITABLE LOCATIONS

9. ENGINEER TO DEDICATE ALL NECESSARY FIRE DAMPERS, ALARMS, SMOKE DETECTORS AND FIRE COMMUNICATION EQUIPMENT AS PER APPLICABLE CODES, AGENCIES AND LOCAL LAWS. ALSO INDICATE ALL CONNECTIONS TO BUILDING FIRE ALARM SYSTEM.

10. FOR TELEPHONE AND COMMUNICATION OUTLETS PROVIDE RECESSED BACK BOXES WITH CONDUIT STUB UP INTO LINE AND CAP THROUGH METAL 3" DIAMETER GROMMET HOLE EXTEND CONDUIT ABOVE FINISHED CEILING

11. ALL ELECTRICAL AND TELEPHONE WORK TO BE PER ALL APPLICABLE CODES, LOCAL LAWS AND AGENCIES

12. APPLIANCE OUTLETS TO BE INSTALLED AS PER MANUFACTURER RECOMMENDATIONS.



**sage**

Agent for the Building
Sage Realty Corporation
777 Third Avenue
New York, New York 10017
Telephone: 212 750-0437

# 777 Third Avenue

Office of the Building Manager
Telephone: 212 759-2960

PROJECT ARCHITECT:

Roy Gee Associates LLC

444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212 772.3863
Email: roygeedes@novad.net

05 28 12 ISSUED FOR FILING

MSMB Capital
Management
Space 22B

PROJECT LOCATION:

777 Third Avenue
New York, NY 10017
22nd Floor

TOTAL AREA:

SHEET TITLE:

Demolition Notes
Construction Notes
Reflected Ceiling Notes
Power & Signal Notes
Building Standard Specs

| ARCHITECT'S SEAL | PROJECT NO: 737.670 |
| --- | --- |
| | DATE: 05.28.12 |
| | DRAWN: RSG |
| | CHECKED: RSG |
| | SHEET NUMBER |
| | A-00400 |

4 OF 9

R-Greebel0000008152



# DEMOLITION PLAN

## PLAN LEGEND

- ----------- Existing Partitions To Remain
- ----------- Partitions & Doors To Be Removed
- Existing Doors To Be Removed
- Existing Doors To Remain

## WORK NOTES

1. REFER TO A-004.00 FOR GENERAL DEMOLITION NOTES
2. REMOVE CEILINGS, LIGHT FIXTURES, HVAC OUTLETS IMPACTED BY NEW PARTITIONS IN SPACE. SAVE AND RELOCATE AS SHOWN ON REFLECTED CEILINGS PLAN ON SHEET A-006.00.
3. REMOVE EXISTING WINDOW SHADES AT WOR AREAS, STORE AND REPLACE AFTER DEMO WORK IS COMPLETED

**sage**

Agent for the Building
Sage Realty Corporation
777 Third Avenue
New York, New York  10017
Telephone: 212 758-0437

## 777 Third Avenue

Office of the Building Manager
Telephone: 212 759-2950

PROJECT ARCHITECT:

**Roy Gee Associates LLC**

444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@covad.net

06.28.12 ISSUED FOR FILING

## MSMB Capital Management Space 22B

PROJECT LOCATION:

## 777 Third Avenue New York, NY 10017

22nd Floor

TOTAL AREA:

SHEET TITLE:

## Demolition Plan & Notes

ARCHITECT'S SEAL

| | |
|---|---|
| PROJECT NO: | 737.876 |
| DATE | 06.28.12 |
| DRAWN | RSG |
| CHECKED | RSG |

SHEET NUMBER:

A-005.00

5 OF 9

CONFIDENTIAL

R-Greebel0000008153







THIRD AVENUE

49TH STREET

48TH STREET

## CONSTRUCTION PLAN    1/8"=1'-0"

NOTE: See Sheet A-008.00
For Individual Pantry Plans

**Sage**

Agent for the Building
Sage Realty Corporation
777 Third Avenue
New York, New York 10017
Telephone: 212 758-0437

### 777 Third Avenue

Office of the Building Manager
Telephone: 212 759-2960

**PROJECT ARCHITECT:**

**Roy Gee Associates LLC**

444 East 62nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@covad.net

06.28.12 ISSUED FOR FILING

**MSMB Capital
Management
Space 22B**

PROJECT LOCATION:

**777 Third Avenue
New York, NY 10017
22nd Floor**

TOTAL AREA:

SHEET TITLE:

**Construction
Plan & Notes
Door Schedule**

| ARCHITECT'S SEAL | PROJECT NO. 737.870 |
| | DATE. 06.28.12 |
| | DRAWN: RGG |
| | CHECKED: RGG |
| | SHEET NUMBER |
| | **A-006.00** |
| | 6 OF 9 |

---

### PLAN LEGEND

EXISTING Partitions To Remain
1: New Full Height Partitions
2: EXISTING Partitions with Glass Clerestory
3: EXISTING Demising Walls
4: New Full Height Glass Partitions
1  Partition Type RE: A-008.00

Areas of EXISTING Stone Flooring.:
Honed White Carrara Marble
Coursed Running Bond Pattern
East to West Axis

### DOOR SCHEDULE

(A) New 3'x FH Tempered Glass Entry Doors
Self-Closing Hardware

(B) New 3' W x FH Wood Doors

(C) All EXISTING Door Including Glass Entry Doors

### WORK NOTES

1. PAINT THROUGHOUT SPACE, COLOR TO BE DETERMINED
2. EXISTING GLASS DOORS AT ENTRY TO ELEVATOR LOBBY TO REMAIN.
3. NEW WOOD DOORS TO MATCH EXISTING IN SPACE, RE: A-004 FOR
4. BUILDING STANDARD CARPET & BASE IN SPACE.
5. BUILDING STANDARD CEILINGS; LIGHTS & HVAC THE SPACE.
6. REINSTALL BUILDING STANDARD SOLAR SHADES AT ALL WINDOWS.
7. EXISTING BUILDING STANDARD PANTRIES IN SPACE SHOWN TO REMAIN.
8. EXISTING BUILDING STANDARD WORKROOM IN SPACE TO REMAIN.

### ABS WORK NOTES

9. ALL NEW POWER AND DATA OUTLETS ABOVE BUILDING STANDARD ALLOTMENT.
10. ALTERNATE FOR POWER, A/V AND CABLE OUTLETS FOR FLAT PANEL TV
    PROVIDE WALL BLOCKING FOR FLAT PANEL TV IN MEETING ROOM, ABS
11. ALTERNATE FOR ONE CORE DRILL IN CONFERENCE ROOM. ABS
12. ALTERNATE FOR NEW GLASS DOOR WITH ELECTRONIC ENTRY SYSTEM
    BETWEEN WAITING AREA & MAIN OFFICE SPACES. ABS

CONFIDENTIAL

R-Greebel0000008154



## REFLECTED CEILING PLAN

1/8"=1'-0"    E= EXISTING   R= RELOCATED  N=NEW

**777 Third Avenue**

PROJECT ARCHITECT:

**Roy Gee Associates LLC**

444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212 772.3663
Email: roygeedes@covad.net

06.28.12 ISSUED FOR FILING

**MSMB Capital
Management
Space 22B**

PROJECT LOCATION:

**777 Third Avenue
New York, NY 10017
22nd Floor**

SHEET TITLE:

**Reflected Ceiling
Plan & Notes**

PROJECT NO: 737.670
DATE: 06.28.12
DRAWN: RSG
CHECKED: RSG
SHEET NUMBER

**A-007.00**

7 OF 9

### HUNG CEILING DETAIL

### PLAN LEGEND

### WORK NOTES

1. REFER TO A-004.00 FOR GENERAL REFLECTED CEILING NOTES.
2. MECHANICAL CONTRACTOR TO VERIFY HVAC AND ELECTRICAL LOCATIONS FOR DUCT WORK, DIFFUSERS, SUPPLY UNITS AND CONTROL LOCATIONS & SPECS.
3. ALL NEW HVAC DIFFUSERS TO BE TIED INTO EXISTING MAIN SUPPLY AIR DUCT OUTLETS AT CORE.
4. ELECTRICAL CONTRACTOR TO VERIFY LOCATIONS AND SWITCHING OF LIGHTING FIXTURES & FIRE SAFETY DEVICES.
5. REWORK CEILINGS IN SPACE 22B TO CONFORM TO NEW OFFICES ON PLAN. SEE LEGEND FOR TYPES RE: A-008.00 FOR SECTIONS & DETAILS.
6. RELOCATE SPRINKLER SYSTEM IN SPACE AS NEEDED. COORDINATE HEAD LOCATIONS WITH ENGINEER AND ARCHITECT BASED ON CEILING PLAN ABOVE.

R-Greebel0000008155





**Agent for the Building**
Sage Realty Corporation
777 Third Avenue
New York, New York 10017
Telephone: 212 758-0437

# 777 Third Avenue
Office of the Building Manager
Telephone: 212 759-2960

PROJECT ARCHITECT:
### Roy Gee Associates LLC

 444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@covad.net

06.28.12 ISSUED FOR FILING

## MSMB Capital
## Management
## Space 22B

PROJECT LOCATION:
### 777 Third Avenue
### New York, NY 10017
### 22nd Floor

TOTAL AREA:

SHEET TITLE:
### Wall Sections
### Ceiling Sections

| ARCHITECT'S SEAL | PROJECT NO: | 737.870 |
| --- | --- | --- |
| | DATE: | 06.28.12 |
| | DRAWN: | RSG |
| | CHECKED: | RSG |
| | SHEET NUMBER | |

A-002.00

8 OF 9

R-Greebel0000008156





**Sage**

Agent for the Building
Sage Realty Corporation
Third Avenue
New York, New York  10017
Telephone: 212 758-9137

**777 Third Avenue**
Office of the Building Manager
Telephone: 212 759-2960

PROJECT ARCHITECT:
**Roy Gee Associates LLC**



444 East 82nd Street Unit 1F
New York, New York 10028
Tel/Fax: 212.772.3863
Email: roygeedes@covad.net

07.09. U2 ISSUED FOR FILING

**MSMB Capital
Management
Space 22B**

PROJECT LOCATION:
**777 Third Avenue
New York, NY 10017·
22nd Floor**

TOTAL AREA:

SHEET TITLE:
**Power & Signal
Plan & Notes**

INCLUDED FOR REFERENCE ONLY FOR FILING

| ARCHITECT'S SEAL | PROJECT NO: 737.870 |
| --- | --- |
| | DATE: 07.09.12 |
| | DRAWN: RSG |
| | CHECKED: RSG |

SHEET NUMBER:
**A-009.00**

9 OF 9

# POWER & SIGNAL PLAN

1/8"=1'-0"    E= EXISTING LOCATIONS & NUMBER MUST BE VERIFIED    N=NEW

THIRD AVENUE

49TH STREET

48TH STREET

## PLAN LEGEND

- Wall Mounted Duplex Electrical Outlet
- Wall Mounted Quadraplex Electrical Outlet
- Wall Mounted Duplex Separate Ciurcuit Electrical
- Wall Mounted Quadraplex Separate Ciurcuit Electrical
- Wall Mounted Duplex Reount Above Electrical Outlet AFF Height from Finished FL On Plan
- Junction Box In Wall or Floor
- Wall Mounted Simplex Outlet W/ Receptacle & Circuit As Reqd
- MVO  Microwave Oven
- Voice Outlet Only
- Wall Mounted Duplex Data Outlet
- Number Indicates Next To Symbol Indicates Number of Outlets TI Communicants To Provide Type & Number of Connections
- Floor Mounted Quadraplex Electrical Outlet
- Quadraplex Floor Mounted Voice/Data Outlet
- CATV Outlet
- New Electrical Base "Whip" For Furniture System, Height To Be Verified By Manufacturer
- New Data Cable Feed For Furniture System, Height To Be Verified By Manufacturer
- Door Bell
- Card Reader
- Intercom to Tel. System
- Electric Magnetic Lock Electric Strike

## WORK NOTES

1. REFER TO A-004.00 FOR POWER AND SIGNAL NOTES.
2. PROVIDE NEW CLASS "E" FIRE PROTECTION SYSTEMS TO MEET BUILDING STANDARDS AND THE NYC BUILDING CODE AS PER LOCATIONS SHOWN ON PLAN A-007.00
3. ALL NEW POWER OUTLETS AND SIGNAL JUNCTION BOXES ON ENTIRE FLOOR.
4. REFER TO A-007.00 FOR LIGHT SWITCHING INFORMATION.
5. CONFERENCE ROOM TO HAVE CORE DRILL FOR FLOOR MOUNTED POWER/SIGNAL BOXES. ABS
6. ALL ENTRIES TO HAVE BOXES FOR CARD READERS & KEY SWITCHES AT DOORS
7. VERIFY THAT ALL EXISTING POWER & DATA OUTLETS EXIST THAT ARE NOT MARKED AS NEW "N" ON PLAN.

THE ITEMS IN THE RED RECTANGLES ARE ABS (ABOVE BUILDING STANDARD)

SCHEDULE "C"

RULES AND REGULATIONS

1.     The sidewalks, plazas, entrances, lobbies, corridors, stairways, driveways, elevators, escalators and other public portions and facilities of the Building (the "Public Areas") shall not be used for any purpose other than ingress to and egress from the tenant's premises for the tenant and its agents, employees, servants, licensees, guests and invitees (collectively, "tenant persons"), and no tenant shall use, or permit the use of, the Public Areas for any other purpose. No bicycles, vehicles, dogs (other than seeing eye dogs) or other animals, fish or birds may be brought into the Building by any tenant or tenant persons.

2.     No tenant shall invite to the tenant's premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of any of the Public Areas and other facilities of the Building by other tenants, or their agents, employees, servants, licensees guests or invitees.

3.     No tenant shall use or permit its employees to use the elevators before 10:00 A.M. in a "Down" direction for purposes of taking a coffee break or similar activities.

4.     Building fire exits and stairways are for emergency use only, and they shall not be used for any other purposes by the tenant or any tenant persons.  No tenant shall encumber or obstruct, or permit the encumbrance or obstruction of, any of the Public Areas, including the fire exits of the Building. No doormat shall be placed or permitted to remain in any public hall or outside any entry door of a tenant's premises.

5.     Landlord reserves the right to control and operate the Public Areas and the facilities furnished for the common use of the tenants, including the right to designate certain elevators for delivery service and which Building entrances shall be used by persons entering, leaving and making deliveries to the Building and certain areas of the plazas as the areas where the tenant and tenant persons may congregate for smoking.

6.     The cost of repairing any damage to the Public Areas or to any facilities used in common with other tenants,

13973734.7                          C-1

                                         R-Greebel0000008158

caused by a tenant or any tenant persons shall be paid by such tenant.

7. Landlord may refuse admission to the Building outside of ordinary business hours to any person not known to the Building concierge or security person then in charge or not having a pass issued by Landlord, the Building concierge or security person then in charge or not otherwise properly identified and may require all persons admitted to or leaving the Building at any time to register (including to comply with Landlord's stand and speak security procedures) and/or to be photographed. Each tenant shall be responsible for all persons for whom it requests such permission and shall be liable to Landlord for all acts of such persons.

8. Any person whose presence in the Building at any time shall, in the judgment of Landlord (or the Building concierge or security person then in charge), be prejudicial to the safety, character, reputation and interests of the Building or its tenants may be denied access to the Building or may be ejected therefrom.

9. At Landlord's option, Landlord may require that all messengers deliver their material to the Building concierge desk (or a package center) for transmittal by the concierge (or center) to the tenants.

10. In case of invasion, riot, public excitement or other commotion, Landlord (or the Building concierge or security person then in charge) may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, and/or take other measures for the safety of the tenants and protection of property in the Building.

11. Landlord (or the Building concierge or security person then in charge) may require any person leaving the Building with any package or other object to Exhibit an outgoing authorized package/materials pass signed by an authorized representative of the tenant from whose premises the package or object is being removed, but the establishment and enforcement, or failure to enforce, of such requirements shall not impose any responsibility on Landlord for the protection of any tenant against the removal of property from the premises of the tenant.

12. Loitering, canvassing, soliciting and peddling in the Building or the Public Areas are prohibited, and each tenant shall cooperate to prevent the same.

13973734.7

C-2

CONFIDENTIAL

R-Greebel0000008159

13.  Neither Landlord nor its agents, employees, servants or contractors shall, in any way, be liable to any tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the tenant's premises or the Building under the provisions of this rule.

14.  No tenant shall obtain or accept or use in its premises ice, drinking water, food, beverage, towel, barbering, boot blacking, floor polishing, lighting maintenance, cleaning or other similar services from any persons not authorized by Landlord in writing to furnish such services, provided always that the charges for such services by persons authorized by Landlord are not excessive.  Such services shall be furnished only at such hours, in such places within the tenant's premises and under such regulations as may be fixed by Landlord.

15.  Each tenant shall furnish to Landlord, and shall update the same from time-to-time when appropriate to ensure that the same shall at all times remain current, the identities of all vendors involved in supplying services to the tenant at the Building and a certificate evidencing appropriate insurance as Landlord may reasonably require.

16.  No awnings or other projections over or around the windows shall be installed by any tenant.  In order to maintain a uniform appearance to persons outside the Building, only such window blinds as are supplied, or permitted, by Landlord shall be used in a tenant's premises, and all electrical fixtures hung in offices or spaces along the perimeter of a tenant's premises must be of a quality, type, design and bulb color approved by Landlord.  No showcase or other articles shall be put by a tenant in front of or affixed to any part of the exterior of the Building or a tenant's premises, nor placed in any Public Areas.

17.  There shall not be used in any space, or in the public halls of the Building, either by a tenant or any tenant persons, including any by jobbers or others, in the delivery or receipt of merchandise or mail, any hand trucks, except those equipped with rubber tires and side guards.  Landlord may regulate the use of hand trucks or rolling carts in the passenger elevators or require use of the freight elevators(s) for such purposes.

18.  All entrance doors in each tenant's premises shall be left locked when the tenant's premises are not in use. Entrance doors shall not be left open at any time.  All windows (which open) in each tenant's premises shall be kept closed at

13973734.7                          C-3

all times, and all blinds or drapes therein above the ground floor shall be lowered or closed when and as reasonably required because of the position of the sun, during the operation of the Building air conditioning system to cool or ventilate the tenant's premises.  None of the heating, ventilating and air-conditioning supplies or exhausts shall be covered or obstructed by any articles.

19.  No noise, including the playing of any musical instruments, radio or television, which, in the judgment of Landlord, might disturb other tenants in the Building shall be made or permitted by any tenant, and no cooking shall be done in any tenant's premises except as expressly approved by Landlord.

20.  Nothing shall be done or permitted in any tenant's premises and nothing shall be brought into or kept in any tenant's premises which would impair or interfere with any of the Building services or the proper and economic heating, cleaning or other servicing of the Building or the tenant's premises, or the use or enjoyment by any other tenant of any other premises or the Public Areas, nor shall there be installed by any tenant any ventilating, air conditioning, electrical or other equipment of any kind which, in the judgment of Landlord, might cause any such impairment or interference.

21.  No dangerous, inflammable, combustible or explosive object or material shall be brought into the Building by any tenant or with the permission of any tenant.

22.  No tenant shall cause or permit any cigarette, cigar, pipe, cooking or other food odors, odors from other processes, or any other objectionable odors, to emanate from the tenant's premises.  Any such condition shall be corrected by the tenant at its expense to Landlord's satisfaction, and the smoking, cooking or other process or occurrence giving rise to the condition discontinued immediately and not resumed until so approved by Landlord.

23.  No acids, vapors or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Building which may damage them.  The water and wash closets and other plumbing fixtures in or serving any tenant's premises shall not be used for any purpose other than the purpose for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other foreign substances shall be deposited therein.  All damages resulting from any misuse of the fixtures shall be borne by the tenant who, or whose tenant persons, shall have caused the same.

13973734.7                          C-4

CONFIDENTIAL

R-Greebel0000008161

24.  No signs, advertisement, notice or other
lettering shall be exhibited, inscribed, painted or affixed by
any tenant on any part of the outside or inside such tenant's
premises or the Building without Landlord's prior written
consent.  In the event of the violation of the foregoing by any
tenant, Landlord may remove the same without any liability and
may charge the expense incurred by such removal to the tenant
violating this rule.  Interior signs and lettering on doors and
elevators shall be inscribed, painted, or affixed for each
tenant by Landlord at the expense of such tenant, and shall be
of a size, color and style acceptable to Landlord.

25.  Landlord shall have the right to prohibit any
advertising by any tenant in any media, including, but not
limited to, newspapers, radio, television or the internet, which
in Landlord's sole judgment impairs the reputation of the
Building or its desirability as an office building, and upon
written notice from Landlord, the tenant immediately shall
refrain from or discontinue such advertising.

26.  No additional locks or bolts of any kind shall be
placed upon any of the doors or windows in any tenant's
premises, and no lock on any door therein shall be changed or
altered in any respect.  Landlord shall not be responsible for
providing keys or other access to tenant and/or tenant persons
for after-hours access to the tenant's premises (such
responsibility shall remain with the tenant).  Duplicate keys
for a tenant's premises and toilet rooms shall be procured only
from Landlord, which may make a reasonable charge therefor.

27.  No tenant shall mark, paint, drill into, or in
any way deface any part of the Building or such tenant's
premises.  No boring, cutting or stringing of wires shall be
permitted, except with Landlord's prior written consent, and as
Landlord may direct.  No tenant shall install any resilient tile
or similar floor covering in such tenant's premises, except in a
manner approved by Landlord.

28.  No tenant shall use or occupy, or permit any
portion of such tenant's premises to be used or occupied, as an
office for a public stenographer or typist, or as a barber or
manicure shop, or as an employment bureau.  No tenant shall
engage or pay any employees on its premises, except those
actually working for such tenant in the Building or advertise
for laborers giving an address at the Building.

29.  No premises shall be used, or permitted to be
used, at any time, for lodging or sleeping or as a store for the

13973734.7

C-5

CONFIDENTIAL

R-Greebel0000008162

sale or display of goods or merchandise of any kind, or as a restaurant, shop, booth, bootblack or other stand, or for the conduct of any business or occupation which involves direct patronage of the general public on such premises, or for manufacturing or for other similar purposes.

30.  The requirements of tenants will be attended to only upon application at the office of the Building.  Employees of Landlord shall not perform any work or do anything outside their regular duties, unless under special instructions from the office of the Building.

31.  Each tenant shall, at its expense, provide artificial light, power and water in such tenant's premises for Landlord's agents, contractors and employees while performing janitorial or other cleaning services and making repairs or alterations in said premises

32.  Any cuspidors or similar containers or receptacles used in a tenant's premises shall be cared for and cleaned by and at the expense of such tenant.

33.  Any and all wet and/or food garbage, including coffee grinds, is to be deposited in a plastic liner bag in a waste basket or other receptacle.

34.  Each tenant shall separate all refuse and rubbish of such tenant in accordance with the methods and procedures set forth, from time to time, by Landlord or otherwise required by law.

35.  Each tenant shall rent from Landlord, at Landlord's then customary Building standard charge, masonite floor protectors which shall be used during any move-in or move-out by the tenant.

36.  Each tenant shall post with Landlord a $2.00 per rentable square foot security deposit, by unendorsed certified check or official bank check, not less than seventy-two (72) hours prior to a scheduled move-out to cover the cost of the rental charge for the masonite floor protectors and repairing any damages to such tenant's premises, the Public Areas and the facilities used in common with other tenants caused by such tenant and any tenant persons, including any contractors during such move-out.  Any unapplied balance shall be returned to such tenant as reasonably promptly as possible after the move-out provided the tenant is otherwise not in default of its lease agreement.

13973734.7

C-6

R-Greebel0000008163

37.   Each tenant shall post with Landlord a $0.10 per rentable square foot advance, by unendorsed certified check or official bank check, not less than seventy-two (72) hours prior to a scheduled move-out to cover the cost of freight elevator service and security provided during such move-out.   Any unapplied balance shall be returned to such tenant as reasonably promptly as possible after the move-out provided the tenant is otherwise not in default of its lease agreement.

38.   Each tenant shall furnish to Landlord prior to moving in or moving out the identities of all vendors involved in the move and a certificate evidencing appropriate insurance as Landlord may reasonably require.

39.   Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from a tenant's premises only on the freight elevator(s) and through the service entrances and corridors, and only during hours and in a manner approved by Landlord.   Landlord reserves the right to inspect all freight to be brought into the Building and to exclude from the Building all freight which violates any of these Rules and Regulations.

40.   The use in a tenant's premises of auxiliary heating devices, such as portable electric heaters, heat lamps or other devices to produce space heating is prohibited.

41.   Each tenant shall be responsible for complying and causing its tenant persons to comply with fire safety laws, including, without limitation, those requiring participation in fire drills and reporting regarding designated fire wardens.

42.   Each tenant shall furnish to Landlord prior to moving in to its premises (and thereafter updating as appropriate so that at all times it shall remain current) a list of persons to be contacted by Landlord's employees in case of an emergency.

43.   Tenant shall promptly report to Landlord any threat received by it which could in any way affect the safety of the Building and/or the safety and well being (to persons and property) of other tenant persons.

44.   If Landlord has reason to believe that a tenant's presence in the Building poses a threat to the safety of the Building and/or to the safety and well-being (to persons and/or to property) of other tenant persons or otherwise poses a threat to the peaceful occupation of the Building's tenant persons,

13973734.7

C-7

CONFIDENTIAL

R-Greebel0000008164

Landlord may institute additional security measures, the cost of which shall be borne solely by the tenant and shall be billed as additional rent to the tenant.

CONFIDENTIAL

R-Greebel0000008165

SCHEDULE "D"

<u>CLEANING SPECIFICATIONS</u>

I    GENERAL CLEANING AND JANITORIAL SPECIFICATIONS

A.   DAILY SERVICES

1.   Empty and clean interiors and exteriors of trash receptacles and places for disposal.

2.   Empty and clean all ash trays and receptacles.

3.   Hand dust all office furniture, fixtures and window sills. If formica or similar desk tops are used, they are to be wiped with a damp cloth where accessible without disturbing documents.

4.   Dust all moldings, door louvers, ventilating louvers within reach, ledges, chair rails, baseboards and trim, damp dusting where necessary.

5.   Dust under all desk equipment and damp wipe all telephone equipment, excluding all electronic desk machines (e.g., Computer terminals and screens, copiers and faxes).

6.   Wash clean all water coolers and fountains.

7.   Wipe clean all chrome, aluminum and other metal work and enamel and mail chutes.

8.   Unwaxed flooring, excluding wood, marble, terrazzo, or carpet, used as corridors adjacent to the core shall be cleaned and dust mopped. This excludes full floor tenants who must maintain their corridor.

9.   Keep supply closets and slop sinks clean and orderly.

10.  Store cleaning equipment in designated areas.

11.  Carpet sweep all floors.

12.  Clean the pantry in the Demised Premises.

13973734.7                          D-1

B.   WEEKLY SERVICES

Wipe clean all brass and other bright work. Refinishing and polishing special metal surfaces are the responsibility of the tenant.

C.   QUARTERLY SERVICES "HIGH DUSTING"

1.   Dust, while in place, all pictures, frames, charts, graphs and similar wall hangings not reached in nightly cleaning, as necessary.

2.   Dust all vertical surfaces, such as walls, partitions, doors, door bucks, door louvers or other ventilating louvers, grills, venetian blinds and other surfaces not reached in nightly cleaning, as necessary. This excludes interior glass partitions located in tenant areas.

3.   Dust all books while in place in libraries, as necessary.

4.   Clean all pipes and other horizontal surfaces not in reach in nightly cleaning. This excludes interior glass partitions located in tenant areas.

5.   Dust exteriors of all lighting fixtures, globes, files and open shelves.

6.   Dust all closet shelving and damp mop closet tile floors where accessible.

D.   ANNUAL SERVICES

1.   Clean all stairwell walls.

2.   Dust ceiling surfaces, other than acoustical ceiling materials. Vacuum clean only acoustical material and other similar surfaces around air diffusers. Wash ceiling areas around air diffusers, if requested.

II   RESTROOMS

With respect to the Building core restrooms only, which excludes private or executive bathrooms:

A.   NIGHTLY SERVICES

1.   Mop, rinse and dry floors; polish mirrors and glass shelves, clean enameled surfaces.

D-2

13973734.7

R-Greebel0000008167

2.    Wash basins, urinals and bowls using non-abrasive cleaner of the bacterial disinfectant type in cold water, remove stains, making certain to clean under sides of rim of urinals and bowls.

3.    Wash both sides of all toilet seats with bacterial disinfectant type cleaner in cold water.

4.    Damp wipe walls and wash the tile wall near urinals with a disinfectant.

5.    Polish flushometers, piping, toilet seat hinges and other metal if not clean and bright.

6.    Fill and maintain mechanical operation of all toilet tissue, soap and sanitary napkin dispensers. The Landlord shall be responsible for the cost of mechanical repairs. The cost of hand towels and soap are the responsibility of the tenant. The Landlord pays for toilet paper.

7.    All waste paper cans and sanitary disposal receptacles are to be emptied and thoroughly cleaned and washed, as necessary.

8.    Scrub floors as necessary.

9.    Private and executive restrooms are excluded from all nightly service.

10.   All supplies are excluded from private and executive restrooms.

B.    MONTHLY SERVICES

Wash down walls in washrooms and stalls as needed from trim to floor. This excludes private and executive restrooms.

III   FLOORS

With respect to the Building:

A.    NIGHTLY CLEANING

1.    Carpet sweep all floors.

2.    Sweep, wet mop with a detergent and rinse all VCT floors.

D-3

13973734.7

CONFIDENTIAL

R-Greebel0000008168

3.   Landlord will maintain surfaces in all public corridors of split tenant floors. Full floors are the responsibility of the tenant.

4.   Vacuum carpets in passenger elevators. Clean and vacuum all elevator saddles and tracks on all floors.

5.   Remove gum and foreign matter from all floors as necessary.

B.   WEEKLY CLEANING

1.   Sweep stairs in fire stairways and dust handrails.

2.   Dust all brass and other bright work. Refinishing or polishing metal or chrome are excluded.

3.   Vacuuming of carpet floors:

(a)   Vacuum clean all carpets once weekly in tenant areas.

(b)   Use a heavy-duty machine with an adjustable height "beater bar" or "beater brush".

(c)   Carpet sweep as necessary.

(d)   Brush or sweep by hand carpet edges inaccessible to high pressure vacuum attachments as required.

(e)   Clean under furniture that can be moved.

IV   GLASS

1.   The cleaning of interior glass partitions is the responsibility of the tenant.

2.   Window cleaning, other than interior glass partitions, shall be in accordance with the existing or future schedule established at the building. The Landlord is responsible for the cost of this service.

13973734.7

CONFIDENTIAL

R-Greebel0000008169

SCHEDULE "E"

FORM OF LETTER OF CREDIT

Dated: _____

Sage Realty Corporation, As Agent
777 Third Avenue
New York, New York  10017

Re:  Irrevocable Clean Letter of Credit

Gentlemen:

By order of our client, _____, we
hereby open our clean Irrevocable Letter of Credit No. _____
in your favor for an amount not to exceed in the aggregate
$_____ U.S. Dollars effective immediately.

Funds under this credit are available to you against your
site draft drawn on us mentioning thereon our Credit No.
_____.

This Letter of Credit shall expire sixteen months from the
date hereof, provided, however, that it is a condition of this
Letter of Credit that it shall be deemed automatically extended,
from time to time, without amendment, for one year from the
expiry date hereof and from each and every future expiry date,
unless at least thirty (30) days prior to any expiry date we
shall notify you by registered mail that we elect not to
consider this Letter of Credit renewed for any such additional
period.

This Letter of Credit is transferable and may be
transferred one or more times.  However, no transfer shall be
effective unless advice of such transfer is received by us in
the form attached signed by you.

We hereby agree with you that all drafts drawn or
negotiated in compliance with the terms of this Letter of Credit
will be duly and promptly honored upon presentment and delivery
of your draft to our office at _____ if
negotiated on or prior to the expiry date as the same may from
time to time be extended.

Presentation under this Letter of Credit may be delivered
to us by a courier of your choice and payment of drawing(s) will

13973734.7

E-1

R-Greebel0000008170

be as per your wire instructions indicated on your letterhead
signed by an authorized signer.

　　　Except as otherwise specified herein, this Letter of Credit
is subject to the Uniform Customs and Practice for Documentary
Credits (1993 Revision), International Chamber of Commerce
Publication No. 500.

Very truly yours,

(Name of Bank)


By: _____

E-2

13973734.7

CONFIDENTIAL

R-Greebel0000008171

Re: Credit ........................................................

Issued By: ........................................................

Gentlemen:

For value received, the undersigned beneficiary irrevocably transfers to:

........................................................
(Name of Second Beneficiary)

........................................................
(Address)

all rights of the undersigned beneficiary to draw under the above Letter of Credit in its entirety.

By this transfer, all rights of the undersigned beneficiary in such Letter of Credit are transferred to the second beneficiary and the second beneficiary shall have the sole rights of beneficiary thereof, including the sole rights relating to any amendments whether increases or extensions or other amendments and whether now existing or hereafter made.  All amendments are to be advised direct to the second beneficiary without necessity of any consent of or notice of the undersigned beneficiary.

The advice of such Letter of Credit is returned herewith, and we ask you to endorse the assignment on the reverse thereof and forward it direct to the second beneficiary with your customary notice of transfer.

Enclosed is remittance of [$100.00] [bank's standard transfer fee] in payment of your transfer commission and in addition thereto we agree to pay you on demand any expenses which may be incurred by you in connection with this transfer.

Very truly yours,

Signature of Beneficiary

SIGNATURE AUTHENTICATED

(Bank)

(Authorized Signature)

E-3

13973734.7

R-Greebel0000008172

| | |
|---|---|
| **From:** | Martin Shkreli [Martin@retrophin.com] |
| **Sent:** | Thursday, August 15 2013 9:08:42 AM |
| **To:** | Greebel, Evan L. |
| **Cc:** | Rosensaft, Michael M. |
| **Subject:** | RE: DB |

E. GREEBEL

DX-7917

exhibitsticker.com

Yes. Also we want him to talk to SEC…

**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Thursday, August 15, 2013 9:08 AM
**To:** Martin Shkreli
**Subject:** DB

AG had a forward option, is DB getting the same thing? Also, I assume we want a release from him.

-----------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** Thursday, August 15, 2013 08:30 AM Eastern Standard Time
**To:** Darren Blanton <DBlanton@coltventures.com>
**Cc:** Rosensaft, Michael M.; Greebel, Evan L.
**Subject:** RE: Transfer to Darren Blanton

Yes. My lawyers are lazy and stupid and paid too much. I send them important emails and they don't respond. Guys – please use the same agreement we used with AG.

**From:** Darren Blanton [mailto:DBlanton@coltventures.com]
**Sent:** Thursday, August 15, 2013 8:27 AM
**To:** Martin Shkreli
**Cc:** michael.rosensaft@kattenlaw.com; evan.greebel@kattenlaw.com
**Subject:** Re: Transfer to Darren Blanton

Is there anything we need to be doing?

Are we still moving forward with this?


Thanks,

Darren

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** Saturday, August 10, 2013 02:05 PM
**To:** Darren Blanton
**Cc:** Rosensaft, Michael M. <michael.rosensaft@kattenlaw.com>; Greebel, Evan L. <evan.greebel@kattenlaw.com>
**Subject:** Transfer to Darren Blanton

KAT_0068358

Hi Guys,

Darren and I have agreed that I will give him 100,000 shares of my stock. Please effect this transaction and send him documents ASAP. Darren, as you know, has been waiting extremely patiently to resolve this matter and we are letting him down. There will be further discussion on resolution but this immediate transfer should begin this process.

Thanks,
Martin

KAT_0068359

**Outlook Mobile Service (Text Messaging)**

| | |
|---|---|
| **From:** | Martin Shkreli <Martin@retrophin.com> |
| **Sent:** | Thursday, August 29, 2013 7:23 PM |
| **To:** | Marc Panoff; Michael Harrison |
| **Subject:** | FW: Settlement Agreements |
| **Attachments:** | 4868_001.pdf; 4867_001.pdf |

**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Thursday, August 29, 2013 2:50 PM
**To:** Martin Shkreli
**Subject:** Fw: Settlement Agreements

-----------------------------------------------------------

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

**From:** Schuyler Marshall [mailto:smarshall@rosewd.com]
**Sent:** Thursday, August 29, 2013 02:46 PM Eastern Standard Time
**To:** Greebel, Evan L.
**Subject:** Settlement Agreements

E. GREEBEL

DX-8154

Katten Draft 8/28/13

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the **"Agreement"**) is made and entered into as of [_____], 2013 by and among Schuyler Marshall (**"Releasor"**), MARTIN SHKRELI (**"Shkreli"**), MSMB CAPITAL MANAGEMENT, LP (**"MSMB Capital LP"**), a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC (**"MSMB Capital LLC"**), a Delaware limited liability company, MSMB HEALTHCARE LP (**"MSMB Healthcare"**), a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC (**"MSMB Investors"**), a Delaware limited liability company and MSMB HEALTHCARE MANAGEMENT LLC (**"MSMB Management"** and, together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and MSMB Investors, the **"MSMB Entities"**), a Delaware limited liability company. Releasor, Shkreli and the MSMB Entities are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

**WHEREAS,** Shkreli is the managing member of MSMB Capital LLC, MSMB Investors and MSMB Management;

**WHEREAS,** MSMB Investors is the general partner of MSMB Healthcare;

**WHEREAS,** MSMB Capital LLC is the general partner of MSMB Capital LP;

**WHEREAS,** Shkreli is the President and Chief Executive Officer of Retrophin, Inc. (**"Retrophin"**), a Delaware corporation;

**WHEREAS,** the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing or future disputes and claims that Releasor may have against Shkreli, any of the MSMB Entities or their respective affiliates.

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

1.     Payment Terms.  Shkreli agrees to deliver or cause to be delivered to the Releasor the total amount of **Six Thousand Three Hundred (6,300)** shares (the **"Shares"**) of common stock, par value $0.0001 per share of Retrophin, as full and final satisfaction for any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, **"Claims"**), including all costs, expenses and attorneys' fees related thereto, which Releasor now has, or which it may have against Shkreli or any MSMB Entity from the beginning of time up to, through, and including the date of this Agreement. The Releasor agrees that any interests that it may have in any of the MSMB Entities are immediately cancelled, that the Releasor is not entitled to any payments for such interests, that no amounts or distributions are owed or deemed to be owed for such interests and that Releasor has no further obligations in any of the MSMB Entities.

1

CONFIDENTIAL

R020210

Katten Draft 8/28/13

2.      Delivery of the Shares. Shkreli and the MSMB Entities represent and warrant to Releasor that on the date of delivery of the Shares to Releasor, Releasor will receive good title to the Shares, fully paid and non-assessable.

3.      Releasor Representations. Releasor hereby represents and warrants that the Shares are being acquired solely for investment for Releasor's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and Releasor has no present intention of selling, granting a participation in, or otherwise distributing the same. Releasor understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Releasor's representations as expressed herein. Releasor understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Releasor must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Releasor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

4.      Brokerage. The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby. Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

5.      Release. In consideration of the delivery of the Shares to Releasor, and based upon the mutual promises contained herein and other good and valuable consideration, Releasor, on his behalf and on behalf of all of his heirs, successors assigns, agents, legal representatives and personal representatives (collectively, the "**Releasor Parties**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Shkreli, each MSMB Entity and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "**Releasees**"), of any and all Claims that Releasor now has, or which it may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Releasor, on behalf of itself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims. If the Releasor does not receive the Shares this Release shall be *void ab initio* and of no further force and effect.

2

R020211

6.     Voluntary Act. The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

7.     Authority. The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

8.     Entire Agreement. This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties. This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties. There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement. The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

9.     Agreement Product of Negotiation; No Drafter. The terms of this Agreement are the result of negotiation among the Parties. Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

10.     Attorneys' Fees. Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

11.     Governing Law; Arbitration; Waiver of Jury Trial. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party. Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions

3

and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity. Any court of competent jurisdiction may enter judgment upon the award. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 11.

      12.    Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

      13.    No Waiver. No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have. Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

      14.    Survival and Benefits. The warranties, representations and covenants contained in this Agreement shall survive the closing herein. This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

      15.    Post Execution Cooperation. The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

<div align="center">4</div>

Katten Draft 8/28/13

16.     Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

17.     Counterparts.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

18.     Headings.  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

19.     Confidentiality.  This Agreement, and any other document relating or referring to the transaction reflected herein or the terms of the release herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties' respective businesses.  The Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other document relating or referring to the transactions set forth herein and/or the terms of the release to any person or entity except as necessary and required by law, regulation or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement immediately in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

20.     Non-Disparagement.  It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties.

**[SIGNATURE PAGE FOLLOWS]**

5

CONFIDENTIAL

R020214

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.

_____
Schuyler Marshall

_____
Martin Shkreli, Individually


**MSMB CAPITAL MANAGEMENT LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member

**MSMB CAPITAL MANAGEMENT LP**
By MSMB Capital Management LLC, its general partner

By:_____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE LP**
By MSMB Healthcare Investors LLC, its general partner

By:_____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE INVESTORS LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE MANAGEMENT LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member


*[Signature Page to Settlement and Release Agreement]*

R020215

Katten Draft 8/28/13

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered into as of [_____ _____], 2013 by and among Schuyler Marshall ("**Releasor**") and RETROPHIN, INC. ("**Retrophin**"), a Delaware corporation.  Releasor and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

**WHEREAS**, Releasor previously invested in Retrophin and received **THIRTY SEVEN THOUSAND EIGHT HUNDRED NINE** (37,809) shares (the "**Initial Distribution**") of common stock, par value $0.0001 per share (the "**Common Stock**") of Retrophin; and

**WHEREAS**, the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing or future disputes and claims that Releasor may have against Retrophin or its affiliates.

**NOW, THEREFORE**, in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

1.    Payment Terms.  Retrophin agree to deliver or cause to be delivered to Releasor the total amount of three hundred thousand dollars ($300,00) (the "**Cash Payment**") as full and final satisfaction for any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "**Claims**"), including all costs, expenses and attorneys' fees related thereto, which Releasor now has, or which it may have against Retrophin from the beginning of time up to, through, and including the date of this Agreement.

2.    Releasor Representations.  Releasor hereby represents and warrants that the Initial Distribution was acquired solely for investment for Releasor's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and Releasor has no present intention of selling, granting a participation in, or otherwise distributing the same.  Releasor understands that the Initial Distribution have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Releasor's representations as expressed herein.  Releasor understands that the shares of Common Stock issued in the Initial Distribution are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Releasor must hold such shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  Releasor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.    Brokerage. The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no

1

R020216

broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby. Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

4.     Release. In consideration of the delivery of the Cash Payment to Releasor, and based upon the mutual promises contained herein and other good and valuable consideration, Releasor, on his behalf and on behalf of all of his heirs, successors assigns, agents, legal representatives and personal representatives (collectively, the "**Releasor Parties**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Retrophin and its officers, directors, shareholders, partners, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "**Releasees**"), of any and all Claims that Releasor now has, or which it may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Releasor, on behalf of itself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims. If the Releasor does not receive the Cash Payment this Release shall be *void ab initio* and of no further force and effect.

5.     Voluntary Act. The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

6.     Authority. The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

7.     Entire Agreement. This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties. This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties. There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement. The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

8.      Agreement Product of Negotiation: No Drafter. The terms of this Agreement are the result of negotiation among the Parties. Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

9.      Attorneys' Fees. Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

10.      Governing Law: Arbitration; Waiver of Jury Trial. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party. Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity. Any court of competent jurisdiction may enter judgment upon the award. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 11.

11.      Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full

3

force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

12.     No Waiver. No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have. Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

13.     Survival and Benefits. The warranties, representations and covenants contained in this Agreement shall survive the closing herein. This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

14.     Post Execution Cooperation. The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

15.     Non-Exclusive Remedies. In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

16.     Counterparts. This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement. For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

17.     Headings. The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

18.     Confidentiality. This Agreement, and any other document relating or referring to the transaction reflected herein or the terms of the release herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties'

4

CONFIDENTIAL                                                                                         R020219

respective businesses. The Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other document relating or referring to the transactions set forth herein and/or the terms of the release to any person or entity except as necessary and required by law, regulation or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement immediately in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

      19.    <u>Non-Disparagement</u>. It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties.

**[SIGNATURE PAGE FOLLOWS]**

5

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.

_Schuyler Marshall_

**RETROPHIN, INC.**

By:_____
Name: Martin Shkreli
Title: Chief Executive Officer

*[Signature Page to Settlement and Release Agreement]*

CONFIDENTIAL

| From: | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
|---|---|
| Sent: | Thursday, December 12, 2013 2:33 AM |
| To: | Marc Panoff |
| Subject: | 2013 Bd Minutes |
| Attachments: | 6_11 Bd minutes (2).DOC; 4_22 Bd minutes (2).DOC; 7_3 Bd minutes (2).DOC; 9_12 Board of Directors Minutes (2).DOC; 9_17 Board of Directors Minutes (2).DOC; 7_24 Bd minutes (2).DOC; 12_6 Bd minutes (2).DOC; 9_9 Bd minutes (2).DOC; Retrophin August PIPE Offering - Minutes.DOC; Retrophin November 8, 2013 Board Meeting Minutes.DOC; Retrophin PIPE Offering - Minutes.DOC |

attached are drafts of the 2013 Bd Minutes.


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)
============================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================

E. GREEBEL

DX-9151

1

DRAFT

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### June 11, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Tuesday, June 11, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.   Also present were Marc Panoff, the Company's Chief Financial Officer, Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Sunil Jain, of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 3:00 p.m.

Mr. Shkreli advised the Board that the Company will not be licensing Synacthen from Novartis Pharma AG and Novartis AG as Novartis consummated a license agreement with Questcor Pharmaceuticals, Inc.   Accordingly the proposed equity financing for which Stifel, Nicholaus & Company Incorporated was acting as placement agent was also terminated.

Mr. Shkreli asked Mr. Hackert to advise the Board on the status of the audit for the year ended December 31, 2012.   Mr. Hackert advised the Board that the audit for the year ended December 31, 2012 was completed.

Next, the Board reviewed and discussed a draft of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"), including the following issues with management and Marcum:

- The audited financial statements;

- Management's discussion and analysis;

- Critical accounting and auditing principles and practices; and

- The adequacy of internal controls

Management advised the Board that they evaluated the Company's controls and procedures and determined that as of December 31, 2012, the Company's disclosure controls are not effective to ensure that information required to be disclosed by the Company in reports that it

CONFIDENTIAL

files or submits under the Exchange Act (i) is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms and (ii) is accumulated and communicated to the Company's management, as appropriate to allow timely decisions regarding required disclosure. Management also determined that as of December 31, 2012, internal controls over financial reporting were not effective as of December 31, 2012. As of December 31, 2012, management identified certain matters that constituted material weaknesses in the Company's internal controls over financial reporting, specific material weaknesses including the fact that the Company (i) experienced difficulty in generating data in a form and format that facilitates the timely analysis of information needed to produce accurate financial reports, (ii) experienced difficulty in applying complex accounting and financial reporting and disclosure rules required under GAAP and the SEC reporting regulations, and (iii) has limited segregation of duties.

Next, the Company's external auditors, Marcum LLP gave a report on the following issues:

- Matters required to be discussed by SAS No. 61 relating to the conduct of the audit;

- The Company's accounting principles and disclosure practices;

- The outside auditor's relationships with the Company in order to evaluate its continued independence;

- Reports required to be submitted to the Board under Section 10A of the Securities Exchange Act of 1934, as amended; and

- Any disagreement or difficulties with management, with none reported.

Next, the Board reviewed the CEO and CFO certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.

Mr. Shkreli updated the Board on the status of the Company and its products. Mr. Shkreli explained that the Company anticipates commencing Phase 2 clinical trials for RE-021 for the treatment of focal segmental glomerulosclerosis in the first half of 2013. Mr. Shkreli also explained that researchers with St. Judes conducted animal studies for RE-024 for the treatment of pantothenate kinase-associated neurodegeneration and that such studies yielded positive results. Mr. Shkreli further explained that based on the outcome of such studies the Company anticipates initiating toxicology studies for RE-024 during the second half of 2013.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

2

R024189

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the 2012 10-K be, and hereby is, approved in all material respects for filing with the SEC, subject to editorial comments and other minor changes deemed necessary or desirable by the officers of the Company filing such report and the mailing of same to the Company's stockholders.

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 4:00 p.m.

_____
Evan Greebel, acting Secretary

3

CONFIDENTIAL                                                                 R024190

DRAFT

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### April 22, 2013

_____

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Monday, April 22, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, was also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 4:40 p.m.

Mr. Shkreli updated the Board on the status of the Company and its products.  Mr. Shkreli explained that the Company anticipates commencing Phase 2 clinical trials for RE-021 for the treatment of focal segmental glomerulosclerosis in the first half of 2013.  Mr. Shkreli also explained that researchers with St. Judes conducted animal studies for RE-024 for the treatment of pantothenate kinase-associated neurodegeneration and that such studies yielded positive results.  Mr. Shkreli further explained that based on the outcome of such studies the Company anticipates initiating toxicology studies for RE-024 during the second half of 2013.

Mr. Shkreli advised the Board that Company has been in on-going discussions with Novartis regarding the Company licensing Synacthen.  Mr. Shkreli further advised the Board that Synacthen is sold in Europe, Asia and South America and is not currently approved for sale or sold in the US.  Mr. Shkreli explained that the proposed term sheet, which was previously provide to the Board and is attached hereto as Exhibit A, contemplates that the Company will make an upfront payment of $12 million to Novartis and the Company would receive the exclusive license to develop, manufacture and sell Synacthen in the United States.  Mr. Shkreli also said that Novartis is upgrading its manufacturing technology which will take approximately 12 months and following the completion of the upgrade the Company would receive the exclusive worldwide right to manufacture, distribute and sell Synacthen for $4 million (other than in certain countries in Europe that were previously licensed to Sigma Tau).  Mr. Shkreli said he believes that such a business annually produces $7 million in revenue.  Mr. Shkreli explained that based on the information supplied in the data room and prior meetings with Novartis, he believes that Synacthen can be used to treat Nephrotic Syndrome and would initially seek FDA approval for that purpose.

Mr. Shkreli advised the Board that in connection with the acquisition of Synacthen the Company would commence an equity financing to raise $30-40 million from new and existing

CONFIDENTIAL

institutional investors. Mr. Shkreli explained that the Company has retained Stifel, Nicolaus and Company, Incorporated, pursuant to the engagement letter which was previously provided to the Board and is attached hereto as Exhibit B. Mr. Shkreli also explained that based upon his initial discussions with such investors, he believes that the Company will sell common stock and warrants at a discount to the current market value and a premium to the price that Company sold common stock and warrants in February 2013.

Mr. Shkreli advised the Board that he believes that the Company needs to retain a Chief Medical Officer and a Chief Financial Officer in order to achieve the Company's identified objectives. Mr. Shkreli explained that he believes that Horacio Plotkin, MD and Marc Panoff, as Chief Medical Officer and Chief Financial Officer, respectively, are the most qualified candidates that he met. Mr. Shkreli further explained that he discussed with Dr. Plotkin that he would receive a base salary of $350,000, a discretionary annual bonus of up to 50% of his base salary, a signing bonus of $20,000 and options to purchase 120,000 shares of restricted common stock which would vest quarterly over a three-year period. Mr. Shkreli further explained that he discussed with Mr. Panoff that he would receive a base salary of $230,000, a discretionary annual bonus of up to 50% of his base salary and be granted 120,000 shares of restricted common stock which would vest quarterly over a three-year period.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the engagement letter with Stifel, Nicolaus and Company, Incorporated, attached hereto as Exhibit B, be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that compensation to be paid to each of Dr. Plotkin and Mr. Panoff, in connection with their employment as Chief Medical Officer and Chief Financial Officer, respectively, be, and it hereby is approved in all material respects;

**FURTHER RESOLVED**, that the Chief Executive Officer be, and he hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver any and all employment and consultant agreements for employees and consultants to the Company, provided that such employees or consultants are not material to the Company and that their agreements would not be required to be disclosed in a current or periodic report filed with the Securities and Exchange Commission;

2

**FURTHER RESOLVED**, that the Chief Executive Officer be and he hereby is authorized, empowered and directed, in the name and on behalf of the Company, to execute and delivery any and all agreements that do not require payments of a material amount of cash or equity and which are not required to be disclosed in a current or periodic report filed with the Securities and Exchange Commission;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 5:300 p.m.

_____
Evan Greebel, acting Secretary

3

R024193

**EXHIBIT A**
**FORM OF SYNACTHEN TERM SHEET**

84720964

CONFIDENTIAL

**EXHIBIT B**
**ENGAGEMENT LETTER WITH STIFEL, NICOLAUS AND COMPANY,**
**INCORPORATED**

84720964

CONFIDENTIAL

DRAFT

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### July 3, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Wednesday, July 3, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.   Also present were Marc Panoff, the Company's Chief Financial Officer and Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 10:00 a.m.

Mr. Shkreli reviewed with the Board the nature of the proposed Synacthen deal with Novartis Pharma AG and Novartis AG.  Mr. Shkreli discussed with the Board that it would be possible for the Company to make a product that would compete with Synacthen and that the Company had procured 10 grams of ACTH, which is the API in Synacthen.  Mr. Shkreli also advised that the 10 grams would make 10,000 vials of the product and he believed that the Company could formulate the product within six (6) months. He said that the Company hoped to start clinical trials in the first quarter of 2014 and that it would cost approximately $2 million to make the product.

Mr. Shkreli also advised the Board on his conversations with Novartis regarding Syntocinon. Mr. Shkreli and the Board discussed the nature and uses of Syntocinon. Mr. Shkreli advised the Board that the Company anticipates negotiating a term sheet with Novartis which he will subsequently discuss with the Board.  Mr. Shkreli updated the Board on his conversations with Stifel Nicholaus & Company regarding an equity financing.



R024196

Mr. Shkreli asked Mr. Panoff to review with the Board compensation and bonuses paid or proposed to be paid to officers, management and employees of the Company for the year ended December 31, 2012.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the bonuses and compensation paid to the officers, management and employees of the Company for the year ended December 31, 2012, be and they hereby approved in all respects.

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 11:00 a.m.

_____
Evan Greebel, acting Secretary

2

CONFIDENTIAL                                                                                   R024197

DRAFT

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### September 12, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Thursday, September 12, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson. Marc Panoff, the Company's Chief Financial Officer, and Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, were also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 12:15 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's discussions with GlaxoSmithKline LLC ("GSK") regarding GSK's 5HT6 program ("5HT6"). Mr. Shkreli noted that 5HT6 had potential applications consistent with other products that the Company was researching or developing. GSK had requested $2-5 million as an upfront fee in connection with the execution of any license agreement. Mr. Shkreli also described the potential Food and Drug Administration approval process of 5HT6.

Mr. Shkreli then discussed with the Board the Company's September 10, 2013 unsolicited letter to Transcept Pharmaceuticals, Inc. ("Transcept"), a pharmaceutical company traded on the NASDAQ Global Market, in which the Company made a non-binding proposal to acquire all of the issued and outstanding shares of Transcept's common stock at a price of $3.50 per share. Mr. Shkreli described Transcept's poor management, noting that its market capitalization was approximately $60 million despite having $77 million in cash, no indebtedness and an FDA-approved product, Intermezzo. Mr. Shkreli also noted that he had discussed the Company's interest in acquiring Transcept with two of Transcept's largest stockholders. Each of those stockholders indicated to Mr. Shkreli that they believed that Transcept should be sold.

The Board then discussed and asked management questions about the above matters.

CONFIDENTIAL

There being no further business to come before the Board in this meeting, the meeting was adjourned at 1:00 p.m.

_____
Evan Greebel, acting Secretary

2

CONFIDENTIAL

R024199

DRAFT

# MINUTES OF A SPECIAL MEETING
# OF
# THE BOARD OF DIRECTORS
# OF
# RETROPHIN, INC.

## September 17, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Tuesday, September 17, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Marc Panoff, the Company's Chief Financial Officer, and Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, were also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 2:30 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's discussions with Stuart Weg, M.D. regarding the Company licensing the rights to intranasal ketamine for any indication from Dr. Weg.  Mr. Shkreli described the provisions of a term sheet that had been previously distributed to the Board and a copy of which is attached hereto as Exhibit A (the "Term Sheet"), pursuant to which, among other things, the Company would pay Dr. Weg $250,000 in exchange for negotiating exclusivity with Dr. Weg with respect to ketamine through December 31, 2013.  Additionally, Mr. Shkreli noted that at least one large pharmaceutical company was investigating using ketamine as the active pharmaceutical ingredient in one or more of its treatments.

Mr. Shkreli continued by discussing the status of the Company's unsolicited proposal to acquire all of the issued and outstanding common stock Transcept Pharmaceuticals, Inc. ("Transcept"), a pharmaceutical company traded on the NASDAQ Global Market, at a price of $3.50 per share.  Mr. Shkreli noted that Transcept's board of directors had rejected the Company's initial proposal and instituted a Tax Benefit Preservation Plan (the "Tax Plan") that limited the Company's ability to acquire more than 4.99% of Transcept's common stock.  Mr. Shkreli suggested delivering a second letter to Transcept in which the Company would increase its offer to $4.00 per share (the "Revised Proposal").  Mr. Shkreli also noted that the Company, together with two of Transcept's other large stockholders, held a sufficient number of shares of Transcept's common stock such that they could call a special meeting of Transcept's stockholders (the "Special Meeting") to consider precatory proposals to eliminate the Tax Plan and to remove certain of Transcept's directors (together, the "Proposals").

Next, Mr. Shkreli discussed the Company's relationship with Dr. Susan Hayflick of Oregon Health & Science University ("OHSU").  Mr. Shkreli noted that Dr. Hayflick is one of

R024200

the world's foremost experts in patothenate kinase-associated neurgeneration ("PKAN"), the disease for which the Company's product RE-024 is being developed. Dr. Hayflick requested a $500,000 grant from the Company's in order to conduct a natural history study of PKAN patients. Mr. Shkreli explained that the data from such a study would be invaluable to, and be shared with, the Company. However, due to OHSU constraints, Dr. Hayflick requested that such grant be structured as a gift to OHSU (the "Gift"). Mr. Shkreli stated that he believed that although such a structure was unusual, he trusted Dr. Hayflick and believed that she and her work would be vital to the development of RE-024. He accordingly recommended to the Board that the Company make such a gift to OHSU.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the Term Sheet in, or substantially in, the form, and containing substantially the terms and provisions of, the Term Sheet attached hereto be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "Authorized Officer") be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Term Sheet, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is authorized, empowered and directed, on behalf of the Company, to deliver the Revised Proposal to Transcept through a letter, press release, or both;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to deliver a letter with certain of Transcept's other stockholders to the board of directors of Transcept demanding the Special Meeting at which the Proposals will be considered by the stockholders of Transcept;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized and directed, on behalf of the Company, to make the Gift to OHSU in an amount equal to $500,000 upon the terms and conditions as the Authorized Officer delivering the same shall approve, the delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to

2

execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 3:15 p.m.

_____
Evan Greebel, acting Secretary

3

CONFIDENTIAL

DRAFT

**MINUTES OF A SPECIAL MEETING
OF
THE BOARD OF DIRECTORS
OF
RETROPHIN, INC.**

**July 24, 2013**

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Wednesday, July 24, 2013, where all members in attendance could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli and Stephen Aselage. Steven Richardson advised that he would not be able to attend the meeting and he sent a written authorization approving the resolutions below. Also present were Marc Panoff, the Company's Chief Financial Officer, Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Sunil Jain, of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 12:00 p.m.

Mr. Shkreli asked Mr. Panoff to review the draft of the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2013 (the "First Quarter 2013 10-Q"), previously provided to the Board and attached hereto as Exhibit A.

Mr. Shkreli asked Marcum to update the Board on the First Quarter 2013 10-Q. Mr. Hackert advised the Board that the First Quarter 2013 10-Q was late. Mr. Hackert also advised the Board that once the First Quarter 2013 10-Q was filed the Company would be a timely filer. Further Marcum delivered a report on the following issues:

- matters required by SAS No. 100;

- the Company's accounting principles & disclosure practices;

- reports required to be submitted under Section 10A of the Securities Exchange Act of 1934;

- any problems or difficulties with management, none reported;  and

- continuation of auditors' independence.

Included in this discussion was the accounting treatment of the warrants issued in connection with the equity financing in February 2013. Also, Marcum and management of the

Company discussed that the Company is working to correct the material weaknesses that were disclosed in the 2012 Form 10-K and previously discussed with the Board.

Next, the Board reviewed and discussed the engagement of Marcum, LLP for the 2013 quarterly financial reviews and fiscal year end audit, the scope of which was included in a draft engagement letter (the "Marcum Engagement Letter"), and previously provided to the Board and attached hereto as Exhibit B.

Next, the Board reviewed the CEO and CFO certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 to be included in the First Quarter 2013 10-Q.

Mr. Shkreli asked Mr. Panoff to discuss the retention of Compensation Advisory Partners LLC to advise the Board on compensation for executive employees and non-executive members of the Board. The Board and management discussed the proposal from Compensation Advisory Partners LLC.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the First Quarter 2013 10-Q be, and hereby is, approved in all material respects for filing with the SEC, subject to editorial comments and other minor changes deemed necessary or desirable by the officers of the Company filing such report and the mailing of same to the Company's stockholders.

**FURTHER RESOLVED,** that the Marcum Engagement Letter, in the form previously distributed to the Board, be and hereby is, approved in all material respects.

**FURTHER RESOLVED**, that the Company engage Compensation Advisory Partners LLC to in accordance with the material terms of the proposed engagement letter previously distributed to the Board and attached hereto as Exhibit C;

**FURTHER RESOLVED**, that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such

2

R024204

officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 12:40 p.m.

_____
Evan Greebel, acting Secretary

3

CONFIDENTIAL                                                                                           R024205

DRAFT

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### December 6, 2013

———————————

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Friday, December 6, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage, Steven Richardson, Cornelius Golding and Jeffrey Paley, MD. Also present were Marc Panoff, the Company's Chief Financial Officer and Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 3:00 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's efforts to license Syntocinon from Novartis Pharma AG ("Novartis"). Mr. Shkreli discussed with the Board that the Company and Novartis finalized the documents for the Company to receive an exclusive US license for Syntocinon. Mr. Shkreli further explained that the documents regarding the proposed license from Novartis that were previously provided to the Board, a form of which was previously delivered to the Board and is attached hereto as Exhibit A, are consistent with the term sheet that the Board previously approved. The Board asked Messrs. Shkreli, Panoff and Greebel questions about the proposed license from Novartis and discussed the terms of the proposed transaction.

Mr. Shkreli updated the Board on his conversations with Srinivas Rao, MD, regarding Dr. Rao joining the Company and the Company's acquisition of Kyalin Biosciences, Inc., a Delaware corporation ("Kyalin"), which was started by Dr. Rao. Mr. Shkreli explained that Dr. Rao and Kyalin are in the process of developing Carbetocin which would be another treatment for Schizophrenia and Autism. Mr. Shrekli also explained that in connection with the proposed acquisition of Kyalin, Dr. Rao will join the Company as the Executive Vice President and Head of Neuroscience. Mr. Shkreli explained that Kyalin is being acquired for $500,000 in cash and $4 million worth of common stock of the Company and that a significant portion of the consideration shall be paid on subsequent anniversaries of the acquisition. Messrs. Shkreli and Panoff reviewed with the Board the proposed stock purchase agreement between the Company, Kyalin and the stockholders of Kyalin ("Purchase Agreement"), the proposed Non-Competition, Non-Solicitation and Non-Disclosure Agreement by and between the Company and Dr. Rao (the "Non-Competition Agreement"), the proposed General Release by and among the Company and the stockholders of Kyalin (the "Release") and the proposed Guaranty Agreement by and among

1

the Company and Royalty Pharma (the "Guaranty"; the Purchase Agreement, Non-Competition Agreement, Release and Guaranty, and each of the other documents and agreements contemplated thereby, collectively referred to herein as the "Transaction Documents") pursuant to which the Company would guaranty Kyalin's obligations to RP Select Finance Trust, a Delaware statutory trust ("RPSFT"), and RPI Finance Trust, a Delaware statutory trust ("RPIFT", and together with RPSFT, "Royalty Pharma"), when and as due, under that certain Amended and Restated Contribution, Subscription, Assignment and Assumption Agreement, dated as of October 8, 2012, by and among Royalty Pharma and Kyalin relating to the acquisition by Royalty Pharma of shares of common stock of Kyalin and the payment to Royalty Pharma of royalties and certain other amounts pursuant to the terms thereof as well as the proposed Employment Agreement by and between the Company and Dr. Rao (the "Employment Agreement"), all of which were previously provided to the Board and attached hereto as Exhibit B. Mr. Shkreli also discussed with the Board that pursuant to the Employment Agreement, Dr. Rao will receive 5% of the Net Sales (as defined in the Employment Agreement) of Syntocinon and Carbetocin. The Board discussed the Transaction Documents and Employment Agreement.

Mr. Shkreli updated the Board on the status of the Company's efforts to license certain intellectual property rights relating to ketamine from Stuart Weg, MD (the "Weg License Agreement"), which was previously provided to the Board and is attached hereto as Exhibit C, for the treatment of Central Nervous System Disorders. The Board discussed the Weg License.

Mr. Shkreli also updated the Board on the Company's discussions with The University of California at San Diego and Dr. David Feifel regarding the Company making a charitable contribution to UCSD (the "Grant Letter") as well as a grant to UCSD pursuant to a Sponsored Research Agreement (the "UCSD SRA") to support Dr. Feifel's studies in accordance with the documents that were previously provided to the Board and attached hereto as Exhibit D. Mr. Shkreli advised the Board that Dr. Feifel is engaged in a research study partially funded by the National Institute of Health to study the effects of oxytocin on Schizophrenia and related research projects. The Board discussed the Grant Letter, the UCSD SRA and the studies being conducted by Dr. Feifel.

Mr. Shkreli asked Mr. Panoff to advise the Board on the Company's anticipated equity financing. Mr. Panoff advised the Board that the Company intends to commence an underwritten offering (the "Proposed Offering") in order to raise additional capital and allow the Company to list its common stock for trading on either the Nasdaq Capital Markets or New York Stock Exchange National Market. Each of these exchanges are national stock exchanges and would allow the Company to have greater visibility to investors. Mr. Panoff also advised the Board that the Company has retained Jefferies LLC ("Jefferies") as the lead underwriter in the offering, pursuant to the engagement letter (the "Jefferies Engagement Letter"), previously distributed to the Board and attached hereto as Exhibit E. Messrs. Shkreli and Panoff advised the Board that the Company intends to raise at least $40 million in the offering. Mr. Shkreli noted that pursuant to the Jefferies Engagement Letter, Jefferies was guaranteed 70% of the compensation from the equity offering and that the gross spread (the difference between the amount that the Company sold stock to Jefferies and that Jefferies sold stock to the investors) would be 6%. Mr. Panoff also advised the Board that in connection with the equity financing, the Board would need to form an Audit Committee, a Compensation and Talent Development Committee and a Nominating and Governance Committee and that the form, structure and

2

R024207

related documentation would be discussed at a subsequent meeting. Mr. Panoff also advised the Board that the Registration Statement for the investors that purchased stock in the Company in the February 2013 and August 2013 equity offerings was effective and that no liquidated damages were owed pursuant to the Registration Rights Agreement.

Mr. Shkreli reviewed with the Board the proposed compensation for non-executive members of the Board. Mr. Panoff updated the Board on the analysis provided by Compensation Advisory Partners LLC and previously distributed to the Board attached hereto as <u>Exhibit F</u>. Mr. Panoff confirmed that the proposed compensation (the "<u>Non-Executive Director Compensation Policy</u>") of $100,000 per director per year, payable in options for shares of common stock and/or cash, with a maximum amount of cash payable per director to not exceed $25,000 per year is consistent with industry standards. The Board discussed the proposed Non-Executive Director Compensation Policy and noted that allowing directors to align their interests with the stockholders of the Company is in the best interest of the Company and its stockholders.

Mr. Shkreli asked Mr. Panoff to update the Board on the status of the Directors and Officers Insurance Policy ("<u>D&O Policy</u>"). Mr. Panoff advised the Board that the current D&O Policy would be expiring in December and that the Company had procured a new D&O Policy that provided greater coverage to the directors and officers. The Board discussed the terms of the proposed D&O Policy.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the license agreement with Novartis, in the form presented to the Board, containing substantially the terms and provisions as set forth therein, be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that, subject to the execution of such agreement, the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "<u>Authorized Officer</u>") be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the license agreement, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the form, terms and provisions of the proposed Transaction Documents and the Employment Agreement, each in substantially the form presented to the Board, and the transactions contemplated thereby be, and they hereby are, approved and adopted in all material respects, and that the consummation by the Company of the transactions contemplated by the Transaction Documents and the Employment Agreement be, and hereby is, approved and authorized in all material respects;

**FURTHER RESOLVED**, that the Company reserve for issuance, and that there are hereby reserved for issuance, the maximum number of shares of common stock, par value $0.0001 per share, of the Company ("<u>Common Stock</u>") that may be issuable pursuant to Section

CONFIDENTIAL

R024208

1.2 of the Purchase Agreement, subject to such adjustments or reclassifications as may be provided therein (the "Shares"), and that such Shares be, and they hereby are, duly authorized for issuance, and when issued and delivered in accordance with the terms and conditions of the Purchase Agreement, shall be duly and validly issued, fully paid and non-assessable shares of Common Stock and the holders thereof shall not be liable for any calls or assessments thereon or for any payment in respect thereof;

**FURTHER RESOLVED**, that the Authorized Officers of the Company be, and each hereby is, authorized, directed and empowered, for and on behalf of and in the name of the Company, to execute and deliver the Transaction Documents and the Employment Agreement with such changes, deletions, additions and alterations thereon or thereto, whether substantial or insubstantial, as any officer executing the same may, in his or her discretion, determine to be necessary, advisable or proper to carry out the transactions contemplated thereby, the execution and delivery thereof by such officer to be conclusive evidence, binding upon the Company;

**FURTHER RESOLVED**, that the license agreement with Dr. Weg, in the form presented to the Board, containing substantially the terms and provisions as set forth therein, be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that, subject to the execution of such agreement, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Weg License Agreement, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the Grant Letter, in the form presented to the Board, containing substantially the terms and provisions as set forth therein, be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that, subject to the execution of such agreement, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Grant Letter, and make the payments as required thereunder, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the UCSD Research Agreement, in the form presented to the Board, containing substantially the terms and provisions as set forth therein, be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that, subject to the execution of such agreement, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the UCSD Research Agreement, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the engagement letter with Jefferies LLC, in the form presented to the Board, containing substantially the terms and provisions as set forth therein, be, and it hereby is, ratified, affirmed, approved and adopted in all material respects, and that, subject to the execution of such agreement, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute

4

and deliver such engagement letter, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the Board has determined that the Proposed Offering is advisable and in the best interest of the Company, and that the Proposed Offering be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that the execution, delivery and performance by the Company of any other agreements, instruments, certificates or documents necessary or appropriate to consummate the Proposed Offering be, and hereby are, authorized, and the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, at the appropriate time or times, to execute, make oath to, acknowledge and deliver, from time to time, in the name and on behalf of the Company, such other agreements, instruments, certificates or documents and do, or cause to be done,  any or all other things as such Authorized Officer may, in his discretion, deem necessary, appropriate or advisable to consummate the Transactions and to carry out the intent of the foregoing resolutions, the taking of such actions to be conclusive evidence that the same have been authorized and approved by the Board;

**FURTHER RESOLVED**, that, in connection with the Proposed Offering, each Authorized Officer, and any person or persons designated and authorized by such Authorized Officer to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed to (1) take all such actions as shall be necessary to prepare and file with the United States Securities and Exchange Commission (the "Commission"), in the name and on behalf of the Company, a registration statement (the "Registration Statement"), under the Securities Act of 1933, as amended, covering the proposed sale of shares of common stock of the Company; (2) cause to be prepared and filed, in the name and on behalf of the Company, any amendment or amendments to the Registration Statement and any supplement or supplements thereto as such officer or officers shall deem necessary or desirable or as shall be required by the Commission; and (3) execute the Registration Statement and any amendment or amendments thereto and any supplement or supplements thereof, in the name and on behalf of the Company, such execution to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the officers of the Company be, and each of them hereby is, authorized, empowered and directed to promptly pay or cause to be paid, in the name and on behalf of the Company, all financial, accounting, brokerage, legal, printing, public relations and other fees and expenses incurred by the Company in connection with the Proposed Offering and the registration of the shares of Common Stock;

**FURTHER RESOLVED**,  that that the Non-Executive Director Compensation Policy is advisable and in the best interest of the Company, and that such Non-Executive Director Compensation Policy be, and it hereby is, adopted and approved in all respects;

CONFIDENTIAL

R024210

**FURTHER RESOLVED**, that the proposed D&O Policy is advisable and in the best interest of the Company, and that the Authorized Officers take such steps to procure and finalize it;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 4:45 p.m.

_____
Evan Greebel, acting Secretary

6

DRAFT

## MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### September 9, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Monday, September 9, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Also present were Marc Panoff, the Company's Chief Financial Officer, Evan L. Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Sunil Jain, of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 5:30 p.m.

Mr. Shkreli asked Mr. Panoff to advise the Board on the financial condition of the Company and recent accounting determinations.  Mr. Panoff advised the Board that management of the Company determined that it is appropriate to restate the audited financials for the year ended December 31, 2012 and the three months ended March 31, 2013, as set forth in the Company's Annual Report on From 10-K for the year ended December 31, 2012 (the "2012 10-K") and the Company's Quarterly Report on Form 10-Q for three months ended March 31, 2013 (the "First Quarter 2013 10-Q"), respectively.  Mr. Panoff explained that it would necessary to restate the Subsequent Event and Liquidity footnotes in the audited financials for 2012 and the financial statements for the three months ended March 30, 2012 as well as amend Management's Discussion and Analysis of Financial Condition and Results of Operation in the 2012 10-K and the First Quarter 2013 10-Q, a draft of which was previously provided to the Board.  Mr. Panoff also explained that such restatements and amendments were due to non-cash changes required by the accounting rules as a result of various settlement agreements entered into by the Company.

Mr. Shkreli asked Mr. Hackert to advise the Board on recent changes to GAAP.  Mr. Panoff advised the Board that management believes that the Company should be an early adopter of Accounting Standards Update ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed").  Mr. Panoff further explained the guidance is effective for fiscal years beginning after December 15, 2013, with early adoption permitted.

Next, the Board reviewed and discussed a draft of the amendments to the 2012 10-K, the audited financial statements for the year ended December 31, 2012, the First Quarter 2013 10-Q

R024212

and the financial statements for the three months ended March 31, 2013. The Board also discussed the following issues with management and Marcum:

- Critical accounting and auditing principles and practices;

- The adequacy of internal controls;

- Reports required to be submitted to the Board under Section 10A of the Securities Exchange Act of 1934, as amended; and

- Any disagreement or difficulties with management, with none reported.

Next, the Board reviewed the CEO and CFO certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.

Mr. Shkreli asked Mr. Panoff to advise the Board on employment matters. Mr. Panoff discussed with the Board that management recommends issuing options to acquire 15,000 shares to Michael Harrison, options to acquire 75,000 shares to Steven Eby and options to acquire 15,000 shares to Christine Giordano. Mr. Panoff also mentioned that all options would vest quarterly over a 3 year period. Mr. Panoff also reviewed the terms of the Consulting Agreements offered to Al Geller and Ken Banta.

Next, Mr. Shkreli discussed the status of Cornelius Golding's nomination to join the Board, noting Mr. Golding's background, experience being a member of other biotechnology companies and experience as a Chair of an Audit Committee. Messrs. Aselage and Richardson reported to the Board that they had each interviewed Mr. Golding over the phone and believed that Mr. Golding would be an excellent addition to the Board.

Mr. Shkreli asked Mr. Panoff to review the Board's prior discussion about compensation for non-executive directors. Mr. Shkreli also explained that he believes it is appropriate for the interests of directors to be aligned with the interest of the stockholders. The Board agreed to continue discussions about compensation and consider such compensation at a subsequent meeting.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the restatement of the audited financials for the year ended December 31, 2012 and the financial statements for the quarter ended March 31, 2013 be, and hereby is, approved in all material respects;

2

R024213

**FURTHER RESOLVED**, that the amendments to the 2012 10-K and the First Quarter 2013 10-Q, be and they hereby are approved for filing with the SEC, subject to final review by members of the Board and other editorial comments and other minor changes deemed necessary or desirable by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "Authorized Officer"), filing such report and the mailing of same to the Company's stockholders;

**FURTHER RESOLVED**, that confirmation of the acceptance to files the 2012 10-K and the First Quarter 2013 10-Q with the SEC may be submitted via email;

**FURTHER RESOLVED**, that early adoption of Accounting Standards Update ("ASU") 2013-04 "Obligations Resulting from Joint and Several Liability Arrangements for Which the Amount at the Reporting Date is Fixed") be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that the options granted to Michael Harrison, Steven Eby and Christine Giordano, be and they hereby are, adopted and approved and subject to the terms of the option grant the issuance of the shares of common stock for which the option is exercisable that the shares of common stock for which the option is exercisable, when so issued, shall be duly authorized, validly issued, fully paid and non-assessable;

**FURTHER RESOLVED**, that the Consulting Agreements for Al Geller and Ken Banta in, or substantially in, the form, and containing substantially the terms and provisions of, the Consulting Agreements attached hereto be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, subject to the execution of such Consulting Agreements, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Consulting Agreements, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that in accordance with Section 3.1 of the Company's Bylaws (the "Bylaws"), the number of directors constituting the Board is increased from three (3) to four (4) directors effective as of October 1, 2013;

**RESOLVED,** that in accordance with Section 3.2 of the Bylaws, that Cornelius Golding is hereby elected as a director of the Corporation effective as of October 1, 2013, to serve until his successor is elected and qualified;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED**, that the Code of Ethics, Insider Trading Policy and Indemnification Agreement in, or substantially in, the form, and containing substantially the terms and provisions of, such policies or agreements attached hereto be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, the Authorized Officers be, and

3

R024214

each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver such policies or agreements, with such changes or modifications thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that all directors, officers, employees and consultants of the Company shall be required to executed the Code of Ethics and Insider Trading Policy;

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 6:45 p.m.


_____
Evan Greebel, acting Secretary

4

R024215

Draft

# MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### August 9, 2013

A special meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Friday, August 9, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson. Marc Panoff, the Company's Chief Financial Officer, and Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, were also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 3:00 p.m.

Mr. Shkreli began the meeting by updating the Board on the status of the Company's efforts to license Syntocinon from Novartis Pharma AG ("Novartis"). Mr. Shkreli discussed the terms of a draft letter agreement (the "Letter Agreement") with Novartis, a form of which is attached hereto as Exhibit A, which Letter Agreement, among other things, (i) contained a term sheet setting forth the basic financial terms of a definitive license agreement between the parties for a U.S. license to Syntocinon, a synthetic oxytocin owned by Novartis, and (ii) provided the Company with 120 days of negotiating exclusivity to license Syntocinon in the United States. Mr. Shkreli noted that the terms of the Letter Agreement required the Company to pay $2 million to Novartis upon its execution, regardless of whether a definitive license agreement was ever executed.

Mr. Shkreli also updated the Board on the status of a proposed private placement offering (collectively, the "Proposed Offering") of stock and warrants to purchase common stock of the Company. Mr. Shkreli indicated that that the Company's financial advisor for the transaction had confirmed investor interest of approximately $15 million to $30 million of securities, and that he was optimistic that the Company would raise more than $25 million in the Proposed Offering.

Mr. Shkreli noted that the agreements and other documents in connection with the Proposed Offering included a Securities Purchase Agreement, a form of which is attached hereto as Exhibit B (the "Purchase Agreement"), Warrants to purchase common stock, a form of which is attached hereto as Exhibit C (the "Warrant"), and a Registration Rights Agreement with the Purchasers, a form of which is attached hereto as Exhibit D (the "Registration Rights Agreement", and together with the Purchase Agreement, the Warrant and all exhibits and schedules thereto and any other documents or agreements executed in connection with the

Proposed Offering (including, without limitation, the Amendments (as defined below)), collectively, the "Transaction Documents").

Mr. Shkreli advised the Board that the Proposed Offering price was approximately $5.00 per share of common stock of the Company (the "Shares"). Mr. Shkreli also explained that each investor in the Proposed Offering would receive Warrants to acquire 50% of the number of Shares acquired by such investor (the "Warrant Shares"), with a proposed exercise price equal to approximately 130% of the purchase price for the Shares. Furthermore, the Warrants would be exercisable at any time from the date of issuance until the fifth anniversary of the date of issuance and contain customary weighted-average anti-dilution protections, which would result in a decrease in the exercise price of the Warrant Shares if the Company successfully sold stock at a per share price lower than such exercise price. The Company would also agree to register the Shares and Warrant Shares following the closing of the Proposed Offering.

Next, in order to permit the Proposed Offering, Mr. Shkreli discussed an amendment, a form of which is attached hereto as Exhibit E, (the "February SPA Amendment") to the Company's Securities Purchase Agreement, dated as of February 12, 2013 (the "February SPA"), and an amendment, a form of which is attached hereto as Exhibit F, (the "February RRA Amendment" and, together with the February SPA Amendment, the "Amendments") to the Company's Registration Rights Agreement, dated as of February 14, 2013. Mr. Shkreli explained that the Amendments were necessary in order for the Company to proceed with the Proposed Offering. Mr. Shkreli noted that the Amendments provided, among other things, that purchasers of the Company's securities under the February SPA would receive $1,835,000 in cash and 73,710 Shares and that such purchasers would have the option to elect to receive additional Shares in lieu of such cash.

Mr. Shkreli then discussed the nomination of Cornelius Golding to the Board, including Mr. Golding's professional background and accomplishments. The Board then discussed Mr. Golding's qualifications and the benefits that his experience would bring to the Board.

Next, Messrs. Shkreli and Panoff provided a management update and an update on the financial condition of the Company. In particular, Messrs. Shkreli and Panoff noted that RE-021, the Company's proposed treatment for focal segmental glomerulosclerosis (FSGS), was set to commence Phase 2 clinical trials in the fourth fiscal quarter of the Company's 2013 fiscal year. They also noted that the Company had received positive survival results from pre-clinical tests of RE-024, the Company's treatment for pantothenate kinase-associated neurodegeneration (PKAN). Mr. Shkreli noted that he was encouraged by these results.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR BE AND IT IS HEREBY RESOLVED**, that the Letter Agreement in, or substantially in, the form, and containing substantially the terms and provisions of, the Letter Agreement attached hereto be, and it hereby is, ratified, affirmed, approved and adopted in all respects, and that, subject to the execution of the Transaction Documents, the Chief Executive Officer of the Company and the Chief Financial Officer of the Company (each, an "Authorized Officer") be, and each of them hereby is, authorized, empowered and directed, in the name and

2

R024217

on behalf of the Company, to execute and deliver the Letter Agreement, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the Board has determined that the Proposed Offering is advisable and in the best interest of the Company, and that the Proposed Offering be, and it hereby is, adopted and approved in all respects;

**FURTHER RESOLVED**, that each of the Purchase Agreement, Warrant, Registration Rights Agreement and each of the Amendments, in each case in, or substantially in, the form, and containing substantially the terms and provisions of, said agreements attached hereto, and the other Transaction Documents, be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, subject to the satisfaction or waiver of the other conditions as set forth in the Purchase Agreement at or prior to the closing of the Proposed Offering, the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver all the Transaction Documents, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that Section 203 of the Delaware General Corporation Law ("DGCL"), shall not apply to Business Combinations (as that term is defined in section 203(c)(3) of the DGCL), between the Company and the investors in the Proposed Offering;

**FURTHER RESOLVED**, that, subject to the satisfaction or waiver of the conditions as set forth in the Purchase Agreement at or prior to the closing of the Proposed Offering, the performance by the Company of its obligations under the Transaction Documents and the consummation of the Proposed Offering be, and they hereby are, approved and adopted in all respects;

**FURTHER RESOLVED**, that the execution, delivery and performance by the Company of any other agreements, instruments, certificates or documents necessary or appropriate to consummate the Proposed Offering be, and hereby are, authorized, and the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, at the appropriate time or times, as provided for or contemplated by the Transaction Documents, to execute, make oath to, acknowledge and deliver, from time to time, in the name and on behalf of the Company, such other agreements, instruments, certificates or documents and do, or cause to be done, any or all other things as such Authorized Officer may, in his discretion, deem necessary, appropriate or advisable to consummate the Transactions and to carry out the intent of the foregoing resolutions, the taking of such actions to be conclusive evidence that the same have been authorized and approved by the Board;

**FURTHER RESOLVED**, that the Board hereby determines and declares that, subject to the payment by or on behalf of each investor in the Proposed Offering (each, a "Purchaser" and collectively, the "Purchasers") of the purchase price for the Shares subscribed by such Purchaser and the satisfaction or waiver of the other conditions to the Company's obligation to consummate the closing of the Proposed Offering under the Purchase Agreement, the issuance of

3

the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares by the Company to the Purchasers is advisable and fair to and in the best interests of the Company and its stockholders;

**FURTHER RESOLVED**, that, subject to the payment by or on behalf of the Purchasers of the purchase price for the Shares and the satisfaction or waiver of the other conditions to the Company's obligation to consummate the closing of the Proposed Offering under the Purchase Agreement, the Company be, and it hereby is, authorized to issue and sell to the Purchasers the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares, and that the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares, when so issued, shall be duly authorized, validly issued, fully paid and non-assessable;

**FURTHER RESOLVED**, that, following the closing of the Proposed Offering, each Authorized Officer, and any person or persons designated and authorized by such Authorized Officer to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed to (1) take all such actions as shall be necessary under the Registration Rights Agreement to prepare and file with the United States Securities and Exchange Commission (the "Commission"), in the name and on behalf of the Company, a registration statement (the "Registration Statement"), under the Securities Act of 1933, as amended, covering the resale of the Shares, the Warrant Shares and all other Registrable Securities (as such term is defined in the Registration Rights Agreement), in accordance with the terms of the Registration Rights Agreement; (2) cause to be prepared and filed, in the name and on behalf of the Company, any amendment or amendments to the Registration Statement and any supplement or supplements thereto as such officer or officers shall deem necessary or desirable or as shall be required by the Commission; and (3) execute the Registration Statement and any amendment or amendments thereto and any supplement or supplements thereof, in the name and on behalf of the Company, such execution to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the officers of the Company be, and each of them hereby is, authorized, empowered and directed to promptly pay or cause to be paid, in the name and on behalf of the Company, all financial, accounting, brokerage, legal, printing, public relations and other fees and expenses incurred by the Company in connection with the Proposed Offering and the registration of the Shares, the Warrant Shares and other Registrable Securities pursuant to the Registration Rights Agreement;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands,

CONFIDENTIAL

R024219

directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 3:45 p.m.

_____
Evan Greebel, acting Secretary

5

R024220

**EXHIBIT A**

**LETTER AGREEMENT**

100111492

**EXHIBIT B**

**FORM OF PURCHASE AGREEMENT**

100111492

R024222

**EXHIBIT C**

**FORM OF WARRANT**

100111492

CONFIDENTIAL

**EXHIBIT D**

**FORM OF REGISTRATION RIGHTS AGREEMENT**

100111492

CONFIDENTIAL

R024224

**EXHIBIT E**

**FORM OF AMENDMENT TO SECURITIES PURCHASE AGREEMENT**

100111492

**EXHIBIT F**

**FORM OF AMENDMENT TO REGISTRATION RIGHTS AGREEMENT**

100111492

CONFIDENTIAL

R024226

Draft

# MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## RETROPHIN, INC.

### November 8, 2013

---

A meeting of the Board of Directors (the "Board") of Retrophin, Inc. (the "Company") took place via teleconference on Friday, November 8, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage, Steven Richardson and Cornelius Golding.  Also present were Marc Panoff, the Company's Chief Financial Officer, Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, and Edward Hackert and Ginger Pagulo of Marcum LLP, the Company's independent registered public accounting firm ("Marcum").

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 1:30 p.m.

Mr. Shkreli began the meeting by asking Mr. Panoff to review the draft of the Company's Quarterly Report on Form 10-Q for the three months ended November 30, 2013 (the "Third Quarter 2013 10-Q").  Mr. Shkreli then asked Marcum to update the Board on the Third Quarter 2013 10-Q.  Marcum delivered a report on the following issues:

- matters required by SAS No. 100;

- the Company's accounting principles & disclosure practices;

- reports required to be submitted under Section 10A of the Securities Exchange Act of 1934;

- any problems or difficulties with management, none reported;  and

- continuation of auditors' independence.

Next, Marcum and management of the Company discussed the remaining open issues with respect to the Third Quarter 2013 10-Q.  Following such discussion, the representatives of Marcum left the meeting at approximately 2:05 p.m.

Next, Mr. Shkreli discussed the status of Jeffrey Paley's nomination to join the Board, noting Dr. Paley's clinical and business background.  Messrs. Aselage and Richardson reported to the Board that they had each interviewed Dr. Paley over the phone and believed that Dr. Paley would be an excellent addition to the Board.

CONFIDENTIAL

R024227

The Board then discussed the need for the Company to establish a stock option plan with which the Company could incentivize its employees. Messrs. Panoff and Greebel noted that the securities laws require that any stock option plan be approved by the Company's stockholders.

Mr. Shkreli then reviewed the status of the Company's proposed royalty agreements with Marek Biestek, a copy of which is attached hereto as Exhibit A (the "Biestek Royalty Agreement") and Andrew Vaino, a copy of which is attached hereto as Exhibit B (the "Vaino Royalty Agreement" and, together with the Biestek Royalty Agreement, the "Royalty Agreements"). Mr. Shkreli noted the contributions that Messrs. Biestek and Vaino had made in the development of RE-024 and that the Royalty Agreements would require the Company to make royalty payments to one or both of Messrs. Biestek and Vaino under certain circumstances. The Board then discussed the terms of the Royalty Agreements and asked management questions about the roles of Messrs. Biestek and Vaino in the creation of RE-024.

Next, Mr. Panoff provided a management update and an update on the financial condition of the Company, noting the Company's cash position and its current liquidity needs. Mr. Panoff also discussed the status of the Securities and Exchange Commission's review of the Company's registration statement on Form S-1 with respect to the resale of securities sold by the Company in private placement transactions during 2013. Mr. Panoff then provided an update regarding the Company's plan to proceed with an underwritten public offering of the Company's common stock. Mr. Panoff noted that he had spoken with several investment banks interested in underwriting such a transaction. The Board then discussed the merits of such an underwritten offering and the benefits of a listing on the NYSE or NASDAQ.

Mr. Shkreli then provided the Board with an update on the development of the Company's product pipeline, noting among other things that he expected the Company's RE-024 study to commence shortly and that he and Mr. Greebel would be traveling the following week to Switzerland to meet with representatives of Novartis Pharma AG to finalize the Company's license of Syntocinon. Mr. Shkreli also updated the Board on the status of the Company's efforts to acquire Transcept Pharmaceuticals, Inc. ("Transcept"). Mr. Shkreli stated that he did not think that other large stockholders of Transcept would be willing to sell their shares of Transcept common stock to the Company for $4.00 per share. Given Transcept's performance, Mr. Shkreli did not believe that the Company should increase its offer above $4.00 per share. Finally, Mr. Shkreli stated that he was confident that the Company could complete an underwritten public offering of the Company's common stock.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR IT IS HEREBY RESOLVED,** that in accordance with Section 3.1 of the Company's Bylaws (the "Bylaws"), the number of directors constituting the Board is increased from four (4) to five (5) directors effective as of November 15, 2013;

**RESOLVED,** that in accordance with Section 3.2 of the Bylaws, that Jeffrey Paley, M.D. is hereby elected as a director of the Corporation effective as of November 15, 2013, to serve until his successor is elected and qualified;

CONFIDENTIAL

R024228

**FURTHER RESOLVED**, that the Royalty Agreements, in each case in, or substantially in, the form, and containing substantially the terms and provisions of, said agreements attached hereto, be, and they hereby are, ratified, affirmed, approved and adopted in all respects; provided, that the Company's adoption of any future royalty agreement shall be subject to the approval of the Board, and that the Chief Executive Officer and Chief Financial Officer of the Company (each, an "Authorized Officer") be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Royalty Agreements, with such changes, modifications or amendments thereto as the Authorized Officer executing the same shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 3:15 p.m.

_____
Evan Greebel, acting Secretary

3

R024229

**EXHIBIT A**

**BIESTEK ROYALTY AGREEMENT**

100111789

CONFIDENTIAL

# EXHIBIT A

## VAINO ROYALTY AGREEMENT

100111789

CONFIDENTIAL                                                                                                          R024231

# MINUTES OF A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## DESERT GATEWAY, INC.

### February 7, 2013

———————————————

A special meeting of the Board of Directors (the "Board") of Desert Gateway, Inc. (the "Company") took place via teleconference on Thursday, February 7, 2013, where all members could hear and be heard.

The following members of the Board were present in person or by telephone: Martin Shkreli, Stephen Aselage and Steven Richardson.  Evan Greebel, of Katten Muchin Rosenman LLP, counsel to the Company, was also present.

Mr. Shkreli acted as Chairman of the meeting and Mr. Greebel acted as Secretary.

Mr. Shkreli confirmed that a quorum was present and called the meeting to order at 1:00 p.m.

Mr. Shkreli updated the Board on a previous private placement, which occurred in January 2013, in which the Company sold an aggregate of approximately 272,000 shares of common stock at a purchase price of $3.00 per share, for an aggregate purchase price of approximately $816,000 (collectively, the "January Transactions").

Mr. Shkreli also updated the Board on the status of a proposed private placement offering (collectively, the "Proposed Offering") of stock and warrants to purchase common stock of the Company.  Mr. Shkreli indicated that that the Company's financial advisor for the transaction had confirmed investor interest in approximately $9,000,000 of securities, and that he hoped to raise more than $10,000,000 in the Proposed Offering.

Mr. Shkreli noted that the agreements and other documents in connection with the Proposed Offering included a Securities Purchase Agreement, a form of which is attached hereto as Exhibit A (the "Purchase Agreement"), Common Stock Purchase Warrants, a form of which is attached hereto as Exhibit B (the "Warrant"), and a Registration Rights Agreement with the Purchasers, a form of which is attached hereto as Exhibit C (the "Registration Rights Agreement", and together with the Purchase Agreement, the Warrant and all exhibits and schedules thereto and any other documents or agreements executed in connection with the Proposed Offering, collectively, the "Transaction Documents").

Mr. Shkreli advised the Board that the Company would sell shares of common stock (the "Shares") in the Proposed Offering at a per Share purchase price equal to 85% of the average of the daily variable weighted average price for the 10 trading day period ending on the day prior to the execution date of the Purchase Agreement, and that the Company currently anticipated such purchase price to be between $3.00 and $3.15 per share.  Mr. Shkreli also explained that each investor in the Proposed Offering would receive Warrants to acquire 50% of the number of

84699753

Shares acquired by such investor (the "Warrant Shares"), with a proposed exercise price equal to 120% of the purchase price for the Shares, or approximately $3.60 to $4.20 per Warrant Share. Furthermore, the Warrants would be exercisable at any time from the date of issuance until the fifth anniversary of the date of issuance and contain customary full-ratchet anti-dilution protections, which would result in a decrease in the exercise price of the Warrant Shares if the Company successfully sold stock at a per share price lower than such exercise price. The Company would also agree to register the Shares and Warrant Shares following the closing of the Proposed Offering.

Next, Mr. Shkreli provided a management update and an update on the financial condition of the Company.

After a discussion of the above matters, the Board unanimously approved and adopted the following resolutions:

**NOW THEREFOR IT IS HEREBY RESOLVED**, that the January Transactions, including the issuance of all shares of common stock of the Company thereunder, be, and they hereby are ratified and approved in all respects;

**FURTHER RESOLVED**, that the Board has determined that the Proposed Offering is advisable and in the best interest of the Company, and that the Proposed Offering be, and it hereby is, adopted and approved in all respects, and that the shares of common stock issued and sold in the January Transactions, when so issued, were duly authorized, validly issued, fully paid and non-assessable;

**FURTHER RESOLVED**, that each of the Purchase Agreement, Warrant and Registration Rights Agreement, in each case in, or substantially in, the form, and containing substantially the terms and provisions of, said agreements attached hereto, and the other Transaction Documents, be, and they hereby are, ratified, affirmed, approved and adopted in all respects, and that, subject to the satisfaction or waiver of the other conditions as set forth in the Purchase Agreement at or prior to the closing of the Proposed Offering, the Chief Executive Officer of the Company (the "Authorized Officer") be, and he hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver all the Transaction Documents, with such changes, modifications or amendments thereto as the Authorized Officer shall approve, the execution and delivery thereof to be conclusive evidence of such approval;

**FURTHER RESOLVED**, that Section 203 of the Delaware General Corporation Law ("DGCL"), shall not apply to Business Combinations (as that term is defined in section 203(c)(3) of the DGCL), between the Company and the investors in the Proposed Offering;

**FURTHER RESOLVED**, that, subject to receipt of the Required Approvals and the satisfaction or waiver of the other conditions as set forth in the Purchase Agreement at or prior to the closing of the Proposed Offering, the performance by the Company of its obligations under the Transaction Documents and the consummation of the Proposed Offering be, and they hereby are, approved and adopted in all respects;

84699753

CONFIDENTIAL

R024233

**FURTHER RESOLVED**, that the execution, delivery and performance by the Company of any other agreements, instruments, certificates or documents necessary or appropriate to consummate the Proposed Offering be, and hereby are, authorized, and the Authorized Officer be, and he hereby is, authorized, empowered and directed, in the name and on behalf of the Company, at the appropriate time or times, as provided for or contemplated by the Transaction Documents, to execute, make oath to, acknowledge and deliver, from time to time, in the name and on behalf of the Company, such other agreements, instruments, certificates or documents and do, or cause to be done,  any or all other things as the Authorized Officer may, in his discretion, deem necessary, appropriate or advisable to consummate the Transactions and to carry out the intent of the foregoing resolutions, the taking of such actions to be conclusive evidence that the same have been authorized and approved by the Board;

**FURTHER RESOLVED**, that the Board hereby determines and declares that, subject to the payment by or on behalf of each investor in the Proposed Offering (each, a "Purchaser" and collectively, the "Purchasers") of the purchase price for the Shares subscribed by such Purchaser and the satisfaction or waiver of the other conditions to the Company's obligation to consummate the closing of the Proposed Offering under the Purchase Agreement, the issuance of the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares by the Company to the Purchasers is advisable and fair to and in the best interests of the Company and its stockholders;

**FURTHER RESOLVED**, that, subject to the payment by or on behalf of the Purchasers of the purchase price for the Shares and the satisfaction or waiver of the other conditions to the Company's obligation to consummate the closing of the Proposed Offering under the Purchase Agreement, the Company be, and it hereby is, authorized to issue and sell to the Purchasers the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares, and that the Shares, the Warrants and, upon exercise of the Warrants, the Warrant Shares, when so issued, shall be duly authorized, validly issued, fully paid and non-assessable;

**FURTHER RESOLVED**, that, following the closing of the Proposed Offering, the Authorized Officer, and any person or persons designated and authorized by the Authorized Officer to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed to (1) take all such actions as shall be necessary under the Registration Rights Agreement to prepare and file with the United States Securities and Exchange Commission (the "Commission"), in the name and on behalf of the Company, a registration statement (the "Registration Statement"), under the Securities Act of 1933, as amended, covering the resale of the Shares, the Warrant Shares and all other Registrable Securities (as such term is defined in the Registration Rights Agreement), in accordance with the terms of the Registration Rights Agreement; (2) cause to be prepared and filed, in the name and on behalf of the Company, any amendment or amendments to the Registration Statement and any supplement or supplements thereto as such officer or officers shall deem necessary or desirable or as shall be required by the Commission; and (3) execute the Registration Statement and any amendment or amendments thereto and any supplement or supplements thereof, in the name and on behalf of the Company, such execution to be conclusive evidence of such approval;

84699753

CONFIDENTIAL

R024234

**FURTHER RESOLVED**, that the officers of the Company be, and each of them hereby is, authorized, empowered and directed to promptly pay or cause to be paid, in the name and on behalf of the Company, all financial, accounting, brokerage, legal, printing, public relations and other fees and expenses incurred by the Company in connection with the Proposed Offering and the registration of the Shares, the Warrant Shares and other Registrable Securities pursuant to the Registration Rights Agreement;

**FURTHER RESOLVED,** that any and all actions heretofore taken by any officer of the Company and of any person or persons designated and authorized to act by any officer of the Company that would have been authorized by the foregoing resolutions, be, and they hereby are, ratified and approved in all respects; and

**FURTHER RESOLVED,** that each of the officers of the Company, and any person or persons designated and authorized to do and perform or cause to be done and performed any acts in the name and on behalf of the Company, be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all other acts, to pay or cause to be paid on behalf of the Company all related costs and expenses and to execute and deliver or cause to be executed and delivered, such other notices, requests, demands, directions, consents, approvals, orders, applications, agreements, instruments, certificates, undertakings, supplements, amendments, further assurances or other agreements or communications of any kind, in the name and on behalf of the Company or otherwise, as such officer or such authorized person may deem necessary, advisable or appropriate to effectuate the intent and purposes of the foregoing resolutions or in furtherance of the foregoing resolutions, the taking of such actions to be conclusive evidence of such approval.

There being no further business to come before the Board in this meeting, the meeting was adjourned at 2:00 p.m.

_____
Evan Greebel, acting Secretary

84699753

4

# EXHIBIT A

# FORM OF PURCHASE AGREEMENT

84699753

R024236

**EXHIBIT B**

**FORM OF WARRANT**

84699753

R024237

**EXHIBIT C**

**FORM OF REGISTRATION RIGHTS AGREEMENT**

84699753

CONFIDENTIAL

R024238