# ATTACHMENT B

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered by and between LINDSAY A. ROSENWALD, M.D. ("**Rosenwald**"), and MARTIN SHKRELI ("**Shkreli**"), MSMB CAPITAL MANAGEMENT, LP, ("**MSMB**"), and RETROPHIN, INC. ("**Retrophin**"), a Delaware corporation.  Rosenwald, Shkreli, MSMB, and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement).

WHEREAS, MSMB, is a New York limited partnership with its principal place of business in New York, New York;

WHEREAS, Shkreli is a founder and managing partner of MSMB;

WHEREAS, Shkreli is the founder, President and Chief Executive Officer of Retrophin;

WHEREAS, a dispute exists between the Parties and the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing disputes and claims between them, with neither admitting the allegations of the other.

### TERMS OF SETTLEMENT AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

1.      Settlement Payment.  Shkreli agrees to deliver or cause to be delivered to Rosenwald the total amount of **Eighty Thousand (80,000)** shares of common stock, par value $0.0001 per share (the "**Shares**") of Retrophin which is freely-trading and not subject to restriction on transfer as full and final satisfaction for any and all claims by Rosenwald against Shkreli, MSMB, or Retrophin.  The Shares shall be delivered to Rosenwald on the date hereof. Rosenwald agrees that immediately following his receipt of the Shares that he will deliver any common stock or duly executed stock powers of Retrophin that he previously received to Shkreli.

2.      Ownership and Delivery of the Stock.  Shkreli, MSMB and Retrophin represent and warrant to Rosenwald as follows:  Shkreli, MSMB and Retrophin have the full right, power, and authority to enter into and to perform this Agreement and all other agreements, certificates, and documents executed or delivered, or to be executed or delivered, by him in connection with this Agreement.  Shkreli, MSMB and Retrophin represent and warrant to Rosenwald that on the date of delivery of the Shares to Rosenwasld, Rosenwald will receive good title to the Stock, fully paid, non-assessable, free and clear of any and all liens, mortgages, pledges, security interests, options, restrictions, charges, prior assignments, agreements, claims, and encumbrances of any kind whatsoever. Rosenwald represents and warrants to Shkreli, MSMB and Retrophin that he has not sold, pledged, encumbered or otherwise transferred any shares of common stock that he previously received from Shkreli or MSMB.

1

GOVERNMENT
EXHIBIT
**51**
15 CR 637 (KAM) (EG)

CONFIDENTIAL

R011454

3.    No Proceedings. As of the date hereof, Shkreli, MSMB and Retrophin represent and warrant to Rosenwald as follows: There are no judgments, suits, actions or proceedings pending or threatened against Shkreli, MSMB and/or Retrophin which in any way seek prevent, enjoin, alter or delay the transactions contemplated hereby.

4.    Brokerage. The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby. Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

5.    Indemnification by Shkreli, MSMB and Retrophin. Shkreli, MSMB and Retrophin covenant to indemnify, defend and hold harmless Rosenwald, Rosenwald's representatives and any heirs of Rosenwald from and against any and all claims, demands, actions, proceedings and judgments against, and any and all fees, penalties, fines, losses, damages, costs, expenses and other liabilities (including reasonable attorneys' fees and costs) sustained or incurred by any of them which arise from, relate to or result from Shkreli, MSMB and Retrophin's breach of their representations, warranties, covenants and obligations under this Agreement.  Should any such claim, demand, lawsuit or proceeding arise or be asserted in any way whatsoever related thereto, Shkreli, MSMB and Retrophin shall defend Rosenwald from any and all costs, expenses, or liability including, but not limited to, the cost of any settlement or judgment made or rendered against Rosenwald, together with all costs or expenses incurred in connection with any such claim, demand, or lawsuit, including reasonable attorney's fees.

6.    Conditional Release by Rosenwald. The following release by Rosenwald is expressly conditioned upon and shall not be effective unless and until the occurrence of the delivery of the Shares identified in Paragraph 1 of this Agreement to Rosenwald. In the event the Shares are not delivered to Rosenwald in accordance with Paragraph 1 of this Agreement the following release by Rosenwald shall not become effective and shall be void *ab initio*. In consideration of the delivery of the Shares to Rosenwald, and based upon the mutual promises contained herein and other good and valuable consideration, Rosenwald on his behalf and on behalf of all of his heirs, assigns, agents, legal representatives and personal representatives (collectively, the "**Rosenwald Releasors**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Shkreli, MSMB and Retrophin, and each of its and their officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "**Shkreli Releasees**"), of any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature, that Rosenwald now has, or which it may have against the

2

Shkreli Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Shkreli Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Rosenwald, on behalf of himself and the Rosenwald Releasors, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims. Rosenwald agrees that, as a further consideration and inducement for this compromise settlement, this Agreement shall apply to all unknown and unanticipated injuries or damages resulting from the event described above, as well as to those now disclosed.

7.    Release by Shkreli, MSMB and Retrophin.  In consideration of the delivery of the Shares to Rosenwald, and based upon the mutual promises contained herein and other good and valuable consideration, Shkreli, MSMB and Retrophin on their behalf and on behalf of all of their officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, legal representatives personal representatives, and any other person, firm or corporation (collectively, the "**Shkreli Releasors**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Rosenwald, and all of partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "**Rosenwald Releasees**"), of any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature, that the Shkreli Releasors now have, or which they may have against the Rosenwald Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees. The Rosenwald Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. The Shkreli Releasors understand and acknowledge the significance and consequence of this release, including the specific release of unknown claims. The Shkreli Releasors agree that, as a further consideration and inducement for this compromise settlement, this Agreement shall apply to all unknown and unanticipated injuries or damages resulting from the event described above, as well as to those now disclosed.

8.    No Admissions of Liability.  The Parties understand and agree that the delivery of the Shares and this Agreement is a compromise made to terminate further controversy respecting all claims for damages that the Parties have asserted, that the compromise is not to be construed as admissions of liability on the part of any Party, and the Parties deny liability and intend merely to avoid litigation.

9.    Voluntary Act.  The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

**CONFIDENTIAL**                                                                                              R011456

10.     Authority.   The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

11.     Entire Agreement.  This Agreement represents the entire and final understanding between the Parties with respect to the controversies herein compromised and settled, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties.  This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties. There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement.  The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

12.     Agreement Product of Negotiation; No Drafter.  The terms of this Agreement are the result of negotiation among the Parties.  Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

13.     Attorneys' Fees.  Should any of the Parties retain the services of an attorney to enforce any of the terms of the Settlement Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

14.     Governing Law.  All questions concerning this Agreement, including but not limited to the execution, performance, construction and enforcement of this Agreement, shall be governed by and resolved in accordance with the laws of the State of New York without application of the principles of conflicts of laws, and the Parties consent that jurisdiction in the courts of New York shall be proper for the resolution of any dispute arising from or concerning this Agreement.

15.     Construction and Severability.  This Agreement shall be construed and interpreted to effectuate the intent of the Parties, which is to resolve completely those claims and disputes between the Parties, as more fully described herein.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining

4

CONFIDENTIAL

R011457

provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

16.  No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy.  The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have.  Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

17.  Survival and Benefits.  The warranties, representations and covenants contained in this Agreement shall survive the closing herein.  This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

18.  Post Execution Cooperation.  The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

19.  No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy.  The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have.  Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

20.  Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

CONFIDENTIAL                                                                R011458

21.     <u>Counterparts</u>.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

22.     <u>Headings.</u>  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.


**[SIGNATURE PAGE FOLLOWS]**

**CONFIDENTIAL**                                                                                    **R011459**

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the last date below written.

By:_____

Lindsay A. Rosenwald, Individually

Date: _____

Martin Shkreli, Individually

Date: _3/13/13_____

**MSMB CAPITAL MANAGEMENT, LP**

By:_____

Martin Shkreli, Managing Partner

Date: _3/13/13_____

**RETROPHIN, INC.**

By:_____

Martin Shkreli, President

Date: _3 /13/13_____

7

CONFIDENTIAL

R011460

| | |
|---|---|
| **From:** | **Greebel, Evan L. <evan.greebel@kattenlaw.com>** |
| **Sent:** | **Friday, April 26, 2013 4:28 PM** |
| **To:** | **Sarah Hassan (sarah.hassan@dynagrowcapital.com)** |
| **Cc:** | **Martin Shkreli (Martin@retrophin.com)** |
| **Subject:** | **FW: Settlement and Release Agreement** |
| **Attachments:** | **doc01328220130426110158.pdf** |

Attached is the duly executed settlement agreement.


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

```
=======================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal
Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot
be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the
taxpayer.
=======================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the
exclusive
use of the individual or entity to whom it is addressed and may contain information that
is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.
If you
are not the intended recipient, you are hereby notified that any viewing, copying,
disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please
notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the
original
message without making any copies.
=======================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership
that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
=======================================================
```

GOVERNMENT
EXHIBIT
**52**
15 CR 637 (KAM) (EG)

R018164

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered into as of April 25, 2013 by and among SARAH HASSAN, solely in her individual capacity ("**Releasor**"), MARTIN SHKRELI, solely in his individual capacity ("**Shkreli**"), MSMB CAPITAL MANAGEMENT, LP ("**MSMB Capital LP**"), a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC ("**MSMB Capital LLC**"), a Delaware limited liability company, MSMB HEALTHCARE LP ("**MSMB Healthcare**"), a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC ("**MSMB Investors**"), a Delaware limited liability company, MSMB HEALTHCARE MANAGEMENT LLC ("**MSMB Management**" and, together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and MSMB Investors, the "**MSMB Entities**"), a Delaware limited liability company, and RETROPHIN, INC. ("**Retrophin**"), a Delaware corporation. Releasor, Shkreli, the MSMB Entities and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

**WHEREAS,** Shkreli is the managing member of MSMB Capital LLC, MSMB Investors and MSMB Management;

**WHEREAS,** MSMB Investors is the general partner of MSMB Healthcare;

**WHEREAS,** MSMB Capital LLC is the general partner of MSMB Capital LP;

**WHEREAS,** Shkreli is the President and Chief Executive Officer of Retrophin;

**WHEREAS,** Releasor made a $300,000 personal investment in MSMB Capital LP in January 2011 (the "**Investment**");

**WHEREAS,** each of the MSMB Entities intends to liquidate and wind up (the "**Liquidation**"); and

**WHEREAS,** in connection with the Liquidation, the Parties are entering into this Agreement in order to settle and compromise fully and finally certain claims as provided herein.

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

    1.    <u>Payment Terms</u>.  Retrophin agrees to deliver or cause to be delivered to Releasor the total amount of $400,000 in cash upon execution and delivery of this Agreement (the "**Liquidation Amount**") as full and final satisfaction for any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "**Claims**"), including all costs, expenses and attorneys' fees related thereto,

84709506v3

1

CONFIDENTIAL

R018165

which Releasor now has, or which she may have, against Shkreli, Retrophin or any MSMB
Entity from the beginning of time up to, through, and including the date of this Agreement and in
exchange for any interest Releasor may have in MSMB Capital LP as of the date of this
Agreement.

2.     Ownership and Delivery of the Shares.  Shkreli, Retrophin and the MSMB
Entities represent and warrant to Releasor on the date of this Agreement that (i) Releasor has been
validly issued, and is the record and beneficial owner of and has good and valid title to, 58,306
shares of common stock, par value $0.0001 per share (the "**Shares**") of Retrophin, and (ii) the
Shares are fully paid, non-assessable, and free and clear of any and all liens, mortgages, pledges,
security interests, options, restrictions, charges, prior assignments, agreements, claims, and
encumbrances of any kind whatsoever, except for liens, mortgages, pledges, security interests,
options, restrictions, charges, prior assignments, agreements, claims, and encumbrances created
due to the action of Releasor.

3.     Releasor Representations.  Releasor hereby represents and warrants that the
Shares are being acquired solely for investment for Releasor's own account, not as a nominee or
agent and not with a view to the resale or distribution of any part thereof, and Releasor has no
present intention of selling, granting a participation in, or otherwise distributing the same.
Releasor understands that the Shares have not been registered under the Securities Act of 1933,
as amended (the "**Securities Act**") by reason of a specific exemption from the registration
provisions of the Securities Act that depends upon, among other things, the bona fide nature of
the investment intent and the accuracy of Releasor's representations as expressed herein.
Releasor understands that the Shares are "restricted securities" under applicable U.S. federal and
state securities laws and that, pursuant to these laws, Releasor must hold the Shares indefinitely
unless they are registered with the Securities and Exchange Commission and qualified by state
authorities, or an exemption from such registration and qualification requirements is available.
Releasor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated
under the Securities Act.

4.     Brokerage. The Parties represent and warrant to each other that they have not dealt
with any broker or finder in connection with this Agreement or the transactions contemplated
hereby, and no broker or any other person is entitled to receive any brokerage commission,
finder's fee or similar compensation in connection with this agreement or the transactions
contemplated hereby.  Each of the Parties shall indemnify and hold the other harmless from and
against all liability, claim, loss, damage or expense, including reasonable attorneys' fees,
pertaining to any broker, finder or other person with whom such Party has dealt.

5.     Release.

a.  Subject to and conditioned upon the delivery of the Liquidation Amount to
Releasor, and based upon the mutual promises contained herein and other good and valuable
consideration, Releasor, on her behalf and on behalf of all of her heirs, assigns, agents, legal
representatives and personal representatives (collectively, the "**Releasor Parties**"), hereby fully
and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever

84709506v3

2

discharges Shkreli, Retrophin and each MSMB Entity and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "**Releasees**"), of any and all Claims that Releasor now has, or which she may have, against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses related thereto. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Releasor, on behalf of herself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims. In the event that Retrophin does not pay to Releasor the Liquidation Amount as provided in this Agreement, this release shall be null and void and of no force and effect.

b.   Based upon the mutual promises contained herein and other good and valuable consideration, each of Shkreli and each MSMB Entity, on its behalf and on behalf of all of the Releasees, hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges the Releasor Parties of any Claims that any Releasee now has, or which it may have, against the Releasor Parties from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses related thereto. The Releasor Parties shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Each of Shkreli and each MSMB Entity, on behalf of itself and the Releasees, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

6.   <u>Voluntary Act</u>.  The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

7.   <u>Authority</u>.   The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

8.   <u>Entire Agreement</u>. This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties. This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties. There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement. The Parties acknowledge and agree that in executing this

CONFIDENTIAL

Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

9. <u>Agreement Product of Negotiation; No Drafter</u>. The terms of this Agreement are the result of negotiation among the Parties. Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

10. <u>Attorneys' Fees</u>. Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

11. <u>Governing Law; Arbitration; Waiver of Jury Trial</u>. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party. Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity. Any court of competent jurisdiction may enter judgment upon the award. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 11.

84709506v3

CONFIDENTIAL                                                                                    R018168

12.     Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

13.     No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy.  The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have. Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

14.     Survival and Benefits.  The warranties, representations and covenants contained in this Agreement shall survive the closing herein.  This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

15.     Post Execution Cooperation.  The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement and the ownership by Releasor of the Shares. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

16.     Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

17.     Counterparts.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

84709506v3

CONFIDENTIAL                                                                                        R018169

18.    Headings.  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

19.    Confidentiality.  This Agreement, and any other document relating or referring to the Liquidation or the terms of the release herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties' respective businesses.  Other than a general statement that the Liquidation has occurred, without providing any details, including the Liquidation Amount, then, without limiting any of the foregoing, the Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other document relating or referring to the Liquidation and/or the terms of the release to any person or entity except as necessary and required by law, regulation, tax filing or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement promptly in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

20.    Non-Disparagement.  It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties with respect to the Investment.


**[SIGNATURE PAGE FOLLOWS]**


84709506v3

6

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.

_____
Sarah Hassan, Individually

_____
Martin Shkreli, Individually

**RETROPHIN, INC.**

By: _____
Name: Martin Shkreli
Title: Chief Executive Officer

**MSMB CAPITAL MANAGEMENT LLC**

By: _____
Name: Martin Shkreli
Title: Managing Member

**MSMB CAPITAL MANAGEMENT LP**
By MSMB Capital Management LLC, its general partner

By: _____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE LP**
By MSMB Healthcare Investors LLC, its general partner

By: _____
Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

84712676

CONFIDENTIAL

R018171

**MSMB   HEALTHCARE   INVESTORS
LLC**

By: _____

Name: Martin Shkreli

Title: Managing Member


**MSMB HEALTHCARE MANAGEMENT
LLC**

By: _____

Name: Martin Shkreli

Title: Managing Member


*[Signature Page to Settlement and Release Agreement]*

84712676

| | |
|---|---|
| **From:** | Greebel, Evan L. |
| **Sent:** | Wednesday, May 01 2013 10:39:42 AM |
| **To:** | Spencer Spielberg (spencer.spielberg@yahoo.com) |
| **Bcc:** | Evan L. Greebel (evan.greebel@kattenlaw.com) |
| **Subject:** | Executed Settlement Agreement |
| **Attachments:** | doc01351720130430180017.pdf |

Hi Spencer, attached is the executed settlement agreement.

Evan


EVAN L. GREEBEL
Partner
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

GOVERNMENT
EXHIBIT
**53**
15 CR 637 (KAM) (EG)

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered into as of April 30, 2013 by and among SPENCER SPIELBERG ("**Releasor**"), MARTIN SHKRELI ("**Shkreli**"), MSMB CAPITAL MANAGEMENT, LP ("**MSMB Capital LP**"), a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC ("**MSMB Capital LLC**"), a Delaware limited liability company, MSMB HEALTHCARE LP ("**MSMB Healthcare**"), a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC ("**MSMB Investors**"), a Delaware limited liability company, MSMB HEALTHCARE MANAGEMENT LLC ("**MSMB Management**" and, together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and MSMB Investors, the "**MSMB Entities**"), a Delaware limited liability company, and RETROPHIN, INC. ("**Retrophin**"), a Delaware corporation. Releasor, Shkreli, the MSMB Entities and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

**WHEREAS,** Shkreli is the managing member of MSMB Capital LLC, MSMB Investors and MSMB Management;

**WHEREAS,** MSMB Investors is the general partner of MSMB Healthcare;

**WHEREAS,** MSMB Capital LLC is the general partner of MSMB Capital LP;

**WHEREAS,** Shkreli is the President and Chief Executive Officer of Retrophin;

**WHEREAS,** each of the MSMB Entities intends to liquidate and wind up (the "**Liquidation**"); and

**WHEREAS,** in connection with the Liquidation, the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing or future disputes and claims that Releasor may have against Shkreli, Retrophin, any of the MSMB Entities or their respective affiliates. The terms of this Agreement shall only be effective upon the delivery of the Shares (as defined below) to the Releasor.

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

1.     <u>Payment Terms</u>.  Retrophin (i) paid $25,000 (the "**Payment**") via wire transfer of immediately available funds to the Releasor on or about March 14, 2013 and (ii) agrees to deliver or cause to be delivered, by June 1, 2013, to Releasor the total amount of 6,000 shares of common stock, par value $0.0001 per share (the "**Shares**" and collectively with the Payment, the "**Liquidation Amount**") of Retrophin, as full and final satisfaction for any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every

1

GR_0001190

kind and nature (collectively, "**Claims**"), including all costs, expenses and attorneys' fees related thereto, which Releasor now has, or which it may have against Shkreli, Retrophin or any MSMB Entity from the beginning of time up to, through, and including the date of this Agreement. The Liquidation Amount shall be delivered to Releasor on the date hereof. The Releasor agrees that any interests that it may have in any of the MSMB Entities are immediately cancelled, that the Releasor is not entitled to any payments for such interests and that no amounts or distributions are owed or deemed to be owed for such interests.

2.    Ownership and Delivery of the Shares. Shkreli, Retrophin and the MSMB Entities represent and warrant to Releasor that on the date of delivery of the Shares to Releasor, Releasor will receive good title to the Shares, fully paid, non-assessable, free and clear of any and all liens, mortgages, pledges, security interests, options, restrictions, charges, prior assignments, agreements, claims, and encumbrances of any kind whatsoever.

3.    Releasor Representations. Releasor hereby represents and warrants that the Shares are being acquired solely for investment for Releasor's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and Releasor has no present intention of selling, granting a participation in, or otherwise distributing the same. Releasor understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Releasor's representations as expressed herein. Releasor understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Releasor must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Releasor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

4.    Brokerage. The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby. Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

5.    Release. In consideration of the delivery of the Liquidation Amount to Releasor, and based upon the mutual promises contained herein and other good and valuable consideration, Releasor, on its behalf and on behalf of all of its heirs, successors assigns, agents, legal representatives and personal representatives (collectively, the "**Releasor Parties**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Shkreli, Retrophin, each MSMB Entity and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated

2

GR_0001191

corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the **"Releasees"**), of any and all Claims that Releasor now has, or which it may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Releasor, on behalf of itself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

6.     Voluntary Act. The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

7.     Authority.   The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

8.     Entire Agreement.  This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties. This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties.  There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement.  The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

9.     Agreement Product of Negotiation; No Drafter.  The terms of this Agreement are the result of negotiation among the Parties. Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

10.     Attorneys' Fees.  Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

3

GR_0001192

11.    Governing Law; Arbitration; Waiver of Jury Trial.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses.  The Parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity.  Any court of competent jurisdiction may enter judgment upon the award.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 11.

12.    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

13.    No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy.  The rights and remedies specified herein are cumulative and

4

not exclusive of each other or of any rights or remedies which any Party would otherwise have. Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

14.   Survival and Benefits.  The warranties, representations and covenants contained in this Agreement shall survive the closing herein.  This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

15.   Post Execution Cooperation.  The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

16.   Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

17.   Counterparts.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

18.   Headings.  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

19.   Confidentiality.  This Agreement, and any other document relating or referring to the Liquidation or the terms of the release herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties' respective businesses.  Other than a general statement that the Liquidation has occurred, without providing any details, including the Liquidation Amount, then, without limiting any of the foregoing, the Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other document relating or referring to the Liquidation and/or the terms of the release to any person or entity except as necessary and required by law, regulation or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement immediately in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making

known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

20.   <u>Non-Disparagement</u>.  It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties.

**[SIGNATURE PAGE FOLLOWS]**

847131264\3

GR_0001195

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.

Spencer Spielberg

Martin Shkreli, Individually

**RETROPHIN, INC.**

By:

Name: Martin Shkreli

Title: Chief Executive Officer

**MSMB CAPITAL MANAGEMENT LLC**

By:

Name: Martin Shkreli

Title: Managing Member

**MSMB CAPITAL MANAGEMENT LP**

By MSMB Capital Management LLC, its general partner

By:

Name: Martin Shkreli

Title: Managing Member

**MSMB HEALTHCARE LP**

By MSMB Healthcare Investors LLC, its general partner

By:

Name: Martin Shkreli

Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

**MSMB   HEALTHCARE   INVESTORS
LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member


**MSMB HEALTHCARE MANAGEMENT
LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

| From: | Greebel, Evan L. |
|---|---|
| **Sent:** | Tuesday, May 14 2013 11:06:59 AM |
| **To:** | David G Trachtenberg (dtrachtenberg@trflaw.com) |
| **Subject:** | Executed Settlement Agreement |
| **Attachments:** | Kocher Settlement.pdf |

Attached is the duly executed settlement agreement; you should also be receiving the wire also


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

GOVERNMENT
EXHIBIT
**54**
15 CR 637 (KAM) (EG)

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered into as of May 13, 2013 by and among Richard Kocher ("**Releasor**"). MARTIN SHKRELI ("**Shkreli**"), MSMB CAPITAL MANAGEMENT, LP ("**MSMB Capital LP**"), a Delaware limited partnership. MSMB CAPITAL MANAGEMENT LLC ("**MSMB Capital LLC**"), a Delaware limited liability company, MSMB HEALTHCARE LP ("**MSMB Healthcare**"), a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC ("**MSMB Investors**"), a Delaware limited liability company. MSMB HEALTHCARE MANAGEMENT LLC ("**MSMB Management**" and, together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and MSMB Investors, the "**MSMB Entities**"), a Delaware limited liability company, and RETROPHIN, INC. ("**Retrophin**"). a Delaware corporation. Releasor, Shkreli, the MSMB Entities and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

**WHEREAS,** Shkreli is the managing member of MSMB Capital LLC, MSMB Investors and MSMB Management;

**WHEREAS,** MSMB Investors is the general partner of MSMB Healthcare;

**WHEREAS,** MSMB Capital LLC is the general partner of MSMB Capital LP;

**WHEREAS,** Shkreli is the President and Chief Executive Officer of Retrophin,

**WHEREAS,** each of the MSMB Entities intends to liquidate and wind up (the "**Liquidation**"), and

**WHEREAS,** in connection with the Liquidation, the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing or future disputes and claims that Releasor may have against Shkreli, Retrophin, any of the MSMB Entities or their respective affiliates.

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration. the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

1.    Payment Terms. The MSMB Entities or Retrophin (individually or collectively, the "**Payor**") agree to deliver or cause to be delivered to Releasor the total amount of one hundred twenty three thousand seven hundred eleven dollars ($123,711) (the "**Cash Payment**") and Shkreli agrees to deliver or cause to be delivered to the Releasor the total amount of **Forty Seven Thousand One Hundred Twenty Eight (47,128)** shares of common stock, par value $0.0001 per share (the "**Shares**" and collectively with the Cash Payment, the "**Liquidation Amount**") of Retrophin which are freely-tradable and which are not and to the best of the Company's knowledge will not be subject to restriction on transfer as full and final satisfaction for any and all claims, obligations, liabilities, promises. agreements, controversies, damages, actions, causes of action. suits, judgments, rights, demands, losses.

1

84715779

debts, contracts, commitments or expenses of every kind and nature (collectively, "**Claims**"), including all costs, expenses and attorneys' fees related thereto, which Releasor now has, or which it may have against Shkreli, Retrophin or any MSMB Entity from the beginning of time up to, through, and including the date of this Agreement. The Cash Payment shall be delivered to Releasor simultaneously with the exchange of executed copies of this Agreement. The Shares shall be delivered to Releasor on or before May 24, 2013; provided, however, that such period may be extended to June ___, 2013 at the election of Shkreli or the MSMB Entities. Releasor agrees that immediately following his receipt of the Shares he will deliver 23,564 shares of the restricted common stock of Retrophin ("**Releasor Stock**") that he previously received along with a duly executed stock power (if necessary) to the MSMB Entities. The Parties agree that any interests that Releasor may have in any of the MSMB Entities are immediately cancelled, that the Releasor is not entitled to any payments for such interests, that no amounts or distributions are owed or deemed to be owed for such interests and that Releasor has no further obligations to, in or arising out of his ownership of any of the MSMB Entities.

2.      Delivery of the Shares. Shkreli, Retrophin and the MSMB Entities represent and warrant to Releasor that on the date of delivery of the Shares to Releasor, Releasor will receive good title to the Shares, fully paid, non-assessable, free and clear of any and all liens, mortgages, pledges, security interests, options, restrictions, charges, prior assignments, agreements, claims, and encumbrances of any kind whatsoever.

3.      Releasor Representations. Releasor represents and warrants that as of the date that the Releasor Stock is delivered to the MSMB Entities, the MSMB Entities will receive good title to the Releasor Stock, fully paid and non-assessable to the best of Releasor's knowledge, and free and clear of any and all liens, mortgages, pledges, security interests, options, restrictions, charges, prior assignments, agreements, claims, and encumbrances of any kind whatsoever.

4.      Brokerage. The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby. Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

5.      Release.

a.      In consideration of the delivery of the Liquidation Amount to Releasor, and based upon the mutual promises contained herein and other good and valuable consideration, Releasor, on his behalf and on behalf of all of his heirs, successors assigns, agents, legal representatives and personal representatives (collectively, the "**Releasor Parties**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Shkreli, Retrophin, each MSMB Entity and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or

84715779

chargeable with responsibility or liability (collectively, the "**Releasees**"), of any and all Claims that Releasor now has, or which he may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, including any claim for attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Releasor, on behalf of itself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims. If the Releasor does not receive the Liquidation Amount this Release shall be *void ab initio* and of no further force and effect.

b.   Based upon the mutual promises contained herein and other good and valuable consideration, each of Shkreli, Retrophin and each MSMB Entity, on his or its behalf and on behalf of all of the Releasees, hereby fully and expressly, knowingly, voluntarily, and unconditionally releases acquits and forever discharges the Releasor Parties of any Claims that any Releasee now has, or which it may have, against the Releasor Parties from the beginning of time up to, through, and including the date of this Agreement, including any claim for attorneys' fees, costs or expenses related thereto. The Releasor Parties shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Each of Shkreli, Retrophin and each MSMB Entity, on behalf of himself, itself and the Releasees, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

6.   <u>Voluntary Act</u>. The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

7.   <u>Authority</u>.   The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

8.   <u>Entire Agreement</u>. This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties. This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties. There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement. The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

9.   <u>Agreement Product of Negotiation; No Drafter</u>. The terms of this Agreement are the result of negotiation among the Parties. Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

3

GR_0001257

10.    Attorneys' Fees.  Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

11.    Governing Law; Arbitration; Waiver of Jury Trial.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses unless the arbitrator rules otherwise, which he may do if he determines that an award of attorneys fees and expenses to one side or the other is appropriate and just  The Parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive.  All such arbitral controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity.  Any court of competent jurisdiction may enter judgment upon the award.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE. THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 11.

12.    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

84715779

13.     No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy.  The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have.  Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

14.     Survival and Benefits.  The warranties, representations and covenants contained in this Agreement shall survive the closing herein.  This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

15.     Post Execution Cooperation.  The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement.  Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

16.     Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity with respect to matters that are not arbitral to enforce this Agreement, including but not limited to seeking specific performance.

17.     Counterparts.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

18.     Headings.  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

19.     Confidentiality.  This Agreement, and any other document relating or referring to this Agreement or the terms of the releases herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties' respective businesses.  Other than a general statement that the Agreement has been made, without providing any details, including the Liquidation Amount, then, without limiting any of the foregoing, the Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other

5

GR_0001259

document relating or referring to this Agreement and/or the terms of the releases herein to any person or entity except as necessary and required by law, regulation or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement immediately in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

20.     Non-Disparagement.  It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties.

**[SIGNATURE PAGE FOLLOWS]**

6

GR_0001260

MSMB    HEALTHCARE    INVESTORS
LLC

By: _____

Name: Martin Shkreli
Title: Managing Member

MSMB HEALTHCARE MANAGEMENT
LLC

By: _____

Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written

_____
Ricard Kocher

_____
Martin Shkreli, Individually

**RETROPHIN, INC.**

By: _____
Name: Martin Shkreli
Title: Chief Executive Officer

**MSMB CAPITAL MANAGEMENT LLC**

By: _____
Name: Martin Shkreli
Title: Managing Member

**MSMB CAPITAL MANAGEMENT LP**
By MSMB Capital Management LLC, its general partner

By _____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE LP**
By MSMB Healthcare Investors LLC, its general partner

By: _____
Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

**From:**        Greebel, Evan L.
**Sent:**        Thursday, May 30 2013 3:16:16 PM
**To:**          traderexp@aol.com
**Bcc:**         Evan L. Greebel (evan.greebel@kattenlaw.com)
**Subject:**     Settlement Agreement
**Attachments:** David Geller Settlement and Release Agreement.pdf


Hi David, attached is the mutually executed settlement agreement.

Evan


EVAN L. GREEBEL
Partner
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

GOVERNMENT
EXHIBIT
**55**
15 CR 637 (KAM) (EG)

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered into as of May 𝟹𝟶, 2013 by and among DAVID GELLER ("**Releasor**"), MARTIN SHKRELI ("**Shkreli**"), MSMB CAPITAL MANAGEMENT, LP ("**MSMB Capital LP**"), a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC ("**MSMB Capital LLC**"), a Delaware limited liability company, MSMB HEALTHCARE LP ("**MSMB Healthcare**"), a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC ("**MSMB Investors**"), a Delaware limited liability company, MSMB HEALTHCARE MANAGEMENT LLC ("**MSMB Management**" and, together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and MSMB Investors, the "**MSMB Entities**"), a Delaware limited liability company, and RETROPHIN, INC. ("**Retrophin**"), a Delaware corporation.  Releasor, Shkreli, the MSMB Entities and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

 **WHEREAS,** Shkreli is the managing member of MSMB Capital LLC, MSMB Investors and MSMB Management;

 **WHEREAS,** MSMB Investors is the general partner of MSMB Healthcare;

 **WHEREAS,** MSMB Capital LLC is the general partner of MSMB Capital LP;

 **WHEREAS,** Shkreli is the President and Chief Executive Officer of Retrophin;

 **WHEREAS,** each of the MSMB Entities intends to liquidate and wind up (the "**Liquidation**"); and

 **WHEREAS,** in connection with the Liquidation, the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing or future disputes and claims that Releasor may have against Shkreli, Retrophin, any of the MSMB Entities or their respective affiliates.  The terms of this Agreement shall only be effective upon the delivery of the Liquidation Amount (as defined below) to the Releasor.

 **NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

 1. Payment Terms.  The MSMB Entities or Retrophin (individually or collectively, the "**Payor**") agree to deliver or cause to be delivered to Releasor the total amount of three hundred thousand dollars ($300,000) (the "**Payment**") following the execution of this Agreement and Releasor previously received 30,514 shares of common stock of Retrophin from the MSMB Entities (the "**Shares**" and collectively with the Payment, the "**Liquidation Amount**"), as full and final satisfaction for any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "**Claims**"), including all costs, expenses and attorneys' fees related thereto, which Releasor now has, or which it may have against Shkreli, Retrophin or any MSMB Entity from the beginning of time up to, through, and including the

1

date of this Agreement.  The Releasor agrees that any interests that it may have in any of the MSMB Entities are immediately cancelled, that the Releasor is not entitled to any payments for such interests and that no amounts or distributions are owed or deemed to be owed for such interests.

2.    Releasor Representations.  Releasor hereby represents and warrants that the Shares were acquired solely for investment for Releasor's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and Releasor has no present intention of selling, granting a participation in, or otherwise distributing the same.  Releasor understands that the Shares have not been registered under the Securities Act of 1933, as amended (the **"Securities Act"**) by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Releasor's representations as expressed herein.  Releasor understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Releasor must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  Releasor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.    Brokerage.  The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby.  Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

4.    Release.  In consideration of the delivery of the Liquidation Amount to Releasor, and based upon the mutual promises contained herein and other good and valuable consideration, Releasor, on its behalf and on behalf of all of its heirs, successors assigns, agents, legal representatives and personal representatives (collectively, the **"Releasor Parties"**), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Shrkeli, Retrophin, each MSMB Entity and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the **"Releasees"**), of any and all Claims that Releasor now has, or which it may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses.  The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement.  Releasor, on behalf of itself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

5.    Voluntary Act.  The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

GR_0001291

6.      Authority.   The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

7.      Entire Agreement.   This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior and contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties.  This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties.  There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement.  The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

8.      Agreement Product of Negotiation; No Drafter.   The terms of this Agreement are the result of negotiation among the Parties.  Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

9.      Attorneys' Fees.   Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

10.     Governing Law; Arbitration; Waiver of Jury Trial.   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses.  The Parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity.  Any court of competent jurisdiction may enter judgment upon the award.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING

3

GR_0001292

HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 10.

11.    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

12.    No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have.  Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

13.    Survival and Benefits.  The warranties, representations and covenants contained in this Agreement shall survive the closing herein.  This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

14.    Post Execution Cooperation.  The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

15.    Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

GR_0001293

16.     Counterparts.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

17.     Headings.  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

18.     Confidentiality.  This Agreement, and any other document relating or referring to the Liquidation or the terms of the release herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties' respective businesses.  Other than a general statement that the Liquidation has occurred, without providing any details, including the Liquidation Amount, then, without limiting any of the foregoing, the Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other document relating or referring to the Liquidation and/or the terms of the release to any person or entity except as necessary and required by law, regulation or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement immediately in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

19.     Non-Disparagement.  It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties.

**[SIGNATURE PAGE FOLLOWS]**

GR_0001294

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.

_____     _____

David Geller                               Martin Shkreli, Individually

**RETROPHIN, INC.**

By: _____

Name: Martin Shkreli

Title: Chief Executive Officer

**MSMB CAPITAL MANAGEMENT LLC**

By: _____

Name: Martin Shkreli

Title: Managing Member

**MSMB CAPITAL MANAGEMENT LP**

By MSMB Capital Management LLC, its general partner

By: _____

Name: Martin Shkreli

Title: Managing Member

**MSMB HEALTHCARE LP**

By MSMB Healthcare Investors LLC, its general partner

By: _____

Name: Martin Shkreli

Title: Managing Member

**MSMB HEALTHCARE INVESTORS LLC**

By: _____

Name: Martin Shkreli

Title: Managing Member

_[Signature Page to Settlement and Release Agreement]_

MSMB HEALTHCARE MANAGEMENT LLC

By: _____

Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (the "**Agreement**") is made and entered into as of June__, 2013 by and among Michael Lavelle ("**Releasor**"), MARTIN SHKRELI ("**Shkreli**"), MSMB CAPITAL MANAGEMENT, LP ("**MSMB Capital LP**"), a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC ("**MSMB Capital LLC**"), a Delaware limited liability company, MSMB HEALTHCARE LP ("**MSMB Healthcare**"), a Delaware limited partnership, MSMB HEALTHCARE INVESTORS LLC ("**MSMB Investors**"), a Delaware limited liability company, MSMB HEALTHCARE MANAGEMENT LLC ("**MSMB Management**" and, together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and MSMB Investors, the "**MSMB Entities**"), a Delaware limited liability company, and RETROPHIN, INC. ("**Retrophin**"), a Delaware corporation. Releasor, Shkreli, the MSMB Entities and Retrophin are at times referred to collectively as the "Parties" or as "Party" in this Agreement.

**WHEREAS,** Shkreli is the managing member of MSMB Capital LLC, MSMB Investors and MSMB Management;

**WHEREAS,** MSMB Investors is the general partner of MSMB Healthcare;

**WHEREAS,** MSMB Capital LLC is the general partner of MSMB Capital LP;

**WHEREAS,** Shkreli is the President and Chief Executive Officer of Retrophin;

**WHEREAS,** each of the MSMB Entities intends to liquidate and wind up (the "**Liquidation**"); and

**WHEREAS,** in connection with the Liquidation, the Parties are entering into this Agreement in order to settle and compromise fully and finally any and all presently existing or future disputes and claims that Releasor may have against Shkreli, Retrophin, any of the MSMB Entities or their respective affiliates.

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to bind themselves as follows:

1.      Payment Terms.  The MSMB Entities or Retrophin (individually or collectively, the "**Payor**"), jointly and severally agree to deliver or cause to be delivered to Releasor the total amount of one million dollars ($1,355,000) (the "**Cash Payment**") and 5,000 shares of common stock, par value $0.0001 per share (the "**Shares**" and collectively with the Cash Payment, the "**Liquidation Amount**") of Retrophin as full and final satisfaction for any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "**Claims**"), including all costs, expenses and attorneys' fees related

84711079v4

GOVERNMENT
EXHIBIT
**56**
15 CR 637 (KAM) (EG)

ML0035

thereto, which Releasor now has, or which it may have against Shkreli, Retrophin or any MSMB Entity from the beginning of time up to, through, and including the date of this Agreement. In connection with the Cash Payment, the Payor and the Releasor agree that (a) the Payor will pay the Releasor $677,500, which represents the first half of the Cash Payment, no later than thirty (30) days following the date hereof and (b) the Payor will pay the Releasor $677,500, representing the second half of the Cash Payment, no later than sixty (60) days following the date hereof. The Payor shall cause the Shares to be delivered to the Releasor within thirty (30) days following the execution of this Agreement. The Releasor agrees that any interests that it may have in any of the MSMB Entities shall be cancelled on and from the date on which the Liquidation Amount has been received in full by the Releasor (the "**Effective Date**"), that the Releasor is not entitled to any payments for such interests on and from the Effective Date and that no amounts or distributions are owed or deemed to be owed for such interests on and from the Effective Date.

2.    Ownership and Delivery of the Shares.  Shkreli, Retrophin and the MSMB Entities represent and warrant to Releasor that on the date of delivery of the Shares to Releasor, Releasor will receive good title to the Shares, fully paid, non-assessable, free and clear of any and all liens, mortgages, pledges, security interests, options, restrictions, charges, prior assignments, agreements, claims, and encumbrances of any kind whatsoever.

3.    Releasor Representations.  Releasor hereby represents and warrants that the Shares are being acquired solely for investment for Releasor's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and Releasor has no present intention of selling, granting a participation in, or otherwise distributing the same. Releasor understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Releasor's representations as expressed herein. Releasor understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Releasor must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Releasor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

4.    Brokerage.  The Parties represent and warrant to each other that they have not dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and no broker or any other person is entitled to receive any brokerage commission, finder's fee or similar compensation in connection with this agreement or the transactions contemplated hereby.  Each of the Parties shall indemnify and hold the other harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, pertaining to any broker, finder or other person with whom such party has dealt.

5.    Release.  In consideration of the delivery of the Liquidation Amount to Releasor, and based upon the mutual promises contained herein and other good and valuable consideration,

84711079v4

Releasor, on his behalf and on behalf of all of his heirs, successors assigns, agents, legal representatives and personal representatives (collectively, the "**Releasor Parties**"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Shkreli, Retrophin, each MSMB Entity and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "**Releasees**"), of any and all Claims that Releasor now has, or which it may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Agreement. Releasor, on behalf of itself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims. If the Releasor does not receive the Liquidation Amount this Release shall be *void ab initio* and of no further force and effect.

6.     Voluntary Act.  The Parties acknowledge, represent and agree, each with the other that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, and have signed the same as their respective free and voluntary act.

7.     Authority.  The individuals signing below on the part of the Parties warrant and represent that they are legally competent and have full authority to enter into this Agreement and to bind the Parties, and that each party has had the opportunity to discuss the terms of this Agreement with legal counsel prior to signing.

8.     Entire Agreement.  This Agreement represents the entire and final understanding between the Parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of the Parties.  This Agreement may not be altered, amended, modified or rescinded in any way except by written instrument duly executed by the Parties.  There are no representations, warranties, agreements, promises, contracts, arrangements, or understandings, verbal or written, between or among the Parties relating to the subject matter of this Agreement, which are not fully expressed in this Agreement.  The Parties acknowledge and agree that in executing this Agreement they have relied upon no representation, statement, promise, understanding, guaranty or inducement of any kind, except those expressly stated in this Agreement.

9.     Agreement Product of Negotiation; No Drafter.  The terms of this Agreement are the result of negotiation among the Parties.  Thus, the Parties agree that no Party shall be deemed the drafter of any provision of this Agreement and that the rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be used in the interpretation of this Agreement.

84711079v4

ML0037

10.     Attorneys' Fees.  Should any of the Parties retain the services of an attorney to enforce any of the terms of this Agreement, the prevailing party, in addition to all other rights and remedies hereunder or as provided by law, will be entitled to recover its reasonable attorney's fees, court costs, and other costs, charges, and expenses expended or incurred therein from the losing party, and the court or arbitrator(s) shall award such fees, costs and expenses to the prevailing party.

11.     Governing Law; Arbitration; Waiver of Jury Trial.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses.  The Parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity.  Any court of competent jurisdiction may enter judgment upon the award.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 11.

12.     Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

4

84711079v4

13.     No Waiver.  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power or remedy which any party may have, nor shall any such delay be construed to be a waiver of any such right, power, or remedy, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of any Party hereunder be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of, any action begun to enforce any such right or remedy.  The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which any Party would otherwise have.  Any waiver, permit, consent, or approval by any party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing signed by the Party to be charged and only as to that specific instance.

14.     Survival and Benefits.  The warranties, representations and covenants contained in this Agreement shall survive the closing herein.  This Agreement shall be binding upon and inure to the benefit of the Parties and, as the context permits, their respective successors, assigns, heirs, executors, administrators, personal representatives, beneficiaries and legal representatives.

15.     Post Execution Cooperation.  The Parties agree they will take any and all necessary steps, sign and execute any and all necessary documents, agreements or instruments which are required to implement or effectuate the terms and conditions of this Agreement. Each Party will refrain from taking any action, either expressly or impliedly, which would have the effect of prohibiting or hindering the performance of any other Party to this Agreement of its obligations herein.

16.     Non-Exclusive Remedies.  In the event of a breach of any provision of this Agreement, the Parties, in addition to and not in lieu of the remedies expressly provided in this Agreement, shall be entitled to exercise such remedies that exist at law or equity to enforce this Agreement, including but not limited to seeking specific performance.

17.     Counterparts.  This Agreement may be executed via facsimile or email and in any number of counterparts, all of which taken together shall constitute one agreement.  For purposes of enforceability, a copy of this fully executed Agreement shall have the same authority as an executed original document.

18.     Headings.  The headings in this Agreement are included only for convenience and reference, said headings are not to be used in construing this Agreement and to have no binding effect upon the Parties.

19.     Confidentiality.  This Agreement, and any other document relating or referring to the Liquidation or the terms of the release herein, shall be deemed confidential and this confidentiality provision shall run in favor of the Parties and shall not be disclosed to any person or entity, except the Parties and their respective employees, attorneys, auditors and accountants who agree to treat this Agreement and its terms as confidential, as reasonably necessary to conduct the Parties' respective businesses.  Other than a general statement that the Liquidation

5

ML0039

has occurred, without providing any details, including the Liquidation Amount, then, without limiting any of the foregoing, the Parties (and their respective employees, attorneys and accountants) shall not disclose this Agreement or any other document relating or referring to the Liquidation and/or the terms of the release to any person or entity except as necessary and required by law, regulation or if required to do so by court order, provided that the Party from whom disclosure is sought notifies the other Parties to this Agreement immediately in writing of any subpoena, demand or order for disclosure and provides the other Party with written notice as soon as practicable. However, nothing contained herein shall prohibit the Parties from making known the terms and conditions of this Agreement if the production of the same is required by a subpoena issued by a lawfully constituted judicial body having jurisdiction over the Party; however, the party receiving any such subpoena agrees to provide prompt written notice to the other party prior to producing the Agreement, and shall afford such other Party a period of no less than five business days (or such shorter time as may be expressly required by such subpoena) to object to such subpoena.

      20.    Non-Disparagement.  It is understood and agreed that, following the execution of this Agreement, the Parties shall not make any derogatory, disparaging or critical statements about one another to third parties.

**[SIGNATURE PAGE FOLLOWS]**

ML0040

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.


_____          _____
Michael Lavelle                          Martin Shkreli, Individually


**RETROPHIN, INC.**

By:_____
Name: Martin Shkreli
Title: Chief Executive Officer


**MSMB CAPITAL MANAGEMENT LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member


**MSMB CAPITAL MANAGEMENT LP**
By MSMB Capital Management LLC, its general partner

By:_____
Name: Martin Shkreli
Title: Managing Member


**MSMB HEALTHCARE LP**
By MSMB Healthcare Investors LLC, its general partner

By:_____
Name: Martin Shkreli
Title: Managing Member


*[Signature Page to Settlement and Release Agreement]*

ML0041

**MSMB   HEALTHCARE   INVESTORS
LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE MANAGEMENT
LLC**

By:_____
Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

ML0042

**IN WITNESS WHEREOF,** the Parties, having read the foregoing Agreement and fully understanding it, voluntarily execute this Agreement effective as of the date first above written.

_____
Michael Lavelle

_____
Martin Shkreli, Individually

**RETROPHIN, INC.**

By: _____
Name: Martin Shkreli
Title: Chief Executive Officer

**MSMB CAPITAL MANAGEMENT LLC**

By: _____
Name: Martin Shkreli
Title: Managing Member

**MSMB CAPITAL MANAGEMENT LP**
By MSMB Capital Management LLC, its general partner

By: _____
Name: Martin Shkreli
Title: Managing Member

**MSMB HEALTHCARE LP**
By MSMB Healthcare Investors LLC, its general partner

By: _____
Name: Martin Shkreli
Title: Managing Member

*[Signature Page to Settlement and Release Agreement]*

ML0043

MSMB   HEALTHCARE   INVESTORS
LLC

By: _____

Name: Martin Shkreli
Title: Managing Member


MSMB HEALTHCARE MANAGEMENT
LLC

By: _____

Name: Martin Shkreli
Title: Managing Member


*[Signature Page to Settlement and Release Agreement]*

| | |
|---|---|
| **From:** | Greebel, Evan L. |
| **Sent:** | Friday, September 20 2013 3:58:39 PM |
| **To:** | agtrading5@hotmail.com |
| **Cc:** | Martin Shkreli; Marc Panoff |
| **Bcc:** | Evan L. Greebel (evan.greebel@kattenlaw.com) |
| **Subject:** | Executed Consulting Agreement |
| **Attachments:** | doc02322520130920150330.pdf, C1803_EXCHANGE_09182013-171215.pdf |

Hi Al,

Attached is a duly executed version of your Consultant Agreement. I will direct the transfer agent to issue you stock. Please advise if you would like stock certificates or if you will hold in book-entry form.

Thanks,
 Evan


EVAN L. GREEBEL
Partner
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)



GOVERNMENT
EXHIBIT
**59-A**
15 CR 637 (KAM) (EG)

## CONSULTING AGREEMENT AND RELEASE

THIS AGREEMENT ("Agreement") is made as of September 20, 2013 between Retrophin, Inc., a Delaware corporation ("Company"), and Alan Geller, an individual ("Consultant"). The Company and Consultant are at times referred to collectively as the "Parties" or as "Party" in this Agreement. The Parties, intending to be mutually bound, hereby agree as follows:

1.      Description of Services. Consultant will serve as an advisor to the Company and provide consulting services (the "Services") on strategic and corporate governance matters to the management of the Company. Consultant shall perform the Services as and when requested by the Company, but in no event shall the performance of such Services account for more than 20% of Consultant's time. Consultant shall be permitted to undertake other employment or activities provided that such employment and activities are not in violation of the terms of this Agreement or compete with the business or activities of the Company.

2.      Compensation.

(a)     In exchange for the Services, the Company shall issue to Consultant an aggregate of 300,000 shares (the "Shares") of common stock, par value $0.0001 per share (the "Common Stock"), of the Company and such Shares shall be payable and issued as follows: (i) 100,000 shares of Common Stock will be issued on the date hereof; (ii) 50,000 shares of Common Stock will be issued on September 30, 2013; (iii) 50,000 shares of Common Stock will; be issued on December 31, 2013; (iv) 50,000 shares of Common Stock will be issued on March 31, 2014 and (v) 50,000 shares of Common Stock will be issued on June 30, 2014.

(b)     In addition to the Shares to be paid to Consultant pursuant to Section 2(a), the Company shall issue and deliver to Consultant 31,500 shares (the "Bonus Shares") of Common Stock following the execution of this Agreement.

3.      Term. This initial term under this Agreement shall be for a the period beginning on the date of this Agreement (the "Effective Date") and ending on June 30, 2014. The Company shall have the sole option to extend this Agreement for successive one-year periods if it provides written notice to Consultant prior to June 30, 2014.

4.      Representation and Warranty.

(a)     Consultant represents and warrants to Company that:

(i)     Services provided under this Agreement will be performed in a diligent and professional manner.

(ii)     Consultant has full power to enter into and fully perform this Agreement without conflict with any other agreement or obligation. To the knowledge of Consultant, no service furnished under this Agreement will infringe upon or violate any rights of any third person, including intellectual property rights.

(iii)     Consultant has no employees or subcontractors.

1

84712819

GR_0001823

(iv)     This Agreement is a valid and legally binding obligation of Consultant.

(v)     Consultant has not been debarred pursuant to the Federal Food, Drug and Cosmetic Act.  The Consultant will not use, or work with, in any capacity the services of any individual, corporation, partnership or association which has been debarred under 21 U.S.C. 335a (a) or (b) or disqualified as a clinical investigator under the provisions of 21 C.F.R. 312.70. In the event Consultant becomes aware of the debarment or disqualification of any such individual, corporation, partnership or association Consultant shall promptly notify Company.

(vi)     Consultant is not under any legal obligation, including any obligation of confidentiality or non-competition, which prevents the Consultant from executing or fully performing this Agreement, or which would render such execution or performance a breach of contract with any third party.

(vii)     The Shares and the Bonus Shares are being acquired solely for investment for Consultant's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof.

(viii)     Consultant has no present intention of selling, granting a participation in, or otherwise distributing the Shares or the Bonus Shares.

(ix)     Consultant understands that the Shares and the Bonus Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Consultant's representations as expressed herein.

(x)     Consultant understands that the Shares and the Bonus Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Consultant must hold the Shares and the Bonus Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.

(xi)     Consultant is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(b)     The Company represents, warrants and covenants that:

(i)     The Company has the requisite corporate power and authority to enter into and to consummate the transactions set forth in this Agreement.

(ii)     The Shares and the Bonus Shares are duly authorized and, when issued, will be duly and validly issued, fully paid and non-assessable, free and clear of all liens imposed by the Company other than restrictions on transfer.

(iii)     The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware, and has the requisite corporate power and authority to own its properties and to carry on its business in all material respects as now being conducted.

(iv)     This Agreement has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company enforceable in accordance with its terms subject to bankruptcy, insolvency, reorganization or similar laws of general applicability affecting the rights and remedies of creditors and to general equity principles.

84712819

GR_0001824

5.    Confidentiality.  Consultant acknowledges that this Agreement creates a confidential relationship between Consultant and Company that is the basis on which Company will allow Consultant to have access to Company's commercially valuable, proprietary, and confidential information.  Consultant will hold such information in strict confidence and will not disclose such information to any third party or use such information in any way except as provided for in this Agreement or with Company's prior consent.  The confidentiality obligation in this paragraph 5 will survive for three years from the termination of this Agreement.

The confidentiality obligations in this paragraph 5 do not apply to information that: (i) was in the public domain at the time it was disclosed to Consultant, or later becomes part of the public domain other than through Consultant's disclosure of that information; (ii) becomes known to Consultant without restriction from a source other than Company, provided that such source is not known by Consultant after due inquiry to be bound by a confidentiality agreement with the Company or by contractual, legal or fiduciary obligations; (iii) must be disclosed pursuant to an order or requirement of a court, administrative agency or other governmental body, provided that, if permitted, Consultant will give Company prompt notice of any such order or requirement or (iv) is or was independently developed by Consultant without reliance on the information disclosed hereunder.

6.    Independent Contractor Status.  Services performed by Consultant for Company under this Agreement will be in Consultant's capacity as an independent contractor and not as agent or representative of Company.  Consultant is not authorized to enter into any contract or commitment on behalf of Company.  The Consultant shall not make any representation, warranty or guaranty on behalf of Company in the performance of the services. As an independent contractor, the Consultant agrees to comply with all applicable tax reporting and/or payment obligations arising from any payments made to Consultant or on Consultant's behalf.  Company will provide the Consultant with Internal Revenue Form 1099 as required. Consultant will assume all responsibility for payment of taxes or other amounts which may be due as the result of payments made by Company under this Agreement.

7.    Indemnification.

(a)    During the Term and thereafter, Consultant shall indemnify and hold Company and its officers, agents, members, directors and employees harmless against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from any negligence or misconduct on the part of Consultant in performance of the Services under this Agreement, or any breach of Consultant's warranties set forth in Section 7 of this Agreement or alleged violation of the rights of others in and to any trade secret, know-how or other confidential information by reason of Company's receipt or use of the Consultant's Services, or otherwise in connection therewith; provided that such claims for losses, expenses or injuries did not result from the gross negligence or willful misconduct of the Company.

(b)    During the Term and thereafter, Company shall indemnify and hold Consultant and its agents and employees harmless against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from

3

GR_0001825

any litigations or claims asserted by third parties against the Consultant due to the Services under this Agreement; provided that such claims for losses, expenses or injuries did not result from the negligence or misconduct of Consultant.

8.    Non-Disparagement/Media.

(a)    Consultant agrees not to make, publish, or communicate to any person or entity, any Disparaging remarks, comments, writings, or statements concerning the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. "Disparaging" remarks, comments, writings, and/or statements are those that impugn, criticize, or denigrate (a) the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents.

(b)    Consultant further agrees that it will not make any statement whatsoever to the press or media (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, or radio or television station) any matter related to the Company, the Services, or any of the Company's affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. If at any time Consultant receives a request for any statement or information from the press or other media, the Executive will direct that request to the Chief Executive Officer of the Company and will say nothing further.

9.    Company Property.  All correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which come into Consultant's possession by, through or in the course of his employment, regardless of the source and whether created by Consultant, are the sole and exclusive property of the Company, and immediately upon the termination of this Agreement, or any time at the Company's reasonable request, Consultant shall return to the Company all such property of the Company.

10.    Release.  Based upon the mutual promises contained herein and other good and valuable consideration, Consultant, on his behalf and on behalf of all of his heirs, successors, assigns, agents, legal representatives and personal representatives (collectively, the "Releasor Parties"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Martin Shkreli, the Company MSMB CAPITAL MANAGEMENT, LP, a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC, a Delaware limited liability company, MSMB Healthcare LP, a Delaware limited partnership, MSMB Healthcare Investors LLC, a Delaware limited liability company, MSMB Healthcare Management LLC, and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "Releasees"),

4

84712819

GR_0001826

of any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "Claims"), including all costs, expenses and attorneys' fees related thereto that Consultant now has, or which he may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Section 10 and this Agreement. Consultant, on behalf of himself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

11.     Miscellaneous. The Services to be provided by Consultant hereunder are of a personal nature and this Agreement will not be assigned by Consultant or Company without the written consent of the other party. This Agreement, including all attachments hereto, is the entire Agreement between the parties regarding the subject matter hereof, superseding all prior agreements, and cannot be amended or modified except in writing signed by both parties.

In accordance with the Company's policies, Consultant shall sign and agree to be bound by the Company's Code of Ethics and Insider Trading Policy.

Given the nature of the obligations set forth in Sections 5, 8 and 10 of this Agreement, Consultant acknowledges and agrees that Company may be irreparably damaged by Consultant's alleged breach or violation of such sections. Without prejudice to the rights and remedies otherwise available to Company, it shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of Sections 5, 8 or 10 of this Agreement.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party. Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as in the preceding paragraph of this Section 11. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT

84712819

GR_0001827

PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT
TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION,
PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS
AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii)
SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR
STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY
HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY
OTHER COURT IN ANY OTHER JURISDICTION.  Each party irrevocably and
unconditionally waives any objection that it may now or hereafter have to the laying of venue of
any action or proceeding arising out of or relating to this Agreement in the courts referred to in
this Section 11.

*[Signature Page to Follow]*

84712819

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

RETROPHIN, INC.

By: _____
Name:   MARC PANOFF
Title:   CFO

Consultant


_____
Alan Geller

84712819

7

GR_0001829

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

RETROPHIN, INC.

By: _____
    Name:
    Title:


Consultant


_____
Alan Geller

84712819

GR_0001830

**From:**        Kevin J. Stanfield [kstanfield@wyrick.com]
**Sent:**        Tuesday, February 19, 2013 10:03 PM
**To:**          martin@msmbcapital.com; martin@retrophin.com
**Subject:**     Your Unauthorized Conversion of Dr. Rosenwald's Investment
**Attachments:** image002.jpg; 20130219162904979.pdf

Mr. Shkreli:

Please see the attached letter sent on behalf of our client, Lindsay A. Rosenwald.

Best regards,

Kevin J. Stanfield
ATTORNEY

Direct: 919.865.1127
kstanfield@wyrick.com



Wyrick Robbins Yates & Ponton LLP
4101 Lake Boone Trail
Raleigh, NC 27607
P: 919.781.4000 F: 919.781.4865
www.wyrick.com

CIRCULAR 230 NOTICE:  To comply with requirements imposed by the United States Treasury Department, any information regarding any U.S. federal tax matters contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, as advice for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

The contents of this e-mail message may be privileged and/or confidential. If you are not the intended recipient, any review, dissemination, copying, distribution or other use of the contents of this message or any attachment by you is strictly prohibited. If you receive this communication in error, please notify us immediately by return e-mail or by telephone (919-781-4000), and please delete this message and all attachments from your system. Thank you.

GOVERNMENT
EXHIBIT
**100-16**
15 CR 637 (KAM) (EG)

1

CONFIDENTIAL

R017888



Wyrick Robbins Yates & Ponton LLP
ATTORNEYS AT LAW

4101 Lake Boone Trail, Suite 300, Raleigh, NC 27607

PO Drawer 17803, Raleigh, NC 27619

P: 919.781.4000   F: 919.781.4865   www.wyrick.com

Kevin J. Stanfield
kstanfield@wyrick.com

**FOR SETTLEMENT PURPOSES ONLY**
**NOT ADMISSIBLE UNDER THE RULES OF EVIDENCE**

February 19, 2013

***Via Electronic Mail (martin@msmbcapital.com; martin@retrophin.com)***
***Original Via Federal Express***

Martin Shkreli
MSMB Capital Management, LP
330 Madison Avenue, Floor 25
New York, NY 10017-5022

Martin Shkreli
Retrophin, Inc.
777 Third Avenue, 22nd Floor
New York, NY 10017

***Re: Lindsay A. Rosenwald v. Martin Shkreli, MSMB Capital Management, LP, and Retrophin, Inc.***
- ***Your Unauthorized Conversion of Dr. Rosenwald's Investment***
- ***Notice of Litigation Hold***

Dear Mr. Shkreli:

This law firm represents Lindsay A. Rosenwald, M.D. We write in an effort to resolve Dr. Rosenwald's claims against you MSMB Capital Management LP ("MSMB Capital") and Retrophin, Inc. ("Retrophin") prior to Dr. Rosenwald commencing litigation. Please direct all future communications or inquiries that you may have about this matter to this law firm and to my attention. If you, MSMB Capital or Retrophin are or will be represented by an attorney, please provide me with your attorney contact information and I will communicate with your attorney directly.

As you know, Dr. Rosenwald is an investor in MSMB Capital. We understand you recently liquidated and converted Dr. Rosenwald's investment in MSMB Capital into shares of Retrophin stock without Dr. Rosenwald's authority or consent. We have serious concerns that your unauthorized conversion of Dr. Rosenwald's investment violates federal and state

Martin Shkreli
February 19, 2013
Page 2

securities laws; the Martin Act, New York General Business Law article 23-A, §§ 352-353j; and may also constitute fraud, breach of fiduciary duties, and an unlawful trade practice.

While it has never been our client's intent to develop an adversarial relationship with you, Dr. Rosenwald expected you to honor your fiduciary obligations to him and to the substantial investment entrusted to you. Dr. Rosenwald is prepared to discuss an appropriate and fair compensation for the damage you caused. We understand Dr. Rosenwald has allegedly been issued 24,000 shares of stock in Retrophin. If you (1) immediately issue Dr. Rosenwald an additional 76,000 shares of Retrophin and (2) put the total 100,000 shares of Retrophin in the anticipated registration statement that will be filed shortly, Dr. Rosenwald will consider his claims against you, MSMB Capital and Retrophin settled and resolved. The additional 74,000 shares of Retrophin stock must be issued and received by Dr. Rosenwald on or before **9 a.m. on Thursday, February 21, 2013**. This is an excellent opportunity to resolve this dispute on favorable financial terms without having to incur the time and expense associated with protracted litigation.

If you reject Dr. Rosenwald's settlement offer, Dr. Rosenwald will pursue all available remedies at his disposal, including immediately filing a civil lawsuit against you, MSMB Capital and Retrophin. In the event Dr. Rosenwald is forced to file a lawsuit, be advised that he will assert claims for violations of securities laws, fraud, unfair and deceptive trade practices, misappropriation and other state and federal claims. You should know the Court can require you to pay punitive damages, triple the amount of Dr. Rosenwald's actual damages, as well as his attorneys' fees and costs. Obviously, the filing of such a lawsuit will necessitate an immediate SEC filing.

In light of the pending dispute and our ongoing investigation, you must not destroy or alter, intentional or otherwise, any documents, evidence or information related to this dispute, and any potential evidence (electronic or hardcopy) must be maintained and preserved. Please instruct MSMB Capital and Retrophin's officers, employees or agents who may have relevant knowledge about this matter and the person(s) responsible for maintaining its computers or IT system not to destroy, discard, alter, or delete any documents, e-mails, text messages, communications, computer records or programs in any way relating to Dr. Rosenwald's investment in MSMB Capital, your conversion of Dr. Rosenwald's investment into Retrophin stock and any correspondence regarding these issues.

Lastly, while we obviously do not represent you, we strongly recommend that you give notice to your General Liability and/or E&O carrier of you unlawful conduct and of Dr. Rosenwald's civil claims against you. Your failure to do so in short order can complicate your ability to seek redress from your carrier(s) in respect of Dr. Rosenwald's claims.

24103.1-767781 v1

CONFIDENTIAL                                                                      R017890

Martin Shkreli
February 19, 2013
Page 3

We trust that you will give this matter your immediate priority and attention. This letter does not purport to be a complete statement of the facts or the law and is without prejudice to Dr. Rosenwald's legal and equitable rights, all of which are expressly reserved.

Sincerely,

WYRICK ROBBINS YATES & PONTON, LLP

Kevin J. Stanfield

cc: Lindsay A. Rosenwald (*via email*)

24103.1-767781 v1

CONFIDENTIAL

R017891



**From:** Schuyler Marshall [mailto:smarshall@rosewd.com]
**Sent:** Monday, June 24, 2013 11:03 AM
**To:** Greebel, Evan L.
**Subject:** RE:

I will be out of the country starting about 1 tomorrow, for about 10 days. If you wish, I could sign the release and deliver it to a trusted 3rd party, such as Darren Blanton, or a local attorney to release to you upon payment of the consideration.

**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Monday, June 24, 2013 9:57 AM
**To:** Schuyler Marshall
**Subject:** RE:

Schuyler, I have been out of the country and just returned. We will revert regarding our conversation from last week.


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Schuyler Marshall [mailto:smarshall@rosewd.com]
**Sent:** Monday, June 24, 2013 10:55 AM
**To:** Greebel, Evan L.
**Subject:**

Evan, I am disappointed no one is responding to calls or emails concerning getting the release executed and our agreement performed. I am still willing to proceed as we agreed. However, in order to ensure preservation of documents in case they are needed, this confirms my request to be provided the following: all documents concerning or relating to my account value at all times;all documents concerning or relating to the fund's , and Martin's investment in Desert Gateway/RTRX; all documents concerning or relating to Martin's acquisition of his shares in RTRX, including the consideration for such shares,and relation or referring to the shares issued to other fund shareholders; all documents relating to Martin's decision to convert a long/short fund into a single investment in one company, including the efforts, , if any to obtain approval for such conversion from any limited partners in the fund ; all documents relating to or concerning the disposition of any fund investment. Evan, my position is that no privilege would apply to communications

1

GOVERNMENT
EXHIBIT
**102-8**
15 CR 637 (KAM) (EG)

R050727

R050727

with attorneys representing MSMB and RTRX as those attorneys owe a duty to the entities and their owners, including limited partners and minority shareholders. This is not a complete request, and hopefully it becomes moot through performance of the agreement outlined in the release you sent. Regards, Schuyler Marshall

```
==========================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal
Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot
be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the
taxpayer.
==========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the
exclusive
use of the individual or entity to whom it is addressed and may contain information that
is
proprietary, privileged, confidential and/or exempt from disclosure under applicable
law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying,
disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please
notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the
original
message without making any copies.
==========================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership
that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
==========================================================
```

2

CONFIDENTIAL

R050728

R050728

GOVERNMENT
EXHIBIT
104-9
15 CR 637 (KAM) (EG)

| | |
|---|---|
| **From:** | Martin Shkreli [Martin@msmbcapital.com] |
| **Sent:** | Friday, March 15 2013 2:57:54 PM |
| **To:** | rich@kocherconstruction.com |
| **Cc:** | Jim@attorneyburke.com; fuldakocher@gmail.com; Greebel, Evan L.; Cotton, Howard E. |
| **Subject:** | RE: FedEx |

I called your office – you can call me with or without counsel at your convenience. 212 983 1310 or my cell phone 646 217 2783. CCing my attorneys if you want to start a dialogue with them.

- - - - - - - - - - - - - - - -

**From:** richard kocher [mailto:rich@kocherconstruction.com]
**Sent:** Friday, March 15, 2013 2:38 PM
**To:** Martin Shkreli
**Cc:** Jim@attorneyburke.com; fuldakocher@gmail.com; kevin@stonecornergroup.com
**Subject:** RE: FedEx

Martin,
Just so you understand my situation. I have counted on what your memo back in Sept. said that we would be taken care of before the end of the year and that we would be able to be taken out in cash or in stock, our choice.   For some reason you are giving me Retrophin Stock that is not tradable and is worth around a quarter of what I am owed, and now you are going to somehow compensate later for it. I'd like to remind you again that when you were in trouble and needed $100,000. I wired it over the next day. I have given you over two months notice. I expect to get in addition to this (insulting) untradeable stock at least $200,000.00 which you owe me in cash wired to my account by early next week. I have already been in touch with council that is versed in this kind of litigation. You should be hearing from them soon. I have damages that have occurred because I have been relying on what you have represented as the manager of MSMB. I also believe that as a manager of MSMB & CEO of Retrophin that you have not lived up to your fiduciary responsibilities to me as a LP, and that I will require a full accounting of both MSMB, Retrophin and your financial involvement. Also, I will make sure that this does go public and will also go to the appropriate agencies. I'm going to attach your e-mail from  Sept. again for you.
To Our Limited Partners,
        I have decided to wind down our hedge fund partnerships with a goal of completing the liquidation of the funds by November or December 1st, 2012. As you know, MSMB has found increasingly compelling opportunities in private equity. We are going to focus our efforts on managing money in a hybrid public-private structure, one which is not generally amenable to the open-ended private hedge funds partnership structure.
        We have decided the best structure for such an entity is a public company or private corporation. Retrophin LLC, our MSMB-founded biotechnology operation, will be that company. Retrophin has made a lot of progress since its inception in 2011. Today, the company has a full pipeline and several marketed (cash-generating) products. Retrophin is currently valued at a modest $80 million, but I personally feel the shares are worth closer to $1 billion, and will reach that lofty number when all is said and done. We anticipate taking the company public in the first half of 2013—we will see what the market thinks then.
        We have tripled the size of our fund if you have not been in the office lately. The most senior hire we have made is that of Tom Fernandez, who joins after 10+ years with the Galleon Group, where he was the original COO of the Company and headed up the IR effort. Tom will hold the title of "President" at MSMB. Many of you have met Jackson Su, our current COO. If you haven't, he is a financial whiz, with experience at hedge funds such as Bonanza, Cramer Rosenthal and Weiss Peck & Greer. Jackson handles all operational matters including HR, IT and Finance. Marek Biestek, my co-founder and partner, and I, round out MSMB's "Executive Committee". This four-person team will manage MSMB's operations going forward, and even though we will not be running "outside money", we will still have activities independent of Retrophin.
        Another key hire at MSMB is that of George Huang, PhD, who comes to us from the recently shuttered "Tiger Cub" Sabretooth. We have very high hopes for George. He, and a new hire, Dr. Christoper

James (an actual brain surgeon) join the biotechnology group with Dr. Andrew Vaino, who has been with MSMB for some time. These three pedigreed individuals contribute in a great way to our firm.

Tim Pierotti, who manages MSMB's Consumer investing efforts, is broadening his role and teaming up with Marek Biestek in looking at medical technology assets. Kevin Mulleady, our original CEO and Investor Relations head, is doing well. He has expanded his role into business development across the capital structure and continues to manage client relationships.

Retrophin has hired Steve Aselage as CEO. We hired Steve from BioMarin, where he was Chief Business Officer. Steve built BioMarin into a $5 billion biotechnology leader. We are proud to have attracted him to run our major private equity business and think he will take us great places. Steve will be based out of San Diego, where we will build an office for him.

I cannot thank you, the partners, enough. I have the most loyal investors in the world. We have received 2 redemptions since inception and are thankful for your patience (and tolerance) while we went through operational mishaps and switched strategies several times. Original MSMB investors (2009) have just about doubled their money net of fees. I regret terminating the fund, but I feel tremendous private equity opportunities are abundant at the moment and we need the latitude to explore them.

A few operational notes—investors will have their limited partnership interests redeemed by the fund for cash. Alternatively, investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares and cash. Keep in mind Retrophin shares are illiquid and no liquid market may develop. However, if you feel the desperate need to keep investing with me, Retrophin will embody all of my investment activities and attention. I think it will prove to be a successful public company and investment, however different from a hedge fund it may be. MSMB will halt reporting at the 9/30/12 period and begin offering cash to purchase limited partnership interests shortly thereafter. If all goes according to plan, you will either be a Retrophin LLC unitholder or have cashed out by 10/31/12.

Thank You,

Martin Shkreli
MSMB

Rich

. . . . . . . . . . . . . . . . . . . .

**From:** Martin Shkreli [mailto:Martin@msmbcapital.com]
**Sent:** Thursday, March 14, 2013 9:57 AM
**To:** rich@kocherconstruction.com
**Subject:** FedEx

Hi Rich,

We sent you a FedEx with your stock certificate but no signed for it. Should we send it again? If so, to what address? After you receive it I propose we do a call to discuss how to make you happy. We really appreciate your investment and want to make sure you make money and feel fairly treated.

Martin Shkreli



From: agtrading5@hotmail.com
To: evan.greebel@kattenlaw.com
Subject: RE: Signing Bonus
Date: Tue, 23 Apr 2013 19:15:59 +0000

Evan,

Sorry for the delay. I do have an attorney looking at this and should have a couple of more questions tomorrow. From my point of view I have a couple of questions and concerns. First off--can we move the second payment beginning on June 30 rather than Sept. 30th? My next concern is the other 300,000 shares that Martin and I agreed on. First of all--while I truly do trust him, I feel that by signing this without anything else on those shares, I have no protection if anything changes that would delay that transfer. Can we incorporate into this some wording and/or a plan to immediately begin that process? Lastly, while my intention is not to sell at all, I feel that I should have at least some portion of my total shares un- restricted. If that other 300,000 shares are privately transferred as Martin mentioned from him and other insiders, that would be fine with me if those were un-restricted and the consultant ones as well as the shares I have now are restricted. At $5 stock price times 300,000 shares, that would equal my initial investment. Again, I have no plans to sell as I am a TRUE believer in Martin , but this is a big portion of my net and I feel that if need be I should have that option. Also, can I get an idea of how long these consultant restrictions are for?

Thanks for the help and time,

Al

From: evan.greebel@kattenlaw.com
To: agtrading5@hotmail.com
CC: Martin@retrophin.com
Subject: Signing Bonus
Date: Fri, 19 Apr 2013 19:23:46 +0000

GOVERNMENT
EXHIBIT
105-12
15 CR 637 (KAM) (EG)

AG000459

Martin agreed with your recollection on signing bonus. I will revise and recirculate it

**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before
the Internal Revenue
Service, any tax advice contained herein is not intended or written to be
used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed
on the taxpayer.

CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information
intended for the exclusive
use of the individual or entity to whom it is addressed and may contain
information that is
proprietary, privileged, confidential and/or exempt from disclosure under
applicable law. If you
are not the intended recipient, you are hereby notified that any viewing,
copying, disclosure or
distribution of this information may be subject to legal restriction or
sanction. Please notify
the sender, by electronic mail or telephone, of any unintended recipients
and delete the original
message without making any copies.

NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability
partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).

AG000460

Outlook.com Print Message

Page 1 of 1

<u>Print</u>

<u>Close</u>

# RE:

From: **Alan Geller** (agtrading5@hotmail.com)
Sent: Tue 9/10/13 1:15 PM
To: Greebel, Evan L. (evan.greebel@kattenlaw.com)

no prob

From: evan.greebel@kattenlaw.com
To: agtrading5@hotmail.com
Subject: Re:
Date: Tue, 10 Sep 2013 12:58:07 +0000

The board approved, and requested I add a concept that you will provide the Servives as and when reasonably requested, but not In excess of 20% of your time.

If that is acceptable I will revise and send back to you

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

**From:** Alan Geller [mailto:agtrading5@hotmail.com]
**Sent:** Tuesday, September 10, 2013 08:39 AM Eastern Standard Time
**To:** Greebel, Evan L.
**Subject:**

Meeting????    "Just trying to get on with my life"

GOVERNMENT
EXHIBIT
**105-48**
15 CR 637 (KAM) (EG)

AG000111

AG001101
4/5/2015



**From:** traderexp@aol.com [mailto:traderexp@aol.com]
**Sent:** Thursday, July 11, 2013 08:10 AM Eastern Standard Time
**To:** Greebel, Evan L.
**Subject:** Settlement agreement

GOVERNMENT
EXHIBIT
**106-28**
15 CR 356 (KAM) (EG)

Evan,

As per Martin's instructions, I will be contacting you with all correspondence going forward.  I have retained counsel to
start  legal action.  As I stated before, I will be contacting the SEC and certain media outlets.  This has nothing to do with
my brother.  I have received broken deals and broken promises over the last few months.  Furthermore, no good faith has
been shown concerning settlement.

KAT_0065085

BA_0084929

CONFIDENTIAL                                                                                                         R139638
                                                                                                                     R139638

I am giving you until Monday evening to make good on our agreement. After that, I will start my actions. I wish it didn't come to this, but I see no other way.

David Geller

CONFIDENTIAL

KAT_0065086

BA_0084930

R139639

R139639

**Outlook Mobile Service (Text Messaging)**

| | |
|---|---|
| **From:** | Spencer Spielberg <spencer.spielberg@yahoo.com> |
| **Sent:** | Thursday, March 14, 2013 4:14 PM |
| **To:** | Martin Shkreli |
| **Cc:** | Greebel, Evan L. |
| **Subject:** | Re: Stock |

Martin:

On 3/7/13 you agreed to me redeeming my investment for $25,000 in cash and $20,000 worth of RTRX.

Today I received a FedEx with 3,695 shares currently valued at $17,551.25

I'm owed 515 more shares of RTRX and $25,000 in cash.

Kevin Mulleady a former employee of MSMB has nothing to do with my investment with MSMB. If he owes shares to your group that is an outside issue with ZERO baring on my redemption. That should not hold up my redemption at all.

I'm becoming very frustrated with this and I'd like to work this out on the phone amicably between the two of us.

You can call me anytime on 917-363-5085 or 212-920-3936.

I'd greatly prefer us settling this prior to me having to take legal recourse to receive my equitable share.

Sincerely,

Spencer Spielberg

On Mar 13, 2013, at 8:37 PM, Martin Shkreli <Martin@msmbcapital.com> wrote:

> We have not agreed to anything until we sign a document. You own that much stock and that's what we owe you. I would like to make sure you make a great return on your investment with MSMB – however I think for you to get the deal I mentioned earlier this week we need Kevin's help to pitch in and make you whole. Our lawyers (CCed) are reaching out to him to make sure this happens. The only thing I can promise you until we sign a further agreement is the stock you own through the fund.
>
> **From:** Spencer Spielberg [mailto:spencer.spielberg@yahoo.com]
> **Sent:** Wednesday, March 13, 2013 8:11 PM

GOVERNMENT
EXHIBIT
**107-7**
15 CR 637 (KAM) (EG)

**To:** Martin Shkreli
**Subject:** Re: Stock

Martin:

This is not what we agreed to. I really don't understand what Kevin would have to do with my investment. You agreed to wiring me $25,000 in cash and sending me $20,000 worth of stock (about 4081 shares based on the $4.90 stock price).

I invested $25,000 of my hard earned money with you in August of 2011. I did my research and was really impressed with your resume and the type of return you could provide through your MSMB Group.

I'm not sure what you want me to do as an investor with an email like this but I would really appreciate if we could move forward on our original agreement from last week so we could both move on to more important things.

Sincerely,

Spencer Spielberg

---

**From:** Martin Shkreli <Martin@msmbcapital.com>
**To:** Spencer Spielberg <spencer.spielberg@yahoo.com>
**Sent:** Wednesday, March 13, 2013 6:35 PM
**Subject:** Stock

Hi Spencer,

We sent you a certificate for 3,695 shares. This represents the total balance of your MSMB Healthcare LP investment. I am willing to buy those shares for the last market price, 4.90, for a total of $18,105.50. This is all I can legally pay for the stock. If you want $45,000 worth of stock, you should ask Kevin Mulleady to help. Basically, you would need $26,894.50 worth of cash or 5,489 shares to finalize our agreements to get you to $45,000. Our MSMB group would be willing to give you half of those shares if Kevin provided you the other half.

Let me know what you think,
Martin Shkreli

CONFIDENTIAL
R050112

| | |
|---|---|
| **From:** | **Martin Shkreli <Martin@retrophin.com>** |
| **Sent:** | **Sunday, March 31, 2013 10:35 PM** |
| **To:** | **Lavelle, Michael** |
| **Cc:** | **evan.greebel@kattenlaw.com** |
| **Subject:** | **Re: Calls** |

Sure, we will get back to you ASAP with some answers.

Sent from my iPad

On Mar 31, 2013, at 4:31 PM, "Lavelle, Michael " <michael.lavelle@citi.com> wrote:

> I want to understand a number of things.
>
> I had a mark to market on my $1mn investment in MSMB at circa $1.25mn. I put forward a capital call on that position , but have heard nothing.
>
> The redemption procedure remains unclear to me.
>
> I do not understand what exactly was in MSMB.
>
> How big was the fund ?
>
> What was it actually invested in ( including Retrophin ) ?
>
> Who audited that fund ?
>
> Retrophin was always pitched to me as additive to MSMB , not as an alternative to it.
>
> I was told by both you and Kevin that Retrophin was a MSMB option.
>
> I was not given an option to debate transfer from MSMB and want to understand it .
>
> On what basis was the reverse of MSMB into Retrophin agreed ?
>
> On what valuation basis ?
>
> Who approved it ?
>
> Did Retrophin raise private equity ?
>
> What are the details of that PIPE and was it offered to all shareholders ?
>
> Who independently audited it ?
>
>
> Michael

**GOVERNMENT
EXHIBIT
108-10
15 CR 637 (KAM) (EG)**

CONFIDENTIAL                                    R020980

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** Sunday, March 31, 2013 07:55 PM
**To:** Lavelle, Michael [ICG-CMO]
**Cc:** Greebel, Evan L. <evan.greebel@kattenlaw.com>
**Subject:** RE: Calls

I haven't retained anyone for this specific matter, Evan is our general attorney for all matters. Kevin informed one of our employees that you were threatening us or something to that extent (keep in mind, third hand). Given that and the breach of contract on his part, I'm nervous that I shouldn't talk to you directly. If you have specific questions, you can CC Evan and we will formulate answers to them.

---

**From:** Lavelle, Michael [mailto:michael.lavelle@citi.com]
**Sent:** Sunday, March 31, 2013 2:36 PM
**To:** Martin Shkreli
**Subject:** Re: Calls

I had one conversation with Kevin when he left as you would expect.

Why would I need to speak to your counsel ?

If you have engaged counsel I will have to do the same , which seems ridiculous without even having a conversation together.

Michael

---

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** Sunday, March 31, 2013 05:24 PM
**To:** Lavelle, Michael [ICG-CMO]
**Subject:** RE: Calls

Hi Michael. I wanted to make sure you had our counsel's name and number: Evan Greebel of Katten Muchin Rosenman, 212-983-1310.
I'm not comfortable speaking with you directly – Kevin's discussion with you violates the CDA he has with us. Unfortunately you are virtually the only investor I am forwarding to our counsel. Nevertheless, I anticipate we can have a conversation that way. In the meantime, one thing you should understand is I am hard at work ensuring Retrophin succeeds—this is an important priority and I hope you can understand that distraction.

Martin

---

**From:** Lavelle, Michael [mailto:michael.lavelle@citi.com]
**Sent:** Thursday, March 28, 2013 7:42 AM
**To:** Martin Shkreli
**Subject:** RE: Calls

What time works ?

---

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** 28 March 2013 00:34
**To:** Lavelle, Michael [ICG-CMO]
**Subject:** RE: Calls

CONFIDENTIAL

Call me tomorrow morning?

**From:** Lavelle, Michael [mailto:michael.lavelle@citi.com]
**Sent:** Wednesday, March 27, 2013 3:07 PM
**To:** Martin Shkreli; Martin Shkreli
**Subject:** Calls

Hi Martin ,

I do not understand why you have yet to call .

As you can imagine my conversations with Kevin have given rise to significant concerns .    I always believe that one should hear both sides of a story before making judgements , but that has been impossible to schedule .

I do not want , and would hope you feel the same, our relationship to become adversarial , so please let me know when we can speak over the next few days .


Michael

+ 44 207 986 1133
+ 44 7775 560 290

CONFIDENTIAL

# EMPLOYMENT AGREEMENT

Employment Agreement, between Martin Shkreli, MSMB Capital Management LLC, MSMB Healthcare Management LLC, MSMB Isotope LLC, SurePoint Fund Management LLC, Retrophin LLC, and its affiliated entities (the "Companies") and Jackson Su (the "Employee").

1. For good consideration, the Companies employ the Employee on the following terms and conditions.

2. **Term of Employment.** Subject to the provisions for termination set forth below this agreement will begin retroactive to January 1, 2012.

3. **Guaranteed Salary.** The Companies shall pay Employee a salary of $150,000 per year, for the services of the Employee, payable at the beginning of each calendar quarter. This agreement shall be considered binding for 18 months beginning January 1, 2012, following execution and under the provisions outlined in clause #11.

4. **Incentive Payments.** The Companies shall pay Employee incentive payments based on performance managed by the Companies. These Incentive Payments will include but are not limited to;

(a) 25% of MSMB Isotope.

(b) 25% of MSMB Consumer.

(c) 18% of MSMB Healthcare and other affiliated funds, not listed above, up to but not limited to 25%. The difference is subjective to the duties carried out as the Chief Operating Officer of the Companies.

(d) 2,500 units of Retrophin LLC.

In the case of Employee departure from the Company, incentive payments will gradually decline 20% each year over the course of 5 years following year of departure.

5. **Fulfillment of Obligation.** At any time and for any obligation, Employee will accept complete fulfillment for Companies by parties owned and/or controlled by either

(a) MSMB Capital Management LLC, MSMB Healthcare Management LLC, and other affiliated groups.

(b) Martin Shkreli.

(c) Any agent acting on behalf of the Companies, such as a bank or broker.

6. **Duties and Position.** The Companies hire the Employee in the capacity of Chief Operating Officer. The Employee's duties may be reasonably modified at the Companies' discretion from time to time.

7. **Employee to Devote Full Time to Companies.** The Employee will devote full time, attention, and energies to the business of the Companies, and, during this employment, will not engage in any other business activity, regardless of whether such activity is pursued for profit, gain, or other pecuniary advantage. Employee is not prohibited from making personal investments in any other businesses provided those investments do not require active involvement in the operation of said companies.

8. **Confidentiality of Proprietary Information.** Employee agrees, during or after the term of this employment, not to reveal confidential information, or trade secrets to any person, firm, corporation, or entity. Should Employee reveal or threaten to reveal this information, the Companies shall be entitled to an injunction restraining the Employee from disclosing same, or from rendering any services to any entity to whom said information has been or is threatened to be disclosed, the right to secure an injunction is not exclusive. and the Companies may pursue any other remedies it has against the Employee for a breach or threatened breach of this condition, including the recovery of damages from the Employee.

**GOVERNMENT EXHIBIT**
**111-1**
**15 CR 637 (KAM) (EG)**

CITRON0896684

CITRON0896684

9. **Reimbursement of Expenses.** The Employee may incur reasonable expenses for furthering the Companies' business, including expenses for entertainment, travel, and similar items. The Companies shall reimburse Employee for all business expenses after the Employee presents an itemized account of expenditures, pursuant to Companies policy.

10. **Healthcare.** The Employee shall be reimbursed for all healthcare expenses incurred, including COBRA payments. Expenses will be reimbursed within 30 days of incurred date. The Companies will secure a long-term healthcare plan with details to be mutually agreed upon between Companies and the Employee.

11. **Vacation.** The Employee shall be entitled to a yearly vacation of 3 weeks at full pay.

12. **Termination of Agreement.** Without cause, the Companies may terminate this agreement at any time upon 90 days' written notice to the Employee, provided that the Companies fulfill the remaining financial obligations due to the Employee (including all salary, bonus and reimbursement payments). If the Companies request, the Employee will continue to perform his/her duties and may be paid his/her regular salary up to the date of termination. Without cause, the Employee may terminate employment upon 90 days' written notice to the Companies. Employee may be required to perform his or her duties and will be paid the regular salary to date of termination but shall receive severance allowance at the Companies' direction. Notwithstanding anything to the contrary contained in this agreement, the Companies may terminate the Employee's employment upon 60 days' notice to the Employee should any of the following events occur:

(a) The sale of substantially all of the Companies' assets to a single purchaser or group of associated purchasers; or

(b) The sale, exchange, or other disposition, in one transaction of the majority of the Companies' outstanding corporate shares; or

(c) The Companies' decision to terminate its business and liquidate its assets; or

(d) The merger or consolidation of the Companies with another company.

(e) Bankruptcy, chapter 11 reorganization or other significant impairment to the Companies.

(f) A loss of greater than 30% in the Companies' healthcare portfolio values for the twelve months ending December 31st, 2012. The percentage figure reflects a decline from the original starting value and not any drawdown from a peak that the portfolios may experience.

The Companies may terminate this agreement and further employment of the Employee for cause, as defined by the following:

(a) repeated and unexcused absences or lateness from normal course of employment.

(b) incurrence of any legal offense by the Employee that would reasonably be deemed to significantly damage the reputation of the Companies.

(c) other egregious or abnormal behavior not befitting acceptable standards of the investment industry.

13. **Death Benefit.** Should Employee die during the term of employment, the Companies shall pay to Employee's estate any compensation due through the end of the month in which death occurred including any salaries, withheld bonuses and compensation.

14. **Assistance in Litigation.** Employee shall upon reasonable notice, furnish such information and proper assistance to the Companies as it may reasonably require in connection with any litigation in which it is, or may become, a party either during or after employment. The Companies will also provide litigation resources on behalf of the Employee should they become necessary, including any litigation in relation to the Employee's participation of business activities related to the Board of Directors and/or management

CITRON0896685

CITRON0896685

roles of any of the Companies' portfolio investments. The Companies will be considered liable for any litigation expense and/or insurance payments resulting in the aforementioned activities.

15. **Effect of Prior Agreements**. This Agreement supersedes any prior agreement between the Companies or any predecessor of the Companies and the Employee, except that this agreement shall not affect or operate to reduce any benefit or compensation inuring to the Employee of a kind elsewhere provided and not expressly provided in this agreement.

16. **Settlement by Arbitration**. Any claim or controversy that arises out of or relates to this agreement, or the breach of it, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered may be entered in any court with jurisdiction.

17. **Limited Effect of Waiver by Companies**. Should Companies waive breach of any provision of this agreement by the Employee, that waiver will not operate or be construed as a waiver of further breach by the Employee.

18. **Severability**. If, for any reason, any provision of this agreement is held invalid, all other provisions of this agreement shall remain in effect. If this agreement is held invalid or cannot be enforced, then to the full extent permitted by law any prior agreement between the Companies (or any predecessor thereof) and the Employee shall be deemed reinstated as if this agreement had not been executed.

19. **Renewal of Agreement.** The agreement, and all terms described, will be extended for a period of twelve months provided neither the Companies nor the Employee provide a written objection 60 days prior to the expiration of the original agreement.

20. **Assumption of Agreement by Companies' Successors and Assignees**. The Companies' rights and obligations under this agreement will inure to the benefit and be binding upon the Companies' successors and assignees.

21. **Oral Modifications Not Binding**. This instrument is the entire agreement of the Companies and the Employee. Oral changes have no effect. It may be altered only by a written agreement signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

22. **Retroactivity**. This agreement and all of the enforceable terms contained herein are considered retroactive to the day of January 1, 2012.

Signed this 12th day of January 2012.

Martin Shkreli
By: MSMB Capital Management LLC, MSMB Healthcare Management LLC, Martin Shkreli

By: Jackson Su

CITRON0896686

CITRON0896686

| | |
|---|---|
| **From:** | Martin Shkreli [Martin@msmbcapital.com] |
| **Sent:** | Monday, September 10, 2012 1:44 AM |
| **To:** | Martin Shkreli |
| **Subject:** | Message From MSMB Capital |
| **Attachments:** | MSMB Letter To Investors.pdf |

To Our Limited Partners,

I have decided to wind down our hedge fund partnerships with a goal of completing the liquidation of the funds by November or December 1st, 2012. As you know, MSMB has found increasingly compelling opportunities in private equity. We are going to focus our efforts on managing money in a hybrid public-private structure, one which is not generally amenable to the open-ended private hedge funds partnership structure.

We have decided the best structure for such an entity is a public company or private corporation. Retrophin LLC, our MSMB-founded biotechnology operation, will be that company. Retrophin has made a lot of progress since its inception in 2011. Today, the company has a full pipeline and several marketed (cash-generating) products. Retrophin is currently valued at a modest $80 million, but I personally feel the shares are worth closer to $1 billion, and will reach that lofty number when all is said and done. We anticipate taking the company public in the first half of 2013—we will see what the market thinks then.

We have tripled the size of our fund if you have not been in the office lately. The most senior hire we have made is that of Tom Fernandez, who joins after 10+ years with the Galleon Group, where he was the original COO of the Company and headed up the IR effort. Tom will hold the title of "President" at MSMB. Many of you have met Jackson Su, our current COO. If you haven't, he is a financial whiz, with experience at hedge funds such as Bonanza, Cramer Rosenthal and Weiss Peck & Greer. Jackson handles all operational matters including HR, IT and Finance. Marek Biestek, my co-founder and partner, and I, round out MSMB's "Executive Committee". This four-person team will manage MSMB's operations going forward, and even though we will not be running "outside money", we will still have activities independent of Retrophin.

Another key hire at MSMB is that of George Huang, PhD, who comes to us from the recently shuttered "Tiger Cub" Sabretooth. We have very high hopes for George. He, and a new hire, Dr. Christoper James (an actual brain surgeon) join the biotechnology group with Dr. Andrew Vaino, who has been with MSMB for some time. These three pedigreed individuals contribute in a great way to our firm.

Tim Pierotti, who manages MSMB's Consumer investing efforts, is broadening his role and teaming up with Marek Biestek in looking at medical technology assets. Kevin Mulleady, our original CEO and Investor Relations head, is doing well. He has expanded his role into business development across the capital structure and continues to manage client relationships.

Retrophin has hired Steve Aselage as CEO. We hired Steve from BioMarin, where he was Chief Business Officer. Steve built BioMarin into a $5 billion biotechnology leader. We are proud to have attracted



GOVERNMENT
EXHIBIT
**222**
15 CR 637 (KAM) (EG)

SR000142

1

him to run our major private equity business and think he will take us great places. Steve will be based out of San Diego, where we will build an office for him.

I cannot thank you, the partners, enough. I have the most loyal investors in the world. We have received 2 redemptions since inception and are thankful for your patience (and tolerance) while we went through operational mishaps and switched strategies several times. Original MSMB investors (2009) have just about doubled their money net of fees. I regret terminating the fund, but I feel tremendous private equity opportunities are abundant at the moment and we need the latitude to explore them.

A few operational notes—investors will have their limited partnership interests redeemed by the fund for cash. Alternatively, investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares and cash. Keep in mind Retrophin shares are illiquid and no liquid market may develop. However, if you feel the desperate need to keep investing with me, Retrophin will embody all of my investment activities and attention. I think it will prove to be a successful public company and investment, however different from a hedge fund it may be. MSMB will halt reporting at the 9/30/12 period and begin offering cash to purchase limited partnership interests shortly thereafter. If all goes according to plan, you will either be a Retrophin LLC unitholder or have cashed out by 10/31/12.

Thank You,

Martin Shkreli
MSMB Capital

SR000143

MSMB Group

To Our Limited Partners,

I have decided to wind down our hedge fund partnerships with a goal of completing the liquidation of the funds by November or December 1st, 2012. As you know, MSMB has found increasingly compelling opportunities in private equity. We are going to focus our efforts on managing money in a hybrid public-private structure, one which is not generally amenable to the open-ended private hedge funds partnership structure.

We have decided the best structure for such an entity is a public company or private corporation. Retrophin LLC, our MSMB-founded biotechnology operation, will be that company. Retrophin has made a lot of progress since its inception in 2011. Today, the company has a full pipeline and several marketed (cash-generating) products. Retrophin is currently valued at a modest $80 million, but I personally feel the shares are worth closer to $1 billion, and will reach that lofty number when all is said and done. We anticipate taking the company public in the first half of 2013 — we will see what the market thinks then.

We have tripled the size of our fund if you have not been in the office lately. The most senior hire we have made is that of Tom Fernandez, who joins after 10+ years with the Galleon Group, where he was the original COO of the Company and headed up the IR effort. Tom will hold the title of "President" at MSMB. Many of you have met Jackson Su, our current COO. If you haven't, he is a financial whiz, with experience at hedge funds such as Bonanza, Cramer Rosenthal and Weiss Peck & Greer. Jackson handles all operational matters including HR, IT and Finance. Marek Biestek, my co-founder and partner, and I, round out MSMB's "Executive Committee". This four-person team will manage MSMB's operations going forward, and even though we will not be running "outside money", we will still have activities independent of Retrophin.

Another key hire at MSMB is that of George Huang, PhD, who comes to us from the recently shuttered "Tiger Cub" Sabretooth. We have very high hopes for George. He, and a new hire, Dr. Christoper James (an actual brain surgeon) join the biotechnology group with Dr. Andrew Vaino, who has been with MSMB for some time. These three pedigreed individuals contribute in a great way to our firm.

Tim Pierotti, who manages MSMB's Consumer investing efforts, is broadening his role and teaming up with Marek Biestek in looking at medical technology assets. Kevin Mulleady, our original CEO and Investor Relations head, is doing well. He has expanded his role into business development across the capital structure and continues to manage client relationships.

MSMB Group

Retrophin has hired Steve Aselage as CEO. We hired Steve from BioMarin, where he was Chief Business Officer. Steve built BioMarin into a $5 billion biotechnology leader. We are proud to have attracted him to run our major private equity business and think he will take us great places. Steve will be based out of San Diego, where we will build an office for him.

I cannot thank you, the partners, enough. I have the most loyal investors in the world. We have received 2 redemptions since inception and are thankful for your patience (and tolerance) while we went through operational mishaps and switched strategies several times. Original MSMB investors (2009) have just about doubled their money net of fees. I regret terminating the fund, but I feel tremendous private equity opportunities are abundant at the moment and we need the latitude to explore them.

A few operational notes—investors will have their limited partnership interests redeemed by the fund for cash. Alternatively, investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares and cash. Keep in mind Retrophin shares are illiquid and no liquid market may develop. However, if you feel the desperate need to keep investing with me, Retrophin will embody all of my investment activities and attention. I think it will prove to be a successful public company and investment, however different from a hedge fund it may be. MSMB will halt reporting at the 9/30/12 period and begin offering cash to purchase limited partnership interests shortly thereafter. If all goes according to plan, you will either be a Retrophin LLC unitholder or have cashed out by 10/31/12.

Thank You,

Martin Shkreli
MSMB Capital

SR000145

## Track Record



| Monthly Net Performance – Inception through July 2012 | | | | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
|      | Jan  | Feb  | Mar  | Apr  | May  | Jun  | Jul  | Aug  | Sep  | Oct  | Nov  | Dec  | YTD  | ITD  |
| 2009 |      |      |      |      |      |      |      |      |      |      | -0.3% | 0.3% | 0.0% | 0.0% |
| 2010 | 0.8% | 22.6% | 6.6% | 5.4% | -7.6% | -2.1% | 3.1% | 1.6% | 2.4% | -4.5% | 1.7% | -4.8% | 24.6% | 24.6% |
| 2011 | 2.6% | 3.4% | 0.5% | -0.6% | -4.6% | 7.6% | 2.6% | -6.4% | 11.0% | -5.0% | -4.1% | 13.6% | 20.0% | 49.5% |
| 2012 | 18.2% | -1.6% | -0.3% | -1.4% | -1.5% | 8.6% | 9.8% |      |      |      |      |      | 34.3% | 100.7% |

*Performance figures shown reflect the NET returns after all fees and expenses. Past performance is not indicative of future results.*

15

| | |
|---|---|
| **From:** | Marc Panoff [Marc@retrophin.com] |
| **Sent:** | Monday, September 09 2013 12:32:11 PM |
| **To:** | Steve Richardson; Stephen Aselage; Martin Shkreli |
| **Cc:** | Greebel, Evan L. |
| **Subject:** | Board Agenda |
| **Attachments:** | Telephonic Board Meeting Agenda 9-9-2013.doc, Exhibit E - Employee Stock Option Grant Proposal.xlsx, EXHIBIT F - Director_Summary_Stats_Exhibits.pdf, EXHIBIT G - Retrophin Insider Trading Policy - Marked.pdf, EXHIBIT H - Retrophin Code of Ethics - Marked.pdf, EXHIBIT I - Geller Consulting Agreement.DOC, EXHIBIT J - Consulting Agreement - Banta.DOC, EXHIBIT K - Form of Indemnification Agreement.DOC |

All,

Attached please find the board agenda and all supporting documents with the exception of the amended 10K, amended March 10Q, and the June 10Q (EXHIBITS A-D).  We are still waiting on comments from Marcum and will have these documents to you as soon as we can prior to the call.

**Dial-in:  917-962-0650 / Conference Code: 877380**

Marc Panoff
Chief Financial Officer
Retrophin, Inc.
777 Third Ave., 22nd Floor
New York, NY 10017
www.retrophin.com

Office: (917) 261-3684
Fax: (646) 861-6485
Cell: (914) 715-0029
marc@retrophin.com

GOVERNMENT
EXHIBIT
**245**
15 CR 637 (KAM) (EG)

KAT_0068996

CONFIDENTIAL

Board Member Average Compensation
Summary Statistics Arrayed by Market Cap

9/4/2013

KAT_0068999

R116 027

BA_0059733

CONFIDENTIAL

### Summary Statistics: Peer Companies with Market Caps of Greater than $150 million *(n=12)*

| Percentile | 3 Month Avg. as of 8/22/2013 | | Avg. Cash | Avg. Equity | | All Other Comp. | Avg. Board Member Comp. |
|---|---|---|---|---|---|---|---|
| | Mkt. Cap | Enterprise Value | | Option | Stock | | |
| | *(000,000s)* | *(000,000s)* | *(000s)* | *(000s)* | *(000s)* | *(000s)* | *(000s)* |
| *75th* | $246 | $225 | $55 | $93 | $8 | $76 | $177 |
| *Median* | $203 | $179 | $28 | $75 | $8 | $69 | $123 |
| *25th* | $182 | $160 | $16 | $48 | $8 | $62 | $73 |

### Summary Statistics: Peer Companies with Market Caps of Less than $150 million *(n=23)*

| Percentile | 3 Month Avg. as of 8/22/2013 | | Avg. Cash | Avg. Equity | | All Other Comp. | Avg. Board Member Comp. |
|---|---|---|---|---|---|---|---|
| | Mkt. Cap | Enterprise Value | | Option | Stock | | |
| | *(000,000s)* | *(000,000s)* | *(000s)* | *(000s)* | *(000s)* | *(000s)* | *(000s)* |
| *75th* | $129 | $94 | $46 | $66 | $26 | $52 | $115 |
| *Median* | $79 | $63 | $41 | $41 | $23 | $36 | $70 |
| *25th* | $59 | $48 | $30 | $16 | $19 | $21 | $49 |

### Summary Statistics: All Peer Companies *(n=35)*

| Percentile | 3 Month Avg. as of 8/22/2013 | | Avg. Cash | Avg. Equity | | All Other Comp. | Avg. Board Member Comp. |
|---|---|---|---|---|---|---|---|
| | Mkt. Cap | Enterprise Value | | Option | Stock | | |
| | *(000,000s)* | *(000,000s)* | *(000s)* | *(000s)* | *(000s)* | *(000s)* | *(000s)* |
| *75th* | $182 | $168 | $48 | $81 | $23 | $72 | $125 |
| *Median* | $130 | $108 | $40 | $54 | $15 | $61 | $77 |
| *25th* | $72 | $50 | $20 | $17 | $12 | $42 | $54 |

Compensation Advisory Partners

Board Member Average Compensation
Peer Companies with Market Caps from $50mm - $150mm, Plus Select Other Companies

9/4/2013

KAT_0069000

R116028

| Company (n = 35) | 3 Month Avg. as of 8/22/2013 | | Board Members Used in Analysis | Avg. Cash | Avg. Equity | | All Other Comp. | Avg. Board Member Comp. |
|---|---|---|---|---|---|---|---|---|
| | Mkt. Cap (mm) | Enterprise Value (mm) | | | Option | Stock | | |
| ACADIA Pharmaceuticals Inc. | $1,600 | $1,478 | 17 | $16 | $61 | | | $77 |
| Sarepta Therapeutics, Inc. | $1,227 | $1,063 | 6 | $55 | $36 | $8 | | $99 |
| Coronado Biosciences, Inc. | $248 | $214 | 7 | $39 | $132 | | $83 | $254 |
| Esperion Therapeutics, Inc. | $246 | $225 | | | | | | |
| OvaScience, Inc. | $238 | $179 | 3 | $16 | $33 | | | $48 |
| Vaccinogen, Inc. | $214 | $263 | | | | | | |
| Durata Therapeutics, Inc. | $203 | $167 | 9 | $10 | $51 | | | $62 |
| Cellceutix Corporation | $187 | $188 | | | | | | |
| Aratana Therapeutics, Inc. | $182 | $172 | | | | | | |
| Corcept Therapeutics Incorporated | $182 | $135 | 7 | $16 | $106 | | $55 | $176 |
| Galena Biopharma, Inc. | $173 | $147 | 5 | $89 | $89 | | | $178 |
| Chelsea Therapeutics International Ltd. | $170 | $145 | 6 | $57 | $89 | | | $146 |
| TNI BioTech, Inc. | $159 | $160 | | | | | | |
| Conatus Pharmaceuticals Inc. | $143 | $204 | | | | | | |
| NanoViricides, Inc. | $137 | $125 | | | | | | |
| ImmunoCellular Therapeutics, Ltd. | $135 | $111 | 7 | $62 | $62 | | | $124 |
| Amicus Therapeutics, Inc. | $133 | $50 | 9 | $48 | $62 | | | $110 |
| Ohr Pharmaceutical, Inc. | $131 | $128 | | | | | | |
| MEI Pharma, Inc. | $129 | $104 | 5 | $40 | $30 | | | $70 |
| AP Pharma Inc. | $128 | $84 | 5 | $21 | $1,120 | | | $1,141 |
| Oncothyreon Inc | $108 | $46 | 5 | $67 | | $30 | | $97 |
| NuPathe, Inc. | $83 | $73 | 6 | $49 | $15 | | | $64 |
| Provectus Pharmaceuticals, Inc. | $82 | $78 | 3 | $53 | | | $68 | $121 |
| Anthera Pharmaceuticals, Inc. | $80 | $48 | 7 | $46 | $16 | | | $62 |
| Galectin Therapeutics, Inc. | $79 | $80 | 4 | $45 | | | | $45 |
| Biodel Inc. | $78 | $48 | 9 | $36 | $7 | | | $43 |
| Mirati Therapeutics, Inc. | $72 | $42 | 4 | $45 | $77 | | $5 | $127 |
| Synthetic Biologics Inc. | $71 | $63 | 5 | $14 | $56 | | | $70 |
| Adamis Pharmaceuticals Corporation | $63 | $64 | 3 | $41 | $3 | | | $44 |
| Rexahn Pharmaceuticals, Inc. | $60 | $48 | 6 | $17 | $10 | | | $26 |
| Ocera Therapeutics, Inc. | $57 | $120 | 6 | $31 | $79 | | | $109 |
| Actinium Pharmaceuticals, Inc. | $53 | $50 | | | | | | |
| Medgenics, Inc. | $52 | $31 | 4 | $30 | $17 | | | $47 |
| Ventrus Biosciences Inc. | $47 | $11 | 4 | $43 | $16 | | | $58 |
| Catalyst Pharmaceutical Partners Inc. | $45 | $32 | 5 | $35 | | $15 | | $50 |
| Genesis Biopharma, Inc. | $41 | $48 | 4 | $20 | $418 | | | $438 |
| | | | | | | | | |
| 75th | $182 | $168 | | $48 | $81 | $23 | $72 | $125 |
| Median | $130 | $108 | | $40 | $54 | $15 | $61 | $77 |
| 25th | $72 | $50 | | $20 | $17 | $12 | $42 | $54 |
| | | | | | | | | |
| Retrophin, Inc. | $70 | $70 | TBD | TBD | TBD | TBD | TBD | TBD |

BA_0059734

Compensation Advisory Partners

CONFIDENTIAL